UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, and RUFUS WHITE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, <br><br> Defendants. | CIVIL ACTION NO. _____ <br><br> SECTION _____ <br><br> JUDGE _____ <br><br> MAGISTRATE _____ <br><br><br> **CLASS ACTION COMPLAINT** |

**COMPLAINT**

**STATEMENT OF CLAIM**

1.     The medical care provided at the Louisiana State Penitentiary at Angola ("Angola") falls far beneath constitutional and statutory standards. Countless prisoners have already suffered serious harm due to Defendants' grossly deficient policies and practices, including unnecessary pain and suffering, exacerbation of existing conditions, permanent disability, disfigurement, and

1

even death. Thousands more are placed at daily risk of suffering the same fate should they need medical care.

2.      Plaintiffs and the Plaintiff Class are housed at Angola in the custody of the Louisiana Department of Public Safety and Corrections ("DOC"). As prisoners at Angola, Plaintiffs are entirely dependent on Defendants for their basic health care. However, the health care Defendants provide falls far short of minimal constitutional requirements and fails to meet prisoners' basic health needs, leaving painful and often life-threatening conditions unaddressed or inadequately addressed. Accordingly, Plaintiffs and the Plaintiff Class seek declaratory and injunctive relief against the DOC and against James LeBlanc, Burl Cain, and Stephanie Lamartiniere in their official capacities, for violations of their constitutional rights under the Eighth Amendment and their statutory rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

3.      Defendants engage in a number of systemic practices that expose all members of the Plaintiff Class to unacceptable risks to their health, including but not limited to:

    a.  Routinely delaying evaluation, treatment, and access to specialty care;

    b.  Declining to provide medically necessary treatments, including surgeries, medication, medical devices, physical therapy, and appropriate screening tests;

    c.  Failing to provide and manage medication in accordance with prescriptions and medically appropriate treatment courses;

    d.  Failing to ensure that Plaintiffs' medical needs are addressed in their follow-up care, dietary plans, work requirements, cell conditions, and other aspects of confinement;

2

e.  Enforcing a "malingering" rule designed to punish Plaintiffs who seek treatment and discourage them from requesting medical assistance; and

f.  Maintaining an insufficient number of qualified medical personnel such as physicians and nurses, such that some medical tasks are performed by unqualified individuals including prisoners.

4.  These medically and constitutionally unacceptable practices have produced an immeasurable amount of needless pain and suffering, exacerbating Plaintiffs' health problems and turning treatable conditions into debilitating and disabling—or even terminal—conditions. Many Plaintiffs and class members have already suffered greatly from Defendants' practices, as shown below, and those who have been fortunate enough to avoid serious harm to date are at constant risk.

5.  As laid out below, Defendants' practices have had devastating consequences for countless prisoners. Prisoners report horror story after horror story: a man denied medical attention four times during a stroke, leaving him blind and paralyzed; a man denied access to a specialist for four years while his throat cancer advanced; a blind man denied even a cane for 16 years. In many cases, only the spectre of legal action has spurred Defendants to provide long-delayed medical care to Plaintiffs.

6.  Despite repeated requests from Plaintiffs and warnings from doctors and advocacy groups, and despite the obviousness of many of these medical urgencies and their devastating consequences, Defendants have been deliberately indifferent to the substantial risks created by their failure to provide minimally adequate health care.

7.     Indeed, Defendants have been aware for more than 25 years that their practices are constitutionally deficient. In 1989, the United States Department of Justice ("DOJ") initiated an investigation into the conditions of confinement at Angola and then sued, culminating in a consent decree regulating Angola's medical care. Among other findings, DOJ found that Angola's "[f]ailure to provide adequate medical and psychiatric care" deprived prisoners of their constitutional rights. DOJ specifically cited a number of practices that Angola continues to this day or reinstated as soon as the consent decree expired, including delaying the provision of necessary medical care, providing inadequate follow-up care, maintaining inadequate medical records, having untrained personnel conducting sick call and distributing medication, employing a punitive malingering rule, and understaffing of medical personnel. Defendant Cain was Warden of Angola during the latter period that the consent decree was in effect.  Given Defendants' longstanding knowledge that its practices are constitutionally deficient, together with the litany of complaints and the devastating, often tragic consequences of their medical neglect, there can be no question that Defendants have been deliberately indifferent to the shortcomings of their system of treatment.

8.     Defendants' failure to provide adequate medical treatment is also a failure to reasonably accommodate prisoners with disabilities, thereby denying those prisoners equal access to prison activities, programs, and services in contravention of federal law.  Moreover, Defendants' broader failure to accommodate individuals with disabilities in performing the tasks of daily life, as described below, also contravenes federal law.  Defendants' methods of administration have the effect of subjecting prisoners with disabilities to discrimination on the basis of their disabilities and defeat the accomplishment of the objectives of a medical care delivery system to prisoners with disabilities.

4

9.    Accordingly, Plaintiffs seek declaratory relief holding Defendants' practices in violation of the Eighth Amendment, the ADA, and the Rehabilitation Act, and injunctive relief compelling Defendants to immediately provide Plaintiffs and the class members they represent with constitutionally adequate health care and accommodation for their disabilities.

## JURISDICTION AND VENUE

10.    Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 12101 *et seq*, and 29 U.S.C. § 794.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the events or omissions complained of occurred in this district.

## PARTIES

### A.) Defendants

12.    Defendant Burl Cain is the Warden of Angola. He has held this position since 1995. In this capacity, he exercises operational control over Angola by making staffing, budget, and administrative decisions. By law, he is responsible for protecting the constitutional rights of all persons held in Angola's custody. At all relevant times, Cain was acting under color of law and as the agent and official representative of DOC. He can be served at 17544 Tunica Trace, Angola, LA 70712.

13. Defendant Stephanie Lamartiniere is the Assistant Warden for Health Services at Angola. She has been in that position since approximately 2013.  In her capacity as Assistant Warden for Health Services, she exercises operational control over the Angola Treatment Center hospital by making staffing, budget, and administrative decisions. By law, she is responsible for protecting the constitutional rights of all persons incarcerated and treated at Angola's hospital. At all

relevant times, Lamartiniere was acting under color of law and as the agent and official

representative of DOC.  She can be served at 17544 Tunica Trace, Angola, LA 70712.

14.     Defendant James M. LeBlanc is the Secretary of Louisiana's Department of Public Safety

and Corrections ("DOC"). In his capacity as Secretary, he is responsible for the functioning and

control of all programs within the Department. He formulates rules and regulations and

determines policy regarding management, personnel, and total operations. He leads and supports

central office and field unit staffs, which are charged with carrying out the work of the agency.

By law, he is responsible for protecting the constitutional rights of all persons held in the DOC's

custody. At all relevant times, LeBlanc was acting under color of law and as the agent and

official representative of DOC. He can be served at 504 Mayflower Street, Baton Rouge, LA

70802.

15.     Defendant DOC, the Louisiana Department of Public Safety and Corrections, is the state

prison system, a division of the State of Louisiana. It is charged with overseeing the custody and

care of offenders in Louisiana. At all relevant times, the DOC operated Angola, a public facility

with programs and services. The DOC is the recipient of federal funds. The DOC can be served

at 504 Mayflower Street, Baton Rouge, LA 70802.

**B.) Plaintiffs**

16.     Plaintiffs and the Plaintiff Class are individuals currently incarcerated at Angola.

17.     The named Plaintiffs each have serious medical needs that have gone untreated,

undertreated, or mistreated by Defendants.

18.     Plaintiff Joseph Lewis, Jr., DOC No. 560138, is 81 years old and has been at Angola for

two years.  He has had chronic problems with his throat since before his arrival at Angola,

including coughing, spitting up mucus, a steady decline in volume, rawness, and pain and burning sensations. Beginning at least as early as February 2013, he has submitted repeated sick call requests and grievances. In response, Angola doctors repeatedly told Mr. Lewis that his throat issues would get better and only prescribed a Q-Tussin spray. Defendants refused to take Mr. Lewis to a hospital or specialist until January 8, 2015, after he was visited by attorneys. A Louisiana State University ("LSU") doctor performed a laryngoscopy and recommended an immediate biopsy. Mr. Lewis received a biopsy at LSU hospital on March 26, 2015 and was diagnosed with throat cancer on April 8, 2015. LSU doctors have recommended further tests to determine the severity and prognosis of Mr. Lewis's cancer. Mr. Lewis is a qualified individual with a disability.

19.     Plaintiff Kentrell Parker, DOC No. 371212, is 36 years old and has been at Angola for 4 years. He was previously housed at Elayn Hunt C.C., where he suffered a neck injury on February 19, 2010 and was rendered quadriplegic. Mr. Parker is completely dependent for his care on prisoner orderlies. The orderlies are not adequately trained. He used to have an air mattress that was appropriate for his condition, but it broke in or around 2011 and has not been replaced. In his experience, men on Ward 2 are often not cleaned at all unless there is a tour group visiting. Mr. Parker is excluded from attending church unless a nurse or EMT accompanies him. In summer 2014, Mr. Parker was accused of disobedience and put in an isolation cell where he could not be seen by staff, until attorneys expressed urgent concern for the health risks that posed. Around the same time, the Angola hospital underwent a severe shortage of hygiene supplies including bed mats, subjecting Mr. Parker to an increased risk of bedsores and other life-threatening complications. He is regularly left to sit in his own feces for several hours before an orderly comes to change his bedding. In May 2015, Mr. Parker was

brought to LSU hospital with a blood infection.  The doctor there told him that bacteria entered his blood from his stool.  He has a tracheotomy hole in his neck.  Angola regularly runs out of tracheal supplies, subjecting him to unnecessary risk of infection.  Mr. Parker does not have a tracheal machine at his bedside that he can use in the event of choking.  He never receives physical therapy and relies on prisoner-orderlies for feeding.  For six of eight days in early April 2015, with only one orderly on the Ward, there was no one to feed Mr. Parker his breakfast and he went hungry.  He is never weighed.  Mr. Parker is a qualified individual with a disability.

20.     Plaintiff Farrell Sampier, DOC No. 607098, is 47 years old and has been at Angola for 2 years.  Although Mr. Sampier was not paralyzed when he entered the DOC system, he is now paraplegic.  While at Orleans Parish Prison, he experienced numbness and pins-and-needles sensations, but his complaints were ignored.  At Elayn Hunt C.C., another DOC prison, he began to experience paralysis.  He was eventually diagnosed with transverse myelitis by an LSU doctor, who told Mr. Sampier that if his condition had been diagnosed sooner he would not be paralyzed.  After his arrival at Angola in June 2013, he developed early decubitus ulcers and a urinary tract infection at the site of his catheter.  Mr. Sampier suffered a quarter-inch tear in his penis that Defendants refused to repair, despite repeated requests for medical attention, and the tear became infected.  Defendants did not provide surgery to move the catheter until March 2015, when Mr. Sampier began meeting with attorneys in connection with this Complaint.  Mr. Sampier also experiences significant problems with chronic care and hygiene on Ward 2.  Mr. Sampier previously received 5 to 10 minutes of physical therapy once a month, but was "discharged" and no longer receives it.  Defendants have refused to provide him with wheelchair gloves to prevent callouses and blisters from forming; instead he purchases mittens from the Angola store.  There is only one orderly on Ward 2, who frequently has to ask for help with tasks

8

like lifting Mr. Sampier. Often other prisoner-patients living on the ward assist with these tasks.

