UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, and RUFUS WHITE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,<br><br>Defendants. | CIVIL ACTION NO. 3:15-cv-00318<br><br>JUDGE BAJ<br><br>MAGISTRATE RLB |

**MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER**

**I.  INTRODUCTION**

Plaintiffs move this Court to enjoin Defendants from confining Kentrell Parker in insolation where he has an imminent and substantial risk of serious harm in the form of choking to death.  Defendants are actively and unacceptably punishing Mr. Parker for being "argumentative" by subjecting him to the risk of death.

This matter is very simple. Mr. Parker is a person with a disability.  He has quadriplegia, meaning that he is paralyzed and cannot control his body below his neck. He has also undergone

1

a tracheotomy, as a result of which there is a piece of plastic pipe in his throat. This tube is at continual risk of becoming blocked by mucus, vomit, or another bodily fluid, a "common complication of tracheostomy tubes." Ex. 1, Feb. 23, 2016 Decl. of Susi Vassallo, MD ("Vassallo Decl."). Because he is paralyzed from the neck down, Mr. Parker has no ability to summon assistance or clear the tube himself if it becomes clogged. For this reason, he must be in an area where choking would be observed by other people at all times. Moreover, Mr. Parker currently has two diagnosed infections in his trachea (staphylococcus and pseudomonas aeruginosa), which increase the risk of the tube becoming clogged. As long as Mr. Parker is in isolation, and only checked on every 2 hours, he is at risk of choking to death without any means to alert staff of his distress.

    This is an intolerable risk. See Vassallo Decl (explaining that keeping Mr. Parker in a locked isolation room "poses a significant risk to his health and may well threaten his life"). Yet despite this obvious, life-threatening risk, Defendants have placed Mr. Parker in isolation three times since he began working with counsel to address the deficiencies in Louisiana State Penitentiary's provision of medical care. Plaintiffs have attempted repeatedly, as detailed herein, to resolve this issue with Defendants directly to no avail. Indeed, Defendants refuse to even acknowledge the heightened risk to Mr. Parker's health and safety posed by his placement in isolation. Currently, they have placed Mr. Parker in isolation for allegedly being "argumentative" with a nurse and thus "affecting the stability of the nursing unit," Ex. 10, Email from James Hilburn to Miranda Tait and all Counsel (Oct. 5, 2015, 5:04 p.m.)—in other words, for being rude.

    Because of the certainty of continued harm and serious risk of irreparable injury to Mr. Parker, including suffocation and death, Plaintiffs ask this Court to issue a Temporary

Restraining Order requiring Defendants to remove Mr. Parker from isolation so that he can be appropriately monitored, to refrain from placing him there again, and not to retaliate against him for his request for this relief or the underlying lawsuit.

## II.  BACKGROUND AND PROCEDURAL HISTORY

Kentrell Parker is an inmate at Louisiana State Penitentiary (hereinafter "LSP") and a named plaintiff in this class-action lawsuit.[1] Mr. Parker is a person with quadriplegia due to the breakage of two bones in his neck at the C3 and C4 vertebrae. He has had this disability since 2010. Mr. Parker cannot move his arms or legs and is completely unable to care for himself due to his disability. He is completely dependent on prison orderlies for feeding, bathing and grooming.

Mr. Parker also has a tracheotomy hole in his neck and relies on a tracheal tube to assist his breathing. Mr. Parker currently has two diagnosed infections in his trachea: staphylococcus and pseudomonas aeruginosa. He is unable to suction his tube himself or otherwise clear his airway should it become obstructed, and Defendants have not provided him with a tracheal suction machine at his bedside to remove secretions in the event of choking. Mr. Parker lives on Ward 2 of the R.E. Barrow, Jr. Treatment Center at LSP. Ward 2 houses prisoners with serious chronic care needs. It consists of an open ward with several rows of beds—where Mr. Parker is normally housed—and also has a series of single, closed-in isolation rooms built into two perimeter walls of the ward—where Mr. Parker is now.

When Mr. Parker is in a bed on the open ward, other prisoners as well as staff can observe him continuously. This is not possible when he is in the isolation room, however. The isolation rooms are kept locked, and have heavy metal doors with small, square windows. There

---

[1] Mr. Parker exhausted his administrative remedies regarding his inadequate medical care prior to the filing of the instant lawsuit.

is no way to see inside the room without standing directly in front of the door to peer through the window.

