JRD:AEP:BPS:SGB:EMP:cem
DJ 168-32M-10

MAY 13 1991



**REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

Honorable Buddy Roemer
Office of the Governor
State Capitol Building
4th Floor
Capitol Access Road
Baton Rouge, LA 70804

    Re:  Notice of Findings of Investigation of
          Louisiana State Penitentiary at Angola

Dear Governor Roemer:

    By letter dated August 8, 1989, we notified you that, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §1997 et seq., the Civil Rights Division of the United States Department of Justice was commencing an investigation into conditions at the Louisiana State Penitentiary (LSP), located in Angola, Louisiana. As specified by the statute, we are now writing to inform you of the conditions at LSP that we have found are depriving inmates of their constitutional rights, the facts supporting our conclusions, and the minimum measures we believe may remedy those conditions.

    Our investigation consisted, first, of several comprehensive tours of LSP with independent experts, most recently in October 1990. We observed conditions in the cellblocks, dormitories, infirmary and mental health unit at various times of the day, interviewed administrators, staff and inmates, and examined a variety of records. Further, we gathered and analyzed documentation relating to the policies and practices of the prison. Throughout the investigation, we received complete cooperation from the administrators and staff at LSP. We look forward to continued cooperation.

cc:  Records      Chrono      Peabody      Schoen
     Bowers       Parks        Hold

Based upon our extensive investigation, we have concluded that conditions at LSP deprive inmates of their constitutional rights. These conditions include:

1. Failure to provide adequate medical and psychiatric care.

2. Failure to provide a safe environment.

3. Segregation of inmates by race in cell assignments.

4. Arbitrary and excessive use of extended lockdown.

The State's failure to provide prisoners with the core requirements of adequate medical and psychiatric care, and a safe environment violates the Eighth Amendment. West v. Atkins, 487 U.S. 42 (1988); Rhodes v. Chapman, 452 U.S. 337 (1981); Estelle v. Gamble, 429 U.S. 97 (1976). Additionally, the State's intentional segregation of cells is a violation of the Equal Protection Clause of the Fourteenth Amendment, Lee v. Washington, 390 U.S. 333 (1968), and Title III of the Civil Rights Act of 1964, 42 U.S.C. §2000b. Set forth below are our findings and recommendations.

A.   Inadequate Medical Care

Our medical consultant identified serious flaws in the provision of medical care at LSP. These deficiencies begin at the intake point in the system, sick-call, and permeate the entire process. Sick call takes place in the middle of the night, between 12 A.M. and 3 A.M., and is conducted by untrained, uncertified nurse assistants who spend less than a minute with each inmate. The nurse assistant does not take vital signs or perform an examination. A sick inmate who does not wake when the nurse assistant makes the rounds will not be seen nor will his complaint be referred to physicians. Moreover, our medical consultant concluded that because the nurse assistants are not formally trained or certified they are simply not qualified to conduct sick call and assess which inmates should be seen by physicians. As a result of the deficiencies cited above, our consultant determined that because sick call is not appropriately conducted, inmates who need medical care and attention are not receiving it.

If the nurse assistant determines that an inmate's illness warrants medical attention, a clinic appointment is scheduled. Due to shortages of both physicians and nurses, an inmate may wait three to five days to see a physician. Because there are so few full time physicians at LSP, inmates are sometimes seen by registered nurses. Our medical consultant found that nurses are not competent to make some of the diagnostic and treatment decisions which they are required to do at LSP.

Our consultant additionally found that the care provided to inmates with chronic illnesses is grossly inadequate. LSP's infirmary maintains two wards with 60 chronic care beds; however, no nurses or medically trained personnel are assigned to provide care to patients in these wards. They are examined by physicians only after going through the inadequate sick call procedures described above. Our medical consultant additionally found that there is a lack of long range planning for treating inmates with chronic medical conditions. Inmates with diabetes are not provided special diets and appropriate glucose levels are not performed. Inmates needing physical therapy services often do not receive them due, in part, to the fact that equipment is unavailable, obsolete, or beyond repair. Acceptable procedures for monitoring the course of chronic diseases, such as high blood pressure, are practically nonexistent. During our investigation, inmates reported receiving blood pressure medications for years without having appropriate blood work done or seeing a physician to review progress or adjust medication. Our review of inmates' records and LSP's practices confirms those reports. Such failure to monitor and treat chronic illness can jeopardize inmates' health.

