## EXECUTIVE SUMMARY OF UNITED STATES' FINDINGS

Dr. Puisis and Ms. Geller will testify to the following medical conditions at LSP as of April 1994.

A.    Inadequate Medical Care

Defendants have failed and continue to fail to provide LSP inmates with adequate medical care.  The medical care at LSP is grossly deficient.   The medical care delivery system at LSP fails to recognize, diagnose, treat, or monitor the serious medical needs of LSP inmates, including serious chronic illnesses and dangerous infectious and contagious diseases.

During extensive investigative tours of LSP, the United States' experts found and will testify to serious flaws in nearly all critical aspects of the LSP medical delivery system which include the following:  (1) sick call screening and classification; (2) scheduling; (3) physician clinic; (4) infirmary care; (5) treatment of chronic illnesses; (6) specialty and subspecialty care; (7) treatment of contagious and infectious diseases; (8) medication administration; (9) maintenance of medical records; (10) security dominance of medical practice; (11) administrative organization such as overall planning and guidance and numbers of critical medical committees; and (12) staffing.[1]   As a result of inadequate medical care at LSP,

---

[1]Casey, 834 F. Supp. at 1545-47 (court found deliberate indifference where systematic deficiencies in medical care consisted of inadequate numbers of medical staff, improper security involvement in providing medical care, inadequate sick call system, untimely and unacceptable delays to outside health providers including specialty care, and inadequate chronic care);
(continued...)

inmates have suffered and continue to suffer serious harm and even death.[2]

      1.  <u>Sick Call</u>

Defendants fail to adequately recognize, screen, and classify (i.e. triage) the serious medical needs of inmates through sick call procedures.  The Emergency Medical Technicians ("EMTs") who conduct sick call are not adequately trained nor sufficiently experienced to recognize serious medical illnesses or to triage sick call.  EMTs are trained to recognize emergency situations requiring emergency transportation to a hospital.  LSP does not have an adequate training program for EMTs to identify serious illnesses at sick call.  Defendants' use of EMTs is not diagnostically productive.[3]  The EMTs are unable to adequately perform the fundamental task of triage and differentiate between acute, chronic, and minor illnesses.[4]  Defendants also do not

---

[1](...continued)
<u>Fambro</u> v. <u>Fulton County, Georgia</u>, 713 F. Supp. 1426, 1430-31 (N.D. Ga. 1989) ("Deliberate indifference to serious medical needs is established where there are systematic deficiencies in the staffing facility's equipment or procedures which effectively deny inmates access to adequate health care.").

[2]<u>Dawson</u>, 527 F. Supp. at 1308 (unsystematic medical care assures "unnecessary and potentially dangerous physical and emotional suffering by at least some among the jail population.").

[3]<u>See</u> <u>Dawson</u>, 527 F. Supp. at 1307-08 (screening of inmates by "staff wholly untrained in the detection of physical . . . illness" contributes to finding of deliberate indifference).

[4]<u>Martino</u> v. <u>Carey</u>, 563 F. Supp. 984, 990 (D. Or. 1983) (system is deficient where personnel make medical care decisions outside the scope of their expertise); <u>Gates</u> v. <u>Collier</u>, 501 F.2d 1291, 1300 (5th Cir. 1974) ("Medical staff . . . fail to
(continued...)

000097

provide the EMTs with basic and fundamental equipment necessary for proper triage.

Finally, the existence of a "malingering rule", designed to punish frequent users of the medical system, significantly erodes the EMTs objectivity and the inmates' confidence in that objectivity whey they try to access the medical system..  The EMTs fear that if they send an inmate to the physician clinic too often, the inmate will be subject to punishment under the malingering rule despite having an identified medical need. Similar deficiencies in sick call policies and procedures have been found to constitute deliberate indifference to the serious medical needs of inmates.[5]

    2.   Scheduling

Upon identifying those inmates in sick call who require medical attention, scheduling for the physician clinic is cumbersome, chaotic, and does not promote timely nor adequate medical care.  Defendants have insufficient support and clerical staff to handle the scheduling needs of LSP.  The computer software used for scheduling is inadequate.  It is antiquated and has limited use given the complexity and volume of scheduling

_____

[4](...continued)
provide adequate medical care.  As a result many inmates have not received prompt or efficient medical examination, treatment, or medication.").

