# LOUISIANA STATE PENITENTIARY AT ANGOLA
## A REPORT

Michael Puisis D.O.
Medical Director
Cermak Health Service
Cook County Jail
Submitted 07/25/94

## OVERVIEW

The Department of Justice (DOJ) has been investigating conditions at Louisiana State Penitentiary at Angola since 1988. I have made two investigatory visits to the prison for the DOJ for the purpose of reviewing the delivery of health care at the facility. This report is a summary of my second visit to the prison on 4/28 to 4/30/94. The report is based on my tour, interviews with staff, review of documents and review of charts.

## ADMINISTRATION

The organizational structure for health care has changed since my last visit. Warden Whitly is still ultimately responsible for health care. The deputy warden, Mr. Peabody now supervises Warden Gary Frank, who is the Assistant Warden overseeing health care. Reporting directly to Warden Frank is Ella Fletcher, the "Hospital Administrator". Dr. Gutierrez replaced Dr. Perrego as Medical Director about two years ago. Dr. Gutierrez reports to Mrs. Fletcher except insofar that Dr. Gutierrez is the named health authority and provides medical direction for the institution. One comment I have regarding Angola is that numerous document and statements reference Angola as a hospital. There is no hospital at Angola. The highest level of acuity at Angola is the infirmary unit. The "New General Hospital" is not equipped, staffed, or maintained as a hospital.

The medical team still has no separate budget and no one, including Mrs. Fletcher, could tell me how much money is spent on health care at Angola. There has been no change in the development of the budget; and supply budgets for various departments are still exhausted before the end of the fiscal year. This results in shortages of supplies in various areas, including pharmaceuticals.

There is no statewide leadership for medical care of state prisoners. Dr. Michael Hegmann, the Medical Director at Hunt Correctional Center, is paid for 4 hours per week to provide consultation to "headquarters" on medical matters at Angola. Dr. Gutierrez stated that he was obligated to report to Dr. Hegmann because of the Department of Justice investigation but that it was his understanding that Dr. Hegmann was not his supervisor. There is a State of Louisiana health care manual which has selected policy but there is no health authority which advises the state prison officials on overall health care policy. This lack of a health authority state wide is a glaring problem.

No attempt has been made to seek separate accreditation for the health care program, although a preliminary consultation with the National Commission on Correctional Health Care was obtained to discover those areas of deficiency at the prison. Mrs. Fletcher indicated that they were unable to seek health care accreditation because they operate on a "crisis management" system and have difficulty in performing all the required committee work with the current number of staff.

The involvement of security in medical matters has not changed. Officers continue to pass medication and correctional staff remain the supervisors of Emergency

Medical Technicians (EMTs). I was told that the involvement of physicians in citing patients for malingering has changed; however, the practice continues albeit with some modification. If physicians feel the need to address a malingering issue from a medical point of view, they should do so outside the criminal justice realm. In my opinion, the practice of physicians punishing inmates is medically unethical. Additional problems I noted on this visit include the practice of making maximum security patients coming to the emergency room wait in 6 foot by 6 foot cages before and after being seen by the ER physician. This practice was explained as necessary to separate various classifications of inmates who may mix in the ER area; and to prevent fights. However I witnessed inmates waiting in cages for 3 hours after their ER visits when the entire ER corridor was deserted. These inmates were already in hand and leg shackles and this sequestering is both medically dangerous and punitive for those seeking ER care. On ward 1 (the infirmary), security can place any individual in a locked room depending on their security classification. Escape risks and protective custody were two reasons cited for placing individuals in locked rooms. These rooms have heavy gauge steel doors with a small (approximately 6 inch square) glass viewing panel. Patients must gain the attention of nursing staff by screaming and banging on the door. Nurses sit behind an enclosed viewing area which muffles sound from the ward. There is no nursing call button in these rooms. On the day of my visit, an infirm AIDS patient, who had difficulty walking, was locked up in one of these rooms because he was described as an escape risk. I was told by the medical director that a man who had his feet amputated was classified as an escape risk and was placed in a locked room. In order for a physician to have a person removed from a locked room the physician must petition the warden. This practice of placement of the infirm or seriously ill in locked rooms is dangerous and violates medical autonomy regarding care of the infirm.

 The Medical Director is forced to be a deputy coroner and thereby participate as a witness to pronounce death at executions. This practice has been denounced as unethical by the American Medical Association. Physicians must not be forced or encouraged to participate in execution of their patients.

 Medical care must be autonomous from security. The medical leadership in any correctional setting must safeguard inmates health insofar as it may be threatened by the correctional environment. Medical leadership must advise correctional officials on how medical care can be delivered so that patient's safety is being safeguarded within the requirements of the correctional environment. The overpowering influence of corrections in the medical arena makes this impossible at Angola.

## PHYSICAL PLANT

 Since my last visit there have been some new plans regarding the physical plant. The day of our visit part of the roof of the "New General Hospital" was being repaired. One of the chronic care wards, ward 3, was evacuated and will be converted into additional pharmacy space. This will reduce the bed space for the chronically ill. Outlying camps still lack rudimentary equipment such as thermometers and handwashing facilities.

