**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, AND RUFUS WHITE, on behalf of themselves and all others similarly situated** | **CIVIL ACTION NO. 15-CV-318** <br><br> **JUDGE: BRIAN A. JACKSON** <br><br> **MAGISTRATE JUDGE:** <br> **RICHARD L. BOURGEOIS, JR.** |
| **VERSUS** | |
| **BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity, JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections in his official capacity and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS** | |

**MEMORANDUM IN OPPOSITION TO RULE 37 MOTION TO COMPEL PRODUCTION, AMEND DEADLINES, AND AWARD SANCTIONS**

NOW INTO COURT, through undersigned counsel, come Defendants, DARREL VANNOY[1], in his official capacity as Warden of the Louisiana State Penitentiary ("LSP"), STEPHANIE LAMARTINIERE, in her official capacity as Assistant Warden for Health Services, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, and the LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS ("DPSC" or "Department"), who respectfully submit this Memorandum in Opposition to the Rule 37 Motion to Compel Production, Amend

---

[1] As the public officer who succeeded Burl Cain as the Warden of Louisiana State Penitentiary, Darrel Vannoy is automatically substituted as a party to this action. FRCP 25(d). Also, he was specifically named as a party in Plaintiff's recently filed Amended Complaint (Doc. No. 44).

1

Deadlines, and Award Sanctions filed by the Plaintiffs herein. (Doc. No. 42).

<u>MAY IT PLEASE THE COURT:</u>

**A.   FACTS AND PROCEDURAL BACKGROUND**

Plaintiffs served their First Set of Requests for Production upon Defendants on September 1, 2015, containing 63 requests for production. In addition to being numerous, most of these requests were overbroad, unduly burdensome, and were not reasonably calculated to lead to the discovery of admissible evidence.

This discovery was forwarded to named Defendants and other DPSC staff within minutes the same day it was received. Defense counsel thereafter also met with their clients and staff at Louisiana State Penitentiary to discuss the discovery and responsive documents. Not surprisingly, given the large number of requests it was necessary for defense counsel to obtain an extension of 30 days in which to respond.

Plaintiffs granted the requested extension. While Defendants did advise Plaintiffs that they anticipated making a substantial document production following the extension, Defendants never agreed that they would not raise appropriate objections. As a matter of fact, on November 2, 2015[2], despite noting several objections, Defendants nonetheless produced a substantial number of documents – 14 banker's boxes full of paper documents and also including several compact discs containing electronic files. Defendants have thereafter supplemented this production as additional documents have been discovered. Specifically, Defendants supplemented their responses on nine separate occasions with the final production occurring on

---

[2] November 1, 2015 was a Sunday.

February 26, 2016.

Following the first supplemental production, Plaintiffs requested a meet and confer, which was held on November 12, 2015. During this conference Plaintiffs inquired about electronically stored information ("ESI"). Plaintiffs admitted during this first meet and confer that they had not bothered to set forth in their discovery specific custodians nor a list of search terms for Defendants to run. Defendants advised Plaintiffs that the IT Department for DPSC was in the process of collecting ESI despite not having been provided a list of custodians and search terms by Plaintiffs. The parties agreed that Defendants would provide Plaintiffs a list of the search terms they proposed for this purpose by Thursday, November 19, 2015, to which Plaintiffs would thereafter add additional terms if necessary. Defendants provided a list of custodians and search terms as agreed.

Plaintiffs notified Defendants on November 20, 2015, that they were reviewing the list and other items sent to Plaintiffs on November 19, 2015, and expected to provide additional search terms to Defendants the next week. Plaintiffs did not send Defendants their list of search terms until 2 weeks later on Friday, December 4, 2015. Moreover, whereas Defendants had included 27 search terms, Plaintiffs' "additional search terms" had the effect of expanding the originally proposed list to a total of ***204*** search terms. It was explained to Plaintiffs on December 4, 2015, that they would need to confer with DPSC's IT Department concerning the proposed list before they could get back with them to discuss their counterproposal.

Defense counsel submitted the counterproposal to the IT Department that same day and were advised on December 8, 2015, that the IT Department was having difficulties locating all of

the inboxes. They were later advised on December 11, 2015, that the IT Department would not be able to run the searches as requested by Plaintiffs due to the limitations of Lotus Notes. Defense counsel requested a written explanation from the IT Department but to no avail. Defense counsel then requested a meeting with DOC staff, including the IT Department, to discuss the specific limitations concerning the system and precisely how this impacted the requested searches. This was soon before the Christmas holiday, and the meeting could not be scheduled until January 8, 2016.

