UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, and RUFUS WHITE, on behalf of themselves and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　　　v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,<br><br>　　　　　Defendants. | CIVIL ACTION NO. 3:15-cv-00318<br><br>JUDGE BAJ<br><br>MAGISTRATE RLB |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

Under the Eighth Amendment, the Louisiana Department of Public Safety and Corrections ("DOC") has an obligation to provide adequate medical care that does not subject prisoners to a "substantial risk of serious harm." *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011). Defendants have utterly failed to meet this obligation at Louisiana State Penitentiary ("LSP" or "Angola"), knowingly providing care that falls far short of the constitutional minimum. As Plaintiffs' medical experts concluded, "the LSP health care delivery system fails to provide adequate care to the population and places inmates at significant risk of serious harm." Ex. 1 ("Med. Report") at 9. Indeed, in over six decades of combined experience in correctional and emergency medicine, "the Louisiana State Penitentiary's delivery of medical care is one of the worst [they] have ever reviewed." *Id.*

Similarly, Defendants have failed to fulfill their obligations to the most vulnerable in their care under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Both Plaintiff's accessibility expert and the DOJ concluded that "the Louisiana State Penitentiary is not accessible to inmates with disabilities." Ex. 2 ("ADA Report") at 11; *see also* Ex. 3. As a result, the deficiencies of the medical care system are felt disproportionately by those with disabilities.

Plaintiffs seek to represent a class of all prisoners who are now or will in the future be confined at LSP (the "Class"), as well as an ADA/RA subclass of inmates with disabilities who are now or will in the future be confined at LSP (the "ADA Subclass"). None of the Plaintiffs request damages or individual relief; rather, they seek injunctive relief to abate the systemic deficiencies in Defendants' policies and practices that subject all inmates to unreasonable risks of serious harm.

These cases are ideally suited for class certification. Defendants have acted (and failed to act) on grounds that apply generally to the Class as a whole. Every inmate at Angola is subject to the same policies and practices. Indeed, the current and former wardens of Angola themselves acknowledged that "the policies and procedures regarding medical care apply across the board to all prisoners." Ex. 4 at 69:8-14; *see also* Ex. 5 at 50:11-51.4.

1

I.     **STATEMENT OF FACTS**

A.     **Defendants' Policies and Practices Expose Class Members to an Unreasonable Risk of Serious Harm**

     1.     *Defendants' Staffing Practices Expose Class Members to an Unreasonable Risk of Serious Harm*

Angola is the largest maximum security prison in America, housing approximately 6250 prisoners. Med. Report at 11. Currently, Angola is staffed by five physicians and one nurse practitioner, the same number of medical providers that it had when it housed approximately 5000 inmates four years ago. *Id.* These providers' caseloads are as much as two to three times higher than the standard correctional caseload. *Id.* Angola also employs approximately 20 registered nurses and 34 licensed practical nurses ("LPNs"). *Id.* at 19. These numbers are similarly inadequate for a population of Angola's size. *Id.* at 19-20.

Defendants' practices and policies deprive patients at LSP of "the most basic and essential elements of adequate health care access," including "timely access to a qualified medical professional who is qualified to diagnose and treat their serious medical needs," "access to a professional medical judgment," and "timely diagnosis and treatment, including being sent to an outside hospital." *Id.* at 7-8. Instead, they use emergency medical technicians ("EMTs") as "front line staff for screening and treatment of patients with routine and urgent health care needs." *Id.* at 8. While EMTs are trained and licensed to perform a specified range of emergent medical care, they "are not licensed to diagnose and treat medical conditions." *Id.* But at LSP, EMTs are the first—and often only—care inmates receive for months at a time. Even in the emergency room, "EMTs independently manage patients with life-threatening conditions that require prompt medical diagnosis and treatment." *Id.* at 21. Because "physicians are not readily available to medically evaluate these patients, . . . too often diagnosis and treatment is unacceptably delayed, sometimes resulting in death." *Id.*

Similarly, Defendants use correctional officers with no medical or pharmaceutical training to distribute medication to the vast majority of inmates. *Id.* at 20, 48-54. Unsurprisingly, Plaintiffs'

medical experts found that "LSP staff do not adhere to procedures to safely administer and document medication administration . . . increas[ing] the risk of harm to patients." *Id.* at 53.

    2.    *Defendants' Policies Regarding Access to Primary Care Expose Class Members to an Unreasonable Risk of Serious Harm*

Defendants' policies impose a number of barriers between Plaintiffs and timely access to adequate medical care. First, as noted, unqualified EMTs are the first line of diagnosis and treatment. The medical evaluations provided in response to sick call requests are "completely inadequate," conducted without proper physical assessments or meaningful consideration of a patient's medical history. *Id.* at 32. This failure to adequately assess medical complaints has contributed to "serious medical conditions resulting in adverse outcomes, including death." *Id.* at 33. Moreover, Defendants' protocols for providing care "are defective in that they provide EMTs inadequate guidance to adequately assess and timely refer patients with serious medical conditions." *Id.* at 40.

