# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, and RUFUS WHITE, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,<br><br>       Defendants. | CIVIL ACTION NO. 3:15-cv-00318<br><br>JUDGE: Hon. Brian A. Jackson<br><br>MAGISTRATE JUDGE:<br>Richard L. Bourgeois, Jr. |

## STATEMENT OF UNDISPUTED MATERIAL FACTS FOR MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' EIGHTH AMENDMENT CLAIM

Pursuant to Local Rule 56(a) of the United States District Court for the Middle District of Louisiana, Plaintiffs respectfully submit this statement of material facts as to which Plaintiffs contend there is no genuine issue of material fact:

1

**BACKGROUND**

1. Louisiana State Penitentiary at Angola ("Angola" or "LSP") is a maximum-security prison in Angola, Louisiana that currently houses approximately 6400 inmates. Ex. AG (Thomas Report) at 5.

2. The proposed Plaintiff Class consists of all prisoners who are now or will in the future be confined at Angola. Rec. Doc. 140 at 1.

3. Defendant Louisiana Department of Public Safety and Corrections ("DOC") is a division of the State of Louisiana charged with overseeing the custody and care of inmates in state prisons, including LSP. Rec. Doc. 71 at 15; La. Rev. Stat. 36:401(B)(4).

4. Defendant Burl Cain was the Warden of Angola from February 1, 1995 through December 31, 2015. He was succeeded by Defendant Darrel Vannoy, who is currently the Warden of Angola. The Warden of Angola is responsible for, among other things, "assign[ing] people to manage the medical care and then be[ing] sure that they do what the policies and procedures say." Ex. AE (Cain Depo.) 6:13-25; Ex. BA (Vannoy Depo.) 16:19-20:6.

5. Defendant Raman Singh has been the Chief Medical and Mental Health Director of the DOC since November 2007. In that position, his job is to "run healthcare operation[s] . . . find out the challenges and to go and find the solutions." Before November 2007, he served as Medical Director of Angola, where his "duty was to manage offender healthcare for LSP inmates." Ex. AF (Singh Depo.) 9:5-18; 24:15-22; 37:15-17.

6. Defendant James LeBlanc is the Secretary of the DOC. He supervises Dr. Singh and is "responsible for whatever goes on in this department." Ex. BB (Leblanc Depo.) 23:9-24:5.

7. Defendant Stephanie Lamartiniere was the Assistant Warden for Health Services at Angola from June 2013 until sometime in 2016. She was succeeded by Defendant Tracy Falgout, who is the current Assistant Warden.[1] The Assistant Warden has "operational control over the medical unit at LSP." This includes, among other responsibilities, budgeting, hiring, medical records, and "any kind of staffing issues." Ex. AQ (Lamartiniere Depo.) 9:4-17, 11:2-9; Ex. L (J. Moore Report) at 4.

8. Defendant Randy Lavespere is the current Medical Director of Angola. This position is responsible for "[m]anaging the doctors, managing the nurses, managing the patients, managing the relationship with headquarters, managing relationships with administration. Pretty much everything." Ex. AL (Lavespere Individual Depo.) 10:9-15.

9. Defendant Stacye Falgout has been the Chief Nursing Officer for the DOC since October 2011. Prior to that time, she was Assistant Director of Nurses at Angola. She reports to Dr. Singh and is "No. 2 in the headquarters realm." Ex. BC (Stayce Falgout Depo.) 7:12-22, 9:4-5; 13:16-18.

10. Defendant Sherwood Poret has been the Director of Nursing at Angola since January 2013 and was the Infection control supervisor before that. He "supervises the 57 nurses working at LSP." Ex. BD (Poret Depo.) 4:17-19; Ex. M (Pls.' Med. Rep.) at 15.

**DEFENDANTS' KNOWLEDGE AND DISREGARD OF DEFICIENCIES AND RISKS**

11. Over the past 25 years, Defendants have been repeatedly notified of deficiencies in their medical practices that place patients at risk, and have acknowledged those deficiencies themselves. This includes the following:

---

[1] After the Second Amended Complaint was filed, Mr. Falgout replaced Ms. Lamartiniere as the Assistant Warden for Health Services. "In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office." *Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985) (citing Fed. R. Civ. P. 25(d)).

