# Louisiana State Penitentiary at Angola

## Health Care Evaluation

Submitted October 3, 2016
Corrected October 5, 2016

Prepared by

Madeleine LaMarre MN, FNP-BC
Mike Puisis DO
Susi Vassallo MD

JX-CCH-000001

# Table of Contents

**Document Review** ...................................................................................3

**Overview** ...............................................................................................4

**Qualifications** ........................................................................................5

**Executive Summary** ..............................................................................7

**Methodology** .......................................................................................10

**Findings** ..............................................................................................11

    Facility Description .......................................................................11

    Organizational Structure and Health Care Leadership.................11

    Human Resources, Staffing and Budget ......................................16

    Health Care Operations, Clinic Space and Sanitation...................28

    Policies and Procedures ..............................................................30

    Access to Care ............................................................................31

    Chronic Disease Management .....................................................42

    Pharmacy and Medication Administration ..................................48

    Laboratory/Radiology..................................................................54

    Health Information Management (HIM) .......................................57

    Urgent/Emergent Care................................................................60

    Specialty Services/Consultations.................................................71

    Inpatient Care.............................................................................79

    Mortality Review .......................................................................84

    Internal Monitoring and Quality Improvement Activities............87

# Document Review

We reviewed the following documents for this report:

Lewis et al. v. Cain et al.  Class Action Complaint. United States District Court, Middle District of Louisiana. Case No. 3:15-cv-00318-BAJ-RLB.  5/20/15.

Lewis et al. v. Cain et al. Second Amended Complaint. United States District Court, Middle District of Louisiana. Case No. 15-318. 7/19/16.

Second Amended Complaint, 7/19/16.

LSP Tables of Organization and Staffing

DOC and LSP Health Care Policies and Procedures

LSP Chronic Disease Manual

Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions. 2002. American Correctional Association (ACA).

Standards for Health Care Services in Prisons. 2014. National Commission on Correctional Health Care (NCCHC).

State Prison Health Care Spending. July 2014. The Pew Charitable Trusts and MacArthur Foundation.

Training Records

Credentialing Files

Peer Review Files

Outside Contracts

Quality Improvement Meeting Minutes

Pharmacy & Therapeutics Committee Meeting Minutes

Health Care Process Tracking Logs

Nursing Administration Policies and Procedures

Staff Licensure and Job Descriptions

Sanitation Reports

Patient Do Not Resuscitate (DNR) Declarations

Sick Call and Emergency Medical Services (EMS) Protocols

Medication Training for Pill Call Officers

AU Board Handout

Health Record Forms (e.g., Initial Intake Medical Screening, EMT forms, etc.)

Health Care Budget Fiscal Year 2015-2016

Health Care Provider Assignments by Housing Unit

Nursing Assignments Unit 1 and 2, 3/15/16.

UM Referral Forms for Specialty Services

Chronic Disease Medication Lists

Infection Control Meeting Minutes 2012-2015

Medical Records (See Appendix A)

Declaration of Monica Dhand MD

Declaration of Jane Andrews MD, MPH

Declaration of Catherine Jones MD
Randy Lane Lavespere MD Consent Order. Inv No. 06-I-117. 10/19/09. Louisiana State Board of Medical Examiners.
August 5, 2016 Randy Lavespere individual and 30(b)(6) depositions
Linda Camille Bunch MD Hiring File
Ronald Sylvest MD Hiring File
Ronald Sylvest MD Consent Order. Inv. No. 13-I-247. 1/11/2016. Louisiana State Board of Medical Examiners.

We received several documents in mid- or late September 2016 and did not have sufficient time to review them for inclusion in this report.  We may discuss these documents in a rebuttal report.  These documents include:
- Medical records for 47 individual prisoners with chronic diseases
- Additional depositions taken in this matter
- Additional administrative and budget records

# Overview

On March 15-18, 2016, Michael Puisis DO, Madeleine LaMarre MN, FNP-BC, and Susi Vassallo MD conducted a site visit at Louisiana State Penitentiary at Angola, Louisiana. The purpose of the site visit was to assess Defendants' policies and practices regarding health care to determine whether they complied with accepted standards of care and whether they placed LSP inmates at risk of harm when they developed serious medical conditions.

We were accompanied by Elizabeth Compa and Mercedes Montagnes of The Promise of Justice Initiative, Jeffrey Dubner of Cohen, Milstein, Sellers & Toll, PLLC and Miranda Tait from the Advocacy Center.

The review team performed the following activities in preparation for and during the site visit:
Reviewed the *Lewis et al. v. Cain et al.* Class Action Complaint
Toured LSP, including medical clinics, infirmaries, acute treatment unit (ATU) and selected inmate housing units, including Death Row
Interviewed health care and custody leadership and staff
Observed medication administration
Observed sick call
Observed emergency response
Reviewed health records and other medically related documents
Interviewed inmates

We thank Darrel Vannoy, Warden, Stephanie Lamartiniere, Assistant Deputy Warden, and Randy Lavespere, M.D. for their assistance in conducting the review.

# Qualifications

Madeleine LaMarre, MN, FNP-BC is an independent consultant in correctional health care with more than 30 years of experience in corrections. Her general qualifications as an expert are set forth in her Curriculum Vitae. She holds current licensure as a family nurse practitioner in the states of Georgia and New Mexico and is nationally certified by the American Nurse Credentialing Center (ANCC). She is a member of the American Nurses Association, the American Association of Nurse Practitioners, and the Academy of Correctional Health Care Professionals. She is familiar with standards of health care in correctional facilities.  Beginning in 1982, she worked as both clinician and administrator of a Georgia Department of Corrections (GDC) facility providing clinical care to inmates. She subsequently became the GDC Nursing Director providing expert clinical assistance in the planning, implementation and evaluation of nursing services.  In 1995, Ms. LaMarre became the GDC Clinical Services Manager and her responsibilities included development of health care policy and oversight of a clinical auditing program to monitor and improve the quality of health care in GDC institutions. She provided technical assistance and consultation to nurses and clinicians to achieve patient care goals.  She is or has been a correctional medical expert in the states of California, Delaware and Ohio, monitoring state compliance with settlement agreements and is currently a monitor at the Dallas, Cook and Passaic County Jails. She has served as a consultant to the Centers for Disease Control and Prevention (CDC) regarding the management of Hepatitis C in correctional facilities and HIV testing implementation for correctional settings. Ms. LaMarre has authored and coauthored several publications, including serving as associate editor of *Clinical Practice in Correctional Medicine*, Second Edition, a textbook on correctional medicine.  In this text, she authored a chapter on the nursing role and practice in correctional health care settings.

Michael Puisis, D.O. has worked as a physician in correctional environments for over 30 years. During that time, in addition to direct patient care, he has served as Assistant Medical Director, Medical Director and then Chief Operating Officer for the Cook County Jail, one of the largest jails in the country.  He also served as Regional Medical Director for the state of New Mexico prison system for Correctional Medical Services and corporate Medical Director of correctional facilities for Addus Health Care.  Dr. Puisis has served as an expert or consultant in cases throughout the country since 1989.  He has been retained by the United States Department of Justice and by the Federal Court in the Northern District of California, as well as numerous lawyers and governmental jurisdictions who either seek to improve care or are challenging the provisions of care in prisons and jails.  He has also been a court-appointed expert in numerous cases.  He is currently serving as an expert or consultant in the following cases:

Lake County Jail, Indiana; medical expert for US Department of Justice
Dallas County Jail; medical monitor
*Plata v. Davis*; Court's medical expert
Consultant to Department of Homeland Security
*Duval et al v. Hogan*; State of Maryland, medical monitor
*Dunn et al v. Thomas*; medical expert  for plaintiffs

*Hall v. County of Fresno*; medical monitor
*Lewis v. Cain*; medical expert for plaintiffs

Dr. Puisis has assisted the American Diabetes Association in establishment of standards of care for diabetics in correctional facilities.  He has also assisted in the revision of the standards of medical care for correctional facilities for the National Commission on Correctional Health Care and the American Public Health Association.  He has published articles related to correctional health care and has edited the only textbook of correctional medicine, *Clinical Practice in Correctional Medicine*,  2nd edition 2006 Mosby Elsevier.  A complete curriculum vitae is attached.

Susi Vassallo, M.D. is a Clinical Professor of Emergency Medicine at the New York University School of Medicine, and a Fellow of the American College of Emergency Medicine and the American College of Medical Toxicology. She actively practices and teaches emergency medicine and medical toxicology at Bellevue Hospital, a large urban emergency department in New York City.  She has a Masters of Science degree in Health Care Management. In the past 15 years, she has served as a medical expert in conditions of confinement litigation in the Texas Department of Justice prison system, on death row at the Louisiana State Penitentiary, at the Mississippi State Penitentiary death row, and at the Rikers Island Jails in New York City. She consults for the Department of Homeland Security Division of Civil Rights and Civil Liberties and, as such, reviews the systems of medical care delivery in Immigrations and Customs Enforcement Detention Centers.

# Executive Summary

Defendants are alleged to engage in a number of systemic practices that expose all members of the Plaintiff Class to unacceptable risks to their health, including, but not limited to:

Routinely delaying evaluation, treatment and access to specialty care;

Declining to provide medically necessary treatments, including surgeries, medication, medical devices, physical therapy, and appropriate screening tests;

Failing to provide and manage medication in accordance with prescriptions and medically appropriate treatment courses;

Failing to ensure that Plaintiffs' medical needs are addressed in their follow-up care, dietary plans, work requirements, cell conditions, and other aspects of confinement;

Enforcing a "malingering" rule designed to punish Plaintiffs who seek treatment and discourage them from seeking medical treatment; and

Maintaining an insufficient number of qualified medical personnel such as physicians and nurses, such that some medical tasks are performed by unqualified individuals including prisoners.[1]

The US Supreme Court has established that prisoners should not be subjected to cruel and unusual punishment proscribed by the Eighth Amendment of the Constitution.  Included in their rights is the right to access to care, the right to a professional medical judgment, and the right to care that is ordered.  The Louisiana State Penitentiary violates these rights of patients with serious medical conditions.

Our review showed serious and systemic problems with access, timeliness and quality of care at Louisiana State Prison. LSP lacks the infrastructure necessary to provide an adequate health care system for patients with serious medical needs.  This includes lack of an adequate organizational structure, health care budget, staffing types and numbers, credentialing and peer review processes, health care policies and procedures, clinic space, medical equipment and supplies, and quality improvement program. In addition to these infrastructure deficiencies, health care processes are broken, including access to care, medication administration, chronic care management and infirmary care.

LSP patients do not have timely access to a medical professional who is qualified to diagnose and treat their serious medical needs.  LSP patients are not provided the most basic and essential elements of adequate health care access. This includes timely access to a qualified medical professional who has access to the patient's medical record, and examines the patient in an adequately equipped and supplied examination room that provides privacy and confidentiality.  Inmates are also punished for seeking medical care.

---

[1] Lewis v. Cain Class Action Complaint.

At LSP, emergency medical technicians (EMTs) and paramedics are front line staff for screening and treatment of patients with routine (sick call) and urgent health care needs. However, instead of conducting sick call in a medical setting, EMTs openly conduct sick call in inmate housing units without the patient's medical record, adequate medical equipment or supplies, and without privacy or confidentiality. Thus, it is not surprising that virtually all EMT assessments are inadequate.  Moreover, EMTs are not licensed to diagnose and treat medical conditions and patients are not provided access to a professional medical judgment.  Physicians are supposed to clinically supervise EMTs, however this does not meaningfully occur.

With respect to urgent care access, we found that EMTs and paramedics independently manage patients with acute and life-threatening conditions and in most cases, a physician never examined the patient during the acute event. As a result, these patients did not receive timely diagnosis and treatment, including being sent to an outside hospital. This resulted in many preventable deaths.

With respect to chronic disease management, we found that LSP chronic disease guidelines are completely inadequate and not based upon nationally recognized clinical practice guidelines. LSP physicians do not perform history and physical examinations pertinent to the patient's diseases, timely address abnormal laboratory tests, assess medication adherence, and monitor the patient in accordance with the patient's disease control.  In fact, in many records we reviewed, the physician did not examine the patient. Predictably, this resulted in patients' chronic diseases being poorly controlled and increasing their risk of harm.

The medication administration process does not ensure that patients timely receive their medications.  Health care understaffing has resulted in correctional officers administering medications, for which they are not trained and licensed. Medication administration records are unreliable and even show that staff document administering medications to patients after they have died. In medical housing units, inmates are used to administer medications to other inmates.

With respect to infirmary care, LSP does not have clinical criteria for admission to the infirmaries. This has resulted in medically unstable inmates being admitted to the infirmary instead of being sent to a hospital, resulting in preventable deaths. Physicians do not perform adequate medical evaluations. Health care understaffing has resulted in inmates being used to provide direct patient care in the infirmary and medical housing units, in violation of correctional standards.

An egregious finding is that LSP hires physicians that are unqualified by virtue of their education and training to treat serious medical conditions commonly found among correctional populations.  Moreover, LSP hires physicians with behavioral or other problems that resulted in discipline against their license, including commission of felony crimes. The entire physician staff working at LSP has had their licenses suspended or restricted by the Louisiana State Board of Medical Examiners (LSBME).  This includes the LSP Medical Director, who had his license suspended in 2006 for his arrest and conviction for possession with the intent to distribute

methamphetamine. This physician has the responsibility to supervise other physicians. Another physician entered into a consent order with the Louisiana State Board of Medical Examiners for sexual misconduct with a patient and boundary violations of prescribing medications to family members and himself without maintaining proper medical records. Another physician had his license suspended in 2013 for dependency on controlled substances which he self-prescribed for his own use.  Another physician had his license placed on probation status for alcohol dependency in 2011. Another physician was initially suspended for alcoholism in 2009.  A recently hired physician served 24 months in federal prison for selling human growth hormone.

In these cases, the Louisiana State Board of Medical Examiners revoked the physicians' license to practice medicine to "ensure the health, safety and welfare of the citizens of this state against the unprofessional, unqualified and unsafe practice of medicine," except in "an institutional, prison, or other structured setting approved by the Board."[2] *In other words, the Board is willing to protect the health, safety and welfare of its citizens, unless they are in prison.* Thus, the State of Louisiana Board of Medical Examiners has essentially sanctioned substandard care for prison inmates. By hiring these physicians, the Louisiana Department of Corrections and Public Safety has essentially ensured inmates receive substandard care.

The evidence of substandard care is borne out by steadily increasing prisoner death rates in Louisiana over the past 13 years.  In 2001, Louisiana prisoners had a mortality rate of 361 per 100,000 prisoners.  This was the 3rd highest death rate of state prison systems in the country. In 2013, the last year for which data is available, Louisiana prisoners had a mortality rate of 628 per 100,000 prisoners.  This was the highest rate in the country.  In 2013 the average death rate for state prisons nationwide was 274 per 100,000.  Louisiana therefore had a mortality rate in 2013 of more than double the average death rate of prisoners in the country.  We incidentally note that during this same period, the health care budget was drastically reduced.  Given our record reviews of deaths, it is our opinion that there are many preventable deaths at LSP that explain this extraordinary prisoner mortality rate. It is our opinion that these preventable excess deaths are a consequence of the systemic inadequacies in the health program.

In summary, the LSP health care delivery system fails to provide adequate care to the population and places inmates at significant risk of serious harm.  In our collective experience of over 60 years in correctional medicine, the Louisiana State Penitentiary's delivery of medical care is one of the worst we have ever reviewed.

---

[2] Randy Lane Lavespere MD Consent Order. Inv No. 06-I-117. 10/19/09. Louisiana State Board of Medical Examiners.

# Methodology

In evaluating the policies and practices in a correctional health care system, correctional medicine experts typically apply several modalities. First, they interview individuals who interact with the system, including both staff and patients. Second, they observe the delivery of care in practice, including the setting in which care is delivered, and assess the extent to which resources are sufficiently available to timely treat patients with serious medical needs. Third, they review the policies and procedures in effect in the system, along with administrative documents such as budget documents, quality improvement reports, etc. Fourth, they review a sample of health records selected from among patients with serious medical needs, including those who required complex or chronic care, or experienced adverse outcomes that are often associated with inadequate treatment, including death.[3] We employed all of these modalities in evaluating LSP's health care system.

In considering whether LSP's policies and practices met community standards, we consider, among other things, the standards promulgated by the National Commission on Correctional Health Care ("NCCHC"). The NCCHC is an organization founded by the American Medical Association that has been issuing standards for correctional health care since 1976. Among correctional health care professionals, they are generally considered an important benchmark for the appropriateness of a given system.  We also considered standards published by the American Correctional Association.

With respect to record review, we selected records of patients with chronic diseases and other serious medical conditions because these are the patients who use the health care system most regularly and are at risk of harm.  We determine whether medical care is consistent with nationally recognized clinical guidelines such as those published by the American Diabetes Association (ADA), the Centers for Disease Control and Prevention (CDC), and the American Thoracic Society, etc. Our review focused on the quality of care as well as clinical systems.

Clinical systems reviewed included intra-system transfer, access to care, medication administration, chronic diseases, specialty services, hospitalizations, inpatient care, and death reviews.  To evaluate the quality of the care provided by primary care physicians, we selected records of patients with chronic diseases to assess whether medical providers provided adequate treatment and monitoring.  The assessment of adequacy of care for these records is not dependent on whether the patient achieves a specific therapeutic goal, but whether the provider provides appropriate treatment, monitoring, and/or referral in response to the patient's serious medical needs. This methodology for record selection maximizes the amount of meaningful information that is available to evaluate the providers' clinical judgment and

---

[3] We have also interviewed and examined many of the named plaintiffs, along with reviewing their records. However, we do not rely on these assessments in determining the overall adequacy of LSP's health care system. Where we discuss individual named plaintiffs in this report, it is solely to discuss how the problems we observed affect them, rather than a step in our method of evaluating the health care system as it affects all inmates.

decision making capacity in order to determine whether patients receive necessary care within a clinically appropriate timeframe.

For efficiency and effectiveness, we have combined our expert reports.  Each of us has reviewed, discussed, and endorsed the contents of this report.

# Findings

## Facility Description

Louisiana State Penitentiary (LSP) at Angola is the largest maximum security prison in the United States.  It is located in a remote area of Louisiana on approximately 28 square miles of farmland.  The prison consists of a main unit consisting of 32 dormitories on the East and West Yards.  The main prison also includes 4 cell blocks (A, B, C, and D) with individual cells; and the R.E. Barrow Treatment Center, which comprises Unit 1 and Unit 2 infirmary housing and the Acute Treatment Unit (ATU).

Infirmary Unit 1 is intended for acute care patients.  Infirmary Unit 2 is intended for persons requiring long-term nursing home type care and also includes hospice patients.  Based on the numbers provided, the main prison, Treatment Unit and infirmaries house a total of 3,216 inmates.

In addition to the main prison, there are 4 remote camps (C, D, F, and J) and a separate building for death row and administrative management inmates. Camps C and D have a combination of dormitories and cellblocks.  Camp F has minimum dormitories.  Camp J is mostly cellblocks except for a worker dormitory.  The outlying camps and death row combined house 3,041 inmates.

## Organizational Structure and Health Care Leadership

**Methodology:** We interviewed facility health care leadership, reviewed tables of organization, staffing and budget reports, and credentialing and peer review documents.

**Standards:** A medical program in a large prison is typically managed by a responsible health authority, which is the person or entity responsible for arranging for all levels of health care and for ensuring quality, accessible and timely health care.[4] Typically, a health authority is a health administrator or a physician.  According to NCCHC Standards, a health administrator "is a person who by virtue of education, experience, or certification (e.g. MSN, MPH, MHA, FACHE, CCHP) is capable of assuming responsibility for arranging all levels of health care and ensuring quality and accessible health services for inmates."  If a health authority is not a physician, then a named physician needs to be the ultimate authority for clinical decisions.

---

[4] Standards for Health Services in Prisons. 2014. NCCHC P-A-02.

**Findings:** The medical program at LSP is not organized on a medical model.  The Assistant Warden, Ms. Stephanie Lamartiniere, has operational control over all aspects of the medical program and directly supervises a significant portion of health care staff. However, she lacks appropriate training in any health related field.

Ms. Lamartiniere is a former secretary to the Warden. She has been a custody employee for 26 years and in her current position for 2 years.  She reports to a Deputy Warden who reports to the Warden.  As noted above, Ms. Lamartiniere has no training in health care.  Furthermore, her leadership involves no real authority to manage the health program. For example, she does not have input into the budget and was unaware of the current budget amount for the medical program.  She was unable to explain what the budgetary needs of the medical program were.  To clarify budget matters she called on two administrative budgetary personnel who work in the Warden's office.  Although she is the named responsible authority for the medical program she had no knowledge about specific medical program operational issues.  She indicated that operational outcomes of the health program are documented on a monthly report to the Warden which includes statistics about the program.   However, Ms. Lamartiniere couldn't elucidate specifics about the report in an interview.  She stated that hiring and firing of all medical staff, including physicians, is through the Warden.

Dr. Randy Lavespere is the Director of Medical Services and administratively reports to Assistant Warden Lamartiniere with a clinical reporting line to Dr. Raman Singh, the Medical/Mental Health Director of the Louisiana Department of Public Safety and Corrections. Dr. Lavespere supervises mental health program staff, the dental department, the pharmacy, laboratory, radiology, nursing, and medical provider staff.   Dr. Hal MacMurdo is listed as the Medical Assistant Director but currently has full time clinical duties providing medical care to over 1300 inmates which makes it difficult for him to engage in any significant administrative responsibility.

The role of a Medical Director is typically to organize and implement the medical program; to provide clinical supervision to provider staff; and to be the final medical authority on all clinical decisions. Dr. Lavespere apparently does not perform many of these typical functions. He provides some direct patient care in the ATU and on Infirmary Unit 1. His purported supervision of clinical care does not include any formal review of his clinical subordinates.  He does not formally supervise the EMT staff.  He does not participate in quality improvement efforts.  He does not perform or oversee mortality review.  He was unable to provide any specifics of how he spends his time in organizing or supervising the medical program.  He said that he has no input into the budget and "[doesn't] even look at a budget . . . ."[5] He also stated, that "The whole state has a resource issue, that's no secret . . . ."[6] It was his understanding that Dr. Singh and the Warden developed the budget. He has never participated in formally assessing whether there is sufficient provider staffing and says he works with whatever is provided in the budget.

---

[5] Transcript of individual Deposition of Randy Lavespere, page 97.
[6] Lavespere individual Deposition Transcript, page 110.

He indicated that he could use additional physician assistants but could not identify any other budgetary needs.

Dr. Lavespere was unfamiliar with any statistics of patients with chronic illness.  Aside from knowing the major medical housing units he could not provide an estimate of types or frequency of clinical conditions of the patients for which he is responsible. He indicated that the medical records department maintained all statistics on clinical matters.  He indicated that his responsibility is to schedule physicians, sign the log for specialty care, review consultation requests, approve all off-site care, review medical records, and assist in developing EMT protocols.

Medical Directors typically make hiring decisions based on the character and training of physician staff. They also make provider assignments based on the training and capabilities of their provider staff.  These decisions are based on the credentials of the provider staff.  Also, Medical Directors monitor physician staff based on specific needs and deficiencies of individual physicians. However, Dr. Lavespere knew very little about the credentials of the physicians working under his direction and was unclear about precisely what was in each physician's credential file. He was not certain about the training of the physicians working under his supervision and did not appear to thoroughly know the deficiencies of his physician staff based on Louisiana State Board of Medical Examiner's investigative reports. During an interview, he referred us to an administrative assistant for any information about credentialing. The credential files had no information with respect to the training or certification of any physicians.

Dr. Lavespere's role with respect to scheduling is limited.  He indicated that medical record staff maintains a provider schedule based on need and the number of patients waiting to be seen in each area.  Dr. Lavespere is assigned to cover the ATU on Mondays and Tuesdays and is back-up for on-call coverage.

As will be discussed in the section on credentialing below, in the past the Louisiana State Board of Medical Examiners (LSBME) has sanctioned 100% of LSP physicians.  Supervision and monitoring this group requires quality leadership, experience, and attention to detailed monitoring.  However, Dr. Lavespere does not participate in monitoring the quality of physician care.  His own prior sanctions with the LSBME make him ill-suited for this leadership position. Of concern is that Dr. Lavespere has a prior felony conviction and served 30 months in a federal prison for selling methamphetamine. According to the Louisiana State Board of Medical Examiners Consent Decree, Dr. Lavespere underwent evaluation at the Palmetto Addiction Recovery Center and was diagnosed with amphetamine, cocaine, and cannabis dependence as well as adjustment disorder and personality disorder with antisocial, narcissistic, and avoidant features. According to the Consent Decree, Dr. Lavespere's supervising physician was to periodically observe his practice and review records to determine whether he was practicing consistently with the accepted standards of medical practice and professionalism.  Although Dr. Lavespere is no longer under a sanction by the Louisiana State Board of Medical Examiners, his potential for relapse and his underlying mental health issue should continue to be monitored. There is no evidence that this occurs.

Our review shows that Dr. Lavespere's practice is not consistent with accepted standards of professionalism and medical practice. He does not believe that inmates are entitled to privacy.[7] Disturbingly, he believes that as Medical Director his biggest challenge is determining "who's telling the truth."[8] He believes that fully half of his patients do not tell the truth.[9] Moreover, he believes that patients "don't want to be better" and that some inmates "want you to take [them off] their medication so their blood pressure will go up so they can have a stroke so they can say, you took my medicine."[10] For any physician, much less the Medical Director, to begin each encounter with a presumption that patients are not telling the truth is the epitome of unprofessionalism.

With respect to medical practice, our record review shows that Dr. Lavespere as well as other medical providers do not document adequate examinations (e.g. history of the chief complaint, review of systems, past medical history and pertinent physical examination and labs) that support the patient's diagnosis and treatment plan.  However, Dr. Lavespere does not believe he has to document a complete medical examination because:

> "When I'm in the ATU working, okay, I don't write all that down. I don't need to, you know. I've done it so many times. . . . If I look at a guy's x-ray and I see that he's got right lower lobe pneumonia, I don't need to go ask him what color sputum you're coughing up, do you have any associated fever with that? I don't need all of that, I've got a diagnosis you know.

> "When you start taking the medical history and review of systems, all of that leads you to a diagnosis, you know. If you've got a diagnosis, why would you need all of that?  It's like going to court and having a verdict and going through the deposition afterwards. You know, it just doesn't make sense and it wastes time. . . .

> "I've been a doctor for 16 years, I don't need all that. . . .

> "Now, my EMT might write, you know, sputum production, short of breath, wheezing, all the kind of stuff. But my orders are going to show what my diagnosis is. If I got a guy on breathing treatments, that's going to tell me he was wheezing. If I got a guy on IV antibiotics, you know, it's going to tell me what I need to know, you know."[11]

Thus, not only does Dr. Lavespere fail to adhere to standards of medical practice and professionalism, it is likely that in his role of Medical Director he will tolerate substandard practice from other medical providers, and our review found this to be the case. This has

---

[7] Lavespere individual Deposition Transcript, page 33.
[8] Lavespere individual Deposition Transcript, page 18.
[9] Lavespere 30(b)(6) Deposition Transcript, page 7.
[10] Lavespere individual Deposition Transcript, page 51.
[11] Lavespere 30(b)(6) Deposition Transcript, pages 60-61.

resulted in widespread harm to patients.  Additionally, until becoming Medical Director, Dr. Lavespere's license was restricted and he was prohibited from prescribing controlled substances. Medical judgment regarding prescriptions should not be subordinated to physicians' license restrictions; rather, physicians who are licensed to prescribe appropriate medications should be employed. Although Dr. Lavespere's restriction was lifted when he became Medical Director, it appears that LSP continues to restrict narcotics in a medically inappropriate fashion, as discussed below.

The Director of Nursing, Sherwood Poret, also reports to the Assistant Warden over medical care, Stephanie Lamartiniere.  He also has no input into the budget.  The Director of Nursing supervises the 57 nurses working at LSP. He does not supervise the emergency medical technicians who provide emergency services and triage and evaluate inmate health requests. He also does not supervise correctional officers who administer medications. The Department of Nursing provides limited training to officers who administer medications.

EMTs are designated security staff and administratively report to the Assistant Warden. EMTs are responsible for triaging and evaluating inmate health requests as well as medical emergency response. EMTs also participate in custody functions such as physically fighting fires. Dr. Lavespere is responsible for clinical supervision of their work yet he does not conduct any formal review of the EMTs' work. He says that he reviews their work "all the time" by reviewing health records on an ad hoc basis.  This is inadequate supervision.  Our review showed that there is no monitoring to ensure that EMTs practice within the scope of their license and that their care is of adequate quality. Dr. Lavespere is responsible for development and periodic review of EMT protocols. Dr. Lavespere indicated that there is no specific training for the EMTs with respect to performance of sick call or use of the protocols except as required by their licensure and scope of practice. He indicated that all basic emergency medical technicians and paramedics should be able to use and follow an EMT protocol.  Thus, for all practical purposes, the EMTs receive no training or supervision, and our review showed they practice well beyond the scope of their licensure, resulting in serious harm to patients.

Correctional officers administer medications but are not meaningfully trained or supervised by medical staff.  Safe medication administration requires knowledge of medications and their side effects, which correctional officers simply do not have. In the past year, the pharmacist has provided a 5 hour training course to some officers, but for all practical purposes they are unsupervised. The practice of using officers to administer medications is dangerous to inmates at LSP.

Inmate workers provide many nursing services to inmates on the infirmary and in medical housing units. Some staff reported that custody supervised inmates and other staff reported that nurses supervised inmates. Based upon this information, we believe that for all intents and purposes, inmate orderlies provide direct health care, even though they are untrained and unsupervised. This is against all correctional standards.

This organizational structure does not have functional lines of authority through a medically trained person and is inappropriate.

## Human Resources, Staffing and Budget

**Methodology:**  We interviewed facility health care leadership and human resources staff. We reviewed current and planned acuity based staffing plans, vacancy and fill rates and job descriptions. We also reviewed the process for credentialing, peer review and annual performance evaluations.

**Standards:** A sufficient number of health staff of varying types provides inmates with adequate and timely evaluation and treatment consistent with contemporary standards of care.[12] Inmates do not provide health care services.[13] All qualified health care professionals have credentials and provide services in accordance with the licensure, certification and registration requirements of the jurisdiction. A restricted license that limits practice to correctional institutions is not in compliance with this standard.[14]

**Findings:** At LSP, the Medical Director and Director of Nursing interview candidates for employment but the Warden gives final approval for all hires.  According to Ms. Lamartiniere, Dr. Singh signs off before any hiring but the Warden is the hiring authority and also responsible for firing employees.  Final responsibility for hiring and firing of professional health care staff should be under control of the supervisory health care professionals in the organization, not a custody official.  Central office should ensure that all newly hired physicians, nurse practitioners and physician assistants are properly licensed and credentialed.

We were provided 3 different sources for staffing information.  These 3 different sources all had different staffing numbers.  One was titled the LSP Direct Medical Care Providers and dated 3/31/15.  Excluding dentists and mental health staff, this list had 105 medical positions.[15]  This list included no pharmacy staff. The second source of staffing information was a 5/20/15 medical staff current employee list. This list included 13 pharmacy staff and totaled 106 employees.[16]  A third source of staffing was the table of organization which included all positions including whether they were filled or not. These tables included 115 positions with 115 positions filled.  However, the numbers of staff in the tables of organization did not match either of the other sources of staffing.  This is a representation of management's lack of ability to present accurate staffing information.  As an example, on the day of our tour the Director of Nursing Sherwood Poret told us that there were 57 nursing staff including 1 respiratory therapist, 2 medical assistants, 20 RNs, and 34 LPNs.  These positions did not correspond to any of the 3 sources of staffing presented to us.

---

[12] NCCHC. P-C-07.

[13] NCCHC. P-C-09.

[14] NCCHC. P-C-01.

[15] LSP Direct Medical Care Providers, 3/31/15.

[16] "Offender Lawsuit 1/1/2010 to 5/20/2015 – Medical Staff."

Since 2009, the number of staff appears to have declined.  Excluding dental and mental health staff there were 118 medical employees in 2009.  This is a decrease of approximately 3 to 13 positions depending on which source of staffing is used. The staffing information provided to us does not include 4 job appointment nursing staff that are non-budgeted temporary hires as described by the Director of Nursing. The decline in staffing has occurred during a time when the number of inmates at LSP increased.  In 2012, the Phelps prison closed and approximately 1000 inmates transferred from Phelps to LSP increasing the population at Angola. This occurred with no increase in staffing. The fact that the staffing level is lower today while the prison census is 20% higher reinforces our findings, discussed below, that the medical system is significantly understaffed.

There are no clerical employees in any of the 3 sources of medical staffing.  This includes medical records, secretarial, and other clerical staff.  Apparently, these clerical positions are on the Warden's budget.  It isn't possible to determine the adequacy of clerical staffing since the number of permanently assigned staff is unknown to the review team.  Also, it appears that these employees report to the Warden and not to medical personnel.  The ultimate hiring authority and supervisor of staff working in the medical program should be a person who understands the responsibilities of the employee.  Information in medical records, for example, needs to be confidential even from custody staff. But, when the Warden is the hiring authority, that confidentiality is more likely to be breached since an Assistant Warden ultimately supervises these staff.

Despite the ambiguity as to accurate staffing data, it is our opinion that there are inadequate staff with respect to physicians and nursing positions, and perhaps other types of staff, as discussed below.

**Medical Provider Staffing**
At the time of our site visit, there were 4 physicians and 1 nurse practitioner in addition to Dr. Lavespere, the Medical Director. Dr. Lavespere provides minimal clinical care. Based on a healthcare provider assignment sheet, Dr. Lavespere is assigned to see patients on death row and to review charts.  In an interview, however, he indicated that he reviews records, signs trip logs for specialty care, and provides emergency care in the main clinic but does not provide care on death row.  The remaining 4 physicians and 1 nurse practitioner cover units housing 6,238 inmates, including those on the 2 infirmary units.  Typically, a physician can reasonably provide care to approximately 600 to 800 inmates depending on medical acuity, but at LSP providers are responsible for over 1,200 inmates each.  This is a drastically high case load.  Since our visit, one physician has left service and another has died.  Only 1 additional physician has been hired.  This has reduced the provider staff to 3 physicians and 1 nurse practitioner, making each provider responsible for almost 1600 inmates.  Inadequate physician staffing contributes to poor quality.  When physician patient load is too high, physicians have inadequate time to properly evaluate patients.

A nurse practitioner covers Camps D and Infirmary Unit 2 of the Treatment Center. Camp D houses 1,067 inmates. The nurse practitioner also sees all HIV patients, cancer patients, hospice

patients and all patients on Infirmary Unit 2, which on the day of our visit housed 28 patients. Patients on Infirmary Unit 2 are complex patients with multiple medical needs and need more than part-time coverage.  This is an overwhelming case load for a nurse practitioner.  Infirmary Unit 2 patients have complicated and serious medical conditions and proper coverage of this unit can take as much as a half-time to full-time provider.  Managing Camp D alone appears to require more than one provider.  This case load is excessive.

A single physician is assigned to Camps C and J, and all patients on the Treatment Unit and death row.  On the day of our visit these units housed 1,713 inmates.  This is a very high caseload for a single physician. The previous physician assigned to these units recently died.

Two other physicians are not trained in primary care.  One of these physicians is a rehabilitation doctor and apparently was named the Assistant Medical Director.  He is assigned to cover 16 dormitories in the main prison yard, which includes Hickory 4, one of the major medical housing units.  This physician's patient case load was 1,348 inmates.  This would be an excessive case load even for an experienced primary care physician.  The second physician is a pain medicine doctor and is assigned to another 16 dormitories in the main prison. These units housed 1,241 inmates on the day of our visit and include Ash 2 and Cypress 2, which are major medical housing units.  This is an excessive case load even for an experienced primary care physician. This physician has recently left service for another job.

The remaining physician covers 841 inmates in the main prison cellblocks in addition to covering the anticoagulation clinic and general medicine clinic.  The general medicine clinic includes all patients who have uncommon medical conditions.  This can be a large number of patients. Depending on the numbers of patient in the anticoagulation and general medicine clinics, this physician also may have an excessive case load.

Instead of having a single infirmary provider, medical providers are responsible for patients from their housing units when they are admitted to Infirmary Unit 1. This is an increased burden to these providers.  This infirmary is large enough to require a single physician to cover inmates on this unit.

**Nurse Staffing**
Based on the table of organization documents, there are currently 5 functional areas of nursing service: administration; infirmary units; medical provider support in main clinic and camps; medication administration; and specialty services scheduling.

According to the Director of Nursing (DON) currently, there are 53 permanent nursing positions and 4 job appointments.[17]   The 4 job appointments are Licensed Practical Nurse positions.  The DON described the positions as follows:

---

[17] We understand Job Appointments to be temporary positions.

20      Registered Nurses
34      Licensed Practical Nurses
2       Certified Nurse Assistants
1       Respiratory Therapist

Based upon our review, we believe that LSP is significantly understaffed with respect to nursing positions, as discussed further below.  Staff is distributed as described below.

### Nursing Administration

Nursing administration includes 6 RNs assigned to supervisory roles; a Director and Assistant Director of Nursing and 4 Nurse Managers/Supervisors.  This is a span of control of 1 supervisor for approximately every 8 staff nurses. This is a reasonable span of control, although it is undermined by the overall levels of nurse understaffing. Also, there are 9 supervisory nurses embedded in infirmary and clinic operations. While many RNs are in supervisory positions some RNs also provide direct patient care.

### Infirmary Units

Based on the table of organization staffing, infirmary unit nursing includes 1 Nurse Manager who supervises Units 1 and 2.  Infirmary unit staffing include 5 supervisory RNs, 4 staff RNs, 12 LPNs and 1 medical specialist. The Director of Nursing told us that the unit 1 and unit 2 infirmaries have 6 nurses (2 RNs and 4 LPNs) to cover these units during the 12 hour day shift and 5 nurses (1 RN and 4 LPNs) on the 12 hour night shift.  The number of nurses in the table of organization is insufficient to staff this unit based on the schedule given to us by the Director of Nursing. In addition, the number of FTE's in the Director of Nurses infirmary staffing plan is inadequate to provide adequate nursing care to this high acuity population that includes patients with quadriplegia, amyotrophic lateral sclerosis (ALS), stroke, etc.[18] As a result of inadequate nurse staffing on the infirmary units, inmates are used to perform toiletry, bathing, transferring, feeding, and turning incapacitated inmates. These tasks should be done by nursing staff and are typically provided by certified medical assistants and nurses' aides. To have inmates perform these tasks can result in abuse, inappropriate or inadequate provision of care, and places patients with significant illness at risk of harm. Dr. Lavespere acknowledged that inmate orderlies may be inappropriate with patients, stating "I'm sure it happens, it's a penitentiary."[19] Nurses on the units told us that correctional officers supervise the work of inmate workers which is also inappropriate.

### Medical and Specialty Clinics

For assistance to providers in clinics and on-site specialty services, LSP utilizes Licensed Practical Nurses (LPNs).  EMTs or medical assistants could be used for this service as well.  Nevertheless, LSP has 9 LPNs, 1 medical specialist and 1 RN assigned for these functions.

---

[18] Instances of prisoners who are housed on the Infirmary Unit with severe medical needs include Kentrell Parker and Farrell Sampier.

[19] Lavespere individual Deposition Transcript. page 95.

A single LPN is the presenter for nearly all telemedicine appointments. Generally, LPNs lack the requisite training to perform medical assessments required to adequately facilitate telemedicine.

***Medication Administration***

As a result of significant understaffing, LSP uses many non-nursing staff to perform typical nursing duties. Correctional officers administer medication to many general population inmates including those in the Main Prison, Camp C, Camp D, and Treatment Unit.[20] Although the Pharmacy Director has recently implemented a 5 hour training program, correctional officers simply do not have the basic education, training and credentialing needed to safely administer medications. Our observation of correctional officers administering medication shows that correctional officers do not correctly administer by comparing the medication administration record with the medication package to ensure that the pharmacy has correctly dispensed the medication and that all medications prescribed for the patient are available. Not ensuring that the patient receives all medications at the correct dose significantly increases the risk of serious harm to patients. Correctional officers also did not document medication administration onto the medication administration record at the time the medication is given to the patient, instead relying on their memory. This renders medication administration records unreliable with respect to accuracy and completeness.

Nurses administer medication on Unit 1 and Unit 2 infirmaries and at Camp J.  With respect to the staffing needs for medication administration, a precise calculation of the number of licensed practical nurses needed to perform all medication administration is beyond the scope of this report, however we believe the number of LPN needs to be significantly increased to safely administer medications to the population at LSP.   Problems in LSP's medication administration are discussed further below.

**Inappropriate Assignment of Health Care Staff**

In addition to unlicensed officers and inmates performing health care duties, we believe that some position classifications are assigned duties not commensurate with their training and licensure, exceed their scope of practice[21] and are not adequately supervised. These duties relate to Access to Care and Emergency Care.

EMTs perform sick call evaluations but are not licensed or trained to perform independent health assessments. Record review shows that EMTs repeatedly make serious clinical errors in

---

[20] The Robert E. Barrow Treatment Center LSP Monthly Management Report for January, 2015 documents under nursing that pill call officers at Camp C, Camp D, Main Prison, and TU had been re-educated on the EMAR system.  During our visit, we were told that nurses administer medication at Camp J, Units 1 and 2, and for psychotropic medications on the treatment unit. Officers administer medication at all other units.

[21] Scope of practice describes the procedures, actions and processes that a health care practitioner is permitted to undertake consistent with their professional licensure.  To maintain adherence to regulations, health care practitioners must practice within the scope of their practice.

performance of sick call and are completely unsupervised by a physician.[22] They should not perform this function. Conversely, registered nurses are trained and licensed to perform independent nursing assessments.

EMTs are trained to respond to medical emergencies and perform an initial triage of the patient. However, review of emergency care shows that once patients are transported to the ATU, EMTs independently manage patients with life-threatening conditions that require prompt medical diagnosis and treatment.  Record review shows that physicians are not readily available to medically evaluate these patients, and too often diagnosis and treatment is unacceptably delayed, sometimes resulting in death.[23]  LSP should staff the ATU with a nurse practitioner or physician.[24]

EMTs can assist providers in clinics and could replace the LPNs who currently perform this function.  Those LPNs replaced can then be re-assigned to administer medication. LPN and RN staff perform scheduling functions which we did not assess for adequacy.

In summary, nurse staffing at LSP is inadequate for a prison of 6,400 inmates. As described above, the nursing staffing deficiencies lead to provision of medical care by unqualified personnel in at least three ways: inmates provide nursing care on the infirmary; officers administer medications; and EMTs perform independent assessments.

Our review did not include the potential for clerical staffing deficiencies because these positions are considered part of the Warden's budget, and we received this information shortly before submitting this report.  Also, sanitation of health units is provided by inmates.  These units were not consistently sanitized and, except for the new procedure center, were cluttered. We did not review staffing for these functions.

**Credentialing**
Credentialing is a process whereby a physician's qualifications are evaluated by reviewing their education, training, experience, licensure, malpractice history, and professional competence with respect to the work they will be expected to perform. Credentialing protects patient safety by preventing incompetent, poorly trained, or impaired physicians from engaging in patient care.  In correctional facilities, the health care needs of patients are typically primary care which requires physicians who have residency training in internal medicine or family practice. Emergency medicine physicians may also be acceptable in certain situations. Credentialing must ensure that a physician is properly trained for the work they will be performing.

---

[22] Physicians cosign inmate health request forms after EMTs have seen the patient, but there is no evidence that physicians provide any feedback to EMTs regarding their clinical assessments. This does not constitute supervision.
[23] This issue is seen in the instance of Rufus White, who sought diagnostic screening for abdominal pain over an extended period.
[24] Dr. Lavespere also acknowledged in his deposition that the ATU does not always have a physician present. Lavespere 30(b)(6) Deposition Transcript, page 44.

In a typical credentialing process, a prospective physician applicant must submit an application, curriculum vitae, and all current licenses, degrees, and certifications. The application typically includes an attestation by the applicant as to whether there has been prior malpractice, adverse action, criminal offense, or other adverse events affecting ability to practice. The credentialing body typically also obtains and reviews a National Practitioner Data Bank (NPDB) report and verifies information on the application and other submitted documents. The applicant is typically interviewed and accounts for problems identified on the documents obtained by the credentialing body.  The sum of these reviews and interviews is acted on by a credentialing body to decide whether the practitioner is trained properly and capable of providing safe and effective care to patients and whether the type of training of the candidate is sufficient given the expected assignment of the candidate. This latter function of a credentialing body, for example, would prevent a psychiatrist from performing surgery because they are not trained to perform surgery.  This type of credentialing process does not appear to be in place for LSP and credentialing appears inadequate and places patients at risk of harm.

With respect to protecting patient safety, the NPDB is a key resource.  President Reagan signed the Health Care Quality Improvement Act in 1986 to protect peer review bodies and to prevent incompetent practitioners from moving state-to-state without disclosure of previous damaging or incompetent performance.  This act led to the development of the NPDB which was initiated to collect adverse information on all providers nationwide. In 1990 NPDB began openly supporting peer review and credentialing organizations. The NPDB is managed by the U.S. Department of Health and Human Services. This service collects information on: medical malpractice payments; adverse licensing actions; adverse privileging actions; negative actions by state licensing authorities; negative actions by accreditation organizations; and civil judgments or criminal convictions that are health-care related. Access to information in the NPDB is limited to health care entities that use them to make licensing, credentialing, privileging, and employment decisions.

Use of NPDB is recommended by the National Commission on Correctional Health Care (NCCHC) standard on credentialing and is part of the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) standards on credentialing.

There is no evidence that any credentialing process exists for physicians at LSP.  Dr. Lavespere, the Medical Director, was not certain of the residency training of all of the physicians under his supervision. He thought that one doctor had training in internal medicine, another in pain medicine and another in rehabilitation medicine.

The only document in the credential files of physicians is the state personnel application. This document lists the supervisor, official position, pay level, job code and position number.  The supervisor who signs this document certifies that the employee reviewed the job description. The organizational chart and duties are also provided to the employee.

For physicians, these files do not include any information typically used to evaluate the qualifications of a physician including:

An application;
Attestation by the applicant as to whether there has been prior malpractice, adverse action, criminal offense, or other adverse events affecting ability to practice;
Verification of training;
Verification of license, DEA license, and board certification certificate; and
National Practitioner Data Bank (NPDB) report.[25]

For all of the physician positions, including the Medical Director position, the only requirement in the job description is a current medical license.  There are only 3 providers included in the physician credential files.  Only one of these providers is still working at the facility.  The only current provider whose file is present is Dr. Lavespere, but his file lists him as the Assistant Medical Director, not the Medical Director.  The lack of complete and current credential files demonstrates lack of organization and an indifference to the quality of physicians providing care to inmates at LSP.

Privileges are the services and procedures that a physician is qualified to perform based on training and experience.  The credentials and training of a physician determine what privileges that physician should have.  As an example, a doctor who is trained and credentialed in general surgery can obtain privileges to perform appendectomies and cholecystectomies.  A physician trained and credentialed in obstetrics can obtain privileges to deliver babies.  Physicians trained and credentialed in internal medicine or family practice can obtain privileges to practice primary care.  Physicians trained and credentialed in internal medicine cannot typically obtain privileges to perform surgery (except for minor procedures).

Correctional medical care is mostly primary care medicine.   Consistent with that need, correctional physicians should be primary care trained physicians. Every correctional medicine program should strive for hiring physicians with this training.  Board certification in one of these fields means that the physician has completed residency training in a primary care field and has passed a qualifying examination by a nationally recognized board of that specialty.

LSP physicians are hired without apparent consideration of their training. Dr. Lavespere indicated that one of his physicians is a rehabilitation physician and another is a pain medicine physician.  None of the physicians had a credential file that verified their training.

LSP hires any physician who is willing to work at the prison.  This is a patient safety issue.  This results in hiring physicians not qualified to provide primary care. This is consistent with the attitude of the statewide Medical Director, Dr. Singh who stated in an interview,

---

[25] Recently, after several attempts to obtain proper credential files, we were provided with information regarding two new doctors who have had somewhat more robust but still inadequate files, Dr. Bunch and Dr. Sylvest.

"It's really impossible to find physicians.  When I was new, I was told that 'we just need a body in that job.' Sometimes it's so desperate a situation, you just need a body in the job."[26]

In addition to hiring physicians unqualified by virtue of their training, LSP hires physicians with behavioral or other problems that resulted in discipline against their license, including commission of felony crimes. The entire physician staff working at LSP has had their license suspended or restricted by the Louisiana State Board of Medical Examiners. None of this information appears to be evaluated with respect to hiring the physician as there is no mention of this information in the physician credential files.[27]  Moreover, this is not in compliance with NCCHC standards that specifically state that hiring physicians with licenses restricted to practice in correctional institutions is not in compliance with the standard.

A query of the Louisiana State Board of Medical Examiners (LSBME)[28] found that the LSP Medical Director had his license suspended in 2006 for his arrest and conviction for possession with the intent to distribute methamphetamine.  After a 30 month prison term in the Federal Bureau of Prisons, the LSBME required drug treatment and a probationary period which terminated 10/27/14. The LSBME also noted that Dr. Lavespere had been diagnosed with a personality disorder with antisocial, narcissistic and avoidant features, which would be a concern for patient care and capacity to provide leadership for the medical program, as discussed above.

Another physician entered into a consent order with the Louisiana State Board of Medical Examiners for sexual misconduct with a patient and boundary violations of prescribing medications to family members and himself without maintaining proper medical records.  The State Board ordered indefinite probation after an initial suspension. The Board required approval of any practice arrangement.

Another physician had his license suspended in 2013 for dependency on controlled substances which he self-prescribed for his own use.  He initially refused to undergo treatment for this condition. His license was placed on probation status in 2013. He was prohibited from supervision of nurse practitioners or physician assistants and had significant restrictions on ability to prescribe controlled substances.

Another physician had his license placed on probation status for alcohol dependency in 2011. In 2013, the physician suffered a relapse and had to be removed from practice.  He was then

---

[26] "Many doctors treating state's prisoners have disciplinary records themselves" Cindy Chang, The Times-Picayune July 29, 2012 found at http://www.nola.com/crime/index.ssf/2012/07/many_doctors_treating_states_p.html.

[27] Here again, the doctors who have been hired by LSP since the time of our site visit have more relevant information in their credentialing files that we received.  Dr. Bunch's file includes her Employment Application, which discusses her felony conviction and sentence.  Dr. Sylvest's file includes his Consent Order with the LSBME stemming from his substance abuse history, and a LSBME form noting that he is working under the supervision of Dr. Singh.

[28] This was accomplished by searching by the name search on the Louisiana State Board of Medical Examiners website at https://apps.lsbme.la.gov/disciplinary/actionsDetail.aspx.

placed on probation for a 10 year period and was subjected to a number of conditions.  This physician has a number of current restrictions on his ability to prescribe controlled substances and was prohibited from supervising nurse practitioners or physician assistants.  The Board must approve his practice setting.

Another physician was initially suspended for alcoholism in 2009.  After a probationary period, his license was reinstated in September of 2015.

Three of these 5 physicians[29] are still under probation and are prohibited from supervising nurse practitioners and physician assistants.

Recently LSP has hired another physician who also has LSBME sanction against her license.  This physician has a felony conviction for conspiracy to import and distribute Human Growth Hormone (HGH) and served 24 months in federal prison, plus a period of probation that ended in March 2016.  Another physician, an orthopedic surgeon, is anticipated to provide limited services at LSP in addition to service at other Louisiana prisons.  This orthopedic physician had his license suspended initially in 1998 due to substance abuse.  He had multiple relapses and in 2016 was placed on indefinite probation subject to a number of restrictions, one of which included institutional practice in a hospital or state or Federal prison.  These documents were not all in their personnel files. The Louisiana Department of Public Safety and Corrections certified in a letter that Dr. Singh was assigned to a monitoring and liaison function.

The fact that every doctor at LSP has a significant disciplinary history makes the lack of adequate credential files and performance monitoring particularly troubling. Given these histories, it is particularly important that their compliance with medical standards, the terms of their restrictions, and their basic competencies be documented and monitored. There is no evidence that this occurs in any meaningful way.

Moreover, the LSBME has restored the licenses of these physicians but only for practice in an institutional setting, i.e., a jail or prison.  The LSBME has suspended these physicians' practice in the community to "ensure the health, safety and welfare of the citizens of this state against the unprofessional, unqualified and unsafe practice of medicine," however is unwilling to provide the same protections to inmates. That the Louisiana Department of Corrections and Public Safety hires these physicians places inmates at risk of serious harm. This is particularly disturbing because inmates have no choice about their provider. When all the providers have been demonstrated to be unsafe, this results in inmates being more vulnerable to abuse without recourse. The hiring of physicians with licenses restricted to prisons is in violation of NCCHC credentialing standard.

---

[29] We understand that one of these physicians is since deceased.

**Peer Review**

Peer review is a means to monitor the quality of physician and other provider care and thereby protects patient safety. Peer review of physicians is typically of two types.  One type of peer review is done on a routine basis for all physicians and is done as a monitoring device to ensure quality of care. This type of peer review is often called performance evaluation program or PEP. A second type of peer review is done when a member of the medical staff may have committed a serious error or exhibits a serious character or behavior problem and needs to be evaluated with respect to possible reduction of privileges. The latter type of peer review is generally a formal quasi-legal procedure that has significant implications for the physician's employment and professional status. Neither of these types of peer reviews appears to be done at LSP. Given that the entire physician staff has been under some license restriction and because physicians are not all trained in primary care, it is critical that monitoring of physicians be thorough.

Typically, even in correctional medical programs, every year every physician undergoes PEP.  At LSP, since 2010, peer review of physician care has been performed only 3 times.  When peer review is done, the audits are not done for individual providers. Instead of each physician having peer review, the statewide Medical Director reviews 15 randomly selected charts for the site.  Since there are 6 providers (5 physicians and a nurse practitioner), this means that, on average, the reviewer will audit only slightly over 2 records for each provider.  Because the charts are randomly chosen, some physicians' work may not be reviewed at all.  As well, sentinel events[30] and high acuity patients are not chosen so that potentially preventable outcomes are not assessed.

The actual peer review format consists of answering 9 questions on the 15 randomly chosen medical charts.  The questions include:

1. There is a facility plan for treatment of chronic diseases.
2. The facility plan is being followed.
3. Exceptions to the facility treatment plan are appropriate.
4. Care is appropriate for specific disease processes.
5. When a referral is ordered the offender is followed medically by health care provider.
6. Lab reports are signed and dated.  (Critical values, next business day).
7. SOAP format is being utilized for chronic care clinic encounters.
8. Medications are prescribed when clinically indicated.
9. Medication duration of therapy is documented.

This type of peer review fails to identify several essential components of peer review:

---

[30] A sentinel event is any event that results in death or serious harm to the patient which is unrelated to the natural course of the patient's illness.

1. It fails to identify individual physician problems.
2. It is an insufficient number of records reviewed.
3. The random record review fails to address potentially preventable events or care of higher acuity patients.
4. It fails to address patients who need specialty care (physician consultation or diagnostic interventions) but who are not referred.

Given the number of physicians with license problems and given that several LSP physicians are practicing primary care without primary care training, peer review needs to be thorough and rigorous.  Instead, it is ineffective.  We identified preventable deaths and inadequate care in almost every medical chart we reviewed.  Yet, the current process does not appear to address existing problems with clinical care.

**Health Care Budget**

The health care budget is embedded in the LSP institutional budget and is under control of the Warden. According to Dr. Lavespere, the Warden and Dr. Singh determine the LSP medical budget.  Neither Assistant Warden Lamartiniere nor any of medical leadership has any input into the budget.  Assistant Warden Lamartiniere did not understand what was in the budget. She did not know the total budget amount for the health program nor any specifics of budget categories. None of the senior medical leadership has any input into staffing levels. The Medical Director, Dr. Lavespere, indicated he had no input into the budget and worked with the staff he had.  The Director of Nursing had no input into the budget.

Budget documents provided to us included 7 brief summaries obtained from the LSP institutional accounting software.  Based on these summaries, the total medical budget at LSP is $16,888,447.   Based on a population on the day of our visit of 6,303 inmates, this is approximately $2,679 per inmate per year. This is an extremely low expenditure per inmate per year. For comparison, in 2011 the annual cost per inmate per year for the State of Louisiana Department of Corrections and Public Safety was $4,660.[31]  Thus, in 2016 LSP is spending almost 43% less per inmate than the statewide average in 2011. This does not take medical inflation into account.  Based on our experience managing correctional medical programs, this figure is drastically less than an amount that would be expected for a facility of this size.

The medical budget allocates $11,993,421 for staffing.  An additional $530,405 is spent on professional contract services.  Salaried and contracted professional services accounts for $12,523,826.  This is 74% of the budget.  Labor costs are typically 50% of a correctional medical program budget.  This is a very high number indicating that a lesser than typical budget amount is dedicated to other budget lines especially pharmaceuticals, specialty services and off-site medical care. The disparity is even more dramatic given LSP's serious understaffing as discussed above.

---

[31] State Prison Health Care Spending: An Examination. July 2014. The Pew Charitable Trusts and MacArthur Foundation. Page 4.

## Health Care Operations, Clinic Space and Sanitation

**Methodology:** We toured areas where health care is delivered at LSP to assess whether each area was of adequate size, medically equipped and supplied, and sanitary. These areas included the main medical clinic, infirmary units, acute treatment area, specialty services clinics, medication administration rooms, laboratory, pharmacy, radiology, and health information management.  We also toured selected housing units including death row. We reviewed health records to determine whether health care operations functioned in an integrated manner that facilitated timely and appropriate care.

**Standards:** Adequate space is provided for administrative, direct care, professional and clerical staff. This space includes conference areas, a storage room for records and toilet facilities.[32] Correctional institutions should also have sufficient space, supplies and equipment readily available for the provision of medical, dental and mental health services.[33] Environmental inspections are conducted in areas where health services are provided to ensure that equipment is inspected and maintained, the unit is clean and sanitary and measures are taken to ensure that the unit is occupationally and environmentally safe.[34] There is an effective program that includes surveillance, prevention and control of communicable disease.[35] Discussion of patient information and clinical encounters are conducted in private and carried out in a manner designed to encourage the patient's subsequent use of health care services.[36]

**Findings:**  Physician and mid-level provider evaluations of patients mostly occur in poorly sized rooms with inadequate equipment and supplies; without adequate privacy; and without a means to sanitize hands between patients. Sick call evaluations are conducted openly in housing units and not in examination rooms that provide privacy, are medically equipped and supplied, and have access to handwashing.

The Robert E. Barrow Treatment Center (REBTC) is the main prison health unit.  There are 7 examination rooms; 3 immediately adjacent to the medical records office and 4 rooms across a hall. These rooms as configured are inadequate for medical care examinations. One of the examination rooms has no sink or hand sanitizer.  In the other rooms the sinks are obstructed by shelving or other storage devices. Soap and hand sanitizer solution was not present. Without sinks and soap, providers can't sanitize their hands between patients which is the standard of care. Wall mounted blood pressure devices are broken. Only one otoscope was operable. Ophthalmoscope heads were missing. Functional blood pressure cuffs and oto-ophthalmoscopes need to be available in each room being used.[37]

---

[32] ACA. 1-HC-7A-08.
[33] NCCHC. P-D-03.
[34] NCCHC. P-B-01 (9), ACA 1-HC-6A-12.
[35] NCCHC. P-B-01.
[36] NCCHC. P-A-09, ACA, 1-HC-3A-10.
[37] See photographs, Attachment B, pages 1-5.

There are 2 doors for each room opening into the examination room on either end of the room. This effectively reduces floor space considerably.  Typically, an examination room is 120 square feet and contains only those items essential for the physical evaluation of the patient.  In LSP, the examination tables butt up against the edge of doors when the doors are open making use of the table difficult.  All of the doors for all of the rooms were open and staff appeared to walk through the rooms even when in use.  These rooms are extremely cluttered.

Every day the medical record clerks place into each doctor's examination room the health records of all patients who will be seen that day as well as all of those records that need to be reviewed for any reason.  This is a large number of records and each record is very large.  There is insufficient space to store these records.  So they are placed on the examination table, desk, and multiple mobile storage devices that are placed in the room.  For some of the rooms, it appeared that doctors examined patients in chairs because the examination tables were filled with records.  These examination rooms as configured have insufficient space, equipment and supplies to permit a confidential and adequate physical examination. This is supported by health record review that showed the majority of medical provider examinations to be inadequate.

The physician examination rooms in the REBTC are also used for specialty clinics for neurology, orthopedics, podiatry, dermatology, and general surgery. These rooms are inadequately equipped and poorly designed for these specialty evaluations. Ophthalmology has a special room for consultations.

Staff support for the medical clinics include 9 LPNs, a medical assistant and 1 RN manager.  This includes the on-site specialty clinics.  Of these 9 LPNs, 2 provide support to physician clinics in the out camps.  These 2 nurses support clinics in Camps C, D, J, TU, and DR. These LPNs are also responsible for all phlebotomy and performance of EKGs at these units.  Four LPNs support specialty clinics and physician clinics in the main prison. This includes performing electrocardiograms and injections.  One of the 10 LPNs assists in telemedicine clinic which includes scheduling and running the clinic.

In a separate building next to the REBTC there is a new procedure center.  This building has 6 newly constructed examination rooms which are all properly equipped.  Two of the rooms are empty and unused.  One room is used to perform electrocardiograms.  A second is used for telemedicine encounters for main prison inmates. A third room is used for spirometry; approximately 40 of these tests are performed weekly according to staff interviewed.  A fourth room is used for specialty care visit including ultrasound, gastroenterology, audiology, and pain clinic.  This clinic appears significantly underutilized and yet is the only clinic in the entire prison that is adequately equipped and supplied.  In addition to the 6 examination rooms, this unit has space equipped to perform upper and lower endoscopy which are performed every other month as needed.

The outlying camps including Camps C, D, J, and Death Row each have separate clinic space. These clinic spaces are also deficient.  Some examination tables have torn covers held together

with tape.  Few tables had paper covering so that the examination of patient is conducted on an unsanitary and uncovered table.  Sinks were sometimes partially obstructed by fixed objects like file cabinets.  Most examination rooms had food and cooking devices including microwave equipment, coffee pots.  One room had a blender.  Another room had a cooler which contained food. Eating and cooking in clinical examination areas is typically prohibited in health care facilities for sanitation reasons.  The layout of the examination table, in some rooms, was such that it would be difficult to perform an adequate examination of the patient because it was not possible to lie flat on the table. There was no fixed equipment including mounted blood pressure cuffs or oto-ophthalmoscopes.  Supplies were present in most of the clinics but it did not appear that the supplies were standardized.  So, the types of supplies were variable and inconsistent.  In the death row unit, the examination area did not have a door.  There was no blood pressure cuff, oto-ophthalmoscope, or supplies.  There was another examination table in an open space near an officer's desk such that a private examination was not possible. The Camp J examination room had a sink but no soap. There were no supplies except gloves.  A nurse who was using the examination room had no equipment or supplies except a blood pressure cuff and a pulse oximeter.  None of the outlying camps had a glucometer to measure capillary blood glucose (CBG) in diabetics.  This is a standard piece of equipment for primary care examination areas.[38]

The REBTC medical unit of the main prison contains most of the operational services for the medical program including an emergency room (ATU), physician clinics for the main prison, a laboratory, medical records office space, an off-site scheduling work space, two infirmaries, and administrative offices. Health Information Management (HIM) is an area that sorts, files and stores medical records. It is also of insufficient size for its mission. This space is extremely cluttered.  It appears to have insufficient space to store current records, and has insufficient space for staff to perform their work.  The records room is adjacent to physician examination rooms.

LSP has its own pharmacy which is located in the REBTC near the infirmary.  The pharmacy is of insufficient size for its mission.  It is cluttered and the floors are extremely dirty. This is because inmate porters (i.e. prisoners who perform janitorial functions) are not allowed into the pharmacy. Nevertheless, sanitation and disinfection standards must be maintained.

## Policies and Procedures

**Methodology:** We interviewed health care leadership and staff and reviewed selected Statewide Department of Public Safety and Corrections Health Care policies and procedures in the LSP Health Care Manual to determine whether they were periodically reviewed and provided sufficient operational to LSP staff to implement the statewide policy.

---

[38] The limitations regarding diabetes management is seen in the case of Edward Washington, who has been required to self-administer insulin even when he was suffering from visual impairment stemming from his uncontrolled blood sugar.

**Standards:** Each policy, procedure, and program in the health care delivery system is reviewed at least annually by the appropriate health care authority and revised if necessary.[39]

**Findings:** We reviewed the Louisiana State Prison (LSP) Angola Health Care Manual, effective 3/11/2009. The Manual specifies that health care policies are to be based on American Correctional Association (ACA) standards and are considered departmental regulations. The policies are not site specific to LSP and most have not been reviewed since 2010 or 2011. This is not compliant with ACA and NCCHC standards to review and update policies annually.

## Access to Care

**Methodology:** We evaluated access to care by interviewing staff and inmates about procedures for accessing care, review of relevant policies and procedures, observation of performance of access to care (sick call, urgent care) in housing units and the ATU, and review of medical records.

**Standards:** Inmates should have timely access to a medical professional, be given a professional medical judgment and receive care that is ordered. Unreasonable barriers should be avoided, such as punishing inmates for seeking care for their serious health needs, assessing excessive fees that prevent or deter inmates from seeking care for their serious health needs or assessing any fees for treatment arising from sexual abuse, deterring inmates from seeking care such as holding sick call at 2 a.m. when the practice is not reasonably related to the needs of the institution, and having an understaffed, underfunded and poorly organized system with the result that it is not able to deliver appropriate and timely care for patients' serious health needs.[40]

### Access to Care Policies and Procedures

The Access to Care and Clinical Services policy (HC-01) was effective 2/28/11; thus it has been five years since its last review. This is not compliant with ACA standards to review each policy and procedure at least annually. The Health Care Manual has not been made site specific to LSP and does not describe how access to care is provided at LSP. The policy states that all inmate Request for Medical Treatment forms shall be signed and dated by the health care practitioner at the earliest possible date. Our review showed this is not taking place as required by LSP policy.

**Findings:** At LSP, EMTs conduct sick call Sunday through Thursday in the outside camps (C, D, F and J). At Death Row, inmates reported that sick call was not routinely performed on weekends. This is not compliant with LSP policies and procedure that require a process for health care professionals to triage inmate requests daily.[41]

---

[39] ACA Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions. ACA. 2004. 1-HC-7A-03 (Ref. 3-4329) and NCCHC P-A-05.
[40] NCCHC. P-A-01
[41] Access to Care and Clinical Services. No. HC-01. LSP Health Care Manual. 2/28/2011.

To access routine care, inmates request a Health Services Request (HSR) form from a housing unit correctional officer and write the nature of the complaint on the form.  There is no space on the HSR form for the inmate to document the date he completed the form, but rather the first space to fill in a date on the form is the "Healthcare Personnel Screening" date. Thus, health record documentation does not facilitate assessing the timeliness of an inmate's access to care. After completing the HSR, inmates place it in the door of their cell or submit it to an EMT when making rounds in the housing units.[42]

We observed EMTs performing sick call. Typically, a correctional officer announces sick call to inmates in the housing unit. The EMT then walks down the tier or dormitory, reviews the inmates HSR and conducts patient assessments in the housing unit. The EMT does not have the health record available to review the patient's past medical history or determine if the patient's complaint is a new or recurring complaint, and what if any previous treatment was provided to the patient. EMTs do not conduct assessments in examination rooms that are adequately equipped and supplied, afford privacy and confidentiality, or have access to handwashing. Moreover, the medical equipment and supplies that EMTs bring with them is not standardized. One EMT in Camp J had only a stethoscope, whereas another in the Transitional Unit brought a small bag with more equipment. Given the circumstances in which assessments take place, it is not surprising that in the majority of cases we reviewed, EMT medical examinations are completely inadequate. In addition, documentation reflected that EMTs usually do not directly communicate or consult with a physician regarding assessment findings at the time the patient assessment is performed.  Therefore, the EMTs make independent assessments on a daily basis, which is beyond their scope of practice.

After EMTs perform sick call, they place the patient's HSR in a physician's box. For the majority of HSRs we reviewed, physicians did not document any information regarding the assessment performed by the EMT or perform any independent evaluation. In most cases, the provider documented that the patient would be seen for sick call PRN (*as needed*) or scheduled the patient for a physician appointment in accordance with a priority system (e.g. category I, II or III). In the majority of forms reviewed, physicians did not legibly date, time or sign the form. Thus, the timeliness of provider review of care provided by EMTs in most cases was unknown. There is no evidence of any physician supervision of the EMTs' practice.

Our review showed that patients submitted repeated HSRs for the same complaint. Because EMTs never have the health record with them when they conduct sick call, in many cases the patient is treated repeatedly with the same medication regimen even if it's failed in the past. This practice resulted in cases where patients complained repeatedly of chest pain, abdominal pain, and other symptoms of potentially serious medical conditions, and were not diagnosed

---

[42] According to the Access to Care and Clinical Services Policy, inmates are supposed to be able to have access to routine and urgent services daily, but an inmate in Death Row reported that routine sick call is not performed on weekends.

and treated in a timely manner.  These patients were later diagnosed with serious medical conditions resulting in adverse outcomes, including death (Patients #17 and #20).[43]

**Urgent Care Access**

Inmates access urgent care in one of three ways.  One is that following a routine assessment in the housing unit, an EMT transports the patient to the acute treatment unit (ATU) for further evaluation and treatment. A second way is that the housing unit correctional officer notifies the ATU that an inmate has an urgent complaint and an EMT responds to the patient's location or a correctional officer escorts the inmate to the ATU.  The third way is that the inmate expresses a self-declared emergency (SDE) and an EMT medic responds to the patient's housing location to assess the patient. Record review showed that EMT assessments on the housing units were inadequate for reasons described earlier in this report.

LSP policy and practices present unreasonable barriers to accessing care.  One barrier is that if an inmate declares a medical emergency and health care staff determine that an emergency does not exist, the inmate is subject to disciplinary action for malingering. This is unreasonable because patients in distress often cannot distinguish between a true medical emergency versus a non-emergency and yet they are subject to punishment. Another reason is that this requires EMTs, who are also correctional staff, to be involved in initiating disciplinary action against inmates which is a role conflict.  A third unreasonable barrier is the co-pay system.  To access care in the absence of sick call, which is not performed daily as required by policy, inmates must self-declare an emergency (SDE). The co-pay charge for a self-declared emergency is double ($6.00) that for routine sick call ($3.00).   This co-pay structure likely discourages inmates from accessing emergency care when they need it. Inmates also pay $2.00 per over the counter (OTC) or prescription medication.  A fourth barrier is that EMTs conduct routine sick call very early in the morning when inmates are sleeping.

We found that patients evaluated and treated in the ATU do not receive timely medical evaluation and treatment by physicians or nurse practitioners licensed to diagnose and treat medical conditions. Nor are patients sent to the hospital when medically necessary.

The ATU is staffed only with EMTs and paramedics. Upon arrival at the ATU, EMTs initiate an Emergency Medical Report-Vital Statistics form (LSP-TC, revised 1999) to document care provided over the period of time the patient is in the ATU. However, it is often not possible to follow the chronology of care. This is because more than one EMT may document on the form, but these additional notes are often not legibly dated, timed, and signed by staff providing care to the patient. Often there are gaps of several hours between assessments, even for patients with serious medical conditions and some notes indicate the patient was assessed in the ATU

---

[43] In addition to the patients studied as part of our sample, and as noted above, the same pattern appears in the histories of several named plaintiffs, most notably Joseph Lewis and Shannon Hurd, both of whom complained of clear warning signs of cancer without receiving medically indicated diagnostic evaluations.

bullpen.[44] Physicians sometimes document onto the Emergency Medical Report form but rarely document the date and time the entry was made. These physician notes generally do not contain clinically pertinent information (e.g. past medical history, review of systems, focused physical examinations) that would reflect an independent evaluation by the physician while the patient was at the ATU. Physicians document what appears to be a summary of clinical information collected by EMTs.  We conclude there are many cases in which a physician or a nurse practitioner never evaluated a patient with serious and life-threatening conditions while they were in the ATU. We found that some patients died due to delayed diagnosis and treatment in the ATU.  The following are examples.

**Patient #20** was a 37 year old man who arrived at LSP in 1998. His medical history includes Bipolar disorder, HIV/AIDS diagnosed in 2010, GERD, abdominal pain and low back pain. On 1/12/15 an EMT documented being assigned to an ambulance run at 18:42 (crossed out and 20:28 documented) and arriving at Raven housing unit at 20:43. The EMT found the patient on the floor in a fetal position complaining of severe abdominal pain that worsened over the past hour. The patient was guarding his abdomen and had abdominal distention. His skin was cool and clammy and the patient was pale. The patient stated that his BM (bowel movements) had been black x 3 days. The EMT documented that the patient denied any other complaint. His vital signs were as follows:

| | | | |
|---|---|---|---|
| At 20:44 | BP=80/63 mm Hg, | pulse=127/minute, | respirations=20/minute. |
| At 20:54 | BP=90/65 mm Hg, | pulse=114/minute, | respirations=20/minute. |

The EMT assisted the patient onto a stretcher and transported him to the ATU arriving at 21:05. *Although the patient's vital signs were significantly abnormal, the EMT did not notify a physician or transport the patient to a hospital.*

At 21:11 an ATU EMT assessed the patient noting guarding and abdominal distention to bilateral upper quadrants but no tenderness on palpation. "Patient states that BM's have been normal." The patient complained of nausea but denied emesis. The EMT gave the patient a GI cocktail and ordered an abdominal x-ray.

| | | | |
|---|---|---|---|
| At 21:44 | BP=107/66 mm Hg, | pulse=122/minute, | respirations=18/minute. |
| At 21:55 Temp=98.1 | BP=104/63 mm Hg, | pulse=113/minute, | respirations=18/minute. |
| At 22:30 | BP=92/58mm Hg, | pulse=110/minute, | respirations=17/minute. |
| At 22:58 | BP=102/63 mm Hg, | pulse=113/minute, | respirations=18/minute. |

---

[44] Patient #15.  This and all numerical Patient identifiers included in this report correspond to the chart review summaries attached hereto as Attachment A.

On 1/12/15 at 21:43 the EMT documented that Dr. Toce gave a telephone order[45] for IV fluids with potassium supplement, Norflex 60 mg IM, and to admit to the nursing unit. However, EMTs continued to monitor the patient in the ATU because there was no bed in the nursing unit.  Given the patient's signs and symptoms and grossly abnormal vital signs, Dr. Toce should have immediately examined the patient or sent the patient to the hospital via ambulance.

On 1/12/15 at 21:56 an abdominal x-ray showed no acute findings.

On 1/12/15 at 22:09 an ISTAT showed the patient was severely anemic (hemoglobin=8.2 and Hematocrit=24) suggesting acute bleeding. *There is no documentation that EMTs notified a physician or that a physician signed this report. At this point, EMTs should have recognized that the patient was internally bleeding and at risk of death.*

EMTs monitored the patient's vital signs every 30 minutes until 04:20.  The EMTs did not perform repeat symptom or physical examinations.  This is not clinically appropriate and falls below the standard of care.

On 1/13/15 at an undocumented time, Dr. Toce wrote an admission assessment in which he documented that the patient had a 4 month history of progressive abdominal pain, nausea and scanty hematemesis.  His review of systems consisted of "10 pound weight loss in two months, food hangs up in lower esophagus and often regurgitated. HIV x 10 years."  The physical exam was that the patient was in "mild acute distress and pale." His abdomen demonstrated "fullness in the epigastric area but not actually tender."  Dr. Toce did not review the CBC that showed the patient's hemoglobin had dropped from 14 to 8 grams, a critical finding.

On 1/13/15 at 10:30 the patient was admitted to the nursing unit. On 1/13/15 at 16:04 an EMT documented that the patient was found in bed in Nursing Unit 1 in cardiac arrest, pale and cyanotic. Advanced Cardiac Life Support (ACLS) measures were implemented. A pulse was reestablished but the patient later died.  On 1/15/15 an autopsy was performed that showed the cause of death to be massive upper GI bleeding and perforated large peptic ulcer; and bilateral bronchopneumonia. The lack of prompt medical evaluation and treatment and failure to send the patient to the hospital when his vital signs were abnormal directly contributed to his death.

**Patient #16** was a 45 year old man transferred to LSP on 2/9/98. In 2012 he complained of hemoptysis (coughing up blood) but this was never fully evaluated. On 12/14/13 the

---

[45] As noted elsewhere in the report, LSP staff rely heavily on telephone orders from physicians that are made on the basis of clinical assessments by lower-level providers (EMTs, LPNs and RNs). With respect to patients presenting urgently, this practice raises two serious concerns: one is the adequacy of the information staff provide the physician upon which they base their orders and as importantly that physicians do not examine patients with abnormal vital signs or other life-threatening signs and symptom, which has resulted in harm to the patients, including multiple deaths.

patient was brought to medical for a self-declared emergency. An EMT documented that the patient complained of fever, chills, body aches, weakness, nausea and diarrhea x 3 days. The patient appeared flushed and covered in sweat, pale and hot to touch.  The patient was febrile (T=101.6◦ F), BP=138/86 mm Hg, pulse=86/minute, respirations=18/minute. Oxygen saturation was not measured. The patient had poor skin turgor, dry cough and breath sounds were congested bilaterally. *The EMT did not notify a physician and a physician did not medically evaluate the patient*. The patient was sent back to his housing unit and referred for ATU follow-up. The EMT completed an ATU referral form for evaluation of fever and diarrhea for 3 days. The patient was charged a $6.00 access fee.

On 12/16/13 at 17:45, an EMT referred the patient to the ATU for abnormal vital signs. The patient was febrile (T=102.5 F), hypotensive (BP=98/62 mm Hg), and tachycardic (pulse=120/minute). These are critical findings that indicate a potentially life threatening condition. On 12/16/13 at 18:05 an EMT saw the patient noting that he was referred for abnormal vital signs. The EMT documented that the patient reported his symptoms began the previous Saturday (12/14/13) and he was treated in the ATU.  His symptoms were now increasing. A second EMT documented that the patient denied chest pain, SOB, N/V/D (*nausea, vomiting, and diarrhea*) and any other symptoms. The EMT noted that the patient's breath sounds were clear bilaterally. His oxygen saturation was low (SpO2=90%). The EMT started oxygen at 4 liters per minute and intravenous fluids (normal saline). *The EMT did not contact a medical provider but treated the patient "in accordance with a protocol."* The records do not indicate what protocol the EMT applied or how the EMT determined it was the appropriate protocol. The EMT took serial vital signs with blood pressure ranging from 141-101/73-58 mm Hg, pulse 102-60/minute, respirations=16-20 and temperature 102.5-101.6◦F.  The EMT treated the patient with guaifenesin and a lay-in. He noted that the patient had already been given acetaminophen and ibuprofen. The patient was released back to his housing unit at 20:20. *The EMT did not refer the patient to a physician for follow-up.*

On 12/18/13 at 09:55 an EMT saw the patient for complaints of weakness, dizziness, diarrhea and difficulty walking to reach the bathroom. He denied nausea and vomiting. The patient's temperature was subnormal (T=95.5 F), and other vital signs were initially within normal limits. At 12:00 the patient was hypotensive (BP=97/63 mm Hg) and tachycardic (pulse=103/minute).  The EMT did not measure the patient's respiration, temperature or oxygen saturation after initial vital signs. There is no documentation that the EMT notified a provider, however at an undocumented date and time a provider documented that the patient's chest x-ray was abnormal, showing bilateral diffuse nodular infiltrates and oxygen saturation was 30-40% on room air and 40-50% via nasal cannula. The patient's WBC was low (3.5, normal=4.5-10.5) and he was thrombocytopenic (Platelets=109,000, normal=150-450,000).

At 16:15, approximately 6 hours after the patient arrived at the ATU, an LSP ambulance was called. The ambulance was en route to the hospital at 16:27 but did not arrive until

19:30.  The ambulance report indicated that over an 8 hour period from 16:20 to 00:15, the patient's respiratory rate ranged from 38-52 breaths/minute, and at 00:15 oxygen saturation was 71%. The EMT noted that the patient complained of bloody sputum but none was observed.   The EMT noted that after giving report to "McNo"[46] with a respiratory rate approaching 50 and oxygen saturation dipping into the mid-80's, the EMT was ordered to divert to E. Jefferson where patient was "promptly put on C-Pap, given multiple IV antibiotics, labs and chest x-ray. The patient was able to compensate for about 1 hour when a decision was made to transport the patient back to McNo with C-Pap and E. Jefferson EMS crew. Oxygen saturation dropped into the 20's when patient talked enroute. The patient was placed on C-Pap in the ER and report given to the physician." At the hospital he was diagnosed with pneumonia and acute renal failure (the patient has only one kidney). He died on 2/14/14 of respiratory failure. This patient did not receive timely and appropriate care when he first presented with fever and respiratory symptoms.   The failure of a physician to timely medically evaluate the patient likely directly contributed to his death.

**Patient #18** was a 31 year old man who arrived at LSP in 2006 with a history of asthma, glaucoma and seizure disorder. In August 2013 he began complaining of cough and chest pain.  He requested an HIV test and signed a consent, but was never tested. On 11/20/13 at 02:15 an EMT saw the patient in the ATU bullpen for a complaint of cough x 6 months. The EMT documented that the patient's chief complaint was a "dry non-productive cough accompanied by chest pain. His cough made him nauseated without vomiting or diarrhea." The patient was feeling weak and tired and had significant weight loss of 57 pounds, (From May 2011 the patient's weight changed from 203 lbs. to 146 lbs.). The EMT documented that the patient was unable to explain weight loss. Patient's last chest x-ray 8/2013 was normal. Temp=100.3 F., BP=115/80 mm Hg, pulse=139/minute and respirations=16.   SpO2=98%.   BBS=CTA (*bilateral breath sound=clear to auscultation*). Skin warm and dry to touch. Throat examination was without redness or pustules. Patient has mild sinus congestion with clear discharge. When patient coughed he held his ribs.   _The EMT did not notify a physician._  The EMT's assessment was cough and weight loss and the EMT's disposition was to send the patient back to his housing unit and have him return to the ATU the following morning. The referral slip was for 09:00 and stated that the patient had fever, tachycardia, cough and weight loss (57 Lbs.).   _Despite the patient's abnormal vital signs, the patient was not seen for another 9 hours._

On 11/20/13 at 11:15 an EMT saw the patient noting a referral for fever, cough, tachycardia x 6 months and weight loss. The EMT noted the patient ambulated in the ATU without difficulty and that the patient was AAOx3 (awake, alert & oriented x 3). The EMT wrote, "Patient was seen earlier this morning and referred back for complaints of runny nose and occasional cough."   The EMT noted the patient had no abnormal

---

[46] This appears to be a reference to University Medical Center in New Orleans.

breathing sounds. The EMT noted the patient had lost 55 pounds in 2 years. Temp=96.7, BP=122/84 mm Hg, pulse=97/minute and respirations=16. SpO2=99%. _The EMT did not document notifying a physician to obtain medical orders._ At some point a chest x-ray and labs, including an HIV test, were ordered. At an undocumented time another EMT noted that the patient had "no cough since arrival." At 16:30 the EMT noted that the patient was waiting to see Dr. Toce. EMTs had not repeated the patient's vital signs for over 5 hours, since the patient's arrival at 11:15. _There is no documentation that a medical provider saw the patient for this significant history of fever, cough and 55 pound weight loss_.

On 11/20/13 labs showed the patient was HIV antibody positive. This result was reported on 11/22/13 at 11:24. Almost two weeks later, on 12/4/13 a medical provider illegibly initialed the report.

On 11/22/13 at 08:30 an EMT saw the patient for dizziness and midsternal chest pain. Portions of the note are illegible. Temp=100.4 F, BP=110/75 mm Hg, pulse=160/minute and respirations=16. SpO2=100%. _There is no documentation that the EMT notified a physician of the patient's abnormal vital signs._ At 1300 the EMT took partial vital signs. Temp=Not measured, BP=124/74 mm Hg, pulse=118/minute and respirations=16. SpO2=Not measured. At 1345 the EMT repeated the patient's vital signs assessing the patient for orthostatic hypotension. At an undocumented time the EMT started an IV. At 13:00 the patient was noted to leave the ATU however, vital signs were recorded thereafter. At an undocumented time, a medical provider documented a note. The provider did not review the patient's medical history, review the patient's onset of symptoms or perform any examination. The provider noted that the patient had "mild epigastric discomfort, not bad enough to treat." The provider noted the patient's hemoglobin and hematocrit were low (H/H=10.7/32.4%) but did not comment on its significance or make any plan aside from "Encouraged to increased ambulation."

On 11/23/13 at 21:00 EMTs responded to the patient's location for complaints of inability to breathe. The patient was warm and diaphoretic His pulse was 130/minute and oxygen saturation=91%. Respirations=21/minute. The EMT noted no abnormal lung sounds and that the patient was not in respiratory distress. The EMT started oxygen at 4 liters per minute and started an IV with lactated ringers. The patient was transported to the ATU where EMTs noted that he "complained of shortness of breath x 20 minutes." He was wrapped in a sheet and shivering. Patient reported 60 pound weight loss and malaise. Temp=100.1, BP=107/60 mm Hg, pulse=109/minute and respirations=22. SpO2=100% at 4 liters of oxygen.

At 21:47 the EMT contacted Dr. Collins who ordered Phenergan, Tylenol and to orally rehydrate the patient. _A physician never examined the patient._ At 00:50 the IV was discontinued and at 0100 the patient was returned to his housing unit. A physician did not make a diagnosis or provide orders for follow-up. On an unknown date, a physician initialed the ATU note. _A physician did not see the patient for follow-up._

On 11/26/13 at 10:15 an EMT saw the patient urgently for decreased appetite and weight loss. The patient presented in a wheelchair due to weakness "ever since I got dehydrated." The patient also complained of chest pain and that it felt like "someone was hitting him with a 5 pound sledgehammer. He is short of breath when he awakes in the morning secondary to coughing. He also complained of vomiting and diarrhea." The EMT documented: "Patient sent over per security secondary to starving himself for 3 months and he is depressed. Mental health contacted by Captain Adams on West Yard."

Despite reports that the patient was "starving himself" EMTs did not weigh the patient. An EMT noted the patient had right upper lobe congestion. EMTs failed to note the patient's HIV test was positive. The EMT contacted Dr. Tarver who gave a telephone order for Phenergan that was given at 12:22. Although no physician orders were written, labs and chest x-ray were performed, including another HIV test.

On an undocumented date and time, Dr. Tarver documented: Weight loss per chart review.  Low grade fever recently.  Still N/V Cough.  CXR=no obvious infiltrate noted, increased BV markings.  _The physician did not examine the patient._ The plan was MVI (multivitamin). Keep follow-up appointment of labs.  At 12:42 the patient was released to his housing unit.

On 11/26/13 mental health saw the patient who stated that he "has had a cold for the past six months, they say I might have HIV."  He has had no appetite and can't keep anything down.

On 11/26/13 labs again showed the patient was HIV antibody positive. His CD4 cell count was 15 cells/ml and HIV RNA viral load was 288,650 copies/ml. He was HCV antibody positive.  The lab reported these tests on 11/27/13.  _A physician did not see the patient for follow-up of this lab showing the patient had AIDS and was severely immunosuppressed._

On 12/2/13 at an undocumented time, Dr. Lavespere saw the patient at the clinic. He did not note the patient had twice tested HIV positive since 11/20/13.  _He did not examine the patient but sent him to the ATU._  Later that day the patient was admitted to the infirmary.  Dr. Tarver wrote an admission note that the patient was HIV positive but did not include past medical or social history or review of systems. _Later that day the patient's vital signs were abnormal. He was febrile, tachycardic and hypotensive (Temp=102◦F, pulse=115/minute, BP=92/52 mm Hg) but was not sent to the hospital._ These were life-threatening abnormal vital signs.  Because the patient did not have a diagnosis, he should have been sent to a hospital.  Four days later, on 12/6/13 he was started on antiretroviral therapy. He was treated presumptively for pneumocystis pneumonia at LSP but his condition worsened. On 12/13/13 he was hospitalized at ILH and died on 1/14/14.  Despite the patient's history of fever, cough and 55 pound weight loss, a physician did not timely evaluate and treat the patient or address two tests

showing that he had HIV/AIDS. The patient should have been directly admitted to the hospital instead of being admitted to the infirmary where he did not receive any treatment for his HIV disease until 4 days later. Had the patient been timely tested, evaluated and treated, his death was likely preventable.

**EMS Sick Call Protocols**

LSP has developed EMS Sick Call Protocols for both routine and urgent conditions.[47] There is no indication that the protocols have been authored or reviewed by any LSP medical authority and they are undated and unsigned.  There is no table of contents or guidance as to who is permitted to use the protocols or what training is required prior to using the protocols. Dr. Lavespere stated that he does not provide any training to the EMTs regarding the protocols.[48] Moreover, the protocols are defective in that they provide EMTs inadequate guidance to adequately assess and timely refer patients with serious medical conditions. The following examples are noted:

> The Burning with Urination protocol does not require a urinalysis, needed to diagnose patients with urinary tract infections;
>
> The Shortness of Breath protocol does not include obtaining a medical history for previous heart disease (e.g., myocardial infarction, heart failure), cardiovascular review of systems (e.g., chest pain, palpitations, dizziness) or cardiovascular risk factors (e.g., hypertension, diabetes);
>
> The Chest Pain protocol states that "If the patient has severe chest pain with unstable vital signs, he should be sent to the ATU immediately." Since many patients experiencing an acute cardiovascular event may not initially have severe chest pain or unstable vital signs, this criteria is likely to delay diagnosis of life-threatening conditions (e.g., myocardial infarction, aortic aneurysm, etc.);
>
> The Vomiting protocol does not include criteria to immediately refer patients with abdominal pain and abnormal abdominal findings (e.g., distended, tender, rigid, and rebound tenderness) to a physician;
>
> The Constipation protocol does not include a review of systems (e.g., weight loss, loss of appetite, blood in stools) to rule out more serious illnesses (e.g., colon cancer);
>
> Some protocols are diagnosis rather than symptom-based and require the EMT to determine the diagnosis before assessing the patient (e.g., athletes foot and jock itch).

According to the Louisiana Bureau of Medical Services Approved Scope of Practice Matrix for Licensed EMS Practitioners, depending on their level of certification, EMT and Paramedic scope of practice relates to trauma/injury management, airway management, vital signs,

---

[47] According to the Louisiana Bureau of Medical Services Approved Scope of Practice Matrix for Licensed EMS Practitioners, depending on their level of certification, EMT and Paramedic scope of practice relates to trauma/injury management, airway management, vital signs, administering pharmaceuticals, vascular access (e.g. starting intravenous lines), taking electrocardiograms (EKGs), and health promotion activities. EMTs and paramedics may also practice according to Treat and Release protocols.

[48] Lavespere deposition, page 92.

administering pharmaceuticals, vascular access (e.g. starting intravenous lines), taking electrocardiograms (EKGs), and health promotion activities. EMTs and paramedics may also practice according to Treat and Release protocols. However we found that EMTs' practice often exceeds their legal scope of practice, independently treating patients with life-threatening conditions. Many of these patients are not never evaluated by a physician.

EMTs and paramedics document that they treat patients "according to protocol" which often involves initiating intravenous fluids, performing EKGs and ordering x-rays, but these protocols do not include medical diagnoses, and EMTs are not trained or licensed to make medical diagnoses. EMTs typically did not document what protocol they followed or how they selected it. Thus almost all patients are treated and released from the ATU without the benefit of receiving a medical diagnosis for their medical conditions.  This access to care system has resulted, and continues to result, in systemic harm, including death to patients at LSP. Dr. Lavespere is directly responsible for the failure to monitor EMT practice and ensure that patients are timely medically evaluated and treated.

Inmates reported that EMTs often do not believe they are sick and make an assumption that symptoms such as altered mental status are due to drug use. If the inmate does not provide a urine sample voluntarily or within some time frame at the discretion of the provider, EMTs catheterize the patient. Catheterizing a patient when medically unnecessary is a violation of the patient and introduces a risk of infection. It is expressly defined as an inappropriate use of a catheter by the Centers for Disease Control (CDC).[49]

The attitude that inmates are not sick extends to the Medical Director, Dr. Randy Lavespere who stated that his biggest challenge was:

> "[Determining w]ho's telling the truth. That's the biggest challenge, you know. I work in a working facility, people don't want to go to work. Point-blank, they don't. So, you know, a lot of them use the medical department for reasons not to go to work. And so my daily job is who's telling me the truth, you know. . . .

> "In Angola, they don't necessarily want to get well because if they get well, then they have to do things."[50]

We conclude that the access to care system at LSP is completely inadequate, and that despite knowledge of the problems, facility officials are not addressing it.

---

[49] According to the Centers for Disease Control, the placement of a urinary catheter "[a]s a means of obtaining urine for culture or other diagnostic tests when the patient can voluntarily void" is an inappropriate use of a catheter. http://www.cdc.gov/hicpac/cauti/002_cauti_sumORecom.html.
[50] Lavespere individual Deposition Transcript, pages 18-22.

## Chronic Disease Management

**Methodology:** We interviewed facility health care leadership and staff involved in management of chronic disease patients. In addition, we reviewed the records of patients with chronic diseases, including diabetes, hypertension, hypothyroidism, HIV infection, clotting disorders, as well as other chronic illnesses. At each visit, we evaluated the quality of provider evaluations and whether they were complete and appropriate (subjective, objective, current labs, assessment and treatment plan). We assessed whether patients were seen in a timely manner in accordance with their disease control. We also evaluated whether the Problem List was updated and continuity of medications provided.

**Standards:** Patients with chronic diseases are identified and enrolled in a chronic disease program to decrease the frequency and severity of the symptoms, prevent disease progression and complication, and foster improved function. The responsible physician establishes and annually approves clinical protocols consistent with national clinical practice guidelines.[51]

### Chronic Disease Policies and Procedures and Clinical Guidelines

LSP has Chronic Care/Special Needs policy and procedure (No. HC-11).  This policy is generic and lacks sufficient operational detail to provide guidance to staff regarding the requirements of the program, including procedures for enrollment, tracking, frequency of monitoring visits, etc.  The policy references the need to have, at a minimum, chronic disease guidelines for hypertension, congestive heart failure, diabetes, hyperlipidemia, asthma, COPD and conditions requiring anticoagulation. The protocol does not address the need to have guidelines for other chronic disease including seizure disorder, HIV and hepatitis C infection.

We reviewed LSP's Chronic Disease Manual that was signed by Dr. Lavespere in July 2016. The manual does not adequately describe the definition of a chronic disease as being:

> *An illness or condition that affects an individual's well-being for an extended interval, usually at least 6 months, and generally is not curable but can be managed to provide optimal functioning within any limitations the condition imposes on the individual.* [52]

The guidelines are limited to the following diseases: asthma/COPD, diabetes, congestive heart failure, hypertension, hepatitis C and HIV infection, hyperlipidemia, seizure disorder and patient's being anticoagulated. LSP's narrow definition of chronic disease does not include patients with other chronic diseases such as chronic kidney disease, thyroid disease, sickle cell disease and autoimmune diseases such as systemic lupus erythematosus (SLE).

The guidelines themselves are skeletal in nature. They do not include the community standard of care that the guidelines are based upon, such as the American Diabetes Association Medical

---

[51] NCCHC. P-G-01, ACA 1-HC-1A-17.
[52] NCCHC. P-G-01.

Standards of Care in Diabetes; Eighth Joint National Committee Guidelines (JNC 8) for the Treatment of Hypertension; or Department of Health and Human Services (DHHS) Guidelines for the Use of Antiretroviral Agents in HIV-1 Infected Adults and Adolescents, etc.

The LSP treatment guidelines provide no clinical criteria for inclusion in the chronic disease program, procedures for enrollment; components of an adequate history and physical examination, definitions of disease control and medical treatments for each disease. They do not provide adequate guidance to LSP providers regarding treatment of chronic diseases and are completely inadequate.

We requested a list of patients with chronic diseases at LSP.  However, what we were provided was a list of patients scheduled for a chronic disease appointment.[53]  This is not a true chronic disease tracking system that includes all patients with chronic diseases, their last appointment, next scheduled appointment and scheduled labs.

Components of a chronic disease program should include at a minimum the following elements:
Identifying and evaluating each of the patient's chronic diseases at every visit;
Performing a pertinent history, including review of systems for each disease;
Referencing current laboratory test results;
Performing a focused physical examination pertaining to each of the patient's medical conditions;
Reviewing medication adherence and assessing obstacles to compliance (e.g. side effects);
Assessing disease control for each of the patient's chronic diseases;
Developing and modifying, as needed, treatment plans related to each of the patient's chronic disease;[54] and
Scheduling clinical follow-up in accordance with the patient's disease control.

As noted above, the LSP chronic disease guidelines lack these elements. At LSP, these steps are not performed. We found a pervasive pattern of providers not performing adequate, medical evaluations.  LSP providers are not all trained in primary care.  Their training deficiencies are evident in their management of patients with chronic diseases.  Most providers seldom take a history or perform a physical examination.   Inadequate chronic care is exemplified in the following examples.

**Patient #29** had approximately 10 visits for sick calls with no physician exam. This patient had complex problems including hypertension, left ventricular systolic

---

[53] These appointment lists indicated that there are hundreds of men at LSP with conditions including Asthma-COPD, Hepatitis-C, seizure disorders, and HIV, or who are prescribed the blood thinner Coumadin.

[54] Reginald George's care reflects the problems in this area; he underwent an extended period from 2010-2012 where he was not receiving HIV medication and his health dramatically worsened (in addition to other reported problems).  Similarly, Ian Cazenave has not received proper and consistent wound care, preventing the chronic wound on his ankle from healing; the prison has offered him amputation even though his condition is likely treatable.

dysfunction, atrial fibrillation kidney dysfunction, asthma, pulmonary hypertension previous double bypass surgery and spinal fusion.  He repeatedly presented to both the ATU and the physician clinic yet there was no physician examination in the medical record.

For **Patient #14** we reviewed more than two years of clinical examinations.  Thirteen provider evaluations occurred over an approximately 27 month period.  Of the 13 encounters, none had an adequate history addressing all of the patient's conditions and only 1 had a reasonably focused physical examination.  This pattern of a lack of adequate history and physical examinations affects care significantly.  This patient's blood pressure and high blood lipids remained out of control for over two years likely contributing to a coronary event requiring a coronary artery stent.  The doctor also took no history with respect to whether the patient was receiving ordered medication. One of the patient's conditions, chronic kidney disease, was unrecognized as a problem. The doctor diagnosed the patient with chronic obstructive lung disease when the patient had no clinical evidence of having this disease.  The 4 chest x-rays in the medical record were all clear; there was no pulmonary function test in the record; and there was no history taken on any of the 13 provider evaluations that would have demonstrated chronic lung disease.

Another example was **Patient #3** who had diabetes, peripheral vascular disease, coronary artery disease, hypertension and hepatitis C.  This patient had uncontrolled diabetes for 2 years.  He was not timely monitored receiving only two hemoglobin A1C tests over a 2 year period.  Typically, uncontrolled persons with diabetes have an A1C test every 3 months.  The patient had 23 abnormally high blood pressure readings over a 2 year period. In only 6 of these episodes did providers add medication to improve blood pressure control. The patient's LDL cholesterol was only assessed once over the 2 year period and was not at goal.  The medication administration records do not verify that the patient consistently received medication.  The patient developed confusion, extremely high blood pressure and critical ischemia with symptoms of signs of leg infection (i.e., a cold necrotic leg wound that was noted to be infected).  Yet the patient was not timely sent to a hospital and subsequently the patient died.  The death was preventable but the Death Summary failed to identify any problems with care.[55] This was consistent with other Death Summaries that we reviewed: although we observed major deviations from standards of care in nearly every case, no Death Summaries acknowledged any problems with care.

**Patient #11** had ongoing active severe Crohn's disease since 2013.  The patient had 30 pound weight loss, anemia, abscess formation, and eventually fistula formation.  Yet in multiple LSP physician visits doctors failed to take adequate histories of the patient's

---

[55] This pattern is also seen in the cases of Alton Adams and Lionel Tolbert, who also suffer from arterial disease that the prison fails to adequately treat.  In the instance of Mr. Adams, this has led to multiple amputations of one leg.

symptoms; failed to perform adequate physical examinations; failed to assess whether the patient was receiving ordered medication; failed to review laboratory and other diagnostic test results with respect to the patient's disease status; and failed to provide adequate medication with respect to the patient's disease status.  The providers managing the patient did not appear to know how to manage the patient's condition. Immunosuppressive drugs indicated as early as 2013 and possibly earlier were not initiated despite worsening disease status for over 2 years.  The result of this neglect was deterioration of the patient's condition and harm including formation of fistulas and surgeries to drain abscess and damage to the gastrointestinal tract from ongoing poorly treated Crohn's disease.  Coordination between the consultants and LSP physicians was extremely poor.  On multiple occasions after a consultant visit or procedure, LSP physicians did not document recognition of what the consultant did or recommended and this appeared to cause delays in managing the patient. As an example, a referral for repeat colonoscopy submitted 6/11/13 was never scheduled according to an 11/26/13 note.  After multiple colorectal consultations or diagnostic tests, LSP providers did not document acknowledgement of recommendations or results of tests.  This resulted in delays in treatment which occurred on multiple occasions.  As an example, after a MRI showing an abdominal abscess on 3/6/14 there was no timely follow up by an LSP provider.  The MRI indicating an abdominal abscess wasn't followed up until 6/18/14 when a doctor noted that the GI service recommended drainage.

The medication administration records at times indicate that the patient did not show up for medication for months at a time. Health care staff should have scheduled a visit to determine whether the patient in fact was not appearing for medication administration, and if so, the patient's reasons (e.g. side effects, scheduling conflict with mediation administration, etc.).  Many other medication records failed to verify that the patient was receiving ordered medication.  A provider medication order failed to result in a prescription for the medication (for a statin drug); the patient never received the drug; and subsequent providers failed to identify the need for the drug.  A doctor's order for Humira was poorly written and appeared to result in an improper dosing of the drug.

During an infirmary admission from December 2014 to April of 2015, providers mostly failed to take any history of the patient's progress, failed to perform adequate physical examinations, and failed to document the current treatment plan for the patient.  The patient's ongoing Crohn's disease was not monitored adequately and additional typical therapy (immunosuppressive therapy) was not initiated for several years.

For **Patient #12**, who had an almost 3 year history of diabetes, LSP doctors failed to bring the patient's diabetes under control.   After two lab results reflecting poor disease control the patient was not seen timely. After labs reflected the patient's diabetes was in poor control (A1C=10.1%) a provider did not see the patient for 9 months to evaluate and modify his treatment for diabetes. After another A1C value of >14% a provider did not evaluate the patient for almost 4 months.  The patient had diabetic nephropathy but it wasn't identified as a problem.   The patient was not evaluated for peripheral

neuropathy (which should be done annually) until he developed a diabetic foot ulcer and was evaluated by a podiatrist.  For years, the medication administration record appeared to show that the patient missed approximately half of his insulin doses but providers never discussed medication issues with the patient.  It appeared that the patient did not receive medication, including for diabetes, for over a year during a time period when the patient's diabetes was very poorly controlled.  The poor control of diabetes will have an effect on the patient and places him at higher risk for microvascular complications such as retinopathy and nephropathy. Medical providers did not timely monitor this patient's diabetes. Given his poor disease control Hemoglobin A1C tests should have been performed every 3 months but instead were done approximately every 6 months even though his diabetes was poorly controlled.

When the patient developed a diabetic foot ulcer, the patient was sent back to his housing unit where less than 50% of dressing changes were done.  Almost all of the physician examinations of the patient failed to include an adequate history and physical examination.  Physicians seldom questioned the patient about high or low blood sugars, whether he was receiving medication, whether he was having side effects from medication, and whether he was having symptoms of neuropathy.  On 7 clinic visits over the more than 2 years of chart review the patient had elevated blood pressure but did not receive an increase of medication or an evaluation as to whether the patient was receiving his ordered medication.  This places the patient at risk of harm and increases the risk of heart and kidney disease.

**Patient #15**, a 40 year old patient, arrived at LSP in 1997.  He had a history of severe hypertension that was never brought under control at LSP. This patient received inadequate medical care for his severe hypertension. At chronic disease visits, physicians did not perform a cardiovascular or neurological review of systems (chest pain, SOB, etc.) or perform adequate vascular examinations (neck, aorta, renal and femoral arteries).  Providers did not monitor the patient in accordance with his disease control, adjust his baseline medication regimen, or order blood pressure monitoring. There is no documentation that the patient was evaluated for secondary causes of hypertension. Despite the patient's severe and uncontrolled hypertension, a physician saw the patient only twice (7/23/13 and 1/14/14) for chronic disease management in the 6 months before his death. MARs show that the patient did not receive his medication because he did "Not Request it" but physicians did not adequately address the patient's medication adherence, including counseling the patient regarding risks of poorly controlled hypertension. In the 24 hours preceding the patient's death, the patient had chest pain, a new heart murmur, abnormal vital signs and EKG. A chest x-ray suggested aortic aneurysmal changes but the patient was not examined by a physician or timely sent to the hospital. On 1/14/14 the patient developed hypotension but was not timely sent to the hospital and died of a dissecting aortic aneurysm.

**Patient #20** was a 37 year old man who arrived at LSP in 1998. His medical history included HIV infection diagnosed in 2010. At chronic disease visits, the physician did not address the patient's HIV infection except to note that the patient was refusing the HIV

clinic. Physicians did not document any discussion with the patient about why he refused to see the HIV specialist, and did not perform any review of systems (e.g., fever, chills, weight loss, cough, etc.) or perform examinations pertinent to his HIV infection. While decisions about antiretroviral therapy may be deferred to specialists, physicians should perform a pertinent review of systems and physical examination related to HIV infection. Instead, LSP physicians ignored his HIV status for several years.

**Patient #19** was a 57 year old man who arrived at LSP in 1984. His medical history included hypothyroidism. For over three years, from 2010 to 2013, his hypothyroidism was not adequately monitored and was poorly controlled with TSH levels ranging from 86 to 127, normal=0.5-4.5.

In an egregious case, **Patient #25** had HIV disease which was initially well controlled but despite the patient's protests, his HIV medications were discontinued and *he was permitted to deteriorate to the point where the patient developed AIDS with CD4 count below 100, before antiretroviral therapy was resumed.* We do not find informed signed refusals of HIV medications during this time frame. The patient alleged that medications were withheld from him because he was being punished. Secondly, the patient had an abnormally high prostate specific antigen (PSA) test indicating potential prostate cancer for over two years before the patient was seen by a urologist and diagnosed with prostate cancer. LSP physicians repeatedly failed to note or address the patient's abnormal test results, including an increased alkaline phosphatase level that might indicate prostate cancer and possible bone metastasis. A LSP provider documented that the patient previously refused evaluation for prostate cancer, however we do not find any signed, informed refusals in the medical record. A prostate biopsy was not performed for over 7 months after it was determined to be medically indicated, and although the biopsy results were suggestive of adenocarcinoma of the prostate, for reasons that are unclear a decision was made to perform another biopsy in 4 months. However, this repeat biopsy did not take place for six months. There is conflicting documentation regarding whether the patient has bone metastasis. Other issues include EMTs not examining patients when presenting with medical complaints. Health record issues are that physicians did not legibly date and time signing of lab and diagnostic reports. Medication administration records were not timely filed in the record to assess medication administration and compliance.

LSP medical providers had ample information available to indicate the severity of the patient's condition, yet they utterly failed to treat him accordingly.

In summary, virtually every chronic disease record we reviewed showed a similar pattern of inadequate medical evaluations and lack of timely monitoring and treatment. In nearly all records we reviewed, patients' chronic diseases were poorly controlled or inadequately treated, increasing the risk of serious harm to these patients. Medical provider performance and LSP's inadequate chronic disease care guidelines are contributing factors.

## Pharmacy and Medication Administration

**Methodology:** We interviewed the Pharmacy Director, toured the pharmacy and medication rooms, observed medication administration, reviewed medication administration records and Pharmacy & Therapeutics Committee Meeting Minutes.

**Standards:** Pharmaceutical operations are sufficient to meet the needs of the facility and conform to legal requirements. Inmates do not prepare, or dispense or administer medication except for self-medication programs.[56] Proper management of pharmaceuticals also includes a formulary with a formalized process for obtaining nonformulary medications. Prescription practices include requirements that medications are prescribed only when clinically indicated as one facet of a program of therapy and that a prescribing provider reevaluates a prescription prior to its renewal. There are procedures for medication procurement, receipt, distribution, storage, dispensing, administration and disposal; secure storage and perpetual inventory of all controlled substances, syringes and needles; and pharmaceuticals are managed in accordance with state and federal laws.[57]

### Pharmacy Services

**Findings:** LSP has an onsite pharmacy that serves more than one institution, including LSP-Angola, Dixon and Avoyelles. According to the Pharmacy Director, the pharmacy has been located in the present space since 1998. Staff includes 4 pharmacists including the Pharmacy Director, and 8 pharmacy technicians. The pharmacy receives approximately 700-800 new medication orders per day and fills 1200-1300 prescriptions per day which includes medication renewals and refills.

Pharmacists receive orders from physicians, a nurse practitioner and EMTs. Pharmacists enter prescription information into the Correctional Institution Pharmacy System (CIPS). Pharmacy technicians fill the prescription via blister pack containers and a pharmacist verifies the filled prescription against the original order. Only pharmacists dispense prescriptions for controlled substances. Pharmacy technicians sort medications by inmate housing location and place them into a box. An inventory list is printed and placed in the box. Drivers take the medication boxes to respective medication rooms located near housing units. Staff at the medication rooms compare the inventory list to medications in the box. If medications are missing, staff emails the pharmacist.[58]

To renew medication orders (e.g., chronic disease medications, etc.), once a month the pharmacy prints and distributes to physicians a list of medication orders that will soon expire. The physicians are supposed to review and renew medications orders to provide medication continuity.

---

[56] NCCHC. P-D-01.
[57] ACA. 1-HC-1A-35. Ref-4341.
[58] See photographs, Attachment B, pages 8-10.

Once a month, pharmacists conduct inspections of medications rooms, infirmary units and ATU medication storage areas for expired medications, etc.  Examples that were provided include notes that the Death Row pill room lacks a thermometer, that no-shows and refusals are not properly recorded, that delivery sheets are incorrectly filed, that KOP medications are not being adequately tracked, and that non-compliance is not being documented.   Some forms simply state "Every thing [sic] looks good."  One report notes that a night-shift sergeant is "ordering too much medication," but there is no further explanation of what this could mean.

Pharmacy and Therapeutics Committee Meetings are held quarterly and include the Pharmacy Director and Medical Directors from LSP and other institutions.  Topics covered include adding and deleting drugs from the formulary and serious medication errors.

We toured the pharmacy area and observed pharmacy technicians filling prescriptions.  The pharmacy is cramped and cluttered.  There is no schedule for sanitation and disinfection practices.  The floors are not routinely cleaned because inmate sanitation workers are not permitted in the pharmacy.  We also observed a pharmacy technician placing pills in a blister pack with her bare fingers, which is unsanitary.

A concern is LSP has a policy that no narcotics are administered to inmates while they are in the housing units. To receive narcotic medications, inmates must be admitted as an inpatient in one of the infirmary units. Not all patients with acute or chronic pain due to malignancy will be housed in the infirmary following their diagnosis, and this policy may result in patients with undertreated severe pain. Physicians treat chronic pain with a combination of non-steroidal anti-inflammatory medications (NSAIDS), aspirin and acetaminophen. They also use Keppra, primarily an antiseizure medication, and Neurontin, for treatment of neuropathic and non-neuropathic pain.  These medications are not the standard for treating non-neuropathic pain and can cause physical and mental side effects.  LSP's use of these medications appears to be excessive.

**Medication Administration**
**Standards:** Administration of medications is by persons properly trained and under the supervision of the health authority and facility or program administrator or designee. There is accountability for administering or distributing medications in a timely manner according to physician orders.[59]

**Findings:** At LSP medications for inmates in housing units are administered by licensed practical nurses (LPNs) and correctional officers. Dr. Lavespere stated that in the medical dormitories, inmate orderlies deliver medications to other inmates.[60]

---

[59] ACA. 1-HC-1A-35. Ref-4341
[60] Lavespere 30(b)(6) Deposition Transcript, page 41.

Medications may be administered up to 4 times a day, and there is morning and afternoon insulin administration. There are no documented times on medication administration records (MARs), such as 8 am, 12 noon and 6 pm. Rather medications are designated to be given at pill call 1, 2, 3 or 4.  Not having designated times for medication administration may be dangerous as certain medications should not be given too closely together or too far apart; and to do so creates a risk of harm to the patient. Health care leadership reported that officers begin administering medications as early as 3:00 am and the last medication administration begins at 7:30 pm.[61]

We observed a license practical nurse administer medications in one of the satellite medication rooms. An inmate presented to the window without his identification card and the LPN sent the patient back to retrieve it. When other inmates came to the window the LPN retrieved the patients' medications from a storage bin and gave it to the inmate. The LPN did not use the medication administration record to determine what medications the patient was supposed to receive. This is dangerous because the nurse is not comparing the order on the MAR to the medications received from the pharmacy to determine if the medication, dosage and frequency of medication match.  The nurse also did not document administration of medications at the time they were given to the patient.  Thus, the LPN is depending on her memory to later record what medications were administered to the patient.  As LPNs may administer medications to more than 100 inmates, this renders MARs unreliable with respect to accuracy of medication administration.

In Main Prison Ash Unit we observed officers administering medications to inmates. We did not observe a Sergeant wash her hands prior to administering medications.  The Sergeant prepared to deliver medications by retrieving medications from the storage bin. The officer then announced Keep on Person (KOP) medication administration and inmates came up to the line to receive their medications. Inmates presented their identification cards but the officer did not verify the patient's name and DOC number on the ID with the DOC number on the patient's prescription. The officer did not use a medication administration record to compare the medications against what the patient was supposed to receive and did not document administration of medications at the time they were given to the patient. As noted above, relying on memory as to what medications were administered to whom renders medication administration records unreliable.[62]

In the Main Prison Cypress Unit we also observed correctional officers administering medications to inmates.  Cypress unit is a medical dormitory housing patients with chronic

---

[61] See photographs, Attachment B, pages 8-10.

[62] The electronic medication software is not fully implemented. In the main prison medical dormitories (Ash 2, Cypress 2, and Hickory 4) officers administer medications on the tiers but do not have access to the electronic medication administration (eMAR) software because there is no wireless or hard wire connection to the eMAR server.  This is inadequate access to the medical record and results in potential for inaccurate entries.  Correctional officers enter their administration of medication at a time later than when it is actually administered.  This significantly increases the risk of documentation errors and is not appropriate medical record documentation.

diseases and disabilities, although medical staff do not make rounds there. Correctional officers did not use the MAR to determine what medications the patient should receive. Some medications had been prepackaged into coin envelopes with only the inmate's name and bed number.[63] There was no identifying information as to what medications were contained in the envelope. Staff poured the medications into a medication cup and poured it into the inmate's hand.  The officer used the same cup over and over, which sometimes touched inmates' hands, which is unsanitary.   Correctional officers did not consistently observe the inmate swallow medications nor did officers initially perform oral cavity checks to ensure he took the medication. After we observed a few minutes, another officer began performing oral cavity checks. Officers did not document administration of medication at the time it was given.

Thus, our review showed that neither licensed practical nurses nor correctional officers following proper procedure to ensure the "5 rights of medication administration." The five rights ensure that the right medication is given to the right patient, at the right dose, by the right route at the right time. However, LPNs are under the supervision of health care professionals, but correctional officers administering medications are not supervised by health care professionals to ensure that they safely perform medication administration. The Pharmacy Director developed a curriculum and provided training to correctional officers 6 or 7 times since September 2015. We reviewed the curriculum and note that this level of training is simply inadequate for officers to safely administer medications to inmates.  This is validated by actual practice, showing that officers do not follow correct procedure and have no supervision by qualified health care professionals. This practice is dangerous and creates a systemic risk of harm to inmates at LSP.

In addition, although we did not observe the practice, Dr. Lavespere reported that in the medical dormitories (Ash and Cypress), inmate orderlies deliver food and pills to patients.[64] Therefore, our review shows that LSP has inadequate health care staff to correctly administer medications to inmates, and that unqualified correctional officers and even inmates deliver medications to other inmates fails to meet NCCHC and ACA Standards. This creates a systemic risk of harm to all inmates at LSP.

We incidentally note that an inmate approached us after we observed medication administration.  He reported that the practice of presenting inmate IDs was new, and that staff had told them just the week before to start bringing their ID to receive medications. He reported that staff also told inmates that they had to take the medication at the time of administration, and could not take medications back to their bunks, but this would last just a few days. He reported that in the past inmates signed the MAR indicating that they had

---

[63] On 1/18/2013 the Director of Nurses issues a memorandum endorsing the prepackaging of inmate medication in coin envelopes that contain only the inmates name and DOC number, and that medication carts would no longer be taken to the cellblocks. This is memorandum essentially endorses the transfer of prescription medications from a properly labeled pharmacy dispensed container into a container that does not contain legally required prescribing information.  The reason for the change in practice was not specified in the memorandum.

[64] Lavespere 30(b)(6) Deposition Transcript, page 41.

received their KOP medications but this was no longer done.  He reported that KOP medications are like a drug store for officers, and that officers take medications for their own personal use. He conveyed that a Sergeant took medications from an inmate's medication container and gave it to him to deliver to an officer that had a headache. The next night a different officer gave another inmate medications to take to the same officer with a headache. He also reported that inmates have operated computers in medication administration rooms for as long as he can remember.

We were not able to determine the accuracy of the information provided by the inmate. However, review of medication administration records confirm that inmates no longer sign receipt of KOP medications which does confirm the lack of documentation that the inmate actually received the medication.   The other information reported by this inmate includes allegation of theft of medications by correctional officers and warrants investigation.

The inmate also reported that there are disabled inmates in the dormitory but no staff to assist them with activities of daily living.  There is a blind inmate that he took it upon himself to see that he could safely ambulate around the dorm, receive his food and perform his hygiene, particularly in the middle of the night when no prisoners or orderlies were assigned to care for him.  He stated that if he didn't do it, he did not know who would help the inmate. If true, this is a concern for how inmates with disabilities are assisted at LSP and another example that LSP has insufficient health care staffing, and relies on untrained inmates to assist other inmates.[65] This subjects vulnerable inmates to potential abuse by other inmates.[66]

**Medication Administration Records**
**Findings:** We reviewed numerous medication administration records in health records. Many patient medication records showed multiple blank spaces, meaning that there is no documentation that the patient was offered medications.  We also noted that officers or LPNs documented that the patient did not request medications for months at a time, yet physicians did not address nonadherence with patients to determine if in fact the patient was taking his medication, and if not, what the reasons were, including side effects.

We also found evidence that MAR documentation was unreliable.  We noted that housing unit correctional officers and/or LPNs documented patients receiving KOP medications while they were in the infirmary, such as IV antibiotics and nebulized treatments.  These are obviously not KOP medications and housing unit staff are documenting that patients receive medications that they have no knowledge that the patient received. This is essentially falsification of the health record. We also noted that staff continued to document receipt of medication on the medication administration record after patients died.   We found the following examples:

---

[65] One instance of such a prisoner is Alton Batiste, who is housed at Camp F and is completely blind.
[66] See photographs, Attachment B, pages 6-7.

**Patient #15** with hypertension was prescribed multiple antihypertensive medications. His September, October, November, and December 2012 MARs showed many blank spaces for the patient's antihypertensive and psychotropic medications (Cozaar, Norvasc, Catapres, Risperdal) as well as refusals. The patient's June 2013 MARs show he was prescribed Catapres and Cozaar for hypertension and received approximately half the monthly doses because he "Did not request it." The patient's Main West August 2013 MARs showed that the patient received about half of his antihypertensive medication doses (Catapres, Cozaar, and Norvasc). From September through January 2014 MAR showed that he was prescribed Catapres, Cozaar, Isordil, and Norvasc for his hypertension.  From September 2013 through January 2014 for virtually every dose on every day staff documented that the patient did not receive his medication because he "Did not Request it."

**Patient #18** with HIV/AIDS was hospitalized on 12/13/13 and died on 1/10/14.  His January 2014 MAR showed that correctional staff documented giving the patient medications via keep on person from 1/1/14 until 1/14/14. However the patient was admitted to the hospital on 12/13/13 and therefore was at the hospital this entire time correctional staff documented that the patient received his medications.  Moreover, correctional staff continued to document the patient received medications *four days after the patient died*. This showed that day after day staff documented administering medications that did not take place, and how utterly unreliable medication administration records are. His record also showed that from June to August 2013 the patient did not receive Xalatan eye drops because he "Did not Request it."

**Patient #20** had bipolar disorder and HIV infection.  In March 2014, MARs show that the patient was prescribed risperidone, Divalproex and Vistaril but staff documented the patient never requested it.  On 4/18/14 mental health saw the patient who was having no acute problems.  MH documented that the patient reported taking his medication however this is not consistent with MAR documentation, but the mental health providers did not address this.  Based upon our review it's not possible to know whether the patient did not receive his medication, or received his medication but staff did not document administration of medication.

In summary, LSP staff do not adhere to procedures to safely administer and document medication administration. The medication administration records are unreliable with respect to accuracy of documentation.

Health care providers should be able to rely on the accuracy of medication records to make appropriate treatment decisions for patients.  Yet the unreliability of the MARs increases the chances that the provider will not make appropriate treatment decisions.  For example, if a patient with hypertension is taking his medication but his hypertension is not controlled, the provider knows to increase the dosage or add another medication.  However, if MARs show the patient is not noncompliant with medications, the provider should meet with the patient to determine obstacles to noncompliance, such as medication side effects, lack of understanding

of the importance of the medication, or scheduling conflicts with medication administration times.

However, MAR documentation shows that when patients do not take their medications for months, patients are not referred timely to a physician to assess the reasons for noncompliance and counsel the patient.   Although staff sometimes refer patients to the physician for noncompliance evaluation, it is not nearly in accordance with the frequency of that ongoing noncompliance is occurring. We believe a contributing factor is that medical leadership has not set this as an expectation.   Dr. Lavespere stated that he did not want to be notified when patients are noncompliant because "there are too many of them."   While we understand that some patients will be occasionally noncompliant, patients with persistent noncompliance or who miss critical medications (e.g., insulin, warfarin, HIV medications and chemotherapy, etc.) should be referred to a provider for counseling. When patients continue to refuse medications after being educated, medical providers should have the patient sign an informed refusal against medical advice noting the specific consequences (e.g. heart attack, stroke, death, etc.). Record review shows this is not taking place.

## Laboratory/Radiology

**Methodology:**   We toured the laboratory and radiology clinic, interviewed laboratory and radiology staff, tracking systems and health care records.

**Standards:** On-site diagnostic services are registered, accredited, or otherwise meet applicable state and federal law. The responsible health authority maintains documentation that on-site diagnostic services (e.g., laboratory, radiology) are certified or licensed to provide that services. There is a procedure manual for on-site services, including protocols for calibration of testing devices to assure accuracy. Facilities with full time health care staff have multiple dip-stick analysis, finger-stick blood glucose tests, peak flow meters, stool blood-testing material, and in facilities housing women, pregnancy test kits. All aspects of the standards are addressed by written policy and defined procedures.[67] Lab and radiology reports are timely reviewed, and legibly signed, dated and timed. Medical providers timely address abnormal lab and radiology reports.

### Laboratory Services

**Findings:** We interviewed Brendan DeLoach, Laboratory Supervisor, who has worked at the facility for two years.  LSP is a Clinical Laboratory Improvement Amendments (CLIA) certified lab of moderate complexity.  A February 2016 letter showed that CLIA certification was renewed with no deficiencies. Staffing consists of 3 medical technicians and 2 clerk/phlebotomists. There are also 2 inmate workers who work in the lab and bag up laboratory specimens, run errands, and provide sanitation. Inmates do not perform laboratory testing.

The laboratory is small for the scope of the work performed. Lab equipment, supplies and tracking logs are placed on every counter, and it is not possible to adequately clean and

---

[67] NCCHC. P-D-04.

disinfect countertops on a daily basis without removing the equipment.[68] Because thousands of potentially infectious body fluids are tested on a monthly basis, it is important that the lab has adequate space to permit sanitation and disinfection of equipment and countertops on a daily basis.

The laboratory is open from the hours of 7:00 am until 4:00 pm Monday through Friday.  The laboratory performs a limited number of laboratory tests including:

> Metabolic panels;
> Lipids;
> Complete Blood Count (CBC);
> Urinalysis;
> HIV antibody;
> RPR for syphilis;
> Hemoglobin A1c
> Prothrombin Time (PT)/International Normalized Ratio (INR)
> Fecal occult blood tests (FOBT);
> Therapeutic Drug Levels (Dilantin, etc.); and
> Troponin

Troponin tests performed at LSP are point-of-care (POC) tests.  After hours, EMTs in the ATU have access to I-Stat POC testing for chemistry panels. In January of 2016 the laboratory performed 1,934 blood tests in-house and sent out 780 tests on a total of 931 inmates.

Glucometer point-of-care testing is available for testing capillary glucose in all medication rooms and on the ambulances but is not available in clinical examination areas. Laboratory personnel told us that approximately 18,000 capillary blood glucose (CBG) tests are performed annually.  This is a relatively small number of tests given the population.  The prevalence of diabetes is estimated at approximately 2 to 2.7% in prison populations.[69] For the 6300 inmates at LSP we would expect at least 130 inmates to have diabetes.  Persons with type 1 diabetes typically test their CBG before each meal and often before bedtime.  Persons with type 2 diabetes test their capillary blood glucose a variable number of times depending on the degree of control of their diabetes.  The number of CBG tests done at LSP is insufficient to assess diabetics' disease control on a daily or weekly basis. There are many more diabetics at LSP so the number of tests for this disease is significantly below expected.[70]

---

[68] See photographs, Attachment B at pages 11-12.

[69] The Health Status of Soon-To-Be-Released Inmates, National Commission on Correctional Health Care Volume 2, April 2002 as found at http://www.ncchc.org/filebin/Health_Status_vol_2.pdf.

[70] The insufficient use of these tests is seen in the experience of Edward Washington.

LSP also uses LabCorp, an outside reference laboratory for labs that cannot be performed on-site (e.g., prostate specific antigen (PSA), Thyroid Stimulating Hormone (TSH) and protein electrophoresis).

Labs are scheduled in two ways.  One is that a medical provider in the main prison will write an order for labs and the order is put in a laboratory box and prioritized for scheduling the lab draw. A second method is that medical providers in the camps write orders that the clinic nurse prioritizes, schedules and draws the labs.  Lab orders that have not been performed due to patient refusal or "No Shows" are kept in the same box.  The Lab Supervisor reported that he sorts through the box weekly and determines who needs to be rescheduled or notifies the physician of refused labs.

After lab tests are performed, the lab keeps a copy of the test result and distributes the lab report to the ordering physician by placing the report in the physician's mail box. The physician is to review, date and sign the report and forward it to medical records.  Staff are to notify physicians of critical lab results by telephone or hand delivering the lab report to the physician. Laboratory staff document the date and time of notification of critical labs to providers on the lab report.

Laboratory staff maintain logs of tests performed by type of test (HIV, syphilis, HbA1c, etc.). The logs are maintained adjacent to machines that perform the specific test and contain confidential medical information*.  Therefore it is concerning that inmates work in the lab and have access to this information, as well as handle potentially infectious specimens.*

Our record review showed the physicians do not timely legibly sign, date and time review of laboratory reports.  We found egregious examples of physicians not addressing abnormal labs or treating patients timely for their serious acute and chronic medical conditions.

For **Patient #18**, physicians did not address a newly positive HIV test for an acutely ill patient for almost two weeks after it was reported. The patient was acutely ill with chest pain, shortness of breath and 55 pound weight loss.  Treatment for pneumonia and newly diagnosed AIDS was delayed and the patient died. I

For **Patient #20**, physicians did not address a critical lab for this acutely ill patient with abdominal pain and distention that showed his hemoglobin dropped from 14 to 8 grams suggesting acute bleeding.  The patient was placed in the infirmary and the next day died of massive GI bleeding.  Review of numerous chronic disease records showed that physicians did not timely address abnormal labs for diabetes (hemoglobin A1Cs) and thyroid disease (thyroid stimulating hormone (TSH)) as well as other tests. Delays in treatment of patients with poorly controlled diabetes can result in macro and microvascular complications such as stroke, vision loss, heart attack, kidney disease, and peripheral vascular disease and neuropathy.

**Radiology Services**

**Findings:** We interviewed Gerald Ducote, LSP Radiology Supervisor for 4.5 years.  Routine radiography and intravenous pyelograms (IVP) are performed on site. To order and schedule radiology procedures, main clinic physician or nurse practitioner write an order in the health record that a nurse "pulls" off the record and places in a radiology box in the clinic. Each day between 3 and 4 pm a radiology technician collects new orders from the box, prioritizes and schedules x-rays to be performed.  In January 2016, radiology services performed 480 x-rays in house.

X-rays are digital and are electronically forwarded to a radiologist in Baton Rouge who reads the x-ray, and is to dictate and electronically sign the report the same day.  These reports are printed from a LSP computer and forwarded to the ordering physician's mail box for review and signature.

A mobile unit comes on-site to perform computerized tomography (CT), magnetic resonance imaging (MRI), and ultrasounds.  These tests are scheduled through the off-site scheduling system.

Radiology staff do not obtain refusal of treatment forms from inmates and it is unclear who, if anyone, obtains refusals.  No Shows were scheduled 3 times and then not scheduled again. When inmates do not appear for scheduled health care appointments, staff need to follow-up to determine whether the patient refused the appointment, or an event outside the inmates control was responsible for not keeping the appointment.

## Health Information Management (HIM)

**Methodology:** We interviewed Kelly Hawkins, Health Records Manager, toured the Health Information Management Unit, reviewed HIM staffing and the health records for organization, ease of navigation, legibility, and timeliness of filing documents into the health record.

**Standards:** A health record is maintained to facilitate continuity of care. The method of recording entries in the health record and the format of the health record are approved by the responsible health authority. The confidentiality of a patient's written or electronic record, as well as orally conveyed information, is maintained.  At a minimum, the health record contains the following elements: Identifying information; a problem list; receiving screening and health assessment forms, progress notes of all significant findings, diagnoses, treatments and dispositions; clinician orders for prescribed medications, list of current medications and medication administration records; reports of laboratory, x-ray and diagnostic studies; flow sheets; consent and refusal forms, results of specialty consultations and off-site referrals; discharge summaries of hospitalizations and other inpatient stays; special needs treatment plans, if applicable; immunizations records, if applicable; place, date and time of each clinical

encounter; signature and title of each documenter. If electronic medical records are used, procedures address integration of health information in paper and electronic form.[71]

**Findings:**  Medical records are maintained centrally in the REBTC. Staffing includes the Health Records Manager, a Health Records Supervisor, 3 Administrative Coordinator-3 positions, and 4 Administrative Coordinator-2 positions.  The Warden has also reassigned two security positions to assist with filing health documents in the records.

LSP's health record is a hybrid of paper and electronic records, but it is primarily paper. The HIM area appears too small for the volume of paper records. This is not surprising considering the average length of sentence of LSP inmates is 92.4 years and almost 20% of inmates are above age 55.[72] Almost all inmate records contain multiple volumes.  Although there was no visible back log of documents to be filed at the time of our site visit, there were boxes stacked in many areas of the room.

Maintenance of health records is governed by policy HC-33 Offender Medical Records dated March 7, 2011.  This policy is not signed and does not appear to have been reviewed since 2011.  To maintain records, HIM staff is continually breaking down records that have reached maximum size and placing key documents from the old record into the current volume.  All current volumes should include certain documents from previous ones. However, health records policy does not specifically state what should be brought forward to the most current volume.  The policy states:

"When the medical record meets the maximum expansion capability, the record shall be divided.  This is done by removing the current and most pertinent documentation and placing it in a new medical record."

This does not give guidance on what documents are to be moved making these subject to the judgment of the records clerk breaking down the record.  Certain information is critical to be carried forward.  This includes:

> The Problem List;
> Recent provider and chronic disease encounter notes;
> Recent and/or significant diagnostic test reports;
> Specialty Services reports;
> Hospital reports;
> Medication Administration Records;
> Annual health tests;
> Immunization records; and
> Tuberculosis screening information.

---

[71] NCCHC P-H-01 to P-H-03.  ACA 1-HC-4A-06, Ref. 3-4376.
[72] Second Amended Complaint, page 25.

Because of the high volume of documents and lack of guidance as to how to perform this task, the risk of missing or misfiled documents is high. The task of maintaining a paper record system in such a large, long-term facility is daunting.  Because this work is under custody supervision, it also may not be carried out in a proper manner to ensure confidentiality of the medical record.

As noted above, LSP has a hybrid health record system.  Clinicians and medics document clinical encounters onto paper records, and nurses document infirmary care onto paper records. However, nurses and correctional officers document administration of medications onto an electronic medication administration record. The electronic medication administration module is not described in current health records policy with procedures for its use.[73]  The electronic medication administration is not integrated with the paper record so medical providers cannot readily search the record to review what medications the patient is receiving and the patient's medication adherence.[74]

Moreover, the electronic medication software is not fully implemented. In the main prison medical dormitories (Ash 2, Cypress 2, and Hickory 4), officers administer medications on the tiers but do not have access to the electronic medication administration (eMAR) software because there is no wireless or hard wire connection to the eMAR server.  This is inadequate access to the medical record and results in potential for inaccurate entries.  Correctional officers enter their administration of medication at a time later than when it is actually administered. As noted earlier in this report, this significantly increases the risk of documentation errors and is not appropriate medical record documentation.

Specialty clinic electronic scheduling software (Eceptionist) is also not integrated into the paper medical record.  Therefore, verification of appointment scheduling is not evident in the paper record.

Based on record review, there were multiple duplicate documents in the records, many misfiled paper documents, and failure to include off-site specialty and hospital discharge summaries in the medical record.  Medication Administration Records (MAR) were seldom completely and consistently filed in the paper records. The MARs also frequently had no entries. These deficiencies made it impossible to determine whether the patient received medication. In many cases there were no meaningful notes; only signatures, verbal orders, telephone orders and orders for follow up appointments.  Some notes written by physicians were not dated or timed and were illegible.  These records were inadequate for use and place patients at risk of harm by reducing the ability of clinicians to understand the medical care being given to their patients.

---

[73] Offender Medical Records. No. HC-33. 3/7/11.  LSP Health Care Manual.

[74] In our review of the medical charts we did not find clear documentation of disability accommodations for any patients, nor of evaluations or assessments of needs in that respect.

Because of the size of LSP, providing a paper record for every clinical encounter is not possible. For this reason alone, LSP should transition to an electronic medical record.  When patients are scheduled to be seen in the main clinic, medical record staff places all charts in the doctor's examination room.   This is cumbersome and clutters the doctor's examination room in a manner that makes physical examination difficult to impossible.   Medical records are transported to the outlying clinics for scheduled appointments.  Because of the distance from outlying camps to the medical records department, urgent and walk-in evaluations are performed without a medical record.  None of the routine sick call evaluations are performed with an accompanying medical record.  Thus a significant portion of clinical work is performed without benefit of access to the medical record at the time of evaluation of the patient.  The lack of timely and complete health information when providers and health care staff evaluate patients is a serious systemic issue that places the patients at risk of ongoing harm.

**Access to Health Information**
This policy states:

> "The Health Authority or designee may share information regarding an offender's medical management with the Warden."

This should only be done on a legitimate "need to know basis" and not a blanket approval.

Moreover, although inmates can sign a release to obtain their medical record for anyone having a legitimate interest, the inmate themselves can't obtain a copy of their record unless authorized by the warden.  The policy states:

> "Offenders shall not be allowed access to their medical record or the medical record of other offenders unless authorized by the Warden or designee."

In other words, prison policy forbids prisoners from having access to their own medical information and is subject to approval or disapproval by a custody official.  At a minimum, inmates should be able to review their medical information.

## Urgent/Emergent Care
**Methodology:** We toured the ATU, observed medical response to an emergency in the ATU, and reviewed records containing urgent events, including hospitalizations.

**Standards:** The institution provides 24-hour emergency medical dental and mental health services. A written plan includes arrangements for the following, which is carried out when necessary: emergency transport of the patient from the facility; use of emergency medical vehicles; use of one or more designated hospital emergency departments or other appropriate facilities; emergency on-call physician, dental, and mental health service when the emergency health care facility is not nearby; security procedures for the immediate transfer of patients for emergency medical care; and notification of the person legally responsible for the facility.

Emergency drugs, supplies and medical equipment are regularly maintained. All aspects of the standard are addressed by written policy and procedure.[75]

**Findings:** EMTs[76] perform all emergency response. EMTs evaluate patients in housing units but can send patients to the ATU for further evaluation.  Their supervision in housing units and in the ATU with respect to emergency response is inadequate and results in EMTs typically managing medical emergencies that are beyond the scope of their training, resulting in harm including many deaths.  Our review showed that EMTs do not consistently consult a physician with respect to their evaluations. Although a physician is assigned to provide on-call coverage to the ATU, physicians are not in the ATU at all times and do not consistently evaluate patients while they are in the ATU.  Therefore, EMTs solely conduct most evaluations of patients presenting urgently. Physician participation is typically only to give orders, often by phone. When EMTs evaluate patients they act under preset protocols as previously discussed in the section on Access to Care.  However, EMTs do not consistently reference these protocols when they evaluate and treat patients and this gives the appearance of EMTs acting independently when they conduct evaluations.  Based upon health record documentation, we believe that in many cases, the EMTs in fact are acting independently.

We were told that staff in the ATU receives notification of emergencies by means of radio devices.  EMT staff responds to these alerts to determine if the emergency is a medical or security emergency.   In the case of a medical emergency, EMT staff will respond; ambulance response may be necessary depending on the location of the patient and nature of the emergency. The ambulance may take some time to arrive at the scene of the emergency depending on the location of the patient.

During our tour, on 3/18/16 at 10:25, there were two patients in the ATU receiving care and we observed a complete trauma emergency response, described below in the case of Patient #44.

Before arrival of **Patient #44**, a staff member who had found the hanging inmate arrived at the ATU. She was upset. Apparently recently she had also been the one to find another inmate who had committed suicide by slashing his own neck. She had taken time off after that incident. The senior correctional officer commented that, "She needs a new job."  These interactions displayed lack of confidentiality with respect to medical information and lack of professionalism between custody and medical staff.

The patient arrived in the ATU with nasotracheal intubation (tube through the nose into the windpipe).  We were told that the patient was intubated on the scene by a paramedic. The patient exhibited extensor posturing (i.e., decerebrate posturing[77]). The medical record documentation in the Accident Injury Report by the paramedic confirms

---

[75] NCCHC. P-E-08. ACA. 1-HC-1A-08. (Ref. 3-4350).

[76] In referring to EMTs we include paramedics.  EMTs at LSP include Basic EMTs, Advanced EMTs, and paramedics.

[77] This is an abnormal posture indicating that there has been brain injury.  In this case, it was likely that the patient had brain injury from the hanging with subsequent lack of oxygen to his brain.

this. The patient was described as having been found hanging with his weight on a shirt tied to the cell bars. There was neck bruising noted. The patient was nonverbal and posturing. Bruising was noted at the C spine. This is a significant finding warranting immediate hospitalization. Nevertheless, no physician or nurse practitioner had evaluated the patient. Instead, EMTs and the paramedic who intubated him were in charge of his care. EMTs are trained on proper resuscitation procedures but for this patient they failed to ensure proper ventilation as the patient was not receiving positive pressure assistance of his ventilations through ambu-bagging.[78] Instead, there was an oxygen mask affixed to the top of his nasotracheal tube to provide oxygen without any positive pressure being applied. He was unconscious but breathing spontaneously.

When the patient returned to the ATU, Dr. Toce was present but did not assess the airway or listen to the lungs to ensure adequate placement of the nasotracheal tube.[79] He helped to move the patient from the backboard to the stretcher. He did not advise positive pressure ventilation although the patient had visible abdominal breathing efforts and inadequate chest movement.

Dr. Toce also did not perform a primary or secondary survey or neurological examination, which are critical in trauma resuscitation. Dr. Lavespere came into the room about 15 minutes later, took out his stethoscope and listened to the lungs and advised bagging of the patient, at which point proper ventilation began. This level of inadequate ventilation most likely harmed the patient and promoted extension of his brain injury. At no point was a ventilator attached to the patient. The patient was unconscious, fully dressed and strapped to a backboard and left the ATU for the hospital in that condition. The patient was not undressed, or assessed for other injuries. This was a significant departure from standard of care.

Several deficiencies occurred in this patient's care. Based on their training, the paramedic, EMTs and Dr. Toce should know that appropriate ventilation is critical to controlling brain edema and the ultimate neurological outcome. Physicians working in remote prisons should be advanced cardiac life support (ACLS) and Advanced Trauma Life Support (ATLS) certified. The physicians caring for this patient failed to understand major aspects of advanced life support.

The same patient presented to the hospital with a GCS (Glasgow Coma Scale) of 5. Due to inadequate sedation, the patient had self-extubated on arrival in the ambulance bay and thrashed around in the ED. His GCS was 11 and he only moaned. He was

---

[78] Bagging the patient refers to use of a bag valve mask arrangement. This is a bladder or bag which is self-inflating. The bag is attached to a mask which fits over a patient's nose and mouth. Staff manually pumps the bag which creates a positive pressure which forces air into the lungs. This type of arrangement is used when the patient cannot breathe adequately on his own.
[79] The lungs are auscultated to determine if air is moving adequately into both lungs. At times the endotracheal tube is misplaced which can result in one or both lungs not receiving air flow. When this occurs the tube is moved so that the lungs are properly aerated.

reintubated by the emergency department staff. The CT of the head demonstrated swelling of the brain and possible anoxic brain injury.  The patient recovered to the point of being returned to the prison.  Because the MRI of the cervical spine showed injury, he was sent back to prison with a cervical collar in place.  The patient did not receive ongoing mental health care for his suicide attempt.

Upon responding to an emergency, in some cases there were "no-transport" orders from staff radioed to the medics on site.  "No-transport" orders are verbal orders given to the medics over the radio, most often from a physician, advising that the patient not be transported from his cell. "No transport" orders result in delay in care, lack of evaluation by a physician and in some cases death.  Activation of emergency response by EMTs should result in transport to the ATU for evaluation by a physician or immediate transport to a hospital.   There were several examples of delays in care or inadequate care due to not transporting the patient to the ATU.

The following cases are examples of no-transport orders and EMT care only.

On 7/13/11 at 20:25, **Patient #39**, a 65 year old patient with a history of diabetes, severe coronary artery disease and heart failure, was found to have a temperature of 103.6 and pulse of 107/minute and an altered mental status. HIs medications included metformin, furosemide, carvedilol, Aspirin, simvastatin and baclofen. The patient was managed by medics in the ATU with verbal orders from Dr. Collins.  For the same patient, on 9/16/11 at 09:15 the medics responded for the complaint of "don't feel good." The patient was seen and evaluated by a medic. The ATU notes show the patient's chest tightness went away at 10:40. There was no other history and there was a physical exam and a signature of Dr. Lavespere.

On 7/16/11 at 12:44 the medics again responded for the patient not feeling well. The patient was transported to the ATU. An EKG was performed and showed sinus rhythm. There was a physical exam but no history by Dr. Lavespere. The patient was discharged back to ASH II and "no intervention required."  On 7/16/11 at 19:54 medics responded for "offender breathing but unresponsive. The glucose was 126. Dr. Lavespere was phoned and *advised no transport order* and patient left in cell.  On 7/20/11 the patient was seen in physician clinic. No history of physical exam performed. The chart notes that the patient is to have insulin given in the ATU on a sliding scale and diabetic teaching next available, signed by Dr. Lavespere.   On 7/26/11 at 19:18, the medics responded for the patient laying on the floor and "vomiting and won't move." Report was given via phone to Dr. MacMurdo who advised leave patient in cell.  On 7/27/11 at 06:17 medics responded to find "offender laying on the floor and "Report to Dr. Lavespere via MD conference call and NT nontransport advised by Dr. Lavespere after patient report. Patient left in cell."

After the last do not transport, the patient died and was moved to the morgue on 8/2/11.  The medical records do not describe the reason or circumstances surrounding

the acute death event. There were 3 no-transport orders given in 3 weeks prior to the patient's death.

**Patient #34** had an ambulance response on 6/24/12 as he could not get out of bed. Dr. Lavespere *ordered no transport*, and the patient was not transported to the ATU.  Three days later the patient was found unresponsive with a glucose of 10, temperature of $91^0$ F, cool, clammy and disoriented. The autopsy was consistent with sepsis, hypoglycemia, hypothermia and cirrhosis. It was noted that the patient had not been able to get out of bed for 6 days after having suffered rib fractures. The autopsy showed hydrothoraces and ascites.

The above cases are examples of no-transport orders resulting inadequate evaluation of the patients.

**Inadequate Care in the ATU**

We observed and were told that evaluation of a patient with altered mental status included performing a urine toxicology test as part of the evaluation.   A positive drug bedside test may not be currently responsible for the clinical findings, and there are many prescribed medications that result in false positive drug tests. Another example is the bedside testing for synthetic cannabinoids known as Mojo. The presence of this in the urine does not preclude other causes of altered mental status. We did not find a written protocol for urine toxicology testing but it was described to us as part of the work up for altered mental status.  We noted in chart reviews and in talking to staff that urine toxicology testing was part of stroke work up at LSP.  This will delay the diagnosis and treatment of stroke patients. EMTs frequently utilize Foley catheterization to obtain urine for urine toxicology.  Performing Foley catheterization on large numbers of patients for urine toxicology testing is painful and invasive, and may introduce infection.

There were several examples of poor care in the ATU.

**Patient 37** presented to the ATU for new onset of seizures. He was subjected to gastrointestinal lavage[80] that revealed no evidence of drugs or blood. He was given naloxone per protocol. During his evaluation he developed decerebrate posturing and his pupils became fixed and dilated indicating significant brain damage.  He was transported to the EKL hospital and CT of the brain showed intracerebral bleeding.  The patient died in the hospital. Lavage for drugs and administration of naloxone for new onset of seizures shows a gross lack of knowledge of emergency care.  Lavage of a patient with new onset seizures represents medical care with no basis in modern practice and delays transport to the hospital.[81]  Both the lavage of a patient and the

---

[80] Gastrointestinal lavage is known colloquially as "stomach pumping."

[81] Benson et al, Position paper update: gastric lavage for gastrointestinal decontamination clinical Toxicology 2013, 51, 140-146.

administration of naloxone may have serious complications when misapplied and may delay proper medical care.  This patient's clinical presentation of seizure with posturing required immediate transport to a hospital.

**Patient #45** is a 40 year old male with a history of mental illness was brought to the ATU on March 18 at 8:55pm. He took the medication Navane for his mental illness. He cut his forearms and they were treated. Mental health was notified at 08:51. His mental health treatment consisted of transferring his to TU for 4-point metal restraints with flex-cuff reinforcements, as ordered by Dr. Toce. The clinician Marcia Booker LMSW evaluated the patient in the ATU. Her assessment consisted of increased risk of self-harm and possible suicide risk currently. The goal was appropriate behavior and preventing harm to self or others.  No other mental health care was provided. Certainly in the year 2016, 4 point metal restraints with flex-cuff reinforcements is not an acceptable treatment for mental health management. Suicide watch should be accompanied by mental health treatment.

**Patient #30** presented with "focal motor seizures" of the arm and face. He was brought to the ATU and given naloxone with a plan for gastrointestinal lavage using activated charcoal. Since the patient did not have evidence of opioid or any other overdose, this plan does not meet standard care.  We observed repeated orders for gastrointestinal lavage, naloxone and point of care drug screens. The medical care evidenced by the use of toxicology screening, lavage and naloxone in this clinical situation is incoherent.  In fact, in all of the instances of gastric lavage and in speaking with staff we could see no indication for gastric lavage.[82]

### Lack of Emergency Response Equipment and Pharmaceuticals in the ATU

Nationwide, prisons have variable ability to care for patients onsite.  Whatever level of emergency care is provided onsite, there needs to be equipment and diagnostic ability necessary to provide that care.  When this can't be provided, patients need to be sent to a hospital so that adequate evaluation can occur.  LSP is a remote prison.  Based on chart reviews patients are kept at the prison instead of being sent to the hospital for evaluation. Because the prison does not have the specialized equipment such as ultrasound, stress testing, echocardiograms, or expertise to apply and interpret these tests, the health care staff should either have this equipment and be trained to use it on site or take people to the outside hospital in a timely manner. This is not the practice at the prison.

As an example, **Patient #30** (the same prisoner described above) was presumptively diagnosed with a deep vein thrombosis[83] of the leg and started on blood thinners without an ultrasound of his leg veins. Typically, ultrasonography is used to diagnose

---

[82] Benson et al; Position Paper Update: Gastric Lavage for Gastrointestinal Decontamination. American Academy of Clinical Toxicology and European Association of poison centers and clinical toxicologists:  Clinical Toxicology 2013, volume 51, 140-146.
[83] A deep vein thrombosis is a blood clot.  This typically occurs in the legs and is diagnosed by ultrasound of the veins of the legs.

deep vein thrombosis.  It is below standard of care to initiate treatment without a diagnosis as there is a significant risk of bleeding from treatment with blood thinners. This patient was on blood thinners for 12 days before the appropriate diagnostic test was performed that revealed he did not have a blood clot, but a calf hematoma.  When deep vein thrombosis was suspected, the patient should have been sent to a hospital for diagnosis.  The prison is not equipped to perform round-the-clock ultrasound.  He was unnecessarily placed on anticoagulant medicine for over a week without a diagnosis and without the disease for which he was being treated.  Anticoagulants are a risk to cause bleeding.  Since this patient had a hematoma, the use of anticoagulants placed the patient at risk of harm and may have exacerbated his condition.

All pharmaceuticals must be properly stored and accounted for by pharmacy. This was not the case. The drawers in the ATU containing drugs were disorderly and the staff could not find drugs.

During the site visit we were told that laboratory testing is not available after hours and on the weekend. During record review we reviewed several staff notes that mentioned that lab was not available due to the time of day.  Patients must have access to laboratory testing necessary for their condition.  When emergency laboratory tests are indicated but when the laboratory is closed the patient needs to be transported to a hospital.  The alternative is to maintain a 24-7 laboratory service.  This does not occur and this places the patients at risk of harm.

> **Patient #40:**  According to the death summary of 5/6/10, completed by Dr. Lavespere, the patient died on 5/13/10. On Sunday, 2/16/2010, the patient presented to the ATU. He was cachectic (thin and wasted) and had a 30 pound weight loss in the past 2 years. According to the death summary, the patient had not been seen by medical since 2008. On the date of presentation, a chest x-ray done in the ATU showed pneumonia and a possible chest mass. "No laboratory could be drawn over the weekend." He was started on antibiotics and admitted to the acute care ward without laboratory testing. Failing to obtain these tests placed the patient at risk of harm.  The following day the patient was found to have a white blood cell count of 2.3 and a positive HIV test. Pneumonia in a patient with wasting and a chest mass needs immediate laboratory testing to exclude life-threatening conditions (severe infection, renal failure, electrolyte abnormalities). Laboratory tests should be available on the weekends. If the laboratory is not available and the patient is acutely ill as in this case, the patient should be transported to the hospital for evaluation. The ATU is not equipped to evaluate a chest mass and the patient requires hospital evaluation.

On many occasions, we found that LSP providers attempt to treat patients at the prison who should have been evaluated at the hospital.  Patient #40 is an instance of this. The ATU is not equipped to diagnose and treat many serious medical problems. The practitioners must anticipate the complications of serious complaints and conditions. For example, if a patient has chest pain of possible cardiac etiology with multiple presentations to the ATU or sick call, serious pathology stemming from the heart, aorta or lungs must be considered and excluded.

When a patient with ascites presents with abdominal pain, the patient needs the procedure of paracentesis to obtain a sample of the abdominal fluid to exclude spontaneous bacterial peritonitis, a serious intraabdominal infection.   There was also delay of transport of patients to area hospitals.  This places patients at risk of harm, including death.  Some of these cases were described earlier in this report.  Additional cases are described below.

**Patient #31** developed ascites and esophageal varices while in custody. On 6/6/14 the patient was seen in the clinic and found to have a blood pressure of 87/27 mm Hg.  The patient's hypotension was not addressed and he was discharged.   On 8/18/14 the patient reported abdominal pain and was noted to be distended and jaundiced.  He was discharged. The next day, 8/19/14, the patient was vomiting and was discharged again. On 8/21/14 the patient was seen in the ATU complaining of worsening abdominal pain and was noted to be tender in the abdomen. The patient, instead of receiving an evaluation of his acute decompensation and abdominal pain, was asked to sign a do not resuscitate order.   On 8/23/14 the patient began vomiting blood and died in the prison. The patient should have been transferred to a hospital for diagnosis and treatment of his worsening abdominal pain.

On 6/9/13 at 12:36, **Patient #32** was seen in the ATU. He stated he had chest pain to the center of his chest that felt like pressure and complained of shortness of breath. He had an EKG that was documented as the same as the EKG done one year before. He was given a GI cocktail and discharged at 13:17.  The physician signature is not legible. On 6/12/13 he returned to the ATU at 05:50. He was seen by the medic and "protocol EKG" and GI Cocktail was the care. There was no physical exam documented. There was no work up for the chest pain to exclude serious pathology. There was no plan documented in the medical record.

On 6/14/13 the patient returned to the ATU coughing up blood. He was seen by a physician and started on Levaquin. On 6/15/13 the patient had a follow up for the diagnosis of cold, on Levaquin. On 6/18/13 a provider submitted a cardiology consultation for the patient's substernal chest pain. It was not yet obtained by the time the patient presented on 6/21/13 with difficulty breathing and had a witnessed cardiac arrest. He had return of spontaneous circulation and was transported to Lane Memorial Hospital where he died.  Because the patient did not receive the standard of care work-up for chest pain, he died.  He should have been sent to the hospital for a work-up of his chest pain.

**Patient #36** was 69 years old with a history of uncontrolled hypertension and chest pain for which he was prescribed nitroglycerin spray and Naproxen.  He presented on 4/26/10 to the ATU with a self-declared emergency.  He was charged $6.00 for this emergency. The physician notes consisted only of "ATU." He was treated for hypertension with clonidine, ibuprofen and nitroglycerin sublingually. Further chart review shows that the patient had complained of angina every 3 days relieved by rest. There was no physical exam and no history recorded on the physician note. He was

discharged at 16:17. No EKG was obtained and no work up for chest pain was initiated. The next notes in the record concern a different patient; they do not belong in this patient record.

On 5/5/10 at 11:25 the patient was brought from his living quarters with the complaint of shortness of breath all morning. He had a fever of 100.4 F and oxygen saturation of 87% on room air. Chest x-ray ordered with pertinent clinical information of shortness of breath demonstrated bilateral pneumonia, He was given a dose of antibiotics. There is no history or physical exam documented by the physician. He was to see the doctor in 2 weeks. He returned to the ATU on 5/8/10 at 08:54. His temperature was 100.8 F, his respiratory rate was 26/minute, the pulse was 71/minute, and the oxygen saturation was 90% on 4 liters nasal cannula. The patient was known to have the diagnosis of bilateral pneumonia since "last Tuesday but hadn't received any meds" and was now out of breath. He was seen again on 5/10, 5/14 and 5/15. On 5/15/10 at 06:40 an ambulance responded to nursing unit 1 and found the patient with a blood pressure of 172/52 mm Hg, Pulse of 102/minute, respiratory rate of 22/minute and oxygen saturation of 89%. The patient was agitated and restless and short of breath, pulling to breathe and had full accessory muscle use noted. The patient has abdomen pain and was rocking back and forth from pain yelling "he's gonna die" repeatedly. The patient was given nebulized treatments in the ATU and was given morphine for "moaning that his entire chest is hurting and he can't breathe." He had placement of a urinary catheter. He received 6 separate administrations of morphine. Versed was administered intravenously. There is no evidence that a physician examined the patient or was present. The patient was then returned to the Unit 1.  On 5/16/10 at 21:35 the patient was brought from nursing unit 1 to the ATU with CPR in progress.  On 5/16/10 he had a cardiac arrest at 22:06 and the FNP Aubin pronounced death in the ATU.  A patient found to have bilateral pneumonia with continued visits to the ATU should be sent to the hospital.  Had this patient been treated properly he more likely than not would have survived his illness.

**Patient #38** was a 59 year old with a history of hypertension diabetes, seizures and stroke. The stroke affected his left side. His medications included amlodipine, insulin, protonix, aspirin, enalapril and furosemide, simvastatin and Dilantin. The mortality summary noted the patient fell onto the floor while sitting on the bed.  Although it was in the death summary written by Dr. MacMurdo that the patient had been "groggy but talkative" at 0100 there was no medical record entry documenting this and no record of the instruction to the EMT staff to "observe the patient very carefully" as is written in the death summary. The patient deteriorated in prison and died 12 hours later at the hospital.  There are no medical records from EKL hospital in the patients' medical records. Given the history of strokes and the lack of definitive care for strokes in the ATU, the patient should have been sent to the hospital immediately.

**Patient #41** had a history of diabetes, chronic obstructive pulmonary disease requiring endotracheal intubation and ventilation, hypertension, gastroesophageal reflux disease,

seizures and hyperlipidemia and was oxygen dependent and in a wheelchair.  His medications included furosemide, insulin, Dilantin, and levetiracetam. Valsartan prednisone and steroid, ipratropium and albuterol inhalers, amitriptyline, hydrochlorothiazide, meloxicam, omeprazole, hydroxyzine and simvastatin. The patient had multiple visits to the ATU, was repeatedly managed without a physician and discharged back to his cell and died that day. This patient should have been transported to the hospital, given the history and presentation. The autopsy showed ischemic heart disease with 90% stenosis of the left anterior descending coronary artery and pulmonary edema.

On 7/26/15 at 23:13 **Patient #42** was unresponsive but breathing upon arrival of the ambulance to the Camp J Bass Unit. His Glasgow Coma Scale was 3[84] with no response to painful stimuli. This should have resulted in immediate hospitalization.  Instead, a medic managed the patient's care. Narcan was administered with no effect. Dr. Lavespere was contacted and ordered urinary catheterization to obtain a urine specimen for toxicology.  This test was negative. The patient was managed by EMTs for over 8 hours.  At 07:29 the next morning, Dr. Lavespere ordered that the patient be sent to Our Lady of the Lake Hospital. At the hospital, the patient was found to have a middle cerebral artery stroke with some hemorrhagic transformation as the cause of his unresponsiveness. This patient suffered permanent neurological disability and the delay in care contributed to this catastrophic outcome.

Another example was **Patient #1** who developed diabetic ketoacidosis.  The patient's blood sugar was over 700, the patient had renal failure (creatinine 2.7), and had electrolyte abnormalities including elevated potassium 7.1.  This is a life threatening condition for which patients are hospitalized.  Instead, providers tried to manage the patient in the ATU by phone.  There was no history or physical examination during much of this patient's management.  The providers never obtained serum ketones, did not assess for precipitating events causing ketoacidosis, failed to take a history or perform a physical examination, did not obtain arterial blood gas testing, blood, urine or other cultures, and cared for the patient without the on-site presence of a physician.  This was a dramatic departure from standard of care.

**Patient #15** was a 40 year old patient with a history of severe hypertension that was never brought under control. On 1/14/14 at 12:37 a medical provider (signature is illegible) saw the patient for follow-up of hypertension. The patient's blood pressure was 216/113 mm Hg. The provider did not obtain a cardiovascular review of systems and the only subjective information documented was "non-compliance" with medications. The patient had a heart murmur; however the provider did not document any description of the murmur or acknowledge that it was new**.**  Ten days later, on

---

[84] A Glasgow Coma Scale of 3 is the lowest possible score and indicates severe brain injury.

Friday 1/24/16 at 14:16 EMTs responded to the patient's location. He complained of left-sided chest pain that radiated to his left arm and jaw for a few minutes with mild (shortness of breath). His pain was rated 10 on a scale of 10. The past medical history consisted of hypertension. An EKG showed changes consistent with ischemia. This presentation was consistent with acute coronary syndrome and the patient should have been immediately hospitalized.  Instead, the patient was placed on a stretcher and transported to the ATU.

On Friday 1/24/14 at 14:50 an ATU EMT saw the patient. He was brought by ambulance for left sided chest pain radiating to his jaw for 20 minutes while attempting to use the restroom. Pain was a 9 of 10 in severity. The patient complained pain is as though a heavy weight on chest. Patient denies nausea and vomiting. The patient was hypotensive (BP=95/48 mm hg). *There is no documentation that a physician was notified or examined the patient.* Despite chest pain radiating to his jaw, hypotension and EKG changes the patient was not transported to the hospital.  The patient's symptoms were consistent with acute coronary syndrome

On 1/24/14 at 15:44 the patient had a chest x-ray requested by Dr. Tarver for chest pain.

The radiologist report, signed on 1/25/14 at 20:33, stated:
"1. Findings concerning for progressive a (sic) the ascending aorta. *I cannot exclude aneurysmal change. A CT scan would be helpful to further evaluate.*
"2. Low lung findings with vascular crowding throughout the lungs. It is difficult to exclude a function of interstitial pulmonary edema.
"3. Cardiac silhouette size enlargement likely accentuated by the lung volumes."

The patient remained hypotensive (BP=89/61 mm Hg). However, despite the patient's clinical condition, at 03:45 the patient was released to his housing unit with plans to have the patient return for blood pressure check in the evening.  This was a significant departure from standard of care. At 1/25/14 at 06:30 (i.e. three hours later) the patient presented again with shortness of breath and nausea. The patient stated that the pain radiated to his throat and was 9 in severity on a scale of 10.  The patient was hypoxic (SpO2=82%) and tachycardic (pulse=104-121/minute). At 07:10 aspirin 324 mg chewable was given to patient.

On 1/25/14 at 08:59 the patient was transported to the hospital. The patient became unresponsive and was taken to Lane Memorial where he was diagnosed with a dissecting aortic aneurysm. He was airlifted to Our Lady of the Lake but did not survive the flight. The autopsy report noted that he had a dissecting aortic aneurysm, cardiac tamponade, cardiomegaly with LVH and acute pulmonary edema.  *Although unmentioned in the health record, Dr. Collins wrote in the patient's death summary that due to bad weather, a decision was made to monitor the patient in the ATU instead of*

*transporting the patient to the hospital.* If the weather precludes transfer for life saving treatment, it should be in the medical record.

In summary, our review showed that urgent and emergent care is inadequate and has resulted in multiple deaths, many of which were likely preventable. In several cases, patients with serious medical conditions failed to be transported to the ATU for medical evaluation by a physician. Physicians do not evaluate patients in the ATU; medics manage patients and appear to be acting out of the scope of their licenses. Patients with life-threatening conditions are not timely transferred to a hospital. Serious medical conditions are mismanaged. Use of improper medic protocols (use of urinary catheters for obtaining specimens in persons capable of normal urination; use of gastric lavage; etc.) demonstrates lack of medical leadership.[85] Repeated presentations to the ATU, or repeated calls for an ambulance, or repeated sick call requests for the same problem, are not perceived as a "red flag" warning for undiagnosed, undifferentiated or undertreated illness. Instead it is cynically perceived as a sign of inconsequential disease or malingering. A cynical attitude toward inmates is unprofessional. In the meantime, serious infection, stroke and other conditions are unrecognized. Mental illness manifesting as suicide attempts are seen as a cause for punishment by the medieval practice of 4-point restraints. Rather than offer the community standard of medical care, patients are made DNR, do not resuscitate and acute problems are left untreated. All of these deficiencies place inmates at risk of harm or actually cause harm.

## Specialty Services/Consultations

**Methodology:** We toured the specialty services area, interviewed nurses who schedule and track specialty services and reviewed records of patients receiving specialty services.

Standards: Hospitalization and specialty care are available to patients in need of these services. Evidence demonstrates there is appropriate access to hospital and specialist care when necessary. Off-site facilities or health professionals provide a summary of the treatment given and any follow-up instructions; this information accompanies the inmate on return to the facility. For on-site specialty services used regularly for medical and mental health care, there are appropriate licenses and certifications. All aspects of the standard are addressed by written policy and procedure. [86]

**Findings:** LSP provides specialty services on-site, by telemedicine, and at off-site consultant offices. The Director of Nursing told us that the onsite specialty clinics include:

---

[85] The placement of urinary catheters in patients perfectly capable of normal urination, for valueless urine toxicology testing, the placement of tubes for gastric lavage, and GI cocktails for chest pain was rampantly apparent, and because it is without basis in modern medicine, it illustrates an inexcusable knowledge deficit or perhaps punitive intent. The attitude of "pump his stomach so he will never do it again" is a bygone of medicine. Patients walk around the dormitories blind from diabetes, a totally preventable devastation. Patients in wheelchairs fall out and are demeaned by staff. These retrograde attributes illustrate how much time has stood still with regards to the standards of medical care at LSP.
[86] NCCHC. P-D-04.

Endoscopy every other month as needed
Gastroenterology- unspecified intervals
Audiology- unspecified intervals
Pain- unspecified intervals
Neurology- weekly
Orthopedics- weekly
Podiatry- every other week
Dermatology- every other week
General Surgery- weekly
Ophthalmology- unspecified intervals
Ultrasounds

LSP has recently hired Ronald Dane Sylvest MD to provide part time orthopedic services on-site. Effective 1/11/16, this physician is under Consent Order by the Louisiana State Board of Medical Examiners for abuse of alcohol and other mood altering substances and has had a history of previous consent actions by the Board in 1998, 2003, 2008, and 2011. In 2013, the Board received anonymous information that the physician had privileges to perform procedures without receiving approval by the Board. Dr. Sylvest also admitted signing his sponsor's name on his Antabuse log and left the state without notifying the physician Health Program and arranging for drug screening. On 3/2/13, the Board suspended his license and he has not practiced medicine in the state since then. The Board has reinstated his license and limited his practice to an institutional setting. He has not practiced medicine for over 3 years. This raises serious questions as to how this physician's practice will be monitored since adequate peer review requires review by another physician in the same specialty.

Off-site specialty care is provided at a variety of locations but most consultations take place at University Medical Center in New Orleans, which is approximately 150 miles one way, and multiple nearby specialists.  Off-site specialty care and off-site diagnostic care includes the mobile x-ray testing for CT scans, MRIs and ultrasounds.[87]

LPNs are assigned to assist in each of the on-site specialty clinics.  These LPNs maintain the schedule for their respective clinic.  Off-site specialty care and some on-site specialty care is tracked by 3 other LPNs who work in what is called the Trip Office.  These nurses accept all referrals from on-site providers and re-referrals from the off-site consultants.

These LPNs track off-site and some on-site specialty care in an electronic tracking system called Eceptionist.  This system includes the date the referral was ordered but does not appear to track whether the appointment was completed or when the appointment was completed relative to the date it was referred.  This is important because there are significant delays in obtaining care, particularly at University Medical Center.  This system also does not track

---

[87] Although the mobile unit services are performed at LSP, it is by outside providers.

whether the appointment was rescheduled, which is another type of delay.  As a result, statistical information provided to us does not indicate whether care was timely.

Medical providers play little role in ensuring that timely referrals occur as the only role providers play is to refer the patient.  All referrals are sent by providers on a paper request to an LPN who works in the LSP scheduling office called the Trip Office.  That LPN enters the patient information including the type of specialty care requested into Eceptionist.  Once this is completed, the LPN sends this information to another nurse in the Louisiana Department of Correction Medical program headquarters.  A staff member in headquarters schedules the referral after the referral is reviewed and approved by the State Medical Director.  If the referral is to University Medical Center, the headquarters staff enters the referral directly into the medical software scheduling program of UMC.

The prison medical headquarters reviews all consults and rejects some consultations.  It is not clear how this information is communicated back to the facility providers.  The Trip Office LPNs place a paper copy of the ordered referral into the provider's mailbox, but there is no notification of when the consultation is scheduled or completed.  Because the appointments are ultimately scheduled by staff in the central office, there is a significant communication gap with the providers caring for the patient.  Information provided to us did not include whether the appointment was completed; the time it took to complete a specialty appointment; or the number of denials of care by the State Medical Director.

We were told by the scheduling nurse that there are frequent delays of care.  In some cases, the DOC Medical Director (Dr. Singh) requires additional information prior to submission of the referral and in some cases, care is denied. We were told that there were frequent communication errors with respect to what needed to be done or what tests needed to accompany the patient on the consultation visit.  All of these issues create delays which are not tracked by the system.  Several chart reviews demonstrated that a patient would go for a specialty care visit without recommended tests, causing the tests to be re-ordered and thereby delaying care of the patient.  The LPNs do write comments about these delays but the delays are apparently not tracked statistically so it is unclear how frequently they occur.  We also noted documentation in medical records reviews that the handicapped van is not always working.  When this van is not working, a disabled inmate is reportedly given a choice to travel in the regular van or reschedule the appointment.[88]  This system appears manifestly inadequate to meet the needs of disabled prisoners. Most off-site medical specialty visits are conducted at UMC-NO, which is approximately 150 miles each way.  This is approximately 4-5 hours of travel for each trip.  This is difficult for a disabled patient and is a barrier to care.  In one record we reviewed, a disabled patient asked to reschedule the visit when the van was operable. As well, some patients need care more urgently and should be transported locally.

---

[88] This pattern is seen in the case of Ricky Davis, who was transported in a non-handicap equipped van following his back surgery and was forced to lay face-down across a bench for the entire return trip to Angola.

The Eceptionist records for 2014 and 2015 that were provided to us did not include any summary data.  We counted running log data that showed that over the 2-year period 2014-2015 there were 11,846 specialty appointments or about 493 per month.  There was no information on timeliness of these appointments or whether in fact the appointment had occurred.  4,937 (41.6%) of these appointments were scheduled at University Medical Center in New Orleans which is 150 miles away.  1,616 (13.6%) appointments occurred by telemedicine with a group called South Telemedicine.  These consultations were for a variety of internal medicine and surgical subspecialties.  3,601 (30.3%) appointments were for on-site specialties.  Not all on-site specialty appointments are tracked in Eceptionist.   The ones that were tracked included mobile x-ray tests, GI clinic, pain clinic, general surgery clinic, and ultrasound clinic.

The 4,937 appointments at UMC over a 24-month period averaged approximately 205 appointments per month.  In a 5-day work week, this averages about 10 a day.

When a patient returns from an off-site visit, they frequently have a recommendation for additional medication or additional therapeutic plan changes.  If the patient returns from the consultation visit Monday through Friday between daytime hours, the patient is to return to the Trip Office.  The LPN in the Trip Office notes any medication changes and writes the prescription and takes it to a physician to sign and also notes any change in therapy.  The LPNs in the Trip Office appear to manage the follow up for the patient; the doctors do not appear to be involved in managing specialty care at all.   Doctors do not even consistently document acknowledgement of these changes.  The Trip Office nurses also photocopy any report that returns with the patient and place this report in the physician's mail box; however we found few provider notes that documented review of the consultation report.  If the patient returns when the Trip Office is closed, the patient returns to the Unit 1 nursing station where apparently the same process occurs.   On some charts reviewed, these orders are not clearly documented as having been reviewed.  As well, there is seldom a physician visit after an off-site visit (either hospitalization or specialty consultation) to address any change in plan based on the hospitalization or off-site consultation.  As a result, there is an apparent lack of continuity of care.[89]

Completed consultation requests are seldom in the medical record.   Mostly parts of the consultation are present and it is at times difficult to determine what occurred at the consultation.  It did not appear, based on medical record documentation, that LSP providers review consultation or hospital discharge summary reports in order to synchronize their primary care efforts with efforts of the specialists. When patients are evaluated in telemedicine clinics or are sent to UMC, the consultant sometimes requests diagnostic studies to be completed prior to follow up.  The providers at LSP do not document their acknowledgement of what is needed at upcoming appointments and some specialty appointments we reviewed were ineffective because the specialists did not have diagnostic test results as recommended.

---

[89] We reviewed three declarations of medical providers at University Medical Center in New Orleans describing their concerns about the quality of care being delivered at Angola and their concerns about continuity of care for patients who are in their care and subsequently return to Angola..

The consultation process for persons who have specialty referrals does not work well.  Because of the lack of training of physician staff, physicians do not always appreciate when patients need referral for care.  For this reason some patients who need specialty referral do not get it.  This under-utilization is only assessed by reviewing sentinel case reviews, which is not part of the quality efforts at LSP but which is in accordance with the standard of care.

These deficiencies are demonstrated in the following examples.

For **Patient #13**, a specialized radiology test (aortogram) was requested 11/20/13 but was not done until 9/11/14, almost 10 months later.  After the same patient was hospitalized for a myocardial infarction, the provider did not review the hospital record or note the recommendations of the hospital physicians.  The providers failed to follow up after this hospitalization and failed to manage the patient appropriately, resulting in heart failure requiring another hospitalization, demonstrating harm to the patient.  After return from the hospital, the providers failed to review the hospital discharge records.  An echocardiogram was requested by a cardiologist after the heart attack around 1/29/15.  This echocardiogram was done but not reviewed by LSP provider staff.  The recommendation for the echocardiogram was not documented as needed by the cardiologist and failed to go with the patient at the follow up cardiology visit on 5/7/15.  The cardiologist recommended the echocardiogram again.  Again the echocardiogram was done and not reviewed by LSP providers.  Again the patient went to the cardiologist without the echocardiogram result resulting in another request for an echocardiogram on 9/23/15.  Thus the cardiologist was unable to assist in the management of the patient.   In the interval between January and September of 2015 the patient experienced 2 hospitalizations for heart failure.  The failure to coordinate specialty care contributed to the harm to the patient.

**Patient #5** had a history of hypertension and asthma.  However, the asthma was probably misdiagnosed as the patient had multiple chest x-rays showing interstitial lung disease and a spirometry showing restrictive lung disease that was unrecognized by providers.  This shows a lack of primary care knowledge of the providers.  This patient began developing stomach pain and weight loss beginning in October of 2012.  At that time the patient weighed about 190 pounds.  Over the next 2 years the patient gradually lost weight, eventually totaling almost 60 pounds.  Although it was documented in medical record clinic visits, it was unnoticed by practitioners over multiple provider visits.  Despite abdominal pain and weight loss, providers failed to take adequate history or perform adequate examination.  Over time the abdominal pain worsened so much that the patient couldn't walk.  He developed diarrhea and vomiting.  After a delay of over 2 years the patient was admitted to a hospital because of fever, severe abdominal pain, and vomiting.  He had lost almost 60 pounds.  An advanced cancer was diagnosed.

Subsequent to surgery, he developed a complication of his surgery and died.  His death was preventable as an earlier diagnosis would have most likely prolonged his life.[90]

**Patient #6** had hypertension and significant cardiac arrhythmia.  The patient had intermittent episodes of atrial fibrillation, supraventricular tachycardia, and even ventricular tachycardia.  The patient was evaluated by cardiologists in hospitals but when seen by cardiologists, the patient had normal sinus rhythm.  Communication with consultants was poor and ineffective in describing the condition of the patient.  In 2013 a cardiology consultant, noting the prison history of atrial fibrillation and supraventricular tachycardia, recommended an echocardiogram and an event recorder test.  The echocardiogram was done but the event recorder which might have identified the patient's arrhythmia was never done. Because of this, the patient's atrial fibrillation, which should have been treated with anticoagulation, was not treated with anticoagulation.  Some two years later, in April of 2015, the patient developed another episode of atrial fibrillation and was hospitalized. During this hospitalization, the patient had atrial fibrillation in the hospital and was anticoagulated at the hospital.  When the patient returned to LSP, a physician did not evaluate the patient and the patient failed to receive recommended anticoagulation for approximately 10 days.  Within 4 days of returning to the prison the patient developed acute shortness of breath with rapid pulse (123/minute).  These were critical symptoms in a patient with recent onset of atrial fibrillation.  Instead of sending the patient to a hospital, a LSP physician ordered a next day follow up.  The patient then developed ominous findings including hypotension (BP= 65/53 mm Hg), altered mental status, shortness of breath, ankle edema, orthopnea and a chest x-ray with congestion—all signs of serious heart failure. Instead of hospitalizing the patient, LSP providers treated the patient on the infirmary without the benefit of diagnostic testing available at a hospital.  For 4 more days the patient remained on the infirmary with poor and inadequate history and physical examinations. The anticoagulation was finally started but the patient failed to improve and the patient was sent to a hospital where he died.  The patient was noted on autopsy to have an intra-cardiac thrombus likely from his atrial fibrillation with multiple pulmonary emboli that likely caused his death.  The death was preventable and was caused by lack of recognition of the need for anticoagulation over a 2-year period and, finally, a lack of providing ordered anticoagulation medication for 10 days due to lack of review and acting on consultant recommendations.  The mortality summary did not identify any problems with the patient's care.

**Patient #7** developed an abnormal chest x-ray showing a mass suspicious for cancer.  The patient was referred to a pulmonologist who requested repeatedly that LSP order a pulmonary function test and fine needle biopsy of the mass.  The patient returned to the pulmonologist three times without the tests being done.  The diagnosis of lung

---

[90] This pattern mirrors the experience of Shannon Hurd, who likely fell victim to the same failure to timely identify serious medical conditions, as did Joseph Lewis, who has since died.

cancer was delayed for over a year and a half because of lack of coordination of specialty care.  Providers at LSP who saw the patient failed to take adequate histories, failed to perform adequate physical examinations, and failed to review or acknowledge the requests of the specialists.  This delay harmed the patient.

After diagnosis of lung cancer at a hospital the patient returned to the prison where his lung cancer was not recognized or acknowledged for weeks.  Providers who evaluated the patient failed to take adequate histories, failed to perform adequate physical examinations and failed to coordinate follow up oncology care.  Within approximately 7 weeks after return to the prison the patient experienced probable ongoing sequelae of his biopsy surgery and was sent to the hospital, where he died.  The lack of adequate provider care contributed to this patient's death.

**Patient #10** was noted to have diarrhea, weight loss and jaundice.  The serum bilirubin was 19.7 and the alkaline phosphatase was 303.  These laboratory results indicate an obstructive jaundice that potentially is life threatening.  A CT scan showed an inferior vena cava thrombus, and a mass in the pancreas with dilated bile ducts.  Instead of sending the patient to a hospital for a biopsy and to address the jaundice with a stent, the patient was kept on the infirmary.  The patient developed fever to 101.4 F.  Fever and obstructive jaundice is a potentially life-threatening presentation but the patient was still kept on the infirmary.  Without defining the prognosis with biopsy, providers told the patient the he had a poor prognosis and recommended palliative care before the diagnosis was made.  The patient was discharged from the infirmary and sent to general population.  The patient was not sent to a hospital for over a month.  The patient had a life threatening obstructive jaundice and the delay in definitive biopsy and treatment of the elevated bilirubin was a significant departure from standard of care.

At the hospital the patient received a diagnosis of pancreatic cancer with metastases and when returned to the prison was placed on the infirmary.  Providers there seldom took a history or performed a physical examination, did not coordinate a follow up with an oncologist, and failed to monitor the patient's bilirubin.  The patient had hypotension (BP 86/55 mm Hg) on the infirmary that was not noticed by a provider.  Providers did not review the hospital care or the therapeutic plan established at the hospital.  The patient was discharged from the infirmary to general population.  In general population, the providers made no effort to coordinate oncology care and at one clinic visit scheduled a 2 month follow up even though the patient had not yet had oncology care coordinated.  Although the patient was eventually evaluated by an oncologist, the LSP providers failed to take histories, perform physical examinations, monitor the patient's progress, or otherwise coordinate oncology care.  The patient developed altered mental status and hypotension and was evaluated in the ATU.  Doctors there tried to persuade the patient not to seek care but the patient insisted on going to the hospital.  After being in the ATU with significant hypotension and hypoglycemia (CBG 15) for 5 hours the patient was transferred to a hospital but the patient expired in the emergency room.  The providers showed a lack of concern for this patient and appeared to promote

a terminal prognosis and delay care before the patient had an adequate chance at treatment.

**Patient #17** was a 46 year old man who arrived at LSP in 2006.  His medical history includes tobacco use, latent TB infection, chronic lymphocytic leukemia (CLL) diagnosed in 2010, s/p completion of six cycles of chemotherapy in 2011, speculated lung nodule suspicious for malignancy per chest CT on 5/1/12.  On 5/16/12 oncology saw the patient for follow-up of CLL and recommended pulmonary consult ASAP, chest CT in 3 months and return to oncology in 3 months. On 5/22/12 pulmonary saw the patient noting he had an enlarging left upper lobe nodule and his impression was malignancy.   He recommended pulmonary cytology studies and follow-up with thoracic oncology clinic in 1-2 weeks after studies are obtained. This never took place. From October 2012 until November 2013 the patient complained repeatedly of chest pain which physicians never medically evaluated.   During the same period of time hematology/oncology saw the patient and requested labs that were not performed at LSP resulting in missed oncology appointments. On 11/1/13 chest x-ray showed a large mass in the left parahilar region extending up the left lobe medially. There were numerous pulmonary nodules scattered through the lung fields on both sides. There was widening of the mediastinum as well suggesting adenopathy. These findings are all worrisome for neoplasm.   It is unclear whether prior films were available for comparison. The above results were called to the Angola x-ray department.   On an undocumented date, Dr. Lavespere initialed this report. On 11/6/13 Heme-oncology saw the patient noting that he had CLL (chronic lymphocytic leukemia) stage 2 with chronic cough, lymphadenopathy, weight loss and new large mediastinal mass all likely secondary to malignancy. Examination showed the patient had bilateral lymphadenopathy in the neck, axilla and groin.  This significant lymphadenopathy was never found by LSP physicians.   On 1/21/14 at 0515 an EMT responded urgently to the patient at Spruce 1 for SOB and inability to sleep. The patient was transported to the ATU.  The patient's chest x-ray had worsened and the patient was sent to ILH.

On 1/21/14 chest x-ray showed a large left hilar/suprahilar mass and diffuse pulmonary parenchymal nodules consistent with metastatic disease. Increasing densities in the left and right perihilar regions could correlate with active infectious infiltrates or worsening metastatic disease. At an undocumented date and time a Dr. Lavespere initialed the report. On 1/23/14 the patient underwent left upper lobe lung biopsy that showed adenocarcinoma of the lung. The patient was intubated and on 2/1/14 the patient died.

These examples of inadequate specialty care demonstrate lack of timely care, lack of follow up, and lack of coordination of care.  These deficiencies resulted in harm to multiple patients, up to and including unnecessary suffering and preventable death.

Of concern is that LSP physicians do not address and implement consultant recommendations. We reviewed statements by LSP consultants that their recommendations were essentially ignored.[91] Dr. Lavespere is aware of these complaints but stated that:

> *I take those [doctors'] recommendations and I fit them within the confines of the penitentiary system. They don't know the penitentiary system, you know. If they go down there and say, well, this guy needs a hat, I can't let him wear a hat, you know. I have to be security-minded, they're not security minded.[92]*

Dr. Lavespere does not prioritize the medical needs of the patient, instead he prioritizes the security rules of the institution, even when they are harmful to the patient.  It does not appear that Dr. Lavespere is willing to advocate for patient's treatment of their serious medical needs, if opposed by security.

## Inpatient Care

**Methodology:** We toured the LSP infirmary units, interviewed staff and patients, and reviewed health records.

**Standards:** Infirmary care, when provided, is appropriate to meet the serious needs of patients. Policy defines the scope of medical psychiatric, and nursing care provided in the infirmary setting. Patients are always within sight or hearing of a qualified health care professional. Determining the number of sufficient and appropriate qualified health care professionals in the infirmary is based upon the number of patients, the severity of their illnesses, and the level of care required for each. A supervising registered nurse is on-site at least once every 24 hours. A manual of nursing care procedures is consistent with the state's nurse practice act and licensure requirements. Admission to and discharge from the infirmary care occur only on the order of a physician or nurse practitioner. The frequency of physician and nursing rounds is specified based upon clinical acuity and the categories of care provided. A complete inpatient health record is kept for each patient. If the inpatient record is retained separately from the outpatient record, a copy of the discharge summary is placed in the patients outpatient chart. All aspects of the standard are addressed by written policy and procedure.[93]

---

[91] Declarations of Monica Dhand MD, Jane Andrews MD, MPH and Catherine Jones MD.

[92] Lavespere individual Deposition Transcript, page 87.  A consultant might recommend a hat if the patient had a history of skin cancer. Wearing a hat is an important way to reduce further exposure to the sun and reduce the risk of recurrence of the cancer.

[93] NCCHC. P-G-03. ACA. 1-HC-1A-09. (Ref. 3-4354).

**Findings:** LSP has 2 infirmary units; Unit 1 and Unit 2. Unit 1 provides nursing care to patients undergoing preparation for tests or who have acute care conditions not requiring hospitalization. Unit 1 has 20 dormitory style beds and 9 locked rooms. Dialysis is performed in one of the locked rooms on unit 1. Unit 2 is for nursing-home type inmates requiring assistance with daily living or who are significantly disabled. This unit also includes the hospice program (although hospice patients are occasionally housed on Ward 1). Unit 2 has 24 dormitory style beds and 10 locked rooms.[94]

Staffing on both units is inadequate. Unit 2, which houses the highest acuity disabled patients and those with very high acuity medical conditions, is managed by a nurse practitioner who spends only part of her time managing this unit. Unit 1 patients are managed by the provider whose housing unit the patient comes from. Nursing staff for the two units consists of 6 nurses in the day shift and 5 nurses on the night shift. At night there is a RN who covers both units. Nurses administer medication, change dressings and give injections.

Inmates provide nursing care with respect to cleaning and bathing, dressing, feeding, and positioning. This is in violation of ACA and NCCHC standards prohibiting inmates from providing direct patient care services to inmates. National Commission on Correctional Health Care (NCCHC) standards recognize that with proper training and supervision "inmates may assist patients with activities of daily living (*except for infirmary patients*)"[95]. Moreover, we conclude that infirmary inmate workers are not actively supervised by registered nurses. We spoke with some nurses on the unit who stated that officers supervise the inmate workers; and some nursing staff said that nurses supervised the inmate workers. We talked to disabled inmates who needed assistance to turn in bed and they indicated that it was often difficult to gain attention of inmate workers to assist them.

Use of inmates to provide direct care services is also not in compliance with LSP's Health Care Assistants policy and procedure, but in fact occurs on a daily basis at LSP.[96] The LSP policy on Health Care Assistants states:

> *Inmates are not to be used for performing direct patient care services; sched-uling health care appointments; determining access of other inmates to health care services; handling or having access to surgical instruments, syringes, nee-dles, medications or health records; or operating diagnostic or therapeutic equipment except under direct supervision, by specialty training staff, in a vo-*

---

[94] See photographs, Attachment B, pages 6-7.

[95] Standards for Health Services in Prisons. 2014. NCCHC. Inmate Workers. P-C-06.

[96] Standard P-C-06 Inmate Workers, Standards for Health Services in Prisons, 2014 National Commission on Correctional Health Care. This standard states, "The intent of this standard is that the health services are provided by health staff and not substituted with inmate workers. Understaffed correctional institutions may be tempted to use inmates in health care delivery to perform services for which civilian personnel are not available. When inmate workers are used as health providers or adjunct health staff there is increased risk to the patient and for the institution. Their use frequently violates state laws, invites litigation, and brings discredit to the correctional health care field, and gives inmates unwarranted power over their peers."

---

*cational training program.* **No inmate or group of inmates is given control or authority over other inmates in the health care area.**[97]

To use inmate workers to provide direct health care services places the patient at risk of harm, and gives inmates unwarranted power over their peers. Dr. Lavespere admitted that inmates may take advantage of other inmates, stating, "I'm sure it happens, I mean it's a penitentiary."[98]

We interviewed patients that were housed in the infirmary and subject to care by other inmates. They include the following cases:

**Patient #23** is a 48 year old man developed paralysis of his lower extremities with incontinence of bowel and bladder while at the Orleans Parish Prison in 2012. He was transferred to LSP and diagnosed with transverse myelitis. He is now housed in in the infirmary. He reported that "health care was awful, a weaker person would have killed himself". He did not initially get physical therapy and an inmate worked on his legs. He developed a decubitus ulcer at the top of his sacrum. Inmate orderlies cleaned him when he defecated. He reported that inmate orderlies don't know how to move people because they haven't been trained, and nurses don't do hands-on care. They had him sign a DNR.[99]

**Patient #24** is a 36 year old man who arrived at LDOC in 1999 and transferred to LSP June 2000. At that time he was healthy. In February 2010 he was playing football and suffered a neck injury in which he fractured C3 and C4. When he became conscious he asked them not to take off his helmet because knew he was paralyzed, however someone removed his helmet. He is quadriplegic with a tracheostomy tube to help with breathing and is housed in the infirmary. He reported that the "inmates did everything for him", including turning and bathing him. The nurse changes his suprapubic catheter every 30 days. He has had a lot of urinary tract infections. They don't measure his fluid intake or urinary output. He reports having lots of spasms but is not on a special air mattress; he has been on a regular mattress since 2011. He reported the clock is behind him so he can't see it and no recreational or occupational therapy is offered to him. He was placed in a locked isolation room in the infirmary with no call system and no way to notify the nurses if his trach tube became clogged and he had trouble breathing. The solid door is locked and the nurses cannot hear him even if he screams. He reported that two orderlies and a janitor take care of 24 ward patients and 10 in the isolation wards. They serve breakfast and if he is asleep they don't wake him up. The food is always cold. Sometimes the orderlies put shampoo in his hair and forget. He last had his hair washed two weeks ago. He has to call someone to drink water

---

[97] HC-23. 4/15/2011.
[98] Lavespere individual Deposition Transcript, page 94.
[99] Patient #23 is also a named plaintiff.

or put Chap Stick on his lips. He reported that sometimes he gets another patient to help him.[100]

Nurses are supposed to perform vital signs every shift for patients on Unit 1 and weekly for patients on Unit 2.  Showering and hygiene are the responsibility of custody even when the Unit 2 patient is unable to move and needs total care.  The timing of showers is regulated by custody. This is inappropriate. On an infirmary unit, the medical needs of the patient as determined by clinical staff must determine the frequency of showers and hygiene needs.

Both Unit 1 and Unit 2 utilize a paper medical record.  But Unit 1 uses a paper medication administration record while Unit 2 utilizes the electronic medication administration record. When patients are admitted to Unit 1, their paper record remains in the medical records department and a new infirmary record is started.  This is inappropriate as the current medical record should be available when evaluating the patient.

None of the single rooms in Unit 1 or 2 have a call bell system.  Some of these rooms are used for hospice patients in which case the door of the room is sometimes left open or unlocked. However, a person with an infirmary-level illness should not be housed in a room that is not within sight or sound of a nurse.  Hospice patients are still subject to disciplinary procedures that include locking them inside these rooms.

Provider care on the infirmary units is not good.  As with chronic disease, providers on the infirmary seldom take adequate history and seldom perform physical examinations appropriate for the patient's condition.  Laboratory and other diagnostic testing are seldom integrated into care of the patient.  Providers fail to properly manage patients that cause harm, including managing patients in the infirmary that should be sent to the hospital.

> **Patient #4** is a 69 year old patient who had hypertension and high blood lipids.  A CT scan documented bronchiectasis and chronic obstructive lung disease which was never recognized while the patient was in general population.  The patient developed fever with 2 lobe pneumonia and an oxygen saturation of 87%.  These are life critical signs. The pneumonia severity index score for this patient, which gives guidance with respect to when patients should be admitted to a hospital with community acquired pneumonia, was 79, which warrants hospitalization.  Instead, the patient was kept at the facility.  The patient deteriorated at the prison infirmary and did not receive hospital-like care.  Physicians initially treated the patient with oral antibiotics and failed to obtain cultures of blood and sputum.  Oral antibiotics in an elderly patient with underlying lung disease and 2 lobe pneumonia is below standard of care.

> The patient deteriorated and developed hypotension, elevated white count indicating systemic infection (WBC 18.5), and altered mental status which yielded a pneumonia

---

[100] Patient #24 is also a named plaintiff.

severity index score of 100 which indicated that hospitalization was necessary.  Instead the patient remained in the prison.  Eventually, the patient was misdiagnosed with pancreatitis which typically requires hospitalization.  The patient was still not sent to a hospital and eventually died. The death summary found no problems with the patient's care.  This death was preventable and caused by poor judgment and care on the part of providers at LSP.  Notably, provider progress notes during these 10 days had inadequate history and physical examinations and failed to integrate laboratory and other diagnostic testing into the care of the patient.  The patient should also have been sent to a hospital when pneumonia was first diagnosed.

**Patient #9** with cirrhosis and ascites transferred to LSP in February of 2014.  The patient was on the infirmary unit and developed a fever and a presumed infection.  The doctor's history and physical examination was inadequate.  Diagnostic tests typically done to evaluate fever and ascites were not done (blood, urine, sputum cultures, paracentesis, and other radiological tests).  The doctor initially started intravenous antibiotics but the patient apparently had an allergic reaction to the medication.  Antibiotics were stopped entirely even though the patient had a presumptive infection. Instead of sending the patient to a hospital for a better evaluation, no interventions were provided to a critically ill patient.  History and physical examinations were inadequate.  Within 5 days the patient developed signs of systemic infection including a fever of 105∘F. and a high white blood cell count (33,000, normal=4-10,000).  At that point, instead of hospitalizing the patient, the doctor suggested a do-not-resuscitate order with the patient, appearing to give up on caring for the patient even though the patient was not terminal.  This, in part, appeared to show a lack of knowledge on the part of the medical staff.  Laboratory tests at this time yielded a Model of End-State Liver Disease (MELD) score of 17 that has over a 95% chance of 3 month survival.  This was a score that the patient had for several months.  The presentation of this patient was of sepsis which warranted hospitalization and intravenous antibiotics.  Instead, the only intervention was oral antibiotics.  The patient was given a benzodiazepine and morphine with no medical indication.  It appeared that these medications were given as palliative sedation.  While the strategy of palliative sedation is used in some patients prior to death, it should be discussed with the patient and clear to the patient why the medication is being used.  The risks of not doing so include hastening death inappropriately, inappropriate use of medication, and uninformed risk to the patient.  Given the vulnerability of inmates with respect to choice of medical care in prisons, decisions such as these need to be fully informed and discussed with the patient.

On 12/2/13 **Patient #18** presented with fever, cough, chest pain and 55 pound weight loss and was admitted to the infirmary with newly diagnosed AIDS.  He was severely immunosuppressed (CD4 count=15 cells, normal=>500 cells). The same day the patient's vital signs were abnormal. He was febrile, tachycardic and hypotensive (Temp=102∘F, pulse=115/minute, BP=92/52 mm Hg) but was not sent to the hospital. On 12/5/13 he

was treated presumptively for pneumocystis pneumonia with oral Bactrim. On 12/6/13 he was started on antiretroviral therapy. Medical providers did not make rounds from 12/6/13 to 12/9/13. Nurses took vital signs only once daily. Nurses did not weigh the patient during his admission or measure his oral intake or urinary output. On 12/8/13 the patient did not receive Bactrim, IV antibiotics or his antiretroviral therapy.  On 12/12/13 at 06:00 the patient's had a fever of 101∘F, but nurses did not take the patient's vital signs until the next day. On 12/13/13 he was hospitalized at ILH and died on 1/14/14 of complications of AIDS.

LSP has an additional feature that is both unusual and fails to meet the standard of care, in that LSP houses men with serious medical needs in so-called "medical dorms," the Ash-2, Cypress-2, and Hickory-4 units described above, where the physical plant is not more suited to disabled men than in any other general population units, and where medical staff do not make rounds. We went to these units during our site visit and observed them to be crowded and disorganized.  There are not proper hygiene practices in place to house very sick individuals.[101] We spoke to several men with serious medical needs who were housed in these dorms.  It was obvious that the prison does not bother to monitor the problems and risks that being housed in this setting presents for people with serious medical needs.

## Mortality Review

**Methodology:** We reviewed 28 health records of patients that died at Angola from 2010 to 2015 to determine whether there were individual or systemic issues related to the health care delivery system.  We also reviewed Medical Summary Reports for a Deceased Offender to determine if LSP health care leadership sought to identify individual or systemic issues requiring corrective action.

**Standards:** All deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures or practices are warranted and to identify issues that require further study.[102] Authorities having jurisdiction are promptly notified of an offender's death.  Procedures specify and govern the actions to be taken in the event of the death of an offender.[103]

**Findings:** State prisoner deaths in Louisiana are very high and have increased steadily over the past 13 years.  In 2001, Louisiana prisoners had a mortality rate of 361 per 100,000 prisoner. This was the 3rd highest death rate of state prison systems in the country.  In 2013, the lastest year for which data is available, Louisiana prisoners had a mortality rate of 628 per 100,000 prisoners.  This was the highest rate in the country.  In 2013 the average death rate for state prisons nationwide was 274 per 100,000.  Louisiana therefore had a mortality rate in 2013 of

---

[101] This pattern is seen in the case of Edward Giovanni, who was repeatedly transferred between the Nursing Units and the medical dorms, and repeatedly developed life-threatening lung infections while housed in the medical dorms.

[102] NCCHC. P-A-10.

[103] ACA. 1-HC-7A-05.

more than double the average death rate of prisoners in the country.[104]  As well, its own mortality rate more than doubled over a 13-year period during a period of time when the nationwide state prisoner mortality rate increased by only 9 deaths, or 4%.  Given our chart reviews of deaths, it is our opinion that there are many preventable deaths at LSP that contribute to this extraordinary prisoner mortality rate.  It is our opinion that these preventable excess deaths are a consequence of the systemic inadequacies in the health program.

As noted above, our review of LSP mortalities showed that in multiple cases the patient's death was likely preventable.  Even in cases which the patient's death was ultimately not preventable, patients did not receive timely and appropriate care, and suffered needlessly.  LSP physicians conduct a Medical Summary Report for a Deceased Offender that is typically an incomplete summary of the patient's care and does not identify whether care for the patient was timely and appropriate, does not identify problems related to systems or quality, and does not determine whether the patient's death was preventable.

Examples include the following:

> **Patient #20** is a 37 year old man with a history of HIV complained severe abdominal pain, difficulty swallowing and weight loss on 9 occasions from September 2014 to December 2014 but was not adequately evaluated for his symptoms. On 1/12/15 at 18:42 the patient was seen urgently for abdominal pain and distention, hypotension and tachycardia.  His hemoglobin dropped from 14 to 8 indicating that the patient was bleeding.  However he was not sent out to the hospital but placed in the infirmary.  The next day at 16:04 the patient was found without life signs.  An autopsy indicated the patient had massive GI bleeding due to a perforated peptic ulcer and bilateral bronchopneumonia.
>
> On 1/19/15, Dr. Helms completed a Medical Summary Report for a Deceased Offender. He categorized the death as Natural Unexpected/Acute Event. He noted that the patient had HIV and that his care was complicated by his constant refusals for medical attention. In describing the chronology of events leading up to the patient's death, Dr. Helms does not address that the patient did not receive timely and appropriate medical evaluation during the 4 month period he complained of weight loss dysphagia, and severe abdominal pain.  In the 24 hours preceding his death, he selectively noted patient vital signs that were not as abnormal as most of his vital signs, and noted the patient had a significant drop in hemoglobin from 14 to 8.2 but did not comment on the appropriateness of admitting him to the infirmary versus sending him to the hospital. The physician did not comment on whether the patient's death was preventable or not.

---

[104] Mortality in Local Jails and State Prisons, 2000-2013 –Statistical Tables; Bureau of Justice Statistics, US Department of Justice, August 2015, NCJ 248756

In another case, **Patient #18** requested an HIV test in August 2013 but was not tested. In November 2013 the patient presented urgently with fever, cough, chest pain and 55 pound weight loss.  On 11/20/13, the patient tested positive for HIV infection but physicians did not acknowledge this report until 12/2/13.  During this period the patient had several ATU visits in which EMTs did not document notifying physicians timely of the patient's abnormal vital signs and physicians did not clinically evaluate the patient for chest pain, shortness of breath, abdominal pain and 55 pound weight loss; nor did a physician see the patient for follow-up following these urgent events.

On 12/2/13 the patient was admitted to the infirmary. Medical evaluation and treatment for his life-threatening conditions were delayed. On 12/5/13 the patient was treated presumptively for pneumocystis pneumonia and on 12/6/13 placed on antiretroviral therapy. While in the infirmary, medical providers did not perform virtually any physical examinations of the patient.  Nurses did not consistently take vital signs or administer medications as ordered. On 12/13/13 he was admitted to the hospital and died on 1/14/14.  Hospital medical records have not been scanned into the record.

Had this patient been tested and treated for HIV in August 2013, or had he been timely hospitalized in November 2013 for treatment, it is likely his death would have been prevented. Instead he was admitted to the LSP nursing unit, but his medical condition exceeded the institution's capacity to properly care for him.

The patient's Medical Summary Report for a Deceased Offender is completed but unsigned. The reviewer categorized the patient's death as Natural Expected/Chronic Illness with Normal Progression. This fails to appreciate the patient's delayed AIDS diagnosis and that with timely antiretroviral therapy, the patient's death was likely preventable.  The summary fails to note that the patient requested an HIV test in August 2013 but was not tested until 11/20/13 when the patient was acutely ill. This abnormal test result was not addressed for two weeks.  In addition, a physician did not timely evaluate the patient when he was acutely ill with chest pain, shortness of breath and 55 pound weight loss.  It did not identify that the patient should have been sent to the hospital instead of being admitted to the infirmary, and did not recognize deficiencies in infirmary care. The Report is simply an incomplete chronology of events that fails to assess the timeliness and appropriateness of care for this patient.

In another case, **Patient #17** was a 46 year old man (described above in the discussion of specialty services) who arrived at LSP in 2006 and died on 2/1/14 of pneumonia, lung adenocarcinoma, respiratory failure and septic shock. His medical history includes tobacco use, latent TB infection, chronic lymphocytic leukemia diagnosed in 2010, s/p completion of six cycles of chemotherapy in 2011, speculated lung nodule suspicious for malignancy per chest CT on 5/1/12.  This patient did not receive timely diagnosis and treatment for his repeated chest pain and adenocarcinoma of the lung.

Dr. Anthony Tarver completed a Medical Summary Report for a Deceased Offender for this patient on 2/6/14. The physician categorized the death as Natural Expected/Chronic Illness with Normal Progression. An autopsy was not performed.  The physician documented an abbreviated summary of the patient's care, but failed to note medical provider's failure to implement the recommendations made to evaluate the patient's spiculated pulmonary nodule in May 2012, including referral to a thoracic surgeon to biopsy the nodule. Over the next 18 months the patient complained of unrelenting chest pain for which he was not appropriately medically evaluated and treated. In most cases the patient was simply treated for chest wall pain without relief. Thus the patient was not diagnosed with adenocarcinoma of the lung until immediately prior to his death. Hematology/oncology specialty services saw the patient for follow-up of his chronic lymphocytic leukemia (CLL) and documented that the patient's pulmonary nodule was being monitored by pulmonary services, however the recommended work-up never took place.  In addition, the patient began to experience right leg pain and at some point the patient required a wheelchair for ambulation, but a diagnosis was never established, and leg x-rays prior to his death revealed lytic lesions, which may have represented metastatic disease.  At chronic disease visits, physicians often did not perform a review of systems or perform adequate, if any physical examinations. Although the patient's death ultimately may not have been preventable, the patient experienced unrelenting pain for which he was not adequately treated.

In summary, LSP does not have an adequate mortality review process to identify and correct health care system issues or those related to timeliness, appropriateness and quality of care. The lack of an adequate mortality review process virtually ensures that preventable deaths will continue.

## Internal Monitoring and Quality Improvement Activities

**Methodology:** We evaluated this area by interviewing staff, reviewing CQI minutes, studies and reports.

**Standards:** A continuous quality improvement program monitors and improves health care delivered in the facility. A CQI program identifies health care aspects to be monitored, implements and monitors corrective action when necessary, and studies the effectiveness of the corrective action plan.  The responsible health authority establishes a quality improvement committee with representatives from major program areas. The committee meets as frequently as necessary, but no less than quarterly. The committee: identifies health care aspects to be monitored and establishes thresholds; designs quality improvement monitoring activities; analyzes the results for factors that may have contributed to less than threshold performance; Designs and implements improvement strategies to correct the identified health care problem and remonitors the performance after implementation of the improvement strategies. The responsible physician is involved in the CQI committee. When the committee identifies a health care problem from its monitoring, a process and/or outcome quality improvement study is

initiated and documented. The committee completes an annual review of the effectiveness of the CQI program by reviewing CQI studies and minutes of CQI, administrative and/or staff meetings, or other pertinent CQI written materials.  All aspects of the standards are addressed by written policy and defined procedures.[105] Reviews address all deaths in custody, suicides, or suicide attempts and illness outbreaks.[106]

**Findings:**  Quality Improvement efforts are evidence of active monitoring to ensure quality of health care in correctional health programs. Senior management should participate and encourage quality efforts.  Support staffing for these efforts must be in place.  These programs need to have a means to identify quality concerns and operational problems; a means to evaluate data with respect to the problem; and a means to implement corrective actions to address problems.  Optimally, all staff participates in improvement efforts.  Both clinical and administrative staff collaborates on these efforts.  When these efforts are not operational, there is a greater likelihood that quality concerns are not identified or corrected, with adverse patient outcomes.  LSP has a minimal quality program that does not appear to have support of clinical leadership, is not adequately staffed, does not identify ongoing quality concerns, and includes only a small number of nursing staff as participants.  This is an ineffective program.

One of the supervisory nurses, Tracy Falgout, is responsible for Quality Improvement.  However, he also has multiple other assignments including education coordinator, producing monthly reports, addressing inmate letters and ensuring transportation occurs for health care appointments.  He is now also the ADA coordinator for LSP.

LSP quality improvement efforts are ineffective.  Participation in the Quality Improvement Committee from 2010 until the second quarter of 2015 was poor.  The Medical Director never participated in any Quality Improvement activity or meetings.  No physician attended Quality Improvement meetings.  No one from the medical department, EMS department, pharmacy, laboratory, radiology, or medical records ever attended Quality Improvement meetings.  Ms. Lamartiniere has attended 2 meetings since 2010.  Mostly, these meetings are attended by nursing supervisors.

Over the 5 year period of meeting minutes, there did not appear to be identification of any new problems.  The same studies were continued over most of the 5 year period.  Several nursing documentation studies from 2010 were discontinued after a few years.  But overall, the group continued to look at the same processes repeatedly.  These included:

> A review of the number of deaths, suicides and suicide watches. This did not include a mortality review of the deaths.
> A HIV post-test notification study which studied whether persons tested for HIV were notified of the results.

---

[105] NCCHC. P-A-06.
[106] ACA. 1-HC-4A-03 (Ref New).

Total skin infections requiring antibiotics.  This study is an infection control metric which is not a quality improvement effort.  These types of infections should be tracked as part of Methicillin resistant *Staphylococcus aureus* (MRSA) monitoring.

Hospice pain management.  This study studies whether pain treatment on the hospice unit is appropriate.

Hospice Bereavement follow up.  This study assesses the effect of hospice deaths on other inmates.

Offender Health Care documentation.

ADA study.  This studies whether inmates with disabilities have appropriate access to ADA accommodations.

Postoperative Infection.  This studies the rate of post-operative infections when inmates return to Angola after surgery.

It did not appear that the Quality Improvement Committee had a mechanism to identify quality concerns.  Because there was no physician participation in quality improvement activity, clinical quality concerns were not a part of Quality Improvement.   There was no involvement of any other staff in quality improvement activity.   As a result, improvement activities appeared confined to issues of concern to nursing staff only.

In addition to Quality Improvement meetings, the Medical Director meets with the Warden on an intermittent basis.  These meetings are documented in minutes which are typically 1 or 2 sentences.  The following are the complete meeting minutes between the Warden and former Medical Director Jason Collins that were provided to us:

Meeting with Warden, March 12, 2012: "Topics discussed: We are trying to cut down on costs and make fewer trips.  Trying to schedule more Telemedicine clinics but we are experiencing many computer problems on the LSU end."

Meeting with Warden May 16, 2012: "Topics discussed: We are trying to cut down on costs and make fewer trips.  Trying to schedule more Telemedicine clinics but we are experiencing many computer problems on the LSU end."[107]

Meeting with Warden September 25, 2012:  "Discussed the need for expansion of the hospital for medical services.  An expansion would greatly benefit the offender population and the LSP budget for offsite trips and future medical bills".

Meeting with Warden December 12, 2012:  "Discussed the influx and affects [sic] of the Phelps Correctional offenders.  Discussed how to see the offenders without causing a backlog in the regular clinics."

---

[107] As this transcription indicates, these two memos had identical content.

Meeting with Warden February 26, 2013:  "The Warden and I discussed the influx of Phelps offenders and the increased Backlog number of regular patients in several clinics.  We talked of ways to cut the numbers by giving clinics more patients each day.  Also the closing of Earl K. Long Medical center was discussed and different outside facilities to send offenders for medical visits."

Meeting with Warden May 7, 2013:  "The Warden and I discussed budgeting costs with the Surgical Center, including ordering supplies and hiring new contract physicians.  This will be an asset to our facility by that will cut down on trip costs and overtime worked."

Meeting with Warden January 14, 2014: "Topics discussed:  Budgeting trips being sent out.  The new contract with GI and the imaging machine are working well in the new Surgical Center.  More cancer diagnoses are being found amongst Offenders in population."

The meetings between Randy Lavespere, Medical Director, and the Warden include the following.

Meeting with Warden November 3, 2014:  "Discussion related to outside facility trips".

Meeting with Warden February 10, 2015:   "Topics discussed: Possible hiring of two new physicians and the medical knowledge they can bring to this facility.  This would increase the availability of appointments and decrease the backlog number".

Meeting with Warden April 6, 2015:  "Topics discussed:  Specific Offender surgeries such as joint replacement, cataract, and hernia repair and budgeting costs for these types of surgeries."[108]

These meetings with the Warden do not appear to be thorough and only address the most important item on the Medical Director's agenda.  This is an ineffective manner of addressing quality concerns and does not include corrective actions necessary to improve services.

The lack of an effective quality improvement program contributes to the systemic inadequacies that we identified in this report.

---

[108] These delays are illustrated in the cases of Otto Barrera, Clyde Carter, and John Tonubbee.

**APPENDIX A: Chart Reviews**

Puisis LSP Chart Reviews

Patient #1

The patient had no problem list in the medical record.  His annual evaluation on 10/17/12 included only hypertension as a problem.  On that day the patient was 6 foot 4 inches tall and weighed 348 pounds and a calculated BMI for this height and weight is 42.4.  The patient was therefore obese.  The patient had 1+ pitting edema but there was no assessment for this abnormality.  A PCC Problem List form dated 6/19/12 listed increased blood pressure and edema from Norvasc as medical problems.  The patient had mild chronic kidney disease for 2 years with elevations of creatinine of 1.37 (0.76-1.27) on 3/11/10; 1.6 (0.5-1.2) on 7/29/10; 1.3 (0.5-1.2) on 2/11/11; and 1.3 (0.5-1.2) on 2/23/12.  This condition appeared unrecognized based on the problem list.

The patient had been at Avoyelles Correctional Center as documented on a progress note 5/3/10.  On 7/21/10 a Patient Data form indicated that the patient underwent a transfer interview in which hypertension was listed as the only problem although obesity was noted in the findings section.  The blood pressure was 140/90.  The examination was documented as normal using a check box format.

On 11/9/10 the blood pressure was 160/100.  A provider noted an elevated creatinine and documented that the patient had no medication that day.  The provider assessed uncontrolled hypertension and that the medication might need to be adjusted but scheduled a 3 month follow up with a follow up blood test.

During an evaluation in the ATU 12/12/10 for knee pain the patient's blood pressure was as high as 199/122.  The patient told a medic that he was not taking his medication.  His medication was given except for Enalapril which was unavailable.  A follow up was not ordered but a provider did see the patient on 12/20/10.  At that visit the provider noted that the blood pressure was 153/90 and documented that the hypertension was stable and did not modify therapy even though the blood pressure was elevated.  A 4 month follow up was scheduled.

On 4/20/11 a provider saw the patient whose blood pressure was 198/100.  The provider noted that the patient missed blood pressure medications on several occasions due to long pill call lines.  The Provider gave an immediate once only dose of clonidine and documented that the patient was uncontrolled because of non-compliance.  No addition medication was provided and a 2 month follow up was noted.

7/24/11 saw medic for health request for ankle swelling.  The blood pressure was 160/100; no intervention was taken but the medic did document that a provider should review the episode.

On 9/21/11 a provider saw the patient in follow up and the blood pressure was 172/101 but the provider did not adjust medication and ordered a 3 month follow up.

On 2/2/12 a provider saw the patient and the blood pressure was 192/96.  The provider documented that the patient wasn't taking medication because the medication line was too long and the patient requested an alternative medication administration process.  The provider ordered Enalapril 10 mg and HCTZ 12.5 and a return appointment in 2 months.  However a MAR from February of 2012 shows that

1

JX-CCH-000091

the patient was on 20 mg of Enalapril; 10 mg of Norvasc; and 25 mg of HCTZ.  The MAR appears to document that on 2/2/12 the Enalapril and HCTZ was stopped.  These were restarted in March at 10 mg Enalapril, 12.5 mg of HCTZ; and 10 mg of Norvasc.  It appears that the provider decreased the medication despite an elevated blood pressure.

The patient placed a health request for ankle pain on 3/5/12.  The blood pressure was 164/90.  The medic took no action about the blood pressure but did request a provider review of the record.  On 3/26/12 a provider saw the patient and the blood pressure was 150/91.  The provider stopped HCTZ and Enalapril and started Cozaar a different angiotensin inhibitor medication.  A 3 month follow up was ordered.

On 5/29/12 a medic evaluated the patient for arm and leg swelling.  The blood pressure was 147/98.  A provider saw the patient but did not address the blood pressure.

On 6/14/12 a provider saw the patient and the blood pressure was 169/102.  The provider noted that the patient missed some doses of medication.  No action was taken to address the elevated blood pressure.

On 6/22/12 a medic saw the patient for had swelling and the blood pressure was 156/86; no action was taken but the patient was scheduled to see a provider.

On 6/27/12 a provider stopped Norvasc and started metoprolol and continued Cozaar and HCTZ.  The MAR for June 2012 verifies that Norvasc was stopped.  The MARs for July through October 2012 did not appear in the medical record but a November 2012 MAR shows that the patient was again on Norvasc 10 mg.

On 4/4/13 a medic saw the patient was a swollen arm.  The blood pressure was 183/125.  A provider changed the time of day that the patient was given medication and ordered immediate only doses of clonidine, Cozaar and HCTZ.  The next day the patient was again seen on an emergency basis for arm swelling.  The blood pressure was 156/96.  The provider decreased the Norvasc to 5 mg.  About 2 weeks later a provider saw the patient and the blood pressure was 140/90; there was no change to therapy.  A one month follow up was scheduled.  However, the patient wasn't seen until 9/19/13.  The blood pressure was 160/110.  The provider increased the Norvasc to 10 mg.

On 10/24/13 a provider saw the patient and the blood pressure was 130/84.  The blood pressure had not been in control since arrival at LSP on 7/21/10 over a 3 year period.

The patient wasn't seen again for over 3 months.  On 2/2/14 there was a referral slip for the patient to be moved "ASAP" to the ATU for possible dehydration.

The patient appeared to arrive in the ATU at 7:51 am and complained to a medic of generalized weakness, "minor" chest pain and shortness of breath.  A provider evaluated the patient and except for noting abdominal discomfort, there was no history.  The provider ordered milk of magnesia and no other testing.

The patient was still in the ATU at 4:30 pm and a capillary blood glucose test read high.  An I-STAT chemistry test showed sodium of 124 (135-145); K 5.6 (3.6-5); $CO_2$ 18 (21-31); glucose > 700 (70-110); BUN 38 (6-20); and creatinine 2.7 (0.5-1.2) with an anion gap of 20.  These test results were indicative of diabetic ketoacidosis.  The patient should have been admitted to a hospital.

2

Instead, a provider gave initial verbal orders for insulin with an order for a urinalysis.  Over the next seven and a half hours the provider gave multiple verbal orders for subcutaneous insulin totaling 135 units of regular insulin with 60 milli-equivalents of potassium 40 of which were intravenous and 20 oral.  The provider also ordered 2 repeat I-STAT chemistry tests.  At 9:15 pm the glucose was still >700 and the creatinine was still 2.3 but the potassium was now 4.6 with a CO2 of 21 and an anion gap of 19.  At just after midnight 2/4/14 the sodium was 136, potassium 3.5, CO2 24 and glucose 535.  The anion gap was 17.

A provider gave verbal orders for more potassium 20 mEq intravenous and 20 mEq orally just after midnight on 2/4/14.  At 2:46 am an I-STAT showed sodium 135, potassium 7.1 (3.6-5); CO2 25; glucose 342; BUN 54; and creatinine 2.1 with an anion gap of 15.  A provider gave a phone order for kayexalate at about 2:15 am.  At 4:05 am a Foley catheter was inserted.  Between midnight and 7 am the patient received 69 units of regular insulin.  The patient was then admitted to the unit 1 infirmary unit.  The last timed note in the ATU was 9:06 am.

An admission record form dated 2/5/14 at 10:54 am documented admission to the infirmary.  A provider wrote an infirmary admission note.  The provider noted only that the patient had no appetite with epigastric discomfort unresponsive to milk of magnesia.  The provider seemed to document that there were no abnormal findings on physical examination.  The provider did not identify recent hyperkalemia as a problem.  The provider documented no assessment or plan on his admission note but did write separate orders that included sliding scale insulin and the patient's blood pressure medication.  A chemistry panel was ordered for every 4 hours.

A note on 2/5/14 that had no time documented that the patient was responding to sliding scale insulin and that the potassium had stabilized.  The provider noted that the blood pressure medications were on hold and the blood pressure had increased to 134/87.  In an un-timed note a provider noted that the patient had a syncopal episodes when he attempted to stand.  The patient regained consciousness and had a rapid respiratory rate without chest pain.  The inmate became pulseless.  CPR failed and the patient was pronounced dead at 10:54 am.

The Medical Summary of the death by Dr. Toce documented that the patient's only problems were hypertension.  The provider documented that "renal abnormalities" were "due to HTN therapy and generally poor HTN control with compliance issues".  The chronic kidney disease was probably due to the hypertension.  The provider noted that the patient was "treated appropriately for DKA" over a 48 hour period.  The provider noted that the patient had syncope the night before but there was no evidence in the medical record of evaluation by a provider for syncope.  The provider noted abnormal respirations and syncope, a brief recovery of consciousness before the patient went into cardiopulmonary arrest.

COMMENTS

COMMENTS

1.    The patient did not have a problem list.  Chronic kidney disease appeared unrecognized for 2 years.
2.   On 11/9/10 the patient had uncontrolled blood pressure.  Blood pressure medication was not increased.

3

3. The patient's blood pressure was not controlled for over 3 years from the time he was admitted to LSP until 10/24/13.

4. On 4/20/11 the patient's blood pressure was 198/100 and the provider noted that this was due to long pill call lines. This was not addressed.

5. On 9/21/11 a provider saw the patient in follow up and the blood pressure was 172/101 but the provider did not adjust medication and ordered a 3 month follow up.

6. On 2/2/12 the patient's blood pressure was elevated and the doctor documented that he would increase medication, but the MAR appears to document that the medication was decreased.

7. On 3/5/12 the blood pressure was elevated and the doctor merely substituted one drug for another that would not be likely to improve blood pressure control.  A 3 month follow up was ordered but the patient should have been seen earlier.

8. On 5/29/12 the patient's blood pressure was elevated but was not addressed.

9. On 6/14/12 the blood pressure was elevated but the doctor took no action because the patient had missed some doses of medication.

10. On 4/5/13 a doctor decreased one of the patient's blood pressure medications when the blood pressure was elevated.  There was no indication for decreasing medication when the blood pressure was elevated.

11. The patient was evaluated in the ATU for weakness and was found to be in diabetic ketoacidosis.  The patient should have been hospitalized but was kept at the prison and managed and did not manage the patient consistent with contemporary standards of care.

12. The death summary did not address the non-standard treatment of ketoacidosis and even stated that the patient was appropriately treated for diabetic ketoacidosis.  The problems with the diabetes management were:
    a. Serum ketones were never obtained.
    b. The patient was not assessed for precipitating events of ketoacidosis including infection or acute major illnesses.
    c. The patient did not have an adequate history or physical examination during his management in the ATU.
    d. The patient was critically ill, but was mostly managed by phone by providers who were not in attendance.
    e.  Inability to quickly obtain necessary diagnostic testing including arterial blood gases, blood and other cultures, prompt diagnostic radiology; round the clock nursing and physician coverage.
    f. Failure to take any history or perform a thorough physical examination by a physician in a critically ill patient.

13. The death was probably not preventable but did have evidence of poor care for the patient's other problems including the diabetic ketoacidosis.  The medical summary failed to identify any problems with care of the patient.


Patient #2

The patient was a 55 year old man.  On 1/21/11 a provider saw the patient and the blood pressure was 170/92.  The rechecked blood pressure was 124/66 and 126/80.  The provider ordered a 6 month follow up with a recheck of blood pressure.  The patient also had abnormal cholesterol as early as 2010.  The

4

patient was evaluated again on 9/30/11 and the blood pressure was 136/82.  The provider ordered a follow up in 3 months with a blood pressure check.  The patient wasn't seen for 6 months.  The blood pressure was 170/92 on 3/30/12 during an annual examination documented on a Patient Data form.  The provider documented that the patient did not want to take blood pressure medication at this time.

On 1/16/13 the LDL cholesterol was 180.  On 4/9/13 an annual examination was done.  A provider documented that the patient didn't want treatment for high blood lipids.  The blood pressure was normal at 120/74.

On 7/19/13 the patient was evaluated in the ATU for a laceration.  The blood pressure was 164/95.  The elevated blood pressure wasn't addressed.

On 8/29/13 a provider documented a blood pressure of 160/88 which is abnormally high.  The only history was that the inmate pulled a groin muscle while lifting boxes.  The only examination involved examination of the abdominal muscle.  Under assessment the provider wrote "HLD-does not want treatment".  This appears to mean hyperlipidemia but the provider did not document what the lipids were or document a discussion with the patient.  The provider did not address the elevated blood pressure ask the patient again if he wanted treatment.

On 9/4/13 the patient was evaluated in the ATU for a rash.  The blood pressure was 156/110.  A provider did not evaluate the patient but the patient was referred for a clinic follow up.  On 9/16/13 a provider saw the patient in follow up.  The blood pressure was 160/84.  The provider didn't identify that the blood pressure was abnormal.  The provider ordered a 4 month follow up.

On 5/2/14 a provider saw the patient for an annual physical and documented on a Patient Data form.  The blood pressure was 142/88.  The provider noted high blood lipids but documented that the patient didn't want treatment.  Even though the blood pressure was elevated, the provider took no action.

On 2/27/15 the patient became unresponsive and sustained a cardiac arrest.  The patient had ventricular fibrillation and received a shock.  The patient was transported to a hospital but died.

The Medical Summary of the inmate's death was written by Dr. Lavespere.  Dr. Lavespere noted that the patient had a prior history of hypertension and hyperlipidemia for which he never took medication.  The description of the cardiac arrest reflected what is in the medical record.   The autopsy showed coronary occlusion with an old myocardial infarct.  There was cardiomegaly with left ventricular hypertrophy.


COMMENTS

1.   The patient had only 1 discussion about his refusal to take blood pressure medication over a 4 year period.  Providers should have had a discussion more than once.
2.   The patient had 3 discussions regarding his not wanting anti-lipid medication over a 5 year period.  Providers should have had this discussion more frequently.
3.   The patient's death might have been preventable if the patient had agreed to take medication.  The patient appeared to have died from coronary artery disease but had refused treatment of his hypertension and high blood lipids.  There could have been a better discussion with the patient about the implications of his decision.  It did not appear the providers were concerned about the patient's refusal.

5

Patient #3

There was no problem list for this patient. The patient had diabetes, peripheral vascular disease, prior coronary bypass surgery, hypertension, and hepatitis C. The patient was evaluated on 11/9/04 at LSU for claudication and was referred for surgery to repair peripheral artery occlusive disease. The patient was housed at DWCC and was apparently lost to follow up. On 10/30/06 a resident provider at the hospital documented that the patient was lost to follow up regarding his aortoiliac work up. The patient had bypass surgery and was discharged from the hospital. The patient had subsequent aortoiliac bypass surgery but detailed hospital records were not present in the medical record. Something happened in the hospital resulting in a long term hospitalization longer than 60 days.

Following this there were no progress notes in the medical record from a hospital note on 1/11/07 until the patient was at LSP on 2/28/08. It wasn't clear what had occurred over this time period. On 2/28/08 a provider at LSP evaluated the patient for an infected stump. There was no history and the only documented examination was that there was granulation tissue. No laboratory tests were addressed and the only assessment was an above knee amputation with a healing wound. A month follow up was scheduled.

A provider saw the patient on 3/27/08. The weight was documented as 157. The blood pressure was 111/66. There was virtually no history only noting that the patient had seen pus from the right stump. The only examination documented was that there was a 1 cm hole without pus. The provider ordered a culture of the wound with a follow up in 2 weeks and a daily dry gauze dressing of the wound. The only issue addressed was the wound.

The 2 week follow up occurred and a provider documented right stump drainage. There was granulation tissue under the packing. The only issue addressed was the wound. A month follow up was scheduled.

A provider saw the patient on 5/8/08. The weight was documented as 150. The blood pressure was 114/69. There was no history. The only notes stated "[right] stump [with] small opening much improved. 0.5 cm opening now with granulation". The only assessment was right stump wound and the only plan was to check the wound in a month. The only issue addressed was the wound.

A provider saw the patient on 6/19/08. The blood pressure was 99/63. The weight was not taken. The only note by the provider was "[right] stump wound closed; well healed". The provider ordered an as needed follow up and did not address any of the patient's other problems.

Dr. Singh the statewide Medical Director discharged the patient from the infirmary on 7/25/08 with a 2 week clinic follow up. There was an order for dressing changes in the ATU but the intervals of dressing changes was not mentioned.

A medic saw the patient on 8/9/08 to change the dressing in the ATU. The medic documented that the patient complained of swelling and tenderness of the right stump. The medic noted that it was possibly infected. A provider also saw the patient but took no history and the only note was "tender fluctuant area at closure of right stump". The provider ordered Bactrim for 10 days. The blood pressure was 175/85 but was not addressed.

6

A provider evaluated the patient in clinic on 8/20/08.  The blood pressure was 127/70.  The note was extremely brief.  There was no history at all.  The note consisted of "R stump wound; pustular drainage noticed cleared; iodoform packing done; dressing [no] complications".  The only assessment was a left stump abscess.  The plan was to continue antibiotics and packing.  The provider did not mention how long the patient had been on antibiotics or when the abscess started.  The patient weight was 101 pounds and the height was 5 foot 8 inches. This is a BMI of 15.4 but the patient had an amputated leg.  The provider did not address any of the patient's other medical conditions.

A provider evaluated the patient in clinic on 9/11/08.  The patient was housed in ASH2.  The blood pressure was high at 176/85.  The provider took virtually no history.  The history was "Bilat AKA; dressing clean on abscess; glu 128 this am; BP perfect on 2 recent visits".  The entire examination consisted of "tiny hole with packing non tender".  The assessment was controlled diabetes, labile hypertension, an abscess and increased cholesterol.  The provider did not note pertinent laboratory data for the elevated cholesterol or recent A1c values.  The only blood sugar evaluated was the value for the current day.  Blood pressure from 2 recent visits was noted.  For all conditions, the provider did not address medications.  The abscess was not thoroughly addressed.  There was no associated plan except to consider adding a diuretic and continuing dressing changes.

A medic evaluated the patient on 10/2/08 for a health request for constipation for 4 days.  The blood pressure was 186/99.  The medic called the state Medical Director and received a phone order for ducolax for a month and a fleet's enema.  The abnormal blood pressure was not addressed.  There was no provider evaluation of the inmate and no referral for follow up.  The patient was charged $3 for the evaluation and $2 for the medication.

A medic evaluated on the patient 10/14/08 emergently in the ATU at 4:43 pm for green discharge around his sacral decubitus.  The medic noted a "musky odor" emanating from the wound.  The blood pressure was 130/92.  The medic took a telephone order for Rocephin and Ciprofloxicin (two antibiotics) for ten days with a follow up clinic appointment.  The medic changed the dressing.

A medic evaluated the patient emergently on 10/15/08 in the ATU for not having had a bowel movement in 4 days.  The medic documented that the patient had chronic constipation.  The blood pressure was 187/97.  A provider documented ordering Metamucil and Milk of Magnesia but took no history and performed no physical examination.  The provider did not address the abnormal blood pressure.

A medic evaluated the patient emergently on 10/28/08 at 1:40 pm for a complaint of abdominal pain.  The blood pressure was 219/109.  The medic noted that the patient had lower abdominal pain for 2days.  The medic noted that the patient had bilateral lower extremity amputations.  The medic noted no rebound tenderness and no guarding.  A provider wrote a brief note.  The provider took no history and performed no physical examination.  There was no assessment or plan except to start an intravenous line, order an abdominal x-ray and order a blood count.  The results of this test were not documented on the note.  There was no indication on the note as to what happened to the patient.  The abnormal blood pressure was not noted.

A provider saw the patient in clinic A on 1/20/09.  The blood pressure was 123/70.  The provider noted bilateral above knee amputations.  The patient complained about swelling and pain in the right stump.  The provider took no other history of the stump pain.  The provider noted no shortness of breath, chest

7

pain or cough.  The only examination of the stump documented only, "stump appears OK".  The provider documented the A1c of 8.6.  The provider increased glyburide but stopped glucophage.

On 1/21/09 the hemoglobin A1c was 9.4 (goal <7); WBC 8.5; hemoglobin 14.9; glucose 184; BUN 16; creatinine 0.9; albumin 3; triglycerides 214 (normal 35-160); cholesterol 145 (normal 140-239).

A wound care form based on an order from 10/15/08 documented that the sacral wound was to be cleaned with saline and covered with a dry dressing.  For February the dressing was changed only 12 times.

There were 4 MARs in the medical record without dates on them.  A MAR for May 2009 documents that the patient failed to receive any medication.

Medical staff wrote a memorandum on 8/12/09 to security that the patient needed to have accu-checks in the ATU daily (5 days a week) for 60 days.  On the same day the patient went to the ATU for a dressing change.  The blood pressure was 168/81 but wasn't addressed.

On 8/26/09 a medic evaluated a patient on an emergent basis for right leg pain for a few weeks.  The medic noted that the stump was red.  A provider evaluated the patient and noted that the patient had pain in the right stump and had a sacral decubitus which was decreased in size.  The provider discontinued dressing changes.  The blood pressure was 197/83 and the medic noted that the patient had not taken his medication that morning.  The blood pressure was not addressed by the provider.

It appears that the MAR for September, 2009 documented that the patient did not show up for 17 doses of Plavix before it was discontinued.  The MAR documented receipt of 30 of 60 prescribed doses of metoprolol and isosorbide for the month.  The other 8 medications do not appear to have been administered.  Insulin was administered 44 (71%) of 62 prescribed doses.  It appeared that for 13 doses, the insulin was documented as given in the wrong row of the MAR.  If these doses are included, the patient received 92% of insulin doses.  This places the inmate at risk of harm.

A provider saw the patient on 9/2/09.  The patient was housed in ASH 2.  The provider noted that the patient was discharged from the unit 2 infirmary 3 weeks ago.  The blood pressure was 199/89 and the weight was 156.  The provider noted pain in the right stump.  The provider noted no chest pain.  The examination was minimal.  The provider noted that the stump had crusting and the stump was cleaned with peroxide.  The provider noted that the A1c was 9.4.  The provider ordered an EKG, and other labs.  The provider decreased the Isordil for unclear reasons.  The provider increased insulin and Lopressor and ordered a follow up in 2 months.  The provider identified all of the patient's medical conditions except the peripheral vascular disease.

On 9/8/09 the EKG showed first degree AV block; inferior myocardial infarction age indeterminate; LVH with repolarization abnormalities and ST-T abnormalities V2-6.

On 10/1/09 at 9:48 pm a medic evaluated the patient for left sided numbness to his jaw.  The medic did not take a history appropriate for angina.  The blood pressure was 200/90.  The patient had no evaluation by a provider.  The medic called a provider who ordered an increase of clonidine and a follow up clinic appointment.  The patient had an inadequate history with respect to his complaint specifically to rule in or rule out acute coronary syndrome.  An EKG was done but was not noted.  An EKG was not

JX-CCH-000098

present for this date.  There was an EKG from 9/8/09 which showed first degree AV block, an old inferior wall myocardial infarction and ST-T wave changes of the lateral leads.

On 10/2/09 laboratory results were: WBC 8.3; hemoglobin 15.1; glucose 142 (normal 70-110); BUN 12 (normal 6-20); creatinine 1 (normal 0.5-1.2); total bilirubin 0.9 (normal 0.2-1); albumin 2.7 (normal3.2-5.5).

On 10/9/09 a provider saw the patient.  The blood pressure was 184/78.  The patient complained of pain in the right stump and the provider also noted that the patient had substernal chest pain the prior week but did not further define the problem.  That was the only history.  The only documented examination was that the stump was healed.  The provider did not address the stump pain.  Labs were noted; the abnormal albumin of 2.7 was not addressed as a problem.  The provider noted that the patient didn't want an A1c at this time.  The provider noted poor blood pressure control and started clonidine.  Although the provider noted angina, the provider did not make any modification to therapy. The provider failed to list peripheral vascular disease as a problem.

The November 2009 MAR recorded administration of 5 of 10 KOP medications but of those 5 medications, the MAR documented that for 3 of the 5 medications, only half of the doses were administered.  For 5 medications the MAR failed to document administration of any medication.  For insulin only 37 of 60 doses were documented as given.  The patient failed to receive 38% of insulin doses mostly at the dinner dose.  It appeared that a CBG was documented 14 times in rows applicable to nitroglycerin and Catapress.  It also appears that single doses of nitroglycerin and Catapress was documented as given immediately below a capillary blood glucose.  This makes it appear that these 14 administrations were for insulin, but they were documented in the wrong area of the MAR.  If these doses are added to the doses of insulin given the patient still would have missed 15% of ordered doses.

The December 2009 MAR recorded administration of no medication except insulin.  For insulin, the MAR shows that there was no documentation on for 23 doses.  Insulin was documented as given for 39 doses.  This demonstrates that the patient did not receive insulin as ordered for 37% of ordered doses.  Notably, it appears that in rows assigned for nitroglycerin that there was documentation of a capillary blood glucose with a notation that nitroglycerin had been administered.  This makes it appear that for these 7 entries, the person making the entry may have documented administration of insulin in the wrong row of the MAR.  If these entries were for insulin the patient would still not have received insulin 26% of the time.

On 12/10/009 a provider saw the patient.  The provider took no history.  The blood pressure was 161/80 which is elevated.  The weight was listed as 150 pounds.  Medication was not listed and the provider did not evaluate for medication side effects or ensure that the patient was receiving medication.  The provider didn't perform a physical examination.  Labs were reviewed.  The provider noted proteinuria; the patient was already on an ace inhibitor.  The blood pressure was elevated and the provider increased Clonidine.  The LDL cholesterol was 105 and not at goal for a diabetic but no changes were made.  The patient was listed as a double amputee but the peripheral vascular disease was not addressed by history.

The MARs for January 2010 document administration of Plavix and Ranitidine on only 3 days.  The remaining days had no entries.  None of the other 10 medications (Metoprolol, Isordil, HCTZ,

JX-CCH-000099

Simvastatin, Tegretol, Norvasc, Glyburide, Enalapril, Docusate, and aspirin) appeared to be administered.  For January nurses documented giving insulin only until January 28.

The capillary blood glucose log for January 2010 shows that even though the patient was an insulin dependent diabetic, the CBGs were tested only 18 times in January which is less than once a day.  Typically, an insulin dependent diabetic is recommended to test their blood glucose multiple times a day.

The MARs for February 2010 do not document administration of any medication except insulin.  For insulin, on 8 days, nurses documented that the patient was absent for both am and pm doses of insulin.  On 3 days, there was no documentation of administration.

On 2/2/10 the lab reported hemoglobin A1c 7.1 (goal < 7).

On 2/23/10 a provider saw the patient in clinic.  The weight was 125.  The blood pressure was 151/86.  The problems were listed as bilateral amputee, hypertension, coronary artery disease, high blood lipids and diabetes.  The peripheral vascular disease wasn't listed as a problem.  The only history the provider documented was no chest pain and no redness bilateral stumps.  The A1c was documented as 7.1 and the creatinine 1.  The stump was documented as "WNL" without discharge.  The albumin was 2.7 but not addressed.  The provider assessed that the stump was "healed".  The provider did not make an assessment of the elevated blood pressure, diabetes, or peripheral vascular disease.   The provider continued existing medications.  The provider ordered follow up in 6 months.  This was not

The March 2010 MAR recorded no administration of medication except for insulin.  For insulin, it appears that the patient was absent 7 times.  There was no documentation for 11 doses.  There was documentation that 44 doses of medication were given.  This demonstrates that the patient did not receive insulin as ordered for 29 % of doses.

On 3/12/10 a medic evaluated the patient emergently in the ATU for pain and edema of his right hand and forearm and left leg stump.  The blood pressure was 173/94.  A provider did not evaluate the patient but ordered Motrin.  The blood pressure and edema of 3 areas was not addressed.

The April 2010 MAR recorded no administration of medication except insulin which was documented as refused 4 times, had no documentation at all 17 times, was listed as absent 6 times, and administration of insulin 33 times.  Insulin was missed or lacked documentation 45% of times.  This is extremely poor documentation of administration of medication and significant deficiency in ensuring medication administration.  Many of these medications were critical medications, including insulin.

On 4/3/10 a medic evaluated the patient for "UTI and poss kidney stones".  The blood pressure was 159/74.  A provider ordered toradol and norflex without evaluation of the patient.  The elevated blood pressure was not addressed.

On 4/4/10 a medic evaluated the patient emergently for having a potential seizure.  The medic documented that patient was found in his wheelchair combative.  The patient was confused.  The patient was brought to the ATU.  The blood pressure was 211/117.  A provider evaluated the patient but took no history, performed no physical examination, made no assessment and ordered immediate Clonidine and Ciprofloxicin based on a urine test with blood and protein in the urine.

10

JX-CCH-000100

On 4/13/10 a medic saw the patient in the ATU for leg pain.  The blood pressure was 173/93.  A provider evaluated the patient and took a history of sacral pain.  There was no other history.  The only examination documented a stage 1 sacral decubitus.  The provider ordered a lumbosacral x-ray but no antibiotic.  The provider did not address the elevated blood pressure.

On 4/23/10 a provider saw the patient at 7 am.  The only history was that the patient noted stump pain.  The stump was painful and had eschar but the extent wasn't documented.  The provider diagnosed stump cellulitis on the left but did not address any of the patient's other conditions.  The provider ordered Ciprofloxicin and Rifampin for a month.  The provider also ordered Keppra for a month but did not include any assessment for which this drug was indicated.  The medication was not assessed.

On 4/30/10, a medic saw the patient in the ATU emergently for leg pain.  The blood pressure was 165/93.  A provider saw the patient and noted that the left distal stump was ecchymotic, cold and tender to the groin.  The provider started gave a one-time-only dose of intravenous Ciprofloxicin and intramuscular Toradol.  No follow up was ordered.

The multiple May 2010 MAR documents show that dressings ordered to the stump twice a day for a month were stopped a day after they were started.  There was no additional orders for dressing changes.  Rochephin (an antibiotic) was ordered for 5 days from 5/12 to 5/17/10 every 12 hours for a total of 12 doses.  The order was canceled on 5/13/10 and the patient received 2 doses.  The patient received ordered Vancomycin from 5/13/10 until 5/20/10 as ordered every 12 hours.  The patient had an order for Clonidine "as needed" for 2 weeks for systolic blood pressure > 160.  Potassium was ordered 5/15/10 for 30 days.  The documentation was that the patient refused medication 3 days.  Keppra was to have been given twice a day for 30 days.  The MAR was initiated on the infirmary starting 5/12/10.  Nurses recorded the patient refusing this medication 16 times; received it 6 times with no documentation 14 times between 5/12/10 to 5/31/10.  Amlodipine and aspirin were refused once and given 18 times with no misses.  Clopidogrel was refused 3 times and given 16 times.  The patient refused Enalapril and Glyburide once.  There was no documentation of giving these medications 3 times and the patient received these medications 34 times.  The patient refused Hydrochlorothiazide 3 times and received it 16 times.  The patient refused Isosorbide, Metoprolol and Ranitidine once, had no documentation on 3 occasions of offering medication and gave medication 34 times.  Simvastatin was refused once, given 15 times and had no documentation 3 times.  This was on an infirmary unit with the highest level of nursing care.

On 5/7/10 a medic evaluated the patient in the ATU at 7:16 pm for a painful right stump.  The blood pressure was 189/105 but was not addressed.  The medic called a provider who stopped Ciprofloxicin and starting Bactrim.  The provider referred to surgery clinic as soon as possible.

On 5/9/10 a provider ordered a surgery evaluation at LSP as soon as possible to evaluate the patient's leg.  This note was not in chronological order in the medical record as were many other notes not in chronological order.

On 5/11/10 a medic evaluated the patient in the ATU.  The patient was currently housed in ASH 2.  The blood pressure was 198/103.  The patient complained of leg pain.  The medic documented that the patient complained of redness and swelling for a month.  A provider saw the patient but took no history.  There was no physical examination.  The provider ordered Rocephin as a stat dose followed by oral Bactrim and Rifampin for 10 days.  The provider also ordered daily dressing changes.

11

On 5/12/10 the patient was seen in the ATU for cellulitis of the left stump.  The blood pressure was 179/93.  A provider saw the patient but did no history.  The entire note was "cellulitis L AKA stump. Admit to unit 1 for [treatment]".  The blood pressure was not addressed.  In a separate referral form, a provider referred to a vascular surgery consultant documenting that the patient had left stump cellulitis with an eschar that appeared ischemic.  There was no pulse.

On 5/13/10 lab results were: sodium 138; potassium 3.4; glucose 58 (normal 70-110); BUN 7; creatinine 1; total bilirubin 1.1 (normal 0.2-1); albumin 2.4 (normal 3.2-5.5); WBC 7.1; hemoglobin 14.8.

On 5/13/10 a provider saw the patient and noted that the patient had a stump infection for a month. The provider noted that the patient "took a few pills of" Ciprofloxicin, Levaquin, Bactrim and Rifampin. The provider noted that the stump was purple with surrounding erythema and induration that was cool to touch.  The provider started Rocephin and Vancomycin.

On 5/14/10 a NP saw the patient.  The blood pressure was 197/95.  The NP noted that an ASAP referral to vascular surgery was made.  The NP noted that the stump was ecchymotic without drainage.  The NP planned to continue the Vancomycin.  The NP ordered sliding scale insulin and potassium for 30 days.

On 5/15/10 a provider ordered to stop the wet to dry dressing and to leave the left stump open to air.

On 5/17/10 a lab result showed vancomycin peak 33.1 (normal 25-40).

On 5/18/10 lab results showed WBC 7.9; hemoglobin 14.6; sodium 138; potassium 3.7; glucose 145; BUN 9; creatinine 0.8; total bilirubin 1.2; albumin 2.5 and vancomycin trough 18.1 (normal 10-15).

On 5/18/10 a NP saw the patient and noted that the stump was improving daily.  However, there was no documentation reflecting why the wound was improving.  The wound had not been thoroughly examined or explored.  The sacral decubitus and none of the other medical conditions were evaluated.

On 5/19/10 a NP saw the patient and noted the vancomycin peak and trough but didn't address the elevated trough level.  The NP didn't address the patient's weight or the dose of vancomycin.

On 5/20/10 a medic documented a note in the ATU at 6:40 pm stating that the patient was short of breath and coughing up phlegm.  The medic noted that the patient complained of an infected stump. The medic took a verbal order from a provider for intravenous Ciprofloxicin every 12 hours for 4 days. There was no provider evaluation of the patient.

On 5/20/10 a provider ordered Ciprofloxicin by IV for 4 days.

On 5/21/10 lab results showed WBC 8.2; hemoglobin 14.2; BUN 10; creatinine 1.1; CK 245 (normal 22-269).

On 5/21/10 chest x-ray results showed slight improvement in heart failure since the x-ray of 5/17/10. Findings were not given.  Some of this report is illegible.

On 5/21/10 the patient was moved from unit 1 infirmary to the ATU for shortness of breath and increased blood pressure. The blood pressure was 216/108 with a respiratory rate of 35.  The temperature was 97.4.  The medic received a phone order from a provider to give 60 mg of Lasix, clonidine, and Nitropatch.  The patient arrived in the ATU at 4:26 am.  The last notation was at 6:10 am on the first ATU note but there was no disposition so it wasn't clear what happened to the patient.  The

JX-CCH-000102

second ATU sheet documented that the last timed entry was 7:15 am. There was no disposition so it wasn't clear what happened to the patient.

Separately, on the same day a provider ordered Bumex by IV for 5 days along with a chest x-ray. Also there was another separate provider order to stop intravenous saline and to repeat the chest x-ray.

On 5/22/10 a chest x-ray report documented slight improvement in the lungs. Some of this report is illegible.

On 5/23/10 a chest x-ray documented worsening of heart failure with bilateral pleural effusions. Some of this report is illegible.

On 5/24/10 a provider ordered to stop Ciprofloxicin and started Bactrim and Clonidine.

On 5/24/10 a provider noted that the patient was in the ER on 5/20/10 for shortness of breath and elevated blood pressure. The patient had pain in his testicle. On physical examination the provider noted atrophic and tender testicle without visible infection. The stump was black. The provider noted a sacral decubitus but failed to describe it thoroughly. Provider wrote for Vancomycin and then changed to oral Bactrim and Ciprofloxicin.

On 5/25/10 laboratory results showed WBC 11.7 (normal 4.5-10.5); hemoglobin 16.4 (normal11-18); glucose 198; sodium 138; potassium 4.9; BUN 29; creatinine 2.1; total bilirubin 0.9; albumin 2.9.

On 5/25/10 a NP saw the patient. The blood pressure was 171/94 with a pulse of 50. The NP documented that the left stump had a dark area of 5-6 cm in diameter. The patient fell from his bed while sleeping. The NP noted no hematoma. The NP did not document modifying blood pressure medication in the note but in a separate order a NP ordered Clonidine 0.2 mg for a year.

On 5/25/10 a provider noted that the patient had constant pain in the left stump which was black. The provider ordered a culture.

On 5/26/10 a NP noted lab results including creatinine of 2.1; BUN 29. The stump was noted to be the same. The NP still failed to assess for pulse, temperature of the stump, and extent of the infection.

On 5/27/10 laboratory results reported sodium 127; potassium 6 (normal 3.6-5); glucose 169; BUN 51; creatinine 2.5; total bilirubin 1.6 (normal 0.2-1); albumin 2.8 (normal 3.2-5.5).

On 5/27/10 a provider saw the patient. The vital signs were not noted. The provider wrote that the left AKA stump was necrotic and was "reportedly" worsening. The provider noted he would coordinate a vascular clinic appointment for the next Thursday. He wrote a referral for left stump cellulitis and left stump ischemia with worsening necrosis. The provider ordered a surgery consult Tuesday for the stump wound.

On 5/27/10 a NP saw the patient and noted that the wound was about 6 cm in diameter but the NP did not determine if there was an extension of the necrotic tissue. Aside from the stump, the NP did not evaluate whether there was any extension of the necrotic tissue.

On 5/27/10 a NP ordered by phone a Foley catheter, Kayexalate, and blood tests.

On 5/28/10 the laboratory reported results of sodium 135; glucose156; BUN 42; creatinine 2.1.

JX-CCH-000103

On 5/28/10 a NP noted that the glucose was 198 and noted that the scrotum appeared "scalded" and excoriated and was tender to touch.  The patient had a Foley catheter.  The NP documented consideration to send the patient to EKL.  A chemistry panel was ordered.  Later on 5/28/10 the patient was sent to EKL ER for recent pulmonary edema and ischemia.  The patient returned with an order to return to vascular clinic on 6/3/10.  The patient arrived at EKL at 2:30 pm.  The patient returned to LSP at 6:19 pm.  The report of this visit was not in the medical record.

On 5/28/10 a provider ordered that the groin wound be open to air and to put talc powder as needed.

Separately, on 5/28/10 a NP ordered to discontinue the Foley catheter, and ordered Diflucan 200 mg for one dose along with Nystatin cream to a rash.

On 5/31/10 a provider ordered to hold clonidine for a systolic blood pressure below 110.

On 6/1/10 the laboratory reported results of WBC 25.1; hemoglobin 12.6; sodium 132 (normal 135-145); potassium 6.7 (normal 3.6-5); BUN 73 (normal 6-20); creatinine 5.8 (normal 0.5-1.2); albumin 2 (normal3.2-5.5).  An EKG was done and showed sinus bradycardia -rate 60, first degree AV block; non-specific intraventricular conduction delay; inferior myocardial infarction with posterior extension-age indeterminate; nonspecific STT wave changes in V2-5.

On 6/1/10 a Nursing Flow Sheet documented that the patient had pink skin that was warm and dry with a lesion on the leg and a rash on the scrotum.  The patient had no dressing on.  This was a significant underestimate of the patient's condition.  The patient was documented as confused.  The patient's sacral decubitus was not assessed.

On 6/1/10 a NP saw the patient.  The blood pressure was 81/50 with a pulse of 43.  The NP documented that the stump remained dark and necrotic.  The NP documented that the patient was scheduled for vascular clinic on 6/3/10.  The patient appeared in shock and should have been transported to a hospital.  Bactrim was discontinued and Rocephin was started, but the patient went to the hospital.

On 6/1/10 the patient was sent emergently to EKL hospital.  The ER report documents that the patient arrived emergently in acute renal failure, hypotension, and altered mental status.   The potassium was 6.7 according to the prison.  The note documented that the patient was recently seen at EKL for urosepsis and infected L AKA stump.  The patient was admitted to the hospital.  The patient had rhabdomyolysis due to tissue ischemia and was in septic shock.  The patient ultimately underwent surgery.  The surgeon described the wounds as follows:  the patient had phimosis at the glans of the penis.  The entire scrotum and penis was necrotic. The area around the glans was necrotic with portions of dry gangrene.  An eschar of the stump was removed.  The underlying tissue was nonviable and were not bleeding.  An incision was made 4-5 cm above the area of nonviable tissue and there was still no bleeding.  An incision was made below the crease of the thigh and there was also no bleeding.  The perineum was then incised and it also did not bleed. The entire bilateral lower extremities and perineal tissues were nonviable.  Further debridement was deemed futile and surgery was ended.

On 6/5/10 the patient was transferred to LSP as a hospice patient.  He expressed this desire to a provider at the hospital. The patient was discharged on Zosyn by IV every 8 hours; Lopressor, Heparin; Pepcid; and potassium.  The patient was admitted to unit 1 infirmary upon return and started on recommended medication.  A provider also ordered a Foley catheter.

14

On 6/6/10 a provider wrote an order for Solumedrol 125 mg by IV with Decadron 75 cc per hour for 30 days.

On 6/7/10 laboratory results reported WBC 22.4 (normal 4.5-10.5); hemoglobin 10.0 (normal 11-18); glucose 344 (normal 70-110); BUN 47 (normal 6-20); creatinine 1.8 (normal0.5-1.20); T bilirubin 2.2 (normal 0.2-1).

On 6/7/10 a provider infirmary note documented that the patient was less responsive.  The blood pressure was 171/95.  The provider documented that further treatment was futile and that the patient was made DNR.  The provider discontinued Solumedrol and Ativan and started Morphine by IV.

On 6/10/10 a provider infirmary note documented that the patient was sleepy.  The provider noted no evidence for gangrene.

On 6/11/10 a Nursing Flow Sheet documented that the patient's skin was warm, dusky even though the patient's stump was necrotic.  The patient was again described as not in pain. The wound care flow sheet was not filled out and appeared to not be addressed.

On 6/12/10 a 24 Hour Nursing Flow Sheet documented under pain that the patient denied pain even though the patient had stump pain for a long time.  The stump was not evaluated by nurses.  The wound care boxes were not filled out even though the patient was admitted for stump cellulitis.

On 6/13/10 at 12:21 pm medics responded to the inmate who had agonal respirations and then went into cardiac arrest.  The patient was noted to be in respiratory arrest at 12:23; cardiac arrest at 12:24 and CPR was initiated at 12:24.  At 12:35 CPR was discontinued.

On 6/14/10 Dr. Guy Williams wrote a medical summary of the death that documented that the patient had a history of diabetes, prior myocardial infarction and peripheral vascular disease with prior amputations had intermittent infections of both stumps for several years.  The summary documents that on May 12, 2010 the patient was on intravenous antibiotics with improvement of the infection.  The summary documents that on 5/20/10 the patient was treated for acute pulmonary edema due to uncontrolled hypertension.  The condition was said to have resolved.  The summary states that the left stump became worse and the patient developed 'progressive' renal failure acidosis and hyperkalemia and then on 6/1/10 the patient was sent to a hospital "where they determined that both legs were necrotic and non-viable, with no surgical remedy possible.  The renal failure was due to rhabdomyolysis and muscle breakdown".  The summary then noted that "According to EKL notes, the patient argued with their plan [hospice care] but unfortunately was not alert enough to sign a DNR upon his return to LSP.  He was made comfortable with narcotics and sedatives".

COMMENTS

1.  The patient was lost to follow up for 2 years although the patient was not at LSP.
2.  There was over a year gap in medical records from 1/11/07 until 2/28/08.
3.  From February 2008 until the patient's death in June of 2010, the patient appeared to have limb ischemia and was inadequately managed based on
    a.  Ongoing infection of his amputated stump.  The patient should have been followed regularly by a vascular surgeon but this did not occur.

JX-CCH-000105

    b. Providers did not monitor the patient's condition with respect to taking a history of claudication or evaluating for that with vascular ultrasounds of his remaining legs. Over the 2 year period he had no vascular ultrasound despite significant PVD.

    c. Failure to manage the risk factors for PVD including:

        i. Diabetes. The patient had poorly controlled diabetes from 2008 until February of 2010 when he had a hemoglobin A1c of 7.1. During this time the A1c values were 8.6 in August of 2008 and 9.4 in January of 2009. After the 9.4 value there was no follow up A1c for a year. Over the more than 2 year period from February 2008 until June of 2010, the medical record has few capillary blood glucose tests consistent with the expectation of testing for persons on insulin. The MAR records show multiple episodes of missing insulin treatment with no subsequent counseling or management of this by providers.

        ii. There were 23 abnormally high blood pressure readings from 8/11/08 until 6/1//10. In only 6 of these episodes did providers add medication to improve control of blood pressure. In 1 of these 6 episodes the medication was a single additional dose only. Because of the failure to properly monitor and manage the blood pressure the patient had uncontrolled hypertension for most of the 2 year period.

        iii. The patient did not have a history taken at interval provider visits whether he was smoking and if he was smoking there was no apparent effort to stop.

        iv. The LDL cholesterol appeared to be assessed only once on 10/2/09. The LDL was 105 which is not at goal for a person with diabetes.

        v. The patient was on medications for hypertension, high blood lipids and peripheral vascular disease (Plavix). Samples of MARs do not verify that the patient consistently received medication for these conditions including anti-lipid drugs and anti-platelet therapy.

4. Beginning in April 2010 the patient showed signs of critical ischemia including confusion, extremely high blood pressure and signs of leg infection but failed to have an appropriate evaluation for this condition. On 4/30/10 the stump was ecchymotic, cold and tender. The patient should have been hospitalized but this did not occur until 6/1/10. The delay in promptly evaluating and treating this patient's condition at a higher level of care (hospital) appeared to contribute to the patient's death. The description of the extent of necrotic and dead tissue indicates a significantly delayed referral to vascular surgery.

5. The death was preventable. Providers failed to manage the patient's serious medical conditions consistent with contemporary standards of care and placed the patient at risk of harm ultimately leading to his death. The medical summary and death review failed to identify any problems with care of this patient even though there were multiple problems.

Patient #4

On 7/6/07 the patient had LDL of 121. The 67 year old patient had a history of high blood pressure and had indication for moderate to high dose of a statin drug but this did not occur.

On 3/26/08 a provider clinic visit documents that the patient's blood pressure was 154/126 and notes that on 2/22/08 the blood pressure was 174/118. The provider took no history and performed no physical examination. The provider assessed hypertension in poor control. The only plan was to replace

16

Vasotec with Diovan which are drugs in the same class and unlikely to have a significant effect. The provider also ordered blood pressure checks twice weekly for a month and a month follow up.

On 7/31/08 laboratory results show cholesterol 181; LDL 128; HDL 36.  This was the last cholesterol test before the patient's death. Given the patient's blood pressure age and lipids current recommendations include using a moderate to high dose of a statin drug.

On 6/11/09 a provider saw the patient.  The blood pressure was 200/100.  The provider took no history and did not perform a physical examination.  The only documentation noted a 5 cm neck mass.  The provider referred the patient to medicine clinic, referred for a CT scan of the neck and ordered follow up in 2 months.  The elevated blood pressure was not addressed.

On 8/4/09 a CT of the neck partially visualized the apices of the lungs and showed focal bronchiectasis and bilateral emphysematous changes. The bronchiectasis and emphysema were not identified by providers.

On 8/13/09 a surgeon consultant evaluated the patient for a lipoma and noted that it required removal under general anesthesia.  The surgeon noted that the patient had angina every 3 days relieved by rest and nitroglycerin.  The surgeon requested clearance for general anesthesia.  The angina had not been identified by LSP providers during clinic visits due to lack of history.

9/2/09 a provider saw the patient for surgical clearance for lipoma removal.  The patient gave a history of smoking.  The provider noted that the patient had no chest pain with exertion but had chest tightness frequently that was relieved by Nitroglycerin and could do 110 pushups without pain.  The blood pressure was 162/84 which is abnormally high.  The physical examination was minimal.  The provider stopped Vasotec and started clonidine at a low dose.  Chest tightness in an elderly person with high blood lipids and hypertension is an indication for stress testing independent of the clearance for surgery.

On 12/3/10 a provider saw the patient.  The blood pressure was 102/78.  The patient was on the Hawk unit.  The provider took no history of the patient's medical conditions except for the lipoma.  The provider noted that the CT scan showed a fatty density consistent with lipoma.  The provider did not note the CT scan report indicating emphysema and bronchiectasis and did not note the angina identified by the provider on 9/2/09.  The provider referred for removal of the lipoma.

On 1/8/10 a provider evaluated the patient apparently for an annual physical.  No history was taken except to list hypertension, atypical chest pain, allergic rhinitis, and GERD as problems.  The elevated LDL cholesterol was not documented as a problem and it was not clear how atypical chest pain was diagnosed as there is no evidence of a patient history by a provider in the record.  All examination boxes were checked normal except for a neck lipoma.  The blood pressure was 148/84 which was documented as "stable" but was high.  The patient was continued on all current medications except the beta-blocker (anti-hypertensive medication) was lowered due to a slow heart rate of 46.  The patient's blood pressure was elevated but the provider decreased the blood pressure medication.  Anti-lipid medication was not added.

The MAR for February of 2010 documents that the patient was not given 22 (26%) of 84 doses of Catapres; 8 (29%) of 28 doses of HCTZ and Norvasc; and 9 (16%) of 56 doses of Atenolol.  The MAR documents that the patient's housing location was D Hawk 2/R.

JX-CCH-000107

The March 2010 MAR documents that the patient was given all 31 doses of Prilosec.  But the patient was not given 19 (20%) of 93 doses of Catapres; 14 (45%) of 31 doses of HCTZ and Norvasc; and 10 (16%) of 62 doses of Atenolol.  The MAR had no documentation on the days that the patient did not receive medication.  This is a significant deficiency of medication administration.  The MAR documents that the patient's housing location was RC/CCR Lower A.

On 3/25/10 a provider clinic note documented that the blood pressure was 166/93 which is abnormally high.  The provider took no history and performed no physical examination.  The patient was apparently being seen for clearance for lipoma removal.  The provider documented that the patient "went for surg but BP too low!"  The provider advised against removal of the lipoma.  The elevated blood pressure was not addressed.

The April MAR documents that the patient was not given 29 (32%) of 90 doses of Catapres for the month.  Notably, documentation on the MAR shows that the initial of the person administering medication on 14 days covered both the evening and night doses implying that the patient was given two doses of medication at the evening dose.  This would be improper medication administration if it occurred.  The MAR documents that the patient was not given 12 (40%) of 30 doses of HCTZ; 19 (63%) of 30 doses of Norvasc; and 14 (23%) of 60 doses of Atenolol.  The MAR had no documentation on the days that the patient did not receive medication.  The MAR documents that the patient's housing location was RC/CCR Lower A which is the reception center which is now closed.

On 4/22/10 at 12:15 pm the patient declared an emergency for headache and elevated blood pressure of 160/100.  The patient stated he was not receiving his medication.  A provider did not evaluate the patient.  The medic evaluating the patient documented that clonidine would be in and he could get the medication at the next pill call.  Headache and elevated blood pressure needs to be evaluated by a provider.

On 4/26/10 the patient self-declared an emergency for feeling weak and dizzy with chest pain.  He did not have shortness of breath.  The patient was sent by a medic to the ATU.  The blood pressure was 178/116.  In the ATU the blood pressure was 197/120 and the temperature 98.5.  The patient complained of headache and chest pain.  There was no provider history or physical examination.  A provider ordered immediate doses of clonidine, ibuprofen and nitroglycerin and recommended no heavy lifting for 2 weeks.  An EKG was not done.  This is a significant departure from standard of care as chest pain with elevated blood pressure needs to be evaluated by a provider and if no provider was available, the patient should have been sent to an emergency room.

The May 2010 MAR for the time period before 5/10/10 when the patient was admitted to the infirmary shows that the patient missed 3 (33%) of 9 doses of HCTZ and Amlodipine; 3 (17%) of 18 doses of Atenolol; and 9 (33%) of 27 doses of Catapres.  The patient was housed on the main prison CBA unit.

On 5/5/10 a chest x-ray reported bilateral infiltrates in both bases specifically the lingula and right middle lobe.

On 5/5/10 at 11:55am, medics evaluated the patient in the ATU for shortness of breath.  The temperature was 100.4 and the oxygen saturation was 87% on room air.  An x-ray showed bibasilar pneumonia.  A provider did not evaluate the patient and did not perform a history or physical examination.  A provider ordered Rocephin as a one-time dose along with oral Ciprofloxicin and Bactrim

JX-CCH-000108

for 2 weeks along with cough syrup and a provider follow up in 2 weeks!  The patient did not apparently receive the oral antibiotics.

On 5/8/10 at 8:54 am medics evaluated the patient who was housed in the CBD unit.  The patient had been diagnosed with pneumonia the prior Tuesday (which was 5/4/10- 4 days previous).  The medic documented that the patient hadn't received any medication.  The patient complained of dizziness and had decreased breath sounds.  The blood pressure was 146/87; respiratory rate of 26; temperature of 100.8 and oxygen saturation of 90 but on 4 liters of oxygen.  The provider's history was extremely brief and only documented shortness of breath, chest pain and no sputum.  There was no physical examination.  The chest x-ray was documented as worse than on 5/5/10.  The provider ordered Azithromycin and Levaquin immediately along with Clonidine, a blood pressure medication, immediately.  The provider admitted the patient to the infirmary for bilateral pneumonia.  Vital signs were ordered twice a day for 3 days.  A provider also ordered a blood count and a chemistry panel and to hold the Clonidine for blood pressure < 110.

On 5/8/10 a provider wrote an admission note to the infirmary.  The history was that the patient had shortness of breath and cough for 5 days with an x-ray showing bi-basilar pneumonia.  The provider noted that the patient had received a dose of Rocephin previously but failed to receive ordered antibiotics and that the x-ray was now worse.  The temperature was 100.8 but an oxygen saturation was not done.

On 5/9/10 a provider noted that the patient had shortness of breath with exertion but had no sputum production.  There was no other history or physical examination except to note blood pressure of 109/64.

On 5/9/10 nurses noted vitals of blood pressure of 84/54; pulse of 60; temperature of 97; and respirations of 18 with oxygen saturation of 100 % on 3 liters of oxygen in the evening.  The morning vitals on the graphic record were normal.  The patient had hypotension for which the patient should have had an immediate provider evaluation.

On 5/10/10 the laboratory reported WBC 18.5 with left shift; sodium 134; $CO_2$ 24; BUN 13; creatinine 1.1; albumin 2.9 (normal 3.2-5.5).  This supports a systemic infection.

On 5/10/10 a provider noted that the blood pressure was 111/60 and that the oxygen saturation was 86% on room air and 92% on oxygen.  The only history was that the patient had shortness of breath with walking 10 feet to the bathroom.  The only examination was to note that the lungs were clear.  There was no assessment or plan documented on the progress note.  In a separate order a provider ordered to stop Clonidine.  The oxygen saturation with two lobe pneumonia and elevated white count are indications for admission to a hospital.

On 5/10/10 nurses document oxygen saturation on 2 liters of 94 with BP 111/70; pulse 55; and respirations 20 with temperature of 97.4.  Nurses obtained vitals twice based on the graphic record.

On 5/11/10 a provider noted that the patient was still short of breath and that the oxygen saturation was decreased- but the provider didn't document the oxygen saturation value.  The provider noted that the patient had a productive cough.  The only examination was that breath sounds were decreased but there were no rales.  The diagnosis was COPD with bilateral pneumonia and the plan was to continue Levaquin.

19

JX-CCH-000109

On 5/11/10 nurses documented oxygen saturation of 100% on 3 liters of oxygen and recorded vitals as VSS [meaning vital signs stable] without documenting the actual results.  Nurses obtained vitals twice based on the graphic record.  The blood pressure was 90/60 in the evening and 98/67 in the day.  These are low blood pressures that should have been evaluated by a provider which did not happen based on documentation in the provider records.

On 5/12/10 a provider saw the patient who had shortness of breath and chest pain on exertion and was not eating.  The provider noted that the patient had atypical chest pain (which did not appear accurate because there was no history to support this diagnosis).  The patient had decreased bowel sounds, no chest tenderness and a soft abdomen.  The provider ordered an x-ray and EKG.  The flat and erect views of the abdomen on x-ray showed moderate retained feces but no bowel gas.  A chest x-ray showed some improvement of the bilateral infiltrates from the 5/8/10 film.  Without documenting this on the note the provider ordered that the patient be checked for impaction.  It is not clear who was supposed to do this.

On 5/13/10 nurses obtained vitals once based on the graphic record.

On 5/14/10 a provider noted that the patient "feels bad".  The patient had shortness of breath and pain in the front and back of the chest.  There was no physical examination, assessment or plan accompanying this note.  The provider ordered Albuterol 4 times a day for 2 weeks; Cardura every night for 90 days and a blood count and chemistry test.  Nurses obtained vitals once on 5/14/10 based on the graphic record.  A nurse noted that the patient was short of breath and wanted to see the provider.

On 5/15/10 a chest x-ray report noted that the technique of the x-ray was considerably different than previous films but there did appear to be improvement of the infiltrates but noted that the technique was "considerably different".

On 5/15/10 at 6:40 am medics evaluated the patient in the ATU for agitation, restlessness and shortness of breath.  The patient was using accessory muscles to breath which is a significant sign of life-threatening diminished oxygen capacity.  The patient repeatedly said he was going to die.  The patient also had abdominal pain and was "rocking back and forth from pain".  The patient was described as "moaning that his entire chest is hurting and he can't breathe".  The patient was not evaluated by a provider.  Instead medics managed the patient apparently by phone orders from providers.  The initial blood pressure was 172/82; pulse 102, temperature 97.1 and respiratory rate of 22 with an oxygen saturation of 89% on oxygen.  The patient was given nebulization treatments, magnesium sulfate, Tigan, and Phenergan.  An abdominal x-ray was normal.  There was no provider evaluation and no disposition on the Emergency Medical Report but the report documented that there was an attached sheet which was not in the medical record.

On 5/15/10 nursing notes document shortness of breath and an oxygen saturation of 80%.  The nurse documented that the patient was "very anxious".  The temperature was not taken.  BP was 120/60 and pulse 65.  The graphic sheet vitals documented a respiratory rate of 32 with an oxygen saturation of 77%.  Vitals were done once this day.  These are life threatening values.  The patient needed immediate hospitalization.

Nursing notes at 6 pm on 5/16/10 document that the patient was short of breath and that the oxygen mask had fallen on the floor and that the oxygen saturation was 89%.  The patient was not evaluated

20

again until 9:35 pm when he was unresponsive.  PM vitals on the graphic sheet showed blood pressure of 90/60.  Vitals were done twice this day. On 5/16/10 at 9:35 pm the patient was being brought by stretcher to the ATU in cardiac arrest.  After being given epinepherine the patient briefly regained pulse and respirations but then went into ventricular fibrillation after which he was defibrillated at 21:48.  The patient was pronounced dead at 22:06.

On 5/18/10 a nurse practitioner wrote a medical summary of the death.  The summary documented that on 5/5/10 the patient had cough and shortness of breath and was diagnosed with bibasilar pneumonia and was started on antibiotics.  The Np documented that on 5/8/10 the shortness of breath continued along with development of a fever with a worsening chest x-ray and the patient was started on intravenous antibiotics and admitted to the infirmary.

The NP documented that on 5/10/10 the white count was 18.5 with dyspnea on exertion.  The NP documented that on 5/14/10 the NP received a report that the patient was feeling bad.

The NP documented that on 5/15/10 the patient was evaluated in the ATU for abdominal pain and shortness of breath and Dr. Collins read the x-ray films.  The NP documented that the patient complained of pain in his abdomen and chest and was treated with nebulization and morphine for pain.  The NP documented that a Foley catheter was inserted yielding 1000 cc of urine.  The NP documented that the patient was re-admitted to unit 1 infirmary with diagnoses of "pleuritic pain of pancreatitis, abdominal aneurysm etc."  Notably, these diagnoses were not present in the medical record notes.

The NP then documented that on 5/16/10 the patient was unresponsive and CPR was started.  The NP does not document that the patient died.

COMMENTS

1.  Given the patient's age, blood pressure, and lipids current recommendations are that the patient had a high risk of cardiovascular disease and should have been on a moderate to high dose of a statin drug which did not happen.  There was a failure to follow up on the patient's high LDL cholesterol level.
2.  The patient had elevated blood pressure from March of 2008 until May of 2010 which was not controlled.  Efforts to control blood pressure were inadequate including only changing medications and on 1 occasion giving a stat dose of clonidine. The elevated blood pressure placed the patient at risk of harm.
3.  The patient had a CT scan on 8/4/09 that incidentally noted bronchiectasis and emphysema which was never acknowledge or evaluated further.
4.  On 4/26/10 the patient experienced high blood pressure and chest pain with shortness of breath but was only evaluated by a medic.  This was a significant departure from standard of care.  The patient needed referral to a provider for an EKG and provider evaluation.
5.  On 5/5/10 the patient had temperature of 100.4, oxygen saturation of 87%, and bibasilar pneumonia.  Given the patient's age and oxygen saturation, the pneumonia severity index was 79 which is class III and warrants short term observation in a hospital.  The medical staff did not use this index and appeared not to know how to manage this critically ill patient.  Instead of sending the patient to a hospital, the patient received only 1 dose of parenteral Rocephin followed by oral antibiotics and remained in general population housing.  This is a significant

21

departure from the standard of care. The fact that the patient had underlying bronchiectasis and emphysema also supported hospitalization. This placed the patient at risk of harm.

6. On 5/8/10 the patient was noted to have failed to receive his oral antibiotics and worsened. His pneumonia severity index of 79 warranted hospitalization. This index was not used by the staff who appeared not to know how to manage the patient's condition. Instead of sending the patient to the hospital, the patient was admitted to the infirmary unit and remained on oral antibiotics which would be insufficient for systemic infection. Also the patient failed to be monitored well on the infirmary unit. Provider staff did not evaluate the patient on a daily basis even when the patient was not well. Vital signs did not appear to be performed as ordered. The blood pressure was low (90/60) on several occasions but not brought to the attention of providers. Low blood pressure is an additional indication for hospital admission.

7. On 5/9/10 nursing notes documented hypotension with a blood pressure of 85/54 with apparent low oxygen saturation (100% on 3 liters of oxygen). The patient had indication of hospitalization which was not done.

8. On 5/10/10 the white blood count was 18.5 indicating significant systemic infection. The patient wasn't admitted to a hospital and remained on oral antibiotics indicating a significant departure from standard of care and placing the patient at significant risk of harm.

9. On 5/12/10, the patient developed abdominal and chest pain but appeared to be misdiagnosed with pancreatitis or aneurysm which diagnoses were noted in the NP medical summary of the death but were not present in the original medical record note. The providers appeared to fail to know how to manage this patient. Also, these diagnoses should have resulted in immediate hospitalization which did not happen.

10. On 5/15/10 the patient had deteriorated. The patient had altered mental status (agitation), oxygen saturation of 89%. This equates to a pneumonia severity index of 100 for which hospitalization is indicated. The providers did not appear to understand how to manage the patient and kept the patient on the infirmary unit.

11. The death was preventable and was caused by repeated significant departures from standard of care. The death summary failed to recognize the significant failures and was written by the nurse practitioner who cared for the patient. Mortality reviews should not be written by providers who cared for the patient. None of the problems that occurred in his care were recognized.

Patient #5

On 5/1/12 a chest x-ray showed interstitial lung disease with possible superimposed pulmonary edema.

On 5/10/12 a chest x-ray showed bilateral diffuse interstitial disease. This abnormality was never recognized by providers.

On 7/26/12 a provider saw the patient for asthma and hypertension. The weight was 192. The provider took no history and performed no physical examination. The provider continued current management. The provider did not address the abnormal chest x-rays even though they may have altered the diagnosis of asthma.

On 10/29/12 the patient placed a health request complaining of stomach pain. The medic referred the patient to a provider. The patient wasn't seen for almost a month.

22

JX-CCH-000112

On 11/21/12 a provider saw the patient for stomach pain.  The provider's history was intermittent abdominal pain not associated with eating but with belching.  The patient said he doubles over in pain.  This was an inadequate history.  The weight was 190 pounds.  The provider noted no rebound but mid-epigastric tenderness.  The provider did not order stool for fecal occult blood or do a rectal examination.  The provider ordered Prilosec and diagnosed GERD.  The history and physical examination was inadequate for the patient's complaint.

On 6/5/13 a NP saw the patient.  The weight was 183.  The reason for the visit was follow up of abdominal pain, GERD and check of H pylori.  The provider noted that the abdominal pain was better but still intermittent.  A rectal examination or stool for occult blood were not done.  The NP took no history with respect to abdominal pain and aside from listing abdominal pain as a problem made no attempt at diagnosis except to order an abdominal x-ray which is not a particularly useful diagnostic tool.  The patient had lost 7 pounds over the past 8 months but was not noticed.

On 8/22/13 a provider saw the patient.   The weight was 174.  The provider saw the patient in follow up of abdominal pain, asthma and hypertension.  The blood pressure was 146/78 which is high.  The provider took little history and documented that the patient had no problems with abdominal pain.  The provider did not address the more than 25 pound weight loss.  Although the blood pressure was elevated the provider assessed hypertension as stable and abdominal pain as stable.   This placed the patient at risk of harm.

On 9/6/13 a medic saw the patient for a complaint of having trouble breathing.  As usual, PEFR testing was not done.  The medic documented that the patient had congestion and gave the patient cough medication and a no duty recommendation for 3 days.  No referral was made. The medic should have referred the patient to a provider.

On 12/10/13 a NP saw the patient.  The weight was 176.  The patient complained of continual abdominal pain with gas.  The patient had wheezing.  The abdomen was soft.  The NP took virtually no history related to the patient's complaint.  The NP diagnosed asthma and ordered inhaled corticosteroids and a chest x-ray.  With respect to abdominal pain, the NP made no diagnosis but ordered simethicone.  The NP did not address the weight loss.  This was inadequate care that placed the patient at risk; the weight loss was not addressed, the prior abnormal x-ray indicating an interstitial lung disease was unrecognized and the weight loss and interstitial lung disease were not evaluated for.

On 12/10/13 a chest x-ray showed a chronic pattern of interstitial lung disease.  This was again not noticed or addressed.

On 12/16/13 a medic evaluated the patient for acute flu like symptoms with a fever of 102.4.  The patient had wheezing.  The medic sent the patient to the ATU.  The patient was sent to the ATU where a medic gave the patient cough medication, Tylenol and an antihistamine.  A provider did not evaluate the patient.  This was beyond the scope of practice for the medic.  The patient had fever and wheezing and needed evaluation by a provider which did not occur.

On 1/6/14 a provider saw the patient who weighed 172 pounds.  The provider did not note the weight loss.  The provider wrote "Everything is good!- no cough compliant with meds".  The provider failed to take an adequate history or to note the continued significant weight loss.

23

On 5/8/14 a provider saw the patient.  The weight was 175.  The blood pressure 142/72.  The provider noted that the patient had hypertension and asthma.  The patient complained of gas and belching.  The provider did not examine the abdomen or note the significant weight loss of the patient.  The provider assessed abdominal pain but didn't take a history or perform a physical examination to evaluate that complaint.  This was a significant departure from standard of care and placed the patient at risk of harm.

On 6/10/14 laboratory results showed H pylori IgG, IgA, and IgM all negative.

On 7/16/14 a spirometry report documented that the patient had mild restrictive disease consistent with his chest x-rays over the past years.  The respiratory therapist noted that the patient was using his rescue inhaler 2-3 times a week and recommended discontinuation of inhaled steroids.  A provider discontinued the inhaled corticosteroids which out examining or questioning the patient.  In fact since the patient had 2-3 exacerbations a week, inhaled corticosteroids were indicated.  The provider followed direction of a non-provider without discussing the issue with the patient. The respiratory therapist included a medication overview for COPD in his consultation but it wasn't clear that the patient had COPD.  Restrictive lung disease is not consistent with asthma or COPD and the provider should have known this.  It did not appear that the respiratory therapist was properly supervised.

On 7/25/14 a medic evaluated the patient in the ATU for abdominal pain.  The medic noted rebound tenderness which is a sign of serious abdominal disease.  A provider evaluated the patient but took no history.  The only examination was documentation that "mass effect L splenic flexure No BM (probably stool)."  The impression was dyspepsia and constipation.  The provider prescribed lactulose with a 2 week follow up.  The provider did not assess the patient's weight.  This evaluation was below standard of care because it included no history and the provider failed to order necessary diagnostic tests such as a CT scan or ultrasound of the abdomen.

On 10/6/14 the patient asked to be seen in a health request for abdominal pain.  The medic told the patient to keep his upcoming appointment.

On 10/21/14 the patient asked to be seen in a health request for abdominal pain.  The medic documented that there was no nausea or vomiting although the patient had diarrhea.  The patient said that he had difficulty eating.  The medic gave the patient Pepto-Bismol and told the patient to increase water consumption.  The medic was practicing out of the scope of his license and needed to refer the patient to a provider.

On 10/23/14 the patient asked to be seen in a health request for abdominal pain, vomiting and diarrhea.  The patient told the medic that he had weight loss.  The medic told the patient to keep his upcoming appointment.  The medic needed to call a provider because the symptoms were possibly of serious disease.  There was another health request evaluation on 10/23/14 and again the medic told the patient to keep his appointment.

On 10/25/14 at 3:30 am a medic evaluated the patient via a health request for abdominal pain such that he couldn't walk.  The medic gave the patient an over-the-counter medication and told him to place another request as needed.  The patient had a serious problem and should have seen a provider.

On 10/25/14 at 2:48 pm medics evaluated the patient in the ATU abdominal pain.  The patient had a fever of 100.8.  A provider didn't take a history or perform a physical examination but made a phone order for an abdominal x-ray, a liter of fluid, simethicone and a follow up in clinic.  An x-ray of abdomen

JX-CCH-000114

showed possible small bowel obstruction.  There was not prompt follow up of the abnormal x-ray which showed a potential life-threatening problem especially with a patient with fever.

On 10/27/14 medics evaluated a patient for dizziness and abdominal pain.  The patient had abdominal pain and distention with nausea and vomiting over the past 3 weeks.  The patient had wheezing.  The patient was transported to the ATU.  In the ATU the provider took a brief history only documenting that the patient was able to eat without pain.  The provider didn't perform a physical examination but apparently gave a verbal order for laboratory tests and an abdominal x-rays along with 2 anti-emetic drugs.  The laboratory reported hemoglobin 9.3 and an x-ray showed mildly improving small bowel dilation.  These were not evaluated in the ATU.  The patient left with an appointment for a week follow up.

On 10/30/14 a provider saw the patient.  The blood pressure was 124/75.  The weight was 136.  The patient had belching and upper abdominal pain.  The provider did note increased bowel sounds with guarding but no rebound.  The provider did order a blood count, an amylase, a chemistry panel, an ultrasound of the abdomen and ensure but did not order stool for fecal occult blood.  The provider noted 60 pounds weight loss over 2 years.  The provider ordered a GI consult.

On 11/1/14 a medic evaluated the patient at the request of the Warden for vomiting.  The medic noted that the patient had been evaluated in the clinic 3 days ago for stomach pain.  The medic talked to a provider who told him that tests had been arranged and medication had been ordered.  The patient was sent back to his housing unit with directions by the provider to continue his current medications.

On 11/3/14 a provider saw the patient for abdominal pain, weight loss and nausea.  The provider noted that the patient was vomiting bile.  The pulse was 108 with a blood pressure of 146/96.  The patient had a tender abdomen with rebound tenderness.  The assessment was R/O pancreatitis and colon cancer.  The patient was admitted to the infirmary with an appointment with gastroenterology pending.  The provider ordered another abdominal film and labs but the patient needed a CT or ultrasound not a plain x-ray.  Given the rebound tenderness with prior fever and evidence of small bowel obstruction, the patient needed to be admitted to the hospital as the patient had a potential critical illness.  Not hospitalizing the patient placed the patient at risk of harm.

Later in the day on 11/3/14 a medic evaluated the patient for abdominal pain with vomiting.  The patient was in the ATU.  There was no provider history or examination the patient.  A NP gave a verbal order for an abdominal x-ray and Zofran an anti-emetic.  The patient was sent to a hospital at about 3 pm.

At the hospital the patient had a subtotal colectomy for a T4N2 colon cancer with possible liver metastases.  The patient was described as having cachexia.  The patient was discharged on 11/10/14.  On 11/13/14 the patient went back to surgery clinic and had his staples removed. A 3 week follow up was ordered.  On 12/3/14 the patient had wound dehiscence and required surgery but after surgery had a stroke and died two days later of a stroke sustained after surgery.

The medical summary death review was completed by the treating provider who apparently was the nurse practitioner.  The nurse practitioner documented that the patient had abdominal pain, weight loss and nausea for seven months culminating in vomiting bile and an x-ray showing small bowel

JX-CCH-000115

obstruction. The NP documented the later problems related to the patient's stroke but failed to identify any problems with the patient's care.

COMMENTS

1. The patient had interstitial lung disease on multiple x-rays and had a restrictive lung pattern on spirometry which was never followed up with an accurate diagnosis. The respiratory therapist is providing advice out of the scope of his license and needs supervision. Providers needed to follow up on these abnormalities but did not. The patient appeared misdiagnosed with asthma.

2. Beginning in October of 2012 the patient developed abdominal pain with progressive weight loss from 190 in November of 2012 to a weight of 136 in November of 2014. The patient ultimately had a colon cancer which could have been diagnosed 2 years before it was. On multiple occasions providers failed to take adequate history, perform physical examinations and failed to refer for appropriate diagnostic evaluations. The patient was evaluated 22 times over these 2 years with either abdominal pain or had documented weight loss and his problem was not properly evaluated.

3. On multiple occasions medics evaluated the patient with serious conditions which did not result in a provider evaluation. The medics appeared to be acting out of the scope of their license. These episodes included:
   a. 12/16/13 the patient had fever of 102.4 with wheezing and the medic gave the patient cough syrup, Tylenol and an antihistamine without referring to a provider. The patient needed immediate referral to a provider.
   b. On 10/23/14 a medic placed a health request for abdominal pain, vomiting and diarrhea. The medic gave the patient Pepto-Bismol and told the patient to seek care as needed. The provider had serious complaints and needed immediate referral to a provider.
   c. On 10/25/14 a medic evaluated the patient at 3:30 am for abdominal pain severe enough that he couldn't walk. The medic gave the patient over-the-counter medication and told him to place another health request as needed. The patient needed immediate referral to a provider.

4. On 10/25/14 the patient had an x-ray showing small bowel obstruction, a potentially life-threatening diagnostic study. The patient had fever of 100.8 that day. The provider who evaluated the patient did not evaluate the x-ray. The patient needed immediate transfer to a hospital but was not sent. This was a significant departure from standard of care and placed the patient at risk of harm.

5. On 10/27/14 the patient had vomiting, weakness, and dizziness with a prior x-ray showing small bowel obstruction with a blood count showing anemia (hemoglobin 9.3) but the provider did not hospitalize the patient. This was a significant departure from standard of care.

6. On 10/30/14 a provider noted 60 pound weight loss with abdominal pain and prior x-ray showing small bowel obstruction with anemia and ordered an outpatient work up. The patient should have been hospitalized.

7. On 11/1/14 a medic called a provider when the patient was vomiting with a prior history of recent small bowel obstruction, anemia and previous fever. The provider told the medic that the patient had an outpatient workup pending. This was a significant departure from standard of care and placed the patient at risk of harm.

26

JX-CCH-000116

8. On 11/3/14 the patient was vomiting bile. Prior studies showed small bowel obstruction and anemia. The NP admitted the patient to the infirmary instead of hospitalization.

9. The mortality summary/review was completed by a nurse practitioner who cared for the patient. No problems were identified even though there were serious problems with care.

Patient #6

This medical record was disorganized. Some medication records did not include the month of medication administration. Electrocardiograms were mixed with medication administration records and death reports not in chronological order. It appears that an infirmary admission from 5/5/15 appears in the medical record after medication administration records and before laboratory results.

The patient did not have a problem list in the beginning of the medical record and it was unclear what list of problems providers were consistently following.

On 5/4/05 an EKG showed atrial fibrillation with rapid ventricular response, non-specific intraventricular conduction delay and inability to rule out an old anterior MI. The ventricular rate was 118.

On 12/24/10 the patient was admitted to Ochsner Medical Center for palpitations from a local jail. The patient had ventricular tachycardia. The patient was treated with intravenous Amiodarone with resolution of the arrhythmia. The patient had cardiac catheterization which was normal. The hospital continued the amiodarone and sent the patient back to the jail. A cardiologist note documented that the patient was currently in sinus rhythm. The cardiologist thought that the arrhythmia was due to low magnesium and potassium. During this admission the echocardiogram showed a 55% ejection fraction with mild aortic, mitral and tricuspid regurgitation. The hospital was not made aware that the patient had previous atrial fibrillation.

On 11/8/11 the laboratory reported creatinine 1.71 (0.76-1.27).

On 12/2/11 an EKG reported atrial flutter with right bundle branch block and lateral infarct age indeterminate.

On 4/12/12 the patient was evaluated by cardiology. The cardiologist documented that the patient had a work up at Ochsner Hospital but he needed the records of this evaluation. Apparently, the cardiologist was seeing the patient without adequate information about the patient. The provider recommended a follow up in a month with an EKG. The cardiologist had not reviewed an EKG. I could not find a follow up cardiology consultation for this patient until 3/8/13.

On 4/24/12 a provider saw the patient for an annual health evaluation. The provider documented continuing "other meds per cardio" but this was the only reference to the cardiologist visit. The provider did not document referring back to cardiology.

A LSU Evidence Based Inmate Consult Form that was not dated but appeared chronologically after a 11/9/12 ATU evaluation for knee pain documents a routine referral to cardiology for syncope with a brief note documenting "Hx of seeing cardiology 4/12- Records were to be obtained – Still lost to F/U-Having intermittent syncopal episodes".

At the next provider clinic on 11/16/12, the provider document an irregular heart rate, noted arrhythmia/flutter in the assessment, but didn't document that cardiology follow up was requested.

27

Nor did the provider order or assess for anticoagulation since the patient appeared to atrial fibrillation with an irregular heart rate.

On 12/16/13 a chest x-ray showed perihilar interstitial infiltrates bilaterally with wall thickening consistent with bronchitis or atypical pneumonia.

On1/7/13 a provider saw the patient who had a complaint of dizziness.  The provider noted that the patient was evaluated in April of 2012 but was lost to follow up and that the patient had syncope on occasion.  The heart was regular rate and rhythm.  The provider documented that the patient was awaiting cardiology appointment.

On 3/8/13 the patient was evaluated by Cardiology at ILH cardiology clinic. At the time the patient had regular rate and rhythm.  The cardiology consultant noted prior episodes of atrial flutter with history of low magnesium and potassium with syncope.  In the history the provider noted a prison EKG of atrial fibrillation in April of 2012.  The cardiology consultant recommended stress echocardiogram test and an event recorder to document his rhythm.  These tests were not evident in the medical record.  The echocardiogram was subsequently documented as done but the event recorder test was apparently not done.  The patient was not placed on anticoagulation.  The recommendation was for a follow up in a month which did not occur.

On 3/19/13 the patient placed a health request for dizziness.  The medic scheduled the patient for a clinic appointment.  On 3/22/13 a provider saw the patient and noted that the patient was recently seen in telemedicine cardiology.  The provider took no history and performed no physical examination.  The provider did not document referral of the patient for electrophysiological studies or for an event recorder or stress echocardiogram as recommended.  The provider did not refer the patient back to cardiology as requested.  It wasn't clear that the provider reviewed the consultation.  There was reference in a subsequent request for consultation on 6/5/13 that an echocardiogram was done at ILH on 4/16/13 but I couldn't locate the report in the records provided.  The event recorder test did not appear to be done.  The patient was not referred back to cardiology.

On 6/4/13 there were multiple EKG tracings.  An ATU note on 6/4/13 at 11:50 pm documented that the patient had hypotension as low as 79/54 with ventricular tachycardia for which the patient received cardioversion by medics.  This was followed by bradycardia.  The ATU note documented a pulse of 28 at 11:40 pm and cardioversion at 11:42 pm.  The patient was given atropine at 28 minutes after midnight and then taken to Lane Hospital.  There was no evidence in this note that a provider participated in this episode of care.

On 6/5/13 an EKG showed sinus bradycardia with marked sinus arrhythmia, left axis deviation, and right bundle branch block.  This EKG was in the progress note section of the medical record.

Apparently the patient was admitted to a hospital on 6/5/13 and discharged on 6/6/13.  The patient had a cardiac catheterization which showed normal coronary arteries.  The patient did not want a defibrillator placed.  The recommendations were to add Lopressor, stop Coreg and titrate beta blocker and ACEI as BP allows, stop Amiodarone due to elevated liver functions.  The diagnoses were VT requiring DC shock; heart failure with EF of 25%; atrial fibrillation; hypertension, RBBB, normal coronary arteries.  There was no discussion regarding anticoagulation and it isn't clear why the patient wasn't anticoagulated since anticoagulation is recommended in persons with atrial fibrillation.

JX-CCH-000118

On 6/14/13, the first visit after discharge from the hospital on 6/6/13 a provider saw the patient in clinic. The pulse was 42. The provider took no history except that the patient had no more near syncope. The provider's note consisted of listing problems with current medications. With respect to the cardiac problem the provider wrote "s/p tachy/brady/V-tach→cardiol (LHC) refused pacer/ICD – TSH 1.31 HTN @goal on CCB(5mg), metop 25 BID + 5 mg ACEI BID No more near syncope. Cannot do orderly work [without] DOE, Δ→Not duty?! Per pt→- CAD". This is an unintelligible note, gives no indication of what occurred at the hospital, and gives no indication of the recommendations of the hospital or definitively states the patient's current diagnoses. The provider did not make a list of assessments and did not list atrial fibrillation as a problem and did not discuss anticoagulation. The problems listed in the body of the note included hypertension listed at goal; chronic kidney disease with no assessment; new onset diabetes for which there was no plan. This note is inadequate because it does not characterize recent cardiac evaluations and failed to accurately define all of the patient's problems including his cardiac problems. The fact that the patient had actual atrial fibrillation was ignored. The provider's failure to perform a physical examination failed to assess for atrial fibrillation.

On 7/21/13 the patient placed a health request stating he wasn't getting medication. The medic referred to a provider.

On 7/28/13 the patient placed a health request stating he wasn't getting medication. The medic referred to a provider.

On 8/5/13 the patient placed a health request stating that he was not getting medication. The medic referred the patient to a provider clinic.

On 8/12/13 a provider saw the patient. The blood pressure was 160/91 and the pulse was 68. The provider noted that the patient was seen for not getting his medication. The provider modified the time the patient gets his medication. The provider didn't assess any of the patient's problems except to note that the coronary artery disease and depression were stable. There was no other assessment or listing of other problems. The elevated blood pressure was not addressed.

Within 2 days on 8/14/13 the patient was evaluated in the ATU for syncope and double vision. Blood pressure was 160/93 and the pulse was 73. A provider saw the patient and noted a normal examination. On 8/14/13 multiple EKG tracings were in the medical record but the ATU provider did not document any of them. The provider documented to keep his scheduled appointment; the patient was sent back to his housing unit. An EKG with this date was in the medical record and noted atrial fibrillation with rapid ventricular response. This EKGs should have been addressed, particularly the atrial fibrillation which required treatment.

On 8/17/13 a medic evaluated the patient for dizziness and left sided weakness with headache. The patient said that he was out of medication for about 3 weeks. The patient was sent to the ATU. An EKG was done but not reported in the note except in one of the ATU notes that states the EKG was the same as the EKG done on 6/5/13. A medic called Dr. Lavespere who recommended scheduling the patient for a category II appointment.

On 8/22/13 there were multiple EKG tracings. One of these showed EKG showed atrial fibrillation with slow ventricular response with a competing junctional pacemaker with RBBB and T wave abnormalities. A second EKG on the same day showed normal sinus rhythm with RBBB, septal infarct age indeterminate

29

and T wave changes.  Another EKG appeared to be a rapid SVT or ventricular tachycardia.  A note from the ATU on 8/22/13 documented that the patient had cardioversion for SVT but vital signs on that note did not indicate instability.  Since the patient was not unstable the patient may not have needed cardioversion.  The patient was sent to Lane hospital.

The consultation note of 8/23/13 from the Cardiovascular Institute of the South documented that the patient had cardioversion.  But this apparently occurred at the prison since it was documented that no procedures were performed at the hospital.  The note documented bradycardia with a rate of 40.  The plan on this note was to discuss the patient's case with the electrophysiological unit at LSU and 'either transfer for evaluation as inpt or plan for evaluation in near future as outpt".  Additionally, the plan included starting Amiodarone.

It appeared that the patient returned to prison on 8/23/13 but there was no progress note in the medical record documenting an evaluation of the hospitalization by a provider immediately upon return.  There was a single prescription for amiodarone which was also added to a current medication list from LSP.  The next note in the progress note section after this 8/22/13 hospitalization was a health request on 8/25/13 in which the inmate documented failure to obtain medication.

The first progress note after this 8/23/13 hospitalization was a provider clinic note on 9/9/13 which documents that the provider saw the patient in clinic.  The pulse was 40.  The provider noted that the patient had been hospitalized for SVT and that the patient refused a defibrillator.  The provider noted that there was no intervention at this hospital visit.  The provider noted that the patient had an upcoming appointment at the Lane Hospital for a procedure but the provider didn't appear to know what the procedure was.  The patient did not have a procedure planned at Lane Hospital but had been referred to LSU electrophysiological unit for recommendations.  The provider failed to identify this recommendation.  The provider noted that the lungs were clear and there was no edema.  The provider noted the A1c of 5.6 and BUN of 30 and creatinine of 1.15.  The provider diagnosed diabetes but had no plan for this.  The provider diagnosed hypertension and chronic kidney disease but documented that these were stable.  This note does not appear to know the cardiac status of the patient and also did not appear to know the cardiology plan for the patient.  The provider did not document that the patient was recently started back on amiodarone even though it had been stopped in the past due to elevation of liver function tests.  The provider didn't document awareness of the patient being on amiodarone or why it was being used.  The provider did not document a plan to follow up for adverse effects of Amiodarone.

The patient was evaluated via telemedicine cardiology on 10/2/13.  The plan was to refer the patient to LSU cardiology electrophysiology unit for further recommendations.  The provider asked for all reports from the Lane Hospital and Ochsner Medical Center and cardiac catheterization reports.  Apparently, prior records still had not been sent with the evaluation.

The next provider visit addressing chronic illness problems was on 12/9/13 when a provider saw the patient.  The pulse was 45.  The provider took no history except to note that the patient wanted his diet order refilled and that the patient had no complaints.  The provider did not address whether the patient was getting his medication.  The blood pressure of 143/75 was noted.  The heart and lungs were examined and 1+ edema was noted.  The A1c of 5.6 was noted.  The provider assessed stable hypertension and coronary artery disease.  No other diagnoses were made.  The provider failed to address the cardiology recommendations for electrophysiology evaluation via referral to LSU and failed

JX-CCH-000120

to list or address the cardiac arrhythmia problem.  The provider's plan did not document following up on side effects of Amiodarone.

On 12/11/13 the patient was apparently evaluated by LSU cardiology.  A consultant communication form documented that the patient was diagnosed with symptomatic SVT with no recurrence since being on Amiodarone.  The consultant did not appear to recognize the prior atrial fibrillation.  It was not clear that adequate supporting historical documents were sent with the patient.  The consultant said that EPS study may be indicated if symptoms reoccurred.  The consultant recommended annual ophthalmology evaluation, PFT, TFT, LFT, BMP while on Amiodorone and a follow up in 6 months.  The patient was listed as being on Amiodarone, Norvasc, aspirin, Vasotec, Lopressor, Coreg, Diltiazem, and Lisinopril.  The 6 month follow up did not occur.

There were no further clinic notes after the 12/11/13 cardiology visit until 8/27/14 when the patient was evaluated in the ATU.  In the interim, an EKG on 4/25/14 showed atrial fibrillation with rapid response.  It did not appear that the patient was evaluated for over 8 months.

From June of 2013 until October of 2014, the medication administration records show that the patient was either a no show for medication or records no administration of medication.  This is a significant problem with the MAR as there is no verification of administration of medication.

The patient was evaluated in the ATU on 8/27/14.  He complained of alteration of consciousness saying he "lost track of where I was".  A provider evaluated the patient but failed to document a thorough history or address whether the patient was receiving his medication.  The provider noted bradycardia and a pulse of 40 and documented that the "pt felt like he was going to faint on the way to breakfast".  Medics documented a pulse as low as 35.  The provider noted that the EKG was similar to 8/13/13 a year earlier and that the patient had pre-syncope.  But the EKG was not described.  One EKG in the record that clearly had 8/27/14 as a date had a baseline that made the EKG difficult to read.  The only plan was hydration.  It appeared that medics documented that Atropine was given intravenously but it wasn't clear if this was given in the ATU or in the ambulance on the way to the ATU.  Atropine is indicated for severe bradycardia.  However, if atropine was given for bradycardia and the patient had a pulse of 38, the provider needed to ensure that the potential cause of the bradycardia did not place the patient at risk of harm.  Instead, the provider didn't even evaluate whether the patient was receiving his medication and didn't document why atropine was given.  It was also not clear from the medic documentation whether a provider gave an order for the atropine.  The patient had symptomatic bradycardia but the provider did not refer back to a cardiologist or ever refer to have a follow up with an LSP provider.  The patient should have been sent to a hospital.  The LSU cardiologist had recommended that EPS studies might be indicated if the patient became symptomatic but this did not occur.

Although the symptomatic bradycardia was a critical event, the patient wasn't evaluated again for over 2 months until 10/31/14.  The provider saw the patient in clinic.  The blood pressure was 132/66 and the pulse was 44.  The provider took no history about symptoms related to bradycardia but did document problems of HTN, SVT, depression, osteoarthritis, prior myocardial infarction, and chronic kidney disease.  The provider failed to note the last documented evaluation in the ATU during which the patient had symptomatic bradycardia.  The provider noted no SVT since Amiodarone was started.  The only physical examination was that the lungs were clear.  The provider documented no evaluation of side effects of Amiodarone as recommended by the telemedicine cardiologist on 12/11/13.  The provider listed problems but included no plans except to approve canvas shoes.  The provider did not note that

JX-CCH-000121

the patient had missed a cardiology appointment.  Since the patient had symptomatic bradycardia, the provider did not refer back to cardiology as recommended for possible electro-physiological studies.

On 3/3/15 a provider saw the patient.  The provider listed the patient's problems but took no history except "no new c/o".  The blood pressure was 112/57 and the pulse was 40.  A pulse of 40 is significant bradycardia but was not addressed.  The provider took no history as to whether the patient had symptoms associated with severe bradycardia.  The physical examination documented clear lungs and regular heart rate and 1+ edema.  The assessment of SVT and hypertension was "controlled".  Heart failure was documented as "stable", even though the provider took no history with respect to heart failure.  The provider noted that the patient had a pending cardiology appointment; an echocardiogram was ordered.  Current therapy was continued but Norvasc was discontinued and Lisinopril was increased without reason.  A 3 month follow up was ordered.

On 3/17/15 the patient had a non-stress echocardiogram at a hospital in New Orleans.  The report reported biatrial enlargement, moderate systolic dysfunction and segmental wall abnormalities.  The EF was 38%.

On 4/25/15 an EKG showed atrial fibrillation with rapid response; rate 100; RBBB. The provider diagnosed new onset atrial fibrillation even though the patient had had atrial fibrillation since at least 2011.  The patient went to Lane Regional Medical Center.

The patient returned from the hospital on 4/25/15.  The patient returned from Lane Hospital with a new order for Eliquis written 4/25/15.  A provider or nurse didn't document evaluation of the patient after return from the hospital.  Eliquis is an anticoagulant and was used for atrial fibrillation which the patient had evidence of since 2011.  This wasn't noted or ordered at the time of return.  Someone wrote on the prescription that there was no Eliquis and that an alternative would be chosen.  The MARs show a prescription for Lovenox from 5/6/15 to 5/10/15 but there was no evidence that the patient received the medication immediately after return from the hospital.  The patient didn't receive Lovenox until 5/5/15, the day he was admitted to the infirmary.  In a later patient instruction, the hospital gave the patient information that he had atrial fibrillation and the Eliquis was anticoagulation for that problem.  There was no hospital discharge summary in the chart.

On 4/29/15 the patient was brought to the ATU by ambulance for weakness and shortness of breath.  The pulse was 123 and the blood pressure was 140/100.  The ATU note was not present in chronological order in the medical record and could not be located.  Medics contacted Dr. MacMurdo who recommended that the patient was to return in the morning for review of laboratory tests.  The patient had not yet received anticoagulation despite having atrial fibrillation.  There was no evaluation of the shortness of breath.

On 4/30/15 a provider sent the patient to the ATU to evaluate labs.  Lab tests that were done were ALT 74 (normal 10-60); AST 93 (normal 10-42); Total bilirubin 1.2 (0.2-1); creatinine 1.64 (0.5-1.2); BUN 34 (normal 6-20).  Notably, the patient had prior elevation of liver function tests while on Amiodarone for which the Amiodarone was stopped.  The provider in the ATU did not review any labs except a WBC of 12.8.  The provider ordered a stat blood count and metabolic panel but did not review these.  The provider merely rescheduled the patient for clinic in a week.  Even though the patient reported a 3 week history of shortness of breath and dyspnea on exertion, and despite documenting coarse breath sounds the provider did no assessment for heart failure or evaluate for a reason for the shortness of breath.

32

The provider noted an elevated white count and treated the patient with antibiotics and albuterol.  The provider did not note whether the patient was getting anticoagulation medicine.

On 5/1/15 the laboratory reported creatinine 1.42 (0.5-1.2) and BUN 27 (6-20).

On 5/4/15 a provider evaluated the patient in clinic at 9:10 am.  The provider's history was that the patient had shortness of breath with minimal exertion, ankle edema, and orthopnea and PND but no chest pain or palpitations.  The patient had a blood pressure of 65/53.  Breath sounds were decreased, the heart irregular rhythm and there was 3+ edema.  These are ominous findings as the patient had hypotension with symptoms of heart failure.  The provider noted a prior echocardiogram result of 30-35% EF.  The provider ordered a nuclear stress test on a separate form ASAP; ordered the catheterization report and the discharge summary from October; ordered Lasix 40 mg daily with Aldactone 25 mg; decreased Lisinopril to daily; and ordered an electrocardiogram and a follow up in 2 weeks.  The provider also noted that the patient needed an electrophysiological study.  The provider did not review the EKG from 5/1/15.  Since the patient's vital sounds were unstable, the patient should have been sent to a hospital or had immediate chest x-ray, oxygen saturation or arterial blood gas, and monitoring on an infirmary unit.  A chest x-ray was performed at 10:50 am which was shortly after the provider saw the patient.  There was cardiomegaly, bibasilar infiltrates and/or congestion with small effusions.  This was consistent with heart failure but was not immediately acted on.

On 5/4/15 at 8:25 pm a medic evaluated the patient in the ATU for feeling week.  The blood pressure was still hypotensive at 93/55 and the pulse 84 with a respiratory rate of 24.  The oxygen saturation was 94 apparently on oxygen.  A provider evaluated the patient and noted orthopnea and PND and ankle swelling.  There were crackles on physical examination, increased JVP and 3+ edema.  The provider admitted the patient to the infirmary unit.  An EKG with an automated reading of extreme bradycardia with 1st degree AV block and nonspecific intraventricular conduction block and probable recent anterolateral myocardial infarction appeared to be atrial fibrillation with a rate over 100 with intraventricular conduction delay.  This tracing was mixed in with MAR reports.  The patient should have been hospitalized.

The admission history and physical examination for an infirmary admission described increased shortness of breath, leg swelling, orthopnea and PND for days but no DOE or chest pain.  The problems were listed as heart failure, atrial fibrillation, right bundle branch block and SVT vs ventricular tachycardia.  The physical examination documented increased JVP, lung crackles, irregular heart rhythm, and 3+ leg edema.  Heart failure was the only diagnosis and the plan was diuresis.  The plan did not include a chest x-ray or determination of oxygenation which are typical evaluations for heart failure.

A provider's note on 5/6/15 described that the patient felt better but had a sore chest wall.  With this exception, there was no history.  The blood pressure was 101/65.  The patient had abnormal basilar lung sounds and 2+ edema.  The diagnoses were heart failure and atrial fibrillation.  The plan was to continue diuresis and possibly re-start the beta blocker and ACEI in the morning.  The provider did not evaluate a chest x-ray or blood oxygenation.  Lab results on 5/6/15 showed calcium 7.7 (normal 8.4-10.2); creatinine 1.7 (0.5-1.2); BUN 45 (normal 6-20) but these results were not evaluated in the provider's note.  On 5/6/15 a provider order for albumin 25% 25 grams by IVP twice a day for 4 days; Lasix 60 mg IVP for 4 days [the frequency did not appear to be noted].  The patient did not appear to have an indication for albumin.  The patient's albumin was not low based on a lab test result of 4/30/15 indicating an albumin of 3.24 (3.2-5.5).  A provider also ordered to hold Lisinopril and Lopressor until

33

further notice and to start Toradol for 3 days.  These ordered were not documented in the provider's note for this day.

On 5/7/15 a provider infirmary note included no history except that the patient felt better.  BP 103/69.  The only physical examination was that the breath sounds were decreased with crackles in the bases, the heart was irregular and there was 2+ edema.  The plan included ordering EKG and labs but the labs weren't specified.  As an addendum the provider noted that he would transfer the patient to ILH for dobutamine and ask for an electrophysiologic studies and possibly a pacemaker.  A provider order to transfer the patient to ILH via ACLS was in the MAR section.  Later, the referral for the ER stated that the patient had prior syncope secondary to SVT or VT with heart failure and atrial fibrillation and EF of 30%.  The patient was hypotensive with increased BUN and creatinine after diuresis.  The provider asked for a cardiology consultation.

From March through May 2015 MARs document no evidence that the patient received much of his medication including Lovenox.   The infirmary MAR shows that the patient received Lovenox on 5/5/15 through 5/7/15.  The patient had missed about 10 days of anticoagulation.

The hospital summary was not in the medical record and the patient died in the hospital on 5/15/15.  On 5/21/15 Dr. MacMurdo wrote the medical summary describing the death.  Dr. MacMurdo listed problems as cardiomyopathy, atrial fibrillation, congestive heart failure, chronic kidney disease, hypertension, Asbergers Syndrome, obesity, degenerative joint disease, depression and myxoma.  The cause of death was listed as cardiopulmonary arrest.  Dr. MacMurdo documented that the patient had atrial fibrillation in 2011.  Dr. MacMurdo documented that the patient was cardioverted of ventricular tachycardia in June of 2013 but had normal cardiac catheterization.  Dr. MacMurdo documented that the patient was started on Amiodarone and had been followed by ILH cardiology since then.  Dr. MacMurdo documented that in on 4/25/15 the patient was sent back to the hospital for atrial fibrillation and was placed on Eliquis which is an anticoagulant.  Dr. MacMurdo then said that on 5/4/15 the patient was admitted to the unit 1 infirmary for heart failure and on 5/7/15 was admitted to the hospital where multiple pulmonary emboli were identified with a right atrial thrombus.  The patient then developed shock and died.  Dr. MacMurdo identified no problems.


COMMENTS

1.  The medical record was disorganized and many documents were not in chronological order.
2.  In 2010 this patient was 68 years old.  A CHAD score rates the stroke risk for persons with atrial fibrillation.  This patient had atrial flutter in 2011 and atrial fibrillation in June of 2013 and again in August of 2013.  Typically patients with a CHAD score over 2 are anticoagulated even when their atrial fibrillation is paroxysmal or intermittent.  This patient's CHAD score was 3 in 2013, given his age and history of hypertension and heart failure.  Yet he was not anticoagulated until May of 2015.  Providers at LSP did not recognize this or bring this up with cardiologists caring for the patient.  It did not appear that cardiologists recognized that the patient was repeatedly in atrial fibrillation because of the lack of information given to them.
3.  The patient's cardiology care was not coordinated or followed up by LSP providers.  In 2010 the patient went to Ochsner Hospital when the patient experienced ventricular tachycardia and was treated with Amiodarone in the hospital.  The next cardiology follow up was a LSU

34

telemedicine visit on 4/12/12.  A cardiologist saw the patient but was not sent information about his prior hospitalization.  He requested an EKG, the prior hospital notes, and a 1 month follow up.  The patient did not follow up for almost a year and when the patient was seen again the records were again unavailable.  On 3/8/13 another LSU telemedicine cardiologist saw the patient and documented a history of prior atrial flutter and recommended an echocardiogram, an event recorder, old records and follow up in a month.  The cardiologist again recommended getting the old records from the hospital because they were unavailable.  The cardiologist believe that the atrial flutter was due to low magnesium.  The echocardiogram appears to have been done but was not in the medical record.  The event recorder recommendation was never carried out.  The patient did not follow up in a month.  After failing to follow up at LSU, on 6/4/13 the patient experienced ventricular tachycardia with hypotension and medics conducted cardioversion after which the patient was sent to a Lane Hospital.  A cardiac catheter was negative for coronary artery disease and the Amiodarone was discontinued due to elevated liver function tests.  On 8/22/13 the patient again experienced a series of arrhythmias including atrial fibrillation and ventricular tachycardia, medics again performed cardioversion although the patient's vital signs were stable making cardioversion unnecessary.  The patient was sent to Lane Hospital apparently without electrocardiograms.  The patient was in sinus rhythm at the hospital.  They recommended a work up at LSU for recommendations on whether further electro-physiologic work up was indicated and restarted Amiodarone.  Based on information they had the cardiologist assessed that the patient experienced supraventricular tachycardia but was currently in sinus rhythm.  The next cardiology consultation was on 10/2/13 when the patient was evaluated by LSU cardiology over telemedicine.  The historical documents were again not available to the cardiologist who documented that the history was obtained from the patient and included that the patient had 2 prior myocardial infarctions but had a prior negative cardiac catheterization with severe LV dysfunction.  The cardiologist documented that the patient had SVT and referred the patient to the LSU cardiology clinic for further recommendations and to include sending all reports from Lane Hospital and Ochsner Medical Center.  The cardiologist again apparently did not have adequate information to make an accurate assessment.  On 12/11/13 the patient went to LSU cardiology and was evaluated by a resident provider.  The resident documented that the patient had a history of supraventricular tachycardia for years and was recently treated in August 2013 with cardioversion at Lane Hospital.  Actually, cardioversion did not take place at Lane Hospital as their note documented that no procedures were performed at the hospital.  The cardioversion was documented as having occurred in the ATU at LSP.  It did not appear that the records were sent with the patient.  The resident recommended continuing Amiodarone and to refer back if the patient became symptomatic.  A 6 month follow up was recommended but failed to occur.  On 8/27/14, about 9 months after the prior cardiology visit, the patient was evaluated in the ATU for symptomatic bradycardia.  The bradycardia was as low as 35 and the patient received atropine given by medics without an apparent order by a provider.  Despite the symptomatic bradycardia the patient was not sent back to cardiology.  The patient wasn't evaluated by a cardiologist again until he developed shortness of breath on 4/25/15 another 6 months later and was found to be in atrial fibrillation.  The patient was sent to Lane Hospital and started on an anticoagulant because of the atrial fibrillation.  Through all of the cardiology visits, providers at LSP failed to consistently document what had occurred, what studies were recommended, what the

JX-CCH-000125

cardiologist recommended, and coordinate their care with the cardiologists. The cardiologists did not appear to have information presented to them that the patient had atrial fibrillation or flutter based on records sent to them and never started the patient on anticoagulation. The lack of coordination of cardiology care contributed to the patient's death.

4. When the patient was finally started on anticoagulation at Lane Hospital on 4/25/15, the LSP providers did not start anticoagulation promptly. The first evidence that the patient received anticoagulation was the MAR from the infirmary unit documenting administration on 5/5/15, 10 days after it was recommended at the hospital. The patient died from multiple pulmonary emboli likely from a thrombus in his right atrium which is associated with atrial fibrillation, a condition the patient had.

5. The death was preventable but the mortality summary did not identify any of the multiple problems with the patient's care.

6. On 5/4/15 the patient a provider saw the patient in clinic after recent discharge from a hospital for atrial fibrillation. The provider didn't note that the patient wasn't receiving prescribed medication (anticoagulation). The provider noted symptoms of out of control heart failure and the blood pressure was 65/53 a critical value. The provider decreased a critical medication (Lisinopril) used for control of heart failure possibly because of the low blood pressure. Given the status of the patient hospitalization was indicated. A chest x-ray performed shortly after the clinic visit showed heart failure but the provider failed to immediately act on the result. Since the patient's vital sounds were unstable, the patient should have been sent to a hospital.

7. On 5/6/15 the patient still was exhibiting signs of heart failure yet the provider gave the patient intravenous albumin which does not have an FDA indication for this purpose.

8. The mortality summary did not identify any of the critical errors with the patient's care.

Patient #7

On 6/29/12 a chest x-ray showed 2 nodules in the left lung suggestive of neoplasm or infection. CT scan was recommended. This was not promptly done.

On 8/1/12 a chest x-ray showed a 3.2 nodular density in the left upper lobe. This was not promptly acted on.

On 10/3/12 a CT scan of the chest showed 2.5 diameter nodule in the left upper lobe of the lung suspicious for neoplasm. This should have prompted urgent biopsy.

On 1/30/13 a provider saw the patient who had a complaint of dizziness. The provider took no history of the patient's complaint and performed no physical examination. The provider listed hypertension, vertigo, and a left upper lobe mass as problems. The provider ordered Keppra for shoulder pain. Keppra has no FDA approved indication for shoulder pain. The provider took no action on the lung mass and ordered a 1 month follow up.

On 2/19/13 the patient was evaluated by an ILH consultant. The blood pressure was 190/110. The provider said that the patient had uncontrolled blood pressure, wheezing which was probably from COPD for which he needed treatment. The consultant recommended a CT guided biopsy, starting inhaled steroids, and to get the blood pressure under control and obtain a 2 dimensional echocardiogram. This evaluation was almost 8 months after identification of the lung mass on chest x-ray. The recommended follow up was 2 weeks, which did not occur.

36

JX-CCH-000126

On 2/22/13 the patient underwent a CT scan without biopsy.  This showed a 3.1 x 2.8 x 2.2 diameter nodule in the left upper lobe of the lung suspicious for neoplasm.  The mass was expanding.

On 2/23/13 patient was evaluated in the ATU for chest tightness.  A medic wrote that a provider recommended monitoring the patient and giving him Zyrtec an antihistamine.  The provider did not order a follow up, order an EKG or chest x-ray.

On 3/20/13 a provider saw the patient.  The blood pressure was 132/90.   The provider performed no physical examination.   The provider noted only 3 problems: hypertension, vertigo, and a left upper lobe mass.  For the lung mass, the provider ordered an inhaler and wrote "pulm plan = CT guided bx? Bronch?".  The provider who didn't know what the work up for the lung mass was ordered a follow up in 4 months without any other recommendations.  This was a significant departure from standard of care and placed the patient at significant risk of harm.

As scheduled, the patient was seen again in 4 months on 7/8/13.  A provider saw the patient but performed no physical examination.  The provider took minimal history.  The provider appeared to note that the pulmonary function tests and CT guided biopsy were received on 2/19/13 but did not document a result or discuss what follow up was necessary.  The provider did not appear to know that the patient failed to have a biopsy yet for his lung mass.  There was no documented plan with respect to the lung mass.  The provider appeared to ignore this problem.   A 3 month follow up was scheduled.  This was a significant departure from standard of care as the follow up of whether the patient had the biopsy was not done.  The patient had an identified lung mass suspicious for cancer for over a year but the provider took no action and scheduled a 3 month follow up with no plan.

On 7/17/13 a provider saw the patient.  The provider took minimal history but performed no physical examination.  The provider noted that the patient was S/P a stroke and that the patient was on Keppra for an old stroke.  The provider noted that the patient had a LUL mass and was waiting for pulmonary follow up, PFTs and a biopsy.  The provider ordered a 3 month follow up but did not intervene to find out when the appointment would be made to diagnose the lung mass.  This was a significant lack of concern and was significantly below standard of care as the patient's lung mass had not been biopsied for over a year.

On 8/28/13 a telemedicine pulmonary consultant documented that the patient had an enlarging LUL worrisome lung mass.  "Did not get FNA/Bx or PFTs.  Now with musculoskeletal complaints".  The pulmonary consultant strongly suggested "Immediate IR FNA of LUL nodule" and a PET-CT scan and re-evaluation "onsite" to be sure that there was no evidence of metastasis, and complete and full PFT.   The pulmonologist also recommended BNP and CMP to evaluate LE edema.  The pulmonologist documented that the patient hadn't been seen since last February when he had a lung nodule.  The recommendations then (in February of 2013) to get an urgent CT scan, an interventional radiologist consult for CT guided biopsy of the lung lesion, an echocardiogram, PFTs, and starting an albuterol inhaler, and return to clinic in 2 weeks.  None of these were done.  The pulmonologist noted that the last CT scan on 2/22/13 showed a 3.1x2.8x2.2 cm mass in the left upper lobe and that this same mass previously measured 2.5x2.2 in October of 2012.  The pulmonologist was documenting a lack of follow up of the patient's lung mass.

On 9/3/13 a provider saw the patient.  The provider saw the patient but performed no physical examination.  The provider took virtually no history except to list previous findings.  The provider noted

a left upper lobe spiculated mass and emphysema and noted that the patient was waiting for a PET scan and fine needle biopsy.  The provider ordered a 3 month follow up.  The mass had been present over a year at this point and the mass had not yet been biopsied.  This was a considerable lack of concern by the provider and a significant departure from standard of care.

On 9/4/13, a provider saw the patient.  The blood pressure was 130/98.  The provider took no history and performed no physical examinations.  The provider noted the blood pressure and documented he would add an ARB antihypertensive medication but might decrease Coreg.  It wasn't definitively clear what the provider was going to do.  The provider noted that the patient had COPD and ordered Ventolin for a year.  The provider did not mention the abnormal lung mass; did not review the pulmonologist's note; and did nothing to start the work up recommended by the pulmonologist.  The failure to follow up on the pulmonary recommendations was a significant departure from standard of care and showed a lack of concern.  The provider scheduled a month follow up.

On 9/9/13 a medic evaluated the patient because he complained of chest pain.  The medic called a provider for instructions.  The provider said to give the patient a GI cocktail and Toradol 60 mg IM.  No follow up was ordered.  The patient was most likely having symptoms of his lung mass but was treated with medication for a stomach problem by phone.

On 9/21/13 the patient was seen in the ATU emergently for non-productive cough.  The medic noted that the patient was awaiting pulmonary tests.  The medic gave the patient cough medication by protocol.

On 9/25/13 a pulmonary consultant saw the patient via telemedicine.  The pulmonologist noted that none of the urgent evaluations recommended had been completed.  The provider referred the facility to his 8/23/13 note requesting urgent evaluations.

On 10/14/13 a biopsy on this date confirmed moderately differentiated invasive mucinous adenocarcinoma.  1/11 lymph nodes were positive for malignancy.  During the biopsy the patient suffered a pneumothorax requiring a chest tube.  The patient spent 3 days in the hospital.  When the patient was discharged the diagnosis was known and documented in the record as moderately differentiated invasive mucinous adenocarcinoma.  The patient was discharged on 10/17/13.

On 10/18/13 the patient was returned to prison and was admitted to the infirmary unit.  The provider noted that the patient had a lung collapse after biopsy.  A minimal examination was done.  The diagnosis of lung cancer was unrecognized.  The patient was discharged to regular housing on 10/22/13 with a follow up in a week.  Providers on the infirmary had not documented identification of lung cancer and had not checked the results of the biopsy which appeared to have been evident at the hospital.

On 10/28/13 a medic evaluated the patient emergently for chest pain.  The patient complained of shortness of breath when supine and that he couldn't breathe.  A provider did not evaluate the patient.  The medics did not document calling a provider.  The medics administered an Atrovent treatment and sent the patient back to his housing unit.  This is substantially below standard of care.  The patient had significant symptoms and needed a provider evaluation.  EMTs are not licensed to independently manage disease which this medic did.

Later on 10/28/13 the patient was admitted to the infirmary on unit 1 S/P thoracotomy.  The provider wrote that the patient had been discharged to camp from the infirmary last week.  The provider wrote

JX-CCH-000128

that the thoracotomy was due to a pneumothorax.  The provider documented a lung mass.  In the admission note the provider noted that the patient sustained a lung collapse when a biopsy was attempted.  It appeared that the patient was being admitted to the infirmary for pain and inability to sleep from the pain.  The provider did not perform a physical examination on the admission to the infirmary even though the patient was on antibiotics and had a chest wound.

On 10/30/13 a wound culture was positive for MRSA and the WBC was 8.8 (4.5-10.5).  A provider noted that the wound color had changed and was dehiscing.  The provider added Zosyn which is an antibiotic.  Blood cultures were not done.

On 11/1/13 the provider noted edema around the wound with dehiscence and yellow discharge.  The provider noted that the patient would be evaluated by the surgeon.

On 11/4/13, the provider documented that the wound was not being addressed.  The provider noted that the patient still had his discharge dressing on.  The provider examined the wound and there was edema around the wound.  The provider did a wound culture.  This speaks to a lack of nursing care.

On 11/6/13 a provider documented that vancomycin was started the day before for MRSA infection.  The provider noted that the patient was scheduled to see surgery.  The provider did not address the biopsy result.
 On 11/8/13 a provider saw the patient documented that the patient had seen the surgeon.  The provider didn't document the biopsy result or the follow up of the lung mass.  His only plan was to continue the antibiotics.

On 11/12/13 a provider noted that the patient was doing well since starting vancomycin. The provider noted a MRSA wound infection and wrote to stop the IV and to discharge the patient in the morning.  There was no documentation of oncology follow up.  The following day on 11/13/13 patient was discharged from the infirmary and sent to general population with a 1 week follow up.  During the entire infirmary stay of almost 3 weeks, the provider did not find out the biopsy result for the lung mass and did not consider what the follow up of the lung mass would be.

On 11/16/13 a provider saw the patient in clinic and noted that the patient had a thoracotomy 2 weeks previous and now had shortness of breath with exertion.  The patient had swelling in the surgical incision site.  The wound grew MRSA.  There was no other history or physical examination.  The provider wrote that the patient had a seroma of the wound, started an antibiotic and scheduled a return visit in a week.  The patient did not acknowledge lung cancer.

On 11/18/13 the patient placed a health request complaining of swelling in his mouth and having a non-productive cough.  A medic saw the patient but gave the patient cough medication without referring to a provider.  The following day on 11/19/13 a provider referred the patient to heme-oncology at ILH "ASAP".  The patient had been diagnosed with lung cancer in late October and was referred to Oncology about 3 weeks later.

On 11/21/13 a provider saw the patient.  The note included no physical examination and only included comments about the patient's hypertension and cancer.  This was the first note after hospital discharge a month previous that acknowledged the lung cancer.  With respect to the cancer the provider said the wound was healed and that the patient had a CT scan "today".  The provider noted that an oncologist was going to continue the work up.  The provider noted that the patient would make many trips for

JX-CCH-000129

treatment but did not indicate when the patient would be seen or the treatment plan. The provider ordered a 3 month follow up. This implies that the provider did not intend to participate at all in the oncology follow up of the patient as the patient would need sooner oncology follow up than 3 months.

On 11/25/13 the patient was seen in the ATU for shortness of breath. The blood pressure was 147/106 and the pulse 98. The medic documented a history of pneumothorax. The provider did a chest x-ray that showed no new pneumothorax. The provider sent the patient back to his housing unit with a recommendation to keep his appointments. This record appeared chronologically out of order with laboratory test and other test results and appeared significantly out of order.

On 12/3/13 a provider saw the patient. The note was brief and including no physical examination. The note included only a list of the 4 problems of the patient with comments. For the lung cancer the provider stated that the patient had moderately well differentiated mucinous adenocarcinoma with positive lymph nodes. The provider did not discuss what the subsequent plan was for treating the patient's cancer. The provider noted that the patient did not have his albuterol inhaler. The provider ordered a 4 month follow up visit. The 4 month follow up visit and lack of knowledge about the follow up of the cancer demonstrates a lack of involvement in management of this patient's lung cancer.

On 12/16/13 an ambulance run form documented a blood pressure or 174/94, pulse 128, respiratory rate 34. The patient was transported to hospital ILH ER for pneumothorax. In the ATU the oxygen saturation was 55% which is extremely life critical. The patient died in the hospital 5 days later on 12/21/13.

The mortality review was a brief 2 paragraphs which do not have a date of completion or an author's name. The summary reports that does not summarize the care provided but only lists the dates that the patient was seen. The review does not identify any problems.

This death was potentially preventable as earlier diagnosis may have prolonged his life. The patient had a significantly abnormal lung x-ray on 6/29/12 but did not have a definitive diagnosis until 10/14/13 almost a year and a half later. Providers were aware of the abnormal lung findings but appeared to lack concern for a timely work up. Consultants urged the providers to timely evaluate the patient but even their recommendations were not addressed timely. After lung cancer was diagnosed, in October of 2013 until December of 2013, the prison providers did not ensure that the patient was evaluated by an oncologist to continue management of the cancer.

COMMENTS

1.  An abnormal chest x-ray showing a nodule on 6/29/12 wasn't evaluated by a CT scan until 10/3/12, about 5 weeks later. The abnormal CT scan showed a lesions suspicious for cancer. The primary care providers at LSP failed to review test results and take appropriate action to get a biopsy. The biopsy wasn't done until 10/14/13 about 15 months later. In the interim, the patient saw a pulmonary consultant on 2/19/13 who recommended a biopsy which did not occur. Another pulmonary consultant evaluated the patient on 8/28/13 and documented that the patient didn't get the biopsy or pulmonary function tests that had been recommended. On 9/25/13 another pulmonary consultant saw the patient and noted that none of the recommended urgent evaluations had been completed. During this time period the primary

JX-CCH-000130

care doctor failed to adequately evaluate the patient or coordinate his care.  This delay in diagnosis harmed the patient by leading to untreated lung cancer for over a year.

2.  Adenocarcinoma of the lung was diagnosed by biopsy on 10/14/13.  When the patient returned to prison the prison doctors didn't initially recognize or acknowledge that the patient had lung cancer.  The patient remained on the infirmary approximately 3 weeks without documentation that he had lung cancer.  The histories and physical examinations were inadequate.  A thorough summary of the events that occurred at the hospital was not documented.  This lack of continuity placed the patient at risk of harm.

3.  The patient developed a methicillin resistant staph aureus wound infection and was treated with intravenous antibiotics.  When the antibiotics were completed the patient was discharged from the infirmary without assessment as to whether the infection had cleared.

4.  Within 4 days of discharge from the infirmary, the patient was seen in a camp clinic with a recurrent infection of his wound.  The doctor took no other history than that the patient had a wound and performed no physical examination.  The doctor did not acknowledge that the patient had lung cancer and did not establish a treatment plan of this problem.

5.  Lung cancer wasn't recognized at the prison until 11/21/13 about a month after discharge from the hospital.  The provider documented that the oncologist would be caring for the patient and ordered a 3 month follow up.  The expectation is that the primary care doctor coordinates care between the specialist and the prison staff.

6.  Many of the provider examinations at the prison lacked histories and physical examinations and failed to follow up on the main problems of the patient specifically his lung cancer.  The patient's problems appeared to be largely ignored.  The providers at the prisons did not document the follow up treatment plan for this patient except to state that he was going to an oncologist.  Within 7 weeks of returning to prison and before seeing the oncologist, the patient became acutely short of breath and was sent to a hospital where he died 5 days later.

7.  The mortality review did not identify any problems.

8.  This death was potentially preventable as earlier diagnosis may have prolonged his life.

Patient #8

This patient was mostly housed at the David Wade Correctional Center and was sent to LSP for hospice care for end-stage liver disease.  The patient was at LSP for only 5 days in the hospice program.

Patient #9

This patient was transferred to LSP from Elayn Hunt Correctional Center (EHCC) sometime in late February of 2014.  On 2/14/14 a NP from EHCC ordered an ultrasound because the patient had cirrhosis.  On 2/24/14 the patient signed a request for accommodation form at LSP.  There was no transfer document in the progress note section of the medical record.  Recent laboratory results prior to transfer were on 2/10/14: WBC 9.7 (3.4-10.8); hemoglobin 10 (12.6-17.7); platelets 90 (155-379); glucose 120 (65-99); sodium 130 (134-144); calcium 8.1 (8.7-10.2).

JX-CCH-000131

Lab results at EHCC on 1/17/14 were: albumin 2 (3.2-5.5); total bilirubin 3.3 (0.2-1); creatinine 0.96 (0.5-1.2); glucose 154 (70-110); BUN 13 (6-20); sodium 131 (135-145); and INR 1.7 (0.8-1.2).  These laboratory results indicate cirrhosis and yield a Model of End-Stage Liver Disease (MELD) score of 17. This equates to over a 95% chance of surviving 3 months.

The recommendations for persons with cirrhosis include ultrasound every 6 months to screen for hepatocellular carcinoma; esophagogastroduodenoscopy (EGD) to rule out esophageal varices; lactulose to prevent hepatic encephalopathy as needed; beta blockers as preventative for esophageal varices; diuretics for ascites; avoidance of hepatotoxins and changes in medications; and management of hyponatremia, subacute bacterial peritonitis, and secondary infections.  Typically, persons with decompensated cirrhosis are evaluated at least once by a gastroenterologist of hepatologist for assessment as to whether treatment for hepatitis C or transplantation is indicated.

On 2/26/14 a provider saw the patient after transfer.  The medical history was poor and only included cirrhosis due to hepatitis C, hypertension, and prior lobectomy due to lung trauma.  The provider took no history of the patient's current status, including symptoms.  The provider documented a normal examination including the abdomen.  The provider prescribed Aldactone 50 mg a day, HCTZ 25 a day and Lasix 40 a day.  The patient had been on Lasix 80 mg a day.  The patient's medications were listed as Aldactone, HCTZ, Wellbutrin, KCL, Lisinopril, Lactulose, Propanolol, and Lasix.  The provider took no history of whether the patient had a recent ultrasound, whether he had ever had an EGD, and what other sequelae of cirrhosis the patient had.  The provider referred the patient to the hepatitis clinic and documented resubmission of an ultrasound request.

On 3/5/14 the laboratory reported WBC 8.4 (4.5-10.5); hemoglobin 9.9 (11-18); platelets 97 (150-450).

On 3/6/14 the laboratory reported glucose 214 (65-99); sodium 133 (134-144); calcium 7.5 (8.7-10.2); albumin 1.8 (3.5-5.5); total bilirubin 3.3 (0-1.2); creatinine 0.87 (0.76-1.27); and INR 1.7 (0.8-1.2).  These values yield a MELD score of 17 and give an estimated 3 month survival of over 95%.  The patient had ascites and could be considered to have decompensated cirrhosis.  Based on this patient's MELD score and decompensated cirrhosis, the patient could be expected to survive at least 3 months.

On 3/8/14 the patient was sent to the ATU for abdominal distention and after complaining on a health request of abdominal pain and difficulty breathing.  A provider saw the patient.  The only history was that the patient had constipation and had dyspnea on exertion.  The provider noted abdominal swelling, clear lungs and 2 + pitting edema.   The provider ordered a chest x-ray and abdominal film but did not review the results.  The provider ordered 2 mg of Bumex intravenously and increased Lasix to BID.  The patient was discharged with follow up with a clinic provider.  Depending on the degree of abdominal swelling, paracentesis may have been indicated.  As well, because this was a complicated patient the patient should probably have had at least 1 consultation with a liver specialist.  It is recommended to consider avoiding ace inhibitors such as Lisinopril in persons with ascites and this medication should have been stopped.  Dietary sodium should also be restricted to 2 grams per day.  Also, although propranolol is recommended to prevent variceal hemorrhage it can worsen survival in persons with refractory ascites; therefore the provider should have considered stopping this drug.  For these latter reasons, it would have been better if the patient had been evaluated by a liver specialist.  The patient was admitted to an infirmary.

JX-CCH-000132

On 3/8/14 a provider admitted the patient to unit 1 infirmary.  The initial temperature by the nurse documented a 101.4 fever.  The time is not clearly stated on the graphic record but appears to be 2 pm.  The infirmary admission note was not filled out.  A provider wrote a brief progress note documenting that the patient was admitted for diuresis.  The provider made no mention of infection or fever even though the patient was started on antibiotics.  The provider stopped HCTZ and started Lasix 40 mg twice a day instead of once a day.  The provider also continued spironolactone and Propanolol.  Zosyn was started for 10 days.  Zosyn was discontinued shortly after starting it by a verbal order because the provider wrote that the patient was allergic to it.  With a low suspicion of bacterial infection, paracentesis is recommended with a culture of ascetic fluid and analysis of the ascetic fluid white count along with blood, urine, and sputum cultures.  If there was a high risk of infection Cefotaxime and albumin are recommended.  Generally empiric antibiotics are recommended for temperature greater than 100; abdominal pain; change in mental status; and ascetic fluid polymorphonuclear leukocyte count > 250 cells/mm.  Zosyn use for intra-abdominal infections is an off label use for Zosyn and is not recommended for mild to moderate community acquired intra-abdominal infections due to risk of toxicity and development of resistant organisms.  The provider started Ciprofloxicin and Flagyl.

On 3/9/14 a provider stopped Ciprofloxicin and Flagyl and started Solumedrol for an apparent local or systemic reaction.  The provider documented that the patient had a reaction to Ciprofloxicin and Flagyl but didn't document what the reaction was.  The provider should have documented what the reaction was.  The provider did not start another antibiotic until starting Keflex and Bactrim orally on 3/15/14.

On 3/10/14 the laboratory reported WBC 7.1 (4.5-10.5); hemoglobin 10.7 (11-18); platelets 103(150-450); albumin 1.8 (3.2-5.5); Tbili 4.2 (0.2-1); calcium 7.5 (8.4-10.2); creatinine 1.1 (0.5-1.2); glucose 177 (70-110); BUN 21 (6-20); sodium 127 (135-145).  A provider documented that the patient had a temperature over the weekend.  The provider documented that the patient had a chest x-ray showing pleural effusion or pneumonia but had a reaction to Ciprofloxicin and Flagyl.  The provider took no history and performed no physical examination, noted no vital signs or lab results except calcium of 7.5 and made no assessment or plan.  With a pleural effusion or pneumonia and cirrhosis, the provider should have noted the current temperature, taken blood, urine, and sputum cultures, and obtained a sample of ascitic fluid for analysis including culture.  This was not done.  The patient should have been placed on a more appropriate empiric antibiotic.  The patient should have been hospitalized.

On 3/12/14 a provider documented that the patient had a sore on his lip.  The provider took no history, performed no physical examination except to note a sore on the lip, and diagnosed herpes and started acyclovir.  The provider documented that the cirrhosis and ascites was improving with diuresis.

On 3/14/14 the patient was re-classed to unit 2 infirmary.

On 3/15/14 patient had a fever of 105 at about 6:30 pm with a fever of 104.6 at 7 pm and 102.4 at 8:20 pm.  The patient was started on oral Kelflex and Bactrim and received the first doses in the afternoon on 3/15/14.

On 3/16/14 in a note that was not timed, a provider patient had hypotension (89/78) with a fever of 105.2 and was kept on oral Keflex and Bactrim.  The provider performed no physical examination and no history except that the patient had copious diarrhea.  The provider documented speaking with the patient about the terminal nature of his illness.  The provider documented that the sister and mother were "in on decision for DNR".  It wasn't clear whether the patient was oriented and why the mother

43

and sister had to contribute to a DNR discussion.  The provider did not document what the advanced directives were or document the wishes of the patient and discussions with the patient.  The patient had signs consistent with shock and sepsis (fever, ascites, and hypotension) and should have been hospitalized.  The treatment plan with this set of vital signs and ascites was significantly below standard of care.

On 3/17/14 provider documented that the patient denied a productive cough or dysuria.  There was no other history.  The doctor did not perform a physical examination.  The doctor diagnosed cirrhosis improving with diuresis, failure to thrive and herpes simplex infection that was resolving.  The provider noted that the Aldactone was stopped and Lasix was increased to 100 mg every morning with 40 MeQ of potassium.  The provider noted that the sodium was 128 and creatinine 1.86 with a BUN of 47.  The provider documented cirrhosis with ascites and +/- peritonitis.  The doctor didn't even note that the patient had hypotension and a significant fever.  The doctor wasn't even paying attention to vital signs for an infirmary patient which is a significant departure from standard of care.  In a later note on the same day a provider documented a hepatitis clinic note documenting stopping Aldactone and changing Lasix to 100 mg daily.  The provider noted lab results including a white count of 33.3.  The doctor assessed late stage cirrhosis with ascites +/- peritonitis.  The patient should have been admitted to a hospital.  If the patient had peritonitis systemic antibiotics were indicated.

On 3/17/14 the laboratory reported calcium 7.6 (8.4-10.2); creatinine 1.99 (0.5-1.2); glucose 132 (70-110); BUN 47 (6-20); sodium 127 (135-145); WBC 33.3 (4.5-10.5); hemoglobin 9.1 (11-18); platelets 69 (150-450).  A white count of 33.3 indicates significant systemic infection requiring intravenous antibiotics.  The patient needed hospitalization.  A provider saw the patient and noted that the patient had been at LSP for a month and a half.  The provider took no history except that an ultrasound ordered at EMCC was not yet done.  The provider noted that the white count was 33 thousand.  The provider diagnosed decompensated cirrhosis with ascites, stopped spironolactone and increased Lasix to 100 mg in the morning from 40 mg BID.  The provider did not address the elevated white count.  The provider did order a blood count, metabolic panel and a urinalysis.  This was a dramatic departure from standard of care.  The patient should have been hospitalized.

On 3/17/14 a provider referred the patient to hospice.  The form required that the life expectancy was less than 6 months.  There was no documentation of discussion with the patient.  The patient signed a hospice form on 3/17/14.

On 3/18/14 a provider saw the patient and noted abdominal discomfort and a white count of 33 with BUN 47 and creatinine 1.86.  The provider increased the Lasix.  The provider was ignoring the needs of the patient with respect to systemic antibiotics.

On 3/19/14 the laboratory reported WBC 13.7 (4.5-10.5); hemoglobin 9.1 (11-18); platelets 72 (150-450).  A provider saw the patient and noted that the patient improved with stopping Aldactone and increasing Lasix.  The provider documented that the ileus was clearing but there was no follow up x-ray in the record.  The provider documented that the temperature was decreasing on Bactrim and Keflex.

On 3/20/14 the patient was re-classed to hospice status.  The provider who evaluated the patient on this day took no history and performed no physical examination.  The note only documented that the white count had decreased to 13.7 and that the patient agreed to hospice status and DNR status and

JX-CCH-000134

would be moved to unit 2.  There were no further provider notes until 4/2/14 when the patient developed altered mental status and became unresponsive.  The patient died later that day.

On 4/1/14 an ultrasound of the abdomen was done.  This study showed a small liver surrounded by ascites.  No liver masses were detected.  The patient was noted by the technician to be not responsive.

From 3/20/14 until the patient's death 2 weeks later there were no provider notes in the record until the day of death documenting his demise.  There was a verbal order for a narcotic patch on 3/21/14 but there was no evidence of a provider evaluation of pain and based on nursing notes it did not appear that the patient was in pain except that the patient was receiving Tylenol for back pain.  Nursing notes through the entire hospice stay document that the patient had no pain.  The RN physical assessment form on 3/20/14 documents that the patient had no pain.  The narcotic appears to have been given for reasons other than pain and did not appear appropriate from a clinical perspective.  On 4/1/14 at 8:10 am a hospice nurse note documented that the patient was sleeping in bed and hard to arouse.  At 11:30 am the same day a physician gave a verbal order for Ativan on 4/1/14.  The order was for Ativan every 8 hours for a month.  Amongst other indications, Ativan has an indication for anxiety.  However, based on nursing notes there was no evidence of anxiety.  Instead nursing notes demonstrate lethargy not anxiety.  The use of both a narcotic and an anxiety agent without a clear medical indication can, at best, be defined as palliative sedation.  A criticism of palliative sedation is that these medications can be applied inappropriately, can hasten death, and may be done without patient informed consent.  There is no evidence from the record that the providers prescribing these medications had any discussion with the patient with respect to the advanced directive wishes of the patient with respect to palliative sedation.  On 4/2/14 a provider gave a verbal order to stop Ativan along with obtaining a serum ammonia level.  Later on 4/2/14 a doctor gave a verbal order to give Narcan which is a drug used to reverse the effects of a narcotic medication.  The provider documented that the patient was experiencing altered mental status.

On 3/26/14 nurses documented that the patient's tongue was swollen and painful.  A provider did not evaluate the patient.  Instead the provider gave a verbal order for Benadryl and Nystatin oral swish without making a diagnosis.  On 4/2/14 a provider gave a verbal order to place the patient's mattress on the floor to prevent further falls.  These orders were given without any provider seeing the patient while in hospice.  Hospice care needs to include participation of providers to manage the medical conditions of the patient.  It appears that only nurses were managing the patient.

 The death summary for this patient was completed by Dr. MacMurdo, the treating physician.  Dr. MacMurdo documented that the patient was admitted to a nursing unit and was given intravenous diuretics for dyspnea on exertion and elevated temperature.  Dr. MacMurdo documented that the patient had abdominal pain and a chest x-ray indicative of effusion or pneumonia.  He then went on to state that the patient was managed on oral antibiotics after a reaction to Ciprofloxicin.  Dr. MacMurdo then went on to state that the patient was referred to hospice and died.  Dr. MacMurdo documented the cause of death as cardiopulmonary arrest secondary to liver cancer.  However, there is no evidence that the patient had liver cancer.

COMMENTS

1. Patients with cirrhosis should have a EGD to screen for esophageal varices, an ultrasound every 6 months to screen for hepatocellular carcinoma, lactulose to prevent hepatic encephalopathy

45

JX-CCH-000135

as needed; beta blockers as preventative for esophageal varices; diuretics for ascites; avoidance of hepatotoxins, adjustment of medications that are metabolized by the liver; and management of hyponatremia, subacute bacterial peritonitis, and secondary infections.  The patient did receive lactulose, a beta blocker, and diuretics.  He received an ultrasound the day before he died.  The EGD had never been done.  There was no evidence that providers adjusted or discontinued medications that were hepatotoxins.  As an example, Lisinopril and beta-blockers may be discontinued in persons with ascites but were continued.  The doctor did not document consideration of these medication issues.  The patient was recently transferred to LSP so some of these deficiencies can be attributed to the prior facility.

2. When the patient developed fever on 3/8/14, he was not properly cared for.  Dr. MacMurdo, described by Dr. Lavespere as a rehabilitation doctor, was caring for this patient.  Dr. MacMurdo does not have training to properly manage patients with end-stage cirrhosis.  The source of infection was not investigated.  The patient should have had blood, urine, and sputum cultures and the patient should have been examined for a source of infection.  The initial note after the fever was noted did not include a thorough history or physical examination.  Under these circumstances, the patient needed hospitalization but this was not done.  The choice of initial antibiotics (Zosyn) was questionable.  This antibiotic and another antibiotic choice (Flagyl and Ciprofloxicin) were also discontinued based on a reaction.  The doctor did not initiate antibiotics until 3/16/14 when the patient again had fever to 105.  The doctor then started oral antibiotics for what was a systemic infection with a fever to 105 and a white count of 33.3 and hypotension.  This was a significant departure from standard of care.  The patient needed hospitalization.

3. When the patient developed signs of systemic infection on 3/16/14, instead of hospitalizing the patient the doctor spoke with the patient about his being a terminal case and suggested a do-not-resuscitate order.  Patients depend on physicians for accurate information with respect to their probability of death.  As of 3/6/14 the patient had a MELD of 17 and an over 95% chance of surviving 3 months.  While the patient did not have a good prognosis, the patient could have survived if properly treated.  The patient should have been hospitalized.  The doctor did not appear to know how to manage the patient and instead of referring to a higher level of care, the doctor stopped caring for the patient and placed the patient in hospice.

4. When the doctor placed the patient in hospice, he ordered palliative sedation (a narcotic and anti-anxiety medication) when the patient had no medical indication for these medications except palliative sedation.  While the strategy of palliative sedation is used in some patients prior to death, it should be discussed with the patient and clear to the patient why the medication is being used.  The risks of not doing so include hastening death, inappropriate use of medication, and uninformed risk to the patient.  Given the vulnerability of inmates with respect to choice of medical care, decisions such as these need to be fully informed and discussed with the patient.

5. While this patient had a poor prognosis, his death was preventable to the extent that he could have survived for a longer period of time.  His prognosis for survival appeared greater than 3 months.  The death summary did not identify any problems with his care even though there were several deficiencies.

Patient #10

46

This patient had a history of hypertension, benign prostatic hypertrophy (BPH), GERD, and hepatitis C. On 5/10/13 the patient had a chest x-ray showing hyper-inflated lungs with mild interstitial markings consistent with chronic obstructive lung disease (COPD).  This was never followed up with a pulmonary function test or other history or physical examination to determine if the patient had COPD.

On 7/9/13 a doctor saw the patient but did not address current chronic illnesses.  No vital signs were done.  The doctor took a history that the patient developed dizziness after starting Cardura for BPH and had associated leg cramps.  Without any physical examination or history, the doctor diagnosed pre-syncope, stopped Cardura, started Flomax and ordered a metabolic panel to assess the leg cramps.  The patient's hypertension, BPH, GERD, or hepatitis C were not addressed.  A 1 week follow up was scheduled after labs were back but this visit never occurred.

The patient wasn't seen until when a medic saw the patient on 10/10/13 for diarrhea for about 2 weeks. The medic documented a weight of 134 pounds but did not document whether this was a weight loss. The medic did not consult a provider and told the patient to seek help again if needed.  Nothing was done for the patient.

About a week later on 10/18/13 a medic saw the patient for a self-declared emergency for diarrhea. The blood pressure was elevated at 150/78 but was not addressed.  The medic documented that the patient was using Pepto-Bismol but made no referrals and did not consult a provider.

On 10/21/13 a doctor evaluated the patient for loose stools, fatigue, dark urine and weight loss.  The doctor noted jaundice.  The only problems assessed were hypertension and hepatitis C.  The doctor referred the patient to the ATU and referred the patient to hepatitis C clinic for asymptomatic jaundice with a total bilirubin of 19.7.  The urgency was not documented.  The laboratory reported these results: alkaline phosphatase 303 (42-121); direct bilirubin 11.2 (0-0.2); total bilirubin 19.7 (0.2-1).  The patient went to the ATU for "work up and possible admit".  The blood pressure was 197/111 but this was not addressed.  A provider took no history except loose stools, fatigue and dark urine for 2 weeks.  The provider noted jaundice and ordered blood tests (CBC, CMP, LFT, UA) and referred the patient to the hepatitis clinic.  This referral never occurred.  A bilirubin of this level is not a matter for routine referral but calls for an immediate diagnosis.

On 10/22/13 an ultrasound showed dilated CBD; IVC thrombus; no pancreatic mass but hyperechoic pancreas; enlarged liver with no mass.  A CT scan was recommended.  The following day on 10/23/14 a CT scan of the abdomen and pelvis showed a mass in head of pancreas with pancreatic duct and biliary duct dilation; enlarged prostate; and an inferior vena cava (IVC) thrombus.  Later on 10/23/14 a provider wrote a note documenting that the patient went for a CT scan "today" and had an ultrasound the day before that showed an IVC thrombus and that the patient had jaundice with bilirubin over 20.  The provider wrote, "phone consult for Karla (off today + wanted to be sure his acute issue got addressed".  The doctor assessed acute onset of jaundice and rule out thrombosis.  The provider referred the patient to the primary care doctor to determine if the patient needed a referral for the thrombosis management.  The blood pressure was elevated at 172/92 but was not addressed.  An IVC thrombus is a life threatening problem and needed to be addressed immediately.  Instead, the provider admitted the patient to the infirmary with a routine referral of evaluation.

On 10/23/13 a provider completed an admission history and physical to the infirmary.  The reason for admission was not listed.  The provider documented a bilirubin of 20 and listed hypertension, BPH, hepatitis C and COPD as problems. Aside from jaundice no abnormal physical findings were

47

documented.  The assessment was hepatitis C with acute biliary obstruction, hepatic vein thrombosis, and a pancreatic mass.  This was inaccurate; the thrombosis was in the inferior vena cava (IVC) not the hepatic vein.  The doctor started Lovenox and Coumadin.

On 10/25/13 a provider documented an INR of 4.1.  There was no history, physical examination or assessment.  The only plan was to stop Lovenox and hold Coumadin.

On 10/28/13 a provider saw the patient on the infirmary and noted that the INR was 2.2 and was awaiting a call from radiology regarding the IVC clots.  The provider documented that the patient had epigastric pain likely due to the pancreatic mass.  There was no physical examination and no assessment or therapeutic plan.

On 10/29/13 a provider documented that there was no thrombus in the portal vein [the CT scan showed a thrombus in the inferior vena cava which is not the portal vein].  The provider didn't know if Coumadin should be continued.  The provider documented an upcoming GI and GU appointments.  No physical examination was done.  Clearly the doctor didn't know what to do.  Instead of sending the patient to a hospital the doctor continued treatment and waited for a routine evaluation.

On 10/30/13 laboratory results reported alkaline phosphatase 363 (42-121); ALT 75 (10-60); AST 78 (10-42); total bilirubin 21.3 (0.2-1.2); direct bilirubin 15.4 (0-0.2).  A provider saw the patient and noted that the patient had an ultrasound that showed an IVC thrombus.  The provider documented that warfarin was started on 10/25/13.  The only assessment was acute onset of jaundice and thrombosis noted on ultrasound.  The provider documented that the patient was getting another ultrasound "today".  The ultrasound showed multiple dilated bile ducts; IVC thrombus; 3 cm mass in head of pancreas.

On 10/31/13 a provider note on the infirmary noted that the temperature was 101.4.  The provider history was that the patient had right upper quadrant abdominal pain that resolved.  The provider documented that the patient had a poor prognosis "even [with] aggressive w/u + mngmt.  He's considering palliative care".  The provider documented that he would discuss the situation with the family.  The provider performed no physical examination and made no assessment of the fever.  The only laboratory tests or diagnostic tests ordered was a urine analysis and a chest x-ray.  The provider documented that he wouldn't start antibiotics for the fever "yet".

On 11/1/13 the provider documented that the patient had fever yesterday but wanted to be discharged so he could discuss his condition with his "fly".  Presumably this meant his family or friends in his housing unit.  But it is unclear.  The provider did not document discussion of the prognosis in the record or document what he believed the prognosis was.  This was all premature as the patient still had not had a definitive diagnosis.  To not treat or investigate the cause of potential infection in a patient with a mass that has yet to be diagnosed is a departure from standard of care.  To send a patient with an undiagnosed pancreatic mass and signs of abdominal infection placed the patient at risk of harm.

On 11/6/13 a doctor saw the patient and noted that the weight was 126 pounds which was a 25 pound weight loss since January of 2013.  The doctor took no history and performed no physical examination.  The doctor noted that the patient had an IVC thrombus and that the INR was 3 on 11/6/13.  This test result was not in the medical record.  The doctor also noted that the patient had a pancreatic mass and noted that the patient decided to pursue treatment but except for stating that the patient was referred to GI, there was no documentation of a plan for this problem.  The doctor referred the patient to Coumadin clinic in a week.  This does not appear to have occurred.

48

JX-CCH-000138

On 11/8/13 a provider performed a Patient Data annual health evaluation.  The weight was 126 but was not addressed.  The provider noted hypertension, pancreatic mass, deep vein thrombosis, hepatitis C, and prostatic hypertrophy as problems.  The patient was on Coumadin, Flomax, Losartan, Prilosec, and Norvasc.  Except for jaundice all examination boxes were checked as normal.  The provider documented that a GI evaluation was pending and that the patient was on Coumadin but did not address the adequacy of the INR.  No plan was mentioned with respect to the pancreatic mass.

On 11/13/13 a doctor saw the patient.  There was no history or physical examination.  The doctor wrote assessments of (1) IVC thrombus stating that the INR was 2.0 and that the goal was 2-3 (2) pancreatic mass with 29 pound weight loss.  The doctor documented no assessment and did not address the treatment plan for the pancreatic cancer.  The doctor ordered Immodium and Questran but did not document why these drugs were being added.  The doctor ordered a 2 week follow up. There was no follow up of the ATU visit of 11/2/13.

On 11/18/13 a medic saw the patient in the ATU based on a health request for diarrhea for 2 weeks.  The patient said he "can't hold any food or fluid down".  Apparently, a doctor wrote a brief note in the physician assessment section.  The doctor noted that the patient was unable to tolerate food but didn't assess the weight or how much the patient was eating and whether this might be causing a problem.  The doctor did not assess for dehydration or malnutrition.  The doctor noted that the lungs were clear and heart had a regular rate and rhythm and that the patient had jaundice.  There was no assessment and the doctor ordered ensure for 2 months.

On 11/19/13 an ultrasound showed multiple dilated bile ducts; IVC thrombus; 2.9 cm mass in head of pancreas.

On 11/20/13 the patient was admitted to the infirmary unit in preparation for a gastroenterology evaluation and biopsy. By the time the patient was admitted he weighed 124 pounds.  On 11/20/13 the patient was evaluated by gastroenterology via telemedicine.

On 11/25/13 the patient was sent to the hospital for diagnostic evaluation.  For almost a month the patient had an extremely high bilirubin.  Instead of a prompt evaluation, the patient wasn't sent for evaluation for almost a month.

 The patient was discharged from the hospital on 12/3/13 and had a diagnosis of high grade adenocarcinoma.

On 12/4/13 a provider noted that the patient had an ERCP and pancreatic cancer was diagnosed with liver metastases.  The provider wrote to check the INR which later was 1.2 and the doctor increased the Coumadin.  There was no history and no physical examination.  The provider did not document a follow up plan with the oncologist.

On 12/5/13 a provider documented no history or physical examination and assessed only 2 problems pancreatic cancer and IVC thrombus.  The INR was documented as 1.2 and Coumadin was increased to 7.5.  The provider did not address a plan for the cancer.  On the same day, the nurse graphic record on the infirmary documented a blood pressure of 93/63 and 96/62.  The patient's hypotension was not addressed.

49

JX-CCH-000139

On 12/6/13 the provider documented no history or physical examination.  The INR was documented as 1.9.  The Coumadin was decreased to 5 mg.

On 12/7/13 a provider took no history and performed no physical examination only noting that the INR was 2.1.  The cancer wasn't addressed.

On 12/8/13 a provider took no history and performed no physical examination only noting that the INR was 2.0.  The cancer wasn't addressed.

On 12/9/13 a provider took no history and performed no physical examination only noting that the INR was 2.2.  The provider noted that the patient had a hematology oncology appointment. On the same day the nurse graphic record shows a blood pressure of 86/55.  This critical hypotension was not addressed.

On 12/11/13 the patient was discharged back to general population despite having recent hypotension and an extremely high bilirubin.

On 12/17/13 an LSU consultation (only part of it was present in the medical record) documented that the patient had stage IV pancreatic adenocarcinoma with liver and lung metastases.  The note documented that the patient gave a history of 6 months of increasing abdominal pain before diagnosis of pancreatic cancer.  The note described that the patient had a biliary stent placed to reduce the bilirubin.  The patient wasn't initially a candidate for chemotherapy because of the elevated bilirubin.  The hospital admission bilirubin was 32.6.  The bilirubin on 12/7/13 was 8.9.  Labs needed to be repeated and when the bilirubin improved they anticipated starting Gemcitabine as a single chemotherapeutic agent.  The patient agreed to chemotherapy.  A return appointment was recommended on 1/14/14.  The last bilirubin in the medical record appeared to be from 10/30/13 when it was 21.3.  The high bilirubin was not being followed despite how abnormal it was.

On 12/18/13 the patient was called to clinic to discuss the oncology visit on 12/17/13.  The doctor documented nothing about the oncology consultation.  There was no history with respect to the patient's cancer or therapeutic plans and the only assessments were pancreatic cancer and low potassium.  The plan was to order a blood count and metabolic panel every week and to add potassium and to change the duty status.  There was no follow appointment scheduled.  The doctor failed to monitor the INR or anticoagulation and failed to acknowledge the IVC thrombus.

The following day another doctor saw the patient and wrote a progress note on 12/19/13.  The provider's only comment was "Doing well".  A 2 month follow up was ordered.  The doctor took no history, performed no physical examination, ordered no laboratory results and documented nothing with respect to managing the follow up of the oncology care.  A 2 month appointment ensured that the provider was not going to participate in assisting the oncologist in care of the patient.

On 1/2/14 a doctor saw the patient in follow up of pancreatic cancer.  The doctor noted that the last ILH visit was 12/17/13.  The only history of further treatment was that the current status was "In decision making stage about chemo vs no chemo".  A minimal examination was done but no laboratory tests were evaluated.  The doctor documented no knowledge of the conditions favoring chemotherapy vs. no chemotherapy.  The doctor noted pancreatic cancer and GERD as the only problems and documented the plan as per the oncology consultant.  No follow up was scheduled.  The doctor failed to acknowledge the IVC thrombus or anticoagulation.

50

On 1/9/14 a doctor documented that the patient had a history of pancreatic cancer and wanted a duty status change.

On 1/13/14 the patient was sent to the ATU for wound care on his penis which resulted from a surgical procedure.  The patient was noted to be on warfarin.  A person documented on the physician assessment section but did not sign their title.  This documented changing a dressing.

On 1/14/14 the patient went to the oncologist.  The Trip Return form documented that the patient went to oncology.  The summary documented that the patient had stage IV adenocarcinoma of the pancreas with radiological evidence of liver and lung metastases.  They recommended a GI consult for manage the high bilirubin and stent because the bilirubin was still high at 4.8.  The recommended a 6-8 week follow up and said they would start a single chemotherapy agent.  The cancer was diagnosed by an ultrasound guided needle biopsy done 11/26/13.  A biliary drain was placed 11/29/13 and a metallic biliary stent was placed 12/3/13.

On 1/24/14 medics evaluated the patient who had developed altered mental status and significant hypotension.  Upon arrival on the unit the blood pressure was 60 systolic at 8:31 am but the diastolic pressure could not be obtained.  The patient was taken to the ATU and arrived in the ATU at 8:50 am.  The CBG was 15 and intravenous glucose was given with some response.  The patient's blood pressure remained low.  At 10:25 am the patient's blood pressure was 75/38 with a pulse of 42 after intravenous fluid.  The provider ordered labs and intravenous fluid.  The patient was "unresponsive on arrival".  Instead of sending the patient immediately to a hospital, the doctor's attempted to manage the patient onsite and even started a discussion with the patient about advanced directives.  The doctor said that the patient refused to sign an advanced directive and wanted to go to the hospital.  The ambulance left the prison for a hospital at 12:13 pm and arrived at the hospital at 1:18 pm.  The patient was transported to Lane Hospital but expired in the emergency room upon arrival at the hospital.

The medical summary found no problems with care and mostly discussed

COMMENTS

1.   The patient had evidence on chest x-ray of chronic obstructive lung disease which was never followed up on.
2.   The patient's first complaints of abdominal problems was on 10/10/13 when the patient had diarrhea and about 9 pound weight loss.  The patient was evaluated by a medic but should have seen a physician, not a medic.  The medic appeared to be acting out of the scope of his license.  Another medic evaluated the patient on 10/18/13 for diarrhea and again the medic failed to refer to a physician.
3.   A doctor saw the patient for diarrhea and weight loss on 10/21/13.  The bilirubin was 19.7 which is a critical level.  The alkaline phosphatase was 303 which is also elevated.  This indicates an obstructive problem in the pancreas or gallbladder and should have been attended to by sending the patient to a hospital.  Instead a doctor referred the patient to the hepatitis clinic.  This is a fundamental lack of appreciation of the condition of the patient.
4.   A CT scan showed a pancreatic mass with biliary duct dilation along with an inferior vena cava thrombus on 10/23/13.  Although anticoagulation was started, the patient didn't have a diagnosis until 11/25/13 when he was admitted to a hospital.  The patient's condition was not one that should have been routinely worked up.  The patient had a critically elevated bilirubin

51

JX-CCH-000141

and on 10/31/13 had a fever.  Obstructive jaundice with fever is a critical condition and the patient should have been admitted to a hospital not worked up on a routine basis.

5.   After the patient was diagnosed with adenocarcinoma the patient returned to the infirmary. From 12/4/13 through 12/11/13 providers wrote 7 notes on the infirmary unit.  None of these interactions included a history or physical examination.  On 2 of these days, the patient experienced hypotension but even these episodes were not evaluated.  The providers did not order or monitor the serum bilirubin that was significantly elevated.  The providers did not monitor the patient's condition.  The providers did not note the follow up with an oncologist.

6.  The patient was discharged to general population on 12/11/13.  The patient was evaluated in clinics by providers on only 3 occasions.  Little to no history was taken.  There was minimal physical examinations.  There was no monitoring of the bilirubin level or monitoring of the IVC thrombus with an INR.  The oncology follow up was addressed only once by saying that the oncologist was debating whether to use chemotherapy or not.  This was not an accurate representation of the oncology recommendation which was to start chemotherapy after the bilirubin was lower.  The providers failed to monitor the patient's thrombosis, bilirubin, or oncology follow up appropriately.

7.  When the patient became hypotensive on 1/24/14, the patient had a critically low blood pressure and yet was not transported to a hospital for almost 5 hours.  During part of this time a provider discussed advanced directives with the patient and did not want to transport the patient to a hospital.  The patient wanted to be treated.  This was a significant delay and may have contributed to his death.

8.  On 11/6/13 before the patient had even had a diagnosis, a doctor noted that the patient wanted to pursue treatment.  This was an unusual question.  After the diagnosis and after the patient had seen the oncologist on 1/24/14, the patient became hypotensive and was critically ill.  The patient wasn't sent to a hospital for 5 hours.  Part of this time a provider documented attempted to discuss advanced directives with the patient.  When the patient wanted care the patient was sent to a hospital albeit significantly in a delayed manner.

Patient #11

On 6/11/2013 a physician saw the patient in clinic in the Pine Unit.  The doctor noted that the patient complained of weight loss and documented that the weight in May of 2012 was 170 pounds and was 141 in June of 2013.  The doctor also noted diarrhea alternating with constipation without cramping. The physician documented that the patient was doing well but it is not clear what this meant with respect to having lost approximately 30 pounds and having diarrhea.  The abdomen was documented as soft.  There was no assessment of the Crohn's disease but the doctor did refer the patient for colonoscopy.  The doctor did not address medication.  The doctor ordered follow up in 6 weeks.

On 6/24/2013 the laboratory reported WBC 10.5 (normal 4.5-10.5); hemoglobin 10.9 (normal 11-18); platelets 618 (normal 150-450). This patient had elevated platelets from this date to 2016.  Over the course of the 2 and a half years, doctors never evaluated the cause of his elevated platelet count or documented a reason why the patient might have elevated platelets.  One reason for elevated platelets is myeloproliferative disorders which are pre-cancerous pathologies of bone marrow.  Another reason for elevated platelets is a reactive thrombocytosis that can be caused by infection, malignancy, having had the spleen taken out and blood loss.  This was never evaluated over the subsequent 2.5 year period.

52

On 6/25/2013 the laboratory reported hemoglobin A1c 5.8 (normal 4.8-5.6; diagnostic for diabetes is >6.4)

On 8/1/2013 a doctor saw the patient in clinic.  The weight was 143.  The doctor took no history of the current symptoms related to weight loss but did document that the patient had a perforated colon during a prior sigmoidoscopy and that a repeat colonoscopy showed a sigmoid mass that was not malignant.  The doctor performed no physical examination.  The doctor documented 4 problems.  The doctor noted that the patient had Crohn's disease.   The doctor noted that the patient was on ensure and another medication that was illegible and had a prior colonoscopy in 2009.  There was no plan except to return in 3 months.  The doctor did not document the status of the patient's disease by assessing symptoms against therapy.  The doctor also noted anemia and elevated platelets as a problem but did not address what he was going to do about it even though anemia can represent a serious problem for persons with Crohn's disease.  The doctor also documented prediabetes and elevated lipids (LDL 172 and HDL of 26 with total cholesterol of 219).  There was no plan but the doctor should have assessed the 10 year cardiovascular risk and considered starting the patients on medication.  The patient had indications for treatment of his blood lipids but this was not done.  The doctor also noted hepatitis A and B infections with elevated alkaline phosphatase but said that the patient went to hepatitis clinic and noted that there was no need for follow up.  The doctor also noted an elevated PSA and said that the urologist was following the patient.

On 8/3/2013 the laboratory reported PSA 7.2 (normal 0-4).

On 10/10/2013 the laboratory reported WBC 11.4 (normal 4.5-10.5); hemoglobin 10.8 (normal 11-18); platelets 489 (150-450)

On 10/10/2013an x-ray of L and R wrist shows patchy decreased mineralization.

On 10/11/2013 the laboratory reported alkaline phosphatase 167 (normal 44-103); iron binding capacity 223 (normal 250-450); serum iron 25 (normal 40-155); iron saturation 11 (normal 15-55); B 12 341 (normal 211-946); folate 17.6 (normal >3); and sedimentation rate 24 (normal <30).  The laboratory values imply an iron deficiency anemia yet this was never pursued further and the patient wasn't treated for iron deficiency anemia.

On 10/17/13 a provider performed an annual history and physical examination.  The provider documented Crohn's disease, pre-diabetes, and elevated PSA as problems.  The provider noted that the patient was taking ensure, a protein supplement, and a gram of sulfasalazine twice a day for the Crohn's disease but took no history with respect to the symptoms of Crohn's and did not evaluated the status or degree of control of this disease including not identifying that the patient had ongoing iron deficiency anemia.  The provider noted that the patient had high blood lipids and noted that a statin drug was indicated.  The plan did not discuss when the colonoscopy would be done.  The doctor did not document starting a statin drug for high blood lipids but started Metformin for pre-diabetes.  Metformin is recommended for pre-diabetes when the A1c is >6.  Notably, review of the MARs show discontinuity of the MARs in the record.  The January through May and December of 2013 MARs were in order in the medical record.  But many MARs were not present.  The MARs for January through May document that the patient was mostly a no show for his Azulfidine.  The December 2013 MAR documents that the medication was keep-on-person but the Azufidine had one notation on 12/18/13 that was circled, which typically means that the patient did not receive medication.  So there is no verification that the patient received his medication over this period of time.  Medication compliance was not discussed by the

JX-CCH-000143

provider on this visit.  Also, metformin was present on the December MAR but there was no verification that it was given.  A statin drug was not present on the MAR for December 2013.

On 11/26/2013 a doctor did a chart review and documented that the patient was last seen for his Crohn's disease 7/28/11 in surgery clinic and had been recommended to have a repeat colonoscopy every 1-2 years.  A referral had been submitted 6/11/13 but the doctor documented that the procedure was never scheduled.  The doctor documented a 30 pound weight loss over the past 18 months.  The plan was that the patient needed repeat colonoscopy and GI referral.  The weight loss had not been addressed on prior physician notes even when it was noted.

On 12/12/2013 the laboratory reported WBC 12.4 (normal 3.4-10.8); hemoglobin 11.1 (normal 12.6-17.7); platelets 490 (normal 155-379); glucose 62 (normal 65-99).

On 12/19/2013 the patient had a colonoscopy at LSP.  The note was placed at the end of the medical record.  Multiple biopsies were taken.  A pathology report documented biopsy of random colon- an anastomosis biopsy site showed chronic inflammation and cryptitis without distortion representing colitis.  IBD could not be ruled out.  Endoscopy correlation was recommended.

On 2/12/2014 the patient was evaluated by gastroenterology via telemedicine.  A complete note of this visit was not present correctly in the medical record.  Part of a telemedicine note dated 2/12/14 was filed at the end of nursing notes from an infirmary admission and not in chronological order.  The note recommends an MR enterography to evaluate for small bowel disease and follow up after the MRI at the clinic.  A doctor from LSP wrote on the note, "Pt doing very well on current tx, wt loss resolving- this can wait until malignancy suspected".  This was an intentional decision to not treat the patient until harm has occurred and reflects a significant departure from standard of care.  In part the purpose of the enterography is to determine if there was an abnormality of the small bowel and the extent of the Crohn's disease including whether a malignancy was present.  Apparently, this test was done at a later date despite this physician's comment.  There were multiple copies of this partial note in multiple parts of the medical record.

On 2/14/2014 the laboratory reported PSA 6.4 (normal 0-4).

On 2/19/2014 the laboratory reported sedimentation rate 44 (normal 0-30); c-reactive protein 13 (normal 0-4.9).  This indicated an inflammatory state suggesting ongoing active Crohn's disease.

On 2/19/2014 the laboratory reported glucose 151 (normal 70-110); creatinine 0.84 (normal 0.5-1.2); WBC 12.9 (normal 4.5-10.5); hemoglobin 12.5 (normal 11-18); platelets 518 (normal 150-450).  This patient had elevated platelets for at least more than half a year without evaluation.

On 3/6/2014 an MRI documented that there was chronic Crohn's disease involving the ileum with a 4 cm abscess involving the surgical anastomosis.  Also noted was moderate to severe prostatic hypertrophy.  This did not appear to be reviewed by physicians at LSP until after review by an LSP gastroenterologist on 6/18/14.

On 4/14/2014 an urologist saw the patient for follow up of increased PSA and prostatic hypertrophy.  The doctor noted that the PSA decreased to 6.4.  The doctor noted that the patient refused a biopsy and wants to wait to follow the PSA. The doctor ordered a PSA for October 14 with a follow up November

54

JX-CCH-000144

2014.  This note was misplaced and was at the end of nursing infirmary notes and not in chronological order.

On 6/18/2014 a doctor at ILH documented that the patient had Crohn's disease since 2009 and was recently taking sulfasalazine.  The doctor noted that in March the patient had an MRI showing a 4 cm intraabdominal abscess and fistulizing Crohn's disease.  The doctor was told that at LSP they reported a colonoscopy from 2013 at Angola that was normal with colitis of the anastamosis.  This note was incomplete and was filed after nursing notes and not in chronological order in the medical record.

On 6/18/2014 a doctor at LSP wrote a brief note documenting that a doctor saw the patient over telemedicine and an MRI was reviewed and that there was a 4 cm abdominal abscess with a left lower quadrant sinus tract.  The writer documented that the telemedicine doctor requested the gastroenterology service drain the abscess and give intravenous antibiotics.  This apparently represents a request to hospitalize the patient.

On 6/24/14 the patient was admitted to the infirmary for a 23 hour observation after a CT guided needle drainage of an intraabdominal abscess.  The patient was discharged from the infirmary on 6/25/14.

On 7/18/2014 a note from ILH was found in the nursing section of the infirmary notes and not in chronological order.  The note documented that the patient was recently admitted for an intraabdominal abscess that required drainage and a colonoscopy that showed a stricture.  The patient was to follow up in the colorectal clinic.  It appears that the patient did not follow up in colorectal clinic and the gastroenterologist documented as a plan "will make sure that patient has follow up in colorectal clinic".  The plan was to order a CT to assess the extent of the abscess with possible need for further surgery.

On 7/30/2014 a CT scan report was found at the end of nursing notes related to an infirmary admission.  The CT scan showed a 4 by 3.6 cm renal cyst; significantly enlarged prostate with an underlying bladder mass; and a long segment with circumferential wall thickening of the ileum with multiple areas of luminal narrowing with perienteric stranding.  A second page of this report had an impression that there was a long segment that possibly represented inflammatory bowel disease, a 2 by 1.3 cm peripheral collection likely an abscess in the ileopsoas, and severe prostate enlargement with a possible underlying bladder mass.  This report does not appear to be acted on.  This CT scan did not get to ILH when they subsequently saw the patient.

On 10/2/2014 a note from an intern at ILH dated 10/2/14 documents that the patient had a recent colonoscopy demonstrating a stricture.  The note documented that an ileocolic resection surgery was planned for 10/31/14.  A CT scan of the abdomen and pelvis was reviewed and described as involving mostly the small bowel with no evidence of colonic involvement.  A left renal cyst and enlarged prostate was noted.

On 10/29/2014 the laboratory reported PSA 5.8 (normal 0-4).

On 12/9/2014 a doctor was to see the patient in clinic but the patient didn't show up as the patient was in New Orleans for a procedure.  The doctor wrote that the patient was being seen to follow up the PSA.  The doctor documented 10 elevated PSA tests since 2008.  The doctor noted that the enlarged prostate

55

was pushing into the bladder.  The doctor wrote that the patient was to return at the next available clinic.

On 12/15/2014 the patient was discharged from ILH.  The note was incomplete and not present in the record in chronological order.  Part of the note recommended a 1 month follow up with colorectal surgery.  A doctor gave a verbal order to admit to Unit 1 infirmary, Senekot; Konsyl; Colace; Norco; metformin; Sulfasalazine; Flomax and a daily wash out of the fistula drainage apparatus.  The volume of contents was to be recorded.

On 12/16/2014 a doctor wrote an admission note to the infirmary.  The doctor noted that the patient had Crohn's disease with surgery and partial colectomy at ILH as a result of development of a hematoma and fistula.  The doctor noted that the patient had a fistula for 40 days.  The doctor noted that the patient was being transferred back to LSP.  There was no other history or physical examination.  The doctor did not note what precisely had occurred recently at the hospital and did not indicate what the follow up plan was.  A second doctor note on the same day documented an assessment as "stable" without specifying what was stable and what the condition of the patient was.

On 12/17/2014 a doctor saw the patient on the infirmary.  There was no history.  Aside from vital signs there was no physical examination except to note that there was 1100 cc of output of the fistula.  There was no assessment of any of the patient's problems and there was no change of plans.

On 12/24/2014 a doctor saw the patient on the infirmary.  There was no history.  A brief examination noted vitals, the output of the fistula a clear chest and regular heart rate.  The impression was "stable".  There was no plan.

On 12/27/2014 a doctor saw the patient on the infirmary.  The only history was that the patient was "doing well".  There was no physical examination except to note vital signs.  The impression was a fistula but no other problems of the patient were addressed.

On 12/29/2014 the laboratory reported WBC 12 (normal 4.5-10.5); hemoglobin 11.3 (normal 11-18); platelets 418 (normal 150-450)

On 12/29/2014 a doctor saw the patient on the infirmary.  Except for noting no complaints and decreased appetite there was no history.  There was no physical examination except noting vital signs and documenting that the wound had an odor.  The only assessment was that there was a fistula.  The doctor ordered ensure, a culture of the fistula, blood cultures, a blood count and metabolic panel, and a surgery consult.  On a separate form this request for surgery was documented as "ASAP".  The referring doctor stated that there were no contents of the fistula in the apparatus.  A duplicate copy of this document was present in the mental health section of the medical record and not in chronological order.

On 12/30/2014 the laboratory reported glucose 113 (normal 65-99); creatinine 0.78 (normal .76-1.27) and blood cultures reported no growth.

On 12/30/2014 a doctor saw the patient on the infirmary.  Except for noting that a surgery consult was made and noting vital signs there was no other documentation.

JX-CCH-000146

On 12/31/2014 a doctor saw the patient on the infirmary.  There was no history, and except for noting no fever and a fistula output of 1100, there was no physical examination.  The doctor noted that there should be unit 2 charting with vital signs but there was no documentation of the frequency of vital signs.

On 1/1/2015 the laboratory reported that the aerobic bacterial culture was heavily contaminated and not useable as a specimen.

On 1/3/2015 the laboratory reported blood cultures without no aerobic or anaerobic growth.

On 1/5/2015 a doctor gave a verbal order for glucerna supplement, vitamin C, zinc, and to remove sutures.

On 1/5/2015 there were 2 provider visits on the infirmary.  A doctor saw the patient but took no history.  There was no physical examination except to note vital signs, noting 2 negative blood cultures, and that the fistula produced 1150 cc.  The only assessment was that the patient was stable.  There was no change to the plan.  The second evaluation was by a NP.  The NP took a history that the fistula was healing with decreased drainage.  The patient denied pain or shortness of breath.  There was no history with respect to control of his Crohn's disease.  The NP completed a physical examination.  The NP noted that the patient had Crohn's disease, diabetes and a fistula.  However the NP did not address the progress or status of the Crohn's disease.

On 1/9/2015 a doctor saw the patient on the infirmary.  There was no history and no physical examination except to note 125 cc of fistula drainage.  There was no assessment or plan.

On 1/9/2015 a physician clinic note was present in the nursing notes of the infirmary.  There were no vitals on this note including weight.  The doctor noted that the patient had a recent resection of his bowel and had a collection device on his abdomen.  That was the entirety of the history.  The doctor noted a PSA of 5.8.  There was no physical examination.  The only assessment was increased PSA and a left renal cyst.  The doctor ordered another PSA test.  This note was found in the nursing notes of an infirmary admission later in the year.

On 1/14/2015 a doctor gave a phone order for Glucophage 500 mg in the morning, Azulfidine a gram twice a day; Flomax; vitamin C and zinc but there was not provider progress note associated with these orders.
On 1/15/2015 the patient was evaluated in colorectal clinic at ILH.  The recommendation was to obtain daily washouts of the fistula.  The recommendation was to change the abdominal device every 5-7 days or more frequently if leaking.  A 6 week follow up was recommended.  These recommendations were not documented as completed in the physician progress notes.

On 1/20/2015 a doctor saw the patient on the infirmary.  There was no history.  Aside from noting no fever and an output from the fistula of 100 ccs, there was no examination.  There was no assessment except "stable" fistula.  No other problems or labs were addressed.  The doctor did not document review of the recent consult visit at ILH.

On 2/1/2015 a doctor saw the patient on the infirmary.  The doctor took no history.  There was no physical examination except to note 1500 cc and no temperature.  There was no assessment.  The doctor noted that Dr. Lavespiere was consulted and the doctor said that he would consult with ILH GI to determine the next steps.  On the same day a doctor gave a phone order for a blood count in the

JX-CCH-000147

morning, a culture of abdominal contents, notification of fever, and blood cultures if the temperature exceeded 101.5.  None of these orders were associated with a progress note describing why this was ordered.

On 2/2/2015 a doctor saw the patient on the infirmary.  The doctor took no history.  The doctor noted that there was a large amount of fecal material in the fistula output and noted that a culture was done and a blood count was done.  The doctor performed no physical examination.  The doctor assessed that he needed to rule out another fistula and documented that there should be compliance with GI.  It wasn't clear what this meant.  Later, the patient presented to the ATU and was evaluated by a medic who noted an abdominal abscess.  The ostomy bag was not holding its seal.  There was no other note associated with this emergency run document.  There were 2 copies of this document in the medical record in different areas and not in chronological order.  On the same day the laboratory reported WBC 10.1 (normal 4.5-10.5); hemoglobin 11.7 (normal 11-18); platelets 544 (normal 150-450); creatinine 1.57 (normal 0.5-1.2); glucose 203; BUN 37 (normal 6-20).  On a separate document a doctor gave a verbal order to transfer the patient to ILH.  The patient was evaluated in the ER at ILH. The doctor documented that the patient was passing bowel contents through his penis when attempting to urinate over the past 2 days.  The patient was not toxic.  The patient was discharged on antibiotics with a recommendation to follow up in surgery clinic on 2/5/15. The WBCs were elevated.  The ER doctor noted that there was a General Surgery appointment was already scheduled for 2/27/15 and a Colorectal Surgery appointment for 3/5/15.  Portions of this ILH note were present in multiple areas of the medical record and not in chronologic order.

On 2/3/2015 at 3:10 am, a doctor gave a verbal order for Bactrim for 10 days and for lab values.  There was also an order for general surgery clinic on 2/5/15 and colorectal clinic on 3/5/15.  Later at 7:30 am a doctor gave a verbal order for Bactrim.  Later, a doctor on the infirmary at LSP noted that the patient returned after an evaluation at ILH.  The doctor did not document the findings at ILH.  The doctor took no history, performed no physical examination and made no assessment.  The doctor ordered Septra for 10 days.  This is the same drug as Bactrim.  The laboratory reported on this day WBC 10.2 (normal 4.5-10.5); hemoglobin 11.1 (normal 11-18); platelets 552 (normal 150-450); creatinine 0.8 (normal 0.5-1.2).

On 2/4/2015 the laboratory reported aerobic bacterial culture was heavily contaminated and not useable as a specimen.  On 2/5/2015 the laboratory reported urine culture no growth.
On 2/5/2015 a doctor saw the patient.  The doctor took no history, and performed no physical examination except to note 400 cc of output that that was foul smelling.  There was no assessment or plan.

On 2/10/2015 a doctor saw the patient on the infirmary.  There was no history and the only physical examination was to note 1500 cc of fecal output from the fistula.  There was no assessment except "getting more foul smelling feces out".  This is not an assessment.  The doctor ordered that the patient be transferred to ILH for evaluation.  Notably on 2/2/15 the consultant at ILH had recommended a 1 week follow up which did not occur.     At ILH, a physician saw the patient and noted that the patient had Crohn's disease with fistula repair in the past.  The consultant documented that the patient was receiving irrigation of the fistula since 12/15/14.  The consultant documented that the fistula drainage had become foul smelling with appearance of fecal material.  The consultant was concerned about new fistula formation.  The patient was documented as being on Septra twice a day [Septra is an antibiotic].  An ILH emergency room doctor documented that the history was that there was a resection of bowel in October but that the patient had developed a fistula immediately after the resection with increased output.  Surgeons placed the patient on antibiotics.  The patient related that the fistula output changed

58

color and had a foul odor with streaks of blood in the ostomy bag.  The patient had not been able to gain weight.  The note ended after the history and was incomplete in the medical record. Portions of this note were present in different sections of the medical record.  It wasn't clear what occurred to this patient at ILH because of disorganization of documents in the medical record.

On 2/11/2015 a doctor saw the patient on the infirmary.  There was no history.  The only physical examination was to document that the abdomen was soft and that the fistula was not closing down.  There was no assessment and no plan.   The doctor did not note what had occurred at ILH the day before.

On 2/16/2015 a doctor saw the patient on the infirmary.  There was no history.  The only physical examination was to document clear lungs and 1500 cc of output from the fistula which still had fecal material and food. The doctor noted that he would contact GI at ILH.

On 2/19/2015 a doctor saw the patient on the infirmary.  There was no history of the patient's condition.  The doctor noted that he spoke with a doctor [apparently at ILH] who said that "nothing could be done".  The fistula output was 1150 cc.  The doctor diagnosed a fistula but addressed no other problems of lab abnormalities.  The doctor ordered more labs.

On 2/20/2015 the laboratory reported WBC 14 (normal 4.5-10.5); hemoglobin 11.2 (normal 11-18); platelets 581 (normal 150-450); glucose 65 (normal 70-110); and creatinine 0.71.

On 2/23/2015 a doctor saw the patient and documented that nurses reported 400-500 output from the fistula.  The doctor noted that general surgery noted that nothing could be done surgically and to continue the present management.  The doctor completed a brief physical examination and noted that there was a fecal smelling from the fistula.  The doctor assessed Crohn's disease and a fistula but documented no other problems.  The doctor wrote to continue per GI recommendations and to keep follow up appointments.  The recommendations from gastroenterology were not clear in the infirmary doctor notes.

On 2/26/2015 a doctor saw the patient on the infirmary.  There was no history or physical examination.  There was no assessment except "No acute" changes.  The doctor noted that the patient was scheduled for surgery at ILH.

On 2/27/2015 the patient went to general surgery instead of colorectal surgery and the appointment needed to be rescheduled.

On 3/2/2015 a doctor saw the patient on the infirmary.  He documented no complaints but took no other history.  Except for noting 400 cc of output from the fistula, there was no physical examination.  The assessment was "fistula repair".   The doctor noted that he recommended following the ILH protocol but this wasn't specified.  The doctor did not address any of the other problems or abnormal labs of the patient.

On 3/5/2015 the patient went to colorectal clinic at ILH for follow up of Crohn's disease.  The patient had a fistula appliance.  The note was incomplete and not present in the medical record.

On 3/6/2015 the laboratory reported WBC 10.2 (normal 4.5-10.5); hemoglobin 9.9 (normal 11-18); and platelets 604 (normal 150-450).

JX-CCH-000149

On 3/6/2015 an eceptionist comment stated that the patient needed 1 month follow up for colorectal clinic to schedule surgery.

On 3/6/2015 a doctor saw the patient on the infirmary.  There was no history.  There was no physical examination.  Vital signs were listed and abnormal labs were listed but not addressed.  The only assessment was "stable".  The follow up planned surgery was not noted.

On 3/12/2015 a doctor saw the patient on the infirmary.  The doctor took no history and performed no physical examination.  Abnormal labs were noted but not addressed.  None of the patient's problems were addressed.  The doctor's assessment stated "as above- asymptomatic".  It is not clear what this meant as there was no history or physical examination and no diagnoses with status and degree of control.

On 3/24/2015 a doctor saw the patient on the infirmary.  There was no history.  The output of the fistula was noted to be 1300 cc.  The documentation in the record with respect to physical examination was unintelligible.

On 3/25/2015 the laboratory reported WBC 11.8 (normal 4.5-10.5); hemoglobin 9.8 (normal 11-18); platelets 482 (normal 150-450); glucose 115 (normal 70-110); BUN 9 (normal 6-20); and creatinine 0.62 (normal 0.5-1.2).

On 3/30/2015 a doctor saw the patient on the infirmary.  The only history was that the patient was "doing well".  There was no physical examination except to document the results of labs including a hemoglobin of 9.8; a white count of 11.8 and platelets of 482,000.  These were abnormal laboratory test results but were not addressed.  None of the other patient's problems were addressed including the BPH and pre-diabetes.

I attempted to examine MAR documents.  As of 4/1/2015 the inmate was on calcium carbonate, Azulfidine 1 gram BID, Flomax, zinc, and Glucophage 500 QD.  Not all MAR sheets were in the medical record so it isn't possible to verify that the patient received medication.  Some of the MARs in the medical record don't have dates on them so it isn't possible to tell which month each MAR belongs to.  Some MARS (for example from August and September of 2015) were completely blank apparently verifying that the patient received no medication.  Some MARs (such as October of 2015) were partly blank but for some items merely have check marks on the form not indicating who gave the medication to the patient; in this case ensure.  MARs were also not in chronologic order in the medical record.

On 4/8/2015 a doctor saw the patient on the infirmary.  The doctor took no history and performed no physical examination.  Abnormal labs were noted but not addressed.  None of the patient's problems were addressed.  The doctor's assessment was that the patient "remains stable".

On 4/10/2015 there was a very brief physician note that documented that there was 1500 cc of output and that the patient has surgery follow up.

On 4/13/2015 there was a very brief physician note that documented that the patient was to have surgical correction of the fistula.  The doctor took no history and performed no physical examination.

60

JX-CCH-000150

On 4/17/2015 a doctor evaluated the patient on the infirmary unit.  The doctor took no history and the only examination documented that there was 300 cc of fistula output.  The doctor documented that the patient had a surgery follow up and ordered a blood count and chemistry panel.   Later, the laboratory reported glucose 63 (normal 70-110); creatinine 0.76; WBC 14.4 (normal 4.5-10.5); hemoglobin 11.5 (normal 11-18); and platelets 556 (normal 150-450).

On 4/24/2015 a doctor wrote an infirmary note without taking any history.  The doctor noted that there was 300-500 cc of daily output from the fistula.  The doctor noted a white count of 14 thousand without any other comment.  This white count indicated infection but the doctor made no effort to identify the source of the infection or to assess whether the infection was related to the fistula.  The only impression was that the patient was "stable".  The only plan was to await the surgery consult.

On 4/26/2015 a doctor gave a telephone order for Bactrim for 10 days.  Bactrim is an antibiotic.

On 5/1/2015 a doctor wrote a brief note on the infirmary stating that the patient had a rash and prescribed hydrocortisone.  The fistula wasn't addressed.

On 5/7/2015 the patient was evaluated in surgery clinic in follow up of an ileocolectomy.  The report of this consultation was not present in the medical record.  On the same day an LSP doctor gave a telephone order for returning to ILH for surgery on 5/26/15 and in need of pre-op chest x-ray and EKG with blood count metabolic panel, pre-albumin and albumin levels as well as a follow up in Colorectal clinic in 1-2 weeks.

On 5/8/2015 the laboratory reported glucose 76; creatinine 1.1; WBC 12.1 (normal 4.5-10.5); hemoglobin 10.9 (normal 11-18); platelets 575 (normal 150-450).  The following day the laboratory reported pre-albumin 21 (normal 20-40).

On 5/10/2015 a doctor wrote an infirmary note stating that there was a fistula with 200 cc of output.  There was no other examination.  There was no diagnoses.  The doctor noted that the patient was awaiting surgical revision in a week and that he would resume antibiotics.

On 5/15/2015 a doctor gave a telephone order for Bactrim twice a day for 2 weeks.

On 5/20/2015 the laboratory reported creatinine 1.05; BUN 11; and glucose 83.  The following day the laboratory reported WBC 10 (normal 4.5-10.5); hemoglobin 11.7 (normal 11-18); and platelets 553 (normal 150-450)

On 5/25/2015 the patient was admitted to a hospital.  On 6/15/2015 the patient was discharged from the hospital.  The patient was admitted for surgical correction of an enterocolic fistula.  There were 2 fistulous tracts.  There were extensive adhesions. The patient was treated with several intravenous antibiotics.  The purulent drainage grew proteus, E. coli, and multiply drug resistant enterococcus.  The hospital discharge summary was duplicated and in the medical record in multiple locations.  Multiple documents in this chart were filed not in chronological order.  It was not clear that the patient was evaluated by a gastroenterologist at the hospital.  A 2 week follow up with colorectal surgery was recommended.

On 6/18/2015 a consultant who apparently saw the patient at LSP, documented that the patient had surgery for Crohn's disease in November of 2014 and "was left with a open wound + suction apparatus

61

on abdominal wall since that time for abscess/fistula".  The consultant went on to add that the patient returned for possible repair in 6/15 which was unsuccessful and that the patient continued to have the abdominal apparatus and open abdominal wound.  The doctor stated that the patient displayed marked depression and requested an antidepressant.  It was not clear what type of consultant was seeing the patient.

On 6/24/2015 a nurse wrote a memo to classification indicating that Dr. Helms sent the patient to Unit 2 infirmary "due to a decline in his medical condition".  There were no progress note related to this physician order.

On 6/30/2015 the laboratory reported PSA 7.8 (normal 0-4).

On 7/2/2015 the patient was evaluated at ILH following surgery on 6/6/15 to repair a fistula.  The fistula was still present.  Binding sutures were removed.  Wound care was recommended.

On 7/13/2015 a doctor evaluated the patient.  There was no history of the patient's current status.  The doctor noted that the patient had Crohn's, prior resection, and abdominal abscess, recent colon surgery, and colostomy.  But the doctor did not take a history or make any assessment of the patient's current status of his Crohn's disease.  The doctor noted that the PSA was elevated but that the patient had a negative biopsy in 2007, 8 years previously.  There was no other history and no physical examination.  Vital signs were not even taken.  The doctor ordered another PSA test and ordered a 6 month follow up.  This physician failed to address or treat the patient's Crohn's disease.

On 7/23/2015 the laboratory reported PSA 8.1 (normal 0-4).

On 8/25/2015 a doctor saw the patient for a surgery clinic at LSP.  The doctor noted that the patient had prior bowel resection and that the fistula output was decreased and that if the output from the fistula decreased further the apparatus may be removed.  **The apparatus had never been mentioned in any prior notes by physicians at LSP.**  A month follow up was recommended.

On 10/8/2015 nurses did symptom screening for TB but did not document a skin test result.
On 10/21/2015 a consultant saw the patient at LSP [it wasn't clear whether this was a telemedicine visit or an onsite visit].  The consultant noted that the patient had Crohn's disease with a fistula.  The patient was eating and had apparent normal bowel function.  The doctor recommended continuing the current therapy and said he would speak with the surgeon about evaluation of closure of the fistula.   A 2 month follow up was ordered.

On 12/16/2015 a doctor saw the patient.  Vitals were not done.  The weight was not taken.  The only history was that the patient was doing well but was still having drainage from the fistula.  The doctor spoke with another physician [presumably a surgeon] who said that no further surgery was planned.  The doctor wrote that he would recommend a GI consultation for possible Humira treatment.

On 12/16/2015 a doctor saw the patient.  It appeared that this was a surgical consultant.  Vital signs were not taken and weight was not taken.  The doctor wrote that the patient was doing well and had small amounts of drainage from the abdomen.  The doctor documented that he spoke with another doctor [apparently a surgeon] who related that no further surgery was planned and that the surgeon recommended GI follow up.

JX-CCH-000152

On 1/1/2016 the laboratory reported Quantiferon Gold tuberculosis test was negative.

A January 2016 MAR documented that Humira needed approval before being administered. The first injection was 1/22/16. There was no March MAR in the medical record.

On 1/7/2016 a doctor saw the patient. The blood pressure was 140/72 and the weight was 132 pounds. The doctor noted that the patient had Crohn's disease with recent surgery a year ago. The doctor wrote that this was the first surgery which is not accurate as the patient had surgery twice. The doctor noted that the patient had an enterocolic fistula which had decreased output. The doctor documented 10-20 cc/day of output from the fistula. It did not appear that there was a physical examination. The doctor noted only Crohn's disease with a fistula as problems. The doctor ordered a Quantiferon Gold tuberculosis test, a blood count, and ordered to begin Humira "ASAP". Humira is a powerful immunosuppressive drug with 3 boxed warnings. The doctor did not document his order for Humira in the note. The doctor ordered follow up in 1-2 months despite starting a powerful medication. On a prescription for Humira the doctor ordered a starter pack and 40 mg every other week for a year. This was presumably misunderstood because the patient received only 40 mg of Humira to start. It is recommended that a starting dose would be 160 mg to start followed by 80 mg the 2nd week and then followed by 40 mg every other week. This prescription error was below standard of care.

Monitoring parameters for Humira include TB screening prior to starting medication; blood counts; assessment for heart failure; Hepatitis B screening; and follow up assessments including for hypersensitivity reactions; lupus like syndromes; signs and symptoms of malignancy (e.g. splenomegaly, hepatomegaly, abdominal pain, persistent fever, night sweats, and weight loss); and periodic skin examinations. The recommended starting dose is 160 mg at week 0 and 80 mg at week 2 followed by 40 mg every other week starting at week 4. This physician did not know the starting dose of Humira and failed to follow up on its use. The initial blood count showed an elevated white count indicating possible infection of the fistula. This was not monitored contrary to black box warnings for this drug. This is below standard of care for use of this drug.

On 11/11/2016 the laboratory reported WBC 13.6 (normal 4.5-10.5); hemoglobin 10.8 (normal 11-18); platelets 600K (normal 150-450K); metabolic panel all normal.
On 1/12/2016 the laboratory reported cholesterol 138; creatinine 0.92; HDL-C 40.2; BUN 13; PSA 7.4 (normal 0-4); WBC 13.4 (normal 4.5-10.5); hemoglobin 10.1 9normal 11-18); and platelets 578 (normal 150-450).

On 1/20/2016 the laboratory reported fecal occult blood positive-1 sample

On 1/21/2016 a NP discharged the patient from unit 2 to a medical dorm.

On 2/1/2016 Humira was documented as given on 2/4/16 and 2/18/16.

On 2/2/2016 a urologist at LSP saw the patient and documented that the patient's PSA was increased and recommended another biopsy.

On 2/5/2016 the patient was evaluated in the GI clinic. They requested that the patient be sent to the emergency room for abdominal pain, fever, chills, or rectal bleeding and follow up in surgery clinic and also follow up in GI clinic in 2 weeks.

JX-CCH-000153

On 2/11/2016 a doctor saw the patient in follow up after discharge from the infirmary. Crohn's disease, hyperlipidemia and hepatitis A and B were listed as problems. The weight was 138 and blood pressure 134/79. The doctor noted that the patient had no complaints and had started Humira. The doctor did not note the dosages being given to the patient. The doctor noted 2 small open areas with drainage. A brief physical examination occurred. The doctor reviewed no lab results. The doctor noted that the patient had an increased PSA but took no action. The doctor also documented that the patient had diabetes but took no history of this, reviewed no lab results and did not identify the status or degree of control for this condition. The doctor ordered a follow up in 4-6 weeks and apparently also ordered that the contents of the colostomy bag be recorded.

On 2/19/2016 a resident saw the patient in gastroenterology clinic and documented that the patient was diagnosed with Crohn's disease in 2009 but apparently was not started on medication. After developing bloody diarrhea in October of 2014 he was hospitalized and needed resection of part of his ileum and colon which was since complicated by a fistula in spring of 2015 with a repeat surgery and additional resection of disease. A new anastomosis was surgically created. The GI doctor documented that a doctor at LSP started Humira to "help speed up healing of ECF". The doctor wrote, "Received 40 mg? Humira on January 22, uncertain why, then standard induction with 160 mg Humira Feb 4 then 80 mg Humira 2/18 without issue". The GI consultant recommended continuing the Humira. The blood pressure was 162/78. The recommendation was to follow up in surgery clinic within 2 weeks. The patient was then sent to the emergency room because of concern about an infection. The patient had no fever, no elevated white count but had an enterocolic fistula with purulent drainage an odor. The history was that the patient had Chron's disease post ileocecectomy and colostomy placement in 2014 complicated by an enterocutaneous fistula since 5/2015. The recommendation was to follow up in GI clinic in 1-2 weeks. The doctor noted that the correctional facility was emailed to the coordinator to schedule the visit. The blood pressure in the hospital was 172/72. A surgical consultant noted 2 enterocolic fistulas in the midline. The patient had laboratory tests including a C difficile test but these were not included in the ER record available in the LSP medical record.

On 2/22/2016 a Trip Return form documented that the patient was taken to the ER from the GI clinic to rule out infection.

The patient wasn't seen in follow up from the recent GI clinic until 3/3/2016. A doctor saw the patient for Crohn's disease. The blood pressure was 147/74. The weight was 140 pounds for a 5 foot 9 inch patient (BMI 20.7 which is within normal limits). The doctor failed to acknowledge that on 2/22/16 the patient was taken to the ER from an outside GI clinic to rule out an acute infection. The doctor did not address the elevated blood pressure even though this may be an adverse reaction to Humira. The doctor noted that the patient had normal bowel movements without pain or diarrhea and that the abdominal fistula was benign. The plan was to continue Humira; obtain labs from the outside hospital and to return for evaluation in 2 months. At the time of this clinic visit the patient was on Humira every other week; zinc; nutritional supplement; Nicoderm; Meloxicam; Tamulosin; Sulfsalazine; Metformin; and folate. The doctor did not address whether the patient was receiving medication and documented only Humira as a current medication.

On 3/10/2016 the patient was to be seen in a physician clinic but it was rescheduled due to an issue with security.

COMMENTS

64

JX-CCH-000154

1. This patient had ongoing active severe Crohn's disease since 2013 by virtue of 30 pound weight loss, anemia, abscess formation, and eventually fistula formation.  Yet in multiple LSP physician visits doctors failed to take adequate histories of the patient's symptoms; failed to perform adequate physical examinations; failed to assess whether the patient was receiving ordered medication; failed to review laboratory and other diagnostic test results with respect to the patient's disease status; and failed to provide adequate medication with respect to the patient's disease status.  The providers managing the patient did not appear to know how to manage the patient's condition.  An immunosuppressive drug indicated as early as 2013 and possibly earlier was not initiated despite worsening disease status for over 2 years.  The result of this neglect was deterioration of the patient's condition and harm including formation of fistulas and surgeries to drain abscess and damage to the gastrointestinal tract from ongoing poorly treated Crohn's disease.

2. Coordination between the consultants and LSP physicians was extremely poor.  On multiple occasions after a consultant visit or procedure, LSP physicians did not document recognition of what the consultant did or recommended and appeared to cause delays in managing the patient.  As an example, a referral for repeat colonoscopy submitted 6/11/13 was never scheduled according to an 11/26/13 note.  After multiple colorectal consultations or diagnostic tests, LSP providers did not document acknowledgement of recommendations or results of tests.  This resulted in delays in treatment and happened on multiple occasions.  As an example, after a MRI showing an abdominal abscess on 3/6/14 there was no timely follow up by an LSP provider.  The MRI indicating an abdominal abscess wasn't followed up until 6/18/14 when a doctor noted that the GI service recommended drainage.

3. The medication administration records at times appear to show that the patient did not show up for medication for months at a time.  Many other medication records failed to verify that the patient was receiving ordered medication.  One prescription of a provider failed to result in a prescription for medication (for a statin drug); the patient never received the drug; and subsequent providers failed to identify the need for the drug.  A doctor's order for Humira was poorly written and appeared to result in an improper dosing of the drug.

4. During an infirmary admission from December 2014 to April of 2015, providers mostly failed to take any history of the patient's progress, failed to perform adequate physical examinations, and failed to document the current treatment plan for the patient.  The patient's ongoing Crohn's disease was not monitored adequately and additional typical therapy (immunosuppressive therapy) was not initiated.

5. The patient had an elevated LDL cholesterol in 2013 which was not addressed or treated.


Patient #12

On 5/17/2013 a doctor saw the patient.  The blood pressure was 153/62.  The doctor took no history.  The doctor documented that the eyes were checked 10/12 and were "OK".  A brief examination documented 1+ leg edema.  The doctor documented that the patient had "white coat" hypertension meaning that the patient's blood pressure was elevated due to being seen by a doctor.  No change to medication was made.  The blood pressure was elevated and the medication should have been increased.

JX-CCH-000155

On 8/28/2013 a doctor saw the patient.  The blood pressure was 156/76.  The doctor noted hypertension, diabetes, high blood lipids and edema as problems.  The doctor took no history except to note "no problems".  The doctor noted that the blood pressure was 156/76 and the A1c was 8.6 and that the laboratory results hadn't been checked in a year.  On physical examination the doctor noted no edema.  The doctor did not evaluate or assess whether evaluation had been done for end-organ damage including retinopathy, neuropathy or nephropathy.  The doctor ordered Coreg for hypertension for 6 months.

The September MAR for 2013 appear to document that the patient **missed all 60 doses of insulin**.

On 9/30/2013 the laboratory reported hemoglobin **A1c 10.1** (normal 4.8-5.6); Total cholesterol 129, LDL-C 62; HDL-C 39.

On 6/26/2014 a doctor saw the patient.  The blood pressure was 179/77 which is elevated.  The doctor noted that edema was a problem. There was no history related to the patient's medical conditions.  The doctor documented, "V/S all good" meaning presumably that the vital signs were good.  However the systolic blood pressure was very high.  The doctor did perform a physical examination but did not examine whether there was edema even though this was listed as a problem.  The doctor did note that the patient had a skin tear under the 3rd toe at the metatarsal joint.  The doctor did not assess for neuropathy, assess the shoes that the patient was wearing, or otherwise act to protect the foot.  The doctor did not address any labs or address medication adherence and did not document review of any laboratory results.  The doctor appeared to add Amlodipine but based on the MAR from June and July of 2014 the doctor actually decreased Amlodipine from 5 mg to 2.5 mg.  This would harm the patient and was unrealized.

On 7/25/2014 the laboratory reported glucose 460 (normal 70-110); sodium 133 (normal 135-145).

On 7/29/2014 a doctor saw the patient.  The blood pressure was 137/84 which is elevated for a diabetic.  The doctor wrote that the blood pressure was at goal.  The doctor documented no history and performed no physical examination.  The doctor documented lower extremity edema as a problem but did not document a physical examination to confirm it.  The only treatment was TED hose.  The doctor documented that the A1c had increased from 8.6 to 10.1.  The doctor increased the metformin to a gram twice a day.  The lower leg edema was not evaluated.  The follow up was 4 months.

The MARs from 6/1/13 to 10/1/14 document that the patient was no show for all insulin doses during this 16 month period.

On 10/28/2014 the laboratory reported microalbumin/creatinine ratio 67.1 (normal 0-30); TSH 5.46 (normal 0.45-4.5); glucose 520 (normal 70-110); sodium 130 (normal 135-145); A1c >14 (normal 4-6).  These are significantly abnormal results yet it does not appear that there was timely follow up.

On 12/2/2014 it was documented that the patient did not show up for his clinic appointment.  The doctor noted that the hemoglobin A1c was 14 which is extremely high.  The doctor scheduled a 2 month follow up.  To schedule a 2 month follow up with such an abnormal lab result placed the patient at risk.

A January 2015 MAR documented that the patient missed 31/62 doses of insulin, missing all the evening doses.  For consecutive months in 2015, it appeared that keep on person medication was given on the following days.  Lisinopril was given 1/8/15; 2/14/15; 3/18/15; 4/15/15; 5/22/15; 6/25/15; 7/28/15;

66

JX-CCH-000156

8/26/15; nothing in September; 10/21/15; 11/17/15; and 12/18/15. Thus because KOP medication appeared to be given late every month, over the course of a year the patient received only 11 months of medication over a 12 month span. For metformin, an oral diabetic medication, the patient received KOP metformin on 1/8; 2/14; 4/12; 5/20; 7/18; 9/12; and 11/17. Thus the patient received 210 of 365 (58%) doses of KOP metformin. Overall, the delays in providing KOP medication resulted in the patient missing significant amounts of medication. The missed diabetic medication was very high which may account for the elevated blood sugar. Notably, providers did not document review of medications when they saw the patient.

A February 2015 MAR documented that the patient missed 29/56 doses of insulin and missed all evening doses of insulin.

On 2/3/2015 a doctor saw the patient. The blood pressure was 143/83 which is elevated for a diabetic. The doctor took no history and performed no examination. The doctor merely listed the patient's problems. The doctor listed a few of the patient's medications but did not list all medications. The doctor failed to assess the patient for diabetic end-organ damage. The doctor ordered a 4 month follow up. The doctor did not address whether the patient was getting his medication. The doctor documented increasing Metformin and insulin but failed to increase medication for his hypertension which was not at goal (<130/80)

A March MAR documented that the patient missed 31/62 doses of insulin all in the evening.

On 3/30/2015 a doctor was to see the patient but wrote that the patient was seen in the General Medicine Clinic. There was no note from the General Medicine clinic so it appeared that the patient was not seen.

An April 2015 MAR documented that the patient missed 31/60 doses of insulin and missed all evening doses of insulin.

A May MAR documented that the patient missed 32 of 62 doses of insulin and missed all evening doses of insulin.

On 5/5/2015 the laboratory reported glucose 435 (normal 70-110); sodium 132 (normal 135-145); vitamin D 20.9 (normal 30-100); A1c >14% (normal 4-6). The diabetes was still in very poor control.

A June MAR documented that the patient missed 32/60 doses of insulin. All evening doses were missed along with 2 morning doses.

On 6/2/2015 a doctor saw the patient. The blood pressure was 178/84 which is very high. The doctor took no history and performed no physical examination. The doctor did not evaluate whether the patient was getting his medication. The doctor only listed the problems and the plan. The doctor noted that the blood pressure was "suddenly" poor and was due to a "bad day @ school". The doctor didn't change blood pressure medication. The doctor documented that the diabetes was "terrible" and increased the metformin and insulin.

A July MAR documented that the patient missed 31/62 doses of insulin all in the evening.

On 7/26/2015 the laboratory reported hemoglobin A1c 13.3 (normal 4.8-5.6).

67

JX-CCH-000157

An August MAR documented that the patient missed 31 of 62 doses of insulin with all but 1 missed doses being in the evening.

On 8/21/2015 a doctor saw the patient.  The blood pressure was 162/82 which is elevated.  The doctor took no history and didn't perform a physical examination.  The doctor documented that the blood pressure was poorly controlled on an ACEI but did not increase the medication.  The diabetes was not assessed even though control was not good.  The doctor did not address medication including whether the patient was actually receiving medication.  The doctor discontinued clinic A appointments and noted to keep general medicine appointments.

A September MAR documented that the patient missed 30/60 doses of insulin with all but 1 missed doses being in the evening.

On 9/15/2015 the laboratory reported glucose 516 (normal 70-110); sodium 126 (normal 135-145); Potassium 5 (normal 3.6-5); CO2 26 (normal 21-31); A1c > 14% (normal 4-6).  A doctor wrote on the A1c report "terrible" and without change for about 2 years.

On 9/15/2015 a medic evaluated the patient emergently because of elevated blood glucose.  The blood pressure was 189/104.  In the physician assessment section, a physician documented that the patient ate lunch and breakfast.  10 units of regular insulin was given and the patient was sent back to his housing unit without any follow up.  The elevated blood pressure was not addressed.

On 9/17/2015 the laboratory reported microalbumin/creatinine ratio 36.6 (normal 0-30).

On 9/20/2015 the laboratory reported lactic acid 17.3 (normal 4.5-19.8).  This lab was found misfiled in the progress note section.

An October 2015 MAR documented that the patient missed 32 doses of 62 doses of insulin, missing all of the evening doses of insulin.

On 10/8/2015 a doctor saw the patient.  The blood pressure was illegible on the note.  The doctor took no history and performed no physical examination.  The doctor only listed problems and his current plan.  The plan was not even intelligible.  For example, the plan for hypertension was "Terrible x 4 mos on ACEI + ↑ CCB → 5 mg/d."  It appears that this means that the blood pressure wasn't in control and the doctor increased a calcium channel blocker but it is unclear.  The MAR verifies that the Amlodipine was increased from 5 mg to 10 mg daily.  The doctor noted that the hemoglobin A1c was 14 over the past 5 months and that the glucose was 516 on 9/15/15 and the doctor documented increasing the insulin.  The doctor ordered a 3 month follow up.  The doctor did not address whether the patient was receiving medication.

A November MAR documented that the patient missed 30/60 doses of insulin all in the evening.

A December MAR documented that the patient missed 30 doses of insulin all in the evening.  This was approximately 50% of doses.

A January MAR documented that that patient missed all 31 evening doses of insulin and missed 1/31 am doses.  This documents that the patient missed over 50% of doses.

JX-CCH-000158

A February MAR documented that the patient missed insulin 30/56 times or 54% of the time. This is an extremely high rate of missing a critical medication. The patient mostly missed the evening dose of medication.

On 2/15/2016 a doctor saw the patient. The blood pressure was elevated for a diabetic at 145/91 (goal <130/80) but blood pressure medication was not increased. The weight was 238. The doctor took no history and performed no physical examination. The doctor did not document whether the patient was receiving medication as prescribed. The entire note was a series of comments with respect to the patient's problems. For hypertension the doctor's documentation is partly illegible. For high blood lipids the doctor wrote that the patient was at goal. For diabetes the doctor only noted that the patient was out of control and he increased metformin and insulin. The MAR for February shows insulin was increased from 50 units of 70/30 in the morning to 55 units. The metformin was not increased. The doctor also documented that the patient had vitamin D deficiency but was on medication. The doctor didn't document lab values for the diabetes or lipids and took no history of compliance or adverse reaction to medication. The doctor ordered a 4 month follow up even though the patient's diabetes wasn't in control. The doctor did not evaluate for end-organ damage with respect to diabetes.

A MAR which has no date on it but presumably was from March 2016. Individual items including vancomycin was documented as ordered 3/18/16 but had no stop date. Vancomycin was documented as given 13 of 14 times. Zosyn was documented as given 28 of 28 times. Other March 2016 MARs document that the patient was on Ergocal, metformin 2 gram a day; Norvasc 10 mg; Lisinopril 20 BID; Zocor 40 mg daily; Insulin 70/30 55 units am and 35 units pm. During March the patient was on the ASH unit before being transferred to the unit 1 infirmary on March 18. The MAR when the patient was on ASH listed daily that the Metformin was KOP but on 2 dates (3/22 and 3/23) documented that the patient received medication. During these dates the patient was on the infirmary so medication could not have been given on the ASH unit. Another MAR from the ASH unit documents that insulin was not given 26 of 36 (72%) of doses and was documented as given in ASH on 2 days when the patient was on the infirmary unit. The documentation of administration of medication is extremely poorly done and makes it difficult to verify that patients actually receive their medication.

On 3/10/2016 the laboratory reported WBC 9.2 (normal 4.5-10.5) and glucose 305 (normal 70-110).

On 3/10/2016 an x-ray of the left foot showed an old fracture of the 4th metatarsal bone of indeterminate age with soft tissue swelling of the dorsum of the foot.

On 3/10/2016 a doctor wrote a referral to podiatry because the patient had a history of a blister on the left foot progressing to an eschar and cellulitis.

On 3/10/2016 a doctor ordered crutches for the patient stating that the patient was non-weight bearing.

On 3/10/2016 the patient complained to a medic via health request stating that the patient had leg and foot pain. The medic documented that the patient had a foot ulcer and was unable to walk and had edema. The foot was hot to touch with swelling to the mid-calf. The medic referred the patient to the ATU. In the ATU the BP was 145/89 which is high for a diabetic. The temperature was 98.9. A doctor saw the patient and documented that the patient had redness and a blister for several days but on the very brief physical examination noted erythema and an eschar on the toe and diagnosed cellulitis. The

69

JX-CCH-000159

doctor did not document the blood sugar but ordered a blood count and chemistry blood test along with an x-ray of the foot. The doctor referred to orthopedics and podiatry and admitted the patient to the infirmary.

On 3/10/2016 the patient was admitted to the infirmary unit for cellulitis of the foot. The patient had cellulitis of the foot with an eschar of the foot.

On 3/11/2016 a physician saw the patient on the infirmary. The doctor noted that the culture of the foot wound was pending. The doctor noted that an orthopedic consultation was pending. The doctor performed no history or physical examination.

On 3/14/2016 the laboratory reported point of care hemoglobin A1c = 11.3% (normal 4-6); glucose 237 (normal 70-110); vancomycin level of 8 (normal 25-40) but also this doesn't state whether this is a peak or trough level; WBC 8.8 (normal 4.5-10.5); creatinine 0.82 (normal 0.5-1.2).

On 3/14/2016 a podiatrist saw the patient at LSP. The podiatrist documented symptoms of neuropathy of both feet but palpable pulses. The patient was described with some deformity of the feet. There were purulent ulcerations of the left foot that were full thickness of skin documented as a grade II ulcer. Dressing changes were recommended as well as continued intravenous antibiotics.

On 3/14/2016 a LSP orthopedic note documented that the patient had a diabetic ulcer with purulent drainage without x-ray evidence for osteomyelitis. The doctor recommended referral to UMC for debridement and intravenous antibiotics. Instead LSP kept the patient placed the patient on the infirmary with intravenous antibiotics.

On 3/14/2016 a doctor saw the patient and noted that the patient still had an eschar and a fracture and had pending appointments with a podiatrist and orthopedic doctor. Aside from documenting an eschar, there was physical examination.

On 3/16/2016 a doctor saw the patient for cellulitis but took no history and performed no physical examination. The doctor wanted the labs ordered on 3/11 to be placed in the chart.

3/17/2016       A physician infirmary note documented the patient was still on vancomycin and zosyn. The note was very brief and basically only listed the problems. The doctor did not document a physical examination of the patient.

On 3/18/2016 a podiatrist saw the patient in follow up and recommended infirmary unit housing with Vancomycin and Zosyn antibiotics for a week.

On 3/18/2016 a physician documented a brief note and did not appear to take much history and did not document a physical examination. The doctor mostly documented the patient's problems without any status update of the problems. The doctor noted that the 4/5th metatarsal was "cleared" by an orthopedic consultant. However, the orthopedic consultant recommended admission to UMC to address the diabetic foot ulcer which was not addressed by the doctor.

On 3/21/2016 a physician documented that the patient had cellulitis and a fracture but there was no history, no physical examination, and no assessment of any other medical problem.

On 3/23/2016 a doctor ordered capillary blood glucose checks twice a day for a year. Notably, persons on insulin typically receive CBG checks before each meal and dose of insulin.

70

JX-CCH-000160

On 3/23/2016 a physician infirmary note documented that the eschar remained and that the patient had cellulitis. The brief note documented a fracture of the metatarsal bone and documented that the capillary blood glucose values were improved without documenting what they were. Since the beginning of this infirmary stay on 3/10/16 the providers did not address any of the patient's other problems including hypertension, nephropathy, and high blood lipids.

On 3/24/2016 the patient was discharged from the clinic and sent back to general population after his last dose of intravenous antibiotics were given. On 3/25/2016 a doctor wrote a discharge summary from the infirmary unit documenting that the admitting diagnosis was cellulitis and the discharge diagnosis was cellulitis. The patient still had a foot ulcer and the discharge order was to pack the wound with iodoform twice a day and to treat another ulcer with betadine and gauze for 2 weeks. The doctor ordered a week follow up and follow up with podiatry in a week. The doctor ordered a wheelchair for 3 months. With respect to wound management in general population, on 3/24/2016 a Wound Management Form documented that dressing changes ordered twice daily from 3/24/16 through 4/7/16 were documented as done 3/26 once; twice on 3/27; once on 3/28; once on 3/29; once on 3/30; and once on 3/31. Dressing changes were done 7 of 30 times as ordered or 23% of the time.

On 4/1/2016 a Wound Management Form documented that dressing changes ordered from 4/1/16 through 4/22/16 were documented as done 4/2; 4/3; 4/5; 4/8; 4/9; 4/10; 4/11; 4/12; 4/18 and 4/20/15. Dressing changes were done 10/22 times or 45% of the time. In order to obtain this service the inmate was required to go from ASH II to the health care unit. For this purpose a memo was written to allow the inmate to travel to the health unit.

The April 2016 MAR for this inmate documented on every entry that the medication was KOP [keep on person]. However, there was no documentation verifying that the patient received his KOP medication. Insulin was documented as given twice a day by nurses except for 1 day that the patient did not show up. The times that insulin was administered was listed as 1 and 4 and this was unclear. The time of administration should be definitively documented.

On 4/1/2016 a doctor saw the patient and noted that the patient was recently on Unit 1 for cellulitis. The toe had been debrided the same day by podiatry. The doctor took virtually no history and performed only a brief physical examination noting that the lungs were clear, heart regular rate and rhythm and that the toe was healing. The blood pressure was not taken. The doctor noted that the capillary blood glucose was 100-200 and was "well controlled". In the assessment, the doctor noted that diabetes was "controlled"; that the cellulitis was being followed by the podiatrist but made no comment about the hypertension or blood lipids. The vitamin D was noted to be low but there was no plan. The doctor ordered a 3 month follow up and ordered additional labs. An A1c level was not noted.

On 4/1/2016 a podiatrist debrided the ulcer and ordered Bactrim for 2 weeks.

On 4/15/2016 a podiatrist saw the patient at LSP. The podiatrist documented symptoms of neuropathy of the feet but normal pedal pulses. There was a grade 2 full thickness ulcer with purulent drainage. The appeared to be 2 documented ulcers. One was 1.6 by 0.8 cm and another 0.7 by 0.5 cm. Dressing changes were recommended.

COMMENT

71

JX-CCH-000161

1. Over almost 3 years doctors at LSP failed to bring the patient's diabetes under control.   After two significantly abnormal hemoglobin A1c values there were no follow up.  After an A1c of 10.1 the patient was not seen for 9 months for diabetes and the abnormal laboratory result was not evaluated.  After an A1c value of >14 the patient wasn't evaluated for almost 4 months.  The patient had diabetic nephropathy but it wasn't identified as a problem.  The patient was not evaluated for neuropathy (which should be done annually) until he developed a diabetic foot ulcer and was evaluated by a podiatrist.  For years, the medication administration record appeared to show that the patient missed approximately half of his insulin doses but providers never discussed medication issues with the patient.  It appeared that the patient did not receive medication, including for diabetes, for over a year during a time period when the patient's diabetes was very poorly controlled.  The poor control of diabetes will have an effect on the patient and places him at higher risk for microvascular complications such as retinopathy and nephropathy.  Monitoring this patient's diabetes was poor.  Hemoglobin A1c tests were done approximately every 6 months even though they were extremely elevated.  They should have been obtained more frequently such as every 3 months.

2. When the patient developed a diabetic foot, the patient was sent back to his housing unit where less than 50% of dressing changes were done.  Almost all of the examinations of the patient failed to include an adequate history and physical examination.  Physicians seldom questioned the patient about high or low blood sugars, whether he was receiving medication, whether he was having side effects from medication, and whether he was having symptoms of neuropathy.  On 7 clinic visits over the more than 2 years of chart review the patient had elevated blood pressure but did not receive an increase of medication or an evaluation as to whether the patient was receiving his ordered medication.  This causes harm to the patient and increases the risk of heart and kidney disease.


Patient #13

As of June of 2007 the patient's current medication list included Lovastatin 80 mg and Lopid 600 mg twice a day.

On 4/19/2012 the laboratory reported LDL-C 177 (74-159)

On 6/12/2012 the laboratory reported LDL-C 238 (74-159)

On 2/16/2013 and EKG showed sinus rhythm with anteroseptal ST elevation CONSIDER ACUTE INFARCT with inferior lateral STT wave changes suggest myocardial ischemia.

On 2/16/2013 a cardiac catheterization report showed LAD had 90% proximal lesion with a 50 % mid and 60% distal lesion.  There was global hypokinesia with EF of 30%.  There was acute LAD plaque rupture and the patient was referred for emergent PCI.

On 3/12/2013 an EKG showed STT wave changes consistent with acute myocardial infarction and left ventricular hypertrophy.

On 3/21/2013 a patient went for a consultant visit without test reports.  The consultant asked that the tests be done and to reschedule the patient after the tests were done.

72

On 9/17/2013 the laboratory reported LDL-C 176 (74-159)

On 1/27/14 a doctor saw the patient and documented that the patient still had symptoms of claudication and was still waiting for a CT aortogram with runoff that was requested on **11/20/13**.

On 2/5/2014 the laboratory reported LDL-C 200 (74-159); HDL 33 (29-71)

On 8/19/2014 the patient was evaluated in vascular clinic.  The consultant noted continued claudication worsening over the past year.  The consultant noted that a CTA aortogram was scheduled in 2013 but was not completed.  The consultant recommended continuing aspirin, plavix and statin; exercise; and smoking cessation; carotid duplex and noninvasive testing and a 6 week follow up.  LSP believed that an aortogram was to be done on this day but it had not been scheduled and needed re-scheduling.

On 9/9/2014 a duplex Doppler documented bilateral superficial femoral artery and right fep-pop bypass graft were occluded.  The ankle brachial index (ABI) was 0.7 on right and 0.6 on left.  Carotid artery duplex showed a 20-50% narrowing bilaterally.  An ankle brachial index compares the resting systolic pressure in the ankle with the systolic brachial pressure.  This index provides a measure of the severity of peripheral vascular disease.  A normal value less than or equal to 0.9 is diagnostic of occlusive arterial disease.  So this patient had peripheral artery disease.

On 9/11/14 a Trip Return form documented that the patient returned from having the aortogram.  The anterior tibial arteries were occluded and unchanged and the common femoral arteries with pseudo-aneurysm were unchanged from the 2013 study.

On 10/21/14 the patient was evaluated in vascular clinic.  The doctor noted the results of the Doppler studies, the aortogram, and noted that the ABI was 0.6.  The doctor recommended continued therapy with Plavix, aspirin and a statin and to provide smoking cessation.  No follow up was recommended.

On 10/22/2014 a doctor saw the patient.  The doctor noted that the patient had claudication and was still smoking.  The doctor documented that the patient had peripheral artery disease (PAD) that was stable.  The doctor did not document review of the vascular clinic note.  The doctor noted that high blood lipids were a problem yet documented that all labs were "OK".  This was inaccurate as the LDL was not at goal.  The plan was to add Zocor but it appeared that the patient was already on Zocor.  The doctor did not appear to understand the patient's current medication.  It might have helped to get the patient to stop smoking but no intervention (smoking cessation counseling or nicotine replacement) was attempted.  Smoking cessation was recommended by the cardiologist.  The doctor did not verify that the patient was getting medication.  The doctor did not document the results of the aortogram and document review of the vascular clinic visit.

On 10/29/2014 a doctor saw the patient.  The doctor documented that the patient continued to have pain with walking but did not ask about angina.  The doctor noted that the patient had a failed bypass surgery and an occluded superficial femoral artery.  The doctor wrote that the patient was on 40 mg of Zocor and although the doctor documented a LDL of 200 did not change to a different statin.  The doctor's plan was to continue current management.  The recommendation for the use of Zocor is if a 40 mg dose is unable to lower LDL-C than the patient should be switched to a different statin rather than increasing Zocor.  This patient had very high LDL-C with substantial risk (prior myocardial infarction and peripheral artery disease) and control of lipids should have been a high priority.  The doctor did not note the ABI and did not document review of the vascular surgeon note.

73

JX-CCH-000163

On 11/14/2014 a doctor saw the patient.  The doctor took no history except no complaints.  The doctor performed no physical examination.  The doctor listed the patient's problems but did not include an assessment of each problem or update the therapeutic plan.  The doctor documented that laboratory tests were ordered at the last clinic visit but had not yet been done.  The doctor requested a 2 month follow up.  The doctor did not identify whether the patient was receiving his medication.  There was no plan.

On 12/14/2014 the EKG showed normal sinus rhythm; atrial enlargement; cannot rule out anteroseptal infarct, possibly acute.

On 12/15/2014 the laboratory reported cholesterol 308 (140-239); HDL-C 34.2 (35-160); TG 322 (35-160); LDL-C 207 (74-159).  This is a very high number.

On 12/17/2014 the patient was found on the floor with chest pain at about 11:35 pm.  The EKG was consistent with a myocardial infarction and the patient was transferred to a hospital.   The patient had a STEMI with a stent placed.  It wasn't clear when the patient returned to prison as progress notes do not include documentation of when he returned.  The patient returned to the hospital on 12/21/14 to rule out pericarditis.  It isn't clear what happened during this hospitalization.  The patient appeared to have been discharged on 12/23/14 because there was a prescription in the progress note section but no discharge summary.

On 1/5/2015 a doctor saw the patient but took no history and aside from listening to the lungs there was no physical examination.  The doctor listed the problems but documented no plans except to say that the patient signed up for smoking cessation.  The doctor did not mention the patient's recent heart attack.

On 1/8/2015 the laboratory reported cholesterol 255 (140-239); HDL-C 37 (29-71); TG 169 (35-160); LDL-C 166 (74-159).

On 1/29/2015 a chest x-ray showed vascular congestion vs reticular interstitial changes throughout lungs with small effusions.  Normal heart size.

On 1/29/2015 a cardiologist saw the patient and documented that the patient had a STEMI in December of 2014 and the cardiologist recommended an increase of Coreg to 6.25 BID, decrease Losartan to 50 every day and an echocardiogram today with a 3 month follow up.

On 1/29/2015 medics evaluated the patient at 5:25 am for shortness of breath and gurgling.  The blood pressure was 150/98.  A doctor evaluated that patient in the ATU but took no history and didn't perform a physical examination.  The doctor treated the patient with IV Lasix twice.  It appeared that the patient was sent back to his housing unit but it wasn't clear.  The patient had symptoms of heart failure and needed a thorough evaluation.

On 1/30/2015 an EKG showed sinus rhythm; anterior myocardial infarction probably recent; possible left atrial enlargement.

On 1/30/2015 the laboratory reported CK 287 (24-204); Troponin I= 0.54 (0-0.04).  This troponin result was listed as a critical value.

On 1/30/2015 a doctor ordered that the patient be sent to a hospital for an elevated troponin test.

JX-CCH-000164

On 1/30/2015 the patient was admitted to the hospital and was discharged 1/31/15. The patient was discharged on 12.5 mg Carvedilol; 75 mg Plavix; 20 mg Zestril; 20 mEq potassium; Lasix 40 mg twice a day; and Zocor 40 mg at night. What occurred at the hospital is not clear. The discharge summary was not in the progress notes section of the medical record. There was no review of this hospitalization upon return.

On 2/10/2015 a doctor saw the patient and documented that the patient was recently at a hospital and had a stent placed in November. However, the doctor did not document the 2 subsequent hospitalizations. The blood pressure was 146/78 which is high. The patient had no current chest pain. The doctor's plan was to continue recommendations of cardiology but didn't document review of the recent cardiology clinic visit and describe what the recommendations were. The doctor failed to monitor the patient's condition by addressing the reasons of the recent hospitalizations.

On 2/16/2015 the laboratory reported LDL-C 199 (74-159); HDL-C 36 (29-71); TG 244 (35-160).

On 2/18/2015 an echocardiogram showed severely depressed LV systolic dysfunction with dilated left atrium and EF between 20-29%.

On 2/19/2015 the patient was evaluated by medics for shortness of breath and wheezing. The blood pressure was 212/122. A doctor saw the patient and took a history of shortness of breath without chest pain, orthopnea or leg swelling. The doctor noted bilateral lung crackles. An EKG showed sinus arrhythmia; probable recent anterior myocardial infarction; T wave abnormalities V1, V5-6; possible left atrial enlargement. A chest x-ray showed diffuse interstitial coarsening consistent with pulmonary edema, atypical infection, or pulmonary fibrosis. Pulmonary edema reflects heart failure which is a critical finding. The doctor did diagnose mild heart failure and ordered intravenous Lasix and wrote to increase Coreg and add Aldactone. The doctor did not review the recent echocardiogram showing significantly reduced heart function. The weight was not checked. The patient was sent back to his housing unit with a 1 week follow up. A recent myocardial infarct with new onset of heart failure was significant and the patient should probably have been monitored more closely. Aldactone is not an optimal choice of a diuretic for heart failure.

On 2/22/2015 the laboratory reported CK 231 (24-204).

On 2/27/2015 medics evaluated the patient for low blood pressure of 86/51. The patient had dizziness. The doctor documented that the medications were reviewed but made no comment about what medications the patient was on. The doctor's plan was to optimize medications but this was unclear. A one week follow up was ordered. No change in medications was documented. In effect nothing was done. The patient should have been admitted to the infirmary for continuous monitoring.

On 3/1/2015 medics evaluated the patient for shortness of breath and coughing pink frothy sputum. The blood pressure was 188/118 with a pulse as high as 136 and a respiratory rate as high as 34. The patient was given Solumedrol, Lasix, Clonidine and was sent to a hospital. A chest x-ray showed bilateral pulmonary edema with possible small right pleural effusion. This hospitalization was preventable as the prior episodes of heart failure did not result in outpatient management appropriate for the patient's condition.

JX-CCH-000165

The hospital discharge summary was not in the medical record progress note section.  A Trip Report documented that the patient returned to LSP on 3/4/15 with a diagnosis of heart failure.  The patient was admitted to the infirmary.

On 3/6/2015 the laboratory reported digoxin 0.7 (0.9-2).

On 3/6/2015 a doctor saw the patient.  The blood pressure was 83/65. The note was a few brief lines.  The doctor noted that the patient had heart failure, PVD with a failed fem-pop, and high blood lipids.  The doctor noted that the patient had numbness in the feet consistent with no cardiorespiratory complaint.  The doctor didn't document what symptoms he questioned the patient about to come to that determination.  The doctor noted no JVP, clear lungs, regular heart rhythm and no edema.  The doctor referred to cardiology, ordered labs, decreased Coreg to 6.25, continued digoxin which was documented as started in unit.  The doctor referred the patient for consideration of a defibrillator.

On 3/7/2015 the EKG showed sinus rhythm; anterior myocardial infarction probably recent; possible left atrial enlargement.

On 3/7/2015 medics saw the patient emergently for chest pain.  The blood pressure was initially 78/56 with a pulse of 114 but increased to 143/87.  The patient had chest pain and was given aspirin, nitroglycerin and oxygen and brought to the ATU.  Medics noted that the patient had orthopnea, and shortness of breath.  A doctor apparently wrote a note with the only history noting that the patient was anxious with pleuritic chest pain but without any other history to verify that the pain was pleuritic.  The doctor documented epigastric tenderness and diagnosed pleuritic chest pain and admitted the patient to unit I infirmary.  I could not find infirmary notes for this patient as the record was not in chronologic order.

On 3/10/2015 the laboratory reported Troponin I = 0.27 (0-0.04).

On 3/12/2015 the laboratory reported digoxin 0.9 (0.9-2).

On 3/16/2015 a doctor saw the patient.  The blood pressure was 74/55.  The doctor took no history except to note lightheadedness but no other complaint.  The doctor noted clear lungs, regular heart rate but did not perform orthostatic blood pressure, assess whether the patient was taking his medication properly or even whether the patient was getting his medication.  The doctor decreased the Lisinopril to 10 mg daily and held the Coreg for a day and requested a 2 week follow up with a digoxin level.

On 3/17/2015 an EKG showed sinus rhythm, probable recent myocardial infarction.

On 3/17/2015 medics evaluated the patient for slurred speech and mumbling.  A doctor in the ATU saw the patient but took no history and except for documenting that the patient was oriented did no neurological examination.  The doctor ordered an EKG and labs but did not review these.  The doctor documented that the patient needed a CT of the brain but apparently sent the patient back to his housing unit.  The patient had a possible stroke but didn't receive a neurological examination or history for his problem.  The patient should have been sent to the hospital as he may have had a TIA or stroke.

On 3/20/2015 the laboratory reported LDL-C 160 (74-159); HDL-C 28.9 (29-71)

On 3/20/2015 a doctor saw the patient in follow up of the 3/17/15 visit for slurred speech.  The only history was that there was no complaints.  The only physical examination listed blood pressure and that

76

JX-CCH-000166

the lungs were clear and the heart rate regular.  Not all problems were listed; only heart failure, CAD/PVD, and high blood lipids.  The only plan was to return in 6 weeks.  The doctor failed to follow up with an appropriate history and physical examination.

On 3/21/2015 the laboratory reported digoxin level <0.2 (0.9-2)

On 3/24/2015 the laboratory reported digoxin level 0.5 (0.9-2)

On 4/21/2015 the laboratory reported digoxin level 0.5 (0.9-2)

On 4/28/2015 an annual evaluation was documented on a Patient Data form.  The patient's problems were listed as heart failure, CAD with prior stent, hypertension and PVD.  No history was taken.  The examination was completely normal.  No laboratory tests were evaluated.  The provider documented that the patient had severe LV dysfunction, 20-50% occlusion of bilateral carotid arteries; and had bilateral occluded arteries in his legs.  There was no plan and no assessment of his status.

On 5/1/2015 a doctor saw the patient and noted CAD with prior stent; CHF; PVD; HTN; and depression.  The history was minimal but the doctor did note that the patient had "some" chest pain lasting 10 minutes.  The lungs were clear; and abdomen was soft.  The doctor noted no plan for the ongoing angina; recent heart failure or PVD except to take nitroglycerin and go to ATU [presumably when angina occurs].  The doctor noted that the patient had a TIA and needed to check the CT of the brain after it was done.  A 6 week follow up was ordered.

On 5/1/2015 a doctor referred the patient to cardiology.

On 5/7/2015 a cardiology consultation recommended checking echocardiogram results as the patient may be having symptoms of heart failure, continuing Coreg and Losartan.  A 3 month follow up was recommended.

On 5/18/2015 a doctor saw the patient.  The doctor listed the medical problems but the only history was no new complaints and no orthopnea.  A brief examination was documented.  The doctor did not review the recent cardiology consultation.  The plan was to increase Zocor to 80 mg a day, noted that an echocardiogram and duplex scan and a cardiology telemedicine consult were pending.  The increase in Zocor did not occur.  For persons with elevated LDL-C on Zocor, it is recommended to switch statins rather than increase the Zocor.  The doctor ordered a 3 month follow up.

On 6/15/2015 a CT of the brain showed mild cerebral atrophy with old infarct vs. volume averaging artifact in right frontal lobe.  No acute infarct or acute hemorrhage.

On 6/17/2015 an echocardiogram showed severe LV systolic dysfunction with < 20% EF and segmental wall abnormalities.

On 7/13/2015 the laboratory reported LDL-C 160 (74-159); HDL-C 29.9 (29-71); cholesterol 239 (140-239).

On 7/14/2015 the laboratory reported digoxin level 0.6 (0.9-2)

On 7/14/2015 a doctor saw the patient.  There was no history.  The doctor did note that the patient "requesting to use bicycle [secondary] pseudoclaudication when walk".  There is no disease called pseudoclaudication.  In fact the patient had real claudication.  If the claudication was worsening, it

JX-CCH-000167

would have been appropriate to repeat the ABI.  The doctor noted that the digoxin level of 0.5 but it wasn't clear from any of the patient's problems that there was an indication for digoxin.  A brief examination was done and the doctor noted that a duplex Doppler and labs were pending.  The doctor increased Coreg but the indication for doing this was unclear as the blood pressure was controlled.  The doctor ordered a 3 month follow up.

On 8/21/2015 a doctor saw the patient.  The blood pressure was 124/79.  There was no history or physical examination.  The doctor listed the patient's problems, listed the cholesterol, HDL and LDL of 150 and noted that the patient was on 80 mg of lipitor.  The doctor added omega 3 fatty acids but there was no assessment or other plan for the other problems.

On 9/3/2015 a telemedicine cardiologist saw the patient.  The complete consultant note was not in the medical record.  The plan of the consultant documented CAD; PAD with bilateral claudication.  The consultant recommended ABI and LE ultrasound at UMCNO and referral for abdominal aortogram with runoff.

On 9/13/2015 an EKG showed marked sinus arrhythmia; probable recent myocardial infarction; T-wave abnormalities V3-6.

On 9/13/2015 medics evaluated the patient for shortness of breath. The blood pressure was 180/120 with a respiratory rate of 24.  The medics gave 40 mg IV Lasix but there was no documentation of a physician order for this medication and medics did not document receiving a physician order for this.  In addition to Lasix, medics gave IV morphine.  The patient was taken to the ATU where the blood pressure was 188/133.  A doctor did no history and the only physical examination was that the patient had lung crackles.  The doctor ordered Albuterol nebulization, and Nitropaste.  Then the doctor ordered Solumedrol and a chewable aspirin along with IV Morphine.  The doctor noted the EKG results.  The patient was sent to a hospital.

On 9/15/2015 the patient was discharge from a hospital with a diagnosis of acute on chronic heart failure with elevated troponin I.  The Lasix was increased to 80 mg a day.  The BNP was 2382 (0-900).  It was recommended that the patient see cardiology in a week.

On 9/17/2015 a provider saw the patient and noted that the Lipitor [anti-lipid drug] was last filled in May of 2015.  The provider documented no swelling, pain when walking and a normal heart and lung examination.  The provider did not discuss the recent hospitalization, but did document that the lower extremity ultrasound was pending.  There was no mention of the aortogram.  A month follow up was scheduled.

On 9/23/2015 a cardiologist apparently saw the patient (the full report was not present and the clinic type was not present) and noted PVD stable and CAD with stent in 2014 and history of respiratory failure with hypoxia.  The consultant could not find recent laboratory tests.  The consultant recommended an echocardiogram and return to clinic in 2 months.

On 9/30/2015 a doctor saw the patient.  The blood pressure was 102/61.  The doctor took no history except that the patient quit smoking and only listed the problems [CHF, CAD, HTN, HLD, and PAD] and documented that the patient was recently admitted for CHF with BNP of 2382.  The doctor noted that a cardiology appointment and echocardiogram were pending.  The doctor ordered blood tests.  The only examination was to document a regular heart rate and clear lungs.  There was no history related to the

JX-CCH-000168

patient's problems and the doctor did not address whether the patient was receiving medication.  The doctor appeared to mix up the vascular surgery follow up with the cardiology appointment when mentioning that the patient had a follow up with cardiology clinic after a duplex scan scheduled for 10/15.  The patient had both cardiology and vascular surgery appointments.

On 10/5/2015 an EKG showed sinus bradycardia; T wave abnormality possible anterolateral ischemia; T-wave abnormality II AVF.

On 10/6/2015 an echocardiogram showed left ventricular enlargement; thinning of the LV septum consistent with old infarct; EF 30-40%; diastolic dysfunction; mildly enlarged R ventricle and atrium; aortic valve sclerosis; mild mitral regurgitation; mild pulmonic valve regurgitation.  A summary was severe LV systolic dysfunction and segmental wall motion abnormalities.

On 10/14/2015 an EKG showed sinus bradycardia, probably recent anterior myocardial infarction, T wave abnormalities V4-6.  The laboratory reported CK 225 (22-269).

On 10/14/2015 medics evaluated the patient for shortness of breath.  The medic documented no chest pain.  The only apparent physician documentation was that the patient had a brief episode of shortness of breath in the morning without chest pain.  An EKG and chest x-ray were done but the doctor did not document review of these.  There was no follow up ordered and the patient was sent back to his housing unit.

On 10/15/15 a doctor wrote on an Eceptionist note to hold off on the aortogram until results of the lower extremity ultrasound were completed.

On 10/17/2015 medics responded to the patient for shortness of breath.  The blood pressure was 190/120 with a respiration rate of 26.  An EKG was done and the patient brought to the ATU.  The EKG showed sinus tachycardia with PVCs, septal infarction age indeterminate.  A second EKG on the same day recorded sinus tachycardia; septal myocardial infarction probably recent; possible anterior injury or acute infarct; left atrial enlargement.  In the ATU the blood pressure was 209/129 with a pulse as high as 118.  The initial oxygen saturation was 80% which is extremely low.  A doctor apparently saw the patient but the only history was that the patient did not have chest pain and no respiratory distress.  Since the patient had shortness of breath as an initial complaint, the physician's history seemed incomplete.  The doctor documented a brief physical examination and only noted rales.   The chest x-ray showed mild heart failure.  The doctor documented that the patient had "old lateral ST +T wave" changes.  This was inconsistent with the EKG reading.  The doctor took no history to confirm that the patient did not have symptoms of coronary artery disease or heart failure as he took no history.  The doctor ordered a chest x-ray and documented "+ CHF".  The doctor gave 80 mg of IV Lasix.  No follow up was ordered and apparently the patient returned to his housing unit.  Based on symptoms, vital signs, EKG and chest x-ray results, and the oxygen saturation, the patient should have been sent to a hospital.

On 10/20/2015 medics again evaluated the patient for shortness of breath and dyspnea on exertion.  The blood pressure was 120/83.  In the doctor's assessment area of the note apparently a doctor wrote for a chest x-ray, a blood count, metabolic panel and troponin.  The EKG showed sinus bradycardia; nonspecific ST elevation V3-5; T-wave abnormality consistent with anterolateral ischemia.  A chest x-ray showed interval improvement with better aeration of both lung fields with near clearing of basilar infiltrates and or congestion.  The last entry was that the patient was feeling better and was discharged.

JX-CCH-000169

There was no history, physical examination, assessment, evaluation of the EKG or the chest x-ray.  The patient was still having symptoms of heart failure but was only being addressed on an emergent basis.

On 10/20/2015 a duplex Doppler documented occlusion of the superficial femoral arteries and an ABI of 0.68 on the right and 0.66 on the left and noted that the right femoral-popliteal bypass graft was occluded.

On 10/23/2015 a chest x-ray showed mild worsening of interstitial markings.

On 10/25/2015 the patient was brought to the ATU for shortness of breath and chest pain.  The blood pressure was 171/116.  An EKG was done.  Nitropaste was used and the patient was given aspirin even though the patient was already on aspirin.  An albuterol inhaler was given.  The medic took a phone order for intravenous Lasix.  The patient was sent back to his housing after the blood pressure decreased to 143/90.  A chest x-ray on this day showed interstitial markings and the EKG was abnormal showing changes consistent with ischemia.  The patient was managed by a medics with a single phone order for Lasix.  This is well beyond the scope of practice for a medic.  The patient was not assessed for heart failure or possible MI by a physician.

On 10/29/2015 the laboratory reported T Cholesterol 202 (100-199); TG 209 (0-149); HDL-C 39 (>39); LDL-C 121 (0-99).

On 11/3/2015 the patient had an abdominal aortogram with runoff and angioplasty of the right SFA.  The consultant recommended treating the left superficial femoral artery if residual claudication occurred.  The right common femoral artery was 30-40% obstructed.  The superficial femoral artery was occluded.  The anterior tibial artery was occluded.  The superficial femoral artery was occluded proximally.

On 11/10/2015 a current medication list documented that the patient was on Plavix 75 mg; aspirin; simvastatin 40 mg daily; Lisinopril 10 mg, and carvedilol.

On 11/16/2015 a doctor saw the patient and listed the patient's problems but took no history except that the patient had pus draining from the angiography site.  The doctor did not document the results of the recent aortogram, did not document follow up with the vascular surgeon or cardiologist, did not document results of the recent echocardiogram, and did not document the several recent ATU visits for out of control heart failure.  The physical examination included only that there was a small amount of green drainage.  No therapeutic plan was documented.  The doctor ordered a 2 week follow up.

On 11/23/2015 a doctor saw the patient.  The blood pressure was 91/63.  The doctor took no history and performed almost no physical examination.  The doctor merely listed some of the patient's problems [HTN, HLD] and listed recent blood pressures and some of the patient's medications.  The LDL was 121 and the doctor did increase the Zocor to 80 mg from 40 mg.  The doctor noted that the angio site in the groin was without discharge.  The doctor took no history of claudication, did not review the recent hospital procedure notes, and did not ask the patient about chest pain, did not document the vascular surgery plan, and did not take note of the recent visits to the ATU for exacerbation of heart failure.  The doctor did not assess whether the patient was receiving his medication or had bleeding with respect to use of Plavix and aspirin.

80

JX-CCH-000170

On 11/25/2015 a Trip Return form documented that the patient returned from cardiology clinic with a 4 month follow up recommended.  The consultant took a history that the patient had improved claudication and could walk a mile without leg pain.   The echocardiogram was not reviewed.

On 12/14/2015 a physician on a physician's clinic progress note ordered Rocephin IM one dose followed by Levaquin for 7 days.  There was no history, physical examination, assessment or other plan.  It wasn't clear why the antibiotic was being prescribed.

On 1/26/2016 the laboratory reported LDL-C 157 (74-159); HDL-C 32.8 (29-78); cholesterol 232 (140-239).

On 2/23/2016 a doctor saw the patient.  There was no history or physical examination.  The doctor noted hypertension and documented that the patient was at goal on ACEI, Coreg, and Lasix.  The HLP, PAD, and CAD documented that the LDL was still 157 and the patient was on Zocor 80 mg.  Later in the note, the doctor noted that the patient was on KOP but was "(not on Zocor)".  The patient's LDL was not at goal yet the doctor did not modify therapy.  The doctor did not assess whether the patient was receiving his medication.  The doctor scheduled a 6 month follow up despite the patient not being at goal for his most at-risk problems (CAD, HBL, and PVD).  The doctor took no history with respect to the patient's symptoms related to his PVD or CAD.

COMMENTS

1. The patient's aortogram requested on 11/20/13 was not done until 9/11/14.
2. On 3/21/13 the patient went to a consultant visit without required test results.
3. The patient's LDL-C was never at goal.  The patient should have been tried on a different statin drug.
4. Smoking cessation using nicotine replacement was not utilized.  Smoking was a major risk factor in this patient's conditions and efforts in addition to counseling should have been attempted.
5. The 10/21/14 vascular surgery note was not reviewed by the primary care doctors.
6. On 10/29/14 a doctor saw the patient but did not take a history with respect to angina.
7. On 11/14/14 the primary care doctor took no history and didn't perform a physical examination.  There was no assessment or update of the plan for the patient's problems.
8. On 1/5/15, during the 1st physician visit after a myocardial infarction, the doctor took no history and performed only a minimal physical examination.  The doctor did not review the recent hospitalization or note recommendations from the hospital cardiologist.
9. On 1/29/15 a doctor evaluated the patient in the ATU for symptoms of heart failure.  The doctor took no history [only the medic took a history] and didn't perform a physical examination.  The doctor treated the patient with two doses of intravenous Lasix and sent the patient back to housing.  This was below standard of care for managing and monitoring heart failure.  The patient should have had additional Lasix to his outpatient regimen, increased monitoring, assessment of oxygenation, and prompt follow up in clinic.  Lack of care may have resulted in hospitalization the following day.
10. After hospitalization on 1/30/15, the first doctor clinic visit was about 10 days later but the doctor failed to acknowledge or review the 1/30/15 hospitalization or the 1/29/15 episode of heart failure.  The doctor also did not review the recent clinic visit on 1/29/15.
11. The patient had an echocardiogram on 2/18/15 but the results were not reviewed by the primary care providers.

81

12. On 2/19/15 the patient had extremely high blood pressure (212/122) and evidence of heart failure. The patient was given intravenous Lasix, an increase of blood pressure medication and sent back to his housing unit with a week follow up. Additional diuretic was not provided. This patient had heart failure after a recent myocardial infarction and should have been monitored more closely on the infirmary unit. The failure to monitor and treat this patient appropriately resulted in a hospitalization for heart failure on 3/1/15.

13. On 3/6/15 the first visit after hospitalization for heart failure did not include a review of the hospital discharge summary. The doctor did not take an adequate history related to heart failure. The doctor referred the patient for a defibrillator but I could find no evidence of the patient being evaluated for a defibrillator by a consultant.

14. On 3/17/15 the patient had slurred speech and was mumbling. A doctor saw the patient in the ATU but took no history and performed no physical examination (including neurological) except to note the orientation of the patient. The doctor noted that a CT scan was indicated and referred the patient for an outpatient study. This patient had acute symptoms of a TIA or stroke but was not examined and was sent for an outpatient workup. This placed the patient at risk of harm.

15. When a doctor saw the patient on 3/20/15 from the 3/17/15 emergency visit, the doctor took no history and performed no physical examination pertinent to the patient's episode of slurred speech. The doctor failed to address this problem.

16. The patient was sent to a cardiologist on 5/7/15 but the recommended echocardiogram was unavailable. The consultant noted that the patient might have been having symptoms of heart failure and recommended an echocardiogram. This test was done in February of 2015 but the results were not sent to the cardiologist. This lack of coordination affected the care of the patient.

17. On 5/18/15 a doctor saw the patient but failed to review the recent cardiology visit.

18. On 6/15/15 a CT scan of the brain was done showing old infarcts and atrophy. There was no documentation of a review of this test.

19. On 7/14/15 a doctor failed to review recent echocardiogram results of 6/17/15 or CT scan results of 6/15/15. The doctor also took no history of the patient's problems. The doctor also used the term pseudoclaudication when referring to the patient's complaint of pain when he walked. This patient had bone fide claudication stemming from occluded peripheral vascular disease. Use of this term was inappropriate.

20. The failure to take appropriate histories and manage the patient's heart failure resulted in another hospitalization for heart failure on 9/13/15.

21. On 9/23/15 the patient again saw a cardiologist and again the echocardiogram results (2 echocardiograms had been done within the past year) were not available to the cardiologist. The cardiologist recommended another echocardiogram. This resulted in a delay in appropriate care for the patient.

22. On 10/14/15 a doctor evaluated a patient in the ATU and the only history was shortness of breath. There was no physical examination. An EKG and chest x-ray were ordered but not reviewed. The patient was sent back to his housing unit without a follow up or change in therapy. This is an inadequate evaluation for a potentially serious condition.

23. On 10/17/15 a doctor evaluated the patient for shortness of breath. The blood pressure was extremely high (209/129) with an oxygen saturation of 80%, a pulse of 118, a chest x-ray

JX-CCH-000172

indicating heart failure, and an abnormal EKG.  The doctor performed only a brief physical examination, treated the patient with a single dose of intravenous Lasix and sent the patient back to his housing unit without follow up.  This was dangerous as the patient appeared to be in acute heart failure.

24. On 10/25/15 the patient again experienced shortness of breath and chest pain with elevated blood pressure (171/116) but was treated only with intravenous Lasix by phone.  The medic gave Nitropaste, aspirin, and albuterol apparently without physician orders by protocol.  The chest x-ray indicated heart failure and the EKG was indicative of ischemia.  The patient should have been evaluated by a physician and the medic appeared to be acting beyond the scope of his license.

25. On 11/16/15 the first LSP physician visit after an aortogram, the doctor failed to take a history or review the results of the aortogram.  There was not therapeutic plan for this patient.

26. On 11/23/15 a doctor saw the patient but took no history of the patient's problems and performed no physical examination.  The doctor did not review recent hospital or specialty notes.

27. On 2/23/15 a doctor evaluated the patient but took no history and performed no physical examination.

28. At no physician visits at LSP did physicians evaluate whether patients were receiving medication appropriately.  MAR records were not all filed in the medical record so it was difficult to determine if patients were receiving ordered medication.

29. Coordination of this patient's specialty care was not good.  An aortogram was recommended by vascular surgery in November of 2013 wasn't done until September of 2014.  Staff at LSP identified that this recommendation was lost to follow up. After the patient sustained a heart attack with placement of a stent on 12/17/14, the patient saw cardiology at ILH in follow up.  The cardiology consultant at ILH recommended a 3 month follow up with an echocardiogram on 1/29/15.  The echocardiogram was done but not sent with the patient when he went for follow up on 5/7/15.  The echocardiogram was done again on 6/17/15.  The next cardiology appointment at ILH was 9/23/15 but the two echocardiograms that had been done 2/18/15 and 6/17/15 were unavailable to the cardiologist and the cardiologist recommended another echocardiogram.  These reports need to accompany the patient to consultation visits.  These deficiencies make specialty consultations very ineffective and inefficient.  Notably between cardiology visits the patient had a hospitalization on 3/1/15 for heart failure which was the reason for evaluation with an echocardiogram.  This ineffective specialty care coordination placed the patient at risk of harm.

30. Follow up of the patient's medical conditions by providers was poor.  Physicians caring for the patient at LSP seldom took an adequate history from the patient related to symptoms related to their conditions.  Frequently, physicians performed no physical examination of the patient related to their conditions.  Doctors frequently failed to follow up on hospitalizations and consultant clinic appointments.  Doctors did not demonstrate ability to manage the medical conditions of the patient.  They mostly failed to take adequate history; failed to perform physical examinations; failed to make necessary adjustments to therapy; and failed to monitor the patient's serious medical conditions.

31. The patient developed signs and symptoms of heart failure in late January of 2015.  The patient presented to the ATU for emergency care yet follow up monitoring and medication adjustment

JX-CCH-000173

was not done resulting in ongoing heart failure ultimately resulting in a preventable hospitalization in March of 2015.  After a heart attack in December of 2014 the first physician visit on 1/5/15 did not include a history of symptoms and included only a minimum physical examination (listening to the lungs).  The doctor did not evaluate or acknowledge the recent hospitalization for myocardial infarction.  On 1/29/15, the patient was evaluated in the ATU for shortness of breath.  The doctor evaluating the patient took no history and didn't perform a physical examination.  The chest x-ray was consistent with heart failure.  The doctor gave the patient intravenous Lasix and sent the patient back to his housing unit.  This placed the patient at risk.  Heart failure developing after myocardial infarction needs closer follow up than the patient received.   No additional medications or monitoring were ordered.  No ordering further monitoring or follow up placed the patient at risk of harm.  The following day a troponin laboratory test was elevated indicating possible heart damage and the patient was sent to a hospital.  The discharge summary of this hospitalization was not in the medical record.  The physician follow up visit on 2/10/15 addressed the 12/17/14 hospital admission but not the hospitalization of 1/29/15.

Patient #14

On 2/23/2006 an eye clinic examination was done.  Another eye examination wasn't documented until 2012.  The patient wasn't evaluated for diabetic retinopathy but it wasn't clear that the patient had diabetic retinopathy at this time.

On 12/28/2011 the patient was referred to eye clinic for decreased vision secondary to right scleral trauma and a cataract.  Also the referral was to evaluate for diabetic retinopathy.

On 3/26/2012 the patient was seen in eye clinic.  Bilateral cataracts were noted but no diabetic retinopathy.

On 6/22/2012 a telemedicine eye clinic was done and no diabetic retinopathy was identified.  The note documented that the patient had trauma in the right eye in 2005.  An onsite LSU appointment was recommended.

On 1/8/2013 a doctor saw the patient.  The blood pressure was 168/62.  The doctor took no history except that the patient had claudication when walking 50 yards.  The doctor performed no physical examination.  The doctor didn't list the patient's medications and did not evaluate whether the patient was receiving medications or had side effects.  The doctor didn't review any labs.  The doctor started Norvasc for a year and added Atrovent even though there was no evidence that the patient ever received Atrovent.  The doctor took no history of COPD and performed no physical examination so it wasn't clear what the indication for Atrovent was.  A 3 month follow up was ordered.

On 4/30/2013 a doctor saw the patient.  The blood pressure was 165/68.  The only history was that the patient had claudication walking 50 yards.  The doctor performed no physical examination.  The doctor added Enalapril 10 mg.  The doctor noted COPD but there was no evidence for this disease.  The doctor did not evaluate any lab results.

84

JX-CCH-000174

The May 2013 MAR documented that none of the patient's medications were given.  These included Isosorbide, Norvasc, Atrovent, Nitroglycerin, Clopidogrel, Lipitor, and Omeprazole.  MARs for April and March were also blank.

On 6/25/2013 a doctor saw the patient.  The blood pressure was 170/68.  The doctor took no history and performed no physical examination.   The doctor listed 7 problems.  The doctor noted that the patient was on only 10 mg of Lipitor.  The doctor added Losartan to the blood pressure regimen.  The doctor didn't evaluate whether the patient was receiving his medications and didn't note all medications the patient was taking.

On 7/25/2013 the laboratory reported A1c 5.8 (4.8-5.6); microalbumin 76 (0-17); TSH 4.46 (0.45-4.5); cholesterol 262 (140-239); HDL-C 41.3 (29-71); and LDL-C 186 )74-159).

On 9/17/2013 a doctor saw the patient.  The blood pressure was 146/59.  The doctor took no history and performed no physical examination.  The doctor listed problems with an associated plan.  The doctor noted "pre-diabetes" with an A1c of 5.8 and started Metformin.  The recent LDL-C was 186 which is high yet the patient was kept on low dose statin even though the patient had a stent.  The doctor did not list the patient's medications or document whether the patient was receiving medication.     The diagnosis of diabetes is made when the A1c is > 6.5 but it is not unreasonable to start Metformin with borderline diabetes.  The doctor ordered no special monitoring for diabetes and did not order further A1c values.

On 2/28/2014 the laboratory reported cholesterol 288 (140-239); HDL-C 39.9 (29-71); and LDL 204 (74-159).

On 3/6/2014 the laboratory reported microalbumin 23.3 (0-17) and microalbumin/creatinine ratio 11.3 (0-30)

On 3/25/2014 the patient was evaluated in ophthalmology and was placed on the list for cataract removal.

On 4/10/2014 a doctor saw the patient.  The blood pressure was 143/63.  The doctor took no history and performed no physical examination.  The note consisted of listing the problems (except PVD and CAD) and writing a plan.  The doctor did not note that the blood pressure was elevated and did not alter therapy.  The doctor documented that the liver function tests were normal and kept the patient on a low dose of Lipitor even though noting that the "FLP still way worse" without documenting the value.  The doctor added omega 3 fatty acids without specifying why.  The doctor documented COPD but there was no evidence for this disease.  A 3 month follow up was scheduled.

On 7/8/2014 a doctor saw the patient.  The blood pressure was 130/45.  The doctor took no history and performed no physical examination.  The doctor listed problems with brief comments about each disease.  The doctor did not mention the PVD.  The doctor documented COPD as a problem although there was no evidence for this disease.  The doctor documented that the LDL-C was 204 and yet kept the patient on a low dose of Lipitor (20 mg).  The doctor commented that fish oil had been added.     The patient had no evidence of a pulmonary function test.

JX-CCH-000175

The September 2014 MARs document that the patient received Naproxen, Selsun, Isordil, Prilosec, Fish Oil, Cozaar, Norvasc, Glucophage, Coreg, Keppra, and Levothyroid on 9/15/14.  The MAR appears to show that the patient did not receive Lipitor.  The next MAR was May of 2013.

On 9/15/2014 the patient had cataract surgery.  The medication list included the following medications: Albuterol, Norvasc, aspirin, Coreg, Plavix, Isordil, Keppra, Levothyroxine, Losartan, Metformin, NTG, Prilosec, and Lipitor.

On 9/16/2014 the patient was seen in UMC eye clinic post-surgery after cataract removal on 9/15/14.

On 10/14/2014 the laboratory reported cholesterol 205 (140-239); HDL 43 (29-71); LDL 137 (74-159).

On 10/15/2014 the laboratory reported microalbumin/creatinine ratio 64.5 (0-30)

On 10/15/2014 the patient was seen in post op after cataract surgery.  A month follow up was recommended.

On 11/6/2014 the patient was a no show for a physician clinic.  A 4 month follow up was scheduled.

On 11/18/2014 the patient was evaluated in ophthalmology after cataract extraction.  The ophthalmologist noted that the patient had run out of his eye drops.  A retina evaluation was recommended.  It isn't clear that this occurred.

On 1/21/2015 the patient had follow up with ophthalmology after cataract removal in the right eye.

On 2/24/2015 the patient had a metallic foreign body removed from the eye and was noted to have a cataract of the L eye.  The patient had already had a cataract removed in the right eye with an implanted lens.  The patient was to be on Vigamox and Gionax eye drops and was to have FU in retina clinic on 2/27/15

On 3/3/2015 the patient was at ILH and they noted that he was currently on prednisolone ophthalmic, Prilosec, NTG, Naproxen, Metformin, Levothyroxine, Keppra, aspirin, and Albuterol.  ILH prescribed Coreg, Clopidogrel, Isordil, Losartan, and Crestor.  The patient was apparently in the hospital but the discharge summary was not in the medical record.  There is no evidence that when the patient returned anyone evaluated the patient or ordered his medication.

On 3/16/2015 a doctor saw the patient.  The blood pressure was 150/63.  The doctor wrote a brief note stating that the patient recently was evaluated by ophthalmology on 2/27/15 and developed chest pain and was readmitted and received his 3rd stent and was discharged 3/3/15.  A brief examination was done.  The only problem listed was a cataract.  The doctor failed to include a history of the patient's other problems, failed to assess whether the patient had chest pain, was getting medication, or had further appointments.  The doctor didn't even note what medication the patient was receiving.  It did not appear that the anti-lipid medication was prescribed.  A 4 month follow up was noted.

On 3/27/2015 the patient saw an ophthalmologist who note that the patient had corneal metallic foreign body with keratitis secondary to grinding metal without eye protection.  This resulted in a scar of the cornea.  The patient had a left cataract and surgery was planned.  An ophthalmology note dated 3/25/15 documented that the patient had no diabetic retinopathy but needed an annual examination.  The note documented a cataract but needing cardiology clearance before stopping Plavix for surgery.

JX-CCH-000176

On 4/7/2015 an EKG showed sinus bradycardia; can not rule out anterior myocardial infarction age indeterminate.

On 4/7/2015 a chest x-ray incidentally noted "atherosclerotic calcifications of the aortic knob".

On 4/13/2015 the patient went in for cataract surgery but was on Plavix and the surgery couldn't be done because of the Plavix use; surgery was cancelled and rescheduled for when the patient was off Plavix.  A UMC medication list documented that the patient was taking albuterol, aspirin, Clopidogrel, Isordil, Keppra, Levothyroxine, Metformin, Naproxen, Prilosec, aspirin,and nitroglycerin.

On 4/13/2015 an ophthalmologist documented FU with cardiology in 2-4 weeks and ophthalmology clinic in 3-4 weeks.  The current medications listed by UMC physicians were albuterol, aspirin, Clopidogrel, Isordil, Keppra, Levothyroxine, Metformin, Naproxen, Nitroglycerin, and Prilosec.  The eye surgery was cancelled because of the Plavix issue.

On 5/5/2015 a doctor saw the patient.  The blood pressure was 178/78.  The only physician history was that the patient had increased dyspnea on exertion and edema since his stent.  The doctor performed no physical examination.  The doctor listed the patient's problems except PVD.  The doctor also listed COPD as a problem but there was no evidence for this in the record and the patient had not had PFTs or a CXR showing COPD.  The doctor noted poor control of HTN and added Aldactone but there is no evidence that this order was carried out.  The doctor's assessment of blood lipids was unintelligible.  It stated "↑→ 20 Lipitor + Ω 3 FA/1 gm BID → poor/worse FLP (2/25/14)- compliance? claims done -takes 2 → ↑→ 40 Lipitor".  The plan was to add Aldactone and "↑→ 40 mg Lipitor Q pm", but it is not clear what this latter order was and it wasn't clear that this order was carried out.  The doctor took no history with respect to whether the patient was receiving medication and whether the patient was having a problem with any medications.  A 3 month follow up was noted.

On 5/7/2015 the patient was evaluated in telemedicine cardiology.  The cardiologist noted elevated blood pressure and increased the Norvasc to 10 mg continued the Coreg at 25 mg and Losartan at 100.  The note was incomplete and it wasn't clear that the HLD was addressed.  The history and physical weren't included.  The blood pressure was 160/55.  The telemedicine notes are not included in their entirety.

On 5/19/2015 the patient experienced dizziness and a medic evaluated the patient.  The medic documented that the patient was admitted to the unit 1 infirmary but there was no accompanying note.

On 5/20/2015 the laboratory reported cholesterol 177 (140-239); HDL-C 38 (29-71); LDL-C 100 (74-159); TSH 5.24 (0.45-4.5)

On 5/20/2015 the laboratory reported cholesterol 177 (140-239); LDL-C 100 (74-159).

On 6/3/2015 a doctor saw the patient.  The blood pressure was 180/57.  The doctor noted the patient's problems but took no history related to these problems except to note neck stiffness and "feeling bad".  The doctor noted no jugular venous pulse, clear lungs, regular heart rhythm and decreased range of motion.  The doctor diagnosed neck sprain and ordered Toradol, Norflex and a depo steroid with a 6 week follow up.  There was no neck examination except that there was decreased range of motion.  The doctor did not address the elevated blood pressure or assess any of the patient's other problems.

JX-CCH-000177

On 6/18/2015 a lumbar x-ray incidentally showed that "There is calcific atherosclerotic disease of the abdominal aorta. Bilateral common iliac stents are noted".

On 6/18/2015 medics evaluated the patient at 3:19 am for low back pain. The pain was described as severe. The patient remained in the ATU until 8 am when a doctor saw the patient. The blood pressure was 172/64. The doctor took a brief history but performed no physical examination. The doctor prescribed Solumedrol IM and Mobic. The patient was scheduled for an offsite trip which was cancelled due to the pain.

On 6/30/2015 a doctor saw the patient. The blood pressure was 157/64. The doctor noted the patient's problems. The only history was that the patient was feeling better off Lipitor without aches and pains. These side effects were not described in detail and the doctor did no lab tests to assess for myopathy. The doctor took no history with respect to claudication or chest pain. A minimal physical examination was performed. The plan was to discontinue Lipitor due to side effects and a 3 month follow up. The doctor noted that a duplex and carotid scan was planned. The doctor did not assess labs or follow up on the recent ATU visit for back pain.

On 7/21/2015 a duplex Doppler noted right external iliac artery 50% or greater segmental stenosis limits blood supply to the femoral bypass. ABI 0.6 on right and 0.5 on left. There was 20-50% narrowing bilaterally of the carotid arteries.

On 8/10/2015 a doctor saw the patient. The blood pressure was 164/57. The only history was that the patient refused a trip for abdominal aortogram because of low back pain; yet the doctor did not follow up with an assessment of whether this was improved. The doctor documented ordering another referral. The doctor took no history and performed no physical examination. The doctor listed some of the patient's problems excluding CAD and PVD. The doctor did not even mention why the patient was scheduled for an aortogram. With respect to lipids the doctor wrote "mm c/o's→ D/C Lipitor". It is unclear what this meant as the doctor did not take a history. The doctor documented that the patient was "≈ goal, LDL =100". This is not goal for a person with diabetes and coronary heart disease; the goal is < 70. The doctor did not take a history with respect to claudication but did note the results of a recent Doppler duplex and carotid scan. Even though the blood pressure was elevated and noted the doctor had no plan to adjust medication. The doctor stopped Lipitor without the LDL being at goal. The metformin was decreased because the A1c was 5.5. The doctor did not verify that the patient was receiving medication or note whether the patient was experiencing bleeding with respect to Plavix.

On 9/21/2015 the laboratory reported cholesterol 253 (140-239); HDL-C 36.9 (29-71); LDL-C 170 (74-159).

On 10/15/2015 a doctor saw the patient. The blood pressure was 176/60. The doctor took no history and performed no physical examination but did note that the patient was off Coreg and Isordil at the request of ophthalmology from 10/12/15. The doctor merely listed some of the patient's problems (not including PVD, CAD) and noted that blood pressure was not in control for 4 months and that according to pharmacy the prescriptions had been sent. The doctor noted that the patient was intolerant of statins but did not document why. The doctor noted a LDL-C of 170 and documented that he might try Lopid or fish oil. The doctor took no history to assess the status of CAD or PVD. The doctor did not document all the patient's medications or document whether the patient was receiving all medications. The doctor ordered labs and a 3 month follow up.

JX-CCH-000178

On 10/16/2015 fish oil was started

On 11/18/2015 medics evaluated the patient emergently at 2:55 am for knee pain and the patient was evaluated in the ATU. The physician in the ATU took no history and performed no physical examination. The doctor gave the patient a balm cream and an ACE wrap with one crutch without having examined the patient or having made a diagnosis.

On 11/18/2015 medics evaluated the patient at 9:20 pm in the ATU for knee pain. The medic did not call a physician but started ibuprofen and rest and ice therapy without consultation. The patient was already on NSAID and had early nephropathy. No follow up was scheduled.

On 11/18/2015 the patient was evaluated at UMC eye center and his medications were listed as Norvasc, aspirin, Clopidogrel, Levothyroxine, Losartan, Meloxicam, Metformin, and Prilosec. He was on no anti-lipid drugs.

On 12/2/2015 medics evaluated the patient emergently for left knee pain and the patient was taken to the ATU. The blood pressure was 183/53. A doctor saw the patient and documented that the patient was to "resume" Coreg and then added that the patient claimed he was already on it. The doctor noted a prescription from 10/15/15. It wasn't clear that what medications the patient was on and it appeared that the doctor didn't know either. The doctor took no history and performed no physical examination. With respect to the knee pain the doctor noted that the joint space was diminished on x-ray. The only history was a knee cap blow with deep joint pain. There was no physical examination. The doctor prescribed a NSAID and Solumedrol 125 IM. There was no follow up ordered.

On 12/17/2015 the patient was evaluated in telemedicine pre-op for cataract surgery. The UMC physician documented that medications on file included Norvasc, aspirin, and Plavix.

On 1/27/2016 the laboratory reported TSH 4.65 (0.45-4.5); urine microalbumin 72.1 (0-17); microalbumin/creatinine ratio 96.8 (0-30); A1c 5.9; creatinine 1.11 (0.5-1.2); hemoglobin 10.7 (11-18). These lab tests were ordered to be done on 12/15/15 and were done over a month late.

On 1/27/2016 a chest x-ray showed clear lungs but noted incidentally that "there is a moderate amount of atherosclerosis".

On 1/28/2016 a doctor saw the patient. The BP was 144/58. The doctor took no history and performed no physical examination. The doctor listed most of the problems (did not list PVD or CAD) and listed his current plans. With respect to lipids the doctor documented that the patient was intolerant of statins and that fish oil had been prescribed. The intolerance was not described. The doctor did not discuss whether the patient was receiving medication or complications of medication. The doctor noted moderate control of hypertension and so increased the Coreg to 25 BID. However it appears that this order was not carried out because when the patient went for cataract surgery 2/18/16 the patient was still on Coreg 12.5 BID. There was no evidence of monitoring blood glucose levels.

The February MARs document that the patient received fish oil, Parafon Forte, Coreg, Capsaicin, Glucophage, Synthroid, and Cymbalta on 2/18/16. Norvasc was documented as refused. Clopidogrel, Cozaar, and Prilosec had no documentation and appeared not to have been given. This was the only MAR for 2016. The next MAR in chronologic order was for September of 2014.

On 2/2/2016 an EKG showed sinus rhythm with non-specific STT wave changes I, II, aVF, V5, V6.

89

On 2/18/2016 the patient returned from a cataract extraction.  His medications ordered upon return were Norvasc, aspirin, Coreg, Plavix, Cymbalta, Ibuprofen, Isordil, Levothyroxine, Cozaar, Metformin, Moxifloxacin, Omega 3 fish oil, Prilosec, and Prednisolone eye drops.

On 2/18/2016 the patient was admitted for 23 hour observation on unit 1.  The patient was on omega 3 fish oil and not on a statin.  There were no physician notes.

On 2/19/2016 the patient was admitted to unit 1 for a hypertensive crisis.  The patient had returned to see the ophthalmologist on 2/19/16 after a 2/18 surgery.  The blood pressure was elevated and the patient was sent to the ER prior to return to the prison.  Coreg was increased from 12.5 to 25 mg BID.  The patient was admitted to the hospital for chest pain from the ER.

On 2/20/2016 the patient was discharged from the hospital for chest pain.  The hospital history was that the patient had CAD with 3 prior stents and PAD s/p fem/fem bypass with HTN, HLD, and type 2 DM.  The systolic blood pressure was >200 with chest pain.  The last stent was placed in March of 2015.  The patient was to be on aspirin and Plavix.  The patient described intermittent chest pain ever since then and used nitroglycerin.  The most recent echocardiogram in March of 2015 showed an EF of 55% and it was redone and was 55%.  Coreg was increased.  The doctor noted that the patient had been on Lipitor but was no longer on this medication for unclear reasons.  The doctor restarted the Lipitor.  In the hospital the lipids were cholesterol 271; TG 159; HDL 40; LDL 199.

On 2/20/2016 the patient was admitted to unit 1 infirmary.  There was no physician notes.

On 3/7/2016 a doctor saw the patient.  The blood pressure was 133/56.  The doctor took no history and performed no physical examination.  The doctor only listed problems along with the current plan which did not include all medications.  The doctor did not assess whether the patient was receiving medication.  The doctor listed hypertension at goal when it was not.  A goal for diabetics is <130/80.  The doctor mentioned that the Lipitor was recently resumed at 40 mg. and mentioned that the LDL-C was 170.  The doctor did not ask about chest pain or claudication and PVD was not listed as a problem.

On 3/20/2016 a nurse documented that UMCNO recommended that LSP start Coreg at 25 mg but the nurse noted that the patient was already on 25 mg Coreg.  This was to address elevated blood pressure and if the patient was already on 25, a doctor should have evaluated the patient to assess whether the regimen should have been increased.  This was related to a 2/20/15 hospital discharge note which appears not to have been reviewed for a month.


COMMENTS

1. On 1/8/13 a doctor took little history and performed no physical examination, didn't list the patient's medications or evaluate whether the patient was receiving medications, and didn't review lab results.  The doctor ordered Atrovent without a clear medical indication.
2. On 4/30/13 a doctor saw the patient but performed no physical examination.  The doctor diagnosed COPD without any documented evidence for this condition.
3. The May 2013 MAR had no evidence that the patient was receiving medication.

JX-CCH-000180

4. On 9/17/13 the doctor took no history and performed no physical examination. The doctor didn't evaluate whether the patient was receiving medication. The doctor started treatment for pre-diabetes but ordered no diabetic monitoring.

5. On 4/10/14 a doctor saw the patient in clinic but took no history and performed no physical examination. The doctor did not address all of the patient's problems. The blood pressure was elevated (143/63) but therapy was not altered. The patient was kept on a low dose of Lipitor even though the LDL cholesterol was 204.

6. On 7/8/14 a doctor saw the patient but took no history and performed no physical examination. The doctor did not appropriately assess all of the patient's problems and identified COPD as a problem without clear evidence that the patient had COPD. Pulmonary function tests were not done.

7. The September 2014 MAR appears to indicate that the patient did not receive Lipitor.

8. The LDL was 137 on 10/14/14 but was not addressed. The microalbumin was elevated on 10/15/14 indicating chronic kidney disease but was not noticed or identified.

9. On 3/16/15 the patient experienced a coronary event requiring a stent. In part, the failure to control the patient's blood lipids, and the failure to control the patient's blood pressure for most of 2013 through 2014 contributed to this harm to the patient.

10. On 5/5/15 the doctor took an inadequate history and performed no physical examination. The doctor did not list all of the patient's conditions and listed COPD when there was no documented evidence for COPD. The doctor ordered Aldactone for elevated blood pressure but it did not appear that the patient received this medication. There was no evaluation of whether the patient was receiving medication.

11. A doctor saw the patient for neck pain on 6/3/15 and the blood pressure was 180/57 which is very elevated. The doctor did not address the elevated blood pressure.

12. On 6/18/15 a doctor saw the patient in the ATU for back pain and the blood pressure was 172/64 which is elevated. The doctor did not address the elevated blood pressure.

13. On 6/30/15 a doctor saw the patient who had elevated blood pressure which was not addressed by the doctor. The doctor had taken the patient off Lipitor without evaluating for myopathy or other side effects of statins. The patient had coronary artery disease, a prior stent, pre-diabetes, and hypertension and high dose statins were indicated. The doctor didn't document why the statin drug was contraindicated. This placed the patient at significant risk of harm.

14. On 7/21/15 the patient had significant peripheral vascular disease but did not have his blood pressure or blood lipids controlled. This placed the patient at risk of harm.

15. On 8/10/15 the patient had elevated blood pressure (164/57) but the provider did not adjust blood pressure medication. The doctor took no history and performed no physical examination. The doctor failed to address some of the patient's problems. The doctor documented that the patient's LDL was at goal when it was not.

16. On 10/15/15 a doctor saw the patient but failed to take a history or perform a physical examination. The patient's blood pressure was elevated because the patient was not receiving medication; the doctor did not adjust medication.

17. On 1/28/16 a doctor saw the patient but failed to take a history or perform a physical examination. The doctor failed to list PVD or CAD as problems. The doctor did not assess whether the patient was receiving medication. The doctor appeared to increase one of the blood pressure medications but it did not appear that the patient received this increased dose.

JX-CCH-000181

18. On 2/20/16 the patient had another hospitalization for coronary artery disease likely contributed to by uncontrolled hypertension and high blood lipids.  Doctors at the hospital re-started a statin not understanding why the statin was discontinued.

19. The first visit after hospitalization, a doctor failed to take a history and performed no physical examination.

20. The patient's blood pressure was not controlled from January of 2013 through March of 2016.

21. The patient's blood lipids were not at goal from January 2013 through March of 2016.

JX-CCH-000182

Louisiana State Prison at Angola
Medical Record Case Reviews
March 15-18, 2016


Patient #15

This 40 year-old man arrived at LSP on 6/16/97.  His medical history includes hypertension and mandibular cyst and s/p osteotomy. He died on 1/25/14 of a dissecting aortic aneurysm, cardiac tamponade, cardiomegaly with left ventricular hypertrophy, and acute pulmonary edema. At the time of death his medications were Norvasc, Clonidine, Cozaar, Isosorbide dinitrate and Zyrtec.

The patient's autopsy report showed that the patient had a dissecting aortic aneurysm, cardiac tamponade,

On 8/14/2000 the patient's blood pressure was 160/120 mm Hg.  The patient had been on as many as 6 antihypertensive medications.

On 4/17/04 at 1918 an EMT saw the patient for chest pain. His blood pressure was severely elevated 210/140 mm Hg. The patient was transported to the ATU and per protocol given Nitroglycerin SL.  After 5 minutes his blood pressure was still severely elevated 180/118 mm Hg. The patient was given a second NTG tablet. At 2015 a physician was contacted and the patient was given clonidine 0.2 mg.  At 2200 the patients' blood pressure was 140/96 mm Hg. The EMT did not obtain an EKG. The patient was not seen by a physician.

On 2/1/09 an EMT documented a referral to the ATU because the patient had chest pain and had not received his medication yesterday or today. His blood pressure was 168/110 mm Hg and 170/113 mm Hg.

On 2/8/09 an EMT saw the patient in the ATU secondary to inability to open his jaw.

2144 BP=227/139 mm Hg
2245 BP=150/99 mm Hg

In 11/2/09 the patient was sent for follow-up of TMJ pain and noted to have hypertensive emergency. (BP=199/128 mm Hg) and sent to the emergency room and BP=212/118 mm Hg. At that time his medications were amlodipine, metoprolol, hydrochlorothiazide, Lotensin and hydralazine.

Urgent Event

On 2/19/10 an EMT saw the patient for vomiting.  The patient's blood pressure was 220/110 mm Hg. The patient denied headache, chest pain, SOB, weakness, dizziness or diarrhea.  At that time he was prescribed Norvasc, Lotensin, Hydralazine and Toprol XL. The patient reported taking his medications

1

JX-CCH-000183

and denied additional treatment. A physician signed, but did not date the form, noting SC (sick call) PRN (as needed). The patient was charged $6.00 for emergency access and $6.00 for two prescriptions (Tylenol and Claritin).

Urgent Care Provider Follow-up.

On 3/10/10 a physician saw the patient for follow-up. BP=224/132 mm Hg.  He noted that the patient did not take his medications regularly. He added Minoxidil 2.5 mg bid. On 3/23/10 he saw the patient for follow-up. BP=136/90 mm Hg. He ordered labs and planned to see the patient in one month.

Medication Administration Records

September to December 2011 MARs show that the patient was prescribed catapres, Lisinopril, Norvasc and hydrochlorothiazide but virtually all doses were circled as not received. In October 2011 the patient was also prescribed risperidone and fluoxetine.

In February 2012 he was receiving four antihypertensive medications (Catapres, HCTZ, Lisinopril, and Norvasc).

On 4/17/12 a physician (Toce) saw the patient for hypertension and URI. BP=182/100 mm Hg. The provider noted the patient was taking 4 antihypertensive medications and was poorly controlled. He increased clonidine from 0.2 mg twice daily to three times daily and changed Lisinopril to Losartan 50 mg twice daily. He planned to see the patient in one month.

On 4/25/12 at 8:35 EMT's saw the patient as a referral from dental for high blood pressure.  He complained of a headache and lightheadedness but denied chest pain and shortness of breath.

| At 8:35 | BP=198/120 mm Hg | Pulse=93/minute | Resp=16/minute |
| At 9:50 | BP=156/103 mm Hg | Pulse= 84/minute | Resp= 16/minute |

At 8:45 Collins gave the EMT a verbal telephone order for clonidine 0.2 mg. The patient left the clinic at 9:56 am. There is no documentation that a provider examined the patient.  A physician signed the note documenting that the patient was seen on 2/17/12 for increased blood pressure and lightheadedness. On Losartan 50 mg and Clonidine 0.2 mg.  There were no orders to see the patient for follow-up.

On 6/21/12 the provider increased the patient's antihypertensive medications.

The patient's September, October, November, and December 2012 documentation shows many blank spaces for the patient's antihypertensive and psychotropic medications (Cozaar, Norvasc, catapres, Risperdal) as well as refusals.

On 4/30/13 an order was written to discontinue many of the patient's antihypertensive medications.

The patient's May 2013 MAR show that

2

On 6/8/13 an EMT saw the patient for toothache.  The patient's blood pressure was 232/149 mm Hg. The EMT circled this measurement. The EMT documented a telephone order from Dr. MacMurdo for clonidine 0.3 mg at 2340 and to recheck in one hour.  An EKG showed no changes since last 12 lead.  The patient was given per dental standing order: Toradol 60 mg, Cefazolin 1 Gram IM and referred to dental clinic on 6/10/13.  The EMT documented that the patient was instructed to sit in the hallway by the ATU and his blood pressure would be checked in 30 minutes.  The EMT documented that the patient left AMA and RTQ per TC security. The EMT referred the patient to dental for signs of infection in an upper right molar. No documentation of a referral to the physician.

On 6/9/13 the patient was seen urgently for jaw pain. The patient complained of ongoing dental pain to upper right molars. Patient was treated with Ancef & Toradol injections yesterday. BP=168/98 and 169/100 mm Hg. Afebrile.  Swelling and redness noted to gums. No pustules or openings noted. Decay noted to tooth.  The patient was treated per protocol: Toradol 10 mg tid (three times daily) x 5 days. Sent to pill call. Patient has referral for dental clinic in am.  No documentation of high blood pressure and discussion with patient. No notification or referral to provider for uncontrolled hypertension.

On 6/9/13 an EMT completed a Refusal to Accept Medical Care form documenting that the patient refused treatment for "Further treatment and evaluation of severe hypertension. Pt left the treatment center AMA.  It was not signed by the patient. (Note: Was this for 6/8/13).

Chronic disease

On 6/19/13 at 1320 a provider saw the patient for hypertension follow-up, chest pain, and "AR" and tooth pain. The patient's blood pressure was severely elevated BP=192/118 mm Hg.  The provider did not perform any CV or neurological ROS. The provider documented that the patient "Claims takes meds". No discussion of any kind documented with the patient. Examination consists of Lungs: CTA, Heart: RRR and ext: no edema.  The assessment is HTN and Plan. Must take meds. Will discuss admit for BP control in am. **This meeting did not take place.  No counseling regarding risks of poorly controlled hypertension.  No follow-up interval noted.**

MARs

The patient's June 2013 MARs show he was prescribed catapres and Cozaar for hypertension and received approximately half the monthly doses because he "Did not request it".

Urgent Event

On 7/2/13 at 1258 the patient was seen urgently by an EMT for falling in the kitchen due to an open drainage hole and injuring his right leg. 2 cm abrasion noted on right shin. The patient's blood pressure was severely elevated BP=187/123 mm Hg and 180/90 mm Hg, pulse=97-94. The EMT did not address the patient's blood pressure.  Another staff member also documented on the note "37 y.o. BM c/o illegible. +abrasion, clear/antibiotic dressing/give dressing/no swelling.  X-ray right shin. The note was

3

signed by the physician and his blood pressure was not addressed.  The patient was assigned bed rest for 2 days and No Duty. There is no documentation that the patient was scheduled for follow-up.

No Show

On 7/3/13 the patient was noted to be a "No Show" for the Physician's Clinic. There is no documentation as to when the patient would be rescheduled.

Sick Call

On 7/18/13 at 2030 the patient declared an emergency for flu-like symptoms and an EMT saw the patient for flu-like symptoms at the **ATU bullpen.** The patient complained of chills, cough, and congestion x 1 week and was seen and placed on Claritin and guaifenesin last week.  No coughing up green mucus. Pt has obvious productive cough, congestion and wheezing noted in bilateral lung fields. Runny nose. Patient denies SOB, CP, and N/V/D. No signs dehydration. Patient has no other medical complaints.  BP=160/90 mm Hg, pulse=84 respirations 18 and Temp 96.9∘F. The staff disposition was flu/viral syndrome protocol, DS #052768 and S/C prn**. The EMT/paramedic ordered Tylenol, Claritin, Mucinex and Bactrim. The patient was charged $6.00 for sick call and $4.00 for each prescription totaling $30.00.  A physician did not see the patient but initialed the EMT's note.**

On 7/23/13 at 1250 medical provider saw the patient for follow-up of a right leg injury. The patient's blood pressure was 211/109 mm Hg.  The provider did not perform a CV or neurological ROS or examine the patient's heart and lungs. There is no documentation of discussion with the patient regarding medication adherence and the reasons for not receiving his medication.  The patient was given clonidine 0.2 mg at 1310. At 1355 the patient's blood pressure is still severely elevated (BP=186/112 mm Hg). The NP's assessment was HTN and plan was noncompliance per MAR and Norvasc 5 mg daily and to return to the clinic in 2 months. The NP did not order blood pressure monitoring.

On 8/8/13 at 2010 the patient was sent from triage to the ATU for uncontrolled hypertension and headache.  BP=161/113 mm Hg.  At 2015 a telephone order from Collins for Clonidine 0.1 mg and recheck in 45 minutes.  Collins verbal order to follow-up BP clinic ATU.

At 2100 BP=158/112 mm Hg.  No action.

At 0922 the patient's blood pressure was still elevated (BP=173/109 mm Hg). Per Collins recheck in 30 minutes.

At 0947 the patient's blood pressure was still elevated (BP=176/100 mm Hg).  Repeat Clonidine 0.1 given at 0955

At 1100 the patient's blood pressure was still elevated (BP=170/114 mm Hg).

At 1145 BP=157/104 mm Hg. The patient was released at 1149. The plan was recheck ATU on 8/9/13, but it was already 8/9/13 and there was no plan thereafter.

4

A physician signed this note but there was no plan for the patient or change in baseline therapy. There was no documentation that the physician examined the patient for scheduled follow-up.  Where was the patient from 2100 to 0922?

On 8/11/13 an EMT saw the patient for loss of appetite x 7 days. The patient was diaphoretic, has soaked his jersey after chills and ached.  His BP=169/106 mm Hg. Afebrile. The EMT performed no examination of any kind. Under Health Care Practitioner notes the EMT noted +moderate blood on urinalysis, no dysuria, CVAT. Under disposition the EMT ordered Bactrim DS for an unspecified frequency and number of days, and noted that the patient had a hypertension appointment in late September. The same day a provider signed with no additional notes or plan.  **The patient likely had systemic infection but the provider did not see the patient.**

The patient's Main West August 2013 MAR's showed that the patient received about half of his antihypertensive medication doses (Catapres, Cozaar, and Norvasc). From September through January 2014 MAR showed that he was prescribed Catapres, Cozaar, Isordil, and Norvasc for his hypertension. **From September 2013 through January 2014 for virtually every dose on every day staff documented that the patient did not receive his medication because he "Did not Request it".**

On 1/14/14 at 1237 a medical provider (signature is illegible) saw the patient for follow-up of hypertension.  The patient's blood pressure was 216/113 mm Hg pulse 90/minute. At 1335 it was 174/90 mm Hg. The provider did not obtain a CV ROS and did not document any discussion with the patient about receiving his medications.  The only information documented was "non-compliance with medications. **Lungs: CTA, heart: RRR with murmur, however the provider did not document any description of the murmur or acknowledge that it was new.**  Clonidine 0.2 mg? now. Plan: Must take meds, decrease sodium, increase water. Follow-up in 2 months.  No discussion of medication regimen or why the patent is not taking medications. No follow-up interval noted.

**On 1/24/16 at 14:16 EMT's responded to the patient's location. He complained of left-sided chest pain that radiated to his left arm and jaw for a few minutes with mild SOB. 10 on a scale of 10. PMH=HTN. EKG showed increased ST changes. The patient was placed on a stretcher and transported to the ATU.**

On Friday 1/24/14 at 14:50 an EMT saw the patient urgently. He was brought by ambulance for left sided chest pain radiating to his jaw for 20 minutes while attempting to use the restroom. Pain was a 9 of 10 in severity. Illegible SOB with BBS and RF CTA**. Patient complained pain is as though a heavy weight on chest**. Patient denies nausea and vomiting, patient voices no other CC at illegible Patient complains of some blurred vision. There is no documentation that a physician was notified or examined the patient at that time, but an IV was started (does not document what kind. No documentation of EKG findings in this note. Despite chest pain radiating to his jaw, hypotension and EKG changes the patient was not transported to the hospital.  **Multiple handwriting on the same note.**

At 14:50 BP=95/48 mm hg, pulse=71, respirations =16 (no Sp02 or temperature measured)

At 15:15 BP=96/49 mm hg, pulse=72, respirations =16 (no Sp02 or temperature measured)

5

At 15:30 BP=101/54 mm hg, pulse=74, respirations =16 (no Sp02 or temperature measured)

On 1/24/14 Anthony Tarver MD requested a chest x-ray. The provider did not document a note.


Radiology

On 1/24/14 at 3:44 pm the patient had a chest x-ray requested by Tarver for chest pain. The radiologist report stated:

1. Findings concerning for progressive a (sic) the ascending aorta. I cannot exclude aneurysmal change. A CT scan would be helpful to further evaluate.

2. Low lung findings with vascular crowding throughout the lungs. It is difficult to exclude a function of interstitial pulmonary edema.

3. Cardiac silhouette size enlargement likely accentuated by the lung volumes.

The radiologist signed the report was electronically on 1/25/14 at 8:33 pm.

At 1618 BP=89/61 mm hg, pulse=71, respirations =not measured 16 (no Sp02 or temperature measured)

At 1748 BP=97/69 mm hg, pulse=69, respirations =not measured 16 (no Sp02 or temperature measured)

At 1819 Dr. Collins was notified and ordered Phenergan for ? symptoms.  The patient was in the ATU for 4 hours before a physician was notified?

At 1900 the patient continued to be hypotensive (BP=90/60 mm Hg) no pulse, respirations, or oxygen saturation documented.

On 1/24/14 at 1913 the patient was hypotensive (BP=82/50) pulse 98/minute, respirations=16 No Sp02. At 2137 temp=101.2

At 2112 a third IV bag was hung (of what?). The EMT did not contact a provider until 2145. The provider ordered ISTAT, Rocephin in IV bag and Ibuprofen Stat.

At 2137 101.2 Temp no other vital signs

**At 2145 Dr. Collins ordered an ISTAT.**

At 0045 the patient's pulse was 80, respirations=21 and regular. No Blood pressure or temperature were recorded. The patient was noted to be sleeping with grimaces. Sp02=100%. When waked and asked if he was in pain he said "not really". The patient stated he has not slept well for two days.

At 0125 the patient's blood pressure=112/60 mm Hg, pulse=104, respirations=20 and Sp02=98%.

 At 0200 the EMT did not take a full set of vital signs. Pulse=81 and Sp02=93%.

At 0313 the patient's vital signs were BP=112/86 mm Hg, pulse=83/minute Sp02=100%.

At 0345 the patient was released with plans to have the patient return for blood pressure check in the evening.  The patient was given a 3 day lay in.

JX-CCH-000188

On 1/25/14 at 6:30 am the patient was seen urgently for shortness of breath, nausea x 1 since leaving the ATU at 3:45 am. The patient complained of pressure in his left side or chest wall. Patient has + use of accessory muscles with BBS (bilateral breath sounds) with crackles at the bases. Skin warm and slightly diaphoretic. Patient states that the pain goes up to his throat. Illegible & neuro intact x 4. Ø Edema. Patient rates pain as a 9 of 10 pain scale. Patient denies headache, states "a little dizzy".

| 6:35 am | BP=104/74 mm Hg | Pulse=104/minute | Resp=22 | SP02=82% |
| 6:38 am | BP=90/62 mm Hg | Pulse =121/minute | Resp=22 | Not measured |
| 6:52 am | BP=105/63 mm Hg | Pulse=113/minute | Resp=22 | SP02=95% |

At 6:40 am the EMT placed oxygen on the patient at 15 LPM via NRB (non-rebreathable mask). An EKG was performed.

7:08 am BP=102/66 mm Hg    Pulse=96/minute    Resp=22    SP02=92% (on O2)
7:10 am Aspirin 324 mg chewable given to patient.

At 7:22 am Collins gave a telephone order place the patient on CPAP.
At 7:30 am another EMT documents unsuccessful attempt to start an IV.
At 7:50 am Collins gave a telephone order to give the patient Lasix IM.   ISTAT Done.
At 8:30 am the patient gave 400 cc's of urine.
At 8:33 am       BP=110/68 mm Hg       Pulse=110/minute       Resp=20       SP02=90%.

At an undocumented time a physician wrote that the patient had EKG changes that past 24 hours now has SOB. Patient for transport to Lane Hospital. Unable to access IV. Please evaluate.

On 1/25/14 an ambulance run report indicates that EMT's were dispatched to the ATU as the patient presented with shortness of breath, hypotension and EKG changes. The EMT's were notified at 8:15 am, enroute at 8:20 am and on the scene at 8:25 am. The EMT's noted that the patient was seen the day before and given 4 liters of fluid for fever and hypotension and was given Lasix. The ambulance transported the patient at 8:59 and was at the hospital at 10 am. Enroute the patient's vital signs were noted to be normal (BP=120-124/80-90 mm Hg, pulse=96-101/minute and the patient was alert and oriented x 4. EMT's applied oxygen at 15 liters/minute. The EMT noted that the patient was given 4 liters of fluid and antibiotics the day prior for fever and hypotension. The EMT's noted that they had been unable to obtain IV access and gave the patient Lasix 40 mg IM. The patient urinated 1200 cc's.

On 1/25/14 at an undated time, a physician wrote a consultant referral note indicating that the patient was originally seen for an upper respiratory infection, cough and decreased blood pressure (BP=90/60 mm Hg). Initial chest x-ray, ISAT and EKG were unremarkable and similar to previous reports. Patient treated with fluids, Rocephin. Temp 101. Symptoms changed at 6 am with shortness of breath, new EKG ST depression, BP=100/60 mm Hg and SPO2 82%. Rx: Alert, PERA, chest/lower crackles, Heart/illegible, Abd/Extremities/Ø.   Sp02=82%, increased with oxygen CPAP to 95%. Impression URI/CHF/possible cardiac changes.   Please evaluate.

7

The patient became unresponsive and was taken to Lane Memorial where he was diagnosed with a dissecting aortic aneurysm. He was airlifted to Our Lady of the Lake but did not survive the flight. His body was transported to East Baton Rouge Parish Coroner's office for the autopsy. The report noted that he had a dissecting aortic aneurysm, cardiac tamponade, cardiomegaly with LVH and acute pulmonary edema. The autopsy was limited to examination of the chest and no other vascular structures.

On 1/3/14 the LSP Medical Summary Report for a Deceased Offender was completed by Jason Collins MD.   The death was classified as A Natural Unexpected Acute Event. Dr. Collins noted that the patient was hypotensive when he arrived at the ATU and chest x-ray showed an increase in heart size and possible early congestive heart failure, however Dr. Collins did not include x-ray findings suggesting aneurysmal changes and pulmonary edema. Due to freezing weather conditions the plan was to closely watch the patient and transport if needed to Lane Regional Medical Center.  He noted that the patient felt better at 4 am and was released to his housing unit and returned at 0700 and was now in moderate heart failure and was treated with diuretics. He did not assess how well staff responded to the patient's long standing uncontrolled hypertension. He did not assess whether the patient's death was preventable.

**Assessment:** This patient received inadequate medical care for his malignant hypertension. Despite the patient's severe and uncontrolled hypertension, a physician saw the patient only twice (7/23/13 and 1/14/14) for chronic disease management in the 6 months before his death. There is no documentation that the patient was evaluated for secondary causes of hypertension. MARs show that the patient did not receive his medication because he did not "Request it" but his medication nonadherence was not adequately addressed.  At chronic disease visits, the physicians did not perform a cardiovascular or neurological review of systems (chest pain, SOB, etc.), perform adequate vascular examinations (neck, aorta, renal and femoral arteries), document review and discussion of patient medication adherence, and risks of medication noncompliance.  Providers did not order blood pressure monitoring after 2005. In the 24 hours preceding the patient's death, the patient had chest pain, abnormal EKG and chest x-ray suggesting aortic aneurysmal changes and the patient was not examined by a physician or sent to the hospital.

Patient #16

This 45 year old man arrived in LDC in 1998 and transferred to LSP on 2/9/98 and died on 2/14/14 of respiratory failure. His medical history included GERD, s/p right nephrectomy secondary to GSW prior to incarceration, left knee meniscal tear, s/p open reduction internal fixation of right ankle tri-malleolar fracture, chronic low back pain and depression.   His medications included omeprazole and amitriptyline.

Upon admission into LDC in 1998 his weight was 175 lbs. He reported using alcohol and drugs.  In 1999 his HIV antibody test was negative.  In 2012 he was TST negative.

On or about June 2012 the patient complained of hemoptysis. I don't find notes indicating a provider performed a clinical evaluation took place.  Moreover a chest x-ray report on 6/6/12 indicates that the patient was N/S (No show).  On 9/6/12 a chest x-ray was to be taken for pre-op prior to ankle surgery but there is no result on the report.

8

On 10/9/12 a provider documented that the patient was still having "occasional hemoptysis".  No constitutional or pulmonary ROS. The provider noted that a 6/7/12 chest x-ray was negative. The patient's lungs were clear.  The provider's assessment was hemoptysis and his plan was a course of antibiotics (Z-pack and Amoxil, and pulmonary consult if out of follow-up (?).  He planned to see the patient in 2 months.

On 12/11/12 a provider saw the patient for follow-up, noting that he had no further hemoptysis since sinus treatment.  No constitutional or pulmonary ROS. The provider noted that the patient's 9/6/12 CXR was negative. No diagnosis or follow-up planned.

On 10/16/13 and 12/9/13 a medical provider saw the patient for routine and ortho follow-up, respectively. The patient's vital signs were normal.  No meaningful history PE was performed.

On 12/14/13 the patient was brought to medical for a self-declared emergency. A health care staff documented that the patient complained of fever, chills, body aches, weakness, nausea and diarrhea x 3 days. Patient appears flushed and covered in sweat, pale and hot to touch.  The patient was febrile (T=101.6∘ F), BP=138/86 mm Hg, pulse=86/minute, respirations=18/minute.  Oxygen saturation was not measured. The staff noted that the patient had poor skin turgor, dry cough and breath sounds were congested bilaterally. The patient left with security in NAD (no acute distress). Staff referred the patient to the Acute Treatment Unit (ATU) and completed an ATU referral form for evaluation of fever and diarrhea for 3 days. The patient was charged a $6.00 access fee.

**On 12/14/13 there is no documentation of a medical evaluation of the patient. On 12/14/15 at an undocumented time, ATU staff wrote a referral slip to security for a 3 day no duty, bed rest.**

On 12/16/13 at 1745, health care staff referred the patient to the ATU for abnormal vital signs.  The patient was febrile (T=102.5 F), hypotensive (BP=98/62 mm Hg), tachycardic (pulse=120/minute). This information was written on the referral slip.

On 12/16/13 at 1805 a medic saw the patient noting that he was referred for abnormal vital signs.  The medic documented that the patient reported his symptoms began the previous Saturday (12/14) and he was treated in the ATU.  His symptoms were now increasing. The patient denied chest pain, SOB, N/V/D and any other symptoms. He noted that his breath sounds were clear bilaterally.    Oxygen saturation=90%.  The medic started oxygen at 4 liters per minute and started intravenous fluids (normal saline).The medic did not contact a medical provider but treated the patient in accordance with a protocol.  The medic took serial vital signs with blood pressure ranging from 141-101/73-58 mm Hg, pulse  102-60/minute, respirations=16-20 and temperature 102.5-101.6∘F.   **The medic treated the patient with guaifenesin, noted that he already had acetaminophen and ibuprofen, and a lay-in. He did not notify or refer the patient to a physician. He was released at 2020.**

On 12/18/13 at 0955 a medic saw the patient for complaints of weakness, dizziness, difficulty walking and reaching the bathroom, and diarrhea.  He denied nausea and vomiting. The patient's temperature was subnormal (T=95.5 F), and other vital signs were initially within normal limits. At 1200 the patient

9

was hypotensive (BP=97/63 mm Hg) and tachycardic 103/minute.  The medic did not measure the patient's respiration, temperature or oxygen saturation after initial measurements. There is no documentation that the medic notified a provider, however a provider documented on the same note indicating that the patient's chest x-ray is abnormal, showing bilateral diffuse nodular infiltrates and oxygen saturation was 30-40% on room air and 40-50% via nasal cannula. The patient's WBC was low (3.5, normal=4.5-10.5) and he was thrombocytopenic (Plt=109, normal=150-450).

At 1615 an ambulance was called. The ambulance was enroute at 1627 but did not arrive at the hospital until 1930.  The ambulance report indicated that from 1620 to 0015 the patient's respiratory rate was noted to range from 38-52 breaths/minute, and oxygen saturation at 0015 was noted to be 71%. The medic noted that the patient complained of bloody sputum but none was observed.  The medic noted that after giving report to McNo with a respiratory rate approaching 50 and oxygen saturation dipping into the mid-80's, the medic was ordered to divert to E. Jefferson where patient was "promptly put on C-Pap, given multiple IV antibiotics, labs and chest x-ray. The patient was able to compensate for about 1 hour when a decision was made to transport the patient to McNo with C-Pap and E. Jefferson EMS crew. Oxygen saturation dropped into the 20's when patient talked enroute. The patient was placed on C-Pap in the ER and report given to the physician.

At the hospital was diagnosed with pneumonia and acute renal failure (the patient has only one kidney).

According to the death summary, the patient had 17 contacts with medical in the 2 years prior to his death. Most visits were related to orthopedic concerns related to his right ankle fracture.

According to the death summary, on 12/14/2013 the patient presented to the acute treatment unit (ATU) with complaints of chills, body aches, loss of appetite and diarrhea. Intravenous fluids and medications were administered per protocol. Two days later the patient returned to the ATU with a fever of 103.5. Again fluids were administered per protocol.  On 12/18/13 the patient returned to the ATU with dyspnea and hypoxia (45%). Chest x-ray showed bilateral nodular infiltrates and questionable hilar adenopathy.  Once stabilized he was sent to the ILH for evaluation. Upon arrival at ILH he was placed on BIPAP. On 12/24/13 he was admitted diagnosed with Acute Respiratory Distress Syndrome, acute interstitial pneumonia, right tension pneumothorax and segmental pulmonary embolism. He was intubated, extubated and re-intubated. His hospital course was complicated and his condition worsened with acute renal failure. With family consultation ventilator support was removed and he died on 2/14/14. The cause of death was determined to be respiratory failure secondary to pneumonia/pulmonary fibrosis and renal failure. There were no areas for improvement identified.

There is no indication that patient was tested for HIV antibody during this time.

**Assessment:** This patient did not receive timely medical evaluation when he presented on 12/14/13 with fever, chills, body aches, dry cough, and diarrhea. The medic treated the patient according to a protocol and did not contact the physician. Again on 12/16/13 the patient presented acutely and was not provided timely and appropriate care. On 12/18/13 the patient's vital signs at 0955 suggested that the patient was in shock but because he was diverted to McNo then to E. Jefferson and back to McNo he

JX-CCH-000192

did not receive definitive care until 12/19/13 at 0115.  There are no hospital records in the chart.  This patient's was neutropenic and thrombocytopenic but was not tested for HIV infection.

Patient #17

This 46 year old man arrived at LSP in 2006 and died on 2/1/14 of pneumonia, lung adenocarcinoma, respiratory failure and septic shock. His medical history includes tobacco use, latent TB infection, chronic lymphocytic leukemia diagnosed in 2010, s/p completion of six cycles of chemotherapy in 2011, speculated lung nodule suspicious for malignancy per chest CT on 5/1/12. At the time of his death his medications were acyclovir, Bactrim, Naproxen, ranitidine, allopurinol.

In February 2010 the patient was diagnosed with chronic lymphocytic leukemia and completed 6 cycles of chemotherapy in January 2011. He tolerated chemotherapy well with decreased lymph node size but was lost to follow-up until April 2012.  In May 2012 CT showed a speculated left upper lobe lung mass suspicious for malignancy.

On 4/11/12 Oncology saw the patient and requested labs, CT of the chest, abdomen and pelvis ASAP, general surgery referral for port D/C and to RTC in 3-5 weeks on 5/16/12.

On 5/1/12 chest CT showed a left apical spiculated nodule suspicious for malignancy. At an undocumented date and time JC initialed the report and noted that the patient had an appointment with oncology the following week.

On 5/16/12 oncology saw the patient for follow-up and recommended pulmonary consult ASAP, chest CT in 3 months and return to oncology in 3 months.   Provider JC signed this recommendation on 5/17/12.

On 5/22/12 pulmonary saw the patient who reported cough but denied SOB or weight loss. The patient weighed 221 pounds. Pulmonary noted the patient had an enlarging LUL nodule and his impression was malignancy.  He recommended pulmonary cytology studies and follow-up with thoracic oncology clinic in 1-2 weeks after studies are obtained. A nurse saw the patient upon return and documented that the patient was a TB suspect.

On 6/4/12 a physician saw the patient for follow-up and noted he had a left upper lobe nodule and work up was in progress. RTC in one month.

On 6/29/12 a physician saw the patient for follow-up of cough, mass LUL and CLL.  The provider did not document a plan to send the patient to thoracic surgery as recommended by pulmonary on 5/22/12.

On 8/22/12 oncology saw the patient and noted that with respect to CLL no worsening of scans since the last appointment. Blood work not performed. Lung nodule being followed by pulmonary. Repeat CT prior to the next appointment. The next scheduled appointment was 11/28/12.

11

JX-CCH-000193

On 9/6/12 an EMT saw the patient for complaints of chest pain for "awhile".

On 9/28/12 a physician saw the patient for treatment of chest pain and treated him symptomatically. Much of the scanned note is illegible.

On 10/1/12 at a telemedicine clinic a physician noted that the patient had a positive sputum for AFB that was Streptomyces and not Mtb. Chest x-ray showed no new changes besides nodule previously seen. This report was not signed by a medical provider.

On 10/9/12 the patient complained of chest pains for 3 months.

On 11/26/12 the patient's WBC=44.5, with high lymphocytes and low neutrophils.

On 1/11/13 saw the physician for follow-up of left upper lobe nodule, chest pain and cough. The provider did not address the patient's lung nodule and treated him with Naproxen and guaifenesin with follow-up in 3 months.

On 1/13/13 the patient submitted a health request form complaining of chest pain.

On 2/28/13 an EMT evaluated the patient for chest pain.

On an undocumented date, the patient submitted a Health Services Request Form complaining of chest pain and Naproxen not working. On 4/18/13 an EMT assessed the patient in Spruce 1. The EMT noted that the patient requested renewal of Naproxen. States on-going problem. States pain is non-radiating.
BP=134/80 mmHg          Pulse=72/minute          Resp=14/minute Temp and SpO2=not measured.

The EMT did not examine the patient. The EMT did not provide medications and referred the patient to the physician.  On 4/22/13 the physician documented to keep his scheduled appointment.

On 4/25/13 the physician saw the patient for chest pain, GERD and CLL. The physician did not perform a ROS for any of these conditions and did not examine the patient.  The plan was Naproxen.
BP=99/68 mm Hg          Pulse=76/minute          Resp=20/minute          Temp= 97 F          Weight=200 lbs.


On an undocumented date, the patient submitted a Health Services Request Form complaining of persistent chest pain and needing to see a doctor. On 5/27/13 an EMT assessed the patient in Spruce 1.
BP=130/80 mm Hg          Pulse=72/minute          Resp=16/minute          Temp= not measured
The EMT documented that the patient had non-radiating chest pain that increased with movement and deep inspiration. No description of onset, location, quality, intensity or duration. The plan was to change the times of administration and refer to the physician. On 5/28/13 the physician signed the form noting the request was category 3 in priority.

12

JX-CCH-000194

On 6/21/13 a physician saw the patient for chest pain and noted he had a 1 cm x 1.5 cm nodular neck lesion.   His white count was significantly elevated (>99,000). The physician ordered Naproxen and planned to get a heme/oncology consult.  On 6/24/13 the consult request was completed.

On an undocumented date, the patient submitted a Health Services Request Form complaining of persistent chest pain and not receiving his medication. On 7/7/13 an EMT assessed the patient in Spruce 1. BP=146/84 mm Hg    Pulse=80/minute        Resp=16/minute        Temp= 97.6 F.
The EMT documented: Patient states he is still experiencing chest wall pain.  States he has seen the doctor for this complaint but never received medications. NAD. BBS CTA. AAOx3. Speaks in full sentences. Skin warm and dry. No description of onset, location, quality, intensity or duration. The plan was sick call prn. Keep scheduled appointment.  A physician wrote to keep 711/13 appointment.

On an undocumented date, the patient submitted a Health Services Request Form complaining of persistent chest pain and not receiving medication ordered by the doctor. On 7/30/13 an EMT assessed the patient in Spruce 1. No ROS or assessment of the patient's chest pain. VS Normal. The plan was sick call prn. On 7/31/13 the physician requested to pull the patient's chart.

On 7/31/13 the patient was transferred to ILH for a hematology consult. Paperwork does not appear to be complete as the contents of the consult are not included. The Problem List included CLL and positive sputum culture, but there was no other information regarding the culture.  The plan was follow-up in 2 months.

On 8/8/13 Dr. Lavespere saw the patient for follow-up.  VS normal. Weight=192 lbs. He documented that "according to offender, no treatment recommended at this time". The patient complained of a productive cough with white sputum. Lungs clear. Plan is to await heme/oncology recommendations. Naproxen for chest wall pain.

On an undocumented date, the patient submitted a Health Services Request Form complaining of persistent chest pain and not receiving ordered medications. On 9/4/13 an EMT assessed the patient in Spruce 1. VS normal.  The EMT noted that the patient complained of chest pain off and on daily x 12-13 months. Denies chest pain or SOB at this time. Pain does not radiate and meds don't help much. He requested to get new medication he never received. The EMT referred the patient to the physician.  The physician did not see the patient but ordered Keppra and Naproxen.

On an undocumented date, an EMT completed a Health Services Request Form documenting SDE (self-declared emergency).  The patient complained of cough and runny nose. Temp=99.8. BBS CTA. The EMT gave the patient a stat dose of Tylenol and planned to see the patient as needed. At an undocumented date and time, Dr. Lavespere initialed the form.

On an undocumented date, the patient submitted a Health Services Request Form complaining of a chest cold. On 9/22/13 an EMT assessed the patient. **The patient complained of a chest cold x one year. BL (bilateral lower congestion) heard. The EMT did not perform a ROS (fever, chills, night sweats, weight loss) or note the patient had a history of a positive TB skin test. The EMT gave the patient**

JX-CCH-000195

**Tylenol and did not refer the patient to a physician**. At an undocumented date and time, Dr. Lavespere initialed the form.

On an undocumented date, the patient submitted a Health Services Request Form requesting his medication administration time to be changed. On 9/30/13 an EMT assessed the patient.  At an undocumented date and time, Dr. Lavespere initialed the form and renewed Keppra and Naproxen.

On an undocumented date, an EMT documented SDE (self-declared emergency)-Leg swelling on a Health Services Request Form. On an EMT assessed the patient at TCBP. The patient complained of glands swelling secondary to leukemia. Patient complained of sputum with yellow coloring. Lungs clear. BP=144/78 mm Hg, pulse=99, respirations=16, Temp not measured and SpO2=97%. The EMT referred the patient to a physician. On 10/29/13 the physician documented s/c prn.

On 10/31/13 the patient was scheduled to see heme/oncology but missed the appointment because labs were not drawn in advance of the clinic.  There is email correspondence from Diane Angelico explaining that if there are special labs the prison cannot perform she believed DOC will approve it.  She went on to document:

"Part of the reason we have not historically done labs at ILH prior to June was costs-we had no money for offender care.        Plus, it costs the prison a whole bunch to bring the patient out for labs then back to clinic at another time. Since June, DOC is paying for care, but we are still trying to save them money by not scheduling trips for labs or diagnostics if they can get them done at the prison."  The patient was scheduled for follow-up at ILH on 11/6/13.

On 11/1/13 at 0716 the patient was seen in the ATU urgently.  **The patient was referred by Dr. Lavespere for sick call complaints of chest congestion and ? pneumonia.** Patient states was put on cough syrup and it was helping.

"States returned back from NO last night was sent to McNo yesterday due to complaints of RUE pain with gland swelling. States did not see a doctor in NO hospital. States just had blood drawn and never seen a doctor. States she is in a wheelchair because he can't."

The EMT did not perform a ROS or a physical examination. There is no documentation that the EMT called a physician but additional undated and untimed notes are included in the note.  **One notation is that a chest x-ray was ordered and showed extensive abnormalities consistent with lymphoma, s/p trip to NO, yesterday got labs, no input on condition; plans of treatment unk(nown).**  Had complete resolution of URI symptoms with OTC Tx.  Chief complaint: right thigh pain x 7-10 days. Plan to increase Keppra 500 to 750 mg twice daily x one year. Follow-up SC. Toce.  **Dr. Toce made no specific plan regarding the patient's abnormal chest x-ray.**

**On 11/1/13 chest x-ray showed "a large mass in the left parahilar region extending up the left lobe medially. There are numerous pulmonary nodules scattered through the lung fields on both sides. There is widening of the mediastinum as well suggesting adenopathy. Findings are all worrisome for**

14

neoplasm.  There are no prior films available for comparison. Is this known?  The above results were called to the Angola x-ray department.  On an undocumented date, Dr. Lavespere initialed this report.

On 11/6/13 Heme-oncology saw the patient noting that he had CLL RAI stage 2 with chronic cough, lymphadenopathy, weight loss and new large mediastinal mass all likely secondary to malignancy. Examination showed the patient had bilateral lymphadenopathy in the patient neck, axilla and groin. He was diagnosed in February 2010 and completed 6 cycles of chemotherapy in January 2011. He as lost to follow-up until April 2012.   He tolerated chemotherapy well and had decreased lymph node size however in May 2012 CT showed lymph node enlargement. He followed up on surveillance, last seen in August 2013. Since then leukocytosis worsened and Angola equipment cannot detect WBC=>99,000.

Chest x-ray findings included:

**"Pulmonary tumors are much more numerous and larger. There is a large mediastinal mass behind the thoracic aorta, extending almost to the apex. This extends inferiorly to the infrahilar area along the mediastinum."**

His CT scan showed extensive LAD and pulmonary nodules and recommended restarting chemotherapy with FCR. It's unclear whether pulmonary findings are associated with CLL or additional primary-will review with heme-onc team. The patient also had asymptomatic hyperkalemia and Kayexalate was given.  Daily monitoring was recommended and continue IVF and Kayexalate to keep potassium <7 or less if symptomatic.  A PICC line was placed.  A LSP provider did not sign and date this report as having been reviewed. The patient was admitted to the hospital and discharged on 11/12/13 with follow-up in 3 weeks.

On 11/12/13 the patient refused admission to the nursing unit.

On 11/20/13 email communication took place between the heme-onc clinic staff and LSP to coordinate labs.

On 12/4/13 the patient was admitted to the hospital for chemotherapy and discharged on 12/8/13. His WBC=85,000. The patient was scheduled for follow-up on 1/8/14.

On an undocumented date, the patient submitted a Health Services Request Form **complaining of coughing.** On 12/20/13 an EMT assessed the patient. Afebrile. VS normal. Lungs clear.  The EMT referred the patient to the physician. At an undocumented date and time a provider illegibly initialed the form, with no plan.

On 12/23/13 a physician saw the patient for review of chest pain but the patients' primary complaint was a productive cough. He noted the patient had coarse breath sounds bilaterally.  VS normal. Afebrile. Weight=186 lbs. He treated him with Levaquin.  He did not plan a follow-up visit.

On an undocumented date, the patient submitted a Health Services Request Form **complaining of chest pains and cough and needing to see a doctor.** On 11/24/13 an EMT assessed the patient at Spruce 1.

15

The patient complained of a productive cough with green sputum. VS normal. Afebrile. Patient has minor congestion noted in lower lung fields. The EMT treated the patient with an OTC.  At an undocumented date and time a provider illegibly initialed the form, with no plan.

On an undocumented date, the patient submitted a Health Services Request Form complaining of right thigh pain and rash. On 11/31/13 an EMT assessed the patient at TC/BC 1. The patient ambulated via wheelchair. His right leg was smaller than his left leg.  The EMT did not describe the rash on the patient's leg. The disposition was physician review. On 1/2/14 the physician reviewed the form and reordered Aquaphor lotion. The patient was charged $6.00.

On 1/6/14 at 1235 the patient was seen urgently for altered mental status.  The patient knew his name and DOC number but not the date or place.

1235    BP=128/71 mm Hg, pulse=100, respirations=16, Temp= 98.3 and SpO2=90%.
1327    BP=128/74 mm Hg, pulse=92, respirations=16, Temp= 98.3 and SpO2=90%.
1414    BP=128/72 mm Hg, pulse=94, respirations=16, Temp= NM and SpO2=NM.

There is no documentation that the EMT notified the physician. At an undocumented time, another staff documented: Patient with CLL now with AMS x 1. Alert and Oriented to name not time and place. Chest x-ray showed marked widening of the mediastinum with large central lung mass. Extensive nodularity throughout the lungs and small right pleural effusion. At an undocumented date and time, Dr. MacMurdo illegibly initialed the report. WBC=52.7. To ILH.

On 1/6/14 the patient was admitted to ILH and diagnosed with pneumonia.  He was discharged back to Angola on 1/8/14.  There is no documentation that health care staff saw the patient upon his return to Angola.

On 1/12/14 the patient was seen for a SDE (self-declared emergency) at TCBP.  The EMT documented that

On 1/13/14 x-ray of the right femur showed a lytic lesion. Clinical correlation was warranted.

On 1/15/14 the patient was apparently seen at the hospital for pneumonia. The plan was that following completion of antibiotics for pneumonia will admit the patient on 1/22/14 for 3rd cycle of chemotherapy. The plan was to administer chemotherapy every month until cycles were completed in March 2014.     During this admission chest CT showed increasing burden of nodular and consolidative disease in the lungs. It was also noted that the patient had a speculated lung lesion discovered on chest CT on 5/1/12 that was being followed by pulmonary (?).

On 1/15/14 a nurse saw the patient upon return from the hospital and noted the plan to admit the patient on 1/22/14.

On 1/17/14 at 1848 an EMT saw the patient urgently for chest pain and sent him to the ATU.  Vital signs WNL however SpO2 was 88%.

16

JX-CCH-000198

On 1/17/14 at 1917 an ATU EMT saw the patient for chest pain and SOB. The patient was coughing up yellow brown sputum. Much of the note is illegible. There is no documentation that the EMT notified a physician and gave orders. The patient was given IV fluids, nebulized albuterol treatment, SoluMedrol and Levaquin.  Vital signs were repeated at 2118 and 2210.  At an undocumented date and time, another unidentified staff person (initials B) documented that the patient was treated for bronchitis that has not responded to Augmentin.  At 2213 the patient was sent back to his quarters via wheelchair.

On 1/20/14 at 1135 an EMT saw the patient in REBTC was seen for a self-declared emergency for a flu-shot reaction and inability to sleep The EMT took vital signs and noted that the patient received a steroid shot but performed no meaningful assessment. The plan was sick call as needed. At an undocumented date and time a physician initialed the form with no plan.

On 1/21/14 at 0515 an EMT responded urgently to the patient at Spruce 1 for **SOB and inability to sleep.** The patient was transported to the ATU.  The patient's chest x-ray had worsened and the patient was sent to ILH.

On 1/21/14 chest x-ray showed a large left hilar/suprahilar mass and diffuse pulmonary parenchymal nodules consistent with metastatic disease. Increasing densities in the left and right perihilar regions could correlate with active infectious infiltrates or worsening metastatic disease. **At an undocumented date and time a Dr. Lavespere initialed the report.**

On 1/23/14 the patient underwent left upper lobe lung biopsy that showed adenocarcinoma of the lung. The patient was intubated and on 2/1/14 the patient died.

**Assessment:** This patient did not receive timely diagnosis and treatment for his repeated chest pain and adenocarcinoma of the lung.  Dr. Anthony Tarver completed a Medical Summary Report for a Deceased Offender on 2/6/14. The physician categorized the death as Natural Expected/Chronic Illness with Normal Progression. An autopsy was not performed.  The physician documented an abbreviated summary of the patient's care, but failed to note medical provider's failure to implement that recommendations made to evaluate the patient's spiculated pulmonary nodule in May 2012, including referral to a thoracic surgeon to biopsy the nodule. Over the next 18 months the patient complained of unrelenting chest pain for which he was not appropriately medically evaluated and treated. In most cases the patient was simply treated for chest wall pain without relief. Thus the patient was not diagnosed with adenocarcinoma of the lung until immediately prior to his death. Hematology/oncology specialty services saw the patient for follow-up of his chronic lymphocytic leukemia (CLL) and documented that the patient's pulmonary nodule was being monitored by pulmonary services, however the required work-up never took place.  In addition, the patient began to experience right leg pain and at some point the patient required a wheelchair for ambulation, but a diagnosis was never established and leg x-rays prior to his death revealed lytic lesions, which may have represented metastatic disease. At chronic disease visits, physicians often did not perform a review of systems or perform adequate, if any physical examinations.  Although the patient's death ultimately may not have been preventable, the patient experienced unrelenting pain for which he was not adequately treated.

17

Patient #18

This 31 year old man arrived at LSP on 8/28/2006 and died on 1/10/14 due to severe influenza type A, pseudomonas and pneumocystis jirovecii pneumonia (PJP) related to AIDS.  His medical history includes AIDS, seizure disorder, asthma, and glaucoma. His medications at the time of death were Truvada, Kaletra, Xalatan, zantac, omeprazole, Tums, Zofran promethazine, and MVI.

On 1/13/14 an autopsy showed the patient died of AIDS, Bilateral bronchopneumonia and interstitial pneumonia, right ventricular dilation and hepatosplenomegaly. He was to be buried on the Farm.

Medication Administration Records

Some MARs do not show the month and year of the MAR.  Orders do not have a start and stop date and ordering provider. January 2014 show that staff documented giving the patient medications on 1/11/14, 1/12/14, 1/13/14 and 1/14/14, four days after the patient died.   The patient was noted as receiving his Truvada and Kaletra via KOP administration. From June to August 2013 the patient did not receive Xalatan eye drops because he "Did not Request it". In May it was noted to be given KOP.

Main West MARs for the months of December 2013 and January 2014 show that officers recorded that the patient received all medications through KOP such as IV antibiotics, albuterol nebulizer treatments, Bactrim even though the patient was in the infirmary at that time, and infirmary MARs show that the patient did not receive several doses of Bactrim and IV antibiotic, Zosyn.  These same MARs show that officers documented the patient receiving medications after he had gone to the hospital and after he had died.

On 5/18/2007 the patient was HCV antibody negative. The patient had no additional labs until 11/20/13.

On 10/5/2011 the patient weighed 206 pounds.

On 9/25/12 the patient weighed 189 pounds, a loss of 17 pounds in one year.

On 9/29/12 mental health saw the patient for suicidal ideation. The patient was distressed because he was gay and had been having sexual relations in prison. The LCSW did not discuss risks of HIV and suggest testing.

Sick call

On 8/7/13 at 2130 the patient submitted a health care request and was seen urgently for non-radiating chest pain for one hour that was reproducible with a deep breath and cough. The patient also had a runny nose. BP=119/64 mm Hg, pulse=80/minute, respirations=14/minute, Temp=100.3 F and SpO2=100%. The patient was not weighed. Exam consisted of "skin color normal, warm and dry. BBS (bilateral breath sounds). CTA (clear to auscultation). Ambulatory without distress." The EMT treated the patient with Claritin, Robitussin and Tylenol.  The patient was given a No Duty for 3 days. No follow-up

18

or referral to a provider was made. The patient was charged $6.00 for the access fee and $2.00 per OTC for a total charge of $12.00.

Urgent

On 8/12/13 at 1315 EMT's saw the patient in the ATU for chest pain x 1 hour.  The pain is described as illegible and rated it a 10 (in severity).   He denied SOB or dyspnea. Temp=99.4, BP=131/87 mm Hg, pulse=132 and respirations=18, SpO2=98%.   The patient was not weighed. At 1415 the patient's BP=126/80 mm Hg, pulse=92, respirations=18. His Temp and SpO2 were not repeated. An EKG showed NSR. The patient was given a GI cocktail and a chest x-ray was ordered.  **An undated and untimed note by a provider noted that the 57 year old patient complained of chest discomfort with chest wall tenderness. The diagnosis was costochondritis and he ordered Toradol that was given at 1430. The physician took no history of the patient's symptoms.**   He patient left the ATU at 1445.

On 8/12/13 a chest x-ray was performed for chest pain.  It was read as normal.  On an undocumented date the report was initialed.

On 8/26/13 the patient saw a mental health worker and requested an HIV test. The patient signed an informed consent and the mental health worker referred him to medical. THE TEST WAS NOT PERFORMED.

On 11/18/13 at 0216 EMT's responded urgently to the patient's dormitory where he was found sitting on a bench in the bathroom. The patient said "I have a cold".  He had a non-productive cough with abdominal pain for two hours. The patient denied headache, blurred vision, N/V/D (nausea, vomiting, and diarrhea).  BP=136/84 mm Hg, pulse=102/minute, respirations=18. No Temp. SpO2=99%. The patient was not weighed. The vital signs were repeated with no significant changes. The exam consisted of BBS CTA with =RTF.  Noted mild congestion left side of lobe every other breath.  W&D with good skin turgor. Report called to ATU and Dr. MacMurdo ordered guaifenesin.  No transport. Left with security. EMT's left at 0228.

On 11/20/13 at 0215 an EMT saw the patient in the ATU bullpen for a complaint of cough x 6 months. The EMT documented that the patient's chief complaint was a dry non-productive cough accompanied by chest pain. His cough made him nauseated without vomiting or diarrhea. Patient feeling weak and tired. The patient had significant weight loss (57 lbs.) from 203 lbs. in May 2011 to 146 lbs. Patient unable to explain weight loss. Patient's last chest x-ray 8/2013 was normal. Temp=100.3, BP=115/80 mm Hg, pulse=139/minute and respirations=16.  SpO2=98%.  BBS=CTA. Skin warm and dry to touch. Throat examination was without redness or pustules. Patient has mild sinus congestion with clear discharge. When patient coughed he held his ribs.  The assessment was cough and weight loss and disposition was to refer to the ATU at 0900. The referral slip stated that the patient had fever, tachycardia cough and weight loss (57 Lbs.).  **THE PATIENT WAS NOT SEEN FOR 9 HOURS.**

On 11/20/13 at 1115 an EMT saw the patient noting a referral for fever, cough, tachycardia x 6 months and weight loss. Patient ambulates in the ATU without difficulty. AAOx3. Patient was seen earlier this morning and referred back for complaints of runny nose and occasional cough.  The EMT noted the

19

JX-CCH-000201

patient had no abnormal breaths sounds. The EMT noted the patient had lost 55 lbs. in 2 years. . Temp=96.7, BP=122/84 mm Hg, pulse=97/minute and respirations=16.  SpO2=99%. The EMT did not document notifying a physician and obtaining orders.  At some point a chest x-ray and labs, including an HIV test was ordered.  At an undocumented time another EMT noted that the patient had no cough since arrival.  At 1630 the EMT noted that the patient was waiting to see Dr. Toce.  EMT's had not repeated vital signs since the patient arrival at 1115.  **THERE IS NO DOCUENTATION THAT A MEDICAL PROVIDER SAW THE PATIENT FOR A HISTORY OF 55 LBS WEIGHT LOSS.** At 1832 Temp=not measured. BP=114/78 mm Hg, pulse=124/minute and respirations=16.  SpO2=99%.

On 11/20/13 a chest x-ray was performed for a history of cough.  It was read as normal.  On an undocumented date the report was initialed.

**On 11/20/13 labs showed the patient was HIV antibody positive. This result was reported on 11/22/13 at 1124.  There are two copies in the record.  On an undocumented date a medical provider signed the report.  On 12/4/13 another medical provider illegibly initialed the report.**

On 11/22/13 at 0830 an EMT saw the patient for dizziness and midsternal chest pain. Portions of the note are illegible. Temp=100.4, BP=110/75 mm Hg, pulse=160/minute and respirations=16. SpO2=100%.   **THERE IS NO DOCUMENTATION THAT THE EMT NOTIFIED A PHYSICIAN OF THE PATIENT'S ABNORMAL VITAL SIGNS.**  At 1300 the EMT measured the patient's vital signs. . Temp=Not measured, BP=124/74 mm Hg, pulse=118/minute and respirations=16.  SpO2=Not measured.  At 1345 the EMT repeated the patient's vital signs assessing the patient for orthostatic hypotension. At an undocumented time the EMT started an IV.  At 1300 the patient was noted to leave the ATU however, vital signs were recorded thereafter. At an undocumented time, a medical provider (?)  documented a note. The provider did not review the patient's medical history, review the patient's onset of symptoms or perform any examination.  The provider noted that the patient had mild epigastric discomfort, not bad enough to treat. The provider noted the patient's hemoglobin and hematocrit were low (H/H=10.7/32.4%) but did not comment on its significance or make any plan aside from "Encouraged to increased ambulation".

On 11/23/13 at 2100 EMT's responded to the patient's location for complaints of inability to breathe. The patient was warm and diaphoretic His pulse was 130/minute and oxygen saturation=91%. Respirations=21/minute. The EMT noted no abnormal lung sounds and that the patient was not in respiratory distress. The EMT started oxygen at 4 liters per minute and started an IV with lactated ringers at KVO.  The patient was transported to the ATU where EMT's noted that he "complained of shortness of breath x 20 minutes".  He was wrapped in a sheet and shivering. Patient reported 60 pound weight loss and malaise.  Temp=100.1, BP=107/60 mm Hg, pulse=109/minute and respirations=22. SpO2=100% at 4 liters of oxygen.  Vital signs were repeated at 2245 and 0033.

At 2147 the EMT contacted Dr. Collins who ordered Phenergan, Tylenol and to orally rehydrate the patient. A PHYSICIAN NEVER EXAMINED THE PATIENT.  At 0050 the IV was discontinued and at 0100 the patient was returned to his housing unit.  No diagnosis or orders for follow-up. On an unknown date, a physician initialed the ATU note.

20

A MEDICAL PROVIDER DID NOT SEE THE PATIENT FOR FOLLOW-UP.

On 11/26/13 at 1015 an EMT saw the patient urgently for decreased appetite and weight loss. The patient presented in a wheelchair due to weakness "ever since I got dehydrated". The patient also complained of chest pain and that it felt like someone was hitting him with a 5 pound sledgehammer. She is short of breath when he awakes in the morning secondary to coughing. He also complained of vomiting and diarrhea. "Patient sent over per security secondary to starving himself for 3 months and he is depressed. Mental health contacted by Captain Adams on West Yard."

| | | | | |
|------|----------|-----------------|-----------------|----------------------|
| 1027 | Temp=98.2 | BP=115/76 mm Hg, | pulse=109/minute | respirations=12. SpO2=100%. |
| 1028 | Temp=NM | BP=115/79 mm Hg, | pulse=124/minute | respirations=12. BS=87. |
| 1240 | Temp=NM | BP=114/75 mm Hg, | pulse=107/minute | respirations=12 SpO2=NM. |

The patient was not weighed. The patient had right upper lobe congestion. The EMT contacted Dr. Tarver who gave a telephone order for Phenergan that was given at 1222. Labs and Chest x-ray were performed although there is no order for them.

On an undocumented date and time, Dr. Tarver documented: Weight loss per chart review.  Low grade fever recently.  Still N/V Cough.  CXR=no obvious infiltrate noted, increased BV markings.  THE PHYSICIAN DID NOT EXAMINE THE PATIENT. PLAN MVI. KEEP CLINIC F/U OF LABS.  At 1242 the patient was released to his housing unit.

On 11/26/13 mental health saw the patient who stated that he "has had a cold for the past six months, they say I might have HIV".  He has had no appetite and can't keep anything down.

On 11/26/13 a chest x-ray was performed for HIV and acute cough.  It was read as normal.  On an undocumented date the report was initialed.

On 11/26/13 labs showed the patient was HIV antibody positive. His CD4 cell count was 15 cells and HIV RNA viral load was 288,650 copies. He was HCV antibody positive.  Toxoplasma Gondii antibodies were negative, RPR=NR.  This was reported on 11/27/13.  On 12/4/13 a staff person illegibly initialed the report.

A PHYSICIAN DID NOT SEE THE PATIENT FOR FOLLOW-UP.

On 12/2/13 at an undocumented time. Dr. Lavespere saw the patient at the clinic.  The note is as follows:

c/o excessive SOB x 1 month.  Chronic cough-no production.  +lightheadedness/dizziness. Sent to x-ray for chest x-ray. The route to ER for evaluation.  HIV labs were ordered.  Dr. Lavespere did not examine the patient.
On 12/2/13 a chest x-ray was requested by Randy Lavespere for obtained for chronic cough.  It showed slight increase in markings in the lung bases when compared to 11/26/13.  **Interstitial infiltrates or congestion not excluded. On an undocumented date, RJ signed the report.**

21

JX-CCH-000203

On 12/2/13 at 1345 an EMT documented that the patient had been seen in the clinic and was sent to the ATU by Dr. Lavespere. The patient presented in a wheelchair and had dyspnea with ambulation. The patient had diminished breath sounds. Weight=148 lbs.

1350    Temp=97.4       BP=113/83 mm Hg,       pulse=124/minute       respirations=24. SpO2=96%.

At an undocumented date and time Dr. Tarver wrote: New HIV+ screen, significant weight loss, weakness. Admit to NCU. Labs already drawn. Has been referred to ID.  THE PHYSICIAN DID NOT EXAMINE THE PATIENT OR MAKE A DIAGNOSIS

On 12/2/13 at 2:15 pm Dr. Tarver wrote an infirmary admission note that the patient was admitted for weight loss, weakness and cough. HIV+, waiting for confirmation. Sent to ATU from clinic. Labs already drawn per Lavespere after discussing case with Dr. Stuart. Patient states too weak to walk, easy DOE. Admit to NCU.  He performed a history and physical that contained no past medical or social history or review of systems.

On 12/2/13 at 1445 the patient was admitted to the infirmary. He was afebrile. BP=113/70 mm Hg, pulse=118/minute, respirations=18/minute, and oxygen saturation=97%.  Height=5'9" and weight=148 lbs. According to the nursing admission assessment the patient was not taking any medications. The patient reported nausea, inadequate food intake and generalized weakness.

On 12/2/13 at 1800 the patient's blood pressure was low (BP=95/54 mmHg), he was tachycardic (pulse=111/minute), respirations=16 and Sp02=95%.

On 12/3/13 at 1800 the patient was febrile (Temp=102∘F.) hypotensive (BP=92/52 mmHg), and tachycardic (pulse=134/minute), respirations=20 and Sp02=98%.

On 12/3/13 at 2000 the patient was febrile (Temp=100∘F.), hypotensive (BP=96/58 mmHg), and tachycardic (pulse=115/minute), respirations=20 and Sp02=96%.

A PHYSICIAN DID NOT SEE THE PATIENT FOR ABNORMAL VITAL SIGNS.

On 12/3/16 a provider ordered Bactrim DS 2 tablets 3 times daily for 21 days.  On 12/3/13 the patient was started on intravenous antibiotics (Zosyn).

On 12/4/13 labs show the patient had a normal white blood cell count (WBC=5.3, normal=4.5-10.5) and high granulocytes (86.1%) suggesting bacterial infection. The patient was also anemic (Hgb/Hct=7.9/24.5%). This was reported at 12/4/13 at 0941.  Lab staff determined this to be a critical result and reported it to Cody Delaney at 0945 and Anthony Tarver MD at 1120. A provider did not legibly sign and date review of this report.

On 12/4/16 at 0850 Tarver wrote a note reviewing labs. He did not document interviewing or examining the patient. He noted the patient was started on IV Zosyn the evening before. To be seen in HIV clinic the next day.

22

On 12/4/13 a chest x-ray was requested due to malnutrition, weight loss and rule out HIV/AIDS. The chest x-ray showed a slight improvement from 12/2/13 in clearing of bibasilar infiltrates.  On an unknown date the report was signed by MacMurdo.

On 12/5/13 a primary care provider saw the patient, noting the patient had a history of a positive HIV test, with fever, cough and SOB. He did not note the patient's 55 pound weight loss or perform an HIV pertinent review of systems. The only examination was of the heart and lungs, reviewed labs and noted that the clinical picture was consistent with PCP pneumonia. He started the patient on Bactrim 2 tablets three times daily x 21 days and prednisone taper. He planned to have the ID physician see the patient in January 2014 and submitted an ID consult. He did not document a follow-up plan.

THE PHYSICIAN DID NOT FOLLOW CURRENT RECOMMENDATIONS TO DEFINITIVELY DIAGNOSE THE PATIENT WITH PCP AND RULE OUT OTHER INFECTIONS BY RECOMMENDED DIAGNOSTIC TESTS SUCH AS BRONCHOALVEOLAR LAVAGE (BAL). THE PROVIDER PERFORMED AN INADEUQATE EVALUATION OF THE PATIENTS' NEWLY DIAGNOSED AIDS TO INCLUDE RISK FACTORS, PMH, HIV PERTINENT REVIEW OF SYSTEMS AND PHYSICAL EXAMINATION. THE PHYSICIAN DID NOT EVALUATE THE PATIENT'S SIGNIFICANT WEIGHT LOSS WHICH MAY BE ASSOCIATED WITH OTHER OPPORTUNISTIC INFECTIONS SUCH AS MYCOBACTERIUM AVIUM COMPLEX.

On 12/6/13 a medical provider wrote an infirmary note but did not examine the patient.

On 12/6/13 the patient was started on Truvada and Kaletra.

On 12/6/13 labs show the patient had a low white blood cell count (WBC=12.4, normal=4.5-10.5) and high 89.6% of granulocytes suggesting bacterial infection. The patient was also anemic (Hgb/Hct=9.1/28.7%). This was reported at 12/6/13 at 0817.  Staff documented that the report was faxed to Dr. Stuart on 12/6/13 at 1000.

On 12/6/13 a sputum specimen was submitted for pneumocystis carinii stain. The specimen contained no pulmonary cells for study.  On 12/12/13 this was reported.

On 12/6/13 a sputum specimen was submitted for gram stain and was of adequate quality. It showed a great amount of yeast. Candida albicans. On 12/10/13 this was reported.  On an unknown date staff documented Diflucan 200 mg daily x 10 days. The initials are illegible.

On Saturday 12/7, Sunday 12/8, and Monday 12/9/13, 12/10/13 and 12/12/13 nurses only took the patient's vital signs once daily. Nurses did not measure the patient's oral intake or output.  Nurses did not weigh the patient during his infirmary admission.

On 12/7/13 nurses notes indicate all normal findings. A nurse assessed the patient at 0600 and 1800. All findings were normal. The treatment plan is the same.

On 12/8/13 the patient did not receive any doses of Bactrim DS. The patient also did not receive Truvada and Kaletra, or prednisone 40 mg.

23

JX-CCH-000205

On 12/8/13 nurses notes indicate all normal findings except the patient had a nonproductive cough and was on 2 liters of oxygen. A nurse assessed the patient at 0600 and 1800. All findings were normal. The treatment plan is the same.

On 12/8/13 the patient did not receive his IV antibiotic at 7 am and 1 pm.

A medical provider did not make rounds on the patient from 12/6 until 12/9/13.  A medical provider conducted rounds on 12/9, 12/11, and 12/13 but did not perform any physical examination.

On 12/9/13 labs show the patient had a high white blood cell count (WBC=12.4, normal=4.5-10.5) and high % of granulocytes suggesting bacterial infection. The patient was also anemic (Hgb/Hct=10.5/32.4%). This was reported at 12/9/13 at 0905.  Staff documented that Dr. MacMurdo was notified 12/9/13 at 1330.

On 12/9/13 nurses notes indicate all normal findings. The lab notified the nurse that the 12/6/13 sputum specimen was insufficient. A nurse notified Dr. Lavespere.  A nurse assessed the patient at 0600 and 1800. All findings were normal.

On 12/10/13 nurses notes indicate all normal findings except nausea for which we was given Phenergan. A nurse assessed the patient at 0600 and 1800. All findings were normal.

On 12/11/13 the patient was given Zofran and Phenergan for nausea.  A nurse assessed the patient at 0600 with all normal findings.  There is no other nursing assessment documented on 12/11/13.  Rounds were documented as occurring every 2 hours.

On 12/11/13 the patient did not receive his IV antibiotic at 7 am and 1 pm.

On 12/11/13 Diflucan 200 mg was ordered for 10 days. The patient received it on 12/11/13 and 12/12/13 but not the remaining 8 days.

On 12/12/13 at 0600 the patient's temperature was 101∘F.  The patient's vital signs were not measured until the following morning.

On 12/12/13 staff obtained a sputum specimen that on 12/14/13 the lab reported was of poor quality and not acceptable for routine bacterial culture.  A provider did not legibly sign and date the report as being reviewed.

On 12/12/13 at 1519 a CBC showed the patient had an elevated WBC (11.4) with increased granulocytes (85%, normal=42-75%). A provider did not legibly sign and date the report as being reviewed.

On 12/13/13 a 24 hour nursing flow sheet shows that at 0700 the patient was given Tylenol for a temperature of 101.1. A nurse documented on the flow sheet at 0600 and 1800 that the patient's lungs were clear bilaterally, cough was TCDB and he was not on oxygen.  Abdomen was soft and nontender, bowel sounds were normal in all 4 quadrants, and the patient had no problems with urination. A nurse

24

documented performing rounds every 2 hours. The patient complained of no pain at any of the 2 hour assessments.

On 12/12/113 at 0825 a nurse documented a progress note indicating that he was alert and oriented x 3, and was ↑in W/C (wheelchair). No N/V. Refused ensure because it made him sick. No complaints at present.

On 12/12/113 at 2025 a nurse documented a progress note noting that the patient's IV was infusing without difficulty.

On 12/13/113 at 0020 a nurse documented a progress note that the patient was sleeping and easily arouses to verbal stimuli.

On Friday, 12/13/13 at 0820 an infirmary nurse noted that the patient reported SOB and inability to breathe. BP=131/78 mm Hg, pulse=154/minute, oxygen saturation=72%. The nurse notified Dr. MacMurdo and at 0827 the patient was taken to the ATU for transfer to the hospital (ILH-McNo).

On 12/13/13 at 0840 an EMT saw the patient who was tachycardic (pulse=164/minute) and tachypneic (respirations=36/minute) and desaturating (SpO2=82%). BP=1377/77 mm Hg. Temp=97.1. The patient complained of abdominal pain and vomiting the past week. A PHYSICIAN DID NOT EXAMINE THE PATIENT.  At an undocumented time, Dr. MacMurdo gave an order for the patient to be sent to ILH. The patient departed at 0953.

THE EMT DID NOT CHECK THE PATIENTS VITAL SIGNS AND OXYGEN SATURATION AGAIN WHILE IN THE ATU FOR ALMOST 75 MINUTES.

At 1000 the ambulance departed and arrived at the McNo hospital at 1300. During transport the patient's pulse=120'-130's and respiratory rate=26-28/minute.

On 12/13/13 a LSP physician wrote a referral that patient was admitted to the hospital (infirmary) for a history of fever, cough, weight loss and anemia. Infectious disease started the patient on HIV protocol, Bactrim for PCP protocol, prednisone, sputum for AFB, silver stain for PCP pending.  Chest x-ray improving.  Today presented with sudden SOB, midepigastric pain and anxiety. BP=131/78 mm Hg, pulse=154/minute, oxygen saturation=72%.

On 12/16/13 mental health documented that the patient has an Axis 1 diagnosis of malingering.

Hospital records are not scanned into the LSP medical record except for a 2 pages from 12/30/13.  The note is from the infectious disease physician who noted that the patient had  severe influenza type A with respiratory failure complicated by pneumediastinum, right pneumothorax with chest tube placement on 12/28/13, complicated by pneumocystis jirovecii pneumonia, leukocytosis with bandemia probably secondary to steroids. He was treated with Tamiflu, Truvada and Kaletra, azithromycin, and pentamidine.  According to the Death Summary Report, the patient was intubated and extubated on more than one occasion and on /11/4/14 he died of complications of PCP and Influenza Type A.

25

**Assessment:** This patient's care was inadequate and indifferent to his serious medical needs.  The patient requested an HIV test on 8/26/13 that was not performed timely.  Timely diagnosis would have resulted in offering of antiretroviral therapy before the patient became morbidly ill.

On 11/20/13 the patient tested positive for HIV infection but this lab report was not timely noted and the patient evaluated for HIV disease until 12/2/13.  During this period the patient had several ATU visits in which EMTs did not document notifying physicians timely of the patient's abnormal vital signs and physicians did not clinically evaluate the patient for chest pain, shortness of breath, abdominal pain and 55 pound weight loss nor did a physician see the patient for follow-up.  Notes are often illegible and confusing with respect to timelines.   Physicians do not date and time ATU notes.

On 11/22/16 when the patient presented with chest pain, shortness of breath, known 55 pound weight loss and abnormal vital signs, this patient should have been admitted directly to the hospital. Instead, on 12/2/13 the patient was admitted to the infirmary without an adequate medical evaluation. Once admitted to the infirmary, medical providers did not perform virtually any physical examinations of the patient.  Nurses did not administer medications as ordered.   Hospital medical records have not been scanned into the record.

This newly diagnosed AIDS patient was admitted to the LSP nursing unit, however his medical condition exceeded the institutions' capacity to properly care for him and he should have been admitted to the hospital at the time of his AIDS diagnosis.

Medication administration records have been falsified. Housing Unit correctional officers documented that the patient receiving medications via KOP such as intravenous antibiotics and nebulized albuterol which would never occur.  Staff continued to document administering medications after the patient was admitted to the hospital and even after the patient had died.

Dr. Randy Lavespere completed the patient's Medical Summary Report for a Deceased Offender.  He categorized the patient's death as Natural Expected/Chronic Illness with Normal Progression.  This fails to appreciate that the patient's delayed AIDS diagnosis and that with timely antiretroviral therapy, the patient's death was likely preventable.  The Report is nothing more than an incomplete chronology of events that fail to assess the timeliness and appropriateness of care for this patient.  For example, the Summary fails to note that the patient requested an HIV test in August 2013 but was not tested until 11/20/13 when the patient was acutely ill.  This abnormal test result was not addressed for two weeks. In addition, a physician did not evaluate the patient for his history of chest pain, shortness of breath and 55 pound weight loss.  This patient received inadequate care.


Patient #19

This 57 year old man arrived at LSP on 1/23/1984. The patient died on 1/23/14 of sepsis. His medical history includes tobacco abuse, diabetes, hypertension, coronary artery disease, s/p STEMI, s/p RCA stent, chronic kidney disease, gout, hypothyroidism, polycythemia and BPH. At the time of his death his

26

JX-CCH-000208

medications were Humulin 70/30, Coreg, Plavix, Gemfibrozil, aspirin, synthroid, allopurinol, Flomax, Proscar, Atrovent, Ventolin HFA, and Neurontin.

In 2009 the patient was treated for hypothyroidism.  In November 2009 his TSH was 48.

In March 2010 Dr. Lavespere noted the patient was seen on 12/28/09 and his TSH was 86.29. His medication was increased at that time, but at a follow-up appointment 1.5 months later his medication was decreased even though his TSH was still high. He increased his synthroid to 0.25 mg

On 2/28/12 the patient had an MI.  He was transferred to Earl K. Long facility and then to the Medical Center of New Orleans.  On 2/29/12 the patient had a cardiology consultation. Echocardiogram showed mildly reduced left ventricular function with ejection fraction of 40%.  At that time the patient was taking enalapril and Norvasc.

May 2012 MARs show dates that the patient signed for KOP medications but most MARs do not have the patient's signature, nevertheless officers document KOP.
On 12/26/12 the patient's potassium was critically high (7.5, normal=3.5-5.2).

On 1/29/13 the patient's TSH was increased (44, normal=0.45-4.50)
On 3/23/14 Dr. Toce saw the patient for chronic disease follow-up. He did not perform a ROS or examine the patient.


On 4/30/13 the patient's TSH was significantly elevated (TSH=168, normal=0.45-4.50). His white blood cell and neutrophil count were elevated (WBC=14.3 and neutrophil=8.3, normal=1.8-7.8). Creatinine was high (2.42, normal=0.76-1.27). Potassium 5.2, normal=3.5-5.2).   His hemoglobin and hematocrit were elevated and H/H=18.1/55.4). His microalbumin/creatinine ratio was elevated (291, normal<30) and uric acid 12.5, normal=3.7-8.6. CK was high (309, normal=24-204).

On 4/30/13 Dr. Paul Toce requested a nephrology consult.

On 6/18/13 renal telemedicine saw the patient noting that he was referred by cardiology. The nephrologist noted that he was recently diagnosed with hypothyroidism. Discontinue Metformin. The nephrologist requested a proteinuria work up with ANA, hepatitis panel SPEP/UPEP and renal ultrasound, PTH, phos and vitamin D level. RTC in 8-12 weeks.

On 8/5/13 Dr. Toce saw the patient for chronic disease follow-up and did not perform a ROS or examine the patient. His hypothyroidism was not at goal. He planned to see him for follow-up in 6 months.

On 9/6/13 at 1051 EMTs responded to the patient's location for complaints of chest pain. The patient reported having midsternal chest pain since earlier in the morning, no DOE. He reported feeling like an elephant was sitting on his chest. BP=151/106 mm Hg.  Pulse=102.  No SpO2. EKG= ST with ectopy. The EMT administered oxygen, aspirin, started an IV and transported the patient to the ATU.

JX-CCH-000209

At 1119 at the ATU an EMT saw the patient and documented that it felt like an elephant was sitting on his chest. BP=134/93 mm Hg, pulse=105, respirations=23 and SpO2=93% on 4 liters of oxygen. At 1201 the patient's oxygen saturation=91%. The patient was given nitroglycerin SL (sublingually) with partial relief.

On 9/6/13 at 1130 the patient had a positive troponin, myoglobin and CKMB level, normal=negative.

On 9/6/13 at 15:50 and EKG showed a septal infarct, age undetermined.

On 9/6/13 at an undocumented time, a NP saw the patient and diagnosed the patient with unstable angina and sent the patient to the New Orleans Medical Center.

On 9/6/13 at 1300 the patient departed LSP and arrived at the hospital at 1600.

On 9/6/13 at 1144 the patient's WBC was elevated (15.6, respectively. normal-4-10), and granulocytes high (77.4%, normal=42.2-75.2). A medical provider did not sign the report, but a handwritten note at the total white count of 15.6 states "chronic". At an undocumented date and time, a provider WB initialed the report.

On 9/6/13 at 2115 the patient returned having had a non-Stemi MI with a stent placed in his circumflex coronary artery and Foley catheter for urinary retention. Recommendation for follow-up with cardiology, rheumatology and renal clinic in one week.  He was prescribed Plavix and Coreg. Upon his return a physician did not see the patient.

On 9/13/14 blood cultures taken and reported on 9/17/13 showed *staphylococcus aureus.* At an undocumented date and time, JC initialed the report.

On 9/16/13 a urology consult was requested to evaluate patient with Foley catheter. One week later on 9/23/13 UM responded, can LSP urology evaluate?

On 9/21/13 at 1415 the patient presented to the ATU with complaints of penile pain secondary to the Foley catheter. His testicles were red and blood was in his urine. Temp=99.8.  The EMT contacted Dr. MacMurdo who ordered IV fluids and IV Levaquin followed by 3 days of oral Levaquin. A physician did not see the patient and his Foley catheter remained intact.

On 9/23/13 at 0750 the patient was seen for follow-up. BP=78/50 mm Hg. He was afebrile. His Foley catheter was removed.  At an undocumented date and time a physician wrote a note. He did not examine the patient. Foley out, may need to replace.  Diagnosis: possible UTI. The patient was given IV Levaquin.

On 9/23/13 the patient's urinalysis was abnormal, showing white blood cells and a large amount of blood. Nitrites were negative.   At an undocumented date and time, JC initialed the report.

On 9/23/13 the patient's WBC was elevated and again when rechecked (19.9 and 17.8, respectively. normal-4-10), and granulocytes high (85.2%, normal=42.2-75.2). At an undocumented date and time, JC initialed the report.

JX-CCH-000210

On 9/24/13 the patient's WBC was elevated (16.1. normal-4-10), and granulocytes high (83%, normal=42.2-75.2). At an undocumented date and time, JC initialed the report.

On 9/23/13 the patient was admitted to the infirmary for treatment of a urinary tract infection.

On 10/3/13 rheumatology telemedicine saw the patient for left elbow olecranon bursitis. He requested a 6-8 week follow-up to drain it.

On 10/8/13 nephrology saw the patient for follow-up, noting that he had a non-STEMI and on 9/9/13 underwent coronary angiography with PCI. .  Ejection fraction 25% at discharge. He went into acute renal failure during the admission with creatinine of 3.5 but it had improved to 2.03. He requested labs and follow-up in 8 weeks.

On 10/10/13 cardiology saw the patient for follow-up.

On 10/10/13 the patient's creatinine was 1.98, PTH=69, normal=15-65), and vitamin D level borderline low (30, normal=30-100)

On 10/10/13 the patient's WBC was elevated (12.9, normal-4-10). At an undocumented date and time, Dr. Lavespere initialed the report.

**On 10/17/13 at 0700 the patient presented to the ATU with SOB x 5 hours.  The EMT noted the patient's use of accessory muscles and speaking in short incomplete sentences.  BP=153/99 mm Hg, pulse=114, respirations=30/minute, Temp=not measured and SpO2=93%. The EMT did not contact a medical provider.  At 0721 and 0800 the EMT repeated vital signs (BP=133-134/85-80, pulse=104-100/minute, respirations=20-22, and SpO2=98-99%. Another EMT documented starting oxygen at 4 liters/minute VS WNL and RTQ (Return to Quarters).  No EMT reassessed the patient's symptoms.  At an undocumented date and time Dr. Lavespere signed the note without comment.**

On 10/29/13 Dr. Lavespere saw the patient for general medicine follow-up.  He noted that the patient was s/p NSTEMI with one stent on 9/16/13 and reviewed labs.  He did not perform any ROS for the patient's cardiovascular disease, COPD, diabetes, gout, kidney or thyroid disease or perform any examination of the patient. He did not note that the patient had an acute episode of SOB 12 days prior.

On 11/4/13 Dr. Lavespere requested a CT scan of the head and neck and chest/abdomen /pelvis for recent +biopsy of squamous cell cancer of ?.  There was no accompanying clinical history.

On 11/6/13 at 1225 he patient had a CT scan of the chest, abdomen and pelvis for a previous diagnosis of "cancer in the lymph nodes". The CT showed enlarged paratracheal and subcarinal lymph nodes; noncalcified pulmonary nodule in the lateral basal segment of the right lower lobe; scattered ground glass opacities are noted in the middle lobe and lingual. There is minimal right pleural effusion. There is no pneumothorax. There was mild fusiform aneurysm of the infrarenal abdominal aorta. The CT scan was reported on 11/7/13 at 2252. A medical provider did not sign and date this report indicating that it had been reviewed.

29

November 2013 MARs show that the patient receives his medications KOP but there is no documentation of when medications were administered to the patient

On 11/12/13 a medical provider (Toce) saw the patient for general medicine follow-up. The provider performed no review of systems and performed no examination of the patient. Rather, the provider reviewed labs for each of the patient's chronic diseases. TSH not at goal 127.5 on synthroid 200 mcg. The provider also noted that the patient had a right lower lobe mass with cervical lymph nodes. The provider documented no plan for this problem and the patient's poorly controlled hypothyroidism. The provider did not address the patient's elevated white blood cell count. Dr. Lavespere signed the note.

On 11/12/13 nephrology saw the patient, noting that he had stage III-IV chronic kidney disease. His creatinine was 1.98 and blood pressure was controlled. He recommended continuing Coreg for blood pressure control, labs and RTC in 3-4 months. He also recommended urology follow-up.

On 11/15/13 GU saw the patient for follow-up of BPH and LUTS. The plan was to continue Flomax and Finasteride, check PSA and RTC in 2 months.

On 12/13/13 at 2141 EMT's responded to the patient's location for complaints of chest pain, SOB and cough. BP=136/90 mm Hg, pulse=102/minute, respirations=24 and Temp not measured. SpO2=97%. The patient reported feeling bad x 3 days. The patient was transported to the ATU.

On 12/13/13 at 2221 an ATU EMT assessed the patient who reported nonradiating sternal chest pain for 6 to 8 minutes. The patient noting that he felt bad for several days with headache, nausea and nonproductive cough. The patient had bilateral expiratory wheezes. The patient had a PMH of stent placement.

At 2228     BP=160/107 mm Hg, pulse=127/minute, respirations=28/minute, Temp=97  SpO2=97%.
At 2236     BP=153/108   mm   Hg,   pulse=127/minute,   respirations=20/minute,   Temp=98
SpO2=98%.
At 2345     BP=151/102   mm   Hg,   pulse=102/minute,   respirations=18/minute,   Temp=98
SpO2=97%.

The EMT started the patient on oxygen via nasal cannula, obtained an EKG but results not documented. Blood glucose=150. At an undocumented time the EMT documented a verbal order from Dr. MacMurdo for IV fluids, IV Levaquin, Robitussin and Claritin. **At 0040 the patient was released back to his housing unit. His vital signs were not taken since 2345 when they were abnormal.** There is no documented plan for follow-up. A chest x-ray was normal.

On 12/16/13 the patient's HbA1c=6.8% and creatinine was 2.09, LDL=105.

On 1/2/14 at a RN performed a nursing admission assessment. Weight=183 lbs. Afebrile. Nurses initiated a graphics flow sheet recording vital signs and input and output. His admission weight was 187 pounds. However after 1/4/13 (185 pounds) nurses did not record his weight again and did not record

30

JX-CCH-000212

his input and output on a daily basis.  Nurses typically documented assessments at 0600 and 1600. Each page of nurses' assessments does not contain the current date.

On 1/2/14 a medical provider performed a history and physical examination. The history of the present illness was documented as follows:

"Fell approximately 1 month ago. Hurt right leg. Having problems with leg since. Now with SOB, orthopnea and DOE. Not feeling well. Has been to the ATU x 2 in the last 3 days."  The provider examined the patient noting 3+ edema Right lower extremity.  Creatinine=2.88. The plan was diuretics and antibiotics.

On 1/2/114 Lavespere documented that the patient was wheezing and had 2+ edema of his right lower extremity. For hypotension Dr. Lavespere planned to decrease diuretics, for COPD, add IV steroids and for diabetic neuropathy, Neurontin.  He ordered daily weights for 3 days, accurate outputs and Vancomycin 1 gram IV every 12 hours for 5 days.

On 1/3/14 at 0909 the patient's creatinine was 2.88 and potassium was 4.7.

On 1/3/14 at 0909 the patient's creatinine was 3.35 and potassium was critically high (6.3).  At 1/3/14 lab staff at 0908 notified Georgia Spears. At an undocumented date and time Dr. Lavespere initialed the report.

On another copy of the report, on 1/3/14 Dr. Toce wrote a note that his EKG showed no peaking T waves and he suspected lab error but also noted the patient's renal disease. His plan was to treat the patient with Kayexalate recheck the patient's labs.

On 1/4/14 IV Vancomycin was started.

On 1/5/14 the patient was given IV SoluMedrol and Bumex.

On 1/6/14 chest x-ray showed patchy new consolidation laterally in the right middle lobe which has developed since the previous exam.  This report was signed by Tarver on 1/9/14.

On 1/6/14 the patient's vancomycin trough was elevated (25.2, normal=10-15). At an undocumented date and time a medical provider illegibly initialed the report.

On 1/6/14 a nurse documented that Dr. Lavespere was at the bedside to see the patient who was more sedated with Neurontin but his feet felt better.  The patient's blood sugars were in the 300's, he did not change his baseline insulin regimen but continued his sliding scale.

On 1/7/14 at 0415 the patient was sent out with the trip officer and returned at 1430.

On 1/8/14 at 0420 the patient was sent out with the trip officer to rheumatology for what turned out to be unsuccessful drainage of his left elbow bursitis. At 1915 the patient returned from rheumatology visit.

31

JX-CCH-000213

On 1/8/14 Dr. Lavespere documented that he did not see the patient because he was out on a trip for 2 consecutive days. He discontinued Vancomycin and started the patient on Levaquin.  He did not address the patient's elevated vancomycin trough of 25.

On 1/9/14 at 0635 the patient's creatinine was 2.56.  Glucose was high (276). At 1/9/14 lab staff at 0915 notified Lisa Lemoine. At an undocumented date and time a medical provider illegibly initialed the report.

On 1/10/14 at 0930 nurse documented that Dr. Lavespere was at the bedside to see the patient. He noted the patient's creatinine trends and documented that the patient still had bilateral wheezing and 1+ lower extremity edema.  The patient had a chest x-ray.

On 1/10/14 at 1800 an LPN documented that the patient's feet were very swollen. Lung fields clear. The only notes were by an LPN. On 1/11/14 at 0300 the nurse documented the patient was noncompliant with measuring his urine.

On 1/11/14 the patient was receiving Levaquin only.

On 1/11/14 and 1/12/14 a provider did not see the patient.

On 1/12/14 Dr. Lavespere ordered Indocin 50 mg three times daily for 5 days.  **Indocin is contraindicated in patients with advanced renal disease.**

On 1/13/14 at 0505 the patient's creatinine was 3.75.  On 1/13/14 at 0723 a medical provider illegibly initialed the report. Lab staff documented notification of Dr. Lavespere at 1230 of this value.

On 1/13/14 at an undocumented time, Dr. Lavespere saw the patient noting that he had left foot pins and needles sensation and could not walk.  He had difficulty standing up. CV=RRR, lungs clear.  Lower extremities had 2+ left and 1+ right edema. He planned to continue the plan.

On 1/13/14 at 1445 the patient complained of chest pain. EKG done. VS and CK.  No documentation that a medical provider was notified.

On 1/13/14 at 1825 the patient's blood pressure was 98/73 mm Hg. Afebrile and SpO2=100% on 2 liters of oxygen via nasal cannula.  The patient reported that he had not urinated all day. At 2020 the patient was still unable to urinate. At 2230 the nurse notified Dr. Tarver who ordered IV fluids at 100 cc per hour and labs including chem-7 and TSH. BP=92/68 mm Hg.

At 0200 BP=91/64 mm Hg.  At 0400 no urine output.

On 1/14/14 at 0800 the patient told the nurse he had not urinated in 2 days. Dr. Toce notified.

32

JX-CCH-000214

On 1/14/14 at 0921 the patient's white blood cell count was elevated (WBC=14.8 normal=4.5-10.0) with high granulocytes (79.7%, normal=42.2-75.2%).  At 1/14/14 at 1605, lab staff notified Dr. Toce. At an undocumented date and time a medical provider illegibly initialed the report.

On 1/14/14 at 0930 a nurse documented that Dr. Toce was at the patient's bedside.

On 1/14/14 Dr. Toce documented that the patient had reportedly not urinated in 48 hours, and that his creatinine was 3.75.  SpO2=96% on room air. No symptoms of CHF very comfy on room air with clear lungs. He reviewed each medical problem and documented on the lower edge of the page. CKD&AKD, rule out obstruction, may need trip out.

On 1/14/14 at 1050 the nurse received an order to catheterize the patient and 300 ccs of urine were collected. The Foley catheter was left in.

On 1/14/14 at 1358 the patient's urinalysis showed white cells, nitrites, blood and glycosuria. At an undocumented date and time a medical provider illegibly initialed the report.

On 1/14/14 at 1605 a nurse documented verbal orders from Dr. Toce for IV fluids at 100 cc/hour.

On 1/15/14 at 0900 the patient's creatinine was critically high (Cr=5.58).  At 0905 the lab called the critical value to Alicia Hughes. At an undocumented date and time a medical provider illegibly initialed the report. The patient's TSH was normal (TSH=4.260).

On 1/15/14 Dr. Toce documented that the patient was hypotensive (BP=90/68 mm Hg) and had a urinary tract infection and was oliguric. Creatinine was 6.2 today. The patient was in acute renal failure. He planned to send the patient to the New Orleans Medical Center.

At 1/15/14 at 1035 a nurse documented that the patient was transported to Lallie Kemp Medical Center.

On 1/15/14 a provider wrote a hospital referral form noting the patient had chronic kidney disease and now acute renal failure with oliguria. Chronic lower extremity leg edema was treated with IV Bumex and cellulitis of lower extremity treated with vancomycin then Levaquin. The patient was transferred to Lallie Kemp and died on 1/23/14.

No hospital records are in the note and the cause of death was not documented.

**Assessment:** This patient did not receive timely and appropriate care for his serious medical conditions. EMTs did not contact a medical provider for complaints of chest pain, SOB and abnormal vital signs. Medical providers did not obtain any disease pertinent review of systems or examine patients. The provider prescribed medications (e.g., vancomycin and Indocin) that exacerbated the patient's renal disease and may have directly contributed to patient's acute renal failure.   The patient had a CT scan in November 2013 that showed the patient had a right lower lobe pulmonary nodule with enlarged lymph nodes which a medical provider noted but did not take any action to medically evaluate the patient's condition.  The provider referenced squamous cell cancer but is unclear as to the location.

33

JX-CCH-000215

On 1/27/14 Dr. Jason Collins completed a Medical Summary Report for a Deceased Offender.  He categorized the patient's death as a Natural Unexpected/Acute Event. He documented that the patient was admitted to the infirmary for cellulitis, treated with Vancomycin and went into acute renal failure, then referred to the hospital where he suffered a viscus perforation and died of sepsis.  No hospital records were available. The Summary Report fails to note a delay in access to an acute care setting on 9/6/14 when the patient presented with chest pain that felt like an "elephant was sitting on his chest". The patient was not sent out for another 4 hours and did not arrive at the hospital for 7 hours. The patient's left ventricular ejection fraction was 25%. Thereafter, when the patient presented with shortness of breath and lower extremity swelling a diagnosis of heart failure was not considered. The report fails to note the patient's abnormal CT scan showing a right lower lobe and enlarged lymph nodes.

Patient #20

This 37 year old man arrived at LSP in 1998. His medical history includes Bipolar disorder, HIV infection diagnosed in 2010, GERD, abdominal pain and low back pain. He died on 1/13/15 of cardiopulmonary arrest secondary to massive GI bleeding.

On September 2010 his CD4 count=584 and HIV viral load=13,000 copies.

On 4/23/13 at 1013 the patient was brought to the ATU by security for acting strange. An EMT assessed the patient who complained of vomiting after eating.  Part of the note is illegible. Eyes have some redness. BP=143/81 mm Hg, pulse=96/minute, respirations=14/minute. Afebrile.   Vital signs were not repeated for 5 hours.  There are other undated, untimed and unsigned notes therefore the chronology of the patient's care is unclear.  At an undocumented date and time, a NP saw the patient, noting the patient began vomiting that morning. Patient unable to urinate for 6 or 7 hours. No PMH or review of systems. No abdominal exam.  The NP's diagnosis was gastroenteritis and to increase fluids. The patient was given IV fluids at an undocumented time and a drug screen was positive for THC. At 1513 the patient was released to his quarters.

Chronic Disease Clinic

On 5/13/13 a medical provider saw the patient for chronic disease follow-up. HIV was not included as one of his chronic diseases, only low back pain, pes planus and scalp nodules. The provider noted the patient had multiple clinic and lab no shows.  Weight=141 lbs. No ROS or PE. The plan was to see the patient in 3 months. He did not acknowledge the patient had HIV and counsel him about the risks of refusal.

Specialty Care

JX-CCH-000216

On 7/22/13 the patient refused a specialty clinic to a security officer. The statement reads "This refusal is made voluntarily. I have read this statement and understand the nature of its contents. I release the Department of Public Safety and Corrections of any liability for any harm that might result from this refusal of treatment." There is no documentation that the medical risks of refusal were explained to the patient by a qualified health care professional.

On 8/15/13 the patient refused physician clinic for low back pain.

Physician Visit

On 9/16/13 a physician saw the patient for follow-up of low back pain. The provider addressed the patient's should pain. HIV not included in list of diseases. Weight=150 lbs. Temp=99.4 F. Labs in 2010. RTC in 4 months. He did not acknowledge the patient had HIV and counsel him about the risks of refusal.

On 1/14/14 the patient refused labs, CMP, CBC, valproic acid and they were rescheduled for 1/31/14.

Urgent Care

On 1/21/14 at 2048 the patient presented with right wrist pain secondary to jamming it BH (behind) a metal pole. No obvious deformity but swelling to right wrist. Patient referred to ATU for possible right wrist fracture. The patient was escorted to the ATU.

On 1/21/14 at 2135 an EMT saw the patient noting that he hyper-flexed his right wrist such that his hand bent back and touched his forearm. There is no documentation that an EMT notified a provider at that time.  The plan was to obtain an x-ray, ice pack, splint, and Toradol 60 mg IM and have MD review. *A provider did not examine the patient.* An x-ray showed a nondisplaced fracture of the radial metaphysis. At an undocumented date and time a provider noted that the patient had a fracture wrist and ortho referral was indicated.

Sick call

On an undocumented date, the patient submitted a Health Services Request stating that he needed a splint due to a small hairline fracture behind his wrist. He has been to the ATU and was given 2 ACE bandages but no splint.  He also requested something for pain. On 1/26/14 at 0658 an EMT screened the patient but did not perform any examination of the patient's wrist. The EMT referred the patient to a physician. On 1/31/14 a physician wrote that he was unable to find paper work in chart, so unsure what to order. Be sure patient has a clinic appointment.

Mental Health

On 1/23/14 mental health saw the patient who was having no acute problems.  MH did not document awareness that the patient was not taking his medication.

Specialty Care

35

JX-CCH-000217

On 1/27/14 the patient refused an unknown type of Specialty Clinic. (Ortho). There is no documentation of the risk of refusal. There is no documentation of the risks of refusal.

On 1/27/14 an order was documented to reschedule ortho appointment.

Medication Administration Records

January 2014 MARs show that the patient was prescribed risperidone, Divalproex and Vistaril but staff documented the patient never requested it.

On 2/7/14 mental health saw the patient who was having no acute problems.  MH did not document awareness that the patient was not taking his medication.

On 2/9/14 at 1138 an EMT saw the patient for reinjuring his right wrist by falling on the ice.  The patient stated he could not grip anything because of pain. He had a right wrist guard on.  No edema or obvious deformity.  *There is no documentation that a physician was notified or saw the patient.* An x-ray of the right wrist was requested, Ibuprofen discontinued and Tylenol ordered.  The EMT noted an ortho clinic was scheduled in the morning.  At an undocumented date and time, a provider initialed the form.

Radiology

On 2/9/14 an x-ray showed a transverse fracture through the distal radial metaphysis with slight palmar impaction. No dislocation. At an undocumented date and time, a provider initialed the report.

Specialty Services

On 2/10/14 ortho saw the patient and noted that he injured his right wrist on 1/21/14 and reinjured it a week prior secondary to a fall on the ice.  He diagnosed the patient with a right colles fracture. The plan was a short right arm cast, Tylenol and follow-up 3 weeks.

Lab Report

On 2/10/14 labs showed the patient's CD4 count=427 cells, HIV RNA viral load=89,000 copies. Hgb=14.5/Hct=44.7.  A provider did not sign this report has being reviewed.

Medication Administration Records

February 2014 MARs show that the patient was prescribed risperidone, Divalproex and Vistaril but staff documented the patient never requested it.

On 2/20/14 mental health saw the patient who reported taking his cast off because medical did not give him a plastic bag to use when showering.  He had no other concerns.

36

JX-CCH-000218

Specialty Care

On 3/5/14 the patient was noted to be a No Show for his ortho appointment.  No refusal of treatment form.

Specialty Care

On 3/10/14 the patient was noted to be a No Show for his ortho appointment. No refusal of treatment form.

Sick Call

On an undocumented date, the patient submitted a Health Services Request stating he needed to see a doctor about the pain in his back and how his arm and shoulder have shrunk on my right side, and they burned like they were on fire for 2 weeks about 3 months ago. I'm experiencing the same symptoms my mom had when she was diagnosed with MS.  On 3/9/14 an EMT saw the patient and documented that the patient noticed decreased muscle mass for 2 weeks with resulting decreased strength. The EMT referred the patient to a physician who documented "Pt has been a no show to ortho clinic multiple times for this complaint.  Keep appointment.

Specialty Care

On 3/20/14 the patient was noted to be a No Show for his ortho appointment. No refusal of treatment form.

Physician Clinic

On 3/28/14 a physician saw the patient for right wrist fracture and HIV infection. The provider noted that the patient complained of a 3 month history of muscle wasting and right wrist fracture x one month (note: it was 1/21/14). The patient complained of occasional hematuria.  Weight=148 lbs. Temp=99 F. The physician did not perform an HIV review of systems or perform a HIV pertinent physical examination. The assessment was Right upper extremity wasting with new C/S (?); HIV referral done.  He requested a neuro consultation.

Physician Clinic

On 3/30/14 the patient refused a physician appointment and C-spine x-ray.

On 3/31/14 the patient refused the HIV clinic. Follow-up was requested in 6 months. There is no documentation that the patient was counseled regarding the risks of refusal.

Medication Administration Records

March 2014 MARs show that the patient was prescribed risperidone, Divalproex and Vistaril but staff documented the patient never requested it.

On 4/18/14 mental health saw the patient who was having no acute problems.  MH documented that the patient reported taking his medication. However MARs do not reflect this.

Medication Administration Records

37

JX-CCH-000219

April 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril but staff documented the patient never requested it.

Specialty Services Appointment

On 5/8/14 the patient was noted to be a No Show for his ortho appointment. No refusal of treatment form.

Medication Administration Records

May 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril but staff documented he never requested it.

On 6/27/14 mental health saw the patient who reported he was doing alright and reported medication compliance.

On 6/30/14 the patient was noted to be a No Show for his ortho appointment. No refusal of treatment form.


Medication Administration Records

June 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril but staff documented he never requested it.

Specialty Services

On 7/21/14 the patient was scheduled for an ortho appointment but it was rescheduled due to emergency symptoms (Meijer).

Medication Administration Records

July 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril but staff documented he never requested it.

Specialty Services

On 8/25/14 the patient was scheduled to see ortho but there is no disposition noted. No refusal of treatment form.

August 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril but staff documented the patient never requested it.

Sick Call

On an undocumented date, the patient submitted a Health Services Request stating that he felt like he had air trapped in his chest and that it burns and hurts around my heart and swallowing was painful and it felt like food gets stuck and makes him choke. On 9/1/14 an EMT saw the patient. Vital signs were normal. Weight was not measured. The EMT did not perform an HIV ROS or perform an examination of the patient's oral cavity or pharynx. The EMT referred the patient to a physician. No medications were ordered.  On 9/2/14 a physician wrote Clinic A, category II.

JX-CCH-000220

Sick Call

On an undocumented date, the patient submitted a Health Services Request stating that he had filled out a sick call request to see the doctor for acid reflux but in the meantime he requested Pepto-Bismol. On 9/8/14 an EMT saw the patient. Vital signs normal. No weight.  No notation of PMH and HIV status. No HIV ROS or PE.  The EMT ordered Pepto-Bismol for the patient. On an undocumented date a provider illegibly initialed the form.

Physician Clinic

On 9/16/14 the patient was scheduled to see the doctor for: difficulty swallowing and choking, wrist fracture and chronic disease, x-ray, but the appointment was cancelled due to a doctors LERN meeting.

Specialty Services

On 9/22/14 the patient was scheduled for an ortho appointment but "left without being seen".


Sick Call

On an undocumented date, the patient submitted a Health Services Request stating: This is my third sick call, I need to see the doctor for acid reflux. I can't eat because it hurts to swallow anything like it gets stuck in my chest. It feels like I have a bunch of air in my chest and I can't burp. It's painful. **I have lost weight and this has been going on for two months.** On 9/23/14 an EMT saw the patient at Raven. Vital signs were not measured except for respirations=14/minute.   SpO2=98%. Weight not measured. Medications risperidone and Divalproex acid. The EMT did not note the patient had HIV infection or address his weight loss. The EMT did not examine the patient's oral cavity for thrush. The plan was OTC, S/C PRN and keep scheduled appointment. On an undocumented date a provider signed the form but made no comment.

Physician Clinic

On 9/24/14 a physician saw the patient for chest pain, difficulty swallowing, choking, wrist and x-ray. Vital signs normal. Weight=138 lbs. The physician noted that the patient had multiple No Shows for ortho and neurosurgery. Does not explore why.  Patient complains of food being stuck after he swallows and he cannot burp. Complaining of burning in stomach and occasionally he regurgitates food. Although he noted the patient had HIV, he performed no ROS or HIV pertinent physical examination. No inquiry into abdominal pain, quality of stools, including tarry or bloody stools.  He did not examine the patient's oral cavity or note the patient's 10 pound weight loss.  His diagnosis was right wrist fracture with right upper extremity wasting, refuses treatment; HIV; LBP; GERD, ?esophageal stricture. He planned to check chest x-ray and ordered Prilosec and Simethicone. RTC next week.

Specialty Services-HIV

On 9/29/14 the patient was scheduled for an infectious disease clinic. Vital signs are recorded for the visit but there is no note. There is an unsigned refusal in which the provider ordered labs and to return in 3-4 weeks or months (?).

Medication Administration Records

39

September 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril but staff documented the patient never requested it.

Lab Report

On 10/6/14 the patient's HIV disease was not controlled.  CD4 count=334 and HIV viral load=97,000 copies. H/H=14.0/42.2%.  A provider has not signed and dated this report.

Provider Clinic

On 10/6/14 the patient was scheduled but not seen for a provider appointment due to being moved to a new housing unit.

Medication Administration Records

October 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril but staff documented the patient never requested it.


Sick Call

On an undocumented date, the patient submitted a Health Services Request stating that he had acid reflux and the medications were not working. He complained of constant sharp chest pain and inability to eat because his food "would not go all the way down and it gets stuck and I have to throw up".  I am in bad pain and I am hungry and cannot eat".  On 11/2/14 an EMT saw the patient. Vital signs normal. No weight. No acknowledgment of HIV infection or weight loss.  The plan was physician referral.  **On 12/13/14 a medical provider illegibly initialed the form.**

Specialty Services HIV

On 11/3/14 a provider saw the patient for HIV infection noting that he had not been seen since 2010. The patient was ART naïve. The patient complained of burning in his stomach x 3 months and 8-10 pound weight loss. The patient also reported fatigue, chills and night sweats. Denied blood in vomit or stools.  He did not address the patient's difficulty swallowing. *The HIV provider did not examine the patient or have an assistant examine the patient.*  He made no reference to labs. The provider's plan was to start ART but first needed to evaluate patient's GI problem first. He planned to obtain H. pylori and if positive to treat and then start ART. He noted the patient's abdominal pain was improved with GI cocktail. The plan was GI cocktail now, Pylori and viral hepatitis labs, "have Dr. Stuart write Rx for Pylori and RTC in 2 illegible (weeks or months). Stop Omeprazole and start Protonix.

On 11/16/14 the patient's Pylori IgG Abs was 0.9, in the indeterminate range.

Physician Clinic

On 11/17/14 the patient was scheduled for follow-up but not seen for reasons that were not documented. The patient's H. Pylori test was negative.  Plan: R/S (Reschedule).

Urgent Care

40

On 11/20/14 at 1507 an EMT saw the patient for coughing up blood in Raven.  The EMT noted that the patient ambulated without assistance. Patient complained of coughing up blood x 3 months. Patient stated that he had difficulty keeping food in his stomach. The EMT performed an abdominal exam that was completely normal. Denies SOB, diarrhea, CP, or dizziness.  The EMT did not note that the patient had HIV infection. Vital signs normal. No weight. The EMT gave the patient Pepto-Bismol. *There is no documentation that the EMT notified a physician.* A chest x-ray ASAP was ordered.  On 11/21/14 a provider illegibly signed the form.

Radiology

On 11/22/14 a chest x-ray with clinical indication as "physical examination" was normal.

Physician Clinic

On 11/24/14 a provider saw the patient for HIV follow-up documenting: Here for follow-up of abdominal pain. Some ease with protonix but still painful, H. pylori indeterminate. October 2014 CD4=334 and HIV viral load=97,000 copies. Will treat with triple therapy and have offender return to initiate ARV. The provider requested follow-up in January 2015 to start ARV.


Medication Administration Records

November 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril. Staff documented he took it daily from 11/8/14 to 11/30/14.

Sick Call

On an undocumented date the patient submitted a Health Services Request Form stating:  "I need to declare a medical emergency. I have an ulcer and acid reflux for months and its gotten a lot worse to the point I cannot take the pain no more, I need to see someone to get some help today.  I can't eat, can't sleep and can barely move around.  On 12/15/14 at 0705 an EMT saw the patient in Raven noting that the patient was alert and oriented x 3, and ambulated without assistance, c/o possible acid reflux x 6 days and needs to see the doctor. The pain is 10. States he cannot eat or sleep and pain is getting worst (sic). The patient was taking pantoprazole and simethicone.  The EMT did not note the patient's HIV infection. *The EMT did not contact a physician. On 12/17/14 a physician ordered Zantac 150 mg twice daily x 3 months and did not request to see the patient.*


Sick Call


On an undocumented date, the patient submitted a Health Services Request stating that he needed to "see someone today because he cannot take this constant burning in my stomach that feels like fire and this constant air that builds in my chest.  I cannot eat or sleep but an hour or two at a time. The Zantac is not working. I made an emergency sick call last week but never received the medication that was ordered.  On 12/22/14 an EMT saw the patient in Raven documenting a completely normal abdominal exam. *The EMT did not contact a physician.* On 12/22/14 a physician wrote to pull the patient's chart.

Urgent Care

41

On 12/22/14 an EMT saw the patient in Raul. The EMT filled out a Health Services Request form for the patient stating that the patient was SDE, abdominal pain. The patient stated he was unable to keep any food down. The EMT did not document any information about the patient's pain, location, quality, intensity, radiation or associated symptoms. The EMT did not note the patient's HIV infection. Vital signs were documented as normal. The EMT did not measure the patient's temperature or weight. **The EMT did not contact the provider but gave the patient a stat dose of Ibuprofen 400 mg. On 12/29/14 a medical provider documented FU prn.**

Urgent Care

On 12/23/14 at 0637 an EMT saw the patient per request of security for abdominal burning and vomiting x 3 days. He denied vomiting blood. The patient was able to keep "a little water down. The patient had orthostatic hypotension BP=106/70 mm Hg and pulse=100 sitting and 92/74 mm Hg and pulse 116 standing. The EMT did not measure Temperature or weigh the patient. No examination of any kind. The EMT documented that the patient had a physician appointment later that day.  On 12/29/14 a physician documented FU prn.

Provider Clinic

On 12/23/14 at 1258 a provider saw the patient for follow-up of abdominal pain noting that he had experienced burning mid epigastric abdominal pain. Can't eat and feels like will vomit.   No constitutional, GI or HIV ROS. Vital signs normal. Weight=134 pounds (a decrease of 14 pounds since March 2014).  The exam consisted of:

CV: S1 and S2 RRR Ø illegible. +2 pulses
Pulmonary: BBS clear
Abd: Flat, soft, NT all 4 quadrants. BS x 4

The physician's diagnosis was abdominal pain ? etiology and HIV. The provider ordered labs, abdominal ultrasound, Ensure, Maalox, D/C protonix and start Prilosec, and GI consult. He requested to follow-up the patient in one week with labs.

Specialty Services

On 12/23/14 a physician requested a GI consult and ordered an abdominal ultrasound for complaints of abdominal pain and weight loss.

Physician Clinic

On 12/30/14 a provider saw the patient who's noted consisted of "Labs not done due to power outage. There was no documented interaction or examination of the patient. BP=115/70 mm Hg, pulse=100/minute, respirations=not measured. Temp=98.8 F. Weight=136 lbs.  The provider made no diagnosis but ordered Maalox, labs done today, and follow-up in 3 weeks.

Lab Report

42

On 12/30/14 labs showed the patient was anemic, with a significant drop in hemoglobin and hematocrit from November 2014.  14.0→12.7, 42.2→35.4%.   A provider initialed this report on 2/3. A provider reviewed a 12/30/14 serum chemistry report on 1/5/14.

Medication Administration Records

December 2014 MARs show that the patient was prescribed risperidone, Divalproex Dr and Vistaril. Staff documented the patient took it most of December.

Urgent Care

On 1/12/15 an EMT documented being assigned to an ambulance run at 1842 (crossed out and 2028 documented) and arriving at Raven housing unit at 2043.  The EMT found the patient on the floor in a fetal position complaining of severe abdominal pain that worsened over the past hour. The patient was guarding abdomen and had distention. Skin cool and clammy. Patient is pale**. Patient states that BM have been black x 3 days.** Patient denies any other complaint.

At 2044          BP=80/63 mm Hg,          pulse=127/minute,          respirations=20/minute.

At 2054          BP=90/65 mm Hg,          pulse=114/minute,          respirations=20/minute.

The EMT assisted the patient onto a stretcher and transported him to the ATU arriving at 2105.

At 2111 an ATU EMT assessed the patient noting guarding and abdominal distention to bilateral upper quadrants. **No tenderness on palpation.** "Patient states that BM's have been normal. Patient complains of nausea, denies emesis. The EMT gave the patient a GI cocktail and ordered an abdominal x-ray.

At 2144          BP=107/66 mm Hg,          pulse=122/minute,          respirations=18/minute.

At 2155          BP=104/63 mm Hg,          pulse=113/minute,          respirations=18/minute. Temp=98.1

At 2230          BP=92/58mm Hg,          pulse=110/minute,          respirations=17/minute.

At 2258          BP=102/63 mm Hg,          pulse=113/minute,          respirations=18/minute.

On 1/12/15 at 2156 an abdominal x-ray showed no acute findings.  Non obstructed bowel gas pattern. No evidence of free intraperitoneal air.  No suspicious calcifications.

On 1/12/15 at 2143 the EMT documented that Dr. Toce gave order for IV fluids with potassium supplement, Norflex 60 mg IM, and to admit to the nursing unit. However, EMT's continued to monitor the patient in the ATU because there was no bed in the nursing unit.

*On 1/12/14 at 2209 an ISTAT showed the patient was severely anemic (hemoglobin=8.2 and Hematocrit=24). There is no documentation that EMTs notified a physician or that a physician signed this report.*

EMT's monitored the patient's vital signs every 30 minutes until 04:20.  The EMT's did not perform a symptom assessment.

On 1/13/15 at an undocumented time, Dr. Toce wrote an admission assessment in which he documented that the patient had a 4 month history of progressive abdominal pain, nausea and scanty hematemesis.  His review of systems consisted of "10 pound weight loss in two months, food hangs up

43

in lower esophagus and often regurgitated. HIV x 10 years.  Physical exam was that the patient was in "mild acute distress and pale". His abdomen demonstrated "fullness in the epigastric area but not actually tender". **He did not review any labs.**

On 1/13/15 at 1030 the patient was admitted to the nursing unit. The nurse noted that he was calm. The nurse assessed the patient reported who reported abdominal pain, nausea and vomiting. His abdomen was flat and tender.

Vital signs BP=102/70 mm Hg,    pulse=103/minute,        respirations=20/minute. Temp=98.8

At 14:50 the nurse gave the patient Ultram.

On 1/13/15 at 1604 the patient an EMT documented that the patient was found in bed in Nursing Unit 1 in cardiac arrest, pale and cyanotic. ACLS measures were implemented. A pulse was reestablished but the patient later died.  At an undocumented date and time, a medical provider (?Dr. Toce) noted that the patient was found down approximately 15 minutes after taking Ultram. Code called, unsuccessful resuscitation. There are no physician notes regarding the resuscitation effort.

On 1/14/15 at 1037 the patient was transported to the morgue.


Medication Administration Records

January 2015 MARs show that correctional officer staff documented that the patient did not show for his Risperidone and Divalproex medication from 1/21/15 to 1/31/15. The patient had been dead for 6 days when staff documented this.

The January 2015 MAR shows an order for Ultram ordered on 1/14/15 for which it was documented that the patient did not request it.  He died the day before.

The January 2015 MAR shows an order for Ultram ordered on 1/22/15 for which it was documented that the patient did not request it.

On 1/15/15 an autopsy was performed that showed the cause of death to be massive upper GI bleeding and perforated large peptic ulcer; and bilateral bronchopneumonia. He also had bullous emphysema. The autopsy also revealed that upon making an incision of the anterior abdominal wall copious amounts of air were expelled from the abdominal cavity. The stomach is distended and contains copious amounts of liquid and coagulated blood emanating from a large perforated ulcer located on the lesser curvature measuring 3 cm in diameter. Blood is also noted in the small and large bowel.

On 1/19/15 Dr. Randy Lavespere completed a Medical Summary Report for a Deceased Offender. He categorized the death as Natural Unexpected/Acute Event. He noted that the patient had HIV and that his care **was complicated by his constant refusals for medical attention**. In describing the chronology of events leading up to the patient's death, Dr. Lavespere does not address that the patient did not receive timely and appropriate medical evaluation during the 4 month period he complained of dysphagia, weight loss and severe abdominal pain.  In the 24 hours preceding his death, the patient had abnormal vital signs, report of tarry stools, and a significant drop in hemoglobin from 14 to 8.2 in a two month period that the treating physician did not address.

44

JX-CCH-000226

Documentation in the record shows that in some instances the patient refused HIV specialty care. However, at primary care visits, physicians virtually never addressed the patient's HIV infection by obtaining an HIV specific review of systems and performing pertinent physical examinations.  There is no documentation that the patient was ever counseled on the benefits of HIV treatment and risks of refusing care.

Assessment: Care for this patient was deliberately indifferent. The lack of medical evaluation for the patient's abdominal pain when he was begging for help is truly shocking.

Patient #21

This 29 year old man arrived at LSP in 2006 (?) and died on 12/28/13 of cardiopulmonary arrest and brain herniation. His medical history includes osteosarcoma of the left lower leg with lung and brain metastasis, s/p chemotherapy, DVT, hypertension, and anemia. At the time of his death his medications were Losartan, hydrochlorothiazide, Lovenox, Bactrim, Fentanyl, lactulose, dexamethasone, and Benadryl.

On an undocumented date the patient submitted a health services request form complaining of pain in his left leg and ankle and inability to put pressure on either leg.  On 6/24/13 an EMT assessed the patient at Eagle 1. The patient stated that he injured his left ankle and lower leg during basketball practice. Patient c/o pain to his shin only, requesting MD to evaluate. No edema or discoloration noted. Ambulates without difficulty. VS normal. The EMT did describe when and how the injury occurred and did not palpate the patient's leg. He referred the patient to a physician. On 6/24/13 a medical provider ordered Naproxen.

On an undocumented date the patient submitted a health services request form stating "I filled out a sick call illegible about my left leg and ankle which has been hurting for the past few weeks. I really need somebody to look at it because it's hurting and starting to swell.  On 6/27/13 an EMT assessed the patient at Camp D, Eagle. The EMT documented: "Pt c/o leg and ankle pain and swelling x 3 weeks, states he has seen medical and received an ACE wrap and no medications, denies any other medical complaints at this time. Ambulates and speaks without difficulty. Mild swelling, no redness, no deformities noted, PMS intact, neuro intact. A&O x 4. VS as above. No distress noted.   There was no assessment and the plan was sick call PRN.  On an undocumented date, a medical provider initialed the note with a plan to schedule the patient for clinic A, category II.

On an undocumented date the patient declared a SDE (self-declared emergency) for a swollen leg. On 6/30/13 an EMT assessed the patient per security. The EMT noted the patient's c/o of (left) foot & leg swelling secondary to basketball injury over 1 week ago. PE: PERRL, A&O x 4, PMS+, FROM x 3, LL extremity 2+ pitting to edema to medial aspect of left ankle. Patient denies CP, SOB, N/V/D. Patient voices no other complaints. Afebrile. VS normal. The EMT referred the patient to the ATU. On an undocumented date, a medical provider initialed the form with no plan.

On 6/30/13 at 1140 an EMT saw the patient.   BP=145/94 mm Hg, pulse=109, respirations=16, temp=98.6 F.  The EMT noted that the patient is being seen in ATU secondary to left leg pain. Patient injured leg playing basketball 2 weeks ago. 1+ pitting edema to left ankle with pain, radiating up into the

45

shin. Patient's left ankle is warm to touch with illegible intact. The EMT ordered an x-ray.   At an undocumented time an EMT documented giving a report to Dr. Collins who ordered Ibuprofen. At 1242 the patient was returned to quarters.  The patient was scheduled for Clinic A that week.

On 6/30/13 the radiologist read the patient's lower left leg x-ray as normal.

On 7/8/13 a Dr. Lavespere saw the patient.  **ATU sheet not in record.** Claims to have hurt his leg while playing basketball. Naproxen ineffective. Pain in middle of leg and laterally.  Left leg: no edema from knee to ankle. +HP mid-shin laterally. Dorsiflexion/plantar flexion WNL.  **Dr. Lavespere did not reference the patient's x-ray.** His diagnosis was left leg/ankle pain and plan was to D/C Naproxen and start Keppra and prednisone. He planned to see the patient in 6 weeks.

On 7/15/13 a physician saw the patient for follow-up of leg and ankle pain. The physician documented that the patient states he sprained his ankle one month ago. X-ray in ATU is not in chart. Still complains of pain and swelling. Prednisone taper not helping. Weight 215. Edema medially and laterally with tenderness to palpation. Plan: HTN stable. **The diagnosis was left ankle sprain and the plan was Motrin, Ice and ACE bandage.  Ortho if no improvement.  RTC in 6 weeks.**

On an undocumented date the patient submitted a health services request form stating that "my whole leg is swollen.  I can't wear shoes.  I can't sleep because it feels like it has a heart in it. The meds I'm getting aren't working. When I press my leg it leaves a mark on it. When I try to put a sock on it hurts. I can barely walk. I sleep with my leg on the floor to ease some of the pain.  On 8/13/13 an EMT saw the patient. VS within normal limits.  AAO x 3. Ambulates with difficulty. c/o swelling and pain to LLE x 2 weeks. +swelling, +indentation, no redness, PMS (pulse, motor, sensation) intact. No bleeding. Denies chest pain or SOB……Patient states he missed appointment due to court. States he needs to see the MD. There was no diagnosis made. The EMT's disposition was Clinic A and on an undocumented date a provider illegibly initialed the form.  **A physician did not see the patient.**

On 8/14/16 the patient declared made a SDE (self-declared emergency) for a swollen left foot. The EMT documented "Patient complains of having left foot injury approximately one month ago……and the pain and swelling never subsided. Patient has limited range of motion and can barely move his toes. Patient denies reinjuring his foot…The EMT measured blood pressure, pulse and respirations but not temperature.  The EMT referred the patient to the ATU. On an undocumented date, a medical provider illegibly initialed the form.

On 8/14/13 at 1340 an ATU EMT saw the patient.  Patient injured foot one month ago and has been medically evaluated for his complaint. The EMT did not take a history of the patient's injury other than denies having new injury. Ambulates with difficulty. Left foot edema noted, no obvious deformities, no crepitus and no redness.

| 1350 BP= 145/86 mm Hg | Pulse=103/min | Resp=16/min | Temp=NM | SpO2=100% |
|---|---|---|---|---|
| 1545 BP= 140/80 mm Hg | Pulse=91/min | Resp=16/min | Temp=NM | SpO2=NM |

At an undocumented date and time a physician documented that the patient had slight swelling, no erythema and no bruising. Impression chronic ankle sprain and ordered an x-ray and plans for clinic A follow-up.

On 8/14/13 a **left ankle** x-ray was normal except there was soft tissue swelling about the ankle.

46

On 8/21/13 the patient presented urgently for left lower leg swelling x 46 days. An EMT assessed the patient and ordered an x-ray and at an undocumented date and time a physician documented a note and ordered and left lower leg ultrasound that was positive for DVT and at 1410 the patient was admitted to the nursing unit.

On 8/21/13 a **left foot** x-ray was normal except there was soft tissue swelling over the dorsum.

A physician wrote infirmary admission orders for vital signs once a shift, however while in the nursing unit, nurses measured vital signs once daily. Weight=215. The diameter of his left leg was not measured at any time.  He was initially treated for leg pain with Tylenol.  His leg pain increased and Ibuprofen was added to the regimen. His pain was 5 of 10 and 8 of 10 on 8/24/13.  On 8/25/13 the patient complained of 8 of 10 leg pain.

A physician made rounds on 8/21, 8/22, 8/23 and 8/26/16.  On 8/26/13 the physician documented that he had copious pain in left lower extremity and cannot ambulate without crutches.  The physician increased Keppra for pain and discharged him from the infirmary on 8/26/13.

On 9/3/13 Dr. Lavespere saw the patient for follow-up of ankle swelling. He noted the patient was recently on the ward for DVT.  INR=1.9.  Left foot with pedal edema. No erythema. Had ultrasound repeat this morning, scan inconclusive per patient.  RTC in am for Coumadin clinic. **The physician did not address the patient's increased blood pressure.**

On 9/3/13 the patient's LLE ultrasound showed DVT limited to the calf.  On 9/13/13 a physician illegibly initialed the report.

On 9/4/13 Dr. Collins saw the patient in Coumadin clinic. He did not document an examination of the patient other than "Pt has swelling".

On an undocumented date the patient submitted a Health Service Request form complaining of very intents (sic) pain from his knee to his foot. This has been going on for a couple of months. The swelling has not gone down since I have had this problem. I am really hurting, thanks for helping." On 9/16/13 at 0632 an EMT saw the patient in Eagle. Vital signs were normal except temperature that was not taken. The EMT noted moderate edema distal to the left knee. Mild edema to the proximal knee. +2 pitting edema to left foot. +heat and mild redness noted. The EMT's plan was "NDBR (No duty, bed rest) x 3 days and referral.  On 9/16/13 a physician illegibly initialed the note.

On 9/16/13 at 1030 the patient was referred to the ATU by security staff.

At 1031 BP=150/127 mm Hg, pulse=120/minute, respirations=16 and Temp=98.1

At 1407 BP=148/101 mm Hg, pulse=93/minute, respirations=16 and Temp=NM

(Note: Although the patient had abnormal vital signs at 1031 EMT's did not repeat his vital signs for 3.5 hours.

At an undocumented date and time, Dr. Collins wrote a note. It is not clear whether he examined the patient or not. There is no ROS or physical examination documented except. Left lower leg swollen. He ordered labs and to continue Coumadin as planned. Keep appointment. **The physician did not address the patient's increased blood pressure.**

JX-CCH-000229

On 9/17/13 at 0934 a physician saw the patient for follow-up of his left leg swelling and hypertension. BP=152/74 mm hg, pulse=106/minute. Afebrile. The physician documented:  "Patient with left DVT. D/W (Discussed with) patient the results of doctors am meeting. Will observe on Nursing Unit and get INR therapeutic. Increased Left lower extremity edema. US on illegible. To ATU.  The physician did not address the patient's poorly controlled hypertension and tachycardia.

On 9/17/13 the patient was readmitted to the infirmary with left lower leg +3 edema and pain.  Dr. Collins performed an admission history and physical.  The extent of the H&P was:

25 year old BM with Hx of DVT for FU and US consult. The physician did not document a review of systems (ROS), past medical history, family history, and social history. The extent of the examination was PERLA and left leg DVT/↑swelling.   The plan was to obtain labs, including a CEA and to repeat an ultrasound.

On 9/18/13 a physician documented a note that the patient reports increased edema. BP=160/72 mm Hg. The physician did not perform a ROS or examine the patient's leg. INR has been low to nontherapeutic. Ultrasound was pending. **The physician did not address the patient's increased blood pressure.**

On 9/20/13 the physician documented a note that did not include a ROS or physical examination.  On 9/20/13=INR=2.1

On 9/23/13 the patient's CEA was high (5.4, normal=0.0-4.7).  A physician did not document review of this abnormal test result.

A physician did not document a clinical examination of the patient from 9/18 until his discharge on 9/27/13.

On 9/29/13 the patient made a self-declared emergency for pain and swelling to his left leg.  An EMT saw the patient at Eagle 1. The EMT noted swelling to the patient's entire left leg. Skin, warm and dry and taught. Pain in ankle on bending the foot upwards. Patient walks with limp.  BP=190/120 mm Hg, pulse=80/minute, respirations18. Temperature not measured. The EMT sent the patient to the ATU.  On 10/15/13 a physician wrote that he is to elevate and rest his leg as much as possible, wear TEDS, for OOB activity. Increased edema secondary to prolonged dependent position +/- post phlebitis syndrome. **The physician did not examine the patient or address the patient's poorly controlled hypertension.**

On 9/29/13 an ultrasound showed a left popliteal DVT.  CBC within normal limits.  No evidence of cellulitis.

On 10/2/13 a physician saw the patient for Coumadin clinic. INR=1.4. The physician increased the patient's Coumadin dose to 7 mg per day. The patient had +1/4 edema left leg.

On 10/8/13 Dr. Lavespere saw the patient and measured the patient's left and right lower legs. 18" versus 16.5".  He otherwise did not assess the patient by performing a ROS or describing the patient's leg. Continue current management.

48

JX-CCH-000230

On 10/9/13 a physician saw the patient for Coumadin clinic. "29 y.o. BM DVT, F/u last week with U/S ILH, same. No c/o bleeding, leg still swollen. BP=125/77 mm Hg. Weight=222 lbs. INR=2.6. Plan f/u 4 weeks. **No ROS, inadequate examination.**

On an undocumented date the patient submitted a health services request form complaining of left leg, knee and feet swelling due to a blood clot. Very, very painful.  Can't move left toes at all, barely can walk. It's a painful situation.  On 10/22/13 at 0637 an EMT assessed the patient noting lateral left lower leg swelling, redness and hot to touch……The EMT measured vital signs except temperature. The EMT referred the patient to the ATU.  At an undocumented date and time a physician (Collins) initialed the note.

On 10/22/13 at 0807 an EMT saw the patient. At an undocumented date and time a physician documented a note ordering a CBC, serum chemistry. The physician planned to start Vancomycin 1 gram daily for 5 days.

On 10/23/13 an EMT saw the patient at the ATU to administer Vancomycin. BP=176/94 mm Hg. Dr. Collins documented that the patient states his leg feels better. Impression: possible mild cellulitis, continue plan.  **Dr. Collins did not address the patient's poorly controlled hypertension.**

On 10/24/13 an EMT saw the patient at the ATU to administer vancomycin. Dr. Collins documented a plan to obtain a MRI if no improvement.

On 10/25/13 an EMT saw the patient at the ATU to administer vancomycin. BP=163/88 and 156/82 mm Hg. Pulse=116 and 90/minute respectively.  A physician did not sign and date this note. The patient's poorly controlled hypertension was not addressed.

On 10/27/13 at 2024 EMT's responded to the patient at Eagle 1. The patient complained of severe left leg pain and intermittent chest pain. The patient was afebrile, hypertensive and tachycardic (pulse=141 and 138/minute). The EMT transported the patient to the ATU. The patient remained hypertensive (systolic in the 150's) and tachycardic (pulse=132-110). At an undocumented time the EMT noted a verbal order from Dr. Collins for IV fluids, to observe vital signs and oxygen saturation. EKG showed sinus tachycardia without ectopy. The patient's left calf=20" and right calf=16" in diameter. The patient was not treated for pain until 0810.  Dr. Collins was to evaluate the patient in the morning for leg swelling.

On 10/28/13 at 0830 the patient was transported via ambulance to McNO.

On 10/28/13 left lower extremity ultrasound showed a nonocclusive DVT.

On 10/28/13 chest CT showed multiple pulmonary lesions concerning for metastatic disease.

On 10/29/13 an x-ray of the left knee shows proximal left tibia with scalloping of the cortex and irregular periosteal reaction 12 cm to the knee. Osteopenia of the femur.

JX-CCH-000231

On 10/29/13 a CT of the left lower extremity showed "focal destruction involving the posterior aspect of the proximal tibial mediadiaphyseal cortex, corresponding in location and configuration to the lesion demonstrated on recent plain radiographs of the left knee on 10/29/13. The lytic process extends longitudinally over distance slightly greater than 6 cm, to a depth of approximately 1 cm with a transverse diameter of approximately 2.3 cm.  The radiologist's impression was that the findings were consistent with a juxtacortical osteosarcoma, likely of the parosteal or aggressive surface subtype. Soft tissue findings may be due in part to edema, but an extensive soft tissue component of the mass is suspected.

On 10/30/13 the patient had a lung biopsy that showed metastatic osteosarcoma.

On 10/31/13 internal medicine saw the patient for follow-up of LLE DVT and suspected left proximal tibial osteosarcoma with lung mets. The patient's LLE was nearly twice the size of his right leg.

On 11/2/13 a MRI showed a brain mass.  Palliative chemotherapy was started.

On 11/29/13 the patient was hospitalized and noted to have osteosarcoma of the left leg with brain mets, DVT, abnormal chest CT, hypertension and tachycardia.  Neurosurgery saw the patient and noted a large midbrain mass and recommended against surgery. The complete hospital report is not in the medical record.

On 12/11/13 the patient was admitted to the nursing unit.

On 12/20/13 he transferred to another correctional facility. HRDC.  His weight was 190 pounds.

On 12/23/13 the patient was transferred to St. Elizabeth's hospital where on 12/28/13 the patient died of complications of metastatic cancer.

On 1/6/14 Dr. Paul Toce completed a Medical Summary Report for a Deceased Offender.

Medication Administration Records

December 2013 MARs show inaccuracies in documentation.  Staff document Morphine Sulfate and hydrocodone as KOP medications that the patient took at each dosing opportunity. From 12/1 to 1212/13 staff documented that the patient did not request Coumadin/Warfarin. For most of this time frame the patient was hospitalized, but this is not reflected on the MAR.  A handwritten MAR does not have a date indicating the month and year. There is no documentation of start and stop dates for each order, or ordering provider.   November 2013 MAR notes that Lovenox which is to be given subcutaneously twice daily, is a KOP medication. A December 2013 MAR shows that staff documented that he was receiving KOP Lovenox, Ensure, and hydrocodone 12/20 to 12/31/13 after the patient was no longer at LSP and 3 days after the patient died.  Another handwritten MAR has no month and date on the MAR.  An order for Coumadin does not have a start and a stop date.  It is written "Coumadin 6 mg q 6 pm x 3 months".

JX-CCH-000232

**Assessment:** This patient did not receive timely diagnosis and treatment for his severe leg pain. The patient had pain and swelling of his left lower extremity for 2 months before he was diagnosed with a DVT. Following initiation of DVT treatment the patient's leg pain and swelling increased in severity, however medical providers did not perform adequate medical examinations or pursue additional diagnoses in addition to DVT.  His pain was not adequately treated.  When admitted to the infirmary for the DVT medical providers performed no meaningful clinical examinations of the patient. Providers did not timely review the patient's x-ray or ultrasound tests, or lab tests including an elevated CEA test. The patient's hypertension was not adequately treated.  Although the patient's death may not have been preventable, the patient did not receive timely and appropriate care for his serious medical conditions

Patient #22

This 41 year old man arrived at LSP on 3/4/2002 and died on 12/17/12 of Non-Hodgkin's Lymphoma and AIDS. His medical history includes recently diagnosed AIDS, GERD, and H. Pylori. At the time of his death his were Truvada, Darunavir, Ritonavir and Bactrim.

Upon arrival at LSP in 2002 the patient weighed 195 pounds.

On 6/5/11 an EMT saw the patient urgently for complaints of stomach cramping and difficulty urinating. Much of the note is illegible. The EMT referred the patient to Clinic A or D. On 6/9/11 a physician saw the patient for hip pain and constipation. **The physician did not perform any ROS or examine the patient.**   He diagnosed him with fecal impaction and treated him with lactulose and ordered labs.

On an undocumented date the patient submitted a Health Care Request Form complaining of diarrhea. On 6/28/11 an EMT saw the patient at Eagle. The EMT measured vital signs except temperature. The EMT did not inquire about the character of his stools, frequency, presence or absence of blood.  The EMT did not weigh the patient, perform a ROS or examine the patient. He treated him with Pepto Bismol.  On an undocumented date, a physician illegibly initialed the form, documenting no plan.

On 7/26/11 labs showed he was anemic.   Hemoglobin=10.7 and Hematocrit=32.6%.   On an undocumented date a physician illegibly initialed the report**.  A provider did not address this abnormal lab report.**

On 10/3/11 Dr. Lavespere saw the patient for follow-up of hip pain. The patient also complained of constipation and hemorrhage and a rash. **The physician did not address the patient's complaint of constipation and hemorrhage, performed no ROS. The exam consisted of noting a hyperpigmented plaque on his trunk, groin and legs.  He did not otherwise examine the patient. Weight=166 lbs. He did not reference the patient's abnormal 7/26/11 CBC showing the patient was anemic.  He treated him with Lamisil and hemorrhoid cream with a plan to return in 3 months.**

On an undocumented date the patient submitted a Health Care Request Form complaining of a severely pruritic rash on his arms, back, and legs. He stated that he was digging his skin off because the rash was so intense. On 11/22/11 an EMT saw the patient at the Eagle Office. Vital signs were taken except temperature. The EMT noted that the patient had tried Clotrimazole and hydrocortisone without relief.

51

JX-CCH-000233

He received a "shot" a month ago with temporary relief but had returned. Rash covers large area usually 6 inches to 2 feet in one patch. No drainage, No pustules. The EMT referred the patient to a provider. On 11/23/11 a provider signed the note and planned to see the patient.

On 12/1/11 a physician saw the patient for generalized pruritus x 6-9 months. He described the patient's rash and planned to refer the patient to dermatology.  We find no documentation that this consult took place.

On 4/12/12 the patient was scheduled to see Dr. Toce but was listed as a No Show to be rescheduled.

On an undocumented date the patient submitted a Health Care Request Form complaining of a body rash and itching. On 4/29/12 an EMT saw the patient at E-2. The EMT measured pulse and respirations only. Appears to be an illegible splash like rash. He referred the patient to a physician who on 4/30/12 noted that he had a pending dermatology appointment.

On 5/12/12 a physician saw the patient for follow-up of rash and constipation. Weight=169 lbs. Afebrile. VS WNL.  He treated him with topical cream, prednisone taper and referral to dermatology. RTC in 3 months.

Dermatology did not see the patient.

On 8/23/12 the physician saw the patient who complained of abdominal pain, constipation, hemorrhoids and rash. Weight=165 lbs.

On an undocumented date the patient self-declared an emergency for abdominal pain. On 8/28/12 an EMT saw the patient at the D Sally port. The EMT documented that the patient complained of cramping abdominal pain in all 4 quadrants. Abdomen Soft, nontender, no palpable masses, rigidity or distention. Patient denies N/V/D. The EMT referred the patient to a physician who, on 8/30/12 noted that the patient was seen on 8/23/12 and to keep the scheduled appointment.

On 9/1/12 abdominal x-ray findings were "Bowel gas pattern is unremarkable with several non-specific air-fluid levels. Several pelvic calcifications are noted, likely pleboliths.  Impression: Negative two view abdominal series. William Gregoire MD.

On 9/1/12 chest x-ray findings were: "The heart size is normal. The lung fields are clear. No acute process is identified. William Gregoire MD.

On 9/1/12 chest x-ray findings were: "The heart size is normal. The lung are clear. There is no pneumothorax. The costophrenic angles are sharp. Impression: Normal study.  Robert Newsome MD.

On 9/6/12 the patient declared a self-emergency. An EMT saw the patient at Eagle Hall. The patient reported nausea, vomiting and chest pain at his xiphoid process that radiates to his back. The pain is so severe that he can't eat. Nothing he does makes it better or worse. The patient had a low grade fever of 99.6.  BP=104/70 mm Hg, Pulse=100/minute, respirations=16/minute.  **The EMT did not examine the**

JX-CCH-000234

patient.  The EMT referred the patient to a physician who on 9/7/12, without seeing the patient, ordered Prilosec 40 mg 2 PC x one year. The physician did not schedule the patient for follow-up.

On 9/12/12 at 0025 an EMT responded urgently to Eagle 2 to assess the patient for severe abdominal pain. The EMT found the patient lying in a lateral recumbent position on the floor. The patient was guarding his abdomen and grimacing. Patient denies nausea, vomiting diarrhea, hematuria, flank pain and constipation.  BP=90/68 mm Hg. Pulse=140/minute then crossed out and 69/minute recorded. The EMT documented that the patient had no increased pain with palpation, no masses, no distention and no rebound tenderness.  The EMT did not measure the patient's temperature. Patient exhibited generalized weakness when assisted to the stretcher. The EMT transported the patient to the ATU.

On 9/12/12 at 0050 an ATU EMT assessed the patient. The EMT noted that the patient complained of abdominal pain for 4-6 weeks. "Patient states illegible non-stop abdominal pain x 4 quads worse in the epigastrium, reproducible by palpation. Patient states illegible frequent nausea and occasional vomiting. Patient stated abdominal illegible secondary to multiple OTC's. **Abdomen is firm secondary to guarding.** Patient had BM today. +BS x 4 quadrants. Patient is thin with poor skin turgor. Patient states more comfortable in RLR (right lateral recumbent) position. Afebrile. BP=117/79 mm Hg, pulse72/minute, respirations=16.  At an undocumented time an EMT received a verbal order from Randy Lavespere for Pepcid, IV fluids, and to hold the patient until lab and x-ray could be completed in the morning.  An abdominal x-ray, CBC and serum chemistry were ordered to be performed in the morning.  At an undocumented date and time, Dr. Collins wrote": 41 year old BM c/o abdominal discomfort, chronic. VSS. BM+, no nausea/vomiting, c/o cramps.  Abd: illegible no rebound. Patient illegible.  Rx Pepto-Bismol. Category 1 appointment.  **A physician did not examine the patient the same day.**

On 9/13/12 Dr. Lavespere saw the patient for follow-up of abdominal cramps, noting that he complained of abdominal pain x one month, worse after eating. Starting N/V x one week. Went to ATU yesterday. Normal chest and abdominal x-ray. Patient reports tarry black stools x one month. Denies frequent NSAIDS. H/H=10.1/31.1%. Weight=148 lbs. Afebrile. BP=112/82 mm Hg. Pulse=80/minute, Respirations=not measured.   PE: Lungs CTA, illegible, **Abd: +BS decreased, midupper/LLQ with guarding, no RLQ tenderness.  The physician noted that the patient had lost 17 lbs. in 3 weeks (however his notes also indicate that the patient weighed 195 lbs. in 2002 and therefore had lost almost 50 lbs. since then. The patient weighed 169 lbs. on 5/12/12 and therefore had lost 21 lbs. in 4 months.).  Dr. Lavespere's diagnosis included GERD, constipation, weight loss and anemia.**

On 9/13/12 tat 1435 he patient was admitted to the infirmary for weight loss and failure to thrive. Dr. MacMurdo performed an admission history and physical noting the patient was: a 41 year old male with black stools and 17 pound weight loss since 8/23/12. Mid upper/LLQ pain worse after eating. On 9/12/12 H/H=10.1/31.1.  He noted his past medical history.  He did not perform a review of systems, family or social history. He documented a normal neck examination and positive bowel sounds with mid-upper and LLQ tenderness to palpation with guarding. His assessment was anemia, weight loss and failure to thrive. He ordered labs, routine vital signs and regular diet.

On 9/14/12 he had a fever of 101.2 F. The physician treated him for presumed diverticulitis with IV Zosyn. Anemia with black stools, check FOBT.

53

On 9/14/12 the patient tested positive for HIV infection. Stool was negative for ova and parasites, and C. difficile culture was negative. FOBT=negative.  The patient was anemic (Hemoglobin=11.3 and Hematocrit=25.3%).  H. pylori was positive.  On an undocumented date a physician initialed the report.

On 9/14/12 abdominal x-ray findings were "No abnormal bowel dilatation. A large amount of stool is identified within the transverse colon and proximal descending colon. Pleboliths are noted within the pelvis. Mild degenerative changes of the hips.  Impression: One large amount of stool transverse and descending colon. William Gregoire MD. On an undocumented date a physician initialed the report.

On 9/17/12 saw the patient in the infirmary documenting that he "felt better". **He noted vital signs but did not perform any ROS or physical examination.**  He did not note the results of labs or x-rays. The patient was started on Celexa and Zantac.

On 9/18/12 his weight was 139 lbs.

On 9/19/12 wrote an infirmary note. There is no documentation that he spoke with the patient. **He noted vital signs but did not perform any ROS or physical examination.**  The patient was febrile (Temp=100 F). He referenced results of labs, FOBT=negative and that his anemia was improving.

On 9/20/12 the physician noted the patient complained of nausea and vomiting. He did not perform a review of systems or any physical examination. He noted the patient was HIV positive and H. pylori positive and he treated him with Biaxin and amoxicillin. **There is no documentation that the physician informed the patient of his HIV test results.** He referred the patient to the HIV clinic.

On 9/21/12 a nurse practitioner saw the patient noting that he had nausea and abdominal discomfort. His abdomen was soft with epigastric discomfort. The NP did not reference labs or new diagnosis of HIV infection.

On 9/24/12 the patient was discharged from the infirmary to his housing unit.  The same day Dr. Bailey ordered HIV labs. There is no clinical note with the lab order.

On 9/24/12 at 2147 an EMT responded urgently to the patient's housing unit Eagle 2. **The EMT documented that the patient had abdominal pain secondary to H. pylori. The EMT documented that the patient had a normal abdominal examination except that his pain increased with palpation.** Patient denies constipation, n/v/d, hematemesis, and hematuria. The EMT contacted Dr. Toce via Med-4 who ordered a stat dose of Pepto-Bismol. The patient was not transported to the ATU.  A physician did not examine the patient.

On 9/25/12 at 1555 an EMT saw the patient for abdominal pain x 2 months. Patient complains of nausea, vomiting, and loose stool. Abdomen: S/N/T, no distention, abdomen has dark discoloration. States pain on palpation. Patient he was discharched (sic) from ward for bacteria.  At an undocumented time, another staff person documented states has dark stools.  There is no documentation that an EMT contacted a physician. At 1635 an EMT gave Noroflex 60 mg IM.  At an undocumented date and time, Dr. Lavespere documented "GI cocktail, pain resolved". The plan was "Quit Smoking, no caffeine, no carbonated beverages. Category II, Camp D clinic. **The physician did not clinically evaluate the patient.**

On 9/25/12 the patient's CD4 count=196 and HIV viral load=127,000 copies.  On an undocumented date a physician initialed the report.

54

On an undocumented date the patient submitted a Health Care Request Form for stomach problems. On 9/26/12 an EMT saw the patient at Eagle.

On 9/26/12 chest x-ray showed a 0.4 cm calcified granuloma right upper lobe. Heart size is normal. Upper abdomen unremarkable.

On 9/27/12 labs showed he was anemic.  Hemoglobin=9.5 and Hematocrit=29.4%.  Serum chemistry was normal. On an undocumented date a physician initialed the report.

On 9/28/12 the patient declared a self-emergency for back pain. An EMT saw the patient at Eagle. Much of the note is illegible. Vital signs normal. Temperature and weight not measured. **The EMT did not perform any review of systems or physical examination.** He gave the patient a stat dose of Ibuprofen and referred the patient to a physician.  On 9/28/12 Dr. Collins initialed the note but made no plan.  **Dr. Collins did not examine the patient. At the top of the page, a staff person documented that the patient was deceased, implying that this document may not have been filed in the record until after his death on 12/28/12.**

On 10/1/12 at 2128 an EMT responded to the patient's location Eagle housing unit. The patient complained of severe abdominal pain. The EMT documented "Responded to Eagle 2 for same complaint. No change in patient condition. Patient received Pepto-Bismol ordered by Dr. Toce. Had not taken yet. Vital signs as noted above. Patient instructed to take Pink Bismuth UAD. Report to Dr. Toce via MD conference. Patient instructed to take meds and see s/c. NT per TO Dr. Toce. The EMT did not assess the patient's abdominal pain, including severity, perform a ROS or examine the patient. **At the top of the page, a staff person documented that the patient was deceased, implying that this document may not have been filed in the record until after his death on 12/28/12.**

**On 10/2/12 at 1148 an EMT responded to Eagle for patient complaints of abdominal pain. The EMT found the patient lying on his right side with knees up to his chest with complaints of abdominal pain. Patient has had abdominal pain x 3 months and was seen and treated. Vital signs stable. Patient loaded up on stretcher and loaded on ambulance. Patient is more comfortable now that he is on his right side. Patient states he is nauseated. Patient has no active vomiting enroute. Patient has no rebound tenderness. Patient brought to ATU and care handed over to Dr. Collins.**

On 10/10/12 Dr. Collins urgently referred the patient to psychiatry for "newly diagnosed HIV-Not dealing with it very well-Numerous somatic complaints.

On 10/11/12 a treatment referral slip was completed for wound care. At the top of the page, a staff person documented that the patient was deceased, implying that this document may not have been filed in the record until after his death on 12/28/12.

On 10/11/12 HIV drug resistance testing showed sensitivity to Truvada component, Darunavir and Ritonavir.

JX-CCH-000237

On 10/11/12 the psychiatrist saw the patient due to a referral from Dr. Collins due to "repeated exaggerated pain complaints, reluctance to return to his dorm. Dr. Murcado speculates that peers are harassing him due to new diagnosis of HIV but he denies peer problems……Reports insomnia due to back pain, poor appetite and weight loss. Denies depressed mood."  The psychiatrist noted that the patient stated: "I'm just sick, I don't have no problem". The psychiatrist noted the patient appeared depressed and started him on Elavil.

On an undocumented date and time the patient declared a self-emergency for hurting all over. On 11/1/12 at 0550 an EMT saw the patient urgently in Eagle. The EMT documented that the patient hurt all over, denies SOB, chest pain,          N/V/D. BBS x 4=clear. No trauma noted.  The EMT did not review the patient's medical history, previous complaints, perform a ROS or a physical examination. The EMT gave the patient Tylenol and have the patient keep a scheduled appointment.

On 11/1/12 at 1110 an EMT evaluated the patient for abdominal pain and distention. The EMT documented that the patient stated that it gets worse every time I eat or drink. Patient has a history of stomach ulcer, HIV. Patient states he is having regular bowel movements BP=100/71 mm Hg, pulse=134/minute), respirations=16, Afebrile. **The EMT did not examine the patient.** The EMT documented ordering a KUB and starting an IV, then documented a verbal order for Zofran from Dr. Lav (sic). The patient was given a bottle of mag citrate and at 1430 reported having 2 BM's.  The EMT did not document a disposition.  On an undocumented date and time Dr. B and Dr. Lavespere initialed the note but did not document a plan **Despite the findings of abdominal pain and distention, and abnormal vital signs, a physician did not examine the patient or document a plan.** At the top of the page, a staff person documented that the patient was deceased, implying that this document may not have been filed in the record until after his death on 12/28/12.

On 11/5/12 at 0910 an EMT saw the patient in the ATU for swelling of his left and right ankle. The patient also complained of chest pain and shortness of breath. Denies N/V/D. complained of blurred vision. PERRL, NAD, no trauma noted. PMS intact, +swelling, no bruising, no deformities, no trauma noted.  Skin W/D. BBS=CTA, Mild pitted edema noted. BP=105/80 mm Hg, pulse=135, respirations=16, Temp=96.1, SpO2=100%.  The EMT documented a telephone order from Dr. Collins to have the patient seen in Clinic A in on week. **Despite the patient's abnormal pulse, the EMT did not repeat the patient's vital signs and a physician did not examine the patient.**

On 11/9/12 a physician ordered antiretroviral therapy for the patient (Truvada, Darunavir and Ritonavir), but did not order Bactrim for PCP prophylaxis.

On 11/19/12 at 1210 an EMT responded urgently to the patient's housing unit for complaints of SOB and abdominal pain x 2 days. The EMT documented that the patient was found sitting in bed with his chest to his knees with security present. PMH: HTN, HIV, abdominal pain, seen in ATU for constipation x Sat night and had bowel movement. c/o he is only defecating new feces, not old feces. Denies CXP (sic) or SOB, BBS=CTA, with =R+F. Abdomen soft nontender, no pain with palpation. Some parts of the note are illegible….Contact M-F with FNP illegible with full report. She ordered no Transport. Send fleets enema and order Ducolax 5 mg twice daily x 3 days……..No duty x 3 days.

56

On 12/3/12 he was severely anemic.  Hemoglobin=7.7 and Hematocrit=24.4%.  On an undocumented date a physician initialed the report.  Dr. Bailey referred the patient to EKL Medical Center for recent HIV diagnosis, 30 pound weight loss in 2 months and cervical lymphadenopathy, never biopsied.

On 12/4/12 the patient was admitted to Earl K. Long Medical Center. His diagnoses included diffuse large B-cell lymphoma, anemia and HIV.  The admitting physician noted that the patient had a one year history of increasing abdominal pain with 40 pound weight loss. He also reported shortness of breath with exertion, neck swelling for several months and recent onset of bilateral lower extremity swelling. He denied fever, chills or night sweats.  **A chest CT showed a "huge mass in the abdomen measuring 20 cm x 16 cm in transverse and AP diameter, with extensive adenopathy". Scans also showed the patient had a large amount of cervical adenopathy 2 x 3 cm on the right side of his neck and 3+ pitting edema of bilateral lower extremities to the mid-shin. An abdominal CT showed massive retroperitoneal adenopathy encasing the aorta and compressing the vena cava. Other scans showed extensive lymphadenopathy involving the internal jugular chain, posterior and cervical retroperitoneal regions.**  Oncology was consulted and MediPort recommended for chemotherapy. However hemodynamic instability due to retroperitoneal lymphadenopathy compression of the inferior vena cava prevented placement of the MediPort. The patient's course was complicated by progressive lower extremity swelling and difficulty with pain control which was accomplished with morphine.  ID was consulted and continued the patient's antiretroviral regimen and added Bactrim for PCP prophylaxis. On 12/4/12 the patient was discharged with a plan was to readmit the patient on 12/19/12 for PICC placement and administration of chemotherapy.

On 12/13/12 a physician saw the patient for HIV follow-up, noting that the patient was awaiting hematology-oncology evaluation. Currently on antiretroviral therapy. Part of the note is illegible.

On 12/17/12 the patient coded and was successfully resuscitated but arrested again at EKL Medical Center and expired.

Medication Administration Records

August 2012 MARs show the patient did not receive doxycycline as ordered, with 7 doses not documented as being given or refused. October 2012 MARs show many blank spaces in which staff did not document the administration status of the medication (i.e. whether it was administered or not). For example, the patient was prescribed omeprazole but there are 13 of 31 spaces that are blank, indicating that the medication was not administered. Likewise, the patient was ordered ranitidine and 14 of 31 spaces are blank. The patient was prescribed Bactrim three times weekly for PCP prophylaxis but there is no documentation on 7 days that the patient was given his medication. October 2012 MARs show the patient was not administered 10 of 23 doses of Celexa.  November 2012 MARs show the patient did not receive Elavil as ordered.

**Assessment:**  This patient did not receive timely and appropriate care for his abdominal pain, weight loss and anemia.  The patient presented repeatedly with severe abdominal pain, nausea and vomiting and each time was treated episodically, most often for GERD or constipation.  Despite the severity of his abdominal pain, anemia and almost 50 pound weight loss since his arrival in 2002 the patient was not

57

referred for a medical evaluation. By the time the patient was hospitalized on 12/3/12 the patient had a huge mass in his abdomen measuring 20 cm x 16 cm with extensive adenopathy surrounding his aorta and inferior vena cava resulting in bilateral lower extremity edema.  In addition, the patient had extensive lymphadenopathy in his neck that was not detected timely because of inadequate clinical evaluations by EMT's and medical providers.  This patient's death may or may not have been preventable, but the patient experienced preventable suffering when he was not diagnosed and treated timely for his lymphoma.


Patient #23

This 48 year-old man arrived at New Orleans Parrish in January 2012 where he was for 14 months then transferred to Hunt in May 2013. At the time of admission his medical history included diabetes. His medications were metformin and NPH insulin.  No known allergies.  Upon arrival he felt he was in good health. We interviewed this patient who related the following experience.

At New Orleans Parrish he began to experience tingling and numbness in his right foot that progressed bilaterally and then escalated. They treated him with gabapentin but did not consult a neurologist. He was at Hunt approximately 3 months, he submitted sick call requests, saw a doctor, and was given medication.  At some point he was in his cell and collapsed and thereafter unable to walk. He began to have problems with urination and bowel movements.  They did not send to the hospital. He was given a wheelchair.

Then he was transferred to Angola.  A nurse processed him and noted that he was incontinent and he was sent to New Orleans Medical Center where he underwent a neurological evaluation and was hospitalized for a month.  He was diagnosed with transverse myelitis. When he returned to LSP he was placed in the medical ward.  He reported that health care was awful, a weaker person would have killed himself. He did not get physical therapy. An inmate came to work on his legs. He had developed a decubitus ulcer at the top of his sacrum.  They had him sign a DNR. Inmate orderlies cleaned him when he defecated. He changed his attitude and stopped smoking. He is working out 2-3 times a week, leaves the unit whenever he can. He has family support.

A neurologist sees him every 3 months.  Last visit was 3 weeks ago.  Cindy Park nurse practitioner sees him when he flags her down but is not sympathetic. He was prescribed Keppra for pain but he stopped taking it because it made him sleepy. Now gets Norflex injections.  Physical therapy once a week for the past few months.

He reported that nurses don't do hands on care. He does get medications on time. Gets a blood test every three months.  He is on a low fat and low salt diet. Hemoglobin A1 c=8.0% in 1/12/16. Orderlies don't know how to move people, haven't been trained. 8 am pill call and 2 pm call.  One might check dressings. His vital signs are taken every Monday.

Assessment: Inmate assistants providing hands on care.

58

Patient #24

This is a 36 year old man who arrived at LDOC in 1999 and transferred to LSP June 2000. At that time he was healthy. In February 2010 he was playing football and he hit someone and fractured C3 and C4. He became conscious and asked them not to take off his helmet. He knew he was paralyzed, became short-winded and stop breathing.  He has diabetes, his joints and elbows are locking up no physical therapy. He got therapy for a certain amount of time but then it stopped.

Prior to the accident he had to fill out a sick call slip they obtained it from the officer in the booth and they go to the ATU, takes a long time, never see the doctor.  Tell the nurse something is wrong with me. Doctor will not come see you.

When he returned to the medical ward the inmates did everything for him. Turn him, bathe him, the nurse changes his suprapubic catheter every 30 days. He has had a lot of urinary tract infections.  They don't measure input or output. They serve breakfast if he is asleep they don't wake me up. The food is always cold. Sometimes uses the microwave.  Feed same thing every day, lots of rice.

Cindy Parks comes but lately hasn't spoken with him. Doesn't know when he was last seen by her. Doesn't get finger stick blood sugars.  Listens to music watches TV.  Brings medication at 8 am, 2 pm and 8 pm.

He has lots of spasm. Is not on a special air mattress. Been on a regular mattress since 2011.   No decubitus. Clock is behind him, he can't see it.  No recreational or occupational therapy.

They give medication to Lionel Parks to put him down. Jamie Jones and Kim Beckman.  They wrote him up for not wanting to take his valium saying he was rood. When they are on duty he doesn't want to interact with him. All he wants to do is sleep.

Had a choking episode and he asked the nurses to take the valve out of his trach tube. He was put in isolation.

Cleans his trach tube once a week.  States he is coughing up blood.

Where he is in the ward the nurses cannot hear him even if she screams.  He has no way to alert the nurses.

Two orderlies and a janitor to take care of 24 ward patients and 10 in the isolation wards.  Sometimes the orderlies put shampoo in his hair and forget.  He last had his hair washed two weeks ago.  Has to call someone to drink water put chapstick. Sometimes he gets another patient to help him.

Assessment:  Inadequate care in the infirmary.  Inmates providing health care.  Put in isolation where he cannot notify anyone for help.

59

JX-CCH-000241

Patient #25

This is a 56 year old man arrived at LSP on 11/15/1999. His medical history includes HIV/AIDS diagnosed in 1992, Hepatitis C infection diagnosed in 1998, peripheral neuropathy, hypertension, hyperlipidemia, latent TB Infection, prostate cancer Gleason 7.  His medications include Truvada, Raltegravir, Neurontin, atenolol, Norvasc, Cozaar, Losartan, Flomax, Ultram, Prilosec, aspirin, finasteride, Lasix, and tamsulosin. According to the complaint, the patient was refused HIV medications for two years as punishment for complaining that correctional officers made mistakes in distributing his medications. At other times officers refused to provide him medications as retaliation for other complaints that he has made. He experiences numbness and swelling in his hands, and has complained about a black box that is used to shackle him as it causes pain and swelling in his wrists. The EMT told him it was a security, not a medical decision. Defendants have failed to provide him shower shoes subjecting him to unnecessary risk of infection due to his compromised immune status.

On 1/14/10 a dipstick urine showed that he was spilling a large amount of protein in his urine. On 2/1/10 the patients CD4 cell count was 980 cells and his viral load was undetectable. His AST was mildly elevated 63, 0-40.   On 5/17/10 his HIV disease was well controlled (CD4 count=646, HIV RNA =undetectable) and LDL=121.

On 5/4/10 his PSA was elevated (5.4, normal=0.4.0). This was illegibly initialed and undated.  On 10/4/10 the provider saw the patient and noted his increased PSA.  He ordered repeat testing including free PSA.

On 12/15/10 his PSA was elevated (5.4, normal=0.4.0). This was illegibly initialed and undated.

On 1/14/11 the patient signed a medical refusal although it did not specify the type of care refused.

On 2/28/11 a specialty clinic provider documented when the last labs and clinic was performed in 9 and 10/2010 and ordered to stop the patient's Truvada and Viramune.  There was no documented reason for stopping the medication.

On 3/12/11 the patient submitted a sick call request stating that his HIV medication had been discontinued for 2 weeks and now some of his blood pressure was stopped.  He requested to see his doctor to restart all medication for his chronic disease. On 3/13/11 an EMT did not see the patient but wrote that the patient was requesting medications. No disposition was written and a provider wrote category 2 on the form with no other plan.

On 3/22/11 a provider saw the patient noting that he had no HIV meds since December 2010. CD4 count 638 and VL=undetectable. The note is partly illegible but it appears that the provider planned to get HIV labs in 4-6 weeks.

On 5/2/11 the HIV provider saw the patient noting that the patient had been a no show because taking medications was a hassle and because of his treatment in the bullpen.  He planned to get labs and see the patient on 5/13/11 to restart medications.

60

On 5/11/11 his CD4 was 484 and viral load=152,280 copies. This was not dated or initialed as being reviewed.

On 6/27/11 the HIV provider saw the patient noting that he wanted to restart his medications. He planned to consult Dr. Stuart and chart check in one week.

On 8/11/11 a chart check was conducted and labs were ordered with follow-up in 3-4 weeks.

On 8/17/11 his CD4 was 463 and viral load=98,760 copies. His AST was increasing 126. This was not dated or initialed as being reviewed.

On 8/29/11 he was noted as a no show for scheduled clinic appointment.

On 9/9/11 the HIV provider saw the patient who stated that he did not want to restart his HIV medications that he was doing well.  Viral load was 99,000 and CD4 463. Recheck labs in 16 weeks and follow-up 2 weeks thereafter.

**On 1/7/12 his CD4 was 198 a**nd viral load=79,000 copies. This was not dated or initialed as being reviewed, however someone circled the CD4 count.

On 1/23/12 the HIV provider saw the patient. She noted that he was off ARV secondary to refusal. She discussed OI's but did not indicate whether he accepted therapy. No HIV ROS.  His CD4 count was 198 and viral load 79,000. The PCP planned to repeat labs and follow-up on 4/30/12. She did not start PCP prophylaxis.

**On 1/28/12 his PSA was elevated (7.2, normal=0.4.0). This was initialed but undated.**

On 3/5/12 he submitted a sick call request complaining of having full blown AIDS and severe diarrhea.

On 3/5/12 he was started on Bactrim for PCP.

**On 6/8/12 his PSA was elevated (6.9, normal=0.4.0). This was illegibly initialed and undated, but someone documented "New ref 7/13/12).**

On 9/24/12 his alkaline phosphatase was increased 160, normal=42-121.  Illegibly initialed and not dated.

**On 9/27/12 his PSA was elevated (8.6, normal=0.4.0). His CD4 was 132 and viral load=75,000 copies. This was not initialed and dated**.

On 2/7/13 his CD4 was 87 and viral load=99,000 copies. This was not dated or initialed as being reviewed.

On 4/4/13 his alkaline phosphatase was increased 160, normal=42-121.  Illegibly initialed and not dated.

61

JX-CCH-000243

On 5/19/13 his CD4 was 176 and viral load=150 copies. This was not dated or initialed as being reviewed.

**On 9/13/13 a physician saw the patient and noted that his PSA was increased but did not address it.**

**On 11/13/13 a physician saw the patient. His blood pressures was 160/90 mm Hg. The provider lists his increased PSA as a problem and doesn't address it. He did not address his poorly controlled hypertension.**

**On 1/7/14 a physician saw the patient noted his increased PSA but did not address it.**

On 3/21/14 the urologist noted that the patient with an increasing PSA who had refused evaluation in the past but now agrees to treatment. There was no documentation that the patient refused evaluation and treatment. Please consider TRUS.

On 10/20/14 the patient underwent prostate biopsy.  On 11/11/14 Dr. Bridges (LSU) saw the patient noting that he was post prostate biopsy that was suspicious for prostate adenocarcinoma (prostatic intraepithelial neoplasm III). The plan was a repeat prostate biopsy in 4 months. On 11/18/14 LDOC UM stated that there was no current appointment and to have the patient see Dr. Bridges in 4 months and then schedule the repeat biopsy.

The patient submitted a sick call request complaining of pain in his kidney and legs, chest tightness, tingling in neck and body and hot flashes. On 1/5/14 it was received and triaged and an EMT saw the patient. The EMT did/did not refer the patient to a medical provider. The EMT measured vital signs except for temperature. The EMT documented the patient's symptoms noting that the pain was intermittent for 2 months and he had no pain at that time.  Patient was in NAD and denied cardiac chest pain, SOB, dyspnea, HA, N/V/D, and abdominal pain. **The EMT performed no examination and the plan was to "keep appointment.**  On 1/7/15 a HCP illegibly signed the note documenting follow-up prn.  No co-pay fees were assessed.

On 1/8/15 a physician (?ID) saw the patient who wanted to stop Lasix since leg swelling had resolved (K2.9). His CD4 was 375 and viral load undetectable.  He stopped Lasix and Atovaquone and planned to continue medications, and ordered labs for 16 weeks with a follow-up appointment two weeks later.

The patient submitted a sick call request requesting to see a bone specialist urgently because of left leg bone pain since the previous year. On 1/12/15 it was received and triaged and an EMT saw the patient. He took vital signs except for temperature. He examined his shin and noting no swelling, bruising or deformity.  The EMT's plan was physician review.  The same day the physician documented neuro: axonal polyneuropathy and noted that his Neurontin was increased on 11/14/14. The provider made no changes to the patient's treatment plan. The patient was charged a $3.00 access fee.

On 1/14/15 a physician saw the patient for pretibial edema, increased PSA, hypertension, and sick all med review. The patient's blood pressure was borderline elevated (BP=140/86 mm Hg) and vital signs

JX-CCH-000244

otherwise normal. His weight was 167 lbs. with chains on. The provider noted that the patient needed a repeat prostate biopsy for increase PSA and noted that his ALK PHOS was also increased. He questioned whether the patient had prostate cancer with liver and bone mets. He planned to obtain another biopsy, x-ray his left lower leg, add potassium for hypokalemia and repeat labs.

On 2/20/15 urology saw the patient noting that a 10/24/14 prostate biopsy was suspicious for cancer and that the patient was to have a TRUS biopsy in March.

On 2/26/15 at 0635 the patient declared a medical emergency on a sick call request complaining of severe dental pain, and that the dentist told him if this ever happened to immediately come to the hospital. It was received and triaged the same day and an EMT saw the patient, noting that he had no discharge, swelling or blood in the area of the compliant. The patient was afebrile and other vital signs were normal. The EMT referred the patient to dental, but did not contact a provider. The patient was charged a $3.00 access fee. Neither a dentist nor medical provider signed the request.

On 2/26/15 at 2310 the patient complained of dental pain, and that the dentist told him if this ever happened to immediately come to the hospital. It was received and triaged the same day and an EMT saw the patient and gave him a stat dose of Ibuprofen and submitted a pharmacy request for OTC x 5 days. On 2/27/15 the dentist signed the request. , noting that he had no discharge, swelling or blood in the area of the compliant. The patient was afebrile and other vital signs were normal. The EMT referred the patient to dental, but did not contact a provider. The patient was charged a $3.00 access fee.

On 3/12/15 at 1220 a physician saw the patient urgently for decreased mobility and chronic bilateral lower extremity leg pain. The patient also complained of weakness and numbness of the neck chest and legs. CPK was 450 and alk phos 347. BP=149-150/83-90 mm Hg) Patient reported 80-100 lbs weight loss. The patient requested a wheelchair. No plan was documented. The provider referred the patient to clinic A in two weeks.

On 3/19/15 Dr. Bridges saw the patient and requested that he be NPO after midnight on 4/26/15 for biopsy.

On 4/1/15 urology saw the patient again noting he was due for another prostate biopsy. He noted that the patient was anemic and had generalized bone pain and c-spine pain.

On 4/15/15 physician cleared him for prostate biopsy following Echocardiogram by cardiology.

**On 4/21/15 the patient submitted a sick call request complaining of not receiving his HIV medication. On 4/21/15 it was received and triaged. It does not appear that an EMT saw the patient. The EMT checked with pharmacy that reported that his medications were at Camp J and now he is at Camp C. He was not charged a copay.**

On 4/27/15 the patient underwent prostate biopsy.

On 5/12/15 oncology saw the patient for follow-up. The patient had adenocarcinoma of the prostate Gleason 7. The patient objects to surgery and to consider radiation.

JX-CCH-000245

On 5/13/15 HIV provider saw the patient for follow-up. His viral load was undetectable. He planned to check labs and see the patient in 4 months.  On 6/4/15 follow-up showed that his CD4 count was 465. Continue meds and RTC in 3 months.

**On 7/21/15 a whole body bone scan showed he was positive for pelvic metastatic disease. Thereafter, oncology referred the patient back to urology.**

**On 8/19/15 he had a bone scan suggestive of mets.**

On 8/18/15 he was seen by heme-oncology in preparation for radiation treatment. However bone scan shows that he has metastatic disease. The oncologist therefore recommended Trelstar treatment. The urologist requested that this be approved and ordered Trelstar in one month. RTC November.

On 8/21/15 urology saw the patient noting that the patient had Gleason 7 prostate cancer.

On 9/22/15 saw the PCP noted prostate cancer with bone mets. Vital signs normal. Weight 162. He ordered ensure and follow-up in one month.

On 10/1/15 Dr. Julie Wang saw the patient.  She noted his biopsy results and that he had been started on bicalutamide but not on Eligard for his prostate cancer.  The patient wants to proceed with radiation therapy.  He had not had any injections. His duty status was modified the same day. There is no documentation that he received the medication. The urologist ordered a spine MRI to evaluate for mets. RTC in 3 months.

**On 1/28/16 radiation oncology saw the patient and noted that that the patient was seen by Dr. Johnson who felt "to be very unlikely to be malignant given his early stage and not likely to be particularly aggressive." A 10/28/15 MRI showed no firm evidence for metastasis. Therefore he was given radiation with neoadjuvant and concurrent ADT.**

On 2/24/16 the GI consultant saw the patient for hepatitis C work up. His CD4 was 358 and viral load undetectable. The consultant ordered labs and planned to see him in April 2016.

No MARs in the health record to know whether patient is receiving his medications.

Assessment:  This case has several serious issues.  The patient's HIV disease which was initially well controlled was permitted to deteriorate to the point where the patient developed AIDS with CD4 count below 100, before antiretroviral therapy was resumed.  We do not find informed signed refusals of HIV medications during this time frame. The patient alleged that medications were withheld from him because he was being punished.  Secondly, the patient had an abnormally high prostate specific antigen (PSA) test indicating potential prostate cancer for over two years before the patient was seen by a urologist and diagnosed with prostate cancer.  LSP physicians repeatedly failed to note or address the patient's abnormal test results, including an increased alkaline phosphatase level that might indicate bone metastasis. A LSP provider documented that the patient previously refused evaluation for prostate

64

cancer, however we do not find signed, informed refusals in the medical record.  A prostate biopsy was not performed for over 7 months after it was determined to be medically indicated, and although the biopsy results were suggestive of adenocarcinoma of the prostate, for reasons that are unclear a decision was made to perform another biopsy in 4 months however this repeat biopsy did not take place for six months.  There is conflicting documentation regarding whether the patient has bone metastasis. Other issues include EMT's not examining patients when presenting with medical complaints. Health record issues are that physicians do not legibly date and time signing of lab and diagnostic reports. Medication administration records were not timely filed in the record to assess medication administration and compliance.


Patient #26

This 61 year old man arrived at LDCO in 1980 and transferred to LSP on 8/30/95. His medical history includes HIV infection, hypertension, hyperlipidemia, (?) stroke, severe lumbar stenosis at L1-2 and L-4-5, right hip replacement 2006 and right knee osteoarthritis, GERD, and BPH. His medications are Epzicom, Reyataz, Norvir, Norvasc, spironolactone, terazosin, and omeprazole.

Health Records

There is a Problem List. There is a tab in the medical record called Master Prison Record which contains charges, sentence, and transfers. "Health Consequences of Illegal Activities. It's blank. Duty status slips filed in Transfer Summary section instead of Duty Status section.

On 8/20/15 ID saw the patient for follow-up. The first part of the note is missing.  The consultant recommended follow-up in one year.

On 12/18/15 a provider saw the patient for follow-up of HIV infection, hypertension and ecchymosis. The provider did not take an HIV ROS. The patient denied chest pain, dyspnea and PND. The patient reported ecchymosis on wrists and ankles in the area of shackles and flex cuffs.  The provider noted labs including HIV (CD4=510, VL=undetectable), LDL=125. The provider conducted a brief but pertinent exam. The provider discontinued Epzicom and continued Reyataz and Norvir. He planned to order labs in March 2016 and to RTC to see Dr. Stuart.

On 2/10/16 a provider saw him for bilateral ankle edema. He treated him with Lasix 30 mg IM and planned to continue spironolactone. To plan for follow-up.

On 2/18/16 at 1337 an EMT and provider saw the patient in the ATU urgently for stomatitis and possible candidiasis. The provider ordered Nystatin and vitamin B6 with 2 week follow-up. This did not take place.

On 3/7/16 a provider saw the patient for bilateral lower extremity cellulitis that failed outpatient treatment, angular stomatitis, HIV infection and anasarca for which he was given multiple doses of steroids, rule out ARI.  He was admitted to NU-1.

JX-CCH-000247

On 3/7/16 he was admitted to the NU with a diagnosis of anasarca and LE cellulitis. The patient was tachycardic (pulse=127/minute) and otherwise were WNL. The patient was afebrile. The provider wrote admission orders that included diet, activity, medications, and labs. The patient is still on only two HIV medications, Reyataz and Ritonavir. He is also on amlodipine that causes peripheral edema.  In his note he indicated that the patient's anasarca may be due to steroids however I find no evidence that the patient has received steroids and none were ordered upon admission to the infirmary. The patient has new onset diabetes (HbA1C=6.6%) and gave the patient diet and education. Chemistry and liver function studies are normal. On 3/1/13/16 the provider discontinued his Norvasc. As of 3/16/16 the patient is still in NU-1.

On 3/14/16 ortho saw the patient for right knee osteoarthritis x 6 years and that his left leg had cellulitis for which he was taking oral antibiotics.  He previously had his knee injected on 2/3/16 but ortho did not inject his right knee and planned to have him return in 3 months.

**George said that last year the officers wouldn't bring him his medication.  He was in lockdown and the officers wouldn't bring it to him. Was at Hunt who gave Norco and Ultram and it's been discontinued it when he came back to LSP.**

Sick call starts at 5 am. Fill out the sick call slip on the ward. Security gives them sick call request.

**In the cell block the patients put the sick call slip in the bars and the EMT makes rounds on the tier. And the EMT assessed the patients through the bars.**

**In the dormitory they EMT stays out in an open area and inmates line up.**

In the ward the food is cold. Used to have hot food when the kitchen was near the Ward. Food is rubbery.

Assessment: The patient is not on an approved HIV medication regimen.  Access to care does not provide privacy or confidentiality.


Patient #27

This 57 year old man arrived at LSP on 8/29/2011. His medical history includes hypertension, diabetes, headaches, latent TB infection treated in 1992-93.

Upon arrival at LSP on 8/29/11 medical staff screened the patient.  On 9/1/11 a physician saw the patient.  The physician ordered labs, CXR and EKG and planned to see the patient in 3 months.

The patient submitted a sick call request to have his eyes examined because they have been itching and watering badly for six months. On 3/28/12 an EMT saw the patient but did not take a history of the patient's symptoms or perform any examination including visual acuity. The EMT referred the patient to

66

a physician for an eye appointment. On 3/290/12 the physician wrote to keep the scheduled appointment. The patient was charged a $3.00 access fee.

On 4/20/12 a medical provider saw the patient for chronic disease follow-up. The patients' blood pressure was severely elevated (BP=181/91 mm Hg). The physician noted that the patient had hypertension for 10 years but refused therapy. He also had bilateral lower extremity edema. His EKG was abnormal (first degree AV block, IVCD, NS TW. He was pre-diabetic (HBA1c=6.4%) in 2006. The physician planned to check his blood pressure Mondays and Thursday for one month and refer to podiatry. He wrote on the podiatry referral form that he had "painful" callous and bunions over the left 5th toe, plantar corn on ball of foot.  His provisional diagnosis was multifactorial (+/- fictitious). He also wrote to add Losartan 100 mg a day or sign treatment refusal.  RTC one month.

On an unknown date the patient submitted a sick call request to have his eyes examined because they have been itching and watering badly. On 4/26/12 an EMT saw the patient noting that the patient's eyes were mildly red. No watering noted. Patient given Visine and told to keep appointment.  The EMT did not take a history of the patient's symptoms or perform any examination including visual acuity. The EMT's disposition was "OTC". On 4/26/12 the physician wrote "CAT 3, Clinic A. The patient was charged a $3.00 access fee.

On 5/17/12 a medical provider saw the patient for chronic disease follow-up. The patients' blood pressure was elevated (BP=164-189/83-106 mm Hg). The physician wrote that the patient agreed to start therapy. He started the patient on Losartan and Norvasc.

On 5/22/12 the provider saw the patient for follow-up noting that his blood pressure was still elevated (BP=176/90 mm Hg) and labs had not returned.

On 6/27/12 the patient's HbA1c was 6.4%. Chemistry and urinalysis were normal.

Interview:  In 2013 he fell and injured his left knee.  An MRI was performed and he was told he needed surgery but it didn't happen. Initially he was given crutches. His knee swelled up. They didn't change his work status. He was in the field when he declared an emergency. They called the EMT who came out and did not perform an examination. And accused him of malingering. They put him in segregation. They gave him a Velcro brace instead of a knee stabilizer.

ON 10/2/13 at 2216 an ATU EMT saw the patient emergently for an altercation with his cell mate. The patient's left eye and left knee were swollen. The EMT did not measure the patient's visual acuity. The EMT contacted the provider who ordered stat x-rays and Ibuprofen two tablets three times day for 5 days and return to the ATU in the morning.

On 10/3/13 at 0720 an ATU EMT saw the patient for follow-up. The patient's left eye was swollen and bloodshot; his knee was swollen and the patient reported that it was unstable. Visual acuity was not measured. An NP saw the patient, noting knee instability. On 10/3/13 the patient was referred to ortho. On 10/3/13 a NP changed his duty status to no duty and no sports for 2 weeks, expiring on 10/17/13.

67

A left knee x-ray showed no fracture or dislocation.  A skull x-ray showed no fracture.  Orbital x-rays showed no fracture but extensive subcutaneous emphysema suggesting pneumothorax.

Chest x-ray showed right sided pneumediastinum.  This was initialed but not dated.

**A facial bone series showed extensive subcutaneous emphysema right side of face and next region with a questionable fracture involving the right mandibular condyle. Air in soft tissues obscures underlying bony detail. Consider CT of the fact to include the mandible. None of the x-ray reports are initialed as signed.**

On 10/7/13 ortho saw the patient noting moderate to severe effusion and suspected medial collateral ligament injury. Knee aspiration was performed and MRI recommended.

On 10/10/13 PCP saw him for follow-up. Vital signs were normal.  Chronic disease labs ordered.

On 10/17/13 the patient submitted a request stating that his knee was swollen and painful to walk on. The EMT saw the patient and measured vital signs except temperature. The EMT noted severe swelling, redness and warm to touch. The EMT referred the patient to the MD. The patient was not charged an access fee.  He was given no duty/bedrest for 3 days.

On 10/21/13 the patient submitted a request to have his duty status renewed. The EMT saw the patient and measured vital signs except temperature. The EMT noted severe swelling to patient's leg from knee to ankle and was hard and warm to touch. The EMT referred the patient to the ATU. The patient was charged $3.00 access fee.  He was given no duty bedrest for 3 days.

The patient submitted SCR on 10/24/13, 10/25, 10/29, 11/5/13, 11/25/13, 12/1/13, 12/3/13, and 12/4/13.

On 10/28/13 an MRI showed that that he had a full thickness MCL tear and ACL tear and vertical tear @ anterior horn lateral meniscus and tear of medial meniscus. Ortho saw the patient the same day noting the MRI results however no plan was made. It appears that the treatment decision was no duty status.

On 11/1/13 a NP changed his duty status to no duty and no sports for one month, expiring on 12/1/13.

On 11/5/13 the patient declared an emergency attempting to get care for his swollen left knee. The EMT performed an examination. The disposition was S/C prn. It was signed by the MD with no note.

ON 11/6/13 a physician changed his permanent duty status to regular duty with restrictions: Squad A, No Kitchen Duty, No Jumping Ditches, No Hobby Craft, No Rodeo, No Sports x Permanent.

Medical record documentation showed that requests were made to LDOC UM to schedule the patient for ortho consultation on 11/8/13 and 12/12/13 and notes indicated that LSP should schedule the patient

JX-CCH-000250

On 12/5/13 the patient submitted a request regarding his knee.  Ortho recommended DS until LSU Ortho at McNO evaluates.   DS review.

On 12/18/13 a physician changed his duty status to regular duty with restrictions: No Prolonged Walking, standing bending or stooping, no hobby craft, no sport x 3 months. Expires 3/8/14.

On 1/9/14 a provider saw the patient noting that he is being written up for jumping ditches and prolonged walking to the field. Ortho wanted extended Duty Status until seen by ortho in New Orleans. **However, 4 months has elapsed since the injury and there was no plan to request orthopedics consultation. He planned to have the patient RTC in 3 months.**

**On 3/10/14 UM Tamrya Young from Office of the Mental/Medical Director wrote "Ortho MD to provide justification why needs to go to F@F because surgery is elective. Also request is from 10/20/13.**

On 3/28/14 ortho saw the patient and noted chronic L ACL. The plan was duty status and knee sleeve with follow-up in 3 months. A knee brace with No-Stays was ordered.

On 4/10/14 a physician changed his duty status to regular duty with restrictions: Out of Field, No Prolonged Walking, No prolonged Standing, no bending or stooping, no hobby craft, no sport x 3 months. Expires 7/1/14.

6/30/14 ortho saw the patient and ordered knee sleeve, Quad exam, Mobic, Duty Status and RTC in 6 months.

On 1/15/16 he was given an updated Medical Duty Status Report:  That stated regular duty with restrictions: Sit to work, no climbing, no jumping, no sports, no hobby craft, no rodeo x six (6) months.

**On 2/22/16 a provider saw the patient for follow-up. His blood pressure was 176/90 mm Hg. The provider did not perform a CV review of systems. Exam was brief. The plan was no changes to antihypertensive medications and RTC in 6 weeks.  As of 3/17/16 this has not taken place.  The patient has not had a HBA1c for two years.**

On 3/9/15 a provider (?) wrote a note observing that the last few ortho referrals did not mention NO referral and to please evaluate. Does he need Sx referral to New Orleans. Dr. R. Lavespere wrote No. 56 year old not a candidate for ACL repair".

On 11/6/15 an MRI showed chronic appearing complete tear of the Posterior collateral ligament.

Picking vegetables bending over, whacking grass.  Been here since 1990.

Fill out form that they get from an officer (Walnut 3).Hold on to it until the EMT comes.  They won't see you if it's not filled out**.  Hollers sick call and you come to the door, no confidentiality. They have a bag with medical equipment.  They don't consistently take vital signs.**

69

JX-CCH-000251

If he is talking to the doctor and complaining other staff including nurses will say, "Oh my feet hurt too". If he is in the field and declares an emergency security will try to convince medical "there is nothing wrong with them. Specialist talked nice him.  Then he sees another specialist and they talk down to him.

**Nurse Betty threatened him and said that he accepted a brace and they couldn't find it. He was going to segregation.**

**Correctional Officers give the wrong meds to patients. Pour medications into their hands from the cup. Use the same cup over and over.  Has them sign for KOPs.**

Rice 6 days a week. High starch intake Grits oatmeal bread.  No fruits and vegetables.  Can peaches. No fresh fruit except Christmas and thanksgiving.

Making 4 cents an hour.


Patient #28

This 67 year old man arrived at LDOC in 1980 and transferred to LSP on 1/3/07. His medical history includes hypertension, severe COPD, pulmonary nodules, hepatitis C infection, family history of colon cancer, Crohn's disease since 2000, s/p colon resections x 2, failure to thrive, ventral hernia, ankylosing spondylosis.  His medications are amlodipine, losartan, albuterol inhaler, adalimumab renewed 12/19/14, megestrol AC, methylprednisone and gabapentin. His Problem List is in the current volume is blank. Chart is a mess.

He was taking Azathioprine, Humira, and Imuran but they are no longer continued.

On 3/2011 he weighed 122 lbs. In 3/2012 he weighed 108 lbs., on 7/13/13 the patient weighed 98 lbs.

On 9/19/13 the GI doc said to continue Humira and Azathioprine.

An 11/14 EKG showed an anteroseptal infarct.

On 12/16/14 a provider (pulmonary) saw the patient noting that he had a history of crohn's disease, spontaneous left tension pneumothorax in November 2014 and was being referred for evaluation of lung nodules identified incidentally on recent chest CT. The patient stated that at baseline he is short of breath with minimal activities. He had a 20 pack year smoking history and is short of breath with minimal activity. Denied weight loss, fever, or chills. The patient's temp was 99 F, BP=144/92 mm Hg, pulse 89, respirations=18 and weight 85 lbs. The provider noted that a chest CT on 11/2014 showing multiple lung nodules 5-9 mm. He has high risk for malignancy considering smoking history.   Will recommend to obtain repeat CT chest without contrast in 3 months from recent CT.  Due 2/2015. Recommend PFW, 6MWT (Six minute walk test). Will prescribe prn albuterol. Return in about 3 months.

70

On 12/24/14 a physician saw the patient for chronic disease follow-up. He listed his current chronic diseases including COPD, Crohn's, hypertension, HCV, ankylosing spondylitis, and weight loss. The providers note was as follows:  weight stable, saw GI 12/19/14, paperwork not on chart. There was no ROS for each disease.  The PE consisted of vital signs (BP=104/71 mm Hg, pulse=95, respirations=16 and temp=98.7 weight=85 lbs.). Lungs CTA, illegible, +bowel sounds noted.  He requested RTC 6 weeks.

The patient submitted a sick call request for a diet double portion duty status. The patient had a history of weight loss. On 2/25/15 The EMT saw the patient the same day noting that the patient stated no medical concerns other than history of crohn's disease and he would like to receive a regular diet, diet duty status and double portion. Patient states he is receiving a special diet duty status already. The EMT measured vital signs **but did not weigh the patient. T**he disposition was s/c sick call as needed. A HCP illegibly signed the note but did not document any note.  He was not charged an access fee.

On 3/20/15 the patient had a repeat chest CT showing a 5 mm RUL nodule. The provider requested a repeat chest CT to be performed in June 2015 prior to pulmonary follow-up.

On 3/24/15 pulmonology saw the patient for follow-up of his pulmonary nodules. He reported SOB with minimal activities. The provider ordered Spiriva and Symbicort and recommended follow-up CT in 3 months and oxygen via nasal cannula during exercise. His weight was 107 lbs.  A provider reviewed the consult and ordered the medications the same day, however I find no MAR that has the prescription.

The patient submitted a sick call request complaining of chest pain and SOB x 3 days. On 5/4/15 at 0900 an EMT saw him and sent him to the ATU.  At 1040 patient was seen emergently for chest pain and shortness of breath. His oxygen saturation as 92% on room air. The patient ambulates via wheelchair, speaks in broken sentences, neuro intact. His blood pressure was 144/101 mm Hg and pulse=88 and 140/90 mm Hg and 84/minute at 12:45. His vital signs were otherwise normal. At an undocumented date and time physician documented a note but did not note the patient's past medical history including noting an EKG that showed previous MI, or perform a review of systems. The only physical examination was that the patient had reproducible chest pain. No documentation of heart or breath sounds. There is no documentation that an EKG was performed. **Troponin level was apparently drawn but not documented.** The patient was sent back to the housing unit at 1250.  The next day a provider saw the patient and stopped his Megace. His weight was 116 lbs.

On 5/21/15 his B-12 level was low (163, normal=211-946). Not initialed by provider was dated.

On 6/23/15 pulmonary saw the patient for follow-up noting that he did not have the requested chest CT.  The patient's blood pressure was elevated (BP=160/90 mm Hg) respiratory rate 20 oxygen saturation 100%. The provider noted that he desaturated during 6MWT (six minute walking test) and would need home oxygen 1-2 liters per minute via nasal cannula during exercise. The pulmonologist ordered to continue Spiriva, Symbicort and prn albuterol and to return after the CT was done.

The patient submitted a sick call request complaining of a sore right forearm. On 6/26/15 an EMT saw him the patient. Vital signs were normal. The EMT documented the patient had a semi hard mass with redness, swelling and warm to touch. Patient stated it was getting worse. The EMT treated the patient

71

JX-CCH-000253

per protocol with Bactrim DS two tablets bid x 10 days.  Under HCP's signature is an illegible initial with no date. The patient was not charged an access fee.

**On 7/8/15 a provider saw the patient for a general medicine visit. All chronic diseases were noted. There was not meaningful evaluation of each chronic disease.** No ROS and no physical examination. The patient's blood pressure was 140/80 and weight 104 lbs.  The provider noted that the patient "claims to hold his bowels in for stooling" but did not examine his abdomen.  The provider noted that the patient claims ear is "infected" then noted that he had debris versus foreign body. **The provider did not conduct any physical examination, made no assessment and his only plan was to lavage his right ear and return to the clinic in 4 months.**

**On 7/17/15 1109 the patient was seen again for shortness of breath, fatigue and sluggishness. The patient complained of left-sided chest pain upon inspiration. A provider did not review the patient's PMH or perform a ROS. The patient's blood pressure 171/109 mm Hg.  The patient had increased JVD. He did not perform an EKG or troponin. CXR was negative. The physician did not make a diagnosis. He gave him an injection of Toradol. He did not order follow-up. He did not address the patient's severe hypertension.**

On 7/24/15 at 2148 EMS saw the patient who complained of losing his breath. His oxygen saturation was 94%. At 2202 and 2208. Vital signs otherwise normal. Dr L(avespere) was contacted and said that no transport was necessary.

On 7/28/15 he refused medical care stating that he did not want to ride in the van because it was too hard to breath in the van.

On 7/29/15 the provider saw the patient and noted that he failed a six minute walk test. The patient requested an oxygen concentrator which the provider approved.  RTC 6 weeks.

**On 8/4/15 pulmonology saw the patient noting that a 7/2/15 chest CT showed the nodules were unchanged. His weight was 97 lbs. Recommended follow-up CT in one year. The pulmonologist noted that the patient desaturated during a 6 minute walk but had not been provided oxygen via nasal cannula. This report was not initialed and dated as having been reviewed.  On 8/4/15 Dr. T reviewed the consult and ordered pulmonology and CT follow up but did not order oxygen for the patient.**

**On 8/28/1 Dr. L wrote that the patient able to have portable oxygen bottle for trips only x year.**

On 9/24/15 he had a colonoscopy that showed an ulcerated stenotic anastomosis and otherwise normal colon. GI recommended increasing Humira to 40 mg sq every week. The biopsy report was in the record.

In January 2016 he was receiving Humira 40 mg weekly and vitamin B-12.

On 11/12/15 a provider saw him for general medicine follow-up. The patient's blood pressure was 136/93 mm and vital signs otherwise normal.  His weight was 98 lbs. NO ROS. NO PE. He noted that he had 6 lbs. weight loss in 4 months but did not address. RTC in 4 months.

72

On 2/3/16 the provider saw the patient. Not in hepatitis C clinic. His blood pressure was 152/95 mm Hg, pulse=88 weight 108. Reviewed liver function tests. He planned to get hepatitis profile and see the patient when labs were back.

On 2/17/16 the provider saw him for follow-up that showed that he had chronic hepatitis C infection. LFT's were normal. There was no examination. He determined that the patient had confirmed chronic infection but was not cirrhotic. See patient in one year.

Medication Administration Records

February 2016 MARs show that he was supposed to be getting Humira weekly but only received it on 2/4, 2/15 and 2/23.  He was taking Azathioprine, Humira, and Imuran but they are no longer continued.

**Assessment:** This patient did not receive timely and appropriate treatment for his severe COPD. Specifically, pulmonary noted the patient failed his 6 minute walking test resulting in oxygen saturation and recommended continuous portable oxygen but this has not been provided to the patient. Medical providers do not perform adequate chronic disease evaluations by performing a review of systems and physical examination for each disease. Medical providers have not addressed the patients' poorly controlled hypertension.  In February 2016 the patient did not receive ordered medication for his Crohn's disease.

JX-CCH-000255

**Louisiana State Prison**
**Case Reviews**
**S. VASSALLO MD**


**Patient #29**

There are ten visits and sick calls in May 2014 with no physician physical exam and with primarily EMT providing care. Then patient was hospitalized.

**Patient** had hypertension, hepatitis C, left ventricular systolic dysfunction, atrial fibrillation, kidney failure, asthma, mild pulmonary hypertension, cardiac double bypass surgery and spinal fusion known since 2013.  He was on a low salt, low fat low cholesterol cardiac diet permanently as issued March 24, 2014 on orders of Dr. Toce.

On March 26, 2014 a chest xray showed the development of pneumonia compared to previous xrays.

On May 9 the patient complained of shortness of breath a verbal orders were given over the telephone by Dr. Macmurdo. On May 14th the patient was seen at 8:30pm and no physical exam was documented. On May 19th the patient was in the physicians clinic; there were no notes only verbal orders. The notes that are present are the telemedicine notes. On May 20 in the evening at 11:17pm the patient was taken to the ATU with shortness of breath and there was no physical exam and no notes.  On May 21st there was an emergency sick call. The notes indicate the patient had been seen in the ATU in the last few days and to continue management. On May 23 at 1:58am the patient was seen again in ATU and there were verbal orders by Dr. Macmurdo at 2:15am for urinary catheterization and a verbal order by Dr. Lavespere. No physical exam was documented and the patient left the ATU at 2:50am. In the May 28th physician clinic there was no physical exam performed. On May 29th at 2:54am the patient was taken to the ATU by wheelchair for the complaint of shortness of breath for weeks. There was no physician assessment, no physical exam and the note said no treatment indicted and to keep the upcoming appointment. The patient left the ATU at 3am. The patient was transferred to Nursing Unit 1. At 4:30am the patient was brought to the ATU for coughing green sputum and shortness of breath for weeks. The patient was taken to Interim LSU Hospital for new onset renal failure atrial fibrillation, ankle swelling and transient abdominal pain and inability to urinate, coughing with white frothy sputum. There is no physical exam, no note that conveys medical decision making, no chest xray or result and no antibiotics. The patient was given a verbal order by Dr. Lavespere for

metoprolol 200mg orally and was sent to the Nursing Unit 1 at 2:45 in the afternoon. On May 30th the patient was sent to the hospital.

Summary: The patient had serious complaints consistent with exacerbation of congestive heart failure, including shortness of breath, repeated visits for shortness of breath, no physician physical exam or treatment and transfer to the Nursing Unit 1 and not the hospital in spite of hypotension, respiratory distress and serious medical problems. The prison ATU and nursing unit does not have the capacity to manage the complications of acute exacerbation of congestive heart failure. Such a patient must be transferred to the hospital for care that includes management of congestive heart failure, history and physical examination diagnosis and treatment. To not provide this level of care in spite of multiple visits to health care carries a substantial risk of serious harm.  The ATU is not an emergency department and is not equipped to care of patients' acute exacerbation of serious medical problems.

**Patient # 30**

This is a 50 year old man who arrived at LSP on 9/28/1992; his medical history includes a seizure disorder after MVA in childhood, high blood pressure requiring multiple anti-hypertensive medications. While in prison, the patient experienced multiple seizures, but was not evaluated appropriately or treated for several months, even though he experienced physical injury as a result.  He was also presumptively diagnosed with a DVT, and started on blood thinners, when he did have the condition for which he was being treated.  He was on blood thinners for 12 days before the appropriate diagnostic test was obtained which revealed that he did not have a blood clot, but actually a hematoma, which would have likely been made worse with blood thinners.

11/05/98-11/07/98
The patient is documented as being in 4 point restraints in notes dated from 3 consecutive days after being involved in a fight.  It is unclear from notes why he was kept in 4 point restraints for 3 days.

On 9/07/05 there is an EMS call for possible seizure.  At the time of their arrival the patient is awake and following simple commands, however he makes no verbal response. On the grounds, that the patient is upright and following commands with normal vital signs, an MD *orders no transport* for patient to the ATU.  There is no interval follow up for this event.

On 11/05/05 there is an EMS report of patient being found on bed with "focal motor seizures" of arm and face. They report the patient is maintaining eye contact and

responding to painful stimuli. The patient was brought to ATU via ambulance awake but non-verbal, pupils were dilated but reactive. He was breathing spontaneously at a rate of 16. He was noted to have rhythmic like movements. He was given Naloxone 2 mg IV, an opioid reversal agent; there is a plan for lavage, activated charcoal and discharge when alert.  This patient does not have stigmata of opioid overdose with dilated pupils, and normal breathing, and his treatment with gastric lavage is not indicated and carries unnecessary risks.  No further evaluation of what may be seizure activity is pursued.

On 11/08/05 the patient makes a request to see a doctor for seizure medications. The provider notes that he had been seen for "rhythmic movements" but specifically states no seizure activity.

On 1/31/06 EMS was called for reports of abnormal behavior and fall. EMS document possible seizure, and after the patient is seen to fall in front of them, they immobilize him, with cervical spine precautions and transport him to ATU.  He was noted to be combative, and found to have a lip laceration.

On 2/2/06, the patient requests to see dental after he notes two loose teeth after having a seizure. He is referred to dental.  He sees the dentist on 2/3/06, who subsequently refers him back to medical clinic to be evaluated for these seizures. A doctor does not evaluate him until 2/22/06 at which point Dilantin started, and he is referred to neurology

On 5/17/2006 Pt. seen by SW for mental health after chin lac thought to be a self-inflicted wound.  He was silent during interview and noted to be staring at the ceiling.  This is consistent with a post ictal period.  Again seizure is mentioned as a possible cause however, because he was unable to provide history, he was place on a suicide watch unnecessarily.

On 6/27/06 he undergoes EEG that shows left temporal slowing waves in a pattern that may be related to focal seizure disorder. Approximately 9 months after the first episode of what was likely a seizure, was documented.

This patient was presenting with multiple episodes of seizure like activity without an evaluation. Seizures are a life threatening event and must be evaluated for the cause and must be treated. This represents a serious life threatening medical condition with no work up and no treatment for months.

On the dates of 10/07/06, 03/06/07, and 5/15/08 he had a CBC drawn, which showed leukopenia to 3.1/3.7/3.4 respectively, there is no cell differential.  There is no documentation of further workup being pursued.

6/25/09 he requests to see a doctor for leg pain and swelling. He does not indicate which leg in his complaint.  Per provider it was the R leg, he was documented as

JX-CCH-000258

having a normal exam, and prescribed "pain cream" though what this is, is unclear and ibuprofen.

On 9/11/09, he filed an injury report stating that a sergeant grabbed his penis the day before.  No injury was found on his genitalia. T4-6 was contacted, unclear if this is a supervisory body, unclear if any investigation of sergeant pursued at this time

On 9/18/09 Pt. made sick call request for difficulty with weight bearing, L calf pain soreness and swelling. Denies any trauma to leg. It is reported that it started spontaneously earlier that morning. He was admitted to the infirmary ward, and started on heparin that morning.

5 days later on, 9/23/09, a tibia XR shows no fracture. Multiple notes document very slow improvement in symptoms on lovenox and warfarin, with only slight reduction in calf circumference.

After 12 days with little improvement, he is sent to an outside hospital Emergency Room on 9/30 after being treated with lovenox and warfarin for presumptive DVT. At the ER he underwent duplex that showed no DVT but did show a calf hematoma. Discharge instructions from ED are to stop warfarin.

 This patient has been treated for an incorrect diagnosis with anticoagulation for 12 days now. Deep vein thrombosis is a potentially life threatening condition because the leg blood clot travel to the lungs causing a pulmonary embolism a serious and potentially life threatening condition.

7/13 creatinine 1.09

On 10/14/09 he is seen by an orthopedist and an MRI ordered

On 11/6/09 the patient undergoes MRI that shows a subacute plantaris tendon rupture with subsequent hematoma.  He is placed on no duty, and no sports x 2 weeks, flex cuffs to ankle 30 days,

On 8/24/11 he requested sick call for lack of balance and difficulty walking. He was documented as ambulating with mild distress but also that he felt better. He is also documented as seeing double, but no visual fields, visual acuity or extraocular movements are documented. These complaints are consistent with stroke. Because the ATU and the prison cannot do a stroke work up the patient should have been transferred to the hospital for a work up of his neurological complaints, including CT scanning of the brain, MRI evaluation, Doppler ultrasound of the arteries of the neck and echocardiogram.

 He was discharged, and then seen in neuro clinic 4 months later. There is No mention made of this episode.

On 6/12/14 he is seen in neuro for seizure disorder. The note reports good seizure control.  Notes there are no side effects from Dilantin. The plan is for him to

continue Dilantin 100 mg BID.  No mention of Dilantin level (prior clinic note indicates level 2.4 which is subtherapeutic)

On 8/8/14 there is a complete metabolic panel with creatinine 2.79, with BUN of 50 and K 6.9 doctor notified bun by report. The anion gap is 21, no repeat test available no documentation regarding kidney failure until April of the next year.

On 10/13/14 he submits request for sick call, and states he had seizure on July 28 (no documentation of this) and has had persistent L shoulder pain and left finger numbness.  Provider notes that he has normal exam without bruising deformity, or evidence of infection redness. He denies sob, or chest pain at that time. His finger numbness is not addressed.

12/23/14 Losartan re-ordered.  However, there is no mention of his creatinine with patients elevated BUN creatinine this would be stopped in the community as ACE I and ARBs are contraindicated in acute renal failure, and no determination of cause has been made as of yet.

On 3/31/15 the patient was seen in clinic for hypertension, and seizure disorder. 160/108 He was ordered for labs including Dilantin level; CMP to rule out renal failure after a creatinine from 10 months previously had noted a BUN creatinine of 50/2.79.  This is not an appropriate time frame for follow up of kidney injury

On 4/22/15 he is seen for hypertension, seizure, d/o, and renal failure (this is crossed out in pen) his BP is 158/109

Dilantin is increased for his seizure disorder with a low level, though they do not review his compliance via the chart or with the patient. creatinine documented as 1.02. Cozaar extended and Norvasc is increased.

On 6/2/15 the patient demanded to be placed on suicide watch. Pt. was upset in restraints in the shower.  The sergeant told social worker that the patient was upset with an officer for unclear reasons.  The social worker documents that the patient was being manipulative, and later suicide watch was stopped and the patient thought to be using for secondary gain.

On 8/12/2015 he was seen in clinic for follow up of hypertension, renal failure and seizure disorder. His BP was146/99

The patient was noted to have weight loss; mild increase in his hypertension, seizure d/o was deferred to neurology.  No documentation regarding the weight loss including relevant questions regarding night sweats, masses, cough, hemoptysis, exposure to IV needles.  Pt. was prescribed double portions for 5 months, and return to clinic in 3 month, but no additional evaluation of the weight loss cause. His hypertension was managed by extending triamterene hctz.

On 10/16/15 the inmate was evaluated for genital injury.  He reported that a corrections officer grabbed his penis and almost jerked it into (illegible) no evidence of injury, Major Jenkins was notified, and pt. referred to MH the next day.  He was

placed on suicide watch for this incident although it was later discontinued and he was noted to have no intent of self harm.

On 11/5/15 he is in clinic to follow up hypertension and seizure disorder Patient reported left finger numbness digits 2-5. His exam documents full range of motion, but it is unclear what was examined.  No sensory exam done.  finger numbness not addressed further

On 1/22/16 162/100 he is transferred via ambulance for 1 inch head lac, run sheet indicates tachycardia. From the run sheet I note that the patient states he fell and hit his head, he had bruising around his eye. The associated incident report documents injuries sustained during a fight, there is no clarification of the nature of injury and documents a refusal to have lac sutured with staples or sutures.

On 1/25/16 there is a report for xray of skull 4 views for headache after trauma, presumably from the same incident that involved the laceration.   This is not the standard of care for evaluation for skull fracture.  Not every patient needs imaging. However if imaging were indicated, it would be a CT scan. The patient with head trauma and headache needs a CT scan. There is no value in a skull xray. Again, the ATU is not the equivalent of a community emergency department and does not have the resources including doctors with proper training and the technology to make diagnoses such as intracranial hemorrhage.

Patient #31

This is a 59 year old man who arrived at LSP on 4/28/93.  His medical history is significant for hepatitis C with cirrhosis.  He developed ascites and esophageal varices while in custody.  This chart covers a period from early 2013 until his death on 8/23/2014 from decompensated end stage liver disease complicated by a GI bleed, and hepatic encephalopathy.  In February 2014 the patient complained for 10 days about worsening swelling and was not given appropriate treatment until one week later, and he was not transferred to a hospital until 10 days had passed while his condition worsened.  The week prior to his death he made multiple complaints concerning for a decompensation of his disease.  He was not transferred to an appropriate facility and did not receive necessary care.  When he was admitted to the medical ward, he had evidence of infection, but was not given antibiotics. Furthermore although there are multiple notes indicating he is encephalopathic, and unable to tolerate lactulose, he is reported as choosing palliative care only, and signs a DNR.  Since he was noted to be encephalopathic, it is not clear that he had capacity

to make this decision.  There is no mention of attempts to reach family members to assist in decision making, or allow for visitation.

On 2/1/14 he complains of swollen testicles, which make walking difficult.  He is given 3 days of bed rest and no other treatments at this point.

On 2/4/14 the patient requests a medical evaluation for bilateral lower extremity swelling and again complains of scrotal swelling. He is noted to have red swollen ankles and a tender abdomen.  He is placed on no duty status, with bedrest up for meals, pill call and showers only. He also has left lower extremity ultrasound study, which shows no deep vein thrombosis. A chest x-ray ordered for pneumonia that day is also reported as normal.  He was given 1L bolus of normal saline, labs were sent and he was given 1 dose of ceftriaxone. He was discharged with Augmentin to treat lower extremity cellulitis. This patient has evidence of hypervolemia and a known history that predisposes him to hypervolemia.

On 2/8/14 the patient again requested to see the doctor and be placed on "the ward" for severe worsening leg swelling which he reports he has had for 2 weeks and again complains of scrotal swelling. He was prescribed Furosemide, spironolactone for his swelling and now clindamycin for possible cellulitis.  He was discharged after receiving stat dose of Lasix and urinating 350 mL.

On 2/10/14 he complains of abdominal pain radiating to his chest.  He has a normal chest xray. His EKG shows slight ST depressions in V2, V3; he is transferred to the hospital at LSU for further evaluation where he is admitted.   CBC shows hemoglobin of 13.4

The Dates of admission to LSU are 2/10/14-2/18/14.  While admitted he was found to have large volume ascites, esophageal varices which were banded during an EGD. The patient had complaints of hypervolemia for 10 days and there was a failure to transfer to an appropriate facility.  During those 10 days his condition worsened and he was given treatment in the form of IV fluids that likely worsened his condition. After his hospitalization he was discharged on spironolactone, and furosemide, and told not to continue propranolol per GI recommendations.

Upon return he has a labs drawn on 2/19/14 with an albumin of 1.89; his liver synthetic function is deteriorating.

On 2/20/14 he is discharged to camp, and given no duty, and no sports for two weeks. He however does not receive his diuretics for the next week.  Both Spironolactone and furosemide are listed as KOP (keep on person) it is unclear if he received these medications, or was given proper instructions regarding them.  As a result of his hypervolemia he is admitted to the "ward" on 2/26/14 for IV diuresis.

JX-CCH-000262

An abdominal x-ray is ordered with the indication being ascites Providers failed to order the appropriate diagnostic test, paracentesis.  He is kept on the ward until his second banding procedure on 3/5/16.

On 3/7/2014 the patient is placed on no duty, no sports for 3 weeks. He is also started on a permanent low salt diet.

On 3/28/14 the patient reports he is having difficulty getting around his prison dorm.  Provider notes possible transfer to medical dorm.  The provider notes that the decision will be made later.  The provider fails to fully investigate his complaint, which could indicate infection or decompensation of his liver disease.

On 6/6/14 he is seen in clinic for follow up his heart rate is 51, and his blood pressure is 87/27.  He is currently on metoprolol for his varices. He is noted to have hypervolemia, hyponatremia and is on fluid restriction to 1.5 L daily. A protein supplement and MVI are added to his medications today. His blood pressure and heart rate are not addressed. He is discharged.   He should have been transferred to the hospital

On 8/18/14 the patient reports abdominal pain, and distention.  He is noted to be distended and jaundiced.  He is given simethicone, milk of magnesia and told to follow up in 1 week for varices, and GERD.  There is failure to transfer to an appropriate facility for decompensated liver failure.  Appropriate evaluation would include labs, and abdominal ultrasound and evaluation for spontaneous bacterial peritonitis.

On 8/19/14, the patient was seen for vomiting by medical screening.  His blood pressure is documented at 100/palp. He complains of a sharp abdominal pain, and states the vomiting began after he used a fleet enema presumably for constipation. He told the evaluator he walked to the screening area, but was noted to be in a wheel chair, there is no further documentation as to his mental status or possible confusion given conflicting history elements.   He was discharged and told to increase his water intake (although he is on a fluid restriction for hypervolemia hyponatremia) and keep his appointments, he is given 3 days of bedrest, and prescribed simethicone, and lactulose. This is an incomplete evaluation given his history exam.  Failure to transport, failure to obtain appropriate tests, failure to appropriately manage decompensating liver failure given he has now been evaluated twice in 2 days for the same complaint.

On 8/21/2014 the patient  was seen in the ATU emergency call he is complaining of abdominal pain that is worse with sitting or laying flat. The provider notes tenderness in in both lower quadrants.  He is noted by the initial provider to appear in poor health with jugular venous distension, lower extremity edema and rhonchi in his right lung.  He was admitted to the ATU and had labs drawn.  Had an ammonia level drawn that was 62 (within normal limits) his sodium was 130, his white count was 10.4 with 90% neutrophils and previous labs show a leukopenia to 4.1,

A chest xray was shows haziness in the left lower lobe that may represent an early pneumonia.

At this point the patient should have been transferred to the hospital for care, evaluation for infection and treatment. These are not available in the ATU Do not resuscitate does not mean do not treat reversible medical problems.

The patient was started on a fentanyl patch for pain, lactulose for constipation, and normal saline intravenously at 100 cc/hr, but also spironolactone, and Lasix, and metoprolol.  He was not started on antibiotics in spite the chest x-ray report, nor was he evaluated for spontaneous bacterial peritonitis. There is no documentation of intent to transfer to higher level of care.

On 8/22/14 a conversation is documented indicating the patient was not in favor of "last minute heroics" but was not ready to sign DNR paperwork. It is unclear if his mental status was fully elucidated.  It is possible that he was encephalopathic at this time, and may not have full capacity to make a decision regarding resuscitation. His mental status is not addressed.

 On 8/23 his systolic blood pressure was <80 and his oxygen saturation was 86% with diminished mental status he was given naloxone and fluid. He was noted to have no urine/fecal output. Subsequently a plan was made to switch to palliative care and he was made DNR.  He subsequently developed coffee ground emesis, and is found pulseless later that day. There is no documentation of discussion with his next of kin who is listed as his brother.

On 8/23/14 death reports indicating cause of death was hepatic failure c/b hepatic encephalopathy, and GI bleed


**Patient #32**

**Patient** presented to the ATU for the complaint of chest pain, a serious complaint with a differential diagnosis of Patient given GI cocktail for shortness of breath and chest pain on June 9th and June 12, 2013. Presented on June 21 and had cardiac arrest.

The patient died of a cardiac arrest. Had he been transferred to the hospital for a proper work up of his chest pain, including serial troponins, stress test, cardiac catheterization, echocardiogram, he likely would have been diagnosed with cardiac disease. The patient suffered death due to the lack of adequate medical care.

PMH:

Insulin dependent DM, HTN

Admitted to Earl K. Long hospital on Jan 23, 2007 with new onset CHF, DM HTN

Labs:

Hemoglobin A1C 8.7 June 15, 2010

JX-CCH-000264

Hemoglobin A1C on December 28, 2011 is 8.6
Creatinine is 1.6 on July 22, 2011
Hemoglobin A1C on Feb 2, 2012 is 8.2 and 10 on 1-3-2013


January 24, 2013
Seen in physician's clinic. Insulin adjusted

Seen in ATU June 9, 2013, 12:36pm
 States chest pain to center states it feels like pressure for one day. Complaint of
shortness of breath. Speaks in full sentences.
 EKG same as July 10, 2012 (one year before) *GI Cocktail*. Arrived at 12:39pm and
left at 13:17pm (1:17pm) Physician signature not legible.

The patient should have been transferred to the hospital for evaluation of chest pain.
The ATU is not able to evaluate chest pain with the necessary tests, including stress
testing, serial troponin cardiac enzyme testing, serial ekg, echocardiogram and the
degree of expertise of the physicians is not adequate.  Most importantly, managing
the acute complications such as respiratory or cardiac failure is not possible in the
ATU. The ATU is not an emergency department and does not have the technology,
expertise or in house specialty care of an emergency department.


Seen on June 12, 2013, 5:50am
Complaining of chest pain and shortness of breath. Pain is sub sternal and non-
radiating. Seen by medic.  "Protocol EKG – done. *GI Cocktail*
No physical exam, no plan, no midlevel, brought by medic at 5:52am and left the
ATU at 6:30am. No treatment.  Medic only.

June 14, 2013
To ATU. Chief complaint is coughing up blood. Seen by MD and started on Levoquin.
PEx and impression noted.

June 15, 2013
Follow up for diagnosis of cold, on Levoquin

June 18, 2015
Consultation to cardiology for substernal chest pain. Not yet obtained.

June 21, 2013 seen at 1450

JX-CCH-000265

Complaint of difficulty breathing. Had witnessed cardiac arrest.
Walked into the ATU on June 21, 2013 stating he could not breath. Became apneic and full Advanced cardiac life support and had temporary return of spontaneous circulation, was transferred to Lane Memorial Hospital and died.

## Patient #33

This patient's medical record reflects multiple visits with only medic level care, no physician exams and verbal orders without an examination. The patient had a number of serious medical problems including heart failure, respiratory failure, kidney failure, accelerated hypertension, anemia and high blood lipids. In spite of these serious medical problems the notes reflect lack of physician care, lack of diagnostics, lack of transfer to the hospital for serious medical conditions.

Physician's clinic May 6, 2016 only physical exam 875 pages of chart (p. 269/875f)
4/5/2016 no physician notes for physician clinic verbal orders but no exam or signature

4/17/2016 return to Angola from Lane Regional Medical Center where a problem list included: decompensated heart failure, acute respiratory failure with hypoxemia, acute renal failure superimposed on stage 4 chronic kidney disease, hyperkalemia, elevated troponin, diabetes accelerated hypertension CHF, Anemia hyperlipidemia. Otherwise only the consultation form lists the patient's medical problems.
Notes on chart:
12/19/15 telephone order and verbal order. Care by EMTs no medical providers. Bloody stool (395/875)
12/19/15 to ATU and verbal order given by Dr. Helms to take patient to NU 1 after EMT took care of patient
2/7/2016 to hospital with respiratory distress (p. 373/ 875)

2/14/16 ambulance record:  all medic notes, no physician notes (p. 382/ 875)
Turned over to MSGT L. Devlouse in ATU No physician assessment.  (385/ 875) physician note on same date but no exam and no vitals performed.
2/18/16 physician clinic can't read signature
2/23/16 Doubt this zebra can change its stripes
Physicians clinic 3/16/16 blood pressure "terrible' no physician signature
Physicians clinic 3/23/16 unsure if physician signature, can't read signatures
4/5/2016 brought to ATU and no notes other than medic.

JX-CCH-000266

**Patient # 34**

6-20 emergency 2010. Right side flank guarding and tenderness found on physical exam by  (unable to read) three days after football injury

6-20 – 12 Verbal order by Dr. Toce on telephone:  x-ray for possible fracture

6-21-12 Examined in ATU, physician signature unreadable

6-24-12 Ambulance to Camp D Eagle 3" 10:43 am: Offender can't get out of bed. EMT – P documented  history and exam.  Called Dr. Lavespere and ordered "NO TRANSPORT' and advised patient to get meds at pill call and keep upcoming appointment. Signed EMT P.

6-27-12 9:55am emergency medical: Unresponsive capillary glucose 10. Temperature 91 F.

Emergency Medical report date is 6-27-2012, 0917:  "offender can't get out of bed" 09:58 Unresponsive / disoriented, lethargic cool and clammy. Foley catheter placed for drug testing.

KUB xray done.

17:05Pm disoriented, found with altered mental status

Transfer note by Dr. Toce for Earl K Long Hospital: NO LAB AT ANGOLA TO CHECK ELECTROLYTES OR CBC.

Transferred to Earl K Long time 1946.

Medical Summary of Deceased Offender

Age 57. DOB 12-1 – 1954

Date of death: June 28 – 2012 in EKL Hospital

Acute Illness less than 24 hours

Medical summary patient presented with acute dehydration, glucose 10, and altered mental status. Then patient developed delirium, silent abdomen and was sent to ELK.

Signed Paul Toce M.D.

Autopsy: Hypothermia due to hypoglycemia due to complications of cirrhosis due to Hepatitis C with contribution of sepsis.

Circumstances of death: In bed for 6 days reportedly having a rib fracture. Extensively congested lungs and bilateral hydrothoraces and ascites. There are subacute rib fractures of ribs 4-6 on the right lateral chest. Negative toxicology

SUMMARY:

Reliance on EMT for physical and diagnosis on the scene.

No physician H and P.

Dr. Toce writes unable to get after hours labs.

JX-CCH-000267

Urine drug testing is of no benefit, is costly to the facility, does not provide a diagnosis even if positive, and delays the evaluation of the patient.
This patient spent 12 hours unnecessarily in the ATU and should have been sent to the hospital upon initial evaluation and certainly before 6 days in bed.
The use of Foley catheters to obtain urine drug tests is

The patient lay in bed for 6 days with two broken ribs, became septic, hypoglycemic and died. He should have been sent to the hospital on 6-24.
No differential diagnosis. Incomplete evaluation. The use of drug screens is completely useless.


**Patient #35**

This is a 33-year-old man who arrived at AU on 1/6/2003.  His known medical problems are a heart murmur, and acid reflux.  He complains of substernal chest pain, he is treated with multiple GI medications with minimal relief, his heart rate is low and his ekg has concerning t wave changes on it but he is not transported for further cardiologic evaluation. His autopsy shows that he has an enlarged heart with LVH indicating that further investigation of his heart is warranted.  He is seen for back pain from working in the kitchen, and then a smoke inhalation after a fire there. He ultimately dies from electrocution while carrying water near electric warmers. Resuscitative efforts were taken immediately, and were appropriate.  The safety of kitchen equipment and procedures need further evaluation, as it is not common for kitchen workers to electrocute themselves simply from transporting water, a common occurrence in most kitchens.
On 7/19/03 the patient requests medical evaluation and complains of substernal chest pain and notes a history of a heart murmur.  He is given a GI cocktail with minimal relief.  He has 2 rhythm strips with deeply biphasic t waves concerning for ischemia. No comment is made.  The ambulance run sheet documents bradycardia to eh low 50s as low as 48, but this is not remarked on. No further cardiac workup was pursued. The patient was not transferred.
On 6/21/08 the patient is evaluated after possible smoke inhalation after a fair in the kitchen.  Patient declined evaluation by MD.
On 9/23/08 the patient is seen for back pain after lifting heavy crates in the kitchen. He is without neurologic symptoms and is treated with Toradol.
On 7/8/11 he was in the kitchen holding a bucket of water.  He was standing between two electric food warmers and there is speculation that a plug came into contact with the water.  By reports he stumbled 20 feet before collapsing on the floor. He sustained a head injury from the fall. He was reported to have "profuse

JX-CCH-000268

bleeding" and then subsequently developed erratic breathing, followed by apnea. Upon EMS arrival EMTs report that CPR was in progress.  Initial rhythm was v-fib and they attempted defibrillation, converting the rhythm to asystole.  He was transported to ATU where code was continued.  He is intubated, 5 minutes later pupils fixed and dilated.  He is given, epi x 2, bicarb x  2, atropine x 2. Final rhythm is asystole at the time he was pronounced
 Rhythm strip with ventricular tachycardia deteriorating into v fib.  Skull XR shows no fracture, cervical spine XR shows no fracture, ETT present in trachea
Autopsy shows: congestive splenomegaly, cerebral edema, cholelithiasis, cardiomegaly with LVH, pulmonary congestion and edema. Cause of death is "probable electrocution." Manner is accidental


**<u>Patient #36</u>**

**Patient 36** was 69 years old with a history of uncontrolled hypertension and chest pain for which he was prescribed nitroglycerin spray and  Naproxen.  He presented on April 26, 2010 to the ATU with a self declared emergency. He had a blood pressure of 178 over 116, pulse of 68 and respiratory rate of 18. No temperature was taken. "He complained of being weak and dizzy with chest pain. Without sweating and without shortness of breath at this time." His physical exam was unremarkable even though the patient had increasing chest pain for 2 hours.  He was charged $6.00 for this emergency. The MD notes consisted only of "ATU". He was treated for hypertension with clonidine, ibuprofen and ntiroglycerin sublingually.  Further chart review shows that the patient had complained of angina every 3 days relieved by rest. There was no physical exam and no history recorded on the physician note. He was discharged at 16:17. No EKG was obtained and no work up for chest pain was initiated.  The next notes in the chart of Patient 36 are concerning a different patient Richard Mahogany that does not belong in Patient 36 chart.

On May 5 at 11:25 the patient was brought from his living quarters with the complaint of shortness of breath all morning. He had a fever of 100.4 and oxygen saturation of 87% on room air. Chest x-ray ordered with pertinent clinical information of shortness of breath demonstrated bilateral pulmonary infiltrates involving the lingual and the right middle lobe. He was given a dose of antibiotics. There is no history or physical exam documented by the physician. He was to see the doctor in 2 weeks. He was found to have pneumonia in both lungs and was started on antibiotics. He returned to the ATU on May 8, May 10 and May 14 and May 15.   On May 8 the patient was brought from his living quarters CBD at 8:54 am to the ATU. He temperature was 100.8, his respiratory

rate was 26 the pulse was 26 and the oxygen saturation was 90% on 4 liters nasal cannula. The patient was known to have the diagnosis of bilateral pneumonia since "last Tuesday but had not received any medication and was now out of breath. The patient was noted to have decreased breath sounds  He was seen by a medic and started on azithromycin and Levoquin.  The chest x-ray was noted to be reported slightly worse. The patient was admitted to Nursing Unit 1.  Although there is a physician signature, there is no physician history or physical exam. On May 10, his white blood cell count was 18, 500, (normal limits are from 4,500 to 10, 500). These results were reported to the LPN named Pat, as noted on the lab result in the chart.  On May 12, an x-ray of the abdomen was ordered and the result was signed off on May 25.  On May 15 an AP (anterior posterior) chest x-ray for ordered for shortness of breath and chest pain and an abdominal x-ray were performed.  It was noted that since the previous study of May 12 there had developed a little less feces through the colon and no significant small bowel gas. This report was signed off on May 25 (after the death of the patient) and the signature was illegible. On May 15 at 6:40am an ambulance responded to Nursing unit 1 and found the patient with a blood pressure of 172/52, Pulse of 102, respiratory rate of 22 and oxygen saturation of 89%. The patient was agitated and restless and short of breath, pulling to breath and had full accessory muscle use noted. The patient has abdomen pain and was rocking back and forth from pain yelling "he's gonna die" repeatedly. The patient was given nebulized treatments in the ATU and was given morphine for "moaning that his entire chest is hurting and he can't breath." He had placement of a urinary catheter. He received 6 separate administrations of morphine. Versed was administered intravenously. There is no evidence that a physician examined the patient or was present. The patient was then returned to the Unit 1.  On May 16 at 21:35 the patient was brought from Nursing unit 1 to the ATU with CPR in progress.  On May 16 he had a cardiac arrest at 22:06 and the  FNP Aubin pronounced death in the ATU.  A patient found to have bilateral pneumonia with continued visits to the ATU should be sent to the hospital.  Had this patient been treated properly he most likely would have survived.

## Patient 38

**Patient 38** was a 59 year old with a history of hypertension diabetes, seizures and stroke. The stroke affected his left side. His medications included amlodpine, insulin, protonix, aspirin, enalapril and furosemide, simvastatin and Dilantin starting in October of 2009.  In March 2008, he was noted to have an elevated creatinine of 1.7, a sign of kidney disease and was positive for hepatitis C.

There is a rhythm strip performed in the ATU 2/5/2011. It is not timed and the signature is illegible.  It shows a wide-complex bradycardia with a rate of about 30-40.  On 2/5/11 at 9:10 the patient was transported by ambulance from the ATU to EKL Emergency Department. It was noted that the patient was living in Nursing unit 2. The patient was hypotensive, paced, intubated and responsive to painful stimuli and moving his legs spontaneously. The patient was on a dopamine drip.  The ATU note  noted a blood pressure of 80/40 and a pulse of 40. The medical record noted the inmate" fell last night" and "this am had mental status changes." The pupils were pinpoint and sluggish and the patient moaned to sternal rub. Although it was in the death summary written by Dr. MacMurdo that the patient had been been "groggy but talkative" at 1am, there was no medical record entry documenting this and no record of the instruction to the EMT staff to "observe the patient very carefully" as is written in the death summary.  The assessment and plan was fall with mental status" changes and send to EKL for CT hear and Dr. Crist accepted. The mortality review noted the patient fell onto the floor while sitting on the bed.  This occurred on 2/5/11 at 1am. He was groggy but talkative. The patient had a history of prior stroke.  Because of his altered mental status (groggy) and history of stroke, the patient needed an immediate physician evaluation.  Instead, Dr. Macmurdo told the EMT staff to observe the patient very carefully.  This instruction is related in the death review but there was no evidence of such a phone call or recommendation in the medical records. The patient deteriorated in the ATU and died 12 hours later at the hospital.  There are no medical records from EKL hospital  in the patient's medical records. Given the history of strokes and the lack of definitive care for strokes in the ATU, the patient should have been sent to the hospital immediately.


**Patient 41**

The patient was recumbent on the bed. The patient was holding the asthma inhaler in the hand. On August 23rd at 10:30am  the patient was transported by ambulance to the ATU for coughing up yellow phlegm, and was found to have respiratory wheezes, oxygen saturation of 100% and was diagnosed with a COPD exacerbation and discharged. The entire episode was managed by the nurse practitioner with no input from the physician. The patient left the ATU at 12:15pm.  He returned at 15:24pm The patient was taken to the ATU via ambulance for shortness of breath his pulse was 108, the blood pressure was 102/ 54at 15:38 and by 16:41 the blood pressure was UTO or unable to obtain with a pulse of 89. Respirations of 6. The notes indicated the patient t had already been seen in the ATU at 12:45pm and had been released. The patient returned for more shortness of breath. The patient is documented  by the medic to become progressively more combative and short of

breath. The patient was diaphoretic on arrival. It is documented that the MD called back at 16:46pm, indicated in the patient had been treated by medics only since 15:38pm. 3:24pm on the same day, via ambulance complaining of increased shortness of breath and intermittent chest pain. The EKG readings demonstrated ventricular tachycardia. The patient was pronounced dead in the ATU at 5:35pm.  In summary, this patient presented to the ATU at 10:30 am on the date of death, and again at 3:24pm. The patient had a history of endotracheal intubation the previous year and multiple medical problems. Nevertheless he was discharged within 2 hours back to his dorm. By 14:55 the ambulance was called again to his dormitory. The patient was turnover to an EMT Dodge with full report and the patient died  in the ATU. . The mortality review of this patient noted he presented to the ATU on August 23, 2010, complaining of shortness of breath and a productive cough with thick yellow sputum. The mortality review did not describe the circumstances of the inadequate care. This patient should have been transported to the hospital by advanced life support ambulance at least at 15:38 when the patient was combative and having ventricular tachycardia and respiratory difficulty.


**Patient #42**

59 year old male date of birth 9-21-56.
History of Celiac disease on dapsone  and herpetiformis

ATU
On July 26 2015 the patient was an ambulance activation "nature of call" "unresponsive but breathing". (Page 452 of 718 medical records).

59 year old with hx of CVA 8/15 left with right hemiparesis d's from nursing unit II
1-24-16 presented with new onset grand mal seizure by description on 1-25-16.
Evaluated at OLOL CT head. Given Valium IVP at ATU  resolved the focal seizures


1/26/16 pt awake Pt seen by Ms. Parks states definitely new signs of recurrent CVA with paresis in right upper extremity, transfer to NU 2
1:26 -16 1 gram of po dilantin
1-26-16 0650 Admit to NU 1 for 23 hours due to seizure. Pt unable to state name answers yesterday to person place and time.
1-27-16 0800 Patient still confused
1-28-16 patient back in is own bed benign made by orderly

JX-CCH-000272

1-29-16 Pt with seizure type activity Pt now with right side facial droop right side weaker and right leg weak.

**Patient #43**

*no prolonged walking ¼ mile without rest July 14, 2015 Dr.MacMurdo*
*3-26 -2015 an endotracheal tube has been placed*
*Filing mistake: These were the records of a different patient Johnson, Leonard included in Anthony Day file*
*CTA with and without IV contrast done on March 26, 2015 shows worsening hydrocephalus , worsening cerebral edema, no brain herniation,*
*CT brain  date is April 7, 2015 intracranial hemorrhage is present,*
*CXR march 27, 2015 cxr*

April 18,
Lump the size of a golf ball November 5, 2013
November 6, 2014 note increasing in size now painful
MRI on March 27, 2015 showed soleus mass right calf mass on exam June 29 2015
Patient returned to treatment center on April 8, 2016
Note written on April 8th 2016 at LSU surgery notes patient with increasing size of right calf mass for 2 years
Jan 27, 2016 mass looks well encapsulate on  MRI
Date of encounter is Feb 2, 2016: Imaging and history reviewed with ortho oncology fellow concern is myxofibrosarcoma
Staging ST on Feb 19, 2016 of chest without contrast
Calf mass biopsy on March 16, 2016

Note Patient will require excision of right calf mass on May 3, 2016

**Patient #44**
Observed ATU emergeny response to hanging and reviewed chart

**ATTACHMENT B**
Site Visit Photographs, March 15-18, 2016

I. Examination Areas:



















JX-CCH-000276

3












II. Housing Units:







JX-CCH-000279







III. Pill Rooms:















JX-CCH-000283

10

IV. Lab:





JX-CCH-000284






JX-CCH-000285

12



# Mark J. Mazz, AIA



# Louisiana State Penitentiary

## Americans with Disabilities Act Review

September 29, 2016

---

Architecture        Consulting        Barrier-Free Design
4016 Jefferson Street, Hyattsville, MD 20781        301-440-4276        301-263-6868 Fax        mark.j.mazz@verizon.net

JX-CCH-000286

I was engaged by The Promise of Justice Initiative to assess the compliance of the Louisiana State Penitentiary with the Uniform Federal Accessibility Standards (UFAS) and the 1991 and 2010 ADA Standards for Accessible Design (1991 ADA Standards and 2010 ADA Standards). My qualifications are in my CV. My CV and fee schedule are in Attachment 1. I conducted my site survey July 6, 2016.

I developed my opinion using the following:
1. My visit to the site July 6, 2016
2. Photos that I took July 6, 2016 (Attachment 3)
3. Uniform Federal Accessibility Standards (UFAS)
4. 1991 ADA Standards for Accessible Design (1991 ADA Standards)
5. 2010 ADA Standards for Accessible Design (2010 ADA Standards)
6. My 30-plus years' experience as an architect and consultant specializing in accessible design
7. Americans with Disabilities Act Title II Regulations: Nondiscrimination of the Basis of Disability in State and Local Government Services, by DOJ, September 15, 2010 (https://www.ada.gov/regs2010/titleII_2010/titleII_2010_regulations.htm) (ADA Title II regulations.)

I reviewed, but did not use in developing my opinion:
1. Lewis et al. v. Cain et al., M.D. La. Case no. 15-318 Complaint
2. Letter from U.S. Department of Justice, Civil Rights Division to Louisiana Department of Public Safety and Corrections dated January 12, 2016 (DOJ Letter)


**Methodology for Applying the Accessibility Standards:**

I have 30-plus years' experience as an architect and as an architectural accessibility consultant. My work includes reviews of correctional facilities in about 10 states, as well as other Section 504 and ADA Title II barriers assessment and transition plans. Also, I was employed for three years as an architect in the Disabilities Rights Section of DOJ's Civil Rights Division. In this practice, I have assessed facilities' compliance with the standards for providing "program access" (that is, access to services, programs, and activities). In my experience, in order to comply with the program access requirements of Section 504 and the ADA, a public entity must provide access to services, programs, and activities (program access) in spaces that comply with applicable standards.

I developed my opinion about whether the Louisiana State Penitentiary is accessible to inmates with disabilities by using the accessibility standards referenced by the US Department of Justice (DOJ).

In my experience, the DOJ Section 504 regulations require new construction, additions, or alterations constructed after March 7, 1988 to comply with the Uniform Federal Accessibility Standards (UFAS).

**28 C.F.R. § 42.522 New construction.**

(a) *Design and construction.* Each new facility constructed by, on behalf of, or for the use of a recipient shall be designed and constructed in such a manner that the facility is readily accessible to and usable by

2

handicapped persons, if the construction was commenced after the effective date of this subpart. Any alterations to existing facilities shall, to the maximum extent feasible, be made in an accessible manner.

(b) *Conformance with Uniform Federal Accessibility Standards.* (1) Effective as of March 7, 1988, design, construction, or alteration of buildings in conformance with sections 3–8 of the Uniform Federal Accessibility Standards (UFAS) (appendix A to 41 CFR subpart 101–19.6) shall be deemed to comply with the requirements of this section with respect to those buildings. Departures from particular technical and scoping requirements of UFAS by the use of other methods are permitted where substantially equivalent or greater access to and usability of the building is provided.

The Americans with Disabilities Act (ADA) Title II regulations require new construction, additions, or alterations constructed on or after January 26, 1992 and before March 15, 2012 to comply with either UFAS, the 1991 ADA Standards, or the 2010 ADA Standards.  Where a space or element is not expressly addressed in the 1991 ADA Standards, the space or element must comply with the 2010 ADA Standards.  New construction, additions, or alterations constructed on or after March 15, 2012 must comply with the 2010 ADA Standards.

28 C.F.R. § 35.151 New construction and alterations
(a) *Design and construction.*
(1) Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992.
(2) *Exception for structural impracticability.*
(i) Full compliance with the requirements of this section is not required where a public entity can demonstrate that it is structurally impracticable to meet the requirements.  Full compliance will be considered structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features.
(ii) If full compliance with this section would be structurally impracticable, compliance with this section is required to the extent that it is not structurally impracticable. In that case, any portion of the facility that can be made accessible shall be made accessible to the extent that it is not structurally impracticable.
(iii) If providing accessibility in conformance with this section to individuals with certain disabilities (e.g., those who use wheelchairs) would be structurally impracticable, accessibility shall nonetheless be ensured to persons with other types of disabilities, (e.g., those who use crutches or who have sight, hearing, or mental impairments) in accordance with this section.
(b) *Alterations.*
(1) Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.
. . .
(c) *Accessibility standards and compliance date.*
(1) If physical construction or alterations commence after July 26, 1992, but prior to the September 15, 2010, then new construction and alterations subject to this section must comply with either the UFAS or the 1991 Standards except that the elevator exemption contained at section 4.1.3(5) and section 4.1.6(1)(k) of the 1991 Standards shall not apply. Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.
(2) If physical construction or alterations commence on or after September 15, 2010, and before March 15, 2012, then new construction and alterations subject to this section may comply with one of the following: the 2010 Standards, UFAS, or the 1991 Standards except that the elevator exemption contained at section 4.1.3(5) and section 4.1.6(1)(k) of the 1991 Standards shall not apply. Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.

3

Architecture      Consulting      Barrier-Free Design
4016 Jefferson Street, Hyattsville, MD 20781    301-440-4276    301-263-6868 Fax    mark.j.mazz@verizon.net
JX-CCH-000288

(3) If physical construction or alterations commence on or after March 15, 2012, then new construction and alterations subject to this section shall comply with the 2010 Standards.
(4) For the purposes of this section, ceremonial groundbreaking or razing of structures prior to site preparation do not commence physical construction or alterations.
(5) *Noncomplying new construction and alterations.*
(i) Newly constructed or altered facilities or elements covered by §§ 35.151(a) or (b) that were constructed or altered before March 15, 2012, and that do not comply with the 1991 Standards or with UFAS shall before March 15, 2012, be made accessible in accordance with either the 1991 Standards, UFAS, or the 2010 Standards.
(ii) Newly constructed or altered facilities or elements covered by §§ 35.151(a) or (b) that are constructed or altered on or after March 15, 2012, and that do not comply with the 1991 Standards or with UFAS shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards.

Since September 15, 2010, the ADA Title II regulations require accessible cells to comply with the 2010 ADA Standards.

28 C.F.R. §35.151(k) *Detention and correctional facilities.*
(1) New construction of jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells in a facility. Cells with mobility features shall be provided in each classification level.
(2) *Alterations to detention and correctional facilities.* Alterations to jails, prisons, and other detention and correctional facilities shall comply with the 2010 Standards except that public entities shall provide accessible mobility features complying with section 807.2 of the 2010 Standards for a minimum of 3%, but no fewer than one, of the total number of cells being altered until at least 3%, but no fewer than one, of the total number of cells in a facility shall provide mobility features complying with section 807.2. Altered cells with mobility features shall be provided in each classification level. However, when alterations are made to specific cells, detention and correctional facility operators may satisfy their obligation to provide the required number of cells with mobility features by providing the required mobility features in substitute cells (cells other than those where alterations are originally planned), provided that each substitute cell—
(i) Is located within the same prison site;
(ii) Is integrated with other cells to the maximum extent feasible;
(iii) Has, at a minimum, equal physical access as the altered cells to areas used by inmates or detainees for visitation, dining, recreation, educational programs, medical services, work programs, religious services, and participation in other programs that the facility offers to inmates or detainees; and,
(iv) If it is technically infeasible to locate a substitute cell within the same prison site, a substitute cell must be provided at another prison site within the corrections system.
(3) With respect to medical and long-term care facilities in jails, prisons, and other detention and correctional facilities, public entities shall apply the 2010 Standards technical and scoping requirements for those facilities irrespective of whether those facilities are licensed.

§ 35.152 Jails, detention and correctional facilities, and community correctional facilities.
(a) *General.* This section applies to public entities that are responsible for the operation or management of adult and juvenile justice jails, detention and correctional facilities, and community correctional facilities, either directly or through contractual, licensing, or other arrangements with public or private entities, in whole or in part, including private correctional facilities.
(b) *Discrimination prohibited.*
(1) Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.
(2) Public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity–

4

Architecture          Consulting          Barrier-Free Design
4016 Jefferson Street, Hyattsville, MD 20781       301-440-4276       301-263-6868 Fax       mark.j.mazz@verizon.net

JX-CCH-000289

(i) Shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available;

(ii) Shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment;

(iii) Shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and

(iv) Shall not deprive inmates or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

(3) Public entities shall implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing.

Also, portions of facilities that have not been altered since March 7, 1988 must comply with Section 504 §42.521.

28 C.F.R. § 42.521 Existing facilities.

(a) *Accessibility.* A recipient shall operate each program or activity to which this subpart applies so that when each part is viewed in its entirety it is readily accessible to and usable by handicapped persons. This section does not require a recipient to make each of its existing facilities or every part of a facility accessible to and usable by handicapped persons.

(b) *Compliance procedures.* A recipient may comply with the requirement of paragraph (a) of this section through acquisition or redesign of equipment, reassignment of services to accessible buildings, assignment of aids to beneficiaries, delivery of services at alternate accessible sites, alteration of existing facilities, or any other method that results in making its program or activity accessible to handicapped persons. A recipient is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with paragraph (a) of this section. In choosing among methods for meeting the requirement of paragraph (a) of this section, a recipient shall give priority to those methods that serve handicapped persons in the most integrated setting appropriate.

Portions of facilities that have not been altered since January 26, 1992 must comply with ADA §35.150(a) and §35.152.

28 C.F.R. § 35.150 Existing facilities

(a) *General.* A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

(2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with §35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

b) *Methods.*

5

(1) *General.* A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

These sections require a public entity to operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.  Services, programs, and activities (i.e. program access) include housing in different levels of confinement, such as minimum security, medium security, and maximum security.  It also includes access to recreational facilities, classrooms, libraries, computers, work programs, visitation areas, mailrooms, commissaries, and other areas.  Facilities designated for accessible services, programs, and activities must comply with alterations provisions of UFAS, the 1991 ADA Standards, or the 2010 ADA Standards (35.150(b)).  (ADA Title II regulations, page 202)

In choosing among methods, the public entity shall give priority consideration to those that will be consistent with provision of services in the most integrated setting appropriate to the needs of individuals with disabilities. Structural changes in existing facilities are required only when there is no other feasible way to make the public entity's program accessible. (It should be noted that "structural changes" include all physical changes to a facility; the term does not refer only to changes to structural features, such as removal of or alteration to a loadbearing structural member.) The requirements of §35.151 for alterations apply to structural changes undertaken to comply with this section. The public entity may comply with the program accessibility requirement by delivering services at alternate accessible sites or making home visits as appropriate.

Where inmates use facilities independently, program access requires that inmates with disabilities, to the extent feasible, also be permitted to use these facilities independently.  Therefore, physical barriers that block independent access must be removed.  Here are some examples.  There must be sufficient clear floor space around the toilet to facilitate an independent transfer.  The shower must be on an accessible route, have sufficient clear floor space, have accessible controls and grab bars, and provide the same level of privacy.  And, recreational equipment must be on an accessible route.

UFAS Section 4.1.4(9)(b) requires 5% of the residential units and all common use areas be made accessible.  The ADA requires each detention and correctional facility to provide accessible mobility features in at least 3% of its cells (§ 35.151(k)(1)).  The accessible cells must be distributed among the types of cells.

Accessible housing cells must be in the most integrated setting that is appropriate to the needs of the inmate.  Section 35.152(b)(2) uses the following criteria:

"(i) Shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available;
(ii) Shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment;

6

(iii) Shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and
(iv) Shall not deprive inmates or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed."

## Deviations from the Standards:

In my experience, Section 504 and the ADA permit deviating from the Standards when compliance with the Standards is structurally impracticable or technically infeasible.   The ADA defines structurally impracticable is applied rarely when unique characteristics of terrain prevent the incorporation of accessible features:

> 28 C.F.R. § 35.151 New construction and alterations
> (2) *Exception for structural impracticability.*
> (i) Full compliance with the requirements of this section is not required where a public entity can demonstrate that it is structurally impracticable to meet the requirements.  Full compliance will be considered structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features.

The Louisiana State Penitentiary is on a very large, flat piece of land.  Some buildings are raised about 3 ½ feet above the ground.  The terrain does not prevent the incorporation of accessible features.  Therefore, none of my findings are structurally impracticable to modify to make accessible.

The ADA Standards define technically infeasible as:

> **Technically Infeasible.** With respect to an *alteration* of a *building* or a *facility*, something that has little likelihood of being accomplished because existing structural conditions would require removing or *altering* a load-bearing member that is an essential part of the *structural frame*; or because other existing physical or *site* constraints prohibit modification or *addition* of *elements*, *spaces*, or features that are in full and strict compliance with the minimum requirements.

If something is technically infeasible, the ADA Standards still requires accessibility to the maximum extent feasible:

> **202.3 Alterations.** Where existing *elements* or *spaces* are *altered*, each *altered element* or *space* shall comply with the applicable requirements of Chapter 2.
> **EXCEPTIONS: 1.** Unless required by 202.4, where *elements* or *spaces* are *altered* and the *circulation path* to the *altered element* or *space* is not *altered*, an *accessible* route shall not be required.
> **2.** In *alterations*, where compliance with applicable requirements is *technically infeasible*, the *alteration* shall comply with the requirements to the maximum extent feasible.

For example, if a designated accessible housing cell cannot be widened to accommodate 60"-diameter turning space, the window controls and the toilet facilities must still be modified to comply.

7

None of my findings require removing or altering load-bearing member that is an essential part of the structural frame. Therefore, none of my findings are technically infeasible to modify to make accessible.


**Standards used During Survey:**

I was not told which parts of Louisiana State Penitentiary were constructed or altered since March 7, 1988. However, most of the toilet rooms and showers and the flooring in cafeteria/visiting area that I surveyed appear to have been altered since January 26, 1992, that is, within the last 24 years. However, I could not determine if any areas were modified since March 15, 2010.

Except to the number of accessible cells that are required, UFAS has substantially the same requirements as 1991 ADA Standards. In that I cannot determine if the alterations were made between March 7, 1988 and January 26, 1992, I chose to use the ADA Standards for my survey. In that I could not determine if any alterations were made since March 15, 2010, I used the alterations provisions in the 1991 ADA Standards.[1]

In that my survey was limited to select dormitories and housing cells, I could not determine if accessible housing cells were integrated for the prison as a whole; among the units I did survey, accessible housing cells were not integrated.


**DOJ Letter:**

DOJ conducted a more extensive survey May 9 - 14, 2010. I was not aware of this survey at the time of my site visit, and did not receive any information about it until August 2016, when I received a document (dated January 2016) identifying deficiencies the DOJ had previously identified. I have reviewed this letter, but its contents did not inform my independent evaluation as described in the rest of this report. From the DOJ Letter, it appears that DOJ surveyed and determined to be covered new construction or alterations or to be areas required by program access:
1. Camp C
2. Camp D
3. Camp J
4. Prison Museum
5. Administrative Office at Reception Center
6. Death Row
7. Visitor Center at the Main Gate
8. R.E. Barrow, Jr. Treatment Center (Hospital)
9. T-Unit Isolation
10. Main Prison area, which includes chapel, visiting, courtroom, hearing room, educational, dining, gym, and hobby shop facilities and several dormitories including Ash 2 and Cypress 2.

---

[1] If I receive information about the dates of construction of the areas of the prison I surveyed that in any way changes my opinion, I will discuss any such potential issues in a rebuttal report.

Their analysis follows the same methodology for determining whether spaces provide program access. The DOJ Letter includes a 20-page chart of barriers that DOJ wants remediated.

In my opinion, the DOJ's findings did not conflict with my findings.


**Extent of My Survey:**

I did not survey the entire Louisiana State Penitentiary. My survey was limited to a few areas that I understand to be used for program access:

1. Dormitories Ash 2 and Cypress 2, including accessible route to public check-in desk, associated recreation yards, van transit parking, Law Library, and visiting area
2. The following spaces used by inmates of Ash 2 and Cypress 2 Dormitories:
    a. Contact visiting space and public side of the non-contact visiting space
    b. Inmate restroom near Law Library
3. Bldg. E, F Camp Dormitory 1
4. Treatment Unit Building
    a. Protection Tier shower
    b. Extended Lockdown (Mental Health) Tier shower and Cell #13
    c. Time Out Cell B
5. R.E. Barrow Treatment Center
    a. Nursing Unit 1
    b. Nursing Unit 2 including Cell #7

Based on my experience and expertise, all these spaces are required for program access. Using the 1991 ADA Standards, I measured the areas listed above including the route to these areas and all ancillary spaces and features that inmates use such as toilet rooms and drinking fountains. Where possible, I took several photos of each barrier to show the context of the barrier and the actual measurement. Barriers to program access that I found are listed in the chart in Attachment 2.

The chart has five columns. "Citation for Remediation" provides the 2010 ADA Standards citation for the alteration requirements, since remediation will occur after the effective date of March 15, 2012. "Citation for Non-Compliance" provides the 1991 ADA Standards citation for the alterations requirements by which program access of the space is determined.
"Description/Issue/Requirement" states the requirement. "Barriers" identifies how it does not comply. And, "Photos" references the photos that show the location and non-complying measurement. The photos are in Attachment 3.


**Findings:**

A complete listing of my findings are in Attachment 2. Briefly, I found that:
1. The accessible route between dormitories and other facilities have many wide gaps that are not covered that can cause the caster wheels on wheelchairs to snag and spill an inmate onto the floor.

9

| Architecture | Consulting | Barrier-Free Design |
4016 Jefferson Street, Hyattsville, MD 20781    301-440-4276    301-263-6868 Fax    mark.j.mazz@verizon.net

JX-CCH-000294

2.  The accessible route between dormitories and other facilities have several abrupt changes in level which can trip inmates who have trouble lifting their feet and can snag a caster wheel on a wheelchair.

3.  Drinking fountains are not paired.  Consequently, either the drinking fountain is too high for an inmate in a wheelchair or too low for an inmate who is unable to bend over.

4.  The undersides of objects, such as counters, are too high and project too far from the wall for inmates with vision impairments to detect with their canes.

5.  Sign-in desks and counters are out of reach for a person in a wheelchair.

6.  The paved accessible routes to the recreation yards stop well before the recreation areas, preventing inmates in wheelchairs from independently using the facilities.

7.  Many visitors in wheelchairs lack the use of a toilet room in that the toilets, lavatories, mirrors, and dispensers are inaccessible.

8.  In the visiting area, many inmates in wheelchairs lack an accessible toilet room in that the door is too narrow, the space around the door is too constricted to open the door, and the lavatory and toilet have no accessible features.

9.  Many ramps lack edge protection such that inmates in wheelchairs or using crutches may stumble at the sides of ramps.

10.  Many ramps lack accessible handrails making it more difficult for an inmate with balance or stamina issues to use the ramps without falling.

11.  Some ramps are too steep for many inmates in wheelchairs to use independently.

12.  In some locations, mail slots are out of reach for many inmates in wheelchairs.

13.  TTY's were not available in the dormitories of inmates with hearing impairments to use. Additionally, shelves were not provided for the TTY's.

14.  In several locations, stools at the J-Pay stations blocked access for an inmate using a wheelchair.

15.  In several medical dormitory bathrooms and nursing unit bathrooms:
    a.  Ramps at the entrance were too steep for many inmates in wheelchairs to use.
    b.  Urinals were too high to use from a wheelchair.
    c.  Mirrors are too high for inmates in wheelchairs.
    d.  Lavatories are unusable for many inmates in wheelchairs because they lack any accessible features; lack adequate knee and toe underneath; or lack pipe insulation to protect against abrasive edges.
    e.  Toilets are unusable for many inmates in wheelchairs and many inmates who have difficulties with balance or standing from a seated position because grab bars are missing, too short, or otherwise noncompliant; the toilets were too low or too close to the wall; or the space around the toilet is too constricted.
    f.  Showers are unusable for many inmates in wheelchairs and many inmates who have difficulties with balance or standing from a seated position because seats are in the wrong place; grab bars are missing, too short, or otherwise noncompliant; controls are inaccessible; or the space adjacent to the shower is too small.
    g.  Bathtubs are unusable for many inmates in wheelchairs because they lack any accessible features including seats, noncompliant grab bars, or controls not within reach.

16.  The Protection Tier shower is unusable for many inmates in wheelchairs because the controls are out of reach, grab bars are too short and missing on one wall, and there is no handheld shower spray or showerhead low enough to use in a seated position.

10

Architecture          Consulting          Barrier-Free Design
4016 Jefferson Street, Hyattsville, MD 20781      301-440-4276      301-263-6868 Fax      mark.j.mazz@verizon.net

JX-CCH-000295

17. The Extended Lockdown shower is unusable for inmates in wheelchairs because it lacks any accessible features.
18. The Extended Lockdown cell is unusable for many inmates in wheelchairs because the door is too narrow, the mirror is too high, the toilet and lavatory lack any accessible features, and the window control is out of reach.
19. The Protection Tier cells appear to be identical to the Extended Lockdown cells. Therefore, the Protection Tier cell is also unusable for many inmates in wheelchairs for the same reasons.
20. Time Out Cell B has no accessible features. Therefore, it is unusable for many inmates in wheelchairs.
21. The entry doors to Nursing Units 1 and 2 are not accessible because they are too narrow through one leaf for many inmates in wheelchairs to use independently.
22. The doors from Nursing Units 1 and 2 to the yard lack sufficient maneuvering space beside the latchside of the doors for many inmates in wheelchairs to use independently.

**Conclusion:**

Based on my experience and my understanding of the requirements, it is my opinion that the Louisiana State Penitentiary is not accessible to inmates with disabilities (as well as visitors with disabilities). The facilities do not comply with Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504). I reserve the right to amend my report should additional information become available.



Architecture          Consulting          Barrier-Free Design
4016 Jefferson Street, Hyattsville, MD 20781     301-440-4276     301-263-6868 Fax     mark.j.mazz@verizon.net

JX-CCH-000296

# Mark J. Mazz, AIA
## Curricula Vitae

## Contact Information:

Mark J. Mazz, AIA
Mark J. Mazz, AIA, LLC
4016 Jefferson St.
Hyattsville, MD 20781
301-440-4276
Mark.j.mazz@verizon.net
www.markjmazz.com

## Background:

More than 30 years ago, Mr. Mazz started his accessibility career with the University of Maryland's Section 504 Transition Plan. Since then, he has been responsible for the accessibility projects in his private practice and in the offices of Edwin F. Ball, AIA, and Celentano Esposito & Associates. Also, Mr. Mazz has collaborated with other nationally known "accessibility firms" including Ron Mace and Barrier Free Environments. His clients include owners, architects, engineers, developers, construction managers, organizations for persons with disabilities, and governmental agencies. His major clients have included the Architect of the Capitol, other Federal agencies, and Howard County Public School System. In his eight years with the Federal Government, Mr. Mazz was an architect in DOJ's Housing and Civil Enforcement and Disability Rights Sections and the senior advisor on accessibility issues in HUD's Office of Fair Housing and Equal Opportunity.

More than 70% of his career has focused on accessibility. For the past 15 years, Mr. Mazz has focused exclusively on the Americans with Disabilities Act (ADA), the Fair Housing Amendments Act (FHA), Section 504 of the Rehabilitation Act (Section 504), the Architectural Barriers Act (ABA), and accessible design issues. Prior to federal employment, he belonged to several disability organizations and donated services through the Spinal Cord Injury Network of Metropolitan Washington and Independence Now, Inc. He continues to donate services through the Maryland Disability Law Center. Additionally, Mr. Mazz is a board member of CALMRA, a community based residential service provider for adults with cognitive disabilities.

## Education:

University of Maryland,    Bachelor of Arch. 1980
College Park              BS, Urban Studies 1980

## Presentations:

**Accessibility Codes and Standards:**
Half Moon Seminars, November 2015: "2010 ADA Standards and Maryland Accessibility Code" (guest presenter)
AIA National Convention:

JX-CCH-000297

"Our Design Culture Needs to Change for Our Projects to Meet the FHA and ADA," June 2014
"ADA Tolerances and Acceptable Measurements," a panel discussion, June 2014
"The ADA and Fair Housing Compliance: Why Does It Go Wrong on Our Projects?" June 2013
"Accessibility Enforcement through the Courts: Four Case Studies", May 2009.
"Let's End the Confusion: The Four Federal Accessibility Laws", May 2008.
"Accessibility Affects Our Life Cycle," May 2007.
Innovations and Collaborations in Housing Affordability Conference, Phoenix, AZ:
"The Four Federal Accessibility Laws Explained", October 2008.
Architectural Exchange East, Richmond, VA:
"The ADA and Fair Housing Compliance: Why Does It Go Wrong on Our Projects?" June 2014
"Old ADAAG, New ADAAG: What's Still Required by the ADA", November 2006
"Four Accessibility Laws: Which Ones Apply to My Project," 2005
Local AIA Chapters:
AIAPV, March 2015, "ADA and FHA: Why Does It Go Wrong on Our Projects?"
Design DC, February 2005, 2014
Western Maryland Architects Group, "ADA Questions and Issues; How to Handle Them"
January 1999
PVAIA, NVAIA, and WAIA Chapters: "The Fair Housing Amendments Act – Accessibility
Guidelines," presented at the' "Surviving the Code Revisions," November 1998
Maryland Society of the AIA annual meeting: "Status and Ramifications of the ADA and the
FHAA" presented at the, October 1997
Chesapeake Bay Chapter: on the ADA and FHAA, summer 1997 Guest
DC Department of Housing and Community Development, 2012, 2014
Building Officials Association of Florida, 2005
Conference on Disability Access, Honolulu, HI, 1999, 2003, and 2006
Panelist - Above the First Floor: A Maryland Downtown Development Association
Lecturer at the State of Maryland's ADA Coordinators Bimonthly Meeting on the ADA, Spring 1997
"Planning and Designing for the Disabled," Presented at the U.S. Baltic Foundation seminar: "Municipal
Government in a Democratic Free Market Society" in Vilnius, Lithuania, June 1991

**ADA:**
Harvard University Graduate School of Design Executive Education:
"ADA, ABA, and 504 Access to Public, Private, and Federal Non-Residential Facilities and
Programs," August 2016
NFMT:
"The ADA: Red Flags that Trigger Complaints," 2014
"The ADA Changed March 15, 2012: What It Requires Now," 2013
ASCE Texas:
"The ADA and Fair Housing Act: What Civil Engineers Must Know," November 2012
Architectural Exchange East:
"Revisions to the ADA: Some aren't in the Building Code," November 2011.
"Old ADAAG, New ADAAG: What's Still Required by the ADA," November 2006
National Association of ADA Coordinators:
"ADA: The Next Generation," December 2010. Presented the Judicial and Detention Facilities
and the Residential Facilities portions
Academy of Architecture for Justice:
"The ADA: How It Applies to Judicial and Correctional Facilities," November 2010
"The ADA: How It Applies to Detention Facilities", AIA Beyond the Horizon: The Next
Generation of Justice Conference, October 2009.
City of Detroit, Curb Ramps, 2006
Leadership Exchange in Arts and Disability (LEAD), Kennedy Center:
"Historic Buildings and Compliance," 2006

Tucson City Government, AZ,
    ADA Training, 2005
University of Maryland School of Architecture:
    "Universal Design Seminars," December 1994
Panelist - for the Potomac Valley AIA's ADA "Round Table" Discussion in 1992

**Fair Housing:**
ASCE Texas:
    "The ADA and Fair Housing Act: What Civil Engineers Must Know," November 2012
Design for All Conference, Honolulu, HI:
    "Fair Housing Act Accessibility Guidelines" and "Fair Housing Act Legal Updates," Oct. 2008
National Association of Home Builders:
    Fair Housing Accessibility Guidelines, 2003
NAPAS, Fair Housing Accessibility Guidelines, 2003
AIA National Conventions, May 1998, 2000, and 2002
    "The Fair Housing Amendments Act – Accessibility Guidelines – It's Not the ADA"
Harvard University Graduate School of Design (Professional Development Course) Executive
Education:
    "Fair Housing, ADA, ABA, and 504 Access to Housing and Dorms," August 2016
    "Advance Training in the Fair Housing Amendments Act," August 1998 and 1999

**Section 504:**
"How to Survey," Training for HUD's investigative staff, August 2007
HUD Baltimore, September 2006.
Miami Dade Housing Authority, 2004
Puerto Rico Housing Authority, 2003
City of Frederick, Accessibility Training, April 2004
HUD Telecast, November 2003

**Emergency and Temporary Housing:**
AHPP Conference, "Accessibility Issues in Direct Housing," February 2008.
HHS - DHS Conference on Emergency Management and Individuals with Disabilities and the Elderly,
"Accessible Emergency Transportable Housing," June 2006
Tampa, FL, "Accessibility and Emergency Transportable Housing," April 2006
Emmitsburg FEMA Training, "The Housing Hour," 2006.


# Publications:

Wrote "Design Details for Accessible Disaster Relief Housing" in 2011for HUD, published 2013
Wrote significant portions of three pages in the first edition of the American Institute of Architects'
"*Interior Graphic Standards*," 2003 and wrote significant portions of 15 pages in the second edition, 2010
Wrote significant portions of five pages in the first edition of the American Institute of Architects'
*"Landscape Architectural Graphic Standards,"* 2006
 "Summary of all Title II and III U.S. Department of Justice Technical Assistance Letters, July 26, 1990 -
December 3, 1995" published by ETA, August 1996 (ADA)
"The ADA Facilities Compliance Workbook, 1996 Supplement," by ETA, published by John Wiley &
Sons, Inc., April 1996
Significantly revised nine pages in the ninth edition of the American Institute of Architects'
"*Architectural Graphic Standards*" and helped create a separate chapter on accessibility for the 10th
edition.  Most pages were reproduced in the eleventh edition.
"Project for Housing Assistance for the Disabled" (SCINMW), self-published July 1984

JX-CCH-000299

"Access Home - A Guide for the Mobility Impaired Consumer" (SCINMW), self-published July 1984

## Awards:

Prince George's County Commission on Persons with Disabilities, Award 1992
Governor's Committee on Employment of Persons with Disabilities, Award of Merit: Howard County Public School System Barrier-Free Plan, 1991
National Association of Counties Achievement Award: "Project for Housing Assistance for the Disabled," 1984
Governor's Committee on Employment of Persons with Disabilities, Highest Design Award: Barrier-Free Homes, 1984 and 1983

## Professional Affiliations:

Registered Architect:    Maryland #6339-A, 1983
National Council of Architectural Registration Board: Certificate #40,527
American Institute of Architects Potomac Valley Chapter (AIAPV), Director beginning 2014
American Institute of Architects (AIA)

## Professional Associations:

Manufactured Housing Consensus Committee member, currently chair of the General Subcommittee, 2010 - present
International Code Council (ICC), 2008 – present.
American Correctional Association (ACA), 2009 - present
Maryland-National Capital Building Industry Association, 1998 – 2004, 2009 - 2010
National Association of Home Builders (NAHB), 1998 – 2004, 2009 - 2010
U.S. Architectural and Transportation Barriers Compliance Board, Advisory Committee on Emergency Transportable Housing, representing HUD 2007 – 2008
Building Officials and Codes Administrators (BOCA), 1998 – 2000
Member of Smart Code Advisory Board, 1999 – 2000
Chair of Maryland Society of Architects' Codes Committee, Chair, 1997 – 2000
Member of the Board of Directors of the Maryland Society of Architects (MSAIA) representing the Potomac Valley Chapter (PVAIA), 1997 – 2000
Chair of the Maryland Building Performance Standard (MBPS) Advisory Committee, 1998 – 1999.

Previously a member the Spinal Cord Injury Network of Metropolitan Washington (SCINMW), the Governor's Accessibility Task Force to the Maryland Stadium Authority, the Maryland Quality Based Selection Council, Prince George's County Committee to Revise Accessibility Building Code, the Maryland Alliance of Advocates with the Handicapped, and an Advisor to Montgomery County Commission for Disabled Individuals

## Community Associations:

Member of the St. Jerome's Parish Finance Council, Hyattsville, MD, 2011 to present
CALMRA (Serving Citizens with Cognitive Disabilities), Board Member, 2010 - present

JX-CCH-000300

Previously, a volunteer for Community Design Services, Inc. of Washington, D.C. and the Neighborhood Design Center of Prince George's County, MD and a member of the St. Jerome's Parish Council, vice-chair of the St. Jerome's School Board, chair of the Leland Memorial Hospital Closure Task Force, chair of Riverdale's Committee on Real Estate Planning and Development and Riverdale's representative for the Planning Area 68 Master Plan revisions and the College Park/Riverdale TDOZ planning process

## Expert at Trial or Deposition: (Past ten years)

David T. Burdette, et al. v. Marriott International, Inc., et al. (No: 03-C-15-9063 Circuit Court for Baltimore County) (for the plaintiff), August 2016

Cynthia Peter, et al v. North Bethesda United Methodist Church (No.: 375158-V Circuit Court for Montgomery County) (for the plaintiff), November 2013

Anna M. Otto v. Gary Warburton, D.D.S., M.D., et al. (No.: 24-C-11-006067 Circuit Court for Baltimore City) (for the plaintiff), July 2012

Stisher, et al. v. The George Washington University, et al. (Civil No. 2010 CA 007396 M Superior Court for the District of Columbia) (for the plaintiff), December 2011

United States of America v. Hialeah Housing Authority, No. 08-22679 U.S. District Court for the S.D. of Florida), (Fair Housing, for the plaintiff) November 2009

Rivera v. Village of Farmingdale, No. 06-2613 (U.S. Dist. Ct. for the E.D. of N.Y.)  (Construction Cost Estimating, for the plaintiff), October 2009

Tracy Miller v. Georgia Department of Corrections and Tony Goodman v. Georgia Department of Corrections (No. 6:99-CV-012 US District Court Southern District for Georgia, Statesboro Div.)  (Section 504 and ADA, for the plaintiffs), March 2009 and September 2010

Beverly Jones-Whitley and Isabel Mercer v. First Washington Realty (ADA, for the plaintiff), May 2008

HUD, on behalf of Montana Fair Housing, Inc v. Brent Nelson, No.:  HUDALJ 05-068-FH, May 2007 (Fair Housing, for the plaintiff)

 Mark J. Mazz, AIA, LLC

October 29, 2014

**Fee Schedule**

| | |
|---|---|
| Consulting: | $290/hour |
| Court and Deposition Time: | $362/hour |
| Reimbursables: | Actual costs |
| Mileage (out of the Washington, D.C. Metro Area): | $0.57/mile |

Architecture          Consulting          Barrier-Free Design
4016 Jefferson Street, Hyattsville, MD 20781     301-440-4276     mark.j.mazz@verizon.net     www.markjmazz.com

JX-CCH-000302



## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | * means the remediation Standard differs from the 1991 ADA Standards | | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 1 | | | **General:** | | |
| 2 | 206.1, 302.3 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.5.4 | Openings along the accessible route cannot exceed 1/2" in the direction of travel. | Along the accessible routes, gaps between sections of concrete have gaps about 3/4" to 1" wide. | 5558, 5563, 5564, 5566, 5591, 5592, 5595, 5597, 5598, 5725 |
| 3 | 206.1, 303.3 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.5.2 | Changes in level that are more than 1/4" must be beveled. | The expansion joint covers fit loosely in the joints. The edges do not fit snuggly to the surface and often create a vertical change in level that is taller than 1/4". | 5610, 5611 |
| 4 | 232, 206.2.4, | 4.1.6,(1), 4.1.3(1), | An accessible route must connect to all accessible spaces and element. | The accessible routes to the outdoor recreational facilities are blocked by unpaved yards. These facilities include: weightlifting equipment, basketball courts, ballfields, volleyball nets, soccer fields | 5574 - 5576, 5589, 5599 - 5601, 5603 |
| 5 | | | **Law Library:** | | |
| 6 | §35.149, 211, 602.7 | 4.1.6,(1), §35.149, 4.1.3(10), 4.15.2 | Where drinking fountains are provided on a floor, there must be at least two. One spout must be no higher than 36" above the floor and the other must be at a standard height. The drinking fountain is located in a detention facility in an area where one does not have access to other drinking fountains on this floor. In that occupants cannot access other parts of the floor, both heights must be available in this area. | There is only one spout. It is mounted about 34" above the floor. | 5774 |
| 7 | | | **Inmate Restroom Law Library:** | | |
| 8 | 213.2, 604.5.1 | 4.1.6,(1), 4.1.3(11), 4.16.4 | The sidewall grab bar at the toilet must be at least 42" long, must be within 12" of the rear wall, and must extend at least 54" from the rear wall. | It is 13 1/2" from the rear wall. | 5791, 5802 |
| 9 | | | **Route to Van** | | |
| 10 | 206.1, 303.4 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.3.8 | Changes in level of more than 1/2" must be ramped at no more than 8.33% or otherwise made accessible. | At the gate to the van space, there is a change in level of about 1" that is not sloped 8.33%. | 5817, 5818 |
| 11 | | | **Re-Entry Club Sandwich Shack:** | | |
| 12 | 204.1, 307.2 | 4.1.6,(1), 4.1.3(2), 4.4.1 | Objects may not protrude into the circulation path by more than 4" if the underside is more than 27" but less than 80" above the floor. | The undersides of the service counters are 34 1/4" above the floor and projects 10" into the circulation path. | 5767, 6768 |

| | | | **Louisiana State Penitentiary - Accessibility Report** | | |
|---|---|---|---|---|---|
| Line # | **Citation for Remediation** (2010 ADA Stds) | **Citation for Non-Compliance** (applicable 1991 or 2010 ADA Stds) | **Description/Issue/Requirement** | **Barriers** | **Photos** |
| | | * means the remediation Standard differs from the 1991 ADA Standards | | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 13 | | | **Ramp connecting the covered walkway near Ash Dormitory to the accessible route to the Clinic:** | | |
| 14 | 206.1, 405.9 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.8.7 | Ramp and landings must have edge protection, which can be a curb, wall, vertical pickets, or a 12" extended platform. | There is no edge protection. | 5558 |
| 15 | 206.1, 405.8 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.8.5 | Ramps, which slope between 5% and 8.33%, that have a vertical rise of more than 6" between landings must have handrails on both sides.  The tops of the handrails must be 34" to 38" above the ramp.  The gripping surface may not be interrupted by supports. | The are 42" tall guards, which protect against falls.  However, there are no handrails. | 5558, 5561, 5562 |
| 16 | | | **Pill Call Window near Ash Dormitory:** | | |
| 17 | §35.149, 211, 602.7 | 4.1.6,(1), §35.149, 4.1.3(10), 4.15.2 | Where drinking fountains are provided on a floor, there must be at least two.  One spout must be no higher than 36" above the floor and the other must be at a standard height.  The drinking fountain is located in a detention facility in an area where one does not have access to other drinking fountains on this floor.  In that occupants cannot access other parts of the floor, both heights must be available in this area. | There is only one spout.  It is mounted about 43" above the floor. | 5569 |
| 18 | 227.3, 904.4* | 4.1.6,(1), 7.2(2), | A 36"-wide portion of the service counter must be no higher than 36". | The entire counter is 38 3/4" above the floor. | 5572, 5573 |
| 19 | | | **Ramp connecting the covered walkway near Ash Dormitory to the recreation yard near the basketball court:** | | |
| 20 | 206.1, 405.8, 505.6 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.8.5 | The tops and sides of ramp handrails cannot be obstructed. | The rail is supported by posts that are as wide as the handrail, that is the posts partially obstruct the sides of the rails. | 5580, 5584 |
| 21 | 206.1, 405.8, 505.10 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.8.5 | Ramp must have handrails that are continuous or must extend at least 12" over the landings in the same direction as the ramp.  The extensions must be level.  Therefore, any bend at the end of the handrail is not part of the 12" level extension. | At the bottom of the ramp, the extension is not level and is about 8" long.  At the top on the field side, the extension is not level. | 5585 - 5587, 5889 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | * means the remediation Standard differs from the 1991 ADA Standards | | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 22 | | | **Accessible route connecting the covered walkway between the Ash and Magnolia Dormitories to the recreation yard near the ballfields:** | | |
| 23 | 206.1, 403.5 | 4.1.6,(1), 4.1.2(1) & (2), | Accessible route must be at least 36" wide when longer than 24". | Between the covered walkway and the ramp, the accessible route is only 34 1/2" wide. | 5593 - 5596 |
| 24 | 206.1, 303.3 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.5.2 | Changes in level that are more than 1/4" must be beveled 1:2. | At the top of the ramp, there is a change in level of about 1/2" that is beveled about 1:1. | 5600, 5602 |
| 25 | 206.1, 405.2 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.8.2 | Ramp slope cannot exceed 8.33%. | The top segment of the ramp has a slope of 9.2%. | 5604, 5606 |
| 26 | 206.1, 405.8, 505.10 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.8.5 | Ramp must have handrails that are continuous or must extend at least 12" over the landings in the same direction as the ramp. The extensions must be level. Therefore, any bend at the end of the handrail is not part of the 12" level extension. | At the top of the ramp, the extension is about 8" long. | 5604, 5607 |
| 27 | | | **Ash 2 Dormitory:** | There are about 86 beds.  I counted 12 wheelchairs.  I saw at least 2 inmates using other mobility devices. | |
| 28 | 217.4.8, | 4.1.6,(1), 4.1.3(17)(c)(ii), | There are more than 4 telephones.  Therefore, at least one TTY must be provided with appropriate signage. | No TTY is provided and there is no signage stating that a TTY is available. | 5689 |
| 29 | 217, 704.2 | 4.1.6,(1), 4.1.3(17), 4.31.3 | There is a bank of 4 or more telephones at an exterior location.  At least one telephone must be accessible.  The operable parts must be reachable by a forward approach and be within 48" of the floor. | There are 4 telephones.  The highest operable part is 50" above the ground. | 5690, 5691 |
| 30 | 217.5, | 4.1.6,(1), 4.1.3(17)(d), | There are at least 3 telephones at this interior location.  Therefore, a shelf and an outlet must be provided. | No shelf is provided at the telephones. | 5694, 5695 |
| 31 | 226, 902.2* | 4.1.6,(1), 4.1.3(18), 4.32.3 | There is a common use work surface.  The clear floor space must be at least 30" wide by 48" long and extend at least 17" underneath the work surface. | At the J-Pay Station, the length of the clear floor space is reduced to 36" by the stool. | 5698, 5702, 5703 |
| 32 | 221.2, 802.1* | 4.1.6,(1), 4.1.3(18), 4.32.3 | If seating is provided in a common use space, at least 5% of the seating areas must be accessible. | There is a seating at tables in the day room.  The clear floor space underneath is blocked by the table support. | 5715 - 5719 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 33 | | | **Ash 2 Dormitory Bathroom:** | | |
| 34 | 206.1, 405.2 | 4.1.6(3)(a), | Existing ramps that are rise no more than 6" may slope a maximum of 10%. Existing ramps that are rise no more than 3" may slope a maximum of 12.5%. | The ramp at the entry rises 3" and is sloped 17.3%. | 5615 - 5617 |
| 35 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are not insulated. | 5671 |
| 36 | 213.3, 605.2 | 4.1.6,(1), 4.1.3(11), 4.18.2 | The rim of the accessible urinal must be within 17" of the floor. | The rim of the urinal is 24" above the floor. | 5625, 5626 |
| 37 | 213.2, 609.3 | 4.1.6,(1), 4.1.3(11), 4.26.2 | Clear space between the grab bars and the walls must be 1 1/2", exactly. | At the toilet, there is 4" clear space between the sidewall grab bar and the wall. | 5633 |
| 38 | 213.2, 604.5.1 | 4.1.6,(1), 4.1.3(11), 4.16.4 | The sidewall grab bar at the toilet must be at least 42" long, must be within 12" of the rear wall, and must extend at least 54" from the rear wall. | The front end of the grab bar is only 44" from the rear wall. | 5641, 5642 |
| 39 | 213.2, 604.2* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Centerline of toilet must be 18" from sidewall. The 2010 ADA Standards permit the centerline to be 16" to 18" from the sidewall. | The toilet centerline is 14 1/2" from the sidewall. | 5635, 5636 |
| 40 | 213.2, 604.3* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Clear floor space at the toilet must be at least 60" wide and 56" deep. | The next toilet reduces the toilet clear floor space to only 40" wide. | 5637, 5638 |
| 41 | | | **Ash 2 Dormitory Shower Area:** | The accessible shower configuration approximates a roll-in shower. | |
| 42 | 222, 803.4, 903* | 4.1.6,(1), 4.1.3(21), 4.35.4 | There is a dressing area with a fixed bench. The bench must be at least 48" long, have back support, and at least 24" deep. | The bench is only 14 1/2" deep. About 6"at one side of the bench does not have back support. In that the bench does not comply with the 1991 Standards, it must comply with the 2010 Standards. It must be at least 42" long, 20" to 24" deep, and have clear floor space to one side of the bench. | 5666, ,5668, 5669 |
| 43 | 213.3.6, 608.2.2 | 4.1.6,(1), 4.1.3(11), 4.21.2 | The minimum dimensions of a roll-in shower are 30" deep by 60" wide at the midpoints. | The shower is only about 24" deep and only about 46" wide. | 5643 - 5645, 5648 - 5654 |
| 44 | 213.2, 608.6 | 4.1.6,(1), 4.1.3(11), 4.21.6 | Either a fixed showerhead mounted 48" above the floor or a handheld shower unit must be provided. | A handheld showerhead is not provided and the fixed showerhead is about 71 1/2" above the floor. | 5659 - 5661, 5664 |
| 45 | 213.2, 608.4 | 4.1.6,(1), 4.1.3(11), 4.21.3 | The roll-in shower has a seat. The controls must be on the wall that is adjacent to the seat. | The seat is mounted on the control wall. | 5643 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | * means the remediation Standard differs from the 1991 ADA Standards | | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 46 | 213.2, 608.4, 610.3 | 4.1.6,(1), 4.1.3(11), 4.21.4 | Shower seat may be rectangular or L-shaped. The side of the seat must be within 3" of the compartment entry. The front edge of rectangular seats must be 15" to 16" from the seat wall. For L-shaped seats, the front edge of the narrow side must be 15" to 16" from the seat wall and the wider side must be 22" to 23" from the seat wall and along the back wall. | It is a rectangular seat and is 24" deep. | 5646, 5647 |
| 47 | 213.2, 608.3 | 4.1.6,(1), 4.1.3(11), 4.21.4 | When a seat is provided in a roll-in shower, the grab bars must extend the length of the sidewall without the seat. On the rear wall, the grab bar must extend from the non-seat wall to where the seat begins. | There is no grab bar on the non-seat side. | 5661 |
| 48 | | | **Cypress 2 Dormitory:** | There are about 86 beds. I counted 3 wheelchairs. I saw one blind inmate. | |
| 49 | §35.149, 211, 602.7 | 4.1.6,(1), §35.149, 4.1.3(10), 4.15.2 | Where drinking fountains are provided on a floor, there must be at least two. One spout must be no higher than 36" above the floor and the other must be at a standard height. The drinking fountain is located in a detention facility in an area where one does not have access to other drinking fountains on this floor. In that occupants cannot access other parts of the floor, both heights must be available in this area. | There is only one spout. It is mounted about 43" above the floor. | 5748 |
| 50 | 217.4.8, | 4.1.6,(1), 4.1.3(17)(c)(ii), | There are more than 4 telephones. Therefore, at least one TTY must be provided with appropriate signage. | No TTY is provided and there is no signage stating that a TTY is available. | 5759, 5760 |
| 51 | 217, 704.2 | 4.1.6,(1), 4.1.3(17), 4.31.3 | There is a bank of 4 or more telephones at an exterior location. At least one telephone must be accessible. The operable parts must be reachable by a forward approach and be within 48" of the floor. | There are 4 telephones. The highest operable part is 50" above the ground. | 5759, 5760 |
| 52 | 217.5, | 4.1.6,(1), 4.1.3(17)(d), | There are at least 3 telephones at this interior location. Therefore, a shelf and an outlet must be provided. | No shelf is provided at the telephones. | 5760 |
| 53 | 226, 902.2* | 4.1.6,(1), 4.1.3(18), 4.32.3 | There is a common use work surface. The clear floor space must be at least 30" wide by 48" long and extend at least 17" underneath the work surface. | At the J-Pay Station, the length of the clear floor space is reduced to about 36" by a bench. | 5761 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4".* | | |
| 54 | 226, 902.2* | 4.1.6,(1), 4.1.3(18), 4.32.3 | There is a common use work surface.  Knee and toe space must be at least 30" wide.  The knee space must be at least 27" high for a depth of at least 8".  The toe space must be at least 9" high and extend 17" underneath. | The knee space under the J-Pay Station is only about 25" high at a depth of 8". | *5761* |
| 55 | 221.2, 802.1* | 4.1.6,(1), 4.1.3(18), 4.32.3 | If seating is provided in a common use space, at least 5% of the seating areas must be accessible. | There is a seating at tables in the day room.  The clear floor space underneath is blocked by the table support. | 5763 |
| 56 | | | **Cypress 2 Dormitory Bathroom:** | | |
| 57 | 206.1, 405.2 | 4.1.6(3)(a), | Existing ramps that are rise no more than 6" may slope a maximum of 10%.  Existing ramps that are rise no more than 3" may slope a maximum of 12.5%. | The ramp at the entry rises 3" and is sloped about 17%. | 5731 |
| 58 | 213.3, 403 | 4.1.6,(1), 4.1.3(11), | Where provided, at least one lavatory must be accessible. | None of the lavatories has accessible features. | 5742 - 5745 |
| 59 | 213.3, 605.2 | 4.1.6,(1), 4.1.3(11), 4.18.2 | The rim of the accessible urinal must be within 17" of the floor. | The rim of the urinal is about 24" above the floor. | 5732 |
| 60 | 213.2, 609.4* | 4.1.6,(1), 4.1.3(11), 4.26.2 | The centerline of the grab bars must be between 33" and 36" above the floor. | The centerline of the toilet sidewall grab bar is 26 1/4" above the floor.  In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which require the top of the grab bars to be between 33" and 36" above the floor. | 5734, 5735 |
| 61 | 213.2, 604.5, 609.2 | 4.1.6,(1), 4.1.3(11), 4.16.4, 4.26.2 | The gripping surface of the grab bar must be equivalent to a grab bar that is 1 1/4" to 1 1/2" in diameter. | The grab bar on the sidewall of the toilet is only 1" in diameter. | 5734, 5736 |
| 62 | 213.2, 604.5.1 | 4.1.6,(1), 4.1.3(11), 4.16.4 | The sidewall grab bar at the toilet must be at least 42" long, must be within 12" of the rear wall, and must extend at least 54" from the rear wall. | The grab bar is about 24" long.  The front end of the grab bar is only about 30" from the rear wall. | 5734 |
| 63 | 213.2, 604.4 | 4.1.6,(1), 4.1.3(11), 4.16.3 | Toilet seat must be 17" to 19" above the floor. | The toilet seat is 15" high. | 5732 |
| 64 | 213.2, 604.3* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Clear floor space at the toilet must be at least 60" wide and 56" deep. | The next toilet reduces the toilet clear floor space to only about 38" wide. | 5737 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 65 | | | **Cypress 2 Dormitory Shower Area:** | The accessible shower configuration approximates a roll-in shower. | |
| 66 | 222, 803.4, 903* | 4.1.6,(1), 4.1.3(21), 4.35.4 | There is a dressing area with a fixed bench. The bench must be at least 48" long, have back support, and at least 24" deep. | The bench is only about 14 1/2" deep. About 6"at one side of the bench does not have back support. In that the bench does not comply with the 1991 Standards, it must comply with the 2010 Standards. It must be at least 42" long, 20" to 24" deep, and have clear floor space to one side of the bench. | 5740 |
| 67 | 213.3.6, 608.2.2 | 4.1.6,(1), 4.1.3(11), 4.21.2 | The minimum dimensions of a roll-in shower are 30" deep by 60" wide at the midpoints. | The shower is only about 24" deep and only about 46" wide. | 5739 |
| 68 | 213.2, 608.5 | 4.1.6,(1), 4.1.3(11), 4.21.5 | Shower controls must be operable without tight grasping or twisting of the wrist. | The shower controls require twisting to operate. | 5739 |
| 69 | 213.2, 608.6 | 4.1.6,(1), 4.1.3(11), 4.21.6 | Either a fixed showerhead mounted 48" above the floor or a handheld shower unit must be provided. | A handheld showerhead is not provided and the fixed showerhead is about 71 1/2" above the floor. | 5739 |
| 70 | 213.2, 608.4 | 4.1.6,(1), 4.1.3(11), 4.21.3 | The roll-in shower has a seat. The controls must be on the wall that is adjacent to the seat. | The seat is mounted on the control wall. | 5739 |
| 71 | 213.2, 608.4, 610.3 | | Shower seat may be rectangular or L-shaped. The side of the seat must be within 3" of the compartment entry. The front edge of rectangular seats must be 15" to 16" from the seat wall. For L-shaped seats, the front edge of the narrow side must be 15" to 16" from the seat wall and the wider side must be 22" to 23" from the seat wall and along the back wall. | It is a rectangular seat and is 24" deep. | 5739 |
| 72 | 213.2, 608.3 | 4.1.6,(1), 4.1.3(11), 4.21.4 | When a seat is provided in a roll-in shower, the grab bars must extend the length of the sidewall without the seat. On the rear wall, the grab bar must extend from the non-seat wall to where the seat begins. | There is no grab bar on the non-seat side. | 5739 |

| | | Louisiana State Penitentiary - Accessibility Report | | |
|---|---|---|---|---|
| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
| | | * means the remediation Standard differs from the 1991 ADA Standards | | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 73 | | | **Bldg. E, Camp F:** | | |
| 74 | 227.3, 904.4* | 4.1.6,(1), 7.2(2), | A 36"-wide portion of the service counter must be no higher than 36". | The Sallyport sign-in counter is 46 1/2" above the floor (between the security gates). In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the accessible counter to extend the same depth as the inaccessible counter and it is not. | 5844 - 5847 |
| 75 | 232, 206.2.4, | 4.1.6,(1), 4.1.3(1), | An accessible route must connect to all accessible spaces and element. | The accessible routes to the outdoor recreational facilities are blocked by unpaved yards. These facilities include: basketball courts and volleyball nets. | 5901, 5906, 5910 |
| 76 | | | **Bldg. E, Camp F Dormitory 1:** | There are about 86 beds. | |
| 77 | 205, 309.3* | 4.1.6,(1), 4.1.3(13), 4.27.3 | Operable parts must be within reach. A side reach is required. If the obstruction is no more than 34" tall and no more than 24" deep, then the operable part must be within 46" of the floor. If the obstruction is more than 34" tall, then the operable part must be within 10" of the front edge and must be within 54" of the floor. | There is no obstruction. The Federal Mail slot is 55 1/4" above the floor. In that is does not comply with the 1991 ADA Standards it must comply with the 2010 ADA Standards which has a maximum height of 48". | 5854, 5855 |
| 78 | §35.149, 211, 602.7 | 4.1.6,(1), §35.149, 4.1.3(10), 4.15.2 | Where drinking fountains are provided on a floor, there must be at least two. One spout must be no higher than 36" above the floor and the other must be at a standard height. The drinking fountain is located in a detention facility in an area where one does not have access to other drinking fountains on this floor. In that occupants cannot access other parts of the floor, both heights must be available in this area. | There is only one spout. It is mounted about 43" above the floor. | 5910 |
| 79 | 205, 602.2 | 4.1.6,(1), 4.1.3(13), 4.15.5 | Drinking fountain clear floor space must be at least 30" wide by 48" deep. | The drinking fountain clear floor space is blocked by a trash can and a laundry cart. | *5910* |
| 80 | 217.4.8, | 4.1.6,(1), 4.1.3(17)(c)(ii), | There are more than 4 telephones. Therefore, at least one TTY must be provided with appropriate signage. | No TTY is provided and there is no signage stating that a TTY is available. | |
| 81 | 217, 704.2 | 4.1.6,(1), 4.1.3(17), 4.31.3 | There is a bank of 4 or more telephones at an exterior location. At least one telephone must be accessible. The operable parts must be reachable by a forward approach and be within 48" of the floor. | There are 4 telephones. The highest operable part is about 55" above the ground. | 5909 |

| | | | **Louisiana State Penitentiary – Accessibility Report** | | |
|---|---|---|---|---|---|
| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
| | | | *\* means the remediation Standard differs from the 1991 ADA Standards* | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 82 | 217.5, | 4.1.6,(1), 4.1.3(17)(d), | There are at least 3 telephones at this interior location. Therefore, a shelf and an outlet must be provided. | No shelf is provided at the telephones. | 5909 |
| 83 | 217.2, 704.2.2 | 4.1.6,(1), 4.1.3(17)(a), 4.31.3 | At least one telephone must be within reach.  A side reach is possible.  Therefore, the operable parts must be within 54" of the floor. | The highest operable part is 55" above the floor.  In that it does not comply with the 1991 Standards it must comply with the 2010 Standards, which requires the operable parts to be within 48" of the floor. | 5860, 5861 |
| 84 | 226, 902.2\* | 4.1.6,(1), 4.1.3(18), 4.32.3 | There is a common use work surface.  The clear floor space must be at least 30" wide by 48" long and extend at least 17" underneath the work surface. | At the J-Pay Station, the length of the clear floor space is blocked by a stool. | 5913 |
| 85 | 226.1, 902.2 | 4.1.6,(1), 4.1.3(18), 4.32 | Seating is provided at the conference table.  A wheelchair space must be provided.  The knee space under the table must be at least 30" wide, 27" tall, and 17" deep. | The knee space under the table is only 23 1/2" tall. | 5858, 5859 |
| 86 | | | **Bldg. E, Camp F Dormitory 1 Bathroom:** | | |
| 87 | 213.3.5, 603.3 | 4.1.6,(1), 4.1.3(11), 4.19.6 | Where mirrors are provided, at least one shall have the bottom of the reflective edge within 40" of the floor. | The reflective surface of the mirror is mounted 58 1/2" above the floor. | 5871, 5872 |
| 88 | 205, 309.3 | 4.1.6,(1), 4.1.3(13), 4.27.3 | Operable parts over an obstruction must be within reach.  Operable parts cannot be beyond the front edge of the clear floor space.  The obstruction must be no more than 34" tall and no more than 25" deep.  Therefore, the operable part must be within 44" of the floor.  If the obstruction is less than 20" deep, the operable part must be within 48" of the floor. | The soap dispenser is above the lavatory and is 51" above the floor. | 5889, 5890 |
| 89 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are not insulated. | 5892 |
| 90 | 213.3, 605.2 | 4.1.6,(1), 4.1.3(11), 4.18.2 | The rim of the accessible urinal must be within 17" of the floor. | The rim of the urinal is about 23 3/4" above the floor. | 5866, 5867 |
| 91 | 213.2, 604.5 | 4.1.6,(1), 4.1.3(11), 4.16.4 | Grab bars must be on the rear wall and on the sidewall nearest the toilet. | There is no grab bar on the rear wall. | 5878 |
| 92 | 213.2, 604.5.1 | 4.1.6,(1), 4.1.3(11), 4.16.4 | The sidewall grab bar at the toilet must be at least 42" long, must be within 12" of the rear wall, and must extend at least 54" from the rear wall. | The front end of the grab bar is only 43 1/2" from the rear wall. | 5880, 5882 |
| 93 | 213.2, 604.4 | 4.1.6,(1), 4.1.3(11), 4.16.3 | Toilet seat must be 17" to 19" above the floor. | The toilet seat is 15" high. | 5876, 5877 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | *1991 ADA Standards citations begin with "4.".* | * means the remediation Standard differs from the 1991 ADA Standards | | |
| 94 | 213.2, 604.2* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Centerline of toilet must be 18" from sidewall. The 2010 ADA Standards permit the centerline to be 16" to 18" from the sidewall. | The toilet centerline is 11" from the sidewall. | 5883, 5884 |
| 95 | 213.2, 604.3* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Clear floor space at the toilet must be at least 60" wide and 56" deep. | The next toilet reduces the toilet clear floor space to only about 46" wide. | 5876 |
| 96 | | | **Bldg. E, Camp F Dormitory 1 Shower Area:** | | |
| 97 | 222, 803.4, 903* | 4.1.6,(1), 4.1.3(21), 4.35.4 | There is a dressing area with a fixed bench. The bench must be at least 48" long, have back support, and at least 24" deep. | The bench is only about 11" deep. There is no back support. In that the bench does not comply with the 1991 Standards, it must comply with the 2010 Standards. It must be at least 42" long, 20" to 24" deep, and have clear floor space to one side of the bench. | 5868 |
| 98 | 206.1, 303.3 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.5.2 | Changes in level that are more than 1/4" must be beveled. | At the entrance to the group shower, there is a change in level of about 4 1/2" that is not beveled. | 5885 |
| 99 | 213.2, 608 | 4.1.6,(1), 4.1.3(11), 4.23.8 | When showers are provided at least one must be accessible. | There are showers, none of which has accessible features. | 5886, 5887 |
| 100 | | | **Treatment Unit Building:** | | |
| 101 | | | **Protection/Lockdown:** | (I was not able to survey a housing cell.) | |
| 102 | 227.3, 904.4* | 4.1.6,(1), 7.2(2), | A 36"-wide portion of the service counter must be no higher than 36". | The sign-in counter is more than 36" above the floor (between the security gates). In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the accessible counter to extend the same depth as the inaccessible counter and it is not. | 5918 |
| 103 | 227.3, 904.4* | 4.1.6,(1), 7.2(2), | A 36"-wide portion of the service counter must be no higher than 36". | The Pill Room counter is more than 36" above the floor (between the security gates). In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the accessible counter to extend the same depth as the inaccessible counter and it is not. | 5919 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | *means the remediation Standard differs from the 1991 ADA Standards* | | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 104 | 211, 602.7 | 4.1.6,(1), 4.1.3(10), | Where drinking fountains are provided on a floor, there must be at least two spouts on that floor. One spout must be no higher than 36" above the floor. The other spout must be mounted between 38" and 43" above the floor. | Near the Time Out Cells, there is only one spout. It is mounted 42" above the floor. | 5964 |
| 105 | | | **Protection Tier Shower:** | | |
| 106 | 206.5, 404.2.4.4 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.6 | Maneuvering space at the door cannot slope more than 2%. | The maneuvering space at the shower door is sloped significantly more than 2%. | 5923 |
| 107 | 213.2, 603.2.1 | 4.1.6,(1), 4.1.3(11), 4.22.3 | Toilet room or bathroom must have an unobstructed turning space of either a 60" diameter circle or a 60" T- | The turning space is only about 59" wide. | 5925 |
| 108 | 213.2, 608.3 | 4.1.6,(1), 4.1.3(11), 4.21.4 | No seat is provided in the roll-in shower. Therefore, grab bars are required on the back wall and two sidewalls that extend to within 6" of the corners. | There are grab bars on only two walls. The grab bars are more than 12" from the corners. | 5925 |
| 109 | 206.1, 303.3 | 4.1.6,(1), 4.1.2(1) & (2), 4.1.3(1), 4.5.2 | Changes in level that are more than 1/4" must be beveled. | There is an uncovered trench under the controls about 8" wide and 2" deep. | 5925 |
| 110 | 213.2, 608.5 | 4.1.6,(1), 4.1.3(11), 4.21.5 | Shower controls must be mounted above the grab bar between 38" and 48". | The shower controls, in the highest position, are mounted about 60" above the floor. | 5925 |
| 111 | 213.2, 608.6 | 4.1.6,(1), 4.1.3(11), 4.21.6 | The hand-held shower spray must be usable as a fixed showerhead or as a handheld. When fixed it must be within reach. A forward reach is required. Therefore, the gripping surface must be within 48" of the floor. | There is no handheld and no fixed head at 48". | 5925 |
| 112 | | | **Extended Lockdown (Mental Health) Tier:** | | |
| 113 | | | **Extended Lockdown (Mental Health) Cell #13:** | | |
| 114 | 232, 226, 902.3 | 4.1.6,(1), 4.1.3(18), 7.2(2) | The food pass/cuff port is a service counter. It must be no higher than 36" above the floor. | The food pass/cuff port is 40" high. | 5933, 5934 |
| 115 | 206.5, 404.2.3 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.5 | Doors that are part of the accessible route must have a minimum clear opening of 32" when the door is open 90 degrees. | The clear opening of the cell door is 28". | 5935, 5936 |
| 116 | 206.5, 404.2.4 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.6 | A forward approach to the sliding door is required. Therefore, the maneuvering space must be the width of the door for a depth of 48". | lavatory protrudes into the maneuvering space. | 5935, 5951 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 117 | 205, 309.3 | 4.1.6,(1), 4.1.3(13), 4.27.4 | Operable parts must be operable with one hand and without tight grasping, tight pinching, or twisting of the wrist.  It must be operable with no more than 5-pounds | The window control requires tight grasping or pinching to operate. | 5956, 5957 |
| 118 | 213.3.5, 603.3 | 4.1.6,(1), 4.1.3(11), 4.19.6 | Where mirrors are provided, at least one shall have the bottom of the reflective edge within 40" of the floor. | The reflective surface of the mirror is mounted more than 40" above the floor. | 5941 |
| 119 | 213.3, 606 | 4.1.6,(1), 4.1.3(11), 4.19 | The accessible lavatory must have the top of its rim or counter 34" or less above the finished floor; the bottom edge of the apron at least 27" above the finished floor; knee and toe clearances that comply with the Standards; and have the pipes underneath insulated. | The lavatory has no accessible features. | 5949, 5950 |
| 120 | 213.2, 604.6 | 4.1.6,(1), 4.1.3(11), 4.16.5 | The toilet flush control must be on the open side of the toilet. | The toilet flush control is on the wall side. | 5947 |
| 121 | 213.2, 604.4 | 4.1.6,(1), 4.1.3(11), 4.16.3 | Toilet seat must be 17" to 19" above the floor. | The toilet seat is only 15 1/4" high. | 5946, 5948 |
| 122 | | | **Extended Lockdown (Mental Health) Shower:** | | |
| 123 | 213.2, 608 | 4.1.6,(1), 4.1.3(11), 4.23.8 | When showers are provided at least one must be accessible. | There are two showerheads, none of which has accessible features. | 5958 - 5961 |
| 124 | | | **Time Out Cell B:** | | |
| 125 | 232.3, | 4.1.6,(1), 232.3, | Housing cells are provided in this area.  Therefore, at least 3% serving each purpose must be accessible. | There are several Time Out housing cells, all serving the same purpose.  None is accessible. | 5963 |
| 126 | | | **R.E. Barrow Treatment Center:** | | |
| 127 | | | **Nursing Unit 2:** | There are about 24 beds in the open area and 10 beds in individual cells. | |
| 128 | 206.5, 404.2.2 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.4 | Where there is a pair of doors, a minimum clear opening of 32" through a single door must be provided. | The clear opening of a single door is 28". | 5967, 5968 |
| 129 | 205, 309.3* | 4.1.6,(1), 4.1.3(13), 4.27.3 | Operable parts must be within reach.  A side reach is required.  If the obstruction is no more than 34" tall and no more than 24" deep, then the operable part must be within 46" of the floor.  If the obstruction is more than 34" tall, then the operable part must be within 10" of the front edge and must be within 54" of the floor. | There is no obstruction.  The Federal Mail slot is 57" above the floor.  In that is does not comply with the 1991 ADA Standards it must comply with the 2010 ADA Standards which has a maximum height of 48". | 5969, 5970 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 130 | 206.5, 404.2.4 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.6 | The pull side of the door requires a forward approach. Therefore, the maneuvering space must be 60" deep and must extend 18" to the side of the latch. | Outside the door to the outdoor areas, the maneuvering space extends only 2" beside the latch side of the door. | 6037 |
| 131 | §35.149, 211, 602.7 | 4.1.6,(1), §35.149, 4.1.3(10), 4.15.2 | Where drinking fountains are provided on a floor, there must be at least two. One spout must be no higher than 36" above the floor and the other must be at a standard height. The drinking fountain is located in a detention facility in an area where one does not have access to other drinking fountains on this floor. In that occupants cannot access other parts of the floor, both heights must be available in this area. | There is only one spout. It is mounted about 43" above the floor. | 6048 |
| 132 | | | **Nursing Unit 2 Bathroom:** | | |
| 133 | 205, 309.3 | 4.1.6,(1), 4.1.3(13), 4.27.3 | Operable parts over an obstruction must be within reach. Operable parts cannot be beyond the front edge of the clear floor space. The obstruction can be no more than 34" tall and no more than 25" deep. Therefore, the operable part must be within 44" of the floor. If the obstruction is less than 20" deep, the operable part must be within 48" of the floor. | The paper towel dispenser is above the lavatory and is 53" above the floor. | 6012, 6013 |
| 134 | 213.3.5, 603.3 | 4.1.6,(1), 4.1.3(11), 4.19.6 | Where mirrors are provided, at least one shall have the bottom of the reflective edge within 40" of the floor. | The reflective surface of the mirror is mounted 42" above the floor. | 5978, 5980 |
| 135 | 213.3, 606.4 | 4.1.6,(1), 4.1.3(11), 4.19.5 | The lavatory faucet must be operable without tight grasping, tight pinching, or twisting of the wrist. | The faucet has knobs that require twisting of the wrist to operate. | 6012 |
| 136 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are not insulated. | 5976 |
| 137 | 213.1, 607.2 | 4.1.6,(1), 4.1.3(11), 4.20.3 | Clearance in front of the tub must be at least as long as the tub and at least 30" wide. A lavatory with compliant knee and toe clearances may overlap the clear floor space at the control end. | The clear floor space is 26 1/2" wide. | 5998, 5999 |
| 138 | 213.1, 607.3 | 4.1.6,(1), 4.1.3(11), 4.20.3 | The bathtub must have a securable seat. | There is no seat for the bathtub. | 5983, 5997 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 139 | 213.1, 607.4 | 4.1.6,(1), 4.1.3(11), 4.20.4 | The bathtub must have a horizontal grab bar on the control wall and horizontal two grab bars on the back wall. The centerline of the bottom grab bar must be 8" to 10" above the tub rim. When the seat is not permanent there must be a grab bar on the headwall. | There is no grab bar on the control wall or headwall. The back wall top grab bar is not horizontal. | 5983, 5997 |
| 140 | 213.1, 607.4 | 4.1.6,(1), 4.1.3(11), 4.20.4 | The grab bars on the back wall to the bathtub must be at least 24" long. | The top back wall grab bar is less than 24" long. | 5983, 5997 |
| 141 | 213.1, 607.5 | 4.1.6,(1), 4.1.3(11), 4.20.5 | The bathtub controls must be mounted between the midpoint and the open end of the tub. | The controls are centered. | 5983, 5997 |
| 142 | 213.2, 604.5 | 4.1.6,(1), 4.1.3(11), 4.16.4 | Grab bars must be on the rear wall and on the sidewall nearest the toilet. | There is no grab bar on the rear wall. | 5982 |
| 143 | 213.2, 609.3 | 4.1.6,(1), 4.1.3(11), 4.26.2 | There must be 1 1/2" of clear space behind and below the rear grab bar. There must be 12" of clear space above and nothing may interfere with the space in front of the | The grab bar is about 18" from the toilet sidewall. | 5983 |
| 144 | 213.2, 609.4* | 4.1.6,(1), 4.1.3(11), 4.26.2 | The centerline of the grab bars must be between 33" and 36" above the floor. | The centerline of the grab bar at the sidewall is 30 3/4" above the floor. In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which require the top of the grab bars to be between 33" and 36" above the floor. | 5988, 5989 |
| 145 | 213.2, 604.5.1 | 4.1.6,(1), 4.1.3(11), 4.16.4 | The sidewall grab bar at the toilet must be at least 42" long, must be within 12" of the rear wall, and must extend at least 54" from the rear wall. | The front end of the grab bar is only about 32" from rear wall. | 5993, 5994, 5998, 5999 |
| 146 | 213.2, 604.2* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Centerline of toilet must be 18" from sidewall. The 2010 ADA Standards permit the centerline to be 16" to 18" from the sidewall. | The toilet centerline is about 30" from the sidewall. | 5982 |
| 147 | | | **Nursing Unit 2 Shower Area:** | | |
| 148 | 213.2, 608.4 | 4.1.6,(1), 4.1.3(11), 4.21.3 | The roll-in shower has a seat. The controls must be on the wall that is adjacent to the seat. | The seat is mounted on the control wall. | 6005 |

| | | | **Louisiana State Penitentiary - Accessibility Report** | | |
|---|---|---|---|---|---|
| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
| | | *1991 ADA Standards citations begin with "4.".* | * means the remediation Standard differs from the 1991 ADA Standards | | |
| 149 | 213.2, 608.4, 610.3 | 4.1.6,(1), 4.1.3(11), 4.21.3 | Shower seat may be rectangular or L-shaped. The side of the seat must be within 3" of the compartment entry. The front edge of rectangular seats must be 15" to 16" from the seat wall. For L-shaped seats, the front edge of the narrow side must be 15" to 16" from the seat wall and the wider side must be 22" to 23" from the seat wall and along the back wall. | It is a rectangular seat and is 24" deep. | 6002, 6003 |
| 150 | 213.2, 608.3 | 4.1.6,(1), 4.1.3(11), 4.21.4 | When a seat is provided in a roll-in shower, the grab bars must extend the length of the sidewall without the seat. On the rear wall, the grab bar must extend from the non-seat wall to where the seat begins. | There is no grab bar on the non-seat side. | 6004 |
| 151 | | | **Nursing Unit 2, Cell #7:** | | |
| 152 | 205, 309.3* | 4.1.6,(1), 4.1.3(13), 4.27.3 | Operable parts must be within reach. A side reach is required. If the obstruction is no more than 34" tall and no more than 24" deep, then the operable part must be within 46" of the floor. If the obstruction is more than 34" tall, then the operable part must be within 10" of the front edge and must be within 54" of the floor. | There is no obstruction. The window control is about 66" above the floor. In that is does not comply with the 1991 ADA Standards it must comply with the 2010 ADA Standards which has a maximum height of 48". | 6034 |
| 153 | 205, 309.3 | 4.1.6,(1), 4.1.3(13), 4.27.4 | Operable parts must be operable with one hand and without tight grasping, tight pinching, or twisting of the wrist. It must be operable with no more than 5-pounds | The window control requires tight grasping or pinching to operate. | 6034 |
| 154 | 213.3, 606 | 4.1.6,(1), 4.1.3(11), 4.19 | The accessible lavatory must have the top of its rim or counter 34" or less above the finished floor; the bottom edge of the apron at least 27" above the finished floor; knee and toe clearances that comply with the Standards; and have the pipes underneath insulated. | The lavatory has no accessible features. | 6022 |
| 155 | 213.2, 604.3* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Clear floor space at the toilet must be at least 60" wide and 56" deep. | The toilet clear floor space is 47 1/4" wide. | 6030, 6031 |
| 156 | 213.2, 604.5 | 4.1.6,(1), 4.1.3(11), 4.16.4 | Grab bars must be on the rear wall and on the sidewall nearest the toilet. | There is no grab bar on the rear wall. | 6022 |

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | *Louisiana State Penitentiary - Accessibility Report* | | |
| | | | \* means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4."* | | |
| 157 | 213.2, 609.4\* | 4.1.6,(1), 4.1.3(11), 4.26.2 | The centerline of the grab bars must be between 33" and 36" above the floor. | The centerline of the grab bar at the sidewall is 31" above the floor. In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which require the top of the grab bars to be between 33" and 36" above the floor. | 6024, 6025 |
| 158 | 213.2, 604.5.1 | 4.1.6,(1), 4.1.3(11), 4.16.4 | The sidewall grab bar at the toilet must be at least 42" long, must be within 12" of the rear wall, and must extend at least 54" from the rear wall. | It is only 24" long. It is 13" from the rear wall. The front end of the grab bar is only 37" from the rear wall. | 6028, 6029 |
| 159 | 213.2, 604.2\* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Centerline of toilet must be 18" from sidewall. The 2010 ADA Standards permit the centerline to be 16" to 18" from the sidewall. | The toilet centerline is 21 3/4" from the sidewall. | 6026, 2027 |
| 160 | 213.2, 604.4 | 4.1.6,(1), 4.1.3(11), 4.16.3 | Toilet seat must be 17" to 19" above the floor. | The toilet seat is only 16" high. | 6022, 6023 |
| 161 | | | **Nursing Unit 1:** | There are about 20 beds in the open area and 9 beds in individual cells. | |
| 162 | 206.5, 404.2.2 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.4 | Where there is a pair of doors, a minimum clear opening of 32" through a single door must be provided. | The clear opening of a single door is 27 1/2". | 6051, 6052 |
| 163 | §35.149, 211, 602.7 | 4.1.6,(1), §35.149, 4.1.3(10), 4.15.2 | Where drinking fountains are provided on a floor, there must be at least two. One spout must be no higher than 36" above the floor and the other must be at a standard height. The drinking fountain is located in a detention facility in an area where one does not have access to other drinking fountains on this floor. In that occupants cannot access other parts of the floor, both heights must be available in this area. | There is only one spout. It is mounted about 43" above the floor. | 6083 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 164 | | | **Nursing Unit 1 Bathroom:** | | |
| 165 | 205, 309.3 | 4.1.6,(1), 4.1.3(13), 4.27.3 | Operable parts over an obstruction must be within reach. Operable parts cannot be beyond the front edge of the clear floor space. The obstruction must be no more than 34" tall and no more than 25" deep. Therefore, the operable part must be within 44" of the floor. If the obstruction is less than 20" deep, the operable part must be within 48" of the floor. | The paper towel dispenser is above the lavatory and is about 53" above the floor. | 6064 |
| 166 | 213.3.5, 603.3 | 4.1.6,(1), 4.1.3(11), 4.19.6 | Where mirrors are provided, at least one shall have the bottom of the reflective edge within 40" of the floor. | The reflective surface of the mirror is mounted 42" above the floor. | 6080, 6081 |
| 167 | 213.3, 606.4 | 4.1.6,(1), 4.1.3(11), 4.19.5 | The lavatory faucet must be operable without tight grasping, tight pinching, or twisting of the wrist. | The faucet has knobs that require twisting of the wrist to operate. | 6080 |
| 168 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are not insulated. | 6079 |
| 169 | 213.1, 607.2 | 4.1.6,(1), 4.1.3(11), 4.20.3 | Clearance in front of the tub must be at least as long as the tub and at least 30" wide. A lavatory with compliant knee and toe clearances may overlap the clear floor space at the control end. | The clear floor space is 30 1/2" wide. | 6069 |
| 170 | 213.1, 607.3 | 4.1.6,(1), 4.1.3(11), 4.20.3 | The bathtub must have a securable seat. | There is no seat for the bathtub. | 6063 |
| 171 | 213.1, 607.4 | 4.1.6,(1), 4.1.3(11), 4.20.4 | The bathtub must have a horizontal grab bar on the control wall and horizontal two grab bars on the back wall. The centerline of the bottom grab bar must be 8" to 10" above the tub rim. When the seat is not permanent there must be a grab bar on the headwall. | There is no grab bar on the control wall or headwall. The back wall top grab bar is not horizontal and there is no lower grab bar. | 6063 |
| 172 | 213.1, 607.4 | 4.1.6,(1), 4.1.3(11), 4.20.4 | The grab bars on the back wall to the bathtub must be at least 24" long. | The top back wall grab bar is less than 24" long. | 6063 |
| 173 | 213.1, 607.5 | 4.1.6,(1), 4.1.3(11), 4.20.5 | The bathtub controls must be mounted between the midpoint and the open end of the tub. | The controls are centered. | 6063 |
| 174 | 213.2, 604.5 | 4.1.6,(1), 4.1.3(11), 4.16.4 | Grab bars must be on the rear wall and on the sidewall nearest the toilet. | There is no grab bar on the rear wall. | 6065 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 175 | 213.2, 609.3 | 4.1.6,(1), 4.1.3(11), 4.26.2 | There must be 1 1/2" of clear space behind and below the rear grab bar. There must be 12" of clear space above and nothing may interfere with the space in front of the | The grab bar is about 18" from the toilet sidewall. | 6065 |
| 176 | 213.2, 609.4* | 4.1.6,(1), 4.1.3(11), 4.26.2 | The centerline of the grab bars must be between 33" and 36" above the floor. | The centerline of the grab bar at the toilet sidewall is about 31" above the floor. In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which require the top of the grab bars to be between 33" and 36" above the floor. | 6065 |
| 177 | 213.2, 604.5.1 | 4.1.6,(1), 4.1.3(11), 4.16.4 | The sidewall grab bar at the toilet must be at least 42" long, must be within 12" of the rear wall, and must extend at least 54" from the rear wall. | The front end of the grab bar is only about 32" from the rear wall. | 6065 |
| 178 | 213.2, 604.2* | 4.1.6,(1), 4.1.3(11), 4.16.2 | Centerline of toilet must be 18" from sidewall. The 2010 ADA Standards permit the centerline to be 16" to 18" from the sidewall. | The toilet centerline is about 30" from the sidewall. | 6065 |
| 179 | | | **Nursing Unit 1 Shower Area:** | | |
| 180 | 213.2, 609.4* | 4.1.6,(1), 4.1.3(11), 4.26.2 | The centerline of the grab bars must be between 33" and 36" above the floor. | The centerline of the grab bars at the shower are 37" above the floor. In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which require the top of the grab bars to be between 33" and 36" above the floor. | 6073, 6076 |
| 181 | 213.2, 608.5 | 4.1.6,(1), 4.1.3(11), 4.21.5 | Shower controls must be mounted above the grab bar between 38" and 48". | The shower controls, in the highest position, are mounted 50" above the floor. | 6075 |
| 182 | 213.2, 608.5 | 4.1.6,(1), 4.1.3(11), 4.21.5 | Shower controls must be operable without tight grasping, tight pinching, or twisting of the wrist. | The faucet does not have lever controls. | 6075 |
| 183 | | | **Visiting Area:** | | |
| 184 | | | **Visitors Entrance:** | | |
| 185 | 227.3, 904.4* | 4.1.6,(1), 7.2(2), | A 36"-wide portion of the service counter must be no higher than 36". | The entire sign-in counter is 40" above the floor (between the security gates). In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the accessible counter to extend the same depth as the inaccessible counter and it is not. | 5831 |

| | | Louisiana State Penitentiary - Accessibility Report | | |
|---|---|---|---|---|
| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
| | | * means the remediation Standard differs from the 1991 ADA Standards | | | |
| | | *1991 ADA Standards citations begin with "4."* | | | |
| 186 | | | **Visitors Women's Room, waiting side:** | | |
| 187 | 216.2, | 4.1.6,(1), 4.1.3(16)(a), | If the toilet room is identified by a sign, then a sign that complies with the ADA Standards must be provided. | The sign has no accessible features. | 6093 |
| 188 | 206.5, 404.2.3 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.5 | Doors that are part of the accessible route must have a minimum clear opening of 32" when the door is open 90 degrees. | The clear opening is 28 1/2". | 6109, 6110 |
| 189 | 205, 309.3 | 4.1.6,(1), 4.1.3(13), 4.27.3 | Operable parts over an obstruction must be within reach. Operable parts cannot be beyond the front edge of the clear floor space.  The obstruction must be no more than 34" tall and no more than 25" deep.  Therefore, the operable part must be within 44" of the floor.  If the obstruction is less than 20" deep, the operable part must be within 48" of the floor. | The paper towel dispenser is above the lavatory is 59 1/2" above the floor. | 6097, 6098 |
| 190 | 213.3.5, 603.3 | 4.1.6,(1), 4.1.3(11), 4.19.6 | Where mirrors are provided, at least one shall have the bottom of the reflective edge within 40" of the floor. | The reflective surface of the mirror is mounted 57" above the floor. | 6097, 6098 |
| 191 | 213.3, 606.4 | 4.1.6,(1), 4.1.3(11), 4.19.5 | The lavatory faucet must be operable without tight grasping, tight pinching, or twisting of the wrist. | The faucet has levers that are only 1" long.  The levers require tight grasping to operate. | 6094 |
| 192 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are not insulated. | 6094 |
| 193 | 213.2, 604.8.1.2 | 4.1.6,(1), 4.1.3(11), 4.17.5 | There is a latch side approach to the stall door.  The maneuvering space must be 42" deep. | The maneuvering space to the latch side of the stall door is only 34 1/4" deep. | 6104, 6105 |
| 194 | 213.2, 604.8.1.1 | 4.1.6,(1)&(d), 4.1.3(7)&(8), 4.17.5 | Accessible stall doors must have a minimum clear opening of 32" when the door is open 90 degrees. | The clear opening of the accessible stall door is 24 1/2". | 6102, 6103 |
| 195 | 213.3, 604.5* | 4.1.6,(3)(e)(ii), 4.17.3 | Alternate stalls must 36" wide exactly or 48" wide exactly and at least 66" deep. | It is 31 1/2" wide.  In that the alternate stall option is not permitted in 2010 ADA Standards, remediation requires converting to a standard accessible stall. | 6107, 6108 |
| 196 | 213.3, 604.5* | 4.1.6,(3)(e)(ii), 4.17.3, 4.17.6 | Alternate stalls that are 36" wide must have grab bars on both sidewalls. | The right wall does not have a grab bar.  In that the alternate stall option is not permitted in 2010 ADA Standards, remediation requires converting to a standard accessible stall. | 6101 |

## Louisiana State Penitentiary - Accessibility Report

| Line # | Citation for Remediation (2010 ADA Stds) | Citation for Non-Compliance (applicable 1991 or 2010 ADA Stds) | Description/Issue/Requirement | Barriers | Photos |
|---|---|---|---|---|---|
| | | *means the remediation Standard differs from the 1991 ADA Standards* | | | |
| | | *1991 ADA Standards citations begin with "4.".* | | | |
| 197 | 213.2, 604.8.1.5* | 4.1.6,(1), 4.1.3(11), 4.17.6 | In a stall, the sidewall grab bar in a stall must be at least 40", must be within 12" of the rear wall, and extend at least 52" from the rear wall. | The front end is only about 32" from the rear wall. In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the front end to be at least 54" from the rear wall. | 6101 |
| 198 | | | **Visiting Area:** | | |
| 199 | | | **Shakedown Room:** | | |
| 200 | 206.5, 404.2.3 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.5 | Doors that are part of the accessible route must have a minimum clear opening of 32" when the door is open 90 degrees. | The clear opening of Shakedown Room #2 door is 28 1/2". | 6205, 6206 |
| 201 | | | **Visiting Area, Non-Contact Booth:** | | |
| 202 | 226, 902.3 | 4.1.6,(1), 4.1.3(18), 4.32.4 | The common use work surface must be no higher than 34". | The counter on both sides is 35 1/2" above the floor. | 6174, 6175 |
| 203 | | | **Visitors Men's Room, waiting side:** | | |
| 204 | 216.2, | 4.1.6,(1), 4.1.3(16)(a), | If the toilet room is identified by a sign, then a sign that complies with the ADA Standards must be provided. | The sign has no accessible features. | 6111 |
| 205 | 206.5, 404.2.3 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.5 | Doors that are part of the accessible route must have a minimum clear opening of 32" when the door is open 90 degrees. | The clear opening is about 28 1/2". | 6111 |
| 206 | 213.3.5, 603.3 | 4.1.6,(1), 4.1.3(11), 4.19.6 | Where mirrors are provided, at least one shall have the bottom of the reflective edge within 40" of the floor. | The reflective surface of the mirror is mounted 49" above the floor. | 6119, 6121 |
| 207 | 213.3, 606.2* | 4.1.6,(1), 4.1.3(11), 4.19.2 | Lavatory knee space must extend at least 8" under the lavatory for a height of at least 27". | The lavatory knee space is only 26" high at the apron. | 6117, 6118 |
| 208 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are not insulated. | 6117 |
| 209 | 213.2, 604.8.1.2 | 4.1.6,(1), 4.1.3(11), 4.17.5 | There is a latch side approach to the stall door. The maneuvering space must be 42" deep. | The maneuvering space to the latch side of the stall door is only about 36" deep. | 6116 |
| 210 | 213.2, 604.8.1.1 | 4.1.6,(1)&(d), 4.1.3(7)&(8), 4.17.5 | Accessible stall doors must have a minimum clear opening of 32" when the door is open 90 degrees. | The clear opening of the accessible stall door is about 24 1/2". | 6116 |
| 211 | 213.3, 604.5* | 4.1.6,(3)(e)(ii), 4.17.3 | Alternate stalls must 36" wide exactly or 48" wide exactly and at least 66" deep. | It is about 32" wide. In that the alternate stall option is not permitted in 2010 ADA Standards, remediation requires converting to a standard accessible stall. | 6125 |

| | | **Louisiana State Penitentiary - Accessibility Report** | | |
|---|---|---|---|---|
| Line # | **Citation for Remediation** (2010 ADA Stds) | **Citation for Non-Compliance** (applicable 1991 or 2010 ADA Stds) | **Description/Issue/Requirement** | **Barriers** | **Photos** |
| | | *1991 ADA Standards citations begin with "4.".* | * means the remediation Standard differs from the 1991 ADA Standards | | |
| 212 | 213.3, 604.5* | 4.1.6,(3)(e)(ii), 4.17.3, 4.17.6 | Alternate stalls that are 36" wide must have grab bars on both sidewalls. | The right wall does not have a grab bar.  In that the alternate stall option is not permitted in 2010 ADA Standards, remediation requires converting to a standard accessible stall. | 6125 |
| 213 | 213.2, 604.8.1.5* | 4.1.6,(1), 4.1.3(11), 4.17.6 | In a stall, the sidewall grab bar in a stall must be at least 40", must be within 12" of the rear wall, and extend at least 52" from the rear wall. | The front end is only about 32" from the rear wall.  In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the front end to be at least 54" from the rear wall. | 6124 |
| 214 | | | **Visitors Women's Room, visiting room side:** | | |
| 215 | 216.2, | 4.1.6,(1), 4.1.3(16)(a), | If the toilet room is identified by a sign, then a sign that complies with the ADA Standards must be provided. | The sign has no accessible features. | 6129 |
| 216 | 204.1, 307.2 | 4.1.6,(1), 4.1.3(2), 4.4.1 | Objects may not protrude into the circulation path by more than 4" if the underside is more than 27" above the floor. | The underside of a baby changing station, when left open, is 28" above the floor and projects 22 1/2" into the circulation path. | 6134, 6136 - 6138 |
| 217 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are only partially insulated. | 6156 |
| 218 | 213.2, 604.8.1.1 | 4.1.6,(1), 4.1.3(11), 4.17.3 | If the toilet is floor-mounted, the stall must be at least 59" deep.  If the toilet is wall-mounted, the stall must be at least 56" deep. | The toilet is floor-mounted and the stall is only 48 1/2" deep. | 6141, 6142 |
| 219 | 213.2, 604.8.1.5* | 4.1.6,(1), 4.1.3(11), 4.17.6 | In a stall, the sidewall grab bar in a stall must be at least 40", must be within 12" of the rear wall, and extend at least 52" from the rear wall. | The front end is only about 32" from the rear wall.  In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the front end to be at least 54" from the rear wall. | |
| 220 | 213.2, 604.7* | 4.1.6,(1), 4.1.3(11), 4.16.6 | When provided, the entire toilet paper dispenser must be no more than 36" from the rear wall.  The 2010 ADA Standards permit the centerline of the toilet paper dispenser to be 7" to 9" in front of the toilet. | The far side of the toilet paper dispenser is 49" from the rear wall.  The centerline of the dispenser is 15" in front of the toilet. | 6149 - 6153 |
| 221 | 213.2, 604.6 | 4.1.6,(1), 4.1.3(11), 4.16.5 | The toilet flush control must be on the open side of the toilet. | The toilet flush control is on the wall side. | 6139 |
| 222 | | | **Visitors Men's Room, visiting room side:** | | |
| 223 | 216.2, | 4.1.6,(1), 4.1.3(16)(a), | If the toilet room is identified by a sign, then a sign that complies with the ADA Standards must be provided. | The sign has no accessible features. | |

| | | | **Louisiana State Penitentiary - Accessibility Report** | | |
|---|---|---|---|---|---|
| Line # | **Citation for Remediation** (2010 ADA Stds) | **Citation for Non-Compliance** (applicable 1991 or 2010 ADA Stds) | **Description/Issue/Requirement** | **Barriers** | **Photos** |
| | | | * means the remediation Standard differs from the 1991 ADA Standards | | |
| | | | *1991 ADA Standards citations begin with "4.".* | | |
| 224 | 213.3, 606.5 | 4.1.6,(1), 4.1.3(11), 4.19.4 | Pipes under the lavatory must be insulated to protect a person from burns and from sharp or abrasive edges. | The pipes under the accessible lavatory are only partially insulated. | 6161 |
| 225 | 213.2, 604.8.1.5* | 4.1.6,(1), 4.1.3(11), 4.17.6 | In a stall, the sidewall grab bar in a stall must be at least 40", must be within 12" of the rear wall, and extend at least 52" from the rear wall. | The grab bar is only about 36" long.  The front end is about 48" from the rear wall.  In that it does not comply with the 1991 ADA Standards, it must comply with the 2010 ADA Standards which requires the front end to be at least 54" from the rear wall. | 6162 |
| 226 | | | **Inmate's Restroom:** | | |
| 227 | 206.5, 404.2.3 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.5 | Doors that are part of the accessible route must have a minimum clear opening of 32" when the door is open 90 degrees. | The clear opening 28 1/2". | 6198, 6199 |
| 228 | 206.5, 404.2.4 | 4.1.6,(1), 4.1.3(7)&(8), 4.13.6 | The pull side of the door requires a forward approach. Therefore, the maneuvering space must be 60" deep and must extend 18" to the side of the latch. | The maneuvering space extends only 8 1/2" beside the latch side of the door. | 6200 |
| 229 | 213.2, | 4.1.6,(1), 4.1.3(11), | Each public and common use toilet room must be accessible. | The Inmate's Restroom does not have any accessible features. | 6201, 6202 |
| 230 | | | | | |


7/6/2016
DSC05555.JPG


7/6/2016
DSC05556.JPG


7/6/2016
DSC05557.JPG


7/6/2016
DSC05558.JPG


7/6/2016
DSC05559.JPG


7/6/2016
DSC05560.JPG


7/6/2016
DSC05561.JPG


7/6/2016
DSC05562.JPG


7/6/2016
DSC05563.JPG

JX-CCH-000325



7/6/2016
DSC05564.JPG



7/6/2016
DSC05565.JPG



7/6/2016
DSC05566.JPG



7/6/2016
DSC05567.JPG



7/6/2016
DSC05568.JPG



7/6/2016
DSC05569.JPG



7/6/2016
DSC05570.JPG



7/6/2016
DSC05571.JPG



7/6/2016
DSC05572.JPG

JX-CCH-000326


7/6/2016
DSC05573.JPG


7/6/2016
DSC05574.JPG


7/6/2016
DSC05575.JPG


7/6/2016
DSC05576.JPG


7/6/2016
DSC05577.JPG


7/6/2016
DSC05578.JPG


7/6/2016
DSC05579.JPG


7/6/2016
DSC05580.JPG


7/6/2016
DSC05581.JPG

JX-CCH-000327



7/6/2016
DSC05582.JPG



7/6/2016
DSC05583.JPG



7/6/2016
DSC05584.JPG



7/6/2016
DSC05585.JPG



7/6/2016
DSC05586.JPG



7/6/2016
DSC05587.JPG



7/6/2016
DSC05588.JPG



7/6/2016
DSC05589.JPG



7/6/2016
DSC05590.JPG

JX-CCH-000328



7/6/2016
DSC05591.JPG



7/6/2016
DSC05592.JPG



7/6/2016
DSC05593.JPG



7/6/2016
DSC05594.JPG



7/6/2016
DSC05595.JPG



7/6/2016
DSC05596.JPG



7/6/2016
DSC05597.JPG



7/6/2016
DSC05598.JPG



7/6/2016
DSC05599.JPG

JX-CCH-000329



7/6/2016
DSC05600.JPG



7/6/2016
DSC05601.JPG



7/6/2016
DSC05602.JPG



7/6/2016
DSC05603.JPG



7/6/2016
DSC05604.JPG



7/6/2016
DSC05605.JPG



7/6/2016
DSC05606.JPG



7/6/2016
DSC05607.JPG



7/6/2016
DSC05608.JPG

JX-CCH-000330



7/6/2016
DSC05609.JPG



7/6/2016
DSC05610.JPG



7/6/2016
DSC05611.JPG



7/6/2016
DSC05612.JPG



7/6/2016
DSC05613.JPG



7/6/2016
DSC05614.JPG



7/6/2016
DSC05615.JPG



7/6/2016
DSC05616.JPG



7/6/2016
DSC05617.JPG

JX-CCH-000331



7/6/2016
DSC05618.JPG



7/6/2016
DSC05619.JPG



7/6/2016
DSC05620.JPG



7/6/2016
DSC05621.JPG



7/6/2016
DSC05622.JPG



7/6/2016
DSC05623.JPG



7/6/2016
DSC05624.JPG



7/6/2016
DSC05625.JPG



7/6/2016
DSC05626.JPG

JX-CCH-000332



7/6/2016
DSC05627.JPG



7/6/2016
DSC05628.JPG



7/6/2016
DSC05629.JPG



7/6/2016
DSC05630.JPG



7/6/2016
DSC05631.JPG



7/6/2016
DSC05632.JPG



7/6/2016
DSC05633.JPG



7/6/2016
DSC05634.JPG



7/6/2016
DSC05635.JPG

JX-CCH-000333



7/6/2016
DSC05636.JPG



7/6/2016
DSC05637.JPG



7/6/2016
DSC05638.JPG



7/6/2016
DSC05639.JPG



7/6/2016
DSC05640.JPG



7/6/2016
DSC05641.JPG



7/6/2016
DSC05642.JPG



7/6/2016
DSC05643.JPG



7/6/2016
DSC05644.JPG

JX-CCH-000334



7/6/2016
DSC05645.JPG



7/6/2016
DSC05646.JPG



7/6/2016
DSC05647.JPG



7/6/2016
DSC05648.JPG



7/6/2016
DSC05649.JPG



7/6/2016
DSC05650.JPG



7/6/2016
DSC05651.JPG



7/6/2016
DSC05652.JPG



7/6/2016
DSC05653.JPG

JX-CCH-000335



7/6/2016
DSC05654.JPG



7/6/2016
DSC05655.JPG



7/6/2016
DSC05656.JPG



7/6/2016
DSC05657.JPG



7/6/2016
DSC05658.JPG



7/6/2016
DSC05659.JPG



7/6/2016
DSC05660.JPG



7/6/2016
DSC05661.JPG



7/6/2016
DSC05662.JPG

JX-CCH-000336



7/6/2016
DSC05663.JPG



7/6/2016
DSC05664.JPG



7/6/2016
DSC05665.JPG



7/6/2016
DSC05666.JPG



7/6/2016
DSC05667.JPG



7/6/2016
DSC05668.JPG



7/6/2016
DSC05669.JPG



7/6/2016
DSC05670.JPG



7/6/2016
DSC05671.JPG

JX-CCH-000337



7/6/2016
DSC05672.JPG



7/6/2016
DSC05673.JPG



7/6/2016
DSC05674.JPG



7/6/2016
DSC05675.JPG



7/6/2016
DSC05676.JPG



7/6/2016
DSC05677.JPG



7/6/2016
DSC05678.JPG



7/6/2016
DSC05679.JPG



7/6/2016
DSC05680.JPG

JX-CCH-000338



7/6/2016
DSC05681.JPG



7/6/2016
DSC05682.JPG



7/6/2016
DSC05683.JPG



7/6/2016
DSC05684.JPG



7/6/2016
DSC05685.JPG



7/6/2016
DSC05686.JPG



7/6/2016
DSC05687.JPG



7/6/2016
DSC05688.JPG



7/6/2016
DSC05689.JPG

JX-CCH-000339



7/6/2016
DSC05690.JPG



7/6/2016
DSC05691.JPG



7/6/2016
DSC05692.JPG



7/6/2016
DSC05693.JPG



7/6/2016
DSC05694.JPG



7/6/2016
DSC05695.JPG



7/6/2016
DSC05696.JPG



7/6/2016
DSC05697.JPG



7/6/2016
DSC05698.JPG

JX-CCH-000340



7/6/2016
DSC05699.JPG



7/6/2016
DSC05700.JPG



7/6/2016
DSC05701.JPG



7/6/2016
DSC05702.JPG



7/6/2016
DSC05703.JPG



7/6/2016
DSC05704.JPG



7/6/2016
DSC05705.JPG



7/6/2016
DSC05706.JPG



7/6/2016
DSC05707.JPG

JX-CCH-000341



7/6/2016
DSC05708.JPG



7/6/2016
DSC05709.JPG



7/6/2016
DSC05710.JPG



7/6/2016
DSC05711.JPG



7/6/2016
DSC05712.JPG



7/6/2016
DSC05713.JPG



7/6/2016
DSC05714.JPG



7/6/2016
DSC05715.JPG



7/6/2016
DSC05716.JPG

JX-CCH-000342



7/6/2016
DSC05717.JPG



7/6/2016
DSC05718.JPG



7/6/2016
DSC05719.JPG



7/6/2016
DSC05720.JPG



7/6/2016
DSC05721.JPG



7/6/2016
DSC05722.JPG



7/6/2016
DSC05723.JPG



7/6/2016
DSC05724.JPG



7/6/2016
DSC05725.JPG

JX-CCH-000343



7/6/2016
DSC05726.JPG



7/6/2016
DSC05727.JPG



7/6/2016
DSC05728.JPG



7/6/2016
DSC05729.JPG



7/6/2016
DSC05730.JPG



7/6/2016
DSC05731.JPG



7/6/2016
DSC05732.JPG



7/6/2016
DSC05733.JPG



7/6/2016
DSC05734.JPG

JX-CCH-000344



7/6/2016
DSC05735.JPG



7/6/2016
DSC05736.JPG



7/6/2016
DSC05737.JPG



7/6/2016
DSC05738.JPG



7/6/2016
DSC05739.JPG



7/6/2016
DSC05740.JPG



7/6/2016
DSC05741.JPG



7/6/2016
DSC05742.JPG



7/6/2016
DSC05743.JPG

JX-CCH-000345



7/6/2016
DSC05744.JPG



7/6/2016
DSC05745.JPG



7/6/2016
DSC05746.JPG



7/6/2016
DSC05747.JPG



7/6/2016
DSC05748.JPG



7/6/2016
DSC05749.JPG



7/6/2016
DSC05750.JPG



7/6/2016
DSC05751.JPG



7/6/2016
DSC05752.JPG

JX-CCH-000346



7/6/2016
DSC05753.JPG



7/6/2016
DSC05754.JPG



7/6/2016
DSC05755.JPG



7/6/2016
DSC05756.JPG



7/6/2016
DSC05757.JPG



7/6/2016
DSC05758.JPG



7/6/2016
DSC05759.JPG



7/6/2016
DSC05760.JPG



7/6/2016
DSC05761.JPG

JX-CCH-000347



7/6/2016
DSC05762.JPG



7/6/2016
DSC05763.JPG



7/6/2016
DSC05764.JPG



7/6/2016
DSC05765.JPG



7/6/2016
DSC05766.JPG



7/6/2016
DSC05767.JPG



7/6/2016
DSC05768.JPG



7/6/2016
DSC05769.JPG



7/6/2016
DSC05770.JPG

JX-CCH-000348



7/6/2016
DSC05771.JPG



7/6/2016
DSC05772.JPG



7/6/2016
DSC05773.JPG



7/6/2016
DSC05774.JPG



7/6/2016
DSC05775.JPG



7/6/2016
DSC05776.JPG



7/6/2016
DSC05777.JPG



7/6/2016
DSC05778.JPG



7/6/2016
DSC05779.JPG

JX-CCH-000349



7/6/2016
DSC05780.JPG



7/6/2016
DSC05781.JPG



7/6/2016
DSC05782.JPG



7/6/2016
DSC05783.JPG



7/6/2016
DSC05784.JPG



7/6/2016
DSC05785.JPG



7/6/2016
DSC05786.JPG



7/6/2016
DSC05787.JPG



7/6/2016
DSC05788.JPG

JX-CCH-000350



7/6/2016
DSC05789.JPG



7/6/2016
DSC05790.JPG



7/6/2016
DSC05791.JPG



7/6/2016
DSC05792.JPG



7/6/2016
DSC05793.JPG



7/6/2016
DSC05794.JPG



7/6/2016
DSC05795.JPG



7/6/2016
DSC05796.JPG



7/6/2016
DSC05797.JPG

JX-CCH-000351



7/6/2016
DSC05798.JPG



7/6/2016
DSC05799.JPG



7/6/2016
DSC05800.JPG



7/6/2016
DSC05801.JPG



7/6/2016
DSC05802.JPG



7/6/2016
DSC05803.JPG



7/6/2016
DSC05804.JPG



7/6/2016
DSC05805.JPG



7/6/2016
DSC05806.JPG

JX-CCH-000352



7/6/2016
DSC05807.JPG



7/6/2016
DSC05808.JPG



7/6/2016
DSC05809.JPG



7/6/2016
DSC05810.JPG



7/6/2016
DSC05811.JPG



7/6/2016
DSC05812.JPG



7/6/2016
DSC05813.JPG



7/6/2016
DSC05814.JPG



7/6/2016
DSC05815.JPG

JX-CCH-000353



7/6/2016
DSC05816.JPG



7/6/2016
DSC05817.JPG



7/6/2016
DSC05818.JPG



7/6/2016
DSC05819.JPG



7/6/2016
DSC05820.JPG



7/6/2016
DSC05821.JPG



7/6/2016
DSC05822.JPG



7/6/2016
DSC05823.JPG



7/6/2016
DSC05824.JPG

JX-CCH-000354



7/6/2016
DSC05825.JPG



7/6/2016
DSC05826.JPG



7/6/2016
DSC05827.JPG



7/6/2016
DSC05828.JPG



7/6/2016
DSC05829.JPG



7/6/2016
DSC05830.JPG



7/6/2016
DSC05831.JPG



7/6/2016
DSC05832.JPG



7/6/2016
DSC05833.JPG

JX-CCH-000355



7/6/2016
DSC05834.JPG



7/6/2016
DSC05835.JPG



7/6/2016
DSC05836.JPG



7/6/2016
DSC05837.JPG



7/6/2016
DSC05838.JPG



7/6/2016
DSC05839.JPG



7/6/2016
DSC05840.JPG



7/6/2016
DSC05841.JPG



7/6/2016
DSC05842.JPG

JX-CCH-000356



7/6/2016
DSC05843.JPG



7/6/2016
DSC05844.JPG



7/6/2016
DSC05845.JPG



7/6/2016
DSC05846.JPG



7/6/2016
DSC05847.JPG



7/6/2016
DSC05848.JPG



7/6/2016
DSC05849.JPG



7/6/2016
DSC05850.JPG



7/6/2016
DSC05851.JPG

JX-CCH-000357



7/6/2016
DSC05852.JPG



7/6/2016
DSC05853.JPG



7/6/2016
DSC05854.JPG



7/6/2016
DSC05855.JPG



7/6/2016
DSC05856.JPG



7/6/2016
DSC05857.JPG



7/6/2016
DSC05858.JPG



7/6/2016
DSC05859.JPG



7/6/2016
DSC05860.JPG

JX-CCH-000358



7/6/2016
DSC05861.JPG



7/6/2016
DSC05862.JPG



7/6/2016
DSC05863.JPG



7/6/2016
DSC05864.JPG



7/6/2016
DSC05865.JPG



7/6/2016
DSC05866.JPG



7/6/2016
DSC05867.JPG



7/6/2016
DSC05868.JPG



7/6/2016
DSC05869.JPG

JX-CCH-000359



7/6/2016
DSC05870.JPG



7/6/2016
DSC05871.JPG



7/6/2016
DSC05872.JPG



7/6/2016
DSC05873.JPG



7/6/2016
DSC05874.JPG



7/6/2016
DSC05875.JPG



7/6/2016
DSC05876.JPG



7/6/2016
DSC05877.JPG



7/6/2016
DSC05878.JPG

JX-CCH-000360



7/6/2016
DSC05879.JPG



7/6/2016
DSC05880.JPG



7/6/2016
DSC05881.JPG



7/6/2016
DSC05882.JPG



7/6/2016
DSC05883.JPG



7/6/2016
DSC05884.JPG



7/6/2016
DSC05885.JPG



7/6/2016
DSC05886.JPG



7/6/2016
DSC05887.JPG

JX-CCH-000361



7/6/2016
DSC05888.JPG



7/6/2016
DSC05889.JPG



7/6/2016
DSC05890.JPG



7/6/2016
DSC05891.JPG



7/6/2016
DSC05892.JPG



7/6/2016
DSC05893.JPG



7/6/2016
DSC05894.JPG



7/6/2016
DSC05895.JPG



7/6/2016
DSC05896.JPG

JX-CCH-000362



7/6/2016
DSC05897.JPG



7/6/2016
DSC05898.JPG



7/6/2016
DSC05899.JPG



7/6/2016
DSC05900.JPG



7/6/2016
DSC05901.JPG



7/6/2016
DSC05902.JPG



7/6/2016
DSC05903.JPG



7/6/2016
DSC05904.JPG



7/6/2016
DSC05905.JPG

JX-CCH-000363



7/6/2016
DSC05906.JPG



7/6/2016
DSC05907.JPG



7/6/2016
DSC05908.JPG



7/6/2016
DSC05909.JPG



7/6/2016
DSC05910.JPG



7/6/2016
DSC05911.JPG



7/6/2016
DSC05912.JPG



7/6/2016
DSC05913.JPG



7/6/2016
DSC05914.JPG

JX-CCH-000364



7/6/2016
DSC05915.JPG



7/6/2016
DSC05916.JPG



7/6/2016
DSC05917.JPG



7/6/2016
DSC05918.JPG



7/6/2016
DSC05919.JPG



7/6/2016
DSC05920.JPG



7/6/2016
DSC05921.JPG



7/6/2016
DSC05922.JPG



7/6/2016
DSC05923.JPG

JX-CCH-000365



7/6/2016
DSC05924.JPG



7/6/2016
DSC05925.JPG



7/6/2016
DSC05926.JPG



7/6/2016
DSC05927.JPG



7/6/2016
DSC05928.JPG



7/6/2016
DSC05929.JPG



7/6/2016
DSC05930.JPG



7/6/2016
DSC05931.JPG



7/6/2016
DSC05932.JPG

JX-CCH-000366


7/6/2016
DSC05933.JPG


7/6/2016
DSC05934.JPG


7/6/2016
DSC05935.JPG


7/6/2016
DSC05936.JPG


7/6/2016
DSC05937.JPG


7/6/2016
DSC05938.JPG


7/6/2016
DSC05939.JPG


7/6/2016
DSC05940.JPG


7/6/2016
DSC05941.JPG

JX-CCH-000367



7/6/2016
DSC05942.JPG



7/6/2016
DSC05943.JPG



7/6/2016
DSC05944.JPG



7/6/2016
DSC05945.JPG



7/6/2016
DSC05946.JPG



7/6/2016
DSC05947.JPG



7/6/2016
DSC05948.JPG



7/6/2016
DSC05949.JPG



7/6/2016
DSC05950.JPG

JX-CCH-000368



7/6/2016
DSC05951.JPG



7/6/2016
DSC05952.JPG



7/6/2016
DSC05953.JPG



7/6/2016
DSC05954.JPG



7/6/2016
DSC05955.JPG



7/6/2016
DSC05956.JPG



7/6/2016
DSC05957.JPG



7/6/2016
DSC05958.JPG



7/6/2016
DSC05959.JPG

JX-CCH-000369



7/6/2016
DSC05960.JPG



7/6/2016
DSC05961.JPG



7/6/2016
DSC05962.JPG



7/6/2016
DSC05963.JPG



7/6/2016
DSC05964.JPG



7/6/2016
DSC05965.JPG



7/6/2016
DSC05966.JPG



7/6/2016
DSC05967.JPG



7/6/2016
DSC05968.JPG

JX-CCH-000370



7/6/2016
DSC05969.JPG



7/6/2016
DSC05970.JPG



7/6/2016
DSC05971.JPG



7/6/2016
DSC05972.JPG



7/6/2016
DSC05973.JPG



7/6/2016
DSC05974.JPG



7/6/2016
DSC05975.JPG



7/6/2016
DSC05976.JPG



7/6/2016
DSC05977.JPG

JX-CCH-000371



7/6/2016
DSC05978.JPG



7/6/2016
DSC05979.JPG



7/6/2016
DSC05980.JPG



7/6/2016
DSC05981.JPG



7/6/2016
DSC05982.JPG



7/6/2016
DSC05983.JPG



7/6/2016
DSC05984.JPG



7/6/2016
DSC05985.JPG



7/6/2016
DSC05986.JPG

JX-CCH-000372



7/6/2016
DSC05987.JPG



7/6/2016
DSC05988.JPG



7/6/2016
DSC05989.JPG



7/6/2016
DSC05990.JPG



7/6/2016
DSC05991.JPG



7/6/2016
DSC05992.JPG



7/6/2016
DSC05993.JPG



7/6/2016
DSC05994.JPG



7/6/2016
DSC05995.JPG

JX-CCH-000373



7/6/2016
DSC05996.JPG



7/6/2016
DSC05997.JPG



7/6/2016
DSC05998.JPG



7/6/2016
DSC05999.JPG



7/6/2016
DSC06000.JPG



7/6/2016
DSC06001.JPG



7/6/2016
DSC06002.JPG



7/6/2016
DSC06003.JPG



7/6/2016
DSC06004.JPG

JX-CCH-000374



7/6/2016
DSC06005.JPG



7/6/2016
DSC06006.JPG



7/6/2016
DSC06007.JPG



7/6/2016
DSC06008.JPG



7/6/2016
DSC06009.JPG



7/6/2016
DSC06010.JPG



7/6/2016
DSC06011.JPG



7/6/2016
DSC06012.JPG



7/6/2016
DSC06013.JPG

JX-CCH-000375



7/6/2016
DSC06014.JPG



7/6/2016
DSC06015.JPG



7/6/2016
DSC06016.JPG



7/6/2016
DSC06017.JPG



7/6/2016
DSC06018.JPG



7/6/2016
DSC06019.JPG



7/6/2016
DSC06020.JPG



7/6/2016
DSC06021.JPG



7/6/2016
DSC06022.JPG

JX-CCH-000376



7/6/2016
DSC06023.JPG



7/6/2016
DSC06024.JPG



7/6/2016
DSC06025.JPG



7/6/2016
DSC06026.JPG



7/6/2016
DSC06027.JPG



7/6/2016
DSC06028.JPG



7/6/2016
DSC06029.JPG



7/6/2016
DSC06030.JPG



7/6/2016
DSC06031.JPG

JX-CCH-000377



7/6/2016
DSC06032.JPG



7/6/2016
DSC06033.JPG



7/6/2016
DSC06034.JPG



7/6/2016
DSC06035.JPG



7/6/2016
DSC06036.JPG



7/6/2016
DSC06037.JPG



7/6/2016
DSC06038.JPG



7/6/2016
DSC06039.JPG



7/6/2016
DSC06040.JPG

JX-CCH-000378



7/6/2016
DSC06041.JPG



7/6/2016
DSC06042.JPG



7/6/2016
DSC06043.JPG



7/6/2016
DSC06044.JPG



7/6/2016
DSC06045.JPG



7/6/2016
DSC06046.JPG



7/6/2016
DSC06047.JPG



7/6/2016
DSC06048.JPG



7/6/2016
DSC06049.JPG

JX-CCH-000379



7/6/2016
DSC06050.JPG



7/6/2016
DSC06051.JPG



7/6/2016
DSC06052.JPG



7/6/2016
DSC06053.JPG



7/6/2016
DSC06054.JPG



7/6/2016
DSC06055.JPG



7/6/2016
DSC06056.JPG



7/6/2016
DSC06057.JPG



7/6/2016
DSC06058.JPG

JX-CCH-000380



7/6/2016
DSC06059.JPG



7/6/2016
DSC06060.JPG



7/6/2016
DSC06061.JPG



7/6/2016
DSC06062.JPG



7/6/2016
DSC06063.JPG



7/6/2016
DSC06064.JPG



7/6/2016
DSC06065.JPG



7/6/2016
DSC06066.JPG



7/6/2016
DSC06067.JPG

JX-CCH-000381



7/6/2016
DSC06068.JPG



7/6/2016
DSC06069.JPG



7/6/2016
DSC06070.JPG



7/6/2016
DSC06071.JPG



7/6/2016
DSC06072.JPG



7/6/2016
DSC06073.JPG



7/6/2016
DSC06074.JPG



7/6/2016
DSC06075.JPG



7/6/2016
DSC06076.JPG

JX-CCH-000382



7/6/2016
DSC06077.JPG



7/6/2016
DSC06078.JPG



7/6/2016
DSC06079.JPG



7/6/2016
DSC06080.JPG



7/6/2016
DSC06081.JPG



7/6/2016
DSC06082.JPG



7/6/2016
DSC06083.JPG



7/6/2016
DSC06084.JPG



7/6/2016
DSC06085.JPG

JX-CCH-000383



7/6/2016
DSC06086.JPG



7/6/2016
DSC06087.JPG



7/6/2016
DSC06088.JPG



7/6/2016
DSC06089.JPG



7/6/2016
DSC06090.JPG



7/6/2016
DSC06091.JPG



7/6/2016
DSC06092.JPG



7/6/2016
DSC06093.JPG



7/6/2016
DSC06094.JPG

JX-CCH-000384



7/6/2016
DSC06095.JPG



7/6/2016
DSC06096.JPG



7/6/2016
DSC06097.JPG



7/6/2016
DSC06098.JPG



7/6/2016
DSC06099.JPG



7/6/2016
DSC06100.JPG



7/6/2016
DSC06101.JPG



7/6/2016
DSC06102.JPG



7/6/2016
DSC06103.JPG

JX-CCH-000385



7/6/2016
DSC06104.JPG



7/6/2016
DSC06105.JPG



7/6/2016
DSC06106.JPG



7/6/2016
DSC06107.JPG



7/6/2016
DSC06108.JPG



7/6/2016
DSC06109.JPG



7/6/2016
DSC06110.JPG



7/6/2016
DSC06111.JPG



7/6/2016
DSC06112.JPG

JX-CCH-000386



7/6/2016
DSC06113.JPG



7/6/2016
DSC06114.JPG



7/6/2016
DSC06115.JPG



7/6/2016
DSC06116.JPG



7/6/2016
DSC06117.JPG



7/6/2016
DSC06118.JPG



7/6/2016
DSC06119.JPG



7/6/2016
DSC06120.JPG



7/6/2016
DSC06121.JPG

JX-CCH-000387



7/6/2016
DSC06122.JPG



7/6/2016
DSC06123.JPG



7/6/2016
DSC06124.JPG



7/6/2016
DSC06125.JPG



7/6/2016
DSC06126.JPG



7/6/2016
DSC06127.JPG



7/6/2016
DSC06128.JPG



7/6/2016
DSC06129.JPG



7/6/2016
DSC06130.JPG

JX-CCH-000388



7/6/2016
DSC06131.JPG



7/6/2016
DSC06132.JPG



7/6/2016
DSC06133.JPG



7/6/2016
DSC06134.JPG



7/6/2016
DSC06135.JPG



7/6/2016
DSC06136.JPG



7/6/2016
DSC06137.JPG



7/6/2016
DSC06138.JPG



7/6/2016
DSC06139.JPG

JX-CCH-000389



7/6/2016
DSC06140.JPG



7/6/2016
DSC06141.JPG



7/6/2016
DSC06142.JPG



7/6/2016
DSC06143.JPG



7/6/2016
DSC06144.JPG



7/6/2016
DSC06145.JPG



7/6/2016
DSC06146.JPG



7/6/2016
DSC06147.JPG



7/6/2016
DSC06148.JPG

JX-CCH-000390


7/6/2016
DSC06149.JPG


7/6/2016
DSC06150.JPG


7/6/2016
DSC06151.JPG


7/6/2016
DSC06152.JPG


7/6/2016
DSC06153.JPG


7/6/2016
DSC06154.JPG


7/6/2016
DSC06155.JPG


7/6/2016
DSC06156.JPG


7/6/2016
DSC06157.JPG

JX-CCH-000391



7/6/2016
DSC06158.JPG



7/6/2016
DSC06159.JPG



7/6/2016
DSC06160.JPG



7/6/2016
DSC06161.JPG



7/6/2016
DSC06162.JPG



7/6/2016
DSC06163.JPG



7/6/2016
DSC06164.JPG



7/6/2016
DSC06165.JPG



7/6/2016
DSC06166.JPG

JX-CCH-000392



7/6/2016
DSC06167.JPG



7/6/2016
DSC06168.JPG



7/6/2016
DSC06169.JPG



7/6/2016
DSC06170.JPG



7/6/2016
DSC06171.JPG



7/6/2016
DSC06172.JPG



7/6/2016
DSC06173.JPG



7/6/2016
DSC06174.JPG



7/6/2016
DSC06175.JPG

JX-CCH-000393



7/6/2016
DSC06176.JPG



7/6/2016
DSC06177.JPG



7/6/2016
DSC06178.JPG



7/6/2016
DSC06179.JPG



7/6/2016
DSC06180.JPG



7/6/2016
DSC06181.JPG



7/6/2016
DSC06182.JPG



7/6/2016
DSC06183.JPG



7/6/2016
DSC06184.JPG

JX-CCH-000394



7/6/2016
DSC06185.JPG



7/6/2016
DSC06186.JPG



7/6/2016
DSC06187.JPG



7/6/2016
DSC06188.JPG



7/6/2016
DSC06189.JPG



7/6/2016
DSC06190.JPG



7/6/2016
DSC06191.JPG



7/6/2016
DSC06192.JPG



7/6/2016
DSC06193.JPG

JX-CCH-000395



7/6/2016
DSC06194.JPG



7/6/2016
DSC06195.JPG



7/6/2016
DSC06196.JPG



7/6/2016
DSC06197.JPG



7/6/2016
DSC06198.JPG



7/6/2016
DSC06199.JPG



7/6/2016
DSC06200.JPG



7/6/2016
DSC06201.JPG



7/6/2016
DSC06202.JPG

JX-CCH-000396



7/6/2016
DSC06203.JPG



7/6/2016
DSC06204.JPG



7/6/2016
DSC06205.JPG



7/6/2016
DSC06206.JPG



7/6/2016
DSC06207.JPG



7/6/2016
DSC06208.JPG

JX-CCH-000397