UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, AND RUFUS WHITE, on behalf of themselves and all others similarly situated

NO. 15-CV-318

VS.

BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

Testimony of

ALTON BATISTE

taken on Friday, August 19, 2016, before Kimberly L. Gibney, Registered Professional Reporter, at Louisiana State Penitentiary, 17544 Tunica Trace, Angola, Louisiana.

COURT REPORTERS OF LOUISIANA, L.L.C.
9614 Brookline Avenue, Suite A
Baton Rouge, Louisiana 70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-Mail: depos@courtreportersla.com

A. Yeah. I got it right now.
Q. Okay. I noticed today that you came in using a cane?
A. Right.
Q. And what do you use that cane for?
A. For my directions.
Q. Okay. And where did you get the cane?
A. From one of the inmate had died.
Q. Have you ever had what they call a tapping cane?
A. I never did.
Q. Do you know what a tapping cane is?
A. I've seen them before but I haven't had none.
Q. Did you ever ask?
A. They issue no kind of cane to me, none at all.
Q. Have you ever asked for a tapping cane?
A. No.
Q. Do you know if any doctor ever ordered you to have a tapping cane?
A. No.
Q. With respect to your right eye, the eye that you have glaucoma, are you having any kind

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, AND RUFUS WHITE, on behalf of themselves and all others similarly situated

NO. 15-CV-318

VS.

BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

Testimony of

EDWARD WASHINGTON

taken on Thursday, August 18, 2016, before Kimberly L. Gibney, Registered Professional Reporter, at Louisiana State Penitentiary, 17544 Tunica Trace, Angola, Louisiana.

COURT REPORTERS OF LOUISIANA, L.L.C.
9614 Brookline Avenue, Suite A
Baton Rouge, Louisiana 70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-Mail: depos@courtreportersla.com

and sticking it and take the sticks, checking blood sugar, you know, for, you know, how high or how low it is. That's twice a day. When the nurse do it or the EMT, that's what they do.

Q. Okay. They apparently put alcohol on your finger, prick your finger to get a little blood out of it?

A. Yes, sir.

Q. And then check your blood sugar level?

A. Yes, sir.

Q. Okay. And do they have a machine that they use to check the level?

A. Yes, sir.

Q. And does it give a little digital reading for your blood sugar level?

A. Yes, they do.

Q. And since you've been on -- diagnosed as a diabetic a couple of years ago, have they been checking your blood sugar level every day like that?

A. No. In the beginning when I first started, you know, shooting the insulin, no, they did not -- they don't check it. But recently this year, you know, from May, March, they have been checking it daily.

Q. Okay.
A. But prior to that, no.
Q. So in May or March of this year, whatever that may be, you're testifying that they've given you daily checks twice a day --
A. Yes, sir.
Q. -- to check your blood sugar blood level, right?
A. Yes, sir, they have.
Q. Let's go back before that. How often were they checking your blood sugar level, say, before that time period?
A. They didn't do it. The only way it was done before then either the doctor would request for you to have it checked in two weeks or a week or whatever based upon you complaining of something -- you know, some reason.
Q. 'Cause there's an allegation in your lawsuit, in the second amended complaint so the record is clear, Paragraph 53. I'm going to read the third sentence. It says, rather than every morning, his sugar is currently tested only several months.
Is that true?
A. Yeah. It will be several months, yeah.

Q. So before they started checking it every day a few months ago this year, they would only check your blood sugar level every few months?
A. Right. And that may be based upon your complaint or request to have it checked. They don't just do it on their own.
Q. Okay. And before they started checking it every day, when they were checking it sporadically I'm going to call it, or rarely, whatever, did they use the Accu-Chek machine and do the same thing when they put alcohol on your finger, drew some blood, put it in the machine and get a reading?
A. Yes, sir.
Q. Is that how they would check it?
A. Yes, sir.
Q. Did they tell you why -- before they started checking it every day, did they tell you why they weren't checking you every day?
A. Well, no, they didn't tell me that before then, no. When I was . . .
Q. Before they were checking you every day, did you ask them to check you every day?
A. Yeah.
Q. And what were you told?

A. They just don't do it. It just wasn't something they do.

Q. And do you recall who told you that they didn't want to check your blood sugar?

A. No. Not at the moment. But I will say this here. At one point, I think it was last year, and I was getting my -- I was telling the lady about me having my blood checked, the status had run out. And she had told me -- that was Ms. -- Sergeant -- I can't think of her name. But she said that she didn't -- they didn't -- can't keep checking the blood sugar because the strips was too high. They cost too much. And that's when I was told about having it checked then.

Q. Do you know of anybody else that has not been provided with regular daily blood sugar checks besides you?

A. Yes. Prisoners. Nobody. That's the way prison -- nobody.

Q. I'm sorry?

A. That would be all diabetic patient, we are all treated the same. That is to say don't nobody get it checked regular unless you, you know, come up on some type of complication or

call?
A. Yes, sir.
Q. And you mentioned that you've seen some other guys were getting insulin checks as well?
A. Um-huh. Yes.
Q. And all those guys are also at Camp J?
A. Yes, ma'am.
Q. Before you lived in Camp J, where did you live?
A. Camp D.
Q. And who did the pill call there?
A. A sergeant, correctional officer or sergeant.
Q. And did you ever see them checking anyone's blood sugar?
A. No.
Q. Would they be qualified to check blood sugar in your understanding?
A. No. They can't do it, huh-uh. They couldn't do it.
Q. And that's when you were self-administrating insulin?
A. Yes.
Q. And you mentioned that one of the side effects from doing the -- from your diabetes was

becoming blind, is that right?
A. Yes.
Q. And can you talk about how that caused problems with your diabetes in your daily life?
A. Yes. My blood sugar -- sometimes, you know, my blood sugar runs, you know, a lot -- run too high, drops too low. And that has effect, you know, on my vision. You know, so I tries to keep it balanced by -- you know, if I'm getting my blood sugar checked, I can try my best to keep it balanced by knowing what I can eat and when or how much I can eat at the time by how high my sugar is.

That way I can have better control of my vision or other parts of my body, you know, throwing up or whatever. Being able to check it, you know, I control that part of my illness a lot better.
Q. Okay. And did being blind ever interfere with your self-administration of the insulin?
A. Yes. Because -- see, 'cause the insulin is like water. And your vision, everything is just -- it fog -- it's got like a haze. So when you put it in the syringe you're really guessing

at what you're putting in that syringe because you can't see. All you can see is something, you know.

So, you know, Sergeant Myles one morning, he said, Eddie, if you shoot that, he said, man, you're going to be out of here, like you're going to die. And he said you've got to let some of that insulin out of that syringe. So at that point I told him I'm not going to shoot it because I'm still not knowing. I'm just guessing it, like, pulling it by how much I draw. So I just give it back to him.

So he called the captain and told the captain that I had to go to the treatment center to get checked or to get the insulin because I'm not drawing it up right and he couldn't do it.

Q. Okay. Just so I understand, when you get your -- when you were at Camp D and you would get your needle, you would get a needle and, like, a bottle of insulin?

A. Right.

Q. And you would pull the insulin out yourself?

A. Right. You're on your own. You don't

get no assistance.

Q. And then you would shoot yourself?

A. Right.

MS. MONTAGNES: That's all I have.

MR. HILBURN: Thank you, Mr. Washington. We're finished.

(Deposition concluded at 12:07 p.m.)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., KENTRELL
PARKER, FARRELL SAMPIER,
REGINALD GEORGE, JOHN
TONUBBEE, OTTO BARRERA, CLYDE
CARTER, CEDRIC EVANS, EDWARD
GIOVANNI, RICKY D. DAVIS,
LIONEL TOLBERT, AND RUFUS
WHITE, JR., ON BEHALF OF
THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED

                     CIVIL ACTION NO. 15-CV-318

VS.

BURL CAIN, WARDEN OF THE
LOUISIANA STATE PENITENTIARY,
IN HIS OFFICIAL CAPACITY;
STEPHANIE LAMARTINIER, ASSISTANT
WARDEN FOR HEALTH SERVICES, IN HER
OFFICIAL CAPACITY; JAMES M. LEBLANC,
SECRETARY OF THE LOUISIANA DEPARTMENT
OF PUBLIC SAFETY AND CORRECTIONS, IN
HIS OFFICIAL CAPACITY, AND THE
LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS

Deposition of

RICKY DAVIS,

taken on Tuesday, August 23, 2016, before Rita

DeRouen, Registered Professional Reporter and

Certified Court Reporter for the State of Louisiana,

at the Louisiana State Penitentiary, 17544 Tunica

Trace, Angola, Louisiana.

COURT REPORTERS OF LOUISIANA, L.L.C.
9614 Brookline Avenue, Suite A
Baton Rouge, Louisiana  70809
PHONE (225) 201-9650 * FAX (225) 201-9651
E-Mail:  depos@courtreportersla.com

A. At University -- some LSU -- it's in that area. I'm not sure if it's under LSU or University.

Q. And that's in New Orleans, right?

A. Yes.

Q. And who did your surgery? Do you remember the doctor?

A. No, I don't.

Q. Not a problem. How were you transported from the prison to University Medical Center in New Orleans?

A. In the Angola rodeo van.

Q. And that was to get to your surgery; is that right?

A. That's correct.

Q. And then you had surgery at University Medical Center in New Orleans. How many days were you in the hospital after your surgery?

A. I believe it was two days.

Q. And at that time, apparently, the doctors discharged you and you were brought back to Angola; is that right?

MS. COMPA: Objection as to the form. But subject to the objection, you can go ahead and answer.

A. I'm not sure if the doctors released me

 because -- well, we might as well get into it right here. When the officer showed up, he said he had orders to take me back. And there was kind of some discrepancy. The young lady, the nurse that was there, I was complaining to her that I'm not ready to go back, I'm hurting right now. And we kind of got into a dispute about that.

And I was explaining to her that they didn't have a handicapped-accessible vehicle to bring me back. Because she was asking me about a wheelchair, did they have a vehicle to bring me back. And they didn't. I was trying to explain to her that they was going to roll me out in the wheelchair and put me in the van. They didn't have no handicapped-accessible vehicle.

Q. So what vehicle did they put you in to bring you back to Angola?

A. Angola rodeo van.

Q. Can you describe what you mean by the Angola rodeo van? What does it look like on the inside?

A. It's a white van with maybe three rows of seats maybe from window to window width-wise, a little space in between.

Q. On your ride down to Angola in that same van, did you sit on one of those passenger seats in the

van?

A. No, I did not.

Q. On the ride from here to the hospital?

A. Oh, to the hospital?

Q. Yes, sir.

A. Yes. Okay. Yes.

Q. And how about the ride from the hospital in New Orleans to Angola in that van, where did you ride?

A. You're speaking about after the surgery?

Q. Yes, sir, after the surgery.

A. I rode across the front seat.

Q. So you were laid face-down?

A. Yes.

Q. Was there anybody in the van with you?

A. Yes. There were a few other patients who had surgery, minor surgeries or whatever, that was occupying the van when I first got in. And one of the security officers made a statement for them to catch the back where I could lie across the front seat. And one of the guys I heard say, We had surgery too, you going to cram us in the back like that, something to that effect.

Q. And on the ride back from the hospital in New Orleans to here, did anything happen on the ride, like an accident or anything on the trip back?

A. No, we didn't have an accident. But it was a rough ride being in suspension and, you know, the van, just the condition of the van.

Q. So it was an uncomfortable ride back from the hospital in New Orleans to here after your surgery?

A. I would say it was a painful ride back.

Q. After your surgery, did you have any kind of staples in your back?

A. Yes, I did.

Q. And when I say L4-L5, do you know what I'm talking about?

A. Yes.

Q. Is that where the staples were?

A. Yes.

Q. When you got back, did they bring you back to your dorm where you were normally housed?

A. No. They have brought me back to Unit 1 over here. It's right up the hall.

Q. And how long did you stay at Unit 1 after you got back from the hospital, Mr. Davis?

A. I can't remember. A few days maybe, three or four days.

Q. And at some point were you transferred back to your dorm?

A. Yes, I was.

# MAIN PRISON WEST YARD
## FAX COVER SHEET

**Ray Vittorio, AW2/MPW/CBLK/Trips**
M/SGT Symonia Davis, Secretary
TELEPHONE: 225-655-2883 or 225 655-2884
FAX: 225-655-2882

**TO:** Ms. Diantha Rogers

**FROM:** Lt Jarvis

**DATE:** 05-05-16

**Fax #** 2273

14 **# OF PAGES** (including cover sheet)

**COMMENTS:** Evacuation Plans for Ash 2, Cyp2, + Hic Unit

# FIRE EVACUATION PLANS
# MAIN PRISON EAST YARD DORMITORIES

The following procedures will be followed in the event of a fire on the East Yard (Ash, Ma Cypress and Spruce Units):

PRIMARY EVACUATION PLAN:

When a fire is detected, the officer aware of the fire will immediately activate his beeper, th alarm system and immediately report the fire to Control Center via radio or by telephone by dialing 3-2800.

The officer will then attempt to extinguish the fire using the fire extinguisher in the area. If is too intense and cannot be extinguished, or heavy smoke begins to fill the area, the officer immediately evacuate inmates from the area.

As instructed by the officer, all inmates will proceed in a single-file line to the area designat the yard, utilizing the route shown on the evacuation route map which is posted in each area. to evacuating the area, the officer must secure all security documents, log books and rosters. all inmates have been evacuated, and the building has been cleared, the officer must conduct count of all inmates evacuated.

The ranking supervisor will immediately take charge upon arriving at the scene, and quickly assess the situation. After assessing the extent of the fire, the supervisor will notify Control C via radio, giving pertinent information and request assistance as needed. He will then supervi the evacuation and assembling of inmates in the designated area on the yard at least 50 feet a from the building.

As soon as possible, after all inmates have been evacuated, they will be assembled by housing and a roll call count will be conducted. The dorm officers and all other additional security will provide security of the inmates on the yard and will ensure that inmates stay assembled in thei assigned units. Roving Security will provide perimeter fence security for the affected area.

SECONDARY EVACUATION PLAN

Should the key officer for some reason not be able to proceed to the exits to unlock the doors fo evacuation, then the area supervisor will immediately dispatch an officer to the East Gate key control box where an additional set of keys is available for emergency use.

The officer will immediately return to the scene with the keys and begin emergency evacuation procedures as previously outlined under the supervision of the area supervisor.

PRIMARY EVACUATION ROUTES FOR THE EAST YARD DORMITORIES:

FIRE EVACUATION OF ASH UNIT

Ash 1 and 4 dorms: If the fire is in the rear of the dorm, inmates will be evacuated through front entrance door, down the walk through the Magnolia - 1 yard access gate to be lined u behind the backstop on the baseball field located behind Ash-2.

Ash 2 dorm: If the fire is in the rear of the dorm, inmates will be evacuated through the front entrance door, down the walk through the Magnolia 1 yard access gate to be lined up on the basketball court on Ash 1 yard located between Ash1 and the east yard doctors clinic.

Ash 3 dorm: If the fire is in the rear of the dorm, inmates will be evacuated through the front entrance door, down the walk through the Magnolia - 1 yard access gate to be lined up behi the backstop on the baseball field located behind Ash2.



# FIRE EVACUATION OF MAGNOLIA UNIT

Magnolia 1, 2, 3, and 4 dorms: If the fire is in the rear of the dorm, inmates will be evacua through the front entrance door, down the walk through the Cypress - 1 yard access gate t lined up behind the third base line on the East Yard baseball field located behind Magnoli

FIRE EVACUATION OF CYPRESS UNIT

Cypress 1, 2, 3, and 4 dorms: If the fire is in the rear of the dorm, inmates will be evacuated through the front entrance door, down the walk through the Spruce- 1 yard access gate to be up behind the backstop on the East Yard baseball field located behind Cypress 1 & 2









Page 5
Main Prison East Yard Evacuation Plan

FIRE EVACUATION OF SPRUCE UNIT

Spruce 1, 2, 3, and 4 dorms: If the fire is in the rear of the dorm, inmates will be evacuate through the front entrance door, down the walk through the walk gate at the end of Spruce be lined up behind the goal post on the East Yard football field located behind Spruce-2.

REAR DOOR EVACUATION
CYPRESS UNIT
LINED UP BEHIND FOOTBALL GOAL POST
SPRUCE-1

REAR DOOR EVACUATION
CYPRESS UNIT
LINED UP BEHIND FOOTBALL GOAL POST
SPRUCE-2

REAR DOOR EVACUATION
CYPRESS UNIT
LINED UP BEHIND FOOTBALL GOAL POST
SPRUCE-3

REAR DOOR EVACUATION
CYPRESS UNIT
LINED UP BEHIND FOOTBALL GOAL POST
SPRUCE-4

JX-CCH-000663

# SECONDARY FIRE EVACUATION ROUTES OF THE EAST YARD DORMITORIE

## SECONDARY EVACUATION ROUTE FOR ASH UNIT

Ash 1 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, across the yard to be lined up behind the backstop on the baseball field.



Ash 2 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, across the yard to be lined up behind the backstop on the baseball field.



Ash 3 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door through the Mag 4 yard access gate, across the yard to be lined up behind the backstop on the East Yard baseball field



Ash 4 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door through the Mag 4 yard access gate, across the yard to be lined up behind the backstop on the East Yard baseball field



SECONDARY EVACUATION ROUTE FOR MAGNOLIA UNIT

Magnolia 1 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door across the yard to be lined up behind third base on the Ash yard baseball field

Magnolia 2 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door across the yard to be lined up behind third base on the Ash yard baseball field

Magnolia 3 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door through the Ash 3 yard access gate, across the yard to be lined up behind third base on the Ash yard baseball field

Magnolia 4 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door through the Ash 3 yard access gate, across the yard to be lined up behind third base on the Ash yard baseball field

SECONDARY EVACUATION ROUTE FOR CYPRESS UNIT

Cypress 1 and 2 dorms: If the fire is in the front of the dorm, inmates will be evacuated thr the rear exit door to be lined up behind the backstop on the Cypress yard baseball field.

Cypress 3 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, across the walk, through the Spruce 4 yard access gate, and onto the yard to be lined up behind the backstop on the Cypress yard baseball field.

Cypress 4 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, through the Mag 3 yard access gate, across the walk, and onto the yard to be lined up behind the backstop on the Cypress yard baseball field.



SECONDARY EVACUATION ROUTE FOR SPRUCE UNIT

Spruce 1 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, across the yard and lined up behind the goal post on the East Yard football field.

Spruce 2 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, across the yard and lined up behind the goal post on the East Yard football field.

Spruce 3 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, across the yard and lined up behind the goal post on the East Yard football field.

Spruce 4 dorm: If the fire is in the front of the dorm, inmates will be evacuated through the rear exit door, across the yard and lined up behind the goal post on the East Yard football field.



# FIRE EVACUATION PLANS
# MAIN PRISON EAST YARD
# NIGHT HOURS AND/OR DURING SEVERE WEATHER
# EVACUATION PROCEDURE

Should an evacuation of the East Yard dormitories (Ash, Magnolia, Cypress, Spruce) becom necessary at night due to fire or severe weather, the following procedure will be followed.

