U.S. Department of Justice
Office of Justice Programs

**Revised, 12/14/06, tld**



## Bureau of Justice Statistics
# Special Report

September 2006, NCJ 213600

# Mental Health Problems of Prison and Jail Inmates

Doris J. James and
Lauren E. Glaze
*BJS Statisticians*

At midyear 2005 more than half of all prison and jail inmates had a mental health problem, including 705,600 inmates in State prisons, 78,800 in Federal prisons, and 479,900 in local jails. These estimates represented 56% of State prisoners, 45% of Federal prisoners, and 64% of jail inmates. The findings in this report were based on data from personal interviews with State and Federal prisoners in 2004 and local jail inmates in 2002.

Mental health problems were defined by two measures: a recent history or symptoms of a mental health problem. They must have occurred in the 12 months prior to the interview. A recent history of mental health problems included a clinical diagnosis or treatment by a mental health professional. Symptoms of a mental disorder were based on criteria specified in the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV).

| Mental health problem | Percent of inmates in — | | |
|---|---|---|---|
| | State prison | Federal prison | Local jail |
| Any mental problem | 56% | 45% | 64% |
| Recent history | 24 | 14 | 21 |
| Symptoms | 49 | 40 | 60 |

More than two-fifths of State prisoners (43%) and more than half of jail inmates (54%) reported symptoms that met the criteria for mania. About 23% of State prisoners and 30% of jail inmates reported symptoms of major depression. An estimated 15% of State prisoners and 24% of jail inmates reported symptoms that met the criteria for a psychotic disorder.

## Highlights

**High prevalence of mental health problems among prison and jail inmates**

| | Percent of inmates in — | | | |
|---|---|---|---|---|
| | State prison | | Local jail | |
| Selected characteristics | With mental problem | Without | With mental problem | Without |
| **Criminal record** | | | | |
| Current or past violent offense | 61% | 56% | 44% | 36% |
| 3 or more prior incarcerations | 25 | 19 | 26 | 20 |
| **Substance dependence or abuse** | 74% | 56% | 76% | 53% |
| **Drug use in month before arrest** | 63% | 49% | 62% | 42% |
| **Family background** | | | | |
| Homelessness in year before arrest | 13% | 6% | 17% | 9% |
| Past physical or sexual abuse | 27 | 10 | 24 | 8 |
| Parents abused alcohol or drugs | 39 | 25 | 37 | 19 |
| **Charged with violating facility rules*** | 58% | 43% | 19% | 9% |
| Physical or verbal assault | 24 | 14 | 8 | 2 |
| **Injured in a fight since admission** | 20% | 10% | 9% | 3% |
| *Includes items not shown. | | | | |

• Nearly a quarter of both State prisoners and jail inmates who had a mental health problem, compared to a fifth of those without, had served 3 or more prior incarcerations.

• Female inmates had higher rates of mental health problems than male inmates (State prisons: 73% of females and 55% of males; local jails: 75% of females and 63% of males).

• About 74% of State prisoners and 76% of local jail inmates who had a mental health problem met criteria for substance dependence or abuse.

• Nearly 63% of State prisoners who had a mental health problem had used drugs in the month before their arrest, compared to 49% of those without a mental health problem.

• State prisoners who had a mental health problem were twice as likely as those without to have been homeless in the year before their arrest (13% compared to 6%).

• Jail inmates who had a mental health problem (24%) were three times as likely as jail inmates without (8%) to report being physically or sexually abused in the past.

• Over 1 in 3 State prisoners and 1 in 6 jail inmates who had a mental health problem had received treatment since admission.

• State prisoners who had a mental health problem were twice as likely as State prisoners without to have been injured in a fight since admission (20% compared to 10%).

JX-CCH-000881

**A quarter of State prisoners had a history of mental health problems**

Among all inmates, State prisoners were most likely to report a recent history of a mental health problem (table 1). About 24% of State prisoners had a recent history of a mental health problem, followed by 21% of jail inmates, and 14% of Federal prisoners.

A recent history of mental health problems was measured by several questions in the BJS' inmate surveys. Offenders were asked about whether in the past 12 months they had been told by a mental health professional that they had a mental disorder or because of a mental health problem had stayed overnight in a hospital, used prescribed medication, or received professional mental health therapy. These items were classified as indicating a recent history of a mental health problem.

State prisoners (18%), Federal prisoners (10%), and jail inmates (14%) most commonly reported that they had used prescribed medication for a mental problem in the year before arrest or since admission. They were least likely to report an overnight stay in a hospital for a mental health problem. Approximately, 5% of inmates in State prisons, 2% in Federal prisons, and 5% in local jails reported an overnight stay in a hospital for a mental health problem.

---

**Prevalence of symptoms of mental disorders among prison and jail inmates**

The Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002, included a modified structured clinical interview for the DSM-IV. The surveys collected information on experiences of inmates in the past 12 months that would indicate symptoms of major depression, mania, or psychotic disorders. The surveys did not assess the severity or duration of the symptoms, and no exclusions were made for symptoms due to medical illness, bereavement, or substance use. Inmates in mental hospitals or otherwise physically or mentally unable to complete the surveys were excluded from the sample.

Estimates of DSM-IV symptoms of mental disorder provide a baseline indication of mental health problems among inmates rather than a clinical diagnosis of mental illness. Major depression or mania symptoms covered a range of feelings and behaviors, such as persistent sadness, loss of interest in activities, insomnia or hypersomnia, psychomotor agitation, and persistent anger or irritability.

Insomnia or hypersomnia and persistent anger were the most frequently reported major depression or mania episodes with nearly half of jail inmates (49%) reporting these symptoms. Attempted suicide was the least reported symptom by State

prisoners (13%), Federal prisoners (6%) and local jail inmates (13%).

A psychotic disorder was indicated by any signs of delusions or hallucinations during the 12-month period. Delusions were characterized by the offenders' belief that other people were controlling their brain or thoughts, could read their mind, or were spying on them. Hallucinations included reports of seeing things others said they did not see or hearing voices others did not hear. Approximately, 24% of jail inmates, 15% of State prisoners, and 10% of Federal prisoners reported at least one symptom of psychotic disorder (table 1).

| Symptoms in past 12 months or since admission | Percent of inmates in — | | | Number of positive responses | Percent of inmates in — | | |
|---|---|---|---|---|---|---|---|
| | State prison | Federal prison | Local jail | | State prison | Federal prison | Local jail |
| **Major depressive or mania symptoms** | | | | **Major depressive disorder symptoms** | | | |
| Persistent sad, numb or empty mood | 32.9% | 23.7% | 39.6% | 0 | 29.5% | 38.8% | 22.8% |
| Loss of interest or pleasure in activities | 35.4 | 30.8 | 36.4 | 1-2 | 26.1 | 27.9 | 23.8 |
| Increased or decreased appetite | 32.4 | 25.1 | 42.8 | 3-4 | 20.5 | 17.1 | 23.0 |
| Insomnia or hypersomnia | 39.8 | 32.8 | 49.2 | 5 or more | 23.9 | 16.2 | 30.4 |
| Psychomotor agitation or retardation | 39.6 | 31.4 | 46.2 | **Mania disorder symptoms** | | | |
| Feelings of worthlessness or excessive guilt | 35.0 | 25.3 | 43.0 | 0 | 27.3% | 35.6% | 22.5% |
| Diminished ability to concentrate or think | 28.4 | 21.3 | 34.1 | 1 | 21.5 | 23.3 | 17.0 |
| Ever attempted suicide | 13.0 | 6.0 | 12.9 | 2 | 20.5 | 17.7 | 20.1 |
| Persistent anger or irritability | 37.8 | 30.5 | 49.4 | 3 | 17.7 | 14.0 | 22.0 |
| Increased/decreased interest in sexual activities | 34.4 | 29.0 | 29.5 | 4 | 13.1 | 9.4 | 18.4 |
| **Psychotic disorder symptoms** | | | | **Psychotic disorder symptoms** | | | |
| Delusions | 11.8% | 7.8% | 17.5% | 0 | 84.6% | 89.8% | 76.0% |
| Hallucinations | 7.9 | 4.8 | 13.7 | 1 | 11.1 | 7.8 | 16.8 |
| | | | | 2 | 4.2 | 2.4 | 7.2 |

Note: Data are based on inmate self-report in the Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002. See *References* for sources on measuring symptoms of mental disorders based on a modified Structured Clinical Interview for the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV).

---

JX-CCH-000882

## Symptoms of mental disorder highest among jail inmates

Jail inmates had the highest rate of symptoms of a mental health disorder (60%), followed by State (49%), and Federal prisoners (40%). Symptoms of a mental health disorder were measured by a series of questions adopted from a structured clinical interview for diagnosing mental disorders based on the DSM-IV (see box on page 2 and References for sources on DSM-IV measures). The questions addressed behaviors or symptoms related to major depression, mania, or psychotic disorders that occurred in the 12 months before the interview.

To meet the criteria for major depression, inmates had to report a depressed mood or decreased interest or pleasure in activities, along with 4 additional symptoms of depression. In order to meet the criteria for mania, during the 12-month period inmates had to report 3 symptoms or a persistent angry mood. For a psychotic disorder, 1 symptom of delusions or hallucinations met the criteria.

The high rate of symptoms of mental health disorder among jail inmates may reflect the role of local jails in the criminal justice system. Jails are locally operated correctional facilities that receive offenders after an arrest and hold them for a short period of time, pending arraignment, trial, conviction, or sentencing. Among other functions, local jails hold mentally ill persons pending their movement to appropriate mental health facilities.

While jails hold inmates sentenced to short terms (usually less than 1 year), State and Federal prisons hold offenders who typically are convicted and sentenced to serve more than 1 year. In general, because of the longer period of incarceration, prisons provide a greater opportunity for inmates to receive a clinical mental health assessment, diagnosis, and treatment by a mental health professional.[1]

[1]Persons who have been judged by a court to be mentally incompetent to stand trial or not guilty by reason of insanity are not held in these correctional facilities and are not covered by this report.

### Table 1. Recent history and symptoms of mental health problems among prison and jail inmates

| | Percent of inmates in — | | |
|---|---|---|---|
| Mental health problem | State prison | Federal prison | Local jail |
| Any mental health problem | 56.2% | 44.8% | 64.2% |
| Recent history of mental health problem[a] | 24.3% | 13.8% | 20.6% |
| Told had disorder by mental health professional | 9.4 | 5.4 | 10.9 |
| Had overnight hospital stay | 5.4 | 2.1 | 4.9 |
| Used prescribed medications | 18.0 | 10.3 | 14.4 |
| Had professional mental health therapy | 15.1 | 8.3 | 10.3 |
| Symptoms of mental health disorders[b] | 49.2% | 39.8% | 60.5% |
| Major depressive disorder | 23.5 | 16.0 | 29.7 |
| Mania disorder | 43.2 | 35.1 | 54.5 |
| Psychotic disorder | 15.4 | 10.2 | 23.9 |

Note: Includes inmates who reported an impairment due to a mental problem. Data are based on the Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002. See Methodology for details on survey sample. See References for sources on measuring symptoms of mental disorder based on a Structured Clinical Interview for the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV).
[a]In year before arrest or since admission.
[b]In the 12 months prior to the interview.

### Table 2. Prevalence of mental health problems among prison and jail inmates

| | State prison inmates | | Federal prison inmates | | Local jail inmates | |
|---|---|---|---|---|---|---|
| Mental health problem | Number | Percent | Number | Percent | Number | Percent |
| Any mental health problem* | 705,600 | 56.2% | 70,200 | 44.8% | 479,900 | 64.2% |
| History and symptoms | 219,700 | 17.5 | 13,900 | 8.9 | 127,800 | 17.1 |
| History only | 85,400 | 6.8 | 7,500 | 4.8 | 26,200 | 3.5 |
| Symptoms only | 396,700 | 31.6 | 48,100 | 30.7 | 322,900 | 43.2 |
| No mental health problem | 549,900 | 43.8% | 86,500 | 55.2% | 267,600 | 35.8% |

Note: Number of inmates was estimated based on the June 30, 2005 custody population in State prisons (1,255,514), Federal prisons (156,643, excluding 19,311 inmates held in private facilities), and local jails (747,529).
*Details do not add to totals due to rounding. Includes State prisoners, Federal prisoners, and local jail inmates who reported an impairment due to a mental problem.

### High proportion of inmates had symptoms of a mental health disorder without a history

Around 4 in 10 local jail inmates and 3 in 10 State and Federal prisoners were found to have symptoms of a mental disorder without a recent history (table 2). A smaller proportion of inmates had both a recent history and symptoms of mental disorder: 17% in State prisons, 9% in Federal prisons, and 17% in local jails.

An estimated 7% of State prisoners, 5% of Federal prisoners, and 3% of local jail inmates were found to have a recent history of a mental health problem and no symptoms.

### About 1 in 10 persons age 18 or older in the U.S. general population met DSM-IV criteria for symptoms of a mental health disorder

• An estimated 11% of the U.S. population age 18 or older met criteria for mental health disorders, based on data in the National Epidemiologic Survey on Alcohol and Related Conditions, 2001-2002 (NESARC).

• Similar to the prison and jail inmate populations, females in the general population had higher rates of mental disorders than males (12% compared to 9%).

| | Percent of U.S. population age 18 or older with symptoms of a mental disorder | | |
|---|---|---|---|
| | Total | Male | Female |
| Any symptom | 10.6% | 8.7% | 12.4% |
| Major depression[a] | 7.9 | 5.5 | 10.1 |
| Mania disorder[a] | 1.8 | 1.6 | 2.0 |
| Psychotic disorder[b] | 3.1 | 3.2 | 3.1 |

Note: See Methodology for sources on mental health disorders in the general population.
[a]In the last 12 months, not excluding symptoms due to bereavement, substance use, or a medical condition.
[b]Based on life-time occurrence.
Source: National Institute on Alcohol Abuse and Alcoholism, NESARC, 2001-2002.

## Table 3. Prison and jail inmates who had a mental health problem, by selected characteristics

| Characteristic | Percent of inmates in — | | |
|---|---|---|---|
| | State prison | Federal prison | Local jail |
| All inmates | 56.2% | 44.8% | 64.2% |
| **Gender** | | | |
| Male | 55.0% | 43.6% | 62.8% |
| Female | 73.1 | 61.2 | 75.4 |
| **Race** | | | |
| White[a] | 62.2% | 49.6% | 71.2% |
| Black[a] | 54.7 | 45.9 | 63.4 |
| Hispanic | 46.3 | 36.8 | 50.7 |
| Other[a,b] | 61.9 | 50.3 | 69.5 |
| **Age** | | | |
| 24 or younger | 62.6% | 57.8% | 70.3% |
| 25-34 | 57.9 | 48.2 | 64.8 |
| 35-44 | 55.9 | 40.1 | 62.0 |
| 45-54 | 51.3 | 41.6 | 52.5 |
| 55 or older | 39.6 | 36.1 | 52.4 |

[a]Excludes persons of Hispanic origin.
[b]Includes American Indians, Alaska Natives, Asians, Native Hawaiians, other Pacific Islanders, and inmates who specified more than one race.

