UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., KENTRELL PARKER,    CIVIL ACTION NO. 15-CV-318
FARRELL SAMPIER, REGINALD GEORGE,
JOHN TONUBBEE, OTTO BARRERA, CLYDE
CARTER, CEDRIC EVANS, EDWARD          JUDGE: SHELLY D. DICK
GIOVANNI,    RICKY D. DAVIS, LIONEL
TOLBERT, AND RUFUS WHITE, on behalf of    MAGISTRATE JUDGE:
themselves and all others similarly situated    RICHARD L. BOURGEOIS, JR.

VERSUS

BURL CAIN, Warden of the Louisiana State
Penitentiary, in his official capacity; STEPHANIE
LAMARTINIERE, Assistant Warden for Health
Services, in her official capacity, JAMES M.
LEBLANC, Secretary of the Louisiana
Department of Public Safety and Corrections
in his official capacity and THE LOUISIANA
DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS

---

## DECLARATION OF TIFFANY BELLUE

I, Tiffany Bellue, declare as follows:

1. I am currently employed by the state of Louisiana, Department of Public Safety and Corrections ("DOC"), as an Administrative Programs Specialist at Louisiana State Penitentiary ("LSP"), and I have held that position since September 23, 2013.

2. My job duties include the receipt of DOC Form A-02-017-A, which is the request for accommodation completed by an offender, and DOC Form B-08-010-A, which is prepared by Dr. Randy Lavespere and Assistant Warden Falgout as LSP's response to the request for accommodation and includes a recommendation as to whatever accommodation is determined to be appropriate under the particular circumstances.

3. After I receive the completed DOC Form A-02-017-A and DOC Form B-08-010-A, I input the information from DOC Form B-08-010-A into Form B-08-010-B, which is in

1

JX-CCH-003170

the ADA database. I also separately enter the information from DOC Form A-02-017-A and DOC Form B-08-010-A into the ADA database. The ADA database is used to track the request for accommodation and response. Finally, I prepare a memo to the offender advising him as to LSP's response to his request for accommodation.

4. My role concerning requests for accommodation is purely administrative, and I have no involvement with the evaluation of offenders' requests for accommodations or an appropriate response.

5. In the past, I have signed responses to Administrative Remedy Procedures (ARPs) based upon requests for accommodations or otherwise related to ADA issues; however, my signature is to indicate only that the document was prepared by me, not that I had any role in the evaluation of offenders' requests for accommodations or ARPs nor in determining a response. Currently, the unit head is Warden Leslie Dupont.

I declare under penalty of perjury that the above statements are true and correct. Executed on this 27th day of September, 2017, in Angola, Louisiana.

_____
Tiffany Bellue

2

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-01**                                                                    **28 February 2011**



## ACCESS TO CARE AND CLINICAL SERVICES

1.   **OBJECTIVE:**  To ensure that unimpeded access to routine (scheduled) and emergent health care services is available to all offenders in a timely and efficient manner and that no offender is refused health care for financial reasons.

2.   **APPLICABLITY:**  Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

3.   **REFERENCES:**  ACA Standards 4-4344, 4-4345, 4-4346, 4-4403 and 4-4403-1 (Adult Correctional Institutions) and Department Offender Posted Policy (DOPP) #031 "Access to Health Care and Clinical Services."

4.   **POLICY:**  It is the Secretary's policy that all facilities shall have a mechanism in place that enables any offender to request access to health care, routine and emergent, on a daily basis and that the response to those requests shall be timely and efficient.  All offenders shall be informed verbally and in writing about procedures to access health services for routine and emergent health care and no offender shall be refused health care for financial reasons.  Access to care is managed by health care staff and no member of the correctional staff shall approve or disapprove requests for health care services.

5.   **DEFINITIONS:**

    A.   **Administrative Remedy Procedure (ARP):**  Offender Grievance Procedure.

    B.   **Backlog:** The number of offenders waiting to be seen by a health care provider or specialty clinic.

    C.   **Critical Lab Values or Test Reports:**  Reports of significantly abnormal laboratory results or other diagnostic test reports which require immediate notification of the responsible health care practitioner for further disposition.

    D.   **Declared Emergency:**  Unexpected health care need that cannot be deferred until the next scheduled sick call.

    E.   **Health Care Practitioner:**  Clinicians (such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners, physician assistants and psychiatrists) trained to diagnose and treat patients.

F.   **Health Care Professional:**  Staff (such as health care practitioners, nurses, social workers and emergency medical technicians) who perform clinical duties in accordance with each health care professional's scope of training and applicable licensing, certification and regulatory requirements.

G.   **Priority System:**  System of scheduling offender health concerns according to levels of appropriate intervention, i.e. emergent, urgent, routine.

H.   **Routine Sick Call:**  A self initiated request for routine care during regularly scheduled sick call hours with a health care provider.

I.   **Sick Call Request:**  Request for Medical Treatment (Form HC-01-A.)

J.   **Tele-health:**  Consultations for various specialties conducted via telecommunications equipment.

K.   **Tracking System:**  A system to log and monitor appointments for follow up care ordered by the practitioner or consultations ordered for specialist evaluations.

L.   **Triage:**  The review or screening of offender health concerns by health care personnel to determine the priority of need and the appropriate level of intervention.

6.   **PROCEDURES:**

A.   Upon arrival at each facility, all offenders shall be informed regarding procedures to access routine and emergent health services (medical, dental and mental health.)  Offenders shall be educated regarding the difference between routine and emergent health needs, chronic clinic encounters and other health care encounters during orientation.   Offenders are also informed about the Administrative Remedy Procedure and the medical co-payment process.  This information is communicated orally and in writing, and is conveyed in a language that is easily understood by each offender.

B.   Each facility shall establish a process for all offenders, including those in segregation, to initiate requests for health services on a daily basis (routine and/or emergent.)  These requests shall be triaged daily by health care professionals.  A priority system shall be used to schedule clinical services.  This system shall address emergent, urgent and routine needs.  Clinical services, which may include tele-health, are available to offenders in a clinical setting at least five days per week and are performed by a health care practitioner.  If tele-health services are utilized for patient encounters, the process shall include provisions for consent which can be implied and confidentiality of health information as outlined in Health Care Policy Nos. HC-25 "Confidentiality" and HC-26 "Informed Consent:  Voluntary and Involuntary Treatment."  The encounter shall be documented in the offender's

**Health Care Policy No. HC-01**
**28 February 2011**
**Page Three**

medical record and any reports from consultation via a tele-health system shall be integrated into the offender's medical record.

C.  Each institution shall maintain a tracking system and a log to assure scheduled follow up from sick call encounters, scheduled consultations and referrals for specialty care onsite and off site.  The tracking system shall be utilized to provide statistical information and summaries for the number of offenders that access routine and emergent health care, the number of offenders referred for health practitioner evaluation and the number of offenders on backlog for clinics and specialty consultations or procedures.  Reports shall be submitted monthly in accordance with the Health Care C-05-001 report.

D.  Each institution shall maintain a system that shall address the specific handling of laboratory and x-ray reports, including a review of findings, reporting of critical lab values or test reports to the responsible health care practitioner and the filing of such reports in the offender's medical record.  All diagnostic reports shall be reviewed and initialed by the health care practitioner.

E.  All sick call requests shall be recorded on the Request for Medical Treatment (Form HC-01-A) and filed in each offender's medical record.  Evaluation and disposition of treatment shall be recorded and signed by the health care provider and reviewed by the healthcare practitioner.  All reviews shall be signed and dated by the health care practitioner at the earliest possible date.

F.  Health care encounters, including medical and mental health interviews, examinations and procedures shall be conducted in a setting that respects the offender's privacy.


s/James M. Le Blanc
Secretary

Form:  HC-01-A        Request for Medical Treatment

This policy supersedes Health Care Policy No. HC-01 dated 01 August 2002.

JX-CCH-003174



BOBBY JINDAL
Governor

JAMES M. LE BLANC
Secretary

# State of Louisiana
Department of Public Safety and Corrections

DATE:     July 29, 2011

TO:     All Wardens and Senior Staff

FROM:     James M. Le Blanc
Secretary

RE:     Health Care Policy No. HC-03 "Continuity of Care"

Please find attached the latest revision of the referenced Health Care Policy.  It is important to specifically point out that this policy governs the procedures for transfers of offenders as it relates to continuity of care issues.  As most of you realize, the Department has received an influx of offenders who require healthcare treatment and infirmary placement over the past several years.  When combined with the many changes to the specialty services available at LSU-HSC facilities throughout the state, we have found a need for centralized management of healthcare related intra-system transfers and infirmary bed utilization.  The intent is to ensure appropriate placements according to an offender's specific healthcare needs as well as the efficient use of the Department's resources.

As such, please be reminded that the appropriate procedure to initiate an intra-system transfer due to medical or mental health reasons is that the Warden or designee shall submit a request for transfer to the Department's Medical/Mental Health Director.  The request shall include a medical summary, reason for the request, and the date the transfer is being requested.  The Medical/Mental Health Director shall review the request, seek additional information as necessary and make a determination on possible placement in consultation with the Headquarters Transfer Section and upon review of the Department's Infirmary Census when indicated.  When in the best interest of the offender and/or the Department, the Medical/Mental Health Director may also deny the request.

It is important to note that for this centralized management approach to work effectively, the Medical/Mental Health Director shall have the authority to decide where the offender shall be housed to ensure the most efficient use of the Department's healthcare resources.  Location decisions will be communicated to the Warden of the receiving institution by the Department's Medical/Mental Health Director.

You are encouraged to review your healthcare operations and support programs (i.e. end-of-life care, healthcare orderly support program, etc.) to ensure your ability to operate at your highest capacity in this regard and within the guidelines set forth.   As part of this review, please ensure your unit's Medical Director or designee maintains Infirmary Census information in the newly created section of the Headquarters Medical Tracking Database to ensure the Medical/Mental Health Director has the resources available to monitor and manage infirmary bed utilization on a statewide level.

Your usual cooperation is appreciated.

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-03**                                                    **05 August 2011**



**CONTINUITY OF CARE**

1.      **OBJECTIVE:**   To ensure that continuity of health care for all offenders is provided from admission to transfer or discharge from a departmental facility, including referral to community based providers when indicated.

2.      **REFERENCES:**   ACA Standards 4-4347 through 4-4349, 4-4361 through 4-4365, 4-4367, 4-4414 (Adult Correctional Institutions); Department Regulation Nos. B-02-001 "Assignment and Transfer of Offenders" and B-08-013 "Offender Reentry Program;" Health Care Policy Nos. HC-06 "Medical Releases," HC-13 "Health Screens, Appraisals and Examinations," HC-14 "Medical Level of Care," HC-15 "Duty Status Classification System," HC-17 "Pharmaceuticals" and HC-33 "Offender Medical Records."

3.      **APPLICABILITY:**   Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens, Wardens and Director of Probation and Parole.   Each Unit Head is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

4.      **POLICY:**  It is the Secretary's policy to provide a treatment delivery system that provides the treating health care practitioner, regardless of location, with effective communication of necessary health information during transfer within the department or to community based providers that ensures quality patient care.

It is further the Secretary's policy to ensure safe and timely transportation of offenders, both inside and outside the facility, for health care appointments and to ensure that offenders are provided ongoing health and wellness information and that each facility has a system establishing baseline data for use in subsequent care and treatment to provide health care information for determining medical level of care, duty status classification, treatment plans and program planning.

5.      **DEFINITIONS:**

A.      **Health Care Personnel:**  Individuals whose primary duty is to provide health services to offenders in keeping with their respective levels of health care training or experience.

**Health Care Policy No. HC-03**
**05 August 2011**
**Page Two**

B.     **Health Care Practitioner:**   Clinicians (such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners, physician assistants and psychiatrists) trained to diagnose and treat patients.

C.     **Health Care Professional:**  Staff who perform clinical duties (such as health care practitioners, nurses, social workers and emergency medical technicians) in accordance with each health care professional's scope of training and applicable licensing, certification and regulatory requirements.

6.     **PROCEDURES:**

A.     Intake

1)     Upon intake at a departmental facility, each offender shall receive an intake medical and mental health screening conducted by health care personnel.  All findings shall be recorded on the RDC Initial Intake Medical Screening (Form HC-13-A).   In addition, a comprehensive health appraisal shall be completed including a review of tests and identification of health care issues, unless there is documented evidence of a health appraisal within the previous 90 days.   All offender health care records received from the transferring facility shall be reviewed by a health care professional.

2)     All intra-system transfer offenders, as well as all in-transit offenders, shall receive a health care screening by health care personnel which begins upon arrival at the facility.  All findings shall be recorded on the Intra-institutional Health Screening (Form HC-13-C).

B.     On Site Health Care

1)     A written individual treatment plan shall be developed for offenders requiring medical supervision, including chronic and convalescent care.  This plan shall include directions to health care and other personnel regarding their roles in the care and supervision of the offender and shall be developed by the appropriate health care practitioner for each offender requiring a treatment plan.

2)     Medical records for health care services rendered prior to an offender's incarceration shall be requested upon the determination of the attending health care practitioner.   The offender shall be required to sign an Authorization to Release Medical Information (Form HC-33-A).

3)     The conditions for periodic health examinations shall be determined by the unit's Medical Director.

**Health Care Policy No. HC-03**
**05 August 2011**
**Page Three**

C. Off Site Health Care

1) Offenders requiring health care beyond the resources available in the facility shall be referred to LSU-HSC, where care is available 24 hours a day, or to another Department facility with the ability to provide the required care. If the referral is to LSU-HSC, all relevant health information shall be completed and sent with the offender. If the required care can be provided within the Department, the transferring facility shall complete a Medical Record Transfer Summary (Form HC-03-A) and the offender's medical record shall accompany him to the receiving facility. Transfers within the Department require the approval of the Department's Medical/Mental Health Director or designee.

2) For offenders requiring health care that neither LSU-HSC nor the Department cannot provide, arrangements shall be made with local or other community resources. Each facility shall establish and maintain a list of referral sources, including emergency and routine care, which shall be reviewed and updated annually.

3) Health care outside of the Department and LSU-HSC shall only be allowed if that care is medically necessary to save life or limb (i.e. closest emergency room, etc.)

4) Examination by a private physician shall only be allowed if court ordered or required by workman's compensation. A workman's compensation visit requires the approval of the Unit Head and Health Authority.

5) All recommendations by non-departmental health care practitioners concerning an offender's treatment shall be reviewed by the offender's primary care provider. If the decision is made not to carry out any or all recommendations, justification shall be documented in the offender's medical record. Duty statuses or recommendations for special accommodations are not a part of the treatment plan and the primary care provider is better suited to make these decisions.

D. Transportation

1) The Warden, in conjunction with the Health Authority, shall ensure safe and timely transportation of offenders for medical, mental health and dental clinic appointments available both inside and outside the facility. Prioritization of medical need, urgency, i.e. ambulance versus standard transport, use of medical escort to

**Health Care Policy No. HC-03**
**05 August 2011**
**Page Four**

accompany correctional staff if indicated and transfer of medical information, etc. shall be addressed.  Each facility shall provide a vehicle equipped with a wheelchair lift with proper means of securing the wheelchair and handicapped offenders during transport.  All footrests on wheelchairs shall be secured in a way that prevents removal of the footrest.

E.    Transfer

1)    To initiate an intra-system transfer due to medical or mental health reasons, the Warden or designee shall submit a request to the Department's Medical/Mental Health Director along with a medical summary, reason for the request and the date the transfer is being requested.  The Department's Medical/Mental Health Director shall have the authority to decide where the offender shall be housed to ensure the most efficient use of the Department's healthcare resources. The Department's Medical/Mental Health Director shall review the request and may:

a.    Ask for more information as necessary;

b.    Make a determination on possible placement in consultation with the Headquarters Transfer Section and upon review of the Department's Infirmary Census when indicated;

c.    Approve the request and assign a facility placement based on the offender's healthcare needs and the efficient utilization of the Department's healthcare resources and notify the affected Wardens of his decision;

d.    Deny the request when it is in the best interest of the offender and/or the Department and notify the Warden of his decision.

2)    Upon transfer of an offender within the Department, a Medical Record Transfer Summary (Form HC-03-A) shall be completed and forwarded with the medical record to the receiving facility.

Information provided on the Medical Record Transfer Summary does not require a release of information.

NOTE:  In complicated cases, the transferring facility shall prepare a case summary note explaining the special circumstances of the case (e.g., complicated medicine or treatment regimens, pending consultation or surgery, special duty limitation for unusual reasons,

JX-CCH-003179

**Health Care Policy No. HC-03**
**05 August 2011**
**Page Five**

etc.)  In addition, a verbal report shall be provided to the receiving facility.

3) Upon transfer of an offender to a community rehabilitation center, transitional work program, local jail facility or any other jurisdiction, a Medical Record Transfer Summary (Form HC-03-A) shall be faxed and/or mailed to the appropriate facility in addition to accompanying the offender.  The medical record shall be retained by the transferring facility as an active medical record in the medical section while the offender remains in the Department's custody.   The confidentiality of the medical record shall be maintained at all times.

F. Medical Parole/Compassionate Release:

1) Should the offender be medically paroled or granted a compassionate release to a health care facility, the health care practitioner shall provide to the facility a written memorandum detailing the summary of care or the entire medical record shall be copied pursuant to applicable state and federal laws.

2 Should the offender be medically paroled or granted a compassionate release to an individual, a summary of care shall be provided to the individual and further instructions shall also be verbalized.

3) Determination of suitability for travel shall be based on medical evaluation with particular attention given to communicable disease clearance.

4) Written instructions regarding medication, any health interventions required in route, as well as standard or specific precautions to be taken by transportation officers shall be provided to the officers separate from the medical record.

5) Upon transfer or release, an adequate supply of medication as stated in Health Care Policy No. HC-17 "Pharmaceuticals" shall accompany the offender.

G. Discharge

1) Upon discharge from the facility, assistance shall be provided to the offender to identify treatment capabilities within his community in accordance with the procedures outlined in Department Regulation No. B-08-013 "Offender Reentry Program."  In addition,

**Health Care Policy No. HC-03**
**05 August 2011**
**Page Six**

upon the offender's written request, information concerning his health care shall be sent to the appropriate health care provider.

2)    When released on parole, appropriate health care information shall be shared with the Probation and Parole District Office via the DPS&C Health Care Discharge Summary to P&P (Form HC-03-B.)

s/James M. Le Blanc
Secretary

Forms:    HC-13-A    RDC Initial Intake Medical Screening
          HC-13-C    Intra-institutional Health Screening
          HC-33-A    Authorization to Release Medical Information
          HC-03-A    Medical Record Transfer Summary
          HC-03-B    DPS&C Health Care Discharge Summary to P&P

This policy supersedes Health Care Policy No. HC-03 dated 01 August 2002 and Page Four dated 20 July 2006.

JX-CCH-003181

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-09**                                                                                   **08 July 2011**



**COMMUNICABLE AND INFECTIOUS DISEASES**
**INFECTION CONTROL PROGRAM**

1.  **OBJECTIVE:**  To ensure that offenders and staff live and work in an environment which maintains infection control practices to monitor, evaluate, treat and contain the spread of communicable and infectious diseases.

2.  **REFERENCES:**    ACA Standards 4-4354, 4-4354-1 and 4-4358 (Adult Correctional Institutions); La. R.S. 15:574.4 and 15:739; State of Louisiana Sanitary Code-Chapter XXVII "Management of Refuse, Infectious Waste, Medical Waste and Potentially Infectious Biomedical Waste" and Department Regulation No. B-09-004 "Indigent Offenders."

3.  **POLICY:**  It is the Secretary's policy that there shall be a written plan to address the management of communicable and infectious diseases which shall include:

    •   Prevention to include immunizations, when applicable;
    •   Surveillance (identification and monitoring);
    •   Offender and staff education and training;
    •   Treatment to include medical isolation, when indicated;
    •   Follow-up care;
    •   Reporting requirements to applicable local, state and federal agencies;
    •   Confidentiality/protected health information;
    •   Appropriate safeguards for offenders and staff;
    •   Post-exposure management protocols particularly for HIV and viral hepatitis infection;
    •   Methicillin Resistant Staphylococcus Aureus (MRSA) management which shall include: evaluating and treating infected offenders; medical isolation, when indicated; follow-up care, including arrangements with appropriate health care authorities for continuity of care if an offender is transferred prior to the completion of therapy.

4.  **APPLICABLILITY:** Deputy Secretary, Undersecretary, Assistant Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens, Wardens, Director of Probation and Parole and Director of Prison Enterprises. Each Unit Head is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

JX-CCH-003182

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Two**

5.    **DEFINITIONS:**  For the purpose of this policy, the following definitions apply:

A.    **High Risk Bodily Fluids (HRBF):**  The fluid known to transmit HIV and Hepatitis B and C viruses, e.g. blood and other bodily fluids containing visible blood, semen and vaginal secretions.

B.    **Low Risk Bodily Fluids (LRBF):**

- Feces;
- Urine;
- Vomit;
- Nasal secretions;
- Saliva;
- Sputum;
- Sweat;
- Tears;
- Considered HRBF if they contain visible blood.

C.    **Personal Protective Equipment:**  Protective equipment includes gloves, gowns, masks and eyewear worn by health care workers to reduce the risk of exposure to potentially infectious materials.

D.    **Universal Precautions:**  Refers to the infection control practices to prevent exposure to bodily fluids or waste by utilizing personal protective equipment appropriate to the task.

E.    **Amniotic Fluid:**  The fluid surrounding the unborn baby in the womb.

F.    **Cerebrospinal Fluid:**  Fluid found around the brain and the spinal cord.

G.    **Communicable/Infectious:**  Spread by direct or indirect contact.

H.    **Contamination:**  The presence of HRBF or LRBF on a surface or piece of clothing.

I.    **Disinfectant Solution:**  A 1:10 solution of bleach (one part bleach mixed with nine equal parts of water or any other chemical used for disinfection) that is effective in killing pathologic bacteria and viruses.

J.    **Hepatitis A, B & C:**  An infectious disease of the liver which is caused by a virus which has been designated as the Hepatitis Virus.

JX-CCH-003183

K.    **HIV (Human Immunodeficiency Virus):**    The virus that causes immunosuppression resulting in any number of opportunistic infections and/or diseases and detected through blood tests.  Blood, vaginal fluid and semen are usual modes of transmission of this virus.

L.    **Infectious Disease:**  Any disease caused by the presence of bacteria, protozoa, viruses or other parasites in the body.  The disease may or may not be communicable/infectious (i.e. transmitted from person to person.)

M.    **Lesion:**  A break in the skin, a cut or a scrape.

N.    **Mucosal:**  Pertaining to the mucous membrane.

O.    **Mucous Membrane:**  The smooth, moist skin found lining the inside of the mouth, nose, vagina, eye socket etc.

P.    **Perinatal:**  Pertaining to or occurring in the period shortly before and after birth.

Q.    **Peritoneal Fluid:**  Fluid from the abdomen.

R.    **Pleural Fluid:**  Fluid in the chest surrounding the lungs.

S.    **Red Biohazard Plastic Bag:**  Disposable red bags that are in compliance with the State of Louisiana Sanitary Code-Chapter XXVII "Management of Refuse, Infectious Waste, Medical Waste and Potentially Infectious Biomedical Waste" used in the safe containment and disposal of infectious waste.

T.    **Saliva:**  Spit.

U.    **Semen:**  The fluid which is discharged from the penis during ejaculation.

V.    **Sputum:**  Fluid that is coughed up from the lungs.

W.    **Synovial Fluid**:  Fluid in any joint.

X.    **Vaginal Secretions:**  Fluid normally found in the vagina that is secreted by vaginal glands.

Y.    **Venipuncture:**  Introduction of a needle into a vein.

Z.    **Medical Isolation:**  Refers to the precautions that are taken to prevent the spread of an infectious agent from an infected or colonized patient to susceptible persons.

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Four**

6. **GENERAL PREVENTION GUIDELINES AND PROCEDURES:** Communicable disease and infection control activities shall be discussed and reviewed at least quarterly by a multidisciplinary team that includes clinical, security and administrative representatives. Each institution shall have a plan for the management of biohazardous waste and for the decontamination of medical and dental equipment.

A. Appropriate protective supplies shall be available at each institution for use as needed. Hand washing and personal hygiene shall be promoted. Offenders and staff shall be taught and continually reminded of the importance of hand washing. Adequate hand washing facilities and soap shall be available for staff and offenders.

B. All offenders shall practice good personal hygiene. Offenders shall avoid touching wounds and shall wash their hands as soon as possible after touching wounds or contaminated dressings or clothing. The practice of hand washing items of clothing in common sinks is prohibited.

C. All offender living areas shall be cleaned on a regular basis with a disinfectant solution. This cleaning shall be documented as to frequency, areas cleaned and chemicals used. Individual living spaces, i.e. cells or beds, shall be cleaned when the offender occupying the space changes.

D. Minimum temperatures shall be monitored on all clothes washing machines. Institutions shall follow the laundry product manufacturer's recommendations regarding required temperature and wash cycle duration to ensure adequate disinfection. These requirements shall be adhered to with the exception of institutions that have been equipped with an Ozone Generation System. A disinfectant (detergent and/or powdered bleach on colored clothes and a liquid bleach on whites) shall be used as part of the wash or rinse cycle.

E. Kitchen areas shall be cleaned with an approved disinfectant. Garbage bins shall be covered. Head covers shall be worn during food service and gloves shall be worn to handle food during direct food contact. Hand washing shall be diligently mandated for all kitchen workers. Dish washer temperature shall be at least 180°F for the rinse cycle or at a temperature in accordance with the manufacturer's guidelines if a sanitizer is used during the rinse cycle.

F. Equipment shall be cleaned on a routine basis with disinfectant. Equipment that is used on an offender shall be cleaned with a disinfectant between uses.

(Effective 01 August 2012 and supersedes Page Four dated 08 July 2011)

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Five**

7.    **GENERAL INFECTION CONTROL GUIDELINES FOR ALL STAFF:**

   A.    Universal precautions shall always be practiced with any bodily fluids.

   B.    Spills and contaminated surfaces shall be cleaned as soon as possible with a disinfectant solution. Staff cleaning up spills or handling contaminated items shall wash their hands after such activities upon removal of their gloves.

   C.    Items soaked with bodily fluids that are disposable shall be placed in a red biohazard plastic bag and sealed. Disposal of the bag shall be in compliance with the State Sanitary Code.

   D.    Contaminated clothing and linens shall be placed in an appropriate bag marked "Contaminated Laundry" and laundered. All persons handling contaminated clothing and linens shall wear gloves.

   E.    Staff whose clothing has been contaminated shall be provided a change of clothing and an opportunity to wash as soon as possible.

   F.    Staff shall cover all open wounds or cuts.

8.    **GENERAL INFECTION CONTROL GUIDELINES FOR HEALTH CARE WORKERS:**

   A.    Gloves shall be worn when anticipating potential contact with any bodily fluid.

   B.    Gloves shall be changed after contact with each patient.

   C.    Masks and protective eyewear or face shields shall be worn during procedures that are likely to generate contact with bodily fluids to prevent exposure of mucous membranes of the mouth, nose and eyes.

   D.    Gowns or aprons shall be worn during procedures that are likely to generate splashes of any bodily fluid.

   E.    All health care workers shall take precautions to prevent injuries caused by needles, scalpels and other sharp instruments or devices including but not limited to the following:

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Six**

1) Needles shall not be recapped;

2) Needles shall not be purposely bent, broken by hand, removed from disposable syringes or otherwise manipulated by hand;

3) Disposable syringes and needles, scalped blades and other sharp items shall be placed in puncture-resistant containers for disposal after use. The puncture-resistant containers shall be readily accessible and disposed of in compliance with the State Sanitary Code;

4) If exposure has occurred, staff shall be promptly evaluated by health care staff.

