# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., ET AL.                          CIVIL ACTION

VERSUS                                             15-318-SDD‑RLB

BURL CAIN, ET AL.

## RULING

This matter is before the Court on the *Motion for Class Certification*[1] filed Plaintiffs, Joseph Lewis, Jr., Kentrell Parker, Farrell Sampier, Reginald George, John Tonubbee, Otto Barrera, Clyde Carter, Edward Giovanni, Ricky D. Davis, Lionel Tolbert, and Rufus White ("Plaintiffs").[2] Defendants, Louisiana Department of Public Safety and Corrections ("DOC"), Darrel Vannoy, in his official capacity as Warden of the Louisiana State Penitentiary ("LSP" or "Angola"), Stephanie LaMartiniere, in her official capacity as Assistant Warden of LSP, James M. Leblanc, in his official capacity as Secretary of DOC, Raman Singh, M.D., in his official capacity as Medical Director for DOC, Stacye Falgout, in her official capacity as the Chief Nursing Officer for DOC, Randy Lavespere, M.D., in his official capacity as the Medical Director for LSP, Sherwood Poret, RN, in his official capacity as the Director of Nursing for the LSP, and Cynthia Park, ACNP, in her official capacity as an Acute Care Nurse Practitioner at LSP (jointly "Defendants"), have filed an *Opposition*[3] to this motion, to which Plaintiffs filed a *Reply*.[4]   The Court held a class

---

[1] Rec. Doc. No. 133; *Supporting Memorandum*, Rec. Doc. No. 140.
[2] Plaintiff Cedric Evans was terminated on June 21, 2016.
[3] Rec. Doc. No. 174.
[4] Rec. Doc. No. 187.
43681

certification hearing on November 2, 2017, where the Parties presented argument and evidence regarding class certification.[5]  Subsequently, the Parties were allowed to submit post-hearing briefs for the Court's consideration.[6]  For the following reasons, Plaintiffs' motion shall be granted.

## I.   BACKGROUND AND PARTIES' ARGUMENTS

This suit is brought by several inmates incarcerated at the Louisiana State Penitentiary ("LSP").  Plaintiffs claim that the medical care provided at LSP violates the Eighth Amendment prohibition of cruel and unusual punishment.  Plaintiffs also claim that the medical treatment of disabled inmates at LSP violates the Americans with Disabilities Act ("ADA")[7] and the Rehabilitation Act ("RA").[8]

Plaintiffs seek to represent a class of all prisoners who are now, or will in the future, be confined at LSP (the "Class"), as well as an ADA Subclass of inmates with disabilities who are now, or will in the future, be confined at LSP (the "ADA Subclass").[9]  Plaintiffs request injunctive relief to abate the alleged systemic deficiencies in Defendants' policies and practices that subject all inmates to unreasonable risks of serious harm.[10]

The Defendants oppose Plaintiffs' *Motion for Class Certification* arguing that both the proposed Class and ADA Subclass are not entitled to class-wide injunctive relief under Rule 23(b)(2) because: (1) the class members have not "been harmed in essentially

---

[5] Rec. Doc. No. 375.
[6] *See* Rec. Doc. Nos. 377 & 378.
[7] 42 U.S.C. § 12101, *et seq.*
[8] 29 U.S.C. § 701.
[9] Rec. Doc. No. 140 at 2.
[10] *Id.*
43681

the same way," and (2) a single injunction could not "provide relief to each member of the class."[11]

In addition, Defendants assert that, even if the ADA Subclass meets the requirements of FRCP 23(a) and (b)(2), the ADA Subclass of individuals have failed to meet the Prison Litigation Reform Act's ("PLRA")[12] exhaustion requirement. Thus, Defendants argue that the ADA Subclass - regardless of meeting the class certification requirements - cannot bring legal action until administrative remedies are exhausted.

## II.    STANDING AND THE PLRA EXHAUSTION REQUIREMENT

Only after the Court has determined if the Named Plaintiffs have standing may it consider whether they have representative capacity to assert the rights of others. Indeed, the Fifth Circuit holds that "[s]tanding is an inherent prerequisite to the class certification inquiry."[13] Defendants contend that several Named Plaintiffs lack standing to represent a class because their claims are moot for various reasons. Named Plaintiffs Joseph Lewis, Jr., Edward Giovanni, Shannon Hurd, and Alton Batiste are now deceased. Cedric Evans has been released from DOC custody, and Alton Adams is no longer at LSP.[14] Defendants also argue that Named Plaintiffs Kentrell Parker ("Parker") and Farrell Sampier ("Sampier") have failed to exhaust administrative remedies prior to filing suit as required by the PLRA.

---

[11] Rec. Doc. No. 174.
[12] 42 U.S.C. § 1997e(a).
[13] *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001).
[14] Plaintiffs dispute whether Alton Adams is still a Named Plaintiff: "Plaintiffs dispute whether Defendants' decision to transfer Mr. Adams to a different prison, transfer him back to LSP, and transfer him out again moots his claim." Rec. Doc. No. 222, p. 2 (citing Rec. Doc. 201-3 at 2-3). Nevertheless, the Court cannot consider his ARP as it was filed after the filing of the *Complaint* on May 20, 2015.
43681

The PLRA mandates that "[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted."[15] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes."[16] The Supreme Court made clear that exhaustion is now mandatory.[17] The Fifth Circuit has held that the available administrative remedy must be pursued to its conclusion.[18] In *Gates v. Cook*, the Fifth Circuit held that exhaustion of remedies by one named representative plaintiff is sufficient to satisfy the requirement for the class.[19]

Defendants contend that, as of May 20, 2015, the date suit was filed, no Named Plaintiff had exhausted his administrative remedies as to the following claims: (1) the use of a co-pay system; (2) malingering; (3) adequacy of the medical records; and (4) ADA facilities.[20] Defendants argue that two of these do not relate to current Named Plaintiffs and are therefore irrelevant, and the remaining two do not raise ADA facilities claims. Defendants maintain that the grievances of Parker and Sampier do not raise a complaint regarding the inadequacy of the facility structures themselves or any structural barriers preventing them from accessing medical care or other LSP programs.

