1               UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF LOUISIANA

3

4   JOSEPH LEWIS JR., ET AL      *    CIVIL ACTION

5   VERSUS                       *    NO. 15-318

6   BURL CAIN, ET AL             *    OCTOBER 9, 2018

7   * * * * * * * * * * * * * * *

8

9                            DAY 1
                    BENCH TRIAL BEFORE
10            THE HONORABLE SHELLY D. DICK
          UNITED STATES CHIEF DISTRICT JUDGE
11

12  APPEARANCES:

13  FOR THE PLAINTIFFS:          THE PROMISE OF JUSTICE
                                 INITIATIVE
14                               BY:  MERCEDES H. MONTAGNES, ESQ.
                                      AMANDA C. ZARROW. ESQ.
15                                    MEREDITH ANGELSON, ESQ.
                                      NISHI KUMAR, ESQ.
16                               636 BARONNE STREET
                                 NEW ORLEANS, LOUISIANA 70113
17
                                 ACLU OF LOUISIANA
18                               BY:  BRUCE W. HAMILTON, ESQ.
                                 P.O. BOX 56157
19                               NEW ORLEANS, LOUISIANA 70156

20                               COHEN MILSTEIN SELLERS & TOLL
                                 PLLC
21                               BY:  JEFFREY B. DUBNER, ESQ.
                                 1100 NEW YORK AVE NW, SUITE 500
22                               WASHINGTON, DC 20005

23                               THE CAPITAL APPEALS PROJECT
                                 BY:  ERICA L. NAVALANCE, ESQ.
24                               636 BARONNE STREET
                                 NEW ORLEANS, LOUISIANA 7013

25

```
 1                              SOUTHERN POVERTY LAW CENTER
                                BY:   JARED F. DAVIDSON, ESQ.
 2                                    JAMILA A. JOHNSON, ESQ.
                                1055 ST. CHARLES AVE., SUITE 505
 3                              NEW ORLEANS, LOUISIANA 70130

 4   FOR THE DEFENDANTS:        KANTROW SPAHT WEAVER &
                                BLITZER
 5                              BY:   RANDAL J. ROBERT, ESQ.
                                      CONNELL L. ARCHEY, ESQ.
 6                                    KEITH FERNANDEZ, ESQ.
                                P.O. BOX 2997
 7                              BATON ROUGE, LOUISIANA 70821

 8                              SHOWS CALI & WALSH LLP
                                BY:   MARY E. ROPER, ESQ.
 9                                    JOHN C. CONINE JR., ESQ.
                                      CAROLINE T BOND, ESQ.
10                                    JEFFREY K. CODY, ESQ.
                                628 ST. LOUIS STREET
11                              BATON ROUGE, LOUISIANA 70802

12   OFFICIAL COURT REPORTER:   SHANNON L. THOMPSON, CCR.
                                UNITED STATES COURTHOUSE
13                              777 FLORIDA STREET
                                BATON ROUGE, LOUISIANA 70801
14                              (225) 389-3567

15        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                  COMPUTER-AIDED TRANSCRIPTION SOFTWARE
16

17

18

19

20

21

22

23

24

25
```

1                              **INDEX**

2                                                          PAGE

3    **OPENING STATEMENT**

4        MERCEDES MONTAGES                                  31

5    **PLAINTIFFS' WITNESSES**

6     **FARRELL SAMPIER**

7      DIRECT EXAMINATION BY MS. MONTAGNES                  43

8      CROSS-EXAMINATION BY MS. ROPER                       68

9      REDIRECT EXAMINATION BY MS. MONTAGNES                88

10    **MICHAEL PUISIS, D.O.**

11     DIRECT EXAMINATION BY MR. DUBNER                     93

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | **(OCTOBER 9, 2018)**                                              |
| 2  | **THE COURT:**  GOOD MORNING, EVERYBODY.  BE SEATED.              |
| 3  | YOU CAN CALL THE CASE.                                             |
| 4  | **THE DEPUTY CLERK:**  DOCKET NO. 15-CV-318, *LEWIS, ET AL*       |
| 5  | *VERSUS CAIN, ET AL*.                                              |
| 6  | **THE COURT:**  IF THE PARTIES WOULD MAKE THEIR                   |
| 7  | APPEARANCES.                                                       |
| 8  | **MS. MONTAGNES:**  GOOD MORNING, YOUR HONOR.  MERCEDES          |
| 9  | MONTAGNES ON BEHALF OF THE PLAINTIFFS.  I'M JOINED AT COUNSEL      |
| 10 | TABLE BY MARTHA CAROLE, OUR PARALEGAL; AMANDA ZARROW; AND          |
| 11 | JEFFREY DUBNER.  I'M ALSO JOINED BY NISHI KUMAR, BRUCE             |
| 12 | HAMILTON, ERIC NAVALANCE; OUR INTERNS, CAMILLE, KENSIE, TOM        |
| 13 | WEBER, AND ALEXANDRA WARREN, AS WELL AS MEREDITH ANGELSON,         |
| 14 | JARED DAVIDSON, AND JAMILA JOHNSON.                                |
| 15 | **THE COURT:**  GOOD MORNING, EVERYONE.  IF YOU MAKE AN          |
| 16 | APPEARANCE, IF YOU DON'T MIND, JUST FOR THE CONVENIENCE OF THE     |
| 17 | COURT, IF YOU WOULD INTRODUCE YOURSELF.  I THINK AFTER TODAY       |
| 18 | I'LL BE ABLE TO GET MOST OF YOUR NAMES, BUT RIGHT NOW I DON'T      |
| 19 | HAVE THEM.  I KNOW MS. MONTAGNES.                                  |
| 20 | COUNSEL FOR THE DEFENSE.                                           |
| 21 | **MS. MONTAGNES:**  THANK YOU.                                    |
| 22 | **MR. ROBERT:**  GOOD MORNING, YOUR HONOR.  RANDAL ROBERT        |
| 23 | ON BEHALF OF THE DEFENDANTS.  I AM JOINED AT COUNSEL TABLE BY      |
| 24 | MR. CONNELL ARCHEY, MS. CAROLINE BOND, MR. JEFF CODY, MR. JOHN     |
| 25 | CONINE, MS. MARY ROPER, AND MR. KEITH FERNANDEZ.  WE HAVE          |

09:04   1   CORPORATE REPRESENTATIVES HERE INSIDE THE BAR, THEY ARE TRACY

2   FALGOUT AND DR. LAVESPERE.  AND I THINK THAT COVERS OUR SIDE.

3          **THE COURT:**  ARE THERE ANY PRELIMINARY MATTERS?  FIRST

4   I GUESS LET'S TALK ABOUT ARE THERE ANY STIPULATIONS THAT HAVE

5   NOT PREVIOUSLY BEEN ENTERED INTO THE RECORD THROUGH STATEMENTS

6   OF STIPULATED FACT?

7          **MR. ROBERT:**  NO, YOUR HONOR.

8          **MS. MONTAGNES:**  NOT THAT I'M AWARE.

9          **THE COURT:**  ANY JOINT ADMISSIONS?

10          **MS. MONTAGNES:**  THERE ARE, YOUR HONOR.

11          **THE COURT:**  YOU WANT TO GIVE US THE JOINT ADMISSIONS?

12          **MS. MONTAGNES:**  AND, YOUR HONOR, JUST ONE OTHER

13   PRELIMINARY MATTER.  MR. ALTON ADAMS WAS WRITTED IN FOR TODAY

14   TO BE HERE AS THE PLAINTIFF REPRESENTATIVE.  HE WAS COMING FROM

15   ELAYN HUNT, AND WE HAVE NOT YET SEEN HIM.

16          **THE COURT:**  WOULD YOU CALL DOWNSTAIRS AND SEE IF WE

17   HAVE ADAMS DOWNSTAIRS?

18          **COURT SECURITY OFFICER:**  WHAT'S THE FIRST NAME AGAIN?

19          **MS. MONTAGNES:**  ALTON ADAMS.  HE'S COMING FROM ELAYN

20   HUNT.  I KNOW THE FOLKS FROM ANGOLA ARE HERE, BUT . . .

21          **THE COURT:**  I KNOW THAT IT WAS A BUSY MORNING

22   DOWNSTAIRS, SO HE MAY BE HERE.  LET'S WAIT AND SEE.

23          **MS. MONTAGNES:**  ALL RIGHT.  AT THIS TIME, YOUR HONOR,

24   I THINK WE WOULD JOINTLY MOVE TO ENTER ALL THE JOINT EXHIBITS

25   INTO THE RECORD.

09:05

1          MS. ROPER:  THAT IS CORRECT, YOUR HONOR.

2          THE COURT:  ALL RIGHT.

3          MS. MONTAGNES:  AND AT THIS TIME THE PLAINTIFFS WOULD

4    MOVE TO ENTER EXHIBITS 1 THROUGH 266, AS WELL AS 403, WHICH ARE

5    UNOBJECTED TO.

6          THE COURT:  1 THROUGH 266 AND 403, GENTLEMEN?

7          MR. ROBERT:  YES.

8          THE COURT:  ADMITTED.  ANYTHING ELSE?

9          MS. ROPER:  I'M SORRY, YOUR HONOR.  WE ALSO HAVE OUR

10   UNOBJECTED TO --

11         THE COURT:  I'M SORRY, MS. ROPER.  I TOTALLY

12   OVERLOOKED YOU.

13         MS. ROPER:  THAT'S OKAY.

14         THE COURT:  I SHOULD HAVE ADDRESSED MY COMMENT TO

15   YOU.  1 THROUGH 266 AND 403, GO AHEAD.

16         MS. ROPER:  YES, YOUR HONOR.  THE PARTIES HAVE AGREED

17   TO ENTER ALL EXHIBITS THAT ARE NOT OBJECTED TO.

18         THE COURT:  FOR THE RECORD, LET'S GO AHEAD AND LET'S

19   IDENTIFY THOSE FOR THE RECORD.

20         MS. MONTAGNES:  IN ADDITION, YOUR HONOR, I WAS GOING

21   TO PROVIDE THE COURT WITH A LIST OF THE DOCUMENTS THAT WE

22   BELIEVE NEED TO BE SEALED BECAUSE THEY CONTAIN PERSONAL HEALTH

23   INFORMATION IN THEM.

24         THE COURT:  THE COURT WILL ISSUE AN ORDER -- ONCE YOU

25   GO THROUGH THOSE, MS. MONTAGNES, THE COURT WILL ISSUE AN ORDER

09:06   1   THAT THOSE EXHIBITS THAT CONTAIN PERSONAL HEALTH INFORMATION

2   WILL BE SEALED.  BUT YOU'RE GOING TO NEED TO LET US KNOW THAT

3   WHEN YOU'RE GETTING READY TO PUBLISH SOMETHING, THAT IT'S A

4   SEALED RECORD.

5            GO AHEAD.

6        **MS. ROPER:**  YES, YOUR HONOR.  I APOLOGIZE.  THE

7   EXHIBITS ON DEFENDANTS' EXHIBIT LIST ARE 1 THROUGH 498 THAT

8   WERE NOT OBJECTED TO.

9        **THE COURT:**  DEFENDANTS' 1 THROUGH 498?

10       **MS. ROPER:**  YES, YOUR HONOR.

11       **THE COURT:**  WITHOUT OBJECTION, DEFENDANTS' 1 THROUGH

12  498.

13       **MS. MONTAGNES:**  AT THIS TIME, YOUR HONOR, I DON'T

14  KNOW IF IT'S BETTER IF WE READ THEM INTO THE RECORD.  WE HAVE

15  THREE LISTS:  ONE REGARDING THE JOINT EXHIBITS; ONE REGARDING

16  DEFENDANTS' EXHIBITS; AND ONE REGARDING PLAINTIFFS' EXHIBITS

17  THAT IDENTIFY THE SEALED DOCUMENTS.

18       **THE COURT:**  OKAY.

19       **MS. MONTAGNES:**  IS THAT SATISFACTORY?

20       **THE COURT:**  YES.  WHY DON'T YOU -- LET'S STATE IT FOR

21  THE RECORD SO THAT AT LEAST WE HAVE A GOOD RECORD OF IT.

22       **MS. MONTAGNES:**  SO STATE ALL THE SEALED ONES?

23       **THE COURT:**  UH-HUH, PLEASE.

24       **MS. MONTAGNES:**  PLAINTIFFS' EXHIBIT 1, 2, 5, 8, 28,

25  31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 47, 51, 52, 53, 60,

1   61, 65, 68, 69, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82, 83,
2   84, 85, 89, 90, 95, 97, 100, 104, 112, 114, 116, 117, 118, 119,
3   120, 121, 122, 123, 131, 133, 135, 137, 138, 140, 145, 148,
4   149, 151, 154, 157, 158, 159, 160, 163, 181, 182, 183, 184,
5   185, 186, 190, 194, 195, 196, 198, 202, 203, 214, 215, 219,
6   221, 222, 224, 227, 228, 229, 231, 232, 234.

7           **THE COURT:**  IS THERE A LIST?

8           **MS. MONTAGNES:**  THERE IS A LIST, YES.

9           **THE COURT:**  THEN WHY DON'T WE JUST FILE THE LIST IN
10  THE RECORD.  SORRY.

11          **MS. MONTAGNES:**  THAT'S OKAY, YOUR HONOR.

12          **THE COURT:**  I SHOULD HAVE ANTICIPATED -- IT'S A
13  HEALTHCARE CASE, IT'S A MEDICAL CARE CASE, I SHOULD HAVE
14  ANTICIPATED THAT HALF THE RECORD WAS GOING TO BE SEALED.

15              LET ME JUST MAKE SOME FINDINGS, THOUGH.  TO THE
16  EXTENT -- AND WE WILL REVIEW THESE CERTAINLY UPON ADMISSION,
17  AND A LOT OF THESE HAVE BEEN PREADMITTED.  BUT THE COURT FINDS
18  THAT THE PUBLIC INTEREST IS OUTWEIGHED BY THE HEALTHCARE
19  PRIVACY CONCERNS.

20              DO YOU HAVE MR. --

21          **THE DEPUTY CLERK:**  NO.

22          **THE COURT:**  ALL RIGHT.  CONTINUING WITH WHAT I WAS
23  SAYING, THE HEALTHCARE -- THE COURT FINDS THAT THE PUBLIC'S
24  INTEREST IN OPEN ACCESS TO THE COURT RECORD IS OUTWEIGHED BY
25  THE PRIVACY CONCERNS OF THE PARTICULAR MEDICAL RECORDS THAT

1  HAVE BEEN IDENTIFIED, AND COUNSEL REPRESENTS THAT ALL OF THE

2  DOCUMENTS THAT ARE GETTING READY TO BE ADMITTED UNDER SEAL OR

3  THAT WILL BE ADMITTED UNDER SEAL ARE HEALTHCARE RECORDS OR

4  CONTAIN HEALTHCARE INFORMATION.  SO IF YOU WILL GIVE THE

5  COURTROOM DEPUTY YOUR LISTS OF THOSE EXHIBITS, WE'LL TRY TO

6  KEEP TRACK OF THEM THAT WAY.

7          **MS. MONTAGNES:**  GREAT.  THANK YOU.  SO JUST TO BE

8  CLEAR, WE DON'T NEED TO FILE ANYTHING; THIS IS SUFFICIENT?

9          **THE COURT:**  IF YOU WANT TO FILE IT IN THE RECORD,

10  LET'S FILE IN THE RECORD YOUR EXHIBIT LISTS OF THE SEALED

11  RECORDS, AND THAT WAY WE ALL KNOW WHAT WE ARE DEALING WITH.

12          **MS. ROPER:**  AND, YOUR HONOR, WE JUST PROVIDED THE

13  COURTROOM DEPUTY WITH DEFENDANTS' LIST OF RECORDS TO BE SEALED

14  AS WELL.

15          **THE COURT:**  WHAT'S YOUR NEXT EXHIBIT NUMBERS?  DO YOU

16  WANT TO IDENTIFY THOSE AS EXHIBIT NUMBERS?  OR JUST FILE THEM

17  IN THE RECORD.  WE DON'T EVEN NEED EXHIBIT NUMBERS.  LET'S JUST

18  FILE THEM IN THE RECORD AS EXHIBIT LISTS.

19          **MS. ROPER:**  OKAY.

20          **THE COURT:**  WHAT ELSE?  WHAT ABOUT SEQUESTRATION?

21          **MS. ROPER:**  A JOINT LIST, A DEFENDANTS' LIST, AND A

22  PLAINTIFFS' LIST.

23          **THE COURT:**  SO WE HAVE A JOINT LIST, A PLAINTIFFS'

24  LIST, A DEFENDANTS' LIST THAT WILL BE FILED IN THE RECORD AS

25  EXHIBIT LISTS OF SEALED EXHIBITS.

09:12   1       **MS. MONTAGNES:**  AT THIS TIME, YOUR HONOR, PLAINTIFFS

2   WOULD MOVE TO SEQUESTER, AS PER THE PARTIES' AGREEMENT, ANYONE

3   WHO IS TESTIFYING IN THIS CASE WHO'S NOT BEEN IDENTIFIED AS A

4   DOC REPRESENTATIVE -- AS THE DOC REPRESENTATIVE OR IS NOT A

5   NAMED DEFENDANT IN THIS CASE, AS WELL AS EXPERTS ARE ALSO

6   ALLOWED TO BE IN THE COURTROOM.

7       **THE COURT:**  OKAY.

8       **MS. ROPER:**  THAT IS CORRECT, YES.

9       **THE COURT:**  THERE'S AN ORDER OF SEQUESTRATION.  THE

10   COURT IS GOING TO ENTER THAT ORDER OF SEQUESTRATION.  IT WILL

11   BE THE PARTIES' RESPONSIBILITY TO ENFORCE THAT AND TO ADVISE

12   THE WITNESSES WHO ARE EITHER NOT A PARTY REPRESENTATIVE OR AN

13   EXPERT THAT THEY ARE UNDER THE RULE OF SEQUESTRATION.

14       **MS. MONTAGNES:**  AND THEN, YOUR HONOR, AT THIS POINT

15   WE WERE HOPING THAT WE COULD TAKE SOME TIME TO ARGUE ON THE

16   OBJECTED EXHIBITS.  THE PARTIES HAVE STIPULATED TO

17   AUTHENTICITY, AND WE WORKED REALLY HARD TO REDUCE THE NUMBER OF

18   EXHIBITS.  PLAINTIFFS STARTED WITH 1300; WE NOW HAVE JUST OVER

19   400.  THERE ARE JUST A SMALL NUMBER OF EXHIBITS THAT CONTINUE

20   TO HAVE OBJECTIONS, AND BECAUSE MANY OF THOSE ARE VERY SIMILAR

21   DOCUMENTS, THE PARTIES AGREED THAT WE COULD MAKE ARGUMENT TODAY

22   AND THAT THEY -- AND THE JUDGE COULD RULE AS TO SOME OF THE

23   HEARSAY AND RELEVANCY ISSUES.

24           BECAUSE MANY OF THE RULINGS WOULD BE REPETITIVE,

25   IT WILL ALSO ALLOW THE PLAINTIFFS TO NOT HAVE TO CALL MANY OF

1   THE DEFENDANTS IN THIS CASE IN ORDER TO HAVE THEM INTRODUCE

2   THOSE, AND IT WOULD JUST ALLOW THE TRIAL TO PROCEED MORE

3   SMOOTHLY.

4         **THE COURT:**  THE COURT WILL ENTERTAIN ARGUMENT, BUT

5   YOU KNOW, OBVIOUSLY RECOGNIZE THAT HEARSAY, THAT'S KIND OF AN

6   EASY ONE; BUT RELEVANCE, IT'S HARD TO DECIDE RELEVANCE IN A

7   VACUUM, LADIES.  BUT IF YOU FEEL LIKE THAT YOU CAN ILLUMINATE

8   THE ISSUES SUFFICIENTLY, CERTAINLY IF IT WILL STREAMLINE

9   MATTERS, THE COURT WILL TAKE ORAL ARGUMENT ON IT.

10         **MS. MONTAGNES:**  AND, YOUR HONOR, IN

11   _MOORHEAD V. MITSUBISHI_, WHICH IS A FIFTH CIRCUIT CASE FROM

12   1987, THE FIFTH CIRCUIT MADE CLEAR THAT RELEVANCE IN A JUDGE

13   TRIAL IS LESS OF A CONCERN BECAUSE YOU ASSUME THAT THE JUDGE

14   WILL ABLE -- WILL MORE BE ABLE, IN HER DECISION-MAKING, TO

15   ASSERT RELEVANCY.

16         THE FIRST DOCUMENTS I WOULD MOVE TO INTRODUCE

17   ARE DOCUMENTS 267 TO 273, AS WELL AS 404.  THESE DOCUMENTS HAVE

18   TO DO WITH A REPORT PRODUCED BY THE WEXFORD CONSULTING GROUP.

19   THE UNDERLYING REPORT, WHICH IS PLAINTIFFS' EXHIBIT 265, IS IN

20   EVIDENCE.  WHAT THESE ARE ARE A SERIES OF EMAILS BETWEEN

21   VARIOUS MEMBERS OF THE ADMINISTRATION, THE SECRETARY OF

22   CORRECTIONS, DR. SINGH, VARIOUS WARDENS IN VARIOUS FACILITIES

23   BACK AND FORTH AMONGST THEMSELVES, DEMONSTRATING THAT THEY HAVE

24   -- AND HIGHLIGHTING THE SALIENT POINTS OF THE REPORT.  THE

25   REPORT IS ENTIRELY ABOUT THE DELIVERY OF HEALTHCARE WITHIN THE

09:14   1   DOC, AND IT'S VARIOUS EMAILS.

2               ONE OF PLAINTIFFS -- ONE OF THE THINGS

3   PLAINTIFFS HAVE TO PROVE IS KNOWLEDGE OF PROBLEMS.  THIS REPORT

4   POINTS OUT MANY OF THE PROBLEMS THAT PLAINTIFFS ARE ALLEGING

5   TODAY, AND IT WAS DELIVERED IN 2009, AND SO WE BELIEVE IT GOES

6   TO KNOWLEDGE.  IT'S NOT BEING OFFERED FOR THE TRUTH OF THE

7   MATTER ASSERTED BUT, RATHER, THE EFFECT OF THE LISTENER, THAT

8   THEY HAVE RECEIVED IT.  IT'S ALSO AN ADMISSION BY A PARTY

9   OPPONENT.

10               **THE COURT:**  OKAY.

11               **MS. ROPER:**  AND, YOUR HONOR, WE OBJECT TO THE

12   UNDERLYING REPORT AS HEARSAY, THE WEXFORD REPORT.  THERE IS NO

13   ONE HERE THAT WILL BE TESTIFYING AS TO THE ACCURACY OF THE

14   REPORT OR THE METHODOLOGY OF COMPILING THE INFORMATION WITHIN

15   THE REPORT.

16               **THE COURT:**  WELL, I THOUGHT THE REPORT WAS ALREADY IN

17   EVIDENCE, 265.

18               **MS. ROPER:**  NO, WE HAD OBJECTED TO THE REPORT AS

19   HEARSAY.  IT'S NOT IN EVIDENCE, YOUR HONOR.

20               **MS. MONTAGNES:**  WE PRODUCED THE LIST TO DEFENDANTS

21   MANY TIMES.  THEY HAD THE FINAL LIST; THEY HAD THE FINAL

22   EXHIBITS.  THIS IS THE FIRST TIME I'M HEARING OF THIS.

23               **MS. ROPER:**  NO.

24               **THE COURT:**  I MEAN, MS. ROPER, YOU STOOD RIGHT THERE

25   AND WE -- SHE SAID WE ARE OFFERING WITHOUT OBJECTION 1 THROUGH

09:15 1    266 AND 403.  SHE'S TELLING ME THAT THE REPORT IS 265, SO WE

2    NEED TO GET ON THE SAME PAGE.

3         **MS. ROPER:**  YES, YOUR HONOR.  WE HAD REPEATEDLY

4    OBJECTED TO THE INTRODUCTION OF THE WEXFORD REPORT.  I'M NOT

5    SURE IF THAT IS --

6         **THE COURT:**  SHE SAID I'M INTRODUCING 1 THROUGH 266.

7    YOU WERE STANDING THERE.  I SAID -- AND I ASKED, IN POOR TASTE,

8    OVERLOOKED YOU AND ASKED YOUR MALE COLLEAGUES IF THEY AGREED

9    WITH THAT.

10        **MS. ROPER:**  OKAY.  265 JUST SAYS IT IS A -- REGARDING

11   HEALTHCARE AT LSP AND OTHER DOC FACILITIES.  IT DOES NOT

12   IDENTIFY ITSELF AS THE WEXFORD REPORT.  WE HAD REPEATEDLY

13   OBJECTED TO THAT AS HEARSAY.

14        **THE COURT:**  WHOSE REPORT IS IT, MS. MONTAGNES?

15        **MS. MONTAGNES:**  SO IT'S A REPORT PRODUCED BY THE

16   WEXFORD CONSULTING GROUP.  THEY ARE A HEALTHCARE DELIVERY

17   CONSULTING GROUP.  THEY DELIVER HEALTHCARE ACROSS THE UNITED

18   STATES INSIDE OF PRISONS, AND THEY WERE HIRED BY THE DEPARTMENT

19   OF CORRECTIONS TO ASSESS THEIR HEALTHCARE DELIVERY IN 2009.  WE

20   HAVE PRODUCED IT TO THE PLAINTIFFS.  BUT IT DOES GET CUT OFF ON

21   THIS LIST, AND I APOLOGIZE TO YOUR HONOR, BUT WE HAVE PRODUCED

22   THIS LIST TO DEFENDANTS.

23        **THE COURT:**  I DON'T THINK THEY ARE SAYING THAT THEY

24   ARE SURPRISED.  IT'S NOT ABOUT WHETHER YOU PRODUCED IT OR NOT.

25   THEY ARE NOT SAYING THEY ARE SURPRISED; THEY ARE SAYING THAT

1    IT'S HEARSAY.

2         MS. MONTAGNES:  YES.  BUT WE PRODUCED LISTS, AND WE

3    WENT THROUGH -- I MEAN, BACK AND FORTH, YOU KNOW, 25 TIMES

4    ABOUT WHAT WAS OBJECTED TO AND WHAT WASN'T OBJECTED TO.  AND

5    THEY HAD THIS LIST AND THIS DOCUMENT.  IT WAS GIVEN TO THEM,

6    AND THEY NEVER OBJECTED TO IT.  I DON'T BELIEVE IT WAS OBJECTED

7    TO ON THE JOINT PRETRIAL ORDER.  I COULD DOUBLE VERIFY THAT.

8         MS. ROPER:  IT ABSOLUTELY WAS OBJECTED TO ON THE

9    JOINT PRETRIAL ORDER, AND IT WAS IDENTIFIED AS SUCH AS THE

10   WEXFORD REPORT CLEARLY ON THAT.  THIS IDENTIFICATION DOES NOT

11   BRING THE WEXFORD REPORT WHATSOEVER INTO THE DESCRIPTION OF IT.

12   AND THE RENUMBERING OF YOUR EXHIBITS DOES NOT ALLOW US TO -- AS

13   FAR AS THE JOINT PRETRIAL ORDER, YOU CAN DEFINITELY SEE THAT WE

14   OBJECTED TO IT ON NUMEROUS OCCASIONS.

15        MS. MONTAGNES:  YOUR HONOR, WE PROVIDED THE

16   DEFENDANTS WITH A LEGEND SO THEY COULD TRANSPOSE THE NUMBERS ON

17   THIS FINAL LIST AND ON THE JOINT PRETRIAL LIST.  WE WILL DEAL

18   WITH THIS SEPARATELY.

19             REGARDLESS, THE EMAILS AND CERTAINLY THE FACT

20   THAT THEY RECEIVED WITH AND GRAPPLED WITH THIS INFORMATION BACK

21   AND FORTH AMONGST EACH OTHER ARE CERTAINLY ADMISSIONS OF A

22   PARTY OPPONENT.

23        MS. ROPER:  AND, YOUR HONOR, WE DID NOT OBJECT TO THE

24   EMAILS OF OUR EMPLOYEES DISCUSSING THE RECEIPT OF THE REPORT.

25   IT'S JUST THE REPORT ITSELF THAT WE HAD CONTINUOUSLY OBJECTED

1    TO AS BEING HEARSAY.

2            **MS. MONTAGNES:**  YOUR HONOR, THAT'S SIMPLY INCORRECT.

3    RECORD DOC. 267 IS AN EMAIL FORWARDING THE REPORT SAYING THAT

4    SECRETARY LEBLANC WOULD LIKE HIS STAFF TO HAVE A FORMAL

5    RESPONSE.  THAT WAS OBJECTED TO.  PLAINTIFFS' EXHIBIT 269 WAS

6    OBJECTED TO.  IT WAS AN EMAIL FROM DR. SINGH TO WARDEN CAIN

7    OUTLINING THE REPORT.  YOU KNOW, THERE ARE SEVERAL EMAILS THAT

8    THEY DO OBJECT TO.  IF THEY'RE WITHDRAWING THOSE OBJECTIONS,

9    THEN THAT'S FINE.

10           **MS. ROPER:**  TO THE EXTENT THAT WE EXCHANGED LISTS

11   WITH -- JUST TO THE EXTENT THAT WE DID WITHDRAW IN AN EXCHANGE

12   OF EXHIBITS BACK AND FORTH BETWEEN THE PARTIES, YOUR HONOR,

13   THERE ARE VOLUMINOUS EXHIBITS, BUT WE DID CONTINUALLY OBJECT TO

14   THE WEXFORD REPORT.

15           **THE COURT:**  I AM LOOKING AT RECORD DOCUMENT 267-1.

16   IS THAT THE PLAINTIFFS' EXHIBIT LIST THAT YOU ARE REFERRING TO,

17   MS. MONTAGNES?

18           **MS. MONTAGNES:**  NO, AND I WAS INCORRECT, YOUR HONOR.

19   WE JUST VERIFIED IT.  THAT OBJECTION WAS LATER WITHDRAWN BY THE

20   DEFENDANTS, AND THEN WE PRODUCED A LIST TO THEM.  AND WE'VE HAD

21   SO MANY BACK AND FORTHS, IT WOULD BE IMPOSSIBLE FOR US TO TRACE

22   IT.  AT THIS POINT WE WILL SIMPLY MOVE TO -- IF THE OBJECTION

23   HOLDS US TO THE UNDERLYING REPORT, WE BELIEVE THAT THE REPORT

24   IS A BUSINESS RECORD, AS WELL AS A PARTY AUTHORIZE -- IT'S

25   AUTHORIZED BY -- THE WEXFORD GROUP IS AUTHORIZED BY THE PARTY

09:20  1    IN ORDER TO PROVIDE INFORMATION AND THEREFORE, THE PARTY

2    OPPONENT ADMISSION WOULD BE TRANSFERRED TO THEM AS WELL.

3            **THE COURT:**  I DON'T KNOW THAT IT'S A PARTY OPPONENT

4    ADMISSION, BUT IT SOUNDS TO ME LIKE IT'S A BUSINESS RECORD.

5    BUT THEY'RE OBJECTING TO IT, SO YOU'RE GOING TO HAVE TO MAKE

6    YOUR -- YOU'RE GOING TO HAVE TO LAY YOUR FOUNDATION FOR IT.

7            **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.  AS TO THE

8    UNDERLYING EMAILS, THOUGH, THEY ARE CLEARLY ADMISSIONS OF PARTY

9    OPPONENTS.  THEY ARE PARTY OPPONENTS EMAILING BACK AND FORTH

10    WITH EACH OTHER ABOUT THE SUBSTANCE OF THIS REPORT.

11            **THE COURT:**  AND IF THEY ARE NOT OFFERED FOR THE TRUTH

12    OF THE MATTER, IF THEY ARE OFFERED FOR THE FACT OF THE

13    KNOWLEDGE, WHICH IS PART OF THE BURDEN OF PROOF, THE COURT IS

14    INCLINED TO ADMIT THEM.  SO WHAT ARE THE EXHIBIT NUMBERS?

15    THEY'RE 267-273, AND 404.  IS THAT CORRECT?

16            **MS. MONTAGNES:**  YES, YOUR HONOR.

17            **THE COURT:**  BUT 265 --

18            **MS. MONTAGNES:**  SHOULD BE UNADMITTED AND WILL . . .

19            **THE COURT:**  COURTROOM DEPUTY, 265 IS NOT IN EVIDENCE.

20    267 TO 273 ARE ADMITTED AND 404 IS ADMITTED.

21            WHAT ELSE?

22            **MS. MONTAGNES:**  YOUR HONOR, DOCUMENTS 274 THROUGH 283

23    ALL GO DIRECTLY TO KNOWLEDGE.

24            SO, FOR EXAMPLE, RECORD DOC. 274 IS AN EMAIL

25    BETWEEN LSU AND LSP DOING A CONTRACT NEGOTIATION IN WHICH THEY

09:21  1  DISCUSSED SOME PROBLEMS THAT THEY'VE HAD WITH THE HEALTHCARE

2  DELIVERY AT LSP.  AGAIN, NOT BEING OFFERED FOR THE TRUTH OF THE

3  MATTER ASSERTED BUT, RATHER, THAT THE PARTIES WERE AWARE THAT

4  THERE WERE CONCERNS ARTICULATED TO THEM BY LSU.

5           DOCUMENT 275 IS A LETTER FROM THE ADVOCACY

6  CENTER PRIOR TO THIS LITIGATION OUTLINING SEVERAL HEALTHCARE

7  PROBLEMS THAT THEY ARE SEEING WITHIN THE INSTITUTION.  AGAIN,

8  GOES DIRECTLY TO THE KNOWLEDGE THAT THE DEFENDANTS HAD THAT

9  THERE WERE CONCERNS ABOUT THE HEALTHCARE DELIVERY.

10           SIMILARLY, 276 IS AN EMAIL WITH CONCERNS ABOUT

11  THE HEALTHCARE DELIVERY REGARDING ONE PATIENT.

12           AND 277 THROUGH 280 ARE POWERPOINT PRESENTATIONS

13  PREPARED BY THE DEFENDANTS OUTLINING HEALTHCARE DELIVERY

14  SERVICES, CLEARLY A BUSINESS RECORD, CLEARLY WE BELIEVE

15  ADMISSIONS OF PARTY OPPONENTS.

16           AND 281, 282 ARE SEVERAL EMAILS BACK AND FORTH

17  REGARDING THE CARE THAT THE PHARMACY IS PROVIDING AT THAT TIME

18  BETWEEN THE DEFENDANTS; AGAIN, ADMISSIONS OF PARTY OPPONENT.

19           **THE COURT:**  WHY AREN'T THESE PARTY ADMISSIONS AND/OR

20  BUSINESS RECORDS, MS. ROPER?

21           **MS. ROPER:**  AND, YOUR HONOR, I DO BELIEVE WE HAD

22  WITHDRAWN THE OBJECTIONS ON THE EMAILS REGARDING THE

23  PHARMACORR, WHICH IS WHAT SHE WAS LAST DISCUSSING.  I'M NOT

24  SURE THAT YOU HAVE THAT NOTED CORRECTLY.

25           THE POWERPOINT PRESENTATION, WE ALSO WITHDREW

09:22 1  OBJECTIONS ON THAT, AND WE WITHDREW MANY OBJECTIONS TO
2  RELEVANCE, YOUR HONOR.  I'M NOT SURE WHY THEY ARE STILL HAVING
3  THEM AS BEING OBJECTED TO.
4          THE LETTERS FROM THE ADVOCACY CENTER, WE
5  OBJECTED ON THE BASIS OF HEARSAY, YOUR HONOR.  THEY WERE
6  SELF-SERVING LETTERS SENT TO US THAT WERE INACCURATE
7  REPRESENTATIONS OF THE CONDITIONS AT LSP, AND WE OBJECT TO THEM
8  ON THE BASIS OF HEARSAY.
9          **THE COURT:**  WHICH ONES ARE THE LETTERS FROM THE
10 ADVOCACY CENTER?
11         **MS. MONTAGNES:**  THERE'S JUST ONE.  IT'S A LETTER, REC
12 DOC. 275, IN WHICH SECRETARY LEBLANC UNDERLINES IT, PUTS NOTES
13 ALL OVER IT, INDICATES THAT HE HAS READ IT AND GRAPPLED WITH
14 IT.
15         **THE COURT:**  YOU CAN PUT SECRETARY LEBLANC ON THE
16 STAND ON 275.  THE OTHERS, 274 AND 276 THROUGH 283 WILL BE
17 ADMITTED.
18         **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.  YOUR HONOR,
19 RECORD DOC. 284 THROUGH 317 HAVE PRIMARILY BEEN OBJECTED TO ON
20 THE BASIS THAT THEY HAVE TO DO WITH SITUATIONS WHICH DON'T
21 OCCUR DIRECTLY AT LSP.  HOWEVER, ALL OF THESE DOCUMENTS ARE
22 EVIDENCE OF HOW HEADQUARTERS RESPONDS TO VARIOUS POLICIES AND
23 PROCEDURES THROUGHOUT THE SYSTEM.  THERE ARE EXAMPLES OF THEM
24 DISCUSSING, FOR EXAMPLE, THE MEDICAL PEER-REVIEW PROCESS, WHICH
25 IS A PROCESS THAT HAPPENS ALL OVER THE SYSTEM.  AND SO TO HAVE

09:24  1  A WARDEN AND DR. SINGH ENGAGED IN A COMMUNICATION ABOUT HOW

2  MEDICAL PEER REVIEW OBVIOUSLY HAS IMPLICATIONS FOR LSP, HOW

3  THEY CONDUCT DEATH REVIEWS, HOW THEY DO THEIR HIRING PRACTICES,

4  PROBLEMS WITH THE PHARMACORR, AGAIN, MANY OF THEM ARE EMAILS

5  ABOUT COST-SAVING MEASURES THAT HAVE BEEN IMPLEMENTED DOC WIDE.

6  AND WHILE THEY MAY BE COMMUNICATIONS WITH PEOPLE WHO AREN'T

7  CURRENTLY EMPLOYED AT DOC, THEY SPEAK TO THE PRACTICES OF

8  HEADQUARTERS.

9       **MS. ROPER:**  AND, YOUR HONOR, WE HAD OBJECTED TO THESE

10  ON THE BASIS THAT THEY WERE NOT LSP ISSUES.  THEY WERE TALKING

11  ABOUT ISSUES AT OTHER DOC FACILITIES, AND THEY WERE NOT

12  RELEVANT TO THE MATTER AT HAND, WHICH IS THE HEALTHCARE

13  DELIVERY AT LOUISIANA STATE PENITENTIARY.

14       **THE COURT:**  I'M GOING TO RESERVE RULING ON THOSE, 284

15  TO 317.  THE COURT WILL RESERVE RULING UNTIL YOU OFFER THEM AT

16  TRIAL.

17       **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.  DOCUMENTS 318

18  TO 344 GO DIRECTLY TO PRACTICES WITHIN LSP.  THEY HAVE BEEN

19  OBJECTED TO, SOME OF THEM AS HEARSAY AND SOME OF THEM AS

20  RELEVANCE.  SINCE THEY'RE EMAILS BETWEEN THE DEFENDANTS, WE

21  THINK THEY'RE ADMISSIONS OF PARTY OPPONENTS, SO THE HEARSAY

22  SHOULD OBVIOUSLY BE OVERRULED.

23       AS TO RELEVANCE, RECORD DOCS. 318, -19, -21,

24  -22, -35, -36, -37, -38, AND -39 ALL GO TO THE PRACTICE OF HOW

25  THEY REVIEWED DEATHS AT LSP, WHICH IS VERY RELEVANT TO THE

09:25   1   INFORMATION HERE AND SOMETHING THAT OUR EXPERTS WILL OPINE ON.

2                       DOCUMENTS 320, 333, 334, AND 340 SPEAK TO THE

3   CHRONIC CARE DELIVERY SYSTEM.

4                       DOCUMENTS 325, 326, 330, AND 331 SPEAK TO DELAYS

5   IN SERVICES.

6                       341, 342, AND 344 ARE KNOWLEDGE.

7           **THE COURT:**  SLOW DOWN JUST A LITTLE BIT.

8           **MS. MONTAGNES:**  SORRY.

9           **THE REPORTER:**  REPEAT THE NUMBERS.

10          **MS. MONTAGNES:**  SURE.  341, 342, AND 344, I

11  APOLOGIZE, GO DIRECTLY TO KNOWLEDGE OF THE PROBLEMS AND OF

12  COMPLAINTS THAT THE DOC HAS RECEIVED.

13                      332 GOES TO QUALITY.  MANY OF THEM SPEAK TO THE

14  PRACTICES WITH REGARDS TO PATIENTS WITH DISABILITIES, INCLUDING

15  323.

16          **THE COURT:**  SO WITH RESPECT TO RELEVANCE, I MEAN, THE

17  COURT CAN SORT THROUGH THAT.  WHAT IS THE EVIDENTIARY

18  OBJECTION?  IS THERE AN EVIDENTIARY OBJECTION, MS. ROPER?

19          **MS. ROPER:**  YES, YOUR HONOR.  TO THE EXTENT THAT ANY

20  OF THESE EXHIBITS THAT SHE IS REFERENCING REFER TO FACILITIES

21  THAT ARE OUTSIDE OF LOUISIANA STATE PENITENTIARY, WE OBJECT ON

22  THAT BASIS, THAT THEY WERE NOT RELEVANT TO THE CARE AT LSP.

23          **MS. MONTAGNES:**  YOUR HONOR, THESE ALL HAVE TO DO WITH

24  LSP'S CARE DELIVERY.

25          **MS. ROPER:**  AND TO THE EXTENT THAT THEY HAVE TO DO

09:26  1   WITH LSP, YOUR HONOR, WE WITHDREW MANY RELEVANCE OBJECTIONS.

2   I'M NOT SURE THAT THAT'S TRANSLATED OVER TO THIS LIST.

3          **THE COURT:**  YOU KNOW WHAT, Y'ALL -- MS. ROPER, YOU

4   KEEP SAYING WE WITHDREW OBJECTIONS AND YET MS. MONTAGNES IS

5   SITTING HERE SAYING THAT YOU OBJECT.  SO CLEARLY THERE'S A

6   DISCONNECT.  YOU ALL NEED TO FIGURE OUT WHAT YOU ARE GOING TO

7   STIPULATE TO ADMISSIBILITY AND WHAT YOU ARE NOT GOING TO

8   STIPULATE TO ADMISSIBILITY.  AND THE FACT THAT YOU PREVIOUSLY

9   STIPULATED TO 265 AND THEN WITHDREW YOUR STIPULATION TO 265 IS

10  NOT BODING WELL FOR THE DEFENDANTS.  SO THE BEST THING THAT I

11  CAN DO IS TO SAY WHY DON'T WE MOVE ON.  LET'S START GETTING ON

12  THE RECORD AND YOU ALL AT THE BREAK OR AT LUNCHTIME SIT DOWN,

13  IF YOU HAVEN'T LOOKED AT THE EXHIBITS, PHYSICALLY PUT YOUR EYES

14  ON THEM.  THAT MIGHT BE A GOOD IDEA SO THAT YOU CAN FIGURE OUT

15  WHAT YOU AGREE TO AND WHAT YOU DON'T AGREE TO.

16         **MS. ROPER:**  AND, YOUR HONOR, WE DID, WE'VE JUST GONE

17  BACK AND FORTH AND THE PARTIES HAVE RENUMBERED SOME OF THE

18  EXHIBITS, WHICH I THINK IS CAUSING SOME OF THE CONFUSION HERE.

19         **THE COURT:**  OKAY.  ALL RIGHT.

20         **MS. MONTAGNES:**  YOUR HONOR, I HAVE TWO OTHER

21  PRELIMINARY MATTERS I WOULD LIKE TO BRING UP.

22         **THE COURT:**  WHAT ARE THEY?

23         **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME WE WOULD

24  MOVE TO STRIKE PORTIONS OF THE DEFENDANTS' FINDINGS OF FACT AND

25  CONCLUSIONS OF LAW.  WITH RESPECT TO THE FIRST ISSUE, IN THEIR

09:28  1  FINDINGS OF FACT AND CONCLUSIONS OF LAW, THE DEFENDANTS

2  REFERENCE ON PAGE 32, 36, 9, 10, AND 30 -- OR, SORRY, JUST ON

3  32 AND 36, THE FACT THAT THE PLAINTIFFS HAVE NOT EXHAUSTED

4  THEIR CLAIMS.  THE COURT RULED IN RECORD DOC. 394 THAT

5  EXHAUSTION IS NOT AN ISSUE IN THIS CASE AND THAT WAS THE,

6  QUOTE, LAW OF THE CASE, AND WE THINK IT'S IMPROPER TO BE MAKING

7  ARGUMENTS WITH RESPECT TO EXHAUSTION IN THE FINDINGS OF FACT

8  AND CONCLUSIONS OF LAW.

9  　　　　　THE COURT:  MS. ROPER.

10  　　　　　MS. ROPER:  YOUR HONOR, THE DEFENDANTS INTEND TO

11  PROFFER EVIDENCE IN THAT REGARD.

12  　　　　　THE COURT:  OKAY.

13  　　　　　MS. MONTAGNES:  IF THEY INTEND TO PROFFER EVIDENCE IN

14  THAT REGARD, YOUR HONOR, THEN THEY ARE WELCOME TO PROFFER THAT

15  IN THE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

16  　　　　　THE COURT:  WELL, THEY ARE PROPOSED FINDINGS OF FACT

17  AND CONCLUSIONS OF LAW.  THEY ARE CERTAINLY NOT BINDING ON THE

18  COURT, YOU KNOW.  I GUESS THEY COULD -- I MEAN, THEORETICALLY,

19  I GUESS ANYBODY COULD PROPOSE WHATEVER THEY WANT.  YOU COULD

20  PROPOSE THAT THE MOON IS MADE OF GREEN CHEESE; IT DOESN'T MAKE

21  IT SO.  SO YOUR MOTION TO STRIKE IS DENIED.

22  　　　　　MS. MONTAGNES:  ALL RIGHT.  YOUR HONOR, THE SECOND

23  MOTION TO STRIKE HAS TO DO WITH THE INCLUSION OF A REFERENCE TO

24  94 HEALTHCARE DIRECTIVES.  THE COURT HAS TWICE RULED THAT

25  DEFENDANTS ARE NOT ALLOWED TO BRING UP THE DIRECTIVES, WHICH

09:29   1   WERE NOT PREVIOUSLY PRODUCED TO THE PLAINTIFFS, THAT HAS ALSO

2   BEEN INCLUDED IN THE FINDINGS OF FACT AND CONCLUSIONS OF LAW,

3   AND WE WOULD MOVE TO STRIKE THAT PORTION AS WELL.

4           **MS. ROPER:**  AND ONCE AGAIN, YOUR HONOR, WE INTEND TO

5   PROFFER THAT INFORMATION TO THE COURT.  THANK YOU.

6           **THE COURT:**  THE OBJECTION IS OVERRULED FOR THE SAME

7   REASONS.

8           **MS. MONTAGNES:**  FINALLY, THE DEFENDANTS INCLUDED IN

9   THEIR FINDINGS OF FACT AND CONCLUSIONS OF LAW THE EXECUTED

10   SETTLEMENT THAT THEY HAVE REACHED WITH THE DEPARTMENT OF

11   JUSTICE WITH REGARDS TO ACCESS TO THE FACILITY.  AND THAT

12   SETTLEMENT WAS PROMULGATED ON NOVEMBER 14, 2017, WHICH IS

13   OUTSIDE OF THE DISCOVERY PERIOD, AND SO WE WOULD MOVE TO STRIKE

14   PORTIONS WHICH REFERENCE THOSE THINGS OUTSIDE OF THE DISCOVERY

15   PERIOD.

16           **MS. ROPER:**  AND, YOUR HONOR, PLAINTIFFS HAVE PROPOSED

17   TO INTRODUCE THE UNEXECUTED SETTLEMENT DOCUMENT, THAT VERY SAME

18   DOCUMENT THAT JUST HAD NOT BEEN EXECUTED YET.  AND WE HAD

19   OBJECTED ON THE BASIS THAT IT WAS JUST -- UNDER 408, THAT IT

20   WAS JUST A SETTLEMENT DOCUMENT, INFORMATION THAT HAD NOT BEEN

21   EXECUTED.  WE THEN PROPOSED THAT WE INTRODUCE THE EXECUTED

22   DOCUMENT IF THEY WERE INTERESTED IN INTRODUCING THE UNEXECUTED

23   DOCUMENT.  WE DO INTEND TO PROFFER THE EXECUTED DOCUMENT IF THE

24   COURT DOES NOT ALLOW THAT DOCUMENT.

25           **THE COURT:**  I MEAN, WHAT IS -- HOW IS IT ADMISSIBLE?

09:30   1   I MEAN, THE FACT THAT THEY MIGHT HAVE WANTED TO INTRODUCE AN

2   EARLIER VERSION, FRANKLY, HOW ARE EITHER ONE OF THEM

3   ADMISSIBLE?

4         **MS. ROPER:**  YOUR HONOR, OUR POSITION IS THAT IT'S

5   RELEVANT TO SHOW THAT THESE ISSUES THAT ARE BEING COMPLAINED OF

6   TODAY HAVE ALREADY BEEN ADDRESSED.

7         **THE COURT:**  SETTLEMENT AGREEMENTS AREN'T ADMISSIBLE.

8   OKAY, AGAIN, HOW IS IT ADMISSIBLE?

9         **MS. ROPER:**  THE POINT OF IT IS, YOUR HONOR, THAT THIS

10   IS AN INJUNCTIVE PROCEEDING, AND IN ORDER TO FASHION AN

11   INJUNCTION, THEIR NEEDS TO BE AN EXISTING ISSUE THAT NEEDS TO

12   BE ADDRESSED.  THESE ISSUES HAVE ALREADY BEEN ADDRESSED BY THIS

13   MATTER.  IT'S UNDER THREE YEARS OF SUPERVISION BY THE

14   DEPARTMENT OF JUSTICE, AND THEY HAVE RESERVED THE RIGHT TO GO

15   BACK TO COURT.  IT DOESN'T MAKE SENSE FOR US TO HAVE ANOTHER

16   INJUNCTION AS -- TWO INJUNCTIONS PROCEEDING AT THE SAME TIME IS

17   OUR POSITION.

18         **THE COURT:**  THE SETTLEMENT AGREEMENT IS NOT

19   ADMISSIBLE.  YOU CAN CERTAINLY OFFER IT AS WE GO THROUGH THE

20   TRIAL, AND IF IT BECOMES SOMEHOW ADMISSIBLE -- I DON'T KNOW HOW

21   IT WOULD, BUT --

22         **MS. MONTAGNES:**  WE WERE OFFERING IT TO SHOW

23   FEASIBILITY, YOUR HONOR, NOT TO SHOW ANYTHING BEYOND THAT, JUST

24   TO SHOW FEASIBILITY.

25         **THE COURT:**  IS THAT PART OF YOUR JOINT ADMISSIONS?

1    **MS. MONTAGNES:**  IT'S NOT.  IT'S ONE OF THE ONES WE
2  ARE GOING TO TALK ABOUT IN THE BREAK.
3          **THE COURT:**  ALL RIGHT.
4          **MS. MONTAGNES:**  SO I HADN'T MOVED ON TO THAT SECTION
5  YET.
6          **THE COURT:**  OKAY.
7          **MS. MONTAGNES:**  AND THEN FINALLY, YOUR HONOR,
8  PLAINTIFFS ARE GOING TO RENEW THEIR MOTION FOR PARTIAL SUMMARY
9  JUDGMENT WITH RESPECT TO THE AMERICANS WITH DISABILITIES ACT.
10  IN THAT ISSUE, WE HAD -- THE DEBATE -- THE ONLY DEBATE, THE
11  ONLY FACTUAL ISSUE WAS WITH REGARDS TO THE DATE OF
12  CONSTRUCTION.  OUR EXPERT'S FINDINGS WERE NOT CONTRADICTED BY
13  THE DEFENDANTS AND THEY -- AND THE ISSUE IS WHETHER THE
14  STANDARDS FROM 1991 WOULD BE STRICTLY APPLIED OR WHETHER THEY
15  WOULD BE PROGRAMMATICALLY APPLIED.
16          IN THE DEFENDANTS' FINDINGS OF FACT AND
17  CONCLUSIONS OF LAW, THEY STIPULATE THAT WARD 1 AND WARD 2
18  WITHIN THE BARROW TREATMENT CENTER, AS WELL AS THE TREATMENT
19  UNIT, WERE ALTERED AFTER 1991, BASED ON A DOCUMENT THAT WE HAD
20  PREVIOUSLY BEEN REPRESENTED BY THE DEFENDANTS THEY COULD NOT
21  DATE.  AND BECAUSE THERE NOW CAN BE NO DISPUTE THAT THERE WERE
22  ALTERATIONS MADE AFTER 1991, WE BELIEVE WITH RESPECT TO THESE
23  SPECIFIC PLACES WITHIN THE TREATMENT CENTER, THERE IS NO --
24  THERE IS ABSOLUTELY NO DISPUTE AS TO FACT SINCE IT WAS CONCEDED
25  IN THEIR PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW.

09:32  1    **THE COURT:**  CAN YOU POINT TO THE FINDINGS OF FACT AND

2    CONCLUSIONS OF LAW THAT YOU REFER TO?

3    **MS. MONTAGNES:**  YES.  IT WAS REC. DOC. 497 AT PAGE

4    25.

5    **THE COURT:**  THE LAST DATES OF CONSTRUCTION,

6    ALTERATION, OR RENOVATION FOR THE LSP MEDICAL FACILITIES WERE

7    8/20/01, R.E. BARROW TREATMENT CENTER, BUILDINGS A, B, C,

8    AND D; 4/1/2006, TREATMENT CENTER; 12/21/2005, TREATMENT CENTER

9    SUPPORT BUILDING; 1/13/15, BARROW TREATMENT CENTER; AND

10   4/16/13, NEW TREATMENT SURGERY CLINIC.

11   MS. ROPER, DO YOU WANT TO ADDRESS THE REURGED

12   MPSJ?

13   **MS. ROPER:**  YES, YOUR HONOR.  THE ISSUE UNDER THE ADA

14   IS WHETHER OR NOT IT WAS A SUBSTANTIAL ALTERATION OR

15   MODIFICATION, NOT JUST ANY ALTERATION OR MODIFICATION.  THOSE

16   DOCUMENTS AND OUR STATEMENT OF FACTS DO NOT CONCEDE OR SHOW

17   THAT THESE WERE SUBSTANTIAL ALTERATIONS OR MODIFICATIONS.  SO

18   THAT IS NOT A PROVEN POINT.

19   ADDITIONALLY, THERE ARE OTHER MEANS OF COMPLYING

20   WITH THE ADA UNDER THE ALTERNATIVE MEASURES, AND THOSE WERE NOT

21   TAKEN INTO ACCOUNT WHATSOEVER BY THE ARCHITECTURAL EXPERT FOR

22   PLAINTIFFS.  WE FEEL THAT THE SIMPLISTIC APPROACH TAKEN BY THE

23   ADA EXPERT PROPOSED BY PLAINTIFFS IS IGNORING MANY RELEVANT

24   FACETS OF THE ADA AND THE RA THAT MUST BE CONSIDERED IN ORDER

25   TO DETERMINE WHETHER OR NOT THERE WAS COMPLIANCE.

09:34   1      **MS. MONTAGNES:**  YOUR HONOR, THE WORD *SUBSTANTIAL* DOES

2    NOT APPEAR IN THE REGULATION.  28 C.F.R. 35.151, IT SPEAKS TO

3    USABILITY.  AND WHILE MS. ROPER IS CORRECT THAT IF THE 1991

4    STANDARDS ARE NOT STRICTLY APPLIED, MEANING THE FACILITY WAS

5    BUILT BEFORE 1991 OR ALTERED BEFORE 1991, THEN WE DO LOOK AT

6    PROBLEMATIC ACCESS.  HOWEVER, IF IT'S ALTERED OR BUILT AFTER

7    1991, THEN THOSE STANDARDS STRICTLY APPLY.  THEY HAVE CONCEDED

8    THAT THEY ALTERED THE FACILITIES AFTER THOSE DATES, AFTER

9    MAKING REPRESENTATIONS IN THEIR MOTIONS THAT THOSE DATES DID

10    NOT APPLY.  THERE IS NO FACTUAL DISPUTE AS TO THE AREAS READ BY

11    YOUR HONOR.

12      **THE COURT:**  THE COURT WILL TAKE THAT UNDER

13    ADVISEMENT, WHETHER OR NOT THE CODE OF FEDERAL REGULATIONS

14    REQUIRE STRICT CONSTRUCTION FOR ALTERATIONS OR MODIFICATIONS

15    AFTER 1991.  THE COURT SIMPLY NEEDS TO LOOK AT THE LANGUAGE OF

16    THE C.F.R. AND AT THE CASE LAW AND WILL DO THAT AND HAVE A

17    RULING FOR YOU, HOPEFULLY, THIS AFTERNOON.

18      **MS. ROPER:**  AND, YOUR HONOR, IF I MAY ADDITIONALLY

19    ADD, ANY ALTERATIONS OR MODIFICATIONS, THE FACT OF THAT, THAT

20    IS PROPOSED IN OUR STATEMENT OF FACTS DOES NOT SHOW THAT IT WAS

21    NOT ALTERED OR MODIFIED IN COMPLIANCE WITH THE ADA.

22      **THE COURT:**  I THINK THE QUESTION IS WHETHER OR NOT

23    THERE'S -- WHETHER OR NOT THAT THE C.F.R. ON APPLICABILITY IS

24    STRICTLY CONSTRUED, AND THE COURT WILL LOOK AT THAT.

25      **MS. MONTAGNES:**  THANK, YOUR HONOR.  JUST A FEW

1   HOUSEKEEPING THINGS.  WE DID PUT THE FINDINGS OF FACT AND

2   CONCLUSIONS OF LAW IN WORD AS WELL AS OCR, THE PLAINTIFFS' AND

3   JOINT EXHIBITS, TO PROVIDE TO THE COURT JUST FOR EASE OF USE

4   AND FOR THE --

5               **THE COURT:**  GIVE THAT TO THE COURTROOM DEPUTY.  THANK

6   YOU.

7               **MS. MONTAGNES:**  THANK YOU.  AND THEN WE WILL BE -- I

8   UNDERSTAND THAT YOUR HONOR DOESN'T WANT TECHNOLOGY TO BE USED,

9   BUT WE WILL BE HAVING A NOTETAKER, IF IT'S OKAY, USING THEIR

10  LAPTOP HERE AS WELL.  AND I JUST -- OUT OF CURIOSITY --

11  ACTUALLY, THAT'S FINE, THAT'S IT.  THANK YOU.

12              **THE COURT:**  YOU CAN ASK YOUR QUESTION.  ASK YOUR

13  QUESTION.

14              **MS. MONTAGNES:**  IS THERE A SPEAKER THAT COULD BE

15  TURNED ON IN THE WAR ROOM SO WE COULD HEAR WHAT WAS HAPPENING

16  IN HERE?

17              **THE COURT:**  WELL, THAT'S A GOOD QUESTION.  I DON'T

18  KNOW.

19                  IS THERE?

20              **THE DEPUTY CLERK:**  I DON'T KNOW THAT ANYONE HAS EVER

21  ASKED THAT QUESTION BEFORE.

22              **THE COURT:**  WE WILL FIND OUT.  WE JUST HAD A MAJOR

23  TECHNOLOGY UPGRADE IN THIS COURTROOM SO THERE VERY WELL MAY BE.

24  SO WE WILL FIND OUT.

25              **MS. MONTAGNES:**  THANK YOU SO MUCH.

09:36   1           THE COURT:  NOW, OBVIOUSLY IF YOUR WITNESSES ARE

2  SEQUESTERED, THEN THEY'RE NOT -- THEY SHOULDN'T BE IN THE WAR

3  ROOM IF THERE IS A SPEAKER, OKAY, OBVIOUSLY.

4           MS. MONTAGNES:  ABSOLUTELY.

5           MS. ROPER:  THANK YOU, YOUR HONOR.

6           THE COURT:  ANYTHING FURTHER?

7           MS. MONTAGNES:  NOT FROM PLAINTIFFS.

8           THE COURT:  THEN WE ARE READY TO PROCEED.  YOU MAY

9  CALL YOUR FIRST WITNESS.

10           MS. MONTAGNES:  YOUR HONOR, I WAS GOING TO GIVE A

11  SHORT OPENING IF THAT'S OKAY.

12           THE COURT:  YOU MAY.

13           MS. MONTAGNES:  THANK YOU.  WE NEED ACCESS FROM THAT

14  COMPUTER.

15           THE DEPUTY CLERK:  OKAY.  IT SHOULD BE THERE.

16           THE COURT:  WAS YOUR WITNESS BROUGHT UP OR YOUR

17  REPRESENTATIVE BROUGHT UP, MS. MONTAGNES?  DO WE HAVE A STATUS?

18           MS. MONTAGNES:  HE'S AVAILABLE TO BE BROUGHT IN.  IF

19  YOUR HONOR WOULDN'T MIND, I'D LIKE FOR HIM TO BE HERE.

20           THE COURT:  LET HIM SIT AT COUNSEL TABLE, PLEASE.

21           MS. MONTAGNES:  THANK YOU.

22           THE COURT:  GO AHEAD AND BRING HIM IN.

23               AND GIVE ME HIS NAME AGAIN.  I'M SORRY.

24           MS. MONTAGNES:  HIS NAME IS ALTON ADAMS.

25           THE COURT:  ADAMS.

09:18   1          **MS. MONTAGNES:**  AND HIS FAMILY, YOUR HONOR -- JUST SO

2   YOU KNOW, HIS FAMILY IS ALSO HERE IN THE AUDIENCE AS WELL.

3          **THE COURT:**  Y'ALL HAVE A CHAIR FOR HIM?

4          **MS. MONTAGNES:**  HE'S IN A WHEELCHAIR, YOUR HONOR.

5          **THE COURT:**  OKAY.

6          **MR. ARCHEY:**  YOUR HONOR, I HEARD ONE COMMENT.  DO YOU

7   HAVE AN ISSUE WITH US TAKING NOTES ON THE COMPUTER?

8          **THE COURT:**  NO, NO, NO.

9          **MR. ARCHEY:**  OKAY.

10          **THE COURT:**  WELL, TO THE EXTENT THAT IF IT GETS LOUD,

11   IT'S DISTRACTING, THE COURT REPORTER WILL LET YOU KNOW.  BUT WE

12   HAVE HAD -- IF YOU ARE BANGING A LOT, NO.  BUT IN GENERAL, NO.

13          SHANNON, JUST LET ME KNOW IF IT GETS TO BE LOUD.

14          **MR. ARCHEY:**  I HEARD A COMMENT, I WANTED TO MAKE

15   SURE.  THANK YOU, JUDGE.

16          **THE COURT:**  YOU'RE WELCOME.

17          **REPORTER'S NOTE:**  (AT THIS TIME, ALTON ADAMS WAS

18   PRESENT IN THE COURTROOM.)

19          **THE COURT:**  GOOD MORNING, SIR.  THEY ARE GOING TO PUT

20   YOU RIGHT HERE AT COUNSEL TABLE.

21          MS. MONTAGNES, YOU MAY PROCEED.

22          **MS. MONTAGNES:**  IN 1791, THE UNITED STATES AMENDED

23   ITS CONSTITUTION TO INCLUDE THE EIGHTH AMENDMENT BAN ON CRUEL

24   AND UNUSUAL PUNISHMENT.  THOUGH WE CANNOT BE SURE, SCHOLARS

25   CONTEND THAT IT WAS ADDED TO DIFFERENTIATE US FROM SOME OF THE

1    MORE BRUTAL ELEMENTS OF THE BRITISH EMPIRE.

2                   LOUISIANA STATE PENITENTIARY, ALSO KNOWN AS

3    ANGOLA, USED TO SIT ON THIS VERY SPOT.  IT NOW SITS ON 18,000

4    ACRES ALONG THE MISSISSIPPI RIVER.  FORMERLY A SLAVE

5    PLANTATION, IT NOW HOUSES MEN IN LOUISIANA WHO ARE SENTENCED

6    FOR THE LONGEST TIMES.  IT IS ROUGHLY AN HOUR LONG DRIVE FROM

7    HERE, AND AT ANY GIVEN TIME, ABOUT 6000 MEN LIVE THERE AND

8    ABOUT 74 PERCENT OF THEM WILL ALSO DIE THERE.

9                   WHEN YOU LOCK A MAN UP IN ANGOLA, YOU ARE, IN

10   ALMOST ALL CASES, TAKING AWAY HIS FAMILY, TAKING AWAY HIS

11   DOCTORS, TAKING AWAY HIS ABILITY TO HELP HIMSELF.  WHEN YOU ARE

12   SERVING TIME AT ANGOLA, YOU CAN'T CHECK YOUR BLOOD PRESSURE

13   WHEN YOU WANT; YOU CAN'T DROP BY A PHARMACY TO ASK ABOUT THE

14   SIDE EFFECTS OF YOUR MEDICATION; AND YOU CAN'T CALL THE

15   LOUISIANA BOARD OF MEDICAL EXAMINERS TO ASK ABOUT YOUR DOCTOR'S

16   DISCIPLINARY HISTORY.  YOU ARE AT THE MERCY OF THE PRISON TO

17   PROVIDE YOU WITH HEALTHCARE AND FULFILL THEIR OBLIGATIONS.

18                   WHEN WE AS A SOCIETY LOCK SOMEONE AWAY, WE TAKE

19   AWAY MANY RIGHTS AND FREEDOMS.  THEY CANNOT VOTE, THEY CANNOT

20   HOLD THE JOB THEY WANT, AND THEY CAN'T GO HOME TO THEIR

21   FAMILIES AT NIGHT.  THEY GIVE UP THE RIGHT TO SAY GOODBYE WHEN

22   A LOVED ONE PASSES, AND THEY CAN'T SEE THEIR CHILDREN'S

23   GRADUATION OR SHARE IN A SUNDAY LUNCH WITH THEIR FAMILY.

24                   THEY ARE A VERY FEW NUMBER OF OBLIGATIONS THAT

25   WE CONTINUE TO PLACE ON THE STATE, AND ONE OF THOSE IS THE

09:41  1   DELIVERY OF HEALTHCARE.  IN THIS VERY COURTHOUSE, THAT RIGHT
2   HAS BEEN AFFIRMED, AS WELL AS THE RIGHT TO BE FREE FROM ABUSE
3   FROM CORRECTIONAL OFFICERS AND THE RIGHT TO RECEIVE MEDICALLY
4   NECESSARY SURGERY.
5              HERE TODAY, WE ARE FOCUSED ON THE RIGHTS OF
6   INDIVIDUALS, INCLUDING THOSE WITH DISABILITIES, TO ACCESS
7   HEALTHCARE AND FOR PATIENTS WITH DISABILITIES SPECIFICALLY TO
8   HAVE ACCESS TO THE FACILITY, MORE GENERALLY.  AND THERE IS NO
9   DOUBT THAT THERE ARE GOOD ACTORS IN THE SYSTEM, BUT THE
10   EVIDENCE WILL SHOW THAT THE SYSTEM ITSELF IS BROKEN.
11              AND IN THIS TRIAL, WE ARE TALKING ABOUT SYSTEMIC
12   PROBLEMS, THE POLICIES AND PROCEDURES WHICH HAVE LED TO
13   PERVASIVE INADEQUATE CARE THROUGHOUT ANGOLA, PROBLEMS THAT HAVE
14   CAUSED OUR PLAINTIFFS, THE PATIENTS OF ANGOLA, TO SUFFER RISK
15   OF PAIN, INJURY, AND LOSS OF LIFE.  AND WE WILL SHOW EXAMPLES
16   OF ACTUAL PAIN, ACTUAL INJURY, AND ACTUAL LOSS OF LIFE.
17              IN ORDER TO PROVE A CLAIM UNDER THE EIGHTH
18   AMENDMENT, WE HAVE TO SHOW THAT THE DEFENDANTS WERE
19   DELIBERATELY INDIFFERENT TO A CONDITION POSING A SUBSTANTIAL
20   RISK OF SERIOUS HARM.  IMPORTANTLY, PLAINTIFFS NEED ONLY
21   DEMONSTRATE A RISK OF HARM.
22              IN THIS TRIAL, WE WILL SHOW YOU EXAMPLES OF
23   ACTUAL HARM.  IN THIS TRIAL, YOU WILL HEAR EXAMPLES OF HOW MEN
24   HAVE ENDURED PAIN, SUFFERED INJURY, AND LOST THEIR LIVES.
25              WITH RESPECT TO SUBJECTIVE DELIBERATE

0 9 : 4 2   1   INDIFFERENCE, THERE ARE MANY WAYS TO SHOW THAT THIS IS

2   SATISFIED.  BUT IN GENERAL, IT REQUIRES SUBJECTIVE KNOWLEDGE OF

3   A SYSTEMIC PROBLEM, THOUGH WILLFUL BLINDNESS IS NOT AN EXCUSE.

4                IN CLASS ACTIONS SUCH AS THIS ONE WHICH ALLEGE

5   SYSTEMIC HEALTHCARE DEFICIENCIES, REPEATED ACTS OF NEGLIGENCE

6   OR CHRONIC UNDERSTAFFING CAN SATISFY DELIBERATE INDIFFERENCE,

7   IN PART, BECAUSE THE EVIDENCE AVAILABLE TO THE DEFENDANTS IS

8   AVAILABLE IN MUCH THE SAME WAY IT'S AVAILABLE TO THE COURT.

9   HOWEVER, WE NEED NOT RELY ON THAT CASE LAW HERE BECAUSE WE KNOW

10  THE DEFENDANTS KNEW THESE PROBLEMS EXISTED, AND THE REASON WE

11  KNOW IS BECAUSE WE HAVE AMPLE EVIDENCE OF IT.

12               THE EVIDENCE INCLUDES THAT 20 YEARS AGO IN A

13  SIMILAR LAWSUIT THE DEFENDANTS RECOGNIZED THAT THE PRACTICES

14  THAT WE SEE TODAY PUT PATIENTS AT RISK.  AND THE EVIDENCE WILL

15  SHOW, IN THEIR INTERNAL AND EXTERNAL COMMUNICATIONS, THE

16  DEFENDANTS ADMIT THESE PROBLEMS.  THEY TELL EACH OTHER ABOUT

17  THE PROBLEMS.

18               THE EVIDENCE WILL SHOW THAT THEIR OWN

19  CONSULTANTS TOLD THEM ABOUT THESE PROBLEMS, THAT THE PATIENTS

20  AND THEIR FAMILIES AND THEIR LOVED ONES TOLD THE DEFENDANTS

21  ABOUT THESE PROBLEMS AND THAT THE EMPIRICAL NUMBERS, MOST

22  IMPORTANTLY, THE ASTRONOMICAL RISE IN THE DEATH RATE IN

23  LOUISIANA'S PRISONS WILL DEMONSTRATE THAT THEY HAD THESE

24  PROBLEMS.

25               TWENTY YEARS AGO IN A CASE CALLED

09:44   1   *WILLIAMS V. LYNN*, ANGOLA ENTERED INTO A STIPULATED AGREEMENT IN

2   WHICH THEY PROMISED TO FIX MANY SYSTEMWIDE POLICIES AND

3   PROCEDURES.  MANY OF THOSE PROBLEMS ARE REOCCURRING TODAY.

4           FOR EXAMPLE, IN 1988, THE DEFENDANTS KNEW THAT

5   THEIR EMTS NEEDED TO BE TRAINED ON THEIR PROTOCOLS.  THEY

6   NEEDED BETTER TRAINING BECAUSE DELIVERING SICK CALL AT ANGOLA

7   IS IMPORTANT.  IT'S THE FRONT LINE OF HEALTHCARE, THE

8   GATEKEEPER TO ACCESSING CARE.  AND IF YOU DON'T IDENTIFY A

9   PROBLEM OR RESPOND, THE PATIENT IS IN TROUBLE.  SO ANGOLA

10  AGREED TO PROVIDE ROBUST TRAINING AND SUPERVISION FROM THE

11  LOUISIANA STATE UNIVERSITY MEDICAL SCHOOL.

12          TODAY, EMTS CONTINUE TO PERFORM SICK CALL BUT

13  WITHOUT THAT ROBUST TRAINING THAT WAS MANDATED BY LSU 20 YEARS

14  AGO.  INDEED, WHEN THE CURRENT MEDICAL DIRECTOR WAS ASKED ABOUT

15  TRAINING EMTS ON THOSE PROTOCOLS, HE SAID THEY WERE, QUOTE,

16  PRETTY SIMPLE AND IDIOT PROOF AND PROVIDED NO EVIDENCE OF

17  TRAINING EMTS ON THOSE PROTOCOLS.

18          THE PRISON IS ALSO FAILING TO MANAGE CHRONIC

19  CARE IN WAYS THAT THEY KNEW CREATED RISKS 20 YEARS AGO.  FOR

20  EXAMPLE, IN *WILLIAMS V. LYNN*, ANGOLA AGREED TO PROVIDE

21  ACCU-CHEKS FOR INSULIN DEPENDENT DIABETICS TWICE A DAY.  IF YOU

22  KNOW ANYTHING ABOUT DIABETES, YOU KNOW HOW IMPORTANT IT IS TO

23  MONITOR YOUR BLOOD SUGAR, BUT THE EVIDENCE WILL SHOW THE

24  DEFENDANTS ARE FAILING TO PROVIDE THAT ACCESS TO PLAINTIFFS

25  TODAY.

09:45   1          AND ANGOLA HAS STILL NOT MODERNIZED IN WAYS IT

2    PROMISED TO 20 YEARS AGO.  IN 1998, THE DEFENDANTS AGREED TO

3    INSTALL A MEDICAL RECORD AUTOMATION SYSTEM, BUT OUR EXPERTS

4    FOUND THAT THE HEALTH RECORDS ARE STILL PRIMARILY PAPER AND

5    THEY CONCLUDED THAT THESE RECORDS WERE INADEQUATE FOR USE AND

6    PLACE PLAINTIFFS AT RISK OF HARM BY REDUCING THE ABILITY OF

7    CLINICIANS TO UNDERSTAND THE MEDICAL CARE BEING GIVEN TO THEIR

8    PATIENTS.  THIS HIGHLIGHTS JUST A FEW EXAMPLES.

9          AND THE EVIDENCE WILL SHOW THAT THE DEFENDANTS

10   KNEW THAT THEY WERE, FOR EXAMPLE, SHORT STAFFED, AND THEY KNEW

11   THEY WERE SHORT STAFFED BECAUSE NURSE ANNETTE DUPRE TOLD THEM

12   IN 2010 WHEN SHE SAID THEY WERE, QUOTE, EXTREMELY SHORT STAFFED

13   AND, QUOTE, IN DESPERATE NEED.  AND THEN NURSE KAREN HART TOLD

14   THEM AGAIN IN 2015.

15          AND THEY KNEW THEY DIDN'T HAVE THE RESOURCES

16   THEY NEEDED BECAUSE THE SECRETARY OF CORRECTIONS HIMSELF

17   ACKNOWLEDGED IT.  HE ACKNOWLEDGED IT IN THE MEDIA, AND HE

18   ACKNOWLEDGED IT IN THE LEGISLATURE.

19          AND THE EVIDENCE WILL SHOW THAT THEIR

20   CONSULTANTS TOLD THEM THAT THEY HAD PROBLEMS, THAT THEY WERE

21   DELIVERING UNTIMELY TREATMENT, THAT THEY HAD BACKLOGS AND

22   PATIENTS HAD TROUBLE ACCESSING CARE AND THAT THEIR QUALITY

23   CONTROL WAS INEFFECTIVE.

24          AND THE EVIDENCE WILL SHOW THAT THEY KNEW THAT

25   LOUISIANA HAD A CLIMBING DEATH RATE, MUCH HIGHER THAN ANYWHERE

09:47   1   ELSE IN THE COUNTRY, AND THEY DIDN'T KNOW HOW TO FIX IT.

2                    ON NOVEMBER 14, 2014, THE HEAD OF THE INFIRMARY

3   UNITS, NURSE HART, SENT HER BOSS, THE HEAD OF NURSING, NURSE

4   SHERWOOD PORET, AN EMAIL.  IN THAT EMAIL, SHE TELLS HIM THAT

5   IT'S A DIRE SITUATION, THAT THE UNIT IS GROSSLY DIRTY, AND NO

6   ONE IS SUPERVISING THE ORDERLIES.  AT THE EXACT SAME TIME, THE

7   EVIDENCE WILL SHOW THAT THERE IS A DRAMATIC RISE IN

8   POSTOPERATIVE INFECTIONS.  SIX ARE DOCUMENTED IN JUST OVER A

9   MONTH AND TWO PATIENTS DIE.

10                    AND THEN DEFENDANTS CONDUCTED A QUALITY

11   ASSESSMENT.  AND WHEN NURSE PORET WAS ASKED ABOUT THAT, UNDER

12   OATH IN HIS DEPOSITION, HE SAID THERE WAS NO BEHAVIOR CHANGE AT

13   LSP.  HE SAID THAT HE SUSPECTED THEY CAME FROM OUTSIDE

14   HOSPITALS.  AND WHEN HE WAS ASKED WHY HE THOUGHT THAT, HE SAID

15   HE DIDN'T INVESTIGATE BEYOND LSP.  THEY KNEW THEIR INFIRMARY

16   WAS DIRTY; THEY KNEW THEIR PATIENTS WERE GETTING SICK; AND THEY

17   DID NOTHING TO CHANGE IT.

18                    ALL OF THIS KNOWLEDGE IS REFLECTED IN THE REVIEW

19   THAT OUR MEDICAL EXPERTS CONDUCTED.  DR. PUISIS, DR. VASSALLO,

20   AND NURSE LAMARRE ARE THREE OF THE MOST ACCOMPLISHED

21   PRACTITIONERS OF CORRECTIONAL MEDICINE IN THE COUNTRY.  DR.

22   PUISIS LITERALLY WROTE THE TEXTBOOK ON CORRECTIONAL MEDICINE.

23   THEY HAVE BEEN AFFIRMED ALL OVER THE COUNTRY AS WELL AS IN THE

24   FIFTH CIRCUIT AND THE SUPREME COURT.  AND WHEN THEY PERFORMED

25   THEIR EVALUATION OF ANGOLA, THEY FOUND REAL PROBLEMS.  THEY

09:48   1   DEPLOYED A JUDGMENT SAMPLING METHOD WHICH HAS BEEN APPROVED IN
        2   OTHER COURTS IN THIS CIRCUIT.
        3               THEY EVALUATED 48 CASES AS PART OF THAT SAMPLE;
        4   28 WERE DEATHS.  OF THE 28 DEATHS THEY REVIEWED, THEY FOUND
        5   26 -- THAT'S 93 PERCENT -- HAD SERIOUS MEDICAL ERRORS AND/OR
        6   WERE PREVENTABLE.  THE TWO THAT WERE NOT -- DID NOT HAVE
        7   SERIOUS PROBLEMS WERE A GENTLEMAN WHO WAS ELECTROCUTED AND A
        8   GENTLEMAN WHO SPENT FIVE DAYS AT ANGOLA BEFORE HE DIED AT
        9   HOSPICE CARE.  AND THESE MEN WERE NOT 80 AND 90 YEARS OLD.
       10   THESE MEN WERE 31, 37, 45 YEARS OLD.
       11               THEY ALSO FOUND SERIOUS PROBLEMS IN THE CHRONIC
       12   CARE CHARTS THEY REVIEWED.  AND THESE ARE NOT SIMPLY A MISLAID
       13   SIGNATURE.  THIS IS PROBLEMS LIKE IGNORING ABNORMAL VITAL
       14   SIGNS, FAILING TO CONDUCT PHYSICAL EXAMS, AND DISEASES ALLOWED
       15   TO PERSIST UNCONTROLLED FOR YEARS WITHOUT USING THE ACCEPTED
       16   STANDARD OF CARE.
       17               THINGS WERE SO BAD THAT OUR EXPERTS CONCLUDED,
       18   IN OUR COLLECTIVE EXPERIENCE OF OVER 60 YEARS IN CORRECTIONAL
       19   MEDICINE, THE LOUISIANA STATE PENITENTIARY'S DELIVERY OF
       20   MEDICAL CARE IS ONE OF THE WORST WE HAVE EVER REVIEWED.
       21               AND YOU ARE GOING TO HEAR AND GET TO KNOW SOME
       22   OF THESE MEN.  THIS IS SHANNON HURD.  SHANNON HURD BEGAN LOSING
       23   WEIGHT AND EXPERIENCING FLU-LIKE SYMPTOMS IN NOVEMBER OF 2012,
       24   AND HE MADE SICK CALL, AFTER SICK CALL, AFTER SICK CALL.  AND
       25   THEN HIS FINGERS AND HIS FEET WENT NUMB IN 2015, AND HE MADE

09:50   1   SICK CALL, AFTER SICK CALL, AFTER SICK CALL.  AND HE LOST
        2   61 POUNDS.  AND HE MADE SICK CALL, AFTER SICK CALL, AFTER SICK
        3   CALL, UNTIL HE HAD MADE 37 SICK CALL REQUESTS.  AND WHEN HE WAS
        4   FINALLY DIAGNOSED AT THE VERY END OF 2015, HIS PROBABLY
        5   TREATABLE RENAL CANCER HAD METASTASIZED TO HIS ENTIRE BODY, AND
        6   HE DIED IN THE PENDENCY OF THIS ACTION FROM LIKELY TREATABLE
        7   CANCER AT THE AGE OF 42.
        8               AND THIS IS KENTRELL PARKER.  KENTRELL PARKER IS
        9   A QUADRIPLEGIC AS A RESULT OF A NECK INJURY HE INCURRED AT LSP
       10   IN 2010.  HE HAS A TRACHEOTOMY TUBE, AND WHEN HE WAS
       11   DISCIPLINED, KENTRELL WAS PLACED IN A ROOM ALONE WITHOUT ACCESS
       12   TO THE NURSES, WITHOUT A CALL BUTTON, WITHOUT ANY ABILITY TO
       13   COMMUNICATE SO THAT IF HE VOMITED AND HE WAS CHOKING, HE HAD NO
       14   WAY TO LET THE NURSES KNOW, SO THAT IF SOMETHING GOT LODGED IN
       15   HIS TRACHEOTOMY TUBE, HE HAD NO WAY TO LET THE NURSES KNOW, SO
       16   THAT IF HE DEFECATED ON HIMSELF, HE HAD NO WAY TO LET THE
       17   NURSES KNOW.
       18               AND THIS IS FARRELL SAMPIER.  FARRELL WAS
       19   DIAGNOSED WITH TRANSVERSE MYELITIS AT ANGOLA.  TRANSVERSE
       20   MYELITIS IS A NONFATAL DISEASE THAT CAUSES INFLAMMATION IN THE
       21   SPINE.  IT PARALYZED HIM.  WHEN MR. SAMPIER FIRST BECAME
       22   INVOLVED IN THIS CASE, EVEN THOUGH HE HAD A NONFATAL DISEASE,
       23   HE WAS LIVING IN HOSPICE.  AND THE EVIDENCE WILL SHOW THAT THE
       24   DOCTORS TOLD HIM STORIES THAT SCARED HIM SO MUCH AND LED HIM TO
       25   BELIEVE THAT HOSPICE WAS HIS ONLY OPTION EVEN THOUGH HE WASN'T

09:52   1   DYING.

2           WHEN MR. SAMPIER WITHDREW FROM HOSPICE, THE

3   EVIDENCE WILL SHOW THAT HE TRIED EVERYTHING HE COULD TO IMPROVE

4   HIS SITUATION AND HE WAS THWARTED.  HE NEEDED PHYSICAL THERAPY

5   TO INCREASE HIS STRENGTH SO THAT HE WOULD NOT LIVE PERMANENTLY

6   ON THE INFIRMARY, AND IT WAS SPARSE AND HE WAS FORCED TO COME

7   UP WITH HIS OWN EXERCISES.  AND HE WANTED GLOVES TO HELP HIM

8   GRIP HIS WHEELCHAIR AND GET AROUND AND HE WAS TOLD NO.  AND

9   THEN HE ASKED HIS FAMILY WOULD THEY BUY HIM GLOVES AND THEY

10  WERE TOLD NO.  AND IT WASN'T UNTIL SOMEONE WHO WAS WORKING IN

11  THE FIELD HAD AN EXTRA PAIR OF GLOVES, THAT THEY GAVE HIM THEIR

12  CASTOFF GLOVES, THAT HE WAS ABLE TO GET THOSE GLOVES TO GET

13  AROUND THE PRISON.  AND HE TRIED TO TAKE CLASSES, ANGER

14  MANAGEMENT CLASSES, PARENTING CLASSES, BUT BEING ON THE

15  INFIRMARY, HE WAS NOT PERMITTED TO TAKE THOSE CLASSES.

16          AND THE EVIDENCE WILL SHOW THAT THESE STORIES

17  ARE EMBLEMATIC OF WHAT'S HAPPENING AT ANGOLA.

18          NOW, THE DEFENDANTS WANT YOU TO BELIEVE THAT

19  THIS IS NOT THEIR FAULT:  EARL K. LONG CLOSED, ANGOLA IS FAR

20  AWAY, THERE ARE A LOT OF PEOPLE AT ANGOLA, OR THEY'RE TRYING

21  THEIR BEST.  BUT THESE DO NOT EXPLAIN NOR DO THEY LEGALLY

22  EXCUSE ANY OF THE PROBLEMS WE WILL HEAR ABOUT IN THIS TRIAL.

23  THEY DO NOT EXCUSE DOCTORS FAILING TO CONDUCT PHYSICAL EXAMS.

24  THEY DO NOT EXCUSE DOCTORS IGNORING ABNORMAL VITAL SIGNS,

25  CONFUSING AND INADEQUATE EMT PROTOCOLS, FAILURE TO HAVE

09:53   1   QUALIFIED MEDICAL PROFESSIONALS DELIVERING SERVICE, THE FAILURE

2   TO USE CONTEMPORARY CHRONIC CARE STANDARDS, THE FAILURE TO

3   RECOGNIZE EMERGENCIES AND PROVIDE TIMELY RESPONSE.

4               NOT ONE OF THESE ACCOUNT FOR FAILING TO RESPOND

5   TO SICK CALL REQUESTS, A PROBLEM THEIR OWN -- DELAYING THEIR

6   RESPONSE TO A SICK CALL REQUEST, A PROBLEM THEIR OWN EXPERT

7   IDENTIFIED.

8               THE CONSTITUTION DOES NOT BEND TO THE LOGISTICAL

9   NEEDS OF PRISON ADMINISTRATORS.  THE DEFENDANTS HAVE FAILED TO

10   UNDERTAKE STANDARD AND CRITICAL STEPS TO EXAMINE AND APPROVE --

11   IMPROVE THE QUALITY OF CARE THEY PROVIDE EVEN WHEN PATIENT

12   AFTER PATIENT PASSES AWAY FROM CONDITIONS THAT ARE NORMALLY

13   TREATABLE.  MANY OF THE THINGS THEY COULD HAVE DONE WERE

14   STANDARD TO PRISONS ALL OVER THE COUNTRY, LIKE AN ADEQUATE

15   MORTALITY REVIEW OR A QUALITY ASSURANCE REVIEW.

16               AS THE SUPREME COURT TAUGHT US IN

17   *BROWN V. PLATA*, IF YOU CANNOT MANAGE TO DELIVER HEALTHCARE, THE

18   SOLUTION IS NOT TO NOT PROVIDE THE HEALTHCARE.  YOU MUST FIND A

19   WAY.

20               WE ARE ASKING THIS COURT TO ENJOIN THE

21   DEFENDANTS FROM CONTINUING TO DELIVER ABYSMAL CARE.  AND WE ARE

22   ALSO ASKING THIS COURT TO ENSURE THAT THE DEFENDANTS MEET THEIR

23   OBLIGATIONS UNDER THE AMERICANS WITH DISABILITIES ACT.

24               THE ADA, THE AMERICANS WITH DISABILITIES ACT,

25   PROVIDES THAT NO PATIENT WITH A DISABILITY CAN BE EXCLUDED FROM

1   PARTICIPATION IN SERVICES, PROGRAMS, OR ACTIVITIES BY A PUBLIC

2   ENTITY OR DISCRIMINATED AGAINST.

3                THE EVIDENCE WILL SHOW THAT THE DEFENDANTS HAVE

4   FAILED IN THE MOST BASIC WAYS.  THEIR TRACKING SYSTEM FOR

5   REQUESTS FOR ACCOMMODATION IS CHAOTIC.  THEIR FACILITY IS

6   INACCESSIBLE, AND THEIR COORDINATORS ARE NOT TRAINED.  THEY

7   DON'T FOLLOW THEIR OWN POLICIES, AND THEY FAILED TO PROTECT AND

8   EMPOWER PATIENTS WITH DISABILITIES BY FAILING TO EVEN BE ABLE

9   TO RECOGNIZE WHEN A REQUEST FOR ACCOMMODATION IS MADE.

10                THOSE WITH DISABILITIES ARE VIEWED SCEPTICALLY

11   BY THE MEDICAL PROFESSIONALS WHO ARE TASKED WITH THEIR CARE.

12   THE EVIDENCE WILL SHOW THAT THE DOCTORS BELIEVE THE PATIENTS

13   LIE, MANIPULATE, AND INTIMIDATE TO GET OUT OF WORKING IN THE

14   PLANTATION'S FIELDS, OFTEN THE SAME FIELDS THEY'RE INJURED.

15                AND THE EVIDENCE WILL SHOW THAT THE FACILITY HAS

16   UTTERLY FAILED TO PROVIDE PROGRAMMATIC ACCESS, MAKING IT NEARLY

17   IMPOSSIBLE FOR PATIENTS TO ACCESS TOILETS, SHOWERS, MEALS, AND

18   FACILITIES ON THE GROUND, MAKING IT IMPOSSIBLE FOR SOME

19   PATIENTS TO ACCESS SCHOOL, CHURCH, WORK, AND THE HOBBY/CRAFT

20   SHOP.

21                YOUR HONOR, THIS IS NOT THE FIRST STOP FOR THESE

22   PLAINTIFFS.  THEY ASKED FOR HELP.  THEY FILED ARPS.  THEY ASKED

23   FOR HELP AGAIN, AND THEN THEY CALLED THEIR FAMILIES AND THEY

24   CALLED THEIR LOVED ONES, AND THEY ASKED FOR HELP.  AND THEN

25   FINALLY, THEY FILED THIS LAWSUIT.  THEY HAVE COME HERE AS A

1    LAST RESORT.

2              WHEN YOU LOOK AT THE EVIDENCE TOGETHER, THE

3    DEATH RATES, THE EXPERT REPORTS, THE DOCUMENTS, THE TESTIMONY,

4    THERE CAN BE NO DOUBT THAT THE DEFENDANTS ARE VIOLATING THE

5    CONSTITUTION AND THE ADA.  THESE MEN ARE NOT HERE FOR MONEY.

6    THESE MEN ARE NOT HERE FOR GLORY.  THESE MEN HAVE RISKED

7    RETALIATION TO SPEAK OUT AND SEEK HELP FOR THEMSELVES AND THEIR

8    FELLOW PATIENTS.

9              AT THE END OF THIS TRIAL, ON BEHALF OF OUR CLASS

10   MEMBERS, ON BEHALF OF THE NAMED PLAINTIFFS WHO HAVE DIED IN THE

11   PENDENCY OF THIS ACTION, AND ON BEHALF OF THEIR FAMILIES, WE

12   ARE GOING TO ASK YOU TO UPHOLD THE CONSTITUTION AND THE

13   AMERICANS WITH DISABILITIES ACT AND FIND THE DEFENDANTS LIABLE

14   FOR THEIR FAILURE TO UPHOLD THEIR DUTY.  THANK YOU.

15             **THE COURT:**  THANK YOU, MS. MONTAGNES.

16             DEFENDANTS.

17             **MR. ROBERT:**  YOUR HONOR, WE'D LIKE TO RESERVE ANY

18   OPENING STATEMENT 'TIL OUR CASE IN CHIEF IF THAT'S OKAY WITH

19   YOU.

20             **THE COURT:**  ALL RIGHT, MR. ROBERT.

21             MS. MONTAGNES, CALL YOUR FIRST WITNESS.

22             **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME WE CALL

23   FARRELL SAMPIER.

24             **THE COURT:**  YOU CAN SIT RIGHT HERE IN FRONT OF THE

25   WITNESS STAND.

1    **FARRELL SAMPIER,**

2  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

3         **THE COURT:**  OFFICER, YOU MAY SIT DOWN OVER HERE.

4              GO AHEAD.

5         **MS. MONTAGNES:**  YOUR HONOR, GIVEN WHERE HE IS, IS IT

6  OKAY IF I DO THE EXAM FROM HERE?

7         **THE COURT:**  YES, ABSOLUTELY.

8         **MS. MONTAGNES:**  OKAY.  THANK YOU.

9         **THE COURT:**  AND IF YOU WANT -- YOU KNOW WHAT, WHY

10 DON'T WE ROTATE HIM SO THAT THE COURT CAN SEE HIM AS WELL,

11 PLEASE.  THANK YOU.  THAT'S GOOD.  PERFECT.

12             AND DO YOU NEED THE MICROPHONE ADJUSTED, SIR?

13        **THE WITNESS:**  YOU CAN PUT IT A LITTLE CLOSER.

14        **THE COURT:**  MS. MONTAGNES, YOU CAN ADJUST IT.  THERE

15 YOU GO.

16        **THE WITNESS:**  ALL RIGHT.

17        **THE COURT:**  GO AHEAD.

18                  **DIRECT EXAMINATION**

19 BY MS. MONTAGNES:

20 **Q.**  GOOD MORNING, MR. SAMPIER.

21 **A.**  GOOD MORNING.

22 **Q.**  CAN YOU STATE YOUR FULL NAME FOR THE RECORD?

23 **A.**  FARRELL SAMPIER.

24 **Q.**  WHERE DO YOU LIVE?

25 **A.**  I'M IN ANGOLA ON WARD 2, THE NURSING UNIT.

10:00  1  **Q.**   AND HOW LONG HAVE YOU LIVED AT ANGOLA?

2  **A.**   I'VE BEEN THERE SEVEN YEARS.

3  **Q.**   AND TELL ME ABOUT THE TIME BEFORE YOU LIVED AT ANGOLA.

4  HOW WERE YOU FEELING RIGHT BEFORE YOU GOT THERE?

5  **A.**   MY CONDITION STARTED OUT WITH SOME NUMBNESS OF THE FOOT,

6  TINGLING, BURNING SENSATION, FELT LIKE I WAS WALKING ON BROKEN

7  GLASS, AND IT STARTED MOVING ITS WAY UP, KIND OF LIKE GOT TO

8  THE THIGH AREA.  I WAS WALKING WHEN I GOT TO HUNTS.  MAYBE A

9  DAY OR TWO BEFORE I WAS TRANSPORTED TO ANGOLA, I LOST MY

10  ABILITY TO WALK.

11  **Q.**   OKAY.  AND TELL ME ABOUT ARRIVING AT ANGOLA.  WHAT WAS

12  THAT LIKE?

13  **A.**   IT WAS QUITE ROUGH.  I WAS TOLD, IF YOU NOT PARALYZED,

14  LOOK, I'M GONNA LOCK YOU UP, I'M GONNA TAKE YOUR WHEELCHAIR,

15  THIS, THAT, AND THE THIRD.

16          **MS. ROPER:**  OBJECTION.

17          **THE COURT:**  WHAT'S YOUR OBJECTION?

18          **MS. ROPER:**  HEARSAY.

19          **MS. MONTAGNES:**  YOUR HONOR, AS PRESENT SENSE

20  IMPRESSION, MR. SAMPIER WAS -- THAT WAS WHAT HE WAS

21  EXPERIENCING.  WE CAN REPHRASE.

22          **THE COURT:**  THE COURT WILL ALLOW IT.

23          **MS. MONTAGNES:**  THANK YOU.

24  BY MS. MONTAGNES:

25  **Q.**   KEEP GOING, MR. SAMPIER.

**A.**   AND AFTER I WAS CHECKED IN, I WAS MOVED TO WARD 1 AT THAT
TIME.

**Q.**   AND HOW WERE YOU FEELING AT THAT TIME?

**A.**   I WAS CONFUSED.  I DIDN'T KNOW WHAT WAS GOING ON.  DURING
THE COURSE FROM THE PARISH TO HUNTS, I FILLED IN NUMEROUS SICK
CALLS.  I WAS JUST GIVEN LIKE A PAIN -- SOMETHING FOR THE PAIN
AND SENT BACK TO THE CELL OR WHATEVER, DORM OR WHATEVER, AND IT
WAS KIND OF ROUGH MENTALLY, PHYSICALLY.  IT WAS ROUGH.

**Q.**   ALL RIGHT.  YOU MENTIONED THAT YOU WERE PLACED ON THE WARD
OR THE INFIRMARY.  CAN YOU DESCRIBE WHAT THAT WAS LIKE?  ONCE
YOU GOT TO ANGOLA -- SORRY, I'M GOING TO CONFUSE THE COURT --
YOU WERE PLACED ON THE WARD OR THE INFIRMARY.  CAN YOU DESCRIBE
WHAT THAT WAS LIKE?

**A.**   YES, MA'AM.  IT WAS -- IT WAS -- IT WAS DARK.  IT WAS --
IT WAS SAD.  IT WAS JUST A LOT OF DEATH.  YOU GOT A LOT OF GUYS
THAT'S HUNGRY, THAT, YOU KNOW, DON'T HAVE NO SUPPORT, NO FAMILY
OR WHATEVER, DON'T HAVE NO MONEY OR WHATEVER.  IT'S A REAL --
IT WAS A REAL SAD SITUATION.

**Q.**   AND WHAT DID IT SMELL LIKE?

**A.**   YOU CONSTANTLY SMELLING FECES, URINE.  IT'S PRETTY FOUL.

**Q.**   AND WHAT KIND OF SOUNDS DID YOU HEAR?

**A.**   YOU KNOW, THESE GUYS 20, 30 YEARS INTO THEIR SENTENCE,
THEY KNOW IT'S TO THE END, IT'S JUST SAD.  YOU HEAR MOANING,
YOU HEAR GUYS CRYING OUT TO THE LORD, LORD, HELP US.
EMOTIONALLY IT'S JUST -- IT'S JUST SAD.

10:04 1  **Q.**   AND WHAT DID YOU SEE THERE?  WHAT DID IT LOOK LIKE?

2  **A.**   LIKE I SAID, IT'S JUST A DARK SETTING.  YOU GOT GUYS --

3  YOU GOT GUYS GIVING YOU AN EFFORT.  THEY'RE OVERWHELMED.

4  **Q.**   WOULD YOU DESCRIBE IT AS CLEAN?

5          **MS. ROPER:**  OBJECTION, YOUR HONOR.  LEADING.

6          **THE COURT:**  I'LL ALLOW IT.

7  BY MS. MONTAGNES:

8  **Q.**   YOU CAN ANSWER.

9  **A.**   THE GUYS -- LIKE I SAID, THE GUYS ARE OVERWHELMED.  BUT

10  NORMALLY YOU GONNA SEE GUYS THAT'S BEEN IN FECES FOR SO MANY --

11  OR IN THEIR URINE FOR SO MANY -- UNTIL THE ORDERLIES CAN GET A

12  CHANCE TO GET TO THEM.  IF A PARTICULAR PATIENT IS GETTING

13  CLEANED, YOU KNOW, GUYS ARE GONNA THROW THEIR GLOVES, THEIR

14  DIRTY DIAPERS, PADS AND WHATNOT ON THE FLOOR.  THEY MIGHT GET

15  CALLED TO ANOTHER PATIENT EMERGENCY AND NOT HAVE A CHANCE TO

16  CLEAN THIS UP, AND THAT WAS PRETTY COMMON.

17          **MS. MONTAGNES:**  YOUR HONOR, I THINK HE'S HAVING A

18  LITTLE BIT OF TROUBLE.  MAY I APPROACH AND GIVE HIM SOME WATER?

19          **THE COURT:**  UH-HUH.

20          **THE WITNESS:**  THANK YOU.

21  BY MS. MONTAGNES:

22  **Q.**   SO YOU DESCRIBED GLOVES AND GARBAGE ON THE FLOOR.  WAS

23  THERE ANY OTHER -- ANYTHING MORE LIKE THAT ALONG THOSE LINES?

24  **A.**   YEAH.  LIKE I SAID, IT WAS -- THE ORDERLIES, THEY -- THE

25  ORDERLIES -- MOST OF THE ORDERLIES, THEY DO WHAT THEY CAN, YOU

10:06   1   KNOW WHAT I'M SAYING, WITH TWO ORDERLIES AT THAT TIME.  I WOULD

2   NOTICE THEY WOULD GO FROM PATIENT TO PATIENT, YOU KNOW, WITHOUT

3   CHANGING GLOVES, JUST BEING UNDER STRESS.

4   Q.   AND WHAT WERE YOUR INTERACTIONS WITH MEDICAL STAFF LIKE?

5   A.   IN THE BEGINNING IT'S REAL -- YOU GONNA GET TALKED TO LIKE

6   AN OFFENDER, BUT SEEM LIKE YOU CONSTANTLY, YOU KNOW, EXCHANGING

7   DIALOGUE WITH THEM ON A DAILY BASIS AND THEY SEE THE TYPE OF

8   CHARACTER YOU HAVE, YOU KNOW, THAT RELATIONSHIP GETS A LITTLE

9   BETTER.

10   Q.   HAVE YOU EVER BEEN TREATED IN AN OUTSIDE HOSPITAL?

11   A.   EXCUSE ME?

12   Q.   HAVE YOU EVER BEEN TREATED IN AN OUTSIDE HOSPITAL?

13   A.   YES, I HAVE.

14   Q.   HOW WOULD YOU SAY THE INFIRMARY IS DIFFERENT FROM AN

15   OUTSIDE HOSPITAL?

16   A.   WELL, THE OUTSIDE HOSPITAL WAS A LOT CLEANER.  YOU HAD

17   CONSTANT -- YOU HAD CONSTANT NURSES WATCHING OVER YOU.  YOU

18   HAVE A CALL BUTTON.  THE FOOD IS A LOT BETTER.  JUST THE

19   GENERAL ATMOSPHERE, THE ATTITUDE OF THE STAFF IS MORE

20   PROFESSIONAL THAN, YOU KNOW, BEING IN PRISON.

21   Q.   WHAT DOES AN AVERAGE DAY ON THE WARD LOOK LIKE?

22   A.   FOR ME IN GENERAL?

23   Q.   (NODDED HEAD.)

24   A.   GET UP IN THE MORNING.  YOU KNOW, YOUR FOOD IS ALWAYS

25   COLD, SO YOU GONNA HAVE AT LEAST -- AT LEAST SEVEN, EIGHT

10:07 1   RUSHING THE MICROWAVE AT THE SAME TIME.  SO AFTER I EAT, I MAKE
2   MY WAY TO THE YARD, GET MY WORKOUT ON, COME BACK IN, BATHE.  BY
3   THAT TIME THE SECOND CHOW IS USUALLY THERE.  I EAT, GET INTO MY
4   STUDIES AND WATCH TV.
5   **Q.**   AND WHERE DO YOU SLEEP?
6   **A.**   WE HAVE BEDS.
7   **Q.**   AND DO YOU HAVE ANY PRIVACY?
8   **A.**   NO, IT'S NO PRIVACY.
9   **Q.**   HOW MANY BEDS?
10  **A.**   IT'S JUST AN OPEN -- IT'S AN OPEN DORM TYPE SETTING.
11  **Q.**   AND HOW MANY BEDS ARE THERE?
12  **A.**   MAYBE 28, SOMEWHERE BETWEEN 28.  SOMETHING LIKE THAT.
13  **Q.**   AND WHAT ACTIVITIES ARE AVAILABLE TO YOU AT THE INFIRMARY
14  OR THE WARD?
15  **A.**   NONE, NO -- THERE WAS NO MEANS FOR ME TO ATTEND ANY
16  CLASSES, TRY TO GET IN ANY SCHOOLS OR NOTHING LIKE THAT.
17  **Q.**   OKAY.  AND AT SOME POINT DID ATTORNEYS COME AND START TO
18  VISIT THE WARD?
19  **A.**   YES, MA'AM.
20  **Q.**   AND WHAT CHANGED WHEN THEY WOULD COME?
21  **A.**   EXCUSE ME?
22  **Q.**   AND WHAT CHANGED WHEN THEY WOULD COME?
23  **A.**   OH, THAT WAS A KNOWN THING.  THE ORDERLIES WOULD BE GIVEN
24  AIR FRESHENER, THEY WOULD MOP.  THE ATTORNEY VISITS IN THERE
25  AND THEY WOULD HAVE TOURS HERE AND THERE.  THEY'D HURRY UP AND

1   SPRUCE UP THE PLACE.

2   **Q.**   ALL RIGHT.  SO YOU SAID THAT WHEN YOU FIRST GOT TO ANGOLA,

3   YOU WERE MOVED TO THE WARD OR THE INFIRMARY, AND THEN WHERE DID

4   YOU GO AFTER THAT?

5   **A.**   AFTER I LEFT WARD 2, I WAS ABLE TO -- IT WAS A LONG HARD

6   STRUGGLE.  IT WAS A LONG HARD FIGHT.  I HAD TO -- I HAD TO

7   REALLY PUT IT ON MY MIND THAT YOU -- LIKE YOU GOT TO -- YOU GOT

8   TO DO WHAT YOU GOT TO DO TO GET YOURSELF TOGETHER.  'CAUSE I

9   JUST -- AT THAT POINT, I DIDN'T WANT TO DIE IN THAT -- IN THAT

10  SITUATION.

11          SO A FRIEND OF MINE, HE WOULD COME STRETCH MY LEGS OR

12  WHATEVER AND THIS WAS -- COULD HAVE BEEN A MONTH AFTER THAT

13  STARTED, I HAD STARTED GETTING THE PHYSICAL THERAPY THEN.  SO

14  WITH THE HELP OF MY FRIEND AND SOME PHYSICAL THERAPY, I JUST

15  HAD TO -- LIKE I SAID, I WOULD GET UP, DO LAPS AROUND THE YARD

16  IN MY WHEELCHAIR, WORK ON MY UPPER BODY.

17          ONCE THEY NOTICED I WAS ABLE TO TRANSFER, I WAS TAKEN

18  OFF PHYSICAL THERAPY.  SO I JUST HAD TO -- I HAD TO JUST KEEP

19  THAT GOING.  I HAD TO CHANGE MY DIET.  WE GET A LOT OF RICE ON

20  THE WARD, SO I HAD TO CHANGE MY DIET TO MORE PROTEIN AND JUST

21  GET MYSELF TOGETHER, YOU KNOW, SO I CAN GET IN GENERAL

22  POPULATION.  LIKE I SAY, I DIDN'T WANT TO DIE IN THAT

23  SITUATION.

24  **Q.**   AND SO I'M GOING TO BACK YOU UP JUST A LITTLE BIT.  BEFORE

25  YOU GOT OFF THE WARD -- I THINK YOU WERE TALKING ABOUT HOW YOU

1  GOT OFF THE WARD.

2  **A.**   UH-HUH.

3  **Q.**   IN THE EARLY DAYS YOU WERE PLACED ON THE WARD, DID YOUR

4  STATUS CHANGE BETWEEN THOSE TWO TIME PERIODS?

5  **A.**   YEAH.  LIKE I SAID, JUST TAKING IT UPON MYSELF TO, YOU

6  KNOW, DO WHATEVER I NEED TO DO TO GET OFF THE WARD.

7  **Q.**   AND BEFORE THEN, WERE YOU PLACED ON HOSPICE?

8  **A.**   YES, I WAS.

9  **Q.**   OKAY.  AND CAN YOU TALK ABOUT WHY YOU WENT ON HOSPICE?

10  **A.**   WHEN I -- WHEN I RETURNED FROM THE STREET I STILL DIDN'T

11  KNOW WHAT WAS GOING ON.  I HAD A LOT OF DOCTORS WORKING ON ME

12  ON THE STREETS, A TEAM OF NEUROLOGISTS.  AND THEY -- IT WAS

13  RARE -- IT WAS A LOT OF CONFUSION WITH THEM, THE MRI'S, THE CAT

14  SCANS.  AND WHEN I MADE IT BACK TO THE WARD -- WHEN I MADE IT

15  BACK TO ANGOLA, I WAS TOLD BY TONIA, MS. TONIA FAUST, THAT --

16        **MS. ROPER:**  OBJECTION, YOUR HONOR.  HEARSAY.

17        **MS. MONTAGNES:**  YOUR HONOR, THIS IS AN EXCEPTION AS

18  TO HIS MEDICAL DIAGNOSIS.  ANY STATEMENTS MADE AS PART OF HIS

19  MEDICAL DIAGNOSIS ARE AN EXCEPTION TO HEARSAY.

20        **THE COURT:**  SO THE STATEMENT BY SOMEBODY AT ANGOLA?

21        **MS. MONTAGNES:**  YES, MA'AM.  AND A PARTY OPPONENT.

22        **THE COURT:**  SO IT'S A PARTY ADMISSION?

23        **MS. MONTAGNES:**  YES.  YES, YOUR HONOR.

24        **THE COURT:**  OVERRULED.

25        **THE WITNESS:**  I WAS TOLD THAT HOSPICE WOULD BE THE

1   BEST THING FOR ME AT THAT TIME.

2   **BY MS. MONTAGNES:**

3   **Q.**   AND DID YOU HAVE ANY MORE CONVERSATIONS WITH MEDICAL STAFF

4   ABOUT WHY HOSPICE WOULD BE IMPORTANT?

5   **A.**   AT THIS PARTICULAR POINT I WAS FEELING A LOT OF CONFUSION.

6   I WASN'T EXACTLY SURE WHAT I HAD.  I DIDN'T KNOW WHY I COULDN'T

7   WALK OR I COULDN'T URINE OR HAD PROBLEMS HOLDING MY BOWELS.

8   AND JUST THE WAY -- JUST THE WAY SHE WAS SAYING IT LIKE, YOU

9   KNOW, HOSPICE WOULD BE BEST FOR YOU, I JUST WENT ON AND, YOU

10  KNOW, GOT IN THE HOSPICE PROGRAM.

11  **Q.**   AND DID YOU BELIEVE YOU WERE DYING?

12  **A.**   NO.  I KNEW I WAS PRETTY BANGED UP, BUT I DIDN'T HAVE NO

13  FEAR OF DYING -- YOU KNOW, DYING.

14  **Q.**   AND DID ANYONE EXPLAIN WHAT YOUR UNDERLYING CONDITION WAS

15  TO YOU?

16  **A.**   I WAS TOLD THAT I HAD TRANSVERSE MYELITIS.

17  **Q.**   DID THEY TELL YOU WHAT THAT WAS?

18  **A.**   THEY JUST TOLD ME IT WAS PRETTY MUCH A AUTOIMMUNE

19  DEFICIENCY.

20          **MS. MONTAGNES:**  ALL RIGHT.  AT THIS TIME I'M GOING TO

21  PULL UP THE JOINT EXHIBIT 10-WW4 AT PAGE 293.

22          **MR. ARCHEY:**  YOUR HONOR, IF I MAY, LET'S JUST MAKE

23  SURE, IS THIS ONE OF THE SEALED DOCUMENTS?  BECAUSE I'M GOING

24  TO BE USING THESE A LOT, AND I'M GOING TO NEED TO KNOW HOW

25  WE'RE GOING TO OPERATE WITH THESE.  THAT'S THE REASON WHY I

10:14   1   RISE.

2              **THE DEPUTY CLERK:**  YOU HAVE TO TELL ME.

3              **MS. MONTAGNES:**  SORRY.  IT'S A MEDICAL RECORD.

4              **MR. ARCHEY:**  SO HOW ARE WE GOING TO DO THIS?  IS WHAT

5   I'M ASKING THE COURT.

6              **THE COURT:**  ALL RIGHT.  SO IT WILL BE PUBLISHED TO

7   COUNSEL, AND TO THE COURT.  IT WILL NOT BE PUBLISHED ON THE

8   GALLERY SCREEN.  SO YOU'LL JUST NEED TO TELL US IF IT'S A

9   SEALED DOCUMENT SO THAT WE CAN MAKE SURE IT'S NOT PUBLISHED TO

10   THE GALLERY.

11              **MR. ARCHEY:**  IF THEY WANT TO WAIVE IT, I DON'T CARE,

12   BUT I NEED TO OPERATE WITH THESE SAME DOCUMENTS.  I JUST WANTED

13   TO KNOW WHAT THE RULES WERE.  THANK YOU, JUDGE.

14              **MS. MONTAGNES:**  YOUR HONOR, WE'RE GOING TO HAVE A

15   LITTLE BIT OF DIFFICULTY BECAUSE I'D LIKE TO SHOW IT TO MR.

16   SAMPIER.  WE HAVE AN IPAD THAT, I BELIEVE, WE COULD MOVE OVER

17   HERE AND MR. SAMPIER COULD LOOK AT THAT.  I BELIEVE THAT WOULD

18   WORK.

19              **THE COURT:**  ANY OBJECTION, COUNSEL?

20              **MS. ROPER:**  NO OBJECTION, YOUR HONOR.

21              **THE COURT:**  YOU ARE JUST GOING TO -- I MEAN, YOU ARE

22   GOING TO HAVE TO HAVE SOME DEGREE OF TRUST THAT WHAT THEY'RE

23   SHOWING HIM ON THE IPAD IS WHAT THEY ARE SAYING THAT THEY ARE

24   SHOWING HIM.  WE ARE COMFORTABLE WITH THAT?

25              **MS. ROPER:**  YES, YOUR HONOR.

10:15  1  BY MS. MONTAGNES:

2  Q.    MR. SAMPIER, DO YOU RECOGNIZE THAT DOCUMENT I SHOWED YOU?

3  A.    YES, MA'AM.

4  Q.    CAN YOU TELL ME WHAT IT IS?

5            MS. ROPER:  IS THERE A WAY TO HAVE IT ON THE SCREEN?

6            THE COURT:  LET'S GO OFF THE RECORD FOR A SECOND.

7                    (OFF-RECORD DISCUSSION.)

8            THE COURT:  YOU KNOW WHAT WE'RE GOING TO DO, WE ARE

9  GOING TO TAKE A 5-MINUTE RECESS SO THAT I CAN SEE IF WE CAN

10  MAKE SOME ACCOMMODATIONS HERE.  I THINK WE CAN USE THE BACK

11  LECTERN.

12            BARB, LET'S GET I.T. UP HERE.

13            WE'RE GOING TO TAKE A 15-MINUTE RECESS.

14            MS. MONTAGNES:  THANK YOU, YOUR HONOR.

15                        (RECESS.)

16            THE COURT:  BE SEATED.

17            THE COURT IS GIVEN TO UNDERSTAND THAT THE

18  PARTIES HAVE COME UP WITH A WORKAROUND?

19            MS. MONTAGNES:  WE HAVE, YOUR HONOR.  WE ARE GOING TO

20  HAVE PAPER COPIES OF ANY EXHIBITS THAT WILL BE GIVEN FOR ANY

21  WITNESS WHO WILL BE IN A WHEELCHAIR.

22            THE COURT:  MR. CONINE, WHY ARE YOU STANDING UP?  OH,

23  BECAUSE MR. DAVENPORT IS WORKING ON YOUR COMPUTER.

24            FOR THE RECORD, THE COURT WANTS TO NOTE FOR THE

25  PARTIES THERE IS A HANDICAP-ACCESSIBLE COURTROOM THAT WE COULD

10:29 1   HAVE USED HAD THE COURT BEEN APPRISED THAT THERE WERE GOING TO

2   BE A NUMBER OF WITNESSES THAT WERE GOING TO NEED

3   ACCOMMODATIONS.  COURTROOM 2 IS A FULLY ACCESSIBLE COURTROOM.

4   WE COULD HAVE USED IT.  SO IF WE NEED IT FOR TOMORROW OR THE

5   NEXT DAY, YOU NEED TO LET ME KNOW SO THAT I CAN MAKE SOME

6   ARRANGEMENTS.  IT'S NOT HARD TO DO.

7        **MS. MONTAGNES:**  IF THE PARTIES COULD CONFER AND GET

8   BACK TO YOU AFTER LUNCH, YOUR HONOR, WOULD THAT BE OKAY?

9        **THE COURT:**  YES.

10        **MS. MONTAGNES:**  AND I APOLOGIZE FOR NOT NOTIFYING THE

11   COURT IN ADVANCE.

12        **THE COURT:**  WELL, I MEAN, I SHOULD HAVE ANTICIPATED

13   IT, BUT YOU KNOW, QUITE FRANKLY, WE ARE DRINKING FROM A

14   FIREHOSE AROUND HERE, SO MY ABILITY TO ANTICIPATE HAS BEEN

15   GRAVELY IMPACTED.

16        **MS. MONTAGNES:**  I KNOW THE FEELING, YOUR HONOR.

17        **THE COURT:**  OKAY.  PLEASE CONTINUE.

18   BY MS. MONTAGNES:

19   **Q.**  ALL RIGHT.  MR. SAMPIER, DO YOU RECOGNIZE --

20        **THE COURT:**  MS. MONTAGNES, I'M SORRY.

21        TRANDON, BEFORE YOU LEAVE, WOULD YOU COME SEE

22   ABOUT MINE WHEN YOU'RE FINISHED?  THANKS.

23        GO AHEAD, MS. MONTAGNES.

24   BY MS. MONTAGNES:

25   **Q.**  MR. SAMPIER, DO YOU RECOGNIZE THAT DOCUMENT IN FRONT OF

1    YOU?

2    **A.**   YES, MA'AM.

3    **Q.**   AND ARE THOSE YOUR INITIALS ON THAT DOCUMENT?

4    **A.**   YES, IT IS.

5    **Q.**   AND WHAT ARE YOU INITIALING?  WHAT ARE YOU SAYING?  I

6    DON'T HAVE IT IN FRONT OF ME.  DID YOU INITIAL BESIDE A REQUEST

7    NOT TO BE RESUSCITATED?

8    **A.**   RIGHT.

9    **Q.**   YES OR NO?

10   **A.**   YES, I DID INITIAL THAT.

11   **Q.**   AND WHY DIDN'T YOU WANT TO BE RESUSCITATED?

12   **A.**   AT THAT TIME DR. TOCE EXPLAINED TO ME IN PRETTY MUCH

13   GRAPHIC DETAIL HOW I WOULD HAVE TO HAVE SOME RIBS CRACKED AND A

14   LUNG PUNCTURED, AND HE WAS LIKE, ARE YOU SURE THAT'S WHAT YOU

15   WANT TO DO?  AND I AGREED TO -- I AGREED AND I INITIALED IT.

16   **Q.**   AND WERE YOU PREPARED AT THAT TIME TO DIE IF YOUR HEART

17   STOPPED?

18   **A.**   NO.  IT WAS -- LIKE I SAID, IT WAS JUST A LOT OF CONFUSION

19   WHEN HE MENTIONED THAT AT THAT TIME.  BUT AFTER HE EXPLAINED IT

20   TO ME, I WAS LIKE, WELL I'M NOT GOING TO HAVE THEM RESUSCITATE

21   ME.

22   **Q.**   AND THEN WHAT CHANGED, MR. SAMPIER?

23   **A.**   AS FAR AS?

24   **Q.**   BEING ON HOSPICE.  WHY DID YOU LEAVE HOSPICE?

25   **A.**   AS I START EDUCATING MYSELF ON MY SITUATION, I -- IT'S A

1  TRANSVERSE MYELITIS FOUNDATION, CHRISTOPHER REED'S FOUNDATION,
2  THE PARALYSIS FOUNDATION AND CHRONIC PAIN.  I WROTE ALL THESE
3  PEOPLE, AND EVERYBODY -- ALL THE INFORMATION I GOT WAS PRETTY
4  MUCH THE SAME ABOUT THE PARALYSIS AND PHYSICAL THERAPY,
5  OCCUPATIONAL THERAPY, AND THAT THE MAIN MEDICATION WOULD BE
6  BACLOFEN AND NEURONTIN.  SO I'M LIKE I'M NOT ABOUT TO DIE.  YOU
7  KNOW, THIS HOSPICE THING, I JUST DIDN'T KNOW WHAT WAS GOING ON
8  AT THE TIME I AGREED TO GET IN HOSPICE.
9  Q.    AND, MR. SAMPIER, I SHOWED YOU THREE PAGES FROM YOUR
10 MEDICAL RECORD.
11 A.    YES, MA'AM.
12 Q.    BUT, IN GENERAL, ARE YOU ABLE TO VIEW YOUR MEDICAL
13 RECORDS?
14 A.    NO, MA'AM.
15 Q.    SO ONCE YOU WROTE TO ALL THESE FOUNDATIONS AND YOU LEARNED
16 THAT IT WAS NOT A FATAL DISEASE, WHAT SORT OF THINGS DID YOU
17 DO?
18 A.    LIKE I SAID, I CHANGED MY DIET.  IT WAS A LONG HARD FIGHT
19 WITH THE CONDITIONING AND JUST STAY FOCUSED, JUST STAY FOCUSED
20 ON TRYING TO GET IN GENERAL POPULATION.
21 Q.    AND WHAT KINDS OF SYMPTOMS DO YOU CONTINUE TO EXPERIENCE
22 TODAY FROM THE TRANSVERSE MYELITIS?
23 A.    JUST THE PARALYSIS AND MY URINE AND, YOU KNOW, MY BOWEL
24 MOVEMENTS I CAN'T CONTROL IT.
25 Q.    IS IT --

**A.**   THERE'S STILL SOME PAIN.

**Q.**   AND HOW DO YOU TREAT THAT PAIN?

**A.**   IF IT GETS OVERWHELMING, I JUST REQUEST FOR A TYLENOL OR IBUPROFEN.

**Q.**   AND YOU MENTIONED THAT YOU CAN'T CONTROL YOUR BOWEL MOVEMENTS OR YOUR URINATION, HOW DO YOU URINATE?

**A.**   THROUGH A CATHETER.

**Q.**   ALL RIGHT.  AND WHAT KIND OF CATHETER DID YOU HAVE INITIALLY?

**A.**   IN THE BEGINNING IT WAS CALLED A FOLEY CATHETER, WHICH IS INSERTED STRAIGHT INTO THE PENIS.

**Q.**   AND HOW DID YOU CARE FOR THAT CATHETER?

**A.**   IT WAS CHANGED EVERY MONTH.  THE DRESSING WOULD BE CHANGED EVERY DAY.

**Q.**   AND DID YOU HAVE ANY PROBLEMS WITH THAT CATHETER?

**A.**   YEAH.  MAYBE A WEEK AFTER IT WAS INSERTED, I STARTED HAVING A REAL FOUL SMELLING BROWNISH MUCUS TYPE PUS COMING FROM THE TIP OF THE PENIS.

**Q.**   AND DID YOU HAVE ANY OTHER ISSUES WITH THE CATHETER?

**A.**   NO.  IT'S BY BEING INSERTED IN AND OUT OF THE PENIS, I DEVELOPED A TEAR, MAYBE A QUARTER INCH TEAR AT THE TIP OF THE PENIS.

**Q.**   AND HAVE YOU EVER HAD ANY OTHER PROBLEMS AS A RESULT OF YOUR PARALYSIS?

**A.**   YEAH.  THAT WOULD BE A BEDSORE.

1    **Q.**   AND FOCUSING JUST ON THE BEDSORES THAT YOU HAD WHILE YOU

2    WERE LIVING IN THE INFIRMARY, CAN YOU DESCRIBE WHAT HAPPENED?

3    **A.**   YEAH.  THE FIRST BEDSORE WE NOTICED AS SOON AS I ARRIVED

4    BACK FROM THE STREET.  THEY USED WHAT THEY CALL A DUODERM PATCH

5    OVER IT.  THEY CLEAN IT, PUT THE DUODERM PATCH ON IT FOR LIKE

6    TWO OR THREE DAYS AT A TIME.  THAT ONE HEALED PRETTY QUICKLY.

7    **Q.**   AND, MR. SAMPIER, ARE YOU ABLE TO WALK?

8    **A.**   NO, MA'AM.

9    **Q.**   AND WHAT SORT OF SERVICES HAVE YOU RECEIVED AT ANGOLA

10   BECAUSE YOU CAN'T WALK?

11   **A.**   SERVICES, NONE.

12   **Q.**   WHAT SORT OF TRAINING HAVE YOU RECEIVED IN THE USE OF YOUR

13   WHEELCHAIR?

14   **A.**   NONE.

15   **Q.**   IF YOUR WHEELCHAIR BREAKS, WHAT HAPPENS?

16   **A.**   I WOULD HAVE TO GET ONE OF THE GUYS THAT'S IN THE HOBBY

17   SHOP THAT HAS ACCESS TO SOME TOOLS AND SEE IF THEY CAN FIX IT.

18   **Q.**   HOW DO YOU MOVE AROUND IN THE BED AND GET FROM YOUR

19   WHEELCHAIR TO THE BED?

20   **A.**   I HAVE TO TIE A SHEET COMING FROM THE TOP BUNK.  IT'S A

21   MAKESHIFT TRAPEZE BAR.  YOU KNOW, IT GETS DIFFICULT 'CAUSE THEY

22   HAVE NO SIDE RAILS.  BUT PRETTY MUCH BY THAT SHEET I CAN

23   CONTROL MY MOVEMENT.

24   **Q.**   AND IN THIS PERIOD WHEN YOU WERE LIVING IN THE INFIRMARY

25   AFTER HOSPICE OR DURING HOSPICE, DID YOU MAKE ANY KIND OF

10:16

1   REQUEST FOR ACCOMMODATIONS?

2   **A.**   YEAH.  IT WAS SOME NECESSITIES.  I REQUESTED SOME WIPES.

3   THE GUY --

4   **Q.**   WHY DID YOU REQUEST WIPES?

5   **A.**   'CAUSE THE GUYS WAS CLEANING US WITH GAUZES, 4X4 GAUZE

6   PADS, AND THAT'S KIND OF ROUGH.  IT'S KIND OF ROUGH BACK THERE.

7   **Q.**   AND WHY WAS IT IMPORTANT THAT YOU COULD WIPE YOURSELF?

8   **A.**   JUST, YOU KNOW, TO GAIN SOME INDEPENDENCE.  I MEAN, THAT'S

9   NOT A POSITION -- THAT'S NOT A POSITION YOU WANT TO BE IN IN

10  PRISON, TO HAVE INMATES HAVE TO CLEAN YOU UP.

11  **Q.**   OKAY.  AND DID YOU REQUEST ANYTHING ELSE?

12  **A.**   THERE WAS SOME NECESSITIES.  LIKE I WANTED SOME GLOVES

13  'CAUSE I STARTED GETTING SOME CALLOUSES ON MY HANDS.  I HAD MY

14  MOM -- WELL, AFTER SHE WENT THROUGH THE RED TAPE WITH THE

15  WIPES, YOU KNOW, I THOUGHT THEY WOULD ALLOW ME TO HAVE SOME

16  GLOVES.  BUT SHE CALLED AND TRIED TO HAVE SOME GLOVES SENT,

17  SOME WHEELCHAIR TYPE GLOVES, AND SHE WAS DENIED.

18  **Q.**   AND THEN DID YOU LOOK -- WERE YOU EVER ABLE TO GET ANY

19  GLOVES?

20  **A.**   OUT OF DESPERATION, I ORDERED SOME OFF OF OUR COMMISSARY,

21  BUT THEY WERE LIKE COTTON TYPE MITTENS AND I COULDN'T GET NO

22  GRIP WITH THOSE, SO THAT WAS A WASTE.

23  **Q.**   AND THEN DO YOU FIND ANY OTHER GLOVES?

24  **A.**   YEAH.  EVENTUALLY ONE OF THE GUYS THAT WORK IN THE FIELD

25  OFFERED ME SOME OF THE FIELD -- THE GLOVES THEY USE IN THE

10:17   1   FIELD, AND THEY HAD A SUEDE TYPE.  I WAS ABLE TO GRIP, I WAS

2   ABLE TO USE THOSE AND GET AROUND A LOT BETTER.

3   **Q.**   DID YOU REQUEST ANYTHING ELSE AT THIS TIME?

4   **A.**   YEAH.  I REQUESTED A TRAPEZE BAR TO HELP ME WITH THE --

5   YOU KNOW, WITH THE MOVING TO PREVENT THE BEDSORE, GET MORE

6   INDEPENDENT WITH TURNING ON MY OWN TO PREVENT THE BED SORE FROM

7   REOCCURRING.

8   **Q.**   AND WHAT WERE YOU -- WHAT HAPPENED?

9   **A.**   INITIALLY I WAS REFUSED, BUT I THINK LIKE TWO WEEKS, DR.

10   TOCE PUT IN AN ORDER FOR ME TO GET THE TRAPEZE BAR.

11   **Q.**   AND WAS THERE ANYTHING ELSE YOU REQUESTED TO HELP YOU WITH

12   YOUR PARALYSIS?

13   **A.**   A SQUEEZE BALL, IT'S THIS LITTLE MECHANISM THAT DETECTS

14   YOUR LUNG CAPACITY, AND THE PHYSICAL THERAPY.

15   **Q.**   SO LET'S TALK ABOUT PHYSICAL THERAPY.  HOW DID YOU REQUEST

16   PHYSICAL THERAPY?

17   **A.**   JUST -- BY THIS TIME I HAD MET ANOTHER INMATE THAT WAS IN

18   A WHEELCHAIR AND HE WOULD JUST INFORM ME ON A FEW THINGS.

19   BY ME READING THE PAMPHLETS AND GATHERING ALL THE INFORMATION I

20   COULD, I JUST NOTED I HAD TO REALLY, YOU KNOW, GET ON THE BALL

21   WITH SOME TYPE OF PHYSICAL THERAPY.

22   **Q.**   AND WAS THAT PROVIDED TO YOU?

23   **A.**   IT TOOK A WHILE, MAYBE SOME MONTHS.  AND SOMEBODY FROM LSU

24   OR -- IT WAS OUTSIDE OF ANGOLA WOULD COME LIKE TWICE A MONTH.

25   BUT WE ONLY INTERACTED MAYBE LIKE THREE TIMES.  I WAS TOLD HE

10:19  1  CAME A COUPLE TIMES WHILE I WAS SLEEPING AND JUST CHECKED OFF

2  HIS LITTLE CLIPBOARD AND LEFT.

3  **Q.**   AND DID YOU BELIEVE YOU WERE GETTING ENOUGH PHYSICAL

4  THERAPY?

5  **A.**   NO.   THAT'S WHY I HAD TO, YOU KNOW, TAKE IT UPON MYSELF

6  AND JUST WORK OUT EVERY DAY INSTEAD OF THE ONCE A WEEK.

7  **Q.**   AND WHEN YOU SAY "TAKE IT UPON YOURSELF," WHAT DO YOU MEAN

8  BY THAT?

9  **A.**   I MEAN, I JUST HAD TO SHOW SOME INITIATIVE.   LIKE I SAID,

10  I JUST HAD TO GET OUT.   I HAD TO GOT OFF THE WARD.   I HAD TO

11  GET IN GENERAL POPULATION.

12  **Q.**   CAN YOU DEMONSTRATE SOME OF THE THINGS YOU WOULD DO?

13  **A.**   YEAH.   I HAVE A STRETCH BAND, YOU KNOW, WE CALLED THEM A

14  RESISTANCE BAND.   I WOULD RUN ONE END AROUND THE FOOT OF MY

15  WHEELCHAIR.   THAT WAY I CAN BICEP AND DO SHOULDERS CROSSWAYS

16  AND UP AND DOWN.   THEN I COULD TAKE THE SAME RESISTANCE BAND

17  AND GO AROUND THE BACK OF THE WHEELCHAIR AND WORK MY CHEST, MY

18  TRICEPS, AND LIKE MY WRIST MUSCLES.   AND I WOULD TURN AND WORK

19  THE TORSO AREA.

20  **Q.**   AND WHO TAUGHT YOU HOW TO DO THAT?

21  **A.**   I JUST -- THAT WAS JUST SOMETHING THAT JUST CAME TO ME.

22  THE PHYSICAL THERAPIST HAD SIMILAR, YOU KNOW, LITTLE BASIC

23  CURLS OR WHATEVER, BUT I WAS DOING THAT BEFORE.   I JUST, YOU

24  KNOW, ADDED WHAT SHE TOLD ME TO MY REGIMEN, TOO.

25  **Q.**   AND WHAT SORT OF -- YOU MENTIONED THAT YOU WANTED TO BE

10:41

1  INDEPENDENT.  WHAT SORT OF THINGS DID YOU WANT TO LEARN HOW TO

2  DO TO BE MORE INDEPENDENT?

3  **A.**   DEFINITELY BATHE MYSELF, DEFINITELY FIGURE OUT SOME KIND

4  OF WAY WHEN I DO HAVE A BOWEL MOVEMENT, IF I FEEL ANY TYPE OF

5  SENSATION TO LET ME KNOW I WAS ABOUT TO HAVE A BOWEL MOVEMENT,

6  DEFINITELY FIGURE OUT SOME KIND OF WAY TO NOT TO DO IT IN THE

7  PAMPER LAYING IN THE BED, YOU KNOW, DEFINITELY TRY TO GET

8  MYSELF ON THE TOILET, YOU KNOW, DO MY BUSINESS AND CLEAN MYSELF

9  UP.

10  **Q.**   AND WHY IS THAT IMPORTANT?

11  **A.**   LIKE I SAID, THAT'S NOT THE PLACE, YOU KNOW, YOU WANT TO

12  HAVE INMATES DOING THAT PARTICULAR THING.

13  **Q.**   AND WHAT KIND OF EDUCATIONAL OPPORTUNITIES WERE THERE FOR

14  YOU ON THE INFIRMARY?

15  **A.**   NONE.  I MEAN, THEY GOT, YOU KNOW, BOOKS OR WHATEVER,

16  MAGAZINES, LITTLE DAILY PAPERS COME IN.  BUT AS FAR AS A CLASS,

17  NONE.

18  **Q.**   AND DO YOU TRY TO GET INTO CLASSES?

19  **A.**   YES, MA'AM.

20  **Q.**   CAN YOU TELL ME HOW?

21  **A.**   YEAH.  IT'S AN EDUCATION BUILDING.  IT'S A SLOT RIGHT BY

22  THE ELEVATOR FOR CLASSES.  YOU GOT ANGER MANAGEMENT, VICTIM

23  AWARENESS, SUBSTANCE ABUSE, CLASSES LIKE THAT, AND YOU FILL OUT

24  YOUR FORM AND SLIP IT IN THE BOX.

25  **Q.**   AND WHAT KIND OF WORK DO YOU DO?

10:42  1    **A.**    I'M A PROFESSIONAL CHEF BEFORE I --

2    **Q.**    AND WHAT KIND OF WORK DO YOU DO AT ANGOLA?

3    **A.**    NONE.

4    **Q.**    AND DO YOU WANT A JOB?

5    **A.**    YEAH.  I WOULD LOVE -- MAN, I WOULD LOVE TO GET BACK IN

6    THE KITCHEN.

7    **Q.**    AND WHY CAN'T YOU HAVE A JOB?

8    **A.**    'CAUSE I'M PARALYZED.

9    **Q.**    AND HOW DO YOU KNOW THAT?

10    **A.**    ASKING AROUND.

11    **Q.**    AND DO YOU EVER HAVE TROUBLE GETTING AROUND THE PRISON?

12    **A.**    WELL, COMING FROM THE MEDICAL UNIT TO MY CHURCH OR

13    WHATEVER, OR GO TO THE EDUCATION BUILDING, YOU GOT SOME

14    SEGMENTS WHERE THE CONCRETE COMES TOGETHER AND A BIG PIECE OF

15    SLAB OF STEEL MIGHT COVER THAT.  YOU GOT A COUPLE OF BAD SPOTS

16    IN FRONT OF THE BLOCKS.  YOU JUST GOT TO LEARN HOW TO NAVIGATE

17    YOUR WAY AROUND THOSE SPOTS.  THAT'S IF I DIDN'T HAVE NOBODY

18    PUSHING ME.  BUT NORMALLY I WOULD TRY TO MAKE A WAY FOR

19    SOMEBODY TO PUSH ME.

20    **Q.**    AND YOU MENTIONED THE EDUCATION BUILDING.  DO YOU EVER

21    HAVE ANY TROUBLE ACCESSING THE EDUCATION BUILDING?

22    **A.**    YEAH.  I'M GLAD -- DURING THE TIME I WAS -- HAD -- I WAS

23    ABLE TO TAKE THOSE CLASSES AND COMPLETE THOSE CLASSES, THE

24    ELEVATOR WAS WORKING.  BUT RECENTLY, MAN, THE ELEVATOR HAS BEEN

25    BROKE A LONG TIME.  AND SOME CATS TOOK IT UPON THEMSELVES TO

10:43

1    TOTE ME UP THE STAIRS, BUT I -- THAT WASN'T SUCH A GOOD IDEA.

2    I GOT NAUSEATED AND I KNEW THAT WAS AN ACCIDENT WAITING TO

3    HAPPEN.

4    **Q.**   AND YOU MENTIONED BEING ABLE TO TAKE CLASSES.  WAS THAT

5    AFTER YOU LEFT THE INFIRMARY?

6    **A.**   YES, MA'AM, IT WAS.

7    **Q.**   OKAY.  I WANT TO TALK A BIT ABOUT THE MEDICAL STAFF ON THE

8    WARD, ON THE INFIRMARY.  WHAT ROLE DO NURSES PLAY ON THE

9    INFIRMARY?

10   **A.**   THE NURSES, THEY PASS OUT PILLS AND DO ANY TYPE OF

11   DRESSING CHANGES, VITALS.

12   **Q.**   AND HOW OFTEN DO THEY DO THE VITALS?

13   **A.**   DO VITALS MAYBE ONCE A WEEK.

14   **Q.**   AND HOW OFTEN ARE YOU EXAMINED BY A DOCTOR?

15   **A.**   MY NEUROLOGIST, I SEE MY NEUROLOGIST ABOUT EVERY 90 DAYS,

16   AND IF A SITUATION COMES UP, I WILL LET THE NURSE KNOW AND THEY

17   WOULD INFORM THE DOCTOR FROM THERE.

18   **Q.**   AND WHAT ROLE DO ORDERLIES PLAY ON THE WARD?

19   **A.**   THEY CARRY A HEAVY LOAD.  THEY PRETTY MUCH -- BESIDES

20   ISSUING OUR MEDICATION, THEY PRETTY MUCH DO EVERYTHING, FEED

21   THE PATIENTS THAT NEED TO BE FED, ROTATE PATIENTS EVERY TWO

22   HOURS, CLEAN, CLEAN PATIENTS, WHOEVER IS ABLE TO MAKE IT TO THE

23   BATHROOM, WHOEVER NEEDS TO BE BED BATH, AND KEEPING THE PLACE

24   CLEAN.  YEAH, THEY PRETTY BUSY.

25   **Q.**   AND JUST SO WE'RE CLEAR, THE ORDERLIES ARE PRIMARILY

10:45   1   PEOPLE WHO ARE ALSO INCARCERATED.  CORRECT?

2   **A.**   YES, MA'AM.

3   **Q.**   HAVE YOU EVER SEEN SOMETHING FROM AN ORDERLY THAT CAUSED

4   YOU CONCERN?

5   **A.**   YEAH.  I SEEN SOME AGGRESSIVENESS, SOME LOUD CUSSING.  I

6   WAS ALMOST DROPPED AT ONE TIME.  I SEEN ANOTHER PATIENT ALMOST

7   DROPPED.  IF THEY NOT STRESSING, THEY HAVE A PRETTY GOOD SHIFT,

8   BUT A LOT OF TIMES THEY STRESSED OUT.

9   **Q.**   AND DID THE ORDERLIES LOSE THEIR JOB AFTER YOU WITNESSED

10   THAT?

11   **A.**   NO, MA'AM.

12   **Q.**   AND WHO SUPERVISES THE ORDERLIES?

13   **A.**   THAT WOULD BE SECURITY.

14   **Q.**   AND WHO ON A DAY-TO-DAY BASIS IS MONITORING THE PATIENTS

15   ON THE WARD?

16   **A.**   PRETTY MUCH THE ORDERLIES.

17   **Q.**   IF A PATIENT IS IN NEED OF HELP, WHO GOES TO THEM?

18   **A.**   NORMALLY A ORDERLY, BUT IF IT'S SERIOUS ENOUGH, A ORDERLY

19   WOULD GO -- THEY WOULD TELL THE ORDERLY, AND THE ORDERLY WOULD

20   GO GET THE NURSE.

21   **Q.**   OTHER THAN THE ORDERLIES AND THE NURSES, ARE THERE OTHER

22   PEOPLE ON THE WARD WHO HELP THE PATIENTS?

23   **A.**   YEAH.  WHATEVER I CAN DO, I HELP OUT A LOT.  OTHER

24   PATIENTS HELP OTHER PATIENTS.  IF A PATIENT NEED TO BE FED AND

25   A ORDERLY IS TIED UP, YOU KNOW, IF I'M ABLE TO GET TO THEIR BED

10:47   1   AND REACH MY ARM UP, I WILL FEED THEM, COVER THEM UP OR

2   WHATEVER, THINGS LIKE THAT.

3   **Q.**   HAVE YOU EVER REFUSED CARE?

4   **A.**   YEAH.   THERE WAS ONCE WHEN I WAS FIRST DIAGNOSED, I WAS

5   PUT ON FOUR ROUNDS OF CHEMO, AND I HAD TO RIDE TO NEW ORLEANS

6   TO GET THE CHEMO AND, MAN, THAT RIDE WAS -- IT WAS HORRIBLE.

7   IT WAS -- I WAS ON A STRETCHER IN AN AMBULANCE AND I WAS

8   SHACKLED WITH A BLACK BOX, AND THE PADLOCK BEHIND ME HAPPEN TO

9   BE -- I WAS LAYING RIGHT ON MY BEDSORE.   AND MAN, IT'S BUMPY,

10   IT'S UNCOMFORTABLE, IT'S VERY PAINFUL.

11         AND ON THE WAY BACK I HAD A ACCIDENT LIKE AS SOON AS

12   WE TOOK OFF, SO WE HAD TO RIDE WITH IT LIKE THAT AND IT WAS --

13   AS MUCH AS IMPORTANCE AS I FELT THE CHEMO WAS AT THAT TIME, I

14   JUST COULDN'T BEAR THAT RIDE.

15   **Q.**   AND IF YOU HAD BEEN PLACED IN AN ADA ACCESSIBLE -- AN

16   ACCESSIBLE VAN, EXCUSE ME, WOULD YOU HAVE GONE TO YOUR NEXT

17   CHEMO?

18   **A.**   OH, MOST DEFINITELY.

19   **Q.**   DO YOU HAVE ANY OTHER ILLNESSES OTHER THAN TRANSVERSE

20   MYELITIS?

21   **A.**   YES.   I'M A TYPE 2 DIABETIC.

22   **Q.**   AND ARE YOU SATISFIED WITH YOUR CARE FOR DIABETES?

23   **A.**   THE ACCU-CHEKS COULD BE BETTER.   I MEAN, I'M GETTING

24   ACCU-CHEK'D NOW 'CAUSE THE LAST EPISODE I HAD, I WAS PLACED ON

25   SOME -- A HEAVY DOSE OF STEROIDS AND THE STEROIDS GIVE YOU --

10:49   1   KEPT MY SUGARS IN THE 400'S.  SO IT'S GETTING CHECKED ON A
       2   DAILY BASIS NOW, BUT OTHER THAN THAT, YOU WOULDN'T HAVE NO IDEA
       3   WHERE YOUR SUGAR LEVEL WAS.
       4            **MS. MONTAGNES:**  THE COURT'S INDULGENCE?
       5   **BY MS. MONTAGNES:**
       6   **Q.**   MR. SAMPIER, JUST TO CLARIFY, WHEN I ASKED YOU ABOUT HOW
       7   OFTEN YOU SEE A DOCTOR, YOU MENTIONED HOW OFTEN YOU SEE A
       8   NEUROLOGIST.
       9   **A.**   YES.
      10   **Q.**   AND YOU MENTIONED THAT IF A PROBLEM ARISES, YOU CAN
      11   OCCASIONALLY SEE A DOCTOR.
      12   **A.**   UH-HUH.
      13   **Q.**   ARE YOU ALSO REGULARLY EXAMINED BY ANY DOCTORS?
      14   **A.**   NO, NOT UNLESS -- YOU KNOW, NOT UNLESS SOMETHING HAPPEN.
      15   **Q.**   ONE LAST QUESTION, MR. SAMPIER, WHAT IS YOUR GENERAL
      16   IMPRESSION OF THE HEALTHCARE STAFF AT LSP?
      17   **A.**   I THINK THEY COULD BE MORE EMPATHETIC, A LITTLE MORE --
      18   JUST A LITTLE MORE CARING ABOUT THEIR JOB.  YOU KNOW, WE DO
      19   WHAT WE DO TO GET OURSELVES IN HERE, BUT IT'S STILL -- YOU
      20   KNOW, IT'S STILL A HUMAN THING.  WITH ALL DUE RESPECT, IT COULD
      21   BE BETTER.  IT COULD BE A LOT BETTER.  IT COULD BE A LOT
      22   BETTER.
      23   **Q.**   THANK YOU, MR. SAMPIER.
      24   **A.**   YOU'RE WELCOME.
      25            **THE COURT:**  CROSS.

1                          CROSS-EXAMINATION

2    BY MS. ROPER:

3    Q.    GOOD MORNING, MR. SAMPIER.

4    A.    GOOD MORNING.

5    Q.    HOW ARE YOU?  YOU INDICATED THAT YOU HAVE SEVERAL

6    CONDITIONS OTHER THAN -- OR THAT YOU ARE A DIABETIC OTHER THAN

7    HAVING THE TRANSVERSE MYELITIS.

8            MS. MONTAGNES:  OBJECTION.  MISSTATES THE TESTIMONY.

9    HE JUST INDICATED HE HAD ONE MORE CONDITION.

10           THE COURT:  REPHRASE.

11   BY MS. ROPER:

12   Q.    OKAY.  IT IS TRUE THAT YOU ACTUALLY HAVE OTHER CONDITIONS

13   OTHER THAN JUST DIABETES AND TRANSVERSE MYELITIS.  IS THAT NOT

14   RIGHT?

15   A.    YES.

16   Q.    AND CAN YOU TELL ME WHAT THOSE OTHER CONDITIONS ARE?

17           MS. MONTAGNES:  OBJECTION; OUTSIDE THE SCOPE OF

18   DIRECT.

19           THE COURT:  I'LL ALLOW IT.

20           THE WITNESS:  THAT WOULD BE IT, THE TRANSVERSE

21   MYELITIS AND THE TYPE 2 DIABETIC.

22   BY MS. ROPER:

23   Q.    OKAY.  DO YOU ALSO HAVE HIGH BLOOD PRESSURE?

24   A.    NO, MA'AM.

25   Q.    OKAY.  YOU HAVE RECEIVED TREATMENT FOR YOUR TRANSVERSE

1  MYELITIS AT LSP?

2  A.   YES, MA'AM.

3  Q.   OKAY.  AND YOU HAVE HAD INITIALLY THE FOLEY CATHETER WHICH

4  WAS PLACED THROUGH THE PENIS.  CORRECT?

5  A.   YES, MA'AM.

6  Q.   OKAY.  AND WHEN THAT BEGAN CAUSING PROBLEMS, THEN YOU WERE

7  GIVEN A SUPRAPUBIC CATHETER?

8  A.   SUPRAPUBIC CATHETER, THAT'S CORRECT.  THAT'S WHAT I HAVE

9  RIGHT NOW.

10  Q.   YES.  OKAY.  AND HAVE YOU HAD ANY PROBLEMS WITH THAT

11  PARTICULAR CATHETER?

12  A.   IT OCCASIONALLY LEAKS.  THAT'S ABOUT IT.

13  Q.   HAS IT BEEN ATTENDED TO WHEN YOU'VE HAD ISSUES WITH IT?

14  A.   YES, MA'AM.

15  Q.   AND YOU TAKE SEVERAL MEDICATIONS ON A DAILY BASIS.  IS

16  THAT RIGHT?

17  A.   YES, MA'AM.

18  Q.   OKAY.  AND WHAT CONDITIONS DO YOU TAKE THOSE MEDICATIONS

19  FOR?

20  A.   FOR THE DIABETES, SOME VITAMIN SUPPLEMENTS.  THAT'S ABOUT

21  IT.  WE NO LONGER -- WE NO LONGER HAVE THE NEURONTIN AND I

22  NEVER GOT ANYTHING IN PLACE OF IT.

23  Q.   DO YOU TAKE BACLOFEN?

24  A.   YES, MA'AM.

25  Q.   OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT YOU'RE

1   TAKING THAT FOR?

2   **A.**    FOR MUSCLE SPASMS.

3   **Q.**    OKAY.  AND YOU SAID YOU'RE NOT TAKING NEURONTIN ANYMORE?

4   **A.**    NO, MA'AM.

5   **Q.**    OKAY.  WHAT ABOUT NORFLEX?

6   **A.**    UPON REQUEST.  I USUALLY HAVE TO MESS WITH THE NORFLEX

7   MAYBE EVERY 90 DAYS, EVERY FOUR MONTHS.  BUT AS OF THE LAST

8   MAYBE YEAR OR SO, I HAVEN'T HAD TO REQUEST FOR IT.

9   **Q.**    OKAY.  IS IT BECAUSE YOU DIDN'T FEEL YOU NEEDED IT?

10  **A.**    IT WAS JUST A REAL BAD BURNING SENSATION I WOULD HAVE, AND

11  THE NORFLEX SHOT WOULD JUST -- WOULD JUST KNOCK IT OUT.

12  **Q.**    OKAY.  DO YOU EVER TAKE TORADOL?  IT'S AN

13  ANTIINFLAMMATORY.  DOES THAT RING A BELL?

14  **A.**    I WOULDN'T KNOW.

15  **Q.**    OKAY.  AND IF THAT'S REFLECTED IN YOUR MEDICAL RECORDS,

16  WOULD YOU DISPUTE THAT AT ALL?

17  **A.**    IF IT'S IN THE -- IF IT'S IN THE MEDICAL REPORT, THAT

18  WOULD BE CORRECT.

19  **Q.**    OKAY.  AND DO YOU TAKE SOMETHING FOR CONSTIPATION ON A

20  DAILY BASIS?

21  **A.**    YES, MA'AM.  SOME STOOL SOFTENER.

22  **Q.**    OKAY.

23  **A.**    COLACE.

24  **Q.**    AND FOR YOUR DIABETES, DO YOU TAKE METFORMIN?  IS THAT

25  RIGHT?

**A.**   METFORMIN, YES, MA'AM.

**Q.**   OKAY.  HAVE YOU EVER TAKE DIABETA?  DOES THAT SOUND FAMILIAR?

**A.**   I WOULDN'T KNOW.

**Q.**   OKAY.

**A.**   UNLESS IT'S ON THE MEDICAL -- ON MY, YOU KNOW, MY PILL SHEET.

**Q.**   OKAY.  BUT YOU HAVE RECEIVED TREATMENT FOR YOUR DIABETES?

**A.**   YES, MA'AM.

**Q.**   OKAY.  AND YOU'VE ALSO RECEIVED AN HGB H1C TEST?  DO YOU KNOW WHAT I'M TALKING ABOUT?

**A.**   THAT WOULD BE FOR --

          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS IS BEYOND THE SCOPE OF THE DIRECT, AND HE'S NOT A DOCTOR, SO . . .

          **THE COURT:**  IT IS BEYOND THE SCOPE OF DIRECT.  WHAT'S THE RELEVANCE OF IT?

          **MS. ROPER:**  THAT'S FINE, YOUR HONOR.  I WILL MOVE ON. I'M JUST TRYING -- I'M JUST TRYING TO ESTABLISH THE CARE THAT HE HAS RECEIVED, WHICH I BELIEVE IS RELEVANT TO THE ISSUE OF DELIBERATE INDIFFERENCE IN THIS CASE.

          **THE COURT:**  IT'S BEYOND THE SCOPE.

          **MS. ROPER:**  OKAY.

BY MS. ROPER:

**Q.**   YOU MENTIONED THAT YOU HAD BEEN PROVIDED WITH SOME

1  PHYSICAL THERAPY.

2  **A.**   YES, MA'AM.

3  **Q.**   AND DO YOU RECALL HOW OFTEN YOU RECEIVE PHYSICAL THERAPY?

4  **A.**   ONCE A WEEK.  ONCE WE GOT THE PHYSICAL THERAPY THAT'S ON

5  STAFF, ONCE A WEEK.

6  **Q.**   OKAY.  AND THEN YOU WERE TAUGHT SOME ADDITIONAL EXERCISES

7  YOU COULD PERFORM ON YOUR OWN?

8  **A.**   YES, MA'AM.

9  **Q.**   AND WAS IT YOUR UNDERSTANDING THAT WAS SO THAT YOU COULD

10  BECOME MORE INDEPENDENT?

11  **A.**   YES, MA'AM.

12  **Q.**   OKAY.  AS FAR AS ANY ACCOMMODATIONS AT THE FACILITY, ANY

13  ASSISTANCE WITH BATHING, YOU HAVE BEEN PROVIDED WITH A SHOWER

14  CELL -- I MEAN, A SHOWER BENCH.  CORRECT?

15  **A.**   YES, MA'AM.

16          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THAT'S

17  OUTSIDE THE SCOPE OF THE DISCOVERY PERIOD, AND I JUST WANT TO

18  BE CONSCIOUS THAT WE'RE NOT ELICITING TESTIMONY OF THINGS THAT

19  HAVE CHANGED OUTSIDE OF THE DISCOVERY HEARING.

20  **BY MS. ROPER:**

21  **Q.**   WHEN DID YOU GET A --

22          **MS. ROPER:**  I'M SORRY.

23          **THE COURT:**  MS. ROPER, LET ME RULE.

24          **MS. ROPER:**  I'M SORRY.

25          **THE COURT:**  THE OBJECTION IS SUSTAINED.

10:57 1   BY MS. ROPER:

2   Q.   OKAY.  I'M NOT SURE THAT WE'VE ESTABLISHED WHEN THAT

3   PARTICULAR -- WHEN DID YOU GET THE SHOWER CHAIR?

4   A.   IT WASN'T PARTICULARLY BOUGHT FOR ME.  IT WAS -- WE JUST

5   SEEN IT ON THE WARD AND JUST TOOK IT AND START USING IT.

6   Q.   DO YOU HAVE ANY IDEA ABOUT WHAT PARTICULAR TIME FRAME THAT

7   WOULD HAVE BEEN?

8   A.   THAT WAS STILL IN -- THAT WAS STILL IN HOSPICE.

9   Q.   WHEN YOU WERE IN HOSPICE?  IS THAT WHAT YOU SAID?

10   A.   COULD BE AFTER HOSPICE.

11   Q.   OKAY.

12   A.   I'M NOT SURE.

13   Q.   OKAY.  AND WHEN YOU SAID THAT YOU WERE ON HOSPICE, ARE YOU

14   AWARE THAT THERE IS A PROGRAM CALLED -- FOR PALLIATIVE CARE?

15   DO YOU KNOW WHAT THAT IS?

16   A.   NO, MA'AM.

17   Q.   OKAY.  WHEN YOU WERE PLACED ON WHAT YOU BELIEVE TO BE

18   HOSPICE, WERE YOU TOLD THAT YOU WERE DYING?

19   A.   NO.  I WAS TOLD THAT REALLY THEY DIDN'T KNOW WHAT WAS

20   GOING ON.

21   Q.   AND WAS IT YOUR UNDERSTANDING THAT YOU WERE BEING PLACED

22   THERE SO THAT YOU COULD RECEIVE NARCOTIC MEDICATIONS?

23   A.   NO.

24   Q.   OKAY.  NO ONE TOLD YOU THAT YOU WERE THERE SO THAT YOU

25   COULD RECEIVE COMFORT CARE FOR YOUR PAIN?

10:58

1   **A.**   NO.   THEY WAS JUST TELLING ME THE PAIN MEDICATION THAT

2   WOULD BE AVAILABLE AT THAT TIME.

3   **Q.**   OKAY.  BUT DID THEY EXPLAIN TO YOU THAT BY GOING INTO THAT

4   PARTICULAR PROGRAM YOU WOULD BE ABLE TO GET THE PAIN MEDICATION

5   THAT YOU NEEDED?

6   **A.**   NO, I WAS NEVER TOLD THAT.

7   **Q.**   OKAY.  WHAT DID THEY TELL YOU WHY YOU WERE IN THAT

8   PARTICULAR PROGRAM?

9   **A.**   HE EXPLAINED THE NEURONTIN AND THE BACLOFEN AND HE SAID

10  ANYTHING OTHER THAN THAT WILL BE A MORPHINE -- YOUR NEXT STEP

11  WILL BE A MORPHINE PATCH, AND I DIDN'T WANT NO PART OF THAT.

12  **Q.**   OKAY.  SO DID YOU REQUEST THAT YOU NOT BE PLACED INTO

13  PALLIATIVE CARE?

14  **A.**   AT THAT TIME I DIDN'T KNOW ANYTHING ABOUT PALLIATIVE CARE.

15  **Q.**   OKAY.  SO NO ONE EXPLAINED THAT TO YOU BEFORE YOU WENT

16  INTO THE PROGRAM?

17  **A.**   NO, MA'AM.

18  **Q.**   YOU MENTIONED THAT YOU ASKED FOR A SQUEEZE BALL.  DID YOU

19  EVER GET THAT?

20  **A.**   IN THE BEGINNING, NO, MA'AM, I DIDN'T, THE SQUEEZE BALL

21  AND THE APPARATUS TO CHECK MY LUNG CAPACITY AND THE TRAPEZE

22  BAR.

23  **Q.**   DID YOU EVENTUALLY GET THE SQUEEZE BALL?

24  **A.**   NO, I DIDN'T.  I DIDN'T GET THE SQUEEZE BALL 'TIL MY

25  RECENT EPISODE WHEN MY TRANSVERSE MYELITIS GOT AGGRESSIVE AND

11:00  1    ATTACKED MY LEFT SIDE.  COULD HAVE BEEN -- I BEEN BACK ON THE

2    WARD MAYBE FIVE, SIX MONTHS, AND I WAS JUST RECENTLY GIVEN A

3    SQUEEZE BALL WHEN I STARTED REHABBING MY LEFT SIDE.

4            **MS. MONTAGNES:**  AND, YOUR HONOR, WE WOULD JUST

5    UNFORTUNATELY MOVE TO STRIKE THAT RESPONSE SINCE IT COMES

6    OUTSIDE OF THE DISCOVERY PERIOD.

7            **MS. ROPER:**  I THINK THEY OPENED THE DOOR, YOUR HONOR,

8    BY ASKING ABOUT IT.

9            **THE COURT:**  OVERRULED.  GO AHEAD.

10   **BY MS. ROPER:**

11   **Q.**   YOU MENTIONED THAT BEFORE YOU CAME TO LOUISIANA STATE

12   PENITENTIARY THAT A LOT OF DOCTORS, A TEAM OF DOCTORS -- AND I

13   MAY BE MISSTATING WHAT YOU SAID, BUT THEY WERE CONFUSED ABOUT

14   WHAT WAS GOING ON WITH YOUR CONDITION?

15   **A.**   RIGHT.

16   **Q.**   OKAY.  AND THEN WHEN YOU CAME TO LOUISIANA STATE

17   PENITENTIARY, YOU WERE SENT OUT FOR A TREATMENT AT ANOTHER --

18   AT AN OUTSIDE HOSPITAL.  IS THAT RIGHT?

19   **A.**   WE TALKING ABOUT THE CHEMO?

20   **Q.**   YES.  YOU WENT OUT FOR A TREATMENT?

21   **A.**   YES.  YES, MA'AM.

22   **Q.**   OKAY.  AND IT WAS WHEN YOU CAME BACK FROM THAT PARTICULAR

23   TREATMENT I THINK YOU SAID THAT YOU HAD THE BEDSORE?

24   **A.**   I HAD -- NO, I HAD THE BEDSORE, YOU KNOW, FROM COMING OFF

25   THE STREET THE FIRST TIME.

11:01   1   Q.   OKAY.  SO THAT'S NOT A BEDSORE THAT HAD DEVELOPED WHILE

        2   YOU WERE AT THE PENITENTIARY.  CORRECT?

        3   A.   NO, IT WASN'T.

        4   Q.   OKAY.  AND THEN YOU DID GET TREATMENT FOR IT WHILE YOU

        5   WERE AT THE PENITENTIARY.  CORRECT?

        6   A.   YES, I DID.

        7   Q.   OKAY.  HAS ANY DOCTOR EVER GIVEN YOU ANY INFORMATION ON

        8   WHAT'S THE BEST YOU CAN EXPECT RIGHT NOW WITH YOUR CONDITION AS

        9   FAR AS MOBILITY IS CONCERNED?

       10   A.   NO, MA'AM.

       11   Q.   OKAY.  HAS ANYONE EVER TOLD YOU THAT YOU WOULD BE ABLE TO

       12   WALK AGAIN?

       13   A.   WHEN I WAS ON THE STREET, ONE OF THE DOCTORS SAID THE

       14   DAMAGE IS PRETTY MUCH DONE.

       15   Q.   AND WHAT DID YOU TAKE THAT TO MEAN?

       16   A.   THAT THE DAMAGE WAS PRETTY MUCH DONE.

       17   Q.   SO IS IT YOUR UNDERSTANDING CURRENTLY THAT THERE IS NO

       18   HOPE THAT YOU WOULD BE OUT OF THE WHEELCHAIR?  IS THAT YOUR

       19   UNDERSTANDING?

       20   A.   FROM WHEN I WAS TOLD THAT, YEAH, THAT WAS MY

       21   UNDERSTANDING.

       22   Q.   OKAY.  AND HAS ANYONE TOLD YOU ANY DIFFERENTLY WHILE YOU

       23   HAVE BEEN IN THE PENITENTIARY?

       24   A.   NO.

       25   Q.   IN FACT, HAVEN'T THEY ENCOURAGED YOU TO BECOME MORE

11:02 1   INDEPENDENT WHILE YOU WERE AT THE PENITENTIARY?

2   **A.**   IT WAS JUST -- I JUST HAD TO PULL MYSELF TOGETHER AND GET

3   IT TOGETHER.

4   **Q.**   AND DID A DR. MACMURDO EVER TRY TO ENCOURAGE YOU TO BECOME

5   MORE INDEPENDENT?

6   **A.**   OH, MAN, DR. MACMURDO THREATENED TO HAVE THE ORDERLIES TO

7   STOP HELPING ME.

8   **Q.**   AND YOU MENTIONED SOMETHING ABOUT TONIA FAUST.  IS THAT

9   RIGHT?

10   **A.**   YEAH.  LIKE I SAID, I WAS TRYING TO GET THE TRAPEZE BARS

11   THROUGH HER, BUT MAYBE TWO WEEKS LATER DR. TOCE SIGNED AN ORDER

12   FOR THE TRAPEZE BAR AND TONIA WAS MAKING A ROUND ONE DAY, AND

13   WHEN SHE SEEN IT AND WAS AWARE THAT I HAD THE TRAPEZE BAR, SHE

14   STOPPED DEAD IN HER TRACKS WITH A LOOK ON HER FACE LIKE -- AND

15   THAT WAS ONE OF THE MAJOR THINGS THAT LET ME KNOW THAT I WAS

16   GOING TO BE IN FOR A LONG RIDE, THAT I REALLY HAD TO GET MYSELF

17   TOGETHER AND MAKE MY WAY OUT OF THAT WARD.

18   **Q.**   ISN'T IT TRUE WHEN YOU FIRST GOT ON THE WARD, YOU WERE

19   ALLOWING THE ORDERLIES TO PRETTY MUCH DO EVERYTHING FOR YOU?

20   **A.**   THINGS THAT I COULDN'T DO ON MY OWN?

21   **Q.**   YES.

22   **A.**   THEY WERE HELPING ME OUT.

23   **Q.**   OKAY.  AND WASN'T IT THE MEDICAL STAFF THAT ENCOURAGED YOU

24   TO BECOME MORE INDEPENDENT?

25   **A.**   MORE -- IT WAS MORE THE ORDERLIES THAN THE MEDICAL STAFF.

11:04   1    **Q.**   AND DID YOU FEEL THAT THE MEDICAL STAFF WAS BEING TOUGH ON
2    YOU AT TIMES?
3    **A.**   YEAH, I WOULD SAY THAT.
4    **Q.**   OKAY.  AND THEY WERE BEING TOUGH ON YOU TO THE EXTENT THAT
5    THEY WANTED YOU TO DO SOME THINGS ON YOUR OWN.  ISN'T THAT
6    RIGHT?
7    **A.**   YEAH.  YEAH, IN A WAY.
8    **Q.**   AND DON'T YOU THINK THAT THAT IS BENEFICIAL TO YOU, TO BE
9    MORE INDEPENDENT?
10   **A.**   YEAH, I WAS -- AFTER THAT EPISODE WITH THE TRAPEZE BAR,
11   THAT PRETTY MUCH PUT IT ON MY MIND TO GET MYSELF TOGETHER AND
12   GET UP OUT OF THERE.
13   **Q.**   AND DID YOU UNDERSTAND THAT IF YOU DID NOT DO SOME THINGS
14   FOR YOURSELF, THAT YOUR CONDITION WOULD NOT GET ANY BETTER?
15   **A.**   YEAH, I WAS DEFINITELY AWARE OF THAT.
16   **Q.**   OKAY.  AND PART OF CARING FOR YOURSELF WAS TO MOVE USING
17   THE TRAPEZE BAR OR ANY OTHER MOBILITY WITH YOUR ARMS IN ORDER
18   TO NOT DEVELOP FURTHER BEDSORES.  IS THAT RIGHT?
19   **A.**   RIGHT.
20   **Q.**   AND DID YOU EVENTUALLY LEARN HOW TO DO THAT?
21   **A.**   YES, I DID.
22   **Q.**   OKAY.  DID ANYONE AT LSP EVER TELL YOU THAT YOUR DISEASE
23   WAS FATAL?
24   **A.**   NO, THEY DIDN'T.
25   **Q.**   AND YOU WERE ABLE TO GET OUT OF THE PALLIATIVE CARE

1  PROGRAM.  CORRECT?

2  **A.**   AND TO THIS DAY I STILL DON'T EVEN KNOW WHAT THE

3  PALLIATIVE CARE PROGRAM IS.

4  **Q.**   OKAY.  WHAT YOU REFERRED TO AS HOSPICE, YOU DID COME OFF

5  OF HOSPICE?

6  **A.**   YES, MA'AM.

7  **Q.**   AND WHILE YOU'VE BEEN IN THE NURSING UNIT, YOU WERE ABLE

8  TO SEE NURSES PRETTY MUCH EVERY DAY?

9  **A.**   YEAH.  YEAH.

10  **Q.**   AND YOU EVENTUALLY GOT TO THE POINT WHERE THE TREATMENT

11  THAT YOU RECEIVED ALLOWED YOU TO EVEN COME OFF OF THE NURSING

12  WARD.  RIGHT?

13        **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THAT'S

14  OUTSIDE OF THE DISCOVERY SCOPE.  WE SPECIFICALLY DIDN'T ASK

15  ABOUT THE TIME AFTER HE WAS ABLE TO LEAVE THE WARD.

16        **MS. ROPER:**  YOUR HONOR, I DON'T BELIEVE THAT IS

17  OUTSIDE THE SCOPE OF THE TIME PERIOD.

18        **MS. MONTAGNES:**  HE LEFT THE WARD AT THE END OF 2016,

19  AFTER SEPTEMBER 30, 2016.

20        **THE COURT:**  CONFINE YOUR QUESTION TO THE DATES.  YOU

21  CAN REPHRASE YOUR QUESTION, PLEASE.

22        **MS. ROPER:**  OKAY.

23  **BY MS. ROPER:**

24  **Q.**   MR. SAMPIER, DO YOU HAVE ANY RECOLLECTION OF WHERE YOU

25  WERE RESIDING AS OF SEPTEMBER 30TH OF 2016?

1    **A.**   2016?  NO.

2    **Q.**   SO YOU DO NOT RECALL EVER COMING OFF OF THE NURSING WARD

3    DURING THAT PERIOD OF TIME?

4    **A.**   NO.

5          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  HE JUST SAID

6    HE DOESN'T REMEMBER.  I'M REPRESENTING TO THE COURT THAT HE WAS

7    STILL LIVING ON THE NURSING WARD.  WE COULD REVISIT THE MEDICAL

8    RECORDS, BUT HE WAS STILL LIVING ON THE WARD.

9          **THE COURT:**  SUSTAINED.  HE'S ANSWERED THE QUESTION.

10   **BY MS. ROPER:**

11   **Q.**   YOU INDICATED AT ONE POINT THAT YOU DECIDED TO CHANGE YOUR

12   DIET TO INCLUDE MORE PROTEIN.  HOW WERE YOU ABLE TO DO THAT?

13   **A.**   ON OUR COMMISSARY LIST, NUTS, WHATEVER TYPE OF FISH THEY

14   HAD AS FAR AS TUNA FISH, SARDINES, JACK MACK, WHOLE GRAIN

15   CEREAL, AND SNACKING ON LIKE MAINLY NUTS AND LIKE CHEESE

16   CRACKERS.

17   **Q.**   SO WHAT ABOUT THE FOOD THAT WAS PROVIDED BY THE DIETICIAN

18   AT LSP, DID YOU --

19   **A.**   A LOT OF RICE, A LOT OF RICE, A LOT OF TIMES I WOULD JUST

20   EAT THE VEGETABLE OR WHATEVER, THE BREAD AND THAT WOULD BE IT.

21   **Q.**   DID YOU EVER HAVE ANY KIND OF CONSULTATION WITH A

22   PHYSICIAN AT LSP ABOUT YOUR DIET?

23   **A.**   YEAH.

24   **Q.**   AND IN THAT CONSULTATION, WERE YOU GIVEN ANY ADVICE ON

25   YOUR DIET?

1    **A.**    NO.

2    **Q.**    WHAT DID THE CONSULTATION CONSIST OF?

3    **A.**    I WAS TELLING HER HOW BAD THE FOOD WAS.

4    **Q.**    AND WERE YOU PLACED ON A RESTRICTED DIET OF ANY SORT?

5    **A.**    JUST ON A LOW SODIUM DIET.

6    **Q.**    WERE YOU NOT PLACED ON A DIET FOR YOUR DIABETES?

7    **A.**    LOW SODIUM, DIABETIC, YEAH.  EITHER YOU ON A REGULAR DIET

8    OR -- YOU ON A DIET OR A REGULAR.

9    **Q.**    OKAY.

10    **A.**    THAT'S THE ONLY TWO OPTIONS.

11    **Q.**    SO YOU WERE ON THE --

12    **A.**    I WAS ON THE DIET.

13    **Q.**    THE DIET?

14    **A.**    UH-HUH.

15    **Q.**    DID YOU RECEIVE THE FOOD THAT YOU WERE PRESCRIBED, TO YOUR

16    UNDERSTANDING?

17    **A.**    UH-HUH.  YES.  YES, MA'AM.

18    **Q.**    AND YOU MENTIONED SOMETHING ABOUT YOUR WHEELCHAIR, IF YOU

19    HAD A PROBLEM WITH YOUR WHEELCHAIR, YOU WOULD HAVE TO GET

20    SOMEONE IN THE HOBBY SHOP TO FIX IT?

21    **A.**    YES.

22    **Q.**    OKAY.  ISN'T IT TRUE THAT A NEW WHEELCHAIR WAS ORDERED FOR

23    YOU AT SOME POINT?

24    **A.**    YEAH.  THAT WAS THE -- THAT'S NOT A -- THAT'S NOT A

25    PARAPLEGIC WHEELCHAIR.  IF YOUR GIRL'S IN LABOR AND Y'ALL RUSH

1    TO THE HOSPITAL, THE WHEELCHAIR THAT THEY HAVE WAITING ON YOU,

2    THAT WAS THAT TYPE OF WHEELCHAIR.

3    **Q.**    AND DID YOU REFUSE THAT WHEELCHAIR?

4    **A.**    YES, I DID.

5    **Q.**    AND DID THEY THEN ORDER ANOTHER WHEELCHAIR THAT MET THE

6    NEEDS THAT YOU NEEDED?

7    **A.**    NO, THEY DIDN'T.

8    **Q.**    SO THE WHEELCHAIR THAT YOU ARE IN TODAY, IS THAT THE

9    WHEELCHAIR THAT YOU HAD WHEN YOU ENTERED THE PENITENTIARY?

10    **A.**    NO.  IT'S ONE OF THE GUYS WHO WAS PARALYZED GOT PAROLED OR

11    WHATEVER AND WENT HOME.  HE LEFT ME THE WHEELCHAIR.

12    **Q.**    AND YOU'RE SURE YOU NEVER SIGNED FOR A NEW WHEELCHAIR.

13    CORRECT?

14    **A.**    NO.  I DIDN'T SIGN FOR NONE, NO, MA'AM.

15    **Q.**    DO YOU HAVE ANY TROUBLE GETTING AROUND IN YOUR WHEELCHAIR

16    AT ANY OF THE -- I THINK YOU MENTIONED YOU MAY HAVE SOME

17    TROUBLE.  IS THAT CORRECT?

18    **A.**    LIKE I SAID, MANEUVERING FROM THE WARDS TO THE CHAPEL OR

19    THE EDUCATION BUILDING, I WOULD NORMALLY TRY TO GET SOMEBODY TO

20    PUSH BECAUSE YOU JUST GOT SOME SPOTS IN THE PAVEMENT WHERE IT'S

21    CRACKED UP, CHIPPED.  AND MAYBE LIKE TWO OR THREE TIMES I DID

22    IT BY MYSELF, AND THE FIRST TIME I HIT A BUMP AND ALMOST FELL

23    OUT THE CHAIR.  YOU GOT TO LIKE WHEELIE AND MANEUVER OVER SOME

24    HUMPS AND SOME OBSTACLES.

25    **Q.**    DO YOU RECALL ABOUT WHEN THOSE PROBLEMS MANEUVERING BEGAN?

**A.**   WHEN I FIRST WAS ABLE TO LEAVE THE WARD AND, YOU KNOW, GO

TO THE CHAPEL OR GO TO THE EDUCATION BUILDING.

**Q.**   AND DO YOU REMEMBER WHAT TIME PERIOD THAT WOULD HAVE BEEN?

**A.**   I WAS STILL ON THE WARD.

**Q.**   SO YOU ARRIVED AT THE PENITENTIARY IN ROUGHLY MAY OF 2013.

IS THAT RIGHT?

**A.**   I KNOW IT WAS '13.

**Q.**   DO YOU RECALL IF YOU WERE STILL ON THE WARD AS OF AUGUST

OF 2016?

**A.**   NO, MA'AM.

**Q.**   WOULD YOU HAVE BEEN HAVING THOSE MOBILITY PROBLEMS,

GETTING AROUND, AT THE PENITENTIARY AS OF AUGUST OF 2016, TO

YOUR RECOLLECTION?

**A.**   WHATEVER THE DATE WAS OF THE TIME PERIOD.  WHEN I

MANEUVERED FROM THE HOSPITAL TO THE GYM TO THE CHAPEL OR TO THE

EDUCATION BUILDING, I HAVE TO BE VERY CAREFUL.

**Q.**   DO YOU RECALL GIVING A DEPOSITION IN AUGUST OF 2016?

**A.**   YES, MA'AM.

**Q.**   AND DO YOU RECALL BEING ASKED ABOUT WHETHER OR NOT YOU HAD

ANY PROBLEMS GETTING AROUND THE FACILITIES AT THE PENITENTIARY?

**A.**   I CAN RECALL BEING ASKED ABOUT THE MOBILITY ON THE WARD.

**Q.**   DO YOU RECALL WHETHER YOU WERE ASKED, DO YOU HAVE ANY

TROUBLE GETTING AROUND IN YOUR WHEELCHAIR, SAY, INSIDE IN THE

BUILDING AND OUTSIDE THE BUILDING?

**A.**   OUTSIDE THE BUILDING AS FAR AS THE YARD?

1   **Q.**   DO YOU RECALL THAT PARTICULAR QUESTION, WHETHER YOU HAD
2   ANY TROUBLE GETTING AROUND IN YOUR WHEELCHAIR INSIDE THE
3   BUILDING AND OUTSIDE THE BUILDING?
4   **A.**   YES, MA'AM.
5   **Q.**   AND DO YOU RECALL WHAT YOUR ANSWER WAS?
6   **A.**   AROUND THE BUILDING AND IN THE YARD, I DON'T HAVE NO
7   PROBLEM WITH THAT.
8   **Q.**   OKAY.  SO YOUR ANSWER AT THAT TIME WAS THAT YOU DID NOT
9   HAVE PROBLEMS.  WOULD YOU AGREE WITH THAT?
10  **A.**   WITH THE INSIDE OF THE BUILDING AND THE YARD, YES, MA'AM.
11  **Q.**   OKAY.  AND SO WHAT DO YOU CONSIDER TO BE HAVING A
12  PROBLEM -- THE THINGS YOU JUST TOLD ME, THOSE ARE NOT INSIDE OF
13  THE BUILDING?
14  **A.**   NO, MA'AM.  THAT'S FROM THE HOSPITAL WARD EITHER TO THE
15  GYM, THE CHAPEL, OR THE EDUCATION BUILDING.  AND WHEN I'M IN
16  THE BUILDING AND OUTSIDE IN THE YARD, I'M PRETTY MUCH GOOD.
17  **Q.**   OKAY.  AND SO WHEN YOU SAY IN THE BUILDING, YOU WERE JUST
18  TALKING ABOUT THE WARD.  IS THAT RIGHT?
19  **A.**   YES, MA'AM.
20  **Q.**   BUT YOU WERE ABLE TO GO AND WORK OUT, IS THAT CORRECT, AT
21  THAT POINT IN TIME?
22  **A.**   YES, MA'AM.
23  **Q.**   AND YOU WERE ABLE TO BENCH PRESS?
24  **A.**   NO, MA'AM.
25  **Q.**   WHAT TYPE OF WORKOUT DID YOU DO?

**A.**   RESISTANCE BANDS, LIKE I DEMONSTRATED EARLIER, UPPER BODY,
USING MY LOWER CHAIR TO SUPPORT THE UPPER BODY AND AROUND THE
BACK.  I DO -- AND I WOULD DO LAPS AROUND THE BASKETBALL COURT.

**Q.**   AND HOW OFTEN WOULD YOU DO THAT?

**A.**   MAYBE ONCE A WEEK, TWICE A MONTH.

**Q.**   AT THE POINT IN TIME THAT YOU ASKED FOR THE GLOVES THAT
WERE TO USE FOR YOUR WHEELCHAIR, YOU WERE STILL CONFINED TO A
BED.  IS THAT NOT RIGHT?

**A.**   YEAH, I WAS JUST STARTING -- BEING PUT IN MY WHEELCHAIR
AND MOVE MYSELF AROUND.

**Q.**   SO YOU HAD NOT YET DEVELOPED ANY CALLOUSES OR ANYTHING AT
THAT POINT IN TIME?

**A.**   WHEN I -- YEAH, WHEN I FIRST STARTED USING THE WHEELCHAIR,
YEAH, I DEVELOPED SOME CALLOUSES.

**Q.**   OKAY.  BUT YOU WERE ASKING FOR THE GLOVES AT THE TIME THAT
YOU WERE STILL PRETTY MUCH CONFINED TO THE BED?

**A.**   NO, I ASKED FOR THE GLOVES WHEN I STARTED GETTING IN THE
WHEELCHAIR AND MOVING AROUND.

**Q.**   WOULD YOU SAY WITHIN THE FIRST FEW DAYS OF GETTING IN THE
WHEELCHAIR YOU ASKED FOR GLOVES?

**A.**   YEAH.  WELL, AT LEAST WITHIN THAT FIRST WEEK.

        **MS. ROPER:**  JUST A MINUTE, YOUR HONOR.

**BY MS. ROPER:**

**Q.**   MR. SAMPIER, AS FAR AS THE RESISTANCE BAND, WHERE DID YOU
OBTAIN THAT?

1   **A.**    FROM ANOTHER INMATE.

2   **Q.**    OKAY.   SO THAT WAS NOT PROVIDED TO YOU BY THE PHYSICAL

3   THERAPIST?

4   **A.**    NO.   THE ONE I HAVE, NO.   THE ONE I GOT RIGHT NOW SINCE

5   THIS LAST EPISODE AND I'M BACK ON PHYSICAL THERAPY, SHE

6   PROVIDED ME WITH ONE.

7   **Q.**    OKAY.   SO PRIOR TO THIS TIME, SHE DID NOT PROVIDE YOU WITH

8   ONE BEFORE?

9   **A.**    NO, MA'AM.

10   **Q.**    AND SO THE SELF-CARE EXERCISES THAT SHE INSTRUCTED YOU ON

11   DID NOT INVOLVE A RESISTANCE BAND?

12   **A.**    THAT'S ONLY RECENTLY.   WE TALKING ABOUT LIKE WITHIN THE

13   LAST TWO MONTHS, SHE PROVIDED ME WITH THE BAND.   BUT IN THE

14   BEGINNING, I HAD THE BAND AND I HAD TO GET IT FROM ANOTHER

15   INMATE.

16   **Q.**    OKAY.   SO WHAT TYPE OF EXERCISES DID SHE INSTRUCT YOU ON

17   IN THE FIRST ROUND OF PHYSICAL THERAPY?

18   **A.**    PRETTY MUCH WHAT I WAS ALREADY DOING, WITH THE EXCEPTION

19   OF HAVING YOUR BAND AROUND SOMETHING TO DO THIS PARTICULAR

20   CHEST EXERCISE WHERE YOU EXTEND YOUR ARM TO THE MIDWAY THROUGH

21   YOUR CHEST.   AND NOW SHE HAS THIS -- IT'S LIKE A CYCLE SHE CAN

22   PLACE ON THE TABLE, AND I CAN USE MY UPPER BODY TO CYCLE.

23   **Q.**    AND ARE YOU GETTING ANY TYPE OF THERAPY FOR YOUR LEGS?

24   **A.**    NO.

25           **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.   SHE JUST

1   ASKED IF HE WAS GETTING IT CURRENTLY, AND IT'S CONFUSING THE

2   WITNESS.

3           MS. ROPER:  I WOULD WITHDRAW.

4           MS. MONTAGNES:  AND SHE'S ELICITING TESTIMONY OUTSIDE

5   OF THE --

6           MS. ROPER:  I APOLOGIZE, YOUR HONOR.

7           THE COURT:  IT'S WITHDRAWN.

8           MS. ROPER:  IT'S NOT INTENTIONAL.

9           THE COURT:  GO AHEAD.  NEXT QUESTION.

10  BY MS. ROPER:

11  Q.   AT ANY POINT IN TIME BEFORE SEPTEMBER 30TH OF 2016, DID

12  YOU GET ANY PHYSICAL THERAPY FOR YOUR LEGS?

13  A.   NO, I NEVER RECEIVED ANY PHYSICAL THERAPY FOR THE LEGS

14  SINCE I'VE BEEN IN ANGOLA.

15  Q.   BUT YOU DID GET LEG STRETCHES AT TIMES?

16  A.   YEAH, THAT WAS FROM A FRIEND OF MINE.

17  Q.   OKAY.  BUT NOT FROM THE PHYSICAL THERAPIST?

18  A.   NO, NOT FROM THE PHYSICAL THERAPIST.

19  Q.   OKAY.  AND WHEN YOU HAVE ASKED FOR HELP FROM A NURSE, YOU

20  ALWAYS RECEIVED THAT PARTICULAR HELP.  IS THAT NOT RIGHT?

21  A.   YES.  AS FAR AS DRESSING CHANGES, YEAH.

22  Q.   YOU UNDERSTAND THAT SOMETIMES THEY MIGHT BE BUSY AND YOU

23  JUST HAVE TO BE PATIENT?

24  A.   OH, YEAH, MOST DEFINITELY.

25          MS. ROPER:  THANK YOU.

1        **MS. MONTAGNES:**  REDIRECT, YOUR HONOR.

2        **THE COURT:**  REDIRECT.

3                     **REDIRECT EXAMINATION**

4    BY MS. MONTAGNES:

5    **Q.**   JUST A FEW MORE QUESTIONS, FARRELL.  YOU'RE ALMOST DONE.

6    **A.**   YES, MA'AM.

7    **Q.**   ARE YOU OKAY?

8    **A.**   YES, I'M GOOD.

9    **Q.**   OKAY.  YOU TOLD MS. ROPER THAT YOU RECEIVED A CHANGE IN

10   CATHETERS.  IS THAT RIGHT?

11   **A.**   YES, MA'AM.

12   **Q.**   AND WHAT WAS THE SECOND CATHETER CALLED?

13   **A.**   THE SECOND CATHETER WAS A SUPRAPUBIC, PUBIC HAIRLINE

14   CATHETER.

15   **Q.**   AND HOW DID YOU COME ABOUT GETTING THAT SECOND CATHETER?

16   **A.**   'CAUSE WE -- TO MY UNDERSTANDING ABOUT A URINARY TRACT

17   INFECTION, RIGHT, I HAD A URINARY TRACT INFECTION.  IT WAS KIND

18   OF LIKE A OUT-OF-BODY EXPERIENCE.  I THOUGHT I WAS LOSING MY

19   MIND, BUT THAT WAS WAY DIFFERENT FROM HAVING THAT DISCHARGE

20   COMING OUT EVERY DAY.  SO THEY SAID IT WAS A URINARY TRACT

21   INFECTION, BUT WHEN I GOT A URINARY TRACT INFECTION, IT WAS WAY

22   DIFFERENT FROM JUST HAVING, YOU KNOW, THE PUS LEAKING OUT.

23   'CAUSE THEY DID A CULTURE A COUPLE OF TIMES, BUT I NEVER REALLY

24   HEARD ANYTHING AFTER THAT.

25   **Q.**   AND SO AFTER YOU HAD THE SERIOUS URINARY TRACT INFECTION,

1    THAT'S WHEN THE CATHETER CHANGED?

2    **A.**    NO.    NO, THE CATHETER CHANGED WAY BEFORE THAT.

3    **Q.**    WAY BEFORE THAT.

4    **A.**    UH-HUH.

5    **Q.**    BUT MY QUESTION TO YOU WAS, BEFORE YOU GOT THIS SUPRAPUBIC

6    CATHETER, WHAT DID YOU HAVE TO DO IN ORDER TO GET THAT SECOND

7    CATHETER?

8    **A.**    IT WAS --

9          **MS. ROPER:**    OBJECTION, YOUR HONOR; ASKED AND

10   ANSWERED.

11         **THE WITNESS:**    IT WAS A LOT OF COMPLAINING, A LOT OF

12   COMPLAINING.

13         **THE COURT:**    SIR, HANG ON, LET ME RULE ON THE

14   OBJECTION.

15         **THE WITNESS:**    I'M SORRY.

16         **THE COURT:**    YOU CAN ANSWER THE QUESTION.

17   **BY MS. MONTAGNES:**

18   **Q.**    KEEP GOING.

19   **A.**    IT WAS JUST A LOT OF COMPLAINING.

20   **Q.**    AND ABOUT HOW LONG WAS THAT?

21   **A.**    MAN, ABOUT A YEAR.

22   **Q.**    AND YOU MENTIONED IN YOUR TESTIMONY AND I JUST WANT TO BE

23   REALLY CLEAR.    THE JUDGE HAS ORDERED THAT WE CAN ONLY TALK

24   ABOUT THE TIME DURING THE DISCOVERY PERIOD.

25   **A.**    OKAY.

1  Q.   SO UP UNTIL SEPTEMBER 3OTH OF 2016.  BUT YOU TESTIFIED

2  THAT YOU RECEIVED WEEKLY PHYSICAL THERAPY.

3  A.   UH-HUH.

4  Q.   I WANT TO ASK, WAS THAT BEFORE WHEN YOU WERE INITIALLY ON

5  THE WARD, OR WAS THAT MORE RECENTLY?

6  A.   THAT WAS BEFORE WHEN I WAS INITIALLY ON THE WARD.  THE

7  PHYSICAL THERAPY CAME LATER ON DOWN THE LINE.  IT WAS A LOT OF

8  -- WENT THROUGH A LOT OF RED TAPE TO GET THAT, TOO.

9  Q.   BUT WERE YOU -- WHILE YOU WERE ON THE WARD THE FIRST TIME,

10  DID YOU GET PHYSICAL THERAPY WEEKLY?

11  A.   WEEKLY, YEAH.

12  Q.   OKAY.  AND WHEN DID YOU FIRST REQUEST THE SQUEEZE BALL?

13  A.   THIS WAS STILL IN THE -- POSSIBLY -- THIS WAS LIKE WHEN I

14  GOT THERE.  THIS COULD HAVE BEEN LIKE -- AS I'M ABLE TO SIT UP,

15  THIS COULD HAVE BEEN LIKE MAYBE TWO TO THREE WEEKS AFTER I CAME

16  OFF THE STREET.

17  Q.   AND YOU JUST RECENTLY GOT THE SQUEEZE BALL.  CORRECT?

18  A.   THE SQUEEZE BALL I HAVE NOW, YEAH.

19        MS. ROPER:  OBJECTION, YOUR HONOR.  THAT'S OUTSIDE

20  THE SCOPE OF PERIOD WHICH COUNSEL HAS BEEN OBJECTING TO

21  CONTINUOUSLY.

22        THE COURT:  SUSTAINED.

23  BY MS. MONTAGNES:

24  Q.   YOU MENTIONED THAT WHEN YOU HAD THAT INTERACTION WITH

25  NURSE FAUST ABOUT THE TRAPEZE BAR, YOU REALIZED THAT YOU HAD TO

1   GET OFF THE INFIRMARY.

2   **A.**   YES, MA'AM.

3   **Q.**   CAN YOU TELL ME WHY?

4   **A.**   LIKE I SAID, THAT LOOK, THAT LOOK  -- I MEAN, SHE STOPPED

5   DEAD IN HER TRACKS WITH A LOOK ON HER FACE LIKE -- I DON'T EVEN

6   KNOW HOW TO EXPLAIN IT, BUT IT WAS THAT LOOK JUST LETTING ME

7   KNOW, YOU KNOW, YOU GOT TO DO SOMETHING, YOU GOT TO DO

8   SOMETHING, MAN, YOU GOT TO SOMETHING REAL QUICK.

9   **Q.**   DID IT SCARE YOU?

10  **A.**   YEAH, IT SCARED ME.

11  **Q.**   AND YOU TESTIFIED THAT YOU SEE NURSES ON A DAILY BASIS

12  WHEN YOU ARE IN THE INFIRMARY.

13  **A.**   UH-HUH.

14  **Q.**   WHERE ARE THE NURSES GENERALLY WHEN YOU ARE IN THE

15  INFIRMARY?

16  **A.**   IF THEY NOT PASSING OUT PILLS OR DOING DRESSING CHANGES,

17  THEY'RE IN THE OFFICE.

18  **Q.**   AND WHERE IS THE OFFICE?

19  **A.**   IF I'M IN MY BED, YOU GOT FOUR ROWS -- FOUR BEDS IN EACH

20  ROW, AND THE NURSES' STATION IS LIKE TO THE RIGHT.  SO WHEN YOU

21  WALK IN THE DORM, YOU GOT LIKE MAYBE 30, 40 FEET, MAYBE A

22  LITTLE MORE THAN THAT AND THE NURSES' STATION IS TO YOUR RIGHT

23  AND ALL THE BEDS ARE TO YOUR LEFT.

24  **Q.**   AND IS THE NURSES' STATION ENCLOSED AT ALL?

25  **A.**   NO, MA'AM, IT'S OPEN.  WE CAN SEE IN.

**Q.**   DOES IT HAVE GLASS?

**A.**   YEAH, IT HAVE GLASS, UH-HUH.

**Q.**   OKAY.  AND THEN YOU MENTIONED THE WAYS IN WHICH YOU WERE

GETTING EXTRA PROTEIN, YOU WERE BUYING THINGS OFF THE

COMMISSARY.

**A.**   RIGHT.

**Q.**   HOW DID YOU PAY FOR THAT FOOD?

**A.**   WITH THE MONEY THAT MY FAMILY WOULD PROVIDE FOR ME.

**Q.**   AND ARE THERE GENTLEMEN ON THE WARD WHO DON'T HAVE ACCESS

TO THAT MONEY?

**A.**   YES.  IT'S SOME GUYS THAT GO TO SLEEP HUNGRY PRETTY MUCH

EVERY NIGHT.  I TRY TO DO WHAT I CAN DO WHEN I CAN DO IT, BUT,

YEAH, IF THEY DON'T HAVE NOTHING, THEY JUST GO TO BED HUNGRY.

    **MS. MONTAGNES:**  NO FURTHER QUESTIONS, YOUR HONOR.

    **THE COURT:**  WE ARE GOING TO TAKE A 15-MINUTE RECESS.

     YOU GET READY WITH YOUR NEXT WITNESS, PLEASE.

       **(RECESS.)**

    **THE COURT:**  BE SEATED.

     IT'S ALMOST 11:40.  THE COURT PLANS TO GO UNTIL

ABOUT 12:45, MAYBE A FEW MINUTES BEFORE 1:00, TAKE A LATE LUNCH

BREAK, SEE IF WE CAN BUILD UP A HEAD OF STEAM HERE.

    NEXT WITNESS.

    **MR. DUBNER:**  THANK YOU, YOUR HONOR.  JEFFREY DUBNER

HERE FOR THE PLAINTIFFS.

      PLAINTIFFS CALL DR. MICHAEL PUISIS.

1    **THE COURT:**  DR. PUISIS.

2                **MICHAEL PUISIS, D.O.,**

3    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

4        **MR. ARCHEY:**  JUDGE, BEFORE THEY GET STARTED IF IT

5    WILL EXPEDITE MATTERS, WE'RE NOT GOING TO HAVE ANY OBJECTION TO

6    HIS EXPERTISE.  I UNDERSTAND THEY STILL WANT TO BRING OUT SOME

7    OF THAT, I GET IT, BUT WE'RE NOT GOING TO HAVE ANY OBJECTIONS

8    IF THAT WILL STREAMLINE THINGS.

9        **THE COURT:**  MR. DUBNER, WHAT'S THE TENDER GOING TO

10   BE?

11       **MR. DUBNER:**  WE WILL TRY TO KEEP IT BRIEF, BUT WE

12   WILL BE TENDERING HIM IN INTERNAL MEDICINE AND CORRECTIONAL

13   MEDICINE.

14       **THE COURT:**  INTERNAL MEDICINE AND CORRECTIONAL

15   MEDICINE.

16       **MR. ARCHEY:**  AND WE HAVE NO OBJECTION, YOUR HONOR.

17       **THE COURT:**  ALL RIGHT.  THE COURT WILL PERMIT DR.

18   PUISIS TO GIVE OPINION TESTIMONY IN THE FIELDS OF INTERNAL

19   MEDICINE AND CORRECTIONAL MEDICINE, AND IF YOU WANT TO GO INTO

20   HIS BACKGROUND, YOU MAY DO SO VERY BRIEFLY.

21       **MR. DUBNER:**  I WILL MAKE IT BRIEF, YOUR HONOR.

22                **DIRECT EXAMINATION**

23   BY MR. DUBNER:

24   **Q.**   GOOD MORNING, DR. PUISIS.

25   **A.**   GOOD MORNING.

11:40   1   **Q.**   COULD YOU JUST STATE YOUR NAME FOR THE RECORD?

2   **A.**   MICHAEL PUISIS.

3   **Q.**   AND --

4   **A.**   IT'S SPELLED P-U-I-S-I-S.

5   **Q.**   AS WE'VE JUST DISCUSSED, WE WILL GO OVER BRIEFLY SOME OF

6   YOUR CREDENTIALS.  COULD YOU JUST DESCRIBE YOUR EDUCATIONAL AND

7   MEDICAL TRAINING?

8   **A.**   I FINISHED OSTEOPATHIC SCHOOL IN 1982.  I DID TRAINING IN

9   INTERNAL MEDICINE AT COOK COUNTY HOSPITAL AND WAS BOARD

10   CERTIFIED IN 1985.

11   **Q.**   AND WHAT HAS YOUR EXPERIENCE WORKING IN CORRECTIONAL

12   MEDICINE BEEN?

13   **A.**   I WAS IN THE NATIONAL HEALTH SERVICE CORPS, AND I STARTED

14   AN OBLIGATION AT THE COOK COUNTY JAIL IN 1985.  I BECAME

15   MEDICAL DIRECTOR, WORKED THERE UNTIL '96, WORKED FOR A COUPLE

16   OF COMPANIES AS THE MEDICAL DIRECTOR OF THEIR PROGRAM,

17   PROVIDING SUPERVISION OVER THE PROGRAMS IN NEW MEXICO AND

18   ILLINOIS, AND THEN BECAME A CONSULTANT.  AND IN 2009, I

19   RETURNED TO COOK COUNTY JAIL AS THE CHIEF OPERATING OFFICER FOR

20   THREE AND A HALF YEARS.

21   **Q.**   WHEN YOU SAY THAT YOU WORKED IN NEW MEXICO, WHAT POSITIONS

22   DO YOU HOLD THERE?

23   **A.**   I WAS THE REGIONAL MEDICAL DIRECTOR.

24   **Q.**   DO YOU ALSO HAVE EXPERIENCE CONSULTING IN CORRECTIONAL

25   MEDICINE?

**A.**    I DO.

**Q.**    AND WHO ARE SOME OF THE ENTITIES THAT YOU HAVE CONSULTED

FOR?

**A.**    I'VE WORKED FOR THE DEPARTMENT OF JUSTICE SINCE THE LATE

'80S, AND I'VE WORKED FOR HOMELAND SECURITY CONSULTING AT ICE

FACILITIES.  I'VE WORKED FOR FEDERAL COURTS IN CALIFORNIA.  I'M

A COURT EXPERT FOR THE JUDGE.  AND I'VE MONITORED ABOUT NINE

PROGRAMS OVER THE COURSE OF MY TENURE.

**Q.**    HAVE YOU ALSO EVER BEEN RETAINED BY ANY PRISON OR JAIL

SYSTEMS THEMSELVES?

**A.**    I HAVE.  I WAS HIRED BY DALLAS COUNTY, STATE OF MARYLAND

FOR BALTIMORE CITY JAIL.  AND THERE WAS ONE OTHER ONE THAT I --

**Q.**    AND WHAT WORK HAVE YOU DONE WITH PROFESSIONAL

ORGANIZATIONS SURROUNDING STANDARDS IN CORRECTIONAL MEDICINE,

IF ANY?

**A.**    I'VE DONE A NUMBER OF KIND OF VOLUNTEER CONSULTING.  I'VE

WORKED FOR THE CENTERS FOR DISEASE CONTROL IN HELPING THEM

ESTABLISH THEIR TB STANDARD.  I WAS ON THE ADVISORY COUNCIL FOR

THE ELIMINATION OF TB FOR THE CENTERS FOR DISEASE CONTROL.  I

WORKED FOR THE AMERICAN DIABETIC ASSOCIATION DEVELOPING

DIABETES STANDARDS FOR JAILS.  I WAS ON A REVISION OF THE

STANDARDS FOR THE NATIONAL COMMISSION OF CORRECTIONAL

HEALTHCARE AND ON THE COMMITTEE FOR THE AMERICAN PUBLIC

HEALTHCARE ASSOCIATION OF JAIL STANDARDS.  THERE MAY HAVE BEEN

ONE OR TWO OTHERS.

1   Q.   AND JUST TO FINISH DISCUSSING YOUR CREDENTIALS, DO YOU

2   HAVE ANY NOTEWORTHY PUBLICATIONS THAT YOU'VE AUTHORED OR EDITED

3   IN THE FIELD?

4   A.   I HAVE AUTHORED A NUMBER OF ARTICLES AND PUBLISHED A

5   TEXTBOOK OF CORRECTIONAL MEDICINE THROUGH TWO EDITIONS.

6   Q.   AND LET'S TURN TO THIS CASE.  WHAT WAS YOUR ASSIGNMENT IN

7   THIS CASE?

8   A.   I WAS ON A TEAM OF THREE, WITH MADDIE LAMARRE AND SUSI

9   VASSALLO, WHO'S AN E.R. PHYSICIAN; AND MADDIE IS A NURSE

10  PRACTITIONER.  AND WE KIND OF DIVIDED UP THE AREAS OF

11  INVESTIGATION SO THAT WE WOULD COVER ALL AREAS THAT WE NEEDED

12  TO COVER, AND WE CAME TO TOUR THE FACILITY AND SPENT FOUR DAYS

13  AT THE FACILITY.

14  Q.   AND WHAT WERE YOU TRYING TO DETERMINE?

15  A.   WE WERE TRYING TO DETERMINE WHETHER CARE WAS ADEQUATE AT

16  THE FACILITY.

17  Q.   OKAY.  DID YOU WORK WITH THE LAWYERS TO DEVELOP SOME

18  SLIDES TO ACCOMPANY YOUR TESTIMONY?

19  A.   I DID.  YES.

20  Q.   COULD YOU JUST GIVE THE COURT AN OVERVIEW OF YOUR

21  FINDINGS?

22  A.   OUR FINDINGS ARE THAT THE CARE OVERALL WAS INADEQUATE AND

23  THAT THERE WERE MULTIPLE SYSTEMIC DEFICIENCIES, OPERATIONAL AND

24  OTHERWISE, COMBINED WITH SIGNIFICANT CLINICAL DEFICIENCIES, THE

25  COMBINATION OF WHICH RESULTED IN MORBIDITY, MORTALITY, AND AN

1   INADEQUATE PROGRAM.

2   **Q.**   AND WE WILL RETURN TO THOSE FINDINGS IN A LITTLE BIT MORE

3   DETAIL, BUT LET'S TALK FIRST ABOUT HOW YOU REACHED THOSE.   WHAT

4   DID YOU DO TO EVALUATE THE CARE GIVEN AT ANGOLA?

5   **A.**   WE INTERVIEWED STAFF AND SOME INMATES, INCLUDING CLASS

6   MEMBERS.   WE REVIEWED DOCUMENTS THAT WERE PROVIDED TO US.   WE

7   TOURED THE FACILITY AND, IN SOME CASES, OBSERVED CARE AS IT WAS

8   PROVIDED, AND WE REVIEWED MEDICAL RECORDS.

9   **Q.**   LET'S BEGIN WITH THAT TOUR OF THE FACILITY.   HOW LONG WAS

10   YOUR VISIT TO ANGOLA?

11   **A.**   IT WAS APPROXIMATELY FOUR DAYS, AND I THINK WE LEFT IN THE

12   FOURTH DAY A LITTLE EARLY.   BUT IT WAS APPROXIMATELY FOUR DAYS.

13   **Q.**   AND WERE ALL THREE OF YOU THERE THE WHOLE TIME?

14   **A.**   I BELIEVE DR. VASSALLO MAY HAVE COME A LITTLE BIT LATE

15   INTO THE FIRST DAY, BUT I DON'T RECALL.

16   **Q.**   COULD YOU HAVE DONE A THOROUGH REVIEW OF THE SITE IN, SAY,

17   ONE DAY?

18   **A.**   NO, THERE'S NO WAY.   I DON'T THINK YOU CAN REASONABLY DO

19   IT IN ONE DAY.

20   **Q.**   AND WHY IS THAT?

21   **A.**   WELL, JUST THE SIZE OF THE FACILITY.   IT WOULD TAKE ONE

22   DAY TO JUST SEE IT AND TO BEGIN YOUR INVESTIGATION.   IT'S, YOU

23   KNOW, A 28-SQUARE-MILE CAMPUS.

24   **Q.**   LET'S TALK ABOUT THE REVIEW OF RECORDS THAT YOU DESCRIBED.

25   WHY DID YOU REVIEW MEDICAL RECORDS IN ASSESSING CARE?

**A.**   WELL, IT IS ONE OF THE MOST IMPORTANT ASPECTS BECAUSE IT

REFLECTS THE ACTUAL CLINICAL CARE THAT THE PATIENTS RECEIVED.

**Q.**   HOW DO YOU DETERMINE WHICH RECORDS TO REVIEW?

**A.**   WE CHOSE RECORDS OF PEOPLE WHO HAD SERIOUS MEDICAL

CONDITIONS OR POTENTIALLY SERIOUS MEDICAL CONDITIONS.  AND THE

REASON FOR DOING THAT IS THAT WE WANT TO TEST THE PROGRAM TO

ENSURE THAT PEOPLE WITH A SERIOUS MEDICAL CONDITION WOULD BE

APPROPRIATELY TREATED, UNDER THE ASSUMPTION THAT IF SOMEONE

WITH A SERIOUS MEDICAL CONDITION WAS APPROPRIATELY TREATED,

THEN OTHERS PROBABLY WOULD ALSO BE SO APPROPRIATELY TREATED.

**Q.**   DID YOU ALSO REVIEW RECORDS OF PATIENTS WHO HAD PASSED

AWAY?

**A.**   YES, WE DID.

**Q.**   AND WHY DID YOU REVIEW THOSE?

**A.**   WELL, OBVIOUSLY THEY HAD A SERIOUS MEDICAL ILLNESS, AND IT

ALLOWS US TO SEE THE DEGREE OF POTENTIAL HARM THAT MAY HAVE

OCCURRED, YOU KNOW, UNDER CONDITIONS OF THE CARE THEY RECEIVED.

**Q.**   IN YOUR EXPERIENCE, IS THIS A STANDARD WAY OF REVIEWING

RECORDS TO DETERMINE THE ADEQUACY OF CARE IN A CORRECTIONAL

MEDICAL FACILITY?

**A.**   YES.

**Q.**   ABOUT HOW MANY CHARTS DID THE THREE OF YOU -- YOURSELF,

DR. VASSALLO, AND NURSE LAMARRE -- REVIEW?

**A.**   I REVIEWED 14 THOROUGHLY, AND A FEW OF THE NAMED

PLAINTIFFS LESS THOROUGHLY.  I DIDN'T WRITE -- INCLUDE THOSE IN

1    MY REPORT, BUT I DID MAKE NOTES ON THEM, AND A TOTAL, IT WAS

2    APPROXIMATELY 50.  I DON'T REMEMBER EXACTLY HOW MANY DR.

3    VASSALLO OR MS. LAMARRE COMPLETED.

4    **Q.**   OF THAT TOTAL OF 50, YOU MEAN ACROSS THE THREE OF YOU?  DO

5    I UNDERSTAND YOU?

6    **A.**   YES.

7    **Q.**   THANK YOU.  AND YOU SAID THAT YOU REVIEWED SOME OF THE

8    NAMED PLAINTIFFS.  DID YOU CONSIDER THEM PART OF THE SAMPLE YOU

9    DESCRIBED OF PATIENTS WITH CHRONIC ILLNESSES OR SERIOUS

10   CONDITIONS?

11   **A.**   THEY ALL HAD A -- WHAT I WOULD CONSIDER A SERIOUS ILLNESS,

12   AND THEIR CARE WAS VERY SIMILAR TO THE CARE OF THE CHARTS I

13   REVIEWED.  I THOUGHT THEY WERE COMPARABLE, ALTHOUGH WE DIDN'T

14   WRITE THEM -- ALTHOUGH I DIDN'T WRITE THEM UP, YOU KNOW, I

15   THOUGHT THERE WAS NO DIFFERENCE IN THE --

16        **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO OBJECT.  THIS

17   IS OUTSIDE OF HIS REPORT.  HE HAS NOTHING IN THE REPORT ABOUT

18   THE NAMED PLAINTIFFS.  THEY JUST DIDN'T ADDRESS THAT IN THEIR

19   EXPERT REPORT.

20        **THE COURT:**  MR. DUBNER.

21        **MR. DUBNER:**  THEY ARE ALL DISCUSSED IN THE REBUTTAL

22   REPORT.  PAGES, I BELIEVE, 7 TO 22 OF THE REBUTTAL REPORT

23   DISCUSSED SEVERAL OF THE NAMED PLAINTIFFS.

24        **THE COURT:**  MR. ARCHEY.

25        **MR. ARCHEY:**  THAT'S RIGHT, IT'S IN THE REBUTTAL

1   REPORT.  THEY DIDN'T PUT IT IN THE RECORD IN THEIR INITIAL

2   REPORT, I AGREE.

3            **THE COURT:**  THE OBJECTION IS SUSTAINED.

4            **MR. DUBNER:**  OKAY, YOUR HONOR.

5   **BY MR. DUBNER:**

6   **Q.**   AND THEN IN ADDITION TO MEDICAL RECORDS, ARE THERE OTHER

7   DOCUMENTS FROM THE DEPARTMENT OF CORRECTIONS OR FROM LSP THAT

8   YOU LOOKED AT?

9   **A.**   THE TEAM LOOKED AT A FAIR NUMBER OF DOCUMENTS.  I, MYSELF,

10  LOOKED AT WHATEVER STAFFING DOCUMENTS WERE AVAILABLE, THE

11  BUDGETARY DOCUMENTS MADE AVAILABLE BY THE WARDEN'S SECRETARY,

12  QUALITY IMPROVEMENT REPORTS, MORTALITY REVIEW OR MORTALITY

13  SUMMARY DOCUMENTS.  WE DOCUMENTED ALL THE DOCUMENTS THAT WE

14  REVIEWED IN OUR REPORT.

15  **Q.**   DID YOU PERSONALLY LOOK AT LSP OR DOC'S POLICIES OR

16  DIRECTIVES IN SIGNIFICANT DETAIL?

17  **A.**   MS. LAMARRE REVIEWED THE POLICIES, SO YOU'D HAVE TO ASK

18  HER.

19  **Q.**   BUT YOU PERSONALLY, THAT WAS NOT ONE OF YOUR ROLES?

20  **A.**   NO.

21  **Q.**   OKAY.  THANK YOU.  SO LET'S TALK ABOUT THE AREAS THAT YOU

22  AND THE OTHER EXPERTS LOOKED AT.  COULD YOU DISCUSS HOW YOU

23  DIVIDED RESPONSIBILITIES AMONG THE THREE EXPERTS?

24  **A.**   I'VE WORKED WITH MS. LAMARRE BEFORE, SO SHE AND I HAVE

25  FAMILIARITY WITH EACH OTHER.  WE FOCUSED ON AREAS WHERE WE HAD

1    PROBABLY THE GREATEST EXPERTISE, AND THAT'S HOW WE DID IT.

2            AND MS. LAMARRE FOCUSED ON -- INCLUDED ACCESS TO

3    CARE, WHICH IS THE SICK CALL PROCESS AND THE MEDICATION

4    ADMINISTRATION, BECAUSE SHE ALSO IS A NURSE IN ADDITION TO

5    BEING A NURSE PRACTITIONER.  SO SHE WAS ABLE TO BOTH REVIEW

6    PATIENT CARE, BUT ALSO THOSE NURSING ITEMS THAT SUSI AND I WERE

7    NOT EXPERT IN.

8    Q.    AND COULD YOU TELL THE COURT WHAT AREAS YOU PERSONALLY

9    FOCUSED ON?

10   A.    I FOCUSED ON THE ORGANIZATIONAL STRUCTURE, THE STAFFING,

11   BUDGET, THE HEALTHCARE OPERATIONS, THE MEDICAL RECORD.  I DID

12   SOME OF CHRONIC CARE, SPECIALTY CARE, LABORATORY, THE INFIRMARY

13   CARE, SOME OF MORTALITY REVIEW, AND QUALITY IMPROVEMENT.

14   Q.    SO HOW DO YOU COMPILE THE THREE EXPERTS' WORK INTO ONE

15   REPORT?

16   A.    WE EACH WROTE SECTIONS.  WE USED A DROPBOX OR EMAIL.  WE

17   WOULD ADD OUR SECTION.  ALL OF US REVIEWED THE ENTIRE REPORT.

18   WE MADE COMMENTS, EDITS TO SECTIONS.  WE ENSURED THAT IN SOME

19   AREAS WHERE TWO OF US WOULD BE WRITING ONE OF THE SECTIONS OF

20   THE REPORT, WE MADE SURE THAT IT WAS INTEGRAL.  WE TRIED TO

21   REDUCE REDUNDANCY, AND THAT'S HOW WE DID IT.

22   Q.    AND DO YOU PERSONALLY REVIEW THE REPORT TO ENSURE THAT YOU

23   AGREED WITH EVERYTHING THAT WAS IN IT?

24   A.    YES.

25   Q.    AND DID YOU SEE ANYTHING IN THE FINAL REPORT THAT YOU

1 DISAGREED WITH?

2 **A.**   NO.

3 **Q.**   I'D LIKE TO DRILL DOWN A LITTLE BIT MORE ON HOW YOU

4 ASSESSED THE CARE WHEN YOU LOOKED AT THE MEDICAL SYSTEM AND, IN

5 PARTICULAR, RECORDS.  WHAT DO YOU LOOK FOR, WHEN YOU REVIEW

6 MEDICAL RECORDS, TO EVALUATE THE ADEQUACY OF CARE?

7 **A.**   I REVIEW EACH EPISODE OF CARE, AND I'M LOOKING AT WHAT THE

8 PROVIDER IS DOING WITH RESPECT TO THE CONDITION OF THE PATIENT

9 TO ENSURE THAT THE HISTORY IS ADEQUATE, THE EXAMINATIONS ARE

10 ADEQUATE, AND THE ASSESSMENT AND PLAN IS ADEQUATE, AND I PUT

11 THAT IN THE CONTEXT OF THE OVERALL CARE OF THE PATIENT.

12        SO, FOR EXAMPLE, IF THE PATIENT SEES A SPECIALIST, I

13 WANT TO MAKE SURE THAT THE REPORT IS PRESENT IN THE RECORD,

14 THAT IT'S REVIEWED, AND THAT THE RECOMMENDATION OF THE

15 SPECIALIST IS ACTED ON.  I WANT TO MAKE SURE THAT THE PROVIDER

16 IS ATTUNED TO THE MEDICATION THAT THE PATIENT IS RECEIVING,

17 NOTES IT IN THE RECORD, AND ENSURES THAT THE PATIENT IS GETTING

18 IT, AND I WANT TO MAKE SURE THAT THE TESTING THAT IS DONE FOR

19 THE PATIENT, LABORATORY TESTING, RADIOLOGICAL TESTING HAS BEEN

20 DONE AND REVIEWED AND ACTED ON BY THE PATIENT.  SO IT IS A WAY

21 TO DEMONSTRATE DEFICIENCIES WHEN THEY OCCURRED.

22        FOR EXAMPLE, IF A PHYSICIAN ORDERS A LAB BUT IT'S NOT

23 REVIEWED, THAT SHOULD BE -- I WOULD NOTE THAT.  IF A PATIENT

24 SHOULD HAVE A LAB AND THE DOCTOR DIDN'T ORDER IT, I WOULD NOTE

25 THAT.  IF A PATIENT ISN'T RECEIVING MEDICATION, I WOULD MAKE

1  NOTE OF THAT.  SO IT REALLY EVALUATES MULTIPLE ASPECTS OF THE

2  PROGRAM AND THE SYSTEM OF PROVIDING CARE, INCLUDING THE QUALITY

3  OF THE PHYSICIAN CARE.

4  **Q.**   IN ASSESSING THE QUALITY OF THE PHYSICIAN CARE AND, LIKE

5  YOU SAID, AND WHETHER SOMETHING SHOULD HAVE BEEN DONE WAS NOT,

6  HOW DO YOU DETERMINE WHAT SHOULD HAVE BEEN DONE?

7  **A.**   WELL, IN GENERAL, WE UTILIZE JUST CONTEMPORARY STANDARDS.

8  SO FOR EXAMPLE, FOR DIABETES, WE WOULD USE AS A BENCHMARK THE

9  AMERICAN DIABETES ASSOCIATION STANDARDS OF DIABETIC CARE; FOR

10 HYPERTENSION, THE NATIONAL HEART, LUNG, AND BLOOD HYPERTENSION

11 STANDARDS, ET CETERA.  AND WHEN THERE IS NOT A STANDARD,

12 PERSONALLY I UTILIZE UPTODATE WHICH IS AN ONLINE RESOURCE FOR

13 PROVISION OF CARE AND PRIMARY CARE.

14 **Q.**   AND ARE THOSE, IN YOUR EXPERIENCE, COMMONLY USED BY

15 PROFESSIONALS IN THE FIELD?

16 **A.**   YES.  THEY ARE JUST STANDARD OF -- SO IF YOU -- IN THE

17 COMMUNITY, THEY WOULD BE CONSIDERED, I BELIEVE, STANDARD OF

18 CARE.

19 **Q.**   IN YOUR REPORT YOU ALSO REFER TO STANDARDS PUT OUT BY THE

20 NATIONAL COMMISSION ON CORRECTIONAL HEALTHCARE, WHICH IF I

21 REFER TO THAT AS THE NCCHC, WILL YOU UNDERSTAND?

22 **A.**   YES.

23 **Q.**   AND THE AMERICAN CORRECTIONAL ASSOCIATION, OR ACA?

24 **A.**   YES.

25 **Q.**   YOU REFER TO THOSE STANDARDS IN YOUR REPORT.  HOW DOES

11:57  1  THAT RELATE TO THE STANDARDS YOU WERE JUST DESCRIBING?

2  **A.**    SO THEY ARE DIFFERENT BECAUSE ACA, NCCHC, AND EVEN THE

3  AMERICAN PUBLIC HEALTH ASSOCIATION STANDARDS ARE NOT CLINICAL

4  STANDARDS.    THEY DESCRIBE RECOMMENDATIONS FOR HOW THE PROCESS

5  OF HEALTHCARE SHOULD BE CONDUCTED, AND THEY GIVE GUIDANCE ON

6  PROCESSES AS OPPOSED TO CLINICAL CARE.

7          AND SO, FOR EXAMPLE, THEY WILL SAY THAT, YOU KNOW, AN

8  INFIRMARY NEEDS TO BE A PLACE WHERE THERE'S AN RN PRESENT,

9  WHERE THE PATIENTS ARE WITHIN SIGHT AND SOUND OF A NURSE, ET

10  CETERA.    THEY HAVE STANDARDS ON CREDENTIALING.    THEY HAVE

11  STANDARDS ON STAFFING.    BUT THEY DON'T TELL YOU HOW DO YOU CARE

12  FOR A DIABETIC.    SO THOSE ARE VERY DIFFERENT.    AND WHILE THE --

13  AND WE USE THE NCCHC PRINCIPALLY TO ENSURE THAT THE POLICIES OF

14  AN ORGANIZATION ARE CONSISTENT WITH THE REQUIREMENTS OF A

15  CORRECTIONAL SYSTEM.

16          BUT WITH RESPECT TO CLINICAL CARE, YOU CAN'T USE IT

17  BECAUSE THEY ARE SILENT.    AND CLINICAL CARE REALLY IS, IN MY

18  ESTIMATION, THE MOST IMPORTANT ASPECT OF CARE BECAUSE IT

19  DETERMINES WHETHER SOMEONE WITH A SERIOUS MEDICAL CONDITION

20  ACTUALLY RECEIVES APPROPRIATE MANAGEMENT.

21  **Q.**    IS IT POSSIBLE TO COMPLY WITH THE NCCHC OR ACA STANDARDS

22  BUT STILL NOT PROVIDE CLINICAL CARE OR STANDARD CARE?

23  **A.**    YES.    I MEAN, I HAVE SEEN IT, YOU KNOW, IN A NUMBER OF

24  OCCASIONS.

25  **Q.**    AND IF YOU COULD BRIEFLY EXPLAIN THE DIFFERENCE BETWEEN

11:59   1   THE STANDARDS.  WHAT IS THE NCCHC?

2   **A.**   THE NCCHC STARTED IN THE SEVENTIES, SIXTY, SEVENTIES, AND

3   IT WAS -- PRIOR TO ITS INITIATION, THE AMERICAN MEDICAL

4   ASSOCIATION DID A SURVEY OF CORRECTIONAL FACILITIES WITH

5   RESPECT TO MEDICAL CARE, AND THEY MADE A NUMBER OF

6   RECOMMENDATIONS ON HOW TO IMPROVE IT.  AND THIS, I BELIEVE, WAS

7   IN THE LATE SIXTIES.

8        THE GROUP THAT PARTICIPATED IN THAT, A FEW OF THEM

9   BECAME THE GROUP THAT ESTABLISHED THE NATIONAL COMMISSION ON

10   CORRECTIONAL HEALTHCARE, AND THAT INITIATIVE TO IMPROVE THE

11   SERVICES IN THE CORRECTIONAL FACILITIES, AND SOME OF THOSE

12   INITIAL RECOMMENDATIONS BECAME THE FOUNDATION OF WHAT THE NCCHC

13   WAS.  SO THEY WERE THE FIRST ORGANIZATION TO DEVELOP

14   RECOMMENDATIONS AND STANDARDS FOR HOW TO MAINTAIN AN

15   APPROPRIATE CORRECTIONAL HEALTH SYSTEM, AND THAT'S HOW THEY

16   STARTED.  AND IT'S A VOLUNTEER ACCREDITING ORGANIZATION.  IT

17   STILL EXISTS TODAY, AND IT WAS THE -- YOU KNOW, THE FOUNDING

18   OF, YOU KNOW, THE IMPROVEMENT OF MEDICAL CARE IN PRISONS AND

19   JAILS.

20   **Q.**   IS THAT WIDELY LOOKED TO WITHIN THE CORRECTIONAL MEDICINE

21   FIELD?

22   **A.**   I'M SORRY.  I DIDN'T HEAR YOU.

23   **Q.**   IS THAT WIDELY LOOKED TO AND RELIED UPON BY EXPERTS IN

24   CORRECTIONAL MEDICINE?

25   **A.**   YES.

12:00   1   **Q.**   AND THEN IF YOU COULD TALK ABOUT THE AMERICAN CORRECTIONAL

2   ASSOCIATION STANDARDS AS WELL.

3   **A.**   WELL, SO THE ACA IS A -- IS PRINCIPALLY A CUSTODY

4   ORGANIZATION, SO THEY ACCREDIT CORRECTIONAL FACILITIES WITH

5   RESPECT TO CUSTODY SYSTEMS.  AND SOMETIME IN THE EIGHTIES OR SO

6   THEY WANTED TO ALSO BEGIN ACCREDITING FACILITIES BASED ON

7   MEDICAL CARE.  SO THEY KIND OF DUPLICATED WHAT THE NCCHC DOES.

8   AND MOST OF THEIR STANDARDS ARE VERY SIMILAR TO THE NCCHC.

9           THEY'RE A DIFFERENT ORGANIZATION.  I THINK THEY

10   ACCREDIT IN A DIFFERENT WAY.  I, MYSELF, AM NOT PARTICULARLY

11   FAMILIAR WITH THE ACA BECAUSE I BELIEVE THAT THE NCCHC, BEING

12   PRINCIPALLY DEDICATED TO HEALTHCARE, IS A BETTER STANDARD SET.

13   BUT THEY'RE ROUGHLY SIMILAR STANDARDS.

14   **Q.**   YOU ALSO REFERRED TO THE AMERICAN PUBLIC HEALTH

15   ASSOCIATION PUTTING OUT STANDARDS.  WHAT ARE THOSE?

16   **A.**   SO THE AMERICAN PUBLIC HEALTH ASSOCIATION HAS PUT OUT

17   STANDARDS ON JAILS AND PRISONS.  THEY ARE PROBABLY A HIGHER

18   LEVEL OF STANDARD.  THEY HAVE GREATER REQUIREMENTS, AND IT'S A

19   LITTLE HIGHER LEVEL THAN WHAT THE NCCHC IS, AND THEY COME AT IT

20   FROM A DIFFERENT PERSPECTIVE, ONE FROM PUBLIC HEALTH.  BUT I

21   THINK THE NCCHC IS PROBABLY MORE UNIVERSALLY IMPLEMENTED.

22   **Q.**   DID YOU RELY ON THOSE STRICTER AMERICAN PUBLIC HEALTH

23   ASSOCIATION STANDARDS IN YOUR REPORT?

24   **A.**   NO.

25   **Q.**   LET'S MOVE OVER TO TALKING ABOUT ANGOLA ITSELF.  I WOULD

12:02   1   LIKE TO GIVE THE COURT -- I WOULD LIKE FOR YOU TO GIVE THE
        2   COURT THE LAY OF THE LAND, SO TO SPEAK.  WHERE IS ANGOLA
        3   LOCATED?
        4   **A.**   SO ANGOLA IS ABOUT -- MY UNDERSTANDING LOOKING UP
        5   WIKIPEDIA, IT'S 50 MILES APPROXIMATELY FROM BATON ROUGE AND
        6   ABOUT 150 MILES FROM NEW ORLEANS.  IT'S NESTLED IN A LITTLE
        7   NOOK OF THE MISSISSIPPI RIVER.  ON ONE SIDE A ROAD FROM
        8   ST. FRANCISVILLE DEAD ENDS AT TUNICA, WHICH IS THE TOWN OF
        9   ANGOLA.  AND IT HAS A -- IT'S A 28-SQUARE-MILE CAMPUS WITH
       10   LITERALLY A SMALL TOWN IN THE MIDDLE OF IT WHERE STAFF STILL
       11   LIVE, AND IT HAS, YOU KNOW, FOUR CAMPS WHICH YOU CAN'T GET TO
       12   EASILY.  YOU HAVE TO DRIVE.  SO IT'S ABOUT A 5- OR A 10-MILE
       13   DRIVE.  I'M NOT SURE OF THE EXACT DISTANCE.  BUT THE FOUR CAMPS
       14   ARE REMOTE ABOUT THE FACILITY.  IT'S A FARM, SO THE LAND IS
       15   USED TO FARM VEGETABLES AND I BELIEVE CATTLE.
       16            AND THEY HAVE A MAIN MEDICAL COMPLEX AREA.  THE
       17   CAMPS -- THE FOUR CAMPS HOLD ABOUT 3000 INDIVIDUALS.  THE
       18   MEDICAL AREA HAS A SERIES OF DORMITORIES.  I THINK IT'S 32
       19   DORMS, THREE OF WHICH ARE MEDICAL DORMS.  IT HAS CELLBLOCKS.
       20   IT ALSO HOLDS ABOUT 3000, 3500 PEOPLE.  THE CELLBLOCKS ARE THE
       21   INDIVIDUAL CELLS, AND THE DORMS ARE, I'M GUESSING, 50 TO 80
       22   PEOPLE, MAYBE PERHAPS MORE.
       23            EACH OF THE CAMPS HAS A MEDICAL CLINIC ASSOCIATED
       24   WITH IT, SO TWO EXAMINATION ROOMS.  THE ROBERT E. BARROW
       25   CENTER, WHICH IS THE MEDICAL COMPLEX CLINIC HAS ADMINISTRATIVE

12:05   1   OFFICES, AN X-RAY UNIT, A LAB, A PHARMACY.  IT HAS SEVEN
      2   EXAMINATION ROOMS WHICH ARE NEXT TO THE MEDICAL RECORD ROOM.
      3   IT HAS TWO INFIRMARIES, UNIT 1 AND 2.  UNIT 1 IS FOR ACUTE
      4   PATIENTS; UNIT 2 IS FOR CHRONIC ILLNESS PATIENTS.
      5            IT USED TO BE CALLED A HOSPITAL.  IT'S NOT A HOSPITAL
      6   AT ALL.  IT'S FAR FROM A HOSPITAL.  IT HAS AN ACUTE TREATMENT
      7   UNIT, OR THEY CALL IT THE ATU, WHERE THEY SEE PATIENTS ON AN
      8   URGENT BASIS.  IT HAS A -- ACROSS THE ROAD FROM THE BARROW
      9   CENTER IS A GARAGE WHERE THEY HOUSE THE AMBULANCE SERVICE, AND
     10   THAT'S WHERE THE EMTS ARE LOCATED.  AND IT HAS A NEW BUILDING
     11   WHICH IS A PROCEDURAL ROOM WHICH IS NEXT TO THE BARROW CENTER.
     12   AND THEY DO COLONOSCOPIES, ULTRASOUNDS, AND SOME TELEMEDICINE.
     13   AND THEY HAVE SIX EXAMINATION ROOMS THERE.
     14   Q.   TO UNDERSTAND A COUPLE OF THE PIECES OF THAT DESCRIPTION,
     15   WHAT DO YOU MEAN WHEN YOU SAID THAT "ANGOLA DOESN'T HAVE A
     16   HOSPITAL"?
     17   A.   WELL, IT DOESN'T HAVE A HOSPITAL.  I MEAN . . .
     18   Q.   LET ME REPHRASE.  WHAT ARE THE DIFFERENCES BETWEEN WHAT
     19   ANGOLA HAS AND A HOSPITAL?
     20   A.   WELL, LET ME JUST PUT IT IN CONTEXT.  I THINK LEGACY-WISE,
     21   I'VE BEEN IN A COUPLE CORRECTIONAL FACILITIES WHERE THEY WOULD
     22   CALL THE MEDICAL UNIT THE HOSPITAL, AND IT'S A COLLOQUIAL TERM
     23   THAT'S USED THAT REALLY DOESN'T MATCH THE DEFINITION OF A
     24   HOSPITAL.  A HOSPITAL WOULD BE A UNIT WHERE THEY HAVE 24-HOUR
     25   SERVICES WITH FULL-TIME LAB, X-RAY, AND SERVICES THAT WOULD

1   PASS ACCREDITATION BY THE JOINT COMMISSION OR BY THE PUBLIC

2   HEALTH DEPARTMENT SO THAT THEY COULD OPERATE AS A HOSPITAL.

3   ANGOLA DOES NOT HAVE THAT.  I MEAN, IT'S MORE OF A WALK-IN

4   URGENT CENTER ARRANGEMENT.

5   **Q.**   AND YOU DESCRIBE THE ACUTE TREATMENT UNIT AT THE ATU.  IS

6   THAT AN EMERGENCY ROOM?

7   **A.**   WELL, NOT BY A STANDARD DEFINITION.  I MEAN, IT'S -- THEY

8   SEE EMERGENCY PATIENTS, BUT IT'S NOT AN EMERGENCY ROOM.  IT

9   DOESN'T HAVE THE SERVICES THAT WOULD NORMALLY BE PRESENT IN AN

10   EMERGENCY ROOM.

11   **Q.**   SO WHAT DOES ANGOLA DO IF A PATIENT NEEDS HOSPITALIZATION

12   OR TO GO TO THE EMERGENCY ROOM?

13   **A.**   WELL, WHAT THEY SHOULD DO IS IF SOMEBODY NEEDS EMERGENCY,

14   THEY SHOULD SEND THEM TO AN EMERGENCY ROOM.  OBVIOUSLY THAT'S A

15   LITTLE COMPLICATED THERE BECAUSE IT'S A TRIP, AND THEY ARE

16   REMOTE, BUT THAT'S WHAT SHOULD HAPPEN.

17   **Q.**   AND IN PRACTICE, DID YOU SEE WHERE THEY SEND PEOPLE?

18   **A.**   SO THEY UTILIZE A VARIETY OF LOCATIONS, INCLUDING THERE'S

19   A FEW LOCAL HOSPITALS.  SOMETIMES THEY SEND THEM TO ORLEANS,

20   SOMETIMES TO BATON ROUGE, SOMETIMES -- I THINK THERE'S A PLACE

21   IN ST. FRANCISVILLE.  BUT DR. VASSALLO DID MOST OF THE

22   EMERGENCY EVALUATION, SO . . .

23   **Q.**   AND LET'S TALK ABOUT THE CLINICAL SPACES THAT YOU LOOKED

24   OUT A LITTLE BIT.  WHAT DEFICITS DID YOU SEE IN THE MEDICAL

25   EXAMINATION AREAS?

**A.**   SO LET ME JUST PREFACE THAT BY SAYING THAT THE NEW
PROCEDURE AREA -- THERE'S SIX EXAMINATION ROOMS -- HAS THE BEST
SUPPLIED AND IT'S CLEAN, IT'S ORDERLY, THEY HAVE EQUIPMENT, BUT
IT'S SIGNIFICANTLY UNDERUTILIZED.  IT IS WHAT SHOULD BE WHAT
EVERY EXAMINATION ROOM SHOULD LOOK LIKE, BUT IT -- THEY ONLY
USE IT FOR COLONOSCOPY, FOR THE ULTRASOUND TECHNICIAN, THE
PERSON WHO DOES SPIROMETRY, AND SOME OF THE SPECIALISTS WHO
COME IN.

THE MAJORITY OF CLINICAL CARE -- BY FAR, THE MAJORITY
OF THE CLINICAL CARE AND ALL OF THE DOCTORS' CLINICS AND OTHER
EVALUATIONS IS CONDUCTED IN -- MOSTLY IN THE BARROW CENTER BUT
THEN IN THE CAMPS AS WELL.

AND I WANT TO PREFACE MY REMARKS BY SAYING THAT A
LARGE VOLUME OF THE EVALUATIONS ARE THE SICK CALL EVALUATIONS,
WHICH ARE EVALUATIONS CONDUCTED BY MEDICS WHO RECEIVE
COMPLAINTS OF INMATES, EITHER ON PAPER OR VERBAL ONES, THAT
THEY HAVE AN ILLNESS AND NEED TO BE EVALUATED, AND THOSE
COMPLAINTS ARE EVALUATED IN THE HALL.  SO THEY'RE EVALUATED
CELL SIDE MOSTLY.

AND WE OBSERVED THOSE.  WE WOKE UP AT, I DON'T KNOW,
IT WAS 4:30 OR SOMETHING IN THE MORNING AND WENT WITH THE MEDIC
AS THEY DID ROUNDS AND DID SICK CALL AND WE WATCHED IT.  SO A
LARGE NUMBER OF EVALUATIONS, BEING THE SICK CALL EVALUATIONS,
ARE NOT CONDUCTED IN A CLINICAL SPACE.  TYPICALLY ALL
EVALUATIONS SHOULD BE CONDUCTED IN A CLINICAL SPACE, BUT A

1   SIGNIFICANT PORTION OF THOSE ARE NOT.  THEY ARE CONDUCTED IN
2   FRONT OF A CELL WHERE OTHER INMATES CAN HEAR OR THEY'RE
3   CONDUCTED IN THE HALL OR -- BUT NOT IN A CLINICAL SPACE.
4           HAVING SAID THAT, THE CLINICAL SPACES --
5   Q.   BEFORE YOU MOVE ON TO THE CLINICAL SPACES, IF I COULD JUST
6   FOLLOWUP ON THAT.
7   A.   SURE.
8   Q.   WHAT ARE THE REASONS THAT A MEDICAL EXAMINATION SHOULD BE
9   PERFORMED IN CLINICAL SPACES?
10  A.   WELL, IT'S A CLINICAL EXAM, AND IMAGINE GOING TO A DOCTOR
11  AND THE DOCTOR SEES YOU IN THE LOBBY.  IT'S INAPPROPRIATE.
12  THIS IS A CLINICAL EXAM AND YOU NEED PRIVACY.  YOU NEED TO
13  EXAMINE THE PATIENTS, SO YOU NEED CERTAIN EQUIPMENT.  YOU NEED
14  TO BE ABLE TO LAY A PATIENT DOWN ON A TABLE AND EVALUATE THEM,
15  SOMETIMES UNDRESS THEM, AND SO THAT SHOULD BE CONDUCTED IN A
16  CLINICAL SPACE.  AND IT'S INAPPROPRIATE TO DO SO IN A -- IN
17  FRONT OF A CELL.
18  Q.   SO NOW TURNING TO THOSE CLINICAL SPACES, WHAT ARE THESE
19  MEDICAL EXAMINATION ROOMS YOU ARE TALKING ABOUT -- OR WHAT ARE
20  THESE MEDICAL ROOMS YOU'RE TALKING ABOUT USED FOR?
21  A.   WELL, THEY ARE USED BY PROVIDERS IN PERFORMING
22  EVALUATIONS.
23  Q.   AND COULD YOU DESCRIBE -- WELL, FIRST OF ALL, YOU
24  VISITED -- COULD YOU DESCRIBE YOUR VISIT AND EXAMINATION OF THE
25  CLINICAL SPACES?

1   **A.**   YES.   I THINK WE SAW ALL -- WE SAW ALL THE CLINICAL SPACES

2   AT ANGOLA, I BELIEVE.

3   **Q.**   AND WHAT WAS YOUR ASSESSMENT OF THEM?

4   **A.**   WELL, THERE ARE MULTIPLE DEFICIENCIES.   STARTING WITH THE

5   BARROW CENTER, THE CLINIC EXAM ROOMS HAVE TWO DOORS, ONE ON

6   EITHER SIDE, WHICH ENTER INTO TWO HALLWAYS.   AND BOTH OF THOSE

7   DOORS WERE OPEN ON THE DAY WE OBSERVED CLINIC.   AND I NOTED

8   PEOPLE WALKING THROUGH FROM ONE HALL TO THE OTHER DURING A TIME

9   THAT PEOPLE ARE BEING EXAMINED.   SO IT WAS AS IF IT WAS NOT AS

10  PRIVATE AS IT SHOULD BE, AND THAT WAS KIND OF A FIRST

11  IMPRESSION.

12          A SECOND IMPRESSION WAS THAT THEY DON'T APPEAR TO

13  HAVE A SYSTEM OF ENSURING THAT THERE IS A STANDARDIZED SET OF

14  EQUIPMENT THAT IS TYPICALLY REQUIRED IN AN EXAM ROOM.   SO, FOR

15  EXAMPLE, IN SOME OF THE ROOMS THERE MIGHT NOT BE A

16  OPHTHALMOSCOPE, WHICH IS A DEVICE USED TO LOOK INSIDE THE EYE.

17          **MR. DUBNER:**   WOULD YOU GIVE US A SLIDE, I BELIEVE,

18  58.

19  **BY MR. DUBNER:**

20  **Q.**   AND CAN YOU EXPLAIN WHAT YOU ARE REFERRING TO?

21  **A.**   I CAN'T SEE THAT.

22  **Q.**   IS IT NOT ON THE SCREEN IN FRONT OF YOU?

23  **A.**   NO.   THE SCREEN IS BLANK IN FRONT OF ME, BUT --

24          **THE COURT:**   HOLD ON.   HOLD ON.

25          **THE WITNESS:**   I MEAN, I'VE SEEN THIS PICTURE AND --

1    **THE COURT:** IF YOU'LL WAIT ONE SECOND, SHE'LL GET IT

2  ON THE SCREEN FOR YOU, SIR.

3    **THE WITNESS:** I MEAN, I HAVE PICTURES HERE, SO I CAN

4  PROBABLY WORK OFF THE PICTURES.

5  **BY MR. DUBNER:**

6  **Q.** DID YOU BRING UP A COPY OF THE SLIDE?

7  **A.** I DID, YEAH. SO I HAVE THE PICTURES, AND I CAN JUST -- I

8  CAN JUST WORK OFF THESE.

9    YOU KNOW, JUDGE, IT'S PROBABLY OKAY.

10    SO THE PICTURE THAT WE HAVE -- AND THEN THESE WERE

11  PICTURES TAKEN -- WHEN WE TOURED, WE WOULD ASK THE ATTORNEYS TO

12  TAKE A PICTURES, AND WHAT YOU SEE HERE IS THERE'S A DEVICE ON

13  THE WALL THAT IS WHITE AND IT HAS TWO LITTLE OBJECTS COMING

14  THROUGH DEVICES. THE OBJECT ON THE RIGHT SHOULD HAVE A HEAD ON

15  IT AND IT WOULD BE A DARK OBJECT. AS YOU SEE ON THE LEFT, IT

16  HAS A HEAD ON IT. SO THERE'S NO OPHTHALMOSCOPE IN THE ROOM,

17  AND THAT'S A PROBLEM. SO WHEN YOU SEE THAT, YOU KNOW THAT

18  SOMEONE IS NOT CHECKING THE ROOMS TO ENSURE THAT ALL THE

19  EQUIPMENT IS THERE. SO THAT WAS ONE ITEM.

20  **Q.** WAS THAT A COMMON PROBLEM IN THE CLINICAL ROOMS?

21  **A.** YEAH. WE WOULD SEE IT IN THE VARIOUS CLINICS, YEAH.

22    **THE COURT:** FOR THE RECORD, WHAT'S YOUR EXHIBIT

23  NUMBER?

24    **MR. DUBNER:** I'M SORRY. IT'S PAGE 277 -- I BELIEVE

25  277 OF THE -- OF JX-6.

1     THE COURT:  JOINT --

2     MR. DUBNER:  I'M SORRY.  PX-60277, I BELIEVE, IS THE

3  EXACT EXHIBIT NUMBER.

4     THE COURT:  PLAINTIFFS' 6 OR JOINT 6?

5     MR. DUBNER:  I MISSPOKE.  IT'S PLAINTIFFS' 6.

6     THE COURT:  OKAY.

7     MR. DUBNER:  IT IS PX-60276.  SORRY.  IT'S AT THE

8  BOTTOM OF THE SLIDE.

9  BY MR. DUBNER:

10 Q.  AS I WAS ASKING, WAS THIS TYPE OF PROBLEM COMMON IN THE

11 CLINICAL SPACES?

12 A.  WE SAW IT IN MOST OF THE AREAS ASIDE FROM THE PROCEDURE

13 BUILDING.  AS I SAID, THOSE SIX CLINICS WERE WELL SUPPLIED AND

14 MAINTAINED, BUT EVERY OTHER CLINIC APPEARED TO HAVE SIMILAR

15 PROBLEMS TO THIS.

16 Q.  WERE THEIR OTHER TYPES OF STANDARD MEDICAL EQUIPMENT THAT

17 WERE NOT PRESENT?

18 A.  BLOOD PRESSURE CUFFS.  NONE OF THE CLINICS HAVE A

19 GLUCOMOTER.  SO A GLUCOMOTER IS A DEVICE -- IT'S A HANDHELD

20 DEVICE THAT IS USED TO TEST BLOOD SUGAR FOR PEOPLE WHO HAVE

21 DIABETES, AND IT'S STANDARD TO HAVE IT AVAILABLE IN A CLINIC,

22 BUT AT ANGOLA, IT WAS ONLY AVAILABLE IN THE MEDICATION ROOMS

23 AND ON THE AMBULANCES.  THAT'S A BARRIER TO MANAGEMENT OF

24 DIABETES.

25     THE SLIDE THAT'S BEING SHOWN, I THINK, SHOWS A BLOOD

1  PRESSURE CUFF THAT -- IT JUST HAS THE DIAL, BUT IT DOESN'T HAVE

2  THE CUFF OR THE BULB TO INFLATE IT, SO IT'S UNUSABLE.

3  AND IN SOME AREAS STAFF WOULD BRING IN THEIR OWN EQUIPMENT, SO

4  THEY WOULD HAVE A BLOOD PRESSURE CUFF TO BRING IN.  BUT WHEN I

5  SEE OBJECTS LIKE THIS FIXED ON THE WALL, THEY SHOULD BE TAKEN

6  OFF IF THEY ARE NOT USED.  AND WHEN THEY'RE LIKE THIS, IT

7  INDICATES THAT NO ONE IS REALLY MANAGING THE UNIT.

8              **MR. DUBNER:**  AND FOR THE RECORD, THAT'S FROM PX-6 AT

9  277.

10             **THE COURT:**  ARE YOU SAYING "PF"?

11             **MR. DUBNER:**  OH, SORRY.  PX, PLAINTIFFS' EXHIBIT.

12             **THE COURT:**  OKAY.

13             **MR. DUBNER:**  SORRY.  THAT'S JUST MY OWN SPEECH.

14             **THE COURT:**  OKAY.  WELL, NOW THAT WE ALL ARE ON THE

15  SAME PAGE, PLAINTIFFS' EXHIBIT 6.

16             **MR. DUBNER:**  PLAINTIFFS' EXHIBIT 6 AT PAGE 277.

17  **BY MR. DUBNER:**

18  **Q.**   AND WHAT OTHER OBSERVATIONS OF THE CLINICAL SPACE DID YOU

19  MAKE?

20  **A.**   WELL, PARTICULARLY IN THE BARROW CENTER IT'S VERY

21  CLUTTERED AND CROWDED.  AND I THINK YOU HAVE TO APPRECIATE THAT

22  THEY USE A PAPER RECORD, AND THE INMATES AT ANGOLA ARE THERE

23  FOR A LONG TIME.  IT'S A MAXIMUM SECURITY PRISON, AND INMATES

24  SERVE LONG SENTENCES.  AS A RESULT, THOSE WITH CHRONIC

25  CONDITIONS HAVE VERY LARGE RECORDS.  AND, TYPICALLY, THEY'RE

1   MULTIPLE VOLUMES, WHICH PRESENTS DIFFICULTIES, AND I CAN TALK

2   ABOUT THAT LATER WHEN I TALK ABOUT MEDICAL RECORDS.  BUT WHAT

3   IT MEANS, IN TERMS OF ACTUALLY SEEING THE PATIENTS, IS THAT

4   THEY HAVE TO MOVE PAPER RECORDS TO WHERE THE PROVIDER IS SEEING

5   THE PATIENT.  AND WHEN THE MEDICS SEE THE PATIENTS CELL SIDE,

6   THEY ARE NOT SEEING THE PATIENT WITH A RECORD, WHICH IS A MAJOR

7   PROBLEM THAT I'M SURE MS. LAMARRE WILL DISCUSS WHEN SHE'S --

8   WHEN SHE TESTIFIES.

9          BUT IN THE CLINICS, PARTICULARLY IN THE BARROW

10  CENTER, THE LARGE VOLUME OF RECORDS ACTUALLY OBSTRUCTS AND IS A

11  BARRIER TO CARE BECAUSE THE MEDICAL RECORDS' STAFF PLACE THE

12  RECORDS IN THE ROOM IN A MANNER THAT MAKES IT DIFFICULT TO

13  EXAMINE THE PATIENT.  AND, YOU KNOW, WE HAVE ONE PICTURE OF

14  THAT.

15         YEAH, SO THIS SLIDE IS JUST FOUR SHOTS OF THE SAME

16  EXAMINATION ROOM.  AND ON THE LEFT, ON THE FAR LEFT PICTURE,

17  YOU SEE A TABLE, A HORIZONTAL SPACE COVERED WITH RECORDS.

18  THAT'S AN EXAMINATION TABLE, SO THAT TABLE SHOULD BE USED FOR A

19  PATIENT TO LIE ON FOR AN EXAMINATION.

20         AND FROM EXPERIENCE, WHEN I TOUR AND I SEE SOMETHING

21  LIKE THIS, IT INDICATES TO ME THAT THE DOCTOR IS NOT USING THE

22  TABLE TO EXAMINE PATIENTS.

23         AND, INDEED, WE NOTED MANY DOCUMENTED NOTES WHERE

24  THERE WAS NO PHYSICAL EXAMINATION.  IT APPEARED THAT THE

25  PATIENTS WERE BEING EXAMINED IN A CHAIR.   YOU CAN JUST SEE THE

1  VOLUME OF RECORDS.  AND ON THE FAR RIGHT IS THE PROVIDER'S DESK
2  THAT HAS -- IT HAS A NUMBER OF DOCUMENTS ON IT.  IT MAKES IT
3  DIFFICULT FOR THE PROVIDERS TO WORK.  SO WHAT THIS INDICATES IS
4  THAT THE SYSTEM HAS TO ENSURE THAT THE PROVIDERS AND THE STAFF
5  THAT WORK IN A FACILITY HAVE THE SUPPLIES, EQUIPMENT, AND THE
6  KIND OF INFRASTRUCTURE IN WHICH TO SUPPORT CARE.  AND IT JUST
7  SHOWS WHAT THE CLINIC LOOKED LIKE.
8         IN THE OUTLYING AREAS, THE CLINICS WERE NOT AS
9  CROWDED, BUT THEY HAD OTHER ISSUES.
10 **Q.**   WHAT WERE SOME OF THOSE OTHER ISSUES?
11 **A.**   WELL, IN THE OUTLYING CAMPS, WE NOTICED MORE THAT THE
12 CLINICS HAD NONSTANDARDIZED SUPPLIES.  SO SOME OF THEM HAD
13 SUPPLIES, BUT THEY WEREN'T STANDARDIZED.  SO THEY MAY NOT BE
14 THE SAME FROM CLINIC TO CLINIC, AND IT WAS MORE DEPENDENT ON
15 THE STAFF THAT WORKED THERE TO BRING ITEMS THAN IT WAS ON
16 MANAGEMENT OR THE SUPERVISORY ARM OF THE PROGRAM TO ENSURE THAT
17 EVERY CLINIC OPENED AND IT HAD THE SAME SET OF SUPPLIES.
18        SO, FOR EXAMPLE, IF I WORKED AT AN HMO, AND AT THE
19 JAIL WHERE I HAD MANAGED, WE HAD A CHECKLIST, AND WHEN THE
20 CLINIC OPENED, WE MADE SURE THAT EVERY ITEM WAS PRESENT.  YOU
21 HAD A PEAK FLOW METER, THERE WAS GLOVES, YOU HAD PEAK FLOW
22 TUBES, YOU HAD TONGUE DEPRESSORS, ET CETERA, AND SOMEONE WOULD
23 CHECK THAT.
24        SO IN THE OUTLYING CAMPS, IT WASN'T STANDARDIZED AND
25 NEITHER IN THE BARROW CENTER WAS IT STANDARDIZED.

1    BUT IN THE OUTLYING CAMPS, WE SAW MORE EVIDENCE OF

2  PEOPLE WORKED REMOTELY AND WOULD HANG OUT IN THE CLINICS IT

3  APPEARED.  SO THERE WAS EVIDENCE OF PEOPLE EATING AND COOKING

4  IN THE CLINICS.  SO PEOPLE HAD MICROWAVES; THERE WERE

5  REFRIGERATORS WITH FOOD.  THERE WAS ONE CLINIC THAT HAD A

6  COOLER, A STYROFOAM COOLER WITH FOOD, AND SO FORTH, IN IT.  AND

7  THAT'S INAPPROPRIATE IN A CLINICAL SPACE PRINCIPALLY BECAUSE

8  FOOD CAN GET CONTAMINATED BY CONTAMINATED WASTE, BUT YOU

9  SHOULDN'T BE EATING IN A CLINICAL SPACE.  IT'S A BAD PRACTICE.

10  SO WE SAW THAT, AND SOME OF THE SLIDES SHOW THAT.

11    THIS SLIDE HAS A -- YOU CAN SEE THE MICROWAVE, AND

12  THIS SLIDE SHOWS A FIXED OBJECT IN FRONT OF THE SINK, PARTIALLY

13  OBSTRUCTING THE SINK.  YOU CAN STILL GET TO THE SINK, BUT IT'S

14  A LITTLE DIFFICULT.  THERE'S ANOTHER SLIDE THAT SHOWS ANOTHER

15  SINK THAT --

16    **THE COURT:**  HOLD ON ONE MINUTE.

17    **THE WITNESS:**  YEAH, OKAY.

18    **THE COURT:**  MR. DUBNER, YOU ARE GOING TO HAVE A

19  PROBLEM BECAUSE YOU ARE NOT REFERRING TO THE RECORD, AND I AM

20  GOING TO ASSUME THAT THIS IS NOT THE END OF THE ROAD FOR YOU.

21  SO I DON'T KNOW IF YOU WANT SOMEBODY TO READ THIS LATER AND

22  KNOW WHAT THEY'RE TALKING ABOUT.

23    **MR. DUBNER:**  AND WE CAN HAVE -- I'LL TRY TO BREAK IN

24  TO GET THOSE IN.

25    AND IF YOU COULD GO BACK TO 057, MARTHA.  THANK YOU.

1   BY MR. DUBNER:

2   Q.   SO THIS SLIDE YOU WERE JUST REFERRING TO IS FROM PAGE 278

3   OF PX-6.  WE LABELED IT AS "DEMONSTRATIVE 057."

4           THE COURT:  YOUR DEMONSTRATIVE EVIDENCE IS NOT THE

5   RECORD.

6           MR. DUBNER:  JUST FOR IDENTIFICATION PURPOSES.

7           THE COURT:  FINE.  BUT, LIKE I SAID, THIS IS PROBABLY

8   NOT THE END OF THE ROAD FOR YOU, SO I DON'T KNOW IF YOU WANT

9   THE COURT OF APPEAL TO KNOW WHAT YOU ARE TALKING ABOUT.

10          MR. DUBNER:  OF COURSE, YOUR HONOR.

11          THE COURT:  GOOD.

12          MR. DUBNER:  SO THAT WAS PLAINTIFFS' EXHIBIT 6 AT

13  PAGE 278, AND WE'RE ABOUT TO TURN TO PLAINTIFFS' EXHIBIT 6,

14  DEMONSTRATIVE 057 AS 277.

15  BY MR. DUBNER:

16  Q.   SORRY, DR. PUISIS, YOU WERE ABOUT TO DESCRIBE THIS

17  PICTURE.

18  A.   SO THIS SHOWS A SINK IN ONE OF THE CLINICS WITH A FIXED

19  CABINET OBSTRUCTING IT, AND THERE'S NO SOAP EVIDENT ON THE

20  SINK; IT MAY BE PRESENT IN A DIFFERENT LOCATION.  BUT, CLEARLY,

21  THIS SINK IS -- DOES NOT APPEAR TO BE USED TO WASH HANDS.  AND

22  WE NOTICED THAT IN SEVERAL OF THE UNITS WHERE SINKS WERE

23  OBSTRUCTED SO YOU COULDN'T WASH HANDS, AND WE DIDN'T NOTICE

24  HAND SANITIZING TOWELETTES IN THE ROOM, WHICH IS A SUBSTITUTE

25  WHEN A SINK IS NOT PRESENT.  SO WHAT THAT MEANS IS THAT THERE

1 IS A BARRIER TO SANITIZING HANDS BETWEEN PATIENTS, WHICH IS A

2 STANDARD OF CARE THAT SHOULD BE DONE.

3 **Q.**    NOW, YOU REFERRED A MOMENT AGO TO -- ABOUT FOOD ITEMS,

4 THAT THERE'S A RISK OF THE FOOD GETTING CONTAMINATED.  IS THERE

5 ALSO A RISK OF THE FOOD AFFECTING PATIENT CARE?

6 **A.**    NOT NECESSARILY, BUT IT CAN ATTRACT RODENTS, VERMIN, AND

7 GENERALLY IS NOT RECOMMENDED TO BE DONE IN A CLINICAL SETTING.

8 **Q.**    OKAY.

9 **MR. DUBNER:**  CAN WE LOOK AT MORE PHOTO ON SLIDE 55,

10 PLEASE.

11 **BY MR. DUBNER:**

12 **Q.**    I'M SHOWING YOU FROM PLAINTIFFS' EXHIBIT 6 AT PAGE 274.

13 CAN YOU DESCRIBE THE HYGIENE DEFICITS THAT YOU OBSERVED?

14 **A.**    SO THESE ARE EXAM TABLES.  WE DID NOT NOTICE AT THE

15 FACILITY THAT THERE WAS PAPER COVERING ON THE EXAM TABLES.  AND

16 SO WHAT WOULD HAPPEN, WE SUPPOSE, IS THAT PATIENTS WOULD LIE ON

17 THIS AND ANOTHER PATIENT WOULD LIE ON IT, BUT THERE WOULD BE NO

18 CLEANING BETWEEN THE PATIENTS.

19 GENERALLY, ONE USES A PAPER COVERING AND BETWEEN

20 PATIENTS THE PAPER COVERING IS REMOVED AND DISCARDED FOR EACH

21 NEW PATIENT, WHICH KEEPS THE SURFACE SANITARY AND CAN PREVENT

22 INFECTION.  SO ONE DOESN'T KNOW WHO LAID ON THIS BEFORE YOU

23 DID, AND IF THEY HAD, FOR EXAMPLE, MRSA, YOU COULD TRANSMIT

24 MRSA FROM PATIENT TO PATIENT.

25 **MR. DUBNER:**  YOUR HONOR, WE'RE ABOUT TO MOVE TO A NEW

AND PRETTY LENGTHY SUBJECT.  I DON'T KNOW IF YOU WOULD LIKE US

TO PROCEED OR TAKE A BREAK.

        **THE COURT:**  YEAH, IT'S 12:30.  WE ARE GOING TO TAKE A

ONE-HOUR LUNCH BREAK.  WE WILL RESUME AT 1:30.

                        **(RECESS.)**

        **THE COURT:**  BE SEATED.

                MS. MONTAGNES.

        **MS. MONTAGNES:**  YOUR HONOR, JUST ONE QUICK

HOUSEKEEPING MATTER.  MR. ADAMS WAS UNABLE TO BRING HIS PAIN

MEDICATION WITH HIM ON THE TRIP, AND SO HE WAS HAVING SOME

SEVERE BACK PAIN SO HE'S LEFT COUNSEL'S TABLE, AND I INFORMED

THE COURTROOM DEPUTY AND SHE JUST ASKED THAT I PUT THAT ON THE

RECORD.

                ALSO, THE WITNESSES WERE HERE FROM ANGOLA TODAY.

WE HAVE NO MORE NEED FOR THEM TODAY, AND SO THEY ARE FREE TO

GO, BUT THE GUARDS -- THE CORRECTIONAL OFFICERS WANTED TO MAKE

SURE THAT YOU WERE OKAY WITH THAT.

        **THE COURT:**  IF YOU WANT TO RELEASE THEM FOR TODAY AND

IF THEY ARE -- IF THE SUBPOENA OR THE WRIT IS FOR THEM TO BE

HERE CONTINUING, THEN I'M ASSUMING -- I'M NOT ASSUMING, THEY'LL

BE BACK.

        **MS. MONTAGNES:**  THEY'LL BE BACK.

        **THE COURT:**  OKAY.

        **MS. MONTAGNES:**  THANK YOU, JUDGE.

        **THE COURT:**  GO AHEAD, MR. DUBNER.

01:36  1           MR. DUBNER:  THANK YOU.  AND I JUST WANTED TO CLARIFY

2      THE RECORD FROM THE MORNING SESSION REGARDING SOME OF THE

3      PHOTOS.  THE PHOTOS THAT DR. PUISIS WERE TESTIFYING ABOUT CAN

4      ALL BE FOUND AT PAGES 274 TO 278 OF PLAINTIFFS' EXHIBIT 6.  I

5      BELIEVE ALL OF THEM HAD CONTEMPORANEOUS WITH THEIR BEING USED,

6      THE SPECIFIC PAGES MENTIONED EXCEPT FOR ONE OF THEM, WHICH WAS

7      WHEN HE WAS DESCRIBING THE SLIDE WITH FOUR PICTURES OF MEDICAL

8      RECORDS IN AN EXAMINATION ROOM AND DISCUSSING THAT SITUATION.

9      THOSE PICTURES WERE ALL FROM PAGES 275 THROUGH 277 OF

10     PLAINTIFFS' EXHIBIT 6.

11               THE COURT:  OKAY.

12               MR. DUBNER:  I JUST WANTED TO MAKE SURE THAT WAS ALL

13     ON THE RECORD.

14               THE COURT:  AND OBVIOUSLY I DON'T NEED TO TELL YOU

15     THAT THE BEST PRACTICE WOULD BE FOR YOU TO REFER TO THEM JUST

16     SO THAT THERE'S NOT ANY CONFUSION, BUT IT'S YOUR RECORD TO

17     PROTECT, AND I'M SURE YOU WILL DO SO.

18               MR. DUBNER:  THANK YOU FOR THE WARNING, YOUR HONOR.

19               THE COURT:  OKAY.

20               MR. DUBNER:  AND WE WILL ATTEMPT TO DO SO GOING

21     FORWARD.

22               THE COURT:  GO AHEAD.

23     BY MR. DUBNER:

24     Q.   DR. PUISIS, WE'RE GOING TO TURN TO CLINICAL CARE AND THE

25     PROBLEMS YOU OBSERVED THERE.  YOU SAID THAT YOU REVIEWED A

01:37  1   SAMPLE OF APPROXIMATELY 50 MEDICAL RECORDS BETWEEN THE THREE

2   EXPERTS.  IN THOSE APPROXIMATELY 50 RECORDS, HOW MANY

3   ENCOUNTERS BETWEEN A PATIENT AND MEDICAL PERSONNEL WOULD YOU

4   HAVE REVIEWED?

5   **A.**   IT WAS AT LEAST IN THE HUNDREDS OR PERHAPS MORE THAN A

6   THOUSAND, BUT I'M NOT SURE ENTIRELY, BUT EACH RECORD WAS

7   REVIEWED FOR UP TO TWO YEARS, AND IT WASN'T JUST THE ENCOUNTERS

8   WITH THE PROVIDERS, IT WAS ENCOUNTERS WITH MID-LEVEL PROVIDERS,

9   PHYSICIAN ASSISTANTS, NURSE PRACTITIONERS, NURSING ENCOUNTERS,

10  DOCUMENTS SUCH AS MEDICATION ADMINISTRATION RECORDS, ET CETERA.

11  SO THERE WERE HUNDREDS TO THOUSANDS.

12  **Q.**   OKAY.  AND YOU SAID, I THINK, FOR UP TO TWO YEARS.  WERE

13  THERE SOME RECORDS WHERE IT WENT BEYOND TWO YEARS OF CARE?

14  **A.**   YEAH, POSSIBLY.

15  **Q.**   WERE THERE SOME THAT WENT AS FAR BACK AS 2008, 2009?

16  **A.**   THAT'S CORRECT.  YEAH.

17  **Q.**   AND WHAT'S THE MOST RECENT RECORDS THAT YOU WERE REVIEWING

18  AT THAT TIME?

19  **A.**   I THINK -- I WANT TO SAY 2015, 2016.

20  **Q.**   OKAY.  SO LET'S TURN TO THE FAILURES OF THE CLINICAL LEVEL

21  THAT YOU DESCRIBED.  CAN YOU GIVE US A BRIEF OVERVIEW OF WHAT

22  YOU FOUND IN TERMS OF ERRORS IN CLINICAL CARE?

23  **A.**   WELL, WE FOUND INADEQUATE CARE IN ALMOST EVERY RECORD THAT

24  WE REVIEWED.  SO THAT'S ONE ITEM.

25          THERE WERE -- THE ERRORS WERE PERVASIVE.  ALL OF US

01:18   1    FOUND ERRORS, AND I FOUND THEM IN EVERY RECORD I REVIEWED.

2    THERE WAS RANGING FROM INADEQUATE CHRONIC DISEASE MANAGEMENT TO

3    DELAYS IN ACCESSING SPECIALTY CARE AND FOLLOWUP OF SPECIALTY

4    CARE, INADEQUATE INFIRMARY CARE, YOU KNOW, THE USE OF PERSONNEL

5    THAT WAS INAPPROPRIATE, WHETHER IT WAS INMATES TO WORK ON THE

6    INFIRMARY OR MEDICS TO DO INDEPENDENT EVALUATIONS OR OFFICERS

7    TO ADMINISTER MEDICATION, THERE WERE -- THE DIAGNOSTIC SERVICES

8    WERE MADE AVAILABLE, BUT SOMETIMES WERE NOT ORDERED, AND WHEN

9    ORDERED, OFTEN NOT FOLLOWED UP.  SO IN COMBINATION WITH THE

10   SYSTEMIC OPERATIONAL PROBLEMS, THERE WERE MANY DEFICIENCIES.

11   **Q.**   LET'S SCROLL DOWN TO SOME OF THOSE PARTICULAR

12   DEFICIENCIES.  FIRST OFF, YOU REFERRED TO CHRONIC DISEASE

13   MANAGEMENT.  CAN YOU EXPLAIN WHAT CHRONIC DISEASE MANAGEMENT

14   IS?

15   **A.**   WELL, TO BEGIN, A CHRONIC DISEASE IS A CONDITION THAT IS

16   PRESENT FOR AT LEAST SIX MONTHS OR MORE AND REQUIRES REGULAR

17   INTERMITTENT MONITORING BY A PHYSICIAN, AND SO THERE'S A WIDE

18   RANGE OF CHRONIC DISEASES, THERE'S THOUSANDS OF THEM, AND THEY

19   REQUIRE MANAGEMENT.

20   **Q.**   AND WERE YOU THE ONLY EXPERT TO LOOK AT THE CHRONIC

21   DISEASE PROGRAM OR WAS THAT SHARED?

22   **A.**   NO, MADDIE LAMARRE LOOKED AT IT.

23          SO IN TERMS OF WHAT ONE ACTUALLY DOES IN A CHRONIC

24   DISEASE PROGRAM IN A PRISON, THE FIRST THING IS TO IDENTIFY

25   THAT SOMEONE HAS A CHRONIC ILLNESS.  SO THE CHRONIC ILLNESS HAS

1   TO BE ON A PROBLEM LIST.  YOU HAVE TO MONITOR THE CHRONIC

2   PROBLEMS AT EVERY VISIT.  AND PHYSICIANS HAVE TO PERFORM

3   HISTORY RELATED TO THE PERSON'S DISEASES.

4          SO IF YOU HAVE DIABETES, HYPERTENSION, AND HIGH BLOOD

5   LIPIDS, YOU SHOULD BE ASKING QUESTIONS OF A PATIENT ON THE

6   HISTORY THAT WOULD PERTAIN TO THOSE ILLNESSES.  YOU SHOULD DO A

7   FOCUSED PHYSICAL EXAM FOR EACH OF THE CHRONIC ILLNESSES.  THEN

8   YOU NEED TO DO WHATEVER LABORATORY TEST OR OTHER STUDIES THAT

9   ARE REQUIRED OF THE PATIENT BASED ON THEIR ILLNESS.  YOU NEED

10  TO FOLLOWUP THOSE STUDIES; WHEN NECESSARY, YOU NEED TO REFER TO

11  A HIGHER LEVEL OF CARE, A SPECIALISTS OR FOR A PROCEDURE, AND

12  FOLLOWUP ON THOSE ITEMS.  AND THE DOCTOR HAS TO MAKE AN

13  ASSESSMENT AS TO THE STATUS OF EACH OF THOSE ILLNESSES AT EVERY

14  VISIT, AND THEN MAKE SURE THAT THERE'S A PLAN, A PLAN OF CARE,

15  FOR EACH OF THE ILLNESSES.  AND ANY SCHEDULING OF CHRONIC

16  DISEASE FOLLOWUP SHOULD BE DONE AT THAT TIME AS WELL.

17  **Q.**   AND IN TERMS OF THESE ASPECTS OF THE CHRONIC DISEASE

18  MANAGEMENT PROGRAM, HOW DO YOU FIND THAT THEY WERE WORKING OR

19  NOT WORKING AT ANGOLA?

20  **A.**   WELL, WE FOUND THAT THEY WEREN'T WORKING AT ALL BECAUSE

21  MANY OF THOSE ELEMENTS COULD NOT BE IDENTIFIED IN THE

22  DOCUMENTATION OF THE RECORDS.

23  **Q.**   AND, YOU KNOW, WALKING THROUGH THE SORT OF STAGES THAT YOU

24  PROVIDED --

25          **MR. DUBNER:**  IF WE COULD GET THE NEXT SLIDE, PLEASE.

**BY MR. DUBNER:**

**Q.**   WALKING THROUGH EACH OF THOSE COMPONENTS YOU DESCRIBED, COULD YOU EXPLAIN THE WAYS IN WHICH THESE WERE OR WERE NOT PRESENT AT ANGOLA?

**A.**   WELL, STARTING WITH THE IDENTIFICATION OF DISEASES, AT MOST OF THE CLINIC VISITS OF PHYSICIANS, THE PATIENT'S DISEASES WERE NOT IDENTIFIED.  SO THE DOCTOR DID NOT DOCUMENT IDENTIFICATION OF THE PERSON'S ILLNESSES AND WOULD ONLY FOCUS ON THE EPISODIC PROBLEM OF THE PATIENT AT THAT MOMENT.

**Q.**   WHY IS IT IMPORTANT TO FOCUS ON ALL OF THE CHRONIC DISEASES RATHER THAN ONLY THE EPISODIC COMPLAINT AT THE MOMENT?

**A.**   WELL, BECAUSE THE PATIENT HAS THE CONDITIONS, AND IT'S NOT THAT AT EVERY VISIT YOU HAVE TO ADDRESS A PERSON'S HIGH BLOOD LIPIDS, BUT YOU NEED TO REMEMBER THAT THE PATIENT HAS THOSE. AND WHEN A PERSON HAS A FOOT ULCER, AS AN EXAMPLE, AND HAS DIABETES, THEY HAVE AN IMPACT -- THE DIABETES HAS AN IMPACT ON THE ULCER.  AND SO IT'S IMPORTANT BECAUSE MANY DISEASES AFFECT OTHER DISEASES THAT YOU NEED TO KEEP TRACK OF ALL OF THEM, AND BECAUSE THEY DON'T DO THAT, THEY LOSE TRACK OF THEM, AND THEY SEEM TO FORGET THAT THEY ACTUALLY EXIST.

BUT MOVING ON, AFTER -- WITH RESPECT TO THE -- SO THE HISTORIES ARE -- THE IDENTIFICATION IS NOT THERE.  WHEN THE DOCTORS SEE THE PATIENTS, THEY DON'T TAKE HISTORIES OR THEY TAKE HISTORIES THAT ARE INADEQUATE.  PHYSICAL EXAMS ARE OFTEN NOT DONE AT ALL.  PATIENTS WILL GO TO SPECIALISTS AND THERE

01:44    1    WILL BE NO FOLLOWUP.  THE DOCTORS DON'T RECOGNIZE OR DOCUMENT
2    ACKNOWLEDGMENT THAT THE PATIENT ACTUALLY WENT TO A SPECIALIST
3    EVEN THOUGH IT'S IN THE RECORD.  DOCTORS WILL NOT REVIEW
4    RECOMMENDATIONS OF SPECIALISTS.  SOMETIMES PATIENTS WILL HAVE
5    ABNORMAL BLOOD TESTS THAT ARE NOT ACKNOWLEDGED OR REVIEWED OR
6    ACTION TAKEN ON, AND THE ASSESSMENTS TEND TO BE VERY BRIEF AND
7    DON'T COVER ALL THE DISEASES.  AND, THEREFORE, AS A RESULT OF
8    ALL THOSE ITEMS I MENTIONED, THE THERAPEUTIC PLAN IS GENERALLY
9    INADEQUATE.
10    **Q.**    AND WHAT CAN THE CONSEQUENCES OF THOSE KINDS OF
11    SHORTCOMINGS BE?
12    **A.**    WELL, IT BRINGS HARM TO THE PATIENT.  SO IT HARMS THE
13    PATIENT BECAUSE THEIR DISEASE IS NOT BEING MANAGED AND IT
14    CAUSES MORBIDITY AND MORTALITY.  AND THE MORBIDITY INCLUDES
15    DIRECT HARM, HOSPITALIZATION, AND DETERIORATION OF DISEASE.
16    **Q.**    AND JUST FOR THE RECORD, WHAT DO YOU MEAN BY THE WORD
17    *MORBIDITY*?
18    **A.**    MORBIDITY IS SOME ASPECT OF HARM.  SO, FOR EXAMPLE, YOU
19    COULD LOSE A LEG IN AN AMPUTATION OR YOU MIGHT BE HOSPITALIZED
20    FOR HEART FAILURE, SOMETHING OF THAT NATURE.
21    **Q.**    I'D LIKE TO WALK YOU THROUGH SOME EXAMPLES OF SOME OF
22    THESE PROBLEMS WE'VE TALKED ABOUT.
23    **MR. DUBNER:**  BUT, FIRST, YOUR HONOR, I'VE HANDED
24    THESE OUT ON FOUR SLIDES OF TIMELINES THAT DR. PUISIS WILL BE
25    USING DURING THIS AFTERNOON'S TESTIMONY.  WE'VE ALSO PROVIDED

01:46   1   THEM TO THE DEFENDANTS A COUPLE DAYS AGO.  I JUST NOW -- IN

2   CASE THE COURT WANTS THOSE AS ANYTHING TO WRITE ON.  THERE WILL

3   ALSO BE TIMES WHEN ON THE SCREEN, WE HAVE MEDICAL RECORDS

4   RATHER THAN THE TIMELINES, SO IF THE COURTS WANTS BOTH AT ONCE.

5   **BY MR. DUBNER:**

6   **Q.**   DR. PUISIS, IF YOU COULD GIVE US AN EXAMPLE OF THE KIND OF

7   PROBLEMS THAT YOU REFERRED TO, AND WHY DON'T WE START WITH

8   PATIENT NO. 11, WHICH IS DEMONSTRATIVE SLIDE 34.  AND THE

9   SOURCE FOR THAT, THAT IS PATIENT NO. -- IN THE RECORD -- IN THE

10   EXHIBITS, THAT IS JOINT EXHIBIT 10-R.  WE WON'T BE USING THE

11   PLAINTIFF'S ACTUAL NAME OR THE PATIENT'S ACTUAL NAME FOR THE

12   CONFIDENTIALITY REASONS, AND WE WON'T BE SHOWING HIS MEDICAL

13   RECORDS ON -- WE WON'T PUBLISH THEM TO THE GALLERY.

14            **MR. ARCHEY:**  YOUR HONOR, IS THAT HOW WE'RE GOING TO

15   OPERATE?  WE ARE GOING TO USE NAMES?  WE'VE GOT THE NAMES, AND

16   THEY'VE BEEN REFERRED TO SO FAR, BY SEVERAL -- I'M JUST, AGAIN,

17   TRYING TO LEARN THE GROUND WORK GOING FORWARD BECAUSE --

18            **THE COURT:**  COUNSEL.

19            **MR. DUBNER:**  AND FOR NAMED PLAINTIFFS, WE HAVE NO

20   OBJECTION TO USING NAMES.  THESE ARE MEANT FOR THE SAMPLE THAT

21   DR. PUISIS AND OTHER EXPERTS REVIEWED WHERE THROUGHOUT THE CASE

22   WE USED ANONYMIZED IDENTIFIERS, WHICH WE'VE PROVIDED THOSE TO

23   BOTH DEFENDANTS AND THE COURT A WHILE BACK.  WE CAN GET COPIES

24   AGAIN IF ANYONE NEEDS THEM.

25            **MR. ARCHEY:**  THEY'RE CLASS MEMBERS, AND I WANT TO USE

01:48   1   THE NAMES.  THEY'RE CLASS MEMBERS, AND WE'VE SEALED THOSE

2   RECORDS, SO . . .

3           **THE COURT:**  WE HAVE SEALED THOSE RECORDS, BUT WE

4   HAVEN'T SEALED THE TESTIMONY OR THE COURTROOM, SO I NEED TO

5   HEAR FROM YOU.  ARE WE GOING TO TALK ABOUT SENSITIVE MEDICAL

6   INFORMATION?

7           **MS. MONTAGNES:**  AND, YOUR HONOR, THE MEDICAL REPORT

8   HAS BEEN PROVIDED IN THE RECORD WITH THE ANONYMOUS PATIENTS.

9           **THE COURT:**  ONE LAWYER AT A TIME.  SIT DOWN.

10              MR. DUBNER.

11          **MR. DUBNER:**  AND YES.  SO FIRST OFF, WE ARE GOING TO

12  BE TALKING ABOUT PERSONAL HEALTH INFORMATION.  SOME OF THESE

13  MEN PASSED AWAY AND WHILE THEY MAY HAVE BEEN CLASS MEMBERS AT

14  ONE POINT ARE NOT MEMBERS OF THE CLASS.

15          **THE COURT:**  DID Y'ALL WORK THIS OUT?

16          **MR. DUBNER:**  WE --

17          **THE COURT:**  I MEAN, DID YOU NOT DISCUSS WITH YOUR

18  OPPOSING COUNSEL THE FACT THAT YOU WERE GOING TO USE PATIENT 1,

19  PATIENT 2, PATIENT 3?

20          **MR. DUBNER:**  WE DID.  I MEAN, WE'VE BEEN USING THESE

21  NUMBERS SINCE THE BEGINNING.  WE PROVIDED THEM WITH THESE

22  DEMONSTRATIVES 48 HOURS BEFORE TESTIMONY AS WE DISCUSSED, AND

23  WE DIDN'T SPECIFICALLY DISCUSS THAT DR. PUISIS, FOR EXAMPLE,

24  WAS GOING TO USE THE NUMBERS THAT WE'VE USED FROM THE BEGINNING

25  OF THE CASE DURING TRIAL.  BUT -- AND I APOLOGIZE, THAT WAS AN

01:49    1    ASSUMPTION THAT WE SHOULD HAVE CHECKED OUT, BUT THIS IS HOW WE

2    HAVE PROCEEDED FROM THE BEGINNING.

3      **THE COURT:**  MS. ROPER, YOU'VE BEEN IN THE CASE SINCE

4    THE BEGINNING.  IS THIS HOW YOU PROCEEDED SINCE THE BEGINNING,

5    BY PATIENT NAME OR PATIENT NUMBER?  I REALIZE Y'ALL ARE A

6    LITTLE BIT OF A DISADVANTAGE BECAUSE YOU'RE A LITTLE NEW TO THE

7    PARTY, BUT . . .

8      **MS. ROPER:**  RIGHT.  YOUR HONOR, THEY MENTIONED

9    NUMBERS THROUGHOUT THE REPORT, BUT NO, NOT AS FAR AS THE TRIAL,

10    WE WERE NOT ON ANY COMMUNICATION WITH THEM THAT THIS IS HOW WE

11    WERE GOING TO REFER TO THE PEOPLE AT THE TRIAL.  THAT'S NOT ANY

12    UNDERSTANDING THAT WE HAD.

13      **MR. DUBNER:**  AND THE ALTERNATIVE, I THINK, YOUR

14    HONOR, WOULD BE THAT WE WOULD ASK TO SEAL THE COURTROOM AND

15    SEAL THIS EVIDENCE.

16      **THE COURT:**  THAT'S NOT HAPPENING.  I MEAN, THIS IS A

17    PUBLIC HEARING; THIS IS A PUBLIC TRIAL; THIS IS A PUBLIC

18    INSTITUTION.  THE PUBLIC HAS A RIGHT TO KNOW WHATEVER IS

19    HAPPENING OR IS NOT HAPPENING AT ANGOLA, AND THAT'S NOT GOING

20    TO HAPPEN, BUT I ALSO DO NOT WANT TO MOVE FORWARD TO YOUR

21    PREJUDICE IF YOU DON'T KNOW WHO PATIENT 11 IS.

22       MR. ARCHEY, DO YOU AND MR. ROBERT KNOW WHO

23    PATIENT 11 IS?

24      **MR. ARCHEY:**  YES.  THAT'S NOT THE PROBLEM.

25      **THE COURT:**  ALL RIGHT.

01:50   1        **MR. ARCHEY:**  YES, I DO KNOW WHO THE PATIENT -- I DO

2   HAVE A LIST, AND I DO KNOW WHO PATIENTS 1 THROUGH 45, WHO THEY

3   ARE, I DO KNOW THAT.  THE PROBLEM IS GOING TO BE, NUMBER ONE, I

4   WANT TO KNOW HOW ARE WE PROCEEDING.  AND NUMBER TWO IS, OUR

5   WITNESSES NEED TO KNOW WHO THESE ARE BECAUSE THEY DON'T KNOW

6   WHO PATIENT NO. 11 IS.

7              ALL RIGHT, DR. LAVESPERE --

8        **THE COURT:**  WELL, DR. LAVESPERE IS SITTING HERE, AND

9   I'M ASSUMING THAT YOU CAN GIVE HIM THE INFORMATION.

10       **MR. ARCHEY:**  WELL, BUT HE'S NOT THE ONLY ONE.  WE'VE

11  GOT A WHOLE NUMBER OF PROVIDERS, NURSES, OTHER PERSONS, STAFF,

12  OTHER PERSONS WHO ARE GOING TO TESTIFY THAT WILL NEED THIS

13  INFORMATION.  I DON'T KNOW HOW --

14       **THE COURT:**  I MEAN, WHAT WE'RE DOING IS THAT

15  PLAINTIFFS' COUNSEL IS GIVING YOU THE JOINT EXHIBIT.  THE JOINT

16  EXHIBIT 10-R, FOR EXAMPLE, I'M SURE HAS PATIENT 11'S NAME ON

17  IT.

18       **MR. ARCHEY:**  NO, I KNOW THE NAMES.

19       **THE COURT:**  ALL RIGHT.  WELL, THEN WE ARE GOING TO

20  PROCEED.

21       **MR. ARCHEY:**  BUT MY WITNESSES DON'T, AND THAT'S A

22  PROBLEM.  IF I CAN'T ASK -- I'LL TAKE DR. LAVESPERE SINCE HE'S

23  HERE -- TELL ME ABOUT PATIENT 11, HE'S GOING TO GO, I DON'T

24  KNOW.

25       **THE COURT:**  NO, YOU SAY LOOK AT JOINT EXHIBIT 10-R,

1 THAT'S PATIENT 11'S MEDICAL CHART.  SO I'M SURE IT SAYS JOHN

2 DOE OR WHATEVER HIS NAME IS.

3            **MR. ARCHEY:**  CORRECT.

4            **THE COURT:**  SO THAT'S HOW YOU GET THERE.

5            **MR. ARCHEY:**  THANK YOU, JUDGE.

6            **THE COURT:**  WE ARE GOING TO PROCEED WITH THE PATIENT

7 NUMBERS.  GO AHEAD.

8            **MR. DUBNER:**  AND JUST FOR CLARITY, WE HAVE NO

9 OBJECTION TO THEM TELLING THEIR OWN EMPLOYEES ABOUT THE NAMES.

10 THAT'S RECORD INFORMATION.

11            **THE COURT:**  WHAT I WANT MOVING FORWARD IS FOR THE

12 PLAINTIFFS TO REFERENCE THE PATIENT NUMBER AND TELL US WHERE

13 THEIR MEDICAL RECORDS ARE IN THE JOINT EXHIBITS SO THAT THERE

14 IS NO CONFUSION ABOUT WHO WE'RE TALKING ABOUT.  THE JOINT

15 EXHIBITS THAT CONTAIN MEDICAL RECORDS HAVE BEEN SEALED.

16 SO NOBODY'S GOING TO DRILL DOWN AND LOOK AT THOSE PERSONS'

17 PARTICULAR MEDICAL RECORDS, BUT YOU'LL KNOW THAT YOU'RE DEALING

18 WITH JOINT EXHIBIT 10-R AND YOU'LL KNOW EXACTLY WHO THAT IS.

19            **MR. ARCHEY:**  VERY LAST COMMENT, JUDGE.  WE DO HAVE A

20 LIST OF 1 THROUGH 45 TO IDENTIFY THEM WHO THEY ARE BY NAME.  IF

21 I CAN BE ABLE TO SHOW THAT TO MY WITNESSES AT ANY TIME WITHOUT

22 VIOLATING ANY ORDERS, THEN WE'RE GOOD.

23            **THE COURT:**  YES.

24            **MR. DUBNER:**  WE HAVE NO OBJECTION TO THAT, AND THAT'S

25 CONSISTENT WITH THE PROTECTIVE ORDER THAT WE AGREED TO IN THE

1  CASE.

2      **MR. ARCHEY:**  THANK YOU, JUDGE.

3      **THE COURT:**  PROCEED.

4      **MR. DUBNER:**  THANK YOU.

5  **BY MR. DUBNER:**

6  **Q.**   AND SO WE'RE GOING TO BE TALKING ABOUT PATIENT NO. 11

7  WHOSE MEDICAL RECORDS ARE IN THE RECORD AS JOINT EXHIBIT 10-R.

8      BUT, DR. PUISIS, IS THIS ONE OF THE PATIENTS THAT YOU

9  REVIEWED IN YOUR SAMPLE?

10  **A.**   YES.

11  **Q.**   AND CAN YOU DISCUSS THIS PATIENT'S MEDICAL NEEDS?

12  **A.**   THIS PATIENT HAD CROHN'S DISEASE, WHICH IS AN INFLAMMATORY

13  CONDITION OF THE BOWEL, WHICH CAUSES -- THERE'S SOME

14  COMPLICATIONS RELATED TO IT, BUT IT GENERALLY REQUIRES CHRONIC

15  DISEASE MONITORING.

16  **Q.**   AND COULD YOU WALK THROUGH THE CHRONIC DISEASE MONITORING

17  AND THE CARE THAT PATIENT NO. 11 RECEIVED AT ANGOLA?

18  **A.**   WE BEGAN TO REVIEW THE CHART AROUND ACTUALLY 2013.  AND AT

19  THAT TIME, THE PATIENT WAS BEING REFERRED FOR A COLONOSCOPY.

20  THE COLONOSCOPY HAD BEEN, I BELIEVE, REQUESTED TWO YEARS

21  PREVIOUS.  THE PATIENT DID NOT GET THE COLONOSCOPY FOR SIX

22  MONTHS, AND THE COLONOSCOPY WAS CONSISTENT WITH COLITIS, SO HE

23  SHOULD HAVE BEEN ON MEDICATION.  HE WAS ON A SINGLE DRUG,

24  AZULFIDINE.  GIVEN THE CONDITION OF THE PATIENT, THERE SHOULD

25  HAVE BEEN A CONSIDERATION FOR ADDITIONAL MEDICATION.  IT WASN'T

01:53   1    DONE.  TYPICALLY PEOPLE WITH CROHN'S DISEASE ARE FOLLOWED BY A

2    GASTROENTEROLOGIST.  AND WE STARTED, AS I SAID, IN JUNE 2013

3    WITH A REFERRAL TO COLONOSCOPY.  THE ACTUAL COLONOSCOPY WAS

4    COMPLETED DECEMBER 19, 2013, AND THREE MONTHS LATER, THE

5    PATIENT WAS REFERRED TO A GASTROENTEROLOGIST.  SO THAT TIMELINE

6    IS NOT TIMELY.

7          WHEN THE GASTROENTEROLOGIST SAW THE PERSON, THE

8    GASTROENTEROLOGIST RECOMMENDED A SPECIALIZED TEST, AN MRI

9    ENTEROGRAPHY, WHICH IS A SPECIAL TEST OF THE INTESTINE, AND TO

10   RETURN AFTER THE TEST.  THE TEST TOOK PLACE ON MARCH 6TH.  SO

11   APPROXIMATELY THREE WEEKS LATER, BUT THE TEST SHOWED AN

12   ABSCESS, WHICH REQUIRES IMMEDIATE ATTENTION.  THE TEST RESULTS

13   WERE NOT REVIEWED BY THE PHYSICIAN, WHICH SHOULD BE DONE IN

14   CHRONIC CARE.  AS I SAID, IN A CHRONIC CARE PROGRAM, A

15   PHYSICIAN WILL MONITOR THE PATIENT AND ANY SPECIALIZED TESTING

16   THAT'S DONE.

17         IN THIS CASE, IT WASN'T DONE, AND THE PATIENT DIDN'T

18   GO BACK TO THE GASTROENTEROLOGIST FOR APPROXIMATELY THREE

19   MONTHS ON JUNE 18TH, AT WHICH TIME THE GASTROENTEROLOGIST

20   IMMEDIATELY REFERRED THE PATIENT TO AN EMERGENCY ROOM AND DID

21   NOT COMPLETE THE ASSESSMENT OR PLAN, BUT SENT THE PATIENT TO

22   THE EMERGENCY ROOM FOR DRAINING THE ABSCESS, AND THAT CAUSED

23   HARM.  IF THAT MRI WAS REVIEWED EARLIER, THE PATIENT WOULD HAVE

24   EITHER BEEN SENT TO AN EMERGENCY ROOM BY A PHYSICIAN OR THEY

25   COULD HAVE CALLED THE GASTROENTEROLOGIST.

01:56   1   **Q.**   AND WHAT ARE SOME OF THE CONSEQUENCES OF NOT HAVING AN

2   ABSCESS TREATED FOR SEVERAL MONTHS IN A PATIENT WITH CROHN'S

3   DISEASE AND POSSIBLY COLITIS?

4   **A.**   WELL, IT PLACES THE PATIENT AT RISK OF HARM.  IT EITHER

5   CAN EXTEND, IT CAN CAUSE SOME LIFE-THREATENING CONDITIONS

6   POTENTIALLY, PERITONITIS, OR IN -- PARTICULARLY WITH PATIENTS

7   WITH CROHN'S, IT CAN LEAD TO FISTULAS WHICH ARE COMMON IN

8   PATIENTS WITH CROHN'S.

9   **Q.**   AND DID YOU SEE EVIDENCE OF ANY OF THAT HARM MANIFESTING

10   WITH PATIENT NO. 11?

11   **A.**   IT DID.  THE PATIENT -- WHEN THE PATIENT WAS REFERRED TO

12   THE ER, THE ER THEN REFERRED THE PATIENT TO SURGEONS, AND THE

13   SURGEONS BEGAN MONITORING THE PATIENT.  BUT THE PATIENT WAS

14   NEVER SENT BACK TO A GASTROENTEROLOGIST.  AND THE SURGEON SAW

15   THE PATIENT BECAUSE A FISTULA HAD DEVELOPED.  AND THE PATIENT

16   HAD SEVERAL, I THINK FIVE OR -- FIVE SUBSEQUENT SURGICAL VISITS

17   AND TWO HOSPITALIZATIONS FOR CORRECTION OF FISTULAS.  A FISTULA

18   INDICATES AT LEAST MODERATE OR MORE LIKELY SEVERE CROHN'S, AND

19   SOMEBODY WITH SEVERE CROHN'S SHOULD BE ON MORE THAN JUST

20   AZULFIDINE, WHICH IS THE MEDICATION THE PATIENT WAS ON.

21        SO THE PATIENT REQUIRED HIGHER LEVEL OF TREATMENT,

22   ADDITIONAL MEDICATION, THAT WAS NOT PROVIDED BECAUSE HE WAS NOT

23   SEEING THE GASTROENTEROLOGIST.  IT WAS BEING MANAGED BY

24   SURGEONS ONLY.  AND THAT IS A RESULT OF JUST NOT COORDINATING

25   CARE, AND THAT'S THE RESPONSIBILITY OF THE PRIMARY CARE

01:57    1    PHYSICIANS.  SO THAT MANAGEMENT BY SURGEONS WENT ON FOR ALMOST

2    TWO YEARS, ABOUT A YEAR AND A HALF, AND EVENTUALLY A SURGEON

3    NOTED THAT THE PATIENT WASN'T BEING MANAGED BY A

4    GASTROENTEROLOGIST, AND RECOMMENDED, YOU NEED TO SEND THE

5    PATIENT BACK TO A GASTROENTEROLOGIST.

6    **Q.**    AND LET ME JUST CLARIFY HERE, WHEN YOU'RE REFERRING TO

7    GASTROENTEROLOGISTS AND SURGEONS, ARE THOSE DOCTORS ON DOC

8    STAFF OR ARE THOSE OUTSIDE SPECIALISTS?

9    **A.**    NO.  THOSE ARE PATIENTS AT A REFERENCE HOSPITAL.

10    **Q.**    I THOUGHT YOU SAID PATIENTS.  DO YOU MEAN PHYSICIANS?

11    **A.**    YES.  YES.  THOSE PHYSICIANS ARE AT AN OUTSIDE FACILITY.

12    **Q.**    AND SO WE'LL GET MORE INTO THE DOCTORS AT ANGOLA A LITTLE

13    BIT LATER ON, BUT WHEN YOU SAY "PRIMARY CARE PHYSICIANS," THOSE

14    ARE DOCTORS AT THE DOC.  IS THAT CORRECT?

15    **A.**    THAT'S CORRECT.

16    **Q.**    THANK YOU.

17    **A.**    YEAH.  AND I MEAN, JUST NOTABLE IN THIS PATIENT'S CARE, A

18    DOCTOR AT LSP -- SO THIS IS THREE YEARS AFTER THE PATIENT WAS

19    REFERRED FOR A COLONOSCOPY, A DOCTOR AT LSP DETERMINED HE MAY

20    NEED ADDITIONAL MEDICATION AND STARTED A DRUG CALLED HUMIRA,

21    WHICH IS A BIOLOGIC MEDICATION THAT'S USED IN PERSONS WITH

22    CROHN'S DISEASE.  HOWEVER, WHEN HE STARTED IT, HE STARTED IT AT

23    THE WRONG DOSE.  HE STARTED IT AT A MAINTENANCE DOSE, AND HE

24    DIDN'T USE A, YOU KNOW, INITIAL LOADING DOSE FOR THE PATIENT.

25    THE PATIENT DID EVENTUALLY GO BACK TO A GASTROENTEROLOGIST IN

1    2016.

2         SO FROM THE TIME OF THE LAST GASTROENTEROLOGY VISIT,

3    IT WAS ALMOST 18 MONTHS.  AND THE GASTROENTEROLOGIST ASSUMED

4    CARE, BUT NOTED, INCIDENTALLY, IN HIS NOTE THAT, FOR SOME

5    REASON, THE PATIENT HAD BEEN STARTED ON THE WRONG DOSE OF

6    HUMIRA, BUT HE CONTINUED CARE, SO --

7    **Q.**   AND DON'T WE JUST --

8    **A.**   GO AHEAD.

9         **MR. DUBNER:**  IF WE COULD, JUST PUT THAT UP BUT WE

10   WON'T PUBLISH THESE UPCOMING MEDICAL RECORDS TO THE GALLERY,

11   BUT IF YOU COULD, GIVE US JX-10-16122.  THANK YOU.

12   **BY MR. DUBNER:**

13   **Q.**   IS THIS THE NOTE YOU WERE REFERRING TO?

14   **A.**   I CAN'T SEE THE NOTE, BUT I HAVE A COPY.

15   **Q.**   BUT YOU DO NOT HAVE IT ON YOUR SCREEN THERE?

16   **A.**   NO.

17        **THE COURT:**  YOU STILL DON'T HAVE THAT ON THE SCREEN?

18        **THE WITNESS:**  HERE IT IS.  THE LIGHT WENT ON.  THERE

19   IT IS.  NOW I CAN SEE IT, THANK YOU.

20        YES.  SO IN THIS NOTE, SORT OF TWO-THIRDS DOWN,

21   THE DOCTOR WRITES:  RECEIVED 40 MILLIGRAMS, QUESTION MARK,

22   HUMIRA, ON JANUARY 22ND, UNCERTAIN WHY.  AND THEN STANDARD

23   INDUCTION WITH 160-MILLIGRAM HUMIRA, FEBRUARY 4TH WITHOUT

24   ISSUE.  SO NO HARM CAME TO THE PATIENT, BUT CLEARLY THE PATIENT

25   WAS STARTED ON THE WRONG DOSE OF THE MEDICATION BECAUSE

02:01

1  TYPICALLY ONE WOULD START WITH 160 MILLIGRAMS AS A LOADING

2  DOSE, REDUCE IT TO 80 IF THERE'S NO PROBLEMS, AND THEN GET A

3  MAINTENANCE DOSE OF 40.  SO IT WOULD HAVE BEEN BETTER HAD THE

4  PATIENT INITIALLY BEEN SEEN BY A GASTROENTEROLOGIST TIMELY AND

5  STARTED ON MEDICATION.  SO AFTER THE JUNE 2014 GASTROENTEROLOGY

6  VISIT, THE PATIENT SHOULD HAVE RETURNED TO GASTROENTEROLOGY.

7              AND THE POINT HERE WITH RESPECT TO CHRONIC CARE

8  IS THAT THERE WERE LONG DELAYS.  THE SPECIALIST DID NOT MONITOR

9  THE PATIENT AS TIMELY AS IT SHOULD HAVE BEEN DONE BECAUSE HE

10  WASN'T REFERRED, AND THE PRIMARY CARE DOCTORS AT LSP WERE NOT

11  COLLABORATING WITH THE SPECIALISTS IN ORDER TO COORDINATE CARE

12  SO THAT IT WAS PROPERLY DONE.

13  Q.  WITH --

14  A.  AND AS A RESULT OF THAT, IT'S LIKELY THAT THE PATIENT HAD

15  MORE EPISODES OF FISTULA THAN NECESSARY.

16  Q.  AND WITHOUT GETTING TOO MUCH INTO THE UNPLEASANT DETAILS,

17  WHAT IS THE -- WHAT IS THE EXPERIENCE OF A FISTULA, GENERALLY

18  SPEAKING?

19  A.  WELL, SO CROHN'S DISEASE, AS I SAID, IT'S AN INFLAMMATORY

20  DISEASE, AND THE INFLAMMATION CAN ERODE THE LINING OF THE

21  INTESTINE, WHETHER IT'S THE COLON OR THE SMALL BOWEL, AND WHEN

22  IT DOES THAT, IT CAN LEAD TO A TRACT, A EPITHELIAL TRACT,

23  BETWEEN THE SMALL INTESTINE TO OTHER ORGANS, SUCH AS THE

24  BLADDER OR WHEREVER.  AND IN THAT CASE, THE CONTENTS OF THE

25  INTESTINE WILL ENTER THE ORGAN THAT THERE'S A FISTULA TO.

02:03    1        I THINK IN THIS CASE, THERE WAS INTESTINAL CONTENTS

2  POURING INTO THE BLADDER WHICH THE PATIENT WAS URINATING.  IT

3  LEADS TO COMPLICATIONS; IT CAN LEAD TO INFECTIONS; IT CAN LEAD

4  TO NECESSITY FOR SURGERY AND OTHER PATHOLOGY.

5  **Q.**    AND THE PROBLEMS THAT YOU DESCRIBED, THE DELAYS AND SO ON

6  IN PATIENT 11'S CARE, WERE THOSE ISOLATED EXAMPLES IN YOUR

7  SAMPLE?

8  **A.**    NO, IT WAS REPEATED.  WE SAW IT OVER AND OVER IN MULTIPLE

9  CASES.

10  **Q.**    LET'S LOOK AT ONE MORE CASE STUDY AT THE MOMENT.  PATIENT

11  NO. 13, WHO IS IN THE MEDICAL RECORDS OR IN EVIDENCE AS JOINT

12  EXHIBIT 10-JJJ.  DO YOU HAVE THE TIMELINE IN FRONT OF YOU, DR.

13  PUISIS?

14  **A.**    I DO.

15  **Q.**    COULD YOU GIVE US AN OVERVIEW OF PATIENT NO. 13'S MEDICAL

16  NEEDS?

17  **A.**    SO PATIENT 13 HAD HIGH BLOOD LIPIDS AND VASCULAR DISEASE.

18  HE HAD CARDIOVASCULAR DISEASE THAT AFFECTED HIS LOWER LIMBS,

19  AND THAT RESULTED IN A REDUCTION IN THE VOLUME OF THE BLOOD

20  SUPPLY TO THE LOWER LIMBS THAT IS CALLED PERIPHERAL VASCULAR

21  DISEASE.  AS WELL, HE HAD HIGH BLOOD LIPIDS, SO HE WAS AT RISK

22  FOR CARDIOVASCULAR DISEASE AND STROKE AND PERIPHERAL VASCULAR

23  DISEASE.  SO THAT'S KIND OF A BACKGROUND.

24  **Q.**    AND COULD YOU WALK THROUGH THE CARE THAT PATIENT NO. 13

25  RECEIVED WHILE AT ANGOLA?

**A.**   SO I THINK THE MOST IMPORTANT FACTOR IS THAT FOR ANYONE
WHO WATCHES TELEVISION, YOU KNOW YOU NEED TO TAKE STATIN DRUGS
IF YOU HAVE HIGH BLOOD LIPIDS, AND THE REASON IS THAT IT IS
RECOMMENDED TO DO THAT BECAUSE IT PREVENTS HEART DISEASE,
STROKE, AND OTHER PERIPHERAL VASCULAR DISEASE.  SO THE REASON
TO TAKE THE MEDICATION IS PREVENTIVE.  AND WHEN YOU DON'T TAKE
IT, YOU'RE LIKELY TO -- MORE LIKELY TO HAVE AN EPISODE.  AND AS
WELL, CERTAIN PERSONS WHO HAVE PERIPHERAL VASCULAR DISEASE AND
SOME PEOPLE WHO HAVE CERTAIN TYPES OF HEART DISEASE TAKE
ANTICOAGULANTS.

          CLOPIDOGREL, WHICH THIS PATIENT WAS ON, IT'S ALSO
KNOWN AS PLAVIX, IS ANOTHER DRUG THAT KIND OF THINS THE BLOOD,
SO TO SPEAK, THAT REDUCES THE INCIDENTS OF CLOTTING THAT CAN
OCCUR WITH RESPECT TO CARDIOVASCULAR DISEASE.  SO IT CAN REDUCE
HEART ATTACK, AND IT REDUCES CLOTS IN THE LEGS WHEN PEOPLE HAVE
PERIPHERAL VASCULAR DISEASE.  SO THOSE TWO DRUGS ARE VERY
IMPORTANT IN THIS PATIENT BECAUSE THEY WOULD PREVENT
COMPLICATIONS OF HIS UNDERLYING CONDITION.

          AND WHAT WE NOTICED IN REVIEWING THE CHART FOR OVER
TWO YEARS WAS WE COULD NOT FIND EVIDENCE, EXCEPT FOR FOUR
MONTHS, WHEN HE RECEIVED THE MEDICATION.  ONE DRUG, THERE WAS
ONLY EVIDENCE HE RECEIVED IT FOR ONE MONTH, AND THE OTHER DRUG,
I THINK, FOR THREE MONTHS, AND WE COULD NOT FIND -- SOMETIMES
THE MARS WERE SIMPLY NOT PRESENT, AND SOMETIMES THE MARS WERE
PRESENT AND THERE WAS NO DOCUMENTATION OF ADMINISTRATION.  AND

02:07  1  WHY THIS IS IMPORTANT IS BECAUSE THIS PATIENT ACTUALLY HAD

2  COMPLICATIONS OF HIS DISEASE.

3  **Q.**   AND IF I COULD JUST INTERRUPT YOU FOR A SECOND.  YOU USED

4  AN ACRONYM, MAR.

5  **A.**   I'M SORRY.

6  **Q.**   CAN YOU JUST SAY WHAT THAT IS?

7  **A.**   A MAR IS A MEDICATION ADMINISTRATION RECORD, M-A-R.  AND

8  I'LL USE THAT ACRONYM GOING FORWARD.

9          SO WE START WHEN HE WAS SEEN BY A VASCULAR SPECIALIST

10  WHO RECOMMENDED A TEST CALLED A CT ANGIOGRAM IN NOVEMBER 20,

11  2013, AND WE NOTED THAT THAT TEST WAS NOT DONE FOR TEN MONTHS.

12  AND DURING THAT TEN MONTHS, THE PATIENT WAS NOT BEING FOLLOWED

13  BY A VASCULAR SURGEON.  THIS PATIENT WAS AT RISK FOR PERIPHERAL

14  VASCULAR DISEASE, AND IN FACT, I THINK HAD IDENTIFIED VASCULAR

15  DISEASE.  SO HE SHOULD HAVE BEEN FOLLOWED, AND THE TEST SHOULD

16  HAVE BEEN DONE EARLIER THAN IT WAS.

17          AS I NOTED, THE PATIENT WAS NOT RECEIVING MEDICATION

18  THAT WOULD PREVENT CERTAIN CARDIOVASCULAR EVENTS.  AND ON

19  DECEMBER 17TH OF 2014, HE HAD A HEART ATTACK.  BECAUSE THERE'S

20  NO EVIDENCE OF HAVING RECEIVED THE STATIN AND NO EVIDENCE OF

21  THE PLAVIX, IT'S LIKELY THAT WAS PREVENTIBLE, AND AFTER THE

22  HEART ATTACK FOR WHICH THE PATIENT WAS HOSPITALIZED, THE

23  PATIENT SAW A CARDIOLOGIST WHO RECOMMENDED ON JANUARY 29TH AN

24  ECHOCARDIOGRAM.  SO THE HEART ATTACK CAUSED COMPLICATIONS WHICH

25  WERE HEART FAILURE, AND SO THAT MORBIDITY WHICH OCCURRED TO THE

02:09   1   PATIENT WAS THE RESULT OF THE HEART ATTACK, AND THE
2   CARDIOLOGIST WANTED AN ECHOCARDIOGRAM.
3        THAT ECHOCARDIOGRAM WAS DONE ON 2/8, BUT THE DOCTOR
4   AT LSP DID NOT DOCUMENT THE REVIEW THAT THE ECHOCARDIOGRAM HAD
5   BEEN DONE AND THAT WHAT THE RESULTS WERE.  AND WHEN THE PATIENT
6   WENT BACK TO THE CARDIOLOGIST, THE CARDIOLOGIST WAS NOT SENT
7   THE ECHOCARDIOGRAM, SO HE RECOMMENDED THAT THEY CHECK IT, BUT
8   HE DIDN'T HAVE IT SO HE COULDN'T GIVE THEM GOOD ADVICE.  THAT'S
9   A BREAKDOWN OF THE CHRONIC CARE PROGRAM THAT I DESCRIBED.
10  AS I DESCRIBED, THE PRIMARY CARE DOCTOR SHOULD BE MONITORING
11  THE PATIENT AND ANY TESTING THAT'S DONE AND COORDINATE CARE
12  BETWEEN THE SPECIALISTS.
13        IN THIS CASE, IT WASN'T DONE AND THE PATIENT WENT
14  BACK TO THE CARDIOLOGIST TWICE, AGAIN, WITHOUT HAVING THE
15  ECHOCARDIOGRAM.  AND IN THE MEANTIME, THE PATIENT HAD AT LEAST
16  TWO HOSPITALIZATIONS FOR HEART FAILURE.  SO THE CARDIOLOGIST,
17  WHO COULD HAVE GIVEN BETTER ADVICE ON HOW TO IMPROVE THE CARE
18  OF THE PATIENT'S HEART FAILURE WAS UNABLE TO DO THAT BECAUSE HE
19  WAS NOT PROVIDED INFORMATION THAT HE SHOULD HAVE BEEN PROVIDED
20  AND WHICH HE HAD RECOMMENDED TO BE DONE.  AND THE LSP DOCTORS
21  WHO COULD, THEMSELVES, HAD INTERPRETED THE ECHOCARDIOGRAM AND
22  APPROVED CARE, DID NOT DO SO.  SO THE SYSTEM JUST FAILED,
23  BECAUSE OF THE COORDINATION.
24        WHEN WE REVIEWED THE PHYSICIAN RECORDS, WE COULD NOT
25  FIND EVIDENCE THAT THEY DOCUMENTED REVIEW OF THE REPORT OF

0 2 : 1 1

1    EITHER THE CARDIOLOGIST OR THE ECHOCARDIOGRAM, AND THAT'S JUST

2    BAD CHRONIC CARE.  AND IT RESULTS IN MORBIDITY, AND THE

3    MORBIDITY TO THIS PATIENT WAS HEART ATTACK AND HOSPITALIZATION

4    THAT PLACED THE PATIENT AT RISK.  THAT IS, HIS HEART FAILURE

5    EXACERBATED AND IS POTENTIALLY LIFE-THREATENING AND REQUIRED

6    HOSPITALIZATION TO CORRECT.  THAT MAY HAVE BEEN PREVENTABLE HAD

7    THE PATIENT HAD COORDINATED CARE.

8    Q.    AND WHEN YOU SAY "MAY HAVE BEEN PREVENTABLE," LOOKING BACK

9    AT MEDICAL RECORDS, DO YOU EVER KNOW FOR SURE THAT SOMETHING

10   WAS PREVENTABLE?

11   A.    WELL, YOU'RE NOT ABSOLUTELY CERTAIN, BUT LET ME JUST SAY

12   THIS, WHEN STATINS ARE RECOMMENDED, THE REASON THAT THEY ARE

13   RECOMMENDED IS TO PREVENT HEART ATTACK.  THAT'S WHY A DOCTOR

14   PRESCRIBES IT.  AND PRESUMABLY, IF YOU DON'T TAKE IT, YOU MAY

15   NOT PREVENT A HEART ATTACK.  SO YOU CAN'T BE 100 PERCENT

16   CERTAIN THAT THIS PARTICULAR -- MISSING THIS PARTICULAR DRUG

17   CAUSED THAT HEART ATTACK, BUT I THINK YOU CAN FOR SURE SAY THAT

18   IT WAS POTENTIALLY -- EITHER POTENTIALLY OR PREVENTABLE.

19   Q.    AND WHAT, IF ANYTHING, CAN YOU SAY ABOUT THE RISK OF

20   SOMETHING -- OF A HEART ATTACK WITHOUT A DRUG LIKE THIS?

21   A.    I'M SURE SCIENTISTS MAY HAVE BETTER NUMBERS THAN I CAN

22   COME UP WITH.  ALL I CAN SAY IS THAT IF YOU TAKE THE DRUG, IT'S

23   IMPROVED.

24   Q.    AND THEN TURNING BACK TO THE TIMELINE, WHAT HAPPENED ON

25   MARCH 17, 2015?

1  **A.**    I'M SORRY.  CAN YOU REPEAT THAT?

2  **Q.**    YES.  WHAT HAPPENED ON MARCH 17, 2015?

3  **A.**    OH, RIGHT.  SO THIS PATIENT HAD -- HE WAS BEING SEEN BY

4  PROVIDERS AT LSP, AND HE HAD AN EPISODE WHERE HE HAD SLURRED

5  SPEECH AND APHASIA.  APHASIA IS AN INABILITY TO SPEAK.  IT'S

6  BECAUSE OF THE COORDINATION BETWEEN -- FROM THE BRAIN TO THE

7  MOUTH AND YOU'RE UNABLE TO ARTICULATE WHAT YOU ARE THINKING,

8  THAT'S APHASIA.

9         SO THE PATIENT WAS SEEN BY A MEDIC, AN EMT, WHO

10  DOCUMENTED THAT CUSTODY SAID THAT THE PATIENT HAD APHASIA AND

11  SLURRED SPEECH, AND THE PATIENT WAS BROUGHT TO THE ATU WHERE A

12  DOCTOR DOCUMENTED A VERY BRIEF NOTE.

13         **MR. DUBNER:**  AND WHY DON'T WE BRING UP THAT NOTE.

14  AGAIN, NOT PUBLISHING TO THE GALLERY, BUT THIS IS JOINT EXHIBIT

15  10-61264.

16  **BY MR. DUBNER:**

17  **Q.**    AND COULD YOU DRAW THE COURT'S ATTENTION TO WHAT YOU'RE

18  TALKING ABOUT WHEN YOU SAY A BRIEF NOTE?

19  **A.**    SO THE TOP PART OF THE NOTE WHERE THE WRITING IS SLANTED

20  UP AND TO THE LEFT IS THE MEDIC, AND THE BOTTOM PART OF THE

21  NOTE IS PRESUMABLY WHERE THE PHYSICIAN DOCUMENTED HIS OR HER

22  NOTE.  AND WHAT'S NOTABLE ABOUT THIS IS THAT THE SLURRED SPEECH

23  AND EXPRESSIVE APHASIA ARE SYMPTOMS OF A POTENTIAL STROKE.  AND

24  WHETHER THAT'S RESOLVED OR NOT, IT'S INDICATIVE OF STROKE-LIKE

25  SYMPTOMS.

1    IN OTHER WORDS, SOMEONE COULD HAVE A CLOT THAT PASSES

2   TO THE BRAIN AND THEN RESOLVES, AND YOUR APHASIA AND

3   DISARTICULATION IMPROVE.  THAT STILL IS SOMETHING THAT'S

4   DANGEROUS AND NEEDS TO BE PROMPTLY INVESTIGATED.  SO WHETHER IT

5   WAS WHAT'S CALLED A TRANSIENT ISCHEMIC EPISODE OR A STROKE, IT

6   NEEDED TO BE EXCLUDED AND EVALUATED PROMPTLY.

7    AND WHAT WE NOTE ON THIS NOTE ARE SEVERAL THINGS THAT

8   I THINK ARE RECURRING; THAT IS, THE HISTORY IS VERY, VERY

9   BRIEF.  AND THE HISTORY IS:  PATIENT BROUGHT IN FOR BRIEF

10  EPISODE OF SLURRED SPEECH AND EXPRESSIVE APHASIA, AND THAT'S

11  IT.  THERE'S NO, DO YOU HAVE OTHER SYMPTOMS?  IS THERE ANYTHING

12  ELSE WRONG?  WHEN DID IT START?  WHEN DID IT RESOLVE?  WHAT WAS

13  IT LIKE?  THERE'S NO HISTORY.  IT'S JUST A REITERATION OF WHAT

14  THE MEDIC HAD WRITTEN.

15   AND THEN THE PHYSICAL EXAM, THE ONLY NEUROLOGICAL

16  EXAM IS THAT THE PATIENT IS ORIENTED TIMES THREE, WHICH MEANS

17  TO PERSON, PLACE, AND TIME.  THERE'S NO NEUROLOGICAL EXAM.  AND

18  STROKES EXPRESS THEMSELVES IN TERMS OF A NEUROLOGICAL EXAM.  SO

19  YOU WOULD HAVE TO SEE IF THE PATIENT HAS ANY MOTOR PROBLEM WITH

20  THEIR ARMS, LEGS, WHETHER THEY HAVE FACIAL PARALYSIS, WHETHER

21  THEY STILL HAVE THAT, WHETHER THEY CAN HEAR, WHETHER THEIR

22  CRANIAL NERVES ARE INTACT.  AND THAT REQUIRES A NEUROLOGICAL

23  EXAM, WHICH WAS NOT DONE.  SO THAT HISTORY AND PHYSICAL ARE --

24  THEY ARE JUST INDIFFERENT TO WHAT THE PATIENT'S CONDITION IS.

25  THEY DON'T REALLY GET AT WHAT NEEDS TO BE DONE.

02:17

1        MOREOVER, THEN THE ASSESSMENT AND PLAN SHOULD BE

2   BELOW THAT, AND THERE IS NO ASSESSMENT.  C1A, I THINK, REFERS

3   TO REFER TO CLINIC CA THIS WEEK.  SO BASICALLY THE DOCTOR IS

4   SAYING SEE THE PATIENT THIS WEEK AND NEEDS CT, PRESUMABLY A CT

5   SCAN.  WELL, YES, THE PATIENT NEEDS A CT SCAN, BUT HE NEEDS IT

6   NOW.  IF YOU HAVE SYMPTOMS OF A STROKE AND WENT TO AN ER, THEY

7   WOULDN'T SEND YOU HOME AND SAY GET A CT SCAN NEXT WEEK.  THEY

8   WOULD SEND YOU TO THE CT ROOM AND GET A CT SCAN, AND THAT'S

9   WHAT SHOULD HAVE HAPPENED, BUT IT DIDN'T HAPPEN.  SO THAT WAS

10  KIND OF UNUSUAL.

11       AND I WANT TO EMPHASIZE ALSO THAT A STROKE, ONE OF

12  THE CAUSES OF STROKE, IS ALSO THE FACT THAT HE WASN'T TAKING

13  HIS STATIN.  STATINS PREVENT HEART ATTACK, STROKE, AND

14  PERIPHERAL VASCULAR DISEASE.  SO HE HAD ALL THREE, SYMPTOMS OF

15  ALL THREE.

16       NOW, WHAT HE ACTUALLY HAD IS NOT CLEAR, ALTHOUGH A CT

17  SCAN WAS DONE, BUT IT WAS DONE THREE MONTHS LATER.  A CT SCAN

18  SHOULD HAVE BEEN DONE PROMPTLY.  IT WAS DONE THREE MONTHS

19  LATER, AND SHOWED A SMALL STROKE.  YOU'LL NEVER KNOW WHETHER

20  THAT STROKE WAS RELATED TO THAT EPISODE OR NOT.  IT MAY HAVE

21  BEEN PRESENT ALREADY, BUT YOU CAN'T REALLY EVALUATE IT OR

22  CREATE A THERAPEUTIC PLAN FOR THE PATIENT IF YOU CONDUCT CARE

23  IN THIS MANNER.  IT'S JUST INAPPROPRIATE.  THE PATIENT HAD AN

24  EMERGENCY NEED AND WAS NOT SENT OUT.

25       AND I THINK WE ALSO HAVE ONE OTHER RECORD THAT I

02:19   1    THOUGHT WOULD BE USEFUL TO MENTION.

2    **Q.**   SURE.

3                **MR. DUBNER:**   IF WE COULD GO TO JX-10-61263.

4                **THE WITNESS:**   SO THIS IS THE SAME PATIENT, AND THIS

5    EXAMINATION IS DONE THREE DAYS LATER.   NOW, RECOLLECT, I

6    MENTIONED THAT THIS PATIENT HAD SYMPTOMS CONSISTENT WITH A

7    STROKE, AND THE DOCTOR RECOMMENDED A CT SCAN AND FOLLOWUP IN

8    THREE DAYS.   SO ONE ONLY HAS TO ASK HIMSELF, WHAT SHOULD A

9    PHYSICIAN DO WHEN SEEING A PATIENT WHO HAD EITHER A TIA OR A

10   STROKE THREE DAYS AGO, AND THAT WOULD BE A HISTORY RELATED TO

11   THE SYMPTOMS THAT THE PATIENT HAD TO SEE IF THEY ARE STILL

12   PRESENT AND SEE IF ANY NEW SYMPTOMS HAD OCCURRED.   AND THEN TO

13   DO AN EXAMINATION THAT INCLUDES A NEUROLOGICAL EXAMINATION TO

14   EXCLUDE THE POSSIBILITY OF ANY FURTHER ADVANCEMENT OR TO

15   CONFIRM THAT WHAT THE PATIENT HAD HAD OCCURRED, AND YOU DON'T

16   SEE THAT.   SO THERE'S VIRTUALLY NO HISTORY.

17               THE PHYSICAL EXAM IS EXTREMELY BRIEF.   IT LOOKS LIKE

18   JVP NEGATIVE, WHICH MEANS JUGULAR VEINOUS PULSE, WHICH IS

19   SOMETHING THAT YOU WOULD ASSESS RELATIVE TO HEART FAILURE.   AND

20   THEN, I BELIEVE, IT'S CTA, PROBABLY MEANS CLEAR TO

21   AUSCULTATION.   THEY'RE TALKING ABOUT THE LUNG.   AND RR MEANS

22   REGULAR RATE.   THEY'RE TALKING ABOUT THE HEART.   SO THEY DIDN'T

23   DO ANY NEUROLOGICAL EXAM.   THERE'S NO HISTORY.   THE ASSESSMENT

24   IS HEART FAILURE, COPD, AND, I THINK, HIGH BLOOD LIPIDS, AND IT

25   DOESN'T MENTION THE CONDITION FOR WHICH THE PATIENT WAS

0 2 : 2 1

1  REFERRED THREE DAYS PREVIOUS, WHICH WAS A SERIOUS CONDITION.

2  AND THE PLAN IS TO RETURN IN SIX WEEKS.

3            NOW, THIS PATIENT WAS ON PLAVIX, WHICH IS MEDICATION

4  THAT'S OFTEN USED FOR PEOPLE WHO HAVE STROKE SYNDROME.

5  HOWEVER, IF THIS PATIENT WAS AT RISK FOR A STROKE, THE

6  PHYSICIAN SHOULD HAVE PUT A STETHOSCOPE ON THE NECK AND

7  LISTENED TO SEE WHAT THE NECK ARTERY SOUNDED LIKE, TO SEE IF

8  THERE WAS A MURMUR OR A BLOCKAGE.  AND THE PATIENT SHOULD HAVE

9  BEEN REFERRED FOR A CAROTID ULTRASOUND TO SEE IF THE NECK

10  ARTERY WAS BLOCKED, AND THE PATIENT NEEDED AN ENDARTERECTOMY.

11  SO NONE OF THAT WAS DONE, AND THIS IS THE KIND OF RECORD THAT

12  WE SAW OVER AND OVER.

13            AND LATER, WE MAY SHOW SOME SLIDES OF WHEN PATIENTS

14  GO TO LSU, THEY WOULD HAVE -- A PHYSICIAN WOULD DOCUMENT THE

15  HISTORY AND PHYSICAL EXAM AND YOU CAN COMPARE THE TWO AND SEE

16  WHAT THEY SHOULD BE WRITING NOTES LIKE AND WHAT THESE NOTES

17  ARE, AND IT SHOWS THE DISCREPANCY AND THE DIFFERENCE.  AND

18  THAT'S A DIFFERENCE IN CARE.

19            SO THIS PATIENT HAD MULTIPLE RISKS FOR PERIPHERAL

20  VASCULAR DISEASE, STROKE, AND HEART ATTACK, AND INDEED HAD A

21  STROKE AND HAD PERIPHERAL ARTERY DISEASE, AND MAY HAVE HAD A

22  STROKE AND HAD EVIDENCE ON A CT SCAN THAT HE DID HAVE AN OLD

23  STROKE, AND YET WASN'T RECEIVING A STATIN DRUG, WASN'T

24  RECEIVING PLAVIX, AND HIS EVALUATIONS WERE JUST REALLY NOT

25  ADEQUATE AT ALL, AND DIDN'T EVALUATE HIS STATUS VISIT TO VISIT.

1   AND THAT'S WHY WE DETERMINED THAT THE CHRONIC DISEASE PROGRAM

2   WASN'T ADEQUATE.

3   **Q.**   IF WE COULD TALK TO A COUPLE OF THESE THAT YOU TALKED

4   ABOUT THERE.  ONE QUESTION THAT I HAVE IS:  IF A PHYSICIAN WAS

5   TAKING THE STEPS THAT YOU WERE DESCRIBING, MEASURING WITH A

6   STETHOSCOPE AND SO ON, BUT JUST NOT WRITING IT DOWN, WOULD THAT

7   STILL CONCERN YOU?

8   **A.**   OH, ABSOLUTELY.  HOW DOES ANYONE KNOW THAT YOU DID IT IF

9   YOU DIDN'T DOCUMENT IT?

10   **Q.**   AND ARE PATIENTS IN LSP SEEN BY MULTIPLE DIFFERENT

11   PHYSICIANS?

12   **A.**   YES.

13          **MR. DUBNER:**  AND ACTUALLY IF YOU COULD PUT BOTH OF

14   THOSE EXHIBITS UP, BOTH 10-61263 AND 10-61264 SIDE BY SIDE.

15   **BY MR. DUBNER:**

16   **Q.**   DO THESE APPEAR TO BE THE SAME PHYSICIAN?

17   **A.**   NO.  I BELIEVE THEY ARE DIFFERENT PEOPLE.

18   **Q.**   AND SO IN WHAT WAYS IS THE FIRST NOTE THAT WE LOOKED AT,

19   10-61264 FROM MARCH 17, 2015, IN WHAT WAYS DOES THE

20   THOROUGHNESS OF THAT AFFECT THE REVIEW THAT THE FOLLOWING

21   PHYSICIAN DOES OR CAN DO?

22   **A.**   WELL, SO ON THE LATTER NOTE, ON THE 3/20/15 NOTE, IN THE

23   TOP BOXED AREA, IT SAYS CHIEF COMPLAINT, FOLLOWUP ATU, SLURRED

24   SPEECH, SO IT'S TELLING YOU WHY THE PERSON IS COMING TO THE

25   CLINIC.  IRONICALLY THE DOCTOR WHO SEES THE PATIENT NEITHER

1  REFERS TO THE PRIOR NOTE, I DON'T KNOW IF HE ACTUALLY READ THE

2  NOTE.  HE SHOULD HAVE, BUT IT'S NOT CLEAR WHETHER HE REVIEWED

3  THE NOTE, AND HE DIDN'T ADDRESS THE SLURRED SPEECH.  SO THE

4  REASON FOR THE VISIT IS NOT ADDRESSED IN THE NOTE.

5         AND WHILE SOMEONE CAN SAY, WELL I EVALUATED HIM FOR

6  THE SLURRED SPEECH, HE JUST DIDN'T HAVE A PROBLEM SO I DIDN'T

7  WRITE IT DOWN, THAT WOULD MAKE NO SENSE TO ME.  AND IT IS BOTH

8  A LEGAL AND A PROFESSIONAL MEDICAL CLINICAL ERROR.

9  Q.  IS IT ALSO ONE THAT CAN INCREASE THE RISK OF HARM TO THE

10 PATIENT?

11 A.  OH, ABSOLUTELY.  YEAH.

12 Q.  IN TERMS OF THE CT SCAN THAT IT SAYS ON 10-61264, YOU SAID

13 IT SAYS NEEDS A CT SCAN.  COULD YOU FIND EVIDENCE THAT THAT

14 OCCURRED?

15 A.  I'M SORRY.  CAN YOU SAY THAT AGAIN?

16 Q.  I'M SORRY.  LET ME REPHRASE THAT.  YOU SAID BEFORE THAT IN

17 THE MARCH 17TH NOTE, THE PHYSICIAN APPEARS TO HAVE RECOMMENDED

18 A CT SCAN?

19 A.  YES.

20 Q.  DID YOU FIND ANY EVIDENCE THAT THAT OCCURRED?

21 A.  YES.

22 Q.  DID YOU FIND ANY EVIDENCE THAT IT WAS REVIEWED TIMELY?

23 A.  SO IT WAS DONE, BUT I COULDN'T VERIFY THAT SOMEBODY LOOKED

24 AT THE CT SCAN AND REVIEWED IT, LET ALONE REVIEWED IT WITH THE

25 PATIENT AND DISCUSSED THE FINDINGS.  SO, TYPICALLY, IF I WOULD

1  ORDER -- IF I WAS SEEING A PATIENT, I ORDERED A CT SCAN, I

2  WOULD SEE THE PATIENT IN FOLLOWUP AND I WOULD SAY, WITH THE

3  PATIENT PRESENT, THE CT SCAN CAME BACK AND THIS IS THE RESULT

4  OF THE CT SCAN.  MOST PEOPLE WHO GO TO A DOCTOR HAVE THAT

5  EXPERIENCE.  THE DOCTOR DISCUSSES WITH YOU THE RESULTS OF THE

6  TEST.  THAT'S NOT DONE.  IT'S SIMPLY, WE FOUND, VERY LITTLE

7  EVIDENCE.  I DON'T KNOW THAT I EVER SAW A CASE THAT I REVIEWED

8  WHERE A DOCTOR ACTUALLY DISCUSSED THE FINDINGS OF A DIAGNOSTIC

9  TEST WITH THE PATIENT AND DIDN'T DOCUMENT IT.

10  Q.  WOULD YOU EXPECT THAT TO BE DOCUMENTED IN THE RECORD?

11  A.  IT'S STANDARD.  I MEAN, IT'S JUST -- IT'S STANDARD AND I

12  THINK ANYONE WHO GOES TO A DOCTOR KNOWS THAT BECAUSE THAT'S

13  WHAT HAPPENS WHEN YOU GO TO A DOCTOR.

14  Q.  AND IF WE COULD TALK ABOUT THE MEDICATION FOR A MOMENT.

15  YOU DESCRIBED THAT THERE WERE ONLY A FEW MONTHS WHEN THE

16  MEDICATION ADMINISTRATION RECORDS, THE MARS, SHOWED THIS

17  PATIENT RECEIVED A DOSAGE.  LET'S SAY THAT A PATIENT IS

18  REFUSING MEDICATION OR NOT SHOWING UP FOR PILL CALL, WHAT

19  SHOULD A PHYSICIAN DO IN THAT SITUATION?

20  A.  WELL, YOU SHOULD DISCUSS IT WITH THE PATIENT, AND THERE

21  SHOULD BE SOME DOCUMENTATION THAT YOU DISCUSSED IT.  I MEAN,

22  THERE SHOULD BE REFUSALS, OF COURSE, BUT PATIENTS SOMETIMES

23  DON'T UNDERSTAND WHAT'S BEING PRESCRIBED TO THEM.  AND I THINK

24  THAT'S COMMON, BUT YOU HAVE TO DISCUSS WITH THE PATIENT WHY

25  THEY'RE ON THE MEDICATION, WHY THEY NEED IT, AND WHAT IS THE

1  PROBLEM WITH TAKING IT, IF THEY DON'T WANT TO TAKE IT.

2          IN THIS CASE, WE COULDN'T FIND ANY EVIDENCE OF THAT,

3  AND IT APPEARED THE PATIENT JUST DIDN'T GET IT.

4  **Q.**   AND AS A GENERAL MATTER, DID YOU FIND EVIDENCE OF DOCTORS

5  DISCUSSING A PATIENT'S REASONS FOR NOT TAKING MEDICATION IN THE

6  OTHER CHARTS YOU LOOKED AT?

7  **A.**   I THINK IT WAS PERVASIVE.  AND YOU KNOW, AS I SAID,

8  MONITORING MEDICATION IS ONE OF THE AIMS OF CHRONIC DISEASE

9  MANAGEMENT.  EVERY VISIT YOU SHOULD BE MONITORING THE

10  MEDICATION.  I DON'T THINK SOME OF THESE RECORDS ARE

11  ACTUALLY -- MARS ARE GETTING TO THE MEDICAL RECORD, AND IN SOME

12  CASES, I DON'T THINK PATIENTS ARE GETTING THE MEDICATION.

13  **Q.**   IS THERE A WAY TO DETERMINE THAT FROM THE WHOLE MEDICAL

14  RECORD NOW?

15  **A.**   YOU CAN'T DETERMINE THE REASON, BUT IT APPEARS THAT THEY

16  ARE NOT GETTING IT.  THAT'S ALL I CAN SAY.

17  **Q.**   OKAY.  SO WE'LL FINISH WITH PATIENT NO. 13 UNLESS THE

18  COURT HAS QUESTIONS ABOUT ANY OF THE PATIENTS WE'VE SPOKEN

19  ABOUT.

20          **THE COURT:**  GO AHEAD.

21  **BY MR. DUBNER:**

22  **Q.**   COULD YOU JUST SORT OF SUM UP BEFORE WE MOVE ON FROM

23  CHRONIC DISEASE MANAGEMENT WHAT THE PATTERNS THAT YOU SAW IN

24  THE CHRONIC DISEASE CHARTS IN GENERAL?

25  **A.**   THIS CHART IS VERY SIMILAR TO OTHER CHARTS WE REVIEWED,

0 2 : 2 9

1   THAT THEY WERE ALL SIMILAR.  THERE WAS A LACK OF HISTORY THAT

2   WAS ADEQUATE.  THERE WAS A LACK OF PHYSICAL EXAMINATION.  THERE

3   WAS A LACK OF MONITORING OF TESTING, WHETHER DOCTORS DIDN'T

4   ORDER TESTS THAT SHOULD HAVE BEEN DONE OR WHEN A TEST WAS DONE,

5   THEY DIDN'T LOOK AT THE RESULTS AND DISCUSS THEM WITH THE

6   PATIENT.  THEY DID NOT MONITOR MEDICATION.  THEY DIDN'T MANAGE

7   MEDICATION, SO THERE WAS NO DISCUSSION WITH THE PATIENT ABOUT

8   WHETHER THEY WERE RECEIVING THE MEDICATION; IF NOT, WHY NOT,

9   AND DISCUSSING COMPLICATIONS.  THEY WOULD ONLY ADDRESS EPISODIC

10  ISSUES.

11          SO, FOR EXAMPLE, IF A PATIENT CAME IN AND THEY HAD

12  FOUR DISEASES, ONE OF WHICH WAS PERIPHERAL VASCULAR DISEASE

13  WITH AN ULCER, THEY MIGHT DISCUSS THE ULCER BECAUSE IT WAS

14  DRAINING PUS, BUT THEY WOULDN'T DISCUSS THE OTHER CONDITIONS OF

15  THE PATIENT.

16          AND THE THERAPEUTIC PLANS, I THOUGHT, WERE

17  INADEQUATE, AND SO ALMOST ON EVERY LEVEL OF CARE AND INCLUDING

18  REFERRAL TO SPECIALISTS, IT WAS NOT CONSISTENT WITH PROPER

19  MANAGEMENT OF CHRONIC DISEASE.

20  **Q.**   LET'S MOVE ON TO SPECIALTY CARE.  WHAT DO YOU MEAN

21  GENERALLY WHEN YOU TALK ABOUT SPECIALITY SERVICES?

22  **A.**   WELL SO SPECIALTY SERVICES, IT IS A SERVICE THAT IS NOT

23  PROVIDED AT THE FACILITY FOR WHICH THE PATIENT NEEDS TO BE SENT

24  TO A DIFFERENT FACILITY FOR.  FOR EXAMPLE, LSP DOESN'T HAVE

25  NEUROLOGISTS.  SO IF SOMEONE NEEDS TO SEE A NEUROLOGIST, THEY

1   WOULD REFER THE PATIENT TO A NEUROLOGIST EITHER VIA

2   TELEMEDICINE OR TO ANOTHER DOCTOR'S OFFICE.  AND IN ADDITION TO

3   CONSULTATION WITH DOCTORS, SPECIALTY CARE MAY CONSIST OF

4   SPECIAL TESTING NEEDS OF THE PATIENT.

5           FOR EXAMPLE, IF THE PATIENT NEEDS A CT SCAN OR AN MRI

6   SCAN OR A CARDIAC STRESS TEST OR OTHER TEST, THE PATIENT MAY

7   NEED TO BE SENT OUTSIDE FOR THAT TEST.  I CONSIDER THAT A

8   SPECIALITY SERVICE AS WELL.

9   **Q.**   AND YOU REFERRED TO TELEMEDICINE.  CAN YOU EXPLAIN WHAT

10  THIS IS?

11  **A.**   TELEMEDICINE IS A PRACTICE MAKING USE OF COMMUNICATION

12  DEVICES SO THAT A REMOTE PHYSICIAN CAN SEE AND EXAMINE A

13  PATIENT AT A DIFFERENT SITE OVER THE COMMUNICATION NETWORK.

14  IT'S LIKE CONDUCTING A PHYSICIAN EXAMINATION VIA SKYPE, JUST TO

15  MAKE A SIMPLE ANALOGY.  THERE ARE DEVICES THAT CAN BE USED AND

16  ATTACHED TO THE TELEMEDICINE EQUIPMENT AT THE SOURCE FACILITY

17  THAT INCLUDES STETHOSCOPES, SPECIALIZED CAMERAS, EVEN

18  OTO OPHTHALMOSCOPES ARE AVAILABLE, AND SO PHYSICIANS CAN

19  EXAMINE A PATIENT REMOTELY.

20  **Q.**   ARE THERE SITUATIONS WHERE TELEMEDICINE IS INSUFFICIENT TO

21  CONDUCT AN EXAM?

22  **A.**   I'VE SEEN IT USED FOR MOST EVERYTHING.  IT'S NOT USEFUL

23  WHEN YOU NEED TO TOUCH THE PATIENT, SO WHEN YOU NEED TO REALLY

24  EXAMINE, PALPATE, IT'S MORE DIFFICULT.  IT'S IMPOSSIBLE TO DO

25  WITH TELEMEDICINE.  YOU EITHER HAVE TO HAVE AN ASSISTANT DO THE

0 2 : 1 3

1    EXAMINATION WHICH KIND OF MAKES TELEMEDICINE ALMOST MOOT, BUT

2    IT'S USEFUL FOR MOST SPECIALITIES.

3    **Q.**    AND IF YOU DO HAVE AN ASSISTANT ASSISTING WITH

4    TELEMEDICINE, WHAT SHOULD THAT PERSON'S QUALIFICATIONS BE?

5    **A.**    WELL, GENERALLY PEOPLE USE REGISTERED NURSES BECAUSE

6    THEY'RE HIGHER LEVEL OF TRAINING AND CAN MAKE INDEPENDENT

7    ASSESSMENTS.  AND THAT'S WHAT MOST FACILITIES USE, MOST

8    CORRECTIONAL PROGRAMS.

9    **Q.**    DOES LSP ALSO HAVE SPECIALISTS COME TO ANGOLA AT TIMES?

10   **A.**    THEY DO.  THEY HAVE A PANEL OF SPECIALISTS.  I DON'T

11   REMEMBER THE EXACT LIST, BUT I THINK A SURGEON, A NEUROLOGIST.

12   THERE WERE SEVERAL OTHERS.  THEY HAVE A GENTLEMAN WHO COMES IN

13   WHO DOES ULTRASOUNDS.  AND THEY HAVE, ON SITE, A TECHNICIAN WHO

14   DOES SPIROMETRY.  SO THEY HAVE A NUMBER OF SPECIALTY

15   CONSULTANTS WHO COME IN, SEE PATIENTS MOSTLY IN THE BARROW

16   CENTER, BUT SOME IN THE PROCEDURE CENTER.

17   **Q.**    SO LET'S TALK ABOUT INCORPORATING SPECIALTY CARE INTO A

18   PATIENT'S CARE.  IN A WELL-FUNCTIONING SYSTEM, HOW ARE OUTSIDE

19   SPECIALISTS INCORPORATED INTO A PATIENT'S MANAGEMENT?

20   **A.**    WELL, IT VARIES BY THE PRACTITIONERS.  WELL-CREDENTIALED

21   INTERNISTS CAN RELY LESS ON SPECIALISTS THAN PEOPLE WHO ARE NOT

22   TRAINED, BUT GENERALLY, YOU SHOULD REFER TO A SPECIALIST ANY

23   PATIENT WHO HAS A CONDITION FOR WHICH YOU DO NOT HAVE TRAINING

24   OR SUFFICIENT EXPERIENCE TO MANAGE.  SO IF IT'S BEYOND YOUR

25   EXPERTISE, YOU SHOULD REFER THE PATIENT.

02:35    1            **MR. DUBNER:**  AND, MARTHA, IF YOU COULD BRING UP SLIDE

2    36, WHICH IS JUST A DEMONSTRATIVE.  THANK YOU.

3    **BY MR. DUBNER:**

4    **Q.**   AND WHAT ABOUT COMMUNICATION BETWEEN A SPECIALIST AND THE

5    PRIMARY CARE PHYSICIAN?

6    **A.**   SO IT'S CRITICAL, BECAUSE THE SPECIALIST IS -- IN LIEU OF

7    YOUR ABILITY TO MANAGE THE PATIENT, YOU'RE SENDING THE PATIENT

8    TO A SPECIALIST.  IN ORDER TO CONTINUE THE PROPER CARE OF THE

9    PATIENT, THE PRIMARY CARE DOCTOR, IN OTHER WORDS, THE DOCTOR

10   WHO IS SENDING THE PATIENT TO THE SPECIALIST, NEEDS TO REVIEW

11   THE SPECIALTY NOTE, THE ENTIRE NOTE, BUT PAYING ATTENTION TO

12   THE ASSESSMENTS AND RECOMMENDATIONS SO THAT THE CARE CAN BE

13   CONTINUOUS AND WITHOUT INTERRUPTION.

14            AND, FURTHERMORE, THE REFERRING PHYSICIAN SHOULD

15   UNDERSTAND THE RECOMMENDATIONS SO THAT THE DOCTOR CAN INTEGRATE

16   THAT CARE INTO THE CARE OF THE PATIENT, BECAUSE SOME DRUGS THAT

17   MIGHT BE PRESCRIBED MIGHT INTERACT WITH DRUGS THE PATIENT IS

18   ALREADY ON.  SOME RECOMMENDATIONS MAY HAVE ALREADY BEEN DONE.

19   AND THERE NEEDS TO BE COORDINATION.  SO IT'S CRITICAL THAT THE

20   PROVIDER WHO REFERS NEEDS TO BE IN COMMUNICATION WITH THE

21   SPECIALIST.  AND GENERALLY, THAT COMMUNICATION IS GENERALLY

22   SUFFICIENT WHEN REPORTS COME FROM THE SPECIALIST TO THE PRIMARY

23   CARE PHYSICIAN.

24   **Q.**   AND DO YOU FIND THAT COMMUNICATION HAPPENING AT ANGOLA IN

25   THAT CAPACITY?

**A.**   NO.   IT'S REALLY AWFUL.   I MEAN, BASICALLY THE WAY THE
SYSTEM IS SET UP, THERE ISN'T -- THERE ARE TWO LPNS, I BELIEVE,
WHO MANAGE WHAT'S CALLED THE "TRIP OFFICE".   AND THE TRIP
OFFICE IS THE CENTER THAT ARRANGES ALL THE REFERRALS.   AND
DOCTORS SEND REFERRAL PAPERWORK TO A TRIP OFFICE NURSE WHO,
THEN, TAKES OVER AND SENDS THAT PAPERWORK TO THE CENTRAL OFFICE
WHERE THE SPECIALTY REFERRAL IS APPROVED OR NOT.   AFTER WHICH,
THE CENTRAL OFFICE MAKES THE SCHEDULING AND THE TRIP OFFICE
COORDINATES SOME OF THAT.   BUT THE TRIP OFFICE AT ANGOLA, THOSE
NURSES, IN MY OPINION, ACT MORE AS THE PRIMARY CARE DOCTOR THAN
THE DOCTOR HIMSELF OR HERSELF.   AND THAT TRIP OFFICE NURSE IS
ACTUALLY THE INTERMEDIARY BETWEEN THE SPECIALISTS AND THE
PRIMARY CARE DOCTOR, AND THE PRIMARY CARE DOCTORS ARE ALMOST
UNINVOLVED.   THEY MAKE A REFERRAL, AND THAT'S PRETTY MUCH THE
END OF THE STORY, AT LEAST WHAT'S DOCUMENTED IN THE RECORD.

         THERE WERE MANY ERRORS WHERE PATIENTS -- AS WE SAID
IN THE ONE PATIENT WHO WENT TO THE CARDIOLOGIST AND WAS
SUPPOSED TO HAVE AN ECHOCARDIOGRAM, IT WAS DONE, BUT THE
CARDIOLOGIST NEVER GOT THE ECHOCARDIOGRAM.   ON THREE
CONSECUTIVE VISITS, THAT ECHOCARDIOGRAM SHOULD HAVE BEEN SENT
WITH THE PATIENT.   WHY WASN'T IT SENT?

         SO INFORMATION BACK AND FORTH, THERE'S A SYSTEM ERROR
AND IT IS -- IT'S PROFOUND IS ALL I CAN SAY, BECAUSE WE SAW IT
MULTIPLE, MULTIPLE TIMES.   IT RESULTS IN SIGNIFICANT DELAYS,
TESTS NOT HAPPENING.   IT RESULTED IN MORBIDITY AND SO FORTH,

1  AND IT'S A BREAKDOWN.  THE COMMUNICATION BETWEEN THE PROVIDER

2  AND THE SPECIALIST IS NOT GOOD.  AND THERE'S VERY LITTLE

3  EVIDENCE ON ANY RECORD WE REVIEWED OF THE SPECIALIST

4  DOCUMENTING A REVIEW OF THE CONSULTATION AND ACKNOWLEDGMENT IN

5  THE DOCUMENTATION THAT THEY UNDERSTOOD THE RECOMMENDATIONS AND

6  THE PLAN OF THE CONSULTANT.

7  **Q.**   AND JUST TO CLARIFY, I THINK YOU JUST SAID THERE WAS NO

8  EVIDENCE -- LITTLE, IF ANY, EVIDENCE THAT YOU SAW THE

9  SPECIALISTS REVIEWING AND DOCUMENTING THE CONSULTATION?

10  **A.**   THE LSP DOCTOR REVIEWING THE SPECIALTY RECOMMENDATIONS AND

11  PLAN, SO AS TO COORDINATE IT INTO THE CARE.  AND THAT HAD

12  EFFECTS ON PEOPLE, SIGNIFICANT EFFECTS.

13  **Q.**   AND WHAT, IF ANYTHING, DID YOU OBSERVE ABOUT THE DECISION

14  WHETHER OR NOT TO REFER A PATIENT AT ALL TO A SPECIALIST?

15  **A.**   CAN YOU REPEAT THAT?

16  **Q.**   YEAH.  WHAT, IF ANYTHING, DID YOU OBSERVE ABOUT THE

17  TIMELINESS OF REFERRALS TO SPECIALISTS IN THE FIRST PLACE?

18  **A.**   WELL, IT WASN'T VERY GOOD.  SO I THINK THERE'S ONE EXAMPLE

19  WHERE, YOU KNOW, A PATIENT HAD A CHEST X-RAY THAT SHOWED

20  POTENTIAL MALIGNANCY, AND THE PATIENT WASN'T REFERRED FOR A CT

21  SCAN FOR, I THINK, SIX MONTHS.  SO DOCTORS AREN'T REVIEWING

22  TESTS TO SEE WHETHER SOMEONE NEEDS TO BE REFERRED.  AND EVEN

23  WHEN THE SPECIALISTS MAKE RECOMMENDATIONS, THAT'S NOT ALWAYS

24  HAPPENING.  SO THERE ARE SIGNIFICANT DELAYS IN OBTAINING

25  SPECIALTY CARE.

02:40   1   **Q.**   WERE THERE ALSO EXAMPLES WHERE A LSP PHYSICIAN DID REFER A

2   PATIENT BUT THAT REFERRAL NEVER HAPPENED?

3   **A.**   YES, I BELIEVE SO.   YES.

4   **Q.**   LET'S LOOK AT ONE OF THE -- ANOTHER CASE STUDY.   IF WE

5   COULD GO TO PATIENT NO. 7, WHICH IS 10- -- JOINT EXHIBIT 10-B.

6   COULD YOU DESCRIBE THIS PATIENT'S MEDICAL NEEDS?

7   **A.**   SO THIS PATIENT IS AROUND -- HE'S LIKE A 59-YEAR-OLD

8   PATIENT WHO, IN JUNE OF 2012, HAD AN X-RAY DONE THAT SHOWED A

9   MASS IN ONE OF THE UPPER LOBES THAT WAS SUSPICIOUS FOR

10   MALIGNANCY.   NOW, GENERALLY, IF I SAW A PATIENT WHO HAD A MASS

11   SUSPICIOUS FOR MALIGNANCY, I WOULD PROCEED IMMEDIATELY TO GET A

12   CT SCAN WITHIN A WEEK OR TWO, AND IF THE MASS WAS EVIDENT ON

13   THE CT SCAN, I WOULD BE REFERRING THAT PERSON FOR A BIOPSY TO A

14   PULMONOLOGIST AS SOON AS POSSIBLE.

15           AND IN THESE KINDS OF SITUATIONS, ONE ONLY NEED

16   PRETEND THAT YOU HAVE THE MASS, AND WHEN WOULD YOU WANT A -- IF

17   A DOCTOR SAW YOU AND SAID YOU HAVE A MASS, I MEAN I KNOW WHAT I

18   WOULD SAY.   I WOULD SAY, WHAT IS IT, AND WHEN CAN I GET IT

19   EVALUATED.

20           **MR. ARCHEY:**   YOUR HONOR, I FEEL LIKE HIS TESTIMONY

21   ABOUT WHAT WE OUGHT TO BE DOING AND FEEL LIKE IF THIS PERSON

22   WERE ME, THAT'S OBJECTIONABLE.   THAT FEELS LIKE THE GOLDEN

23   RULE.   THAT'S NOT THE PROPER KIND OF TESTIMONY.   HIS OPINION

24   CAN BE STATED WITHOUT HIM GOING INTO THAT KIND OF EMOTIONAL

25   PULL, IF YOU WILL.   HE CAN DO THAT.   SO I'LL OBJECT TO THAT.

0 2 : 4 3

1          **THE COURT:**  DO YOU WANT TO RESPOND?

2          **MR. DUBNER:**  JUST THAT I THINK TO THE EXTENT THAT

3    YOUR HONOR FINDS IT USEFUL TO PUT IT INTO THE CONTEXT OF COMMON

4    SENSE AND UNDERSTANDABLE MEDICAL CARE, IT'S OFTEN HARD TO

5    DESCRIBE MEDICAL CARE WITHOUT RELATING IT TO PEOPLE'S OWN

6    EXPERIENCES AND TO PUT INTO A FORM THAT IS RECOGNIZABLE.

7          **THE COURT:**  IT'S A BENCH TRIAL; IT'S OVERRULED.

8    **BY MR. DUBNER:**

9    **Q.**   YOU CAN CONTINUE, DOCTOR.

10   **A.**   IN ANY CASE, THIS PATIENT HAD AN ABNORMAL X-RAY SUSPICIOUS

11   FOR CANCER.  A CT SCAN -- THE RADIOLOGIST READING THE X-RAY

12   RECOMMENDED A CT SCAN.  THE CT SCAN WAS DONE APPROXIMATELY

13   THREE MONTHS LATER.  THE CT SCAN SHOWED AN ABNORMAL, SUSPICIOUS

14   LESION SUSPICIOUS FOR CANCER.

15          THE NEXT STEP OBVIOUSLY IS A BIOPSY.  SO THE PATIENT

16   WAS REFERRED TO A PULMONOLOGIST, BUT THE PATIENT DIDN'T SEE A

17   PULMONOLOGIST FOR APPROXIMATELY FOUR MONTHS.  SO THIS IS NOW

18   SEVEN MONTHS APPROXIMATELY, SEVEN OR EIGHT MONTHS, FROM THE

19   TIME THAT THE PATIENT HAD THE ABNORMAL X-RAY.  THE

20   PULMONOLOGIST RECOMMENDED A BIOPSY.

21   **Q.**   AND WE HAVE THAT NOTE IF YOU WOULD LIKE TO PRESENT THAT,

22   DR. PUISIS.

23          **MR. DUBNER:**  IF YOU COULD GIVE US JX-10-02651 AS WELL

24   AS THE FOLLOWING PAGE AS WELL, JX-10-02652.

25          **THE WITNESS:**  SO THIS IS A NOTE OF THE SPECIALIST.

02:45   1   NOW IT'S A PULMONOLOGIST'S NOTE, BUT I WOULD DRAW ATTENTION TO
        2   JUST THE PRESENTATION OF THE NOTE ITSELF AS AN EXAMPLE OF HOW
        3   SOMEONE SHOULD WRITE A NOTE, RECOGNIZING THAT THIS IS A
        4   SPECIALIST, I GRANT THAT, BUT HE'S AN INTERNIST WHO ALSO IS A
        5   PULMONOLOGIST.  AND TO A CERTAIN EXTENT, THE NOTES AT LSP
        6   SHOULD LOOK MORE LIKE THIS THAN NOT, AND YOU'LL NOTE THAT
        7   THERE'S A HISTORY, THAT THERE'S A PHYSICAL EXAM SECTION, AND
        8   THAT THERE'S AN ASSESSMENT AND RECOMMENDATIONS.
        9           IN THIS CASE, THE PULMONOLOGIST NOTES THAT THERE'S A
       10   NODULE IN THE LEFT UPPER LOBE, AND THAT THE PATIENT NEEDS A
       11   CT-GUIDED BIOPSY TO RULE OUT LUNG CANCER.  AND SO THAT WAS HIS
       12   RECOMMENDATION.  AND THIS OCCURRED APPROXIMATELY SEVEN, EIGHT
       13   MONTHS AFTER THE INITIAL X-RAY.
       14           MOVING BACK TO THE TIMELINE --
       15           **MR. DUBNER:**  IF WE GO TO 10-02656.
       16   **BY MR. DUBNER:**
       17   **Q.**   WHAT HAPPENED THE NEXT TIME HE WAS -- THE PATIENT WAS SEEN
       18   BY A PHYSICIAN AT LSP?
       19   **A.**   OKAY.  SO THIS IS THE PHYSICIAN'S NOTE AFTER THE SPECIALTY
       20   VISIT, AND THIS OCCURRED, I BELIEVE, A MONTH AFTER THE VISIT,
       21   APPROXIMATELY.  SO THAT ALREADY IS A LITTLE TARDY FOR A
       22   POST-SPECIALTY VISIT.  NEVERTHELESS, THE DOCTOR -- THERE'S NO
       23   SPECIFIC HISTORY, THERE'S NO EXAMINATION, THERE'S NO
       24   ASSESSMENT, BUT THE DOCTOR DOES WRITE THE CONDITIONS ONE, TWO,
       25   THREE, HYPERTENSION, CHRONIC VERTIGO, AND LEFT UPPER LOBE MASS.

02:47  1    BUT ON THE LEFT UPPER LOBE MASS, THE DOCTOR WRITES:  PULMONARY

2    PLAN EQUALS CT-GUIDED BIOPSY, QUESTION MARK, BRONC, QUESTION

3    MARK.  THE SPECIALIST WAS NOT QUESTIONING WHETHER THE TEST

4    NEEDED TO BE DONE.  HE HAD SPECIFIC RECOMMENDATIONS.

5          MY INTERPRETATION OF THIS NOTE IS THAT THE DOCTOR

6    WASN'T SURE WHAT THE PULMONOLOGIST RECOMMENDED.  WHAT SHOULD

7    HAVE OCCURRED ON THIS NOTE IS THE DOCTOR SHOULD HAVE

8    DOCUMENTED, REVIEWED PULMONOGIST'S NOTE, RECOMMENDATION FOR

9    BIOPSY.  AND IT APPEARS THAT THE DOCTOR WASN'T SURE WHAT WAS

10   RECOMMENDED, AND THAT JUST VERIFIES TO US THAT THE COORDINATION

11   BETWEEN THE SPECIALIST AND THE PRIMARY CARE DOCTOR WAS POOR

12   AND, IN OUR OPINION, RESULTED IN THE DELAYS THAT OCCURRED.

13         SO IF YOU MOVE BACK TO THE TIMELINE, YOU'LL SEE THAT

14   THE PULMONOLOGIST, ON FEBRUARY 19TH, RECOMMENDED THAT IT BE

15   BIOPSIED.  THE DOCTOR SAW THE PATIENT IN MARCH, A MONTH LATER,

16   WASN'T SURE ABOUT THE RECOMMENDATION.  THE NEXT VISIT TO THE

17   PULMONOLOGIST, AUGUST 28, 2013, ALMOST SIX, SEVEN MONTHS LATER,

18   SO THIS IS OVER A YEAR FROM THE TIME THAT THE PATIENT HAS THE

19   ABNORMAL X-RAY, THE PULMONOLOGIST SAYS:  THE BIOPSY DIDN'T

20   OCCUR, WHAT GIVES?  AND HE RECOMMENDED ANOTHER BIOPSY.  HE

21   RECOMMENDED THE BIOPSY.

22   **Q.**  WE CAN PULL THAT NOTE UP AS WELL.

23         **MR. DUBNER:**  IF YOU COULD GIVE US JX-10-02601,

24   PLEASE.  THANK YOU.

25         **THE WITNESS:**  SO THE PULMONOLOGIST, THIS IS THE 8/28

02:49     1    NOTE, IN KIND OF THE THIRD BLOCK DOWN, WRITES:  STRONGLY

2    SUGGEST IMMEDIATE IR, WHICH IS INTERVENTIONAL RADIOLOGY; FNA,

3    FINE NEEDLE ASPIRATION, OF LEFT UPPER LOBE NODULE.  SO THE

4    PULMONOLOGIST APPEARS TO, YOU KNOW, BE EMPHASIZING THAT, YOU

5    KNOW, I STRONGLY SUGGEST YOU GET AN IMMEDIATE BIOPSY.  SO THIS

6    IS ALREADY OVER A YEAR.  AND THEN IF YOU MOVE TO THE NEXT --

7    BACK TO THE --   DID YOU HAVE ANOTHER QUESTION?

8    **BY MR. DUBNER:**

9    **Q.**   YES.  IF WE COULD LOOK AT THE HISTORY OF PRESENT ILLNESS

10    SECTION, WHAT DID THE SPECIALIST DOCUMENT THERE?

11    **A.**   WELL, SO THAT -- HE ACTUALLY GIVES THE -- KIND OF THE

12    SUMMARY OF WHAT HAPPENED.  HE PRESENTED FOR A LUNG NODULE AFTER

13    THE LAST VISIT IN FEBRUARY.  AT THAT TIME, RECOMMENDATIONS WERE

14    FOR AN URGENT CT SCAN WITHOUT CONTRAST AND DUE TO THE LEFT

15    UPPER LOBE LOOKING MALIGNANT, AND A INTERVENTIONAL RADIOLOGY

16    CONSULT FOR A BIOPSY WITH AN ECHO PULMONARY FUNCTION TEST WITH

17    A BRONCHODILATOR AND BACK IN OUR CLINIC IN TWO WEEKS, WHICH

18    OBVIOUSLY DIDN'T OCCUR.

19    **Q.**   SO IF WE WANT TO MOVE BACK TO THE TIMELINE, COULD YOU TELL

20    US WHAT HAPPENED NEXT?

21    **A.**   YEAH.  SO ON SEPTEMBER -- SO THAT WAS AUGUST 28TH.

22         AND THEN ON SEPTEMBER 25TH, THE BIOPSY WAS STILL NOT

23    DONE.  SO HE, AGAIN, RECOMMENDED THE BIOPSY.  AND EVENTUALLY,

24    OCTOBER 14TH, THE PATIENT WENT IN FOR A BIOPSY, BUT REALLY WHAT

25    HAPPENED IS THAT THE -- WHETHER IT WAS DUE TO AN ADVANCEMENT OF

02:51

1  THE CONDITION OR NOT, THE PATIENT, INSTEAD OF GETTING A BIOPSY

2  UNDERWENT A LOBECTOMY, SO THEY JUST TOOK OUT THE PORTION OF THE

3  LUNG THAT WAS INFESTED WITH THE CANCER AND A ADENOCARCINOMA WAS

4  DIAGNOSED.  AND THE PATIENT RETURNED TO THE PRISON.

5  **Q.**   AND WHAT HAPPENED WHEN HE RETURNED BACK TO THE PRISON?

6  **A.**   WELL, INITIALLY THE DOCTORS DID NOT REVIEW THE RECORDS

7  THAT DOCUMENTED WHAT HAD OCCURRED TO THE PATIENT, AND THE

8  PATIENT WASN'T INITIALLY -- THE PATIENT WAS SUPPOSED TO GO TO

9  ONCOLOGY, AND I THINK HAD AN ONCOLOGY APPOINTMENT EVENTUALLY

10 SET UP IN NOVEMBER.  SO HE COMES BACK IN OCTOBER.  IN NOVEMBER,

11 THEY FINALLY REFER THE PATIENT TO ONCOLOGY, AND THE PATIENT WAS

12 SCHEDULED FOR, LIKE, JANUARY 8TH OR SOMETHING.

13          **MR. DUBNER:**  MARTHA, IF YOU COULD PLEASE BRING UP

14 JX-10-02599 AND JX-10-02597.

15 **BY MR. DUBNER:**

16 **Q.**   AND COULD YOU TELL THE COURT WHAT YOU SAW IN THE MEDICAL

17 RECORDS AT THAT TIME?

18 **A.**   WELL, THE RIGHT-HAND DOCUMENT IS JUST A REFERRAL FORM.

19 THE PATIENT IS REFERRED TO HEM/ONC, WHICH IS HEMATOLOGY, AND

20 IT'S DATED AND SIGNED ON NOVEMBER 19TH.  SO THE PATIENT CAME

21 BACK OCTOBER 14TH AND WAS REFERRED TO ONCOLOGY ON 11/19, AND A

22 DIFFERENT DOCUMENT LATER DOCUMENTED THAT THE PATIENT WAS

23 SCHEDULED FOR JANUARY 8TH, WHICH WOULD HAVE BEEN TWO MORE

24 MONTHS, WHICH I THINK IS NOT PARTICULARLY TIMELY.

25 **Q.**   AND WHY WOULD YOU SAY THAT'S NOT PARTICULARLY TIMELY?

02:54  1    **A.**    WELL, IT'S TWO MONTHS.  YOU NEED CHEMOTHERAPY.  I MEAN, I

2    THINK IT WOULD BE MORE APPROPRIATE TO DO IT TIMELIER.

3    **Q.**    AND ON THE LEFT-HAND NOTE, 10-02599 FROM NOVEMBER 18,

4    2013, CAN YOU EXPLAIN WHAT YOU FOUND NOTEWORTHY ABOUT THAT

5    NOTE?

6    **A.**    WELL, I'M NOT SURE WHAT YOU'RE INTERESTED IN.

7    **Q.**    CAN YOU DESCRIBE WHAT THE NOTE SUGGESTS THE PHYSICIANS DID

8    WHEN THE PATIENT WAS FIRST SEEN AFTER RETURNING FROM THE

9    HOSPITAL?

10    **A.**    SO THIS IS DATED NOVEMBER 21TH, SO THIS IS WELL AFTER THE

11    PATIENT WAS -- IS A HEALTH REQUEST.

12    **Q.**    AND IS THERE ANY RECOGNITION OF THE RECENT BIOPSY OR THE

13    RECENT DIAGNOSIS?

14    **A.**    WELL, SO THIS IS A HEALTH REQUEST, MEANING THAT THE

15    PATIENT HAD A PROBLEM AND PLACED A WRITTEN DOCUMENT TO THE

16    HEALTH STAFF THAT HE HAD A PROBLEM, AND HE WAS COMPLAINING THAT

17    HIS TONGUE AND MOUTH WERE SWOLLEN.  AND IT SOUNDS LIKE HE WAS

18    HAVING VOMITING, AND A EMT EVALUATED THE PATIENT AND GAVE THE

19    PATIENT KIND OF COLD TABLETS AND COUGH SYRUP.

20           I MEAN, I WOULD JUST COMMENT ON THIS, THAT THIS IS

21    SOMETHING THAT PROBABLY A DOCTOR SHOULD HAVE EVALUATED, BUT

22    IT'S NOT PARTICULARLY RELATED TO THE TIMELINE THAT I HAVE.

23    **Q.**    OKAY.  IN TERMS OF THE REFERRAL BACK TO HEM/ONC THAT HE

24    WAS SCHEDULED TO -- SETUP IN NOVEMBER TO OCCUR IN JANUARY, WHAT

25    HAPPENED BEFORE THAT REFERRAL COULD TAKE PLACE?

02:55  1  **A.**   HE DIED.

2  **Q.**   WAS THE DEATH RELATED TO THE CANCER?

3  **A.**   I BELIEVE IT WAS, YES.

4  **Q.**   AND SO WHAT CONCLUSIONS DID YOU DRAW ABOUT SPECIALTY

5  SERVICES FROM THIS EXAMPLE, OR FROM -- LET ME RETRACT THE

6  QUESTION FOR A MOMENT.

7           WAS THIS AN ISOLATED EXAMPLE, OR DID YOU SEE THE SAME

8  SORTS OF DEFICITS IN CARE IN OTHER CASES?

9  **A.**   THIS WAS A RECURRING PROBLEM.

10  **Q.**   AND WHAT CONCLUSIONS DID YOU DRAW ABOUT SPECIALTY SERVICES

11  FROM THAT RECURRING PROBLEM?

12  **A.**   THEY'RE NOT TIMELY.  THERE'S A SIGNIFICANT LACK OF

13  COORDINATION BETWEEN THE PRIMARY CARE PHYSICIANS AT LSP AND THE

14  SPECIALISTS.  SPECIALTY RECOMMENDATIONS ARE NOT REVIEWED.

15  THERE'S NO DOCUMENTATION OF THE REPORTS, AND THE COORDINATION

16  OF CARE IS VERY POOR AND RESULTS IN MORBIDITY AND POSSIBLY EVEN

17  MORTALITY.

18  **Q.**   LET'S MOVE FORWARD TO INPATIENT CARE.

19           **MR. DUBNER:**  AND I'M NOT SURE, THIS SECTION WILL TAKE

20  ABOUT THE SAME AMOUNT OF TIME AS THE PREVIOUS ONES.  I DON'T

21  KNOW WHEN YOUR HONOR WANTS TO TAKE THE AFTERNOON BREAK OR --

22           **THE COURT:**  YEAH, LET'S TAKE A 15-MINUTE RECESS.

23           **MR. DUBNER:**  OKAY.

24                    **(RECESS.)**

25           **THE COURT:**  BE SEATED.

1      COUNSEL, GO AHEAD.

2          **MS. MONTAGNES:**  SORRY.  JUST ONE HOUSEKEEPING THING.

3  WITH REGARDS TO THE ADA ACCESSIBLE COURTROOM, WE WILL HAVE

4  SOMEONE TESTIFYING ON THURSDAY AND FRIDAY -- SOMEONE HERE

5  THURSDAY AND FRIDAY, WE'RE NOT EXACTLY SURE WHEN THEY'LL

6  TESTIFY.  AND SO IF WE COULD HAVE IT, WE WOULD BE GRATEFUL FOR

7  THAT, BUT IF WE CAN'T, WE WILL MAKE IT WORK.

8          **THE COURT:**  I KNOW THERE IS A JURY TRIAL -- WELL, I

9  DON'T KNOW IF IT'S A JURY TRIAL.  IT IS A JURY TRIAL.  YEAH,

10 THERE IS A JURY TRIAL, BUT LET ME MAKE SOME ARRANGEMENTS, AND

11 WE'LL EITHER MAKE ARRANGEMENTS FOR THIS COURTROOM, OR WE'LL USE

12 THAT COURTROOM.

13         **MS. MONTAGNES:**  YEAH.

14         **THE COURT:**  WE WILL ACCOMMODATE YOUR WITNESSES.

15         **MS. MONTAGNES:**  YEAH, AND WE DON'T THINK THERE WILL

16 BE ANY EXHIBITS.  SO IF HE HAS TO TESTIFY HERE, WE ARE FINE

17 WITH THAT.

18         **THE COURT:**  PLEASE PROCEED.

19 **BY MR. DUBNER:**

20 **Q.**  SO, DR. PUISIS, BEFORE WE MOVE ONTO THE NEXT TOPIC, THE

21 PROBLEMS THAT YOU'VE DESCRIBED IN CHRONIC CARE AND SPECIALTY

22 SERVICES, WERE THOSE ISOLATED TO A PARTICULAR PERIOD OF TIME

23 DURING WHAT YOU REVIEWED?

24 **A.**  NO.  I MEAN, I THINK CONSISTENTLY ALL THE RECORDS WE

25 LOOKED AT CONTAINED THOSE TYPES OF PROBLEMS, AND THAT RANGED

1  FROM 2008 ALL THE WAY TO 2016.

2  **Q.**    THANK YOU.  SO LET'S MOVE TO INPATIENT CARE.  FIRST OFF,

3  WHAT IS INPATIENT CARE?

4  **A.**    WELL, WITH RESPECT TO CORRECTIONS, INPATIENT CARE

5  TYPICALLY REFERS TO INFIRMARY CARE, BUT THE IDEA THERE IS THAT

6  CORRECTIONAL FACILITIES SHOULD HOUSE PEOPLE IN THE APPROPRIATE

7  SETTING BASED ON THEIR CONDITION, AND WHEN THEY CAN'T BE HOUSED

8  IN GENERAL POPULATION, THEY SHOULD BE MOVED UP TO A HIGHER

9  LEVEL OF CARE.  AND IN SOME FACILITIES, THAT'S SPECIALIZED

10  MEDICAL HOUSING, AND THEN A HIGHER LEVEL OF CARE MAY BE

11  INFIRMARY CARE, AND THEN THEY NEED TO BE MOVED TO A SKILLED

12  NURSING UNIT OR A HOSPITAL.  BUT, TYPICALLY, MOST PRISONS HAVE

13  AN INFIRMARY, WHICH LSP DOES HAVE.

14  **Q.**    AND WHAT ARE THE STANDARDS FOR CARE IN AN INFIRMARY FOR

15  THAT TO BE ADEQUATE?

16  **A.**    WELL, THE FIRST THING IS TO MAKE SURE THAT THE PATIENT IS

17  HOUSED APPROPRIATELY SO THAT THE ASSIGNMENT OF THE PATIENT IS

18  IN THE RIGHT PLACE.  SO NOT PLACING PEOPLE IN THE INFIRMARY WHO

19  SHOULD BE IN A HOSPITAL OR NOT PLACING PEOPLE IN GENERAL

20  POPULATION THAT NEED TO BE IN AN INFIRMARY.  SO AS A RESULT,

21  MOST CORRECTIONAL SYSTEMS HAVE CRITERIA THAT DEFINE WHO SHOULD

22  BE ADMITTED TO THEIR INFIRMARY BECAUSE THEY HAVE A GENERAL

23  SENSE, OR SHOULD HAVE A GENERAL SENSE OF WHAT CONDITIONS CAN BE

24  CARED FOR ON THE INFIRMARY.  SO THAT'S FUNDAMENTAL.

25              AND THEN BEYOND THAT, THE INFIRMARY UNIT THEY HAVE

1  SHOULD BE ABLE TO SATISFY THE REQUIREMENTS OF THE PATIENT,

2  WHATEVER THAT IS.  IF THE REQUIREMENTS EXCEED THE CAPACITY OF

3  THE INFIRMARY, THE PATIENT SHOULD BE SENT TO A HIGHER LEVEL OF

4  CARE.

5        AND THEN THE PATIENTS -- BECAUSE IT'S AN INPATIENT

6  SETTING, THE PATIENT SHOULD BE WITHIN SIGHT AND SOUND OF THE

7  NURSE.  AND BY SOUND, I MEAN THAT THE NURSE SHOULD BE ABLE TO

8  HEAR THE PATIENT.  SO IN SITUATIONS WHERE, AS WITH LSP, WHERE

9  THE NURSES HAVE A NURSING STATION THAT IS ENCLOSED WITH GLASS

10  OR PLASTIC, I FORGOT WHICH, BUT THEY'RE IN A ROOM THAT THEY CAN

11  SEE PATIENTS THROUGH THE GLASS BUT THEY CAN'T HEAR THEM, THERE

12  NEEDS TO BE A WAY TO HEAR THEM.

13        AND, TYPICALLY, MOST PRISONS THAT HAVE INDIVIDUAL

14  CELLS FOR THE INFIRMARY, THEY HAVE A CALL SYSTEM.  SO THERE'S

15  AN ELECTRONIC SYSTEM WHERE A PATIENT CAN PRESS A BUTTON AND A

16  NURSE CAN COMMUNICATE TO THEM.

17        LSP ALSO HAS INDIVIDUAL ROOMS THAT HAVE STEEL DOORS,

18  AND IN THOSE ROOMS, YOU SHOULD BE ABLE TO COMMUNICATE WITH THE

19  NURSES, BUT LSP DOES NOT HAVE A MEANS OF COMMUNICATION WITH A

20  NURSE IN THOSE ROOMS.  SO THEY LACK SOME ABILITY TO HEAR THE

21  PATIENT.

22        THE ADMISSION OR DISCHARGE FROM AN INFIRMARY UNIT

23  SHOULD BE UNDER ORDERS OF A PHYSICIAN, AND IT'S PERMISSIBLE

24  THAT NURSE PRACTITIONERS OR MID-LEVEL PROVIDERS COULD ALSO MAKE

25  THOSE ADMISSION OR DISCHARGE DECISIONS.  AND EACH PATIENT

1  SHOULD HAVE A HEALTH RECORD.  I WOULD NOTE THAT THE HEALTH

2  RECORD SHOULD BE A COMPLETE HEALTH RECORD.

3          AT LSP, AS AN EXAMPLE, LIKE ON UNIT 1, THEY HAVE THE

4  INFIRMARY RECORD, BUT THE OUTPATIENT RECORD IS NOT KEPT ON THE

5  INFIRMARY.  SO YOU CAN'T REVIEW THE PRIOR PROBLEMS OF THE

6  PATIENT OR WHAT WAS HAPPENING, YOU CAN'T REVIEW SPECIALTY

7  CONSULTATIONS.  YOU WOULD HAVE TO ASK FOR THE RECORD.  SO IT'S

8  NOT EASILY AVAILABLE.  I PRESUME IT CAN BE OBTAINED, THOUGH.

9  AND YOU SHOULDN'T USE INMATES FOR PROVISION OF SERVICES, AND

10 THAT'S BOTH AN NCCHC STANDARD AND IT'S -- FOR A VARIETY OF

11 REASONS I THINK IT'S IMPORTANT TO MAINTAIN.

12 **Q.**    AND WHY DON'T WE LOOK AT THOSE NCCHC STANDARDS SO YOU CAN

13 SHOW WHAT YOU'RE TALKING ABOUT.

14          **MR. DUBNER:**  IF YOU COULD GIVE US PX-243.

15 **BY MR. DUBNER:**

16 **Q.**    AND COULD YOU DESCRIBE WHAT PLAINTIFF'S EXHIBIT 243

17 APPEARS TO BE?

18 **A.**    SO THIS IS JUST A COVER OF THE STANDARD MANUAL OF THE

19 NATIONAL COMMISSION ON CORRECTIONAL HEALTHCARE FOR PRISONS.

20          **MR. DUBNER:**  COULD YOU GIVE US PAGE 130.

21 **BY MR. DUBNER:**

22 **Q.**    AND WHAT IS THIS STANDARD FOR?

23 **A.**    THIS IS A STANDARD FOR INFIRMARY CARE FROM THE NATIONAL

24 COMMISSION ON CORRECTIONAL HEALTHCARE.

25 **Q.**    AND IS THIS REFLECTIVE OF THE STANDARD WITHIN THE PRACTICE

1  OF CORRECTIONAL MEDICINE?

2  **A.**   YES.

3  **Q.**   COULD YOU READ NO. 2 FOR THE COURT?

4  **A.**   IT SAYS "PATIENTS ARE ALWAYS WITHIN SIGHT OR HEARING OF A

5  QUALIFIED HEALTHCARE PROFESSIONAL."

6  **Q.**   AND IS THAT THE SAME STANDARD THAT YOU JUST SET OUT?

7  **A.**   YES.

8  **Q.**   AND WE'LL JUST DO ONE MORE.

9        **MR. DUBNER:**   IF YOU COULD GIVE US PAGES 64 AND 65.

10  WE CAN JUST DO 65, AND THEN WE CAN COME BACK TO 64, THAT'S

11  FINE.

12  **BY MR. DUBNER:**

13  **Q.**   IF YOU COULD, IF I COULD DRAW YOUR ATTENTION TO THE FIRST

14  SENTENCE ON THAT PAGE, COULD YOU EXPLAIN WHAT IT SAYS ABOUT THE

15  USE OF INMATE ORDERLIES?

16  **A.**   SO I'LL READ.  IT SAYS "THE USE OF INMATES IN APPROPRIATE

17  PEER HEALTH-RELATED PROGRAMS IS PERMITTED.  FOR EXAMPLE,

18  INMATES MAY ASSIST PATIENTS IN ACTIVITIES OF DAILY LIVING,

19  EXCEPT FOR INFIRMARY PATIENTS."

20        AND JUST BY THE WAY, AN ACTIVITY OF DAILY LIVING

21  IS -- GENERALLY REFERS TO WALKING, BATHING, DRESSING, FEEDING

22  YOURSELF, AND TOILETING, SO THAT'S CLEAR.

23  **Q.**   OKAY.  THANK YOU.  SO LET'S TALK ABOUT THE INFIRMARY AT

24  LSP.  DID IT COMPORT WITH THE STANDARDS THAT YOU LAID OUT FOR

25  THE COURT?

03:23

1    **A.**    IN SEVERAL AREAS, NO.  IT USES INMATE WORKERS AS BASICALLY

2    NURSING ASSISTANTS.  A COMPLETE HEALTH RECORD IS NOT AVAILABLE,

3    ALTHOUGH I PRESUME THAT ONE COULD ASK FOR IT, BUT I DID NOT

4    NOTE THAT IT WAS PRESENT, AND I WAS TOLD THAT THOSE RECORDS

5    WERE IN MEDICAL RECORDS AND NOT ON THE INFIRMARY.  AND PATIENTS

6    ARE NOT CONSISTENTLY WITHIN SIGHT OR SOUND OF A HEALTH

7    PROFESSIONAL.  AND I THINK THE MOST IMPORTANT ITEM IS THAT THE

8    PATIENTS ARE -- WHO MAYBE SHOULD BE ON THE INFIRMARY ARE NOT;

9    THEY ARE IN GENERAL POPULATION.  AND PATIENTS WHO ARE ON THE

10    INFIRMARY OFTEN SHOULD BE IN A HOSPITAL.  SO THE ASSIGNMENT IS

11    NOT APPROPRIATE FOR THE LEVEL OF CARE THAT'S REQUIRED OF THE

12    PATIENT.

13    **Q.**    AND WHAT ARE SOME OF THE POTENTIAL CONSEQUENCES OF BEING

14    ASSIGNED TO AN INAPPROPRIATE LEVEL OF CARE?

15    **A.**    WELL, MORBIDITY AND MORTALITY.

16    **Q.**    WHAT ROLE DID PROVIDERS APPEAR TO PLAY IN THE INFIRMARY?

17    AND ACTUALLY, IF I COULD, JUST TO CLARIFY, SO WHAT DOES THE

18    WORD *PROVIDER* MEAN IN YOUR FIELD?

19    **A.**    A PROVIDER IS ANYONE WHO IS AUTHORIZED BY THE STATE

20    REGULATION BOARDS TO PRESCRIBE MEDICATION AND DIAGNOSE AND

21    TREAT ILLNESS.  SO FOR PRACTICAL PURPOSES, IT'S A PHYSICIAN

22    ASSISTANT, A NURSE PRACTITIONER, OR A PHYSICIAN.

23    **Q.**    THANK YOU.  SO TO RETURN TO THE QUESTION, WHAT ROLE DID

24    PROVIDERS PLAY IN THE INFIRMARY?

25    **A.**    WELL, SO THERE ARE TWO INFIRMARIES, FIRST OF ALL, AND

1   THERE'S INFIRMARY 1 AND INFIRMARY 2.  INFIRMARY 1 IS A -- IT'S

2   CALLED AN ACUTE INFIRMARY.  SO IT'S FOR PEOPLE WHO HAVE MORE

3   URGENT CONDITIONS OR EPISODIC CONDITIONS WHO NEED -- WHO

4   REQUIRE INFIRMARY HOUSING.  AND ON THAT UNIT, THE DOCTORS WHO

5   ARE OSTENSIBLY ASSIGNED TO MANAGE THE PATIENT IN THE POPULATION

6   FROM WHICH THEY YIELD; SO IF A PATIENT IS FROM CAMP C OR FROM

7   ASH 2, THE DOCTOR WHO COVERS ASH 2 WILL SEE THE PATIENT ON

8   INFIRMARY 1.  SO IT'S A VARIETY OF PHYSICIANS WHO COME IN AND

9   EXAMINE THE PATIENT IN ADDITION TO THEIR OTHER DUTIES IN THE

10  CAMP OR ON THE UNIT THEY COVER.

11          ON INFIRMARY 2, IT IS A DIFFERENT UNIT.  IT'S A UNIT

12  FOR PEOPLE WHO HAVE MORE CHRONIC DISABILITIES OR CONDITIONS

13  THAT REQUIRE LONG-TERM HOUSING IN A PROTECTED UNIT.

14          SO THERE WAS A PATIENT IN THERE WHO HAD TRANSVERSE

15  MYELITIS, THERE'S PATIENTS WHO HAVE PARAPLEGIA, QUADRIPLEGIA,

16  OR ARE IN HOSPICE AS AN EXAMPLE, AND THOSE PATIENTS ARE COVERED

17  BY A NURSE PRACTITIONER WHO HAS MULTIPLE OTHER ASSIGNMENTS.

18  SHE COVERS THE HIV CLINIC, SHE COVERS, I THINK, A CAMP, AND MY

19  RECOLLECTION IS THAT SOMEWHERE BETWEEN 1200 TO 1600 INMATES

20  SHE'S COVERING.  BOTH INFIRMARIES ARE AROUND 32 BEDS.

21          AND IN MY EXPERIENCE, FOR THE TYPES OF PATIENTS THEY

22  HAD WHEN I WAS MANAGING, WE WOULD HAVE EITHER A HALF-TIME OR

23  FULL-TIME PHYSICIAN ASSIGNED TO EACH ONE BECAUSE OF THE ACUITY

24  OF THE PATIENTS, AND SO I THINK THE LEVEL OF PROVIDER COVERAGE

25  IS LESS THAN ADEQUATE.

1    **Q.**    AND DO YOU SEE THE LEVEL OF PROVIDER COVERAGE REFLECTED IN

2    THE MEDICAL RECORDS OF PERSONS IN THE INFIRMARY?

3    **A.**    I DID.  YES.

4    **Q.**    AND COULD YOU DESCRIBE THAT?  WE'LL RETURN TO THE CASE

5    STUDY IN A LITTLE BIT.  BUT IF YOU COULD DESCRIBE THAT AT A

6    GENERAL LEVEL.

7    **A.**    WELL, IT'S VERY SIMILAR TO THE GENERAL POPULATION.  WE

8    LOOKED AT A NOTE FROM A SPECIALIST AS AN EXAMPLE OF WHAT A NOTE

9    MIGHT LOOK LIKE, AND WE SAW WHAT THE PROVIDER WROTE IN ONE OF

10   THE GENERAL POPULATION CLINICS.  THE INFIRMARY IS THE SAME

11   ISSUE.  IN MY REVIEW OF THE NOTES, THE PHYSICIANS WOULD WRITE

12   WHAT I WOULD CALL EPISODIC NOTES.  IN OTHER WORDS, THEY WERE

13   MOSTLY CONCERNED WITH THE PROBLEM OF THE MOMENT, THE EPISODE.

14   AND THEY DID NOT GENERALLY IDENTIFY ALL OF THE PATIENT'S

15   PROBLEMS AND MANAGE THEM SEQUENTIALLY IN EACH OF THEIR NOTES,

16   AND SO IT WAS LESS THAN ADEQUATE, FOLLOWING UP ON LABS,

17   ORDERING LABS, ET CETERA.  AND YOU'LL SEE THAT ON SOME OF THE

18   NOTES THAT WE HAVE FOR EXHIBITS.

19   **Q.**    LET'S TURN TO THE NURSES.  WHAT ROLE DID NURSES PLAY IN

20   THE INFIRMARY?

21   **A.**    SO THE NURSES ARE ASSIGNED TO ADMINISTER MEDICATION,

22   CHANGE DRESSINGS, CHANGE DEVICES, LIKE IF SOMEBODY NEEDS A

23   CATHETER, THEY WOULD MAKE THE CATHETER CHANGE, AND THEY WOULD

24   TAKE VITALS.

25           AND THE INMATE WORKERS WOULD DO ALL THE ACTIVITY OF

1   DAILY LIVING MANAGEMENT, WHICH WAS CONSIDERABLE, PARTICULARLY

2   ON UNIT 2, WHERE THERE WERE MANY LONG-TERM PATIENTS WITH

3   LONG-TERM DISABILITIES AND INABILITY TO CARE FOR THEMSELVES.

4   **Q.**   AND WE DO HAVE UP ON THE SCREEN PX-243-0064, WHICH IS THE

5   REMAINDER OF THAT NCCHC STANDARD.  SO IF YOU COULD, DOES THE

6   DEFINITION THERE MATCH THE DEFINITION THAT YOU PROVIDED

7   EARLIER?

8   **A.**   YEAH.

9   **Q.**   AND SO WHY IS IT INAPPROPRIATE FOR ORDERLIES TO -- FOR

10  INMATES TO PERFORM THESE TASKS?

11  **A.**   WELL, I THINK ON SEVERAL FOLD.  ONE IS THE TRAINING ISSUE.

12  A PERSON WHO IS A NURSE'S AIDE HAS TRAINING ON HOW TO PROVIDE

13  CERTAIN CARE.  AND, SECONDLY, IT'S THE NURSE'S AIDE'S

14  RESPONSIBILITY TO DO THAT.  THAT'S THE JOB.  AND THE NURSE'S

15  AIDE WOULD BE UNDER THE SUPERVISION OF A NURSE.

16        THE INMATES DO NOT HAVE TRAINING, AND I THINK A VERY

17  IMPORTANT ITEM, AND ONE OF THE REASONS THE NCCHC DOES NOT

18  PERMIT IT, IS THAT THERE IS THE POTENTIAL FOR UNDUE LEVERAGE,

19  AN INMATE COULD NOT PROVIDE SERVICES UNLESS RECEIVING SOME

20  GRATUITY FROM THE INMATE.  IF THAT OCCURS, THE CARE MIGHT NOT

21  BE PROVIDED, AND BECAUSE THAT CAN OCCUR, BECAUSE IT'S A

22  POSSIBILITY, IT'S REALLY STRONGLY RECOMMENDED NOT TO DO THAT.

23        AND AS WELL, AT ANGOLA, THE OFFICERS SUPERVISE THE

24  INMATE ORDERLIES AND THEY REGULATE WHEN INMATES CAN TAKE

25  SHOWERS AND THEY DIRECT THAT.  THESE ARE PATIENTS WHO HAVE

1   MEDICAL CONDITIONS, SOME OF WHICH INCLUDE INCONTINENCE.  AND

2   SOME OF THE INMATES MAY HAVE PRESSURE ULCERS WITH INCONTINENCE.

3   WHEN THAT OCCURS, THE SANITATION OF THE INMATES, THE HYGIENE OF

4   THE INMATES, NEEDS TO BE DIRECTED BY MEDICAL PERSONNEL AND NOT

5   CUSTODY PERSONNEL.  AND SO NURSES SHOULD BE DIRECTLY IN

6   CONTROL -- PHYSICIANS AND NURSES, SHOULD BE DIRECTLY IN CONTROL

7   OF DIRECTING BY VIRTUE OF ORDERS WHEN PATIENTS ARE TO SHOWER

8   AND WHEN THEY ARE TO CLEAN.  AND WHEN THAT'S UNDER THE CONTROL

9   OF INMATES AND OFFICERS, BAD STUFF CAN HAPPEN.

10  **Q.**   DID YOU REVIEW THE TRAINING THAT ORDERLIES RECEIVED?

11  **A.**   I DIDN'T, NO.

12  **Q.**   AND SO YOU SAID THAT BECAUSE CUSTODY SET THE BATHING AND

13  CLEANING SCHEDULING, I BELIEVE YOU SAID, WHAT WAS THE

14  RELATIONSHIP BETWEEN THE MEDICAL SUPERVISION AND THE CUSTODY

15  SUPERVISION OF MATTERS SUCH AS THAT?

16  **A.**   WELL, IT WAS HARD TO TELL.  I HAVE TO ADMIT WHEN I WOULD

17  TALK TO DIFFERENT PEOPLE, I THINK ONE SUPERVISOR TOLD US THAT

18  NURSES SUPERVISE IT, BUT THE NURSES SAID NO, CUSTODY SUPERVISES

19  IT.  SO THE PEOPLE WHO WERE ACTUALLY RESPONSIBLE FOR

20  SUPERVISING TOLD ME THAT CUSTODY SUPERVISED.  SO THERE WAS SOME

21  DIFFERENCES THERE.  BUT I MEAN, I DIDN'T SIT THERE FOR 24 HOURS

22  WATCHING THROUGH A CYCLE OF TAKING SHOWERS, BUT I DID NOTICE

23  THAT THERE WAS A SCHEDULE.  I THINK -- I BELIEVE I TALKED TO AN

24  OFFICER WHO TALKED TO ME ABOUT THE SCHEDULE, AND I JUST THINK

25  THAT'S INAPPROPRIATE.  I THINK THE PHYSICIAN SHOULD WRITE

1    ORDERS FOR PEOPLE BEING ADMITTED TO AN INFIRMARY, AND THOSE
2    ORDERS SHOULD INCLUDE, YOU KNOW, WHAT'S APPROPRIATE WITH
3    RESPECT TO THEIR TOILETRY.
4    **Q.**   AND THEN IN TERMS OF THE CLEANING SCHEDULE, CLEANING OF
5    THE NURSING UNIT, HOW IMPORTANT IS CLEANLINESS ON AN INFIRMARY?
6    **A.**   WELL, IT'S WHERE YOU HAVE PEOPLE WHO ARE MOST DISABLED AND
7    MOST LIKELY SICKER THAN OTHER INMATES AND MORE LIKELY TO HAVE
8    SOILING OF THEMSELVES AND INFECTIONS.  THERE'S MORE PEOPLE WITH
9    DRESSING CHANGES, AND THEREFORE, YOU HAVE MORE POTENTIAL FOR
10   CONTAMINATION AND SPREAD OF INFECTION.  SO IT SHOULD BE
11   SANITIZED SIMILAR TO A SKILLED NURSING HOME OR A HOSPITAL.  AND
12   THAT HAS TO BE DONE ON A SCHEDULE THAT'S DIRECTED BASED ON, YOU
13   KNOW, PROPER HOSPITAL SANITATION.
14   **Q.**   YOU REFERRED A LITTLE BIT EARLIER TO THE SOLITARY CELLS IN
15   THE NURSING UNITS, WHAT ARE SOME OF THE CONCERNS WITH WHAT YOU
16   RAISED OF HAVING INMATE -- PATIENTS IN CELLS WHERE THEY'RE NOT
17   WITHIN SIGHT OR SOUND OF A NURSE?
18   **A.**   WELL, IT CAN BE DANGEROUS, PARTICULARLY IF YOU HAVE A
19   DISABLED PERSON WHO IS UNABLE TO WALK, THEY WOULD BE LYING IN
20   BED.  AND HOW ARE THEY GOING TO GAIN ATTENTION OF A NURSE IF
21   THEY ARE IN A ROOM WITH A STEEL DOOR AND A NURSE IS IN ANOTHER
22   ROOM IN A DIFFERENT PART OF THE COMPLEX?  YOU JUST CAN'T HEAR
23   THEM, AND SO THE ONLY -- I'M NOT SURE.  I MEAN, PATIENTS MUST
24   SCREAM OR SOMETHING.  I DON'T KNOW HOW THEY CAN COMMUNICATE.
25   YOU NEED TO BE ABLE TO HAVE SOME WAY TO MAKE CONTACT WITH THE

1   PATIENT.  THE PATIENT NEEDS TO HAVE A WAY TO MAKE CONTACT WITH

2   YOU.  SO IF A PATIENT IS QUADRIPLEGIC, SPECIAL CONSIDERATION

3   NEEDS TO BE DEVELOPED SO THAT THE SYSTEM PROVIDES AN

4   OPPORTUNITY FOR THAT PATIENT TO COMMUNICATE WITH THE NURSE WHEN

5   THEY FEEL THEY'RE IN DISTRESS.

6   **Q.**   AND IS IT SUFFICIENT IN YOUR MIND IF THE PATIENT COULD

7   SHOUT FOR AN ORDERLY OR ANOTHER INMATE AND THAT INMATE COULD

8   GET A NURSE?

9   **A.**   NO.  I THINK THAT'S INAPPROPRIATE.  YOU CAN'T COUNT ON THE

10  USE OF OTHER CLIENTS OR OTHER PATIENTS TO PROVIDE OVERSIGHT

11  OVER THE PATIENTS THAT YOU'RE CARING FOR.

12  **Q.**   IS THERE SOMETHING USED IN THE INFIRMARY CALLED A DO NOT

13  RESUSCITATE ORDER?

14  **A.**   YEAH.  I MEAN, THAT'S A TYPICAL STANDARD PRACTICE.

15  **Q.**   AND CAN YOU DESCRIBE WHAT THAT TYPE OF ORDER IS?  AND I

16  MIGHT REFER TO IT AS A DNR IF THAT'S ALL RIGHT.

17  **A.**   SO IN THE TERMINAL STAGES OF LIFE WHEN IT IS PRESUMED THAT

18  A PATIENT IS SOON TO DIE, A PHYSICIAN CAN DISCUSS WITH A

19  PATIENT, YOU KNOW, WHAT ARE THEIR WISHES WITH RESPECT TO

20  INTERVENTIONS IF THEY SHOULD HAVE A CARDIAC ARREST OR STOP

21  BREATHING, AND WHAT WOULD THEY LIKE THE HEALTH PROGRAM TO DO.

22  AND, TYPICALLY, THOSE ARE OPEN AND FRANK DISCUSSIONS.

23       IN MY EXPERIENCE, WE WOULD HAVE A WITNESS WHO WAS

24  INDEPENDENT SUCH AS A CHAPLAIN OR A FAMILY MEMBER PARTICIPATE

25  SO THAT THERE WAS NO POSSIBILITY THAT THERE WAS ANY PREJUDICE

1   TOWARD THE PATIENT.  BUT THERE NEEDS TO BE A FRANK DISCUSSION

2   ABOUT WHAT THE PATIENT WANTS AND DESIRES, AND THE PHYSICIANS

3   WOULD ADHERE TO THAT.  AND OBVIOUSLY, SOME PATIENTS WANT NO

4   INTERVENTION, AND THAT'S PERFECTLY FINE.

5   **Q.**   IS IT STANDARD TO DISCUSS A DO NOT RESUSCITATE ORDER WITH

6   A PATIENT WHO DOESN'T HAVE A TERMINAL CONDITION?

7   **A.**   WHY WOULD YOU DO THAT?  I MEAN, I DON'T UNDERSTAND WHY YOU

8   WOULD DO IT, THE PATIENT'S NOT GOING TO DIE.

9   **Q.**   JUST TO ASK THE QUESTION, IS THAT A STANDARD PRACTICE?

10  **A.**   NO.

11  **Q.**   AND WOULD YOU HAVE CONCERNS ABOUT THE APPROPRIATENESS OF

12  THAT?

13  **A.**   IT'S INAPPROPRIATE.

14  **Q.**   DID YOU HEAR MR. SAMPIER'S TESTIMONY EARLIER TODAY ABOUT A

15  DOCTOR TELLING HIM THAT IF HE NEEDED TO BE RESUSCITATED, THE

16  MEDICAL STAFF WOULD BREAK HIS RIBS AND PUNCTURE HIS LUNG AS

17  PART OF THE TREATMENT?

18  **A.**   YOU KNOW, I WASN'T LISTENING CAREFULLY, BUT I DID HEAR

19  THAT, YES.

20  **Q.**   IS THAT KIND OF CONVERSATION A STANDARD PART OF DISCUSSING

21  A DO NOT RESUSCITATE ORDER?

22  **A.**   NO.  YOU KNOW, OCCASIONALLY RIBS ARE BROKEN DURING CPR,

23  BUT IT'S NOT INTENDED, THAT'S FOR SURE, AND IT'S NOT A DESIRED

24  OUTCOME.  THE PRESUMPTION IS THAT YOU COULD DO CPR WITHOUT

25  DOING THAT.  SO I WOULD THINK THAT MIGHT FRIGHTEN A PATIENT,

1    BUT IT'S NOT GENERALLY DONE.

2    **Q.**    AND WHAT SHOULD OCCUR IN THAT CONVERSATION?

3    **A.**    WELL, THE DISCUSSION SHOULD BE ABOUT THE DESIRES OF THE

4    PATIENT.  YOU HAVE THIS CONDITION, YOU HAVE THIS PROBABILITY OF

5    LIVING.  YOU MAY HAVE PAIN, THIS MIGHT OCCUR TO YOU, AND WHAT

6    WOULD YOU LIKE TO DO.  WOULD YOU LIKE US TO RESUSCITATE YOU,

7    SEND YOU TO A HOSPITAL, AND HAVE THEM INTUBATE YOU EVEN THOUGH

8    YOU MAY LIVE ON A VENTILATOR FOR THE REST OF YOUR LIFE, OR

9    WOULD YOU PREFER THAT WE STOP INTERVENTIONS SHORT OF MAYBE

10   GIVING ANTIBIOTICS, AND WE WOULD DO EVERYTHING TO MAKE YOU

11   COMFORTABLE, BUT NO OTHER INTERVENTIONS.  SO YOU WOULD HAVE TO

12   DESCRIBE TO THEM PRACTICALLY, IN LANGUAGE THEY COULD

13   UNDERSTAND, WHAT ARE THE LIKELY SCENARIOS IN YOUR CASE, KNOWING

14   IN ADVANCE THAT YOU CAN'T PREDICT EVERYTHING THAT'S GOING TO

15   HAPPEN, AND YOU WOULD TRY TO MAKE SURE THE PATIENT UNDERSTOOD

16   AND THEN THE PATIENT WOULD MAKE A DECISION.

17   **Q.**    AND IS IT APPROPRIATE TO MAKE NARCOTIC MEDICATION

18   AVAILABLE ONLY TO PATIENTS WHO ARE ON PALLIATIVE OR HOSPICE

19   CARE?

20   **A.**    NO.

21   **Q.**    AND ONE QUESTION ALSO ON MR. SAMPIER'S TESTIMONY.  DID YOU

22   HEAR HIS TESTIMONY ABOUT THE MEDICAL STAFF BEING HARD ON HIM TO

23   TRY TO GET HIM TO TREAT HIMSELF AND IMPROVE HIS CONDITION?

24   **A.**    I DID HEAR A LITTLE BIT OF THAT, YES.

25   **Q.**    AND FROM WHAT YOU HEARD, DID THAT SOUND LIKE AN

APPROPRIATE FORM OF TREATMENT FOR TRANSVERSE MYELITIS?

**A.**   NO.   PATIENTS SHOULD BE GIVEN THE OPPORTUNITY AND THE

ACCESS TO AN ABILITY TO IMPROVE.   SO IF A PATIENT IS DISABLED,

THE SYSTEM SHOULD PROVIDE FOR THAT PATIENT ACCESS TO EITHER

SERVICES, PHYSICAL THERAPY OR OTHERWISE, EQUIPMENT, OR TRAINING

NECESSARY TO IMPROVE, AND THE EXPECTATION THAT A PATIENT CAN

FIGURE THAT OUT FOR THEMSELVES IS INAPPROPRIATE.

**Q.**   SO LET'S TURN TO AN EXAMPLE OF THE PROBLEMS AS A WHOLE

THAT WE SAW IN THE INFIRMARY CARE.   WE HAVE ONE MORE TIMELINE,

WHICH IS PATIENT NO. 3.   PATIENT NO. 3'S MEDICAL RECORDS ARE IN

EVIDENCE AS JOINT EXHIBIT 10-AAA.   COULD YOU GIVE AN OVERVIEW

OF PATIENT NO. 3'S MEDICAL CONDITIONS?

**A.**   SO THIS IS A PATIENT WHO HAD MULTIPLE CONDITIONS.   HE HAD

UNDERLYING DIABETES, PERIPHERAL VASCULAR DISEASE, WHICH WE'VE

ALREADY DISCUSSED, WHICH IS CARDIOVASCULAR DISEASE OF ARTERIES

OTHER THAN IN THE HEART.   HE HAD CORONARY ARTERY DISEASE.   SO

HE ACTUALLY HAD HEART DISEASE RELATED TO ATHEROSCLEROSIS.   HE

HAD HYPERTENSION, HEPATITIS C, AND HIGH BLOOD LIPIDS.

**Q.**   AND WHAT ARE SOME OF THE IMPORTANT TREATMENTS FOR THESE

CONDITIONS?

**A.**   WELL, SO HIS MAIN CONDITION WAS THE PERIPHERAL VASCULAR

DISEASE AND I MEAN, OBVIOUSLY FOR THE DIABETES AND THE

CARDIOVASCULAR DISEASE, YOU SHOULD BE ON STATINS AND POSSIBLY

ON ANTICOAGULANTS, EITHER ASPIRIN OR PLAVIX.

            AND FOR THE PERIPHERAL VASCULAR DISEASE, SO THIS IS A

1   DISEASE WHERE YOU HAVE ENCROACHMENT AND NARROWING OF THE
2   ARTERIES THAT GO TO THE LOWER EXTREMITIES, AND WHEN THOSE
3   ARTERIES ARE SUFFICIENTLY OCCLUDED, THE LIMB DEVELOPS PAIN.
4   IT'S VERY SIMILAR TO A HEART ATTACK.  A HEART ATTACK IS JUST
5   PAIN IN THE HEART WHEN YOU HAVE A LACK OF OXYGEN.
6         WHEN THAT SAME CONDITION OCCURS IN THE LEG, YOUR LEG
7   MUSCLE DEVELOPS PAIN, AND SO PAIN IS THE FIRST SYMPTOM OF
8   PERIPHERAL VASCULAR DISEASE, AND IT'S CALLED CLAUDICATION.  SO
9   WHEN PATIENTS WHO HAVE LEGS WALK, AND THEY HAVE PERIPHERAL
10  VASCULAR DISEASE, THEY DEVELOP PAIN WHEN THEY WALK.
11  IN ADDITION, A MORE CRITICAL SIGN FOR PEOPLE WHO HAVE
12  PERIPHERAL VASCULAR DISEASE IS TISSUE LOSS.  SO IF YOU HAVE
13  TISSUE NECROSIS OR ULCERS IN A LIMB WHERE YOU HAVE PERIPHERAL
14  VASCULAR DISEASE, IT'S A SIGN OF MORE CRITICAL PERIPHERAL
15  VASCULAR DISEASE THAT WARRANTS VERY PROMPT AND CLOSE ATTENTION.
16  SO THOSE ARE KIND OF MANIFESTATIONS OF PERIPHERAL VASCULAR
17  DISEASE.
18  Q.   OKAY.  AND COULD YOU WALK THE COURT THROUGH THE CARE THAT
19  PATIENT NO. 3 RECEIVED?
20  A.   SO THIS IS ONE WE WENT BACK A WAYS.  THIS IS 2008.  AND HE
21  HAD JUST COME INTO LSP, I THINK, A MONTH OR TWO BEFORE, AND HE
22  WAS FIRST SEEN -- MAY NOT HAVE BEEN FIRST SEEN, BUT WHEN WE
23  FIRST STARTED REVIEWING WAS MARCH 27, 2008.  AND BECAUSE OF
24  THIS PATIENT'S DIABETES, HE ALREADY HAD HAD ULCERS AND DISEASE
25  IN BOTH OF HIS LEGS THAT REQUIRED AMPUTATION.  SO HE HAD

1   ABOVE-THE-KNEE AMPUTATIONS OF BOTH LEGS.  SO HE HAD STUMPS

2   ABOVE HIS KNEES --

3            **MR. ARCHEY:**  YOUR HONOR, I PROBABLY SHOULD HAVE DONE

4   THIS EARLIER AND I APOLOGIZE FOR MY TARDINESS.  BUT WE'RE HERE

5   ABOUT THE CONDITIONS AT ANGOLA IN 2016.  WHAT'S GOING ON IN

6   2010 IS NOT 2016, AND SO A LOT OF THINGS CHANGED, AS YOU WILL

7   HEAR.  A LOT OF THE CONDITIONS SYSTEMS, EVERYTHING WE'RE

8   TALKING ABOUT, A LOT OF VERY SIGNIFICANT CHANGE TOOK PLACE.  SO

9   I GUESS MY OBJECTION IS RELEVANCE THAT WE COULD NARROW THIS

10  TRIAL DOWN TO THE CONDITIONS THAT ARE RELEVANT, NOT CONDITIONS

11  SIX, SEVEN YEARS PRIOR TO WHEN WE KNOW THINGS CHANGED AND

12  CHANGED SIGNIFICANTLY, AND MANY OF THOSE CHANGES OUTSIDE OF OUR

13  CONTROL EVEN.

14           **THE COURT:**  OKAY.

15           **MR. ARCHEY:**  AND SO THAT'S THE REASON WHY I STAND TO

16  OBJECT AT THIS POINT.

17           **THE COURT:**  THE OBJECTION IS TO RELEVANCE, AND THE

18  COURT IS PERFECTLY CAPABLE OF UNDERSTANDING THE WORD *RELEVANCE*

19  WITHOUT A SPEAKING OBJECTION.  IT REALLY IS NOT TERRIBLY

20  RELEVANT.  I'M GOING TO GIVE YOU ABOUT AN INCH OF LATITUDE.

21           **MR. DUBNER:**  I APPRECIATE THAT, YOUR HONOR, AND IF I

22  COULD JUST RESPOND BRIEFLY.  AS DR. PUISIS TESTIFIED EARLIER,

23  THEY SAW THE SAME TYPES OF CONDITIONS FROM 2008 TO 2016 AS AN

24  EXAMPLE OF THE --

25           **THE COURT:**  THEN LAY YOUR FOUNDATION AND MOVE ON.

1    BUT THE OBJECTION IS A VALID OBJECTION.  I'LL GIVE YOU A LITTLE

2    BIT OF LATITUDE.

3              **MR. DUBNER:**  I APPRECIATE THAT.

4    **BY MR. DUBNER:**

5    **Q.**   AND ONE QUESTION BEFORE YOU GET MORE INTO PATIENT NO. 3.

6    IS THIS AN EXAMPLE OF THE KINDS OF PROBLEMS THAT YOU SAW IN

7    INFIRMARY CARE AND IN CHRONIC SPECIALTY CARE THROUGHOUT THE

8    RANGE OF CHARTS THAT YOU LOOKED AT IN TIME?

9    **A.**   YES.  IN FACT, THIS PERSON HAD PERIPHERAL VASCULAR

10   DISEASE.  WE'VE ALREADY DISCUSSED A CASE VERY SIMILAR THAT

11   OCCURRED, I BELIEVE, IN 2015, 2016.  SO IT WAS VERY SIMILAR.

12   **Q.**   AND CAN YOU EXPLAIN A LITTLE BIT OF WHY YOU PICKED THIS

13   CHART TO PRESENT?  WHAT ABOUT THIS YOU THOUGHT MOST COMPELLING

14   OR WAS MOST IMPORTANT FOR ILLUSTRATING YOUR OPINION?

15   **A.**   WELL, THIS WAS ONE OF THE DEATHS.  SO WE WERE GIVEN A LIST

16   OF PATIENTS WHO DIED AND WE PICKED FROM THOSE, AND THAT'S WHY

17   THIS WAS INITIALLY PICKED.

18   **Q.**   SO LET'S TRY TO MOVE THROUGH THIS, BUT AS THE COURT HAS

19   REQUESTED, TRY TO MOVE THROUGH IT PERHAPS IN A MORE SUMMARY

20   FASHION THAN THE PREVIOUS ONES.  BUT LET'S START WITH THAT

21   MARCH 27, 2008, YOU SAID THAT HE HAD HAD AN INFECTED STUMP, I

22   BELIEVE.  AND IF WE COULD SKIP THE RECORD UP TO THIS ONE FOR

23   NOW, BUT WHAT SHOULD HAVE HAPPENED AT THAT POINT AND WHAT DID

24   HAPPEN?

25   **A.**   WELL, I THINK I CAN -- IF YOU WANT A SHORTER SUMMARY, LET

ME JUST SUMMARIZE IT.  THE PATIENT HAD MULTIPLE PROBLEMS.
THROUGHOUT THE REVIEW, THE DIABETES AFFECTS -- WHEN SOMEONE HAS
A SKIN ULCER OR AN INFECTION, IT CAN AFFECT THE DIABETES, AND
THE DIABETES CAN AFFECT THE INFECTION.  AND THE DIABETES WAS
NOT MANAGED WELL OR NOT DOCUMENTED AS MANAGED THROUGH MOST OF
THE COURSE OF THIS INMATE'S MEDICAL RECORD.  SO THAT WAS ONE
KIND OF BASELINE.

HE DEVELOPED, VERY EARLY ON IN 2008, AN ULCER ON HIS
STUMP.  AND AN ULCER IN A DIABETIC ON AN EXTREMITY SHOULD
RESULT IN AN EVALUATION, AND IF THE ULCER IS CHRONIC OR EXISTS
FOR LONGER THAN A FEW WEEKS, YOU SHOULD EVALUATE WHETHER THE
PATIENT HAS OSTEOMYELITIS OR AN INFECTION OF THE BONE
UNDERLYING THE INFECTION, AND THAT DIDN'T OCCUR.

AND EARLY ON IN 2008, HE HAD THAT AND PROBABLY SHOULD
HAVE BEEN ADMITTED TO AN INFIRMARY BECAUSE HE NEEDED CLOSER
MANAGEMENT.  HE DID HAVE AN AKA OR AN AMPUTATION.  SO IF HE HAD
HAD BOTH LEGS IN PLACE, HE CERTAINLY SHOULD HAVE BEEN ON THE
INFIRMARY, BUT I WOULD HAVE PUT THIS PATIENT ON AN INFIRMARY.
ABOUT EIGHT MONTHS LATER, HE DEVELOPED A PRESSURE ULCER ON HIS
SACRUM.  NOW, BECAUSE HE HAD BOTH LEGS AMPUTATED, HE COULDN'T
WALK, AND SO THEY GAVE HIM A WHEELCHAIR TO SIT ON.  HE WOULD
MANEUVER HIMSELF IN GENERAL POPULATION ON A WHEELCHAIR, BUT HE
DEVELOPED A PRESSURE ULCER ON HIS BUTTOCKS.  SO A PRESSURE
ULCER NEEDS TO BE TREATED BY RELIEVING THE PRESSURE.  YOU HAVE
TO REMOVE THE PRESSURE TO TREAT IT.

1    THE ONLY WAY TO DO THAT IS TO GET HIM OFF THE

2  WHEELCHAIR AND HE SHOULD HAVE BEEN PLACED ON THE INFIRMARY.  SO

3  THIS PATIENT, IN LATE 2008, SHOULD HAVE BEEN ON THE INFIRMARY,

4  BUT WAS NOT PUT ON THE INFIRMARY, WAS KEPT IN GENERAL

5  POPULATION ON A WHEELCHAIR UNDER THE SAME CIRCUMSTANCES OF

6  PRESSURE THAT CAUSED THE ULCER IN THE FIRST PLACE.

7        **MR. DUBNER:**  AND IF WE COULD LOOK BRIEFLY AT

8  JX-10-54042.

9  **BY MR. DUBNER:**

10  **Q.**   SO THIS, I BELIEVE, IS THE NOTE DOCUMENTING THAT PRESSURE

11  ULCER.  CAN YOU EXPLAIN WHAT THE ROLE OF THE PHYSICIAN WAS IN

12  RESPONDING TO THIS PRESSURE ULCER?

13  **A.**   WELL, HE DIDN'T SEE THE PATIENT.

14  **Q.**   AND HOW CAN YOU TELL THAT?

15  **A.**   WELL, BECAUSE IT'S A TELEPHONE ORDER.  SO IN THE

16  PHYSICIAN'S SECTION, IT'S ON THE BOTTOM PART OF THE CHART, IT

17  SAYS PHYSICIAN ASSESSMENT AND TREATMENT, IT SAYS T/O, THAT'S

18  TELEPHONE ORDER, ROUNDTREE.  SO I ASSUME DR. ROUNDTREE IS THE

19  DOCTOR, AND THE PERSON WHO WROTE THE NOTE, IT'S THE SAME

20  HANDWRITING AS ABOVE, WHICH IS THE MEDIC, WROTE THE ORDERS OF

21  THE PHYSICIAN.  SO THE PHYSICIAN IS DOING THIS BY REMOTE

22  CONTROL.  HE'S NOT SEEING THE PATIENT.  IT'S JUST

23  INAPPROPRIATE.  YOU SHOULD EVALUATE THE ULCER, AND AT THIS

24  POINT, THE PATIENT SHOULD HAVE BEEN ADMITTED TO THE INFIRMARY

25  TO GET HIM OFF THE WHEELCHAIR TO REDUCE THE PRESSURE, AND THAT

1    DIDN'T OCCUR.

2          SO MOVING ON IF YOU WANT TO GO FASTER --

3    **Q.**   IF WE COULD MOVE TO APRIL 23, 2010, IF YOU COULD JUST GIVE

4    A SUMMARY OF THE CARE IN BETWEEN THOSE DATES, AND THEN WE CAN

5    FOCUS IN ON THE END OF LIFE.

6    **A.**   I'M SORRY.  WHAT DID YOU SAY?

7    **Q.**   I'M SORRY.  I WAS SAYING IF YOU WANT TO JUST GIVE A

8    SUMMARY, YOU KNOW, A VERY BRIEF SUMMARY OF THE CARE, FROM THAT

9    POINT THROUGH APRIL 2010, THEN WE'LL MOVE FORWARD TO THE END OF

10   LIFE THESIS.

11   **A.**   OKAY.  SO, YOU KNOW, A YEAR WENT BY, THE PATIENT'S IN

12   GENERAL POPULATION.  HAS A PRESSURE ULCER THAT WAXED AND WANED,

13   AND HAS INFECTIONS ON HIS STUMP VIRTUALLY CONTINUOUSLY, AND THE

14   SAME TYPE OF INADEQUATE HISTORY AND PHYSICAL EXAMINATIONS.  AND

15   REMEMBER THAT IF SOMEBODY HAS A CHRONIC INFECTION LASTING MORE

16   THAN A FEW WEEKS, YOU NEED TO ASSESS FOR OSTEOMYELITIS AND

17   DEEPER INFECTION.  AND BECAUSE HE HAD PERIPHERAL VASCULAR

18   DISEASE, HE SHOULD HAVE HAD ULTRASOUND OF HIS ARTERIES TO HIS

19   LOWER EXTREMITIES, HAD A REFERRAL TO A VASCULAR SURGEON TO

20   ASSESS WHETHER HE NEEDED SURGERY TO IMPROVE THE CIRCULATION TO

21   HIS LEG, BECAUSE OTHERWISE IT WOULDN'T HEAL, AND HE SHOULD HAVE

22   HAD EVALUATION FOR OSTEOMYELITIS, INCLUDING POSSIBLY AN MRI,

23   BUT AT LEAST RADIOLOGICAL STUDIES, A TEST CALLED A CRP, OR

24   SEDIMENTATION RATE, POSSIBLY BLOOD CULTURES, AND CERTAINLY

25   LONG-TERM ANTIBIOTIC THERAPY IF NEEDED.  BUT HE DID GET

1  INTERMITTENT ANTIBIOTIC THERAPY, BUT HE DIDN'T GET ANY OF THE
2  OTHER TREATMENTS THAT I JUST INDICATED WHICH ARE PRETTY
3  STANDARD OF CARE FOR HIS CONDITION.  SO THAT WENT ON FOR TWO
4  YEARS.
5        AND THEN HE STARTED DEVELOPING -- IN 2010, HE WAS
6  EVALUATED AND A MEDIC, I BELIEVE, ON THE 23RD OF APRIL NOTED
7  THAT HE HAD AN ESCHAR, AND ESCHAR IS DEAD TISSUE.  THAT'S ALL
8  IT IS.  IT'S A SCAB.  AND WHEN YOU SEE AN ESCHAR, YOU DON'T
9  KNOW WHAT'S UNDERNEATH IT.  IS THE TISSUE LIVING OR DEAD, AND
10 HOW FAR IS THE DEAD TISSUE EXTENDING.  AND ESCHARS MUST BE
11 REMOVED.  THEY SHOULD BE REMOVED UNTIL YOU GET VIABLE TISSUE,
12 AND THAT SHOULD BE DONE AS SOON AS POSSIBLE.  AND THE PATIENT
13 HAD STUMP PAIN.
14       SO AS I SAID BEFORE, BECAUSE HE HAD PERIPHERAL
15 VASCULAR DISEASE, THE PAIN WAS AN INDICATION OF BAD
16 CIRCULATION, AND THE ESCHAR WAS AN INDICATION OF DEAD TISSUE,
17 BOTH OF WHICH INDICATE A CRITICAL LEG.  AND BY THAT I MEAN IT'S
18 SOMETHING THAT A VASCULAR SURGEON SHOULD HAVE SEEN PROMPTLY,
19 AND IT DIDN'T OCCUR.
20       AND FOLLOWING THAT, ABOUT A WEEK LATER, A MEDIC
21 DOCUMENTED THAT THE PATIENT HAD AN ECCHYMOTIC, WHICH MEANS A
22 DARKENED SKIN WITH A COLD STUMP.  A LEG THAT IS COLD INDICATES
23 THAT IT HAS NO VASCULAR SUPPLY.  IT HAS NO VASCULAR SUPPLY.
24 THAT'S A LIFE-THREATENING DANGER.  THAT PATIENT SHOULD HAVE
25 BEEN ADMITTED TO A HOSPITAL.  ON EITHER OF THOSE OCCASIONS, I

1  PROBABLY WOULD HAVE ADMITTED THE PATIENT TO A HOSPITAL BECAUSE

2  THE PATIENT WAS AT RISK OF DEATH AND LOSING WHATEVER WAS LEFT

3  OF THE LIMB.

4          AND THEN, STILL LATER IN MAY, MAY 12TH, EVENTUALLY

5  THERE WAS AN ADMISSION TO THE INFIRMARY.  SO THE REASON WHY WE

6  ARE BRINGING THIS UP IN THE INFIRMARY IS FROM 2008 UNTIL EARLY

7  2010, THE PATIENT SHOULD HAVE BEEN ON THE INFIRMARY BUT WAS

8  NOT.  HE WAS IN GENERAL POPULATION.  AND THEN BEGINNING IN

9  2010, HE SHOULD HAVE BEEN IN A HOSPITAL, BUT INSTEAD, WAS PUT

10 ON THE INFIRMARY.  BOTH OF THOSE ARE BAD ASSIGNMENTS.  IT'S A

11 BAD RECOGNITION OF WHAT THE PATIENT NEEDED, AND IT WAS

12 INAPPROPRIATE.  AND IT WAS A PATIENT SAFETY ISSUE.  SO IT

13 PLACED THE PATIENT AT RISK OF HARM.

14 Q.  NOW, A QUICK QUESTION FOR YOU BEFORE WE MOVE ON TO THE

15 INFIRMARY STAY.  YOU REFERRED TO A COUPLE OF THINGS BEING

16 ASSESSED BY A MEDIC.  WITHOUT THE RECORDS IN FRONT OF YOU, IS

17 IT POSSIBLE THAT THAT WAS A PHYSICIAN RATHER THAN A MEDIC IN

18 SOME INSTANCES?

19 A.  I'M PRETTY SURE IT WAS A MEDIC, BUT I'D HAVE TO LOOK AT

20 THE RECORD FOR SURE.  BUT WE DID HAVE ONE -- I WANTED TO SHOW

21 THE INFIRMARY ADMISSION NOTE TO THE COURT BECAUSE IT KIND OF

22 TYPIFIES SOME OF THE HISTORY AND PHYSICAL EXAM THAT WE

23 ENCOUNTERED.

24          MR. DUBNER:  SO, MARTHA, IF YOU COULD GIVE US JOINT

25 EXHIBIT 10-55094 AND 55095.

1          **THE WITNESS:**  SO THIS IS THE INFIRMARY ADMISSION NOTE

2    OF A PATIENT WHO HAS BEEN DESCRIBED AS HAVING A COLD ECCHYMOTIC

3    LEG WITH AN ESCHAR, WHO HAS A HISTORY OF PERIPHERAL VASCULAR

4    DISEASE, DIABETES, HYPERTENSION, CORONARY ARTERY DISEASE.  AND

5    THIS IS THE NOTE.  YOU'LL SEE THE HISTORY, WHICH IS VIRTUALLY A

6    71-YEAR-OLD A.D, I BELIEVE THAT'S DIABETIC, WITH ABOVE-THE-KNEE

7    AMPUTATION, STUMP CELLULITIS, THAT'S THE HISTORY.  THERE'S NO

8    HISTORY OF DO YOU HAVE PAIN?  HOW LONG HAVE YOU HAD THAT SORE

9    ON YOUR LEG?  WHAT'S HAPPENED TO YOU?  WHAT YOUR BLOOD PRESSURE

10   CONTROL IS, WHAT YOUR DIABETES CONTROL IS.  THERE'S NO HISTORY.

11   THERE'S A LINE THROUGH THE ENTIRETY OF THE HISTORICAL SECTION.

12          WHEN YOU LOOK AT THE PHYSICAL EXAM SECTION ON

13   THE SECOND PAGE, IT HAS THE VITAL SIGNS, AND YOU'LL NOTE THE

14   BLOOD PRESSURE IS 179/83, WHICH IS SIGNIFICANTLY -- AT LEAST

15   THE SYSTOLIC PRESSURE IS SIGNIFICANTLY ELEVATED.  THAT'S AN

16   ABNORMAL BLOOD PRESSURE, THAT SHOULD BE IMMEDIATELY ATTENDED

17   TO, AND IT HAS A FRAIL, ELDERLY DIABETIC WITH RIGHT AKA AND

18   RIGHT STUMP CELLULITIS.  THAT'S THE EXAMINATION.  THAT'S MORE

19   OF A HISTORICAL ELEMENT.  AND THEN HE HAS, FOR EXAM, OKAY, AND

20   DRAWS A LINE THROUGH EVERYTHING EXCEPT AKA CELLULITIS, AND THE

21   ASSESSMENT IS CELLULITIS.

22          YOU'LL NOTE THAT IN THE ASSESSMENT, NONE OF THE

23   PATIENT'S OTHER CONDITIONS ARE MENTIONED.  WHAT IS THE STATUS

24   OF THE DIABETES?  WHAT'S THE STATUS OF THE HIGH BLOOD PRESSURE?

25   WE SEE THAT THE BLOOD PRESSURE IS ELEVATED.  HE'S NOT

04:00    1    MENTIONING IT.  WHAT'S THE PRESSURE OF HIS -- WHAT'S THE STATUS
         2    OF HIS LIPIDS?  WHAT'S THE STATUS OF HIS PERIPHERAL VASCULAR
         3    DISEASE?  NONE OF THAT IS ASSESSED.
         4              PREVIOUSLY, LESS THAN A FEW WEEKS PRIOR TO THIS,
         5    THE PATIENT WAS DESCRIBED AS HAVING A COLD, ECCHYMOTIC LEG.
         6    IT'S NOT MENTIONED IN HERE, AND IT'S NOT ASSESSED.  THAT'S
         7    CRITICAL, BECAUSE IF THE PATIENT STILL HAS A COLD LEG, THE
         8    PATIENT SHOULD HAVE BEEN IMMEDIATELY ADMITTED TO THE HOSPITAL.
         9              SO THIS IS SUCH A DEFECTIVE NOTE, BUT IT
        10    TYPIFIES WHAT WE SAW OVER AND OVER AGAIN.  AND INFECTIONS IN
        11    THE LEG, EVEN IF HE THOUGHT IT WAS CELLULITIS, IN SOMEONE WITH
        12    DIABETES, CELLULITIS CAN AFFECT THE DIABETES, SO THE BLOOD
        13    SUGAR CAN GO EXTREMELY HIGH.  THE BLOOD SUGAR IS NOT EVEN
        14    MENTIONED.  THERE'S NO MENTION OF WHETHER -- WHERE THE
        15    INFECTION IS OR WHETHER THIS ESCHAR IS STILL THERE.  ESCHAR IS
        16    DEAD TISSUE; SO THAT DOESN'T DISAPPEAR.  HE PROBABLY STILL HAD
        17    IT.  THERE'S NO MENTION OF IT.  SO IT'S JUST A BAD NOTE.  AND
        18    THE ONLY PLAN WAS TO ADMIT TO UNIT 1 FOR TREATMENT.
        19              NOW, IT'S NOT TO GET BLOOD CULTURES, WHICH
        20    PROBABLY SHOULD HAVE BEEN DONE, AND BY THE WAY, I MEAN THIS
        21    PERSON SHOULD HAVE BEEN ADMITTED TO A HOSPITAL, BUT HE SHOULD
        22    HAVE SEEN A VASCULAR SURGEON, HE SHOULD HAVE HAD IMMEDIATE
        23    BLOOD CULTURES, HE SHOULD HAVE HAD INVESTIGATION FOR
        24    OSTEOMYELITIS, AND HE SHOULD HAVE HAD THE ESCHAR REMOVED
        25    PROMPTLY.  AND NONE OF THAT WAS DONE.  SO IT'S JUST A BAD NOTE.

04:02   1          THE COURT:  COUNSEL, EITHER CONNECT THIS TO SOMETHING

2    MORE GERMANE TO OUR TIME PERIOD OR MOVE TO THE NEXT LINE OF

3    QUESTIONING.

4          MR. DUBNER:  OKAY, YOUR HONOR.  AND THIS IS SOMETHING

5    I CAN'T REALLY DO THROUGH DR. PUISIS, BUT THIS DOES GO TO

6    KNOWLEDGE, YOUR HONOR.  AS MY CO-COUNSEL SAID EARLIER TODAY,

7    PROBLEMS THAT ARE LONG-STANDING, ARE SEVERE, AND HAVE BEEN

8    GOING ON FOR A SIGNIFICANT AMOUNT OF TIME, ARE RELEVANT TO THE

9    DEFENDANT'S KNOWLEDGE FOR PURPOSE OF DELIBERATE INDIFFERENCE;

10   AND SO IN ADDITION TO WHAT DR. PUISIS SAID, THAT HE SAW SIMILAR

11   CONDITIONS OVER A LONG PERIOD OF TIME, THAT THIS IS EMBLEMATIC

12   OF WHAT HE SAW, IT IS RELEVANT FOR THAT PURPOSE AS WELL.

13         THE COURT:  FINE.  YOU JUST OPENED THE DOOR FOR THEM

14   TO PUT ON FIVE DAYS' WORTH OF EVERYTHING THAT'S CHANGED SINCE

15   2010.  GO AHEAD.

16         MR. DUBNER:  AND JUST TO BE CLEAR --

17         THE COURT:  PROCEED.

18         MR. DUBNER:  -- THAT WAS 2010 TO 2016?

19         THE COURT:  I MEAN, 2010 TO WHEN YOUR SUIT WAS FILED,

20   2015.

21         MR. DUBNER:  OKAY.  THANK YOU, YOUR HONOR.

22   BY MR. DUBNER:

23   Q.   AND SO JUST TO FINISH THIS UP, WHAT CONDITION DID THIS

24   TREATMENT LEAVE THIS PATIENT IN AT THE TIME HE WAS LEAVING THE

25   INFIRMARY?

0 4 : 0 3

1   **A.**   THIS PATIENT DIED, I BELIEVE.

2   **Q.**   YES.  AND IF YOU COULD --

3   **A.**   SO HE WENT TO A HOSPITAL.  HE ULTIMATELY DEVELOPED SHOCK

4   ON THE INFIRMARY.  AND IN A STATE OF SHOCK, HE WAS TRANSPORTED

5   TO A HOSPITAL.  AT THE HOSPITAL, THEY DID EMERGENT SURGERY.

6   THEY TRIED TO REMOVE THE DEAD TISSUE, BUT BOTH LEGS HAD NO

7   VIABLE TISSUE, AND THERE WAS NO CIRCULATION TO EITHER LEG.

8   THEY KEPT EXTENDING UPWARD TO TRY TO FIND LIVING TISSUE, AND

9   THEY GOT INTO THE PERINEUM, WHICH IS THE AREA AROUND THE

10  BUTTOCKS, BUT THE ENTIRE PENIS AND THE PERINEUM WAS DEAD.  AND

11  THEY ABORTED THE SURGERY SAYING THAT THEY COULD NOT FIND LIVE

12  TISSUE, AND THAT THE PATIENT WAS SENT BACK TO THE PRISON UNDER

13  HOSPICE.

14          **MR. DUBNER:**  AND JUST VERY BRIEFLY IF YOU COULD PUT

15  UP JX 10-54970 AND 971.

16  **BY MR. DUBNER:**

17  **Q.**   AND DR. PUISIS, GIVEN THOSE FINDINGS IN THE ONES YOU WOULD

18  HAVE SENT TO AN OUTSIDE HOSPITAL, TO A SURGEON, WOULD YOU HAVE

19  EXPECTED TO SEE EVIDENCE OF A RECOGNITION OF THE EXTENT OF THE

20  DAMAGE IN THE NOTES AT LSP?

21  **A.**   IT SHOULD BE PROPORTIONAL.  YOU SHOULD AT LEAST SEE SOME

22  OF THEM.  I MEAN, IF IN THE HOSPITAL, THEY FOUND THAT THERE WAS

23  NO CIRCULATION TO EITHER LEG OR BLOOD FLOW TO THE PERINEUM, IT

24  SHOULD HAVE BEEN EVIDENT AT THE PRISON.

25  **Q.**   HAVE YOU EVER ENCOUNTERED THIS LEVEL OF BILATERAL DEAD

04:05   1   TISSUE IN A PATIENT EITHER IN REVIEW OR IN PRACTICE?

2   **A.**   NO.

3   **Q.**   SO TO STEP AWAY FROM PATIENT NO. 3, HOW IS THIS REFLECTIVE

4   OF -- IS THIS REPRESENTATIVE OF THE CONDITIONS AS YOU SAW THEM

5   THROUGHOUT THE TIME PERIOD YOU REVIEWED?

6           **MR. ARCHEY:**  OBJECTION.  OBJECTION, YOUR HONOR.

7   MEANING THAT WE GOT DEAD TISSUE?

8           **MR. DUBNER:**  I'LL REPHRASE.

9           **MR. ARCHEY:**  THANK YOU.

10   **BY MR. DUBNER:**

11   **Q.**   HOW WAS THE CARE THAT YOU OBSERVED HERE, AND SPECIFICALLY

12   DELAYS IN CARE AND FAILURES TO PROVIDE WHAT YOU VIEWED AS

13   APPROPRIATE CARE?  HOW DOES THAT COMPARE TO WHAT YOU SAW IN

14   RECORDS THROUGHOUT THE TIME PERIOD YOU REVIEWED?

15   **A.**   I THINK IT WAS CONSISTENT THROUGHOUT.  AND ALL OF THE

16   EXPERTS FOUND THAT PEOPLE WHO SHOULD HAVE BEEN SENT TO THE

17   HOSPITAL WERE NOT.  AND AS HAPPENED IN THIS CASE, LATE IN THE

18   COURSE, AND THAT I FOUND, AND I THINK THE OTHERS DID AS WELL,

19   PATIENTS WHO SHOULD HAVE BEEN ON THE INFIRMARY WHO WERE NOT

20   PLACED ON THE INFIRMARY.

21   **Q.**   THE PROBLEMS THAT YOU SAW IN INFIRMARY CARE AND IN CHRONIC

22   CARE LIKE PERIPHERAL VASCULAR DISEASE, DID THEY APPEAR TO BE

23   RELATED TO THE AVAILABILITY OF OUTSIDE SERVICES AS FAR AS YOU

24   COULD TELL?

25   **A.**   I THINK IT'S DIRECTLY RELATED TO SPECIALTY CARE.  SO THIS

04:06   1   PERSON SHOULD HAVE BEEN REFERRED TO A VASCULAR SURGEON BUT WAS
       2   NOT.
       3   **Q.**   AND LET ME REPHRASE THE QUESTION.  DID THE LSP PHYSICIANS,
       4   WHAT YOU BELIEVED TO BE A FAILURE TO RECOGNIZE, A FAILURE TO
       5   PROVIDE APPROPRIATE TREATMENT, DID YOU SEE ANY EVIDENCE THAT
       6   THAT WAS CAUSED BY ANYTHING GOING ON AT OUTSIDE FACILITIES?
       7   **A.**   I'M NOT SURE I UNDERSTAND YOUR QUESTION.
       8   **Q.**   WE'LL LEAVE IT AND POSSIBLY COME BACK.
       9          HOW WOULD YOU CHARACTERIZE THE FREQUENCY OF PATTERNS
      10   OF CARE SUCH AS THIS IN THE RECORDS THAT YOU REVIEWED OF
      11   INFIRMARY CARE OR, FOR THAT MATTER, CHRONIC DISEASE CARE?
      12   **A.**   I THINK IT CONSISTENTLY RECURRED, OVER ALL TIME PERIODS.
      13   **Q.**   THANK YOU.  LET'S TALK BRIEFLY ABOUT DIAGNOSTIC SERVICES.
      14   WHAT ARE DIAGNOSTIC SERVICES?
      15   **A.**   ARE YOU TALKING ABOUT THE LABORATORY, X-RAY?
      16   **Q.**   EXACTLY.
      17   **A.**   SO DIAGNOSTIC SERVICES ARE THOSE SERVICES THAT ARE
      18   PROVIDED THAT SUPPORT PHYSICIANS IN DIAGNOSING ILLNESS.  THAT
      19   INCLUDES X-RAY TESTING, PULMONARY FUNCTION TESTS, ULTRASOUNDS,
      20   LABORATORY TESTS, ET CETERA.
      21   **Q.**   AND DID YOU EVALUATE THE DIAGNOSTIC SERVICES AT ANGOLA AT
      22   ALL?
      23   **A.**   WE DID.  THEY HAVE A LABORATORY, AND THEY HAVE SOME
      24   ON-SITE RADIOLOGY.
      25   **Q.**   AND WHAT DID YOU DO TO ASSESS LABORATORY SERVICES?

04:08   1   **A.**   WE WENT INTO THE LAB, WE TALKED TO THE LAB SUPERVISOR, WE
2   RECEIVED EVIDENCE OF WHAT TESTS THEY DO, WE LOOKED AT THEIR
3   CERTIFICATION, ET CETERA.
4   **Q.**   AND WHAT CONCLUSIONS DO YOU DRAW ABOUT THE USE OF THE
5   LABORATORY SERVICES AT ANGOLA?
6   **A.**   WELL, THEY'RE CLIA CERTIFIED.  SO, YOU KNOW, THE LAB WAS A
7   LITTLE CLUTTERED.  THEY USED INMATE WORKERS FOR SOME THINGS.  I
8   THINK THERE COULD BE SOME IMPROVEMENTS THERE, BUT OVERALL, I
9   THINK THE LAB KIND OF FUNCTIONED AS IT WAS SUPPOSED TO
10  FUNCTION.  AND SO DID THE RADIOLOGY.  SO IF A DOCTOR ORDERED A
11  LAB, IT APPEARED THAT IT WAS DONE, AND IT APPEARED THAT IT WAS
12  DONE COMPETENTLY.  WE DIDN'T FIND ANY PROBLEMS WITH THE LAB OR
13  ROUTINE X-RAYS.
14  **Q.**   SO YOU DIDN'T FIND ANY PROBLEM WITH THE LAB ITSELF ON
15  THOSE FRONTS.  DID YOU FIND ANY PROBLEM WITH THE UTILIZATION OF
16  THE LAB BY PHYSICIANS AT LSP?
17  **A.**   SO SOMETIMES PHYSICIANS SHOULD HAVE ORDERED LABS, DID NOT.
18  AND WHEN LABS WERE ORDERED, THEY WEREN'T ALWAYS REVIEWED.  SO
19  THE BIGGEST PROBLEM WITH THE DIAGNOSTICS WAS NOT THE FACT THAT
20  THEY HAD DIAGNOSTIC TESTING.  THAT APPEARED TO BE FUNCTIONING
21  FINE, BUT THE FACT THAT THE ORDERING WAS NOT CONSISTENTLY DONE
22  WHEN IT SHOULD HAVE BEEN DONE, AND WHEN TESTS WERE ORDERED,
23  THEY WERE NOT REVIEWED, WAS I THINK, THE MOST HARMFUL ASPECT.
24  AS WE SAW IN THE X-RAY THAT WAS DONE, AND YOU KNOW, THEY DIDN'T
25  GET A CT SCAN FOR FOUR MONTHS AND THEN DIDN'T GET A FOLLOWUP.

1   SO IT WAS THE REVIEW, THE DOCUMENTATION OF THE REVIEW, AND THE

2   FOLLOWUP OF THE TESTING THAT WAS INAPPROPRIATE.

3            THE SPECIAL CASE IS FOR CAPILLARY BLOOD GLUCOSE

4   TESTING, WHICH IS WHAT'S CALLED A POINT OF CARE TEST.

5   CAPILLARY BLOOD GLUCOSE TEST IS IT'S LIKE A FINGER STICK WHERE

6   DIABETICS CAN TEST THEIR OWN BLOOD GLUCOSE ON A DEVICE, AND IT

7   GIVES THEM AN INDICATION OF THEIR BLOOD GLUCOSE LEVEL.  IT

8   APPEARED THAT IT WAS INSUFFICIENTLY AVAILABLE, BUT THAT WAS

9   REALLY THE ONLY AREA OF LAB THAT I RECOGNIZED THAT WAS REALLY

10  INEFFICIENT.  OTHERWISE LAB TESTING WAS FINE, EXCEPT FOR BLOOD

11  GLUCOSE, AND IT WAS THE FOLLOWUP.

12  **Q.**   AND JUST BRIEFLY, WHY IS IT CONCERNING TO HAVE AN APPARENT

13  LACK OF AVAILABILITY OF THOSE BLOOD GLUCOSE TESTS?

14  **A.**   WELL, BECAUSE DIABETICS NEED IT TO MONITOR THEIR BLOOD

15  SUGAR LEVEL WITH RESPECT TO GETTING INSULIN.

16  **Q.**   AND ARE THERE RISKS THAT NOT HAVING THAT ACCESS POSES?

17  **A.**   SURE.  YEAH, YOU CAN BECOME HYPOGLYCEMIC OR HYPERGLYCEMIC,

18  POOR CONTROL, AND IT MIGHT BE UNRECOGNIZED, AND YOU COULD HAVE

19  ADVERSE EVENTS.

20  **Q.**   WE'RE GOING TO MOVE ON TO THE ADMINISTRATIVE SIDE OF

21  THINGS IN A MOMENT, BUT I JUST WANTED TO WRAP UP ON CLINICAL

22  MATTERS.  DO YOU THINK THAT THE PROBLEMS THAT YOU SAW WOULD

23  HAVE BEEN SOLVED BY A BETTER OUTSIDE HOSPITAL?

24  **A.**   I'M NOT SURE I UNDERSTAND.  YOU MEAN THE PROBLEMS BY THE

25  PERFORMANCE OF LSP PHYSICIANS?

**Q.**   THAT'S CORRECT.

**A.**   THEY'RE UNCONNECTED.  UNLESS AN OUTSIDE HOSPITAL WAS
MANAGING ALL THE CARE, INCLUDING THE CARE AT LSP, NO, AN
OUTSIDE HOSPITAL WOULD NOT HAVE MADE A DIFFERENT.  THEY DID
HAVE ACCESS TO OUTSIDE HOSPITALS.

**Q.**   SO, FOR EXAMPLE, YOU DIDN'T SEE ANY EVIDENCE OR DID YOU
SEE ANY EVIDENCE THAT OUTSIDE HOSPITALS WERE RESPONSIBLE IN
SOME WAY FOR LSP DOCTORS' FAILURE TO RECOGNIZE HOW TO TREAT
CHRONIC DISEASE, PATIENTS WITH CHRONIC ILLNESSES?

**A.**   NO.

**Q.**   AND DID YOU SEE ANY EVIDENCE THAT OUTSIDE HOSPITALS WERE
RESPONSIBLE FOR THE CARE THAT YOU OBSERVED ON THE INFIRMARY?

**A.**   NO.

**Q.**   AND DID YOU SEE ANY EVIDENCE THAT OUTSIDE HOSPITALS WERE
RESPONSIBLE FOR PHYSICIANS AT LSP NOT ORDERING OR REVIEWING
LABS TIMELY?

**A.**   NO.

**Q.**   OKAY.  SO LET'S MOVE TO THE OPERATIONAL SIDE OF YOUR
OPINIONS.  BEFORE WE TALK ABOUT WHAT YOU CONCLUDED ABOUT ANGOLA
ITSELF, WHAT COMPONENTS DOES A CORRECTIONAL MEDICAL SYSTEM NEED
TO HAVE, TO HAVE A REASONABLE LIKELIHOOD OF PROVIDING ADEQUATE
CARE?

**A.**   SO MANAGEMENT NEEDS TO PROVIDE TO THE CLINICAL STAFF,
INCLUDING NURSES, MEDICS, AND PHYSICIANS, PROCESSES AND SYSTEMS
TO ENSURE THAT THEY CAN ADEQUATELY PROVIDE CARE, AND THAT WOULD

1   INCLUDE THAT YOU HAVE ADEQUATE LEADERSHIP; THAT THE STAFFING IS

2   ADEQUATE; THAT THE PHYSICIANS ARE OF ADEQUATE QUALITY AND

3   TRAINING; THAT THERE'S A REVIEW OF THE CARE; THAT THE BUDGET IS

4   SUFFICIENT TO PROVIDE SERVICES; THAT YOU HAVE ADEQUATE CLINICAL

5   SPACE; YOU HAVE A MEDICAL RECORD THAT WORKS; YOU HAVE A

6   SCHEDULING PROCESS THAT WORKS; AND THAT YOU MONITOR CARE IN A

7   WAY SO THAT YOU ENSURE THAT MISTAKES ARE NOT MADE AND THAT YOU

8   IMPROVE.

9   **Q.**   AND DID YOU FIND THESE ELEMENTS TO BE ADEQUATE AT ANGOLA?

10  **A.**   NO.

11  **Q.**   COULD YOU GIVE JUST AN OVERVIEW OF WHAT YOU CONCLUDED

12  ABOUT THE ADMINISTRATIVE AND OPERATIONAL ASPECTS OF CARE AT

13  ANGOLA?

14  **A.**   WELL, SO THE MEDICAL LEADERSHIP WAS INADEQUATE, BOTH IN

15  TERMS OF THE ADMINISTRATIVE AND THE CLINICAL.  THE RELATIONSHIP

16  WITH CUSTODY AND MEDICAL WAS OFTEN INAPPROPRIATE, AND IT

17  APPEARED THAT THE CLINICIANS ADVOCATED THAT BECAUSE IT WAS A

18  PRISON, WE COULD DO THINGS DIFFERENTLY AND NOT ACT

19  PROFESSIONALLY.  THE PROVIDERS WERE -- THERE WAS NO

20  CREDENTIALING, AND THE PROVIDERS DID NOT ALL HAVE TRAINING THAT

21  WAS APPROPRIATE FOR WHAT THEY WERE ACTUALLY DOING.  THE PEER

22  REVIEW WAS SIGNIFICANTLY SUBSTANDARD.  THE BUDGET WAS VERY LOW

23  AND APPEARED, TO ME, INADEQUATE TO SUPPORT THE SERVICES THAT

24  WERE REQUIRED.  THE CLINICAL SPACE HAD PROBLEMS THAT COULD HAVE

25  BEEN IMPROVED.  THERE WAS NO MORTALITY REVIEW TO SPEAK OF, AND

1    THE QUALITY IMPROVEMENT WAS ALMOST NONEXISTENT.

2              **MR. DUBNER:**    OKAY.    SO YOU CAN TAKE THAT SLIDE DOWN.

3    THANK YOU.

4    **BY MR. DUBNER:**

5    **Q.**    SO LET'S FOCUS FIRST ON THE HEALTHCARE LEADERSHIP.

6    HOW IS THE LEADERSHIP OF LSP'S MEDICAL SYSTEM STRUCTURED?

7    **A.**    WELL, IT'S DESIGNED ON A CUSTODY MODEL.    SO, TYPICALLY, IN

8    A CORRECTIONAL SYSTEM, THE HEALTHCARE PROGRAM IS UNDER MEDICAL

9    LEADERSHIP.    IN OTHER WORDS, THE MEDICAL LEADERSHIP WILL

10    DEVELOP THE BUDGET, THEY WILL DETERMINE WHAT THE NEEDS ARE, AND

11    ADVOCATE FOR THOSE NEEDS, WHETHER THEY RECEIVE BUDGETARY

12    SUPPORT TO ATTAIN THOSE NEEDS OR NOT IS ANOTHER QUESTION, BUT

13    THEY WOULD ADVOCATE AND MANAGE THE PROGRAM.

14              AT LSP, WHEN WE VISITED, THE HEALTH AUTHORITY WAS AN

15    ASSISTANT WARDEN WHO HAD NO EXPERIENCE IN MANAGING A MEDICAL

16    PROGRAM BEFORE, AND HAD REALLY -- WAS UNABLE TO RESPOND TO HOW

17    THE PROGRAM OPERATED.    SHE REALLY HAD NO KNOWLEDGE OF HOW THE

18    BUDGET WORKED, SHE HAD NO KNOWLEDGE OF WHAT THE BUDGET WAS.

19    SHE DIDN'T KNOW WHAT THE MEDICAL PROCEDURES WERE, AND SHE

20    APPEARED NOT TO BE AN ADVOCATE FOR THE PROGRAM.    SHE WAS A

21    PREVIOUS SECRETARY TO THE WARDEN, AND HAD NO EXPERIENCE IN

22    HEALTHCARE.    AND THAT'S JUST -- I THINK THAT'S IRRESPONSIBLE.

23    **Q.**    IS THAT COMMON FOR A HEALTHCARE ADMINISTRATOR TO NOT HAVE

24    A BACKGROUND IN HEALTHCARE?

25    **A.**    IT IS VERY UNCOMMON.    I MEAN, FOR INSTANCE, THE STANDARDS

04:17  1    OF THE NCCHC, THEY RECOMMEND THAT YOU HAVE SOMEBODY WHO HAS

       2    HEALTH EXPERIENCE, AND THAT SHOULD HAPPEN.  AND EVEN IN

       3    PROGRAMS WHERE THE WARDEN IS THE, YOU KNOW, THE ULTIMATE

       4    AUTHORITY, THE WARDEN WOULD HAVE A -- AND THIS OCCURS IN

       5    GEORGIA, FOR EXAMPLE, WHERE THE WARDENS RUN THE SHOW, BUT THE

       6    WARDEN HAS A HEALTH MANAGER WHO IS ALLOWED TO RUN THE PROGRAM.

       7    AND THAT JUST HAS TO OCCUR, AND IT DOESN'T IN THIS FACILITY.

       8    Q.    FROM YOUR ASSESSMENT, DID IT APPEAR THAT THE ASSISTANT

       9    WARDEN FOR HEALTH SERVICES OR THE MEDICAL DIRECTOR WERE, AS YOU

      10    PUT IT, RUNNING THE PROGRAM?

      11    A.    NO.

      12    Q.    WHAT DUTIES WERE NOT BEING CARRIED OUT THAT SHOULD HAVE

      13    BEEN BEING CARRIED OUT BY THE ASSISTANT WARDEN AND/OR THE

      14    MEDICAL DIRECTOR?

      15    A.    WELL, SOMEONE WHO'S RUNNING THE PROGRAM SHOULD KNOW --

      16    SHOULD HAVE A SENSE OF HOW MANY STAFF THEY NEED.  AND IN TIMES,

      17    LET'S SAY THE BUDGET IS TIGHT, YOU DON'T HAVE ENOUGH STAFF, YOU

      18    AT LEAST KNOW WHAT YOU NEED, BUT I DIDN'T GET THAT SENSE AT

      19    ANGOLA.  I GOT A SENSE OF -- AND PEOPLE TOLD ME DIRECTLY, I

      20    DON'T KNOW WHAT THE BUDGET IS.  THE WARDEN TAKES CARE OF THE

      21    BUDGET WITH DR. SINGH, AND THEY TELL ME WHAT THE BUDGET IS AND

      22    I JUST DO WHATEVER -- WHATEVER I GET, I'M HAPPY WITH.  AND THAT

      23    DOES NOT CHARACTERIZE LEADERSHIP THAT WOULD ADVOCATE FOR ANY

      24    IMPROVEMENT IN THE PROGRAM.  THE PEOPLE WHO ARE RESPONSIBLE FOR

      25    THE PROGRAM HAVE TO HAVE A WAY TO IDENTIFY WHAT THE PROBLEMS

04:19   1    ARE AND CORRECT THE PROBLEMS.  AND THAT WE DID NOT SEE EITHER

2    IN THE MEDICAL SIDE OR ON THE CUSTODY SIDE.

3    **Q.**   AND WHAT EFFECT DOES THAT LACK OF INVOLVEMENT IN THE

4    BUDGET HAVE, IF ANY, ON THE ALLOCATION OF THE BUDGET?

5    **A.**   WELL, OBVIOUSLY IF THE MEDICAL PEOPLE WHO ARE RUNNING THE

6    PROGRAM DON'T HAVE ANY EFFECT ON THE BUDGET, THEN THE PEOPLE

7    WHO ORGANIZE THE BUDGET DO IT -- DO SO IN A MANNER THAT IS MOST

8    ADVANTAGEOUS TO THEM, OR WHAT THEY BELIEVE IS THE RIGHT THING

9    TO DO.  AND IF THEY DON'T HAVE THE RIGHT INFORMATION, THEY ARE

10   GOING TO MAKE WRONG DECISIONS.

11   **Q.**   IN TERMS OF THE JOB OF A HEALTHCARE ADMINISTRATOR, IN THIS

12   FACILITY, THE ASSISTANT WARDEN FOR HEALTH SERVICES, HOW BIG IS

13   THAT JOB TYPICALLY?

14   **A.**   I MEAN, I CAN TELL YOU I WAS THE CHIEF OPERATING OFFICER

15   AT THE COOK COUNTY JAIL.  THERE WERE, AT THAT TIME, 7, 8000

16   INMATES, SO IT'S NOT FAR FROM WHERE ANGOLA IS, THEY WERE ABOUT

17   6500.  IT'S ABOUT THE SAME SIZE.  IT'S A BIG JOB.  THERE'S A

18   LOT OF MOVING PARTS; THERE'S A LOT OF DIFFERENT STAFF; THERE'S

19   OPERATIONAL PROBLEMS.  AND IT'S A FULL-TIME JOB.

20   **Q.**   WOULD IT BE POSSIBLE TO EFFECTIVELY CARRY OUT THE ROLE OF

21   A HEALTH SERVICES ADMINISTRATOR WHILE ALSO CARRYING SIGNIFICANT

22   OTHER DUTIES?

23   **A.**   I DON'T THINK SO.

24   **Q.**   LET'S MOVE OVER TO THE MEDICAL DIRECTOR.  AT THE TIME OF

25   YOUR SITE VISIT, WHO WAS THE MEDICAL DIRECTOR?

04:20   1   **A.**   DR. LAVESPERE.

2   **Q.**   AND WHAT DID YOU DETERMINE ABOUT HOW HE CARRIED OUT THE

3   DUTIES OF MEDICAL DIRECTOR?

4   **A.**   WELL, I THOUGHT DR. LAVESPERE WAS UNENGAGED.  HE DID NOT

5   KNOW WHAT THE BUDGET WAS, AND LEFT IT TO OTHERS TO FIGURE OUT

6   WHAT THE BUDGET SHOULD BE.

7          FROM MY PERSPECTIVE, HE SHOULD AT LEAST KNOW WHAT'S

8   NECESSARY.  AND WHEN ADDITIONAL RESOURCES ARE NECESSARY, HE

9   SHOULD ADVOCATE FOR THEM, BUT I DID NOT GET A SENSE THAT THAT

10   OCCURRED.

11   **Q.**   AND WHAT DID YOU BASE THAT SENSE ON?

12   **A.**   IN INTERVIEW.

13   **Q.**   NOW, WHAT DID YOU DETERMINE ABOUT HOW HE CARRIED OUT --

14   ABOUT HIS SUPERVISION OF PHYSICIANS?

15   **A.**   SO THE SUPERVISION WAS ALSO NONEXISTENT.  THE PEER REVIEW

16   WAS -- HE DID NOT PERFORM PEER REVIEW.  HE DID NOT KNOW THE

17   CREDENTIALS OF THE PHYSICIANS WORKING AT THE FACILITY.  HE MAY

18   SCHEDULE ASSIGNMENTS WITHOUT KNOWING THE CREDENTIALS OF THE

19   PHYSICIANS.  HE DID NOT REVIEW SENTINEL EVENTS OR MORTALITY

20   REVIEW.  HE DID NOT KNOW ANY STATISTICAL INFORMATION ABOUT THE

21   KINDS OF ILLNESSES THAT WERE PREVALENT IN THE POPULATION, AND

22   HE DIDN'T UNDERSTAND IF THERE WERE ANY PROBLEMS AT THE

23   FACILITY.

24   **Q.**   AND ARE THOSE THINGS THAT YOU WOULD EXPECT A MEDICAL

25   DIRECTOR TO BE INVOLVED IN OR INFORMED OF?

**A.**   THEY'RE FUNDAMENTAL.

**Q.**   AND YOU USED A PHRASE A MOMENT AGO "SENTINEL EVENTS,"
COULD YOU EXPLAIN WHAT THAT MEANS?

**A.**   SO A SENTINEL EVENT IS A SERIOUS EPISODE WHERE -- IT
RELATES TO AN ADVERSE EVENT THAT OCCURRED.  SO, FOR INSTANCE,
SOMEONE WAS HOSPITALIZED IN A MANNER THAT IS UNUSUAL OR
UNANTICIPATED.  SO IT'S AN UNANTICIPATED, UNUSUAL EVENT OF A
SIGNIFICANT ADVERSE NATURE, SUCH AS A DEATH WOULD BE A GOOD
EXAMPLE.

**Q.**   OKAY.  AND WHAT DID YOU DETERMINE ABOUT DR. LAVESPERE'S
INVOLVEMENT IN QUALITY IMPROVEMENT EFFORTS?

**A.**   HE DIDN'T PARTICIPATE.

**Q.**   AND WHAT, IF ANYTHING, DID YOU OBSERVE ABOUT HIS VIEW OF
ADEQUATE MEDICAL EXAMINATIONS AND MEDICAL HISTORY AND
DOCUMENTATION OF THOSE THINGS?

**A.**   WE QUOTED IN THE REPORT FROM HIS DEPOSITION WHERE HE
BASICALLY SAYS THAT HE DOESN'T NEED TO DOCUMENT A COMPLETE NOTE
BECAUSE, I UNDERSTAND WHAT I'M DOING AND IF SOMEONE HAS A LUNG
INFECTION, I JUST HAVE TO WRITE THE ORDER; AND I DON'T NEED TO
WRITE DOWN THE HISTORY BECAUSE IT'S OBVIOUS IF THEY HAVE
SPUTUM, THE MEDIC MIGHT WRITE THAT DOWN, BUT I DON'T NEED TO DO
THAT.  AND SO BASICALLY ASSERTING THAT COMPLETE OVER-ADEQUATE
DOCUMENTATION IS UNNECESSARY, AND WE DON'T AGREE WITH THAT.

**Q.**   IS IT CONCERNING TO YOU FOR A MEDICAL DIRECTOR OF A
FACILITY TO HOLD THAT VIEW?

04:24    1    **A.**    WELL, OBVIOUSLY, IF HE HAS THAT VIEW, THEN WHAT ABOUT THE

2    OTHER PHYSICIANS?  SO ONE OF THE REASONS WHY YOU SEE HISTORY

3    AND PHYSICAL EXAMS DOCUMENTED AS WE DID ON THAT INFIRMARY

4    RECORD IS THAT IF THE MEDICAL DIRECTOR DOESN'T BELIEVE THAT YOU

5    NEED TO DOCUMENT, THEN PROBABLY NO ONE ELSE WILL FEEL THE SAME

6    WAY.  I MEAN, THEY WON'T DO IT EITHER.

7    **Q.**    AND WHAT, IF ANYTHING, DID YOU OBSERVE ABOUT DR.

8    LAVESPERE'S ATTITUDE TOWARD THE PATIENTS?

9    **A.**    WELL, IT WAS -- IT TOOK A CUSTODY SLANT.  SO WE -- AND WE

10    HAVE SEVERAL REFERENCES IN THE REPORT WHERE HE WOULD SAY THINGS

11    LIKE, YOU KNOW, INMATES MIGHT TAKE ADVANTAGE OF ANOTHER INMATE

12    ON THE INFIRMARY IF THEY'RE AN INMATE WORKER, BUT IT'S A

13    PRISON, AND THE ATTITUDE THAT IT'S A PRISON; THEREFORE, THE

14    PROFESSIONALISM OF THE CLINICAL STAFF CAN BE OTHER THAN

15    PROFESSIONAL IS SOMETHING THAT GAVE US CONCERN.

16    **MR. DUBNER:**  AND, MARTHA, IF YOU COULD PULL UP JX-6

17    AT 41.  I'M SORRY.  NOT JX-6, PX-6, PLAINTIFFS' EXHIBIT 6.

18    **BY MR. DUBNER:**

19    **Q.**    AND WHILE THAT'S HAPPENING, DR. PUISIS, WHAT, IF ANYTHING,

20    DID YOU OBSERVE ABOUT DR. LAVESPERE'S BELIEF IN THE HONESTY OF

21    THE PATIENTS?

22    **A.**    WE ALSO CITED THAT, REFERENCED IT IN THE REPORT, THAT HE

23    SAYS ONE OF HIS MAIN ISSUES IS DETERMINING WHO'S TELLING THE

24    TRUTH AND WHO'S NOT, AND WE FIND THAT UNPROFESSIONAL.

25    I'VE WORKED IN CORRECTIONS FOR 32 YEARS, AND I'VE

1   TREATED MANY MAXIMUM SECURITY INMATES, AND I'VE SEEN MANY

2   PATIENTS MYSELF.  I DID DIRECT PATIENT CARE.  AND IN TALKING TO

3   CIVILIAN COLLEAGUES OF MINE, I DIDN'T PERCEIVE THAT PATIENTS

4   WERE SPECIFICALLY LYING TO ME.  THERE ARE SOME PATIENTS WHO TRY

5   TO TAKE ADVANTAGE OF THE SYSTEM TO GET SOMETHING THAT THEY

6   CAN'T OTHERWISE RECEIVE, BUT I THOUGHT IT WAS -- WE THOUGHT IT

7   WAS UNPROFESSIONAL, THE ENTIRE GROUP DID.

8   **Q.**   AND WHAT ARE SOME OF THE RISKS OF BRINGING THAT ATTITUDE

9   TO THE DOCTOR/PATIENT RELATIONSHIP?

10  **A.**   WELL, THEN YOU'RE  -- IT CAN AFFECT YOUR CLINICAL

11  DECISION-MAKING.  IF YOU THINK PEOPLE ARE NOT HONEST, YOU MAY

12  THINK THAT THEIR HISTORY IS INADEQUATE AND YOU MAY NOT TRUST

13  THEM.  IF YOU DON'T TRUST THEM, YOU'RE NOT LIKELY TO, AS

14  FREQUENTLY AS YOU SHOULD, COMPLETE INVESTIGATIONS.

15  **Q.**   AND DID THAT COMPORT WITH WHAT YOU SAW AS TO THE

16  COMPLETENESS OF EXAMINATIONS IN THE RECORDS?

17  **A.**   WELL, WE DID SEE THAT PEOPLE'S EXAMINATION -- PEOPLE DID

18  NOT RECEIVE CARE THAT WE THOUGHT THEY SHOULD HAVE.  I CAN'T

19  SPEAK TO WHETHER THE ATTITUDE AFFECTED IT, BUT IT'S POSSIBLE.

20  **Q.**   AND YOU SAID YOU QUOTED SOME STATEMENTS FROM

21  DR. LAVESPERE'S DEPOSITION IN YOUR REPORT.  IF I COULD JUST

22  READ ONE, ONE'S ON THE SCREEN.

23          **MR. DUBNER:**  WE ACTUALLY CAN RETURN TO PUBLISHING

24  THINGS TO THE GALLERY.  SORRY.  I SHOULD HAVE SAID THAT.

25  **BY MR. DUBNER:**

04:28    1    **Q.**    SO I WANT TO READ YOU A QUOTE THAT YOU CITED IN YOUR

2    REPORT.  DR. LAVESPERE TESTIFIED "IN ANGOLA, THEY DON'T

3    NECESSARILY WANT TO GET WELL, BECAUSE IF THEY GET WELL, THEN

4    THEY HAVE TO DO THINGS."

5            IS THAT AN ATTITUDE THAT IS APPROPRIATE FOR A

6    TREATING PHYSICIAN OR A MEDICAL DIRECTOR IN YOUR VIEW?

7    **A.**    NO.

8    **Q.**    AND WHY NOT?

9    **A.**    YOUR RESPONSIBILITY IS TO DETERMINE IF THEY HAVE ILLNESS,

10    AND IF THEY HAVE ILLNESS, TO TREAT IT.  AND WHETHER YOU'RE A

11    CIVILIAN OR AN INMATE, YOU KNOW, PEOPLE ARE THE SAME, AND YOU

12    HAVE TO PROFESSIONALLY EXAMINE PEOPLE, ORDER TESTS, EVALUATE

13    THE TESTS, TAKE A HISTORY, AND BASED ON THOSE PIECES OF

14    EVIDENCE, MAKE CLINICAL DECISIONS.  AND IT'S GOT NOTHING TO DO

15    WITH WHETHER THEY WANT TO WORK OR NOT, IN MY OPINION.

16    **Q.**    AND LEAVING ASIDE QUESTIONS OF CAUSATION, DID THE RISKS

17    THAT YOU SEE FROM THE ATTITUDES THAT WE JUST DISCUSSED, DID

18    THEY CORRELATE WITH THE PROBLEMS THAT YOU OBSERVED IN THE

19    MEDICAL RECORDS?

20    **A.**    WELL, WE SAW PEOPLE NOT PERFORMING EXAMINATIONS, NOT

21    TAKING HISTORIES.  IT'S POSSIBLE THAT IT'S -- THEY HAVE ISSUES

22    FROM A CYNICAL ATTITUDE.

23    **Q.**    LET'S TALK ABOUT STAFFING AND HIRING, WHILE WE'RE ON THE

24    SUBJECT OF PHYSICIANS.  WE'RE GOING TO FOCUS ON PROVIDER

25    LEVELS, WHICH I BELIEVE YOU SAID BEFORE INCLUDED PHYSICIANS AND

1  NURSE PRACTITIONERS.  IS THAT CORRECT?

2  A.    CORRECT.

3  Q.    SO WHAT, IF ANYTHING, DID YOU CONCLUDE ABOUT PROVIDER

4  STAFFING AT LSP?

5  A.    THE RATIO OF PATIENTS TO PROVIDER IS HIGH, SO IT APPEARS

6  THAT THEY'RE UNDERSTAFFED WITH RESPECT TO PROVIDERS.  AND

7  INDEED, I HAVE TALKED TO DR. LAVESPERE, AND HE INDICATED THAT

8  HE THOUGHT HE COULD USE A FEW MORE MID-LEVEL PROVIDERS.  I

9  THINK THEY COULD HAVE USED MORE THAN A FEW, BUT YOU KNOW, I'M

10 NOT EXACTLY SURE HOW MANY.  BUT IN ANY CASE, THEY NEEDED MORE

11 PHYSICIANS.

12 Q.    HOW DO YOU, AS AN EXPERT, EVALUATE WHETHER THERE ARE

13 ENOUGH PROVIDERS IN A FACILITY?

14 A.    WE USED A VERY ROUGH GUIDELINE.  AND I WANT TO GRANT THAT

15 IT IS A ROUGH GUIDELINE, BUT YOU KNOW, AROUND 800 PATIENTS PER

16 PROVIDER IS GENERALLY, IN MALE FACILITIES, A REASONABLE NUMBER.

17         BUT ON THE INFIRMARIES, FOR INSTANCE, THEY SHOULD

18 HAVE A SINGLE OR A HALF-TIME PROVIDER ON EACH OF THEIR

19 INFIRMARY UNITS.  AND SO IT DEPENDS ON THE ACUITY OF THE

20 PATIENTS.

21         ON THE MEDICAL UNITS THEY NEEDED MORE, BUT WE USED A

22 ROUGH NUMBER OF AROUND 800, AND IT GIVES YOU A BALLPARK BACK AT

23 THE ENVELOPE IDEA ON WHETHER IT'S ROUGHLY ADEQUATE.

24 Q.    AND JUST TO MAKE SURE I UNDERSTAND, WOULD THAT NUMBER BE

25 LOWER OR HIGHER FOR CASELOADS THAT INCLUDED MANY HIGH ACUITY

1  PATIENTS?

2  **A.**   CORRECT.  SO FOR LIKE ASH 2 AND THOSE UNITS WHERE THEY

3  HAVE MEDICAL DORMS, THEY SHOULD HAVE A HIGHER RATIO.  THEY MAY

4  EVEN NEED A SINGLE PHYSICIAN FOR ONE OF THOSE DORMS.

5  **Q.**   AND DID YOU REVIEW PROVIDERS' CASELOADS AT ANGOLA?

6  **A.**   YES, WE DID.

7        **MR. DUBNER:**  MARTHA, IF YOU COULD GIVE US SLIDE 45.

8  **BY MR. DUBNER:**

9  **Q.**   AND WHILE WE'RE PULLING IT UP, HOW WOULD YOU CHARACTERIZE

10  THE GENERAL MATTER OF PROVIDERS' CASELOADS AT ANGOLA?

11  **A.**   WELL, THEY ARE HIGH.  SO THE SLIDE'S UP, YOU CAN SEE THE

12  RATIOS RANGE FROM 841 AT A LOW TO 1700 AT A HIGH.  AND I WOULD

13  NOTE THE NURSE PRACTITIONER, WHO'S COVERING ALMOST 1100 PEOPLE,

14  1095, WAS ALSO RESPONSIBLE FOR THE ENTIRETY OF UNIT 2, AND ALL

15  THE HIV PATIENTS, CANCER PATIENTS, AND HOSPICE PATIENTS.

16  THAT'S WAY TOO MUCH.  PARTICULARLY FOR A MID-LEVEL PROVIDER.

17  BUT I THINK IN ALL CASES, THE RATIOS ARE HIGH.

18  **Q.**   AND WHY DON'T WE JUST WALK THROUGH THESE ONE BY ONE.  YOU

19  CAN TALK ABOUT THE PATIENT POPULATIONS IF YOU DON'T MIND.

20        FOR PHYSICIAN NO. 1, ARE THERE HIGH ACUITY AREAS

21  WITHIN THE -- AND LET ME STEP BACK A MOMENT AND JUST NOTE THAT

22  THIS IS ALL DRAWN FROM YOUR EXPERT REPORT, PLAINTIFF'S EXHIBIT

23  6 AT 18.  COULD YOU DESCRIBE WHAT YOU FOUND FOR PHYSICIAN NO. 1

24  AND YOUR VIEW OF THAT CASELOAD.

25  **A.**   I MEAN, I DON'T REMEMBER C AND J.  SO I'M NOT SURE OF THE

1    PATIENT POPULATION THERE, BUT THAT'S A HIGH NUMBER.  IT'S

2    ALMOST 2000 PEOPLE.  SO IT'S TOO MUCH FOR A PHYSICIAN

3    REGARDLESS OF THE PATIENT TYPE.

4    **Q.**   AND WHAT IS THE TREATMENT UNIT?

5    **A.**   THE TREATMENT UNIT, I BELIEVE, IS THE MENTAL HEALTH UNIT.

6    **Q.**   AND WOULD THAT OFTEN BE A HIGH ACUITY BODY OF PATIENTS OF

7    MENTAL HEALTH?

8    **A.**   IT'S A HIGH ACUITY BY VIRTUE OF THE PATIENTS BEING

9    DIFFICULT.  SO THEY ARE MENTALLY ILL, IT'S HARDER TO

10   COMMUNICATE BECAUSE THEY HAVE DELUSIONS, SOME OF THEM; SOME OF

11   THEM HAVE SCHIZOPHRENIA; SOME OF THEM HAVE BEHAVIORAL

12   DISORDERS.  THEY'RE VERY DIFFICULT PATIENTS TO MANAGE.  I'VE

13   DONE IT MYSELF; IT'S A HARD JOB.  IT'S HARD TO GET AT THEM AND

14   YOU HAVE TO SPEND A LITTLE MORE TIME.

15   **Q.**   AND DOES THAT CONTRIBUTE TO YOUR BELIEF THAT THIS CASELOAD

16   FOR PHYSICIAN NO. 1 IS EXCESSIVE?

17   **A.**   SURE.  BUT IN ADDITION, THE 1700 PEOPLE IS A LOT OF

18   PEOPLE.

19   **Q.**   OKAY.  AND THEN TURNING TO PHYSICIAN NO. 2.  WHAT DO YOU

20   CONCLUDE ABOUT HIS CASELOAD?

21   **A.**   WELL, THAT'S A HIGH NUMBER, PARTICULARLY IT'S IN THE MAIN

22   CELLBLOCK.  I'M NOT SURE IF THIS INCLUDES ANY OF THE

23   DORMITORIES THERE, MEDICAL DORMITORIES.  BUT THAT'S A HIGH

24   NUMBER.  AND IF IT INCLUDES MEDICAL DORMITORIES, IT'S A VERY

25   HIGH NUMBER.

1  **Q.**   AND LET'S JUST TALK ABOUT THOSE MEDICAL DORMITORIES FOR A

2  MOMENT BECAUSE YOU MENTIONED THEM BEFORE BUT WE DIDN'T -- I'M

3  NOT SURE IF WE EXPLAINED THEM.  WHAT ARE THE MEDICAL

4  DORMITORIES?

5  **A.**   SO THERE'S THREE, POSSIBLY MORE, DORMITORIES IN THE MAIN

6  PRISON AREA THAT ARE DESIGNATED AS MEDICAL UNITS, AND PEOPLE

7  HOUSED ON THOSE UNITS HAVE CONDITIONS THAT ARE CONSIDERED

8  INAPPROPRIATE FOR GENERAL POPULATION.  SO THEY WOULD PUT PEOPLE

9  THERE WHO, FOR INSTANCE, ARE IN WHEELCHAIRS OR PARTIALLY

10  DISABLED, BLIND, HAVE SIGNIFICANT CHRONIC ILLNESS OR

11  DISABILITIES.

12  **Q.**   AND TO YOUR KNOWLEDGE, WAS THERE -- DID DOCTORS OR NURSES

13  GO TO THE MEDICAL DORMITORIES?

14  **A.**   NO.

15  **Q.**   TURNING TO PHYSICIAN NO. 3, WHAT DID YOU CONCLUDE ABOUT

16  THAT CASELOAD?

17  **A.**   SO THAT'S THE CLOSEST TO, YOU KNOW, A CASELOAD THAT MIGHT

18  BE REASONABLE, BUT THAT PERSON IS ALSO MANAGING THE GENERAL

19  MEDICINE CLINIC AND THE ANTI-COAGULATION CLINIC.  SO IT'S A

20  HIGHER ACUITY CASELOAD, AND WITHOUT KNOWING THE SPECIFICS, IT

21  MAY OR MAY NOT BE, YOU KNOW, BORDERLINE ADEQUATE.  IT'S HARD TO

22  TELL.

23  **Q.**   AND THEN FOR PHYSICIAN 4, COULD YOU GIVE YOUR OPINION

24  ABOUT THAT CASELOAD AS WELL?

25  **A.**   SO THIS IS THE MAIN YARD.  AGAIN, IF IT INCLUDES ANY

1  MEDICAL DORMS, IT'S CERTAINLY HIGH, BUT 1200 IS ON THE HIGH

2  RANGE.  MY SUSPICION WHEN I SAY IN THE HIGH RANGE IS THAT IF

3  YOU EXPECT A PHYSICIAN TO WRITE A NOTE THAT'S ADEQUATE THAT HAS

4  A HISTORY, A PHYSICAL EXAM, A GOOD ASSESSMENT, YOU HAVE TO GIVE

5  THEM TIME TO DO THAT.

6         AND MY OWN IMPRESSION WAS IS THAT MOST OF THAT WAS

7  RELATED TO THE CREDENTIALING OF THE PHYSICIANS, BUT SOME OF IT

8  MAY HAVE BEEN RELATED TO THE TIME FACTOR THAT THEY HAVE TO GET

9  SO MANY PEOPLE SEEN, THAT THEY DON'T HAVE TIME TO WRITE A

10 REASONABLE NOTE.

11 Q.   AND SO WHAT EFFECTS DO EXCESSIVE PROVIDER CASELOADS HAVE,

12 IF ANY, ON THE RISK OF HARM TO PATIENTS?

13 A.   WELL, THEY INCREASE IT.

14 Q.   YOU MENTIONED A MOMENT AGO ABOUT CREDENTIALING.  COULD YOU

15 EXPLAIN WHAT CREDENTIALING IS?

16 A.   CREDENTIALING IS CONSIDERED WITH PRIVILEGING.

17 CREDENTIALING IS MERELY A LISTING AND VERIFICATION OF THE

18 TRAINING AND CERTIFICATES OF A PROVIDER.  FOR EXAMPLE, I

19 FINISHED A PROGRAM IN INTERNAL MEDICINE, AND I HAVE BOARD

20 CERTIFICATION IN INTERNAL MEDICINE.  A CREDENTIAL EFFORT FOR ME

21 WOULD BE TO DETERMINE, TO VERIFY THAT I ACTUALLY FINISHED THE

22 PROGRAM AND WOULD VERIFY THAT I HAVE BOARD CERTIFICATION, AND

23 WOULD ALSO VERIFY AND ESTABLISH WHETHER I HAD ANY LICENSE

24 RESTRICTIONS, WHETHER I HAD ANY MALPRACTICE LITIGATION, WHETHER

25 I HAD HAD CHARACTER ISSUES, WHETHER I HAD A PREVIOUS ARREST FOR

1   A FELONY, OR WHETHER I HAD ANY OTHER ISSUES SUCH AS SUBSTANCE

2   ABUSE OR SUBSTANCE USE THAT MIGHT AFFECT MY ABILITY TO

3   PRACTICE.  SO CREDENTIALING IS THE ESTABLISHMENT OF THE

4   TRAINING AND CERTIFICATION AND QUALIFICATIONS OF A PHYSICIAN.

5          PRIVILEGING IS THE ASSIGNMENT OF WHAT A PHYSICIAN CAN

6   DO BASED ON HIS CREDENTIALS.  SO IF I AM AN INTERNIST, I CAN BE

7   PRIVILEGED TO SEE PEOPLE IN PRIMARY CARE.  IF I HAVE TRAINING

8   AS A SURGEON, I CAN HAVE PRIVILEGES TO DO HERNIA REPAIR.  IF I

9   AM AN OBSTETRICIAN, I CAN HAVE PRIVILEGES TO DELIVER BABIES.

10  BUT IF I AM AN OBSTETRICIAN, I GENERALLY CAN'T OBTAIN

11  PRIVILEGES TO DO PRIMARY CARE OR DO SURGERY FOR A HERNIA.  AND

12  IF I AM AN INTERNIST, I CAN'T OBTAIN PRIVILEGES TO DELIVER

13  BABIES OR TO DO NEUROSURGERY.  SO THE PRIVILEGING IS CONNECTED

14  TO THE CREDENTIALS AND THE CREDENTIALS IS THE ESTABLISHMENT OF

15  YOUR TRAINING AND CHARACTER AND YOUR QUALIFICATIONS.

16  Q.   AND HOW DO CORRECTIONAL MEDICAL SYSTEMS USUALLY CARRY OUT

17  THE CREDENTIALING AND PRIVILEGE PROCESS?

18  A.   SO I MEAN, THE NATIONAL COMMISSION ESTABLISHES THAT YOU

19  SHOULD DO IT, AND THAT IT SHOULD INCLUDE A REVIEW OF THE

20  NATIONAL PRACTITIONER DATABANK.  AND THE NATIONAL PRACTITIONER

21  DATABANK IS A GOVERNMENTAL SOURCE OF INFORMATION ESTABLISHED, I

22  CAN'T -- UNDER RONALD REAGAN ACTUALLY, THAT ESTABLISHED A

23  NATIONAL DATABANK OF PHYSICIANS TO PREVENT, ON THE BASIS OF

24  PATIENT SAFETY, PREVENTS PHYSICIANS WHO HAD MALPRACTICE ISSUES

25  OR WERE HARMFUL TO PATIENTS, FROM CROSSING STATES LINES TO

1    OBTAIN LICENSES IN OTHER STATES.  SO THAT'S HOW IT WAS

2    ESTABLISHED.  SO THE NATIONAL COMMISSION RECOMMENDS THAT YOU

3    USE THAT AS PART OF YOUR CREDENTIALING.

4          BUT IN GENERAL, THE CREDENTIALING OF CORRECTIONAL

5    PHYSICIANS SHOULD BE NO DIFFERENT THAN IN THE COMMUNITY, IT'S

6    JUST THAT THE TYPE OF CARE THAT'S REQUIRED IS DIFFERENT THAN IN

7    THE COMMUNITY.  IN CORRECTIONS, THE CARE THAT'S REQUIRED IS

8    PRIMARY CARE.  SO MOST PHYSICIANS SHOULD BE EITHER FAMILY

9    PRACTICE OR INTERNAL MEDICINE, AND YOU SHOULD DEVELOP

10   CREDENTIALS THAT ESTABLISH THAT PEOPLE HAVE THAT CREDENTIAL SO

11   THAT THEY CAN BE PRIVILEGED TO WORK IN A CORRECTIONAL SETTING.

12         NOW, SOME PHYSICIANS WORKING IN CORRECTIONS WILL BE

13   DOING OTHER THINGS.  IF A DOCTOR IN CORRECTIONS JUST SEES

14   ORTHOPEDIC PATIENTS, THAT'S FINE; BUT THEIR CREDENTIAL THEN IS

15   NEEDING CREDENTIALS FOR ORTHOPEDICS.  IF YOU HAVE A PODIATRIST

16   WORKING IN A CORRECTIONAL SETTING, THEY WOULD NEED CREDENTIALS

17   TO VERIFY THAT THEY CAN UNDERTAKE PODIATRIC CARE.

18   Q.   AND WOULD SOMEBODY WHO HAS THOSE KIND OF CREDENTIALS,

19   LET'S SAY A PODIATRIST, WOULD THAT PERSON TYPICALLY BE

20   PRIVILEGED AND ALLOWED TO PROVIDE PRIMARY CARE?

21   A.   NO.

22   Q.   WHAT DID YOU OBSERVE AT LSP ABOUT CREDENTIALING AND

23   PRIVILEGING?

24   A.   WELL, THEY DON'T CREDENTIAL.  THERE'S NO CREDENTIALING

25   THAT I COULD FIND.  I WAS REFERRED TO THE CREDENTIAL FILES,

1   WHICH THE WARDEN'S SECRETARY HAD, OR ONE OF THE SECRETARIES

2   HAD, AND I LOOKED AT TWO FILES, AND IT ONLY CONTAINED FILES FOR

3   TWO OF THE DOCTORS, ONE OF WHOM WAS NO LONGER WORKING THERE,

4   AND THE OTHER WAS THE CREDENTIALS FOR DR. LAVESPERE WHO, AT

5   THAT TIME, WAS THE MEDICAL DIRECTOR BUT HE WAS -- IN THE

6   CREDENTIAL FILE, IT SAID HE WAS THE ASSISTANT MEDICAL DIRECTOR.

7   AND THE CREDENTIAL FILES HAD NO INFORMATION ABOUT THEIR

8   CREDENTIALS.  IT ONLY HAD A FORM THAT'S USED BY STATE

9   GOVERNMENT AS AN APPLICATION FORM, AND IT HAD NO CREDENTIALING

10   INFORMATION WITH RESPECT TO THEIR PROFESSIONAL CREDENTIALS.

11          MR. DUBNER:  AND IF YOU COULD BRING UP PX-2430056.

12   THANK YOU.

13   BY MR. DUBNER:

14   Q.   AND SO YOU REFERRED TO THE NCCHC STANDARDS.  ARE THESE THE

15   STANDARDS YOU WERE REFERRING TO?

16   A.   YES.

17   Q.   AND SO IF YOU COULD READ NO. 4 UNDER COMPLIANCE

18   INDICATORS.

19   A.   YES.  IT SAYS "THE HRA MAINTAINS VERIFICATION OF CURRENT

20   CREDENTIALS FOR ALL QUALIFIED HEALTHCARE PROFESSIONALS AT A

21   READILY ACCESSIBLE LOCATION."

22   Q.   AND IS THAT WHAT YOUR -- AND DID YOU FIND LSP TO BE

23   COMPLIANT WITH THAT HERE?

24   A.   NO.

25   Q.   DID YOU FIND THAT PHYSICIANS WERE PRACTICING OUTSIDE OF

1    WHAT THEY WOULD ORDINARILY BE ABLE TO BE PRIVILEGED FOR?

2    **A.**    WELL, REMEMBER, THERE WERE NO CREDENTIAL FILES SO I

3    COULDN'T KNOW WHAT CREDENTIALS PEOPLE HAD.  I WAS TOLD,

4    ANECDOTALLY, WHICH I DON'T CONSIDER COMPLETE VERIFICATION, THAT

5    ONE OF THE DOCTORS WAS A FAMILY PRACTITIONER; ONE WAS AN

6    INTERNIST; ONE WAS A PAIN MEDICINE DOCTOR; AND ONE WAS A REHAB

7    DOCTOR, SO I DON'T CONSIDER THAT VERIFIED INFORMATION BECAUSE

8    YOU REALLY NEED TO SEE NOT ONLY THE LICENSE, BUT THE

9    CERTIFICATES, THE NATIONAL PRACTITIONER DATABANK, ET CETERA.

10    BUT THAT COHORT IS NOT CONSISTENTLY APPROPRIATE FOR A

11    CORRECTIONAL SETTING.

12    **Q.**    ARE REHAB SPECIALISTS AND PAIN MANAGEMENT SPECIALISTS, ARE

13    THEY TYPICALLY PRIVILEGED TO PROVIDE INTERNAL -- PRIMARY CARE?

14    **A.**    NO.  BUT THE REHAB DOCTOR, FOR EXAMPLE, COULD HAVE WORKED

15    ON UNIT 2 PART-TIME, AND ADDRESS PEOPLE WITH DISABILITIES.

16    A PAIN MEDICINE DOCTOR, I WOULDN'T HIRE SOMEBODY LIKE THAT.

17    BUT THE FAMILY PRACTITIONER AND INTERNIST WOULD IF THEY HAD

18    COMPLETED THEIR TRAINING AND WERE PROPERLY CREDENTIALED.

19    **Q.**    AND FROM YOUR REVIEW, WERE THE DOCTORS WHO HAD TRAINED AS

20    PAIN MANAGEMENT AND REHAB SPECIALISTS, WERE THEY PROVIDING

21    PRIMARY CARE?

22    **A.**    YES.  EVERYONE WAS PROVIDING PRIMARY CARE.

23    **Q.**    AND YOU SPOKE OF THIS BRIEFLY EARLIER, BUT DID YOU SPEAK

24    WITH THE MEDICAL DIRECTOR ABOUT THE CREDENTIALING?  AND WHAT

25    WAS HE ABLE TO TELL YOU, IF ANYTHING, ABOUT THE CREDENTIALING

1   FILES?

2   **A.**   HE DIDN'T KNOW FOR SURE.  HE WAS THE ONE, I THINK, WHO

3   TOLD ME THAT ONE OF THE DOCTORS WAS A PAIN DOCTOR AND THE OTHER

4   DOCTOR WAS A REHAB DOCTOR, BUT HE WAS UNFAMILIAR WITH THEIR

5   CREDENTIALS AND JUST REFERRED ME TO THE SECRETARY.

6   **Q.**   LET'S TALK ABOUT DISCIPLINARY HISTORIES WHICH YOU ALSO

7   SAID WAS AN ASPECT OF CREDENTIALING.  DO MANY OF ANGOLA'S

8   PHYSICIANS HAVE DISCIPLINARY HISTORIES?

9   **A.**   THEY ALL HAD DISCIPLINARY HISTORIES.

10  **Q.**   WHEN THEY STARTED ANGOLA, DID MANY OF THEM HAVE RESTRICTED

11  LICENSES?

12  **A.**   YES.

13  **Q.**   DO YOU KNOW, DID ALL OF THEM HAVE RESTRICTED LICENSES?

14  **A.**   I BELIEVE THEY DID, YES.  AND SOME OF THEM, THEY REGAINED

15  THEIR STATURE EITHER -- DURING THE TIME THEY WERE WORKING.

16  **Q.**   AND WHEN THEY STARTED ANGOLA, COULD THEY HAVE PRACTICED

17  OUTSIDE OF AN INSTITUTIONAL SETTING?

18  **A.**   NO.

19  **Q.**   AND WHY IS THAT?

20  **A.**   'CAUSE THE STATE BOARD WOULDN'T ALLOW IT.

21  **Q.**   AND SO WHEN YOU SAY "THE STATE BOARD WOULDN'T ALLOW IT,"

22  WHAT ARE YOU REFERRING TO?

23  **A.**   THE STATE BOARD HAS A STATEMENT THAT SAYS ON THE BASIS OF

24  SAFETY, PATIENT SAFETY, THESE PEOPLE ARE NOT PERMITTED TO

25  PRACTICE IN THE COMMUNITY, BUT IT DOES PERMIT THEM TO PRACTICE

04:46    1    IN A CORRECTIONAL FACILITY.

2    Q.    AND DOES THAT CONCERN YOU, THE ALLOWANCE OF A PHYSICIAN

3    WHO IS PREVENTED FROM PROVIDING CARE IN THE COMMUNITY DUE TO

4    PATIENT SAFETY CONCERNS, PROVIDING CARE IN A PENITENTIARY?

5    A.    YES.  AND I MEAN, I'VE SEEN IT IN OTHER -- I'VE SEEN IT IN

6    CALIFORNIA, AND I BELIEVE CALIFORNIA CHANGED THAT LAW, BUT THE

7    CASE I WAS INVOLVED IN WAS A CLASS ACTION AND THE JUDGE

8    ACTUALLY REQUIRED THE STATE TO HIRE CREDENTIALED PEOPLE, BUT

9    THE -- YOU KNOW, THE NCCHC, IN THEIR STANDARDS, RECOMMENDS

10    AGAINST THAT, AND SAYS IT'S NOT A GOOD PRACTICE.

11    Q.    AND WE STILL HAVE, I BELIEVE, PLAINTIFF'S EXHIBIT 243,

12    PAGE 56.  COULD YOU READ NO. 5 IN THE COMPLIANCE INDICATORS?

13    A.    YES.  IT SAYS "A RESTRICTED LICENSE THAT LIMITS PRACTICE

14    TO CORRECTIONAL INSTITUTIONS IS NOT IN COMPLIANCE WITH THE

15    STANDARD."

16    Q.    IS THAT WHAT -- THE STANDARD THAT YOU WERE REFERRING TO?

17    A.    YES.

18    Q.    DOES IT CONCERN YOU THAT ALL OF THE PHYSICIANS AT ANGOLA

19    HAVE DISCIPLINARY HISTORIES?

20    A.    YES.

21    Q.    AND WHY IS THAT?

22    A.    I CAN SPEAK FOR MYSELF.  I'VE EMPLOYED OR WORKED IN

23    LOCATIONS WHERE A PHYSICIAN HAD A SUBSTANCE ABUSE PROBLEM.  AND

24    PERSONALLY, I DON'T BELIEVE THAT THAT'S NECESSARILY AN

25    IMPEDIMENT.  AND THIS PHYSICIAN WAS UNDER SUPERVISION, WAS

1   INVOLVED IN REHAB, HAD OCCURRED A WHILE AGO, THERE WAS

2   MONITORING THAT WAS ONGOING, AND WE PAID ATTENTION TO THAT.  HE

3   SPOKE WITH ME ABOUT IT, ET CETERA, SO I DON'T SEE THAT IT'S

4   NECESSARILY A PROBLEM, BUT WHEN THE ENTIRE STAFF IS, AND THE

5   LEADERSHIP IS, THEN THE SUPERVISION LEVEL HAS TO BE

6   CONSIDERABLE.  AND WE FOUND NO EVIDENCE OF EXTERNAL

7   SUPERVISION.

8            WE WERE TOLD THAT DR. SINGH DOES SUPERVISE, BUT WE

9   COULDN'T FIND EVIDENCE OF THE SUPERVISION IN ANY DOCUMENTATION.

10  AND IF IT OCCURRED, IT WASN'T REALLY ON SITE.

11           IT MAKES IT MORE DIFFICULT BECAUSE YOU HAVE A WHOLE

12  -- THE WHOLE STAFF, IT HAS THE SAME PROBLEM, AND IT BECOMES

13  MUCH MORE DIFFICULT TO ENSURE THAT THE -- ANY DIFFICULTIES WITH

14  RESPECT TO THE CHARACTEROLOGICAL ISSUES THAT MAY ARISE ARE

15  GOING TO BE ADDRESSED.

16  **Q.**   WHAT WOULD THAT SUPERVISION AND MONITORING NORMALLY

17  CONSIST OF?

18  **A.**   WELL, STATE LAW REGULATES SOME OF IT.  SO DURING THE

19  PERIOD WHEN THERE'S A RESTRICTION, STATE LAW GENERALLY

20  ESTABLISHES THE MONITORING REQUIREMENTS.  I MEAN, FOR SOME

21  PHYSICIANS, IT MAY BE TAKING MEDICATION, IT MIGHT BE ATTENDING

22  CERTAIN COUNSELING SESSIONS, ET CETERA.

23           BUT FROM MY PERSPECTIVE, IT'S A PATIENT SAFETY ISSUE.

24  SO IT'S MORE THAT YOU WOULD PAY ATTENTION TO THE QUALITY OF

25  PATIENT CARE ASPECTS THAT I FEEL IS MOST IMPORTANT.  SO WHEN A

1  PATIENT -- WHEN A DOCTOR CAN'T PERFORM APPROPRIATELY AND

2  PATIENT ERRORS ARE MADE, THAT'S A PROBLEM, AND SO THERE HAS TO

3  BE MUCH MORE ATTENTION TO THAT.

4  **Q.**   IS THERE ANYTHING ABOUT A CORRECTIONAL SETTING IN

5  PARTICULAR THAT MAKES IT MORE PROBLEMATIC IN SOME WAYS THAN IN

6  THE OUTSIDE COMMUNITY FOR A SIGNIFICANT NUMBER OF PROVIDERS TO

7  HAVE DISCIPLINARY HISTORIES?

8  **A.**   I MEAN, NOT NECESSARILY, NO.

9  **Q.**   WHAT WOULD SOMEBODY IN THE COMMUNITY DO, IN YOUR

10  EXPERIENCE, TO DETERMINE WHAT THE DISCIPLINARY HISTORY OF A

11  PROVIDER WAS?

12  **A.**   WELL, ONCE THE BOARD PROMULGATES A DECISION, IT'S PUBLIC

13  KNOWLEDGE.  I MEAN, I FOUND OUT ABOUT ALL THE ANGOLA PROVIDERS

14  'CAUSE I JUST WENT TO THE WEBSITE OF THE MEDICAL BOARD, AND

15  THEY PUBLISH THE SANCTION.

16  **Q.**   AND WHAT ABILITY DO PATIENTS IN THE COMMUNITY OR PEOPLE

17  SEEKING MEDICAL CARE HAVE TO CHOOSE BETWEEN DOCTORS WHO MAY OR

18  MAY NOT HAVE A DISCIPLINARY HISTORY?

19  **A.**   I THINK IT'S OBVIOUS.  I MEAN, IF YOU KNOW THAT THEY HAVE

20  IT, YOU CAN EITHER GO TO THEM OR NOT.

21  **Q.**   DOES THAT OPTION EXIST, IN YOUR EXPERIENCE, FOR PEOPLE IN

22  A CORRECTIONAL SETTING?

23  **A.**   NO.

24  **Q.**   SO YOU SAID THAT ALL OF THE PHYSICIANS HAVE A DISCIPLINARY

25  HISTORY AT ANGOLA.  HAVE YOU SEEN ANY OTHER FACILITIES WHERE

04:51

1  ALL OF THE PROVIDER STAFF OR ALL THE PHYSICIAN STAFF HAS A

2  DISCIPLINARY HISTORY, OR HAVE DISCIPLINARY HISTORIES, I SHOULD

3  SAY?

4  **A.**   NO.  NOT THE ENTIRE STAFF, NO.

5  **Q.**   HAVE THERE BEEN ANYWHERE A SIGNIFICANT PORTION OF THE

6  STAFF DO?

7  **A.**   NO.

8  **Q.**   OKAY.  AND YOU REFERENCED EARLIER YOUR WORK IN CALIFORNIA.

9  DID YOU OBSERVE PROBLEMS ALONG THESE LINES IN CALIFORNIA?

10 **A.**   SO IT WAS VERY SIMILAR.  IN 2004, I THINK, WHEN I FIRST

11 WENT INTO CALIFORNIA, WE DID MORTALITY REVIEWS AND WE DID

12 CREDENTIALING REVIEWS, AND THERE WERE APPROXIMATELY 36 PERCENT

13 OR SOMETHING OF THE DEATHS WERE PREVENTABLE AND THE JUDGE

14 ORDERED A SECONDARY EVALUATION BY UC SAN DIEGO.  THEY CONCURRED

15 WITH OUR FINDINGS.  THE PHYSICIANS -- WE DID A REVIEW OF

16 CREDENTIALING AND FOUND THAT INDEED THE STATE HAD THE SAME

17 SYSTEM OF ALLOWING PROVIDERS TO WORK WHO HAD SANCTIONS, AND IT

18 WAS THE ONLY PLACE THEY COULD WORK.  AND THEY HAD A SIMILAR

19 SITUATION WHERE THEY HAD OBSTETRICIANS, NEUROSURGEONS,

20 CARDIOTHORACIC SURGEONS, WHO WERE RETIRED OR ELDERLY WHO WERE

21 PERFORMING PRIMARY CARE.  AND MANY OF THOSE PHYSICIANS WERE

22 RESPONSIBLE FOR PREVENTABLE DEATH.

23        AND OUR RECOMMENDATION TO THE JUDGE WAS TO INSTITUTE

24 CREDENTIALING, WHICH HE DID IN AN ORDER, BECAUSE IN HIS

25 OPINION, IT WAS -- THE CARE WAS RELATED TO HARM AND,

1    SPECIFICALLY, DEATH.

2           AND, INDEED, ONE OF THE SUBSEQUENT MEDICAL DIRECTORS

3    DID A STUDY THAT'S -- I THINK HE PUBLISHED IT, AND HE LOOKED --

4           **MR. ARCHEY:**  I OBJECT IF IT'S NOT SOMETHING THAT'S

5    BEEN PRODUCED OR A PART OF THE RECORD OR WHAT HAVE YOU.

6           **THE WITNESS:**  AND WE DIDN'T PRODUCE IT.

7           **MR. DUBNER:**  I DON'T THINK WE DID WITH THIS

8    PARTICULAR STUDY, SO WE CAN MOVE ON.

9           **THE WITNESS:**  YEAH, OKAY.  I MEAN, I CAN LEAVE IT.  I

10   MEAN, IT DOESN'T --

11          **THE COURT:**  MOVE ON TO THE NEXT LINE OF QUESTIONING.

12          **THE WITNESS:**  OKAY.

13          **THE COURT:**  WE'RE GOING TO BREAK IN ABOUT FIVE

14   MINUTES.

15          **MR. DUBNER:**  SURE THING.  WE'LL WRAP UP THIS TOPIC.

16   **BY MR. DUBNER:**

17   **Q.**   YOU ALSO REFERRED A MOMENT AGO TO THE LEADERSHIP HAVING

18   DISCIPLINARY HISTORIES.  WHO WERE YOU REFERRING TO THERE?

19   **A.**   DR. LAVESPERE.

20   **Q.**   AND JUST FOR A CLEAR RECORD, DOES DR. LAVESPERE HAVE A

21   DISCIPLINARY HISTORY AS WELL?

22   **A.**   HE DOES.

23   **Q.**   AND IN WHAT WAYS, IF ANY, DOES IT CONCERN YOU FOR A

24   MEDICAL DIRECTOR TO HAVE THE KIND OF DISCIPLINARY HISTORY THAT

25   YOU REVIEWED?

**A.**   WELL, IT WAS RELATED TO SUBSTANCES, AND WE WERE MORE
CONCERNED PARTICULARLY GIVEN COMMENTS IN THE DEPOSITION AND
COMMENTS THAT ARE CITED IN THE REPORT THAT INDICATE AN ATTITUDE
POTENTIALLY TOWARD INMATES THAT, YOU KNOW, THEY'RE JUST INMATES
AND, THEREFORE, YOU KNOW, ONE WOULD EXPECT PROBLEMS ON THE
INFIRMARY WITH INMATES TAKING CARE OF THEM, AND I DON'T TRUST
INMATES, SO FORTH AND SO ON.

          THE CITATIONS IN THE REPORT OF THE MEDICAL BOARD
RELATED TO MENTAL HEALTH ISSUES GAVE US CONCERN THAT PERHAPS
THOSE CHARACTER ISSUES MAY AFFECT THE PERFORMANCE AND MAY
AFFECT THE LEADERSHIP DECISIONS AND SOME OF THE COMMENTS THAT
MIGHT ADVERSELY AFFECT MEDICAL CARE.

**Q.**   AND ARE THE CONCERNS THAT YOU HAD ABOUT THAT HISTORY AND
ABOUT THE BOARD'S FINDINGS, ARE THEY CONSISTENT WITH WHAT YOU
OBSERVED IN THE RECORD REVIEW?

**A.**   YES.

**Q.**   ARE THEY CONSISTENT WITH WHAT YOU REVIEWED AS TO WHAT YOU
CONCLUDED AS TO SUPERVISION OF OTHER PHYSICIANS?

**A.**   YES.

**Q.**   AND ARE THERE WAYS IN WHICH THE DISCIPLINARY HISTORIES
THAT YOU'VE SPOKEN ABOUT AND THE TRAINING ISSUES THAT YOU'VE
SPOKEN ABOUT, ARE THERE WAYS THAT THEY INTERACT WITH EACH OTHER
TO GIVE YOU CONCERNS?

**A.**   CAN YOU REPEAT THAT?

**Q.**   WE'LL MOVE ON.  IT'S NOT A GREAT QUESTION FOR 4:55.

1    **MR. DUBNER:**  WE'RE ACTUALLY DONE WITH THIS SECTION,

2  YOUR HONOR, AND SO --

3    **THE COURT:**  LET'S TAKE A BREAK UNTIL -- WE ARE GOING

4  TO RECONVENE AT 9:30 IN THE MORNING.  THE COURT HAS ANOTHER

5  OBLIGATION AT 8:30 THAT REQUIRES ATTENTION, SO WE WILL

6  RECONVENE AT 9:30.  WE WILL STAND IN ADJOURNMENT UNTIL THEN.

7              **(PROCEEDINGS RECESSED UNTIL 10/10/2018.)**

8                        **CERTIFICATE**

9       I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

10  UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

11  CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

12  THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

13  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15                    *Shannon Thompson*

16                    SHANNON THOMPSON, CCR,

17                    OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25