1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF LOUISIANA

3

4    JOSEPH LEWIS JR., ET AL      *    CIVIL ACTION

5    VERSUS                       *    NO. 15-318

6    BURL CAIN, ET AL             *    OCTOBER 10, 2018

7    * * * * * * * * * * * * * *

8

9                              DAY 2
                        BENCH TRIAL BEFORE
10                 THE HONORABLE SHELLY D. DICK
               UNITED STATES CHIEF DISTRICT JUDGE
11

12   APPEARANCES:

13   FOR THE PLAINTIFFS:          THE PROMISE OF JUSTICE
                                  INITIATIVE
14                                BY:  MERCEDES H. MONTAGNES, ESQ.
                                       AMANDA C. ZARROW. ESQ.
15                                     MEREDITH ANGELSON, ESQ.
                                       NISHI KUMAR, ESQ.
16                                636 BARONNE STREET
                                  NEW ORLEANS, LOUISIANA 70113
17
                                  ACLU OF LOUISIANA
18                                BY:  BRUCE W. HAMILTON, ESQ.
                                  P.O. BOX 56157
19                                NEW ORLEANS, LOUISIANA 70156

20                                COHEN MILSTEIN SELLERS & TOLL
                                  PLLC
21                                BY:  JEFFREY B. DUBNER, ESQ.
                                  1100 NEW YORK AVE NW, SUITE 500
22                                WASHINGTON, DC 20005

23                                THE CAPITAL APPEALS PROJECT
                                  BY:  ERICA L. NAVALANCE, ESQ.
24                                636 BARONNE STREET
                                  NEW ORLEANS, LOUISIANA 7013

25

```
 1                                    SOUTHERN POVERTY LAW CENTER
                                      BY:   JARED F. DAVIDSON, ESQ.
 2                                          JAMILA A. JOHNSON, ESQ.
                                      1055 ST. CHARLES AVE., SUITE 505
 3                                    NEW ORLEANS, LOUISIANA 70130

 4   FOR THE DEFENDANTS:             KANTROW SPAHT WEAVER &
                                      BLITZER
 5                                    BY:   RANDAL J. ROBERT, ESQ.
                                            CONNELL L. ARCHEY, ESQ.
 6                                          KEITH FERNANDEZ, ESQ.
                                      P.O. BOX 2997
 7                                    BATON ROUGE, LOUISIANA 70821

 8                                    SHOWS CALI & WALSH LLP
                                      BY:   MARY E. ROPER, ESQ.
 9                                          JOHN C. CONINE JR., ESQ.
                                            CAROLINE T BOND, ESQ.
10                                          JEFFREY K. CODY, ESQ.
                                      628 ST. LOUIS STREET
11                                    BATON ROUGE, LOUISIANA 70802

12   OFFICIAL COURT REPORTER:        SHANNON L. THOMPSON, CCR.
                                      UNITED STATES COURTHOUSE
13                                    777 FLORIDA STREET
                                      BATON ROUGE, LOUISIANA 70801
14                                    (225) 389-3567

15        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                  COMPUTER-AIDED TRANSCRIPTION SOFTWARE
16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2                                                    PAGE

3  PLAINTIFFS' WITNESSES

4   MICHAEL PUISIS, D.O.

5    DIRECT EXAMINATION CONTINUED BY MR. DUBNER      11

6    CROSS-EXAMINATION BY MR. ARCHEY                 51

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **(OCTOBER 10, 2018)**

2           **THE COURT:**  GOOD MORNING.  BE SEATED.

3                SORRY FOR THE LATE START, BUT HOPEFULLY YOU GOT

4   TO USE IT TO YOUR ADVANTAGE.  THERE WERE TWO -- A MATTER OF

5   HOUSEKEEPING.  TWO EXHIBITS LISTS FILED LAST NIGHT, A JOINT

6   EXHIBIT LIST REVISED AND A PLAINTIFFS' FINAL EXHIBIT LIST,

7   RECORD DOCUMENTS 518 AND 519.  ARE THERE ANY DIFFERENCES IN

8   WHAT WAS PLACED ON THE RECORD YESTERDAY?

9           **MS. MONTAGNES:**  THE ONLY DIFFERENCE, YOUR HONOR, IS

10  THAT BECAUSE OF A MIX-UP OF BACK AND FORTH OF WITNESS LISTS,

11  265 IS NO LONGER -- WE WANT TO UN-ADMIT THAT FROM EVIDENCE,

12  PLAINTIFFS' EXHIBIT 265.

13          **THE COURT:**  OKAY.

14          **MS. MONTAGNES:**  OKAY.  IT WAS TAKEN OUT.

15               AND THEN THIS WAS BECAUSE YOUR HONOR ASKED US TO

16  SUBMIT THE LIST OF WHAT WAS SEALED AND UNSEALED INTO THE

17  RECORD, SO PLAINTIFFS DID PLAINTIFFS' LIST AND THE JOINT LIST,

18  JUST SO THAT THE COURT HAD RECORD OF WHAT WAS SUPPOSED TO BE

19  SEALED, AND WE'RE JUST WORKING TO FINE TUNE A FEW DETAILS WITH

20  BARBARA ON THAT.

21          **THE COURT:**  PERFECT.  THANK YOU VERY MUCH.

22          **MR. ROBERT:**  YOUR HONOR, CAN I JUST ADD BEFORE WE --

23          **THE COURT:**  YOU MAY.

24          **MR. ROBERT:**  SHE REVISED THE WITNESS LIST TO

25  RECOGNIZE THAT ERROR THAT WAS MADE.

10:02   1          THE COURT:  THE EXHIBIT LIST?

2          MR. ROBERT:  THE EXHIBIT LIST.  I'M SORRY.

3          THE COURT:  IT'S OKAY.

4          MR. ROBERT:  THE ERROR THAT WAS MADE BY PLAINTIFFS IN

5    TAKING THAT OFF OF THE LIST.  WHAT WE NEED NOW -- BECAUSE WE

6    FOUND THIS ERROR OF SOMETHING THAT WAS OBJECTED TO AND WAS

7    SOMEHOW REMOVED FROM THE EXHIBIT LIST, WE NEED NOW TO GO

8    THROUGH THOSE UN-OBJECTED TO EXHIBITS AND MAKE SURE THERE

9    AREN'T ANY MORE INADVERTENT MISTAKES OF THINGS THAT WERE TAKEN

10   OFF THE LIST.  AND WE'RE GOING TO DO THAT, AND WE'LL NOTIFY THE

11   COURT PROMPTLY IF THERE'S ANYTHING ELSE LIKE THAT THAT NEEDS TO

12   BE ADDRESSED.  BUT WE NEED -- JUST NEED THE OPPORTUNITY TO BE

13   ABLE TO REVIEW THOSE IN THE EVENING AND DETERMINE -- MAKE SURE

14   THERE'S NO OTHER MISTAKES.

15          MS. MONTAGNES:  SO I TAKE ISSUE WITH HIS

16   CHARACTERIZATION OF WHAT HAPPENED, BUT I DON'T THINK IT'S WORTH

17   GETTING INTO THE BACK AND FORTH ABOUT IT.

18          THE COURT:  ALL RIGHT.

19          MS. MONTAGNES:  BUT PLAINTIFFS ARE FINE.  IF

20   DEFENDANTS DON'T INTEND FOR AN EXHIBIT TO BE UN-OBJECTED TO, WE

21   HAVE NO INTEREST IN TRYING TO DO ANYTHING.  WE'VE BEEN AS

22   TRANSPARENT AS WE CAN BE, AND THAT'S ALL I CAN SAY ABOUT THAT.

23          THE COURT:  GOOD.  WE WILL JUST CONTINUE TO WORK

24   TOGETHER.

25          MR. ROBERT:  THANK YOU, YOUR HONOR.

10:03   1              THE COURT:  WE CAN PROCEED.

        2              YOUR WITNESS, MR. DUBNER.

        3         MR. DUBNER:  THANK YOU.  AND, FIRST, JUST TWO

        4    HOUSEKEEPING MATTERS FROM YESTERDAY.  THE FIRST IS WITH REGARD

        5    TO THE PLAINTIFF IDENTIFIERS OR THE PLAINTIFFS WHO ARE BEING --

        6    THE PATIENTS WITHIN THE EXPERT'S SAMPLE WHO ARE BEING

        7    IDENTIFIED ONLY BY PATIENT NUMBERS.  WE HAVE A LIST OF WHO EACH

        8    OF THOSE PATIENTS IS SO THAT THEY CAN BE CORRELATED TO THE

        9    MEDICAL RECORDS.  WE'RE INTRODUCING THIS AS JX-146.  DEFENDANTS

       10    HAVE INDICATED THAT THEY HAVE NO OBJECTION TO THAT BEING

       11    INTRODUCED AS A JOINT EXHIBIT AND OFFERED INTO EVIDENCE.

       12              MR. ARCHEY:  UNDER SEAL AS WELL, YOUR HONOR.

       13              MR. DUBNER:  UNDER SEAL, YES.

       14              THE COURT:  I WAS GOING TO SAY, IF IT HAS THEIR NAMES

       15    AND THEIR EXHIBIT NUMBERS.  SO IT WILL BE ADMITTED UNDER SEAL.

       16              AND WHAT'S YOUR EXHIBIT NUMBER AGAIN?

       17    PLAINTIFFS' EXHIBIT . . .

       18              MR. DUBNER:  IT'S JOINT EXHIBIT 146.

       19              MR. ARCHEY:  WE HAVE NO OBJECTION, YOUR HONOR.

       20              THE COURT:  JOINT EXHIBIT 146 IS ADMITTED UNDER SEAL.

       21              MS. MONTAGNES:  AND, YOUR HONOR, I'M SORRY, I SPOKE

       22    TOO SOON.  IN ORDER FOR PLAINTIFFS TO HAVE -- YOU KNOW, WE'VE

       23    RELIED ON THESE LISTS, WE'VE PROVIDED THEM TO THE DEFENDANTS A

       24    LONG TIME AGO, WE NOTED WHAT WAS UN-OBJECTED TO, AND WE

       25    UNDERSTAND THAT THERE MAY HAVE BEEN SOME ERRORS AND THEY DIDN'T

10:04   1   LOOK AT IT AT THAT TIME BUT THEY ARE LOOKING AT IT NOW, BUT TO

2   SAY -- WE JUST NEED A DEADLINE BECAUSE IT'S GOING TO AFFECT WHO

3   WE'RE GOING TO CALL IN THIS CASE.  AND THE WHOLE PURPOSE OF

4   DOING THIS IN ADVANCE WAS, YOU KNOW, SO THAT WE COULD

5   UNDERSTAND WHO WE NEEDED TO CALL, AND SO IF THEY COULD PROVIDE

6   IT TO US BY MID-DAY TOMORROW, THAT WOULD BE REASONABLE.

7         THE COURT:  THEY ACTUALLY ASKED FOR -- HE ASKED FOR

8   THIS EVENING.  SO WHAT ARE YOU ASKING FOR, MR. ROBERT?

9         MR. ROBERT:  JUDGE, THIS EVENING IS FINE.  THAT'S

10   FINE.  BUT IT'S SOMETHING THAT WE'VE GOT TO DO NOW THAT WE

11   SHOULDN'T HAVE TO DO, BUT WE'RE GOING TO DO IT.  WE'LL DO IT IN

12   WHATEVER TIME FRAME YOU WANT.

13         THE COURT:  LET'S NOT NAME-CALL AND POINT FINGERS,

14   AND I REALIZE YOU WEREN'T NAME-CALLING, BUT LET'S JUST -- WE'RE

15   GOING TO BE HERE FOR THREE WEEKS AND WE NEED TO GET ALONG.

16   OKAY?  SO GIVE HER WHATEVER OBJECTIONS YOU HAVE BY OPENING OF

17   COURT TOMORROW MORNING.

18         MR. ROBERT:  OKAY.  THANK YOU, YOUR HONOR.

19         THE COURT:  ANYTHING ELSE?

20         MR. DUBNER:  FIRST, I'M JUST HANDING TO MS. ALCON

21   BOTH A USB DRIVE AND A PRINTED COPY OF JX-146.

22         THE COURT:  ALL RIGHT.

23         MR. DUBNER:  AND THEN THERE WAS ONE MATTER THAT WE

24   WANTED TO REVISIT FROM YESTERDAY, WHICH WAS THE MATTER ABOUT

25   THE PLAINTIFFS' EXPERT'S REBUTTAL REPORT.  AND, YOU KNOW, I MAY

1   NOT HAVE FULLY EXPLAINED THE CIRCUMSTANCES OF THAT.  THAT WAS A

2   REBUTTAL REPORT THAT WAS PREPARED BEFORE THE EXPERTS WERE EVER

3   DEPOSED.  IT WAS PRODUCED TO DEFENDANTS TWO YEARS AGO IN, I

4   BELIEVE, NOVEMBER OF 2016, AND YOU KNOW, IN TERMS OF USING IT

5   IN THE EXPERT'S DIRECT, IT WOULD SEEM TO BE IN THE INTEREST OF

6   JUDICIAL EFFICIENCY IN LIMITING THE AMOUNT THAT THEY MIGHT HAVE

7   TO DO ON REBUTTAL IF THE EXPERTS DO COME BACK AT THE END OF

8   TRIAL.  WE DON'T BELIEVE THERE'S ANY PREJUDICE GIVEN THAT THIS

9   IS SOMETHING THAT DEFENDANTS HAVE HAD FOR TWO YEARS NOW AND

10  THAT THEY HAD THE OPPORTUNITY TO AND DID DEPOSE THE EXPERTS ON.

11  AND SO, YOU KNOW, WE DO BELIEVE THAT IT WOULD BE APPROPRIATE

12  FOR THE EXPERTS TO BE ABLE TO TESTIFY TO THAT.  IT'S NOT

13  SOMETHING WE'RE GOING TO BE RELYING ON HEAVILY, IN ANY EVENT.

14  IT'S ALSO IN EVIDENCE ALREADY.  IT WAS INTRODUCED AND OFFERED

15  AS PART OF THE UN-OBJECTED TO LIST, AND SO -- AND, I DON'T

16  BELIEVE, HAS EVER HAD AN OBJECTION FROM DEFENDANTS.  SO WE

17  WOULD JUST RESPECTFULLY ASK THAT THE COURT RECONSIDER THAT

18  RULING.

19            **THE COURT:**  MR. ARCHEY, YOU WANT TO RESPOND?

20            **MR. ARCHEY:**  YOUR HONOR, IT'S NOT THE MATTER OF THE

21  PREJUDICE OR NOTICE, ALL THAT'S TRUE.  IT'S A MATTER OF THE

22  DEADLINES FOR DISCLOSING EXPERT OPINIONS AS THIS COURT'S

23  ADDRESSED THROUGHOUT THIS CASE.  IF YOU DON'T MAKE THE

24  DEADLINE, THEN THOSE OPINIONS DON'T COME IN.  THAT'S WHAT

25  HAPPENED HERE.

10:06   1          IN THEIR ORIGINAL REPORT, THEY DIDN'T ADDRESS
2    ANY OF THIS.  THIS ISN'T APPROPRIATE REBUTTAL TO COME IN.  OUR
3    EXPERTS MAKE SOME COMMENTS, AND THEY COME IN WITH THESE LIKE
4    THIS THAT WASN'T IN THE ORIGINAL REPORT, AND IT SHOULD HAVE
5    BEEN IN THE ORIGINAL REPORT, AND IT WAS NOT.
6          **THE COURT:**  WELL, THERE WASN'T --
7          **MR. ARCHEY:**  AND SO NOW OUR EXPERT DOES NOT HAVE AN
8    OPPORTUNITY TO GO BACK AND RESPOND TO THIS NEW INFORMATION
9    THAT'S, QUOTE, IN THE REBUTTAL.
10          **THE COURT:**  OKAY.
11          **MR. ARCHEY:**  THAT'S THE PROBLEM.  THAT'S THE
12    PREJUDICE.
13          **THE COURT:**  WELL, THERE WASN'T A DEADLINE FOR
14    REBUTTAL REPORTS, AND IF THEY GAVE A REBUTTAL REPORT IN
15    RESPONSE OR DR. PUISIS SPECIFICALLY GAVE A REBUTTAL REPORT IN
16    RESPONSE TO YOUR EXPERT'S REPORT, I WOULD LET HIM COME IN ON
17    REBUTTAL.  SO THE QUESTION IS JUST REALLY A QUESTION OF TIMING.
18    ARE WE GOING TO LET HIM DO IT NOW ON DIRECT, OR ARE WE GOING TO
19    WAIT AND LET HIM DO IT ON REBUTTAL?  BUT THE COURT'S INCLINED
20    TO LET HIM GIVE REBUTTAL OPINION TESTIMONY IN REBUTTAL OF
21    WHATEVER ADMISSIBLE OPINION TESTIMONY YOUR EXPERT HAS.
22          **MR. ARCHEY:**  YOUR HONOR, AND I SPOKE WITH COUNSEL AND
23    WE RECOGNIZE SOME OF THE EFFICIENCIES WITH THAT.  WE'RE GOING
24    TO MAINTAIN OUR OBJECTION 'CAUSE WE THINK IT'S BEYOND THE SCOPE
25    OF AN APPROPRIATE REBUTTAL.  IF THE COURT RULES AS YOU DO, THEN

10:08  1    LET'S PROCEED AS ALONG THESE LINES, SO . . .

2              **THE COURT:**  ALL RIGHT.  THEN LET'S JUST MAKE -- LET'S

3    TRY TO DO IT EFFICIENTLY.  GO AHEAD AND GO INTO THE REBUTTAL,

4    MAKE YOUR OBJECTIONS FOR THE RECORD, I'LL RULE ON THEM, AND

5    THEN YOU CAN PRESERVE THEM FOR THE RECORD.

6              **MR. DUBNER:**  THANK YOU, YOUR HONOR.  AND JUST TO

7    CLARIFY ONE POINT.  THERE WAS A DEADLINE FOR THE REBUTTAL

8    REPORT.  THE PARTIES NEGOTIATED IT AND, I BELIEVE, IT WAS

9    ORDERED BY THE COURT PRIOR TO YOUR HONOR TAKING OVER THE CASE.

10   WE COULD FIND A DOCKET ENTRY IF IT WOULD BE HELPFUL.

11             **THE COURT:**  I DON'T KNOW WHAT THE BACK FEED IS.  IT

12   DOESN'T MATTER.

13             SO IT'S YOUR CONTENTION THAT THERE WAS A

14   REBUTTAL DEADLINE WHEN THE PRIOR JUDGE WAS HANDLING IT, AND

15   Y'ALL COMPLIED WITH THAT DEADLINE?

16             **MR. DUBNER:**  YES, YOUR HONOR.  WE CAN PULL IT UP AT

17   THE BREAK.

18             **THE COURT:**  WELL, THE COURT'S INCLINED TO LET YOU

19   MOVE FORWARD AND GO AHEAD AND DO IT ON DIRECT RATHER THAN

20   REBUTTAL SO THAT WE CAN GO ON AND MAKE SOME HAY WHILE THE SUN

21   IS SHINING.

22             **MR. ARCHEY:**  DO I NEED TO MAKE MY OBJECTION AT THAT

23   TIME, OR IS THIS SUFFICIENT, YOUR HONOR?

24             **THE COURT:**  THIS IS SUFFICIENT.  YOUR OBJECTION IS

25   NOTED FOR THE RECORD.

10:09   1          **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

2          **THE COURT:**  PROCEED.

3                   **DIRECT EXAMINATION CONTINUED**

4     BY MR. DUBNER:

5     **Q.**   GOOD MORNING, DR. PUISIS.

6     **A.**   GOOD MORNING.

7     **Q.**   THERE ARE A FEW BRIEF THINGS THAT I JUST WANT TO TOUCH ON

8     FROM YESTERDAY.  THE FIRST, WE SPOKE AT THE BEGINNING OF THE

9     EXAMINATION BRIEFLY ABOUT THE NAMED PLAINTIFFS.  DO YOU INCLUDE

10    THE NAMED PLAINTIFFS AS PART OF YOUR SAMPLE IN THIS CASE?

11    **A.**   NO.

12    **Q.**   AND WHY NOT?

13    **A.**   BECAUSE WE PICKED RECORDS FROM LISTS THAT WERE GIVEN TO

14    US.

15    **Q.**   AND DID YOU SUBSEQUENTLY REVIEW THE NAMES -- SOME OF THE

16    NAMED PLAINTIFFS' RECORDS?

17    **A.**   I MET SEVERAL NAMED PLAINTIFFS AT THE FACILITY, AND WHEN I

18    INTERVIEWED THEM I HAD THEIR RECORD PRESENT.

19    **Q.**   AND UNDERSTANDING THAT -- AND DID YOU ALSO REVIEW SOME OF

20    THE RECORDS IN RESPONSE TO DR. THOMAS' REPORT?

21    **A.**   THAT'S CORRECT.

22    **Q.**   AND I UNDERSTAND THAT THEY WEREN'T PART OF YOUR SAMPLE.

23    DID YOU FIND THE CARE THERE TO BE CONSISTENT WITH WHAT YOU SAW

24    ON YOUR SAMPLE?

25    **A.**   IT WAS.

10:10   1   **Q.**   THANK YOU.  I'D ALSO LIKE TO TALK ABOUT THE ISSUE OF
2   PATIENTS REFUSING MEDICAL CARE.  WHAT IS THE STANDARD PRACTICE
3   FOR A PRACTITIONER IN CORRECTIONAL MEDICINE WHEN A PATIENT
4   REFUSES MEDICAL CARE?
5   **A.**   TYPICALLY, A REFUSAL FORM IS SIGNED FOR EACH REFUSAL, AND
6   FOR CERTAIN ITEMS, WHEN PATIENTS REFUSE REPEATEDLY, NURSES WILL
7   NOTIFY A PHYSICIAN WHO WILL MEET WITH THE PATIENT AND DOCUMENT
8   A DISCUSSION TO TRY TO DETERMINE WHY THE PATIENT IS REFUSING.
9   **Q.**   AND WHAT ARE SOME OF THE THINGS THAT THEY SHOULD BE
10   DISCUSSING AT THAT TIME?
11   **A.**   WELL, FOR INSTANCE, IF A PATIENT REFUSES INSULIN AND THE
12   PATIENT IS A TYPE I DIABETIC, THE PATIENT COULD DIE IF THEY
13   DON'T TAKE INSULIN; SO THE DOCTOR HAS TO DISCUSS THAT WITH THE
14   PATIENT.  THE DOCTOR WOULD DISCUSS POTENTIAL PATIENT HARMS AND
15   CONSEQUENCES AND TRY TO ELICIT THE REASONS WHY THEY REFUSED.
16   **Q.**   AND WHAT IF THE REFUSAL IS SOMETHING TO DO WITH THE
17   DIFFICULTY OF GETTING THE SERVICE OR THE BURDEN OF GETTING THE
18   SERVICE?
19   **A.**   I'M NOT SURE I UNDERSTAND THE QUESTION.
20   **Q.**   AS A HYPOTHETICAL, IF A PATIENT SAYS THAT THE DISTANCE
21   THEY HAVE TO TRAVEL OR THE COMFORT AND SAFETY OF THE MECHANISM
22   OF TRAVEL IS WHY THEY ARE NOT -- WHY THEY ARE REFUSING, WHAT
23   WOULD YOU THINK SHOULD HAPPEN IN THAT CIRCUMSTANCE?
24   **A.**   WELL, I THINK YOU SHOULD TAKE THAT INTO CONSIDERATION.  IF
25   THE OBJECTION IS A TRUE BARRIER TO CARE, OBVIOUSLY THAT WOULD

10:12

1   BE AN IDENTIFICATION OF A PROBLEM THAT SHOULD BE WORKED OUT

2   THROUGH A QUALITY COMMITTEE, AND IF IT'S A TRUE BARRIER CAUSED

3   BY THE SYSTEM, THAT SHOULD BE TAKEN INTO CONSIDERATION.

4   **Q.**   AND LET'S MOVE TO ONE MORE CLEAN-UP PIECE.  YOU SPOKE

5   ABOUT THE IMPORTANCE OF PATIENTS ON THE INFIRMARY BEING WITHIN

6   SIGHT AND SOUND OF -- SIGHT OR SOUND OF NURSES ON THE INFIRMARY

7   AT ALL TIMES.  IS THAT CORRECT?

8   **A.**   THAT'S CORRECT.

9           **MR. DUBNER:**  AND IF WE COULD BRING UP PLAINTIFFS'

10  EXHIBIT 6 AT PAGE 81.

11  **BY MR. DUBNER:**

12  **Q.**   DO YOU REPORT ANY INCIDENCES OF THIS PRINCIPLE NOT BEING

13  FOLLOWED IN YOUR -- THIS STANDARD NOT BEING FOLLOWED IN YOUR

14  REPORT?  AND I'LL DRAW YOUR ATTENTION TO A SENTENCE ABOUT

15  TWO-THIRDS OF THE WAY -- THREE QUARTERS OF THE WAY DOWN THE

16  PAGE THAT BEGINS WITH "HE WAS PLACED IN A LOCKED ISOLATION

17  ROOM . . ."

18  **A.**   NO, THAT'S TRUE.  THIS IS A CASE OF AN INMATE WHO WAS IN

19  ONE OF THE SINGLE ROOMS, AND THE INMATE SAID THAT HE HAD A

20  TRACH TUBE AND BECAME CLOGGED AND HE HAD TROUBLE BREATHING.

21  THAT'S REALLY DANGEROUS IN THIS CASE BECAUSE IF THE TRACH TUBE

22  BECOMES BLOCKED, HE CAN'T EVEN SCREAM.  SO IT WAS DANGEROUS.

23  **Q.**   OKAY.  LET'S MOVE BACK TO WHERE WE WERE WHEN WE LEFT OFF

24  YESTERDAY.

25          **MR. DUBNER:**  IF YOU COULD BRING UP DEMONSTRATIVE 44,

1    MARTHA.

2              THE COURT:  WHAT'S YOUR EXHIBIT NUMBER?

3              MR. DUBNER:  OH, THIS IS A DEMONSTRATIVE EXHIBIT.

4    THIS IS NOT --

5              THE COURT:  OH, YOU DON'T HAVE IT ADMITTED?

6              MR. DUBNER:  NO.

7              THE COURT:  OKAY.

8    BY MR. DUBNER:

9    Q.   SO YESTERDAY YOU WERE DISCUSSING THE OPERATIONAL FAILURES,

10   AND I BELIEVE YOU SPOKE ABOUT MEDICAL LEADERSHIP AND PROVIDER

11   STAFFING AND CREDENTIALING.  SO LET'S PICK UP WITH THE SECOND

12   PROBLEM THAT YOU OBSERVED THERE, INAPPROPRIATE RELATIONSHIP

13   BETWEEN CUSTODY AND MEDICAL.

14             MR. DUBNER:  AND YOU CAN TAKE THE EXHIBIT DOWN.

15   BY MR. DUBNER:

16   Q.   WHAT DID YOU OBSERVE ABOUT THE RELATIONSHIP BETWEEN

17   MEDICAL MANAGEMENT AND CUSTODY MANAGEMENT AT ANGOLA?

18   A.   WELL, THE DEPUTY WARDEN IS THE HEALTH AUTHORITY.  SO IT

19   APPEARED TO CREATE A -- SOMEWHAT OF A CONFLICT, BUT THE MOST

20   STRIKING ITEM IN MY MIND WAS THE PRACTICE OF WHAT WE WERE TOLD

21   IS AGGRAVATED MALINGERING, WHICH IS A PRACTICE.  IT'S ACTUALLY

22   A PUNISHMENT ISSUED TO THE INMATE.  WHEN THE INMATE COMPLAINS

23   OF A CERTAIN CONDITION AND IS EVALUATED FOR THAT CONDITION BUT

24   THE STAFF MEMBER WHO EVALUATES THE PATIENT DETERMINES THAT THE

25   PATIENT DOES NOT HAVE THE CONDITION, THEN THE PATIENT IS

10:15

1   PUNISHED, CAN BE ISSUED A CITATION.  AND THERE'S TWO PROBLEMS

2   THAT WE HAD WITH IT.  NUMBER ONE, THE MEDICAL STAFF SHOULD NOT

3   BE PARTICIPATING IN PUNISHMENT.  THEIR PURPOSE IS

4   PROFESSIONALLY MEDICAL AND CLINICAL CARE, AND SO IT'S NOT

5   PUNISHMENT.  SO THAT'S ONE PROBLEM.

6           BUT THE SECOND ONE IS THAT SIMILAR TO ANY PATIENT WHO

7   WOULD GO TO AN EMERGENCY ROOM, PATIENTS DON'T KNOW WHAT THEY

8   HAVE WHEN THEY MAKE A COMPLAINT.  IF I HAVE CHEST PAIN AND GO

9   TO AN EMERGENCY ROOM AND THEY DO AN EVALUATION AND DISCOVER I

10  DO NOT HAVE HEART DISEASE OR AN ULCER, I FEEL VERY HAPPY BUT I

11  WOULDN'T BE PUNISHED FOR THAT.  IN THIS CASE, THE INMATES ARE

12  PUNISHED.  SO IT'S PERVERSE, AND IT'S AN ABERRATION OF

13  PROFESSIONAL RESPONSIBILITY.

14          SO FROM OUR POINT OF VIEW, PROFESSIONALS SHOULD NOT

15  PARTICIPATE IN THAT, AND THE FACT THAT THE CLINICAL LEADERSHIP

16  DOES NOT OBJECT TO PARTICIPATION, I THINK, IS A DERELICTION OF

17  THEIR PROFESSIONAL RESPONSIBILITY.

18  Q.   DOES THE PRACTICE OF HAVING A CHARGE OF MALINGERING CARRY

19  DISCIPLINARY PUNISHMENT?  IS THAT SOMETHING THAT IS COMMON IN

20  CORRECTIONAL MEDICINE?

21  A.   I HAVEN'T SEEN IT AT OTHER FACILITIES, NO.

22  Q.   AND WOULD IT CONCERN YOU LESS IF THE CHARGE EXISTED BUT

23  PATIENTS WERE RARELY ACTUALLY WRITTEN UP FOR IT?

24  A.   NO.  BECAUSE IT, AS I SAID, IT'S A -- IT CAUSES CONFUSION

25  OF ROLES.  THE PROFESSIONAL STAFF, INCLUDING MEDICS, NURSES,

1    AND PHYSICIANS, SHOULD NOT PARTICIPATE IN PUNISHMENT.  AND

2    THEIR ROLE IS A PROFESSIONAL CLINICAL ONE.  SO IT SHOULDN'T BE

3    ON THE BOOKS.  WHETHER IT FREQUENTLY OCCURS OR NOT, I THINK, IS

4    IMMATERIAL.

5    **Q.**   WHAT, IF ANYTHING, DID YOU OBSERVE ABOUT THE WAY THE

6    MEDICAL AND CUSTODY RELATIONSHIP AFFECTS PATIENT

7    CONFIDENTIALITY?

8    **A.**   WELL, IT'S MOST EVIDENT IN THE PROCESS OF EVALUATING SICK

9    CALLS OR HEALTH REQUESTS BECAUSE THOSE ARE DONE IN PUBLIC AND

10   IF OFFICERS ARE AROUND, THEY CAN HEAR THE COMPLAINT OF THE

11   INMATE AND THEY CAN HEAR THE DISCUSSION.

12          BUT IN GENERAL, IT'S NOT AS TIGHT AS IT SHOULD BE,

13   I'LL SAY THAT.  YOU KNOW, DOORS ARE OPEN.  PEOPLE DO WALK

14   THROUGH ROOMS.  IT'S NOT THE WORST I'VE SEEN, BUT THERE'S A

15   LACK OF PRIVACY.  BUT IT'S MOST EVIDENT IN THE SICK CALL

16   PROCESS.

17   **Q.**   IN YOUR EXPERIENCE, IS IT POSSIBLE TO PROVIDE CONFIDENTIAL

18   MEDICAL TREATMENT IN A MAXIMUM SECURITY PRISON?

19   **A.**   SURE.

20   **Q.**   AND COULD YOU EXPOUND ON THAT?

21   **A.**   I MEAN, I'VE WORKED IN MAXIMUM SECURITY PRISONS AND JAILS,

22   AND PATIENTS ARE SEEN BEHIND CLOSED DOORS.  WHEN AN INMATE IS

23   EXTREMELY VIOLENT, YOU KNOW, ARRANGEMENTS ARE MADE, BUT I'VE

24   NOT SEEN A PLACE WHERE YOU CAN'T ENSURE CONFIDENTIALITY.

25   **Q.**   AND DO YOU SEE ANY WAYS IN WHICH THE MEDICAL AND CUSTODY

10:19  1   RELATIONSHIP INTERFERED WITH ACCESS TO ANY KINDS OF MEDICAL
      2   TREATMENT?
      3   **A.**   CAN YOU REPEAT THAT?
      4   **Q.**   YEAH.  LET ME REPHRASE THE QUESTION.  DO YOU SEE ANY WAYS
      5   IN WHICH SECURITY CONCERNS INTERFERED WITH PATIENTS' ABILITY TO
      6   OBTAIN PAIN MANAGEMENT THERAPY?
      7   **A.**   WELL, THERE'S -- YOU CAN'T GET NARCOTICS IN GENERAL
      8   POPULATION, AND THAT'S AN EXTREME BARRIER.  THE THOUGHT THAT
      9   YOU WOULD ONLY HAVE 48 PEOPLE IN THE FACILITY THAT MIGHT NEED
     10   NARCOTICS IS -- IT'S NOT A GOOD PREMISE ON WHICH TO BASE A
     11   PROGRAM.  BUT PEOPLE SHOULD HAVE ACCESS, YOU KNOW, REGARDLESS
     12   OF THEIR HOUSING.  AND THE INABILITY TO ADMINISTER MEDS, I
     13   MEAN, I DON'T SEE IT AS MUCH AS A CUSTODY ISSUE AS A MEDICAL
     14   ISSUE.  YOU SHOULD BE ABLE TO ADMINISTER MEDICATION ANYWHERE.
     15   IF A PERSON IS IN A MAXIMUM SECURITY UNIT, THEY SHOULD BE ABLE
     16   TO RECEIVE A NARCOTIC.  IF THEY'RE ON A GENERAL MEDICINE UNIT,
     17   THEY SHOULD BE ABLE TO RECEIVE A NARCOTIC.  THE FACT THAT
     18   THAT'S NOT DONE IS INAPPROPRIATE.  THEY DON'T HAVE ACCESS TO
     19   REQUIRED MEDICATION.
     20   **Q.**   AND CAN YOU GIVE AN EXAMPLE OF A CONDITION WHERE NARCOTIC
     21   MEDICATION IS PARTICULARLY IMPORTANT FOR THE TREATMENT OF THE
     22   ILLNESS?
     23   **A.**   WELL, THE ONE WE SAW ON TOUR WAS THE GENTLEMAN WITH SICKLE
     24   CELL DISEASE.  THAT CAN CAUSE CONSIDERABLE PAIN AND FREQUENTLY
     25   REQUIRES NARCOTIC MEDICATION.

10:21   1   **Q.**   AND WHY IS IT THAT CAUSES CONSIDERABLE PAIN?

2   **A.**   THE DISEASE IS A CONGENITAL DISEASE OF THE RED BLOOD CELLS

3   THAT UNDER OXYGEN DEPRIVATION, THEY SICKLE, AND WHEN THEY

4   SICKLE, THEY CAN FORM INFARCTS AND THEY DO SO IN BONES AND IN

5   OTHER ORGANS.  AND WHEN THAT -- THOSE INFARCTS OCCUR, THEY

6   CAUSE PAIN.

7   **Q.**   AND WHAT IS AN *INFARCT*?

8   **A.**   IT'S LIKE A STROKE.  BUT THESE ARE MINI.  SO IN THE SMALL

9   VESSELS OF THE BONES, THE CELLS WILL SICKLE AND THE PAIN CAN BE

10   CONSIDERABLE.

11   **Q.**   AND WHAT EFFECTS DOES INADEQUATE PAIN MANAGEMENT HAVE ON

12   THE PROGNOSIS OF A PATIENT WITH SICKLE CELL DISORDER?

13   **A.**   WELL, MANAGEMENT OF THE PAIN REDUCES THE SEVERITY OF THE

14   PARTICULAR EPISODE.  BUT FIRST AND FOREMOST, IT'S CRUEL.  IF

15   YOU ALLOW PEOPLE TO ENDURE PAIN WITHOUT TREATMENT, IT'S JUST

16   CRUELTY.

17          AND OUR MAIN PURPOSE AS PROVIDERS IS TO PROVIDE THAT

18   PAIN MANAGEMENT, BUT PEOPLE WITH SICKLE DISEASE WHO -- AND IT'S

19   NOT SO MUCH THE PAIN MANAGEMENT, BUT THE OTHER MANAGEMENT THAT

20   REALLY AFFECTS THE PROGNOSIS.

21   **Q.**   AND HOW IS NARCOTIC PAIN MEDICATION USUALLY HANDLED IN A

22   CORRECTIONAL FACILITY?

23   **A.**   WELL, THE SAME RULES APPLY IN CORRECTIONS AS THEY DO IN A

24   CIVILIAN COMMUNITY.  NURSES KEEP IT UNDER LOCK AND KEY.  IT HAS

25   TO BE -- IN MOST STATES, THE LAWS REQUIRE IT BE IN A DOUBLE

10:23

1  SECURED OR DOUBLE-LOCKED UNIT.  SO, IN OTHER WORDS, IN A LOCKED

2  CABINET WITHIN A LOCKED PHARMACY ROOM, AND THERE'S STRICT

3  ACCOUNTING OF EVERY PILL.

4         SO WHEN NURSES TAKE FROM A STOCK AMOUNT OF A

5  NARCOTIC, THEY WOULD HAVE TO NOTE THAT THEY REMOVED ONE PILL.

6  AND, TYPICALLY, THERE'S AN ACCOUNTING OF THAT AFTER EACH SHIFT.

7  SO THAT'S HOW IT'S ACCOUNTED FOR.  AND THERE ARE A VARIETY OF

8  WAYS TO DO THAT, BUT THAT'S BASICALLY HOW IT HAPPENS.

9  Q.   IS IT COMMON FOR PATIENTS TO HAVE TO TRAVEL SEVERAL MILES

10  TO OBTAIN NARCOTIC MEDICATION?

11  A.   NOT IN MY EXPERIENCE.

12  Q.   AND WHAT, IF ANYTHING, DOES ANGOLA USE TYPICALLY INSTEAD

13  OF NARCOTIC PAIN MEDICATION FOR PAIN MANAGEMENT?

14  A.   WELL, THEY USE TYLENOL AND IBUPROFEN.  I DON'T THINK IT'S

15  MORE THAN THAT.

16  Q.   ARE YOU FAMILIAR WITH A DRUG CALLED KEPPRA?

17  A.   KEPPRA IS AN ANTIEPILEPTIC.

18  Q.   AND ARE YOU FAMILIAR WITH A DRUG CALLED NEURONTIN?

19  A.   YES.

20  Q.   AND WHAT ARE THE INDICATIONS FOR NEURONTIN?

21  A.   NEURONTIN HAS -- IT'S USED FOR A VARIETY OF CONDITIONS,

22  BUT MOSTLY IT'S FOR DISORDERS WHERE PEOPLE HAVE NERVE DAMAGE

23  AND EPILEPSY, BUT NERVE DAMAGE WITH, LIKE, PAIN SYNDROMES DUE

24  TO NERVE PROBLEMS.

25  Q.   ARE THERE TYPES OF PAIN FOR WHICH KEPPRA AND NEURONTIN ARE

1    EFFECTIVE PAIN THERAPY?

2    **A.**   IT'S NOT REALLY INDICATED FOR -- IT WOULDN'T BE INDICATED

3    FOR A SICKLE DISEASE, THAT'S FOR CERTAIN, AND IT'S NOT

4    INDICATED, IN GENERAL, FOR PAIN MANAGEMENT.

5    **Q.**   ARE THERE ANY TYPES OF PAIN FOR WHICH IT IS -- FOR WHICH

6    THEY ARE USED?

7    **A.**   NEUROPATHIC PAIN, NEURONTIN HAS A, I THINK, OFF-LABEL

8    INDICATION, BUT I DON'T EVEN THINK IT HAS A LABELED INDICATION

9    FOR THAT.

10   **Q.**   AND WOULD IT BE APPROPRIATE TO BE USING KEPPRA AND

11   NEURONTIN FOR NON-NERVE PAIN ON A REGULAR BASIS?

12   **A.**   ARE YOU SUGGESTING AS FOR SICKLE DISEASE?

13   **Q.**   NO.  SORRY.  MOVING ON FROM SICKLE DISEASE.

14   **A.**   OKAY.  NO.  I DON'T -- NO.

15   **Q.**   AND ONE LAST QUESTION ON THE PAIN MEDICATION ISSUE.  WOULD

16   IT BE APPROPRIATE, IN YOUR VIEW AS A MATTER OF PROFESSIONAL

17   MEDICINE, TO LIMIT THE USE OF NARCOTICS TO HOSPICE CARE?

18   **A.**   IT'S NOT A QUESTION OF CORRECTIONAL MEDICINE, IT'S ANY

19   MEDICINE.  YOU WOULDN'T LIMIT NARCOTICS TO HOSPICE CARE UNDER

20   ANY CIRCUMSTANCES, LET ALONE CORRECTIONS.

21   **Q.**   LET'S MOVE ON TO THE SUBJECT OF THE HEALTHCARE BUDGET.

22   DID YOU LOOK AT THE BUDGET AT ANGOLA?

23   **A.**   WE ATTEMPTED TO.  IT WAS A LITTLE HARD TO GET THE BUDGET

24   DOCUMENTS, BUT THE ASSISTANT WARDEN HAD THE WARDEN'S

25   SECRETARIES COME AND THEY WERE HELPFUL IN EXPLAINING HOW THE

10:27    1    BUDGET WAS DERIVED.

2    **Q.**    WHAT DO YOU LOOK FOR WHEN YOU REVIEW A FACILITY'S BUDGET?

3    **A.**    I MEAN, I JUST -- I GENERALLY LOOK FOR THE COST PER INMATE

4    PER YEAR AS ONE FACTOR.  I LOOK FOR THE RATIOS OF HOW MUCH

5    MONEY IS SPENT OF THE BUDGET ON STAFFING AS OPPOSED TO OTHER

6    ITEMS, AND JUST ADMINISTRATIVELY, I THINK IT'S USEFUL TO LOOK

7    AT, YOU KNOW, HOW MUCH IS SPENT ON HOSPITALIZATION,

8    PHARMACEUTICALS, ET CETERA.  SO I GENERALLY LOOK AT THOSE

9    ITEMS.

10                **MR. DUBNER:**  MARTHA, IF YOU COULD GIVE US SLIDE 50,

11    PLEASE.

12    **BY MR. DUBNER:**

13    **Q.**    AND THIS IS A DEMONSTRATIVE DRAWING FROM PLAINTIFFS'

14    EXHIBIT 6.

15                WHAT DID YOU FIND ABOUT THE SIZE OF THE BUDGET AT

16    ANGOLA?

17    **A.**    IT'S LOW COMPARATIVE -- IN COMPARISON TO OTHER STATES OR

18    EVEN IN COMPARISON TO THE AVERAGE SPENDING IN LOUISIANA.

19    **Q.**    AND HOW DID YOU DETERMINE THAT?

20    **A.**    WELL, THE ONLY GOOD COMPARISON DOCUMENT IS A STUDY BY THE

21    PEW CENTER THAT COMPARED ALL 50 STATE CORRECTIONAL BUDGETS.

22    AND I DID TALK TO THE AUTHORS ONCE BY PHONE, NOT IN RELATION TO

23    THIS CASE, BUT THEY HAD INDICATED THAT THEY DID SOME

24    CONSIDERABLE WORK WITH EACH STATE AND HAD CALLED EACH STATE AND

25    WERE VERY CERTAIN THAT THE DATA WAS ACCURATE.  SO I THINK IT'S

10:29   1   A REASONABLE STUDY, AND DATA WAS ONE THAT I USED TO JUST

2   COMPARE.

3   **Q.**   IS THAT STUDY CONSIDERED RELIABLE AMONG EXPERTS IN

4   CORRECTIONAL MEDICINE?

5   **A.**   PEOPLE I KNOW USE IT, AND I CERTAINLY HAVE USED IT.

6   **Q.**   AND SO WHAT DID THAT SHOW YOU, SPECIFICALLY IN TERMS OF

7   THE DOLLAR AMOUNTS FOR LOUISIANA COMPARED TO OTHER STATES AND

8   ANGOLA COMPARED TO LOUISIANA AS A WHOLE?

9   **A.**   LOUISIANA WAS IN THE LOWER PORTION OF THE STATES.  I'M NOT

10   SURE OF THE EXACT NUMBER, BUT IT WAS IN A LOWER TEN, I BELIEVE,

11   AND ANGOLA IS A FRACTION -- I MEAN, IT'S ABOUT HALF OF WHAT THE

12   LOUISIANA STATE PRISON SPENDING IS.  SO ON A PER CAPITA BASIS,

13   ANGOLA IS VERY LOW.

14         **MR. DUBNER:**   MARTHA, CAN YOU GIVE US SLIDE 48.

15   **BY MR. DUBNER:**

16   **Q.**   YOU ALSO DISCUSSED A MOMENT AGO LOOKING AT THE

17   APPORTIONMENT OF THE BUDGET, I BELIEVE.  WHAT DID YOU DETERMINE

18   ABOUT THE APPORTIONMENT OF THE BUDGET WITHIN ANGOLA?

19   **A.**   WELL, SO THIS WAS FROM WHAT THE -- WHAT INFORMATION I

20   COULD GATHER FROM THE WARDEN'S ADMINISTRATIVE STAFF, BUT MOST

21   OF -- MORE THAN EXPECTED, THERE WERE HIGHER LABOR COSTS.  SO

22   WHAT THAT MEANS IN A NUTSHELL IS THAT PROPORTIONATELY LESS IS

23   SPENT ON NONLABOR COSTS, WHICH ARE PHARMACEUTICALS, OFFSITE

24   MEDICAL WHICH IS HOSPITALIZATION, SPECIALTY CARE EQUIPMENT,

25   SUPPLIES.  AND THERE WAS NO LINE ITEM BUDGET, SO THAT COULDN'T

10:11

1    BE EXAMINED THOROUGHLY.  SO THIS IS REALLY GROSS NUMBERS, AND

2    THERE WASN'T A LOT OF DETAIL.  BUT THAT WOULD BE MY OPINION

3    THAT IT LOOKS LIKE, YOU KNOW, IT'S SLANTED TOWARD STAFF AND

4    CONTRACT MEDICAL ON SITE AND IT LACKS DETAIL ON PHARMACEUTICALS

5    AND OTHER ITEMS.

6    **Q.**   AND --

7    **A.**   FOR EXAMPLE, HEPATIS C WOULD BE AN EXAMPLE WHERE WE JUST

8    COULDN'T DETERMINE WHAT WAS BEING SPENT ON IT 'CAUSE THE

9    PHARMACY BUDGET IS -- THERE WAS NO INFORMATION ON IT.  AND THAT

10   COST IS CONSIDERABLE, GENERALLY.

11   **Q.**   AND WHY IS IT IMPORTANT TO BE ABLE TO UNDERSTAND THE

12   AMOUNT THAT'S BEING SPENT ON, FOR EXAMPLE, HEPATITIS C?

13   **A.**   WELL, IT GIVES YOU AN IDEA ON YOUR SPENDING

14   ADMINISTRATIVELY AND WHETHER THERE MIGHT BE A PROBLEM IN A

15   CERTAIN AREA OR NOT A PROBLEM.  IF THE PHARMACEUTICAL SPENDING

16   IS LOW, YOU WOULDN'T ACTUALLY KNOW WHETHER YOU WERE BEING VERY

17   EFFICIENT AND PEOPLE DIDN'T NEED THE SERVICE OR YOU JUST

18   WEREN'T SPENDING IT, BUT IT DOES GIVE YOU CLUES AS TO HOW TO

19   LOOK AT IT.

20   **Q.**   AND WERE YOU CONCERNED BY THE AMOUNT OF DETAIL OR LEVEL OF

21   DETAIL THAT YOU SAW IN THE BUDGET DOCUMENTS YOU WERE PROVIDED?

22   **A.**   IT WAS VERY GROSS DETAIL.  THERE WAS VERY LITTLE -- THERE

23   WAS NO DETAIL AT ALL.  IT WAS JUST GROSS NUMBERS.

24   **Q.**   AND WHO DID YOU SPEAK WITH AT ANGOLA ABOUT THE BUDGET?

25   **A.**   I DON'T REMEMBER THE NAMES, BUT THERE WERE -- THE

10:33

1  ASSISTANT WARDEN BROUGHT IN TWO ADMINISTRATIVE SECRETARIES TO

2  THE WARDEN WHO WERE FAMILIAR WITH THE INSTITUTIONAL ACCOUNTING

3  SOFTWARE AND WERE ABLE TO ANSWER QUESTIONS.

4  **Q.**   AND IN ADDITION TO THE ASSISTANT WARDEN, WERE THERE ANY

5  OTHER MEMBERS OF THE LEADERSHIP OF THE MEDICAL TEAM WHO YOU

6  SPOKE TO ABOUT THE BUDGET?

7  **A.**   I ASKED, BUT NO ONE WAS FAMILIAR WITH IT, AND NO ONE COULD

8  ANSWER ANY SPECIFIC QUESTIONS ABOUT THE BUDGET.

9  **Q.**   AND WHO DID YOU ASK?

10 **A.**   I ASKED THE DIRECTOR OF NURSES, THE MEDICAL DIRECTOR, AND

11 THE ASSISTANT WARDEN, WHO WAS THE HEALTH AUTHORITY.

12 **Q.**   AND ORDINARILY WOULD YOU EXPECT SOME, OR ALL OF THOSE

13 PEOPLE, TO BE ABLE TO DISCUSS THE BUDGET AND THE WAY IT WAS

14 APPORTIONED?

15 **A.**   EACH IN THEIR OWN AREA OF SERVICE SHOULD BE ABLE TO BE

16 VERY FAMILIAR WITH THE BUDGET.

17 **Q.**   AND HOW DID THESE FINDINGS ABOUT THE SIZE AND DETAIL OF

18 THE BUDGET AFFECT THE RISK TO PATIENTS OF EXPERIENCING HARM?

19 **A.**   WELL, IT -- SO THE BUDGET LOOKS LOW, AND THE QUESTION IS,

20 ARE SERVICES PROVIDED THAT SHOULD BE.  IT'S LESS LIKELY, GIVEN

21 THE SIZE OF THE BUDGET, THAT APPROPRIATE SERVICES ARE BEING

22 PROVIDED.  GIVEN THE DETAIL, YOU CAN'T REALLY INVESTIGATE IT

23 VERY THOROUGHLY, BUT IT SURE SUGGESTS THAT THERE ARE PROBLEMS.

24      **MR. DUBNER:**  AND YOU CAN TAKE THAT SLIDE DOWN,

25 MARTHA.  THANK YOU.

10:34  1  **BY MR. DUBNER:**

2  **Q.**   LET'S MOVE OVER TO PEER REVIEW, WHICH YOU IDENTIFIED

3  YESTERDAY AS ONE OF THE OPERATIONAL CONCERNS YOU HAD.   WHAT IS

4  PEER REVIEW?

5  **A.**   PEER REVIEW IS -- THERE ARE TWO TYPES OF PEER REVIEW.   AND

6  WHEN I MENTIONED PEER REVIEW, I'M SPEAKING SPECIFICALLY OF

7  PHYSICIANS, BUT NURSES CONDUCT THEIR OWN PEER REVIEW

8  INDEPENDENTLY.   AND PEER REVIEW IS GROUPS OF PEERS WHO EVALUATE

9  THE CARE OF ANOTHER PEER OR COLLEAGUE BASED ON THE CLINICAL

10  PROCESS THAT A CERTAIN INDIVIDUAL HAS PROVIDED.   SO A SENIOR

11  PHYSICIAN WILL EVALUATE A PEER PHYSICIAN, A SUBORDINATE

12  PHYSICIAN, AND ASSESS WHETHER THE CARE THAT PHYSICIAN PROVIDES

13  IS APPROPRIATE AND ADEQUATE.

14       BUT THERE ARE TWO KINDS OF PEER REVIEWS.   ONE IS

15  CALLED PROFESSIONAL EVALUATION PROGRAM, OR PEP, AND IN THAT

16  ONE, A PHYSICIAN'S PRACTICE IS EVALUATED TYPICALLY ON AN ANNUAL

17  BASIS.

18       SO AT THE INSTITUTIONS I'VE MANAGED, WE WOULD DO IT

19  ON AN ANNUAL BASIS, AND I THINK MOST HMOS AND OTHER

20  ORGANIZATIONS THAT DO IT DO THE SAME, AND THEY WILL EVALUATE

21  CERTAIN RECORDS THAT THE PHYSICIAN -- WHERE THE PHYSICIAN HAS

22  SEEN PATIENTS AND EVALUATE WHETHER THEIR TREATMENT IS

23  APPROPRIATE AND WHETHER THEIR CARE THAT THEY PROVIDE IS

24  APPROPRIATE.

25       A SECOND TYPE OF PEER REVIEW IS WHEN THERE HAS BEEN A

10:36   1   SENTINEL EVENT SUCH AS A DEATH OR AN UNUSUAL MORBID EVENT THAT

2   IS UNEXPECTED AND SUGGESTS THAT THERE MAY HAVE BEEN PROBLEMS;

3   THAT TYPE OF PEER REVIEW IS A -- MORE OF A QUASI LEGAL

4   PROCEDURE WHERE THE PHYSICIAN MAY BE REPORTED FOR CLINICAL

5   ACTIONS THAT WERE INAPPROPRIATE, AND A GROUP OF SENIOR

6   PHYSICIANS WOULD REVIEW THAT CARE TO DETERMINE IF A REDUCTION

7   OF PRIVILEGES IS NECESSARY.

8           SO, FOR EXAMPLE, IF A DOCTOR -- IF SOMEONE DIED AND A

9   DOCTOR CLEARLY MADE AN EGREGIOUS MISTAKE, THE SENIOR PHYSICIANS

10   WOULD THEN REVIEW THAT CARE AND DETERMINE IF THE DOCTOR HAS THE

11   APPROPRIATE PRIVILEGES OR SHOULD HAVE A REDUCTION IN

12   PRIVILEGES.  AND OFTEN IT IS A -- IT INVOLVES WHETHER THE

13   PHYSICIAN SHOULD BE SUSPENDED OR TERMINATED.  SO THAT'S THE

14   SECOND ONE.

15           ANGOLA DOESN'T APPEAR TO DO ANY OF THAT.  I FOUND NO

16   EVIDENCE THAT THAT OCCURS.

17           AND WITH THE RESPECT TO THE FIRST TYPE OF PEER

18   REVIEW, WHICH IS THE REVIEW OF PHYSICIAN CARE, THE MEDICAL

19   DIRECTOR -- I WAS TOLD THE MEDICAL DIRECTOR COMES IN ONCE A

20   YEAR AND REVIEWS 15 RECORDS, BUT WHAT I WAS TOLD IS THAT THE

21   REVIEW IS NOT OF A SINGLE PHYSICIAN, IT'S OF THE FACILITY.  SO

22   THE MEDICAL DIRECTOR -- AND AT THAT TIME, IT WAS DR. SINGH --

23   WOULD COME IN AND REVIEW A CHART, AND SAY THAT THE CARE THAT

24   WAS BEING PROVIDED WAS ADEQUATE OR INADEQUATE, BUT THERE WOULD

25   BE NO COMMENTS WITH RESPECT TO INDIVIDUAL PROVIDERS.  NOW, WE

10:18

1   WERE GIVEN NO DOCUMENTATION OF THOSE REVIEWS, SO THAT WAS NOT

2   PROVIDED TO US.  SO I'M NOT CERTAIN WHAT THEY LOOK LIKE OR WHAT

3   REVIEW WAS ACTUALLY CONDUCTED, BUT THAT'S WHAT I WAS TOLD BY

4   DR. LAVESPERE.

5           MR. DUBNER:  MARTHA, IF YOU COULD PULL UP PX-6 AT

6   PAGE 26.

7   BY MR. DUBNER:

8   Q.   DR. PUISIS, WHEN YOU WROTE YOUR REPORT IN THIS CASE, WAS

9   THAT CLOSER IN TIME TO WHEN YOU LOOKED AT THE SUBJECT OF PEER

10  REVIEW IN DETAIL?

11  A.   WHEN I LOOKED AT WHAT SUBJECT?

12  Q.   WHEN YOU LOOKED AT THE PEER REVIEW IN THIS CASE AT ANGOLA

13  IN DETAIL.

14  A.   I DON'T UNDERSTAND THE QUESTION.

15  Q.   LET ME DRAW YOUR ATTENTION TO PAGE 26 OF YOUR REPORT.  I

16  JUST WANT TO CHECK ON ONE THING.  IN THE SECOND PARAGRAPH, YOU

17  WROTE IN THAT SECOND SENTENCE, "AT LSP, SINCE 2010, PEER REVIEW

18  OF PHYSICIAN CARE HAS BEEN PERFORMED ONLY THREE TIMES."

19          DOES THAT REFRESH YOUR RECOLLECTION ABOUT HOW OFTEN

20  PEER REVIEW WAS PERFORMED?

21  A.   YEAH, IT WAS INFREQUENT.  IT WAS NOT ON A REGULAR BASIS.

22  Q.   OKAY.  THANK YOU.

23          MR. DUBNER:  YOU CAN TAKE THAT DOWN, MARTHA.

24  BY MR. DUBNER:

25  Q.   SO WHY IS THIS FORM OF PEER REVIEW THAT YOU JUST DESCRIBED

10:40   1   TAKING PLACE AT ANGOLA INADEQUATE FROM THE STANDPOINT OF

2   PROFESSIONAL PRACTICES?

3   **A.**   WELL, YOU ARE NOT IDENTIFYING PROBLEMS AND DEFICIENCIES.

4   SO AS WE WENT -- FOR AN EXAMPLE, AS WE WENT THROUGH RECORD

5   REVIEWS, WE REPEATEDLY FOUND LONG PERIODS WHERE PEOPLE HAD BEEN

6   EITHER REFERRED FOR SPECIALTY APPOINTMENTS AND THEY DIDN'T

7   HAPPEN OR THEY WEREN'T REFERRED AT ALL AND THEY SHOULD HAVE

8   BEEN REFERRED.  WE FOUND HISTORY AND PHYSICALS NOT DOCUMENTED

9   AS BEING DONE, AND YOU COULD OBVIOUSLY SEE THAT MEDICS WERE

10   ACTING INDEPENDENTLY AND WITHOUT SUPERVISION OF PHYSICIANS.

11        WHEN PEER REVIEW IS DONE, THOSE CAN BE IDENTIFIED OR

12   SHOULD BE IDENTIFIED, AND WHEN THEY ARE IDENTIFIED, YOU WOULD

13   TRY TO FIND ESTABLISHED CORRECTIVE ACTIONS TO MAKE THE SYSTEM

14   SAFER, BUT IT DIDN'T APPEAR THAT THAT WAS HAPPENING BECAUSE WE

15   WOULD SEE THE SAME PROBLEMS OVER YEARS OF RECORD REVIEWS.  SO

16   THERE'S NO EVIDENCE THAT THERE IS A SYSTEM OF MONITORING AND

17   CORRECTIVE ACTION, AND AS A RESULT, THE SAME PROBLEMS KEEP

18   CONTINUING.

19   **Q.**   DOES THE NCCHC LAY OUT STANDARDS FOR PEER REVIEW?

20   **A.**   IT DOES RECOMMEND PEER REVIEW.  IT IS ONE OF THEIR

21   STANDARDS, AND THEY DO TALK ABOUT PROFESSIONAL EVALUATION, YES.

22        **MR. DUBNER:**  MARTHA, IF YOU COULD BRING UP NCCHC.

23             AND, YOUR HONOR, IF I COULD HAVE YOUR INDULGENCE

24   A MOMENT, TOO, JUST TO GET THE PAGE NUMBERS.  THANK YOU.

25        **THE COURT:**  TAKE YOUR TIME.

10:42    1              **MR. DUBNER:**  AND THAT WILL BE PX-243, PLAINTIFFS'
         2   EXHIBIT 243 AT -- WE CAN MOVE ON FROM THAT.  THANK YOU, THOUGH.
         3   **BY MR. DUBNER:**
         4   **Q.**  DR. PUISIS, HOW DOES THE INADEQUACIES THAT YOU OBSERVED IN
         5   THE PEER REVIEW INTERACT WITH THE CREDENTIALING AND PRIVILEGING
         6   ISSUES THAT YOU'VE DISCUSSED YESTERDAY?
         7   **A.**  WELL, WHEN PHYSICIANS AREN'T CREDENTIALED PROPERLY,
         8   THERE'S A HIGHER RISK THAT THEY WILL MAKE MISTAKES, AND IF A
         9   PROGRAM HAS POORLY CREDENTIALED PHYSICIANS, THE LEVEL OF
        10   MONITORING SHOULD BE INCREASED, IN MY OPINION, AND THAT DIDN'T
        11   APPEAR TO BE OCCURRING.  IT WAS A COMBINATION OF POOR
        12   CREDENTIALING AND LACK OF MONITORING AND, I THINK, IT -- THE
        13   RESULTS ARE WHAT THEY ARE.
        14   **Q.**  AND WHAT DO YOU MEAN BY THE RESULTS ARE WHAT THEY ARE?
        15   **A.**  WELL, THERE'S INADEQUATE CARE.  YOU KNOW, YOU CAN'T HIRE
        16   PEOPLE WHO DON'T KNOW HOW TO DO WHAT THEY'RE SUPPOSED TO BE
        17   DOING AND THEN NOT MONITOR THEM AND EXPECT THAT CARE WILL BE
        18   ADEQUATE.
        19   **Q.**  AND LET'S TALK ABOUT MORTALITY REVIEW WHICH YOU DISCUSS IN
        20   YOUR REPORT.  WHAT IS MORTALITY REVIEW?
        21   **A.**  MORTALITY REVIEW IS AN EXERCISE OF CRITICALLY, CRITICALLY
        22   REVIEWING THE DEATH TO DETERMINE IF, IN THE COURSE OF CARE OF
        23   THE PATIENT, THERE WERE ANY PROBLEMS THAT WERE IDENTIFIED THAT
        24   CAN BE CORRECTED IN ORDER TO PREVENT FURTHER DEATHS.
        25   **Q.**  AND HOW IS THAT TYPICALLY CONDUCTED?

10:44    1  **A.**    IT'S TYPICALLY CONDUCTED BY PERSONS UNINVOLVED IN THE

2  CARE, ALTHOUGH -- AND IT'S USUALLY DONE BY A GROUP.  THE GROUP

3  MAY INTERVIEW THE CLINICIANS, NURSES, DOCTORS, MEDICS, MENTAL

4  HEALTH PROFESSIONALS WHO CARED FOR THE PATIENT TO DETERMINE

5  WHAT HAPPENED, BUT THE GROUP THAT DOES THE INTERVIEW REVIEWS

6  THE PATIENT'S PROBLEMS, THEIR MEDICATIONS, THE COURSE OF

7  TREATMENT, AND DOES SO FOR AS LONG AS -- AS FAR BACK AS IS

8  NECESSARY TO DETERMINE WHETHER THE PRESUMED CAUSE OF DEATH

9  COULD ACTUALLY HAVE BEEN MODIFIED BY CARE THAT WAS PROVIDED.

10          AND TO GIVE AN EXAMPLE OF THAT, IF SOMEONE DIES OF

11  COLON CANCER, WERE THEY OFFERED THE OPPORTUNITY TO BE SCREENED

12  FOR COLON CANCER.  I MEAN, THAT WOULD BE A SIMPLE ONE.  IF THEY

13  WERE NOT, YOU KNOW, YOU WOULD SAY WE HAVE TO IMPROVE THE SYSTEM

14  TO MAKE SURE WE OFFER PEOPLE COLON CANCER SCREENING.  BUT

15  THAT'S GENERALLY THE PROCESS, AND IT IS NOT RECOMMENDED TO HAVE

16  THE PERSON WHO PROVIDED CARE PERFORM THE PEER REVIEW BECAUSE

17  OBVIOUSLY THEY ARE LESS LIKELY TO IDENTIFY PROBLEMS WITH THEIR

18  OWN CARE.

19  **Q.**    AND DID LSP CONDUCT A FORM OF MORTALITY REVIEW?

20  **A.**    I WOULDN'T CALL IT MORTALITY REVIEW.  SO THEY MOSTLY

21  PERFORM A DEATH SUMMARY, AND THE PHYSICIAN WHO CARED FOR THE

22  PATIENT PROVIDES A PARAGRAPH OR TWO SUMMARY OF THE

23  CIRCUMSTANCES SURROUNDING THE DEATH, BUT IT'S NOT A CRITICAL

24  REVIEW OF THE DEATH.

25          **MR. DUBNER:**  LET'S LOOK AT AN EXAMPLE OF A MEDICAL

10:47   1   SUMMARY REPORT.  AND THESE ARE SEALED EXHIBITS.  WE WON'T BE

2   PUBLISHING THEM TO THE GALLERY.  LET'S FIRST LOOK AT

3   PLAINTIFFS' EXHIBIT 233 AT PAGE 61.

4               **THE REPORTER:**  I'M SORRY.  CAN YOU SAY THAT AGAIN?

5               **MR. DUBNER:**  YES.  PLAINTIFFS' EXHIBIT 233 AT PAGE

6   61.

7   **BY MR. DUBNER:**

8   **Q.**   AND IS THIS ONE OF THE PATIENTS WHO YOU TALKED ABOUT

9   YESTERDAY?

10   **A.**   THIS, I THINK, IS PATIENT 3, IF I REMEMBER, YES.

11   **Q.**   AND JUST AS A QUICK REMINDER, WHICH PATIENT WAS PATIENT

12   NO. 3?

13   **A.**   HE HAD -- HE HAD PERIPHERAL VASCULAR DISEASE AND HAD

14   INFECTIONS, AND HE IS THE ONE WHO HAD NONVIABLE TISSUE ON BOTH

15   LEGS UP INTO THE PERINEUM.

16   **Q.**   AND YOU OBSERVED YESTERDAY NUMEROUS -- OF WHAT YOU BELIEVE

17   WERE PROBLEMS IN HIS CARE AND DELAYS AND THE LIKE.  IS THAT

18   CORRECT?

19   **A.**   THAT'S CORRECT.

20   **Q.**   AND I BELIEVE YOU OPINED THAT IN YOUR EXPERIENCE, YOU HAD

21   NEVER SEEN THAT EXTENT OF DEAD TISSUE IN A PATIENT?

22   **A.**   CORRECT.

23   **Q.**   HOW WOULD YOU CHARACTERIZE THE MEDICAL SUMMARY REPORT THAT

24   LSP PERFORMED?

25   **A.**   SO AS I SAID, IT'S JUST A -- IT'S A SUMMARY OF THE -- FROM

10:48   1   THE PERSPECTIVE OF THE PROVIDER, OF THE LAST FEW DAYS OF HIS

2   LIFE, AND IT FAILS TO ADDRESS WHAT WE CONSIDERED SOME SERIOUS

3   PROBLEMS SUCH AS WHEN THE PATIENT HAD AN ESCHAR OF THE STUMP.

4           THERE WAS -- IF I WERE LOOKING AT THIS CRITICALLY, I

5   WOULD SAY WHY DID THEY NOT DETERMINE IF THE PATIENT HAD

6   ADEQUATE VASCULATURE WITH AN ULTRASOUND.  THERE WAS NO PULSE

7   TAKEN OF THE FEMORAL ARTERY.  THE PATIENT SHOULD HAVE BEEN

8   REFERRED TO VASCULAR, WHY WASN'T THAT DONE.

9           SO THERE WERE A NUMBER OF QUESTIONS THAT THIS TYPE OF

10   SUMMARY DOES NOT PROVIDE THAT I THINK WOULD BE OBVIOUS TO

11   ANYONE LOOKING IT AT CRITICALLY, AND WHY WAS HE ADMITTED TO THE

12   INFIRMARY INSTEAD OF A HOSPITAL, AND IF YOU GO BACK INTO THE

13   RECORD, WHY TWO YEARS AGO, WASN'T HE REFERRED TO THE VASCULAR

14   SURGERY AND EVALUATION FOR OSTEOMYELITIS AND WHY DIDN'T HE GET

15   ADMITTED TO THE INFIRMARY.  SO IT'S A NONCRITICAL EVALUATION,

16   AND IT IDENTIFIES NO PROBLEMS, WHEN IN FACT, THERE WERE MANY

17   PROBLEMS.

18   Q.   WAS THAT A COMMON PATTERN THAT YOU SAW IN THE MEDICAL

19   REPORTS?

20   A.   ALL THE DEATH REPORTS WERE SIMILAR.

21   Q.   AND LET'S JUST LOOK AT ONE MORE, WHICH IS PLAINTIFFS'

22   EXHIBIT 233 AT PAGE 325.  IS THIS ALSO ONE OF THE PATIENTS YOU

23   DISCUSSED YESTERDAY?

24   A.   CORRECT.

25   Q.   COULD YOU JUST BRIEFLY RECAP WHICH PATIENT IT IS?

10:50    1   **A.**   SO THIS WAS THE PATIENT WHO HAD A -- WHAT IS THAT, YEAH, A

2   59 YEAR OLD WHO THE NODULE IDENTIFIED ON A CHEST X-RAY THAT WAS

3   SUGGESTIVE OF CANCER, AND FOR 15 MONTHS, HE DIDN'T GET A BIOPSY

4   BUT HE HAD BEEN REFERRED TO PULMONARY, AND A PULMONOLOGIST SAW

5   HIM THREE TIMES WITHOUT THE BIOPSY HAVING BEEN DONE, DESPITE

6   RECOMMENDATIONS.  AND THEN ONCE THE BIOPSY WAS DONE, THERE WAS

7   A REFERRAL TO ONCOLOGY THAT WAS NOT TIMELY, AND THE PATIENT

8   SUBSEQUENTLY DIED WITHOUT HAVING BEEN TREATED EXCEPT FOR A

9   LOBECTOMY, WHICH IS PARTIAL TREATMENT.  AND THERE WERE MANY

10   OPPORTUNITIES FOR IMPROVEMENT IN THIS RECORD, BUT NONE OF THEM

11   ARE IDENTIFIED IN THIS SUMMARY.

12   **Q.**   ARE THERE ANY PROBLEMS OF CONCERNS IDENTIFIED AT ALL IN

13   THE SUMMARY?  LET ME REPHRASE THAT.

14        ANY PROBLEMS WITH THE CARE PROVIDED TO THE PATIENT IN

15   THE SUMMARY?

16   **A.**   NO.

17   **Q.**   AND, AGAIN, WAS THIS A CONSISTENT PATTERN THROUGHOUT THE

18   TIME PERIOD?

19   **A.**   YES.

20        **MR. DUBNER:**  AND IF YOU COULD PUT UP SLIDE 63,

21   MARTHA.  THANK YOU.  AND THIS CAN BE PUBLISHED TO THE GALLERY

22   AGAIN.

23   **BY MR. DUBNER:**

24   **Q.**   IN TOTAL IN THE SAMPLE OF APPROXIMATELY 15 PATIENTS THAT

25   YOU MENTIONED YESTERDAY, HOW MANY OF THEM INVOLVED PATIENTS WHO

1  PASSED AWAY?

2  **A.**   WE LOOKED AT 28 DEATH CHARTS TOTAL.

3  **Q.**   AND OF THOSE 28, HOW MANY -- AND HOW MANY OF THEM DID YOU

4  IDENTIFY WHAT YOU VIEWED AS SERIOUS CONCERNS IN THE MEDICAL

5  CARE THAT WAS PROVIDED?

6  **A.**   ALMOST ALL -- FOR MINE, I DID TEN, AND ONE PATIENT WAS

7  MAINLY ADMITTED FOR HOSPICE AND THERE WAS NOTHING IDENTIFIED

8  THERE WAS A PROBLEM.  BUT ALMOST ALL THE REST HAD SOME DEGREE

9  OF PROBLEMS, AND A NUMBER WERE PREVENTIBLE.

10  **Q.**   AND IN HOW MANY MEDICAL SUMMARY REPORTS DID YOU OBSERVE A

11  SINGLE IDENTIFICATION OF A PROBLEM IN THE CARE THAT THE PATIENT

12  RECEIVED?

13  **A.**   WELL, LIKE I SAY, THAT ONE HOSPICE ONE.  I DON'T THINK I

14  IDENTIFIED ANY THAT --

15  **Q.**   SORRY.  LET ME REPHRASE.  IN DEFENDANTS' MEDICAL SUMMARY

16  REPORTS, IN HOW MANY OF THOSE REPORTS DID YOU OBSERVE A DIRECT

17  IDENTIFICATION OF ANY PROBLEMS?

18  **A.**   I DIDN'T NOTICE ANY IN THE ONES I REVIEWED.

19  **Q.**   IN YOUR OPINION, HOW DOES THIS CONTRIBUTE TO THE PROBLEMS

20  IN CARE THAT YOU DISCUSSED YESTERDAY?

21  **A.**   WELL, IF YOU DON'T LOOK FOR PROBLEMS, YOU DON'T FIND THEM.

22  AND IF YOU DON'T FIND PROBLEMS, YOU CAN'T FIX IF THERE'S

23  ANYTHING WRONG.  AND I BELIEVE THAT THEY HAVE PROBLEMS, AND

24  THEY HAVE AN INADEQUATE SERVICE, AND THEY DON'T LOOK FOR THE

25  PROBLEMS, SO THEY DON'T FIND IT.

10:53 1   Q.   AND JUST, AGAIN, IS IT A STANDARD PRACTICE IN, IN

2   PARTICULAR, CORRECTIONAL MEDICINE, TO LOOK FOR PROBLEMS WHEN A

3   DEATH OCCURS?

4   A.   YES.

5   Q.   IS THAT A SUBJECT OF STANDARDS ISSUED BY NCCHC, FOR

6   EXAMPLE?

7   A.   YES.  THE NCCHC STANDARD DOES COVER THAT, YES.

8   Q.   LET'S MOVE TO THE QUALITY IMPROVEMENT PROGRAMS.  I BELIEVE

9   YESTERDAY YOU REFERRED TO A CONTINUOUS QUALITY IMPROVEMENT

10   PROGRAM.  WHAT IS THAT, AS A GENERAL MATTER?

11   A.   A CONTINUOUS QUALITY IMPROVEMENT PROGRAM IS SOMETHING

12   THAT'S A STANDARD OF THE NCCHC.  IT'S AN EXPECTATION, AND

13   BASICALLY IT IS A PROGRAM THAT -- IN WHICH A SYSTEM CAN, NUMBER

14   ONE, IDENTIFY PROBLEMS THAT EXISTS, THAT THEY CAN COLLECT DATA

15   AND MEASURE THE PROBLEM AND STUDY IT AND DISCUSS HOW TO IMPROVE

16   IT, AND THEN ATTEMPT TO TAKE CORRECTIVE ACTION TO FIX THE

17   PROBLEM, AND THEN REVISIT TO SEE IF THEY SUCCEEDED.  SO THAT

18   PROCESS IS CONTINUOUS, AND IT IS HOW ANY MEDICAL PROGRAM,

19   WHETHER IT'S IN CORRECTIONS OR A CIVILIAN SECTOR CAN IMPROVE

20   ITS SERVICE.

21   Q.   SO HOW DOES A WELL-FUNCTIONING CONTINUOUS QUALITY

22   IMPROVEMENT -- OR IF I USE THE PHRASE *CQI*, WILL YOU UNDERSTAND

23   THAT TO MEAN QUALITY IMPROVEMENT?

24   A.   YES.

25   Q.   HOW DOES A WELL-FUNCTIONING CQI PROGRAM OPERATE?

10:55    1    **A.**    WELL, GENERALLY, IT HAS -- IT HAS TO HAVE THE SUPPORT OF

2    THE LEADERSHIP.  THE LEADERSHIP HAS TO NOT ONLY BUY IN, BUT

3    THEY HAVE TO PROMOTE IT.  AND IF THE LEADERSHIP DOESN'T PROMOTE

4    THE FACT THAT WE'RE GOING TO HAVE A QUALITY IMPROVEMENT PROGRAM

5    AND WE'RE GOING TO TRY TO IMPROVE CONTINUOUSLY, IT WON'T

6    HAPPEN.  SO THAT'S FUNDAMENTAL.

7            AND THE SECOND PART IS THAT IT HAS TO HAVE

8    PARTICIPATION FROM EVERY AREA OF SERVICE, INCLUDING THE SUPPORT

9    SERVICES.

10            SO ON EVERY QUALITY IMPROVEMENT COMMITTEE THAT I'VE

11    BEEN PART OF, AND EVEN ONES THAT I'VE SEEN WHERE I'M NOT PART

12    OF, THE QUALITY IMPROVEMENT MEETINGS OCCUR MONTHLY AND THEN A

13    MAJOR ONE QUARTERLY, AND YOU INCLUDE THE PHARMACY, NURSING,

14    PHYSICIAN LEADERSHIP, EVEN MENTAL HEALTH.  BUT EVERY DEPARTMENT

15    HEAD WOULD PARTICIPATE, AND THE EXTENT TO WHICH LINE STAFF CAN

16    PARTICIPATE IN THOSE STUDIES AND ACTIVITIES, THE BETTER IT IS

17    FOR THE ORGANIZATION.

18    **Q.**    AND SO FOCUSING ON THOSE TWO ASPECTS, DID YOU -- WHAT ROLE

19    FOR LEADERSHIP OR PARTICIPATION OF LEADERSHIP DID YOU OBSERVE

20    IN THE CQI PROGRAM AT ANGOLA?

21    **A.**    WELL, VERY LITTLE.  SO THE MEDICAL DIRECTOR, DR.

22    LAVESPERE, DID NOT PARTICIPATE IN QI.  I LOOKED AT THE MEETING

23    MINUTES, I THINK, FOR ALMOST FIVE YEARS FROM 2010 TO 2015, AND

24    THE MEDICAL DIRECTOR, WHETHER IT WAS DR. LAVESPERE OR SOMEONE

25    ELSE, WAS A -- THEY JUST WEREN'T PARTICIPATING.

10:57  1      MS. LAMARTINIERE PARTICIPATED IN A COUPLE OF MEETINGS

2   OVER THE YEARS, BUT WHEN I TALKED TO HER SHE REALLY DID NOT

3   HAVE A SENSE OF PERFORMING ANYTHING FOR THAT COMMITTEE, BUT SHE

4   DID ATTEND TWO MEETINGS.

5           AND THE ONLY PERSON THAT -- THE ONLY GROUP THAT

6   REALLY PARTICIPATED WERE THE NURSING SUPERVISORS, AND THE

7   DIRECTOR OF THE PROGRAM WAS A SUPERVISORY NURSE WHO HAD

8   MULTIPLE OTHER RESPONSIBILITIES.

9           AND SO IT WASN'T A FULLY DEDICATED POSITION, AND A

10  GROUP OF NURSES WOULD MEET AND DISCUSS THE SAME STUDIES OVER

11  AND OVER FOR YEARS, AND THE STUDIES WERE NOT REALLY CRITICAL

12  STUDIES OF IDENTIFICATION OF PROBLEMS AND TRYING TO FIX THEM,

13  BUT WERE MORE OBSERVATIONAL ONES SUCH AS LOOKING AT THE DATA ON

14  DEATH BUT NOT DOCUMENTING ANY ANALYSIS OF IT.  AND BECAUSE THE

15  PHYSICIANS DIDN'T PARTICIPATE, THERE WAS NO CLINICAL -- THERE

16  WAS NO CLINICAL ELEMENT TO THE EVALUATION.

17          SO, FOR EXAMPLE, ONE NURSE STUDY WAS LOOKING AT PAIN

18  MANAGEMENT IN HOSPICE CARE.  I MEAN, IT'S NICE THAT THE NURSES

19  DID THAT, BUT CAN THE NURSES, IN THEIR PROFESSIONAL ROLE AS

20  NURSES, DETERMINE IF PAIN MEDICATION WAS ADEQUATE FOR PATIENTS

21  IN HOSPICE.  IT SEEMS LIKE THE PHYSICIANS NEEDED TO BE

22  PARTICIPANTS AND WEREN'T.  SO IT LACKED PARTICIPATION FROM ALL

23  MEMBERS OF THE PROGRAM.

24  Q.   DID YOU SEE ANY EVIDENCE OF PARTICIPATION BY, FOR EXAMPLE,

25  THE MEDICS AND THEIR DEPARTMENT?

1   **A.**   NO.

2   **Q.**   AND DID YOU SEE ANY EVIDENCE OF MEMBERS OF THE PHARMACY

3   STAFF PARTICIPATING?

4   **A.**   NO.

5   **Q.**   AND IN TERMS OF --

6          **MR. DUBNER:**   LET'S TURN TO SLIDE 60, IF WE COULD.

7   BY MR. DUBNER:

8   **Q.**   AND SO IN TERMS OF THE STEPS THAT A CQI PROGRAM NORMALLY

9   TAKES, COULD YOU WALK THROUGH, WALK THE COURT THROUGH WHAT A

10  CQI PROGRAM ORDINARILY DOES AND NEEDS TO DO TO BE ABLE TO

11  IMPROVE THE PROBLEMS?

12  **A.**   SO I ALREADY DID THIS, BUT I CAN DO IT AGAIN, IF YOU WANT.

13  THE LEADERSHIP HAS TO BUY IN --

14         **MR. ARCHEY:**   YOUR HONOR, I'VE BEEN SO QUIET.  CAN WE

15  MOVE ON?  IF HE'S ALREADY DONE IT, DOES HE NEED TO DO IT AGAIN?

16         **MR. DUBNER:**   IF THE COURT BELIEVES IT COULD BE

17  HELPFUL, WE CAN MOVE ON.

18         **THE COURT:**   MOVE ON, PLEASE.

19         **MR. DUBNER:**   OKAY.

20  BY MR. DUBNER:

21  **Q.**   IN YOUR OPINION, HOW DOES THE FORM OF THE CQI THAT ANGOLA

22  UNDERTAKES AFFECT THE PROBLEMS IN CARE THAT WE DISCUSSED

23  YESTERDAY?

24  **A.**   WELL, IT'S PRETTY CLEAR THAT THEY DON'T HAVE A CQI PROGRAM

25  THAT'S EFFECTIVE.  IT'S A GROUP OF NURSES WHO MEET.  THEY HAVE

11:01  1   A VERY LIMITED PERSPECTIVE AND AGENDA.  THERE IS NO
       2   PARTICIPATION FROM MEDICAL; AS A RESULT, THE SERIOUS PROBLEMS
       3   THAT EXIST IN MEDICAL CARE.  AND I'M TALKING ABOUT SCHEDULING
       4   APPOINTMENTS TO SPECIALISTS.  WHY DON'T RECORDS, REPORTS, FROM
       5   THE SPECIALISTS COME BACK TO THE PROVIDERS?  WHY DON'T THE
       6   PROVIDERS REVIEW THOSE REPORTS?  WHY DOES IT TAKE 12 MONTHS OR
       7   15 MONTHS TO GET A BIOPSY OF A PROBABLE LUNG CANCER?
       8   THOSE PROBLEMS DON'T GET IDENTIFIED.  AND WHEN THEY DON'T GET
       9   IDENTIFIED, THERE IS NO DISCUSSION ON HOW TO IMPROVE IT; AND AS
      10   A RESULT OF THAT, THE SAME PROBLEMS REOCCUR OVER AND OVER, AND
      11   IT'S HARMFUL.  IT CAUSES MORBIDITY AND MORTALITY.
      12   Q.   THE PROBLEMS THAT WE'VE TALKED ABOUT IN THE CQI PROGRAM,
      13   DID YOU SEE THOSE THROUGHOUT THE TIME PERIOD THAT YOU LOOKED
      14   AT?
      15   A.   I MEAN, THE PROBLEMS WERE -- YES, FROM 2008, I LOOKED AT
      16   CHARTS THAT SPAN FROM 2008 TO 2015, 2016, AND THEY WERE THE
      17   SAME.
      18   Q.   AND JUST FOCUSING ON THE CONTINUOUS QUALITY IMPROVEMENT
      19   PROGRAM, DID THAT APPEAR TO HAVE DEFICIENCIES THAT YOU
      20   DESCRIBED FROM THE ENTIRE PERIOD THAT YOU LOOKED AT?
      21   A.   WELL, THE MINUTE -- YES, WE LOOKED AT MINUTES FROM 2010 TO
      22   2015 AND THERE WAS NO PARTICIPATION.  THE DOCUMENTED STUDIES
      23   WERE THE SAME OVER AND OVER.  SO IT DID NOT APPEAR THAT
      24   ANYTHING NEW WAS BEING IDENTIFIED.
      25   Q.   AND IS THERE ANY WAY IN WHICH -- DO YOU SEE ANY WAY IN

11:02

1   WHICH PROBLEMS AT AN OUTSIDE HOSPITAL WOULD HAVE ANY EFFECT ON

2   THE PROBLEMS THAT YOU OBSERVED IN ANGOLA'S CQI PROGRAM?

3   **A.**   I'M NOT SURE I UNDERSTAND THE QUESTION.

4   **Q.**   LET ME REPHRASE.  IS THERE ANY WAY, IN YOUR OPINION, THAT

5   THE PROBLEMS IN THE CQI PROGRAM COULD BE ATTRIBUTED TO AN

6   OUTSIDE FACILITY, AN INDEPENDENT HOSPITAL, RATHER THAN TO

7   ANGOLA?

8   **A.**   I MEAN, NO.  THE PROGRAM IS RESPONSIBLE FOR ITSELF.

9   THEY'RE RESPONSIBLE FOR THEIR CQI.  IF THEY IDENTIFY THAT THERE

10  IS A PROBLEM WITH THE SERVICES PROVIDED BY AN OUTSIDE HOSPITAL,

11  THEY HAVE TO FIND AN ALTERNATIVE.  I MEAN, IT'S AS SIMPLE AS

12  THAT.

13          I MEAN, I CAN GIVE YOU AN EXAMPLE FROM A DIFFERENT

14  CORRECTIONAL FACILITY WHERE, YOU KNOW, I'VE EXPERIENCED THERE'S

15  A FACILITY IN A REMOTE PLACE IN CALIFORNIA WHERE THE ACCESS TO

16  CERTAIN TYPES OF SPECIALISTS IS LOW, AND SO THEY JUST HAD TO

17  FIND A NEW FACILITY.  WELL, THAT COULD BE IDENTIFIED IN QI, AND

18  YOU WOULD JUST GO ABOUT IDENTIFYING AND CORRECTING IT, AND

19  THAT'S JUST PART OF THE PLAN.

20  **Q.**   TO ASK A SIMILAR QUESTION OF THE OTHER FORMS THAT WE HAVE

21  TALKED ABOUT TODAY.  IN YOUR OPINION, ARE THE DEFICITS THAT YOU

22  OBSERVED IN PEER REVIEW, DO YOU SEE ANY WAY THAT THEY'RE

23  ATTRIBUTABLE TO ANY PROBLEMS IN AN OUTSIDE HOSPITAL?

24  **A.**   NO.

25  **Q.**   AND IN TERMS OF THE DEFICITS THAT YOU OBSERVED IN

11:04  1   MORTALITY REVIEW, DO YOU SEE ANY WAY THAT THOSE ARE

2   ATTRIBUTABLE TO AN OUTSIDE HOSPITAL?

3   **A.**   NO.

4   **Q.**   I'D LIKE TO TURN TO INMATE MORTALITY, AND JUST SORT OF

5   LOOKING GLOBALLY AT THE PROBLEMS THAT YOU HAVE DESCRIBED, WHAT

6   EFFECT DO THEY HAVE ON PATIENTS' RISK OF PREVENTIBLE DEATH?

7   **A.**   WHAT IS THE RISK OF MORTALITY TO PREVENTIBLE DEATH?

8   **Q.**   THE PROBLEMS YOU'VE OBSERVED, IN WHAT WAY DO THEY AFFECT

9   PATIENTS' RISK OF MORTALITY?

10   **A.**   THEY INCREASE IT.

11   **Q.**   AND WHAT DID YOU DO TO DETERMINE WHETHER PREVENTIBLE

12   DEATHS WERE, IN FACT, OCCURRING?

13   **A.**   WHEN I REVIEW RECORDS, I OFTEN WILL TRY TO IDENTIFY

14   WHEN -- IF AN INTERVENTION HAD OCCURRED APPROPRIATELY THE DEATH

15   COULD HAVE BEEN PREVENTIBLE, OR THE PATIENT'S SURVIVAL WOULD

16   HAVE BEEN EXTENDED TO A REASONABLY SIGNIFICANT DEGREE.  THAT'S

17   WHAT I CONSIDER PREVENTIBLE.  AND SOMETIMES EVEN THOUGH

18   MISTAKES MAY BE MADE, A DEATH IS NOT PREVENTIBLE.  BUT THAT'S

19   HOW I DO IT.

20        SO, FOR EXAMPLE, IF SOMEONE HAS A LUNG NODULE IN YEAR

21   ONE, AND FOR 15 MONTHS YOU FAILED TO DO A BIOPSY AND TAKE

22   ACTION AND THE PATIENT DIES OF LUNG CANCER DESPITE THREE

23   RECOMMENDATIONS FROM A PULMONOLOGIST TO DO A BIOPSY, THAT'S

24   PREVENTIBLE.

25        IF A PATIENT HAS COMPLAINTS OF WEIGHT LOSS OR

11:06    1    ABDOMINAL PAIN, AND FOR TWO YEARS YOU FAILED TO EVALUATE FOR
2    COLON CANCER AND THE PATIENT DIES OF COLON CANCER, THAT'S
3    PREVENTIBLE.
4            IF THE PATIENT HAS SIGNS OF AN ISCHEMIC LEG FOR OVER
5    A YEAR AND YOU FAILED TO EVALUATE IT AND THE PATIENT DIES OF
6    NECROSIS AND SEPSIS, THAT'S PREVENTIBLE.
7            SO WE LOOK AT THE DEATH AND MAKE A JUDGMENT AS TO
8    WHETHER INTERVENTION WOULD HAVE PREVENTED THE DEATH OR
9    SIGNIFICANTLY EXTENDED THE LIFE OF THE PATIENT.
10   **Q.**   DID YOU LOOK AT ANY STATISTICS REGARDING THE DEATH RATE,
11   THE MORTALITY RATE AT ANGOLA?
12   **A.**   YES.
13   **Q.**   OR I'M SORRY.  LET ME REPHRASE THE QUESTION.
14   DID YOU LOOK AT ANY STATISTICS REGARDING THE MORTALITY RATE IN
15   DOC PRISONS?
16   **A.**   WE LOOKED AT THE DEPARTMENT OF JUSTICE STATISTICS, THEY
17   HAVE A STATISTICAL TABLE.
18           **MR. DUBNER:**  MARTHA, IF YOU COULD BRING UP
19   PLAINTIFFS' EXHIBIT 345 AT PAGE 1.
20   **BY MR. DUBNER:**
21   **Q.**   COULD YOU EXPLAIN WHAT THIS STATISTICAL TABLE THAT YOU ARE
22   REFERRING TO IS?
23   **A.**   SO THE DEPARTMENT OF JUSTICE HAS A REQUIREMENT THAT --
24           **MR. ARCHEY:**  YOUR HONOR, THIS IS A DOCUMENT WE OBJECT
25   TO, AND SO WE OBJECT TO THIS DOCUMENT WITHOUT --

11:08   1       **MR. ROBERT:**  OH, I THINK SHE ALLOWED THIS.  WE WILL
2    WITHDRAW THAT.
3       **MR. ARCHEY:**  WITHDRAWN.  I'M SORRY, JUDGE.
4       **MR. DUBNER:**  THIS WAS THE SUBJECT AT THE REQUEST FOR
5    JUDICIAL NOTICE.
6       **MR. ROBERT:**  WE GOT IT.
7       **MR. ARCHEY:**  NEVERMIND, JUDGE.  MY BAD.
8       **THE COURT:**  GO AHEAD.
9    BY MR. DUBNER:
10   Q.   I'M SORRY, DR. PUISIS.  CONTINUE.
11   A.   SO THIS DATA AND THIS DOCUMENT IS PRODUCED BY THE
12   DEPARTMENT OF JUSTICE STATISTICAL TEAM.  AND THE DEPARTMENT OF
13   JUSTICE HAS A REQUIREMENT THAT EVERY STATE CORRECTIONAL
14   FACILITY, AND THE FEDERAL PRISONS AS WELL, REPORT DEATHS TO THE
15   DEPARTMENT OF JUSTICE.  THERE'S A FORM THAT'S TO BE USED, AND
16   SO THEY KEEP STATISTICS ON IT.  AND THE LAST -- THE LATEST DATA
17   IS FROM 2013.  SO THIS DOCUMENT IS FROM 2000 TO 2013 SUMMARY,
18   AND THEY WILL PUBLISH OTHER DATA IN SUBSEQUENT YEARS.
19      **MR. DUBNER:**  MARTHA, IF YOU WOULD GIVE US PAGE 26.
20   BY MR. DUBNER:
21   Q.   SO TURNING TO TABLE 26 OF THE REPORT, CAN YOU EXPLAIN WHAT
22   THIS TABLE IN PARTICULAR IS?
23   A.   SO THIS IS ONE OF THE SUMMARY TABLES THAT HAS THE ANNUAL
24   DEATH RATE FOR EACH STATE IN THE FEDERAL SYSTEM AS WELL AS A
25   STATE AVERAGE.

11:09  1   **Q.**   AND WHAT DID YOU OBSERVE IN LOUISIANA'S MORTALITY RATE IN
       2   RESEARCHING THIS?
       3   **A.**   WELL, THERE'S A COUPLE THINGS.  ONE THING THAT THE COURT
       4   SHOULD UNDERSTAND IS THAT IT'S NOT APPROPRIATE TO --
       5   STATISTICALLY, TO COMPARE LOUISIANA TO, LET'S SAY, ILLINOIS OR
       6   TO CALIFORNIA BECAUSE THE POPULATION IN LOUISIANA IS
       7   STATISTICALLY DIFFERENT, OR CAN BE, AND IN ORDER TO MAKE THAT
       8   COMPARISON, ONE WOULD NEED TO DO AN ADJUSTMENT TO THE
       9   STATISTICS.
      10        IN OTHER WORDS, YOU WOULD HAVE TO ACCOUNT FOR THE AGE
      11   DIFFERENCES BETWEEN THE LOUISIANA PRISON POPULATION AND THE AGE
      12   DIFFERENCE OF THE ILLINOIS POPULATION, AND YOU WOULD HAVE TO DO
      13   THAT FOR EVERY FACTOR THAT WAS PRESENT.  IT COULD BE THE NUMBER
      14   OF HEPATIS C PATIENTS WOULD BE DIFFERENT, AND THAT COULD BE AN
      15   IMPORTANT FACTOR.  SO THE COMPARISON BETWEEN STATES IS NOT
      16   SOMETHING THAT SHOULD BE DONE, ALTHOUGH IT CAN SUGGEST CERTAIN
      17   THINGS.  IT'S NOT SOMETHING THAT IS AS RELIABLE AN INDICATOR OF
      18   A PROBLEM, BUT WHAT IS USEFUL TO COMPARE IS WITHIN THE STATE
      19   ITSELF, THE DEATH RATE.
      20        SO IN LOUISIANA, THE DEATH RATE DOUBLED.  IT WENT
      21   FROM 361 IN 2001 TO OVER 600.  THAT, I BELIEVE, IS SIGNIFICANT.
      22   AND IF YOU -- THE AVERAGE NATION-WIDE DEATH RATE DID NOT
      23   DOUBLE, AND SO THAT'S MORE AN INDICATION OF THE QUALITY OF CARE
      24   WITHIN LOUISIANA.  SO YOU CAN'T COMPARE -- LOUISIANA HAS ONE OF
      25   THE HIGHEST DEATH RATES IN THE COUNTRY, YOU CAN'T SAY THAT

1   IT'S, THEREFORE, BETTER OR WORSE THAN ILLINOIS, BUT YOU CAN SAY

2   THAT SOMETHING IS HAPPENING IN LOUISIANA THAT IS REALLY AMISS.

3   AND BECAUSE THEIR OWN DEATH RATE IS DOUBLING, THEY SHOULD HAVE

4   TAKEN NOTICE, AND IT SHOULD BE ADDRESSED BOTH IN QUALITY AND IN

5   THE TYPES OF DEATH THEY HAVE.  SO THAT'S HOW I WOULD INTERPRET

6   THIS.

7          I WOULD LOOK AT A HIGH DEATH RATE AND SAY IT SUGGESTS

8   THAT YOU SHOULD LOOK FURTHER AT YOUR OWN MORTALITY IF IT'S

9   HIGHER THAN OTHER STATES.  BUT IT'S NOT SOMETHING THAT'S

10  STATISTICALLY RELIABLE THAT YOU CAN DEPEND ON.  BUT WITHIN A

11  STATE SYSTEM ITSELF, IF I WORKED AT THE COOK COUNTY JAIL AND

12  OUR DEATH RATE DOUBLED OR TRIPLED OVER A MATTER OF TEN YEARS, I

13  WOULD BE CONCERNED AND TRY TO FIND WHY THAT'S OCCURRING.

14          MR. DUBNER:  MARTHA, IF YOU COULD GIVE US SLIDE 41.

15  BY MR. DUBNER:

16  Q.   AND YOU REFERRED TO THE MORTALITY RATE DOUBLING.  SLIDE 41

17  IS AN EXHIBIT DRAWN FROM OR DETAILING THOSE DEATH RATES IN

18  TABLE 26 ON PAGE 26 OF PLAINTIFFS' EXHIBIT 345.  DID THE

19  DOUBLING MORTALITY RATE THAT YOU REFERRED TO OCCUR AT ONCE OR

20  WAS IT A YEAR AFTER YEAR PROGRESSION?

21  A.   WELL, THE RATE NEVER IS PERFECT, IT GOES UP AND DOWN, BUT

22  OVER TIME, THE LINE IS UPWARD.  SO I WOULD CONSIDER THIS A

23  CONSISTENT PATTERN, EVEN THOUGH IN 2006, 2007, THERE APPEARED

24  TO BE LOWER RATES, BUT STILL THE PATTERN OVERALL IS UPWARD.

25  Q.   AND IN THE CONTEXT OF THE PROBLEMS YOU OBSERVED IN

1   CLINICAL CARE, WHAT DO THESE STATISTICS SUGGEST TO YOU?

2   **A.**   WELL, WE NOTED -- I NOTED AT LEAST IN THE RECORDS I

3   REVIEWED, THERE WERE A HIGH NUMBER OF PREVENTIBLE DEATHS.  SO

4   IF THE DEATH RATE IS INCREASING AND THEY'RE PREVENTIBLE DEATHS,

5   IT WOULD SUGGEST TO ME THAT THE EXCESS MAY BE PARTLY

6   PREVENTIBLE.  I MEAN, IT'S HARD TO TELL BECAUSE OF THE ANALYSIS

7   AND THE DEATH SUMMARIES ARE NOT CRITICAL, YOU CAN'T TELL, BUT

8   BASED ON OUR OWN DEATH REVIEWS, IT CERTAINLY APPEARED TO US AS

9   A GROUP THAT THERE WERE PREVENTIBLE DEATHS AND THERE PROBABLY

10  ARE MANY PREVENTIBLE DEATHS.

11          **MR. DUBNER:**  YOUR HONOR, I'M GOING TO CONCLUDE

12  SHORTLY, BUT COULD I HAVE A MOMENT TO CONSULT WITH MY

13  CO-COUNSEL?

14          **THE COURT:**  TAKE A MINUTE.

15  **BY MR. DUBNER:**

16  **Q.**   SO, DR. PUISIS, I'D LIKE TO RETURN TO YOUR OVERALL

17  FINDINGS.  BASED ON ALL THESE OBSERVATIONS THAT YOU DISCUSSED

18  IN THE PAST DAY, WHAT CONCLUSIONS DID YOU DRAW ABOUT THE

19  ADEQUACY OF THE MEDICAL CARE PROVIDED AT LSP?

20  **A.**   IT'S OUR OPINION THAT THE CARE IS INADEQUATE.

21  **Q.**   IN YOUR OPINION, ARE PATIENTS SYSTEMATICALLY DENIED TIMELY

22  ACCESS TO A PROFESSIONAL MEDICAL OPINION?

23  **A.**   YES.

24  **Q.**   AND IN YOUR OPINION, ARE PATIENTS SYSTEMATICALLY DENIED

25  TIMELY ACCESS TO TREATMENT FOR SERIOUS MEDICAL NEEDS?

**A.**   YES.

**Q.**   IN YOUR OPINION, DO THE OPERATIONAL FAILURES THAT YOU HAVE

DISCUSSED CONTRIBUTE TO THOSE FINDINGS?

**A.**   YES.

**Q.**   AND WHAT RISKS DOES LSP'S SYSTEM EXPOSE INMATES TO?

**A.**   MORBIDITY AND MORTALITY.

**Q.**   HOW WIDESPREAD ARE THESE RISKS?

**A.**   I WOULD SAY THEY ARE SIGNIFICANT BASED ON OUR RECORD

REVIEWS.

**Q.**   AND WHAT TIME PERIOD DID YOU FIND THEM TO COVER?

**A.**   2008 TO 2015.

**Q.**   AND IN YOUR REPORT -- DID YOU LOOK AT CARE IN 2016 AS

WELL?

**A.**   YES.

**Q.**   AND DID YOU FIND SIMILAR RISKS THERE AS WELL?

**A.**   I HAD A FEW PATIENTS WHOSE CARE EXTENDED INTO 2016, YES.

**Q.**   AND DID YOU MAKE THE SAME OBSERVATIONS ABOUT THE RISK OF

CARE IN THAT --

**A.**   YES.

**Q.**   DID YOU SEE ANY EVIDENCE THAT THE CARE CHANGED IN A

SIGNIFICANT WAY BETWEEN 2015 AND 2016?

**A.**   NO.

**Q.**   AND DID YOU SEE ANY EVIDENCE THAT ANY INADEQUACIES IN

OUTSIDE HOSPITALS EXPLAINED ALL OF THE PROBLEMS -- EXPLAINED

THE ENTIRETY OF THE PROBLEMS THAT YOU'VE DISCUSSED FOR THE LAST

1  TWO DAYS?

2  **A.**   NO, I NEVER FOUND THAT.

3  **Q.**   IN YOUR OPINION, YOU WROTE THAT IN YOUR YEARS IN

4  CORRECTIONAL MEDICINE AND ALL OF YOUR EXPERIENCE, THIS WAS ONE

5  OF THE WORST SYSTEMS YOU HAD EVER REVIEWED.  COULD YOU JUST

6  BRIEFLY EXPLAIN WHY YOU BELIEVE IT IS AT THAT LEVEL?

7  **A.**   WELL, STARTING WITH THE CREDENTIALING, IT'S CERTAINLY -- I

8  HAVE NEVER SEEN A FACILITY WHERE THE CREDENTIALING WAS SO POOR

9  AND THE NUMBER AND EXTENT OF THE MORBIDITY AND MORTALITY WAS

10  SIGNIFICANT, AND THERE WERE MANY CASES WHERE, YOU KNOW, WE

11  WOULD JUST SHAKE OUR -- I MEAN, THE GROUP, WE TALKED ABOUT --

12  WE REVIEWED CHARTS IN ONE OF THE ROOMS.  IT WAS -- WE WOULD

13  JUST SEE CASES THAT, YOU KNOW, WE HADN'T SEEN IN A WHILE.

14  **Q.**   AND WHAT DO YOU MEAN CASES YOU HADN'T SEEN IN A WHILE?

15  **A.**   WELL, I MEAN, I SAW SOME CASES IN THE CALIFORNIA SYSTEM

16  THAT WERE AS BAD, BUT THE NUMBER HERE WAS, I THINK, GREATER IN

17  TERMS OF THE RATIO.

18  **Q.**   AND WHEN YOU SAY YOU SAW CASES IN THE CALIFORNIA SYSTEM

19  THERE WERE AS BAD, WAS THAT PRIOR TO THE IMPLEMENTATION OF THE

20  --

21  **A.**   YES. YES.

22  **Q.**   THANK YOU, DR. PUISIS.

23       **MR. DUBNER:**  WE HAVE NO FURTHER QUESTIONS, BUT TWO

24  SMALL HOUSEKEEPING MATTERS THAT PLAINTIFFS WOULD LIKE TO DO

25  NOW.  ONE IS JUST THAT WE'D LIKE TO INTRODUCE PLAINTIFFS'

1   DEMONSTRATIVE 41, WHICH IS THE SUMMARY OF THE BUREAU OF

2   JUSTICE'S REPORT WHICH IS IN EVIDENCE AS A RULE 1006 SUMMARY.

3   **MR. ARCHEY:**  WE OBJECT, YOUR HONOR.  IT WASN'T ON THE

4   JOINT EXHIBIT LIST OR THE PRETRIAL EXHIBIT LIST.  I'M SORRY.

5   AND WE'VE NEVER SEEN IT 'TIL THE 72 HOURS BEFORE THAT WE AGREED

6   TO VOLUNTARILY AMONG OURSELVES.  AND I DON'T EVEN THINK IT'S A

7   SUMMARY, I THINK IT'S AN ARGUMENTATIVE DOCUMENT THEY PUT

8   TOGETHER.  IT DOESN'T SUMMARIZE EVERYTHING IN THOSE CHARTS, SO

9   WE OBJECT.

10   **MR. DUBNER:**  THE ONE CLARIFICATION I'LL MAKE IS THAT

11   THIS WAS USED -- THE EXACT SAME CHART WAS USED IN THE CLASS

12   CERTIFICATION HEARING, BUT HE IS CORRECT, IT WASN'T ON THE

13   JOINT EXHIBIT LIST.

14   **THE COURT:**  WAS IT PROVIDED TO THEM MORE THAN 72

15   HOURS AGO?

16   **MR. DUBNER:**  IT WAS, AND IT WAS PROVIDED AS PART OF

17   THE CLASS CERTIFICATION AND IT WAS IN THE FINDINGS OF FACT AND

18   CONCLUSIONS OF LAW.

19   **THE COURT:**  IT'S ALREADY IN THE RECORD.  THE COURT

20   WILL SUSTAIN THE OBJECTION.

21   **MR. DUBNER:**  THANK YOU, YOUR HONOR.  AND THEN JUST TO

22   CLOSE THE LOOP ON THE EXPERT'S REBUTTAL REPORT.  WE HAVE THE

23   INFORMATION ABOUT THE DATES OF THAT IF THE COURT WOULD LIKE

24   THAT, OR WE CAN JUST SUBMIT THAT AT THE BREAK TO MS. ALCON.

25   **THE COURT:**  WHY DON'T YOU JUST GO AHEAD AND PUT IT ON

11:20  1    THE RECORD.  SINCE I HAVE ALREADY OVERRULED THE OBJECTION,
2    LET'S PUT IT ON THE RECORD SO YOU HAVE A RECORD OF IT.
3            **MR. DUBNER:**  SURE THING.  SO THE DEADLINE FOR
4    REBUTTAL REPORTS WAS RECORD DOC. 24, AND THEN THAT WAS REVISED
5    SUBSEQUENTLY IN RECORD DOC. 120 AND SET AT NOVEMBER 14, 2016,
6    WHICH IS WHEN THE REBUTTAL REPORT WAS PROVIDED.  AND JUST FOR
7    CLARITY, THERE WERE ALSO SOME SUPPLEMENTAL CHART REVIEWS THAT
8    WERE PART OF THE EXPERT SAMPLE THAT WERE PROVIDED TO THE
9    DEFENDANTS AT THAT TIME.  THOSE WERE THE SUBJECT OF A MOTION IN
10   LIMINE THAT THE COURT RULED ON.  THE COURT ADMITTED THOSE, AND
11   GAVE DEFENDANTS LEAVE TO DEPOSE THE EXPERTS AGAIN, WHICH THEY
12   DIDN'T TAKE THAT OPPORTUNITY.  I BELIEVE THAT'S CORRECT.
13           **THE COURT:**  I RECALL.  OKAY.  ANYTHING FURTHER?
14           **MR. DUBNER:**  NO, YOUR HONOR.
15           **THE COURT:**  WE CAN TAKE A BREAK OR WE CAN TAKE AN
16   EARLY LUNCH.  WE HAVEN'T BEEN ON THE RECORD VERY LONG, BUT I
17   WILL -- LET'S TAKE A 15-MINUTE RECESS.
18           **MR. ARCHEY:**  THAT WILL BE FINE, YOUR HONOR, JUST GIVE
19   ME TIME TO SET UP.
20           **THE COURT:**  A 15-MINUTE RECESS.
21           **MR. ARCHEY:**  THANK YOU.
22           **THE CLERK:**  ALL RISE.
23                       **(RECESS.)**
24           **THE COURT:**  BE SEATED.
25           YOUR WITNESS, MR. ARCHEY.

1          CROSS-EXAMINATION

2    BY MR. ARCHEY:

3    Q.    GOOD MORNING, DR. PUISIS.

4    A.    GOOD MORNING.

5    Q.    I WANT TO START WITH SHANNON HURD.  LET'S START RIGHT

6    THERE.  SHANNON HURD IS THE INMATE WHO DEVELOPED THE RENAL

7    KIDNEY CANCER.  IS THAT RIGHT?

8    A.    I'M NOT SURE.  CAN YOU -- IS THAT ONE OF THE FIRST 14?

9    Q.    IT'S THE ONE THAT THE PLAINTIFFS PUT IN THEIR OPENING WITH

10   HIS PICTURE, AND YOU'VE TALKED ABOUT IT, WHERE YOU ACCUSE LSP

11   PHYSICIANS OF NOT NOTICING HIS WEIGHT LOSS, NOT PICKING UP ON

12   ABDOMEN PAIN, LETTING THE MAN DEVELOP CANCER AND DIE.  YOU

13   DON'T KNOW WHAT I'M TALKING ABOUT?

14   A.    IF YOU CAN REFER TO THE PATIENT NUMBER.

15   Q.    HE DOES NOT HAVE A PATIENT NUMBER BECAUSE HE'S A NAMED

16   PLAINTIFF.

17   A.    OKAY.

18   Q.    IT'S ON PAGE 18 OF YOUR CHART REVIEW.  YOU DON'T KNOW WHO

19   I'M TALKING ABOUT?

20   A.    THAT RECORD WAS REVIEWED BY MS. LAMARRE.

21   Q.    YOU'VE GIVEN LOTS OF OPINIONS ABOUT HIM YESTERDAY AND

22   TODAY.  YOU CLOSED BY TALKING ABOUT HIM.

23        MR. DUBNER:  OBJECTION, YOUR HONOR.  DR. PUISIS

24   NEVER MENTIONED SHANNON HURD.

25        MR. ARCHEY:  I BEG TO DIFFER, JUDGE.  YES, HE DID.

1    I'LL MOVE ON.  I WILL RE-ASK THE QUESTION.

2              **THE COURT:**  DO THAT.

3              **MR. ARCHEY:**  ALL RIGHT.

4    **BY MR. ARCHEY:**

5    **Q.**    HOW MANY CHARTS DID YOU PERSONALLY REVIEW?

6    **A.**    I REVIEWED 14 RECORDS THAT ARE IN THE REPORT, AND I

7    REVIEWED THE RECORDS OF, I THINK, THREE OR FOUR NAMED

8    PLAINTIFFS IN INTERVIEWS, AND A COUPLE WITH RESPECT TO THE

9    REBUTTAL.

10   **Q.**    AT THE CLASS CERTIFICATION HEARING, YOU TESTIFIED THAT

11   MS. LAMARRE DID ALL THE CHART REVIEWS.

12             **MR. DUBNER:**  OBJECTION, YOUR HONOR.  MISCHARACTERIZES

13   THE TESTIMONY.

14             **MR. ARCHEY:**  I'LL READ IT IF YOU'D LIKE.

15             **THE COURT:**  IT'S REALLY IMPROPER IMPEACHMENT.  JUST

16   ASK HIM THE QUESTION.

17   **BY MR. ARCHEY:**

18   **Q.**    LET ME ASK YOU THIS.  AT YOUR DEPOSITION, YOU SAID YOU

19   ONLY REVIEWED FOUR CHARTS.

20             **MR. DUBNER:**  AGAIN, OBJECTION, YOUR HONOR,

21   MISCHARACTERIZING THE TESTIMONY.

22             **THE COURT:**  IT'S AN IMPROPER OBJECTION, MR. ARCHEY.

23   ASK HIM THE QUESTION.  IF HE DENIES THE QUESTION, THEN YOU

24   CONFRONT HIM WITH HIS DEPOSITION.

25   **BY MR. ARCHEY:**

1  Q.  HOW MANY CHARTS DID YOU REVIEW PRIOR TO YOUR DEPOSITION?

2  A.  I'M NOT SURE ABOUT PRIOR TO THE DEPOSITION, BUT WITH

3  RESPECT TO THIS CASE, I REVIEWED 14 RECORDS THAT ARE DOCUMENTED

4  IN THE REPORT.

5  Q.  OKAY.

6  A.  I REVIEWED SEVERAL RECORDS OF INMATES WHO WE INTERVIEWED

7  AT THE FACILITY THAT ARE NOT IN THE REPORT, AND I INTERVIEWED

8  SEVERAL CHARTS WITH RESPECT TO A REBUTTAL.

9  Q.  SO AT YOUR DEPOSITION WHEN YOU TESTIFIED YOU REVIEWED FOUR

10  CHARTS PRIOR TO THAT.  IS THAT CORRECT OR NOT?

11  A.  I DON'T RECALL SAYING THAT.

12  Q.  OKAY.  WHILE WE'RE BRINGING THAT OUT, DR. PUISIS, YOUR

13  OPINIONS ARE BASED UPON THE CHART REVIEWS DONE BY MS. LAMARRE.

14  IS THAT ACCURATE?

15  A.  THEY ARE BASED ON CHART REVIEWS THAT I DID AND --

16  PREDOMINANTLY, AND THE ONES THAT MS. LAMARRE DID AND THAT

17  DR. VASALLO DID, I ALSO TOOK INTO CONSIDERATION.

18  Q.  WELL, THE CHART REVIEWS THAT YOU PRODUCED FOR US FOR THIS

19  COURT WERE DONE BY MS. LAMARRE AND THAT'S WHAT YOU RELIED UPON.

20  CORRECT?

21        MR. DUBNER:  OBJECTION, YOUR HONOR.  THERE'S BEEN NO

22  FOUNDATION FOR THAT ASSERTION.

23        THE COURT:  LET'S JUST TRY TO MOVE ON.  OBJECTION

24  OVERRULED.

25  BY MR. ARCHEY:

11:14:2   1   Q.   ON PAGE 76 OF THE CLASS CERTIFICATION HEARING, YOU WERE

2   ASKED:  "DID YOU ACTUALLY REVIEW THE CHARTS THEMSELVES OR JUST

3   WHAT SHE" -- REFERRING TO MS. LAMARRE -- "REPORTED WAS IN HER

4   CHARTS?"

5            YOU ANSWERED: "I REVIEWED HER REPORT."

6   A.   THAT'S CORRECT.  WE ALL REVIEWED EACH OTHER'S WORK, BUT

7   THAT DOESN'T MEAN THAT I REVIEWED THE RECORD.

8   Q.   AND YOU FURTHER TESTIFIED AT THE CLASS CERTIFICATION

9   HEARING THAT "MS. LAMARRE REVIEWED THE CHARTS INDEPENDENTLY

10   WITHOUT ANY OVERVIEW BY YOU."

11            AND YOU SAID:  "CORRECT.  SHE'S A NURSE

12   PRACTITIONER."

13            CORRECT?

14   A.   THAT'S CORRECT.

15   Q.   SO AS TO SHANNON HURD, LET'S START THERE, THAT WAS A CHART

16   REVIEWED BY MS. LAMARRE.  CORRECT?

17   A.   IF YOU GIVE ME THE NUMBER, I WOULD KNOW FOR SURE, BUT --

18   Q.   IT'S BY NAME IN YOUR REPORT, THAT'S ALL I CAN TELL YOU.

19   A.   OKAY.  I'LL PRESUME SHE DID REVIEW IT.

20   Q.   HERE IS THE -- THERE IS THE PAGE WHERE HER REVIEW STARTS.

21            MR. DUBNER:  AND OBJECT, YOUR HONOR.  HE'S REFERRING

22   TO THIS AS THE PLAINTIFFS' REPORT.  THIS IS THE PLAINTIFFS'

23   REBUTTAL REPORT, JUST TO BE CLEAR, FOR THE RECORD.

24            THE WITNESS:  YEAH, THIS ISN'T THE REPORT 'CAUSE WE

25   DIDN'T PUT NAMES OF THE PATIENTS IN OUR REPORT.

**BY MR. ARCHEY:**

**Q.**   OKAY.  WELL, SHANNON HURD HAS BECOME AN ISSUE IN THIS TRIAL.  THAT'S ONE OF THE PRIMARY OUT THE GATE, GOT IT IN OPENING, AND IT HAS BEEN REFERRED TO REPEATEDLY BECAUSE OF THE KIDNEY CANCER THAT THIS INMATE DEVELOPED.

          ARE YOU FAMILIAR WITH THAT?

**A.**   I DIDN'T REVIEW THAT RECORD.

**Q.**   OKAY.

**A.**   SO THAT RECORD WAS NOT INCORPORATED INTO OUR REPORT.

**Q.**   ALL RIGHT.  SO WHEN YOU TESTIFIED ABOUT THE KIDNEY CANCER BEING DEVELOPED WHERE WEIGHT LOSS WAS NOT OBSERVED AND ABDOMEN PAIN, YOU'RE RELYING UPON MS. LAMARRE'S CHART REVIEW.  RIGHT?

**A.**   THAT'S CORRECT.

**Q.**   OKAY.  NOW, WHAT ARE THE PRIMARY INDICATORS FOR KIDNEY CANCER?

**A.**   CAN YOU BE MORE SPECIFIC?

**Q.**   SURE.  WEIGHT LOSS?  BLOOD IN THE URINE?  ABDOMEN MASS? PAIN?  THOSE ARE THE PRIMARY INDICATORS.  CORRECT?

**A.**   YOU MEAN SYMPTOMS AND SIGNS?

**Q.**   YES.  THANK YOU.

**A.**   OKAY.  YES.

**Q.**   OKAY.  WEIGHT LOSS, DID MR. SHANNON HURD HAVE A WEIGHT LOSS THAT SHOULD HAVE BEEN IDENTIFIED?

          **MR. DUBNER:**  I'M GOING TO OBJECT, YOUR HONOR.  HE HAS ALREADY TESTIFIED THAT THIS WASN'T A CHART THAT HE REVIEWED AND

1   HE DOESN'T HAVE KNOWLEDGE.

2           **THE COURT:**  IF HE KNOWS, HE CAN ANSWER.  IF HE

3   DOESN'T KNOW, HE'LL SAY HE DOESN'T KNOW.  OBJECTION OVERRULED.

4                   DO YOU KNOW, SIR?

5           **THE WITNESS:**  NO, I DIDN'T REVIEW THIS RECORD.  AND I

6   DON'T FEEL THAT I SHOULD ANSWER THAT QUESTION.

7   **BY MR. ARCHEY:**

8   **Q.**   DID YOU FIND THE RECORD REVIEWS THAT WERE DONE BY

9   MS. LAMARRE TO BE FAIR AND REPRESENTATIONS OF THE CHARTS?

10  **A.**   I FOUND -- I'VE WORKED WITH MS. LAMARRE, AND I'VE REVIEWED

11  RECORDS THAT SHE HAS IN THE PAST, SO I KNOW THAT HER WORK IS OF

12  GOOD QUALITY, AND I'VE REVIEWED HER REVIEW, AND THAT'S WHAT I

13  DID.

14  **Q.**   IN THIS CASE, DO YOU KNOW IF MS. LAMARRE'S RECORDS REVIEW

15  WERE FAIR REPRESENTATIONS OF THE CHARTS?

16  **A.**   I BELIEVE THEY WOULD BE, YES.

17  **Q.**   OKAY.  WHAT DO YOU BASE THAT UPON?

18  **A.**   MY EXPERIENCE WITH MS. LAMARRE.

19  **Q.**   OKAY.  NOT ANYTHING --

20  **A.**   AND HER -- AND THE REVIEW THAT SHE WROTE.

21  **Q.**   NOT COMPARING HER REVIEWS TO THE ACTUAL RECORDS, THOUGH.

22  RIGHT?

23  **A.**   I DIDN'T REVIEW THE RECORDS, THAT'S CORRECT.

24  **Q.**   ALL RIGHT.  WITH THIS MR. SHANNON HURD, LET'S GO THROUGH

25  HIM.  ALL RIGHT.  LET'S TALK ABOUT THE WEIGHT LOSS, BECAUSE

1   MS. LAMARRE WRITES IN HER RECORD REVIEW THAT MR. HURD HAD
2   WEIGHT LOSS THAT WAS NEVER ADDRESSED AND THAT LED TO HIS
3   DEVELOPMENT OF CANCER, SHOULD HAVE BEEN PICKED UP EARLIER, AND
4   THAT'S WHY IT WAS BAD CARE.  ARE YOU FAMILIAR WITH ANY OF THAT?
5   **A.**   YOU KNOW, I DIDN'T REVIEW THE REBUTTALS PRIOR TO THE --
6   THIS MEETING, BUT IF YOU CAN REFRESH MY RECOLLECTION.
7   **Q.**   I'LL BE GLAD TO.
8   **A.**   THAT WOULD BE FINE.
9   **Q.**   I'LL BE GLAD TO.  LET'S BEGIN RIGHT HERE AT THE TOP.  IT
10  SAYS ON MARCH 19, 2012, MR. HURD WEIGHED 233 POUNDS, AND THEN
11  ON NOVEMBER 4, 2013, A DOCTOR SAW HIM AND HE WEIGHED
12  218 POUNDS, A 15-POUND WEIGHT LOSS.  ALL RIGHT.  IS THAT PART
13  OF WHAT YOU ARE RELYING UPON FOR THE OPINIONS IN THIS CASE?
14  **A.**   I HAVE A PROBLEM WITH USING THE RECORD REVIEW THAT ANOTHER
15  EXPERT DID TO CHARACTERIZE MY WORK.  WHILE I REVIEWED
16  MS. LAMARRE'S REPORT, IT'S JUST A LITTLE DIFFICULT TO ANSWER
17  YOUR QUESTIONS BECAUSE IT WASN'T SOMETHING THAT I PERSONALLY
18  REVIEWED.
19  **Q.**   WELL, LET'S GO THROUGH IT BECAUSE HERE, THIS IS THE RECORD
20  OF 233 POUNDS ON MARCH 19, 2012.
21  **A.**   OKAY.
22  **Q.**   DO YOU SEE THAT?
23  **A.**   I DO.
24  **Q.**   ALL RIGHT.  IS IT MEDICALLY ADVISABLE TO LOSE WEIGHT FOR
25  HEALTH REASONS IF WE'RE OVERWEIGHT?

1    **A.**   IT IS.

2    **Q.**   OKAY.  THIS RECORD, ON SEPTEMBER 24, 2012, MR. HURD NOW IS

3    220 POUNDS.  DO YOU THINK IT WOULD BE APPROPRIATE IF HE WAS 5

4    FOOT 9 INCHES TO HAVE DROPPED 15 POUNDS?

5    **A.**   WAS HE INTENDING TO DO IT?  THAT'S THE PROBLEM.

6    **Q.**   OKAY.  WELL, WE WILL KEEP GOING.

7    **A.**   OKAY.

8    **Q.**   OKAY.  LET'S GO TO THE NEXT ONE, NEXT ENTRY, WHICH IS

9    JANUARY 23, 2013, HIS WEIGHT IS NOW 228 POUNDS.  DO YOU SEE

10   THAT?

11   **A.**   I DO.

12   **Q.**   OKAY.  SO THIS PATIENT'S WEIGHT WOULD FLUCTUATE, WOULD IT

13   NOT?

14   **A.**   WELL, WOULD IS PROBABLY THE WRONG WORD.  IT IS.

15   **Q.**   IT DID.  IT DID.  CORRECT?

16   **A.**   YES.

17   **Q.**   AND HERE WE HAVE ON APRIL 1, 2013, 229 POUNDS.  CORRECT?

18   **A.**   THAT'S CORRECT.

19   **Q.**   SO NOW IT'S BEEN STEADY AT 228, 229 POUNDS.

20         WE GO TO APRIL 9, 2013, IT'S 230 POUNDS HERE, STILL

21   IN THAT SAME RANGE.  CORRECT?

22   **A.**   CORRECT.

23   **Q.**   OKAY.  APRIL 17, 2013, HIS WEIGHT IS 232 POUNDS.  DO YOU

24   SEE THAT?

25   **A.**   I DO.

1  Q.   OKAY.  APRIL 24, 2013, HIS WEIGHT IS 238 POUNDS.  DO YOU

2  SEE THAT?

3  A.   I DO.

4  Q.   MARCH 1, 2013, HIS WEIGHT IS 235 POUNDS.  DO YOU SEE THAT?

5  A.   I DO.

6  Q.   MARCH -- I'M SORRY, MAY 8, 2013, HIS WEIGHT IS 237 POUNDS.

7         MR. ARCHEY:  AND, YOUR HONOR, I REALIZE NOW THAT I'M

8  DOING EXACTLY WHAT MY CO-COUNSEL DID WHEN HE STARTED.  THESE

9  RECORDS ARE ALL IN JOINT EXHIBIT NO. 10, AND THEY START AT

10 25787 AND THROUGH THAT AREA.

11        MR. DUBNER:  AND JUST TO CLARIFY, I DON'T ACTUALLY

12 BELIEVE MY EXHIBITS START AT 2578, IN THAT AREA.  I DON'T

13 BELIEVE THAT'S ACCURATE, BUT WE'LL CLEAR THAT UP WITH THE EXACT

14 REFERENCES -- WITH THE CORRECT NUMBERS LATER.

15        MR. ARCHEY:  WELL, I'LL START IDENTIFYING THEM BY

16 NUMBER.

17 BY MR. ARCHEY:

18 Q.   THE NEXT ONE IS MAY 20, 2013, AND THIS IS 25742 OF JOINT

19 EXHIBIT 10.  MR. HURD'S WEIGHT IS 231 POUNDS.  DO YOU SEE THAT?

20 A.   I DO.

21 Q.   JUNE 6, 2013, MR. HURD'S WEIGHT IS 226 POUNDS, AND THIS IS

22 AS OF -- OR DOCUMENT NO. 25741.  DO YOU SEE THAT?

23 A.   I DO.

24 Q.   JULY 25, 2013, MR. HURD'S WEIGHT IS 233 POUNDS.  THIS IS

25 DOCUMENT NO. 25730.  DO YOU SEE THAT?

1   **A.**   I DO.

2   **Q.**   AUGUST 9, 2013, MR. HURD'S WEIGHT IS 235 POUNDS.  DO YOU

3   SEE THAT?

4   **A.**   I DO.

5   **Q.**   JANUARY 4, 2013, MR. HURD'S WEIGHT IS 218 POUNDS NOW.  DO

6   YOU SEE THAT?

7   **A.**   I DO.

8   **Q.**   AND, PREVIOUSLY, HE'S HAD WEIGHT OF 220 POUNDS OVER HIS

9   HISTORY.   CORRECT?

10   **A.**   I CAN'T REMEMBER, BUT IF YOU SAY ONE OF THOSE RECORDS WAS

11   220, I'LL BELIEVE YOU.

12   **Q.**   JANUARY 16, 2014, MR. HURD'S WEIGHT IS 225 POUNDS.  THIS

13   IS DOCUMENT NO. 25704.  DO YOU SEE THAT?

14   **A.**   THAT'S CORRECT.

15   **Q.**   MAY 12, 2014, MR. HURD'S WEIGHT IS 206 POUNDS.

16   DO YOU SEE THAT?

17   **A.**   I DO.

18   **Q.**   THAT'S DOCUMENT NO. 25526.

19            NOW, WHAT MS. LAMARRE DID WAS TOOK THE HIGHEST WEIGHT

20   THAT MR. HURD HAD AND USED THAT AS FOR COMPARISON AS OPPOSED TO

21   WHAT HE HAD PRIOR TO THAT.  ARE YOU AWARE OF THAT?

22   **A.**   NO.

23   **Q.**   HE STARTS OUT ON SEPTEMBER 24, 2012, AT 220 POUNDS AND SHE

24   DOES ALL OF HER CALCULATIONS FROM A MARCH 19, 2012, RECORD OF

25   235 POUNDS, THAT'S 15 POUNDS WERE ADDED TO THE WEIGHT LOSS

11:53  1   THAT'S ON HIS CHART REVIEW.  ARE YOU AWARE OF THAT?

2   **A.**   NO.

3   **Q.**   MS. LAMARRE SAYS THAT MR. HURD CONTINUED TO COMPLAIN OF

4   WEIGHT LOSS OR PAIN ON HIS LEFT SIDE, THE SIDE OF HIS

5   CARCINOMA.  ARE YOU AWARE -- ARE YOU AWARE OF ANY RECORD OF

6   PAIN ON -- WITH MR. HURD ON HIS LEFT SIDE PRIOR TO OCTOBER OF

7   2015?

8   **A.**   WELL, IF YOU GIVE ME THE RECORD, IT WOULD TAKE ME A WHILE,

9   BUT I CAN TELL YOU.

10  **Q.**   IF I TELL YOU THAT THERE ARE NONE, ARE YOU GOING TO BE

11  ABLE TO DISPUTE THAT?

12  **A.**   WELL, LIKE I SAY, IF YOU WANT ME TO REVIEW IT, I CAN DO

13  THAT.

14  **Q.**   WELL, THE PROBLEM IS THAT YOU'VE ADOPTED THIS REPORT,

15  BECAUSE IN YOUR EXPERT REPORT, YOU ACTUALLY SAID THESE ARE THE

16  OPINIONS OF ALL OF US.  YOU'VE SAID IT THROUGH THE LAST TWO

17  DAYS, THAT WE ALL AGREE.  RIGHT?

18  **A.**   THAT'S CORRECT.

19  **Q.**   MR. HURD'S NAME IS IN YOUR ORIGINAL EXPERT REPORT.  ARE

20  YOU FAMILIAR WITH THAT?

21  **A.**   THIS IS OUR -- THE REPORT IN 2016 IS OUR ORIGINAL REPORT.

22  **Q.**   RIGHT, AND HIS NAME IS IN THAT ORIGINAL REPORT.  ARE YOU

23  AWARE OF THAT?

24  **A.**   HE -- IF IT IS, WE DIDN'T PUT ANY OF THE NAMES IN THE

25  REPORT.  WE PUT PATIENT IDENTIFIERS ON A SEPARATE DOCUMENT, SO

11:55   1   IF YOU'RE REFERRING TO -- I'M NOT SURE WHICH REPORT YOU'RE

       2   REFERRING TO.

       3   **Q.**   I'M REFERRING TO YOUR ORIGINAL REPORT.  YOU DO MENTION

       4   MR. HURD BY NAME IN THAT ORIGINAL REPORT.  ISN'T THAT TRUE?

       5   **A.**   IN OUR REPORT, WE DID NOT MENTION ANY NAMES.  THE REPORT

       6   I'M REFERRING TO IS OCTOBER 5, 2016.

       7   **Q.**   YOUR ORIGINAL REPORT.  THAT'S THE ONE I'M REFERRING TO AS

       8   WELL.

       9   **A.**   OKAY.  WE --

      10        **THE COURT:**  WHAT HE SAID WAS HE DIDN'T PUT ANY NAMES

      11   IN HIS REPORT.  SO IF YOU'VE GOT A NAME IN HIS REPORT, SHOW IT

      12   TO HIM.

      13   **BY MR. ARCHEY:**

      14   **Q.**   FOOTNOTE 43, YOU MENTION MR. HURD BY NAME.  SHANNON HURD.

      15        **THE COURT:**  ARE YOU GOING TO SHOW IT TO HIM?

      16        **THE WITNESS:**  YEAH, WHY DON'T YOU DO THAT.

      17        **THE COURT:**  OR ARE YOU GOING TO MAKE HIM GUESS?

      18             YOU CAN USE THE ELMO.

      19        **MR. ARCHEY:**  JUDGE, I APOLOGIZE FOR NOT HAVING THAT.

      20   **BY MR. ARCHEY:**

      21   **Q.**   SEE DOWN HERE AT THE BOTTOM WHERE THE FOOTNOTE IS.  IT'S

      22   ACTUALLY HIGHLIGHTED WITH SHANNON HURD WITH THE WAY THE

      23   COMPUTER WORKS.  DO YOU SEE THAT?

      24   **A.**   OH, OKAY.  YEAH.  OKAY.

      25   **Q.**   YOU DID MENTION SHANNON HURD BY NAME IN YOUR ORIGINAL

11:56   1    REPORT.  CORRECT?

2    **A.**   YEAH.  THIS IS NOT ONE OF THE PATIENTS THAT'S REVIEWED IN

3    THE RECORD REVIEWS.

4    **Q.**   RIGHT, BUT YOU DID MENTION HIM.

5    **A.**   SO THIS IS A FOOTNOTE, OKAY.

6    **Q.**   RIGHT.  AND YOU TALK ABOUT HIS CARE TOO DOWN THERE.

7    **A.**   OKAY.

8    **Q.**   AND YOU GOT A CRITICISM OF IT.  RIGHT?

9    **A.**   THAT'S CORRECT.

10   **Q.**   OKAY.  SO IT WAS ONE OF THE ORIGINAL PARTS OF YOUR

11   ORIGINAL REPORT.  RIGHT?

12   **A.**   THAT'S CORRECT.

13   **Q.**   AND ONE OF THE THINGS -- IT'S ALSO IN FOOTNOTE 92.  90,

14   I'M SORRY, 90.  SO IT'S IN THERE TWICE WITH CRITICISMS.  RIGHT?

15   DO YOU SEE THAT NOW?

16   **A.**   IT NEEDS TO BE A LITTLE LIGHTER.  WHAT PAGE IS IT?  92,

17   YOU SAID?

18   **Q.**   PAGE 76, FOOTNOTE 90.

19   **A.**   I CAN'T READ YOUR PAGES.

20   **Q.**   I UNDERSTAND.

21   **A.**   BUT I HAVE A COPY, SO I'LL JUST LOOK AT THAT.  YES.

22   **Q.**   ALL RIGHT.  THIS WRITE-UP BY MS. LAMARRE STATES:

23   "MR. HURD CONTINUED TO COMPLAIN OF WEIGHT LOSS OR PAIN ON HIS

24   LEFT SIDE, THE SIDE OF HIS CARCINOMA."  AND SHE'S TALKING IN

25   2014, EARLY 2015.  ARE YOU AWARE OF ANY LEFT-SIDED ABDOMEN

11:58    1    COMPLAINTS OF PAIN PRIOR TO THAT DATE?

2    **A.**    AS I SAID, WE DID NOT REVIEW RECORDS THAT WERE REVIEWED BY

3    THE OTHER EXPERTS.

4    **Q.**    SO IF THAT STATEMENT IS SHOWN TO BE DEMONSTRATIVELY FALSE,

5    THEN THAT MAKES THIS CHART REVIEW MISLEADING AT BEST.  CORRECT?

6    **A.**    YOU KNOW, I DON'T FEEL IT APPROPRIATE TO SPEAK FOR

7    MS. LAMARRE IN THIS CASE, SO WITH -- I WOULD NEED TO GO BACK

8    AND REVIEW THE RECORD IF YOU WANT ME TO ASK -- ANSWER WITH

9    RESPECT TO THE DETAIL OF THE CASE.

10    **Q.**    OKAY.  MS. LAMARRE FURTHER GOES AND CRITICIZES THESE

11    PHYSICIANS BECAUSE SHE SAYS THERE'S A URINALYSIS WHICH SHOWED

12    TRACE BLOOD.  AND SHE'S TALKING ABOUT APRIL 15, 2015.  DO YOU

13    SEE THAT?

14    **A.**    YES, I DO.

15    **Q.**    OKAY.  THE FACT OF THE MATTER IS, THAT URINALYSIS WITH

16    TRACE BLOOD WAS ON APRIL 17, 2014.  DO YOU SEE THAT?

17              **MR. DUBNER:**  OBJECTION, YOUR HONOR.  THIS DOESN'T

18    APPEAR TO BE FROM THE RECORDS IN EVIDENCE.  THERE'S NO BATES

19    STAMP ON IT.

20              **MR. ARCHEY:**  IT IS DOCUMENT NO. 25217, JUDGE.  THANK

21    YOU, JUDGE.

22    **BY MR. ARCHEY:**

23    **Q.**    DO YOU SEE THAT?

24    **A.**    I SEE THE LAB YOU'RE PUTTING UP, YES.

25    **Q.**    OKAY.  IF THERE'S NO OTHER URINALYSIS THERE, MS. LAMARRE

12:00  1  IS JUST WRONG ON HER REPORT.

2  **A.**   WELL, ONCE AGAIN, I'D HAVE TO REVIEW THE RECORD.

3  **Q.**   OKAY.

4  **A.**   IF YOU WANT ME TO DEFINITIVELY ANSWER THE QUESTION, I

5  WOULD HAVE TO REVIEW THE RECORD.

6  **Q.**   SHE CONTINUES, AND SHE'S VERY CRITICAL OF LSP FOR NOT

7  IDENTIFYING THE URINALYSIS, OR TAKING ACTION BASED UPON BLOOD

8  URINALYSIS.  FIRST OFF, THERE ARE MANY REASONS WHY THERE COULD

9  BE TRACE BLOOD IN A URINALYSIS.  IS THAT FAIR?

10  **A.**   IT'S CORRECT, YEAH.

11  **Q.**   AND ARE YOU AWARE THAT THERE WERE LATER URINALYSES IN

12  WHICH BLOOD WAS FOUND NOT TO BE PRESENT?  THIS IS DOCUMENT

13  NO. 25216 ON NOVEMBER 3, 2015, BLOOD NEGATIVE.

14          **THE COURT:**  COUNSEL, HE SAID HE WANTED TO LOOK AT THE

15  MEDICAL RECORDS.  IF YOU WANT HIM TO LOOK AT THE MEDICAL

16  RECORDS AND YOU WANT TO CROSS-EXAMINE HIM, YOU CAN.  OTHERWISE,

17  I SEE THAT DR. LAMARRE, OR I DON'T KNOW IF SHE'S A DOCTOR, I

18  GUESS SHE IS, IS GOING TO TESTIFY, SO YOU CAN CROSS-EXAMINE

19  HER.

20          **MR. ARCHEY:**  I WILL ASK THIS QUESTION, JUDGE, IF I

21  MAY.

22  **BY MR. ARCHEY:**

23  **Q.**   THIS CHART NEVER REFERS TO THE NEGATIVE BLOOD URINALYSIS.

24  ARE YOU AWARE OF THAT?  THIS CHART REVIEW.

25  **A.**   WELL, WITHOUT EVEN REVIEWING THE RECORD, YOU COULD HAVE A

12:01

1   POSITIVE -- YOU COULD HAVE TRACE BLOOD, AND THEN YOU COULD HAVE

2   NEGATIVE BLOOD, AND YOU COULD STILL HAVE RENAL CANCER AND YOU

3   COULD HAVE REAPPEARANCE OF THE BLOOD.  IT'S NOT AS IF IT'S

4   CONTINUOUS.  IT DEPENDS ON THE SAMPLE.

5   Q.   ALL RIGHT.  BUT THESE ARE THE ONLY URINALYSES AND THIS IS

6   HER -- MY POINT IS, SHE NEVER REFERS TO THE NEGATIVE URINALYSES

7   IN HER REPORT.  DON'T YOU THINK THAT'S SOMETHING THAT OUGHT TO

8   BE IN THERE SINCE SHE'S CRITICIZING THESE PHYSICIANS FOR NOT

9   ACTING ON THE URINALYSES?

10              MR. DUBNER:  OBJECTION; ASKED AND ANSWERED.

11              THE COURT:  I'LL OVERRULE THE OBJECTION.  LAST TIME

12   YOU CAN ASK IT.

13              IF YOU KNOW, YOU CAN ANSWER.

14              THE WITNESS:  YOU KNOW, THE TESTS CAN BE VARIABLE,

15   AND ONE COULD HAVE A POSITIVE URINE.  IT COULD -- YOU COULD

16   HAVE A NEGATIVE URINE, YOU COULD HAVE A POSITIVE URINE.  I

17   THINK THE POINT SHE'S MAKING IS THAT THE PATIENT HAD A POSITIVE

18   URINE, AND WHEN HE HAD A POSITIVE URINE, SOME ACTION SHOULD

19   HAVE BEEN TAKEN.

20   BY MR. ARCHEY:

21   Q.   DOCTOR, ARE YOU AWARE -- WELL, STRIKE THAT.

22              A PATIENT HAS A FUNDAMENTAL RIGHT TO REFUSE

23   HEALTHCARE.  IS THAT CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   AND IF A PATIENT REFUSES HEALTHCARE, THERE SHOULD BE A

1   DOCUMENT.  CORRECT?

2   **A.**    THAT'S CORRECT.

3   **Q.**    ALL RIGHT.  AND IN MR. SHANNON HURD'S CASE, ARE YOU AWARE

4   THAT HE DID TURN DOWN HEALTHCARE?

5   **A.**    CAN YOU REPEAT THAT?  I DIDN'T HEAR IT.

6   **Q.**    YEAH.  IN MR. SHANNON HURD'S CASE, ARE YOU AWARE THAT HE

7   DID TURN DOWN HEALTHCARE?

8   **A.**    NO.  COULD YOU PUT THAT  -- THE LAST DOCUMENT YOU PUT UP,

9   IS THERE A REFUSAL?

10  **Q.**    THERE IS, AND THAT WAS THE FIRST ONE.  BUT I'M GOING TO GO

11  TO THE ONE THAT'S PROBABLY MORE RELEVANT.

12          THIS IS DOCUMENT NO. 25568, AND THIS IS -- I'M SORRY.

13  FEBRUARY 4, 2012.  THIS IS THE COMMENT I WANT TO FOCUS ON.  MS.

14  LAMARRE IS VERY CRITICAL OF THESE PHYSICIANS FOR NOT GETTING

15  BLOOD TESTS, LABS DONE TIMELY, FOR MR. HURD.  DO YOU SEE THAT?

16  DIDN'T FOLLOW UP, DIDN'T GET THE BLOOD TEST?  THE TESTS THAT

17  WERE NOT ORDERED WERE NOT DONE.

18          **MR. DUBNER:**  OBJECTION, YOUR HONOR.  HE IS PUTTING ON

19  HALF OF A DOCUMENT AND HALF OF THE PAGE.  SOME OF IT STARTS ON

20  THE PREVIOUS PAGE.  IF HE'S GOING TO BE DOING THIS -- I'M SORRY

21  FOR NOT OBJECTING SOONER -- HE SHOULD BE GIVING DR. PUISIS THE

22  FULL DOCUMENT.

23          **MR. ARCHEY:**  IT'S HIS DOCUMENT, JUDGE.

24          **THE WITNESS:**  IT'S THE REPORT.

25          **THE COURT:**  HE SAID HE WANTED TO LOOK AT THE RECORD

12:03    1    BEFORE TESTIFYING AS TO THIS GENTLEMAN, SO MOVE ON AND RESERVE

2    YOUR QUESTIONS FOR LAMARRE.

3           **MR. ARCHEY:**  CAN I ASK ONE MORE QUESTION, AND I WILL

4    DO SO, JUDGE?  BECAUSE THIS IS VERY RELEVANT TO THE REPORT.

5    **BY MR. ARCHEY:**

6    **Q.**   RIGHT HERE, SHE SAYS THERE'S A SEVEN-MONTH DELAY IN

7    GETTING THE BLOOD TESTS DONE TO EVALUATE A SERIOUS MEDICAL

8    CONDITION.  ARE YOU AWARE THAT THE DELAY WAS BECAUSE THIS

9    INMATE REFUSED THE TESTS THAT WERE ORDERED?

10    **A.**   WAS THE REFUSAL ONE OF THOSE DOCUMENTS YOU SHOWED ME?

11    **Q.**   IT IS THIS DOCUMENT RIGHT HERE.  THIS IS DOCUMENT

12    NO. 25482.  DO YOU SEE WHERE HE REFUSED THE BLOOD TEST?  THE

13    LAB WAS ON JUNE 11, 2015.

14    **A.**   DO YOU HAVE THE REFUSAL FORM FOR THAT?

15    **Q.**   WELL, THIS NOTES THE REFUSAL.  LET ME KEEP GOING.  YOU SEE

16    THAT.  RIGHT?

17    **A.**   WELL, THAT'S NOT A REFUSAL FORM.

18    **Q.**   OKAY.

19           **THE COURT:**  SO A PROVIDER NOTES THAT THE PATIENT

20    REFUSES IT.  DO YOU HAVE THE REFUSAL FORM?  WELL, JUST ANSWER

21    THE QUESTION; ASK YOUR NEXT QUESTION.

22    **BY MR. ARCHEY:**

23    **Q.**   ALL RIGHT.  HERE IS WHERE MR. HURD THEN GOES TO SEE THE

24    PROVIDER ON JUNE 24, 2015, DOCUMENT NO. 25483.

25           **MR. DUBNER:**  AND AGAIN, YOUR HONOR, IF COUNSEL COULD

12:05   1   PUT UP THE ENTIRE DOCUMENT WHEN HE IS TRYING TO EXAMINE THE
2   WITNESS ON THE DOCUMENTS.
3   BY MR. ARCHEY:
4   Q.   ALL RIGHT.  DOCTOR, YOU SEE WHERE THE PROVIDER NOTES THAT
5   MR. HURD REFUSED THE LABS, AND ON JUNE 11, THEY WERE
6   RESCHEDULED FOR JUNE 26.  DO YOU SEE THAT?
7   A.   I SEE THAT THE PROVIDER DOCUMENTED THAT, YES.
8   Q.   OKAY.  AND THE NEXT ONE IS DOCUMENT NO. 25481 WHERE
9   MR. HURD SIGNS A REFUSAL NOT WANTING HIS LABS.  DO YOU SEE
10   THAT?
11   A.   SO HE SAYS BECAUSE I ATE AND DID NOT FAST --
12       THE COURT:  PUT IT BACK SO THAT HE CAN -- DON'T ASK
13   HIM A -- MR. ARCHEY, REALLY, HOW ABOUT LET'S PLAY FAIR.
14       MR. ARCHEY:  I MEANT TO, JUDGE.  MY APOLOGIES.
15       THE COURT:  OKAY, GOOD.  LEAVE IT ON THERE; LET THE
16   MAN ANSWER THE QUESTION, FOR HEAVEN'S SAKES.
17       MR. ARCHEY:  MY APOLOGIES, JUDGE.
18       THE COURT:  LET'S MOVE ON.
19       THE WITNESS:  WHAT IS THIS REFUSAL FOR?
20   BY MR. ARCHEY:
21   Q.   THE LABS.  THEY WERE ORDERED AS SHOWN ON THE PREVIOUS
22   CHART.
23   A.   WELL, HE'S SAYING HE DIDN'T FAST.  SO HE'S PROBABLY
24   REFERRING TO A BLOOD GLUCOSE.  SO THAT WOULD BE A REASONABLE
25   STATEMENT, AND THEY SHOULD REDO THE LAB.

12:06 1    Q.   OKAY.

2    A.   RIGHT?  I MEAN . . .

3    Q.   OKAY.  AND I'LL SHOW YOU THE NEXT DOCUMENT, WHICH IS

4    DOCUMENT NO. 25477.

5         MR. DUBNER:  AGAIN, YOUR HONOR, THIS IS ONLY

6    TWO-THIRDS OF THE DOCUMENT.

7         THE COURT:  ALL YOU HAVE TO DO IS ZOOM OUT.  USE THE

8    LITTLE THING ON THE TOP.

9         MR. ARCHEY:  JUDGE, THAT'S AS FAR AS IT'S GOING IS

10   THE PROBLEM.

11        THE COURT:  ALL RIGHT.  ASK YOUR QUESTION.

12        MR. ARCHEY:  ALL RIGHT.

13   BY MR. ARCHEY:

14   Q.   THIS IS ANOTHER DOCUMENT FROM THE PROVIDER DOCUMENTING A

15   NO SHOW AND THAT HE REFUSED THE LAB AND THE LAST TWO CALL-OUTS.

16   DO YOU SEE THAT?

17   A.   SO THAT LAB IS THE SAME LAB THAT WAS SAID TO HAVE BEEN

18   REFUSED PREVIOUSLY.  CORRECT?

19   Q.   CORRECT.  WE'VE GOT TWO LABS THAT HE REFUSED.

20   A.   RIGHT.  BUT THAT REFUSAL WAS PROBABLY BECAUSE HE ATE

21   SOMETHING, AND IT SHOULD HAVE JUST BEEN RESCHEDULED.

22   Q.   ALL RIGHT.  HERE'S ANOTHER PROVIDER NOTE.  WELL, HE'S ALSO

23   MISSED AN APPOINTMENT WITH THE PROVIDER ACCORDING TO THE

24   RECORDS.  RIGHT?

25   A.   WELL, DO YOU HAVE THE REFUSAL FOR THAT?  I MEAN -- OKAY.

12:07    1          THE COURT:  YOU ARE GOING TO MOVE ON TO ANOTHER LINE

2    OF QUESTIONING.  HE DOESN'T HAVE THE RECORD IN FRONT OF HIM.

3    HE'S ASKED TO HAVE THE RECORD IN FRONT OF HIM.  IT'S A RECORD

4    THAT ANOTHER EXPERT REVIEWED, AND YOU CAN RESERVE YOUR

5    QUESTIONS FOR THAT EXPERT.  LET'S MOVE TO ANOTHER LINE OF

6    QUESTIONING, PLEASE.

7    BY MR. ARCHEY:

8    Q.   YOUR OPINIONS ARE BASED ON THESE CHART REVIEWS.  RIGHT?

9    A.   YES.

10   Q.   IF THE CHART REVIEWS ARE BAD, UNFAIR, SLANTED AND BIASED,

11   THAT WOULD AFFECT YOUR OPINIONS, WOULD IT NOT?

12   A.   IF THEY WERE, YES.

13   Q.   NOW, DOCTOR, YOU WERE HERE ON -- WAS IT YESTERDAY WHEN WE

14   STARTED TRIAL WITH MR. SAMPIER.  CORRECT?  WHEN HE TESTIFIED?

15   A.   I WAS HERE FOR PART OF IT.

16   Q.   I'M TRYING TO FIGURE OUT WHAT LSP PHYSICIANS FAILED TO DO

17   FOR THE GENTLEMAN.  HE HAS TRANSVERSE MYELITIS THAT HE

18   CONTRACTED PRIOR TO ARRIVING AT LSP.  CORRECT?

19   A.   YEAH.

20   Q.   HE CAME TO LSP, HE HAD A DECUBITUS ULCER.  CORRECT?

21   A.   YES.

22   Q.   OKAY.  IT HEALED UP WHEN HE GOT TO LSP; THEY TREATED IT,

23   IT GOT WELL.  CORRECT?

24   A.   YOU KNOW, I'M NOT SURE.

25   Q.   DO YOU HAVE AN OPINION AS TO ANY WAY IN WHICH HIS CARE WAS

1  DEFICIENT?

2  **A.**   SO I CAN'T REMEMBER WHETHER I REVIEWED -- I DON'T BELIEVE

3  I REVIEWED HIS CARE, AND I DON'T BELIEVE I INTERVIEWED HIM.  I

4  THINK MS. LAMARRE INTERVIEWED HIM.  I THINK I INTERVIEWED THREE

5  -- OTIS [SIC] BARRERA AND THREE OTHERS, AND I HAD NOTES FOR

6  THOSE.  THEY WERE SUBMITTED, BUT I DON'T BELIEVE I INTERVIEWED

7  THE PERSON YOU ARE ASKING ABOUT.

8  **Q.**   SO MY QUESTION IS --

9  **A.**   YES.

10  **Q.**   DO YOU HAVE AN OPINION AS TO WHETHER THE CARE PROVIDED TO

11  MR. SAMPIER WAS DEFICIENT IN ANY MANNER?

12  **A.**   I DON'T HAVE AN OPINION BECAUSE I DIDN'T REVIEW THE

13  RECORD.

14  **Q.**   THANK YOU, SIR.  ALL RIGHT.  THE THIRD INDIVIDUAL THAT WAS

15  TALKED ABOUT IN THE OPENING WAS KENTRELL PARKER.  AND MR.

16  KENTRELL PARKER IS A QUADRIPLEGIC, AND HE CAME TO LSP THAT WAY.

17  DO YOU HAVE AN OPINION AS TO HOW HIS CARE MAY HAVE BEEN

18  DEFICIENT, IF AT ALL?

19  **A.**   SO --

20  **Q.**   AND LET ME CORRECT A STATEMENT, JUDGE.  HE ACTUALLY

21  INJURED HIMSELF PLAYING FOOTBALL WHILE AT LSP AND THAT'S WHAT

22  PARALYZED HIM.  MY APOLOGIES FOR THAT MISSTATEMENT.

23  **A.**   SO I BELIEVE I HAD A BRIEF DISCUSSION WITH AN INMATE WHO

24  WAS QUADRIPLEGIC AND I'M NOT SURE IF IT WAS THE SAME

25  INDIVIDUAL, BUT I BELIEVE IT IS, AND THE PROBLEM WITH HIS CARE

1    WAS THE FACT THAT THE ACTIVITY OF DAILY LIVING SUPPORT WAS

2    INADEQUATE.

3    **Q.**    MEANING THAT HE WAS BEING TREATED OR BEING ASSISTED BY

4    ORDERLIES.  IS THAT RIGHT?

5    **A.**    YES.

6    **Q.**    OKAY.  AND ORDERLIES CERTAINLY CAN ASSIST INMATES,

7    PATIENTS, WITH THE ACTIVITIES OF DAILY LIVING.  CORRECT?

8    **A.**    IN MY OPINION, NOT ON AN INFIRMARY.

9    **Q.**    ALL RIGHT.  THAT IS ALLOWED BOTH BY NCCHC AND BY ACA.

10   CORRECT?

11   **A.**    NOT BY THE NCCHC.

12   **Q.**    ALL RIGHT.  IT IS ALLOWED BY THE ACA.  CORRECT?

13   **A.**    I'M NOT SURE.

14   **Q.**    AND THIS INSTITUTION IS ACCREDITED, AN ACCREDITED

15   INSTITUTION FOR MEDICAL HEALTHCARE BY ACA.  CORRECT?

16   **A.**    IF YOU TELL ME THAT IT IS, OKAY.

17   **Q.**    YOU DON'T KNOW THAT?

18   **A.**    NO.

19   **Q.**    OKAY.  DOCTOR, YOU BELIEVE THAT PHYSICIANS IN CORRECTIONAL

20   CUSTODY SHOULD BE ADVOCATES FOR IMPROVED CARE FOR THE

21   PRISONERS.  CORRECT?

22   **A.**    COULD YOU REPEAT THAT, PLEASE?

23   **Q.**    CERTAINLY.  YOU BELIEVE THAT PHYSICIANS SHOULD BE

24   ADVOCATES FOR IMPROVED CARE FOR PRISONERS.  CORRECT?

25   **A.**    PHYSICIANS SHOULD STRIVE TO IMPROVE CARE, YES.

**Q.**   AND BE ADVOCATES FOR THEIR PATIENTS.  CORRECT?

**A.**   WELL, I THINK ADVOCATE IS -- IN THE SAME SENSE THAT A

CIVILIAN PHYSICIAN SHOULD ADVOCATE FOR THEIR PATIENTS, BUT THE

PHYSICIAN NEEDS TO BE CONCERNED FOR THEIR PATIENTS, YES.

**Q.**   OKAY.  AND IT'S BEEN MENTIONED EARLIER, YOU WROTE THE BOOK

ON CORRECTIONAL MEDICINE.  RIGHT?

**A.**   I EDITED THE BOOK.

**Q.**   OKAY.

**A.**   AND WROTE SEVERAL CHAPTERS, YES.

**Q.**   RIGHT.  AND IN YOUR BOOK, THERE'S A CHAPTER ON HOW

PHYSICIANS SHOULD BE ADVOCATES FOR BOTH THE PRISONERS AND FOR

IMPROVED HEALTHCARE IN THE PRISON SYSTEM.  CORRECT?

**A.**   IN THE SENSE OF TAKING CARE OF THE PATIENTS, YES.

**Q.**   AND IN FACT, YOU SAY THAT THE -- YOU PROMOTE THE BEST

PRACTICES MODEL THAT SHOULD BE USED IN YOUR BOOK.  CORRECT?

**A.**   THAT'S TRUE.

**Q.**   AND YOU BELIEVE THAT PHYSICIANS SHOULD ADHERE TO THESE

BEST PRACTICES MODELS.  CORRECT?

**A.**   I BELIEVE THEY SHOULD.

**Q.**   AND YOU WROTE IN YOUR BOOK THAT PHYSICIANS ACTING AS

PATIENT AND PUBLIC HEALTH ADVOCATES SHOULD CHANGE MEDICINE IN

PRISONS.  RIGHT?

**A.**   I THINK THEY SHOULD TRY TO IMPROVE IT, YES.

**Q.**   AND THAT'S WHAT YOU'VE DONE YOUR ENTIRE CAREER DOING.

RIGHT?

1    **A.**    I HAVE.

2    **Q.**    OKAY.  AND THAT'S WHAT YOU'RE DOING HERE TODAY.  RIGHT?

3    **A.**    WELL, WHAT I'M DOING HERE TODAY IS ACTING AS AN EXPERT IN

4    A CASE.

5    **Q.**    YOU'RE NOT AN EXPERT IN COMMUNITY MEDICINE, THOUGH.

6    CORRECT?

7    **A.**    WELL, I'M AN INTERNIST WHO PRACTICES IN CORRECTIONS, SO

8    I'M AN EXPERT IN INTERNAL MEDICINE IN CORRECTIONS.

9    **Q.**    DOCTOR, DO YOU REMEMBER TESTIFYING AT THE CLASS

10    CERTIFICATION HEARING ABOUT COMMUNITY MEDICINE?

11    **A.**    I DIDN'T HEAR YOUR ENTIRE QUESTION.  YOU WERE --

12    **Q.**    CERTAINLY.  LET ME TRY AGAIN.

13    **A.**    YEAH.

14    **Q.**    DO YOU REMEMBER TESTIFYING AT THE CLASS CERTIFICATION

15    HEARING ABOUT COMMUNITY MEDICINE?

16    **A.**    I DON'T REMEMBER WHAT I SAID, BUT IF YOU CAN REFRESH -- IF

17    YOU HAVE A QUESTION.

18    **Q.**    OKAY.  I'LL BE GLAD TO DO SO, DOCTOR.

19            ON PAGE 90 OF THE CLASS CERTIFICATION HEARING, YOU

20    WERE ASKED, AND YOU TESTIFIED THAT -- BEGINNING ON LINE 22:

21    "THE ONLY THING I CAN SAY IS, I'M NOT AN EXPERT IN COMMUNITY

22    MEDICINE.  I'M AN EXPERT IN CORRECTIONAL MEDICINE."  THAT'S

23    YOUR TESTIMONY.  DO YOU SEE THAT?

24    **A.**    THAT'S CORRECT.

25            **MR. DUBNER:**  AND JUST FOR THE RULE OF COMPLETENESS,

1   YOUR HONOR, I BELIEVE IT WOULD BE APPROPRIATE TO READ THE REST

2   OF THE ANSWER.

3        **MR. ARCHEY:**  SURE.  I'LL BE GLAD TO.  "I'M AN EXPERT

4   IN CORRECTIONAL MEDICINE, SO I KNOW A GREAT DEAL ABOUT

5   SCHEDULING ISSUES RELATED TO WHAT'S GOING ON IN CORRECTIONS.  I

6   FEEL A LITTLE UNCOMFORTABLE TALKING ABOUT HOW COMMUNITY

7   MEDICINE IS ORGANIZED.  IT'S NOT MY AREA OF EXPERTISE.  SO IN

8   PART, YOUR QUESTION IS SOMETHING I'D PROBABLY LIKE TO RESEARCH

9   A LITTLE IF YOU WANT ME TO ACTUALLY ANSWER THAT."

10        **MR. DUBNER:**  AND JUST SO THE RECORD IS CLEAR, TO

11  CORRECT A COUPLE OF MISSTATEMENTS, THE MINOR ONES, THE QUOTE

12  IS -- COULD YOU PUT THAT BACK, PLEASE?  THANK YOU.  "FOR THE

13  RECORD, I BELIEVE IT'S NOT AN AREA OF MY EXPERTISE.  SO IN

14  PART, YOUR QUESTION IS SOMETHING I'D PROBABLY WANT TO RESEARCH

15  A LITTLE IF YOU WANT ME TO ACTUALLY ANSWER THAT."

16        **MR. ARCHEY:**  OKAY.

17  **BY MR. ARCHEY:**

18  **Q.**   YOU TESTIFIED YOU'RE NOT AN EXPERT IN COMMUNITY MEDICINE,

19  DIDN'T YOU?

20  **A.**   WHAT WAS THE QUESTION AGAIN?

21  **Q.**   THE QUESTION IS ABOUT WHAT GOES ON IN THE COMMUNITY.  IT

22  SAYS "SO IF A ROUTINE PERSON IN A COMMUNITY HAD A PARTICULAR

23  CONCERN AND THEY NEED TO CALL THEIR DOCTOR, MORE LIKELY THAN

24  NOT THAN, THEY WOULD BE SCHEDULED FOR AN APPOINTMENT.  IS THAT

25  CORRECT?"

1   **A.**   CORRECT.  OKAY.

2          **MR. DUBNER:**  I'M SORRY TO STAND UP AGAIN.  BUT JUST

3   TO GET THE RECORD CLEAR, THE QUESTION WAS:  "MORE THAN LIKELY,

4   THEY WOULD BE SCHEDULED FOR AN APPOINTMENT.  IS THAT RIGHT?"  I

5   MEAN, IF WE ARE GOING TO BE READING THIS INTO THE RECORD, IT

6   SHOULD BE AN ACCURATE REFLECTION OF THE RECORD.

7          **MR. ARCHEY:**  ALL RIGHT.

8   **BY MR. ARCHEY:**

9   **Q.**   AND YOU ANSWERED THAT YOU'RE NOT AN EXPERT IN COMMUNITY

10  MEDICINE.

11  **A.**   SO LET ME JUST EXPLAIN.  WITH RESPECT TO THE CLINICAL

12  ISSUE -- SO, FOR EXAMPLE, IF SOMEONE HAS BLOOD IN THE URINE TO

13  TAKE AN EXAMPLE THAT YOU BROUGHT UP ALREADY, I AM TOTALLY AN

14  EXPERT IN IDENTIFYING OR TRYING TO KNOW WHEN THAT PERSON SHOULD

15  BE REFERRED.

16         WITH RESPECT TO HOW THEY DO IT AT HEALTH SOUTH OR IN

17  AN HMO IN THE COMMUNITY, THE EXACT METHOD ON HOW THEY DO THAT

18  MIGHT BE SOMETHING I DON'T KNOW ENOUGH ABOUT BUT CAN FIND, BUT

19  THE FACT THAT THEY SHOULD BE EVALUATED AND THE TIMELINESS OF

20  THE EVALUATION, I AM -- I WOULD KNOW AND FEEL I AM AN EXPERT IN

21  THAT.

22  **Q.**   THERE ARE SOME THINGS THAT HAVE NATIONAL STANDARDS

23  OVERRIDING EVERYTHING SUCH AS THE TREATMENT OF DIABETES, FOR

24  INSTANCE.  CORRECT?  THAT WOULD BE A NATIONAL STANDARD GOVERNED

25  BY THE AMERICAN DIABETES ASSOCIATION?

1    **A.**    THERE IS A NATIONAL STANDARD ON DIABETES, YES.

2    **Q.**    ALL RIGHT.  BUT THERE'S ALSO COMMUNITY STANDARDS OF CARE

3    FOR MEDICINE.  CORRECT?

4    **A.**    I'M NOT SURE WHAT YOU MEAN.

5    **Q.**    YEAH, IT HAPPENS EVERY DAY IN ILLEGAL MALPRACTICE ACTIONS,

6    DOCTORS ARE HELD TO THE STANDARD OF CARE OF THE COMMUNITY.

7    CORRECT?

8         **MR. DUBNER:**  OBJECTION.  HE'S CALLING FOR A LEGAL

9    OPINION.

10         **MR. ARCHEY:**  WELL, HE'S AN EXPERT, JUDGE, AND THIS IS

11   THE AREA HE'S TESTIFYING ON.

12         **THE COURT:**  REPHRASE.  NO, YOU JUST ASKED HIM A LEGAL

13   QUESTION.  YOU ASKED HIM IF IN MEDICAL MALPRACTICE CASES,

14   DOCTORS TESTIFY TO THE STANDARD OF CARE.  ASK A DIFFERENT

15   QUESTION AND QUIT ARGUING WITH ME.

16         **MR. ARCHEY:**  I'M SORRY, JUDGE.  I APOLOGIZE.

17   **BY MR. ARCHEY:**

18   **Q.**    THERE IS A STANDARD OF CARE FOR THE COMMUNITY THAT DOCTORS

19   ARE HELD TO.  CORRECT?

20   **A.**    IN OUR REPORT, I REFER -- WHAT I'M REFERRING TO IS THE

21   STANDARD OF CLINICAL CARE.

22   **Q.**    AND THE STANDARD OF CLINICAL CARE VARIES FROM COMMUNITY TO

23   COMMUNITY, DOES IT NOT?

24   **A.**    NO.

25   **Q.**    YOU THINK THE STANDARD OF CLINICAL CARE IS THE SAME FOR

1  WEST FELICIANA PARISH AS IT IS FOR NEW YORK CITY MAYO HOSPITAL?

2  IS THAT YOUR TESTIMONY?

3  **A.**    IN MY OPINION, THE STANDARD OF CARE FOR DIABETES IS THE

4  SAME IN ANY PART OF THE COUNTRY.

5  **Q.**    AND I DON'T DISAGREE WITH YOU.

6  **A.**    AND AT ANY CORRECTIONAL FACILITY.  I'VE PRACTICED IN A

7  NUMBER OF DIFFERENT CORRECTIONAL FACILITIES, AND HAVE SEEN

8  PATIENTS AND THE STANDARD OF CARE HAS BEEN IDENTICAL.

9  **Q.**    AND THAT'S NOT WHAT I ASKED YOU ABOUT.  I ASKED ABOUT

10  CLINICAL CARE WHICH IS WHAT YOU REFERRED TO.  THAT STANDARD OF

11  CARE, IS THERE A COMMUNITY STANDARD OF CARE FOR THAT, FOR

12  CLINICAL CARE?  I'M NOT TALKING ABOUT LIKE DIABETES THAT YOU

13  JUST REFERRED TO, I UNDERSTAND THAT.

14  **A.**    WELL, I'M NOT SURE OF THE CONTEXT, BUT IF YOU'RE SAYING

15  THAT DOCTORS AT LSU TREAT DIABETES DIFFERENT THAN DOCTORS IN

16  ST. FRANCISVILLE, I WOULD SAY NO, THAT THEY WOULD BE HELD TO

17  THE SAME STANDARD.

18  **Q.**    ALL RIGHT.  WHAT ABOUT JUST THE CLINICAL CARE PATIENTS,

19  ISN'T THERE A DIFFERENCE IN THE STANDARD OF CARE FOR

20  COMMUNITIES, DIFFERENT COMMUNITY TO COMMUNITY?

21  **A.**    WELL, I'M NOT SURE WHAT YOU MEAN BY STANDARD OF CARE, BUT

22  WHAT I WOULD MEAN IS IF SOMEBODY HAS DIABETES, HOW OFTEN SHOULD

23  THEY BEEN SCREENED FOR RETINOPATHY, WHAT IS THE LEVEL OF BLOOD

24  SUGAR CONTROL THAT IS REQUIRED, SHOULD THEY BE TREATED FOR --

25  WITH STATINS FOR LIPID MEDICINE.  AND THOSE ARE THE STANDARDS

1  THAT I THINK ARE IDENTICAL WHICHEVER COMMUNITY YOU ARE IN.

2  **Q.**   WHY DOES THE STANDARD REFER TO COMMUNITY STANDARDS AS

3  OPPOSED TO NATIONAL STANDARDS?  IS THERE A DIFFERENCE?

4  **A.**   I DON'T SEE A DIFFERENCE.

5  **Q.**   THEN WHY USE THE WORDS *COMMUNITY STANDARDS* AS YOU DID

6  THROUGHOUT YOUR REPORT?

7  **A.**   IN OUR REPORT?

8  **Q.**   YES, SIR.  YOU USED IT IN YOUR REPORT AND YOU'VE USED IT

9  TODAY.

10  **A.**   SO BECAUSE WE SEE IT AS THE SAME.  I MEAN, THE ADA, FOR

11  EXAMPLE, WE WOULD CONSIDER A COMMUNITY STANDARD, AND WE WOULD

12  CONSIDER THE NATIONAL HEART, LUNG, AND BLOOD JNC8 A COMMUNITY

13  STANDARD.  AND THAT'S WHAT WE'RE REFERRING TO.

14  **Q.**   DID YOU DO ANYTHING TO DETERMINE WHAT THE STANDARD OF CARE

15  IS IN WEST FELICIANA PARISH?

16  **A.**   ARE YOU IMPLYING BY THE QUESTION THAT THE MEDICAL CARE IN

17  FELICIANA PARISH IS DIFFERENT THAN THE CARE THAT'S RECEIVED IN

18  NEW ORLEANS?

19  **Q.**   I ASKED MY QUESTION.  DID YOU DO ANYTHING TO FIND OUT WHAT

20  THE STANDARD OF CARE IS IN WEST FELICIANA PARISH?

21  **A.**   I DON'T THINK THERE SHOULD BE A DIFFERENCE BETWEEN THE

22  STANDARD OF CARE IN WEST FELICIANA PARISH AS OPPOSED TO

23  ANYWHERE ELSE.

24  **Q.**   SO DID YOU DO ANYTHING TO DETERMINE WHETHER THAT STANDARD

25  OF CARE WAS DIFFERENT?

**A.**    NO.

**Q.**    DID YOU DO ANYTHING TO DETERMINE WHETHER THAT STANDARD OF
CARE IN LOUISIANA IS DIFFERENT THAN IT IS IN THE REST OF THE
COUNTRY?

**A.**    NO.

**Q.**    SO HOW ARE YOU ABLE TO ASSESS WHETHER THE CARE AT LSP
MEETS THE COMMUNITY STANDARDS WHEN YOU MADE NO ATTEMPT TO
DETERMINE WHAT THOSE COMMUNITY STANDARDS WERE, DOCTOR?

**A.**    I DO KNOW WHAT THE STANDARDS ARE.

**Q.**    YOU JUST TOLD ME YOU MADE NO EFFORT TO ADDRESS IT.

**A.**    WELL --

        **MR. DUBNER:**  OBJECT, YOUR HONOR; MISCHARACTERIZING
THE TESTIMONY.

        **THE COURT:**  OVERRULED.  GO ON.

        **THE WITNESS:**  SHOULD I ANSWER?

        **THE COURT:**  YES, YOU CAN.

        **THE WITNESS:**  YEAH, THE STANDARD OF CARE AT THE
PRISON, WE DO KNOW WHAT IT SHOULD BE, AND I DON'T THINK THAT IF
DOCTORS IN WEST FELICIANA PARISH ARE NOT PROVIDING CARE THAT'S
CONSISTENT WITH WHAT, FOR EXAMPLE, THE AMERICAN DIABETES
ASSOCIATION SAYS, THEN I THINK THOSE PHYSICIANS ARE PRACTICING
BELOW STANDARD.  SO I DON'T HAVE TO REVIEW EVERY SINGLE
LOCATION.  I DON'T HAVE TO GO TO THE COMMUNITY AND EXAMINE THE
LOCATION OF EVERY SINGLE FACILITY I VISIT FOR ONE OF THESE
EVALUATIONS TO DETERMINE IF THE CARE IS THE SAME IN THE

1    COMMUNITY.  THAT'S NOT THE TASK.

2    BY MR. ARCHEY:

3    Q.    THEN, MY LAST QUESTION, AND I'LL MOVE ON, IS:  THEN, WHY

4    DO YOU TALK ABOUT THE COMMUNITY STANDARD OF CARE THROUGHOUT THE

5    REPORT?

6    A.    BECAUSE --

7            MR. DUBNER:  OBJECTION; ASKED AND ANSWERED.

8            THE COURT:  OVERRULED.  GO AHEAD.

9            THE WITNESS:  COLLOQUIALLY, THE AMERICAN DIABETES

10   ASSOCIATION STANDARDS ARE THE COMMUNITY STANDARD, AND THAT'S

11   WHAT WE ARE REFERRING TO.  SO MAYBE IT'S A MISINTERPRETATION ON

12   YOUR PART OF WHAT WE PERCEIVE AS A COMMUNITY STANDARD.

13   BY MR. ARCHEY:

14   Q.    IN YOUR REPORT, YOU WANT TO HOLD LSP TO THE STANDARDS SET

15   FORTH AS SET FORTH IN YOUR TREATISE TEXTBOOK.  IS THAT FAIR?

16   A.    THE TEXTBOOK DOESN'T REALLY SET STANDARDS.  IN THE

17   TEXTBOOK, THE RECOMMENDATION FOR CHRONIC DISEASE, FOR EXAMPLE,

18   IS TO USE THE NATIONAL STANDARDS THAT ARE PUBLISHED.

19   Q.    RIGHT, BUT THE PRACTICES AND THE POLICIES THAT ARE SET

20   FORTH IN YOUR TEXTBOOK, THAT'S WHAT YOU ARE HOLDING AND SAY

21   THAT THE LOUISIANA STATE POLICE SHOULD ADHERE TO.  IS THAT

22   FAIR?

23   A.    REMEMBER, IT DEPENDS ON THE CONDITION, BUT YES.

24   Q.    AND YOUR BOOK SETS FORTH THE BEST PRACTICES.  RIGHT?

25   A.    SO THE LAST EDITION WAS 2010, AND I'M SURE THERE HAVE BEEN

1    IMPROVEMENTS AND CHANGES TO THE STANDARDS.

2    Q.    THERE IS A DIFFERENCE BETWEEN PRACTICING MEDICINE IN A

3    CORRECTIONAL SETTING THAN THERE IS IN THE COMMUNITY.  CORRECT?

4    A.    THERE'S A DIFFERENCE BECAUSE THE LOCATION IS DIFFERENT AND

5    YOU'RE WORKING IN AN ENVIRONMENT WHERE PATIENTS ARE IN CUSTODY

6    SO THERE ARE CERTAIN INHERENT BARRIERS THAT WOULD NOT BE

7    PRESENT IN THE COMMUNITY.

8    Q.    RIGHT.  A PHYSICIAN IN THE COMMUNITY, IF HE IS NOT HAPPY

9    WITH HIS DOCTOR -- STRIKE THAT.  I'M SORRY.

10            A PERSON IN THE COMMUNITY WHO IS SEEKING CARE, IF

11    HE'S NOT HAPPY WITH HIS DOCTOR, HE JUST GOES SOMEWHERE ELSE.

12    RIGHT?

13    A.    THAT'S CORRECT.

14    Q.    OKAY.  AND IN A CORRECTIONAL INSTITUTION, THAT'S NOT AN

15    OPTION FOR THE INMATE, IS IT?

16    A.    NO.

17    Q.    AND IT'S ALSO NOT AN OPTION FOR THE DOCTOR, IS IT?

18    A.    WELL, SOMETIMES THE DOCTOR CAN ASK SOMEONE ELSE TO SEE

19    HIM, BUT GENERALLY, YES.

20    Q.    OKAY.  AND SO PHYSICIANS IN THE FREE WORLD WILL SAY THEY

21    WANT TO MAKE THEIR PATIENTS HAPPY SO THEY DON'T GO ELSEWHERE,

22    THAT'S PART OF THE PRACTICE OF MEDICINE.  IS THAT FAIR?

23    A.    I HAVEN'T SPENT A LOT OF -- I HAVEN'T PRACTICED IN --

24    ASIDE FROM RESIDENCY, I HAVEN'T PRACTICED IN A COMMUNITY.  I'M

25    NOT SURE.  I SUPPOSE I COULD TRY TO REVIEW THAT FOR YOU, BUT I

1    DON'T THINK I WANT TO COMMENT ON IT.

2    **Q.**    BECAUSE YOU'RE NOT AN EXPERT IN COMMUNITY MEDICINE.

3    CORRECT?

4    **A.**    WELL, I HAVEN'T -- I MEAN, YOU'RE ASKING ME TO COMMENT ON

5    WHETHER PHYSICIANS IN THE COMMUNITY HAVE A CERTAIN ATTITUDE

6    TOWARDS THEIR PATIENTS, AND I JUST DON'T KNOW THAT TO BE TRUE

7    OR NOT.

8    **Q.**    IT'S IN YOUR BOOK.  DON'T YOU KNOW THAT TO BE TRUE FROM

9    YOUR BOOK?

10    **A.**    CAN YOU ASK THE QUESTION?

11    **Q.**    SURELY.  THE DIFFERENCES BETWEEN PRACTICING IN A COMMUNITY

12    AND PRACTICING IN A CORRECTIONAL FACILITY, PHYSICIANS IN A

13    CORRECTIONAL FACILITY HAVE TO TAKE INTO ACCOUNT THINGS LIKE

14    CONSISTENCY OF TREATMENT AMONG ALL THE INMATES THAT THEY

15    SERVICE.  CORRECT?

16    **A.**    I'M NOT SURE WHAT YOU MEAN BY *CONSISTENCY OF TREATMENT*.

17    **Q.**    ONE OF THE BIG PERKS IN A CORRECTIONAL FACILITY ARE

18    MEDICAL PASSES THAT ALLOWS THE INMATE TO HAVE SOME PRIVILEGE.

19    ARE YOU FAMILIAR WITH THAT?

20    **A.**    YES.

21    **Q.**    OKAY.  AND EVEN THOUGH A PHYSICIAN MAY WANT TO, IF HE

22    STARTS TO PROVIDE THOSE PASSES, HE'S GOING TO HAVE A LIST --

23    EVERY OTHER INMATE THAT THEY TALK TO IS GOING TO BE THERE

24    WANTING THE SAME THING.  RIGHT?

25    **A.**    THAT CAN HAPPEN.

1   **Q.**   SO THAT'S WHY PHYSICIANS HAVE TO TREAT THESE INMATES

2   DIFFERENT THAN OUT IN THE REAL WORLD.  CORRECT?

3   **A.**   THOSE ARE CONSIDERATIONS.

4   **Q.**   UH-HUH.

5   **A.**   BUT IN ALL RESPECTS, PHYSICIANS NEED TO ENSURE THAT THEIR

6   PRIMARY OBJECTIVE IS THE CLINICAL CARE OF THE PATIENT.  WITHIN

7   THAT CONTEXT, THEY'RE WORKING IN AN ENVIRONMENT WHERE PEOPLE

8   DON'T HAVE ACCESS TO DRUG STORES, THEY HAVE TO USE A

9   COMMISSARY, THEY ARE NOT FREE TO MOVE ABOUT, ET CETERA.  THOSE

10  RESTRICTIONS ARE PART OF WHAT ONE HAS TO CONTEND WITH.

11  **Q.**   UNAMBIGUOUS, CONSISTENTLY APPLIED RULES RESULT IN FEWER

12  CONFLICTS IN A CORRECTIONAL SETTING.  IS THAT FAIR?

13  **A.**   I THINK THAT'S TRUE.

14  **Q.**   AND PROVIDERS WHO ISSUE A LESS THAN MEDICALLY NECESSARY

15  PASS MAY SOON FACE A RASH OF ADDITIONAL INMATE REQUESTS FOR THE

16  SAME PASS BASED ON EXPERIENCING THE SAME SYMPTOMS.

17  **A.**   THAT CAN HAPPEN.

18  **Q.**   DOCTOR, LET'S TALK ABOUT SOME OF THE SERVICES, THE RANGE

19  OF SERVICES OFFERED AT LOUISIANA STATE PENITENTIARY.  THERE IS

20  AN INTAKE AND INITIAL SCREENING PROCESS THAT TAKES PLACE WHEN

21  AN OFFENDER ARRIVES AT LSP.  CORRECT?

22  **A.**   YES.

23  **Q.**   AND YOU'RE NOT CRITICAL OF THAT, ARE YOU?

24  **A.**   PART OF THE PROBLEM IS THE RECORDS WE CHOSE, THE LENGTH OF

25  STAY OF INMATES IS SO LONG THAT ONE HAS TO WORK A LITTLE BIT AT

12:29   1    REVIEWING THE RECEPTION PROCESS, AND WE DID NOT LOOK IN-DEPTH

2    AT THE RECEPTION PROCESS BUT WE DIDN'T IDENTIFY ANY ISSUES.

3    **Q.**   RIGHT.  SO THERE'S NOTHING IN YOUR REPORT ABOUT ANY

4    PROBLEMS WITH THE INTAKE AND INITIAL SCREENING.  CORRECT?

5    **A.**   THAT'S TRUE.

6    **Q.**   YOU HAVE HAD PROBLEMS IN OTHER FACILITIES THAT YOU'VE

7    REVIEWED BEFORE WITH THEIR INTAKE AND SCREENING PROCESS.

8    RIGHT?

9    **A.**   PARTICULARLY IN JAILS WHERE INTAKE IS A SIGNIFICANT

10   ELEMENT OF MEDICAL CARE, I HAVE FOUND PROBLEMS, YES.

11   **Q.**   INFECTIOUS DISEASE PREVENTION IS ANOTHER SERVICE THAT LSP

12   PROVIDES.  YOUR REPORT HAS NO CRITICISMS OF THEIR INFECTIOUS

13   DISEASE PREVENTION, DOES IT?

14   **A.**   THE PROBLEM IS YOU HAVE VIRTUALLY NO INFECTIOUS CONTROL

15   PROGRAM.  SO THERE'S NO DATA TO LOOK AT WITH RESPECT TO THAT SO

16   IT'S HARD TO EVALUATE IT.  FOR EXAMPLE, WE DIDN'T LOOK AT

17   HEPATITIS C.  HAD WE SPENT MORE TIME, WE CERTAINLY WOULD HAVE

18   LOOKED AT THAT TO SEE HOW MANY PEOPLE WERE BEING TREATED, BUT

19   WE DIDN'T LOOK AT IT.

20   **Q.**   IS IT IN YOUR REPORT?  DO YOU HAVE ANY CRITICISMS OF THE

21   INFECTIOUS DISEASE PREVENTION PROGRAM AT LSP IN YOUR REPORT?

22   **A.**   IT'S NOT IN OUR REPORT, BUT WE DIDN'T LOOK AT IT CLOSELY.

23   **Q.**   AND IN FACT, WHAT THE RECORDS SHOW IS INMATES WERE

24   RECEIVING ANNUAL TB SCREENINGS, DO THEY NOT?

25   **A.**   AGAIN, WE DIDN'T LOOK AT THAT CLOSELY, AND IT'S NOT IN OUR

REPORT.

**Q.**   THE INMATES RECEIVE ANNUAL HEPATIS C SCREENINGS.  ARE YOU

AWARE OF THAT?

**A.**   I BELIEVE THEY ARE TESTED FOR HEP-C.  I DON'T KNOW THAT

THEY RECEIVE IT ANNUALLY, AND EVERYONE RECEIVES IT.  I DID

INTERVIEW ONE OF THE NAMED COMPLAINANTS WHO HAD NOT BEEN

SCREENED, AND EVENTUALLY WAS, BUT HAD EVIDENCE THAT HE SHOULD

HAVE BEEN.  SO, YOU KNOW, IF WE HAD EVALUATED THAT MORE

CLOSELY, I WOULD HAVE AN ANSWER FOR YOU.

**Q.**   THE INMATES RECEIVE ANNUAL FLU SHOTS.  ARE YOU AWARE OF

THAT?

**A.**   NO.

**Q.**   THE INMATES OVER 50 RECEIVE ANNUAL PHYSICALS.  ARE YOU

AWARE OF THAT?

**A.**   I MEAN, I BELIEVE THAT INMATES ARE EVALUATED ON AN ANNUAL

BASIS, BUT THE QUALITY OF THOSE IS QUESTIONABLE.

**Q.**   THEY DO GET AN ANNUAL PHYSICAL ONCE A YEAR.  CORRECT?

**A.**   YES.  WE DID SEE NOTES THAT THERE'S AN ANNUAL EVENT WHERE

THEY ARE TESTED FOR TB, AND THAT THEY HAVE A QUESTIONNAIRE AND

AN EVALUATION.

**Q.**   VISION CARE IS PROVIDED AT LSP.  CORRECT?

**A.**   I THINK YOU DO HAVE VISION CARE, YES.

**Q.**   YOU HAVE NO CRITICISMS OF THAT, DID YOU?

**A.**   WE DID NOT EVALUATE THAT.

**Q.**   DENTAL CARE IS PROVIDED AT LSP.  CORRECT?

1   A.   WE DID NOT EVALUATE DENTAL CARE.

2   Q.   DO YOU SEE THAT DENTAL CARE IS PROVIDED?

3   A.   YOU DO HAVE A DENTIST, YES.

4   Q.   AND FACILITIES AS WELL.  CORRECT?

5   A.   YES.

6   Q.   MENTAL HEALTH IS PROVIDED AT LSP.  CORRECT?

7   A.   THAT'S CORRECT.

8   Q.   THERE IS A RADIOLOGIST ON SITE AT LSP.  CORRECT?

9   A.   YES.

10  Q.   AND THAT'S --

11  A.   WE HAD NO OBJECTIONS TO THE RADIOLOGIST.

12  Q.   FULL-SERVICE LABORATORY IS ON SITE AT LSP.  CORRECT?

13  A.   AND I TESTIFIED WITH RESPECT TO MY COMMENTS ON LABORATORY,

14  SO YOU HAVE THOSE.

15  Q.   A FULL-SERVICE PHARMACY IS ON SITE.  CORRECT?

16  A.   YES.

17  Q.   AND DO YOU HAVE ANY CRITICISMS OF THE PHARMACY AFTER THE

18  PHARMACY WAS REESTABLISHED AFTER PHARMACORR?

19  A.   WE HAVE SIGNIFICANT PROBLEMS WITH MEDICATION MANAGEMENT.

20  Q.   ALL RIGHT.  WE ARE GOING TO GET TO THAT OBVIOUSLY, BUT AS

21  FAR AS THE PHARMACY ITSELF, THERE IS A FULL-SERVICE PHARMACY ON

22  SITE THAT PROVIDES ALL THE MEDICATIONS TO BE DISTRIBUTED TO THE

23  INMATES.  CORRECT?

24  A.   THERE IS.

25  Q.   THERE'S AN AMBULANCE SERVICE ON SITE.  CORRECT?

1   **A.**   YES.

2   **Q.**   THERE IS -- I'LL CALL IT AN EMERGENCY ROOM, I GUESS ATU,

3   TO HANDLE THE EMERGENT SITUATIONS; THEY HAVE THAT.  CORRECT?

4   **A.**   YES.

5   **Q.**   THEY HAVE PHYSICIAN CLINICS.  CORRECT?

6   **A.**   THAT'S CORRECT.

7   **Q.**   THEY HAVE A NURSING UNIT FOR ACUTE CARE PATIENTS.

8   CORRECT?

9   **A.**   YES.

10  **Q.**   THEY HAVE ANOTHER NURSING UNIT FOR LONG-TERM CARE

11  PATIENTS.  CORRECT?

12  **A.**   YES.

13  **Q.**   THEY HAVE SPECIALTY CLINICS ON SITE THAT ARE MANNED WITH

14  CONTRACT PHYSICIANS.  CORRECT?

15  **A.**   YES.

16  **Q.**   SPECIALTY SERVICES ARE AVAILABLE OFFSITE THROUGH

17  CONTRACTS.  CORRECT?

18  **A.**   YES.

19  **Q.**   TELEMED IS USED ON SITE.  IS THAT RIGHT?

20  **A.**   THAT'S CORRECT.

21  **Q.**   THERE ARE CONTRACTUAL ARRANGEMENTS WITH OUTSIDE HOSPITALS

22  FOR EMERGENT SERVICES.  CORRECT?

23  **A.**   THERE'S ARRANGEMENTS FOR OUTSIDE SERVICES.  WE DIDN'T OR

24  WEREN'T BEING -- WE WEREN'T PROVIDED WITH THE CONTRACTS, SO I

25  CAN'T SPEAK TO THE CONTRACTS, BUT YES, THERE IS AVAILABILITY OF

1   SERVICES OFFSITE.

2   **Q.**   LSP HAS MEDICAL DORMS AT EACH OF ITS OUT CAMPS.  CORRECT?

3   **A.**   YOU MEAN CAMP LIKE J, A, C?

4   **Q.**   YES, SIR.

5   **A.**   WE DID NOT REVIEW THE MEDICAL DORMS IN THE OUT CAMPS.  WE

6   REVIEWED THE MEDICAL DORMS IN THE MAIN UNIT.

7   **Q.**   LSP HAS A NATIONALLY RECOGNIZED AND AWARDED HOSPICE

8   PROGRAM.  CORRECT?

9   **A.**   I KNOW THEY HAVE A HOSPICE PROGRAM.

10   **Q.**   YOU DON'T KNOW ANYTHING ABOUT IT BEING NATIONALLY

11   RECOGNIZED?

12   **A.**   YOU KNOW, I HEARD YEARS AGO THAT THEY DID HAVE SOME

13   NATIONAL RECOGNITION, BUT I'M NOT SURE CURRENTLY WHAT THE

14   STATUS IS.

15   **Q.**   THE CONTRACTS FOR ON-SITE CLINICS FOR SPECIALTY CARE, THEY

16   HAVE AN ORTHOPEDIC PHYSICIAN THAT COMES BY MONTHLY.  ARE YOU

17   AWARE OF THAT?

18   **A.**   YES.  THEY HAVE ABOUT 10 OR 12, 13 CLINICS.

19        **MR. DUBNER:**  OBJECTION, YOUR HONOR.  THAT CALLS FOR

20   SOMETHING THAT HAPPENED AFTER THE DISCOVERY CUTOFF.

21        **THE COURT:**  CAN YOU LIMIT YOUR QUESTION TO THE PERIOD

22   OF TIME, PLEASE?

23        **MR. ARCHEY:**  I BELIEVE I HAVE, JUDGE.  IF I HAVE

24   CROSSED THE LINE, I DON'T BELIEVE I HAVE.

25        **THE COURT:**  NO, JUST REPHRASE YOUR QUESTION TO THE

1   PERIOD OF TIME, PLEASE.

2   **BY MR. ARCHEY:**

3   **Q.**   PRIOR TO SEPTEMBER 30TH OF 2016, THERE WAS AN

4   ORTHOPEDIC -- CONTRACTS WITH ORTHOPEDIC PHYSICIANS TO COME TO

5   LSP ON A REGULAR BASIS.  CORRECT?

6   **A.**   MY UNDERSTANDING WAS THEY WERE GOING TO HIRE AN ORTHOPEDIC

7   PHYSICIAN, BUT HE HADN'T BEEN WORKING AT THE TIME WE STARTED

8   OUR REVIEW.

9   **Q.**   ALL RIGHT.  SO YOU DON'T KNOW ABOUT WHETHER IT WAS BEFORE

10  SEPTEMBER 30TH OR NOT?

11  **A.**   WE HAD A LIST, AND I THINK WE PUT IT IN THE REPORT OF THE

12  SPECIALTY SERVICES THAT WERE AVAILABLE.

13  **Q.**   RIGHT.

14  **A.**   AND IF YOU WANT, I CAN LOOK FOR THAT OR TRY TO FIND IT FOR

15  YOU, BUT WHATEVER SPECIALTY SERVICES THEY TOLD US WERE

16  AVAILABLE, THEY WERE --

17  **Q.**   ORTHOPEDICS WAS ONE?

18  **A.**   OKAY.

19  **Q.**   GENERAL MEDICINE?

20  **A.**   OKAY.

21  **Q.**   GENERAL MEDICINE.  CORRECT?

22  **A.**   GENERAL MEDICINE WAS THE LOUISIANA PHYSICIANS, THE LSP

23  PHYSICIANS.

24  **Q.**   YOU DON'T KNOW OF ANY CONTRACT PHYSICIANS THAT WERE

25  BROUGHT FROM OUTSIDE ON A REGULAR BASIS?

1  **A.**   WELL, AS I SAID, IT'S IN THE REPORT.  I THINK THEY MAY

2  HAVE HAD ONE PERSON COME IN FOR THAT.

3  **Q.**   DERMATOLOGY WAS CONTRACTED TO COME IN?

4  **A.**   I THINK THEY HAD DERMATOLOGY, YES.

5  **Q.**   NEUROLOGY IS CONTRACTED TO COME IN?

6  **A.**   LIKE I SAY, IF YOU WANT ME TO REVIEW THE REPORT, I CAN GO

7  AND FIND IT AND TELL YOU ALL OF THEM THAT WERE IN THERE.

8  **Q.**   UROLOGY WAS CONTRACTED TO COME IN?

9  **A.**   YES, UROLOGY, I'M PRETTY SURE WAS.

10  **Q.**   PHYSICAL THERAPY?

11  **A.**   YES.

12  **Q.**   HEPATITIS?

13  **A.**   YES.

14  **Q.**   PODIATRY?

15  **A.**   YES.

16  **Q.**   GASTROINTESTINAL?

17  **A.**   YES.

18  **Q.**   AND MINOR SURGERY?

19  **A.**   YES.

20  **Q.**   COUMADIN CLINIC?

21  **A.**   THAT WAS MANAGED, I BELIEVE, BY ONE OF THE LSP PHYSICIANS.

22  **Q.**   OKAY.  THEY HAD A COUMADIN CLINIC THAT THEY RAN, THOUGH.

23  IS THAT RIGHT?

24  **A.**   YES.

25  **Q.**   THERE IS A HIV CLINIC, KNOWN AS CLINIC DEBBIE?

1 2 : 1 7   1    **A.**    YES.

2    **Q.**    AND OPHTHALMOLOGY -- THEY HAD AN EYE CLINIC AS WELL.

3    CORRECT?

4    **A.**    YES.

5    **Q.**    COLONOSCOPIES AND ENDOSCOPIES WERE CONTRACTED AND

6    ADMINISTERED THROUGH GI ASSOCIATES OF BATON ROUGE.  ARE YOU

7    FAMILIAR WITH THAT?

8    **A.**    THAT'S CORRECT.

9    **Q.**    A RESPIRATORY POSITION WAS CREATED IN 2014.  ARE YOU

10    FAMILIAR WITH THAT?

11    **A.**    THEY HAD A RESPIRATORY THERAPIST WHO WORKED AND DID

12    SPIROMETRY.

13    **Q.**    AND, OF COURSE, IN THE FALL OF 2015, LSP OPENED A NEW

14    MEDICAL BUILDING WHICH ALLOWED LSP TO INCREASE THE SERVICES

15    AVAILABLE ON SITE.  RIGHT?

16    **A.**    IN WHAT MONTH?

17    **Q.**    FALL OF 2015.

18    **A.**    YES.  THEY OPENED THAT -- YOU'RE TALKING ABOUT THE

19    TREATMENT CENTER?

20    **Q.**    YES.

21    **A.**    YES.

22    **Q.**    ALL RIGHT.  THE HOSPICE PROGRAM IS A CERTIFIED PROGRAM.

23    ARE YOU AWARE OF THAT?

24    **A.**    NO.  I WASN'T AWARE OF WHAT CERTIFICATION THEY HAD.

25    **Q.**    THE LABORATORY IS CERTIFIED PURSUANT TO CLIA, THAT'S THE

1   CLINICAL LABORATORY IMPROVEMENT ACT.  CORRECT?

2   **A.**   THAT'S CORRECT.

3   **Q.**   LSP PHARMACY CONTINUES TO BE CERTIFIED THROUGH THE

4   LOUISIANA BOARD OF PHARMACY.  ARE YOU FAMILIAR WITH THAT?

5   **A.**   YES.  I ASSUMED THAT, YES.

6   **Q.**   AND THE ADVANCED LIFE SUPPORT AMBULANCES CONTINUE TO BE

7   CERTIFIED.  ARE YOU FAMILIAR WITH THAT?

8   **A.**   YES.

9   **Q.**   AND LSP IS ACCREDITED BY THE ACA EVERY THREE YEARS.  ARE

10  YOU FAMILIAR WITH THAT?

11  **A.**   YES.  I WAS TOLD THAT, YES.

12          **MR. ARCHEY:**  ALL RIGHT.  YOUR HONOR, THIS MIGHT BE A

13  GOOD TIME TO BREAK, OR I'LL LEAVE IT TO THE COURT'S DISCRETION.

14          **THE COURT:**  WE ARE GOING TO TAKE ABOUT AN HOUR AND 15

15  MINUTES FOR LUNCH.  IT'S ALMOST A QUARTER TO 1:00.  WE WILL

16  RESUME AT 2:00.

17          **MR. ROBERT:**  THANK YOU, YOUR HONOR.

18                              **(RECESS.)**

19          **THE COURT:**  BE SEATED.

20              ONE HOUSEKEEPING MATTER THAT I FORGOT TO TELL

21  Y'ALL YESTERDAY AND I FEEL BAD ABOUT IT.  WOULD YOU PLEASE EAT

22  LUNCH IN THE ATTORNEY CONFERENCE ROOM.  THE REASON BEING THAT

23  THE COURT SECURITY OFFICER HAS TO STAY HERE BECAUSE WE DON'T

24  HAVE THE ABILITY TO LOCK THE ANTEROOM DOORS.  WE ONLY CAN LOCK

25  THE -- SO I HAVE CHEATED THEM OUT OF LUNCH TWO DAYS IN A ROW.

0 2 : 0 1

1    SO YOU ARE WELCOME TO USE IT.  YOU ARE STILL WELCOME TO HAVE

2    YOUR SNACKS IN THERE, TO CLEAN UP AFTER YOURSELF, BUT IF

3    TOMORROW AND THE REST OF THE TIME IF YOU'LL JUST EAT IN THE

4    ATTORNEY CONFERENCE ROOM, THAT WOULD BE HELPFUL, OR YOU CAN EAT

5    DOWNSTAIRS IN THE -- WHAT USED TO BE A CAFETERIA.

6                    MR. ARCHEY, YOUR WITNESS.

7              **MR. ARCHEY:**  THANK YOU, JUDGE.

8              **MS. MONTAGNES:**  YOUR HONOR?

9              **THE COURT:**  OH, YES.  I'M SORRY.

10             **MS. MONTAGNES:**  COULD I ASK JUST ONE FOLLOWUP

11   QUESTION ABOUT THAT?  WE'VE WORKED OUT WITH THE MARSHALS THAT

12   WE CAN EAT WITH OUR CLIENTS AT LUNCHTIME BECAUSE THEY'RE NOT

13   LETTING US GO BACK THERE ANYMORE, NOT FOR ANY -- JUST BECAUSE

14   THERE WAS SO MUCH GOING ON WITH THE JURY TRIAL.

15             **THE COURT:**  RIGHT.

16             **MS. MONTAGNES:**  SO THAT WOULD MEAN THAT COURT

17   SECURITY WOULD PROBABLY HAVE TO BE HERE ON THE LUNCHTIME, BUT

18   WE'LL EAT FOR LIKE 20 MINUTES OR SO AND THEN COME UP.

19             **THE COURT:**  YEAH, THAT WOULD BE OKAY, AND I'LL MAKE

20   ARRANGEMENTS WITH THE COURT SECURITY TO EITHER OPEN IT, YOU

21   KNOW, RIGHT BEFORE WE START, COME BACK FROM LUNCH, OR TO KEEP

22   IT OPEN FOR 15 OR 20 MINUTES.  AND THEN, HOPEFULLY, THE REST OF

23   THE WEEK IT WON'T BE A PROBLEM BECAUSE WE WON'T HAVE -- THAT

24   JURY TRIAL SHOULD BE OVER TOMORROW.

25             **MS. MONTAGNES:**  OH, GREAT.  OKAY.

1    **THE COURT:**  ALL RIGHT.

2    **MS. MONTAGNES:**  THANK YOU, JUDGE.

3    **THE COURT:**  MR. ARCHEY, SORRY ABOUT THAT.  YOUR

4    WITNESS.

5    **MR. ARCHEY:**  THANK YOU, JUDGE.

6    BY MR. ARCHEY:

7    **Q.**   ALL RIGHT, DR. PUISIS, LET'S TALK ABOUT DR. LAVESPERE FOR

8    A MOMENT.  HE'S THE MEDICAL DIRECTOR AT LSP.  CORRECT?

9    **A.**   YES.

10   **Q.**   AND DR. LAVESPERE'S BACKGROUND IS AS A FAMILY CARE

11   PHYSICIAN.  CORRECT?

12   **A.**   THAT'S CORRECT.

13   **Q.**   AND THAT'S THE KIND OF PHYSICIAN YOU THINK SHOULD BE

14   WORKING AT LSP.  RIGHT?

15   **A.**   YES, BUT I WANT TO QUALIFY.  THERE WAS NO CREDENTIALS THAT

16   I WAS ABLE TO REVIEW BECAUSE THEY'RE NOT PRESENT, SO I TAKE

17   THAT BASED ON HIS COMMENTS TO ME.

18   **Q.**   WEREN'T YOU INFORMED THAT THE CREDENTIAL FILES WERE KEPT

19   AT DOC HEADQUARTERS?

20   **A.**   NO.  DR. LAVESPERE TOLD ME THAT THE CREDENTIAL FILES WERE

21   IN THE SECRETARY'S OFFICE.

22   **Q.**   ALL RIGHT.

23   **A.**   AND I DID CHECK THOSE TWO FILES, AND THEY HAD NO

24   CREDENTIALS FOR ANY OF THE PHYSICIANS IN IT.

25   **Q.**   ALL RIGHT.  AND WHEN YOU WERE -- YOU DID YOUR SITE TOUR,

1   YOU VISITED WITH DR. LAVESPERE FOR A PERIOD OF TIME.  IS THAT

2   RIGHT?

3   **A.**   I DID.

4   **Q.**   HOW LONG?

5   **A.**   I THINK IT WAS PROBABLY ABOUT AN HOUR, MAYBE AN HOUR AND A

6   HALF, PLUS OR MINUS.  I'M NOT --

7   **Q.**   MAYBE 20 MINUTES?

8   **A.**   YOU KNOW, I DON'T REMEMBER EXACTLY.

9   **Q.**   OKAY.  AND YOU'VE GIVEN A LOT OF PRETTY STRONG OPINIONS

10  HERE IN COURT ABOUT DR. LAVESPERE, HAVEN'T YOU?

11  **A.**   I HAVE.

12  **Q.**   YOU'RE NOT A PSYCHIATRIST, ARE YOU?

13  **A.**   I'M NOT A PSYCHIATRIST.

14  **Q.**   AND YOU GIVE THOSE OPINIONS FROM ONE SHORT INTERVIEW WITH

15  DR. LAVESPERE WITH NO CLINICAL FINDINGS AS TO HIS CHARACTER.

16  THAT'S WHAT YOU'VE DONE.  IS THAT RIGHT?

17  **A.**   WHAT COMMENTS ARE YOU TALKING ABOUT?

18  **Q.**   YOU'VE QUESTIONED HIS CHARACTER AND AS A PHYSICIAN BASED

19  UPON HIS PAST HISTORY.  RIGHT?

20  **A.**   WE MENTIONED THAT THE BOARD OF MEDICAL EXAMINERS IN

21  LOUISIANA MADE COMMENTS ABOUT DR. LAVESPERE BASED, I ASSUME, ON

22  AN EVALUATION, AND WE USED THOSE COMMENTS TO SUPPORT OUR

23  REPORT.

24  **Q.**   YOU DID MORE THAN THAT.  IN COURT YOU TESTIFIED TO HIS

25  LACK OF CHARACTER.  CORRECT?

02:04   1   **A.**   IF YOU CAN POINT TO EXACTLY WHAT YOU'RE REFERRING TO, I'LL

2   ADDRESS IT.

3   **Q.**   DO YOU --

4   **A.**   BUT WE DO HAVE QUESTIONS ABOUT DR. LAVESPERE'S CHARACTER,

5   YES.

6   **Q.**   ALL RIGHT.  BASED UPON NOTHING MORE THAN YOUR SHORT

7   INTERVIEW AND HIS PAST HISTORY.  CORRECT?

8   **A.**   THE PAST HISTORY, THE INTERVIEW, AND THE OUTCOMES OF WHAT

9   WE SAW AT LSP, YES.

10   **Q.**   ALL RIGHT.  SO YOU'RE NOT QUALIFIED TO GIVE A PSYCHIATRIC

11   OPINION OF ANY KIND, ARE YOU?

12   **A.**   I'M NOT GIVING A PSYCHIATRIC OPINION.

13   **Q.**   NOW, DO YOU KNOW HOW LONG DR. LAVESPERE HAS BEEN AT LSP?

14   **A.**   I'M NOT SURE.

15   **Q.**   DO YOU KNOW WHAT POSITIONS DR. LAVESPERE HAS HELD AT LSP?

16   **A.**   I KNOW FOR SURE HE'S BEEN AN ASSISTANT MEDICAL DIRECTOR

17   AND A MEDICAL DIRECTOR.

18   **Q.**   HE WORKED HIS WAY UP THE RANKS, DIDN'T HE?

19   **A.**   HE'S BEEN AN ASSISTANT MEDICAL DIRECTOR AND A MEDICAL

20   DIRECTOR, TO THE BEST OF MY KNOWLEDGE.

21   **Q.**   DID YOU HAVE ANY DISCUSSION WITH DR. LAVESPERE CONCERNING

22   OR ABOUT HIS ATTITUDE TOWARD THE PATIENTS THAT HE TAKES CARE

23   OF?

24   **A.**   WE ASKED HIM WHAT HE DID.  HE HAS A DEPOSITION, WHICH WE

25   READ, AND WE LOOKED AT THE REPORT OF THE BOARD.

02:06  1  **Q.**   DID YOU TALK WITH DR. LAVESPERE DIRECTLY ABOUT HIS

2  ATTITUDE AND THE WAY HE FEELS ABOUT HIS PATIENTS AT LSP?

3  **A.**   I CAN'T RECOLLECT.  I MEAN, I HAVE NOTES.  I DON'T -- I

4  MAY NOT HAVE.  I'M NOT SURE.

5  **Q.**   ALL RIGHT.  ONE OF THE THINGS THAT YOU HAVE ARGUED AND HAS

6  BEEN ARGUED IS THAT DR. LAVESPERE IS TO BE CRITICIZED BECAUSE

7  HE BELIEVES THAT APPROXIMATELY HALF OF THE COMPLAINTS ARE NOT

8  TRUE, THAT -- HAS TO FIGURE OUT WHICH INMATES ARE LYING OR

9  SOMETHING TO THAT EFFECT.  RIGHT?

10  **A.**   YES.

11  **Q.**   ISN'T IT TRUE THAT YOUR STUDIES HAVE FOUND THAT 40 PERCENT

12  OF COMPLAINTS -- MEDICAL REQUESTS FOR MEDICAL CARE ARE INVALID?

13  **A.**   I'M NOT SURE WHAT YOU'RE ASKING.

14  **Q.**   OKAY.  WELL, LET'S LOOK AT YOUR TEXTBOOK.  ISN'T IT

15  TRUE -- LET ME SHOW YOU THE PAGE.  DOCTOR, DO YOU RECOGNIZE

16  THIS --

17  **A.**   YES.

18  **Q.**   -- AS THE TEXTBOOK THAT YOU WROTE?

19  **A.**   YES.

20  **Q.**   I'M GOING TO DIRECT YOU TO PAGE 55 IN THE TEXTBOOK.

21  **A.**   YES.

22  **Q.**   ON THE RIGHT AND HIGHLIGHTED OUT OF YOUR TEXTBOOK, TWO

23  STUDIES THAT LOOKED AT THE REASONS THAT INMATES COME TO SICK

24  CALL CONCLUDED THAT APPROXIMATELY 40 PERCENT OF THE REQUESTS

25  FOR HEALTHCARE ATTENTION WERE MEDICALLY UNNECESSARY OR DID NOT

02:08   1   REQUIRE CLINICAL EVALUATION.

2           **MR. DUBNER:**  OBJECTION.  AGAIN, TO THE EXTENT THE

3   WITNESS IS NOT BEING PROVIDED THE FULL PAGE AND BOOK THAT HE IS

4   BEING ASKED ABOUT.

5           **THE COURT:**  OVERRULED.

6   **BY MR. ARCHEY:**

7   **Q.**  DO YOU SEE THAT, DOCTOR?

8   **A.**  YES.

9   **Q.**  SO WHAT DR. LAVESPERE IS SAYING IS HIS EXPERIENCE IS

10   COMPLETELY CONSISTENT WITH WHAT'S IN YOUR BOOK?

11   **A.**  NO.  I'M NOT SURE OF YOUR QUESTION -- AND CAN YOU STATE

12   IT?

13   **Q.**  DR. LAVESPERE, WHEN HE SAID, "I FIND THAT APPROXIMATELY

14   HALF OF THE COMPLAINTS ARE NOT VALID," THAT IS COMPLETELY

15   CONSISTENT WITH WHAT'S IN YOUR TEXTBOOK?

16   **A.**  NO, IT ISN'T.

17   **Q.**  40 PERCENT?

18   **A.**  NO.  YOU'RE COMPARING APPLES TO ORANGES.  WHAT THE BOOK IS

19   SAYING IS JUST THAT 40 PERCENT OF THE SICK CALL REQUESTS ARE

20   UNNECESSARY.  BUT WHAT THEY MEAN IS THAT INMATES PLACE SICK

21   CALL REQUESTS FOR A VARIETY OF REASONS.  SOMETIMES THEY PLACE

22   SICK CALL REQUESTS FOR SHOES, FOR EXAMPLE, THEY'RE NOT HEALTH

23   REQUESTS.  SO I BELIEVE THAT STUDY -- AND IF I -- IF YOU GAVE

24   ME THAT BOOK, I'D READ THAT ONE SECTION.  BUT I'M ALMOST SURE

25   THAT WHAT THAT REFERS TO IS THE FACT THAT REQUESTS ARE NOT

02:09   1   ALWAYS MEDICAL IN NATURE, AND THAT SOME REQUESTS CAN BE HANDLED
        2   ADMINISTRATIVELY, UP TO 40 PERCENT.
        3           SO, FOR EXAMPLE, IF AN INMATE REQUESTS SPECIAL SHOES
        4   AND IT'S NOT A MEDICAL NECESSITY, IT SHOULD BE REALLY TAKEN UP
        5   WITH CUSTODY.  AND SO THAT'S PARTLY WHAT THAT'S DISCUSSING, AND
        6   THAT'S MAINLY WHAT THAT'S DISCUSSING.  AND SO I THINK YOU'RE
        7   MISREPRESENTING -- YOU'RE REPRESENTING THAT BOOK AS SOMETHING
        8   DR. LAVESPERE SAID, AND THEY ARE NOT THE SAME THING.
        9           AND DR. LAVESPERE ISN'T NECESSARILY TALKING ABOUT --
       10   MY UNDERSTANDING IN THE DEPOSITION, HE'S NOT TALKING ABOUT SICK
       11   CALL REQUESTS; HE'S TALKING ABOUT HE DOESN'T BELIEVE THE
       12   INMATES.
       13   **Q.**   RIGHT, AND THAT'S WHAT THE SICK CALL --
       14   **A.**   THAT'S DIFFERENT.
       15   **Q.**   SICK CALL REQUESTS IS THE FIRST ACCESS POINT TO THE
       16   HEALTHCARE SYSTEM.  CORRECT?
       17   **A.**   RIGHT, BUT THAT DOESN'T HAVE ANYTHING TO DO WITH WHETHER
       18   YOU TRUST INMATES OR NOT.
       19   **Q.**   SICK CALL IS THE PRIMARY MANNER BY WHICH AN INMATE
       20   ACCESSES HEALTHCARE.  RIGHT?
       21   **A.**   TRUE.
       22   **Q.**   OKAY.  AND ACA STANDARDS PROVIDE THAT THERE SHOULD BE A
       23   PROCESS FOR ALL OFFENDERS TO INITIATE REQUESTS FOR HEALTHCARE
       24   SERVICES ON A DAILY BASIS.  RIGHT?
       25   **A.**   TRUE.

Q.   AND LSP DOES THAT.  RIGHT?

A.   THAT'S CORRECT.

Q.   NOW, THERE ARE MULTIPLE WAYS TO MAKE HEALTHCARE AVAILABLE
TO INMATES, SUCH AS, YOU CAN HAVE A WRITTEN REQUEST, YOU CAN
HAVE A SIGN-UP, YOU CAN HAVE A WALK-IN, TELEPHONE, SCHEDULE
APPOINTMENTS.  THOSE ARE SOME OF THE WAYS.  RIGHT?

A.   THAT'S CORRECT.

Q.   AND WHICHEVER SYSTEM IS CHOSEN -- AND THERE ARE PLUSES AND
MINUSES TO EACH OF THOSE SYSTEMS.  RIGHT?

A.   THAT'S RIGHT.

Q.   AND AT LSP, THEY HAVE GONE WITH THE HEALTHCARE REQUEST,
THE WRITTEN REQUEST.  RIGHT?

A.   THEY USE THE HEALTH REQUEST, BUT THEY ALSO BASICALLY TOUR
THE FACILITY IS WHAT THEY DO, AND THE INMATES CAN JUST SAY THEY
WANT TO SEE THE MEDIC.

Q.   RIGHT.

A.   AND HAND THEM A REQUEST.

Q.   ALL RIGHT.  SO THERE'S A WRITTEN REQUEST WHERE THE
PROVIDER GOES TO -- OR I'LL TAKE AWAY PROVIDER.  THE MEDICAL
PERSONNEL GOES TO THE INMATE AND PROVIDES THEM A WAY TO GET
HEALTHCARE REQUESTS.  RIGHT?

A.   THAT'S RIGHT.  THE MEDICS, AT 4:30, GO UP.  THEY TOUR THE
UNITS, AND THE INMATES PRESENT THEMSELVES.

Q.   NOW, SOME OF THE POSITIVES OF THIS IS IT CREATES A WRITTEN
REQUEST THAT STARTS THE RECORD.  CORRECT?

1    A.    THAT'S HELPFUL, YES.

2    Q.    OKAY.  AND, OF COURSE, THE MEDIC GOES TO THE INMATE, WHICH

3    EASES ALL THE LOGISTICAL BURDENS OF THE INMATE COMING TO A

4    FACILITY.  CORRECT?

5    A.    I DON'T PERCEIVE IT THAT WAY.

6    Q.    OKAY.  WELL, IF YOU HAVE A SYSTEM WHERE THE INMATE HAS TO

7    GO TO A CLINIC, YOU'VE GOT TO GET THE INMATE THERE, YOU'VE GOT

8    THE WAITING TIME THERE, YOU'VE GOT SECURITY CONCERNS THERE.

9    RIGHT?

10   A.    THAT'S CORRECT.

11   Q.    OKAY.  SO BY GOING -- TAKING THE MEDIC TO THE INMATE, THAT

12   AVOIDS THOSE ISSUES AND STILL GETS A POINT OF ACCESS OF

13   HEALTHCARE TO THAT INMATE.  CORRECT?

14   A.    WELL, THERE'S TWO ISSUES.  ONE, IT'S A MEDIC, WHICH WE

15   HAVE A PROBLEM WITH.

16   Q.    WE'RE GOING TO TALK ABOUT THAT.  I JUST WANT YOU TO

17   ADDRESS THIS.

18   A.    OKAY.  THE SECOND PART, PROVIDED THAT THE CLINICAL SPACE

19   IS APPROPRIATE --

20   Q.    OKAY.

21   A.    -- IT WOULD BE FINE.

22   Q.    AND WE'RE GOING TO -- I'M GOING TO TALK ABOUT BOTH OF

23   THOSE ISSUES.

24   A.    OKAY.

25   Q.    ALL RIGHT.  AND SO THAT THAT MEDIC THEN DOES GO TO WHERE

1    THE INMATE IS, BE IT THE CELL OR THE DORM.  RIGHT?

2    **A.**    THAT'S WHAT YOU DO AT LSP, YES.

3    **Q.**    OKAY.  NOW, THE INMATE IS REQUIRED TO PAY A CO-PAY OF $3.

4    RIGHT?

5    **A.**    I BELIEVE THAT'S TRUE.

6    **Q.**    OKAY.  THAT'S VERY COMMON TO CHARGE PRISONERS A CO-PAY.

7    CORRECT?

8    **A.**    I THINK IT IS.  YES.

9    **Q.**    AND, IN FACT, THE AVERAGE CO-PAY AROUND THE COUNTRY IS $5.

10   RIGHT?

11   **A.**    I DON'T KNOW THAT.

12   **Q.**    I'M GOING BACK TO YOUR TEXTBOOK.  I'M ON PAGE 31 HERE.

13   **A.**    OKAY.

14   **Q.**    YOU'RE TALKING ABOUT CO-PAYS THERE, AND IT SAYS "THIS FEE,

15   USUALLY APPROXIMATELY $5 IS GENERALLY ASSESSED BY THE NURSING

16   STAFF."  DO YOU SEE THAT?

17   **A.**    OKAY.  JUST REMEMBER IT'S 2009, BUT THAT'S OKAY.

18   **Q.**    RIGHT.

19   **A.**    OKAY.

20   **Q.**    SO WE'VE GONE OFF FROM THERE.

21   **A.**    OKAY.  YEAH.

22   **Q.**    SO IT WOULD BE ACTUALLY GREATER THAN $5 AT THIS POINT?

23   **A.**    I DON'T KNOW RIGHT NOW.

24   **Q.**    ALL RIGHT.

25   **A.**    OKAY.

1    Q.    SO WE KNOW IN 2009, IT WAS APPROXIMATELY $5.

2    A.    OKAY.

3    Q.    OF COURSE, LSP'S CO-PAY IS $3; BELOW THAT.  RIGHT?

4    A.    CORRECT.

5    Q.    AND LSP'S CO-PAY HAS NEVER GONE UP SINCE THE 1990S, HAS

6    IT?

7    A.    I DON'T KNOW.

8    Q.    IF YOU HAD A SYSTEM TO ACCESS HEALTHCARE WITH EITHER --

9    WITH A SIGN-UP OR APPOINTMENTS, YOU WOULD HAVE MORE NO-SHOWS

10   THAT WOULD TAKE AWAY FROM THE PROVIDER TIME.  CORRECT?

11   A.    CAN YOU REPEAT THAT?  IF YOU HAD A SIGN-UP WITH --

12   Q.    OR APPOINTMENTS, AND THEN THE INMATES DON'T SHOW, WHICH

13   HAPPENS, THAT WOULD INCREASE PROVIDER -- WASTE PROVIDER TIME.

14   RIGHT?

15   A.    IF INMATES DON'T SHOW, IT DOES WASTE TIME BECAUSE YOU HAVE

16   TO RESCHEDULE THE APPOINTMENTS, CORRECT.

17   Q.    OKAY.  AND BY TAKING THE MEDIC TO WHERE THE INMATE IS,

18   THAT DOESN'T IMPACT OPERATIONS OF THE FACILITY.  CORRECT?  OF

19   LSP.

20   A.    NO, IT JUST AFFECTS THE CARE OF THE INMATE.

21   Q.    WELL, AND WE'RE GOING TO TALK ABOUT THAT, BUT THE

22   OPERATIONS -- HEALTHCARE DOES HAVE TO BE PROVIDED WITHIN THE

23   CONTEXT OF THE PRISON OPERATIONS FOR IT TO BE EFFECTIVE.

24   RIGHT?

25   A.    CORRECT, BUT CUSTODY HAS TO ENSURE THAT THE CARE IS

1  ADEQUATE.

2  **Q.**   ALL RIGHT.  NOW, WHEN THE MEDIC GOES AND SEES AN INMATE

3  AND THERE'S A HEALTH-SERVICE REQUEST, THAT REQUEST NEEDS TO BE

4  TRIAGED, REVIEWED BY A PHYSICIAN WITHIN -- STRIKE THAT.

5            NEEDS TO BE -- LET ME START THIS OVER.

6            WHEN THE INMATE HAS REQUESTED SERVICES THROUGH HEALTH

7  SERVICES REQUESTS, HE NEEDS TO BE SEEN WITHIN 24 HOURS AND

8  ASSESSED WITHIN 72 HOURS.  CORRECT?

9  **A.**   CORRECT.  AT LEAST BY A NURSE.

10 **Q.**   THESE MEDICS, THEY ARE HEALTH-TRAINED PERSONNEL.  CORRECT?

11 **A.**   THEY'RE TRAINED AS MEDICS, YES.

12 **Q.**   HEALTH-TRAINED.  RIGHT?

13 **A.**   YES, IT'S A HEALTH TRAINING.

14 **Q.**   AND THEY'RE TRAINED TO DO TRIAGE.  RIGHT?

15 **A.**   THEY'RE TRAINED TO DO EMERGENCY RESPONSE.

16 **Q.**   AND TRIAGE PROVIDES A WAY TO ALLOCATE RESOURCES IN AN

17 EFFECTIVE, TIMELY, AND CLINICALLY APPROPRIATE MANNER.  CORRECT?

18 **A.**   NOW, ARE YOU SPEAKING ABOUT TRIAGE IN THE CORRECTIONAL

19 SENSE OR IN THE COMMUNITY OR WHAT ARE YOU -- WHAT'S THE

20 REFERENCE HERE?

21 **Q.**   TRIAGING PATIENTS PROVIDES A WAY TO ALLOCATE RESOURCES IN

22 AN EFFECTIVE, TIMELY, AND CLINICALLY APPROPRIATE MANNER.

23 CORRECT?

24 **A.**   IT DOES, YES.

25 **Q.**   OKAY.  AND SINCE WE KNOW THAT AT LEAST -- OR APPROXIMATELY

1   40 PERCENT OF THESE REQUESTS ARE MEDICALLY UNNECESSARY, IT

2   MAKES SENSE TO TRIAGE THESE PATIENTS BEFORE THEY SEE A

3   PROVIDER, DOESN'T IT?

4   **A.**   WELL, AGAIN, I THINK YOU'RE MISINTERPRETING THIS

5   40 PERCENT BUSINESS.  SO IF THERE'S 100 REQUESTS AND TEN OF

6   THEM ARE FOR SHOES AND TWO OF THEM ARE TO SEE MENTAL HEALTH AND

7   THE -- YOU KNOW, THE REST ARE NOT MEDICAL IN NATURE, THE

8   PURPOSE OF THE TRIAGE IS ACTUALLY TO SORT THOSE OUT AND TO

9   REDIRECT THEM TO THE APPROPRIATE PERSONNEL.  SO IN THAT SENSE,

10   IT'S EFFECTIVE, BUT I THINK YOU'RE MAKING THIS 40 PERCENT

11   APPEAR TO BE SOMETHING IT'S NOT.

12   **Q.**   DOCTOR, IT'S APPROPRIATE TO USE HEALTH-TRAINED PERSONNEL

13   TO ACT ON THESE SICK CALL REQUESTS.  CORRECT?

14   **A.**   IT IS.

15   **Q.**   IN FACT, ACCORDING TO YOUR BOOK, IT'S NOT LIMITED TO

16   NURSING; IT CAN BE HEALTH-TRAINED PERSONNEL IN ADDITION TO

17   NURSING.  CORRECT?

18   **A.**   RNS SHOULD DO ANYTHING THAT REQUIRES AN INDEPENDENT

19   ASSESSMENT.

20   **Q.**   BUT YOU ARE OKAY, IN YOUR BOOK, WITH HEALTH-TRAINED

21   PERSONNEL ACTING AS IN THESE REQUESTED SERVICES?

22   **A.**   WELL, IT SHOULD BE RNS.

23   **Q.**   IN YOUR BOOK, I'M ON PAGE ON 55 OF YOUR BOOK, YOU TALK

24   ABOUT -- AT THE BEGINNING OF THIS SECTION, THE NURSES, AND THEN

25   AFTER THE NURSES YOU TALK ABOUT THE USE OF HEALTH-TRAINED

1   PERSONNEL TO ACT ON REQUESTS IS ALLOWED.  CORRECT?

2   **A.**   RIGHT.  BUT IT SHOULD BE RNS.

3   **Q.**   DOCTOR, PREVIOUSLY YOU HAVE APPROVED THE USE OF EMTS,

4   THESE MEDICS, AT LSP.  CORRECT?

5   **A.**   ARE YOU TALKING ABOUT 1990?

6   **Q.**   I AM.

7   **A.**   YEAH.  SO I DID NOT COMMENT ON THE USE OF RNS, I DON'T

8   BELIEVE, IN 1990, BUT THAT WAS 1990.

9   **Q.**   SO . . .

10  **A.**   AND I DON'T AGREE THAT MEDICS SHOULD BE USED FOR TRIAGE.

11  **Q.**   OKAY.

12  **A.**   AND NEITHER DO I AGREE THAT MEDICS SHOULD BE USED TO

13  EVALUATE HEALTH REQUESTS.

14  **Q.**   IN 1999, YOU APPROVED THE USE OF THE MEDICS AT LSP, AND

15  YOUR BOOK WAS PUBLISHED IN 2009.  IS THAT WHAT YOU TOLD ME?

16  AND IT ALSO APPROVES THE USE OF THESE MEDICS AS HEALTH-TRAINED

17  PERSONNEL.  RIGHT?

18  **A.**   I DON'T THINK IN '99 I DID.

19  **Q.**   YOU DON'T THINK YOU DID WHAT?

20  **A.**   NO.  MY INVOLVEMENT IN LSP TOWARD THE END WAS AN AGREEMENT

21  WITH DR. KAREM FROM LSU ON HOW THEY WOULD TAKE OVER SOME OF THE

22  MANAGEMENT, AND I WASN'T INVOLVED IN SAYING THAT THEY SHOULD

23  ALLOW MEDICS TO DO SICK CALL.

24  **Q.**   WHAT THE MEDICS AT LSP ARE DOING TODAY IS THE SAME THING

25  THEY WERE DOING BACK IN THE 1990S.  CORRECT?

02:20   1    **A.**   IT IS.

2    **Q.**   THE DIFFERENCE IS, IN THE '90S, THERE WAS A LACK OF

3    SUPERVISION AND TRAINING THROUGH THE PROTOCOLS.  CORRECT?

4    **A.**   THERE WAS MORE THAN THAT.

5    **Q.**   BUT THAT WAS ONE OF THE ISSUES.  RIGHT?

6    **A.**   RIGHT.

7    **Q.**   OKAY.  THERE WAS A CONSENT DECREE ENTERED IN THE 1990

8    LITIGATION WHICH PROVIDED FOR EMTS TO DO SICK CALL.  RIGHT?

9    **A.**   I DON'T RECALL THE EXACT DETAILS OF THE CONSENT AGREEMENT

10   BECAUSE THAT WAS ENTERED INTO BETWEEN THE DOJ AND THE STATE.

11   **Q.**   OKAY.  BUT YOU MONITORED IT FOR THE COURT THEREAFTER.

12   RIGHT?

13   **A.**   I MONITORED, CORRECT.

14   **Q.**   OKAY.  SO THIS IS THE CONSENT DECREE I'M SHOWING YOU.

15   THIS IS PAGE 3 OF EXHIBIT --

16          **MR. ARCHEY:**  MARY, GIVE ME THE EXHIBIT NUMBER,

17   PLEASE.

18   **BY MR. ARCHEY:**

19   **Q.**   WHILE SHE'S LOOKING UP THE NUMBER, THIS STATES THAT "LSP

20   SHALL HAVE AN ADEQUATE SICK CALL SYSTEM IF LSP CHOOSES TO USE

21   EMTS FOR SICK CALL, LSP SHALL IMPLEMENT A PROGRAM TO TRAIN EMT

22   PERSONNEL PROVIDING SICK CALL SERVICES."  DO YOU SEE THAT?

23   **A.**   YES.

24   **Q.**   OKAY.  SO THAT WAS THE AGREEMENT THAT WAS ENTERED IN --

25   WITH THE COURT IN 1998?

**A.**   THAT'S CORRECT.

**Q.**   AND YOU MONITORED THAT AGREEMENT THEREAFTER.  RIGHT?

**A.**   I DID.  BUT I DIDN'T WRITE THE AGREEMENT.

**Q.**   I WANT TO SHOW YOU YOUR MONITORING REPORT, YOUR FIRST
MONITORING REPORT, ON PAGE 2.

         **MR. DUBNER:**  I'M GOING TO OBJECT, AGAIN.  WE DON'T
EVEN HAVE THE EXHIBIT NUMBER FOR THIS.  IF WE COULD GET THE
FULL -- BOTH THE EXHIBIT NUMBER AND THE FULL REPORT TO DR.
PUISIS.

         **THE COURT:**  HE'S GETTING IT.

              IT'S YOUR RECORD, MR. ARCHEY.  I DON'T KNOW WHAT
YOU ARE GOING TO DO WITH THIS AT THE COURT OF APPEALS IF YOU
EVER GET THERE, BUT WHATEVER.

         **MR. ARCHEY:**  YES, YOUR HONOR.  GIVE ME ONE SECOND.
MY TEAM IS GETTING IT FOR ME, JUDGE.

**BY MR. ARCHEY:**

**Q.**   DOCTOR, WHILE THEY ARE LOOKING THAT UP, I'LL GIVE YOU AN
OPPORTUNITY TO READ THROUGH YOUR COMMENTS HERE.

**A.**   UH-HUH.

         **THE COURT:**  YOU'RE REFERRING TO THE CONSENT DECREE AS
HIS COMMENTS?

         **MR. ARCHEY:**  NO, JUDGE.  THIS IS HIS FIRST MONITORING
REPORT WRITTEN BY DR. PUISIS.

         **THE COURT:**  ALL RIGHT.

**BY MR. ARCHEY:**

Q.    DR. PUISIS, I HAVE TURNED TO THE LAST PAGE OF THIS REPORT.
IS THAT YOUR SIGNATURE AND THE DATE?

A.    YES.

Q.    IT'S DATED JANUARY 4, 1999?

A.    YES, IT IS.

Q.    GOING BACK TO PAGE 2.  YOU TALK ABOUT "ON A POSITIVE SIDE,
DR. STEWART HAS TAKEN INITIAL STEPS TO CREATE AN EMT TRAINING
PROGRAM.  I BELIEVE DR. STEWART IS DOING AN EXCELLENT JOB AND
HIS WORK IS WELL RECEIVED BY THE EMTS.  THIS PROGRAM CONSISTS
OF DIDACTIC SESSIONS AND GROUP DISCUSSION ABOUT PROBLEM CASES.
AN EMT PROTOCOL MANUAL HAS BEEN DEVELOPED.  THIS WORK IS AN
EXCELLENT BEGINNING, BUT THE PROGRAM IS NOT YET COMPLETELY
ESTABLISHED.  SOME OF THE PROTOCOLS COULD BE MODIFIED.  THE
TRAINING PROGRAM COULD BENEFIT FROM UNDERSTANDING WHY INMATES
ARE PLACING SICK CALLS."  YOU APPROVED THE USE OF EMTS FOR
DOING SICK CALLS IN 1999 AT LSP.  CORRECT?

A.    WELL, I WOULDN'T GO THAT FAR.  SO MY RECOLLECTION -- SO
THIS IS 19 YEARS AGO -- PRIOR TO THAT, THE COURT ENTERED INTO
AN AGREEMENT WITH THE DOJ.  I BELIEVE THIS OCCURRED AFTER DR.
KAREM WAS INVOLVED.  DO YOU RECALL THAT?

Q.    DR. KAREM WAS INVOLVED AT THIS TIME, YES, SIR.

A.    AT THIS TIME, YES.  SO THE COURT REQUIRED AN AGREEMENT
BETWEEN THE JUSTICE DEPARTMENT AND THE STATE, AND DR. KAREM WAS
GOING TO ASSUME SOME RESPONSIBILITIES AT THE FACILITY.

          PRIOR TO THAT, I WAS VERY CRITICAL OF THE SICK CALL

02:25  1  PROCESS.  IT WAS A PROCESS WHERE THE INMATES WOULD HAVE -- SICK
2  CALL WOULD BE CONDUCTED AT 2:30 IN THE MORNING.  I ACTUALLY
3  WENT TO ONE.  THEY WOULD BE REQUIRED TO STAND OUTSIDE.  I WENT
4  TO A CAMP SICK CALL WHERE THE INMATES WERE STANDING OUTSIDE IN
5  THE RAIN AND A MEDIC WAS EVALUATING THEM, AND I WAS VERY
6  CRITICAL OF THE MEDIC'S EVALUATION BECAUSE THE MEDIC WAS MAKING
7  INDEPENDENT JUDGMENTS, VERY SIMILAR TO WHAT OCCURS TODAY.
8           AND I CAN TELL YOU AN ANECDOTE IF YOU WANT WHERE A
9  MEDIC WAS EVALUATING SOMEONE AND THE INMATE WAS CLEARLY HAVING
10  HEART FAILURE.  HE HAD TACHYCARDIA.  THE PULSE WAS LIKE 120,
11  130 AND WAS SHORT OF BREATH, AND THE MEDIC TOLD ME, "WELL, YOU
12  DON'T KNOW INMATES LIKE I DO.  INMATES CAN MAKE THEIR PULSE GO
13  FAST," ASSUMING THEREFORE THAT THE INMATE WAS MAKING UP A PULSE
14  OF 130.
15           THE INMATES HAD -- THE MEDICS HAD VERY LITTLE
16  CAPACITY TO EVALUATE INMATES FOR THEIR CLINICAL CONDITIONS AND
17  THEY STILL DO, AND I WAS NEVER A BIG PROPONENT OF THE WAY SICK
18  CALL WAS BEING CONDUCTED.
19           SO WHEN THE AGREEMENT OCCURRED, I HAD A MONITOR.  AND
20  UNDER THE CIRCUMSTANCES, A PHYSICIAN FROM LSU WAS ATTEMPTING TO
21  TRAIN THE MEDICS, AND I THOUGHT HE WAS DOING A GOOD JOB AND I
22  SAID SO.  BUT THAT DOESN'T MEAN THAT I AGREE THAT MEDICS SHOULD
23  BE CONDUCTING SICK CALL.
24  **Q.**   YOU ISSUED A REPORT WHICH SAID THEY WERE CONDUCTING SICK
25  CALL, AND THE COURT, AFTER YOUR REPORT, DISMISSED OR WITH --

1    DISMISSED THE PARTIES FROM THE CONSENT DECREE.  CORRECT?

2    **A.**   THE AGREEMENT WAS THAT THEY WOULD DO IT.  IT WAS BEYOND MY

3    CONTROL, AND WE HAD VERY LITTLE  -- I HAD VERY LITTLE INPUT

4    INTO THE FINAL DECISION ON THE AGREEMENT.

5    **Q.**   AND YOU REFERENCED WHAT AN EXCELLENT JOB THEY WERE DOING

6    WITH THE MEDICS?

7    **A.**   I THOUGHT THE DOCTOR WAS DOING A GOOD JOB OF TRYING TO

8    TRAIN THE MEDICS, THAT'S CORRECT.

9    **Q.**   NOW, DOCTOR, THE NEXT DOCUMENT I'M SHOWING YOU IS ALSO

10   FROM DEFENDANT'S TRIAL EXHIBIT 502, AND IT DOES HAVE THE NUMBER

11   AT THE TOP, 06434.  THESE WERE THE PROTOCOLS BACK IN 1996 FOR

12   SICK CALL.  PRETTY SKINNY, AREN'T THEY?

13   **A.**   THEY ARE.

14   **Q.**   TODAY, WHAT DO THE PROTOCOLS LOOK LIKE?

15   **A.**   YOU KNOW, I DIDN'T REVIEW THEM BECAUSE I THINK MS. LAMARRE

16   REVIEWED THE MEDIC PROTOCOLS WITH DR. VASSALLO.

17   **Q.**   PROTOCOLS TODAY CONSIST OF A FULL BINDER, DON'T THEY?

18   **A.**   I'M NOT SURE.

19   **Q.**   ALL RIGHT.  YOU ARE CONCERNED ABOUT THE LACK OF PRIVACY

20   DURING SICK CALL.  THAT'S ONE OF THE CRITICISMS YOU HAVE.

21   CORRECT?

22   **A.**   THAT'S CORRECT.

23   **Q.**   ALL RIGHT.  IN A PRISON SYSTEM, PRIVACY IS NOT NEARLY WHAT

24   IT IS OUT IN THE FREE WORLD, IS IT?

25   **A.**   WITH RESPECT TO HEALTH ENCOUNTERS?

**Q.**   NO.  WITH RESPECT TO GENERAL CONDITIONS OVERALL.

**A.**   I'M MORE CONCERNED ABOUT HEALTH ENCOUNTERS.  AND THE HEALTH ENCOUNTERS, THEY SHOULD BE PRIVATE.

**Q.**   I WANT YOU TO ANSWER MY QUESTION, IF YOU WOULD.

**A.**   OKAY.

**Q.**   OVERALL, THE PRIVACY CONCERNS IN A PRISON BECOME LESS.  RIGHT?

**A.**   BECOME LESS IMPORTANT?

**Q.**   YOU SHOWER IN ROOMS WITH EACH OTHER TOGETHER, YOU GO TO THE BATHROOM WITH EACH OTHER, YOU SEE EACH OTHER NAKED.  YOU DON'T HAVE THOSE CONCERNS OUT IN THE FREE WORLD LIKE YOU DO IN A PRISON.  RIGHT?

**A.**   I THINK IT DEPENDS ON THE PRISON, BUT I MEAN, I THINK YOU'RE PROBABLY RIGHT, THERE'S LESS PRIVACY.

**Q.**   AND THAT YOU'RE WORRIED ABOUT THE PRIVACY OF THE INMATES, WHEN AN INMATE HAS TO GO TO HIV CLINIC AND HAS TO DO THAT REGULARLY, THAT'S GOING TO BE KNOWN THROUGHOUT THE POPULATION, ISN'T IT?

**A.**   WELL, DEPENDS HOW YOU CONDUCT HIV CLINIC.

**Q.**   HOW ARE YOU GOING TO GET THE INMATES THERE WITHOUT PEOPLE KNOWING WHERE THEY'RE GOING OR WHAT THEY'RE DOING?

**A.**   I'VE DONE IT WHERE I'VE MANAGED.

**Q.**   WORD GETS AROUND.  IT'S A PRETTY SMALL COMMUNITY AND THE RUMORS FLY, DON'T THEY?

         **MR. DUBNER:**  OBJECTION; CALLING FOR SPECULATION.

1          **MR. ARCHEY:**  HE SAYS HE'S AN EXPERT.

2          **THE COURT:**  SUSTAINED.

3     BY MR. ARCHEY:

4     **Q.**   ALL RIGHT.  ARE YOU AWARE THAT IF AN INMATE SAYS I'M NOT

5     COMFORTABLE TALKING IN THIS SETTING, THAT HE CAN GO GET A

6     PRIVACY VISIT AT THE ATU?

7     **A.**   NO.

8     **Q.**   ALL RIGHT.  IN ADDITION TO THE SICK CALL AND THE HEALTH

9     SERVICES REQUESTS, URGENT CARE ACCESS IS AVAILABLE IN THREE

10    DIFFERENT WAYS AT LSP.  IS THAT RIGHT?

11    **A.**   YES.

12    **Q.**   OKAY.  EMT, AT A SICK CALL, CAN DETERMINE THAT THAT

13    INMATE, THAT PATIENT, NEEDS TO GO SEE -- GO TO THE ATU

14    IMMEDIATELY AT THAT TIME.  RIGHT?

15    **A.**   THAT'S CORRECT.

16    **Q.**   A CORRECTIONAL OFFICER CAN SEND AN INMATE TO THE ATU AT

17    ANY POINT IN TIME.  RIGHT?

18    **A.**   THAT'S CORRECT.

19    **Q.**   THE CORRECTIONAL OFFICER CAN ALSO CALL FOR AN AMBULANCE AT

20    ANY TIME.  RIGHT?

21    **A.**   THAT'S CORRECT.

22    **Q.**   AND THE INMATE HIMSELF CAN DECLARE A SELF-DECLARED

23    EMERGENCY AND GET AN AMBULANCE OR AN IMMEDIATE VISIT.  CORRECT?

24    **A.**   THAT'S CORRECT.

25    **Q.**   NOW, URGENT CARE ACCESS, IT'S EQUIVALENT OF EITHER AN

1    EMERGENCY ROOM OR AN AFTER-HOURS CLINIC.  CORRECT?

2    **A.**    ARE YOU TALKING ABOUT AT LSP OR IN GENERAL?

3    **Q.**    I GUESS I'M TALKING IN GENERAL FIRST.

4    **A.**    IT WOULD -- IT JUST MEANS THAT YOU HAVE ACCESS ON AN

5    URGENT BASIS.

6    **Q.**    OKAY.  NOW, YOU'RE CONCERNED ABOUT THE MALINGERING POLICY

7    AT LSP.  CORRECT?

8    **A.**    YES.

9    **Q.**    ALL RIGHT.  DO YOU KNOW HOW OFTEN LSP FINDS THAT AN INMATE

10   IS MALINGERING AND CHARGES THEM THAT EXTRA $3 CO-PAY?

11   **A.**    NO.

12   **Q.**    DO YOU KNOW IT'S LESS THAN 1 PERCENT?

13   **A.**    NO, I DIDN'T KNOW THAT.

14   **Q.**    IT'S LIKE 0.3 PERCENT.

15          YOU GAVE A HYPOTHETICAL OF SOMEONE WHO SAYS "I THINK

16   I HAVE A HEART CONDITION."  IT TURNS OUT TO BE INDIGESTION.

17   ISN'T IT TRUE THAT THEY -- LSP NEVER IMPOSES A MALINGERING

18   CHARGE UNLESS IT'S EXAGGERATED AND DELIBERATE?

19   **A.**    YOU'D HAVE TO DEFINE WHAT THAT MEANS.

20   **Q.**    DID YOU SEE A MALINGERING CHARGE THAT WAS IMPOSED

21   UNREASONABLY?

22   **A.**    I AM MORE CONCERNED ABOUT THE POLICY.  I MEAN, WE'VE

23   ALREADY STATED WE HAVEN'T -- WE HAVEN'T LOOKED INTO INDIVIDUAL

24   CASES, AND THERE MAY NOT BE MANY INDIVIDUAL CASES.  THE POLICY

25   IS WHAT I'M MOST CONCERNED ABOUT.  THE APPLICATION, I DIDN'T

1    SEE IN CHART REVIEW.  SO WHAT YOU SAY IS PROBABLY TRUE; THEY

2    PROBABLY DON'T USE IT OFTEN.  BUT THE FACT THAT YOU HAVE A

3    POLICY THAT PERMITS IT IS, I BELIEVE, INAPPROPRIATE,

4    UNPROFESSIONAL, AND PERVERSE.

5    **Q.**    EVEN THOUGH IT'S IMPLIED IN A -- APPLIED IN A WAY THAT IS

6    VERY REASONABLE ON THE FACE OF IT?

7    **A.**    THE POLICY SAYS WHAT IT SAYS, AND THAT'S WHAT I HAVE

8    OBJECTION TO.

9    **Q.**    ARE YOU AWARE OF OTHER CORRECTIONAL FACILITIES THAT HAVE A

10   SIMILAR MALINGERING TYPE POLICY?

11   **A.**    NO.

12   **Q.**    ARE YOU AWARE THERE'S A POLICY IN ALABAMA'S CORRECTIONAL

13   FACILITY WHERE YOU WERE?

14   **A.**    I DON'T BELIEVE THEY HAD AN AGGRAVATED MALINGERING, MY

15   RECOLLECTION.  THEY MAY HAVE, BUT I'M NOT SURE.  I'D HAVE TO

16   DOUBLECHECK MY REPORT.  IT'S BEEN FOUR OR FIVE YEARS SINCE I'VE

17   BEEN THERE.

18   **Q.**    YEAH, THEIR POLICY WENT UP TO AS MUCH AS $20 FOR MISSING A

19   SCHEDULED APPOINTMENT.

20   **A.**    WELL, I DISAGREE WITH THAT AS WELL.

21          **MR. DUBNER:**  OBJECTION.  THESE FACTS ARE NOT IN

22   EVIDENCE ANYWHERE.

23          **MR. ARCHEY:**  HE CAN ANSWER THEM, JUDGE.  THAT'S THE

24   QUESTION.

25          **THE COURT:**  WELL, THEY DON'T HAVE TO BE IN -- HE'S

1    GOT HIM ON CROSS.  I'LL ALLOW IT.

2    **BY MR. ARCHEY:**

3    **Q.**    SO THIS IS A POLICY THAT IS APPLIED IN OTHER PLACES AS

4    WELL.  CORRECT?

5    **A.**    IT MAY BE.  I DON'T KNOW, THOUGH.

6    **Q.**    ALL RIGHT.  CHRONIC DISEASE MANAGEMENT, LSP HAS A CHRONIC

7    CARE/SPECIAL NEEDS POLICY AND PROCEDURE MANUAL.  CORRECT?

8    **A.**    THEY DO.

9    **Q.**    YOU'RE CRITICAL OF SOME OF THE DISEASES THAT ARE NOT

10   INCLUDED IN THEIR MANUAL, THOUGH.  RIGHT?

11   **A.**    YES.

12   **Q.**    OKAY.  LIKE, FOR EXAMPLE, WE'VE TALKED ABOUT SICKLE CELL

13   DISEASE.  YOU THINK THERE OUGHT TO BE A CHRONIC DISEASE POLICY

14   FOR SICKLE CELL DISEASE.  RIGHT?

15   **A.**    WELL, I THINK THE PREFERENCE IS THAT THEY USE NATIONAL

16   STANDARDS, AND THEY DON'T HAVE TO DEVELOP A POLICY FOR EVERY

17   SINGLE DISEASE.

18   **Q.**    WELL, THAT'S MY QUESTION.

19   **A.**    CORRECT.

20   **Q.**    I THOUGHT THAT YOU HAD GIVEN ME -- GIVEN US THAT OPINION.

21   SO MY QUESTION IS:  IS THEIR CHRONIC DISEASE MANUAL SUFFICIENT

22   AS IS, OR DO YOU THINK THERE'S SOMETHING ELSE THAT SHOULD BE

23   ADDED?

24   **A.**    THE MANAGEMENT OF CHRONIC ILLNESS DOES NOT INCLUDE ALL THE

25   DISEASES THAT ARE CHRONIC ILLNESSES.  SO, FOR EXAMPLE, A PERSON

1    WHO HAS CROHN'S DISEASE IS NOT REGULARLY SEEN IN A CHRONIC

2    CLINIC VISIT, ALTHOUGH THEY APPARENTLY HAVE A GENERAL MEDICINE

3    CLINIC WHERE THESE PEOPLE ARE SEEN, BUT THEIR DISEASE WAS NOT

4    MANAGED.

5             AND IN GENERAL, WE FIND IT MORE USEFUL THAT INSTEAD

6    OF TRYING TO RECONSTRUCT A POLICY FOR EVERY DISEASE IN

7    EXISTENCE, THAT YOU JUST USE NATIONAL STANDARDS AND COMMUNITY

8    STANDARD OF CARE AND SEE ALL THE PATIENTS FOR ALL OF THEIR

9    PROBLEMS WHEN YOU SEE A PATIENT.

10   Q.   SO THERE'S A NATIONAL STANDARD AND A COMMUNITY STANDARD OF

11   CARE?

12   A.   WELL, AND I'M USING THOSE RELATIVELY INTERCHANGEABLY.  SO

13   THE ADA STANDARD FOR DIABETES IS A COMMUNITY STANDARD, AND I'VE

14   ALREADY SAID THAT.  AND THE NATIONAL HEART, LUNG, AND BLOOD IS

15   A COMMUNITY STANDARD FOR HYPERTENSION, AND WHEN THOSE DON'T

16   EXIST --

17   Q.   YOU HAVEN'T ANSWERED MY QUESTION.

18   A.   OKAY.  I'M SORRY.  I'LL LISTEN AGAIN.  GO AHEAD.

19   Q.   MY QUESTION IS:  DO YOU FIND THAT THE LSP CHRONIC CARE AND

20   SPECIAL NEEDS POLICY AND PROCEDURE IS SUFFICIENT AS IT IS, OR

21   DO WE NEED TO DO SOMETHING?

22   A.   YOU NEED TO REVISE IT, YES.

23   Q.   ALL RIGHT.  REVISE, MAYBE UPDATE.

24             LET'S TALK ABOUT THE CONTENT OF IT.  DOES IT HAVE --

25   ARE THERE OTHER DISEASES THAT SHOULD BE INCLUDED THAT ARE NOT

1   INCLUDED IN THAT MANUAL?

2   **A.**   IF YOU ARE GOING TO HAVE DIRECTION, DISEASE-SPECIFIC, YOU

3   NEED TO INCLUDE THE COMMON DISEASES THAT YOU HAVE.  I THINK AN

4   IMPROVED WAY TO DO IT WOULD BE TO JUST STIPULATE THAT YOU WILL

5   REQUIRE THE PHYSICIANS TO USE COMMUNITY STANDARDS.

6   **Q.**   OKAY.  I'M STILL STRUGGLING.  YOU THINK OUR MANUAL SHOULD

7   BE REVISED.  YOU WANT US TO FOLLOW NATIONAL STANDARDS?

8   **A.**   YES.

9   **Q.**   WHAT ELSE?

10  **A.**   LET ME JUST BACK UP.  YOUR CHRONIC DISEASE MANUAL WAS

11  REVIEWED BY MS. LAMARRE.  I DID THE OVERVIEW OF CHRONIC

12  DISEASE.  BUT I'M HAPPY TO LOOK AT YOUR MANUAL AND ANSWER ANY

13  QUESTIONS YOU HAVE.

14  **Q.**   SO YOU'RE DEFERRING TO MS. LAMARRE FOR THAT?

15  **A.**   ON THE QUESTION YOU'RE ASKING, BUT I CAN GIVE YOU AN

16  ANSWER THAT FOR, IN GENERAL, RATHER THAN WRITE A SPECIFIC

17  STANDARD, YOU RECONSTRUCT A STANDARD FOR EACH DISEASE.  IT'S

18  BEST TO USE THE COMMUNITY STANDARD, AND WHERE THERE'S NO

19  COMMUNITY STANDARD, YOU SHOULD USE A TEXT LIKE UPTODATE, AND

20  THAT SHOULD BE YOUR REFERENCE.

21  **Q.**   LET'S GO TO --

22  **A.**   AND WHAT THE MANUAL SHOULD DO IS THE MANUAL SHOULD GIVE

23  GUIDANCE AS TO HOW OFTEN PEOPLE SHOULD BE SEEN AS A BASELINE,

24  AND HOW YOU ENROLL PEOPLE IN CLINIC, AND HOW OFTEN YOU SHOULD

25  SEE THEM.

**Q.**   WHAT ARE THE PROCEDURES THAT LSP USES TO TRACK CHRONIC

DISEASES?

**A.**   THE SCHEDULE.

**Q.**   WHAT DO YOU MEAN BY *SCHEDULE*?

**A.**   YOU DON'T HAVE A ROSTER.  SO MANY CORRECTIONAL FACILITIES

HAVE A ROSTER, OR A LIST, OF ALL THE PATIENTS WHO HAVE CHRONIC

ILLNESS.

WHEN WE ASKED FOR ONE, THERE WASN'T ONE.  AND WHAT WE

WERE TOLD IS THAT THERE IS A SCHEDULE, AND YOU HAVE A CHRONIC

DISEASE SCHEDULE, AND PRESUMABLY THAT SCHEDULE CONTAINS ALL THE

PEOPLE WHO HAVE CHRONIC ILLNESS.

**Q.**   ARE THERE ANY OTHER PROCEDURES THAT LSP USES TO TRACK

CHRONIC DISEASE?

**A.**   NOT THAT I WAS MADE AWARE OF.

**Q.**   SPECIALTY CARE.  WHAT ARE THE PROCEDURES THAT LSP USES TO

TRACK SPECIALTY CARE?

**A.**   AND YOU'RE SPEAKING ABOUT SPECIALTY CARE APPOINTMENTS TO

LIKE A SPECIALIST ON THE OUTSIDE?

**Q.**   I AM, YES, SIR.

**A.**   THE TRIP OFFICE.

**Q.**   OKAY.  WHAT ELSE?

**A.**   THAT WAS THE ONLY ONE THAT I WAS MADE AWARE OF.

**Q.**   I WANT YOUR FULL ANSWER.  ANYTHING ELSE YOU'RE AWARE OF AS

FAR AS SCHEDULING SPECIALTY APPOINTMENTS?

**MR. DUBNER:**  OBJECTION; ASKED AND ANSWERED.

02:40  1              **MR. ARCHEY:**  YOUR HONOR, I'VE GOT -- I'M GOING TO

2    HAVE SOME OTHER TESTIMONY, AND I WANT TO MAKE SURE I HAVE A

3    FULL ANSWER THAT'S ALL.  I'M GIVING HIM A WIDE BERTH.

4              **THE COURT:**  OVERRULED.

5              **THE WITNESS:**  THE TRIP OFFICE GAVE US A LIST OF ALL

6    THE SCHEDULED APPOINTMENTS, AND THAT WAS WHAT WE WERE PROVIDED

7    WHEN WE ASKED FOR A LIST OF SPECIALTY CARE.

8    BY MR. ARCHEY:

9    **Q.**   IS THERE ANYTHING IN THE CHART THAT IS USED TO TRACK

10   SPECIALTY CARE?

11   **A.**   NOT THE CHARTS I REVIEWED.

12   **Q.**   IS THERE ANYTHING IN THE CHARTS TO TRACK CHRONIC CARE?

13   **A.**   I THINK THE -- WHERE -- ON THE NOTE THAT SAYS GENERAL

14   MEDICAL CLINIC, THEY WOULD HAVE A NOTATION THAT IT'S CHRONIC

15   CARE, BUT THAT'S THE PURPOSE OF IT.

16   **Q.**   ANYTHING ELSE YOU'RE AWARE OF THAT WAS USED IN THE CHARTS

17   TO TRACK CHRONIC CARE?

18   **A.**   NO.

19   **Q.**   LET'S TALK ABOUT CREDENTIALING.  ALL RIGHT.  YOU ARE VERY

20   CRITICAL OF PHYSICIANS WHO HAVE RESTRICTIONS ON THEIR LICENSE

21   PRACTICING AT LSP.  IS THAT FAIR?

22   **A.**   YES.

23   **Q.**   THE LOUISIANA STATE MEDICAL BOARD HAS APPROVED EACH OF

24   THESE PHYSICIANS TO PRACTICE.  CORRECT?

25   **A.**   YES.

**Q.**   AND THEIR APPROVALS TO PRACTICE IS NOT LIMITED TO PRISONS,
IS IT?

**A.**   SOME OF THEM IT WAS AND SOME IT ISN'T -- ARE NOT.

**Q.**   THEY WERE ACTUALLY FOR ANY INSTITUTIONAL ORGANIZATION OR
INSTITUTION SUCH AS A HOSPITAL, GOVERNMENT FACILITY --

**A.**   IT'S AN INSTITUTIONAL PRACTICE, RIGHT.

**Q.**   SO THEY COULD GO PRACTICE AT A HOSPITAL.  RIGHT?

**A.**   I BELIEVE, BUT I'M NOT EXACTLY SURE OF THE LAW, BUT IT
MIGHT BE.

**Q.**   SO THESE DOCTORS THAT ARE AUTHORIZED TO PRACTICE AT THE
HOSPITALS IN THE COMMUNITY, BY THE LOUISIANA STATE BOARD OF
MEDICINE, ARE PRACTICING AT LSP.  CORRECT?

**A.**   WELL, YOU'RE NOT CONSIDERING THE PRIVILEGE.

**Q.**   JUST ANSWER MY QUESTION ABOUT THEIR --

**A.**   WELL, BUT IT'S NOT ENTIRELY TRUE.  YOUR QUESTION IMPLIES
THAT THEY CAN PRACTICE AT A HOSPITAL, AND MAYBE THEY CAN'T,
BECAUSE THEY HAVE TO BE -- BECAUSE THEY HAVE TO RETAIN
PRIVILEGES IN ORDER TO PRACTICE AT A HOSPITAL.  THAT'S FOR
SURE.

**Q.**   LET'S TAKE IT ONE BREAK AT A -- ONE PIECE AT A TIME.

**A.**   OKAY.

**Q.**   SO IT'S CREDENTIALING AND THEN PRIVILEGES.  RIGHT?

**A.**   THAT'S TRUE.

**Q.**   ALL RIGHT.  SO THEN WITH THE STATE MEDICAL BOARD, THEY ARE
NOW CREDENTIALED TO GO PRACTICE AT A HOSPITAL.  CORRECT?

1   **A.**   LET'S PUT IT THIS WAY, AS AN EXAMPLE.   CAN I USE A NAME
2   HERE?
3   **Q.**   WELL, FIRST I'D LIKE YOU TO ASK MY QUESTION, THEN YOU CAN
4   TALK ALL YOU WANT.
5   **A.**   OKAY.   GO AHEAD, AND ANSWER [SIC] THE QUESTION AGAIN.
6   **Q.**   MY QUESTION IS:   WITH THE LOUISIANA STATE BOARD'S
7   APPROVAL, THESE PHYSICIANS WITH RESTRICTIONS COULD GO -- ARE
8   CREDENTIALED TO PRACTICE IN A HOSPITAL.   CORRECT?
9   **A.**   THEY CAN PRACTICE BASED ON THE PRIVILEGES A HOSPITAL GIVES
10  THEM.
11  **Q.**   THEY ARE CREDENTIALED, AND THEN THEY HAVE TO GO GET
12  PRIVILEGES?
13  **A.**   THEY HAVE TO GET PRIVILEGES BY THE HOSPITAL IN WHICH THEY
14  WANT TO PRACTICE, THAT'S CORRECT.
15  **Q.**   OKAY.   SO NOW WE GOT A PRIVILEGES ISSUE, BUT THE
16  CREDENTIALS, THEY ARE AUTHORIZED?
17  **A.**   WELL, THAT DOESN'T MEAN THEY CAN PRACTICE.
18  **Q.**   A HOSPITAL IS PART OF THE COMMUNITY, THOUGH.   RIGHT?
19  **A.**   A HOSPITAL IS PART OF THE COMMUNITY.
20  **Q.**   LET'S GO TO THE DISCUSSION OF THE BUDGET FOR A MOMENT.
21  YOU SPOKE WITH DR. LAVESPERE -- OR LET ME RESTATE THAT.
22          DR. LAVESPERE TESTIFIED THAT THE BUDGET HAS NO
23  BEARING ON WHAT SERVICES HE PROVIDES.   IF AN INMATE NEEDS
24  SOMETHING, THEY GET IT.
25          ARE YOU FAMILIAR WITH THAT?

**A.**    I THINK I DO REMEMBER HIM SAYING THAT, YES.

**Q.**    OKAY.  AND INCLUDING SOME VERY, VERY EXPENSIVE

MEDICATIONS.  RIGHT?

**A.**    I'M NOT SURE.  HE SAID SOMETHING LIKE THAT IN ONE OF HIS

DEPOSITIONS, AND I REMEMBER READING IT, BUT . . .

**Q.**    HIV MEDICATIONS ARE VERY EXPENSIVE.  RIGHT?

**A.**    YES.

**Q.**    AND THESE PATIENTS AT LSP HAVE ACCESS TO AND ARE GETTING

THE HIV MEDICATIONS.  CORRECT?

**A.**    YES.  I'M NOT SURE COMPLETELY ABOUT THE ACCESS, BUT

INMATES DO RECEIVE HIV MEDICATION, YES.

**Q.**    RADIATION FOR CANCER TREATMENT, CHEMOTHERAPY, THOSE TYPES

OF PROCEDURES ARE ALSO EXPENSIVE.  CORRECT?

**A.**    THEY CAN BE, YES.

**Q.**    AND THE INMATES AT LSP ARE GETTING THOSE SERVICES.

CORRECT?

**A.**    THE CHARTS I REVIEWED, SOME DID AND SOME DIDN'T.

**Q.**    WELL, WE'LL GET TO SOME OF YOUR COMPLAINTS ABOUT THE

DELAYS AND WHAT ALL, WE'LL GET TO THAT IN A LITTLE BIT.  BUT AS

FAR AS WHETHER THOSE ARE AVAILABLE TO THE INMATES, THEY ARE,

AREN'T THEY?

**A.**    I PRESUME THEY ARE.

**Q.**    YOU EVER SEEN AN INSTANCE WHERE A PROCEDURE OR MEDICATION

WAS TURNED DOWN BECAUSE OF BUDGET?

**A.**    WHAT WE SAW WAS PEOPLE WHO DID NOT RECEIVE CARE THAT THEY

1    SHOULD HAVE RECEIVED.  I CAN'T SPECULATE AS TO WHETHER THAT WAS

2    A BUDGETARY REASON OR NOT.

3    Q.    OKAY.

4    A.    I MEAN, IF A PERSON DOESN'T SEE A -- GET A BIOPSY FOR 15

5    MONTHS AND NEVER RECEIVES CHEMOTHERAPY, IS THAT BECAUSE THERE

6    ISN'T A BUDGET?  I COULD ONLY SPECULATE.  BUT I MEAN, THAT

7    WOULD TAKE A LEVEL OF INVESTIGATION THAT WE WERE NOT CAPABLE OF

8    PERFORMING.

9    Q.    SO ALL I NEED TO KNOW IS, AS YOU SIT HERE TODAY, YOU FOUND

10   NO EVIDENCE THAT CARE WAS TURNED DOWN BECAUSE OF BUDGET.

11   CORRECT?

12   A.    I DIDN'T SEE A DOCUMENT THAT SAYS WE'RE NOT GOING TO DO

13   THIS BECAUSE OF THE BUDGET.

14   Q.    NOW, AS YOU LOOKED AT LSP'S BUDGET, DID YOU TAKE INTO

15   ACCOUNT THE MEDICAID EFFECT ON THE BUDGET?

16   A.    ARE YOU SPEAKING OF THE 340B PRICING?

17   Q.    THAT'S PART OF IT, YES.

18   A.    I'M SURE THAT LOWERS COST.

19   Q.    IT SAVES THEM MILLION OF DOLLARS, DIDN'T IT?

20   A.    BUT IT'S STILL A VERY LOW BUDGET, RELATIVE, EVEN THAT --

21   EVEN GIVEN THAT.  AND I KNOW THAT BECAUSE I DID SOME WORK IN

22   ILLINOIS, AND ILLINOIS TOOK ADVANTAGE OF 340B PRICING FOR HIV

23   AND HEP-C DRUGS AND THEY STILL HAD SIGNIFICANT PHARMACEUTICAL

24   COSTS, AND SO I DON'T THINK THAT COULD COMPLETELY ACCOUNT FOR

25   THE LOW PROPORTION OF PHARMACEUTICALS.

0 2 : 4 6

1   Q.   I'M JUST ASKING YOU, THOUGH, THE MONEY SAVED FROM THE 340B

2   PROGRAM WITH MEDICARE IS MILLIONS OF DOLLARS THAT WOULD

3   OTHERWISE HAVE TO BE IN THAT BUDGET.   CORRECT?

4   A.   IT MIGHT IF YOU'RE GETTING 340B.

5   Q.   ARE YOU AWARE OF WHETHER LSP IS GETTING 340B?

6   A.   NO, I WASN'T.

7   Q.   SO YOU HAVE THESE OPINIONS ABOUT THE BUDGET AND ARE NOT

8   EVEN AWARE OF THIS VERY SIGNIFICANT ITEM THAT HAS AN IMPACT ON

9   THE BUDGET?

10  A.   THE QUESTION IS UNUSUAL BECAUSE THE LEVEL OF SPECIFICITY

11  THAT WE WERE GIVEN RELATIVE TO BUDGET WAS MINISCULE.   THERE WAS

12  NO LINE ITEM BUDGET, AND WE HAD VERY LITTLE INFORMATION.   AND

13  AS I SAID PREVIOUSLY UNDER TESTIMONY, WE HAD TO MAKE GROSS

14  CONJECTURES ABOUT THE BUDGET BECAUSE OF THE LIMITED INFORMATION

15  WE WERE GIVEN.

16  Q.   DID YOU TAKE INTO ACCOUNT THAT LSP OR LOUISIANA WAS THE

17  FIRST STATE TO RECEIVE MEDICAID FUNDING FOR ITS PRISONERS WHEN

18  THEY GO TO OUTSIDE HOSPITALS?

19  A.   MOST CORRECTIONAL FACILITIES GET THAT.

20  Q.   ARE YOU AWARE THAT LSP WAS -- OR LOUISIANA WAS THE FIRST

21  STATE TO DO THAT, TAKE ADVANTAGE OF THAT OPPORTUNITY?

22  A.   NO, I WASN'T AWARE THEY WERE THE FIRST.   BUT I KNOW AS

23  SOON AS IT BECAME AVAILABLE, I KNOW IT WAS DONE AT LEAST AT

24  COOK COUNTY, IN ILLINOIS.   MANY STATES DID IT.

25  Q.   WHEN LSP SENDS AN INMATE OUT TO AN OUTSIDE PROVIDER --

0 2 : 4 8   1    LSU, EARL K. LONG BACK IN THE DAY, UMCNO -- ARE YOU AWARE OF

2    HOW THAT CHARGE IS PAID?

3    **A.**   NO.

4    **Q.**   IF THOSE CHARGES ARE NOT PART OF THE BUDGET, THAT, AGAIN,

5    WOULD BE A SIGNIFICANT, SIGNIFICANT IMPACT ON WHAT THE BUDGET

6    WOULD BE, WOULD IT NOT?

7    **A.**   IT COULD.

8    **Q.**   ALL RIGHT.  LET'S TALK ABOUT THE PHARMACY FOR A MOMENT.

9    THE PHARMACY OUT THERE IS WELL-RUN; FAIR?

10   **A.**   MS. LAMARRE LOOKED AT THE PHARMACY.  THE OPERATIONS SHE

11   THOUGHT WERE REASONABLE, YES.

12   **Q.**   NARCOTICS BEING ADMINISTERED IN A -- TO INMATES IN THE

13   HOUSING UNITS.  NOW THAT IS SOMETHING THAT IS PROHIBITED

14   GENERALLY IN PRISONS ACROSS THE COUNTRY.  CORRECT?

15   **A.**   NO.

16   **Q.**   NO?

17   **A.**   NO, I DON'T AGREE WITH THAT.

18   **Q.**   I'M GOING TO SHOW YOU YOUR TEXTBOOK AGAIN.  I'M ON PAGE

19   22.

20   **A.**   OKAY.

21   **Q.**   THE TEXTBOOK STATES "IN MANY CORRECTIONAL FACILITIES,

22   FORMULARIES EITHER PROHIBIT OR SEVERELY LIMIT THE AVAILABILITY

23   OF NARCOTICS AND OTHER PAIN MEDICATION."  IS THAT A TRUE

24   STATEMENT?

25   **A.**   OKAY.  WELL, CAN I SEE THE BOOK AND THE SECTION WHERE

02:50   1    YOU'RE TAKING IT FROM?  NO, CAN YOU BRING IT UP?

2                  **THE COURT:**  YOU MAY APPROACH.

3                  **THE WITNESS:**  AND JUST SHOW ME THE PAGE.

4                  **MR. ARCHEY:**  PAGE 22.

5                  **THE WITNESS:**  OKAY.  THANKS.

6                  **THE COURT:**  ASK YOUR QUESTION AGAIN, PLEASE.

7                  **THE WITNESS:**  DO YOU WANT IT BACK?

8    **BY MR. ARCHEY:**

9    **Q.**    DO YOU NEED IT?

10   **A.**    NOT RIGHT NOW, NO.

11   **Q.**    DOCTOR, YOUR TEXT REPORTS THAT "IN MANY CORRECTIONAL

12   FACILITIES FORMULARIES EITHER PROHIBIT OR SEVERELY LIMIT THE

13   AVAILABILITY OF NARCOTICS AND OTHER PAIN MEDICATIONS." CORRECT?

14   **A.**    CORRECT.  HOWEVER, LET ME PUT THAT INTO CONTEXT.  THAT'S

15   ON A SECTION ON HOSPICE AND RECEIPT OF PAIN MEDICATION.  THE

16   AUTHOR IS NOT IMPLYING THAT PAIN MEDICATIONS ARE NOT TO BE

17   ADMINISTERED OR PROVIDED WHEN NECESSARY.

18   **Q.**    BUT IT --

19   **A.**    AND WHAT SHE'S SAYING IS THAT -- SO THIS IS JAHANO, WHO IS

20   A LAYPERSON, NOT A CLINICIAN.  NOT THAT THAT IS IMPORTANT, BUT

21   IT IS PARTLY IMPORTANT BECAUSE IT'S NOT A CLINICIAN, BUT SHE'S

22   JUST SAYING THAT THERE'S RULES WITHIN CORRECTIONAL FACILITIES

23   THAT MAKE IT MORE DIFFICULT TO ADMINISTER PAIN MEDICATION.

24   **Q.**    EXACTLY.

25   **A.**    SHE'S NOT SAYING THAT YOU SHOULDN'T GIVE IT.

02:52   1   **Q.**   BUT IT SAYS -- CONFIRMS THAT IN MANY CORRECTIONAL
2   INSTITUTIONS, THEY'RE PROHIBITED OR SEVERELY LIMITED.  CORRECT?
3   **A.**   WELL, I THINK WHAT SHE'S TALKING ABOUT IS THE PROCESS OF
4   GETTING IT.  THERE CAN BE A BARRIER TO GETTING IT, BUT SHE'S
5   NOT SAYING THAT YOU SHOULDN'T RECEIVE IT.
6   **Q.**   EITHER PROHIBIT OR SEVERELY LIMIT.  CORRECT?
7   **A.**   SHE'S NOT SAYING THAT YOU SHOULD NOT GET THE MEDICATION.
8   **Q.**   ALL RIGHT.  AND LSP ALSO HAS A PROCEDURE FOR INMATES TO
9   GET NARCOTICS WITH BARRIERS.  RIGHT?
10   **A.**   LSP REDUCES THE ABILITY OF PEOPLE TO RECEIVE MEDICATION,
11   SO PEOPLE WHO SHOULD RECEIVE IT DON'T RECEIVE IT.
12   **Q.**   YOU'RE SURE?
13   **A.**   THAT'S NOT WHAT THE AUTHOR IS SAYING IN THE BOOK.
14   **Q.**   SEVERELY LIMITS THE AVAILABILITY.  CORRECT?
15   **A.**   THAT DOES NOT MEAN THAT INMATES -- NOT SEVERELY LIMIT THE
16   PATIENT FROM RECEIVING THE MEDICATION.  SHE'S NOT SAYING THAT.
17   **Q.**   THESE NARCOTICS, IF THEY ARE PRESCRIBED, ARE AVAILABLE TO
18   THE INMATE BUT THEY HAVE TO COME TO THE TREATMENT CENTER TO GET
19   THE NARCOTICS.  CORRECT?
20   **A.**   YOU SHOULD BE ABLE TO RECEIVE NARCOTICS AS NEEDED FOR
21   CARE.
22   **Q.**   PLEASE ANSWER MY QUESTION AND THEN YOU CAN SAY --
23   **A.**   I BELIEVE I AM.
24   **Q.**   OKAY.  THE INMATES WHO HAVE BEEN PRESCRIBED NARCOTICS,
25   HAVE AVAILABILITY OF THE NARCOTICS WHEN THEY COME TO THE

1   TREATMENT UNIT TO GET THEIR NARCOTICS?

2   **A.**   IN LSP, INMATES HAVE TO BE ON THE INFIRMARY TO RECEIVE

3   NARCOTICS.  AND INMATES WHO NEED NARCOTICS DO NOT ALWAYS

4   RECEIVE IT.

5   **Q.**   ARE YOU AWARE OF SITUATIONS WHERE THE INMATE CAN COME IN,

6   GET THE NARCOTICS, AND THEN LEAVE?

7   **A.**   I BELIEVE THEY CAN, BUT IT'S A DIFFICULT PROCESS, AND

8   PEOPLE WHO NEED NARCOTICS DON'T ALWAYS RECEIVE IT.

9   **Q.**   NOW, THERE HAS BEEN AN OPIOID CRISIS IN THIS COUNTRY OVER

10  THE LAST NUMBER OF YEARS.  CORRECT?

11  **A.**   THAT'S CORRECT.

12  **Q.**   AND PRIOR TO THAT, DOCTORS WERE OVERPRESCRIBING OPIOIDS IN

13  THE COMMUNITY.  CORRECT?

14  **A.**   I AGREE WITH THAT, YES.

15  **Q.**   CDC CAME IN AND SAID THIS IS A CRISIS AND PUT SEVERE -- OR

16  RESTRICTED AND LIMITED THESE OPIOIDS.  CORRECT?

17  **A.**   WELL, THEY'VE CHANGED THEIR POLICY A NUMBER OF TIMES.

18  **Q.**   OKAY.  MANY STATES HAVE COME IN AND PASSED LAWS THAT

19  PROHIBIT DOCTORS TO PRESCRIBING THESE OPIOIDS FOR UP TO SEVEN

20  DAYS AFTER AN INCIDENT EXCEPT FOR PALLIATIVE CARE.  CORRECT?

21  **A.**   THERE'S MORE AWARENESS NOW ABOUT PRESCRIPTION OF NARCOTICS

22  GIVEN THE OPIOID CRISIS, CORRECT.  BUT PEOPLE WITH SICKLE

23  DISEASE SHOULD RECEIVE NARCOTICS WHEN NEEDED.

24  **Q.**   DO YOU KNOW HOW MANY SICKLE CELL PATIENTS THERE ARE AT

25  LSP?

**A.**    I SUSPECT NOT A LOT BUT SOME.

**Q.**    LESS THAN FIVE?

**A.**    I REALLY DON'T KNOW.  YOU DIDN'T HAVE A CHRONIC DISEASE

ROSTER, SO IT WAS HARD TO TELL.

**Q.**    ALL RIGHT.  YOU TALKED SOME ABOUT PEER REVIEW.

**A.**    YES.

**Q.**    YOU SAID THAT DR. SINGH WOULD COME REVIEW 15 CHARTS

ANNUALLY AS PART OF THE PEER REVIEW.  RIGHT?

**A.**    THAT'S WHAT I WAS TOLD.

**Q.**    IN THREE YEARS, HE WOULD DO AS MANY CHARTS AS Y'ALL DID

FOR THIS CASE.  RIGHT?

**A.**    A LITTLE LESS, YEAH.  BUT I DON'T THINK HE DID THEM AT THE

SAME LEVEL OF INTENSITY THAT WE DID.

**Q.**    IN ADDITION, DR. LAVESPERE SUPERVISES HIS STAFF THERE.

CORRECT?

**A.**    THAT'S CORRECT.

**Q.**    HE HAS MEETINGS EVERY MORNING AT 7:30 WITH HIS PHYSICIANS

AND PROVIDERS.  RIGHT?

**A.**    I THINK HE DOES MEET WITH THE STAFF, BUT I'M NOT SURE OF

THE FREQUENCY.

**Q.**    THAT WOULD BE A VERY GOOD THING, WOULD IT NOT?

**A.**    IT IS.

**Q.**    COORDINATE CARE; SEE WHERE PROBLEMS ARE?

**A.**    IT IS.

**Q.**    MAKE SURE HE UNDERSTANDS WHAT'S GOING ON IN HIS

1    FACILITIES?

2    **A.**    IT IS.

3    **Q.**    IN ADDITION, ARE YOU AWARE THAT A PHYSICIAN FROM OUTSIDE

4    LSP COMES IN AND DOES A PEER REVIEW AT LSP?

5    **A.**    WE WERE NOT TOLD THAT.

6    **Q.**    OKAY.  SO IF THAT'S GOING ON, YOU'RE JUST NOT AWARE OF IT?

7    **A.**    WE WEREN'T TOLD.

8    **Q.**    ALL RIGHT.  LET'S TALK ABOUT PILL CALL A LITTLE BIT.

9    MEDICATIONS AT LSP ARE ADMINISTERED FOUR TIMES A DAY.  CORRECT?

10    **A.**    THERE'S FOUR TIMES WHEN THEY ADMINISTER MEDICATION, YES.

11    **Q.**    OKAY.  AND OUTSIDE OF THE INFIRMARY, CORRECTIONAL OFFICERS

12    ADMINISTER THE PILL CALL.  RIGHT?

13    **A.**    THAT'S CORRECT, EXCEPT IN A COUPLE OF THE CAMPS, NURSES

14    ADMINISTER MEDS.

15    **Q.**    THE ACA AND NCCHC STANDARDS ALLOW CORRECTIONAL OFFICERS TO

16    DO -- ADMINISTER MEDICATIONS IN CERTAIN SITUATIONS.  CORRECT?

17    **A.**    IN VERY SMALL FACILITIES.  THE NCCHC DOES NOT ENCOURAGE

18    WIDESPREAD ADMINISTRATION OF MEDS BY AN OFFICER IN A LARGE

19    PRISON FACILITY.

20    **Q.**    I DIDN'T ASK IF THEY ENCOURAGE.  BUT THEY DO ALLOW IT.

21    RIGHT?

22    **A.**    WELL, SO I SAT ON THE COMMITTEE TO REVISE THE STANDARDS,

23    SO I KNOW THIS ONE FAIRLY WELL.  THE INTENT IN THAT STANDARD IS

24    THAT IN SMALL JAILS, YOU'RE TALKING ABOUT A 25-BED JAIL WHERE

25    IT IS NOT FEASIBLE TO HAVE A NURSE PRESENT OR HIRED ON STAFF,

02:58   1  THEY WOULD ALLOW CORRECTIONAL OFFICERS TO ADMINISTER MEDS.

2  **Q.**   AND THESE --

3  **A.**   BUT --

4  **Q.**   I'M SORRY.  GO AHEAD.

5  **A.**   SO THAT'S THE INTENT OF THAT STANDARD, AND IT'S NOT MEANT

6  TO IMPLY THAT AT A 6000-BED PRISON FACILITY, IT IS APPROPRIATE

7  FOR OFFICERS TO ADMINISTER MEDICATION.

8  **Q.**   THE ACA ALLOWS CORRECTIONAL OFFICERS TO ADMINISTER

9  MEDICATIONS.  CORRECT?

10  **A.**   I CAN'T SPEAK FOR THE ACA.

11  **Q.**   OKAY.  IN 1994, IN THE PRIOR LITIGATION WITH LSP,

12  CORRECTIONAL OFFICERS WERE DOING PILL CALL AT THAT TIME, TOO,

13  WEREN'T THEY?

14  **A.**   I DON'T RECALL.

15  **Q.**   AND YOU WERE CRITICAL OF THAT PILL CALL AT THAT TIME, TOO.

16  RIGHT?

17  **A.**   YOU KNOW, I -- IT WAS -- THE REPORTS I DID WERE, YOU KNOW,

18  20 YEARS AGO.  I REALLY DON'T REMEMBER.

19  **Q.**   AND CORRECTIONAL OFFICERS CONTINUE TO DO PILL CALL SINCE

20  THAT TIME?

21  **A.**   THEY ARE DOING PILL CALL WHEN WE REVIEWED THE FACILITY,

22  YES.

23  **Q.**   DID YOU REVIEW THE TRAINING THE OFFICERS RECEIVED IN ORDER

24  TO DO PILL CALL?

25  **A.**   I DID NOT.

02:59   1   **Q.**   ARE YOU AWARE THAT THE TRAINING IS 435 PAGES LONG?

2   **A.**   SO IT SEEMS THAT YOU'VE PICKED THE AREAS TO QUESTION ME ON

3   THE AREAS THAT MS. LAMARRE DID THE INVESTIGATION ON.  WHICH I'M

4   HAPPY TO ANSWER THE QUESTIONS, BUT I WOULD PREFER IF YOU WOULD

5   HOLD YOUR QUESTION, AND WHEN SHE IS A WITNESS, YOU COULD ASK

6   HER.

7   **Q.**   ALL RIGHT.

8   **A.**   I MEAN, I'M HAPPY TO TRY TO ANSWER AS BEST I CAN.

9   **Q.**   THE PILL CALL PROCEDURES AND POLICY MANUAL IS 168 PAGES

10   LONG.  ARE YOU AWARE OF THAT?

11   **A.**   NO.

12   **Q.**   QUALITY IMPROVEMENT, QUALITY AND CONTROL.  YOU DID FIND

13   MINUTES WHERE THERE WERE MEETINGS.  CORRECT?

14   **A.**   THERE WERE MINUTES, YES.

15   **Q.**   OKAY.  AND SO THERE WERE MEETINGS, YOU JUST ARE CRITICAL

16   OF THE WAY THOSE MEETINGS TOOK PLACE?

17   **A.**   I'M CRITICAL OF THE LACK OF ATTENDANCE OF MOST OF THE

18   STAFF AND THE LACK OF IDENTIFICATION OF PROBLEMS AND ATTEMPTS

19   TO FIX THEM.

20   **Q.**   MORTALITY.  YOU NOW RECOGNIZE THAT LOUISIANA'S MORTALITY

21   RATE IS EQUIVALENT TO THE OTHER STATES AND ITS PEER STATES IN

22   THE SOUTH AND WHAT HAVE YOU.  CORRECT?

23            **MR. DUBNER:**  OBJECTION; THAT MISSTATES THE TESTIMONY.

24            **MR. ARCHEY:**  EXCUSE ME?

25            **MR. DUBNER:**  OBJECTION; MISSTATES THE TESTIMONY.

1    **THE COURT:**  OVERRULED.

2  **BY MR. ARCHEY:**

3  **Q.**   LOUISIANA'S MORTALITY RATE IS NOW EQUIVALENT TO OTHER

4  STATES IN THE AREA.  CORRECT?

5  **A.**   THE LATEST FIGURES I HAVE, THEY'RE NOT, BUT IF YOU HAVE

6  LATER FIGURES, THEY ARE NOW PUBLISHED AND WE WERE NOT MADE

7  AWARE OF THEM.

8  **Q.**   WELL, I THOUGHT YOU --

9    **MR. DUBNER:**  THE STUFF HE'S ASKING ABOUT NOW IS --

10    **THE COURT:**  WHAT IS YOUR OBJECTION?  DON'T JUST JUMP

11  UP AND START TALKING.  WHAT'S YOUR OBJECTION?

12    **MR. DUBNER:**  OBJECTION; CALLS FOR TESTIMONY PAST THE

13  DISCOVERY CUTOFF.

14    **THE COURT:**  CONFINE YOUR QUESTION TO THE PERIOD OF

15  TIME.

16    **MR. ARCHEY:**  AND IT IS, YOUR HONOR.  LET ME CLARIFY.

17  **BY MR. ARCHEY:**

18  **Q.**   YOUR OPINION TODAY VERSUS YOUR OPINION AT THE CLASS

19  CERTIFICATION IS DIFFERENT AS TO THE DEATH RATES.  ISN'T THAT

20  TRUE?

21  **A.**   YOU'D HAVE TO ASK -- I MEAN, I'M NOT SURE WHAT YOU'RE

22  REFERRING TO.

23  **Q.**   YOU RECOGNIZE THAT, PREVIOUSLY, LSP'S NUMBERS WERE

24  INACCURATE BECAUSE OF THE PRISONERS THAT WERE SENT TO LOCAL

25  JAILS THAT WERE NOT INCLUDED WITHIN THE CALCULATION?

03:02  1   **A.**   WE DID NOT -- I DID NOT MAKE AN ASSERTION ABOUT RATES

2   RELATED TO PRISONERS FROM OTHER JURISDICTIONS.

3   **Q.**   ALL RIGHT.

4   **A.**   I'M NOT SURE WHO DID, BUT IT WASN'T ME.

5   **Q.**   WELL, DURING YOUR TESTIMONY EARLIER TODAY, YOU DID.  YOU

6   SAID THAT YOU NOW RECOGNIZE THAT THE RATE'S THE SAME, BUT

7   THAT'S NOT THE IMPORTANT THING TO LOOK AT.  YOU SAID LOOK AT

8   THE INCREASE.  THAT'S WHAT YOU SAID ON DIRECT.

9   **A.**   CAN YOU REREAD WHAT THE -- IN THE TRANSCRIPT?  I DIDN'T

10  SAY THAT.

11  **Q.**   ALL RIGHT.  WE DON'T --

12  **A.**   I'M NOT SURE WHAT YOU'RE REFERRING TO.  WHAT I WAS -- WHAT

13  I WAS REFERRING TO WAS THE RATE OF MORTALITY IN LOUISIANA, I

14  SAID, CANNOT BE COMPARED TO OTHER STATE SYSTEMS.  SO THE STATE

15  OF ILLINOIS CAN'T BE COMPARED TO THE STATE OF LOUISIANA UNLESS

16  YOU ADJUST THE RATE FOR RISK FACTORS FOR MORTALITY.  THAT'S

17  WHAT I WAS REFERRING TO.  IT HAD NOTHING TO DO WITH THE

18  PARISHES IN LOUISIANA.  IT'S JUST THAT -- MAYBE YOU

19  MISINTERPRETED WHAT I SAID.

20  **Q.**   IN LOUISIANA, THE HEALTHCARE IN THE GENERAL POPULATION IS

21  GENERALLY ONE OF THE WORST IN THE COUNTRY.  ARE YOU AWARE OF

22  THAT?

23  **A.**   YES.  THE MORTALITY RATE IN THE STATE OF LOUISIANA IS

24  HIGH.  AND THAT'S A RISK FACTOR, BY THE WAY, FOR DEATH.  SO --

25  AND THAT'S WHY I SAID THAT YOU CAN'T COMPARE ILLINOIS TO

03:03  1   LOUISIANA BECAUSE THE CIVILIAN RATES ARE DIFFERENT, THE RISK

2   FACTORS OF THE PEOPLE COMING INTO THE PRISON ARE DIFFERENT, AND

3   YOU -- THEREFORE, YOU CAN'T COMPARE THOSE, BUT LOUISIANA, YOU

4   COULD COMPARE IT TO LOUISIANA ON A YEAR BY YEAR BASIS.

5   **Q.**   WE HAVE --

6   **A.**   I THINK YOU MISUNDERSTOOD WHAT I WAS SAYING.

7   **Q.**   WE HAVE CANCER RATES THAT ARE HIGHER HERE THAN OTHER

8   PLACES.

9   **A.**   THAT'S TRUE.

10   **Q.**   WE HAVE OBESITY PROBLEMS HERE THAT ARE NOT PRESENT IN

11   OTHER PLACES.

12   **A.**   YES.

13   **Q.**   WE HAVE HIGHER RATES OF SMOKING HERE THAN OTHER PLACES.

14   **A.**   YOU DO, I THINK.

15   **Q.**   ALL OF THAT LEADS TO MULTIPLE HEALTHCARE PROBLEMS FROM

16   DIABETES TO HIGH BLOOD PRESSURE TO ANY NUMBER OF ISSUES.  IS

17   THAT FAIR?

18   **A.**   THAT'S CORRECT.

19   **Q.**   OUR DIET HERE, ALTHOUGH IT TASTES GOOD, IS NOT AS GOOD AS

20   ELSEWHERE.

21   **A.**   WELL THAT'S DEBATABLE.

22   **Q.**   OKAY.  WE'LL GRANT YOU THAT.

23         NOW, DID YOU -- WELL, FIRST OFF, YOU'RE NOT A

24   STATISTICIAN, ARE YOU?

25   **A.**   NO, I'M NOT.

03:04    1    Q.    SO ALL YOU'RE DOING IS POINTING OUT RAW NUMBERS WHEN YOU

2    WERE POINTING OUT THESE NUMBERS TO THE BUREAU OF JUSTICE AND

3    THE --

4    A.    WELL, ON THIS ONE, I DID CALL THE BUREAU OF JUSTICE

5    STATISTICIAN WHO DID THE REPORT AND I TALKED TO HER AND SHE

6    CONFIRMED WHAT BASICALLY I INTERPRETED FOR THE COURT, WHICH IS

7    THAT UNLESS YOU ADJUST THE STATISTICS FOR A RISK FACTOR, YOU

8    CAN'T COMPARE STATE TO STATE.

9    Q.    OKAY.

10    A.    BUT WHAT I WAS COMPARING IS LOUISIANA TO LOUISIANA OVER 12

11    YEARS.

12    Q.    LET'S GO THERE.

13    A.    YES.

14    Q.    NOW, ARE YOU AWARE WHAT CHANGED IN SENTENCING LAWS IN

15    LOUISIANA?

16    A.    NO.

17    Q.    ARE YOU AWARE THAT IN 1968, LOUISIANA IMPLEMENTED

18    MANDATORY LIFE SENTENCES?

19    A.    FOR WHAT?

20    Q.    FOR ITS POPULATION, PEOPLE WHO ARE SENTENCED TO ANGOLA,

21    FOR INSTANCE.

22    A.    YOU'RE SAYING THAT THE STATE MANDATED EVERYONE COMING TO

23    ANGOLA HAS A LIFE SENTENCE?

24    Q.    THEY PUT IN LIFE SENTENCES THAT WERE NOT PRESENT BEFORE.

25    A.    I MEAN, I -- OKAY.

1   Q.   YEAH, LIFE IS LIFE WITH NO PAROLE.  ARE YOU AWARE OF THAT?

2   A.   NO.

3   Q.   DID YOU MAKE ANY EFFORT TO SEE WHAT THE AVERAGE AGE OF THE

4   POPULATION IS OUT AT LSP FROM YOUR 12-YEAR PERIOD WHEN YOU SAY

5   THE NUMBERS ARE GOING UP?

6   A.   SO MY UNDERSTANDING OF LSP IS THAT IT HAS ALWAYS BEEN A

7   MAXIMUM SECURITY PRISON WHERE PEOPLE ARE LONG-TERM INMATES.

8   ALL OF THE INMATES ARE THERE FOR 20 YEARS, YOU KNOW, MOSTLY FOR

9   10, 20 YEARS OR MORE, AND MANY PEOPLE WITH LIFE.

10  Q.   DID YOU --

11  A.   AND THAT'S HOW THE FACILITY HAS BEEN.

12  Q.   DID YOU UNDERTAKE ANY STUDY, REVIEW, OR ANY PROCESS TO SEE

13  IF THE AVERAGE AGE OF THE POPULATION AT LSP HAS INCREASED OVER

14  THESE 12 YEARS?

15  A.   NO, BUT WHAT WE ARE SUGGESTING IS THAT WHEN YOU DOUBLE THE

16  MORTALITY RATE, IT SUGGESTS THAT THERE ARE OTHER FACTORS

17  INVOLVED IN THE EXCESS MORTALITY.

18  Q.   BUT YOU DIDN'T EVEN LOOK AT THE AGING POPULATION AT LSP,

19  DID YOU?

20  A.   WE WOULD NOT HAVE THE DATA TO DO A STATISTICAL ANALYSIS

21  THAT YOU'RE SUGGESTING.

22  Q.   YOU DIDN'T DO IT, DID YOU?

23  A.   NO, WE DIDN'T.  BUT WE'RE NOT MAKING ANY MAJOR ASSERTION

24  THAT THAT IS AN ISSUE.  WE'RE JUST SAYING THAT THE DOUBLING OF

25  THE RATE SUGGESTS THAT THERE IS EXCESS MORTALITY.  THAT'S ALL

03:07  1  WE'RE SAYING.

2  **Q.**   YOU COULD ALSO FIND THAT THE RATE INCREASE SUGGESTS THAT

3  THE POPULATION HAS AGED?

4  **A.**   WELL, IT STANDS IF PEOPLE ARE THERE FOR LIFE -- I MEAN,

5  I'M NOT SURE IF IT'S ANY DIFFERENT THAN IT WAS IN 1990 OR IN

6  1980.

7  **Q.**   DOCTOR, COMMUNITY HOSPITALS MAKE ERRORS IN TREATMENT AS

8  WELL, DON'T THEY?

9  **A.**   YES.

10  **Q.**   AND IT ACTUALLY HAS BEEN WRITTEN UP IN NUMEROUS ARTICLES

11  AS BEING A, QUOTE, EPIDEMIC IN MEDICAL CARE, HASN'T IT?

12  **A.**   THERE HAS BEEN SOME LITERATURE ON THAT, YES.

13  **Q.**   MEDICAL ERRORS ARE NOW THE NUMBER THREE CAUSE OF DEATHS IN

14  THE UNITED STATES.  CORRECT?

15  **A.**   I'M NOT SURE IF THAT'S CORRECT OR NOT.

16  **Q.**   A JOHNS HOPKINS STUDY SUGGESTS THAT MEDICAL ERRORS ARE THE

17  THIRD LEADING CAUSE OF DEATH IN THE UNITED STATES.  DO YOU HAVE

18  ANY INFORMATION ON THAT?

19  **A.**   IS THAT FROM THE -- WHERE IS THAT FROM?  SO THERE'S NO

20  QUESTION THAT MEDICAL ERRORS CAUSE DEATHS.  I MEAN, I AGREE TO

21  THAT.

22  **Q.**   OKAY.

23          **MR. DUBNER:**  OBJECTION, YOUR HONOR.  THIS IS A

24  DOCUMENT THAT'S NEVER BEEN PROVIDED TO PLAINTIFFS.  WE SHOULD

25  HAVE BEEN PROVIDED --

03:08  1           **THE COURT:**  CAN YOU IDENTIFY IT?

2           **MR. ARCHEY:**  YOUR HONOR, IT HAS NOT.  IT WAS JUST A

3  TREATISE AND I'M ASKING HIM ABOUT IT.  THAT'S ALL.  HE WANTED

4  TO SEE IT SO I SHOWED IT TO HIM.

5           **MR. DUBNER:**  ALL WE'RE ASKING IS THAT PLAINTIFFS'

6  COUNSEL HAVE A COPY OF IT SO WE CAN REVIEW WHAT'S BEING SHOWN

7  TO THE WITNESS.

8           **THE COURT:**  THAT WOULD BE THE POLITE THING TO DO.

9  YOU CAN ASK YOUR NEXT QUESTION, SIR.

10  **BY MR. ARCHEY:**

11  **Q.**  ALL RIGHT.  WHEN YOU DID YOUR CHART REVIEWS, YOU SELECTED

12  DEATH CHARTS IN SOME OF THE SICKEST INMATES TO REVIEW.

13  CORRECT?

14  **A.**  WE SELECTED -- I MEAN, WE JUST HAD THE DEATH LIST THAT

15  SAID CAUSE OF DEATH, AGE, I THINK, WAS ON THERE, AND FROM THOSE

16  WE PICKED.

17  **Q.**  IT CERTAINLY WAS NOT A RANDOM SELECTION, WAS IT?

18  **A.**  WELL, IT WASN'T RANDOM, BUT THERE WASN'T A LOT OF

19  INFORMATION TO PICK FROM.

20  **Q.**  WHAT DO YOU MEAN WHEN "THERE WASN'T A LOT OF INFORMATION

21  TO PICK FROM"?

22  **A.**  WELL, IT HAD THE NAME, THE CAUSE OF DEATH, THE AGE, AND

23  THAT WAS IT.

24  **Q.**  RIGHT, BUT YOU PICKED FROM THE DEATHS?

25  **A.**  WE PICKED, YES.  WE PICKED.

1    **Q.**    YOU DIDN'T GO TO THE POPULATION AND SAY --

2    **A.**    NO, NO.  WE PICKED, AND WE WOULD --

3    **Q.**    RIGHT.

4    **A.**    IT WAS A NONRANDOM SELECTION.

5    **Q.**    AND THIS WASN'T LIKE PING PONG BALLS OR WHATEVER TO GET A

6    RANDOM SELECTION?

7    **A.**    NO, THAT'S CORRECT.

8    **Q.**    OKAY.  IN ADDITION TO THE DEATH CHARTS, YOU THEN PICKED

9    SOME OTHERS THAT WERE VERY SICK PEOPLE THAT NEEDED CARE.

10   RIGHT?

11   **A.**    CAN YOU REPEAT THAT?  I DIDN'T GET IT.

12   **Q.**    IN ADDITION TO THE DEATH CHARTS, YOU PICKED SOME OTHER

13   CHARTS TO REVIEW THAT WERE VERY SICK INDIVIDUALS AND NEEDED

14   CARE.  CORRECT?

15   **A.**    THEY HAD SERIOUS MEDICAL ILLNESS, CORRECT.

16   **Q.**    ALL RIGHT.  I WANT TO TALK ABOUT THESE CHARTS SOME MORE.

17           **MR. ARCHEY:**  YOUR HONOR, WE INTRODUCED THIS LIST THIS

18   MORNING AS A JOINT EXHIBIT NUMBER, OUR LATEST ONE.

19           JEFF, DO YOU HAVE THE NUMBER?

20           **THE DEPUTY CLERK:**  146.

21           **MR. ARCHEY:**  146.

22   BY MR. ARCHEY:

23   **Q.**    ALL RIGHT.  THESE ARE THE 45 CHARTS THAT YOU AND YOUR TEAM

24   REVIEWED.  I WANT TO GO THROUGH THEM WITH YOU.

25           ON CHART NO. 1 THERE, DO HAVE AN OPINION ON CHART

1   NO. 1 AS TO WHETHER THIS MEDICAL CARE WAS INADEQUATE OR NOT?

2   **A.**   SO I DID 1 THROUGH 14.  AND ONE OF THEM, I THINK IT WAS

3   INMATE 8 OR 9, THAT INMATE BASICALLY SPENT A VERY SHORT TIME AT

4   LSP AND CAME DIRECTLY INTO HOSPICE AND DIED SHORTLY AFTER HE

5   ARRIVED, AND I DID NOT FIND SIGNIFICANT PROBLEMS.  I MEAN, IT

6   WAS JUST A VERY SHORT TIME.  I DIDN'T FIND PROBLEMS.

7           EVERYONE ELSE, I FOUND PROBLEMS IN ALMOST EVERY OTHER

8   CHART.

9   **Q.**   OKAY.  WELL, LET'S TALK ABOUT NO. 1 THEN.

10   **A.**   OKAY.

11   **Q.**   WHAT IS YOUR OPINION ON CHART NO. 1 AS TO WHETHER THE CARE

12   WAS INADEQUATE?

13   **A.**   SO I CAN TELL YOU -- SO I IDENTIFIED 12, AT LEAST 12

14   PROBLEMS, AND I THINK OVERALL CARE WAS INADEQUATE.  AND I CAN

15   GO THROUGH THE PROBLEMS IF YOU WANT ME TO.

16   **Q.**   WELL, LET ME ASK YOU SOME QUESTIONS.

17   **A.**   SURE.

18   **Q.**   THIS IS YOUR WRITEUP THAT I'M SHOWING YOU?

19   **A.**   YEAH.

20   **Q.**   IS THAT YOUR WRITEUP?

21   **A.**   IS THIS FROM THE CHART REVIEWS?

22   **Q.**   IT IS.

23   **A.**   YES.

24   **Q.**   OKAY.  THIS GENTLEMAN WEIGHED 348 POUNDS AND HE WAS OBESE.

25   CORRECT?

1  **A.**   I THINK THIS WAS AN OVERWEIGHT PERSON, YES.

2  **Q.**   AND HIS PROBLEMS INCLUDED HYPERTENSION AND KIDNEY

3  PROBLEMS.   RIGHT?

4  **A.**   YES.  HE HAD HYPERTENSION, DIABETES.  I'M NOT SURE THE

5  CHRONIC KIDNEY DISEASE WAS IDENTIFIED, BUT I THINK HE HAD IT.

6  **Q.**   AND HE WAS NONCOMPLIANT WITH HIS MEDICATIONS.  CORRECT?

7  **A.**   WELL, I'M NOT SURE OF THAT.

8  **Q.**   WELL, IF YOU WILL LOOK AT LINE -- IT'S UP ON THE SCREEN.

9  IF WE COULD BRING IT UP ON THE SCREEN IF IT'S NOT.

10 **A.**   ALL RIGHT.

11 **Q.**   I'VE GOT IT HIGHLIGHTED FOR YOU IF THAT WILL HELP ANY.

12 **A.**   YEAH, IT DOES.  JUST SHOW ME WHERE YOU'RE LOOKING.

13 **Q.**   WE'VE GOT THREE PLACES HERE WHERE HE'S TALKING ABOUT NOT

14 TAKING HIS MEDICATION.  DO YOU SEE THAT?

15 **A.**   YES.

16 **Q.**   AND I'M GOING TO SHOW YOU JOINT EXHIBIT NO. -- FROM JOINT

17 EXHIBIT NO. 10, DOCUMENT NO. 51364.  IT'S A REFUSAL TO ACCEPT

18 MEDICAL CARE SIGNED BY THIS INMATE.  DO YOU SEE THAT?

19 **A.**   YES.

20 **Q.**   I'M GOING TO SHOW YOU DOCUMENT NO. 31361 OUT OF JOINT

21 EXHIBIT 1, WHERE IT'S A DOCTOR'S CALL -- 51361 -- WHERE HE SAYS

22 BLOOD PRESSURE IS UP BUT DOESN'T WANT MEDS.  DO YOU SEE THAT?

23 **A.**   YES.

24 **Q.**   AND I'VE GOT A JULY 12, 2000 --

25 **A.**   BUT RECOGNIZE THAT SOME OF THAT WAS BEFORE THE PERIOD OF

1    REVIEW THAT I DID.

2    Q.    ALL RIGHT.  LET ME SHOW YOU THIS ONE.

3    A.    I THINK THAT LAST ONE WASN'T INCLUDED IN THE REVIEW.

4    Q.    OKAY.  LET ME SHOW YOU THE NEXT ONE, WHICH IS --

5    A.    I'M NOT SURE ABOUT THE FIRST ONE.  I DIDN'T LOOK AT THE

6    DATE.

7    Q.    JULY 12, 2010.  THIS IS DOCUMENT NO. 51351.  HE REFUSES TO

8    ACCEPT MEDICAL CARE, AND HE'S ADVISED THAT "INVOLVED IN AN MVA,

9    ADVISED AGAINST UNDISCLOSED INJURIES, COMMA, OR DEATH BEFORE --

10   SOMETHING -- TREATMENT."

11        HE IS ADVISED BAD THINGS CAN HAPPEN IF HE DOESN'T

12   ACCEPT CARE.  RIGHT?

13   A.    THAT'S WHAT IT SAYS, YES.

14   Q.    THE NEXT DOCUMENT IS 51341.  IT'S DECEMBER 12, 2010.  HE

15   SEES A PROVIDER AT THE TREATMENT CENTER, AND HE STATES THAT

16   "HAS NOT BEEN TAKING HIS MEDICATION DAILY, STATES HE WAS TOLD

17   ABOUT RENAL FAILURE." DO YOU SEE THAT?

18   A.    YES.

19   Q.    THE NEXT DOCUMENT IS 51347.  IT'S NOVEMBER 9, 2010.  HE'S

20   NOTED TO HAVE "HIGH BLOOD PRESSURE WITH ZERO BLOOD PRESSURE

21   MEDS TODAY."  DO YOU SEE THAT?

22   A.    I DO.

23   Q.    THE NEXT DOCUMENT IS 51339.  IT'S DECEMBER 20, 2010.  THEY

24   ARE TALKING ABOUT A RIGHT KNEE INJURY, BUT HE NEVER TOOK

25   ANTI-INFLAMMATORIES.  DO YOU SEE THAT?

1    **A.**    YES.  CAN YOU TELL ME WHAT LOCATION HE WAS IN?

2    **Q.**    YOU MEAN WHERE WAS HE BEING HOUSED?

3    **A.**    YES.

4    **Q.**    DOCTOR, IF I SEE SOMETHING IN ONE OF THESE RECORDS, I WILL

5    TELL YOU THAT, BUT I --

6    **A.**    IT SAID MAG-2, BUT I'M NOT SURE WHAT THAT IS.

7    **Q.**    THE NEXT DOCUMENT IS 51338.  IT'S APRIL 20, 2011.  "HAS

8    MISSED BLOOD PRESSURE MEDS" -- I CAN'T MAKE OUT THE WORD, BUT

9    IT SAYS "SECONDARY TO LONG PILL CALL LINES."

10    **A.**    CALL LINES, RIGHT.

11    **Q.**    AND THERE'S A WORD BEFORE THAT I CAN'T -- OH, SECONDARY,

12    SECONDARY.

13    **A.**    RIGHT.

14    **Q.**    NEXT WE HAVE A NOTE FROM A PROVIDER.

15    **A.**    CAN YOU GO BACK TO THAT LAST ONE?  WHAT WAS THE DATE ON

16    THAT?

17    **Q.**    APRIL 20, 2011.

18    **A.**    OKAY.

19    **Q.**    YOU'RE GOOD?

20    **A.**    YEAH.

21    **Q.**    THE NEXT RECORD IS 51335, FEBRUARY 2, 2012.

22    "NON-COMPLAINT WITH MEDS SECONDARY TO," I GUESS THAT'S "PILL

23    CALL LINE TOO LONG."  DO YOU SEE THAT?

24    **A.**    YES.

25    **Q.**    THE NEXT DOCUMENT IS 51309.  IT'S OCTOBER 17, 2013.  "NO

1    SHOW ON CALL OUT."  DO YOU SEE THAT?

2    **A.**    YES.

3    **Q.**    OF COURSE, HE PASSES AWAY ON FEBRUARY 5, 2014.  CORRECT?

4    **A.**    CORRECT.

5    **Q.**    AND AT THE TIME OF HIS DEATH, HE NOW WEIGHED 378.5 POUNDS.

6    CORRECT?

7    **A.**    OKAY.

8    **Q.**    DOCTOR, THIS DEATH WAS NOT PREVENTABLE, WAS IT?

9    **A.**    WELL, HE DIED OF A PULMONARY EMBOLISM.  SO WHILE THERE ARE

10    PROBLEMS, MY COMMENTS WERE THAT IT WAS PROBABLY NOT PREVENTIBLE

11    BECAUSE HE DIED OF A PULMONARY EMBOLISM, BUT THAT DOESN'T MEAN

12    THAT THE CARE WAS APPROPRIATE.

13    **Q.**    AND HE HAS THE RIGHT TO TURN DOWN CARE, WHICH HE DID ON

14    MANY NUMEROUS OCCASIONS, DESPITE BEING TOLD THAT IT WOULD HURT

15    HIM.  RIGHT?

16    **A.**    SO LET ME JUST ANSWER WHAT YOU'RE IMPLYING.  YOU'RE

17    IMPLYING THAT BECAUSE THERE WERE DOCUMENTATIONS OF REFUSAL,

18    THAT, THEREFORE, IT WAS THE PATIENT'S RESPONSIBILITY.  I WOULD

19    JUST HAVE A COUPLE OF COMMENTS TO THAT.  ONE IS THAT I DIDN'T

20    COUNT THE NUMBER, BUT BASED ON THAT QUICK PLACING UP OF THE

21    MEDICAL RECORD, MOST OF THE DOCUMENTS WERE BASED ON PROVIDER

22    NOTES ABOUT WHAT WAS HAPPENING TO THE PATIENT.  I THINK THERE

23    WAS ONE REFUSAL.  THERE HAVE BEEN TWO SIGNED REFUSALS.  AND,

24    TYPICALLY, IF A PATIENT REFUSES MEDICATION, HE HAS TO SIGN FOR

25    EVERY SINGLE TIME THEY REFUSE.

1     THIS PATIENT'S CARE WAS REVIEWED FOR A COUPLE OF

2   YEARS, AND THE EXERCISE WOULD BE TO GO BACK TO THE

3   DOCUMENTATION ON THE MEDICATION ADMINISTRATION RECORD AND SEE

4   HOW OFTEN HE WAS OFFERED THE MEDICATION.  AND SECONDLY, WHEN

5   THE DOCTORS ARE SAYING THAT HE IS NOT GETTING HIS MEDICATION

6   BECAUSE THE LINE IS TOO LONG, THERE SHOULD BE SOME

7   INVESTIGATION INTO THAT.

8     SO I DON'T AGREE THAT THE PATIENT IS REFUSING

9   MEDICATION ON -- CONTINUALLY.  I THINK YOU WOULD HAVE TO

10  DEMONSTRATE THAT BY USE OF THE MAR, AND THAT IS WHERE THE

11  PEOPLE WHO ADMINISTER THE MEDICATION ACTUALLY DOCUMENT THAT THE

12  PATIENT IS REFUSING.  IF YOU DON'T HAVE THAT, YOU DON'T REALLY

13  HAVE GREAT EVIDENCE THAT THEY ARE REFUSING THE MEDICATION.

14    SO, FOR INSTANCE --

15  **Q.**  DOCTOR, IF I COULD -- EXCUSE ME.

16  **A.**  GO AHEAD.

17    **MR. DUBNER:**  OBJECTION, YOUR HONOR.  HE IS NOT

18  ALLOWING THE WITNESS --

19    **MR. ARCHEY:**  THAT WAS A VERY LONG WINDING ANSWER,

20  VERY NARRATIVE, YOUR HONOR.

21    **THE WITNESS:**  I'M TRYING TO ANSWER WHAT I BELIEVE  --

22    **THE COURT:**  OKAY.  WE'RE GOING TO TAKE A BREAK.

23    **MR. ARCHEY:**  OKAY.

24    **THE COURT:**  FIFTEEN MINUTES.

25            **(RECESS.)**

1    **THE COURT:**  BE SEATED.

2            WE'RE GOING TO GO 'TIL 5:00 IF THAT HELPS YOU

3    ALL WITH YOUR PLANNING.

4            GO AHEAD.  YOUR WITNESS.

5    **MR. ARCHEY:**  YOUR HONOR, AT THIS TIME, I'LL MOVE TO

6    INTRODUCE INTO EVIDENCE DOCUMENT NOS. 502U AND 502FF.

7    **MR. DUBNER:**  NO OBJECTION.

8    **THE COURT:**  ADMITTED.

9    BY MR. ARCHEY:

10    **Q.**  DR. PUISIS, LET'S GO TO PATIENT NO. 2.  YOU HAVE THE CHART

11    THERE IN FRONT OF YOU.  YOU GOT THE NAME?

12    **A.**  YES, I HAVE THE NAME.  WELL, I SAW THE NAME FOR A SECOND.

13    **Q.**  I'M SORRY.  YOU GOT IT?

14    **A.**  MR. HINTON.

15    **Q.**  NO, DON'T SAY IT.

16    **A.**  I'M SORRY.

17    **Q.**  MY BAD.  ALL RIGHT.  THIS PATIENT HAD A HEART ATTACK.

18    CORRECT?

19    **A.**  I MEAN, IF -- UNLESS YOU WANT ME TO READ THE WHOLE THING,

20    IF YOU SAY THEY DID, I'LL ACCEPT THAT.

21    **Q.**  OKAY.  LET ME GO TO PAGE 5.  THIS IS THE SECOND PAGE OF

22    YOUR REVIEW FOR THIS.  THIS PATIENT ALSO DID NOT WANT TO TAKE

23    HIS BLOOD PRESSURE MEDICATION.  DO YOU SEE THAT?  I'VE GOT IT

24    HIGHLIGHTED ON THE SCREEN IF YOU'D LIKE, RIGHT THERE AT THE

25    TOP.

**A.**   YES.

**Q.**   THAT'S YOUR FINDING.  RIGHT?

**A.**   YES.  WELL, I SAID THAT PROVIDER DOCUMENTED THAT THE
PATIENT DIDN'T WANT TO TAKE HIS MEDICATION, WHICH IS NOT THE
SAME AS THE PATIENT DIDN'T WANT TO TAKE IT.  BUT I ACCEPT IT.

**Q.**   AND HERE IS A PROVIDER DOCUMENTATION.  IT'S DOCUMENT
NO. 24625, WHERE THIS PATIENT REFUSED HIS MEDICATIONS ON
OCTOBER 22, 2010.  CORRECT?

**A.**   THAT'S CORRECT.

**Q.**   ALL RIGHT.  AND WE ALSO HAVE WHERE THE PATIENT GOT AN
ANNUAL PHYSICAL ON MARCH 10 -- OR MARCH 30, 2012.  DO YOU SEE
THAT?

**A.**   YES.

**Q.**   SO THIS IS A DOCUMENT THAT CONFIRMS THAT LSP WAS DOING
ANNUAL PHYSICALS.  RIGHT?

**A.**   IT'S NOT REALLY A PHYSICAL.  WELL, LET'S SEE.  YEAH, IT'S
A CHECKED BOX, PHYSICAL, YEAH.

**Q.**   SO THEY WERE DOING ANNUAL PHYSICALS AS SHOWN BY THIS
DOCUMENT.  RIGHT?

**A.**   CORRECT.

**Q.**   AND THE DOCUMENT ALSO ADDRESSES THAT THIS PATIENT DOES NOT
WANT BLOOD PRESSURE MEDS AT THIS TIME.  CORRECT?

**A.**   CORRECT.

**Q.**   THEN WE GO TO THE NEXT DOCUMENT IS THAT THIS PATIENT WAS A
NO SHOW FOR A CHEST X-RAY ON APRIL 1, 2012.  IT'S DOCUMENT NO.

1    24623.  DO YOU SEE THAT?

2    A.    YES.

3    Q.    THERE IS A REFUSAL TO ACCEPT MEDICARE CARE SIGNED BY THE

4    PATIENT AND IT'S DATED APRIL 3, 2012.  DO YOU SEE THAT?

5    A.    CORRECT.

6    Q.    HIS RESPONSE WAS, HE JUST DIDN'T NEED THE MEDICATIONS AT

7    THIS TIME.  CORRECT?

8    A.    CORRECT.

9    Q.    THE NEXT DOCUMENT IS APRIL 9, 2013.  THIS IS ANOTHER

10   PHYSICAL THAT WAS GIVEN TO THE PATIENT.  DO YOU SEE THAT?

11   A.    YES.

12   Q.    AND HERE HE SAYS DOES NOT WANT HIS CHOLESTEROL MEDS.

13   CORRECT?

14   A.    YES.

15   Q.    AND THE LAST DOCUMENT I JUST SHOWED YOU WAS 24650.

16          THE NEXT DOCUMENT IS A REFUSAL OF A CHEST X-RAY ON

17   APRIL 10, 2013.  THIS IS DOCUMENT 24648.  DO YOU SEE THAT?

18   A.    YES.

19   Q.    AND HERE THE INMATE REFUSED TO SIGN.  YOU CAN'T FORCE HIM

20   TO SIGN ANYTHING, CAN YOU?

21   A.    I PRESUME NOT, NO.

22   Q.    WELL, FROM A MEDICAL PERSPECTIVE, YOU CANNOT, CAN YOU?

23   A.    NO.  NO.  YOU CAN'T FORCE HIM TO SIGN.

24   Q.    ALL RIGHT.  NOW I HAVE ANOTHER REFUSAL TO ACCEPT MEDICAL

25   CARE, THIS WAS APRIL 11, 2013.  THIS ONE IS SIGNED BY THE

1    PATIENT.  "NO NEED AT THIS TIME."  DO YOU SEE THAT?

2    A.    THAT'S CORRECT.

3    Q.    AND IT'S DOCUMENT NO. 24647.

4    A.    RIGHT.

5    Q.    THE NEXT DOCUMENT I WANT TO SHOW YOU IS AUGUST 29, 2017.

6    "REFERS TO HDL, DOES NOT WANT TREATMENT.  "DO YOU SEE THAT?

7    A.    YES.  SO LET ME ASK YOU -- WELL, YOU KNOW WHAT, LET ME

8    JUST -- YEAH, I DO SEE IT.

9    Q.    AND THIS IS DOCUMENT NO. 24641.  CORRECT?

10   A.    I DIDN'T SEE THE NUMBER.

11   Q.    I APOLOGIZE.

12   A.    THAT'S OKAY.  YOU'RE SAYING IT'S WHAT DOCUMENT?

13   Q.    24641.  UP AT THE TOP, THAT'S FOR OUR RECORD.

14   A.    YES.

15   Q.    THANK YOU.

16   A.    DO YOU WANT ME TO VERIFY THE DOCUMENT NUMBER?

17   Q.    NO.  I'LL JUST SAY IT FOR THE RECORD.

18   A.    OKAY.  ALL RIGHT.

19   Q.    MY BAD.  SORRY, DOCTOR.

20   A.    THAT'S OKAY.

21   Q.    THE NEXT DOCUMENT IS MAY 2, 2014.  WE HAVE YET ANOTHER

22   ANNUAL PHYSICAL.

23   A.    YES.

24   Q.    AND SHOWING THAT THE PATIENT IS STILL REFUSING CARE THAT'S

25   BEING OFFERED TO HIM.  CORRECT?

1    **A.**    YES.

2    **Q.**    AND THAT HE WANTED NO MEDICATIONS.  CORRECT?

3    **A.**    YES.

4    **Q.**    AND THIS IS DOCUMENT NO. 24635.  NOW, DOCTOR, WITH THESE

5    REFUSALS FOR MEDICATIONS, YOU FOUND THAT THIS DEATH WAS

6    PREVENTIBLE ONLY IF THE PATIENT HAD TAKEN HIS MEDICATIONS.

7    CORRECT?

8    **A.**    I SAID IT MIGHT HAVE BEEN PREVENTED IF HE AGREED TO TAKE

9    HIS MEDICATION.

10    **Q.**    THE PATIENT DID NOT TAKE HIS MEDICATIONS, DID HE?

11    **A.**    THAT'S CORRECT, YEAH.

12    **Q.**    SO THIS WAS A NON-PREVENTIBLE DEATH.  CORRECT?

13    **A.**    YEAH.  I MEAN, THE ONLY QUESTION I HAD WAS -- WAS -- DID

14    THE PROVIDERS DISCUSS WITH THE PATIENT THE REASONS FOR TAKING

15    THE MEDICATION.  TYPICALLY, YOU WOULD DOCUMENT THAT.  WHAT WAS

16    DOCUMENTED WAS PATIENT REFUSED, PATIENT REFUSED, BUT GENERALLY,

17    WHEN A PROVIDER DOES THAT, THEY WILL SAY, I HAD A DISCUSSION

18    WITH THE PATIENT AND DISCUSSED THAT HE NEEDS TO TAKE THE STATIN

19    DRUG BECAUSE, ET CETERA, ET CETERA.  SO, YOU KNOW, I WAS

20    CRITICAL, AND I ONLY HAD THREE COMMENTS, I BELIEVE.  YEAH.  AND

21    THEY WERE, YOU KNOW, THEY SHOULD HAVE HAD A MORE THOROUGH

22    DISCUSSION, BUT I AGREED HE DIDN'T TAKE HIS MEDICATION AND HE

23    HAD AN ADVERSE EVENT.

24    **Q.**    AND BECAUSE HE DID NOT TAKE HIS MEDICATION, THIS DEATH WAS

25    NOT PREVENTIBLE.  CORRECT?

**A.**    I THINK I WOULD REPHRASE IT TO SAY YOU CAN'T BLAME THE
PROVIDERS FOR HIS DEATH.  THE PATIENT COULD HAVE PREVENTED HIS
DEATH IF HE HAD TAKEN MEDICATION, WHICH IS WHAT I SAID.  BUT I
THINK IT'S PRETTY MUCH WHAT YOU'RE GETTING AT.

**Q.**    OKAY.  LET'S GO TO PATIENT NO. 3 NOW.

**A.**    OKAY.

**Q.**    GIVE YOU A MOMENT TO GET HIS NAME OFF THE CHART THERE.
YOU SEE IT?  DON'T SAY IT OUT LOUD, PLEASE.

**A.**    YES.

**Q.**    YOU GOT IT?

**A.**    I DO, YEAH.

**Q.**    ALL RIGHT.  PATIENT NO. 3 WE'VE ACTUALLY SPOKE ABOUT THE
LAST TWO DAYS.  CORRECT?

**A.**    YES.  HE'S A FAIRLY COMPLEX PATIENT.

**Q.**    YEAH, AND THIS COMPLEX CARE INVOLVES A LOT OF SYSTEMS AND
IT'S DIFFICULT HIGH LEVEL MEDICINE, ISN'T IT?

**A.**    WHAT DO YOU MEAN "HIGH LEVEL MEDICINE"?

**Q.**    YOU GOT LOTS OF SYSTEMS IN PLAY AND LOTS OF -- WELL,
SYSTEMS IN PLAY IN THE BODY.  RIGHT?  YOU GOT TO WORRY ABOUT
ONE MEDICATION ADVERSELY AFFECTING ANOTHER SYSTEM, CONCERN WITH
THIS, MAY BE ADVERSE FOR THAT.

**A.**    WELL, I THINK FOR ALL THESE PATIENTS, THEY'RE COMPLEX.

**Q.**    THIS PATIENT IS PARTICULARLY COMPLEX, IS HE NOT?

**A.**    THIS PATIENT HAD MORE, I BELIEVE, SPECIALTY CARE NEEDS.

**Q.**    OKAY.  AND WHEN YOU GET INTO A COMPLEX MEDICAL SITUATION

1  LIKE THIS, NOW YOU BEGIN TO SEE THOSE ERRORS THAT ARE BEING

2  REPORTED BY JOHNS HOPKINS AND OTHERS OUT IN THE COMMUNITY.

3  RIGHT?

4  **A.**   WELL, YES AND NO.  I MEAN, YOU HAVE -- IT'S NOT THE SAME

5  AS A JOHNS HOPKINS PATIENT, BUT THE PATIENT HAS A COMPLEX

6  ILLNESS AND HE REQUIRES CARE.  I MEAN, I AGREE WITH THAT.  I

7  DON'T WANT TO MAKE AN ASSERTION THAT IT'S SIMILAR TO THE JOHNS

8  HOPKINS STUDY BECAUSE I DON'T KNOW WHO THEY STUDIED, FRANKLY.

9  **Q.**   YOU FOUND --

10  **A.**   I'M OKAY WITH TALKING ABOUT THIS PATIENT.

11  **Q.**   YOU FOUND THAT THIS PATIENT FAILED TO TAKE HIS MEDICATIONS

12  AS WELL.  CORRECT?

13  **A.**   ARE YOU REFERRING TO THE FIRST HIGHLIGHT?

14  **Q.**   AND THE SECOND, YES.

15  **A.**   OKAY.  SO THE FIRST HIGHLIGHT IS A MAR FOR 2009, DOCUMENTS

16  THE PATIENT FAILED TO RECEIVE ANY MEDICATION.  THAT'S NOT THAT

17  HE DIDN'T TAKE IT.  IT'S THAT HE DIDN'T RECEIVE IT, WHICH IS

18  DIFFERENT.  RECEIPT OF THE MEDICATION MEANS THAT THE LSP STAFF

19  IS RESPONSIBLE TO GIVE IT TO HIM AND RECORD THAT HE DIDN'T TAKE

20  IT.  THAT WAS NOT DONE.  THERE WAS JUST NO DOCUMENTATION THAT

21  HE RECEIVED THE MEDICATION.

22  **Q.**   WHICH COULD BE THE SAME AS A REFUSAL, COULD IT NOT?

23  **A.**   WELL, IT MIGHT BE, IF YOU DOCUMENT IT, BUT IF YOU DON'T

24  KNOW, YOU DON'T KNOW WHETHER HE RECEIVED IT OR NOT.

25  **Q.**   LOOK AT THE NEXT HIGHLIGHT, PLEASE.

**A.**   OKAY.  IT APPEARS THAT FOR THE MAR, MEDICATION
ADMINISTRATION RECORD, FOR SEPTEMBER 2009, DOCUMENTED THE
PATIENT DIDN'T SHOW UP 17 DOSES OF PLAVIX BEFORE IT WAS
DISCONTINUED, AND 30 OF 60 PRESCRIBED DOSES OF METOPROLOL AND
ISOSORBIDE.  NOW, WHEN WE -- SO THAT LANGUAGE DID NOT SHOW --
THE NURSE -- AND UNFORTUNATELY, I'M NOT SURE IF THIS WAS AN
OFFICER WHO ADMINISTERED OR A NURSE, BUT THE STANDARD OF CARE
IS THE NURSE WOULD DESCRIBE THE REASON FOR THE PATIENT NOT
RECEIVING THE MEDICATION, AND IT WOULD BE -- "NS" WOULD BE
DOCUMENTED AS NO SHOW.  SO I'M NOT SURE THAT THAT OCCURRED AT
THAT TIME.  SO, BASICALLY, I WAS LOOKING AT THE DOCUMENTATION
ON THE MAR.

**Q.**   OKAY.  WHICH SHOWED THAT HE'S NOT GETTING ALL OF HIS
MEDICATIONS.  CORRECT?

**A.**   HE'S NOT GETTING HIS MEDICATION, CORRECT.  HE'S NOT
RECEIVING THEM.

**Q.**   LET'S GO TO YOUR NEXT PAGE OF YOUR REPORT.  YOU ALSO NOTED
IN NOVEMBER OF 2009, THE MAR RECORDED ADMINISTRATION OF FIVE OF
TEN -- KOP IS KEEP ON PERSON.  CORRECT?

**A.**   YES.

**Q.**   KEEP ON PERSON MEDICATIONS, AND AGAIN, SHOWS ABOUT HALF --
HE'S GETTING ABOUT HALF OF HIS MEDICATIONS.  RIGHT?

**A.**   THAT'S CORRECT.

**Q.**   WHAT ASSUMPTION DO YOU MAKE?  YOU MAKE AN ASSUMPTION THAT
LSP IS NOT OFFERING TO THEM OR HE'S REFUSING THEM?

**A.**   WHAT I AM DOCUMENTING IS I'M REFLECTING THE DOCUMENTATION

OF THE PERSON ADMINISTERING THE MEDICATION, AND ONE OF THE

THINGS THAT WE FOUND WAS THAT PARTICULARLY WHEN THE OFFICERS

ADMINISTERED THE MEDICATION, THEY DO SO INAPPROPRIATELY.

FOR EXAMPLE, THEY GO TO A DORMITORY AND ADMINISTER

MEDICATION TO DOZENS OF PEOPLE, AND THEN AT A LATER TIME,

PERHAPS HALF AN HOUR TO SEVERAL HOURS LATER, GO BACK TO ANOTHER

AREA WHERE THEY OSTENSIBLY RECORD THE ADMINISTRATION OF

MEDICATION.  AND THAT'S INAPPROPRIATE BECAUSE I DON'T BELIEVE

ANYONE HAS THE POWER TO MEMORIZE EVERYTHING THEY DID, AND SO

THAT'S A PROBLEM, AND IT RESULTS IN DOCUMENTATION SUCH AS I AM

DOCUMENTING HERE WHERE YOU DON'T KNOW WHY THE PATIENT DIDN'T

RECEIVE MEDICATION.

**Q.**   ALTERNATIVELY, HE JUST WASN'T TAKING HIS MEDICATION?

**A.**   WELL, I GUESS, PROVE IT.

**Q.**   OKAY.

**A.**   YOU KNOW WHAT I MEAN?  THE MAR, THE MEDICATION

ADMINISTRATION RECORD, IS THE LEGAL DOCUMENT WHICH PROVES AND

VERIFIES THE ADMINISTRATION OF MEDICATION.

**Q.**   OKAY.

**A.**   WHEN IT'S NOT FILLED OUT, ONE CANNOT VERIFY THE

ADMINISTRATION OF MEDICATION.

**Q.**   AND YOU FOUND THAT HE WAS GETTING MEDICATIONS, JUST NOT

ALL OF THEM THROUGHOUT 2009 AND INTO 2010.  CORRECT?

**A.**   THAT'S CORRECT.  I WOULD ADD -- I MEAN, IT WAS -- THAT

03:55   1   RECOLLECTION THING I JUST MENTIONED, MS. LAMARRE NOTED THAT A

2   PATIENT WHO WAS DOCUMENTED AS RECEIVING MEDICATION WHEN HE WAS

3   DEAD.

4   **Q.**   WHAT DO YOU KNOW ABOUT THAT?

5   **A.**   WELL, I KNOW THAT THAT'S WHAT SHE SAID.

6   **Q.**   WHAT ELSE DO YOU KNOW ABOUT THAT?  I WANT TO TALK ABOUT

7   IT.  WHAT ELSE DO YOU KNOW ABOUT THAT?

8   **A.**   THAT'S WHAT I KNOW ABOUT THAT.

9   **Q.**   ARE YOU AWARE THAT THAT WAS A KEEP ON PERSON DOCUMENTATION

10   THAT SHE WAS LOOKING AT?

11   **A.**   WELL, MAYBE IT WASN'T DOCUMENTED AS SUCH.

12   **Q.**   ARE YOU AWARE THAT THEY GET A 30-DAY SUPPLY OF KEEP ON

13   MEDICINE [SIC], AND IT'S CHARTED OUT FOR 30 DAYS AND IF HE DIES

14   BEFORE THE END OF THE 30 DAYS, IT'S GOING TO SHOW HIM STILL

15   HAVING THE MEDICATION AFTER HIS DEATH?

16   **A.**   SO IN SOME OF THE MARS I LOOKED AT PERSONALLY --

17   **Q.**   ANSWER MY QUESTION, PLEASE.

18   **A.**   I AM.  I'M ANSWERING IT BY THIS ANSWER.  ON SOME OF THE

19   MARS I LOOKED AT, IT DOES NOT DOCUMENT THAT THE MEDICATION IS

20   KOP.  SO I LOOKED CAREFULLY ON SEVERAL MARS, AND I WOULD SEE

21   ONE NOTE THAT THERE WAS A NURSE INITIAL ON IT, AND I DIDN'T

22   KNOW IF THAT WAS A KOP OR NOT.

23   **Q.**   SO MS. LAMARRE'S EXAMPLE, IF THAT'S A KOP, THAT EXPLAINS

24   IT, DOESN'T IT?

25   **A.**   WELL, IT MIGHT, BUT AS I SAID, THE DOCUMENTATION IS NOT

GOOD.

Q.    THAT DOCUMENTATION SAYS KOP.  ARE YOU AWARE OF THAT?

A.    WELL, IF IT SAYS IT, IT SAYS IT.  IN THE MARS I LOOKED AT,
I DIDN'T SEE THE DOCUMENTATION OF KOP.

Q.    ALL RIGHT.  I'LL SHOW IT TO YOU IN A MINUTE.

A.    OKAY, FINE.

Q.    IT'S FURTHER DOWN.  WE'LL CONTINUE WITH THIS PATIENT.  YOU
DID FIND WHERE HE'S GETTING SOME MEDICATIONS BUT NOT ALL OF
THEM, AND THAT'S CONTINUING ON INTO 2010.  CORRECT?

A.    YES, AND THAT INCLUDES THE INSULIN, YES.

Q.    HERE IN 2010, THE NURSE IS ACTUALLY NOTING REFUSALS BASED
UPON YOUR NOTE.  CORRECT?

A.    I DOCUMENT -- I SAY THAT HE REFUSED MEDICATION THREE DAYS,
AND THAT A NURSE RECORDED THE PATIENT REFUSED MEDICATION 26
TIMES.

Q.    SO THAT'S A REFUSAL; WE'RE SURE ABOUT THAT?

A.    THAT'S A REFUSAL, RIGHT.

Q.    ALL RIGHT.  LET'S GO THROUGH THIS GENTLEMAN A LITTLE BIT.
THIS IS FEBRUARY 23 OF 2010, WHERE HE'S AT THE PHYSICIAN'S
CLINIC.  THIS IS OUR AMPUTEE.  CORRECT?

A.    YES.  IS THIS THE PERSON WITH BILATERAL AMPUTATIONS?  I
THINK SO.

Q.    HE'S GOT AN ABOVE-THE-KNEE AMPUTATION.  CORRECT?

A.    YES.

Q.    OKAY.  AND THIS CHART HAS A LOT OF INFORMATION ON IT.

1  THIS IS PRETTY GOOD REVIEW OF SYSTEMS, IS IT NOT?

2  **A.**   SHOW ME THE REVIEW OF SYSTEMS.

3  **Q.**   WELL, MAYBE I'M USING THE TERM WRONG, DOCTOR.  THERE'S A

4  LOT OF INFORMATION HERE.  WHAT'S THE PHYSICIAN PROVIDER NOTE ON

5  THIS CHART?

6  **A.**   CAN YOU REPEAT THE QUESTION?

7  **Q.**   I'M JUST LOOKING AT THIS SAYING THERE'S A LOT OF

8  INFORMATION ON THIS CHART SUCH THAT IT LOOKS LIKE HE'S GOT LABS

9  REPORTED, HE'S GOT AN INFORMATION, HE'S GOT AN ASSESSMENT, A

10 PLAN.  THERE'S A LOT ON THIS CHART.  RIGHT?

11 **A.**   SO LET'S START WITH THE HISTORY.  DO YOU WANT ME TO GO

12 THROUGH IT AND INTERPRET IT FOR YOU, OR DO YOU WANT TO

13 INTERPRET IT, AND ASK ME IF I AGREE?

14 **Q.**   NO.  I JUST WANTED YOU TO -- CAN YOU DO IT IN 25 WORDS OR

15 LESS ON WHAT THIS CHART SHOWS?  HOW ABOUT THAT?  I DON'T WANT

16 YOU TO GO THROUGH EVERY LINE.

17 **A.**   WELL, I DON'T KNOW IF I CAN DO IT IN 25 WORDS OR LESS, BUT

18 I CAN MAKE AN ATTEMPT.

19        SO THE PATIENT HAS PERIPHERAL VASCULAR DISEASE, AND

20 THAT'S NOT LISTED AS A PROBLEM.  SO THAT WAS ONE THING.  THE

21 PROBLEMS ARE LISTED IN THE CHIEF COMPLAINTS SECTION.  SO IT

22 SAYS:  "ATUI BILATERAL AMPUTEE, DIABETES, HYPERTENSION, CAD,

23 HLD."  AND THEY'RE CIRCLED, BUT THERE'S VERY LITTLE HISTORY

24 RELATED TO THEM.

25        SO LET'S TAKE THE AMPUTEE.  AND THIS PERSON HAS

04:00   1   PERIPHERAL VASCULAR DISEASE, AND IT SAYS -- I BELIEVE IT SAYS
2   BL.  I THINK HE MEANS BILATERAL AKA OR AMPUTATION.  AND THEN
3   IT'S A LITTLE DIFFICULT TO READ, BUT IT APPEARS TO INDICATE "NO
4   REDNESS, RIGHT."  NOW, THAT'S -- SO THAT'S THE ENTIRE HISTORY
5   FOR THE PERSON'S PERIPHERAL VASCULAR DISEASE, AND I WOULD SAY
6   THAT'S WEAK.  HE DOES LIST SOME OF THE LABS, WHICH IS GOOD.
7   THE PHYSICAL EXAM, HE LISTENS TO THE LUNGS.  APPARENTLY THE
8   ABDOMEN, HE HAS A SCRIBBLE, I THINK IT JUST MEANS NO, OR
9   NOTHING WRONG, BUT IT'S HARD TO TELL, AND I'M NOT SURE IF I CAN
10   UNDERSTAND THE REST OF THE PHYSICAL EXAM.
11        SO THEN THE ASSESSMENT FOR THIS, WHERE I THINK THE
12   HISTORY IS INADEQUATE, THE EXAM DOESN'T INCLUDE A VERY GOOD
13   EXAM OF THE LEG, THE PULSES OR THE EXTREMITY.  BASICALLY SAYS
14   THAT THE HYPERTENSION IS IN FAIR CONTROL, AND THE BLOOD
15   PRESSURE IS ACTUALLY NOT LEGIBLE ON THIS.  I DON'T KNOW IF
16   THAT'S YOUR -- SO I HAVE ONE -- IN MY RECORD REVIEW, I HAVE
17   151/86, WHICH IS -- IT'S POOR -- IT'S NOT GOOD CONTROL, SO
18   TYPICALLY IT SHOULD BE UNDER 140/80, AND AT THAT LEVEL OF
19   CONTROL, YOU SHOULD ADD MEDICATION, WHICH WAS NOT DONE.
20   Q.   DO YOU SEE THE BLOOD PRESSURE READING ON THIS CHART?
21   A.   WELL, SO THIS IS 2/23/10.  CORRECT?
22   Q.   YES.
23   A.   IN MY NOTES IN THE REPORT, I HAVE LISTED THE BLOOD
24   PRESSURE IS 151/86.  I THINK THE PHOTOCOPY THAT YOU HAVE HERE
25   IS ILLEGIBLE.  BUT I HAVE IT AS 151/86.

1    Q.   WELL, I'M TRYING TO FIGURE OUT WHERE IT IS ON HERE IT'S

2    ILLEGIBLE.  I SEE 121.

3    A.   IT'S CIRCLED IN THE TOP-MOST LEFT CIRCLE THAT YOU HAVE --

4    Q.   OKAY.

5    A.   -- IS WHERE THE BLOOD PRESSURE IS SUPPOSED TO BE.  IT'S

6    ILLEGIBLE --

7    Q.   THANK YOU.

8    A.   -- BUT I ACTUALLY HAVE IT IN MY NOTE AS 151/86.

9    Q.   OKAY.  SO YOU SEE THE 86 THERE?

10   A.   RIGHT.  SO AT THIS POINT, THE DOCTOR IS DOCUMENTING THAT

11   THERE IS NO DISCHARGE IN THE STUMP, AND THAT THE STUMP IS

12   HEALED.  BUT -- AND ALTHOUGH THE BLOOD PRESSURE IS LISTED -- I

13   MEAN, THE A1C IS LISTED AS 7.4, WHICH IS REASONABLE CONTROL,

14   THE DOCTOR'S ASSESSMENT DOESN'T ADDRESS THE DIABETES.  AND

15   ALTHOUGH THE HYPERTENSION IS LISTED AS FAIR CONTROL, THAT'S

16   SORT OF A SUBJECTIVE OPINION.  IT'S NOT AT GOAL.  THERE WAS NO

17   PLAN FOR THAT, AND --

18   Q.   DOCTOR, I THOUGHT DM MEANT DIABETES.

19   A.   IT DOES.

20   Q.   OKAY.  SO IT'S IN THE ASSESSMENT.  RIGHT?

21   A.   RIGHT.  BUT WHAT DOES IT MEAN?

22   Q.   HE NOTED IT AND IT'S WITHIN FAIR CONTROL.  RIGHT?

23   A.   SO THE ASSESSMENT IS HE HAS DIABETES.  THAT'S NOT REALLY

24   AN ASSESSMENT.  IN FACT, THOUGH, IT'S ACTUALLY NOT UNREASONABLE

25   CONTROL, AND I'VE SAID THAT.

**Q.**    AND HE SAID CONTINUE THE MEDS.  RIGHT?

**A.**    HE SAYS CONTINUE THE MEDS, RIGHT, AND HE FOLLOWED UP, I

THINK, FOR SIX MONTHS.

**Q.**    LET'S LOOK AT THE NEXT CHART IF WE MAY.

**A.**    OKAY.

**Q.**    WHICH IS TWO MONTHS LATER ON APRIL 23, 2010.  THIS IS

DOCUMENT NO. 55027.

**A.**    OKAY.

**Q.**    ALL RIGHT.  HE WAS SEEN IN THE ATU FOR BILATERAL STUMP

PAIN.  DO YOU SEE THAT?

**A.**    YES.

**Q.**    AND WE HAVE A SOAP NOTE HERE.  WHAT DOES SOAP STAND FOR?

**A.**    SUBJECTIVE, OBJECTIVE, ASSESSMENT, AND PLAN.

**Q.**    OKAY.  SO THIS PHYSICIAN GOES THROUGH THE SOAP CRITERIA.

IS THAT FAIR?

**A.**    HE USES THE SOAP CRITERIA.

**Q.**    OKAY.  AND I ALSO NOTE THAT HIS PRESCRIPTIONS WERE

REVISED, DOWN AT THE LEFT.  RIGHT?

**A.**    HE ADDED ANTIBIOTICS AND STARTED KEPPRA.  SO DO YOU WANT

TO AN OPINION ON THAT?

**Q.**    SURE, DOCTOR, GO AHEAD.

**A.**    SO WHY DID HE ORDER KEPPRA?

**Q.**    DOCTOR, I'M NOT GOING TO BE ABLE TO ANSWER MEDICAL

QUESTIONS FOR YOU.

**A.**    WELL, I TELL YOU, I'M A DOCTOR, AND I CAN'T FIGURE OUT

1    EITHER.  YOU CAN PUT IT BACK UP.  I CAN EXPLAIN.  I MEAN, THERE

2    IS NO EXPLANATION FOR WHY THE KEPPRA IS ORDERED.  NONE.  THERE

3    IS NO ASSESSMENT THAT RELATES TO WHY KEPPRA SHOULD BE USED.

4    AND THE OTHER COMMENT THAT --

5    **Q.**    LET ME TRY THIS.

6    **A.**    YEAH.

7    **Q.**    LET ME SWIM DEEP IN SOME -- JUMP IN SOME DEEP WATERS.

8    ISN'T THAT A NERVE PAIN MEDICATION?

9    **A.**    IT'S AN ANTI-EPILEPTIC IS WHAT IT IS.

10   **Q.**    ISN'T THAT USED FOR NERVE PAIN, OFF LABEL?

11   **A.**    IT MAY BE OFF LABEL, BUT YOU KNOW, IT'S UNCLEAR WHY HE'S

12   USING IT.

13   **Q.**    OKAY.  I JUST GAVE YOU AN OFF-LABEL USE OF NERVE PAIN.

14   **A.**    WELL, WHAT I'M SAYING IS THAT THE PROBLEM WITH THE NOTE IS

15   YOU SHOULDN'T HAVE TO SPECULATE TO INTERPRET A NOTE.

16   **Q.**    ALL RIGHT, DOCTOR.

17   **A.**    THE NOTES SHOULD DESCRIBE WHAT THE DOCTOR IS THINKING.

18   **Q.**    NOW WE COME TO MAY 9, 2010.  THIS IS DOCUMENT NO. 55024.

19   THE PATIENT'S BEING SEEN ONE MONTH, OR LESS THAN A MONTH AFTER

20   THE PREVIOUS VISIT.  RIGHT?  ACTUALLY A LITTLE MORE THAN TWO

21   WEEKS.

22   **A.**    THIS IS A REFERRAL FORM, NOT A NOTE.

23   **Q.**    ALL RIGHT.  HE'S BEING REFERRED OUT?

24   **A.**    HE'S BEING REFERRED, CORRECT.

25   **Q.**    AND HE'S BEING REFERRED TO THE SURGICAL HOSPITAL AT LSP, I

1   GUESS -- BEING REFERRED TO A SURGICAL HOSPITAL -- LET ME LEAVE

2   IT THERE -- BECAUSE HIS STUMP IS COLD TO THE TOUCH, WHICH IS A

3   PROBLEM OBVIOUSLY.  RIGHT?

4   **A.**   IT'S AN URGENT PROBLEM.

5   **Q.**   OKAY.

6   **A.**   IN FACT, IT MAY BE AN EMERGENCY PROBLEM.

7   **Q.**   THE VERY NEXT DAY HE IS SEEN WITH THIS REFERRAL SLIP,

8   MAY 11, 2010.  THIS IS DOCUMENT NO. 55023.  HE'S HAD A DRESSING

9   CHANGE WITH STERILE WATER, AND THEN HELP ME OUT, SOMETHING

10  WOUND WITH -- OF HIS STUMP.  RIGHT?

11  **A.**   YOU'RE SAYING THIS IS AN EVALUATION DOCUMENTATION?

12  **Q.**   I'M JUST SAYING IT'S A REFERRAL SLIP.

13  **A.**   IT'S ANOTHER REFERRAL SLIP, YES.

14  **Q.**   ON MAY 13, WE'VE GOT A CONSULTANT REFERRAL SLIP.  THIS IS

15  DOCUMENT NO. 54925, A 71-YEAR-OLD MAN.  THIS MAN IS 71 YEARS

16  OLD WITH THESE HEALTH PROBLEMS AND THE AMPUTATION.  RIGHT?  AND

17  VASCULAR DISEASE.  RIGHT?

18  **A.**   I'M SORRY.  YOUR WORDS SLURRED A LITTLE BIT AND I COULDN'T

19  HEAR.

20  **Q.**   MY APOLOGIES.  THIS GENTLEMAN IS 71 YEARS OLD WITH

21  VASCULAR DISEASE AND THESE AMPUTATIONS AND DIABETES AND THESE

22  OTHER ISSUES.  CORRECT?

23  **A.**   CORRECT.

24  **Q.**   OKAY.  AND THEY STILL GET HIM REFERRED OUT HERE TO A

25  VASCULAR SURGERY ASAP.  DO YOU SEE THAT?

**A.**    YES.

**Q.**    THE PATIENT, ON MAY 14, 2010, REFUSED CARE.  DO YOU SEE THAT?

**A.**    YES.

**Q.**    OKAY.  AND THIS IS DOCUMENT NO. 54934.

**A.**    YES.

**Q.**    ON MAY 10TH -- I'M SORRY, MAY 27, 2010, HE IS SEEN IN THE PHYSICIAN'S CLINIC.  THIS IS DOCUMENT NO. 55017, STILL ADDRESSING HIS LEFT ABOVE-THE-KNEE SITE.  CORRECT?

**A.**    HE'S EVALUATING -- HE'S ONLY EVALUATING -- WELL, IT'S NOT CLEAR WHAT HE'S DOING.

**Q.**    OKAY.  HE'S COORDINATING WITH THE VASCULAR CLINIC.  RIGHT?

**A.**    SO THIS NOTE IS UNCLEAR, AND SO I CAN ONLY SPECULATE, BUT HE'S SAYING -- CAN YOU PUT IT BACK UP?

**Q.**    OH, I'M SORRY.

**A.**    NO, I WASN'T DONE.  HE'S SAYING THAT THE LEFT SITE HAS NECROSIS REPORTEDLY.  I MEAN, THE WAY I READ THAT IS IF HE'S SAYING THAT REPORTEDLY THE LEFT NECROSIS IS GETTING LARGER, THAT THAT'S NOT AN EVALUATION.  SO I'M ASSUMING THAT THIS IS NOT REALLY A PATIENT -- A PERSON-TO-PERSON ENCOUNTER, THAT THIS IS PROBABLY JUST A CHART NOTE WHERE THE DOCTOR IS SAYING THAT THE NECROSIS IS REPORTEDLY GETTING LARGER, AND WILL COORDINATE WITH THE VASCULAR CLINIC FOR AN APPOINTMENT, THAT HE NEEDS AN ANGIOGRAM.

**Q.**    DOCTOR, YOU'VE GOT TWO INITIALS ON THIS CHART.

1    **A.**    YES.

2    **Q.**    WHICH IS THE SAME INDIVIDUAL OF -- MADE THE NOTE AND MADE

3    THE RECOMMENDATION AT THE BOTTOM.  RIGHT?

4    **A.**    YES.

5    **Q.**    MAY 28TH, THIS IS DOCUMENT NO. 55003.  AGAIN, THIS IS A

6    REFERRAL TO EARL K. LONG ER FOR HIS PROBLEM WITH HIS LEFT

7    STUMP.  DO YOU SEE THAT?

8    **A.**    YES.

9    **Q.**    ON JUNE 5, 2010, WE HAVE AN EMERGENCY RUN WHERE HE HAS

10    SOME DIFFICULTIES.  THE AMBULANCE GETS HIM AND BRINGS HIM IN.

11    RIGHT?

12    **A.**    THIS IS AFTER HE WAS HOSPITALIZED, I BELIEVE.  CORRECT?

13    **Q.**    OKAY.

14    **A.**    YEAH.

15    **Q.**    SO HE'S GOTTEN TREATMENT AT THE HOSPITAL BY THIS TIME.

16    RIGHT?

17    **A.**    YES.

18    **Q.**    OKAY.  HE WAS SENT EMERGENTLY TO EARL K. LONG ON JUNE 1.

19    RIGHT?

20    **A.**    I'M NOT SURE WHICH HOSPITAL HE WENT TO.

21    **Q.**    OKAY.  BUT ON JUNE 1, HE WENT EMERGENTLY TO THE HOSPITAL?

22    **A.**    HE WENT TO A HOSPITAL, CORRECT.

23    **Q.**    AND THEN ON JUNE 5, HE WAS TRANSFERRED TO A HOSPICE

24    PROGRAM.  RIGHT?

25    **A.**    HE WAS RETURNED FROM THE HOSPITAL, CORRECT.

1  Q.   OKAY.  AND THEN -- AND THEN TAKEN INTO THE HOSPICE

2  PROGRAM.  RIGHT?

3  A.   HE WAS IN HOSPICE, CORRECT.

4  Q.   AND THEN ON JUNE 13, 2010, THE GENTLEMAN THEN DIED.

5  CORRECT?

6  A.   YES.

7  Q.   OKAY.  CPR IS INITIATED AND HE DIES?

8  A.   YES.

9  Q.   NOW, DOCTOR, YOU'VE ALLUDED TO IT A FEW TIMES.  DO YOU

10 KNOW HOW CARE -- THIS IS 2010 WHEN THIS OCCURRED, IN JUNE OF

11 2010.  DO YOU KNOW HOW CARE HAS CHANGED FROM JUNE OF 2010 TO

12 THE 2016 TIME FRAME?

13 A.   I MEAN, WITH RESPECT TO REFERRALS OUT, I DON'T THINK THERE

14 WAS MUCH DIFFERENCE, BUT. . .

15 Q.   LET ME DO THIS FOR YOU.

16 A.   OKAY.

17 Q.   IN 2010, LSP RELIED HEAVILY UPON EARL K. LONG HOSPITAL FOR

18 ITS OUTPATIENT SERVICES.  ARE YOU AWARE OF THAT?

19 A.   I KNOW THEY USED EARL K. LONG, CORRECT.

20 Q.   EARL K. LONG CLOSED BY 2013.  ARE YOU AWARE OF THAT?

21 A.   I'M NOT SURE THAT -- I MEAN, I HEARD IT CLOSED, BUT I'M

22 NOT SURE WHEN.

23 Q.   ALL RIGHT.  AND THEN LSU, IN THE MEANTIME, STOPPED

24 PROVIDING SERVICES TO LSP.  ARE YOU AWARE OF THAT?

25 A.   NO.  I MEAN, I HAVE HEARD THAT THERE WERE SERVICE CHANGES,

04:13    1    BUT I'M NOT SPECIFICALLY AWARE OF DATES, ET CETERA.

2    **Q.**    AND IN THE MEANTIME, BECAUSE OF HURRICANE KATRINA, THE

3    HOSPITAL IN NEW ORLEANS WAS STILL NOT UP AND THEY HAD AN

4    INTERIM LSU HOSPITAL DOWN THERE THAT WAS UNABLE TO PROVIDE CARE

5    TO LSP.  ARE YOU AWARE OF THAT?

6    **A.**    NOT IN DETAIL, NO.

7    **Q.**    ARE YOU AWARE THAT EVEN WITH ALL THE MONEY THAT WAS

8    AVAILABLE, THAT THERE WERE NOT SIMPLY NOT PROVIDERS TO PROVIDE

9    SERVICES TO LSP PATIENTS IN THE 2013 TIME FRAME?

10    **A.**    THERE WERE NO PROVIDERS TO ACCEPT PATIENTS.

11    **Q.**    THERE WAS A SHORTAGE OF PROVIDERS, AN EXTREME SHORTAGE OF

12    PROVIDERS TO TAKE PATIENTS, THAT'S CORRECT.

13    **A.**    WELL, IT'S A LITTLE -- I MEAN, IT'S YOUR RESPONSIBILITY,

14    SO I SUPPOSE YOU SHOULD FIND ONE.

15    **Q.**    AND IF THERE ARE SIMPLY NONE AVAILABLE BECAUSE OF THE

16    SITUATION, DID YOU EVEN LOOK AT THAT AS YOU DID YOUR REPORT?

17    **A.**    WELL, LET ME JUST SAY THIS.  SO --

18    **Q.**    ANSWER MY QUESTION, PLEASE.  DID YOU --

19    **A.**    NO, I AM BY WAY OF MY ANSWER.  IT'S SLIGHTLY ROUNDABOUT.

20    IF YOU THINK IT'S INAPPROPRIATE, JUST LET ME KNOW AND I'LL

21    STOP.  BUT WHEN I WAS IN NEW MEXICO, WE WOULD HAVE PATIENTS WHO

22    WE SENT OUT OF STATE.  I MEAN, YOU HAVE TO REFER PEOPLE FOR

23    WHAT THEY NEED, AND WHEN IT'S REQUIRED, YOU -- AND I THINK EVEN

24    IN THE COMMUNITY, THAT'S WHAT HAPPENS.  PEOPLE WHO ARE URGENTLY

25    SICK ARE SENT ELSEWHERE.  SO I JUST THINK THAT IT'S SOMETHING

1   THAT YOU NEED TO ADDRESS.

2   **Q.**   DID YOU TAKE INTO ACCOUNT THESE DIFFICULTIES THAT THIS --

3   THAT LSP WAS FACING AT THAT PERIOD OF TIME DID YOU REACH YOUR

4   CONCLUSIONS THAT THEY WERE BEING DELIBERATELY INDIFFERENT TO

5   THE CARE AND FOR THESE PRISONERS?

6   **A.**   THIS GENTLEMAN HAD A --

7   **Q.**   I'M NOT TALKING ABOUT THIS GENTLEMAN.  ANSWER MY QUESTION.

8          **MR. DUBNER:**  YOUR HONOR, HE KEEPS TALK OVER THE

9   WITNESS AS HE'S TRYING TO ANSWER.

10         **THE COURT:**  ARE YOU FINISHED ASKING YOUR QUESTION?

11         **MR. ARCHEY:**  I WAS, BUT THE PROBLEM IS, JUDGE, HE'S

12  NOT BEING RESPONSIVE, SO . . .

13         **THE COURT:**  ANSWER THE --

14         **THE WITNESS:**  WELL, I'M SAYING THIS GENTLEMAN HAD TWO

15  YEARS OF A CONDITION FOR WHICH HE SHOULD HAVE BEEN REFERRED AND

16  WAS NOT.  WHEN IT BECAME AN EMERGENCY, WHAT YOU'RE NOW SAYING

17  IS THAT WE HAD A SITUATION DURING THAT TIME WHEN WE HAD THE

18  EMERGENCY WHERE WE DIDN'T HAVE SUFFICIENT DOCTORS.

19  **BY MR. ARCHEY:**

20  **Q.**   THAT IS NOT WHAT I'M SAYING.

21  **A.**   OKAY.  THEN I APOLOGIZE.

22  **Q.**   I'M ASKING YOU, DID YOU TAKE INTO ACCOUNT THE DIFFICULTIES

23  AND LACK OF RESOURCES AND PROVIDERS THAT LSP WAS FACING IN THE

24  2012 AND '13 TIME PERIOD AS YOU PREPARED YOUR REPORT?  DID YOU

25  TAKE THAT INTO ACCOUNT?  THAT'S ALL I WANT TO KNOW RIGHT NOW.

04:15   1    **A.**   NO, BECAUSE FOR THIS GENTLEMAN, HE HAD --

2    **Q.**   I'M NOT ASKING ABOUT THIS GENTLEMAN.

3            **MR. DUBNER:**  OBJECTION, YOUR HONOR.  HE IS TALKING

4    OVER THE WITNESS.

5            **THE WITNESS:**  BUT IT MATTERS.

6            **THE COURT:**  WHAT'S YOUR QUESTION, MR. ARCHEY?

7    **BY MR. ARCHEY:**

8    **Q.**   I'M NOT ASKING ABOUT THIS GENTLEMAN.  I JUST WANT TO KNOW

9    DID YOU TAKE INTO ACCOUNT THE LACK OF RESOURCES AND LACK OF

10    PROVIDERS THAT WERE NOT AVAILABLE TO LSP DUE TO ALL THIS

11    CONVERGENCE OF CIRCUMSTANCES IN THE 2012 AND 2013 TIME PERIOD?

12    **A.**   NO, BECAUSE I THINK IT COULD HAVE BEEN ADDRESSED.

13    **Q.**   BUT YOU DIDN'T TAKE IT INTO ACCOUNT, DID YOU?

14            **THE COURT:**  HE SAID NO, HE DIDN'T TAKE IT INTO

15    ACCOUNT.

16            **THE WITNESS:**  I SAID NO.

17    **BY MR. ARCHEY:**

18    **Q.**   ALL RIGHT.  LET'S LOOK AT THE NEXT ONE, PATIENT NO. 4 NOW.

19    **A.**   OKAY.

20    **Q.**   GIVE YOU A SECOND TO GET ORIENTED WITH THE NAME AND WHAT

21    HAVE YOU.

22    **A.**   YEAH, I DON'T NEED THE NAME.

23    **Q.**   OKAY.  FAIR ENOUGH.  ALL RIGHT, PATIENT NO. 4, HE WAS 70

24    YEARS OLD, HE HAD EMPHYSEMA, BRONCHITIS, OR BRONCHIALES,

25    ANGINA, AND HE SMOKED.  CORRECT?

1   **A.**   YES, I BELIEVE THAT'S TRUE.

2   **Q.**   OKAY.  AGAIN, ON AUGUST 10, 2009, THIS PATIENT REFUSED

3   CARE.  DO YOU SEE THAT?

4   **A.**   YES.

5   **Q.**   AND THIS IS DOCUMENT NO. 40383.  DO YOU SEE THAT?

6   **A.**   YES.

7   **Q.**   IN JUNE OF 2009, YOU HAD NOTED THAT HE HAD A 5-CENTIMETER

8   NECK MASS.  CORRECT?

9   **A.**   THAT'S CORRECT.

10   **Q.**   AND THEN -- GETS MY DATES IN BETTER ORDER -- IT WAS AFTER

11   THAT THAT HE REFUSED CARE.  CORRECT?

12   **A.**   CAN YOU GO THROUGH THOSE TWO AGAIN A LITTLE SLOWER?

13   **Q.**   YEAH.

14   **A.**   YEAH, YOU'RE FLIPPING THEM PRETTY FAST AND IT'S --

15   **Q.**   MY BAD, DOCTOR.  I APOLOGIZE.

16   **A.**   YEAH, THAT'S OKAY.

17   **Q.**   THE FIRST ONE IS JUNE 11, 2009.

18   **A.**   OKAY.

19   **Q.**   THAT'S THE MASS ON HIS NECK.  CORRECT?

20   **A.**   THAT'S CORRECT.

21   **Q.**   THEN IN AUGUST, TWO MONTHS LATER, HE'S REFUSING CARE.

22   CORRECT?

23   **A.**   THAT'S FOR -- YEAH, ONE VISIT, RIGHT.

24   **Q.**   AND BY AUGUST 13, HE'S REPORTING TO HAVE ANGINA EVERY

25   THREE DAYS, RELIEVED BY REST AND NITROGLYCERIN.  RIGHT?

1    **A.**    YES.

2    **Q.**    OKAY.  READY TO MOVE?

3    **A.**    YES, IF THAT'S ALL HAVE YOU ON THAT.

4    **Q.**    ON SEPTEMBER 2, 2009, THIS IS DOCUMENT NO. 43080, HE'S

5    BEEN SEEN BY A PROVIDER FOR A SURGICAL CLEARANCE.  CORRECT?  TO

6    HAVE THAT LIPOMA REMOVED.  CORRECT?

7    **A.**    YES.

8    **Q.**    AND HE'S NOTED TO STILL BE A SMOKER.  CORRECT?

9    **A.**    YES.

10   **Q.**    ON OCTOBER 7, 2009, HE WAS A NO SHOW FOR A GENERAL MEDICAL

11   CLINIC, HE HAD TO BE RESCHEDULED.  CORRECT?

12   **A.**    YES.

13   **Q.**    THIS IS DOCUMENT 40378.

14   **A.**    YES.

15   **Q.**    ON OCTOBER 14, 2009, ANOTHER REFUSAL TO ACCEPT CARE.  THIS

16   IS DOCUMENT NO. 40376.  DO YOU SEE THAT?

17   **A.**    THIS IS -- OKAY.

18   **Q.**    OKAY.

19   **A.**    CAN YOU -- OKAY.  SO HE'S REFUSING A FLU VACCINE.

20   **Q.**    OKAY.

21   **A.**    OKAY.

22   **Q.**    AND HE'S EXPLAINING TO HIM THAT IT WAS RECOMMENDED --

23   **A.**    HE'S NOT REFUSING TO BE SEEN; HE'S REFUSING A FLU VACCINE,

24   OKAY.

25   **Q.**    IT'S RECOMMENDED FOR HIM FOR HIS CHRONIC ILLNESS AND HIS

1    AGE.

2    **A.**    RIGHT.   RIGHT.   HE'S REFUSING A FLU VACCINE.   I SEE.

3    **Q.**    ALL RIGHT.   THIS IS A TRIP TICKET FOR JANUARY 22, 2010,

4    WHERE HE REFUSED TO GO ON A TRIP.   DO YOU SEE THAT?

5    **A.**    THIS IS TO THE -- IT'S NOT CLEAR.   THIS IS FOR SURGERY,

6    RIGHT, FOR HIS LIPOMA?

7    **Q.**    I BELIEVE SO, BUT I DON'T WANT TO MISSTATE, DOCTOR.   WE

8    ARE GOING TO KEEP GOING THROUGH THE RECORD.   THIS IS DOCUMENT

9    NO. 40366.

10    **A.**    OKAY.

11    **Q.**    ANOTHER DOCUMENT ON THE SAME DATE, JANUARY 22, 2010,

12    REFUSAL AT EKL, OR EARL K. LONG.

13    **A.**    RIGHT, THAT'S CORRECT.

14    **Q.**    THIS IS DOCUMENT NO. 40365, CORRECT?

15    **A.**    OKAY.

16    **Q.**    NEXT DOCUMENT IS FEBRUARY 2, 2010.   AGAIN, THIS IS TO BE

17    CLEARED FOR THE LIPOMA REMOVAL.   THIS IS DOCUMENT 40364.   AND

18    BOTTOM, IT SAYS ADVISED AGAINST -- WHAT'S THAT WORD, DOCTOR,

19    THE REMOVAL OF THE LIPOMA?

20    **A.**    RIGHT.   SO YOU'RE MOVING KIND OF FAST HERE, BUT THAT HE

21    REFUSED THE CLINIC AND THEN HE WENT TO THE CLINIC, OR WHAT'S

22    HAPPENING?

23    **Q.**    IT'S A LATER DATE.   JANUARY 22 IS WHEN HE REFUSED.

24    **A.**    OKAY.

25    **Q.**    OKAY.   FEBRUARY 2 IS WHERE --

1   **A.**   FEBRUARY 2, HE AGREED TO GO.

2   **Q.**   RIGHT.  AND WE'VE GOT AN ADVISE AGAINST.

3   **A.**   HE REFUSED, BUT THEN HE WENT, AND THEN THEY SAID THE BLOOD

4   PRESSURE WAS TOO LOW.  OKAY.  IT WAS KIND OF HIGH ON THE NOTE,

5   BY THE WAY.  IF YOU LOOK AT THE LEFT, THE DIASTOLIC IS 93,

6   THAT'S HIGH.  SO IT MAY HAVE BEEN LOW WHEN HE WENT FOR SURGERY.

7   OKAY.  I SEE IT.

8   **Q.**   THEN IN YOUR CHART, YOU NOTE THAT ON MARCH 25, 2010, THE

9   PROVIDER ADVISED AGAINST REMOVAL OF THE LIPOMA, CORRECT?

10  **A.**   YES.  AND SO TO BE CLEAR ABOUT WHAT HAPPENED, SO I -- IN

11  MY NOTES, I HAVE THAT THE BLOOD PRESSURE IS 166 OVER 93, WHICH

12  WAS ILLEGIBLE ON YOURS, BUT I THINK ON THE ORIGINAL IT WAS

13  THERE.  AND THAT'S HIGH, BUT THE DOCTOR NOTED THAT WHEN HE WENT

14  FOR THE SURGERY, THE BLOOD PRESSURE WAS TOO LOW AND THE DOCTOR

15  ADVISED AGAINST REMOVAL, BUT THE ELEVATED BLOOD PRESSURE WASN'T

16  ADDRESSED IS WHAT I WROTE.

17  **Q.**   OKAY.  AND THEN IT'S ABOUT SIX WEEKS LATER WHEN THE

18  PATIENT DIES, CORRECT?

19  **A.**   THE PATIENT DIES IN MAY OF 2010.

20  **Q.**   SO WE'VE GOT A 70-YEAR-OLD GENTLEMAN THAT'S A SMOKER THAT

21  HAD A LIPOMA THAT CANNOT BE SURGICALLY OPERATED ON.  CORRECT?

22  **A.**   WELL, I WOULDN'T CHARACTERIZE IT AS THAT.

23  **Q.**   THAT'S WHAT THE OUTSIDE PROVIDER CONCLUDED.  RIGHT?

24  **A.**   YOU DON'T KNOW WHAT THE CIRCUMSTANCES WERE.  AS I SAID,

25  WHEN THE DOCTOR SAW THE PATIENT, THE BLOOD PRESSURE WAS TOO

04:24   1   HIGH.  WHEN HE WAS SEEN IN THE SURGERY CLINIC, THE DOCTOR

2   DOCUMENTED THAT THE BLOOD PRESSURE WAS LOW.  BUT WE DON'T HAVE

3   THE SURGICAL NOTES SO IT'S NOT CLEAR EXACTLY WHAT HAPPENED, WHY

4   THEY DIDN'T SEE HIM.

5   **Q.**   YOUR NOTE SAID THAT THE LSU PROVIDER RECOMMENDED AGAINST

6   THE SURGERY.  RIGHT?

7   **A.**   HE DID, YES.  THAT'S WHAT MY NOTES SAYS.

8   **Q.**   OKAY.  LET'S GO TO THE NEXT ONE.

9   **A.**   WELL, CAN I BRING UP ONE OF THE NOTES THAT YOU BROUGHT UP?

10  BECAUSE I THINK YOU ARE MOVING QUICKLY.

11  **Q.**   I AM MOVING QUICKLY.  I'M TRYING NOT TO MOVE TOO QUICKLY.

12  **A.**   I UNDERSTAND.  SO GO BACK TO THE 9/2/09.

13  **Q.**   I REALLY DON'T CARE TO DO SO.

14  **A.**   OKAY.  THAT'S FINE.

15  **Q.**   YOU CAN DO THAT ON CROSS OR REBUTTAL WITH YOUR ATTORNEY.

16  **A.**   IT'S YOUR QUESTION.  SURE.  YEAH, SURE.

17  **Q.**   NOW I'D LIKE TO TALK ABOUT PATIENT NO. 5.

18  **A.**   OKAY.

19  **Q.**   IF YOU NEED A NAME, THERE IT IS.

20  **A.**   I'M GOOD.

21  **Q.**   OKAY.  THIS PATIENT HAD LUNG DISEASE AND STAGE 4 COLON

22  CANCER.  CORRECT?

23  **A.**   INITIALLY, THIS PATIENT HAD INTERSTITIAL LUNG DISEASE AND

24  PULMONARY EDEMA.

25  **Q.**   AND OVER A PERIOD OF TIME, HE WAS EVALUATED OVER 22 TIMES

04:25  1    FOR TWO YEARS PRIOR TO HIS DEATH.  CORRECT?

2    **A.**    THAT'S WHAT I WROTE, YES.

3    **Q.**    THAT GENTLEMAN IS GETTING PLENTY OF CARE, ISN'T HE?

4    **A.**    WELL, HE WAS SEEN 22 TIMES.

5    **Q.**    OKAY.  THIS IS A WEIGHT LOSS SITUATION.  LET'S GO THROUGH

6    YOUR NUMBERS ON YOUR REPORT HERE.  ON JULY 26, 2012, THIS

7    GENTLEMAN'S WEIGHT WAS 192.

8    **A.**    OKAY.

9    **Q.**    DO YOU SEE THAT?

10   **A.**    YES.

11   **Q.**    READY TO MOVE?

12   **A.**    YES.

13   **Q.**    OKAY.  ON JUNE 5, 2013, A WHOLE YEAR LATER, HIS WEIGHT IS

14   NOW 183.  CORRECT?

15   **A.**    YOU'RE ONLY SHOWING THE BOTTOM PART.  JUST SLIDE IT DOWN A

16   LITTLE BIT.

17   **Q.**    I APOLOGIZE.

18   **A.**    YEAH, THAT'S OKAY.

19   **Q.**    LET ME MOVE BACK OUT.

20   **A.**    IT'S 183, CORRECT.

21   **Q.**    SO WE'VE GOT A 9-POUND LOSS OVER A YEAR, NOT PARTICULARLY

22   ANYTHING TO GET CONCERNED ABOUT, IS IT?

23   **A.**    WELL, IT DEPENDS.  I MEAN, IT'S A NINE-POUND LOSS.

24   **Q.**    OVER A YEAR.

25   **A.**    CORRECT.  CAN YOU LOSE NINE POUNDS IN A YEAR?  I'M JUST

1   KIDDING.

2   **Q.**   I PROBABLY COULD LOSE NINE POUNDS.

3   **A.**   I'M JUST KIDDING, AND I APOLOGIZE.

4   **Q.**   ALL RIGHT.  ON AUGUST 22, 2013, NOW HIS WEIGHT'S DOWN TO

5   174.  SO NOW WE'VE GOT ANOTHER NINE-POUND LOSS.  RIGHT?

6   **A.**   THAT'S CORRECT.

7   **Q.**   ON DECEMBER 10 2013, THOUGH, HE GAINS TWO POUNDS.  RIGHT?

8   **A.**   THAT'S CORRECT.

9   **Q.**   OKAY.  ON JANUARY 6, 2014, HIS WEIGHT IS 172, HE'S NOW

10  LOST FOUR ADDITIONAL POUNDS?

11  **A.**   FROM THE LAST VISIT, CORRECT.

12  **Q.**   THAT'S RIGHT.  IF YOU GO BACK TO AUGUST OF 2013, HE IS TWO

13  POUNDS DIFFERENT FROM THERE, WHICH IS REALLY THE SAME WEIGHT,

14  IS IT NOT?

15  **A.**   YEAH.  I THINK YOU'RE RIGHT, YEAH.

16  **Q.**   DOCTOR, THIS IS A JULY 16, 2014, WHERE HIS WEIGHT IS NOW

17  NOTED TO BE, ON PAGE 2 HERE, 170 POUNDS.  STILL IN THE SAME

18  VICINITY IT HAS BEEN FOR ALMOST TWO YEARS.  CORRECT?

19  **A.**   WELL, IT'S 170 POUNDS.  YOU'RE COMPARING IT TO WHAT OTHER

20  DATE?

21  **Q.**   WELL, THROUGHOUT ALL OF 2013, 172, 174, 176.

22  **A.**   RIGHT.  I MEAN, IN JULY OF 2012, IT WAS 192.  AND JUNE OF

23  2013, IT WAS 182, AND SO I THINK IT'S GOING DOWN.

24  **Q.**   THE LAST DOCUMENT IS DOCUMENT NO. 55650, OCTOBER 30 OF

25  2014.  WE HAVE A REFERRAL FOR SEVERAL THINGS TO AN OUTSIDE

04:29   1   PROVIDER.  DO YOU SEE THIS, TO THE LSU HEALTH SYSTEM?

        2   **A.**   YES, THIS IS THE ONE THAT SAYS 58-YEAR-OLD WITH UPPER

        3   ABDOMINAL PAIN FOR SEVEN MONTHS, RIGHT.

        4   **Q.**   OKAY.  AND THIS IS DOCUMENT NO. 55641.  RIGHT?

        5   **A.**   I DIDN'T SEE THE NUMBER, BUT THAT'S -- I DON'T NEED TO SEE

        6   THE NUMBER.

        7   **Q.**   THAT'S MY APOLOGY.

        8   **A.**   YEAH, I'M OKAY.

        9   **Q.**   ON NOVEMBER 6, 2014, IT SAYS OFFENDER OUT ON HOSPITAL TRIP

       10   TODAY.

       11   **A.**   THAT'S WHAT IT SAYS.

       12   **Q.**   DOCUMENT NO. 55633.  SO HE'S GETTING CARE AT THE HOSPITAL.

       13   CORRECT?

       14   **A.**   IT SAYS HE'S OUT ON A TRIP.

       15   **Q.**   LET ME SHOW YOU THE NOTE FROM THE LSU PROVIDER.  THIS IS

       16   NOVEMBER 8, 2014, DOCUMENT NO. 55620, DOCUMENTING THE CARE THE

       17   GENTLEMAN IS GETTING.  CORRECT?

       18   **A.**   IT'S A NOTE FROM AN OUTSIDE SPECIALIST, YES.

       19   **Q.**   AN OUTSIDE SPECIALIST DIAGNOSED THIS GENTLEMAN WITH LIKELY

       20   STAGE 4 COLON CANCER.  CORRECT?

       21   **A.**   YES.

       22   **Q.**   THE HOSPITAL DOES A SURGERY ON THIS GENTLEMAN.  CORRECT?

       23   **A.**   I'D HAVE TO REVIEW MY NOTES, BUT I BELIEVE THEY DID, YES.

       24   **Q.**   OKAY.  THIS IS A NOVEMBER 13, 2014, NOTE.  55583 IS THE

       25   DOCUMENT NUMBER.

1   **A.**   CORRECT.

2   **Q.**   SO HE GETS A SURGERY ABOUT AN OUTSIDE PROVIDER.  CORRECT?

3   **A.**   THAT'S CORRECT.

4   **Q.**   HE THEN DEVELOPS COMPLICATIONS FROM THAT SURGERY.

5   CORRECT?  HERE IS A NOVEMBER 14, 2014, NOTE.  THIS IS DOCUMENT

6   NO. 55601.  LSP IS SENDING HIM OUT WITH A ILH SURGERY ONE DAY

7   AFTER COMING BACK FROM THE SURGERY.  RIGHT?

8   **A.**   YES.  HE HAD -- HIS WOUND SEPARATED.

9   **Q.**   AND THAT'S MY NEXT CHART, WHICH SHOWS AN ADMIT DATE OF

10  NOVEMBER 15, 2014, AT THE LSU HOSPITAL.  THIS IS DOCUMENT NO.

11  55597, REFERS TO WOUND ADHESION AND AN ANASTOMOTIC LEAK.  WHAT

12  ARE THOSE, DOCTOR?

13  **A.**   SO BASICALLY THE WOUND SEPARATED AND THERE WAS LEAKAGE

14  THROUGH THE WOUND.

15  **Q.**   AND THAT COMPLICATION WAS FROM THE SURGERY THAT WAS

16  PERFORMED BY THE LSU PROVIDER.  CORRECT?

17  **A.**   THAT'S CORRECT.

18  **Q.**   THE GENTLEMEN THEREAFTER HAD A STROKE AND DIED.  RIGHT?

19  **A.**   THAT'S CORRECT.

20  **Q.**   ALL RIGHT, DOCTOR, LET'S GO TO CHART NO. 6.  THERE IS A

21  NAME IF THAT HELPS YOU STAY ORIENTED.

22  **A.**   I'M GOOD.

23  **Q.**   OKAY.  THIS PATIENT WAS A 73-YEAR-OLD GENTLEMAN WITH

24  CORONARY HEART DISEASE, HYPERTENSION, DIABETES, AND CHRONIC

25  KIDNEY DISEASE.  CORRECT?

1  **A.**   HE HAD MULTIPLE PROBLEMS, YES.

2  **Q.**   AND HE WAS SEEN AT LEAST NINE TIMES BY A OUTSIDE HEART

3  SPECIALIST.  CORRECT?

4  **A.**   HE WAS SEEN A NUMBER OF TIMES.  WITHOUT REVIEWING THE

5  RECORD RIGHT AWAY, I'M NOT SURE HOW MANY.

6  **Q.**   OKAY.  THIS IS DOCUMENT NO. 8438, DECEMBER 24, 2010,

7  OCHSNER MEDICAL CENTER.  CORRECT?

8  **A.**   12/24/10, HE SAW AN OUTSIDE SPECIALIST, YES.

9  **Q.**   HERE'S THE NOTE FROM THE OUTSIDE SPECIALIST WHO IS A

10  CARDIOVASCULAR -- RESULT.  DO YOU SEE THAT?

11  **A.**   THAT'S AN ECHOCARDIOGRAM REPORT.

12  **Q.**   OKAY.  THIS IS APRIL 12, 2012, A TELEMEDICINE CLINIC BY

13  THE OUTSIDE PROVIDER.  IT'S DOCUMENT NO. 8378.  ANOTHER CONTACT

14  WITH AN OUTSIDE PROVIDER FOR HIS CONDITION.  CORRECT?

15  **A.**   YES.

16  **Q.**   THE NEXT DOCUMENT IS MARCH 8, 2013, ANOTHER OUTSIDE

17  PROVIDER AT LSU, I BELIEVE.  AND IT'S DOCUMENT NO. 8321.  DO

18  YOU SEE THAT?

19  **A.**   IT'S 3/8/13, YES, I SEE THIS.

20  **Q.**   ON JUNE 5, 2013, THIS GENTLEMAN WAS SENT TO THE

21  CARDIOVASCULAR INSTITUTE OF THE SOUTH TO BE SEEN.  THIS IS

22  DOCUMENT NO. 8352.  DO YOU SEE THAT?

23  **A.**   YES.

24  **Q.**   ON AUGUST 23, 2013, THIS GENTLEMAN WAS SENT TO LANE

25  REGIONAL MEDICAL CENTER, AND THIS IS DOCUMENT NO. 8245.  DO YOU

1    SEE THAT?

2    **A.**    YES.  I'M NOT SURE EXACTLY WHAT THIS DOCUMENT IS.  IT'S

3    A -- CAN YOU ENLARGE IT A LITTLE?  JUST ENLARGE IT JUST A

4    LITTLE?

5    **Q.**    I'LL TRY.

6    **A.**    I'M GETTING REFRACTION FROM THE LIGHT.

7    **Q.**    DOES IT SAY ECHO --

8    **A.**    YEAH, IT'S A CONCLUSION OF THE ECHOCARDIOGRAM.

9    **Q.**    OKAY.  THE NEXT DOCUMENT IS AUGUST 23, 2013.  THIS IS

10   DOCUMENT NO. 8311, AGAIN, AT THE CARDIOVASCULAR INSTITUTE OF

11   THE SOUTH.  BEING SEEN FOR HIS HEART PROBLEMS.  RIGHT?

12   **A.**    IT'S A DISCHARGE NOTICE THAT IT'S KIND OF -- YES, IT'S

13   SOME TYPE OF DISCHARGE NOTICE THAT HE IS BEING DISCHARGED.

14   **Q.**    SO HE'S ACTUALLY BEING ADMITTED TO THE HOSPITAL THERE?

15   **A.**    WELL, IT'S NOT CLEAR.

16   **Q.**    ALL RIGHT.  NEXT ONE -- DOCTOR, I'VE GOT GOOD COUNSEL

17   HELPING ME.  IN THE MIDDLE HERE ON THE FOLLOWUP PLAN, IT SAYS

18   "PATIENT HAD PREVIOUSLY DECLINED ICD FOR CARDIOMYOPATHY."  DO

19   YOU SEE THAT?

20   **A.**    I DO SEE THAT.

21   **Q.**    WHAT IS AN ICD?

22   **A.**    IT'S A DEFIBRILLATOR.

23   **Q.**    HE DECLINED IT?

24   **A.**    YES.

25   **Q.**    AND THIS IS NOT AN LSP NOTE, THIS IS AN OUTSIDE PROVIDER

1   NOTE.  RIGHT?

2   **A.**   YES.

3   **Q.**   THE NEXT NOTE IS OCTOBER 2, 2013, HE IS BEING SEEN AGAIN

4   BY AN OUTSIDE PROVIDER FOR HIS HEART CONDITION.  THIS IS

5   8/3/06. CORRECT?

6   **A.**   YES.

7   **Q.**   DECEMBER 11 --

8   **A.**   YOU JUST WANT ME TO ACKNOWLEDGE THAT THESE ARE REPORTS.

9   YOU DON'T WANT ME TO MAKE COMMENTS ON THE REPORTS THEMSELVES?

10  **Q.**   I WANT TO SHOW THAT THIS GENTLEMAN IS GETTING A LOT OF

11  CARE FOR HIS HEART CONDITION BY OUTSIDE PROVIDERS.

12  **A.**   OKAY.

13  **Q.**   THAT'S A FACT, IS IT NOT?

14  **A.**   HE IS GOING, RIGHT.

15  **Q.**   OKAY.

16  **A.**   THE QUESTION IS THE COORDINATION.

17  **Q.**   AND WE'LL TALK ABOUT THAT IN A SECOND.

18  **A.**   OKAY.

19  **Q.**   THE NEXT ONE IS DECEMBER 11, 2013, THIS IS DOCUMENT NO.

20  8294, ANOTHER OUTSIDE PROVIDER.  DO YOU SEE THAT?

21  **A.**   YES.

22  **Q.**   THIS OUTSIDE PROVIDER, UNDER ASSESSMENT, WHAT DOES IT SAY?

23  **A.**   THE ASSESSMENT IS REALLY HIGHLIGHTED IN A WAY THAT I CAN'T

24  READ ANYTHING ON IT.

25  **Q.**   DOESN'T IT SAY "NO DIAGNOSIS FOUND"?

**A.**    IF THAT'S THE ASSESSMENT.

**Q.**    THAT'S WHAT I'M ASKING.

**A.**    WELL, I CAN'T READ THE -- THE LINE ABOVE IT IS, ON MINE, VERY DARK, SO I CAN'T READ THAT.  IT SAYS NO DIAGNOSIS FOUND. I DON'T KNOW WHAT THAT'S IN THE CONTEXT OF.  HANG ON.  LET ME JUST -- YEAH, I THINK IT IS ASSESSMENT ABOVE IT.  SOMEBODY HIGHLIGHTED IT AND IT'S VERY DIFFICULT TO READ WITH THE GLARE HERE.

**Q.**    I THINK IT'S JUST THE WAY THE DOCUMENT --

**A.**    YEAH.

**Q.**    WOULD YOU LIKE TO LOOK AT THE ORIGINAL?

**A.**    NO, NO, THAT'S OKAY.  I DON'T THINK IT MATTERS.

**Q.**    ON MARCH 17, 2015, HE'S BACK AT LSU HEALTH.  THIS IS -- WHAT KIND OF REPORT IS THIS OR WHAT AM I LOOKING AT HERE, DOCTOR?

**A.**    YOU ARE LOOKING AT AN ECHOCARDIOGRAM REPORT, I BELIEVE.

**Q.**    OKAY.  AND THIS IS DOCUMENT NO. 8263.  CORRECT?

**A.**    YOU'RE -- YOU GOT TO LOWER IT A LITTLE BIT IF YOU WANT ME TO READ THE DOCUMENT.

**Q.**    I'M SORRY.

**A.**    I MEAN, I DON'T NEED TO READ THE DOCUMENT NUMBER.

**Q.**    I'M SORRY.

**A.**    I TRUST YOU.

**Q.**    ALL RIGHT.  THE NEXT ONE IS MARCH 17, 2015, STILL AN ECHOCARDIOGRAM REPORT.  CORRECT?

04:39 1   **A.**   THAT'S CORRECT, YES.

2   **Q.**   APRIL 25, 2015, AT LANE REGIONAL MEDICAL CENTER, HE

3   ARRIVES ON APRIL 25, 2015.  CORRECT?

4   **A.**   YES.

5   **Q.**   AND BEING TREATED FOR HIS HEART CONDITION.  RIGHT?

6   **A.**   THIS IS BASICALLY AN ORDER FORM FOR SOME VISIT.

7   **Q.**   OKAY.

8          **MR. DUBNER:**  AND, YOUR HONOR, I'D JUST LIKE TO OBJECT

9   ON THE BASIS OF THE CUMULATIVE.  THIS IS IN EVIDENCE ALREADY,

10   AND IT WAS SUMMARIZED IN DR. PUISIS' REPORT THAT THESE VISITS

11   OCCURRED.  WE'VE SPENT A LOT OF TIME --

12          **THE COURT:**  WE ARE GOING TO CLOSE EVIDENCE FOR THE

13   DAY.

14             DR. PUISIS, YOU CAN STEP DOWN.

15             MR. ARCHEY, THERE'S 45 -- YOU MAY STEP DOWN,

16   SIR.  THERE ARE 45 OF THESE PATIENTS AND YOU'RE ON NUMBER 6.

17   ARE YOU GOING TO GO THROUGH EACH ONE OF THESE?

18          **MR. ARCHEY:**  I'M GOING TO GO THROUGH -- THE SHORT

19   ANSWER IS YES.

20          **THE COURT:**  NO.  THE SHORT ANSWER IS NO, ABSOLUTELY

21   NOT.

22          **MR. ARCHEY:**  ALL RIGHT, YOUR HONOR.

23          **THE COURT:**  SO TAKE THE EVENING AND FIGURE OUT WHAT

24   YOU ARE DOING BECAUSE WE'RE NOT GOING TO DO THIS.  WE'RE NOT

25   GOING TO BE HERE FOR FOUR DAYS TO GO THROUGH RECORDS THAT THE

04:40

1   COURT CAN REVIEW.  IF YOU WANT TO SUMMARIZE THEM AND DRAW SOME

2   POINTS WITH THE DOCTOR, YOU CAN DO THAT, BUT WE'RE NOT GOING TO

3   GO THROUGH EVERY SINGLE CHART.

4           **MR. ARCHEY:**  IF I COULD SAY THIS, YOUR HONOR.  HE

5   SAID HE WENT THROUGH 14, AND I WAS GOING THROUGH THOSE, AND

6   THEN JUST CONFIRM HE DIDN'T DO THE REST.

7           **THE COURT:**  AND THEN YOU'RE GOING TO GO THROUGH 15

8   THROUGH 45 WITH THE OTHER EXPERT WITNESSES?  THAT'S NOT GOING

9   TO HAPPEN.  FIGURE OUT WHAT YOU WANT TO LEARN, SUMMARIZE WHAT

10  YOU WANT TO DO, GET TO THE POINT, AND LET'S MOVE ON.  THIS IS

11  NOT A DEPOSITION, AND YOU'RE NOT GOING TO WASTE THE COURT'S

12  TIME.  IT'S THAT SIMPLE.  YOU SHOULD BE SHOOTING WITH A RIFLE,

13  NOT A SHOTGUN.

14          **MR. ARCHEY:**  YOUR HONOR, IF I MAY RESPOND?

15          **THE COURT:**  YOU MAY.

16          **MR. ARCHEY:**  THE REASON FOR THIS IS THE GENTLEMAN HAS

17  SAID THAT IT'S ALL ABOUT CLINICAL CARE, AND I'M SHOWING THAT

18  THEY'RE GETTING CLINICAL CARE.  THEY'RE GETTING TAKEN TO

19  OUTSIDE PROVIDERS, THEY'RE GETTING SEEN.

20          **THE COURT:**  YOU KNOW WHAT, I'M NOT GOING TO TELL YOU

21  HOW TO PRACTICE LAW.  I'VE TOLD YOU WHAT THE COURT'S RULING IS.

22  YOU CAN FIGURE OUT A DIFFERENT WAY TO DO THIS.  IF YOU WANT TO

23  SHOW THAT THEY'RE GETTING CLINICAL CARE, IT MIGHT BE SOMETHING

24  LIKE THIS:  DOCTOR, WOULD YOU AGREE WITH ME THAT THIS GENTLEMAN

25  RECEIVED 30 CLINIC VISITS?  MOVE ON.

1    I CAN READ THAT THEY GOT CLINICAL CARE, MR.

2  ARCHEY.  I'M NOT BLIND.  IT'S A BENCH TRIAL.  WE'RE NOT GOING

3  TO BE HERE ALL DAY, AND IF THIS WAS A JURY TRIAL YOU WOULDN'T

4  BE DOING THAT EITHER.  SO, FIGURE IT OUT, COME TO THE POINT.

5  AND HERE'S THE ALTERNATIVE.  I'M GOING TO GIVE YOU ABOUT TWO

6  HOURS IN THE MORNING, AND THEN I'M GOING TO TELL YOU YOUR

7  CROSS-EXAMINATION IS OVER, SO YOU MIGHT WANT TO FIGURE OUT WHAT

8  YOU WANT TO ACCOMPLISH IN A COUPLE OF HOURS.  AND WE'LL DO THE

9  SAME THING WITH ALL THE WITNESSES, BUT WE'RE NOT GOING TO BE

10  HERE FOR THREE WEEKS GOING OVER EVERY SINGLE PAGE.  THERE YOU

11  GO.

12    WE WILL RECONVENE TOMORROW MORNING AT 9:00 A.M.

13    **(PROCEEDINGS RECESSED UNTIL 10/11/2018.)**

14    **CERTIFICATE**

15    I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

16  UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

17  CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

18  THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

19  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20

21    *Shannon Thompson*

22    SHANNON THOMPSON, CCR,

23    OFFICIAL COURT REPORTER

24

25