1

2                    UNITED STATES DISTRICT COURT

3                    MIDDLE DISTRICT OF LOUISIANA

4

5   JOSEPH LEWIS JR., ET AL      *    CIVIL ACTION

6   VERSUS                       *    NO. 15-318

7   BURL CAIN, ET AL             *    OCTOBER 15, 2018

8   * * * * * * * * * * * * * * *

9

10                              DAY 5
                        BENCH TRIAL BEFORE
11                THE HONORABLE SHELLY D. DICK
               UNITED STATES CHIEF DISTRICT JUDGE
12

13  APPEARANCES:

14  FOR THE PLAINTIFFS:            THE PROMISE OF JUSTICE
                                   INITIATIVE
15                                 BY:  MERCEDES H. MONTAGNES, ESQ.
                                        AMANDA C. ZARROW. ESQ.
16                                      MEREDITH ANGELSON, ESQ.
                                        NISHI KUMAR, ESQ.
17                                 636 BARONNE STREET
                                   NEW ORLEANS, LOUISIANA 70113
18
                                   ACLU OF LOUISIANA
19                                 BY:  BRUCE W. HAMILTON, ESQ.
                                   P.O. BOX 56157
20                                 NEW ORLEANS, LOUISIANA 70156

21                                 COHEN MILSTEIN SELLERS & TOLL
                                   PLLC
22                                 BY:  JEFFREY B. DUBNER, ESQ.
                                   1100 NEW YORK AVE NW, SUITE 500
23                                 WASHINGTON, DC 20005

24                                 THE CAPITAL APPEALS PROJECT
                                   BY:  ERICA L. NAVALANCE, ESQ.
25                                 636 BARONNE STREET
                                   NEW ORLEANS, LOUISIANA 7013

```
 1

 2                                    SOUTHERN POVERTY LAW CENTER
                                      BY:  JARED F. DAVIDSON, ESQ.
 3                                         JAMILA A. JOHNSON, ESQ.
                                      1055 ST. CHARLES AVE., SUITE 505
 4                                    NEW ORLEANS, LOUISIANA 70130

 5    FOR THE DEFENDANTS:            KANTROW SPAHT WEAVER &
                                     BLITZER
 6                                   BY:  RANDAL J. ROBERT, ESQ.
                                         CONNELL L. ARCHEY, ESQ.
 7                                       KEITH FERNANDEZ, ESQ.
                                     P.O. BOX 2997
 8                                   BATON ROUGE, LOUISIANA 70821

 9                                   SHOWS CALI & WALSH LLP
                                     BY:  MARY E. ROPER, ESQ.
10                                       JOHN C. CONINE JR., ESQ.
                                         CAROLINE T BOND, ESQ.
11                                       JEFFREY K. CODY, ESQ.
                                     628 ST. LOUIS STREET
12                                   BATON ROUGE, LOUISIANA 70802

13    OFFICIAL COURT REPORTER:       SHANNON L. THOMPSON, CCR.
                                     UNITED STATES COURTHOUSE
14                                   777 FLORIDA STREET
                                     BATON ROUGE, LOUISIANA 70801
15                                   (225) 389-3567

16         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                  COMPUTER-AIDED TRANSCRIPTION SOFTWARE
17

18

19

20

21

22

23

24

25
```

1                                 **INDEX**

2                                                         <u>PAGE</u>

3    **PLAINTIFFS' WITNESSES**

4     OTTO BARRERA

5       DIRECT EXAMINATION CONTINUED BY MR. HAMILTON      6

6       CROSS-EXAMINATION BY MS. ROPER                    21

7       REDIRECT EXAMINATION BY MR. HAMILTON              51

8     CHARLES T. BUTLER

9       DIRECT EXAMINATION BY MR. DAVIDSON                54

10      CROSS-EXAMINATION BY MS. ROPER                    75

11    DANIEL PRINCE

12      DIRECT EXAMINATION BY MS. KUMAR                   93

13      CROSS-EXAMINATION BY ROBERT                       114

14      REDIRECT EXAMINATION BY MS. KUMAR                 130

15    SUSIE VASSALLO, M.D.

16      DIRECT EXAMINATION OF QUALIFICATIONS BY MR. DUBNEY   131

17      CROSS-EXAMINATION ON QUALIFICATIONS BY MR. ARCHEY   136

18      DIRECT EXAMINATION BY MR. DUBNEY                  138

19

20

21

22

23

24

25

1          **(OCTOBER 15, 2018)**

2          **THE COURT:**  GOOD MORNING.  BE SEATED.

3                  THE COURT HAS ONE THING THAT IT WANTS TO PUT ON

4     THE RECORD, GO TIGERS.

5                  AND THE COURT HAS ONE MATTER OF HOUSEKEEPING.

6     SOME THINGS HAVE ARISEN OVER THE WEEKEND THAT IS GOING TO

7     REQUIRE THE COURT'S ATTENTION THIS AFTERNOON.  I HAVE MET WITH

8     CHAMBER'S STAFF TO TRY TO FIGURE OUT HOW WE ARE GOING TO DO

9     THIS, AND WHAT WE'VE DECIDED TO DO IS WE WILL TAKE A 30-MINUTE

10    LUNCH BREAK -- BUT WE WILL ADJOURN UNTIL TOMORROW MORNING -- AT

11    2:30 TO ENABLE THE COURT TO TAKE CARE OF SOME OTHER MATTERS.

12    SO WITH THAT BEING SAID, HOPEFULLY THAT WILL ALLOW Y'ALL TO DO

13    SOME PLANNING.

14                ARE THE PLAINTIFFS READY WITH THEIR NEXT

15    WITNESS?

16          **MS. MONTAGNES:**  WE ARE, YOUR HONOR, BUT THERE'S JUST

17    ONE LITTLE HOUSEKEEPING MATTER.

18          **THE COURT:**  APPROACH.

19          **MS. MONTAGNES:**  THIS IS A USB CONTAINING EXHIBIT 405,

20    EXHIBIT 406, WHICH WERE THE CHAPTERS OF THE BOOK THAT WERE

21    PREVIOUSLY ADMITTED.  AND THEN WE'VE ADDED ON HERE EXHIBIT 407

22    AND 408, IF THE COURT IS SO INCLINED TO ADMIT THE IMAGES THAT

23    THE COURT TOOK JUDICIAL NOTICE OF.  WE THOUGHT IT WOULD BE

24    CLEANER IF THEY WERE SIMPLY ADMITTED AS EXHIBITS RATHER THAN US

25    FILING THEM SEPARATELY INTO THE RECORD.

1    **THE COURT:**  ARE THERE ANY OBJECTIONS?

2    **MR. ROBERT:**  I DIDN'T UNDERSTAND WHAT SHE WAS SAYING.

3    **THE COURT:**  OKAY.  TELL THEM WHAT 407 AND 408 ARE.

4    YOU KNOW WHAT 405 AND 406 ARE?

5    **MS. ROPER:**  YES, YOUR HONOR.  IF THOSE ARE THE GOOGLE

6    MAPS THAT WE JUST DISCUSSED, THEN WE'D HAVE NO OBJECTION.

7    **MR. ROBERT:**  THANK YOU, MARY.

8    **THE COURT:**  OKAY.  THERE'S NO OBJECTIONS THEN FROM

9    THE DEFENDANTS, ADMITTED.

10    **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

11    **THE COURT:**  NEXT WITNESS.

12    **MR. HAMILTON:**  YOUR HONOR, WE WOULD CALL OTTO BARRERA

13    BACK TO THE STAND.

14    **THE COURT:**  THAT'S CORRECT, WE DIDN'T FINISH HIM.  MY

15    BAD.

16    **MS. MONTAGNES:**  AND YOUR HONOR, PURSUANT TO THE

17    PARTIES' AGREEMENT, WOULD IT BE OKAY IF MR. DAVIS HAD ONE ARM

18    FREE SO HE WAS ABLE TO WRITE?

19    **THE COURT:**  YES, IT IS.

20    **MS. MONTAGNES:**  THANK YOU.

21    **THE COURT:**  WILL YOU PLEASE TAKE CARE OF THAT FOR ME,

22    SIR.

23    **OTTO BARRERA,**

24    HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS.

25    **THE COURT:**  RIGHT BACK UP HERE, SIR.  JUST TAKE THE

09:03  1    STAND AS YOU WERE FRIDAY AFTERNOON.

2              CAN YOU LET HIM HAVE HIS RIGHT HAND OR HIS

3    DOMINANT HAND FREE, PLEASE.

4              YOU ARE STILL UNDER OATH, SIR.

5              WHICH HAND DO YOU USE, YOUR RIGHT HAND OR YOUR

6    LEFT HAND?

7         **THE WITNESS:**  RIGHT HAND.

8         **THE COURT:**  WOULD YOU FREE HIS RIGHT HAND, PLEASE.

9         **THE WITNESS:**  THANK YOU.

10         **THE COURT:**  GO AHEAD, SIR.

11              **DIRECT EXAMINATION CONTINUED**

12   BY MR. HAMILTON:

13   **Q.**   GOOD MORNING, MR. BARRERA.

14   **A.**   GOOD MORNING.

15   **Q.**   WE HAD TO INTERRUPT YOUR TESTIMONY FOR THE WEEKEND, SO I'D

16   JUST LIKE TO BRIEFLY SUMMARIZE WHAT WE TALKED ABOUT ON FRIDAY.

17   **A.**   OKAY.

18         **MS. ROPER:**  OBJECTION, YOUR HONOR.  WE DON'T NEED A

19   SUMMARY, I DON'T BELIEVE.

20         **THE COURT:**  OVERRULED.  BE BRIEF.

21   BY MR. HAMILTON:

22   **Q.**   YOU TESTIFIED THAT YOU CAME TO ANGOLA WITH INJURIES FROM A

23   GUNSHOT WOUND AND YOU WERE REQUIRING MAXILLOFACIAL SURGERY

24   WHICH YOU HAD BEGUN TO HAVE, BUT THAT STOPPED WHEN YOU GOT TO

25   ANGOLA.  IS THAT A FAIR SUMMARY?

09:05

1   A.   YES.  THAT'S CORRECT.

2   Q.   MR. BARRERA, DID THE DOCTORS QUESTION WHETHER YOU COULD

3   SWALLOW FOOD PROPERLY?

4   A.   NO.

5   Q.   THE DOCTORS AT ANGOLA.

6   A.   NO.  I WAS NEVER QUESTIONED ABOUT A DIET OR ANYTHING.  I

7   WAS -- WHEN I ARRIVED AND WENT -- WHEN I WAS PUT IN WARD 1,

8   WHEN I CAME IN AND THEN, I GUESS, IT MIGHT HAVE BEEN TWO WEEKS,

9   A WEEK, TWO WEEKS THAT I SPENT IN THERE, AND THEN THEY MOVED ME

10  TO WARD 2 SO THAT I WOULD BE HOUSED THERE.  THAT WOULD BE MY

11  HOUSING.  BUT AS FAR AS A DIET, I WAS NEVER PREPARED A DIET.

12  I'VE SEEN PAPERWORK, THEY HAD PAPERWORK WHERE I HAD MECHANICAL

13  SOFT, BUT IT WAS NEVER ISSUED.

14  Q.   DID ANYONE ACCUSE YOU OF EATING SOLID FOOD?

15  A.   YES.  I WAS ACCUSED OF EATING SOLID FOODS BY DR. MACMURDO,

16  WHICH APPARENTLY IT CAME FROM A NURSE, DAVID SOCHA.  I BELIEVE

17  THAT'S HOW YOU PRONOUNCE IT.  HE'D SIT THERE AND JUST KIND OF

18  OVERSEE EVERYBODY WHEN HE WORKED.

19       BUT ONCE THE HISPANIC COMMUNITY IN THE PRISON FOUND

20  OUT I WAS IN THE WARD, THEY WOULD TRY TO BRING THE FOOD, AND SO

21  THEY BROUGHT ME WHAT THEY CALL -- FROM A BURRITO THAT HAS RICE,

22  BEANS, JUST TYPICAL MEXICAN FOOD.  I WOULD JUST CUT IT UP AND I

23  WOULD EAT THE INSIDE OUT OF IT AND -- BUT IT ALSO COMES WITH

24  REGULAR TORTILLA CHIPS AND HOT SAUCE.

25       AND HE TOLD THE DOCTOR THAT THAT'S -- THAT I WAS

09:07  1    CHEWING FINE AND COULD EAT FINE BECAUSE APPARENTLY HE HAD SEEN
       2    THE CHIPS AND THE HOT SAUCE AND HE TOLD THEM THAT I WAS EATING
       3    THAT.  AND WHEN DR. MACMURDO APPROACHED ME BEHIND THAT, HE TOLD
       4    ME HE WAS GOING TO TAKE AWAY -- TAKE, YOU KNOW -- PUT THE
       5    LIQUID DIET -- THAT I WAS EATING FINE BECAUSE HE HAD BEEN TOLD.
       6    AND I TOLD HIM, I SAID, NO, I CANNOT -- WASN'T EATING NO -- I
       7    KIND OF LAUGHED.  I FIGURED HE WAS JUST JOKING, YOU KNOW.  I
       8    SAID I CAN'T EAT.

       9            AT THAT TIME, I BELIEVE I HAD FIVE OR SEVEN TEETH IN
      10    MY MOUTH, AND NONE OF THEM WERE LINED UP TO WHERE I COULD EVEN
      11    BITE WITH ANYTHING.  AND AS THE PICTURES SHOWED LAST WEEK, I
      12    COULDN'T EVEN CLOSE MY MOUTH.  IT WAS JUST A HOLE THERE.

      13            SO THEN AFTER I FILED THE ARP AND THE LEGALITY PART
      14    CAME IN, I WAS -- AFTER THAT, I RETALIATED AGAINST HIM, AND
      15    WHEN I GOT -- THEY PUT ME IN A LOCKED CELL AND BACK IN -- I'M
      16    SORRY -- BACK IN WARD 1.

      17    **Q.**   OKAY.  SO DR. MACMURDO BELIEVED YOU WERE EATING CORN
      18    CHIPS?

      19    **A.**   YES.

      20    **Q.**   AND THAT WAS NOT POSSIBLE FOR YOU TO DO?

      21    **A.**   NO, NOT EVEN TO THIS DAY.

      22    **Q.**   HAVE YOU EVER HEARD OF SOMETHING CALLED THE BARIUM SWALLOW
      23    TEST?

      24    **A.**   YES.  I WAS REFERRED AND TAKEN TO A HOSPITAL IN LALLIE
      25    KEMP, I BELIEVE, IF THAT'S THE RIGHT PRONUNCIATION.

09:09

1    **Q.**   LALLIE KEMP HOSPITAL?

2    **A.**   YES, SIR.  I THINK THAT'S AN INDEPENDENT.  SO I WAS TAKEN

3    THERE WITH A COUPLE MORE INMATES, AND WE WERE SITTING IN THE

4    WAITING ROOM.  EVERYBODY GOT SEEN AND I WAS STILL SITTING

5    THERE, AND THE OFFICER ON THE TRIP -- A LADY CAME IN TO FIX THE

6    COMPUTER THEY HAD IN THAT ROOM.  SHE WAS ADJUSTING IT OR

7    SOMETHING AND SHE CAME IN.  HE ASKED HER IF I WAS GOING TO BE

8    SEEN, WHERE THE DOCTOR WAS, 'CAUSE I WAS DUE TO GET A BARIUM

9    SWALLOW TEST.  AND THEY TOLD HER -- TOLD THEM THAT I -- THEY NO

10   LONGER DID THAT TEST AT THAT HOSPITAL THERE, SO I WENT BACK TO

11   ANGOLA.  THEY RESCHEDULED IT.

12   **Q.**   OKAY.  DO YOU RECALL YOUR TRANSPORTATION TO LALLIE KEMP

13   FOR THAT SWALLOW TEST?

14   **A.**   SIR?

15   **Q.**   DO YOU RECALL YOUR TRANSPORTATION TO LALLIE KEMP FOR THAT

16   SWALLOW TEST?

17   **A.**   WELL, AS TRANSPORTATION IN THE VAN, I MEAN, THE VANS WE

18   HAD AT THAT TIME WAS PRETTY MUCH DELAPIDATED, AND I WAS -- I

19   HAD A BLACK BOX ON AT THAT TIME.

20   **Q.**   A "BLACK BOX," CAN YOU EXPLAIN WHAT THAT IS FOR THE COURT?

21   **A.**   YEAH.  IT'S A RESTRAINING DEVICE USED TO -- ONCE THEY PUT

22   THE HANDCUFFS ON YOU, IT'S A LITTLE BLACK METAL BOX.  THE

23   INMATE SITTING WITH THE ATTORNEYS TODAY HAS ONE ON.  AND IT

24   KEEPS YOU FROM MOVING REALLY ANY.  IT STRAPS YOU UP AND KEEPS

25   YOUR ARMS CLOSER TO YOUR BODY, AND THEY PUT YOUR ONE ARM

09:11   1   THAT -- HAND PALM FACING UP AND THE OTHER ONE FACING DOWN AND
2   THE BLACK BOX IS IN THE UP POSITION LIKE THIS.  AND IT MAKES IT
3   DIFFICULT TO -- WHEN YOU GO ON HOSPITAL TRIPS AND YOU GET FED,
4   IT'S HARD TO EAT.  THEY MAKE YOUR ARMS SWELL UP.  THEY JUST
5   REDUCE -- THEY RESTRICT YOU.
6   **Q.**   DID THAT CAUSE ANY OTHER PROBLEMS FOR YOU?
7   **A.**   WELL, YES.  FIRST OF ALL, THE SWELLING OF MY ARMS AND
8   STUFF, BUT THE MAIN PROBLEM WAS IT TIGHTENS THE CHAIN THAT
9   GOES -- THE WAIST CHAIN, IT'S PULLED TIGHTER IN THAT MANNER.
10  AND IN THE VANS, WE ALWAYS BUMPING AND MOVING AROUND.  IT WAS
11  RUBBING AND PULLING ON MY PECTORAL TUBE BECAUSE AT THAT TIME I
12  HAD A LONG ONE, AND IT WOULD CAUSE IT TO BLEED.  AND IT WAS
13  ALWAYS -- GOING TO TRIPS, ONCE YOU GOT IT HEALED UP OR CLEANED
14  IT UP AND GOT TO NOT WORRY ABOUT IT, I'D BE READY FOR ANOTHER
15  TRIP.
16  **Q.**   SO WEARING A BLACK BOX CAUSED YOU TO IRRITATE YOUR PEG
17  TUBE?
18  **A.**   YES.  WEARING THE BLACK BOX, I'VE BEEN TO THE HOSPITAL
19  MANY TIMES, AND WE ARE THE ONLY PRISON -- LSP IS THE ONLY
20  PRISON -- BEING INSIDE THE HOLDING TANK THERE, IS THE ONLY
21  PRISON THAT USES THAT BOX IN A HUMILIATING MANNER LIKE THAT AND
22  RESTRICTS THE MOVEMENT.
23  **Q.**   WHAT SHAPE WAS YOUR PEG TUBE IN WHEN YOU GOT BACK FROM
24  LALLIE KEMP?  WHAT SHAPE WAS YOUR --
25  **A.**   IT WAS OOZING BLOOD AND RAW ONCE I GOT BACK TO THE PRISON.

1   Q.   OKAY.  WE'LL TALK SOME ABOUT YOUR PEG TUBE, BUT I WANT TO

2   FOCUS ON THE SWALLOW TEST.  DID YOU EVENTUALLY GET THE SWALLOW

3   TEST?

4   A.   YES, THAT TEST TOOK PLACE IN NEW ORLEANS.

5   Q.   CAN YOU DESCRIBE THAT TEST FOR THE COURT?

6   A.   I REMEMBER GOING.  I GUESS THEY USE A BARIUM DYE.  THEY

7   HAVE THE MACHINE WHERE YOU CAN SEE THE DYE GOING DOWN YOUR

8   THROAT.  THEY GIVE ME A PILL, A GOOD SIZE PILL, AND I TRY TO

9   SWALLOW IT, AND IT FEELS LIKE IT'S HUNG UP.  I DON'T KNOW IF

10   IT'S -- I DON'T KNOW BECAUSE I'M NOT A DOCTOR, BUT I DON'T KNOW

11   HOW THE -- WHERE MY TRACH WAS.  I DON'T KNOW HOW THAT

12   AFFECTS -- BUT ANYWAY, IT ALWAYS FELT LIKE IT -- BIG SOLIDS

13   WOULD GET STUCK, AND SO I HAD TO COUGH THAT BARIUM SWALLOW --

14   THAT PILL UP 'CAUSE I COULDN'T TAKE IT DOWN.  AND THEN, YOU

15   KNOW, THEY HAD ME DRINK SOME WATER.

16   Q.   SO WHAT WAS THE RESULT OF THE TEST?

17   A.   I NEEDED TO BE ON A -- I COULD EAT SOFT FOODS OR

18   MECHANICAL CHOPPED, SOFT FOOD, PUDDING, JELLO, JUST THINGS THAT

19   I DIDN'T HAVE TO CHEW AND HAVE A DANGER OF CHOKING ON.

20   Q.   I WANT TO COME BACK TO THE PEG TUBE.

21   A.   OKAY.

22   Q.   CAN YOU DESCRIBE -- CAN YOU TELL THE COURT WHAT IT'S LIKE

23   TO HAVE A PEG TUBE?

24   A.   A PECTORAL TUBE, THERE'S DIFFERENT KINDS.  AND IT'S

25   SOMETHING THAT -- IT'S AN OPEN WOUND.  IT GOES STRAIGHT TO YOUR

09:14   1   STOMACH.  IT'S LIKE A HOLE DRILLED IN YOUR STOMACH FROM THE

2   OUTSIDE AND GOES STRAIGHT IN, AND YOU CAN TAKE YOUR FOOD INTAKE

3   OR PROTEIN.

4        WHEN I FIRST AWOKE IN THE HOSPITAL, THEY HAD ME ON

5   THIS.  IT SMELLED LIKE -- IT LOOKED LIKE CORNMEAL AND A BUNCH

6   OF LIQUIDS THAT SMELLED LIKE FISH OIL, AND THEY WOULD ATTACH

7   THE HOLES KIND OF LIKE AN IV AND THEY WOULD FEED IT INTO IT.

8        WHEN I WAS AT HOME, THEY WOULD PUT IT IN THE TUBE, MY

9   MEDICATION, BUT I WOULDN'T -- I DIDN'T HAVE -- I HAD LIQUID

10   LORTAB AND I WOULD PUT THAT IN THERE, AND THE OTHER MEDICATIONS

11   THAT I HAD, I WOULD CRUSH THEM AT HOME AND MIX THEM UP WITH

12   WARM WATER AND PUT THEM IN THERE.

13   Q.   IS IT EASIER FOR YOU TO TAKE YOUR MEDICATIONS AND EAT

14   THROUGH YOUR PEG TUBE?

15   A.   YES, YES.  IT'S NOT BAD BUT IT HAS -- YOU DO HAVE TO MAKE

16   SURE THAT IT IS -- DEPENDING ON THE SIZE OF THE TUBE, TO MAKE

17   SURE THAT IT IS FINELY CRUSHED OR HAD COMPLETELY DISSOLVED IN

18   THE WATER.

19   Q.   WHAT KIND OF MAINTENANCE OR CLEANING DOES A PEG TUBE

20   REQUIRE?

21   A.   WELL, LIKE I SAID, IT'S AN OPEN WOUND.  YOU NEED TO

22   CLEANSE IT ON A DAILY BASIS, DEPENDING ON WHAT ACTIVITY OR WHAT

23   YOU MIGHT BE DOING.

24        DURING THE WARMER MONTHS, IF YOU ARE OUTSIDE OR EVEN

25   INSIDE, AS FAR AS BEING IN THE DORM, 'CAUSE IT'S NOT

1   CONTROLLED, THE CLIMATE IS NOT CONTROLLED, SO DURING THE SUMMER

2   MONTHS YOU SWEAT -- WELL, NOT THE SWEAT, JUST THE MOISTURE

3   AROUND THE TUBE.  SO WITH THAT, I WOULD WASH IT OFF AND CLEANSE

4   IT MAYBE THREE, FOUR TIMES A DAY.

5        BUT DURING THE WINTERTIME, IT KIND OF SLOWS DOWN

6   'CAUSE THAT'S NOT -- THE HUMIDITY THAT WE HAVE HERE IN THE

7   SOUTH, SO IT DOESN'T STAY AS WET.  IT SHOULD BE CLEANSED WITH

8   STERILE WATER.

9        I NEVER RECEIVED ANY STERILE WATER TILL WHEN I WAS

10  PUT OUT IN ASH 2.  I MEAN, YES, FROM WHEN I LEFT TO ASH 2, I

11  HAD ASKED THE NURSE IF I COULD GET SOME WOUND SPRAY OR STERILE

12  WATER, AND THEY TOLD ME JUST TO USE THE WATER THAT WE GOT OUT

13  THERE.  AND I TOLD HER, WELL, Y'ALL DON'T EVEN DRINK THE WATER

14  AROUND HERE.  WHY WOULD I WANT TO PUT IT ON MY -- I DON'T WANT

15  TO PUT IT ON MY WOUND.

16       BUT THE LAST TIME I HAD MY PEG TUBE, ROUGHLY A MONTH

17  AGO, A MONTH AND A HALF AGO, THE YOUNG MAN GIVE ME TWO BOTTLES

18  OF STERILE WATER.

19  **Q.**   MR. BARRERA, I JUST WANT TO REMIND YOU TO RESTRICT YOUR

20  TESTIMONY TO BEFORE SEPTEMBER 30, 2016.

21  **A.**   OKAY.  THAT'S FINE.

22  **Q.**   SO WHAT HAPPENS TO THE PEG TUBE WHEN IT'S NOT MAINTAINED

23  OR CLEANED?

24  **A.**   WELL, IT'S LIKE ANY WOUND THAT YOU DON'T MAINTAIN OR CLEAN

25  IT, EVENTUALLY IT'S GOING TO GET INFECTED.  AND LIKE I SAID,

09:17   1   THERE IS SEVERAL TYPES, TWO TYPES THAT I KNOW OF, AND ONE HAS A

2   OUTSIDE -- IT GOES ON THE OUTER SIDE OF THE TUBE TO KEEP IT

3   FROM FALLING INTO YOUR BELLY, A LITTLE RETAINER, AND THAT'S

4   KIND OF HARDER TO MAINTAIN BECAUSE IT RUBS IT.  IT STAYS MOIST

5   UNDER THERE THE WHOLE TIME.  SO IT'S HARD TO MAINTAIN IF YOU

6   DON'T -- IF YOU DON'T KEEP IT MAINTAINED ON A REGULAR BASIS,

7   YOU CAN SUFFER AN INFECTION.  BUT IF YOU MOVE A LOT AND, LIKE I

8   SAID, WITH THE CHAIN OR SOMETHING LIKE THAT RUBBING AGAINST IT,

9   IT GETS IRRITATED.  EVEN IN YOUR SLEEP -- I'VE SLEPT ON MY BACK

10   OR ON MY SIDE SINCE THE SITUATION.

11   **Q.**   SO YOU HAD THE PEG TUBE WHEN YOU ARRIVED AT ANGOLA.  IS

12   THAT CORRECT?

13   **A.**   YES, I DID.

14   **Q.**   AND YOU HAD IT WHEN YOU WERE AT ELAYN HUNT BEFORE ANGOLA?

15   **A.**   YES.

16   **Q.**   HOW OFTEN WAS THE PEG TUBE CHECKED AT HUNT?

17   **A.**   AT HUNT, THEY WOULD TAKE ME EVERY MONDAY, WEDNESDAY, AND A

18   FRIDAY TO THE CLINIC AND THEY WOULD CLEAN IT UP FOR ME, MAKE

19   SURE THERE WAS NO INFECTION, PUT SOME ANTIBIOTIC CREAM ON IT.

20   **Q.**   AND HOW OFTEN WAS IT CHECKED AT ANGOLA?

21   **A.**   THEY DIDN'T HARDLY PAY NO MIND TO IT.  I MEAN, I WASHED

22   IT.  I TAKE A SHOWER DAILY, AND I WIPED IT OFF AND CLEANED IT

23   MYSELF.  BUT I MEAN, AS FAR AS ANYBODY CHECKING IT, IT WASN'T

24   LIKE THEY WOULD COME IN AND CHECK, SPECIFICALLY ASK, "LET ME

25   CHECK YOUR PEG TUBE" UNTIL I STARTED COMPLAINING.

09:19

1  **Q.**   OKAY.  AND AFTER YOU STARTED COMPLAINING, WAS IT EVER

2  REPLACED?

3  **A.**   IT WAS REPLACED.  NOT IN A RAPID MANNER OR ANYTHING, BUT

4  IT WAS REPLACED THERE.  IT WAS REPLACED THERE AT ANGOLA.

5  **Q.**   CAN YOU DESCRIBE THAT PROCEDURE?

6  **A.**   YES, I CAN.  AS I STATED, IN MY MIND, BECAUSE OF THE FACT

7  THAT THE PROCEDURE -- THE PROPER PROCEDURE AND THE PROCEDURE

8  THAT THE DOCTOR THAT DAY USED ON ME.

9  **Q.**   WHAT PROCEDURE DID HE USE ON YOU?

10  **A.**   I WAS TOLD THAT I WAS GETTING MY PECTORAL TUBE REMOVED AND

11  CHANGED THAT MORNING, AND I HAD WENT -- THEY TOOK ME TO A

12  LITTLE OPERATING ROOM BACK THERE, A LITTLE DAY SURGERY ROOM

13  RIGHT BEFORE YOU GET INTO THE EMERGENCY ROOM.

14          AND THERE WAS A DR. MORRISON, MORRIS, I BELIEVE HE

15  COMES FROM OUTSIDE THE CAMP ON OCCASIONS.  AND THEY LAID ME

16  DOWN ON A LITTLE BED THERE, AND HIM AND THE NURSE -- HE ASKED

17  THE NURSE IF SHE HAD EVER DID ONE BEFORE, AND SHE SAID, NO, I

18  NEVER DID ONE.  AND HE SAID, WELL, THIS WILL BE MY FIRST BUT I

19  READ UP ON IT.

20          AND I TRY TO GIVE PEOPLE THE BENEFIT OF THE DOUBT AND

21  FIGURED HE WAS JUST -- BEDSIDE MANNER, JOKING.  AND THEN HE

22  ASKED ME IF I WAS READY.  I SAID, YES, AND HE WENT TO PULLING

23  ON IT, AND WHEN HE WAS PULLING ON IT, HE WAS LIFTING ME OFF THE

24  BED WITH IT.  AND HE KEPT PULLING AND PULLING, AND I SAID,

25  APPARENTLY YOU DON'T KNOW WHAT YOU DOING.  HE SAID, YEAH, YEAH,

0 9 : 2 1

1   I READ UP ON IT, I KNOW WHAT I'M DOING.  AND HE TOLD THE NURSE,

2   HE SAID, GET ME A PAIR OF THEM LITTLE PLIERS.  HE COULDN'T --

3   HE DIDN'T KNOW THE NAME OF THE -- AND I TOLD HIM YOU TALKING

4   ABOUT A HEMOSTAT.  'CAUSE HE TOLD HER IT'S THE ONES THAT CLAMP

5   AND STAY CLAMPED.  YOU TALKING ABOUT THE HEMOSTATS?  AND HE

6   SAID, YEAH, THAT'S WHAT I WANT.  SO SHE WENT AND GOT THAT.  AND

7   I SAID DON'T PUT THAT ON THE TUBE, IT'S GOING TO BUST IT DUE TO

8   THE SHARP TEETH IN IT, AND HE PUT IT ON THERE AND JERKED AND IT

9   POPPED IN HALF.  ONE PIECE WENT IN MY STOMACH AND THE OTHER

10  HALF CAME OUT.  AND THEN THEY PUT ANOTHER ONE IN.

11          AND AS I CAME BACK FROM THERE, AS I WAS LEAVING THE

12  OPERATING ROOM, MS. BETH COMPO WAS COMING INTO THE HALL AND I

13  HAD TO MEET WITH HER THAT DAY.

14  **Q.**   THAT'S ONE OF YOUR ATTORNEYS?

15  **A.**   IT WAS RIGHT AFTER THAT.  YEAH, IT WAS PAINFUL, VERY, VERY

16  UNPROFESSIONAL.  IF YOU DON'T HAVE THE STUDIES FOR CERTAIN

17  THINGS, YOU SHOULDN'T BE DOING THEM.

18  **Q.**   DO YOU REMEMBER WHEN THAT PROCEDURE WAS, MR. BARRERA?

19  **A.**   I REALLY CAN'T RECALL.

20  **Q.**   THAT'S OKAY.  WE HAVE YOUR MEDICAL RECORDS.  WHAT HAPPENED

21  TO THAT PEG TUBE, THE ONE THAT HAD BEEN REPLACED?

22  **A.**   THAT PEG TUBE LATER FELL OUT WHILE I WAS IN BED.

23  **Q.**   OKAY.

24  **A.**   IT WAS A LONG TUBE.  SO I WAS LAYING DOWN AND WHEN I

25  ROLLED OVER, I FELT A -- I FELT A -- I ROLLED OVER ON MY SIDE

1  AND I FELT LIKE WHEN YOU PULL A PLUNGER OUT, JUST A POPPING

2  NOISE, AND I LOOKED DOWN AND I SEEN THE TUBE LAYING BESIDE ME.

3            AND SO I LAID ON MY BACK.  I HADN'T EATEN NOTHING

4  ALL -- PROBABLY SINCE ABOUT 7:00 THAT EVENING.  SO I KEPT MY

5  WOUND SPRAY AND THE GAUZES RIGHT THERE AND GRABBED IT AND

6  CLEANED IT OFF.  AND IT WAS ROUGHLY 3:00 IN THE MORNING AND MS.

7  DARCI, THE NURSE THAT WAS WORKING THAT NIGHT -- I HAD ASKED

8  PRINCE, HE WAS THE NIGHT ORDERLY, I HAD ASKED HIM TO CALL MS.

9  DARCI.  AND HE SAID, OTTO, WHAT YOU WANT?  IT'S 3:00 IN THE

10  MORNING.  I SAID MY TUBE FELL OUT.  I SAID COULD YOU CALL HER.

11            SO SHE CAME TO THE BEDSIDE TO SEE WHAT I NEEDED, AND

12  SHE LOOKED AT THE SITUATION.  I HAD PUT THE GAUZES OVER IT,

13  TOLD HER WHAT IT WAS.  AND IN THE STORAGE ROOM THEY KEPT TUBES

14  IN THERE.  I DON'T KNOW IF IT'S A TUBE THAT'S SUPPOSED TO STAY

15  IN THE INFIRMARY OR NOT, BUT THEY GOT SOME TUBES IN THERE.  AND

16  SHE ASKED ME WHAT SIZE.  I SAID DO YOU KNOW HOW TO PUT THIS

17  BACK IN?  AND SHE SAID SHE HAD WORKED AT AN OLD FOLKS' HOME,

18  AND SHE SAID THEY USED TO COME OUT ON THE PATIENTS ALL THE

19  TIME.  SO SHE ASKED ME WHAT SIZE IT WAS, AND I TOLD HER AND SHE

20  WENT IN AND GOT IT.

21            NURSE KEVIN CAME OVER AND HE WAS LOOKING FOR BETADINE

22  AND STUFF TO CLEAN IT, AND BY THE TIME HE FOUND SOMETHING TO

23  CLEAN IT WITH, LIKE I TOLD YOU, I HAD MY STUFF RIGHT THERE.  I

24  CLEANED IT AND SHE PUT THE TUBE IN AND THEN AIRED UP THE LITTLE

25  BULB WITH A SYRINGE THAT COMES WITH IT.  IT'S GOT A LITTLE

09:24   1   SYRINGE AND YOU PUT WATER IN IT AND FILL UP THE LITTLE BULB TO

2   RETAIN IT IN YOUR STOMACH.  AND SHE DID THAT, AND THEN AFTER --

3   I THINK IT WAS ROUGHLY 9:00 THAT MORNING, MAYBE EARLIER, MAYBE

4   LATER, BUT THEY CAME AND TOLD ME I HAD AN EMERGENCY TRIP TO NEW

5   ORLEANS.

6           AND SO WHEN I GOT TO NEW ORLEANS, THE UNIVERSITY HAD

7   JUST OPENED.  I GOT TO NEW ORLEANS AND I -- THEY PUT ME IN A

8   LITTLE ROOM THERE AND THEY COULD NOT LOCATE A PECTORAL TUBE

9   FOR -- THE PROPER PECTORAL TUBE.  'CAUSE THEY GOT ONE THAT'S

10  GOT A STRING IN IT, AND I DON'T KNOW HOW THAT ONE WORKS, BUT --

11  OR HOW IT WAS USED.  BUT I SAT THERE FROM THAT MORNING ROUGHLY

12  TILL MAYBE 3:00, 4:00 IN THE EVENING, AND THEY FINALLY TOLD ME

13  THEY COULDN'T FIND ONE AND THEY WOULD MAKE AN APPOINTMENT FOR

14  ME TO COME BACK.

15          AND THEN MONDAY I RETURNED.  I DIDN'T GO TO THE

16  EMERGENCY ROOM.  I WENT INTO THE -- WHERE THE DOCTORS ARE, AND

17  THEY TOOK ME UP TO A ROOM AND I SAT THERE.  IT TOOK A LITTLE

18  WHILE, AND A DOCTOR CAME IN AND TOLD ME THAT THEY DIDN'T HAVE

19  THE TYPE OF PECTORAL TUBE THAT THEY HAD INSERTED, THAT I HAD

20  INSERTED IN THERE.  THEY HAD A NEW STYLE, WHICH WAS CALLED A

21  MIC-KEY.  THAT'S WHAT I WEAR TODAY.  AND HE INSERTED IT -- FIVE

22  MINUTES, PUT IT IN, BLOW THE BULB UP AND I WAS GOOD TO GO.  AND

23  IT'S EASIER TO MAINTAIN, A LOT EASIER TO MAINTAIN.

24  **Q.**   OKAY.  MR. BARRERA, ARE YOU FAMILIAR WITH THE

25  ADMINISTRATIVE REMEDY PROCEDURE AT ANGOLA?

**A.**    YEAH.  I WAS TOLD HOW TO FILE ONE, YES.

**Q.**    HAVE YOU EVER FILED ONE?

**A.**    THE ONE THAT CURRENTLY ATTACHES WHAT I WROTE TO THIS

PARTICULAR CASE.

**Q.**    OKAY.  AND DO YOU KNOW WHEN YOU FILED THAT ARP?

**A.**    I BELIEVE THAT WAS IN '15.

**Q.**    OKAY.  AND WHAT DID YOU -- WHAT RELIEF WERE YOU ASKING FOR

IN THE ARP?

**A.**    I JUST WANTED THEM TO CHANGE IT.

**Q.**    CHANGE THE PEG TUBE?

**A.**    CHANGE THE -- YOU KNOW, JUST GIVE ME THE STUFF TO WORK

WITH TO HYGIENICALLY -- AND JUST SO I DON'T HAVE ALL THE

TROUBLE WITH IT.  PRETTY MUCH SELF -- TAKE CARE OF MYSELF.

SINCE I'VE BEEN HERE AND A LOT OF THINGS ARE -- I'D RATHER DO

IT MYSELF.  AFTER THE EXPERIENCES THAT I HAVE EXPERIENCED UNDER

THE HANDS OF SOME OF THESE PEOPLE, I'D RATHER DO IT MYSELF.

**Q.**    WHAT ELSE DID YOU ASK FOR IN THE ARP?

**A.**    I BELIEVE IT WAS TO HAVE THE MEDICATIONS AND STUFF TO DO

THAT.  I ASKED FOR THE COST TO BE COVERED FOR THE PAIN AND

SUFFERING, AND I DON'T QUITE RECALL THE WHOLE THING.

**Q.**    DID YOU ASK FOR SURGERY?

**A.**    YES, I HAD ASKED FOR THE SURGERY FOR MY FACE.  IT WAS

SIMPLE, WHAT I WROTE WAS TO HAVE THE SURGERY SO, ONCE I

FINISHED MY PRISON TERM AND RETURN TO SOCIETY, I COULD BE

SELF-RELIANT AND PRODUCTIVE.  AS WE TOLD -- I TOLD THIS COURT

1    LAST WEEK, I HAVE FOUR DAUGHTERS AND THE MAIN PRIORITY IS

2    MAKING SURE THEY'RE PROVIDED FOR.

3    **Q.**   AND WHAT WAS THE RESULT OF THAT ARP, MR. BARRERA?

4    **A.**   IT WAS DENIED.  IN MOST CASES, THE FIRST ONE IS DENIED.

5    AND THEN THEY GET THE SECOND ONE, AND THE SECOND ONE WAS

6    DENIED.

7    **Q.**   HAVE ANY OF THE ANGOLA DOCTORS SHOWED YOU YOUR MEDICAL

8    RECORDS?

9    **A.**   I HAVE NEVER SEEN MY MEDICAL RECORDS AT ANGOLA.

10   **Q.**   OKAY.  DO YOU RECALL GIVING A DEPOSITION IN THIS CASE IN

11   AUGUST OF 2016?

12   **A.**   SIR?

13   **Q.**   DO YOU RECALL GIVING A DEPOSITION IN AUGUST OF 2016?

14   **A.**   YES.

15   **Q.**   DID YOU NOTICE ANY CHANGE IN YOUR -- NOW REMINDING YOU TO

16   RESTRICT YOUR ANSWERS TO BEFORE SEPTEMBER 30, 2016.

17   **A.**   OKAY.

18   **Q.**   DID YOU NOTICE ANY CHANGE IN YOUR MEDICAL CARE AFTER THE

19   DEPOSITION?

20   **A.**   DRAMATICALLY.

21   **Q.**   DRAMATICALLY HOW?

22   **A.**   EVERYTHING CAME RIGHT TO ME.  I DIDN'T -- ONCE THE LEGAL

23   SYSTEM TOOK CARE -- TOOK PART OF IT IS WHEN ANGOLA STARTED TO

24   ACT.

25   **Q.**   SO WHEN YOU CAME TO ANGOLA, YOU REQUIRED ORAL

1    MAXILLOFACIAL SURGERY AND APPROXIMATELY THREE YEARS LATER, AT

2    YOUR DEPOSITION, YOU STILL HAD NOT RECEIVED THOSE SURGERIES.

3    IS THAT CORRECT?

4    **A.**    NO.  I HAD A COUPLE OF TEETH EXTRACTED.

5           **MR. HAMILTON:**  YOUR HONOR, IF I COULD JUST HAVE A

6    MOMENT TO CONFER WITH CO-COUNSEL?

7           **THE COURT:**  YOU MAY.

8    **BY MR. HAMILTON:**

9    **Q.**    JUST TO CLARIFY, MR. BARRERA, SO YOU HAD NOT RECEIVED THE

10   SURGERY ON YOUR FACE AS OF SEPTEMBER 30, 2016?

11   **A.**    NO, NOT TILL THE DEPOSITION TOOK PLACE.

12   **Q.**    OKAY.  THANK YOU, MR. BARRERA.  PLEASE ANSWER DEFENSE

13   COUNSEL'S QUESTIONS.

14                    **CROSS-EXAMINATION**

15   **BY MS. ROPER:**

16   **Q.**    GOOD MORNING, MR. BARRERA.

17   **A.**    GOOD MORNING.

18   **Q.**    YOU TESTIFIED ON DIRECT EXAMINATION ABOUT YOUR LENGTHY

19   MARRIAGE OF 26 YEARS?

20   **A.**    MA'AM?  YEAH, ROUGHLY 26 YEARS.

21   **Q.**    YOU'RE STILL MARRIED?

22   **A.**    YES, MA'AM.

23   **Q.**    IS THIS THE SAME WOMAN THAT YOU TRIED TO KILL?

24          **MR. HAMILTON:**  OBJECTION, YOUR HONOR; RELEVANCE.

25          **MS. ROPER:**  YOUR HONOR, THEY OPENED THE DOOR TO THIS.

09:31   1   WE WERE NOT GOING TO PRESENT ANY TESTIMONY IN THIS REGARD.

2         **MR. HAMILTON:**  I DON'T BELIEVE --

3         **THE COURT:**  I MEAN, WHAT IS THE POINT OF IT, THOUGH?

4   WHAT IS THE RELEVANCE?  OKAY, THEY OPENED THE DOOR, YAY.  WHAT

5   IS THE RELEVANCE OF IT OTHER THAN --

6         **MS. ROPER:**  WELL, YOUR HONOR, HE'S TESTIFIED TO SOME

7   THINGS TO TRY TO PAINT A PICTURE.

8         **THE COURT:**  BUT DOES IT GO TO HIS TRUTH?  DOES IT GO

9   TO HIS VERACITY?  DOES IT GO TO HIS CREDIBILITY, OR WE'RE JUST

10  TRYING TO MAKE HIM LOOK LIKE A REALLY BAD GUY?

11        **MS. ROPER:**  NO, YOUR HONOR, IT GOES TO HIS

12  CREDIBILITY.

13        **THE COURT:**  HOW?

14        **MS. ROPER:**  BECAUSE OF THE PICTURE HE'S TRYING TO

15  PAINT OF HIMSELF AS A FAMILY MAN.

16        **THE COURT:**  THE OBJECTION IS SUSTAINED.

17        **MS. ROPER:**  THAT'S FINE.

18  **BY MS. ROPER:**

19  **Q.**   OKAY.  THE NEXT THING YOU HAD TESTIFIED TO WAS THAT YOU

20  HAD TURNED YOURSELF IN?

21  **A.**   YES, I DID.  ON SEPTEMBER 3RD.

22  **Q.**   ON SEPTEMBER 3RD?

23  **A.**   YES.

24  **Q.**   OF WHAT YEAR?

25  **A.**   OF '13.

09:32   1    **Q.**   YOU TURNED YOURSELF IN.  IS THAT CORRECT?

2    **A.**   YES, I DID.

3    **Q.**   ISN'T IT TRUE THAT THE POLICE WERE CALLED TO YOUR HOME BY

4    YOUR TEENAGE DAUGHTER?

5              **MR. HAMILTON:**  OBJECTION, YOUR HONOR; RELEVANCE.

6              **MS. ROPER:**  YOUR HONOR, THIS GOES DIRECTLY TO HIS

7    CREDIBILITY.

8              **THE COURT:**  WELL, THAT DOES GO TO HIS CREDIBILITY.

9    HE SAID HE TURNED HIMSELF IN, SO . . .

10             **MR. HAMILTON:**  YOUR HONOR, WE DIDN'T FILE A MOTION IN

11   LIMINE BECAUSE DEFENSE COUNSEL AGREED NOT TO GO INTO THE

12   CRIMINAL HISTORY OF OUR PATIENTS.

13             **MS. ROPER:**  YES, YOUR HONOR, WE AGREED TO THAT, BUT

14   THEY CANNOT THEN TURN AROUND AND SUBORN PERJURY OF THIS MAN ON

15   THE STAND.

16             **THE COURT:**  WELL, I DON'T KNOW THAT HE'S SUBORN --

17   OKAY, EVERYBODY TAKE A DEEP BREATH.  I DON'T KNOW THAT WE CAN

18   GO SO FAR AS TO SAYING THAT HE'S SUBORNED PERJURY.

19             **MS. ROPER:**  WELL, I --

20             **THE COURT:**  YOU OPENED THE DOOR WITH -- AND I DON'T

21   KNOW THAT YOU OPENED THE DOOR, BUT MR. BARRERA TESTIFIED HE

22   TURNED HIMSELF IN AND NOW SHE'S GOING TO GO TO HIS CREDIBILITY,

23   DID HE TURN HIMSELF IN OR WAS HE ARRESTED.  I WILL GIVE YOU A

24   VERY SHORT LEASH.

25             **MS. ROPER:**  THANK YOU, YOUR HONOR.

0 9 : 1 3

1              **THE COURT:**  YOUR OBJECTION IS OVERRULED.

2              **MS. ROPER:**  THANK YOU, YOUR HONOR.

3    BY MS. ROPER:

4    **Q.**   MR. BARRERA, ISN'T IT TRUE THAT YOUR DAUGHTER FLED THE

5    HOME AND CALLED THE POLICE?

6    **A.**   NO, THAT WASN'T ON SEPTEMBER 3RD.  ACTUALLY THAT DAY IT

7    WAS ON MOTHER'S DAY, AND MY DAUGHTER AND THEM WERE AWAY WITH

8    HER BOYFRIEND'S FAMILY.  AND ON THAT PARTICULAR DAY, ON

9    MOTHER'S DAY I WAS AT HOME.  I WAS TAKING A SHOWER AND I WAS

10   HAVING PROBLEMS WITH MY TRACH, SO I PULLED IT OUT AND I

11   BANDAGED IT UP.  AND SHE CAME OVER LATER AND SHE NOTICED THAT I

12   HAD THE BANDAGE OVER MY TRACH, WHERE MY TRACH WAS, AND SHE

13   CALLED THE AMBULANCE.  I TOLD HER IT WAS FINE, WE'D GO IN AND

14   HAVE IT FIXED UP.  BUT THAT WAS ON MOTHER'S DAY.

15             WHEN I TURNED -- ON JULY THE 3RD, I TOOK MY COURT

16   PLEA AND THE JUDGE GAVE ME UNTIL SEPTEMBER THE 3RD TO TURN

17   MYSELF IN, WHICH I DID IN ST. CHARLES PARISH WITH ALL MY

18   DAUGHTERS EXCEPT THE OLDEST AND MY GRANDBABY AND MY SISTER AND

19   MY BROTHER-IN-LAW FROM TEXAS.

20   **Q.**   SO IF NEWS REPORTS DISAGREE WITH THAT, YOU WOULD SAY THOSE

21   ARE INACCURATE?

22   **A.**   EXACTLY.

23             **MR. HAMILTON:**  YOUR HONOR, OBJECTION.

24             **THE COURT:**  ASKED AND ANSWERED.  LET'S MOVE ON.

25   BY MS. ROPER:

09:34  1  **Q.**   OKAY.  AND, IN FACT, THE DAMAGE TO YOUR JAW WAS CAUSED BY

2  A SELF-INFLICTED GUNSHOT WOUND.  IS THAT RIGHT?

3        **MR. HAMILTON:**  OBJECTION.

4        **THE COURT:**  WHAT IS THE RELEVANCE OF THAT?

5        **MS. ROPER:**  I BELIEVE HE'S TRYING TO TESTIFY TO

6  SOMETHING ABOUT PULLING HIS TRACH OUT, AND I'M A LITTLE

7  CONFUSED AS TO WHAT --

8        **THE COURT:**  HE CAME TO YOU IN THE CONDITION THAT HE

9  CAME TO YOU.  WHAT THE QUESTION IS -- I DON'T CARE.  I DON'T

10  CARE HOW HE GOT THE WAY HE GOT.  HE CAME TO ANGOLA.  HE CAME TO

11  BE A WARD OF THE STATE IN A PARTICULAR CONDITION.  NOW, LET'S

12  TALK ABOUT HOW DID ANGOLA TREAT HIM GIVEN THAT CONDITION.  THE

13  OBJECTION IS SUSTAINED.  MOVE ON.

14        **MS. ROPER:**  YOUR HONOR, I'M SORRY.  I THOUGHT THAT HE

15  HAD OPENED THE DOOR WHEN HE SAID THAT HE HAD BEEN SHOT, SO I

16  WAS JUST TRYING TO CLARIFY THAT.

17  **BY MS. ROPER:**

18  **Q.**   BEFORE YOU CAME TO ANGOLA, YOU HAD BEEN EVALUATED BY

19  SURGEONS ON THE OUTSIDE.  IS THAT RIGHT?

20  **A.**   YES, I HAD.

21  **Q.**   OKAY.  AND I BELIEVE YOU TESTIFIED THAT YOU WERE TOLD THAT

22  YOU WOULD NEED SIGNIFICANT SURGERIES OVER A FIVE-YEAR PERIOD?

23  **A.**   YES.

24  **Q.**   OKAY.  AND THEY DID INDICATE IT WOULD TAKE AROUND FIVE

25  YEARS.  IS THAT RIGHT?

**A.**    YES, I WOULD, YEAH.

**Q.**    OKAY.  AND THIS INFORMATION THAT WAS CONVEYED TO YOU WAS APPROXIMATELY THE SUMMER OF 2012.  IS THAT RIGHT?

**A.**    MA'AM?

**Q.**    WHEN YOU WERE TOLD THAT IT WOULD TAKE AROUND FIVE YEARS TO RECONSTRUCT YOUR JAW, WAS THAT AROUND THE SUMMER OF 2012?

**A.**    NO.  THAT WAS IN 2013.

**Q.**    OKAY.

**A.**    AFTER I WAS RELEASED FROM THE HOSPITAL.

**Q.**    SO WHEN IN 2013 WERE YOU TOLD THAT IT WOULD TAKE ABOUT FIVE YEARS?

**A.**    I HAD -- ROUGHLY AUGUST, I BELIEVE, BECAUSE THAT'S WHEN I HAD THE -- I HAD MY SURGERIES FOR REMOVAL OF MY FIBULA TO REPLACE MY JAWBONE.

**Q.**    OKAY.  AND THE INJURY TO YOUR JAWBONE OCCURRED, WAS THAT THE SUMMER OF 2012?

**A.**    2012, YES.

**Q.**    OKAY.  SO ABOUT A YEAR LATER YOU HAD THE SURGERY.  RIGHT?

**A.**    ROUGHLY, YES.

**Q.**    OKAY.  BUT THEN YOU UNDERSTOOD YOU WERE GOING TO NEED ADDITIONAL SURGERIES?

**A.**    REPEAT THE QUESTION, PLEASE.

**Q.**    I'M SORRY.  I THINK YOU'VE ANSWERED THE QUESTION.  I JUST WANTED TO MAKE SURE I'M ON THE RIGHT TRACK OF THE FIVE-YEAR PERIOD, WHEN THAT WOULD BEGIN, AND THAT WOULD HAVE BEEN

09:37  1    STARTING IN AUGUST OF 2013.  IS THAT CORRECT?

2    **A.**    YES.

3    **Q.**    OKAY.  IN AUGUST OF 2013, IS THAT ALSO WHEN THE PEG TUBE

4    WAS FIRST INSTALLED, OR WAS THAT SOME OTHER TIME?

5    **A.**    WHEN THE PEG TUB WAS SUPPOSED TO BE WHAT?

6    **Q.**    WHEN IT WAS FIRST INSERTED INTO YOUR --

7    **A.**    NO.  I WOKE UP WITH THE PEG TUBE IN THE HOSPITAL, SO IT

8    HAD TO BE IN 2012.  I DIDN'T GO TO THE HOSPITAL TO HAVE ONE PUT

9    IN AND AWAKE.

10    **Q.**    OKAY, OKAY.  AND YOU ARRIVED AT LOUISIANA STATE

11    PENITENTIARY, I BELIEVE, LATE NOVEMBER OF 2013.  IS THAT RIGHT?

12    **A.**    YES.  IT WAS THE 25TH, TO BE EXACT, TWO DAYS BEFORE MY

13    DAUGHTER'S BIRTHDAY.

14    **Q.**    OKAY.  YOU SAID THE 23RD OF NOVEMBER OF 2013?

15    **A.**    THE 25TH.

16    **Q.**    THE 25TH.  OKAY.  DO YOU RECALL A HEALTH SCREENING BEING

17    CONDUCTED ON YOU UPON ENTRY INTO THE PENITENTIARY?

18    **A.**    YOU MEAN A HEALTH SCREENING, IN WHAT MANNER?

19    **Q.**    SOME QUESTIONS BEING ASKED OF YOU AS TO THE CONDITIONS

20    THAT YOU HAD, AND SO FORTH.

21    **A.**    THE ONLY ONE THAT ASKED ME ANYTHING ABOUT MY CONDITION WAS

22    MS. ARANT.  EVERYBODY WAS TOO BUSY LOOKING TO SEE IF I WAS IN

23    THERE FOR A COCAINE CHARGE.

24    **Q.**    OKAY.  AND WHEN YOU SAY "MS. ARANT," ARE YOU REFERRING TO

25    NURSE TAMMY ARANT?

09:38   1    **A.**   YES.

2    **Q.**   OKAY.  AND IS SHE THE ONE THAT CONDUCTED THE INTAKE WITH

3    YOU?

4    **A.**   SHE WAS AT THE INTAKE ALONG WITH, I BELIEVE, IT WAS FOUR

5    OR FIVE OTHERS.  I DON'T RECALL HOW MANY WERE AT THE TABLE AT

6    THAT TIME.

7    **Q.**   OKAY.  AND YOU WERE ASKED A SERIES OF QUESTIONS, AND SO

8    FORTH.  IS THAT RIGHT?

9    **A.**   YES.

10   **Q.**   OKAY.  AND YOU MENTIONED THAT, I BELIEVE, THAT NURSE ARANT

11   DECIDED THAT YOU PROBABLY NEEDED TO GO ON THE NURSING WARD.  IS

12   THAT RIGHT?

13   **A.**   THAT IS CORRECT.

14   **Q.**   AND DID YOU AGREE WITH HER ASSESSMENT?

15   **A.**   YES, I DID.

16   **Q.**   AND SHORTLY AFTER YOUR ENTRY INTO THE PENITENTIARY YOU

17   WERE SENT OUT FOR A BARIUM SWALLOW TEST.  IS THAT RIGHT?

18   **A.**   YES.  THE FIRST ONE?

19   **Q.**   YES, THE FIRST ONE.

20   **A.**   UH-HUH.

21   **Q.**   OKAY.  AND THAT WAS -- LET'S SEE.  EXCUSE ME.  AND THERE

22   WAS A NOTATION, IT WAS JANUARY 2ND, I BELIEVE, OF -- HOLD ON

23   JUST ONE MOMENT.  I'M SORRY.  I GOT THAT DATE WRONG.  INITIALLY

24   IT APPEARS THAT YOU WERE SENT OUT ON DECEMBER 2ND OF 2013.

25   DOES THAT SOUND RIGHT?

09:39  1          MR. HAMILTON:  YOUR HONOR, I BELIEVE --

2          THE WITNESS:  NO.

3          MR. HAMILTON:  -- HE HAS TESTIFIED THAT HE DOESN'T

4    REMEMBER WHEN THE SWALLOW TEST WAS.

5          THE WITNESS:  DECEMBER 2ND OF 2013?

6    BY MS. ROPER:

7    Q.   YES, SIR.

8    A.   IT MIGHT HAVE BEEN.  I DON'T RECALL.

9    Q.   OKAY.  AND DO YOU RECALL IN THE DEPOSITION THAT WAS TAKEN

10   ON AUGUST 23RD OF 2016, BEING ASKED ABOUT WHEN THAT WOULD HAVE

11   BEEN?

12   A.   I'M NOT UNDERSTANDING YOUR QUESTION.

13   Q.   OKAY.  DO YOU RECALL BEING ASKED ABOUT A BARIUM SWALLOW

14   TEST IN YOUR DEPOSITION THAT WAS TAKEN ON AUGUST 23, 2016?

15   A.   I'M NOT SURE.

16   Q.   OKAY.  AND DO YOU RECALL SHORTLY THEREAFTER BEING SENT OUT

17   TO BE EVALUATED BY AN ORAL MAXILLOFACIAL SURGEON?

18   A.   BEING SENT OUT?  I DON'T KNOW ABOUT THE DATE, BUT I WENT

19   TO LSU AND THEY REMOVED SOME TEETH.

20   Q.   OKAY.

21   A.   AND THAT'S WHEN THE DOCTOR LOOKED AT ME.  THERE WAS TWO

22   YOUNGER STUDENTS THERE.  THEY DID THE TOOTH PULLING, AND THEN

23   THEY SENT ME BACK, AND THEN THEY TOOK -- IT WAS FOUR DOCTORS

24   THERE IN THAT GROUP, AND THEY TOOK PICTURES AND STUFF AND --

25   SEVERAL PICTURES.

1    AND THEN THAT FOLLOWING TIME I WENT BACK, THEY TOOK

2  SEVERAL MORE PICTURES BY A BUNCH OF ANOTHER GROUP OF DOCTORS,

3  AND THAT'S WHEN THEY HAD TOLD -- THEY DIDN'T TELL ME THEN.

4  THEY LET ME KNOW THAT, YES, I NEEDED IT, THAT I NEEDED THE

5  SURGERY.

6  **Q.**    AND YOU'RE SAYING THAT SEVERAL DOCTORS AT LSU EXAMINED

7  YOU.  IS THAT RIGHT?

8  **A.**    YES.

9  **Q.**    OKAY.  AND THEN YOU WERE SENT OUT SHORTLY AFTER THAT VISIT

10 TO LSU FOR ANOTHER BARIUM SWALLOW TEST LATER ON THAT MONTH?

11 **A.**    YES.  I BELIEVE SO.

12 **Q.**    OKAY.  YOU WERE THEN SENT FOR A CT EXAM ON FEBRUARY 24TH

13 OF 2014?

14 **A.**    WHAT IS THAT?

15 **Q.**    YOU WERE SENT FOR A CT SCAN?

16 **A.**    YES.

17 **Q.**    FEBRUARY 24TH?

18 **A.**    THE MACHINE THAT PUT YOU INTO THAT --

19 **Q.**    RIGHT.  THAT WAS FEBRUARY 24TH OF 2014.  DO YOU DISAGREE

20 WITH THAT?

21 **A.**    NO.  I'M NOT SURE OF THE DATES, MA'AM.

22 **Q.**    OKAY.  IF YOUR MEDICAL RECORDS REFLECT THAT DATE, DO YOU

23 HAVE ANY REASON TO DISAGREE WITH THAT?

24 **A.**    I WENT INTO -- I BELIEVE THAT WAS THE CT SCAN.  IS THAT

25 WHAT YOU'RE REFERRING TO?

09:42  1   Q.   YES, SIR.

2   A.   YES, I REMEMBER HAVING ONE.

3   Q.   OKAY.  AND THEN YOU WERE SEEN AGAIN ON MARCH 10, 2014, BY

4   THE ORAL MAXILLOFACIAL SURGEON AGAIN?

5   A.   YES.

6   Q.   YOU WERE THEN SEEN AGAIN ON APRIL 9TH OF 2014 IN THE ORAL

7   MAXILLOFACIAL -- I'M SORRY, I'M BUTCHERING THAT -- SURGEON'S

8   OFFICE FOR THE EXTRACTION OF TWO TEETH.  IS THAT RIGHT?

9   A.   YES, I BELIEVE THEY PULLED TWO TEETH ON THAT DAY.

10   Q.   YOU WERE THEN SENT FOR A SURGERY ON --

11   A.   NO.

12   Q.   I'M SORRY.  GO AHEAD.

13   A.   I MEAN, I'M NOT SURE OF THE DATE.  I KNOW WHAT'S BEEN DONE

14   TO ME, BUT I DON'T KNOW THE DATES.  I'M JUST HAVING A HARD TIME

15   WITH THE DATES.

16   Q.   BUT YOU DO RECALL A SERIES OF APPOINTMENTS PRETTY CLOSE IN

17   TIME?

18   A.   YES.

19   Q.   ONE AFTER THE OTHER?

20   A.   YES.

21   Q.   OKAY.

22   A.   I REMEMBER GOING TO THE APPOINTMENTS, THAT'S TRUE.

23   Q.   OKAY.

24   A.   BUT I ALSO REMEMBER THE DOCTOR TELLING ME THAT ANGOLA

25   WASN'T GOING TO COVER ANYTHING BECAUSE IT WAS PLASTIC SURGERY.

**Q.**   OKAY.  BUT YOU WERE THEN SENT FOR A SURGERY CONSULT ON
APRIL 14TH OF 2015, FOR REPLACEMENT OF YOUR PEG TUBE.  IS THAT
RIGHT?

**A.**   YES.  I GUESS THAT WAS --

**Q.**   AND THEN DECEMBER 29TH OF 2015, YOU WERE REFERRED FOR A
SURGICAL CONSULTATION WITH THE ORAL MAXILLOFACIAL SURGEON?

**A.**   AND THAT WAS WHAT YEAR?

**Q.**   THAT WAS DECEMBER 29TH OF 2015.  DOES THAT SOUND ABOUT
RIGHT?

**A.**   I'M NOT SURE OF THE DATES.

**Q.**   OKAY.

**A.**   BUT I KNOW --

**Q.**   BUT IF YOUR MEDICAL RECORDS REFLECT THAT DATE, DO YOU HAVE
ANY REASON TO DISAGREE WITH THAT?

**A.**   I KNOW I'VE SEEN THE MAXILLOFACIAL SURGEON FOR THE -- WHEN
MY LIP, WHEN THE GRAFT COME UP ON ONE SIDE.  AND THEN THE
SECOND ONE, THE GRAFT DETERIORATED ON THE INSIDE AND I
SWALLOWED THAT ONE.  BUT I DON'T RECALL THE DATES.

**Q.**   DO YOU RECALL ABOUT HOW MANY TIMES YOU WERE SEEN BY THE
MAXILLOFACIAL SURGEON?

**A.**   NO, I DON'T.

**Q.**   MORE THAN ONCE?

**A.**   OH, MORE THAN ONCE, YES, MA'AM.

**Q.**   SEVERAL TIMES.  RIGHT?

**A.**   YES.

1    Q.   OKAY.  YOU WERE THEN SENT FOR ANOTHER BARIUM SWALLOW TEST,

2    AND I THINK I -- PRIOR TO THE DATE FOR THE SURGEON.  I GOT A

3    LITTLE OUT OF ORDER HERE -- IS NOVEMBER 17TH OF 2015?

4    A.   I DID WHAT?

5    Q.   YOU HAD A THIRD BARIUM SWALLOW TEST ON NOVEMBER 17TH OF

6    2015.  DO YOU RECALL THAT?

7    A.   I'VE HAD TWO BARIUM SWALLOW TESTS.  LIKE I SAY, THE FIRST

8    ONE AT LALLIE KEMP, THAT ONE WAS -- THEY DIDN'T DO IT.  THEY

9    DIDN'T HAVE THE EQUIPMENT.

10   Q.   AND THE SWALLOW TEST CAME BACK NORMAL?

11   A.   I WAS NEVER INFORMED OF THAT.  I WAS JUST TOLD THAT I WAS

12   SUPPOSED TO BE ON A CHOPPED DIET.

13   Q.   OKAY.

14   A.   YOU'RE INFORMED VERY LITTLE IN THE PRISON SYSTEM.

15   Q.   OKAY.  YOU THEN HAD YOUR -- HAD AN EVALUATION ON DECEMBER

16   29TH BY A SPEECH PATHOLOGIST AT UMCNO.  IS THAT RIGHT?  DO YOU

17   RECALL THAT?

18   A.   WHAT WAS THAT FOR?

19   Q.   A SPEECH PATHOLOGIST EVALUATED YOU.

20   A.   I DON'T RECALL.

21   Q.   YOU DON'T REMEMBER THAT?

22   A.   I DON'T RECALL, NO.

23   Q.   DO YOU RECALL EARLY 2016, AROUND JANUARY 2ND, YOU WERE

24   SEEN IN THE PHYSICIAN'S CLINIC AT LSP, AND THERE WAS A NOTATION

25   IN THE MEDICAL RECORD THAT YOU HAD PASSED YOUR BARIUM SWALLOW

1  TEST?  WERE YOU AWARE OF THAT?

2  **A.**  NO.

3  **Q.**  OKAY.  SEPTEMBER 22ND, '16, YOU WERE SENT OUT FOR A

4  PRE-OP, A PRE-OPERATION EVALUATION TO PREPARE FOR YOUR

5  RECONSTRUCTION SURGERY?

6  **A.**  YES.  I MEAN, I BELIEVE THAT WAS AFTER WE FILED AN ARP AND

7  THE DEPOSITION.

8  **Q.**  OKAY.  AND YOU EVENTUALLY HAD THAT SURGERY.  RIGHT?

9  **A.**  I'VE HAD SEVERAL, SEVERAL SURGERIES, YES.

10         **MR. HAMILTON:**  OBJECTION.  THIS IS OUTSIDE THE

11  DISCOVERY PERIOD, YOUR HONOR.

12         **THE COURT:**  WHAT'S THE TIMEFRAME?

13         **MS. ROPER:**  THE TIMEFRAME OF THE SURGERY, I BELIEVE,

14  WAS A COUPLE OF WEEKS AFTER THAT, AFTER THE PRE-OP.

15         **THE COURT:**  WHICH WAS IN SEPTEMBER OF 2016?

16         **MS. ROPER:**  SO WE MAY BE A WEEK OR SO INTO OCTOBER OF

17  2016.

18         **THE COURT:**  AND WHEN WAS THE DEPOSITION?

19         **MS. ROPER:**  THE DEPOSITION WAS IN AUGUST OF 2016.

20         **THE COURT:**  ALL RIGHT.  IT'S ASKED AND ANSWERED.

21  I'LL ALLOW IT.

22  BY MS. ROPER:

23  **Q.**  YOU WERE EVENTUALLY DISCHARGED FROM THE NURSING UNIT.

24  CORRECT?

25  **A.**  MA'AM?

1   Q.   YOU NO LONGER LIVE ON THE NURSING UNIT.  RIGHT?

2   A.   NO.  THEY HAD --

3        MR. HAMILTON:  OBJECTION, YOUR HONOR.  IT'S OUTSIDE

4   THE DISCOVERY PERIOD AS WELL.

5        THE COURT:  SUSTAINED.

6        MS. ROPER:  YOUR HONOR, I WOULD LIKE TO PROFFER SOME

7   OF THIS INFORMATION.

8        THE COURT:  YOU CAN PROFFER IT AT THE BREAK.

9        MS. ROPER:  OKAY.  THANK YOU.

10  BY MS. ROPER:

11  Q.   MR. BARRERA, LET'S FOCUS ON YOUR PEG TUBE FOR A MOMENT.

12  OKAY?  YOU RECEIVED YOUR MEDICATION WHILE YOU WERE ON THE

13  NURSING UNIT THROUGH YOUR PEG TUBE.  IS THAT RIGHT?

14  A.   YES, SOMETIMES.  WELL, IT WAS LATER.

15  Q.   OKAY.  AND THEY WOULD CRUSH IT UP?

16  A.   I WOULD CRUSH IT UP.

17  Q.   YOU WOULD CRUSH IT UP?

18  A.   YEAH.  THEY GAVE ME A PILL CRUSHER.

19       MR. HAMILTON:  YOUR HONOR, I'D LIKE TO CORRECT MY

20  PREVIOUS OBJECTION.  MR. BARRERA MOVED OFF THE WARD IN DECEMBER

21  OF 2015, I BELIEVE, WHICH IS WITHIN THE DISCOVERY PERIOD.

22       THE COURT:  OKAY.  YOU CAN ASK THE QUESTION.  HE HAS

23  WITHDRAWN HIS OBJECTION.

24       MS. ROPER:  THANK YOU, YOUR HONOR.

25       THE COURT:  DOES THAT CLEAR YOUR PROFFER?

1    **MS. ROPER:**  IT DOES ON THAT PARTICULAR POINT, YES,
2  YOUR HONOR.
3         **THE COURT:**  ALL RIGHT.
4  BY MS. ROPER:
5  **Q.**   SO MR. BARRERA, AS FAR AS THE -- YOU EVENTUALLY MOVED OFF
6  THE WARD.  CORRECT?
7  **A.**   I WAS MOVED OFF THE WARD DUE TO THE FACT THAT THEY SAY I
8  SEE TOO MUCH THAT GOES ON.
9  **Q.**   THAT YOU WHAT?
10 **A.**   THAT I SEE TOO MUCH THAT GOES ON IN THE WARD AND THEY
11 HAD --
12        **THE COURT:**  WELL, SHE DIDN'T ASK WHY YOU WERE MOVED
13 OFF THE WARD.  SHE ASKED YOU WERE YOU MOVED OFF THE WARD?
14        **THE WITNESS:**  MA'AM?
15        **THE COURT:**  WERE YOU MOVED OFF THE WARD, NOT WHY WERE
16 YOU MOVED OFF THE WARD.
17        **THE WITNESS:**  YES.
18        **THE COURT:**  WERE YOU MOVED OFF THE WARD IN 2015?
19        **THE WITNESS:**  YES, MA'AM.
20        **THE COURT:**  OKAY.  NEXT QUESTION.
21 BY MS. ROPER:
22 **Q.**   MR. BARRERA, YOU THEN WERE MOVED TO THE ASSISTED LIVING
23 DORM.  IS THAT RIGHT?
24 **A.**   MA'AM?
25 **Q.**   YOU ARE NOW LIVING -- OR YOU WERE MOVED TO THE ASSISTED

09:49  1   LIVING DORM AFTER THE WARD.  IS THAT RIGHT?

2   **A.**   ASH 2.

3   **Q.**   ASH 2.  AND THAT IS AN ASSISTED LIVING DORM?

4   **A.**   I DON'T KNOW WHERE THE ASSISTANCE COMES FROM.

5   **Q.**   OKAY.

6   **A.**   I MEAN, THAT'S WHERE I LIVE, IN ASH 2.

7   **Q.**   YOU LIVE IN ASH 2?

8   **A.**   YES.

9   **Q.**   OKAY.  OR YOU WERE MOVED TO ASH 2.  UP UNTIL SEPTEMBER 30,

10   2016, YOU REMAIN IN ASH 2?

11   **A.**   I STILL REMAIN IN ASH 2.

12   **Q.**   OKAY.  AND WHILE YOU WERE IN ASH 2, DID YOU HAVE ANY

13   ASSISTANCE FROM ANY HEALTHCARE ORDERLIES WHILE YOU WERE IN ASH

14   2?

15          **MR. HAMILTON:**  OBJECTION, YOUR HONOR.  THIS IS

16   OUTSIDE THE SCOPE OF HIS TESTIMONY.

17          **THE COURT:**  I'M GOING TO ALLOW IT.

18          **THE WITNESS:**  DID I HAVE ANY ASSISTANCE?

19          **MS. ROPER:**  YES, SIR.

20          **THE WITNESS:**  WELL, I DON'T KNOW, MAYBE MOVED MY BED

21   WHEN IT'S TIME TO GI WHEN THEY COME IN AND SPRAY WATER

22   EVERYWHERE INSIDE THE -- INSIDE YOUR ASSISTED LIVING DORM, YES.

23   **BY MS. ROPER:**

24   **Q.**   OKAY.  AND YOU'VE NEVER HAD ANY PROBLEM WITH ANY

25   HEALTHCARE ORDERLY.  RIGHT?

1   **A.**   NOT THAT I KNOW OF.

2   **Q.**   IN FACT, THEY ARE PRETTY GOOD, AREN'T THEY?

3   **A.**   IT DEPENDS HOW YOU'RE GRADING THEM.

4   **Q.**   DO YOU RECALL TELLING ME THAT IN YOUR DEPOSITION?

5   **A.**   HUH?

6   **Q.**   DO YOU RECALL THAT?

7   **A.**   YES, YES.

8   **Q.**   YOU DO?

9   **A.**   I DO.

10  **Q.**   OKAY.  AS FAR AS YOUR PEG TUBE, THE NOURISHMENT THAT YOU

11  WERE TO RECEIVE FROM THAT, YOU WERE GIVEN PROTEIN SHAKES BY THE

12  STAFF?

13  **A.**   YES.

14  **Q.**   OKAY.  AND HOW MANY TIMES A DAY WERE YOU GIVEN THE PROTEIN

15  SHAKES THROUGH YOUR PEG TUBE?

16  **A.**   WHEN I WAS ON THE WARD OR WHEN I WAS --

17  **Q.**   LET'S FIRST START WHEN YOU WERE ON THE WARD.

18  **A.**   ON THE WARD.  WHEN I WAS PUT IN THE ROOM, DR. MACMURDO PUT

19  ME DOWN TO THREE CANS A DAY:  BREAKFAST, LUNCH, AND DINNER.

20  **Q.**   OKAY.  YOU MAINTAINED THAT THE ENTIRE TIME YOU WERE ON THE

21  WARD?

22  **A.**   MA'AM?

23  **Q.**   IS THAT WHAT YOU RECEIVED FOR THE DURATION OF THE TIME

24  THAT YOU WERE ON THE WARD?

25  **A.**   YES.

09:52  1   **Q.**   OKAY.  AND YOU WERE ALSO PRESCRIBED A MECHANICAL SOFT DIET

2   AT SOME POINT?

3   **A.**   YES.

4   **Q.**   AND, IN FACT, YOU HAD HAD A MECHANICAL SOFT DIET

5   PRESCRIBED FOR YOU BEFORE YOU CAME TO LOUISIANA STATE

6   PENITENTIARY.  RIGHT?

7   **A.**   YEAH.

8   **Q.**   OKAY.  BUT YOU DISCONTINUED THAT ON YOUR OWN, DIDN'T YOU?

9   **A.**   WHEN I GOT, WHEN I GOT PUT -- WENT TO HUNT, I DIDN'T HAVE

10  NO EQUIPMENT FOR A MECHANICAL SOFT DIET.

11           WHEN I WAS AT -- WHEN I WAS IN THE PARISH, THEY FED

12  ME STUFF THAT WAS CAPABLE OF EATING, MECHANICAL SOFT.

13  **Q.**   AND SO DO YOU AGREE THAT YOU DISCONTINUED THAT ON YOUR

14  OWN?

15  **A.**   MA'AM?

16  **Q.**   DO YOU AGREE THAT YOU DECIDED TO DISCONTINUE YOUR SOFT

17  DIET ON YOUR OWN?

18  **A.**   I'M NOT UNDERSTANDING YOU.

19  **Q.**   OKAY.  IF YOUR MEDICAL RECORDS INDICATE THAT YOU DECIDED

20  TO DISCONTINUE YOUR SOFT DIET, WOULD YOU DISAGREE WITH THAT?

21  **A.**   YOU HAVE MY SIGNATURE?

22  **Q.**   NO, THAT'S NOT WHAT I'M ASKING YOU.

23  **A.**   I KNOW.

24  **Q.**   ARE YOU TELLING ME THAT IS NOT CORRECT?

25  **A.**   THAT IS NOT CORRECT.

1    **MS. ROPER:**  OKAY.  I'D LIKE TO PULL UP JOINT EXHIBIT

2    10D.

3              **THE DEPUTY CLERK:**  AND IT'S UNDER SEAL?

4              **MS. ROPER:**  IT'S UNDER SEAL, YOUR HONOR.  10D AND THE

5    NUMBER IS --THE BATES NUMBER IS 10-03749.

6    **BY MS. ROPER:**

7    **Q.**   ON THE RIGHT-HAND SIDE WHERE "S" IS IN THE RECORD, CAN YOU

8    READ THAT, MR. BARRERA?

9    **A.**   (NO ORAL RESPONSE.)

10   **Q.**   I'D LIKE TO READ, "PATIENT HERE FOR FOLLOW-UP VISIT TO

11   CHECK ON HIS CONDITION . . ." AND THEN SKIP TO "BOTTOM LIP IS

12   MISSING AND AS A RESULT, HE HAS TROUBLE CONTROLLING SALIVA AND

13   SLOBBERING."  DO YOU AGREE WITH THAT?

14   **A.**   YEAH, I DO.

15   **Q.**   IT SAYS THAT YOU DENIED ANY PROBLEMS AT THAT TIME.  DO YOU

16   AGREE WITH THAT STATEMENT IN THE RECORD?

17   **A.**   THAT I DENY ANY PROBLEMS?

18   **Q.**   YES, SIR.

19   **A.**   NO.

20   **Q.**   YOU DON'T AGREE WITH THAT?

21   **A.**   NO.

22   **Q.**   OKAY.  AND THEN THE NEXT THING SAYS, "HE STATES THAT HE

23   SELF DISCONTINUED HIS MECHANICAL SOFT DIET AND IS CUTTING UP

24   HIS OWN FOOD BUT ADMITS TO HAVING SOME DIFFICULTY."  DO YOU

25   AGREE WITH THAT STATEMENT?

1 **A.**   YEAH, BUT THEY WASN'T GIVING ME ANYTHING THAT WAS CAPABLE

2 OF EATING.   I HAD NO CHOICE BUT TO CUT IT UP MYSELF.

3 **Q.**   OKAY.   AND THEN THE NEXT SENTENCE SAYS, "HE SAYS, THOUGH,

4 THAT HE FEELS SATED," MEANING FULL.   DO YOU DISAGREE WITH THAT?

5 **A.**   MA'AM?

6 **Q.**   DO YOU DISAGREE WITH THE STATEMENT IN YOUR RECORD THAT YOU

7 FELT --

8 **A.**   YES.

9 **Q.**   -- SATED, WHICH IF YOU DON'T KNOW WHAT THAT MEANS --

10 **A.**   I DON'T KNOW.   I DON'T RECALL SEEING THIS PAPER.

11 **Q.**   ALL RIGHT.   THANK YOU.

12         ALL RIGHT.   SO YOU INDICATED, I BELIEVE, FRIDAY THAT

13 THE DIET THAT YOU WERE PRESCRIBED AT LOUISIANA STATE

14 PENITENTIARY WAS NOT GIVEN TO YOU.   DID I UNDERSTAND THAT

15 CORRECTLY?

16 **A.**   YES.

17 **Q.**   OKAY.   BUT YOU NEVER MADE ANY KIND OF COMPLAINTS TO ANYONE

18 TO LET THEM KNOW?

19 **A.**   I'M SITTING IN A HOSPITAL HAVING TO TAKE MY FOOD AND SHOVE

20 IT DOWN MY THROAT, AND YOU HAVE FOUR NURSES SITTING IN THE WARD

21 WATCHING YOU DO EVERYTHING AND DOCTORS COMING IN AND OUT, I

22 DON'T BELIEVE I SHOULD HAVE TO VOICE IT.   THEY KNOW MY

23 CONDITION.   THEY HAD PAPERWORK BEHIND MY CONDITION.

24 **Q.**   SO YOU NEVER HAD ANY CONVERSATIONS WITH ANYONE ABOUT THE

25 FACT THAT YOU WERE NOT RECEIVING A SOFT DIET?

1   **A.**   HAVE I EVER?  YES.

2   **Q.**   WHO DID YOU HAVE CONVERSATIONS WITH?

3   **A.**   I HAD CONVERSATIONS WITH DR. LAVESPERE ABOUT NOT RECEIVING

4   MY DIET.

5   **Q.**   OKAY.  AND DID DR. LAVESPERE REFUSE TO GIVE YOU YOUR DIET?

6   **A.**   DR. LAVESPERE DID NOT REFUSE TO GIVE ME MY DIET.  HE SAID

7   HE MADE A SHEET OUT.

8           AS A MATTER OF FACT, WHEN WE TALKED THAT DAY, THE

9   FIRST TIME HE MADE A DIET, I TOOK IT TO THE KITCHEN.  THE

10  SECOND TIME HE GAVE IT TO ME, I HAD TO COME BACK BECAUSE THEY

11  WERE NOT SENDING ME ANYTHING FROM THE KITCHEN.

12  **Q.**   DID HE --

13  **A.**   SO I WENT BACK WITH IT.  I TALKED TO DR. LAVESPERE.  HE

14  GAVE ME THE DIET SHEET OR THE PAPERWORK TO GET IT DONE.  I TAKE

15  IT BACK OVER THERE.  AND THEN THEY GET START -- SHE GOT THAT

16  AND THEN THEY STARTED SENDING ME CHICKEN BROTH AND -- CHICKEN

17  BROTH AND MUSHROOMS, CONDENSED MUSHROOMS, MIXED TOGETHER IN A

18  PEANUT BUTTER CAN -- SENDING IT TO ME.  THAT WAS MY WHOLE MEAL.

19  THEY WOULD SEND EVERYTHING IN THAT BUCKET FOR ONE DAY.  THAT

20  WAS EVERY DAY FOR -- THE SAME MEAL EVERY DAY FOR SEVERAL

21  MONTHS, SEVERAL MONTHS.  THEY CHANGED PERSONNEL IN THERE AND

22  NOW -- BUT I STILL DON'T RECEIVE A DIET.

23  **Q.**   AND IS IT YOUR REPRESENTATION THAT YOU WERE NOT ABLE TO

24  EAT ANYTHING BUT A SOFT DIET?

25  **A.**   I EAT SOFT FOOD, YEAH.  I MEAN, CHOPPED UP, CRUSHED UP,

09:58   1   YOU KNOW, I TAKE A -- LIKE I WOULD GET THE VANILLA WAFERS OR

2   MASHED POTATOES, BUT I'D CRUSH THEM UP AND SOAK THEM IN THE

3   MILK AND THAT'S THE ONLY WAY I WOULD EAT IT.

4   **Q.**   WERE YOU ABLE TO EAT CHIPS?

5   **A.**   I DON'T EAT NO CHIPS.

6   **Q.**   AND OATMEAL RAISIN COOKIES?

7   **A.**   OATMEAL RAISIN COOKIES THAT I BOUGHT I WOULD PUT THEM IN

8   MY COFFEE, CRUSH THEM UP AND PUT THEM IN MY COFFEE.

9   **Q.**   HONEYBUNS?  DID YOU EAT HONEYBUNS AS WELL?

10   **A.**   DID I EAT HONEYBUNS?

11   **Q.**   YES, SIR.

12   **A.**   NO.

13   **Q.**   JALAPEÑOS?

14   **A.**   JALAPEÑOS?

15   **Q.**   YES, SIR.

16   **A.**   NO.

17   **Q.**   CHEETOS?

18   **A.**   NO CHEETOS.

19   **Q.**   BEEF STEW?

20   **A.**   NO.

21   **Q.**   CRACKERS?

22   **A.**   YEAH.  IN MY BOX OF CRACKERS --I KNOW WHERE YOU'RE LEADING

23   TO BECAUSE YOU HAVE MY GROCERY LIST.

24   **Q.**   I HAVE YOUR WHAT LIST?

25   **A.**   THE COMMISSARY LIST --

09:59   1   Q.   YES, SIR.

2   A.   -- IS WHAT YOU'RE READING OFF OF.

3   Q.   DO YOU AGREE THAT YOU ORDERED THESE THINGS AND PURCHASED

4   THEM?

5   A.   I BOUGHT EVERY BIT OF THAT.

6   Q.   OKAY.  TOASTER PASTRIES?

7   A.   EVERY BIT.

8   Q.   TORTILLAS?

9   A.   EVERY BIT.

10   Q.   HOT SAUCE, PEPPERMINT TWISTS?

11   A.   PEPPERMINT TWISTS?  YEAH.

12   Q.   LITTLE DEBBIES?

13   A.   YEAH.

14   Q.   SOMETHING CALLED KAYAK FINE LONG CUT.  IS THAT CHEWING

15   TOBACCO?

16   A.   THAT'S A TOBACCO, YES.

17   Q.   OKAY.  YOU USED THAT AS WELL?

18   A.   NO.

19   Q.   OKAY.  YOU PURCHASED THAT ON THREE OCCASIONS, DIDN'T YOU?

20   A.   MA'AM?

21   Q.   YOU PURCHASED THAT ON AT LEAST THREE OCCASIONS IN THESE?

22   A.   EXACTLY.  I PURCHASED THAT.  THERE'S NOTHING IN MY DIET

23   THAT RESTRICTS ME FROM PURCHASING ANYTHING THAT THE CANTEEN

24   OFFERS.

25   Q.   SO YOU'RE NOT DENYING THAT YOU PURCHASED THESE ITEMS?

1   A.   NOT AT ALL.

2   Q.   OKAY.  PEANUT BUTTER ALSO.  RIGHT?

3   A.   MA'AM?

4   Q.   YOU ALSO PURCHASED PEANUT BUTTER?

5   A.   YES.

6   Q.   ON MORE THAN ONE OCCASION?

7   A.   MA'AM?

8   Q.   ON MORE THAN ONE OCCASION YOU PURCHASED PEANUT BUTTER?

9   A.   YES.

10  Q.   OKAY.  AND WERE YOU EATING THESE ITEMS?

11  A.   MA'AM?

12  Q.   YOU WERE NOT EATING THESE ITEMS?

13  A.   I WOULD MIX IN MY -- I'D MIX MY PEANUT BUTTER WITH THE

14  ENSURE AND THE COFFEE.

15  Q.   AND AS FAR AS THE CHIPS, YOU WERE SOAKING THOSE?

16  A.   CRUSH THE CHIPS WITH LIKE A -- WITH THE MACARONI AND

17  CHEESE CASSEROLE LIKE AND COOK IT DOWN TO WHERE IT'S REAL SOFT,

18  AND THAT'S WHAT I ATE.

19  Q.   OKAY.  YOU MENTIONED THAT YOU WERE NOT ALLOWED TO TAKE

20  CLASSES WHILE YOU WERE ON THE NURSING WARD.  RIGHT?

21  A.   YES, WHILE I WAS ON -- IN THE MEDICAL WARD.

22  Q.   OKAY.  AND WAS THERE A PARTICULAR URGENCY TO YOUR NEED TO

23  TAKE THESE CLASSES?

24  A.   WELL, ONCE I FOUND OUT THAT I NEEDED TO TAKE THEM, I DON'T

25  LIKE PUTTING OFF THINGS, SO I NEEDED -- THE STATE REQUIRED ME

10:01 1   TO TAKE THEM THREE SPECIFIC CLASSES BEFORE MY RELEASE.  SO I

2   WAS IN THE WARD, DIDN'T HAVE NOTHING TO DO, READ BOOKS OR

3   WHATEVER, BUT IT WAS A PRIME OPPORTUNITY TO TAKE MY CLASSES.

4   **Q.**   BUT THERE WAS NO PARTICULAR REASON YOU HAD TO TAKE YOUR

5   CLASSES BEFORE YOU GOT OFF OF THE NURSING WARD.  CORRECT?

6   **A.**   IT'S A REQUIREMENT OF THE STATE FOR ME TO HAVE THAT.

7   **Q.**   BEFORE YOU'RE RELEASED.  CORRECT?

8   **A.**   MA'AM?

9   **Q.**   BEFORE YOU ARE RELEASED?

10   **A.**   YES.

11   **Q.**   BUT YOU'RE NOT ABOUT TO BE RELEASED ANYTIME SOON?

12   **A.**   WELL, YES, IT'S COMING.  IT'S SLOW.

13   **Q.**   OKAY.  BUT AT THE TIME YOU WERE ON THE NURSING WARD, IT

14   WAS NOT IMMINENT THAT YOU WERE ABOUT TO BE RELEASED, WAS IT?

15   **A.**   WELL, YES, FOR ME.  MAYBE FOR YOU IT'S NOT IMPORTANT, BUT

16   FOR MYSELF IT IS IMPORTANT BECAUSE IT WAS SOMETHING THAT I

17   NEEDED.  IF YOU WERE TO TRY TO SCHEDULE YOURSELF A CLASS, YOU'D

18   PROBABLY BE ON A WAITING LIST.

19          I TOOK THE CLASSES IN 2015, '16, SOMETHING LIKE THAT.

20   I GOT CERTIFICATES FOR IT.  BUT WE WERE TOLD ON THE WARD THEY

21   DON'T MAKE NO -- ON WARD 2 IS AN ASSISTED LIVING WARD,

22   LONG-TERM, SO I FIGURED I WAS GOING TO BE ON THERE FOR A WHILE,

23   SO I WOULD TAKE MY CLASSES.

24   **Q.**   AND HOW LENGTHY WAS THE CLASS THAT YOU HAD TO TAKE FOR

25   ANGER MANAGEMENT?

10:03

1  **A.**   MA'AM?

2  **Q.**   I THINK YOU SAID THAT YOU HAD TO TAKE A CLASS FOR ANGER

3  MANAGEMENT.  IS THAT RIGHT?

4  **A.**   I TAKE ANGER MANAGEMENT, SUBSTANCE ABUSE, AND A 100-HOUR

5  CLASS.  THAT'S WHAT -- AS FAR AS -- I DON'T KNOW HOW THE STATE

6  RATES WHAT CLASSES YOU HAVE TO DO BUT THEM WERE THE CLASSES

7  THAT WERE REQUIRED.

8  **Q.**   OKAY.  AND THE 100-HOUR CLASS, IS THAT ONE OF THE TWO THAT

9  YOU'D MENTIONED, OR THAT WAS SOMETHING ELSE?

10  **A.**   WAS THAT WHAT?

11  **Q.**   ONE OF THE TWO CLASSES THAT YOU MENTIONED BY NAME, OR WAS

12  THAT AN ADDITIONAL CLASS?

13  **A.**   NO, THAT'S A -- ALL THREE ARE SINGLE CLASSES ALONE.  YOU

14  DON'T TAKE NONE OF THEM AT ONCE, JUST ONE TIME.

15  **Q.**   OKAY.  BUT YOU HAVE BEEN ABLE TO TAKE AND COMPLETE THOSE

16  CLASSES.  RIGHT?

17  **A.**   YES, MA'AM.

18  **Q.**   OKAY.  AND YOU WERE ABLE TO BEGIN THAT UPON YOUR RELEASE

19  FROM THE NURSING WARD.  RIGHT?

20  **A.**   THE WHAT?

21  **Q.**   YOU WERE ABLE TO BEGIN YOUR CLASSES UPON RELEASE FROM THE

22  NURSING WARD.  RIGHT?

23  **A.**   WELL, NO, NOT EXACTLY.  I HAD APPLIED FOR THE CLASSES AND

24  THERE WERE BEING DELAYED, SO I WENT AND ASKED SOMEBODY BEHIND

25  THE CLASSES.  AND AT THAT TIME, A LOT OF THE LIFERS WERE IN

1   CLASSES AND THEY WERE BACKLOGGED.  I HAD TOLD THEM -- AND I

2   TOLD THE YOUNG MAN THAT I WAS TRYING TO TAKE THE CLASSES

3   BECAUSE THAT'S WHAT I NEEDED AND IF HE COULD FIND TIME, PUT ME

4   IN A CLASS IF HE COULD PUT ME IN A CLASS.

5   **Q.**   OKAY.  AND THEN YOU WERE PUT IN A CLASS?

6   **A.**   BUT I COULDN'T NEVER GET ANYTHING IN THE WARD.

7   **Q.**   OKAY.  WHEN DID YOU COMPLETE ALL OF YOUR CLASSES?

8   **A.**   OH, ROUGHLY IN '15 -- '16 BECAUSE I DIDN'T GO TILL -- HAD

9   TO BE IN '15, PROBABLY ABOUT THE MIDDLE.

10  **Q.**   ABOUT THE MIDDLE OF 2016?

11  **A.**   YEAH, SOMEWHERE IN THAT AREA.

12  **Q.**   OKAY.  AND WHEN DID YOU GET OFF THE NURSING WARD?

13  **A.**   I GOT OFF THE WARD ON -- I BELIEVE IT WAS DECEMBER 15TH

14  WHEN I WAS MOVED TO THE DORM.

15  **Q.**   DECEMBER 15TH OF 2015?

16  **A.**   YES, MA'AM.

17  **Q.**   OKAY.  DO YOU RECALL BEING ASKED ABOUT WHETHER OR NOT YOU

18  NEEDED ANY ACCOMMODATIONS UPON YOUR ENTRY INTO LOUISIANA STATE

19  PENITENTIARY?

20  **A.**   I DON'T RECALL, NO.

21  **Q.**   OKAY.

22  **A.**   I MEAN, ONCE THEY WERE -- ONCE I WAS TOLD I WOULD GO TO

23  THE WARD --

24  **Q.**   SO ARE YOU DENYING IT, OR YOU JUST DON'T RECALL IT?

25  **A.**   NO, I DON'T RECALL.  BUT ONCE I WENT TO THE WARD -- I

1   MEAN, KNOWING THAT I WAS GOING TO BE IN THE MEDICAL WARD, I

2   FIGURED I WOULD GET THE ATTENTION THAT I NEEDED BEING THAT

3   Y'ALL KNOWING MY CONDITION I WOULD -- THAT WOULD BE PROVIDED

4   FOR ME.

5   **Q.**   OKAY.

6   **A.**   TO GET THINGS AT ANGOLA, YOU HAVE TO PRETTY MUCH PRESSURE

7   PEOPLE TO DO IT OR BE CONSISTENT BEHIND IT.  AND WHEN I -- I

8   NEVER DONE THIS.  SO I CAME TO THE WARD, THE DOCTORS, THE

9   NURSES, EVERYTHING RIGHT THERE ON TOP OF YOU, YOU FIGURED YOU

10  WOULD GET WHAT YOU NEEDED THERE WITHOUT HAVING TO ASK FOR IT

11  BECAUSE THEY ALREADY KNOW YOUR CONDITION.

12          **MS. ROPER:**  I'D LIKE TO PULL UP JOINT EXHIBIT --

13          **THE DEPUTY CLERK:**  IS IT SEALED?

14          **MS. ROPER:**  YES, SEALED, YOUR HONOR.  THE NUMBER IS

15  10-03748, THE BATES NUMBER.  IT IS JOINT EXHIBIT 10D1.

16  **BY MS. ROPER:**

17  **Q.**   CAN YOU TAKE A LOOK AT THAT FOR ME, MR. BARRERA, AND TELL

18  ME IF YOU RECOGNIZE YOUR SIGNATURE ANYWHERE ON THAT DOCUMENT?

19  **A.**   IF I RECOGNIZE WHAT?

20  **Q.**   YOUR SIGNATURE, SIR.

21  **A.**   YES, MA'AM.

22  **Q.**   OKAY.  AND CAN YOU READ THE -- THE BEGINNING OF THE FORM

23  IS -- IS IT "REQUEST FOR ACCOMMODATION"?  DO YOU AGREE WITH

24  THAT?

25  **A.**   YES.

10:07   1   **Q.**   OKAY.  AND DO YOU SEE YOUR INITIALS ON THE FORM AT ALL?

2   **A.**   I DIDN'T UNDERSTAND YOU.  I COULDN'T HEAR YOU CLEARLY.

3   **Q.**   OKAY.  TOWARD THE TOP OF THE FORM THERE IS WHAT APPEARS TO

4   BE YOUR INITIALS, AN "O" AND A "B" BY "I DO NOT REQUEST AN

5   ACCOMMODATION."

6   **A.**   YES.

7   **Q.**   DO YOU SEE THAT?

8   **A.**   UH-HUH.

9   **Q.**   ARE YOU DENYING THAT THAT IS YOUR --

10   **A.**   OH, THAT'S MY SIGNATURE.

11   **Q.**    -- INDICATION?

12   **A.**   I INITIALED IT.

13   **Q.**   OKAY.

14   **A.**   I DON'T UNDERSTAND THAT FORM, "REQUEST FOR ACCOMMODATION."

15   IF I WAS GOING TO BE IN THE HOSPITAL, WHAT MORE ACCOMMODATION

16   WOULD I NEED?

17   **Q.**   OKAY.  SO WHEN YOU SIGNED THE FORM, YOU DIDN'T UNDERSTAND

18   WHAT YOU WERE SIGNING?

19   **A.**   HUH?

20   **Q.**   YOU DID NOT UNDERSTAND WHAT YOU WERE SIGNING?

21   **A.**   YES.  I JUST FIGURED I'M ON THE WARD, THE MEDICAL SERVICES

22   SHOULD BE PROVIDED THERE.

23   **Q.**   OKAY.  AND THIS FORM IS DATED 11/25/13.  CORRECT?

24   **A.**   YES.

25   **Q.**   AND THAT WOULD HAVE BEEN AS A PART OF YOUR INTAKE INTO THE

10:08   1   PRISON.  CORRECT?

2   **A.**    UH-HUH.  YES, MA'AM.

3   **Q.**    OKAY.  THANK YOU, MR. BARRERA.

4           **THE COURT:**  REDIRECT?

5           **MR. HAMILTON:**  VERY BRIEFLY, YOUR HONOR.

6           **THE WITNESS:**  YOU'RE WELCOME.

7                   **REDIRECT EXAMINATION**

8   **BY MR. HAMILTON:**

9   **Q.**    MR. BARRERA, I JUST WANT TO GO BACK TO ONE OF THE EXHIBITS

10   THAT DEFENSE COUNSEL SHOWED YOU.

11           ALEXANDER, COULD YOU BRING UP JOINT EXHIBIT 10-03749.

12           MR. BARRERA, CAN YOU READ THE DATE AT THE TOP OF THAT

13   RECORD?  IT'S ON THE TOP LEFT-HAND SIDE.

14   **A.**    NOVEMBER 15, 2013.

15   **Q.**    THANK YOU.  AND CAN YOU READ THE NAME OF THE INSTITUTION

16   AT THE CENTER OF THE PAGE ON THE TOP?

17   **A.**    ELAYN HUNT CORRECTIONAL CENTER.

18   **Q.**    SO THIS IS FROM ELAYN HUNT IN 2013?

19   **A.**    YEAH.

20   **Q.**    AND I BELIEVE YOU WERE DIRECTED TO THE NOTATION THAT SAYS,

21   "HE STATES THAT HE SELF-DISCONTINUED HIS MECHANICAL SOFT DIET."

22   DID YOU, IN FACT, DISCONTINUE YOUR MECHANICAL SOFT DIET?

23   **A.**    I COULDN'T DISCONTINUE IT IF I WAS NEVER PROVIDED ONE.

24   **Q.**    OKAY.  REGARDING YOUR DIET, DID YOU ASK PEOPLE IN THE

25   PRISON, IN THE KITCHEN TO GIVE YOU HELP GETTING THE MECHANICAL

SOFT DIET?

**A.**    WHEN I WAS ON -- WHEN I GOT MOVED TO ASH 2, THEY KNEW WHAT I NEEDED, BUT IT WAS NEVER BEING SENT FROM THE KITCHEN.  AND WHEN THEY WOULD GO DOWN THERE, THE OFFICER IN THE KITCHEN WOULD TELL THEM THEY WASN'T GOING TO PROVIDE IT.  ONE OF THEM GOT CUSSED OUT AND TOLD TO GET OUT OF THE KITCHEN.  EVERYTHING PRETTY MUCH AT ANGOLA IS JUST VERY UNPROFESSIONAL.

**Q.**    DID YOU REQUEST TO HAVE A BLENDER OR A FOOD PROCESSOR?

**A.**    WHEN I WAS ON, WHEN I WAS ON THE WARD, AND EVEN AFTER I LEFT THE WARD, I HAD TOLD THE NURSE, YOU KNOW, WHY CAN'T I BUY MY BLENDER.  MY PEOPLE WILL BUY ME A BLENDER.  MY FAMILY WHO TAKES CARE OF ME, THEY'LL BUY ME WHAT I NEED.  THEY TOLD ME I COULDN'T HAVE THAT.  BUT IT JUST -- YOU HAVE TO -- I BELIEVE YOU HAVE TO BE OF THE CHOSEN FEW TO GET WHAT YOU NEED.  THEY CAN HAVE COFFEE POTS, COOKERS, TOASTERS, WHATEVER, BUT TO PROVIDE FOR MY MEDICAL NEEDS, I CAN'T HAVE IT.

**Q.**    OKAY.  AND DEFENSE COUNSEL REFERRED TO SEVERAL ITEMS ON YOUR COMMISSARY LIST THAT YOU BOUGHT.  DID YOU EAT ALL OF THOSE ITEMS, MR. BARRERA?

**A.**    NO.  I KNOW THERE'S MANY HERE IN --

              **MS. ROPER:**  YOUR HONOR --

              **THE WITNESS:**  IN COURT AND MANY HERE TO KNOW --

              **MS. ROPER:**  YOUR HONOR, OBJECTION.

              **THE COURT:**  SIR, JUST A MINUTE.  ONE MOMENT, PLEASE.
                      YES?

10:12   1          **MS. ROPER:**  YOUR HONOR, THAT WAS ASKED AND IF HE

2    DIDN'T LIKE THE ANSWER, HE'S ASKING IT AGAIN.  I BELIEVE IT'S

3    AN ATTEMPT TO LEAD.

4          **THE COURT:**  IT'S REDIRECT.  YOU WENT INTO IT.  YOU

5    ASKED HIM IF THEY WERE ON HIS COMMISSARY LIST.  OVERRULED.

6    **BY MR. HAMILTON:**

7    **Q.**  I JUST WANT TO CLARIFY, MR. BARRERA.  WHAT DID YOU DO WITH

8    THE ITEMS THAT YOU GOT AT THE COMMISSARY THAT YOU DIDN'T EAT?

9    **A.**  WELL, THERE'S A LOT OF LESS UNFORTUNATE PEOPLE THAN MYSELF

10   AND --

11         **THE DEPUTY CLERK:**  CAN YOU TALK INTO THE MICROPHONE?

12         **THE REPORTER:**  REPEAT WHAT YOU JUST SAID.

13         **THE WITNESS:**  I AM.  THERE'S A LOT MORE UNFORTUNATE

14   PEOPLE IN THAT MEDICAL DORM THAT SOME HAVE NOTHING, AND IT'S

15   EASY TO BUY COOKIES OR CRACKERS AND HAND THEM OUT.  SOMETIMES

16   THEY WANT TO EAT.  SOMETIMES WE EAT FAIRLY EARLY.  IN THE DORM

17   OUR LAST MEAL NORMALLY COMES AROUND 2:00, 2:30 AND THEY EAT

18   EARLY.  SOME OF THE GUYS SOMETIMES ARE HUNGRY.  I DON'T MIND

19   GIVING ANYBODY ANYTHING.

20         **MR. HAMILTON:**  THANK YOU, MR. BARRERA.  THAT'S ALL

21   THE QUESTIONS I HAVE.

22         **THE WITNESS:**  YOU'RE WELCOME.

23         **THE COURT:**  YOU MAY STEP DOWN, SIR.

24            YOUR NEXT WITNESS.

25         **MR. DAVIDSON:**  GOOD AFTERNOON, YOUR HONOR.  AT THIS

1   TIME WE CALL CHARLES BUTLER.

2            **MS. MONTAGNES:**  YOUR HONOR, WHILE WE WAIT FOR MR.

3   BUTLER TO COME OUT, I WOULD LIKE TO SAY ON THE RECORD THAT MR.

4   HAMILTON DID NOT IN ANY WAY SUBORN PERJURY AND THAT THROWING

5   AROUND THAT IMPLICATION --

6            **THE COURT:**  OKAY, WE DON'T NEED TO GO THERE.  YOU MAY

7   SIT DOWN.  THANK YOU.

8                        **CHARLES T. BUTLER,**

9   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

10           **MR. DAVIDSON:**  YOUR HONOR, IF WE CAN BE SURE THAT MR.

11  BUTLER IS ABLE TO MOVE HIS DOMINANT HAND, WE WOULD BE MOST

12  GRATEFUL.

13           **THE COURT:**  CAN YOU TAKE CARE OF THAT PLEASE FOR ME,

14  OFFICER.  THANK YOU.

15                      **DIRECT EXAMINATION**

16  BY MR. DAVIDSON:

17  **Q.**   GOOD MORNING.

18  **A.**   GOOD MORNING.

19  **Q.**   CAN YOU PLEASE STATE YOUR FULL NAME FOR THE RECORD?

20  **A.**   I AM CHARLES TERRY BUTLER.

21  **Q.**   AND HOW OLD ARE YOU, MR. BUTLER?

22  **A.**   I AM 67 YEARS OLD.

23  **Q.**   WHERE ARE YOU FROM?

24  **A.**   I AM FROM NORTHEAST LOUISIANA, TENSAS PARISH, NEWELLTON,

25  LOUISIANA.

**Q.   WHERE DO YOU LIVE NOW?**

**A.**   I LIVE AT THE LOUISIANA STATE PENITENTIARY AT ANGOLA, THE MAIN PRISON, EAST YARD, ASH 3.

**Q.**   AND HOW LONG HAVE YOU LIVED AT ANGOLA, MR. BUTLER?

**A.**   I HAVE BEEN AT ANGOLA SINCE 1997.

**Q.**   WHY ARE YOU HERE TESTIFYING TODAY?

**A.**   I AM HERE TESTIFYING TODAY BECAUSE THERE HAS BEEN WRONGS THAT NEED TO BE RIGHTED, AND I HAVE BEEN VICTIMIZED BY THE ACTIONS MYSELF.

**Q.**   WHEN YOU SAY "WRONGS THAT NEED TO BE RIGHTED," WHAT ARE YOU REFERRING TO?

**A.**   I AM REFERRING TO THE INADEQUATE DELIVERY OF HEALTHCARE AND TREATMENT AT THE STATE PRISON.

**Q.**   NOW, MR. BUTLER, I'M GOING TO ASK YOU SOME QUESTIONS TODAY ABOUT THE MEDICAL CARE AT ANGOLA AND YOUR PERSONAL EXPERIENCES, AND ALMOST ALL OF MY QUESTIONS ARE GOING TO BE CONFINED TO THE TIME PERIOD UP THROUGH SEPTEMBER OF 2016.  WE'RE PRIMARILY FOCUSED ON THE PERIOD 2015 TO 2016.  DO YOU UNDERSTAND?

**A.**   YES, I DO.

**Q.**   SO WITH THOSE CAVEATS IN MIND, COULD YOU JUST DESCRIBE FOR THE COURT THE MAJOR MEDICAL ISSUES THAT YOU'VE HAD WHILE YOU'VE BEEN AT ANGOLA?

**A.**   MY MAJOR ISSUES HAVE BEEN OSTEOARTHRITIS, HEPATITIS C, HYPERTENSION, A FRACTURED CLAVICLE AND SHOULDER, AND LUNG CANCER.

1   Q.   FIRST, I'D LIKE TO TALK WITH YOU ABOUT YOUR HEPATITIS C

2   DIAGNOSIS.  WHAT'S YOUR UNDERSTANDING OF HEPATITIS C, MR.

3   BUTLER?

4   A.   I UNDERSTAND THAT HEPATITIS C IS A CHRONIC INFLAMMATORY

5   DISEASE OF THE LIVER USUALLY CAUSED BY A VIRUS.

6   Q.   AND WHEN DID YOU FIRST FIND OUT THAT YOU HAD HEPATITIS C?

7   A.   I FOUND THE FACT OUT IN EITHER 1995 OR 1996.

8   Q.   SO THAT'S BEFORE YOU CAME TO ANGOLA?

9   A.   YES, IT WAS.

10  Q.   AND SINCE YOU'VE BEEN AT ANGOLA, HAVE YOU EVER BEEN

11  PROVIDED ANY TREATMENT FOR YOUR HEPATITIS C?

12  A.   YES, I HAVE.

13  Q.   WHAT WAS THAT?

14  A.   I WAS TREATED WITH INTERFERON AND AN ANTIBIOTIC, BACTRIM,

15  I BELIEVE THE NAME IS, AND ANTIDEPRESSANTS, ZOLOFT.

16  Q.   NOW WERE YOU PROVIDED THAT TREATMENT IMMEDIATELY UPON

17  ARRIVAL AT ANGOLA?

18  A.   NO, IT WAS NOT IMMEDIATELY.

19  Q.   HOW LONG AFTER YOU ARRIVED AT ANGOLA WERE YOU PUT ON

20  INTERFERON?

21  A.   I WOULD SAY ANYWHERE FROM TWO TO THREE YEARS.

22  Q.   WAS YOUR TREATMENT SUCCESSFUL?

23  A.   IN MY OPINION, YES, THEY WERE.  HOWEVER, OUT OF A 12-WEEK

24  RECOMMENDED REGIMEN PROGRAM, I ONLY RECEIVED SIX TO EIGHT

25  TREATMENTS AND IT WAS DISCONTINUED.

10:21   1   **Q.**   YOU SAID THAT YOU THOUGHT IT WAS SUCCESSFUL.  ARE YOU

2   CURED OF HEPATITIS C AT THIS POINT?

3   **A.**   NO, I AM NOT CURED.  BUT AT THE TIME I WAS UNDER

4   TREATMENT, MY ENZYME LEVELS WERE DEPLETED AND WERE STABILIZED

5   SO THAT THE DISEASE WAS, MORE OR LESS, STAGNANT INSTEAD OF

6   PROGRESSIVE.

7   **Q.**   TO YOUR KNOWLEDGE, HAS YOUR HEPATITIS C REMAINED STAGNANT

8   OR HAS IT PROGRESSED?

9   **A.**   FROM AN ANNUAL REVIEW, IT REMAINS STAGNANT.

10   **Q.**   DO YOU KNOW IF THERE ARE ANY OTHER TREATMENTS FOR

11   HEPATITIS C?

12   **A.**   YES, THERE IS.  ONE OTHER EFFECTIVE TREATMENT FOR

13   HEPATITIS C AND IT IS NAMED HARVONI.

14   **Q.**   AND HOW DID YOU FIND OUT ABOUT THAT?

15   **A.**   I SAW IT ADVERTISED ON TELEVISION; I READ MEDICAL DATA

16   REFERRING TO IT.

17   **Q.**   HAVE YOU EVER SPOKEN WITH ANY ANGOLA'S MEDICAL STAFF ABOUT

18   GETTING ON HARVONI FOR TREATMENTS?

19   **A.**   YES, I HAVE.

20   **Q.**   WHO DID YOU SPEAK WITH?

21   **A.**   I SPOKE WITH DR. LAVESPERE.

22   **Q.**   AND WHAT WAS THE RESULT OF THAT CONVERSATION?

23   **A.**   DR. LAVESPERE INFORMED ME THAT, YES, THERE WAS AN

24   EFFECTIVE TREATMENT, BUT BECAUSE OF THE COST, I WOULD NOT BE

25   ABLE TO GET IT.

10:23 1   **Q.**   WERE YOU PROVIDED WITH ANY OTHER EXPLANATION ASIDE FROM

2   COST, AS TO WHY YOU WOULD NOT BE ON HARVONI?

3   **A.**   NO, I WAS NOT.

4   **Q.**   WHAT, IF ANY, EDUCATION OR COUNSELING HAVE YOU BEEN

5   PROVIDED ABOUT HOW TO INCREASE YOUR LIFE'S LONGEVITY IN SPITE

6   OF HAVING HEPATITIS C?

7   **A.**   I HAVEN'T RECEIVED ANY FURTHER EDUCATIONAL COURSES OR

8   COUNSELING, BUT THEY DID HAVE AN INFORMATION PAMPHLET, BUT IT

9   WAS NOT ADEQUATE TO INFORM ME FULLY OF HOW TO MANAGE THE

10   DISEASE.

11   **Q.**   DID ANYBODY SIT DOWN WITH YOU AND THAT PAMPHLET, GO

12   THROUGH IT IN DETAIL WITH YOU?

13   **A.**   NO, THEY DID NOT.

14   **Q.**   MR. BUTLER, WHAT'S IT LIKE LIVING WITH HEPATITIS C?

15   **A.**   LIVING WITH HEPATITIS C IS PAINFUL.  I AM ALWAYS FATIGUED,

16   AND THERE'S ALWAYS THE DEPRESSIVE THOUGHT THAT THE DISEASE IS

17   CHRONIC AND FATAL IF I CANNOT CURE IT.

18   **Q.**   THANK YOU.

19           I'D LIKE TO SPEAK WITH YOU NOW ABOUT YOUR

20   OSTEOARTHRITIS THAT YOU MENTIONED.  APPROXIMATELY WHEN WAS THAT

21   DIAGNOSED?

22   **A.**   THE OSTEOARTHRITIS WAS DIAGNOSED IN -- BETWEEN 2000 AND

23   2003.

24   **Q.**   AND WHAT PART OF YOUR BODY DOES YOUR OSTEOARTHRITIS

25   AFFECT?

**A.**   IT AFFECTS MY LEFT KNEE.  THE OSTEO AFFECTS MY CERVICAL

SPINE, MY LUMBAR SPINE, AND MAINLY MY JOINTS.

**Q.**   WHAT ARE THE MAIN SYMPTOMS THAT YOU EXPERIENCE?

**A.**   I HAVE A BURNING SENSATION.  I HAVE CONSTANT PAIN.  I HAVE

CRAMPING OF MY JOINTS AND EXTREMITIES.

**Q.**   HOW DOES THAT IMPACT YOUR DAILY LIVING?

**A.**   THE CRAMPING CAN CAUSE ME TO TRY TO GRASP OBJECTS AND I

JUST LOSE CONTROL, I CANNOT HOLD IT.  THE PAIN LIMITS MY

MOVEMENT AND CERTAIN ACTIVITIES THAT I AM RESTRICTED FROM

DOING.

**Q.**   WHAT KIND OF ACTIVITIES?

**A.**   WALKING UP STAIRS, RUNNING, STANDING FOR LONG PERIODS OF

TIME, BENDING, STOOPING, WRITING.

**Q.**   YOU MENTIONED ONE OF YOUR SYMPTOMS WAS PAIN.  WHICH

DOCTORS, IF ANY, AT ANGOLA WERE TREATING YOU FOR YOUR PAIN?

**A.**   THERE WAS A DR. COMEAUX THAT WAS COMING FOR A PAIN

MANAGEMENT CLINIC, DR. LAVESPERE, DR. TOCE.

**Q.**   YOU MENTIONED DR. TOCE.  WAS HE PARTIALLY RESPONSIBLE FOR

TREATING YOU FOR YOUR PAIN?

**A.**   YES, HE WAS.

**Q.**   AND IN THE COURSE OF DR. TOCE'S TREATMENT FOR YOUR PAIN,

DID HE EVER INFORM YOU ABOUT RESTRICTIONS ON HIS LICENSE THAT

PREVENTED HIM FROM TREATING PATIENTS WITH CHRONIC PAIN?

**A.**   NO, HE DID NOT.

**Q.**   WAS THAT INFORMATION YOU WOULD HAVE WANTED TO KNOW?

**A.**    BY ALL MEANS, YES.

**Q.**    I'D LIKE TO TALK TO YOU ABOUT DUTY STATUSES AT ANGOLA, MR. BUTLER.

**A.**    YES.

**Q.**    CAN YOU JUST REMIND THE COURT EXACTLY WHAT A DUTY STATUS IS?

**A.**    A DUTY STATUS IS A MEDICAL EVALUATION THAT IS ISSUED TO THE PATIENT, TO THE OFFENDER, AND TO THE CLASSIFICATION DEPARTMENT SO THAT THE OFFENDER CAN BE PLACED IN A WORKING POSITION OR A DUTY THAT WOULD NOT CAUSE HIM BODILY HARM.

        **MR. DAVIDSON:**  AND YOUR HONOR, AT THIS TIME I'M GOING TO BE ENGAGING IN A LOT OF QUESTIONING THAT TOUCHES VERY BRIEFLY UPON MATTERS THAT PREDATE THE 2016 TIME PERIOD, BUT THIS IS REALLY CRUCIAL INFORMATION TO UNDERSTAND EVENTS THAT ACTUALLY HAPPENED IN 2016.  AND IT'S ALSO VERY CRUCIAL IN ORDER TO ESTABLISH KNOWLEDGE IN DEFENDANTS' RECKLESS ACTIONS IN LIGHT OF THAT KNOWLEDGE FOR REASONS THAT MY CO-COUNSEL EXPLAINED ON FRIDAY.  SO WITH THE COURT'S INDULGENCE, I WILL TOUCH UPON THOSE MATTERS VERY BRIEFLY.

        **THE COURT:**  WELL, LET'S JUST SEE WHERE YOU GO.

        **MR. DAVIDSON:**  THANK YOU, YOUR HONOR.

BY MR. DAVIDSON:

**Q.**    MR. BUTLER, WHEN YOU ARRIVED AT ANGOLA, WHAT WAS YOUR DUTY STATUS?

**A.**    I HAD A REGULAR-DUTY DUTY STATUS.

10:28

1    Q.    AND WHAT DOES THAT MEAN?

2    A.    THAT MEANS THAT I WAS -- I WAS CAPABLE AND ABLE OF

3    PERFORMING ANY MANUAL LABOR.

4    Q.    AND WHAT WAS YOUR JOB?

5    A.    MY JOB WAS WORKING IN THE FIELD LINES.

6    Q.    AT SOME POINT DID YOUR DUTY STATUS CHANGE?

7    A.    YES, IT DID.

8    Q.    AND WHY DID IT CHANGE?

9    A.    IT CHANGED BECAUSE THE OSTEOARTHRITIS HAD BEGUN TO

10    MANIFEST ITSELF AND IT STARTED GIVING ME PAIN AND PROBLEMS WITH

11    BENDING OR STOOPING.

12    Q.    AND THE REVISIONS THAT WERE MADE TO YOUR DUTY STATUS, CAN

13    YOU JUST DESCRIBE FOR THE COURT WHAT THOSE WERE?

14    A.    MY DUTY STATUS WAS CHANGED TO A SQUAD A WITH RESTRICTIONS,

15    WHICH RESTRICTIONS WERE NO PROLONGED STANDING, NO PROLONGED

16    WALKING, NO BENDING, NO STOOPING, NO LIFTING WEIGHTS OVER TEN

17    POUNDS, AND NO SPORTS.

18    Q.    NOW YOU JUST MENTIONED PREVIOUSLY THAT YOUR INITIAL JOB

19    WAS WORKING ON THE FARM LINE AT ANGOLA.  IMMEDIATELY AFTER YOUR

20    DUTY STATUS WAS CHANGED WITH THOSE RESTRICTIONS YOU JUST

21    MENTIONED, WERE YOU TAKEN IMMEDIATELY OUT OF THE FARM LINE?

22    A.    NO, I WAS NOT.

23    Q.    WHAT KINDS OF WORK WERE YOU DOING ON THE FARM?

24    A.    I WAS HOEING CROPS.  I WAS PLANTING VEGETABLES.  I WAS

25    HARVESTING VEGETABLES.  WE WAS DOING -- CUTTING GRASS.  WE WERE

10:30   1   BALING HAY, JUST NORMAL FARM DUTIES.

2   **Q.**   HOW DID THAT ATTACK YOUR OSTEOARTHRITIS?

3   **A.**   IT AGGRAVATED IT VERY MUCH.  IT BECAME VERY PAINFUL.  EVEN

4   AT ONE POINT WHEN I WAS LIFTING A LOCKER BOX, MY HAND CRAMPED,

5   I LOST CONTROL AND THE BOX DROPPED, FELL ONTO MY FOOT,

6   FRACTURING IT.

7   **Q.**   MR. BUTLER, WHAT WOULD HAVE HAPPENED, IF YOU KNOW, IF YOU

8   HAD DECLINED DOING THE FARMWORK GIVEN YOUR DUTY STATUS

9   RESTRICTIONS?

10   **A.**   I WOULD HAVE FACED DISCIPLINARY ACTION.

11   **Q.**   WHAT KIND?

12   **A.**   MORE THAN LIKELY --

13           **MS. ROPER:**  OBJECTION, YOUR HONOR.

14           **THE WITNESS:**   -- I WOULD HAVE GOTTEN A DISCIPLINARY

15   REPORT.

16           **THE COURT:**  SIR --

17           **MR. DAVIDSON:**  MR. BUTLER --

18           **THE COURT:**   -- YOU HAVE TO -- WHENEVER THE OTHER

19   LAWYER OBJECTS, YOU HAVE TO STOP FOR A MOMENT.

20               YOUR OBJECTION?

21           **MS. ROPER:**  SPECULATION, YOUR HONOR.

22           **THE COURT:**  SUSTAINED.

23               NEXT QUESTION.

24   **BY MR. DAVIDSON:**

25   **Q.**   MR. BUTLER, DID YOU EVENTUALLY STOP WORKING ON THE FARM

1    LINE?

2    **A.**   YES, I DID.

3    **Q.**   AND WHAT WAS YOUR NEXT JOB?

4    **A.**   MY NEXT JOB WAS AT THE PRISON ENTERPRISES PRINT SHOP.

5          **MS. ROPER:**  AND YOUR HONOR, AGAIN, IF WE COULD JUST

6    KIND OF HAVE A TIMEFRAME OF WHAT THEY ARE TALKING ABOUT.  THEY

7    ALREADY INDICATED IT DOES PREDATE THE RELEVANT TIME PERIOD, BUT

8    IT'S NOT --

9          **THE COURT:**  WHAT TIMEFRAME ARE WE TALKING ABOUT,

10   COUNSEL?

11   **BY MR. DAVIDSON:**

12   **Q.**   MR. BUTLER, CAN YOU APPROXIMATE ABOUT WHEN YOU STARTED

13   WORKING IN THE PRISON ENTERPRISE'S PRINT SHOP?

14   **A.**   ANYWHERE FROM 1999 TO 2002.

15         **THE COURT:**  OKAY, NEXT LINE OF QUESTIONING.

16         **MR. DAVIDSON:**  YOUR HONOR, VERY BRIEFLY, IF I MAY

17   INQUIRE INTO MR. BUTLER'S PARTICULAR JOB RESPONSIBILITIES?

18         **THE COURT:**  NO, NOT IN 1999 YOU MAY NOT.

19         **MR. DAVIDSON:**  UNDERSTOOD, YOUR HONOR.

20         **THE COURT:**  NEXT.

21   **BY MR. DAVIDSON:**

22   **Q.**   MR. BUTLER, I WANT TO TALK ABOUT THE SHOULDER INJURY THAT

23   YOU ALLUDED TO EARLIER.  WHEN DID THAT INJURY OCCUR?

24   **A.**   JANUARY 2016.

25   **Q.**   AND WHAT WERE YOU DOING AT THE TIME OF YOUR SHOULDER

1  INJURY?

2  **A.**    I WAS HANGING DRYWALL.

3  **Q.**    WAS THAT YOUR REGULAR JOB AT THE TIME?

4  **A.**    YES, IT WAS.

5  **Q.**    AND WHAT WAS YOUR DUTY STATUS AT THAT TIME?

6  **A.**    AT THAT TIME IT WAS SQUAD A WITH RESTRICTIONS.

7  **Q.**    AND WERE THOSE THE SAME RESTRICTIONS YOU MENTIONED

8  EARLIER?

9  **A.**    SAME ONES, YES.

10  **Q.**    NO PROLONGED WALKING?

11  **A.**    NO PROLONGED WALKING, NO PROLONGED STANDING, NO BENDING,

12  NO LIFTING WEIGHTS OVER TEN POUNDS.

13  **Q.**    MY HUSBAND DOESN'T BELIEVE ME WHEN I SAY THAT I DID

14  CONSTRUCTION IN HIGH SCHOOL BUT I DID, BUT I'VE NEVER DONE

15  DRYWALL.  SO CAN YOU JUST DESCRIBE FOR THE COURT WHAT DRYWALL

16  ENTAILS?

17  **A.**    DRYWALL ENTAILS WORKING WITH SHEETS OF SHEETROCK THAT ARE

18  USUALLY ANYWHERE FROM 6 TO 8 FEET LONG, 4 FOOT WIDE, WEIGHING

19  IN THE NEIGHBORHOOD OF 20 TO 25 POUNDS.  YOU MUST HANG THESE

20  SHEETS OVERHEAD AND YOU NAIL THEM TO WALL FRAMES.

21  **Q.**    SO WHEN YOU WERE HANGING THE DRYWALL, WAS ONE OF YOUR

22  RESPONSIBILITIES ACTUALLY LIFTING THAT DRYWALL?

23  **A.**    YES, IT WAS.

24  **Q.**    AND WHERE ARE YOU DURING THIS PROCESS?  ARE YOU ON THE

25  GROUND?

10:34   1   **A.**   YOU ARE EITHER ON THE GROUND OR LIKE I WAS, STANDING ON
2   THE SCAFFOLDING.
3   **Q.**   HOW HIGH UP IS THAT SCAFFOLDING, MR. BUTLER?
4   **A.**   THE SCAFFOLDING I WAS ON WAS 8 FOOT HIGH.
5   **Q.**   HOW OLD WERE YOU AT THE TIME?
6   **A.**   I WAS 65 AT THE TIME.
7   **Q.**   WHAT WAS THE STATUS OF YOUR OSTEOARTHRITIS AT THAT TIME?
8   **A.**   IT HAD PROGRESSED AND IT WAS STILL MUCH AGGRAVATED.
9   **Q.**   AND WHAT KIND OF SAFETY EQUIPMENT WERE THEY GIVING Y'ALL
10   WHEN YOU WERE DOING THIS DRYWALLING?
11   **A.**   WELL, THE FULL CURRICULUM WOULD CALL FOR A HARDHAT, A
12   SAFETY HARNESS, AND THAT'S ABOUT IT.
13   **Q.**   DID YOU HAVE A SAFETY HARNESS?
14   **A.**   NO, I DID NOT.
15   **Q.**   DID YOU HAVE A HARDHAT?
16   **A.**   NO, I DID NOT.
17   **Q.**   SO I WANT TO CIRCLE BACK TO YOUR SHOULDER INJURY THAT
18   HAPPENED WHILE YOU WERE DOING DRYWALLING.  CAN YOU JUST
19   DESCRIBE FOR THE COURT EXACTLY HOW THAT HAPPENED?
20   **A.**   THE CAUSE OF THE SHOULDER INJURY WAS BECAUSE I WAS
21   OVERMEDICATED AND I LOST CONSCIOUSNESS, AND BECAUSE I DID NOT
22   HAVE A SAFETY HARNESS WHILE UNCONSCIOUS, I FELL FROM THE
23   SCAFFOLDING ONTO THE FLOOR, FRACTURING MY SHOULDER, HAVING A
24   CONCUSSION, CONTUSIONS, FRACTURED RIBS, AND A FRACTURED LEFT
25   CLAVICLE.

10:36   1              **THE COURT:**  AND WHAT WAS THE TIMEFRAME, SIR?

2              **THE WITNESS:**  THAT WAS JANUARY OF 2016.

3   BY MR. DAVIDSON:

4   **Q.**   I AM GOING TO UNPACK WHAT YOU JUST DESCRIBED, MR. BUTLER.

5   AND SPECIFICALLY, I WANT TO TALK ABOUT THIS ISSUE OF -- I THINK

6   YOU USED THE TERM "OVERMEDICATION."  WHAT DO YOU MEAN WHEN YOU

7   SAY THAT YOU LOST CONSCIOUSNESS AS A RESULT OF OVERMEDICATION?

8   **A.**   I HAD HAD A REACTION TO A COMBINATION OF MANY DIFFERENT

9   DRUGS THAT I -- THAT PRISON POLICY REQUIRED ME TO TAKE ALL AT

10  THE SAME TIME, INSTEAD OF BEING SPACED OUT OVER THE 24 HOUR

11  PERIOD.

12              AT THAT TIME I WAS TAKING IN THE NEIGHBORHOOD OF 15

13  TO 18 DIFFERENT MEDICATIONS.  SOME WERE SEDATIVES; SOME WERE

14  PAIN PILLS; SOME WERE VITAMINS; SOME WERE HYPERTENSION

15  MEDICATIONS; SOME WERE ACID BLOCKERS.

16  **Q.**   SO DO I UNDERSTAND CORRECTLY THAT ON THE DAY THAT YOU

17  FELL, YOU HAD TO TAKE ALL OF THESE MEDICATIONS ALL AT ONCE?

18  **A.**   YES, I DID.

19  **Q.**   DID YOU INFORM ANYONE THAT TAKING THESE MEDICATIONS ALL AT

20  ONCE MIGHT BE DANGEROUS TO YOU?

21  **A.**   YES, I DID.

22  **Q.**   WHO DID YOU TELL?

23  **A.**   I HAD INFORMED MR. TIM BYRD AND A MR. JIM BODIN.

24  **Q.**   AND WHAT DID THEY DO IN RESPONSE?

25  **A.**   THEY RESPONDED THAT THEY WOULD CHECK INTO IT, BUT THEY

1  NEVER DID.

2  **Q.**   SO WHAT DID YOU HAVE TO DO AS A RESULT?

3  **A.**   AS A RESULT, I HAD TO CONTINUE TO TAKE THE MEDICATIONS

4  BECAUSE POLICY PREVENTED ME FROM LEAVING THE PRISON GROUNDS

5  WITH THE MEDICATIONS, AND POLICY REQUIRES ME TO TAKE THE

6  MEDICATION AT THE PILL-CALL WINDOW WHEN I RECEIVE THEM.

7  **Q.**   SO GOING BACK TO THE MOMENT THAT YOU FELL, YOU SAID YOU

8  LOST UNCONSCIOUSNESS [SIC]?

9  **A.**   YES.

10 **Q.**   WHAT'S THE FIRST THING THAT YOU REMEMBER?

11 **A.**   THE FIRST THING I REMEMBER, WAKING UP ON THE FLOOR LOOKING

12 INTO THE FACE OF MR. BODIN.

13 **Q.**   HOW DID YOU FEEL WHEN YOU WOKE UP?

14 **A.**   I WAS IN PAIN.  I WAS DIZZY.  I WAS DISORIENTED.

15 **Q.**   WHERE WERE YOU IN PAIN?

16 **A.**   MY LEFT SHOULDER, MY HEAD, MY LEFT RIBCAGE, AND MY NECK,

17 MY CERVICAL SPINE.

18 **Q.**   FORGIVE ME, MR. BUTLER, FOR NOT ASKING YOU INITIALLY,

19 WHERE WERE YOU AT THE TIME THAT YOU WERE DOING THIS DRYWALL?

20 **A.**   I WAS AT DOC HEADQUARTERS.

21 **Q.**   WHERE'S THAT?

22 **A.**   THAT'S DOWNTOWN BATON ROUGE ON MAYFLOWER STREET.

23 **Q.**   SO DID THEY TAKE YOU TO A HOSPITAL AFTER YOU WOKE UP?

24 **A.**   NO, THEY DID NOT.

25 **Q.**   WHERE DID YOU GO?

10:40    1    **A.**    THEY HAD ME STAND UP, WALK A DISTANCE, APPROXIMATELY

2    30 FEET.    THEY HAD ME SIT ON A STACK OF LUMBER, AND THAT'S IT.

3    **Q.**    WHAT HAPPENED NEXT?

4    **A.**    NEXT, THERE WAS A LADY THERE THAT APPEARED THAT QUESTIONED

5    ME WHETHER OR NOT I WAS HURTING, IF I WAS DIZZY.    AND AFTER

6    THAT, THEY MADE ME WALK DOWN A FLIGHT OF STAIRS AND THEY PLACED

7    ME IN A PICKUP TRUCK AND BROUGHT ME BACK TO ANGOLA WITHOUT

8    STOPPING AT ANY HOSPITAL OR CALLING EMTS.

9    **Q.**    DID THEY STABILIZE YOU IN THE PICKUP TRUCK?

10    **A.**    NO, THEY DID NOT.    AND BY ME NOT BEING STABILIZED, THE

11    FRACTURED CLAVICLE WAS AGGRAVATED AND DISPLACED.

12    **Q.**    HOW DID IT FEEL WHILE YOU WERE DRIVING DOWN THE ROAD BACK

13    UP TO ANGOLA?

14    **A.**    IT WAS TORTUROUS, VERY PAINFUL.

15    **Q.**    AND WHAT HAPPENED ONCE Y'ALL GOT TO ANGOLA?

16    **A.**    WHEN WE MADE IT BACK TO ANGOLA, I WAS BROUGHT TO THE

17    EMERGENCY ROOM AND SEEN BY DR. TOCE AND HE HAD X-RAYS TAKEN.

18    **Q.**    AND DID YOU AND DR. TOCE DISCUSS YOUR TREATMENT?

19    **A.**    DR. TOCE TOLD ME THAT HE WOULD SCHEDULE ME FOR SURGERY,

20    AND THEY WOULD BRING ME TO UNIVERSITY FOR THE SURGERY.

21    **Q.**    DID YOU GET THE SURGERY?

22    **A.**    NO, I DID NOT.

23    **Q.**    AS OF SEPTEMBER OF 2016, HAVE YOU HAD THE SURGERY?

24    **A.**    NO.

25    **Q.**    AND WHAT WAS YOUR UNDERSTANDING OF THE SURGERY THAT YOU

1   WERE SUPPOSED TO HAVE?

2   **A.**   MY UNDERSTANDING WAS THAT THE FRACTURED CLAVICLE WOULD BE

3   REDUCED AND A PIN OR CLAMPS WOULD BE PLACED ON THE CLAVICLE FOR

4   HEALING PURPOSES.

5   **Q.**   AND AS OF SEPTEMBER OF 2016, WERE YOU STILL EXPERIENCING

6   ANY SYMPTOMS AS A RESULT OF YOUR FALL?

7   **A.**   OH, YES.

8   **Q.**   LIKE WHAT?

9   **A.**   THERE WERE TIMES I WOULD STILL GET DIZZY.  I WAS STILL

10  HAVING HEADACHES, AND THE CLAVICLE WAS STILL VERY PAINFUL.

11  **Q.**   HAS THAT IMPACTED YOUR MOBILITY AT ALL?

12  **A.**   OH, YES.  IT RESTRICTED MY LIFTING MY ARM, THE DISTANCE.

13  IT SOMETIMES WOULD CRAMP UP AND WOULD GO NUMB, AND IT WAS LIKE

14  ELECTRIC SHOTS WOULD SHOOT THROUGH IT AT TIMES LIKE A NERVE

15  ENDING THAT'S ENCAPSULATED OR SOMETHING.

16  **Q.**   MR. BUTLER, HAVE YOU EVER SPENT ANY TIME ON THE WARDS AT

17  ANGOLA?

18  **A.**   YES, I HAVE.

19  **Q.**   ABOUT WHEN WAS THAT?

20  **A.**   APPROXIMATELY FEBRUARY, MARCH OF 2016, AND ALSO WHEN I HAD

21  A POLYP REMOVED FROM MY COLON.

22  **Q.**   JUST REMIND THE COURT WHAT THE WARD IS.

23  **A.**   THE WARD IS AT THE TREATMENT CENTER AT ANGOLA, AND IT IS

24  SIMILAR TO A REGULAR HOSPITAL ON THE STREET.

25  **Q.**   WHEN YOU SAY "SIMILAR TO A REGULAR HOSPITAL," DO YOU MEAN

1  THAT THE CONDITIONS INSIDE OF IT ARE LIKE A REGULAR HOSPITAL?

2  **A.**   NO.  IT IS SET UP TO TREAT INPATIENTS, PEOPLE THAT ARE

3  SICK AND ARE NOT AMBULATORY OR ABLE TO GET BACK AND FORTH TO

4  THE HOSPITAL.

5  **Q.**   WHAT ARE THE CONDITIONS LIKE IN THE WARD?

6  **A.**   THE WARD AT THE TREATMENT CENTER IS -- WHAT'S THE WORD?

7  THE WARD IS IN BAD CONDITION.  THE WARD IS INADEQUATE.

8  **Q.**   WHAT DO YOU MEAN?

9  **A.**   THE WARD IS ATROCIOUS.

10 **Q.**   CAN YOU BE A LITTLE MORE SPECIFIC?  WHAT DO YOU MEAN?  HOW

11 IS THE CLEANLINESS?

12 **A.**   ON A SCALE FROM 1 TO 10, THE CLEANLINESS WOULD BE 3.

13 **Q.**   ONE BEING DIRTY OR ONE BEING CLEAN?

14 **A.**   ONE BEING DIRTY.

15        **MR. DAVIDSON:**  YOUR HONOR, THIS IS A GOOD TIME FOR A

16 BREAK, IF YOU'D LIKE TO TAKE A BREAK.  I'M HAPPY TO CONTINUE.

17 I PROBABLY HAVE ABOUT 15 OR SO MINUTES LEFT, THOUGH.

18        **THE COURT:**  OKAY, COUNSEL, WE'LL TAKE A BREAK.  WE

19 ARE GOING TO BE IN RECESS FOR TEN MINUTES.

20        **MR. DAVIDSON:**  THANK YOU, MR. BUTLER.

21        **THE WITNESS:**  YES.

22               **(RECESS.)**

23        **THE COURT:**  BE SEATED.

24        GO AHEAD.

25        **MR. DAVIDSON:**  THANK YOU.

**BY MR. DAVIDSON:**

**Q.**   AND MR. BUTLER, YOU ARE STILL UNDER OATH.  DO YOU UNDERSTAND?

**A.**   YES.

**Q.**   SO NOW I'D LIKE TO TALK TO YOU ABOUT -- I THINK YOU DESCRIBED IT AS LUNG LESIONS EARLIER?

**A.**   YES.

**Q.**   OR LUNG CANCER.  AT WHICH POINT DID YOU DISCOVER THAT YOU HAD THESE LUNG LESIONS?

**A.**   WELL, BECAUSE DR. TOCE AND DR. LAVESPERE KEPT HIDDEN THE EXISTENCE OF THE LESIONS, I DID NOT FIND OUT ABOUT THE LESION UNTIL PERHAPS MARCH OR APRIL, MAYBE EVEN MAY, OF 2016.

**Q.**   I JUST WANT TO BACK UP JUST SO THE RECORD IS CLEAR.  WHAT DO YOU MEAN "THE EXISTENCE OF THE LESIONS WERE KEPT HIDDEN"?

**A.**   WELL, I USUALLY TAKE A CHEST X-RAY EVERY SIX MONTHS OR SO, AND THE SIZE OF THIS PARTICULAR LESION DEMONSTRATES THAT IT TOOK A GOOD BIT OF TIME FOR IT TO GROW TO THE SIZE WHERE IT WOULD BE NOTICEABLE.  AND I INADVERTENTLY LEARNED OF THE EXISTENCE OF THE LESION FROM SPEAKING WITH AN LSU RESIDENT ORTHOPEDIC WHO SAW THE LESION ON MY X-RAY AND ASKED ME HOW WERE THEY TREATING THE LUNG CANCER.  AND THIS WAS TOTALLY SHOCKING.

**Q.**   NO ONE HAD EVER TOLD YOU YOU HAD LUNG CANCER?

**A.**   NO ONE HAD EVER MENTIONED THE LESION TO ME.

**Q.**   I THINK YOU MENTIONED THIS HAPPENED MAYBE SOMEWHERE IN MARCH, APRIL OF 2016?

11:00  1    **A.**    YES.

2    **Q.**    AND AFTER YOU DISCOVERED YOU HAD LUNG CANCER, WERE YOU

3    PRESCRIBED ANY COURSE OF TREATMENT?

4    **A.**    NOT NECESSARILY COURSE OF TREATMENT, AS IT WAS PRESCRIBED

5    TESTS TO BE PERFORMED TO DETERMINE WHETHER OR NOT IT WAS BENIGN

6    OR MALIGNANT.  I WAS TOLD THAT I WOULD HAVE A CAT SCAN DONE,

7    BUT AFTER SIX OR EIGHT MONTHS OR SO I HAD NOT.

8    **Q.**    WHAT ABOUT A BIOPSY?

9    **A.**    THE BIOPSY WOULD HAVE COME AFTER THE CAT SCAN, AND I WAS

10    SCHEDULED TO HAVE THE BIOPSY IN DECEMBER OF 2016.

11    **Q.**    AND I'M GOING TO STOP YOU RIGHT THERE.  I JUST WANT TO BE

12    REALLY CAREFUL 'CAUSE WE'RE GETTING UP AGAINST THE DISCOVERY

13    PERIOD WITH SOME OF THIS STUFF I UNDERSTAND, BUT I JUST WANT TO

14    REMIND YOU THAT TO THE EXTENT POSSIBLE TO CABIN YOUR ANSWERS TO

15    THINGS JUST IN SEPTEMBER OF 2016.  AND THAT'S ON ME, SO I

16    APOLOGIZE, MR. BUTLER.

17    **A.**    YES.

18    **Q.**    SO THESE TESTS THAT YOU MENTIONED, THE CAT SCAN, THE

19    BIOPSY, WERE THEY TIMELY PERFORMED?

20    **A.**    NO, THEY WERE NOT.

21    **Q.**    AND DO YOU RECALL ANY OF THE CIRCUMSTANCES UNDERLYING WHY

22    THEY WEREN'T PERFORMED TIMELY?

23    **A.**    NOT AT THIS TIME I CANNOT.

24    **Q.**    SWITCHING GEARS, MR. BUTLER.  CAN YOU JUST DESCRIBE FOR

25    THE COURT WHAT A CALLOUT IS?

11:02    1    **A.**    A CALLOUT IS A LISTING OF OFFENDER NAMES THAT HAVE EITHER

2    VOLUNTEERED TO ATTEND DIFFERENT FUNCTIONS OR THEY HAVE BEEN

3    ORDERED TO ATTEND ADMINISTRATIVE MEETINGS OR INTERVIEWS OR

4    MEDICAL INTERVIEWS.

5    **Q.**    AND I WANT TO BE REALLY CLEAR, ARE YOU PERSONALLY FAMILIAR

6    WITH ANY OF THE CONSEQUENCES THAT MIGHT BEFALL A PATIENT FROM

7    ANGOLA IF THEY DO NOT GO ON A CALLOUT?

8    **A.**    IF THEY DO NOT GO ON A CALLOUT -- IF IT'S A MEDICAL

9    CALLOUT, IT IS A MANDATORY CALLOUT.  IT'S MANDATORY THAT THEY

10    ATTEND.

11    **Q.**    CAN I STOP YOU RIGHT THERE AND JUST ASK YOU A QUICK

12    QUESTION?

13    **A.**    YES.

14    **Q.**    WHAT ARE THE CONSEQUENCES OF NOT -- AGAIN, IF YOU'RE

15    PERSONALLY AWARE OF THE CONSEQUENCES, WHAT ARE THE CONSEQUENCES

16    OF NOT ATTENDING A MANDATORY CALLOUT?

17    **A.**    IF YOU FAIL TO ATTEND A MANDATORY CALLOUT, THERE WILL BE

18    DISCIPLINARY ACTION.

19    **Q.**    THANK YOU, MR. BUTLER.

20         FINALLY, I'D JUST LIKE TO TALK WITH YOU BRIEFLY ABOUT

21    MEDICATION ADMINISTRATION AT ANGOLA.  HAVE YOU EVER HAD ANY

22    PROBLEMS GETTING YOUR MEDICATION ON TIME SINCE YOU'VE BEEN AT

23    ANGOLA?

24    **A.**    YES, I HAVE.

25    **Q.**    AND CAN YOU JUST DESCRIBE FOR THE COURT WHAT KINDS OF

1    PROBLEMS YOU'VE HAD?

2    **A.**    ONE OF THE MOST --

3              **MS. ROPER:**    YOUR HONOR, IF WE COULD HAVE A TIMEFRAME

4    ON THAT?

5              **THE COURT:**    A TIMEFRAME, MR. DAVIDSON?

6    **BY MR. DAVIDSON:**

7    **Q.**    MR. BUTLER, UP THROUGH SEPTEMBER 2016, HAVE YOU EVER HAD

8    ANY ISSUES?

9              **THE COURT:**    NO.    BETWEEN WHAT TIME AND WHAT TIME?

10   NOT UP THROUGH 2016.    A MINUTE AGO HE WAS TALKING ABOUT 1999.

11             **MR. DAVIDSON:**    MY APOLOGIES, YOUR HONOR.

12   **BY MR. DAVIDSON:**

13   **Q.**    AGAIN, MR. BUTLER, I'M SORRY.    MR. BUTLER, BETWEEN 2015

14   AND 2016, HAVE YOU EVER HAD ANY PROBLEMS WITH OBTAINING YOUR

15   MEDICATIONS ON TIME?

16   **A.**    YES, I HAVE.

17   **Q.**    AND CAN YOU JUST DESCRIBE FOR THE COURT THE TYPES OF

18   PROBLEMS YOU'VE HAD DURING THAT TIMEFRAME?

19   **A.**    ONE OF THE PROBLEMS WAS THAT I WOULD REQUEST A REFILL OF A

20   MEDICATION AND IT WOULD TAKE APPROXIMATELY 10 TO 12 DAYS TO

21   RECEIVE THIS REFILL.    ANOTHER PROBLEM WOULD BE THAT I WOULD

22   RECEIVE THE WRONG MEDICATION.

23   **Q.**    WHAT KINDS OF MEDICATIONS ARE WE TALKING ABOUT?

24   **A.**    IN MY PARTICULAR SITUATION, PAIN MEDICATIONS, HYPERTENSION

25   MEDICATIONS.

1            **MR. DAVIDSON:**  IF I MAY BRIEFLY CONSULT WITH

2    CO-COUNSEL, YOUR HONOR?

3    **BY MR. DAVIDSON:**

4    **Q.**   FINALLY, MR. BUTLER, HAVE YOU EVER BEEN ABLE TO PERSONALLY

5    REVIEW YOUR MEDICAL RECORDS FROM ANGOLA?

6    **A.**   NO, I HAVE NOT.

7            **MR. DAVIDSON:**  NOTHING FURTHER AT THIS TIME, YOUR

8    HONOR.

9            **THE COURT:**  CROSS?

10           **MS. ROPER:**  YES, YOUR HONOR.

11                         **CROSS-EXAMINATION**

12   **BY MS. ROPER:**

13   **Q.**   MR. BUTLER, GOOD MORNING OR AFTERNOON.  I JUST LOST TRACK

14   OF TIME HERE.

15   **A.**   GOOD AFTERNOON.

16   **Q.**   AS FAR AS YOUR MEDICAL RECORDS, IS IT YOUR UNDERSTANDING

17   THAT YOUR COUNSEL MAY HAVE A COPY OF THAT?

18           **MR. DAVIDSON:**  OBJECTION; OUTSIDE THE SCOPE OF DIRECT

19   AS WELL AS RELEVANCE, YOUR HONOR.

20           **THE COURT:**  OVERRULED.

21           **THE WITNESS:**  I CAN RECALL SIGNING FORMS GRANTING MY

22   PERMISSION TO RELEASE, BUT AS FAR AS MY PERSONAL KNOWLEDGE OF

23   HIM REVIEWING MY RECORDS, I HAVE NONE.

24   **BY MS. ROPER:**

25   **Q.**   OKAY.  BUT YOU TOOK STEPS TO ALLOW YOUR COUNSEL TO OBTAIN

11:07 1    YOUR RECORDS.  CORRECT?

2    **A.**   YES, I DID.

3    **Q.**   AND HAVE YOU EVER ASKED TO REVIEW YOUR RECORDS FROM THEM?

4    **A.**   FROM THEM?

5    **Q.**   YES.

6              **MR. DAVIDSON:**  OBJECTION, YOUR HONOR.  THIS IS

7    PRIVILEGED INFORMATION.  MS. ROPER IS REQUESTING THE CONTENTS

8    OF CONVERSATIONS BETWEEN MR. BUTLER AND MYSELF, INCLUDING

9    WHETHER OR NOT WE DISCUSSED REVIEWING HIS MEDICAL RECORDS.  I'D

10   JUST LIKE TO PUT THE PRIVILEGED NATURE ON THE RECORD.

11             **THE COURT:**  YOU HAVE.

12                  REPHRASE YOUR QUESTION.

13             **MS. ROPER:**  I WILL.  THANK YOU.

14   BY MS. ROPER:

15   **Q.**   MR. BUTLER, HAVE YOU, IN FACT, MADE AN ATTEMPT TO REVIEW

16   YOUR MEDICAL RECORDS?

17   **A.**   OH, I HAVE ASKED BEFORE, YES.

18   **Q.**   OKAY.  AND HAVE YOU BEEN ABLE TO REVIEW YOUR RECORDS?

19   **A.**   NO, I HAVE NOT.

20   **Q.**   OKAY.

21             **THE COURT:**  HAVE YOU ASKED ANGOLA FOR YOUR MEDICAL

22   RECORDS, SIR?

23             **THE WITNESS:**  HAVE I ASKED?

24             **THE COURT:**  ANGOLA?

25             **THE WITNESS:**  INFORMALLY, YES.

11:08   1              THE COURT:  ALL RIGHT.  THANK YOU.
        2                   GO AHEAD.
        3    BY MS. ROPER:
        4    Q.   I BELIEVE YOU DID TESTIFY THAT YOU RECEIVED TREATMENT FOR
        5    YOUR HEP-C?
        6    A.   YES, I DID.
        7    Q.   OKAY.  AND I THINK YOU SAID ABOUT EIGHT TO NINE TREATMENTS
        8    OF THE INTERFERON.  CORRECT?
        9    A.   YES.
       10    Q.   OKAY.  COULD IT HAVE BEEN MORE LIKE 10 TO 12 TREATMENTS?
       11    A.   NO.  ACTUALLY, IT WAS A 12 TREATMENT REGIMEN AND I ONLY
       12    RECEIVED 6 TO 8 TREATMENTS BEFORE IT WAS DISCONTINUED.
       13    Q.   DO YOU RECALL HAVING YOUR DEPOSITION TAKEN ON MAY 31ST OF
       14    2018?
       15    A.   YES, I DO.  YES.
       16    Q.   AND DO YOU RECALL BEING ASKED ABOUT ANY TREATMENT FOR YOUR
       17    HEPATITIS C ON THAT DAY?
       18    A.   YES.
       19    Q.   AND DO YOU RECALL WHAT ANSWER YOU GAVE ME ON THAT DATE
       20    WHEN I ASKED YOU THAT?
       21    A.   MORE THAN LIKELY I SAID IT WAS ANYWHERE FROM 8 TO 10
       22    TREATMENTS, YES.
       23    Q.   OKAY.  BUT YOUR TESTIMONY TODAY IS THAT IT WAS ONLY 6 TO
       24    8?
       25    A.   IN THE SAME RANGE, YES.

11:09   1              MS. ROPER:  OKAY.  I'D LIKE TO SHOW -- THIS IS PAGE 9

2    OF HIS DEPOSITION, LINE 21.

3              THE WITNESS:  YES.

4    BY MS. ROPER:

5    Q.   AND DO YOU SEE THAT ON THE SCREEN, BEGINNING AT LINE 21

6    DOWN HERE?  DO YOU SEE THE QUESTION THAT WAS ASKED OF YOU IN

7    THAT DEPOSITION, WHERE I ASKED YOU, "FOR YOUR HEPATITIS C, CAN

8    YOU TELL ME WHETHER OR NOT YOU RECEIVED ANY TREATMENT AT ANGOLA

9    FOR YOUR HEPATITIS C"?

10   A.   YES, I DID.

11   Q.   AND DO YOU SEE THE ANSWER THAT IS PROVIDED IN THE

12   DEPOSITION?

13   A.   "IT WAS YEARS AGO I RECEIVED PERHAPS, WHICH IS

14   APPROXIMATELY 10 TO 12 TREATMENTS."

15   Q.   OKAY.

16   A.   IT'S NOT A DEFINITIVE NUMBER.

17   Q.   BUT YOU DO AGREE THAT THIS IS DIFFERENT THAN WHAT YOU ARE

18   TESTIFYING TO TODAY.  CORRECT?

19   A.   (NO ORAL RESPONSE.)

20   Q.   AND WE'LL GO TO THE NEXT PAGE TO COMPLETE WHAT YOU

21   ANSWERED ON THAT DAY.

22   A.   OKAY.

23   Q.   YOU CAN FINISH READING THE SENTENCE AT THE TOP OF THE

24   PAGE, ON PAGE 10, BEGINNING AT LINE 1.

25   A.   "AND IT WAS DISCONTINUED, I WAS TOLD BECAUSE IT WAS NOT

1   EFFECTIVE."

2   **Q.**   THANK YOU.

3         AND IT WAS THE DOCTOR AT EARL K. LONG THAT TOLD YOU

4   THAT THE TREATMENT WAS NOT EFFECTIVE.   CORRECT?

5   **A.**   YES.

6   **Q.**   OKAY.  SO IT WAS NOT A DOCTOR AT LOUISIANA STATE

7   PENITENTIARY THAT DISCONTINUED YOUR TREATMENT, WAS IT?

8   **A.**   WELL, WHEN YOU SAY THE DOCTOR AT EARL K. LONG, IT WAS THE

9   HEPATITIS CLINIC THAT WOULD COME TO LSP.

10  **Q.**   OKAY.  AND THE CLINIC THAT CAME TO LSP THAT YOU WERE SEEN

11  IN WAS STAFFED BY A DOCTOR FROM EARL K. LONG.  CORRECT?

12  **A.**   CORRECT.

13  **Q.**   AND YOU WERE UNDER THE TREATMENT OF A DR. CASSIDY, WHO IS

14  NOW SENATOR CASSIDY.  IS THAT RIGHT?

15  **A.**   THAT'S CORRECT.

16  **Q.**   AND IN FACT, HE IS THE ONE THAT TOLD YOU THAT HE WAS

17  DISCONTINUING YOUR TREATMENT?

18  **A.**   ACTUALLY IT WAS A NURSE PRACTITIONER THAT MENTIONED IT.

19  **Q.**   BUT IT WAS DR. CASSIDY THAT WAS THE TREATING PHYSICIAN?

20  **A.**   YES.

21  **Q.**   OKAY.  AND YOU DID NOT FILE ANY KIND OF ADMINISTRATIVE

22  REMEDY PROCEDURE COMPLAINT REGARDING THE LACK OF ANY FURTHER

23  HEPATITIS TREATMENT, DID YOU?

24  **A.**   NO, I DID NOT.

25  **Q.**   OVER THE YEARS YOU HAD A LOT OF LAB WORK DONE, AND I WANT

1   TO FOCUS ON THE YEARS OF 2015 AND 2016 UP THROUGH SEPTEMBER 30

2   OF 2016.  BUT BRIEFLY, I'D JUST LIKE TO -- WITH THE COURT'S

3   INDULGENCE, IF I COULD CAPTURE A COUPLE OF TIMES PRECEDING

4   THAT, JUST FOR A HISTORICAL REFERENCE.

5           THE COURT:  IF THERE'S NO OBJECTION, GO AHEAD.

6   BY MS. ROPER:

7   Q.    MR. BUTLER, YOU'VE BEEN RECEIVING LAB WORK PRETTY

8   REGULARLY AT LOUISIANA STATE PENITENTIARY, HAVEN'T YOU?

9   A.    YES.

10  Q.    YOU RECEIVED LAB WORK IN APRIL OF 2014?

11  A.    SOMETIME DURING THE YEAR, YES.

12  Q.    OKAY.  AND, AGAIN, IN SEPTEMBER OF 2014?

13          MR. HAMILTON:  OBJECTION; OUTSIDE THE SCOPE OF MY

14  DIRECT.

15          THE COURT:  NO, YOU OPENED THE DOOR BEFORE 2016.

16  OVERRULED.

17              ASK QUESTIONS.

18          THE WITNESS:  WOULD YOU REPEAT IT, PLEASE?

19  BY MS. ROPER:

20  Q.    YOU HAVE RECEIVED NUMEROUS LAB TESTS, HAVEN'T YOU?

21  A.    YES.

22  Q.    SEPTEMBER OF 2014, YOU RECEIVED LAB WORK?

23  A.    YES.

24  Q.    OKAY.  AND IF THESE DATES ARE -- TELL ME IF YOU DISAGREE,

25  I'M JUST GOING THROUGH WHAT IS SHOWING IN YOUR MEDICAL RECORD.

1  IF YOU DISAGREE WITH WHAT I'M SEEING, PLEASE TELL ME.

2  **A.**   WELL AT THIS TIME, FROM 2014, I CAN'T BE SPECIFIC AS TO

3  THAT, YOU KNOW, PARTICULAR DATE.

4  **Q.**   WOULD YOU AGREE THAT YOU HAD RECEIVED LAB WORK

5  APPROXIMATELY EVERY THREE TO FOUR MONTHS DURING THE PERIOD OF

6  2015 AND 2016?

7  **A.**   NO, I WOULD NOT AGREE.

8  **Q.**   OKAY.  SO IF YOUR RECORD SHOWS THAT YOU RECEIVED LAB WORK

9  JANUARY 2015, YOU WOULD DISAGREE?

10         **THE COURT:**  JUST GIVE ME THE EXHIBIT NUMBER, COUNSEL,

11  AND I'LL JUST TAKE A LOOK AT IT.  HOW ABOUT THAT?

12         **MS. ROPER:**  SURE.  ACTUALLY, YOUR HONOR, THESE ARE

13  NOT --

14         **MR. DAVIDSON:**  EXACTLY, YOUR HONOR.  THESE ARE NOT IN

15  EVIDENCE.

16         **MS. ROPER:**  THESE ARE NOT IN EVIDENCE, YOUR HONOR.

17         **THE COURT:**  OKAY.  THEN GO AHEAD WITH YOUR QUESTIONS.

18         **MS. ROPER:**  OKAY.

19  **BY MS. ROPER:**

20  **Q.**   MAY 2015, DID YOU RECEIVE ANY LAB WORK, ROUGHLY, IN THAT

21  TIME PERIOD THAT YOU'RE AWARE OF?

22  **A.**   ONCE AGAIN, COUNSEL, I CAN'T BE FOR CERTAIN.

23  **Q.**   OKAY.  DO YOU DISPUTE THAT YOU RECEIVED QUITE A FEW?  IF I

24  SAID AT LEAST THREE DURING 2015, DOES THAT SOUND ABOUT RIGHT?

25  **A.**   YES.  THAT'S FINE, YES.

1  Q.   OKAY.  AND ROUGHLY, SEVEN IN 2016.  DOES THAT SOUND ABOUT

2  RIGHT?

3  A.   I CAN'T BE SPECIFIC ON THAT NUMBER.

4  Q.   HOW MANY WOULD YOU THINK YOU HAD RECEIVED IN 2016?

5  A.   AT THIS TIME I'M UNABLE TO EVEN ESTIMATE BECAUSE THERE'S

6  SO MANY DIFFERENT INSTANCES WHERE I WOULD GET LAB WORK DONE.

7  Q.   OKAY.

8  A.   I COULD GET A CBC.  I COULD -- COULD BE FOR MY LIVER

9  ENZYMES.  IT COULD BE FOR A COMMON COLD.  IT COULD BE FOR A

10  CONDITION THAT JUST MANIFEST ITSELF.

11  Q.   OKAY.  AND CAN YOU TELL ME WHAT YOU RECALL RECEIVING LAB

12  WORK FOR DURING 2015 AND 2016?

13  A.   I CANNOT BE SPECIFIC ON THAT POINT.

14  Q.   DID YOU RECEIVE ANYTHING FOR LIVER ENZYMES?  DO YOU KNOW?

15  A.   YES.

16  Q.   OKAY.  AND DO YOU KNOW IF YOU RECEIVED ANYTHING TO -- LET

17  ME BACK UP.  ON THE LIVER ENZYMES, WAS THAT DONE IN CONJUNCTION

18  WITH THE HEPATITIS C CLINIC?  IS THAT YOUR UNDERSTANDING?

19  A.   YES.

20  Q.   SO YOU WERE BEING FOLLOWED IN THE HEPATITIS C CLINIC

21  DURING 2015?

22  A.   YES.

23  Q.   AND ALSO DURING 2016?

24  A.   YES.

25  Q.   AND DID ANYONE EVER RECOMMEND THAT YOU RECEIVE ANY FURTHER

1  TREATMENT FOR YOUR HEPATITIS C AT THAT TIME, DURING THOSE

2  YEARS?

3  **A.**   AT THAT PARTICULAR TIME, NO ONE RECOMMENDED IT.  HOWEVER,

4  WHEN THE TREATMENT WAS DISCONTINUED, I WAS TOLD THAT MY ENZYME

5  LEVEL HAD DECREASED, HAD STABILIZED.  SO I HAD A PROBLEM

6  UNDERSTANDING WHY THEY SAY THE TREATMENT WAS INEFFECTIVE WHEN

7  IT HAD STABILIZED MY ENZYMES.

8  **Q.**   AND YOU INDICATED THAT YOU DID RECEIVE A PAMPHLET ON YOUR

9  HEPATITIS C.  IS THAT RIGHT?

10  **A.**   YES.

11  **Q.**   DID YOU READ IT?

12  **A.**   YES, I DID.

13  **Q.**   DID YOU UNDERSTAND IT?

14  **A.**   PARTIALLY, YES.

15  **Q.**   DID YOU ASK ANY QUESTIONS AT YOUR FOLLOW-UP CLINIC VISITS

16  ABOUT WHAT -- THE INFORMATION THAT WAS IN THE PAMPHLET?

17  **A.**   NO.

18  **Q.**   AND I BELIEVE YOU INDICATED THAT THE -- YOU WERE ASSIGNED

19  A REGULAR DUTY STATUS, SQUAD A.  DID I UNDERSTAND YOU

20  CORRECTLY?

21  **A.**   YES.

22  **Q.**   AND IS IT YOUR UNDERSTANDING THAT SQUAD A ALLOWS YOU TO

23  LIFT UP TO 30 POUNDS?

24  **A.**   NO.  IT'S MY UNDERSTANDING THAT THE RESTRICTIONS FOR SQUAD

25  A IS LIFTING TEN POUNDS.

1  Q.   AND AS FAR AS LIFTING THE DRYWALL, WAS THAT SOMETHING YOU

2  WERE DOING ON YOUR OWN, OR WOULD OTHER PEOPLE BE HELPING LIFT

3  THE DRYWALL?

4  A.   I WAS ORDERED TO DO THE DRYWALL.

5  Q.   THAT'S NOT WHAT I'M ASKING.  WERE YOU LIFTING THE SHEET OF

6  DRYWALL BY YOURSELF, OR WERE THERE OTHER PEOPLE LIFTING THE

7  DRYWALL WITH YOU?

8  A.   THERE WERE OTHER PEOPLE LIFTING AT TIMES, AND AT TIMES

9  THERE WAS ONLY MYSELF.

10  Q.   OKAY.  AND WHEN YOU TESTIFIED THAT YOU THOUGHT A SHEET

11  WOULD BE ABOUT 25 POUNDS?

12  A.   25 TO 35 POUNDS, YES.

13  Q.   OKAY.  DO YOU RECALL RECEIVING NUMEROUS X-RAYS WHILE YOU

14  HAVE BEEN AT LOUISIANA STATE PENITENTIARY DURING THE YEARS OF

15  2015 AND 2016 UP THROUGH SEPTEMBER 30TH OF 2016?

16  A.   WOULD YOU PLEASE REPEAT THE QUESTION?  I DIDN'T HEAR THE

17  BEGINNING.

18  Q.   I'M SORRY.  DO YOU RECALL RECEIVING NUMEROUS X-RAYS WHILE

19  YOU'VE BEEN AT LOUISIANA STATE PENITENTIARY DURING THE PERIOD

20  OF 2015 THROUGH SEPTEMBER 30TH OF 2016?

21  A.   I CANNOT SAY I RECEIVED NUMEROUS X-RAYS.  I MIGHT HAVE

22  RECEIVED A NUMBER OF X-RAYS BECAUSE OF INJURIES OR CONDITIONS.

23  Q.   OKAY.  DO YOU RECALL HAVING AN X-RAY FOR NECK AND BACK

24  PAIN ON JANUARY 26TH OF 2015?

25  A.   I'M SURE I HAD X-RAYS FOR NECK AND BACK PAIN, BUT AS FAR

1   AS THE DATES ARE CONCERNED, I'M NOT CERTAIN.

2   **Q.**   DO YOU RECALL HAVING AN X-RAY AROUND ABOUT SOMETIME IN

3   OCTOBER OF 2015 FOR LOW BACK PAIN?

4   **A.**   QUITE POSSIBLY, YES.

5   **Q.**   OKAY.  DO YOU RECALL IN JANUARY OF 2016 HAVING AN X-RAY

6   FOR LEFT WALL CHEST PAIN?

7   **A.**   POSSIBLY, YES.

8   **Q.**   DO YOU RECALL HAVING ANOTHER X-RAY IN FEBRUARY OF 2016 FOR

9   PAIN IN YOUR LEFT CLAVICLE?

10  **A.**   GIVE ME THAT DATE AGAIN.

11  **Q.**   FEBRUARY OF 2016.

12  **A.**   YES.

13  **Q.**   AND AGAIN, MAY OF 2016, FOR PAIN IN YOUR LEFT CLAVICLE?

14  **A.**   YES.

15  **Q.**   OKAY.  DO YOU RECALL HAVING A CT SCAN OF YOUR CHEST IN

16  JULY OF 2016?

17  **A.**   YES, PERHAPS.

18  **Q.**   DO YOU RECALL BEING TOLD THAT SOMETHING UNUSUAL WAS SEEN

19  ON THE X-RAY IN YOUR LUNG?

20              **THE COURT:**  WAS THAT A CT OR AN X-RAY?

21              **MS. ROPER:**  I'M SORRY.  I BELIEVE THAT WAS THE CT.

22              **THE COURT:**  THE CT MAY OF 2016?

23              **MS. ROPER:**  JULY OF 2016.

24              **THE COURT:**  OH, OKAY.  THANK YOU.

25              **THE WITNESS:**  NO, I DO NOT RECALL BEING TOLD THAT.

11:20 1  BY MS. ROPER:

2  **Q.**   OKAY.  DO YOU RECALL ANYONE TELLING YOU THAT YOU WERE

3  GOING TO HAVE A BIOPSY?

4  **A.**   YES.

5  **Q.**   OKAY.  AND WHO TOLD YOU THAT?

6  **A.**   I BELIEVE IT WAS DR. MCCLAIN.

7  **Q.**   AND DR. MCCLAIN WOULD BE WITH --

8  **A.**   HE WAS A PHYSICIAN AT LSP.

9  **Q.**   OKAY.  AND DID YOU UNDERSTAND WHAT THE PURPOSE OF THE

10  BIOPSY WAS FOR?

11  **A.**   YES, I DID.

12  **Q.**   AND DO YOU RECALL, ROUGHLY, WHEN THE BIOPSY WOULD HAVE

13  BEEN SCHEDULED FOR?

14  **A.**   I WOULD BELIEVE THE BIOPSY THAT DR. MCCLAIN TOLD ME WOULD

15  BE IN DECEMBER OF 2016.

16       **MR. DAVIDSON:**  AND YOUR HONOR, I WOULD JUST NOTE THAT

17  WE ARE PAST THE DISCOVERY PERIOD AT THIS POINT.

18       **THE COURT:**  NOTED.

19       **MS. ROPER:**  OKAY.

20       **THE COURT:**  SIR, YOU UNDERSTOOD THE BIOPSY WAS

21  BECAUSE OF WHAT THEY FOUND ON THE CT SCAN?  I SHOULD ASK THAT.

22  WAS THE BIOPSY BECAUSE OF WHAT THEY SAW ON THE CT SCAN?

23       **THE WITNESS:**  THE BIOPSY WAS BECAUSE OF WHAT THEY

24  FOUND ON THE HEART X-RAY.

25       **THE COURT:**  OKAY.

1     THE WITNESS:  THE INITIAL.

2     THE COURT:  AND THAT WAS EARLIER THAN THE CT SCAN?

3     THE WITNESS:  YES.

4     THE COURT:  OKAY.

5     THE WITNESS:  YES, YOUR HONOR.  EXCUSE ME.

6     THE COURT:  THANK YOU, SIR.

7  BY MS. ROPER:

8  Q.   SO WAS IT YOUR UNDERSTANDING THAT THE CT SCAN WAS TO GET

9  MORE INFORMATION ABOUT WHAT THEY WERE CONCERNED ABOUT ON THE

10 X-RAY?

11 A.   WHEN YOU SAY "THEY," WHO ARE YOU REFERRING TO?

12 Q.   I'M REFERRING TO ANGOLA PENITENTIARY PHYSICIANS OR HEALTH

13 PROVIDERS.

14 A.   AND YOUR QUESTION AGAIN?

15 Q.   MY QUESTION, AGAIN, YOU JUST INDICATED TO THE COURT THAT

16 YOU BELIEVED THAT THERE WAS A SUSPICIOUS THING NOTED ON YOUR

17 HEART X-RAY.  CORRECT?

18 A.   YES.

19     MR. DAVIDSON:  OBJECTION, YOUR HONOR.  IT DOES

20 MISCHARACTERIZE THE TESTIMONY.  I THINK YOU CALLED IT A

21 SUSPICIOUS THING.

22     THE COURT:  OVERRULED.

23 BY MS. ROPER:

24 Q.   AND I APOLOGIZE FOR NOT REMEMBERING YOUR EXACT WORDING.

25 AFTER THERE WAS SOMETHING OF CONCERN NOTED ON YOUR HEART X-RAY,

11:23    1    SOMEONE SCHEDULED YOU FOR A CT SCAN.  CORRECT?

2    A.    YES.

3    Q.    AND DO YOU KNOW WHAT PHYSICIAN THAT WOULD HAVE BEEN THAT

4    SCHEDULED YOU FOR THAT?

5    A.    ONCE AGAIN, THAT WOULD HAVE BEEN DR. MCCLAIN.

6    Q.    OKAY.  SO THE LSU PHYSICIANS WERE THE ONES THAT WERE

7    SCHEDULING YOU FOR THESE APPOINTMENTS TO SEE ABOUT THE

8    SUSPICIOUS IMAGE ON YOUR LUNG.  IS THAT RIGHT?

9    A.    NO.

10    Q.    OKAY.  IF YOU COULD EXPLAIN, PLEASE.

11    A.    OKAY.  IT WAS AN LSU PHYSICIAN THAT BROUGHT MY ATTENTION

12    TO THE LUNG LESION.  AS FAR AS LSU'S SCHEDULING ME FOR THE

13    DIFFERENT TESTS, I HAVE NO WAY OF KNOWING.  BUT I DO NOT

14    BELIEVE THEY WERE RESPONSIBLE FOR THE SCHEDULING.  DR. MCCLAIN,

15    A PHYSICIAN AT LSP, IS THE ONE THAT DID THE SCHEDULING, AND DR.

16    TOCE.

17    Q.    OKAY.  I MISUNDERSTOOD YOU.  WHEN I THOUGHT YOU SAID DR.

18    MCCLAIN, I THOUGHT YOU SAID HE WAS AT LSU.  BUT YOU ARE SAYING

19    HE WAS AN LSP PHYSICIAN?

20    A.    HE WAS THE PRIMARY CARE PHYSICIAN AT LSP.

21    Q.    COULD THAT HAVE BEEN A DR. MACMURDO?

22    A.    NO.

23    Q.    OKAY.  DR. MCCAIN PERHAPS?

24    A.    PERHAPS, YES.  THANK YOU.

25    Q.    ALL RIGHT.  DO YOU RECALL BEING SEEN -- SENT OUT FOR A

1    REFERRAL TO BE SEEN BY THE LSU PULMONOLOGIST ROUGHLY IN JULY OF

2    2016?

3    A.    LSU PULMONOLOGIST?  CAN YOU TELL ME WHICH HOSPITAL?

4    Q.    I BELIEVE IT WAS AT CNO, NEW ORLEANS.

5    A.    NOT IN JULY 2016, NO.

6    Q.    OKAY.  DO YOU RECALL ANY APPOINTMENTS THAT YOU WERE SENT

7    OUT TO SEE A PULMONOLOGIST DURING 2015 OR 2016?

8    A.    YES.

9    Q.    OKAY.

10   A.    2016 I SAW A PULMONOLOGIST.

11   Q.    OKAY.  AND, ROUGHLY, WHEN WOULD THAT HAVE BEEN?

12   A.    I'M NOT SURE OF THE EXACT DATE, THOUGH I DO RECALL IT WAS

13   2016.

14   Q.    OKAY.  AND DO YOU RECALL WHY YOU WERE BEING SEEN BY THE

15   PULMONOLOGIST?

16   A.    I WAS BEING EXAMINED TO FOLLOW -- I WAS BEING EXAMINED TO

17   FOLLOW THE PROGRESSION OF THE LUNG LESION.

18   Q.    AND DID YOU HAVE ANY APPOINTMENTS THROUGH TELEMED SERVICES

19   TO BE FOLLOWED UP WITH ABOUT THE LUNG LESION?

20   A.    I CAN'T RECALL AT THIS TIME ABOUT TELEMED, NO.

21   Q.    ARE YOU FAMILIAR WITH TELEMED?

22   A.    YES, I AM.

23   Q.    DO YOU RECALL HAVING ANY APPOINTMENTS THROUGH TELEMED

24   DURING 2015 OR 2016?

25   A.    A NUMBER OF TIMES I HAD TELEMED APPOINTMENTS DEALING WITH

1   THE HEPATITIS CLINIC, AND I DID HAVE ONE DEALING WITH THE

2   PULMONOLOGIST FROM UNIVERSITY, YES.

3   **Q.**   OKAY.  AND DO YOU REMEMBER HAVING A PULMONARY FUNCTION

4   TEST AROUND SEPTEMBER OF 2016?

5   **A.**   YES.

6   **Q.**   OKAY.  AND IT CAME BACK WITH MINIMAL OBSTRUCTIVE AIRWAY

7   DISEASE?

8   **A.**   AS FAR --

9        **MR. DAVIDSON:**  EXCUSE ME, YOUR HONOR.  ONCE AGAIN,

10  THE FOLLOW-UP TESTING FOR THE RESULTS ARE AFTER THE DISCOVERY

11  PERIOD.

12       **THE COURT:**  I'M GOING TO ALLOW IT.  OVERRULED.

13       **THE WITNESS:**  WOULD YOU REPEAT IT?

14  **BY MS. ROPER:**

15  **Q.**   OKAY.  THE PULMONARY FUNCTION TEST THAT YOU HAD IN

16  SEPTEMBER OF 2016, DO YOU RECALL THAT THE RESULTS WERE MINIMAL

17  OBSTRUCTIVE AIRWAY DISEASE?

18  **A.**   NO, I WAS NOT TOLD THAT.

19  **Q.**   OKAY.

20  **A.**   I WAS TOLD THAT IT WAS CLEAR.

21  **Q.**   AND WHEN YOU --

22  **A.**   WHEN I SAY CLEAR, I MEAN THAT THE FUNCTION TEST WOULD FIND

23  THAT THERE WERE NO OBSTRUCTIONS.

24  **Q.**   OKAY.  AND THERE WAS A SPIROMETRY TEST AS WELL, AND I DO

25  BELIEVE THAT THAT WAS CLEAR.  IS THAT MAYBE WHAT YOU'RE

1    REFERRING TO?

2    **A.**   NO.   I'M SPEAKING STRICTLY TO THE PULMONARY FUNCTION.   I

3    WAS TOLD THERE WAS NO OBSTRUCTIONS.

4    **Q.**   OKAY.   WERE YOU EVER A SMOKER?

5    **A.**   YES.

6    **Q.**   HOW LONG DID YOU SMOKE?

7    **A.**   OH, PERHAPS 30 YEARS OR MORE.

8    **Q.**   OKAY.   AND YOU MENTIONED ABOUT YOUR MEDICATION, HAVING

9    SOME ISSUES WITH NOT RECEIVING YOUR MEDICATION TIMELY?

10   **A.**   YES.

11   **Q.**   AND I BELIEVE YOU SAID THAT YOU WOULD REQUEST A REFILL AND

12   THEN IT WOULD TAKE SEVERAL DAYS TO GET IT SOMETIMES?

13   **A.**   YES.

14   **Q.**   OKAY.   DID YOU REQUEST THE REFILL BEFORE YOUR PILLS WERE

15   DONE OR AT THE POINT WHERE THEY WERE OUT?

16   **A.**   WELL, ON -- IF IT'S A KEEP-ON-PERSON MEDICATION, ON THE

17   CARD IS AN INDICATION OF WHEN YOU SHOULD MAKE THE REORDER

18   REQUEST, AND I ALWAYS FOLLOW THE PILL CARD.

19   **Q.**   AND THE DATE THAT YOU ARE TO MAKE THE REORDER REQUEST ON

20   THOSE KEEP-ON-PERSON MEDICATIONS, YOU SHOULD STILL HAVE

21   MEDICATION LEFT.   IS THAT RIGHT?

22   **A.**   YES.   YOU SHOULD HAVE AT LEAST SEVEN LEFT.

23   **Q.**   OKAY.   SO IF IT WOULD TAKE SEVERAL DAYS, YOU'RE SAYING

24   THAT YOU STILL RAN OUT OF MEDICATION.   CORRECT?

25   **A.**   YES.   UH-HUH.

**Q.**   OKAY.  YOU ALSO INDICATED THAT YOU BELIEVE YOU GOT THE
WRONG MEDICATION.  IS THAT RIGHT?

**A.**   I DIDN'T HEAR ALL OF THAT.

**Q.**   OKAY.  AND CORRECT ME IF I'M WRONG, I BELIEVE YOU SAID
THAT YOU MAY HAVE GOTTEN THE WRONG MEDICATION?

**A.**   YES, I HAVE.

**Q.**   ON HOW MANY OCCASIONS?

**A.**   12, 15.

**Q.**   AND HOW IS IT THAT YOU BELIEVE THE MEDICATION WAS THE
WRONG MEDICINE?

**A.**   WELL, AFTER A WHILE TAKING THE MEDICATION, YOU BECOME
FAMILIAR WITH IT.  YOU BECOME FAMILIAR WITH THE NAME, THE LOOKS
OF IT.

**Q.**   SO YOU WERE BASING IT ON THE WAY THAT IT LOOKED, THE
COLOR?

**A.**   YEAH.

**Q.**   THE SHAPE, THINGS LIKE THAT?

**A.**   THE SHAPE, THE COLOR, THE NAME, THE WAY IT LOOKED, THAT'S
SOME OF THE WAYS YOU COULD TELL.

**Q.**   THANK YOU, MR. BUTLER.

          **THE COURT:**  REDIRECT?

          **MR. DAVIDSON:**  NO REDIRECT, YOUR HONOR.

          **THE COURT:**  SIR, YOU MAY STEP DOWN.

          LET'S TAKE A 30-MINUTE LUNCH BREAK.  IT'S 11:30.
WE'LL RESUME AT NOON.

1    **MR. DAVIDSON:**  THANK YOU, YOUR HONOR.

2                          **(RECESS.)**

3          **THE COURT:**  BE SEATED.

4                ARE YOU READY WITH YOUR NEXT WITNESS?

5          **MS. KUMAR:**  YES, YOUR HONOR.  NISHA KUMAR, COUNSEL

6    FOR PLAINTIFFS.  AND WE'D CALL MR. DANNY PRINCE, WHO IS ALREADY

7    GETTING READY TO GO ON THE STAND.

8          **THE COURT:**  MR. PRINCE.

9                       **DANNY PRINCE,**

10   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

11         **THE COURT:**  GO AHEAD, MS. KUMAR.

12                    **DIRECT EXAMINATION**

13   **BY MS. KUMAR:**

14   **Q.**   GOOD AFTERNOON.

15   **A.**   GOOD AFTERNOON.

16   **Q.**   CAN YOU PLEASE STATE YOUR NAME FOR THE RECORD?

17   **A.**   DANNY PRINCE.

18   **Q.**   AND HOW OLD ARE YOU, MR. PRINCE?

19   **A.**   42.

20   **Q.**   AND WHERE ARE YOU FROM?

21   **A.**   I'M FROM LAFAYETTE, LOUISIANA.

22   **Q.**   AND WHAT'S YOUR CURRENT ADDRESS?

23   **A.**   ANGOLA STATE PENITENTIARY.

24   **Q.**   MR. PRINCE, HOW LONG HAVE YOU BEEN AT ANGOLA?

25   **A.**   SINCE MARCH OF 2013.

12:06   1   **Q.**   AND WHY ARE YOU HERE TESTIFYING BEFORE THE COURT TODAY?

2   **A.**   TRYING TO GET A BETTER ESTABLISHMENT FOR ACCESS TO MEDICAL

3   TREATMENT FOR PATIENTS AND NON-PATIENTS AT ANGOLA.

4   **Q.**   MR. PRINCE, I WOULD LIKE TO TURN TO YOUR EMPLOYMENT

5   HISTORY AT ANGOLA.  HAVE YOU EVER HAD A JOB ASSIGNMENT?

6   **A.**   YES, MA'AM.

7   **Q.**   MR. PRINCE, THE DISCOVERY PERIOD IN THIS CASE ENDED ON

8   SEPTEMBER 30, 2016, AND WE'RE PARTICULARLY FOCUSING ON 2015 AND

9   2016.

10   **A.**   CORRECT.

11   **Q.**   WHAT JOB, IF ANY, DID YOU HAVE DURING THAT PERIOD?

12   **A.**   DURING THAT PERIOD OF TIME I WORKED AS A -- I WAS IN A

13   BIBLE COLLEGE AS A STUDENT FULL-TIME, I WORKED AS A HEALTHCARE

14   ORDERLY IN ASH 2.

15   **Q.**   AND WHAT IS ASH 2?

16   **A.**   ASH 2 IS A LIVING ASSISTANCE DORM.

17   **Q.**   HOW DID YOU END UP IN ASH 2?

18   **A.**   WITH MY WORK PERFORMANCE AS A HEALTHCARE ORDERLY, THEY

19   MOVED ME INTO THE DORM SO I WOULD BE CLOSER TO THE PATIENTS AND

20   BE ABLE TO HELP THEM BETTER.

21   **Q.**   DO YOU KNOW HOW THE PATIENTS END UP IN ASH 2?

22   **A.**   YES, MA'AM.  THE PATIENTS COME OFF OF ILLNESSES, OUT THE

23   HOSPITAL, AND END UP BEING PUT IN THESE DORMS IN ASH 2 OR

24   CYPRESS 2, AND THEY NEED TO BE PLACED TOGETHER SO THE

25   HEALTHCARE ORDERLY COULD CARE FOR THEM IN A BETTER PLACE.

1  Q.   YOU SAID ASH 2 WAS AN ASSISTED LIVING DORM.  ARE THERE

2  OTHER DORMS FOR PEOPLE WHO NEED LIVING ASSISTANCE?

3  A.   YES, MA'AM.  THERE'S ASH 2, CYPRESS 2, AND HICKORY 4 ON

4  THE MAIN PRISON.

5  Q.   AND IS THERE ANY DIFFERENCE BETWEEN ASH 2 AND THE OTHER

6  TWO LIVING ASSISTANCE DORMS?

7  A.   ASH 2 IS -- THEY SEND MORE OF THE PATIENTS THAT ARE

8  NEEDING MORE HEALTHCARE ORDERLIES AND MORE ATTENTION.

9  Q.   CAN YOU DESCRIBE THE POPULATION OF ASH 2 IN MORE DETAIL

10  FOR US?

11  A.   ASH 2 HAS APPROXIMATELY 86 INMATES IN IT, 44 -- 43 OF

12  WHICH ARE PATIENTS; THE OTHER 43 ARE NON-PATIENTS.

13  Q.   AND CAN YOU DESCRIBE ANY SYMPTOMS YOU'VE OBSERVED THE

14  PATIENTS IN ASH 2 EXHIBITING?

15  A.   I'VE RAN ACROSS SO MANY DIFFERENT SYMPTOMS.  YOU HAVE SOME

16  PATIENTS COME IN THERE THAT HAD STROKES, SOME OF THEM HAD HEART

17  ATTACKS, RECUPERATING FROM THAT, SOME HAVE SEIZURES --

18  DIFFERENT TIMES.  OTHER PATIENTS, SOME SUFFER FROM MENTAL

19  ILLNESSES THAT NEED TO BE WATCHED, YOU KNOW, UNDER DIFFERENT --

20  THAT KIND OF CARE.  YOU HAVE PATIENTS THAT ARE DEALING WITH

21  CHEMO COMING THROUGH, YOU KNOW, RECOVERING FROM CANCER OR GOING

22  THROUGH TREATMENT OF CANCER THAT HAVE TRACHS OR COLOSTOMY BAGS.

23  IT'S JUST A LOT.  I CAN'T REMEMBER ALL OF THEM.  IT'S JUST A

24  WIDE RANGE OF PATIENTS WE HAVE WITH SYMPTOMS.

25  Q.   AND CAN YOU DESCRIBE WHAT TYPES OF ASSISTANCE THE PATIENTS

1  NEED?

2  **A.**   DIFFERENT PATIENTS, DEPENDING ON THEIR CONDITION, NEEDS

3  DIFFERENT ASSISTANCE.  YOU HAVE SOME PATIENTS THAT WILL NEED TO

4  BE TRANSPORTED FROM THE DORMS TO WHEREVER THEY NEED TO GO,

5  WHETHER IT'S TO CALLOUTS, TO THE HOSPITAL, OR TO THE YARD, OR

6  TO THE STORE, THE CANTEEN.  SOME PATIENTS NEED TO BE EVEN TAKEN

7  OUT.  THEY ARE PARALYZED FROM THE WAIST DOWN.  THEY NEED TO BE

8  TRANSFERRED FROM THEIR BED TO THE WHEELCHAIRS.  SOME NEED HELP

9  GETTING IN AND OUT OF THE SHOWER.  WE NEED TO -- WE FEED ALL OF

10  THEM IN THE DORMS, OR WE HAVE TO BRING THEM THEIR TRAYS, MAKE

11  SURE THAT THEIR LINENS CHANGED, JUST -- IT'S A WIDE RANGE OF

12  THINGS WE HAVE TO DO, DEPENDING ON THE CONDITION OF THE

13  PATIENTS.

14  **Q.**   AND WHO PROVIDES THAT ASSISTANCE?

15  **A.**   THE HEALTHCARE ORDERLIES THAT WORK ON THE UNIT.

16  **Q.**   DO YOU KNOW HOW MANY PATIENTS THERE ARE ON ASH 2 AT ANY

17  GIVEN TIME?

18  **A.**   USUALLY IT'S AROUND 43.

19  **Q.**   AND DO YOU KNOW HOW MANY ORDERLIES ARE WORKING AT ANY

20  GIVEN TIME?

21  **A.**   ORDERLIES ON A -- AT NIGHTTIME, WE HAVE TWO ORDERLIES

22  WORKING AT NIGHT.  AND DURING THE DAY, IT'S ANYWHERE FROM THREE

23  TO FIVE ORDERLIES, DEPENDING ON IF WE'RE FULL OR SHORTHANDED ON

24  THEM.

25  **Q.**   HAVE YOU OBSERVED INTERACTIONS BETWEEN THE PATIENTS AND

1   THE ORDERLIES ON ASH 2?

2   **A.**   YES, MA'AM, I HAVE.

3   **Q.**   AND CAN YOU DESCRIBE HOW HEALTHCARE ORDERLIES TREAT THE

4   PATIENTS ON ASH 2?

5   **A.**   THAT QUESTION IS KIND OF -- IT GOES BOTH WAYS, BECAUSE

6   I'VE WITNESSED DIFFERENT -- DEPENDING ON THE HEALTHCARE ORDERLY

7   HIMSELF AND ON THE PATIENTS.  I'VE SEEN A LOT OF GOOD

8   HEALTHCARE ORDERLIES, YOU KNOW, THAT GO BEYOND THEIR JOB RANGE,

9   AND THEY REALLY HELP THE PATIENT, EVEN WORKING ON THEIR TIME

10  THAT THEY'RE NOT SCHEDULED TO WORK.

11          AND I'VE ALSO SEEN THE FLIP SIDE OF THAT.  I'VE SEEN

12  HEALTHCARE ORDERLIES THAT DON'T -- THEY'RE JUST THERE FOR AN

13  EASY JOB AND, YOU KNOW, NOT THERE TO HELP.  YOU KNOW, THEY ARE

14  ONLY THERE FOR THEMSELVES.

15          AND, YOU KNOW, I'VE SEEN ABUSIVE SITUATIONS.  I'VE

16  SEEN VERBAL, YOU KNOW, FROM BOTH SIDES, THOUGH.  IT'S BEEN

17  PATIENTS, YOU KNOW, GETTING INTO IT WITH HEALTHCARE ORDERLIES

18  BECAUSE THEY DON'T HAVE THE TIME TO TAKE CARE OF THEM BECAUSE

19  THEY'RE SO BUSY.

20          I'VE ALSO SEEN THE HEALTHCARE ORDERLIES GETTING INTO

21  IT WITH THE PATIENTS, YOU KNOW.  IT'S BEEN VERBAL.  THERE'S

22  EVEN BEEN FIGHTS PHYSICALLY WITH -- BETWEEN HEALTHCARE

23  ORDERLIES AND PATIENTS.

24  **Q.**   ANYTHING ELSE YOU'VE OBSERVED?

25  **A.**   AS FAR AS THE INTERACTIONS BETWEEN THE PATIENTS AND THE --

1  THERE'S BEEN -- I CAN'T REALLY SAY THERE'S MORE THAN THAT

2  BECAUSE IT'S AROUND THE RANGE OF THE PATIENTS AND THE ORDERLIES

3  ASSOCIATING WITH EACH OTHER.  THERE'S SO MANY INSTANCES TO

4  WHERE THINGS LEAD TO EITHER THE GOOD OR THE BAD SIDE OF IT, YOU

5  KNOW.

6  Q.   MR. PRINCE, HAVE YOU EVER OBSERVED NEGLECT OF PATIENTS ON

7  ASH 2?

8  A.   YES, MA'AM, I HAVE.  BUT THE MAJORITY OF THE TIME IT'S DUE

9  TO BEING SHORTHANDED.  WE DON'T HAVE, YOU KNOW, ENOUGH OF THE

10  HEALTHCARE ORDERLIES TO TAKE CARE OF THE NUMBER OF PATIENTS

11  THAT WE HAVE.  I MEAN, IF WE HAVE SO MANY CALLOUTS, YOU KNOW,

12  WE CAN'T BRING -- WE HAVE TO BE -- HEALTHCARE ORDERLIES WORKING

13  AT A DAY.  ONE OF US HAS TO STAY IN THE DORM TO WATCH OVER THE

14  REST OF THEM WHILE YOU HAVE TWO TO BRING THEM ON CALLOUTS AND

15  TAKE CARE OF THEM.  AND IF YOU HAVE SEVEN OR EIGHT CALLOUTS,

16  YOU KNOW, FOR ONE DAY, YOU KNOW, IT'S -- WE DON'T HAVE TIME

17  TO -- WE CAN'T JUST BRING THEM AND BRING THEM IN.  SOMEBODY'S

18  GONNA HAVE TO BE LEFT BEHIND TILL WE CAN GET BACK TO THEM, YOU

19  KNOW, SO . . .

20  Q.   MR. PRINCE, WHO ARE THE DOCTORS THAT COME TO ASH 2?

21  A.   I DON'T -- NO DOCTORS COME TO ASH 2 UNLESS THERE'S LIKE A

22  TOUR OR SOMETHING COMING THROUGH.

23  Q.   MR. PRICE, THEN, WHO ARE THE NURSES THAT COME TO ASH 2?

24  A.   NONE OF THE NURSES COME TO ASH 2 EITHER.

25  Q.   SO WHO SUPERVISES YOUR WORK AS A HEALTHCARE ORDERLY?

1 **A.**   SECURITY IS REALLY MY SUPERVISOR.  I MEAN, WE PRETTY MUCH

2 SUPERVISE OURSELVES.  WE KNOW WHAT OUR JOB IS, AS FAR AS WHAT

3 WE WERE TOLD AND TRAINED TO DO, AND IT'S UP TO US TO EITHER DO

4 IT OR DON'T DO IT.

5 **Q.**   CAN YOU DESCRIBE THE CONDITIONS IN ASH 2?

6 **A.**   ASH 2 IS A -- IT'S A VERY CROWDED DORM.  WE HAVE SO MANY

7 PATIENTS WITH WHEELCHAIRS IN THE SPACE, THE LIVING SPACES, YOU

8 KNOW, PLUS YOU HAVE OTHER INMATES WITH ALL THEIR PROPERTY AND

9 THE PATIENTS' PROPERTY.  IT'S JUST -- IT'S REALLY OVERCROWDED.

10       THERE'S A LOT MORE FIGHTS AND ARGUMENTS OCCUR BECAUSE

11 OF THE ROOM TO PASS OR YOU'RE IN SOMEBODY'S AISLE THAT YOU'RE

12 NOT SUPPOSED TO BE IN BECAUSE YOU HAVE TO VEER OFF SO A

13 WHEELCHAIR COULD PASS.  IT'S JUST -- IT'S CROWDED.

14       THE BATHROOM AREA IS CROWDED BECAUSE YOU HAVE

15 WHEELCHAIRS TRYING TO GET BACK THERE.  YOU HAVE OTHER PATIENTS

16 TRYING TO GET BACK THERE.  YOU KNOW, YOU HAVE TO REALIZE WE

17 HAVE 43 PATIENTS AND WE'VE GOT 43 REGULAR INMATES THAT ARE

18 REGULAR POPULATION INMATES, YOU KNOW.  IT'S A CONSTANT BATTLE

19 OF WHO'S GOING TO GET THERE FIRST OR HOW LONG DO WE HAVE TO

20 WAIT TO SWITCH SPOTS.  YOU KNOW.  IT'S JUST CROWDED.  GETTING

21 IN THE SHOWER YOU HAVE TO HAVE -- LIKE WAIT AND WAIT AND WAIT,

22 YOU KNOW.  GETTING INTO THE BATHROOM, YOU HAVE TO WAIT.

23 **Q.**   MR. PRINCE, CAN YOU DESCRIBE THE HYGIENE CONDITIONS IN ASH

24 2?

25 **A.**   ASH 2 IS NOT REALLY A -- IT'S NOT REALLY A VERY CLEAN DORM

1  BECAUSE WE DON'T HAVE -- WE SHORT ON -- WE'RE ALWAYS SHORT ON

2  DORM ORDERLIES.  AND IN ASH 2 ITSELF IS -- THE PATIENTS CAN'T

3  REALLY TAKE CARE OF CLEANING UP BEHIND THEMSELVES.  AND THE

4  DORM ORDERLY'S JOB IS TO CLEAN THE DORM BUT THEY CLEAN THE DORM

5  IN THE MORNING, AND SOMETIMES THEY'LL CLEAN IT AT NIGHT.  BUT

6  ONCE THEIR JOB IS DONE FOR THAT DAY IN THE MORNING TO CLEAN IT,

7  THEY DON'T CLEAN IT AFTER THAT.  SO WHATEVER MESS IS MADE, IT'S

8  UP TO THE PEOPLE IN THE DORM TO EITHER CLEAN UP BEHIND THE

9  PATIENTS OR JUST LEAVE IT THERE.

10  Q.   AND CAN YOU DESCRIBE THE ACCESS TO MEDICAL CARE THAT THE

11  PATIENTS ON ASH 2 HAVE?

12  A.   YES, MA'AM.  THEY MAKE SICK CALL OR THEY MAKE EMERGENCY OR

13  THEY -- OR THE ORDERLIES CAN PUSH THEM TO THE HOSPITAL.

14  Q.   AND WHAT WOULD YOUR OPTIONS BE AS A HEALTHCARE ORDERLY IF

15  ONE OF YOUR PATIENTS WAS REALLY SICK?

16  A.   CAN YOU -- LIKE DYING SICK OR LIKE --

17  Q.   WELL, SO OTHER THAN MAKING SICK CALL OR MAKING EMERGENCY,

18  IS THERE ANY OTHER WAY THAT YOUR PATIENTS CAN ACCESS

19  HEALTHCARE?

20  A.   WE CAN INFORM SECURITY AND THEY CAN HIT THE BEEPER AND

21  HAVE AN AMBULANCE COME FOR THEM, THAT'S ABOUT IT.

22  Q.   AND HAS A PATIENT EVER DIED IN FRONT OF YOU IN ASH 2, MR.

23  PRINCE?

24  A.   YES, MA'AM.

25  Q.   DO YOU FEEL COMFORTABLE DESCRIBING THAT INCIDENT FOR THE

1  COURT?

2  **A.**   YES, MA'AM, I GUESS I COULD TALK ABOUT IT.

3       **MR. ROBERT:**   YOUR HONOR, EXCUSE ME.  CAN WE GET A

4  TIME PERIOD ON THIS?

5       **THE COURT:**  MA'AM?

6       **MS. KUMAR:**  SURE.

7  **BY MS. KUMAR:**

8  **Q.**   AND MR. PRINCE, AROUND WHAT YEAR WAS THAT INCIDENT?

9  **A.**   I BELIEVE IT WAS IN 2016, MAYBE.

10  **Q.**   OKAY.

11  **A.**   MAYBE 2016.  I'M NOT SURE EXACTLY THE YEAR, BUT IT'S

12  WITHIN -- AROUND 2016, I BELIEVE, IS THE RIGHT -- I'M NOT SURE.

13  **Q.**   CAN YOU DESCRIBE THAT INCIDENT FOR THE COURT?

14  **A.**   YES, MA'AM.  ONE OF MY PATIENTS THAT I USED TO TAKE CARE

15  OF AND A FRIEND OF MINE, HE HAD BEEN COMPLAINING ABOUT HAVING A

16  LOT OF SORENESS IN HIS THROAT AND HE FELT LIKE HE HAD HAD A

17  COLD AT FIRST.  HE HAD A TRACH IN HIS THROAT.  HE HAD A LOT OF

18  DIFFERENT HEALTH ISSUES.  I DIDN'T KNOW ALL OF THEM.  AND HE

19  KEPT MAKING EMERGENCIES, GOING TO THE EMERGENCY ROOM, AND I'M

20  NOT EXACTLY SURE OF THE TREATMENT THAT HE WAS GETTING AT THE

21  EMERGENCY ROOM, OR AT THE HOSPITAL.  I'M NOT AWARE OF THAT.  I

22  JUST KNOW HE KEPT COMING BACK.  HE WAS COMPLAINING.  WE'D HAVE

23  TO TURN AROUND IN A DAY OR SO AND SEND HIM BACK TO THE

24  EMERGENCY ROOM 'CAUSE YOU COULD JUST TELL HE WAS GETTING REAL

25  BAD.  HE WAS TURNING PALE.  HE STARTED COMPLAINING ABOUT HAVING

1   TROUBLE BREATHING, AND I WOKE UP ONE MORNING AND -- LIKE

2   ABOUT 5:30, 6:00 IN THE MORNING TO TWO OTHER INMATES THAT

3   PRACTICED -- THAT ARE TRAINED IN CPR, DOING CPR ON HIM.  AND HE

4   HAD PASSED AWAY.  IT HAD SOMETHING TO DO WITH AN INFECTION IN

5   HIS TRACH OR SOMETHING OR HIS LUNGS.

6   **Q.**   MR. PRINCE, HOW MANY PATIENTS IN WHEELCHAIRS ARE THERE ON

7   ASH 2?

8   **A.**   I WOULD SAY APPROXIMATELY ANYWHERE FROM 20 TO 25 PATIENTS.

9   **Q.**   AND HAVE YOU OBSERVED PATIENTS IN WHEELCHAIRS GOING AROUND

10  ANGOLA?

11  **A.**   YES, MA'AM.

12  **Q.**   CAN YOU DESCRIBE HOW PATIENTS IN WHEELCHAIRS GET AROUND IN

13  ANGOLA?

14  **A.**   AS BEST THEY CAN.  I MEAN, IF THERE'S SOMEBODY THAT -- YOU

15  KNOW, ANOTHER PERSON TO PUSH THEM OR A HEALTHCARE ORDERLY TO

16  BRING THEM WHERE THEY HAVE TO GO.  SOMETIMES THEY HAVE TO PUSH

17  THEMSELVES, YOU KNOW, ROLL THEMSELVES OR THAT'S ABOUT IT.

18  **Q.**   AND DO YOU KNOW HOW PATIENTS IN WHEELCHAIRS ARE

19  TRANSPORTED TO APPOINTMENTS OUTSIDE OF ANGOLA?

20  **A.**   YES, MA'AM.  I BELIEVE THEY HAVE A HANDICAP VAN THAT THEY

21  USE.

22  **Q.**   AND HAVE YOU EVER OBSERVED THE HANDICAP VAN NOT BEING

23  AVAILABLE TO TRANSPORT PATIENTS TO OUTSIDE APPOINTMENTS?

24  **A.**   I'VE HEARD SOME OF MY --

25          **MR. ROBERT:**  OBJECTION, YOUR HONOR; HEARSAY.

 1        **THE COURT:**  REPHRASE YOUR QUESTION.

 2                JUST ONE SECOND, SIR.  SHE'S GOING TO REPHRASE.

 3   BY MS. KUMAR:

 4   **Q.**   MR. PRINCE, CAN YOU JUST DESCRIBE ANY TIMES YOU'VE

 5   OBSERVED PATIENTS NOT BEING ABLE TO BE TRANSPORTED TO OUTSIDE

 6   APPOINTMENTS USING THE HANDICAP VAN?

 7   **A.**   JUST WHEN THE VAN WASN'T AVAILABLE, THE INMATE HAD TO HAVE

 8   THEIR TRIP CANCELLED OR RESCHEDULED.

 9   **Q.**   AND TO YOUR KNOWLEDGE, WHAT HAPPENS GENERALLY IF A PATIENT

10   DOESN'T GO TO A CALLOUT?

11   **A.**   WOULD THAT BE FOR -- BECAUSE THEY DON'T WANT TO?  I MEAN,

12   CAN YOU ELABORATE?

13   **Q.**   SURE.  IF THERE'S A MEDICAL CALLOUT AND THERE'S A PATIENT

14   WHO DOESN'T GO, ARE THERE ANY CONSEQUENCES FOR NOT GOING TO

15   THAT CALLOUT?

16   **A.**   YES, MA'AM.  IF A PATIENT REFUSES TO GO OR DOESN'T GO WHEN

17   HE'S SUPPOSED TO GO, HE COULD BE WRITTEN UP OR LOCKED UP,

18   DEPENDING.

19   **Q.**   AND DOES THIS HAPPEN EVEN IF PATIENTS ARE TOO SICK TO GO

20   TO CALLOUTS?

21   **A.**   IT COULD, YES, MA'AM.

22   **Q.**   MR. PRINCE, YOU MENTIONED THAT THE SHOWERS IN ASH 2 ARE

23   HARD TO ACCESS.  HAVE YOU EVER HAD TO HELP INMATES USE THE

24   SHOWERS?

25   **A.**   YES, MA'AM.

1   **Q.**   CAN YOU DESCRIBE THAT EXPERIENCE?

2   **A.**   I'VE HELPED SEVERAL INMATES GET TO AND FROM THE SHOWER, A

3   BUNCH OF DIFFERENT PATIENTS I'VE TAKEN CARE OF OVER THE COURSE

4   OF TIME.   THE SHOWER AREA TO GET -- WE CAN'T BRING THE CHAIRS

5   COMPLETELY INTO THE SHOWER BECAUSE YOU ALWAYS HAVE OTHER PEOPLE

6   SHOWERING.   SO WE HAVE TO LEAVE THE CHAIR OUTSIDE THE SHOWER

7   AREA AND ASSIST THE INMATE EITHER IN A ROLLING CHAIR, WHICH WE

8   HAVE NOW, BUT WE DIDN'T BACK THEN.   SOME OF THE PATIENTS CAN

9   WALK SOME.   THEY JUST HAVE DIFFERENT BALANCES, YOU KNOW.

10        BUT I REMEMBER ONE INCIDENT WHERE I WAS HELPING A

11   PATIENT COME OUT THE SHOWER AND HE DIDN'T HAVE -- HE HAD

12   PROBLEMS WITH HIS BALANCE, AND HE HAD ON THESE REAL SLIPPERY

13   SHOES AND HE WIND UP FALLING, ME TRYING TO BREAK -- NOT REALLY

14   BREAK HIS FALL, BUT KEEP HIM FROM HITTING HIS HEAD, HIS BODY

15   WEIGHT WIND UP FALLING ON TOP OF ME, YOU KNOW.   AND IT'S

16   JUST -- IT WASN'T A REAL SAFE -- THE FLOOR IS KIND OF SLIPPERY,

17   YOU KNOW, THE SHOES THAT WE HAD, THE SHOWER SHOES THAT WE HAVE.

18   SO THAT WAS JUST ONE INCIDENT WHERE IT WAS TRANSPORTING, YOU

19   KNOW, HOW IT'S NOT -- IT WASN'T TOO SAFE.

20   **Q.**   AND DO YOU REMEMBER WHAT YEAR THAT INCIDENT WAS?

21   **A.**   I BELIEVE THAT WAS IN 2015.

22   **Q.**   MR. PRINCE, I WANT TO TURN TO THE TRAINING THAT YOU

23   RECEIVED AS A HEALTHCARE ORDERLY.   CAN YOU DESCRIBE ANY

24   TRAINING YOU RECEIVED BEFORE BECOMING A HEALTHCARE ORDERLY?

25   **A.**   BEFORE BECOMING A HEALTHCARE ORDERLY?

1  Q.  YES.

2  A.  I DIDN'T HAVE NO TRAINING.

3  Q.  OKAY.  AND DID YOU RECEIVE ANY TRAINING AT SOME POINT

4  AFTER THAT?

5  A.  YES, MA'AM.

6  Q.  OKAY.  CAN YOU DESCRIBE WHAT THAT TRAINING CONSISTED OF?

7  A.  I HAD A TWO-DAY HANDS-ON AND VIDEO CLASS WITH MR. TRACY.

8  Q.  OKAY.  AND UP THROUGH SEPTEMBER 30TH OF 2016, DID YOU EVER

9  REPEAT THAT CLASS?

10  A.  IN 2016, YOU SAID?

11  Q.  YEP.

12  A.  I DON'T THINK I HAD, NO, MA'AM.

13  Q.  AND DID YOU EVER RECEIVE ANY OTHER TRAINING UP THROUGH

14  SEPTEMBER 30TH OF 2016?

15  A.  YES, MA'AM.  I TOOK A CPR CLASS.

16  Q.  AND WHO TAUGHT THAT CLASS?

17  A.  SOME OTHER INMATES THERE WERE -- I THINK THEY'RE CERTIFIED

18  TO TEACH IT OR SOMETHING, I BELIEVE.

19  Q.  HAVE YOU EVER BEEN PROVIDED WITH A DESCRIPTION OF YOUR JOB

20  DUTIES BY THE MEDICAL STAFF AT ANGOLA?

21  A.  LIKE VERBALLY OR IN WRITING OR --

22  Q.  LET'S SAY IN WRITING.  HAVE YOU EVER BEEN PROVIDED WITH A

23  LIST?

24  A.  NO.

25  Q.  NO?

1   **A.**   I DON'T BELIEVE SO.

2   **Q.**   AND HAVE YOU EVER BEEN TOLD BY MEDICAL STAFF THAT THERE

3   ARE CERTAIN TASKS THAT YOU COULD OR COULD NOT PERFORM AS A

4   HEALTHCARE ORDERLY?

5   **A.**   NO, MA'AM.

6   **Q.**   MR. PRINCE, I WOULD LIKE TO TURN TO YOUR OWN EXPERIENCES

7   TRYING TO ACCESS MEDICAL CARE WHILE AT ANGOLA.  HAVE YOU HAD AN

8   OCCASION TO REQUEST MEDICAL CARE WHILE YOU'VE BEEN AT ANGOLA?

9   **A.**   YES, MA'AM.

10  **Q.**   AND CAN YOU EXPLAIN WHAT HAPPENED?

11  **A.**   YES, MA'AM.  I WAS HURT IN THE ANGOLA RODEO AND I SUFFERED

12  DIFFERENT INJURIES, THREE DIFFERENT INJURIES.  I WAS KICKED.

13  **Q.**   I'M SORRY.  JUST REAL QUICK, MR. PRINCE, CAN YOU DESCRIBE

14  FOR THE COURT THE EVENTS THAT YOU PARTICIPATED IN DURING THE

15  RODEO?

16  **A.**   YES, MA'AM.  I PARTICIPATED IN AN EVENT CALLED "GUTS AND

17  GLORY"; ONE CALLED "BUST OUT"; ONE CALLED "BULLDOGGING"; A FEW

18  OTHER EVENTS LIKE "CONVICT POKER" AND "PINBALL."

19  **Q.**   LET'S JUST TAKE THE "GUTS AND GLORY" EVENT.

20  **A.**   ALL RIGHT.

21  **Q.**   CAN YOU EXPLAIN WHAT THE GOAL OF THAT EVENT IS?

22  **A.**   GUTS AND GLORY IS AN EVENT WHERE THEY TIE A CHIP BETWEEN

23  THE BULL'S HORNS, AND THE INMATES THAT PARTICIPATE AS

24  CONTESTANTS IN THE RODEO GO OUT AND TRY TO SNATCH THE CHIP FROM

25  BETWEEN THE BULL'S HORNS.

1 2 : 2 7

1  **Q.**   AND WHAT PROTECTIVE GEAR WERE YOU WEARING DURING THAT

2  EVENT?

3  **A.**   NONE.  WE'RE NOT ALLOWED TO WEAR IT ON THAT EVENT.

4  **Q.**   DO YOU KNOW WHY NOT?

5  **A.**   THEY SAY BECAUSE IT'S -- BECAUSE WE'RE NOT SUPPOSED TO --

6  IT'S LIKE MORE ATTRACTION, I GUESS, WHERE IF -- WITHOUT THE

7  PROTECTION WE'RE MORE SCARED TO ATTACK THE BULL.  'CAUSE WITH

8  THE PROTECTION, WE WOULDN'T HAVE -- YOU KNOW, IF YOU -- IT'S

9  GUTS AND GLORY, YOU KNOW.  YOU EITHER HAVE THE GUTS TO BE ABLE

10  TO ATTACK THE BULL, WHICH IF YOU HAVE A PROTECTIVE VEST ON OR

11  GEAR, YOU'RE NOT GOING TO BE AS SCARED OF THE BULL, YOU KNOW,

12  SO . . . WITHOUT IT, YOU KNOW.

13  **Q.**   GO AHEAD, MR. PRINCE.  CAN YOU JUST DESCRIBE WHAT HAPPENED

14  DURING THE GUTS AND GLORY EVENT?

15  **A.**   YES, MA'AM.  I WAS A CONTESTANT; I WAS CHASING THE BULL.

16  THE BULL WIND UP FALLING DOWN AND I RAN UP TO THE BULL WHILE HE

17  WAS DOWN AND I GRABBED THE ONE HORN HE HAD AND WENT TO REACH

18  FOR THE CHIP AND THE BULL SHOOK AND CAME UP AND HE HIT ME IN MY

19  CHEST RIGHT OVER MY HEART, SENDING ME UP IN THE AIR.

20  **Q.**   DID YOU RECEIVE ANY MEDICAL ATTENTION?

21  **A.**   YES, MA'AM.  I WAS BROUGHT TO THE ATU.  MY FIRST -- WHEN I

22  FINALLY MADE IT TO THE GATE, EMT PULLED ME THROUGH THE GATE,

23  AND THEY TOOK MY BLOOD PRESSURE, LOOKED AT MY CHEST, AND I HAD

24  TO SIT AND WAIT UNTIL THE RODEO WAS OVER TO BE TRANSPORTED TO

25  THE HOSPITAL.

**Q.**   AND HOW WERE YOU TRANSPORTED TO THE ATU?

**A.**   BY AMBULANCE.  YEAH, BY AMBULANCE.

**Q.**   WERE YOU ALONE IN THE AMBULANCE?

**A.**   NO, MA'AM.  WE HAD -- I HAD, I BELIEVE, IT WAS FIVE OR SIX
OTHER INMATES AND TWO EMTS, ONE BACK THERE WITH US AND ONE
DRIVING.

**Q.**   DID YOU SUSTAIN ANY OTHER INJURIES DURING THAT YEAR'S
RODEO?

**A.**   YES, MA'AM, I DID.

**Q.**   CAN YOU JUST VERY BRIEFLY DESCRIBE THOSE FOR THE COURT?

**A.**   YES, MA'AM.  I WAS KICKED IN MY ABDOMEN FROM RIDING A
BULL.  I WAS THROWN UNDERNEATH ANOTHER BULL, AND I WAS DOING
BULLDOGGING AND FLIPPING THE CALF OVER, AND THE CALF CAME DOWN
BACK ON ME AND FRACTURED MY LEFT RIB.

**Q.**   AND WHAT, IF ANY, SYMPTOMS DID YOU EXPERIENCE AFTER YOU
SUSTAINED THESE INJURIES?

**A.**   AT FIRST, IT WAS JUST SORENESS.  THEN GRADUALLY I STARTED
TO LOSE MY STRENGTH, AS FAR AS -- I WAS ALWAYS AN ATHLETIC
PERSON.  I WORKED OUT AND RAN THE YARD EVERY DAY.  I STARTED
LOSING MY ABILITY TO BREATHE.  I DIDN'T HAVE NO WIND ANYMORE TO
DO MY RUNNING.  I STARTED CATCHING CHEST PAINS IN TIME.  THINGS
JUST GRADUALLY KEPT GROWING AND GROWING.  I STARTED VOMITING.
THAT'S WHEN THE PROBLEMS REALLY STARTED.  MY CHEST PAINS, JUST
SHARP PAINS GOING DOWN MY LEFT ARM UP MY NECK ON THE LEFT SIDE.
I WIND UP WITH LOSING --I WAS 197 POUNDS BEFORE MY INJURY, AND

1   I WIND UP LOSING ABOUT 50 POUNDS WITHIN ABOUT SIX MONTHS, NOT

2   ABLE TO EAT.  I WAS STARTING TO GET CONSTIPATED A LOT, WASN'T

3   ABLE TO USE THE BATHROOM.  MY THROAT FELT LIKE IT WOULD SWELL

4   UP.  IT WAS HEADACHES, NUMBNESS IN MY LIMBS.

5   **Q.**   DID THESE SYMPTOMS PERSIST THROUGH 2015 AND 2016, MR.

6   PRINCE?

7   **A.**   YES, MA'AM.

8   **Q.**   AS OF SEPTEMBER 30, 2016, HAD YOU RECEIVED A DIAGNOSIS FOR

9   YOUR SYMPTOMS?

10   **A.**   CAN YOU REPEAT THAT DATE?

11   **Q.**   AS OF SEPTEMBER 30, 2016, HAD YOU RECEIVED A DIAGNOSIS FOR

12   YOUR SYMPTOMS?

13   **A.**   NO, MA'AM.  THE ONLY THING I WAS TOLD WAS THAT I HAD A

14   HIATAL HERNIA IN MY ESOPHAGUS.

15   **Q.**   AND WHEN WAS THAT?

16   **A.**   I WANT TO SAY THAT WAS IN 2015 OR '16.

17   **Q.**   DID YOU RECEIVE ANY TREATMENT FOR THAT HERNIA?

18   **A.**   I'M TAKING -- I WAS GIVEN PRILOSEC FOR THE HEARTBURN.  I'M

19   NOT SURE IF THAT'S TO HELP THAT OR NOT.

20   **Q.**   ANYTHING ELSE?

21   **A.**   FOR TREATMENT?

22   **Q.**   UH-HUH.

23   **A.**   NO, MA'AM.

24           **THE COURT:**  WHEN DID YOUR SYMPTOMS BEGIN?

25           **THE WITNESS:**  MA'AM?

1    **THE COURT:**  WHEN DID YOUR SYMPTOMS BEGIN?

2         **THE WITNESS:**  THEY STARTED IN -- AROUND 2014, THEY

3    STARTED PROGRESSING GRADUALLY.

4    BY MS. KUMAR:

5    **Q.**   MR. PRINCE, DID YOU MAKE ANY SICK CALLS IN AN ATTEMPT TO

6    GET A DIAGNOSIS FOR YOUR CONDITION?

7    **A.**   YES, MA'AM.  I'VE MADE CLOSE TO 100, IF NOT MORE,

8    EMERGENCY SICK CALLS, TRYING TO FIND OUT WHAT'S WRONG WITH ME.

9    I'VE MADE A FEW REGULAR SICK CALLS BECAUSE I WAS DIRECTED TO,

10   SAYING THAT A LOT OF TIMES I WOULD BE TOLD THAT IF IT'S NOT A

11   MEDICAL EMERGENCY, THAT I NEEDED TO HANDLE IT THROUGH ROUTINE

12   SICK CALLS.  SO I WAS TRYING TO FOLLOW THE RULES AND DO IT

13   THROUGH ROUTINE SICK CALLS.

14   **Q.**   MR. PRINCE, I JUST WANT TO TURN VERY BRIEFLY TOWARDS

15   MEDICATION ADMINISTRATION.  WHAT, IF ANY, MEDICATIONS DID YOU

16   TAKE AS OF SEPTEMBER 30, 2016?

17   **A.**   WHAT MEDICINES I'VE TAKEN?

18   **Q.**   YES.

19   **A.**   I'VE BEEN PRESCRIBED A LOT OF DIFFERENT MEDICATIONS, NOT

20   ALL AT ONE TIME.  SOME WERE JUST SWAPPING AROUND.  I KNOW I'VE

21   TAKEN PRILOSEC, I'VE TAKEN STOOL SOFTENERS, I'VE TAKEN SOME

22   DIFFERENT TYPES OF PAIN PILLS, LIKE IBUPROFEN OR NAPROXEN.

23   **Q.**   DID YOU RECEIVE ANY OF THOSE MEDICATIONS FROM PILL CALL?

24   **A.**   YES, MA'AM.

25   **Q.**   AND WHAT, IF ANY, ISSUES HAVE YOU HAD OBTAINING YOUR

1   MEDICATIONS FROM PILL CALL?

2   **A.**   I'VE NOT HAD ANY ISSUES PERTAINING -- GETTING MY MEDICINE

3   FROM PILL CALL.  I MEAN, I'VE RECEIVED OTHER PEOPLE'S MEDICINE

4   BUT NOT MY OWN, YOU KNOW, BUT I'VE NEVER HAD AN ISSUE GETTING

5   MY OWN IS WHAT I'M SAYING.  BUT I'VE GOTTEN OTHER PEOPLE'S WITH

6   MINE.

7   **Q.**   AND CAN YOU EXPLAIN WHAT HAPPENED WHEN YOU RECEIVED OTHER

8   PEOPLE'S MEDICATIONS?

9   **A.**   I JUST -- THERE'S A GUY THAT LIVES IN THE DORM WITH ME,

10  AND HIS NAME IS PRETTY SIMILAR TO MINE, AND HIS NAME IS DEREK

11  PRICE AND MY NAME IS DANNY PRINCE, AND I JUST ENDED UP WITH HIS

12  IN MY STACK.  SO I JUST BRING IT BACK TO THE PILL CALL LADY,

13  AND THEY TAKE CARE OF WHAT THEY GOT TO TAKE CARE OF.  GIVE IT

14  TO HIM, I GUESS.

15  **Q.**   SO WHO GAVE YOU THE WRONG MEDICATION?

16  **A.**   THE SECURITY OFFICER.

17  **Q.**   JUST A COUPLE LAST QUESTIONS, MR. PRINCE.  DO YOU KNOW

18  WHAT A MALINGERING CHARGE IS?

19  **A.**   YES, MA'AM.

20  **Q.**   CAN YOU EXPLAIN WHAT THAT REFERS TO?

21  **A.**   MALINGERING IS A DISCIPLINARY WRITE-UP WHEN AN INMATE

22  MAKES SICK CALL OR EMERGENCY SICK CALL AND THE -- I GUESS IT

23  WOULD BE THE EMT, OR WHOEVER IS SEEING YOU AT THE TIME, FEELS

24  LIKE YOU'RE FAKING THE -- JUST FOR WHATEVER REASON, THEY FEEL

25  LIKE YOU'RE FAKING I GUESS, I DON'T KNOW, THEY CAN WRITE YOU UP

1  ON MALINGERING AND YOU HAVE THAT WRITE-UP.  YOU HAVE TO GO TO

2  COURT, AND THAT'LL BE PUT IN YOUR JACKET, YOUR RECORD.

3  **Q.**   MR. PRINCE, WHEN, IF EVER, AT YOUR TIME AT ANGOLA HAVE YOU

4  BEEN ACCUSED OF MALINGERING?

5  **A.**   I DON'T REMEMBER THE EXACT DATE.  I BELIEVE IT WAS IN

6  2015.  IT COULD HAVE BEEN IN 2016, BUT I'M PRETTY SURE IT'S IN

7  2015.  I WAS INSTRUCTED BY -- I WAS GOING THROUGH A TIME WHERE

8  I WAS VOMITING VERY FREQUENTLY, AND THE ONLY THING THAT SEEMED

9  TO HELP ME WAS TO GET A SHOT OF EITHER PHENERGAN OR ZOFRAN TO

10  CALM MY STOMACH DOWN.

11       AND THERE WAS A CAPTAIN FAUST THAT SECURES OUR WALK,

12  HE'S SECURITY OVER OUR WALK, AND HE WAS MAKING ROUNDS AND HE

13  SEEN ME THROWING UP IN THE DORM BECAUSE I HAD A PUKE BUCKET BY

14  MY BED AT THE TIME, AND HE TOLD ME THAT HE COULDN'T LEAVE ME IN

15  THE DORM IN THAT CONDITION.  SO HE TOLD ME I HAD TO GO TO THE

16  EMERGENCY ROOM, SO THEY PUT ME IN A WHEELCHAIR, PUSHED ME UP

17  THERE, AND EMT CHRISTY DARBONNE -- I BELIEVE IS HER NAME --

18  CAME TO THE DOOR, CALLED ME INTO THE EMERGENCY ROOM, ASKED ME

19  WHAT I WAS THERE FOR.  I EXPLAINED TO HER THAT CAPTAIN FAUST

20  SENT ME UP THERE 'CAUSE I WAS VOMITING IN THE DORM AND I

21  COULDN'T STAY THERE, I HAD TO GET SEEN.  SO SHE TOLD ME TO GO

22  BACK IN THE HALL.  I WENT BACK OUT IN THE HALLWAY, SAT THERE

23  FOR ABOUT 30 MINUTES.  SHE CALLED ME BACK IN; I WENT IN, I WENT

24  BACK THROUGH THE DOORS.  SHE HAD TWO PAPERS ON THE DESK FOR ME

25  TO SIGN:  ONE WAS A WRITE-UP FOR MALINGERING; THE OTHER ONE WAS

1   MY MEDICAL FEE PAPER TO SIGN AND TREATMENT PAPER.  SO I ASKED

2   HER WHAT THE WRITE-UP WAS FOR.  SHE TOLD ME IT WAS FOR

3   MALINGERING, AND I'M LIKE WHAT THEY -- AND I TRIED TO EXPLAIN

4   TO HER THAT THEY SENT ME UP HERE, AND SHE'S LIKE, NO, I DON'T

5   CARE, YOU KNOW, SIGN THE WRITE-UP.  SO I REFUSED TO SIGN THE

6   WRITE-UP.  I SIGNED THE FORM FOR THE FEE.  THEN SHE WIND UP

7   TAKING MY VITAL SIGNS AFTERWARDS AND, YOU KNOW, TO SEE IF I WAS

8   REALLY ALL RIGHT OR NOT.  BUT THEN SHE SEARCHED ME DOWN, AND

9   THAT WAS MY INCIDENT WITH THE MALINGERING CHARGE.

10  Q.   MR. PRINCE, SOON AFTER THAT, DID YOU RECEIVE ANY MEDICAL

11  ATTENTION FOR THE CONDITION YOU HAD COME TO THE ATU FOR?

12  A.   YES, MA'AM.  LATER ON THAT NIGHT I HAD TO MAKE AN ANOTHER

13  EMERGENCY 'CAUSE I WAS CONTINUING TO VOMIT.  MS. DARBONNE TRIED

14  TO GIVE ME SOME PEPTO-BISMOL WHICH I HAD IN THE DORM ALREADY,

15  SO I REFUSED IT.

16         BUT LATER THAT NIGHT, LIKE I SAID AGAIN, I HAD TO

17  MAKE ANOTHER EMERGENCY, AND THE EMT THAT WAS ON THAT NIGHT, I

18  BELIEVE HE WAS A LIEUTENANT.  I CAN'T REMEMBER HIS NAME.  HE

19  WIND UP GIVING ME A SHOT OF PHENERGAN TO CALM MY STOMACH DOWN

20  FROM THE VOMITING.

21  Q.   AND HOW LONG DID THE VOMITING CONTINUE AFTER THAT?

22  A.   I STILL VOMIT TILL THIS DAY, YOU KNOW.  IT'S NOT AS BAD

23  TODAY, BUT I STILL VOMIT TO THIS DAY.

24  Q.   AS OF SEPTEMBER 30, 2016, PLEASE REMEMBER --

25  A.   OH, I'M SORRY.

**Q.**   -- MR. PRINCE, WE'RE TALKING EARLIER ABOUT THAT PERIOD, EVEN AFTER THE INCIDENT AT THE ATU, YOU DID NOT RECEIVE A DIAGNOSIS FOR YOUR CONDITION?

**A.**   NO, MA'AM.

**Q.**   THANK YOU.

          **THE COURT:**  CROSS?

                       **CROSS-EXAMINATION**

**BY MR. ROBERT:**

**Q.**   GOOD AFTERNOON, MR. PRINCE.

**A.**   GOOD AFTERNOON.

**Q.**   I'D LIKE TO START OUT WITH YOUR TESTIMONY REGARDING WORKING AS A HEALTHCARE ORDERLY.  YOU BEGAN WORKING AS A HEALTHCARE ORDERLY IN 2014.  WOULD THAT BE CORRECT?

**A.**   I BELIEVE THAT'S CORRECT.  YES, SIR.

**Q.**   AND YOU WORKED AS BOTH A HEALTHCARE ORDERLY AND A CLEANING ORDERLY.  ISN'T THAT RIGHT?

**A.**   CORRECT.

**Q.**   OKAY.  AND YOU HAD BEEN TRAINED AS AN ORDERLY.  CORRECT?

**A.**   YOU SAID I HAVEN'T BEEN?

**Q.**   YOU HAD BEEN TRAINED.

**A.**   YES, SIR, I HAVE NOW, YEAH.

**Q.**   OKAY.  AND YOU RECEIVED A TWO-DAY TRAINING CLASS WITH -- BY MR. TRACY FALGOUST.  ISN'T THAT CORRECT?

**A.**   CORRECT.

**Q.**   AND YOU ALSO HAD A ONE-DAY CLASS WITH A MS. VELMA AT THE

1   WARD, DIDN'T YOU?

2   **A.**   I BELIEVE THAT WAS IN 2017.

3   **Q.**   OH, OKAY, MY APOLOGIES.  ALL RIGHT.  AND YOU BELIEVE, AS

4   YOU SIT HERE TODAY, YOU HAVE BEEN SUFFICIENTLY TRAINED AS A

5   HEALTHCARE ORDERLY?

6   **A.**   FOR WHAT I DO, I BELIEVE, YES, SIR, I BELIEVE SO, FOR WHAT

7   MY JOB ASSIGNMENT IS.

8   **Q.**   OKAY.  AND AS A HEALTHCARE ORDERLY, WHAT EXACTLY DO YOU

9   DO?

10   **A.**   ARE YOU ASKING ME WHAT I DO OR WHAT I'M SUPPOSED TO DO?

11   **Q.**   LET'S START OUT WITH WHAT YOU DO.

12   **A.**   ALL RIGHT.

13        **MS. KUMAR:**  YOUR HONOR, OBJECTION.  MR. ROBERT IS NOT

14   CABINING THE TESTIMONY TO THE DISCOVERY PERIOD, AND I BELIEVE

15   THAT HE'S TRYING TO ELICIT JOB DUTIES THAT ARE FROM BEYOND

16   SEPTEMBER 30, 2016.

17        **MR. ROBERT:**  MY APOLOGIES, YOUR HONOR.  I CAN CLARIFY

18   THAT.

19   **BY MR. ROBERT:**

20   **Q.**   I WANT YOU TO STICK WITHIN THE 2015-2016 TIME PERIOD.  I

21   REALLY DON'T WANT TO HEAR ANYTHING BEYOND SEPTEMBER 30, 2016.

22   I REALLY JUST WANT TO KNOW WHAT YOU DO WORKING AS A HEALTHCARE

23   ORDERLY.

24   **A.**   OKAY.  I CARE FOR THE PATIENTS IN THE DORM, FOR ONE.  ANY

25   NEED THAT THEY HAVE THAT THEY CANNOT DO ON THEIR OWN, I ASSIST

1  THEM WITH IT.  I TRY TO GIVE THEM AS MUCH -- KEEP THEM AS MUCH

2  INDEPENDENT ON THEMSELVES AS POSSIBLE WITHOUT HAVING THEM

3  REALLY SUFFER.  I, WITH THE CREW, HELP FEED THEM IN THE DORM.

4       IF THEY HAVE TO GO ON ANY HOSPITAL CALLOUTS OR ANY

5  OTHER TRIPS AROUND THE PRISON, I HAVE TO PUSH THEM WHERE THEY

6  NEED TO GO -- IF THEY WANT TO GO ON THE YARD.  SOME OF THEM I

7  HAVE TO HELP OUT THE WHEELCHAIR; SOME OF THEM I HAVE TO HELP

8  INTO CHAIRS AND INTO THE SHOWER; SOME, YOU KNOW, I HAVE TO

9  CLEAN THEIR BEDS IF THEY STOOL ON THE BED OR URINE IN THE BED

10  OR ON THEIR CLOTHES, THEMSELVES; SOME I'VE HAD TO BRING OXYGEN

11  BOTTLES BACK TO THE HOSPITAL FOR THEM.  YOU KNOW, IT'S JUST THE

12  THINGS THAT THEY CANNOT DO FOR THEMSELVES, I HELP THEM DO IT,

13  YOU KNOW.

14  Q.    AND THAT'S WHAT HEALTHCARE ORDERLIES DO; CORRECT?

15  A.    CORRECT.

16  Q.    AND THAT'S WHAT OTHER HEALTHCARE ORDERLIES DO IN AND

17  AROUND ANGOLA; CORRECT?

18  A.    CORRECT.

19  Q.    AND DO YOU FEEL THAT YOU ARE RESPONSIVE TO YOUR PATIENTS'

20  NEEDS AS A HEALTHCARE ORDERLY?

21  A.    I FEEL LIKE I DO THE BEST THAT I CAN DO 'CAUSE I'M ONLY

22  ONE PERSON, AND THERE'S A REAL DEMAND FOR SO MANY PATIENTS.  SO

23  I MEAN, AS FAR AS WHAT MY JOB IS AND WHAT I DO, YES, SIR, I

24  GIVE MY PATIENTS THE BEST THAT I CAN GIVE OF ME.  BUT I'M

25  LIMITED AS ONLY ONE PERSON.  SOMETIMES I HAVE TO NEGLECT A

1   PATIENT OR TWO BECAUSE I'M TAKING CARE OF ANOTHER PATIENT.  I

2   CAN'T JUST LEAVE THAT PATIENT IN THE POSITION HE'S IN.

3   **Q.**   AND THERE ARE OTHER HEALTHCARE ORDERLIES IN ASH 2.

4   CORRECT?

5   **A.**   YES, SIR, THERE ARE.

6   **Q.**   OKAY.  AND I THINK YOU TESTIFIED EARLIER ABOUT HOW YOU GOT

7   THIS JOB AS A HEALTHCARE ORDERLY.  YOU SAID YOU WERE DOING A

8   REALLY GOOD JOB OVER AT THE BIBLE COLLEGE.  RIGHT?

9   **A.**   NO.

10           **MS. KUMAR:**  OBJECTION, YOUR HONOR.  I BELIEVE THAT'S

11   MISSTATING MR. PRINCE'S TESTIMONY.

12           **THE COURT:**  WELL, HE'S GOT HIM ON CROSS.  OVERRULED.

13           **THE WITNESS:**  I DON'T RECALL SAYING THAT, NO, SIR.

14   **BY MR. ROBERT:**

15   **Q.**   OH, YOU DON'T.  OKAY.  WELL, HOW DID YOU COME TO GET A JOB

16   AS A HEALTHCARE ORDERLY?  HOW WERE YOU SELECTED?

17   **A.**   I WENT -- I GOT REALLY SICK -- WELL, YOU KNOW, FROM MY

18   INJURIES AND I WAS ACTUALLY -- LEFT BIBLE COLLEGE 'CAUSE OF MY

19   CONDITION.  I WASN'T ABLE TO KEEP UP WITH MY STUDIES AND MY

20   ASSIGNMENTS, SO I RESIGNED FROM BIBLE COLLEGE, AND I WENT AND

21   TALKED TO ONE OF THE GUYS THAT WAS A PERSON THAT GETS US THE

22   JOBS AS HEALTHCARE ORDERLY, AND HE WENT AND TURNED MY NAME INTO

23   THE COLONEL, AND THE COLONEL HIRED ME.

24   **Q.**   AND I THINK YOU -- I HAVE THIS NOTE HERE, SO I THINK I GOT

25   IT RIGHT.  I THINK YOU TESTIFIED THERE'S A LOT OF GOOD

1  HEALTHCARE ORDERLIES AT ANGOLA.  CORRECT?

2  A.   CORRECT.  AND THERE ARE.

3  Q.   AND THERE'S A FEW BAD APPLES.  RIGHT?

4  A.   THERE ARE.

5  Q.   AND WHEN YOU SAY -- I HEARD YOU SAY -- MENTION THE WORD

6  "ABUSIVE" AND I WANT TO MAKE SURE I'M CLEAR ON THAT.  WHEN YOU

7  SAY "ABUSIVE," YOU WERE TALKING ABOUT VERBALLY ABUSIVE?

8  A.   BOTH VERBALLY AND PHYSICALLY.

9  Q.   OKAY.

10  A.   RIGHT.

11  Q.   WHAT KIND OF PHYSICAL ABUSE HAVE YOU WITNESSED?

12  A.   I'VE WITNESSED ORDERLIES GETTING IN FIGHTS WITH PATIENTS.

13  Q.   OKAY.  I THINK YOU TESTIFIED TO THAT.  MY APOLOGIES.

14         AND YOU SAW THAT GOING BOTH WAYS SOMETIMES.  CORRECT?

15  A.   CORRECT.

16  Q.   AND WHEN YOU SAW THINGS LIKE THAT, YOU WOULD REPORT IT;

17  RIGHT?

18  A.   I WOULDN'T HAVE TO.  IT WAS ALREADY REPORTED, OR THE

19  SECURITY OFFICER WOULD SEE IT.

20  Q.   AND THE SECURITY OFFICER WOULD DO SOMETHING ABOUT IT.

21  CORRECT?

22  A.   CORRECT.

23  Q.   OKAY.  AND YOU SAID ABOUT -- THE TESTIMONY WAS ELICITED

24  ABOUT NEGLECT OF THE PATIENTS.  WHAT DO YOU MEAN BY THAT?

25  A.   MEANING THAT IF ONE PATIENT ASKED ME TO DO -- TO CHANGE

1    THE LINEN ON HIS BED 'CAUSE HE USED THE BATHROOM ON HIMSELF AND

2    ON THE BED AND I'M ALREADY IN THE MIDDLE OF CHANGING ANOTHER

3    PATIENT'S DIAPER BECAUSE HE STOOLED ON HIMSELF, THAT MEANS I

4    HAVE TO NEGLECT THE ONE PATIENT WHILE I'M FINISHING TAKING CARE

5    OF THE OTHER PATIENT.

6    Q.    SO YOU HAVE TO FINISH UP WITH THE ONE PATIENT THAT YOU'RE

7    WORKING ON -- IT MIGHT TAKE YOU ANOTHER 10, 15 MINUTES OR SO TO

8    DO THAT -- AND THEN YOU GO OVER AND HELP THAT -- THE OTHER

9    PATIENT.  CORRECT?

10   A.    CORRECT.

11   Q.    LET'S TALK ABOUT -- I WANT TO ASK YOU BEFORE WE GET OFF

12   THE SUBJECT OF HEALTHCARE, BEING A HEALTHCARE ORDERLY, I WANT

13   TO ASK YOU IF YOU'VE EVER ASSISTED A PATIENT BY THE NAME OF

14   KENTRELL PARKER?

15          MS. KUMAR:  OBJECTION, YOUR HONOR.  MR. ROBERT IS,

16   AGAIN, TRYING TO ELICIT TESTIMONY FROM OUTSIDE THE DISCOVERY

17   PERIOD.

18          THE COURT:  WAS THIS BEFORE 2015 OR AFTER 2016, MR.

19   ROBERT?

20          MR. ROBERT:  HE CAN TELL US, YOUR HONOR.  I'M NOT

21   SURE IF IT IS OR NOT, I'LL BE PERFECTLY HONEST WITH YOU.

22          THE COURT:  I'LL ALLOW THE QUESTION.

23   BY MR. ROBERT:

24   Q.    WAS IT DURING THE 2015-2016 TIME PERIOD?

25   A.    NO, SIR.

1  **Q.**   WHEN DID YOU TREAT OR WORK AS A HEALTHCARE ORDERLY WITH

2  MR. PARKER?

3  **A.**   I DIDN'T KNOW MR. KENTRELL TILL 2017.

4  **Q.**   ALL RIGHT.  I WON'T GO THERE THEN.

5         LET'S GO NOW -- SHIFTING GEARS -- OH, BEFORE WE GET

6  OFF OF THE DORM, YOU TALKED ABOUT THE CLEANLINESS OF THE DORM,

7  AND I THINK YOU INDICATED THAT THE CLEANING ORDERLIES, THEY

8  CLEAN THE DORMS IN THE MORNINGS AND IN THE EVENING.  CORRECT?

9  **A.**   CORRECT.

10 **Q.**   AND IT'S YOUR TESTIMONY THAT THE CLEANING ORDERLIES DON'T

11 DO ANYTHING AT ALL DURING THE DAY?

12 **A.**   I MEAN, THEY'RE DOING SOMETHING DURING THE DAY.  I DON'T

13 KNOW WHAT THEY'RE DOING.  SOMETIMES WE DON'T EVEN HAVE CLEANING

14 ORDERLIES, YOU KNOW.  THE ONE WE JUST HAD GOT LOCKED UP, AND WE

15 JUST GOT HIS REPLACEMENT LIKE THREE DAYS LATER WITH TWO.

16 **Q.**   WELL, WE'RE TALKING ABOUT RIGHT NOW.  I DON'T WANT TO TALK

17 ABOUT RIGHT NOW.  I WANT TO TALK ABOUT 2015 AND 2016.

18 **A.**   OH, OKAY.

19 **Q.**   YOU TESTIFIED THAT THEY CLEANED TWICE A DAY, IN THE

20 MORNING AND THE EVENING.  ISN'T THAT CORRECT?

21 **A.**   SOMETIMES.  CORRECT.

22 **Q.**   SO NOW IT'S SOMETIMES?

23 **A.**   CORRECT.

24 **Q.**   ALL RIGHT.

25 **A.**   IT DEPENDS ON THE ORDERLY THAT WE HAVE AT THE TIME.

**Q.**   AND THE CLEANING ORDERLIES DON'T CLEAN AT ALL IN ASH 2 DURING THE DAYTIME OTHER THAN IN THE MORNING AND IN THE EVENING.  CORRECT?

**A.**   THEY MIGHT, DEPENDING ON WHAT THEY WANT TO DO.  IT'S UP TO THEM.

**Q.**   AND AS A HEALTHCARE ORDERLY, IF SOMEONE SOILED THEMSELVES OR IF THERE WAS A NEED TO CLEAN UP AFTER A PATIENT DURING THE DAY, THAT WOULD BE YOUR JOB AS A HEALTHCARE ORDERLY.  RIGHT?

**A.**   CORRECT.

**Q.**   AND YOU DID YOUR JOB WELL, DIDN'T YOU?

**A.**   THE BEST THAT I COULD, YES, SIR.

**Q.**   YOU TALKED ABOUT THE PATIENT THAT YOU SAW DIE.  YOU SAID THAT HE WAS TAKEN TO THE EMERGENCY ROOM.  CORRECT?

**A.**   I DON'T KNOW IF HE WAS TAKEN -- I KNOW HE WAS TAKEN OUT BY AMBULANCE.  I DON'T KNOW WHERE HE WENT.

**Q.**   SO YOU DON'T KNOW WHERE HE WENT, WHETHER HE WENT TO THE EMERGENCY ROOM OR WHETHER HE WENT TO AN OUTSIDE HOSPITAL OR WHAT HAVE YOU.  CORRECT?

**A.**   CORRECT.

**Q.**   AND YOU DON'T KNOW WHAT HIS CONDITION WAS.  CORRECT?

**A.**   BESIDES WHAT HE TOLD ME HE WAS COMPLAINING ABOUT.

**Q.**   AND YOU DON'T KNOW WHAT TREATMENT HE GOT.  CORRECT?

**A.**   BESIDES WHAT HE TOLD ME, NO.

**Q.**   ALL RIGHT.  LET'S TALK ABOUT YOUR MEDICAL CARE NOW.  AND YOU WERE IN THE ANGOLA RODEO AND YOU GOT KICKED BY A BULL.

1  CORRECT?

2  **A.**    YES, SIR, AT ONE TIME.

3  **Q.**    AND YOU VOLUNTARILY PARTICIPATED IN THE ANGOLA RODEO.

4  CORRECT?

5  **A.**    CORRECT.

6  **Q.**    NOBODY MADE YOU PARTICIPATE IN THE RODEO, DID THEY?

7  **A.**    NO, SIR.

8  **Q.**    AND NOBODY TOLD YOU YOU HAD TO PARTICIPATE IN THIS EVENT

9  WHERE YOU CHASED A BULL AROUND TO TRY TO GET THE CHIP OFF ITS

10  HEAD.  RIGHT?

11  **A.**    NO, SIR.

12  **Q.**    YOU CHOSE TO DO THAT.  CORRECT?

13  **A.**    CORRECT.

14  **Q.**    AS YOU SIT HERE TODAY, YOU KNEW THAT THERE WERE RISKS

15  ASSOCIATED WITH PARTICIPATING IN THAT EVENT.  CORRECT?

16  **A.**    YES, SIR.

17  **Q.**    NOBODY HAD TO TELL YOU THAT.  RIGHT?

18  **A.**    CORRECT.

19  **Q.**    AND WHILE YOU WERE AT THE EVENT, YOU GOT HIT BY A BULL.

20  RIGHT?

21  **A.**    CORRECT.

22  **Q.**    AND WHEN THAT HAPPENED YOU WERE SEEN BY AN EMT.  CORRECT?

23  **A.**    CORRECT.

24  **Q.**    AND THAT EMT TOOK YOUR BLOOD PRESSURE AND TRIAGED YOU.

25  CORRECT?

1 2 : 5 0

1   **A.**   CORRECT.

2   **Q.**   AND THEN AFTER YOU WERE TRIAGED, YOU TOOK AN AMBULANCE AND

3   YOU WENT TO THE ATU.  RIGHT?

4   **A.**   YES, SIR.

5   **Q.**   AND WHEN YOU WENT TO THE ATU, THEY LOOKED AT YOU AND THEY

6   GAVE YOU AN X-RAY.  RIGHT?

7   **A.**   CORRECT.

8   **Q.**   AND THE X-RAY SHOWED YOU HAD A FRACTURED RIB?

9   **A.**   IN ONE OF THE INJURIES, YES, SIR.

10   **Q.**   OKAY.  WHAT OTHER TREATMENT DID YOU GET FOR YOUR FRACTURED

11   RIB?

12   **A.**   I BELIEVE I WAS PUT ON SOME PAIN MEDICINE, MAYBE.

13   **Q.**   THEY CAN'T GIVE YOU A CAST FOR A FRACTURED RIB, CAN THEY?

14   **A.**   NO, THEY CAN'T.

15   **Q.**   NOW LET'S TALK ABOUT YOUR VOMITING.  YOU'VE BEEN SEEN A

16   LOT OF TIMES FOR YOUR NAUSEA AND VOMITING, HAVEN'T YOU?

17   **A.**   CORRECT.

18   **Q.**   I MEAN, OVER THE LAST TWO YEARS YOU MOST PROBABLY HAVE

19   BEEN SEEN AT LEAST 20, 30 TIMES, HUH?

20   **A.**   IF NOT MORE.  IT SEEMS LIKE MORE THAN THAT.

21   **Q.**   OKAY.  AND WHEN YOU COME IN -- I'LL START AT THE END OF

22   2014.  IT LOOKS LIKE THAT'S SOME OF THE EARLIER TIMES YOU WERE

23   COMPLAINING ABOUT NAUSEA AND VOMITING, AND YOU WENT TO THE ATU?

24   **A.**   CORRECT.

25   **Q.**   DO YOU RECALL THEM DOING TESTS ON YOU AT THE ATU, A CBC

1 2 : 5 1  1   AND A CHEM 14?

2   **A.**   WOULD THAT BE BLOOD WORK?

3   **Q.**   YEAH.

4   **A.**   CORRECT.

5   **Q.**   AND THEY DID THE BLOOD WORK ON YOU AND THEY GAVE YOU SOME

6   ZOFRAN.  RIGHT?

7   **A.**   CORRECT.

8   **Q.**   AND THEN FOUR DAYS LATER YOU COME BACK TO THE ATU ABOUT

9   NAUSEA -- COMPLAINING OF NAUSEA AND VOMITING.  RIGHT?

10  **A.**   I BELIEVE SO.  I MEAN, I CAN'T BE POSITIVE HOW MANY DAYS

11  WENT --

12  **Q.**   YEAH.

13  **A.**   I'VE BEEN BACK AND FORTH SO MANY TIMES, SO . . .

14  **Q.**   BUT THAT DOESN'T SOUND LIKE IT'S TOO FAR OFF.  RIGHT?

15  **A.**   RIGHT.

16  **Q.**   OKAY.  AND THEN WHEN YOU CAME TO THE ATU THE SECOND TIME,

17  YOU WERE SCHEDULED FOR A CLINIC APPOINTMENT.  CORRECT?

18  **A.**   I HAVE NO IDEA.

19  **Q.**   WERE YOU SEEN IN THE CLINIC SHORTLY AFTER GOING TO THE ATU

20  WITH THOSE COMPLAINTS, LIKE SIX DAYS LATER?

21  **A.**   THAT WOULD BE SURPRISING BUT IT'S POSSIBLE, I GUESS.

22  **Q.**   YOU REMEMBER GOING TO THE CLINIC A AND THEM DOING A

23  COMPLETE BLOOD PANEL ON YOU?

24  **A.**   GOING TO THE -- YOU MEAN DOING A -- TAKING BLOOD?

25  **Q.**   YEAH.

**A.**   IT COULD HAPPEN 'CAUSE I'VE HAVE HAD A LOT OF BLOOD DRAWN, YES, SIR.

**Q.**   AND THEY WERE DOING TESTS WITH THAT.  RIGHT?

**A.**   CORRECT.

**Q.**   AND THOSE TESTS WERE NEGATIVE.  RIGHT?

**A.**   AS FAR AS I WAS INFORMED, YES, SIR.

**Q.**   BUT YOU WERE INFORMED THAT THEY WERE NEGATIVE.  RIGHT?

**A.**   CORRECT.

**Q.**   OKAY.  AND THEN ABOUT A MONTH LATER, YOU GO BACK TO THE CLINIC A FOR A FOLLOW-UP.  RIGHT?

**A.**   I MEAN, I'M NOT -- I'VE BEEN IN BACK AND FORTH, SO I MEAN, I DON'T KNOW HOW LONG THE PERIOD OF TIME IS.

**Q.**   WELL, YOU REMEMBER GOING TO THE CLINIC AND GETTING AN X-RAY DONE?

**A.**   I'VE HAD A BUNCH OF THOSE DONE, TOO.

**Q.**   AND THOSE X-RAYS, THEY TOLD YOU THEY WERE NORMAL.  RIGHT?

**A.**   THEY HAVEN'T TOLD ME NOTHING ABOUT NO X-RAY.

**Q.**   OKAY.  DO YOU REMEMBER GETTING METAMUCIL FOR YOUR CONSTIPATION?

**A.**   CORRECT.

**Q.**   AND THAT WOULD BE A DIAGNOSIS OF REFLUX.  RIGHT?

**A.**   CORRECT.  HIATAL HERNIA.

**Q.**   I MEAN, I'VE GOT A BUNCH OF SICK CALLS.  YOU'VE GOTTEN SHOTS OF PHENERGAN FOR YOUR NAUSEA?

**A.**   CORRECT.

12:53   1   **Q.**   YOU'VE GOTTEN GI COCKTAILS BECAUSE OF YOUR NAUSEA AND
        2   VOMITING.  RIGHT?
        3   **A.**   CORRECT.
        4   **Q.**   AND ALL THIS WHEN YOU GO TO THE ATU OR YOU GO TO THE
        5   CLINIC.  RIGHT?
        6   **A.**   CORRECT.
        7   **Q.**   AND THEN AFTER NUMEROUS VISITS IT'S DECIDED WE'RE GOING TO
        8   SEND YOU TO A GI DOCTOR BECAUSE YOU'RE STILL HAVING THESE
        9   COMPLAINTS?  DO YOU REMEMBER THAT, A GASTROENTEROLOGIST?
       10   **A.**   AFTER NUMEROUS VISITS AND MY FAMILY CALLING UP HERE, YES,
       11   SIR.
       12   **Q.**   AND THAT'S WHEN THEY SCHEDULED YOU FOR A -- YOU'VE GOT TO
       13   HAVE A COLONOSCOPY DONE.  RIGHT?
       14   **A.**   I THINK THAT'S THE FIRST ONE I HAD, YES, SIR.
       15   **Q.**   AND THAT WAS NORMAL.  RIGHT?
       16   **A.**   I BELIEVE, SIR.  I WASN'T TOLD BY THE GASTROENTEROLOGIST
       17   NOTHING.  I BELIEVE I SEEN ONE OF THE DOCTORS HERE AT ANGOLA,
       18   AND I DON'T KNOW IF HE TOLD ME IT WAS NORMAL OR NOT, BUT I
       19   MEAN, HE TOLD ME -- THEY DIDN'T TELL ME NOTHING WAS WRONG.
       20   **Q.**   THEY DIDN'T TELL YOU ANYTHING WAS WRONG.  CORRECT?
       21   **A.**   CORRECT.
       22   **Q.**   AND YOU ALSO HAD AN ESOPHAGEAL SCOPE DONE, A SCOPE DOWN
       23   YOUR MOUTH.  RIGHT?
       24   **A.**   CORRECT.
       25   **Q.**   OKAY.  AND THAT WAS NORMAL, WASN'T IT?

**A.**   BESIDE THE HERNIA, THEM FINDING THE HERNIA.

**Q.**   THEY FOUND A SMALL HIATAL HERNIA.  RIGHT?

**A.**   CORRECT.

**Q.**   OKAY.  AND THEN SHORTLY AFTER YOU COME BACK TO THE ATU, YOU HAD NAUSEA AND VOMITING AGAIN.  RIGHT?

**A.**   CORRECT.  I NEVER STOPPED.

**Q.**   OKAY.  SO THEY SENT YOU BACK TO THE GI DOCTOR.  RIGHT? YOU SEE HIM AGAIN?

**A.**   LIKE A YEAR LATER, I BELIEVE.

**Q.**   WELL, IT DOESN'T LOOK LIKE THAT TO ME, BUT IF THAT'S THE TIME PERIOD YOU THINK IT WAS.

**A.**   I'M NOT SURE HOW LONG IT WAS, BUT --

**Q.**   IT LOOKS LIKE ABOUT A MONTH LATER TO ME.

**A.**   FROM THE TEST?

**Q.**   YEAH.

**A.**   FROM THE FIRST TEST?

**Q.**   FROM THE FIRST TEST.

**A.**   OH, THAT MUST HAVE BEEN A FOLLOW-UP APPOINTMENT THEN.

**Q.**   AND THEN AT THAT TIME YOU WENT BACK TO THE GI DOCTOR, THEY DID AN ULTRASOUND OF YOUR RIGHT UPPER QUADRANT.  DO YOU REMEMBER HAVING AN ULTRASOUND DONE?

**A.**   CORRECT.

**Q.**   AND STILL NOBODY FOUND ANYTHING REALLY WRONG WITH YOU. RIGHT?

**A.**   CORRECT.

1 2 : 5 5    1    **Q.**    OKAY.

2    **A.**    NOBODY TOLD ME NOTHING WAS WRONG WITH ME.

3    **Q.**    BUT YOU TOLD US YOU KEEP MAKING EMERGENCY REQUESTS AND

4    YOU'D DONE IT A HUNDRED TIMES.  RIGHT?

5    **A.**    CLOSE TO IT, CORRECT.

6    **Q.**    OKAY.  AND WHEN YOU WERE WRITTEN UP FOR THAT MALINGERING

7    CHARGE, WEREN'T YOU TOLD THAT THIS IS NOT AN EMERGENCY, THAT

8    YOU COULD HAVE MADE A SICK CALL FOR THAT?

9    **A.**    NO, IT WAS NOT.  I WAS TOLD THE DAY BEFORE BY THE SAME EMT

10    THAT STATEMENT, AND AT THIS TIME, I WAS TOLD TO GO TO THE

11    EMERGENCY ROOM.  I WAS FORCED TO GO TO THE EMERGENCY ROOM.  I

12    EITHER FOLLOWED MY CAPTAIN'S ORDERS OR GET WROTE UP, OR I GET

13    SENT TO THE ATU AND GET WROTE UP.  AND A MALINGERING CHARGE, TO

14    ME, IS A LITTLE BIT BETTER THAN AN AGGRAVATED DISOBEDIENCE

15    CHARGE.

16    **Q.**    NOW LET ME ASK YOU SOMETHING, MR. PRINCE.  YOU USE

17    TOBACCO?

18    **A.**    YES, SIR, I DO.

19    **Q.**    YOU USE SKOAL, DON'T YOU?

20    **A.**    YES, SIR.

21    **Q.**    AND YOU'VE BEEN USING SKOAL FOR A VERY LONG TIME, HAVEN'T

22    YOU?

23    **A.**    YES, SIR, A LITTLE -- A GOOD LITTLE WHILE.

24    **Q.**    I USED SKOAL FOR ABOUT 30 YEARS MYSELF, AND I SWALLOWED A

25    LOT OF SKOAL IN MY DAY.  DO YOU DO THAT SOMETIMES?

**A.**   NO, I DON'T, UNLESS -- I MEAN, IT'S POSSIBLE THROUGH JUST

HAVING IT IN YOUR MOUTH, YOU NEVER KNOW.

**Q.**   YOU CAN --

**A.**   YOU KNOW, SWALLOWING SALIVA.

**Q.**   YOU USE IT A LOT.  RIGHT?

**A.**   CORRECT.

**Q.**   AND YOU'VE BEEN TOLD BY DOCTORS THAT DOING SKOAL ISN'T

REALLY GOOD FOR YOUR GASTRO ISSUES, HAVEN'T YOU?

**A.**   CORRECT.

**Q.**   BUT YOU'RE STILL DOING IT, AREN'T YOU?

**A.**   YES.  TODAY I AM, YES.

**Q.**   ALSO, HAVE YOU HAD MENTAL HEALTH TREATMENT?

**A.**   I WAS --

        **MS. KUMAR:**  OBJECTION, YOUR HONOR.  THAT'S NOT

RELEVANT.

        **MR. ROBERT:**  IT'S VERY RELEVANT, YOUR HONOR.

        **THE COURT:**  WHAT'S THE RELEVANCE?

        **MR. ROBERT:**  IT'S VERY RELEVANT BECAUSE HE'S GOT A

DIAGNOSIS THAT RELATES VERY CLOSELY TO THE ISSUES THAT HE

CONTINUES TO RAISE AND RAISE AND RAISE.

        **THE COURT:**  I'LL GIVE YOU A SMALL AMOUNT OF LEEWAY.

            YOU CAN ANSWER THE QUESTION, MENTAL HEALTH.

        **THE WITNESS:**  YOU SAID I CAN?

        **THE COURT:**  YOU CAN, YES, SIR.

        **THE WITNESS:**  CAN YOU REPEAT THE QUESTION, PLEASE?

BY MR. ROBERT:

**Q.**   YES.  I JUST ASKED YOU, HAVE YOU HAD A DIAGNOSIS OF SOMATIC SYMPTOM DISORDER?

**A.**   I'M NOT SURE WHAT THAT IS.

**Q.**   NOBODY'S EVER TOLD YOU THAT?

**A.**   I'VE NEVER HEARD THAT PHRASE, NO, SIR.  I'VE BEEN -- THE DIAGNOSIS THAT I'VE GOTTEN FROM MY MENTAL HEALTH WAS -- OR I GUESS IT STILL IS, I'M NOT SURE, THAT I SUFFER FROM PANIC ATTACKS, ANXIETY ATTACKS IS WHAT IT IS.

**Q.**   BUT YOU'VE NEVER HEARD THE PHRASE "SOMATIC SYSTEM DISORDER."  CORRECT?

**A.**   CORRECT.  I DON'T EVEN KNOW WHAT THAT IS.

            **MR. ROBERT:**  THANK YOU, MR. PRINCE.

            **THE COURT:**  REDIRECT?

            **MS. KUMAR:**  THE COURT'S INDULGENCE FOR A MOMENT?

            **THE COURT:**  OKAY.

                            **REDIRECT EXAMINATION**

BY MS. KUMAR:

**Q.**   MR. PRINCE, VERY BRIEFLY, CAN YOU TELL US WHY YOU PARTICIPATED IN THE 2013 RODEO?

**A.**   YES, MA'AM.  I PARTICIPATED IN THE RODEO TO HELP SUPPORT MYSELF IN PRISON.  IT WAS MY ONLY REALLY WAY OF HAVING A INCOME.  WE DO GET PAID FOR WINNING EVENTS, AND AT THE TIME, MY FAMILY WAS NOT DOING TOO GOOD TO FINANCIALLY TAKE CARE OF ME. SO I DECIDED TO PARTICIPATE TO TRY TO HELP GET THE THINGS I

1    NEEDED, YOU KNOW, WINNING EVENTS.

2    **Q.**    WHAT WAS YOUR HOURLY WAGE AS A HEALTHCARE ORDERLY?

3    **A.**    I WAS MAKING 4 CENTS AN HOUR, I BELIEVE.

4    **Q.**    AND HOW MUCH WERE THE CASH PRIZES THAT WERE AVAILABLE FOR

5    THE RODEO?

6    **A.**    SOME OF THE PRIZES WERE UP TO $500; SOME RANGED AT $250;

7    SOME RANGED AT LIKE $150; AND SOME A LITTLE BIT LOWER.

8    **Q.**    THANK YOU.

9            **THE COURT:**  YOU MAY STEP DOWN, SIR.

10                NEXT WITNESS.

11           **MR. DUBNER:**  JEFFREY DUBNER, FOR THE PLAINTIFFS, YOUR

12    HONOR.  PLAINTIFFS CALL DR. SUSI VASSALLO.

13           **THE DEPUTY CLERK:**  RAISE YOUR RIGHT HAND.

14                        **SUSI VASSALLO, M.D.,**

15    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

16           **THE WITNESS:**  GOOD AFTERNOON, YOUR HONOR.

17                   **DIRECT EXAMINATION**

18    BY MR. DUBNER:

19    **Q.**    GOOD AFTERNOON.  COULD YOU STATE YOUR NAME FOR THE RECORD?

20    **A.**    SUSI VASSALLO.

21    **Q.**    WHERE ARE YOU FROM?

22    **A.**    AUSTIN, TEXAS.

23    **Q.**    AND WHAT JOB DO YOU CURRENTLY HOLD?

24    **A.**    I AM A PROFESSOR, A CLINICAL PROFESSOR, OF EMERGENCY

25    MEDICINE AT THE NYU, NEW YORK UNIVERSITY SCHOOL OF MEDICINE.

**Q.**    AND DO YOU ACTIVELY PRACTICE MEDICINE?

**A.**    YES.

**Q.**    WHERE DO YOU PRACTICE?

**A.**    BELLEVUE HOSPITAL, EMERGENCY DEPARTMENT.

**Q.**    WHAT IS BELLEVUE HOSPITAL?

**A.**    PROBABLY ONE OF THE OLDEST HOSPITALS IN THE COUNTRY.  IT'S A LARGE PUBLIC HOSPITAL FOR NEW YORK CITY, THE LARGEST.

**Q.**    AND COULD YOU BRIEFLY GO THROUGH YOUR EDUCATIONAL BACKGROUND?

**A.**    I WAS BORN AND RAISED IN AUSTIN, TEXAS, SO I WENT TO THE UNIVERSITY OF TEXAS AT AUSTIN.  I WENT TO MEDICAL SCHOOL AT THE UNIVERSITY OF TEXAS IN HOUSTON.  I THEN WENT TO A RESIDENCY IN EMERGENCY MEDICINE AT DETROIT RECEIVING HOSPITAL IN DOWNTOWN DETROIT, WAYNE STATE UNIVERSITY.  THEN I WENT TO NEW YORK UNIVERSITY SCHOOL OF MEDICINE TO DO TWO MORE YEARS OF TRAINING IN MEDICAL TOXICOLOGY.  THEN I SUBSEQUENTLY RELATIVELY RECENTLY GOT A MASTER'S OF SCIENCE IN HEALTHCARE ADMINISTRATION FROM THE UNIVERSITY OF TEXAS AT DALLAS AND THE UNIVERSITY OF TEXAS, SOUTHWESTERN SCHOOL OF MEDICINE.

**Q.**    AND DO YOU HAVE ANY BOARD CERTIFICATIONS?

**A.**    I'M BOARD CERTIFIED IN EMERGENCY MEDICINE AND MEDICAL TOXICOLOGY.

**Q.**    AND CAN YOU JUST BRIEFLY EXPLAIN WHAT MEDICAL TOXICOLOGY IS?

**A.**    MEDICAL TOXICOLOGY IS AN AMERICAN BOARD OF MEDICAL

01:02  1  SPECIALITIES SPECIALTY, CONCERNING OVERDOSES, POISONINGS, AND

2  THE INTERACTIONS WITH SUBSTANCES IN THE BODY.

3  **Q.**    WHERE ARE YOU LICENSED TO PRACTICE?

4  **A.**    TEXAS, NEW YORK, CALIFORNIA AS A VOLUNTARY STATUS.  I'VE

5  NEVER USED THAT.

6  **Q.**    AND PRIOR TO YOUR CURRENT EMPLOYMENT, WHERE HAVE YOU

7  PRACTICED EMERGENCY MEDICINE?

8  **A.**    IT'S REALLY CONCURRENT BECAUSE I HAVE BEEN AT BELLEVUE

9  SINCE 1987, AT NYU.  DURING THAT TIME, I HAVE DONE MOONLIGHTING

10  AT OTHER PLACES, INCLUDING HOLDING A POSITION AS A -- ON THE

11  FACULTY OF THE UNIVERSITY OF TEXAS MEDICAL SCHOOL AT AUSTIN,

12  TEXAS, WHICH IS RELATIVELY A NEW MEDICAL SCHOOL.  I'VE ALSO

13  GONE FREQUENTLY TO SOUTH TEXAS TO HARLINGEN TO WORK.  I WENT TO

14  AMARILLO, SO VARIOUS SITES THAT ARE MORE RURAL IN TEXAS

15  PRIMARILY.  THOSE OPPORTUNITIES I TAKE WHEN I HAVE THEM.

16  **Q.**    DO YOU TREAT INCARCERATED INDIVIDUALS IN YOUR CURRENT JOB?

17  **A.**    YES.  AT BELLEVUE WE SEE ALL OF THE MALE PRISONERS FOR NEW

18  YORK CITY FOR RIKERS ISLAND.  SO WHEN ONE OF THOSE PEOPLE UNDER

19  THE CARE OF THE DEPARTMENT OF CORRECTIONS, MALES WHO REQUIRE

20  HOSPITALIZATION OR HOSPITAL EVALUATION, I SEE THEM.

21         LIKEWISE, THE NEW YORK POLICE DEPARTMENT, NYPD, WILL

22  BRING PEOPLE WHO ARE JUST TAKEN INTO CUSTODY TO US FOR MEDICAL

23  CLEARANCE OR WHATEVER MEDICAL COMPLAINT THEY MAY HAVE.

24  **Q.**    SO ABOUT HOW OFTEN WOULD YOU SAY YOU TREAT INCARCERATED

25  PATIENTS?

01:04  1   **A.**   WELL, THAT'S EVERY DAY.  EVERY DAY THAT I WORK WHICH IS --

2   I'M SEEING THOSE PATIENTS.  THERE ARE AT LEAST 20 TO 30 OF

3   THOSE INDIVIDUALS EVERY DAY.

4   **Q.**   AND DOES THAT INCLUDE PRISONERS WITH HIGH-LEVEL SECURITY

5   STATUS?

6   **A.**   OF COURSE, YES.

7   **Q.**   DO YOU WORK WITH EMERGENCY MEDICAL TECHNICIANS IN YOUR

8   WORK?

9   **A.**   YES.  BECAUSE WE'RE IN THE EMERGENCY DEPARTMENT, A

10  SIGNIFICANT NUMBER OF OUR PATIENTS COME TO US IN THE AMBULANCE,

11  AND THOSE ARE EMERGENCY MEDICAL TECHNICIANS WHO BRING THOSE

12  PEOPLE TO US.

13  **Q.**   DO YOU HAVE TRAINING AS AN EMERGENCY MEDICAL TECHNICIAN

14  YOURSELF?

15  **A.**   WHEN I WAS AT THE UNIVERSITY OF TEXAS, THEY OFFERED A

16  COURSE TO BECOME AN EMT.  I TOOK THE COURSE.  I NEVER GOT

17  LICENSED.  I NEVER TRIED.  IT WAS AN INTERESTING COURSE.  IT

18  OPENED MY EYES TO THAT TRAINING.

19  **Q.**   AND DO YOU HAVE ANY EXPERIENCE ESTABLISHING OR WORKING IN

20  EMERGENCY MEDICAL SITUATIONS IN CRISIS SITUATIONS?

21  **A.**   WELL, I MEAN, 9/11, WHEN THE WORLD TRADE CENTER WAS BOMBED

22  OR RUN INTO WITH A BOMB, NO; BUT WHEN THE AIRPLANES HIT IT, SO

23  WE WENT DOWNTOWN ON THAT TIME, AND I STAYED FOR TWO OR THREE

24  DAYS.  WE SET UP EMERGENCY QUARTERS RIGHT THERE WHEN BUILDING

25  FIVE FELL, WE WERE ALL THERE.  IT WAS COMPLETELY BLACK.  YOU

01:05   1    COULDN'T SEE YOUR HAND IN FRONT OF YOUR FACE.  SO THAT WAS

2    THREE DAYS WHERE WE ESTABLISHED EMERGENCY CARE ON THE SCENE.  I

3    WAS IN HAITI AT THE EARTHQUAKE.  SAME THING, ESTABLISHED

4    EMERGENCY CARE.  AND OF COURSE, WE HAD SUPER STORM SANDY, WHICH

5    WIPED OUT BELLEVUE HOSPITAL, THE ONE NEXT TO IT, TISCH, AND THE

6    VA.  SO WE HAD TO ESTABLISH CARE WITHOUT ANY RESOURCES IN ORDER

7    TO CARE FOR THE PEOPLE WHO WOULD NORMALLY COME TO BELLEVUE

8    EVERY DAY.

9    **Q.**    DO YOU HAVE ANY CERTIFICATIONS IN CORRECTIONAL MEDICINE?

10    **A.**    I'M A CERTIFIED CORRECTIONAL HEALTH PROFESSIONAL BY THE

11    NATIONAL COMMISSION FOR CORRECTIONAL HEALTHCARE.

12    **Q.**    AND WHAT EXPERIENCE DO YOU HAVE EVALUATING CORRECTIONAL

13    HEALTHCARE SYSTEMS?

14    **A.**    WELL, I HAVE -- MOST RECENTLY, I WOULD SAY IN THE LAST

15    COUPLE OF YEARS -- BEEN WORKING FOR HOMELAND SECURITY,

16    DEPARTMENT OF HOMELAND SECURITY, AND WE LOOKED AT SEVEN

17    DIFFERENT SYSTEMS, PRISON SYSTEMS; MAYBE TWO OF THOSE WERE

18    JAILS, LOOKED AT THEIR MEDICAL CARE.  AND I WAS RESPONSIBLE FOR

19    EVALUATING THE MEDICAL CARE PROVIDED THERE AND ASSESSING THAT

20    CARE BASED ON THE NATIONAL STANDARDS.

21            BEFORE THAT, OF COURSE, I DID WORK, PARTICULARLY WITH

22    REGARDS TO TEMPERATURES AND CONDITIONS WITH REGARD TO

23    TEMPERATURE, PARTICULAR IN THE TEXAS DEPARTMENT OF CORRECTIONS.

24            OF COURSE, HERE AT LOUISIANA STATE PENITENTIARY, WE

25    DID IT ON DEATH ROW AND MY -- OF COURSE, MISSISSIPPI ALSO --

01:06   1   THE CONDITIONS OF CONFINEMENT ON DEATH ROW AT PARCHMAN.

2               AND IN NEW YORK CITY, THEY ASKED ME TO RATE BOTH

3   SIDES OF THE ISSUE, ASKED ME TO BE AN EXPERT ON CORRECTIONAL

4   CONDITIONS, PARTICULARLY WITH REGARD TO TEMPERATURE.

5   **Q.**   AND HAVE YOU ALSO BEEN RETAINED AS AN EXPERT OR A

6   CONSULTANT ON BEHALF OF POLICE OR CORRECTIONAL DEFENDANTS?

7   **A.**   ALL THE TIME.  NEW YORK CITY CALLS ON ME REGULARLY TO LOOK

8   AT CASES WHERE THEY ARE -- USUALLY, IT'S COMING FROM A LAWSUIT

9   AND I -- MOST OF THESE ARE USE OF FORCE WITH AN ALLEGATION BY

10   THE PLAINTIFF OF SOME EXCESSIVE USE OF FORCE, I DO THOSE ALL

11   THE TIME.

12               **MR. DUBNER:**  YOUR HONOR, PLAINTIFFS TENDER DR.

13   VASSALLO AS AN EXPERT IN EMERGENCY MEDICINE, MEDICAL TOXICOLOGY

14   AND CORRECTIONAL MEDICINE.

15               **THE COURT:**  ANY CROSS ON THE TENDER?

16               **MR. ARCHEY:**  TWO OR THREE QUESTIONS, YOUR HONOR.  NO

17   OBJECTION TO HER -- WHAT WERE THE THREE AREAS AGAIN?

18               **MR. DUBNER:**  EMERGENCY MEDICINE, MEDICAL TOXICOLOGY,

19   AND CORRECTIONAL MEDICINE.

20               **MR. ARCHEY:**  FIRST TWO, NO OBJECTIONS AT ALL.

21               **CROSS-EXAMINATION ON QUALIFICATIONS**

22   BY MR. ARCHEY:

23   **Q.**   LET ME ASK YOU JUST TWO OR THREE QUESTIONS ABOUT THE

24   CORRECTIONAL, THOUGH.  YOUR TESTIMONY IS FOCUSED ON TEMPERATURE

25   IN THESE HEAT CASES ON DEATH ROW AND ELSEWHERE.  IS THAT FAIR?

**A.**   WELL, THAT WAS DEFINITELY THE CASE HERE AT LSP, AND IN TEXAS, THE TESTIMONY WAS PRIMARILY WITH HEAT.  WITH REGARDS TO MISSISSIPPI, IT WAS BROADER -- WAS ALL THE CONDITIONS.  AND RIKERS, IT WAS PRIMARILY WITH RESPECT TO TEMPERATURE, YES.

**Q.**   ALL RIGHT.  AND AS TO EXPERT TESTIMONY AS TO THE HEALTHCARE, LIKE WE'RE TALKING ABOUT HERE TODAY, HAVE YOU DONE THIS BEFORE?

**A.**   YES.  WELL, I DON'T KNOW WHAT YOU MEAN BY "THIS," BUT I DID ASSESS FOR TWO YEARS FOR THE DEPARTMENT OF HOMELAND SECURITY, THE PRISON SYSTEMS AND THE CONDITIONS, THE MEDICAL QUALITY OF CARE, WITH REGARDS TO THE DETENTION OF THE ICE DETAINEES IN THOSE PRISONS.

**Q.**   AND THAT WAS OUT IN SAN DIEGO?

**A.**   WELL, THERE'S SEVEN PLACES I'M HELPING.

**Q.**   A PRISON LIKE THIS -- AND IF I'M WRONG, PLEASE CORRECT ME AND I'LL PROBABLY SIT DOWN -- MY UNDERSTANDING IS YOU'VE DONE NOTHING LIKE THIS PREVIOUSLY.  YOUR WORK HAS BEEN IN THESE TEMPERATURE AREAS, AND THEN YOU'VE GOT SOME EXPERIENCE WORKING IN THE FIELD.  IS THAT FAIR OR NO?

**A.**   WELL, I THINK I'M DRAWING MORE SIMILARITIES TO MY HOMELAND SECURITY WHERE I WENT IN AS THE SOLE MEDICAL PERSON TO LOOK AT THE MEDICAL CARE FOR APPROXIMATELY SEVEN PRISONS AND JAILS, SO I THINK THAT'S EXACTLY WHAT I DID THERE IS EXACTLY WHAT I WAS CHARGED TO DO HERE, WAS LOOK AT THAT CORRECTIONAL -- LOOK AT THE CORRECTIONAL MEDICAL CARE.

01:09   1   Q.   AND THOSE ARE GENERALLY SHORT-TERM STAYS, ARE THEY NOT?

2   A.   ICE DETAINEES?

3   Q.   YES, MA'AM.

4   A.   YEAH, USUALLY LESS THAN FIVE YEARS.

5           MR. ARCHEY:   YOUR HONOR, THOSE ARE ALL MY QUESTIONS.

6   YOUR HONOR, WE ACCEPT THIS DOCTOR, OBVIOUSLY, AS AN EXPERT IN

7   THE ER EMERGENCY MEDICINE AND MEDICAL TOXICOLOGY.  I'VE GOT NO

8   BASIS TO OBJECT TO THAT.

9           FOR THE CORRECTIONAL MEDICINE AREA THAT THEY ARE

10   TALKING ABOUT, SHE CERTAINLY HAS SOME TRAINING IN THAT, WE'RE

11   GOING TO MAINTAIN OUR OBJECTION.  AND I'M SURE THE COURT'S

12   GOING TO HAVE A RESPONSE.

13           THE COURT:   THE COURT IS GOING ACCEPT DR. VASSALLO IN

14   THE FIELDS AS TENDERED, MEDICAL TOXICOLOGY, EMERGENCY MEDICINE,

15   AND ALSO CORRECTIONAL MEDICINE.  THE COURT FINDS THAT SHE HAS

16   THE SKILL, EXPERTISE, AND EXPERIENCE TO GIVE OPINION TESTIMONY

17   IN ALL THREE FIELDS.

18           YOU MAY PROCEED.

19                    DIRECT EXAMINATION

20   BY MR. DUBNER:

21   Q.   SO TURNING TO THIS CASE, DR. VASSALLO, WHAT WAS YOUR

22   ASSIGNMENT IN THIS MATTER?

23   A.   MY ASSIGNMENT WAS TO ASCERTAIN -- WITH EMPHASIS ON THE

24   EMERGENCY CARE AND THE EMTS' CARE -- TO LOOK AT PARTICULARLY

25   THOSE AREAS OF CARE AS THEY ARE RENDERED AT LSP.

01:10  1   **Q.**   AND WHAT DID YOU DO TO FORM AN OPINION ON THOSE MATTERS?

2   **A.**   FIRST, THERE WAS A SITE VISIT, AND I SPENT TWO DAYS ON

3   SITE.  DURING THAT TIME I TALKED TO PATIENTS, I TALKED TO

4   STAFF, I TALKED TO THE EMTS, AND I OBSERVED IN THE ATU.

5           SUBSEQUENT TO THAT SITE VISIT, I DID CHART REVIEWS,

6   AND I SHOULD SAY BEFORE THAT SITE VISIT, I HAD VISITED LSP FOR

7   AT LEAST ONE VISIT WITH THE ADVOCACY CENTER WITH ATTORNEY

8   MIRANDA TATE.  AND WE HAD SPENT AT LEAST ONE DAY IN THE

9   INFIRMARY.

10          AND BEFORE THAT I HAD, OF COURSE, BEEN TO THE DEATH

11  ROW AND LOOKED AT CONDITIONS AND MEDICAL RECORDS ON THOSE

12  PRISONERS.

13  **Q.**   AND FOR YOUR OPINIONS IN THIS CASE, WERE YOU RELYING IN

14  ANY SIGNIFICANT WAY ON THE FIRST TWO VISITS OR JUST THE THIRD?

15  **A.**   NO.  EXCEPT TO THE EXTENT THAT I DID NOT SEE THE INFIRMARY

16  ON OUR -- ON THAT LAST VISIT THAT I'M SPEAKING TO BECAUSE I HAD

17  ALREADY SEEN IT.  SO I HAD SEEN THE CONDITIONS IN THE

18  INFIRMARY.  I TALKED TO PATIENTS IN THE INFIRMARY.  SO I HAD

19  THAT KNOWLEDGE.

20  **Q.**   AND YOU REFERRED TO REVIEWING MEDICAL RECORDS.  HOW DO YOU

21  CHOOSE WHAT MEDICAL RECORDS TO REVIEW?

22  **A.**   BECAUSE I AM IN EMERGENCY MEDICINE, IT'S MY EXPERIENCE

23  THAT ONE WAY TO FIND PEOPLE WHO HAVE BEEN SERIOUSLY ILL -- AND

24  I WAS LOOKING FOR PEOPLE WITH SERIOUS ILLNESS -- IS TO LOOK AT

25  PEOPLE THAT HAVE BEEN HOSPITALIZED OR DIED.  SO I PARTICULARLY

1    JUST CHOSE RANDOMLY FROM THOSE TWO LISTS.

2    **Q.**    AND HOW DO YOU DETERMINE WHICH PATIENTS HAD DIED OR BEEN

3    HOSPITALIZED?

4    **A.**    WELL, THERE WAS A LIST OF DEATHS.  I THINK WE WERE

5    PROVIDED THAT SOMEWHERE IN THE FALL OF 2015, AND SO I THINK

6    THAT LIST STOPPED KIND OF IN JANUARY OF 2016, WE DIDN'T GET ANY

7    FURTHER DEATHS.  AND DOES THAT ANSWER YOUR QUESTION?

8    **Q.**    YES, IT DOES.

9    **A.**    OKAY.

10   **Q.**    AND SO JUST TO BRIEFLY BRING UP JOINT EXHIBIT 146, AND

11   THIS IS UNDER SEAL, SO WE CANNOT PUBLISH IT TO THE GALLERY.

12           NOW, THIS IS A LIST OF THE PATIENTS FROM THE SAMPLE.

13   WHICH PATIENTS DID YOU REVIEW?

14   **A.**    MY REVIEW STARTED WITH PATIENT NO. 29 AND CONTINUED ON TO

15   PATIENT 45.

16           **THE COURT:**  AND THIS IS A REVIEW OF CHARTS, NOT OF

17   PATIENTS.  RIGHT?

18           **MR. DUBNER:**  THIS IS A REVIEW OF MEDICAL RECORDS --

19           **THE COURT:**  OKAY.

20           **MR. DUBNER:**  -- OF PATIENTS, BUT NOT OF MEETING WITH

21   THE PATIENT'S THEMSELVES, YES.

22           **THE COURT:**  SO CHARTS, RIGHT?  YOUR QUESTION WAS

23   WHICH PATIENTS DID YOU REVIEW.  I WANTED TO MAKE SURE I

24   UNDERSTOOD.

25           **MR. DUBNER:**  YES.  THANK YOU, YOUR HONOR.

**BY MR. DUBNER:**

**Q.**   IN TERMS OF THE EXPERT REPORT ITSELF, DID YOU REVIEW THE PARTS OF THE REPORT THAT WERE OUTSIDE THE AREAS THAT YOU FOCUSED ON YOURSELF?

**A.**   I READ THE ENTIRE REPORT AND REVIEWED IT.

**Q.**   AND DID ANYTHING THAT YOU OBSERVED, EITHER IN THE CHARTS YOU REVIEWED OR YOUR SITE VISITS, GIVE YOU ANY REASON TO THINK THAT THE CONCLUSIONS IN THE OTHER SECTIONS OUTSIDE THE EMERGENCY CARE WAS WRONG?

**A.**   NO.

**Q.**   IN THE MEDICAL RECORDS THAT YOU REVIEWED, DID YOU SEE CLINICAL ENCOUNTERS THAT INVOLVED CHRONIC DISEASE MANAGEMENT?

**A.**   YES.

**Q.**   AND DID YOU SEE CLINICAL ENCOUNTERS THAT INVOLVED SPECIALTY SERVICES?

**A.**   YES.  I MEAN, I READ THE ENTIRETY OF EVERY CHART FROM PAGE 1 TO 800, 1 TO 2000.  WHATEVER IT WAS, I READ THE ENTIRETY OF THE CHART.  SO I SAW EVERYTHING IN THE CHART.

**Q.**   AND WERE THOSE -- WERE THE RESULTS OF YOUR REVIEWS CONSISTENT WITH THE FINDINGS OF DR. PUISIS AND NURSE PRACTITIONER LAMARRE?

**A.**   YES.

**Q.**   TURNING TO THE AREAS THAT YOU SPECIFICALLY LOOKED AT, COULD YOU GIVE THE COURT AN OVERVIEW OF YOUR FINDINGS?

**A.**   WITH RESPECT TO THE EMTS, EMTS ARE USED AS PRIMARY

1   PROVIDERS.  WITH RESPECT TO THE CARE IN THE ATU, IT'S THE --

2   SOME OF THAT CARE REFLECTS VERY OUTDATED CARE THAT IS CURRENTLY

3   NO LONGER STANDARD OF PRACTICE.  SO WITH RESPECT TO THOSE TWO,

4   I THINK THAT WAS THE PRIMARY FINDING.

5   **Q.**   AND WHAT, IF ANYTHING, DID YOU FIND ABOUT HOW THE CARE

6   AFFECTED PATIENTS' RISK OF HARM?

7   **A.**   WELL, THE -- BECAUSE THE CARE SO OFTEN IN THE EMERGENCY

8   UNIT, OR ACUTE ATU, IS RENDERED BY EMTS, WHO ARE TRAINED TO BE

9   IN THE PRE-HOSPITAL SETTING AND NOT TO RENDER ONGOING CARE FOR

10  A NUMBER OF HOURS, THAT CARE, BECAUSE OF THEIR KNOWLEDGE AND

11  TRAINING AND LACK OF OVERSIGHT, RESULTED IN SIGNIFICANT HARMS

12  AND EVEN DEATH.

13  **Q.**   AND JUST FOR THE RECORD, YOU USED THE ACRONYM ATU, WHAT IS

14  THAT?

15  **A.**   ACUTE TREATMENT UNIT.

16  **Q.**   THANK YOU.

17        LET'S TALK ABOUT EMERGENCY MEDICAL TECHNICIANS.

18  WHAT, GENERALLY SPEAKING, IS AN EMERGENCY MEDICAL TECHNICIAN?

19  **A.**   IN GENERAL, THAT PERSON IS TRAINED TO PROVIDE

20  STABILIZATION AND TRANSPORTATION IN THE PRE-HOSPITAL SETTING.

21  **Q.**   AND WHAT DO YOU MEAN BY "PRE-HOSPITAL SETTING"?

22  **A.**   WELL, OUTSIDE OF THE HOSPITAL, IF ONE COLLAPSES, THEN ONE

23  HOPEFULLY GETS AN EMT TO COME AND HELP HIM OR HER, AND SO

24  THAT'S ANYTHING, ONCE YOU GET TO THE HOSPITAL, THE CARE IS NO

25  LONGER RENDERED BY AN EMT.

1    SO FOR ME, HOSPITAL EQUALS ATU IN HOW I'M TALKING

2   ABOUT THIS AND ASSESSING IT.  SO IF AN EMT OUTSIDE GOES TO A

3   STREET TO A CRASH OR A MEDICAL ILLNESS OR WHATEVER IT IS, WE

4   ARE ALL VERY FAMILIAR WITH THAT, IT IS A CRITICAL PART OF OUR

5   PUBLIC HEALTH HERE IN AMERICA, THAT PATIENT IS THEN

6   TRANSPORTED, STABILIZED SO THE CONDITION DOESN'T WORSEN,

7   STABILIZED AND TRANSPORTED TO A HOSPITAL.  THAT'S HOW IT IS IN

8   THE FREE WORLD, AND THAT WAS HAPPENING AT ANGOLA EXCEPT THAT

9   WHEN THE PATIENT THEN ARRIVED IN THE HOSPITAL, WHICH IS THE ATU

10  FOR THE PURPOSE OF MY DISCUSSION, THEY CONTINUED TO MANAGE THE

11  PATIENT WITH LIMITED OVERSIGHT.

12  **Q.**   OKAY.  AND WHEN YOU SAY "THE HOSPITAL IS THE ATU FOR

13  PURPOSES OF YOUR DISCUSSION," IS THE ATU A HOSPITAL?

14  **A.**   WELL, NO.  SO THE ATU IS THEIR AREA FOR URGENT AND

15  EMERGENCY CARE.  IT'S SPECIFICALLY WRITTEN IN THEIR PROTOCOLS.

16  IT'S PEOPLE THAT HAVE SERIOUS ILLNESS SHOULD BE TAKEN TO ATU.

17  SO IT'S LIKE THEIR EQUIVALENT OF AN ON-SITE EMERGENCY

18  DEPARTMENT OR EMERGENCY ROOM, I SHOULD SAY.

19  **Q.**   AND WE'LL RETURN TO THIS IN A LITTLE BIT.  BUT DOES IT

20  HAVE ALL OF THE ATTRIBUTES THAT AN EMERGENCY ROOM TYPICALLY

21  DOES?

22  **A.**   WELL, EMERGENCY ROOMS IN HOSPITALS ARE VERY SOPHISTICATED,

23  AND THEY DO NOT HAVE ALL OF THOSE THINGS.  THEY DON'T HAVE ALL

24  THE TESTS.  THEY DON'T HAVE CAT SCANS, ANCILLARY ASSISTANCE

25  THEY DON'T HAVE, AND SO THE ANSWER IS NO.

01:18    1    **Q.**   LET'S TURN BACK TO EMTS.  ARE THERE MULTIPLE LEVELS OF
2    EMTS?
3    **A.**   THERE ARE.  GENERALLY, THERE'S A RESPONDER, WHO'S ALMOST
4    LIKE A GOOD SAMARITAN BUT HAS ABOUT 20 HOURS OF TRAINING.
5    THERE'S AN EMT, AN EMT ADVANCED, AND A PARAMEDIC.
6           AND GENERALLY, WE EMERGENCY MEDICINE PHYSICIANS
7    DISTINGUISH PARAMEDICS AND WE JUST CALL THEM PARAMEDICS.  YOU
8    CAN CALL THEM EMTP BUT THEY'RE PARAMEDICS.  THEY'RE MUCH MORE
9    TRAINED, MAYBE A 1000 HOURS OF TRAINING VERSUS EMT, EMTA VERSUS
10    A PARAMEDIC.  A PARAMEDIC IS A HIGHER LEVEL OF TRAINING.
11    **Q.**   AND IS IT APPROPRIATE, FOR CONVENIENCE SAKE, TO REFER TO
12    ALL FOUR LEVELS AS EMTS?
13    **A.**   FOR CONVENIENCE, YES.  BUT WHEN THERE'S A PARAMEDIC, IT'S
14    A VERY, VERY DIFFERENT TRAINING.
15    **Q.**   AND YOU SAID THAT PARAMEDICS HAVE UP TO, I THINK, 1000
16    HOURS.  HOW DOES THAT COMPARE TO THE TRAINING THAT A DOCTOR OR
17    A REGISTERED NURSE HAS?
18    **A.**   WELL, A REGISTERED NURSE USUALLY HAS SOME KIND OF A
19    DEGREE.  CERTAINLY, BECOMING A REGISTERED NURSE IS A TWO-YEAR
20    TRAINING PROGRAM, DEPENDING ON IF YOU GET YOUR BACHELOR'S OR
21    ASSOCIATE'S DEGREE AND THEN GET YOUR RN, BUT IT'S TWO YEARS OF
22    CLINICAL TRAINING.  A PHYSICIAN, IT'S FOUR YEARS OF MEDICAL
23    SCHOOL, RESIDENCY, AND SOMETIMES FELLOWSHIP, AND FURTHER
24    TRAINING.
25    **Q.**   SO YOU SAID EARLIER THAT EMTS STABILIZE PATIENTS IN A

1  PRE-HOSPITAL SETTING.  MORE SPECIFICALLY, WHAT ARE EMTS TRAINED

2  TO DO?

3  **A.**    SO EMTS ARE TRAINED TO HAVE SKILLS OR TRAINED IN CERTAIN

4  SKILLS AND PROCEDURES THAT ARE STABILIZING, AND THEY ARE

5  TRAINED WHEN TO USE THOSE SKILLS AND PROCEDURES.  AND THEY HAVE

6  VARIOUS LEVELS OF INPUT, EITHER ON-LINE OR PROTOCOL-DRIVEN CARE

7  THAT THEY ARE PERFORMING.

8         IN OTHER WORDS, THEY ARE PERFORMING THOSE SKILLS AND

9  PROCEDURES UNDER MEDICAL DIRECTION THAT MAY BE BY A SET OF

10  PROTOCOLS.  IT MAY BE BY TELEPHONE CONTACT IN A PRE-HOSPITAL.

11  THE THING IS THAT ALL OF THIS IS HAPPENING BEFORE YOU GET TO

12  THE HOSPITAL, AND WHAT THEY ARE NOT DOING IS MAKING A

13  DIAGNOSIS.  SO THEY OBSERVE, THEY STABILIZE, AND THEN THEY

14  BRING THE PATIENT TO ME IN THE EMERGENCY DEPARTMENT.

15         MY JOB, AS A PHYSICIAN, IS TO SAY WHY AND WHAT HAS

16  HAPPENED TO THE PATIENT, WHAT ARE THE CAUSES OF THESE SIGNS AND

17  SYMPTOMS.  AND THEY OFTEN WILL ASK ME, WHAT DID YOU FIND, DOC?

18  THAT'S A VERY COMMON INTERACTION.  THEY SAY, I THOUGHT IT MAY

19  BE THIS, I THOUGHT IT MIGHT BE THAT.  SOMETIMES THEY'RE RIGHT

20  AND SOMETIMES THEY'RE WRONG.

21  **Q.**    AND YOU SAID THAT THEY AREN'T -- THAT THEY DON'T MAKE

22  DIAGNOSES, BUT THEY DO OBSERVE.  WHAT IS THE DIFFERENCE BETWEEN

23  THOSE TWO THINGS?

24  **A.**    WELL, THE PROCESS OF MAKING AN OBSERVATION, BLOOD

25  PRESSURE, COLOR OF THE PATIENT, THE PRESENCE OF BREATH SOUNDS,

1  THE PRESENCE OF ABDOMINAL PAIN, WHATEVER ABNORMALITY OR

2  WHATEVER COMPLAINT IS AND COMING TO A CONCLUSION REQUIRES A

3  GREAT DEAL OF TRAINING, BECAUSE THERE'S ALWAYS SEVERAL THINGS

4  IT COULD BE, AND DECIDING WHAT IT IS, BASED ON SEVERAL THINGS,

5  TAKES A LOT.  IT CAN BE A VERY COMPLEX PROCESS.  SO A DIAGNOSIS

6  IS NOT IN THE PURVIEW OR IN THE TRAINING OR KNOWLEDGE BASIS OF

7  AN EMT OR A PARAMEDIC, EMTP.

8  Q.   I'D LIKE TO SHOW YOU DEFENDANTS' EXHIBIT 15, AND THIS CAN

9  BE PUBLISHED TO THE GALLERY.

10        DR. VASSALLO, ARE YOU FAMILIAR WITH THIS DOCUMENT?

11  A.   YES.

12  Q.   AND WHAT IS IT?

13  A.   SO THIS IS -- I'M TALKING ABOUT THE EMT, PARAMEDIC,

14  ADVANCED EMT, AND THE RESPONDER, AND THEIR SCOPE OF PRACTICE.

15  WE SEE THEIR VARIOUS SKILLS AND PROCEDURES FOR WHICH THEY ARE

16  TRAINED AND CREDENTIALED -- OR NOT CREDENTIALED.  THIS IS

17  ACTUALLY FOUR PAGES.

18  Q.   AND HOW DO THESE SKILLS AND PROCEDURES RELATE TO WHAT YOU

19  SAID BEFORE ABOUT PRE-HOSPITAL CARE?

20  A.   WELL, THEY ARE MEANT TO BE PERFORMED IN THE PRE-HOSPITAL

21  SETTING.  THIS IS A -- THIS IS WHAT WE KNOW AN EMT IS.  YOU

22  CALL FOR HELP BY 911, AND AN EMT HOPEFULLY WILL COME AND HELP

23  YOU OUT AND HOPEFULLY WILL MOVE YOU TO THE HOSPITAL, WHEN IT'S

24  APPROPRIATE.

25  Q.   AND IF WE COULD GO TO PAGE 2949 OF THE EXHIBIT.

1          **THE COURT:**  WHAT'S YOUR EXHIBIT NUMBER?

2          **MR. DUBNER:**  IT'S DEFENDANTS' EXHIBIT 15.

3     BY MR. DUBNER:

4     **Q.**   THERE ARE A FEW OF THESE THAT I'D LIKE TO ASK ABOUT IN

5     PARTICULAR.  THE FIRST LINE SAYS TRAUMA TRIAGE.  WHAT DOES

6     TRAUMA TRIAGE MEAN?

7     **A.**   TRIAGE IS THE PROCESS OF SEPARATING INTO GROUPS BASED ON

8     THE SERIOUSNESS OF THE ILLNESS.  SO, FOR EXAMPLE, THE WHOLE

9     IDEA OF EMTS STARTED YEARS AGO AND WAS ESTABLISHED BY THE

10    NATIONAL HIGHWAY TRAFFIC ADMINISTRATION.  SO THEY WERE FOCUSED

11    ON GETTING PEOPLE OFF THE HIGHWAYS 40 YEARS AGO.  SO THE TRAUMA

12    TRIAGE IS IMPORTANT, WHO NEEDS TO GO TO THE HOSPITAL AND WHO

13    DOES NOT.  BUT MOST EVERYBODY IN A CRASH IS GOING TO GO TO THE

14    HOSPITAL IF THERE'S A COMPLAINT.

15    **Q.**   AND IS THAT DIFFERENT FROM TRIAGING PATIENTS WITH

16    NON-TRAUMA SYMPTOMS?

17    **A.**   YES, BECAUSE IT'S A MEDICAL PROBLEM AND NOT A TRAUMA.

18    NOTHING HAS OCCURRED TO THEM, THAT WE KNOW OF.

19    **Q.**   SO IS THERE ANYTHING WITHIN EMTS' TRAINING OR SCOPE OF

20    PRACTICE THAT ALLOWS THEM TO TRIAGE PATIENTS IN NON-TRAUMA

21    SITUATIONS?

22    **A.**   WELL, YES, BECAUSE IF SOMEBODY COMES AND SAYS I HAVE CHEST

23    PAIN, THAT'S NOT TRAUMA, AND THAT PATIENT WILL BE EVALUATED.

24    CHEST PAIN IS POTENTIALLY A LIFE-THREATENING COMPLAINT.  AND

25    THEN COMES THE SECOND HALF OF THAT.  IF THEY LOOK AT AN EKG, IF

01:24

1   THEY'RE A PARAMEDIC, AND THEY SEE THAT THERE'S LACK OF OXYGEN

2   TO THE HEART, ISCHEMIA, OR CHANGES, THEN THEY ARE GOING TO LET

3   US KNOW BEFORE THEY EVEN ARRIVE THAT THEY HAVE SOMEBODY WITH

4   EKG CHANGES.

5            ON THE OTHER HAND, A PARAMEDIC WILL KNOW THAT YOU

6   DON'T HAVE TO HAVE CHANGES ON THE EKG IN ORDER TO BE HAVING A

7   HEART ATTACK.  BUT, BASICALLY, A MEDICAL SYMPTOM, WHEN AN EMT

8   COMES PRE-HOSPITAL, THAT PATIENT IS GOING TO GO TO A HOSPITAL

9   FOR AN EVALUATION.  THAT'S HOW IT WORKS.

10  **Q.**   AND I THINK YOU REFERRED TO EMTS TELLING YOU.  WHO IS THE

11  "WE" IN THAT EXPLANATION?

12  **A.**   WELL, WE -- ANYTIME I'VE SAID "WE," I THINK, I'M TALKING

13  ABOUT EMERGENCY MEDICINE PHYSICIANS WORKING IN EMERGENCY

14  DEPARTMENTS INTERACTING WITH EMTS WHO ARE BRINGING PATIENTS.

15  SOME PATIENTS WALK IN, OF COURSE, BUT MANY PATIENTS ARE BROUGHT

16  TO AN EMERGENCY DEPARTMENT BY EMERGENCY MEDICAL TECHNICIANS.

17  **Q.**   JUST TWO OTHER THINGS THAT I WANTED TO ASK YOU ABOUT.  THE

18  FIRST:  DOWN IN THE SECOND GROUP, THERE'S SOMETHING THAT SAYS

19  TREAT AND RELEASE PROTOCOL IMPLEMENTATION.  COULD YOU EXPLAIN

20  WHAT A TREAT AND RELEASE PROTOCOL IS?

21  **A.**   WELL, IN THE PRE-HOSPITAL SETTING, THERE ARE -- IF A

22  PATIENT -- IT'S POSSIBLE FOR A PATIENT TO SAY THEY DON'T WANT

23  TO GO TO THE HOSPITAL.  IF I CALL 911 AND I -- AND AN EMT COMES

24  TO ME AND I SAID, NO, IT'S FINE, I'M FINE.  AS LONG AS THAT

25  PATIENT HAS THE CAPACITY TO REFUSE, HAS A CLEAR MENTAL STATUS,

01:26  1   UNDERSTANDS THE IMPLICATIONS OF NOT BEING TRANSPORTED TO THE

2   HOSPITAL, THAT PATIENT HAS THE CAPACITY TO NOT CATCH THAT RIDE

3   TO THE HOSPITAL.  BUT EMTS ARE NOT SERVING AS A -- OR ALLOWED

4   TO MAKE THAT DECISION TO NOT TRANSPORT.  SO PATIENTS HAVE THE

5   RIGHT TO REFUSE TRANSPORT IF THEY HAVE A CLEAR MENTAL STATUS

6   AND THEY ARE NOT SUICIDAL, THEY ARE NOT UNDER POLICE CUSTODY,

7   SOMEBODY'S NOT CALLING FOR THEM, THEN THEY ARE TREATED AND THEY

8   ARE RELEASED.  BUT THEY HAVE TO HAVE A CLEAR MENTAL STATUS AND

9   CAPACITY TO UNDERSTAND THE IMPLICATIONS.

10  Q.   AND WHAT DOES IT MEAN, GENERALLY SPEAKING, TO PRACTICE

11  UNDER A PROTOCOL?

12  A.   WELL, THE MOST WELL-KNOWN AND ACCEPTED PROTOCOLS, I THINK,

13  ARE THE AMERICAN HEART ASSOCIATION'S PROTOCOLS FOR HOW TO TREAT

14  VARIOUS HEART RHYTHMS.  FOR EXAMPLE, WHEN THE VENTRICULAR

15  FIBRILLATION, WHEN THE HEART JUST STARTS TO SHAKE AND

16  DOESN'T -- SO THESE ARE PROTOCOLS THAT ARE VETTED.  THEY ARE

17  EVIDENCE-BASED, AND THEY ARE UPDATED ALL THE TIME.  SO THERE

18  ARE PROTOCOLS THAT -- BY THE AMERICAN HEART ASSOCIATION

19  TREATING A NUMBER OF CARDIAC CONDITIONS.  THERE ARE PROTOCOLS

20  PUT FORTH BY, LIKE I SAID EARLIER, THAT ARE DEVELOPED -- IF YOU

21  GO ON EMS.GOV, SINCE MOST OF THIS IS STARTED BY THE GOVERNMENT

22  AND DEVELOPED FOR THE EMT AND THE EMERGENCY MEDICINE MEDICAL

23  SERVICES, THAT PROTOCOLS FOR WHICH EMTS FUNCTION ALSO.  THOSE

24  PROTOCOLS ARE DEVELOPED, THEY ARE RESEARCHED, THEY ARE -- AND

25  THEY HAVE EVIDENCE BEHIND THEM.  AND ONCE THE HOSPITAL -- THE

01:28   1   PATIENT HITS THE HOSPITAL, THAT'S IT.  THE EMT IS OFF THE CASE.

2   **Q.**   CAN A PROTOCOL EXPAND AN EMTS' SCOPE OF PRACTICE?

3   **A.**   NO, THAT'S -- NO.  IF YOU'RE PRACTICING OFF A VETTED

4   PROTOCOL, YOU'RE PRACTICING WITHIN THE SCOPE OF YOUR PRACTICE,

5   YOUR KNOWLEDGE AND YOUR TRAINING.

6   **Q.**   AND JUST ONE LAST QUESTION ON DEFENDANTS' EXHIBIT 15.  I

7   SEE SOME OF THE BOXES ON THIS TABLE HAVE ASTERISKS.  DO YOU

8   KNOW WHAT MEANS?

9   **A.**   WELL, IT SAYS HERE ON THE BOTTOM OF FOUR OUT OF FOUR

10   PAGES, THAT THE PROCEDURES WITH ASTERISKS ARE APPROVED AS

11   OPTIONAL MODULES.  AND WHAT THIS MEANS IS THAT IF PEOPLE -- OR

12   PARAMEDICS OR WHOMEVER -- IS ALLOWED TO DO THEM -- YOU CAN SEE

13   WHO'S ALLOWED BY THE CHECK MARKS -- THEY NEED SPECIAL TRAINING

14   IN ORDER TO BE ALLOWED TO PERFORM THOSE PROCEDURES.

15   **Q.**   OKAY.  SO LET'S TURN TO ANGOLA NOW, NOW THAT WE HAVE THAT

16   BACKGROUND.  HOW DOES WHAT YOU'VE DESCRIBED AS A TYPICAL ROLE

17   OF AN EMT COMPARE TO THE ROLE OF EMTS AT ANGOLA?

18   **A.**   WELL, SOME OF IT COMPARES VERY FAVORABLY, AND THAT IS THAT

19   THE PARAMEDICS WILL GO -- OR I SHOULD SAY EMTS BECAUSE IN THIS

20   CASE, IT REALLY IS EMTS, AND THERE IS A PARAMEDIC, BUT THE EMTS

21   GO OUT TO THE PERSON WITH THE COMPLAINT AND THEY ASSESS THE

22   PATIENT.  THEY MAKE AN OBSERVATION, AND THEY BRING THE PATIENT

23   TO THE ATU.  THAT IS EXACTLY WHAT EMTS ARE TRAINED TO DO.

24          THE DIFFERENCE IS THAT SOMETIMES THEY CALL IN FOR

25   MEDICAL CONTROL AND THERE -- AND THERE'S A NO-TRANSPORT ORDER

01:29  1    GIVEN BY THE PHYSICIAN.  WHAT WORRIES ME THERE IS BECAUSE
       2    ANYTIME I'M TAKING A CALL FROM SOMEONE OUTSIDE -- EMT, WHOEVER
       3    IT IS, THE NEW YORK CITY POISON CONTROL -- I'M ALWAYS ON THE
       4    PHONE TAKING CALLS, AND I'M AWARE OF THE EXPERTISE AND
       5    KNOWLEDGE AND TRAINING OF THE PERSON ON THE OTHER LINE OF IT,
       6    AND MY ABILITY TO ASSESS LONG DISTANCE BY TELEPHONE IS NOT THE
       7    SAME AS WHEN I HAVE A PATIENT IN FRONT OF ME.  SO IT'S
       8    DANGEROUS TO HAVE THE EYES AND EARS OF SOMEBODY OUT THERE IN
       9    THE UNIT, OR ON THE ROWS OR ON THE TIERS, AND SAY NO TRANSPORT.
      10    THAT'S A DANGEROUS PRACTICE BECAUSE PARAMEDICS AND EMTS ARE
      11    TRAINED TO TRANSPORT FOR AN ASSESSMENT BY THE DOCTOR OR A
      12    MID-LEVEL PHYSICIAN ASSISTANT, NURSE PRACTITIONER, OR A
      13    PHYSICIAN.  THOSE ARE THE PRACTITIONERS THAT ARE IN AMERICA.
      14    THOSE ARE CALLED PRACTITIONERS.  THEY ARE CERTIFIED TO
      15    DIAGNOSE, TO PUT ALL THAT INFORMATION TOGETHER AND MAKE A
      16    DIAGNOSIS.
      17    Q.    AND THEN HOW, IF AT ALL, DOES THE CARE AT ANGOLA, ONCE A
      18    PATIENT HAS BEEN TRANSPORTED, COMPARE TO THE USE OF EMTS
      19    OUTSIDE OF ANGOLA?
      20    A.    WELL, THE PROBLEM AT ANGOLA IS THAT THE EMTS CONTINUE TO
      21    MANAGE THE PATIENT.  NOW, THERE ARE EXCEPTIONS TO THAT BUT
      22    MOST COMMONLY, THE EMTS WILL MANAGE PATIENTS WITH CALLING TO
      23    THE DOCTORS.  THEY WILL BE GIVEN VERBAL ORDERS OR TELEPHONE
      24    ORDERS, AND SO THE DOCTOR IS RELYING ON THE INFORMATION THEY
      25    ARE GIVEN BY SOMEONE WHO IS OBSERVING SOMETHING BUT NOT TRAINED

01:31   1   TO MAKE SERIAL OBSERVATIONS OVER MANY, MANY, MANY, MANY HOURS

2   AND TO KNOW WHAT THAT MEANS.  IT'S THE MEANING OF THE

3   OBSERVATION THAT'S THE QUESTION HERE.  IT'S THE WHY IS THIS

4   HAPPENING, NOT THE PRESENCE OF THE OBSERVATION.

5   **Q.**   IS THE USE OF TELEPHONE ORDERS WITHOUT A PRACTITIONER

6   PRESENT FOR EXTENDED PERIODS OF TIME, IS THAT A COMMON PRACTICE

7   OUTSIDE OF ANGOLA?

8   **A.**   WELL, THE KEY QUESTION IS EXTENDED PERIOD OF TIME.  SO IF

9   SOMEBODY'S COMING IN TO THE HOSPITAL 20 MINUTES, IF THAT'S HOW

10   IT IS AT ANGOLA, OR A RURAL SETTING, OF COURSE, MAYBE THAT'S

11   THE CASE.  BUT THE PERIODS OF TIME THAT OCCUR AT ANGOLA ARE

12   ABSOLUTELY ASTONISHING.

13   **Q.**   WHY DON'T WE GO TO AN EXAMPLE OF THOSE PERIODS OF TIME?  I

14   THINK THIS WOULD BE A GOOD PLACE TO SHOW THE COURT AN EXAMPLE

15   OF THE KINDS OF INSTANCES YOU'RE TALKING ABOUT.  THIS IS GOING

16   TO BE FOR THE SEALED DOCUMENTS.  WE CAN TAKE THAT OFF.   AND

17   ALSO, IF THE TOUCH SCREEN COULD BE MADE AVAILABLE TO THE

18   WITNESS.

19            **THE DEPUTY CLERK:**  I'M TRYING.

20            **MR. DUBNER:**  IF IT CAN.

21            **THE COURT:**  DID THEY LOOK AT THAT?

22            **MR. DUBNER:**  OH, OKAY.  WE CAN JUST HAVE MARTHA DRAW

23   ON IT IF THAT'S STILL CAUSING PROBLEMS.

24            **MR. ARCHEY:**  I THINK THAT WAS A TOUCHDOWN PLAY FOR

25   LSU.

0 1 : 3 2

1          **MR. DUBNER:**  AND IF I COULD APPROACH TO JUST HAND OUT

2   A DEMONSTRATIVE?

3          **THE COURT:**  YOU MAY.  SHOW IT TO OPPOSING COUNSEL

4   FIRST.

5   **BY MR. DUBNER:**

6   **Q.**   SO DR. VASSALLO, I JUST HANDED YOU UP A CHART ABOUT

7   PATIENT NO. 42.  WAS THIS ONE OF THE PATIENTS WHO YOU -- WHOSE

8   RECORDS YOU REVIEWED?

9   **A.**   YES.

10  **Q.**   AND CAN YOU GIVE AN OVERVIEW OF WHAT HAPPENED WITH THIS

11  PATIENT?

12  **A.**   THE CALL CAME IN AT 2318, WHICH IS 11:18 P.M. AT NIGHT,

13  THAT THE PATIENT WAS TOTALLY UNRESPONSIVE.  AND THE GLASGOW

14  COMA SCALE OF THREE MEANS HIS VERBAL, MOTOR, AND EYE OPENING,

15  WAS -- THE PATIENT WAS TOTALLY UNCONSCIOUS.  IF YOU'RE DEAD YOU

16  GET A THREE, SO VERY UNCONSCIOUS.  AND AT THAT TIME, THE

17  PATIENT WAS TRANSPORTED APPROPRIATELY TO THE ATU, AND THERE

18  WERE SEVERAL OBSERVATIONS MADE IN THE ATU, WHICH IS LISTED

19  HERE.  AND THE PATIENT, UNCONSCIOUS, HAD SMALL PUPILS AND

20  NORMAL RESPIRATIONS, WAS GIVEN NALOXONE, WHICH IS NARCAN.

21  **Q.**   AND WHY DON'T WE PULL UP THE RECORD THAT SHOWS THIS, SO

22  THAT YOU CAN DEMONSTRATE WHAT YOU'RE TALKING ABOUT IN THE

23  DOCUMENT.

24          IF YOU COULD GIVE US JOINT EXHIBIT 10 AT 15238.

25          **THE COURT:**  I'M CONFUSED BECAUSE THIS IS SAYING THAT

1   YOUR SOURCE IS PLAINTIFFS' EXHIBIT 6.

2            **MR. DUBNER:**  THAT IS WHERE IN THE EXPERT REPORT IT

3   REFERS TO IT.

4            **THE COURT:**  GOTCHA.

5            **MR. DUBNER:**  RATHER THAN WHERE THE ACTUAL RECORDS

6   DOES.

7            **THE COURT:**  ALL RIGHT.  SO THE RECORDS ARE JOINT

8   EXHIBIT WHAT?

9            **MR. DUBNER:**  JOINT EXHIBIT 10 AT 15238 AND I

10  BELIEVE -- DO YOU KNOW WHICH IS THE JOINT EXHIBIT?

11           **MS. MONTAGNES:**  IT'S JOINT EXHIBIT 10P.

12           **THE COURT:**  CARRY ON.

13  **BY MR. DUBNER:**

14  **Q.**   SO IF YOU COULD EXPLAIN WHAT THIS RECORD SHOWS?

15  **A.**   SO THIS RECORD STARTS AT THE TIME IS 2338.

16           IS THIS A TOUCHSCREEN?  OR SHOULD I JUST --

17           **THE COURT:**  IT IS A TOUCHSCREEN BUT IT'S BROKEN.

18           **THE WITNESS:**  OKAY.

19           **THE COURT:**  SO THERE YOU GO.

20           **THE WITNESS:**  ALL RIGHT.  WELL, I TOUCHED IT AND

21  NOTHING HAPPENED.

22           **THE COURT:**  IT WILL BE FIXED THIS AFTERNOON.

23  **BY MR. DUBNER:**

24  **Q.**   MARTHA CAN HIGHLIGHT THINGS IF YOU WANT TO REQUEST THAT

25  SHE HIGHLIGHT ANYTHING.

**A.**   SO YOU SEE TIME 2338, THAT'S 11:38 P.M., AND WHAT'S

IMPORTANT IN THIS FIRST ROW IS THAT THE PATIENT IS NOW IN THE

ATU.  THE PULSE IS 60.  THE BLOOD PRESSURE IS 153/60 OR 163.

BUT THE RESPIRATIONS ARE 12.  SO THAT'S A PRETTY GOOD

RESPIRATORY RATE, BUT THE PATIENT IS UNRESPONSIVE.

IF YOU'RE UNRESPONSIVE -- AND THIS IS COMPLICATED.  THIS IS

WHERE PEOPLE ARE TRAINED FOR YEARS TO UNDERSTAND THIS, AND I

DON'T EXPECT AN EMT TO UNDERSTAND THIS.

BUT WHAT'S INTERESTING IS THIS PATIENT IS GIVEN

NARCAN INTRAVENOUSLY.  TWO MINUTES LATER -- NARCAN REVERSES

OPIATES.  TWO MINUTES -- AT 2340, AND IT SAYS NO EFFECT.

NARCAN -- SO THE REASON WE USE NARCAN, IN SOME CASES -- USUALLY

NOT WITH RESPIRATORY RATES OF 12, BECAUSE IF YOU'RE UNCONSCIOUS

FROM AN OPIATE, THEN YOU'RE NOT BREATHING, WHICH IS WHY WE HAVE

30,000 PEOPLE DYING IN THIS COUNTRY FROM OPIATES.  THEY DIE OF

NOT BREATHING, NOT FROM UNCONSCIOUSNESS.  THOSE TWO THINGS GO

TOGETHER.

SO THEY GAVE IT.  NOTHING HAPPENED, NO RESPONSE.  SO

RIGHT AWAY THIS IS NOT AN OPIATE.  IT'S NOT AN OPIATE BECAUSE

OF THE VITALS SIGNS, IT'S NOT AN OPIATE BECAUSE THERE'S NO

RESPONSE FOR NARCAN.  OKAY?  SO WE STILL HAVE AN UNRESPONSIVE

PERSON, AND IF YOU LOOK ON THAT RIGHT -- AND THEN THE

UNRESPONSIVE PERSON, WHO IS HAVING A -- AS YOU CAN SEE ON THE

LOWER RIGHT PHYSICIAN ASSESSMENT OF THE EMTS CONTINUOUSLY ARE

CHARTING, WHAT THEY ARE TRAINED TO DO, IS TO MAKE THE

1   OBSERVATION OF THE VITAL SIGNS.

2   **Q.**   AND TO STEP BACK FOR A MOMENT.  IS THERE A PHYSICIAN

3   PRESENT AS FAR AS THE RECORD REFLECTS?

4   **A.**   NO.

5   **Q.**   YOU CAN CONTINUE.

6   **A.**   SO THEN IT SAYS TOXCUP.  SO THAT MEANS -- AND I OBSERVED

7   THIS WHEN I WAS IN THE ATU, AND AS A TOXICOLOGIST, I WAS VERY

8   INTERESTED IN THIS.  AND SO THEY GET SOME URINE.  IN THIS CASE,

9   THE PATIENT IS UNRESPONSIVE, SO THEY ARE PUTTING A FOLEY

10   CATHETER IN THE PENIS TO OBTAIN URINE.  THE PROBLEM IS THAT IN

11   CURRENT MEDICAL PRACTICE, THERE'S NO POINT TO THAT.  AND THE

12   REASON THERE'S NO POINT IS BECAUSE IF YOU MOJO, SYNTHETIC

13   CANNABINOIDS OR COCAINE OR MARIJUANA, WHATEVER IT IS, JUST EVEN

14   IF YOUR ALCOHOL LEVEL IS SKY HIGH DOESN'T MEAN THAT YOU'RE

15   UNRESPONSIVE FROM THAT CAUSE.  THIS IS A VERY JUNIOR KIND OF AN

16   ERROR TO MAKE.

17            SO WHAT IF THE TOXCUP WAS POSITIVE FOR MOJO OR

18   SYNTHETIC CANNABINOIDS OR WHATEVER THAT TOXCUP IS LOOKING FOR,

19   IT DOESN'T MEAN THAT THAT'S THE CAUSE.  SO THE PROBLEM IS THE

20   ATTRIBUTION, THE UNDERSTANDING THAT IF THE TOXICOLOGY SHOWS

21   SOMETHING, THAT THAT'S THE PROBLEM.  THAT IS SUCH A -- I MEAN,

22   WE TEACH MEDICAL STUDENTS THAT ALL THE TIME.  AND IT

23   SPECIFICALLY SPEAKS TO THAT ACTUALLY IN THE EMS.GOV PROTOCOLS

24   SAYING, DON'T THINK THAT JUST BECAUSE SOMEBODY HAS AN ALCOHOL

25   LEVEL THAT'S HIGH, THAT THAT IS THE CAUSE OF THEIR

01:38 1    UNCONSCIOUSNESS; IN THIS CASE, IT'S UNRESPONSIVENESS.

2              SO WE ARE DOING A CATHETERIZATION ON SOMEBODY THAT

3    THE RESULTS OF THE TOXCUP HAVE NO BEARING ON THE DIAGNOSIS.

4    AND IF YOU'RE USING IT TO MAKE THE DIAGNOSIS, YOU DON'T KNOW

5    WHAT YOU'RE DOING.  AND THEN -- SO WE HAVE THOSE TWO THINGS

6    HAPPENING.

7              WE DO HAVE NOW THREE -- WE CAN SEE THERE JUST BELOW,

8    IT SAYS THIRD LITER OF NORMAL SALINE AT 2:45.  SO THERE'S

9    NORMAL SALINE BEING GIVEN.  THREE LITERS, I'M NOT SURE WHY

10   THREE LITERS.  THE PATIENT DOESN'T HAVE A LOW BLOOD PRESSURE.

11   THEY PUT A FOLEY CATHETER IN, SO IT'S NOT SO HE'LL URINATE,

12   BECAUSE YOU PUT A FOLEY CATHETER IN, YOU'RE GOING TO GET SOME

13   URINE OUT.  I DON'T KNOW.

14   Q.   AND TO STEP BACK.  WHAT IS NORMAL SALINE USUALLY GIVEN

15   FOR?

16   A.   WELL, IT CAN BE GIVEN JUST WITH VERY LITTLE REASON.  WE

17   JUST START A SALINE IV, BUT THE PROBLEM HERE IS WHEN YOU HAVE

18   SOMEONE UNRESPONSIVE, YOU HAVE A DIFFERENTIAL DIAGNOSIS.  YOU

19   HAVE A SET OF THINGS THAT COULD BE WRONG WITH THE PATIENT, AND

20   YOU CAN'T JUST WILLY NILLY GIVE THREE AND EVENTUALLY FOUR

21   LITERS OF NORMAL SALINE.  WE HAVE THAT ALL THE TIME.

22   Q.   AND WHAT ARE SOME OF THE THINGS THAT THE SYMPTOMS SO FAR

23   COULD HAVE BEEN CONSISTENT WITH?

24   A.   CLEARLY, IT COULD BE -- UNCONSCIOUSNESS COULD BE A PROBLEM

25   WITH ELECTROLYTES, SUCH AS THE SODIUM.  THAT'S 110, IN WHICH

01:40   1   CASE THIS IS NOT APPROPRIATE.  IT COULD BE TRAUMA, IT COULD BE

2   A HEMORRHAGE, IT COULD BE A STROKE.  THOSE ARE JUST SOME OF THE

3   EASY, EASY THINGS.

4          A BLEED INTO THE HEAD OR A STROKE, ESPECIALLY IN THE

5   BRAIN STEM, WILL GIVE YOU EXACTLY THIS, 2-MILLIMETER PUPILS,

6   WHICH WAS DOCUMENTED SEVERAL TIMES, A TOTALLY UNRESPONSIVE

7   PATIENT.  AND WHEN YOU WATCH THOSE VITAL SIGNS, AND YOU SEE

8   THAT THE PATIENT IS ON OXYGEN, THAT'S GOOD, WE THINK.  AND YOU

9   SEE THAT THERE'S FROM 0008, WHICH IS 12:08, TO 1:45, THAT THE

10  EMERGENCY MEDICINE TECHNICIAN SAYS, RESPONSIVE TO VERBAL AND

11  PAINFUL STIMULI.

12         SO WHAT IS THE MEANING OF THAT WHEN SOMEONE IS DYING

13  FROM A STROKE?  NOTHING.  PEOPLE ARE DYING, AND THEY OFTEN WILL

14  MOAN, MOVE, MOVE THINGS.  WHAT IS THE MEANING OF THAT?  THE

15  LEVEL OF -- THE LEVEL OF JUDGMENT AND KNOWLEDGE AND TRAINING TO

16  IDENTIFY A STROKE OR TO IDENTIFY WHAT'S HAPPENING HERE IS WAY

17  ABOVE EVEN A PARAMEDIC LEVEL OF TRAINING.

18         AND SO THERE'S NOTHING GOOD HAPPENING THERE, AND

19  WE'RE SITTING AROUND WATCHING A PATIENT NOW FROM 11:38 IN THE

20  ATU TO -- THIS PARTICULAR PAGE STOPS AT 2:45 A.M.

21  Q.   AND WHY DON'T WE MOVE TO THE NEXT PAGE.

22         THE COURT:  HOLD ON JUST A MINUTE.  I NEED TO ASK A

23  QUESTION.  OKAY, SO A PATIENT PRESENTS WITH WHAT WE SEE HERE.

24  WHAT SHOULD HAVE BEEN DONE?

25         THE WITNESS:  WHAT SHOULD HAVE BEEN DONE WHEN

01:41   1   SOMEONE'S UNRESPONSIVE, THAT PATIENT SHOULD GO TO A HOSPITAL.
2   NOW --
3           THE COURT:  OKAY, THEY'RE AT THE ATU.
4           THE WITNESS:  OKAY, I MEAN, OUT OF THE ATU, OFF THE
5   PREMISES, TO THE HOSPITAL.
6           THE COURT:  OKAY, SO WHAT SHOULD HAVE BEEN DONE TO
7   STABILIZE HIM OR HER -- WELL, IT'S OBVIOUSLY A HIM.
8           THE WITNESS:  WELL, IN THIS CASE, THE PATIENT HAD --
9   THE BLOOD SUGAR WAS CHECKED.  THE PATIENT DID NOT SEEM TO NEED
10  ANY HELP WITH INTUBATION OR THE PATIENT WAS BREATHING AT 12.
11          THE COURT:  BREATHING.
12          THE WITNESS:  THE PATIENT IS STABLE TO GO.  WHAT
13  WE -- AND LET'S JUST SAY THAT YOU DON'T KNOW AND YOU JUST DON'T
14  KNOW ANYTHING ABOUT THE USE OF NARCAN.  YOU DON'T UNDERSTAND
15  THAT A RESPIRATORY RATE OF 12 MEANS IT CANNOT BE AN OPIATE, AND
16  YOU GIVE NARCAN.  THE ANSWER TO NARCAN IS IMMEDIATE.  THEY WAKE
17  RIGHT UP AND SAY, HEY, DOC, GIVE ME MY METHADONE.  IT'S AN
18  ABSOLUTE CLEARING OF THE MENTAL STATUS.  EVEN IF YOU DON'T
19  UNDERSTAND THE USE OF NARCAN, WHAT YOU SHOULD KNOW IS IF
20  SOMEBODY IS UNRESPONSIVE AND SOMEWHERE ON HERE HAD A GLASGOW
21  COMA SCALE, I THINK, ALSO --
22          DO WE HAVE THAT ON THE NEXT PAGE?
23          MR. DUBNER:  ON THE PREVIOUS PAGE.
24          THE WITNESS:  OKAY.
25          THE COURT:  OKAY.  SO --

1       THE WITNESS:  OF THREE, I MENTIONED THAT.

2       THE COURT:  SO MISTAKE TO GIVE THE NARCAN BECAUSE THE

3  GUY'S GOT A RESPIRATORY RATE, SO BUT GIVES THE NARCAN, DOUBLE

4  MISTAKE, BECAUSE NOW THE PATIENT DOESN'T WAKE UP AND RESPOND AS

5  YOU WOULD INDICATE, OR AS WOULD BE INDICATED FROM NARCAN.  SO

6  SHOULD NOT HAVE HAD A TOXCUP, OR WHATEVER THAT THING IS CALLED,

7  A TOX SCREEN, NONE OF THAT.  SHOULD HAVE JUST BEEN TRANSPORTED

8  TO WHEREVER, BATON ROUGE OR NEW ORLEANS OR ST. FRANCISVILLE OR

9  SOMEWHERE.

10      THE WITNESS:  THAT'S ABSOLUTELY RIGHT, YOUR HONOR.

11      THE COURT:  OKAY.

12  BY MR. DUBNER:

13  Q.   AND IF I COULD FOLLOW-UP ON THAT WITH A COUPLE OF

14  QUESTIONS.  WHEN YOU SAID "STABILIZE A PATIENT FOR PRE-HOSPITAL

15  CARE," HOW LONG ARE EMTS USUALLY STABILIZING A PATIENT FOR?

16  A.   IT DEPENDS ON WHERE YOU ARE.  I MEAN, WHEN I PRACTICED IN

17  AMARILLO, IT CAN BE 45 MINUTES TO GET TO A HEALTHCARE FACILITY.

18  IT'S NOT THAT LONG HERE.  I MEAN, IT TAKES TIME.  BUT WHATEVER

19  THAT PERIOD IS, IT'S USUALLY RELATIVELY SHORT.

20      WHEN I FLEW HELICOPTER AS A DOCTOR, WE'D FLY OUT, I'D

21  LIE DOWN IN THE MUD, WE'D INTUBATE THE PATIENT IN THE MUD IN

22  ANN ARBOR AND FLY BACK TO DETROIT.  IT WAS 35 MINUTES.

23  Q.   IS IT TYPICAL FOR EMTS TO STABILIZE AND MONITOR A PATIENT

24  IN ONE LOCATION FOR AN EXTENDED PERIOD OF TIME?

25  A.   NO.  THIS IS THE ENTIRE -- YOU'VE JUST EXPLAINED THE

01:42

1  ENTIRETY OF THE PROBLEM --

2  **Q.**   AND --

3  **A.**   -- AS IT'S DEMONSTRATED HERE, PARTICULARLY.

4  **Q.**   AND ONE OF THE CONDITIONS THAT YOU REFERENCED THIS IS

5  CONSISTENT WITH IS A STROKE.  WHAT IS THE IMPORTANCE OF TIMELY

6  DIAGNOSIS AND TREATMENT OF A STROKE?

7  **A.**   WELL, THE IMPORTANCE IS THAT TIME IS BRAIN.  I MEAN, THE

8  TIME THAT YOU HAVE NO BLOOD FLOW, WHICH IS THAT THE BLOOD

9  VESSEL IS BLOCKED BY A CLOT, EITHER THAT FLEW THERE OR

10  DEVELOPED THERE BECAUSE YOU HAVE ATHEROSCLEROSIS, OR HARDENING

11  OF THE ARTERIES, OR YOU BLED INTO THE BRAIN FROM EITHER HIGH

12  BLOOD PRESSURE OR BECAUSE YOU JUST HAVE LOUSY ARTERIES, AND YOU

13  POPPED ONE.  AND IT'S PUTTING PRESSURE ON THE BRAIN, AND NOW

14  YOU'RE GIVING ALSO 4 LITERS.

15          YOU HAVE A BRAIN HERE -- IF YOU HAVE A STROKE, YOU

16  HAVE A BRAIN IN A BOX, WHICH IS THE SKULL IS GETTING TIGHTER

17  AND TIGHTER AND TIGHTER, AND NOW YOU ARE STARTING TO KILL THE

18  PATIENT.  SO THE STROKE TODAY -- STROKE CARE IS EXTREMELY

19  ADVANCED TODAY AND IN THE LAST FIVE -- ACTUALLY, TEN YEARS.

20  **Q.**   AND WHEN A PATIENT DOESN'T GET TIMELY CARE FOR A STROKE,

21  CAN THAT EXACERBATE THE DEFICITS OR INJURY TO THE PATIENT?

22  **A.**   OF COURSE.

23  **Q.**   LET'S MOVE TO THE NEXT PAGE AND JUST QUICKLY LOOK AT THIS.

24  SO ON THE PAGE WE LOOKED AT SO FAR, THE PATIENT WAS BROUGHT TO

25  THE ATU AT 11:38, AND WE SEE THROUGH 2:45 IN THE MORNING.

1    IF WE COULD LOOK AT JOINT EXHIBIT 10 AT 15237.  HOW
2 LONG DID EMTS CONTINUE TO MANAGE THE PATIENT WITHOUT A --
3 WITHOUT TRANSPORT?
4 **A.**   WELL, AT 7:29 A.M. DR. LAVESPERE SAID TO TAKE THE PATIENT
5 TO OUR LADY OF THE LAKE, OLOL.  SO THAT WAS FROM 11:30,
6 APPROXIMATELY, AT NIGHT WHEN THE PATIENT GOT TO THE ATU UNTIL
7 7:30 IN THE MORNING.  AND THEN THE PATIENT LEFT, BUT THE DOCTOR
8 MAY HAVE BEEN THERE.  I DON'T KNOW IF THAT "PER DR. LAVESPERE,"
9 IF HE CAME IN THE MORNING OR IF HE DIDN'T, I DON'T KNOW, BUT IT
10 WAS AT LEAST TEN HOURS, FROM 11:30 TO 7:30.
11 **Q.**   AND IF WE LOOK AT THE BOTTOM OF THE PAGE, WHAT TIME DID
12 THE PATIENT ACTUALLY LEAVE THE ATU?
13 **A.**   0924 IS 9:24 A.M.
14 **Q.**   AND IN ALL THIS TIME, IS THERE ANY EVIDENCE OF A DOCTOR
15 EXAMINING THE PATIENT?
16 **A.**   NO, THERE'S NO EXAMINATION.
17 **Q.**   AND --
18 **A.**   THE MOST IMPORTANT PART OF THE EXAMINATION IS THE
19 NEUROLOGIC EXAMINATION.  MORE RESPONSIVE IS A NICE THING TO
20 NOTE, BUT THERE ARE A LOT MORE TO IT WHEN YOU'RE HAVING A
21 STROKE.  NO FACIAL DROOP, THAT'S GOOD.  BUT THIS IS A
22 COMPLICATED CASE.  THIS PATIENT IS UNRESPONSIVE, NEAR DEATH.
23 **Q.**   WHAT ARE SOME OF THE TESTS THAT NEED TO BE PERFORMED ON A
24 PATIENT SUCH AS THIS?
25 **A.**   WELL, WE ALWAYS START WITH A CAT SCAN WITHIN A FEW MINUTES

01:47

1    OF HITTING THE ER.  NO MATTER WHAT, THIS PATIENT IS GOING TO

2    GET A CAT SCAN, AND THEN IT GOES FROM THERE.  STROKE WORKUPS

3    ARE COMPLICATED, AND KNOWING THAT EVEN IF THE CAT SCAN IS

4    NEGATIVE, WHICH USUALLY IT IS, WHEN THERE'S A QUICK ONSET.  IF

5    I HAVE A STROKE RIGHT THIS MINUTE, IN THE NEXT 15 MINUTES OR 30

6    MINUTES, WHEN I GET TO THE HOSPITAL, MY CAT SCAN IS GOING TO BE

7    NEGATIVE BECAUSE I'M SITTING HERE TALKING.  BUT OVER TIME AS

8    SWELLING HAPPENS, IT STARTS TO LOOK WRONG.  SO THAT'S WHY IF I

9    HAVE THE SYMPTOMS OF A STROKE, I GET A CAT SCAN TO MAKE SURE

10   THERE'S NO BLOOD IN THE BRAIN.  I GET AN EXAMINATION BY SOMEONE

11   WHO KNOWS WHAT STROKES LOOK LIKE, AND THEN I GO TO MRI OR SOME

12   OTHER MORE ADVANCED IMAGING.  BUT CAT SCAN IS FIRST.

13   **Q.**   AND SO LET'S, VERY BRIEFLY, LOOK AT JOINT EXHIBIT 10 AT

14   15210.  THIS IS ALL STILL PART OF JOINT EXHIBIT 10P.

15          AND COULD YOU BRIEFLY TELL THE COURT, EXPLAIN WHAT

16   THESE RECORDS SHOW?

17   **A.**   SO THIS IS AT 1:00 IN THE AFTERNOON.  THE PATIENT LEFT

18   ANGOLA AROUND 9:30, AND THEN BY THE TIME -- WHEN THE PATIENT

19   HIT THE EMERGENCY DEPARTMENT IN THE HOSPITAL, OF COURSE, THE

20   PATIENT GOES FOR A CAT SCAN RIGHT AWAY.  AND THEN THE

21   NEUROLOGIST SEES THE PATIENT BECAUSE IF YOU CALL THEM TOO

22   EARLY, THEY JUST SAY, GET A CAT SCAN.  GET A CAT SCAN WAS

23   GOTTEN.  AND THEN THEY WROTE A NOTE, WHICH IS USUALLY SOME

24   PERIOD AFTERWARDS.

25          THE CAT SCAN, WHICH WAS OBTAINED UPON ARRIVAL OF THE

1    PATIENT, SHOWED A STROKE, AND NOT ONLY A STROKE, BUT 5

2    MILLIMETERS OF SHIFT.  WHAT THAT MEANS IS WE HAVE A BRAIN IN A

3    BOX, WHICH IS A RIGID BOX, AND THAT BRAIN IS SWELLING AND

4    SWELLING FROM LACK OF OXYGEN AND IT'S STARTING TO MOVE.  AND

5    THE EASIEST PLACE FOR IT TO EVENTUALLY MOVE IS OUT THE HOLE OF

6    THE SPINAL CORD COMES UP.  SO IT STARTS TO SHIFT DOWN, AND

7    USUALLY 7 MILLIMETERS OF SHIFT IS ENOUGH TO GO AND HAVE A

8    CRANIOTOMY, AND YOU MIGHT EVEN HAVE HALF YOUR SKULL TAKEN OFF

9    TO MAKE ROOM IN THE BOX.  SO THIS IS A SEVERE STROKE WITH

10    SWELLING REFLECTIVE OF THE TEN HOURS THAT THE PATIENT WAS

11    RECEIVING NO STROKE CARE.

12    Q.    AND IS THERE ANY POSSIBLE CONNECTION BETWEEN THE SALINE

13    THAT YOU MENTIONED AND THE 5-MILLIMETER SHIFT?

14    A.    YES.  BUT YOU KNOW WHAT?  THAT PATIENT MIGHT HAVE HAD 5

15    MILLIMETERS OF SHIFT WITHOUT SALINE.  THIS WAS A SEVERE STROKE

16    BUT IT DIDN'T HELP.

17    Q.    WHAT DO YOU MEAN THAT "IT DIDN'T HELP"?

18    A.    WELL, GIVING SOMEBODY WITH HAVING A STROKE 4 LITERS,

19    ACTUALLY, I CAN'T -- THIS PARTICULAR CASE, THERE WAS NO REASON

20    TO GIVE 4 LITERS.

21    Q.    WHAT EFFECT COULD THAT KIND OF SALINE HAVE ON A PATIENT

22    HAVING A STROKE OR JUST HAD A STROKE?

23    A.    TO FURTHER BRAIN SWELLING.

24    Q.    THANK YOU.

25              SO WE'VE GONE, OBVIOUSLY, IN DETAIL INTO THIS

01:49   1   PATIENT.  DID YOU SEE SIMILAR PROBLEMS THROUGHOUT THE RECORDS

2   THAT YOU LOOKED AT?

3   **A.**   YES.

4   **Q.**   DID THEY COVER THE WHOLE TIME PERIOD OF RECORDS THAT YOU

5   WERE LOOKING AT?

6   **A.**   YES.

7   **Q.**   AND WE COULD TAKE A BREAK HERE OR I COULD KEEP GOING FOR

8   ANOTHER SECTION?

9           **THE COURT:**  NO.

10          **MR. DUBNER:**  OKAY.

11          **THE COURT:**  KEEP GOING.  I'D LIKE TO TRY TO FINISH BY

12  2:30, AND I REALLY DON'T WANT THE DOCTOR TO HAVE TO COME BACK

13  TOMORROW FOR THE CROSS.

14          **MR. DUBNER:**  OF COURSE, AND SHE IS EXPECTING TO COME

15  BACK FOR TOMORROW, SO THAT'S NOT A CONCERN OF HER.

16          **THE COURT:**  ALL RIGHT.  WELL, THEN, LET'S JUST CARRY

17  ON.

18  BY MR. DUBNER:

19  **Q.**   WHEN YOU CONDUCTED YOUR SITE VISIT IN 2016, YOU SAID YOU

20  HAD THE OPPORTUNITY TO SPEND SOME TIME IN THE ATU.  DID YOU

21  WITNESS ANY EMERGENCY CARE IN PERSON?

22  **A.**   I WAS THERE FOR ABOUT THREE HOURS, AND DURING THAT TIME, A

23  CALL CAME IN THAT SOMETHING WAS WRONG IN ONE OF THE TIERS, AND

24  EVERYBODY KIND OF RAN, AND I RAN WITH THEM.  THEY SAID I COULD

25  COME, AND THEY INDICATED WITH THEIR HAND PUSHING UPWARDS, AND I

01:50  1  SAID, WHAT DOES THAT MEAN?  AND THEY SAID IT'S A HANGING.  AND

2  SO THERE WAS SOMEONE WHO HUNG HIMSELF AND WHO WAS BROUGHT BY

3  THE PARAMEDIC, APPROPRIATELY HAVING BEEN BROUGHT FROM A HANGING

4  INTO THE EMERGENCY DEPARTMENT, WHICH IS THE ATU IN THIS CASE.

5  **Q.**   WHAT DO YOU MEAN WHEN YOU SAY "APPROPRIATELY"?

6  **A.**   WELL, BECAUSE THAT'S EXACTLY WHAT EMTS SHOULD DO, AND

7  THANK GOD THEY'RE THERE.  AND, ACTUALLY, THIS WAS VERY GOOD

8  CARE IN THE SENSE THAT THAT EMT -- I MEAN, I SHOULD SAY EMTP,

9  PARAMEDIC, NASAL TRACHEALLY INTUBATED THE PATIENT.  BUT THAT'S

10  NOT SO EASY.  I'M GOOD AT IT 'CAUSE I'M ONE OF THE OLD -- BUT A

11  LOT OF PEOPLE DON'T EVEN KNOW HOW TO DO THAT ANYMORE -- THAT

12  IS, THE PATIENT'S BREATHING, SO YOU'RE GOING TO PUT A TUBE INTO

13  THEIR NOSE AND GUIDE IT INTO THE WINDPIPE.  YOU CAN IMAGINE

14  THAT THAT'S HARD TO DO SOMETIMES.

15        SO HE DID A GOOD JOB.  AND WHEN HE ARRIVED -- WHEN

16  THE PATIENT ARRIVED IN THE ATU, THE PATIENT WAS PROPERLY BEING

17  BAGGED, WHICH IS WHEN YOU ARE INFLATING THE LUNGS.  NOW, THE

18  THING IS, THIS PATIENT WAS UNCONSCIOUS, POSTURING, WHICH MEANS

19  THERE'S A CERTAIN KIND OF MOVEMENT EXTENSION HERE, AND

20  INADEQUATELY BREATHING BECAUSE OF HIS UNCONSCIOUSNESS IN HIS

21  INJURY.

22  **Q.**   SO THE CARE, YOU SAID, WAS APPROPRIATE UP UNTIL THE

23  PATIENT REACHED THE ATU?

24  **A.**   RIGHT.

25  **Q.**   WHAT HAPPENED IN THE ATU ITSELF?

**A.**   WELL, SO THEN DR. TOCE RECEIVED THE PATIENT AND ALL
BAGGING STOPPED.  AND I HAVE TO GIVE DR. LAVESPERE TOTAL
CREDIT.  HE CAME IN ABOUT -- I WAS STANDING THERE THE WHOLE
TIME -- ABOUT 10 OR 15 MINUTES LATER, SAW THAT HE HAD A PATIENT
WHO WAS UNCONSCIOUS, POSTURING, AND NOT RECEIVING ANY KIND OF
BAGGING, AND HE STEPPED UP AND SAID WE GOT TO GET BAGGED.  SO
THE -- THAT 10 OR 15 MINUTES, THE PATIENT WAS BEING
INADEQUATELY VENTILATED, NOT GETTING OXYGEN AND GAS EXCHANGES
AS IT SHOULD HAVE BEEN GIVEN, AND DR. LAVESPERE RECOGNIZED
THAT.

**Q.**   BUT WAS THERE ANYBODY ON SCENE WHO SHOULD HAVE RECOGNIZED
IT SOONER?

**A.**   WELL, DR. TOCE TO START WITH.  I MEAN, HE RECEIVED THE
PATIENT.  HE WAS STANDING RIGHT THERE, AND THE PATIENT WAS JUST
OVER THERE WITH A LITTLE OXYGEN MASK STUCK ON POSTURING
UNCONSCIOUS WITH A SEVERE ANOXIC, MEANING LACK OF OXYGEN, WHILE
HE WAS HANGING, INJURY TO THE BRAIN.

**THE COURT:**  WHAT IS "POSTURING"?

**THE WITNESS:**  "POSTURING," YOUR HONOR, IS WHEN YOU
HAVE A CERTAIN INJURY EITHER TO THE BRAIN UP HERE OR TO THE
LOWER PART OF THE BRAIN.  YOU EITHER CURVE UP OR CURVE DOWN.

**THE COURT:**  I'M SORRY.

**MR. ARCHEY:**  YOUR HONOR, THEY NEVER GAVE THE NUMBER.

**MR. DUBNER:**  OH.

**MR. ARCHEY:**  THIS IS PATIENT 44?

01:53  1          **MR. DUBNER:**  I APOLOGIZE FOR THAT.  YES, THIS IS

2    PATIENT 44 IN THE REPORT.  WE ACTUALLY HAVE -- SO THE MEDICAL

3    RECORDS FOR THIS ARE DX744.  THEY ARE NOT YET ADMITTED INTO

4    EVIDENCE.  WE HAVE AN OBJECTION BASED ON WHEN THEY WERE

5    PRODUCED, BUT PLAINTIFFS WITHDRAW THAT OBJECTION.  SO THOSE CAN

6    BE MOVED INTO EVIDENCE.  AND SO IF WE COULD LOOK AT --

7          **THE COURT:**  IS THERE ANY OBJECTION TO D -- OBVIOUSLY,

8    NOT, IT'S YOUR EXHIBIT.  SO D744 IS ADMITTED?

9          **MR. DUBNER:**  YEAH, DX744.  SORRY.  I CONTINUE TO PUT

10   THE X IN.

11          IF WE COULD GET PAGE 91, PAGE 91 OF THE

12   DEFENDANTS' 744.  IT SHOULD NOT BE ON THE GALLERY, NO.

13   **BY MR. DUBNER:**

14   **Q.**   AND DR. VASSALLO, I BELIEVE THESE ARE THE NOTES FROM THAT

15   ENCOUNTER IN THE ATU.  FIRST, I'D LIKE TO DRAW YOUR ATTENTION

16   TO WHERE IT SAYS "SEE SPINE X-RAY."  CAN YOU EXPLAIN WHAT THAT

17   INDICATES HERE?

18   **A.**   WELL, SO -- AND I OBSERVED THIS 'CAUSE I WAS IN THE ROOM.

19   SO THE PATIENT IS THERE POSTURING, NOT BEING BAGGED, WHO IS

20   THEN TAKEN FOR A CAT SCAN -- I MEAN, EXCUSE ME -- NOT A -- A

21   PLANE X-RAY OF THE C-SPINE.  NOW, A PATIENT WHO'S HANGING HAS A

22   POSSIBLE INJURY TO THE NECK, SO YOU WOULD THINK THAT GETTING A

23   C-SPINE X-RAY IS A GOOD IDEA, BUT IF IT'S POSITIVE, SHOWING AN

24   ABNORMALITY, OR IF IT SHOWS NO ABNORMALITY, THE C-SPINE

25   PRECAUTIONS HAVE TO BE MAINTAINED.

1    IN OTHER WORDS, YOU'RE NOT GOING TO SAY, OH, THAT ONE

2    VIEW OF THAT CERVICAL SPINE LOOKED GOOD TO ME, SO WE'RE GOING

3    TO TAKE OFF THE COLLAR AND LET THE GUY BOUNCE AROUND.  THE FACT

4    IS THAT IN THIS CASE, THIS C-SPINE X-RAY EVENTUALLY WAS READ AS

5    INADEQUATE, AND ONE OF THE PROBLEMS WITH GETTING ONE VIEW IN

6    SUCH A CRITICAL SITUATION IS THAT OFTEN YOU ARE NOT ABLE TO GET

7    AN ADEQUATE VIEW.  IT'S ONE VIEW, AND THINGS ARE MISSED, AND

8    THAT VIEW WAS INADEQUATE FOR THE LOWER C-SPINE.

9    SO WHAT WE'RE DOING HERE IS WE'RE SPENDING TIME AND

10   WE'RE SPENDING TIME DOING SOMETHING THAT'S NOT GOING TO CHANGE

11   YOUR CLINICAL CARE OF THE PATIENT.  THE PATIENT IS GOING TO GET

12   A CAT SCAN OF THE NECK.  HE NEEDS TO GO TO A PLACE WHERE THE

13   PATIENT CAN BE SUPPORTED, GET THE CAT SCAN, AND THAT IS A

14   HOSPITAL.  THAT TOOK ABOUT TEN MINUTES, BUT IT WAS SYMPTOMATIC

15   TO ME OF THE LACK OF UNDERSTANDING.  I DON'T -- OR A LACK OF

16   GOOD PROTOCOL.  I'M NOT SURE WHAT.

17   Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE NOTE TO THE

18   RIGHT OF THE C-SPINE X-RAY, WHAT IS THIS NOTE?

19   A.   SO IT'S A DESCRIPTION, AND I HAVE THE IMPRESSION THAT THIS

20   WAS DONE BY THE PHYSICIAN, PATIENT FOUND HANGING FROM SHEET.

21   SECURITY TOOK HIM DOWN AND STARTED CPR.  EMT ARRIVAL, FOUND

22   PATIENT INTUBATED, WHATEVER.  I KNOW THAT THE PARAMEDIC, THE

23   EMTP, INTUBATED THE PATIENT.  HE WASN'T FOUND INTUBATED.

24   AND IN THE ATU, THE PATIENT HAD SPONTANEOUS

25   RESPIRATIONS BUT A DECREASE IN MENTAL STATUS.  THE PATIENT WAS

01:56 1    UNCONSCIOUS, AS WE KNOW, AND SOME DECEREBRATE POSTURING.

2    POSTURING IS JUST A SIGN IN THIS KIND OF AN INJURY TO THE BRAIN

3    FROM LACK OF OXYGEN FROM BEING HUNG.

4    **Q.**   IS THIS TYPICAL OF A NOTE THAT YOU WOULD SEE FROM AN

5    EMERGENCY MEDICINE PHYSICIAN?

6    **A.**   WELL, THE MORE SERIOUS THE CASE, USUALLY THE MORE WE

7    WRITE.  NOW, WE MIGHT NOT WRITE IT RIGHT THEN BECAUSE WHOEVER

8    WROTE THIS SHOULD BE MANAGING THE PATIENT.  I UNDERSTAND THAT.

9    WE MIGHT HAVE TO COME BACK TO THE RECORD AND WRITE EVERYTHING

10   WE CAN, INCLUDING A NEUROLOGIC EXAM.  THE FACT THAT THE

11   PATIENT -- WHATEVER THERE IS THAT'S HAPPENING, USUALLY A LOT OF

12   THINGS ARE HAPPENING WHEN SOMEONE JUST HUNG THEMSELF IS

13   POSTURING AND UNCONSCIOUS AND WENT FOR X-RAY.  BUT THIS

14   DOESN'T -- WHERE IS THE NEUROLOGIC EXAM?  CUT THE PATIENT'S

15   CLOTHES OFF.  ARE THERE OTHER INJURIES?  IT'S A SUICIDE

16   ATTEMPT, CUT THE PATIENT'S CLOTHES OFF.  YOU DON'T HAVE TO MOVE

17   THEM, DO AN EXAM.

18   **Q.**   AND WHY IS IT IMPORTANT TO HAVE THAT KIND OF MORE COMPLETE

19   DOCUMENTATION?

20   **A.**   WELL, IT'S IMPORTANT -- WELL, FIRST OF ALL, IT REFLECTS

21   THAT YOU DID THOSE THINGS.  THAT'S THE ONLY RECORD.  AND I

22   HAPPENED TO OBSERVE THIS ONE, AND I KNOW WHAT WAS AND WASN'T

23   DONE AND I KNOW THE PATIENT LEFT FULLY CLOTHED AND WAS NEVER

24   EXAMINED IN THAT WAY.  AND THIS IS A TOOL TO SAY WHAT YOU DID,

25   TO COMMUNICATE WITH OTHERS FOR THE FUTURE.  AND IT'S A PHYSICAL

01:58   1   EXAM AND A DIAGNOSIS HERE WAS STRAIGHTFORWARD, BUT IT SHOULD BE

2   WRITE DOWN -- WRITTEN DOWN.

3   **Q.**   AND WHY IS IMPORTANT TO HAVE THAT COMMUNICATION WITH

4   OTHERS WHO WILL REVIEW IT IN THE FUTURE?

5   **A.**   WELL, BECAUSE, IN GENERAL, A MEDICAL RECORD TELLS

6   EVERYBODY WHO EVER LOOKS AT IT WHAT THE DOCTOR THOUGHT AND DID,

7   DID AND THOUGHT.  IT'S THE MEDICAL DECISION-MAKING, HOW DID THE

8   DOCTOR THINK ABOUT THIS PATIENT AND TAKE ACTION, BASED ON WHAT

9   THE PATIENT -- WHAT THAT DOCTOR THOUGHT THE POSSIBILITIES WERE.

10   THIS WAS CLEAR-CUT.  THE PATIENT HAD AN INJURY TO THE BRAIN AND

11   MAYBE THE CERVICAL SPINE BECAUSE HE'D BEEN HANGING.

12   **Q.**   AND SO YOU SAID PIECES OF WHAT SHOULD AND SHOULDN'T HAVE

13   BEEN DONE.  JUST BRIEFLY, TO SUM UP ON THAT, WHAT SHOULD HAVE

14   BEEN DONE WITH THIS PATIENT ONCE HE ARRIVED AT THE ATU?

15   **A.**   WELL, FIRST OF ALL, HE NEEDS TO GET OUT OF THE ATU AND GO

16   STRAIGHT TO THE HOSPITAL WHICH IS -- I MEAN, YOU HAVE AN HOUR

17   OF TRANSPORT.  YOU HAVE A TRANSPORT TIME.  THE PATIENT ALSO IS

18   INTUBATED AND NEEDS TO BE SEDATED BECAUSE WE DON'T WANT THIS

19   PATIENT, WHO IS -- HAD AN INJURY TO THE BRAIN TO SUFFER MORE

20   INJURY, EITHER BY PULLING OUT HIS BREATHING TUBE, WILDLY

21   FIGHTING AND INCREASING HIS INTRACRANIAL PRESSURE, WHICH IS

22   INJURIOUS TO A BRAIN THAT'S ALREADY INJURED.  SO THERE'S

23   SEDATION, AND GET THE PATIENT OUT OF THE EMERGENCY DEPARTMENT,

24   SEND THEM TO THE HOSPITAL.  WHAT ARE WE GOING TO DO IN THE ATU

25   WITH THIS PATIENT?  NOTHING.

01:59   1   **Q.**   AND YOU REFERRED TO SEDATION.  LET'S GET ONE MORE DOCUMENT

2   ABOUT THIS PATIENT.  IF YOU COULD GIVE PAGE 92 OF DEFENDANTS'

3   EXHIBIT 744.  AND WHAT IS THIS DOCUMENT?

4   **A.**   THIS IS THE DOCUMENT THAT IS ACTUALLY DONE WHEN THE EMTS

5   IN THE AMBULANCE ARE TAKING THE PATIENT FROM THE ATU TO THE

6   HOSPITAL, OFF OF LSP'S GROUNDS, AND THE PATIENT IS -- WHAT'S

7   INTERESTING ABOUT THIS TO ME IS THAT THE -- THEY'RE HAVING

8   TROUBLE IN THE AMBULANCE AND THIS HAPPENS.  THEY GIVE A VALIUM,

9   10 MILLIGRAMS.  THE PATIENT IS GETTING WILD BECAUSE HE HAS

10   NO -- HIS BRAIN IS NOT FUNCTIONING BECAUSE HE HAS NO OXYGEN TO

11   HIS BRAIN FOR THE PERIOD HE WAS HANGING, WHATEVER IT WAS.  HE'S

12   GETTING WILD.  HE'S NOT AWAKE.  THIS WORD IS COMBATIVE.  THAT

13   DOESN'T MEAN THAT THE PATIENT IS AWARE THAT HE'S FIGHTING.

14   HE'S COMBATIVE, THAT MEANS YOU'RE -- IN THIS CASE, YOU START

15   PULLING AT THINGS, YOU'RE CONFUSED, AND YOU HAVE AN INJURY TO

16   YOUR BRAIN AND YOU'RE NOT THINKING.

17        SO THEN THEY CALL IN AND SOMEBODY GIVES AN ORDER TO

18   GIVE 10 MILLIGRAMS OF VALIUM.  THEN THEY GIVE IT AGAIN.  IT

19   DOESN'T WORK, AND THEN THEY GIVE PHENERGAN 12.5, WHICH IS AN

20   ANTI-NAUSEA, IT'S A PHENOTHIAZINE DRUG.  IT CAN MAKE A PERSON

21   SLEEPY BUT IN SUCH A DIRE SITUATION, WE HAVE AN INTUBATED

22   PATIENT WITH NO MENTAL STATUS AND A CERVICAL SPINE INJURY

23   POSSIBLY, YOU'VE GOT TO SEDATE THE PATIENT.  THE PATIENT

24   ALREADY HAS A BREATHING TUBE.  THE PATIENT IS NOT GOING TO DIE

25   OF THE SEDATION BECAUSE YOU GAVE TOO MUCH.  THE PATIENT HAS A

02:01   1   BREATHING TUBE,  KNOCK THEM OUT, PUT THEM DOWN, GET THEM THERE

2   SAFELY.  THIS PATIENT PULLED HIS TUBE UP, OUT BECAUSE SOMEBODY

3   GIVING ORDERS IS INADEQUATELY -- PHENERGAN IN THIS PATIENT,

4   THAT IS JUST NOT QUALITY CARE.

5   **Q.**   AND WHAT ARE SOME OF THE RISKS THAT CAN HAPPEN FROM A

6   PATIENT EXTUBATING HIMSELF IN THIS KIND OF A SITUATION.

7   **A.**   WELL, HE CAN DIE, HE CAN DIE.  HE CAN STOP BREATHING, HE

8   CAN VOMIT BECAUSE HE'S GOT A BRAIN INJURY, VOMIT AND ASPIRATE

9   AND DIE.

10   **Q.**   SO ONE QUESTION FROM A LITTLE BIT EARLIER ON THE PATIENT.

11   YOU REFERRED TO AN X-RAY BEING USED IN A SITUATION WHERE IT

12   SIMPLY WASN'T CALLED FOR.  IS THAT SOMETHING THAT YOU SAW IN

13   OTHER SITUATIONS, X-RAYS BEING USED WHEN A HIGHER LEVEL OF

14   DIAGNOSTIC WAS APPROPRIATE?

15   **A.**   YES.  IT WAS A FREQUENT -- I THINK WHEN YOU HAVE AN X-RAY,

16   YOU GET ONE, BUT THAT IS NOT TO SAY IT'S INDICATED OR HELPFUL.

17   THERE WERE MANY X-RAYS THAT WERE OBTAINED.  THERE WAS IN

18   PARTICULARLY A GUY WHO HAD AN INJURY TO THE BRAIN -- EXCUSE

19   ME -- HE FELL AND HIT HIS HEAD.  HE GOT A SKULL X-RAY.  WE

20   DON'T GET SKULL X-RAYS ANYMORE.  IF IT'S NEGATIVE, MEANING

21   THERE'S NO FRACTURE OR BROKEN BONE ON THE SKULL BONE, YOU STILL

22   ARE INTERESTED IN THE BRAIN.  YOU NEED A CAT SCAN OF THAT

23   BRAIN.  IF IT SHOWS A FRACTURE, THEN YOU'RE STILL WORRIED ABOUT

24   THE BRAIN.  YOU STILL NEED A CAT SCAN.  SO EXCEPT FOR CHILDREN,

25   WE DON'T USE SKULL X-RAYS ANYMORE.  IT DOESN'T GIVE YOU ANY

1    INFORMATION.

2    **Q.**   AND WHEN IS THE -- WAS THE EXAMPLE YOU WERE JUST TALKING

3    ABOUT, WHEN DID THAT TAKE PLACE?

4    **A.**   I HAVE THAT FOR -- I NOTED THAT FOR PATIENT 30.  AND I

5    NOTICED MANY X-RAYS DONE IN THE ATU FOR ABDOMINAL X-RAYS.  IT'S

6    VERY UNUSUAL TO GET ABDOMINAL X-RAYS ANYMORE, BUT I CAN

7    UNDERSTAND IF YOU'RE STRUGGLING WITH LIMITED RESOURCES, THAT

8    YOU MIGHT GET AN ABDOMINAL FILM.  AND THEN WHEN IT DOESN'T SHOW

9    ANYTHING, IF YOU'RE USING THAT INFORMATION CORRECTLY, YOU

10   REALIZE THAT THAT DOESN'T MEAN THAT NOTHING'S WRONG WITH THE

11   PATIENT.

12        I MEAN, EVEN IF YOU'RE LOOKING FOR A BOWEL BLOCKAGE,

13   OBSTRUCTION, THE SENSITIVITY AND SPECIFICITY, THE USE, THE

14   UTILITY OF THAT X-RAY IS DOWN IN THE 60, 70 PERCENT, SOMEWHERE

15   DOWN THERE.  THAT MEANS THAT 30 PERCENT OF THE TIME, YOU'RE

16   GOING TO HAVE SOMEBODY WHO HAS A BOWEL OBSTRUCTION AND YOU'RE

17   NOT SEEING IT ON THE X-RAY.

18        SO I UNDERSTAND GETTING THEM WHEN YOU DON'T HAVE

19   RESOURCES AND YOU'RE TRYING TO -- BUT IT'S NOT -- BUT AS LONG

20   AS YOU UNDERSTAND WHAT IT MEANS.

21        BUT WHAT I SAW WAS THAT INFORMATION WAS USED TO MOVE

22   THE PATIENT -- SOMEHOW CONFIRM A DIAGNOSIS OF REFLUX OR

23   SOMETHING, IT DOESN'T.

24   **Q.**   LET'S STEP BACK A BIT FROM THE ATU.  YOU REFERRED EARLIER

25   TO "NO TRANSPORT" ORDERS.  CAN YOU GIVE THE COURT AN EXAMPLE OF

1   WHAT YOU'RE TALKING ABOUT THERE?

2   **A.**   WELL, I OBSERVED A NO TRANSPORT ORDER 'CAUSE I WAS WALKING

3   AROUND THE TIER, AND THE PATIENT IN FRONT OF ME WAS ON THE

4   GROUND, OUT OF THE WHEELCHAIR, AND I THOUGHT THE PATIENT SHOULD

5   BE TRANSPORTED TO THE ATU, BUT THE CALL WAS MADE BY THE EMT WHO

6   RECEIVED A NO TRANSPORT ORDER.  I CAN TELL YOU SHE WAS

7   SURPRISED.  I WAS SURPRISED AND SHE JUST SAID, I DON'T KNOW.

8   SO THERE -- AND THEN WE SAW IN THE RECORD MULTIPLE TIMES AND

9   THE --

10          **MR. ARCHEY:**  YOUR HONOR, I APOLOGIZE.  I KNOW SHE'S

11  GOT -- THESE ARE PATIENTS, SO IF WE COULD HAVE A NUMBER SO WE

12  CAN FOLLOW ALONG BECAUSE I THINK SHE'S GOT THAT, I REALLY DO.

13          **MR. DUBNER:**  AND THE FIRST ONE DID NOT HAVE A NUMBER.

14  THAT WAS --

15  **BY MR. DUBNER:**

16  **Q.**   AND COULD YOU GIVE A CONTEXT OF WHEN YOU SAID YOU SAW THAT

17  PATIENT?

18  **A.**   YEAH.  I JUST OBSERVED, I WAS WALKING --

19          **MR. ARCHEY:**  SO IT'S NOT ONE.  I'M SORRY.

20          **THE WITNESS:**  YES, SIR.

21          **MR. ARCHEY:**  MY APOLOGIES, JUDGE.

22          **THE COURT:**  OKAY.  BUT SO WHEN YOU SAID "SHE SHRUGGED

23  HER SHOULDERS AND DIDN'T UNDERSTAND," THIS IS BECAUSE THE EMT

24  CALLED ATU AND RECEIVED A NO TRANSPORT INSTRUCTION FROM ATU; IS

25  THAT WHAT YOUR TESTIMONY IS?

02:05  1          THE WITNESS:  YES, YOUR HONOR, EXACTLY.

2          THE COURT:  SO THE EMT IS NOT DECIDING TO TRANSPORT

3    OR NOT TRANSPORT, OR AT LEAST IN THE EXAMPLE THAT YOU

4    WITNESSED?

5          THE WITNESS:  THAT'S CORRECT.

6          THE COURT:  THE EMT DIDN'T MAKE THE CALL.  THE EMT

7    CALLED SOMEBODY, AND SOMEBODY SAID DON'T TRANSPORT?

8          THE WITNESS:  YOU'RE CORRECT.  THAT'S CORRECT.

9    BY MR. DUBNER:

10   Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHO THE EMT CALLED?

11   A.   THE DOCTOR.  THERE WAS A DOCTOR ON THE OTHER END OF THAT

12   TELEPHONE.

13          AND THERE ARE OTHER EXAMPLES, EVEN IN MY REVIEW, OF

14   NO TRANSPORT ORDERS, AND IN ONE OF THOSE, IT WAS WITHIN A SIX-

15   OR SEVEN-DAY PERIOD, ALTHOUGH THE PATIENT HAD BEEN SEEN ONCE

16   PREVIOUSLY, AND NOW THE PATIENT COMPLAINED AGAIN, THAT IS NOT A

17   COMPLAINING PATIENT.  THAT IS WHAT WE CALL A SECOND CHANCE TO

18   GET IT RIGHT.  THAT'S CALLED A BOUNCE BACK, A SECOND CHANCE TO

19   HAVE A LOOK.  DID I MAKE A MISTAKE?  IS THERE SOMETHING MORE

20   GOING ON?  THAT PATIENT WAS NO TRANSPORTED, AND THAT PATIENT

21   DIED SEVEN DAYS LATER.

22          SO NO TRANSPORT IS A DANGEROUS THING BECAUSE THE

23   DOCTOR IS RELYING ON THE KNOWLEDGE AND UNDERSTANDING AND

24   OBSERVATION POWERS OF THE EMT AND MAYBE SOMETHING THAT HE KNOWS

25   ABOUT THE -- HE MAY KNOW THE PATIENT, HE MAY KNOW THE PATIENT

02:06  1  FOR MANY YEARS, BUT IT'S STILL DANGEROUS ON THAT DAY WITH THAT
2  PATIENT'S COMPLAINT TO NOT HAVE A PEEK AT THAT PATIENT, AT
3  LEAST THE PROVIDER.
4  **Q.**   AND WITH THE PARTICULAR CASE YOU'RE TALKING ABOUT, WHAT
5  PATIENT NUMBER IS THAT?
6       **THE COURT:**  IS THIS THE PATIENT THAT DIED THAT YOU'RE
7  ASKING ABOUT?
8       **MR. DUBNER:**  YES, THE ONE THAT SHE WAS JUST REFERRING
9  TO.
10       **THE WITNESS:**  I'LL TELL YOU, AND I THINK THAT'S 42.
11       **MR. DUBNER:**  I BELIEVE --
12       **THE WITNESS:**  WAIT A MINUTE, THAT'S NOT 42.
13       **THE COURT:**  NO, PATIENT 42 IS THE ONE WITH THE
14  STROKE.
15       **THE WITNESS:**  YEAH.  EXCUSE ME.  OKAY, I FOUND HIM.
16  HE'S NO. 34, IN FACT.
17  **BY MR. DUBNER:**
18  **Q.**   THANK YOU.
19       AND JUST BRIEFLY, WHAT WAS THE PATIENT'S MEDICAL
20  CONDITION?
21  **A.**   THAT PATIENT, FIRST CALL WAS FOR I CAN'T GET OUT OF BED,
22  AND THE PATIENT ATTRIBUTED HIS NOT BEING ABLE TO GET OUT OF BED
23  TO AN INJURY THAT OCCURRED THREE DAYS PREVIOUS PLAYING
24  FOOTBALL.  THE PATIENT DID GO SEE A DOCTOR IN THE THREE-DAY
25  PERIOD.

02:07

1        AND THEN THE SECOND TIME AFTER THE DOCTOR SAW HIM,

2   THE PATIENT THEN COMPLAINED AGAIN ABOUT RIGHT-SIDED PAIN AND

3   WAS A NO TRANSPORT ORDER.

4        SO THEN ANOTHER FEW DAYS PASSED, AND WE HAVE THE

5   RECORDS FOR THAT, I THINK, AND THE PATIENT DIED.  WHAT DID THE

6   PATIENT DIE OF?  IT SAYS INFECTION, SO MAYBE THE PATIENT DIED

7   OF INFECTION OR MAYBE HE DIED OF WHATEVER WAS HURTING HIM THAT

8   WAS NEVER DIAGNOSED.

9   **Q.**   AND DID YOU LOOK AT THE MORTALITY -- THE MEDICAL SUMMARY

10  REPORT FOR THIS PATIENT?

11  **A.**   I DID.  I ACTUALLY LOOKED AT ALL OF THEM BECAUSE I WAS

12  FASCINATED BY THEM, BUT, YES, I DID.

13  **Q.**   AND WHAT DID THAT SAY ABOUT THIS PATIENT'S CAUSE OF DEATH?

14  **A.**   IT SAID THAT THE PATIENT -- AND I DON'T KNOW IF WE'RE

15  GOING TO SHOW IT, BUT IT SAID THAT THERE WAS AN ACUTE, MEANING

16  SHORT-LIVED, CHANGE AND THE PATIENT BECAME -- DEVELOPED

17  DELIRIUM AND BLOOD SUGAR WAS 10, THERE WAS LOW BLOOD SUGAR.  IT

18  DIDN'T EXPLAIN AT ALL THE PROGRESSION OF THIS ILLNESS.  IT

19  MISREPRESENTED THE FACTS OF THE PATIENT'S DEATH.  I SAW THAT IN

20  DEATH REVIEWS TOO FREQUENTLY.

21  **Q.**   DO YOU HAVE EXPERIENCE DOING DEATH REVIEWS FROM YOUR

22  PRACTICE?

23  **A.**   YES.  I MEAN, WE DO MORBIDITY AND MORTALITY, THAT'S WHY

24  IT'S M&M.  THAT'S ALMOST EVERY WEEK WE DO M&M.  I DO IT AS A

25  PROFESSOR, AS A PART OF MY TEACHING DUTIES, AND WE DO IT AS A

02:08  1   GROUP.  THAT'S HOW YOU LEARN.  SO, YES, THAT'S DEATH REVIEWS.

2   Q.   WHEN YOU SAY "WE DO IT AS A GROUP," WHO IS THE GROUP OF?

3   A.   WELL, I MEAN, I'M IN A TRAINING PROGRAM.  EVEN IF YOU'RE

4   NOT, YOU ALWAYS REVIEW DEATHS.  AND THE IDEA IS TO GET A ROOT

5   CAUSE ANALYSIS, WHY DID THIS HAPPEN TO THIS PATIENT?  TO LOOK

6   AT THE TRUTH AND THE FACTS OF WHAT HAPPENED AND SAY, WHERE CAN

7   WE DO BETTER?  THAT'S WHAT IT'S ABOUT.  IT'S NOT AN AUTOPSY.

8   IT'S TO SAY, HOW COULD THIS HAVE GONE BETTER?  HOW COULD THIS

9   GUY NOT HAVE DIED?

10       OR IF IT'S JUST MORBIDITY, MEANING ILLNESS, HOW COULD

11  THIS ILLNESS THAT THIS PERSON HAS SUFFERED THAT WE MISSED, HOW

12  COULD WE NOT MISS IT AGAIN?  I WRITE THEM AND DO THEM ALL THE

13  TIME.  IT'S A VERY ORGANIZED MATTER.

14  Q.   AND HOW DID THE MEDICAL SUMMARY REPORTS AT ANGOLA COMPARE

15  TO THE M&M PROCESS?

16  A.   WELL, THEY JUST -- THEY DIDN'T APPROACH IT FROM ANY

17  ORGANIZED POINT OF VIEW, AND THERE WAS NO DISSECTION OF WHAT

18  HAPPENED.  IT'S JUST LIKE, HEY, THE GUY HAD SEPSIS.  HIS BLOOD

19  PRESSURE -- I MEAN, HIS SUGAR WAS 10, HE GOT DELIRIUM AND DIED.

20  THAT'S NOT A MORBIDITY OR A MORTALITY REVIEW.  THAT IS A

21  SUMMARY AS THE DOCTOR WHO TOOK CARE OF THE PATIENT.  THE

22  SUMMARY -- SOME KIND OF SUMMARY AND I DON'T UNDERSTAND THAT

23  SUMMARY BECAUSE THAT'S NOT HOW IT HAPPENED.  I SAW THAT ALL THE

24  TIME.

25  Q.   LET'S MOVE ON FROM THIS TOPIC AND THESE PARTICULAR

02:10 1    PATIENTS TO EMT PROTOCOLS.  YOU'VE DESCRIBED EARLIER WHAT AN

2    EMT PROTOCOL IS.  DID YOU LOOK AT ANGOLA'S PROTOCOLS?

3    **A.**   I DID.

4         **MR. DUBNER:**  AND MARTHA, IF YOU COULD GIVE US JOINT

5    EXHIBIT 8A, AND THESE CAN BE PUBLISHED TO THE GALLERY.

6    **BY MR. DUBNER:**

7    **Q.**   NOW, DO THESE PROTOCOLS COMPLY WITH STANDARDS FOR EMS

8    PROTOCOLS OR EMT PROTOCOLS?

9    **A.**   WELL, IT COMPLIED IN THE SENSE THAT IT WAS PROTOCOL.  WHAT

10   DIDN'T COMPLY IS THAT IT REQUIRED MORE OF THE PATIENT -- OF THE

11   EMT, EXCUSE ME.  SO THERE ARE NATIONAL BASED PROTOCOLS FOR EMTS

12   SET OUT BY THE NATIONAL EMS.GOV SOCIETIES, AND THESE HAD

13   INDIVIDUAL CHARACTERISTICS THAT WERE IMPLEMENTED AT ANGOLA,

14   WHICH I UNDERSTAND EXCEPT THAT THEY REQUESTED -- THEY REQUIRED

15   TOO MUCH FROM AN EMT.  IT REQUIRED TOO MUCH KNOWLEDGE.

16        FOR EXAMPLE, IF A PATIENT IS VOMITING, WHICH IN THE

17   NATIONAL BASED -- WE UNDERSTAND, IT SAYS RIGHT THERE IN THE

18   NATIONAL BASE, VOMITING IS A SIGN OF A SERIOUS ILLNESS IN SOME

19   CASES.  SO YOU PICK THE VOMITING PROTOCOL.  NOW, YOU'RE -- BUT

20   NOW MAYBE YOU HAVE TO GO TO THE ABDOMINAL PAIN PROTOCOL AND

21   MAYBE THE VOMITING IS DUE TO A HEAD INJURY OR A HEADACHE.  SO

22   THEY ARE MOVING AROUND, AND IT'S SUGGESTING THEY ARE HAVING TO

23   USE PROTOCOLS FOR HOURS.  IT'S NOT JUST IN THE PRE-HOSPITAL,

24   THE PATIENT'S VOMITING, I'M GOING TO GIVE HIM AN ANTIEMETIC,

25   ANTI-NAUSEA, AND GIVE HIM -- ESTABLISH AN IV AND TAKE HIM TO

1   SOMEONE WHO CAN ANSWER THE QUESTION WHY.  THAT'S THE QUESTION

2   THAT IS NEVER ANSWERED, NOT NEVER, BUT NOT ANSWERED BY THE

3   APPROPRIATE PERSON AT ANGOLA.

4           **MR. DUBNER:**  AND WHY DON'T WE PULL UP THE VOMITING

5   PROTOCOL.  IF YOU COULD BRING UP JOINT EXHIBIT 8 AT 55.

6   **BY MR. DUBNER:**

7   **Q.**   SO COULD YOU JUST WALK THE COURT THROUGH WHAT THIS

8   PROTOCOL MEANS AND HOW IT IS USED BY ANY EMT?

9   **A.**   SO THE PROTOCOL, YOUR HONOR, REALLY THE PART TO FOCUS ON

10  STARTS WITH THE WORD "PROTOCOL" HALFWAY DOWN THE -- AND I'M

11  STARTING THERE BECAUSE THE ESSENTIAL PIECE HERE IS THAT IF A

12  PATIENT IS VOMITING, YOU SHOULD SEND THE PATIENT TO THE ATU

13  IMMEDIATELY FOR A TEMPERATURE GREATER THAN 101, THAT'S GOOD.

14  A BLOOD PRESSURE THAT'S LESS THAN 90, THAT'S GOOD, GO TO THE

15  ATU WITH THAT.  OR IF THERE'S BLOODY OR OLD BLOOD, WHICH LOOKS

16  LIKE COFFEE GROUND VOMIT, THOSE ARE GOOD THINGS.

17          THE PROBLEM IS YOU CAN HAVE A SERIOUS PROBLEM -- AND

18  CAN YOU MAKE THAT SMALL ONE MORE TIME?

19          YOU CAN HAVE A VERY SERIOUS PROBLEM WITH YOUR BELLY.

20  YOU CAN HAVE APPENDICITIS WITHOUT FEVER.  YOU CAN HAVE INTERNAL

21  BLEEDING WITHOUT VOMITING.  YOU CAN HAVE AN INJURY TO THE

22  SPLEEN.  A LOT OF THINGS IT COULD BE.  SO VOMITING IN AND OF

23  ITSELF, IF A PATIENT IS VOMITING, HE SHOULD GO THE ATU.

24          NOW, LOOK UP AT THE TOP.  YOU CAN GET SOME

25  INFORMATION ABOUT THIS PERSON VOMITING.  THOSE ARE HISTORICAL

0 2 : 1 3

1    THINGS:  DID YOU GET HIT ON THE HEAD?  DID YOU HAVE AN ABDOMEN

2    INJURY?  DO YOU HAVE PAIN?  DID YOU INGEST SOMETHING OF A TOXIC

3    SUBSTANCE?  AND THAT'S THE HISTORY OF THE PRESENT ILLNESS.

4    THAT'S GOOD FOR AN EMT TO GET.  BUT THE EMTS HERE ARE SERVING

5    AS THE DOORWAY, THE GATEWAY TO MEDICAL CARE, WHICH IS A

6    PROVIDER, PRIMARILY EITHER A NURSE PRACTITIONER AT ANGOLA, OR A

7    PHYSICIAN, NOT THE MID-LEVELS THAT OTHER PLACES HAVE.

8         SO THE PROBLEM IS IF YOU HAVE AN EMT USE THIS

9    PROTOCOL TO ASSESS OPENING THE DOOR TO MEDICAL CARE, THIS IS

10   GOING TO RESULT IN CATASTROPHES, NOT THAT THE THINGS THAT ARE

11   WRITTEN THERE.  IT'S WHAT'S NOT WRITTEN THERE THAT CAN --

12   DOCTORS KNOW THAT YOU DON'T HAVE TO HAVE THESE THINGS AND YOU

13   CAN BE CRITICALLY ILL.  IF YOU HAVE THEM, GO TO THE ATU.  BUT

14   IF YOU DON'T GO -- DON'T GO, HAVE THEM, YOU SHOULD STILL GO TO

15   THE ATU IF YOU'RE VOMITING.

16   **Q.**  AND IF WE LOOK AT THE "PHYSICAL ASSESSMENT" SECTION, ARE

17   ALL OF THE THINGS THAT ARE LISTED THERE WITHIN EMTS' TRAINING

18   AND SCOPE OF PRACTICE?

19   **A.**  AN EMT CAN TAKE VITAL SIGNS, LOOK AT THE COLOR OF THE

20   SKIN, CAN LISTEN TO THE ABDOMEN, AND THAT'S A LITTLE HARDER.

21   SO ARE THEY TRAINED TO LISTEN TO THE ABDOMEN?  YES.  ARE THEY

22   TRAINED TO THE POINT WHERE THEY ARE GOING TO BE ABLE TO

23   HYPERACTIVE -- HYPOACTIVE AND ABSENT?  THAT CAN BE VERY

24   DIFFICULT.  ANY DOCTOR KNOWS THAT.  I'M SURE THAT THE DOCTORS

25   AT ANGOLA UNDERSTAND HOW DIFFICULT THAT IS.

02:15  1        AND THEN ABDOMINAL PAIN, IS IT DISTENDED?  THIS IS

2    GETTING MORE SUBJECTIVE.  IS IT RIGID?  IS IT REBOUND?  THOSE

3    ARE SUBJECTIVE FINDINGS WHERE A DOCTOR TAKES EXPERIENCE TO KNOW

4    WHAT THOSE ARE.

5        SO THE PROBLEM WITH THIS PROTOCOL IS THAT THIS

6    PHYSICAL -- THAT I'M WORRIED THAT WE ARE OPENING THE DOOR TO

7    MEDICAL CARE OR NOT OPENING THE DOOR TO MEDICAL CARE BASED ON

8    PEOPLE WHO ARE NOT EXPERIENCED TO THE LEVEL OR TRAINED OR HAVE

9    THE KNOWLEDGE TO DO THAT LEVEL AND QUALITY OF PHYSICAL

10   ASSESSMENT.

11   Q.   THANK YOU.

12        LET'S LOOK AT ONE MORE SICK CALL PROTOCOL AND SEE

13   IF -- WHICH IS AT JOINT EXHIBIT 8 AT 24.  THIS IS JOINT EXHIBIT

14   8-00024.  THIS IS THE ABDOMINAL PAIN PROTOCOL.  DOES THIS HAVE

15   SIMILAR PROBLEMS AS THE LAST ONE WE LOOKED AT?

16   A.   YES, IT DOES.

17   Q.   AND CAN YOU DESCRIBE THOSE?

18   A.   WELL, AGAIN, WE HAVE AT THE PROTOCOL, ANY PATIENT WITH

19   FEVER, BLOODY STOOLS, SEVERE DISTENTION.  A LITTLE DISTENTION

20   MAY BE SERIOUS, I DON'T -- SEVERE DISTENTION, THAT'S

21   SUBJECTIVE.  DISTENTION IS WRONG, YOU SHOULDN'T HAVE IT.  IF

22   YOU HAVE DISTENTION, WHAT IS THE PROBLEM THAT THE PATIENT HAS

23   PAIN AND DISTENTION?  THERE IS SUBJECTIVITY AND THE NEED FOR

24   KNOWLEDGE AND AN INTERPRETATION AND A DIAGNOSIS HERE, AND THAT

25   EITHER DOES OR DOES NOT OPEN THE DOOR TO MEDICAL CARE.  AND

1    THAT'S MY --  THAT'S THE PROBLEM.

2    **Q.**    AND IS THAT SUBJECTIVITY CONSISTENT WITH EMTS' TRAINING

3    AND LICENSING?

4    **A.**    NO.  EMTS WORK IN THE PRE-HOSPITAL SETTING.  THEY WOULD

5    OBSERVE THESE, TO THE EXTENT THAT THEY HAVE THE KNOWLEDGE AND

6    CAPACITY TO DO SO, AND THEN THEY GO TO THE HOSPITAL AND THE

7    DOCTOR -- THEY SAY, THIS GUY HAS ABDOMINAL PAIN AND I THINK

8    HE'S DISTENDED OR I DON'T THINK HE'S DISTENDED.  DOC, WHAT DO

9    YOU THINK IT IS?  SO I DO A PHYSICAL EXAMINATION.  I KNOW A

10   DIFFERENTIAL DIAGNOSIS.  I MAY OR MAY NOT GET LABS, USUALLY WE

11   DO, AND YOU MAKE A DIAGNOSIS.  AND YOU USE ANCILLARY THINGS

12   LIKE A ULTRASOUND, CAT SCAN, WHATEVER YOU WANT TO DO.

13   **Q.**    AND YOUR CONCERNS ABOUT THE USE OF THOSE PROTOCOLS AS

14   GATEWAYS TO MEDICAL CARE, IS THAT CONSISTENT WITH WHAT YOU SAW

15   IN THE CHARTS YOU REVIEWED THEMSELVES?

16   **A.**    TOTALLY.

17   **Q.**    IN WHAT WAYS?

18   **A.**    WELL, BECAUSE WHAT I SAW WAS THAT EMTS WERE MAKING

19   ASSESSMENTS AND DOING PHYSICAL EXAMINATIONS AND THE DOCTOR

20   NEVER SAW THEM, SO THE DIAGNOSIS -- THE PATIENT HAS, WHATEVER,

21   GETS PEPTO-BISMOL, THE ADMINISTRATION OF PEPTO-BISMOL OR AN

22   ANTI-VOMITING DRUG, AND THE FACT THAT THE PATIENT FEELS BETTER

23   IS NOT A DIAGNOSIS.

24         IF I GIVE SOMEBODY WITH A HEMORRHAGE INTO THEIR BRAIN

25   TYLENOL, THEY MAY FEEL BETTER, THAT DOESN'T MEAN THEY DIDN'T

1   HAVE A HEMORRHAGE.  SO PAIN MEDICINE -- THINGS THAT ARE

2   ANTACIDS AND ACTUALLY PLACEBO, YOU CAN GIVE THEM WATER.  THIRTY

3   PERCENT OF PEOPLE GIVEN A PLACEBO WILL GET BETTER BECAUSE THEY

4   FEEL LIKE THEY GOT SOME TREATMENT.

5           SO WHAT WE NEED HERE IS A DIAGNOSIS AND NOT THE FACT

6   THAT THEY GOT BETTER WITH THIS, AND THEN THEY ARE MAGICALLY

7   FINE.  AND BECAUSE WE DO THAT SOMETIMES IN MEDICINE, BUT I'M A

8   DOCTOR AND I ALREADY KNOW WHAT THE PATIENT HAS WHEN I DO THAT.

9   AND IF I'M USING THAT DIAGNOSTICALLY, THAT IS WAY BEYOND SCOPE

10  FOR AN EMT.

11  Q.   AND DOES IT LEAD TO A DIAGNOSIS FOR PATIENTS IN MANY

12  CASES?

13  A.   WELL, IN SOME CASES, WHEN A DOCTOR IS SEEING A PATIENT,

14  THEY'VE ALREADY SAID, THIS IS MOST LIKELY GASTROESOPHAGEAL

15  REFLUX DISEASE, BASED ON THE SYMPTOMS AND THE EXAMINATION,

16  MAYBE LABORATORY, YES OR NO, OR THE PATIENT'S HISTORY.

17  SOMETIMES IT IS, BUT YOU ALREADY KNEW WHAT IT WAS AND YOU'RE

18  TREATING IT, AND YOU'RE GETTING THE EXPECTED RESULT.

19          BUT THE PROBLEM IS THEY DON'T KNOW WHAT THIS IS.

20  THEY'RE GETTING A RESULT AND THEY'RE EQUATING THAT WITH A

21  DIAGNOSIS.  THAT'S THE PROBLEM.

22  Q.   LET'S MOVE ON TO THE EMERGENCY PROTOCOLS AS WELL, WHICH

23  BEGIN AT JOINT EXHIBIT 8A AT 00082.  WHAT KIND OF PROBLEMS DID

24  YOU SEE IN THE EMERGENCY PROTOCOLS?

25  A.   WELL, I DON'T HAVE IT IN FRONT OF ME.  SO THERE WERE

02:19   1  THE -- A NUMBER OF EMERGENCY PROTOCOLS, AND SOME OF THEM WERE

2  THE AMERICAN HEART ASSOCIATION TREATMENT FOR CARDIAC

3  DYSRHYTHMIA, SUCH AS VENTRICULAR FIBRILLATION.  AND THOSE ARE

4  NATIONAL STANDARDS THAT PEOPLE WHO ARE -- SO THOSE REALLY JUST

5  COME RIGHT OUT OF THE TRAINING MANUAL BY THE AMERICAN HEART

6  ASSOCIATION.  THAT'S NOT WHAT I'M BEING SHOWN HERE.  SO MAYBE I

7  WANT TO BACKTRACK, BUT SO CARDIAC ARREST.

8  Q.   SURE, WE CAN TALK ABOUT THE CARDIAC ONES FIRST.

9         IN THAT CASE, MARTHA, IF YOU COULD GIVE US JOINT

10  EXHIBIT 8A AT 00064 AND 65.

11         AND YOU CAN CONTINUE, DR. VASSALLO.

12  A.   SO THIS REALLY NEEDS TO SIMPLY BE RIGHT OUT OF THE

13  AMERICAN HEART ASSOCIATION MANUAL.  YOU DON'T NEED TO REWRITE

14  IT, AND SO THIS IS NOT BAD.  THIS IS JUST ANOTHER PIECE.

15  EVERYBODY WHO'S TRAINED AS AN EMT SHOULD BE -- AND ANYBODY

16  WORKING THERE REALLY SHOULD BE BASIC LIFE SUPPORT OR ADVANCED

17  CARDIAC LIFE SUPPORT CERTIFIED IN THIS KIND OF A SETTING.  SO

18  SOME OF THIS IS OUTDATED, AND WE'LL SEE THAT THERE'S SOME

19  THINGS MARKED OUT HERE.

20         FOR EXAMPLE, ESCALATING, THAT'S BECAUSE THIS IS NOT

21  THE UP-TO-DATE AMERICAN HEART ASSOCIATION GUIDELINE.  AND SO

22  INSTEAD OF JUST PUTTING THE NEW ONE OUT THERE, WHICH SHOULD BE

23  DONE, I'M SURE THAT THE DOCTOR CAN DO THAT.  THEY ARE MARKING

24  THINGS OUT BECAUSE WE DON'T USUALLY USE EPINEPHRINE IN THIS WAY

25  BECAUSE THE EVIDENCE IS IT DOESN'T WORK WHEN IT'S USED.  IT'S

0 2 : 2 1

1  NOT BENEFICIAL.  SO THE AMERICAN HEART ASSOCIATION EVERY FEW

2  YEARS CHANGES THE RECOMMENDATION BASED ON EVIDENCE, SO THAT'S

3  EASY.

4  **Q.**   AND ASSUMING THAT THE EMT STAFF AT ANGOLA IS TRAINED AND

5  CERTIFIED BY ACLS, WOULD IT STILL BE PROBLEMATIC TO HAVE THESE

6  PROTOCOLS?

7  **A.**   WELL, IT'S DUPLICATIVE BUT NOT.  BECAUSE IT HAS THESE

8  LITTLE CHANGES, AND IT'S JUST UNNECESSARY.  WHAT WE SHOULD DO

9  IS MEET THE NATIONAL STANDARD FOR THESE PROBLEMS, ASYSTOLE.

10 THAT IS A NATIONAL STANDARD, AMERICAN HEART ASSOCIATION,

11 ADVANCED -- WE DON'T NEED TO WRITE ANYTHING ELSE, THAT'S IT,

12 THAT'S THAT.

13 **Q.**   IS THERE ANYTHING UNIQUE ABOUT MEDICAL ILLNESSES OR

14 HEALTHCARE AT ANGOLA THAT WOULD REQUIRE A DIFFERENT PROTOCOL

15 THAN IS PUT OUT BY THE AMERICAN HEART ASSOCIATION?

16 **A.**   NO.  THAT IS A PRE-HOSPITAL CARE PROTOCOL, AND

17 PRE-HOSPITAL CARE AT ANGOLA EXISTS.  EMTS GO OUT THERE,

18 PARAMEDICS INTUBATE, THEY GIVE MEDICATIONS AND THEY TRANSPORT

19 TO THE ATU AND CONTINUE THOSE THINGS.

20 **Q.**   SO IN ADDITION TO THE TWO SETS OF PROTOCOLS WE'VE LOOKED

21 AT SO FAR, AND ACTUALLY TO TAKE A STEP BACK, WE'VE LOOKED AT

22 ONE OF THE ADVANCED CARDIAC LIFE SUPPORT PROTOCOLS.  ARE THE

23 SORT OF PROBLEMS THAT YOU'VE DESCRIBED, ARE THEY CONSISTENT

24 THROUGHOUT THE PROTOCOLS?

25 **A.**   YES.  I MEAN, THE PROBLEM IS THAT THIS IS VERY OLD.  IT

1  MAY BE THAT THERE JUST HASN'T BEEN TIME FOR THE MEDICAL

2  DIRECTOR TO UPDATE THIS OR SWITCH INTO AHA.  THIS IS VERY --

3  THIS IS THE OLD ONE, BY MANY YEARS.

4  **Q.**   DO YOU HAVE A SENSE OF APPROXIMATELY HOW MANY YEARS THAT

5  WOULD BE?

6  **A.**   TEN.

7  **Q.**   AND HOW OFTEN HAS IT BEEN UPDATED SINCE THEN?

8  **A.**   I DON'T KNOW EXACTLY.  I THINK THE LAST ONE WAS 2014 OR

9  '16.  I JUST GOT IT.  I'VE BEEN READING IT, BUT I DON'T KNOW.

10  **Q.**   AND HAD THERE BEEN OTHER UPDATES BETWEEN THIS VERSION AND

11  THAT VERSION?

12  **A.**   THEY UPDATE IT REGULARLY BUT NOT FREQUENTLY, SO I DON'T

13  KNOW.

14  **Q.**   OKAY.  AND THEN TO GO BACK TO MY QUESTION.  YOU KNOW, IS

15  WHAT WE SEE ON THIS PARTICULAR PROTOCOL, THE ASYSTOLE

16  TREATMENT PROTOCOL, IS THAT CONSISTENT THROUGHOUT THE ACLS

17  PROTOCOLS?

18  **A.**   YES.

19  **Q.**   AND I BELIEVE I ASKED THAT, AFTER LOOKING AT THE VOMITING

20  PROTOCOL, BUT JUST TO BE SURE, WHEN WE WERE TALKING ABOUT THE

21  SICK CALL PROTOCOLS, ARE THE PROBLEMS THAT YOU SAW WITH THE

22  ABDOMINAL PAIN AND VOMITING ONES, ARE THOSE CONSISTENT

23  THROUGHOUT THE SICK CALL PROTOCOLS?

24  **A.**   YES.

25  **Q.**   OKAY.  LET'S MOVE TO THE MEDICAL EMERGENCY TREATMENT

1    PROTOCOLS, WHICH START AT JOINT EXHIBIT 8A AT 00082.  NOW, WHAT

2    KIND OF PROBLEMS DID YOU SEE IN THESE PROTOCOLS?  AND FIRST

3    OFF, ACTUALLY, LET ME ASK A MORE FOUNDATIONAL QUESTION.  HOW DO

4    THESE PROTOCOLS DIFFER FROM THE SICK CALL PROTOCOLS THAT WE

5    ALREADY LOOKED AT?

6    **A.**    THEY ARE MORE SPECIFIC, MORE DEVELOPED, AND THEY REQUIRE

7    MORE OF THE EMT.

8    **Q.**    AND WHAT DO YOU MEAN "THEY REQUIRE MORE OF THE EMT"?

9    **A.**    WELL, LET'S GO TO NO. 4 ON THIS PAGE.  SO IF THE PATIENT'S

10   COMPLAINT AND CLINICAL PRESENTATION DICTATES THE NEED FOR AN

11   IV, THEN START AN IV, THAT'S FINE.  AND THEN IF THE PATIENT'S

12   BLOOD PRESSURE IS HYPOTENSIVE, THAT IS LOW, ABNORMALLY LOW,

13   DANGEROUSLY LOW, LOW, AS IS DEFINED IN THE PREVIOUS PROTOCOLS,

14   OR LESS THAN 90, AT ANGOLA IT'S LESS THAN 90, IT'S WRITTEN IN

15   THE PREVIOUS HYPOTENSIVE, THEN REFER TO THE SYMPTOMATIC

16   HYPOTENSION PROTOCOL FOR TREATMENT.  WELL, NOW, IF THE PATIENT

17   IS HYPOTENSIVE, THE PATIENT NEEDS A DOCTOR OR A PA OR A NURSE

18   PRACTITIONER OR A PRACTITIONER WHO CAN UNDERSTAND WHY THAT IS.

19   NOW, YOU'VE GOT AN EMT GOING TO ANOTHER PROTOCOL, AND WHEN YOU

20   LOOK AT -- IF WE WERE TO LOOK AT THAT HYPOTENSIVE PROTOCOL,

21   SYMPTOMATIC HYPOTENSION IS SOMETIMES VERY SERIOUS.

22   **Q.**    AND WHY DON'T WE BRING THAT UP AS WELL, THAT'S JOINT

23   EXHIBIT 8A AT 00096.

24   **A.**    SO NOW THE PATIENT HAS BEEN DETERMINED TO HAVE ABDOMINAL

25   PAIN AND TO NOW HAVE ABNORMAL VITAL SIGNS, POTENTIALLY

1   LIFE-THREATENING, POTENTIALLY NOT.  AND NOW WE HAVE AN EMT

2   MOVING THROUGH ANOTHER PROTOCOL.  WHERE'S THE DOCTOR?  SO NOW

3   WE HAVE THE PARAMEDIC CAN DO THE PHYSICAL EXAM; THAT'S NUMBER

4   ONE.  GIVE SOME OXYGEN.  KEEP MONITORING THE VITALS SIGNS, AND

5   WE'VE SEEN THEY DO THAT VERY WELL, VERY PROFESSIONALLY.  AND IF

6   YOU -- IF THEY NEED HELP WITH THE AIRWAY, YOU PUT A TUBE DOWN

7   THEIR TRACHEA AND HELP THEM.  IF THERE'S ARRHYTHMIA, WE HAVE

8   AMERICAN HEART ASSOCIATION, WE GO TO THAT.

9           NOW, NUMBER THREE, IT'S GETTING VERY DIFFICULT, VERY

10  COMPLICATED.  IF NO PULMONARY EDEMA IS PRESENT -- PULMONARY

11  EDEMA IS WHEN THE LUNGS FILL UP WITH OXYGEN -- I MEAN, EXCUSE

12  ME -- FILL UP WITH FLUID.  SO NOW YOU HAVE A VERY COMPLICATED

13  PATIENT.  YOU HAVE A LOW BLOOD PRESSURE.  THAT'S WHY WE'RE IN

14  THIS PROTOCOL.  NOW YOU'RE ASKING THIS EMT TO DETERMINE IF THIS

15  IS BECAUSE THE LUNGS ARE FILLING WITH FLUID.  IF THERE IS NO

16  PULMONARY EDEMA PRESENT AND THE PATIENT'S BLOOD PRESSURE IS TOO

17  LOW, WELL THEN YOU CAN GIVE FLUIDS.  THIS IS COMPLICATED STUFF.

18  AND YOU START GIVING -- AND REEVALUATING.  THIS IS WHERE A

19  PROVIDER SHOULD BE.  THIS IS NOT FOR AN EMT IN THE ATU.  IF THE

20  BLOOD PRESSURE IMPROVES, GIVE SOME MORE, THAT'S OKAY.

21          NOW, VERY OUT OF DATE HERE AND VERY STRANGE IS TO USE

22  A PNEUMATIC ANTISHOCK GARMENT.  THAT WAS TAKEN OUT IN THE '80S

23  OR '90S, SO NOBODY USES THE MAST TROUSERS ANYMORE.

24  Q.   AND WHAT IS A PNEUMATIC ANTISHOCK GARMENT?

25  A.   WELL, IT'S SOMETHING THAT BRINGS UP THE BLOOD PRESSURE,

1    BUT IT'S BEEN SHOWN TO BE NOT USEFUL AND WAS TAKEN OUT OF THE

2    EMS SYSTEMS.

3    **Q.**    AND IF I COULD PAUSE HERE BEFORE YOU GO FORWARD, JUST TO

4    ASK ABOUT, YOU KNOW, SOMETHING YOU SAID.  YOU SAID THIS IS, YOU

5    KNOW, NOT EMT MATERIAL, THIS IS PROVIDER MATERIAL.  HOW WOULD

6    THIS -- YOU KNOW, WHAT WOULD THE EQUIVALENT PROTOCOL LOOK LIKE

7    OUTSIDE OF ANGOLA?

8    **A.**    WELL, THERE WOULDN'T BE.  I MEAN, THERE WOULD BE NO SUCH,

9    YOU REALLY HAVE TO MOVE TO NUMBER FOUR TO REALLY PUT THE SEAL

10   ON THIS.  OKAY?

11   **Q.**    UH-HUH.

12   **A.**    LOOK THERE, IF THE LUNG SOUNDS SHOW THAT THEY ARE

13   OVERLOADED WITH FLUID AND THAT'S THE REASON THE PATIENT HAS

14   CONGESTIVE HEART FAILURE, WHATEVER IS GOING ON, WHATEVER IS THE

15   REASON THAT THE LUNGS HAVE FILLED WITH FLUID.  IT COULD BE

16   LIVER FAILURE, I DON'T KNOW, THERE'S A DIFFERENTIAL DIAGNOSIS.

17   NOW, WE'RE GOING TO -- THE EMT IS SUPPOSED TO START PRESSORS.

18   PRESSORS INCREASE THE BLOOD PRESSURE.  DOPAMINE, IT'S USUALLY

19   NOT USED ANYMORE, SO THAT REFLECTS SOME AGE TO THIS THING.

20   IT'S NOREPINEPHRINE NOW ALMOST EXCLUSIVELY.

21          BUT LET'S JUST SAY THEY WE LET SOMEBODY USE DOPAMINE

22   HERE.  THIS IS NOT -- AND NOW WE'RE STARTING -- THESE PATIENTS

23   ARE WITHIN 23 MILES OF -- ANGOLA IS A BIG PLACE, BUT NOT BIG

24   ENOUGH TO GET THERE.  SO THIS IS GOING ON.  THIS IS SO DIRECTED

25   IN THIS PROTOCOL BECAUSE IT'S UNDERSTOOD THAT EMTS ARE GOING TO

1   BE THE EYES AND EARS OF THE PHYSICIAN CARRYING FOR COMPLICATED

2   PATIENTS WITH SEVERE ILLNESS IN THE ATU.  AND THESE ARE

3   COMPLICATED EVEN FOR EMERGENCY PHYSICIANS WITH EXPERIENCE AND

4   CRITICAL CARE SPECIALISTS.  WHEN YOU GET THIS QUESTION ABOUT

5   FLUID IN THE LUNGS AND LOW BLOOD PRESSURE, YOU ARE WAY OUT OF

6   SCOPE FOR AN EMT AND FOR SOME DOCTORS.

7   **Q.**   IT SAYS AT THE BOTTOM OF THE PROTOCOL, "BEGIN TRANSPORTING

8   TO THE RECEIVING MEDICAL FACILITY AS SOON AS POSSIBLE," ISN'T

9   THAT SUFFICIENT OR IS THAT SUFFICIENT TO TAKE CARE OF YOUR

10  CONCERN THAT THE EMT IS TREATING RATHER THAN A PROVIDER?

11  **A.**   NO.  THIS IS NOT A -- NO, IT'S NOT.  BECAUSE THIS IS --

12  THIS JUST DOESN'T HAPPEN LIKE THIS.  YOU DON'T -- THIS IS NOT

13  HOW AN EMT IS GOING TO BE FUNCTIONING IN THE SHORT PIECE OF,

14  LET'S SAY, HALF AN HOUR TO AN HOUR.

15  **Q.**   AND WHAT DO YOU MEAN WHEN YOU SAY "THIS IS NOT HOW AN EMT

16  IS GOING TO BE FUNCTIONING"?

17  **A.**   WELL, BECAUSE THIS PATIENT IS -- AS SOON AS IT'S --

18  REMEMBER, WE ALREADY HAD THE ACUTE ABDOMINAL PAIN.  RIGHT?

19  THEN WE DETERMINED THERE'S A BLOOD PRESSURE PROBLEM.  NOW WE'VE

20  GONE TO A NEW PROTOCOL, AND THAT IS THIS PATIENT HAS SYMPTOMS

21  OF -- AND A LOW BLOOD PRESSURE.  NOW, WHERE IS THE

22  TRANSPORTATION?  THIS IS CALLED STABILIZATION AND

23  TRANSPORTATION.

24          TRANSPORTATION, THIS CAN BE DONE AT THE SAME TIME.

25  YOU FIND THE PATIENT ON THE TIER, OR OUT IN THE FIELD WITH THIS

1    PROBLEM, YOU PICK THEM UP AND YOU'RE -- YOU PUT THAT PATIENT

2    INTO THE AMBULANCE.  YOU CAN DO ALL THIS STUFF AND SWITCH ALL

3    YOUR PROTOCOLS, AND YOU GET TO THE ATU AND YOU NEED A DOCTOR OR

4    A NURSE PRACTITIONER OR A PHYSICIAN ASSISTANT.  THIS STUFF HERE

5    IS NOT GOING TO BE HAPPENING ON ANGOLA.  THIS SUGGESTS, BY

6    VIRTUE OF THE AMOUNT OF TIME IT GOES TO GO FROM ONE PROTOCOL TO

7    THE OTHER, TO THE OTHER, THAT THE PATIENT IS BEING MANAGED OVER

8    TIME, MORE TIME THAN TRANSPORTATION TAKES.

9              **THE COURT:**  COUNSEL, WE'RE GOING TO NEED TO TAKE A

10   BREAK.  WE ARE GOING TO BE ADJOURNED UNTIL TOMORROW MORNING AT

11   9:00 A.M.

12             **THE WITNESS:**  THANK YOU, YOUR HONOR.

13             **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

14             **THE COURT:**  OKAY.

15          **(PROCEEDINGS RECESSED UNTIL OCTOBER 16, 2018.)**

16                        **CERTIFICATE**

17      I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

18   UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

19   CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

20   THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

21   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23                    *Shannon Thompson*

24                    SHANNON THOMPSON, CCR,

25                    OFFICIAL COURT REPORTER