Mr. Sampier is susceptible to decubitus ulcers, or bedsores, because of his illness, and the lack of

staffing on the Ward exacerbates his risk. Mr. Sampier is a qualified individual with a disability.

21.     Plaintiff Reginald George, DOC No. 111518, is 56 years old and has been at Angola for

22 years. Mr. George has HIV. From 2010 to 2012, Defendants refused to provide him with any

HIV medication as punishment for complaining about errors that untrained security guards made

in distributing his medication. At other times, security guards have refused to provide him with

his medication in retaliation for other complaints he has made. He experiences swelling in his

legs and numbness in his hands. He has previously made sick call about the "black box," the

device used to keep him shackled, because it caused pain and swelling in his wrists. The EMT

who responded to his sick call told him that whether he must wear a black box is a security

decision, not a medical decision, and provided no treatment. Defendants have also failed to

provide Mr. George with shower shoes, subjecting him to an unnecessary risk of contracting

infection as a result of his compromised immune system. Mr. George is a qualified individual

with a disability.

22.     Plaintiff John Tonubbee, DOC No. 98923, is 72 years old and has been at Angola for 34

years. Dr. Jonathan Roundtree, a former Angola doctor, diagnosed him with degenerative joint

disorder in his knees in 2005. Dr. Roundtree recommended surgery in 2005, but Defendants still

have not provided the surgery. Mr. Tonubbee was told that there was a backlog of surgery needs

and no money to fund the surgeries. He does not have cartilage in his knees and can feel his

bones grinding against each other. Mr. Tonubbee believes this disorder resulted from 16 years of

manipulating, rolling and turning 500-pound barrels for his work duty requirements at Angola.

Mr. Tonubbee received a permanent restricted duty status for "chronic knee pain." He has been

prescribed cortisone shots for his knees four to six times a month but only receives them approximately once every six months.  He did not receive cortisone shots at all from February to October 2013, during which time he endured severe pain.  He also needs special orthopedic shoes, which the prison has only issued twice, in 2008 and 2010, and the shoes were not specific to his medical needs of severe bunions and overlapping toes.  The shoes caused Mr. Tonubbee additional pain in his feet and knees.  He requested that the doctor issue him orthopedic shoes appropriate for his medical needs and was denied.  Mr. Tonubbee was told to purchase his own shoes from the Commissary.  The Commissary only sells non-orthopedic tennis shoes that fall apart when they become wet.  Mr. Tonubbee has been re-gluing his shoes in an effort to get them to last longer than three months.  Mr. Tonubbee is a qualified individual with a disability.

23.     Plaintiff Otto Barrera, DOC No. 615551, is 49 years old and has been at Angola since November 2013.  In 2012, as a result of a gunshot wound, he lost much of his lower jaw.  He had multiple surgeries before his incarceration including a skin graft and bone removal.  He is currently missing his bottom lip and part of his tongue.  Mr. Barrera has difficulty chewing and swallowing as a result of his injuries, and the difficulty is worsening.  He was referred for reconstructive surgery around August 2014, but Defendants deemed the surgery "cosmetic" and denied it on that basis.  He is supposed to be on a soft diet but receives the same food as other men on the hospital ward so he must tear the food into small pieces with his hands before placing it in the back of his mouth to attempt to swallow.  Mr. Barrera receives medications through an enteral tube. During a previous incarceration at Elayn Hunt Correctional Center, Mr. Barrera saw doctors three days a week and had his enteral tube cleaned regularly.  At Angola, the tube was not cleaned or changed for approximately a year and a half, during which time it oozed blood every two to three days and caused Mr. Barrera severe pain.  Defendants refused Mr. Barrera's

requests for the tube to be cleaned or replaced until the day he met with attorneys in April 2015, when it was abruptly and painfully pulled out. Mr. Barrera is a qualified individual with a disability.

24.    Plaintiff Clyde Carter, DOC No. 99041, is 56 years old and has been at Angola for 27 years. In or about October 2013, Mr. Carter fell in the cell block and injured his knee. He made sick call, and received an examination and MRI. Mr. Carter appears to have one or more torn ligaments in his knee. The specialist who came to Angola recommended surgery. To date, he has not received surgery. Angola doctors refuse to approve the surgery recommendation. He saw a specialist at Angola from Charity hospital who told him, "It seems like every time I schedule a surgery for you, they just blow it off." He has made sick call more than 15 times; he is charged money for each request but does not receive treatment. He has contacted Warden Lamartiniere but she tells him to make sick call. The doctor recommended a stabilizing brace with metal rods on the side, but the prison only allows him to use a Velcro brace that does not hold his injured knee in place. He has received a temporary duty status to restrict him from fieldwork, but it has repeatedly expired and he has been forced back to the fields. On December 10, 2013, he re-injured his knee in the field and made emergency sick call, but was not permitted to leave the field and was instead written up for malingering. While working in the field, Mr. Carter is repeatedly required to jump ditches and perform other physically demanding tasks beyond working the crops. If he refuses, he is written up for disobedience. His duty status says "no uneven ground," but in practice in the field this purported restriction is meaningless. He also has a bottom-bunk duty status but was still assigned to a top bunk until late 2014, a year after his initial injury.

25.    Plaintiff Cedric Evans, DOC No. 394117, is 50 years old and has been at Angola for 7

years.  In 2014, he hurt his collarbone while lifting his locker box, which Defendants require him

and many other prisoners to do three times per week.  He received an x-ray but was told nothing

was wrong with his collarbone, even though he could not hold up his left arm.  He hurt his right

forearm a few months later, also while lifting his locker box.  He later saw a specialist at LSU,

who x-rayed his arm and diagnosed it as broken.  During the examination, the doctor noticed a

knot on his collarbone, x-rayed it, and diagnosed it as broken, too.  Mr. Evans was required to

work in the field throughout this months-long stretch of having an undiagnosed broken clavicle

and experienced severe pain.  He made sick call and filed an administrative grievance.  His

clavicle appears to be healing itself now but has significant calcium buildup that causes pain and

discomfort.  He cannot sleep on his left side.  He has impaired mobility in his left shoulder.

26.    Plaintiff Edward Giovanni, DOC No. 96746, is 62 years old and has been at Angola for

34 years.  Despite his poor health, Defendants have housed Mr. Giovanni in "medical dorms"

that are not actually equipped to meet the medical and accommodation-related needs of their

residents.  Mr. Giovanni spent several months housed in Cypress-2, a medical dorm which to his

knowledge housed 86 prisoners but was designed to house 50.  In or about June 2014, he

suffered a bacterial infection that caused his lungs to collapse, and spent weeks in a wheelchair

because of severely diminished breathing capacity.  Mr. Giovanni requested to be moved to

Ward 2 of the Angola Treatment Center but Dr. Lavespere denied the transfer on the basis that

there was no room.  During the summer of 2013, Mr. Giovanni suffered in the extreme heat

conditions of Cypress-2, where several elderly and infirm men were housed with no medical

staff.  Mr. Giovanni was taken from his dorm by ambulance on or about July 1, 2014, to an

outside hospital for emergency medical attention.  Mr. Giovanni is scared to walk, and now only

stays in bed, sits in his chair, and goes to the bathroom.  Mr. Giovanni may be eligible for

veterans' benefits but the prison has told him that they do not provide transportation to VA

facilities.  Mr. Giovanni has multiple hernias, including one the size of a softball on his upper

thigh, about which he has an individual lawsuit pending.  In or around 2010, the Angola

urologist, Dr. Brunner, told him that the hernia must be addressed surgically.  Dr. Collins told

Mr. Giovanni that the prison cannot afford the needed hernia surgeries since the shut-down of

Earl K. Long hospital, and that the waiting list was extensive.   Mr. Giovanni is a qualified

individual with a disability.

27.     Plaintiff Ricky D. Davis, DOC No. 554718, is 48 years old and has been at Angola for

four years.  He previously had a disc pressing on a nerve in his back that was causing numbness

in his extremities and underwent a laminectomy, a procedure in which bones are clipped to

relieve pressure on nerves, in February 2014.  Upon returning to Angola two days after this

procedure, Mr. Davis was forced to ride face down laying across the front seat because there was

no handicap-accessible van.  He was sent back to the dorm with staples in his back.  In

September 2014, Mr. Davis had a telemedicine consultation with a neurologist who told him he

would need an additional surgery because the first was unsuccessful.  He has "no kitchen" duty

status but he is assigned to scrub pots and pans outside, sitting on a crate, which aggravates his

back injury and contribute to continued pain.  In early 2015, Mr. Davis was brought to a

neurosurgeon.  He had to wear shackles, a "black box" and a waist strap, causing his wrists to

swell considerably.

28.     Plaintiff Lionel Tolbert, DOC No. 91931, is 59 years old and has been at Angola for 33

years.  He has been diagnosed with heart disease (arteriosclerosis and arrhythmia), hypertension,

and high cholesterol.  He received multiple stents between 2005 and 2014 while in Angola

custody.  He also has severe arterial blockages in his legs that cause extreme pain, swelling and discoloration.  He has difficulty walking and experiences severe burning in his muscles because of inadequate bloodflow.  He has been diagnosed with diabetes, for which he takes Metformin. His blood is only monitored once a year, but should be monitored more frequently—anywhere from once a week if his condition is unstable to twice a year if it is completely stable.  He consistently takes his medications, but has noticed apparent arbitrary changes in the medication he receives, such as receiving different-colored pills at various pill calls for the same prescription.  He is supposed to receive a special diet but only receives the same food the other men receive but without seasoning.  Mr. Tolbert is a qualified individual with a disability.

29.    Plaintiff Rufus White, DOC No. 322954, is 40 years old and has been at Angola for twelve years.  He has old gunshot wounds, asthma, and arthritis in his shoulder.  He experiences sharp pains in his chest that have not been diagnosed despite his requests for examination and treatment.  He believes he may have pneumonia, which he previously had at Angola.  Doctors at Angola refused to perform a chest x-ray on the basis that Mr. White did not have a fever. Plaintiff White recalls that when he previously had pneumonia at Angola he did not run a fever. Immediately following a visit by attorneys investigating medical care at Angola on August 19, 2014, Mr. White had a chest x-ray taken.  He was not informed of what the physicians were looking for or the results other than that the x-ray was "okay." On approximately February 5, 2015, a second x-ray was performed at Angola.  Mr. White was not informed of the reason for the x-ray or the result. He occasionally has blood in his stool.  Mr. White previously had permanent indoor duty status, because of his asthma and gunshot wounds, but Dr. Toce revoked it on the basis that Mr. White "look[ed] healthy" and only used his inhaler every other day.  Mr. White's duty status was returned to field duty.  In or around July 2014, Mr. White lost

14

consciousness by the re-entry shack in the east yard and was taken to the hospital but the doctors did not give him any information about his condition.  Mr. White is a qualified individual with a disability.