While inside this locked room, there is no way for Mr. Parker to contact staff or anyone else outside of the room other than trying to yell for attention and hoping someone hears him—which would be impossible if he were choking.  Prisoners who do not have Mr. Parker's disabilities typically signal their need for attention by banging on the locked door from the inside and/or yelling until staff come to the room to respond. Medical staff only makes rounds or maintain observation of the locked rooms *every two hours*.

Plaintiffs first expressed urgent concern to Defendants about the risk to Mr. Parker's health of his being locked in an isolation room in June 2014.  Ex. 2, Letter from Miranda Tait to Warden Stephanie Lamartiniere (June 26, 2014).[2]  Defendants did not respond to this letter, so Plaintiffs sent a follow-up letter directly to Counsel for Defendants.  Ex. 3, Letter from Miranda Tait to James Hilburn (July 9, 2014).  When Defendants ultimately responded to Plaintiffs' communications, Mr. Parker had already been returned to a bed on the ward.  Defendants did not explain when nor why he was returned to a bed on the ward other than to say it was in accordance with physicians' orders.  Ex. 4, Email from James Hilburn to Miranda Tait (July 11, 2014).

The second time this issue arose was in Fall 2015.  On or about September 24, 2015, Mr. Parker was placed in one of the closed, locked rooms as disciplinary isolation for an alleged infraction of "generally prohibited behavior."  Upon learning of this punishment, Plaintiffs contacted the Treatment Center Medical Warden and attorney for LSP Mr. Hilburn on September 29, 2015, requesting that Mr. Parker be removed from the locked room and returned to the open

---

[2] Counsel for Defendants was copied on all correspondence between Plaintiffs' counsel and Warden Lamartiniere.

ward due to the severe and immediate risks to his health posed by his confinement in an isolation room. Ex. 5, Letter from Miranda Tait to Warden Stephanie Lamartiniere (Sept. 29, 2015). Plaintiffs followed up on Oct. 1, 2015 due to Defendants' failure to respond. Ex. 6, Email from Miranda Tait to Warden Stephanie Lamartiniere (Oct. 1, 2015). On October 1, 2015, counsel for LSP responded that Mr. Parker's placement in the locked room did not pose an undue threat to his health. Ex. 7, Email from James Hilburn to Miranda Tait (Oct. 1, 2015). After conferring in detail with Dr. Susi Vassallo about the potential danger to Mr. Parker's health in a locked room, Mr. Parker's attorneys sent another letter on October 5, 2015, to Mr. Hilburn, again requesting Mr. Parker's return to the open ward and explaining the risk of an airway obstruction. Ex. 8, Letter from Miranda Tait to James Hilburn (Oct. 5, 2015). Plaintiffs learned from Mr. Parker's mother on October 5 that he had been returned to the Ward that afternoon and sought confirmation from Mr. Hilburn, who dismissed Plaintiffs' concerns but stated he would follow up with the prison. Ex. 9, Email from James Hilburn to Miranda Tait and all Counsel (Oct. 5, 2015, 4:39 p.m.). Mr. Hilburn confirmed that evening that Mr. Parker had been returned to the open ward. Ex. 10, Email from James Hilburn to Miranda Tait and all Counsel (Oct. 5, 2015, 5:04 p.m.).

     The very same issue arose once again immediately following a visit between Mr. Parker and his attorneys on Ward 2 on Thursday, February 18, 2016. Mr. Parker met with Plaintiffs' counsel Elizabeth Compa and her legal clerk for several minutes that day in the course of a larger visit related to the instant litigation.[3] On information and belief, Mr. Parker received a disciplinary write-up that evening for "attempting to manipulate medical care" and was told he

---

[3] Plaintiffs note that this is one of several adverse actions Defendants have taken against named class members since the filing of this lawsuit, and that it is not the first that exposed a named class member to life-threatening health risks. Named plaintiff Edward Giovanni was moved from a medical ward to another housing unit over the protestations of Plaintiffs' counsel that it could jeopardize his health. As a result, he contracted a near-fatal lung infection that required outside hospitalization.

would be put in isolation the next day. Plaintiffs' counsel spoke with Mr. Parker the morning of February 19. Plaintiffs sent a letter to Defendants that afternoon, laying out again their urgent concerns. Ex. 11, Letter from Elizabeth Compa to Warden Stephanie Lamartiniere (Feb. 19, 2016). Having received no response, Plaintiffs sent another letter the morning of February 22, 2016, urging Mr. Parker's immediate return to the open ward and once again asking that he not be placed in isolation in the future. Ex. 12, Letter from Elizabeth Compa to Warden Stephanie Lamartiniere, James Hilburn, and Jeffrey Cody (Feb. 22, 2016). Mr. Hilburn replied that afternoon dismissing Plaintiffs' concerns with respect to the severe risk of keeping Mr. Parker in an isolation room. Ex. 13, Email from James Hilburn to All Counsel (Feb. 22, 2016). Mr. Hilburn's justification for placing a paralyzed man at risk of choking to death in an isolated room where he cannot be viewed even by passersby was as follows:

> Offender Parker was issued a disciplinary report on February 18, 2016, by RN Manager Karen Hart for General Prohibited Behaviors. Offender Parker was abusive to staff who were trying to provide him with medical treatment. He told one nurse who was trying to assist with his medical care to get away from him that she could not take care of him. He was argumentative and was affecting the stability of the nursing unit. Offender Parker has not been to disciplinary court at the time of the writing of this correspondence. He will appear before the disciplinary court when scheduled. The outcome of his disciplinary proceedings will determine his housing location.

*Id.* He further stated that even in the locked room, Mr. Parker has "immediate access to the healthcare staff on duty" but in no way explains how this is the case given that Mr. Parker has literally ***no way to ask for assistance*** if, for instance, he chokes from an obstructed airway. *Id.*

This is the third time this issue has arisen, and the third time Defendants have refused to address the serious risk to Mr. Parker's health and safety that is created when he is put in an isolation room with limited visibility to others. This risk is immediate and it is extreme. Telling Mr. Parker that he should simply await a disciplinary proceeding at some unspecified future date,

6

and denying that there is any risk to his health and safety posed by his isolation, is an utterly inadequate response.

### III. ARGUMENT

***A. A Temporary Restraining Order Is Necessary to Protect Mr. Parker from Immediate and Irreparable Injury.***

A TRO is appropriate where "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" Fed. R. Civ. P. 65(b).  Here, the risk to Mr. Parker is manifest and severe, as described herein and as detailed in the declaration of Plaintiffs' expert Dr. Susi Vassallo.  Vassallo Decl.  At present, despite urgent and repeated efforts by Plaintiffs' counsel to alert Defendants to the exigency of removing Mr. Parker from isolation, he remains confined and at substantial and serious risk of death.

"The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985) (citations omitted).  This Court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past." *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435 (1941).  In determining whether to issue a preliminary injunction, the Court must find that Plaintiffs have met four factors:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest.

*Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). "While the movant

needs not always show a probability of success on the merits, he must present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities, [i.e., the other three factors] weighs heavily in the favor of granting the stay." *United States v. McKenzie*, 697 F.2d 1225, 1226 (5th Cir. 1983).

The requested Temporary Restraining Order is necessary to ensure that the serious ongoing violation of the Eighth Amendment—the unnecessary and willful exposing of Mr. Parker to "significant risk of immediate and irreparable injury" (Vassallo Decl.)—is remedied. Plaintiffs meet the requirements for issuance of a TRO. Indeed, in analogous situations where a confined Plaintiff with an urgent medical need is faced with risk of imminent and catastrophic harm, courts have repeatedly issued TROs. *See, e.g.*, *Kirsch v. Racine County Sheriff*, 2008 WL 4780614, at *1 (E.D. Wis. Oct. 30, 2008) (granting incarcerated plaintiff's motion for TRO where the withholding of his methadone treatment would "cause terrible physical pain, withdrawal symptoms and serious risk of cardiac arrhythmia and heart attack"); *Rosado v. Alameida*, 349 F. Supp. 2d 1340 (S.D. Cal. 2004) (granting a converted TRO to provide access to liver transplant services); *Doe v. Barron*, 92 F. Supp. 2d 694, 696 (S.D. Ohio 1999) (confirming TRO compelling prison personnel to transport plaintiff to medical provider for abortion services); *McLaughlin v. Williams*, 801 F. Supp. 633 (S.D. Fla. 1992) (confirming TRO compelling defendant to facilitate plaintiff's placement on waiting list for liver transplant); cf. *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680 (7th Cir. 2012) (urging prompt attention where serious medical need is being ignored); *Webster v. Sowders*, 846 F.2d 1032, 1034 (6th Cir. 1988) (noting that the lower court granted a TRO to plaintiffs who were assigned to perform asbestos removal under unsafe conditions); *See also, e.g., East v. Blue Cross and Blue Shield of Louisiana*, et al., 2014 WL 8332136, at *1-2 (M.D. La. Feb. 24, 2014) (granting non-prisoner

plaintiffs' motion for TRO based on need for medical care and risk of death absent that care).