Although medical attention is afforded in emergency situations, the aftercare provided is deficient. There is inadequate follow-up when diagnostic tests are ordered or emergency care provided. For example, our investigation revealed that months after inmates were sent to nearby hospitals for radiologic procedures, LSP had not received the results. Inmates may not be referred back to the clinic for removal of stitches. The failure to provide such follow-up when tests are ordered or when emergency care is provided is not consistent with professional standards of care, jeopardizes inmates' health, and subjects them to unreasonable risks of harm.

Our consultant additionally found that both the storage and distribution of medication are inadequate. Medication orders may take more than two weeks to fill. Minimally trained security guards dispense medications. There is no adequate procedure for assuring that inmates receive the correct medications nor are there safeguards in place to be sure inmates ingest medication. Additionally, our consultant found that LSP does not adequately monitor the effectiveness of medications prescribed. As a result, inmates may not be not treated for side effects or may continue to receive medications that are not effective and do not resolve their medical conditions.

Generally, our consultant found that documentation of medical evaluations and treatment is inadequate, especially for inmates with more serious and chronic diseases. There are also unacceptable delays in placing hospital communications, e.g.,

- 4 -

results of radiologic procedures and emergency room reports, in inmates' charts. Because current and complete medical information is not maintained in the chart, professional staff lack important information on which to base their judgments and services. This deficiency subjects LSP inmates to unnecessary risk of harm from questionable treatment decisions.

Our consultant found that LSP lacks adequately trained and sufficient numbers of staff, both professional, *e.g.*, physicians and nurses, and security. Due to such shortages, untrained personnel are sometimes required to make health related decisions. As a consequence, inmates do not receive appropriate medical care.

LSP has not formulated sufficient or current policy manuals relating to its health care delivery system. Our consultant concluded that such manuals are crucial in order to provide all inmates with consistent and adequate care. The result of all the deficiencies cited above is that LSP inmates are being denied access to diagnosis and treatment by qualified health care professionals. As a result, their health is jeopardized and they are subject to undue risk of harm.

B.  <u>Inadequate Psychiatric Care</u>

Inmates placed in LSP's Mental Health Unit (MHU) are those assessed as chronically or acutely mentally ill, mentally retarded, and/or lacking behavioral controls. The MHU houses both treatment and extended care units. Both areas are staffed by correctional guards who are not trained in mental health and visited by the mental health team. Our psychiatric consultant found that the extended care unit -- the unit that houses inmates with the most severe mental disorders -- is essentially an extended lockdown area. Inmates housed in this unit are treated in the same fashion as inmates housed in extended lockdown throughout the institution -- *e.g.*, they are locked within cells up to 24 hours a day, are shackled in leg irons, cuffs and chains when transported or let out of their cells -- even though they have not necessarily been determined to be violent, only mentally ill. Further, they do not receive any active psychiatric or psychological treatment. Our investigation revealed that a number of chronically and acutely mentally ill inmates are housed in extended lockdown throughout LSP, particularly in Camp J, the punishment camp, where they also receive inadequate psychiatric care. Our psychiatric consultant found that LSP's treatment of mentally ill inmates significantly contributes to deterioration of their mental condition and does not approach accepted standards of care.

Our consultant found that there is no place to treat LSP's acutely psychotic inmates. They are sometimes placed in locked rooms in the Infirmary, sometimes in locked cells on the MHU. In either case, they receive no psychiatric treatment. Our consultant found that the failure to provide adequate psychiatric treatment to these and other mentally ill inmates results in excessive chemical and physical restraint and jeopardizes their mental and physical health. During our investigation, LSP informed us that Camp A is being renovated to provide additional mental health care. LSP will house some of its mentally ill inmates in dormitories in Camp A and anticipates that additional space for programming will be available there. However, the deficiencies cited above will continue to exist for a large number of chronically and acutely mentally ill inmates.