[5]Casey, 834 F. Supp. at 1545-46 ("Prison officials must provide a system of 'ready access to medical care'" through an adequate sick call system); Dawson 527 F. Supp. at 1273, 1308 (denial of adequate sick call procedures contributes to finding of deliberate indifference).

3

needs at LSP.  Scheduling problems and delays are compounded by poor communication and coordination between the medical and security personnel.  As with the original scheduling, the system for rescheduling inmates not seen during their appointment at the clinic is equally inadequate.  Scheduling and rescheduling problems lead to missed appointments, extensive delays, patients left untreated altogether for extended periods of time and cause substantial harm to LSP inmates.

In addition to inadequate staffing and poor organization, no system exists to prioritize scheduled or rescheduled appointments on a daily basis according to acuity of medical condition. Physicians see inmates on a first come, first serve basis. Inmates with a serious medical problem have the same probability of being treated as inmates with minor medical concerns. Consequently, due to overcrowding at the clinic, inmates with serious medical needs often remain unexamined and untreated, especially when repeatedly brought late to the clinic due to security concerns or inadequate communication between security, medical, and scheduling personnel.  Similar delays in the provision of necessary medical care have been found to constitute deliberate indifference to inmates' serious medical needs, both real and potential.[6]

---

[6]See Wellman, 715 F.2d at 273 (a systematic failure to receive treatment for extended period of time constitutes deliberate indifference); Ramos, 639 F.2d at 578 (no staff to transport prisoners to off-site medical facilities creates delay that constitutes cruel and unusual punishment by denying prisoners "access to reasonably adequate health care."); Balla v.
(continued...)

4

### 3. Physician Clinic

The physicians are regularly unable to examine and treat all inmates scheduled for the clinic.  Inadequate clinic and waiting space further limits the number of inmates that physicians may adequately examine.  The physician clinic is understaffed and the clinic is consistently overcrowded.[7]  Given the number of scheduled inmates, the number of physicians, and the inadequate clinical space, Defendants are unable to meet the minimal medical needs of LSP inmates identified at sick call.

In addition to a lack of adequate physician staff, the experience and training of LSP physicians is insufficient to meet the needs of the inmates.  LSP has an inadequate number of generalists on staff to provide adequate care.  The majority of physicians are either surgeons or anesthesiologists.  Only a limited number of physicians on staff have experience in internal medicine.  Furthermore, a significant number of physicians at LSP have no post-graduate experience or training in diagnosing serious medical problems such as chronic illnesses.  Finally, at least half of the physicians on staff at LSP are on probation or practice with restricted licenses.

---

[6](...continued)
Idaho State Board of Corrections, 595 F. Supp. 1558, 1566-67, 1576 (D. Idaho 1984) (deliberate indifference evidenced when requests for care had been submitted by inmates and were never responded to by staff); Dawson, 527 F. Supp. at 1308 (untimely access to medical care constitutes deliberate indifference to the potentially serious medical needs of inmates).

[7]Casey, 834 F. Supp. at 1545 (lack of staff resulting in delays in the assessment and treatment of inmate medical needs may constitute deliberate indifference).

5

Defendants are improperly using unlicensed staff as licensed physician assistants. Because Defendants are understaffed in physicians and the physician clinic is repeatedly overcrowded, Defendants are using their unlicensed assistants to physicians to diagnose and make independent medical assessments that form the basis of treatment protocols. Under Louisiana law, only properly licensed physician assistants are qualified to make independent medical assessments, designate treatment plans, and prescribe medications. Defendants are in direct violation of a letter of understanding from the Louisiana Board of Medical Examiners detailing the proper use of their assistants to physicians and warning LSP that independent practice of medicine by their assistants to physician is illegal.[8]

Finally, the limited physician clinics at the camps outside the New General Hospital do not have adequate space and equipment for physical examinations and are otherwise inadequately equipped to provide for proper medical diagnosis.