## SICK CALL

Sick call at Angola is a process whereby EMTs evaluate inmates' medical complaints and decide whether or not there is a need for a subsequent physician encounter. If a physician encounter is deemed necessary the patient is either referred directly to the ER; given a blue slip for a next day visit to the physicians' clinic; or referred to elective physician sick call on a priority basis. Priority is assigned by labeling a patient as category I through III. A blue slip requires a next day visit. Category I requires a visit within 3 days; category II within 5 days and category III within 2 weeks. Thus "sick call" is an EMT gatekeeper function to see the physician in clinic.

There has been no change in the process of triaging inmate complaints for physician clinic with the exception that nurse assistants have been replaced by EMTs. Since inmates do not have access to see a physician except through an EMT, it is vital that the EMT have the ability to discern amongst medical complaints and conditions which require physician follow up. EMTs are trained as "emergency evaluators". Customarily, they work on ambulances and are trained in the evaluation of acutely ill patients. They are not trained to discern whether someone's complaint is a result of an acute medical illness, a chronic disease or a minor illness. They are trained to recognize emergency situations in which emergency transportation to a hospital is required. In fact, the EMT manual at Angola pertains exclusively to treatment of emergency type situations. At Angola they are being used to make decisions which they are not trained or experienced in making. For example, I witnessed an inmate who complained of shortness of breath and chest pain; had a pulse taken by the EMT of 84; and was scheduled for an elective physician visit. I talked to the inmate who had a long history of hypertension and recent history of shortness of breath. I examined him and discovered leg swelling and a pulse of 116. This presentation indicated that the patient might have been in congestive heart failure. When I told the EMT about the inmate's high pulse, the medic indicated that the inmate was probably "manipulating his own pulse". This inmate should have been sent to the physician's clinic that night or the next day. On the other hand, another inmate with a benign rash was scheduled for an emergency physician visit. This earnest EMT did not have the necessary skills or training to apply appropriate judgement in triaging these patients.

Medics also stated to me that they were sensitive about excessively sending patients to the emergency room for fear of getting the inmate "into trouble" ; specifically having them cited for aggravated malingering. A medic may send an inmate to the emergency room yet the inmate can be punished for seeking care. This is an inappropriate practice.

Scheduling patients for physician's clinic is cumbersome, chaotic and does not promote timely care. After triaging patients in sick call, EMTs go to medical records and pull the charts of each patient seen. They attach their triaging sheet to the medical record and check a box which either denies a physician visit; schedules a physician visit based on category; or refers the triage sheet with the medical record to the physician for review. EMTs directly schedule patients for physician sick call by delivering the

chart with the triage sheet to the lone scheduling clerk. If the EMT elects to have the physician review the triage encounter, the chart is pulled and piled on a cart. These carts with up to 150 charts for physician review are reviewed by physicians the next day. Physicians, if indicated, will schedule inmates for physician clinic. They indicate an acuity level of clinic from category I to III and the charts are returned to the scheduling clerk who makes the appointment within 24 hours. The scheduling clerk uses a homemade computer software program for scheduling which has limited functionality. She reviews each chart which is presented to her ( as many as 300 per day ) and based on the category listed, she assigns an appointment date for the patient. Appointments to dental and a variety of other on site specialty clinics are entered and maintained by other staff. The day before the scheduled clinic, the clerk prints a list of all patients scheduled for all clinics and presents this list to security and medical records so that charts can be pulled and inmates are brought to the clinic. On any given day 150 patients may be scheduled for physician sick call. Physicians are regularly unable to see all of these patients. From one to three physicians are assigned to examine these patients, but it is not possible to provide appropriate medical care at this patient physician ratio. Physicians leave at a designated time so those patients not seen on any given day have their charts returned to the scheduling clerk for reschedule. The scheduling and order of appointments on a daily basis do not take into consideration the acuity category of a patient. The rescheduling process leads to missed appointments, delays in seeing patients and losing patients to follow up. Physicians I talked to were dissatisfied and confused by the scheduling system. Physicians complained that clinical care was compromised because patients missed appointments. They describe patients splinted for fractures who were not seen again for months when the bone fractured had healed in a deformed position.

Patients are seen on a first come first serve basis. In this system, patients with simple problems have the same probability of being seen first as someone with a serious problem. Patients with serious medical conditions who are repeatedly brought late to the clinic may not be seen for extended periods of time.

Because physician clinic is conducted only in the "New General Hospital", the examination rooms must serve all 5000 inmates for the purpose of routine physician clinic. As a result, there is insufficient waiting room for patients being brought for examination. As an adjustment to this problem, officers bring patients to the clinic in batches; however clinic space and the number of physicians limit the number of patients who can be seen. Physicians stated that they frequently do not see all of the patients who present to the clinic. For the purpose of physician sick call, it would be more appropriate to treat each camp as a separate facility. Each facility with a population over 300 individuals should have physician sick call 5 times a week. The current physician clinic arrangement serves approximately 5000 individuals. A more efficient system would provide primary care in camp sick call rooms and specialty care at the central facility.

In addition, there is no provision for inmates in segregation to access sick call. The current system is for the inmate to request medical assistance from an officer. This is inappropriate. Health care providers should perform segregation rounds daily and

clinically check these inmates.