At the January 8, 2016, meeting defense counsel was advised that the IT Department could not run searches utilizing proximity limiters (which accounted for approximately a quarter of the 204 search queries requested in Plaintiffs' counterproposal), only one IT employee could be devoted to running the searches, and the searches would take 3 – 5 minutes per term per each mailbox. On January 12, 2016, Plaintiffs' counsel requested a second meet and confer to discuss discovery issues, including production of electronic discovery. Defense counsel was out of the office most of that week and was unable to meet until the following week, on January 20, 2016.

After this second meet and confer, Defendants responded with a counterproposal to Plaintiffs' counterproposal, suggesting modifications to some search queries, objecting to several terms that Defendants felt were unduly burdensome due to being too general, and requesting that Plaintiffs reduce the total number of terms to no more than 75. According to the Department's IT employee who was to perform the searches, even this counterproposal would have required 6 - 8 weeks simply to access the documents (because of both staffing and technological constraints), followed by defense counsel's review for privilege. At Defendants' suggestion, Plaintiffs

4

dropped several custodians from their list of custodians requested to limit the burden on Defendants and decrease the time required. At Plaintiffs' suggestion, Defendants researched the possibility of utilizing a third-party vendor to both accelerate the review process and identify unnecessarily burdensome search terms.

Plaintiffs are incorrect in their assertion that Defendants did not seek internal approval of a vendor until Plaintiffs had proposed a status conference with the Court (held on March 2, 2016). In fact, defense counsel had met with staff at DPSC on February 16, 2016, to discuss the use of Nextpoint, Inc., a vendor that based on defense counsel's research appeared to be most capable of performing the tasks required at a reasonable cost. While the client did authorize the use of Nextpoint, Inc., Defendants still were required to await approval by the Department's budget office and the Attorney General. At the time that the parties had submitted the joint motion to revise scheduling order, final approval still had not been given to use Nextpoint, Inc.

Although Nextpoint, Inc. would have been able to provide a simple, expedient solution to the problems faced by Defendants, it became apparent very shortly before the deadline to submit hit counts to Plaintiffs that the contract with Nextpoint, Inc. would not be approved in time. Defendants attempted, in the week in advance of the March 21, 2016 deadline, to utilize their existing document management software to perform a hit count search on representative custodians' mailboxes. Late in the afternoon on Friday, March 18, 2016, after spending the week importing the emails into the software, Defendants began to run the searches and discovered that the software had not properly imported the files into the database and therefore would not be capable of providing the required hit counts. In a desperate attempt to comply with

this Court's order, extensive research was performed on standalone programs that could assist in the performance of hit counts. This research led to the discovery of dtSearch, a standalone program that allowed Defendants to build an index utilizing the emails produced by DPSC's IT Department and run hit counts. The hit counts created using this process were provided to Plaintiffs' counsel and utilized for purposes of negotiating the final search terms.

Running Plaintiffs' original terms separately resulted in 642,888 hits, which far exceeded the total number of e-mails (492,711) that were included in all of the mailboxes collectively. Plaintiffs agreed to a few limiting terms and dropped approximately 20 of the terms they had set forth in their December 4, 2015 counterproposal. The parties eventually reached a consensus as to the content and syntax of a single search query combining all of the search terms that Defendants would run on the agreed-upon custodians. The parties had anticipated that this search would yield approximately 115,000 e-mails.

After much discussion, the parties agreed to the following production schedule:

- Defendants would attempt to produce the first 50,000 files by May 2, 2016;
- Defendants would attempt to produce the next 50,000 files by June 1, 2016;
- Defendants would produce the remaining files by June 15, 2016; and,
- Defendants would produce a privilege log within 7 days following the production of all documents.

Defendants, who had expressed doubt at the outset that the above deadlines were realistic, had reserved the right to seek an extension of the production deadline should it appear Defendants would be unable to produce the documents as outlined.