Defendants also employ a policy of disciplining or threatening to discipline inmates for "malingering," which forces inmates to weigh the chance they will receive appropriate medical care against the risk they will be disbelieved and disciplined.[1] To further reduce their costs, Defendants have imposed an "unreasonable barrier" to accessing care: a co-pay system in which inmates are charged $3 for routine sick call and $6 for emergency sick call, along with $2 for each medication or prescription. *Id.* at 33. Given that inmates are paid just a few cents per hour, it can amount to more than a month's pay for an emergency call without any guarantee of treatment. As Major Darren Cashio, who supervises Angola's EMTs, testified, the purpose of this charge is to keep inmates from making repeated calls "until somebody sees [them]." Ex. 7 at 86:17. "This co-pay structure likely discourages inmates from accessing emergency care when they need it." Med. Report at 33.

---

[1] *See, e.g.*, Ex. 6 ("I am aware that if I declare myself a medical emergency and health care staff determine that an emergency does not exist, I may be subject to disciplinary action for malingering.").

3.    *Defendants' Policies Regarding Access to Specialty Care and Outside Facilities Expose Class Members to an Unreasonable Risk of Serious Harm*

Defendants' policies deny Plaintiffs timely access to specialists and procedures that Defendants cannot or do not perform on site. Defendants' written policies set up a "medically necessary" test that Defendants use to delay or deny prescribed treatment, reducing inmates' access to outside providers unless the Medical Director approves it. Ex. 8-9. As Judge DeGravelles has previously observed, these policies "arguably disregard[] a doctor's judgment that a certain operation may be 'medically necessary' by deeming the underlying problem to be a non-emergency." *Hacker v. Cain*, No. 14-cv-63, 2016 WL 3167176, at *14 (M.D. La. June 6, 2016), *appeal filed*, No. 16-30801 (5th Cir. June 8, 2016). "LSP has a general program, effectively dogma, from which few deviations are, at best, grudgingly allowed, in which a doctor's 'recommended' treatment will be ignored if classified as a 'non-emergency' by a coterie of unknown 'specialists.'" *Id.* at *15 (internal citations omitted).

Defendants rigorously apply this policy, cancelling any "surgery which is not absolutely necessary," Ex. 10, and "refer[ring] only patients that are truly medically necessary," Ex. 11. Yet while "medical necessity" is a critical judgment for access to care, Dr. Singh claims the DOC has no definition of medical necessity.  Ex. 12 151:20-21.

In practice, Defendants' definition of medical necessity prevents patients from receiving diagnosis or treatment until a condition has advanced to a crisis. Countless Class members have requested medical attention or a visiting specialist has recommended a procedure, only to have the referral countermanded by DOC headquarters. Indeed, Jason Collins, the former Medical Director of Angola, testified that when he and his medical team sent a referral to headquarters, that was "as far as [they] could take it" and he had no idea "how the decisions were made" as to whether a referral was accepted or implemented. Ex. 13 at 23:8-24:14; *see also* Ex. 14 at 40:17-21 ("We recommend this guy needs surgery, and it goes to Dr. Singh's office. You know, he decides, based

on the doctors talking, who gets treated and who don't."). As DOC's scheduling nurse acknowledged, "there are frequent delays of care." Med. Report at 73. Entire classes of procedures, from hernia surgery to cataract surgery to colonoscopies, have been put on hold for months or years because Defendants do not consider them medically necessary enough to warrant the expense. *See, e.g.*, Ex. 15 ("[P]lease inform your staff to stop inputting screening colonoscopy request into ecceptionist until DOC HQ gives approval to resume entering for screeing [sic] c-scopes.").

Additionally, "physicians do not always appreciate when patients need referral for care," so "some patients who need specialty referral do not get it." Med. Report at 75. Even when specialty care is provided, "there is an apparent lack of continuity of care" in LSP following specialists' recommendations. *Id.* at 74. Three hospital physicians who have treated patients from LSP have sworn that "their recommendations were essentially ignored." *Id.* at 79; *see also* Ex. 16-18. This "lack of timely care, lack of follow up, and lack of coordination of care" has "resulted in harm to multiple patients, up to and including unnecessary suffering and preventable death." Med. Report at 78.

4. *Defendants' Inadequate Infirmary Practices Exposes Class Members to an Unreasonable Risk of Serious Harm*

For patients who need daily nursing care, Angola maintains two infirmary units. *Id.* at 80. As with the remainder of the prison's medical system, "[s]taffing on both units is inadequate." *Id.* Infirmary patients receive minimal care from actual medical providers, with providers "seldom tak[ing] adequate history and seldom perform[ing] physical examinations appropriate for the patient's condition. Laboratory and other diagnostic testing are seldom integrated into care of the patient. Providers fail to properly manage patients [in ways] that cause harm, including managing patients in the infirmary that should be sent to the hospital." *Id.* at 82.

Due to the staff shortages, "[i]nmates provide nursing care with respect to cleaning and bathing, dressing, feeding and positions," which violates standards for use of inmate orderlies. *Id.* at

5

80. Nor are these inmate workers "actively supervised by registered nurses." *Id.* This leaves the most vulnerable patients at the mercy of fellow inmates with limited training, which "places the patient at risk of harm, and gives inmates unwarranted power over their peers." *Id.* at 81. This has resulted in "a dire situation" in the infirmary, as orderlies do not do even "the housecleaning tasks they are supposed to do." Ex. 19; *see also* Ex. 20 ("On Nursing Unit 2 some of the beds are grossly dirty. . . .).