3

# EXTERNAL REVIEWS

12. On August 8, 1989, the Civil Rights Division of the United States Department of Justice ("DOJ") began an investigation into conditions of confinement at Angola, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. Ex. B (1991 DOJ Letter) at 1.

13. The investigation included tours of the prison with experts; observation of conditions in the cellblocks, dormitories, and infirmary; interviews with administrators, staff and inmates; and review of records. *Id.*

14. On May 13, 1991, the DOJ issued a findings letter that concluded conditions at Angola deprived inmates of their constitutional rights, including the failure to provide adequate medical and psychiatric care. *Id.* at p. 2.

15. The DOJ identified "serious flaws in the provision of medical care," beginning at the intake point in the prison's healthcare system and permeating the entire process. As a result, the DOJ concluded that "inmates who need medical care and attention are not receiving it." *Id.*

16. Among the deficiencies identified by the DOJ were delays in treatment; inadequate follow-up when diagnostic tests are ordered; "grossly inadequate" treatment of chronic illness; a lack of adequately trained and sufficient numbers of staff (physicians, nurses, and security); inadequate sick call procedures; a lack of safeguards to ensure inmates receive correct medication; and insufficient health-care policies. *Id.* at 2-4.

17. The DOJ specifically found that an inmate "may wait three to five days to see a physician" because of staff shortages, and delays in treatment also occurred through

scheduling errors and a failure to follow-up or refer patients to hospitals or off-site health care providers. *Id.* at 2-3.

18. On January 2, 1992, inmates at Angola filed a class action lawsuit under 42 U.S.C. § 1983 against the prison warden and the DOC secretary, alleging medical care at the prison was unconstitutionally deficient. The DOJ intervened as a plaintiff under CRIPA, and the case was tried in September 1994. Ex. BE (1998 Consent Decree).

19. In April 1994, Dr. Michael Puisis, acting as an expert on behalf of the DOJ, made the second of two investigatory visits to Angola. He found "serious problems in health care delivery," including "failure to follow up diagnostic testing; failure to properly examine patients; failure to perform indicated diagnostic testing; inappropriate treatment; lack of timely diagnostic testing or treatment; failure to treat in accordance with current standards … lack of review by an appropriately qualified health care person; ignorance of appropriate treatment for a given disease; and finally, callous treatment by health care personnel." Ex. C (1994 Puisis Report) at 12.

20. Dr. Puisis found the aging population at Angola had a significant chronic-disease burden, and his review of medical records "demonstrated a lack of follow up and lack of timely treatment of chronic diseases." *Id.* at 10

21. Dr. Puisis specifically noted the number of physicians was "insufficient to provide appropriate care." During his visit, every prison staff member he spoke with acknowledged the number of health care personnel was "inadequate to serve the inmates." *Id.* at 8-9

22. Dr. Puisis also noted that security officers were required to perform medical tasks; emergency medical technicians worked "out of the scope of their training" and made medical decisions they were not trained or experienced in making; unlicensed nursing

assistants illegally worked independently in examining patients and diagnosing illnesses; and officers continued to "illegally repackage and dispense medication." *Id.* at 3-10.

23. Also in 1994, the DOJ prepared a report of its finding based on its experts' investigations. The DOJ found significant delays in treatment because security decided the manner and time of patients' transportation, and inmates were forced to wait for excessive and unacceptable periods for elective and radiological services. Angola officials continued to place patients in the infirmary who should have been sent to the hospital. Ex. E. (DOJ 1994) at 6-14.

24. The DOJ found that "no medical protocols exist at LSP to guide medical staff in how to recognize and treat chronic illnesses, and that there was "no screening system to detect chronic illnesses, particularly for older inmates," and concluded Defendants were "dangerously deficient in the treatment of chronic illnesses." *Id.* at 8.