Primary Evacuation Plan:

When a fire is detected, the officer aware of the fire will immediately activate his beeper, the alarm system, and report the fire to control center via radio or telephone by dialing 3-2800.

The officer will then attempt to extinguish the fire if possible. If the fire is too intense and can extinguished without jeopardizing the officer, or heavy smoke begins to fill the area, the offic immediately evacuate the inmates from the area.

As instructed by the officer, all inmates will proceed in single line to the area designated on th utilizing the route shown on the evacuation route map which is posted in each area. Prior to evacuating the area, the officer must secure all security documents, log books and rosters. Once all inmates have been evacuated, and the building has been cleared, the officer must con roll call count to ensure all inmates are accounted.

The ranking supervisor will immediately take charge upon arriving at the scene, and quickly a the situation. After assessing the extent of the fire, the supervisor will notify control center via giving pertinent information and request assistance as needed. He will then supervise the evac and assembling of inmates in designated area on the walk at least 50 feet from the affected bui

The ranking supervisor will also assess the area to determine if sufficient risk exists for the evacuation of adjoining buildings, protecting human life being the main factor in this decision. **Note: If secondary exits (rear door exits) must be utilized due to the location of the fire, R Security will be notified to provide perimeter security of fence during the movement afte and during severe weather. All available security should also be summoned to provide sec of movement until the inmates have been moved to secure location. Either to the designat area on the walk, or to the gym when return to the housing area is likely to be delayed for extended period of time.**

As soon as possible, after all inmates have been evacuated, they will be assembled by housing u and a roll call count will be conducted. The dorm officers and all additional security will provide security of the inmates movement and will ensure that inmates stay separated by unit until the er main prison count clears and inmates have returned to their housing location, or until they have secured in another housing area.

**Note: Anytime there is a large movement of inmates after dark through the yard, or durin severe weather an emergency count of all inmates at the Main Prison will be conducted.**

# MAIN PRISON EAST
# DORMITORY
# NIGHT HOURS AND/OR DURING SEVERE WEATHER
# EVACUATION ROUTE

Should evacuation of a dormitory be necessary due to fire during severe weather or during night evacuation route will be utilized in the movement of the inmates Noting that front door exits should alw except when the evacuation through the front exits would or could result in the endangerment of human exits evacuation is necessary due to life threading conditions, Only the dormitory area effected will be ev through the rear exit. All other dormitories will be evacuated if necessary through front door exits.

Supervisors will insure that all available officers are summonsed to the area to assist and that all notified to be alert during any movement of inmates on open yards.

As with any incident involving unscheduled mast movement of inmates, Notification must be ma Majors, Lt. Colonel, Colonel, East yard Asst. Warden, the Asst Warden of the Main Prison and The Asst Security.

During evacuations the inmates would be escorted to the east yard gate paired up and a roll call c conducted as required per procedure of all evacuations, however evacuations requiring a distances in asse would be escorted to the Main Prison Gym such as Bomb threats, Sever Gas leakage, and Etc, and where danger to life is believed to be present.

Secondary evacuation sites that may be considered should the main prison gym also pose a threat fenced compound and/or the rodeo grounds but only with the expressed approval of the Angola warden or

Page 2
Main Prison West Yard Evacuation Plan
West Yard Dormitory Routes
Revised 10-31-01

FIRE EVACUATION OF PINE UNIT:
In the event of a fire in the rear of the dorm, the offenders and personnel will be evacu through the front entrance door onto the walk and onto the Pine yard. Should the fire l the front of the dorm offenders and personnel will then exit through the rear door Once on the yard Offenders and personnel from Pine 3 and 4 will be routed around Pir Pine 2 to the designated area on the yard behind Pine 1 and 2 along with the offenders personnel from Pine 1 and 2.

Pine 1, 2, 3, and 4 offenders and personnel will assemble according to their respective in an area behind Oak 1 and 2 to the perimeter fence between Main Prison Tower 2 an

FIRE EVACUATION OF WALNUT UNIT:
In the event of a fire in the rear of the dorm, the offenders will be evacuated through the doors onto the walk and onto the yard. Should the fire be in the front of the dorm, offen and personnel in Walnut 1 and 2 will be evacuated through the rear exit door and onto Offenders and personnel in Walnut 3 and 4 will be evacuated through the rear exit door the yard along with the Walnut 1 and 2 offenders and personnel.
Walnut 1, 2, 3 and 4 offenders and personnel will be assembled according to their prosp dorms in an area to the inside perimeter fence between Main Prison Towers 16 and 17.

FIRE EVACUATION OF HICKORY UNIT:
In the event of a fire in the rear of the dorm, the offenders and personnel will be evacuat through the front entrance door onto the walk and onto the yard. Should the fire be in th part of the dorm, offenders and personnel from Hickory 1, 2, 3 and 4 will be evacuated th the rear exit doors and onto the yard to an area designated by security.

Hickory 1, 2, 3 and 4 offenders and personnel will be assembled according to their respe dorms in an area to the inside perimeter fence between Main Prison Towers 9 and 16.

SECONDARY EVACUATION PLAN:

Should the key officer, for some reason not be able to proceed to the exits to unlock for evacuation, then the area supervisor will immediately dispatch an officer to the West and retrieve the additional set of keys stored there for emergency use.

The officer will immediately return to the area with the keys and begin emergency evacua procedures as previously outlined under the supervision of the area supervisor.



DORM 3
DORM 4
DORM 2
DORM 1
T.V. ROOM
GAME ROOM
SHOWERS
MECH. ELECT.
ELECT. MECH.
PASSAGE
COVERED WALKWAY
To Hickory Yard
To Walnut Unit

JX-CCH-000671



2014

LA

Louisiana

# 2014 Disability Status Report

# Louisiana

www.disabilitystatistics.org

Yang-Tan Institute on Employment and Disability at the Cornell University ILR School

# Contents

**Introduction**

| | |
|---|---|
| 2014 Annual Disability Status Report | 2 |
| ACS Disability Questions | 3 |
| Notes | 4 |

**Summary**

| | |
|---|---|
| Louisiana Summary | 5 |
| Prevalence by State: Ages 21 to 64 | 7 |
| Employment by State: Ages 21 to 64 | 8 |

**Demographics**

| | |
|---|---|
| Prevalence: All Ages | 9 |
| Prevalence: Ages 4 and under | 11 |
| Prevalence: Ages 5 to 15 | 13 |
| Prevalence: Ages 16 to 20 | 15 |
| Prevalence: Ages 21 to 64 (Working-Age) | 17 |
| Prevalence: Ages 65 to 74 | 19 |
| Prevalence: Ages 75 and Older | 21 |
| Prevalence: Gender and Age | 23 |
| Prevalence: Hispanic / Latino Origin and Age | 26 |
| Prevalence: Race | 29 |

**Outcomes**

| | |
|---|---|
| Employment | 29 |
| Not Working but Actively Looking for Work | 33 |
| Full-Time / Full-Year Employment | 35 |
| Annual Earnings (Full-Time / Full-Year workers) | 37 |
| Annual Household Income | 39 |
| Poverty | 41 |
| Supplemental Security Income (SSI) | 43 |
| Education: High School Diploma / Equivalent | 45 |
| Education: Some College / Associate's Degree | 47 |
| Education: Bachelor's Degree or More | 49 |
| Veterans Service-Connected Disability | 51 |
| Health Insurance Coverage | 53 |
| Type of Health Insurance Coverage | 55 |

**Glossary** 58

**About the Disability Status Report** 64

JX-CCH-000673

# The 2014 Annual Disability Status Report

The Annual Disability Status Reports provide policy makers, disability advocates, reporters, and the public with a summary of the most recent demographic and economic statistics on the non-institutionalized population with disabilities. They contain information on the population size and disability prevalence for various demographic subpopulations, as well as statistics related to employment, earnings, household income, veterans' service-connected disability and health insurance. Comparisons are made to people without disabilities and across disability types. Disability Status Reports and other statistics are available for the United States overall, each state, the District of Columbia, and Puerto Rico at www.disabilitystatistics.org.

The Status Reports primarily look at the working-age population because the employment gap between people with and without disabilities is a major focus of government programs and advocacy efforts. Employment is also a key factor in the social integration and economic self-sufficiency of working-age people with disabilities.

The information in this report is based on data from the US Census Bureau's American Community Survey (ACS) - a survey sent each year to a random sample of over 3.5 million households. For more information see the Census Bureau's ACS website http://www.census.gov/acs/www/ and our Guide to Disability Statistics from the American Community Survey (2008 Forward): http://disabilitystatistics.org/sources.cfm.

The estimates in these reports are based on responses from a sample of the population and may differ from actual population values because of sampling variability and other factors. Differences observed between the estimates for two or more groups may not be statistically significant.

## Suggested Citation

Erickson, W., Lee, C., & von Schrader, S. (2016). 2014 Disability Status Report: Louisiana. Ithaca, NY: Cornell University Yang Tan Institute on Employment and Disability(YTI).

We would like to thank Sara VanLooy, Jason Criss, and Joe Williams for their assistance with editing and production of this document.

# ACS Disability Questions

There is no single accepted definition of disability. Different definitions and disability questions may identify different populations with disabilities and result in larger or smaller estimates.

Below are the six questions used in the ACS to identify persons with disabilities. Note that the Census Bureau refers to each of the individual types as "difficulty" while in this report the term "disability" is used.

**Hearing Disability** (asked of all ages):

- Is this person deaf or does he/she have serious difficulty hearing?

**Visual Disability** (asked of all ages):

- Is this person blind or does he/she have serious difficulty seeing even when wearing glasses?

**Cognitive Disability** (asked of persons ages 5 or older):

- Because of a physical, mental, or emotional condition, does this person have serious difficulty concentrating, remembering, or making decisions?

**Ambulatory Disability** (asked of persons ages 5 or older):

- Does this person have serious difficulty walking or climbing stairs?

**Self-Care Disability** (asked of persons ages 5 or older):

- Does this person have difficulty dressing or bathing?

**Independent Living Disability** (asked of persons ages 15 or older):

- Because of a physical, mental, or emotional condition, does this person have difficulty doing errands alone such as visiting a doctor's office or shopping?

**Note:**

- The "Any Disability" category used in this report includes persons who reported one or more of the individual disability types.
- Respondents could report more than one disability type.
- Some disability questions were not asked of children.
- A separate set of survey questions identify veterans with service-connected disabilities. Based on a separate set of survey questions, this report includes estimates related to veterans' service-connected disability (see page 51).

JX-CCH-000675

# Notes

**Spanish Language Reports:** Spanish language versions of the Annual Disability Status Reports for the US, all 50 states, Puerto Rico, and Washington D.C. can be downloaded at the same location as the English Status Reports. The Spanish translation was made possible through funding from the Northeast ADA Center through a grant from NIDILRR National Institute on Disability,Independent Living, and Rehabilitation Research

**Puerto Rico:** A Puerto Rico Disability Status Report, based on the parallel 2014 Puerto Rico Community Survey (PRCS), is available again this year in English as well as Spanish. However, please note that the Puerto Rico sample is not included in any U.S. population estimates included in these reports.

**Group Quarters:** In 2006, the ACS began surveying the group quarters population. We include the non-institutionalized group quarters population, but due to small state level sample sizes exclude the institutionalized group quarters population (see glossary) in the Disability Status Reports.

**Margin of Error (MOE):** As in previous years' reports we provide the 90% MOE to better illustrate sampling variability. See the glossary entry for more information on this topic.

**Glossary:** As in previous years, we provide a comprehensive glossary at the back of this report defining the terms used in the Disability Status Report (see glossary).

Note: According to the Census Bureau, estimates based on the ACS Public Use Microdata Sample (PUMS) file such as those included in this report may differ slightly from the ACS summary tables produced by the Census Bureau, because they are subject to additional sampling error and further data processing operations. Please see http://www.disabilitystatistics.org/faq.cfm#Q4 for further information.

Case 3:15-cv-00318-SDD-RLB Document 153-42 11/04/16 Page 6 of 35

# Louisiana Summary

These statistics indicate the social and economic status of non-institutionalized people with disabilities in Louisiana, using data from the 2014 American Community Survey (ACS).

**Age:** In 2014, the prevalence of disability in LA was:

- 14.8 percent for persons of all ages
- 0.6 percent for persons ages 4 and under
- 7.1 percent for persons ages 5 to 15
- 7.4 percent for persons ages 16 to 20
- 13.4 percent for persons ages 21 to 64
- 30.9 percent for persons ages 65 to 74
- 53.9 percent for persons ages 75+

**Disability Type:** In 2014, the prevalence of the six disability types among persons of all ages in LA was:

- 3.0% reported a Visual Disability
- 3.6% reported a Hearing Disability
- 8.7% reported an Ambulatory Disability
- 6.5% reported a Cognitive Disability
- 3.6% reported a Self-Care Disability
- 6.9% reported an Independent Living Disability

**Gender:** In 2014, 15.1 percent of females of all ages and 14.4 percent of males of all ages in LA reported a disability.

**Hispanic/Latino:** In 2014, the prevalence of disability among persons of all ages of Hispanic or Latino origin in LA was 7.7 percent.

**Race:** In LA in 2014, the prevalence of disability for working-age people (ages 21 to 64) was:

- 12.7 percent among Whites
- 15.1 percent among Black / African Americans
- 5.6 percent among Asians
- 25.0 percent among Native Americans
- 11.9 percent among persons of some other race(s)

**Employment:** In 2014, the employment rate of working-age people (ages 21 to 64) with disabilities in LA was 33.5 percent.

**Looking for Work:** In LA in 2014, the percentage actively looking for work among people with disabilities who were not working was 7.8 percent.

JX-CCH-000677

Case 3:15-cv-00318-SDD-RLB Document 153-42 11/04/16 Page 7 of 35

**Full-Time/Full-Year Employment:** In LA in 2014, the percentage of working-age people with disabilities working full-time/full-year was 22.5 percent.

**Annual Earnings:** In 2014, the median annual earnings of working-age people with disabilities working full-time/full-year in LA was $36,300.

**Annual Household Income:** In LA in 2014, the median annual income of households with working-age people with disabilities was $35,300.

**Poverty:** In LA in 2014, the poverty rate of working-age people with disabilities was 30.2 percent.

**Supplemental Security Income:** In 2014, the percentage of working-age people with disabilities receiving SSI payments in LA was 23.4 percent.

**Educational Attainment:** In 2014, the percentage of working-age people with disabilities in LA:

- with only a high school diploma or equivalent was 36.5 percent
- with only some college or an associate degree was 25.0 percent
- with a bachelor's degree or more was 11.0 percent.

**Veterans Service-Connected Disability:** In 2014, the percentage of working-age civilian veterans with a VA determined Service-Connected Disability was 20.5 percent in LA.

**Health Insurance Coverage:** In 2014 in LA, 83.8 percent of working-age people with disabilities had health insurance.

# Prevalence: Ages 21 - 64

This summary lists percentages by state of non-institutionalized working-age (ages 21 to 64) people with disabilities using data from the 2014 American Community Survey (ACS). The US disability prevalence rate for this population was 10.8%

| Location | 2014 (%) |
|---|---|
| Alabama | **14.9** |
| Alaska | **9.9** |
| Arizona | **11.0** |
| Arkansas | **15.4** |
| California | **8.4** |
| Colorado | **9.0** |
| Connecticut | **8.9** |
| Delaware | **9.8** |
| District of Columbia | **9.9** |
| Florida | **10.4** |
| Georgia | **11.5** |
| Hawaii | **8.3** |
| Idaho | **11.0** |
| Illinois | **8.8** |
| Indiana | **12.6** |
| Iowa | **9.5** |
| Kansas | **11.3** |
| Kentucky | **16.7** |
| Louisiana | **13.4** |
| Maine | **14.7** |
| Maryland | **8.6** |
| Massachusetts | **9.3** |
| Michigan | **13.0** |
| Minnesota | **8.8** |
| Mississippi | **15.7** |
| Missouri | **13.3** |
| Montana | **12.0** |
| Nebraska | **9.0** |
| Nevada | **12.0** |
| New Hampshire | **9.6** |
| New Jersey | **8.1** |
| New Mexico | **13.8** |
| New York | **9.1** |
| North Carolina | **12.1** |
| North Dakota | **8.3** |
| Ohio | **12.5** |
| Oklahoma | **14.8** |
| Oregon | **13.4** |
| Pennsylvania | **11.7** |
| Puerto Rico | **19.0** |
| Rhode Island | **12.1** |
| South Carolina | **13.3** |
| South Dakota | **10.5** |
| Tennessee | **14.7** |
| Texas | **10.2** |
| Utah | **8.7** |
| Vermont | **13.4** |
| Virginia | **9.7** |
| Washington | **11.2** |
| West Virginia | **17.8** |
| Wisconsin | **10.1** |
| Wyoming | **10.7** |

JX-CCH-000679

# Employment: Ages 21 - 64

This summary lists employment rates by state of non-institutionalized working-age (ages 21 to 64) people with disabilities using data from the 2014 American Community Survey (ACS). The employment rate in the US for this population was 34.6% for people with disabilities and 77.6% for people without disabilities.

| Location | People with Disabilities 2014 | People without Disabilities 2014 |
|---|---|---|
| Alabama | **27.1** | **73.8** |
| Alaska | **42.1** | **79.1** |
| Arizona | **33.2** | **74.5** |
| Arkansas | **30.9** | **76.2** |
| California | **33.5** | **74.7** |
| Colorado | **40.7** | **80.7** |
| Connecticut | **40.3** | **79.9** |
| Delaware | **36.8** | **78.1** |
| District of Columbia | **34.7** | **79.9** |
| Florida | **30.4** | **75.7** |
| Georgia | **29.8** | **75.7** |
| Hawaii | **45.2** | **79.9** |
| Idaho | **35.7** | **77.3** |
| Illinois | **36.1** | **77.9** |
| Indiana | **37.5** | **78.8** |
| Iowa | **43.6** | **84.2** |
| Kansas | **39.7** | **81.2** |
| Kentucky | **27.3** | **76.1** |
| Louisiana | **33.5** | **74.8** |
| Maine | **32.6** | **80.9** |
| Maryland | **39.9** | **80.8** |
| Massachusetts | **35.2** | **81.2** |
| Michigan | **29.7** | **75.9** |
| Minnesota | **44.0** | **84.3** |
| Mississippi | **28.3** | **73.9** |
| Missouri | **32.9** | **79.1** |
| Montana | **41.0** | **78.2** |
| Nebraska | **46.2** | **86.2** |
| Nevada | **42.0** | **76.1** |
| New Hampshire | **40.2** | **83.2** |
| New Jersey | **39.9** | **78.8** |
| New Mexico | **31.0** | **73.4** |
| New York | **33.3** | **77.0** |
| North Carolina | **31.7** | **76.9** |
| North Dakota | **53.7** | **83.6** |
| Ohio | **34.4** | **79.1** |
| Oklahoma | **37.9** | **77.6** |
| Oregon | **36.0** | **76.8** |
| Pennsylvania | **35.4** | **78.9** |
| Puerto Rico | **22.6** | **56.0** |
| Rhode Island | **35.5** | **79.8** |
| South Carolina | **29.4** | **76.8** |
| South Dakota | **48.1** | **85.8** |
| Tennessee | **29.9** | **76.6** |
| Texas | **38.4** | **77.6** |
| Utah | **42.4** | **79.0** |
| Vermont | **36.0** | **83.1** |
| Virginia | **37.8** | **80.4** |
| Washington | **38.3** | **78.0** |
| West Virginia | **26.7** | **72.6** |
| Wisconsin | **39.8** | **82.3** |
| Wyoming | **46.7** | **82.3** |

Case 3:15-cv-00318-SDD-RLB Document 358-5 11/09/17 Page 40 of 134

# Prevalence

## All Ages

### Introduction

This section addresses the prevalence of disability among non-institutionalized people of all ages in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

Prevalence:
All Ages
**14.8%**

- In 2014, the overall percentage (prevalence rate) of people with a disability of all ages in LA was 14.8 percent.
- In other words, in 2014, 673,400 of the 4,561,400 individuals of all ages in LA reported one or more disabilities.
- In LA in 2014, among the six types of disabilities identified in the ACS, the highest prevalence rate was for "Ambulatory Disability," 8.7 percent. The lowest prevalence rate was for "Visual Disability," 3.0 percent.