## Mental health problems more common among female, white, and young inmates

Female inmates had much higher rates of mental health problems than male inmates. An estimated 73% of females in State prisons, compared to 55% of male inmates, had a mental health problem (table 3). In Federal prisons, the rate was 61% of females compared to 44% of males; and in local jails, 75% of females compared to 63% of male inmates.

The same percentage of females in State prisons or local jails (23%) said that in the past 12 months they had been diagnosed with a mental disorder by a mental health professional. This was almost three times the rate of male inmates (around 8%) who had been told they had a mental health problem.

| Mental problem* | Percent of inmates in — | | | |
|---|---|---|---|---|
| | State prison | | Local jail | |
| | Male | Female | Male | Female |
| Recent history | 22% | 48% | 18% | 40% |
| Diagnosed | 8 | 23 | 9 | 23 |
| Overnight stay | 5 | 9 | 4 | 9 |
| Medication | 16 | 39 | 12 | 30 |
| Therapy | 14 | 32 | 9 | 23 |
| Symptoms | 48% | 62% | 59% | 70% |

*See table 1 for detailed description of categories.

## Table 4. Homelessness, employment before arrest, and family background of prison and jail inmates, by mental health status

| Characteristic | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| Homelessness in past year | 13.2% | 6.3% | 6.6% | 2.6% | 17.2% | 8.8% |
| Employed in month before arrest[a] | 70.1% | 75.6% | 67.7% | 76.2% | 68.7% | 75.9% |
| **Ever physically or sexually abused before admission** | 27.0% | 10.5% | 17.0% | 6.4% | 24.2% | 7.6% |
| Physically abused | 22.4 | 8.3 | 13.7 | 5.4 | 20.4 | 5.7 |
| Sexually abused | 12.5 | 3.8 | 7.3 | 1.7 | 10.2 | 3.2 |
| **While growing up —** | | | | | | |
| Ever received public assistance[b] | 42.5% | 30.6% | 33.3% | 24.9% | 42.6% | 30.3% |
| Ever lived in foster home, agency or institution | 18.5 | 9.5 | 9.8 | 6.3 | 14.5 | 6.0 |
| Lived most of the time with — | | | | | | |
| Both parents | 41.9% | 47.7% | 45.4% | 50.5% | 40.5% | 49.1% |
| One parent | 43.8 | 40.8 | 39.8 | 38.8 | 45.4 | 40.4 |
| Someone else | 11.6 | 10.2 | 13.5 | 10.3 | 12.0 | 9.4 |
| Parents or guardians ever abused — | 39.3 | 25.1 | 33.3 | 20.0 | 37.3 | 18.7 |
| Alcohol | 23.6 | 16.9 | 21.7 | 15.4 | 23.2 | 14.1 |
| Drugs | 3.1 | 1.9 | 2.2 | 1.4 | 2.7 | 1.1 |
| Both alcohol and drugs | 12.7 | 6.2 | 9.4 | 3.2 | 11.5 | 3.4 |
| Neither | 60.7 | 74.9 | 66.7 | 80.0 | 62.7 | 81.3 |
| Family member ever incarcerated — | 51.7% | 41.3% | 44.6% | 38.9% | 52.1% | 36.2% |
| Mother | 7.2 | 4.0 | 5.0 | 3.2 | 9.4 | 3.4 |
| Father | 20.1 | 13.4 | 15.3 | 9.9 | 22.1 | 12.6 |
| Brother | 35.5 | 29.4 | 29.4 | 27.0 | 34.8 | 25.8 |
| Sister | 7.0 | 5.1 | 5.5 | 4.2 | 11.3 | 5.1 |
| Child | 2.7 | 2.3 | 3.4 | 2.8 | 4.0 | 2.6 |
| Spouse | 1.7 | 0.9 | 2.6 | 1.8 | 2.4 | 0.9 |

[a]The reference period for jail inmates was in the month before admission.
[b]Public assistance includes public housing, AFDC, food stamps, Medicaid, WIC, and other welfare programs.

The prevalence of mental health problems varied by racial or ethnic group. Among State prisoners, 62% of white inmates, compared to 55% of blacks and 46% of Hispanics, were found to have a mental health problem. Among jail inmates, whites (71%) were also more likely than blacks (63%) or Hispanics (51%) to have a mental health problem.

The rate of mental health problems also varied by the age of inmates. Inmates age 24 or younger had the highest rate of mental health problems and those age 55 or older had the lowest rate. Among State prisoners, an estimated 63% of those age 24 or younger had a mental health problem, compared to 40% of those age 55 or older. An estimated 70% of local jail inmates age 24 or younger had a mental health problem, compared to 52% of those age 55 or older.

## Homelessness, foster care more common among inmates who had mental health problems

State prisoners (13%) and local jail inmates (17%) who had a mental health problem were twice as likely as inmates without a mental health problem (6% in State prisons; 9% in local jails) to have been homeless in the year before their incarceration (table 4).

About 18% of State prisoners who had a mental health problem, compared to 9% of State prisoners who did not have a mental problem, said that they had lived in a foster home, agency, or institution while growing up.

Among jail inmates, about 14% of those who had a mental health problem had lived in a foster home, agency, or institution while growing up, compared to 6% of jail inmates who did not have a mental health problem.

JX-CCH-000884

## Low rates of employment, high rates of illegal income among inmates who had mental problems

An estimated 70% of State prisoners who had a mental health problem, compared to 76% of those without, said they were employed in the month before their arrest. Among Federal prisoners, 68% of those who had a mental health problem were employed, compared to 76% of those who did not have a mental problem.

Among jail inmates, 69% of those who had a mental health problem reported that they were employed, while 76% of those without were employed in the month before their arrest.

Of State prisoners who had a mental health problem, 65% had received income from wages or salary in the month before their arrest. This percentage was larger for inmates without a mental health problem (71%). Over a quarter (28%) of State prisoners who had a mental health problem reported income from illegal sources, compared to around a fifth (21%) of State prisoners without a mental problem.

| Sources of income[a] | Percent of State prison inmates | |
|---|---|---|
| | With mental problem | Without |
| Wages, salary | 65% | 71% |
| Welfare | 6 | 4 |
| Assistance from family or friends | 14 | 8 |
| Illegal income | 28 | 21 |
| Compensation payments[b] | 9 | 6 |

[a]Includes personal income in month before arrest, except for compensation which was in the month before admission.
[b]Includes Supplemental Security Income (SSI) payments and pension.

### Table 5. Substance dependence or abuse among prison and jail inmates, by mental health status

| Substance dependence or abuse | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| **Any alcohol or drugs** | 74.1% | 55.6% | 63.6% | 49.5% | 76.4% | 53.2% |
| Dependence | 53.9 | 34.5 | 45.1 | 27.3 | 56.3 | 25.4 |
| Abuse only | 20.2 | 21.1 | 18.5 | 22.2 | 20.1 | 27.8 |
| **Alcohol** | 50.8% | 36.0% | 43.7% | 30.3% | 53.4% | 34.6% |
| Dependence | 30.4 | 17.9 | 25.1 | 12.7 | 29.0 | 11.8 |
| Abuse only | 20.4 | 18.0 | 18.6 | 17.7 | 24.4 | 22.8 |
| **Drugs** | 61.9% | 42.6% | 53.2% | 39.2% | 63.3% | 36.0% |
| Dependence | 43.8 | 26.1 | 37.1 | 22.0 | 46.0 | 17.6 |
| Abuse only | 18.0 | 16.5 | 16.1 | 17.2 | 17.3 | 18.4 |
| **No dependence or abuse** | 25.9% | 44.4% | 36.4% | 50.5% | 23.6% | 46.8% |

Note: Substance dependence or abuse was based on criteria specified in the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV). For details, see *Substance Dependence, Abuse and Treatment of Jail Inmates, 2002*, <http://www.ojp.usdoj.gov/bjs/abstract/sdatji02.htm>.

## Past physical or sexual abuse more prevalent among inmates who had mental health problems

State prisoners who had a mental health problem (27%) were over two times more likely than those without (10%) to report being physically or sexually abused in the past.

Jail inmates who had a mental health problem were three times more likely than jail inmates without to have been physically or sexually abused in the past (24% compared to 8%).

## Family members of inmates with mental problems had high rates of substance use and incarceration

Inmates who had a mental health problem were more likely than inmates without to have family members who abused drugs or alcohol or both. Among State prisoners, 39% of those

who had a mental health problem reported that a parent or guardian abused alcohol, drugs, or both while they were growing up. In comparison, 25% of State prisoners without a mental problem reported parental abuse of alcohol, drugs, or both.

A third (33%) of Federal prisoners who had a mental health problem, compared to a fifth (20%) of those without, reported that a parent or guardian abused alcohol, drugs, or both while they were growing up.

An estimated 37% of jail inmates who had a mental health problem said a parent had abused alcohol, drugs, or both while they were growing up. This was almost twice the rate for jail inmates without a mental health problem (19%).

The majority of prison and jail inmates who had a mental health problem (52%) reported that they had a family member who had been incarcerated in the past. Among those without a mental health problem, about 41% of State inmates and 36% of jails inmates reported that a family member had served time.

Over a third of both State prisoners and jail inmates who had a mental health problem (35%) had a brother who had served time in prison or jail. The rate for inmates without a mental health problem was 29% in State prisons and 26% in local jails.

### High rates of both mental health problems and substance dependence or abuse among State prison and local jail inmates

• An estimated 42% of inmates in State prisons and 49% in local jails were found to have both a mental health problem and substance dependence or abuse.

• Slightly less than a quarter (24%) of State prisoners and a fifth (19%) of local jail inmates met the criteria for substance dependence or abuse only.

| Mental health problems and substance dependence or abuse | Percent of inmates in — | | |
|---|---|---|---|
| | State prison | Federal prison | Local jail |
| Both | 41.7% | 28.5% | 48.7% |
| Dependence or abuse only | 24.4 | 27.3 | 18.9 |
| Mental problems only | 14.5 | 16.3 | 15.0 |
| None | 19.5 | 27.8 | 17.3 |

JX-CCH-000885

**Inmates who had mental health problems had high rates of substance dependence or abuse**

Among inmates who had a mental health problem, local jail inmates had the highest rate of dependence or abuse of alcohol or drugs (76%), followed by State prisoners (74%), and Federal prisoners (64%) (table 5). Substance dependence or abuse was measured as defined in the DSM-IV.[2]

Among inmates without a mental health problem, 56% in State prisons, 49% in Federal prisons, and 53% in local jails were dependent on or abused alcohol or drugs.

[2]For a detailed description of the DSM-IV measures, see *Substance Dependence, Abuse and Treatment of Jail Inmates, 2002*, <http://www.ojp.usdoj.gov/bjs/abstract/sdatji02.htm.>

By specific type of substance, inmates who had a mental health problem had higher rates of dependence or abuse of drugs than alcohol. Among State prisoners who had a mental problem, 62% were dependent on or abused drugs and 51% alcohol. An estimated 63% of local jail inmates who had a mental problem were dependent on or abused drugs, while about 53% were dependent on or abused alcohol.

When dependence was estimated separately from abuse only, local jail inmates who had a mental health problem had the highest rate of drug dependence (46%). They were two and a half times more likely to be dependent on drugs than jail inmates without a mental problem (18%).

A larger percentage of State prisoners who had a mental health problem than those without were found to be dependent on drugs (44% compared to 26%). Among Federal prisoners, 37% who had a mental health problem were found to be dependent on drugs, compared to 22% of those without.

State prisoners (30%) and local jail inmates (29%) who had a mental health problem had about the same rate of alcohol dependence. A quarter of Federal prisoners (25%) who had a mental problem were dependent on alcohol.

**Over a third of inmates who had mental health problems had used drugs at the time of the offense**

Over a third (37%) of State prisoners who had a mental health problem said they had used drugs at the time of the offense, compared to over a quarter (26%) of State prisoners without a mental problem (table 6). Also, over a third (34%) of local jail inmates who had a mental health problem said they had used drugs at the time of the offense, compared to a fifth (20%) of jail inmates who did not have a mental problem.

Marijuana or hashish was the most common drug inmates said they had used in the month before the offense (table 7). Among inmates who had a mental health problem, more than two-fifths of those in State prisons (46%), Federal prisons (41%), or local jails (43%) reported they had used marijuana or hashish in the month before the offense.

Almost a quarter of inmates in State prisons or local jails who had a mental health problem (24%) reported they had used cocaine or crack in the month before the offense. A smaller percentage of inmates who had a mental health problem had used methamphetamines in the month before the offense — 13% of State prisoners, 11% of Federal prisoners, and 12% of jail inmates.

**Binge drinking prevalent among inmates who had mental problems**

Inmates who had a mental health problem were more likely than inmates without a mental problem to report a

**Table 6. Substance use among prison inmates and convicted jail inmates, by mental health status**

| Type of substance | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| **Alcohol or drugs** | | | | | | |
| Regular use[a] | 87.1% | 77.2% | 82.3% | 75.4% | 89.9% | 78.7% |
| In month before offense | 80.3 | 70.4 | 75.8 | 68.1 | 81.6 | 69.6 |
| At time of offense | 53.2 | 42.8 | 41.1 | 30.6 | 53.8 | 42.8 |
| **Drugs** | | | | | | |
| Regular use[a] | 75.5% | 61.2% | 71.0% | 59.2% | 78.1% | 57.5% |
| In month before offense | 62.8 | 49.1 | 57.1 | 45.2 | 62.1 | 41.7 |
| At time of offense | 37.5 | 25.8 | 31.1 | 23.0 | 34.0 | 19.8 |
| **Alcohol** | | | | | | |
| Regular use[a] | 67.9% | 58.3% | 66.0% | 58.2% | 72.6% | 61.8% |
| In month before offense | 61.7 | 52.5 | 59.5 | 53.6 | 80.7 | 74.1 |
| At time of offense | 34.0 | 27.5 | 21.7 | 15.1 | 35.0 | 30.4 |
| Binge drinking[b] | 43.5 | 29.5 | 37.8 | 25.7 | 48.2 | 29.9 |

[a]Regular alcohol use is defined as daily or almost daily or more than once a week for more than a month. Regular drug use is defined as once a week or more for at least one month.
[b]Binge drinking is defined as having consumed a fifth of liquor in a single day, or the equivalent of 20 drinks, 3 bottles of wine, or 3 six-packs of beer.