9. **GENERAL INFECTION CONTROL GUIDELINES FOR SECURITY STAFF:**

A. Searches

1) Staff shall ensure all open wounds and skin breaks are covered to prevent possible exposure to bodily fluids.

2) Staff shall wear personal protective equipment when there is a potential for possible exposure to any bodily fluid including bodily fluids on offenders, clothing, linen or any other potentially contaminated object.

3) Staff shall avoid needle sticks or punctures with any sharp objects (e.g. knives or razors that may be contaminated with bodily fluids.)

4) Staff shall never blindly place hands in areas where there may be sharp objects that could cut or puncture the skin and shall be particularly alert for such objects during searches.

B. Use of Force

1) Staff shall wear appropriate personal protective equipment based on the anticipated potential exposure to bodily fluids.

2) When a situation warrants immediate action (i.e. breaking up a fight) and there is no time to don personal protective equipment, staff shall handle the emergency and then immediately:

a. Thoroughly wash hands and all areas of the body that were exposed to contamination;

JX-CCH-003187

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Seven**

    b.    Remove contaminated clothing and place in an appropriate bag marked "Contaminated Laundery";

    c.    Be promptly evaluated by health care staff if exposure has occurred.

C.    Training

    1)    All new staff shall receive training and introduction to communicable and infectious diseases during orientation. Documentation that staff received the orientation shall be retained in the staff member's personnel and/or training file.

    2)    Counseling shall be available to all staff who request such services regarding their concerns about communicable and infectious/diseases, including ways to prevent the spread of the diseases to others.

D.    Surveillance

    1)    The Secretary or designee may authorize the testing of an employee for communicable or infectious diseases at the Department's expense when such testing is in the best interest of the Department.

    2)    Any person who is involved in or witnesses an incident that could have resulted in a potential exposure to communicable and infectious diseases shall notify their immediate supervisor that an incident has occurred.

E.    Identification and Treatment

    1)    Staff shall report all needle stick accidents or bodily fluid exposures immediately to their supervisor and follow the Unusual Occurrence Report procedures.

    2)    The employee shall be evaluated as soon as possible by health care staff for post-exposure evaluation and prophylactic treatment if indicated.

**10.    GENERAL INFECTION CONTROL GUIDELINES FOR ALL OFFENDERS:**

A.    Universal precautions shall always be practiced with any bodily fluids.

B.    Spills shall be cleaned up as soon as possible with a disinfectant solution.

JX-CCH-003188

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Eight**

C.  Items soaked with bodily fluids that are disposable shall be placed in a red biohazard plastic bag and sealed.  Disposal of the bag shall be in compliance with the State Sanitary Code.

D.  Offenders cleaning up spills or handling contaminated items shall wash their hands after such activities upon removal of their gloves

E.  Contaminated clothes and linens shall be placed in an appropriate bag marked "Contaminated Laundry" and laundered.  All persons handling contaminated clothing and linens shall wear gloves while doing so.

F.  Offenders whose clothes have been contaminated shall be provided a change of clothes and an opportunity to wash as soon as possible.

G.  Offenders shall cover all open wounds or cuts.

H.  Education/Counseling

   1)  All new offenders entering the system shall receive orientation focused on communicable and infectious diseases.

   2)  Documentation that the offender received this orientation shall be placed and maintained in each offender's record.

   3)  Continuing education regarding blood borne infectious diseases and other communicable and infectious diseases shall be conducted as deemed necessary by the responsible Health Authority at each institution.

   4)  Counseling shall be available to all offenders who request such services regarding their concerns about communicable and infectious diseases, including ways to prevent the spread of the diseases to others.

I.  Surveillance

   1)  An offender shall be tested for a communicable and infectious disease if the offender has been in an altercation and there is reason to believe that an exchange of body fluids between the offender and another person has taken place.

   2)  Any offender who is involved in an incident in which another person is potentially exposed to an infectious disease by the throwing of feces, urine, blood, saliva, human bite or any form of human waste or bodily fluid on the other person shall be tested to determine whether the aggressive offender is infected with a contagious and infectious disease in compliance with applicable state and federal

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Nine**

laws.  The costs associated with this testing shall be paid by the offender in accordance with Department Regulation No. B-09-004 "Indigent Offenders."

J.      Identification and Treatment

Offenders that have had an exposure (e.g. splashing into the eye, mouth or an open lesion, puncture with a contaminated item or a human bite, etc.) shall be evaluated by health care staff regarding the exposure and potential post-exposure prophylactic treatment and follow-up recommendations.

**11.    CONTAMINATED EQUIPMENT OR SPILLS:**

A.      All equipment contaminated with bodily fluids shall be initially cleaned with soap and water followed by a wiping of all exposed surfaces with a disinfectant solution.

B.      Security equipment (i.e. handcuffs) that potentially has been contaminated with bodily fluids shall be similarly washed and then disinfected.

C.      Each work area within the institution shall be provided with disposable gloves for use by staff members and offenders when it is necessary to handle or cleanup HRBF or LRBF.  They can be disposed of in the normal trash unless they are contaminated with HRBF or LRBF.  They then shall be disposed of according to the institution's infection control procedures, along with all other materials used in the cleanup process.

**12.    PRE-PAROLE TESTING AND FOLLOW-UP:**

A.      Infectious disease testing shall be conducted on all offenders after the Parole Board grants parole.  In the case of IMPACT trainees, testing shall be conducted when the offender reaches the advanced platoon.

B.      Internal procedures shall be established at each institution for referral of the offender to the medical department for pre-testing counseling and the appropriate testing prior to the offender's transfer or release from custody.

C.      The following tests shall be performed, unless the offender's current status for a particular illness is already documented in the medical record:  Rapid Plasma Reagin (RPR) test for syphilis; HIV; Hepatitis A antibody, Hepatitis B surface antigen and Hepatitis C antibody.  Previous positive results do not require retesting for verification, but negative test results should be current within six months.

D.      Infectious Disease Testing Prior to Parole (Form HC-09-A) shall be completed for each offender who has been granted parole, specifying

JX-CCH-003190

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Ten**

which tests are required and what follow-up the offender may need, based on lab results.

E.    The offender shall be responsible for the cost of the tests:

1)    Test results and any unpaid testing fee balances shall be sent by the institution's medical department in a confidential manner to the Probation and Parole District Office responsible for parole supervision of the offender.  Test results for those offenders who shall reside out of state shall be sent to Probation and Parole Headquarters.  All results shall be handled in accordance with Probation and Parole Policy No. 617 "Infectious Disease Testing for Parolees."

2)    Infectious Disease Testing Prior to Release on Parole (Form HC-09-B) shall be used to track test results.  Each institution shall complete this form on a quarterly basis and forward to the Director of Nursing at Dixon Correctional Institute (DCI) within five working days after the end of the quarter.  The nursing staff at DCI shall be responsible for compiling the data and reporting the information to the Department's Medical/Mental Health Director on a quarterly basis.

**13.    METHICILLIN RESISTANT STAPHYLOCCUS AUREUS (MRSA) MANAGEMENT:**

A.    Offenders with any open, draining wound shall not be transferred from one institution to another in most situations.

B.    If the offender has any open draining wounds, they shall be treated at the facility where they reside and then transferred at a later date when there is no longer any drainage.

C.    Exceptions shall not be allowed without the approval of the Department's Medical/Mental Health Director or designee, and such approval shall not be given absent the need for emergency transfer due to mental health, medical, custody or other urgent considerations.

s/James M. Le Blanc
Secretary

Forms:    HC-09-A    Infectious Disease Testing Prior to Parole
          HC-09-B    Infectious Disease Testing Prior to Parole Results

JX-CCH-003191

**Health Care Policy No. HC-09**
**08 July 2011**
**Page Eleven**

This Health Care Policy supersedes Health Care Policy No. HC-09 dated 29 August 2003.

JX-CCH-003192

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-09A**



**30 September 2011**

**COMMUNICABLE AND INFECTIOUS DISEASES INFECTION CONTROL PROGRAM**

**TUBERCULOSIS**

1.    **OBJECTIVE:** To address the management of tuberculosis.

2.    **REFERENCES:** ACA Standards 4-4355 and 4-4386 (Adult Correctional Institutions); Center for Disease Control and Prevention (CDC) recommendations and guidelines and Department Regulation No. A-01-013 "Forms Management Program."

3.    **POLICY:** It is the Secretary's policy that there shall be a written plan to address the management of tuberculosis.

4.    **APPLICABILITY:** Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens, Wardens and Director of Probation and Parole. Each Unit Head is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.    **DEFINITIONS:**

   A.    **Latent Tuberculosis Infection (LTBI):** A person carrying tuberculosis bacteria that usually results in a positive tuberculin skin test (TST) and who has no evidence of active tuberculosis disease. This person is not infectious. The main risk is that approximately 10% (5% in the first two years and 0.1% per year thereafter, but higher risk if immunosuppressed) of these patients will go on to develop active tuberculosis at a later stage of their life.

   B.    **Contact:** A person who has shared the same air with a person who has infectious tuberculosis for a sufficient amount of time to allow possible transmission of M. tuberculosis.

6.    **PROCEDURES:**

   A.    There shall be a written plan to address the management of tuberculosis.

   B.    This plan shall include procedures for:

      1)    Initial and ongoing testing for infection;
      2)    Surveillance;
      3)    Treatment (including treatment of latent tuberculosis);
      4)    Follow-up;

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Two**

5)    Isolation (when indicated).

C.    Testing Guidelines

1)    Offenders

a.    Offender testing for the detection of tuberculosis shall be done by utilizing the Offender Tuberculosis Screening Test (TST) (Form HC-09A-A) upon intake into the system and annually thereafter if the offender is negative on previous TST.

b.    Annual testing or medical evaluation for signs and/or symptoms of tuberculosis shall be done on all offenders.  If there is verification that an offender has tested positive in the past, follow-up testing is not indicated.  Rather, the offender shall be evaluated initially and then annually by an LPN, RN or higher level health care professional for signs and/or symptoms of active disease by completing the Offender Tuberculosis Signs and Symptoms Review (Form HC-09A-B.)  The Medical Director or designee at each facility shall determine when an offender requires a physician or mid-level evaluation, based on the reported positive signs or symptoms.  All offenders with three or more positive responses on Form HC-09A-B shall be evaluated by a healthcare practitioner.

2)    Employees

a.    All new employees shall be tested for tuberculosis prior to job assignment and annually thereafter utilizing the Employee Tuberculosis Testing (Form HC-09A-C).  In accordance with CDC guidelines, tuberculin skin testing (TST) is considered both valid and safe throughout pregnancy.  Since tuberculosis poses a significant risk to the expectant mother and her unborn child, the CDC strongly recommends this testing during pregnancy.  Therefore, pregnancy is not a contraindication to TST within the Department of Public Safety and Corrections because of the high prevalence of tuberculosis, and the consequences of undiagnosed LTBI.   There shall be no exception to the requirement for TST during pregnancy.

b.    Direct care staff employed by private contractors shall conduct TST in accordance with the provisions of this regulation and documentation of testing shall be submitted for inclusion in the contractor's file prior to job assignment.

c.    If the employee provides written documentation verifying a positive test in the past, or has been treated in the past for LTBI or active tuberculosis, TST is not indicated.  Rather, the employee shall be evaluated for signs and/or symptoms of active disease at the time of

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Three**

employment and annually thereafter by utilizing the Employee Tuberculosis Signs and Symptoms Review (Form HC-09A-D.)  This form shall be completed by a LPN, RN or higher level health care professional.  Medical recommendations shall be made after review of Form HC-09A-D by the appropriate health care professional.  Continued surveillance and follow-up shall be done on an annual basis.

    d.    Employees shall have 30 days to comply with the latest medical recommendations (TST application, TST interpretation, evaluation of signs and/or symptoms or other evaluation or treatment recommendation.)  If noncompliant, the employee shall be placed on leave and possible subsequent employment action may be taken as this noncompliance may pose a public health risk to the institution.

D.    Verification of Prior Testing

    1)    When an employee or offender claims to have had a TST administered in the past, which was said to be positive or reactive, valid written documentation from a health care provider must be obtained from the testing site.  In addition, it is necessary to determine whether or not adequate treatment was administered after the positive test.  If the documentation confirms a positive test but fails to confirm adequate prophylactic treatment, consideration shall be given to initiating prophylaxis treatment for LTBI.

    2)    When verification is not possible or is unclear, repeat TST shall be performed.  The risk of causing a skin reaction from the test is out-weighed by the legitimate public health need to know the true TS status of the employee or the offender.

E.    TST

    1)    Injection

        a.    0.1 ml of purified protein derivative tuberculin, containing 5 tuberculin units (TU), is injected intradermally into the inner surface of the forearm with the needle bevel facing upward.

        b.    Correct injection will result in formation of a wheal, similar to an insect bite, 6 mm to 10 mm in diameter.

        c.    Subcutaneous injection without wheal formation is an incorrect injection and re-application shall be done immediately at another site.

    2)    Reading

JX-CCH-003195

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Four**

    a.    At 48-72 hours, the injection site is inspected for induration by a licensed nurse.

    b.    The reading is recorded as millimeter (mm) of palpable induration and documented on the appropriate infection control form; the diameter of the indurated area shall be measured across the forearm (perpendicular to the long axis.)

    c.    Size of induration, and not erythema (redness), shall be interpreted and documented.

    d.    If no induration is felt, then the reading shall be zero mm.

    e.    If a patient fails to return within 72 hours after injection and has a negative test, tuberculin testing shall be repeated.  If a positive reaction is measurable up to one week after testing, that shall be considered a valid reading and testing shall not be repeated.

3)    Interpretation of results

    a.    Routine screening:  10 mm or greater is a significant and positive reaction.

    b.    Close contact or other high risk:  5 mm or more is significant if the patient:

        ▪    Is known to be HIV positive;

        ▪    Has had recent contact with an active TB case;

        ▪    Has fibrotic changes on chest x-ray suggestive of and consistent with old healed tuberculosis;

        ▪    Has had an organ transplant, or is otherwise immunosuppressed (receiving the equivalent of >= 15 mg/day of prednisone for >= 1 month.)

    c.    Less than 5 mm of induration does not exclude the possibility of active TB.

    d.    Even though the TST is a valuable tool, it is not perfect.  Several factors can affect the test reaction:

        i.    False positive

            ▪    Nontuberculous mycobacteria;

JX-CCH-003196

- Prior BCG vaccination.

   ii.   False Negative

- Anergy;

- Recent TB infection;

- Recent live-virus vaccination;

- Miliary TB disease.

4) Conversion

   a.   Have had a known exposure in a correctional facility (i.e., close contact with an offender or staff member with infectious TB disease) after having a previous (baseline) TST value of 0 mm, TST results of >5 mm should be considered positive and interpreted as a new infection.

   b.   Correctional facility staff and offenders with a screening baseline TST result of >1 mm, but <10 mm, who are subsequently exposed to TB disease, should be considered newly infected if they have TST values increase by >10 mm on retest (see Table below.)  For example, a baseline TST result with 8 mm induration and a repeat TST result one year later with 18 mm induration would indicate a new infection. However, a repeat TST result with 12 mm induration would not indicate a new infection.

**Criteria for evaluation of correctional facility staff and inmates with latent tuberculosis infection (LTBI) for tuberculosis (TB) disease, by test result**

| Purpose | TST* result | QFT-G† result |
|---|---|---|
| Baseline | >10 mm§ (either first or second step) | Positive single-step test result |
| Serial testing (no known exposure) | Increase of >10 mm | Change from negative to positive |
| Known exposure (close contact) | >5 mm in those with a baseline TST of 0 mm<br>Increase of >10 mm in those with baseline or previous follow-up screening TST result of <10 mm | Change from negative to positive |

\* Tuberculin skin test.
† QuantiFERON®-TB Gold.
§ Except for persons in whom a 5 mm induration test (TST) result is considered positive: 1) persons infected with human immunodeficiency virus, 2) persons who are recent contacts of patients with TB disease, 3) persons with fibrotic changes on chest radiograph consistent with previous TB disease, 4) organ transplant recipients and patients with other immunocompromising conditions (e.g., persons receiving >15 mg/day of prednisone for >1 month), and 5) persons suspected of having TB disease.

5) Boosted reaction, two-step testing

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Six**

    a.    In some people who were infected with M. tuberculosis in the distant past, the delayed-type hypersensitivity reaction to tuberculin may wane over the years. When these people are tested many years after infection, they may have a negative reaction.

    b.    The skin test may stimulate (boost) their ability to react to tuberculin, causing a positive reaction to subsequent tests, which would be incorrectly interpreted as a conversion.

    c.    The facility's Medical Director or Health Authority may therefore elect to perform two-step testing on select employees or offenders if there is a strong suspicion that the person was exposed to M. tuberculosis in the remote past:

        i.    If the reaction to the first test is classified as negative, a second test shall be done one to three weeks later.

        ii.    A positive reaction to a second test represents a boosted reaction, and the person shall be classified as previously infected and not a negative result.

        iii.    If the second test is also negative, the person would be classified as uninfected, and a positive reaction to subsequent testing represents a skin test conversion, and thus a new infection.

F.    Follow-up Testing

    1)    Offenders

        a.    The health care staff shall evaluate all offenders who have a positive tuberculin skin test.  These offenders shall receive counseling regarding their positive status and recommended treatment, risk assessment for HIV infection and evaluation for treatment of LTBI.

        b.    False negative reactions may occur in TB-infected persons when their immune system is weakened.  Since immunosuppressed persons may have falsely negative tuberculin reactions due to anergy, consideration shall be given for TST with controls (e.g. mumps, candida, and tetanus toxoid) or use of interferon-y-release assays (IGRAs) such as T-SPOT.  However, the use of anergy testing in conjunction with tuberculin skin testing is no longer routinely recommended for testing programs for M. tuberculosis infection, even in HIV-positive persons.

    2)    Employees

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Seven**

    a.    Each DPS&C unit shall develop and implement a specific employee screening procedure.

    b.    This procedure shall include at least the following provisions:

        i.    Annual TB screening; if there is documentation of a previously positive TST, signs/symptoms evaluation shall be conducted by a licensed nurse with follow-up as medically indicated.

        ii.    Counseling on TB risks at the time of screening.

        iii.    Availability of chest x-ray when indicated.

        iv.    Referral to appropriate departmental health care staff, public health services or personal health care provider for evaluation, treatment decisions, and follow-up when the TST is positive. The employee is required to submit written documentation from the evaluating and/or treating health care provider within <u>30 days</u>, noting treatment decisions and scheduled subsequent care. The employee shall also submit subsequent documentation to ensure compliance with the medical treatment if subsequent care is recommended.

        v.    When the employee's TB status is a potential danger to others (e.g., refuses recommended follow-up, is noncompliant with medications, fails to provide required documentation from health unit or personal health care provider within 30 days, etc.), the employee shall be placed on leave and possible subsequent employment action may be taken. Refusal to undergo annual TST shall also result in leave and possible employment action, because of the significant public health risk of not identifying and treating a potentially infectious person.

G.    Treatment for LTBI

    1)    Because of proven increased risk of tuberculosis spread in incarcerated populations, all offenders with a TST of 10 mm or greater shall be prescribed prophylactic treatment, with possible exceptions as follows:

        a.    Relative medical contraindications

            i.    Relative medical contraindications to routine INH prophylaxis include:

               ▪    History of chronic liver disease; especially with elevated liver enzymes and proven cirrhosis;

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Eight**

- Dilantin use;

- Pregnancy-INH shall be initiated after delivery.

ii.  These offenders must be observed closely for evidence of future active disease:

- Subject to annual signs and symptom evaluation;

- Subject to chest x-ray (if warranted-see Section 6.G.2)b. below).

iii.  If the patient is considered a high risk for development of TB disease (see Section 6.G.2) below), regardless of the relative medical contraindications, treatment for LTBI shall be initiated.

b.  Refusal

i.  If the offender refuses to take INH prophylaxis, he must sign the Refusal to Accept Medical or Mental Health Care (Form HC-26-A.)

ii.  The offender shall be observed closely for evidence of future active disease.  Because of the potential public health consequences, this observation may be done in a lockdown setting or in medical isolation, and may be continued until compliance with evaluation and/or treatment recommendation is achieved, based on the recommendations of the Health Authority or Medical Director in conjunction with the Unit Head

2)  If clinically indicated, treatment for LTBI is recommended in spite of relative medical contraindications:

a.  Close contact with a sputum <u>smear</u> positive case of TB, i.e. dorm mate, cell mate, prolonged daily contact.

b.  Abnormal chest x-ray, which would make subsequent follow-up chest x-rays difficult to interpret for active tuberculosis, such as severe COPD.

c.  Recent conversion within the past two years.

d.  Special medical conditions causing increased risk of reactivation:

- HIV infection;

- Substance abuse (especially drug injection);

JX-CCH-003200

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Nine**

- Recent infection with M. tuberculosis (within the past 2 years);

- Chest x-ray findings suggestive of previous TB (in a person who received inadequate or no treatment);

- Silicosis;

- Diabetes mellitus;

- Prolonged corticosteroid therapy;

- Immunosuppressive therapy;

- Hematologic and reticuloendothelial diseases (e.g., leukemia and Hodgkin's disease);

- End-stage renal disease;

- Previous intestinal bypass;

- Prior partial or total gastrectomy;

- Chronic malabsorption syndrome;

- Carcinoma of the oropharynx and upper gastrointestinal tract;

- Being 10% or more below ideal body weight.

3) All tuberculosis therapy (prophylactic or therapeutic) shall be administered by direct observation therapy (DOT.)

4) Chest x-rays shall be obtained on all offenders unless contraindicated (i.e., pregnancy) with:

a. TST readings of 10 mm or greater;

b. TST readings of 5 mm or greater if patient:

i. Is a known HIV positive patient;

ii. Has prior chest x-ray findings suggestive or consistent with TB.

5) Clinical and laboratory monitoring

a. Pretreatment evaluation:

JX-CCH-003201

     i.      Discuss the details of the patient's risk for TB disease;

     ii.     Emphasize the benefits of treatment and the importance of adherence to the drug regimen;

     iii.    Review possible adverse effects of the regimen, including interactions with other drugs;

     iv.    Establish an optimal follow-up plan.

b.    History shall document:

     i.      Risk factors for TB;

     ii.     Prior treatment for TB or LTBI;

     iii.    Preexisting medical conditions that constitute a contraindication to treatment or are associated with an increased risk for adverse effects of treatment;

     iv.    Attention to current drugs which may interact with the drugs used for treatment.

c.    Women receiving rifampin and on contraceptives are at an increased risk for becoming pregnant and shall be advised to consider an additional form of contraception.

d.    Baseline lab testing

     i.      Baseline testing is not routinely indicated for all patients at the start of treatment for LTBI;

     ii.     Baseline testing is indicated for patients with a known liver disorder, known HIV infection, pregnant women and those in the immediate postpartum period and patients who take substantial amounts of medications with hepatotoxic potential.

e.    Patients being treated for LTBI shall receive a clinical evaluation monthly if receiving INH or rifampin alone or at two, four and eight weeks if receiving both rifampin and pyrazinamide.

f.    Routine laboratory monitoring during treatment of LTBI is indicated in patients:

     i.      Whose baseline liver function tests are abnormal;

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Eleven**

      ii.      For any patient who complains of symptoms compatible with hepatotoxicity or acute arthritis.

    g.      It is recommended to discontinue prophylactic treatment if liver enzyme levels exceed three times the upper limit of normal if associated with symptoms and five times the upper limit of normal if asymptomatic.

H.    Treatment of Tuberculosis Disease

    1)    Treatment of suspected tuberculosis disease should follow the current guidelines of the CDC.

    2)    If suspected with pulmonary, airway, or laryngeal tuberculosis:

      a.    Offenders

          i.      Shall be placed in medical isolation, in a negative-pressure room, while undergoing definitive testing and treatment;

          ii.      Shall remain in medical isolation until there is confirmation that the offender is no longer infectious.

      b.    Employees

          i.      The employee shall remain on extended medical leave until deemed no longer infectious;

          ii.      Documentation shall be presented from the health unit or private health care provider stating that the employee is no longer infectious and poses no threat to others by returning to work.

I.    Transfers

    Any offender being considered for a transfer must have a current TST and be in a non-infectious state.  Exceptions may be made for emergency transfers by the Department's Medical/Mental Health Director.  The transferring facility shall brief the receiving facility regarding all healthcare needs and appropriate precautions to ensure a safe transfer

J.    The Medical Director of the facility shall be responsible for making additional recommendations for all persons suspected of and/or diagnosed with TB disease. These recommendations shall include case reporting, contact investigation, containment and isolation as needed.  These decisions shall be in compliance with the guidelines from the CDC and the State Health Department.

JX-CCH-003203

**Health Care Policy No. HC-09A**
**30 September 2011**
**Page Twelve**

K.     Discharge/Release from custody

If an offender is on LTBI or tuberculosis disease treatment and is scheduled to be released:

- On parole, then the appropriate Probation and Parole District Office shall be notified of the need for the continued treatment and a follow-up appointment with a health care provider shall be scheduled.

- As a full term release, then a follow up appointment with a health care provider shall be scheduled by the releasing facility and the Office of Public Health shall be notified.

s/James M. Le Blanc
Secretary

Forms:     HC-09A-A:    Offender Tuberculosis Testing
           HC-09A-B:    Offender Tuberculosis Signs and Symptoms Review
           HC-09A-C:    Employee Tuberculosis Testing
           HC-09A-D:    Employee Tuberculosis Signs and Symptoms Review
           HC-26-A:     Refusal to Accept Medical or Mental Health Care

This policy supersedes Health Care Policy No. HC-09A dated 01 August 2002.

HC-09B Attachment A



PRIOR HCV (+) SCREEN    HCV SUSPICION BY HCP    INMATE REQUEST

Laboratory evidence of liver disease
(abnormal PT, bilirubin, albumen, platelet count)

ALT

NORMAL

≥ULN and no anti-HCV test

Anti-HCV lab

≥ULN
and anti-HCV (+)

MONITOR

POSITIVE

NEGATIVE

ABSOLUTE CONTRAINDICATIONS
ANC<1000
PLTS <75,000
Autoimmune disease
Poorly controlled chronic disease
        DM, HTN, CAD, RF, creat >2.0
Seizures within past 12 months
Major mental illness/ suicide attempts
Prison sentence < 24 months
Active substance abuse within past 12 months
Transplant
Pregnancy
CD4 <300
Age <18
Decompensated cirrhosis or sequelae
        Ascites, varices, etc.

WORK UP FOR OTHER
CAUSES OF ↑ ALT

NEGATIVE

REFER TO
HEPATITIS STAFF

POSITIVE

NO REFERRAL INDICATED,
MONITOR

REVIEW RELATIVE
CONTRAINDICATIONS

Revised 8/12/04

JX-CCH-003205

HC - 09 B Attachment B



**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-09B**                                                                 **08      June**
**2011**



**COMMUNICABLE AND INFECTIOUS DISEASES INFECTION CONTROL PROGRAM**

**VIRAL HEPATITIS**

1.    **OBJECTIVE:**  To address the management of viral hepatitis infection.

2.    **REFERENCES:**  ACA Standards 4-4356 and 4-4387 (Adult Correctional Institutions;) La. R.S. 15:739 and Center for Disease Control (CDC) guidelines.

3.    **POLICY:**  It is the Secretary's policy that there shall be a written plan to address the management of viral hepatitis A, B and C infections.