---

[15] *Supra* n. 12.

[16] *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

[17] *Id.* at 524, 122 S.Ct. 983.

[18] *Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir. 2001).

[19] 376 F.3d 323, 330 (5th Cir. 2004)(citing *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498–99 (5th Cir.1968) (exhaustion of remedies requirement satisfied for class action if named plaintiff representing class exhausted remedies); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1776 (2d ed. 1986) ("[W]hen prospective relief is the primary remedy being sought, a representative who has exhausted his administrative remedies may bring a class suit on behalf of those who have not done so.").

[20] Rec. Doc. No. 378, p. 4.

43681

Plaintiffs claim that, before filing suit, Named Plaintiffs filed and exhausted at least twenty-eight (28) Administrative Remedy Procedure grievances ("ARPs") regarding medical care and at least eight (8) specifically relating to an individual's disability. Plaintiffs contend that the burden of establishing failure to exhaust administrative remedies is on the Defendants. Indeed, the Fifth Circuit has held that, "[f]ailure to exhaust is an affirmative defense, such that the defendants have the burden of demonstrating that [plaintiff] failed to exhaust administrative remedies."[21] Plaintiffs further contend that the Defendants have failed to carry this burden as to the General Class and ADA Subclass based at least on the allegations set forth in the ARPs submitted by Parker, Sampier, and Davis.

As to the General Class, Defendants argue that no claims have been exhausted regarding the issue of co-pays or malingering.[22] This is incorrect. In the ARPs filed by Clyde Carter ("Carter"), he clearly complains about being charged a $6.00 co-pay although he allegedly received no medical treatment.[23] Further, in the same ARP, Carter complains that he was "locked up" "just for trying to get some kind of medical assistance"[24] and requests relief that "no kind of retaliation be taken against me for the fling of this Administrative Remedy."[25] This ARP was exhausted on June 30, 2014, well before the filing of this action. This establishes that administrative remedies have been exhausted as to claims of malingering and co-pays.

---

[21] *Wilson v. Epps*, 776 F.3d 296, 299, 5th Cir. 2015)(citing *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)).
[22] Defendants do not appear to challenge the exhaustion of other complaints of the General Glass.
[23] Rec. Doc. No. 261-6, p. 6, 9-10.
[24] *Id.* at p. 9.
[25] *Id.* at p. 10.
43681

As to the ADA Subclass, Parker's ARP includes the following summarization of his complaint: "COMPLAINS THAT THE TREATMENT CENTER IS NOT SUITABLE [sic] STAFFED OR EQUIPPED TO ACCOMMODATE QUADRIPLEGIC PATIENTS SUCH AS HIMSELF."[26] Sampier's ARP complains of several inadequacies in medical care and ultimately requests the following relief: "Complainant seek [sic] to be released to a medical facility that is equipped to adequately handle the basic and serious medical needs required for a quadriplegic."[27] The record reflects that both grievances were investigated, denied, appealed, and denied again. Carter also exhausted an ARP complaining about not being able to walk on "the uneven grounds" at LSP due to his knee disability.[28] The ARP of Ricky Davis complains of the failure of LSP to transfer him to the hospital for surgery in a handicap accessible transport vehicle.[29] It is undisputed that this claim was exhausted on April 1, 2015, prior to filing suit.

Plaintiffs cite to this Court's recent decision in *Hacker v. Cain*,[30] which involved an inmate's Eighth Amendment and ADA/RA claims regarding treatment of his cataracts. Much like the present case, the defendants claimed the plaintiff's administrative remedies were not exhausted because he failed to specifically request a particular accommodation. The Court denied the defendants' argument, finding as follows:

> Defendants' second argument in favor of summary judgment as to this claim—Plaintiff failed to properly exhaust his remedies, as the PLRA requires, by not specifically requesting an accommodation (beyond cataracts surgery) pursuant to the ADA/RA in his ARP—is oversold. Per the

---

[26] Rec. Doc. No. 359, p. 26.
[27] Rec. Doc. No. 359-1, pp. 1-2.
[28] Rec. Doc. No. 187-8, p. 3.
[29] Rec. Doc. No. 359 at 42-53.
[30] No. 3:14-00063-JWD-EWD, 2016 WL 3167176 (M.D. La. June 6, 2016).
43681

PLRA, "a grievance complaint must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit." It need not "give adequate notice of all claims or potential defendants." Rather, an ARP must do no more than "address the same inappropriate behavior by ... [Defendants] that is addressed in the" later filed suit. Plaintiff's ARP, as well as his medical record, leave no doubt as to the nature of his complaint: his worsening eyesight and approaching blindness. While he may have specifically asked for surgery, no reasonable reader could be confused about the underlying medical problem; indeed, LSP and LDPSC specifically define "cataracts surgery" as "medically necessary." With enough evidence available to validate this inference, a reasonable jury could readily reach the pivotal subsidiary conclusion that Defendants **were on notice of Plaintiff's need for an accommodation**, as his declining vision necessarily rendered him unable to perform the work of an inmate whose vision was unimpaired. **The PLRA requires no more than such holistic and general notice, one which Plaintiff's ARP sufficiently provided**.[31]

Relying on *Hacker*, Plaintiffs maintain that, at least Parker's, Sampier's, and Davis' ARPs "provided Defendants with both specific and 'holistic and general' notice that LSP's facilities were not equipped to accommodate inmates with disabilities."[32]

Plaintiffs also cite the Fifth Circuit's decision in *Johnson v. Johnson*,[33] holding that:

In deciding how much detail is required in a given case, we believe that a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials "time and opportunity to address complaints internally," *Porter v. Nussle*, 534 U.S. 516, 525, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Thus, a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit.[34]

The *Johnson* court also quoted a federal rules decision from the Northern District of Illinois holding that "inmates complaining about various aspects of the conditions in their housing