## FACTUAL ALLEGATIONS

### A.) Overview of Medical Care at Louisiana State Penitentiary

30.    Angola has been operating as a prison for well over a century.  It is the largest men's prison and only maximum-security men's prison in Louisiana.  The facility houses over 6,000 prisoners.  In 2010 (the most recent Annual Report available), the average age of the population was 41.6 with 18.3% at or over age 55, and the average length of sentence was 92.40 years. Angola also houses the state's death row population.

31.    Prisoners serving sentences at Angola are generally required to work, usually in the prison's agricultural fields.  Most of the men at Angola are serving sentences "at hard labor." The most common job is agricultural work in the "fields."  This work consists of tending the crops over Angola's 18,000-acre property.  Field work is physically demanding, requiring men to bend at the knees, hips and back, as well as to walk long distances and hop across agricultural ditches—trenches some two to three feet wide—with no assistance.  Even elderly prisoners are required to do this work.

32.    Individual prisoners' work restrictions, if any, are made through a "duty status," which states specific work restrictions and the time period they cover.

33.    The medical services DOC provides to prisoners at Angola consist of both on-site treatment by DOC personnel and off-site treatment by local hospitals and specialists.

(1) On-site Care

34.     The R.E. Barrow, Jr. Treatment Center ("TC") opened at Angola in or around 1994.  The TC houses several dozen recuperating or chronically ill prisoners on two wards; an original third ward was shuttered for use as storage space in 1994.  The TC houses the Acute Treatment Unit ("ATU") which functions as Angola's emergency department and serves prisoners throughout the prison.  Currently, Ward 1 of the TC serves Angola's infirmary while Ward 2 houses prisoners with serious chronic care needs.

35.     The prison offers some services on-site including primary care and a handful of specialty clinics for chronic illnesses such as diabetes, HIV, and hepatitis.  Some lab work is performed on prison grounds, and some is sent off-site.

36.     Subject to the supervision and oversight of Defendant Lamartiniere, Angola employs a medical staff consisting of Dr. Randy Lavespere, the Medical Director, and approximately five other doctors.

37.     Defendant Lamartiniere does not have a background in medical care and her previous job at Angola was as secretary to Warden Cain.

38.     The failures in Angola's delivery of medical care begin with its intake procedure and extend through the failure to diagnose or properly treat illnesses, including severe and even terminal illnesses.

39.     To request health care, prisoners must submit a Health Care Request Form, Form HC-01-A, known as a "sick call form," describing the need for medical attention.  Prisoners are charged $3.00 for "routine sick call" or $6.00 for emergency sick call.

40.    Defendants threaten punishment to every prisoner who seeks emergency treatment, placing a written warning on the Health Care Request Form that states "if I declare myself a medical emergency and health care staff determine that an emergency does not exist, I may be subject to disciplinary action for malingering."  Defendants frequently make verbal threats of malingering charges as well.  As punishment for supposed malingering, Defendants may issue a disciplinary write-up with consequences that include extended lock-down in a disciplinary camp, in addition to the denial of medical attention.

41.    "Sick call" is handled by Emergency Medical Technicians ("EMTs").  EMTs perform an initial assessment of a prisoner's condition and rank them from 1-4 in terms of urgency.  Some are seen or sent to the ATU immediately; some do not see a doctor for months, or at all.  Prisoners are charged the fees for sick call and prescriptions regardless of whether they see a doctor.

42.    Under this protocol, persons lacking the medical training and experience of physicians, certified physicians' assistants, or registered nurses are delegated the responsibility and authority to determine whether a prisoner will be scheduled for an appointment with a doctor and what, if any, treatment short of a doctor's appointment an ailing prisoner will receive.

43.    Angola staff are also responsible for distributing prescription medications to prisoners through the "Pill Call" process.  Outside the TC, medication distribution and management is generally performed by security staff rather than nurses.  During Pill Call, prisoners are regularly forced to stand in line for extended periods of time including outdoors under harsh conditions.  Pill Calls do not generally occur at regular hours and prisoners are thus unable to adhere to regular medication regimens.

44.    Although Angola prisoners are not in possession of their prescriptions, they are expected to track their own need for prescription refills and request refills several days before the prescription runs out.  Defendants do not assist prisoners in tracking this information, causing lapses in prisoners' use of prescription medication.

45.    Many tasks involving the care of chronically ill prisoners are left to so-called orderlies. Orderlies are Angola prisoners who have been assigned to work as medical staff.  These men carry out a range of functions throughout the prison, including providing baths, changing wound dressings, and handling hospital linens.  The orderlies are not properly trained for many of the duties they are required to perform.

    (2) Off-site Care

46.    Angola does not have the capacity to perform most high-level and specialty care, including surgery.  For such services, Defendants send prisoners to off-site facilities, mainly in the Louisiana State University ("LSU") system.

47.    In 2013 and 2014, the State of Louisiana privatized the seven hospitals in LSU's Health Care Services Division.  Six of the original seven hospitals in this system have been transformed to public-private partnerships, including the hospital that treated most Angola prisoners in need of hospital care, Earl K. Long Hospital in Baton Rouge.  These hospitals now refuse to treat Angola prisoners.

48.    Around the same time, the LSU School of Medicine terminated a residency rotation at Angola that brought medical students from LSU School of Medicine to Angola to perform diagnostic procedures and some surgeries.

49.     Neither the DOC nor the State of Louisiana has adequately replaced the services provided by the defunct residency program or the LSU hospitals.  At present, most Angola prisoners with acute medical needs requiring off-site attention are taken to Interim LSU Hospital in New Orleans, Lallie Kemp Regional Medical Center in Independence, or Lane Regional Medical Center in Zachary. Due to Interim LSU Hospital's distance from Angola, Defendants frequently decline to use it, even though Lallie Kemp and Lane have significantly less capacity than the LSU hospitals that are no longer available to Angola prisoners.

50.     Even though the LSU system has been reduced to one hospital, Defendants' health care policies state that health care delivered outside of DOC facilities or the LSU system "shall only be allowed if that care is medically necessary to save life or limb."  DOC Health Care Policy No. HC-03(6)(C)(3)).

51.     Defendants have publicly claimed that they have "vastly expanded the types of health care offered inside some prisons" since Earl K. Long's closure, such that "[s]tate prisoners with health problems travel less and spend fewer hours admitted to hospitals under the new system." *See* Ben Wallace, *With Closure of Public Hospitals, Medical Care for Louisiana Inmates Shifts to Prisons*, THE ADVOCATE, Dec. 1, 2014, *available at* theadvocate.com/news/10931711-123/with-closure-of-public-hospitals.

52.     At Angola, however, there has been no discernable expansion of medical care since Earl K. Long's closure.  On the contrary, Plaintiffs and other prisoners report that they receive even less care now than under the previous system. For instance, few if any prisoners receive physical therapy, and screenings for common cancers and other medical conditions appear to have disappeared.

53.     Defendants also stated in December 2014 that they planned to "treat[] some parish inmates at prisons such as the Louisiana State Penitentiary at Angola," further burdening the Angola system and limiting the care available to members of the Plaintiff class.  *Id*.

54.     Similarly, Defendant Warden Cain stated that as a result of cutbacks and increased costs, "our pharmacy at Angola is doing the pharmacy work for Avoyelles and another prison or two." Sue Lincoln, *Inmate Care More Complicated Since Privatization*, WRKF, Feb. 10, 2015, *available at* wrkf.org/post/inmate-care-more-complicated-privatization.  In addition to its own prisoners, Angola's pharmacy services Dixon Correctional Institution and Avoyelles Correctional Center. Angola pharmacists report that they process about 263,000 prescriptions per month.

55.     Defendants have not indicated that they hired additional pharmacy staff to address this increased workload.

56.     Defendants have also acknowledged delayed and withheld care in emails.  For example, in February 2012, DOC employee Stacye Falgout sent an email to colleagues regarding "Offender visits to outside facilities," in which she noted, "Secretary LeBlanc and Dr. Singh have expressed their concerns to Secretary Greenstein and the Governor's Office regarding delay of critical care. DHH and the Governor's office are in agreement that delay of care is not acceptable. . . . These are some examples of problems that have been brought up recently: Radiotherapy delayed for over 4 months after recommended; Refusal to provide a hip replacement until after the offender gets out of prison which is several years from now; Cancellation of an appointment and suggest resubmit if still needed. It appears that this may be a way of delaying care."  Email from Stacye Falgout, Corrections, to Bessie Carter et al., Feb. 2, 2012, 9:29 AM.

**B.) Defendants' Provision of Medical Care Is Medically and Constitutionally Deficient.**

57.    The Plaintiffs described above are suffering as a result of unconstitutional policies and practices that lead to endemic deficiencies in medical care.  This inadequate care affects all Angola prisoners with serious medical needs, especially those with disabilities, and places every other prisoner at Angola at a risk of harm.

58.    Defendants have a policy and practice of failing to provide adequate medical care to prisoners, and are deliberately indifferent to the fact that their failure to do so subjects Plaintiffs to a substantial risk of serious harm, unnecessary suffering, clinical deterioration, or death.

59.    Defendants fully control all medical care available to prisoners at Angola. Defendant DOC currently incarcerates at Angola significant numbers of individuals with disabilities, as that term is defined in the ADA and Rehabilitation Act.  Defendants fail to provide prisoners with disabilities with basic reasonable accommodations to ensure equivalent access to all of the programs, activities, and services offered at the prison.  Defendants' failure to accommodate prisoners with disabilities not only denies them access to prison programs and services, but also substantially increases the risk that they will be injured in an emergency.  Defendants' refusal to accommodate prisoners with disabilities contributes to the provision of inadequate medical care.

60.    The following systemic policies and practices, both individually and in combination, deprive Plaintiffs of their right to adequate medical care.

　　　i.    Defendants Routinely Delay Evaluation, Treatment, and Access to Specialty Care

61.    Defendants routinely fail to provide timely access to health care at all stages of the health care delivery system.

62.    First, Defendants delay evaluation and initial response when a medical need first arises or comes to their attention. Defendants fail to provide timely access to health care and are deliberately indifferent to the risk of harm and injury to prisoners that results from this systemic failure.

63.    When a sick call form is submitted, it is not processed in a medically acceptable or timely manner.  Inadequately trained lower-level staff triage the sick call forms and decide whether to schedule a visit with a doctor, nurse or other qualified staff, without sufficient information. Prisoners face a delay of many weeks or often months before they receive medicine or are examined by qualified clinicians.  Prisoners experience harm and unnecessary pain and suffering as a result.

64.    EMTs are trained to respond to immediate medical emergencies, and lack the training, expertise, and experience to evaluate or diagnose most medical needs.  Thus Defendants' sick call process delegates determinations regarding prisoners' medical problems and needs to individuals unqualified to perform this function, with often severe consequences for those prisoners.