### i. *There Is a Substantial Likelihood of Plaintiffs' Success on the Merits.*

In evaluating the likelihood of success on the merits, courts evaluate Plaintiffs' ability to meet the requirements of the substantive law governing their causes of action. *See, e.g., Mississippi Power & Light Co.*, 760 F.2d at 622 ("To evaluate the plaintiff's likelihood of success we determine what is the proper standard to be applied in evaluating plaintiff's claims, and then we apply that standard to the facts presented in the record."). In demonstrating its substantial likelihood of success, Plaintiffs are permitted to use evidence that would normally be inadmissible at trial such as hearsay evidence and declarations. *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. . . . Thus, the district court can accept evidence in the form of deposition transcripts and affidavits."). Here, Plaintiffs claim that Defendants have placed Plaintiff Kentrell Parker in conditions of confinement that pose a substantial, unacceptable and unnecessary risk of serious harm, in violation of the Eighth Amendment. For the reasons detailed below, Plaintiffs are highly likely to succeed on this claim.

### a. **Plaintiffs are likely to succeed on the claim that Mr. Parker's conditions of confinement violate the Eighth Amendment's ban on cruel and unusual punishment.**

Housing a prisoner in conditions of confinement that pose a substantial risk of serious harm is a well-established Eighth Amendment violation. The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment applies "to the States by

reason of the Due Process Clause of the Fourteenth Amendment." *Robinson v. California,* 370 U.S. 660, 675 (1962).

Conditions of confinement that pose a substantial risk of serious harm to prisoners are a well-established Eighth Amendment violation in the Fifth Circuit. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)). Defendants must "provide humane conditions of confinement," must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

In the instant litigation, Plaintiffs allege that the provision of medical care at the Louisiana State Penitentiary is constitutionally inadequate. This *Motion for Temporary Restraining Order*, however, solely pertains to the current conditions of confinement of one of the named plaintiffs in the instant action who, for the reasons detailed herein, faces a unique, immediate and serious risk of irreparable harm. Accordingly, the relevant question is whether Mr. Parker is likely to succeed in showing that placing him in an isolated room for alleged disciplinary infractions violates the Eighth Amendment.

### i. Mr. Parker faces a substantial risk of serious harm.

It is uncontested that Mr. Parker suffers from a form of paralysis that renders him completely unable to use his arms and legs or control his body below the neck. He is able to speak on his own, but cannot perform even basic self-care such as feeding himself, cleaning himself, or using the bathroom. He has undergone a tracheotomy and still has a tube in his throat. As a result of these physical limitations, Mr. Parker is extremely vulnerable to choking and other airway hazards. Vassallo Decl. ¶ 7. The plastic tube in Mr. Parker's throat could very

10

plausibly become filled with mucus or other secretions—"a common complication of tracheostomy tubes"—which would inhibit his ability to breathe. *Id.* If he were to vomit, the vomit could enter the tube and obstruct his breathing that way. *Id.* In either scenario, Mr. Parker would have absolutely no means to request immediate medical intervention. *Id.* ¶ 8. He cannot get up to bang on the door, and if he is choking he cannot yell or scream. *Id.* Given the present circumstances, there is a substantial risk that Mr. Parker could choke to death without medical staff even being aware that anything is amiss. *Id.* ¶ 9.

### ii. Defendants have acted with deliberate indifference to Mr. Parker's substantial risk of suffocation and death.

Defendants have actual knowledge of the substantial risk Mr. Parker faces and the ongoing harms he endures as a result of his isolation. As detailed *supra*, Counsel for Plaintiffs corresponded with counsel for Defendants about the specific risks associated with Mr. Parker being locked in an isolation room in June 2014; again in September and October 2015; and once more in the days leading up to filing the instant motion with this Court.

The long history of correspondence between the parties around this specific Plaintiff and this specific issue demonstrates that Defendants have full knowledge of Mr. Parker's conditions of confinement as well as the excessive risk to his health and safety posed by his being in an isolation room. Defendants are disregarding this excessive risk by keeping Mr. Parker—who is paralyzed and lacks use of his limbs—in isolation. *See Farmer*, 511 U.S. at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

### ii. Mr. Parker Faces Irreparable Harm if a TRO Does Not Issue.

As detailed above, Mr. Parker's continued confinement in a locked isolation room puts him at serious risk of death. Namely, he faces the risk of choking or having some other health

emergency wherein he is completely incapable of asking for medical attention because he is laying unobserved in a locked room, and dying because he does not receive timely medical attention. Vassallo Decl. There can be no doubt that such harm would be irreparable.