Our expert additionally concluded that the lack of treatment and the manner of dispensing psychotropic medications leads to an excessive use of high dosages of long acting psychotropic medications. These medications can have dangerous side effects and need close monitoring, which is not available at LSP. As a consequence, the inmates taking such drugs are being subjected to unnecessary risk of harm.

In October 1990, the mental health staff reported a caseload of almost 1500 inmates, 300 of whom receive psychotropic medication. The current staff of two psychiatric consultants who spend a total of 20 hours a week at LSP is totally inadequate to monitor drug side effects, review charts, examine inmates and provide necessary oversight. Additionally, there are no staff to provide coverage for staff attending inservice or other training; security staff assigned to the mental health unit must volunteer for specialized training on their own time. As a result of staff shortages and untrained staff, there is a failure to monitor and treat mentally ill inmates. Our psychiatric consultant found that a number of suicides that took place on this unit may well have been prevented if there were adequate numbers of trained staff available. Our consultant concluded that this level of staffing translates into the inadequate psychiatric treatment and the consequent harm described above.

The deficiencies cited above endanger the physical and mental health of the inmates and subject them to unreasonable risks of bodily harm.

C. Unsafe Environment

The temperature in the majority of cells and dormitories at LSP was well over 90 degrees when we toured the prison in early September 1990. Fans were scarce; ventilation was inadequate. Bars were hot to the touch and inmates were observed lying nude

on the concrete floor, ostensibly to stay cool. For those in extended lockdown, there is no way to seek escape from these unhealthy conditions. Such conditions put the inmates at risk for any number of heat-related maladies. In particular, excessive heat poses a danger to those LSP inmates on psychotropic medications whose high body temperatures can cause serious and life threatening side effects. This is especially true for LSP inmates on such drugs because, as has been noted above, there is inadequate oversight by qualified staff of inmates with chronic conditions.

Our fire safety consultant found several fire safety violations. One major deficiency cited is that no cells or cellblocks are sprinklered. Our investigation revealed, in addition, that smoke detectors are not consistently placed and many of those tested did not work. Fire alarm pulls were not readily accessible and correction staff were not properly trained in their operation. The alarms are not wired into the fire station. Notification of a fire requires radio or telephone contact and creates unacceptable delays.

Safe evacuation in the event of a fire is quite problematic. Our consultant determined that in some buildings, egress cannot be accomplished without passing through spaces more hazardous than those from which an inmate is exiting. Corridors are not sufficiently protected from areas of potential hazard. Doors do not meet accepted standards, and are made less effective by undercutting and the use of transoms. Our consultant concluded that all cell doors should be able to be released at a single control (gang release) in order to effectuate a safe evacuation of the tiers. However, on several tiers, it was necessary to manually unlock individual cells. When asked to open these cells, guards often failed to do so or took minutes to complete the task. We found that many electrical and manual gang releases were inoperative and that some tiers had none. Our consultant concluded that there is a significant danger that inmates would not be able to be safely evacuated from many tiers, dormitories, and other buildings at LSP in the case of a fire.

Our consultant also found that the structure of Camp A and Camp H endangers inmates confined there. The roofs in both camps are made of combustible material and are not reinforced. He recommended that the second floors of the buildings in both camps not be used to house inmates.

D. Segregation of Inmates by Race in Cell Assignments

Most inmates who are confined to cells at LSP live in single cells. However all cells that house more than one inmate are segregated on the basis of race. We were informed that it is

- 7 -

LSP's policy and practice to assign inmates to cells on the basis of their race, i.e., black inmates with black inmates, white inmates with white inmates. This State implemented intentional segregation violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution and Title III of the Civil Rights Act of 1964.