4. <u>Infirmary Care</u>

Defendants are improperly using the infirmary in the New General Hospital as an acute care hospital for which it is not licensed. Defendants continue to place patients who should be hospitalized in the infirmary unit. Defendants' use of isolation rooms in the infirmary is improper and dangerous. Defendants

---

[8]<u>Balla</u>, 595 F. Supp. at 1575 (practice of "medical personnel
. . . providing treatment for which they are neither trained nor
licensed to provide . . . . is deliberately indifferent to the
serious medical needs of the inmates.").

6

place seriously ill patients in locked rooms that may adversely affect their medical conditions.  Nurses in the nursing station are unable to see or hear inmates in the locked isolation rooms and infrequently check the inmates in these rooms.

Furthermore, defendants use the locked rooms for respiratory isolation to house inmates with active contagious tuberculosis. These rooms actually have positive pressure to the general ward, drawing air from the isolation room into the general ward, thereby disseminating tuberculosis bacteria to inmates in the ward.

Defendants also have no policies or procedures specifically designed to guide health care practitioners in managing care on the infirmary unit.

Finally, limited bedspace in the infirmary coupled with the closing of one of the wards will lead to more inmates being placed in the general population where the follow-up care is poor.  Deficiencies in infirmary space, access, and care have contributed to findings of unconstitutional medical care conditions in prisons.[9]

---

[9]See, e.g., Casey, 834 F. Supp. at 1494 (Court found improper infirmary care contributed to deliberate indifference and stated that "[b]ecause of the . . . limited space [in the infirmary] for men, prisoners stay in a hospital longer than necessary, or fairly sick people are returned to housing units."); Palmigiano v. Garrahy, 443 F. Supp. 956, 974 (D.R.I. 1977) (defendants were deliberately indifferent in maintaining an infirmary without written procedures for staff guidance that inadequately treated inmates with infectious diseases such as tuberculosis in isolation rooms set aside for such infectious diseases that did not contain separate and proper ventilation systems).

7

## 5.  <u>Treatment of Chronic Illnesses</u>

Defendants are dangerously deficient in the treatment of chronic illnesses.  As a whole, staff physicians have limited experience and training in recognizing and treating chronic conditions.  EMTs in charge of sick call have no training in recognizing symptoms of chronic illnesses.  No medical protocols exist at LSP to guide medical staff in how to recognize and treat chronic illnesses.[10]

Even after identifying inmates with chronic illnesses, LSP does not provide adequate follow-up care for such inmates.  LSP has no tracking system nor even a list of inmates requiring treatment for chronic illnesses.  LSP has no screening system to detect chronic illnesses, particularly for older inmates.  At a minimum, LSP should have a system of annual physical examinations for inmates over a certain age, such as fifty years, in order to detect and prevent chronic illnesses.  Diagnostic tests such as routine blood tests, electrocardiograms (EKGs), and chest x-rays are not reviewed and followed up on in a timely manner.  Furthermore, tests and consultations conducted off-site are often filed in the medical record unacceptably late, if at all.  Many death charts do not have signed death certificates and there is no formal review of deaths or quality assurance review of care.  Medical care at the outcamp clinics is severely impaired by an almost complete lack of medical equipment.  Federal courts have

---

[10]<u>Balla</u>, 595 F. Supp. at 1575 (medical staff must be competent to deal with prisoner problems).

8

found lack of treatment and follow-up care of chronic conditions and illnesses to constitute deliberate indifference to the serious medical needs of inmates.[11]

### 6.  Specialty and Subspecialty Care

LSP has an inadequate number of specialty and subspecialty clinics to serve the serious medical needs of its inmates, especially given the long waits for off-site consultation. Furthermore, the consultative reports from off-site specialty care often are not returned with the inmates to LSP.  Inmates must wait for excessive and unacceptable periods for elective surgery and radiological services.  On-site surgery does not conform to routine infection control practices.  No physical therapy services exist for inmates requiring such services and Defendants have failed to make LSP adequately accessible to handicapped inmates, causing inmates significant harm including death.  Finally, Defendants keep no records to monitor the number of inmates who have serious medical needs that are being treated or that need to be treated in specialty clinics such as hypertension, heart disease, and seizures.  The deficiencies

---

[11]See, e.g., Casey, 834 F. Supp. at 1491, 1546-47 (current system of care for chronically ill was unconstitutional because "defendants have no system to follow chronic conditions including obstructive lung diseases [such as asthma], hypertension, diabetes, elevated cholesterol, seizure disorders, HIV disease, tuberculosis, and glaucoma.  In addition, defendants do not have a uniform system of patient education for diseases.").