In summary, access to medical care at Angola is poor, and is encumbered by inefficiencies and rework. EMTs work out of the scope of their training. The scheduling system is poorly designed and understaffed and leads to poor clinical outcomes and untimely appointments. Insufficient physicians are present to see the numbers of patients presenting to medical clinics. Insufficient clinic and waiting space limit the number of patients who can be seen in the physician's clinic.

## INFIRMARY CARE

Smoking has been prohibited on the infirmary unit and vitals are now taken; conditions are, however, otherwise unchanged from my last visit. One of the chronic care units has been closed. This will place more chronically ill patients into general population where follow up is poor. There are no policies or procedures developed specifically for guiding health care practitioners in managing care on the infirmary unit. Dr. Gutierrez indicated to me that he uses the state manual as his guideline for infirmary care, but there is no specific policy in that manual which addresses infirmary care at Angola. Correctional staff continue to place seriously ill patients in locked rooms which may adversely affect their medical conditions. I also discovered that locked rooms are used for the purpose of respiratory isolation. These rooms are actually positive pressure to the general ward. They have been used for isolating patients with active contagious tuberculosis. This is inappropriate and will lead to dissemination of tuberculosis. Patients who should be hospitalized continue to be admitted to the infirmary unit. For example, one inmate who died was placed on the infirmary unit to rule out myocardial infarction (heart attack). The infirmary at Angola is not staffed as a coronary care unit and there is no cardiac monitoring system. Placing patients with life threatening conditions on this unit is dangerous. Lastly, a memo from Warden Whitly to Richard Stadler dated May 6, 1993 indicated that the "Task Force" recommended closure of the infirmary unit. Despite the multitude of problems with the infirmary unit, it would be extremely dangerous not to have an infirmary unit at the prison.

## EMERGENCY CARE

Emergency care of the inmates occurs at Earl K Long Hospital or at Charity Hospital. Because of the distance to Charity Hospital (60 miles), this hospital should not be used in acute life threatening situations. The on site emergency response at Angola is excellent and is the one bright spot in their medical care delivery system. Emergency Medical Technicians and Paramedics operate out of a separate garage utilizing state of the art emergency response equipment. While I do not advocate triaging routine health conditions by EMTs, there is certainly a need for the type of emergency response they provide. They deserve credit in maintaining this unit as they do.

## TREATMENT OF THE PHYSICALLY IMPAIRED

Housing units, including the infirmary, still do not accommodate paraplegics. I witnessed multiple handicapped patients on the infirmary unit who were using wheelchairs. Nevertheless, the Medical Director told me that there were not enough patients to justify the cost of retrofitting the unit. The American Disabilities Act requires that accommodations be made for the handicapped. I was anecdotally told that there was a death of a handicapped person who was placed in a tub to bathe because there was no handicap accessible shower. The inmate was found drowned in the bathtub. Handicapped accessible living units must be made available.

## CHRONIC DISEASE CARE

With the exception of the addition of a diabetic clinic there has been no improvement in treating chronic disease since my last report. I was told that there are no routine annual physicals for inmates, including those over 50 years of age, because it is assumed that everyone uses the medical services at least once a year. This is unacceptable. The purpose of annual physicals is a screening examination. Screening examinations should be consistent with the U. S. Public Health Service Guidelines. In addition all inmates should have a yearly PPD skin test.

## SUBSPECIALTY AND HOSPITAL CARE

Waits for selected surgeries have been reduced but long waits for subspecialty and necessary elective surgery are still commonplace. Consultation reports of patients who go off site for care never return with the patients and never get on the chart. Physicians almost never know what diagnoses the off site consultant makes; neither do they know what occurred to their patients during hospitalization. One clinician told me of a patient who went off site for a biopsy and was scheduled for an off site surgery without physicians at Angola knowing the diagnosis. This remains unacceptable.

Clinics for ENT, Neurology, Orthopedics Minor Surgery, Diabetes, HIV and Surgery are held on site. I was told that the Orthopedic clinic will end the week after our visit because of insufficient funds. This is an unacceptable level of subspecialty care, particularly because of the long waits for off site visits. A needs assessment of which subspecialties are in most need based on the number of scheduled appointments should be done. Based on this information subspecialty clinics should be added at Angola or timely off site visits must be arranged. One alternative to these suggestions is to engage in televideo consultations for selected subspecialists. This technology is available. I would suggest utilizing subspecialists at the Louisiana State University Medical School.

Some on site surgery is performed at Angola. The room used for these procedures does not conform to routine infection control guidelines as would be customary for a comparable licensed same day surgery unit in the community. While it is an excellent idea to perform simple same day surgery type cases at Angola, these must be done in accordance with all acceptable infection control and JCAHO guidelines.

## CONTAGIOUS AND INFECTIOUS DISEASES

An Infection Control Program was initiated in January of 1993 with the hiring of Sharon Hager, a registered nurse who has a masters in public health. Besides a part time clerk, Mrs. Hager works alone. Her responsibilities have not been delineated in a job description. She has excellent credentials and enthusiasm for her work, but is overwhelmed with clerical tasks and routine PPD testing. She would function more appropriately if she had clerical help as well as several medics to assist her in performing PPDs.