Upon uploading the documents to Nextpoint, Inc., it was discovered that the total number of files actually far exceeded 115,000 because, while this original number accounted for e-mails, it had not accounted for any of the attachments to those e-mails.[3] The total number of files was determined to be in excess of 160,000. Following two rounds of de-duplication by Nextpoint, Inc., the total number was decreased to approximately 146,000 files.

Though Defendants had originally believed that only 5 – 6 people could be utilized for Defendants' document review, they were instead able to utilize 12 – 13 people for this task. Naturally, the amount of time that can be devoted to the document review has fluctuated per person since the people assigned to this task have had other litigation matters, assignments, and deadlines to attend to at the same time.

After extracting the individual email files identified as having hits using dtSearch, Defendants submitted the data to be uploaded to Nextpoint, Inc. for import. This process was completed on April 12, 2016. In accordance with Plaintiffs' counsel's request for the emails to be reviewed and produced as prioritized by custodian, Defendants attempted to divide the imported emails by custodian and distribute them to reviewers accordingly. Defendants were later informed by Nextpoint, Inc. that due to the emails being extracted as .MSG files rather than being imported as entire .PST files, the metatdata which specifies the custodian and the folder location within their mailbox for each .msg file was not present and would prevent the files from

---

[3] Plaintiffs' counsel was advised of a substantial increase in the total number of files to be reviewed as a result of the attachments now being counted separately from their parent emails but were advised that despite this increase, Defendants would endeavor to meet the deadlines previously agreed upon.

being sorted by custodian(as a metadata field).[4]

As a solution to this problem and since all other metadata was intact, Defendants, with the approval of both Nextpoint, Inc. and Plaintiffs, sorted the emails by running queries for all documents "to", "from", "carbon copied", and "blind copied" for each listed custodian. This process was complicated by the fact that these e-mails included text specific to Lotus Notes' canonical naming format which required a number of queries to be written for each custodian before running them and sorting them.

As a result, Defendants were unable to begin the review process until April 12, 2016, which was about a week and a half later than the parties had anticipated. Due to this delay, Defendants were unable to produce 50,000 files by May 2, 2016, as had been provided in the agreed-upon schedule in the April 1, 2016 Status Report. Defendants produced all of the files that had been reviewed and were ready for production at that time, *i.e.*, approximately 28,000 documents.[5] Upon conferring with Plaintiffs' counsel, Defendants thereafter supplemented the remaining files necessary in order to produce the first 50,000 files the following week.

Defendants advised Plaintiffs at that time that they believed the current staff[6] involved in the document review and the pace of the document review should be sufficient so that the delay in meeting the initial production deadline should not prevent Defendants from complying with

---

[4]PST files are Outlook files which contain an individual's entire mailbox, calendar, contacts, etc. MSG files are the individual emails housed in various folders inside of one's mailbox which are all contained inside a PST file. MSG files contain only the data in the message header (to/from/cc./bcc, subject line, and time and date), the text of the email, and any files that may be attached to the email.
[5]Due to technical difficulties experienced in the uploading the files, this production was delayed to May 3.
[6] Defendants have dedicated 11 attorneys and a law clerk to the review process. The law clerk, who subsequently passed the Louisiana bar, was recently hired on as an associate in light of the ongoing needs of the e-mail review.

8

the scheduled production deadlines set for June 1 and June 15. This was an accurate statement and was made in good faith based upon the rapid rate of review that Defendants were experiencing at that time. The productivity Defendants had experienced at that time is evidenced by the fact Defendants were able to produce over 22,000 (the amount needed to complete the initial production quota of 50,000 files) by the following week.

Nevertheless, Defendants could not predict with any degree of certainty on April 1, 2016, whether the rate of review could be maintained at a sufficient rate from week-to-week in order for Defendants to meet the demands of the agreed-upon production schedule. Hence, Defendants had reserved the right to seek an extension if necessary.

**B.    LAW AND ARGUMENT**

    **I.    Plaintiffs have not conferred in good faith prior to filing their motion to compel.**

FRCP Rule 37(a)(3)(B) provides that a "party seeking discovery may move for an order compelling an answer, designation, production or inspection." Rule 37, however, also requires that any such "motion must include a certification that the ***movant has in good faith conferred or attempted to confer*** with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." FRCP 37(a)(1). (Emphasis supplied.) What constitutes a good faith effort to confer must be determined on a case-by-case basis, to ascertain whether the movant has made a ***sincere effort*** to resolve the discovery dispute without court intervention. District courts have warned that this conferral requirement should not be regarded as an empty formality, and that perfunctory efforts are "wholly inadequate" as a sincere effort to understand and resolve the dispute. *Naviant Marketing Solutions, Inc. v. Larry Tucker, Inc.,* 339 F.3d 180,

9

186, Fed.R.Serv. 3d 553 (3d Cir. 2003); *U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.,* 23 F.R.D. 521, 529 (D.D.C. 2006).