### B. These Deficient Policies and Practices Have Exacerbated Medical Needs, Produced Incalculable Pain, and Resulted in Numerous Preventable Deaths

The policies and practices described above have had the results one would expect: countless Class members have suffered serious medical conditions, devastating permanent impairments, pain and suffering, and preventable deaths. In Plaintiffs' medical experts' review of numerous patients' medical records and death summaries, nearly every one showed "a similar pattern of inadequate medical evaluations and lack of timely monitoring and treatment." Med. Report at 47. As Plaintiffs' experts documented, a "review of LSP mortalities showed that in multiple cases the patient's death was likely preventable. Even in cases in which the patient's death was ultimately not preventable patients did not receive timely and appropriate care, and suffered needlessly." *Id.* at 85. For example:

- A 31-year-old man who tested positive for HIV after losing 55 pounds was not examined by a doctor or started on antiretroviral therapy for two weeks, leading to his death. *Id.* at 37-40.

- A 45-year-old man exhibiting symptoms of a life-threatening condition was treated by EMTs for four days, without any examination by a doctor. When finally transferred to a hospital, he was diagnosed with pneumonia and renal failure and passed away soon after. *Id.* at 35-37.

- Defendants ignored the "grossly abnormal vital signs" of a "severely anemic" 37-year-old man, leading to his death from internal bleeding. *Id.* at 34-35.

- For three weeks, a 65-year-old man repeatedly made sick call for vomiting and other complaints, while Defendant Lavespere refused to see him in the emergency room—leading to yet another death. *Id.* at 63-64.

- An inmate with fractured ribs died of sepsis and other avoidable conditions after Defendant Lavespere ordered EMTs not to bring him to the emergency room. *Id.* at 64.

Although Plaintiffs' experts focused on a sample of absent Class members, the named

plaintiffs have similarly suffered. For example:

- Plaintiff Shannon Hurd complained for years of weight loss, pain in his side, and other symptoms of kidney cancer. By the time he was finally screened for cancer after five years of sick call requests, his cancer had metastasized throughout his body. Compl. ¶¶ 18-21.[2]

- Plaintiff Joseph Lewis, Jr. complained for years of throat problems, while telling Defendants he had a family history of cancer. He did not receive a laryngoscopy until meeting with Plaintiffs' counsel, by which point he had advanced throat cancer. Compl. ¶ 56.

- Defendants denied Plaintiff Alton Adams stents for his peripheral artery disease, providing minimal treatment until amputation was necessary. They then failed to catch major infections for weeks, resulting in severe pain and further amputations. Compl. ¶¶ 22-26.

- Before he was incarcerated, Plaintiff Otto Barrera was receiving reconstructive surgery to repair a disfiguring gunshot wound to his face that interferes with talking and eating. Defendants have repeatedly refused to allow him to continue that surgery, claiming that it is "cosmetic" and not "medically necessary." Compl. ¶ 41.

These are not mere anecdotes; all of Defendants' failures combine to create the single worst correctional system in the country in terms of inmate mortality. Since 2008, Louisiana's mortality rate has been twice the national average *every single year*. Ex. 21 at Table 26. Moreover, Louisiana has shown a precipitous decline since 2008. Its average mortality rate from 2001 to 2007 was just under 400 deaths per 100,000 inmates; since 2008 it has never been lower than 526 deaths per 100,000 inmates, and was most recently recorded at 628—30% higher than its pre-2008 peak. *Id.* These bottom-tier outcomes are unsurprising, given that Louisiana spent just half of the national average on correctional health care, third lowest in the nation, as of 2008. Ex. 22 at 5.

### C. Defendants Are Aware of the Risks that Their Policies and Practices Create

Defendants have been aware of their severe staffing shortage for years. Dr. Singh wrote to Secretary LeBlanc in approximately 2009 that the medical system had a "[l]ack of adequate staff" that could "lead to compromised health care delivery." Ex. 23 at 4. He recognized the exact risks

---

[2] All references to "Compl." are to the Second Amended Complaint, Doc. No. 71.

that have devastated so many class members: "[w]hen we are stretched thin, chances for errors are high and it is very possible for cancers and other diseases to be missed early on." *Id.* But despite this recognition that DOC was understaffed, LSP's staffing shortage has become *more* dire. LSP now has *fewer* medical employees than in 2009—despite adding roughly 1000 inmates. Med. Report at 17.

Defendants have received repeated warnings, both internal and external, about their deficient care. For example, in August 2014, the Stroke Program Coordinator at Interim LSU Hospital alerted Defendants that "in the last month and a half . . . I have had three inmates from Angola that presented with obvious stroke symptoms. All of them were out of the window because it either took them a while to get here or the medical staff at Angola did not think the inmate was having a stroke." Ex. 24. As the nurse explained, prompt emergent care for stroke victims was necessary to "prevent severe disability." *Id.* That same week, the Interim Chairman of Oral Maxillofacial Surgery at LSU warned Angola about the "number of inmates who present to us with 3 week old fractures that are already infected." Ex. 25. Despite these emails going to senior medical leadership at the DOC, including multiple Defendants, the EMTs were not informed that they were failing to recognize signs of stroke or infection. Ex. 7 at 77:9-19. As Dr. Lavespere's predecessor, Dr. Collins, put it, a patient has to "want to change before you can help them," but the DOC refused to fix its problems—like a "cancer patient that's refusing chemo." Ex. 26 at 124:24-125:9.