25. The DOJ found the physician clinic was understaffed and consistently overcrowded. *Id.* at 5.

26. The DOJ noted the following "critical" staffing shortages at Angola: (1) physicians, (2) licensed physician assistants (3) registered nurses, (4) licensed practical nurses, (5) a medical records professional, (6) a registered dietician, and (7) physical therapists." *Id.* at 17.

27. Staff physicians had "limited experience and training in recognizing and treating chronic conditions" and emergency medical technicians ("EMTs") in charge of sick call had "no training in recognizing symptoms of chronic illnesses." *Id.* at 8.

28. The EMTs were "not adequately trained nor sufficiently experienced to recognize serious medical illness or triage sick call," and they could not differentiate "between acute, chronic, and minor illnesses." *Id.* at 2.

29. Angola had "no policies or procedures specifically designed to guide health care practitioners in managing care on the infirmary unit." *Id.* at 7.

30. There was "no ongoing quality assurance" at the prison; officials had no program "to review, identify, and correct medication errors or to control access to the medications." No quality assurance committee or peer review system existed to monitor the quality of medical care. *Id.* at 12, 16.

31. On September 24, 1998, District Court Judge Frank J. Polozola approved a settlement agreement to the 1992 lawsuit. The agreement required specific improvements to the system of medical care at Angola, including "sick call" reviews by physicians within 72 hours; the use of contemporary standards of care to diagnose, treat, monitor, and classify inmates with chronic illnesses; establishment of a quality assurance committee; provision of physical therapy; reduction of orthopaedic and neurology backlogs; automatic referrals to external physicians; and the provision of "adequate medical leadership" at Angola. Ex. BE.

32. Most of the issues identified by the DOJ and Dr. Puisis continue today. *See infra* ¶¶ 38-70.

33. On October 14 and 15, 2009, Wexford Consulting Group ("Wexford") conducted site visits to Angola and other DOC prisons. Wexford issued a report titled "Summary of Observations and Recommendations" on December 23, 2009. Ex. D (Wexford Report).

34. The Wexford report noted that inmates suffered delays in health care provider appointments because of large backlogs. The report said inmates were "not being seen in a timely fashion" and Angola would need "intense intervention to bring it within [national] standards." *Id.*

35. The Wexford report also noted that security officers were engaged in distributing medications. *Id.*

36. Defendants Singh, Cain, LeBlanc, and Stacye Falgout all received the Wexford report. Ex. O (January 13, 2010 Email from Singh to Cain); Ex. BF (December 23, 2009 Email from Melocchi to Singh); Ex. BG (January 14, 2010 Email from S. Falgout to Dupuis).

37. The backlogs, lack of timely appointments, and use of security officers to administer medication all continue today. *See infra* ¶¶ 38-50, 58.

## DELAYS IN TREATMENT

38. In early 2012, Defendants LeBlanc and Singh notified Department of Health Secretary Greenstein and the Governor's Office that they were concerned about delays in inmates' critical care. Ex. Q (February 03, 2012 Email).

39. According to Nursing Director Annette Dupuis, Angola had a backlog of 100 offenders waiting to be seen in May 2012 and referrals were being written daily. Ex. R (March 11, 2012 Email from Dupuis to Oliveaux).

40. Also in mid-2012, Defendant Stacye Falgout was informed that cancer patients at Angola awaiting follow-up treatment were put on hold because the treatment center did not have a contract with the prison. Ex. BH (December 04, 2012 Email to S. Falgout); Ex. T (Offenders Pending RAD Treatment).

41. According to Defendant Singh, in December 2013, some inmates had been waiting for CT scans, MRIs, and cancer care since late 2011, and no colonoscopies had been done for 2 years or longer. Ex. S (December 13, 2013 Email from Singh to Cain).

42. Defendants Singh and Lamartiniere overruled then-Medical Director Jason Collins's attempts to ensure that inmates received colonoscopies. Ex. AN (December 13, 2013

8

Email from Lamartiniere to Collins); Ex. AM (December 13, 2013 Email from Singh to Benedict).

43. Inmates with hernias did not receive timely treatment. For example, in January 2015, Defendant Poret sent a list of 65 hernia patients to DOC headquarters, which responded that only the top 10 could be scheduled for treatment. Ex. W (Norris Depo.) 36:19-21; Ex. BN (January 26, 2015 Email from Oliveaux to Poret and attachment).