JX-CCH-000681

# Prevalence of disability among non-institutionalized people of all ages in Louisiana in 2014*

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 14.8 | 0.38 | 673,400 | 17,390 | 4,561,400 | 42,515 |
| Visual | 3.0 | 0.18 | 135,100 | 8,300 | 4,561,400 | 42,515 |
| Hearing | 3.6 | 0.20 | 166,300 | 9,170 | 4,561,400 | 42,515 |
| Ambulatory | 8.7 | 0.31 | 371,600 | 13,400 | 4,254,800 | 40,152 |
| Cognitive | 6.5 | 0.27 | 277,400 | 11,700 | 4,254,800 | 40,152 |
| Self-Care | 3.6 | 0.21 | 152,700 | 8,810 | 4,254,800 | 40,152 |
| Independent Living | 6.9 | 0.30 | 249,800 | 11,140 | 3,626,000 | 34,963 |

* **Note:** Children under the age of five were only asked about Vision and Hearing disabilities. The Independent Living disability question was only asked of persons aged 16 years old and older.

# Prevalence

## Ages 4 years and under

### Introduction

This section focuses on the prevalence of disability among non-institutionalized children ages 4 and under in Louisiana, using data from the 2014 American Community Survey (ACS). Only the two sensory disability questions were asked of this population. For definitions of terms, see Glossary.

### Quick Statistics

Prevalence: Ages 4 and under
**0.6%**

- In 2014, the overall percentage (prevalence rate) of children with a visual and/or hearing disability ages 0 to 4 in LA was 0.6 percent.
- In other words, in 2014, 1,900 of the 306,600 children ages 0 to 4 in LA reported one or more disabilities.
- In LA in 2014, 0.4 percent reported a visual disability
- In LA in 2014, 0.4 percent reported a hearing disability

## Prevalence of disability among non-institutionalized people ages 4 and under in Louisiana in 2014



| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 0.6 | 3.29 | 1,900 | 1,000 | 306,600 | 2,363 |
| Visual | 0.4 | 3.29 | 1,300 | 820 | 306,600 | 2,363 |
| Hearing | 0.4 | 3.29 | 1,200 | 810 | 306,600 | 2,363 |

# Prevalence

## Ages 5 to 15 years

### Introduction

This section focuses on the prevalence of disability among non-institutionalized children ages 5 to 15 in Louisiana, using data from the 2014 American Community Survey (ACS)*. For definitions of terms, see Glossary.

### Quick Statistics

Prevalence: Ages 5 to 15 years

**7.1%**

- In 2014, the overall percentage (prevalence rate) of children with a disability ages 5 to 15 in LA was 7.1 percent.
- In other words, in 2014, 49,100 of the 688,600 individuals ages 5 to 15 in LA reported one or more disabilities.
- In LA in 2014, among the five types of disabilities* identified in the ACS, the highest prevalence rate was for "Cognitive Disability," 5.9 percent. The lowest prevalence rate was for "Visual Disability," 0.7 percent.

* **Note:** The "Independent Living Disability" question was not asked of children ages 15 years and younger.

# Prevalence of disability* among non-institutionalized people ages 5 to 15 in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 7.1 | 0.71 | 49,100 | 5,050 | 688,600 | 5,728 |
| Visual | 0.7 | 3.29 | 4,900 | 1,610 | 688,600 | 5,728 |
| Hearing | 0.7 | 3.29 | 4,600 | 1,550 | 688,600 | 5,728 |
| Ambulatory | 0.9 | 3.29 | 6,000 | 1,780 | 688,600 | 5,728 |
| Cognitive | 5.9 | 0.65 | 40,500 | 4,590 | 688,600 | 5,728 |
| Self-Care | 1.3 | 3.29 | 9,000 | 2,170 | 688,600 | 5,728 |

* **Note:** The "Independent Living Disability" question was not asked of children ages 15 years and younger.

Case 3:15-cv-00318-SDD-RLB Document 358-5 11/09/17 Page 16 of 105

# Prevalence

## Ages 16 to 20 years

### Introduction

This section focuses on the prevalence of disability among non-institutionalized people ages 16 to 20 in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

Prevalence: Ages 16 to 20 years
**7.4%**

- In 2014, the overall percentage (prevalence rate) of people with a disability ages 16 to 20 in LA was 7.4 percent.
- In other words, in 2014, 22,600 of the 307,200 individuals ages 16 to 20 in LA reported one or more disabilities.
- In LA in 2014, among the six types of disabilities identified in the ACS, the highest prevalence rate was for "Cognitive Disability," 5.5 percent. The lowest prevalence rate was for "Hearing Disability," 0.7 percent.

# Prevalence of disability among non-institutionalized people ages 16 to 20 in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 7.4 | 1.08 | 22,600 | 3,440 | 307,200 | 2,641 |
| Visual | 0.7 | 3.29 | 2,300 | 1,090 | 307,200 | 2,641 |
| Hearing | 0.7 | 3.29 | 2,100 | 1,040 | 307,200 | 2,641 |
| Ambulatory | 1.0 | 3.29 | 3,200 | 1,290 | 307,200 | 2,641 |
| Cognitive | 5.5 | 0.94 | 16,800 | 2,970 | 307,200 | 2,641 |
| Self-Care | 0.7 | 3.29 | 2,100 | 1,040 | 307,200 | 2,641 |
| Independent Living | 2.2 | 0.61 | 6,800 | 1,880 | 307,200 | 2,641 |

Case 3:15-cv-00318-SDD-RLB Document 358-42 11/09/17 Page 18 of 135

# Prevalence

## Ages 21 to 64 years

### Introduction

This section focuses on the prevalence of disability among non-institutionalized working-age people (ages 21 to 64) in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

Prevalence:
Ages 21 to 64 years
**13.4%**

- In 2014, the overall percentage (prevalence rate) of working age people (ages 21 to 64) with a disability in LA was 13.4 percent.
- In other words, in 2014, 354,600 of the 2,647,500 individuals ages 21 to 64 in LA reported one or more disabilities.
- In LA in 2014, among the six types of disabilities identified in the ACS, the highest prevalence rate was for "Ambulatory Disability," 7.3 percent. The lowest prevalence rate was "Hearing Disability," 2.5 percent.

JX-CCH-000689

# Prevalence of disability among non-institutionalized people ages 21 to 64 in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 13.4 | 0.48 | 354,600 | 13,110 | 2,647,500 | 24,186 |
| Visual | 2.9 | 0.24 | 77,000 | 6,300 | 2,647,500 | 24,186 |
| Hearing | 2.5 | 0.22 | 66,600 | 5,870 | 2,647,500 | 24,186 |
| Ambulatory | 7.3 | 0.37 | 194,100 | 9,880 | 2,647,500 | 24,186 |
| Cognitive | 5.7 | 0.33 | 151,000 | 8,760 | 2,647,500 | 24,186 |
| Self-Care | 2.8 | 0.23 | 74,700 | 6,210 | 2,647,500 | 24,186 |
| Independent Living | 5.0 | 0.31 | 131,400 | 8,190 | 2,647,500 | 24,186 |

JX-CCH-000690

# Prevalence

## Ages 65 to 74 years

### Introduction

This section explores the prevalence of disability among non-institutionalized people ages 65 to 74 in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

Prevalence:
Ages 65 to 74
years
**30.9%**

- In 2014, the overall percentage (prevalence rate) of people with a disability ages 65 to 74 in LA was 30.9 percent.
- In other words, in 2014, 113,600 of the 367,600 individuals ages 65 to 74 in LA reported one or more disabilities.
- In LA in 2014, among the six types of disabilities identified in the ACS, the highest prevalence rate was for "Ambulatory Disability," 20.6 percent. The lowest prevalence rate was for "Visual Disability," 6.3 percent.

# Prevalence of disability among non-institutionalized people ages 65 to 74 in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 30.9 | 1.75 | 113,600 | 7,630 | 367,600 | 4,533 |
| Visual | 6.3 | 0.92 | 23,100 | 3,480 | 367,600 | 4,533 |
| Hearing | 10.2 | 1.15 | 37,600 | 4,430 | 367,600 | 4,533 |
| Ambulatory | 20.6 | 1.53 | 75,800 | 6,260 | 367,600 | 4,533 |
| Cognitive | 7.0 | 0.96 | 25,600 | 3,660 | 367,600 | 4,533 |
| Self-Care | 7.0 | 0.96 | 25,600 | 3,660 | 367,600 | 4,533 |
| Independent Living | 10.7 | 1.17 | 39,200 | 4,520 | 367,600 | 4,533 |

# Prevalence

## Ages 75 and Older

### Introduction

This section focuses on the prevalence of disability among non-institutionalized people ages 75 and older in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

Prevalence: Ages 75 and Older
**53.9%**

- In 2014, the overall percentage (prevalence rate) of people with a disability ages 75 and older in LA was 53.9 percent.
- In other words, in 2014, 131,600 of the 243,900 individuals ages 75 and older in LA reported one or more disabilities.
- In LA in 2014, among the six types of disabilities identified in the ACS, the highest prevalence rate was for "Ambulatory Disability," 37.9 percent. The lowest prevalence rate was for "Visual Disability," 10.9 percent.

# Prevalence of disability among non-institutionalized people ages 75 and older in Louisiana in 2014



| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 53.9 | 2.31 | 131,600 | 8,190 | 243,900 | 3,064 |
| Visual | 10.9 | 1.44 | 26,500 | 3,720 | 243,900 | 3,064 |
| Hearing | 22.2 | 1.93 | 54,100 | 5,300 | 243,900 | 3,064 |
| Ambulatory | 37.9 | 2.25 | 92,500 | 6,900 | 243,900 | 3,064 |
| Cognitive | 17.8 | 1.77 | 43,400 | 4,750 | 243,900 | 3,064 |
| Self-Care | 17.0 | 1.74 | 41,400 | 4,640 | 243,900 | 3,064 |
| Independent Living | 29.3 | 2.11 | 71,400 | 6,080 | 243,900 | 3,064 |

JX-CCH-000694

Case 3:15-cv-00318-SDD-RLB Document 358-42 11/09/16 Page 24 of 135

# Prevalence

## Gender and Age

### Introduction

This section examines the prevalence of disability among people by gender and age group in Louisiana, using data from the 2014 American Community Survey (ACS)*. For definitions of terms, see Glossary.

### Quick Statistics

Prevalence: Males All Ages
**14.4%**

Prevalence: Female All Ages
**15.1%**

- In LA in 2014, the overall percentage (prevalence rate) of males with a disability of all ages was 14.4 percent.
- In other words, in 2014, 317,900 of the 2,203,400 males of all ages in LA reported one or more disabilities.
- In LA in 2014, the overall percentage (prevalence rate) of females with a disability of all ages was 15.1 percent.
- In other words, in 2014, 355,400 of the 2,358,000 females of all ages in LA reported one or more disabilities.

* **Note:** Children ages 0-4 were only asked about visual and hearing disabilities, children ages 5-15 were not asked the "Independent Living Disability" question.

Case 3:15-cv-00318-SDD-RLB Document 358-42 11/14/16 Page 25 of 36

## Prevalence of disability among non-institutionalized people by gender and age group in Louisiana in 2014



| Gender & Age | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| **Males** | | | | | | |
| Males: All Ages | 14.4 | 0.54 | 317,900 | 12,470 | 2,203,400 | 20,233 |
| Males: Ages 4 and under | 0.7 | 3.29 | 1,000 | 730 | 154,000 | 1,210 |
| Males: Ages 5-15 | 8.9 | 1.10 | 31,100 | 4,030 | 351,800 | 2,964 |
| Males: Ages 16-20 | 8.6 | 1.63 | 13,500 | 2,660 | 155,900 | 1,312 |
| Males: Ages 21-64 | 13.3 | 0.69 | 169,800 | 9,270 | 1,274,400 | 11,432 |
| Males: Ages 65-74 | 30.2 | 2.56 | 51,100 | 5,150 | 169,100 | 2,075 |
| Males: Ages 75+ | 52.3 | 3.65 | 51,300 | 5,160 | 98,200 | 1,240 |
| **Females** | | | | | | |
| Females: All Ages | 15.1 | 0.53 | 355,400 | 13,130 | 2,358,000 | 22,282 |
| Females: Ages 4 and under | 0.6 | 3.29 | 900 | 680 | 152,600 | 1,153 |
| Females: Ages 5-15 | 5.3 | 0.89 | 17,900 | 3,060 | 336,800 | 2,764 |
| Females: Ages 16-20 | 6.1 | 1.41 | 9,200 | 2,190 | 151,400 | 1,329 |
| Females: Ages 21-64 | 13.5 | 0.67 | 184,800 | 9,650 | 1,373,100 | 12,754 |
| Females: Ages 65-74 | 31.5 | 2.39 | 62,500 | 5,690 | 198,500 | 2,458 |
| Females: Ages 75+ | 55.0 | 2.99 | 80,200 | 6,430 | 145,700 | 1,824 |

*** Note:** Children ages 0-4 were only asked about visual and hearing disabilities, children ages 5-15 were not asked the "Independent Living Disability" question.

# Prevalence

## Hispanic/Latino Origin and Age

### Introduction

This section examines the prevalence of disability among people by Hispanic/Latino origin and age group in Louisiana, using data from the 2014 American Community Survey (ACS) *. For definitions of terms, see Glossary.

### Quick Statistics

Prevalence: Hispanic All Ages
**7.7%**

Prevalence: Non-Hispanic All Ages
**15.1%**

- In LA in 2014, the overall percentage (prevalence rate) of disability among people of Hispanic/Latino origin of all ages was 7.7 percent.
- In other words, in 2014, 16,800 of the 217,300 people of Hispanic/Latino origin of all ages in LA reported one or more disabilities.
- In LA in 2014, the overall percentage (prevalence rate) of disability among people of non-Hispanic/Latino origin of all ages was 15.1 percent.
- In other words, in 2014, 656,600 of the 4,344,100 people of non-Hispanic/Latino origin of all ages in LA reported one or more disabilities.

* **Note:** Children ages 0-4 were only asked about visual and hearing disabilities, children age 5-15 were not asked the "Independent Living Disability" question.

## Prevalence of disability among non-institutionalized people by Hispanic / Latino origin and age group in Louisiana in 2014

| Hispanic/Latino Origin & Age | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| **Hispanic** | | | | | | |
| Hispanic - All Ages | 7.7 | 1.31 | 16,800 | 2,960 | 217,300 | 1,793 |
| Hispanic - Ages 4 and under | 1.4 | 3.29 | 300 | 400 | 24,100 | 162 |
| Hispanic - Ages 5-15 | 7.3 | 3.15 | 2,600 | 1,180 | 36,100 | 301 |
| Hispanic - Ages 16-20 | 10.6 | 6.17 | 1,400 | 850 | 13,100 | 122 |
| Hispanic - Ages 21-64 | 6.1 | 1.51 | 8,000 | 2,050 | 131,700 | 1,043 |
| Hispanic - Ages 65-74 | 31.6 | 12.64 | 2,200 | 1,080 | 7,100 | 93 |
| Hispanic - Ages 75+ | 41.1 | 15.43 | 2,200 | 1,070 | 5,300 | 72 |
| **Non-Hispanic** | | | | | | |
| Non-Hispanic - All Ages | 15.1 | 0.39 | 656,600 | 17,210 | 4,344,100 | 40,722 |
| Non-Hispanic - Ages 4 and under | 0.6 | 3.29 | 1,600 | 910 | 282,500 | 2,201 |
| Non-Hispanic - Ages 5-15 | 7.1 | 0.73 | 46,400 | 4,910 | 652,500 | 5,427 |
| Non-Hispanic - Ages 16-20 | 7.2 | 1.09 | 21,300 | 3,330 | 294,200 | 2,519 |
| Non-Hispanic - Ages 21-64 | 13.8 | 0.50 | 346,600 | 12,980 | 2,515,800 | 23,143 |
| Non-Hispanic - Ages 65-74 | 30.9 | 1.76 | 111,300 | 7,550 | 360,500 | 4,440 |
| Non-Hispanic - Ages 75+ | 54.2 | 2.34 | 129,400 | 8,130 | 238,600 | 2,992 |

* **Note:** Children ages 0-4 were only asked about visual and hearing disabilities, children ages 5-15 were not asked the "Independent Living Disability" question.

JX-CCH-000700

# Prevalence

## Race

### Introduction

This section presents the disability prevalence rate among non-institutionalized working-age people (ages 21 to 64) by race category in LA, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

In 2014, among working-age people in LA:

- 12.7 percent of persons who were White reported a disability.
- 15.1 percent of persons who were Black/African American reported a disability.
- 25.0 percent of persons who were Native American reported a disability.
- 5.6 percent of persons who were Asian reported a disability.
- 11.9 percent of persons who were some other race(s) reported a disability.

## Prevalence of disability among non-institutionalized working-age people (ages 21 to 64) by race in Louisiana in 2014

| Race | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| White | 12.7 | 0.59 | 216,600 | 10,410 | 1,700,800 | 16,225 |
| Black/African American | 15.1 | 0.90 | 124,600 | 7,980 | 824,100 | 6,794 |
| Native American or Alaska Native | 25.0 | 7.87 | 4,000 | 1,440 | 15,900 | 167 |
| Asian | 5.6 | 2.35 | 2,800 | 1,220 | 50,400 | 461 |
| Some other race(s) | 11.9 | 3.13 | 6,700 | 1,870 | 56,200 | 539 |

# Employment

## Introduction

This section examines the employment rates of non-institutionalized working-age people (ages 21 to 64) with disabilities in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

## Quick Statistics

Employment:
with disability
**33.5%**

Employment:
without
disability
**74.8%**

- In 2014, the employment rate of working-age people with disabilities in LA was 33.5 percent.
- In 2014, the employment rate of working-age people without disabilities in LA was 74.8 percent.
- The gap between the employment rates of working-age people with and without disabilities was 41.3 percentage points.
- Among the six types of disabilities identified in the ACS, the highest employment rate was for people with a "Hearing Disability," 47.9 percent. The lowest employment rate was for people with a "Self-Care Disability," 12.9 percent.