**Table 7. Drug use in the month before the offense among convicted prison and jail inmates, by mental health status**

| Types of drug used in month before offense | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| Any drug | 62.8% | 49.1% | 57.1% | 45.2% | 62.1% | 41.7% |
| Marijuana or hashish | 45.7% | 33.3% | 41.2% | 32.0% | 43.4% | 27.1% |
| Cocaine or crack | 24.4 | 17.9 | 21.1 | 15.5 | 24.2 | 14.7 |
| Heroin/opiates | 8.9 | 7.2 | 7.2 | 4.7 | 9.6 | 4.6 |
| Depressants[a] | 7.3 | 3.0 | 6.7 | 2.7 | 8.5 | 2.0 |
| Methamphetamines | 12.6 | 8.8 | 10.9 | 9.6 | 11.7 | 6.2 |
| Other stimulants[b] | 5.8 | 2.8 | 4.5 | 2.5 | 5.2 | 2.4 |
| Hallucinogens[c] | 8.0 | 3.4 | 9.3 | 3.0 | 7.5 | 2.9 |

[a]Include barbiturates, tranquilizers, and quaaludes.
[b]Include amphetamines.
[c]Include LSD, PCP, and ecstasy.

JX-CCH-000886

binge drinking experience. Among State prisoners who had a mental health problem, 43% said they had participated in binge drinking in the past, compared to 29% of State prisoners without mental problems.

Similarly, jail inmates who had mental problems (48%) had a much higher rate of binge drinking than jail inmates without mental problems (30%).

Inmates who had a mental problem were more likely than inmates without to have been using alcohol at the time of the offense (State prisoners, 34% compared to 27%; Federal prisoners, 22% compared to 15%; and jail inmates, 35% compared to 30%.)

## Violent offenses common among State prisoners who had a mental health problem

Among State prisoners who had a mental health problem, nearly half (49%) had a violent offense as their most serious offense, followed by property (20%) and drug offenses (19%) (table 8). Among all types of offenses, robbery was the most common offense (14%), followed by drug trafficking (13%) and homicide (12%).

An estimated 46% of State prisoners without a mental health problem were held for a violent offense, including 13% for homicide and 11% for robbery.

About 24% of State prisoners without a mental problem were held for drug offenses, particularly drug trafficking (17%).

Almost an equal percentage of jail inmates who had a mental health problem were held for violent (26%) and property (27%) offenses. About 12% were held for aggravated assault. Jail inmates who had a mental health problem were two times more likely than jail inmates without a mental problem to be held for burglary (8% compared to 4%).

## Use of a weapon did not vary by mental health status

Convicted violent offenders who had a mental health problem were as likely as those without to have used a weapon during the offense (table 9). An estimated 37% of both State prisoners who had a mental problem and those without said they had used a weapon during the offense.

By specific type of weapon, among convicted violent offenders in State prisons who had a mental health problem, slightly less than a quarter (24%) had used a firearm, while a tenth (10%) had used a knife or sharp object.

## Violent criminal record more prevalent among inmates who had a mental health problem

State prisoners who had a mental health problem (61%) were more likely than State prisoners without (56%) to have a current or past violent offense.

### Table 8. Most serious offense among prison and jail inmates, by mental health status

| Most serious offense | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|---|---|
| **Total** | 100% | 100% | 100% | 100% | 100% | 100% |
| **Violent offenses** | 49.0% | 46.5% | 16.0% | 13.2% | 26.5% | 23.7% |
| Homicide | 11.6 | 12.9 | 2.5 | 2.3 | 2.6 | 2.5 |
| Sexual assault* | 11.0 | 10.4 | 1.1 | 0.7 | 3.4 | 3.6 |
| Robbery | 13.6 | 11.3 | 9.6 | 7.6 | 5.7 | 5.1 |
| Assault | 10.5 | 9.7 | 2.0 | 1.9 | 12.5 | 10.5 |
| **Property offenses** | 19.6% | 17.7% | 7.2% | 6.1% | 26.9% | 19.7% |
| Burglary | 8.6 | 7.7 | 0.7 | 0.3 | 7.9 | 4.2 |
| Larceny/theft | 4.2 | 3.5 | 0.5 | 0.4 | 7.7 | 5.6 |
| Fraud | 3.0 | 2.7 | 4.9 | 4.5 | 5.3 | 4.2 |
| **Drug offenses** | 19.3% | 23.8% | 51.3% | 58.3% | 23.4% | 27.0% |
| Possession | 5.7 | 6.3 | 2.0 | 3.8 | 10.1 | 12.3 |
| Trafficking | 12.9 | 17.0 | 47.7 | 52.6 | 11.6 | 12.9 |
| **Public-order offenses** | 11.9% | 11.9% | 22.3% | 19.0% | 22.6% | 29.3% |
| Weapons | 2.6 | 2.4 | 14.0 | 8.5 | 2.3 | 1.4 |
| DWI/DUI | 2.2 | 3.2 | 0.2 | 0.2 | 5.5 | 8.1 |

Note: Summary categories include offenses not shown.
*Includes rape and other sexual assault.

### Table 9. Use of weapon, by mental health status of convicted violent State prison and local jail inmates

| Use of weapons | Percent of inmates in — | | | |
| | State prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|
| **Any weapon** | 37.2% | 36.9% | 20.6% | 21.2% |
| Firearm | 24.4 | 27.5 | 12.3 | 13.1 |
| Knife or sharp object | 10.2 | 7.4 | 6.1 | 5.1 |
| Other weapons* | 3.7 | 2.7 | 2.8 | 4.0 |
| **No weapon** | 62.8% | 63.1% | 79.4% | 78.8% |
| **Number of violent inmates** | 328,670 | 242,524 | 60,787 | 34,305 |

Note: Details do not add to total because inmates may have used more than one weapon.
*Other weapons include blunt objects, stun guns, toy guns, or other specified weapons.

Among repeat offenders, an estimated 47% of State prisoners who had a mental health problem were violent recidivists, compared to 39% of State prisoners without a mental problem (table 10).

| Violent criminal record | Percent of State prison inmates with violent criminal record | |
| | With mental problem | Without |
|---|---|---|
| Any violent offense | 61% | 56% |
| Current violent offense, no prior | 13 | 17 |
| Violent recidivist | 47 | 39 |

Note: Details may not add to total due to rounding.

Nearly a third (32%) of local jail inmates who had a mental health problem were repeat violent offenders, while about a quarter (22%) of jail inmates without a mental problem were violent recidivists.

A larger proportion of inmates who had a mental health problem had served more prior sentences than inmates without a mental problem (table 11). An estimated 47% of State prisoners who had a mental health problem, compared to 39% of those without, had served 3 or more prior sentences to probation or incarceration. Among jail inmates, 42% of those with a mental health problem had served 3 or more prior sentences to probation or incarceration, compared to 33% of jail inmates without a mental problem.

**State prisoners who had mental health problems had longer sentences than prisoners without**

Overall, State prisoners who had a mental health problem reported a mean maximum sentence that was 5 months longer than State prisoners without a mental problem (146 months compared to 141 months) (table 12). Among jail inmates, the mean sentence for those who had a mental problem was 5 months shorter than that for jail inmates without a mental problem (40 months compared to 45 months).

By most serious offense, excluding offenders sentenced to life or death, both violent State prisoners who had a mental health problem and those without had about the same mean sentence length. Violent State prisoners who had a mental health problem were sentenced to serve a mean maximum sentence length of 212 months and those without, 211 months.

Among prisoners sentenced to life or death, there was little variation in sentence length by mental health status (not shown in table). About 8% of State prisoners who had a mental health problem and 9% of those without were sentenced to life or death. Among Federal prisoners, 3% of both those who had a mental health problem and those without were sentenced to life or death.

### Table 10. Criminal record of prison and jail inmates, by mental health status

| | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| Criminal record | With mental problem | Without | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|---|---|
| **No prior sentence** | 20.5% | 27.0% | 32.2% | 36.9% | 34.9% | 43.3% |
| Current violent offense | 13.4 | 16.9 | 5.1 | 4.9 | 12.1 | 13.8 |
| Current drug offense | 3.1 | 5.1 | 15.2 | 21.6 | 8.8 | 12.6 |
| Current other offense | 4.1 | 5.0 | 11.9 | 10.4 | 14.0 | 16.8 |
| **Violent recidivist** | 47.4% | 39.2% | 27.5% | 23.8% | 31.9% | 22.4% |
| Current and prior violent | 17.2 | 13.4 | 7.4 | 4.4 | 9.9 | 6.8 |
| Current violent only | 17.7 | 15.3 | 4.9 | 4.4 | 11.4 | 6.9 |
| Prior violent only | 12.5 | 10.4 | 15.3 | 15.0 | 10.5 | 8.7 |
| **Nonviolent recidivist** | 32.0% | 33.8% | 40.3% | 39.2% | 33.2% | 34.3% |
| Prior drugs only | 3.0 | 4.0 | 7.1 | 9.5 | 3.0 | 3.4 |
| Other prior offenses | 29.0 | 29.8 | 33.2 | 29.8 | 30.2 | 30.9 |

Note: Excludes inmates for whom offense and prior probation or incarceration sentences were unknown.

### Table 11. Number of prior probation or incarceration sentences among prison and jail inmates, by mental health status

| | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| Number of prior sentences | With mental problem | Without | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|---|---|
| 0 | 22.1% | 28.5% | 34.1% | 38.3% | 24.5% | 30.6% |
| 1 | 15.3 | 16.1 | 14.9 | 16.5 | 16.8 | 18.9 |
| 2 | 15.5 | 16.8 | 15.6 | 14.9 | 16.7 | 17.2 |
| 3-5 | 26.3 | 24.0 | 21.3 | 20.1 | 22.8 | 20.3 |
| 6-10 | 13.9 | 10.6 | 10.0 | 7.1 | 12.4 | 8.6 |
| 11 or more | 6.9 | 4.0 | 4.0 | 3.1 | 6.7 | 4.4 |

Note: Excludes inmates for whom prior probation or incarceration sentences were unknown.

### Table 12. Mean maximum sentence length and mean total time expected to serve, by mental health status and offense

| | Mean maximum sentence length[a] | | Mean total time expected to serve until release[b] | |
| Most serious offense | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|
| **State prison inmates** | | | | |
| All offenses[c] | 146 mos | 141 mos | 93 mos | 89 mos |
| Violent | 212 | 211 | 139 | 138 |
| Property | 103 | 96 | 60 | 58 |
| Drug | 84 | 94 | 48 | 50 |
| Public-order | 81 | 66 | 51 | 40 |
| **Federal prison inmates** | | | | |
| All offenses[c] | 128 mos | 135 mos | 99 mos | 106 mos |
| Violent | 174 | 202 | 119 | 131 |
| Property | 70 | 53 | 63 | 58 |
| Drug | 131 | 139 | 103 | 112 |
| Public-order | 102 | 100 | 87 | 83 |
| **Local jail inmates** | | | | |
| All offenses[c] | 40 mos | 45 mos | 14 mos | 18 mos |
| Violent | 67 | 73 | 18 | 31 |
| Property | 41 | 36 | 16 | 14 |
| Drug | 40 | 59 | 18 | 25 |
| Public-order | 16 | 16 | 7 | 8 |

[a]Based on the total maximum sentence for all consecutive sentences. Excludes inmates for whom offense was unknown.
[b]Based on time served when interviewed and time to be served until the expected date of release. Excludes inmates for whom admission date or expected release date were unknown.
[c]Includes other offenses not shown.

JX-CCH-000888

**State prisoners who had a mental health problem expected to serve 4 months longer than those without**

Overall, the mean time State prisoners who had a mental health problem expected to serve was 4 months longer than State prisoners without a mental problem (93 months compared to 89 months). Among convicted jail inmates who expected to serve their time in a local jail, there was little variation by mental health status in the amount of time expected to be served. About 55% of those who had a mental problem, and 54% of those without, expected to serve 6 months or less (table 13).

**A third of State prisoners who had mental health problems had received treatment since admission**

State prisoners who had a mental health problem (34%) had the highest rate of mental health treatment since admission, followed by Federal prisoners (24%) and local jail inmates (17%) (table 14).

All Federal prisons and most State prisons and jail jurisdictions, as a matter of policy, provide mental health services to inmates, including screening inmates at intake for mental health problems, providing therapy or counseling by trained mental health professionals, and distributing psychotropic medication.[3]

[3]See *Mental Health Treatment in State Prisons, 2000*, <http://www.ojp.usdoj.gov/bjs/abstract/mhtsp00.htm> and *Census of Jails, 1999*, <http://www.ojp.usdoj.gov/bjs/abstract/cj99.htm>.

More than a fifth of inmates (22%) in State prison who had a mental health problem had received mental health treatment during the year before their arrest, including 16% who had used prescribed medications, 11% who had professional therapy, and 6% who had stayed overnight in a hospital because of a mental or emotional problem.

Among jail inmates who had a mental health problem, an estimated 23% had received treatment during the year before their arrest: 17% had used medication, 12% had received professional therapy, and 7% had stayed overnight in a hospital because of a mental or emotional problem.

Taking a prescribed medication for a mental health problem was the most common type of treatment inmates who had a mental health problem had received since admission to prison or jail. About 27% of State prisoners, 19% of Federal prisoners, and 15% of jail inmates who had a mental problem had used prescribed medication for a mental problem since admission.

An overnight stay in a hospital was the least likely method of treatment inmates had received since admission. Among inmates who had a mental problem, about 5% of those in State prisons, 3% in Federal prisons, and 2% in local jails had stayed overnight in a hospital for a mental problem.

**Use of medication for a mental health problem by State prisoners rose between 1997 and 2004**

The proportion of State prisoners who had used prescribed medication for a mental health problem since admission to prison rose to 15% in 2004, up from 12% in 1997 (table 15). There was little change in the percentage of inmates who reported an overnight stay in a hospital since admission (around 3%), or in the percentage who had received professional mental health therapy (around 12%).

State prisoners who said they had ever used prescribed medication for a mental or emotional problem in the past rose to 24% in 2004, up from 19% in 1997. Overall, 31% of State prisoners said they had ever received mental health treatment in the past, up from 28% in 1997.

**Table 13. Mean time expected to be served by convicted local jail inmates sentenced to jail**

| Mean time expected to be served | Percent of convicted local jail inmates | |
|---|---|---|
| | With mental problem | Without |
| Less than 3 months | 27.4% | 26.8% |
| 3 to 6 months | 27.9 | 27.3 |
| 7 to 12 months | 24.0 | 22.4 |
| 13 to 24 months | 9.7 | 8.7 |
| 25 to 36 months | 3.7 | 3.4 |
| 37 to 60 months | 3.2 | 5.0 |
| More than 5 years | 4.0 | 6.4 |
| Number of inmates | 115,290 | 72,356 |

Note: Excludes inmates for whom admission date or expected release date were unknown.

**Table 14. Mental health treatment received by inmates who had a mental health problem**

| Type of mental health treatment | Percent of inmates who had a mental problem in — | | |
|---|---|---|---|
| | State prison | Federal prison | Local jails |
| Ever received mental health treatment | 49.3% | 35.3% | 42.7% |
| Had overnight hospital stay | 20.0 | 9.5 | 18.0 |
| Used prescribed medications | 39.5 | 28.0 | 32.7 |
| Had professional mental health therapy | 35.4 | 25.6 | 31.1 |
| Received treatment during year before arrest | 22.3% | 14.9% | 22.6% |
| Had overnight hospital stay | 5.8 | 3.2 | 6.6 |
| Used prescribed medications | 15.8 | 10.1 | 16.9 |
| On prescribed medication at time of arrest | 11.3 | 7.3 | 12.3 |
| Had professional mental health therapy | 11.5 | 8.0 | 12.3 |
| Received treatment after admission | 33.8% | 24.0% | 17.5% |
| Had overnight hospital stay | 5.4 | 2.7 | 2.2 |
| Used prescribed medications | 26.8 | 19.5 | 14.8 |
| Had professional mental health therapy | 22.6 | 15.1 | 7.3 |

Note: Excludes other mental health treatment.