4.    **APPLICABILITY:**  Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.    **GENERAL:**

The viral hepatitis infection management plan shall include procedures for:

- Surveillance (identification and monitoring);
- Immunization and other prevention measures;
- Treatment protocols;
- Follow-up care;
- Isolation (when indicated);
- Pre- and Post-exposure management protocols;
- Education and staff training; and
- Discharge planning.

6.    **PROCEDURES FOR HEPATITIS A:**

A.    Transmission

Hepatitis A virus (HAV) infection is acquired primarily by the fecal-oral route by either person-to-person contact or ingestion of contaminated food or water.  HAV can be stable in the environment for months.  Heating food to temperatures greater than

**Health Care Policy No. HC-09B**
**08 June 2011**
**Page Two**

185°F (85°C) for one minute or disinfecting surfaces with a 1:10 dilution of bleach in tap water will inactivate HAV.

B.    Surveillance for Hepatitis A

Hepatitis A is a reportable disease.  The goals of Hepatitis A surveillance include:

- Identifying contacts of contagious case-patients who might require postexposure prophylaxis;
- Detecting outbreaks;
- Monitoring disease incidence by identifying acute, symptomatic infections in all age groups; and
- Determining the epidemiologic characteristics of infected persons, including the source of infection.

C.    Treatment for HAV Infection

Prophylactic vaccination and post exposure prophylaxis are the treatments to be considered for the elimination of Hepatitis A infections.  Medical isolation may be required to contain the possible transmission of the virus until it is confirmed that the patient is not contagious.  Medical isolation, if indicated, is mostly beneficial when performed early in the infection.

D.    Postexposure Prophylaxis Against HAV Infection

Individuals exposed to active HAV and who are not immune as a result of previous Hepatitis A vaccine or prior exposure shall be treated according to current CDC guidelines.

**7.    PROCEDURES FOR HEPATITIS B:**

A.    Transmission

Hepatitis B virus (HBV) infection is spread by contact with an infected person's blood and/or body fluids.

B.    Prophylaxis Against HBV Infection

Since there is no known cure for Hepatitis B infection, prevention is important. Hepatitis B vaccine is the best protection against HBV infection.  All direct care staff shall be offered the Hepatitis B vaccine.

C.    Treatment for HBV Infection

**Health Care Policy No. HC-09B**
**08 June 2011**
**Page Three**

Once the primary care provider has determined that an offender is positive for Hepatitis B, the offender shall be referred to the Louisiana State University (LSU) hospital hepatitis clinic by completing the Hepatitis Clinic Screening (Form HC-09-A.)

D.      Post Exposure Prophylaxis Against HBV Infection

Each facility shall have a post exposure policy and procedure for offenders and employees based on CDC guidelines.  This policy shall address at a minimum, post exposure prophylaxis and follow up testing.  Offenders cannot refuse to have blood drawn for testing if they are involved in an incident in which another person was exposed to their blood or body fluids.

8.      **PROCEDURES FOR HEPATITIS C:**

A.      Hepatitis C virus (HCV) infection is a bloodborne pathogen and is transmitted primarily through large or repeated direct percutaneous exposures to blood.

B.      Any changes to existing guidelines for screening, work-up, and treatment of offenders with HCV shall be determined by the cooperative efforts of the Department and LSU hospital hepatitis staff.

C.      Education about the risk factors for HCV shall be included in health education information given to offenders during orientation at the offender's permanent state facility assignment.

D.      A Hepatitis Clinic Screening (Form HC-09B-A) shall be completed for all HCV positive offenders and forwarded to LSU hospital hepatitis staff.  If treatment is contraindicated as detailed in Section 8.N., this shall be indicated on Form HC-09B-A, with the required information necessary to add the offender to the LSUMC and DPS&C databases (i.e., name, DOC number, facility, date of HCV test, results of ALT, etc.) and reason(s) for exclusion from treatment.  Form HC-09B-A may also be used to obtain confirmation from the LSU hospital hepatitis staff that treatment is contraindicated for an offender based on the absolute or relative contraindications.  If there is uncertainty about whether the offender qualifies for treatment consideration, Form HC-09B-A shall be completed and sent to the LSU hospital hepatitis staff for disposition.  A copy of the form shall also be forwarded to the Louisiana State Penitentiary (LSP) Medical Director, who compiles the Department's database of all HCV positive offenders.

E.      Via Form HC-09B-A, qualifying HCV positive adult male offenders housed at non-LSP facilities are referred to the reviewing LSU hospital hepatitis staff.  Their recommendations may include transfer of the offender to Elayn Hunt Correctional Center (EHCC) for further evaluation, work-up and treatment.  At LSP, Form HC-09B-A shall likewise be completed as appropriate for all HCV positive offenders and sent to the LSU hospital hepatitis staff and the LSP Medical Director.  However, a clinic

JX-CCH-003209

**Health Care Policy No. HC-09B**
**08 June 2011**
**Page Four**

referral form must be completed for the offender to be referred to the on-site hepatitis clinic.

F.    LSP, EHCC and LCIW offenders who have not been excluded from treatment consideration based on the established criteria shall be seen in the respective on-site hepatitis clinic for further evaluation, work-up and possible treatment.

G.    Offenders who are transferred to EHCC for further evaluation shall remain at EHCC during the course of their treatment.   The offender shall be returned to the transferring facility when:

1)    It is determined after further work-up that the offender does not qualify for treatment;

2)    The offender refuses or cannot tolerate the treatment; or

3)    Treatment is completed.

H.    Follow-up and surveillance shall continue at the offender's original facility, pursuant to the provisions of this policy.  However, in the event of extenuating circumstances that prevent the offender from being treated at the original facility, an offender may undergo work-up and treatment at a facility other than LSP, EHCC or LCIW.  These facilities shall then follow the same guidelines as those listed for offenders transferred to EHCC.  Since there will be no on-site hepatitis clinic, they shall be followed in the hepatitis clinic at an LSU hospital.

I.    If a health care practitioner has a clinical suspicion that an offender is infected with HCV, screening is initiated by performing a Liver Enzyme Level (ALT) test.

J.    If the ALT is elevated (any elevation above the upper limit of normal (>ULN) for the testing lab) and the elevation cannot be attributed to medication or other medical conditions, an HCV screening antibody test shall be performed.  If HCV test is positive, treatment screening shall be initiated by assessing the absolute contraindications for treatment.

K.    If the ALT test is within normal limits, the offender shall be observed with annual ALT testing if indicated.

L.    If there is a confirmed report of a prior positive HCV screening antibody test, then further testing is required to determine the qualification for treatment.

1)    Perform ALT:

- If the ALT result is normal, no further work-up needed, follow ALT levels every one to two years;

- If the ALT result is elevated, evaluate for absolute contraindications to treatment.

2) If the offender has laboratory evidence of significant liver disease (e.g. prolonged PT, elevated total bilirubin; decreased albumin, or low platelet count) initiate screening for treatment even if the ALT is normal.

M. If the offender is HCV (+), has at least one elevated ALT (or has other evidence of significant liver disease) and is negative for all absolute contraindications, the offender shall be referred to the LSU Hospital hepatitis staff for evaluation of relative contraindications. If the offender is positive for any of the absolute contraindications, referral for treatment to the LSU hospital hepatitis clinic is not indicated. Rather, the offender shall be evaluated by the facility medical staff on a regular basis (annually at a minimum.) However, Form HC-09B-A is to be completed as described in this Section, whether for treatment consideration or not, and sent to the LSU hospital hepatitis staff and the LSP Medical Director.

N. Absolute contraindications to treatment

1) Absolute neutrophil count (ANC) < 1000 cells/mm$^3$;

2) Platelets < 75,000 cells/mm$^3$;

3) Previously diagnosed autoimmune disease:

    a. Rheumatoid arthritis;
    b. Multiple sclerosis;
    c. Hemolytic anemia (Hgb <10 grams);
    d. Certain types of glomerulonephritis;
    e. Myasthenia gravis;
    f. Chronic thyroiditis;
    g. Reiter's syndrome;
    h. Graves' disease;
    i. Systemic lupus erythematosus (SLE).

4) Poorly controlled chronic disease:

    a. DM (HgA1C > 9);
    b. HTN (SBP >150 mmHg, DBP > 100 mmHg) on repeat readings;
    c. Severe or unstable coronary artery disease (CAD):

        - Symptomatic angina;
        - S/p coronary bypass, angioplasty, or MI in preceding 12 months;
        - Hx CHF;
        - Cardiomyopathy;

JX-CCH-003211

**Health Care Policy No. HC-09B**
**08 June 2011**
**Page Six**

- Dysrhythmias;
- If >50 years old, need EKG; if abnormal or history indicates, order exercise stress test (EST); if EST is normal, review subjective contraindications.

5) Renal disease with serum creatinine >2.0 mg/dl, or chronic renal failure requiring dialysis;

6) Seizures (any seizure documented in preceding 12 months);

7) Diagnosis of major depression or psychotic disorders (i.e., schizophrenia, bipolar, etc.) documented chronic violent behavior; major suicide attempt. If history or current status is questionable, get an evaluation by a psychiatrist due to psychiatric contraindications to interferon therapy;

8) Decompensated cirrhosis or sequelae (ascites, varices, etc.);

9) Remaining time left until earliest discharge date less than two years (24 months);

10) Positive illicit drug screen or Disciplinary Board Court conviction for drug paraphernalia within previous 12 months;

11) Solid organ transplant;

12) Pregnancy;

13) Concurrent HIV infection with CD4 count < 300;

14) Age < 18.

Note: Because some of these contraindications may change with time, continued follow-up and evaluation is required, with referral when indicated.

O. Relative Contraindications

1) Age >60;

2) Stable CAD/abnormal ECG;

3) Controlled chronic disease;

4) Any serious disease with a poor ten year survival;

5) Previous or current diagnosis of neoplasm;

**Health Care Policy No. HC-09B**
**08 June 2011**
**Page Seven**

      6)     Psoriasis;

      7)     Thyroid Disease (hyperthyroidism or hypothyroidism).

P.    Treatment for HCV Infection

      1)     The primary goal for treatment of HCV is the prevention of cirrhosis.  There are different treatment modalities currently available for the treatment of HCV. The decision to treat, and with which modality, shall be made in consultation with LSU hospital hepatology staff.

      2)     If the offender is currently taking Isoniazid (INH) for tuberculosis or another potentially hepatotoxic medication, referral can be delayed.  The ALT shall be rechecked six weeks after the treatment is completed to determine if the elevation is due to HCV or the medication.  If the ALT is still elevated, then referral is indicated.

      3)     If the offender tests positive for tuberculosis (TST) (with normal chest x-ray) while undergoing ALT evaluation for HCV, the initiation of INH shall be delayed until the evaluation is completed.

      4)     The LSU hospital hepatitis staff will review all biopsy results and other clinical findings to determine HCV management.

Q.    Prophylaxis against HCV Infection

      1)     Currently, there is no vaccine available for the prevention of Hepatitis C.

      2)     Currently, there is no recommended prophylactic treatment for HCV exposure.

s/James M. Le Blanc
Secretary

Form HC-09B-A:    Hepatitis Clinic Screening

    This Health Care Policy supersedes Health Care Policy No. HC-34 dated 30 August 2004.

**Health Care Policy No. HC-09C**
**Attachment A**
**01 December 2015**

# Opt-out HIV Testing Protocols Flow Chart

- Each facility will keep an ongoing and updated list of all offenders scheduled to be discharged within the next six months.
- Based on this list, offenders will be scheduled for opt-out HIV testing app. six months prior to the offender's earliest release date.
- This will allocate app. five months for HIV tx and discharge planning for offenders that are found to be HIV+





JX-CCH-003214

**Health Care Policy No. HC-09C**
**Attachment A**
**Page Two**



---

<u>If an offender's earliest release date changes and:</u>

- The offender is HIV+ → there is no need to retest *because the offender is known to be HIV+.*

- The offender is HIV- and the previous HIV test falls within the previous 12 months of the offender's new earliest release date → there is no need to retest *because the offender had an HIV test within 12 months of his release.*

- If an offender is HIV- and the previous HIV test was given more than 12 months from the offender's new earliest release date → must retest offender prior to release *because the offender is not known to be HIV+ and he has not had an HIV test within 12 months of his release.*

JX-CCH-003215

**Health Care Policy No. HC-09C**
**Attachment B**
**01 December 2015**

## Board of Pardons Committee on Parole HIV Testing Protocols Flow Chart



**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-09C**



**01 December 2015**

**COMMUNICABLE AND INFECTIOUS DISEASES INFECTION CONTROL PROGRAM**

**HUMAN IMMUNODEFICIENCY VIRUS (HIV)**

**1.    OBJECTIVE:**  To address the management of HIV infection.

**2.    REFERENCE:**  ACA Standards 4-4354 and 4-4357 (Adult Correctional Institutions); La. R.S. 15:574.4.2, 40:1171.3 – 40:1171.4; Probation and Parole Policy No. 617 "Infectious Disease Testing for Parolees;" Department Regulation No. HC-09 "Communicable and Infectious Diseases Infection Control Program."

**3.    POLICY:**  It is the Secretary's policy that there shall be a written plan to address the management of HIV infection in offenders.

**4.    APPLICABILITY:**  Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Director of Probation and Parole, Chairman and Members of the Board of Pardons Committee on Parole, Regional Wardens and Wardens.  Each Unit Head is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

**5.    DEFINITIONS:**

A.    **Contact Investigation**: A process that involves identifying and evaluating individuals possibly exposed to HIV and, if appropriate, initiating post-exposure management protocol.

B.    **Health Care Personnel:** Individuals whose primary duty is to provide health services to offenders in keeping with their respective levels of health care training or experience.

C.    **Health Care Practitioner:** Clinicians trained to diagnose and treat offenders, such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners and physician assistants.

D.    **Inter-system Transfers:** Transfers from one distinct correctional system to another (i.e. transfer of an offender from a non-LA DPS&C facility to a LA DPS&C facility). This includes LA DPS&C offenders in a non-LA DPS&C facility, such as a local facility work release, who are transferred to a LA DPS&C facility.

E.    **Mandatory HIV Testing:** HIV testing that cannot be refused.

JX-CCH-003217

**Health Care Policy No. HC-09C**
**01 December 2015**
**Page Two**

F.   **Mental Health Care Practitioner:** Staff who perform clinical duties for mentally ill patients, for example, physicians, psychologists, nurses and social workers in accordance with each health care professional's scope of training and applicable licensing, certification and regulatory requirements.

G.   **Opt-out HIV Testing:** HIV testing performed after verbally informing the offender that the test shall be performed unless the offender declines or opt-out of the testing and that the offender has this right to choose to decline or opt-out. Consent is then assumed unless the patient declines testing.

**6.   PROCEDURES:**

A.   State laws regarding HIV testing, consent, confidentiality and counseling shall be followed in accordance with the provisions of La. R.S. 40:1171.3 – 40:1171.4.

   1)   Oral information given at the time of opt-out HIV testing shall include an explanation of HIV infection and the meanings of positive and negative test results and the offender shall be offered an opportunity to ask questions.

   2)   Consent for opt-out HIV testing shall be incorporated into the offender's general informed consent for medical care on the same basis as are other screening or diagnostic tests; a separate consent form for HIV testing shall not be necessary.

B.   The Unit Head shall ensure that each facility has procedures for the management of HIV infection to include the following:

   1)   Surveillance (identification and monitoring);
   2)   Immunization and other prevention measures, when applicable;
   3)   Indications for HIV testing;
   4)   Treatment protocols;
   5)   Follow-up care;
   6)   Isolation only when clinically indicated;
   7)   Appropriate safeguards for offenders and staff;
   8)   Post-exposure management protocols;
   9)   Education of offenders about HIV infection in accordance with Department Regulation No. HC-09 "Communicable and Infectious Diseases Infection Control Program;"
   10)  Staff orientation and training on HIV infection and testing procedures;
   11)  Confidentiality/protected health information;
   12)  Discharge planning for HIV positive offenders; and
   13)  Reporting requirements to state and local Office of Public Health.

C.   Types of HIV Testing

JX-CCH-003218

**Health Care Policy No. HC-09C**
**01 December 2015**
**Page Three**

1) HIV Testing Upon Intake

   Opt-out HIV testing shall be offered to all inter-system transfers, unless the offender is known to be HIV positive (on prescribed HIV medications or had a documented HIV positive test result).

2) HIV Testing During Incarceration

   a. Opt-out HIV testing shall be offered:

      i. When clinically indicated; and
      ii. When ordered by a health care practitioner after review of a self-initiated request.

   b. Mandatory HIV testing shall be conducted:

      i. Based on public health needs;
      ii. As part of post-exposure protocol; and
      iii. When required by court.

   c. Requests for HIV testing shall be made at any time during an offender's incarceration.

      i. The offender may request an HIV test from health care personnel. The granting or denial of an offender's request for HIV testing shall not be based on the offender's previous decision to opt-out of HIV testing.

      ii. The Unit Medical Director or designee shall be responsible for reviewing the offender's request for HIV testing and, if indicated, ordering the HIV test.

3) HIV Testing Prior to Release

   a. Mandatory HIV testing shall be conducted prior to release, on all offenders granted parole by the Board of Pardons Committee on Parole, pursuant to La. R.S. 15:574.4.2.

   b. Opt-out HIV testing shall be offered to all offenders who do not require mandatory HIV testing prior to release from a DPS&C facility, unless the offender is known to be HIV positive or had a documented HIV test within the previous 12 months prior to release.

D. HIV Protocols

   1) Protocol for Offenders Testing Negative for HIV

JX-CCH-003219

**Health Care Policy No. HC-09C**
**01 December 2015**
**Page Four**

  a. All offenders obtaining a negative result from a preliminary HIV test shall be informed at the time of testing of their negative HIV test results and these results shall be documented in the offender's medical record. A second confirmatory HIV test shall not be necessary.

  b. Post-test counseling for offenders obtaining a negative result from an HIV test shall not be necessary.

 2) Protocol for Offenders Testing Positive for HIV

  a. All offenders obtaining an initial positive result from a preliminary HIV test shall undergo a second confirmatory HIV test, in accordance with requirements set forth by the Louisiana Department of Health and Hospitals (DHH). The DHH Office of Public Health (OPH) STD/HIV Program specifies that a test using a blood specimen be used for all confirmatory tests, and that confirmatory test methodology must be different than the methodology of the preliminary test.

  b. The protocol for offenders obtaining a positive result from a confirmatory HIV test shall include the following procedures:

   i. The treating health care practitioner or designee shall refer the offender to the appropriate health care and support services;

   ii. The treatment plan of HIV-infected offenders may include the services of an infectious disease specialist or a health care practitioner with an understanding of the treatment of HIV infection. The role of the specialist is consultative, co-managerial or primary care;

   iii. The treating health care practitioner or designee may refer the offender to the mental health care practitioner for short-term mental health support; referrals shall be need-based; and

   iv. The treating mental health care practitioner may determine that HIV positive offenders with existing mental health conditions require increased monitoring and intervention;

  c. Housing assignments based solely on an offender testing positive for HIV shall be prohibited. Department facilities shall have the authority to remove any offender from general population for medical or security reasons.

**Health Care Policy No. HC-09C**
**01 December 2015**
**Page Five**

E.  Contact Investigation

1)  A contact investigation shall occur when an offender is identified as being a new converter for HIV, meaning the offender initially obtained a negative result from an HIV test then, at a later time during their incarceration, obtained a positive result from an HIV test.

2)  The Unit Health Authority or designated infection control nurse shall be responsible for:

a.  Notifying the OPH Disease Intervention Specialist (DIS) of any new converters;

b.  Participating in the OPH DIS meetings and interviews with the new converter;

c.  Ensuring that the contact investigation is completed promptly and appropriately;

d.  Ensuring that all offenders identified as having possible exposure with the new converter are offered counseling and HIV testing; and

e.  Ensuring confidentiality by completing the contact investigation without revealing identifying information of the new converter.

F.  Post-Exposure Management Protocol

1)  The institution's post-exposure policy for offenders and employees shall be determined by the Unit Health Authority based on acceptable standards of health care.

2)  Post-exposure prophylaxis and follow-up testing shall be followed pursuant to Health Care Policy No. HC-09 "Communicable and Infectious Diseases Infection Control Program."

G.  HIV Discharge Planning

1)  General Procedures

a.  The Unit Head shall ensure that each facility maintains an ongoing list of all offenders scheduled to be discharged within the next six months, the list is updated monthly and the Unit Health Authority or designee has access to the list. Based on this list, offenders shall be scheduled for opt-out HIV testing approximately five – six months prior to the offender's earliest release date. This shall

**Health Care Policy No. HC-09C**
**01 December 2015**
**Page Six**

allocate approximately five months for HIV treatment and HIV discharge planning for offenders that are found to be HIV positive.

b.   Prior to release, all offenders shall be informed of the results of any HIV test they received during incarceration.

c.   HIV discharge planning, HIV follow-up care and continuation of HIV medications upon discharge shall involve health care practitioners, health care personnel, the OPH STD/HIV Program if available, and Probation and Parole Officer(s) if being released under parole supervision.

d.   Opt-out HIV testing protocols for offender releases are detailed in Attachment A "Opt-out HIV Testing Protocols Flow Chart."

e.   HIV testing protocols for offender releases through the Office of Probation and Parole are detailed in Attachment B "Board of Pardons Committee on Parole HIV Testing Protocols Flow Chart."

2)   Role of Health Care Practitioners

a.   The treating health care practitioner shall assess the offender and obtain labs.

b.   The health care practitioner shall refer the offender for a tele-medicine appointment or onsite appointment to include the services of an infectious disease specialist or health care practitioner with an understanding of the treatment of HIV infection.

c.   Upon discharge from the Department, the Unit Medical Director shall provide the offender with a four week supply of HIV medication(s), as well as prescription(s) for a 30 day supply of HIV medication(s) to be filled after release.

3)   Role of Health Care Personnel

a.   To ensure continuity of HIV care, health care personnel shall complete a "Referral to Office of Public Health – STD/HIV Program" (Form HC-09C-A) for each HIV positive offender who is discharging and submit the form to the OPH STD/HIV Program.

b.   If the exception occurs that an offender is released from the Department prior to receiving results of the confirmatory HIV test, health care personnel shall provide the offender with a contact at the OPH STD/HIV Program to follow-up with upon release

**Health Care Policy No. HC-09C**
**01 December 2015**
**Page Seven**

regarding HIV results and HIV follow-up care and treatment, and document this information in the offender's medical record.

c.  For offenders granted parole by the Board of Pardons Committee on Parole, health care personnel shall complete "Infectious Disease Testing Prior to Parole" (Form HC-09-A). The completion of this form shall act as the offender's consent to complete an HIV test and, if the offender tests positive for HIV, the offender's consent to seek advice and counseling from the appropriate health care and support services. Prior to release, health care personnel shall file "Infectious Disease Testing Prior to Parole" (Form HC-09-A) in the offender's medical record, and submit a copy to the offender's Probation and Parole District Administrator, and the Board of Pardons Committee on Parole, Parole Program Manager. The Parole Program Manager's receipt of this form shall serve as the releasing facility's certification of the offender's agreement to comply with La. R.S. 15:574.4.2, which mandates that the Board of Pardons Committee on Parole shall require an offender to submit to HIV testing prior to placing the offender on parole.

d.  For HIV positive offenders discharging under the supervision of Probation and Parole, health care personnel shall document in the "Medical" section of the "DPS&C Discharge Summary" (Form HC-03-B) the offender's HIV test results and pending medical appointments. Prior to release, health care personnel shall file this form in the offender's medical record, submit it to the offender's Probation and Parole District Office, and send a copy to the offender.

4)  Role of Louisiana OPH STD/HIV Program

a.  The goal of the services provided by the OPH STD/HIV Program is to connect HIV positive offenders to HIV treatment; as well as retention of HIV positive offenders in HIV treatment services upon release from incarceration.

b.  The OPH STD/HIV Program provides pre-release medical and case management coordination for HIV positive offenders being discharged from the Department starting up to 180 days prior to the offender's earliest release date. Pre-release services provided by the OPH STD/HIV Program include: (1) access to the Louisiana Health Access Program (LA HAP), including the Louisiana Drug Assistance Program (LDAP), (2) referral to an HIV medical appointment and (3) referral to Ryan White HIV/AIDS Program for case management services. Participation in these

services is voluntary and offenders may decline the services in their entirety or any part of the support offered.

i.　Not all offenders will be eligible for all services offered (e.g. offenders who have not been on any HIV medications while in a Department facility shall not be eligible for LDAP).

ii.　The Unit Head shall ensure that offenders who elect to be referred to case management upon release have the option to participate in the video conferencing intervention.

5)　Role of Office of Probation and Parole and Board of Pardons Committee on Parole

a.　Pursuant to La. R.S. 15:574.4.2, if an offender granted parole by the Board of Pardons Committee on Parole, the Committee on Parole shall require the offender to complete an HIV test and, if the offender tests positive for HIV, the granting of parole shall be conditioned upon the offender seeking advice and counseling from the appropriate health care and support services.

b.　An offender granted parole by the Board of Pardons Committee on Parole shall not be released from the Department until the Committee on Parole has received the offender's "Infectious Disease Testing Prior to Parole" (Form HC-09-A) from the releasing facility.

c.　The Office of Probation and Parole shall:

i.　Advise the offender that the granting of parole is conditioned upon the offender seeking HIV advice, treatment and counseling from the appropriate health care and support services and that failure to seek or follow that advice may result in the revocation of parole.

ii.　Ensure the parolee completes all appropriate HIV follow-up care, treatment and counseling as recommended by the Louisiana OPH STD/HIV Program and as indicated on the "DPS&C Discharge Summary" (Form HC-03-B). Failure to comply with the recommendations as to HIV follow-up care, treatment and counseling may result in the revocation of parole.

**7.　MONITORING REQUIREMENTS/REPORTS:**

A.　The Unit Health Authority or designated infection control nurse shall be responsible for:

**Health Care Policy No. HC-09C**
**01 December 2015**
**Page Nine**

    1)    Documenting the following information for every offender being offered opt-out HIV testing and filing a physical copy of this information in the offender's medical record:

        a.    The date the offender was offered opt-out HIV testing;

        b.    The reason the offender was offered opt-out HIV testing;

        c.    The results of the offender's preliminary HIV test and, if applicable, confirmatory HIV test; and

        d.    If the offender did not receive HIV testing, the reason the offender did not receive HIV testing: the offender opted-out, the offender is known to be HIV positive, or the offender had a documented HIV test within the previous 12 months;

    2)    Should an offender opt-out of the HIV testing, ensuring that the offender completes the "Opt-Out HIV Testing Refusal" (Form HC-09C-B) and filing it in the offender's medical record.

    3)    Documenting an ongoing list of all offenders offered opt-out HIV testing. By the 15th of each month, the Unit Health Authority or designated infection control nurse shall be responsible for submitting the list for the previous month to the Medical/Mental Health Director and the Louisiana Department of Health and Hospitals, OPH.


s/James M. Le Blanc
Secretary

Attachments:    A    Opt-out HIV Testing Protocols Flow Chart
                  B    Board of Pardons Committee on Parole HIV Testing Protocols Flow Chart

Forms:    HC-09C-A    Referral to Office of Public Health-STD/HIV Program
         HC-09-A    Infectious Disease Testing Prior to Parole
         HC-03-B    DPS&C Mental Health and Medical Discharge Summary to Probation and Parole
         HC-09C-B    Opt-out HIV Testing Refusal

This policy supersedes Health Care Policy No. HC-09C dated 04 May 2011.

JX-CCH-003225

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-11**



**15 April 2011**

**CHRONIC CARE/SPECIAL NEEDS**

1.   **OBJECTIVE:**  To provide and monitor the treatment of offenders with chronic illness and/or special needs.