---

[31] *Id.* at *18 (internal citations omitted)(emphasis added).
[32] Rec. Doc. No. 377, p. 12, quoting *Hacker* at *19. Plaintiff contend that a number of other Plaintiffs exhausted claims on these issues; however, many of these were not filed or exhausted until after May 20, 2015.
[33] 385 F.3d 503 (5th Cir. 2004).
[34] *Id.* at 516-17.
43681

unit need only grieve their placement in that unit, not each of the various alleged unconstitutional conditions present in the unit; '[o]therwise the defendants could obstruct legal remedies to unconstitutional actions by subdividing the grievances....')."[35]

Additionally, the Supreme Court has held that "extra-statutory limitations on a prisoner's capacity to sue" generally excuse any lack of detail in named plaintiffs' grievances.[36] In this context, it is important to note that Defendants do not allow multiple complaints in a single grievance.[37] Plaintiffs contend the Defendants exhaustion requirements necessitate little specificity, multiple complaints are not allowed in a single grievance, and inmates are barred from filing more than one grievance at a time.[38] Thus, following Supreme Court precedent, Plaintiffs argue that any lack of detail in the Named Plaintiffs' grievances is excused due to these extra-statutory limitations on [Plaintiffs'] capacity to sue.

Plaintiffs also argue that Defendants read the PLRA's exhaustion requirement too broadly as Defendants appear to argue that each of the subdivided claims must be individually exhausted by one of the Named Plaintiffs. Plaintiffs maintain that many of these subdivided claims may be exhausted by a single grievance. Thus, Plaintiffs contend that violations of the ADA/RA for non-compliance by the facilities housing and treating inmates and violations of the ADA/RA relating to the medical care and treatment provided (or not provided) to inmates with disabilities may both be exhausted by a single grievance claiming any violation of the ADA/RA with sufficient facts to place LSP on notice

---

[35] *Id.* at 521 (quoting *Lewis v. Washington*, 197 F.R.D. 611, 614 (N.D.Ill.2000)).
[36] *Ross v. Blake*, 136 S.Ct. 1850, 1857 n. 1 (2016).
[37] Rec. Doc. No. 187, Exhibit B at 6.
[38] Rec. Doc. No. 180, p. 5.
43681

of the problem(s). Further, because Defendants' procedure requires little specificity and prohibits inmates from including multiple complaints in a single grievance, the standard for a sufficient ARP is low.

Considering the above, the Court finds that Parker's, Sampier's, and Davis' ARPs put the Defendants on notice that they were complaining about LSP's failure to accommodate inmates with disabilities in treatment, medical care, and access to handicap accessible transportation, facilities, and medical equipment. The grievances provided Defendants with a fair opportunity to address the problems that would later form the basis of the lawsuit, and it is meritless to argue that these ARPs failed to provide notice to Defendants that violations of the ADA/RA were implicated.

Moreover, the Court finds it disingenuous to now argue an exhaustion defense when the Defendants' Rule 30(b)(6) designated representative Trish Foster testified, under oath and on the record, that the claims of the Named Plaintiffs, at that time, were exhausted:

> Q: She can have it in front of her or she can answer maybe if there are any unresolved ARPs of any of the plaintiffs outstanding.
>
> A: I know there is none that – I know everybody has went through both steps. I did check that. Everybody has completed and exhausted their ARPs.
>
> * * *
>
> Q: Was there any grievance in the plaintiffs that had not been exhausted that you recall?
>
> A: No. They have all went through the first and second step.[39]

---

[39] Rec. Doc. No. 180-1, p. 27, lines 9-16, 23-25 through p. 28, line 1.

43681

This testimony was given before the *Complaint* was amended, but Plaintiffs Parker, Sampier, and Davis were Named Plaintiffs at the time of this testimony. Parker later submitted a *Declaration* stating that "though she testified in her deposition that all of the Plaintiffs had exhausted the ARPs for their claims in the Complaint, she has come to the realization sometime after giving her deposition that this statement is not true."[40] Nevertheless, the Fifth Circuit has held that a party cannot defeat a summary judgment motion "using an affidavit that impeaches, without explanation, sworn testimony."[41] Considering that Defendants have an obligation "to prepare [their] designee to give binding answers" and "cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition,"[42] the Court finds that Defendants are bound by this sworn statement as to the Named Plaintiffs at the time of the deposition.

Accordingly, the Court finds that at least one Named Plaintiff has exhausted administrative remedies and has standing to represent the ADA Subclass. Further, at least one Named Plaintiff has standing to represent the General Class for the Eighth Amendment claim on the theories advanced.

## III. CLASS CERTIFICATION UNDER RULE 23

Class action is the exception to the usual rule that litigation is conducted by and on behalf of individual named parties only.[43] The requirements for class certification are

---

[40] Rec. Doc. No. 198-2.
[41] *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). The Court acknowledges that this is not a motion for summary judgment but finds that the principle applies equally under the circumstances.
[42] *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, No. 06-cv-271, 2007 WL 4410370, at *8 (N.D. Tex. Dec. 14, 2007).
[43] *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (internal citation omitted).
43681

governed by Rule 23 of Federal Rules of Civil Procedure. To obtain class certification, parties must satisfy Rule 23(a)'s four prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of that class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Assuming the proposed class satisfies the requirements of Rule 23(a), Plaintiffs must also establish the requirements of Rule 23(b)(1), (2), or (3).[44] Plaintiffs seek class certification under Rule 23(b)(2), which permits certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole."[45] Plaintiffs, as the party seeking class certification, bear the burden of demonstrating that the requirements of Rule 23 have been met.[46] "Rule 23 does not set forth a mere pleading standard."[47]

It is well-established that "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class."[48] Generally, "a district court has broad discretion when deciding a motion for class certification."[49] Before concluding that a class has satisfied the requirements of Rule 23(a), an analysis will "[f]requently … entail some overlap with the merits of the plaintiff's underlying claim."[50] The Fifth Circuit has