65.    Lengthy delays in responding to sick call forms and providing necessary health care are the prison-wide norm. For example:

    a.    Plaintiff Joseph Lewis has had chronic throat problems since his arrival at Angola in 2012 and has repeatedly filed sick call forms reporting his symptoms. Defendants took no meaningful steps to diagnose the cause of his symptoms until January 2015, after attorneys visited Mr. Lewis. At that time, he was sent to LSU Hospital and recommended for an immediate biopsy by the LSU specialist. Defendants then waited another three months before allowing Mr. Lewis to

receive a biopsy.  He was diagnosed with throat cancer in April 2015 and requires additional follow-up testing.

b.  Plaintiff Rufus White awaited a chest x-ray for more than two years to investigate chronic chest pain.

c.  Plaintiff Clyde Carter has suffered from an apparent torn knee ligament since December 2013 with neither diagnosis nor treatment.  Mr. Carter has submitted approximately 15 sick call forms without receiving appropriate treatment.

d.  Plaintiff Cedric Evans has suffered from an apparent broken collarbone for several months before diagnosis.  He has been awaiting treatment since March 2014.

e.  Plaintiff Ricky Davis made sick call April 9, 2010, May 3, 2010, August 4, 2010, September 1, 2010, October 11, 2010, February 14, 2011, May 1, 2011, June 11, 2011, June 16, 2011, October 18, 2012, May 25, 2013, and March 16, 2015, complaining of back and leg pain and/or numbness in his legs.

f.  Plaintiff Edward Giovanni made sick call about his breathing trouble and/or problems with intense summer heat on January 17, 2011, May 16, 2011, May 29, 2011, October 23, 2011, January 22, 2012, July 3, 2012, July 5, 2012, July 16, 2012, and August 1, 2012.  Three of these were Emergency Sick Calls.  He also made sick call for breathing trouble and a red spot on his leg, requesting examination and diagnosis, on October 11, 2012.

g.  In addition to the named plaintiffs, a 75-year-old prisoner suffered a stroke in July 2014 while housed in the Ash-2 dorm, and made four requests for emergency

medical attention, telling medical personnel he believed he was having a stroke due to numbness in his body, but Angola staff only took his blood pressure, said he was fine, and sent him back to the medical dorm.  He only received medical attention after his fourth request. Early intervention is critical during a stroke and Defendants failed to appropriately diagnose and treat this prisoner for several hours.  As a result of the stroke and the delays in treatment, this prisoner is now blind and unable to walk, experiences ongoing numbness in the left side of his face as well as ear pain, and has difficulty chewing.

h.   One 63-year-old prisoner with a family history of kidney failure has been urinating blood for more than four years with no diagnosis.  In July 2014, he was sent to Lallie Kemp hospital but Angola staff did not send his records so the hospital refused to admit him.  He subsequently returned and had a scope (camera inserted in his penis) that left his penis torn and bleeding.  Defendants failed to provide the prescribed follow-up treatment of antibiotics, warm baths, and daily checkups.

i.   One 53-year-old prisoner who has been at Angola for 16 years is awaiting a colonoscopy and a prostate cancer screening that were recommended about two years ago, and has undiagnosed spots all over his skin.  He often cannot empty his bladder, wakes up five times a night to urinate, only passes bowels once every six days, and has had black and red blood in his stool.  This prisoner's symptoms are consistent with an enlarged prostate and require additional screening for cancer and attention from a urologist.

24

      j.   A 55-year-old prisoner with diagnosed Chronic Obstructive Pulmonary Disorder waited ten months to have a spot on his lung biopsied. He is still awaiting results.

66.    Angola doctors tell prisoners that they can only talk to them about whatever problem was listed on the sick call form. Prisoners are not allowed to raise any other medical issues during these appointments, and to the extent they try to do so the doctors ignore them.

67.    Even after a physician has recommended treatment or further diagnostic tests, Defendants routinely delay for months or years before providing the recommended care. For example:

      a.   Dr. Roundtree recommended surgery ten years ago for Plaintiff John Tonubbee's degenerative joint condition. To date, Mr. Tonnubee still has not received the recommended surgery.

      b.   One 39-year-old prisoner who has been at Angola for two years has a needle embedded in his foot that causes severe pain and has been identified in x-rays but subsequently ignored. The Angola doctors refuse to speak to him about this problem or to perform surgery to remove the needle, despite his pain. He also broke his leg as a result of a fall brought on by his foot pain.

68.    Prisoners with HIV, including Plaintiff Reginald George, have been subjected to years-long suspensions in the delivery of medications, doctor visits, and other forms of care.

69.    In several instances, Defendants have denied care for years until Plaintiffs began to meet with attorneys in connection with this action. The prospect of legal action has repeatedly been the only thing that has spurred Defendants to provide long-delayed treatment. For example:

a.  Plaintiff Joseph Lewis did not have his throat biopsied until after he met with attorneys, despite years of requests.  He was diagnosed in April 2015 with throat cancer.

b.  Plaintiff Rufus White received a chest x-ray that he had been requesting for more than two years only after meeting with attorneys.  He was not informed of the results

c.  Plaintiff Farrell Sampier only received surgery to relieve the pain of his split penis at the site of his catheter after he met with attorneys.

d.  Plaintiff Ricky Davis was only brought to a neurosurgeon after he began meeting with attorneys, although he was already awaiting an appointment for about a year.

e.  Plaintiff Clyde Carter, who needs knee surgery, was given a top bunk despite being officially assigned to a bottom bunk for a year after his injury.  He received a bottom bunk in late 2014 after he began meeting with attorneys.

f.  Plaintiff Edward Giovanni was only transferred from the Cypress-2 dorm to the TC Ward upon the urging of attorneys who were gravely concerned for his medical condition and the conditions in the Cypress dorm.

g.  A 57-year-old prisoner who has been at Angola for 36 years was blinded by a cellmate in 1998.  For the next 16 years, Defendants refused to give him a cane, house him in a ward with accommodations for vision-impaired prisoners, or provide with any assistance from caretakers.  Instead, he was dependent on fellow prisoners for most aspects of daily life.  The prison first provided him a cane on February 11, 2015, immediately before a return visit by attorneys.  Even then, the

cane was a standard support cane, not a tapping cane, and thus inappropriate for his disability.

h.  A 40-year-old prisoner who has been at Angola for five years and suffers from severe hemorrhoids and rectal fissures he began to develop around 2009, received surgery in January 2015, after he began meeting with attorneys.  The surgery did not resolve the problem.

i.  A 50-year-old prisoner who has been at Angola for 25 years suffered with an epididymis cyst in his testicle the size of a softball for five years before finally receiving surgery in September 2014, after he began to meet with attorneys.

j.  A 59-year-old prisoner who was awaiting hernia surgery since 2008 finally received surgery in 2015, after he began meeting with attorneys.

70.  In these instances, Defendants delayed treatment until they were aware that a lawsuit was imminent.

ii.  <u>Defendants Routinely Deny Plaintiffs Medically Necessary Treatment</u>

71.  Not only do Defendants delay medical care to dangerous extremes, they have a practice of entirely denying Plaintiffs medically necessary care, including surgery, diagnostic tests, follow-up care, medication, medical devices, physical therapy, and medical supplies.

72.  Defendants' refusal to perform hernia surgeries illustrates their willful refusal to provide medically necessary care to prisoners, despite knowing that failure to do so will cause continuing and worsening pain and suffering. Several prisoners have been awaiting surgery for large hernias for years. A 55-year-old prisoner who has been at Angola for 37 years has had an inguinal hernia on his right side for about four years and receives no treatment for frequent stabbing pain other

than occasional over-the-counter medications.  Dr. Lavespere told this prisoner that he was on a list of some 200 men who need hernia surgery.

73.     In 2012, Defendants gathered a group of prisoners with hernias in need of surgery, and told them that the prison will not perform surgeries because of budget cuts.  Dr. Collins and other Angola staff informed a gathering of several class members that the prison would not pay for their needed surgeries and that, barring a lawsuit, they would simply not receive the treatment they needed.  This practice has been noted in other litigation brought by individual Angola prisoners and has been acknowledged by this Court.  *Giovanni v. Cain et al.*, no. 13-cv-00566-BAJ-RLB, Doc. 32, Magistrate Judge's report, Feb. 11, 2015 (denying summary judgment, citing "affidavits of defendants Kenny Norris and Stephanie Lamartiniere indicat[ing] that prison officials have admittedly relied upon the over-stressed charity hospital system for hernia surgeries, which system is only performing a limited number of such surgeries, and then only when the need for surgery has become an emergency," and citing *Hymel Varnado v.Hymel Varnado v. James LeBlanc, et al*., Civil Action No. 13-0348-JWD-SCR; *Kenneth Lesley v. N. Burl Cain, et al.*, Civil Action No. 13-0490-JJB-SCR; *Wayne Fritz v. N. Burl Cain et al.*, Civil Action No. 13-0673-JWD-SCR, noting that all of these cases survived summary judgment motions).

74.     A 50-year-old prisoner who has been at Angola for 25 years suffered with an epididymis cyst in his testicle the size of a softball for five years before finally receiving surgery in September 2014.  A doctor told him in 2010 that surgery was the only treatment option, and that Angola was waiting for the New Orleans urology clinic to schedule the surgery.  However, the prisoner saw a doctor in New Orleans in 2013 who asked him why he did not come to the surgery that had been scheduled a year previously.  Throughout these years, he experienced

constant, sometimes debilitating pain.  His cyst once ruptured when he was hit with a softball, but refilled within two weeks.

75.    Defendants' outright refusal to provide medically necessary treatment—whether due to expense, inattention, or other reasons—extends to a wide variety of conditions. For example:

    a.    Plaintiff John Tonubbee has received no treatment for a degenerative joint disorder diagnosed in 2005.  Angola doctors have told him that he will not receive surgery due to a lack of funds.

    b.    Plaintiff Otto Barrera has been refused reconstructive surgery for his face because the surgery was deemed "cosmetic," even though he is missing the lower half of his jaw, is unable to eat, and requires an enteral tube for eating and medication delivery.

    c.    Plaintiff Kentrell Parker, who is quadriplegic, has for years received no physical therapy at all.

    d.    Plaintiff Lionel Tolbert has been denied surgery to resolve arterial blockages in his legs and suffers extreme pain, swelling, and discoloration.

76.    Similarly, Defendants fail to provide follow-up care that is ordered by outside medical providers.  For example:

    a.    Plaintiff Ricky Davis had surgery in February 2014, and instead of being allowed to convalesce in the infirmary as ordered, he was sent straight back to his dorm with staples still in his back.

b.  After his penis was internally torn during a medical exam, a 63-year-old prisoner was prescribed antibiotics, warm baths, and daily checkups.  He received none of these forms of follow-up care.

77.    Doctors at Interim LSU Hospital regularly make written requests follow-up appointments with prisoners on the prisoners' discharge forms, but find these requests ignored by DOC.  As a result, these doctors may not see prisoners for several months, by which point the prisoners' illnesses have become advanced or untreatable.

78.    The inevitable consequences of Defendants' denials of care are tragically illustrated by James Johnson, DOC No. 87338, who died March 10, 2015.  He received treatment for multiple myeloma until 2012, when Defendants told him that the treatment was too expensive to continue. Instead of receiving chemotherapy, he received steroids that caused his legs to swell and his blood sugar to remain high. His cancer progressed to the point where he could not even have a broken arm set, due to the deterioration of his shoulder.  After denying curative treatment for years, Defendants placed him in hospice care in approximately June 2014. Before his death, he reported that his doctors only made rounds once every one to two months.

iii.  <u>Defendants Do Not Provide and Manage Medication in Accordance with Prescriptions and Medically Appropriate Treatment Courses</u>

79.    Defendants do not properly provide or manage prescribed medication, leading to widespread use of incorrect and inappropriate medication, interrupted or incomplete dosages, and sudden introduction or cessation of medications that are supposed to be gradually tapered up or down. As a consequence, Plaintiffs face a serious risk of unnecessary harm, ineffective treatment, and potentially severe or life-threatening side effects.