### iii. The Threatened Injury to Mr. Parker Outweighs Any Harm a TRO May Cause to Defendants.

The threatened injury to Mr. Parker is severe and very potentially fatal. Vassallo Decl. ¶ 10. Should these harms occur, Plaintiffs would have no adequate remedy at law. Defendants, however, face no harm beyond returning one of the most vulnerable individuals in their custody to a housing location where he does not face the unnecessary and severe risk of death. Plaintiffs merely ask that Defendants be required to house an incarcerated man with quadriplegia in an area where his very fragile health can be observed by other human beings. Given that Mr. Parker is generally housed on the open ward, it is hard to see any harm at all to Defendants—certainly nothing beyond a *de minimis* harm.

Defendants' explanation that Mr. Parker was placed in isolation for allegedly being "argumentative" does not come close to justifying the risk to which he is exposed. Rude or even abusive language cannot justify putting a paralyzed human being without any ability to call for help in a position to choke to death.

### iv. Granting a TRO Will Protect the Public Interest by Barring Violations of Fundamental Constitutional Rights.

Prohibiting further violations of Mr. Parker's rights through the issuance of a TRO will promote the public interest. As the Fifth Circuit has stated, "the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992). Here, Plaintiffs ask this Court to issue a TRO preventing Defendants—who are public officials—from willfully

placing a paralyzed inmate at a heightened risk of choking to death unobserved, a clear violation of the Eight Amendment's requirement that they "provide humane conditions of confinement" and "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson*, 468 U.S. at 526-27). Eliminating the conditions that pose a severe and immediate risk of death through the modest remedy of returning Mr. Parker to the bed where he is generally housed would only benefit the public interest.

> ### v. Plaintiffs' Proposed Preliminary Injunctive Relief is Narrow, Necessary, and Non-intrusive, as Required by the Prison Litigation Reform Act.

The requested relief is consistent with the requirements of the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626(a)(2) ("PLRA"). The relevant provisions of the PLRA require that, in order to grant injunctive relief, the Court find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id*. The PLRA further stipulates that the court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C.A. § 3626(a).

Here, the relief requested is simply that Mr. Parker be returned to a bed on the ward where other people can see him and can signal the need for medical attention in the event that his airway is blocked. Plaintiffs are well aware that federal courts are reluctant to intrude into the administration of prisons, where officials are generally given significant latitude and deference. The risk to Mr. Parker, however, is so severe—and the remedy so modest—that a TRO would comport with the requirements of the PLRA and should issue as soon as possible.

### C. No Bond Should Be Required.

Federal Rule of Civil Procedure 65(c) provides that the Court should levy "security in an amount that the court considers proper to pay the costs and damages sustained by any party

found to have been wrongfully enjoined or restrained." Given that there are no costs or damages associated with the relief Plaintiffs request (simply moving Mr. Parker back from isolation to the ward where he was previously housed), the "proper" amount is zero dollars.

If the Court does determine that a different amount would be proper, Plaintiffs respectfully request that the Court waive the bond requirement, given the obviousness of the risk to Mr. Parker's health, his indigence, and the strong public interest involved. *See, e.g.*, *Molton Co v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (approving waiver of bond given strength of case and "the strong public interest" involved); *Campos v. INS*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998) (because plaintiffs were indigent and sought to vindicate their constitutional rights, consistent with the public interest, the court did not require a bond). Furthermore, the requirement of a bond is contrary to the proposition that inadequate resources under no circumstances justify a prison's deprivation of constitutional rights. *See, e.g.*, *Smith v. Sullivan,* 553 F.2d 373, 378 (5th Cir. 1977) (inadequate resources can *never* be a justification for depriving an inmate of his constitutional rights). Consistent with this well-established principle, this Court should not require Plaintiffs, who are indigent, to post a bond in order to protect Mr. Parker's constitutional rights.

## IV. CONCLUSION

Because the Plaintiffs have satisfied all of the elements for the issuance of a Temporary Restraining Order, the motion should be **GRANTED.**

Respectfully submitted this 23rd day of February, 2016,

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative

14

636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org

### CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2016, I electronically filed this Motion for Temporary Restraining Order with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

I further certify that copies of all pleadings and other papers filed in the action to date or to be presented to the Court at the hearing, have been furnished to the Defendants attorney, who have already made an appearance in this matter.

Dated:    February 23, 2016                           /s/ Mercedes Montagnes
                                                      Mercedes Montagnes