E.   Arbitrary and Excessive Use of Extended Lockdown

Our investigation revealed that a significant minority of LSP inmates are assigned to extended lockdown for months and years at a time. The conditions in extended lockdown are quite severe. Time out of cells is limited to one hour per day, three or four days per week. Inmates are limited to one outside visit a week; some are limited to one a month. Their telephone privileges are severely circumscribed. Many receive no reading material. When inmates are taken from cells, restraints, in various combinations, are used. During our tours, we observed inmates wearing leg manacles, handcuffs, and waist chains whenever they were transported from their cells. Absent a finding that a particular inmate has a propensity for violence or that security concerns justify them, the imposition of such restrictive and punitive conditions is arbitrary and without penological justification. LSP has not demonstrated that its decision to treat all lockdown inmates in this fashion is based on such findings or concerns.

Moreover, even as to those who are placed in extended lockdown or administrative segregation because of rule infractions or a demonstrated propensity for violence and for whom penological justification for some of the above cited restrictions may be appropriate, our penological consultant found that a minimum of one hour per day of out-of-cell exercise is necessary to prevent physical and mental deterioration.

Finally, some of the inmates assigned to extended lockdown are inmates who are in protective custody because they need protection, e.g., they are vulnerable to assaults by other inmates, are former law enforcement officers, etc. Our consultant found the placement of such protective custody inmates in extended lockdown where they are subjected to the restrictive conditions of confinement reserved for the most violent inmates or others who are being disciplined for rules infractions to be without penological justification.

Minimally Necessary Remedies

Based upon the circumstances discussed above, we have concluded that LSP inmates are being subjected to conditions that deprive them of their constitutional rights. In order to eliminate the conditions that result in these deprivations, at a minimum, LSP must implement the following remedies:

- 8 -

1) The State must provide adequate medical care to LSP inmates, including identification, treatment, and management of their acute and chronic medical conditions. Among other things, the State must ensure that appropriately trained health care personnel conduct triage for sick call, that there is adequate oversight by qualified personnel of inmates with chronic conditions or on psychotropic medications, and that procedures are instituted to ensure appropriate administration of medications.

2) The State must provide adequate psychiatric care to LSP inmates, including identification, treatment, and management of their acute and chronic mental illnesses.

3) The State must ensure that there are a sufficient number of trained, competent and qualified professional and security staff to provide LSP inmates with adequate medical treatment and psychiatric treatment and to adequately supervise and protect them from harm.

4) The State must remove fire hazards and make appropriate renovations to protect LSP inmates from undue risk of harm due to fire.

5) The State must ensure that adequate ventilation is provided in areas where inmates are housed.

6) The State must immediately cease assigning inmates to cells on the basis of race and must assign inmates to cells based upon neutral classification criteria.

7) The State may only subject an inmate to extended lockdown based upon a finding that a particular inmate has a propensity for violence, has violated LSP rules, or that security concerns justify the assignment. All inmates, including those assigned to extended lockdown, must receive at least one hour out-of-cell time per day.

To rectify the deficiencies at LSP and to ensure that constitutionally adequate conditions are maintained thereafter, we propose to negotiate an agreement with the State of Louisiana, to be entered as an order of a federal court, which shall provide, at a minimum, that the above referenced remedies will be implemented at LSP.

Our attorneys will be contacting the State's Attorney General's Office to discuss this matter in greater detail. In the meantime, should you or your staff have any questions

- 9 -

regarding this matter, please feel free to call Arthur E. Peabody, Jr., Chief, Special Litigation Section, at (202) 514-6255. To date, we have been able to conduct this investigation in the spirit of cooperation intended by the Civil Rights of Institutionalized Persons Act, and look forward to continuing to work in the same manner with State officials toward an amicable resolution of this matter.

                                Sincerely,

                                John R. Dunne
                                Assistant Attorney General
                                Civil Rights Division

cc:   Honorable William J. Guste
      Attorney General
      State of Louisiana

      P. Raymond Lamonica, Esquire
      United States Attorney

      Mr. John L. Whitley
      Warden, Louisiana State Penitentiary

      Mr. Bruce N. Lynn
      Secretary, Department of Corrections