9

noted above in providing critical specialty care are
unconstitutional.[12]

       7.  <u>Treatment of Contagious and Infectious Diseases</u>

      Defendants' control of infectious diseases such as
hepatitis, tuberculosis, HIV, and other sexually transmitted
diseases is grossly inadequate creating significant risks to the
inmates and LSP employees.  Infection control is carried out by
one nurse who devotes most of her time to conducting TB skin
tests on staff and employees and AIDS education. . One nurse is
grossly inadequate to staff a critically needed infection control
program at LSP and prevent the spread of potentially fatal
diseases.  Furthermore, the infection control manual is
incomplete and has not been approved by the Department of Public
Safety and Corrections.  Yearly ongoing TB screening of inmates
does not exist.  Current TB isolation practices are inadequate
and potentially dangerous.  No data is available or collected to
determine the prevalence of any contagious or infectious

_____

      [12] <u>See, e.g.</u>, <u>Johnson</u> v. <u>Bowers</u>, 884 F.2d 1053, 1056 (8th
Cir. 1989) (excessive waits for elective surgery constitutes
deliberate indifference); <u>Benter</u> v. <u>Peck</u>, 825 F. Supp. 1411 (S.D.
Iowa 1993) (prison official's intentional refusal to investigate
inmate's serious need for eyeglasses and doctor's intentional
refusal to provide eyeglasses constitutes deliberate
indifference); <u>Williams</u> v. <u>ICC Committee</u>, 812 F. Supp. 1029
(N.D.Ca. 1992); <u>Candelaria</u> v. <u>Coughlin</u>, 787 F. Supp. 368
(S.D.N.Y. 1992), <u>aff'd</u>, 979 F.2d 845 (2d. Cir. 1992) (paraplegic
inmate's need for adequate wheelchair and orthopedic treatment
stated cause of action for deliberate indifference to his serious
medical needs).

diseases.  The LSP inmate population is at high risk for tuberculosis, syphilis, and HIV and at a minimum such diseases should be reported and tracked.  The treatment of contagious and infectious diseases at LSP is clearly unconstitutional.[13]

8.  Medication Administration

The current method of medication administration is dangerous.  Unlicensed security personnel administer medication with minimal training.  The system of dispensing medications from multi-dose vials is antiquated and poorly organized.  Unlicensed security personnel are repackaging medications without proper training, knowledge or experience.  Medication administration is also rushed and haphazard.  The security personnel responsible for medication administration have no understanding of proper medication storage, possible dangerous side effects of certain drugs, and do not check the dosage or whether inmates take the medicine.  The Medication Administration Records (MARs) are grossly inadequate and contain large gaps in critical information.  Finally, when an inmate moves from one camp to another, transportation of their medications is frequently

[13] See, e.g., Gates, 501 F.2d at 1300 (allowing inmates with serious contagious diseases to mingle with general prison population ruled unconstitutional); Gillespie v. Crawford, 833 F.2d 47, 50 (5th Cir. 1987) (inmate stated cause of action by alleging that conditions of confinement led him to contract TB); Grubbs v. Bradley, 552 F. Supp. 1052, 1069 (M.D. Tenn. 1982) (deliberate indifference found where "deficiencies exist in the monitoring and control of both tuberculosis and venereal disease, both of which present serious problems in the institutional setting.").  See also Palmigiano, 443 F. Supp. at 975 (lack of an adequate medical care system "is perhaps best illustrated by the near total lack of available statistical information," including inmates with various chronic conditions and infectious diseases).

delayed, routinely taking up to three days to reach the inmate. Such an unnecessary gap in inmate medication regimens may have serious health consequences to inmates, especially inmates with serious medical needs.[14]