During 1992 at least 2 cases of active contagious pulmonary tuberculosis were discovered. A number of inmates and employees converted their TB skin tests as a result of these cases. Shortly after the discovery of these cases, the National Guard was called in to provide help in skin testing staff and inmates because of a lack of staffing. Recently Mrs. Hager has been required to perform TB skin tests on staff and employees. This responsibility takes most of her time. However, this job is best done by an LPN, an EMT or any health technician who is properly trained.

There should be a single person named as the tuberculosis control authority at the prison. Even though the Medical Director is the named health authority, I was astonished at his lack of knowledge regarding the recent cases of tuberculosis. No one at the prison understood that the current TB isolation procedures were inadequate and would contribute to the spread of tuberculosis at the institution. This places both inmates and employees at risk. The authority on tuberculosis at the prison should be knowledgeable on all aspects of the disease and should perform data collection and set policy as set forth by the Centers for Disease Control in their statement on Control of Tuberculosis in Correctional Facilities. Yearly ongoing tuberculosis screening must take place.

Staff I interviewed indicated that there was no available data on the rates for any contagious or infectious diseases. In the requests for documents, however, rates for the 1992 tuberculosis testing indicate that rates were widely different between the camps. This might indicate that transmission is ongoing in the prison and should be investigated with appropriate PPD follow up testing. Tuberculosis and other contagious disease rates should be tracked. Because Mrs. Hager has been directed to perform TB skin testing, she is unable to do those things normally required of an infection control nurse. These include: tasks mandated by law under OSHA (Hepatitis vaccination of at risk staff, body fluid precaution training, and maintenance of OSHA records); followup and reporting of syphilis cases detected at intake screening; data collection and reporting of contagious diseases; running an infection control committee; and assisting in patient education in the area of contagious diseases such as tuberculosis and HIV infection. Infection control within the prison takes place haphazardly. Data collection on contagious diseases are not kept. I found it remarkable that no one could tell me the rates of any of the infection or contagious diseases in the inmate population. This population is at high risk for tuberculosis, syphilis, and HIV. These diseases are reportable and should be tracked within the prison. The Angola infection control manual consists of a manual developed for the state department of health. There is

nothing specifically pertinent to infection control issues at the prison. Topics, such as nosocomial infection, have less bearing on the institution than respiratory transmission of tuberculosis which is not mentioned in the manual.

## DENTAL

I did not have an opportunity to examine the dental clinic during this tour, but was told that much of the dental equipment was repaired and that staff were added.

## MEDICAL STAFF

Dr. Gutierrez, a Board Certified surgeon, is the medical director. He is a pediatric surgeon who has no experience in general internal medicine or correctional health care. He spends over 90% of his time involved in administrative matters which are designated to him by correctional officials. Most of this administrative work is involved in answering complaints of inmates and lawyers. He also is involved in addressing duty status of inmates. He spends about one day a week in court. These tasks do not allow Dr. Gutierrez to perform tasks customarily assigned to a medical director. He was unaware of the number of cases of tuberculosis which had occurred at the prison. He indicated to me that the state health department wrote a report on the Tuberculosis cases at the prison, but he had never read it. It is unacceptable for the health authority not to have been familiar with such a report. He was not sure exactly why the national guard was brought to Angola due to a "medical emergency". He did not know whether or not there were skin test conversions as a result of the tuberculosis cases. Deaths are not reviewed; there is no chart review to ensure quality of the medical staff; Infection Control, Disaster, and Drug and Formulary committees do not exist. All of this must be done. The medical director position should include a job description which includes all those tasks required of a medical director. Administrative assistance should be available to allow him time to perform these necessary tasks.

Five other physicians work at Angola. Two are surgeons, one is an anesthesiologist one is an internists and one is a general practitioner. Three of six physicians are either on probation or have restricted licenses. Their are insufficient generalists at Angola to provide appropriate care. The number of physicians is insufficient to provide appropriate care. In an attempt to address the lack of physicians a number of "assistant physicians" were hired. These individuals are treated by Angola staff as physician assistants, but are unlicensed physicians. The perception of one physician that I spoke with was that these assistant physicians were diagnosing and treating patients. One assistant physician I interviewed called herself a physician assistant. The work they described to me was equivalent to that of a physician assistant. They work independently in examining patients and in diagnosing illness which has been proscribed as illegal . One of the assistant physicians told me that the only difference between what she does now and what she did when she was a practicing physician in Nigeria was that someone has to sign her charts. This practice is illegal. The Louisiana Board of Medical Examiners warned the medical director that independent practice by

these individuals is illegal. In my opinion, these practitioners are working independently and illegally.

There is no orientation of physicians when they begin work at Angola except to provide them a copy of the state health manual. One of the physicians just prior to my visit had been assigned to develop an EMT training manual, yet he had never seen an EMT sick call.

None of the physicians has admitting privileges at any of the hospitals where inmates are sent. The communication between the medical staff at Angola and the referral hospitals is extremely poor. It would make sense for the medical staff, or at least the Medical Director to have privileges at the referral hospitals.