"The good faith language encompasses, among other things, honesty in one's purpose to meaningfully discuss the discovery dispute and faithfulness to one's obligation to secure information without court action." *Compass Bank v. Shamgochian,* 287 F.R.D. 397, 399 (S.D. Tex. 2012). (Internal citations omitted.) The requirement to confer entails two-way communication "which is necessary to genuinely discuss any discovery issues and to avoid judicial recourse." *Id.* "The ***parties are not to treat the informal negotiation process as simply a formal prerequisite*** to judicial review of the discovery dispute." *Id.* (Emphasis supplied.) See, *Larkin v. U.S. Dept. of Navy,* 2002 WL 31427319 (E.D. La. 2002) (efforts made by government ruled only a "surface attempt" where, after a first Rule 37 conference, plaintiffs' supplemented their discovery responses, and the very next day at 12:50 p.m., the government faxed general letter noting unspecified problems with supplemented responses and filed motion to compel 3½ hours later.) However, in *Care Environmental Corp. v. M2 Technologies, Inc.,* 05-1600, 2006 WL 1517742 (E.D. N.Y. 2012), the court found a good faith effort by engaging in two hour substantive telephone conversation on the discovery requests and responses.

Defendants advised Plaintiffs on June 1, 2016, that the next production quota of 50,000 files could not be met and that an extension of time was therefore necessary. Even so, Defendants had provided Plaintiffs with all of the files that were ready for production that day, *i.e.*, approximately 25,500 files. Defendants expressed that they needed an extension of the production deadlines of until mid-to-late July, and reminded Plaintiffs that their right to seek an

extension had been previously reserved.[7] Be that as it may, Defendants stated that they were willing to make a weekly rolling production of files to Plaintiffs in an effort to limit as much as possible any prejudice[8] to Plaintiffs. Plaintiffs did not request a meet and confer to discuss this issue until the following week. By that time, Defendants had already produced an additional 8,000 files to them.

At the meet and confer held on June 8, 2016, Plaintiffs initially advised Defendants that they could not agree to an extension until the end of July for the production of ESI due to other deadlines as well as their need to schedule depositions.[9] Plaintiffs then suggested that any extension of the ESI deadline they might agree to would require the parties to consent to an extension of the amendment deadline until 2 weeks following the final production of ESI. Defendants readily agreed to the proposed extension of the amendment deadline on those terms and proposed an extension of the ESI deadline to mid-July, rather than late-July.

Just when it appeared that the parties had possibly reached an agreement that would resolve the dispute and obviate the need to concern the Court's intervention, Plaintiffs then

---

[7] Plaintiffs complain that Defendants have not submitted a formal motion to extend the final production deadline beyond June 15, 2016. Yet, since that deadline is not part of the Court's scheduling order, Defendants are not sure that a formal motion would be appropriate. The deadline was formerly agreed to by the parties, with the caveat that Defendants had reserved the right to seek an extension of the deadline. While it is believed that the parties can agree to extend this deadline without the Court's involvement since it does not form part of the current scheduling order, Defendants are not sure what is required in this instance given that the parties cannot reach an agreement. Defendants also do not agree with Plaintiffs that modification of the ESI production deadline necessarily impacts other deadlines that are set forth within the scheduling order. Should this Court indicate that a formal motion is necessary, then Defendants will certainly submit one.

[8] To be clear, Defendants believe that a rolling weekly production of files will have the effect of matching Plaintiffs' likely rate of review.