Indeed, Defendants' awareness of their legal exposure leads them to consciously *avoid* documenting problems.[3] Staff members have been advised not to put things in emails because of legal liability. *See, e.g.*, Ex. 27 at 68:18-21 ("Q. Have you ever been told, for example, be careful what you put in e-mails, because they might be subject to litigation? A. Yes."); Ex. 28 at 34780 ("Reminder: watch the contents of your emails, these can be used in court."). Dr. Singh has advised

---

[3] Defendants unquestionably know that their policies expose them to legal liability; many of the same practices were the subject of a lawsuit by the DOJ in the 1990s, leading to a trial and post-trial consent decree in 1998. Compl. ¶¶ 156-63.

staff not to acknowledge that referrals were denied due to "resource limitations" but instead to use the vague term "medically necessary." Ex. 29. Correctional personnel conducting DOC's biennial "peer reviews" of Angola consciously refrain from noting staffing shortages in the reviews. Ex. 30. Perhaps most troublingly, Dr. Singh has advised the DOC Secretary, Defendant James LeBlanc, "to not dig too deep" into suspicious deaths, Ex. 31, and Angola's mortality reviews consistently contain only "an incomplete summary of the patient's care [that] does not identify whether care for the patient was timely and appropriate, does not identify problems related to systems or quality and does not determine whether the patient's death was preventable." Med. Report at 85.

### D.    Defendants Discriminate Against Inmates with Disabilities[4]

Just as they have failed to provide a minimally adequate medical system, Defendants have failed in their obligations to inmates with disabilities. LSP discriminates against individuals with disabilities through its failure to comply with the RA, the Uniform Federal Accessibility Standards, and the ADA and its implementing regulations. Plaintiffs' accessibility expert surveyed areas of the prison required for ADA Class members to access services, programs, and activities and found "that the Louisiana State Penitentiary is not accessible to inmates with disabilities." ADA Report at 11. Many areas of the prison—including "medical dormitories" that house dozens of inmates in wheelchairs—cannot be independently accessed by mobility-impaired inmates. ADA Report at 9-11 & Attach. 2. Even Warden Vannoy acknowledges that "Angola has a lot of work to do on a physical plant to be ADA, to meet the ADA requirements." Ex. 4 at 18-20.[5]

---

[4] Several pieces of ADA-related discovery are outstanding, including the depositions of the current ADA Coordinator and his predecessor. Pursuant to the Court's October 6, 2016 Order, Doc. No. 129, Plaintiffs will supplement the ADA section of this brief two weeks after the depositions, which are currently scheduled for October 26 and 27.

[5] The Department of Justice recently came to a similar conclusion:

    Based on this compliance review of LSP's programs, services, activities, and facilities, the United
    States has concluded that LSP contains architectural and programmatic barriers to access for persons

Defendants' policies similarly discriminate against inmates with disabilities. Directive 07.004 provides that all "[s]everely handicapped inmates requiring medical care and/or assistance with basic life functions shall be housed at" the Treatment Center. Ex. 32. This policy ignores the ADA's requirement that public entities administer services such as housing "in the most integrated setting appropriate" to "enable[] individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § 35.130(d); 28 C.F.R. Pt. 35, App. A (2010).[6]

LSP Directive # 09.036 prohibits any inmate "requiring a duty status"[7] from using the hobbyshop, one of the principal forms of recreation and of supplementing an inmates' income. Ex. 34. But duty statuses are essential for inmates with disabilities to ensure that their work assignments are compatible with their needs, meaning that any inmate with a disability who requires a work accommodation loses access to recreational and remunerative activities.

Defendants' practices for implementing their policies are similarly deficient. While Nurse Tracy Falgout, LSP's ADA Coordinator as of September, testified that each inmate is supposed to receive an initial assessment that details accommodations he needs, Ex. 35 at 94:20-95:10, not a single medical chart reviewed by Plaintiffs' experts included "clear documentation of disability

---

with disabilities and that qualified individuals with disabilities are, by reason of such disabilities, excluded from participation in or are denied the benefits of many of LSP's programs, services, or activities or are subjected to discrimination in violation of Title II of the ADA and Section 504. The programmatic barriers include: the failure to provide accessible transportation to transport inmates with disabilities to the medical infirmary and other areas, as needed; limited access to jobs for inmates with mobility disabilities; the failure to adopt and implement an inmate grievance procedure; and, the failure to designate an ADA Coordinator.

Ex. 3 at 4593.

[6] Moreover, Defendants do not even follow their own policy. Rather than housing all inmates with severe disabilities at the Treatment Center, where they could at least conceivably receive appropriate accommodations, most are in so-called "medical dormitories" that were actually "designed for general population." Ex. 33 at 2-00073666. Defendants do not provide *any* medical care at these dorms, other than the same sick call and pill call provided in general population dorms.