44. Defendant Stacye Falgout was notified in January 2014 that several scheduled procedures and surgery dates were cancelled because of inadequate preparation and/or following of instructions, according to Nurse Melanie Benedict. Ex. AA (January 7, 2014 Email from Benedict to Falgout).

45. In August 2014, Defendant Singh received notice from a treating physician at LSU that Angola patients were arriving at Interim LSU Hospital in New Orleans with "obvious stroke symptoms" "out of the window because it either took them a while to get [there] or the medical staff at Angola did not think the inmate was having a stroke." Despite this warning, Defendants did not warn EMTs that they were failing to recognize signs of stroke. Ex. X (August 25, 2014 Email from Hargrove to Singh); Ex. BI (Cashio Depo.) 77:9-19.

46. Around the same time, Defendants Singh and Stacye Falgout received notice from LSU's Chairman of Oral Surgery that several inmates arrived for treatment with three-week old fractures that were already infected but "could have been treated easily if diagnosed sooner." Despite this warning, Defendants did not warn EMTs that they were failing to recognize signs of infection. Ex. Y at 6 (August 21, 2014 Email from Schmidt to Singh & S. Falgout); Ex. BI 77:9-19.

47. As of October 2015, at least 23 patients at Angola who had been diagnosed with cataracts and referred for surgery were awaiting surgery, and most of them had been waiting for several years. Ex. V (Cataract Backlog).

48. Defendants' expert Dr. Jacqueline Moore observed that there are "inconsistent times that the offenders were seen by a provider. Some offenders were seen within 6 days others not until 2 months." Ex. L at 16-17.

49. Defendants' expert Dr. David Thomas observed that nearly one-third of all specialty consultations were outstanding. Ex. AG (D. Thomas Report) at 19.

50. In a sample of 45 medical records, Plaintiffs' experts Dr. Michael Puisis, Dr. Susi Vassallo, and nurse Madeleine LaMarre found dozens of cases of delayed treatment or diagnosis with which Defendants' experts do not disagree. Ex. M 34-35, 43-47, 61-69, 75-78, 82-83, 85-86; Ex. AH (Thomas Depo.) 70:17-71:19.

### INADEQUATE STAFFING

51. In 2010, Defendant Singh noted that the entire DOC was operating with "bare minimum staff," which he acknowledged was "taking its toll." He knew the inadequate staff at Angola could lead to "compromised health care delivery and possible law suits which will cost millions of dollars," and that "[w]hen we are stretched thin, chances for errors are high and it is very possible for cancers and other diseases to be missed early on." Ex. A (Singh Memo) at 1, 4.

52. In 2010 and 2011, Angola had shortages of EMTs and paramedics. Ex. F (REBTC Monthly Management Report, January 2010) at 1; Ex. G (REBTC Monthly Management Report, January 2011) at 2.

53. Likewise, Angola's nursing director in 2010 informed a deputy warden that her department was "extremely short staffed," despite an increase in workload, which she said could cause patient care to suffer to the point of unsafe practice, including a greater risk of medication errors that could lead to patient deaths. Ex. H (August 8, 2010 Email from Dupuis to Barr); Ex. I (December 2, 2010 Email from Dupuis to Jett).

54. In August 2010, Assistant Warden for Treatment Joe Ruebush, also a nurse, wrote to Singh that one of his nurses had caught a medication error. "Thank God a nurse found this," he wrote. "I am not as confident that a pill call officer would have even known to question this … Very serious adverse effects is an understatement. This could have been life threatening. … It is a matter of time before one of these slip through and we have a bad outcome." Ex. AJ (August, 6 2010 Email from Ruebush to Singh).

55. In 2012, closure of the C. Paul Phelps Correctional Center led to the transfer of approximately 1,000 inmates to Angola with no increase in staffing. Ex. M at 17; Ex. N (December 18, 2012 Email from Singh to LeBlanc).