# Employment of non-institutionalized working-age people (ages 21 to 64) by disability status in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 74.8 | 0.66 | 1,715,800 | 23,710 | 2,292,900 | 20,572 |
| Any Disability | 33.5 | 1.82 | 118,900 | 7,800 | 354,600 | 3,614 |
| Visual | 39.5 | 4.04 | 30,400 | 3,980 | 77,000 | 731 |
| Hearing | 47.9 | 4.43 | 31,900 | 4,080 | 66,600 | 709 |
| Ambulatory | 24.5 | 2.24 | 47,500 | 4,970 | 194,100 | 2,023 |
| Cognitive | 24.0 | 2.52 | 36,200 | 4,340 | 151,000 | 1,485 |
| Self-Care | 12.9 | 2.81 | 9,600 | 2,250 | 74,700 | 756 |
| Independent Living | 15.1 | 2.27 | 19,900 | 3,230 | 131,400 | 1,312 |

# Not Working but Actively Looking for Work

## Introduction

This section focuses on the percentage of non-institutionalized working-age people (ages 21 to 64) with disabilities in Louisiana who are not working but actively looking for work, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

## Quick Statistics

Actively Looking: with disability
**7.8%**

Actively Looking: without disability
**19.5%**

- In 2014 in LA, the percentage of working-age people with disabilities who were not working but actively looking for work was 7.8 percent.
- In 2014 in LA, the percentage of working-age people without disabilities who were not working but actively looking for work was 19.5 percent.
- The difference in the percentage of not working but actively looking for work between working-age people with and without disabilities was 11.7 percentage points.
- Among the six types of disabilities identified in the ACS, the highest percentage of not working but actively looking for work was for people with a "Cognitive Disability," 7.0 percent. The lowest percentage was for people with a "Self-Care Disability," 3.4 percent.

## Percentage who are not working but actively looking for work among non-institutionalized working-age people (ages 21 to 64) in Louisiana in 2014



| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 19.5 | 1.20 | 112,300 | 7,580 | 577,100 | 5,146 |
| Any Disability | 7.8 | 1.27 | 18,400 | 3,100 | 235,600 | 2,400 |
| Visual | 6.9 | 2.69 | 3,200 | 1,300 | 46,600 | 436 |
| Hearing | 4.3 | 2.50 | 1,500 | 880 | 34,700 | 354 |
| Ambulatory | 5.1 | 1.32 | 7,400 | 1,970 | 146,600 | 1,539 |
| Cognitive | 7.0 | 1.73 | 8,000 | 2,050 | 114,800 | 1,126 |
| Self-Care | 3.4 | 1.63 | 2,200 | 1,080 | 65,100 | 649 |
| Independent Living | 4.8 | 1.47 | 5,400 | 1,680 | 111,500 | 1,108 |

JX-CCH-000706

# Full-Time / Full-Year Employment

## Introduction

This section presents the percentage of non-institutionalized working-age people (ages 21 to 64) with disabilities working full-time/full-year in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

## Quick Statistics

FT / FY Employment: with disability
**22.5%**

FT / FY Employment: without disability
**57.9%**

- In 2014, the percentage of working-age people with disabilities working full-time/full-year in LA was 22.5 percent.
- In 2014, the percentage of working-age people without disabilities working full-time/full-year in LA was 57.9 percent.
- The difference in the percentage working full-time/full-year between working-age people with and without disabilities was 35.4 percentage points.
- Among the six types of disabilities identified in the ACS, the highest full-time/full-year employment rate was for people with "Hearing Disability," 34.5 percent. The lowest full-time/full-year employment rate was for people with "Self-Care Disability," 7.9 percent.

## Full-Time/Full-Year employment of non-institutionalized working-age people (ages 21 to 64) by disability status in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 57.9 | 0.75 | 1,326,600 | 22,310 | 2,292,900 | 20,572 |
| Any Disability | 22.5 | 1.61 | 79,700 | 6,420 | 354,600 | 3,614 |
| Visual | 28.5 | 3.73 | 21,900 | 3,390 | 77,000 | 731 |
| Hearing | 34.5 | 4.22 | 23,000 | 3,470 | 66,600 | 709 |
| Ambulatory | 15.6 | 1.89 | 30,300 | 3,970 | 194,100 | 2,023 |
| Cognitive | 13.9 | 2.04 | 21,000 | 3,310 | 151,000 | 1,485 |
| Self-Care | 7.9 | 2.26 | 5,900 | 1,760 | 74,700 | 756 |
| Independent Living | 8.5 | 1.76 | 11,100 | 2,410 | 131,400 | 1,312 |

# Annual Earnings (Full-Time / Full-Year workers)

## Introduction

This section examines the median annual earnings of non-institutionalized working-age people (ages 21 to 64) with disabilities who work full-time/full-year in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

## Quick Statistics

Earnings: with disability
**$36,300**

Earnings: without disability
**$40,300**

- In 2014, the median earnings of working-age people with disabilities who worked full-time/full-year in LA was $36,300.
- In 2014, the median earnings of working-age people without disabilities who worked full-time/full-year in LA was $40,300.
- The difference in the median earnings between working-age people with and without disabilities who worked full-time/full-year was $4,000.
- Among the six types of disabilities identified in the ACS, the highest annual earnings was for people with "Hearing Disability," $45,400. The lowest annual earnings was for people with "Cognitive Disability," $29,200.

# Median annual earnings of non-institutionalized working-age people (ages 21 to 64) who work full-time/full-year by disability status in Louisiana in 2014

| Disability Type | Median Earnings | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|
| No Disability | $40,300 | $800 | 1,327,000 | 11,844 |
| Any Disability | $36,300 | $2,890 | 80,000 | 839 |
| Visual | $34,300 | $4,850 | 22,000 | 204 |
| Hearing | $45,400 | $6,680 | 23,000 | 265 |
| Ambulatory | $31,800 | $4,130 | 30,000 | 332 |
| Cognitive | $29,200 | $4,750 | 21,000 | 218 |
| Self-Care | $30,300 | $9,670 | 6,000 | 71 |
| Independent Living | $30,300 | $7,280 | 11,000 | 127 |

JX-CCH-000710

# Annual Household Income

## Introduction

This section illustrates the median annual income* of households that include any working-age people (ages 21 to 64) with disabilities in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

## Quick Statistics

Household Income: with disability
**$35,300**

Household Income: without disability
**$53,400**

- In 2014, the median income of households that include any working-age people with disabilities in LA was $35,300.
- In 2014, the median income of households that do not include any working-age people with disabilities in LA was $53,400.
- The difference in the median income between households including and not including working-age people with disabilities was $18,100.
- Among the six types of disabilities identified in the ACS, the highest median income was for households including persons with a "Hearing Disability," $43,400. The lowest median income was for households containing persons with a "Cognitive Disability" $27,600 .

* **Note:** Household income is not available for persons living in group quarters.

## Median annual income* of households including any working-age people (ages 21 to 64) by disability status in Louisiana in 2014

| Disability Type | Median H.H. Income | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|
| No Disability | $53,400 | $1,610 | 1,139,000 | 11,007 |
| Any Disability | $35,300 | 2,350 | 275,000 | 3,031 |
| Visual | $37,800 | 4,540 | 65,000 | 660 |
| Hearing | $43,400 | 5,710 | 59,000 | 651 |
| Ambulatory | $30,700 | 2,910 | 160,000 | 1,776 |
| Cognitive | $27,600 | 3,180 | 114,000 | 1,246 |
| Self-Care | $32,000 | 4,580 | 60,000 | 665 |
| Independent Living | $31,500 | 3,440 | 103,000 | 1,128 |

* **Note:** Household income is not available for persons living in group quarters.

JX-CCH-000712

# Poverty

## Introduction

This section examines the poverty rates* of non-institutionalized working-age people (ages 21 to 64) with disabilities in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

## Quick Statistics

Poverty: with disability
**30.2%**

Poverty: without disability
**15.6%**

- In 2014, the poverty rate of working-age people with disabilities in LA was 30.2 percent.
- In 2014, the poverty rate of working-age people without disabilities in LA was 15.6 percent.
- The difference in the poverty rate between working-age people with and without disabilities was 14.6 percentage points.
- Among the six types of disabilities identified in the ACS, the highest poverty rate was for people with "Cognitive Disability," 36.8 percent. The lowest poverty rate was for people with "Hearing Disability," 24.5 percent.

* **Note:** The Census Bureau does not calculate poverty status for those people living in military group quarters or college dormitories.

## Poverty rates* of non-institutionalized working-age people (ages 21 to 64) by disability status in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 15.6 | 0.79 | 356,600 | 18,780 | 2,285,800 | 20,475 |
| Any Disability | 30.2 | 2.52 | 107,200 | 10,600 | 354,500 | 3,613 |
| Visual | 29.5 | 5.38 | 22,700 | 4,920 | 77,000 | 731 |
| Hearing | 24.5 | 5.45 | 16,300 | 4,170 | 66,600 | 709 |
| Ambulatory | 32.0 | 3.47 | 62,200 | 8,110 | 194,100 | 2,023 |
| Cognitive | 36.8 | 4.06 | 55,500 | 7,670 | 151,000 | 1,484 |
| Self-Care | 33.7 | 5.66 | 25,200 | 5,180 | 74,700 | 756 |
| Independent Living | 32.5 | 4.23 | 42,700 | 6,730 | 131,400 | 1,312 |

* **Note:** The Census Bureau does not calculate poverty status for those people living in military group quarters or college dormitories.

# Supplemental Security Income (SSI)

## Introduction

This section focuses on the percentage of non-institutionalized working-age people (ages 21 to 64) with disabilities who receive Supplemental Security Income (SSI) payments in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary. Please note that these results will differ from official Social Security Administration reports for several reasons. For additional information, please email DisabilityStatistics@cornell.edu.

## Quick Statistics

SSI Recipients: with disability
**23.4%**

- In 2014, the percentage of working-age people with disabilities receiving Supplemental Security Income payments in LA was 23.4 percent.
- In 2014, the number of working-age people with disabilities receiving Supplemental Security Income payments in LA was 83,000.
- Among the six types of disabilities identified in the ACS, the highest percentage that received SSI was people with "Self-Care Disability," 35.2 percent. The lowest percentage that received SSI was people with "Hearing Disability," 16.1 percent.

# Percentage of non-institutionalized working-age people (ages 21 to 64) with disabilities who receive Supplemental Security Income (SSI) payments in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Any Disability | 23.4 | 1.63 | 83,000 | 6,540 | 354,600 | 3,614 |
| Visual | 23.2 | 3.49 | 17,900 | 3,060 | 77,000 | 731 |
| Hearing | 16.1 | 3.26 | 10,800 | 2,370 | 66,600 | 709 |
| Ambulatory | 25.2 | 2.26 | 48,800 | 5,040 | 194,100 | 2,023 |
| Cognitive | 32.3 | 2.76 | 48,700 | 5,030 | 151,000 | 1,485 |
| Self-Care | 35.2 | 4.00 | 26,300 | 3,710 | 74,700 | 756 |
| Independent Living | 34.7 | 3.01 | 45,500 | 4,860 | 131,400 | 1,312 |

# Education

## High School Diploma/Equivalent

### Introduction

This section explores the percentage of non-institutionalized working-age people (ages 21 to 64) with disabilities with only a high school diploma or equivalent in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

High School Only: with disability
**36.5%**

High School Only: without disability
**32.4%**

- In 2014, the percentage of working-age people with disabilities with only a high school diploma or equivalent in LA was 36.5 percent.
- In 2014, the percentage of working-age people without disabilities with only a high school diploma or equivalent in LA was 32.4 percent.
- The difference in the percentage with only a high school diploma or equivalent between working-age people with and without disabilities was 4.1 percentage points.
- Among the six types of disabilities identified in the ACS, the highest percentage with only a high school diploma or equivalent was for people with "Ambulatory Disability," 37.4 percent. The lowest percentage with only a high school diploma or equivalent was for people with "Visual Disability," 32.6 percent.

## Percentage of non-institutionalized working-age people (ages 21 to 64) with only a high school diploma or equivalent by disability status in LA in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 32.4 | 0.71 | 742,100 | 18,100 | 2,292,900 | 20,572 |
| Any Disability | 36.5 | 1.85 | 129,600 | 8,130 | 354,600 | 3,614 |
| Visual | 32.6 | 3.87 | 25,100 | 3,620 | 77,000 | 731 |
| Hearing | 36.5 | 4.27 | 24,300 | 3,560 | 66,600 | 709 |
| Ambulatory | 37.4 | 2.52 | 72,700 | 6,130 | 194,100 | 2,023 |
| Cognitive | 35.7 | 2.83 | 53,900 | 5,290 | 151,000 | 1,485 |
| Self-Care | 33.3 | 3.95 | 24,900 | 3,610 | 74,700 | 756 |
| Independent Living | 35.0 | 3.02 | 46,000 | 4,890 | 131,400 | 1,312 |

JX-CCH-000718

# Education

## Some College/Associate's Degree

### Introduction

This section examines the percentage of non-institutionalized working-age people (ages 21 to 64) with disabilities with only some college or an Associate's degree in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

Some College: with disability
**25.0%**

Some College: without disability
**30.9%**

- In 2014, the percentage of working-age people with disabilities with only some college or an Associate's degree in LA was 25.0 percent.
- In 2014, the percentage of working-age people without disabilities with only some college or an Associate's degree in LA was 30.9 percent.
- The difference in the percentage with only some college or an Associate's degree between working-age people with and without disabilities was 5.9 percentage points.
- Among the six types of disabilities identified in the ACS, the highest percentage with only some college or an Associate's degree was for people with "Visual Disability," 26.2 percent. The lowest percentage with only some college or Associate's degree was for people with "Independent Living Disability," 20.2 percent.

Case 3:15-cv-00318-SDD-RLB Document 358-42 11/09/16 Page 49 of 135

## Percentage of non-institutionalized working-age people (ages 21 to 64) with only some college or an Associate's degree by disability status in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 30.9 | 0.70 | 707,800 | 17,750 | 2,292,900 | 20,572 |
| Any Disability | 25.0 | 1.67 | 88,800 | 6,760 | 354,600 | 3,614 |
| Visual | 26.2 | 3.63 | 20,200 | 3,250 | 77,000 | 731 |
| Hearing | 25.7 | 3.88 | 17,100 | 2,990 | 66,600 | 709 |
| Ambulatory | 24.6 | 2.24 | 47,700 | 4,980 | 194,100 | 2,023 |
| Cognitive | 20.9 | 2.40 | 31,600 | 4,060 | 151,000 | 1,485 |
| Self-Care | 21.9 | 3.47 | 16,400 | 2,930 | 74,700 | 756 |
| Independent Living | 20.2 | 2.54 | 26,500 | 3,720 | 131,400 | 1,312 |

Document 158-42 10/9/17 Page 50 of 135

# Education

## Bachelor's Degree or More

### Introduction

This section presents the percentage of non-institutionalized working-age people (ages 21 to 64) with disabilities with a Bachelor's degree or more in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

### Quick Statistics

Bachelor's Degree or More: with disability
**11.0%**

Bachelor's Degree or More: without disability
**24.7%**

- In 2014, the percentage of working-age people with disabilities with a Bachelor's degree or more in LA was 11.0 percent.
- In 2014, the percentage of working-age people without disabilities with a Bachelor's degree or more in LA was 24.7 percent.
- The difference in the percentage with a Bachelor's degree or more between working-age people with and without disabilities was 13.7 percentage points.
- Among the six types of disabilities identified in the ACS, the highest percentage with a Bachelor's degree or more was for people with "Hearing Disability," 13.7 percent. The lowest percentage with a Bachelor's degree or more was for people with "Cognitive Disability," 7.9 percent.

# Percentage of non-institutionalized working-age people (ages 21 to 64) with a Bachelor's degree or more by disability status in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 24.7 | 0.65 | 566,400 | 16,160 | 2,292,900 | 20,572 |
| Any Disability | 11.0 | 1.20 | 39,100 | 4,510 | 354,600 | 3,614 |
| Visual | 9.3 | 2.40 | 7,100 | 1,930 | 77,000 | 731 |
| Hearing | 13.7 | 3.05 | 9,100 | 2,180 | 66,600 | 709 |
| Ambulatory | 9.9 | 1.55 | 19,200 | 3,170 | 194,100 | 2,023 |
| Cognitive | 7.9 | 1.59 | 11,900 | 2,490 | 151,000 | 1,485 |
| Self-Care | 9.0 | 2.40 | 6,700 | 1,880 | 74,700 | 756 |
| Independent Living | 8.2 | 1.73 | 10,800 | 2,380 | 131,400 | 1,312 |

# Veterans Service-Connected Disability Rating

## Introduction

This section presents the percentage of non-institutionalized working-age (ages 21 to 64) civilian veterans reporting a service-connected disability rating in Louisiana. The 2014 American Community Survey (ACS) asks if the veteran has a service-connected disability, and if so, what their rating is (0-100%). A "service-connected" disability is one that has been determined by the Department of Veterans Affairs (VA) as being a result of disease or injury incurred or aggravated during military service. Note that a veteran can receive disability compensation for a wide range of conditions, and a veteran with a service-connected disability may not report having one of the six ACS functional or activity limitation disabilities. For definitions of terms, see Glossary.

## Quick Statistics

Veterans with a Service-Connected Disability
**20.5%**

- In 2014, there were 142,700 working-age civilian veterans in LA, of whom 29,200 had a VA service-connected disability.
- In 2014, the percentage of working-age civilian veterans in LA with a VA service-connected disability was 20.5 percent.
- In 2014, 9,500 working-age civilian veterans in LA had the most severe service-connected disability rating (70 percent or above).
- In 2014, 32.6 percent of the working-age civilian veterans in LA who had a service connected disability had a service-connected disability rating of 70 percent or above.

## Disability rating of working-age civilian veterans (ages 21 to 64) with a service-connected disability in Louisiana in 2014

| Service-Connected Disability | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| Has a service-connected disability rating (0-100%) | 20.5 | 2.45 | 29,200 | 3,900 | 142,700 | 1,364 |
| **Disability rating of veterans with a service connected-disability** | | | | | | |
| 0 percent | 5.0 | 2.92 | 1,500 | 870 | 29,200 | 316 |
| 10 or 20 percent | 24.6 | 5.78 | 7,200 | 1,940 | 29,200 | 316 |
| 30 or 40 percent | 18.9 | 5.25 | 5,500 | 1,700 | 29,200 | 316 |
| 50 or 60 percent | 13.2 | 4.54 | 3,900 | 1,420 | 29,200 | 316 |
| 70 percent or higher | 32.6 | 6.29 | 9,500 | 2,230 | 29,200 | 316 |
| Rating not reported | 5.7 | 3.11 | 1,700 | 930 | 29,200 | 316 |

# Health Insurance Coverage

## Introduction

This section examines the health insurance coverage of non-institutionalized working-age people (ages 21 to 64) with disabilities in Louisiana, using data from the 2014 American Community Survey (ACS). For definitions of terms, see Glossary.