**Table 15. Mental health treatment received by all State prison inmates, 2004 and 1997**

| Type of mental health treatment | Percent of State prison inmates | |
|---|---|---|
| | 2004 | 1997 |
| Ever any mental health treatment | 31.2% | 28.3% |
| Had overnight hospital stay | 12.2 | 10.7 |
| Used prescribed medications | 23.9 | 18.9 |
| Had professional mental health therapy | 21.6 | 21.8 |
| Had other mental health treatment | 3.6 | 3.3 |
| Received treatment after admission | 19.3% | 17.4% |
| Had overnight hospital stay | 3.1 | 3.8 |
| Used prescribed medications | 15.1 | 12.3 |
| Had professional mental health therapy | 12.7 | 12.3 |
| Had other mental health treatment | 1.9 | 1.9 |
| Number of inmates | 1,226,171 | 1,059,607 |

JXCCH-000889

Among jail inmates, in 2002 around 30% said they had received treatment for a mental health problem in the past, up from 25% in 1996. The proportion who had received treatment since admission (11%) was unchanged.

| Mental health treatment | Percent of jail inmates | |
|---|---|---|
| | 2002 | 1996 |
| Ever any treatment | 30% | 25% |
|   Overnight stay | 12 | 10 |
|   Medication | 22 | 17 |
|   Therapy | 22 | 18 |
|   Other treatment | 3 | 3 |
| Since admission | 11% | 11% |
|   Overnight stay | 1 | 1 |
|   Medication | 9 | 9 |
|   Therapy | 5 | 4 |
|   Other treatment | 1 | -- |
| --Less than 0.5%. | | |

### Rule violations and injuries from a fight more common among inmates who had a mental health problem

Prison or jail inmates who had a mental health problem were more likely than those without to have been charged with breaking facility rules since admission (table 16). Among State prisoners, 58% of those who had a mental health problem, compared to 43% of those without, had been charged with rule violations.

An estimated 24% of State prisoners who had a mental health problem, compared to 14% of those without, had been charged with a physical or verbal assault on correctional staff or another inmate. Among Federal prisoners who had a mental health problem, 15% had been charged with a physical or verbal assault on correctional staff or another inmate compared to 7% of those without a mental problem.

Jail inmates who had a mental health problem were twice as likely as those without to have been charged with

### Three-quarters of female inmates in State prisons who had a mental health problem met criteria for substance dependence or abuse

Female State prisoners who had a mental health problem were more likely than those without to —

• meet criteria for substance dependence or abuse (74% compared to 54%),

• have a current or past violent offense (40% compared to 32%),

• have used cocaine or crack in the month before arrest (34% compared to 24%),

• have been homeless in the year before arrest (17% compared to 9%).

They were also more likely to report —

• 3 or more prior sentences to probation or incarceration (36% compared to 29%),

• past physical or sexual abuse (68% compared to 44%),

• parental abuse of alcohol or drugs (47% compared to 29%),

• a physical or verbal assault charge since admission (17% compared to 6%).

### Characteristics of females in State prison, by mental health status

| Selected characteristics | Percent of female inmates | |
|---|---|---|
| | With mental problem | Without |
| **Criminal record** | | |
|   Current or past violent offense | 40.4% | 32.2% |
|   3 or more prior probations or incarcerations | 35.9 | 28.7 |
| **Substance dependence or abuse** | 74.5% | 53.6% |
|   Alcohol | 41.7 | 25.8 |
|   Drugs | 65.5 | 45.6 |
| **Drug use in month before arrest\*** | 63.7% | 49.5% |
|   Cocaine or crack | 33.9 | 24.2 |
|   Methamphetamines | 17.1 | 16.3 |
| **Family background** | | |
|   Homeless in year before arrest | 16.6% | 9.5% |
|   Past physical or sexual abuse | 68.4 | 44.0 |
|   Parent abused alcohol or drugs | 46.9 | 29.1 |
| **Charged with violating facility rules\*** | 50.4% | 30.6% |
|   Physical or verbal assault | 16.9 | 5.7 |
| **Injured in a fight since admission** | 10.3% | 3.8% |
| \*Includes items not shown. | | |

facility rule violations (19% compared to 9%).

Inmates in local jails who had a mental health problem were also four times as likely as those without to have been charged with a physical or verbal assault on correctional staff or another inmate (8% compared to 2%).

A larger percentage of inmates who had a mental health problem had been injured in a fight since admission than those without a mental problem (State prisoners, 20% compared to 10%; Federal prisoners, 11% compared to 6%; jail inmates, 9% compared to 3%).

### Table 16. Disciplinary problems among prison and jail inmates since admission, by mental health status

| Type of disciplinary problem since admission | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| **Charged with rule violations\*** | 57.7% | 43.2% | 40.0% | 27.7% | 19.0% | 9.1% |
|   Assault | 24.1 | 13.8 | 15.4 | 6.9 | 8.2 | 2.4 |
|     Physical assault | 17.6 | 10.4 | 11.0 | 5.4 | 4.7 | 1.6 |
|     Verbal assault | 15.2 | 6.7 | 7.9 | 2.4 | 5.2 | 0.9 |
| **Injured in a fight** | 20.4% | 10.1% | 11.4% | 5.8% | 9.3% | 2.9% |

\*Includes violations not shown (for example: possession of a weapon, stolen property or contraband, drug law violations, work slowdowns, food strikes, setting fires or rioting, being out of place, disobeying orders, abusive language, horseplay, or failing to follow sanitary regulations).

JX-CCH-000890

## Methodology

The findings in this report are based on data in the Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002. Conducted every 5 to 6 years since 1972, the BJS' inmate surveys are the only national source of detailed information on criminal offenders, particularly special populations such as drug and alcohol users and offenders who have mental health problems.

The survey design included a stratified two-stage sample where facilities were selected in the first stage and inmates to be interviewed in the second stage. In the second sampling stage, interviewers from the Census Bureau visited each selected facility and systematically selected a sample of inmates. Computer-assisted personal interviewing (CAPI) was used to conduct the interviews.

### Survey of Inmates in State and Federal Correctional Facilities, 2004

The State prison sample was selected from a universe of 1,585 facilities. A total of 287 State prisons participated in the survey; 2 refused, 11 were closed or had no inmates to survey, and 1 was erroneously included in the universe. A total of 14,499 inmates in the State facilities were interviewed; 1,653 inmates refused to participate, resulting in a second-stage nonresponse rate of 10.2%.

The Federal prison sample was selected from 148 Federal prisons and satellite facilities. Thirty-nine of the 40 prisons selected participated in the survey. After the initial sample of inmates was drawn, a secondary sample of 1 in 3 drug offenders was selected. A total of 3,686 inmates in Federal facilities were interviewed and 567 refused to participate, resulting in a second-stage nonresponse rate of 13.3%.

### Survey of Inmates in Local Jails, 2002

The local jail sample was selected from a universe of 3,365. Overall, 465 jails were selected, and interviews were held in 417 jails; 39 jails refused or were excluded for administrative reasons; and 9 were closed or had no inmates. A total of 6,982 inmates were interviewed; 768 inmates refused to participate, resulting in a second-stage nonresponse rate of 9.9%.

### Accuracy of survey estimates

The accuracy of the survey estimates depends on sampling and measurement errors. Sampling errors occur by chance because a sample of inmates rather than all inmates were interviewed. Measurement error can be attributed to many sources, such as nonresponse, recall difficulties, differences in the interpretation of questions among inmates, and processing errors.

The sampling error, as measured by an estimated standard error, varies by the size of the estimate and the size of the base population. These standard errors may be used to construct confidence intervals around percentages. For example, the 95% confidence interval around the percentage of jail inmates in 2002 who had a mental health problem is approximately 64.2% plus or minus 1.96 times .83% (or 62.6% to 65.8%). Standard error tables for data in this report are provided in the Appendix which is available in the electronic version of the report at <http://www.ojp.usdoj.gov/bjs/abstract/mhppji.htm>.

A detailed description of the methodology for the State and Federal Prison survey, including standard error tables and links to other reports or findings will be available at <http://www.icpsr.umich.edu> in Winter 2007. A detailed description of the methodology for the Survey of Inmates in Local Jails is available at <http://webapp.icpsr.umich.edu/cocoon/NACJD-STUDY/04359.xml>.

### Measures of mental health problems in the general population

Caution should be used when making comparisons between prison and jail inmates and the general population based on the a 12-month DSM-IV structured interview. There are significant variations in the questionnaire design and data analysis. For example, questions on the severity or duration of symptoms and questions about whether symptoms are due to breavement, substance use, or a medical condition may vary from survey to survey.

For details on the methodology used in the National Epidemiologic Survey on Alcohol and Related Conditions, sponsored by the National Institute on Alcohol Abuse and Alcoholism, see the Data Reference Manual, <http://niaaa.census.gov/>. For additional information on the prevalence of mental disorders in the general population, see the National Survey on Drug Use and Health, sponsored by the Substance Abuse and Mental Health Services Administration, <http://www.oas.samhsa.gov/nsduh.htm>. Also, see the National Comorbidity Survey Replication Study, sponsored primarily by the National Institute of Mental Health, <http://www.nimh.nih.gov/healthinformation/ncs-r.cfm>.

**References**

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV), 1994.

Michael B. First, Robert, L. Spitzer, Miriam Gibbon, and Janet B.W. Williams, *User's Guide for the Structured Clinical Interview for DSM-IV Axis I Disorders,* American Psychiatric Publishing, Inc. Arlington, Va., March 2002.

U.S. Department of Health and Human Services, National Epidemiologic Survey on Alcohol and Related Conditions, 2002, National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, Bethesda, Maryland.

U.S. Department of Health and Human Services, National Survey on Drug Use and Health, 2002, Substance Abuse and Mental Health Services Administration, Office of Applied Studies, Rockville, Maryland.

**U.S. Department of Justice**
Office of Justice Programs
Bureau of Justice Statistics

Washington, DC 20531

*Official Business*
Penalty for Private Use $300

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/BJS
Permit No. G-91

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Jeffrey L. Sedgwick is director.

Doris J. James and Lauren E. Glaze wrote this report, under the supervision of Allen J. Beck. Laura M. Maruschak, Todd D. Minton, and Tracy L. Snell verified the report. Rebecca L. Medway provided programming assistance. Tina Dorsey edited the report and Jayne Robinson prepared it for final printing, under the supervision of Marianne Zawitz.

Tracy L. Snell, under the supervision of Allen J. Beck, was project manager for the Survey of Inmates in State and Federal Correctional Facilities.

For the State and Federal prisoners survey, at the U.S. Census Bureau Steven M. Bittner, Colette Heiston, and Kenneth Mayo carried out questionnaire design, data collection and processing, under the supervision of Marilyn M. Monahan, Demographic Surveys Division. Renee Arion programmed the questionnaire and Dave Keating programmed the listing instrument, under the supervision of Rob Wallace, Technologies Management Office. Programming assistance in the Demographic Surveys Division was provided by Chris Alaura, Mildred Ballenger, Bach-Loan Nguyen, and Scott Raudabaugh, under the supervision of David Watt.

Dave Hornick and Danielle N. Castelo, Demographic Surveys Methods Division, under the supervision of Thomas F. Moore, designed the sample and weighting specifications. Sydnee Chattin-Reynolds and Luis Padilla, Field Division, under the supervision of Richard Ning, coordinated the field operations. The affiliations for the Census Bureau date to the time of the survey.

Contributors to the Survey of Inmates in Local Jails are listed in *Profile of Jail Inmates, 2002*, at <http://www.ojp.usdoj.gov/bjs/abstract/pji02.htm>.

September 2006, NCJ 213600

This report in portable document format and in ASCII and its related statistical data and tables— including appendix tables— are available at the BJS World Wide Web Internet site: <http://www.ojp.usdoj.gov/bjs/mhppji.htm>

**Office of Justice Programs**

Partnerships for Safer Communities
http://www.ojp.usdoj.gov

JX-CCH-000892

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER,FARRELL SAMPIER, REGINALD GEORGE,JOHN TONUBBEE, OTTO BARRERA,CLYDE CARTER,CEDRIC EVANS,EDWARD GIOVANNI,RICKY D. DAVIS,LIONEL TOLBERT, and RUFUS WHITE,on behalf of themselves and all others similarly situated, | CIVIL ACTION NO. 15-318 JUDGE:  BAJ MAG:  RLB |

Plaintiffs,

V.

BURL CAIN, Warden of the Louisiana State
Penitentiary, in his official capacity;
STEPHANIE LAMARTINIERE, Assistant Warden for
Health Services, in her official capacity;
JAMES LEBLANC, Secretary of the Louisiana
Department of Public Safety and Corrections, in
his official capacity; and THE LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS.
Defendants.


30(b)(6) DEPOSITION OF THE LOUISIANA

DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

through its designated representative, TRISH

FOSTER, given in the above-entitled cause,

pursuant to the following stipulation, before

Sandra P. DiFebbo, Certified Shorthand Reporter,

in and for the State of Louisiana, at Angola

State Penitentiary, 17544 Tunica Trace, Angola,

Louisiana, on the 4th day of August, 2016.

```
 1    their relief.  I didn't look at specific ARPs to
 2    be able to -- granted ARPs to tell you that.
 3    I'm going to give you an example.  I've seen
 4    this, where EMS has seen an inmate, and they may
 5    have charged him for a sick call and something
 6    else, and they've given the sick call amount
 7    back to them.  That's a granted ARP.  If they've
 8    asked to see a doctor, if they've scheduled an
 9    appointment and got them in here to see a
10    doctor, that's a granted ARP.  So if they ask
11    for specific reliefs, and we can grant it, we'll
12    grant it like that.
13    Q.    In terms of rejected ARPs, are there any
14    healthcare ARPs that are rejected without going
15    through Miss Lofton and Miss Lamartiniere?
16    A.    Yes.  Rejected ARPs are rejected.  They
17    don't go out to anyone.  We have a certain
18    procedure in the ARP system that we can reject
19    ARPs by. I'm going to give you an example.  If
20    they are untimely.  If they are over 90 days
21    from the date of the incident, we can reject it.
22    If they are complaining about medical and
23    security, it's called a multiple complaint.  We
24    can reject it, because we would have to send
25    that ARP to security and medical, and it is just
```

1   A.     No.

2          MR. DUBNER:

3              James, this is sort of the core of

4   what the topic we had designated was.  We're

5   going to have to think about what we can do on

6   this.  If we continue the deposition at another

7   time or --

8          MR. HILBURN:

9              She can have it in front of her or

10  she can answer maybe if there are any unresolved

11  ARPs of any of the plaintiffs outstanding.

12         THE WITNESS:

13             I know there is none that -- I know

14  everybody has went through both steps.  I did

15  check that.  Everybody has completed and

16  exhausted their ARPs.