2.   **REFERENCES:**   ACA Standards 4-4359 and 4-4399 (Adult Correctional Institutions) and Health Care Policy No. HC-39 "Transfer of Severely Mentally Ill and/or Severely Developmentally Delayed Offenders."

3.   **APPLICABILITY:** Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

4.   **POLICY:**  It is the Secretary's policy to ensure that each unit has a well coordinated plan of care for offenders diagnosed with chronic illness and/or special needs.

5.   **DEFINITIONS:**

   A.   **Chronic Care:**  Health care provided over a long period of time to offenders with chronic illnesses.  This care usually includes initial assessment, treatment and periodic monitoring to manage the offender's condition.

   B.   **Special Needs:** A mental and/or physical condition that requires different accommodations or arrangements than a general population offender normally would receive.  Offenders with special needs may include, but are not limited to, the emotionally disturbed, developmentally disabled, mentally ill, physically handicapped, chronically ill, the disabled or infirm and the drug or alcohol addicted.

6.   **PROCEDURES:**

   A.   Each institution shall develop a plan, establish protocols, and conduct chronic care clinics for the management of offenders with chronic illnesses, including at a minimum: hypertension; diabetes; congestive

JX-CCH-003226

**Health Care Policy No. HC-11**
**15 April 2011**
**Page Two**

heart failure; hyperlipidemia and asthma/COPD.  In addition there shall be a protocol for offenders on Coumadin therapy.  The plan shall address the following:

1)      Monitoring of medication;

2)      Laboratory testing;

3)      Frequency of follow-up in the chronic care clinic;

4)      Health record forms;

5)      Frequency of specialist consultation and review.

Note:  When being seen in chronic care clinic by a health care practitioner, a subjective and objective assessment plan (SOAP) format shall be utilized for documentation.

B.      Consultation shall be initiated between the institution and appropriate program administrators or designees and the responsible clinician or designee prior to taking action regarding offenders with special needs.  When immediate action is required, consultation to review the appropriateness of the action occurs as soon as possible, but no later than 72 hours.  Examples include, but are not limited to: housing assignments; program assignments; disciplinary measures and transfers to other facilities.

s/James M. Le Blanc
Secretary

This policy supersedes HC Policy No. HC-11 dated 01 August 2002.

JX-CCH-003227

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC–13**
          **10 February 2009**



**HEALTH SCREENS, APPRAISALS AND EXAMINATIONS**

**OBJECTIVE:**    To provide a system for evaluating the health needs of offenders entering the system, transferring between facilities and during their period of incarceration; to insure that the health and safety needs of the institution, the offender, staff and other offenders are met; and to insure that offenders receive the proper housing and activity assignments.

**REFERENCES:**    1-HC-1A-19, 1-HC-1A-20, 1-HC-1A-21, 1-HC-1A-22 and 1-HC-1A-23 and Department Regulation No. B-06-003 "Medical Reimbursement Plan."

**POLICY:**

1.    **RECEPTION UNIT SCREENINGS/APPRAISALS:**

    A.    Intake medical screens for offender transfers, excluding intrasystem transfers, commence upon the offender's arrival at the institution and are performed by health-trained or qualified health care personnel; these screenings are generally performed at HRDC, WRDC, FRDC and LSP/Death Row.   All findings are recorded utilizing the RDC Intake Medical Screening (Form HC–13–A attached) approved by the Health Authority.  The screening includes at least the following:

        1)    Inquiry into:

            • Any past history of serious infectious or communicable illness, and any treatment or symptoms (for example, a chronic cough, hemoptysis, lethargy, weakness, weight loss, loss of appetite, fever, night sweats that are suggestive of such illness) and medications;
            • Current illness and health problems, including communicable/ contagious diseases;
            • Dental problems;
            • Use of alcohol and other drugs, including type(s) of drugs used, mode of use, amounts used, frequency used, date or time of last use and history of any problems that may have occurred after ceasing use (e.g., convulsions);
            • The possibility of pregnancy and history of problems (females only); and other health problems designated by the responsible physician;
            • Private insurance coverage in compliance with La. R.S. 15:831.

**Health Care Policy No. HC–13**
**10 February 2009**
**Page Two**

2) Observation of the following:

- Behavior, including state of consciousness, mental status, appearance, conduct, tremor and sweating;
- Body deformities, ease of movement and related issues;
- Condition of the skin, including trauma markings, bruises, lesions, jaundice, rashes, infestations, recent tattoos, and needle marks or indications of drug abuse;
- Mouth, teeth, and gums looking for obvious dental problems.

3) Medical disposition of the offender:

- General population;
- General population with prompt referral to appropriate health care services;
- Referral to appropriate health care service for emergency treatment.

4) Offenders who are unconscious, semiconscious, severely bleeding, or otherwise obviously in need of immediate medical attention, are referred. When they are referred to an emergency department, their admission or return to the institution is predicated on written medical clearance. When screening is conducted by trained custody staff, procedures will require a subsequent review of positive findings by the licensed health care staff. Written procedures and screening protocols are established by the responsible physician in cooperation with the Warden.

D. Comprehensive health appraisals will be completed for each offender, excluding intrasystem transfers, after arrival at the institution; these appraisals are routinely performed at HRDC, WRDC, FRDC and LSP/Death Row, and occasionally at other institutions utilizing the RDC Health Appraisal and Treatment Plan (Form HC-13-B attached). For offenders with a documented health appraisal within the previous ninety days, a new health appraisal is not required except as determined by the Health Authority. Health appraisals include the following:

1) Within fourteen days after arrival at the institution:

- Review of the earlier receiving screen;
- Collection of additional data to complete the medical, dental, mental health and immunization histories;
- Laboratory or diagnostic tests to detect communicable/contagious disease, including venereal disease and tuberculosis;
- Record of height, weight, pulse, blood pressure and temperature;
- Other tests and/or examinations, as appropriate.

2)  Within fourteen days after arrival for offenders with identified significant health care problems:

- Medical examination, by MD or midlevel provider under the supervision of a physician, including review of mental and dental status (for those offenders with significant health problems discovered on earlier screening such as cardiac problems, diabetes, communicable diseases, etc);
- Review of the results of the medical examination, tests and identification of problems by a physician or other qualified provider, if such is authorized in the medical practice act;
- Initiation of therapy, if indicated;
- Development and implementation of a treatment plan, including recommendations concerning housing, job assignment and program participation.

3)  For offenders with no significant health care problems, the appraisal as noted in 2) above will be accomplished within 30 days of reception.

4)  Health appraisal data collection and recording will include the following:

- A uniform process as determined by the Health Authority;
- Health history and vital signs collected by health-trained or qualified health care personnel;
- Collection of all other health appraisal data performed only by qualified health personnel;
- Review of the results of the medical examination, tests and identification of problems is performed by a physician or mid-level practitioner, as allowed by law;
- Medical level of care codes and recommended duty status.

## 2.  GENERAL SCREENINGS:

A.  Intrasystem transfer screenings will be conducted on all offenders on their arrival to the institution by health-trained or qualified health care personnel utilizing the Intrainstitutional Health Screening (Form HC-13-C attached).  All findings are recorded on a screening form approved by the Health Authority, and will, at a minimum, include the following:

1)  Inquiry into:

- Current treatment of medical or dental problems;
- Current medications;
- Current medical or dental complaints.

JX-CCH-003230

**Health Care Policy No. HC–13**
**10 February 2009**
**Page Four**

        2)    Observation of:

- General appearance and behavior;
- Physical deformities;
- Evidence of abuse or trauma.

        3)    Medical disposition:

- General population;
- General population with appropriate referral to health care service;
- Referral to appropriate health care service for service emergency treatment.

B.    In-transit offenders will receive a health screening by health-trained or qualified health care personnel on entry into the Department of Public Safety and Corrections.  Findings are recorded on the intrasystem screening form that will accompany the offender to all subsequent facilities until the offender reaches his/her final destination.  Health screens will be reviewed at each institution by health trained or qualified health care personnel.  Procedures will be in place for continuity of care.

<u>s/James M. Le Blanc</u>
Secretary

Forms:      HC-13-A:    RDC Initial Intake Medical Screening
             HC-13-B:    RDC Health Appraisal and Treatment Plan
             HC-13-C:    Intrainstitutional Health Screening

This supersedes Health Care Policy No. H–13 dated 01 August 2002 and Page One dated 20 December 2002.

JX-CCH-003231

**Health Care Policy No. HC–13**
**10 February 2009**
**Page Five**

JX-CCH-003232

**Form HC-13-A**
**10 February 2009**

# RDC Initial Intake Medical Screening

**Facility:** _____     **Admission Date:** _____

DOC # _____ NAME _____ RACE _____ DOB _____ AGE_____

PRIOR INCARCERATION:   Y*   N  *WHERE/WHEN_____   TRANSFERRED FROM: _____

ALLERGIES(describe reactions): _____

INSURANCE: _____

ADMISSION V/S:   BP: _____   Pulse: _____   Resp: _____   Temp:_____   Height: _____   Weight: _____   SPO$_2$ _____

VISUAL ACUITY:  Left Eye: 20/_____   Right Eye: 20/_____   Wears Glasses:  Y   N   Has Glasses Here:  Y  N   Wears Contacts:  Y   N

CURRENT MEDICATIONS and/or MEDICAL TREATMENT _____
_____

### MEDICAL CONDITIONS (Circle and/or Complete Current and Previous Conditions):

| Cardiovascular Disease | Respiratory Disease | GI/GU | Blood Disorders | Infectious Disease | Reproductive |
|---|---|---|---|---|---|
| CAD / MI | COPD | Dialysis | Sickle Cell | HIV/AIDS | Abnormal PAP |
| CHF | Emphysema | Ostomy | Anemia | Genital Herpes | Abnormal Mammo |
| HTN | Asthma | GERD | Long Term Anticoagulation | Syphilis | LMP_____ |
| CABG/ Stent | **Endocrine** | Hemmorhoids | Bleeding Disorder | Chlamydia | |
| **Neurological** | Diabetes | **Cancer** | Leukemia | Hep A B C | |
| Stroke / TIA | Hyperthyroidism | Chemotherapy | | Staph/MRSA | |
| Seizure Disorder | Hypothroidism | Radiation | | Pregnant Y / N EDD _____ | |

Other/Comments: _____

### FAMILY HISTORY (Circle and/or Complete):

Cancer          Cardiovascular Disease          Diabetes          Hypertension          Mental Illness

Renal Disease          Respiratory Disease   Other/Comments: _____

### SKIN ABNORMALITIES:

Jaundice:       Y   N       Trauma Markings:   Y   N

Needle Marks:  Y   N       Infestations:       Y   N



BACK

**Indicate The Location Of The Following:**

Scars – S
Tattoos – T
Lesions – L
Bruises – B
Abscess/Boils – A
Rashes – R
Cuts – C

Comments/Describe Tattoos:
_____
_____
_____
_____
_____

### GENERAL CONDITION:

Behavior: _____

Level of Consciousness/Orientation: _____

General Appearance: _____Conduct During Assessment:_____

Tremor Y / N                Sweating  Y   N

Ease of Movement: _____Deformities/Abnormalities:_____

Prostheses/Orthotics:  Y   N  _____

Medical Equipment:  Y   N    W/C  Walker  Cane  Other_____

**TB SCREENING (Indicate S/S Present Over The Past 3 Months):**

| | | |
|---|---|---|
| Unexplained Weight Loss | Y   N | Comments:_____ |
| Loss of Appetite | Y   N | _____ |
| Fever/Chills/Night Sweats | Y   N | _____ |
| Productive Cough > 1 Month | Y   N | _____ |
| Coughing Up Blood | Y   N | _____ |
| Lethargy/Weakness/Fatigue | Y   N | _____ |

OTHER:_____

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| **Health Care Provider Completing Form** | **DATE/TIME** | **Physician Review** | **DATE/TIME** |

**Form HC-13-A**
**10 February 2009**
**Page 2 of 2**

## RDC Initial Intake Medical Screening Form

**Facility:** _____

**Admission Date:** _____

**PRIOR SURGERIES**                                    **DATE**          **HOPITAL / OUT PT CLINIC**          **PHYSICIAN**

_____          _____          _____          _____

_____          _____          _____          _____

_____          _____          _____          _____

**DENTAL CONDITION (Circle and/or Complete):** Dentures:  Y    N     Upper    Lower    Partial     Dental Problems/Comments: _____
_____
_____

**SUBSTANCE ABUSE HISTORY:  (Circle and/or Complete)**

Smoke Cigarettes:    Y    N     How long _____     Pks/day: _____    Quit Smoking (approx. date) _____

Alcohol:   Y    N    How long _____    What type_____     Freq/Amt: _____     Last Use (approx. date): _____

Drug Abuse:  Y    N   How long _____     What drug(s)/mode_____     Freq/Amt: _____     Last Use (approx. date): _____

IV Drug Abuse:   Y    N      Seizures/Convulsions/Other from Stopping Alcohol/Drugs:  Y     N      Substance Abuse Treatment:  Y    N     Inpatient  Outpatient

Other/Comments: _____

**MENTAL HEALTH:**

Current MH Treatment:  Y   N      History of MH treatment:  Y   N   Inpatient   Outpatient          Current Suicidal Ideation:  Y    N      History of Suicide Attempts:  Y   N

Current Symptoms of:   Psychosis    Depression    Anxiety    Aggression    Other/Comments (Include locations and approx. dates of treatment if known):_____
_____

**OTHER PERTINENT FINDINGS:** _____
_____
_____
_____

## DISPOSITION

GENERAL POPULATION

GENERAL POPULATION WITH REFERRAL TO M.D., M.H., DENTIST_____

URGENT REFERRAL TO E.R., M.H. ON CALL, PHYSICIAN ON DUTY/CALL (if off site, written clearance required before
readmission to    the institution)_____

_____          _____          _____          _____
**Health Care Provider Completing Form**     **DATE/TIME**                    **Physician Review**                    **DATE/TIME**

JX-CCH-003234

**Form HC–13–B**
**10 February 2009**

### RDC Health Appraisal and Treatment Plan

Facility: _____

Admission Date:_____

DOC # _____ NAME _____ RACE ____ DOB _____ AGE_____

**ALLERGIES:** _____

**ADMISSION V/S:** BP: _____Pulse:_____Resp: _____Temp:_____Height: _____Weight: _____ SPO$_2$ _____

**VISUAL ACUITY:** Left Eye: 20/_____ Right Eye: 20/_____ Wears Glasses: Y  N

Has Glasses Here: Y  N  Wears Contacts: Y  N

Other/Comments:_____

**HEARING:** Hearing Impaired: Y  N  Left Ear: Partial  Total (Deaf)  Right Ear: Partial  Total (Deaf)  Hearing Aides:  L   R   Both   N/A

**CURRENT MEDICATIONS:** Y  N  Transfer Meds Available:  Y  N  List Current Medications:_____

_____

_____

LABORATORY/TEST RESULTS: **PPD (Date Adm):**_____ **PPD (Date Read/Results):**_____ **CXR (Date/Results):**_____

RPR (Date Drawn/Results): _____ Other:_____ Completed Childhood Immunizations:  Y   N

_____  _____  ☐Reviewed By Provider_____  _____
Nurse's Signature                     Date          Physician or Mid-level Provider's Signature          Date

### INITIAL PHYSICAL EXAM

Date:_____  V/S: B/P:_____  P:_____  R:____ T:_____  Wt: _____  SPO$_2$:_____

### ------------TO BE COMPLETED BY PHYSICIAN OR MID-LEVEL PROVIDER ONLY------------

HEENT:_____

Heart: _____

Lungs:_____

Abdomen:_____

Neuro:_____

Extremities:_____

GU: _____

Current Complaints: _____

_____

Impression:_____

_____

**FOLLOW UP:**
Hearing Impaired   Y         N                          Referral for Hearing Aids?   Y         N         N/A

OFF-SITE APPOINTMENTS: _____ (decision to keep off site appointments may be deferred at receiving institutions)

FOLLOW UP AT PERMANENT INSTITUTION:_____  _____

**TREATMENT PLAN:**
(See physician order sheet for medications/treatments specific for this offender):
MEDICATIONS ORDERED: [ ] TREATMENTS: [ ] FOLLOW UP INDICATED: [ ]

DUTY STATUS:_____

MEDICAL LEVEL OF CARE (LOC): circle    LOC I    LOC II    LOC III

_____    _____
Physician or Mid-level Provider's Signature                    DATE/TIME

**Form HC-13-C**
**10 February 2009**

## INTRAINSTITUTIONAL HEALTH SCREENING
## FACILITY:_____

NAME:_____ DOC:_____ RACE:_____ DOB:_____

TRANSFERRED FROM:_____ALLERGIES:_____PPD:_____

(CURRENT COMPLAINT)                              CURRENT TREATMENT/MEDICATION
MEDICAL:_____ _____    _____
_____ _____
_____ _____
_____ _____
_____ _____
DENTAL:_____ _____    _____
_____ _____
MENTAL HEALTH:_____ _____
_____ _____
_____ _____

GENERAL APPEARANCE/BEHAVIOR

Physical Deformities:_____ Diet:_____
Evidence of Abuse or Trauma:_____
Prosthetic Devices or Medical Equip:_____
Duty Status:_____ _____

SCHEDULED FOLLOW UP (note dates and locations of any scheduled clinic, hospital, lab or x-ray appointments):
_____
_____

MENTAL HEALTH SCREEN (only for weekends or after hour transfers):
        HX Suicide Behavior:_____ Current Suicide Ideation:_____

        HX Out/In-Patient Psychiatric TX:_____
        Current Signs of Psychosis, Depression, Anxiety or Aggression:_____

DISPOSITION:
[ ]     GENERAL POPULATION
[ ]     GENERAL POPULATION WITH REFERRAL TO MD, DENTIST, MENTAL HEALTH
[ ]     EMERGENCY REFERRAL TO:_____
[ ]     OFFENDER HAS BEEN INSTRUCTED ON PROCEDURES (for sick call, pill call, medical co-payments)

NURSE SIGNATURE:_____ DATE/TIME:_____

JX-CCH-003236

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-14**



**23 September 2009**

**MEDICAL LEVEL OF CARE**

1.   **REFERENCES:**   Department Regulation No. B-02-001 "Assignment and Transfer of Offenders" and ACA Standard 4-4348 (Adult Correctional Institutions.)

2.   **PURPOSE:**  To establish a Medical Level of Care (LOC) Classification System for the offender population that ensures placement at an appropriate institution which provides the medical resources required by the offender.

3.   **POLICY:**  It is the Secretary's policy that a Medical LOC be assigned to every offender for institutional placement.  The LOC designation indicates the highest LOC available at each institution, thereby including consecutively lower LOC designations.

4.   **PROCEDURES:**

    A.   Reception Center staff shall assign each offender a LOC designation in order for classification staff to ensure placement at an appropriate institution that will provide the medical resources required by the offender.

    B.   Level of Care 1

        a.   Facility has on site infirmary with a Registered Nurse (RN) available 24 hours per day.

        b.   A physician, Nurse Practitioner (NP) or Physician Assistant (PA) is on site 24 hours per day or readily available to travel to the institution.

    C.   Level of Care 2

        a.   Facility has on site infirmary staffed with a Licensed Practical Nurse (LPN) available 24 hours per day.

        b.   A physician, NP or PA is on-call 24 hours per day or there is access to an emergency medical facility in a nearby community.

**Health Care Policy No. HC-14**
**23 September 2009**
**Page Two**

NOTE:      Offenders needing wound care or requiring significant help with activities of daily living may very well be LOC 2, depending upon their overall medical requirements.

D.    Level of Care 3

    a.    Facility has availability of 24 hour health care trained staff on site (i.e., LPN, EMT and/or health care trained Security Officers) on site or in a community setting.

    b.    Offenders should be medically stable, needing only routine care.

NOTE:      (See Department Regulation No. B-02-001, Appendix III "JLDCC and DCI Baton Rouge Crews" for additional details.)

E.    LOC Ratings are as follows:

    1)    LOC I - LSP, LCIW and EHCC

    2)    LOC II - DWCC, FWCC , DCI, AVC, WNC, PCC, ALC and RCC

    3)    LOC III - JLDCC, DCI Baton Rouge Crews and Work Release Programs

Note:      Offenders being considered for possible work release program participation must also meet the following additional requirements:

- Must be stabilized on all currently prescribed medications.

- Has no significant medical conditions that require more than routine medical care, as determined by the Health Care Authority or designee. (Examples of offenders who should be considered for work release if otherwise eligible: offenders with chronic illnesses, but who are stable, functional and have required only routine care in the past six months, e.g. diabetics, even those on insulin without frequently debilitating hypoglycemic or hyperglycemic episodes in the previous six months; HIV positive offenders without any significant, acute illness in the previous six months; mild intermittent or mild persistent bronchial asthma and mental health issues in remission with good responses.)

F.    Should institutional medical staff determine that the offender's medical need has changed and is not consistent with the designated LOC, the

JX-CCH-003238

**Health Care Policy No. HC-14**
**23 September 2009**
**Page Three**

Health Care Authority shall make a request to the Department's Medical/Mental Health Director for a transfer. This request shall include a brief medical summary and description of the change in offender's medical condition. The Department's Medical/Mental Health Director shall have final authority to determine the medical LOC of an offender and shall approve or deny the request.

G.    An offender's LOC may be changed to a less restrictive designation by the Health Care Authority or designee.

H.    Should institutional staff determine that the LOC designation for the institution is no longer accurate according to the actual services provided, the Health Care Authority shall contact the Unit Head to request a re-evaluation of the LOC designation of the facility pursuant to this policy. Upon concurrence, the Unit Head shall send a request to the Department's Medical/Mental Health Director who shall make a recommendation to the Secretary for a final determination of the institution's medical LOC designation.

s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-14 dated 01 August 2002.

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-15**



**06 May 2011**

## DUTY STATUS CLASSIFICATION SYSTEM

1.   **OBJECTIVE:**   To state the general guidelines regarding the duty status classification system and to assist the Classification Department in placing offenders in appropriate duty assignments.

2.   **REFERENCES:**   ACA Standards 4-4365 and 4-4371 (Adult Correctional Institutions) and Health Care Policy Nos. HC-03 "Continuity of Care," HC-13 "Health Screens, Appraisals and Examinations," HC-16 "Elective Procedures, Prostheses and Orthodontic Devices," HC-33 "Offender Medical Records" and HC-45 "Psychotropic Medication and Heat Pathology."

3.   **POLICY:**  It is the Secretary's policy that each offender shall be assigned a duty status based on their health condition (i.e. medical, mental health, dental or related.)

4.   **APPLICABILITY:**   Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.   **PROCEDURES:**  Determination of an offender's duty status is the responsibility of the direct health care staff at the institution where the offender is housed.  A duty status shall only be given by the Department's direct health care staff or by contractors working as primary care providers for the Department. On-site or off-site consultants shall not assign a duty status.  Consultant evaluations shall be reviewed by the direct health care staff who shall determine the appropriate duty status.  The duty status issued by the receiving institution supersedes any prior duty status.

    A.   As part of the direct health care staff's intake review, a non-confidential summary of potential restrictions in duty assignment based upon health care factors shall be furnished to the Classification Department utilizing the Offender Duty Status (Form HC-15-A) for use in initial and re-classification decision making.

JX-CCH-003240

**Health Care Policy No. HC-15**
**06 May 2011**
**Page Two**

B.     Offenders can not refuse an assigned duty status.

C.     Duty statuses are assigned based on an offender's health condition and are subject to change according to changes in an offender's health (including permanently assigned duty statuses.)  However, duty statuses shall not be changed due to any other non-health related reason (i.e. to grant certain privileges such as participation in sports or to obtain desired housing assignments, etc.)

D.     A duty status can be changed after a clinical examination or medical record review by the direct health care staff.  When a change is made, the reason shall be documented in the offender's medical record.

E.     Health care staff shall not recommend specific duty assignments for offenders (i.e. dorm orderly, kitchen worker, etc.)  The Classification Department shall use an offender's assigned duty status as a guide when placing offenders in duty assignments.

F.     Health care staff shall be cautious when choosing words to describe a duty status restriction.  For example, instead of using "no sitting" which would indicate that an offender can never sit down, health care staff shall use more suitable phrasing such as "avoid jobs that require prolonged sitting."  Additionally, phrases such as "no walking more than 100 yards," "no standing for more than 30 minutes" or "no lifting more than 25 pounds" should generally be avoided, as there is a lack of medical literature to substantiate such specific limitations.

G.     An offender shall be assigned one of the following duty statuses:

1)     Regular Duty-No Restrictions

2)     Regular Duty-With Restrictions

Offenders assigned this duty status are able to perform full-time work or education assignments, but may be restricted from certain aspects of work, sports and recreational activities due to health-related reasons.  For example, offenders on Coumadin (a type of blood thinner medication), shall not be allowed to participate in contact sports or an otherwise healthy offender with a seizure disorder shall not be allowed to drive a motorized vehicle, etc.

**Health Care Policy No. HC-15**
**06 May 2011**
**Page Three**

3)      Limited Duty

Offenders assigned this duty status are unable to perform full-time work or educational assignments due to health-related reasons. This duty status may also include further restrictions regarding work, sports and recreational activities.

4)      No Duty

Offenders assigned this duty status are unable to perform any work or educational assignment due to health-related reasons. This duty status shall be ordered on very rare occasions when no other duty status is appropriate. Participation in sports or recreational activities is prohibited.

5)      No Duty/Bed Rest

Offenders assigned this duty status shall be restricted to their beds. They shall be allowed out of bed only for pill call, meals, bathroom privileges, roll calls and medical callouts. Participation in sports or recreational activities is prohibited.

6)      Temporary

Activities of offenders assigned this duty status are severely restricted on a temporary basis for a time period of less than three months. Participation in sports and recreational activities is prohibited.

s/James M. Le Blanc
Secretary

Form:        HC-15-A        Offender Duty Status

This policy supersedes Health Care Policy No. HC-15 dated 01 August 2002.

JX-CCH-003242

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC–16**



**27 August 2010**

**ELECTIVE PROCEDURES, PROSTHESES AND ORTHODONTIC DEVICES**

1.    **REFERENCES:**    ACA Standards 4-4375 and 4-4398 (Adult Correctional Institutions); Louisiana Constitution Art. 1 § 3 "Right to Individual Dignity" and § 12 "Freedom from Discrimination;" Americans with Disabilities Act of 1990 (ADA) as amended; Civil Rights for Handicapped Persons La. R.S. 46:2251 et seq.; Rehabilitation Act of 1973; 28 C.F.R. § 35.104 and 28 C.F.R. § 39.103; La. R.S. 40:731 et seq., 46:2365, 49:145 et seq. and 51:2231 et seq.; Department Regulation Nos. B-08-010 "Americans with Disabilities Act," B-08-018 "Effective Communication with the Hearing Impaired" and Health Care Policy Nos. HC-02 "Healthcare Co-Payments" and HC-15 "Duty Status Classification System."

2.    **PURPOSE:**  To state the general guidelines regarding departmental policies concerning the provision of medical/dental auxiliary aids or adaptive devices, elective procedures or surgery for offenders.

3.    **DEFINITIONS:**

    A.    Elective procedure:  Any planned non-emergency procedure.  It may be either medically necessary (e.g., cataract surgery, routinely scheduled heart surgery, etc.) or optional (e.g., cosmetic, etc.)

    B.    Individualized devices/aids: Those that cannot be used by others (including but not limited to eye glasses, dentures, hearing aids, etc.)

    C.    Major life activity: Walking, seeing, hearing, breathing, caring for one's self, sitting, standing, lifting, learning, thinking and working.  This list is illustrative only.