---

[44] *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).
[45] Fed. R. Civ. P. 23(b)(2).
[46] *Ibe*, 836 F.3d at 528 (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F. 3d 732, 737-38 (5th Cir. 2003)).
[47] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 2551 (2011).
[48] *Perry*, 675 F.3d at 837 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).
[49] *Dockery v. Fischer*, No. 13-cv-326, 2015 WL 5737608 at *7 (S.D. Miss. Sept. 29, 2015) (citing *Allison v. Citgo Petroluem Corp.*, 151 F.3d 402, 408 (5th Cir.1998)).
[50] *Wal-Mart*, 564 U.S. at 351.
43681

traditionally construed this directive to require a district court to "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."[51]

However, Rule 23 does not require Plaintiffs to show that questions common to the class "will be answered, on the merits, in favor of the class."[52] "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[53]

## Class Certification of the Class and ADA Subclass

### *Numerosity*

Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." The numerosity requirement "requires examination of the specific facts of each case and imposes no absolute limitations."[54] However, the Fifth Circuit has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable."[55] In addition, courts must consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim."[56] Relevance of the numerosity requirement to class certification may in

---

[51] *Perry*, 675 F.3d at 837 (quoting *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2007)(internal quotations omitted)).

[52] *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459, 133 S. Ct. 1184, 1191 (2013)).

[53] *Amgen*, 568 U.S. at 466, 133 S. Ct. at 1194-95.

[54] *Dockery*, 2015 WL 5737608 at *8 (quoting *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 329, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)).

[55] *Ibe*, 836 F.3d at 528 (quoting *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013)).

[56] *Dockery*, 2015 WL 5737608 at *8 (quoting *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).

43681

appropriate cases be less significant where classwide discrimination has been alleged. In addition, the fluid nature of a plaintiff class, as in prison-litigation context, counsels in favor of certification of all present and future members. Although there is no strict threshold, classes containing more than 40 members are generally large enough to warrant certification.[57]

Plaintiffs' proposed Class consists of approximately 6400 incarcerated individuals.[58] While the number of members in Plaintiffs' proposed ADA Subclass is not exact, Plaintiffs estimate that hundreds of inmates at LSP have mobility, visual, cognitive, or other medical impairments.[59] To further support that the ADA Subclass satisfies the numerosity requirement, Plaintiffs cite a 2014 statistic demonstrating that 14.4% of non-institutionalized males in Louisiana reported a disability.[60] Applying this rate to LSP's amount of inmates, Plaintiffs estimate that the ADA Subclass would consist of 900 members with disabilities.[61] Defendants have conceded that numerosity is established in this case: "Defendants do not contest that Plaintiffs have satisfied the numerosity required in order for them to establish the purported Class and purported ADA Subclass *as that class and subclass have been identified by Plaintiffs*."[62] Therefore, the Court finds that the numerosity requirement is satisfied.

---

[57] *Braggs v. Dunn*, 318 F.R.D. 653, 661 (M.D. Ala. 2017).
[58] Doc. 140 at 15.
[59] *Id.*
[60] *Id.* (discussing Doc. 133-42).
[61] *Id.*
[62] Rec. Doc. No. 174, p. 8 (emphasis original).
43681

*Commonality & Typicality*[63]

The Supreme Court, in *Wal-Mart Stores, Inc. v. Dukes*, further defined the contours

of the "rigorous analysis" required by Rule 23.[64] Under *Wal-Mart*, "[w]hat matters to class

certification…is not the raising of common 'questions'—even in droves—but, rather the

capacity of a class wide proceeding to generate common *answers* apt to drive the

resolution of the litigation. Dissimilarities within the proposed class are what have the

potential to impede the generation of common answers."[65]

The *Wal-Mart* decision has heightened the standards for establishing commonality

under Rule 23(a)(2) demanding more than the presentation of questions that are common

to the class "because any competently crafted class complaint literally raises common

questions."[66] Furthermore, members of a proposed class do not establish that "their

claims can productively be litigated at once," merely by alleging a violation of the same

legal provision by the same defendant.[67] Thus, as evident in *Perry*, the commonality test

requires more than establishing that there is "at least one issue whose resolution *will*

*affect all or a significant number* of the putative class members."[68]

In order to satisfy commonality under *Wal-Mart*, the claims of every class member

must "depend upon a common contention … that is capable of class wide resolution,"

meaning that the contention is "of such a nature … that determination of its truth or falsity

---

[63] The Parties agreed at the hearing that the same evidence supports the requirements of commonality and typicality, and the Court need not consider them separately.
[64] *Perry*, 675 F.3d at 837 (citing *Wal-Mart*, 131 S.Ct. at 2551-52).
[65] 131 S.Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.REV. 97, 132 (2009)) (emphasis original).
[66] 131 S.Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L.REV. at 131-32).
[67] *Id.*
[68] 675 F.3d at 840 (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993)) (original emphasis) (internal quotation marks and citation omitted).
43681

will resolve an issue that is central to the validity of each of the claims in one stroke."[69]

Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury."[70]  Yet, the Fifth Circuit has clarified that "this contention need not relate specifically to the damages component of the class members' claims.  Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'"[71]

As to typicality, "Rule 23(a) requires that the named representatives' claims be typical of those of the class."[72]    Prior to *Wal-Mart*, the typicality test was "not demanding."[73]   The extent to which *Wal-Mart* changed the threshold for typicality in unclear.  The Court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."[74]  As the Fifth Circuit has described it, "typicality is commonality addressed from the perspective of the named plaintiffs.  Commonality requires showing that, in fact, all members of the proposed class share a common claim….Typicality requires showing that, in fact, the proposed representatives have that claim."[75]   The claims of all class members need not be identical.[76]  However, typicality demands that claims "arise from a similar course of conduct and share the same legal theory."[77]

---

[69] 131 S.Ct. at 2551.
[70] *Id.* (quoting *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364).
[71] *Cole v. Livingston*, No. 14-698, 2016 WL3258345 (S.D. Tex. June 14, 2016).
[72] *Lanbecker v. Electronic Data Systems Corp.,* 476 F.3d 299, 314 (5th Cir. 2007).
[73] *Cole,* 2016 WL 3258345 at *8, (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)).
[74] 131 S.Ct. at 2551 n.5.
[75] *M.D. v. Perry*, 297 F.R.D. 7, 29 (S.D. Tex. 2013).
[76] *Cole,* 2016 WL3258345 at *8 (citing *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001)).
[77] *Id.*
43681