80.    Prisoners at Angola are subject to abrupt changes in their prescribed medications.  These include substitution of prescribed medication with other medication, which is not always clinically indicated for the prisoner's medical need; failure to follow medically appropriate dispensation schedules; the sudden cessation of prescribed medications; and the failure to monitor medications that are supposed to be administered with oversight.  Relatedly, Defendants fail to provide special diets that are prescribed to help manage an illness, a medication, or both.  Defendants also fail to provide necessary medical devices and supplies, including those prescribed by outside doctors.  As a result of these practices, prisoners at Angola risk unnecessary pain and are subject to complications that can cause serious harm to their health.

81.    Defendants routinely fail to provide prisoners with the full course of their medication, fail to provide medication as prescribed or in a timely fashion, and inappropriately start and stop medication.  As a result, prisoners suffer unnecessary harm, including the risk of developing drug-resistant strains of bacteria.  For example:

     a.    Plaintiff Reginald George was refused medications to manage his HIV between 2010 and 2012 despite his requests and despite the importance of consistency in antiretroviral treatment.

     b.    Plaintiff John Tonubee is prescribed cortisone shots for his knees four to six times a month, but only receives them approximately every six months.

     c.    Many class members have simply not been given their medication at all because Defendants failed to replenish the pharmacy supply.

     d.    A 50-year-old prisoner diagnosed with congestive heart failure in 2007 saw his diuretic medication abruptly switched by Defendants and began to experience

more shortness of breath.  The same prisoner received a laxative (milk of

magnesia) when he had diarrhea, and received only ibuprofen when he came to

the Treatment Center with a kidney stone (which he subsequently passed with

extreme pain).

e. A 38-year-old prisoner who has been at Angola for four years has a protruding

abdominal hernia that causes severe pain and a hemorrhoid in the crack of his

buttocks that is inflamed and painful.  He has only been given Preparation H and

suppositories, at times inconsistently.

f. A 40-year-old prisoner who has been at Angola for five years has suffered from

severe hemorrhoids and rectal fissures for more than two years.  He has requested

treatment from Defendants on multiple occasions.  His hemorrhoids are untreated.

Although he received surgery to repair his rectal fissures in January 2015, the

surgery did not resolve the problem.  He used to receive suppositories but no

longer does, and he has been told they are too expensive.

82.     Defendants only provide medications that are listed on a limited formulary of approved

medication, and routinely substitute doctor-approved drug regimens with drugs on the formulary.

In practice While this policy could be constitutionally adequate in theory, in practice prisoners

are deprived of medications that are well-established as effective for their health conditions, and

receive inferior, inappropriate, or obsolete medications, or nothing at all.

83.     Class members suffering severe pain provide an example of Defendants' provision of

inappropriate or inadequate medication. Several class members receive Keppra—a seizure

medication—to treat pain, even though Keppra does not relieve pain. Other prisoners have

received only over-the-counter treatments like ibuprofen or Tylenol for very painful conditions like kidney stones or hernias.

84.     Defendants routinely fail to provide or maintain medically necessary devices. For example:

> a.  Plaintiff Otto Barrera's enteral feeding and medication tube was not cleaned or replaced for approximately a year and a half, until the day he was scheduled to meet with attorneys in connection with this action, April 29, 2015.  At the prison where he was previously housed the tube was cleaned regularly. When not changed regularly, the tube oozes blood every two or three days.

> b.  Plaintiff Clyde Carter, who has had one or more apparent torn knee ligaments for over a year, has not only been refused surgery but has also been refused a doctor-recommended stabilizing knee brace with metal rods, and instead given only a Velcro brace that does not hold his injured knee in place.  He has regularly been forced to work in the fields with this inadequate device.

> c.  As described above, a 57-year-old prisoner who has been blind since 1998, was not given a cane for 16 years, until he was visited by attorneys.  He then received a standard cane, not a medically appropriate tapping cane, on February 11, 2015.

85.     Defendants also fail to maintain sufficient medical supplies on site.

> a.  In or around May 2014, the Angola hospital ran out of a number of hygienic supplies, including yellow plastic pads that assist in preventing bedsores from developing and becoming infected.  Defendants informed prisoners that they would have to wait longer to have their mats changed.  Many of the prisoners who

utilize these pads are paraplegic; nearly all are bedridden. These men are forced to sit in their own urine and feces until they can get the attention of an orderly to change their pads.

b.  In addition to the shortage of hygienic pads, Plaintiff Kentrell Parker also endures regular shortages of tracheal supplies, subjecting him to unnecessary risk of infection or other complications.

c.  Defendants have failed to provide Plaintiff Farrell Sampier with wheelchair gloves to prevent the formation of callouses and blisters on his hands. He has purchased mittens from the Commissary to try to address this problem.

d.  Defendants have failed to provide Plaintiff John Tonubbee with orthopedic shoes that are appropriate to his condition.

iv.  <u>Defendants Do Not Maintain Medically Adequate Records or Ensure that Plaintiffs' Medical Needs Are Addressed in Follow-Up Care or Conditions of Confinement</u>

86.    Defendants' record-keeping practices are inadequate, not only contributing to the problems discussed above but also leading to a failure to provide adequate follow-up care. Similarly, Defendants' failure to adequately track Plaintiffs' medical care prevents Plaintiffs' diagnoses and medical needs from being incorporated in their dietary plans, work requirements, housing assignments, and other aspects of their confinement.

87.    Defendants' system for tracking prescription medications, the Electronic Medical Administration Record, expects prisoners themselves to track their need for prescription refills and make those requests several days before their prescriptions run out. Even when prisoners do make timely requests, they frequently face gaps in their prescription medication regimens.

88.    Prisoners who request medical visits but are refused are entered into the system as "no shows" and are held responsible for having missed medical appointments even where they had no ability to do otherwise.

89.    Defendants' record-keeping practices are also inadequate in that they regularly lead to prisoners being transported to outside hospitals only to learn that they cannot be seen because their records were not transmitted.

90.    Doctors in New Orleans who treat Angola prisoners report that they often receive confusing and apparently padded medical records for these patients.

91.    Many prisoners are on prescribed diets with medically important restrictions. Defendants do not provide compliant meals to many such prisoners.  For example:

      a.    Mr. Barrera is not supposed to be given large pieces of food because his lower jaw is missing, but he does not receive different food from anyone else.

      b.    Mr. Tolbert is supposed to receive a special diet because of his diabetes but instead receives the same food as other prisoners but without seasoning.

      c.    A 58-year-old prisoner taking Coumadin, a blood thinner, is not provided with a medically required diet, even though an unregulated diet can lead to dangerously low levels of coagulants, with potentially fatal consequences.

92.    Additionally, Defendants fail to monitor medications that are supposed to be administered with oversight such as regular blood tests, subjecting prisoners to the substantial risk of serious harm.  For example:

      a.    The 58-year-old prisoner taking Coumadin, described above, does not receive regular blood tests, although standard medical practice is to monitor patients'

clotting time with weekly or monthly blood tests to avoid potentially fatal complications.

b.  Several diabetic prisoners, including Plaintiff Lionel Tolbert, report that they have no means of monitoring their own blood sugar levels.  A 51-year-old prisoner who is housed at Camp J, among Angola's most restrictive housing units, is required to self-administer insulin, but his diabetes has caused him to suffer vision impairment making this task especially difficult and exposing him to the unnecessary risk of harm.

93.    As a result of Defendants' failure to appropriately staff Angola's medical unit, even basic tasks of self-care and personal hygiene are not done for men who cannot do them on their own. For example, Plaintiff Kentrell Parker has missed several days of breakfast because, although his food was delivered, there was no one to feed him.

94.    Prisoners with injuries or disabilities are often required to work in the fields. (See paragraph 44, above.)  Although medical staff sometimes provide a "duty status" to prisoners who have a medical need for a work exemption or restriction (or would provide such status if prisoners were not denied medical examinations as described above), duty status is often assigned late, inadequately, or not at all.  This includes only assigning duty status for a short period to prisoners with a long medical recovery period, or assigning certain restrictions but not other medically necessary restrictions.  Moreover, even when duty status is assigned, Plaintiffs are often forced to perform work beyond its scope due to Defendants' poor record-keeping or correctional officers' sheer disregard of the duty status.  For example:

a.  Plaintiff Cedric Evans was forced to work in the fields during several months where he had an undiagnosed broken clavicle.

b.  Since apparently tearing ligaments in his knee in October 2013, Plaintiff Clyde Carter has been issued short-term duty statuses restricting him from field work, but is repeatedly forced back into the fields before they are renewed.

c.  Plaintiff Ricky D. Davis was assigned to scrub kitchen pots and pans outdoors on the ground despite being given "No Kitchen" duty status.  By assigning Mr. Davis to this task, Defendants willfully subjected him to a risk of exacerbating the back injury that his duty status is purportedly intended to avoid.

95.    Defendants also discourage prisoners from seeking medically based work restrictions by adding on punitive and medically unnecessary restrictions such as bans on "hobbycraft" activities.

v.  Defendants Use a "Malingering" Rule Designed to Discourage Plaintiffs from Requesting Medical Assistance

96.    Defendants threaten to punish and do punish Plaintiffs for alleged malingering as a means of discouraging individuals from seeking access to medical care.  As described *supra*, Defendants' sick call form bears written warning to the prisoner that "if I declare myself a medical emergency and health care staff determine that an emergency does not exist, I may be subject to disciplinary action for malingering."

97.    Accusations of—and punishment for allegations of—malingering have a chilling effect on Angola prisoners' ability to seek appropriate medical care.  Defendants' actions, ranging from disregard and neglect of medical complaints to actual disciplinary write-ups, reflect their approach to Plaintiffs' medical needs as, primarily, a matter of identifying who is malingering. For example,

a. Plaintiff Clyde Carter was accused of malingering when he initially injured his knee, and faces charges of disobedience when his injury interferes with his ability to perform field work.

b. Plaintiff Kentrell Parker, who is quadriplegic, was put in an isolation cell after being accused of disobedience in response to his verbal complaints about receiving inadequate care, even though he is unable to move any body part below his neck and would be unable to notify staff if he undergoes a medical emergency while in an isolation room.

98.    Several prisoners also report having been retaliated against, including by being sent to extended lockdown, for pursuing complaints about medical care.  Many prisoners have been verbally discouraged by staff from pursuing medical care.  Some prisoners who were interviewed in the course of the investigation preceding this Complaint asked not to participate as named plaintiffs specifically because of their fear of retaliation.

99.    The U.S. Department of Justice cited the threat of a malingering charge as a deterrent to seeking medical care as far back as the 1990s, as described below.

vii.    <u>Defendants Fail to Employ Sufficient Medical Staff, and Employ Correctional Personnel, Orderlies, or EMTs to Perform Tasks that Should Be Performed by Medical Professionals</u>

100.    Underlying many of the deficiencies in the delivery of medical care at Angola is Defendants' chronic failure to fill enough health care positions with qualified professionals. Defendants do not employ enough medical, dental, and mental health professionals (not only licensed doctors but qualified nurses and physician's assistants) to meet the needs of the Angola population and maintain a community standard of care for the men housed at the prison.