Defendants have no quality assurance program to review identify and correct medication errors or to control access to the medications. Security personnel often rely on inmates to catch errors. LSP has no formal system for monitoring important drug and electrolyte levels in the blood of inmates taking anticonvulsant, psychotropic and heart medications. Finally, prescriptions for medication are written for unacceptably long periods of time for the convenience of the medical staff and to decrease the overcrowding at physician clinics due to inadequate staff and inefficient sick call and scheduling procedures. The lack of an effective system for providing needed medication has been held to contribute to the unconstitutionality of overall medical care.[15]

9.  Maintenance of Medical Records

---

[14]Fambro, 713 F. Supp. at 1429 (court held medical care deliberately indifferent where "inmates have had to wait for up to three days for medication [including] [i]nmates who are dependent on pharmaceuticals for the hour-to-hour maintenance of their physical health and safety [and those inmates] with epilepsy and diabetes [who are] placed in risk of serious bodily injury or death by the shortcomings of the medical delivery system.").

[15] See, e.g., Casey, 834 F. Supp. at 1549; Palmigiano, 443 F. Supp. at 975 (failure to properly monitor the prescription of psychotropic medication or to maintain system or method to ensure that inmates take medications contributed to finding of deliberate indifference).

12

The medical records are unnecessarily voluminous, lack elementary organization, and preclude medical staff from the meaningful access and review necessary for adequate treatment decisions.   Critical forms and reports are often missing, untimely filed, or misfiled.   No accurate chronology exists that medical staff may easily follow.   The records contain no Medication Profiles, documents usually prepared by the pharmacy that chronicle an inmate's medication history.   Consultation reports and off-site specialty visits and reports of hospitalization are often not in the charts.   Defendants lack an integrated medical recordkeeping system.   Mental health records are kept separate from medical records and critical information contained in these records remains inaccessible to mental health and medical caretakers.   Similar deficiencies in medical record keeping have contributed to courts finding deliberate indifference.[16]

Furthermore, the record keeping system at LSP makes it impossible to accurately identify and track those residents with serious medical disorders.   Defendants do not track or even

---

[16]Fambro, 713 F. Supp. at 1429 ("Medical records and charts are disorganized and sometimes incomplete.   When follow-up care is rendered, [medical staff has] difficulty in determining what if any prior treatment an inmate has received."); Burks v. Teasdale, 492 F. Supp. 650, 662, 676 (W.D. Mo. 1980) ("inadequate, inaccurate and unprofessionally maintained medical records" found to be "constitutionally infirm."   Court further noted the "critical importance of adequate and accurate medical records in any attempt to provide continuity of medical care . . . ," and the significant "relationship between proper medical records and adequate medical care."); Feliciano, 497 F. Supp. at 21 (Poor medical record keeping contributed to finding of inadequate medical care).

13

maintain a list of inmates being treated for serious disorders such as heart disease, hepatitis, inactive TB, seizures, or hypertension.  Such inability to track or even adequately identify inmates with serious medical needs substantially hampers the planning and delivery of adequate medical care.[17]

10.  Security Dominance of Medical Practice

Security unnecessarily and unacceptably dominates the medical care system of LSP.  Security often overrides physician decisions to the detriment of inmates' health.  Untrained security personnel conduct and supervise sick call and medication administration to the substantial detriment of the inmates. Security also decides the manner and time of inmate transportation to medical care internally and off-site, leading to significant delays in treatment.  Security controls the dietary services for inmates on special meals, often resulting in these inmates not receiving medically required diets.  Finally, Defendants continue to enforce disciplinary rules known as "malingering" that punish inmates from accessing the health care system under certain conditions.  These malingering rules chill inmates from requesting sick call, dissuade sick call personnel from scheduling inmates to physician clinic, and require medical personnel to involve themselves inappropriately in security matters in punishing their own patients.  Inappropriate roles of

_____

[17]Palmigiano, 443 F. Supp. at 975.