## STAFFING

Currently 6 physicians and 3 "assistant physicians" work at Angola. One of the physicians is the medical director. In my opinion, these are an insufficient number to provide an appropriate level of health care. Currently, patients are not being seen; there are insufficient physician sick calls to see the required numbers of patients; committee work is not being done; there is no quality assurance; no annual physicals are done; aside from diabetes clinic there are no chronic disease clinics; review of consultant work is not being done; and in my review of the charts I noticed a lack of care being provided to patients on the infirmary units. It is an accepted daily occurrence that patients scheduled for physician sick call are not seen. In 1992 there was a "medical emergency". This situation resulted from an agreement between a federal judge and Mr. Stadler to bring the national guard into the Angola State Prison to assist in reducing the load on the physician's clinics and in assisting in providing TB skin testing of inmates after a two case outbreak of tuberculosis. This crisis situation, in my opinion, is a direct result of the existing inadequate staffing at the prison. I have never heard of a situation in a prison where the national guard was brought in to provide routine health care. Without exception, every staff I spoke with at Angola State Prison indicated that the number of health care personnel were inadequate to serve the inmates.

With this as a backdrop, a task force headed by Dr. Michael Hegmann was formed to make an assessment with recommendations to Secretary Stadler regarding health care at Angola. The report was issued 4/12/93. This task force surprisingly recommended decreasing the number of physicians to five and increasing physician assistants to six individuals. After reading the Task Force Report I could not understand how they came to their conclusions regarding the numbers of physician hours per week required for particular tasks. For example, the emergency room is listed as requiring only 63 hours of coverage despite being open 24 hours a day 7 days a week. The infirmary is listed as needing only 12.5 hour of coverage a week. Two wards housing approximately 60 beds require infirmary coverage. I witnessed individuals with end stage emphysema, terminal cancer, terminal AIDS, pulmonary tuberculosis, end stage cardiomyopathy, stroke victims, paraplegics, and a variety of other conditions being housed on these units. These units are the equivalent of a skilled nursing unit.

Occasionally, acute care hospital type patients are housed there. It is inconceivable to me how these patients can be appropriately followed with 12.5 hours of physician time per week. The chronic care clinics are listed as requiring only 5.2 hours a week. This is also an unbelievable number. I was told that 121 patients are diabetic. The follow up of these patients alone would require more than 5.2 hours per week. In addition, there were 29 deaths at Angola in 1993. 20 of these deaths were from chronic diseases, including cancer, hypertension, kidney failure, AIDS, and coronary artery disease. This indicates an aging population with a significant chronic disease burden. My review of the medical records demonstrated lack of follow up and lack of timely treatment of chronic diseases. It is therefore not credible to state that only 5.2 hours of chronic disease clinic is required. More than this is indicated. Periodic exams were listed as requiring only 5.5 hours per week. With an aging prison population and given that individuals over 50 should receive an annual periodic exam and those over 40 should receive a biennial exam, it is not understandable how this can be accomplished in 5.5 hours per week. Lastly, only 2 hours per week were allotted to minor surgery despite the statement by Ms. Fletcher that more than that is currently being done. Is the intention to decrease the current services?

Twenty four hour emergency room coverage would require 4.8 full time equivalent (FTE) physicians. The infirmary should have 1.6 FTE physician to allow for full time coverage 9-5 p.m. Mondays to Fridays. A combination physician sick call and chronic disease clinic should take place in each camp five times a week. The remainder of the day for each of these physicians should be involved in training medics, performing committee work, reviewing charts, renewing medication and any other required administrative work. One physician assistant should be assigned to perform annual or biennial health examinations. One physician assistant should be assigned to each camp for the purpose of working with nurses or medics in a screening sick call and assisting the physician in physician sick call. These totals yield 11.4 FTE physicians and 6 FTE physician assistants. Keep in mind that this includes complete coverage of the emergency room. Should the contract service for the emergency room continue then the number of FTEs could be proportionately reduced.

While I was not able to examine all clinic and support areas, I nevertheless discovered that ancillary staffing is inadequate in several areas. There are few clerical staff in clinical areas. As a result nurses perform clerical duties, scheduling is dysfunctional, clinical staff (EMTs) pull their own medical records, and the infection control nurse does her own clerical work. EMTs, in addition to their duties at Angola, provide service for the West Feliciana Parish. Problems with scheduling seemed especially problematic. I was told by physicians that patients splinted for fractures and requested to return in a few days did not return for months. These examples highlight the inadequate ancillary staffing. These clerical problems are magnified because of a lack of automation of common clerical functions and an appropriately supported ancillary infrastructure.

There are still excessive waits for radiologic services. Officers continue to illegally repackage and dispense medication. The fact that officers are required to perform medical tasks is a reflection of inadequate health care staffing. There are also

plans to drastically reduce laboratory services which could negatively affect health care for inmates if an appropriate contract with an outside vendor is not in place.

## PLASMAPHERESIS

Dr. Gutierrez indicated that he disagreed with the plasmapheresis program but that it was nevertheless ongoing. I spoke with correctional staff who indicated that the program was discontinued. If this program has been discontinued, I would commend the correctional administration for a wise decision.