[9] Defendants are not sure exactly why Plaintiffs must wait until the end of ESI production to schedule depositions. Indeed, Plaintiffs had already scheduled a 30(b)(6) deposition to proceed on July 27, 2016, even before this discovery dispute arose. Also, since Defendants have been producing ESI to Plaintiffs in accordance with a prioritized list of custodians at Plaintiffs' request, it would seem that they had some idea before now of which custodians they might have at least begun to schedule for depositions before the end of the ESI production.

demanded that ESI production had to be completed by the end of June. Defendants had already expressed that, even with diligent effort, they did not believe this was possible due to trials, hearings, and other matters that were proceeding at the same time as the ongoing e-mail review. Plaintiffs ultimately terminated the conference over a disagreement that essentially amounted to a difference of 2 weeks.

In the motion to compel, however, Plaintiffs now seek to have this Court order that Defendants produce the remaining ESI by June 22, 2016, rather than by June 30, 2016, as they had proposed during the meet and confer. Defendants are at a loss to explain why Plaintiffs have now changed their minds concerning the deadline for production. Be that as it may, Defendants are continually producing files to Plaintiffs on a weekly basis. In fact, Defendants sent nearly 13,000 additional files to Plaintiffs on June 15, 2016. Defendants plan to continue to make weekly productions of the files to Plaintiffs in order to minimize any prejudice they might claim, as promised on June 1, 2016; however, Defendants still believe that the final production will extend into July.

## II. Defendants have complied with FRCP 34.

Plaintiffs cannot be arguing in earnest that Defendants have failed to comply with FRCP 34 with respect to their First Set of Requests for Production that were served upon Defendants on September 1, 2015. As noted previously, Plaintiffs did not include a list of search terms or custodians in that discovery. "Typically, a party requesting discovery of electronically stored information . . . begins the process by identifying certain 'custodians' who are thought to possess or control documents containing certain designated 'search terms.'" *Bagley v. Yale Univ.*, 307

12

F.R.D. 59, 60 (D. Conn. 2015).

Indeed, Plaintiffs did not provide Defendants a proposed list of search terms or custodians until December 4, 2015.[10] Prior to that date, Plaintiffs had advised Defendants that it was fine with them if Defendants "wait to perform the searches" of ESI until Plaintiffs had submitted their own terms.[11] The statement that Plaintiffs have been awaiting the ESI production for over 9 months is absurd considering that Plaintiffs' search terms were not submitted until 3 months after their requests for production were propounded. Furthermore, as this Court is already aware, the parties were unable to finalize an agreement concerning the search terms and custodians for the ESI search until as recently as April 1, 2016.[12]

While Plaintiffs suggest that the number of files to be reviewed is "modest", they do not support that characterization with any compelling evidence. As noted earlier, the files to be reviewed consist of approximately 115,000 e-mails; however, with attachments included, the total file count is actually in excess of 146,000 files. Defense counsel is unaware of any similar-sized production having ever been requested of DPSC in any prior litigation.

This Court has previously determined in *Shaw Grp. Inc. v. Zurich Am. Ins. Co.*, No. CIV.A. 12-257-JJB, 2014 WL 4373210, (M.D. La. Sept. 3, 2014) that a party's proposed ESI search consisting of 90 search terms would generate too many non-responsive documents. In that case, the search terms had generated 103,202 e-mails and 20,000 attachments, would take 10–12 weeks to review, an additional 2 weeks to perform redactions and draft a privilege log, and

---

[10] Exhibit "A", p. 1., E-mail from Beth Compa to Jeffrey Cody, December 4, 2015, 11:06 AM.
[11] *Id.*, p. 1., E-mail from Jeff Dubner to Jeffrey Cody, November 23, 2015, 11:16 AM.
[12] Exhibit "B", p. 1., E-mail from Jeffrey Cody to Jeff Dubner, April 1, 2016, 12:20 PM.

13

would cost between $550,000.00–$650,000.00 in legal fees and related production costs. This was deemed to be an undue burden and expense.

Here, Plaintiffs' proposed search consists of approximately 180 search terms, which has generated 115,000 e-mails and over 30,000 attachments. Though the parties had originally proposed 2½ months to conduct the ESI review (effectively just 2 months' time due to Defendants' inability to start the review until April 12, 2016), by comparison to the production at issue in *Shaw Grp. Inc.* (which actually involved fewer files overall than the Defendants are required to produce in the present case), a timeframe of greater than 12 weeks (or 3 months) would seem to be a minimum requirement. Like the situation in *Shaw Grp. Inc.*, the ESI review being undertaken by Defendants is also causing an undue burden and expense. Presently, Defendants have incurred legal fees of $217,461.50 for the 1,507 hours it took to undertake the privilege review of the ESI for the months of April and May, 2016.[13]