[7] Defendants use "duty statuses" to assign accommodations for work. For example, an inmate with mobility impairments may be exempted from work on uneven ground. In practice, duty statuses are implemented by untrained security officers, who determine whether a duty status exempts an inmate from the work the officer wants performed.

accommodations" or "evaluations or assessments of needs in that respect." Med. Report at 59 n.74.

Defendants' former ADA Coordinator was not even familiar with the assessment form that

Defendants supposedly use routinely. Ex. 36 at 19:25-20:12. This is unsurprising, as staff receive no

instructions on how to implement LSP's disability policies. Ex. 35 at 93:16-22. Instead, Defendants

simply rely on the fact that "[a]ll staff have the ability to review the policy." *Id.* at 93:18-19.

Unsurprisingly, these failures to track and train lead to a wide variety of adverse consequences:

- Defendants rely on inmates to provide accommodations without appropriate supervision. For example, Plaintiff Alton Baptiste has received virtually no assistance since becoming blind, relying instead on other inmates in his dorm to assist him in adapting to everyday life. Mr. Baptiste has never been providing with any mobility assistance and relies on a cane he was given by a dying inmate to assist him. Ex. 37 at 13:2-17.

- Defendants do not appropriately accommodate inmates in obtaining medical treatment. For example, Plaintiff Edward Washington, a diabetic, has gone blind from uncontrolled diabetes. He has requested daily access to sugar testing to help him control his diabetes but has not always received it—and when he has, has been forced to self-administer insulin despite his blindness. Ex. 38 at 11:17-14:20, 20:24-23:3.

- Defendants do not appropriately accommodate disabilities in security procedures. For example, Defendants have repeatedly placed Plaintiff Kentrell Parker in a locked room where he could not be observed, even though he is a quadraplegic with a tracheal tube that could become clogged. *See* Doc. No. 28. As Defendant Park said, medical practitioners are not "able to intervene" in security decisions such as this. Ex. 27 at 13:14-21.

- Defendants transport inmates with disabilities in "rodeo vans" that are not equipped with wheelchair lifts or proper securement features, subjecting inmates with disabilities to painful and dangerous transportation. For example, Plaintiff Ricky Davis was forced to lie down in a rodeo van when returning from back surgery, aggravating his pain. Ex. 39 at 9:25-12:6.

- Because Defendants' evacuation plans ignore inmates with disabilities, Class members are at serious risk in the event of an emergency. *See* Ex. 40; Ex. 35 at 113:20-114:1.

## II.    LEGAL STANDARD

To proceed as an injunctive class, Plaintiffs must satisfy the Court that they meet the

requirements of Federal Rule of Civil Procedure 23(a) and (b)(2). *M.D. ex rel. Stukenberg v. Perry*, 675

F.3d 832, 837 (5th Cir. 2012). Rule 23(a) requires that (1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims

or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See generally Dockery v. Fischer*, No. 13-cv-326, --- F. Supp. 3d ----, 2015 WL 5737608, at *8-13 (S.D. Miss. Sept. 29, 2015).

When prisoners seek injunctive relief from the conditions of their confinement, they need not prove that the challenged conditions have already resulted in actual injury to each prisoner; rather, the inquiry focuses on the unreasonable *risk* of harm. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994) ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement . . . if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."). The Supreme Court recently reaffirmed that claims regarding the constitutionality of correctional health care systems are amenable to class treatment, affirming a grant of injunctive relief to a class of tens of thousands of prisoners in multiple prisons across California who alleged "systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to a substantial risk of serious harm and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society." *Brown v. Plata*, 563 U.S. at 505 (internal quotation marks omitted).[8]

---

[8] *See also, e.g.*, *M.D.*, 675 F.3d at 847 (noting that Rule 23(b)(2) class can be certified "based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing—'with respect to the class,' so long as declaratory or injunctive relief settling the legality of the State's behavior with respect to the class as a whole is appropriate"); *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) (in Eighth Amendment class action, affirming liability finding and affirming injunctive relief in part); *Dockery*, 2015 WL 5737608, at *13-18 (certifying class action regarding medical treatment and housing for prisoners in East Mississippi Correctional Facility); *Jones v. Gusman*, 296 F.R.D. 416, 464-67 (E.D. La. 2013) (certifying settlement class alleging deficiencies in health care in parish jails).

Similarly, ADA and RA claims are routinely certified as class actions where correctional facilities discriminate against inmates with disabilities. *See, e.g.*, *Armstrong v. Davis*, 275 F.3d 849, 856-57 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005) (affirming certification of class of "all present and future California state prisoners and parolees with mobility, sight, hearing, learning, developmental and kidney disabilities that substantially limit one or more of their major life activities"); *Dunn v. Dunn*, --- F. Supp. 3d ----, 2016 WL 4718216, at *7 (M.D. Ala. Sept. 9, 2016) (certifying class to challenge "the denial of a system that would have the effect of ensuring that they and their fellow prisoners were appropriately accommodated").[9]

## III.    ARGUMENT

There can be no serious dispute that class certification is appropriate in this case. Defendants concede that their "policies and procedures regarding medical care apply across the board to all prisoners." Ex. 4 at 69:8-14. If they are inadequate, *every* inmate risks having medical needs ignored or exacerbated. Injunctive relief compelling Defendants to meet constitutional standards will reduce that risk for *every* inmate. Courts routinely certify cases challenging the adequacy of a correctional medical system. *See, e.g.*, *Hernandez*, 305 F.R.D. at 152 ("[C]lasses like the class and subclass here have been routinely certified."). This case should be no different.