56. In her Report, Defendants' expert Jacqueline Moore acknowledged several ongoing staffing shortages including "physician manpower shortages," the need for a chronic care nurse, and the need for a dedicated Health Services Administrator. In deposition she also acknowledged that nurses complained about inadequate staffing in the outpatient and infirmary care. Ex. L at 6, 25-26; Ex. AW (Moore Depo.) at 87-88.

57. On February 19, 2016, Defendant LeBlanc testified to the Louisiana Legislature that the prison system has an "already saturated staff, especially as it relates to medical and mental health" and admitted that "at this point we don't have enough resources to do what we have to do." Defendant LeBlanc subsequently acknowledged that "We can't medicate them, we can't house them, we can't feed them—and those are constitutional

issues." (Overview from and discussion with state agencies regarding Fiscal Year 2015-2016 and Fiscal Year 2016-2017 budgets: Hearing before the H. Comm. on Appropriations, La. Legis. 1st Spec. Sess. (2016) (statement of James LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections) via Louisiana House of Representatives Video Archives, *available at* http://house.louisiana.gov/H_Video/VideoArchivePlayer.aspx?v=house/2016/feb/0219_16_AP_P1 (last visited Jan. 5, 2017); Bryn Stole, *Corrections outlines plans for $14.2 million shortfall, including plans to potentially shut down two privately run prisons, reducing sheriffs' pay for housing state inmates*, The Advocate, Mar. 3, 2016, *available at* www.theadvocate.com/baton_rouge/news/politics/legislature/article_cff0af83-7a6b-50c0-9e2c-6e78eb878ddf.html)

**MEDICAL SERVICES NOT DELIVERED BY QUALIFIED MEDICAL STAFF**

58. Correctional officers at Angola administer medication to inmates in some housing units and are supervised by other correctional officers. Ex. BJ (Willis Depo.) 11:10-25; 12:21-24; Ex. L at 27.

59. Acting as orderlies, Angola inmates deliver direct patient care to other inmates, including hygienic services such as showering and cleaning, and feeding inmates who cannot feed themselves. Ex. BK (Response to RFA) at No. 6; Ex. AL 94:25-95:5; Ex. BM (Orderly Training); Ex. M at 80.

60. LSP's policy states: "Inmates are not to be used for performing direct patient care services." Ex. AK (HC-23 April 15, 2011)

61. EMTs at Angola triage "sick call" forms submitted by inmates. Ex. BK at No. 8.

62. In Louisiana, EMTs' scope of practice includes only "trauma triage," not routine triage. Ex. BL (Moore Rep. Appendix A).

63. Angola's "sick call" process does not comply with the prison's policies and procedures, which mandate that medical professionals triage inmate requests daily. Ex. M at 31, citing Access to Care and Clinical Services. No. HC-01, LSP Health Care Manual, 2/28/2011; Ex. L at 16.

## CHRONIC CARE

64. Defendants are aware that prisoners have high rates of chronic medical conditions. Ex. AS (Aging Population Presentation by Falgout) at 8.

65. Defendants employ physicians who lack any background in internal medicine, family medicine, or another specialty that would prepare them to treat complex chronic conditions. Ex. M at 23.

66. In 2012, a medical peer reviewer at Angola recommended that Dr. Collins review the chronic disease manual and discuss it with his health care staff, since he noted some variations in labs being ordered. Ex. AZ (Healthcare Professional Peer Review Report, 2012).

67. In 2014, a medical peer reviewer at Angola found deficiencies in chronic care services, including failure to follow the facility plan. Ex. Z (LSP Medical Peer Review by Dr. Johnny F. Prejean, 2014) at 2.

68. In 2016, the American Correctional Association ("ACA") found in its chart review that some charts did not have a plan for the treatment of offenders with chronic conditions and other charts did not have a plan to address the monitoring of medication, laboratory

testing, use of CCC's, health record forms, or frequency of consultation specialist and review. Ex. AR (ACA Medical Evaluation).

69. Plaintiffs' experts found "a similar pattern of inadequate medical evaluations and lack of timely monitoring and treatment" in "virtually every chronic disease record" they reviewed. Defendants' experts reported no disagreement with the vast majority of these chart reviews. Ex. M at 42-47; Ex. AH 70:17-71:19.