## Quick Statistics

Health Coverage: with Disability
**83.8%**

Health Coverage: without Disability
**78.1%**

- In 2014, 83.8 percent of working-age people with disabilities in LA had some type of health insurance coverage.
- In 2014, 78.1 percent of working-age people without disabilities in LA had some type of health insurance coverage.
- The difference in the health insurance coverage rate between working-age people with and without disabilities was 5.7 percentage points.
- Among the six types of disabilities identified in the ACS, the highest health insurance coverage rate was for people with "Self-Care Disability," 91.4 percent. The lowest health insurance coverage rate was for people with "Visual Disability," 83.7 percent.

JX-CCH-000725

# Health Insurance Coverage of non-institutionalized working-age people (ages 21 to 64) by disability status in Louisiana in 2014

| Disability Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| No Disability | 78.1 | 0.76 | 1,789,700 | 29,190 | 2,292,900 | 20,572 |
| Any Disability | 83.8 | 1.72 | 297,200 | 14,680 | 354,600 | 3,614 |
| Visual | 83.7 | 3.70 | 64,400 | 7,010 | 77,000 | 731 |
| Hearing | 86.1 | 3.73 | 57,400 | 6,630 | 66,600 | 709 |
| Ambulatory | 85.1 | 2.25 | 165,200 | 11,110 | 194,100 | 2,023 |
| Cognitive | 84.8 | 2.57 | 128,000 | 9,820 | 151,000 | 1,485 |
| Self-Care | 91.4 | 2.85 | 68,200 | 7,210 | 74,700 | 756 |
| Independent Living | 89.3 | 2.37 | 117,300 | 9,410 | 131,400 | 1,312 |

# Type of Health Insurance Coverage

## Introduction

This section examines the type of health insurance coverage for non-institutionalized working-age people (ages 21 to 64) with disabilities in Louisiana, using data from the 2014 American Community Survey (ACS). Note that people can report more than one type of insurance coverage. For definitions of terms, see Glossary.

## Quick Statistics

Coverage through Employer/Union: with Disability
**31.6%**

Coverage through Employer/Union: without Disability
**60.0%**

- In 2014, 31.6 percent of working-age people with disabilities in LA reported health insurance coverage through a current or former employer or union (theirs or another family member).
- In 2014, 60.0 percent of working-age people without disabilities in LA reported health insurance coverage through a current or former employer or union (theirs or another family member).
- In 2014, 9.2 percent of working-age people with disabilities in LA reported purchasing health insurance coverage directly from an insurance company (by themselves or another family member).
- In 2014, 26.5 percent of working-age people with disabilities in LA reported Medicare coverage and 38.8 percent reported Medicaid coverage (or other government-assistance plan for those with low incomes or a disability).

## Type of Health Insurance Coverage of non-institutionalized working-age people (ages 21 to 64) by disability status in Louisiana in 2014

| Disability Status/ Insurance Type | % | MOE | Number | MOE | Base Pop. | Sample Size |
|---|---|---|---|---|---|---|
| **Any Disability** | | | | | | |
| Uninsured | 16.2 | 1.72 | 57,400 | 6,620 | 354,600 | 3,614 |
| Employer/Union | 31.6 | 2.17 | 112,100 | 9,200 | 354,600 | 3,614 |
| Purchased | 9.2 | 1.35 | 32,800 | 5,020 | 354,600 | 3,614 |
| Medicare | 26.5 | 2.06 | 94,100 | 8,450 | 354,600 | 3,614 |
| Medicaid | 38.8 | 2.28 | 137,400 | 10,160 | 354,600 | 3,614 |
| Military/VA | 6.6 | 1.16 | 23,400 | 4,250 | 354,600 | 3,614 |
| Indian Health Service | 0.0 | 3.29 | 200 | 400 | 354,600 | 3,614 |
| **No Disability** | | | | | | |
| Uninsured | 21.9 | 0.76 | 503,200 | 18,640 | 2,292,900 | 20,572 |
| Employer/Union | 60.0 | 0.90 | 1,376,500 | 27,390 | 2,292,900 | 20,572 |
| Purchased | 10.7 | 0.57 | 245,700 | 13,420 | 2,292,900 | 20,572 |
| Medicare | 2.1 | 0.26 | 48,500 | 6,100 | 2,292,900 | 20,572 |
| Medicaid | 7.4 | 0.48 | 169,600 | 11,250 | 2,292,900 | 20,572 |
| Military/VA | 3.6 | 0.34 | 83,400 | 7,960 | 2,292,900 | 20,572 |
| Indian Health Service | 0.1 | 3.29 | 1,300 | 1,000 | 2,292,900 | 20,572 |

JX-CCH-000729

# Glossary

## Actively Looking for Work

A person is defined as ACTIVELY looking for work if he or she reports looking for work during the last four weeks.

## Ambulatory Disability

This disability type is based on the question (*asked of persons ages 5 or older*): Does this person have serious difficulty walking or climbing stairs?

## Base Population (Base Pop.)

The estimated number of individuals upon which the calculation is based. (For percentages, this is the denominator).

## Cognitive Disability

This disability type is based on the question (*asked of persons ages 5 or older*): Because of a physical, mental, or emotional condition, does this person have serious difficulty concentrating, remembering, or making decisions?

## Disability and Disability Types

The ACS definition of disability is based on six questions. A person is coded as having a disability if he or she or a proxy respondent answers affirmatively for one or more of these six categories.

- *Hearing Disability* *(asked of all ages):* Is this person deaf or does he/she have serious difficulty hearing?
- *Visual Disability* *(asked of all ages)*: Is this person blind or does he/she have serious difficulty seeing even when wearing glasses?
- *Cognitive Disability* *(asked of persons ages 5 or older)*: Because of a physical, mental, or emotional condition, does this person have serious difficulty concentrating, remembering, or making decisions?
- *Ambulatory Disability* (asked of persons ages 5 or older): Does this person have serious difficulty walking or climbing stairs?
- *Self-care Disability* *(asked of persons ages 5 or older)*: Does this person have difficulty dressing or bathing?
- *Independent Living Disability* *(asked of persons ages 15 or older):* Because of a physical, mental, or emotional condition, does this person have difficulty doing errands alone such as visiting a doctor's office or shopping?

## Earnings

Earnings are defined as wages, salary, commissions, bonuses, or tips from all jobs including self-employment income (NET income after business expenses) from own nonfarm businesses or farm businesses, including proprietorships and partnerships.

## Education

Our definition is based on the responses to the question: "What is the highest degree or level of school this person has completed? If currently enrolled, mark the previous grade or highest degree received." Our category "high school diploma/equivalent" includes those marking the ACS option "Regular high school diploma — GED or alternative credential." Our category "Some college/Associate's degree" includes those marking the ACS options: some college credit, but less than 1 year of college credit; one or more years of college credit but no degree, or "Associate's degree (for example: AA, AS)." Our category "a Bachelor's or more" includes those marking the ACS options: "Bachelor's degree (for example: BA, BS)"; "Master's degree (for example: MA, MS, MEng, MEd, MSW, MBA)"; "Professional degree (for example: MD, DDS, DVM, LLB, JD)"; or "Doctorate degree (for example: PhD, EdD)." Note in 2008 changes were made to some of the response categories and the layout of this question.

## Employment

A person is considered employed if he or she is either

a. “at work”: those who did any work at all during the reference week as a paid employee (worked in his or her own business or profession, worked on his or her own farm, or worked 15 or more hours as an unpaid worker on a family farm or business) or
b. were “with a job but not at work,” : had a job but temporarily did not work at that job during the reference week due to illness, bad weather, industrial dispute, vacation or other personal reasons. The reference week is defined as the week preceding the date the questionnaire was completed.

## Full-Time/Full-Year Employment

A person is considered employed full-time/full-year if he or she worked 35 hours or more per week (full-time) and 50 or more weeks per year (full-year). The reference period is defined as the year preceding the date the questionnaire was completed. Note: this does not signify whether a person is eligible for fringe benefits. The question and response categories regarding weeks worked per year was changed in 2008.

## Group Quarters (GQ)

A GQ is a place where people live or stay that is normally owned or managed by an entity or organization providing housing and/or services for the residents. These services may include custodial or medical care as well as other types of assistance, and residency is commonly restricted to those receiving these services. People living in group quarters are usually not related to each other. Group quarters include such places as college residence halls, residential treatment centers, skilled nursing facilities, group homes, military barracks, correctional facilities, and workers' dormitories. See the definitions of institutional GQs and non-institutional GQs for more information. In addition, a description of the types of group quarters included in the 2008 ACS is located on the U.S. Census Bureau's Web site at www.census.gov/acs/www/Downloads/

2008_ACS_GQ_Definitions.pdf.

## Health Insurance Coverage

Is based on the following question: Is this person CURRENTLY covered by any of the following types of health insurance or health coverage plans? Mark "Yes" or "No" for EACH type of coverage in items a – h.

a. Insurance through a current or former employer or union (of this person or another family member)
b. Insurance purchased directly from an insurance company (by this person or another family member)
c. Medicare, for people 65 and older, or people with certain disabilities
d. Medicaid, Medical Assistance, or any kind of government-assistance plan for those with low incomes or a disability
e. VA (including those who have ever used or enrolled for VA health care)
f. TRICARE or other military health care
g. Indian Health Service
h. Any other type of health insurance or health coverage plan – Specify (Note: "Other type" were recoded into one of the categories a-g by the Census Bureau)

## Hearing Disability

This disability type is based on the question *(asked of all ages)*: Is this person deaf or does he/she have serious difficulty hearing?

## Hispanic or Latino Origin

People of Hispanic or Latino origin are those who classify themselves in a specific Hispanic or Latino category in response to the question, "Is this person Spanish/Hispanic/Latino?" Specifically, those of Hispanic or Latino origin are those who are Cuban; Mexican, Mexican American, Chicano; Puerto Rican; or other Spanish/Hispanic/Latino. Origin may be the heritage, nationality group, lineage, or country of birth of the person or the person's parents or ancestors before their arrival in the United States. People who identify their origin as Spanish, Hispanic, or Latino may be of any race.

## Household Income

Household Income is defined as the total income of a household including: wages, salary, commissions, bonuses, or tips from all jobs; self-employment income (NET income after business expenses) from own non-farm or farm businesses, including proprietorships and partnerships; interest, dividends, net rental income, royalty income, or income from real estates and trusts; Social Security or Railroad Retirement; Supplemental Security Income; any public assistance or welfare payments from the state or local welfare office; retirement, survivor or disability pensions; and any other regularly received income (e.g., Veterans' payments, unemployment compensation, child support or alimony). Median household income is calculated with the household as the unit of analysis, using household weights without adjusting for household size.

JX-CCH-000732

## Independent Living Disability

This disability type is based on the question *(asked of persons ages 15 or older)*: Because of a physical, mental, or emotional condition, does this person have difficulty doing errands alone such as visiting a doctors office or shopping?

## Institutional Group Quarters (GQs)

Includes facilities for people under formally authorized, supervised care or custody at the time of enumeration. Generally, restricted to the institution, under the care or supervision of trained staff, and classified as "patients" or "inmates." Includes: correctional, nursing, and in-patient hospice facilities, psychiatric hospitals, juvenile group homes and residential treatment centers.

## Margin of Error (MOE)

Data, such as data from the American Community Survey, is based on a sample, and therefore statistics derived from this data are subject to sampling variability. The margin of error (MOE) is a measure of the degree of sampling variability. In a random sample, the degree of sampling variation is determined by the underlying variability of the phenomena being estimated (e.g., income) and the size of the sample (i.e., the number of survey participants used to calculate the statistic). The smaller the margin of error, the lower the sampling variability and the more "precise" the estimate. A margin of error is the difference between an estimate and its upper or lower confidence bounds. Confidence bounds are calculated by adding the MOE to the estimate (upper bound) and subtracting the MOE from the estimate (lower bound). All margins of error in this report are based on a 90 percent confidence level. This means that there is a 90% certainty that the actual value lies somewhere between the upper and lower confidence bounds.

## Non-Institutional Group Quarters (GQs)

Includes facilities that are not classified as institutional group quarters; such as college/university housing, group homes intended for adults, residential treatment facilities for adults, workers' group living quarters and Job Corps centers and religious group quarters.

## Not Working but Actively Looking for Work

A person is defined as not working but actively looking for work if he or she reports not being employed, but has been looking for work during the last four weeks.

## Number

This term appears in the tables; it refers to estimated number of people in the category. (for percentages, this is the numerator).

## Poverty

The poverty measure is computed based upon the standards defined in Directive 14 from the Office of Management and Budget. These standards use poverty thresholds created in 1982 and index these thresholds to 2008 dollars using poverty factors based upon the Consumer Price Index. They use the family as the income sharing unit and family income is the sum of total income from each family member living in the household. The poverty threshold depends upon the size of the family; the age of the householder; and the number of related children under the age of 18.

## Race

Race categories are based on the question, "[w]hat is this person's race? Mark (X) one or more races to indicate what this person considers himself/herself to be." Responses include the following: White; Black or African-American; American Indian or Alaska Native (print name of enrolled or principal tribe); Asian Indian; Chinese; Filipino; Japanese; Korean; Vietnamese; Other Asian (Print Race); Native Hawaiian; Guamanian or Chamarro; Samoan; Other Pacific Islander (Print Race Below); Some other race (print race below). "Other race" also contains people who report more than one race.

## Sample Size

The number of survey participants used to calculate the statistic.

## Self-care Disability

This disability type is based on the question (*asked of persons ages 5 or older*): 17c. Does this person have difficulty dressing or bathing?

## Supplemental Security Income (SSI)

A person is defined as receiving SSI payments if he or she reports receiving (SSI) income in the 12 months prior to the survey.

**Note:** The Supplemental Security Income (SSI) does not apply to Puerto Rico. SSI is a federal cash assistance program that provides monthly payments to low-income aged, blind, or disabled persons in the 50 states, the District of Columbia, and the Northern Mariana Islands.

## Veteran Service-Connected Disability

A disease or injury determined to have occurred in or to have been aggravated by military service. A disability is evaluated according to the VA Schedule for Rating Disabilities in Title 38, CFR, and Part 4. Extent of disability is expressed as a

percentage from 0% (for conditions that exist but are not disabling to a compensable degree) to 100%, in increments of 10%. This information was determined by the following two part question:

a. **Does this person have a VA service-connected disability rating?**
   Yes (such as 0%, 10%, 20%, ... , 100%)
   No *SKIP* to question 28a
b. **What is this person's service-connected disability rating?"**
   Responses included: 0 percent; 10 or 20 percent; 30 or 40 percent; 50 or 60 percent; 70 percent or higher

## Visual Disability

This disability type is based on the question:*(asked of all ages)*: Is this person blind or does he/she have serious difficulty seeing even when wearing glasses?

# About the Disability Status Reports

The Cornell University Disability Status Reports is produced and funded by the Yang Tan Institute at the Cornell University ILR School. This effort originated as a product of the Rehabilitation Research and Training Center on Disability Demographics and Statistics (StatsRRTC) funded to the Yang Tan Institute in the ILR School at Cornell University by the U.S. Department of Education, National Institute on Disability and Rehabilitation Research (grant No. H133B031111).

The contents of this report do not necessarily represent the policy of the Department of Education, and you should not assume endorsement by the Federal Government (Edgar, 75.620 (b)).

## Contact Us

K. Lisa Yang and Hock E. Tan
Institute on Employment and Disability
Cornell University
Ithaca, New York 14853
Phone: 607.255.7727
Email: disabilitystatistics@cornell.edu
Web: www.disabilitystatistics.org

# Agreement between State of Louisiana, et al., and the United States Department of Justice

The parties do hereby agree as follows:

**1. The Litigation**

In 1992, inmates at Louisiana State Penitentiary (LSP) filed Williams v. Stalder, 92-1 on the docket of the United States District Court, Middle District of Louisiana, against the Warden of LSP and Secretary of the Louisiana Department of Public Safety and Corrections (DPSC) alleging medical care at LSP was deficient and unconstitutional. Subsequently, the United States Department of Justice (DOJ) intervened on the side of Plaintiff class. The case was tried in September of 1994 and awaits decision.

**2. Parties**

This agreement is entered into by the United States Department of Justice and the State of Louisiana, Department of Public Safety and Corrections.

**3. Scope of agreement**

In negotiating for and entering into the following stipulated agreement ("Agreement"), defendants do not admit or concede that LSP inmates' constitutional rights are currently being or have been in the past violated at LSP. Nothing in this agreement indicates that either party admits or denies that medical care at LSP is constitutional or unconstitutional.

For the purpose of resolving the issue of medical care raised by this litigation, the United States and the defendants enter into this agreement. The United States and the defendants agree that the United States' claims in this action will be dismissed conditioned on defendants' compliance with

the terms of this agreement.

Immediately upon execution of this agreement, the parties shall jointly move the Court for entry of an order conditionally dismissing the United States' claims in this action pursuant to Fed. R. Civ. P. 41 (a)(2), conditional upon defendants achieving substantial compliance with its terms, and shall attach this Agreement to such motion. The motion shall request that the United States' claims in this action be placed on the Court's inactive docket, although the Court shall retain jurisdiction over the United States' claims in this action until a final dismissal with prejudice.

Dr. Karam and Dr. Puisis will address the medical care delivery system at LSP as described in paragraph 4 and 5 below. On or before January 8, 1999, they will inform the Court and counsel whether the medical care system, as described in paragraph 4 and 5, is functioning adequately. If Dr. Karam and Dr. Puisis agree that it is functioning adequately, the United States' claims in this case will be dismissed on February 12, 1999.

If Dr. Karam and Dr. Puisis determine that the areas of the medical care system identified in section 4 and 5 below are not functioning adequately, upon motion of the United States its claims in the case shall be reopened and returned to the Court's active docket. If Dr. Karam and Dr. Puisis cannot agree that the areas of the medical care system identified in section 4 and 5 below are functioning adequately, the United States may file a motion to restore its claims in the case to the Court's active docket. In the same event that Dr. Karam and Dr. Puisis disagree, the Defendants may file a motion to terminate this agreement and dismiss the United States' claims in the case based on proof of substantial compliance with the terms of section 4 and 5. If the United States does not move to reinstate its case within two weeks after Dr. Karam and Dr. Puisis inform the Court of their conclusions, then the United States' claims in the action shall be dismissed. The parties at any time

may agree to extend this agreement.

**4. Additional improvements to be made.**

On May 9, 10 and 11, 1998, LSP was toured by Dr. Michael Puisis on behalf of DOJ. Certain areas of medical care were deemed to be in need of remediation. LSP and defendants agree to make the following changes in the medical care delivery system at LSP:

Security officers will be present during telemedicine encounters and the examination rooms during clinical encounters only when requested by the medical staff. LSP will take reasonable steps - with due regard for security concerns - to provide confidentiality between inmates and health care providers during sick call encounters on segregation units.