17  BY MR. DUBNER:

18  Q.     ARPs regarding medical care?

19  A.     Yes.

20  Q.     Is there anything else you observed in

21  reviewing them along those lines?

22  A.     Not that I can recall.

23  Q.     Was there any grievance in the plaintiffs

24  that had not been exhausted that you recall?

25  A.     No.  They have all went through the first

JX-CCH-000895

STATE OF LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES

**Department Regulation**
**No. B-05-005**



20 November 2011

**CLASSIFICATION, SENTENCING AND SERVICE FUNCTIONS**
**Administrative Remedy Procedure/Disciplinary Process**
**Administrative Remedy Procedure**

1.  **AUTHORITY:**  Secretary of the Department of Public Safety and Corrections as contained in Chapter 9 of Title 36.

2.  **REFERENCES:** ACA Standards, applicable statutes, Department Regulation Nos. A-01-013 "Forms Management Program," C-05-001 "Activity Reports/Unusual Occurrence Reports-Operational Units" and C-05-004 "Basic Jail Guidelines" (VI-B-002 Grievance Process) and the Rule published in the Louisiana Register dated November 20, 2011.

3.  **PURPOSE:**  To constitute the Department's "Administrative Remedy Procedure" for offenders as a regulation.

4.  **APPLICABILITY:**  Deputy Secretary, Chief of Operations, Regional Wardens, Wardens, and Sheriffs or Administrators of local jail facilities.  Each Unit Head is responsible for ensuring that all unit written policies and procedures are in place to comply with the provisions of this regulation.

5.  **POLICY:**  It is the Secretary's policy that all offenders and employees have reasonable access to and comply with the Department's "Administrative Remedy Procedure" through which an offender may seek formal review of a complaint relating to most aspects of his incarceration.  Offenders housed in local jail facilities shall also be afforded reasonable access to a grievance remedy procedure as outlined in Department Regulation No. C-05-004 "Basic Jail Guidelines" (VI-B-002 Grievance Process.)

    Revisions will be accomplished through this regulation under the signature of the Secretary.

s/James M. Le Blanc
Secretary

This regulation supersedes Department Regulation No. B-05-005 dated 28 January 2005.

**(NOTE:  The Administrative Remedy Procedure (ARP), which also includes Lost Property Claims, follows this regulation.)**

JX-CCH-000896

## ADMINISTRATIVE REMEDY PROCEDURE

On September 18, 1985, the Department of Public Safety and Corrections installed in all of its adult institutions a formal grievance mechanism for use by all offenders committed to the custody of the Department. The process bears the name Administrative Remedy Procedure (ARP). Offenders are required to use the procedure before they can proceed with a suit in Federal and State Courts.

Offenders are encouraged to continue to seek solutions to their concerns through informal means, but in order to ensure their right to use the formal procedure, they shall make their request to the Warden in writing within a 90 day period after an incident has occurred. If, after filing in the formal procedure an offender receives a satisfactory response through informal means, the offender may request (in writing) that the Warden cancel his formal request for an administrative remedy.

All offenders may request information about or assistance in using the procedure from their classification officer or from a counsel substitute who services their living area.

Original letters or requests to the Warden should be as brief as possible. Offenders should present as many facts as possible to answer all questions (who, what, when, where and how) concerning the incident. If a request is unclear or the volume of attached material is too great, it may be rejected and returned to the offender with a request for clarity or summarization on one additional page. The deadline for this request begins on the date the resubmission is received in the Warden's office.

Once an offender's request is accepted into the procedure, he must use the manila envelope that is furnished to him with the First Step Response (Form B-05-005-ARP-2) to continue in the procedure. The flaps on the envelope may be tucked into the envelope for mailing to the facility's ARP Screening Officer.

## PURPOSE

Corrections Services has established the Administrative Remedy Procedure through which an offender may seek formal review of a complaint which relates to any aspect of his incarceration if less formal methods have not resolved the matter. Such complaints and grievances include, but are not limited to any and all claims seeking monetary, injunctive, declaratory or any other form of relief authorized by law and by way of illustration, includes actions pertaining to conditions of confinement, personal injuries, medical malpractice, time computations, even though urged as a writ of habeas corpus, or challenges to rules, regulations, policies or statutes. Through this procedure, offenders shall receive reasonable responses and where appropriate, meaningful remedies.

## APPLICABILITY

Offenders may request administrative remedies to situations arising from policies, conditions or events within the institution that affect them personally.

There are procedures already in place within all DPS&C institutions which are specifically and expressly incorporated into and made a part of this Administrative Remedy Procedure. These

procedures shall constitute the administrative remedies for disciplinary matters and lost property claims.

The following matters shall not be appealable through this Administrative Remedy Procedure:

1.  Court decisions and pending criminal matters over which the Department has no control or jurisdiction;

2.  Pardon Board and Parole Board decisions (under Louisiana law, decisions of these Boards are discretionary, and may not be challenged);

3.  Louisiana Risk Review Panel recommendations;

4.  Lockdown Review Board decisions (offenders are furnished written reasons at the time this decision is made as to why they are not being released from lockdown, if that is the case. The Board's decision may not be challenged. There are, however, two bases for request for administrative remedy on Lockdown Review Board hearings):

    - That no reasons were given for the decision of the Board;

    - That a hearing was not held within 90 days from the offender's original placement in lockdown or from the last hearing. There will be a 20 day grace period attached hereto, due to administrative scheduling problems of the Board; therefore, a claim based on this ground will not be valid until 110 days have passed and no hearing has been held.

## DEFINITIONS

As used in this procedure, the following definitions shall apply:

**ARP SCREENING OFFICER:** A staff member, designated by the Warden, whose responsibility is to coordinate and facilitate the Administrative Remedy Procedure process.

**GRIEVANCE:** A written complaint by an offender on the offender's own behalf regarding a policy applicable within an institution, a condition within an institution, an action involving an offender of an institution, or an incident occurring within an institution.

**EMERGENCY GRIEVANCE:** A matter in which disposition within the regular time limits would subject the offender to a substantial risk of personal injury, or cause other serious and irreparable harm to the offender.

**DAYS:** Calendar days.

## POLICY

All offenders, regardless of their classification, impairment, or disability, shall be entitled to invoke this grievance procedure. It shall be the responsibility of the Warden to provide appropriate assistance for offenders with literacy deficiencies or language barriers. No action shall be taken against an offender for the good faith use of or good faith participation in the

procedure. Reprisals of any nature are prohibited. Offenders are entitled to pursue, through the grievance procedure, a complaint that a reprisal occurred.

**REVIEWERS:** If an offender registers a complaint against a staff member, that employee shall not play a part in making a decision on the request. However, this shall not prevent the employee from participating at the Step One level, since this employee may be the best source from which to begin collecting information on an alleged incident. If the offender is not satisfied with the decision rendered at the First Step, he should pursue his grievance to the Secretary, through the Chief of Operations/Office of Adult Services via the Second Step.

**COMMUNICATIONS:** Offenders must be made aware of the system by oral explanation at orientation and should have the opportunity to ask questions and receive oral answers. The procedures shall be posted in writing in areas readily accessible to all offenders.

**WRITTEN RESPONSES:** At each stage of decision and review, offenders will be provided written answers that explain the information gathered or the reason for the decision reached along with simple directions for obtaining further review.

## PROCEDURE

**SCREENING:** The ARP Screening Officer shall screen all requests prior to assignment to the First Step. The screening process should not unreasonably restrain the offender's opportunity to seek a remedy. If a request is rejected, it must be for one of the following reasons, which shall be noted on the Request for Administrative Remedy (Form B-05-005-ARP-1.)

1.  This matter is not appealable through this process, such as:

    a.  Court decisions;
    b.  Parole Board/Pardon Board decisions;
    c.  Louisiana Risk Review Panel recommendations;
    d.  Lockdown Review Board (refer to section on "APPLICABILITY".)

2.  There are specialized administrative remedy procedures in place for this specific type of complaint, such as:

    a.  Disciplinary matters;
    b.  Lost property claims.

3.  It is a duplicate request.

4.  In cases where a number of offenders have filed similar or identical requests seeking administrative remedy, it is appropriate to respond only to the offender who filed the initial request. Copies of the decision sent to other offenders who filed requests simultaneously regarding the same issue will constitute a completed action. All such requests will be logged separately.

5.  The complaint concerns an action not yet taken or a decision which has not yet been made.

6.  The offender has requested a remedy for another offender.

JX-CCH-000899

7.   The offender has requested a remedy for more than one incident (a multiple complaint.)

8.   Established rules and procedures were not followed.

9.   If an offender refuses to cooperate with the inquiry into his allegation, the request may be denied due to lack of cooperation.

10.   There has been a time lapse of more than 90 days between the event and the initial request, unless waived by the Warden.

Notice of the initial acceptance or rejection of the request shall be furnished to the offender.

**INITIATION OF PROCESS:**  Offenders should always try to resolve their problems within the institution informally, before initiating the formal process.   This informal resolution may be accomplished through discussions with staff members, etc.  If the offender is unable to resolve his problems or obtain relief in this fashion, he may initiate the formal process.

The method by which this process is initiated is by a letter from the offender to the Warden.  For purposes of this process, a letter is:

1.   Any form of written communication which contains this phrase:  "This is a request for administrative remedy" or "ARP;" or

2.   Request for Administrative Remedy (Form B-05-005-ARP-1) at those institutions that wish to furnish forms for commencement of this process.

No request for administrative remedy shall be denied acceptance into the Administrative Remedy Procedure because it is or is not on a form; however, no letter as set forth above shall be accepted into the process unless it contains the phrase, "This is a request for administrative remedy."

Nothing in this procedure should serve to prevent or discourage an offender from communicating with the Warden or anyone else in the Department of Public Safety and Corrections.  The requirements set forth in this document for acceptance into the Administrative Remedy Procedure are solely to assure that incidents which may give rise to a cause of action will be handled through this two step system of review.  All forms of communication to the Warden will be handled, investigated, and responded to as the Warden deems appropriate.

If an offender refuses to cooperate with the inquiry into his allegation, the request may be denied by noting the lack of cooperation on the appropriate Step Response and returning it to the offender.

**MULTIPLE REQUESTS:**  If an offender submits multiple requests during the review of a previous request, they will be logged and set aside for handling at such time as the request currently in the system has been exhausted at the Second Step or until time limits to proceed from the First Step to the Second Step have lapsed.  The Warden may determine whether a letter of instruction to the offender is in order.

**REPRISALS:**  No action shall be taken against anyone for the good faith use of or good faith participation in the procedure.

The prohibition against reprisals should not be construed to prohibit discipline of offenders who do not use the system in good faith. Those who file requests that are frivolous or deliberately malicious may be disciplined under the appropriate rule violation described in the DPS&C "Disciplinary Rules and Procedures for Adult Offenders."

## PROCESS

**FIRST STEP (Time Limit 40 days):** The offender commences the process by writing a letter to the Warden, in which he briefly sets out the basis for his claim, and the relief sought (refer to section on "PROCEDURE – Initiation of Process" for the requirements of the letter.) The offender should make a copy of his letter of complaint and retain it for his own records. The original letter will become a part of the process and will not be returned to the offender. The institution is not responsible for furnishing the offender with copies of his letter of complaint. This letter shall be written to the Warden within 90 days of an alleged event. (This requirement may be waived when circumstances warrant. The Warden or designee shall use reasonable judgment in such matters.) The requests shall be screened by the ARP Screening Officer and a notice shall be sent to the offender advising that his request is being processed or is being rejected. The Warden may assign another staff person to conduct further fact-finding and/or information gathering prior to rendering his response. The Warden shall respond to the offender within 40 days from the date the request is received at the First Step utilizing the First Step Response (Form B-05-005-ARP-2.)

For offenders wishing to continue to the Second Step, sufficient space will be allowed on the response to <u>give a reason</u> for requesting review at the next level. There is no need to rewrite the original letter of request as it will be available to all reviewers at each Step of the process.

**SECOND STEP (Time limit 45 days):** An offender who is dissatisfied with the First Step Response (Form B-05-005-ARP-2) may appeal to the Secretary of the Department of Public Safety and Corrections by so indicating that he is not satisfied in the appropriate space on the response form and forwarding it to the ARP Screening Officer within 5 days of receipt of the decision. A final decision will be made by the Secretary or designee and the offender shall be notified within 45 days of receipt utilizing the Second Step Response (Form B-05-005-ARP-3.) A copy of the Secretary's decision shall be sent to the Warden.

If an offender is not satisfied with the Second Step Response (Form B-05-005-ARP-3), he may file suit in District Court. The offender must furnish the administrative remedy procedure number on the court forms.

**MONETARY DAMAGES:** The Department of Public Safety and Corrections based upon credible facts within a grievance or complaint filed by an offender, may determine that such an offender is entitled to monetary damages where monetary damages are deemed by the Department as appropriate to render a fair and just remedy.

Upon a determination that monetary damages should be awarded, the remaining question is quantum, or the determination as to the dollar amount of the monetary damages to be awarded. The matter of determining quantum shall be transferred to the Office of Risk Management of the Division of Administration which shall then have the discretionary power to determine quantum. The determination reached by the Office of Risk Management shall be returned to the Department of Public Safety and Corrections for a final decision. If a settlement is reached, a copy of the signed release shall be given to the Warden on that same date.

**DEADLINES AND TIME LIMITS:** No more than 90 days from the initiation to completion of the process shall elapse, unless an extension has been granted. Absent such an extension, expiration of response time limits shall entitle the offender to move on to the next Step in the process. Time limits begin on the date the request is assigned to a staff member for the First Step Response (Form B-05-005-ARP-2.)

An offender may request an extension in writing of up to five days in which to file at any stage of the process. This request shall be made to the ARP Screening Officer for an extension to initiate a request; to the Warden for the First Step Response (Form B-05-005-ARP-2) and to the Secretary through the Chief of Operations/Office of Adult Services for the Second Step Response (Form B-05-005-ARP-3.) The offender must certify valid reasons for the delay, which reasons must accompany his untimely request. The issue of sufficiency of valid reasons for delay shall be addressed at each Step, along with the substantive issue of the complaint.

The Warden may request permission for an extension of not more than five days from Chief of Operations/Office of Adult Services for the Step One review/response. The offender must be notified in writing of such an extension.

In no case may the cumulative extensions exceed 25 days.

**PROBLEMS OF AN EMERGENCY NATURE:** If an offender feels he is subjected to emergency conditions, he must send an emergency request to the shift supervisor. The shift supervisor shall immediately review the request and forward the request to the level at which corrective action can be taken. All emergency requests shall be documented on an Unusual Occurrence Report.