    D.    Medically necessary procedure: Treatments/procedures routinely prescribed by health care providers to maintain/preserve basic health and/or functionality (e.g., cardiac bypass surgery, gallbladder removal, surgical treatments of various cancers, spinal surgeries, orthopedic surgeries, etc.)

JX-CCH-003243

**Health Care Policy No. HC-16**
**27 August 2010**
**Page Two**

E.  Non-individualized devices/aids:  Those that can be used by multiple users (including but not limited to wheelchairs, canes, walkers, CPAP machines, etc.)

F.  Non-medically necessary procedure: Procedure that is not necessary to preserve basic health (including but not limited to replacing missing front teeth, cosmetic surgery, tattoo removal, Lasik eye surgery, etc.)

4.  **POLICY:**  It is the Secretary's policy to provide medically necessary elective procedures or surgeries for offenders and to ensure medical/dental auxiliary aids or adaptive devices (including but not limited to eyeglasses, hearing aids, dentures, wheelchairs or other prosthetic devices, etc.) are provided when medically necessary as determined by a health care provider (approval by the unit's Medical Director may be required.)

5.  **PROCEDURES:**

A.  Elective Procedures

Non-medically necessary elective procedures are not routinely provided. In exceptional cases when a procedure that is non-medically necessary is recommended, the unit's Medical Director shall notify the Warden, who shall submit a written request to the Department's Medical/Mental Health Director for consideration.  If approved, a clinic visit or procedure shall then be scheduled.

B.  Prostheses and Orthodontic Devices

1)  The unit's Medical Director shall screen all referrals for appropriateness and compliance with departmental policy regarding medical prosthesis and devices.

2)  Prior to purchasing any alternate prostheses/devise, should the unit Medical Director have institutional safety concerns regarding a specific prosthetic device, the appropriate Security Administrator shall be consulted.  If the concerns are validated, an alternate prostheses/devise shall be considered.  If necessary, the unit Warden may consult with the Department's Medical/Mental Health Director to reach a final disposition.

3)  Basic auxiliary aids/prosthetic devices that are deemed medically necessary shall be provided by the Department.  The Department shall not provide aids or devices that are cosmetically or otherwise enhanced and that do not provide any additional medical benefit.

JX-CCH-003244

**Health Care Policy No. HC-16**
**27 August 2010**
**Page Three**

4) A medical co-payment charge may be assessed to the offender in accordance with Health Care Policy No. HC-02 "Medical Co-Payment" for individualized medical prostheses and orthodontic devices. Replacement of devices that were damaged, broken or lost due to obvious negligence shall be replaced at the discretion of the unit's Medical Director; however, a co-payment shall be applied each time the device is replaced. The Department shall provide for the routine maintenance and repair of the device that occurs through normal usage by the offender as outlined in the manufacture's guidelines.

5) There shall be no co-payment for non-individualized auxiliary aids/adaptive devices, prosthetic devices or medical devices furnished by the Department and the offender shall return these items to the medical department of the unit prior to release. The Warden or designee is authorized to allow an offender to be released from custody with a non-individualized device in exceptional cases.

6) If indicated, when an auxiliary aid/adaptive devise or a prosthetic devise is issued to an offender, the unit's medical provider shall ensure that an appropriate duty status clearly stating the offender's limitations and/or required accommodations is issued as outlined in Health Care Policy No. HC-15 "Duty Status Classification System."

C. Eyeglasses

1) The Department shall furnish prescription eyeglasses to any offender requiring them, as documented through a professional prescription.

2) Reading glasses may be purchased through the offender canteen or purchased by the Department.

3) Offenders having glasses upon admission may retain the glasses once approved by security to ensure that the model of device addresses institutional safety concerns. Glasses shall not be allowed from an outside source unless approved by the Warden or designee.

4) The Department shall provide new eyeglasses if the offender's prescription changes greater than ½ diopter sphere or cylinder or the addition of increased power is indicated.

JX-CCH-003245

**Health Care Policy No. HC-16**
**27 August 2010**
**Page Four**

5) The Department shall not provide contact lenses and/or contact lens maintenance supplies to an offender in lieu of eye glasses. If a unit allows offenders to purchase their own contact lenses through an approval process, then the offender shall be responsible for contact lens solution or any other necessary supplies in addition to future costs of replacements.

D. Dental Adaptive Devices

A dental prosthesis may be provided to offenders in cases where the number and location of missing teeth make proper mastication too difficult and/or when the health of the offender would be adversely affected for this reason, as determined by the dentist. However, the Department is not required to replace missing teeth, regardless of when or where the teeth were removed. A dental prosthesis shall not be considered if any of the following conditions are present:

- Poor periodontal health;
- Poor oral hygiene;
- Non-restorable teeth present;
- Chronic infection;
- Restorations have not been completed;
- Eight or more posterior teeth in occlusion, to include bicuspid occlusion;
- The offender has less than one year remaining on his sentence.

E. Hearing Aids

1) The supplying of hearing aids to offenders is addressed pursuant to Department Regulation No. B-08-010 "Americans with Disability Act."

2) The current Occupational Safety and Health Administration (OSHA) standards shall be utilized to determine if an offender can be assisted by the use of a hearing aid. At intake, an initial hearing test shall be scheduled for those offenders identified as possibly hard of hearing or deaf. An offender may request a hearing test if his hearing has degenerated during the course of his incarceration. This request may also be made for the offender by a staff member. The request shall be made utilizing Form A-02-017-A "Request for Accommodation" in accordance with Department Regulation No. B-08-018 "Effective Communication with the Hearing Impaired." If the hearing test reveals that a hearing aid is medically warranted, the appropriate steps shall be initiated to provide the offender with an

JX-CCH-003246

**Health Care Policy No. HC-16**
**27 August 2010**
**Page Five**

aid.  Further, the offender shall be given an option to remain at his current facility or to administratively transfer to one of the specialized facilities for deaf or hearing impaired offenders (LSP, RCC or LCIW.)  The location of the transfer shall be determined by the Office of Adult Services.

F.    Prosthetic Device

1)    A prosthesis or artificial device (including wheelchairs, etc.) to replace a missing body part or to cope with a disability which prohibits major life activities, may be provided if deemed essential for overall health maintenance by the unit's Medical Director in consultation with the Warden.

2)    The prosthesis shall meet the minimum requirements of the function.

3)    A prosthetic device of a cosmetic nature only, shall not be provided unless approved by the Warden and the Department's Medical/Mental Health Director with adequate written justification from the unit's Medical Director.

4)    The prosthesis may be replaced due to normal wear and tear at the discretion of the unit's Medical Director.

5)    Offenders having a prosthetic device upon admission may be allowed to keep the device at the discretion of the unit Medical Director.   If approved, this device shall be considered personal property and shall be allowed to leave with the offender upon discharge.

s/James M. Le Blanc
Secretary

Form:        A-02-017-A    Request for Accommodation

This policy supersedes Health Care Policy No. HC-16 dated 12 August 2010.

Attachment A

DPS&C Formulary 28 February 2011

| Generic Name | Brand Name | Drug Class |
|---|---|---|
| Abacavir | Ziagen | *ANTIVIRALS* |
| Abacavir/Zidovudine/Lamivudine | Trizivir | *ANTIVIRALS* |
| Acetaminophen | Tylenol | *ANALGESIC NON NARCOTIC* |
| Acetaminophen with Codeine | Tylenol #3 | *ANALGESIC NARCOTIC* |
| Acetaminophen with Oxycodone | Tylox | *ANALGESIC NARCOTIC* |
| Acetic Acid (Otic) | Vosol | *OTIC* |
| Activated Charcoal | Actidose | *ANTIDOTES* |
| Acyclovir capsules | Zovirax | *ANTIVIRALS* |
| Adenosine | Adenocard | *ANTIARRHYTHMICS* |
| Adult Nutritional Supplement | Boost/Ensure/ Resource etc. | *DIETARY PRODUCTS* |
| Albuterol | Ventolin; Proventil (Repetab) Inhaler | *ANTIASTHMATICS* |
| Alcohol (Isopropyl) | Rubbing Alcohol | *CHEMICALS* |
| Alendronate | Fosomax | *MISC. ENDOCRINE* |
| Allopurinol | Zyloprim | *GOUT* |
| Aluminum Hydroxide Gel | Amphojel | *ANTIACIDS* |
| Aluminum Sulfate & Calcium Acetate | Domeboro  OTIC | *OTIC* |
| Amantadine | Symmetrel | *ANTIDYSKINETICS* |
| Amlexanox | Aphthasol | *UNCLASSIFIED* |
| Aminophylline | Aminophylline | *ANTIASTHMATICS* |
| Amiodarone | Cordarone | *ANTIARRHYTHMICS* |
| Amitriptyline HCl | Elavil | *ANTIDEPRESSANTS* |
| Amlodipine | Norvasc | *CALCIUM CHANNEL BLOCKER* |
| Ammonia Aromatic Spirit Solution | Ammonia Aromatic Spirit Solution | *UNCLASSIFIED* |
| Ammonium Lactate | Lac-Hydrin | *DERMATOLOGICALS* |
| Amoxicillin | Polymox; Amoxil; Trimox | *PENICILLINS* |
| Amoxicillin/Potassium Clavulanate | Augmentin | *PENICILLINS* |
| Antipyrine & Benzocaine with Glycerin (Otic) | Auralgan Otic Solution | *OTIC* |
| Antivenin (Crotalidae) Polyvalent Snake | Snake Antivenin | *PASSIVE IMMUNIZING AGENTS* |
| Artificial Tears (Ophthalmic) | Isopto Tears | *OPHTHALMIC* |
| Ascorbic Acid (Vitamin C) | Ascorbic Acid (Vitamin C) | *VITAMINS* |
| Aspirin | Aspirin | *ANALGESIC NON NARCOTIC* |
| Atazanavir | Reyataz | *ANTIVIRALS* |
| Atenolol | Tenormin | *BETA BLOCKERS* |
| Atropine Sulfate | Atropine Sulfate | *UNCLASSIFIED* |
| Atropine Sulfate (Ophthalmic) | Isopto Atropine Ophthalmic | *OPHTHALMIC* |
| Azithromycin | Zithromax | *MACROLIDE ANTIBIOTICS* |
| Baby Shampoo | Baby Shampoo | *DERMATOLOGICALS* |
| Bacitracin Ointment | Bacitracin Ointment | *DERMATOLOGICALS* |
| Bacitracin Ointment (Ophthalmic) | Bacitracin Ointment (Ophthalmic) | *OPHTHALMIC* |
| Baclofen | Lioresal | *SKELETAL MUSCLE RELAXANTS* |
| Balsalazide | Colazal | *MISC GI. * |
| Beclomethasone | QVAR | *ANTIASTHMATICS* |
| Belladonna Alkaloids with phenobarbital | Donnatol Tablets and Liquid | *ULCER DRUGS* |
| Benzathine Penicillin G | Bicillin-LA | *PENICILLINS* |
| Benzocaine Gel | Orabase-B; Orajel Maximum Strength | *MOUTH & THROAT (LOCAL)* |
| Benzocaine/Butyl Aminobenzoate/Tetracaine Spray | Cetacaine | *MOUTH & THROAT (LOCAL)* |
| Benzocaine/Cetylpyridinium Cl | Cepacol Anesthetic | *MOUTH & THROAT (LOCAL)* |
| Benzocaine/Menthol | Chloraseptic; Anbesol | *MOUTH & THROAT (LOCAL)* |
| Benzonatate | Tessalon Perle | *COUGH/COLD/ALLERGY* |
| Benzoyl Peroxide | Bar, Gel | *DERMATOLOGICALS* |
| Benztropine Mesylate | Cogentin | *ANTIDYSKINETICS* |
| Betamethasone Dipropionate (Cream and/or Ointment) | Diprosone | *DERMATOLOGICALS* |
| Betamethasone Sodium Phosphate/Betamethasone A | Celestone Soluspan | *CORTICOSTEROIDS* |
| Bethanechol | Urecholine | *URINARY ANTISPASMODICS* |
| Biperiden | Akineton | *ANTIDYSKINETICS* |
| Bisacodyl | Dulcolax | *LAXATIVES AND STOOL SOFTNERS |
| Bismuth Subsalicylate Susp. | Pepto Bismol | *ANTIDIARRHEAL* |
| Boric Acid | Boric Acid | *DERMATOLOGICALS* |
| Brimonidine Tartrate | Alphagan eye drops | *OPHTHALMIC* |
| Bromocriptine Mesylate | Parlodel | *ANTIDYSKINETICS* |
| Budesonide/Formoterol | Symbicort | *ANTIASTHMATICS* |
| Bumetanide | Bumex | *DIURETICS* |
| Bupropion HCl | Zyban S-R; Wellbutrin | *ANTIDEPRESSANTS* |
| Buspirone | Buspar | *ANTIANXIETY AGENTS* |

| | | |
|---|---|---|
| Calamine 8%/Diphenhydramine HCl 1% Lotion | Caladryl Lotion | *DERMATOLOGICALS* |
| Calamine Lotion | Calamine Lotion | *DERMATOLOGICALS* |
| Calcipotriene | Dovonex | *DERMATOLOGICALS* |
| Calcitrol (Vitamin D3) | Rocaltrol | *VITAMINS* |
| Calcium Acetate | Phoslo | *MISC. G. I.* |
| Calcium Carbonate | Calcium 500mg; TUMS; OSCAL | *MINERALS AND ELECTROLYTES* |
| Calcium Carbonate with Vit. D | Oscal-D 500 | *MINERALS AND ELECTROLYTES* |
| Calcium Chloride | Calcium Chloride | *MINERALS AND ELECTROLYTES* |
| Calcium Gluconate | Calcium Gluconate | *MINERALS AND ELECTROLYTES* |
| Calcium Polycarb | Fibernorm | *LAXATIVES AND STOOL SOFTNERS |
| Camphor 10.8%/Phenol 4.7% | Campho-Phenique | *DERMATOLOGICALS* |
| Camphor/Menthol/Alum/Salicylic Acid/Phenol Oint | Carmex | *MOUTH & THROAT (LOCAL)* |
| Carbachol (Ophthalmic) | Isopto Carbachol | *OPHTHALMIC* |
| Carbamazepine | Tegretol | *ANTICONVULSANTS* |
| Carbamide Peroxide | Gly-Oxide | *MOUTH & THROAT (LOCAL)* |
| Carbamide Peroxide (Otic) | Debrox | *OTIC* |
| Carvedilol | Coreg | *BETA BLOCKERS* |
| Cefadroxil    (1st Gen.) | Duricef | *CEPHALOSPORINS* |
| Cefazolin    (1st Gen.) | Ancef | *CEPHALOSPORINS* |
| Cefoxitin (2nd Gen.) | Mefoxin | *CEPHALOSPORINS* |
| Ceftriaxone    (3rd Gen.) | Rocephin | *CEPHALOSPORINS* |
| Cefuroxime    (2nd Gen.) | Ceftin | *CEPHALOSPORINS* |
| Cephalexin    (1st Gen.) | Keflex | *CEPHALOSPORINS* |
| Cetirizine Hcl | Zyrtec | *ANTIHISTAMINES* |
| Chlorhexidine Gluconate | Peridex | *MOUTH & THROAT (LOCAL)* |
| Chlorhexidine Gluconate | Hibiclens; Betasept | *ANTISEPTICS & DISINFECTANTS* |
| Chlorpheniramine  Maleate | ChlorTrimeton | *ANTIHISTAMINES* |
| Chlorpromazine | Thorazine | *ANTIPSYCHOTICS* |
| Chlorzoxazone | Parafon DSC | *SKELETAL MUSCLE RELAXANTS* |
| Cholestyramine | Questran | *ANTIHYPERLIPIDEMICS* |
| Ciprofloxacin | Cipro (tablets and IV) | *FLUOROQUINOLONES* |
| Ciprofloxacin (Ophthalmic) | Ciloxan Drops Only | *OPHTHALMIC* |
| Citalopram (SSRI) | Celexa | *ANTIDEPRESSANTS* |
| Clarithromycin | Biaxin | *MACROLIDE ANTIBIOTICS* |
| Clindamycin | Cleocin | *MACROLIDE ANTIBIOTICS* |
| Clobetasol Proprionate | Temovate; Temovate-E | *DERMATOLOGICALS* |
| Clonazepam | Klonopin | *ANTICONVULSANTS* |
| Clonidine HCL | Catapres | *ANTIHYPERTENSIVES* |
| Clopidogrel | Plavix | *MISC. HEMATOLOGICAL* |
| Clotrimazole cream | Lotrimin; Mycelex; Gyne-Lotrimin | *DERMATOLOGICALS* |
| Clotrimazole troche | Mycelex | *MOUTH & THROAT (LOCAL)* |
| Clotrimazole/Betamethasone Dipropionate | Lotrisone | *DERMATOLOGICALS* |
| Coal Tar Shampoo | P&S Plus | *DERMATOLOGICALS* |
| Cocoa Butter | Cocoa Butter | *DERMATOLOGICALS* |
| Colchicine | Colchicine | *GOUT* |
| Collagenase | Santyl | *DERMATOLOGICALS* |
| Corn Starch Baby Powder | Corn Starch Baby Powder | *DERMATOLOGICALS* |
| Cyanocobalamin (Vitamin B12) | Vitamin B12 | *HEMATOPOEIC* |
| Cyclobenzaprine | Flexeril | *SKELETAL MUSCLE RELAXANTS* |
| Cyclopentolate | Cyclogyl | *OPHTHALMIC* |
| Cyproheptadine HCl | Periactin | *ANTIHISTAMINES* |
| Danazol | Danocrine | *ANDROGENS-ANABOLIC* |
| Dapsone (DDS) | Dapsone | *MISC. ANTIINFECTIVES* |
| Darunavir | Prezista | *ANTIVIRALS* |
| Delavirdine | Rescriptor | *ANTIVIRALS* |
| Dexamethasone | Decadron | *CORTICOSTEROIDS* |
| Dexamethasone Phosphate (Ophthalmic) | Decadron | *OPHTHALMIC* |
| Dexamethasone/Neomycin/ &Polymixin B ophthalmic | Maxitrol | *OPHTHALMIC* |
| Dextranomer | Duoderm CGF | *DERMATOLOGICALS* |
| Dextrose 50% Solution (Intravenous) | Dextrose 50% Solution Intravenous | *NUTRIENTS* |
| Dextrose 5% and Ringer's Lactate Solution (IV Fluid) | D5/RL | *MINERALS AND ELECTROLYTES* |
| Dextrose 5% in Water (IV Fluid) | D5W | *NUTRIENTS* |
| Dextrose 5% Sodium/Chloride 0.9% 20 Meq K (IV Fluid | D5 NS 20 Meq K | *MINERALS AND ELECTROLYTES* |
| Dextrose 5% Sodium/Chloride 0.9% (IV Fluid) | D5 NS | *MINERALS AND ELECTROLYTES* |
| Dextrose 5% Sodium/Chloride0.45% (IV Fluid) | D5 1/2 NS | *MINERALS AND ELECTROLYTES |
| Diatrizoate Sodium | Hypaque | *DIAGNOSTIC PRODUCTS* |
| Diazepam | Valium | *ANTIANXIETY AGENTS* |
| Dibucaine | Nupercainal | *DERMATOLOGICALS* |
| Diclofenac Sodium (Ophthalmic) | Voltaren | *OPHTHALMIC* |

| Dicloxacillin | Dynapen | *PENICILLINS* |
| Dicyclomine | Bentyl | *ULCER DRUGS* |
| Didanosine (DDI)      (NRTI) | Videx | *ANTIVIRALS* |
| Diflunisal | Dolobid | *ANALGESIC ANTI-INFLAMATORIES |
| Digoxin | Lanoxin | *CARDIOTONICS* |
| Diltiazem | Cardizem SR & CD | *CALCIUM CHANNEL BLOCKERS* |
| Dimenhydrinate | Dramamine | *ANTIEMETICS* |
| Dinoprostone (Prostaglandin E2) | Prostin E-2 Supp.; Prepidyl Gel | *OXYTOCICS* |
| Diphenhydramine HCl | Benadryl | *ANTIHISTAMINES* |
| Diphenoxylate/Atropine Sulfate | Lomotil | *ANTIDIARRHEAL* |
| Diphtheria and Tetanus Toxoids (Adsorbed) | Diphtheria and Tetanus Toxoids (Adsorbed) | *TOXOIDS* |
| Divalproex Delayed Release | Depakote | *ANTICONVULSANT* |
| Dobutamine HCl | Dobutrex | *PRESSORS* |
| Docusate Calcium, Sodium | Surfak, Colace | *LAXATIVES AND STOOL SOFTNERS |
| Dopamine HCl | Intropin | *PRESSORS* |
| Dorzolamide HCl (Ophthalmic) | TruSopt | *OPHTHALMIC* |
| Douche | Massengil | *DERMATOLOGICALS* |
| Doxazosin Mesylate | Cardura | *ANTIHYPERTENSIVES* |
| Doxepin HCl | Sinequan | *ANTIDEPRESSANTS* |
| Doxycycline Hyclate | Vibramycin; Vibratab | *TETRACYCLINES* |
| Efavirenz | Sustiva | *ANTIVIRALS* |
| Efavirenz/Emtricitabine/Tenofovir | Atripla | *ANTIVIRALS* |
| Emtricitabine | Emtriva | *ANTIVIRALS* |
| Emtricitabine/Tenofovir | Truvada | *ANTIVIRALS* |
| Enalapril | Vasotec | *ANTIHYPERTENSIVES* |
| Enfuvirtide | Fuzeon | *ANTIVIRALS* |
| Enoxaparin | Lovenox | *ANTICOAGULANTS* |
| Epinephrine HCl | Adrenalin; Epipen | *ANTIASTHMATICS* |
| Ergocalciferol (Vitamin D2) | Ergocalciferol (Vitamin D2) | *VITAMINS* |
| Erythomycin Topical | Erythromycin Topical (Various Brands) | *DERMATOLOGICALS* |
| Erythromycin Ethylsuccinate | EES | *MACROLIDE ANTIBIOTICS* |
| Erythromycin (Ophthalmic) | Erythromycin (Ophthalmic) | *OPHTHALMIC* |
| Estradiol | Estrace | *ESTROGENS* |
| Ethambutol | Myambutol | *ANTIMYCOBACTERIAL AGENTS* |
| Ethyl Chloride | Ethyl Chloride | *DERMATOLOGICALS* |
| Etravirine | Intelence | *ANTIVIRALS* |
| Eucerin | Eucerin | *DERMATOLOGICALS* |
| Fentanyl patch | Duragesic patch | *ANALGESIC NARCOTIC* |
| Ferric Subsulfate | Monsel's Solution | *HEMATOPOETIC* |
| Ferrous Sulfate | Ferrous Sulfate | *HEMATOPOETIC* |
| Finasteride | Proscar | *GENITOURINARY AGENT* |
| Fluconazole | Diflucan | *ANTIFUNGALS (ORAL)* |
| Flumazenil | Romazicon | *ANTIANXIETY AGENTS* |
| Flunisolide Nasal | Flunisolide Nasal | *SYSTEMIC AND TOPICAL NASAL P |
| Fluocinonide | Lidex | *DERMATOLOGICALS* |
| Fluorescein Sodium (Ophthalmic) | Fluorescein Sodium (Ophthalmic) | *OPHTHALMIC* |
| Fluorescein Sodium/Benoxinate HCl (Ophthalmic) | Fluress Ophth. Sol. | *OPHTHALMIC* |
| Fluoxetine HCl    (SSRI) | Prozac | *ANTIDEPRESSANTS* |
| Fluphenazine Decanoate | Prolixin Decanoate | *ANTIPSYCHOTICS* |
| Fluphenazine HCl | Prolixin; Permitil | *ANTIPSYCHOTICS* |
| Folic Acid | Folic Acid | *HEMATOPOETIC* |
| Fosamprenavir | Lexiva | *ANTIVIRALS* |
| Fosphenytoin | Cerebyx | *ANTICONVULSANTS* |
| Furosemide | Lasix | *DIURETICS* |
| Ganciclovir (DHPG) | Cytovene | *ANTIVIRALS* |
| Gemfibrozil | Lopid | *ANTIHYPERLIPIDEMICS* |
| Gentamicin | Garamycin | *AMINOGLYCOSIDES* |
| Gentamicin (Ophthalmic) | Garamicin; Genoptic | *OPHTHALMIC* |
| Gentian Violet 1% Solution | Gentian Violet 1% Solution | *DERMATOLOGICALS* |
| Glipizide | Glucotrol | *ANTIDIABETIC* |
| Glucagon HCl | Glucagon Hcl | *ANTIDIABETIC* |
| Glucose gel | Glucose gel | *NUTRIENTS* |
| Glyburide | DiaBeta; Micronase | *ANTIDIABETIC* |
| Glyburide & Metformin | Glucovance | *ANTIDIABETIC* |
| Guaifenesin | Robitussin | *COUGH/COLD/ALLERGY* |
| Haloperidol | Haldol | *ANTIPSYCHOTICS* |
| Haloperidol Decanoate | Haldol Decanoate | *ANTIPSYCHOTICS* |
| Hand & Body Lotion | Hand and Body Lotion | *DERMATOLOGICALS* |
| Hemorrhoidal Suppository | Anusol | *ANORECTAL* |