Plaintiffs claim that Defendants have failed in their constitutional obligations by subjecting the Class and ADA Subclass members to unreasonable risks of harm.[78] Failure to act can also constitute a policy or practice.[79] To prove an Eighth Amendment violation, Plaintiffs will need to prove that Defendants were deliberately indifferent to the risk posed to LSP's inmates.[80]

The conceptual gap between an individual person's Eighth Amendment claim and "the existence of a class of persons who have suffered the same injury," must be abridged by significant proof that Defendants operated under a general policy that subjected all inmates to unreasonable risks of serious harm.[81] Such proof appears to be present here. Defendants admit that "policies and procedures regarding medical care apply across the board to all prisoners."[82] Additionally, Plaintiffs have offered a wide variety of evidence alleging systemic deficiencies within Defendants' medical healthcare policies and procedures. Such allegations, if found to be true, subject all inmates to unreasonable risks of serious harm.

To determine whether Plaintiffs present "common questions of law and fact, a court must trace the class claims and conclude that the common questions, and answers, will resolve them without the need for additional extensive individualized inquiry."[83] Plaintiffs' common questions regarding the General Class include:

> (a) whether the medical system at Angola increases inmates' risk of serious harm; (b) whether Defendants were aware that their system at Angola

---

[78] Doc. 140 at 2.
[79] *Dockery v. Fischer*, 2015 WL 5737608 at *8-13.
[80] *Cole*, 2016 WL3258345 at *7.
[81] *Wal-Mart*, 131 S.Ct at 2553-2554 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740).
[82] Doc. 140 at 14.
[83] *Dockery*, 2015 WL 5737608 at *11.

43681

increases inmates' risk of serious harm; (c) whether the staffing levels at Angola are adequate to provide constitutionally sufficient medical care; (d) whether correctional staff perform medical functions that are inappropriate given their limited training and lack of licensure; (e) whether the DOC applies its "medically necessary" policy in a way that impedes Class members' ability to receive timely diagnosis and treatment; (f) whether Defendants' malingering and co-pay policies impede Class members' ability to receive timely diagnosis and treatment; and (g) what remedial measures are appropriate to mitigate the deficiencies in Defendants' practices.[84]

Similarly, the Named Plaintiffs of the ADA Subclass claim Defendants have failed in their obligations to inmates with disabilities to comply with the RA, the Uniform Federal Accessibility Standards, and the ADA and its implementing regulations.[85] Plaintiffs' common questions as to whether LSP meets its obligations under the ADA and RA include:

(a) whether LSP has architectural barriers that make its programs, services, and activities inaccessible to inmates with disabilities; (b) whether Defendants' policies discriminate against individuals with disabilities; (c) whether Defendants ensure that every program, service, or activity offered to inmates is readily accessible to and usable by individuals with disabilities; (d) whether Defendants adequately take disabilities into account in the disciplinary process; (e) whether Defendants adequately provide access to jobs for inmates with disabilities; (f) whether Defendants adequately identify, track, and provide the accommodations that inmates with disabilities require; (g) whether Defendants provide accessible transportation to transport inmates with disabilities within the prison and outside the prison; and (h) hat remedial measures are appropriate to mitigate the deficiencies in Defendants' practices.[86]

Defendants argue that Plaintiffs fail to meet the commonality and typicality requirements because the Class and ADA Subclass members have not suffered the same injury.[87] However, the existence of factual variations within a proposed class does not

---

[84] Doc. 140 at 16.
[85] Doc. 140 at 10.
[86] *Id.* at 17.
[87] Doc. 174 at 8.
43681

necessarily destroy commonality.[88] The commonality requirement is satisfied, as long as the Class's common questions are "dispositive of their claim and the claim arises out of a single course of conduct and on a single theory of liability."[89]

The Named Plaintiffs of the Class claim that Defendants violated their Eighth Amendment rights. The claim arises out of Defendants' alleged failure to provide a minimally adequate medical system that does not subject prisoners to a "substantial risk of serious harm," by knowingly providing care that falls below the constitutional minimum.[90] Thus, the Class's common questions of law and fact establish commonality.

While Defendants assert that the individually Named Plaintiffs' disabilities and alleged denied accommodations are different, the basis of liability Plaintiffs assert is not the denial of the accommodations themselves, but the denial of a system that would have the effect of ensuring that they and their fellow prisoners are appropriately accommodated. Furthermore, "[c]ourts regularly certify classes of inmates who are disabled, even if they do not have the same disability."[91]

In addition, the Defendants fail to negate the injury at the center of the Class's claims: the exposure to an unreasonable risk of serious harm. It seems unlikely that any two inmates would have the exact same exposure to a substantial risk of serious harm, but this should not destroy commonality. The evidence presented by Plaintiffs calls into serious question the adequacy of LSP's healthcare and medical policies, as applied in practice, in reducing the health risk of inmates, and particularly for those inmates that are

---

[88] *Dockery*, 2015 WL 5737608 at *11.
[89] *Id.* (internal citations omitted).
[90] Doc. 140 at 2.
[91] *Cole*, 2016 WL3258345 at *6 (citing *Hernandez v. County of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015)).
43681

disabled. Plaintiffs offer common complaints that Defendants' policies pose a substantial risk of serious harm to the health of all inmates and argue Defendants have been deliberately indifferent to this risk.