101.    Defendants are well aware of this staffing problem.  In 2012, Dr. Raman Singh, the

Medical Director for the DOC, was quoted with regard to medical staffing, stating, "I can't find a

doctor at all for six months, and that creates a huge liability for the unit and for the institution.

To me, it's like running Angola without security. The point is, it's easier to find security officers.

It's really impossible to find physicians. When I was new, I was told that 'we just need a body in

that job.' Sometimes it's so desperate a situation, you just need a body in the job." Cindy Chang,

*Many doctors treating state's prisoners have disciplinary records themselves*, THE TIMES-

PICAYUNE, July 29, 2012, *available at*

www.nola.com/crime/index.ssf/2012/07/many_doctors_treating_states_p.html.

102.    Several Angola doctors have restricted medical licenses that limit where they can

practice, whom they can treat, or what type of treatment they can order.  *Id.*  These restrictions

highlight the apparent scarcity of doctors willing to work at Angola.

103.    Instead of maintaining an adequate medical staff to carry out the duties involved in caring

for a population of more than 6,000 prisoners, Defendants call upon correctional personnel,

EMTs, and prisoner orderlies to perform tasks that require qualified medical professionals. This

directly contributes to the many deficiencies in care described above.

104.    EMTs, in responding to Sick Call requests, are called upon to make medical decisions

that they are not qualified to render.  The EMTs effectively serve as gatekeepers between the

vast majority of the men housed at Angola and the doctors, nurses, and other qualified medical

staff at the prison. These lower-level medical staff may fail to recognize when a prisoner is

experiencing an emergency.

105.    In many parts of the prison beyond the Treatment Center, security staff perform Pill Call, where medications are dispensed multiple times per day.  Security staff are unqualified to perform this role.

106.    Defendants have not adequately trained security and health care staff on how to handle health care emergencies, and as a result of this failure to respond properly and timely to emergencies, prisoners suffer avoidable harm and injuries, including unnecessary deaths. Correctional staff, who lack medical training, also act as gatekeepers, making critical decisions about whether emergency care is warranted when a medical situation arises in areas of the prison where medical staff may not be present. In the course of their general oversight responsibilities within the prison, these correctional officers decide whether and when to contact medical staff when a prisoner complains of or shows signs of a medical emergency.

107.    Defendants do not maintain sufficient trained staff in Ward 2, the chronic care ward of the TC, to take care of prisoners with paraplegia or other conditions.

108.    Nurses employed in Ward 2 rarely leave their glassed-in "pod" on Ward 2 to make rounds on the ward.  This responsibility is instead left to prisoner orderlies who have been assigned to work as orderlies.

109.    In addition to their lack of medical training, prisoner orderlies are tasked with more work than they are able to carry out in a given day.  Ward 2 generally has only one orderly who is caring for dozens of prisoners.  The orderly often has to ask assistance from other prisoners in order to perform certain tasks for the men in need of the most acute care. Orderlies receive minimal training and, for many of their tasks, no training at all.

110.    Prisoners with paraplegia, such as Plaintiff Kentrell Parker, are entirely dependent upon orderlies to assist them with major life activities.  The vast majority of his daily care is carried out by orderlies who lack sufficient medical training for the sorts of tasks they perform for Mr. Parker, including bathing and changing wound dressings.  The same is true for Plaintiff Farrell Sampier and several other men on Ward 2 who have paraplegia.

111.    Orderlies sometimes physically abuse men who are in their care.  The lack of supervision from prison staff allows this abuse to occur.  Prisoners have observed physical and sexual abuse of prisoners by orderlies with no apparent punishment or intervention from prison staff.

112.    The experiences of the named Plaintiffs as alleged herein provide only a partial view of the pervasive, systemic nature of the deficiencies characterizing Angola's provision of and/or failure to provide medical care to the prisoners in its custody.  The critical implications of the systemic deficiencies characterizing the provision of medical care at Angola are both apparent and disturbing.

**C.) Defendants Have Been Deliberately Indifferent to the Substantial Risk of Serious Harm to Which Their Policies and Practices Expose Plaintiffs**

113.    Defendants are well aware that the systemic policies and practices discussed above are ongoing and pose a substantial risk of serious harm, including unnecessary pain and suffering, long-term disability or disfigurement, and death.  Defendants are on notice from several sources, including direct observation and receipt of prisoner complaints, previous DOJ and class action litigation, and communications from Plaintiffs' attorneys.

     i.  <u>Defendants Are Aware of Prisoner Health Problems and the Care<br>Prisoners Receive, from Direct Observation and Patient Complaints</u>

114.    Defendants have seen countless examples of the tragic consequences of their inadequate care. As outlined above, Defendants have repeatedly seen their prisoners—men entirely under their control and care—complain of health care problems for years before even being examined, and then learned that their conditions have progressed past the point of treatment. The many resulting deaths and permanent disabilities, only a few of which are outlined above, put Defendants on notice that their policies and practices were insufficient to fulfill their constitutional responsibility to Plaintiffs.

115.    Plaintiffs themselves have repeatedly complained about Defendants' practices, as have many members of the Plaintiff Class.  Counsel for Plaintiffs have received reports of inadequate medical care from more than 200 men imprisoned at Angola, the vast majority of whom have complained to Defendants through Sick Call, the designated first-line mechanism to bring their medical complaints to the attention of Defendants. Many of these men, including all named Plaintiffs, have also utilized the Administrative Remedy Procedure ("ARP") grievance process, which brings their concerns to the attention of various officials at the prison and the DOC.

116.    When prisoners submit ARPs and Defendants provide a response (which does not always occur), the responses are incorrect, inadequate, incomplete, arbitrary, or even counterproductive. For example, one prisoner received an ARP response saying that he had seen a doctor on a date that had not yet occurred.  Generally, ARP responses consist of formulaic language citing elements of the prisoner's medical records and stating that their complaints are therefore unfounded.  Second-step ARP responses, which come from DOC headquarters, generally say that the medical care the prisoner is receiving "is deemed adequate."

ii.  The DOJ and Prior Litigation Identified Defendants' Medical and
Constitutional Deficiencies

117.    In addition to contemporary complaints, Defendants have been aware that many of their

policies and practices are medically and constitutionally deficient for more than 25 years.

118.    At least as early as 1991, the United States Department of Justice informed DOC that its

"[f]ailure to provide adequate medical and psychiatric care" deprived Angola prisoners of their

constitutional rights.  DOJ specifically cited a number of practices that Angola continues to this

day, including delaying the provision of necessary medical care, providing inadequate follow-up

care, maintaining inadequate medical records, having untrained personnel conducting sick call

and distributing medication, employing the punitive malingering rule, and understaffing their

medical personnel.  *See* Exhibit A.

119.    In January 1992, prisoners filed a class action lawsuit, *Lynn v. Williams*, case no. 92-cv-

001 (M.D.La.), against the DOC in this Court, alleging that their constitutional rights had been

violated by the conditions of their confinement. In July 1994, DOJ asked the court to allow them

to intervene under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, *et seq*. In

September 1994, this Court granted the DOJ's request to intervene as a plaintiff in the lawsuit.

120.    DOJ provided an Executive Summary of its findings to the court.  *See* Exhibit B.  As the

DOJ reported:

> "Defendants have failed and continue to fail to provide LSP inmates with adequate
> medical care. The medical care at LSP is grossly deficient. The medical care delivery
> system at LSP fails to recognize, diagnose, treat, or monitor the serious medical needs of
> LSP inmates, including serious chronic illnesses and dangerous infectious and contagious
> diseases.
>
> "During extensive investigative tours of LSP, the United States' experts found and will
> testify to serious flaws in nearly all critical aspects of the LSP medical delivery system
> which include the following: (1) sick call screening and classification; (2) scheduling; (3)

physician clinic; (4) infirmary care; (5) treatment of chronic illnesses; (6) specialty and subspecialty care; (7) treatment of contagious and infectious diseases; (8) medication administration; (9) maintenance of medical records; (10) security dominance of medical practice; (11) administrative organization such as overall planning and guidance and numbers of critical medical committees; and (12) staffing.  As a result of inadequate medical care at LSP, inmates have suffered and continue to suffer serious harm and even death."

121.    The Executive Summary went on to discuss several other specific deficiencies, such as:

"Defendants fail to adequately recognize, screen, and classify (i.e. triage) the serious medical needs of inmates through sick call procedures. The Emergency Medical Technicians ("EMTs") who conduct sick call are not adequately trained nor sufficiently experienced to recognize serious medical illnesses or to triage sick call. EMTs are trained to recognize emergency situations requiring emergency transportation to a hospital. LSP does not have an adequate training program for EMTs to identify serious illnesses at sick call. Defendants' use of EMTs is not diagnostically productive.  The EMTs are unable to adequately perform the fundamental task of triage and differentiate between acute, chronic, and minor illnesses.  Defendants also do not provide the EMTs with basic and fundamental equipment necessary for proper triage.

"[T]he existence of a 'malingering rule,' designed to punish frequent users of the medical system, significantly erodes the EMTs' objectivity and the inmates' confidence in that objectivity when they try to access the medical system. . . .

"Scheduling and rescheduling problems lead to missed appointments, extensive delays, patients left untreated altogether for extended periods of time and cause substantial harm to Angola inmates. . . .

"Defendants' use of isolation rooms in the infirmary is improper and dangerous. Defendants place seriously ill patients in locked rooms that may adversely affect their medical conditions.  Nurses in the nursing station are unable to see or hear inmates in the locked isolation rooms and infrequently check on the inmates in these rooms. . . .

"[L]imited bedspace in the infirmary coupled with the closing of one of the wards will lead to more inmates being placed in the general population where follow-up care is poor. . . .

"Even after identifying inmates with chronic illnesses, Angola does not provide adequate follow-up care for such inmates. . . . Diagnostic tests such as routine blood tests, electrocardiograms (EKGs), and chest x-rays are not reviewed and followed up on in a timely manner. . . .

44

"Inmates must wait for excessive and unacceptable periods for elective surgery and radiological services. . . . No physical therapy services exist for inmates requiring such services and Defendants have failed to make Angola adequately accessible to handicapped inmates, causing inmates significant harm including death. . . .

"The current method of medication administration is dangerous.  Unlicensed security personnel administer medication with minimal training. . . . Medication administration is also rushed and haphazard. . . .

"Security unnecessarily and unacceptably dominates the medical care system of Angola. Security often overrides physician decisions to the detriment of inmates' health. Untrained security personnel conduct and supervise sick call and medication administration to the substantial detriment of the inmates.  Security also decides the manner and time of inmate transportation to medical care internally and off-site, leading to significant delays in treatment.  Security controls the dietary services for inmates on special meals, often resulting in these inmates not receiving medically required diets. Finally, Defendants continue to enforce disciplinary rules known as "malingering" that punish inmates from accessing the health care system under certain conditions. . . .

"The medical department . . . budget is often exhausted before the end of the fiscal year, creating substantial shortages of critical medical supplies. . . .