14

security staff have contributed to findings of deliberate
indifference to serious medical needs.[18]

Medical care must be autonomous from security.  Medical
leadership is responsible for inmate health and not with
discipline within the correctional environment.  Medical
leadership must advise correctional officers on how medical care
is to be delivered so that the patient's health is maintained
within the requirements of the correctional environment.  The
overpowering influence of security over the medical system at LSP
makes it impossible for medical leadership to adequately and
properly perform their designated functions and courts have found
such involvement unconstitutional.[19]

      11.   <u>Administration of the Medical System</u>

The administration of the medical system at LSP is severely
deficient in organization, budget, and critical medical
committees.  The medical director is inefficiently utilized.  He
has no job description and spends nearly ninety-five per cent of
his time on administrative and legal matters such as responding
to various complaints regarding medical care.  The medical
director does not have sufficient clerical staff to handle his
overwhelming administrative duties.  Outside his administrative

---

[18]<u>See, e.g.</u>, <u>Gates</u>, 501 F.2d at 1300 ("Inmates are often
discouraged from seeking medical attention by the prison practice
of punishing those who on examination appear to be healthy.").

[19] <u>See, e.g.</u>, <u>Casey</u>, 834 F. Supp. at 1545 (inappropriate
interference by security staff can rise to deliberate
indifference and constitute a constitutional violation especially
where security staff "have the authority to overrule medical
orders . . . . [and] interfere with access to medical care.").

000110

duties, the medical director has an extremely limited clinical practice.  The medical department at LSP has no separate budget and the budget is often exhausted before the end of the fiscal year, creating substantial shortages of critical medical supplies.

Crucial committees either do not exist at LSP or have met only once since its formation in early 1994.  No quality assurance committee or peer review system exists to monitor the quality of medical care delivery at LSP.  No Mortality Review Committee exists to analyze the death of an inmate and recommend critical and necessary changes in the medical system to prevent future deaths.  An Infection Control Committee does not exist to adequately manage and monitor serious contagious and infectious diseases.  No Drug and Formulary Committee exists to manage medication administration and monitoring.  It is impossible to manage and execute an adequate medical care delivery system without oversight and guidance from critical core committees. Such a poorly administered medical care system and lack of committee leadership and guidance are inadequate and unconstitutional.[20]

---

[20] See, e.g., Johnson v. Lockhart, 941 F.2d 705, 707 (8th Cir. 1991) ("[a]bdication of policy making and oversight responsibilities can reach the level of deliberate indifference and result in unnecessary and wanton infliction of pain to prisoners when tacit authorization of subordinates' misconduct causes constitutional injury"); Martino, 563 F. Supp. at 989 (inadequate medical care because no written procedure and no preventive care including lack of regular physical examinations); Palmigiano, 443 F. Supp. at 973-75 (lack of organization as a whole contributed to inadequacy of medical care).

16

12.  <u>Staffing</u>

Defendants are inadequately operating a medical care
delivery system at LSP with critical shortages of key personnel.
LSP lacks sufficient key professional medical staff:  (1)
physicians, (2) licensed physician assistants (as opposed to the
unlicensed assistants to physicians), (3) registered nurses, (4)
licensed practical nurses, (5) a medical records professional
(necessary to handle the complex and voluminous medical record
requirements of LSP), (6) a registered dietician (to handle the
special diet requirements of inmates currently ignored by
Defendants), and (7) physical therapists.  Furthermore,
Defendants lack critical non-professional staff necessary to
allow the professional staff to free themselves from current
administrative duties such as scheduling and coordinating the
central supply.  Defendants are critically short of clerks to
provide necessary administrative support functions for the
following:  (1) the Medical Director and physicians, (2) the
nursing department, (3) the radiology department and pharmacy,
and (4) medical records.  The shortage of staff and the
inadequate training of existing staff are clearly
unconstitutional.[21]

_____

[21] <u>See, e.g.</u>, <u>Gates</u>, 501 F.2d at 1300 (insufficient staff
and inadequate training fail to provide adequate medical care,
resulting in delays of medical exams, treatment, or medication);
<u>Casey</u>, 834 F. Supp. at 1544-45 (inadequate number of medical
staff which leads to substantial harm rises to level of
deliberate indifference); <u>Fambro</u>, 713 F. Supp. at 1429;
<u>Palmigiano</u>, 443 F. Supp. at 975.

17