## MEDICAL RECORDS

Medical records are still not confidential. Officers take short cuts through the medical records departments during off hours. According to Mrs. Fletcher, physicians do not have access to medical information in a timely fashion. There is a plan to remedy this situation by installation of a computer network which will utilize in house software to automate the medical record. Given the problems with the in house scheduling system, I would encourage professional consultant help in automating this complicated task.

There are significant problems with the organization of the medical records. Many charts I examined were out of order. Prescriptions are not placed on the charts. There is no problem list in use and it is impossible to determine at a glance what are the active ongoing problems a patient has. Consultation reports and off site specialty visit and reports of hospitalization are not on any of the charts. Despite these glaring deficiencies in charting essential medical information, every medication administration record is placed in the record. As a result, patients who are incarcerated for years and are on chronic medication have enormous medical records filled with information which has limited clinical significance. While it is worthwhile to record medication passage, charting needs to be streamlined so that the record is practically useful.

## DEATHS

During 1993 there were 29 deaths at Angola. This appears to me to be a very high number. Cancer was the number one cause of death. Despite this there is no policy on screening for common cancers. AIDS was the 2nd leading cause of death. There were several suspicious sounding deaths. One man died of hypertension; this is an uncommon occurrence because hypertension is usually treatable in its acute form. The death from neuroleptic malignant syndrome is also unusual and may indicate an inadequately vigilant psychiatric team. The death from drowning, I heard anecdotally was the result of a handicapped person being placed in a bathtub because the showers were not handicapped accessible. Review of the deaths will provide a gauge of the quality of care at the institution.

# MEDICAL CHART REVIEWS

## SUMMARY

I asked to review charts of two patients with tuberculosis and one patient on the infirmary ward. Ten other charts of patients with a variety of medical conditions were randomly chosen for my review by Angola staff. All of the 13 charts I reviewed had medical errors and most of the charts revealed serious problems in health care delivery. These problems included failure to follow up diagnostic testing; failure to properly examine patients; failure to perform indicated diagnostic testing; inappropriate treatment; lack of timely diagnostic testing or treatment; failure to treat in accordance with current standards (i.e. isolation for pulmonary tuberculosis); lack of review by an appropriately qualified health care person; ignorance of appropriate treatment for a given disease; and finally, callous treatment by health care personnel.

These problems were never addressed at Angola because there is no on going quality assurance at the prison. Additionally, the mix of physicians at the jail leads to poor care. Most of the patients at the prison require internal medicine or general medicine physicians; yet only two of the six physicians are experienced in these disciplines. Three of the physicians are surgeons and one is an anesthesiologist. These individuals are not trained to treat most of the conditions which the patients have. The following is a case by case review of charts I examined.

## REVIEWS

Patient 1 had hypertension, diabetes and leg edema (swelling). A transfer form from another parish jail indicated that an echocardiogram was scheduled to evaluate the patient's heart as a result of having discovered leg edema. This was never followed up on at Angola. The initial exam at Angola was listed as normal despite the patient having a history of long standing leg edema. An abnormal electrocardiogram indicating first degree AV block and anterior fascicular block was not noted by a physician. Isoniazid was prescribed without vitamin B6. This may lead to neurologic impairment.

Patient 2 had frequent and severe leg cramps, at times requiring intravenous therapy, yet had no diagnostic workup as the reason for the cramping. Abnormal kidney function tests and abnormal electrolytes were present in the chart, but these were not commented on by physicians nor were they repeated. This inmate was tested positive for HIV infection in 6/92 but I could find no evidence that a complete blood count; a T cell count, or a PPD skin test had been done. These tests are customarily done for patients with HIV infection.

Patient 3 had documented evidence of having sexual encounters in 1983, 1985 and 1990. These included rectal intercourse, oral sex and an unspecified "aggravated sex offense". Despite this, the inmate was not offered condoms. On 5/1/91 the inmate was

diagnosed as HIV antibody positive. There is more than reasonable suspicion that this inmate has been transmitting HIV to other inmates or may have acquired the disease while incarcerated. Condoms should be available to sexually active inmates.

On 5/91 the inmate was placed on diflucan for an "? of early yeast". It appears that he remained on the medication for 3 years without an appropriate ongoing indication. On 8/23/93 he complained of a one and a half month cough and was placed on parenteral antibiotics without the benefit of a chest radiograph. This is unacceptable practice. On 9/13/93 he complained of coughing up blood yet no x-ray was done. A chest x-ray was eventually ordered on 11/11/93, almost 3 months after it should have been. The x-ray report was not noted by the physician.

Patient 4 was admitted to the prison 11/5/93. He had a history of manic depressive disorder (a psychiatric condition). Though hypertension was not listed as a medical problem the patient was being treated with antihypertensive drugs upon arrival at the prison. His blood pressure medication was discontinued with a notation "to check BP". By 3/93 the diagnosis of hypertension appeared on the chart and one of his two blood pressure medications (hydrochlorothiazide) was restarted. This had minimal effect and on 4/19/83 his second medication (nifedipine was added) for an extremely high blood pressure. The next day the blood pressure was very high (170/130) and despite this there was no examination to determine if there was end organ damage from the hypertension. Patients with this degree of blood pressure elevation should have their heart, lungs, and fundi examined and should have blood work done to assess their kidney function. These were not done. The patient was not seen again until 5/13/93 which is an unacceptable delay. At that visit the physician wrote that the patient had "never been hypertensive". There was no examination of the patient. This is poor follow up.