Defendants have utilized 12 people for the process of reviewing the e-mails and attachments for privilege, including a determination of any documents that need redaction of personal identifying information. Though a clawback agreement has been entered into between the parties, Defendants do not believe that this precludes the duty upon defense counsel to review these files thoroughly for privilege prior to turning them over to Plaintiffs. This is an important duty that requires a legal determination and defense counsel does not take it lightly. Thus, while Plaintiffs are relying upon "law student interns and other personnel" for their responsiveness review, Defendants are utilizing attorneys for their privilege review of the same documents.

---

[13] Exhibit "C", *Affidavit of Jennifer Juneau*. As noted therein, the total incurred fees for the ESI review is after defense counsel reduced their bill by $45,833.

### III.     Plaintiffs are entitled to no remedies as they have not been prejudiced.

Plaintiffs are not truly prejudiced by extending the agreed production deadline from June 15, 2016 to July 15, 2016.

They are not prejudiced by the fact that the deadline for amending the complaint/adding parties was to occur on June 10, 2016. As a matter of fact, Plaintiffs had only planned on having 100,000 files by June 1, 2016; thus, they knew they would not have all of the files prior to the June 10, 2016 deadline. It is unrealistic for Plaintiffs to suggest to the Court that they would have had sufficient time from June 1, 2016 to June 10, 2016 to review all of the next anticipated batch of 50,000 files in time to raise additional claims and/or add parties to their lawsuit.

Though Plaintiffs seek an extension of the amendment deadline as part of the overall relief sought in the subject motion, Defendants note that they did proceed with filing an amended complaint on June 10, 2016. While Plaintiffs will likely suggest that they had no choice but to file an amended complaint to comply with the scheduling order, a review of the amended complaint reveals Plaintiffs have added only an additional 5 inmates[14] as parties herein and substantively added very little to the allegations set forth in the original complaint. These enhancements are modest considering Plaintiffs have propounded four sets of discovery since the inception of this case; they conducted a 4-day site visit of Louisiana State Penitentiary with their experts occurring on March 15 – 18, 2016; the Advocacy Center has conducted numerous visits to Louisiana State Penitentiary and other correctional facilities in the state aimed at developing

---

[14] Defendants note that, in addition to the 5 *living* inmates added as additional parties, Plaintiffs include Lionel Parks based on a representation that he "intended to enroll" in this action seeking injunctive and declaratory relief "before his death".

15

their case; and, as of June 1, 2016, Plaintiffs had received over 75,000 files as part of the ESI production, not to mention an additional 8,000 files by June 6, 2016. It is really too incredible to believe that Plaintiffs suffer so much by the lack of additional files that they could not meaningfully add additional claims or parties in this matter.

Also, Plaintiffs have not shown that they should be compensated for any costs of an extended e-mail review period or the costs of filing this motion. As shown above, this motion could have been avoided. Plaintiffs should not be compensated for using unpaid interns to conduct their e-mail review, especially considering the importance they place upon the files.

## C.   CONCLUSION

WHEREFORE, Defendants, Darrel Vannoy, in his official capacity as Warden of the Louisiana State Penitentiary ("LSP"), Stephanie Lamartiniere, in her official capacity as Assistant Warden for Health Services, James M. LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, and the Louisiana Department Of Public Safety And Corrections, pray that Plaintiffs' Rule 37 Motion to Compel Production, Amend Deadlines, and Award Sanctions be denied.

Respectfully Submitted:

/s/ Jeffrey K. Cody
E. Wade Shows, La. Bar Roll No. 7637, wade@scwllp.com
James L. Hilburn, La. Bar Roll No. 20221, jamesh@scwllp.com
Jeffrey K. Cody, La. Bar Roll No. 28536, jeffreyc@scwllp.com
**SHOWS, CALI, & WALSH, L.L.P.**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821

Telephone: (225) 346-1461
Facsimile:  (225) 346-1467

## *CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that on the 16th day of June, 2016, a copy of the foregoing has this date been served upon all counsel of record via CM/ECF system and has been filed electronically with the Clerk of Court using the CM/ECF system.

/s/ Jeffrey K. Cody
Jeffrey K. Cody