### A.    Plaintiffs' Claims Satisfy Rule 23(a)

#### 1.    *Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." While there is no exact threshold for numerosity, the Fifth Circuit has approved certification of classes of as few as 48 correctional inmates, including future inmates. *See Jones v.*

---

[9] *See also, e.g.*, *Williams v. Conway*, 312 F.R.D. 248 (N.D.N.Y. 2016); *Hernandez v. County of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015); *Lacy v. Dart*, No. 14-cv-6259, 2015 WL 1995576 (N.D. Ill. 2015); *Henderson v. Thomas*, 289 F.R.D. 506 (M.D. Ala. 2012); *Bumgarner v. NCDOC*, 276 F.R.D. 452 (E.D.N.C. 2011).

*Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975); *see also, e.g.*, *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012) (approving certification of class with approximately 125 members); William B. Rubenstein, et al., Newberg on Class Actions § 3.12 (5th ed. 2011) (showing of 40 or more members raises presumption of numerosity).[10] Here, the Class includes approximately 6400 incarcerated individuals—a group that unquestionably exceeds the numerosity threshold. Similarly, hundreds of inmates at LSP have mobility impairments, visual impairments, cognitive impairments, or other medical impairments.[11] *See, e.g.*, *Dunn*, 2016 WL 4718216, at *7 (certifying class of "at least—and probably quite substantially more than—150 prisoners with disabilities"); *Williams*, 312 F.R.D. at 252 (certifying ADA class on basis of statistic that 0.14% of Americans are deaf and defendants incarcerate approximately 50,000 inmates); *Dockery*, 2015 WL 5737608, at *15 (certifying class of 1200-1500 inmates, as well as subclasses of 150 and 850-1000 inmates); *Jones*, 296 F.R.D. at 465 (certifying class of 2500 inmates). Accordingly, the numerosity requirement is satisfied.

    2. *Commonality*

    To satisfy Rule 23(a)(2), Plaintiffs must show that "there are questions of law or fact common to the class." To do so, Plaintiffs' claims "must depend upon a common contention" that "is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In identifying common questions, the Court need not (indeed, must not) determine whether those questions will ultimately be resolved in Plaintiffs' favor; rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1195 (2013); *see also, e.g.*, *Dockery*, 2015 WL 5737608, at *9 (at class certification

---

[10] *See also Henderson*, 289 F.R.D. at 510 ("[T]he fluid nature of a plaintiff class—as in the prison-litigation context—counsels in favor of certification of all present and future members.").

[11] As of 2014, approximately 14.4 percent of non-institutionalized males in Louisiana reported a disability. Ex. 41 at 23 & 25. At this rate, LSP would have approximately 900 inmates with disabilities.

plaintiffs need not "establish that the harm actually occurred, i.e., they do not need to prove that the policies they identified did, in fact, cause the harm they are alleging").

The common policies, practices, or courses of conduct challenged "need not be formal or officially-adopted"; "a policy can be identified on the basis of custom or consistent practice" or "based on the defendant's deliberate indifference." *Dockery*, 2015 WL 5737608, at *8. "[F]ailure to act can also constitute a policy or practice." *Id.* at *10. "The critical question here is whether the government has failed to respond to a need . . . in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations." *Id.* at *8 (internal quotation marks omitted). The plaintiff must also "connect[] the policy or practice to the alleged harm,"—i.e., to the increased risk of serious harm. *Id.* at *9.

The Supreme Court, the Fifth Circuit, and countless other courts have recognized that common questions exist in cases concerning conditions of confinement.[12] Here as well, common questions abound, including (but not limited to): (a) whether the medical system at Angola increases inmates' risk of serious harm; (b) whether Defendants were aware that their system created a risk of serious harm; (c) whether the staffing levels at Angola are adequate to provide constitutionally sufficient medical care; (d) whether correctional staff perform medical functions that are inappropriate given their limited training and lack of licensure; (e) whether the DOC applies its "medically necessary" policy in a way that impedes Class members' ability to receive timely diagnosis and treatment; (f) whether Defendants' malingering and co-pay policies impede Class members' ability to receive timely diagnosis and treatment; and (g) what remedial measures are appropriate to

---

[12] *See, e.g.*, *Plata*, 563 U.S. at 506-08; *M.D.*, 675 F.3d at 837; *Cook*, 376 F.3d at 328; *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014); *Dockery*, 2015 WL 5737608, at *15-17; *Decoteau v. Raemisch*, 304 F.R.D. 683, 688-89 (D. Colo. 2014); *Redmond v. Bigelow*, No. 13-cv-393, 2014 WL 2765469, at *4 (D. Utah June 18, 2014); *Jones*, 296 F.R.D. at 465; *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013); *Henderson*, 289 F.R.D. at 511; *Olson v. Brown*, 284 F.R.D. 398, 410-12 (N.D. 2012); *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, No. 08-cv-1317, 2012 WL 6738517, at *18 (S.D. Ind. Dec. 31, 2012).

mitigate the deficiencies in Defendants' practices.