70. Defendants' expert Jacqueline Moore also found deficiencies in chronic care in several of the medical records she reviewed in her limited chart review. She determined that from July 2015 to February 2016, 1176 chronic care offenders were seen but that the number appears low in comparison with the characteristics of a patient population with many inmates over 43. These low numbers may be due to physician manpower shortages. Ex. L 24-25.

## MORTALITY, QUALITY CONTROL, AND SPENDING

71. Between February 1, 1995 and December 31, 2015, the inmate population at Angola increased from 5,108 to 6,325. Ex. AE 52:21-23.

72. During that time, Angola's medical staff decreased from about 1,800 to about 1,500. Ex. A 51:7-9.

73. Angola staff complained that the Warden would frequently cut staff or overtime without notification or reason. Ex. L at 6.

74. The Bureau of Justice Statistics' report on mortality rates is a reliable source for correctional mortality. Ex. AH (Thomas Depo.) 63:5-11.

75. The mortality rate in Louisiana prisons was the third-worst rate in the country as of 2001, 63% above the national average—but its rate spiked in 2008 and has risen

14

dramatically since. Since then, Louisiana's prison mortality rate has been the worst in the country and at least twice the national average every single year. The three highest mortality rates ever recorded for any state correctional system are the last three years reported for Louisiana. Ex. AX (BJS 2000-2013 Statistical Tables) at Table 26.

76. Louisiana has the highest inmate death rate in the country. *Id.*; Ex. AF 286:8-10.

77. Between 2011 and 2015, cases of hypertension at Angola increased 20 percent (from 2192 to 2631); diabetes cases increased 30 percent (from 445 to 578); cancer cases increased 126 percent (from 70 to 158); hyperlipidemia cases increased 241 percent (from 128 to 437); ischemic heart disease cases increased 288 percent (from 17 to 66); and COPD/Asthma cases increased 188 percent (from 210 to 605), according to Defendant Nursing Manager Karen Hart. Ex. K (2011 Census and Acuity Documentation).

78. Hart documented an increase in the inmate population and chronic conditions from 2011 to 2015, along with a decrease in external resources. During the same period, the number of nursing staff members remained static, Hart reported. Ex. K

79. Angola's Quality Improvement Committee has no mechanism to identify quality concerns or to provide corrective action. Ex. M at 89; Ex. L at 29.

80. Defendants' expert wrote that Angola's quality improvement program is "largely ineffective." Ex. L at 29.

81. As of 2013, Louisiana had the third-lowest rate of per-inmate health care spending in the nation. Ex. AT (Pew Report).

82. Between 2001 and 2008, Louisiana's per-inmate spending grew by just 11 percent while the median growth was 32 percent. *Id.*

83. Between the 2014 and 2015 fiscal years, Angola cut the amount it spent on health care. Ex. AV (Jan. 30, 2015 presentation to the Police Jury Association Convention)

84. The largest category of grievances filed by inmates, known as administrative remedy procedures ("ARP"), is access to care. Ex. L at 30.

85. The number of medical ARPs filed in 2010 and 2011 were 411 and 476, respectively. The number of letters to the Assistant Warden of Health Services in 2010 and 2011 were 1,297 and 1,554, respectively. Ex. F; Ex. G.

Respectfully submitted by:

*/s/ Mercedes Montagnes*
Mercedes Montagnes, La. Bar No. 33287
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Telephone: (504) 529-5955
Facsimile: (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Jeffrey B. Dubner (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: jdubner@cohenmilstein.com

Bruce Hamilton, La. Bar No. 33170
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (888) 534-2996
Email: bhamilton@laaclu.org

Miranda Tait, La. Bar No. 28898
Derek Warden, La. Bar No. 37348
Advocacy Center
600 Jefferson Street, Suite 812

Lafayette, LA 70501
Telephone: (337) 237-7380
Facsimile: (337) 237-0486
Email: mtait@advocacyla.org

**CERTIFICATE OF SERVICE**

    I hereby certify that on January 6, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Mercedes Montagnes*
Mercedes Montagnes