LSP shall have an adequate sick call system. If LSP chooses to use EMT's for sick call, LSP shall implement a program to train the EMT personnel providing sick call services. EMT training for sick call will be conducted under the supervision and direction of LSU Medical School personnel who will determine the amount of training needed in subjects relative to sick call medical care. The amount of training will be adequate to carry out the purposes of this paragraph. Protocols will be developed and implemented and Licensed EMTs will be trained in the use of the protocols. Licensed EMTs will be able to speak with a physician if the Licensed EMT believes that an immediate or next day appointment is necessary.

Sick call encounter notes normally will be reviewed and initialed by a physician within twenty-four hours of the sick call encounter, but in no event more than 72 hours after the encounter. Inmates will be informed of their appointments for on-site visits absent particularized security reasons to the contrary. Co-payments will not be charged if LSP cancels an appointment and the inmate appears at sick call to inquire or for rescheduling.

Accu-checks will be performed by insulin dependent diabetic inmates at least twice a day and the results of the Accu-checks will be retained in the inmate medical record. When Accu-checks are refused by an inmate, then that refusal shall be reflected in the inmate's records.

LSP will use contemporary standards of care to diagnose, treat, monitor and classify inmates with chronic illnesses. Hemoglobin A1c testing and other testing deemed appropriate for insulin dependent diabetics will be performed on a regular basis consistent with recommendations of the American Diabetes Association.

Dr. Karam will consult with Dr. Puisis to determine the need for and appropriateness of using flowsheets to track the progress of diabetic and HIV positive inmates as well as for other chronic diseases. The LSP medical department will then initiate and use flowsheets to the

extent that they are determined to be appropriate.

Each inmate chart, whether computerized or written, shall contain a problem list for use by LSP and LSU physicians - at least on a prospective basis. Physician clinical encounters with inmates will be properly documented.

A quality assurance committee will be established and meet once every month and minutes of the committee meetings will be retained.

All non-trauma deaths are reviewed by a mortality committee on a monthly basis.

LSP has or will conduct viral load tests on HIV positive inmates, and appropriate HIV/AIDS therapy, classification, diagnosis and monitoring will be made available consistent with national standards.

Physical therapy will be provided for those inmates for whom physical therapy is indicated to either restore or keep function or for rehabilitative purposes.

Quality assurance of both LSP staff physicians and sick call personnel will be instituted by utilizing a review process by LSU Medical School physicians. Although LSU and LSP may develop any system of Quality Assurance that is effective, random chart reviews and random reviews of ARPs relating to medical care will be components of the program.

Orthopaedic and Neurology backlogs will be reduced to levels deemed acceptable by Dr. Karam and Dr. Puisis.

A decision to override or not follow the outside orders are reviewed by the medical director at LSP, documented in the patient record and communicated promptly to the outside provider. LSP physicians will promptly follow up on patients returning from out-patient appointments or from hospitalization.

When an inmate accesses the medical care system on at least three occasions during a sixty day period, then the inmate will be referred to a physician from the LSU School of Medicine. The LSU physician will review the inmate's record and determine whether a physical examination of the inmate or other action is warranted. Based on their experience with this referral process, the LSU physician may modify the number of sick calls, emergencies and other events accessing medical care that will trigger review by the LSU physician.

After the review by the LSU physician has been completed, a decision may be made to initiate a malingering or work offense write-up. Correctional staff - and not LSP or LSU medical personnel (including EMT's) - will actually initiate and prepare any writeup for malingering or work offense. No inmate will be disciplined or written up for malingering or aggravated work offense based on an inmate's access to the medical care system through sick call,

regularly scheduled clinics or physicians clinics until after the LSU physician has evaluated the patient and determined that the inmate's complaint or complaints had little or no merit. Although the LSU physician may not overrule any subsequent write up nor participate in the disciplinary process, all malingering write ups will be reviewed by the LSU physician as a step in the quality assurance process.

Defendants shall install and bring on line a medical record automation system. The medical records department shall continue to be under the direction of a full time health information consultant who is an accredited records technician. Records will be available on weekends, nights and holidays. A quality assurance program will be instituted in the medical records department. LSP will complete installation of the medical information system and will provide the Information Systems manager adequate clinical direction for development and use. Features that will be implemented are chronic disease problem lists and integration of medication summaries from the pharmacy.

Dr. Karam and Dr. Puisis will address the areas listed above and make a determination whether these areas are functioning adequately. Dr. Karam and Dr. Puisis will inform the Court and counsel for the parties of their conclusions before January 8, 1999.

**5. New Position at LSP**

In order to help implement the changes made and to be made at LSP, the position of Health Services Coordinator has been created and has been filled initially by Dr. Billy Cannon. The initial responsibilities of the Health Services Coordinator shall be to work with the Assistant Warden for Medical Services/Hospital Administrator on administrative issues regarding LSP doctors, pharmacy, lab services, infection control, EMS and liaison between LSP and LSU.

Defendants shall provide adequate medical leadership at LSP.

Determination of whether LSP is providing adequate medical leadership will be made jointly by Dr. Puisis and Dr. Karam. If they are unable to agree, the Court will determine whether LSP is providing adequate medical leadership, based on the information supplied to the Court by Dr. Puisis

and Dr. Karam.

**6. Verification of changes and dismissal of Williams II**

Incidents of non-compliance do not necessarily prevent a finding of substantial compliance. The determination of substantial compliance shall take into account the extent to which exceptions to substantial compliance are isolated, unintentional, and are addressed by corrective action.

The DOJ will reinspect LSP before December 15, 1998 for the limited purpose of verifying that the defendants have substantially implemented the improvements described in paragraph 4 and 5 above.

Thus done and signed on the dates below written.

FOR DEFENDANTS

RICHARD P. IEYOUB
Attorney General
State of Louisiana

By:

Richard A. Curry
McGlinchey Stafford
Ninth Floor
One American Place
Baton Rouge, LA 70825
(225)383-9000

FOR THE PLAINTIFF-INTERVENOR

BILL LANN LEE
Acting Assistant Attorney General
Civil Rights Division

By:

Steven H. Rosenbaum
Chief
William G. Maddox
Christopher N. Cheng (PA#69066)
Trial Attorneys
U.S Department of Justice
Civil Rights Division
Special Litigation Section
P.O. Box 66400
Washington D.C. 20035
(202) 514-8892

L. J. Hymel
United States Attorney
Middle District of Louisiana
777 Florida Street
Room 208
Baton Rouge, LA 70801

# COHENMILSTEIN

JX-CCH-000744

COHENMILSTEIN

## COHEN MILSTEIN SELLERS & TOLL PLLC

For decades, Cohen Milstein Sellers & Toll PLLC has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States for violations of the antitrust, securities, consumer protection, civil rights/discrimination, ERISA, employment, and human rights laws. Cohen Milstein is also at the forefront of numerous innovative legal actions that are expanding the quality and availability of legal recourse for aggrieved individuals and businesses both domestic and international. Over its history, Cohen Milstein has obtained many landmark judgments and settlements for individuals and businesses in the United States and abroad. The firm's most significant past and present cases include:

- HEMT MBS Litigation, (No. 1:08-cv-05653, U.S. District Court for the Southern District of New York). On May 10, 2016, U.S. District Judge Paul A. Crotty finally approved a $110 million settlement in the mortgage-backed securities class action brought by investors against Credit Suisse AG and its affiliates. This settlement ends claims brought by the New Jersey Carpenters Health Fund and other investors who claimed that the offering documents for the mortgage-backed securities at issue violated the Securities Act as they contained false and misleading misstatements concerning compliance with underwriting standards.

- In re Urethane Antitrust Litigation (Polyether Polyol Cases) (D. Kan.). Cohen Milstein serves as co-lead counsel on behalf of a class of direct purchasers of chemicals used to make many everyday products, from mattress foam to carpet cushion, who were overcharged as a result of a nationwide price-fixing conspiracy. On February 25, 2016, Cohen Milstein reached an agreement with The Dow Chemical Company to settle the case against Dow for $835 million. Combined with earlier settlements obtained from Bayer, Huntsman, and BASF, the Dow settlement pushed the total settlements in the case to $974 million. The settlement was approved on July 29, 2016.

- RALI MBS Litigation, (Civ. No. 08-8781, U.S. District Court for the Southern District of New York). In July 2015 On July 31, 2015, Judge Katherine Failla gave final approval to a $235 million settlement with underwriters Citigroup Global Markets Inc., Goldman Sachs & Co., and UBS Securities LLC. She also approved a plan for distribution to investors of those funds as well as the previously approved $100 million settlement with RALI, its affiliates, and the individual Defendants that was reached in in 2013. This global settlement marks an end to a long and complicated class action over MBS offerings that RALI and certain of its affiliates issued and sold to the New Jersey Carpenters Health Fund and other investors from 2006 through 2007. The case took seven years of intense litigation to resolve.

- In re: Bear Stearns Mortgage Pass-Through Certificates Litigation (No. 08-08093, U.S. District Court for the Southern District of New York). On May 27, 2015, U.S. District Judge Laura Taylor Swain finally approved a class action settlement with JPMorgan Chase & Co., which agreed to pay $500 million and up to an additional $5 million in litigation-related expenses to resolve claims arising from the sale of $27.2 billion of mortgage-backed securities issued by Bear Stearns & Co. during 2006 and 2007 in 22 separate public offerings.

- Harborview MBS Litigation, (No. 08-5093, U.S. District Court for the Southern District of New York). In February 2014, Cohen Milstein reached a settlement with the Royal Bank of Scotland (RBS) in the Harborview MBS Litigation, resolving claims that RBS duped investors into buying securities backed by shoddy home loans. The $275 million settlement is the fifth largest class action settlement in a federal MBS case. This case is one of eight significant MBS actions that Cohen Milstein has been named lead or co-lead counsel by courts and one of three that were nearly thrown out by the court, only to be revived in 2012.
- In Re Electronic Books Antitrust Litigation, (No. 11-md-02293, U.S. District Court for the Southern District of New York). In August 2014, a New York federal judge approved a $400 million antitrust settlement in the hotly contested ebooks price-fixing suit against Apple Inc. Combined with $166 million in previous settlements with five defendant publishing companies, consumers could receive more than $560 million. The settlement resolves damages claims brought by a class of ebook purchasers and attorneys general from 33 U.S. states and territories.

- Countrywide MBS Litigation, (2:10-cv-00302, U.S. District Court in the Central District of California). In April 2013, Plaintiffs in the landmark mortgage-backed securities (MBS) class action litigation against Countrywide Financial Corporation and others, led by Lead Plaintiff, the Iowa Public Employees' Retirement System (IPERS), agreed to a $500 million settlement. It is the nation's largest MBS-federal securities class action settlement. The settlement was approved in December 2013 and brings to a close the consolidated class action lawsuit brought in 2010 by multiple retirement funds against Countrywide and other defendants for securities violations involving the packaging and sale of MBS. The settlement is also one of the largest (top 20) class action securities settlements of all time.

- In re Beacon Associates Litigation (No. 09-cv-0777, United States District Court for the Southern District of New York). Class action settlement of $219 million for trustees and participants in ERISA-covered employee benefit plans whose assets were lost through investments made on their behalf by Beacon Associates LLC I & II in the investment schemes of Bernard Madoff.

- In re Plasma-Derivative Protein Therapies Antitrust Litigation (No. 09 C 7666, United States District Court for the Northern District of Illinois). After four years of litigation, in October of 2013, CSL Limited, CSL Behring LLC, CSL Plasma, Inc. (collectively, "CSL"), and the Plasma Protein Therapeutics Association ("PPTA") agreed to pay $64 million dollars to settle a lawsuit brought by the University of Utah Hospital and other health care providers alleging that CSL, the PPTA, and Baxter agreed between 2003-2009 to restrict the supply of immunoglobulin and albumin, and thereby increase the prices of those therapies. Two months later, Baxter International Inc. and Baxter Healthcare Corp. (collectively "Baxter") agreed to pay an additional $64 million to settle these claims – bringing the total recovery to the class to $128 million.

- Keepseagle v. Vilsack, Civil Action No. 1:99CV03119 (D.D.C.). A class of Native American farmers and ranchers allege that they have been systematically denied the same opportunities to obtain farm loans and loan servicing that have been routinely afforded white farmers by the USDA. A class was certified in 2001 by Judge Emmet Sullivan, District Judge for the U.S. District Court for the District of Columbia, and the D.C. Circuit declined USDA's request to review that decision. On October 19, 2010, the case reached a historic settlement, with the USDA agreeing to pay $680 million in damages to thousands of Native American farmers and ranchers and forgive up to $80 million worth of outstanding farm loan

debt.

- In re Parmalat Securities Litigation, No. 04 MD 1653 (S.D.N.Y.). In this securities litigation case, Cohen Milstein has successfully negotiated two partial settlements totaling approximately $90 million. At the second partial settlement hearing, Judge Lewis A. Kaplan remarked that plaintiffs counsel "did a wonderful job here for the class and were in all respects totally professional and totally prepared. I wish I had counsel this good in front of me in every case." Our clients, four large European institutional investors, were appointed as co-lead plaintiffs and we were appointed as co-lead counsel. Most notably, this case allowed us the opportunity to demonstrate our expertise in the bankruptcy area. During the litigation, the company subsequently emerged from bankruptcy and we added "New Parmalat" as a defendant because of the egregious fraud committed by the now-bankrupt old Parmalat. New Parmalat strenuously objected and Judge Kaplan of the Southern District of New York ruled in the class plaintiffs' favor, a ruling which was affirmed on appeal. This innovative approach of adding New Parmalat enabled the class to obtain an important additional source of compensation, as we subsequently settled with New Parmalat.

- Dukes v. Wal-Mart Stores, Inc., No. C-01-2252 (N.D. Cal.). Cohen Milstein is co-lead counsel in this sex discrimination case. In 2004, the U.S. District Court certified a nationwide class action lawsuit for all female employees of Wal-Mart who worked in U.S. stores anytime after December 26, 1998. This was the largest civil rights class action ever certified against a private employer, including approximately 1.5 million current and former female employees. That ruling was appealed, and while affirmed by the Ninth Circuit, was reversed by the Supreme Court in June 2011. Cohen Milstein argued the case for the plaintiffs-respondents in the Supreme Court. Since then, the *Dukes* action has been amended to address only the Wal-Mart regions that include stores in California, and other regional class cases have been or are soon to be filed. This litigation to resolve the merits of the claims – whether Wal-Mart discriminates against its female retail employees in pay and promotions – continues.

- Rubin v. MF Global, Ltd. (08-CV-02233, S.D.N.Y.). Acting as co-lead counsel in this class action, the Firm represented the Central States, Southeast and Southwest Areas Pension Fund which was one of the co-lead plaintiffs in the case. In September 2010, as a result of Plaintiffs' decision to appeal, the U.S. Second Circuit Court of Appeals vacated in part the lower court's dismissal of the case and remanded the case for further proceedings. In overturning the District Court decision, the Second Circuit issued a decision which differentiated between a forecast or a forward looking statement accompanied by cautionary language -- which the Appellate Court said would be insulated from liability under the bespeaks caution doctrine -- from a factual statement, or non-forward-looking statement, for which liability may exist. Importantly, the Second Circuit accepted Plaintiffs' position that where a statement is mixed, the court can sever the forward-looking aspect of the statement from the non-forward looking aspect. The Court further stated that statements or omissions as to existing operations (and present intentions as to future operations) are not protected by the bespeaks caution doctrine. Mediation followed this decision and resulted in a settlement comprised of $90 million in cash.

- Hughes v. Huron Consulting Group (09-CV-04734, N.D. Ill.). Cohen Milstein represented lead plaintiffs the Public School Teachers' Pension & Retirement Fund of Chicago and the Arkansas Public Employees Retirement System ("APERS") in this case against Huron Consulting Group, founded by former Arthur Anderson personnel following its collapse in the wake of the Enron scandal. In August 2010, the District Court for the Northern District of Illinois denied defendants' motions to dismiss in their entirety and upheld plaintiffs' allegations that defendants intentionally improperly accounted for acquisition-

related payments, which allowed plaintiffs to move forward with discovery. The case was settled for $40 million, comprised of $27 million in cash and 474,547 shares in Huron common stock, with an aggregate value at the time of final approval in 2011 of approximately $13 million.

- In re Lucent Technologies Securities Litigation, Civ. Action No. 00-621 (JAP) (D.N.J.). A settlement in this massive securities fraud class action was reached in late March 2003. The class portion of the settlement amounts to over $500 million in cash, stock and warrants and ranks as the second largest securities class action settlement ever completed. Cohen Milstein represented one of the co-lead plaintiffs in this action, a private mutual fund.

- Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al., Civil Action No. 00-015 (Knox County Superior Court, Me.). In 2004, a state court jury from Maine found three blueberry processing companies liable for participating in a four-year price-fixing and non-solicitation conspiracy that artificially lowered the prices defendants paid to approximately 800 growers for wild blueberries. The jury ordered defendants Cherryfield Foods, Inc., Jasper Wyman & Son, Inc., and Allen's Blueberry Freezer, Inc. to pay $18.68 million in damages, the amount which the growers would have been paid absent the defendants' conspiracy. After a mandatory trebling of this damage figure under Maine antitrust law, the total amount of the verdict for the plaintiffs is just over $56 million. The Firm served as co-lead counsel.

- In re StarLink Corn Products, Liability Litigation, MDL No. 1403. (N.D. Ill.). Cohen Milstein successfully represented U.S. corn farmers in a national class action against Aventis CropScience USA Holding and Garst Seed Company, the manufacturer and primary distributor of StarLink corn seeds. StarLink is a genetically modified corn variety that the United States government permitted for sale as animal feed and for industrial purposes, but never approved for human consumption. However, StarLink was found in corn products sold in grocery stores across the country and was traced to widespread contamination of the U.S. commodity corn supply. The Firm, as co-lead counsel, achieved a final settlement providing more than $110 million for U.S. corn farmers, which was approved by a federal district court in April 2003. This settlement was the first successful resolution of tort claims brought by farmers against the manufacturers of genetically modified seeds.

- Snyder v. Nationwide Mutual Insurance Company, No. 97/0633 (Sup. Ct. N.Y. Onondaga Cty.). Cohen Milstein served as one of plaintiffs' principal counsel in this case on behalf of persons who held life insurance policies issued by Nationwide through its captive agency force. The action alleged consumer fraud and misrepresentations. Plaintiffs obtained a settlement valued at more than $85 million. The judge praised the efforts of Cohen Milstein and its co-counsel for having done "a very, very good job for all the people." He complimented "not only the manner" in which the result was arrived at, but also the "time … in which it was done."

- Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al., No. 1:01CV02313 (D.D.C.). Cohen Milstein has been co-lead counsel in this case since its inception in 2001. Plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol. Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition. Cohen Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations

brought by the Federal Trade Commission and State Attorneys General offices.