Abuse of the emergency review process by an offender shall be treated as a frivolous or malicious request and the offender shall be disciplined accordingly. Particularly, but not exclusively, matters relating to administrative transfers and time computation disputes are not to be treated as emergencies for purposes of this procedure, but shall be expeditiously handled by the shift supervisor, when appropriate.

<u>**SENSITIVE ISSUES:**</u> If the offender believes the complaint is sensitive and that he would be adversely affected if the complaint became known at the institution, he may file the complaint directly with the Secretary through the Chief of Operations/Office of Adult Services (Second Step Response-Form B-05-005-ARP-3. The offender must explain, in writing, his reason for not filing the complaint at the institution.

If the Chief of Operations/Office of Adult Services agrees that the complaint is sensitive, he shall accept and respond to the complaint. If he does not agree that the complaint is sensitive, he shall so advise the offender in writing, and return the complaint to the Warden's office. The offender shall then have five days from the date the rejection memo is received in the Warden's office to submit his request through regular channels (beginning with the First Step if his complaint is acceptable for processing in the Administrative Remedy Procedure).

**RECORDS:** Administrative Remedy Procedure records are confidential. Employees who are participating in the disposition of a request may have access to records essential to the resolution of requests. Otherwise, release of these records is governed by La. R.S. 15:574.12.

All reports, investigations, etc., other than the offender's original letter and responses, are prepared in anticipation of litigation, and are prepared to become part of the attorney's work product for the attorney handling the anticipated eventual litigation of this matter and are therefore confidential and not subject to discovery.

Records shall be maintained as follows:

A computerized log shall document the nature of each request, all relevant dates and disposition at each step.  Each institution shall submit reports on Administrative Remedy Procedure activity in accordance with Department Regulation No. C-05-001 "Activity Reports/Unusual Occurrence Reports-Operational Units."

Individual requests and disposition, and all responses and pertinent documents shall be kept on file at the institution or at Headquarters.

Records shall be kept at least three years following final disposition of the request.

**TRANSFERRED OFFENDERS:**  When an offender has filed a request at one institution and is transferred prior to the review, or if he files a request after transfer on an action taken by the sending institution, the sending institution shall complete the processing through the First Step Response (From B-05-005-ARP-2.)   The Warden of the receiving institution shall assist in communication with the offender.

**DISCHARGED OFFENDERS:**  If an offender is discharged before the review of an issue that affects the offender after discharge is completed, or if he files a request after discharge on such an issue, the institution shall complete the processing and shall notify the offender at his last known address.  All other requests shall be considered moot when the offender discharges and the process shall not be completed.

**ANNUAL REVIEW:**  The Warden shall annually solicit comments and suggestions on the processing, the efficiency and the credibility of the Administrative Remedy Procedure from offenders and staff.  A report with the results of such review shall be provided to the Chief of Operations/Office of Adult Services no later than January 31st of each year.

## LOST PROPERTY CLAIMS

The purpose of this section is to establish a uniform procedure for handling "Lost Property Claims" filed by offenders in the custody of the Department of Public Safety and Corrections. Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this procedure and for advising offenders and affected employees of its contents.

## PROCEDURES:

1.     When an offender suffers a loss of personal property, he may submit a Lost Personal Property Claim (Form B-05-005-A) to the Warden or designee. The claim shall include the date the loss occurred, a full statement of the circumstances which resulted in the loss of property, a list of the items which are missing, the value of each lost item and any proof of ownership or value of the property available to the offender. All claims for lost personal property must be submitted to the Warden or designee within ten days of discovery of the loss.

       Under no circumstances will an offender be compensated for an unsubstantiated loss, or for a loss which results from the offender's own acts or for any loss resulting from bartering, trading, selling to or gambling with other offenders.

2.     The Warden or designee shall assign an employee to investigate the claim. The investigative officer shall investigate the claim fully and will submit his report and recommendations to the Warden or designee.

3.     If a loss of an offender's personal property occurs through the negligence of the institution and/or its employees, the offender's claim may be processed in accordance with the following procedures:

       A.    MONETARY:

             1)     The Warden or designee shall recommend a reasonable value for the lost personal property (with the exception of personal clothing) as described on the Lost Personal Property Claim (Form B-05-005-A.) Liability shall be pursuant to Department Regulation No. C-03-007 "Offender Personal Property List, State Issued Items, Procedures for the Reception, Transfer and Disposal of Offender Personal Belongings;"

             2)     A Lost Personal Property Claim Response (Form B-05-005-B) and Agreement (Form B-05-005-C) shall be completed and submitted to the offender for his signature; and

             3)     The claim shall be submitted to the Chief of Operations/Office of Adult Services for review and final approval.

       B.    NON-MONETARY:
             1)     The offender is entitled only to state issue where state issued items are available;

2)   The Warden or designee shall review the claim and determine whether or not the institution is responsible;

3)   A Lost Personal Property Claim Response (Form B-05-005-B) shall be completed and submitted to the offender for his signature;

4)   An Agreement (Form B-05-005-C) shall be completed and submitted to the offender for his signature when state issue replacement has been offered.

4.   If the Warden or designee determines that the institution and/or its employees are not responsible for the offender's loss of property, the claim shall be denied, and a Lost Personal Property Claim Response (Form B-05-005-B) shall be submitted to the offender indicating the reason.  If the offender is not satisfied with the resolution at the unit level, he may indicate by checking the appropriate box on the Lost Personal Property Claim Response (Form B-05-005-B) and submitting it to the Screening Officer within five days of receipt.  The Screening Officer shall provide the offender with an acknowledgment of receipt and date forwarded to the Chief of Operations/Office of Adult Services.  A copy of the offender's original Lost Personal Property Claim (Form B-05-005-A) and Lost Personal Property Claim Response (Form B-05-005-B) and other relevant documentation shall be attached.

JX-CCH-000905

## ADMINISTRATIVE REMEDY PROCEDURE & PROPERTY CLAIMS

### INPUT SCREEN

163P55

CASE NUMBER: LSP-2014-2339
EVACUEE:

DOC #: 371212          BACKLOG:
LAST NAME: PARKER          FIRST NAME: KENTRELL
RECORD TYPE: A     SUBJECT CODE: 0103 - QUALITY OF MEDICAL TREATMENT
INCIDENT DATE: ONGOING   SUBJECT TYPE :
LSP Only
LSP RESPONDENT: Med Services Warden

LSP HOUSING: REBTC

|         | DATE RECEIVED | ACCEPTED DATE | DISPOSITION DATE | DISPOSITION CODE |
|---------|---------------|---------------|------------------|------------------|
| STEP 1: | 07/30/2014    | 08/13/2014    | 09/24/2014       | 03-Granted in part |
| STEP 2: | 10/10/2014    | 10/10/2014    | 10/30/2014       | 02-Denied        |

COMPLAINT: FINAL  : COMPLAINS THAT THE TREATMENT CENTER IS NOT SUITABLE STAFFED
OR EQUIPPED TO ACCOMMODATE QUADRIPLEGIC PATIENTS SUCH AS HIMSELF.
IF REJECTED REASON:

07/30/2014

07/30/2014

JX-CCH-000906

CASE NUMBER: LSP-2014-2339

FIRST STEP RESPONSE FORM (FIRST STEP RESPONDENT)

TO: PARKER, KENTRELL 371212                    TC  W2
                                               Living Quarters

Response to request dated 07/29/2014, received in this office on 07/30/2014

This is in response to your ARP 2014-2339.  After careful review of the pertinent volumes of your current medical record, I find the following:  The extensive documentation in your medical record indicates that you have been afforded the opportunity to address your concerns with professional staff in a manner that is consistent with guidelines set by LSP Policy and your level of need. It is noted that you returned to LSP after a compassionate release was authorized and arranged for you.  However, the compassionate release was revoked due to behavioral issues.  You have been on the Nursing Units at the REBTC since 10/2011.

In general, you are a quadriplegic and have no voluntary movement below your neck.  You do speak well and you are able to turn your head from side to side without difficulty. The suprapubic catheter insertion site is cleaned daily as ordered and the #4 pediatric tracheotomy site is cared for daily.  Granulation tissue is noted around the tracheotomy site and no drainage has been noted.

Your allegation that you are denied medications is invalid. You currently are prescribed 23 medications. Special medications are a medicated shampoo for your skin and scalp and a special mouthwash.  You are also prescribed a muscle relaxer, anticonvulsant and a sedative. There are 4 different medications prescribed for assistance with your bowel movements and to help prevent constipation.  You take a multiple vitamin, plus 2 additional supplements.  It is noted that you have medication for itching, if needed, a medication for gastroesophageal reflux, a blood thinner to prevent blood clots and  cough medication and nebulizer treatments.  You also take an antihistamine and a blood pressure medication.  Obviously, you are not being denied medication.  A Physician's refusal to prescribe certain medications is not a denial of care or medication.

You currently have a special wheelchair for quadriplegics, an air mattress and an electric bed, therefore, your claim that you are denied proper mobility aids is unfounded and invalid.

Your activities of daily living, including, turning, bathing, range of motion and diaper changes are fulfilled, not only by the assigned orderlies/Nurses on the Nursing Unit, but also, and in addition to, the multiple visitors that come to see you on a daily basis.  The attention and care that you receive is above and beyond the community standard.  I find no evidence to support your claim that you are denied necessary care or that your care does not meet acceptable standards of care.

Your complaint related to the suction machine is incorrect.  The suction machine has tubing connected to it, ready for use and the staff is educated on the use of the suction machine.  The suction machine is in the room with you.

Documentation supports that you have refusals, which indicate that you do not always participate and are noncompliant with your ordered/prescribed care.  Your refusals may have prevented you from maximizing the benefits of treatment offered to you.
The Physician's Orders, Progress Notes, Medication Records, Radiology Reports, Consultant Reports and Nurses Notes demonstrate that the members of the LSP and the LSU Medical Teams have responded to your situation.  The Neurology Specialist noted on 11-10-2012, "benefit from Chiro. or PT is not

feasible." Disagreeing with a Physician's diagnosis, treatment, or judgement is insufficient to state an Eighth Amendment claim of deliberate indifference.

You have failed to provide any evidence to substantiate your allegation that your Rights have been violated or that your care has not met acceptable standards of care. I find no evidence to support your claim that the Nursing Units are not staffed appropriately. Furthermore, I find no evidence to support your claim that the Nurses and Doctors have not performed their assigned duties in accordance with established guidelines and Department of Corrections and State Board Rules and Regulations. It does not mean you are being denied care, because the care does not meet your demands.

Your allegations and accusations are without merit.

Monetary compensation is not an option at this level of the ARP Process and is denied.
Your request for adequate staffing of the Nursing Units has been granted.
Your request for pain medication has been granted. You are currently prescribed Valium, Neurontin and Baclofen.
Your request for adequate and necessary treatment and assistance with your activities of daily living has been granted and is performed in a timely manner. It is only hindered by your noncompliance.
Your medical concerns are being met by the LSP Medical Department and the Department is only hindered by your self-imposed, noncompliance and refusals.
Your request for a copy of your medical record is not a Medical issue and is denied. This matter would be better addressed through the Health Information Management Department, which handles the copy and release of any patient information request.

Your request for remedy has been partially granted.

Prepared by: _____
              Stephanie Lamartiniere
              Assistant Warden Health Services

              9/24/14
              Date

                                                JOSEPH F.G. LAMARTINIERE
                                                ASSISTANT WARDEN
                                                Unit Head

Instructions to Offender: If you are not satisfied with this response, you may go to Step Two by checking below and forwarding to the ARP Screening Officer in the manila envelope within 5 days of your receipt of this decision.

(X) I am not satisfied with this response and wish to proceed to Step Two.

Reason: This response avoid address'in the issues of this complaint directly. Therefore, I would like to proceed to the next level.

     10-1-14
     Date

                                      571212
                                Offender's Signature   DOC#

LOUISIANA STATE PENITENTIARY
ANGOLA, LOUISIANA

INMATE:   371212 KENTRELL PARKER

LOCATION:  TC W2

### ACKNOWLEDGMENT OF RECEIPT OF SECOND STEP RESPONSE

This will acknowledge receipt of the SECOND STEP response
(SECRETARY'S RESPONSE) OF ARP #LSP-2014-2339 .

RECEIVED BY: _Kentrell Parker 371212_

DATE RECEIVED: _11-7-2014_

DELIVERED BY: _Sgt E London_

==================================================================
PLEASE READ THE FOLLOWING
INSTRUCTIONS TO DELIVERY OFFICER:

1. Have the inmate sign and date the second step portion of
   the envelope acknowledging receipt of the second step
   response.

2. Have the inmate sign this receipt.

3. Delivery Officer signs receipt and dates it.

4. Give the inmate the contents of the envelope.

5. Return the envelope and the receipt to LEGAL PROGRAMS DEPARTMENT.

2nd Time
Sent Out

10-7-14

RECEIVED

DEC 0 1 2014

Legal Programs Department

RECEIVED

NOV 19 2014

Legal Programs Department

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES

CASE NUMBER: LSP-2014-2339

SECOND STEP RESPONSE FORM
(HEADQUARTERS)

TO: <u>PARKER, KENTRELL   371212</u>                        <u>LSP</u>
Offender Name and Number                         Living Unit

Response to Request Dated 10/01/2014, Received in this Office on 10/10/2014:

Your request for an Administrative review of ARP# LSP-2014-2339 has been received. A qualified member of the Headquarters staff has reviewed your request in order to render a fair and impartial response.

Your statement has been considered as well as your medical records. The medical staff is well aware of your medical condition and has adequate information upon which to base a determination of your medical concerns and the treatment necessary. Medical opinion is controlling. The medical care you have received and will continue to receive is deemed adequate. No further investigation will be conducted as this issue has been clearly addressed in the first step response.

Therefore, your request for relief is denied.

_____
Date

_____
Secretary's Signature or His Designee

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES
OFFENDERS RELIEF REQUEST FORM

CASE NUMBER: LSP-2014 -2339

TO:   <u>KENTRELL PARKER 371212</u>          <u>TC  W2</u>
      Offender's Name and Number              Living Quarters

                    <u>ONGOING</u>
                    Date of Incident

X                   ACCEPTED:  This request comes to you from the Wardens Office.  A response will be
                    issued within 40 days of this date.

                    REJECTED:  Your request has been  rejected for the following reason(s):

      <u>08/13/2014</u>                              <u>Trish Foster</u>
         Date                                  Warden's Signature or Designee

JX-CCH-000911

2014—2339

0103/ Med Serv

WARDEN BURL CAIN
LOUISIANA STATE PENITENTIARY
ANGOLA, LOUISIANA 70712

KENTRELL PARKER
#371212 TC W 2
LOUISIANA STATE PENITENTIARY
ANGOLA, LOUISIANA 70712

7/28/14

R E C E I V E D

JUL 3 0 2014

Legal Programs Department

RECEIVED

JUL 3 0 2014

WARDEN'S OFFICE

## THIS IS A REQUEST FOR ADMINISTRATIVE REMEDY

Dear Warden Cain:

This request for Administrative Remedy is being submitted as a result of inadequate medical care, indicating not only gross negligence, but deliberate indifference to my serious medical needs. It is against the medical director and medical staff of the R. E. Barrow Treatment Center at the Louisiana State Penitentiary. The deliberate indifference complained of herein is ongoing. As a result, I am subjected to unnecessary pain and suffering in violation of the Eighth Amendment to the United States Constitution.