JX-CCH-003250

| Heparin Sodium | Heparin Sodium | *ANTICOAGULANTS* |
|---|---|---|
| Hepatitis A Vaccine (Inactivated) | Hepatitis A Vaccine (Inactivated) | *VACCINES* |
| Hepatitis B Immune Globulin | H-BIG; HyperHep | *PASSIVE IMMUNIZING AGENTS* |
| Hydralazine | Apresoline | *ANTIHYPERTENSIVES* |
| Hydrochlorothiazide | Esidrix; HydroDiuril; Oretic | *DIURETICS* |
| Hydrocodone Bitartrate/Acetaminophen | Lortab 5, 7.5, 10 and elixir | *ANALGESIC NARCOTIC* |
| Hydrocortisone  Suppository | Anusol HC | *ANORECTAL* |
| Hydrocortisone Cream & Lotion | Hydrocortisone Cream & Lotion | *DERMATOLOGICALS* |
| Hydrocortisone Cream/Pramoxine | Proctofoam HC; ProctoCream HC | *ANORECTAL* |
| Hydrocortisone Sodium Succinate | Solu Cortef; A-HydroCort | *CORTICOSTEROIDS* |
| Hydrogen peroxide 3% | Hydrogen peroxide 3% | *ANTISEPTICS & DISINFECTANTS* |
| Hydroxychloroquine | Plaquenil | *ANTIMALARIAL* |
| Hydroxyurea | Hydrea | *ANTINEOPLASTICS* |
| Hydroxyzine pamoate | Vistaril | *ANTIHISTAMINE* |
| Hyoscyamine | Levsin | *URINARY ANTISPASMODICS* |
| Hysteroscopy Fluid (32% Dextran 70 in D10/W) | Hyskon | *UNCLASSIFIED* |
| Ibuprofen | Motrin; Rufen | *ANALGESIC ANTI-INFLAMATORIES |
| Imipramine HCl | Tofranil | *ANTIDEPRESSANTS* |
| Immune Globulin (Serum) | Gamimune-N; Gamastan; Gammagard | *PASSIVE IMMUNIZING AGENTS* |
| Indinavir Sulfate      (PI) | Crixivan | *ANTIVIRALS* |
| Indomethacin | Indocin | *ANALGESIC ANTI-INFLAMATORIES |
| Influenza Vaccine | Influenza Vaccine | *VACCINES* |
| Insulin Human Isophane (rDNA) | Humulin-N, Novolin-N | *ANTIDIABETIC* |
| Insulin Human Isophane/Regular (rDNA) | Humulin 70/30; Novolin 70/30 | *ANTIDIABETIC* |
| Insulin Human Regular (rDNA) | Humulin-R; Novolin-R | *ANTIDIABETIC* |
| Interferon Alfa (-2a, -2b) | Roferon-A, Intron-A | *ANTIVIRAL* |
| Iodoform Gauze | Iodoform Gauze | *DERMATOLOGICALS* |
| Iopanoic Acid | Telepaque | *DIAGNOSTIC PRODUCTS* |
| Ipratropium Bromide | Atrovent (Inhaler & nebulizer solution) | *ANTIASTHMATICS* |
| Ipratropium/Albuterol | Combivent | *ANTIASTHMATICS* |
| Iron/Vitamin B12/Folic Acid (Oral) | Niferex-150 Forte | *HEMATOPOETIC* |
| Isoniazid (INH) | Isoniazid (INH) | *ANTIMYCOBACTERIAL AGENTS* |
| Isopropyl Alcohol Skin Preps | Isopropyl Alcohol Skin Preps | *CHEMICALS* |
| Isoproterenol | Isuprel | *ANTIASTHMATICS* |
| Isosorbide | Ismotic | *DIURETICS* |
| Isosorbide Dinitrate | Isordil; Isordil -SR | *ANTIANGINAL AGENTS* |
| Isosorbide Mononitrate | Imdur | *ANTIANGINAL AGENTS* |
| Ketoconazole | Nizoral | *ANTIFUNGALS (ORAL)* |
| Ketorolac | Toradol Injection and Tablets | *ANALGESIC ANTI-INFLAMATORIES |
| Labetalol | Trandate | *BETA BLOCKERS* |
| Lactulose | Chronulac; Duphalac | *MISC. G. I.* |
| Lamivudine (3TC)    (NRTI) | Epivir (3TC) | *ANTIVIRALS* |
| Lamivudine(3TC)/Zidovudine (AZT) (NRTI) | Combivir | *ANTIVIRALS* |
| Latanoprost | Xalatan eye drops | *OPHTHALMIC* |
| Leucovorin Calcium | Wellcovorin | *HEMATOPOETIC* |
| Levofloxacin | Levaquin | *FLUOROQUINOLONES* |
| Levothyroxine Sodium | Levoxyl; Synthroid | *THYROID* |
| Lidocaine Hydrochloride (Cardiac) | Xylocaine | *ANTIARRHYTHMICS* |
| Lidocaine Hydrochloride (Local) | Xylocaine | *LOCAL ANESTHETICS-PARENTERAL |
| Lidocaine Hydrochloride (Topical) | Xylocaine | *DERMATOLOGICALS* |
| Lidocaine/Epinephrine | Xylocaine/Epinephrine | *LOCAL ANESTHETICS-PARENTERAL |
| Lisinopril | Zestril/Prinivil | *ANTIHYPERTENSIVES* |
| Lithium Carbonate | Eskalith; Eskalith-CR | *ANTIPSYCHOTICS* |
| Lithium Citrate | Lithium Citrate | *ANTIPSYCHOTICS* |
| Loperamide | Imodium | *ANTIDIARRHEAL* |
| Lopinavir/Ritonavir | Kaletra | *ANTIVIRALS* |
| Loratadine | Claritin (generic) | *ANTIHISTAMINES* |
| Lorazepam | Ativan | *ANTIANXIETY AGENTS* |
| Losartan | Cozaar | *ANTIHYPERTENSIVES* |
| Magnesium and Alumina/Simethicone | Maalox Plus | *ANTIACIDS* |
| Magnesium Citrate | Citroma | *LAXATIVES AND STOOL SOFTNERS |
| Magnesium Hydroxide (MOM) | Milk of Magnesia | *LAXATIVES AND STOOL SOFTNERS |
| Magnesium Sulfate | Epsom Salt | *DERMATOLOGICALS* |
| Magnesium Sulfate | Magnesium Sulfate | *MINERALS AND ELECTROLYTES* |
| Mannitol | Mannitol | *DIURETICS* |
| Meclizine HCl | Antivert | *ANTIEMETICS* |
| Meclofenamate Sodium | Meclomen | *ANALGESIC ANTI-INFLAMATORIES |
| Medroxyprogesterone Acetate | Provera; Depo-Provera | *PROGESTINS* |
| Megestrol Acetate | Megace | *ANTINEOPLASTICS* |

JX-CCH-003251

| Meloxicam | Mobic | *ANALGESIC ANTI-INFLAMATORIES |
|---|---|---|
| Meperidine HCl | Demerol | *ANALGESIC NARCOTIC* |
| Metaraminol Bitartrate | Aramine | *PRESSORS* |
| Metformin | Glucophage, Glucophage XR | *ANTIDIABETIC* |
| Methadone | Methadone | *ANALGESIC NARCOTIC* |
| Methimazole | Tapazole | *THYROID* |
| Methocarbamol | Robaxin | *SKELETAL MUSCLE RELAXANTS* |
| Methotrexate (MTX) | Methotrexate | *ANALGESIC ANTI-INFLAMATORIES |
| Methyl Salicylate & Menthol | Analgesic Balm | *DERMATOLOGICALS* |
| Methyldopa/Methyldopate HCl | Aldomet | *ANTIHYPERTENSIVES* |
| Methylergonovine Maleate | Methergine | *OXYTOCICS* |
| Methylprednisolone | Medrol Dosepak, Depo Medrol | *CORTICOSTEROIDS* |
| Methylprednisolone Sodium Succinate | Solu-Medrol; A-MethaPred | *CORTICOSTEROIDS* |
| Metoclopramide | Reglan | *MISC. G. I.* |
| Metolazone | Zaroxolyn | *DIURETICS* |
| Metoprolol | Lopressor | *BETA BLOCKERS* |
| Metronidazole | Flagyl | *MISC. ANTIINFECTIVES* |
| Miconazole | Monostat | *VAGINAL PRODUCTS* |
| Midazolam   (with pulse ox & telemetry) | Versed | *HYPNOTICS* |
| Minoxidil | Loniten | *ANTIHYPERTENSIVES* |
| Mirtazapine | Remeron | *ANTIDEPRESSANTS* |
| Morphine Sulfate | MS Contin (SR Prep); Roxanol; Ampules | *ANALGESIC NARCOTIC* |
| Multiple Vitamin | Theragran | *MULTIVITAMINS* |
| Multivitamin Prenatal (Oral) | Pramet FA; Prenate-90 | *MULTIVITAMINS* |
| Multivitamin Therapuetic With FE | Formula B Plus | *MULTIVITAMIN* |
| Multivitamin with Minerals (Oral) | Theragran-M | *MULTIVITAMINS* |
| Mupirocin | Bactroban (ointment only) | *DERMATOLOGICALS* |
| Naloxone HCl | Narcan | *ANALGESIC NARCOTIC* |
| Naproxen | Naprosyn; Naprelan | *ANALGESIC ANTI-INFLAMATORIES |
| Naproxen sodium | Anaprox | *ANALGESIC ANTI-INFLAMATORIES |
| Nelfinavir Mesylate        (PI) | Viracept | *ANTIVIRALS* |
| Neomycin Base/Bacitracin/Polymyxin B Sulf/Hydroc | Cortisporin Ophth. | *OPHTHALMIC* |
| Neomycin Base/Polymyxin B Sulfate/Hydrocortisone | Cortisporin Ophth | *OPHTHALMIC* |
| Neomycin Sulfate | Neomycin Sulfate | *AMINOGLYCOSIDES* |
| Nevirapine     (NNRTI) | Viramune | *ANTIVIRALS* |
| Niacin (Nicotinic Acid) | Niacin; Slo-Niacin | *VITAMINS* |
| Nitrofurantoin Macrocrystals | Macrodantin | *URINARY ANTIINFECTIVES* |
| Nitroglycerin | Minitran Patch; NitroBID; Nitrolingual-SL & | *ANTIANGINAL AGENTS* |
| Nitroprusside Sodium | Nipride | *ANTIHYPERTENSIVES* |
| Norepinephrine Bitartrate | Levophed | *PRESSORS* |
| Norethindrone/Ethinyl Estradiol | Ortho-Novum | *CONTRACEPTIVES* |
| Norgestrel/Ethinyl Estradiol | Lo-Ovral | *CONTRACEPTIVES* |
| Nortriptyline HCl | Pamelor | *ANTIDEPRESSANTS* |
| Nystatin | Mycostatin | *ANTIFUNGALS (ORAL)* |
| Nystatin/Triamcinolone | Mycolog cream | *DERMATOLOGICALS* |
| Olanzapine | Zyprexa | *ANTIPSYCHOTICS* |
| Omeprazole | Prilosec OTC | *ULCER DRUGS* |
| Ondansetron | Zofran | *ANTIEMETICS* |
| Ophthalmic Irrigating Solution (Ophthalmic) | Isotonic Eye Wash | *OPHTHALMIC* |
| Oxybutynin HCl | Ditropan | *URINARY ANTISPASMODICS* |
| Oxymetazoline HCl | Afrin Nasal Spray | *SYSTEMIC AND TOPICAL NASAL P |
| Oxytocin | Pitocin | *OXYTOCICS* |
| Pancrelipase | Pancrelipase | *DIGESTIVE AIDS* |
| Pancuronium Bromide         (LSP Lethal Injection Onl | Pavulon | *NEUROMUSCULAR AGENTS* |
| Paroxetine   (SSRI) | Paxil | *ANTIDEPRESSANTS* |
| PEG 3350 and Electrolyte Solution | Colyte; GoLYTELY | *LAXATIVES AND STOOL SOFTNERS |
| Pegylated Interferon Alfa (-2a, -2b) | PEGASYS, PEG-Intron | *ANTIVIRALS* |
| Penicillin V Potassium | Penicillin-VK | *PENICILLINS* |
| Pentamidine Isethionate | NebuPent | *MISC. ANTIINFECTIVES* |
| Permethrin | Elimite, Acticin | *DERMATOLOGICALS* |
| Petrolatum | Vaseline | *DERMATOLOGICALS* |
| Phenazopyridine HCl | Pyridium | *MICELLANEOUS GENITOURINARY A |
| Phenobarbital | Phenobarbital | *ANTICONVULSANTS* |
| Phenol Mouthwash | Chloraseptic | *MOUTH & THROAT (LOCAL)* |
| Phenylephrine HCl | Sudafed PE | *SYSTEMIC AND TOPICAL NASAL P |
| Phenytoin Sodium | Dilantin | *ANTICONVULSANTS* |
| PhisoDerm Scrub (Baby Formulation) | PhisoDerm | *DERMATOLOGICALS* |
| Phytonadione | Aqua-Mephyton | *VITAMINS* |
| Pilocarpine HCl (Ophthalmic) | Isopto Carpine Solution | *OPHTHALMIC* |

| | | |
|---|---|---|
| Piroxicam | Feldene | *ANALGESIC ANTI-INFLAMATORIES |
| Pneumococcal Vaccine (Polyvalent) | Pneumovax-23; PNU-Imune 23 | *VACCINES* |
| Podophyllum Resin | Podocon-25 | *DERMATOLOGICALS* |
| Polymyxin B Sulfate/Bacitracin/Neomycin Sulfate Oir | Neosporin | *DERMATOLOGICALS* |
| Polymyxin B/Neomycin/Hydrocortisone (Otic) | Cortisporin Otic | *OTIC* |
| Potassium Chloride | Micro-K; IV additive | *MINERALS AND ELECTROLYTES* |
| Povidone-Iodine | Betadine | *ANTISEPTICS & DISINFECTANTS* |
| Pravastatin | Pravachol | *ANTIHYPERLIPIDEMICS* |
| Prednisolone Acetate (Ophthalmic) | Pred Forte; Econopred Plus; Pred Mild | *OPHTHALMIC* |
| Prednisone | Deltasone; Orasone | *CORTICOSTEROIDS* |
| Probenecid | Benemid | *GOUT* |
| Prochlorperazine | Compazine | *ANTIEMETICS* |
| Promethazine HCl | Phenergan | *ANTIHISTAMINES* |
| Proparacaine HCL | Alcaine eye drops | *OPHTHALMIC* |
| Propranolol HCl | Inderal | *BETA BLOCKERS* |
| Propylthiouracil (PTU) | Propylthiouracil (PTU) | *THYROID* |
| Psyllium Hydrophilic Mucilloid | Metamucil | *LAXATIVES AND STOOL SOFTNERS |
| Pyrazinamide | Pyrazinamide | *ANTIMYCOBACTERIAL AGENTS* |
| Pyrethrins/Piperonyl | Liceaway; R&C Spray | *DERMATOLOGICALS* |
| Pyridoxine HCl (Vitamin B6) | Pyridoxine HCl (Vitamin B6) | *VITAMINS* |
| Pyrimathamine | Daraprim | *ANTIMALARIAL* |
| Quinidine Gluconate | Quinaglute; Quinidex Extentabs | *ANTIARRHYTHMICS* |
| <span style="color:red">Raltegavir</span> | <span style="color:red">Isentress</span> | <span style="color:red">*ANTIVIRALS*</span> |
| Ranitidine | Zantac | *ULCER DRUGS* |
| Recombinant Hepatitis B Vaccine (Adult) | Recombivax, Engerix | *VACCINES* |
| Recombinant Hepatitis B & Hep A Vaccine (Adult) | Twinrix | |
| Rho(D) Immune Globulin | RhoGam | *PASSIVE IMMUNIZING AGENTS* |
| Ribavarin | Rebetol | *ANTIVIRALS* |
| Rifabutin | Mycobutin | *ANTIMYCOBACTERIAL AGENTS* |
| Rifampin | Rifadin; Rimactane | *ANTIMYCOBACTERIAL AGENTS* |
| Ringer's Lactate Solution (IV Fluid) | RL | *MINERALS AND ELECTROLYTES* |
| Risperidone | Risperdal | *ANTIPSYCHOTICS* |
| Ritonavir    (PI) | Norvir | *ANTIVIRALS* |
| Salicylic Acid | Mediplast | *DERMATOLOGICALS* |
| Salicylic Acid 2% Soap | Fostex Acne Medication | *DERMATOLOGICALS* |
| Saquinavir Mesylate        (PI) | Invirase; Fortovase | *ANTIVIRALS* |
| Scopolamine HBr (Ophthalmic) | Isopto Hyoscine Ophth | *OPHTHALMIC* |
| Selenium Sulfide Lotion | Selsun; Selsun Blue | *DERMATOLOGICALS* |
| Sertraline | Zoloft | *ANTIDEPRESSANTS* |
| Sevelamer | Renagel | *MISC. G. I.* |
| Silver Nitrate Sticks | Silver Nitrate Sticks | *DERMATOLOGICALS* |
| Silver Sulfadiazine | Silvadene; Thermazene | *DERMATOLOGICALS* |
| Simethicone | Simethicone | *MISC. G. I.* |
| Simvastatin | Zocor | *ANTIHYPERLIPIDEMICS* |
| Soap for Sensitive Skin | Dial; Dove | *DERMATOLOGICALS* |
| Sodium Bicarbonate | Sodium Bicarbonate | *MINERALS AND ELECTROLYTES* |
| Sodium Chloride 0.45% in Water (1/2 Normal Saline) | 1/2 NS | *MINERALS AND ELECTROLYTES* |
| Sodium Chloride 0.65% Spray | Ocean | *SYSTEMIC AND TOPICAL NASAL P |
| Sodium Chloride 0.9% in Water Irrigation Solution | Sodium Chloride 0.9% in Water Irrigation So | *MICELLANEOUS GENITOURINARY A |
| Sodium Chloride 0.9% in Water (Normal Saline) (IV Fl | NS | *MINERALS AND ELECTROLYTES* |
| <span style="color:red">Sodium Chloride 0.9% With 20 Meq Potassium (IV Fl</span> | <span style="color:red">NS With 20 meq K</span> | <span style="color:red">*MINERALS AND ELECTROLYTES*</span> |
| Sodium Chloride 0.9% (for Hand-Held Nebulizer) | Sodium Chloride 0.9% | *COUGH/COLD/ALLERGY* |
| Sodium Chloride 0.9% (NS) Bacteriostatic forInjectio | Sodium Chloride 0.9% (NS) Bacteriostatic fo | *MINERALS AND ELECTROLYTES* |
| Sodium Phosphate (Adult)(Monobasic/Dibasic) | Fleets Enema; Fleet Oral Solution | *LAXATIVES AND STOOL SOFTNERS |
| Sodium Polystyrene Sulfonate | Kayexalate | *POTASSIUM REMOVING RESIN* |
| Sodium Sufacetamide (Ophthalmic) | Sulamyd | *OPHTHALMIC* |
| Spironolactone | Aldactone | *DIURETICS* |
| Stavudine (D4T)      (NRTI) | Zerit | *ANTIVIRALS* |
| Sterile Water for Irrigation | Sterile Water for Irrigation | *MICELLANEOUS GENITOURINARY A |
| Streptomycin | Streptomycin | *AMINOGLYCOSIDES* |
| Sulfasalazine | Azulfidine | *MISC. G. I.* |
| <span style="color:red">Sumatriptan</span> | <span style="color:red">Imitrex</span> | <span style="color:red">*MIGRANE AGENT*</span> |
| Sunscreen | Sunscreen | *DERMATOLOGICALS* |
| Surgical Lubricating Jelly | Surgilube; K-Y Jelly | *DERMATOLOGICALS* |
| Tamoxifen Citrate | Nolvadex | *ANTINEOPLASTICS* |
| <span style="color:red">Tamsulosin</span> | <span style="color:red">Flomax</span> | <span style="color:red">*GENITOURINARY AGENTS - MISC*</span> |
| Tegaderm Dressing | Tegaderm Dressing | *DERMATOLOGICALS* |
| Tenofovir | Viread | *ANTIVIRALS* |
| Terbinafine HCl | Lamisil tablets | *ANTIFUNGALS (ORAL)* |

| | | |
|---|---|---|
| Terbinafine HCl | Lamisil cream | *DERMATOLOGICALS* |
| Terbutaline Sulfate | Brethine | *ANTIASTHMATICS* |
| Terconazole | Terazol-3 | *VAGINAL PRODUCTS* |
| Testosterone Cypionate (in oil) | Depo-Testosterone | *ANDROGENS-ANABOLIC* |
| Tetanus Immune Globulin | Hypertet | *PASSIVE IMMUNIZING AGENTS* |
| Tetracycline | Sumycin; Achromycin-V | *TETRACYCLINES* |
| Tetrahydrozoline HCl (Ophthalmic) | Visine | *OPHTHALMIC* |
| Theophylline (Sustained Release 8-24 Hour Tablets) | TheoDUR | *ANTIASTHMATICS* |
| Thiopental Sodium | Pentothal | *GENERAL ANESTHETICS* |
| Thioridazine HCl | Mellaril | *ANTIPSYCHOTICS* |
| Thiothixene HCl | Navane | *ANTIPSYCHOTICS* |
| Tiagabine | Gabitril | *ANTICONVULSANTS* |
| Timolol Maleate (Ophthalmic) | Timoptic | *OPHTHALMIC* |
| Tipranavir | Aptivus | *ANTIVIRALS* |
| Tobramycin (Ophthalmic) | Tobrex | *OPHTHALMIC* |
| Tobramycin/Dexamethasone (Ophthalmic) | Tobradex  Drops Only | *OPHTHALMIC* |
| Tocopherol (Vitamin E) | Tocopherol (Vitamin E) | *VITAMINS* |
| Tolnaftate | Tinactin | *DERMATOLOGICALS* |
| Tramadol (Six month limit per prescription) | Ultram | *ANALGESIC OPIODS* |
| Trazodone HCl | Desyrel | *ANTIDEPRESSANTS* |
| Tretinoin | Retin-A | *DERMATOLOGICALS* |
| Triamcinolone Acetonide | Kenalog-40 | *CORTICOSTEROIDS* |
| Triamcinolone Acetonide | Nasacort AQ | *SYSTEMIC AND TOPICAL NASAL P |
| Triamcinolone Acetonide Cream Lotion & Ointment | Kenalog; Aristocort | *DERMATOLOGICALS* |
| Triamcinolone Acetonide Paste | Kenalog in Orabase | *MOUTH & THROAT (LOCAL)* |
| Triamterene/Hydrochlorthiazide | Maxzide, Maxide 25 | *DIURETICS* |
| Trichloroacetic Acid | Trichloroacetic Acid | *DERMATOLOGICALS* |
| Trifluoperazine HCl | Stelazine | *ANTIPSYCHOTICS* |
| Trifluridine (Ophthalmic) | Viroptic | *OPHTHALMIC* |
| Trimethoprim/Sulfamethoxazole (Co-trimoxazole) (SI | Bactrim-DS | *MISC. ANTIINFECTIVES* |
| Triprolidine HCl/Pseudoephedrine HCl | Actifed | *COUGH/COLD/ALLERGY* |
| Tuberculin Purified Protein Derivative (PPD) (Mantou | Tubersol | *DIAGNOSTIC PRODUCTS* |
| Valproic Acid | Depakene | *ANTICONVULSANTS* |
| Vancomycin | Vancocin | *MISC. ANTIINFECTIVES* |
| Vaseline Petrolatum Dressing | Vaseline Petrolatum Dressing | *DERMATOLOGICALS* |
| Verapamil HCl | Isoptin; Isoptin-SR; Calan | *CALCIUM CHANNEL BLOCKERS* |
| Vinegar White | Vinegar White | *DERMATOLOGICALS* |
| Vitamin A and Vitamin D Ointment | A&D Ointment | *DERMATOLOGICALS* |
| Vitamin B Complex with C & Folic Acid | Diatx | *VITAMINS* |
| Vitamin D | Vitamin D | *VITAMINS* |
| Warfarin Sodium | Coumadin | *ANTICOAGULANTS* |
| Water- Bacteriostatic for Injection | Water- Bacteriostatic for Injection | *PHARMACEUTICAL ADJUVANTS* |
| Water-Sterile for Injection | Water-Sterile for Injection | *PHARMACEUTICAL ADJUVANTS* |
| Water for Injection-Sterile (Drug Diluent) | Water for Injection-Sterile (Drug Diluent) | *PHARMACEUTICAL ADJUVANTS* |
| White Petrolatum Ointment (Ophthalmic) | Lacri-Lube | *OPHTHALMIC* |
| Witch Hazel and Glycerin | Tuck Pads; AER | *DERMATOLOGICALS* |
| Zafirlukast | Accolate | *ANTIASTHMATICS* |
| Zidovudine (AZT)     (NRTI) | Retrovir | *ANTIVIRALS* |
| Zinc Oxide in White Petrolatum | Zinc Oxide Ointment | *DERMATOLOGICALS* |
| Zinc Sulfate | Zinc Sulfate | *MINERALS AND ELECTROLYTES* |
| Ziprasidone | Geodon | *ANTIPSYCHOTICS* |
| | | |
| | | |
| | | |
| | | |

JX-CCH-003254

**Attachment B**

# DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
# CORRECTIONS SERVICES

# PHARMACY & THERAPEUTICS COMMITTEE

# Formulary

# Policy and Procedures

## 28 February 2011

JX-CCH-003255

**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**FORMULARY POLICY AND PROCEDURES**

1.    **The Formulary**

The Department of Public Safety and Corrections (DPS&C) Formulary is a continuously revised compilation of pharmaceuticals and dietary supplements that take into consideration the unique characteristics and needs of the offender population.   There are two classifications of medications as described below:

A.    Formulary Agents: Drugs available for prescription by all licensed prescribers practicing in the DPS&C.  Certain medications on the DPS&C Formulary may be approved only for selected institutions.

B.    Non-Formulary Agents: Drugs not included in the DPS&C Formulary. These include agents which are occasionally medically necessary but are used only rarely.  These also include agents for which an acceptable substitute exits on the formulary.

2.    **Department Pharmacy and Therapeutics Committee**

The DPS&C Pharmacy and Therapeutics (DPS&C P&T) Committee is a subcommittee of DPS&C Medical Staff, which shall act as an advisory committee to the Department's Medical/Mental Health Director who shall appoint the members and Chairman of the Committee.  The Chairman shall be responsible for ensuring the Committee meets quarterly.  The Committee is charged with the responsibility of recommending a medically appropriate and fiscally responsible formulary for the Department.  The formulary and the subsequent addition and deletion of formulary items, medications on KOP program and non-prescription OTC medications available to offenders from the pharmacy and in canteens are governed by the Department's Medical/Mental Health Director based on the clinical recommendations of the Committee.  Any requests for changes to the DPS&C Formulary and the usage of non-formulary drugs are reviewed quarterly and on a priority basis by the DPS&C P&T Committee.

3.    **Institutional Pharmacy and Therapeutics Committee**

A.    The unit Health Care Authority shall establish a unit P&T Committee which shall include, at a minimum, the Medical Director and a nurse representative.  The unit P&T Committee shall meet quarterly to review "drug utilization reports" for the institution and to make recommendations to the DPS&C P&T Committee.  The institutional formulary does not have to include all items listed on the DPS&C Formulary.  All agents recommended by consultative

JX-CCH-003256

**Health Care Policy No. HC-17**
**Attachment B**
**Page Two**

physicians shall be reviewed by an institutional Medical Director or designee.

B.     A prescriber (physician, nurse practitioner etc,) may determine that the non-formulary agent is medically necessary. The prescriber shall complete a Non-Formulary Drug Request (Form HC-17-A) electronically or in writing, and submit it to the appropriate reviewer as designated by the Department's Medical/Mental Health Director. If approved, the form shall be forwarded by email or fax to a pharmacist who shall purchase and dispense the medication. All approved and denied requests shall be stored electronically or attached to the hard copy prescription.  The contractor may provide a Non-Formulary Drug Request form which must be approved by the Department's Medical/Mental Health Director.

C.     When a request is made to add an agent to the institutional formulary which is on the DPS&C Formulary, the unit P&T Committee shall make changes deemed appropriate.

D.     When a request is made to add an agent to the institutional formulary which is not on the DPS&C Formulary and the unit P&T Committee agrees, the Committee shall forward a Request to Add a Pharmaceutical Agent to the Formulary (Form HC-17-B) to the DPS&C P&T Committee for consideration.

**4.     Changes to the DPS&C Formulary**

A.     All requests for changes to the DPS&C Formulary generated at the institutional level shall be submitted on a Request to Add A Pharmaceutical Agent (Form HC-17-B) to the Formulary along with any needed supplementary documentation to support the need for change.   Requests shall be submitted to the DPS&C P&T Committee Chairman for consideration and review by the Committee on an as needed or priority basis.  The DPS&C P&T Committee shall decide if the requested item shall be added to the formulary.

B.     When the DPS&C P&T Committee receives a sufficient number of reports of non-formulary drug use of a particular agent, the Committee shall consider a formal addition of the agent.  If the agent is not added, the Committee may recommend the institution discontinue use of this medication.

C.     The addition of a drug to, or deletion of a drug from, the formulary may be expedited in the event that failure to do so could cause

**Health Care Policy No. HC-17**
**Attachment B**
**Page Three**

harm to the offender population or result in additional costs to the Department.  The Committee Chairman shall conduct a phone or email poll of the membership concerning any emergency formulary changes and upon approval of the Department's Medical/Mental Health Director, implementation of the changes may begin.

D.    The DPS&C P&T Committee shall report the results of its decisions to the Department's Medical/Mental Health Director for approval.

**5.    Generic Substitutions**

The institution's pharmacy may substitute generically equivalent drugs for specifically ordered trade name agents.  Generic substitutions shall be made only if the generic drug is the same dosage form, possesses the same dosage release mechanism and provides the same dosage of medication.

**6.    Distribution of Information**

Following approval by the Department's Medical/Mental Health Director, the information from each DPS&C P&T Committee meeting shall be distributed to the unit Health Care Authorities, who shall distribute copies of the information to the Warden and institutional P&T Committee members.