At the certification hearing, Plaintiffs' expert, Dr. Michael Puisis, was accepted by the Court as an expert in correctional medicine without opposition from the Defendants.[92] In their post-hearing brief, Defendants make much of the fact that nurse practitioner Madeleine LaMarre ("LaMarre") and Dr. Suzi Vassallo ("Vassallo") contributed to the report submitted by Dr. Puisis, arguing that, to the extent Dr. Puisis relied on findings by LaMarre and Vassallo, those opinions or findings should be "discarded."[93] However, Dr. Puisis' hearing testimony clearly undermines any suggestion that he adopted the opinions of others without being personally involved with the investigation of LSP and his ultimate findings. Dr. Puisis testified as follows:

> I worked with two colleagues, Maddy Lamar, who is a nurse practitioner, and Suzie Vassallo, who is an emergency room physician. We reviewed multiple documents. And I should add that each of us looked at a particular area of specialty. We did some things in common. We took a tour of the facility, and we also made individual observations of certain practices. I believe both Maddy and I, maybe Suzie did as well, watched medication administration of one of the units. We got up at four in the morning and went to sick call, accompanied the medics on sick call so we could actually see how they do it. I toured all the units, all the clinics on campus, and Suzie went to the ATU and observed directly the process of the delivery of care in that emergency area.
>
> Maddy went to the pharmacy and observed the inside of the pharmacy, and she observed nursing medication as well. So we did a fair amount of observation that supported our findings. And in addition to that, we interviewed a number of key staff. We talked to multiple inmates. And we reviewed multiple records. And in the review of the records, it's important to note that we reviewed a large span of time for each record. So while we may have reviewed 40-some records, and actually we reviewed more than

---

[92] *See* Transcript, Rec. Doc. No. 373, p. 37
[93] Rec. Doc. No. 378, p. 11.
43681

that if you include the named plaintiffs and other chronic care records that were reviewed that are not included in the report, we reviewed multiple episodes of care. So if we reviewed 40 records, we may have reviewed thousands of episodes of care within the span of that grouping. And the evidence for that is in our report, which is included as appendices. So the combination of that resulted in our report.[94]

It is clear to the Court that Dr. Puisis was a substantial participant in the investigation which yielded his conclusions. Further, nothing prohibits an expert relying on a research team to collect data and conduct research upon which the expert can base his ultimate findings and conclusions.[95]

Next, Defendants argue that very few LSP policies and procedures were actually considered, and no LSP Healthcare Directives were discussed in Plaintiffs' expert report, although evidence established that the Healthcare Manual reviewed by Plaintiffs' experts contained LSP's Directives. The Court finds this a curious argument considering that the Defendants were recently sanctioned[96] for failing to disclose several LSP Directives that were responsive to Plaintiffs' discovery requests. Further, Plaintiffs obtained a copy of the LSP Healthcare Manual - not from the Defendants as requested - but from a public records request, and the Manual did not include all of LSP's current Directives.[97]

The Court finds that sufficient evidence has been presented to establish that the commonality and typicality requirements are met. Warden Darrel Vannoy testified that the prison's policies and procedures regarding medical care apply across the board to all

---

[94] Transcript, Rec. Doc. No. 373, p. 37, lines 18-25 through p. 38, lines 1-21.
[95] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 578, 591 (1993)("Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation."
[96] *See* Rec. Doc. No. 388.
[97] *See* Rec. Doc. No. 387, p. 3.
43681

prisoners.[98]  A great deal of evidence was introduced to suggest that understaffing at LSP increases the risk of harm to inmates.  The Fifth Circuit has held that "class claims could conceivably be based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing—'with respect to the class,' so long as declaratory or injunctive relief 'settling the legality of the [State's] behavior with respect to the class as a whole is appropriate.'"[99]  Dr. Puisis testified that, "what is eminently evident in Angola is that they lack staffing for sure in nursing and in physicians, and the EMT's are misplaced. In other words, I think they're doing the wrong assignments."[100]  Dr. Puisis also testified that this understaffing was demonstrated by several non-nurses performing nursing duties.  Dr. Puisis stated that inmates were performing nursing duties in the infirmary, inmate orderlies advised that they assist officers in administering medications, and a large number of officers are administering medications to a large number of seriously ill patients.[101]  Thus, in Dr. Puisis' opinion:  "you don't have enough staff if you have to use officers to administer medication."[102]    Additionally, Dr. Puisis was critical of his observation that "diabetics seldom get, diabetics who are taking insulin seldom get the number of blood sugar checks that I think is typical of a diabetic.  And that's a result of lack of access to nurses, I believe."[103]

Dr. Puisis also testified, based on his thirty years of experience and management

---

[98] Rec. Doc. No. 358-3, p. 32.
[99] *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 847-48 (5th Cir. 2012)(quoting Fed.R.Civ.P. 23(b)(2) 1966 Amendment advisory committee note).
[100] Rec. Doc. No. 373, p. 45, lines 8-11.
[101] *Id.* at p. 45, lines 12-20.
[102] *Id.*
[103] *Id.* at p. 45, lines 21-25 through p. 46, lines 1-2.
43681

of prisons and jails, that "the number of inmates per physician is extremely high at Angola."[104]  Dr. Puisis testified:

> If you look at the numbers and you say one doctor is seeing --responsible for 1600 people, and you review records and you note that when medics are seeing people, both in the ATU and in sick call, there is seldom a physician related evaluation. And you also note that the physicians seldom write histories and physical examinations.  In part, I believe that is due to staffing. In part, I believe it is due to practice, inter-credential. But it became clear to us that under any scenario we could think of, both nursing and physicians midlevels and doctors were deficient.[105]

Dr. Puisis was also critical of the credentialing and training of the Angola physicians.  Dr. Puisis explained that, in a typical practice, physicians are credentialed, meaning that the hiring authority reviews a physician's experience and training and then gives the physician privileges based on the credentials.  Dr. Puisis testified that, in a prison setting, the need for physicians is typically primary care medicine, so physicians should be trained and privileged in either family practice or internal medicine, which typically includes emergency room training.[106]  Yet, at Angola, Dr. Puisis testified that "there really is no credentialing at all that I could tell."[107]  Further problematic, in Dr. Puisis' opinion, "the organization goes out of its way to just hire any physician they can get, because they're desperate for physicians."[108]  Thus, the practice is "that the system approaches the state licensing board to solicit physicians who have problems with their license who are not permitted by the state to otherwise see civilian patients.  But they are permitted to see prisoners."[109]  Dr. Puisis testified that, "the character issues of all five of