"Defendants are inadequately operating a medical care delivery system at Angola with critical shortages of key personnel.  Angola lacks sufficient key professional medical staff: (1) physicians, (2) licensed physician assistants (as opposed to unlicensed assistants to physicians), (3) registered nurses, (4) licensed practical nurses, (5) a medical records professional (necessary to handle the complex and voluminous medical record requirements of Angola), (6) a registered dietician, and (7) physical therapists. Furthermore, Defendants lack critical non-professional staff necessary to allow the professional staff to free themselves from current administrative duties . . . ."

122.  Plaintiffs' medical expert in the *Lynn* litigation, Michael Puisis, D.O., submitted a report

illustrating several of the problems described in the DOJ Executive Summary.  *See* Exhibit C.

Dr. Puisis noted "shortages of supplies in various areas, including pharmaceuticals" and

"involvement of security in medical matters."  He expressed concern about leaving infirm

individuals in locked rooms alone:

"On ward 1 (the infirmary), security can place any individual in a locked room depending on their security classification.  Escape risks and protective custody were two reasons

45

cited for placing individuals in locked rooms. These rooms have heavy gauge steel doors with a small (approximately 6 inch square) glass viewing panel. Patients must gain the attention of nursing staff by screaming and banging on the door. Nurses sit behind an enclosed viewing area which muffles sound from the ward. There is no nursing call button in these rooms. On the day of my visit, an infirm AIDS patient, who had difficulty walking, was locked up in one of these rooms because he was described as an escape risk. I was told by the medical director that a man who had his feet amputated was classified as an escape risk and was placed in a locked room. In order for a physician to have a person removed from a locked room the physician must petition the warden. This practice of placing the infirm or seriously ill in locked rooms is dangerous and violates medical autonomy regarding care of the infirm."

123.    Dr. Puisis additionally noted that EMTs were "being used to make decisions which they are not trained or experienced in making." He related physician reports of "patients splinted for fractures who were not seen again for months when the bone fractured had healed in a deformed position." He expressed concern that since one of the original three chronic care units had been closed, "[t]his will place more chronically ill patients into general population where follow up is poor." He noted that "[h]ousing units, including the infirmary, still do not accommodate paraplegics."

124.    The *Lynn v. Williams* litigation led to the entry of a consent decree in September 1998. Defendant Warden Cain was Warden of Angola while the consent decree was in effect. The following year, however, over the objection of the DOJ, the consent decree was terminated.

### iii.   Plaintiffs' Counsel Have Informed Defendants of Their Deficiencies

125.    Plaintiffs' counsel have contacted Defendants regarding concerns about medical care as detailed in this complaint at numerous points since 2013. Defendants were aware of multiple visits conducted by Plaintiffs' counsel to investigate allegations of inadequate medical care. On ten occasions, Plaintiffs' counsel wrote letters or emails to Defendants regarding reports of specific urgent medical needs of some individuals.

126.    On December 9, 2014, Plaintiffs' counsel sent a letter to Warden Cain detailing their concerns with regard to the inadequate provision of medical care.

127.    Defendant Warden Cain responded by letter on December 22, 2014, citing the closure of Earl K. Long Medical Center and "the transition of medical care from state hospitals to private facilities" as causing interruptions and changes in the delivery of care but maintaining that the prison has "established reasonable and sound medical practices and treatment" to prisoners.

128.    Defendant Warden Cain's response is inaccurate.  As merely one example, the letter states that the prison has an on-site specialty clinic for Physical Therapy.  However, according to Angola personnel, no one is currently receiving physical therapy and those prisoners who ask about it are merely told that they are on the waiting list.

**D.) Defendants fail to adequately accommodate prisoners with disabilities.**

129.    In addition to and overlapping with the inadequate delivery of medical care, Angola fails to reasonably accommodate prisoners with disabilities.

130.    Under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), Defendants must provide reasonable accommodations in programs, services, and activities to, prisoners who have disabilities. However, Defendants lack adequate policies and practices for identifying and tracking prisoners with disabilities and refuse to provide the reasonable accommodations those prisoners require.

131.    Defendants lack policies and practices to ensure that prisoners with disabilities who require assistive devices, including, but not limited to, wheelchairs, walkers, crutches, canes, braces, tapping canes, hearing aids, and pocket talkers, as accommodations are provided with and allowed to retain those devices.

132.     Defendants fail to ensure that prisoners with disabilities have equal access to all programs and services offered at the jail. Defendants' systemic failure to accommodate prisoners with disabilities results in the widespread exclusion of prisoners with disabilities from many of the programs, services, and activities offered by Defendants, including health care services and exercise.

133.     Defendants fail to ensure that prisoners with disabilities are assigned to and are actually housed in housing units and bed assignments that are accessible and safe.

134.     Prisoners with the most acute medical needs are housed in the TC, Angola's prison hospital.  When the TC opened it had three wards, but the DOC has since converted one of the wards into a storage space, eliminating much of the original medical capacity.

135.     Currently, Ward 1 is Angola's Infirmary while Ward 2 houses prisoners with serious chronic care needs.  Several of the prisoners living on Ward 2 have been there for years. Conditions on Ward 2 are unhealthy and dangerous: the ward is not regularly cleaned and has visible dust on many surfaces.  There are flies that land on prisoners' food trays.  Several men there have open wounds, often pressure sores from poor management of their conditions.  The chair that is used to assist men in showering is merely hosed off between uses, not disinfected. This unhygienic practice exposes these men to the unnecessary risk of infection. Ward 2 often has a foul odor inside; parts of the bathroom area are covered with rust.  Plaintiffs such as Mr. Parker suffer from unnecessary exposure to second-hand smoke caused when Angola staff and prisoners smoke cigarettes in close proximity to the living quarters.  This practice further degrades the hygienic environment on the ward.

136.     Angola also operates two "medical dorms," Ash and Cypress, outside of the TC.  These dorms were not designed to be medical facilities and are not equipped for prisoners with serious

medical needs, nor are they staffed by medical personnel or assistive individuals such as ASL interpreters.  They also house far more prisoners than they are designed to house.  Plaintiff Edward Giovanni was housed in the Ash dorm despite his very poor health, until attorneys in connection with this action urgently requested that he be moved to the TC.

137.    Many areas of Angola are physically inaccessible to prisoners with disabilities, particularly in the two so-called "medical dorms," both because of the facilities' physical plant and because Defendants fail to provide needed assistive devices. Ash and Cypress lack basic features of accessibility, such as doorways wide enough to accommodate wheelchairs or bathroom facilities designed for handicapped access.

138.    In some instances, disabled prisoners are excluded from participating in prison activities because of insufficient staff. For instance, Mr. Parker is excluded from attending church unless a nurse or EMT accompanies him and they are frequently unavailable.

139.    There is a shortage of bottom-bunk beds throughout the housing units at Angola relative to the needs of the prisoners.  As a result, prisoners with ongoing disabilities as well as those with short-term medical ailments are frequently required to remain assigned to a top bunk. Plaintiff Clyde Carter had a top bunk for a year after being assigned bottom bunk status in or around December 2013.

140.    Prisoners at Angola are required to lift their locker boxes, individual trunks for storing their personal effects which are made of steel and measure roughly 1.5'x1.5'x3', about three times per week during inspections.  These locker boxes are heavy and cumbersome.  Prisoners sometimes injure themselves lifting these boxes; other times, they incur injuries elsewhere but suffer additional pain and potential injury from having to lift these boxes.  Plaintiff Cedric Evans broke his collarbone lifting his locker box.

141.    Angola's principal handicapped transport van is insufficiently equipped and dangerous to use.  Several prisoners have fallen while being transported.  At times, prisoners' wheelchairs are affixed to the floor of the van using "flex cuffs," plastic handcuffs that are not designed for such use.  The straps are broken and there are no shoulder harnesses or seatbelts.  This is the only van Angola uses to transport disabled prisoners.  Plaintiff Ricky D. Davis has been forced to ride face-down across a front seat while being transported to Angola post-surgery because a handicap-equipped van was not available.

142.    Angola has a more suitable transport van that it acquired after the closure of C. Paul Phelps state prison in 2012, but Defendants elect not to use this van, either because there is not sufficient seating for security, or so as not to subject it to normal wear and tear.

### E.) Defendants' Failures Have a Disproportionately Harmful Effect onOn Prisoners with Disabilities.

143.    Every failure of the Defendants to provide adequate medical care has an even more extreme effect on a prisoner with a disability.  This is because prisoners with disabilities are in constant need of stabilizing care and the management of a chronic condition.  Every failure potentially exacerbates a lifelong condition that will, as a result of the failure, need even more qualified care.  Prisoners with disabilities at Angola are therefore condemned to a lifetime of poor care.

144.    Defendants' failure to properly staff and supply Ward 2 contribute to unsanitary conditions inside the ward itself and to unsanitary conditions of the prisoners themselves.  Prisoners who suffer from paralysis such as Plaintiffs Sampier and Parker must rely on staff to keep the area around them clean and to provide sterile medical supplies.  Staff are required to assist prisoners with bathing but are often pressed for time, leaving prisoners lying in their own

50

excrement for hours. They are similarly unable to properly turn prisoners' bodies to avoid pressure sores. This leads to life-threatening infections and unnecessary suffering for the weakest and most vulnerable prisoners.

145.    Defendants' failure to provide adequate accessible and emergency transportation mean that prisoners with disabilities miss important appointments for off-site medical care, thus aggravating their conditions.

146.    Prisoners with chronic conditions requiring medication suffer disproportionate harm as interruptions and mistakes in the delivery and administration of their medication lead to a worsening of their condition or death.

147.    Prisoners with compromised immune systems such as those with HIV who must wait on the Defendants' slow sick call procedure can seriously sicken in a shorter amount of time than those with intact immune systems. The delay in all levels of Angola's medical care system takes a much heavier toll on such serious medical conditions.

148.    The failure to screen for cancer appropriately means that the disease may not be detected soon enough for effective treatment and remission. Prisoners with cancer therefore suffer the risk of an unnecessarily progressed disease and possible disfigurement and death.

## CLASS ACTION ALLEGATIONS

### I. Angola Prisoner Class

149.    Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all prisoners who are now, or will in the future be, subjected to the medical care policies and practices of the Louisiana State Penitentiary at Angola (the "Plaintiff Class"). They seek declaratory and injunctive relief to

terminate the ongoing course of conduct on the part of Defendants that is depriving the named Plaintiffs and the Plaintiff Class of their constitutional right to adequate medical care, and to enjoin the policies and practices adopted and implemented by Defendants that result in the deprivation of those rights. "Medical care" consists of attention and treatment by adequately trained professionals that seeks to manage, accommodate, resolve, or mitigate physical ailments affecting the human body. This includes primary care, necessary screening and diagnostic care, chronic care, surgical care, and care related to hearing, and vision.

150.    The class is so numerous that joinder of all members is impracticable. There are over 6,000 prisoners in custody at Angola, all of whom are dependent entirely on Defendants for the provision of health care. Defendants' policies and practices put all Angola prisoners at risk of receiving inadequate health care while in custody at Angola.

151.    The Plaintiff Class members are identifiable using records maintained in the ordinary course of business by the DOC and/or Angola.

152.    Members of the proposed Plaintiff Class are equally subject to the actual or potential adverse impacts on their physical health resulting from the longstanding and ongoing pattern and practice of systemic unconstitutional acts and omissions on the part of Defendants described in this Complaint.