The patient was not seen again until 7/93 when he complained of swollen ankles. Swollen ankles in poorly treated hypertensives may indicate congestive heart failure. The patient had a history of being on a third antihypertensive (Altace) but there was no documentation as to who started this medication. On 7/29/93 at 8 a.m. the inmate vomited twice and had slurred speech according to the chart. He was not examined by a physician. The physician did prescribe an antivomiting medication by phone. The note indicated that the patient refused a physician exam. At 11 pm the patient complained of dizziness and had a blood pressure of 171/111 which is high. This clinical picture could be indicative of a stroke. Nevertheless the patient was not examined until 2 months later on 9/20/93.

Over the next 6 months several different physicians saw the patient. On 2/27/94 the patient presented to the clinic with a complaint of shortness of breath, a respiratory rate of 36 which is very high and a blood pressure of 160/120. This patient should have been examined by a physician immediately. The note stated "please rush" and requested to have the patient scheduled in the physician's clinic for shortness of breath. He was not seen for three days. When he was seen his symptoms had resolved so the physician did not examine him. This is unacceptable follow up.

000127    00134

Patient 5 had a positive tuberculosis skin test on 12/9/81 with a normal chest x-ray. On 7/16/92 he complained of right sided chest pain. The medic note stated, "no chart no plug". The patient did not see a physician. On 7/31/92 he had an appointment to see a physician for chest pain when he coughed. The visit was rescheduled. On 8/14/92 he was seen in clinic and complained that he had a cough along with right sided chest pain for 3 months. A chest x-ray was done which indicated a cavitary infiltrate highly suspicious for tuberculosis. This is an extraordinary long time complete his diagnostic work up. He was sent to a hospital. There was no information on the chart about his hospital care; nor was there information about what medication he was on. This is unacceptable record keeping. His appointments on 9/14/92 and 10/2/92 were both rescheduled. This is consistent with the lack of available physician sick call time.

Patient 6 gave a history at intake (2/5/92) that he had a previously positive TB skin test. The chest x-ray was normal on 2/9/92. Beginning 2/3/92 EMTs document giving the inmate cough syrup for a "chest cold". No physician referral occurred. On 2/4/92 an EMT again documented a "chest cold" and examined the chest and wrote "no chest congestion noted". EMTs are not trained or licensed to perform this type of diagnostic maneuver. The medic then wrote "placed on CTM for subjective purposes only". CTM is an over-the-counter cold remedy. The medic implies that there is nothing wrong with the inmate. On 4/21/92 an EMT evaluated the inmate for chest pain and cough. Again the EMT examined the inmate and stated that the lungs were clear. This is an inappropriate level of intervention by an EMT. This is work which should be done by a physician. The medic did not refer the inmate to see a physician. On 4/23/92, over 2 months after the initial presenting complaint, the inmate was seen in the emergency room and diagnosed with lung infiltrates. The physician ordered TB tests of the sputum and placed the inmate on ward I. This is inappropriate because ward I has no proper isolation unit. The culture was subsequently positive for tuberculosis. Placing this inmate with TB on ward I unnecessarily exposed other inmates and staff to tuberculosis. This case exemplifies the problems of substituting appropriate physician sick call with EMT sick call.

Patient 7 was evaluated on Ward I. His medical record was unavailable except for his Ward I chart. Patients on Ward I, an infirmary unit, do not always have their complete medical record on the unit. This is not acceptable practice. The inmate was recently diagnosed as having Pneumocystis pneumonia, an infection associated with AIDS. This patient was in respiratory isolation. There was no indication for having him in respiratory isolation. There was a mistaken belief, on the part of the staff, that his pneumonia was contagious. It was not. This was medical ignorance. The patient was being kept in a locked room and had no way to communicate with the staff except to bang on the door or scream; however he was too weak to get up from bed and was exceedingly frail. I asked the nurse how often she went into the room to check on the patient and she replied, "as little as possible". On 7/29/94, the day of my visit, the patient had been checked at 7:45 a.m. but was not checked as of 6 p.m. when I was on

14

the unit. This combination of medical ignorance and staff indifference is unacceptable care.

Patient 8 had no intake screening exam on record. The earliest record is from 5/7/87 when the patient was started on a diuretic (water pill) for hypertension. On 6/5/87 the patient was diagnosed with gout without the benefit of the blood test (uric acid) or a joint aspiration which are customarily done for diagnostic purposes in gout. Colchicine which is often used to treat gout was not used because it was unavailable. The water pill was continued despite being noted for its tendency to promote the development of gout. These are all problems.
On 3/26/88 the patient was seen in the emergency room for back pain and had significant protein in his urine. Kidney function tests should have been done but were not. Additional diagnostic work up should have been done but was not. The patient was diagnosed as having constipation which was not consistent with his constellation of signs and symptoms. On 3/29/88 an appropriate diagnostic work up was initiated and a second follow up exam was conducted. Different physicians then began seeing the patient and the work up abruptly stops. An intravenous pyelogram ( a dye study of the kidney) revealed possible renal infection and or kidney stone formation. This was never followed up on. Gout predisposes patients to kidney stones and may lead to renal failure. This possibility was never investigated. I also did not find a urine analysis on the chart despite the fact that this patient should have had one.