Similarly, the ADA and RA claims present common questions that can be resolved on a classwide basis, as courts routinely find. *See, e.g.*, *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997), (finding "whether the Secretary violated [the RA] or the ADA by failing to direct local . . . officials to enforce these statutes" to be a common question); *see also* cases cited *supra* p. 13 & n.9. The Plaintiffs' claims present a number of common questions as to whether LSP meets its obligations under the ADA and RA, including (but not limited to): (a) whether LSP has architectural barriers that make its programs, services, and activities inaccessible to inmates with disabilities; (b) whether Defendants' policies discriminate against individuals with disabilities; (c) whether Defendants ensure that every program, service, or activity offered to inmates is readily accessible to and usable by individuals with disabilities; (d) whether Defendants adequately take disabilities into account in the disciplinary process; (e) whether Defendants adequately provide access to jobs for inmates with disabilities; (f) whether Defendants adequately identify, track, and provide the accommodations that inmates with disabilities require; (g) whether Defendants provide accessible transportation to transport inmates with disabilities within the prison and outside the prison; and (h) what remedial measures are appropriate to mitigate the deficiencies in Defendants' practices.

### 3. *Typicality*

To satisfy Rule 23(a)(3), named Plaintiffs' claims must be "typical of the claims … of the class." "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by M.D.*, 675 F.3d 832 (quoting 5-23 Moore's Federal Practice—Civil § 23.24); *accord, e.g.*, *Dockery*, 2015 WL 5737608, at *11. "Often, once commonality is shown typicality will follow as a matter of course." *Dockery*, 2015 WL 5737608, at *12. Typicality is thus "somewhat of a low hurdle." *Dunn*, 2016 WL 4718216, at *10 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147,

157 n.13 (1982)).

Each of the named plaintiffs is incarcerated at LSP and each is subject to the same policies and procedures as the absent class members. Thus the claims of the named plaintiffs are typical of the claims of the Class as a whole.[13] Similarly, the named Plaintiffs' claims are representative of those shared by the ADA Subclass. The named Plaintiffs include individuals with a variety of disabilities: mobility impairments, visual impairments, cognitive impairments, and a wide variety of other conditions requiring medical intervention to allow daily life activities. *See generally* Compl. ¶¶ 18-55. As with the broader medical claims, this is more than adequate to satisfy the typicality requirement. *See, e.g.*, *Dunn*, 2016 WL 4718216, at *10 ("It is true that the named plaintiffs (and the class members more generally) have diverse disabilities and require various different accommodations for those disabilities. Their claims were not disability or accommodation-specific, though; they challenged systemic practices with which they all interact and from which they all allegedly suffer.").

### 4. *Adequacy of Representation*

The final Rule 23(a) requirement is that "the representative parties will fairly and adequately protect the interests of the class." In evaluating this requirement a court "must consider '[1] the zeal and competence of the representative[s'] counsel and [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees.'" *Dockery*, 2015 WL 5737608, at *12 (alterations in original) (quoting *Berger v. Compaq*

---

[13] *See, e.g.*, *Parsons*, 754 F.3d at 686 ("[G]iven that every inmate in ADC custody is highly likely to require medical, mental health, and dental care, each of the named plaintiffs is similarly positioned to all other ADC inmates with respect to a substantial risk of serious harm resulting from exposure to the defendants' policies and practices governing health care."); *Dockery*, 2015 WL 5737608, at *17 ("As the claims of each putative class and subclass member (1) arise from the same policy or practice, i.e. the prison officials' alleged failure to take corrective action, and the same defect, i.e. the existence of inhumane conditions of confinement, and (2) are based on the same legal theory, i.e. the alleged violation of the Eighth Amendment right to be free from cruel and unusual punishment, the Court finds that Plaintiffs have satisfied the Rule 23(a)(3) typicality commonality requirement with respect to the general EMCF Class and each of the subclass[es]."); *Jones*, 296 F.R.D. at 466 ("While class members' experiences at OPP may differ, 'the claims arise from a similar course of conduct and share the same legal theory' and, therefore, 'factual differences will not defeat typicality' in this case." (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)).

*Comput. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)).[14] Each named plaintiff has been actively involved in the litigation, reviewing and commenting on filings, discussing the facts of the case in multiple meetings with counsel, answering Defendants' interrogatories, and sitting for depositions. Notably, even though each has suffered serious harm due to Defendants' deliberate indifference—in some cases, harm as severe as preventable amputation, avoidable paralysis, or years of cancer progression without treatment—none of them are seeking damages in this case. This demonstrates each named plaintiff's commitment to improving the conditions for *all* Class members and to zealously representing their interests in this litigation.