- Kruman v. Christie's International PLC, et al., Docket No. 01-7309. A $40 million settlement on behalf of all persons who bought or sold items through Christie's or Sotheby's auction houses in non-internet actions was approved in this action. Cohen Milstein served as one of three leading counsel on behalf of foreign plaintiffs. The Court noted that approval of the settlement was particularly appropriate, given the significant obstacles that faced plaintiffs and plaintiffs' counsel in the litigation. The settlement marked the first time that claims on behalf of foreign plaintiffs under U.S. antitrust laws have been resolved in a U.S. court, a milestone in U.S. antitrust jurisprudence.

- Roberts v. Texaco, Inc., 94-Civ. 2015 (S.D.N.Y.). Cohen Milstein represented a class of African-American employees in this landmark litigation that resulted in the then-largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief). The Court hailed the work of class counsel for, *inter alia,* "framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole …".

- Trotter v. Perdue Farms, Inc., Case No. 99-893 (RRM) (JJF) (MPT), D. Del. This suit on behalf of hourly workers at Perdue's chicken processing facilities – which employ approximately 15,000 people – forced Perdue to pay employees for time spent "donning and doffing," that is, obtaining, putting on, sanitizing and removing protective equipment that they must use both for their own safety and to comply with USDA regulations for the safety of the food supply. The suit alleged that Perdue's practice of not counting donning and doffing time as hours worked violated the Fair Labor Standards Act and state law. In a separate settlement with the Department of Labor, Perdue agreed to change its pay practices. In addition, Perdue is required to issue retroactive credit under one of its retirement plans for "donning and doffing" work if the credit would improve employees' or former employees' eligibility for pension benefits. Cohen Milstein was co-lead counsel.

**Awards & Recognition**

In October 2016, National Law Journal named Cohen Milstein one of six finalists in the category of class actions for its Elite Trial Lawyers list.

In 2016, Cohen Milstein Partner Martha Geer was selected as a 2016 North Carolina Leaders in the Law Honoree.

In 2016, the Washington Lawyers' Committee for Civil Rights and Urban Affairs named Cohen Milstein Sellers & Toll a recipient of its 2016 Outstanding Achievement Award.

In 2016, for the eighth consecutive year, Cohen Milstein was recognized by The Legal 500 as one of the leading plaintiff class action antitrust firms in the United States.

In 2016, Agnieszka Fryszman, Joel Laitman, Chris Lometti, Kit Pierson, Joe Sellers and Steve Toll were named to the 2016 Lawdragon 500 Leading Lawyers in America. As one of the most elite distinctions in the legal profession, the annual Lawdragon 500 recognizes the 'best of the best' of the 1.2 million members of the U.S. legal profession.

In 2016, Law360 named Cohen Milstein Partner Julie Goldsmith Reiser one of the 25 Most Influential Women in Securities Law.

In 2016, Cohen Milstein is named to the National Law Journal's "Plaintiffs Hot List" for the fifth time in six years.

In 2016, Law360 names Cohen Milstein as one of the top firms for female attorneys.

In 2015, Law360 selects Cohen Milstein as the sole plaintiff firm to be selected in two "Practice Groups of the Year" categories and one of only five class action firms recognized.
In 2015, Cohen Milstein was named an Elite Trial Lawyer Firm by the National Law Journal for the second year in a row.

In 2015, Cohen Milstein Partner Steven J. Toll named a Law360 MVP in Securities Law.

In 2015, Cohen Milstein is selected as a "Most Feared Plaintiffs Firm" by Law360 for the third year in a row.

In 2015, Partner Richard Koffman was named, for the fifth consecutive year, in the Legal 500 United States "Leading Lawyers" list under the category of "Litigation - Mass Tort and Class Action: Plaintiff Representation - Antitrust".

In 2015, Cohen Milstein Attorney Jeffrey Dubner was named a National Law Journal D.C. Rising Star.

In 2015, five Cohen Milstein Attorneys were named to the 2016 The Best Lawyers in America© list.

In 2015, Cohen Milstein's Denver office was named "Antitrust Law Firm of the Year – Colorado" by Global Law Experts.

In 2015, Partners Theodore J. Leopold and Leslie M. Kroeger and Of Counsel Attorney Stephan A. LeClainche were selected to the 2015 Florida Super Lawyers list and Adam J. Langino was selected to the Florida Rising Stars list.

In 2015, Cohen Milstein attorneys R. Joseph Barton, Andrew Friedman, Agnieszka Fryszman, Karen Handorf, Kit A. Pierson, Julie Reiser, Joseph M. Sellers, Linda Singer, Daniel A. Small, Daniel S. Sommers, Steven J. Toll and Christine E. Webber were selected as Washington DC Super Lawyers.

In 2015, Cohen Milstein attorneys Laura Alexander, Monya Bunch, S. Douglas Bunch, Joshua S. Devore, Jeffrey Dubner, Johanna Hickman, Kalpana Kotagal, Emmy Levens, and David Young were selected as Washington DC Rising Stars by Super Lawyers.

In 2015, for the fourth time in five years, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**

In 2015, Cohen Milstein Partner Carol V. Gilden was selected as "Pension Funds Litigation Attorney of the Year in Illinois" for the second year in a row by the Corporate INTL Legal Awards.

In 2014, Cohen Milstein's Antitrust Practice was selected as a Practice Group of the Year by Law360.

In 2014, Cohen Milstein Partner Kit Pierson was selected as an MVP by Law360.

In 2014, Cohen Milstein was named a "**Most Feared Plaintiffs Firm**" by Law360 for the second year in a row.

In 2014, Cohen Milstein was selected as an **Elite Trial Lawyer** firm by the National Law Journal.

Cohen Milstein Partners Steven J. Toll, Joseph M. Sellers, Kit A. Pierson, and Agnieszka M. Fryszman Selected to the **2014 Lawdragon 500**.

Joseph M. Sellers, Theodore J. Leopold, and Leslie M. Kroeger Make "**Best Lawyers**' List" for 2015.

Released in 2014, the 2013 SCAS 50 Report on Total Securities Class Action Settlements once again ranked Cohen Milstein as a top firm.

In 2014, Theodore J. Leopold, a partner at Cohen Milstein, was been selected to the Top 100 Miami Florida Super Lawyers list.  Partner Leslie M. Kroeger was selected to the **2014 Florida Super Lawyers** list and Diana L. Martin was selected to the **Florida Rising Stars** list.

In 2014, Cohen Milstein attorneys Leslie M. Kroeger and Adam J. Langino were both recognized in the 2014 edition of **Florida Trend's Florida Legal Elite**™.  Kroeger is recognized as Legal Elite and Langino is listed as an Up-and-Comer.

In 2014, Cohen Milstein was selected to the selected to the **National Law Journal's Midsize Hot List**.

In 2014, Cohen Milstein was recognized as a "**Highly Recommended Washington, DC Litigation Firm**" by Benchmark Plaintiff: The Definitive Guide to America's Leading Plaintiff Firms and Attorneys.

In 2014, Cohen Milstein was ranked as a **Leading Plaintiff Class Action Antitrust Firm in the United States by the Legal 500** for the sixth year in a row.

In 2014, Partner Richard Koffman was named, for the fourth consecutive year, in the Legal 500 United States "**Leading Lawyers**" list under the category of "Litigation - Mass Tort and Class Action: Plaintiff Representation - Antitrust".

In 2014, Cohen Milstein attorneys Christopher Cormier, Agnieszka Fryszman, Julie Goldsmith Reiser, Joseph Sellers, Daniel Sommers, and Steven Toll were recognized **as Local Litigation Stars** by Benchmark Plaintiff: The Definitive Guide to America's Leading Plaintiff Firms and Attorneys.

In 2014, Cohen Milstein attorneys R. Joseph Barton, Andrew Friedman, Agnieszka Fryszman, Karen Handorf, Kit A. Pierson, Julie Reiser, Joseph M. Sellers, Linda Singer, Daniel A. Small, Daniel S. Sommers, Steven J. Toll and Christine E. Webber were selected as **Washington DC Super Lawyers**.

In 2014, Cohen Milstein attorneys Laura Alexander, Monya Bunch, S. Douglas Bunch, Joshua S. Devore, Jeffrey Dubner, Johanna Hickman, Joshua Kolsky, Kalpana Kotagal, Emmy Levens, Michelle Yau and David Young were selected as **Washington DC Rising Stars** by Super Lawyers.

In 2014, Cohen Milstein Partner Carol V. Gilden was selected as the Illinois Pension Fund Attorney of the Year.

In 2014, Best Lawyers named Cohen Milstein Partner Joseph Sellers D.C. Litigation - Labor & Employment Lawyer of the Year.

In 2013, for the third-year in a row, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**.

In 2013, Cohen Milstein was named a "**Most Feared Plaintiffs Firm**" by Law360.
In 2013, Cohen Milstein was ranked as a Leading Plaintiff Class Action Antitrust Firm in the United States by the Legal 500 for the fifth year in a row.

In 2013, Cohen Milstein attorneys Joseph Barton, Andrew Friedman, Agnieszka Fryszman, Karen Handorf, Kit A. Pierson, Julie G. Reiser, Joseph M. Sellers, Daniel A. Small, Daniel S. Sommers, Steven J. Toll, and Christine E. Webber were selected as **Washington DC Super Lawyers**.

In 2013, Cohen Milstein attorneys Joshua Devore and Michelle Yau were selected as **Washington DC Rising Stars** by Super Lawyers.

In 2013, Cohen Milstein Partner Carol V. Gilden was selected as a **2013 Illinois Super Lawyer**. She has been selected every year since 2005.

In 2012, for the second-year in a row, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**.

In 2012, Cohen Milstein was the recipient of the Judith M. Conti Pro Bono Law Firm of the Year Award from the Employment Justice Center.

In 2012, Cohen Milstein was recognized as a "Highly Recommended Washington, DC Litigation Firm" by Benchmark Plaintiff: The Definitive Guide to America's Leading Plaintiff Firms and Attorneys.

In 2012, Cohen Milstein was ranked as a top firm by the 2011 SCAS Report on Total Securities Class Action Settlements.

In 2012, Cohen Milstein was ranked as a Leading Plaintiff Class Action Antitrust Firm in the United States by the Legal 500 for the fourth year in a row.

In 2012, Partner Joseph M. Sellers was selected as a **Washington DC Super Lawyer**. Mr. Sellers was also selected for this prestigious award in 2007, 2008, 2009, 2010, and 2012.

In 2012, Partner Steven J. Toll was selected as a **Washington DC Super Lawyer**. Mr. Toll was also selected for this prestigious award in 2007, 2009, 2010, and 2011.

In 2012, Partner Daniel S. Sommers was selected as a **Washington DC Super Lawyer**. Mr. Sommers was also selected for this prestigious award in 2011.

In 2012, Partner Christine E. Webber was selected as a **Washington DC Super Lawyer**. Ms. Webber was also selected for this prestigious award in 2007.

In 2012, Partner Agnieszka M. Fryszman was selected as a **Washington DC Super Lawyer**.

In 2012, Partner Kit A. Pierson was selected as a **Washington DC Super Lawyer**.

In 2012, Partner Carol V. Gilden was selected as an **Illinois Super Lawyer**. Ms. Gilden was also selected for this prestigious award in 2005, 2006, 2007, 2008, 2009, 2010, and 2011.

In 2011, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**.

In 2011, Partner Joseph M. Sellers was selected as a **"Visionary"** by The *National Law Journal.*

In 2011, Partner J. Douglas Richards, Of Counsel Joel Laitman, and Of Counsel Christoper Lometti were selected as **New York - Metro Super Lawyers**.

In 2011, Partner Joseph M. Sellers and the *Keepseagle v. Vilsack* team were selected as a finalist for the **2011 Trial Lawyer of the Year Award** from the Public Justice Foundation.

In 2011, **Cohen Milstein was ranked as a Leading Plaintiff Class Action Antitrust Firm in the United States** by the Legal 500 for the third year in a row.

In 2011, Partners Steven Toll, Joseph Sellers, and Daniel Sommers were selected as **Washington DC Super Lawyers**. Partner J. Douglas Richards, Of Counsel Joel Laitman and Christoper Lometti were selected as **New York - Metro Super Lawyers**. Partner Carol Gilden was selected as an **Illinois Super Lawyer**.

In 2011, Cohen Milstein was a recipient of The *National Law Journal's* **Pro Bono Award**. The Firm was named one of the "six firms that best reflect the pro bono tradition."

In 2010, Partner Joseph M. Sellers was selected as one of "**The Decade's Most Influential Lawyers**" by *The National Law Journal*.

In 2010, Partner Steven J. Toll was named one of Law360's "**Most Admired Attorneys**".

In 2010, Partner Andrew N. Friedman was selected as a **Washington DC Super Lawyer**.

In 2010, Partner Linda Singer was selected as one of "**Washington's Most Influential Women Lawyers**" by *The National Law Journal*.

In 2010, Partner Agnieszka M. Fryszman was selected as a finalist for the **Trial Lawyer of the Year Award** from the Public Justice Foundation.

In 2010, Partners Joseph M. Sellers and Agnieszka M. Fryszman were both selected as one of the **Lawdragon 500 Leading Lawyers in America**.

In 2010, Cohen Milstein was once again ranked as a **Leading Plaintiff Class Action Antitrust Firm in the United States** by the Legal 500.

In 2009, Partner Steven J. Toll was named a **Top Attorney in Corporate Litigation for Securities Litigation** by Super Lawyers.

In 2009, Partners Joseph M. Sellers and Christine E. Webber were named as **Top Washington Lawyers** by the Washingtonian Magazine.

In 2009, Cohen Milstein was recognized as **one of the top 50 law offices in Washington D.C. for diversity efforts**.

In 2009, Cohen Milstein was nominated for the prestigious **Class Action Law Firm of the Year** award by Global Pensions magazine for the third year in a row.

Cohen Milstein ranked as a **2009 Leading Plaintiff Class Action Antitrust Firm in the United States** by *The Legal500*.

The **2008 SCAS Report on Total Securities Class Action Settlements** ranked Cohen Milstein as a top firm for the second year in a row.

In 2008, Cohen Milstein was nominated for the prestigious **Class Action Law Firm of the Year** award by Global Pensions magazine for the second year in a row.

In 2008, Managing Partner Steven J. Toll was named one of Lawdragon's **100 Lawyers You Need to Know in Securities Litigation.**

In 2008, Steven J. Toll and Joseph M. Sellers were both named as one of Lawdragon's "**500 Leading Lawyers in America**."

Case 3:15-cv-00318-SDD-RLB Document 353-4 11/04/16 Page 12 of 13

**Daniel A. Small**

Daniel A. Small has been a Partner at Cohen Milstein for more than 20 years and chaired or co-chaired the firm's Antitrust practice group from 2008 to 2014. He is a member of the firm's Executive Committee.

When he arrived at Cohen Milstein 26 years ago, Mr. Small was assigned to work on securities fraud cases. One year later, he received an assignment in an antitrust case and has worked virtually full time on antitrust cases ever since. He has represented plaintiff classes as lead or co-lead counsel numerous times and has tried cases before juries and has argued cases in several appellate courts, including the United States Supreme Court. He also has defended unions against antitrust claims and represented a key duplication machine manufacturer on its monopolization claims against the dominant competitor.

Mr. Small has obtained favorable settlements and judgments totaling hundreds of millions of dollars and has been involved with a broad array of markets, everything from computer software and hardware to wild blueberries and hospital nurses. He has developed a sophisticated understanding of how conspiracies and monopolies operate in a range of complex markets. He has spent years studying the economic issues that underpin his cases, and the challenges of using antitrust litigation to achieve just compensation for victims, and to encourage and facilitate freer and more open markets in this country.

His work in complex civil litigation has made him one of the most respected and feared litigants in the class action antitrust space: *The Legal 500* has recognized Mr. Small and Cohen Milstein as a "Leading Plaintiffs Antitrust Class Action Lawyer/Firm" annually since 2009; *Benchmark Plaintiff* has repeatedly awarded him "National Litigation Star – Antitrust"; and in 2014, he was named a "Leading Competition Lawyer" by the *International Who's Who of Competition Lawyers & Economists*.

Currently, Mr. Small is litigating the following notable matters, among others:

- VFX/Animation Workers Litigation: Cohen Milstein is one of three court-appointed co-lead firms in litigation alleging that the major animation studios conspired to suppress the pay of special effects and animation workers. The litigation has survived a motion to dismiss and the plaintiffs recently filed a motion for class certification.
- Prime Healthcare Services Litigation: Cohen Milstein is defending the Service Employees International Union (SEIU) in an antitrust conspiracy action brought by Prime Healthcare Services, a hospital chain in Southern California, alleging that SEIU conspired with Kaiser Permanente to drive Prime and certain other hospitals out of the market. Cohen Milstein led the successful effort to have the complaint and amended complaint dismissed in the Southern District of California. The case is on appeal in the Ninth Circuit where Mr. Small recently argued on behalf of the SEIU and its local union, UHW.
- Google Wi-Fi Litigation: Cohen Milstein is co-lead counsel in a nationwide class action lawsuit alleging Google violated the Wiretap Act when its Street View vehicles collected payload data from unencrypted Wi-Fi networks, including the home networks of individuals. The litigation survived a motion to dismiss, which was affirmed on an interlocutory appeal to the Ninth Circuit. Currently, the firm is in the midst of jurisdictional discovery.
- Michigan Blue Cross Litigation: Cohen Milstein is co-lead counsel in this class action challenging Michigan Blue Cross's use of most favored nation provisions in its provider agreements with hospitals in Michigan. The class plaintiffs secured a $30 million settlement, which was approved by the United

States District Court for the Eastern District of Michigan. Mr. Small defended the settlement on appeal, arguing recently before the Sixth Circuit Court of Appeals.

Past successes include:

- In re Buspirone Antitrust Litigation: $90 million settlement. Cohen Milstein served as co-lead counsel in a class action lawsuit alleging that Bristol Myers-Squibb Co., the manufacturer of the prescription drug Buspar, conspired to keep generic versions of the drug out of the market.
- *Pease v. Jasper Wyman & Son, et al.:* $56 million judgment. Cohen Milstein was lead counsel representing a class of wild blueberry growers in Maine who sued four blueberry processors for conspiring to depress blueberry prices. The litigation was tried before a jury in Maine state court, where Mr. Small was co-lead trial counsel. The jury found the processors liable for 100% of the damages estimated by the plaintiffs' expert and awarded the growers $18.68 million in damages, which was trebled under Maine antitrust law.

Mr. Small attended Colgate University, where he graduated with a B.A., *cum laude*, in History. He earned his J.D. at American University's Washington College of Law. Following law school, Mr. Small clerked for the Honorable Judge Roger Vinson, United States District Court for the Northern District of Florida, from 1986 to 1988. He serves on the Advisory Board of the American Antitrust Institute and is chair of the selection committee for the annual Jerry S. Cohen Memorial Writing Award for Antitrust Scholarship.