I am diagnosed as a quadriplegic and presently housed in Ward II and my condition constitutes a serious medical need. The Medical Director and Medical Staff are subjectively aware of my serious medical needs. I suffer daily with severe pain, and also regularly suffer other serious medical problems. My condition and medical needs have been diagnosed by physician and are so obvious that even a layperson would easily recognize the necessity for a doctor's attention and special care.

I am being denied adequate medical care resulting from deliberate indifference to my serious medical needs posing substantial risk to my health and well being.

The R. E. Barrow Treatment Center is inadequately staffed to provide necessary medical care for the number and type of patients housed. As a result of quadriplegia, I have several serious medical conditions. Due to atrophy of my muscles from the neck down, I have very little cushion in my legs and buttocks to protect my feet, legs, coccyx

and sacrum, which easily become bruised or affected by pressure sores/decubitus ulcers. Quadriplegics suffering with Decubitus ulcers require regimented and frequent attention, *i.e.*, including but not limited to, cleaning and bathing, range of motion exercises, turning of the body, various medications, and dressing changes. All of the aforementioned are to be done on a regular and regimented schedule and I am not receiving this necessary care. Additionally, I am subjected to unsanitary conditions. I am being denied medication for pain, necessary mobility aids, proper turning to alleviate pressure on hot spots, use of pressure reduction devices and adequate air mattress, proper hygiene, adequate range of motion therapy, and adequate bathing.

In spite of repeated complaints, I am not being prescribed medication for pain and I am not being provided adequate treatment and care. I am often left in feces for long periods of time and have to endure flies and mosquitoes all over me. I have a trachea tube in my throat for breathing and I am in constant risk of choking because staff fails to keep the suction machine near my bed. This appears to be deliberate without regard for my health and well being. Moreover, many of the decisions appear to be based upon cost. Medical treatment for a serious medical need can not be delayed or denied on grounds of cost.

The actions and inactions of the medical staff are common practice establishing a pattern, and that he is not the only Offender subjected to such treatment.

## RELIEF REQUESTED

Based on the foregoing, I request the following relief:

1.    That I receive monetary damages for the unnecessary pain and suffering resulting from the inadequate care and deliberate indifference to my serious medical needs.

2.    That the R. E. Barrow Treatment Center be properly staffed with a sufficient number of nurses to adequately and properly treat the number/type of patients within it's care.

3.    That I be provided medication for the serious pain I endure on a daily basis.

4.    That I receive adequate and necessary treatment to prevent and care for decubitus ulcers, including turning of the body in a timely manner, range of motion therapy in a

REV00000930

timely manner, baths in a timely manner, and any needed dressing changes in a timely manner performed by properly trained and qualified staff.

5.    That adequate steps be taken to assure that proper and timely rounds are being made by qualified trained staff to assure assessment and documentation to provide adequate care.

6.    That a true and correct copy of my medical file be provided and that same be made a part of the administrative record.

Respectfully submitted,

KENTRELL PARKER
#371212 TC W 2
LOUISIANA STATE PENITENTIARY
ANGOLA, LOUISIANA 70712

CASE NUMBER: LSP-2014-2339

FIRST STEP RESPONSE FORM (FIRST STEP RESPONDENT)

TO: PARKER, KENTRELL 371212          TC  W2
                                     Living Quarters

Response to request dated 07/29/2014, received in this office on 07/30/2014

This is in response to your ARP 2014-2339. After careful review of the pertinent volumes of your current medical record, I find the following: The extensive documentation in your medical record indicates that you have been afforded the opportunity to address your concerns with professional staff in a manner that is consistent with guidelines set by LSP Policy and your level of need. It is noted that you returned to LSP after a compassionate release was authorized and arranged for you. However, the compassionate release was revoked due to behavioral issues. You have been on the Nursing Units at the REBTC since 10/2011.

In general, you are a quadriplegic and have no voluntary movement below your neck. You do speak well and you are able to turn your head from side to side without difficulty. The suprapubic catheter insertion site is cleaned daily as ordered and the #4 pediatric tracheotomy site is cared for daily. Granulation tissue is noted around the tracheotomy site and no drainage has been noted.

Your allegation that you are denied medications is invalid. You currently are prescribed 23 medications. Special medications are a medicated shampoo for your skin and scalp and a special mouthwash. You are also prescribed a muscle relaxer, anticonvulsant and a sedative. There are 4 different medications prescribed for assistance with your bowel movements and to help prevent constipation. You take a multiple vitamin, plus 2 additional supplements. It is noted that you have medication for itching, if needed, a medication for gastroesophageal reflux, a blood thinner to prevent blood clots and cough medication and nebulizer treatments. You also take an antihistamine and a blood pressure medication. Obviously, you are not being denied medication. A Physician's refusal to prescribe certain medications is not a denial of care or medication.

You currently have a special wheelchair for quadriplegics, an air mattress and an electric bed, therefore, your claim that you are denied proper mobility aids is unfounded and invalid.

Your activities of daily living, including, turning, bathing, range of motion and diaper changes are fulfilled, not only by the assigned orderlies/Nurses on the Nursing Unit, but also, and in addition to, the multiple visitors that come to see you on a daily basis. The attention and care that you receive is above and beyond the community standard. I find no evidence to support your claim that you are denied necessary care or that your care does not meet acceptable standards of care.

Your complaint related to the suction machine is incorrect. The suction machine has tubing connected to it, ready for use and the staff is educated on the use of the suction machine. The suction machine is in the room with you.

Documentation supports that you have refusals, which indicate that you do not always participate and are noncompliant with your ordered/prescribed care. Your refusals may have prevented you from maximizing the benefits of treatment offered to you.

The Physician's Orders, Progress Notes, Medication Records, Radiology Reports, Consultant Reports and Nurses Notes demonstrate that the members of the LSP and the LSU Medical Teams have responded to your situation. The Neurology Specialist noted on 11-10-2012, "benefit from Chiro. or PT is not

REV00000930

feasible." Disagreeing with a Physician's diagnosis, treatment, or judgement is insufficient to state an Eighth Amendment claim of deliberate indifference.

You have failed to provide any evidence to substantiate your allegation that your Rights have been violated or that your care has not met acceptable standards of care. I find no evidence to support your claim that the Nursing Units are not staffed appropriately. Furthermore, I find no evidence to support your claim that the Nurses and Doctors have not performed their assigned duties in accordance with established guidelines and Department of Corrections and State Board Rules and Regulations. It does not mean you are being denied care, because the care does not meet your demands.

Your allegations and accusations are without merit.

Monetary compensation is not an option at this level of the ARP Process and is denied.
Your request for adequate staffing of the Nursing Units has been granted.
Your request for pain medication has been granted.  You are currently prescribed Valium, Neurontin and Baclofen.
Your request for adequate and necessary treatment and assistance with your activities of daily living has been granted and is performed in a timely manner.  It is only hindered by your noncompliance.
Your medical concerns are being met by the LSP Medical Department and the Department is only hindered by your self-imposed, noncompliance and refusals.
Your request for a copy of your medical record is not a Medical issue and is denied.  This matter would be better addressed through the Health Information Management Department, which handles the copy and release of any patient information request.

Your request for remedy has been partially granted.

Prepared by: _____
             Stephanie Lamartiniere
             Assistant Warden Health Services

_____9/24/14_____
       Date

                                            JOSEPH F.G. LAMARTINIERE
                                            ASSISTANT WARDEN
                                            _____
                                                     Unit Head

Instructions to Offender:  If you are not satisfied with this response, you may go to Step Two by checking below and forwarding to the ARP Screening Officer in the manila envelope within 5 days of your receipt of this decision.

( ) I am not satisfied with this response and wish to proceed to Step Two.

Reason: _____
_____
_____
_____

_____          _____
       Date                            Offender's Signature    DOC#

JX-CCH-000916



LOUISIANA STATE PENITENTIARY

ANGOLA, LOUISIANA

ARP NUMBER:  LSP - 2014 - **2339**

RE:  KENTRELL PARKER    371212

LOCATION:  T C W2

I HEREBY ACKNOWLEDGE RECEIPT OF 1ST STEP RESPONSE FORM REGARDING REQUEST FOR REMEDY NUMBER LSP-2014-2339.

RECEIVED BY:  Kentrell Parker 371212    (T.A)

(INMATE'S NAME & NUMBER)

DATE RECEIVED:  10/1/13

DELIVERED BY:

============================================================

1.  Have the inmate sign this receipt.

2.  Delivery Officer signs the reciept and dates it.

3.  Give the Inmate the Manila Envelope and contents.

4.  Return the reciept to LEGAL PROGRAMS DEPARTMENT.

**R E C E I V E D**

OCT 0 7 2014

Legal Programs Department

TREATMENT CENTER

CASE NUMBER: LSP-2014-2339

FIRST STEP RESPONSE FORM (FIRST STEP RESPONDENT)

TO: PARKER, KENTRELL 371212      TC_W2
                                      Living Quarters

Response to request dated 07/29/2014, received in this office on 07/30/2014

This is in response to your ARP 2014-2339. After careful review of the pertinent volumes of your current medical record, I find the following: The extensive documentation in your medical record indicates that you have been afforded the opportunity to address your concerns with professional staff in a manner that is consistent with guidelines set by LSP Policy and your level of need. It is noted that you returned to LSP after a compassionate release was authorized and arranged for you. However, the compassionate release was revoked due to behavioral issues. You have been on the Nursing Units at the REBTC since 10/2011.

In general, you are a quadriplegic and have no voluntary movement below your neck. You do speak well and you are able to turn your head from side to side without difficulty. The suprapubic catheter insertion site is cleaned daily as ordered and the #4 pediatric tracheotomy site is cared for daily. Granulation tissue is noted around the tracheotomy site and no drainage has been noted.

Your allegation that you are denied medications is invalid. You currently are prescribed 23 medications. Special medications are a medicated shampoo for your skin and scalp and a special mouthwash. You are also prescribed a muscle relaxer, anticonvulsant and a sedative. There are 4 different medications prescribed for assistance with your bowel movements and to help prevent constipation. You take a multiple vitamin, plus 2 additional supplements. It is noted that you have medication for itching, if needed, a medication for gastroesophageal reflux, a blood thinner to prevent blood clots and cough medication and nebulizer treatments. You also take an antihistamine and a blood pressure medication. Obviously, you are not being denied medication. A Physician's refusal to prescribe certain medications is not a denial of care or medication.

You currently have a special wheelchair for quadriplegics, an air mattress and an electric bed, therefore, your claim that you are denied proper mobility aids is unfounded and invalid.

Your activities of daily living, including, turning, bathing, range of motion and diaper changes are fulfilled, not only by the assigned orderlies/Nurses on the Nursing Unit, but also, and in addition to, the multiple visitors that come to see you on a daily basis. The attention and care that you receive is above and beyond the community standard. I find no evidence to support your claim that you are denied necessary care or that your care does not meet acceptable standards of care.

Your complaint related to the suction machine is incorrect. The suction machine has tubing connected to it, ready for use and the staff is educated on the use of the suction machine. The suction machine is in the room with you.

Documentation supports that you have refusals, which indicate that you do not always participate and are noncompliant with your ordered/prescribed care. Your refusals may have prevented you from maximizing the benefits of treatment offered to you.
The Physician's Orders, Progress Notes, Medication Records, Radiology Reports, Consultant Reports and Nurses Notes demonstrate that the members of the LSP and the LSU Medical Teams have responded to your situation. The Neurology Specialist noted on 11-10-2012, "benefit from Chiro. or PT is not

feasible." Disagreeing with a Physician's diagnosis, treatment, or judgement is insufficient to state an Eighth Amendment claim of deliberate indifference.

You have failed to provide any evidence to substantiate your allegation that your Rights have been violated or that your care has not met acceptable standards of care. I find no evidence to support your claim that the Nursing Units are not staffed appropriately. Furthermore, I find no evidence to support your claim that the Nurses and Doctors have not performed their assigned duties in accordance with established guidelines and Department of Corrections and State Board Rules and Regulations. It does not mean you are being denied care, because the care does not meet your demands.

Your allegations and accusations are without merit.

Monetary compensation is not an option at this level of the ARP Process and is denied.
Your request for adequate staffing of the Nursing Units has been granted.
Your request for pain medication has been granted. You are currently prescribed Valium, Neurontin and Baclofen.
Your request for adequate and necessary treatment and assistance with your activities of daily living has been granted and is performed in a timely manner. It is only hindered by your noncompliance.
Your medical concerns are being met by the LSP Medical Department and the Department is only hindered by your self-imposed, noncompliance and refusals.
Your request for a copy of your medical record is not a Medical issue and is denied. This matter would be better addressed through the Health Information Management Department, which handles the copy and release of any patient information request.

Your request for remedy has been partially granted.

Prepared by: _____

        Stephanie Lamartiniere
        Assistant Warden Health Services

        9/24/14
        Date

                                JOSEPH F. G. LAMARTINIERE
                                ASSISTANT WARDEN
                                Unit Head

**Instructions to Offender:** If you are not satisfied with this response, you may go to Step Two by checking below and forwarding to the ARP Screening Officer in the manila envelope within 5 days of your receipt of this decision.

(✓) I am not satisfied with this response and wish to proceed to Step Two.

Reason: _This RESPONSE Avoid Addressing the ISSUES of this Complaint directly. Therefore, I would like to proceed to the NEXT level_

    10-1-14
    Date                                       Offender's Signature   DOC#

JX-CCH-000919

LOUISIANA STATE PENITENTIARY
ANGOLA, LOUISIANA

INMATE:    371212 KENTRELL PARKER

LOCATION:  TC W2

### ACKNOWLEDGMENT OF RECEIPT OF SECOND STEP RESPONSE

This will acknowledge receipt of the SECOND STEP response
(SECRETARY'S RESPONSE) OF ARP #LSP-2014-2339 .

RECEIVED BY: *Kentrell Parker* 371212

DATE RECEIVED: *11-7-2014*

DELIVERED BY: *Sgt E London*

==================================================================
PLEASE READ THE FOLLOWING
INSTRUCTIONS TO DELIVERY OFFICER:

1.  Have the inmate sign and date the second step portion of
    the envelope acknowledging receipt of the second step
    response.