JX-CCH-003258

**Health Care Policy No. HC-17**
**28 February 2011**
**Attachment C**

## APPROVED KEEP ON PERSON (KOP) MEDICATIONS

1.  Topical creams, ointment, soaps and shampoos with the exception of caustic agents used to treat warts and expensive creams such as Dovenex used to treat chronic skin conditions.
2.  Metered dose inhalers.
3.  Nasal inhalers and sprays.
4.  Otic suspensions and solutions.
5.  Opthalmic solutions and suspensions.
6.  Nitroglycerin tablets.
7.  Vaginal creams and suppositories.
8.  Hormonal medications-Premarin, Provera, Oral contraceptives.
9.  Hemorrhoidal creams and suppositories.
10. Ibuprofen maximum dose 400 mg three times per day.
11. 24 hour supply of Acyclovir, Didanosine, Crixivan, Phoslo, and Mycelex Troche.
12. All approved canteen items. *See Appendix.
13. Sumatriptan (Imitrex)Tablets 9 tablets per month only
14. Calcium Polycarb (Fibernorm)
15. Phenylephrine 10 mg Tablets

JX-CCH-003259

**Health Care Policy No. HC-17**
**28 February 2011**
**Attachment D**
**Page One**

## APPROVED OTC CANTEEN MEDICATIONS

| |
|---|
| **1" - 3" Bandaids** |
| **Ambi Skin Cream** |
| **Acetominophen, Generic, Extra Strength Caplets (24's)** |
| **Acne Preps - Listed Below as Clearasil & Benzoyl Peroxide** |
| **Adult Nutritional Supplement/Resource (Case)** |
| **Alleve Tablets/Naproxen Sodium (24's)** |
| **Alka Seltzer (12's)** |
| **Allergy Tablets - Chlortrimeton brand** |
| **Allergy Tablets - Claritin brand, 10 mg** |
| **Anesthetic - Ora Gel** |
| **Antacid** |
| **Antifungal Cream & Powder - Tolnaftate Cream & Powder** |
| **Aspirin (100's)** |
| **Baby Oil** |
| **B.C. Powder (24's)** |
| **Benzoyl Peroxide Cream - Listed above as Acne Prep** |
| **Benadryl Cream** |
| **Bengay - Analgesic Balm** |
| **Blistex - Lip Balm** |
| **Caladryl** |
| **Chapet Lip Balm** |
| **Contact Lens Solution** |
| **Clearasil - Listed above as Acne Prep** |
| **Disposable Douche- LCIW** |
| **Docusate Sodium - General Laxative (30's)** |
| **Dulcolax Tablets - Laxative (10's)** |
| **Debrox Otic Suspension - Ear Drops** |

**Health Care Policy No. HC-17**
**28 February 2011**
**Attachment D**
**Page Two**

| |
|---|
| **Visine Ophthalmic Solution- Eye Drops** |
| **Hemorrhoidal Cream or Suppositories - Preparation H or Equiv-No Hydrocortisone Allowed** |
| **Ibuprofen 200 mg (50's)** |
| **Imodium A. D. (12's)** |
| **Laxative/Enteric - Listed above as Dulcolax** |
| **Maalox Plus Suspension (12 oz or 50 or less tablets)** |
| **Noxzema** |
| **Metamucil (30's)** |
| **Miconazole Vaginal Cream - & Suppositories *****LCIW ONLY ****** |
| **Halls Mentholated Cough Drops** |
| **Milk of Magnesia or equivalent (12 oz)** |
| **Mouthwash - Plastic Bottle/No Alcohol Allowed** |
| **Muscle Rub - Extra Strength** |
| **Pepto Bismol or Eq-Pink Bismuth (8 oz susp. or 30 or less tablets)** |
| **Polident Tablets or Equivalent** |
| **Robitussin-Alcohol Free** |
| **Rolaids (12's)** |
| **Saline Nasal Spray (1 btl)** |
| **Suave or Equivalent Moisturizing Lotion** |
| **Selenium Sulfide Shampoo** |
| **Sore Throat Lozenge - Cepacol or Equivalent** |
| **Sunscreen with SPF 30 or greater** |
| **Tolnaftate Cream - Listed earlier as Antifungal Cream** |
| **Triple Antibiotic cream or Ointment** |
| **Vicks Vapor Rub** |
| **Visine Ophthalmic Solution - Listed above as eye drops** |
| **Multi -vitamins - Generic (100's)** |
| **Super B Complex Vitamins - Referred to as High Potency Vitamins (130's)** |

JX-CCH-003261

**Health Care Policy No. HC-17**
**28 February 2011**
**Attachment D**
**Page Three**

| |
|---|
| **Sensodyne Toothpaste** |
| **1% Hydrocortisone** |
| **Listerine Toothpaste** |
| **Glucose Tablets** |
| **Smoking Cessation Patches** |

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-17**



**07 October 2011**

## PHARMACEUTICALS

1. **OBJECTIVE:** To provide for the proper handling of prescription and non-prescription medications for offenders.

2. **REFERENCES:** ACA Standards 4-4378 and 4-4379 (Adult Correctional Institutions) and La. R. S. 37:1162 and 1182.

3. **POLICY:** It is the Secretary's policy that pharmaceutical procedures and practices in the Department of Public Safety and Corrections (DPS&C) shall conform with all state and federal laws and regulations relating to the procurement, dispensing, distribution, administration and disposal of medications.

4. **APPLICABILITY:** Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens. Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5. **DEFINITION:**

   **Pharmacist:** A registered pharmacist employed by or contracted by DPS&C, or a registered pharmacist employed by or contracted by a private vendor who provides pharmacy services for the DPS&C.

6. **PROCEDURES:**

   A. A pharmacist shall be responsible for all medications procured and dispensed within each institution. In addition, the pharmacist shall also be responsible for the disposal of medication and for all required record keeping.

   B. A permit shall be obtained from the Louisiana Board of Pharmacy and a Controlled Substance Registration Certificate from the Drug Enforcement Administration prior to the opening, operating or maintaining of a pharmacy in any institution.

   C. Prescription practices include the following requirements:

JX-CCH-003263

**Health Care Policy No. HC-17**
**07 October 2011**
**Page Two**

    1)    Medications are prescribed only when clinically indicated as one facet of a program of therapy;

    2)    A prescribing provider reevaluates a prescription prior to its renewal;

    3)    Each prescribed order for medication to be administered, distributed or dispensed shall be signed by a licensed prescriber and noted in the offender's medical record;

    4)    A "Stop-order" time period shall be stated for all medications.

D.    Licensed prescribers employed by or contracted by the DPS&C shall adhere to the DPS&C Formulary (see Attachment A) approved by the Department's Medical/Mental Health Director. When necessary, non-formulary medications may be obtained by following the procedures contained in the Formulary Policy and Procedures (see Attachment B for specific instructions.)

E.    Each institution shall maintain secure storage and perpetual inventory of all controlled substances, syringes and needles, sharps, instruments/tools and caustic and/or flammable substances, considered to be a security risk.

    1)    Narcotic drugs and other controlled dangerous substances may be ordered, stored and administered or dispensed in the same manner as other medications provided appropriate security measures are used and an accurate record is maintained and kept up to date by the pharmacist. The record book must contain a running (perpetual) inventory by substance showing when, how much and from where each amount was received and when, how much and to whom each amount was given and the current balance on hand.

    2)    A pharmacist shall perform a physical inventory of all stock controlled dangerous substances on hand within an institution at least once a year. Working stock shall be verified on a regular basis, preferably at each work shift change. Any theft or unexplained loss of a controlled dangerous substance shall be reported immediately to the Warden, the Secretary, the Department's Medical/Mental Health Director, the Louisiana State Board of Pharmacy and the Drug Enforcement Administration.

**Health Care Policy No. HC-17**
**07 October 2011**
**Page Three**

F.     Prescriptions shall be filled and medications dispensed, distributed and administered in a timely manner and according to the licensed prescriber's orders.

G.     The health care staff, including but not limited to, Emergency Medical Technicians, Paramedics, Licensed Practical Nurses and Registered Nurses may accept prescription orders transmitted verbally or electronically from a duly licensed prescriber.  These orders may be transmitted to the pharmacy, and the pharmacist may fill the prescription pursuant to these orders.  The licensed prescriber who initiated the order shall sign or countersign the order in the offender's medical record in a timely manner.

H.     Medications shall be administered by licensed health care personnel or distributed by persons who have completed training approved by the Department's Medical/Mental Health Director.

I.     When possible, all non-emergency oral prescription medications shall be packaged in blister pack pill cards at institutions that house more than 200 offenders.  Each pill card shall be labeled according to the Louisiana State Board of Pharmacy labeling and dispensing guidelines.  The information required on each pill card shall include, but is not limited to:

1)     Name, DOC number and housing location of the offender;

2)     Name of the staff person who filled the prescription and dispensed it;

3)     Name of the medication and directions for its use;

4)     Date of filling and dispensing the medication;

5)     Name and address of the pharmacy or licensed prescriber if an offsite pharmacy fills the prescription;

6)     Stop date;

7)     Prescription number;

8)     Prescriber's name;

9)     Dosage form (e.g. capsule, tablet, etc.);

10)    Strength;

JX-CCH-003265

**Health Care Policy No. HC-17**
**07 October 2011**
**Page Four**

J.    All medications administered or distributed to offenders for self administration shall be done so in accordance with the following procedures:

    1)    By single dosage, except:

        a.    Those medications approved by policy for certain offenders as Keep on Person (KOP);

        b.    A one-day supply or next dose for offenders leaving the facility on work crews or trips;

        c.    Unique dosing schedules in properly labeled containers.

        d.    Within time guidelines set forth by the responsible Health Care Authority and Medical Director;

        e.    By properly trained staff members or licensed health care personnel;

        f.    According to orders or authorization by the licensed prescriber.

K.    No offender is authorized to handle any medication (other than his own) at any time.

L.    Each prescription medication or non-prescription medication administered or distributed directly to an offender shall be recorded immediately on the medication administration record with the date, time of pill call, description, amount of the medication and the signature of the person administering or distributing the medication. The medication administration pages from the medical record may be temporarily filed separately until the medication is complete or discontinued or the offender is transferred to another institution or released, at which time they shall be inserted into the record.

M.    Medications which have potential for abuse, misuse, those which may be costly or caustic or require close monitoring be restricted from the KOP program. The DPS&C Pharmacy and Therapeutics (P&T) Committee shall recommend drug additions and deletions to the KOP program to the Department's Medical/Mental Health Director for approval. (See Attachment C "Approved Keep on Person (KOP) Medications.")

N.    The Department's Medical/Mental Health Director is authorized to implement additional KOP medications at his discretion on a trial basis at any unit.

JX-CCH-003266

**Health Care Policy No. HC-17**
**07 October 2011**
**Page Five**

O.    Approved non-prescription (over-the-counter) medications are available to offenders from the pharmacy and in canteens at each institution.  Non-prescription medications available in the canteen are approved by the Department's Medical/Mental Health Director. (See Attachment D "Approved Over-the-Counter (OTC) medications.")

P.    In institutions without an on-site pharmacy, prescription medications for administration or dispensing shall come from medications purchased according to rules and regulations of the Louisiana Board of Pharmacy.

Q.    Offenders being released from custody or to the custody of the Division of Probation and Parole or assigned to a transitional work program shall receive a minimum of two weeks supply of prescription medications (personally or by a guardian or other responsible person) unless circumstances warrant otherwise.  Additionally, prescriptions may be given if deemed appropriate by the Warden or designee.   Each offender transferred to another institution shall generally receive a five day supply of prescription medications, (excluding controlled medications, other than Clonazepam and Phenobarbital, refrigerated items, injectables, approved KOP medications and nutritional supplements.)  The medications shall be appropriately packaged and transported with the offender to the receiving institution.


<u>s/James M. Le Blanc</u>
Secretary

Attachment A:    DPS&C Formulary
Attachment B:    Pharmacy & Therapeutics Committee Formulary Policy and Procedures
Attachment C:    Approved Keep on Person (KOP) Medications
Attachment D:    Approved OTC Canteen Medications

Forms:        HC-17-A:    Non-Formulary Drug Request
              HC-17-B:    Request to Add a Pharmaceutical Agent to the Formulary

This policy supersedes Health Care Policy No. HC-17 dated 28 February 2011.

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-18**



**07 January 2011**

**DIETARY SERVICE**

1.      **OBJECTIVE:**   To establish policies, instructions and procedures pertaining to dietary services.

2.      **REFERENCES:**   ACA Standards 4-4316 and 4-4318 (Adult Correctional Institutions).

3.      **APPLICABILITY:**   Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedure are in place to comply with the provisions of this policy.

4.      **POLICY:**   It is the Secretary's policy to provide meals that are nutritionally balanced and to provide therapeutic diets to those offenders whose clinical findings necessitate alteration from their regular institutional diet.

5.      **DEFINITIONS:**

   A.      **Therapeutic Diet:**  A diet prescribed by a health care practitioner as a part of the patient's medical treatment.

   B.      **Health Care Practitioner:**   Clinicians (such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners, physician assistants and psychiatrists) trained to diagnose and treat patients.

6.      **PROCEDURES:**

   A.      Dietary allowances are reviewed at least annually by a qualified nutritionist or dietician to ensure that they meet the nationally recommended dietary allowances for basic nutrition.

JX-CCH-003268

**Health Care Policy No. HC-18**
**07 January 2011**
**Page Two**

B.    Menu evaluations are conducted at least quarterly by Food Services supervisory staff to verify adherence to the established basic daily servings.

C.    Therapeutic diets are provided as prescribed by the appropriate health care practitioner.  The health care practitioner shall submit a written order, which is specific and complete, to authorize the therapeutic diet.  These orders for therapeutic diets shall be rewritten annually or more often if clinically indicated.

D.    Therapeutic diets shall be kept as similar as possible to the foods served to other offenders.

E.    A therapeutic diet manual which consists of all applicable therapeutic diets shall be available in the health services and food services areas for reference and information.


s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-18 dated 01 August 2002.

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-19**                                                  **07 January 2011**



**HEALTH AUTHORITY**

1.    **OBJECTIVE:**  To identify the responsible Health Authority at each institution and to define the responsibilities of this position.

2.    **REFERENCES:**  ACA Standards 4-4380, 4-4381, 4-4407, 4-4426 and 4-4427 (Adult Correctional Institutions.)

3.    **APPLICABLITY:**    Deputy  Secretary,  Chief  of  Operations,  Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

4.    **POLICY:**  It is the Secretary's policy that each unit has a designated Health Authority with  the  responsibility  for  health  care  services  pursuant  to  a  written  agreement, contract or job description.  If the Health Authority is not a physician, final clinical judgment shall rest with a single, designated, responsible physician.

5.    **DEFINITIONS:**

A.    **Health Authority:**  The health administrator or agency responsible for the provision of health care services at an institution or system of institutions.  The designated, responsible physician may be the Health Authority.  The Health Authority  is  authorized  and  responsible  for  making  decisions  about  the deployment of health resources and the day-to-day operations of the health services program.

B.    **Health Care Practitioner:**    Clinicians  (such  as  physicians,  dentists, psychologists, podiatrists, optometrists, nurse practitioners, physician assistants and psychiatrists) trained to diagnose and treat patients.

6.    **RESPONSIBILITIES:**

A.    Establish a mission statement that defines the scope of health care services. Health services provide for the physical and mental well-being of the offender

JX-CCH-003270

**Health Care Policy No. HC-19**
**07 January 2011**
**Page Two**

population and shall include medical and dental services, mental health services, nursing care, personal hygiene, dietary services, health education and attending to environmental conditions.

B.    Develop mechanisms, including written agreements and guidelines, when necessary, to ensure that the scope of services is provided and properly monitored.

C.    Develop an institution's operational health policies and procedures.

D.    Identify the type of health care providers needed to give the determined scope of services.

E.    Establish systems for the coordination of care among multidisciplinary health care providers.

F.    Develop a management program to ensure that appropriate services are rendered and monitored for quality assurance on a regular basis.

G.    Ensure that clinical decisions are the sole province of the responsible clinician and are not to be countermanded by non-clinicians.

H.    The Health Authority shall determine what equipment, supplies and materials are necessary to provide health services.

I.    The Health Authority shall assist the Warden in determining that adequate space is provided for administrative, direct care, professional and clerical staff. This space includes conference areas, a storage room for records, a public lobby and toilet facilities.

J.    The Health Authority shall consult with the Warden to ensure that exercise areas are available to meet exercise and physical therapy requirements of individual offender treatment plans.

s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-19 dated 01 August 2002.

JX-CCH-003271

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-20**



**15 April 2011**

**PERSONNEL QUALIFICATIONS**

1.  **OBJECTIVE:**  To ensure that all Department of Public Safety and Corrections institutions provide health care services through qualified health care staff.

2.  **REFERENCES:**  ACA Standards 4-4382 and 4-4383 (Adult Correctional Institutions.)

3.  **POLICY:**  It is the Secretary's policy that health care in each correctional institution shall be provided by qualified health care personnel whose duties and responsibilities are governed by written job descriptions, contracts or written agreements that are on file at the applicable institution and approved by the Health Authority.

4.  **APPLICABILITY:**  Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.  **DEFINITIONS:**

    A.  **Credentials:**  Documentation that demonstrates health care professionals are qualified and currently licensed, certified, and/or registered, as applicable, to provide health services within their scope of practice.

    B.  **Health Care Practitioner:**  Clinicians trained to diagnose and treat patients, such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners and physician assistants.

    C.  **Health Care Professional:**  Staff who perform clinical duties, such as health care practitioners, nurses, social workers and emergency medical technicians, in accordance with each health care professional's scope of training and applicable licensing, certification and regulatory requirements.

    D.  **Midlevel Practitioner:**  A nurse practitioner or physician assistant licensed or credentialed to assume an expanded role in providing medical care under the supervision of a physician.

JX-CCH-003272

**Health Care Policy No. HC-20**
**15 April 2011**
**Page Two**

6. **PROCEDURES:**

    A.    Verification of current credentials and job descriptions, contract or written agreements of all health care professionals shall be on file at each institution where the services are provided.

    B.    At hiring, verification of current credentials and job descriptions, contract or written agreements of each health care professional shall be made by the hiring authority or designee.  Hiring or entering into a contractual agreement with any health care professional having an encumbered license requires the approval of the Secretary or designee in conjunction with the Department's Medical/Mental Health Director.

    C.    At hiring, the employee shall be responsible for providing proof of credentials.  The employee shall be in compliance with this policy by providing credentials for copying or a letter confirming credential status from the state licensing or certification body.

    D.    The health care professional shall be responsible for maintaining a current and valid license and/or certification to practice their profession.  The Department shall bear no expense, including fines, for any lapse in licensure or from any action by the issuing board.

    E.    The health care professional's supervisor and/or the institution's Human Resources office shall monitor the current status of the health care professional's license or certification to avoid lapse or expiration.

    F.    Verification of current credentials and job descriptions, contract or written agreements of each health care professional shall be made by the hiring authority or designee on an annual basis.

    G.    If it is discovered that the health care professional's license and/or certification is suspended by the state licensing or certification body or the health care professional has allowed the license and/or certification to expire, the Warden or designee shall notify the Department's Medical/Mental Health Director immediately and appropriate action shall be taken in accordance with Section 6.H.

    H.    If the health care professional's license and/or certification is suspended by the state licensing or certification body, or the health care professional allows them to expire, the health care professional may be subject to disciplinary action.  Disciplinary action may consist of, but shall not be limited to, suspension without pay until the license or certification is restored to a valid and current status or employment termination.

JX-CCH-003273

**Health Care Policy No. HC-20**
**15 April 2011**
**Page Three**

I.    Health care professionals shall perform clinical duties in accordance with their training and applicable licensing, certification and regulatory requirements.

J.    The mid-level practitioner is authorized to practice within their own license and under Clinical Practice Guidelines outlined in a collaborative practice agreement between the mid-level practitioner and one or more collaborating physicians as required by the appropriate licensing board.

s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-20 dated 01 August 2002.

JX-CCH-003274

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-21**



**07 October 2011**

**NURSING SERVICE**

1.    **OBJECTIVE:** To define the scope of nursing services within the correctional setting.

2.    **POLICY:** It is the Secretary's policy that the scope of nursing practice in Department of Public Safety and Corrections facilities shall be in compliance with the Nurse Practice Act as well as the standards of the American Correctional Association (ACA.)  The nursing profession is committed to respect for human beings.  This commitment can not be altered by the fact that the individuals being cared for are incarcerated.  The philosophy and ethics, responsibilities, functions, roles, skills and legal authority that guide the practice of nurses in a health care setting also guide the practice of nurses in corrections.

3.    **APPLICABILITY:** Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

4.    **DEFINITION:**

**Health Care Practitioner:**  Clinicians trained to diagnose and treat patients, such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners and physician assistants.

5.    **PROCEDURES:**

A.    All treatment performed by nurses shall be pursuant to written, standing or verbal orders by personnel authorized by law to give such orders. Registered Nurses and Licensed Practical Nurses must practice within the scope of applicable laws, regulations and licensure.

B.    Registered nurses may, based on their individual judgment of each situation, accept verbal orders initiated by an authorized prescriber and transmitted through a licensed or certified health care practitioner, provided the order is related to the said practitioner's scope of practice.

JX-CCH-003275

The registered nurse may delegate to a licensed practical nurse the acceptance of verbal orders (including telephone orders) from a physician, dentist or other authorized prescriber in accord with the Board of Nursing's rules on delegation.

C.      Nursing administrators shall have the responsibility and authority for the quality of nursing practice within the correctional health care system. This responsibility includes planning, organizing and evaluating nursing services. Staffing patterns shall reflect provisions of nursing care commensurate with the qualifications of nursing personnel and shall be designed to meet the nursing needs of the offenders.

D.      Registered nurses are prohibited from delegating complex tasks to anyone other than another registered nurse. A complex task is one that requires judgment to safely alter a standard procedure, or requires the consideration of a number of factors to perform a procedure, or requires judgment to determine how to proceed from one step to the next.

E.      Nursing practice in correctional facilities is characterized by a high degree of autonomy. The nurse is expected to make independent assessments, plan appropriate nursing intervention and provide nursing care. Effective nursing practice in a correctional facility requires a variety of assessment skills, including interviewing, communication, physical assessment and behavioral observation.

F.      The nurse shall make determinations relative to health and illness of offenders based upon applicable nursing theories and scientific knowledge. Such determinations involve independent nursing judgment concerning an offender's actual or potential health problems or needs. The nursing assessment, which includes data collection and nursing diagnosis, is the basis on which the nurse prepares a plan of nursing care that must be organized and documented in a manner that results in the achievement of the desired outcomes. When the needs of the offender require professional expertise beyond the scope of nursing practice, the nurse shall initiate referrals to a healthcare practitioner.

G.      All offender reception and diagnostic initial intake medical screening forms and requests for medical treatment encounters completed by a nurse shall be referred by the nurse for healthcare practitioner review. There is no specific requirement regarding when such review should take place. Timing of the review is based upon the nature of the encounter.

H.      The nurse in a correctional setting, utilizing current principles of Public Health Nursing, must promote a healthful environment and strive to

JX-CCH-003276

**Health Care Policy No. HC-21**
**07 October 2011**
**Page Three**

reduce the incidence of communicable diseases within the correctional setting.

I.  Nurses in correctional facilities provide health care services and shall not participate in procedures performed solely for correctional purposes, including participating in disciplinary court deliberations and conducting body cavity or strip searches to detect contraband.  Matters of nursing judgment are solely within the province of the nurse; however, security regulations applicable to facility personnel shall also apply to health care personnel.

J.  Medication shall be administered to offenders or delivered to them for self administration in accordance with state laws, practice, rulings and departmental regulations.


s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-21 dated 15 April 2011.

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-23**



**15 April 2011**

**HEALTH CARE ASSISTANTS**

1.   **OBJECTIVE:** To ensure that the use of health care assistants, volunteers, and/or students/interns in the delivery of health care services is in compliance with state laws and unit policies.

2.   **REFERENCES:**  ACA Standards 4-4391, 4-4392 and 4-4393 (Adult Correctional Institutions.)

3.   **POLICY:**  It is the Secretary's policy to utilize assistants in the delivery of health care services in a manner that is beneficial to the offenders, volunteers, institution and Department.

4.   **APPLICABILITY:**   Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.   **PROCEDURES:**

   A.   Volunteer Program

   When volunteers are used in the delivery of health care:

   1)   There shall be a documented system for selection, training, staff supervision and faculty orientation;

   2)   There shall be documentation that defines the tasks, responsibilities and  authority of the volunteers;

   3)   Volunteers may only perform duties consistent with their credentials and training;

   4)   Volunteers shall agree in writing to abide by all institutional policies, including those relating to security and confidentiality of information;

   5)   All aspects of the Volunteer Program relating to the delivery of health care services shall be approved by the Health Authority.

   B.   Students and/or Interns

**Health Care Policy No. HC–23**
**15 April 2011**
**Page Two**

1) Any student, intern or medical resident delivering health care, as part of a formal training program, shall work under staff supervision commensurate with their level of training;

2) There shall be a written agreement between the correctional institution and the training or educational facility that states the scope of work, length of agreement and legal or liability issues if applicable;

3) Students or interns shall agree in writing to abide by all institutional policies, including those relating to security and confidentiality of information.

C.    Offender Assistants

1) Unless prohibited by state law, offenders (under staff supervision) may perform familial duties commensurate with their level of documented training.  These duties may include the following:

a.    Peer support and education;
b.    Hospice or end of life care activities;
c.    Assisting impaired offenders on a one-on-one basis with activities of daily living;
d.    Serving as a companion to offenders on suicide watch if qualified and trained through a formal program that is part of the suicide prevention plan.

2) Offenders shall not to be used for the following duties:

a.    Performing direct patient care services;
b.    Scheduling health care appointments;
c.    Determining access of other offenders to health care services;
d.    Handling or having access to surgical instruments, syringes, needles, medications or health records;
e.    Operating diagnostic or therapeutic equipment except under direct supervision (by specially trained staff) in a vocational training program.

s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-23 dated 01 August 2001.

JX-CCH-003279

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-31**



**18 March 2011**

**HEALTH AUTHORITY MEETINGS, GOALS AND OBJECTIVES**–

1.    **OBJECTIVE:**   To ensure that health care services which are provided are continually monitored, evaluated and improved as necessary.

2.    **REFERENCES:**   ACA Standards 4-4408, 4-4422, 4-4423 and 4-4424 (Adult Correctional Institutions.)

3.    **POLICY:**   It is the Secretary's policy that each facility's Warden and Health Authority shall meet quarterly, to set annual goals and objectives and to ensure the delivery of health care meets community standards.

4.    **APPLICABLILITY:**   Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.    **PROCEDURES:**

A.    Quarterly Administrative Meetings

1)    The Warden shall meet with the Health Authority quarterly to review reports submitted by the Health Authority regarding the facility's health services system and health environment, including plans to address issues discussed.

2)    The Quarterly Administrative Meetings shall be documented and the minutes shall reflect topics discussed

B.    Goals and Objectives

1)    Each facility shall establish measurable goals and objectives that are reviewed at least annually and updated as necessary.

2)    Each facility shall develop and maintain an internal system for evaluating the achievement of goals and objectives:

**Health Care Policy No. HC-31**
**18 March 2011**
**Page Two**

        a.     The internal administrative audit shall exist separate apart from audits conducted by other agencies;

        b.     As the internal audit reveals the degree of compliance with established goals and objectives, program changes shall be implemented as necessary.