---

[104] *Id.* at p. 46, lines 5-6.
[105] *Id.* at p. 46, lines 6-16.
[106] *Id.* at p. 47.
[107] *Id.* at p. 48, lines 6-7.
[108] *Id.*, lines 10-12.  Dr. Puisis testified about a comment in a newspaper article by Dr. Singh, who said the prison just needed to get any doctors because they were desperate.  *Id.*
[109] *Id.*, lines 15-19.
43681

the physicians that we looked at [at Angola] had prior state sanctions. And at one point were not permitted to work in the civilian community for a variety of reasons."[110] Also problematic for Dr. Puisis is that one of the five doctors is an orthopedic doctor who would not be appropriate to provide general medical care in a prison based on the general kinds of conditions presented. Dr. Puisis posed the question: "People have diabetes, what is an orthopedic doctor going to do to manage the diabetes?"[111]

Dr. Puisis testified that there is a problem with Angola hiring doctors with insufficient training and potential character issues because those doctors need to be monitored and managed; however, "because everyone is in the same boat, the monitoring will probably not occur, and we did not see evidence of it. So that's my concern with the credentialing at LSP."[112]

Dr. Puisis was also critical of the use of emergency medical technicians ("EMTs") to provide care for sick calls. He explained that state regulations typically require EMTs to work under direct supervision of a physician under a set of clearly defined protocols. However, at LSP:

> The way medics are used … is extremely different. So it's out of the ordinary with respect to their training. So you would not have medics in the community going house to house, for example, when people have complaints about shortness of breath, or a rash, and then making a decision and giving them medication based on an evaluation without a communication with a provider. And what we noticed on multiple chart reviews was there was no documented communication to a provider, none. And we noticed that repeatedly on hundreds and hundreds of episodes of care.
>
> And so basically the emergency medical technicians are working independently it appears based on the documentation. And we believe that

---

[110] *Id.* at p. 49, lines 5-8.
[111] *Id.*, lines 13-14.
[112] *Id.* at p. 49, lines 24-25 through p. 50, lines 1-2.

43681

it is out of the scope of their license, and we believe it's a direct impediment to access to care, because the patient in access to care is seeking a professional opinion with respect to their condition, and they're not receiving it. Very few medic evaluations result in a physician evaluation.[113]

This was particularly troubling to Dr. Puisis because:

some of the deaths that we saw were inmates who were repeatedly trying to access care and were being seen by a medic and basically managed by a medic without physician intervention over multiple episodes of care even when they had extremely serious conditions such as shock, or they were about to die, literally, and some of them did within a matter of days.[114]

Plaintiffs also offered evidence that several policies and practices at LSP restrict inmate access to diagnosis and treatment. Dr. Puisis testified about several systemic practices that, in his opinion, contribute to the risk of inadequate medical care and serious harm. In addition to his criticism of understaffing, lack of credentials and proper training, use of EMTs to handle sick calls, and use of inmate orderlies and officers to administer medication, Dr. Puisis also took issue with LSP's policy regarding malingering. Dr. Puisis testified that Angola is one of the only correctional programs in which he has seen this policy. He explains:

Aggravated malingering is actually displayed on the sick call form. It warns the person filling out the form that if you complain and do not have the condition that you state you have, you can be punished. Well, imagine if you're a civilian, and I go to an emergency room with chest pains. I really don't know what I have when I go to the emergency room. I don't know if I have an ulcer, or if I have a heart attack. That's why I go to an emergency room. And yet to expect an inmate to know in advance that they will have or not have a condition, is so beyond the concept of, to me, fairness that it struck me as you could only have this if the leadership agree to it. And, but because any leadership that I'm familiar with would oppose that and get rid of that immediately.

---

[113] *Id.* at pp. 55, lines 9-25 through p. 56, line 1.
[114] *Id.* at p. 56, lines 4-10. Dr. Puisis also testified that the barrier to access was further demonstrated by the fact that, although at a typical correctional facility, approximately 80% of the sick calls would result in a physician or physician assistant consultation, at Angola, his team found "virtually no physician evaluations based on sick call requests." *Id.* at p. 57, lines 2-4.

43681

Another policy troubling to Dr. Puisis is the restriction of access to specialty care. Dr. Puisis testified that, "[w]hen the seriousness of a patient's condition exceeds the ability of a physician at the site to care for the patient, the patient should be referred to a consultant who can properly care for the patient. That's the kind of backdrop of what specialty care is in a prison."[115] However, Dr. Puisis testified that Angola utilizes a facility in New Orleans, nearly two hours away, and the system of managing specialty care "makes it extremely difficult to track whether people actually have received their care."[116] Dr. Puisis further testified that there are also numerous problems with the system utilized to refer a patient for offsite care, including timely scheduling, getting "lost" in the system, and timely appointments.[117] Another problematic discovery regarding specialty care is that patient inmates would report to the specialist without the appropriate relevant testing done beforehand to provide to the specialist.[118] Dr. Puisis also ascertained that there was "hardly ever"[119] a follow-up with a primary care doctor to discuss what treatment the specialist had recommended. Dr. Puisis described one incident demonstrating this problem:

> And tragically, in one circumstance a patient was admitted to a hospital and was diagnosed with atrial fibrillation and started on a blood thinner. Because, as you know, blood thinners prevent atrial fibrillation from causing emboli. And the patient, the patient was not evaluated post-hospitalization with respect to what the recommendations were, so the anti-coagulant was never ordered. And within ten days the patient died of multiple pulmonary emboli in a cardiac thrombus.[120]

---

[115] *Id.* at pp. 64, lines 23-23 through p. 65, lines 1-2.
[116] *Id.* at p. 65, lines 7-9.
[117] *Id.* at pp. 65-66.
[118] *Id.* at p. 66.
[119] *Id.* at p. 67, lines 8-9.
[120] *Id.*, lines 9-18.

43681

Finally, with respect to specialty care, Dr. Puisis testified that there were many cases of delayed referral for patients who needed referral. He explained: "Many of the preventable deaths were people who for months or years had a complaint that required an evaluation which did not occur timely, and result[ed] in either morbidity or mortality."[121]

The Court finds that the evidence clearly satisfies commonality and typicality as the challenged policies and practices pose several common question of fact and law as set forth above. Because Defendants admit that these policies and practices apply to all inmates, and all inmates will at some point will need some type of medical care while incarcerated, the alleged exposure of the entire Class to these policies is capable of classwide resolution under Rule 23. Further, the Court finds that there are common resolutions that would answer these common questions across the board.