153.    There are questions of law and fact common to the members of the class. Such questions include, but are not limited to:

> a.    whether Defendants' medical care system fails to provide minimally adequate care in violation of the Cruel and Unusual Punishments clause of the Eighth Amendment;

     b.   whether Defendants' medical care system places the prisoners at Angola at an unreasonable risk of suffering new or worsening physical injury or illness, or premature death;

     c.   whether Defendants have been deliberately indifferent to the resulting harm and risk of harm to Class members who are deprived of minimally adequate medical care; and

     d.   what injunctive relief is appropriate to bring Defendants' medical care system into compliance with the Eighth Amendment.

154.    Defendants are expected to raise common defenses to these claims, including denying that they are deliberately indifferent and denying that their actions violate the law.

155.    The claims of the Plaintiffs are typical of those of the Plaintiff Class, as their claims arise from the same policies, practices, or courses of conduct, and their claims are based on the same theory of law as the class's claims. The named Plaintiffs are individual prisoners at Angola suffering from an array of serious medical problems and reflecting a range of serious health care needs that are typical of the prisoner population at Angola. The named Plaintiffs and the proposed class they seek to represent have suffered direct injuries and will continue to be directly injured due to Defendants' unlawful and unconstitutional pattern and practice of providing inadequate medical care at Angola.

156.    Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff class because Plaintiffs do not have any interests antagonistic to the class. Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendants. Plaintiffs

are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

157.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all class members, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class.  Defendants' health care policies are promulgated, disseminated, and enforced from Angola and the DOC headquarters in Baton Rouge.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff class.

**II. Disability Subclass**

158.    Plaintiffs with disabilities bring this action on their own behalf and, pursuant to Fed. R. Civ. P. 23(a) and b(2), on behalf of a subclass of all qualified individuals with a disability, as that term is defined in 42 U.S.C. § 12101 and 29 U.S.C. § 705(9)(B), and who are now, or will be in the future, subjected to the medical care policies and practices of the Louisiana State Penitentiary at Angola ("Disability Subclass").  All prisoners with disabilities who are incarcerated in the prison are being discriminated against or denied access to programs, services, and activities offered at the prison as a result of the policies and practices of Defendant DOC.

159.    The proposed subclass as defined is sufficiently numerous that joinder of all members of the subclass is impracticable and infeasible.  The exact number of members of the Disability Subclass is unknown, and class membership changes constantly as prisoners are transferred into and out of Angola.

160.    The Disability Subclass members are identifiable using records maintained in the ordinary course of business by Defendants.

161.    There are questions of law and fact common to the Disability Subclass, including but not limited to:

        a.    whether Defendants reasonably accommodate prisoners with disabilities;

        b.    whether Defendants' medical care system violates the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and

        c.    what injunctive relief is appropriate to bring Defendants' medical care system into compliance with the Americans with Disabilities Act and the Rehabilitation Act.

162.    Defendants are expected to raise common defenses to these claims, including denying that their actions violate the law.

163.    The claims of the named Plaintiffs are typical of the claims of the members of the proposed subclass.  Plaintiffs and all other members of the subclass have sustained similar injuries arising out of and caused by Defendants' common course of conduct and policies in violation of the law as alleged herein.

164.    Plaintiffs are members of the subclass and will fairly and adequately represent and protect the interests of the putative class members because they have no disabling conflict(s) of interest that would be antagonistic to those of the other subclass members.  Plaintiffs, as well as Disability Subclass members, seek to enjoin the unlawful acts and omissions of Defendants.  Plaintiffs have retained counsel who are competent and experienced in complex class action litigation and prisoners' rights litigation.

165.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the

subclass, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the subclass and will apply to all members of the subclass.

## CAUSES OF ACTION

**I.    EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT**
(Against Defendants LeBlanc, Cain, and Lamartiniere)

166.    By their policies and practices described herein, Defendants subject Plaintiffs and the

Plaintiff Class to a substantial risk of serious harm and injury from inadequate medical care.

These policies and practices have been and continue to be implemented by Defendants and their

agents, officials, employees, and all persons acting in concert with them under color of state law,

in their official capacities, and are the proximate cause of the Plaintiffs' and the Plaintiff Class's

ongoing deprivation of rights secured by the United States Constitution under the Eighth

Amendment.

167.    Defendants have been and are aware of all of the deprivations complained of herein, and

have condoned or been deliberately indifferent to such conduct.

**II.    AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT**
(Against Defendant DOC)

168.    The ADA prohibits public entities, including DOC, from denying "a qualified individual

with a disability . . . the benefits of the services, programs, or activities of the public entity"

because of the individual's disability. 42 U.S.C. § 12132.

169.    Defendant DOC is responsible for all violations of the ADA committed by hired and

contracted medical staff at Angola.

170.    The ADA defines "a qualified individual with a disability" as a person who suffers from a "physical or mental impairment that substantially limits one or more major life activities," including but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(1)(A), (2)(A).  All Plaintiffs with Disabilities Subclass members are qualified individuals with disabilities as defined in the ADA, as they have impairments that substantially limit one or more major life activities.

171.    The programs, services, and activities that Defendant DOC provides to prisoners include, but are not limited to, sleeping, eating, showering, toileting, exercising, safety and security, Angola's administrative, disciplinary, and classification proceedings, medical, mental health, and dental services, the library, educational, vocational, substance abuse, and other classes, and discharge services.  Defendant DOC's programs, services, and activities are covered by the ADA.

172.    Under the ADA, Defendant DOC must provide prisoners with disabilities reasonable accommodations and modifications so that they can avail themselves of and participate in all programs and activities offered by Defendants.

173.    Defendant DOC fails to accommodate the Plaintiffs and the Disability Subclass they represent as described above, including by:

    a.    failing to "ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or

activities of a public entity, or be subjected to discrimination by any public entity," 28 C.F.R. § 35.152(b)(1);

b.  failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals," 28 C.F.R. § 35.152(b)(2);

c.  failing to "implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 [accessibility] Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing," 28 C.F.R. § 35.152(b)(3);

d.  failing or refusing to provide Plaintiffs and the Disability Subclass they represent with reasonable accommodations and other services related to their disabilities, see generally 28 C.F.R. § 35.130(a);

e.  denying Plaintiffs and the Disability Subclass they represent "the opportunity to participate in or benefit from [an] aid, benefit, or service" provided by Defendants, 28 C.F.R. § 35.130(b)(1)(i);

f.  failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," 28 C.F.R. 35.130(b)(7);

g.  failing to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the [ADA]," 28 C.F.R. 35.133(a); and

    h.   failing to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity, 28 C.F.R. § 35.160(b)(1).

174.    As a result of Defendant DOC's discrimination against and failure to provide reasonable accommodations to prisoners with disabilities, Plaintiffs and the Disability Subclass they represent do not have equal access to prison activities, programs, and services for which they are otherwise qualified.

175.    At all times relevant to this action, Defendant DOC was the recipient of federal funding within the meaning of the Rehabilitation Act.  As recipients of federal funds, they are required to reasonably accommodate prisoners with disabilities in their facilities, programs, activities, and services, and to provide a grievance procedure.

176.    Plaintiffs and the Disability Subclass they represent are qualified individuals with disabilities as defined in the Rehabilitation Act.

177.    By their policy and practice of discriminating against and failing to reasonably accommodate prisoners with disabilities, Defendant DOC violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

178.    As a result of Defendant DOC's discriminating against and failing to provide a grievance procedure and reasonable accommodations, Plaintiffs and the Disability Subclass they represent do not have equal access to prison activities, programs, and services for which they are otherwise qualified.

179.    Defendants' methods of administration as described in this Complaint subject individuals with disabilities to discrimination on the basis of disability, in violation of both the ADA, 28 C.F.R. § 35.130(b)(3), and the Rehabilitation Act, 28 C.F.R. § 41.51(b)(3).  Section 504's regulations prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . .(i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipients program with respect to handicapped persons." 28 CFR 35.130(b)(3)(i)-(iii).

180.    By depriving prisoners with disabilities timely sick call responses, adequate and qualified medical staffing, medical facilities, medical equipment, medication administration, chronic illness care, surgery, screening, Defendants are "defeating or substantially impairing accomplishment of" the provision of constitutionally adequate medical care to prisoners.  That failure has a more harmful impact on prisoners with disabilities and therefore has the effect of discriminating on the basis of disability.

## ATTORNEYS' FEES AND COSTS

181.    Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also request attorneys' fees, costs, and expenses against DOC for the ADA and Rehabilitation Act claims, pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

182.    Plaintiffs and the Plaintiff Class have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless Plaintiffs and the Plaintiff Class are granted the relief they

request.  The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

WHEREFORE, Plaintiffs respectfully request that the Court award the following relief:

A. Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and (2), and certify a class consisting of all Angola prisoners who are or may be subject to the prison's delivery of medical care and a subclass consisting of all Angola prisoners with disabilities;

B. Grant declaratory and injunctive relief, as set out in this Complaint;

C. Enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting Plaintiffs and the Plaintiff Class to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

D. Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and member of the Plaintiff Class suffer due to Defendants' inadequate medical care.  Defendants' plan shall include but not be limited to:

    a. Staffing that is sufficient to provide Plaintiffs and the Plaintiff Class with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

    b. Policies and practices that provide timely access to health care, including reliable screening for medical conditions; timely access to medically necessary surgeries; and access to adequate rehabilitative care;

    c. Timely and competent responses to health care emergencies;

    d. Timely and competent prescription and distribution of medications and supplies necessary for medically adequate care;

    e.   Timely access to competent care for chronic diseases;

    f.   Medically appropriate follow-up care, including but not limited to appropriate dietary, duty status, and medical monitoring plans;

    g.   Basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, including but not limited to maintaining sufficient hygiene supplies and a smoke-free environment;

    h.   Reasonable accommodations for individuals with disabilities;

    i.   A regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies; and

    j.   Any other forms of relief necessary for the delivery of constitutionally adequate medical care.

E.  Enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from retaliating against Plaintiffs in any manner for filing this complaint;

F.  Find that Plaintiffs are the prevailing party in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses under 42 U.S.C. §§ 1988 and 12205;;

G.  Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and,

H.  Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.

Date: May 20, 2015

                    Respectfully submitted,

                    Mercedes Montagnes, La. Bar No. 33287 (Co-lead Counsel)
                    Elizabeth Compa, La. Bar No. 35004
                    The Promise of Justice Initiative
                    636 Baronne Street
                    New Orleans, LA  70113
                    Telephone:  (504) 529-5955

Facsimile:  (504) 558-0378
mmontagnes@thejusticecenter.org
bcompa@thejusticecenter.org

Jeffrey B. Dubner (*pro hac vice* pending*)* (Co-lead Counsel)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW
Washington, DC  20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
jdubner@cohenmilstein.com

Miranda Tait, La. Bar No. 28898
Advocacy Center
600 Jefferson Street, Suite 812
Lafayette, LA  70501
Telephone: (337) 237-7380
Facsimile: (337) 237-0486
mtait@advocacyla.org

Candice C. Sirmon, La. Bar No. 30728
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
csirmon@laaclu.org