Patient 9 did not have a complete record available. It appears that he was admitted in 1983 and had a history of hypertension, diabetes, and glaucoma. Despite being a diabetic there is no evidence that the patient had ever had an ophthalmologic examination. All diabetics should have this examination yearly. Diabetic retinopathy is a leading cause of preventable blindness. High cholesterols (325 and 241) were noted in 1983 but were never followed up on. Despite being a diabetic with high cholesterol the patient was never on an appropriate diet. The urine was positive for blood and protein but this was never followed up on. This is a mistake, especially in a diabetic for whom diabetic nephropathy is a leading cause of renal failure.

Patient 10 appears to have been in another prison and was transferred to Angola 4/7/92. He was a diabetic with hypertension. On 1/14/92 at the referring prison he had an abnormal electrocardiogram and chest x-ray both of which supported the diagnosis of an enlarged heart. This was probably a result of his hypertension and was indicative of end organ damage from longstanding hypertension. On 2/3/93 he complained of blurry vision but did not receive a retinal exam by an ophthalmologist. All diabetics should have this type of examination. These are not done at Angola. On 2/18/93 the patient was seen for an infected wound and the physician note states that the patient had not been seen in diabetic clinic since 12/92. This is not timely care.

Patient 11 had a fall 11/92 and had low back pain. After he began having left arm and leg numbness he was referred for an MRI and CT scan on 1/25/93. The

00136

Angola ER physician note on 4/15/93 states, "unusual case needs CT scan ASAP". The CT scan did not take place until 5/18/93. An EMG scheduled on 3/11/93 was not done until 6/3/93. On 8/3/93 the patient was cited for "Rule #16". I am not sure what infraction this was. The MRI was done on 9/7/93, almost 9 months after referral. What is remarkable about this patient's record is that despite multiple off site tests and clinic appointments there is nothing in the record regarding the results of the tests or the diagnoses made during off site consultation until a note dated 1/6/94 states that the patient had a stroke confirmed by MRI which resulted in left sided weakness. High cholesterol and calcium values were never followed up on nor were they treated. In summary, this patient's care was impossible to follow from the record. There were unacceptable delays in working this patient up. There was no evidence that he was being treated for his high cholesterol or his stroke.

Patient 12 had diabetic retinopathy diagnosed 1/26/94. This test should be performed yearly. There is no indication when the inmate was admitted, so I could not determine if he had a timely evaluation.

Patient 13 had optic disc disease was identified at a Shreveport jail in April of 1991. Physicians there thought the left retina might have had a melanoma. Though an optometrist saw him 8/10/93 he never had an ophthalmologist examination to rule out melanoma. In February of 1992 he was discovered to have atrial fibrillation and pneumonia. He should have been sent to a hospital immediately. Instead, he was treated with intramuscular antibiotics and started on a medication to control the atrial fibrillation without the benefit of a cardiac monitor. He was given a follow up appointment for a week. This life threatening situation was inappropriately treated. Five days later he was sent to Earl K Long Hospital where he remained until 3/23/94 a time period of almost one month. There was no report from the hospital; it was not possible to determine the diagnoses. He was placed on warfarin, a blood thinner, but wasn't seen for a month. This is unacceptable care for a patient with a serious cardiac arrhythmia and on medication (warfarin) which requires very careful monitoring. When patients are placed on warfarin the prothrombin time must be monitored to ensure that the blood is appropriately thinned. Inappropriate monitoring can lead to life threatening problems, including fatal internal bleeding. This blood test was never done at the jail. In addition to these problems this patient had a biopsy which indicated moderate to severe dysplastic actinic keratosis (a pre-cancerous lesion) which was never followed up on. In summary, this patient had significant medical problems which were not appropriately followed up on.

Patient 1 = Cleonis Smith
Patient 2 = Andre Dawson
Patient 3 = Calvin Clark
Patient 4 = Ernest Dopplemore
Patient 5 = Joseph Clay
Patient 6 = LeRoy Jackson
Patient 7 = Glensell Gordon
Patient 8 = Harold Robinson
Patient 9 = Cleve Lowery
Patient 10 = Christopher Shabazaka   A.K.A. Christopher Kenner
Patient 11 = Alvin Lewis
Patient 12 = John McNamer
Patient 13 = John Collins

## DECLARATION OF MICHAEL PUISIS, M.D.

I, Michael Puisis, M.D., do declare that the attached document is a true and accurate copy of the report I prepared and submitted to the Department of Justice submitted July 29, 1994, regarding inadequate medical care at Louisiana State Penitentiary following my April 27-30, 1994 tour of the facility.

_____
Michael Puisis, M.D.

I declare under penalty of perjury the foregoing is true and correct.

Executed this __29__ day of July, 1994.