### B.    Plaintiffs' Claims Satisfy Rule 23(b)(2)

Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Where class members only seek injunctive relief, Rule 23(b)(2) requires that (1) "class members must have been harmed in essentially the same way" and (2) "the injunctive relief sought must be specific." *M.D.*, 675 F.3d at 845; *see also, e.g.*, *Dockery*, 2015 WL 5737608, at *12-13. Eighth Amendment and ADA claims are "precisely the sorts of claims that Rule 23(b)(2) was designed to facilitate." *Hernandez*, 305 F.R.D. at 163 (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).

The first requirement of Rule 23(b)(2) is satisfied by the same evidence as commonality, because "[i]n establishing commonality the plaintiff will have identified a common practice or policy that is the source of the class members' harm. So, if she prevails on the merits, a single injunction barring or modifying that course of that behavior will, in the ordinary course of things, provide relief to the members of the class." *Dockery*, 2015 WL 5737608, at *12. Plaintiffs seek no individualized

---

[14] The qualifications of the proposed class counsel are discussed *infra* p. 20.

relief, challenging Defendants' policies, practices, and omissions regarding provision of access to care across LSP. Because Defendants' overall failures in providing that access put all class members at a substantial risk of severe harm should they develop any serious medical need, a carefully crafted injunction would provide relief to all members of the class.

As to the second requirement, "[t]he precise terms of the injunction need not be decided at class certification, only that the class members' claim is such that a sufficiently specific injunction can be conceived . . . ." *Id.* at *13; *accord, e.g.*, *Morrow v. Wash.*, 277 F.R.D. 172, 198 (E.D. Tex. 2011). The Court need only determine that the claims are "susceptible to common, specific relief." *Stukenberg v. Perry*, 294 F.R.D. 7, 47 (S.D. Tex. 2013). There are ample precedents for specific injunctive terms directing prison officials to improve medical systems, both from Plaintiffs' experts' experience and from court-ordered injunctions and consent decrees in several analogous cases. *See, e.g.*, Ex. 42; Stipulation, *Parsons v. Ryan*, No. 12-cv-601, Doc. No. 1185 (Oct. 14, 2014). LSP's deficiencies, while pervasive, can be mitigated by a number of specific injunctive measures, such as (a) requiring staffing levels appropriate for the population; (b) requiring medical personnel to practice within the limits of their license and prohibiting use of unlicensed personnel for tasks requiring medical training; (c) changing referral policies to ensure timely access to outside and specialty care; (d) specific changes to practices in infirmary care, emergency care, medication administration, and other areas; (e) institution of appropriate means of tracking and implementing accommodations; and (f) training staff on their obligations to accommodate inmates with disabilities.

Indeed, the Fifth Circuit recently made clear that a class action is the *only* way to provide appropriate relief in a case such as this. In *Ball v. LeBlanc*, 792 F.3d 584 (2015), the Fifth Circuit vacated an injunction requiring the DOC to provide adequate cooling methods throughout death row, holding that the Prison Litigation Reform Act "limits relief to the particular plaintiffs before the court" and bars "facility-wide relief" in a non-class action. *Id.* at 599. Here, however, adequate

relief is impossible without facility-wide relief. For example, there is no individually tailored relief that can ensure that a named plaintiff receives adequate treatment in a medical emergency; without facility-wide relief, the plaintiffs would still be treated by EMTs rather than doctors.

### C. Plaintiffs' Counsel Should Be Appointed as Class Counsel Under Rule 23(g)

Finally, the Court must appoint class counsel, considering (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g). These factors strongly support appointing the Promise of Justice Initiative ("PJI"), Cohen Milstein Sellers & Toll ("CMST"), the Advocacy Center, and the American Civil Liberties Union of Louisiana ("ACLU-LA").

First, PJI, the Advocacy Center, and ACLU-LA have spent years investigating and litigating the claims in this case, interviewing hundreds of inmates. Second, counsel includes one of the country's premier class action firms. *See* Ex. 43. Third, PJI, the Advocacy Center, and ACLU-LA are dedicated to ensuring constitutional conditions for institutionalized individuals. *See* Ex. 44-46. Finally, the Court has seen firsthand the resources and acumen Plaintiffs' counsel bring to this case. PJI and its Director Mercedes Montagnes previously litigated *Ball v. LeBlanc*, succeeding at trial and then continuing to fight for their clients through the appeal and remedy phases. They and their co-counsel have already committed thousands of hours to representing the class in this case, and will continue to fight to get Class members the care they need.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court find that Plaintiffs' proposed class and subclass meet the requirements of Rule 23(a) and 23(b)(2); certify the class and subclass; and appoint the undersigned counsel as counsel for the class and subclass under Rule 23(g).

Dated: October 14, 2016

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Telephone: (504) 529-5955
Facsimile: (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Daniel A. Small (*pro hac vice*)
Jeffrey B. Dubner (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com
Email: jdubner@cohenmilstein.com

Justin P. Harrison, La. Bar No. 33575
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (888) 534-2996
Email: jharrison@laaclu.org

Miranda Tait, La. Bar No. 28898
Advocacy Center
600 Jefferson Street, Suite 812
Lafayette, LA 70501
Telephone: (337) 237-7380
Facsimile: (337) 237-0486
Email: mtait@advocacyla.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ Mercedes Montagnes
Mercedes Montagnes