**Jeffrey Dubner**

Jeffrey B. Dubner is an Associate at Cohen Milstein and a member of the Antitrust practice group, having joined the firm in 2011. In this role, Mr. Dubner represents a broad range of individuals, businesses, and unions in civil litigation, with a focus on multi-district class actions and antitrust litigation. He has represented both plaintiffs and defendants in antitrust matters, dealing with the application of the Sherman Act in industries from health care and financial services to professional sports and publishing. In addition to state and federal antitrust laws, Mr. Dubner has litigated claims under the Stored Communications Act, the Commodities Exchange Act, the Eighth Amendment, the Americans with Disabilities Act, and other state and federal causes of action.

Mr. Dubner has been recognized by several prominent organizations for his litigation achievements. The American Antitrust Institute recognized him in 2016 for Outstanding Antitrust Litigation Achievement by a Young Lawyer, one of just four attorneys so honored. *National Law Journal* named him a Rising Star in 2015, and *Super Lawyers* has named in a Rising Star for the past three years.

Mr. Dubner is currently litigating the following matters:

- *UEBT v. Sutter Health*: Cohen Milstein represents self-insured entities in Northern California who are challenging anticompetitive practices by Sutter Health, the dominant hospital system in Northern California. Plaintiffs have defeated Sutter Health's motion to compel arbitration and demurrer, and the case is currently in discovery.
- *Lewis v. Cain*: Mr. Dubner is co-lead counsel on a class action lawsuit alleging that the Louisiana Department of Public Safety and Corrections failed to provide adequate health care services to inmates at Angola Prison, the largest state-run maximum security prison in the United States. The case is currently in discovery.
- *In re Animation Workers Antitrust Litigation*: Cohen Milstein is one of three court-appointed co-lead counsels in a litigation alleging that the major animation studios conspired to limit the opportunities and suppress the pay of special effects and animation workers by agreeing not to poach each other's employees. The litigation has survived a motion to dismiss and plaintiffs have moved for class certification. Mr. Dubner has been involved in all aspects of the litigation.
- *In re Interest Rate Swaps Antitrust Litigation*: Cohen Milstein represents The City of Baltimore and the Public School Teachers' Pension and Retirement Fund of Chicago on behalf of a putative class in an action alleging that major investment banks conspired to prevent an exchange-traded market for interest rate swaps from developing. The case is currently pending centralization by the Joint Panel on Multidistrict Litigation.

Mr. Dubner played an important role in litigating the following successes:

- *Garber v. Office of the Commissioner of Baseball* and *Laumann v. National Hockey League*: Cohen Milstein was co-lead counsel for plaintiffs in class actions alleging that the system of geographical broadcasting territories employed by Major League Baseball and the National Hockey League amount to unlawful market allocation under Section 1 of the Sherman Act. The last settlements were reached on the eve of trial and are awaiting final Court approval. Mr. Dubner was lead associate on the NHL and MLB lawsuits and was involved in all aspects of the litigation, including arguing motions and examining witnesses before the court.

- *Cason-Merenda v. Detroit Medical Center*: Cohen Milstein represents a class of nurses alleging that Detroit hospitals suppressed wages through anti-competitive information exchanges. All eight defendants settled, creating a common fund of more than $90 million for Detroit's nurses. Mr. Dubner participated in the trial preparation for the case.
- *In re Electronic Books Antitrust Litigation*: Cohen Milstein was co-lead counsel in a class action lawsuit alleging that Apple and five of the leading U.S. publishers conspired to raise the retail prices of ebooks. The five publishing defendants settled for $166 million and a settlement was reached with Apple for an additional $400 million. Mr. Dubner was lead associate on the case and was involved in all aspects of the litigation, including trial preparation.
- *Prime Healthcare Services v. SEIU*: Cohen Milstein successfully defended the Service Employees International Union (SEIU) against antitrust claims brought by Prime Healthcare Services, alleging that SEIU conspired with Kaiser Permanente to drive Prime out of the market. Cohen Milstein succeeded in having the complaint and the amended complaint dismissed in the Southern District of California and defeating an appeal in the Ninth Circuit. Mr. Dubner was the lead associate on the case and was involved in all aspects of the litigation, including drafting the successful motions to dismiss and appellate brief.

Prior to joining the firm, Mr. Dubner was a law clerk for the Honorable Guido Calabresi of the U.S. Court of Appeals for the Second Circuit and the Honorable John G. Koeltl of the U.S. District Court for the Southern District of New York. Mr. Dubner attended Harvard University, graduating *cum laude* with a B.A. in Psychology, and earned his J.D. *magna cum laude* from Harvard Law School. Mr. Dubner served as a Notes Editor for the *Harvard Law Review*. Mr. Dubner is admitted to practice in New York, the District of Columbia, the Southern District of New York, and the Eastern District of Michigan. He is also a New York Times–published crossword constructor.

Case 3:15-cv-00318-SDD-RLB Document 153-4 11/14/16 Page 1 of 1

# The Promise of Justice Initiative

The Promise of Justice Initiative (PJI) is a private, non-profit organization that advocates for humane, fair, and equal treatment of individuals in the criminal justice system. Staff representing prisoners on death row at The Capital Appeals Project (CAP) launched PJI, to address the bigger issues of capital punishment and needed reform to Louisiana's criminal justice system. PJI's larger projects include supporting access to justice, civil rights litigation, policy initiatives, and providing consultation in individual cases.

## Representative Cases

***Ball v. LeBlanc***

This case challenges the constitutionality of the heat conditions on death row at Louisiana State Penitentiary. The case is currently on remand from the United States Court of Appeals for the Fifth Circuit.

***Hoffman v. Jindal***

This case challenges the constitutionality of execution in Louisiana. Lethal injections are currently stayed until January 2018.

## PJI Attorneys

MERCEDES MONTAGNES
Mercedes received a JD degree from Harvard Law School. At Harvard, Mercedes worked as a student attorney for the Criminal Justice Institute and held summer internships with a civil rights attorney and the Public Defender's Office in New Orleans. During law school, Montagnes was the President of the Harvard Law and Policy Review and is a recipient of the Harvard Law School Public Venture Seed Grant. She served as a law clerk in Federal District Court and Appeals Courts and then worked at the Capital Appeals Project and eventually the Promise of Justice Initiative in New Orleans.



Case 3:15-cv-00318-SDD-RLB Document 153-46 11/14/16 Page 1 of 1

The Advocacy Center is a private, federally-funded, non-profit corporation, designated by Louisiana to serve as the State's Protection and Advocacy system for persons with disabilities. It is part of a nationwide network of disability rights programs (hereinafter, "Protection and Advocacy organizations") created under federal law to provide legal representation and other advocacy services on behalf of persons with disabilities. The Advocacy Center, and other Protection and Advocacy organizations around the country have broad authority to pursue legal remedies to ensure the protection of the constitutional and statutory rights of individuals with disabilities. *See* Protection and Advocacy of Individual Rights Program of the Rehabilitation Act of 1973, 29 U.S.C. § 794e; Protection and Advocacy for Individuals with Mental Illness ("PAIMI") Act of 1986, 42 U.S.C. § 10801 *et seq.*; Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15041-45.

**Voice 504-522-2337 • Fax 504-522-5507 • Toll Free 1-800-960-7705 • www.advocacyla.org**

**8325 Oak Street • New Orleans, Louisiana 70118-2043**

JUSTIN P. HARRISON
INTERIM LEGAL DIRECTOR

The ACLU of Louisiana is the state affiliate of the ACLU. The ACLU Foundation of Louisiana is the nonprofit public education and litigation arm of the affiliate. Since its founding in 1920, the ACLU has been a foremost champion of constitutional rights, particularly in the nation's federal and state courts. The ACLU has appeared before the United States Supreme Court more than any organization except the federal government, and on any given day, the ACLU is involved in hundreds of §1983 cases around the country, including many prisoners' rights matters arising out of the Eighth Amendment and the Prison Litigation Reform Act. As a non-profit, nonpartisan organization, it defends the civil liberties of all segments of the population with regard to personal belief or political affiliation.

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION OF
LOUISIANA
PO BOX 56157
NEW ORLEANS, LA 70156
T/504.522.0617
WWW.LAACLU.ORG

The ACLU of Louisiana has participated in many of the leading Constitutional cases litigated in Louisiana. While its work is not limited to prisoners' rights, it receives and reviews more than 1400 inmate complaints a year, and it regularly represents prisoners and pretrial detainees who have suffered Constitutional violations in the custody of the Louisiana Department of Corrections or Louisiana's various parish jails. It is currently counsel in several such matters pending in the Fifth Circuit and Louisiana's federal district courts.

Case 3:15-cv-00318-BAJ-RLB Document 358-1 11/29/16 Page 121 of 134

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, and RUFUS WHITE, on behalf of themselves and all others similarly situated,

CIVIL ACTION
NO. 15-318
JUDGE: BAJ
MAG: RLB

Plaintiffs,

V.

BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS.

Defendants.

DEPOSITION OF DONALD K. BARR, given in the above-entitled cause, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, at Shows, Cali & Walsh, 628 St. Louis, Baton Rouge, Louisiana, on the 27th day of October, 2016.

appeal back to us about that. We also have the ARP system. He can file an ARP, what we call an ARP, and an appeal, too.

Q. If he doesn't file an ARP, how does he appeal?

A. He can, I guess, he can make an appeal to the ADA coordinator.

Q. What was a general time line? If someone made a request for accommodation, how quickly could they expect to be responded to?

A. Fairly quickly. I think it's like two days they are supposed to be.

Q. What sort of training have you received on the ADA?

A. The training that I received is the regular training that everyone receives at the training academy through the classroom instructions.

Q. When was that?

A. It's yearly, every year.

Q. About how long is dedicated to the ADA?

A. I want to say an hour or something like that.

Q. So you received an hour of training every year on the ADA?

A. Classroom instructions it's called.
Q. Sorry. Just you have to say yes or no.
A. Yes. Okay.
Q. What about inmates? Are there any -- so, for example, if an inmate were to become blind after 15 years at the institution, do you offer any kind of training for them in terms of adaptive functioning within the institution?
A. I really don't know what training they would give a blind person. I mean, he would be able to -- what we do when a person becomes blind, we have a prison ward where we put him on. He can have assistance, someone to assist him. He would not be in population where he would be at risk, you know. There are some security issues there, too. He would be placed on the prison ward and be assisted during that time.
Q. When you were ADA coordinator, did you have a committee, an ADA committee that you --
A. I did not have one, no, ma'am.
Q. Are you aware any ADA committee at the institution?
A. Yes, they have one.
Q. What is that?
A. It's the ADA committee. I can't remember

Case 3:15-cv-00318-BAJ-RLB Document 318-1 11/02/16 Page 24 of 34

the exact title.

Q. What do they do?

A. Just supposed to have meetings and review issues.

Q. When you were ADA coordinator, did they have any meetings?

A. No, ma'am. I didn't have any.

Q. Are you aware of any meetings that have happened?

A. No, ma'am, I haven't.

Q. If they had meetings, would they have notes and agendas and things like that to document the meetings?

A. I can't say, because I had not been to one, so I don't know.

Q. But, typically, when you have a meeting at the prison --

A. Generally, when you have a meeting, you do make documentations.

Q. Do you know -- so the ADA committee. You said they're supposed to review things. Are they supposed to be an oversight to the ADA coordinator?

A. I don't know if it would be oversight. It would probably be more of a resolution issue for resolutions, you know. I can't say. I hadn't done

it. I really don't know.

Q. To your knowledge, does Angola have a transition plan?

A. Explain what you mean, transition plan.

Q. A self-evaluation transition plan that was generated at the prison about getting into compliance with all of the ADA regulations.

A. I'm sure they do.

Q. Have you ever seen it?

A. Is it the justice thing?

Q. No. The justice department created a plan. What I'm asking about is something that predated that, that was created by the institution.

A. I have not seen that, that I remember, that I can recollect.

Q. I want to talk about how you track requests for accommodations. We'll start by giving you what we'll mark as Exhibit 1. Do you recognize this form?

A. Yes, ma'am.

Q. What is this?

A. It's a Request for Accommodation.

Q. Is this the form that we've talked about before?

A. Yes, ma'am.

Q. Let's talk about -- if you can help me just walk through. This first page is filled out by who?

A. It's got Bruce Dodd on here.

Q. Is it generally filled out by an inmate or by a staff member?

A. This is submitted by the inmate.

Q. The first page?

A. Oh, this first page, that's done by us.

Q. Then the second page is usually filled out by an inmate?

A. Yeah. He signs it. You see there.

Q. In this instance, it looks like it was done on April 25th.

A. Yes, ma'am.

Q. He is saying that he -- I'm just going to -- if you don't mind reading Section 3 briefly.

A. Uh-huh. You want me to read it?

Q. Read it to yourself so you are familiar with it.

A. (Witness complies.) Okay. I read that Section 3.

Q. What does it appear -- the inmate's name is Earl Peters; is that right?

A. Yes, ma'am.

Q. What does it appear is his issue?

A. He is making a complaint that he suffered from a hernia, and he is physically unable to lift his locker boxes from the floor. If he does, he says it causes him pain and suffering.

Q. What are his proposed solutions? Did you have a chance to read that?

A. I didn't read that. (Witness peruses document.) Okay.

Q. What are his proposed solutions?

A. He is asking to be transported to a medical facility where he can receive surgical correction, and he is also asking that he be provided with pain medication for his condition. He is also asking to be excused from having to lift the lockers twice a week and performing activities that would cause him pain due to his conditions with his hernia.

Q. Then on the next page, what is the response?

A. "Not an ADA issue. FLU," I think is what it is, "with medical for you. Medical needs per established policies and procedures."

Q. And so the response is that --

A. Disapproved.

Q. Does Tiffany Bellue have any medical training, to your knowledge?

A. I can't answer that. I don't know.

Q. But her role at the prison is not in medical?

A. No.

Q. Her role is administrative?

A. Correct.

Q. And then on the next page, next few pages, actually, it seems like there is several pages being filled out. It looks like he has -- this patient has a permanent impairment due to an aneurysm from the first page. For the next four pages, we don't know who filled that out, right? It's not signed.

A. I don't know. I don't see anything signed.

Q. We don't know if that was filled out by someone in medical or by Tiffany Bellue?

A. I don't have any idea.

Q. This next page appears to be just a logistical page sort of documenting the ARP; is that right?

A. Correct.

Q. The next page is a response from

Case 3:15-cv-00318-SDD-RLB Document 358-5 11/29/16 Page 129 of 134

immediate medical attention, including x-rays and observation in the infirmary ward. He was on the infirmary ward. I would have to assume he had to receive some sort of medical attention.

Q. Yeah, absolutely. I just want to be clear. I don't think the contention is whether or not he received medical attention. What I'm asking is, after he received medical attention, he is saying I need to be somewhere where there is access to a handicapped shower. My question is, based on this documentation, is there evidence that a medical professional looked at that and reviewed it?

A. I didn't see that.

Q. Thank you. I'm going to give you two exhibits right now. I'll mark this as Exhibit 4. I'm also going to give you this, which I'm going to mark as Exhibit 5.

Did you have a chance to look through everything, Warden?

A. Well, yeah. I looked through this. This is another -- the same that I just looked at.

Q. I want to start with Exhibit 4. It appears that this is a request from a man named Richard Rousell. He is complaining that the

Case 3:15-cv-00318-SDD-RLB Document 351 11/09/17 Page 130 of 134

assist in changing the infrastructure. I think that's -- I'm sure that's ongoing right now. I have not kept up with it since I've been gone, but I know that has been addressed by the architect, and he is to report to the justice department once they conclude that, that issue.

Q. Let me ask you. I know it was brief, but in your time as the ADA coordinator, did you provide any accommodations for folks who are mentally ill?

A. Mentally ill? I'm sure I -- I'm pretty sure I hadn't.

Q. Let me ask you. In your role as an ADA coordinator, would you ever see your role as intervening in a disciplinary proceeding if a particular inmate was mentally ill?

A. I don't know if I would get that. If an inmate had an issue in a disciplinary court, I don't know if the court -- whoever the chairman of the court was would address that problem, if he would send it to the ADA coordinator or not. It would be up the individual who was holding that court to make that request for an investigation and determine an issue in regards to mental health. Most of those issues are referred to the mental

A. Any what?

Q. Tapping canes.

A. I know they have canes. I can't tell you if they're tapping canes. I don't know the difference between a cane and a tapping cane. I know one is used to find directions. I do know that.

Q. What about Braille? Have you ever seen anything available in Braille?

A. I seen Braille on some of our newer buildings that we built on the name of the building, the room. The buildings. I've seen some on the newer buildings.

Q. What about in the Request for Accommodation form, for example? Do you have that available in Braille?

A. You know, I don't know.

Q. Have you seen -- in the library, are there any books in Braille there?

A. I do not know that either.

Q. Do you know of any written materials that are available in Braille?

A. No, ma'am. I don't have any knowledge of that.

Q. What about audiobooks? Have you ever

seen audiobooks that are available that people can listen to?

A. I've seen tape players that some of them listen to, yes. I can't tell you who has them. I've seen it.

Q. Are there any work assignments available to blind inmates?

A. I think they're pretty much no duty.

Q. That would be determined by medical?

A. Yes, ma'am.

Q. So if you are no duty, you're not able to obtain incentive wages at all, right?

A. If you don't work, no, ma'am.

Q. If you are no duty, are you able to participate in hobby craft?

A. No, ma'am.

Q. What about seeing eye dogs? Have you seen any seeing eye dogs?

A. No, ma'am. I have not seen any.

Q. Are seeing eye dogs trained at the dog pen?

A. No, ma'am.

Q. We spoke about the escort. So the escorts are what you would call an inmate orderly? Is that right?

A. Yes, ma'am.

Q. Do you know how often an ophthalmologist comes to Angola?

A. I'm thinking, and I don't want to guess, but -- I don't want guess. I think once a week. I'm not sure of that.

Q. How are blind inmates -- how do they make sick call?

A. Most of them are on the ward. They're there with medical all the time, so the request is right there at any time they want it.

Q. I guess the same would go for pill call, since they're on the ward?

A. Yes, ma'am. Pills are delivered to them. The nurses do that.

Q. So they're not sort of being subject to a regular pill call situation?

A. Not really, no, ma'am.

Q. What about ARPs? How do blind inmates file ARPs?

A. I have not seen one, so I don't know whether -- I just can't say. I don't know how they would. I hadn't ever seen one.

Q. What about disciplinary proceedings? Have you ever heard about anything being done for

for the job that he would want, and they would address his request.

Q. If someone is no duty, do they receive any discounts at the canteen or on phone calls or anything?

A. Not that I know of.

Q. What about physical therapy? Who determines whether or not an inmate receives physical therapy?

A. The medical doctor does.

Q. Wheelchair repair. I know that different inmates have different needs with regards to wheelchairs. If a particular inmate needs a particular wheelchair, how do they acquire that?

A. Do what now?

Q. If a particular inmate needs a special wheelchair, how does that process work?

A. He'd have to do it through the medical department, right.

Q. The medical department would make the request?

A. Yes, ma'am.

Q. What sort of accommodations are made for deaf inmates?

A. Of course they're screened and have