2.  Have the inmate sign this receipt.

3.  Delivery Officer signs receipt and dates it.

4.  Give the inmate the contents of the envelope.

5.  Return the envelope and the receipt to LEGAL PROGRAMS DEPARTMENT.

*2nd Time Sent Out*

*10-7-14*

RECEIVED
DEC 0 1 2014
Legal Programs Department

RECEIVED
NOV 19 2014
Legal Programs Department

## LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
## CORRECTIONS SERVICES

### CASE NUMBER: LSP-2014-2339

### SECOND STEP RESPONSE FORM
### (HEADQUARTERS)

TO: <u>PARKER, KENTRELL    371212</u>                    <u>LSP</u>
    Offender Name and Number                         Living Unit

Response to Request Dated 10/01/2014, Received in this Office on 10/10/2014:

Your request for an Administrative review of ARP# LSP-2014-2339 has been received. A qualified member of the Headquarters staff has reviewed your request in order to render a fair and impartial response.

Your statement has been considered as well as your medical records. The medical staff is well aware of your medical condition and has adequate information upon which to base a determination of your medical concerns and the treatment necessary. Medical opinion is controlling. The medical care you have received and will continue to receive is deemed adequate. No further investigation will be conducted as this issue has been clearly addressed in the first step response.

Therefore, your request for relief is denied.

<u>10/20/14</u>                                      _____
    Date                                      Secretary's Signature or His Designee

## ADMINISTRATIVE REMEDY PROCEDURE & PROPERTY CLAIMS

### INPUT SCREEN

5̇ 8̇ p9s

CASE NUMBER: LSP-2015-0502
EVACUEE:

DOC #: 554718          BACKLOG:
LAST NAME: DAVIS       FIRST NAME: RICKY
RECORD TYPE: A     SUBJECT CODE: 0899 - OTHER
INCIDENT DATE: 2/23/15   SUBJECT TYPE :
LSP Only
LSP RESPONDENT: Med Services Warden

LSP HOUSING: CAMP D

| | DATE RECEIVED | ACCEPTED DATE | DISPOSITION DATE | DISPOSITION CODE |
|---|---|---|---|---|
| STEP 1: | 02/23/2015 | 03/06/2015 | 04/01/2015 | 03-Granted in part |
| STEP 2: | 04/21/2015 | 04/21/2015 | 05/21/2015 | 02-Denied |

COMPLAINT: FINAL  : OFFENDER CLAIMS HE HAD BACK SURGERY IN 2014 AND A COUPLE OF
DAYS AFTER SURGERY HE WAS TRANSPORTED BACK TO LSP IN A VAN WITH SHACKLES
AROUND ON HIS SURGERY SITE HE ALSO CLAIMS HE WAS RELEASED BACK IN POPULATION
WHEN HE WASN'T FULLY RECOVERED. HE IS WRITING AN ARP SINCE HE RECENTLY FOUND
OUT HE HAS TO HAVE SURGERY AGAIN TO PREVENT THE SAME SITUATION FROM
HAPPENEING.
IF REJECTED REASON:

02/23/2015

02/23/2015

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES
OFFENDERS RELIEF REQUEST FORM

CASE NUMBER: LSP-2015 -0502

TO:   RICKY DAVIS 554718                    D EAG 1
      Offender's Name and Number           Living Quarters


      2/23/15
      Date of Incident


X              ACCEPTED:  This request comes to you from the Wardens Office.  A response will be
               issued within 40 days of this date.

               REJECTED:  Your request has been  rejected for the following reason(s):


      03/06/2015                                          Trish Foster
        Date                                      Warden's Signature or Designee

2015-0502
0899 / Med Services
Warden.

RECEIVED
FEB 23 2015
WARDEN'S OFFICE
RECEIVED
FEB 23 2015
Legal Programs Department

2-23-15  Administrative Remedy Procedure

On the morning of February 25, 2014, I arrived at
University Hospital in New Orleans, La, to have back surgery.
On February 27, 2014, I was discharged from the hospital.
Upon my discharge I asked the attending nurse (see hospital log)
if she would please explain to L.S.P. guards the significance
of me needing to be transported by a Vehicle suitable for my
Condition, such as handicap accessible, being I just had surgery
and staples in my back. E.H.C.C. Sgt Milligan and a female
Sgt on guard detail, that day, suggested the L.S.P. guards Contact
E.H.C.C. for assistance with handicap accessible Vehicle.
Despite my pleas, L.S.P. guards said they were instructed
to transport me back to LSP in the patrol Van along with
the others. They began to Restrain me with leg irons, handcuffs,
blackbox and a large chain placed around my lower back.
Again, I tried to explain about the staples in my back but was
told to just lay on my stomach. There were other inmates
who were also being transported after having surgery who
Can attest to what I'm stating (see hospital log 2-27-14).
After Returning to L.S.P. I was placed on unit one hospital
ward. After four days on the unit Doctor Macmurdo said
he was sending me back to Gen. population, despite me still
feeling bad. The following morning I was examine by Doctor
Karla Bridgedhol in which she Concluded that I should
Remain on the unit for a few more days before being Returned
to Gen. population but Doctor Macmurdo Changed the order
and discharged me on March 6, 2014 sending me back to Gen.
population without any Concern for my safety or well being.

Relief Requested:

A Change in Policy):

1. An overseeing Committee of outside doctors involved in monitoring the treatment and recovery of patients.

2. Proper Vehicles and restraints suitable for transporting handicap/injured patients.

3. Because I am filing this A.R.P., I ask to be protected from any ill doings or acts, to cause me unjust suffering, of Retaliation by state employees.

Written, Copied and signed this 23, day of February 2015

REV00000960

CASE NUMBER: LSP-2015-0502

FIRST STEP RESPONSE FORM (FIRST STEP RESPONDENT)

TO: DAVIS, RICKY 554718

D EAG 1
Living Quarters

Response to request dated 02/22/2015, received in this office on 02/23/2015

This is in response to your ARP 2015-0502. After careful review of the pertinent volumes of your current medical record, I find the following: The extensive documentation in your medical record indicates that you have been afforded the opportunity to address your concerns with professional staff in a manner that is consistent with guidelines set by LSP Policy and your level of need.
You have been followed on a regular basis in the LSP Physician's Clinic and your last encounter was on 12-5-2014 at the time of this response.
You are also followed in the ILH Neurosurgery Clinic and your last encounter was on 1-12-2015.
You have been seen and treated in the Pain Management Clinic at LSP. Your last encounter was on 12-19-2014.
You had an MRI completed on 8-29-2014.
Your multiple sick calls and self declared emergencies were reviewed by the Physician and changes were made as medically indicated.

The LSP and ILH Medical Teams have responded to your situation. Your accusations and allegation are invalid and unfounded.

You have failed to provide any evidence to substantiate your allegation that you were subjected to medical deficiencies or that your care has not met acceptable standards of care. It does not mean you are not receiving care because the care does not meet your demands. I find no evidence to support your claim that there was a medical need of a handicapped vehicle for your transportation.
The Security and Classification Departments determine your level of Security and the need and type of restraints used for transportation. There was no need for medical intervention.

Your request for an "overseeing committee" is denied, as it is not medically indicated.
Your request for proper vehicles and restraints has been granted. Multiple types of vehicles are available for transportation.
Department Regulation B-0-005, " Administrative Remedy Procedure," prohibits reprisals for an offenders use of the ARP Process.

Your request for remedy has been partially granted.

Prepared by: _____
Stephanie Lamartiniere
Assistant Warden Health Services

_____
Date

_____
Unit Head

Instructions to Offender: If you are not satisfied with this response, you may go to Step Two by checking below and forwarding to the ARP Screening Officer in the manila envelope within 5 days of your receipt of this decision.

( )  I am not satisfied with this response and wish to proceed to Step Two.

Reason:

_____           _____
Date                                   Offender's Signature    DOC#

JX-CCH-000927

LOUISIANA STATE PENITENTIARY

ANGOLA, LOUISIANA

ARP NUMBER:  LSP - 2015 - 0502

RE:  RICKY DAVIS   554718

LOCATION:  D Eag-1

I HEREBY ACKNOWLEDGE RECEIPT OF 1ST STEP RESPONSE FORM REGARDING REQUEST
FOR REMEDY NUMBER LSP-2015-0502.

RECEIVED BY:  Ricky Davis #554718
                     (INMATE'S NAME & NUMBER)

DATE RECEIVED:  4-10-15

DELIVERED BY:

=================================================================

1.   Have the inmate sign this receipt.

2.   Delivery Officer signs the reciept and dates it.

3.   Give the Inmate the Manila Envelope and contents.

4.   Return the reciept to LEGAL PROGRAMS DEPARTMENT.

**RECEIVED**

APR 1 3 2015

LEGAL PROGRAMS DEPARTMENT

JX-CCH-000928

ARP Statement

Offender Name:  Ricky Davis                    Offender Number:    554718

ARP #:    LSP 2015-0502                         Date:      3-23-2015

Statement:

    In reference to A.R.P. listed above, I have no knowledge of the alleged incident. When offender has been in surgery, The transport officers must follow the doctor's order on how an offender is transported whether it's by ambulance, Handicap van , or regular patrol. An officer will not make that determination because he is not medically qualified to know the needs of a patient after surgery. Therefore, if the doctor does not order special transportation for an offender, he will travel by regular patrol.

Juan Anthony
Employee Name (Print)

Employee Signature

JX-CCH-000929

CASE NUMBER: LSP-2015-0502

FIRST STEP RESPONSE FORM (FIRST STEP RESPONDENT)

TO: DAVIS, RICKY 554718

D EAG 1
Living Quarters

Response to request dated 02/22/2015, received in this office on 02/23/2015

This is in response to your ARP 2015-0502. After careful review of the pertinent volumes of your current medical record, I find the following: The extensive documentation in your medical record indicates that you have been afforded the opportunity to address your concerns with professional staff in a manner that is consistent with guidelines set by LSP Policy and your level of need.
You have been followed on a regular basis in the LSP Physician's Clinic and your last encounter was on 12-5-2014 at the time of this response.
You are also followed in the ILH Neurosurgery Clinic and your last encounter was on 1-12-2015.
You have been seen and treated in the Pain Management Clinic at LSP. Your last encounter was on 12-19-2014.
You had an MRI completed on 8-29-2014.
Your multiple sick calls and self declared emergencies were reviewed by the Physician and changes were made as medically indicated.

The LSP and ILH Medical Teams have responded to your situation. Your accusations and allegation are invalid and unfounded.

You have failed to provide any evidence to substantiate your allegation that you were subjected to medical deficiencies or that your care has not met acceptable standards of care. It does not mean you are not receiving care because the care does not meet your demands. I find no evidence to support your claim that there was a medical need of a handicapped vehicle for your transportation.
The Security and Classification Departments determine your level of Security and the need and type of restraints used for transportation. There was no need for medical intervention.

Your request for an "overseeing committee" is denied, as it is not medically indicated.
Your request for proper vehicles and restraints has been granted. Multiple types of vehicles are available for transportation.
Department Regulation B-0-005, " Administrative Remedy Procedure," prohibits reprisals for an offenders use of the ARP Process.

Your request for remedy has been partially granted.

Prepared by: _[signature]_
_Stephanie Lamartiniere_
Assistant Warden Health Services

_[signature]_ 4-1-15
Date

_[signature]_
Unit Head

Instructions to Offender: If you are not satisfied with this response, you may go to Step Two by checking below and forwarding to the ARP Screening Officer in the manila envelope within 5 days of your receipt of this decision.

( )  I am not satisfied with this response and wish to proceed to Step Two.

Reason:

_____

_____

_____

_____


_____                    _____
Date                                          Offender's Signature    DOC#

1-13-15  I AM NOT SATISFIED WITH THIS RESPONSE
AND WISH TO PROCEED TO STEP TWO.
Reason:

IT IS CLEAR FROM YOUR RESPONSE THAT YOU
HAVE FAILED TO CONDUCT A COMPLETE INVESTIGATION.
I HAVE ASSERTED THAT I WAS FORCED TO WEAR AN
IRON CHAIN AROUND MY BACK WHILE STILL HAVING
STAPLES AFTER SURGERY. I ALSO HAD TO LAY ACROSS THE
FRONT SEAT *OF THE ANGOLA RODEO VAN ON MY
STOMACH, YET YOU HAVE NOT MENTIONED ANY OF THIS
OR TALKED TO ANY POTENTIAL WITNESSES IN YOUR REPORT.

GRANTING MY REQUEST FOR PROPER VEHICLES AND
RESTRAINTS ARE A FACILITY NEED, BUT WHAT GOOD IS
ANY OF THIS IF I'm NOT ALLOWED ACCESS IN MY TIME
OF NEED? MY ARGUMENT IS THAT YOU FAILED TO
ENFORCE POLICY.

THIS IS THE VERY REASON WHY I ASKED FOR AN
OVERSEEING COMMITTEE OF OUTSIDE DOCTORS, TO
ENSURE THAT PROPER PROCEDURES ARE CARRIED OUT
AND FOLLOWED, AND TO HOLD THOSE RESPONSIBLE WHO
DON'T COMPLY.

Signed this 13th day of April, 2015

Ricky J. Davis #554718

JX-CCH-000932

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES

CASE NUMBER: LSP-2015-0502

SECOND STEP RESPONSE FORM
(HEADQUARTERS)

TO: <u>DAVIS, RICKY   554718</u>
      Offender Name and Number

<u>LSP</u>
Living Unit

Response to Request Dated 04/13/2015, Received in this Office on 04/21/2015:

Your request for an Administrative review of ARP# LSP-2015-0502 has been received. A qualified member of the Headquarters staff has reviewed your request in order to render a fair and impartial response.

It has been determined that your complaint is without merit. The medical staff is well aware of your medical condition and has adequate information upon which to base a determination of your medical concerns and the treatment necessary. Medical opinion is controlling. The post-operative care you received after surgery in February of 2014 from the Medical staff has been determined to be adequate for your health care concerns; you will continue to receive appropriate medical care. As such, this office has accepted staff's position in this matter and concurs with the response provided at the First Level. Therefore, administrative intervention is not forthcoming.

Your request for relief is denied.

_____
05/21/15
Date

_____
Secretary's Signature or His Designee

**RECEIVED**

MAY 2 8 2015

**LEGAL** PROGRAMS DEPARTMENT

LOUISIANA STATE PENITENTIARY
ANGOLA, LOUISIANA

INMATE:    554718 RICKY DAVIS

LOCATION:  D EAG 1

### ACKNOWLEDGMENT OF RECEIPT OF SECOND STEP RESPONSE

This will acknowledge receipt of the SECOND STEP response
(SECRETARY'S RESPONSE) OF ARP #LSP-2015-0502 .

RECEIVED BY: _Ricky Davis_

DATE RECEIVED: _6-1-15_

DELIVERED BY: _D. Johs_

==================================================================
PLEASE READ THE FOLLOWING
INSTRUCTIONS TO DELIVERY OFFICER:

1. Have the inmate sign and date the second step portion of
   the envelope acknowledging receipt of the second step
   response.

2. Have the inmate sign this receipt.

3. Delivery Officer signs receipt and dates it.

4. Give the inmate the contents of the envelope.

5. Return the envelope and the receipt to LEGAL PROGRAMS DEPARTMENT.

4/14/2015

**RECEIVED**

JUN 0 3 2015

**LEGAL** PROGRAMS DEPARTMENT

JX-CCH-000934