   3)    Each policy, procedure and program in the health care delivery system shall be reviewed at least annually by the Health Authority and revised if indicated.

s/James M. Le Blanc
Secretary

This Health Care Policy supersedes Health Care Policy No. HC-31 "Quarterly Meetings and Statistical Reports" dated 01 August 2002.

JX-CCH-003281

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-32**



**27 January 2010**

**PEER REVIEW, INTERNAL REVIEW AND QUALITY ASSURANCE**

1. **REFERENCES:** ACA Standards 4-4410, 4-4411 and 4-4420 (Adult Correctional Institutions).

2. **PURPOSE:** To state procedures for external review of healthcare professionals and to develop an internal system for continuous review, planning and improvement of healthcare services available to offenders. To review, identify and provide preventive or corrective measures for offender and staff injuries.

3. **POLICY:** It is the Secretary's policy that there is a documented external peer review, internal review and quality assurance program for all health care practitioners which shall be established in conformity with ACA standards. Each unit shall develop policy and procedures pertaining to peer review, internal review and quality assurance.

4. **PROCEDURE:**

   A. Peer Review – An external review of all healthcare professionals (including physicians, nurse practitioners, physician assistants, mental health professionals, psychologists and dentists) that shall be completed every two years during a C-05-003 audit or at an alternate date or time. To coordinate the scheduling of a peer review, the unit shall contact the DPS&C Medical/Mental Health Director six months prior to the review's due date. The following requirements shall be met:

      1) The reviewing professional shall hold basic credentials at least equal to or greater than the credentials of the individual being reviewed.

      2) The reviewer shall not have provided routine services to the institution under review within the past two years prior to the audit.

      3) In the event problems of practice arise, an immediate review by a panel of independent professional(s) selected in consultation with the Secretary or designee and the DPS&C Medical/Mental Health Director may be conducted if deemed necessary after careful consideration by the Warden, appropriate Regional Warden and the DPS&C Medical/Mental Health Director.

4)  The reviewer shall randomly select a minimum of ten medical records from a list of offenders who have received services from the area under review (i.e. chronic care clinic logs, printout by mental health level of care, dental clinic scheduling calendar, etc). For example, the reviewer may choose to select four records of diabetic offenders, two with heart disease, two with hypertension and two with bronchial asthma, or any other combination that results in a comprehensive review.  The reviewer shall use the following documents to perform peer reviews:

    a.  Healthcare Professional Peer Review for Physician, Nurse Practitioner and Physician Assistant (Form HC-32-A.)

    b.  Healthcare Professional Peer Review for Dental Professional (Form HC-32-B.)

    c.  Healthcare Professional Peer Review for Mental Health Professional (Form HC-32-C.)

    d.  Healthcare Professional Peer Review Report (Form HC-32-D.)

5)  The reviewer shall assess whether the community standard of care is being delivered, including but not limited to, the review of the following:

    a.  Chronic disease guidelines and adherence to the guidelines.

    b.  Appropriateness of specialty referrals and continued follow up in primary care while specialty appointment is pending.

    c.  Adherence to Subjective, Objective, Assessment and Plan (SOAP) format during clinic encounters.

    d.  Lab/test reports being reviewed in a timely manner and acted upon in a timely manner.

    e.  Quality of documentation.

    f.  Appropriate review/signature/date of documentation (including sick call review by healthcare practitioner.)

6)  A report of the findings shall be provided within three weeks to the DPS&C Medical/Mental Health Director, appropriate Regional Warden and unit Warden.  The report is confidential; however, action should be taken as necessary.

**Health Care Policy No. HC-32**
**22 January 2010**
**Page Three**

B.    Internal Review and Quality Assurance

1)    A system of meaningful internal review and quality assurance shall be developed and implemented by the unit's Health Authority in conjunction with the DPS&C Medical/Mental Health Director.  The necessary elements of the system shall include:

a.    An established multidisciplinary Quality Assurance/Quality Improvement Committee that shall meet quarterly. Unit head and Unit's Health Authority shall work in conjunction with Department's Medical/Mental Health Director's office to schedule these meetings.

b.    The committee shall determine what studies are to be implemented, maintaining a minimum of five at any given time.  Certain items shall be routinely studied and monitored. These high risk, high volume items include but are not limited to access to care, intake screening, health assessment and continuity of care.    The DPS&C Medical/Mental Health Director may also instruct the committee to conduct studies as deemed necessary.

c.    Data from all studies shall be collected, trended, analyzed and combined with planning, intervening and reassessing, resulting in more effective access, improved quality of care and better utilization of resources.

d.    On-site monitoring of health service outcomes on a regular basis through:

i.    Chart reviews by the responsible physician or designee, including investigation of complaints and quality of health records;

ii.    Review of prescribing practices and administration of medication practices;

iii.    Systematic investigation of complaints and grievances;

iv.    Monitoring of corrective action plans.

e.    A review of all deaths in custody, suicides or suicide attempts and illness outbreaks.

**Health Care Policy No. HC-32**
**22 January 2010**
**Page Four**

        f.      Corrective action plans to address and resolve identified problems and concerns.

        g.     Reevaluating problems or concerns to determine whether corrective measures have achieved and sustained the desired results.

        h.     Incorporating findings of internal review activities into the unit's educational and training activities.

        i.       Maintaining records of internal review activities (i.e. minutes of the meetings).

        j.       Issuing a quarterly quality assurance/internal review report to the DPS&C Medical/Mental Health Director, appropriate Regional Warden, unit Warden and unit Health Authority of the findings of internal review activities.

        k.     Requiring that records of internal review activities comply with legal requirements of confidentiality.

    2)     There is a written plan to address offender and staff injury prevention. The plan is based on an analysis of the institution's injury experience and includes methods for identification of problems and preventive or corrective measures.

s/James M. Le Blanc
Secretary

     This policy supersedes Health Care Policy No. HC–32 dated 13 May 2005.

Forms:
HC-32-A    Healthcare Professional Peer Review for Physician, Nurse Practitioner and Physician Assistant
HC-32-B    Healthcare Professional Peer Review for Dental Professional
HC-32-C    Healthcare Professional Peer Review for Mental Health Professional
HC-32-D    Healthcare Professional Peer Review Report

JX-CCH-003285

**Health Care Policy No. HC-33**
**10 November 2010**
**Attachment**

## DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
## HEALTH INFORMATION DISCLOSURE REFERENCE CHART

I    -    Internal Disclosure
E    -    External Disclosure

| REQUESTER | SUMMARY | PATIENT AUTHORIZATION REQUIRED? | CHARGE FOR COPIES? | DISCLOSURE CODE |
|---|---|---|---|---|
| Attorney for Patient | The attorney may receive a copy of the medical record upon written patient authorization. | YES | YES | E |
| Attorney General | Patient authorization is not required. The facility has the legal right to defend itself in an action. | NO | NO | E |
| Center of Communicable Disease Control | Confirmation of a reportable communicable disease, the facility shall notify the local health department. | NO | NO | E |
| Counsel's Office | Attorneys representing the Department of Corrections. | NO | NO | I |
| Court Order | A court order is a document signed by a judge. | NO | NO | I |
| Deceased Patient's Estate Administrator / Executor | Health care information and records with the exception of any psychiatric records, shall be available to anyone having a legitimate interest, provided the patient or his legal representative, or in case of a deceased patient, the executer of his will, the administrator of his estate, the surviving spouse, the parents or the children of the deceased patient, seeking any medical records relating to the patient's medical treatment, history or condition, either personally or through an attorney, shall have the right to obtain a copy of such record upon furnishing a signed authorization and upon payment of reasonable copying charges. | YES Authorization from Administrator or Executor Required | YES | I |
| Departmental Employees Access to Offender Health Information | Employees have access to limited/ minimum health information/records directly relating to the employee's specific job function and need to know basis, as determined by Departmental policy. | NO | NO | I |
| District Attorney | District Attorneys may obtain copies of health records of offenders if they have written authorization from offender or a court order, if relevant in any judicial proceeding. | NO | NO | E |
| Family of Deceased Offender | Requests must be accompanied by proof that the requester is the administrator or executor of the offender's estate. | Authorization of the Administrator or Executor | YES | E |
| Family of | Patient authorization is needed to give | YES | YES | E |

JX-CCH-003286

| Offender | health record/health information to family members. Written consent must be filed in the offender's medical record. | | | |
|---|---|---|---|---|
| Funeral Director | Disclosure of PHI in order to perform other functions authorized by law. | NO | NO | E |
| Grievance Program | The offender grievance program provides an orderly, fair, simple, expeditious method of resolving grievances. | NO | NO | I |
| Other health care providers | Health care information may be given to health care providers for treatment purposes. | NO | NO | E |
| Insurance Companies Representing Offender | Requested to verify treatment provided by the Department. | YES | YES | E |
| Law Enforcement Agencies | FBI, CIA, Louisiana State Police, City and Parish Police, including out-of-state police agencies, when relevant to a criminal investigation or judicial proceeding. | NO | NO | E |
| Medical Examiner, Coroner and Coroner's Physician | May have access to the health information pertinent to the investigation of the person's death. | NO | NO | E |
| Office of Family Support – Disability Determination | Responsible for adjudication of disability claims on behalf of the Federal Government under the Social Security Act. | YES | NO | E |
| Patient Representative | Offender must give written authorization to request medical records be released on his behalf. | YES | YES | I |
| Released or Paroled Patients | Released or paroled patients have the right to receive a copy of their health record. | YES | YES | E |
| Subpoena | The production of a medical record in a judicial or administrative proceeding. | Subpoena | YES | E |

JX-CCH-003287

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-33**



**07 March 2011**

### OFFENDER MEDICAL RECORDS

1.  **OBJECTIVE:**  To provide a mechanism of organization and standardization regarding the format and the recording of entries into an offender's medical record and to provide guidelines regarding the storage of inactive medical records.

2.  **REFERENCES:**  Health Insurance and Portability Act of 1996; La. R.S. 40:1299.96 (A)(2)(b) and La. R.S. 44:36 (D); ACA Standards 4-4095, 4-4096, 4-4099, 4-4396 and 4-4413 through 4415 (Adult Correctional Institutions) and Health Care Policy No. HC-25 "Confidentiality."

3.  **POLICY:**  It is the Secretary's policy that an offender's health information shall be lawfully protected while allowing access to health information required to provide and promote quality health care, to protect the offender's health and well being and to further the legitimate purposes of the Department, public health agencies and law enforcement agencies as detailed herein.

4.  **APPLICABILITY:**  Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.  **PROCEDURES**:

    A.  All offenders entering the system shall have a medical record initiated during the reception process.

    B.  All medical records shall be stored in a confidential and secure manner, safe from unauthorized use.

    C.  Medical records shall be retained in the original or microfilmed or similarly reproduced form which does not adversely affect their function.

    D.  The medical record shall contain the following items filed in a uniform manner:

JX-CCH-003288

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Two**

  1)  Patient identification on each sheet;
  2)  Completed receiving screening form;
  3)  Health appraisal data forms;
  4)  Problem summary list which shall be updated during every health care practitioner visit;
  5)  Record of immunizations;
  6)  All findings, diagnoses, treatments and dispositions;
  7)  Record of prescribed medications and their administration records, if applicable;
  8)  Laboratory, x-ray and diagnostic studies;
  9)  Place, date and time of health encounters;
  10)  Health services reports (e.g., emergency department, dental, mental health, telemedicine or other consultations);
  11)  Individualized treatment plans, including notations of any disabilities and need for auxiliary aids, when applicable;
  12)  Progress reports;
  13)  A discharge summary of hospitalization and other termination summaries;
  14)  Legible signature (includes electronic) and title of the provider (may use ink, type or stamp under the signature);
  15)  Consent and refusal forms;
  16)  Release of information forms;
  17)  Documentation of all occasions of medical and mental health service provided both on-site and off-site for inpatient or ambulatory encounters.

E.  The method of recording entries in the records, the form and format of the records and the procedures for their maintenance and safekeeping shall be approved by the Health Authority. The medical record is made available to and is used for documentation by all health care professionals.

F.  Each medical record shall be considered a written, individual treatment plan, which includes directions to health care and other personnel regarding their roles in the care and supervision of the offender.

**6.  CONFIDENTIALITY OF MEDICAL RECORDS:**

Any information that is derived from a clinical relationship between an offender and a healthcare provider is confidential information. All offender medical records shall be considered confidential.

A.  The medical record shall be stored securely and separately from the Master Record with access controlled by the Health Authority or designee.

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Three**

    B.    Medical information shall not be disclosed to anyone except in accordance with Health Care Policy No. HC-25 "Confidentiality" and applicable state and federal law.

    C.    The Health Authority or designee may share information regarding an offender's medical management with the Warden.

    D.    All offender medical records that are transferred to another institution shall be done so in a confidential manner.

    E.    Offenders shall not be allowed access to their medical record or the medical record of other offenders unless authorized by the Warden or designee.

**7.    INACTIVE MEDICAL RECORDS:**

    A.    Inactive medical records shall be reactivated (if available) if the offender returns to the Department's custody.

    B.    Inactive medical records shall be retained as permanent records in compliance with the legal requirements of the state of Louisiana for a period of six years from the date the full term sentence imposed upon the offender expires or six years from the date of death.  Medical record information is transmitted to specific and designated physicians or medical facilities in the community on the written request/authorization of the offender.

**8.    DOCUMENTATION PRACTICES:**

    A.    Each entry into the medical record shall have the offender's identifying information, the date, time and place of the health encounter.

    B.    Each entry into the medical record shall be typed or handwritten in ink. The entry shall be signed legibly by the appropriate health care professional. This provision shall not apply to electronic medical records.

**9.    MEDICAL RECORD ORGANIZATION:**

    A.    The medical record shall be organized in a standard format using a ten section 12 ¼" wide by 9 ½" high medical record folder.  The format of the medical record is source oriented.  This includes a separate section for each category of record.  In addition, some sections may have sub-section dividers within to help quickly identify information.  Sections III, VI and VIII shall not have sub-section dividers.

JX-CCH-003290

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Four**

B.  Each medical record shall have the offender's DOC # placed with stickers on the side of the medical record.  Each medical record shall be labeled across the front of the chart with the offender's name, DOC number, volume number, allergies and any other special precautions.  The charts shall be labeled and dated on the front when an offender is released or deceased.

C.  All documents contained in the medical record shall be filed in "reverse" chronological order, having the most recent information on top.  Each subsection within the categorical section shall be filed in "reverse" chronological order.

D.  When the medical record meets the maximum expansion capability, the record shall be divided.  This is done by removing the current and most pertinent documentation and placing it in a new medical record.  The new medical record shall be the active volume.  All volumes (active and old) shall be labeled accordingly.  A multi-volume label shall be placed on the medical records (e.g., Volume Two of Three.)

**10.    MEDICAL RECORD CHART ORDER AND FORMAT:**

A.  Section I-Miscellaneous

1)  Miscellaneous correspondence.

2)  Miscellaneous memorandums and multiple nursing treatment notes (these are documented nursing encounters of routine care, i.e. wound care, weight, accuchecks, etc.)

3)  Authorization for release of information.  Any consent to release information (medical or mental health) while the offender is incarcerated.

B.  Section II-Reception and Diagnostic and Transfers

1)  Infection control (includes TB, flu, pneumovax and immunization.)

2)  Documentation

a.    Transfer summaries;
b.    Intake screening form;
c.    Medical access and medical co-payment explanation form;
d.    Reception and diagnostic health appraisals;
e.    Standing orders, if applicable;

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Five**

    f.  Orientation form.

   3)  Health consequences of illegal activities.

   4)  Master Prison Record, if applicable.

C.  Section III-Medication Administration Record

   1)  Medication Administration Records.

D.  Section IV-Duty Status and Diet Slips

   1)  Duty Status;

   2)  Diet Slips.

E.  Section V-Case Summary and Test Results

   1)  Master problem list and flowsheets:

     a.  Problem Summary List;
     b.  Flowsheet recordings of multiple measurements.

   2)  Laboratory results.

   3)  EKG's.

   4)  Radiology reports (on-site.)

   5)  Unusual laboratory/diagnostic results. (These results are from outside facilities including nuclear medicine reports, ultrasounds, echocardiograms, audiology reports, treadmill reports and CT scans performed while incarcerated.)

   Note: All test results shall be filed here regardless of where they are performed.

F.  Section VI-Outpatient Encounters

   (All outpatient medical encounters on-site and off-site with the offender by health care professionals.
   1)  Physician's outpatient progress notes;
   2)  Unique encounter-type nursing documentation;
   3)  Sick call documentation;

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Six**

4)     Emergency sick call documentation;
5)     Notes documenting specialty medical encounters (in-house and outside referrals);
6)     Single sheet, outpatient surgery notes;
7)     Return speciality clinic recommendations;
8)     Chronic clinic notes;
9)     Annual physical examinations;
10)    Discharge summaries from outside hospitalizations**;**
11)    Telemedicine documentation.

Note: Excludes notes by a mental health worker, psychiatrist, dentist or optometrist.

G.     Section VII-Old Medical Records and Referral Paperwork

1)     Copies of medical records before incarceration.

2)     Authorization to obtain medical information.

H.     Section VIII-Mental Health Evaluations and Treatments

1)     Contact notes;
2)     MH consultation notes;
3)     Request for psychiatric/psychological evaluation;
4)     Nursing psychiatric progress notes;
5)     AIMS examination;
6)     Mental health advisory;
7)     Psychosocial assessment;
8)     Notification of transfer;
9)     Notification of hearing;
10)    Substance abuse assessment form;
11)    Mental Health LOC, service code documents and reception and diagnostic assessment data;
12)    Code change requests;
13)    All reception and diagnostic clinical reports;
14)    Risks and precautions;
15)    Mental health management order;
16)    Suicide watch log sheet;
17)    Mental health behavioral checklist;
18)    Psychological testing;
19)    Psychiatric progress notes.

I.     Section IX-Dental, Optometry and Audiology

JX-CCH-003293

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Seven**

    1)    Dental

        Dental evaluations, recommendations, consent for oral surgery, refusal forms and acknowledgement of receipt of dentures, partials, etc.

    2)    Optometry

        Optometry evaluations, recommendations, refusal forms and acknowledgement of receipt of eyeglasses.

    3)    Audiology

        Initial hearing screening, audiology evaluation, recommendations, refusal forms, election forms and acknowledgement of receipt of hearing aids.

J.    Section X-Outside Hospitalization Nursing Unit Admission Record

    Each admission may have a subsection tab labeled with the dates of admission and discharge. Each admission is filed with the most recent on top. The Nursing Unit Record includes all events that occur while the offender is admitted on the Nursing Unit. Documentation that is generated that has a designated section for filing shall be filed in those particular sections after the offender is discharged from the Nursing Unit. All specialty consultation, both on-site and off-site, that occurs while an offender is admitted to a Nursing Unit shall be filed in Section VI after the offender is discharged from the unit.

## 11.    RELEASE OF INFORMATION:

A.    Medical records, except psychiatric records (which includes any psychological or mental health records), shall be available to anyone having a legitimate interest, provided the offender or in case of death, the legal heir or next of kin, has consented in writing to their release utilizing the Authorization to Release Medical Information (Form HC-33-A.) Upon receipt of advance payment of the copying charges, the medical records shall be released. (See Section 13. "Fees for Copying Medical Records" for additional information.)

B.    A signed authorization is also needed for the Office of Family Support-Disability Determination. The Health Information Management Department shall compare the signature of the offender with other signatures in the medical record to ensure authenticity of the signature.

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Eight**

C.    Information from the medical record may be disclosed to Department employees to use and the divulging of such information may only be the minimum necessary amount of information required to complete the desired task.    Medical charts, records, reports, documents and other memoranda prepared by physicians, surgeons, psychiatrists, nurses and employees of the Department may be released, without consent of the offender, to the following when they are legitimately and properly interested in the disease or in the condition of the patient:

1)    Board of Parole;
2)    Board of Pardons;
3)    Governor;
4)    Health care practitioners;
5)    Hospitals, clinics and nursing homes;
6)    Courts (whenever the past or present condition is the issue or is relevant in any judicial proceeding);
7)    Other appropriate governmental agencies or officials when access to such information is imperative for discharge of the responsibilities of the requesting agency or officer;
8)    Probation and Parole Officers;
9)    Public health activities; and
10)    Law enforcement agencies when such information is relevant to a criminal investigation, judicial or administrative proceeding.

Verbal requests made by the parties listed above are acceptable. However, the Warden or designee reserves the right to require a written request before releasing any information.  The individual or agency shall certify in writing that they will not release the information to any other agency and shall maintain the confidentiality of the information.  Any other access/release shall be approved by the Warden or designee before access shall be granted.  In this case, it shall be restricted to a legitimate need-to-know basis.

D.    A patient's written authorization is not required for release of information when release is to another health care practitioner currently providing care to the offender.

E.    Psychiatric medical records shall not be released without a court order except in exceptional situations when the Warden may approve the release of psychiatric records on a case-by-case basis if deemed beneficial to the offender and/or the Department.

JX-CCH-003295

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Nine**

    F.     When a request for medical records is made through a power of attorney, the institution must have documentation that authenticity of the power of attorney has been verified.

    G.     The Advocacy Center shall have access to all records of any individual who is a client, if such individual, legal guardian, conservator or other legal guardian has authorized the Advocacy Center to have access. All inquires made by Advocacy Center representatives shall be directed to the Headquarters Legal Section for consideration.

    H.     The Department does not conduct covered transactions defined in the Health Insurance and Portability Act of 1996 (HIPPA) and therefore, is not a "covered entity" under HIPPA.

    I.     Additional information is available on the attached Health Information Disclosure Reference Chart.

**12.    SUBPOENAED RECORDS:**

    A.     Whenever any medical record is subpoenaed (except in the case of medical records for which a release has been obtained), the pertinent records shall be submitted to the appropriate court for a ruling as to whether the information should be made available to the person who caused the subpoena to be issued.

    B.     The Headquarters Legal Section shall examine the information and shall withhold the information should it find a protective order is necessary for the following reasons:

        1)    That the information is not relevant to the proceedings;
        2)    That the information was derived from communications which were obviously made in confidence that they would not be disclosed;
        3)    That confidentiality is essential to future useful relations between the source and the recorder of the information.

**13.    FEES FOR COPYING MEDICAL RECORDS:**

    A.     Collection of Fees for Reproduction of Medical Records

| | |
|---|---|
| First 25 pages | $1.00 per page |
| From 26 to 350 pages | $0.50 per page |
| More than 350 pages | $0.25 per page |
| Handling Fee | Not to exceed $25.00 |
| Postage | Actual Postage Cost |

JX-CCH-003296

**Health Care Policy No. HC-33**
**07 March 2011**
**Page Ten**

B.  Collection of Fee for Reproduction of X-rays, Microfilm and Electronic Imaging Media

    Each Media                 Actual Reproduction Cost
    Handling Fee              $10.00

D.  If treatment records are generated, maintained or stored in digital format, copies may be requested to be provided in digital format and charged at the rate stated in Section 13.A.; however, the charges for providing digital copies shall not exceed one hundred dollars, including all postage and handling charges actually incurred.

E.  If X-rays and other imaging media are generated, maintained or stored in digital format, copies may be requested to be provided in digital format and charged at the rate stated in Section 13.B.; however, the charges for providing digital imaging media copies shall not exceed two hundred dollars, including all postage and handling charges actually incurred.

F.  Each request for records submitted by the offender or other person authorized to request records pursuant to the provisions of this policy shall be subject to only one handling charge, and the institution shall not divide the separate requests for different types of records, including but not limited to, billing or invoice statements. The institution shall not charge any other fee which is not specifically authorized by this regulation and applicable law, except for notary fees and fees for expedited requests as contracted by the parties.

s/James M. Le Blanc
Secretary

Attachment:  Health Information Disclosure Reference Chart

Form: HC-33-A        Authorization to Release Medical Information

This policy supersedes Health Care Policy No. HC-33 dated 10 November 2010.

JX-CCH-003297

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-34**



**28  February 2011**

**OFFENDER HYGIENE**

1.  **OBJECTIVE:** To provide appropriate services and supplies to promote the maintenance of acceptable levels of hygiene for those offenders housed in medical housing units.

2.  **REFERENCES:** ACA Standards 4-4342, 4-4416, 4-4417, 4-4418 and 4-4419 (Adult Correctional Institutions.)

3.  **APPLICABILITY:** Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

4.  **DEFINITION:**

    Medical Housing Unit:  Any area within the facility utilized to house offenders for medical reasons.

5.  **PROCEDURES:**

    A.  Articles necessary for maintaining proper personal hygiene are available to all offenders and provided to those who are indigent.  Each offender shall be provided:

    - Soap;
    - Toilet paper;
    - Tooth brush;
    - Tooth paste;
    - Shaving equipment upon request;
    - Denture cleanser and adhesives, if indicated.

    B.  When standard issued clothing presents a security or medical risk (i.e. suicide observation) provisions shall be made to supply the offenders with a garment that promotes offender safety in a way that is designed to prevent humiliation and degradation.

    C.  The medical housing unit and infirmary area shall have sufficient bathing facilities to allow offenders housed there to bathe daily.

JX-CCH-003298

**Health Care Policy No. HC-34**
**28 February 2011**
**Page Two**

D.    Offenders shall have access to operable washbasins with hot and cold running water in the medical housing unit or infirmary area at a minimum ratio of one basin for every twelve occupants, unless state or local building or health codes specify a different ratio.

E.    Offenders shall have unrestricted access to toilets and hand washing facilities 24 hours per day when they are confined in the medical housing unit or in the infirmary area.

- Toilets shall be provided at a minimum ratio of one for every twelve offenders in a male institution and one for every eight offenders in a female institution.  Urinals may be substituted for up to one-half of the toilets in the male facilities;
- All housing units with three or more offenders shall have a minimum of two toilets;
- These ratios apply unless state or local building or health codes specify a different ratio.


s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-34 dated 01 August 2002.

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**
**No. HC-41**



**15 April 2011**

**AUTOMATED EXTERNAL DEFIBRILLATORS**

1.     **OBJECTIVE:**   To define the policy of the Department of Public Safety and Corrections regarding the use of Automated External Defibrillators (AEDs.)

2.     **REFERENCE:**  ACA Standard 4-4390 (Adult Correctional Institutions.)

3.     **POLICY:**   It is the Secretary's policy that Automated External Defibrillators (AEDs) shall be available at each institution and appropriate training shall be provided to personnel responsible for their use.

4.     **APPLICABILITY:**    Deputy Secretary, Chief of Operations, Department's Medical/Mental Health Director, Regional Wardens and Wardens.  Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.     **DEFINITION:**

       **Automated External Defibrillator (AED):**  A device that is used to administer an electric shock through the chest wall to the heart.  The device has a built-in computer that assesses the patient's heart rhythm, judges whether defibrillation is required and then administers the shock.  Audible and/or visual prompts assist the user through the process.   Most AEDs are designed to be used by nonmedical personnel such as police, firefighters, flight attendants, security officers and other lay rescuers who have been properly trained.

6.     **PROCEDURES:**

       A.     The use of AEDs shall be available at each institution as a mechanism to facilitate the emergency treatment of sudden cardiac arrest.

       B.     The Health Authority in consultation with the Warden or designee shall determine the number and location of AEDs.

       C.     Written institutional policies and procedures for the use of AEDs shall include, at a minimum, the following:

JX-CCH-003300

**Health Care Policy No. HC – 41**
**15 April 2011**
**Page Two**

- Education/training of appropriate personnel;
- Indications for use;
- Procedure to follow when used;
- Review and evaluation of use by the Medical Director or designee (must be a physician);
- Post-use care of the AED.


s/James M. Le Blanc
Secretary

This policy supersedes Health Care Policy No. HC-41 dated 20 December 2002.

JX-CCH-003301