<u>ADA SubClass</u>

Turning to the ADA Subclass, Plaintiff claim that the policies and practices at LSP present common questions capable of classwide resolution. Plaintiffs contend that the policies and practices subject to the ADA claims fall into two broad categories: (1) denial of the benefit of services, programs, or activities on the basis of a disability, and (2) Defendants' use of methods of administration that effect discrimination.[122]

The Supreme Court has held that Title II of the ADA applies to state prison facilities and state prison services.[123] The Supreme Court has also recognized that, "insofar as

---

[121] *Id.*, lines 20-25.
[122] *See* Rec. Doc. No. 377, p. 7.
[123] *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (noting that state prisons "fall squarely within the statutory definition of 'public entity'" because the ADA, 42 U.S.C. § 12131(1)(B), defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government").
43681

Title II creates a private cause of action against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."[124] The RA applies to recipients of federal funding.[125] Furthermore, when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA.[126]

Title II of the ADA, which governs access to "Public Services," states in part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[127]  The Rehabilitation Act states that "[n]o otherwise qualified individual with a disability ... shall solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance .... "[128]  The ADA states that "[t]he remedies, procedures and rights" available under the Rehabilitation Act are also accessible under the ADA.[129]  The Fifth Circuit has recognized that "[j]urisprudence interpreting either section is applicable to both,"[130] and that "[t]he RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts."[131]

---

[124] *United States v. Georgia*, 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006).
[125] *Delano–Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).
[126] *Id.* at 574–75.
[127] 42 U.S.C. § 12132.
[128] 29 U.S.C. § 794(a).
[129] *Delano–Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (quoting 42 U.S.C. § 12133).
[130] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).
[131] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).
43681

Considering the claim regarding access to programs, benefits, and services, Plaintiffs have presented sufficient evidence to certify an ADA Subclass on this issue. Inmate Davis testified about the lack of a handicap accessible van to transport him back to LSP from a hospital following his back surgery and the fact that he was laid face down across the front seat in a rodeo van with staples in his back.[132]  A plethora of physical barriers and inappropriately equipped facilities were found and documented in the Evaluation by Plaintiffs' architectural expert Mark Mazz.[133]  Evidence was presented showing that disabled inmates with a duty status[134] were prohibited from certain programs and activities,[135] were not provided reasonable accommodations, modifications, and medical aids,[136] and were not considered in LSP's evacuation plans or emergency planning.[137]

With regard to methods of administration, Plaintiffs submitted evidence regarding, *inter alia*, the inadequacy of the current LSP ADA Coordinator as required by 28 C.F.R. 35.107(a),[138] the failure to adequately train employees on the implementation of disability policies,[139] placing disabled inmates in "medical dormitories" not equipped for the

---

[132] Rec. Doc. No. 358-5 at 14-16.

[133] Rec. Doc. No. 358-2 at 294-296.

[134] A "duty status" is a written designation assigned by a prison medical doctor indicating an inmate's physical or mental ability to perform hard labor in accordance with his sentence.  Duty statuses are generally assigned by physicians following a medical evaluation, and they are subject to change depending on changes in the medical condition of a particular inmate.  Duty statuses may range from no duty (indicating a need for bed rest), to light duty or regular duty with restrictions, and finally to regular duty without restrictions (indicating the inmate is capable of performing any and all hard labor).  *Armant v. Stalder*, 287 Fed. Appx. 351, 352 n. 1 (5th Cir. 2008).

[135] Rec. Doc. No. 358-4 at 152; Rec. Doc. No. 358-5 at 132, 134; Rec. Doc. No. 358-2 at 294-96; Rec. Doc. No. 358-3 at 2.

[136] Rec. Doc. No. 358-5 at 4-11.

[137] *Id.* at 17-30; Rec. Doc. No. 358-4 at 167-68.

[138] Rec. Doc. No. 358-3 at 2; Rec. Doc. No. 358-5 at 122-23, 127, 130; Rec. Doc. No. 358-6 at 94, 101, 103-104; Rec. Doc. No. 359 at 1.

[139] Rec. Doc. No. 358-4 at 164.

43681

disabled,[140] and LSP's alleged failure to provide adequate procedures for requesting accommodations and appealing denials.[141]

Because all of the ADA policies and procedures pose multiple common questions of fact and law and apply across the board to all disabled inmates, the Court finds that certification of the ADA Subclass is appropriate. Whether Defendants had knowledge of insufficient accommodations for persons with disabilities can be evaluated in "one stroke" for this entire Subclass.[142] As the District Court for the Northern District of California succinctly stated: "No individualized inquiry into the experiences of any particular inmate or Plaintiff is necessary. The claims of the inmates with disabilities sub-class also satisfy the commonality requirement: either the Plaintiffs are housed in a facility that comports with the ADA or they are not."[143]

---

[140] *Id.* at 139-140, 142.
[141] Rec. Doc. No. 385-6 at 96-97.
[142] *See Hernandez*, 305 F.R.D. at 157.
[143] *Id.*
43681

## IV.    CONCLUSION[144]

For the reasons set forth above, the Court GRANTS Plaintiffs' *Motion for Class Certification*[145] and appoints all Named Plaintiffs who are still living and currently housed at LSP, and have fully exhausted administrative remedies at the time of the filing of this lawsuit, as class representatives.   The Court designates Plaintiffs' counsel as Class Counsel under Rule 23(g).   The Class and Subclass are defined as follows:  "all inmates who now, or will be in the future, incarcerated at LSP" and "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP."

The Court will set a Scheduling Conference by separate notice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>February 26, 2018</u>.


_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[144] The Court notes that the findings herein regarding exhaustion under the PLRA are final and are the "law of the case"; however, the Court makes no definitive findings on the merits, and Plaintiffs will be required to prove the merits of their case at trial.
[145] Rec. Doc. No. 133.
43681