UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


JOSEPH LEWIS JR., ET AL      *     CIVIL ACTION

VERSUS                *     NO. 15-318

BURL CAIN, ET AL          *     OCTOBER 16, 2018

* * * * * * * * * * * * * *


DAY 6
BENCH TRIAL BEFORE
THE HONORABLE SHELLY D. DICK
UNITED STATES CHIEF DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:         THE PROMISE OF JUSTICE
                               INITIATIVE
                               BY:   MERCEDES H. MONTAGNES, ESQ.
                                     AMANDA C. ZARROW. ESQ.
                                     MEREDITH ANGELSON, ESQ.
                                     NISHI KUMAR, ESQ.
                               636 BARONNE STREET
                               NEW ORLEANS, LOUISIANA 70113

                               ACLU OF LOUISIANA
                               BY:   BRUCE W. HAMILTON, ESQ.
                               P.O. BOX 56157
                               NEW ORLEANS, LOUISIANA 70156

                               COHEN MILSTEIN SELLERS & TOLL
                               PLLC
                               BY:   JEFFREY B. DUBNER, ESQ.
                               1100 NEW YORK AVE NW, SUITE 500
                               WASHINGTON, DC 20005

                               THE CAPITAL APPEALS PROJECT
                               BY:   ERICA L. NAVALANCE, ESQ.
                               636 BARONNE STREET
                               NEW ORLEANS, LOUISIANA 7013

```
 1                                    SOUTHERN POVERTY LAW CENTER
                                      BY:   JARED F. DAVIDSON, ESQ.
 2                                          JAMILA A. JOHNSON, ESQ.
                                      1055 ST. CHARLES AVE., SUITE 505
 3                                    NEW ORLEANS, LOUISIANA 70130

 4     FOR THE DEFENDANTS:            KANTROW SPAHT WEAVER &
                                      BLITZER
 5                                    BY:   RANDAL J. ROBERT, ESQ.
                                            CONNELL L. ARCHEY, ESQ.
 6                                          KEITH FERNANDEZ, ESQ.
                                      P.O. BOX 2997
 7                                    BATON ROUGE, LOUISIANA 70821

 8                                    SHOWS CALI & WALSH LLP
                                      BY:   MARY E. ROPER, ESQ.
 9                                          JOHN C. CONINE JR., ESQ.
                                            CAROLINE T BOND, ESQ.
10                                          JEFFREY K. CODY, ESQ.
                                      628 ST. LOUIS STREET
11                                    BATON ROUGE, LOUISIANA 70802

12     OFFICIAL COURT REPORTER:       SHANNON L. THOMPSON, CCR.
                                      UNITED STATES COURTHOUSE
13                                    777 FLORIDA STREET
                                      BATON ROUGE, LOUISIANA 70801
14                                    (225) 389-3567

15          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                    COMPUTER-AIDED TRANSCRIPTION SOFTWARE

16

17

18

19

20

21

22

23

24

25
```

1                            **INDEX**

2                                                              <u>PAGE</u>

3    **PLAINTIFFS' WITNESSES**

4     SUSIE VASSALLO, M.D.

5      DIRECT EXAMINATION CONTINUED BY MR. DUBNEY            4

6      CROSS-EXAMINATION BY MR. ARCHEY                       23

7      REDIRECT EXAMINATION BY MR. DUBNEY                    103

8     MADELINE LAMARRE, MN, FNP-BC

9      DIRECT EXAMINATION OF QUALIFICATIONS BY MS. MONTAGNES  129

10     CROSS-EXAMINATION OF QUALIFICATIONS BY MR. ARCHEY     134

11     DIRECT EXAMINATION OF QUALIFICATIONS MS. MONTAGNES    138

12     DIRECT EXAMINATION BY MS. MONTAGNES                   141

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (OCTOBER 16, 2018)

2          THE COURT:  GOOD MORNING.  BE SEATED.

3          WE WERE, I THINK, IN THE MIDDLE OF DR.

4    VASSALLO'S TESTIMONY.  DO YOU WANT TO RESUME?

5          THE WITNESS:  GOOD MORNING, YOUR HONOR.

6          THE COURT:  GOOD MORNING.

7          ALL RIGHT, MR. DUBNER, YOU MAY CONTINUE.

8          MR. DUBNER:  THANK YOU, YOUR HONOR.  AND JUST BEFORE

9    WE START, IF THE PLAINTIFFS' REPRESENTATIVE, FARRELL SAMPIER,

10   COULD HAVE ONE ARM FREE?  THE COURT SECURITY OFFICER WAS JUST

11   WAITING FOR AN INSTRUCTION.

12         THE COURT:  YES.

13         MR. DUBNER:  THANK YOU.

14         THE COURT:  YOU CAN PROCEED WHILE THEY ARE TAKING

15   CARE OF THAT.

16         MR. DUBNER:  ABSOLUTELY.

17              DIRECT EXAMINATION CONTINUED

18   BY MR. DUBNER:

19   Q.   GOOD MORNING, DR. VASSALLO.

20   A.   GOOD MORNING.

21   Q.   WHEN WE LEFT OFF YESTERDAY, WE WERE DISCUSSING LSP'S EMT

22   PROTOCOLS.  I FIRST WANT TO RETURN TO THE SICK CALL PROTOCOLS

23   FOR A MOMENT.

24         MARTHA, IF YOU COULD BRING UP JX-8A AT 00055.

25         NOW, YOU DISCUSSED YOUR CONCERNS WITH THE

SYMPTOMATOLOGY THAT'S LISTED IN THE PROTOCOL SECTION, BUT I
DON'T BELIEVE WE TALKED ABOUT THE LAST LINE THERE:  "REFER FOR
MD REVIEW."  CAN YOU EXPLAIN WHAT EMTS DO WHEN THEY ARE
CONDUCTING SICK CALL IF THEY DON'T BELIEVE THE PATIENT'S
CONDITION WARRANTS TRANSPORT TO THE ATU?
**A.**    WELL, IN SOME CASES, THEY WRITE "RTC" WHICH IS RETURN TO
CLINIC, AND THEY SET A TIME FOR THAT, OR TRY TO GIVE A TIME FOR
A CLINIC VISIT.  IN SOME INSTANCES, THEY MAKE A DECISION AND
GIVE SOMETHING TO TREAT THAT SYMPTOM SUCH AS TYLENOL OR
PEPTO-BISMOL, AND THAT'S THE END OF THE -- AND THE DOOR TO
FURTHER CARE ON THAT EPISODE IS CLOSED.
**Q.**    AND YOU KNOW, HOW LONG ARE THE WAIT TIMES FOR THOSE RETURN
TO CLINIC ORDERS?
**A.**    IT CAN BE THE NEXT DAY; IT COULD BE MONTHS.
**Q.**    AND DO EMTS ALWAYS CALL DOCTORS OR PROVIDERS TO HELP THEM
DECIDE?  TO HELP THEM DECIDE WHETHER TO JUST PUT RTC FOR
SOMEBODY?
**A.**    IN SICK CALL, NO.
**Q.**    WAS IT COMMON FOR EMTS TO CALL DOCTORS FOR GUIDANCE IN
YOUR OBSERVATION?
**A.**    FOR SICK CALL, NO.
**Q.**    AND IS THIS TYPICAL OUTSIDE OF ANGOLA FOR AN EMT TO BE THE
ONLY MEDICAL PERSONNEL WHO WILL SEE A PATIENT FOR POSSIBLY, AS
YOU SAID, YOU KNOW, A MONTH OR MONTHS?
**A.**    NO.  BECAUSE EMTS ARE STABILIZATION AND TRANSPORT.  THEY

1 ARE NOT THE PRIMARY -- THEY ARE NOT PROVIDERS.

2 **Q.** HOW IS THIS DIFFERENT FROM THE TREAT AND RELEASE PROTOCOLS

3 THAT YOU DESCRIBED WHEN YOU WERE TALKING ABOUT THE SCOPE OF

4 PRACTICE MATRIX?

5 **A.** WELL, AT SICK CALL, WE HAVE THE TREAT AND RELEASE, AS I'VE

6 JUST SPOKEN TO IT. THAT MEANS THE PATIENT IS ASSESSED, THE

7 COMPLAINT IS ASSESSED.

8 FOR EXAMPLE, IT COULD BE A MEDICATION REFILL. THAT'S

9 TREAT, ORDER A REFILL, OR PUT IN THERE "PLEASE REFILL," AND THE

10 PATIENT GOES BACK TO HIS CELL, SO TO SPEAK, OR TO THE

11 DORMITORY. THAT'S ACCEPTABLE AND NORMAL.

12 OTHER THAN THAT, TREAT AND RELEASE IS HAPPENING IN

13 THE ATU, AND THAT'S WHERE I HAVE A PROBLEM WITH IT, WHERE THE

14 EMT IS THE ONLY HEALTHCARE PROVIDER OF ANY TYPE TO SEE THE

15 PATIENT, AND THEN THE PATIENT IS DISCHARGED WITHOUT A PHYSICIAN

16 SEEING THE PATIENT, EXAMINING THE PATIENT, RECORDING THE

17 FINDINGS, AND ESTABLISHING A DIAGNOSIS AND A PLAN.

18 **Q.** AND WAS THAT A COMMON OCCURRENCE IN YOUR REVIEW OF THE

19 RECORDS?

20 **A.** EXTREMELY.

21 **Q.** AND SO WHAT CONCERNS DO YOU HAVE ABOUT THAT USE OF EMTS?

22 **A.** WELL, THE ATU IS PARTICULARLY USED AND TO BE USED AND IS

23 USED FOR SERIOUS COMPLAINTS, AND SERIOUS COMPLAINTS REQUIRE

24 SERIOUS ASSESSMENT. AND EMTS DON'T HAVE THE KNOWLEDGE OR

25 TRAINING AND THAT'S NOT THEIR JOB TO ANSWER THE QUESTION WHY IS

THE CHEST PAIN THERE, WHY IS THE ABDOMINAL PAIN THERE.  THAT'S

NOT THEIR JOB OR THEIR TRAINING AND IT'S NOT WITHIN THEIR

SCOPE.  THAT'S WHY I'M WORRIED.

**Q.**  AND WHAT IMPLICATIONS DOES THAT HAVE FOR THE PATIENT'S

ABILITY TO RECEIVE A TIMELY DIAGNOSIS?

**A.**  WELL, WE SAW MULTIPLE TIMES IN THE CHART THAT BECAUSE THAT

WAS HAPPENING, PATIENTS DID NOT HAVE RECEIVE A DIAGNOSIS AND

DID NOT RECEIVE THE PROPER WORKUP FOR SERIOUS MEDICAL

COMPLAINTS THAT RESULTED IN THEIR DEATH OR A DELAYED TRANSFER

TO THE HOSPITAL, WHICH RESULTED IN SIGNIFICANT HARM.

**Q.**  DO YOUR CONCERNS HERE APPLY TO ALL FOUR LEVELS OF EMTS?

**A.**  YES.

**Q.**  WHY ISN'T THE ADDITIONAL TRAINING THAT YOU SAID PARAMEDICS

RECEIVE, WHY ISN'T THAT SUFFICIENT TO ALLOW THEM TO PRACTICE IN

THIS WAY?

**A.**  BECAUSE PARAMEDICS ARE -- ALTHOUGH THEY ARE BETTER TRAINED

TO CHOOSE AND ASCERTAIN WHEN TO PUT IN A -- TO DECOMPRESS A

LUNG THAT'S COLLAPSED, THOSE KINDS OF THINGS, AND THEY CAN DO

THAT, THAT'S GOOD TRAINING.  BUT WHEN IT COMES TO WHY DID THAT

LUNG COLLAPSE, WHY HAS THE PATIENT STOPPED BREATHING AND NEED

TO BE INTUBATED, A TUBE DOWN INTO THE BREATHING -- TO THE

TRACHEA, THAT'S NOT PART OF WHAT THEY'RE SUPPOSED TO DO.  SO

THIS IS THE ANSWER OF DIAGNOSIS AND WHY.  THIS IS WHAT WE NEED

AND PARAMEDICS ARE NOT -- THAT'S NOT THEIR TRAINING.  THEY

ALWAYS COME TO ME ALL THE TIME AND SAY, WHAT HAPPENED AND WHY

1  DID IT HAPPEN, AND THAT'S MY JOB IN THE EMERGENCY ROOM.  AND

2  THAT'S THE JOB OF THE DOCTOR AT ANGOLA IN THE ATU.

3  Q.    OKAY.  I WANT TO TALK ABOUT ONE LAST PROTOCOL, THE DRUG

4  OVERDOSE TESTING PROTOCOL, WHICH IS JOINT EXHIBIT 8A AT 00067.

5            I'M SORRY.  I MUST HAVE GIVEN YOU THE WRONG NUMBER,

6  MARTHA.

7            IF YOU CAN INDULGE ME FOR A MOMENT, YOUR HONOR.  I'M

8  SORRY.

9            WHILE WE ARE PULLING THAT UP, WE TALKED ABOUT THE USE

10  OF DRUG TESTING IN THE CONTEXT OF PATIENT 42 YESTERDAY.  IN

11  YOUR REVIEW OF THE MEDICAL RECORDS, HOW OFTEN DID EMTS APPLY

12  TREATMENT THAT SUGGESTED THEY SUSPECTED A DRUG OVERDOSE?

13  A.    WHEN THE PATIENT HAD AN ALTERED MENTAL STATUS, IT WAS IN

14  MY REVIEW OF THE RECORDS MORE THAN HALF THE TIME.  I DON'T WANT

15  TO SAY UNIVERSALLY, BUT IT WAS EXTREMELY COMMON.

16  Q.    SO IT IS JOINT EXHIBIT 8A AT 00087.  AND SO ALTERED MENTAL

17  STATUS, IF WE LOOK AT THE FIRST LINE, IS LISTED AS A CRITERIA

18  FOR THE DRUG OVERDOSE TREATMENT PROTOCOL.  IS IT APPROPRIATE IN

19  YOUR MIND TO -- AND LET ME STEP BACK FOR A SECOND.

20            SO WHEN THEY DO FOLLOW THAT PROTOCOL, WHAT DO THEY --

21  WHAT, IF ANYTHING, DID THEY ADMINISTER TO THE PATIENT?

22  A.    WELL, ONE THING THAT MAY BE ADMINISTERED IS NARCAN OR

23  NALOXONE TO REVERSE AN OPIATE.  THE OTHER THING THAT MAY BE

24  PERFORMED, PROCEDURE, IS LAVAGE, WHICH IS JUST PUMPING THE

25  STOMACH IS HOW WE COULD CALL IT IN COLLOQUIAL, AND THE OTHER

1    THING IS DOING A URINE DRUG SCREEN, WHICH IS CALLED THE TOX

2    CUP.  SO THOSE WOULD BE THE THREE PRIMARY PIECES TO THE DRUG

3    OVERDOSE FOR ALTERED MENTAL STATUS PROTOCOL.

4    **Q.**    OKAY.  IS IT APPROPRIATE, IN YOUR OPINION, TO ADMINISTER

5    NALOXONE TO THE MAJORITY OF PATIENTS WHO HAVE ALTERED MENTAL

6    STATUS?

7    **A.**    NO.

8    **Q.**    WHY NOT?

9    **A.**    WELL, BECAUSE NALOXONE IS -- SHOULD BE GIVEN WHEN THERE'S

10    A SIGN OF AN OPIATE INTOXICATION TO INCREASE THE RESPIRATORY

11    RATE SO THAT THE PATIENT IS NO LONGER HAVING A RESPIRATORY

12    EMERGENCY.  THE PROBLEM IS THAT WHEN YOU -- FOR EXAMPLE,

13    SOMEBODY MAY HAVE ACCESS OR BE PRESCRIBED AN OPIATE FOR PAIN IN

14    THE INFIRMARY OR WHEREVER IT IS.  NOW YOU REVERSE THAT OPIATE

15    AND THE PERSON MAY HAVE SOMETHING ELSE WRONG WITH THEM AND

16    START TO REVERSE IF THEY START TO VOMIT, IF THEY ARE PUT INTO

17    OPIATE WITHDRAWAL.  I'VE HAD THAT HAPPEN AND OBSERVED THAT OVER

18    MY MANY YEARS, MANY TIMES.  SO SOMEBODY IS NOW IN OPIATE

19    WITHDRAWAL, VOMITING, WITH AN ALTERED MENTAL STATUS AND IS

20    ASPIRATING, THAT VOMIT IS BEING SUCKED BACK INTO THE LUNGS.

21    IT'S A BIG PROBLEM.  IT CAN BE DANGEROUS.

22         BUT, MORE IMPORTANTLY, IS THAT IT'S NOT HELPFUL, AND

23    SO THAT'S THE ISSUE WITH NALOXONE.

24    **Q.**    AND YOU ALSO MENTIONED LAVAGE.  IS THAT APPROPRIATE TO DO

25    WHEN PATIENTS PRESENT WITH ALTERED MENTAL STATUS?

**A.**   NO.  I MEAN, LAVAGE -- THE AMERICAN COLLEGE OF MEDICAL

TOXICOLOGY HAS A POSITION PAPER FOR IT.  LAVAGE IS VERY

INFREQUENTLY USED.  NOW WHEN I TRAINED IN 1984, EVERYBODY GOT

LAVAGE.  I THINK THAT'S ABOUT 30 YEARS AGO.  SO THAT PRACTICE

SHOULD HAVE STOPPED.  THAT IS A 30-YEAR-OLD PRACTICE.  IF I

LAVAGE -- IF WE LAVAGE ONE PERSON PER YEAR IN THE BELLEVUE

EMERGENCY DEPARTMENT, WE SEE 150,000 PATIENTS PER YEAR, OR TWO

PATIENTS, THAT'S ABOUT WHAT WE DO.  AND THAT'S WITH THE

TOXICOLOGY STANDING THERE, CLEAR ABNORMALITIES FROM OVERDOSE,

PARTICULARLY SHOWN ON THE ELECTROCARDIOGRAM, CLEAR SITUATION

WHERE IT MAY BE INDICATED.  NONE OF THESE PATIENTS HAD THAT.

**Q.**   AND WHAT ARE SOME OF THE RISKS OF LAVAGE IN A CIRCUMSTANCE

WHERE IT'S NOT INDICATED?

**A.**   WELL, FIRST OF ALL, IT'S A TRAUMATIC THING.  THE TUBE THAT

YOU'RE PUTTING DOWN THE -- IT'S NOT A NASOGASTRIC TUBE,

ALTHOUGH YOU CAN PUT -- I MEAN, THESE TUBES ARE ABOUT 40

FRENCH.  THEY'RE ABOUT THE SIZE OF A CARROT, A CARROT THAT YOU

BUY IN ONE OF THOSE BAGS, FOR LIKE 49 CENTS FOR A BAG OF

CARROTS.  SO THAT'S A BIG TUBE.  YOU PUT IT DOWN THE MOUTH.

SOME PEOPLE PUT INTO THE AIRWAY.  I THINK THESE PARAMEDICS KNOW

BETTER THAN THAT, SO I'M NOT SAYING THEY ARE DOING THAT.  IT

CAN PERFORATE THE ESOPHAGUS, IT CAN GET COILED UP, AND MORE

THAN ANYTHING, THE PATIENT CAN CAUSE -- HAVING A TUBE THAT SIZE

STUFFED DOWN YOUR MOUTH CAN CAUSE VOMITING, AGAIN, THEN YOU

HAVE AN ASPIRATION RISK.  IT'S A RISK/BENEFIT RATIO, AND

THERE'S NO BENEFIT WHEN IT'S NOT INDICATED.  AND ALL THE RISKS

TAKE AN INCREASED PART THEN IN THAT DECISION IN THAT PROCEDURE.

**Q.**    AND IN THE CIRCUMSTANCES IN THE RECORDS WHERE YOU SAW

DEFENDANTS USING LAVAGE, WAS IT INDICATED?

**A.**    NO.

**Q.**    MOVING BACK TO THE PROTOCOLS JUST BROADLY, DO YOU SEE

PROBLEMS IN HOW EMTS DOCUMENT THE USE OF PROTOCOLS?

**A.**    WELL, THE WORD "AS PER PROTOCOL" IS THE ONLY THING I EVER

SAW, AND AS PER PROTOCOL, I DON'T KNOW HOW, AND EVEN IF THEY

DID SAY THE PROTOCOL, I DON'T SPECIFICALLY REMEMBER THAT THEY

WOULD WRITE ABDOMINAL PROTOCOL OR ANYTHING LIKE THAT.  BUT THE

PROBLEM IS THEN, WHAT WAS THE MEDICAL DECISION-MAKING THAT

BROUGHT THEM TO THAT DECISION TO USE THAT PROTOCOL?  WHY THE

ABDOMINAL PAIN AND NOT THE VOMITING?  IF THERE'S VOMITING

PRESENT WITH ABDOMINAL PAIN, THE USE, THE MEDICAL

DECISION-MAKING, THE UNDERSTANDING, THE THINKING PROCESS WAS

NOT ON THE PAPER, AND THAT'S WHAT I'D LIKE TO KNOW IN THE ATU.

**Q.**    DID YOU SEE MANY SITUATIONS WHERE EMTS COULD HAVE USED

MULTIPLE DIFFERENT PROTOCOLS BUT DIDN'T SAY WHICH WAS WHICH OR

WHICH THEY USED?

**A.**    YES.  I MEAN, WHEN YOU HAVE A SYMPTOM, THERE ARE OFTEN

MANY PROTOCOLS.  MANY THINGS COULD CAUSE THE SYMPTOM,

THEREFORE, THERE ARE POSSIBILITIES FOR PROTOCOLS AS TO WHICH

ONE TO CHOOSE, YES.

**Q.**    NOW, YOU SAID YESTERDAY THAT EMTS OFTEN APPEAR TO BE

PRACTICING WITHOUT PROVIDER SUPERVISION.  IS THAT RIGHT?

**A.**    THAT'S CORRECT.

       **MR. DUBNER:**  I WOULD LIKE TO LOOK BACK AT ONE DETAIL OF PATIENT NO. 42'S CHARTS.  THIS SHOULD NOT BE PUBLISHED TO THE GALLERY.  MARTHA, IF YOU COULD BRING UP JOINT EXHIBIT 1OP AT 15237 AND 15238.

**BY MR. DUBNER:**

**Q.**    NOW, DR. VASSALLO, HALFWAY DOWN THE PAGE, THERE'S A LINE THAT SAYS "PHYSICIAN ASSESSMENT AND TREATMENT."  DO YOU SEE THAT?

**A.**    ARE WE ON THE LEFT?

**Q.**    ON BOTH OF THE PAGES.

**A.**    YES.  OKAY, OF COURSE.  THAT'S THE -- YES, I DO.

**Q.**    AND AS FAR AS YOU CAN TELL, WHO WAS WRITING BELOW THOSE LINES?

**A.**    WELL, IT APPEARS THAT AN EMT WAS WRITING THAT, THE CAREGIVER THERE, BECAUSE I'M QUITE SURE THAT DR. LAVESPERE DOES NOT REFER TO HIMSELF IN THE THIRD PERSON.

**Q.**    AND YOU'RE REFERRING TO THE 729 LINE ON --

**A.**    "0729 TO LOL, PER DR. LAVESPERE."  HE WOULDN'T WRITE THAT. SO SOMEONE WROTE THAT, THAT HE GAVE AN ORDER TO TRANSFER THE PATIENT TO OUR LADY OF THE LAKE.

**Q.**    WAS IT TYPICAL TO SEE MEDICS AS THE ONLY PEOPLE WRITING IN THE PHYSICIAN ASSESSMENT AND TREATMENT SECTION?

**A.**    COMPLETELY.

**Q.** AND ON THESE TWO IN PARTICULAR, FOR EXAMPLE, DID A
PROVIDER DOCUMENT ANY EXAMINATION OR CARE OF THE PATIENT DONE
ON EITHER OF THESE?

**A.** NO.

**Q.** WAS THAT COMMON IN YOUR REVIEW OF CHARTS?

**A.** VERY COMMON.

**Q.** IS THAT A TYPICAL PRACTICE OUTSIDE OF ANGOLA?

**A.** NO. I MEAN, MEDICAL DOCUMENTATION IS HOW WE COMMUNICATE
OUR THOUGHTS WITH THE REST OF THE WORLD, HOW WE COMMUNICATE OUR
DECISION-MAKING, AND HOW WE COMMUNICATE WITH OTHERS
SUBSEQUENTLY.

**Q.** AND IF THERE IS NO DOCUMENTATION OF A PHYSICIAN EXAMINING
OR PROVIDING ANY TREATMENT TO A PATIENT, WHAT DOES THAT SUGGEST
FOR WHETHER A PROVIDER DID, IN FACT, EXAMINE OR PROVIDE
TREATMENT?

**A.** WELL, THEN THEY DIDN'T DO IT. IF THEY DIDN'T WRITE DOWN
"I DID A PHYSICAL EXAMINATION," THEY DIDN'T DO ONE. EVEN IF
YOU DON'T WRITE ALL THE DETAILS OF IT, YOU DIDN'T DO IT.

**Q.** AND SO IN THIS RECORD, AS YOU DISCUSSED YESTERDAY, THE
PATIENT WAS ONLY SEEN BY MEDICS FOR EIGHT HOURS OR SO, IT
APPEARED. ARE YOU FAMILIAR WITH ANY SITUATIONS WHERE IT WOULD
BE APPROPRIATE FOR EMTS TO TREAT A PATIENT FOR SEVERAL HOURS
WITHOUT A PROVIDER EXAMINATION?

**A.** IN THE PRE-HOSPITAL SETTING IN REMOTE AREAS, SOMETHING
LIKE THAT COULD HAPPEN AS THEY TRANSPORT THE PATIENT TO MEDICAL

CARE, BUT IN THE EMERGENCY DEPARTMENT IN THE ACUTE TREATMENT

UNIT, ABSOLUTELY NOT.

**Q.**   DEFENDANTS HAVE SAID THAT BECAUSE SOME DOCTORS AT ANGOLA

LIVE ON THE PRISON GROUNDS, THEY HAVE THE ABILITY TO COME INTO

THE ATU ON NIGHTS OR WEEKENDS.  IN YOUR REVIEW OF THE RECORDS,

DID THAT APPEAR TO BE A COMMON PRACTICE?

**A.**   NO.

**Q.**   DID YOU SEE ANY INSTANCES WHERE IT APPEARED THAT

PHYSICIANS CAME IN AT NIGHT OR ON THE WEEKEND?

**A.**   I CAN'T COMMENT ABOUT THE WEEKEND, BUT ON THE OVERNIGHTS,

THE EMTS RAN THE CARE.  WAS THERE AN INSTANCE IN THE COURT

WHERE THAT EVER HAPPENED?  IT COULD BE, BUT THE PREDOMINANCE OF

THE CARE WAS PROVIDED BY EMTS DURING THE NIGHTTIME.

**Q.**   AND NOW MOVING AWAY FROM INDIVIDUAL PATIENT ENCOUNTERS.

MOVING AWAY FROM THE INDIVIDUAL PATIENT ENCOUNTERS, YOU'VE

NOTED THAT EMTS ARE ALSO CORRECTIONS OFFICERS.  IS THAT

CONCERNING TO YOU?

**A.**   IT IS VERY CONCERNING BECAUSE THERE'S A -- EVEN WHEN A --

THERE'S ALWAYS THE SECURITY VERSUS THE MEDICAL CARE OF THE

PATIENT CONCERN IN A SETTING TAKING CARE OF A PRISONER.  AND

HERE WE HAVE, WITHIN ONE PERSON, WE HAVE THE HEALTHCARE OF THE

PATIENT AND THE WELL-BEING OF THE PATIENT THAT CONFLICT WITH

THE SECURITY CONCERNS, AND THE EMTS RESPONDING AND CAN BE FIRED

BY THE WARDEN BECAUSE THERE'S A SECURITY CHAIN OF COMMAND.  SO

IF I AM A HEALTHCARE PROVIDER AND I AM NOT CONTROLLED -- MY JOB

1   IS NOT DEPENDENT ON THE SECURITY CHAIN OF COMMAND, THEN I CAN

2   PUSH BACK A LITTLE ON SECURITY AND COME TO AN AGREEMENT WITH

3   HOW WE'RE GOING TO HANDLE A PARTICULAR SITUATION.

4           AND I DO THAT ALL THE TIME.  AND SO DO OUR EMTS WHO

5   TAKE CARE OF PRISONERS.  SO WE CAN SAY, THIS IS UNSAFE, THIS IS

6   -- HERE WE HAVE A DUAL LOYALTY AND WE HAVE SOMEBODY WHO CAN

7   DISCIPLINE THAT EMT IN THE SECURITY, SO WE CANNOT PUT,

8   NECESSARILY, ALL THE TIME WE HAVE THAT CONFLICT IS PRESENT IN

9   THAT KIND OF A SETUP.

10  Q.   AND TO WHAT EXTENT DO EMTS AT ANGOLA APPEAR TO BE

11  RECEIVING ANY KIND OF QUALITY REVIEW FROM THE MEDICAL

12  DEPARTMENT?

13  A.   I DIDN'T SEE ANY DOCUMENTATION OF QUALITY REVIEW.  I KNOW

14  THAT AS A PROVIDER OF EMERGENCY MEDICINE CARE, OFTEN I WILL

15  TALK TO AN EMT OR A PARAMEDIC ABOUT WHAT HAPPENED, WHAT I SAW,

16  WHAT THEY DID, AND HOW THEY THOUGHT, THAT'S NOT QUALITY REVIEW.

17  THAT'S TEACHING.  THAT'S COMMENTARY.  THAT'S A CONVERSATION.

18          QUALITY REVIEW TAKES -- IS MUCH MORE DETAILED AND

19  SHOULD BE DOCUMENTED AT SOME POINT.  SO I'M NOT SAYING THAT

20  THERE IS NEVER A CONVERSATION.  WHAT I'M SAYING IS THERE'S NO

21  EVIDENCE OF WHAT WE CALL QUALITY ASSURANCE AS IT EXISTS TODAY

22  IN MEDICINE.

23  Q.   AND WHAT DO YOU MEAN WHEN YOU SAY "QUALITY ASSURANCE AS IT

24  EXISTS TODAY IN MEDICINE"?

25  A.   WELL, THERE'S A DOCUMENTATION OF QUALITY REVIEW.  THERE'S

A REVIEW OF CREDENTIALS.  THERE'S A REVIEW OF WHAT HAPPENED IN

ANY PARTICULAR CASE.  IT'S WRITTEN DOWN, AND IT'S IN THE FILE,

AND IT'S ON A REGULAR SYSTEMATIC APPROACH TO THAT.  THAT'S HOW

IT SHOULD BE DONE.  THAT'S HOW MEDICAL DIRECTORS OF EMERGENCY

MEDICINE SERVICES OPERATE, OR SHOULD OPERATE.

**Q.**    NOW TURNING BRIEFLY TO THE ATU ITSELF, WHAT'S YOUR OVERALL

ASSESSMENT OF THE SUITABILITY OF THE ATU FOR THE PURPOSES THAT

DEFENDANTS USE IT FOR?

**A.**    WELL, THE GOOD THINGS ABOUT IT IS THAT THEY CAN DO CERTAIN

THINGS THERE.  THEY DON'T HAVE MANY THINGS AVAILABLE AND THE

THINGS THAT ARE AVAILABLE, FOR EXAMPLE, THE DAY THAT I WAS

THERE, THE RESPIRATOR WASN'T USED ON THE PATIENT WHO NEEDED TO

BE -- BUT THAT PATIENT WAS GOING TO BE TRANSFERRED OUT.  THEY

DON'T HAVE ULTRASOUND.  THEY DON'T HAVE SOME OF THE MATERIALS

FOR -- AND JUST THE STANDARD OF THE PLACE IS -- FOR EXAMPLE,

THE WAY THAT THEY KEEP THEIR PHARMACEUTICALS ALL IN ONE DRAWER

WITH HANDWRITTEN THINGS, THAT WOULD NEVER -- THE ATU WOULD NOT

PASS ANY KIND OF NATIONAL STANDARD FOR AN EMERGENCY ROOM SUCH

AS A JCAHO OR THE NATIONAL LICENSING OR CREDENTIALING BODY FOR

WHICH WE ALL HAVE TO RESPOND.

**Q.**    AND JUST BRIEFLY, WHAT IS JCAHO?

**A.**    WELL, I ALWAYS FORGET WHAT THE ACRONYM IS FOR, BUT

BASICALLY IT'S THE NATIONAL STANDARD FOR HOSPITAL SYSTEMS

REVIEW, AND WE ALL HAVE TO UNDERGO THAT REVIEW WHEN JCAHO, AS

THE GOVERNMENT, COMES IN TO LOOK AT OUR EMERGENCY DEPARTMENT IN

OUR HOSPITAL.  WE ARE WARNED AND TOLD NOT TO HAVE FOOD ON THE
DESK.  WE ARE TOLD TO KEEP IT CLEAN, CLEAN IT UP.  AND
EVERYBODY IS CHECKING THAT ALL SYSTEMS SUCH AS PHARMACY,
OPERATIONS, UNDERSTANDING OF FIRE SAFETY, ALL OF THOSE THINGS
ARE REVIEWED SO THAT WE ARE READY TO GO.

**Q.**   AND JCAHO, IS IT POSSIBLE THAT THAT'S THE JOINT COMMISSION
ON ACCREDITATION OF HEALTHCARE ORGANIZATIONS?

**A.**   THANK YOU, YES.  THAT'S EXACTLY WHAT IT IS.

**Q.**   I THINK IT'S SPELLED J-C-A-H-O NORMALLY?

**A.**   YES.  AND IT'S GOT A NICKNAME JCAHO, SO . . .

**Q.**   YOU SAID A MOMENT AGO THAT THE ATU DOESN'T HAVE SOME OF
THE MATERIALS.  I THINK YOU MAY HAVE NOT FINISHED THE SENTENCE.
WHAT KIND OF MATERIALS WERE YOU REFERRING TO?

**A.**   WELL, THE -- WHEN I WAS THERE, THEY WERE LOOKING FOR
CERTAIN THINGS.  SO THE BAGGING, THE INTUBATION MATERIALS, I DO
BELIEVE WERE THERE.  I DIDN'T SEE THE BREADTH OF ITEMS THAT I
WOULD HAVE LIKED TO HAVE SEEN, PARTICULARLY ANCILLARY HEALTH
LIKE OVERHEAD X-RAY, CAT SCAN, WHICH WE'VE TALKED ABOUT
YESTERDAY AT LENGTH.

ULTRASOUND IS AN INTEGRAL PART OF PHYSICAL
EXAMINATION IN EMERGENCY MEDICINE TODAY.  AND PEOPLE --
EMERGENCY MEDICINE PHYSICIANS ARE TRAINED TO USE THAT TO PLACE
IV'S TO ASCERTAIN IF THERE'S BLOOD IN THE ABDOMEN, TO SEE IF
THE LUNGS ARE COLLAPSED.  IT GOES ON AND ON.  ULTRASOUND IS
USED FOR EVERYTHING.  IT'S AN EXTENSION OF THE PROVIDER'S

PHYSICAL EXAMINATION.

**Q.** DR. VASSALLO, I'D LIKE TO BEGIN WRAPPING UP. I THINK FIRST SORT OF A CONCLUDING QUESTION, YOU NOTED A FEW PLACES YESTERDAY WHERE EMTS APPEAR TO BE DOING A GOOD JOB. WHERE IN YOUR MIND DOES THE GOOD USE OF EMTS END AND THE PROBLEMS BEGIN AT ANGOLA?

**A.** WELL, THE EMTS ARE DOING A GOOD JOB. IT'S JUST THAT THEY ARE DOING -- EVEN IN THE ATU, THEY DO WHAT THEY KNOW HOW TO DO. IT'S JUST NOT THE JOB THAT HAS TO BE DONE. WHERE THE CARE IS GOOD AND THE JOB IS GOOD AND EXACTLY AS IT SHOULD BE IS IN THE PRE-ATU OUT IN THE FIELD JUST AS OUR PARAMEDICS AND EMTS IN THE PUBLIC HEALTH ARENA AND FREE PEOPLE TODAY ARE USED. THEY ARE DOING A GOOD JOB.

WHEN THEY GET TO THE EMT, THEY'RE PLACED INTO THE ATU, THEY'RE PLACED IN A POSITION THAT EXTENDS THEIR SCOPE, THEIR KNOWLEDGE. THEY DO THEIR BEST. THEY RECORD THE PATIENT IS DYING IN FRONT OF THEM. THEY UNDERSTAND THAT. THEY CONTINUE TO RECORD VITAL SIGNS. THAT'S WHAT THEY KNOW HOW TO DO. THEY MAKE THE OBSERVATION, THE PATIENT AS HE'S DYING OF HIS STROKE, HAVING PERMANENT NEUROLOGIC INJURY, THEY RECORD HE'S MORE AWAKE. THAT'S NOT WHAT THIS IS ABOUT. SO TO ANSWER YOUR QUESTION SUCCINCTLY, PRE-HOSPITAL CARE, AND THEN IT SHOULD STOP.

WITH RESPECT TO SICK CALL, THEY SHOULD NOT BE THE GATEKEEPER FOR TO HEALTHCARE. THAT IS NOT THEIR SCOPE OR THEIR

TRAINING.

**Q.** AND ON THE WHOLE, WHAT CONCLUSIONS DID YOU DRAW ABOUT THE PRACTICE OF EMERGENCY MEDICINE AT ANGOLA?

**A.** HAVING TRAINED IN THE '80S, THE EARLY '80S, AND PROGRESSED OVER 30 YEARS OF KEEPING UP WITH IT, IT JUST SEEMS LIKE IT STOPPED. IT'S FROZEN IN TIME IN THE '80S. AND THAT WAS MY OVERALL IMPRESSION.

**Q.** AND WHAT EFFECT -- AND IF WE COULD DIG INTO THAT A SLIGHT BIT MORE, YOU KNOW, IN WHAT WAYS IS IT FROZEN IN TIME IN YOUR VIEW?

**A.** WELL, FIRST AND FOREMOST, THE USE OF EMTS TO BE THE GATEKEEPER TO CARE, THAT'S A VERY OLD PRACTICE, AND I KNOW THAT SOME OF THOSE PLACES THAT THAT HAPPENED OR WERE UNDER, YOU KNOW, A COURT ORDER TO MAKE CHANGES, BUT THAT'S ALL OLD AND I DON'T KNOW ANY DETAILS ABOUT IT.

AND THEN THE PHYSICIAN, AS TO THE EXTENT THAT THE PHYSICIAN IS THE MEDICAL DIRECTOR OF EMS SERVICES AT ANGOLA, THERE'S BEEN NO UPDATE. I DON'T KNOW IF IT'S A KNOWLEDGE GAP, TIME, IF IT'S OPERATIONAL, WHERE HE HAS TOO MUCH TO DO, AND IS ASSIGNED TOO MANY -- AND DOESN'T HAVE ANY HELP, AND IS JUST OVERWHELMED BY THE DUTIES OF CARING FOR THE PATIENTS, IF IT'S CYNICAL, I HAVE NO IDEA. BUT ALL I KNOW IS THAT IT'S STOPPED IN THE '80S, AND THAT BOTHERS ME AS A PHYSICIAN VERY MUCH.

**Q.** AND WHAT EFFECT DO THESE PROBLEMS YOU'VE IDENTIFIED HAVE ON THE RISK OF HARM TO PATIENTS?

**A.** WELL, THE HARMS ARE SHOWN IN THE MEDICAL RECORDS. WE'VE SHOWN SOME HARMS. A PATIENT WHO CANNOT ACCESS CARE AND GOES TO SICK CALL SEVERAL TIMES AND IS DISCHARGED, AND THE MORE THEY GO, THE MORE THEIR COMPLAINT IS THOUGHT TO BE -- HAVE NO MERIT, THAT'S A VERY DANGEROUS PROCESS. WE CALL THAT A CHANCE TO MAKE A CHANGE.

IF SOMEONE COMES IN FOR CHEST PAIN THREE TIMES IN A ROW OVER TWO WEEKS, IT'S A DANGEROUS PATIENT. SOMETHING IS HAPPENING WITH THAT PATIENT. OR IF IT'S NOT, SHOW ME IT'S NOT. GET A TROPONIN, GET AN ECHO, DO A STRESS TEST, DO SOMETHING. SHOW ME THAT THAT'S NOT A CARDIAC OR A SERIOUS ABNORMALITY WITHIN THE CHEST. AND THEN YOU CAN SAY, LISTEN, THIS IS NOT SERIOUS PAIN. I HAVE DONE THE WORKUP, YOU HAVE BEEN EVALUATED. THE PATIENT HAS TO BE EVALUATED BEFORE THEY ARE CONTINUOUSLY DISCHARGED.

**Q.** YOU TESTIFIED EARLIER THAT YOU SEE UPWARDS OF 20 OR 30 PATIENTS FROM CORRECTIONAL INSTITUTIONS BASICALLY EVERY DAY YOU PRACTICE. HAVE YOU EVER HAD EVIDENCE OF THIS KIND OF PRACTICE OF CARE AT A CORRECTIONAL FACILITY?

**A.** WELL, 30 YEARS AGO APPROXIMATELY WHEN I CAME TO BELLEVUE, WE SAW THAT, AND THE PROBLEM WAS THERE WAS A PRIVATE COMPANY THAT WAS RUNNING CARE AT RIKERS ISLAND JAILS, AND THAT PRIVATE COMPANY WAS NOT -- WAS SAVING MONEY BY NOT TRANSPORTING. SO THEY WOULD HANG ONTO PATIENTS WHO WERE DEATHLY ILL, THEY WOULD COME TO BELLEVUE CRITICALLY ILL AT THE POINT OF DEATH, AND THAT

WAS A PROBLEM.  SO THE DEPARTMENT OF HEALTH, MENTAL HEALTH
SERVICES FOR NEW YORK CITY TOOK OVER THE CONTROL OF HEALTHCARE
AT RIKERS.  WE DON'T SEE THAT ANYMORE.  AND THEY HAVE DOCTORS
AT RIKERS NOW.  THEY HAVE AN EMERGENCY DEPARTMENT.  THEY HAVE
CLINICS, A LOT OF CLINICS.  AND THE CARE HAS MOVED UP AND
ESCALATED TO THE RIGHT PEOPLE.  IT'S VERY UNUSUAL.

         AS A MATTER OF FACT, I HAVEN'T SEEN THAT FOR MANY,
MANY YEARS IN THE MALE PRISON -- OR JAIL POPULATION FROM RIKERS
WHO COME TO US FROM THE DEPARTMENT OF CORRECTIONS.

**Q.**   AND YOU'VE SAID YOU'VE ALSO PRACTICED IN TEXAS IN A NUMBER
OF LOCATIONS.  HAVE YOU EVER HAD CAUSE TO BELIEVE THAT THESE
SORTS OF -- THIS PATTERN OF PRACTICE WAS HAPPENING AT ANY
PLACES YOU HAVE WORKED THERE?

**A.**   NO.

**Q.**   AND YOU ALSO TESTIFIED THAT YOU'VE PRACTICED EMERGENCY
MEDICINE IN CRISIS SITUATIONS, LIKE AFTER 9/11 OR HURRICANE
SANDY.  WERE EMTS USED IN ANYTHING LIKE THE WAY THEY'RE USED AT
ANGOLA IN THOSE KINDS OF CRISIS SITUATIONS?

**A.**   NO.

**Q.**   YOU ALSO SAID EARLIER THAT YOU'VE BEEN CERTIFIED BY THE
NATIONAL COMMISSION ON CORRECTIONAL HEALTHCARE, AND THAT YOU'VE
EVALUATED, I THINK, ABOUT A DOZEN CORRECTIONAL FACILITIES.
HAVE YOU EVER SEEN EMTS USED IN THE MANNER THAT THEY'RE USED AT
ANGOLA IN THAT WORK AND CERTIFICATION?

**A.**   THE PART THAT I WANT TO ANSWER IS THAT THE PRE-HOSPITAL IS

THE SAME.  IT'S WHEN YOU GET INTO THE HOSPITAL OR THE
ENVIRONMENT THAT THE CARE DIFFERS DRAMATICALLY, AND THE EMT IS
NO LONGER TO PROVIDE THE CARE.

**Q.**   AND WHEN YOU SAY "PRE-HOSPITAL," DOES THAT INCLUDE SICK
CALL OR IS SICK CALL DIFFERENTIATED FROM THAT?

**A.**   SICK CALL IS DIFFERENTIATED FROM THAT.  I HAVE NOT SEEN
EMTS USED IN THIS WAY.

**Q.**   AND THEN JUST BROADENING OUT FOR ONE MOMENT, CONSIDERING
BOTH EMERGENCY CARE AND WHAT YOU SAW OF NON-EMERGENCY CARE IN
THE MEDICAL RECORDS THAT YOU REVIEWED, WHAT'S YOUR OVERALL
ASSESSMENT OF THE ADEQUACY OF CARE AT ANGOLA?

**A.**   THERE ARE EPISODES OF GOOD CARE, BUT THE HUNDREDS AND
HUNDREDS OF PAGES WHERE THERE'S NO DOCUMENTED CARE AND THE
TRAJECTORY OF THE PATIENTS OVER TIME AND YEARS WITHOUT THAT
CARE, THAT STABILIZATION OF PROCESSES, TO THE EXTENT THAT WE
CAN STABILIZE THESE, IS POOR.  SO IN THAT SENSE, THE CARE IS
NOT STANDARD OF CARE IN AMERICA TODAY.

**Q.**   AND WHAT EFFECT DOES THAT HAVE ON THE RISK OF HARM TO
PATIENTS?

**A.**   WELL, PATIENTS ARE HARMED BECAUSE THEIR CONDITIONS ARE NOT
STABILIZED, THEIR BLOOD PRESSURES ARE NOT TREATED PROPERLY.
OVER TIME, THERE IS AN ALLOWANCE FOR HIGH BLOOD PRESSURE.
THERE IS A -- SO TO SHORTLY ANSWER, PATIENTS SUFFER HARMS AT
ANGOLA, AND WE HAD THOUSAND OF PAGES TO DEMONSTRATE THAT.

**Q.**   AND WERE YOU USING BLOOD PRESSURE AS ONE EXAMPLE OF THAT

OR WAS THAT THE TOTALITY?

**A.**   YES.   THERE ARE MANY EXAMPLES, SO I PROBABLY SHOULDN'T

JUST GET TO BLOOD PRESSURE CONTROL, ONE ANY PARTICULAR THING.

THERE ARE SO MANY PAGES WITH RTC EVEN FROM THE PHYSICIANS WITH

NO PHYSICAL EXAMINATION IN THE CHRONIC CARE, BECAUSE REMEMBER I

LOOKED AT ATU AND SICK CALL, BUT I READ EVERY CHART, THOUSANDS

OF PAGES SOME OF THESE AND HUNDREDS FOR SURE.   NOT THOUSANDS,

2000.   SO THERE WERE A LOTS OF CHARTS, A LOT OF PAGES WITH

ALMOST NOTHING GOING ON.

**Q.**   THANK YOU, DR. VASSALLO.   THAT'S ALL I HAVE.

                **THE COURT:**  CROSS.

                        **CROSS-EXAMINATION**

**BY MR. ARCHEY:**

**Q.**   GOOD MORNING, DR. VASSALLO.

**A.**   GOOD MORNING, MR. ARCHEY.

**Q.**   WE'VE BEEN VISITING OUT IN THE HALL, AND I GET TO SEE YOU

IN COURT TODAY.

**A.**   YES, MY PLEASURE.

**Q.**   MINE AS WELL.   THANK YOU.

                LET ME BEGIN WITH TALKING ABOUT THE ATU.   THE ATU,

THAT STANDS FOR THE ASSESSMENT AND TREATMENT CENTER.   ARE YOU

AWARE OF THAT?

**A.**   YES.

**Q.**   OKAY.   AND THE PURPOSE OF THAT UNIT IS, AS THE NAME

STATES, IS TO RECEIVE THE PATIENT, ASSESS THE PATIENT AND TREAT

THE PATIENT.  AND THEN ONE OF THREE OUTCOMES FROM THERE:

RETURN BACK TO WHERE HE CAME FROM, HIS DORM OR WHAT HAVE YOU;

SENT TO THE INFIRMARY; OR SENT OFFSITE TO THE HOSPITAL.  THOSE

ARE THE OUTCOMES FROM THE ATU.  IS THAT FAIR?

**A.**   YES.

**Q.**   OKAY.  LSP IS A MAXIMUM SECURITY PRISON.  IS THAT RIGHT?

**A.**   YES.

**Q.**   HAVE YOU EVER WORKED IN A MAXIMUM SECURITY PRISON?

**A.**   NO.

**Q.**   HAVE YOU EVER WORKED IN A CORRECTIONS FACILITY AT ALL?

**A.**   NO.

**Q.**   WELL, BEFORE I GO THERE, WHAT ARE THE PURPOSES OF A

FACILITY SUCH AS LSP WITH THESE PRISONERS?  LET ME ASK IT THIS

WAY.  THE PURPOSE IS TO PROTECT THE PUBLIC FROM THESE

INDIVIDUALS WHILE TAKING CARE OF THEM AS THEY ARE HOUSED THERE

AT LSP.  IS THAT A FAIR?

**A.**   YES.

**Q.**   WHEN A DECISION IS MADE TO TRANSPORT A PATIENT OFFSITE,

THAT IS A LOGISTICALLY DIFFICULT UNDERTAKING.  ISN'T THAT FAIR?

**A.**   SIR, IT'S A LOGISTICAL UNDERTAKING.  AND AFTER SO MANY

YEARS AT ANGOLA, THAT SHOULD BE A CLEAR PROCESS WITH THE WAY TO

DO IT.

          WE HAVE HIGH SECURITY PATIENTS COMING TO US AT

BELLEVUE FROM HIGH PROFILE, NATIONAL INCIDENTS ALL THE TIME.

YOU GET SEVERAL CORRECTIONS OFFICERS THERE WITH THEIR GUNS AND

THEIR SHIELDS AND YOU TAKE CARE OF THAT PATIENT.

**Q.**   AND AS FAR AS WHAT IT TAKES, THOUGH, TO GET THEM TO YOU AT BELLEVUE OR FROM LSP TO AN EMERGENCY ROOM, DO YOU KNOW WHAT ALL THAT ENTAILS?

**A.**   SOMEBODY WITH A HEALTHCARE EMERGENCY?

**Q.**   YES, MA'AM.

**A.**   WHO HAS EMTS IN THE AMBULANCE WITH THEM AND THEY CAN HAVE SECURITY PERSONNEL IN THE AMBULANCE AS WELL.

**Q.**   RIGHT.

**A.**   THEY CAN BE SHACKLED, AS THEY ARE AND RESTRAINED, AND THEY CAN BE SEDATED IF THAT'S NECESSARY.

**Q.**   MUST ARRANGE FOR AT LEAST TWO SECURITY OFFICERS TO GO WITH THE TRANSPORT.  ARE YOU AWARE OF THAT?

**A.**   I'M SURE THAT'S THE CASE.  I CERTAINLY SEE THAT IN MY OWN PRACTICE.

**Q.**   THE SECURITY OFFICERS MUST GO DRAW WEAPONS, BECAUSE THEY'RE NOT CARRYING THEM INSIDE LSP.  THAT HAS TO HAPPEN BEFORE THEY LEAVE OUT.  CORRECT?

**A.**   YES, SIR.

**Q.**   AND, OF COURSE, THERE'S PAPERWORK LIKE A TRIP TICKET AND THOSE TYPES OF THINGS?

**A.**   YES, SIR.

**Q.**   ALL RIGHT.  DEATH ROW INMATES TAKE EVEN FURTHER SECURITY MEASURES?

**A.**   YES, SIR.

09:41  1    **Q.**   DO YOU UNDERSTAND THAT?  WHILE ALL THIS IS GOING ON, THE

2    DOCTOR, THE PROVIDER, AT THE ATU IS COORDINATING WITH THE

3    RECEIVING ER UNIT.  ARE YOU AWARE OF THAT?

4    **A.**   THAT'S NORMAL PRACTICE, SIR.

5    **Q.**   ALL RIGHT.

6    **A.**   YES, SIR.

7    **Q.**   OKAY.  AND PAPERWORK IS BEING GATHERED FROM THE ATU TO

8    SEND WITH THE PATIENT AS WELL.  RIGHT?

9    **A.**   YES.

10   **Q.**   THE CLOSEST EMERGENCY ROOM OF ANY KIND FROM LSP IS AT

11   LEAST 30 MINUTES AWAY.  RIGHT?

12   **A.**   YES.

13   **Q.**   THE CLOSEST EMERGENCY ROOM THAT HAS A ROBUST ER

14   DEPARTMENT, IF I CAN USE THAT TERM, IS REALLY IN BATON ROUGE, A

15   GOOD HOUR AWAY?

16   **A.**   YES.

17   **Q.**   DO YOU KNOW HOW MANY AMBULANCE SERVICES THERE ARE IN WEST

18   FELICIANA PARISH?

19   **A.**   I DON'T.

20   **Q.**   THEY HAVE TWO AMBULANCES IN THE ENTIRE PARISH.  SO LSP HAS

21   DONE A GOOD THING BY INCORPORATING AND HAVING ITS OWN AMBULANCE

22   SERVICE ON SITE TO TAKE CARE OF THAT PROBLEM.  IS THAT FAIR?

23   **A.**   YES.

24   **Q.**   NOW, YOU'RE CRITICAL OF THE EMTS BEING CORRECTIONAL

25   OFFICERS 'CAUSE THAT KIND OF BLURS THEIR CHAIN.  IS THAT FAIR?

**A.**    YES.

**Q.**    OKAY.  SO BECAUSE OF THAT, THAT CAUSES EVEN A GREATER

RELIANCE ON THESE SECURITY OFFICERS WHO -- IN ORDER TO

TRANSPORT A PATIENT OFF SITE.  FAIR?

**A.**    COULD YOU -- MY UNDERSTANDING OF YOUR QUESTION IS THAT --

COULD YOU ASK THE QUESTION AGAIN?

**Q.**    I'LL TRY, SURE.

**A.**    THANK YOU.

**Q.**    IF, UNDER YOUR VIEW, IF AN EMT IS NOT ABLE TO BE A

SECURITY, THEN WE'VE GOT TO GO GET THESE SECURITY OFFICERS ANY

TIME THE EMTS LEAVE THE GATE BECAUSE THEY ARE NO LONGER

SECURITY; RIGHT?

**A.**    THAT'S TRUE.

**Q.**    ALL RIGHT.  YOU MENTIONED ACCREDITATION.  LSP IS ACA

ACCREDITED.  CORRECT?

**A.**    CORRECT.

**Q.**    AND THE ATU, IT'S NOT AN EMERGENCY ROOM, IS IT?

**A.**    IT IS NOT.

**Q.**    IT DOESN'T PURPORT TO BE, DOES IT?

**A.**    NO.

**Q.**    SO YOU WOULDN'T EXPECT IT TO ATTEMPT TO BE JCAHO

ACCREDITED IN SOME MANNER AS AN EMERGENCY ROOM IN BELLEVUE

WOULD BE; CORRECT?

**A.**    CORRECT.

**Q.**    YOU MENTIONED TOWARD THE END OF YOUR TESTIMONY ABOUT THE

09:43  1  PATIENTS WHO HAVE ARCS OF BAD CARE WHERE BLOOD PRESSURE, FOR
2  INSTANCE, AS AN EXAMPLE, IS NOT CONTROLLED OVER SOME PERIOD OF
3  TIME.  YOU REFERRED TO THAT?
4  **A.**  YES.
5  **Q.**  ISN'T IT TRUE THAT THERE ARE EXTENSIVE, EXTENSIVE NOTES
6  AND DOCUMENTATION IN THESE RECORDS OF THE PATIENTS REFUSING
7  CARE AND THAT CONTRIBUTES TO THINGS SUCH AS HIGH BLOOD PRESSURE
8  UNCONTROLLED FOR PERIODS OF TIME?
9  **A.**  THERE ARE RECORDS THAT RECORD A PATIENT'S REFUSAL OF CARE.
10  **Q.**  BECAUSE A PATIENT HAS A RIGHT TO TURN DOWN CARE.  CORRECT?
11  **A.**  YES.
12  **Q.**  ALL RIGHT.  LET'S TALK ABOUT THE CHART REVIEWS.  NOW, WHEN
13  YOU CAME TO THE SITE, MY UNDERSTANDING IS YOU WERE A LITTLE
14  LATER GETTING THERE THAT FIRST DAY.  FLIGHT ARRANGEMENTS, WHAT
15  HAVE YOU, THE OTHER TWO EXPERTS GOT THERE BEFORE YOU DID.  IS
16  THAT FAIR?
17  **A.**  I WAS NOT THERE AT ALL ON THE FIRST DAY.
18  **Q.**  OKAY.  DID YOU HAVE ANY INVOLVEMENT IN SELECTING THE
19  CHARTS THAT WERE REVIEWED, OR WAS THAT DONE BY DR. PUISIS
20  AND/OR MS. LAMARRE?
21  **A.**  I WAS GIVEN AT SOME POINT -- WELL, THE SECOND AND THIRD
22  DAY ON SITE, MY MEMORY OF THAT IS JUST THAT WE HAD HUGE STACKS
23  OF PAPERWORK AND I JUST GRABBED THEM.  SO EXACTLY WHICH CHARTS
24  WERE BROUGHT TO ME ON THAT SECOND AND THIRD DAY, I DID NOT
25  SELECT.

**Q.** OKAY. SO THAT WAS DONE BY OTHERS, NOT YOU. IS THAT FAIR?

**A.** YES.

**Q.** OKAY. AND IT'S YOUR APPRECIATION THAT THOSE CHARTS THAT WERE SELECTED, IT WASN'T ANY KIND OF RANDOMNESS, IT WAS AN EFFORT TO GO PICK UP SOME OF THE WORST CHARTS THAT COULD BE FOUND AS FAR AS DEATHS AND/OR SERIOUS ILLNESSES, IF YOU WILL?

**A.** WELL, SIR, I DON'T BELIEVE THAT'S CORRECT. I DO KNOW THAT I REQUESTED, AFTER THE SITE VISIT, THAT THE CHARTS THAT I LOOKED AT AND I CHOSE TO LOOK AT WERE THOSE WHO HAD BEEN PATIENTS WHO HAD BEEN HOSPITALIZED OR DEAD -- DIED. SO THAT WAS AFTER THE SITE VISIT.

SO ON THE SITE VISIT WHEN I WAS THERE, THERE WERE CERTAIN CHARTS THAT I REQUESTED TO KNOW MORE ABOUT THAT I DID NOT EVER RECEIVE. SO I'M DISTINGUISHING THE SITE VISIT FROM THE AFTER SITE VISIT CHART SELECTION.

**Q.** ALL RIGHT. IN THE CHARTS, THOUGH, THAT YOU WERE ON FOR THE SITE VISIT, THOSE WERE SELECTED BY OTHERS AND WERE AVAILABLE THERE FOR YOU TO REVIEW BOTH DURING THE SITE VISIT AND LATER. IS THAT FAIR?

**A.** YES. WE ALSO HAD LISTS OF INR'S WHICH IS THE MEASURE OF THE STATUS OF THE COUMADIN. WE HAD LISTS OF HEMOGLOBIN A1C. AND SO MY MEMORY OF THE SELECTION PROCESS WAS USING SEVERAL DIFFERENT SOURCES TO TRY TO LOOK AT CHARTS. THAT'S MY MEMORY OF IT.

**Q.** ALL RIGHT. AND YOU REVIEWED CHARTS NUMBERED 29 THROUGH

45.   AM I CORRECT?

A.   YES.

Q.   LET'S WALK THROUGH THOSE, IF WE CAN.  DO YOU HAVE THESE BY PATIENT NAME OR NUMBER?  DON'T REFER TO THE NAME, PLEASE, BUT HOW DO YOU NEED TO REFER TO THE INDIVIDUAL?

A.   I THINK WE SHOULD JUST USE THE NUMBERS.  I HAVE THE NAME HERE OUTSIDE.

Q.   OKAY, GOOD.  ALL RIGHT, LET'S BEGIN WITH PATIENT NO. 29. THIS PATIENT HAD A HISTORY OF HYPERTENSION, HEPATITIS C, LEFT VENTRICULAR DYSFUNCTION, ATRIAL FIBRILLATION, KIDNEY FAILURE, ASTHMA, MILD PULMONARY HYPERTENSION, CARDIO DOUBLE BYPASS SURGERY, AND SPINAL FUSION.  HE HAD ALL THAT GOING ON.  RIGHT?

A.   YES, SIR, THAT'S CORRECT.

Q.   ALL RIGHT.  YOU NOTE THAT THERE WAS AN X-RAY ON MARCH 26, 2014, THAT SHOWED SOME DEVELOPMENT OF PNEUMONIA IS THE WAY YOU REFERRED TO.  RIGHT?  DO YOU HAVE YOUR CHART HERE IN FRONT OF YOU?

A.   I DO.  YES.

Q.   AND I'M SHOWING IT ON THE SCREEN NOW.  IT IS SEALED.  THIS IS DOCUMENT NO. PX-6.20256.  THE HIGHLIGHTING ON A SEPARATE PARAGRAPH THERE SAYS "ON MARCH 26, 2014, A CHEST X-RAY SHOWED THE DEVELOPMENT OF PNEUMONIA AND COMPARED TO PREVIOUS X-RAYS." RIGHT?

A.   YES.

Q.   ALL RIGHT.  AND THEN THERE IS ANOTHER X-RAY ON APRIL 7,

09:48   1   2014.  THIS IS DOCUMENT NO. JOINT EXHIBIT 10-09540.  IT SHOWS A

        2   STABLE CHEST X-RAY.  RIGHT?

        3   **A.**   THAT'S WHAT IT SAYS, YES.

        4   **Q.**   SO THAT WOULD MEAN WHATEVER WAS SHOWING UP ON THAT

        5   PREVIOUS X-RAY HAD CLEARED UP BY THIS TIME.  IS THAT FAIR?

        6   **A.**   WELL, I DON'T KNOW ABOUT THE WORDS "CLEARED UP."  IT WAS

        7   STABLE.

        8   **Q.**   STABLE, THANK YOU.  I'M SORRY.

        9   **A.**   HE HAS LEFT LINGULAR ATELECTASIS.  THAT MEANS THAT IN THE

       10   LEFT LOWER LOBE OF THE LEFT CHEST, THERE'S SOME AREA THAT'S

       11   EITHER -- IT WAS POORLY EXPANDED.  SO IT MAY HAVE BEEN ONLY

       12   THAT IN MARCH, OR IT MAY HAVE BEEN ATELECTASIS IF THE PATIENT

       13   HAD FEVER AND THE SIGNS OF THE PNEUMONIA OR SOMETHING, WELL,

       14   THEN IT WAS PNEUMONIA.  SO IT WAS STILL PRESENT IS ALL -- THAT

       15   FINDING WAS STILL PRESENT A MONTH LATER, AND I DON'T KNOW WHY

       16   OR WHAT IT MEANS.

       17   **Q.**   NOW YOU, ON THIS PARTICULAR CHART, BETWEEN MARCH 9 AND --

       18   I'M SORRY, BETWEEN MAY 9 AND THE END OF MAY, MAY 30, THERE WERE

       19   MULTIPLE COMPLAINTS OF SHORTNESS OF BREATH.  CORRECT?

       20   **A.**   YES.

       21   **Q.**   AND IT'S YOUR CONTENTION THAT BECAUSE OF THAT, THIS

       22   PATIENT SHOULD HAVE BEEN TRANSFERRED TO THE HOSPITAL FOR CARE.

       23   IS THAT FAIR?

       24   **A.**   (NO ORAL RESPONSE.)

       25   **Q.**   AND I'LL SHOW YOU, THIS IS ON PAGE -- OR DOCUMENT

PX6.0257.  IT'S UNDER YOUR "ASSESSMENTS," AND I'VE GOT IT

HIGHLIGHTED THERE.  THAT'S YOUR NOTE.  RIGHT?

**A.**   YES, BUT THAT'S NOT THE ENTIRETY OF MY OPINION ABOUT THIS

PATIENT.

**Q.**   I UNDERSTAND, BUT I WANT TO TALK ABOUT THIS FOR A MOMENT.

**A.**   OKAY.

**Q.**   AND SO IT'S YOUR CONTENTION THAT BECAUSE OF THOSE

SYMPTOMS, HE SHOULD HAVE BEEN TRANSFERRED TO THE HOSPITAL.

RIGHT?

**A.**   YES.

**Q.**   ARE YOU AWARE THAT THIS GENTLEMAN WAS SEEN AT THE HOSPITAL

A NUMBER OF TIMES DURING THAT PERIOD OF TIME?

**A.**   NO.

**Q.**   I'M GOING TO SHOW YOU DOCUMENT NO. 10-09614.  THIS IS

WHERE HE'S SEEN AT THE HOSPITAL FOR, AMONG OTHER THINGS, THE

SHORTNESS OF BREATH.  THIS IS AN OUTSIDE PROVIDER.  YOU DON'T

NOTE THAT ON THE CHART, DID YOU?

**A.**   NO.

         CAN YOU MOVE TO THE TOP OF THAT AGAIN?

**Q.**   I CAN TRY.

**A.**   THERE YOU GO.

**Q.**   IS THAT WHAT YOU NEED?

**A.**   YES, SIR.

**Q.**   OKAY.

**A.**   AND THE DATE ON THIS IS -- WHAT'S THE DAY OF THIS NOTE,

SIR?

**Q.** IT IS HIGHLIGHTED AT THE TOP THERE, MAY 15, 2014.

**A.** THE ENCOUNTER DATE, YES, SIR, YOU'RE CORRECT, MAY 15TH.

**Q.** OKAY. AND I'M GOING TO SHOW YOU THE SECOND PAGE OF THIS CHART WHICH IS JOINT EXHIBIT 10-09613. CONCLUSION IS GOOD LV FUNCTION. WHAT'S LV?

**A.** LEFT VENTRICLE.

**Q.** WHICH IS WHAT WAS SHOWING ON THAT PREVIOUS X-RAY YOU AND I TALKED ABOUT?

**A.** NO, SIR.

**Q.** IT IS NOT?

**A.** NO. IT'S JUST -- THIS WAS AN ECHO, WHICH IS AN ULTRASOUND OF THE HEART, THAT SHOWS THAT THE LEFT VENTRICLE OF THE HEART HAS GOOD FUNCTION.

**Q.** OKAY.

**A.** IT DOESN'T SPEAK TO THE X-RAYS THAT YOU WERE REFERRING TO EARLIER.

**Q.** MY BAD. PLEASE, I HOPE YOU UNDERSTAND TODAY I DO NOT WANT TO ARGUE MEDICINE WITH YOU, I WILL LOSE.

**A.** I DON'T WANT TO ARGUE AT ALL, SIR.

**Q.** FAIR ENOUGH. THIS PATIENT DID GO TO THE HOSPITAL AS SHOWN IN THAT RECORD DURING THIS PERIOD OF TIME. RIGHT?

**A.** YES.

WHAT HOSPITAL WAS IT, SIR? I DIDN'T HAVE A CHANCE TO LOOK. I JUST WANT TO MAKE SURE I UNDERSTAND WHAT YOU'RE

1   SAYING.

2   Q.   YES.  I DON'T KNOW THAT I -- I DON'T WANT TO MISREPRESENT

3   THAT I KNOW WHICH HOSPITAL THIS IS.  I DON'T KNOW IS GOING TO

4   BE MY SHORT ANSWER.  I'LL LET YOU LOOK AT BOTH PIECES OF PAPER

5   IN THEIR ENTIRETY IF YOU'D LIKE.

6   A.   NO, THAT'S FINE.  IT REALLY DOESN'T MATTER TO ME THAT

7   MUCH.

8   Q.   OKAY.  ALL RIGHT.  LET ME SHOW YOU THE NEXT RECORD.  FOUR

9   DAYS LATER, DR. LAVESPERE ASKED THAT THIS PATIENT BE REFERRED

10  OUT TO LSU CARDIOLOGY.  THIS IS DOCUMENT NO. JOINT EXHIBIT

11  10-09622.  I'LL GIVE YOU A SECOND TO CATCH UP WITH THAT.  ARE

12  YOU FAMILIAR WITH THIS, MA'AM?  IT'S NOT IN YOUR CHART REVIEW

13  EITHER, IS IT?

14  A.   THE QUESTION IS AM I FAMILIAR WITH IT, AND THE ANSWER IS

15  NO.

16  Q.   OKAY.

17  A.   AND IT IS NOT IN MY CHART REVIEW.  BUT CAN YOU MOVE IT

18  DOWN AGAIN SO I CAN SEE WHAT QUESTION WAS BEING ASKED?

19  Q.   I'LL SHOW YOU AS MUCH -- THE ENTIRETY OF THE PAGE AS I

20  CAN.

21  A.   THAT WOULD BE HELPFUL, GOOD.

22  Q.   I THINK THAT GETS IT ALL RIGHT THERE.

23  A.   OKAY.  SO WHERE IS THE -- I DON'T SEE ANY KIND OF

24  DIAGNOSIS OR ANY KIND OF -- LIKE, WHAT HAPPENED?

25  Q.   RIGHT.  LOOK AT THE BOTTOM.  DR. LAVESPERE ASKED LSU

CARDIOLOGY TO REFER THIS PATIENT OUT TO LSU CARDIOLOGY, AND LSU
CARDIOLOGY REPLIED DOWN AT THE BOTTOM, "THE REFERRAL YOU PLACED
FOR THIS PATIENT HAS BEEN CAREFULLY REVIEWED BY A CLINICIAN AND
ILH CARD EP LSU.  AFTER CAREFUL CONSIDERATION OF THE
INFORMATION AVAILABLE, THIS SERVICE CANNOT BE AUTHORIZED.  DENY
REASON:  OTHER.  REVIEWERS COMMENTS:  DOCTOR STATES FOLLOW-UP
IN TELEMED."

**A.**    SO USUALLY CARDIOLOGY EP IS ELECTROPHYSIOLOGY STUDIES.

**Q.**    RIGHT.

**A.**    AND THAT'S IMPORTANT BECAUSE THE QUESTION BEING ASKED HERE
IS RELATIVELY NARROW BY THE ELECTROPHYSIOLOGIST, AND I'M NOT
SURE, I DON'T SEE THE REFERRAL FROM DR. LAVESPERE AND TO
UNDERSTAND THIS.  SO IT'S NOT IN MY NOTE, BUT TO UNDERSTAND ITS
BEARING ON THIS PATIENT'S CARE IN MY ASSESSMENT THAT THE
PATIENT HAD POORLY DOCUMENTED MEDICAL RECORDS AT LSP, I WOULD
HAVE TO SEE DR. LAVESPERE'S REFERRAL NOTE.

**Q.**    DR. LAVESPERE ATTEMPTED TO REFER HIM OUT, DIDN'T HE, AND
WAS TURNED DOWN.  THAT'S WHAT THE RECORD SHOWS.  RIGHT?

**A.**    YES.

**Q.**    ALL RIGHT.  THAT WAS ON MAY 19.

          LET ME SHOW YOU MAY 21 NOW.  THIS IS DOCUMENT NO.
JOINT EXHIBIT 10-09605.  THIS IS A RECORD OF CONSULT FOR THIS
INDIVIDUAL, AND LET ME ZOOM OUT AND LET YOU GET --

**A.**    SO THE CONSULT HERE, IF I MAY?

**Q.**    YES.

**A.** THE CONSULT IS -- THE REASON IS THE PATIENT HAS ASTHMA AND COPD.

**Q.** OKAY.

**A.** AND THERE IS A RESULT HERE BY DR. WELSH THAT HE SUSPECTS THAT THE SHORTNESS OF BREATH -- THAT THE LUNGS ARE NOT THE ISSUE. HE RECOMMENDS SPIROMETRY. HE'D LIKE TO RESCHEDULE THE PATIENT FOR TWO WEEKS.

**Q.** OKAY.

**A.** AND THERE ARE A LOT OF LABS AND THERE ARE OTHER THINGS DONE HERE. CAN YOU MOVE THE PAGE UP A LITTLE BIT FOR ME?

**Q.** BE GLAD TO.

**A.** OKAY. WHAT STANDS OUT IS THAT THERE IS A PHYSICAL EXAMINATION, A PAST MEDICAL HISTORY, AND SO FORTH. CAN I SEE THE PHYSICAL EXAMINATION?

**Q.** I'VE GOT IT. THIS IS ACTUALLY -- OH, I'M SORRY. I'VE GOT FOUR PAGES HERE SO I DON'T KNOW WHERE YOU WANT ME TO GO.

**A.** WELL, LET'S GO TO ALL FOUR.

**Q.** BE GLAD TO. THIS I BELIEVE TO BE --

**A.** MEDICATIONS.

**Q.** RIGHT.

**A.** RIGHT. GO AHEAD.

**Q.** A LOT OF MEDICATIONS THIS INDIVIDUAL WAS ON. RIGHT?

**A.** YES, SIR.

**Q.** SO HE'S GETTING A LOT OF HEALTHCARE AT LSP THROUGH THE MEDICATION. RIGHT?

A.   WELL, HE HAS A LOT OF MEDICATION, SIR.  I DON'T KNOW THAT THAT TELLS YOU ANYTHING ABOUT THE HEALTHCARE.

Q.   FAIR.  NOW, THE NEXT PAGE HAS MORE.  I'LL LET YOU LOOK THROUGH THAT.

A.   OKAY.  SO IF WE CAN JUST MOVE THAT DOWN SO THAT I CAN SEE THE PHYSICAL EXAMINATION.  OKAY.  AND NOW --

Q.   I GOT ONE MORE PAGE AND THAT'S IT.

A.   OKAY.  AND THAT SPIROMETRY WAS IN MARCH OF 2014.  I THOUGHT WE WERE ALREADY IN MAY OF 2014.

Q.   WE ARE, MA'AM.  THIS DOCUMENT IS DATED MAY.

A.   OKAY.  SO THEY ARE COMMENTING ON A MARCH SPIROMETRY, WHICH IS FINE.  THEY'RE JUST PUTTING IN WHAT HAS BEEN DONE IN THE PAST AND THEY'VE RECOMMENDING ANOTHER ONE, BUT THEY'RE NOT SURE THAT THE LUNGS ARE THE PROBLEM.

Q.   ALL RIGHT.  SO THIS IS ANOTHER OUTSIDE PROVIDER THAT SAW THIS INDIVIDUAL, THIS PATIENT, DURING THIS PERIOD OF TIME. RIGHT?

A.   YES.

Q.   AND THIS SAME PERIOD OF TIME, MY NEXT DOCUMENT IS JOINT EXHIBIT 10-09538.  THIS IS A CHEST X-RAY DONE AT LSP.  AGAIN, FOLLOWING UP ON THE PATIENT AND FOLLOWING UP ON THE CHEST X-RAYS WE NOTED EARLIER.  RIGHT?

A.   WELL, SIR, IT'S A CHEST X-RAY WITH A READING.

Q.   OKAY.

A.   IT'S MAY 23RD.  IT'S NOT A FOLLOW-UP.  IT'S SIMPLY A

RADIOLOGIST READING A CHEST X-RAY.

Q.   FAIR ENOUGH.

A.   CAN YOU SHOW IT TO ME ONE MORE TIME?  I'M SORRY.  I WAS BUSY TALKING.

Q.   OKAY.

A.   SO THE IMPRESSION SHOWS THAT THERE'S A LARGE HEART, WHICH IS CARDIOMEGALY, WITH MILDLY WORSENING VASCULAR CONGESTION. THIS SUGGESTS THAT THE -- THIS PERSON WHO'S READING THIS AND COMPARING THEM TO PREVIOUS X-RAYS, SINCE IT'S WORSENING, THERE'S A COMPARISON BEING MADE, SHOWS THAT HIS CONGESTIVE HEART FAILURE AND HIS LARGE -- IS WORSENING, AND THAT THE LEFT LOWER LOBE AND THE LINGULA, WHICH I COMMENTED ON EARLIER, WAS INCREASING OPACITY.  SO SOMETHING'S GOING ON.  IT'S GETTING WORSE.  AND THIS IS IN MAY AND THE PREVIOUS ONE, LIKE YOU POINTED OUT, WAS MARCH 26TH.  SO WE'RE IN MAY NOW AND THE X-RAY IS GETTING WORSE.

Q.   AND WE'VE HAD TWO OUTSIDE PROVIDERS SEE THIS INDIVIDUAL DURING THIS PERIOD OF TIME SO FAR.  RIGHT?

A.   THAT IS TRUE, BUT THE QUESTION BEING ASKED, THE ELECTROPHYSIOLOGIST IS NOT ANSWERING THIS QUESTION.

Q.   OKAY.

A.   SO, YES, THEY SAW TWO OUTSIDE PROVIDERS.

Q.   LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS JOINT EXHIBIT 10-909587.  THIS IS MAY 30, 2014.  IT'S A CONSULTANT REFERRAL FORM WHERE HE IS BEING REFERRED TO ILH ER, WHICH IS WHAT YOU

WANT. CORRECT? I MEAN, YOU CONTEND HE SHOULD HAVE BEEN
REFERRED OUT TO THE HOSPITAL. HE IS. RIGHT?

**A.** YES.

**Q.** AND, NOW, I NOTICED THAT THEY NOTE ON HERE THAT THE
PATIENT PRESENTED IN AFIB AT 180 DUE TO NOT TAKING HIS
METOPROLOL. IS THAT WHAT THAT IS?

**A.** YES.

**Q.** OKAY. AND, THEN, SO A PATIENT NOT TAKING HIS MEDICATIONS
IS GOING TO PLACE HIM AT MORE RISK FOR HARM. IS THAT FAIR?

**A.** BEFORE I ANSWER YOUR QUESTION, SIR, CAN YOU MOVE IT DOWN?
WHO WROTE THIS? WHO SIGNED -- WHO WROTE THAT?

**Q.** MA'AM, I'M NOT GOING TO BE ABLE TO ANSWER YOUR QUESTION
OTHER THAN WHAT THE DOCUMENT SHOWS.

**A.** BECAUSE IT'S SUCH AN UNUSUAL CONCLUSION. THE PATIENT
COULD HAVE SAID, I'M NOT TAKING MY METOPROLOL. I DON'T KNOW IF
THAT'S TRUE OR NOT. AND CERTAINLY THE PERIOD OF TIME THAT HE
WAS WORSENING AND SHOWING INCREASE IN CONGESTION ON HIS CHEST
X-RAY, IF THE PATIENT WAS NOT TAKING THE MEDICATION, THAT IS A
PROBLEM. I DON'T HAVE EVIDENCE FOR THAT SIMPLY HERE, AND I
DON'T KNOW WHO WROTE THIS.

**Q.** IF DR. WELSH, A PULMONOLOGIST, IS THE INDIVIDUAL WHO WROTE
THIS -- STRIKE THAT.

**A.** WELL, HE'S NOT, RIGHT, BECAUSE THIS IS THE EMERGENCY ROOM.
SO HE'S NOT IN THE ER.

**Q.** OKAY. MY BAD.

**A.**   SURELY.

**Q.**   MA'AM, THE POINT IS, THESE RECORDS SHOW THAT DURING THIS PERIOD OF TIME, THERE WERE THREE OUTSIDE HOSPITAL VISITS FOR THIS INDIVIDUAL.   CORRECT?

**A.**   YES.

**Q.**   ALL RIGHT, MA'AM.   LET'S GO TO THE NEXT CHART, WHICH IS PATIENT NO. 30.

          **MR. DUBNER:**   AND YOUR HONOR, TO THE EXTENT THAT WE'RE GOING TO BE GOING THROUGH ALL 16 OF THESE, WE'LL OBJECT AS CUMULATIVE.   IT'S THE SAME ISSUE AS WE HAD WITH DR. PUISIS.

          **MR. ARCHEY:**   YOUR HONOR, THEY'RE GOING TO PICK UP. MOST OF THESE ARE KIND OF QUICK, BUT I DO HAVE A POINT AND A REASON AND THIS IS VERY IMPORTANT TO OUR DEFENSE.

          **THE COURT:**   OBJECTION IS OVERRULED.   GO AHEAD.

          **MR. ARCHEY:**   THANK YOU, YOUR HONOR.

**BY MR. ARCHEY:**

**Q.**   ALL RIGHT.   ON PATIENT 30, THIS INDIVIDUAL HAD A HISTORY OF SEIZURE DISORDER, HIGH BLOOD PRESSURE, AND HE HAD MENTAL HEALTH ISSUES.   THIS IS THE INDIVIDUAL THAT GOT INTO A FIGHT, HAD A CUT ON HIS HEAD, AND YOUR CRITICISM IS THAT HE WAS GIVEN A X-RAY AS OPPOSED TO A CT SCAN.   IS THAT RIGHT?   THAT'S PART OF IT.

**A.**   MY PRIMARY CRITICISM WITH THIS CASE IS I DON'T REALLY CARE IF HE HAD A SKULL X-RAY OR NOT.   I KNOW OF ITS LIMITATIONS AND ITS USAGES.   MY PRIMARY CRITICISM WITH PATIENT NO. 30 WAS THAT

HE WAS TREATED FOR A DEEP VEIN THROMBOSIS FOR 12 DAYS AND DID

NOT HAVE ONE WITH THE MEDICATION.  PARTICULARLY WITH COUMADIN,

WHICH IS WHEN HE'S IN FIGHTS AND HE'S IN THE PRISON SETTING,

THE RISK OF COUMADIN WHEN YOU GET HIT ON THE HEAD, FOR EXAMPLE,

IS MUCH GREATER.  SO YOU'RE GIVING HIM MEDICATION WITH

POTENTIAL LETHAL OUTCOME WHEN YOU'RE IN A PRISON POPULATION

WITH NO DIAGNOSIS, AND ULTIMATELY THAT WAS NOT THE DIAGNOSIS.

THERE WAS NO DEEP VEIN THROMBOSIS.

Q.    I'LL COME BACK TO THAT RIGHT AFTER WE DISCUSS THIS.

A.    OKAY.

          THE COURT:  ARE WE ON CHART NO. 30?  I'M SORRY.

          MR. ARCHEY:  WE ARE, YOUR HONOR.

          THE COURT:  OKAY.

BY MR. ARCHEY:

Q.    ALL RIGHT.  THIS IS JOINT EXHIBIT 10-06345.  THIS IS

JANUARY 22, 2016.  THIS IS WHERE THE PATIENT PRESENTED WITH

LACERATION ON TOP OF HIS HEAD.  THIS EMT NOTED THAT HE DID NOT

LOSE CONSCIOUSNESS.  PATIENT DENIES BLURRED VISION, NAUSEA, AND

HEADACHE.  NO OTHER TRAUMA NOTED.  PATIENT M-A-E-W STANDS AND

WALKS WITHOUT ASSISTANCE, DENIES BEING DIZZY.  SO IS THAT A

NEUROLOGICAL ASSESSMENT THERE BY THIS EMT OF THIS PATIENT?

A.    THE ABILITY TO WALK, SIR, IS ANY LAY PERSON CAN MAKE THAT

OBSERVATION.  THIS IS NOT WHAT WE CALL A NEUROLOGIC ASSESSMENT.

Q.    OKAY.

A.    IT'S AN OBSERVATION AS A LAY PERSON, THE LEVEL THAT

1   SOMEONE CAN WALK.

2   **Q.**   WELL, THERE'S MORE TO IT THAN THAT.

3   **A.**   YES, SIR, YOU'RE RIGHT. BUT WHATEVER IS HERE, THAT HE

4   STANDS AND WALKS WITHOUT ASSISTANCE, IS NOT A NEUROLOGIC

5   EXAMINATION.

6   **Q.**   OKAY. BUT THE BLURRED VISION, NAUSEA, HEADACHE, THOSE ARE

7   OBSERVATIONS?

8   **A.**   THOSE ARE SYMPTOMS THAT THE PATIENT IS REPORTING HE DOES

9   NOT HAVE.

10   **Q.**   OKAY. LET ME SHOW YOU THE NEXT RECORD, WHICH IS DOCUMENT

11   NO. JOINT EXHIBIT 10-06346. INDICATES HE HAD BEEN IN A FIGHT,

12   HAD A LACERATION. PATIENT REFUSED WOUND CARE, STAPLE SUTURES,

13   WILL ALLOW X-RAY AND BAND-AID, M.D. TO REVIEW.

14   **A.**   SIR, JUST TO BE CLEAR, IT SAYS THAT HE REFUSES WOUND

15   CLOSURE.

16   **Q.**   OKAY.

17   **A.**   AND HE DID -- HERE YOU CAN SEE THAT THEY PROVIDED THE

18   X-RAY AND THEY PROVIDED THE BAND-AID. AND CAN YOU JUST -- I'M

19   SORRY -- BACK UP A LITTLE BIT ONE MORE TIME?

20   **Q.**   IS THAT WHAT YOU NEED?

21   **A.**   IT'S PERFECT LIKE IT IS.

22   **Q.**   OKAY.

23   **A.**   GIVE ME JUST TWO SECONDS TO LOOK AT IT. AND SO THAT'S

24   WHAT WE HAVE. A PERSON WHO WAS IN A FIGHT, SUFFERED A

25   LACERATION, GOT AN X-RAY, GOT A BAND-AID AND WAS AGREEABLE TO

THAT.  AND IT WAS ABOUT HALF A CENTIMETER, WHICH IS 5

MILLIMETERS -- 5 CENTIMETERS, MY ERROR, 5 CENTIMETERS.

**Q.**   OKAY.

**A.**   THAT'S WHAT HE HAD, YES, SIR.

**Q.**   OKAY.  AND THIS PATIENT TURNED DOWN THE WOUND CLOSURE

PROCEDURES AS SHOWN ON THIS DOCUMENT, JOINT EXHIBIT 10-06347,

JANUARY 22, 2016.  CORRECT?

**A.**   YES.

**Q.**   AND THIS IS WHAT YOU'D LIKE TO SEE IN THE RECORD WHEN

THERE'S A REFUSAL OF CARE, A SIGNED DOCUMENT BY THE PATIENT.

RIGHT?

**A.**   YES.  IN GENERAL, SIR -- AND JUST TO SUPPLEMENT -- IN

GENERAL, WHEN THERE'S A REFUSAL OF CARE AND IT MAKES A

DIFFERENCE, WE USUALLY TALK ABOUT WHY HE'S REFUSING HIS CARE.

LIKE IF SOMEBODY IS GOING TO -- IF IT'S A 5-CENTIMETER

LACERATION, I EXPRESS -- I USUALLY SAY WHY THE PATIENT'S NOT

GOING TO -- GOING TO REFUSE.  THEY HAVE A REASON.  THEY'RE IN A

RUSH, THEY DON'T LIKE NEEDLES, WHATEVER IT IS.  THEY'RE

ALLERGIC TO LIDOCAINE.  I DON'T KNOW, BUT IT'S REASONABLE TO

PUT A REASON FOR A REFUSAL, AND THEN THEY CAN SIGN IT AND THEN

EVERYBODY -- WHOEVER LOOKS AT THAT REFUSAL UNDERSTANDS WHY THE

REFUSAL EXISTS.

**Q.**   ALL RIGHT.  YOU WANT TO TALK ABOUT THE DVTS, I'LL TALK

ABOUT THE DVT WITH YOU.  I DO NOT HAVE MY DOCUMENTS HERE TO

SHOW THEM -- IN FRONT OF YOU, SO WE'RE GOING TO DO IT MAYBE A

LITTLE BLIND.  THE DOCTORS AT LSP -- STRIKE THAT.

THE PATIENT PRESENTED WITH SWELLING IN HIS LOWER LEGS WITH THE DOCTOR -- WHICH THE DOCTORS AT LSP ASSESSED INITIALLY AS A POTENTIAL DVT.  CORRECT?

**A.** YES.  I THINK IT WAS JUST ONE LEG.

**Q.** OKAY.

**A.** WHICH WOULD BE MORE CONCERNING THAN BOTH LEGS, YES.

**Q.** OKAY.  AND SO THEY ASSESSED DVT AND THEN STARTED THIS GENTLEMAN ON COUMADIN, WHICH IS THE TREATMENT FOR DVT.  CORRECT?

**A.** WELL, THE TREATMENT IS COUMADIN, BUT IF YOU REALLY THINK SOMEBODY HAS A DVT, YOU NEED TO START THEM ON HEPARIN.  COUMADIN TAKES ABOUT THREE TO FIVE DAYS, LET'S SAY THREE TO BE FAIR AND CONSERVATIVE, BEFORE IT EVEN STARTS TO WORK.  SO IF YOU'RE REALLY CONCERNED, THEN YOU'RE GOING TO START THE PATIENT ON HEPARIN.

**Q.** AND THEN IT TURNS OUTS THAT ONCE HE'S ASSESSED OVER THE NEXT TEN DAYS, I THINK IT IS, IT TURNS OUT HE DOES NOT HAVE A DVT.  IT'S JUST A, WHAT, HEMATOMA IN HIS LEG.  RIGHT?

**A.** SO HE WAS FOR 12 DAYS ON COUMADIN IN A PRISON SETTING WITH NO INDICATION, THAT'S CORRECT.

**Q.** ALL RIGHT.  AND THAT'S JUST AN EXAMPLE OF A DIAGNOSIS ERROR THAT OCCURS IN THE FREE WORLD EVERYDAY.  ISN'T THAT RIGHT?

**A.** WELL, NO, SIR.  I MEAN, THE FIRST PART IS RIGHT.  IT WAS

1  AN ERROR OF DIAGNOSIS.  IT SHOWS, AGAIN, THAT IT WOULD BE

2  HELPFUL TO HAVE ULTRASOUND, AND SOMEONE WHO CAN USE IT RIGHT

3  THERE, ULTRASOUND BEDSIDE WOULD HAVE TOLD THE DOCTOR RIGHT THEN

4  THAT HE DIDN'T HAVE A DVT.

5  **Q.**   RIGHT.  BUT MEDICAL ERRORS OCCUR IN THE PRACTICE IN THE

6  COMMUNITY IN MEDICINE.  CORRECT?

7  **A.**   CORRECT.

8  **Q.**   AND THERE ARE STUDIES WHICH DOCUMENT THE PERCENTAGE OR THE

9  RATE OF THESE ERRORS AT 15 PERCENT FOR STROKES, FOR INSTANCE.

10  CORRECT?

11  **A.**   I DON'T KNOW THAT TO BE THE CASE TODAY, NO.

12  **Q.**   YOU'RE NOT AWARE OF THAT?  YOU'RE NOT AWARE OF A STUDY BY

13  THE AMA FROM JUST THIS PAST MONTH SAYING DIAGNOSIS ERRORS ARE

14  15 PERCENT FOR STROKES?

15  **A.**   I WOULD HAVE TO READ THE STUDY TO UNDERSTAND WHAT IT'S

16  SAYING, AND I DISAGREE WITH THAT, BECAUSE 15 PERCENT ERROR FOR

17  STROKES, REALLY, THAT'S VERY HIGH.  15 OUT OF 100 PEOPLE HAVE

18  MISSED STROKES?  THE AMA -- I'D LIKE TO SEE THE BASIS OF THAT

19  PAPER.  I CANNOT AGREE WITH YOU.

20       **MR. ARCHEY:**  YOUR HONOR, I'D LIKE TO APPROACH AND

21  ALLOW HER -- PROVIDE THE PAPER TO HER.  I HAVE A COPY FOR YOUR

22  HONOR.

23       **THE COURT:**  YOU MAY.

24       **THE WITNESS:**  THANK YOU.

25  **BY MR. ARCHEY:**

**Q.** AND LET ME CORRECT MYSELF BEFORE MY VERY ABLE COUNSEL
DOES. THIS PARTICULAR STUDY WAS IN 2013, NOT LAST MONTH.
THAT'S ANOTHER STUDY.

**A.** WELL, IT APPEARS THAT -- DOESN'T THIS SAY 2009? ARCHIVES
OF INTERNAL MEDICINE, 2009. SO IT'S NINE YEARS AGO. I HAVE
DIAGNOSTIC ERROR IN MEDICINE IS WHAT YOU HANDED ME. SO THIS IS
AN INVESTIGATION IN THE ARCHIVES OF INTERNAL MEDICINE FROM
2009. IS THAT THE ONE YOU MEANT TO HAND ME? MAYBE NOT. MAYBE
YOU GOT A MORE RECENT ONE.

    **MR. ARCHEY:** I APOLOGIZE, YOUR HONOR. THAT IS WHAT I
MEANT TO HAND YOU.

    DID YOU GET THE RIGHT ONE, JUDGE?

    **THE COURT:** USE THAT MIDDLE PODIUM, PLEASE.

    **MR. ARCHEY:** I WILL.

    **THE COURT:** IF YOU'RE GOING TO STAY UP HERE, JUST USE
THE MIDDLE PODIUM.

    **MR. ARCHEY:** JUST FOR A SECOND, YOUR HONOR.

**BY MR. ARCHEY:**

**Q.** THAT, AS OF 2009, WHICH IS RIGHT ON THE CUSP OF WHAT YOUR
SAMPLE WENT THROUGH ALL THE WAY BACK TO 2010, SHOWS DIAGNOSTIC
ERRORS ARE 15 TO 25 PERCENT FOR MANY OF THESE CONDITIONS
INCLUDING STROKE, PULMONARY CANCERS. DO YOU SEE THAT IN THE
CHART ON THE TOP OF THE SECOND PAGE?

**A.** MR. ARCHEY, THERE IS NO WAY THAT I CAN DISCUSS A PAPER
THAT I HAVEN'T READ. IF YOU HAD GIVEN ME A CHANCE YESTERDAY, I

10:09 1    WOULD HAVE READ THIS PAPER, AND I WOULD BE ABLE TO ANSWER YOUR

2    QUESTION.

3    **Q.**    OKAY, MA'AM.  LET'S MOVE ON THEN.  PATIENT NO. 31, THIS

4    PATIENT HAD A HISTORY OF HEPATITIS C WITH CIRRHOSIS AND HAD END

5    STAGE LIVER FAILURE.

6    **A.**    I'M SORRY, SIR.  WHICH PATIENT AGAIN?

7    **Q.**    31.

8    **A.**    OKAY, THANKS.

9    **Q.**    YOU WITH ME?

10   **A.**    YES, SIR.

11   **Q.**    ALL RIGHT.  AND I'M GOING TO SHOW YOU FIRST JOINT EXHIBIT

12   10-47916.

13   **A.**    THAT'S HOW IT WAS IN THE CHART, UPSIDE DOWN, BUT TURN IT

14   RIGHT SIDE UP FOR ME TO READ IT.

15   **Q.**    I JUST WANTED TO GET THE NUMBER FIRST.

16   **A.**    I'M JUST PLAYING BUT THANK YOU.

17   **Q.**    I UNDERSTAND.  OKAY.  WE'VE GOT A DISCUSSION WITH THE

18   PATIENT ON AUGUST 22 OF 2014 ABOUT A DNR.

19   **A.**    THAT'S RIGHT.

20   **Q.**    OKAY.  AND THEN ON AUGUST 23, THE NEXT DAY, THERE'S MORE

21   DISCUSSION WHERE HE'S IN FAVOR OF THE DNR.  SO HE WAS GIVEN A

22   FULL DAY TO CONSIDER THAT AND NOT FORCED TO RUSH INTO THAT DNR

23   DECISION.

24   **A.**    I DISAGREE WITH THAT CHARACTERIZATION OF THIS METHOD OF

25   GETTING A DNR IN A PATIENT WHO DIES THE NEXT DAY AND IS CLEARLY

1   DYING.

2   **Q.**   I HAVE ANOTHER NOTE WHICH IS JOINT EXHIBIT 10-47924 WHERE

3   THERE'S ANOTHER PROVIDER DISCUSSING THE DNR DECISION WITH THIS

4   PATIENT.  DO YOU SEE THAT?

5   **A.**   I DO.

6   **Q.**   OKAY.  AND THE RECORD ACTUALLY INCLUDES A DNR DOCUMENT

7   EXECUTED BY THIS PATIENT AS JOINT EXHIBIT 10-47942.  CORRECT?

8   **A.**   YES.  HE SIGNED THE DNR, YES, SIR.

9   **Q.**   AND WITH THAT, THEN LSP BEGAN PALLIATIVE CARE THROUGH A

10  FENTANYL -- IF I'M SAYING THAT CORRECT -- PATCH?

11  **A.**   SO, SIR, THE DNR WAS OBTAINED ON THE 22ND AND THE 23RD,

12  AND THEY START PALLIATIVE CARE ON THE SAME DAY THEY OBTAINED

13  THE DNR.  THAT IS --

14  **Q.**   AND THIS IS DOCUMENT NO. 10-47912.  CORRECT?

15  **A.**   I DON'T KNOW, SIR.  IT'S UPSIDE DOWN AGAIN.

16  **Q.**   I'M SORRY.  YOU DON'T NEED TO ANSWER.  IT'S FOR THE

17  RECORD.

18  **A.**   OH, OKAY.

19  **Q.**   AND THEN THE PATIENT THEN, AS YOU SAID, DIED FROM HIS VERY

20  SERIOUS ILLNESSES AT THAT TIME.  RIGHT?

21  **A.**   YES.

22  **Q.**   OKAY.  LET'S GO TO PATIENT NO. 32 NOW.  THIS INDIVIDUAL --

23  ARE YOU WITH ME?

24  **A.**   32?

25  **Q.**   YES, MA'AM.

10:12 1  **A.**   I WASN'T AND THANK YOU.  NOW I AM.

2  **Q.**   ALL RIGHT.  THIS INDIVIDUAL HAD A LONG HISTORY OF HEART

3  DISEASE AND HE CONTINUED TO SMOKE THROUGH THAT PERIOD OF TIME.

4  CORRECT?

5  **A.**   I KNOW HE HAD HEART DISEASE, AND I WOULDN'T DOUBT AT ALL

6  THAT HE SMOKED.

7  **Q.**   OKAY.

8  **A.**   MANY PEOPLE DO.

9  **Q.**   RIGHT.  AND THAT'S VERY BAD FOR YOUR CONDITION WHEN YOU

10  HAVE HEART DISEASE.  IS THAT FAIR?

11  **A.**   IT'S BAD EVEN IF YOU DON'T HAVE HEART DISEASE, SIR.

12  **Q.**   OKAY.  FAIR ENOUGH.

13  **A.**   YES, SIR.

14  **Q.**   IT'S EVEN WORSE WITH HEART DISEASE, THOUGH, ISN'T IT?

15  **A.**   IT'S BAD.

16  **Q.**   OKAY.

17  **A.**   SMOKING IS BAD.

18  **Q.**   ALL RIGHT.  I THINK WE CAN GET A STIPULATION AMONG THAT.

19  **A.**   THAT'S RIGHT.

20       **MR. DUBNER:**  NO OBJECTION.

21       **THE COURT:**  AND BELIEVE IT OR NOT, I DIDN'T EVEN

22  REALLY NEED THAT TESTIMONY, BUT OKAY, WE HAVE IT NOW.  WE ARE

23  ALL ON THE SAME PAGE, SMOKING BAD.

24       **MR. ARCHEY:**  SMOKING BAD.

25  BY MR. ARCHEY:

Q.   ALL RIGHT.  AND HERE YOU'RE SAYING THIS PATIENT, AGAIN, SHOULD HAVE BEEN SENT TO THE HOSPITAL THROUGH THE JUNE 12TH THROUGH JUNE 21 TIME PERIOD, IN THAT TIME PERIOD.  RIGHT?

A.   LET ME JUST TURN TO THAT PAGE.  I WAS JUST LOOKING AT --

Q.   CERTAINLY.

A.   I'D LIKE TO AGREE WITH YOU THAT HE SHOULD HAVE BEEN SENT. I'D LIKE TO EXPLAIN WHY.  MAY I?

Q.   YES, MA'AM, YOU MAY.

A.   OKAY.  SO HE HAD HEART DISEASE, LIKE YOU SAID, AND HE SMOKED, WHICH IS AN ADDITIONAL RISK FACTOR.  AND HE WAS GIVEN GI COCKTAILS FOR SHORTNESS OF BREATH AND CHEST PAIN ON JUNE 9TH AND THE 12TH, AND THEN HE CAME BACK ON THE 21ST.  HERE'S A MAN WITH SERIOUS HEART DISEASE, AS YOU'VE ALREADY ELUCIDATED, WHO HAS SERIOUS RISK FACTORS, WHO IS COMPLAINING OF CHEST PAIN SEVERAL TIMES AND THEN UPS AND DIES.  IT'S NOT A SURPRISE.

Q.   HE SHOULD BE REFERRED TO CARDIOLOGY?

A.   WELL, WE, AS EMERGENCY PHYSICIANS, SEE THIS.  IT DOESN'T -- IT'S NOT A REFERRAL TO CARDIOLOGY.  WHAT HE SHOULD BE IS HE HAS TWO TROPONINS.  HE SPENDS 24 HOURS IN THE HOSPITAL UNDER OBSERVATIONS TO SEE IF THE EKG IS CHANGING DURING THAT PERIOD OF TIME.  SO CARDIOLOGISTS DON'T NEED TO BE -- AND I'M NOT SUGGESTING THAT WE NEED A CARDIOLOGIST AT THIS STAGE OF THINGS.  WHAT WE NEED IS A DOCTOR WHO RECOGNIZES THAT A PATIENT WITH SERIOUS HEART DISEASE WHO SMOKES IS A HIGH-RISK PATIENT WHO NEEDS TO BE OFFERED A LEVEL OF CARE AND EVALUATION THAT IS

NOT OFFERED IN THE ATU.

Q.   MA'AM, I'M SHOWING YOU DOCUMENT NO. JOINT EXHIBIT
10-27236.  HERE'S A REFERRAL FOR CARDIOLOGY ON JUNE 18 RIGHT IN
THIS PERIOD OF TIME.  DO YOU SEE THAT?

A.   YES.

Q.   AND THAT'S WHAT THIS PROCESS SHOULD PRODUCE TO GET THIS
GENTLEMAN CARE THAT HE NEEDED FOR HIS SERIOUS CONDITION.
RIGHT?

A.   I'M GLAD THAT THE PROCESS RESULTED IN REFERRAL ON THE
21ST, BUT THE PROCESS WOULD HAVE BEEN PROPERLY CARRIED OUT
SHOULD IT HAVE RESULTED IN REFERRAL ON THE 9TH AND THE 12TH.
AND ON JUNE 21ST, HE HAD A CARDIAC ARREST.  CAN YOU SHOW ME
AGAIN THE PAPER?  WHAT WAS THE DATE OF THE LAST ONE YOU PUT
OUT?  HE HAD A CARDIAC ARREST ON THE 21ST.

Q.   JUNE 18, MA'AM.

A.   OKAY.  AND WHERE IS THE SUBSTANCE OF THE ANALYSIS?

Q.   I APOLOGIZE.  I DON'T HAVE IT.

A.   OKAY.  I THINK THAT'S EXTREMELY IMPORTANT.  THE FACT THAT
THERE EXISTS THIS PIECE OF PAPER DOESN'T EXPLAIN AT ALL THAT HE
WAS SEEN, HAD TROPONIN, ANY KIND OF WORKUP, SO I CANNOT SAY
WHAT THAT MEANS.  IT HAS NO MEANING TO ME CURRENTLY IN THE
STATE IT'S BEEN PRESENTED TO ME.

Q.   LET'S GO TO PATIENT NO. 33.  THIS INDIVIDUAL HAD SUFFERED
FROM A RENAL DISORDER, HYPERTENSION, DIABETES, HYPERLIPIDEMIA,
AND GLAUCOMA.  AND YOU'RE FOCUSING ON A PERIOD OF TIME FROM

1  FEBRUARY OF 2016 TO APRIL OF 2016.  IS THAT NOT --

2  A.   I'M LISTENING TO YOU.  LET ME JUST TURN TO IT.

3  Q.   CERTAINLY.

4  A.   OKAY.  MY FOCUS HERE IS THE MEDIC ONLY LEVEL OF CARE, AND

5  YOUR QUESTION CONCERNS THE DATES OF THAT MEDIC ONLY CARE?

6  Q.   WELL, AS I LOOK AT YOUR CHART REVIEW OR YOUR WRITE-UP

7  HERE, IT'S FEBRUARY THROUGH APRIL OF 2016 THAT YOU SEEM TO BE

8  FOCUSING UPON THAT THE -- THOSE ARE THE NOTES THAT YOU MADE IN

9  YOUR CHART REVIEW.

10  A.   WHAT I HAVE HERE FOR PATIENT NO. 33 STARTS WITH THE

11  COMMENT ABOUT THE PHYSICIAN CLINIC ON MAY 6, 2016, ONLY

12  PHYSICAL EXAMINATION.  I GIVE THE PAGE OF 875 PAGES OF THE

13  CHART.  I PUT PAGE 269.  AND ON APRIL 5TH, WHICH IS PRECEDING

14  MAY 6TH, THERE WERE NO PHYSICIAN NOTES FOR THE PHYSICIAN AND

15  THERE WAS NO --

16  Q.   LET ME GET YOU --

17  A.   DO YOU WANT ME TO --

18  Q.    -- FOCUSED ON WHAT I WANT YOU TO LOOK AT.

19  A.   OKAY, GOOD.

20  Q.   THIS IS EXHIBIT NO. PX6-0266.

21  A.   YES, SIR.

22  Q.   AND I WANT TO TALK ABOUT THE LACK OF TRANSFER TO THE

23  HOSPITAL FOR SERIOUS MEDICAL CONDITIONS.

24  A.   OKAY.

25  Q.   THAT'S PART OF YOUR OPINION.  RIGHT?

**A.**   YES.

**Q.**   MA'AM, THIS IS DOCUMENT NO. JOINT EXHIBIT 10-54127.  HE IS
AT LANE REGIONAL MEDICAL CENTER.  REASON FOR VISIT IS ACUTE
DECOMPENSATION OF CHRONIC CHF.  WHAT IS CHF?

**A.**   WELL, CHF IS CONGESTIVE HEART FAILURE, BUT THIS WAS TWO
MONTHS PREVIOUS TO THE DATE THAT WE'RE TALKING ABOUT.

**Q.**   OKAY.  AND WHAT DOES ACUTE DECOMPENSATION MEAN?

**A.**   IT'S GOTTEN WORSE.

**Q.**   WHAT IS DECOMPENSATION?

**A.**   GOTTEN WORSE.

**Q.**   ALL RIGHT.

**A.**   IF I'M DECOMPENSATING, I'M GETTING WORSE.

**Q.**   AND WHAT DID THIS HOSPITAL DO FOR THIS PATIENT, DISCHARGED
HIM TO JAIL OR PRISON?

**A.**   WELL, I WILL ANSWER YOUR QUESTION, BUT THE DATE OF THIS IS
FEBRUARY 7TH AND THE DISCUSSION THAT I WAS HAVING ABOUT THIS
PATIENT WAS IN MAY.  SO YOU CAN SHOW ME AGAIN THAT PIECE OF
PAPER SO I CAN UNDERSTAND WHAT THE HOSPITAL DID AND ANSWER YOUR
QUESTION, SO . . .

**Q.**   IF I NEED TO SHOW YOU MORE, LET ME KNOW.

**A.**   YOU DO, PLEASE.

**Q.**   THERE'S ONE, TWO MORE PAGES.

**A.**   THIS IS THE DISCHARGE SUMMARY.  WHERE ARE THE NOTES?  WHAT
HAPPENED TO THE PATIENT?  WHAT WAS DONE IS WHAT I -- I THINK
YOU'RE ASKING ME WHAT WAS DONE?

**Q.** MY REAL POINT IS, THEY SENT HIM TO THE HOSPITAL. THE HOSPITAL NOTED HE HAD ACUTE DECOMPENSATION OF CHRONIC HEART FAILURE AND SENT HIM BACK. RIGHT?

**A.** IN FEBRUARY, THAT HAPPENED.

**Q.** OKAY. THE NEXT DOCUMENT I WANT TO POINT YOU TO IS JOINT EXHIBIT 10-54109. THIS GENTLEMAN WENT TO THE HOSPITAL AGAIN ON MARCH 31, 2016. CORRECT?

**A.** YES.

**Q.** OKAY. AND THEY NOTE THAT HE CAN WALK A FEW STEPS, THEN SHORTNESS OF BREATH LIMITS HIM. THIS GENTLEMAN IS VERY SICK FROM HIS CONGESTIVE HEART FAILURE. CORRECT?

**A.** AND YOUR POINT IS VERY WELL TAKEN. IN A PATIENT LIKE THAT WHO REPORTS REPEATEDLY TO THE ATU SHOULD SEE A DOCTOR AND NOT JUST AN EMT.

**Q.** MA'AM, THEY ARE SENDING HIM TO OUTSIDE HOSPITALS AND THEY'RE JUST SENDING HIM BACK.

**A.** SIR, THIS IS BEFORE THE PERIOD OF TIME THAT I HAVE CRITICISM OF. THIS PATIENT WAS INCREDIBLY SICK, WHICH YOU JUST POINTED OUT, AND NOW WE HAVE ONLY EMTS SEEING THE PATIENT OVER AND OVER WITH A DOCTOR CALLING IN ORDERS. THAT IS EXACTLY WHAT I'M TALKING ABOUT IN MY TESTIMONY YESTERDAY AND TODAY.

**Q.** LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS JOINT EXHIBIT 10-54102, APRIL 5, 2016. ONCE AGAIN, GOES TO THE HOSPITAL FOR HIS CONDITION. CORRECT?

**A.** THIS IS TELEMEDICINE. RIGHT? IT SAYS TELEMEDICINE,

TELEMEDICINE IS NOT IN THE HOSPITAL.

**Q.**    FAIR ENOUGH, DOCTOR.

**A.**    BUT NOT TO DISCOUNT TELEMEDICINE, BUT AGAIN, THE DATE HERE IS APRIL.  THE PATIENT IS INCREDIBLY SICK AND IS NOW -- AND SO YOU'RE RIGHT, HE SAW THE TELEMEDICINE PEOPLE IN APRIL.

**Q.**    MA'AM, THE NEXT DOCUMENT IS JOINT EXHIBIT 10-54069, APRIL 17, 2016.  HE IS SEEN AT LANE REGIONAL MEDICAL CENTER YET AGAIN.  CORRECT?

**A.**    IT DOESN'T SAY THAT.  THEY HAVE A DATE, 4/17/16.  THERE'S A HEALTH SUMMARY.  I'M NOT SURE WHY THAT WAS PRINTED OUT.  CAN YOU SHOW ME EVIDENCE OF ANY KIND OF CARE?

**Q.**    I THOUGHT THAT THIS WAS THE SUMMARY OF THE CARE AT THE END OF THE VISIT.  BUT, DOCTOR, AS I SAID, I DON'T WANT TO ARGUE MEDICINE WITH YOU.  THAT'S NOT THE PURPOSE OF MY QUESTIONS. LET ME TRY THIS PAGE.

        DOWN AT THE BOTTOM, IT SAYS ENCOUNTERS.  AND IT DOES INCLUDE APRIL 14, 2016, SO MAYBE HE WAS ADMITTED FOR THREE DAYS?  IS THAT WHAT WE SEE HERE?

**A.**    I CAN'T TELL YET BY THIS, BUT I WOULD LIKE TO SEE WHAT IS THE DIAGNOSIS?  WHAT DOES THE NEXT PAGE SHOW?  WHAT IS THE DIAGNOSIS?

**Q.**    MA'AM, I PRINTED OUT THIS DISCHARGE SUMMARY, AND THAT'S WHAT I HAVE.  I APOLOGIZE IF YOU NEEDED SOMETHING MORE.

**A.**    WELL, I UNDERSTAND, SIR, THAT IT'S VERY DIFFICULT TO TELL CARE OR THE QUALITY OF IT IN THIS MANNER.

**Q.** OKAY. BUT THE POINT IS, HE WAS SENT TO ANOTHER OUTSIDE HOSPITAL YET AGAIN, AND IT APPEARS THAT HE MIGHT HAVE STAYED THERE THREE DAYS. RIGHT?

**A.** YES, SIR. THIS WAS AN INCREDIBLY SICK PERSON WHICH WAS KNOWN WHEN HE PRESENTED REPEATEDLY TO THE ATU AND DID NOT RECEIVE MORE THAN A MEDIC-LEVEL OF CARE, SIR.

**Q.** NOW, I HAVE AT LEAST FIVE LSP PHYSICIAN NOTES FOR THIS INDIVIDUAL OVER THAT SAME PERIOD OF TIME. ARE YOU FAMILIAR WITH THAT?

**A.** NO. YOU CAN SHOW ME THAT. I'D LIKE TO SEE THAT, SIR.

**Q.** I'M GOING TO MOVE ON. IS IT YOUR --

    **THE COURT:** MR. ARCHEY, IF I LOOK AT THE RECORD, TELL ME WHERE IN THE RECORD I CAN SEE THE FIVE LSP PHYSICIAN NOTES.

    **MR. ARCHEY:** GIVE ME A SECOND, YOUR HONOR, I WILL DO SO.

    **THE COURT:** JUST GIVE ME THE EXHIBIT NUMBER. I CAN DIG AROUND IN THERE.

    **MR. ARCHEY:** OH. IT'S JOINT EXHIBIT 10 AND IT'S IN THE RANGE OF 54120, 110, IN THAT RANGE, YOUR HONOR.

    **THE COURT:** OKAY.

    **MR. DUBNER:** AND FOR THE COURT'S CONVENIENCE, THAT'S JOINT EXHIBIT 10ZZ IF THAT HELPS.

    **MR. ARCHEY:** THANK YOU, JEFF.

    **THE COURT:** ZZ LIKE IN ZEBRA ZEBRA?

    **MR. DUBNER:** EXACTLY.

1      **THE COURT:**  THANK YOU.

2  **BY MR. ARCHEY:**

3  **Q.**   I'M GOING TO GO TO PATIENT NO. 34 NOW.  ARE YOU WITH ME?

4  **A.**   YES.

5  **Q.**   THIS IS THE INDIVIDUAL WHO BROKE HIS RIBS PLAYING FOOTBALL

6  AND THEN IS SEEN BY DR. LAVESPERE.  I'M SORRY.  STRIKE THAT.  .

7      IS SEEN BY EMTS WHO SPEAK TO DR. LAVESPERE AND GIVEN

8  A TRANSPORT ORDER ON JUNE 24, FOUR DAYS LATER.

9  **A.**   EXCEPT FOR THE AUTOPSY, SIR, CAN YOU SHOW ME WHERE THERE

10  WAS ANY EVIDENCE THAT HE BROKE RIBS?  CAN YOU SHOW THE CHEST

11  X-RAY REPORT OR X-RAY REPORT THAT SHOWED THAT HE BROKE RIBS?  I

12  DO KNOW THAT IN THE AUTOPSY, THERE WERE TWO BROKEN RIBS, WEEKS

13  OR REMOTE, MEANING SOMETIME IN THE FUTURE HE BROKE RIBS.

14  **Q.**   WELL, MA'AM, I'LL SHOW YOU WHAT I HAVE.  I DON'T KNOW IF

15  THIS IS GOING TO SATISFY YOU OR NOT.

16  **A.**   I THINK IT'S VERY IMPORTANT THAT WE --

17  **Q.**   BUT ON JOINT EXHIBIT 10-28688, HERE IS THE SELF-DECLARED

18  EMERGENCY WHERE HE SAYS HE FELL THREE DAYS AGO WHILE PLAYING

19  FOOTBALL, RIGHT FLANK PAIN, ET CETERA.  SO THIS STARTS THE

20  INCIDENT OF CARE FOR THIS INDIVIDUAL.  FAIR?

21  **A.**   THE PATIENT'S COMPLAINT IS RIGHT FLANK PAIN.  HE

22  ATTRIBUTES THAT TO HAVING FALLEN PLAYING FOOTBALL, AND WHETHER

23  THAT WAS THE CAUSE OF HIS RIGHT FLANK PAIN OR NOT, I HAVE NOT

24  SEEN THAT EXCEPT THE AUTOPSY AND THE FACT THAT HE DIED.

25  **Q.**   AND HE DID HAVE BROKEN RIBS ON THE AUTOPSY.  RIGHT?

A.    REMOTE.

Q.    OKAY.

A.    NOT NECESSARILY SIX DAYS.

Q.    THE NEXT DOCUMENT I'M GOING TO SHOW YOU IS 10-28686.  THIS DOCUMENT IS DATED JUNE 20, 2012, ALSO.  FOR BACK TO ATU IN THE MORNING FOR X-RAY, PER TELEPHONE ORDER OF DR. TOCE, AND HE WAS GIVEN IBUPROFEN FOR HIS PAIN.

A.    WITH NO DIAGNOSIS, YOU'RE ABSOLUTELY CORRECT.  HE WAS GIVEN IBUPROFEN FOR PAIN OF UNKNOWN REASON.

Q.    OKAY.  AND HERE IS THE REFERRAL SLIP FOR THE X-RAY FOR THE POSSIBLE FRACTURED RIBS DATED JUNE 20, 2012.  YES?

A.    THAT IS WHAT THIS IS, YES.

Q.    AND THIS IS JOINT EXHIBIT 10-286889.

A.    THERE WAS NO EVIDENCE THAT DR. TOCE SAW HIM.  HE'S ORDERING X-RAYS AND NEVER HAVING SEEN THE PATIENT, AND NOW IT'S IN THE THIRD OR FOURTH DAY AND HE'S ABOUT TO DIE.

Q.    WE'RE ACTUALLY IN JUST DAY TWO.

A.    OKAY.  I ACCEPT IF YOU TELL ME IT'S DAY TWO.

Q.    HERE WE ARE ON JUNE 21, 2012.  THIS IS DOCUMENT NO. 10-28685.  AND REFERRING AGAIN TO THE RIB PAIN FROM PLAYING FOOTBALL.  X-RAY, REFERS TO THE X-RAYS.  RIGHT?

A.    X-RAY SEEN.

Q.    OKAY.  MA'AM, HERE'S THE DIAGNOSTIC RADIOLOGY, I GUESS, ORDER.  EXAMINATION DESIRED, IT'S FOR THE RIBS.  THIS IS JOINT EXHIBIT 10-28671.

**A.**   IT'S ORDERED ON JUNE 22ND.  AND THAT'S WHAT IT IS.

**Q.**   OKAY.  THAT BRINGS US UP TO THE JUNE 24 WHEN WE HAVE THE AMBULANCE RUN INVOLVING DR. LAVESPERE'S DECISION.  ALL RIGHT. LET'S GO THROUGH THIS CHART IN SOME DETAIL.

**A.**   CAN WE MOVE IT DOWN, SIR?

**Q.**   WE CAN.  AND IT'S JOINT EXHIBIT 10-28684.  AND, DOCTOR, I'LL DO MY BEST TO GET ALL OF IT ON THERE AS YOU LIKE.

**A.**   WOULD YOU LIKE ME TO DO IT?

**Q.**   NO, I'M GOING TO ASK YOU SPECIFIC QUESTIONS.  I DON'T WANT TO TAKE -- I WANT TO BEGIN WITH THE VITAL SIGNS.  VITAL SIGNS, THOSE ARE NORMAL, ARE THEY NOT?

**A.**   YES.

**Q.**   OKAY.

**A.**   I DON'T SEE A TEMPERATURE, BUT WHAT IS RECORDED THERE IS NORMAL.

**Q.**   OKAY.

**A.**   AND THE CHIEF COMPLAINT IS THAT HE CAN'T GET OUT OF BED.

**Q.**   WELL, LET'S LOOK AT THAT.  IF WE GO FURTHER DOWN TO WHAT THE EMT NOTED, HE SAID THAT HE FOUND THAT THE PATIENT WAS ABLE TO SIT UP, THEN STAND WITHOUT ASSISTANCE, AND HE AMBULATED WITH A NORMAL GATE.  DO YOU SEE THAT?

**A.**   YES.  HE WAS ABLE TO SIT UP AND STAND WITHOUT ASSISTANCE, YES.

**Q.**   AND AMBULATE WITH A NORMAL GATE.  CORRECT?

**A.**   THAT'S WHAT THIS EMT SAYS, YES, SIR.

**Q.** OKAY. AND THE EMT ALSO NOTED THAT THIS PATIENT DENIED SHORTNESS OF BREATH. CORRECT?

**A.** THAT'S NOTED.

**Q.** HE NOTES THAT "DBS CTA WITH EQUAL R/F AND GOOD AIR EXCHANGE." PLEASE INTERPRET ALL THAT FOR ME.

**A.** I DON'T SEE IT, BUT FROM WHAT YOU SAID, THE BREATH SOUNDS OR BILITERAL BREATH SOUNDS ARE CLEAR TO AUSCULTATION WITH R/F -- I DON'T KNOW WHAT THAT IS.

**Q.** OKAY. BUT GOOD AIR --

**A.** OR MAYBE IT'S MEANT TO SAY WITHOUT ROUSE, I DON'T KNOW. BUT, ANYWAY, THE LUNG EXAM, AS IT WAS PERFORMED HERE, WAS NORMAL. AND I DON'T HAVE ANY REASON TO DOUBT THAT.

**Q.** OKAY. HE GOES FURTHER DOWN, AFTER TALKING ABOUT HIS GATE, BEING ABLE TO STAND AND WHAT HAVE YOU, IT SAYS PULSE AND NEURO IS INTACT TIMES FOUR. DO YOU SEE THAT?

**A.** UH-HUH. I DON'T KNOW WHAT NEURO INTACT TIMES FOUR -- THAT'S USUALLY ALERT AND ORIENTED. TIMES FOUR MEANS YOU KNOW YOUR NAME, WHERE YOU ARE, THE DATE, AND THE CIRCUMSTANCES.

**Q.** OKAY. HE GOES ON TO SAY, IT SAYS, THAT PATIENT DENIES HAVING ANY OTHER COMPLAINTS. DO YOU SEE THAT?

**A.** YES.

**Q.** AND THEN HE HAS A CONFERENCE CALL WITH DR. LAVESPERE.

**A.** YES.

**Q.** THAT'S NOTED ON THIS RECORD. RIGHT?

**A.** THAT'S RIGHT.

**Q.** AND AFTER GIVING A FULL REPORT, AS NOTED ON THIS DOCUMENT, BASED ON THE INFORMATION THAT WAS PROVIDED TO HIM, DR. LAVESPERE ORDERED THE NO TRANSPORT ORDER AT THAT TIME. CORRECT?

**A.** WELL, THAT'S MY CONCERN. AND YOU'RE ABSOLUTELY RIGHT, THAT'S EXACTLY WHAT HE DID. HE SAID DON'T BRING THIS PATIENT TO SEE THE ATU AND I'M NOT GOING TO SEE HIM.

**Q.** RIGHT. HE'S GOT NORMAL VITAL SIGNS, HE'S GOT -- HE HAS BEEN ASSESSED AS BROKEN RIBS, AND HE APPEARS TO BE DOING FINE BY EVERYTHING THAT THE EMT IS REPORTING TO DR. LAVESPERE. RIGHT?

**A.** NO, SIR, THAT'S NOT CORRECT.

**Q.** ALL RIGHT.

**A.** HE WAS SEEN -- WOULD YOU LIKE ME TO EXPLAIN MY ANSWER?

**Q.** NO, MA'AM, I WOULDN'T.

AND HE GOES DOWN FURTHER, AND HE SAYS HE ADVISED THE PATIENT TO GO GET MEDS AT PILL CALL AND KEEP HIS UPCOMING APPOINTMENT. CORRECT?

**A.** THAT'S WHAT HE SAID.

**Q.** ALL RIGHT.

**A.** AND THE PATIENT DIED, THANKS TO THAT KIND OF CARE.

**Q.** BAD THINGS HAPPEN SOMETIMES UNEXPECTEDLY IN MEDICINE.

**A.** THIS WAS NOT AT ALL UNEXPECTED, SIR.

**Q.** MA'AM, THIS IS BROKEN RIBS. HE'S PRESENTING VERY CONSISTENT WITH BROKEN RIBS.

**A.**   SIR, THERE'S NO EVIDENCE OF BROKEN RIBS.  THIS IS A
PATIENT WHO IS PRESENTING REPEATEDLY AND DIES.

**Q.**   PRESENTING REPEATEDLY?

**A.**   WELL, I HAVE THE 20TH.  I HAVE VERBAL ORDERS ON THE 20TH,
I HAVE THE 21ST IN THE ATU, I HAVE THE 24TH, THAT'S THE NO
TRANSPORT.  THEN I HAVE THE 27TH IS WHEN HE COMES IN.  SO THE
20TH TO 27TH, OVER SEVEN DAYS, THIS GUY DIES.

**Q.**   MA'AM, HAVE YOU EVER BEEN SUED BY A PATIENT FOR ALLEGEDLY
NOT TREATING HIM?

**A.**   NO.

**Q.**   HAVE YOU EVER BEEN SUED BY A PRISONER FOR ALLEGEDLY NOT
TREATING THEM?

**A.**   I DON'T -- NO.

**Q.**   DO YOU KNOW WHO TERRY MYLES IS?

**A.**   NO.

          **MR. DUBNER:**  OBJECTION; BEYOND THE SCOPE.

          **THE COURT:**  OKAY.  WE ARE GOING TO TAKE A 15-MINUTE
BREAK UNLESS YOU'RE RIGHT IN THE MIDDLE OF A -- IS THIS A GOOD
TIME?

          **MR. ARCHEY:**  THIS WILL BE FINE, YOUR HONOR.

          **THE COURT:**  WE ARE GOING TO TAKE A 15-MINUTE RECESS.

                    **(RECESS.)**

          **THE COURT:**  BE SEATED.

          I THINK THERE WAS AN OBJECTION ON THE RECORD
THAT I HAD NOT RULED ON.  THE OBJECTION IS OVERRULED.  YOU MAY

CONTINUE.

     **MR. ARCHEY:**  THANK YOU, JUDGE.

**BY MR. ARCHEY:**

**Q.**  DR. VASSALLO, A MR. THOMAS E. MYLES FILED SUIT AGAINST YOU
FOR REFUSING TO PROVIDE CARE TO HIM.  ISN'T THAT TRUE?

**A.**  I DON'T KNOW THAT TO BE THE CASE.

     **MR. ARCHEY:**  JUDGE, MAY I APPROACH?

     **THE COURT:**  YOU MAY.

**BY MR. ARCHEY:**

**Q.**  MA'AM, I'VE HANDED YOU A PLEADING.  I WANT TO POINT YOU TO
SOME VERY SPECIFIC PARTS OF IT.  FIRST, IN THE CAPTION THERE AT
THE TOP IN THE MIDDLE OF ALL THOSE NAMES, THERE IS A DR. SUSIE
VASSALLO.  IS THAT YOU?

**A.**  YES.

**Q.**  THERE ARE PAGE NUMBERS BUT THEY'RE KIND OF CUT OFF, BUT IF
YOU GO BY PARAGRAPH NUMBERS, I'D LIKE FOR YOU TO TURN TO
PARAGRAPH 203.  ALL RIGHT.  THIS IS REFERRING TO AN INCIDENT
THAT OCCURRED AT BELLEVUE.  YOU WORK AT BELLEVUE.  CORRECT?

**A.**  YES.

**Q.**  AND THIS -- GIVE YOU A SECOND TO LOOK THROUGH THAT.  YOU
CAN READ IT ON THE SCREEN, AND YOU ALSO HAVE A COPY OF IT IN
FRONT OF YOU IF THAT HELPS AS WELL.

**A.**  OKAY.  LET ME LOOK AT IT.  I'VE READ IT.

**Q.**  THIS PATIENT, WHO WAS AN INMATE, CLAIMED THAT HE HAD BEEN
INJURED, FORCIBLE, POWERFUL FORCE, HE WAS SERIOUSLY INJURED AND

THAT HE CAME TO YOU, AND AT THAT TIME, HE COULD NOT STAND,

COULD NOT WALK, HE WAS IN SEVERE PAIN, AND FORCED IN SHOCK

FROM THE -- THAT'S PARAGRAPH 205.  DO YOU SEE THAT?

A.    I'M READING PARAGRAPH 205, YES.

Q.    PARAGRAPH 206, HE ALLEGES THAT YOU FAILED TO CONDUCT ANY

SEMBLANCE OF A PHYSICAL EXAMINATION OF HIM, NOT EVEN ANY

CURSORY OR PERFUNCTORY EXAM WHATSOEVER.  DO YOU SEE THAT?

A.    THAT'S WHAT HE SAYS AND THAT'S WHAT'S WRITTEN DOWN.

Q.    AND HE GOES FURTHER AND SAYS THAT YOU DIDN'T DO ANYTHING

BEYOND ASKING HIM WHAT WAS THE MATTER.  DO YOU SEE THAT?

A.    THAT'S WHAT HE SAYS.

Q.    AND HE GOES FURTHER AND SAYS THAT YOU FAILED TO PERFORM

ANY VISUAL EXAM OF HIS INJURED AREAS, FAILED TO PALPATE THE

INJURED AREAS, FAILED TO ASSESS, AND HE GOES ON WITH THOSE

TYPES OF ALLEGATIONS.  CORRECT?

A.    THAT'S CORRECT.

Q.    AND HE ALLEGES THAT AFTER YOU SPOKE WITH THE SECURITY

GUARDS, YOU TOLD HIM THAT HE WOULD NOT BE ADMITTED, TO GO ON

AND TO BE INCARCERATED.  CORRECT?

A.    THAT'S WHAT IT SAYS.

Q.    PARAGRAPH 214, HE ALLEGES THAT YOU DISCHARGED HIM WHILE HE

WAS STILL NON-AMBULATORY, AND DID SO WITHOUT PROVIDING ANY

MECHANICAL AIDS FOR AMBULATION, SUCH AS A WALKING CANE,

CRUTCHES OR WHEELCHAIR.  CORRECT?

A.    THAT'S WHAT IT SAYS.

**Q.** MA'AM, THIS LAWSUIT WAS DISMISSED ONLY ON AUGUST 3 OF THIS YEAR, JUST RECENTLY. ARE YOU FAMILIAR WITH THAT?

**A.** SIR, I HAVE NEVER SEEN THIS COMPLAINT. I AM UNFAMILIAR WITH THIS PATIENT'S NAME, AND I HAVE NEVER READ ANY OF THE THINGS YOU'VE JUST READ.

**Q.** OKAY. THESE ARE SERIOUS ALLEGATIONS, ARE THEY NOT?

**A.** YEAH, AND THEY'RE COMPLETELY FALSE TOO. THEY MAY BE SERIOUS AND THEY'RE COMPLETELY FALSE.

**Q.** OKAY. SO AN INMATE ACCUSED YOU OF THINGS THAT WERE NOT TRUE?

**A.** THAT'S TRUE. HE WAS AN INMATE. MY MEMORY OF THIS GUY IS THAT HE WAS ONE OF THE *OCCUPY WALL STREET* INDIVIDUALS WHO WAS IN NYPD CUSTODY. TO THE EXTENT THAT THAT'S AN INMATE, HE WAS AN INMATE.

**Q.** OKAY.

    **MR. ARCHEY:** YOUR HONOR, I'D LIKE TO OFFER THIS DOCUMENT INTO EVIDENCE AS OUR NEXT DEFENSE EXHIBIT.

    **MR. DUBNER:** OBJECTION; HEARSAY.

    **THE COURT:** MR. ARCHEY, DO YOU WANT TO ADDRESS THE OBJECTION?

    **MR. ARCHEY:** YOUR HONOR, SHE ADMITTED IT'S HER. SHE JUST SAID SHE HADN'T SEEN IT, BUT SHE ADMITTED IT'S HER. AND SHE RECALLS THE INCIDENT. IT IS ALSO FILED IN FEDERAL COURT. I'VE GOT THE PACER INFORMATION AT THE TOP THERE. I THINK IT'S APPROPRIATE TO BE ADMITTED FOR CROSS-EXAMINATION PURPOSES.

10:57  1    **THE COURT:**  WELL, I WILL ADMIT FOR IMPEACHMENT
2    PURPOSES.  OBJECTION'S OVERRULED.
3         **MR. ARCHEY:**  ALL RIGHT.  AND I WILL NEED HELP ON WHAT
4    THE NEXT EXHIBIT NUMBER SHOULD BE.
5              746, MADAM CLERK, DOES THAT RIGHT?
6         **THE DEPUTY CLERK:**  Y'ALL DID NOT GIVE ME A LIST.  YOU
7    ONLY GAVE ME A LIST OF WHAT'S UNDER SEAL.
8         **MR. ARCHEY:**  WE'LL TAKE CARE OF THAT AT THE NEXT
9    BREAK.  WE'LL GET YOU STRAIGHT.
10        **THE COURT:**  WE'RE GOING TO ADMIT IT AS 746.  IF WE
11   NEED TO CHANGE THE RECORD, WE WILL.
12        **MR. ARCHEY:**  THANK YOU, JUDGE.
13   **BY MR. ARCHEY:**
14   **Q.**  MA'AM, YOU PROVIDE WORLD CLASS EMERGENCY ROOM SERVICES,
15   DON'T YOU?
16   **A.**  THAT'S FOR YOU TO SAY, SIR.
17   **Q.**  WELL, YOU WORK AT BELLEVUE, YOU TEACH AT NYU, YOU TEACH AT
18   UT, AND YOU'VE DONE IT FOR OVER 20 YEARS.
19   **A.**  WELL, THANK YOU.
20   **Q.**  AND YOU STILL HAVE THOSE ALLEGATIONS MADE AGAINST YOU;
21   RIGHT?
22   **A.**  APPARENTLY THEY WERE MADE AGAINST ME, YES, SIR.
23   **Q.**  ALL RIGHT.  LET'S CONTINUE ON WITH THE CHART REVIEWS.  I
24   WANT TO GO TO PATIENT NO. 35 NOW, THE NEXT ONE UP.  THIS
25   GENTLEMAN WAS ELECTROCUTED IN THE KITCHEN IN A VERY UNFORTUNATE

10:58  1  ACCIDENT, AND YOU FOUND THAT THE RESUSCITATIVE EFFORTS WERE

2  TAKEN IMMEDIATELY AND WERE APPROPRIATE?

3  **A.**   ABSOLUTELY.

4  **Q.**   OKAY.  LET'S GO TO NO. 36 NOW.  THIS INDIVIDUAL WAS 70

5  YEARS OLD, HE HAD EMPHYSEMA, BRONCHIECTASIS, IF I'M SAYING THAT

6  RIGHT, ANGINA, AND, AGAIN, HE WAS A SMOKER, WHICH WE NOW KNOW

7  IS BAD.

8  **A.**   YES, SIR.

9  **Q.**   HIS RECORD CONTAINS NUMEROUS REFUSALS OF CARE.  ISN'T THAT

10  RIGHT?

11  **A.**   LET ME JUST CATCH UP WITH YOU ON 36.

12  **Q.**   SURELY.

13  **A.**   ONE MOMENT.  THANK YOU.

14  **Q.**   36, TAKE YOUR TIME, MA'AM.

15  **A.**   MY NOTES HERE DON'T REMARK ON THE REFUSALS OF CARE THAT

16  YOU WERE REFERRING TO.  UNLESS YOU CAN SHOW IT TO ME, I'M NOT

17  WANTING TO READ AND WASTE YOUR TIME.  IF YOU CAN SHOW ME THAT I

18  DID THAT OR YOU CAN SHOW ME REFERRALS, THEN I CAN ANSWER YOUR

19  QUESTION.

20  **Q.**   MA'AM, I'M GOING TO SHOW YOU JUST A COUPLE.  FOR THE

21  RECORD, I'M NOT GOING TO GO THROUGH THESE TO USE UP THE COURT'S

22  TIME.  THIS IS JOINT EXHIBIT 10-40365, REFUSED CARE AT --

23  THAT'S EARL K. LONG -- EKL.  SO HE'S REFUSING CARE TO BE SENT

24  OUT.  DO YOU SEE THAT?

25  **A.**   SO THIS IS THAT HE REFUSED CARE WHEN HE GOT TO THE

HOSPITAL, THAT'S WHAT YOU'RE SAYING?  THAT'S THE CASE.

**Q.**   I'M SAYING WHAT THE DOCUMENT SAYS IS ALL I'M SAYING,
MA'AM.  HE REFUSED THE --

**A.**   CAN YOU PUT IT BACK UP?

**Q.**   SURE.

**A.**   DO YOU WANT ME TO ANSWER YOUR QUESTION?

**Q.**   SURELY.

**A.**   OKAY.  SO THIS IS A TRIP RETURN, AND IT APPEARS THAT HE
RETURNED TO THE TREATMENT CENTER ON JANUARY 22ND IN THE
AFTERNOON.  AND IT SAYS, REFUSED AT EARL K. LONG.

**Q.**   OKAY.

**A.**   THAT'S WHAT IT SAYS, YES, HE REFUSED.

**Q.**   AND I DO HAVE THE ACTUAL TRIP TICKET OR TRIP NOTE, WHICH
IS JOINT EXHIBIT 10-40366 WHERE IT'S CLEARLY CHECKED THAT
INMATE REFUSAL IS CHECKED YES.

**A.**   CORRECT.

**Q.**   OKAY.  LET ME GO FORWARD TO THIS GENTLEMAN HAS TWO ISSUES,
ONE OF WHICH IS A LIPOMA.  THIS IS JOINT EXHIBIT 10-40364.

**A.**   AGAIN, SIR, ARE WE STILL ON PATIENT 36?

**Q.**   WE ARE.

**A.**   OKAY.  AND WHAT DID YOU SAY, THE PATIENT HAS A WHAT?

**Q.**   LIPOMA.

**A.**   LIPOMA?

**Q.**   YES, MA'AM.

**A.**   YES.

**Q.** AND EXHIBIT NO. 10-40364, THIS IS A CONSULT WITH GENERAL MEDICINE, AND THEY ADVISED AGAINST THE EXCISION OF THE LIPOMA. ADVISED AGAINST SURGERY ON THE LIPOMA.

**A.** THAT'S CORRECT. SOMEONE ADVISED AGAINST EXCISION OF THE LIPOMA, CORRECT.

**Q.** ALL RIGHT. NOW, IN MAY OF 2010, THIS GENTLEMAN DOES, WHEN HE PASSES, I'M GOING TO SHOW YOU THE INFIRMARY.

**A.** OKAY.

**Q.** I'M SORRY. ATU, I GUESS THAT'S ATU, NOTE. THIS IS EXHIBIT NO. 10-40351. HE'S BEEN MANAGED BY A NURSE PRACTITIONER WHEN HE -- AT THE TIME THAT HE PASSES. CORRECT?

**A.** CAN YOU PLEASE MOVE THE DOCUMENT DOWN JUST FOR A MOMENT SO I CAN BE FAMILIAR? SO IT'S MAY 16TH?

**Q.** YES, MA'AM.

**A.** AND IT'S 9:35 P.M. WHEN HE PRESENTS. HE IS UNRESPONSIVE, AND HE HAS BLOOD SUGAR OF 146, AND HE'S UNRESPONSIVE. AND THEN I SEE 9:35 P.M. AND THERE'S A SIGNATURE OF A NURSE PRACTITIONER, THERE'S A SIGNATURE ABOVE IT OF AN EMT AND IT APPEARS LIKE THE EMT CALLED THE -- SO THEN I DON'T KNOW. I DON'T KNOW WHAT THE NURSE PRACTITIONER'S PART IN THIS CARE WAS AND AT WHAT TIME IT STARTED.

**Q.** OKAY. GOT A NURSE PRACTITIONER INVOLVED IN THE PATIENT'S CARE, THAT'S WHAT YOU WANT TO SEE IN THAT ATU. CORRECT?

**A.** THAT'S A TRUE STATEMENT, BUT THAT CHART YOU JUST SHOWED ME DOES NOT DEMONSTRATE A NURSE PRACTITIONER'S INVOLVEMENT IN CARE

EXCEPT THERE'S A SIGNATURE AT THE BOTTOM OF THE PAGE.

**Q.** MA'AM, LET'S GO TO THE NEXT CHART. IT'S 37 THROUGH 40. I HAVE NO CHART REVIEW PERFORMED BY YOU ON THOSE CHARTS. IS THAT A CORRECT STATEMENT OR NOT?

**A.** WELL, AT THAT POINT, I PUT THE CHART REVIEW, WHICH YOU WILL SHE IN MY CHART REVIEW OR MY SUMMARY, I SHOULD SAY, IN THE BODY OF THE REPORT ON PAGES 60 TO 64 RIGHT AROUND THERE, WHICH I'M SURE YOU KNOW WHAT THEY ARE.

**Q.** ALL RIGHT. SO AS FAR AS THE CHART REVIEWS, YOU HAVE NO CHART REVIEWS LIKE YOU DO WITH THE OTHERS. IS THAT FAIR?

**A.** NOW, WHICH NUMBERS DID YOU SAY AGAIN, SIR?

**Q.** 37 THROUGH 40.

**A.** WELL, I HAVE A CHART REVIEW HERE, PATIENT 38 IN FRONT OF ME FROM THE REPORT, PATIENT 41. IS THAT INCLUDED?

**Q.** NO, MA'AM. 37 THROUGH 40.

**A.** WELL, 37 THROUGH 40 INCLUDES 38, AND HERE'S 38 RIGHT HERE.

**Q.** I MIGHT NEED TO LOOK AT THAT FROM YOU BECAUSE I DON'T HAVE THAT IN MY RECORDS.

**A.** OKAY.

**Q.** TO MAKE SURE WE'RE LOOKING AT THE SAME THING.

**A.** IT'S PATIENT 38.

     **MR. ARCHEY:** YOUR HONOR, MAY I APPROACH?

     **THE COURT:** YOU MAY.

     **THE WITNESS:** DON'T TAKE IT AWAY NOW.

**BY MR. ARCHEY:**

Q.   WELL, LET'S GO THROUGH THESE THEN.  ON PATIENT NO. 37 --

A.   AND IF YOU'RE GOING TO REFER TO 37?

Q.   I'M STARTING AT 37, YES.

A.   THEN I NEED TO SEE THE BODY OF THE REPORT BECAUSE AS YOU POINTED OUT CORRECTLY, THAT PATIENT 37 DOES NOT HAVE AN INDIVIDUALIZED REPORT LIKE I HAVE HERE, AND THAT I PUT IT JUST AS A PARAGRAPH.  AND THERE WE GO.  THANK YOU.

Q.   LET ME KNOW WHEN YOU'RE READY AND I'LL TURN IT OVER TO THE NEXT PAGE.

A.   OKAY.  CAN YOU PUT THE SECOND PAGE OF THE REPORT ON PATIENT 37 UP, PLEASE?  ARE WE ABLE TO GET THEM SIDE BY SIDE?

Q.   MAYBE.  LET ME SEE WHAT I CAN DO.

A.   OKAY, THAT'S HELPFUL.

Q.   OKAY.

A.   GO AHEAD.

Q.   ALL RIGHT.  HAVE YOU HAD A CHANCE TO LOOK AT 37 AND BE ORIENTED?

A.   YES, I'M ORIENTED.

Q.   OKAY.  ALL RIGHT.  NOW, THIS PATIENT HAD -- HE HAD A SEIZURE THAT STARTED THE INCIDENT.  CORRECT?

A.   YES.

Q.   OKAY.  AND HE HAD NEVER HAD A SEIZURE BEFORE?

A.   THAT'S CORRECT.

Q.   OKAY.  HE WAS TRANSPORTED TO THE ATU, TREATED, AND THEN TRANSPORTED TO EARL K. LONG.  CORRECT?

**A.** YES. IF YOU -- YES.

**Q.** OKAY. AND THIS PATIENT SUFFERED FROM A HEMORRHAGIC STROKE. IS THAT RIGHT?

**A.** WELL, THE PATIENT IN THE ATU WAS TREATED FOR AN OVERDOSE WITH THE GASTROINTESTINAL LAVAGE, HE WAS GIVEN NALOXONE PER PROTOCOL, HE HAD A DRUG TEST, THEN HE STARTED POSTURING, WHICH WE DISCUSSED YESTERDAY WHAT THAT MEANS, THAT HE WAS SIGNIFICANTLY UNDERGOING BRAIN DAMAGE. THEN HE WAS TAKEN TO THE HOSPITAL AND THAT CAT SCAN ACTUALLY INITIALLY DID NOT SHOW HEMORRHAGIC TRANSFORMATION INITIALLY BECAUSE OF THE TIME DELAY, IT APPEARED TO ME FROM REVIEWING THE CAT SCAN AND THE NOTES, THAT THE PATIENT HAD A STROKE, ISCHEMIC STROKE, AND HAD HEMORRHAGIC TRANSFORMATION, WHICH MEANS THAT HE STARTED OUT WITH JUST NO OXYGEN THERE AND IT STARTED TO BLEED AROUND IT. SO THE ANSWER IS YES, HE HAD AN INTRACEREBRAL HEMORRHAGE, AND THAT'S HOW IT WENT IN THE ATU, YES.

**Q.** ALL RIGHT. AND THE AUTOPSY REPORT INDICATES THAT HE DIED DESPITE VIGOROUS MEDICAL ATTENTION. CORRECT?

**A.** I DIDN'T SEE THE AUTOPSY. CAN YOU SHOW ME THAT?

**Q.** I'LL BE GLAD TO. CONFIRMS NEW ONSET SEIZURES AND THAT HE WAS UNRESPONSIVE. AND DESPITE VIGOROUS MEDICAL ATTENTION, HE WAS PRONOUNCED DEAD.

      **MR. DUBNER:** OBJECTION, YOUR HONOR. I DON'T BELIEVE THIS WAS EVER PRODUCED TO PLAINTIFFS.

      **MR. ARCHEY:** YOUR HONOR, IT'S PART OF -- I'LL BE

1   CAREFUL ON DOCUMENTS, BUT MY UNDERSTANDING IS IT'S PART OF

2   DEFENDANTS' EXHIBIT 24 -- 742, I'M SORRY, 742 IS WHAT THIS CAME

3   OUT OF.

4          **MR. DUBNER:**  AND 742 IS NOT YET IN EVIDENCE.

5   PLAINTIFFS HAVE AN OBJECTION.  AS DR. VASSALLO TESTIFIED, THERE

6   ARE SEVERAL, I'M NOT SURE HOW MANY, MEDICAL RECORDS THAT WE

7   REQUESTED SPECIFICALLY AND DEFENDANTS DIDN'T PRODUCE TO US AT

8   ANY POINT DURING DISCOVERY.  WE RECEIVED THIS, I BELIEVE, FOR

9   THE FIRST TIME ABOUT THREE DAYS AGO.  I'M SORRY, NOT THREE

10  DAYS, BUT ABOUT THREE WEEKS AGO BEFORE TRIAL.

11         **THE COURT:**  SO IT'S PATIENT 37.  SHE REVIEWED THE

12  MEDICAL RECORD AND CHART OF PATIENT 37, BUT YET THIS WASN'T IN

13  THE MEDICAL CHART THAT SHE RECEIVED?  IS YOUR -- WHERE IS

14  PATIENT 37'S MEDICAL CHART?  IT'S IN PLAINTIFFS' EXHIBIT 10.

15  OR --

16         **MR. ARCHEY:**  IT IS NOT PART OF 10.  IT IS PART OF

17  DEFENDANTS' EXHIBIT 7 --

18         **THE COURT:**  742.

19         **MR. ARCHEY:**  742.

20         **MR. DUBNER:**  AND FOR CLARIFICATION, THERE WERE CHARTS

21  THAT WERE REVIEWED ON SITE DURING THE SITE VISIT THAT WERE THEN

22  NOT PRODUCED TO US.  WE HAD A NUMBER OF BACK-AND-FORTHS ABOUT

23  WHAT CHARTS WOULD BE PRODUCED AND WOUND UP, PER DEFENDANTS'

24  OBJECTIONS OF BURDEN, NOT GETTING ALL OF THE CHARTS WE

25  REQUESTED FROM THEM.

11:09

1        **THE WITNESS:**  YOUR HONOR, IF I MAY, I REMEMBER HAVING

2   SEEN THIS BECAUSE HE HAS A TATTOO AND IT SAYS BRAIN, BUT

3   ACTUALLY I THINK IT WAS BRIAN, AND THE AUTOPSY -- I THOUGHT

4   THAT WAS OF INTEREST THAT THE AUTOPSY SHOWED THE TATTOO THAT

5   SAID BRAIN.

6        IF YOU PUT IT BACK UP, MR. ARCHEY, AND I

7   REMEMBER THAT BECAUSE IT WAS VERY WEIRD AND I THOUGHT MAYBE

8   THEY SPELLED BRIAN TO SPELL AS BRAIN, BUT I DON'T KNOW.

9        **THE COURT:**  SO THIS --

10        **THE WITNESS:**  BRIAN OR BRAIN, WHATEVER, I SEEM TO

11   REMEMBER THESE.  SO I DON'T -- I DON'T KNOW, I THINK I MIGHT

12   HAVE SEEN IT, IF THAT'S IMPORTANT TO THE COURT.  MY

13   DISAGREEMENT WITH THIS IS THAT IT WOULD BE UNUSUAL FOR A

14   PATHOLOGIST TO MAKE THE COMMENT, DESPITE VIGOROUS MEDICAL

15   ATTENTION, OF WHICH HE WOULD NOT KNOW.  AND THAT WOULD BE A

16   DECISION OR A COMMENTARY BY A PATHOLOGIST WHICH IS -- I

17   VEHEMENTLY DISAGREE WITH VIGOROUS MEDICAL ATTENTION.  THAT'S

18   USUALLY NOT THE PART OF THE PATHOLOGIST WHOSE JOB WAS TO ASSESS

19   DEAD PEOPLE AND THE CAUSE OF DEATH.

20        **MR. DUBNER:**  WE WILL WITHDRAW OUR OBJECTION.

21        **THE COURT:**  ALL RIGHT.  SO ARE YOU GOING TO MOVE TO

22   ADMIT 742?

23        **MR. ARCHEY:**  I AM, YOUR HONOR, THE ENTIRE DOCUMENT OF

24   742.

25        **MR. DUBNER:**  NO OBJECTION.

1          **THE COURT:** D742 IS ADMITTED.

2     **BY MR. ARCHEY:**

3     **Q.** LET'S GO TO 38. THAT'S WHERE YOU DO HAVE A CHART REVIEW

4     AND APPARENTLY IT DID NOT MAKE IT TO ME, WHICH IS MY PROBLEM,

5     NOT YOURS. THIS IS WHERE THIS PATIENT FELL AND HE HIT HIS

6     HEAD. SO HE HAD SOME HEAD TRAUMA. IS THAT RIGHT?

7     **A.** 38, SIR?

8     **Q.** YES, MA'AM, THAT'S RIGHT.

9     **A.** OKAY. LET ME JUST HAVE A QUICK LOOK AT MY REVIEW HERE.

10    **Q.** BY ALL MEANS.

11    **A.** SO BASED ON MY REVIEW, THE ATU NOTE SHOWED A BLOOD

12    PRESSURE OF 80/40, WHICH I THINK WE CAN AGREE IS LOW, AND IS

13    LOW, A PULSE OF 40. AND THE MEDICAL RECORD FROM THE ATU NOTED

14    THAT THE INMATE FELL LAST NIGHT AND THIS MORNING HAD MENTAL

15    STATUS CHANGES.

16    **Q.** OKAY.

17    **A.** AND IT GOES ON, REPORT GOES ON.

18    **Q.** MA'AM, LET ME SHOW YOU JOINT EXHIBIT 10-33440. THIS IS AN

19    AMBULANCE RUN REPORT. IT SHOWS THAT ASSIGNED AT 0910, HE IS AT

20    THE HOSPITAL AT 10:59. SO THIS GENTLEMAN WAS TRANSPORTED OUT

21    TO THE HOSPITAL ON A PROMPT BASIS, WAS HE NOT?

22    **A.** SIR, IF THIS STARTS WITH THE AMBULANCE RUN REPORT, I NEED

23    TO SEE THE ATU REPORT IN ORDER TO KNOW HOW PROMPT AND HOW LONG

24    THE PATIENT WAS IN THE ATU OR THE NURSING UNIT.

25    **Q.** I'M SHOWING YOU JOINT EXHIBIT 10-33443 SHOWING THAT, IF

1  I'M READING IT CORRECTLY, THE TIME SEEN IS 0900.

2  **A.**   AGAIN, WE HAVE AN EMERGENCY MEDICAL REPORT.  THAT IS NOT

3  THE REPORT OF THE ATU.  I SPECIFICALLY HAVE IN MY REPORT THAT

4  THE PATIENT WENT FROM THE ATU -- AND I NEED TO SEE THE ATU

5  RECORD.

6  **Q.**   MA'AM, THEY'RE TELLING ME THIS IS IT.

7  **A.**   IT IS NOT.

8  **Q.**   OKAY.  THAT'S WHAT WE HAVE AND I'M AWARE OF NO OTHER

9  DOCUMENT, THAT THIS IS THE ATU REPORT.

10  **A.**   OKAY.  WELL, I'LL CAN LOOK IT.  WHAT WAS YOUR QUESTION?

11  **Q.**   OKAY.  IT SHOWS THE TIME SEEN AT 0900 BASED ON THIS

12  DOCUMENT.  CORRECT?

13  **A.**   YES.

14  **Q.**   ARE YOU READY?

15  **A.**   NO.  LET'S KEEP IT UP, SIR, IF YOU DON'T MIND.

16  **Q.**   DON'T MIND AT ALL.

17  **A.**   OKAY.  THANK YOU.  I HAVE REVIEWED IT.

18  **Q.**   OKAY.  AND IF I GO TO THE AMBULANCE RUN NOW -- WELL, LET

19  ME GO BACK TO THIS.  THE BOTTOM, I THINK IT WAS CUT OFF AS YOU

20  WERE LOOKING AT YOUR FIRST -- AND I APOLOGIZE, THAT WAS

21  NOTHING.  THAT WAS JUST THE PROJECTOR.  DO YOU SEE THE TIME

22  LEFT DOWN AT THE BOTTOM, 10:05?

23  **A.**   YES.

24  **Q.**   OKAY.  SO HE IS OUT THE DOOR HEADED TO THE EMERGENCY ROOM

25  WITHIN AN HOUR AND FIVE MINUTES OF HITTING THE ATU.  CORRECT?

**A.**   YES.

**Q.**   AND THEN THE AMBULANCE RUN REPORT IS JOINT EXHIBIT 10-33440.  HE'S AT THE HOSPITAL AT 10:59.

**A.**   YES.

**Q.**   OKAY.  ALL RIGHT.  SO THIS IS A FAIRLY QUICK RESPONSE TO THIS GENTLEMAN'S PRESENTATIONS, IS IT NOT?

**A.**   I BELIEVE SO.  COULD YOU PUT THAT LAST PIECE OF PAPER UP ONE MORE TIME SO I CAN SEE WHAT THE BODY OF THE NOTE SAYS?

**Q.**   ARE YOU TALKING ABOUT THE AMBULANCE RUN, MA'AM?

**A.**   YEAH.  YES, SIR.  SORRY.  YES, THE ANSWER IS YES, IT WAS PROMPT.  AND THERE'S A DOCTOR IN THE ATU ON THAT EVENT.

**Q.**   ALL RIGHT.  LET ME GO TO PATIENT NO. 39.  DO YOU HAVE A CHART REVIEW FOR PATIENT NO. 39?

**A.**   IT'S PAGE 63 OF THE REPORT, IF YOU CAN SHOW ME THAT.

**Q.**   I'M TRYING TO GET ALL OF IT ON ONE PAGE, ONE SCREEN FOR YOU.

**A.**   OKAY.

          **MR. ARCHEY:**  JEFF, THIS IS PLAINTIFFS' EXHIBIT 6 THAT WE ARE LOOKING AT.  IS THAT RIGHT?  AND PAGES 63 AND 64. RIGHT?

          **MR. DUBNER:**  THAT'S CORRECT.

          **THE WITNESS:**  OKAY, I'VE READ IT.

**BY MR. ARCHEY:**

**Q.**   THIS GENTLEMAN HAD A HISTORY OF DIABETES, SEVERE CORONARY ARTERY DISEASE, HEART FAILURE, AND OBESITY.  HE WAS 310 POUNDS.

1   CORRECT?

2   **A.**   YES.

3   **Q.**   I WANT TO SHOW YOU THE JULY 16, 2011, ATU RECORD.  THIS IS

4   JOINT EXHIBIT 10-34752.

5   **A.**   YES, SIR.  AND THE PREVIOUS THING, WHAT WAS THE DATE ON

6   THAT PREVIOUS PAPER?  THIS IS JULY 16TH.  I HAVE TO FOLLOW MY

7   NOTES AND THAT.

8   **Q.**   CERTAINLY, MA'AM.

9   **A.**   OH, I HAVE IT HERE.  SO WHAT I'M LOOKING AT, AND WHAT I'M

10  LOOKING AT AS YOU ASKED ME THE QUESTIONS IS, AS YOU SAID, WE

11  HAVE A HISTORY OF DIABETES, SEVERE CORONARY ARTERY DISEASE, AND

12  A TEMPERATURE OF 103.6 IN A PATIENT WHO IS 65 YEARS OLD, A FAST

13  PULSE, AND AN ALTERED MENTAL STATUS.  NOW I'M TRYING TO FOLLOW

14  ALONG WITH YOU.

15  **Q.**   OKAY.

16  **A.**   HE WAS MANAGED -- I DO SEE IN THE NEXT SENTENCE THAT

17  YOU -- IF YOU COULD PUT IT BACK UP, THAT HE WAS AGAIN MANAGED

18  ONLY BY MEDICS, ALTHOUGH THIS WAS A VERY SERIOUS PRESENTATION,

19  PARTICULARLY IN SOMEONE WHO, BY VIRTUE OF DIABETES, IS

20  IMMUNOCOMPROMISED, AND HE'S ALTERED.  SO HE'S MANAGED AND GIVEN

21  VERBALS BY DR. COLLINS.  SO NOW THAT WAS OF CONCERN TO ME.

22          THEN ON SEPTEMBER 16TH AT 9:15, AGAIN, MEDICS

23  RESPONDED, PATIENT DIDN'T FEEL WELL, AND HE GOT BETTER OVER THE

24  NEXT HOUR, BUT THERE WAS NO EXAMINATION BY A PHYSICIAN OR

25  PHYSICAL EXAMINATION.

Q.   ALL RIGHT.

A.   AND THEN THE NEXT PAGE -- SO WE GO FROM THE 7/13/11 WHICH

IS --

Q.   MA'AM, LISTEN, I'D LIKE TO ASK QUESTIONS AS OPPOSED TO YOU

READING YOUR WHOLE CHART REVIEW.

A.   PLEASE DO.

Q.   OKAY.  AND I WANT YOU TO BE FAMILIAR, BUT THIS IS MY TIME

TO QUESTION YOU.

         ALL RIGHT.  ON JULY 16, 2011, IS THE ATU VISIT WHERE

IT'S NOTED HE'S NOT WEARING HIS NITRO PATCH, IT'S IN QUOTES,

"DON'T WANT TO," AND IT LOOKS LIKE HE WAS DISCHARGED TO ASH 2.

DO YOU KNOW WHAT ASH 2 IS?

A.   YES.  IT IS ONE OF THE NURSING UNITS.

Q.   OKAY.  LET ME GO TO JULY 19, 2011.  THIS IS JOINT EXHIBIT

10-36469.  IT INDICATES HE WAS -- ALL OF HIS LABS WERE WITHIN

NORMAL LIMITS.  HE'S THE SAME AS HE WAS, HAS BEEN THROUGHOUT

THE DAY, SAW HIM IN THE ATU.  DR. LAVESPERE SIGNED THIS CHART

RECORD.  CORRECT?

A.   YES, HE SIGNED THE RECORD.

Q.   MA'AM, THE NEXT DAY ON JULY 21, I HAVE JOINT EXHIBIT

10-36667.  THIS PHYSICIAN PROGRESS NOTE INDICATES THAT HE'S

MUCH MORE ALERT, CARRYING ON A REGULAR CONVERSATION, BEING

TREATED IN THE NURSING UNIT.  CORRECT?

A.   THE NOTE DOES SAY THAT.

Q.   AND, IN FACT, ABOVE THAT, IT INDICATES THAT THE NURSE

REPORTED THAT THE INMATE WAS -- I APOLOGIZE.  I DON'T KNOW HOW

ELSE TO DO THIS -- MASTURBATING THIS MORNING IN HIS BED.

CORRECT?

**A.**   YEAH, I'VE SEEN A LOT OF DYING PEOPLE DO THAT, SIR.

**Q.**   OKAY.

**A.**   IT'S STRANGE; I DON'T UNDERSTAND IT.

     **MR. ARCHEY:**  I APOLOGIZE, YOUR HONOR.

     **THE COURT:**  IT'S THE LAST CHANCE.

     **MR. ARCHEY:**  I APOLOGIZE.  I DON'T KNOW HOW ELSE TO

DO IT, JUDGE.

     **THE COURT:**  I COULDN'T HELP IT.

**BY MR. ARCHEY:**

**Q.**   LET ME SHOW YOU THE NEXT RECORD.

     **MR. DUBNER:**  WOULD YOU LIKE ONE OF US TO MOVE TO

STRIKE, YOUR HONOR?

**BY MR. ARCHEY:**

**Q.**   ALL RIGHT.  I'M SHOWING THE NEXT RECORD WHICH IS JULY 27,

2011, PATIENT HAS BEEN REFUSING HIS MEDS FOR TWO DAYS.  PATIENT

IN THIS KIND OF CONDITION REFUSING HIS MEDS WOULD BE A BAD

THING?

**A.**   SIR, THE NATURE OF THE CALL IS A UNRESPONSIVE PATIENT, SO

REFUSING IS PRESENT IN THIS NOTE.  I DON'T KNOW HOW LONG HE HAS

BEEN UNRESPONSIVE AND REFUSING.  IT'S NOT CLEAR FROM THIS NOTE.

**Q.**   OKAY.  AND THIS OBESE PATIENT, WHO WAS NONCOMPLIANT WITH

HIS MEDICATIONS, HAD MANY ILLNESSES AND EVENTUALLY DIED.

1    CORRECT?

2    **A.**   YES, HE DIED.

3    **Q.**   ALL RIGHT.  LET'S GO TO PATIENT NO. 40 NOW.  AGAIN, I

4    DON'T SEE WHERE YOU HAVE A CHART REVIEW ON NO. 40.

5    **A.**   I REVIEWED THE CHART, AND I PUT IT IN THE BODY OF PAGE 66.

6          **MR. ARCHEY:**  YOUR HONOR, AT THIS TIME, I'D LIKE TO

7    MOVE TO INTRODUCE THE RECORDS FOR PATIENT 39 INTO EVIDENCE AS

8    DEFENDANTS' EXHIBIT 743.

9          **MR. DUBNER:**  NO OBJECTION, YOUR HONOR.

10          **THE COURT:**  EXHIBIT 743 WILL BE ADMITTED.

11   **BY MR. ARCHEY:**

12   **Q.**   ALL RIGHT.  NOW WE'RE ON PATIENT 40.

13   **A.**   AND ARE YOU GOING TO SHOW IT TO ME, SIR?

14   **Q.**   GIVE ME A SECOND.

15   **A.**   OKAY.

16   **Q.**   I'LL TRY TO GET THERE FOR YOU.

17   **A.**   OKAY.

18   **Q.**   AND IS THAT ALL YOU NEED THERE IS THAT PARAGRAPH?

19   **A.**   LET ME START WITH THIS.

20   **Q.**   SURE.

21   **A.**   AND THEN I'LL SEE.  IT LOOKS LIKE IT MIGHT -- I DON'T KNOW

22   IF THAT'S THE END, BUT LET ME READ THIS ONE.  THANK YOU.

23   **Q.**   SURE.

24   **A.**   I HAVE REVIEWED IT.

25   **Q.**   MA'AM, THIS IS A -- ONE OF YOUR CRITICISM IS THAT LABS

1  WERE NOT AVAILABLE ON THE WEEKEND WHICH COULD CAUSE --

2  POTENTIALLY CAUSE HARM.  IS THAT RIGHT?

3  **A.**   IT CONTRIBUTES TO HARM IF LABS ARE NECESSARY AND THE

4  PATIENT DOES NOT HAVE THEM, THAT COULD CONTRIBUTE TO HARM, YES.

5  **Q.**   AND I MOVED THE EXPERT REPORT DOWN TO WHERE YOU CAN SEE

6  THE PARAGRAPH BEFORE THAT, THAT'S ACTUALLY WHAT YOU ARE

7  REFERRING TO WITH THIS PARTICULAR PATIENT, AMONG OTHER THINGS,

8  I'M SURE.  CORRECT?

9  **A.**   YEAH.  THE BODY OF MY COMMENTARY THERE SAYS NO LABORATORY

10 COULD BE DRAWN OVER THE WEEKEND, AND THAT'S CORRECT.

11 **Q.**   AND THE DATE THERE IS SUNDAY, FEBRUARY 16, 2010?

12 **A.**   YES, SIR.

13 **Q.**   OKAY.  I'M GOING TO SHOW YOU THE ATU REPORT DATED

14 FEBRUARY 16, 2010.  THIS IS THE DOCUMENT LEADING UP OR THE

15 REFERENCE TO THE LABS.  IS THAT RIGHT?

16 **A.**   WELL, IT APPEARS TO BE ATU.

17 **Q.**   OKAY.

18 **A.**   AND WHAT IS YOUR QUESTION, SIR?

19 **Q.**   MA'AM, FEBRUARY 16, 2010, IS A TUESDAY.

20 **A.**   OKAY.

21 **Q.**   SO YOU'RE WRONG IN YOUR WRITE-UP.

22 **A.**   CAN YOU PUT THE PAPER BACK, PLEASE?

23 **Q.**   I'LL BE GLAD TO.  THE ATU RECORD IS DATED FEBRUARY 16,

24 2010.  RIGHT?

25 **A.**   YES.  AND THE PARAGRAPH AGAIN?

1 **Q.** STATES "ON SUNDAY, FEBRUARY 16, 2010, THE PATIENT
2 PRESENTED TO THE ATU."
3 **A.** CAN YOU --
4　　　　**MR. ARCHEY:** JUDGE, I DON'T KNOW WHY IT'S FUZZY.
5　　　　**THE WITNESS:** IT'S FUZZY. AND SO ARE THE DAYS OF THE
6 WEEK?
7 **BY MR. ARCHEY:**
8 **Q.** EXCUSE ME?
9 **A.** THE DAY OF THE WEEK IS ALSO FUZZY HERE.
10 **Q.** OKAY.
11 **A.** SO YOU'RE RIGHT, SIR. IF SUNDAY, FEBRUARY 16, 2010, WAS
12 NOT -- IF THAT DATE WAS NOT A SUNDAY, I STAND CORRECTED.
13　　　　**MR. ARCHEY:** YOUR HONOR, CAN I ASK FOR JUDICIAL
14 NOTICE THAT FEBRUARY 16, 2010 IS A TUESDAY?
15　　　　**MR. DUBNER:** NO OBJECTION.
16　　　　**THE COURT:** YES, JUDICIALLY NOTED.
17 **BY MR. ARCHEY:**
18 **Q.** THIS PATIENT GOT HIS LABS AS HE NEEDED. CORRECT?
19 **A.** CAN YOU SHOW ME THAT? WHERE ARE THE LABS?
20 **Q.** FIRST I HAVE A URINALYSIS.
21 **A.** YES, THAT'S A URINALYSIS FROM THAT DATE.
22 **Q.** OKAY. AND THEN I HAVE THE LABS WITH THE BLOOD WORK
23 COLLECTED AT 6:30 ON FEBRUARY 17TH, THE NEXT DAY.
24 **A.** THE NEXT DAY, YOU'RE RIGHT. IT'S 6:30 IN THE MORNING THE
25 NEXT DAY.

**Q.** OKAY.

**A.** IT WAS REPORTED ON THE FOLLOWING DAY, THE 19TH, WHICH MUST

HAVE BEEN THEN A FRIDAY. SO THEY WERE DONE, THE PATIENT WAS IN

THE ATU ON THE 16TH, THE LABS WERE COLLECTED ON THE 17TH, AND

THE RESULTS WERE GIVEN ON THE 19TH.

**Q.** OKAY. OF COURSE, THIS IS ALL IN 2010. CORRECT?

**A.** CORRECT.

**Q.** LET'S GO TO PATIENT NO. 41.

        **MR. ARCHEY:** YOUR HONOR, AT THIS TIME --

            JOHN, WHAT RECORD, WHAT EXHIBIT NUMBER ARE

THESE? OH, I'M GOOD WITH THESE.

**BY MR. ARCHEY:**

**Q.** OKAY. TURN TO PATIENT 41 AT THIS TIME, PLEASE. LET ME

KNOW WHEN YOU ARE READY, MA'AM.

**A.** I'M ON PAGE -- I AM ON MY NOTES FROM 41, GO AHEAD.

**Q.** OKAY. ALL RIGHT. THIS GENTLEMAN HAD A HISTORY OF

HYPERTENSION, COPD, HEPATITIS C, GASTRO -- REFLUX DISEASE,

AMONG OTHER THINGS. RIGHT?

**A.** I REFER TO COPD. I HAVE NO REASON TO DOUBT THAT HE HAD

THOSE DISEASES IF YOU SAY HE HAD THEM.

**Q.** OKAY. WELL, LET ME MOVE ON THEN. THIS PATIENT REFUSED TO

BE TRANSPORTED OFF SITE FROM LSP THREE DIFFERENT TIMES. ARE

YOU AWARE OF THAT?

**A.** IN MARCH OF 2010, I SEE A REFUSAL TO BE TRANSPORTED.

**Q.** OKAY.

**A.**   TRANSPORT TO ATU FOR A FOLLOW-UP.

**Q.**   ON MARCH 12TH, 2010, THIS IS JOINT EXHIBIT 10-07720,
REFUSED TO BE TRANSPORTED.  CORRECT?

**A.**   TO THE ATU, YES, SIR, THAT'S CORRECT.

**Q.**   I WILL SHOW YOU THE NEXT ONE WHICH IS JUNE 24, 2010.
THIS IS JOINT EXHIBIT 10-07712, REFUSAL TO ACCEPT MEDICAL CARE.

**A.**   YES, SIR, AND THIS ONE, AS YOU SEE, HE FELT HE WAS
SMOTHERED BECAUSE HE COULDN'T BREATHE --

**Q.**   OKAY.

**A.**   -- IN THE TRANSPORTATION, SO HE HAD A -- THIS ONE
DEMONSTRATES THE CORRECTNESS OF GIVING SOME KIND OF REASON
BEHIND THE REFUSAL, AND IT IS A REFUSAL.

**Q.**   OKAY.  LET ME SHOW YOU THE NEXT ONE, WHICH IS JUNE 29,
2010.  HE'S REFUSING ALL MEDS AND INSULIN.  OFFENDER INSTRUCTED
THAT HE NEEDS TO THINK ABOUT THIS DECISION BECAUSE HE IS A
DIABETIC AND CAN CAUSE HIMSELF GREAT HARM.

**A.**   YES, SIR, THAT'S WHAT IT SAYS.

**Q.**   AND THAT'S A GOOD REFUSAL TO ACCEPT MEDICAL CARE NOTE.
CORRECT?

**A.**   YES.

**Q.**   THAT'S WHAT YOU WANT TO SEE.  RIGHT?

**A.**   I DO.

**Q.**   HERE IS ANOTHER REFUSAL TO ACCEPT CARE WHERE HE IS
REFUSING TO BE TRANSPORTED, AND HE SAYS BECAUSE HE CAN'T WEAR
THE BLACK BOX.

**A.**   CORRECT.

**Q.**   OKAY.  ALL RIGHT.  SIX DAYS LATER, HE PRESENTS IN THE ATU

ON AUGUST 23, 2010.  THIS IS DOCUMENT NO. 10-0769.  THE LAST

DOCUMENT WAS 10-07697.

         **REPORTER'S NOTE:**  (AT THIS TIME, MARY ROPER WAS

PRESENT IN THE COURTROOM.)

**BY MR. ARCHEY:**

**Q.**   ALL RIGHT, DOCTOR, IN THE ATU, HE IS CARED FOR IN THE ATU

FOR SEVERAL HOURS THAT AFTERNOON OR THAT DAY.  CORRECT?

**A.**   LET ME JUST BRIEFLY LOOK AT IT.  I SEE THAT HE WAS SEEN AT

10:30 A.M. AND THEN LET ME JUST REVIEW FOR A MOMENT, PLEASE.

CAN YOU ASK YOUR QUESTION AGAIN, PLEASE?

**Q.**   SURELY.  HE'S SEEN AT THE ATU IN THE MORNING, AND I MOVED

IT UP A LITTLE BIT, IT SHOWS HIM LEAVING THE ATU AT 12:15 ON

THAT DAY.

**A.**   THAT'S CORRECT.

**Q.**   OKAY.  HE THEN COMES BACK TO THE ATU AT 1524, WHICH IS

3:24 IN THE EVENING.  THIS IS -- OR AFTERNOON.  THIS IS JOINT

EXHIBIT 10-07692.  ALL RIGHT.  AND HE'S NOTED AS BECOMING MORE

AND MORE COMBATIVE.  DO YOU SEE THAT?

**A.**   YES.

**Q.**   OKAY.  AND YOU ALSO SEE WHERE THEY CALL THE DOCTOR, CALLED

M.D. AT 1646.  CORRECT?

**A.**   IT'S VERY IMPORTANT TO UNDERSTAND THAT THE WORD

"COMBATIVE" IN A MEDICAL CONTEXT IS DUE TO ALTERED MENTAL

1   STATUS AND PROBLEMS IN A PATIENT WHO IS SICK.  COMBATIVE

2   DOESN'T MEAN HE'S FIGHTING FOR NO REASON.  COMBATIVE IS A

3   SERIOUS SIGN, JUST SO WE UNDERSTAND THAT WE ARE COMMUNICATING.

4   Q.   WELL, THAT'S ONE INTERPRETATION OF IT.  CORRECT?

5   A.   IT'S ONE.

6   Q.   OKAY.  LET ME SHOW YOU THE NEXT PAGE OF THAT SAME --

7   A.   SIR, DID YOU HAVE A QUESTION ON THAT ONE?

8   Q.   YES, MA'AM.  YOU'VE ALREADY ANSWERED IT.

9        THE NEXT ONE IS JOINT EXHIBIT 10-07693, IT'S PAGE 2

10  OF THAT SAME VISIT.  AND I WANT TO GIVE YOU AS MUCH TIME TO

11  LOOK AT WHICHEVER YOU LIKE, BUT THE DOCTOR IS THERE WITH THIS

12  INDIVIDUAL WHEN HE CODES AND EVENTUALLY DIES.  CORRECT?

13  A.   THE DOCTOR WAS THERE, THAT'S CORRECT.

14  Q.   OKAY.  SO HE IS BEING SEEN BY A PHYSICIAN AT THE ATU WHEN

15  THIS EVENT GOES DOWN.  CORRECT?

16  A.   YES.

17  Q.   AND THIS, AGAIN, WAS IN 2010 THOUGH.  RIGHT?

18  A.   WELL, THAT IS THE DATE, YES.

19       **MR. ARCHEY:**  ALL RIGHT.  YOUR HONOR, I UNDERSTAND I'M

20  SUPPOSED TO ASK THAT THE RECORDS FOR PATIENT NO. 40 BE ADMITTED

21  INTO EVIDENCE AS DEFENDANTS' EXHIBIT 743.

22       **MR. DUBNER:**  AND THOSE ONES, WE WOULD OBJECT TO.

23  AGAIN, I'M FAIRLY CERTAIN THAT WE RECEIVED THOSE ON SITE AND

24  DEFENDANTS REFUSED TO PROVIDE A COPY TO US FOR OUR EXPERTS TO

25  REVIEW AFTER THE SITE VISIT.

1    **THE COURT:**  DO YOU WANT TO RESPOND?

2         **MR. ARCHEY:**  YOUR HONOR, I CAN'T SAY WHAT HAPPENED

3    BACK AT THAT TIMEFRAME.  I KNOW THEY'VE HAD THEM, I KNOW THEY

4    WERE LISTED, I KNOW THESE EXPERTS LOOKED AT THEM.  I KNOW SHE'S

5    IDENTIFIED THEM, AND SHE REFERENCED THEM IN HER REPORT, SO

6    THAT'S EVIDENCE THAT THEY HAD THEM.

7         **THE COURT:**  THE COURT'S GOING TO ADMIT THE RECORDS

8    FOR PATIENT NO. 40, BUT I DON'T THINK YOU'RE ON EXHIBIT 743.

9    THAT WAS PATIENT 39.

10        **MR. ARCHEY:**  JOHN, GIVE ME A NUMBER.  WHAT NUMBER

11   WOULD THAT BE?  I THINK IT MIGHT HAVE BEEN MARKED EARLIER AND

12   NOT ADMITTED MIGHT BE WHAT'S HAPPENED, JUDGE.  THEY WERE

13   PRE-MARKED.

14        **THE COURT:**  I ADMITTED 743.

15        **MR. ARCHEY:**  OKAY.

16        **THE COURT:**  BUT YOU REPRESENTED THAT IT WAS PATIENT

17   39.  BUT AT ANY RATE, WHATEVER IT IS, 743 IS IN EVIDENCE.

18        **MR. ARCHEY:**  GIVE ME A SECOND, MAYBE DURING A BREAK,

19   TO MAKE SURE WE HAVE ALL THAT STRAIGHT, JUDGE, IF WE MAY.

20   **BY MR. ARCHEY:**

21   **Q.**   DOCTOR, NOW LET'S GO TO PATIENT 42.  THIS IS THE PATIENT

22   THAT YOU SPENT A LARGE PORTION OF YOUR DIRECT EXAMINATION

23   SPEAKING ABOUT.  CORRECT?

24   **A.**   I'M FAMILIAR WITH PATIENT 42, YES, SIR.

25   **Q.**   AND PATIENT 42, WILL YOU AGREE WITH ME THAT THE INITIAL

1    OPINION OF THE PROVIDERS AT LSP WAS THAT THEY WERE LIKELY

2    DEALING WITH A MOJO INCIDENT?

3    **A.**    I CANNOT AGREE WITH THAT.  COULD YOU SHOW ME THE PAPER?

4    **Q.**    I DON'T HAVE A PIECE OF PAPER.  I'M JUST SAYING BASED UPON

5    WHAT OCCURRED AND THE TYPES OF THINGS THEY WERE DOING, ISN'T

6    IT -- DOESN'T IT APPEAR THAT THEY BELIEVED THEY WERE DEALING

7    WITH A MOJO INCIDENT?

8    **A.**    SIR, GETTING A URINE TOXICOLOGY, WHICH THEY DID ROUTINELY

9    FOR EVERYBODY, IF THAT INDICATES THEY THINK THE DIAGNOSIS IS A

10   MOJO INCIDENT, THEN THAT'S WHAT THEY THOUGHT.  BUT IN MY REVIEW

11   OF MULTIPLE RECORDS, THAT IS NOT WHY THEY WOULD DO A URINE

12   TOXICOLOGY.  THEY HAD NO DIAGNOSIS.  THEY WERE FISHING.

13   **Q.**    WHAT IS MOJO?

14   **A.**    WELL, GENERALLY WE USE IT FOR THE WORDS OF SYNTHETIC

15   CANNABINOIDS.

16   **Q.**    AND SYNTHETIC MARIJUANA.  RIGHT?

17   **A.**    CORRECT.

18   **Q.**    OKAY.  AND SYNTHETIC MARIJUANA CAN PRESENT IN MANY WAYS

19   BECAUSE YOU DON'T KNOW EXACTLY HOW IT WAS MADE.  WHOEVER

20   SYNTHESIZED THAT MARIJUANA COMES WITH DIFFERENT PRESENTATIONS.

21   ISN'T THAT FAIR?

22   **A.**    I'VE SEEN HUNDREDS OF CASES, AND THEY CAN LOOK A NUMBER OF

23   WAYS.  THEY CAN PRESENT IN A NUMBER OF WAYS.

24   **Q.**    OKAY.  SO ULTIMATELY YOU'RE CRITICAL OF WHAT OCCURRED, AND

25   I GET THAT, LSP BELIEVED THAT THEY WERE DEALING WITH A MOJO

1   INCIDENT IN RESPONSE TO THIS PATIENT?

2   **A.**   I DISAGREE WITH THAT.

3   **Q.**   ARE YOU AWARE THAT MOJO WAS A PROBLEM OUT AT LSP AND THAT

4   THEY HAD PATIENTS WHO WOULD SUFFER FROM OVERDOSES OF MOJO?

5   **A.**   I AM COMPLETELY CERTAIN THAT THAT IS THE CASE, YES.  IT'S

6   A NATIONAL PROBLEM.

7   **Q.**   OKAY.  AND, MA'AM, LET ME GO TO PATIENT 43.  PATIENT 43,

8   GIVE YOU A SECOND TO CATCH UP.

9   **A.**   I AM WITH YOU.

10  **Q.**   THIS GENTLEMAN HAS A RIGHT CALF MASS THAT WAS BEING

11  ASSESSED.  CORRECT?

12  **A.**   YES.

13  **Q.**   ALL RIGHT.  AND HE NEEDED BIOPSIES, CT SCANS, HE GOT THEM,

14  DIDN'T HE?

15  **A.**   OVER THREE YEARS, YES.

16  **Q.**   WELL, THE FIRST -- LET'S GO THROUGH IT THEN.  I'M GOING TO

17  SHOW YOU THE FIRST DOCUMENT, WHICH IS JOINT EXHIBIT 10-17907.

18  THIS IS NOVEMBER 25, 2014.  IT'S REFERENCING IN THIS MASS.  IT

19  SAYS NOT EXPECTED TO REPRESENT A HEMATOMA.  NOW, WHAT IS A

20  HEMATOMA FIRST?

21  **A.**   WELL, FIRST, THAT'S A BLOOD CLOT, BUT SECONDLY, THE LUMP

22  SIZE GOLF BALL WAS NOVEMBER 5TH, 2013.  THAT'S THE FIRST

23  DOCUMENTATION IN THE MEDICAL RECORD THAT I REVIEWED AND I

24  CHARTED IT.

25  **Q.**   OKAY.  SO HERE, THOUGH, WHAT DOES IT MEAN WHEN IT SAYS NOT

EXPECTED TO REPRESENT A HEMATOMA?

**A.**   IT MEANS THAT THIS ULTRASOUND IS NOT A HEMATOMA.  THIS

MASS IS NOT A HEMATOMA, ACCORDING TO THAT MOST LIKELY

INTERPRETATION OF THAT ULTRASOUND.

**Q.**   THEN ON MARCH 27, 2015, THIS IS JOINT EXHIBIT 10-17906.

WE HAVE A MRI OF THE LOWER EXTREMITY, AND IT FINDS AN

INDETERMINATE SOFT MASS LESION AND RECOMMENDS CLINICAL

CORRELATION AND BIOPSY IS SUGGESTED.  RIGHT?

**A.**   YES, I SEE ALMOST TWO YEARS TO THE DATE OF THE ONSET OF

THE GOLF BALL SIZE MASS.

**Q.**   WELL, NOT EXACTLY.  YOU TOLD ME DECEMBER OF 2013.

CORRECT?

**A.**   NOVEMBER OF 2013.

**Q.**   OKAY.

**A.**   AND WHAT WAS THE DATE OF THAT OTHER ONE?  IF I HAVE TO

CORRECT MY TIMING, I WILL.

**Q.**   WELL, THE FIRST ONE I SHOWED YOU WAS NOVEMBER 14TH, AND

NOW WE'RE IN MARCH OF 2015.

**A.**   OKAY.  AND I AM CORRECTING YOU, SIR.  NOVEMBER 5TH, 2013,

WAS THE FIRST TIME, AND NOW WE'RE IN '15.  THAT'S TWO YEARS.

**Q.**   WELL, LATE '13, EARLY '15?

**A.**   I'M SURE THE COURT CAN TELL HOW LONG IT IS, AND MAYBE I'M

-- MY ADDITIONS AREN'T THAT GOOD.

**Q.**   OKAY.  FAIR ENOUGH.

**A.**   BUT IT SEEMS -- IT APPEARS TO BE ABOUT A YEAR AND A HALF

1  TO TWO YEARS.

2  **Q.**    THIS IS NOVEMBER 13, 2015.  HE IS REFERRED TO ORTHO.  IT

3  SAYS STATUS:  EXCISE BIOPSY, RIGHT CALF IN NEW ORLEANS.  OKAY.

4  DO YOU SEE THAT, MA'AM?

5  **A.**    THAT'S THE BIOPSY, YES.

6  **Q.**    OKAY.  THE NEXT DOCUMENT I'D LIKE TO SHOW YOU IS -- THERE

7  IT IS, JANUARY 26TH, 2016, IMAGING REPORT, MRI AGAIN OF THE

8  LOWER EXTREMITY.  RIGHT?

9  **A.**    YES.

10  **Q.**    THIS IS DOCUMENT NO. 10-17905.  DOWN AT THE BOTTOM, DOES

11  THAT APPEAR TO BE -- OR DO YOU KNOW WHOSE INITIALS THOSE ARE?

12  **A.**    PROBABLY DR. LAVESPERE.

13  **Q.**    OKAY.  AND SECOND PAGE OF THAT REPORT.

14  **A.**    YES.  SO YOU'RE RIGHT.

15  **Q.**    OKAY.

16  **A.**    THE MASS STARTED IN 2013, AND WE ARE NOW IN JANUARY OF

17  2016 AND WE'RE GETTING AN MRI THAT'S A CONCERN OF SARCOMA.

18  THAT'S A LONG TIME TO HAVE A SARCOMA.

19  **Q.**    WELL, THAT'S THE SECOND MRI, ISN'T IT?

20  **A.**    YOU'LL HAVE TO SHOW ME.

21  **Q.**    WELL, I DID.  THE NEXT ONE IS FEBRUARY 2, 2016.  THIS IS

22  JOINT EXHIBIT 10-17903, SAYING LET'S GO GET A BIOPSY AT THIS

23  TIME.  RIGHT?

24  **A.**    I'M NOT FOLLOWING BECAUSE I THOUGHT YOU SHOWED ME AN

25  ORTHOPEDICS THAT THEY DID A BIOPSY ALREADY.

Q.   I'M SHOWING YOU WHAT THE RECORDS SHOW, MA'AM.

A.   OKAY.  CAN YOU SHOW ME --

Q.   THERE WERE TWO BIOPSIES IS WHAT I'M SAYING.

A.   OKAY.

Q.   THIS IS A CT SCAN.  "NO SUSPICIOUS PULMONARY NODULE OR ADENOPATHY IS DETECTED TO STRONGLY INDICATE METASTATIC DISEASE IN THE THORAX."

LET ME GO TO THE -- ON MARCH 24, 2016, THIS IS I BELIEVE TO BE A BIOPSY REPORT.  IF I AM INCORRECT, PLEASE CORRECT ME.

A.   THAT'S CORRECT.

Q.   OKAY.  AND THE NEXT PAGE, WHICH IS JOINT EXHIBIT 10-17897, HAS THE FINDINGS WHICH IS THAT IT'S A BENIGN MYXOID LESION.

A.   YEAH, THANK GOD.

Q.   WHICH THE VERY FIRST RECORD WE LOOKED AT SUGGESTED THAT, DIDN'T IT?

A.   NO, SIR.

Q.   MA'AM, LET'S GO TO PATIENT 44 NOW.  PATIENT 44, AS YOU PULL UP YOUR RECORDS, THIS IS WHERE YOU WITNESSED THE RESPONSE TO THE HANGING.  IS THAT RIGHT?

A.   YES.

Q.   DO YOU KNOW HOW THE PATIENT DID?

A.   YES.

Q.   HOW DID HE DO?

A.   HE SURVIVED.

**Q.**   THE INITIAL EVENT, I'LL SHOW YOU THE AMBULANCE RUN JUST TO GIVE US A DATE, IS MARCH 18, 2016.  I DON'T HAVE ANYTHING -- ANY OTHER QUESTIONS ON THAT OTHER THAN I WANTED TO MAKE SURE WE WERE STRAIGHT ON WHEN THE EVENT OCCURRED.

**A.**   THAT'S CORRECT.

**Q.**   OKAY.  I'LL SHOW YOU A RECORD FROM OUR LADY OF THE LAKE THREE DAYS LATER ON MAY 21, 2012.

**A.**   YES.

**Q.**   AND THEY REFER TO THIS PATIENT AS BEING OVERLY MANIPULATIVE, ATYPICAL SYMPTOMS OF PSYCHOSIS, POSSIBLY MALINGERING.  DO YOU SEE THAT?

**A.**   YES, I'VE READ THAT.

**Q.**   AND THOSE ARE THE LADY OF THE LAKE PHYSICIANS DESCRIBING THIS PATIENT, NOT LSP PHYSICIANS.  CORRECT?

**A.**   IS IT A PHYSICIAN, SIR?

**Q.**   WELL, TELL ME, DOCTOR, IS IT A NURSES' NOTE MAYBE?  I DON'T KNOW.  I HAVE THE RECORD.

**A.**   I CAN'T TELL, SIR.

**Q.**   OKAY.

**A.**   I DON'T KNOW WHO MADE THAT.  I KNOW THAT HE TRIED TO COMMIT SUICIDE, SO IT'S PRETTY SERIOUS.  SO IF HE WAS MALINGERING AT THAT POINT OR NOT AND WHO ASSESSED THAT, I'M NOT CLEAR.

**Q.**   LET ME SHOW YOU THE NEXT RECORD, WHICH IS MAY 5, 2016. THIS IS A VISIT AT NEURO, INDICATES HE HAS NO NEUROLOGICAL

1   DEFICITS, NO COGNITIVE DEFICITS, NO SPINAL CORD INJURY.

2   **A.**   YEAH.  SO THIS WAS IN MAY.

3   **Q.**   CORRECT.

4   **A.**   AND I HAVE NO REASON TO DISPUTE THIS.  HE TRIED TO HANG

5   HIMSELF AND HE SURVIVED AND HE HAD NO DEFICITS.

6   **Q.**   SO LSP WAS ABLE TO PROVIDE CARE AND TO SAVE THIS MAN'S

7   LIFE.  CORRECT?

8   **A.**   YES.

9   **Q.**   LET'S GO TO CHART NO. 45.

10          **MR. ARCHEY:**  YOUR HONOR, THE RECORDS FOR PATIENT NO.

11  44 ARE DEFENSE EXHIBIT 744, AND I NEED TO OFFER THOSE INTO

12  EVIDENCE.

13          **MR. DUBNER:**  WE WITHDREW THAT DURING PLAINTIFFS'

14  DIRECT.  I BELIEVE IT WAS MOVED INTO EVIDENCE AT THAT TIME.

15          **THE COURT:**  I DIDN'T HEAR WHAT YOU SAID.  YOU SAID

16  "MUMBLE MUMBLE" IS WHAT I HEARD.

17          **MR. DUBNER:**  SORRY ABOUT THAT, YOUR HONOR.  I SAID I

18  BELIEVE THAT WAS ADMITTED DURING PLAINTIFFS' DIRECT.  WE

19  WITHDREW OUR OBJECTION AT THAT TIME IN THE CASE.

20          **THE COURT:**  744 IS ALREADY IN EVIDENCE.

21          **MR. ARCHEY:**  OKAY.  VERY GOOD, YOUR HONOR.

22  BY MR. ARCHEY:

23  **Q.**   LAST ONE.  THIS IS PATIENT 45.  ARE YOU ORIENTED OR DO YOU

24  NEED A SECOND?

25  **A.**   WELL, I DON'T HAVE ANYTHING.  IF YOU CAN SHOW ME THAT, I

THINK IT'S ABOUT PAGE 65 OF MY REPORT.  CAN YOU PUT THAT UP?

Q.    I WILL, BECAUSE THERE'S NO CHART REVIEW BY YOU SEPARATE OF THAT.  CORRECT?

A.    I REVIEWED THE CHART AND PUT IT IN THIS PARAGRAPH FORM, YOU'RE CORRECT.

Q.    OKAY.  THERE YOU GO.

A.    I HAVE READ PATIENT 45.

Q.    OKAY.  THE PRIMARY COMPLAINT SEEMS TO BE THAT LSP USED A 4-POINT RESTRAINT ON THIS INDIVIDUAL.

A.    CAN YOU PUT THE CHART BACK UP, PLEASE?  THERE IS NO EXPLANATION IN THE CHART AS TO WHY THE PATIENT WAS KEPT FOR THIS DEGREE OF TIME IN 4-POINT MENTAL RESTRAINTS, THAT IS CORRECT.

Q.    OKAY.  AND YOU SAY "THIS DEGREE OF TIME," WHAT DEGREE OF TIME?

A.    WELL, PUT IT BACK UP, PLEASE, SIR.  I DON'T KNOW, I WITHDRAW THAT COMMENT.

Q.    THIS IS AN INDIVIDUAL THAT HAD ATTEMPTED SUICIDE BY CUTTING HIMSELF.  CORRECT?

A.    YES.

Q.    AND YOU CERTAINLY EXPECT LSP TO RESPOND TO SUICIDE ATTEMPTS AND PRECLUDE PATIENTS FROM HARMING THEMSELVES, WHEN POSSIBLE.  CORRECT?

A.    I EXPECT THAT.

Q.    LET ME SHOW YOU THE LAST RECORD FOR THIS INDIVIDUAL, WHICH

11:50  1  IS AUGUST 9, 2016, WHERE HE'S NOTED AS MALINGERING FROM

2  SEDATIVES, CANNABIS-INDUCED PSYCHOSIS, AND IS REFERRED TO

3  PSYCHIATRY.

4  **A.**   THAT'S THE REFERRAL NOTE.

5  **Q.**   OKAY.  SO THE USE OF A 4-POINT RESTRAINT WITH SOMEONE WHO

6  HAS COMMITTED SUICIDE FOR SOME UNKNOWN PERIOD OF TIME --

7  **A.**   IS UNACCEPTABLE.

8         **MR. ROBERT:**  ATTEMPTED.

9  **BY MR. ARCHEY:**

10  **Q.**   ATTEMPTED SUICIDE, THANK YOU, RANDY.

11         YOU'RE SAYING THE USE OF 4-POINT RESTRAINTS IS

12  UNACCEPTABLE IN ANY CASE?

13  **A.**   NO, SIR, I'M NOT SAYING THAT.  WOULD YOU LIKE ME TO

14  EXPLAIN?

15  **Q.**   YES, MA'AM, GO AHEAD.

16  **A.**   FOR VERY BRIEF PERIODS OF TIME, IF SOMEONE -- AND BELLEVUE

17  IS A MAJOR PSYCHIATRIC HOSPITAL, WE SEE SUICIDAL PATIENTS

18  REQUIRING SOME RESTRAINT HUNDREDS AND HUNDREDS AND HUNDREDS OF

19  TIMES.  SO FOR A BRIEF PERIOD OF TIME UNTIL YOU CAN GET

20  CHEMICAL RESTRAINT, BEING SEDATION, WE CAN PUT THEM IN TO

21  PROTECT HIMSELF AND THE STAFF.

22  **Q.**   OKAY.

23  **A.**   BUT THEY ARE NOT HELD THAT -- THEY ARE PUT INTO A SAFE

24  SETTING WHERE THEY CANNOT HARM THEMSELVES, AND THEY ARE NOT

25  TIED DOWN BY FOUR POINTS ON BOTH ARMS AND BOTH LEGS.

**Q.** AND MA'AM, YOU DON'T KNOW HOW LONG THIS INDIVIDUAL WAS IN 4-POINT RESTRAINTS, DO YOU?

**A.** I DON'T.

**Q.** YOU MENTIONED SEDATION. ARE YOU AWARE THAT LSP DOES NOT HAVE SEDATION DRUGS AVAILABLE TO IT LIKE YOU DO IN THE FREE WORLD?

**A.** NO, SIR, I'M AWARE THAT THEY HAVE VALIUM. I'M AWARE THAT THERE IS A PROBLEM WITH PROPOFOL. I THOUGHT OF SOMETHING ABOUT THE LETHAL INJECTION PROTOCOLS, SO THEY DO, BECAUSE THEY ARE GIVING VALIUM, FOR EXAMPLE.

**Q.** RIGHT. ANYTHING ABOVE VALIUM, ARE YOU AWARE THAT THE DRUG MANUFACTURERS SIMPLY WON'T SELL THEM PROPRANOLOL BECAUSE OF THE CONCERNS AND THE ISSUES SURROUNDING THE DEATH PENALTY?

**A.** I AM AWARE OF THAT.

**Q.** AS WELL AS -- WHAT'S THE OTHER ONE? -- SUCCINYL?

**A.** YEAH, SUCCINYL CHOLINE IS A PARALYZING DRUG WHICH I DON'T RECOMMEND IN THIS CASE.

**Q.** ALL RIGHT. BUT YOU WERE ALSO CRITICAL OF THE OTHER PATIENT WHO WAS TRANSPORTED AND TRIED TO PULL AT HIS TUBE AND UN-INTUBATE HIMSELF?

**A.** I AM CRITICAL OF THAT.

**Q.** RIGHT. LSP, ALL THEY HAD TO PRESCRIBE TO THAT INDIVIDUAL WAS VALIUM, WHICH THEY DID.

**A.** THEY NEEDED TO GIVE A LOT MORE, SIR.

**Q.** BECAUSE THEY DIDN'T HAVE THE DRUGS AVAILABLE TO THEM THAT

1  THEY REALLY NEED TO BE ABLE TO -- WHICH WERE THOSE OTHERS THAT

2  YOU MENTIONED?

3  **A.**   VALIUM IS PERFECT; YOU JUST GIVE MORE.

4  **Q.**   MA'AM, LET'S TALK ABOUT THE PROTOCOLS FOR JUST A MOMENT.

5  ANY TIME A PATIENT PRESENTS WITH VOMITING, ARE YOU SAYING HE

6  SHOULD GO TO THE HOSPITAL?

7  **A.**   NO.  I THINK HE SHOULD HAVE AN EVALUATION BY SOMEONE WHO'S

8  AT THE LEVEL ABOVE AN EMT TO MAKE A DECISION ABOUT WHETHER OR

9  NOT HE SHOULD SEE A PROVIDER OR NOT, LIKE A NURSE.

10  **Q.**   AND WHEN A PATIENT SUBMITS A HEALTH SERVICES REQUEST, THE

11  SICK CALL FORM, A PHYSICIAN ACTUALLY SEES THAT WITHIN 24 HOURS,

12  DOESN'T HE?

13  **A.**   I DIDN'T SEE EVIDENCE OF THAT IN THE CHART.

14  **Q.**   YOU SAW EVIDENCE WHERE THE PHYSICIAN WOULD SIGN OFF ON

15  THESE HEALTH SERVICES REQUESTS, EVERY ONE OF THEM.  RIGHT?

16  **A.**   YEAH, THEY WERE NOT DATED OR TIMED.

17  **Q.**   OKAY.  AND IF THEY TELL YOU THAT WE SIGN OFF ON THEM

18  WITHIN 24 HOURS, DO YOU HAVE A BASIS TO DISPUTE THAT?

19  **A.**   NO.

20  **Q.**   NOW, IN THE 1990 LITIGATION WITH LSP, THE COMPLAINTS WERE

21  THAT THE PROTOCOLS WERE NOT ROBUST ENOUGH.

22          **MR. DUBNER:**  OBJECTION, TIMEFRAME.

23          **MR. ARCHEY:**  1990S.  1996.

24          **MR. DUBNER:**  OBJECTION.

25          **THE COURT:**  WHY ARE WE TALKING ABOUT 1996?

         **MR. ARCHEY:**  IF I COULD ASK THE REST OF MY
QUESTION -- THEN TODAY YOUR COMPLAINTS ARE --
         **THE COURT:**  WELL, YOU COULD BE A LITTLE MORE POLITE.
         **MR. ARCHEY:**  I'M SORRY, YOUR HONOR.
         **THE COURT:**  WHY ARE WE TALKING ABOUT 1996?  THAT WAS
MY QUESTION.
         **MR. ARCHEY:**  MY APOLOGIES, YOUR HONOR.  I'M SORRY.
         **THE COURT:**  APOLOGY'S ACCEPTED.  WHY ARE WE TALKING
ABOUT 1996?  THERE'S AN OBJECTION ON THE TABLE.
         **MR. ARCHEY:**  TO COMPARE THOSE PROTOCOLS AT THAT TIME
TO WHAT THEY ARE TODAY.
         **THE COURT:**  AND WHY IS THAT RELEVANT?
         **MR. ARCHEY:**  BECAUSE TODAY THEY SAY THAT THEY'RE TOO
BIG, AND IN 1996, THEY WERE TOO LITTLE.
         **THE COURT:**  I'M SUSTAINING THE OBJECTION.  NEXT LINE
OF QUESTIONING.
         **MR. ARCHEY:**  YES, YOUR HONOR.
**BY MR. ARCHEY:**
**Q.**   NOW DURING THE DAY, THERE IS A PHYSICIAN AVAILABLE TO THE
ATU DURING THE DAY.  CORRECT?
**A.**   THAT'S MY UNDERSTANDING, YES.
**Q.**   THE PROBLEM IS AT NIGHT WHEN THE PHYSICIANS ARE ON CALL,
IF YOU WILL.  CORRECT?
**A.**   WHAT PROBLEM ARE YOU REFERRING TO?
**Q.**   WELL, THAT'S ONE OF THE CRITICISMS YOU HAVE IS THAT THE

PHYSICIANS ARE ONLY ON CALL AT NIGHT AND THEY CAN GIVE VERBAL

ORDERS, BUT THAT'S HOW IT GENERALLY WORKS.

**A.**    MY CRITICISM IS EVEN DURING THE DAYTIME, WHICH WE'VE SEEN

MULTIPLE PHYSICIANS OFTEN DO NOT MANAGE THOSE PATIENTS IN THE

ATU.  IT MAY BE DIFFERENT CLINIC RESPONSIBILITIES, I DON'T KNOW

WHAT ITS REASON.  SIMILARLY, AT NIGHT, THEY DON'T MANAGE THE

PATIENTS IN THE ATU.

**Q.**    PHYSICIANS DURING THE DAY ARE LITERALLY STEPS ACROSS THE

HALL FROM THE ATU.

**A.**    IF THEY DON'T DO A PHYSICAL EXAM AND THEY DON'T EXAMINE

AND THEY DON'T DO ANYTHING, I DON'T CARE HOW FAR AWAY THEY ARE,

SIR.

**Q.**    OKAY.

**A.**    THEY ARE TOO FAR.

**Q.**    ALL RIGHT.  ARE YOU A MEMBER OF THE AMERICAN CORRECTIONAL

ASSOCIATION, ACA?

**A.**    NO, I AM NOT.

**Q.**    YOU WERE AT ONE TIME THOUGH?

**A.**    WAS I?

**Q.**    YOU WERE AT ONE TIME.

**A.**    IF I WAS, I WAS.  HOW MANY YEARS AGO WAS THAT?

**Q.**    IT'S ON YOUR CV IN THE 2007, I BELIEVE, TIMEFRAME.  I WILL

NEED TO PULL OUT YOUR CV TO GIVE YOU THE EXACT DATE.

**A.**    NO.  I DON'T THINK I'VE EVER BEEN A MEMBER OF THE AMERICAN

CORRECTIONAL ASSOCIATION, I DON'T THINK SO.

**Q.**   ALL RIGHT.

**A.**   I'VE NEVER JOINED THAT.

**Q.**   LSP IS AN ACA ACCREDITED INSTITUTION.  CORRECT?

**A.**   IT'S MY UNDERSTANDING, YES.

      **MR. ARCHEY:**  ONE MOMENT, YOUR HONOR, IF I MAY.  YOUR HONOR, IF I CAN OFFER ONE MORE DOCUMENT INTO EVIDENCE AND I WILL BE CONCLUDED.  FOR PATIENT 45, THOSE ARE -- THOSE RECORDS -- THAT CHART IS DEFENDANTS' EXHIBIT 745, AND I'D OFFER IT INTO EVIDENCE AT THIS TIME.

      **MR. DUBNER:**  SAME OBJECTION FOR THE RECORD, YOUR HONOR.

      **THE COURT:**  THE COURT WILL OVERRULE THE OBJECTION AND ADMIT THE EXHIBIT.

      **MR. ARCHEY:**  DR. VASSALLO, THANK YOU FOR YOUR TIME. I HAVE NO MORE QUESTIONS.

      **THE WITNESS:**  THANK YOU, MR. ARCHEY.  MY PLEASURE.

      **THE COURT:**  BRIEF REDIRECT.

      I THINK HE'S GOING TO ASK YOU SOME MORE QUESTIONS.  NOPE, NOT YET.

      **THE WITNESS:**  EXCUSE ME, YOUR HONOR.  I'M NOT FAMILIAR WITH THE --

      **THE COURT:**  THEY GET ONE MORE SHOT AT YOU.

      **THE WITNESS:**  OKAY.  IT LOOKS LIKE I'M READY TO RUN AROUND.

      **THE COURT:**  YEAH, I'D BE READY TO RUN IF I WERE YOU

11:58  1    TOO.  I'M READY TO RUN.

2              MR. DUBNER:  I WILL TRY TO LET BOTH OF YOU -- AND ALL

3    OF US -- GO AS SOON AS I CAN.

4              THE COURT:  LET'S ALL GO RUNNING, OKAY.

5                   REDIRECT.

6                   **REDIRECT EXAMINATION**

7    BY MR. DUBNER:

8    **Q.**   LET'S START WITH THOSE CHART REVIEWS THAT MR. ARCHEY WAS

9    JUST GOING THROUGH.  I'LL TRY TO BE AS BRIEF AS POSSIBLE ON THE

10   ONES THAT WE TOUCH ON.

11             IF WE COULD START WITH PATIENT NO. 29, AND BRING UP

12   JOINT EXHIBIT 10-09614.  DO YOU RECALL MR. ARCHEY SUGGESTING

13   THAT THIS PATIENT WAS --

14             **MR. ARCHEY:**  THE SCREENS SEEM TO BE BLANK, YOUR

15   HONOR.

16             **THE COURT:**  MINE IS TOO.

17             **MR. DUBNER:**  IT MAY STILL BE ON THE --

18             **THE DEPUTY CLERK:**  IT'S STILL ON DOCUMENT CAMERA.

19             **MR. DUBNER:**  YEP.

20             **THE DEPUTY CLERK:**  IT'S GOING TO TAKE A MINUTE TO

21   WARM BACK UP.  AND THESE ARE SEALED.  RIGHT?  10 IS ALL SEALED?

22             **MR. DUBNER:**  THESE ARE SEALED, YES.

23             **THE DEPUTY CLERK:**  THANK YOU.

24             **MR. DUBNER:**  I THINK PROBABLY EVERYTHING WE ARE GOING

25   TO BE USING IS SEALED.

1      **THE DEPUTY CLERK:**  OKAY.

2      **THE COURT:**  ALL RIGHT.  WE HAVE IT.

3  **BY MR. DUBNER:**

4  **Q.**   DO YOU RECALL MR. ARCHEY ASKING YOU TO CONFIRM THAT THIS

5  PATIENT WAS SEEN AT THE HOSPITAL ON A NUMBER OF OCCASIONS?

6  **A.**   EXCUSE ME, IF I CAN JUST GET MY LIST OF NAMES AND NUMBERS.

7  **Q.**   OF COURSE.

8      AND WHY DON'T YOU BRING UP O9613 AS WELL, MARTHA.

9  THANK YOU.

10  **A.**   I THINK HE PROBABLY DID.  I DON'T SPECIFICALLY RECALL HIS

11  QUESTIONS FOR THIS PATIENT.

12  **Q.**   OF COURSE.

13      THEN I'LL JUST ASK, DO THOSE RECORDS SHOW WHETHER

14  THIS WAS A HOSPITALIZATION AS OPPOSED TO A TELEMEDICINE

15  CONSULTATION?

16  **A.**   THEY DON'T, EXCEPT TO THE EXTENT THAT THEY HAVE A PHYSICAL

17  EXAM, AND I DON'T KNOW HOW THEY ARE DOING PHYSICAL EXAMS OVER

18  TELEMEDICINE, IF IT IS A -- IF THEY HAVE A WAY TO DO THAT, THEN

19  MAYBE IT WAS -- BUT TELEMEDICINE CAN DO PHYSICAL EXAMS, SOMEONE

20  HOLDS THE STETHOSCOPE AND THEY DO DIFFERENT THINGS.  BUT TO THE

21  EXTENT THAT THERE IS A PHYSICAL EXAM HERE, IT'S NOT CLEAR TO ME

22  WHAT HAPPENED.

23  **Q.**   AND THAT'S ALL RIGHT.  YOU DO SAY IN YOUR REPORT THAT

24  THERE ARE TELEMEDICINE NOTES, YOU DO ACKNOWLEDGE CONSULTATIONS

25  ON VARIOUS OCCASIONS FOR THIS PATIENT, DON'T YOU?

**A.**   I TOTALLY ACKNOWLEDGE THAT, YES.

**Q.**   THANK YOU.

WE CAN TAKE THAT DOWN.

ON PATIENT NO. 30, THIS WAS THE PATIENT WITH THE DEEP VEIN THROMBOSIS, OR WITH THE SUSPECTED DVT, WHO WAS PUT ON BLOOD THINNERS.  YOU REFERRED TO THE RISK OF BLOOD THINNERS IN A PRISON SETTING.  CAN YOU JUST EXPLAIN WHAT YOU MEAN BY THAT?

**A.**   WELL, WHEN WE PUT SOMEBODY ON A BLOOD THINNER SUCH AT COUMADIN, AND THEY'RE IN A PRISON SETTING, WE'RE AWARE THAT THE NEED FOR THE COUMADIN SHOULD BE DEFINITELY ESTABLISHED BECAUSE AS IS THE CASE WITH THIS GENTLEMAN WHO HAD AN INJURY AND RECEIVED A SKULL X-RAY, THEREFORE, IT WAS AN INJURY TO THE HEAD.  SO PATIENTS WHO ARE ON COUMADIN WHO ARE HIT IN THE HEAD HAVE A SIGNIFICANT RISK OF DEATH.  SO WE'VE GOT TO BE SURE WHEN WE PUT A PATIENT ON COUMADIN, THAT THE PATIENT NEEDS COUMADIN.

**Q.**   AND I THINK WE MIGHT BE CONFLATING TWO INCIDENTS.  IF WE COULD SEPARATE THEM, I BELIEVE THERE WAS A SKULL X-RAY IN 2016 AND EARLIER THE DEEP VEIN THROMBOSIS.

**A.**   WHAT I'M TRYING TO EXPLAIN IS THAT TRAUMA HAPPENS IN PRISONS AND PATIENTS ON COUMADIN WHO ARE AT RISK OF TRAUMA IN A PRISON SETTING, I SHOULD BE ABSOLUTELY CERTAIN AS THE PROVIDER THAT THAT PATIENT NEEDS TO BE ON COUMADIN.  I CAN'T SAY I GUESS MAYBE IT'S THE DEEP VEIN THROMBOSIS AND START TREATMENT WITH COUMADIN.  I SHOULD BE UNDERSTANDING THAT THERE IS A SIGNIFICANT RISK TO COUMADIN IN THIS ROUGH ENVIRONMENT AND MAKE

1   SURE THAT THERE IS A DEEP VEIN THROMBOSIS BY ULTRASOUND.

2   **Q.**   AND IT TURNED OUT, I BELIEVE YOU SAID, THAT THIS PATIENT

3   HAD A HEMATOMA RATHER THAN A DEEP VEIN THROMBOSIS.  IS THAT

4   CORRECT?

5   **A.**   THAT'S RIGHT.

6   **Q.**   AND WHAT ARE THE RISKS OF USING BLOOD THINNERS IN A

7   PATIENT WITH A HEMATOMA?

8   **A.**   WELL, THE RISK OF HAVING A -- USING A BLOOD THINNER IS

9   THAT THE PATIENT WILL BLEED, AND BLEED INTO THE HEAD, BLEED

10  INTO THE LEG, AND I CANNOT SAY IN THIS PATIENT IF THE COUMADIN

11  CAUSED THE HEMATOMA OR IF IT WAS ALWAYS THE HEMATOMA PRESENT

12  FOR WHICH THEY WERE TREATING A DEEP VEIN THROMBOSIS.  AND THE

13  PROBLEM IS IF YOU ALREADY HAVE A HEMATOMA, YOU DON'T WANT TO

14  GIVE A BLOOD THINNER AND WORSEN THE HEMATOMA.

15         SO THE MOST IMPORTANT THING IS THAT IF YOU THINK YOU

16  HAVE A DEEP VEIN THROMBOSIS OR ANY CONDITION FOR WHICH YOU ARE

17  GOING TO PRESCRIBE COUMADIN IN A PRISON, YOU SHOULD BE SURE

18  THEY HAVE THE CONDITION.

19  **Q.**   LET'S MOVE ON TO PATIENT NO. 31.  I BELIEVE YOU SAID THAT

20  THEY DISCUSSED A DNR WITH THE PATIENT WHILE HE WAS DYING.  IS

21  THAT A COMMON PRACTICE IN MEDICINE IN YOUR EXPERIENCE?

22  **A.**   THIS PATIENT 31, AS WAS BROUGHT OUT, WAS A SICK PATIENT

23  AND HAD MULTIPLE CO-MORBIDITIES, THAT IS, HAD A LOT OF MEDICAL

24  ILLNESSES, AND WAS MADE DO NOT RESUSCITATE AND THE MEDICATIONS

25  WERE STOPPED AND HOSPICE WAS STARTED ALMOST WITHIN THE SAME

1    48-HOUR PERIOD, THAT'S VERY UNUSUAL.

2    **Q.**    AND --

3    **A.**    IT SHOULD BE DONE EARLIER.  IF YOU KNOW A PATIENT IS DYING

4    AND YOU WANT IT TO BE DONE WITHOUT RESUSCITATION, DO NOT

5    RESUSCITATE, THE CONVERSATION AND THE DOCUMENTATION SHOULD

6    HAPPEN WHEN THE PATIENT HAS A CLEAR MENTAL STATUS.  THERE WAS A

7    LOT OF WARNING THIS PATIENT WAS SICK, AND AT THAT TIME YOU CAN

8    START TO TALK ABOUT DO NOT RESUSCITATE.  THAT SHOULD BE THE

9    STANDARD.

10   **Q.**    AND ARE THERE RISKS OR PROBLEMS THAT YOU SEE WITH

11   DISCUSSING A DNR WHEN A PATIENT IS IN A PAINFUL STAGE OF DEATH?

12   **A.**    AN INDIVIDUAL WHO DECIDES THEY DON'T WANT TO UNDERGO A

13   RESUSCITATION SHOULD HAVE A CLEAR UNDERSTANDING OF THAT AND

14   SHOULD UNDERSTAND ALL OF THE CIRCUMSTANCES ABOUT THAT AND THAT

15   SHOULD BE COUNSELED AND DISCUSSED WITH, AND PREFERABLY WITH

16   SOME SORT OF FAMILY AS A SUPPORT.  IT'S A BIG DECISION TO

17   DECIDE TO RENDER YOURSELF DO NOT RESUSCITATE.

18   **Q.**    AND DO YOU HAVE ANY CONCERNS ABOUT A PATIENT BEING PUT ON

19   DNR SHORTLY BEFORE BEING GIVEN SERIOUS PAIN MEDICATION?  LET ME

20   REPHRASE.

21          DO YOU HAVE ANY CONCERNS ABOUT A PATIENT IN SEVERE

22   PAIN HAVING A DNR DISCUSSED WITH THEM AND THEN BEING PUT ON

23   SEVERE PAIN MEDICATION?

24   **A.**    WELL, PATIENTS WHO ARE ABOUT TO DIE AND HAVE SERIOUS

25   MEDICAL ILLNESSES SOMETIMES HAVE SEVERE PAIN.  THEIR PAIN

1 SHOULD BE CONTROLLED. AND THE PATIENT IS, THEREFORE, ABLE TO

2 HAVE A DISCUSSION. THE PATIENT SHOULD NOT BE LETHARGIC,

3 GROGGY, ASLEEP, UNRESPONSIVE, OR ANYTHING ELSE, OR

4 ENCEPHALOPATHIC, WHICH MEANS THAT THE MIND IS NOT WORKING AT

5 THE TIME THAT THEY SIGN A DNR.

6      SO MY CONCERN IS DO NOT RESUSCITATE DISCUSSIONS

7 SHOULD BE HELD WITH PATIENTS WHEN THEY ARE ABLE TO UNDERSTAND

8 IT, DISCUSS IT, AND MAKE A DECISION. AND WE DO THAT ALL THE

9 TIME.

10 **Q.** OKAY. LET'S MOVE TO PATIENT NO. 32.

11      AND MARTHA, IF YOU WOULD BRING UP JOINT EXHIBIT

12 EXHIBIT 10 AT 27236.

13      GIVE ME ONE MOMENT, YOUR HONOR, AND I'LL GIVE YOU THE

14 PART OF JOINT EXHIBIT 10. I BELIEVE THIS IS IN JOINT EXHIBIT

15 10DD.

16      THIS IS A REFERRAL FOR A CONSULTATION THAT MR. ARCHEY

17 SHOWED YOU FROM PATIENT NO. 32. WHAT'S THE DATE ON THE

18 REFERRAL?

19 **A.** DATE OF CONSULTATION IS JUNE 18TH, 2013, AND I WONDER IF

20 THE REFERRAL, R.E., IS -- REFERRAL IS PROBABLY UP IN THE UPPER

21 RIGHT CORNER, 6/21. NO, THAT CANNOT BE. 6/18 IS THE DATE THAT

22 I'M SEEING. I SEE SOMETHING 8/23 TO THE RIGHT. I'M NOT

23 TOTALLY CLEAR.

24 **Q.** THERE ARE THREE DIFFERENT DATES ON THIS, SOME ABOUT TWO

25 MONTHS APART. DO YOU RECALL EVER SEEING ANY EVIDENCE THAT THIS

1  CONSULTATION TOOK PLACE?

2  **A.**   NO.

3  **Q.**   AND, IN FACT, THE PATIENT PASSED AWAY ON JUNE 21ST, 2013.

4  ISN'T THAT CORRECT?

5  **A.**   IT IS CORRECT.

6  **Q.**   ON PATIENT NO. 33, FIRST OFF, IF WE GO TO PAGE 266 OF

7  PLAINTIFFS' EXHIBIT 6, YOUR REPORT.  MR. ARCHEY MENTIONED TWO

8  HOSPITAL VISITS WITH THIS PATIENT IN, I BELIEVE, FEBRUARY AND

9  APRIL, EARLY FEBRUARY, EARLY APRIL.  DID YOU ACKNOWLEDGE THOSE

10  IN YOUR REPORT?

11  **A.**   I HAVE TO FIND OUT WHERE YOU'RE LOOKING.

12  **Q.**   IT SHOULD BE ON THE SCREEN.

13  **A.**   OKAY.  THANK YOU.  SORRY, IT IS.  SO CAN YOU ASK THE

14  QUESTION AGAIN?

15  **Q.**   ABSOLUTELY.

16          SO MR. ARCHEY PRESENTED YOU EVIDENCE OF TWO

17  HOSPITALIZATIONS IN FEBRUARY AND APRIL OF 2016.  DID YOU

18  ACKNOWLEDGE THOSE IN YOUR REPORT?

19  **A.**   WELL, THE OPENING SENTENCE SAYS THAT THE PATIENT'S MEDICAL

20  RECORD REFLECTS MULTIPLE VISITS WITH ONLY MEDIC-LEVEL CARE, NO

21  PHYSICIAN EXAMS, AND VERBAL ORDERS WITHOUT AN EXAMINATION.

22  **Q.**   AND THEN IF YOU LOOK AT TWO PARAGRAPHS BELOW THAT.

23  **A.**   YES.

24  **Q.**   DO YOU ACKNOWLEDGE A VISIT TO LANE REGIONAL AT THAT TIME?

25  **A.**   I DO.

**Q.** AND THEN IF YOU WILL -- GO AHEAD.

**A.** WELL, IT SAYS FEBRUARY 14TH, AMBULANCE RECORD, ALL MEDIC NOTES, NO PHYSICIAN NOTES. AND THEN I POINT SPECIFICALLY TO THE PAGES OF THE MEDICAL RECORD, WHICH IS 875 PAGES, TO PAGE 382.

**Q.** AND I'M SORRY, I MAY NOT BE BEING SPECIFIC ENOUGH HERE. IN THE PARAGRAPH BEFORE THAT, AT THE BEGINNING, IT SAYS 4/17/2016, RETURN TO ANGOLA FROM LANE REGIONAL MEDICAL CENTER.

**A.** RIGHT. I THINK THAT'S -- THAT SHOWS THAT I'M ACKNOWLEDGING THAT HE WENT OUTSIDE FOR MEDICAL CARE.

**Q.** RIGHT.

AND YOU REFERRED TO NOT SEEING THE DISCHARGE NOTES IN THE RECORD. DID YOU SEE MULTIPLE INSTANCES WHERE DISCHARGE NOTES OR OTHER NOTES FROM AN OUTSIDE VISIT WERE MISSING FROM THE RECORD?

**A.** I HAD DIFFICULTY TELLING WHAT HAPPENED AT THE HOSPITAL AND WHAT THE COMMUNICATION WAS, SO IN THE MEDICAL RECORD, AS I LOOKED FOR A CLEAR RECORD OF THAT COMMUNICATION, I DID NOT SEE IT.

**Q.** AND TO STEP BACK AND TALK ABOUT THE ORGANIZATION OF THE MEDICAL RECORDS FOR A MOMENT, HOW WOULD YOU CHARACTERIZE THEIR ORGANIZATION?

**A.** WELL, I MEAN, IT WAS VERY CHAOTIC. IT WAS PAPER AND THEY WERE MISFILED SOMETIMES. THEY WERE PRESENTED TO US AND I UNDERSTAND THAT I WAS ON SITE, AND I KNOW THAT WE HAVE PICTURES

OF THOSE CHAOTIC, LARGE MEDICAL RECORDS, AND THEN I UNDERSTAND

THAT SOME OF THESE WERE SCANNED IN AND IN THE PROCESS OF

SCANNING IN SUCH A MEDICAL RECORD WITH 800 PAGES WOULD BE VERY

DIFFICULT FOR THE PERSON WHO'S IN CHARGE OF SCANNING.  HOWEVER,

IT ALSO MAY JUST SIMPLY REFLECT THE CHAOS OF THE MEDICAL

RECORD, BECAUSE SOMETIMES WE HAD A RECORD OF ONE DATE; 60 PAGES

LATER, WE WERE BACK TO THE SAME EPISODE OF CARE.  THAT MADE IT

VERY DIFFICULT AND TIME CONSUMING.

**Q.**   AND THE CHAOS YOU DESCRIBE, YOU SAW THAT IN BOTH THE

RECORDS YOU REVIEWED ON SITE AND THE ONES YOU HAVE SCANNED

COPIES OF; IS THAT CORRECT?

**A.**   YES.

**Q.**   WERE THERE TIMES WHEN THERE WERE RECORDS FROM COMPLETELY

DIFFERENT PATIENTS IN SOME OF THE RECORDS?

**A.**   I DID SEE THAT, YES.

**Q.**   AND WOULD IT SURPRISE YOU IF SOMEWHERE IN THE TEN OF

THOUSANDS OF PAGES YOU SAID YOU REVIEWED, THERE WAS A NOTE OF

SOME SORT THAT YOU MISSED SOMEWHERE IN YOUR CHARTS?

**A.**   THAT'S POSSIBLE.

**Q.**   WOULD, YOU KNOW, ISOLATED INSTANCES OF THAT GIVE YOU A

REASON TO DOUBT YOUR CONCLUSIONS?

**A.**   NO.

**Q.**   AND WHILE WE ARE ON THAT SUBJECT, DID ANYTHING MR. ARCHEY

SHOWED YOU, EITHER THE PATIENTS WE'VE TALKED ABOUT SO FAR OR

THE OTHERS, GIVE YOU REASON TO DOUBT ANY OF YOUR CONCLUSIONS?

**A.**    NO.

**Q.**    TURNING NEXT TO PATIENT NO. 34.  IF WE COULD LOOK AT JOINT
EXHIBIT 10 AT 28686, WHICH, YOUR HONOR, IS PART OF JOINT
EXHIBIT 10EE.

          I BELIEVE YOU REFERRED TO INSTANCES OF PROVIDERS NOT
DOCUMENTING ANYTHING OTHER THAN A SIGNATURE ON ATU REPORTS.  IS
THIS AN EXAMPLE OF WHAT YOU'RE TALKING ABOUT?

**A.**    YES.

**Q.**    AND THEN WE ARE TALKING HERE ABOUT PATIENT NO. 34 WHO WAS
THE PATIENT WITH THE DEATH OVER ONE WEEK AFTER AN INJURY, IT
APPEARED.  YOU WERE STARTING TO EXPLAIN, I THINK, AND MR.
ARCHEY ASKED YOU NOT TO, WHY THE FINDINGS OF THE DOCTORS OVER
TIME, NOT NECESSARILY ON THIS CHART, WERE INADEQUATE.  COULD
YOU EXPLAIN THAT A LITTLE BIT?

**A.**    YES.  AND TO DO SO, LET ME JUST LOOK AT THIS BECAUSE THIS
WAS A, I FOUND, A VERY EGREGIOUS EXAMPLE OF MEDICAL CARE THAT
IS INSUFFICIENT AND CONTRIBUTES BY ITS INSUFFICIENCY TO THE
PATIENT'S DEATH.  THIS PATIENT COMPLAINED ON THE 20TH OF JUNE
ABOUT PAIN.  HE GOT A VERBAL ORDER, MAYBE TO GET AN X-RAY.
THE NEXT DAY, THE 21ST, HE WAS EXAMINED IN THE ATU BY SOMEBODY.
THREE DAYS LATER, HE'S STILL SICK, AND THERE'S NO TRANSPORT.
WE DON'T HAVE A DIAGNOSIS AT THAT POINT.  WE HAVE NO DIAGNOSIS.
AND EVEN IF WE HAD RIB FRACTURES, EVEN IF CLINICALLY DR.
LAVESPERE OR ANY DOCTOR HAD FELT A POP UNDER A -- OR DONE A
PHYSICAL EXAM AND COME TO A CONCLUSION, NOW WE'RE THREE DAYS

IN, YOU HAVE A RIGHT SIDE OF LOWER RIB FRACTURES WHICH WERE
FOUND ON AUTOPSY, THAT'S ASSOCIATED WITH A SPLENIC INJURY,
LIVER INJURY ON THE RIGHT SIDE, ALL KINDS OF THINGS CAN HAPPEN.
YOU CAN HAVE A COLLAPSED LUNG.  THAT'S A SERIOUS INJURY.  THE
RIBS ARE THAT LOW DOWN -- SO THIS IS A PATIENT WHO IF IT WERE
CORRECT, HAD A RIB FRACTURE WHO CONTINUES TO COMPLAIN, AND IS
SEEN AND SEEN AND SEEN DURING THIS SIX DAYS AND DIES, THAT IS A
TERRIBLE -- THAT'S A TERRIBLE OUTCOME, BUT PREDICTABLE IF THIS
CONTINUES.

**Q.**   AND IF WE LOOK AT JOINT EXHIBIT 10-28684, THIS WAS THE NO
TRANSPORT AMBULANCE RUN REPORT.  MR. ARCHEY POINTED OUT SOME
THINGS HERE, VITAL SIGNS AND THE LIKE, THAT DIDN'T INDICATE ANY
SERIOUS PROBLEM.  I'D LIKE TO DRAW YOUR ATTENTION TO THE THIRD
LINE OF THE NARRATIVE SUMMARY, OR ACTUALLY THE SECOND LINE OF
THE NARRATIVE SUMMARY.  IT SAYS RIB PAIN, AND THEN WHAT DOES X
AND A DIVISION SIGN TEND TO MEAN?

**A.**   I'M GOING TO START, PATIENT COMPLAINED OF RIGHT RIB PAIN
FOR ONE WEEK.  PATIENT STATES THAT HE FELL AND THE NEXT,
PATIENT STATES INCREASING PAIN.  THAT'S AN ARROW UPWARDS, AND
IT INCREASING PAIN WITH PALPATION.

**Q.**   AND SO IF WE JUST STOP THERE, ARE THOSE POTENTIALLY
SERIOUS SYMPTOMS?

**A.**   YES.

**Q.**   ARE THOSE SYMPTOMS THAT A PHYSICIAN SHOULD EVALUATE BEFORE
DETERMINING WHETHER ANY CARE IS NEEDED?

**A.** YES.

**Q.** LET'S MOVE TO PATIENT NO. 36, VERY BRIEFLY. ON THIS PATIENT, MR. ARCHEY ASKED YOU ABOUT A LIPOMA REMOVAL, I BELIEVE. DID YOU HAVE THAT THE PATIENT HAD -- HE REFUSED TO -- DO YOU HAVE ANY CRITICISMS OF THEIR CONDUCT SURROUNDING THE PATIENT'S LIPOMA?

**A.** NO. IT'S REALLY HARD TO CRITICIZE CARE WITH REGARDS TO LIPOMA.

**Q.** OKAY.

**A.** WHICH IS A BENIGN LITTLE FAT DEPOSIT UNDER THE SKIN. THAT WAS NOT THE ESSENCE OF THIS PATIENT'S ISSUE.

**Q.** AND THEN IF WE COULD LOOK AT PATIENT NO. 38. I DON'T HAVE THE CHART REFERENCE, BUT IF WE LOOK AT PLAINTIFFS' EXHIBIT 6 AT 270 AND 271. AND DO YOU RECALL WITH THIS PATIENT MR. ARCHEY ASKING YOU IF THE TRANSPORT TO A HOSPITAL WAS PROMPT? I'M NOT SURE, YOU MAY NEED A MOMENT TO RECOLLECT THIS PATIENT IN PARTICULAR.

**A.** I RECALL THE QUESTION.

**Q.** AND I BELIEVE THE BASIS OF IT WAS THAT THE PATIENT WAS SEEN IN THE MORNING AND SENT TO EARL K. LONG AROUND 9:00 IN THE MORNING. DOES THAT SOUND CORRECT?

**A.** THAT IS CORRECT.

**Q.** AGAIN, I DON'T HAVE THE RECORDS TO SHOW YOU, I'M SORRY TO SAY, BUT IN YOUR CHART REVIEW, WHEN WERE MEDICAL PERSONNEL FIRST AWARE OF THIS PATIENT'S MEDICAL CONCERNS?

**A.**   IT APPEARS IN MY CHART REVIEW, AND I HAVE TO RELY ON THAT BECAUSE I DON'T REMEMBER IT SPECIFICALLY, THAT THE MEDICAL CARE STARTED THE NEXT MORNING.  AND I NEED TO LOOK AT THIS TO BE CERTAIN.

**Q.**   WHY DON'T I DRAW YOUR ATTENTION TO TWO THINGS.  THE FIRST IS ON THAT AT THE END OF THE SECOND LINE ON PAGE 271, ON 2/5/11 AT 9:10, THE PATIENT WAS TRANSPORTED BY AMBULANCE FROM THE ATU TO EARL K. LONG EMERGENCY DEPARTMENT, AND THAT IS THE TRANSPORT THAT MR. ARCHEY WAS ASSERTING WAS PROMPT.  AND THEN IF WE GO DOWN ABOUT HALFWAY DOWN THE PAGE, IT SAYS THE MORTALITY REVIEW NOTED THE PATIENT FELL ONTO THE FLOOR WHILE SITTING ON THE BED. THIS OCCURRED ON 2/5/11 AT 1:00 A.M.

**A.**   RIGHT.

**Q.**   AND IF YOU WOULD CONTINUE TO READ FROM THERE FOR A MOMENT.

**A.**   SO IT APPEARS THAT DR. MACMURDO NOTED THE PATIENT HAD BEEN GROGGY BUT TALKATIVE AT 1:00 A.M.  THERE WAS NO MEDICAL RECORD ENTRY DOCUMENTING THIS AND NO RECORD OF INSTRUCTION TO THE EMT STAFF TO OBSERVE THE PATIENT VERY CAREFULLY, AS IS WRITTEN IN THE DEATH SUMMARY.

**Q.**   BUT ACCORDING TO THE DEATH SUMMARY, AND ACCORDING TO YOUR CHART, DR. MACMURDO WAS AWARE OF THE PATIENT'S CONDITION AS EARLY AS 1:00 A.M.; IS THAT CORRECT?

**A.**   THAT'S CORRECT.  THAT WAS ON 2/5 AT 1:00 A.M.

**Q.**   AND THEN LET'S MOVE TO PATIENT 39 BRIEFLY.  FIRST OF ALL, YOU REFERRED TO BOTH ASH 2 AND THE NURSING UNIT.  DO YOU KNOW

1　WHAT THE DIFFERENCE BETWEEN -- IS THERE A DIFFERENCE BETWEEN

2　THOSE TWO THINGS?

3　**A.**　AT THIS MOMENT, I'M NOT CERTAIN BECAUSE THE LAST TIME I

4　WAS IN THE TWO-SIDED INFIRMARY WAS BEFORE MY SITE VISIT IN

5　2016.

6　**Q.**　OKAY.  WE DON'T NEED TO --

7　**A.**　I KNOW THAT SOME ARE FOR ACUTE CARE; SOME ARE MORE CHRONIC

8　PROBLEMS.

9　**Q.**　AND ARE YOU FAMILIAR ALSO WITH THE MEDICAL DORMITORIES AS

10　DISTINCT FROM THE NURSING UNIT?

11　**A.**　YES.  I KNOW OF THE PRESENCE OF THOSE, YES.

12　**Q.**　OKAY.  DO YOU KNOW THEIR NAMES OFFHAND?

13　**A.**　NO.

14　**Q.**　OKAY.  LET'S BRING UP JOINT EXHIBIT 10 AT 36667.  AND FOR

15　THE COURT, WHAT PART OF JOINT EXHIBIT 10 IS THIS IN?

16　　　　SO YES, THIS IS PART OF JOINT EXHIBIT 10II, YOUR

17　HONOR.  SORRY FOR THE DELAY.

18　　　　SO MR. ARCHEY SHOWED YOU THIS NOTE FROM, I BELIEVE,

19　THE DAY THE PATIENT WAS ADMITTED TO THE NURSING UNIT.  AND THIS

20　NOTE DOCUMENTS SOMETHING OF AN EVALUATION OF THE PATIENT.  IS

21　THAT CORRECT?

22　**A.**　CORRECT.

23　**Q.**　AND IF WE THEN GO TO PAGE 36664, THIS IS THE NEXT DAY, THE

24　PATIENT APPEARS TO STILL BE IN THE INFIRMARY.  HOW WOULD YOU

25　DESCRIBED THE NOTES FROM 7/22, 7/23, AND 7/24?

**A.** WELL, I MEAN, IT SAYS CHART CHECK, CHART CHECK, CHART CHECK. THERE'S NO EVALUATION OF THE PATIENT. THERE'S AN EVALUATION OF THE CHART.

**Q.** AND IS THAT A CONCERN IN YOUR MIND?

**A.** YES. THE PATIENT IS IN THIS UNIT BECAUSE THERE'S CONCERN ABOUT HIS CONDITION, BUT THERE'S NO DOCUMENTATION TO SUGGEST THERE WAS ANYTHING OTHER THAN A CHART CHECK.

**Q.** AND THEN ON THE NEXT LINE IT SAYS DC TO CAMP ASH 2. IS IT POSSIBLE THAT ASH 2 IS ONE OF THE MEDICAL DORMITORIES WE SPOKE OF BEFORE?

**A.** THAT'S WHAT IT IS.

**Q.** AND LOOKING AT YOUR REVIEW OF THIS PATIENT IN YOUR REPORT, PLAINTIFFS' EXHIBIT 6 AT 63.

**A.** CAN YOU PUT THAT UP?

**Q.** ABSOLUTELY. THANK YOU FOR BEARING WITH US.

SO STARTING ABOUT THREE QUARTERS OF THE WAY DOWN THE PAGE IN THE MIDDLE OF THE LAST FULL PARAGRAPH, YOU WRITE ABOUT NO TRANSPORT ORDERS ON JULY 26TH AND JULY 27TH; IS THAT CORRECT?

**A.** CORRECT.

**Q.** THOSE ARE THE DAYS THAT -- THE TWO DAYS IMMEDIATELY AFTER HE WAS DISCHARGED FROM THE NURSING UNIT?

**A.** CORRECT.

**Q.** AND COULD YOU READ WHAT THE CONDITIONS OF THE PATIENT WERE AT THE TIME THOSE NO TRANSPORT ORDERS WERE GIVEN?

**A.** ON THE 26TH, THE MEDICS RESPONDED FOR PATIENT LYING ON THE FLOOR AND VOMITING AND WON'T MOVE, WAS HOW IT WAS CHARTED. THE REPORT WAS GIVEN BY PHONE TO DR. MACMURDO AND HE SAID LEAVE THE PATIENT THERE IN HIS CELL. THEN IT'S A LITTLE LESS THAN 12 HOURS LATER, MEDICS RESPONDED TO FIND THE OFFENDER LAYING ON THE FLOOR. REPORTED TO DR. LAVESPERE, AND THERE WAS ANOTHER NO TRANSPORT ORDER, AND THE PATIENT WAS LEFT IN THE CELL. AND THEN HE PROCEEDED TO DIE ON THE AUGUST 2ND.

**Q.** AND SO MR. ARCHEY SHOWED YOU VARIOUS RECORDS FROM EARLIER IN THE PATIENT'S TREATMENT, BUT IF I UNDERSTAND YOUR TESTIMONY ON THE RECORDS JUST NOW, ON JULY 22ND, 23ND, AND 24TH, HE WAS IN THE NURSING UNIT WITH ONLY A CHART REVIEW, AND THEN JULY 26TH AND 27TH WAS NO TRANSPORT OF THESE SYMPTOMS. IS THAT WHERE YOUR CONCERNS ABOUT THIS PATIENT'S TREATMENT FOCUS?

**A.** WELL, IT'S REALLY A LITTLE BIT SHOCKING TO THE SENSES, ISN'T IT? IT IS TO MY SENSES AS A PHYSICIAN.

**Q.** WHY?

**A.** WELL, BECAUSE YOU HAVE A PATIENT WHO IS JUST UNDER THE CARE OF A NURSING UNIT WHO HAD A COMPLAINT THAT WAS IMPORTANT, AND IN THIS CASE, THE DIABETIC IMMUNOCOMPROMISE WITH A 103.6 DEGREE FEVER, ALTERED MENTAL STATUS, VERY SICK AS WAS POINTED OUT, IS NOW IN THE NURSING UNIT OKAY, NOT MUCH IS DONE, BUT HE IS FOLLOWED. HE GETS OUT AND HE IS LYING ON THE GROUND AND IS NO TRANSPORTED. HOW CAN THAT BE? THAT IS JUST UNBELIEVABLE.

**Q.** LET'S MOVE TO PATIENT NO. 40 AS WELL.

1    AND IF YOU COULD BRING UP PLAINTIFFS' EXHIBIT 233 AT

2    49.

3    THIS WAS THE PATIENT WHERE MR. ARCHEY PULLED OUT A

4    CALENDAR AND SAID THAT YOU WERE WRONG ABOUT SUNDAY,

5    FEBRUARY 16TH, 2010.  DO YOU RECALL THAT?

6    **A.**   YES, I DO.

7    **Q.**   YOU SAID YESTERDAY THAT YOU REVIEWED ALL OF THE MEDICAL

8    SUMMARY REPORTS, THE MORTALITY REVIEWS?

9    **A.**   I DID.

10   **Q.**   I'M SHOWING YOU THE MEDICAL SUMMARY REPORT FOR THIS

11   PATIENT.  COULD YOU JUST READ THE BEGINNING OF THE SECOND

12   PARAGRAPH?

13   **A.**   YES, AND THAT'S PROBABLY -- IT SAYS "ON SUNDAY,

14   FEBRUARY 16TH, 2010, THE OFFENDER PRESENTED TO THE ER WITH A

15   COMPLAINT OF DIFFICULTY SWALLOWING, ET CETERA."

16   **MR. DUBNER:**  AND IF WE COULD GO TO PAGE 50 AS WELL,

17   MARTHA.

18   **THE WITNESS:**  THEY MUST HAVE BEEN USING THE SAME

19   CALENDAR I WAS.

20   **BY MR. DUBNER:**

21   **Q.**   AND WHO WAS IT, JUST FOR THE RECORD, WHO WROTE THIS

22   REPORT?

23   **A.**   DR. LAVESPERE.

24   **Q.**   IF WE COULD GO TO -- OH, YES, AND THEN ONE THING WHILE

25   WE'RE STILL ON THIS.  YOUR CONCLUSION THAT NO LABORATORY COULD

1  BE DRAWN OVER THE WEEKEND, YOUR OBSERVATION, IS THAT FROM THIS

2  MEDICAL SUMMARY REPORT AS WELL?

3  **A.**   I WOULD HAVE TO READ IT TO SEE IF IT'S IN THIS MEDICAL

4  SUMMARY REPORT, BUT I WAS TOLD THAT, IT WAS CHARTED, AND I

5  DIDN'T HAVE ANY REASON TO SUSPECT THAT THAT WASN'T THE CASE.

6  **Q.**   AND IN ADDITION TO THAT, JUST FOCUSING ON THE HIGHLIGHTED

7  PARAGRAPH.

8  **A.**   OKAY.

9  **Q.**   IF YOU LOOK ABOUT FIVE LINES DOWN, WAS THAT A MEDICAL

10  SUMMARY REPORT AS WELL?

11  **A.**   YES.  IT SAYS NO LABORATORY COULD BE DRAWN OVER THE

12  WEEKEND.

13  **Q.**   AND THEN PARAGRAPH -- EXCUSE ME -- PATIENT NO. 41.  IF YOU

14  COULD BRING UP JOINT EXHIBIT 10 AT 7720.

15  **A.**   WHICH PATIENT NO. WAS IT AGAIN?

16  **Q.**   PATIENT NO. 41.

17  **A.**   OKAY, THANKS.

18  **Q.**   WE ARE NEARLY DONE WITH THESE.

19       THANK YOU.  SO THIS IS FROM, I BELIEVE, JOINT EXHIBIT

20  10G AT 7720.  MR. ARCHEY PRESENTED THIS AS AN EXAMPLE OF THE

21  PATIENT REFUSING TO BE TRANSPORTED OFFSITE.  WHERE WAS THE

22  PATIENT REFUSING TO BE TRANSPORTED TO?

23  **A.**   TRANSPORT TO ATU FOR FURTHER TREATMENT AND EVALUATION BY A

24  DOCTOR AFTER REFUSAL.

25  **Q.**   AND IS THE ATU OFFSITE?

**A.** NO.

**Q.** AND THESE REFUSALS THAT MR. ARCHEY SHOWED YOU FROM, I
BELIEVE, ROUGHLY THE MARCH 2010 PERIOD, WAS DEFENDANTS' CONDUCT
IN THIS INSTANCE SOMETHING YOU CRITICIZED IN YOUR REPORT?

**A.** NO.

**Q.** AND THEN PATIENT NO. 42, WE SPOKE A LITTLE BIT ABOUT MOJO,
SYNTHETIC CANNABINOID.  YOU SAID THAT'S A NATIONAL PROBLEM; IS
THAT CORRECT?

**A.** IT'S A BIG PROBLEM.

**Q.** AND IS THIS -- IS THE WAY THAT LSP HANDLES SUSPICIONS OF
MOJO, IS THAT CONSISTENT WITH HOW MOJO IS RESPONDED TO
ELSEWHERE IN YOUR EXPERIENCE?

**A.** NO.  IT'S REALLY IMPORTANT TO UNDERSTAND THAT THE PRESENCE
OR ABSENCE OF CANNABINOIDS IN URINE HAS NO BEARING ON THE WAY
THAT YOU CARE FOR A PATIENT IN THE EMERGENCY DEPARTMENT, WHICH
I WENT INTO GREAT DETAIL YESTERDAY EXPLAINING THE PROPER WAY TO
USE URINE TOXICOLOGY.

**Q.** WHAT WOULD DETERMINE THAT THE PATIENT WAS -- WHAT, IF
ANYTHING, WOULD DETERMINE THAT PATIENT 42 HAD USED SYNTHETIC
CANNABINOIDS -- I'LL WITHDRAW THE QUESTION AND JUST MOVE
FORWARD.

AND SO THEN PATIENT NO. 43, JUST TO STEP BACK A
LITTLE BIT, THE PATIENTS THAT YOU DON'T HAVE CHART REVIEWS FOR
BUT YOU ONLY WROTE ABOUT THEM IN THE REPORT, ARE THESE
GENERALLY RECORDS THAT YOU ONLY WERE ABLE TO REVIEW ON SITE

1 DURING YOUR SITE VISIT?

2 **A.**  I DON'T REALLY REMEMBER THAT AND WHY.  I DON'T REMEMBER IF

3 IT WAS JUST ON SITE, BUT I CAN TELL YOU THAT I REVIEWED THE

4 ENTIRETY OF EVERY CHART, EVERY PAGE OF EVERY CHART, AND IF

5 THERE'S SOME SUMMARIES, IT'S BECAUSE OF TIME AND -- JUST TIME.

6 **Q.**  AND THERE WERE SOME THAT YOU HAD REVIEWED.  ARE THERE SOME

7 CHARTS THAT YOU REVIEWED -- I'LL WITHDRAW THE QUESTION.

8       ALSO WITH THIS PATIENT, MR. ARCHEY POINTS TO THE FACT

9 THAT THE PATIENT'S MASS ULTIMATELY PROVED TO BE BENIGN.  DOES

10 THAT VITIATE IN ANY WAY YOUR CONCERNS ABOUT THE CARE THE

11 PATIENT RECEIVED?

12 **A.**  NO.  I MEAN, MY RESPONSE TO THAT WAS THANK GOD THAT HE

13 DIDN'T HAVE A RHABDOMYOSARCOMA AND WAS GOING TO DIE OF IT FOR A

14 THREE-YEAR DELAY.

15 **Q.**  AND MR. ARCHEY ALSO SUGGESTED THAT THE FIRST RECORD THAT

16 HE SHOWED YOU, I BELIEVE JOINT EXHIBIT 10 AT 17907, SUGGESTED

17 THAT THIS RECORD SHOWED THAT THE DOCTORS BELIEVED FROM THE

18 BEGINNING THAT IT WAS BENIGN.  AND IF YOU COULD JUST, ONCE WE

19 GET THAT UP ON THE SCREEN, EXPLAIN WHY THAT'S NOT ACTUALLY WHAT

20 THAT SHOWS.

21 **A.**  AND YOUR QUESTION IS HOW DOES THIS ULTRASOUND RESULT?

22 **Q.**  AND SO TO RESTATE A VERY GARBLED QUESTION, MR. ARCHEY

23 ASKED YOU IF THIS RECORD SHOWED FROM THE BEGINNING THE DOCTORS

24 OR WHOEVER WROTE THIS RECORD, BELIEVED THAT THE MASS WOULD

25 ULTIMATELY PROVE TO BE BENIGN.  IS THAT CORRECT?

**A.**   WELL, NO.  THIS RECORD JUST SAYS THAT THIS ULTRASOUND
SHOWS THAT THIS IS MOST LIKELY NOT A HEMATOMA, WHICH IS A
BRUISE OR A COLLECTION OF BLOOD.  IT'S GOT NO BEARING ON
ANYTHING ELSE.  THEY DON'T COMMENT ON IT.

**Q.**   DOES THAT RULE OUT THE POSSIBILITY THAT IT WAS A
MALIGNANCY?

**A.**   NO.  IT PUSHES IT IN THE DIRECTION OF SOMETHING OTHER THAN
A HEMATOMA, AND NOW YOU'RE LEFT WITH A COUPLE OF THINGS THAT A
MASS IN THE CALF CAN BE, AND THEY WORRY YOU, UNTIL YOU RULE OUT
IF THEY'RE SERIOUS.

**Q.**   AND YOU SAID YESTERDAY YOU REVIEWED THE PORTIONS OF THE
REPORT THAT TALKED ABOUT CHRONIC DISEASE MANAGEMENT, SPECIALTY
SERVICES, AND DELAYS IN ACCESS TO SPECIALTY SERVICES AND
TESTING.  IS THIS CONSISTENT WITH WHAT WAS WRITTEN IN THAT
REPORT?

**A.**   ONE HUNDRED PERCENT.

**Q.**   PATIENT NO. 44.  THIS WAS THE PATIENT WHO, AFTER BEING
TAKEN TO OUR LADY OF THE LAKE, A PRACTITIONER OF SOME SORT AT
OUR LADY OF THE LAKE SUGGESTED THAT HE MAY HAVE BEEN
MALINGERING IN CERTAIN WAYS.  ARE THERE DIFFERENCES IN HOW THAT
PRACTITIONER WAS USING MALINGERING FROM HOW IT'S USED AT LSP?

**A.**   WELL, THE WORD "MALINGERING" MEANS FAKING.  AND SO THIS
PATIENT HAD ALMOST KILLED HIMSELF BY HANGING HIMSELF AND
SURVIVED.  THERE WAS NOTHING FAKE ABOUT THAT.  SO THE QUESTION
WAS, THE PATIENT THEN WANTED TO GO TO ANOTHER HOSPITAL, AND THE

1  PERSON WHO DID THAT SAID MALINGERING THERE, WAS SAYING --

2  RESPONDING TO THAT PATIENT ABOUT FAKING SOMETHING.  CERTAINLY

3  HADN'T FAKED THE SUICIDE ATTEMPT, AND THEN I DON'T KNOW.

4  MALINGERING MEANS FAKING.

5  Q.    IS MALINGERING -- TAKING IT OUT OF THE LSP CONTEXT, IS

6  MALINGERING A MEDICAL DIAGNOSIS?  TO REPHRASE, IS MALINGERING A

7  TERM THAT IS USED IN MEDICINE?

8  A.    WELL, WE'VE GOT TO BE CAREFUL BECAUSE SOMETIMES THEY'RE

9  NOT FAKING, AND YOU'RE JUST MISSING IT.  SO I RECOMMEND AGAINST

10  THAT, BECAUSE WHEN YOU'RE PROVEN WRONG, YOU LOOK LIKE A FOOL.

11  Q.    BUT IT IS A CONCEPT THAT IS USED BY PHYSICIANS?

12  A.    ABSOLUTELY.

13  Q.    OUTSIDE OF LSP, IS IT USUALLY ACCOMPANIED BY DISCIPLINARY

14  ACTION?

15  A.    NO.

16  Q.    AND IS THERE ANY EVIDENCE OF THE DOCTOR OR WHOEVER THE

17  PRACTITIONER IS AT OUR LADY OF THE LAKE STARTING ANY SORT OF

18  DISCIPLINARY PROCESS OR ANY DISCIPLINE BEING DONE AT OUR LADY

19  OF THE LAKE TO THE PATIENT?

20  A.    NO.

21  Q.    AND SO THEN ONLY A FEW MORE MINUTES, I BELIEVE.  TO STEP

22  AWAY FROM THE CHART REVIEWS, THOUGH.

23        DR. VASSALLO, MR. ARCHEY SHOWED YOU A COMPLAINT FROM

24  A PRO SE LAWSUIT THAT WAS FILED SOMETIME IN THE LAST SEVERAL

25  YEARS.  IS THAT CORRECT?

**A.**   YES.

**Q.**   DO YOU KNOW HOW THAT COMPLAINT WAS RESOLVED?

**A.**   WELL, HE TOLD ME.  HE SAID IT WAS DISMISSED IN AUGUST.  I
HAD NO IDEA WHATEVER HAPPENED TO THAT.  I KNEW THAT SOMEBODY
COMPLAINED.  I DIDN'T KNOW IT WAS A LAWSUIT.  I HAD NEVER SEEN
THAT PIECE OF PAPER.  IT SUGGESTS TO ME THAT BELLEVUE'S RISK
MANAGEMENT SHOULD BE A LITTLE MORE COMMUNICATIVE IF I'VE GOT TO
BE IN A FEDERAL COURT IN LOUISIANA TO GET THAT BROUGHT TO MY
ATTENTION.

**Q.**   AND DO YOU RECALL WHETHER YOU WERE EVEN A PART OF THE
LAWSUIT AT THE BEGINNING OF IT WHEN THE PATIENT FIRST -- THE
PLAINTIFF IN IT FIRST FILED IT?

**A.**   I DON'T KNOW ANYTHING ABOUT WHAT HAPPENED IN THAT LAWSUIT.
I DIDN'T EVEN KNOW IT WAS A LAWSUIT.  I KNEW THERE WAS A
COMPLAINT AND THAT WAS IT.  I JUST SAW WHAT I SAW.

          **MR. DUBNER:**  AND YOUR HONOR, I DON'T THINK THERE'S
ANY NEED TO USE THIS WITH THE WITNESS, BUT COULD WE TAKE
JUDICIAL NOTICE AS WELL OF AN ORDER OF THE SOUTHERN DISTRICT OF
NEW YORK DISMISSING THAT CASE?  I CAN HAND IT UP.  IT IS CASE
14-CIV-9302, DOCUMENT 123, FILED ON AUGUST 3RD, 2018.  NOT FOR
THE TRUTH OF THE MATTER ASSERTED, OF COURSE, BUT ONLY FOR THE
FACT THAT THESE -- YOU KNOW, THE FACTS INSIDE OF IT, OR SORRY,
THE PRESENCE OF THE STATEMENTS INSIDE OF IT.

          **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO HAVE NO
OBJECTION.  HE CAN INTRODUCE THE DOCUMENT IF HE LIKES.  IT WAS

1    DISMISSED ON PRESCRIPTION.

2                **THE COURT:**  YEAH, MR. ARCHEY BROUGHT THAT OUT.  THE

3    COURT WILL TAKE NOTICE OF IT.  YOU DON'T NEED TO PUT IT IN THE

4    RECORD.

5                **MR. DUBNER:**  THANK YOU.

6    **BY MR. DUBNER:**

7    **Q.**   MR. ARCHEY, AT THE VERY BEGINNING, DESCRIBED SOME STEPS

8    THAT IT TAKES BEFORE A PATIENT CAN BE TRANSPORTED, GUARDS NEED

9    TO BE POTENTIALLY SUMMONED, THEY POTENTIALLY NEED TO GET

10   WEAPONS FROM THE WEAPON CABINET, ET CETERA.  WHAT IS THAT --

11   THE FACT THAT THERE IS SOME TIME THAT NEEDS TO TAKE PLACE THEN,

12   WHAT DOES THAT SUGGEST FOR HOW QUICKLY THE MEDICAL STAFF NEEDS

13   TO BE MAKING THE DETERMINATION WHETHER TO TRANSPORT?

14   **A.**   OH, THAT'S AN INTERESTING OBSERVATION.  THE LONGER YOU

15   THINK IT'S GOING TO TAKE TO GET TO CARE THAT IS REQUIRED FOR

16   THE PATIENT, THE EARLIER YOU NEED TO START.  IT'S A BASIC TENET

17   OF ALL OF OUR CARE OUTSIDE, AND IT'S EVEN MORE IMPORTANT WHERE

18   YOU HAVE RESTRICTED MOVEMENT LIKE IN A CORRECTIONAL FACILITY.

19               **MR. DUBNER:**  PERMISSION TO APPROACH, YOUR HONOR.

20               **THE COURT:**  GRANTED.

21   **BY MR. DUBNER:**

22   **Q.**   I'VE HANDED YOU THE STUDY THAT MR. ARCHEY USED ON

23   CROSS-EXAMINATION AND I'M GOING TO HAVE VERY, VERY FEW

24   QUESTIONS ON IT, BUT I JUST WANT TO CHECK.  MR. ARCHEY SAID

25   THAT THIS STUDY SHOWED THAT 15 PERCENT OF STROKES WERE -- THAT

1  THERE WAS MEDICAL ERROR IN 15 PERCENT OF STROKE DIAGNOSES, AND
2  POINTED YOU TO A TABLE ON IT WITH A SECOND OR THIRD PAGE.  FROM
3  YOUR REVIEW, UNDERSTANDING YOU'VE ONLY HAD A MOMENT TO REVIEW
4  IT, IS THAT WHAT THAT TABLE SHOWS?
5  **A.**   WELL, THE PERCENTAGE IS 2.6 AND THE NUMBER OF PATIENTS
6  MISSED OUT OF THE 583 ARE 15, SO THE PERCENTAGE IS MORE LIKE I
7  WOULD THINK, 2.6 PERCENT.  15 PATIENTS, 2.6 PERCENT.
8  **Q.**   AND IS THAT THE NUMBER OF -- IS THAT THE PERCENTAGE OF
9  STROKE PATIENTS WHERE THERE'S MEDICAL ERROR OR IS THAT THE
10  PERCENTAGE OF MEDICAL ERROR THAT INVOLVES STROKES?
11  **A.**   WELL, THE TITLE OF THIS TABLE IS "THE MOST FREQUENTLY
12  MISSED DIAGNOSES AMONG 583 PHYSICIAN REPORTED CASES OF
13  DIAGNOSTIC ERROR."  SO 2.6 PERCENT IS CERTAINLY NOT THE MOST
14  FREQUENTLY MISSED BECAUSE UP AT THE TOP, PULMONARY EMBOLISM IS
15  AT 4.5 PERCENT, FOR WHAT IT'S WORTH, WHICH IS NOT TOO MUCH.
16  **Q.**   AND THEN MR. ARCHEY SUGGESTED THAT YOU WERE LOOKING FOR
17  CHARTS -- YOU CAN PUT THAT AWAY.
18  **A.**   OH, THAT'S GOOD.
19  **Q.**   MR. ARCHEY SUGGESTED THAT YOU WERE LOOKING FOR CHARTS THAT
20  HAD THE WORST CARE.  IS THAT AN ACCURATE DESCRIPTION OF HOW YOU
21  WERE CHOOSING CHARTS IN THIS CASE?
22  **A.**   I HAD NO IDEA WHAT THE CARE WAS GOING TO BE WHEN I CHOSE
23  THE CHART.
24  **Q.**   YOU SAID YESTERDAY THAT YOU WERE LOOKING FOR
25  HOSPITALIZATIONS AND DEATHS.  WHY HOSPITALIZATIONS AND DEATHS?

**A.** WELL, I WANT TO KNOW WHEN SOMEBODY GETS TO THE HOSPITAL, WHY THEY GOT THERE AND HOW THEY GOT THERE. MY CHOICE OF CHARTS COULD HAVE RESULTED IN A COMPLETELY DIFFERENT FINDING THAT PATIENTS WERE APPROPRIATELY AND NECESSARILY SENT QUICKLY TO THE HOSPITAL. I HAD NO IDEA WHAT I WAS GOING TO FIND, AND WHAT IT FOUND IS THAT THE PATIENTS WENT TO THE HOSPITAL BECAUSE THEY HAD GOTTEN POOR CARE AND HAD TO GO TO THE HOSPITAL EXCEPT IN THE CASES THAT WE'VE DISCUSSED WHERE THAT WAS NOT THE CASE.

**Q.** AND THEN, FINALLY, MR. ARCHEY ASKED ABOUT THE CHARTS THAT YOU REVIEWED WHILE YOU WERE ON SITE. YOU SAID YOU SORT OF GRABBED SOME FROM, YOU KNOW, THE PILE, SO TO SPEAK, TO PARAPHRASE BOTH YOU AND MR. ARCHEY. DO YOU RECALL, HAD YOU REQUESTED CHARTS TO REVIEW FROM THE LISTS BEFORE THE SITE VISIT?

**A.** I DON'T REMEMBER DOING ANY WORK ON THIS CASE BEFORE THE SITE VISIT.

**Q.** OKAY. SO YOU DON'T RECALL WHETHER OR NOT THAT HAPPENED?

**A.** I JUST DO NOT RECALL THAT.

**MR. DUBNER:** NO FURTHER QUESTIONS. THANK YOU FOR YOUR TIME, DR. VASSALLO.

**THE WITNESS:** THANK YOU.

**THE COURT:** WE'RE GOING TO TAKE A LUNCH BREAK. THANK YOU, DOCTOR, FOR YOUR TESTIMONY.

**THE WITNESS:** THANK YOU, YOUR HONOR.

**THE COURT:** WE'RE GOING TO BE IN RECESS UNTIL 1:45.

1                        (RECESS.)

2              THE COURT:  BE SEATED.

3                   NEXT WITNESS.

4              MS. MONTAGNES:  YOUR HONOR, MERCEDES MONTAGNES, ON

5    BEHALF OF PLAINTIFFS.  AT THIS POINT WE CALL NURSE MADDY --

6    NURSE PRACTITIONER MADELINE LAMARRE.

7              THE COURT:  OKAY.

8                   MADELINE LAMARRE, MN, FNP-BC,

9    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

10             THE COURT:  MS. MONTAGNES, YOU MAY PROCEED.

11             DIRECT EXAMINATION OF QUALIFICATIONS

12   BY MS. MONTAGNES:

13   Q.   GOOD AFTERNOON, MS. LAMARRE.

14        WHAT IS YOUR CURRENT POSITION?

15   A.   I'M A CORRECTIONAL HEALTHCARE CONSULTANT.

16   Q.   AND WHAT IS YOUR EDUCATIONAL BACKGROUND?

17   A.   I GOT A BACHELOR OF SCIENCE IN NURSING IN 1977.  I GOT A

18   MASTER OF SCIENCE IN NURSING IN 1982 FROM EMORY UNIVERSITY, AND

19   I'M BOARD CERTIFIED AS A FAMILY NURSE PRACTITIONER.

20   Q.   AND CAN YOU BRIEFLY DESCRIBE THE ROLE OF A NURSE

21   PRACTITIONER VERSUS A REGISTERED NURSE?

22   A.   NURSE PRACTITIONERS ARE ADVANCED PRACTICE NURSES WHO

23   TYPICALLY HAVE THEIR MASTER'S IN NURSING, A MASTER'S LEVEL

24   PREPARATION.  AND AS A FAMILY NURSE PRACTITIONER, I'M QUALIFIED

25   TO MEDICALLY EVALUATE, DIAGNOSE, AND TREAT COMMON OCCURRING

ILLNESSES LIKE HYPERTENSION, DIABETES, ET CETERA.

**Q.**   AND WOULD A REGISTERED NURSE ALSO HAVE THAT CAPACITY?

**A.**   NO.

**Q.**   CAN YOU BRIEFLY DESCRIBE YOUR EXPERIENCE IN CORRECTIONS?

**A.**   YES.  I FIRST STARTED WORKING AS A NURSE PRACTITIONER FOR THE GEORGIA DEPARTMENT OF CORRECTIONS AT ONE OF THEIR CORRECTIONAL FACILITIES IN 1982.  I WAS BOTH THE ADMINISTRATOR AND THE SOLE FAMILY NURSE PRACTITIONER, SOLE HEALTHCARE PROVIDER AT THAT CLINIC.  AND I WORKED THERE FOR ABOUT TWO YEARS.  AND IN 1984, I WAS HIRED BY THE GEORGIA DEPARTMENT OF CORRECTIONS AS A FULL-TIME EMPLOYEE IN THEIR OFFICE OF HEALTH SERVICES AS A NURSE CONSULTANT.

**Q.**   AND HOW LONG WERE YOU IN THAT ROLE FOR?

**A.**   I WAS IN THE NURSE CONSULTANT ROLE FOR ABOUT TEN YEARS, AND IN THAT CAPACITY, I EVALUATED NURSING SERVICES, DEVELOPED POLICIES AND PROCEDURES, I WROTE TRAINING FOR -- ACTUALLY FOR CORRECTIONAL OFFICERS AND NURSES RELATED TO CERTAIN HEALTHCARE RELATED FUNCTIONS.

AND THEN IN 1995, I WAS PROMOTED TO THE CLINICAL SERVICES MANAGER THAT TOOK MORE ADVANTAGE OF MY ADVANCED PRACTICE SKILLS.  I WROTE POLICIES AND PROCEDURES, CHRONIC DISEASE GUIDELINES, NURSING PROTOCOLS THAT WOULD BE USED BY STAFF IN THE GEORGIA DEPARTMENT OF CORRECTIONS.  I WAS ALSO HEAD OF A CLINICAL AUDITING PROCESS.  SO I TOOK A TEAM OF DOCTORS, NURSE PRACTITIONERS, AND NURSES OUT TO GEORGIA

CORRECTIONAL FACILITIES TO MONITOR THE QUALITY OF HEALTHCARE IN
THOSE INSTITUTIONS.  I SERVED AS A PUBLIC HEALTH LIAISON
WITH -- BETWEEN THE GEORGIA DEPARTMENT OF CORRECTIONS AND THE
CENTERS FOR DISEASE CONTROL IN THE STATE HEALTH DEPARTMENT, SO
THOSE WERE MY BROAD RESPONSIBILITIES.
Q.   AND WHEN YOU JOINED THE GEORGIA DEPARTMENT OF CORRECTIONS
IN 1984, CAN YOU DESCRIBE WHAT THE STATE OF HEALTHCARE WAS
THERE?
A.   YES.  SO IN 1984 THE GEORGIA DEPARTMENT OF CORRECTIONS DID
NOT REALLY HAVE A HEALTHCARE SYSTEM AT ALL.  THE FACILITIES
WERE BASICALLY RUN BY THE PERSONALITIES OF THE WARDEN.  THERE
WAS NO CENTRALIZED, STATEWIDE SET OF POLICIES AND PROCEDURES.
THERE WAS NO UNDERSTANDING THAT THERE WOULD BE ANY
STANDARDIZATION TO HEALTHCARE.  THERE WERE INADEQUATE NUMBERS
OF HEALTHCARE STAFF.  AND, FRANKLY, EVERYTHING WAS JUST BROKEN.
          SHORTLY BEFORE I ARRIVED TO THE DEPARTMENT OF
CORRECTIONS, THERE WAS ONE PRISON WHO THE ONLY DOCTOR WAS AN
INMATE.  HE WAS A REAL DOCTOR BUT HE WAS AN INMATE, AND THAT'S
HOW BAD THINGS WERE IN THE GEORGIA DEPARTMENT OF CORRECTIONS IN
THE EARLY '80S.
Q.   AND WHAT WAS YOUR EXPERIENCE IN IMPROVING THIS CARE, IF IT
IMPROVED OVER YOUR TIME THERE?
A.   SO WHEN I JOINED THE DEPARTMENT, THERE WERE SEVEN OR EIGHT
CLASS ACTION LAWSUITS, MOST OF THEM INVOLVING HEALTHCARE, AND
THINGS REALLY DIDN'T GET BETTER UNTIL THE INTERVENTION OF THE

FEDERAL COURT.  THE COMMISSIONER AT THAT TIME REALIZED THAT THERE WERE SERIOUS PROBLEMS WITH HEALTHCARE AND HE AGREED TO -- WITH THE COURT, TO AN INDEPENDENT PHYSICIAN MONITOR, WHO WORKED WITH OUR OFFICE, THE OFFICE OF HEALTH SERVICES, TO BASICALLY MENTOR US IN HOW TO DEVELOP AN ADEQUATE HEALTHCARE SYSTEM.  SO WE -- REALLY WITHOUT THE INTERVENTION OF THE COURTS AND THE COOPERATION OF THE COMMISSIONER, IT WOULD HAVE BEEN DIFFICULT TO MAKE ANY PROGRESS.

**Q.**    WHAT WAS THE OUTCOME OF THAT EXPERIENCE?

**A.**    THE FINAL OUTCOME WAS THAT BY 1998 TO 2000, WE'D RESOLVED ALL CLASS ACTION LAWSUITS INVOLVING HEALTHCARE.

**Q.**    AND CAN YOU TALK BRIEFLY ABOUT YOUR EXPERIENCE AS A COURT-APPOINTED MONITOR?

**A.**    YES.  IN 2002 I WAS APPOINTED BY JUDGE THELTON HENDERSON TO BE A MEDICAL EXPERT IN THE *PLATA* CASE IN CALIFORNIA, AND IN THAT CAPACITY, I WAS A NEUTRAL AND INDEPENDENT MONITOR THAT MONITORED HEALTHCARE IN THE 34-SOME STATE PRISONS IN THE STATE OF CALIFORNIA.

**Q.**    AND CAN YOU TALK BRIEFLY ABOUT OTHER TIMES WHEN YOU HAVE WORKED AS A MONITOR?

**A.**    YES.  I WAS INVOLVED IN SEVERAL DEPARTMENT OF JUSTICE MONITORING ENGAGEMENTS.  SO AFTER THE PARTIES SETTLED AND HAD A MEMORANDUM OF UNDERSTANDING OR A SETTLEMENT AGREEMENT, I WAS PICKED TO BE PART OF A TEAM OF DOCTORS AND NURSE PRACTITIONERS, NURSES, TO MONITOR HEALTHCARE IN THE STATES OF OHIO, DELAWARE,

COOK COUNTY JAIL IN CHICAGO, DALLAS COUNTY JAIL, AND THE STATE

COUNTY JAIL.

**Q.**   AND HAVE YOU EVER BEEN USED AS AN EXPERT IN THE MANNER

THAT YOU ARE BEING USED IN THIS CASE BEFORE?

**A.**   I'M SORRY.  WOULD YOU REPEAT THAT?

**Q.**   HAVE YOU EVER BEEN USED AS AN EXPERT IN THE SAME MANNER

THAT YOU ARE BEING USED FOR PLAINTIFFS IN THIS CASE?

**A.**   YES.

**Q.**   AND WHAT STATES HAVE YOU DONE THAT IN?

**A.**   THE STATE OF ILLINOIS, I'VE BEEN PART OF AN INVESTIGATION,

SO TO SPEAK.  AND THAT'S ALL THAT COMES TO MIND RIGHT NOW.

THERE MAY BE OTHERS, BUT THEY DON'T COME TO MIND.

**Q.**   HAVE YOU SERVED AS AN EXPERT IN MISSISSIPPI?

**A.**   YES.

**Q.**   AND ALABAMA?

**A.**   YES.

**Q.**   AND EARLIER YOU MENTIONED THAT YOU HAD DONE SOME WORK AS A

PUBLIC HEALTH LIAISON.  WERE YOU EVER INVOLVED IN ESTABLISHING

STANDARDS OF CARE RELATED TO PUBLIC HEALTH?

**A.**   YES.  SO WHEN I WORKED FOR THE GEORGIA DEPARTMENT OF

CORRECTIONS, I SERVED AS THE LIAISON BETWEEN THE DEPARTMENT AND

THE STATE PUBLIC HEALTH DEPARTMENT IN THE CDC, AND WE INVITED

THE CDC TO COME INTO THE GEORGIA DEPARTMENT OF CORRECTIONS

WHENEVER WE HAD A DISEASE OUTBREAK, A FOOD-BORNE ILLNESS.  WE

HAD OUTBREAKS OF HEPATITIS B.  WE HAD CASES OF HIV

SEROCONVERSION IN THE DEPARTMENT, AND WE WANTED VERY MUCH TO
UNDERSTAND WHAT WAS CONTRIBUTING TO THOSE OUTBREAKS AND WHAT WE
COULD DO TO PREVENT THEM IN THE FUTURE.

      I ALSO WAS INVITED BY THE CENTERS FOR DISEASE CONTROL
TO BE ON A PANEL TO MAKE RECOMMENDATIONS REGARDING PREVENTION
AND CONTROL OF HEPATITIS C IN CORRECTIONAL FACILITIES, AND TO
ASSIST WITH DEVELOPING GUIDELINES FOR THE IMPLEMENTATION OF HIV
TESTING GUIDELINES IN CORRECTIONAL FACILITIES.

**Q.**   AND DO YOU HAVE ANY -- HAVE YOU EVER PUBLISHED IN THE AREA
RELEVANT TO CORRECTIONAL HEALTHCARE?

**A.**   YES.  I'VE PUBLISHED A NUMBER OF PUBLICATIONS.  THE ONE
MOST RECENTLY IS A CHAPTER IN DR. PUISIS' TEXTBOOK ON
CORRECTIONAL MEDICINE RELATED TO THE NURSING ROLE ON
CORRECTIONAL FACILITIES.

      **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME THE
PLAINTIFFS WOULD LIKE TO TENDER MADELINE LAMARRE AS AN EXPERT
IN CORRECTIONAL HEALTHCARE.

      **MR. ARCHEY:**  YOUR HONOR, IF I MAY, I'D LIKE TO ASK
JUST A FEW QUESTIONS.

      **THE COURT:**  CROSS ON THE TENDER.

      **CROSS-EXAMINATION OF QUALIFICATIONS**

BY MR. ARCHEY:

**Q.**   MS. LAMARRE, YOU LAST PRACTICED AS A NURSE PRACTITIONER IN
THE 2005 TO 2007 TIMEFRAME.  CORRECT?

**A.**   IN A DIRECT CLINICAL PRACTICE, YES.

Q.   AND AS A NURSE PRACTITIONER, YOU ARE NOT QUALIFIED TO
SUPERVISE THE PRACTICE OF A PHYSICIAN, CORRECT?

A.   THAT'S CORRECT.

Q.   AND YOU DID NOT -- IN THIS CASE, YOU DID NOT ASSESS
WHETHER THE NURSES AT LSP ARE VIOLATING THE NURSE PRACTICE AS
TO THEIR SCOPE OF PRACTICE, CORRECT?

A.   NOT THE NURSES, NO.

Q.   AND YOU'RE NOT GOING TO TESTIFY THAT THE NURSES HAD A ROLE
IN PLACING PATIENTS IN ANY APPROPRIATE CARE SETTING, CORRECT?

A.   I'M SORRY.  WOULD YOU REPEAT THE QUESTION?

Q.   YEAH, IT GOT GARBLED.

     ARE YOU GOING TO TESTIFY THAT THE NURSES HAD A ROLE
IN PLACING THE PATIENTS IN AN APPROPRIATE MEDICAL SETTING?

A.   NO.  I DON'T THINK I FORMED ANY OPINIONS ABOUT THAT.

Q.   AND YOU'RE NOT PLANNING TO TESTIFY ON ANY SYSTEMATIC
NURSING DEFICIENCIES AT LSP, CORRECT?

A.   I'M NOT SURE THAT THAT'S CORRECT.

Q.   WELL, REMEMBER AT YOUR DEPOSITION YOU WERE ASKED THAT
EXACT QUESTION; YOU SAID YOU WERE NOT.  HAS YOUR OPINION
CHANGED?

          **THE COURT:**  SHOW HER THE DEPOSITION.

          **MR. ARCHEY:**  MAY I APPROACH?

          **THE COURT:**  GIVE HER A CHANCE TO ADMIT IT OR NOT.

          **MR. ARCHEY:**  I WILL, JUDGE.

               YOU WANT ME TO APPROACH OR GO TO THE SCREEN,

1 JUDGE?

2          THE COURT: MS. MONTAGNES, WOULD YOU LET HIM USE THE

3 ELMO, PLEASE.

4 BY MR. ARCHEY:

5 Q.   MS. LAMARRE, I'M LOOKING AT PAGE 95, LINE 4.  IT SAYS "SO

6 YOU'RE NOT PLANNING TO TESTIFY AS TO ANY SYSTEMATIC NURSING

7 DEFICIENCY; IS THAT CORRECT?"  YOU SAID "IN THE INFIRMARY, I'M

8 NOT."

9 A.   THAT'S CORRECT.  I THINK WHAT I'LL TESTIFY TO RELATED TO

10 THE INFIRMARY IS WHETHER THERE WAS -- WHAT THE NURSING STAFFING

11 SHOULD -- WHETHER THERE OUGHT TO BE MORE NURSES, BUT NOT TO THE

12 QUALITY OF THE NURSING CARE.

13 Q.   RIGHT.  OR ANY SYSTEMATIC NURSING DEFICIENCY, CORRECT?

14 A.   RELATED TO CLINICAL CARE.

15 Q.   AND THAT INCLUDED THE MEDICAL DORMS AS WELL, CORRECT?

16 A.   CORRECT.

17          MR. ARCHEY:  YOUR HONOR, WE DO NOT HAVE AN OBJECTION

18 TO MS. LAMARRE BEING AN EXPERT IN CORRECTIONAL MEDICINE, BUT

19 HERE'S THE PROBLEM, AND HERE'S THE OBJECTION I DO WANT TO

20 RAISE, SHE IS NOT QUALIFIED TO SUPERVISE PHYSICIANS AS SHE

21 SAID, AND SHE SHOULD NOT BE HEARD TO GIVE OPINIONS IN THIS

22 COURT AS TO THE PHYSICIAN STANDARD OF CARE.  I'VE GOT TWO CASES

23 I'D LIKE TO PRESENT TO THE COURT.  I HAVE COPIES FOR EVERYONE,

24 IF I MAY, JUDGE.

25          THE COURT:  OKAY.

0 2 : 0 4

1    **MR. ARCHEY:** YOUR HONOR, THE FIRST CASE IS

2   *HAMILTON V. PIKE COUNTY*, IT'S 2012, INVOLVING MS. LAMARRE, I'M

3   SORRY, WHERE THE COURT WOULD NOT ALLOW HER TO TESTIFY AS TO

4   PHYSICIAN STANDARD OF CARE.  THIS WAS AN INMATE SUING FOR

5   CONSTITUTIONAL VIOLATIONS AND HER TESTIMONY WAS LIMITED.

6            THE SECOND CASE I PRESENTED TO YOUR HONOR IS A

7   FIFTH CIRCUIT CASE SIMILARLY SAYING A NURSE PRACTITIONER IS NOT

8   ALLOWED TO TESTIFY AS TO A PHYSICIAN STANDARD OF CARE.  AND TO

9   BE CLEAR -- SHE'S GOT HER OUTLINE.  THE OTHER AREAS SUCH AS

10  POLICIES AND PROCEDURES, THOSE TYPES OF THINGS, SURE, SHE CAN

11  OFFER THAT TESTIMONY, BUT WHERE WE OBJECT IS FOR HER TO COME

12  AND CRITICIZE WHAT THESE PHYSICIANS ARE DOING AND THE CARE

13  GOING ON IN THE CLINICS LIKE THAT.  I THINK THAT'S

14  INAPPROPRIATE AND THAT'S WHERE OUR OBJECTION IS, YOUR HONOR.

15           **THE COURT:** DO YOU WANT TO ADDRESS THE OBJECTION?

16           **MS. MONTAGNES:** THANK YOU, YOUR HONOR.  WELL, FIRST I

17  WOULD SAY THAT MS. LAMARRE HAS BEEN APPROVED TO EVALUATE THE

18  STANDARD OF CARE IN THE CALIFORNIA CASE.  SHE REGULARLY GIVES

19  REPORTS ABOUT WHETHER OR NOT PHYSICIANS ARE MEETING THE

20  STANDARD OF CARE.  WHAT MS. LAMARRE CAN TESTIFY, AND I CAN ASK

21  HER A FEW ADDITIONAL QUESTIONS IF YOUR HONOR WOULD WANT, BUT

22  WHAT SHE DOES IS SHE EVALUATES WHETHER OR NOT THE PHYSICIANS

23  ARE MEETING NATIONAL STANDARDS AND WHETHER OR NOT THOSE ARE

24  SPECIFIED.

25           SHE TESTIFIED ABOUT THIS IN MISSISSIPPI JUST A

02:05  1    FEW MONTHS AGO, AND SHE REGULARLY PROVIDES REPORTS.  SHE WAS

2    ACCEPTED AS A CORRECTIONAL HEALTHCARE EXPERT IN MISSISSIPPI

3    JUST A FEW -- JUST LAST YEAR IN A VERY SIMILAR CASE.  AND SO

4    THERE'S A DISTINCTION BETWEEN, AND I THINK MS. LAMARRE CAN

5    ACTUALLY SPEAK TO THIS MORE ELOQUENTLY THAN I COULD, AND IF YOU

6    DON'T MIND, WE COULD ASK HER SOME OF THOSE QUESTIONS ABOUT THE

7    DISTINCTION THAT SHE'S DRAWING HERE.

8            **THE COURT:**  WELL, ASK HER SOME -- I GUESS MAYBE WHAT

9    NEEDS TO BE DISCERNED IS WHAT IS THE SCOPE OF EXPERTISE OF A

10   CORRECTIONAL HEALTHCARE EXPERT.  I MEAN, WHAT IS THE SCOPE OF

11   THE OPINION TESTIMONY TYPICALLY OFFERED BY A CORRECTIONAL

12   HEALTHCARE EXPERT.  I MEAN, WE'RE NOT TALKING -- YOU KNOW, THIS

13   ISN'T A -- THE TENDER ISN'T IN A FIELD THAT IS EASILY

14   ASCERTAINABLE BY THE COURT LIKE NEUROLOGY OR, YOU KNOW,

15   ORTHOPEDIC SURGERY OR SOMETHING LIKE THAT.  SO PERHAPS YOU

16   COULD ELUCIDATE THE SCOPE AND -- THE NATURE AND SCOPE OF A

17   CORRECTIONAL HEALTHCARE EXPERT.

18           **DIRECT EXAMINATION OF QUALIFICATIONS CONTINUED**

19   **BY MS. MONTAGNES:**

20   **Q.**   MS. LAMARRE, CAN YOU TALK BRIEFLY ABOUT HOW YOU WOULD

21   EVALUATE -- HOW YOU EVALUATED PHYSICIAN CARE WHEN YOU WERE

22   LOOKING AT THE CHART REVIEWS?

23   **A.**   YES.  SO WHAT I DO IS LOOK TO SEE WHETHER OR NOT THE CARE

24   THAT ANY MEDICAL PROVIDER PROVIDES, WHETHER IT'S A NURSE

25   PRACTITIONER OR A PHYSICIAN, IS COMPLIANT WITH NATIONALLY

RECOGNIZED PUBLISHED STANDARDS, AND I JUST COMMENT ON WHETHER
OR NOT THE PROVIDER MEETS THOSE STANDARDS OR DOESN'T MEET THOSE
STANDARDS.

I DON'T MAKE DECISIONS IF THE DOCTOR CHOOSES ONE DRUG
VERSUS ANOTHER DRUG FOR THE TREATMENT OF HYPERTENSION.  I DON'T
MAKE ANY COMMENT ON THAT, BUT IF A PATIENT IS POORLY -- IF
THEIR HYPERTENSION IS POORLY CONTROLLED AND THEY SAY, I DON'T
WANT TO SEE YOU FOR A YEAR, THAT'S NOT IN ACCORDANCE WITH
PUBLISHED GUIDELINES ABOUT THE FREQUENCY OF FOLLOW-UP FOR
PATIENTS WITH POORLY CONTROLLED HYPERTENSION.

**Q.**    AND IN YOUR WORK AS A COURT-APPOINTED MONITOR, DO YOU
REGULARLY MAKE THESE KINDS OF ASSESSMENTS?

**A.**    YES.

**Q.**    COULD YOU GIVE US JUST A FEW EXAMPLES OF PLACES WHERE YOU
HAVE MADE THESE AS A COURT-APPOINTED MONITOR OR A THIRD-PARTY
MONITOR?

**A.**    I'M CURRENTLY DOING IT IN THE STATE OF CALIFORNIA.  EVERY
MONTH, I REVIEW CARE AT A PRISON, SUBMIT A REPORT TO THE
RECEIVER.

**Q.**    AND THAT CASE, JUST TO BE CLEAR FOR THE RECORD, IS
*BROWN V. PLATA*?

**A.**    YES.

**Q.**    OKAY.  AND IN DALLAS COUNTY JAIL, DID YOU MAKE THOSE KINDS
OF ASSESSMENTS?

**A.**    I DID, ALTHOUGH MY FOCUS OF AN AREA I WAS REVIEWING WAS A

LITTLE BIT MORE NARROW, SO NOT AS OFTEN.

**Q.**   IN COOK COUNTY JAIL, DID YOU MAKE THOSE KINDS OF
ASSESSMENTS?

**A.**   YES.  IN COOK COUNTY JAIL, I REVIEWED HIV CARE, SO I WAS
REVIEWING THE CARE OF PHYSICIANS WHO PROVIDED THAT CARE.

**Q.**   AND IN DELAWARE, DID YOU MAKE THOSE KINDS OF ASSESSMENTS?

**A.**   YES.

**Q.**   AND IN OHIO, DID YOU MAKE THOSE KINDS OF ASSESSMENTS?

**A.**   YES.

       **MS. MONTAGNES:**  YOUR HONOR, IF IT WOULD BE BETTER, I
COULD TENDER NURSE PRACTITIONER LAMARRE AS AN EXPERT IN
CORRECTIONAL HEALTHCARE -- A CORRECTIONAL HEALTHCARE -- GIVE ME
A MINUTE, YOUR HONOR.  I'M TRYING TO NARROW IT APPROPRIATELY.

       **THE COURT:**  WELL, THE TENDER IS CORRECTIONAL
HEALTHCARE.  THE COURT'S GOING TO ACCEPT NURSE PRACTITIONER
LAMARRE IN THAT FIELD.  THE COURT'S GOING TO OVERRULE THE
OBJECTION BY THE DEFENDANTS.  I'VE LOOKED AT THESE CASES
BRIEFLY AND THEY'RE BOTH MEDICAL MALPRACTICE CASES.  SO IN
THOSE CASES, THE TENDER WAS AS TO WHETHER OR NOT THE PARTICULAR
PHYSICIAN, IN A DISCREET CASE, ABIDED BY THE APPROPRIATE
STANDARD OF CARE APPLICABLE TO THE UNDERLYING SUBSTANCE OF THAT
CASE.

       THIS IS A BIT DIFFERENT.  THIS IS WHAT ARE THE
PUBLISHED STANDARDS OF CARE FOR A PARTICULAR DISCIPLINE OR
DIAGNOSTIC ENDEAVOR AND WERE THEY MET OR NOT.  THE DEFENDANTS

INDICATED THEY HAD NO OBJECTION TO HER GIVING OPINION TESTIMONY

AS TO WHAT THE POLICIES AND PROTOCOLS ARE.  THE COURT FINDS

THAT MS. LAMARRE HAS SUFFICIENT KNOWLEDGE, SKILL, AND

EXPERIENCE TO TESTIFY AS A CORRECTIONAL HEALTHCARE EXPERT.

**MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

**DIRECT EXAMINATION**

BY MS. MONTAGNES:

**Q.**  MS. LAMARRE, WHAT WERE YOU TASKED WITH EVALUATING AT

ANGOLA?

**A.**  I WAS ASKED TO EVALUATE THE ADEQUACY OF HEALTHCARE AT THE

PRISON.

**Q.**  AND DID YOU ASSESS THAT?

**A.**  YES, I DID.

**Q.**  AND HOW DID YOU ASSESS THAT?

**A.**  WELL, I HAVE A METHODOLOGY THAT I'VE USED OVER THE YEARS

IN WHICH THERE ARE CERTAIN THINGS THAT YOU DO AT EVERY PRISON

FACILITY TO EVALUATE THE DIFFERENT COMPONENTS OF HEALTHCARE.

SO IT BEGINS WITH DOING A TOUR OF MEDICAL AREAS AND HOUSING

UNITS, SEGREGATION UNITS, TO SEE WHAT THE CONDITIONS OF

CONFINEMENT ARE, WHERE IS HEALTHCARE DELIVERED.  THEN WE

INTERVIEW STAFF, WE INTERVIEW INMATES, TO GET FEEDBACK ON WHAT

THEIR EXPERIENCES AND HOW SYSTEMS ARE WORKING FROM THE

PERSPECTIVE OF STAFF AS WELL AS A PERSPECTIVE OF INMATES.  I

REVIEW MEDICAL RECORDS, WHICH IS A VERY IMPORTANT COMPONENT OF

REVIEWING THE SYSTEM, REVIEW DOCUMENTS, SUCH AS POLICIES AND

PROCEDURES AND QUALITY IMPROVEMENT MINUTES.  SO A SERIES OF
DOCUMENTS THAT I REVIEW AS WELL.

**Q.**    AND WAS THIS THE PROCESS THAT THE TEAM USED IN EVALUATING
LSP?

**A.**    YES.

**Q.**    AND YOU INDICATED THAT YOU REVIEWED MEDICAL RECORDS, WHAT
IS THE PROCESS FOR SELECTING MEDICAL RECORDS?

**A.**    WELL, AS A GENERAL COMMENT, WHAT I DO IS SELECT RECORDS
THAT WOULD MOST LIKELY INFORM ME ABOUT PATIENTS WHO USE THE
HEALTHCARE SYSTEM REGULARLY.  SO I SELECT PATIENTS WITH CHRONIC
DISEASES, BECAUSE I KNOW THERE WILL BE MEDICAL PROVIDER VISITS,
THEY'LL GET MEDICATIONS.  IN MANY CASES THEY'LL GET SPECIALTY
SERVICES.  I'LL SELECT RECORDS OF PATIENTS WHO HAVE BEEN
HOSPITALIZED.  I WILL REQUEST TO REVIEW MORTALITY RECORDS TO
SEE WHAT HAPPENED PRECEDING THEIR DEATH, TO SEE IF CARE WAS
TIMELY AND APPROPRIATE.

**Q.**    AND HOW WERE CHARTS SELECTED IN THIS CASE?

**A.**    WE REQUESTED A LIST OF DOCUMENTS OF TRACKING LOGS OF
PATIENTS WITH HOSPITALIZATIONS, PATIENTS WITH CHRONIC DISEASES.
WE REQUESTED A LIST OF PATIENTS WHO HAD DIED, AND WE SELECTED
RECORDS INITIALLY FROM THAT LIST.  AND THEN WHEN WE WERE ON
SITE, I BELIEVE THAT THERE WAS A MORE RANDOM SELECTION OF --
FROM THE POOL OF CHRONIC DISEASE RECORDS, WE EACH SELECTED
RECORDS FROM THAT -- THAT LIST OF RECORDS THAT WERE PROVIDED TO
US.

**Q.**   AND HOW DO YOU PERFORM A RECORD REVIEW?

**A.**   FOR MYSELF, I TYPICALLY START FROM THE TIME THE PATIENT TRANSFERRED INTO THE FACILITY AND THEN MOVED FORWARD TO THE CURRENT DAY.

IN THIS CASE AT LSP, BECAUSE INMATES WERE, IN SOME CASES, THERE AT THE PRISON FOR MANY, MANY YEARS, I SORT OF MOVED QUICKLY TO MAKE SURE I UNDERSTAND THE HEALTH CONDITIONS OF THE PATIENT, AND THEN REALLY FOCUSED ON THE PERIOD OF 2000 -- YOU KNOW, LATE 2012, 2013, '14, '15, UP TO 2016.

**Q.**   AND DID YOU PRODUCE THOSE CHART REVIEWS AS PART OF YOUR MEDICAL REPORT?

**A.**   YES.

**Q.**   AND THEN DID YOU SUBSEQUENTLY PRODUCE SUPPLEMENTAL CHART REVIEWS?

**A.**   YES.

**Q.**   AND WHAT WERE THOSE?

**A.**   THOSE WERE RECORDS THAT I --

            **MR. ARCHEY:**  OBJECTION.

            **THE COURT:**  HOLD ON.  OKAY.  WHAT'S YOUR OBJECTION?

            **MR. ARCHEY:**  THE SUPPLEMENTAL CHART REVIEWS, YOUR HONOR, ARE NOT INTO EVIDENCE AND WE OBJECT TO THAT, AND WE OBJECT IF THEY'RE GOING TO GO START TRYING TO LAY A FOUNDATION ON THOSE.  THEY WERE NOT IDENTIFIED ON THE JOINT PRETRIAL ORDER.  WE HAVE NOT PREPARED FOR THEM TO BE PRESENTED HERE AT TRIAL, AND THEY ARE NOT PART OF THIS TRIAL.

02:13   1          YOU HAVE HEARD ALL WEEK -- OR TWO WEEKS I GUESS

2    NOW -- ABOUT THE 45 CHARTS, THAT'S WHAT WE ARE PREPARED FOR,

3    AND THAT'S WHAT WE'VE BEEN DEALING WITH.  THIS IS SOMETHING

4    OVER AND ABOVE AND BEYOND THAT, THAT THEY ARE NOW GOING TO,

5    APPARENTLY, TRY TO GET INTO.

6          **THE COURT:**  MS. MONTAGNES?

7          **MS. MONTAGNES:**  WELL, ON REC. DOC. 248, THE

8    DEFENDANTS FILED A MOTION IN LIMINE TO EXCLUDE THESE CHARTS.

9    WE RESPONDED IN REC. DOC. 274, AND THIS COURT, IN REC. DOC.

10   353, ADMITTED THEM AND GAVE THE DEFENDANTS LEAVE TO DEPOSE OUR

11   EXPERTS WITH REGARDS TO THESE ADDITIONAL CHART REVIEWS.  THEY

12   DID NOT TAKE THAT OPPORTUNITY, YOUR HONOR, AND WHILE THEY MAY

13   NOT BE IN EVIDENCE, AND I DO INTEND TO MOVE THEM INTO EVIDENCE,

14   EVEN IF THEY'RE NOT IN EVIDENCE, THEY HELPED FORM THE BASIS OF

15   MS. LAMARRE'S OPINION AND THEREFORE SHE CAN TESTIFY AS TO THEM.

16         **THE COURT:**  321?

17         **MS. MONTAGNES:**  YOUR ORDER IS ON REC. DOC. 353.  THEY

18   WERE -- AND TO BE CLEAR, THEY WERE INADVERTENTLY LEFT OFF OF

19   PLAINTIFFS' EXHIBIT 28.  WHEN WE DISCOVERED THAT, WE ASKED THE

20   DEFENDANTS IF THEY WOULD ALLOW US TO SUPPLEMENT.  THEY

21   WOULDN'T.  IT WAS OUR FAULT.  WE ACCEPT THAT.  BUT SHE CAN

22   CERTAINLY TESTIFY AS TO THE CONTENT.  IN MOST CASES, THE EXPERT

23   REPORT ISN'T EVEN IN EVIDENCE.

24         **MR. ARCHEY:**  YOUR HONOR, THE RECORDS ARE NOT PART OF

25   THE JOINT PRETRIAL ORDER.  THEY WEREN'T IDENTIFIED.  THEY ARE

NOT THERE, AND --

       **THE COURT:**  RIGHT, BUT WAS THERE A MOTION IN LIMINE

THAT I RULED ON?  AND I DO TEND TO REMEMBER THAT.  I LOOKED AT

ALL THESE MOTIONS.  I LOOKED AT ALL THE RULINGS ON THE MOTIONS

IN LIMINE LAST WEEK, AND NOW IT'S JUST NOT COMING TO ME BECAUSE

IT'S JUST NOT.

       **MR. ARCHEY:**  WE DON'T DENY THAT, YOUR HONOR, BUT

THAT'S DIFFERENT FROM IS IT ON THE PRETRIAL ORDER WHERE IT'S

BEEN IDENTIFIED, AND IT'S AN EXHIBIT.

       **THE COURT:**  YOU FILED YOUR MOTION IN LIMINE AFTER THE

PRETRIAL ORDER, MR. ARCHEY.

       **MR. ROBERT:**  NO, NO, ON THE EXHIBITS THAT WERE

SUBMITTED FOR TRIAL --

       **THE COURT:**  I CAN'T HEAR YOU.

       **MR. ARCHEY:**  IF I MAY DEFER, YOUR HONOR.

       **MR. ROBERT:**  I'M SORRY, YOUR HONOR.  ON THE EXHIBITS

THAT WERE SUBMITTED FOR TRIAL, THAT WERE SUBMITTED, YOU KNOW,

ELECTRONICALLY, THOSE DOCUMENTS WERE NOT INCLUDED AMONGST THE

EXHIBITS.  WHEN WE'VE BEEN TALKING ALL ALONG IN THIS CASE ABOUT

45 RECORDS, NOW THEY WANT TO ADD THIS TO THE DOCUMENTS IN

EVIDENCE WHEN THEY WERE NOT -- WHEN WE ALL HAD TO SUBMIT OUR

EXHIBITS AT A CERTAIN TIME AND THEY DIDN'T DO IT.  AND YOUR

HONOR, WE'VE BEEN CALLED ON NOT PROVIDING THEM WITH DOCUMENTS

AND SO ON AND SO FORTH FOR A LONG TIME, AND THIS IS ONE THAT

THEY DIDN'T INCLUDE.  AND IF IT WAS INADVERTENT, I UNDERSTAND

02:15  1    THAT, BUT IT'S STILL OBJECTIONABLE.

2              **MS. MONTAGNES:**  SO YOUR HONOR, JUST TO BE CLEAR, THE

3    MOTION IN LIMINE WAS DENIED NOVEMBER OF LAST YEAR, WHICH WAS

4    FIVE MONTHS AFTER WE FILED THE FINAL PRETRIAL ORDER, AND SO WE

5    WERE NOT ABLE TO INCLUDE THESE IN THE PRETRIAL ORDER.  WE WOULD

6    HAVE BEEN, BUT THEY WERE THE SUBJECT OF A MOTION IN LIMINE UP

7    UNTIL NOVEMBER OF LAST YEAR.

8              **THE COURT:**  JUST GIVE ME A SECOND.  THE SUPPLEMENTAL

9    CHART REVIEW IS PART OF THE REBUTTAL REPORT?

10             **MS. MONTAGNES:**  WE INTENDED TO INCLUDE IT IN THAT AND

11   WE JUST FAILED TO.  IT WAS OUR MISTAKE.  AND YOUR HONOR, MAY I

12   ADD ONE THING, THE ADDITIONAL MEDICAL RECORDS THAT WERE

13   PROVIDED TO US SUBSEQUENTLY, YOU KNOW, WE ACTUALLY NEVER SAW

14   THOSE UNTIL THREE WEEKS AGO.  THESE CHART REVIEWS WERE PROVIDED

15   TO THEM TWO YEARS AGO AND, YOU KNOW, THEY ALSO REPRESENT, UNDER

16   FEDERAL RULES OF EVIDENCE 106, A SUMMARY OF VOLUMINOUS RECORDS.

17   THE MEDICAL RECORDS ARE IN EVIDENCE, AND THESE ARE MERELY A

18   SUMMARY OF THOSE MEDICAL RECORDS.

19             **THE COURT:**  OKAY.  WELL, HERE'S THE ISSUE AS I

20   UNDERSTAND IT.  IT WAS A YEAR AGO, OCTOBER OF 2017, THAT THE

21   COURT DENIED THE MOTION TO EXCLUDE THE EXPERT SUPPLEMENTAL

22   CHART REVIEW.  THAT'S AT RECORD DOCUMENT 353.  THEN THE

23   PRETRIAL ORDER GETS FILED AFTER THAT, AND THE PRETRIAL ORDER --

24             **MS. MONTAGNES:**  NO.

25             **THE COURT:**  BEG YOUR PARDON?

**MS. MONTAGNES:** IT WAS ACTUALLY FILED BEFORE THAT. BECAUSE OF JUDGE JACKSON RECUSING HIMSELF, IT WAS FILED -- AND THAT'S JUST THE ORDER OF THINGS WERE A BIT MESSED UP IN THIS CASE. IT WAS FILED SEVEN MONTHS PRIOR TO THAT. THIS FIRST AMENDED -- FIRST AMENDED PRETRIAL ORDER WAS FILED SEVEN MONTHS PRIOR TO THE CLASS CERT.

**THE COURT:** YEAH, THE COURT STANDS CORRECTED. SO MAY -- RECORD DOCUMENT 267, MAY 12, 2017, IS THE AMENDED, FIRST AMENDED JOINT PRETRIAL ORDER. IN THAT, APPARENTLY THE SUPPLEMENTAL CHART REVIEW IS NOT INDICATED. THEN IN OCTOBER, THE DEFENDANTS FILE A MOTION IN LIMINE TO EXCLUDE THE SUPPLEMENTAL CHART REVIEW AND TESTIMONY REGARDING THE SUPPLEMENTAL CHART REVIEW. THE COURT DENIED THAT MOTION, GAVE THE DEFENDANTS LEAVE TO TAKE THE DEPOSITION. YOU DIDN'T TAKE THE DEPOSITION. SO WHERE IS THE SURPRISE?

**MR. ROBERT:** WELL, YOUR HONOR, THE PROBLEM IS WE SUBMITTED EXHIBITS. WE WERE REQUIRED WITHIN THE TIME PERIOD TO SUBMIT EXHIBITS TO THE COURT. WE PROVIDED OUR EXHIBITS; THEY PROVIDED THEIR EXHIBITS. THEY DIDN'T PROVIDE THAT AS AN EXHIBIT TO THE COURT.

**MS. MONTAGNES:** YOUR HONOR, THAT'S ABSOLUTELY TRUE AND IT WAS A HUNDRED PERCENT OUR MISTAKE. MY POSITION IS WE BELIEVE WE SHOULD BE ABLE TO MOVE THESE INTO EVIDENCE BECAUSE THEY ARE SUMMARIES OF THE MEDICAL RECORDS THAT EXIST IN EVIDENCE. HOWEVER, AT THE VERY LEAST, NURSE PRACTITIONER --

02:19  1    **THE COURT:**  THE MEDICAL RECORDS ARE ALREADY IN

2    EVIDENCE?

3         **MS. MONTAGNES:**  YES.

4         **THE COURT:**  THE ONES THAT ARE THE SUPPLEMENTAL CHART

5    REVIEW?

6         **MS. MONTAGNES:**  YES.

7         **THE COURT:**  THEN I'M GOING TO OVERRULE THE OBJECTION.

8         **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

9         **THE COURT:**  PROCEED.

10        **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

11   **BY MS. MONTAGNES:**

12   **Q.**   SO THIS PROCESS THAT YOU DESCRIBED, MS. LAMARRE, IS THAT

13   WHAT'S KNOWN AS "TARGETED SAMPLING"?

14   **A.**   THE RECORD SELECTION?

15   **Q.**   YES.

16   **A.**   YES, IT IS.

17   **Q.**   OVERALL, CAN YOU ESTIMATE HOW MANY PATIENT ENCOUNTERS YOU

18   REVIEWED?

19   **A.**   IT'S HARD TO ESTIMATE, BUT I WOULD SAY THAT WITHIN EACH

20   INDIVIDUAL RECORD, I COULD HAVE REVIEWED, YOU KNOW, MORE THAN A

21   HUNDRED DIFFERENT ENCOUNTERS OF DIFFERENT TYPES.  IF YOU

22   INCLUDE REVIEWING MEDICATION RECORDS, WHICH SORT OF EXPANDS

23   THAT NUMBER EXPONENTIALLY, I MEAN, PROBABLY MORE THAN A

24   THOUSAND DIFFERENT ENCOUNTERS OF DIFFERENT KINDS.

25   **Q.**   AND WHEN YOU WERE REVIEWING THESE RECORDS, WHAT

CONSIDERATIONS WERE INVOLVED IN REVIEWING MORTALITY
HOSPITALIZATIONS IN CHRONIC CARE RECORDS?

**A.** WELL, GENERALLY SPEAKING, I'M REVIEWING THE RECORDS TO
SEE -- TO REVIEW THE CHRONOLOGY OF CARE AND WERE PATIENTS
TIMELY SEEN. IF PROVIDERS ORDERED MEDICATIONS, WERE THEY
TIMELY ADMINISTERED. IF LABS WERE ORDERED, WERE THEY TIMELY
OBTAINED AND WERE THEY TIMELY REVIEWED. I'M LOOKING IN THE
RECORD TO SEE HOW THE HEALTHCARE SYSTEMS WORK AND WHEN PATIENTS
ARE SEEN BY MEDICAL PROVIDERS, YOU KNOW, ARE THEY ACTUALLY
MEDICALLY EVALUATED, PERIOD, ARE THEY SEEN AND TIMELY SEEN.
AND IF THERE'S NEED FOR FOLLOW-UP, ARE THEY TIMELY FOLLOWED UP.
SO I LOOKED TO SEE WHETHER CARE IS TIMELY ACCESSIBLE,
APPROPRIATE, AND FOLLOWED UP ON AS CLINICALLY INDICATED.

**Q.** AND CAN YOU DESCRIBE THE MOST STRIKING ASPECTS OF YOUR
FINDINGS?

**A.** YES. SO WHAT WAS REALLY, REALLY STRIKING ABOUT LSP IS
THE, YOU KNOW, THE LACK OF AN ADEQUATE COMPREHENSIVE HEALTHCARE
PROGRAM THAT ENSURED THAT PATIENTS GOT TIMELY CARE FOR THEIR
SERIOUS MEDICAL PROBLEMS. I WAS STRUCK BY JUST THE SHEER
NUMBER OF ENCOUNTERS WHERE PATIENTS PRESENTED WITH SIGNS AND
SYMPTOMS OF SERIOUS MEDICAL CONDITIONS AND WERE NOT SEEN BY A
PHYSICIAN. I WAS STRUCK BY THE NUMBER OF ENCOUNTERS IN WHICH
PATIENTS PRESENTED WITH LIFE-THREATENING VITAL SIGNS IN WHICH
THEY WERE NOT EVALUATED BY A PHYSICIAN AND THEY WERE NOT SENT
TO A HOSPITAL.

1   I WAS STRUCK BY THE FACT THAT EMTS, WHO ARE VERY GOOD AT
2   EMERGENCY RESPONSE, ARE BASICALLY THE GATE-KEEPERS FOR CARE.
3   THEY NOT ONLY RESPOND TO EMERGENCIES, BUT THEY DO ROUTINE SICK
4   CALL.  IN THE ATU, THEY'RE MAKING DECISIONS ABOUT WHETHER TO
5   CONTACT THE DOCTOR OR NOT, AND SO THERE WAS THIS GATEKEEPER
6   SYSTEM BY THE EMTS THAT WAS HIGHLY INAPPROPRIATE IN TERMS OF
7   THEIR SCOPE OF PRACTICE.

8           I WAS STRUCK BY A MEDICATION SYSTEM THAT DID NOT
9   ENSURE THAT PATIENTS TIMELY RECEIVED THEIR MEDICATIONS.  AND
10  THE MEDICATION ADMINISTRATION RECORDS ARE, I THINK, HIGHLY
11  INACCURATE.  THEY'RE UNRELIABLE.  YOU REALLY CAN'T TELL WHETHER
12  PATIENTS ARE GETTING THEIR MEDICATIONS OR NOT.

13          I WAS STRUCK BY THE LACK OF ADEQUATE STAFFING SUCH
14  THAT THEY'RE USING CORRECTIONAL OFFICERS TO ADMINISTER
15  MEDICATIONS.  THEY ARE USING INMATES IN THE INFIRMARY TO
16  DELIVER HANDS-ON CARE WHICH IS NOT APPROPRIATE, AND IT'S A SIGN
17  THAT THEY HAVE INADEQUATE HEALTHCARE STAFFING.

18          AND IT WAS ALSO HARD TO MISS WHAT I PERCEIVE TO BE A
19  PUNITIVE ATTITUDE TOWARDS INMATES, YOU KNOW, PUNISHING THEM FOR
20  SEEKING HEALTHCARE.  YOU KNOW, IF THEY PUT IN A HEALTH REQUEST
21  SAYING THEY HAVE AN EMERGENCY AND AN EMT DECIDES IT'S NOT AN
22  EMERGENCY, THAT THEY CAN BE CHARGED WITH A DISCIPLINARY FOR
23  MALINGERING, AND THAT'S REALLY NOT APPROPRIATE FOR ANY
24  HEALTHCARE PROFESSIONAL TO BE DOING.
25  Q.   AND YOU MENTIONED THAT THE MAIN TIME PERIOD THAT YOU

REVIEWED WAS THE END OF 2012 UP UNTIL, INCLUDING 2016.  WOULD

YOU SAY THAT THERE WAS DRAMATIC CHANGES IN CARE OVER THAT TIME

THAT YOU OBSERVED?

**A.**   NO.

**Q.**   DID YOU NOTICE ANY IMPROVEMENT IN THE CARE BETWEEN 2013

AND 2016?

**A.**   NO.

**Q.**   DO YOU FEEL CONFIDENT THAT THE OPINION THAT YOU ARE GIVING

ACCURATELY REFLECTS WHAT EXISTED AT LSP BETWEEN 2013 AND

SEPTEMBER 30TH, 2016?

**A.**   I DO.

          **MS. MONTAGNES:**  SO JUST PRIOR TO US DOING THIS, YOUR

HONOR, I JUST REALIZED THAT I NEGLECTED TO PROVIDE THE COURT

WITH THE NEW EXHIBITS AND A NUMBER, AND SO I WANTED TO JUST

BACK UP FOR ONE SECOND.  WHAT I HAVE HERE IS A NEW CHART

PATIENT IDENTIFIER THAT I'D LIKE TO GIVE TO THE COURT AND TO

THE PARTIES AND MARK THIS AS A SEALED EXHIBIT PLAINTIFFS' 409,

AND THEN I WILL SHORTLY PROVIDE THE COURT WITH COPIES OF THE

SUPPLEMENTAL CHART REVIEWS AND THOSE WILL BE PLAINTIFFS'

EXHIBIT 410.

          **THE COURT:**  AND HAVE YOU PROVIDED THOSE TO OPPOSING

COUNSEL?

          **MS. MONTAGNES:**  THEY HAVE THE SUPPLEMENTAL CHART

REVIEWS, YES, YOUR HONOR.

          **MR. ARCHEY:**  YOUR HONOR, WE MAINTAIN OUR OBJECTION.

1   I KNOW YOU'VE RULED ON 410, I GUESS YOU'VE ALREADY RULED 409 IS

2   RELATED TO THAT, BUT WE JUST OBJECT AND MAINTAIN OUR OBJECTION

3   RECOGNIZING YOUR COURT'S RULING.

4           **THE COURT:**  YOUR OBJECTION IS NOTED.  409 AND 410 ARE

5   ADMITTED.

6           **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.  MAY I

7   APPROACH TO GIVE TO THE --

8           **THE COURT:**  YOU MAY.

9           **MS. MONTAGNES:**  MARTHA, COULD YOU PULL UP THE FIRST

10  SLIDE.

11  **BY MS. MONTAGNES:**

12  **Q.**   MS. LAMARRE, YOU MENTIONED THAT YOU WERE EVALUATING

13  WHETHER OR NOT LSP HAD AN ADEQUATE HEALTHCARE SYSTEM.  WHAT ARE

14  THE COMPONENTS OF AN ADEQUATE HEALTHCARE SYSTEM?

15  **A.**   THERE ARE THOSE THAT YOU SEE LISTED HERE.  THERE ARE A

16  NUMBER OF COMPONENTS, ORGANIZATIONAL STRUCTURE, HEALTHCARE

17  LEADERSHIP, HUMAN RESOURCES, I.E. STAFFING AND BUDGET,

18  HEALTHCARE OPERATIONS, YOU KNOW, BASIC CLINIC FUNCTIONS,

19  POLICIES AND PROCEDURES, ACCESS TO CARE, CHRONIC DISEASE

20  MANAGEMENT, PHARMACY AND MEDICATION ADMINISTRATION.  I DON'T

21  KNOW IF I NEED TO READ ALL THESE FOR THE COURT, BUT THERE ARE A

22  NUMBER OF COMPONENTS THAT, YOU KNOW, ARE REQUIRED TO HAVE AN

23  ADEQUATE HEALTHCARE SYSTEM AND NEED TO FUNCTION TOGETHER.

24  **Q.**   AND WHAT WERE THE PRIMARY FOCUSES OF YOUR REVIEW?

25  **A.**   THE HIGHLIGHTED AREAS, CLINIC SPACE AND SANITATION,

POLICIES AND PROCEDURES, ACCESS TO CARE, CHRONIC DISEASE
MANAGEMENT, PHARMACY AND MEDICATION ADMINISTRATION, AND HEALTH
INFORMATION MANAGEMENT.

**Q.**   ALL RIGHT.  SO LET'S TALK WITH THE -- TALK FIRST ABOUT THE
PHYSICAL SPACE.  HOW WOULD YOU DESCRIBE THE PHYSICAL SPACE YOU
ENCOUNTERED?

**A.**   SO I NOTE MY COLLEAGUES TESTIFIED ON SOME ASPECTS OF THE
CLINIC SPACE SO I'LL TRY TO BE FOCUSED ABOUT THIS.  THE AREAS
THAT I REALLY FOCUSED ON WAS THE CLINICAL EXAMINATION ROOMS
THAT WERE AVAILABLE FOR MEDICAL PROVIDERS, NURSES, EMTS, AND
OTHER STAFF TO USE.  AND WHAT I FOUND IS THAT, YOU KNOW,
ESSENTIALLY THERE ARE AN INSUFFICIENT NUMBER OF ADEQUATELY
EQUIPPED AND SUPPLIED MEDICAL EXAMINATION ROOMS IN THE
FACILITY, AND I WAS PARTICULARLY STRUCK BY THE FACT THAT IN THE
HOUSING UNITS WHERE THE EMTS CONDUCT SICK CALL, THERE ARE NO
EXAMINATION ROOMS.  THERE ARE NO EXAMINATION ROOMS IN THE OUT
CAMPS AND, THEREFORE, EMTS CONDUCT SICK CALL BY JUST WALKING
DOWN THE CELLBLOCK WITH THEIR STETHOSCOPE OVER THEIR SHOULDERS
OR THEY GO INTO THE MEDICAL DORMS WITH A SMALL BAG AND THEY
EXAMINE OR ASSESS INMATES IN THE DORMITORY WHERE OTHER INMATES
CAN HEAR.  THERE'S NO PRIVACY.  THERE'S NO MEDICAL EQUIPMENT.
THERE'S NO EXAM TABLE.  THEY DON'T HAVE THE MEDICAL RECORD WITH
THEM TO SEE IF A PATIENT'S COMPLAINING OF ABDOMINAL PAIN TODAY,
HAVE THEY -- IS THIS THE FIRST TIME OR HAVE THEY COMPLAINED SIX
TIMES.  SO THE LACK OF -- AND THERE'S NO ACCESS TO HAND

WASHING.  THE LACK OF SUFFICIENT NUMBER OF EXAMINATION ROOMS IS

A MAJOR PROBLEM AT LSP.

THIS PICTURE HERE THAT WE SEE IS IN THE MAIN CLINIC,

AND IT SHOWS THE CLUTTER THAT EXISTED IN SOME OF THE ROOMS.  AS

YOU CAN SEE, THE MEDICAL RECORDS ARE VERY, VERY LARGE BECAUSE

PATIENTS HAVE HAD SUCH LONG LENGTHS OF STAY AND THEY'RE PILED

UP ON THE EXAM TABLE.  AND MY EXPERIENCE IS THAT WHEN YOU SEE

MEDICAL RECORDS PILED UP ON AN EXAM TABLE, IT SUGGESTS THAT THE

EXAM TABLE IS NOT USED TO LAY PATIENTS DOWN TO DO ABDOMINAL

EXAMS, ET CETERA.  SO THE CLINIC SPACE WAS BASICALLY CLUTTERED,

DISORGANIZED, NOT CLEAN.  THESE EXAM ROOMS DIDN'T HAVE

OTOSCOPES AND OPHTHALMOSCOPES FOR THE DOCTORS TO USE, THEY

SHARED THEM.

I MEAN, IF YOU CAN IMAGINE YOU'RE IN THE COMMUNITY,

YOU GO TO YOUR DOCTOR'S OFFICE AND HE WANTS TO EXAMINE YOUR

EARS, BUT SAYS I'VE GOT TO GO DOWN THE HALL AND BORROW IT FROM

MY OTHER COLLEAGUE WHO IS USING IT NOW, I MEAN, IT JUST DOESN'T

WORK.  SO BASICALLY THAT'S ONE OF THE MAIN IMPRESSIONS.

**Q.**   DID YOU HAVE AN OPPORTUNITY TO LOOK IN THE PHARMACY AT

ALL?

**A.**   I DID.  I TOURED OTHER ANCILLARY PARTS OF THE INSTITUTION.

THE PHARMACY IS, IN MY OPINION, INSUFFICIENT FOR ITS SIZE.  AND

THE REASON THAT I SAY THAT IS THAT ALL THE COUNTERS WERE

COMPLETELY FILLED WITH ITEMS AND MEDICATIONS, ET CETERA, TO THE

EXTENT THAT IT REALLY WASN'T POSSIBLE TO CLEAN SURFACES IN THE

AREA BECAUSE THERE WAS SO MUCH PILED ON TOP OF THE COUNTERS.
AND THE FLOORS WERE DIRTY BECAUSE INMATE ORDERLIES WHO DO
SANITATION WERE NOT ALLOWED IN THE PHARMACY, WHICH IS
UNDERSTANDABLE, BUT IF YOU'RE NOT GOING TO ALLOW INMATES IN TO
CLEAN IN THE PHARMACY, THEN SOME OTHER MECHANISM FOR PROVIDING
SANITATION NEEDS TO BE PERFORMED.

**Q.**   AND DID YOU HAVE AN OPPORTUNITY TO VISIT THE INFIRMARY?

**A.**   I DID.

**Q.**   AND DID YOU DRAW ANY CONCLUSIONS ABOUT THAT PHYSICAL
SPACE?

**A.**   I FORMED SOME LIMITED IMPRESSIONS BECAUSE DR. PUISIS
MOSTLY LOOKED AT THAT AREA, BUT WHAT I DID NOTICE IS THE BEDS
SEEMED TO BE RELATIVELY CLOSE TOGETHER, WHICH DIDN'T ALLOW FOR
PATIENT PRIVACY, AND THERE WERE SEVERAL ROOMS THAT WERE NOT IN
THE MAIN AREA, THEY WERE OFF TO THE SIDE, THAT WERE ISOLATION
ROOMS FOR PATIENTS THAT WERE BEING DISCIPLINED IN WHICH THEY
WOULD BE LOCKED IN THE ROOM, BUT THERE'S NO CALL SYSTEM.  SO IF
THE PATIENT WAS IN DISTRESS, THEY HAD NO WAY TO NOTIFY
HEALTHCARE STAFF THAT THEY WERE IN DISTRESS.  AND IT WAS
PARTICULARLY CONCERNING BECAUSE THERE WAS A QUADRIPLEGIC
PATIENT WHO HAD A TRACH TUBE THAT SOMETIMES BECAME BLOCKED SO
HE COULDN'T BREATHE, THAT WAS LOCKED IN THAT ROOM, AND YOU CAN
IMAGINE A QUADRIPLEGIC HAVING NO WAY TO EVEN PUSH A BUTTON
BEING LOCKED IN A ROOM, HE COULD EASILY GO INTO RESPIRATORY
DISTRESS AND HAVE A VERY BAD OUTCOME.

**Q.** AND DID YOU OBSERVE NURSES DELIVERING HEALTHCARE IN THE INFIRMARY?

**A.** I DID NOT.

**Q.** DID YOU HAVE AN OCCASION TO VISIT THE MEDICAL DORMS?

**A.** I DID.

**Q.** AND DID YOU MAKE ANY OBSERVATIONS THERE?

**A.** I DID. THE MEDICAL DORMS IS -- AT LEAST ONE MEDICAL DORM IS WHERE WE OBSERVED SICK CALL BEING PERFORMED IN A PERIOD OF ABOUT THREE MINUTES, ACTUALLY BY THE TIME -- WE WENT THERE PURPOSEFULLY TO WATCH SICK CALL BE PERFORMED AND WHILE WE WERE WAITING, THE PEOPLE THAT WE WERE WITH CAME AND SAID IT'S OVER. AND WE SAID WHAT DO YOU MEAN IT'S OVER? THEY SAID IT'S ALREADY BEEN DONE. SO WHILE WE WERE WAITING, WE DIDN'T REALIZE THAT THE MEDIC WAS WALKING UP AND DOWN THE TIERS, ET CETERA, SO IT WAS INFORMING, ONCE AGAIN, ABOUT HOW SICK CALL IS CONDUCTED IN THE HOUSING UNITS.

AND WE OBSERVED SICK CALL, BUT I CAN TALK ABOUT THAT LATER. I'M SORRY, WE OBSERVED MEDICATION ADMINISTRATION, I CAN TALK ABOUT THAT LATER.

**Q.** SO TURNING NOW TO POLICIES AND PROCEDURES. CAN YOU DESCRIBE THE VARIOUS KINDS OF POLICIES AND PROCEDURES THAT YOU REVIEWED AT ANGOLA?

**A.** YES. SO THERE IS AN LSP POLICY AND PROCEDURE MANUAL. I REVIEWED THE SELECTED POLICIES. I DIDN'T REVIEW ALL THE POLICIES. IT WAS LAST REVIEWED -- THERE WERE SOME VARYING

PERIODS OF TIME THAT INDIVIDUAL POLICIES WERE REVIEWED, BUT MOST OF THE POLICIES WERE REVIEWED IN 2010, 2011, WHICH IS NOT REALLY IN COMPLIANCE WITH ACA STANDARDS, THE AMERICAN CORRECTIONAL ASSOCIATION STANDARDS, OR THE NATIONAL COMMISSION ON CORRECTIONAL HEALTH STANDARDS, TO REVIEW POLICIES ANNUALLY AND UPDATE THEM AS NEEDED.  AND SO THE POLICIES WERE ALSO NOT SITE-SPECIFIC TO ANGOLA, MEANING DESCRIBING HEALTHCARE OPERATIONS, LIKE WHAT TIME DOES SICK CALL START HERE, HOW -- YOU KNOW, WHAT -- WHO'S RESPONSIBLE FOR WHO, WHAT, WHEN, WHERE THINGS WERE SUPPOSED TO HAPPEN.  THEY WERE JUST KIND OF GENERIC LIKE SOMETHING WILL HAPPEN, BUT IT DOESN'T SAY REALLY WHO IS RESPONSIBLE.  SO THEY'RE NOT SITE-SPECIFIC.

**Q.**    AND DID YOU OBSERVE ANYTHING IN THE CLINICAL CARE THAT WAS REFLECTED IN THESE POLICIES?

**A.**    SO WHAT I OBSERVED IS THAT THE ACTUAL PRACTICES WERE NOT NECESSARILY CONSISTENT WITH THE POLICIES.  SO, FOR EXAMPLE, THE ACCESS TO CARE POLICY IN THE MANUAL SAID THAT INMATES WOULD HAVE THE OPPORTUNITY TO ACCESS -- TO SUBMIT HEALTH REQUESTS SEVEN DAYS A WEEK FOR ROUTINE AND URGENT CARE, BUT IN PRACTICE, LSP WAS ONLY CONDUCTING ROUTINE SICK CALL FIVE DAYS A WEEK, SUNDAY THROUGH THURSDAY.

        ANOTHER ASPECT OF THE POLICIES THAT WASN'T IN COMPLIANCE WITH THEIR OWN POLICIES IS THAT PATIENTS IN THE INFIRMARY WOULD BE WITHIN SIGHT OR SOUND OF STAFF AT ALL TIMES, AND AS I DESCRIBED, THOSE LOCKED ROOMS WHERE THE PATIENTS

1    DIDN'T HAVE THE ABILITY TO NOTIFY ANYONE IF THEY WERE IN

2    DISTRESS, THEY'RE NOT WITHIN SIGHT OR SOUND.

3    **Q.**    AND DID YOU OBSERVE ANYTHING ABOUT THE PHARMACY POLICY

4    RELATED TO ACCESS TO -- RELATED TO YOUR CHART REVIEWS?

5    **A.**    WELL, WITH RESPECT TO PHARMACY PRACTICES AND MEDICATION

6    ADMINISTRATION, THE POLICY SAYS THAT MEDICATIONS WILL BE

7    ADMINISTERED BY TRAINED STAFF, AND THERE IS A -- THE PHARMACY

8    OR THE PHARMACISTS HAS DEVELOPED A TRAINING PROGRAM FOR

9    CORRECTIONAL OFFICERS, BUT THE SIGN-IN SHEETS THAT I SAW, THE

10   TRAINING SHEETS, SHOW THAT NOT ALL THE OFFICERS HAD BEEN

11   TRAINED, SO I CONCLUDED THAT IT MAY BE THAT NOT ALL THE

12   OFFICERS HAVE BEEN TRAINED TO GIVE MEDICATIONS.

13   **Q.**    AND DID YOU REVIEW ANY GUIDELINES?

14   **A.**    I DID.

15   **Q.**    AND WHAT WERE THOSE?

16   **A.**    I REVIEWED THE DEPARTMENT'S CHRONIC DISEASE GUIDELINES;

17   THE MOST COMMON IS HIV, HYPERTENSION, DIABETES, ET CETERA.

18   **Q.**    AND WHY ARE THOSE IMPORTANT?

19   **A.**    CHRONIC DISEASE GUIDELINES ARE IMPORTANT IN A CORRECTIONAL

20   AGENCY TO GIVE GUIDANCE TO CLINICIANS ABOUT WHAT STANDARD THE

21   DEPARTMENT EXPECTS THEM TO MEET IN TERMS OF DELIVERING CHRONIC

22   DISEASE CARE TO PATIENTS AT THE FACILITY, AND THEY SHOULD BE

23   BASED ON -- THEY SHOULD BE EVIDENCE-BASED AND BASED ON NATIONAL

24   GUIDELINES THAT ARE BEING UPDATED ALL THE TIME TO BASICALLY

25   GIVE GUIDANCE ABOUT WHO SHOULD BE ENROLLED IN THE CLINIC,

WHAT'S THE BASELINE EVALUATION FOR EACH PATIENT, HOW OFTEN

SHOULD PATIENTS BE SEEN, HOW OFTEN SHOULD THEY BE SEEN IF

THEY'RE WELL-CONTROLLED, AND HOW OFTEN SHOULD THEY BE SEEN IF

THEY ARE POORLY CONTROLLED.  AND THE GUIDELINES THAT I REVIEWED

WERE VERY SKELETAL.  THEY JUST DIDN'T REALLY INCLUDE -- THEY

INCLUDED, YOU KNOW, HYPERTENSION AND YOU DO THESE LABS, AND SEE

AS CLINICALLY INDICATED, AND IT JUST WASN'T REALLY ADEQUATE TO

ENSURE THAT CLINICIANS KNEW WHAT THEY SHOULD BE DOING.

**Q.**   AND WHAT, IF ANY, IMPACT DID YOU NOTE IN YOUR CHART

REVIEWS RELATED TO THESE SPARSE GUIDELINES?

**A.**   WHAT I NOTICED WHEN THERE WERE CHRONIC DISEASE VISITS IS

THAT MEDICAL PROVIDERS OFTEN DIDN'T TAKE THE HISTORY OF THE

COMPLAINT, PERFORM WHAT WE CALL A REVIEW OF SYSTEMS SO THAT IF

YOU HAVE HYPERTENSION, I AS A NURSE PRACTITIONER CAN ASK YOU IF

YOU'RE HAVING ANY SYMPTOMS OF TARGET ORGAN DAMAGE LIKE DO YOU

HAVE CHEST PAIN, DO YOU HAVE SHORTNESS OF BREATH, DO YOU HAVE A

HEADACHE, THAT MIGHT BE RELATED TO A HEART ATTACK OR STROKE IF

YOUR BLOOD PRESSURE IS REALLY HIGH.

THERE WAS VERY, VERY LITTLE DOCUMENTATION OF THE

STEPS OF CLINICAL EVALUATION WHERE YOU ASK THE PATIENT HOW

THEY'RE DOING, WHAT SYMPTOMS THEY'RE HAVING, THE PHYSICAL EXAM

MIGHT BE EXTREMELY LIMITED.  THERE MAY NOT BE REFERENCE TO LABS

THAT ARE PERTINENT TO THAT PATIENT'S CHRONIC DISEASE.  THERE

WERE NO REALLY -- THERE WERE VERY FEW, I WON'T SAY THERE WERE

NO, BUT THERE WERE VERY FEW ASSESSMENTS OF DISEASE CONTROL.

SOMETIMES THERE WOULD JUST BE HYPERTENSION INSTEAD OF HYPERTENSION WELL CONTROLLED OR HYPERTENSION POORLY CONTROLLED. AND THEN THE PLAN SHOULD REFLECT THE PROVIDER'S ASSESSMENT OF HOW WELL CONTROLLED THE PATIENT IS AND THE NEXT STEPS.

THE OTHER THING I'LL MENTION THAT IS GOING TO BE A THEME, WAS A THEME THROUGHOUT MY RECORDS IS THAT THERE WERE PATIENTS THAT WERE NOT TAKING THEIR CHRONIC DISEASE MEDICATIONS AND -- OR AT LEAST IT WAS DOCUMENTED THAT THEY WERE NONCOMPLIANT. IT'S IMPORTANT FOR US AS CLINICIANS TO UNDERSTAND IF PATIENTS AREN'T TAKING THEIR MEDICATIONS, WHY AREN'T YOU TAKING YOUR MEDICATIONS. IS IT BECAUSE A MEDICATION -- YOU WENT TO PILL CALL AND THE MEDICATIONS WEREN'T THERE, OR YOU'RE TAKING THE MEDICATIONS AND THEY MAKE YOU SICK AND YOU DON'T WANT TO TAKE IT ANYMORE? OR THE PATIENT DOESN'T UNDERSTAND WHY IT'S IMPORTANT THAT I'M TAKING THIS MEDICATION. IT'S REALLY IMPORTANT FOR PROVIDERS TO ASSESS MEDICATION COMPLIANCE AND IF THERE ARE PROBLEMS WITH IT, TO EXPLORE IT WITH THE PATIENT, DOCUMENT IT, AND THEN MAKE A PLAN, BECAUSE IT MIGHT BE THAT A CHANGE OF MEDICATION MIGHT BE THE APPROPRIATE STRATEGY, OR YOU CERTAINLY DON'T WANT TO ADD A MEDICATION TO A REGIMEN IF THE PATIENT IS NOT TAKING THE MEDICATION. BUT IF THEY'RE TAKING THE MEDICATION AND THEY'RE STILL NOT WELL CONTROLLED, THEN YOU MIGHT WANT TO ADD A NEW MEDICATION. SO THE LACK OF DISCUSSION OF -- THE DOCUMENTED DISCUSSION OF THE PROVIDER WITH THE PATIENT WAS A MAJOR, MAJOR CONCERN IN THE

1  CHRONIC DISEASE RECORDS.

2  **Q.**    AND DID YOU REVIEW ANY TRAINING MATERIALS?

3  **A.**    I DID.

4  **Q.**    AND WHAT WERE THOSE TRAINING MATERIALS?

5  **A.**    I REVIEWED MEDICATION ADMINISTRATION TRAINING FOR

6  CORRECTIONAL OFFICERS, AND I REVIEWED HEALTHCARE ORDERLY

7  TRAINING FOR INMATES.

8  **Q.**    AND WHAT, IF ANY, CONCLUSIONS WERE YOU ABLE TO DRAW ABOUT

9  THE ORDERLY TRAINING?

10  **A.**    WELL, MY IMPRESSION WAS THAT THE -- THAT TRAINING WAS VERY

11  THOROUGH IN MANY RESPECTS, BUT ESSENTIALLY IT WAS TRAINING

12  INMATES TO PROVIDE NURSING CARE, AND INMATES -- YOU KNOW, BY

13  NATIONAL COMMISSION STANDARDS, INMATES CAN PROVIDE ASSISTANCE

14  WITH ACTIVITIES OF DAILY LIVING EXCEPT IN INFIRMARIES.  SO YOU

15  COULD HAVE AN INMATE HEALTHCARE ORDERLY IN THE MEDICAL DORM

16  HELPING INMATES, YOU KNOW, WITH FEEDING AND IF THEY NEED

17  ASSISTANCE GETTING TO THE BATHROOM AND SHOWERING, THAT WOULD

18  MEET NATIONAL COMMISSION STANDARDS.  BUT WHEN YOU'VE GOT

19  HEALTHCARE ORDERLIES IN THE INFIRMARY TURNING PATIENTS AND

20  DOING CATHETER CARE, THAT IS REALLY -- THAT'S PROVIDING NURSING

21  CARE AND INMATES SHOULD NOT BE INVOLVED IN THAT.

22  **Q.**    AND WHAT, IF ANY, CONCLUSIONS WERE YOU ABLE TO DRAW ABOUT

23  THE PILL CALL TRAINING?

24  **A.**    SO AS I SAID, THE MEDICATION ADMINISTRATION WAS VERY

25  THOROUGH.  THE PROBLEM IS THAT THE TRAINING SAID THAT OFFICERS

SHOULD BE FAMILIAR WITH THE MEDICATIONS, THEIR DOSAGES AND SIDE EFFECTS. AND CORRECTIONAL OFFICERS SIMPLY DO NOT HAVE THE TRAINING TO KNOW MEDICATIONS AND WHAT THEY ARE FOR AND WHAT THEIR SIDE EFFECTS ARE, AND THEY DON'T HAVE THE CAPACITY TO RECOGNIZE IF THE PHARMACY HAS FILLED A PRESCRIPTION THAT SHOULDN'T BE FILLED. LIKE IF THE PATIENT IS ALLERGIC TO PENICILLIN AND THE PHARMACY SENDS AMOXICILLIN WHICH IS A FORM OF PENICILLIN, ARE OFFICERS GOING TO KNOW THAT? NOT NECESSARILY. SO IT CREATES A RISK OF HARM TO PATIENTS BECAUSE OFFICERS ARE PERFORMING A FUNCTION THAT THEY ARE NOT ADEQUATELY -- THAT THEY DO NOT HAVE ADEQUATE KNOWLEDGE FOR.

THE OTHER THING THAT I NOTICED ABOUT THE TRAINING IS THAT IT CORRECTLY SAYS THAT WHEN AN OFFICER GIVES A MEDICATION TO A PATIENT, THAT THEY SHOULD HAVE THE MEDICATION ADMINISTRATION RECORD WITH THEM TO SEE WHAT MEDICINE THE PATIENT IS DUE SO THAT THE OFFICER CAN GO TO THE CONTAINER THAT HAS THE MEDICINE, PULL IT OUT, COMPARE THE MAR WITH THE BLISTER PACK TO SEE DO THEY MATCH, AND ARE ALL THE MEDICINES THERE THAT THE MAR SAYS SHOULD BE THERE, AND ARE THERE ANY MEDICINES THAT WERE DISCONTINUED ON THE MAR THAT ARE THERE THAT SHOULDN'T BE GIVEN. AND WHAT I OBSERVED IS THAT ACTUALLY NEITHER THE NURSES NOR THE OFFICERS HAD THE MAR PRESENT WHEN THEY GAVE THE MEDICATION WHICH IS A MAJOR RISK TO PATIENTS.

**Q.** AND WHAT, IF ANY, CONCLUSIONS WERE YOU ABLE TO DRAW ABOUT THE OVERALL WRITTEN POLICIES, PROCEDURES, PROTOCOLS, AND

GUIDELINES OR TRAININGS THAT YOU REVIEWED?

A.   WELL, IN A GENERAL SENSE, THAT THEY'RE INADEQUATE TO PROVIDE GUIDANCE TO STAFF ON HOW TO -- HOW OPERATIONS SHOULD BE PERFORMED.  THEY WERE JUST INADEQUATE WITH RESPECT TO ESTABLISHING AN ADEQUATE HEALTHCARE SYSTEM.

Q.   TURNING NOW TO MEDICATION ADMINISTRATION.  WHAT DID YOU EVALUATE -- WHAT DID YOU REVIEW IN ORDER TO FORM AN OPINION ABOUT THE ADMINISTRATION OF MEDICATION?

A.   I REVIEWED THEIR POLICIES AND PROCEDURES.  I INTERVIEWED THE PHARMACISTS.  I OBSERVED CORRECTIONAL OFFICERS AND NURSES ADMINISTERING MEDICATIONS, AND I REVIEWED MEDICATION ADMINISTRATION RECORDS.

Q.   SO CAN YOU TALK GENERALLY ABOUT THE ROLE OF MEDICATION ADMINISTRATION RELATIVE TO THE DELIVERY OF HEALTHCARE IN A CORRECTIONAL SETTING?

A.   IT SEEMS OBVIOUS, BUT ADMINISTERING MEDICATIONS -- YOU KNOW, MEDICATION TREATMENT IS ONE OF THE PRIMARY STRATEGIES THAT CLINICIANS HAVE TO TREAT PATIENTS WITH SERIOUS MEDICAL CONDITIONS.  AND INMATES AS A WHOLE, BROADLY SPEAKING, ARE A PRETTY UNHEALTHY POPULATION.  SO YOU WOULD EXPECT THERE TO BE A HIGH FREQUENCY OF ADMINISTERING DANGEROUS DRUGS TO PATIENTS IN A CORRECTIONAL SETTING.

     THE SECOND THING IS THAT IT'S A VERY HIGH-RISK AREA. HOSPITALS AND OTHER HEALTHCARE ORGANIZATIONS FOCUS ON THE PREVENTION OF MEDICATION ERRORS IN HEALTHCARE SETTINGS BECAUSE

THEY CAN CAUSE HARM, AND WHILE MANY MEDICATION ERRORS WON'T
RESULT IN HARM OR DEATH, SOME WILL.  SO IT'S VERY IMPORTANT TO
MINIMIZE THE RISK OF MEDICATION ERRORS.

THE SHEER VOLUME OF MEDICATIONS THAT ARE GIVEN ON A
DAILY BASIS AT ANY CORRECTIONAL FACILITY, BUT LSP IN PARTICULAR
BECAUSE THEY HAVE A POPULATION OF 6,000 INMATES, MEANS THAT
THERE'S THIS EXTRAORDINARILY HIGH VOLUME AND EXTRAORDINARILY
HIGH POTENTIAL FOR MEDICATION ERROR.

**Q.**    AND IF YOU COULD JUST BRIEFLY DESCRIBE -- I KNOW WE'VE
GOTTEN INTO IT TANGENTIALLY -- HOW DOES LSP ADMINISTER
MEDICATION.

**A.**    OKAY.  THERE ARE TWO WAYS THAT MEDICATIONS ARE DELIVERED.
THERE'S MEDICATIONS THAT ARE DELIVERED IN AN INPATIENT SETTING,
WHICH IS THE NURSING UNITS, AND THOSE MEDICATIONS ARE DELIVERED
BY NURSES.  AND THEN THERE'S THE OUTPATIENT SETTING, DIFFERENT
HOUSING UNITS, AND IN SOME UNITS, THE MEDICATIONS ARE GIVEN BY
NURSES BUT IN OTHER UNITS, THEY'RE GIVEN BY CORRECTIONAL
OFFICERS.

**Q.**    AND WHAT LEVEL OF STAFF SHOULD BE ADMINISTERING
MEDICATIONS?

**A.**    WELL, IT'S IMPORTANT THAT PEOPLE THAT -- IN A STAFF THAT
ADMINISTER MEDICATIONS HAVE THE ADEQUATE EDUCATIONAL
PREPARATION AND TRAINING TO DO WHAT THEY ARE BEING ASKED TO DO.
IN HEALTHCARE SETTINGS, IT'S A LICENSED PRACTICAL NURSE OR IT'S
A REGISTERED NURSE.  THE NATIONAL COMMISSION STANDARDS SAY THAT

IN FACILITIES THAT HAVE HEALTHCARE STAFF SEVEN DAYS A WEEK FOR
AT LEAST 16 HOURS A DAY, HEALTHCARE STAFF SHOULD ADMINISTER THE
MEDICATIONS.  SO LSP CERTAINLY QUALIFIES OR MEETS THAT
CRITERIA.  AND, THEREFORE, IN MY OPINION, YOU KNOW, LICENSED
PRACTICAL NURSES OR REGISTERED NURSES SHOULD BE GIVING ALL
MEDICATIONS.

**Q.**    AND WHAT IS THE STANDARD IN NURSING PRACTICE WITH REGARD
TO MEDICATION ADMINISTRATION?

**A.**    THERE ARE CALLED THE FIVE RIGHTS:  THE RIGHT PATIENT, THE
RIGHT MEDICATION, THE RIGHT DRUG, THE RIGHT DOSAGE BY THE RIGHT
ROUTE, AT THE RIGHT TIME.

            **MS. MONTAGNES:**  MARTHA, IF YOU COULD PULL UP SLIDE
109.

**BY MS. MONTAGNES:**

**Q.**    WHY ARE THESE IMPORTANT?

**A.**    WELL, THEY'RE A MEASURE OF SAFETY.  THESE ARE THE THINGS
THAT NURSES ARE TRAINED TO DO AND SPEND YEARS WHILE THEY ARE
BEING EDUCATED, YOU KNOW, BEING SUPERVISED MAKING SURE IT'S
DONE RIGHT TO MAKE SURE THAT THE PATIENT, YOU KNOW, THE
MEDICATION BEING ORDERED BY A PROVIDER IS GETTING TO THE
PATIENT.

**Q.**    AND IF YOU COULD JUST TAKE US THROUGH EACH OF THESE.

**A.**    SO IN TERMS OF MY OBSERVATIONS, THERE WERE PROBLEMS WITH
BOTH NURSES AND CORRECTIONAL OFFICERS.  IN TERMS OF THE RIGHT
PATIENT, WHAT YOU EXPECT IS THAT THE INMATE WILL PRESENT

HIMSELF TO THE WINDOW OR UP TO THE MEDICATION LINE AND PRESENT

THEIR ID, AND THAT THE NURSE OR CORRECTIONAL OFFICER WILL

ACTUALLY LOOK AT THE ID AND COMPARE IT AGAINST THE MEDICATION

BLISTER PACK TO MAKE SURE THAT THERE'S A MATCH.  YOU KNOW, IF

THERE ARE TWO JOHN SMITHS, YOU WANT TO MAKE SURE THAT YOU'VE

GOT THE RIGHT ONE.

AND IN NURSING TODAY, USUALLY THERE'S A SECOND

IDENTIFIER, SO THERE'S NOT ONLY AN ID CARD, BUT THE NURSE SAYS,

WHAT'S YOUR DATE OF BIRTH?  OR WHAT'S YOUR INMATE ID NUMBER?

SO TYPICALLY WHAT I OBSERVED IS THAT THE INMATE WOULD PRESENT

THE INMATE ID CARD, BUT SOMETIMES, TALKING ABOUT THE NURSES,

THE NURSES WOULD LOOK AT IT AND EXAMINE IT.  SOMETIMES IT WAS A

LITTLE CURSORY.  THE OFFICERS -- THE INMATE WOULD PRESENT IT,

SOMETIMES THE OFFICERS LOOKED AT IT, SOMETIMES THE INMATE KIND

OF FLASHED IT AND THE OFFICER DIDN'T REALLY CHECK THE NAME ON

IT, BUT THE INMATES, THEY BROUGHT IT UP.  SO THE PROCESS WAS

SOMEWHAT CURSORY WITH RESPECT TO REALLY VERIFYING THAT THIS IS

THE PATIENT WHO SHOULD GET THIS MEDICATION.

**Q.**   AND WHAT DID YOU OBSERVE WITH REGARD TO THE RIGHT

MEDICATION?

**A.**   SO THIS IS A CRITICAL PIECE.  IN ORDER TO MAKE SURE YOU

ARE GETTING THE RIGHT MEDICATION, THAT YOU'RE GETTING ALL THE

MEDICATIONS THAT SHOULD BE GIVEN AND YOU'RE NOT GETTING

MEDICATIONS THAT SHOULDN'T BE GIVEN, IT'S IMPORTANT TO HAVE THE

MEDICATION ADMINISTRATION RECORD PRESENT AT THE TIME OF

MEDICATION ADMINISTRATION AND TO DOCUMENT ADMINISTERING THE
MEDICATION AS YOU GIVE IT, AND THIS WAS NOT THE CASE.  AND THIS
COVERS ACTUALLY THE NEXT TWO, THE RIGHT MEDICATION, THE RIGHT
DOSE BY THE RIGHT ROUTE, AND THE RIGHT TIME, BECAUSE THAT'S ALL
CONTAINED IN THE MAR.

AND THIS IS ONE OF THE MAJOR FAILURES OF THE
MEDICATION SYSTEM IS THAT THE MEDICATION RECORD WAS NOT
PRESENT.

NOW, IN THE UNIT WHERE THE NURSE GAVE THE MEDICATION,
I THINK THE NURSE ON THE COMPUTER COULD HAVE ENTERED IT AT THAT
TIME, BUT IN THE DORMITORIES, THE OFFICERS WHO ARE TO ENTER
THE -- GIVING THE MEDICATION ON AN EMAR, THEY DON'T HAVE A
COMPUTER IN THE DORMITORIES.  AND EVEN IF THEY DID, APPARENTLY
THERE'S NO WIRELESS CONNECTION.  SO PART OF THE REASON THAT THE
OFFICERS AREN'T -- PART OF THE REASON THAT THEY'RE NOT
ADMINISTERING OR DOCUMENTING ADMINISTERING MEDICATIONS AT THE
TIME THEY GIVE IT IS THEY HAVE NO WIRELESS CONNECTION. THEY
HAVE NO CAPACITY TO DOCUMENT IT ELECTRONICALLY.  SO WHAT THEY
DO IS THEY GO SOMEWHERE AFTER PILL CALL IS OVER AND THEN HAVE
TO TRY TO REMEMBER ALL THE PATIENTS THAT THEY GAVE MEDICATION
TO.  AND THIS IS NOT A RELIABLE -- THIS IS ABSOLUTELY NOT A
RELIABLE METHODOLOGY TO ACCURATELY, YOU KNOW, DOCUMENT THE
ADMINISTRATION OR NOT.
**Q.**  AND JUST TO CLARIFY, YOU SAY THE NURSES COULD HAVE ENTERED
THEM.  DID YOU OBSERVE WHETHER OR NOT THEY DID ENTER THEM?

**A.** MY RECOLLECTION IS THAT THEY DID NOT.

IF I COULD ADD ONE THING, I WOULD LIKE TO SAY THAT FROM MY REVIEW IN THE RECORDS CHRONOLOGICALLY, THE DOCUMENTATION OF MEDICATION ADMINISTRATION CHANGED OVER TIME. BEFORE THERE WAS THE ELECTRONIC EMAR, ALL THE MARS WERE HANDWRITTEN AND THERE WERE INDIVIDUAL -- EVERY TIME A DIFFERENT STAFF MEMBER DOCUMENTED A MEDICATION, THEY PUT THEIR INITIAL AND THEN SIGNED IT AT THE BOTTOM.

WHEN THEY WENT TO AN ELECTRONIC SYSTEM, THE -- FOR EXAMPLE, WHEN THE OFFICERS DOCUMENT THAT A PATIENT WAS A NO-SHOW FOR MEDICATION ADMINISTRATION, THERE'S NO WAY ON THE EMAR TO DOCUMENT WHO INDICATED THAT THAT PATIENT WAS A NO-SHOW. SO YOU'LL SEE THESE NO-SHOWS ALL THE WAY ACROSS THE PAGE WITH NO DOCUMENTATION OF WHO ENTERED THAT INFORMATION INTO THE MAR. AND THAT'S A MEDICAL/LEGAL ISSUE.

THE OTHER ISSUE RELATED TO THAT IS THAT I FOUND MARS, ELECTRONIC MARS, THAT SAID THE PATIENT DIDN'T GET THEIR MEDICATION ALL MONTH LONG, AND THEN I FOUND ANOTHER SET OF MARS FOR THE SAME TIME PERIOD THAT WERE HANDWRITTEN THAT SHOWED THE PATIENT DID GET THEIR MEDICATIONS. AND, THEREFORE, IT LOOKED LIKE THERE WAS A DUPLICATE SYSTEM, BUT IT RAISES SERIOUS QUESTIONS ABOUT THE ELECTRONIC EMARS AND THEIR ACCURACY.

**Q.** AND LET'S GO AHEAD AND LOOK AT SOME OF THOSE.

MARTHA, COULD YOU BRING UP 10W-20352. AND THIS SHOULD BE SEALED TO THE COURTROOM.

MS. LAMARRE, CAN YOU DESCRIBE WHAT WE ARE SEEING HERE?

**A.** WE'RE SEEING AN MAR FOR A PATIENT IN JANUARY OF 2013 THAT WAS IN A HOUSING UNIT.

**Q.** AND CAN YOU INDICATE -- CAN YOU -- ARE THOSE -- ALONG THE TOP LINE THERE, IT APPEARS THAT THERE'S VARIOUS INITIALS. IS THAT RIGHT?

**A.** THAT'S CORRECT. SO THIS, AS I WAS JUST DESCRIBING, AN EXAMPLE OF AN MAR WHERE AT EACH DAY, STAFF MEMBERS, YOU KNOW, DIFFERENT STAFF MEMBERS DOCUMENT GIVING THE MEDICATION.

THE OTHER THING THAT'S NOTABLE IS THAT -- THERE'S A KOP MEDICATION. NOW, NORMALLY WHEN A STAFF MEMBER GIVES SOMEONE A KOP MEDICATION, WHAT'S DOCUMENTED IS THE DAY OF THE MONTH THE PATIENT WAS GIVEN THE KOP MEDICATION. IN THIS CASE, KOP IS WRITTEN AS HOW THAT PATIENT IS GETTING THE MEDICATION, BUT THERE'S NO DOCUMENTATION FOR THE WHOLE MONTH THAT THE PATIENT RECEIVED THE MEDICATION. AND THIS IS ALSO ANOTHER TYPICAL FINDING IN OTHER MARS WHERE SOMEONE IS INDICATED -- A PATIENT IS INDICATED AS GETTING THEIR MEDICATION KOP, BUT YOU CAN LOOK AT A WHOLE MONTH AND NOT SEE WHAT DAY WAS THIS PATIENT GIVEN THE KOP MEDICATION. INSTEAD YOU SEE KOP, KOP, KOP EVERY DAY. ONCE A NURSE OR AN OFFICER GIVES THAT MEDICATION TO THE PATIENT, YOU DON'T DOCUMENT KOP ANYMORE BECAUSE YOU DON'T KNOW IF THE PATIENT IS TAKING THE KOP MEDICATION. YOU DOCUMENT THE DAY YOU GIVE THE MEDICATION TO THE PATIENT AND THEN AFTER THAT, AS A NURSE OR AN OFFICER, IN THIS CASE, YOU'RE LOOKING TO SEE

02:57  1  WHEN IS THAT DUE AGAIN, YOU KNOW, IN ANOTHER 30 -- AND IT

2  DEPENDS ON HOW MUCH MEDICATION THE PATIENT IS GIVEN.  SOME

3  PHARMACISTS WILL GIVE 14 DAYS, SOMETIMES THEY DO 30 DAYS.

4  HISTORICALLY MANY SYSTEMS USE 30 DAYS.  AND SO IF I'M A NURSE,

5  I KNOW IF IT'S GIVEN ON THE 5TH OF THE MONTH, THAT WHEN THAT

6  NEXT MAR COMES, OKAY, WHERE IS THE MEDICATION, I SHOULD EXPECT

7  IT FROM THE PHARMACY.

8  Q.    AND DOWN HERE ON THE BOTTOM RIGHT-HAND CORNER, IS THAT THE

9  DOCUMENTATION THAT YOU REFERRED TO OF WHO IS INITIALING IT?

10  A.    THE LOWER RIGHT-HAND CORNER?

11  Q.    YES.

12  A.    THOSE ARE THE STAFF MEMBERS ON THIS HANDWRITTEN MAR THAT

13  DO NOT APPEAR CONSISTENTLY ON THE EMARS.

14  Q.    AND WE'LL GET TO THAT.

15         MARTHA, COULD YOU BRING UP 1OFFF-57583.  AND THIS IS

16  PATIENT 16.

17         AND MS. LAMARRE, CAN YOU DESCRIBE WHAT WE'RE SEEING

18  HERE?

19  A.    SO THIS MAR REPRESENTS A TYPE OF DOCUMENTATION OF RECEIPT

20  OF KOP MEDICATION THAT I'M USED TO SEEING IN OTHER SYSTEMS.  IN

21  OTHER WORDS, THE PATIENT COMES TO GET THEIR MEDICATION AND TO

22  SHOW DEFINITIVELY THAT THEY WERE GIVEN IT, THE NURSE HAS THE

23  PATIENT SIGN THE MAR THAT THEY RECEIVED IT.

24         NOW, WHAT APPEARS TO BE MISSING HERE IS THAT IT'S --

25  THERE'S AN INDICATION OF WHEN MEDICINE WAS DISCONTINUED.  AT

THE TOP WHERE OMEPRAZOLE IS LISTED, IT SAYS IT WAS DC'D ON

12/28/10, WHICH IS IMPORTANT INFORMATION, BUT MY QUESTION IS ON

WHAT DAY WAS THIS PATIENT GIVEN THIS KOP MEDICATION AND THIS

MAR DOESN'T -- AT LEAST BEST I CAN TELL, IT DOESN'T INDICATE

THAT.

**MS. MONTAGNES:** MARTHA, CAN YOU BRING UP 10JJ-39522.

**BY MS. MONTAGNES:**

**Q.** AND THIS IS PATIENT 18.

AND MS. LAMARRE, CAN YOU TELL ME WHAT WE ARE SEEING

HERE?

**A.** YES. SO THIS WOULD BE ANOTHER EXAMPLE OF A METHODOLOGY OF

DOCUMENTING KOP MEDICATION. IN THIS CASE, SOMEONE HAS

DOCUMENTED THAT IT WAS RECEIVED ON 7/12/12. NOW, IT WASN'T --

NORMALLY YOU WOULD LOOK FOR IT TO BE INITIALED ON THE 12TH, BUT

THAT'S -- THIS IS WHAT IT WAS. IT APPEARS TO ME THAT THIS IS

PROBABLY STAFF DOCUMENTING THAT AS OPPOSED TO AN INMATE

SIGNATURE OR INITIALS, BUT IT'S NOT POSSIBLE TO KNOW.

**MS. MONTAGNES:** ALL RIGHT. MARTHA, CAN YOU BRING UP

10JJ-39498.

**BY MS. MONTAGNES:**

**Q.** THIS IS PATIENT NO. 18.

SO NURSE LAMARRE, CAN YOU TELL ME WHAT WE'RE LOOKING

AT HERE?

**A.** SO PATIENT 18 WAS A PATIENT WHO BECAME ACUTELY ILL. HE

HAD UNDIAGNOSED AIDS, AND IT WAS FINALLY RECOGNIZED AND HE WAS

ADMITTED TO THE INFIRMARY ON DECEMBER 12TH.  SO A FEW DAYS --

**Q.**   IF I WERE TO REPRESENT TO YOU THAT IT WAS DECEMBER 2ND,
WOULD YOU --

**A.**   EXCUSE ME.  I APOLOGIZE, DECEMBER 2ND.

          **MS. MONTAGNES:**  AND MARTHA, COULD YOU INDICATE THAT
ON THERE FOR US.

**BY MS. MONTAGNES:**

**Q.**   AND HOW LONG WAS HE IN THE INFIRMARY?

**A.**   HE WAS IN THE INFIRMARY UNTIL DECEMBER 13TH WHEN HE WAS
SENT TO THE HOSPITAL.

**Q.**   ALL RIGHT.  AND WHAT IS THE SECOND MEDICATION HERE ON THIS
LIST?

**A.**   THAT'S BACTRIM.

**Q.**   ALL RIGHT.  AND WHAT IS BACTRIM?

**A.**   BACTRIM IS AN ANTIBIOTIC USED TO TREAT PNEUMOCYSTIS
PNEUMONIA?

**Q.**   ALL RIGHT.  NOW, FOCUSING ON THE BACTRIM DELIVERY, WAS
THERE -- WERE THERE ANY MISSED -- DID HE MISS THAT MEDICATION
AT ALL OVER HIS TIME IN THE INFIRMARY?

**A.**   HE DID.  ON THE 8TH OF DECEMBER, THERE WAS THE 8 A.M. DOSE
AND THE 2 P.M. DOSE THAT HE DID NOT RECEIVE.  THERE'S ALSO THE
DOSE OF PREDNISONE 40 MILLIGRAMS THAT HE DID NOT RECEIVE.

**Q.**   THAT'S OKAY, WE'RE GOING TO JUST FOCUS ON THE BACTRIM.

**A.**   OKAY.

**Q.**   AND JUST TO CLARIFY ONE QUESTION, HOW DO YOU KNOW THAT

THIS IS THE DOCUMENTATION FROM THE INFIRMARY?

**A.**   HE WAS PLACED IN THE INFIRMARY.  I REVIEWED THE RECORD AND HE WAS IN THE INFIRMARY AT THIS TIME.

**Q.**   ARE THOSE RECORDS KEPT SEPARATE FROM THE REST OF HIS MEDICAL FILE?

**A.**   THAT'S CORRECT.

     **MS. MONTAGNES:**  MARTHA, COULD YOU PULL UP JJ-39505.

**BY MS. MONTAGNES:**

**Q.**   ALL RIGHT.  WHAT IS THIS?

**A.**   SO THIS IS AN ELECTRONIC EMAR FOR THE SAME PATIENT FOR THE SAME PERIOD OF TIME.

**Q.**   AND WHERE IS THIS CHART FROM?

**A.**   WHERE'S THE EMAR FROM?

**Q.**   YEAH.

**A.**   HIS HOUSING UNIT, I GUESS THAT'S HICKORY.

**Q.**   ALL RIGHT.

**A.**   HICKORY 4.

**Q.**   IS BACTRIM THE THIRD MEDICATION THAT'S SLIGHTLY OBSCURED BY THE HOLE PUNCH?

**A.**   IT IS.

**Q.**   OKAY.  AND JUST TO REFRESH EVERYONE, HE WAS ADMITTED TO THE INFIRMARY ON THE 2ND?

**A.**   CORRECT.

**Q.**   AND HE LEFT FOR THE HOSPITAL ON THE 13TH?

**A.**   CORRECT.

Q.   AND IF THE COURT WILL RECALL, ON THE 8TH, YOU TESTIFIED THAT HE DIDN'T RECEIVE TWO OF HIS DOSES ON THE 8TH.  IS THAT RIGHT?

A.   CORRECT.

Q.   AND WHAT IS DOCUMENTED HERE?

A.   THAT HE RECEIVED THEM KOP, KEEP ON PERSON.

Q.   OKAY.  AND IF WE COULD JUST DO A SIDE BY SIDE ANALYSIS OF THAT, AND SO IT APPEARS THAT THESE ARE FOR THE SAME TIME PERIOD?

A.   YES.

Q.   FOR THE SAME PATIENT?

A.   YES.

Q.   FOR THE SAME DRUG?

A.   CORRECT.

Q.   BUT THEY DOCUMENT TWO DIFFERENT EXPERIENCES?

A.   YES.

Q.   AND WE'VE HEARD SOME ARGUMENT THAT THE WAY THAT THIS IS DOCUMENTED IS THAT THE FIRST DAY THAT IT SAYS KOP IS THE DAY THAT IT'S DELIVERED TO THE PATIENT.  EVEN IF THAT WERE TRUE, TURNING BACK TO THE ELECTRONIC EMAR, WOULD PATIENT 18 HAVE BEEN AT THE DORM AVAILABLE TO ACCEPT THOSE KOP MEDICATIONS?

A.   NO.

Q.   AND WHY IS THAT?

A.   HE WAS IN THE INFIRMARY.

Q.   AND TURNING TO THE DOCUMENTATION OF THE EMAR KOP, IS THAT

THE PROPER WAY TO DOCUMENT KOP?

**A.**   NO, IT'S NOT.  AS I DISCUSSED EARLIER, THE USUAL PRACTICE IS TO DOCUMENT THE DAY YOU GIVE THE MEDICATION TO THE PATIENT AND THEN THAT'S IT, BUT IN THIS CASE, THE PATIENT WAS NEVER ON KOP FOR THESE MEDICATIONS ON THE EMAR.  THE PATIENT WAS ACUTELY ILL IN THE INFIRMARY AND NOT ON ANY KOP MEDICATION.  WHAT THIS TELLS ME IS THAT IN THE HOUSING UNITS, THE OFFICERS GET THIS MAR, THEY JUST DOCUMENT, YOU KNOW, THE PATIENT'S NOT THERE BUT THEY ARE DOCUMENTING THAT HE IS GETTING THE MEDICATION, THAT THEY'RE JUST FILLING IT IN WITHOUT KNOWING WHAT'S HAPPENING WITH THE PATIENT.

         **MS. MONTAGNES:**  MARTHA, CAN WE BRING UP 1OJJ-39506.

**BY MS. MONTAGNES:**

**Q.**   MS. LAMARRE, I WANT TO DIRECT YOUR ATTENTION TO THE BOTTOM HERE.  WHAT DRUG IS THAT?

**A.**   LORAZEPAM, INJECTABLE.

**Q.**   AND WHAT IS LORAZEPAM INJECTABLE?

**A.**   IT'S A BENZODIAZEPINE.  IT'S A CONTROLLED SUBSTANCE.

**Q.**   AND WHERE IS THIS RECORD FROM?

**A.**   THIS IS FROM THE HOUSING UNIT.

**Q.**   AND WHEN WAS THIS BEING DOCUMENTED?

**A.**   IT WAS DOCUMENTED THAT THE PATIENT RECEIVED THIS ON DECEMBER 19TH.

**Q.**   AND DO YOU KNOW WHERE THE PATIENT WAS ON DECEMBER 19TH?

**A.**   AT THIS POINT, THE PATIENT IS IN THE HOSPITAL.

Q.   WHEN YOU SAY "HOSPITAL," DO YOU MEAN THE ATU?

A.   THE OUTSIDE HOSPITAL.  HE WAS ACUTELY ILL.

Q.   AND SO WHAT DOES THIS TELL YOU?

A.   WELL, THE FIRST THING IT TELLS ME IS THAT THIS CONTROLLED SUBSTANCE WAS ORDERED FOR THE PATIENT AFTER HE WAS IN THE HOSPITAL, AND SO WHERE THE ORIGINAL ORDER CAME FROM FOR AN INJECTION CONTROLLED SUBSTANCE AFTER THE PATIENT WAS IN THE HOSPITAL BECOMES A MYSTERY.  THAT'S THE FIRST THING.

     THE SECOND THING, LORAZEPAM INJECTABLE IS NEVER GOING TO BE KOP AND IT'S DOCUMENTED AS BEING KOP WHEN THE PATIENT IS IN THE HOSPITAL.

Q.   AND IS LORAZEPAM A CONTROLLED SUBSTANCE?

A.   IT IS.

     MS. MONTAGNES:  MARTHA, CAN YOU PULL UP 10JJ-39494.

BY MS. MONTAGNES:

Q.   THIS IS, AGAIN, PATIENT 18.  I BELIEVE THE COURT HAS SEEN THIS BEFORE.

     NURSE LAMARRE -- MS. LAMARRE, I APOLOGIZE, CAN YOU TELL ME WHERE THIS MAR IS FROM?

A.   ONCE AGAIN, THIS IS AN ELECTRONIC MAR FROM THE HOUSING UNIT, HICKORY 4.

Q.   AND FOR WHAT MONTH IS THIS FOR?

A.   THIS IS FOR JANUARY 2014.

Q.   AND DID ANYTHING OF NOTE OCCUR WITH PATIENT 18 DURING THIS MONTH?

A.    YES.  HE DIED ON JANUARY 10TH.

          **MS. MONTAGNES:**  MARTHA, COULD YOU INDICATE THAT.

THANK YOU.

**BY MS. MONTAGNES:**

Q.    SO RECALLING THAT IT WAS INDICATED ON THE LAST RECORD THAT

HE RECEIVED KOP ON THE 5TH AND THE 6TH, LET'S JUST ACCEPT AS A

PREMISE THAT FOR 30 DAYS, HE WOULD HAVE THAT.  DOES THIS RECORD

SHOW THAT EVEN AFTER THE 30 DAYS, HE WAS STILL RECEIVING

MEDICATION?

A.    I'M SORRY.  AFTER THE -- WOULD YOU REPEAT THAT?

Q.    5TH OR 6TH OF JANUARY, HE WAS STILL RECEIVING MEDICATION?

A.    YES.

Q.    ALL RIGHT.  AND WHAT, IF ANYTHING, WERE YOU ABLE TO

CONCLUDE ABOUT THIS RECORD?

A.    WELL, ONCE AGAIN, IT'S COMPLETELY INACCURATE.  THE STAFF

ARE DOCUMENTING THAT THE PATIENT IS RECEIVING MEDICATION THAT

THE PATIENT IS NOT GETTING.  EITHER PRIOR TO HIS GOING TO THE

HOSPITAL AND AFTER HE GOES TO THE HOSPITAL, HE'S NOT IN THE

FACILITY AT THIS POINT AND HE DIES ON JANUARY 10TH AND HE'S

STILL GETTING IT BY THE 14TH, ACCORDING TO THE MAR.  AND THERE

ARE NO SIGNATURES OF STAFF WHO ARE ENTERING THIS INFORMATION.

SO ESSENTIALLY THIS SYSTEM OF THIS METHODOLOGY OF DOCUMENTING

MEDICATIONS RENDERS THE MARS UNRELIABLE.

          **MS. MONTAGNES:**  MARTHA, YOU CAN TAKE THAT DOWN.

                    WHILE WE'RE HERE, WHY DON'T WE PULL UP SLIDE

1    105.

2    **BY MS. MONTAGNES:**

3    **Q.**    AND BEFORE WE GO INTO THIS, MS. LAMARRE, WERE THERE ANY

4    MISTAKES THAT YOU NOTICED ON THIS SLIDE AFTER WE HAD ALREADY

5    SUBMITTED THEM TO THE DEFENDANTS?

6    **A.**    YES.  I THINK IT INDICATES THAT THE PATIENT DIED ON

7    JANUARY 14TH WHEN THAT HE DIED ON JANUARY 1OTH, 2014.

8    **Q.**    OKAY.  AND CAN YOU JUST BRIEFLY DESCRIBE WHAT HAPPENED

9    WITH PATIENT 18 LEADING UP TO HIS DEATH?

10   **A.**    YES.  SO THIS WAS A PATIENT WHO IN AUGUST OF 2013 HAD SOME

11   CONCERNS ABOUT HIS HEALTH, HE WAS HAVING SOME SYMPTOMS AND HE

12   REQUESTED AN HIV TEST.  I THINK MENTAL HEALTH STAFF CONSENTED

13   HIM, HE SIGNED THAT HE WANTED THE TEST AND HE WAS NOT TESTED.

14          SO IN NOVEMBER HE BEGINS TO PRESENT WITH FEVER,

15   COUGH, CHEST PAIN, AND A 55-POUND WEIGHT LOSS.  ON THE 2OTH OF

16   NOVEMBER, HE TESTS POSITIVE FOR HIV, BUT THIS REPORT IS NOT

17   REVIEWED BY A PHYSICIAN UNTIL DECEMBER 12TH, THE DAY HE'S

18   ADMITTED TO THE HOSPITAL.  IN THE MEANTIME, HE COMES BACK

19   REPEATEDLY AND IS -- LET ME TURN TO MY -- ONE MOMENT, PLEASE.

20          SO FROM THE PERIOD OF AUGUST TO NOVEMBER, HE

21   PRESENTED SEVERAL TIMES WITH ABNORMAL VITAL SIGNS, SHORTNESS OF

22   BREATH, AND A 55-POUND WEIGHT LOSS, AND ESSENTIALLY HE WAS NOT

23   EVALUATED, MEDICALLY EVALUATED BY A PHYSICIAN.  EVERYTHING WAS

24   HANDLED.  THE EMTS ARE TAKING THE PATIENT TO THE ATU.  THEY

25   TREAT HIM SYMPTOMATICALLY.  THEY SEND HIM BACK TO THE HOUSING

UNIT. HE COMES BACK NOVEMBER 18TH AFTER THEY FIND HIM JUST
SITTING ON THE FLOOR, HE SAYS I HAVE A COLD. HE HAS A
NONPRODUCTIVE COUGH WITH DIARRHEA, I'M SORRY, EXCUSE ME,
ABDOMINAL PAIN. AND ON THAT OCCASION ON THE 18TH, IT WAS A NO
TRANSPORT. HE WAS SEEN IN HIS HOUSING UNIT.

AND THEN ON THE 20TH OF NOVEMBER 2013 AT 2:00 IN THE
MORNING, HE'S SEEN FOR A COUGH TIMES SIX MONTHS, AND, AGAIN,
HE'S HAD SIGNIFICANT WEIGHT LOSS. AND THE EMT ASKED THE
PATIENT ABOUT HIS WEIGHT LOSS AND DOCUMENTS THAT HE'S UNABLE TO
EXPLAIN IT. AND HIS VITAL SIGNS -- HE HAD A TEMPERATURE OF
100.3. HE HAD A PULSE OF 139 PER MINUTE, AND HE WAS SENT AWAY.
HE BASICALLY SAID GO TO THE BULLPEN, WE'LL SEE YOU IN THE
MORNING, AND TO SEND SOMEONE WITH, YOU KNOW, A 50 TO 60-POUND
WEIGHT LOSS AND A FEVER AWAY INSTEAD OF CALLING THE DOCTOR AND
ARRANGING TO GET HIM MEDICALLY EVALUATED WAS A PROBLEM. HE IS
SEEN THE NEXT MORNING. ONCE AGAIN, HIS WEIGHT LOSS IS NOTED,
AND THERE'S NO DOCUMENTATION THAT A PROVIDER SAW HIM FOR A
55-POUND WEIGHT LOSS.

ON THE 20TH, THAT SAME DAY, HE HAD A CHEST X-RAY, IT
WAS READ AS NORMAL. NOW, PATIENTS WITH PNEUMOCYSTIS EARLY ON
CAN HAVE A NORMAL CHEST X-RAY.

**Q.** AND WHAT IS PNEUMOCYSTIS?

**A.** PNEUMOCYSTIS PNEUMONIA IS AN OPPORTUNISTIC INFECTION THAT
PATIENTS WITH AIDS GET. SO WHEN THERE'S A DISCONNECT WHERE THE
PATIENT LOOKS REALLY, REALLY SICK AND THEN YOU HAVE A SINGLE

TEST THAT'S NORMAL, YOU HAVE TO KEEP GOING.  IF A PATIENT LOOKS

REALLY ILL, YOU CAN'T JUST SAY, OH, CHEST X-RAY IS NORMAL, WE

CAN IGNORE IT.

HE CAME IN ON NOVEMBER 22ND, ALSO HAVING DIZZINESS,

CHEST PAIN.  PORTIONS OF THE NOTE I FOUND TO BE ILLEGIBLE.

HE'S GOT A FEVER.  ONCE AGAIN, THERE'S NO DOCUMENTATION THAT AN

EMT NOTIFIED A PHYSICIAN.  NOW, THE EMTS ARE STARTING IVS, ET

CETERA, AND THAT'S -- I'LL JUST MAKE A GENERAL COMMENT THAT I

SOMETIMES SAW EMTS DOCUMENT THAT THEY WERE TREATING THE PATIENT

IN ACCORDANCE WITH A PROTOCOL, BUT THEY NEVER NAMED THE

PROTOCOL.  WHAT'S THE PROTOCOL THAT THEY'RE TREATING THE

PATIENT, AND THAT'S IMPORTANT BECAUSE THAT'S SUPPOSED TO BE THE

CLINICAL GUIDANCE FROM THE PHYSICIAN ABOUT WHAT YOU'RE SUPPOSED

TO DO.

ON 11/23, THE PATIENT COMPLAINED OF DIFFICULTY

BREATHING.  HE HAD A PULSE OF 130 A MINUTE.  HIS OXYGEN

SATURATION WAS LOW.  IT WAS 91 PERCENT.  HIS RESPIRATIONS WERE

21 PER MINUTE, EACH MINUTE.  ONCE AGAIN, HE'S TREATED SORT OF

EPISODICALLY AND SYMPTOMATICALLY.  AND ON THE 23RD AT 2147 IN

THE EVENING, THE EMT CONTACTS A PHYSICIAN WHO ORDERS PHENERGAN

AND TYLENOL, BUT A PHYSICIAN DOESN'T EXAMINE THE PATIENT.

SO ON THE 26TH OF NOVEMBER, HE WAS SEEN AGAIN FOR

DECREASED APPETITE AND WEIGHT LOSS.  SO HERE, EVER SINCE, YOU

KNOW, FOR APPROXIMATELY A WEEK, WE'VE KNOWN THAT THERE'S A

PATIENT WHO'S LOST LIKE BETWEEN 50 AND 60 POUNDS AND HE HASN'T

BEEN EVALUATED BY A PHYSICIAN.  HIS VITAL SIGNS ARE ABNORMAL.
ON 11/26, HE WAS TESTED AGAIN FOR HIV, SUGGESTING THAT NO ONE
LOOKED AT THE PREVIOUS TEST, AND IT CAME BACK POSITIVE, AND HIS
CD4 CELL COUNT IS 15, SO HE IS SEVERELY IMMUNOSUPPRESSED.
NORMAL IS ABOVE 500.  HE HAS NO IMMUNE SYSTEM.  AND HE'S
RELEASED FROM THE ATU AND A PHYSICIAN DOESN'T SEE HIM FOR
FOLLOW-UP.

ON DECEMBER 2ND IS WHEN DR. LAVESPERE SEES HIM AS A
PATIENT AT THE CLINIC AND ENTERS A NOTE AND THEN HE'S SENT TO
THE INFIRMARY.  BUT HERE'S AN ACUTELY ILL PATIENT WITH A LAB
TEST THAT WASN'T TIMELY FOLLOWED, WITH EMTS WHO DIDN'T CONTACT
THE PHYSICIAN, AND ONCE THE PHYSICIAN WAS NOTIFIED DIDN'T SAY,
LET'S GET THIS GUY IN HERE SO I CAN COME AND EVALUATE HIM.
Q.    AND WHAT, IF ANYTHING, CAN YOU JUST TELL US ABOUT THE LAST
MONTH OF HIS LIFE?
A.    SO ONCE HE WAS ADMITTED TO THE INFIRMARY ON DECEMBER 2ND,
TREATMENT FOR PNEUMOCYSTIS WAS STARTED PRETTY QUICKLY, BUT HE
WAS SO ACUTELY ILL AND HIS VITAL SIGNS UNSTABLE, IT REALLY
RAISES THE QUESTION AS TO THAT HE SHOULD HAVE BEEN SENT TO THE
HOSPITAL THEN.  ANTI-RETROVIRAL THERAPY WASN'T STARTED FOR FOUR
DAYS AFTER HE ARRIVED.  HIS CONDITION GOT WORSE AND HE
DETERIORATED AND WAS SENT TO THE HOSPITAL ON DECEMBER 13TH.
Q.    SO LET'S JUST WRAP UP SOME OF THE MEDICAL ADMINISTRATION
ISSUES THAT WE DIDN'T QUITE GET TO FINISH UP BEFORE.  DID YOU
DRAW ANY CONCLUSIONS ABOUT THE SANITATION PRACTICES OF NURSES

1 AND CORRECTIONAL OFFICERS?

2 **A.** I DID NOT OBSERVE NURSES OR CORRECTIONAL OFFICERS WASHING

3 THEIR HANDS EITHER AT THE BEGINNING OF MEDICATION

4 ADMINISTRATION OR BETWEEN PATIENTS, AND TYPICALLY AT MINIMUM,

5 YOU WANT A HAND SANITIZER RIGHT THERE WHEN YOU'RE GIVING

6 MEDICATION SO THAT EVERY FEW PATIENTS OR SO, YOU'RE SANITIZING

7 YOUR HANDS. I DIDN'T OBSERVE THAT.

8 **Q.** I WANT TO TURN AND TALK A LITTLE BIT ABOUT MEDICATION

9 NONCOMPLIANCE. HOW SHOULD A HEALTHCARE SYSTEM ADDRESS

10 NONCOMPLIANCE OF MEDICATION?

11 **A.** WELL, IN ANY RELATIONSHIP, PROVIDER/PATIENT RELATIONSHIP,

12 WHEN ONE PRESCRIBES MEDICATION FOR SERIOUS MEDICAL CONDITIONS,

13 PART OF THE EVALUATION IS ARE YOU TAKING THE MEDICATION.

14 PROVIDERS NEED TO KNOW BECAUSE IF THE PATIENT'S NOT TAKING THE

15 MEDICATION YOU WANT TO FIND OUT WHY, YOU KNOW. AND AGAIN, IS

16 IT BECAUSE YOU DON'T UNDERSTAND HOW IMPORTANT IT IS, HOW IT'S

17 GOING TO HELP YOU, WHAT THE RISKS ARE OF NOT TAKING THE

18 MEDICATION, IS THE MEDICATION MAKING YOU SICK, IS THERE

19 SOMETHING ABOUT YOUR SCHEDULE THAT MAKES IT DIFFICULT FOR YOU

20 TO TAKE THE MEDICATION? DO YOU WORK THE NIGHT SHIFT AND YOU'RE

21 SUPPOSED TO TAKE IT IN THE MORNING AND YOU FALL ASLEEP, ET

22 CETERA? SO THERE ARE A LOT OF REASONS THAT PATIENTS DON'T TAKE

23 THE MEDICATION, AND IT'S IMPORTANT TO THE TREATMENT PLAN TO

24 ASSESS WHETHER THEY'RE TAKING THEIR MEDICATIONS AND, IF NOT,

25 WHY NOT.

**Q.** AND WHAT, IF ANY, OPINION WERE YOU ABLE TO FORM ABOUT THE
ADEQUACY OF THE MEDICATION ADMINISTRATION PROGRAM AT ANGOLA?

**A.** I THINK THAT THE PROGRAM DOES NOT ASSURE THAT PATIENTS GET
THEIR MEDICATIONS. THERE'S REALLY NO WAY TO KNOW BECAUSE THE
MEDICATION RECORDS ARE UNRELIABLE. IN MANY OF THE NOTES THAT I
REVIEWED, THERE WERE SOME PATIENTS WHO SAID, I'M NOT TAKING MY
MEDICATION. IT WAS AN HIV PATIENT WHO FOR A TIME SAID, I'M NOT
TAKING MY HIV MEDICATION, AND THERE WAS DOCUMENTATION OF THE
NURSE PRACTITIONER EXPLAINING TO THE PATIENT THE RISKS OF NOT
TAKING THE MEDICATION. OKAY.

THERE WERE OTHER SITUATIONS WHERE A PATIENT WAS
DOCUMENTED AS NOT TAKING MEDICATION, JUST SAID NONCOMPLIANCE.
THERE WAS NO DISCUSSION. AND THIS PARTICULAR PATIENT, PATIENT
NO. 15, HAD A EXTRAORDINARILY HIGH -- TERM IS MALIGNANT
HYPERTENSION. HIS HYPERTENSION SIMPLY WASN'T CONTROLLED. HE
WAS PRESCRIBED NUMEROUS MEDICATIONS FOR HIS BLOOD PRESSURE, AND
OVER A PERIOD OF YEARS AT ONE POINT HE WAS TAKING THE MEDICINE,
THEN THE ELECTRONIC MARS CAME ALONG THAT SAID HE WASN'T TAKING
THE MEDICATION, AND THE NO-SHOWS, NO-SHOWS, NO-SHOWS THAT I
SAW, I THOUGHT BASED ON WHAT I KNOW ABOUT THESE MARS, I DON'T
KNOW WHETHER HE WAS NOT SHOWING UP TO TAKE HIS MEDICATION OR
THIS IS JUST THE DOCUMENTATION. AND SO THE PLACE TO CLEAR THAT
UP IS FOR THE PROVIDER TO REALLY HAVE A CONVERSATION AND
DOCUMENT THAT, BUT I SAW NONCOMPLIANCE WITH NO DISCUSSION, AND
THE BLOOD PRESSURE WOULD BE EXTRAORDINARILY POOR CONTROLLED AND

THE PATIENT WOULD NOT BE BROUGHT BACK TIMELY TO CONTINUE TO
MONITOR THE PATIENT AND CONTINUE TO TRY TO INTERVENE WITH THE
PATIENT.

**Q.**   AND WERE THERE ANY OTHER CONCLUSIONS YOU WERE ABLE TO DRAW
ABOUT THE SYSTEM OF MEDICATION ADMINISTRATION AND THE RISKS TO
PATIENTS?

**A.**   I THINK THAT THERE'S A HIGH RISK OF HARM BECAUSE THE
SYSTEM, AS I REVIEWED IT, DOES NOT DEMONSTRATE THAT PATIENTS
ARE RECEIVING THEIR MEDICATIONS.

**Q.**   THANK YOU.

         **MS. MONTAGNES:**  YOUR HONOR, NOW IS A GOOD TIME TO
TAKE A BREAK.  I JUST DON'T KNOW HOW --

         **THE COURT:**  YES, LET'S TAKE A 15-MINUTE RECESS.

         **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

                         **(RECESS.)**

         **THE COURT:**  BE SEATED.

                 CARRY ON.

**BY MS. MONTAGNES:**

**Q.**   AND MS. LAMARRE, TURNING TO THE DELIVERY OF MEDICAL CARE,
WHAT DOES ACCESS TO CARE MEAN IN A PRISON SETTING?

**A.**   THE CONCEPT OF ACCESS TO CARE IS EXTREMELY IMPORTANT
BECAUSE INMATES ARE LOCKED DOWN, THEY ARE BEHIND CELL DOORS,
THEY CANNOT MOVE FREELY ABOUT.  THE CONCEPT IS THAT WHEN
INMATES PRESENT OR COMPLAIN OF OR WISH TO EXPRESS A HEALTHCARE
NEED, THAT THEY HAVE A MEANS TO SUBMIT THEIR REQUEST AND

1    RECEIVE A TIMELY MEDICAL DIAGNOSIS FOR THEIR COMPLAINT.

2    Q.    AND WHAT HAPPENS IN A CORRECTIONAL SYSTEM IF THEY DON'T

3    PROVIDE ADEQUATE ACCESS TO CARE?

4    A.    WELL, TYPICALLY THERE'S HARM THAT CAN BE ANYTHING FROM,

5    YOU KNOW, PREVENTABLE SUFFERING FROM UNTREATED PAIN TO HARM

6    FROM LACK OF DIAGNOSIS OF SERIOUS AND LIFE-THREATENING MEDICAL

7    CONDITIONS.

8    Q.    AND WHAT DID YOU DO TO REVIEW ACCESS TO CARE AT ANGOLA?

9    A.    SO I REVIEWED THEIR POLICIES AND PROCEDURES.  I REVIEWED

10   WHERE SICK CALL WAS CONDUCTED.  I REVIEWED WHO -- WHAT STAFF,

11   TYPE OF STAFF CONDUCTED SICK CALL.  I OBSERVED SICK CALL BEST I

12   COULD, EVEN THOUGH IT OCCURRED IN A FLASH IN ONE OF THE MEDICAL

13   DORMS, AND I REVIEWED MEDICAL RECORDS TO ASSESS THE SICK CALL

14   SYSTEM.

15   Q.    AND HOW DO PATIENTS AT LSP ACCESS ROUTINE CARE?

16   A.    SO THEY REQUEST A HEALTH SERVICE REQUEST FORM FROM AN

17   OFFICER AND THEY FILL IT OUT, THE TOP PORTION OUT THAT SAYS

18   WHAT THEIR COMPLAINT IS, AND THEN WHEN THE EMT COMES BY, IF

19   IT'S SUNDAY THROUGH THURSDAY, THE EMT WALKS DOWN, WHO'S GOT A

20   SICK CALL REQUEST, AND INTERVIEWS PATIENTS RIGHT THEN AND THERE

21   AS OPPOSED TO ESCORTING THE PATIENT TO AN EXAMINATION ROOM

22   WHERE THEY CAN BE EXAMINED.

23   Q.    AND IN YOUR OPINION DOES THIS SYSTEM PROVIDE TIMELY AND

24   APPROPRIATE ACCESS TO CARE FOR PATIENTS?

25   A.    IT DOESN'T.

**Q.**   AND WOULD YOU DESCRIBE SOME OF THE REASONS?

**A.**   WELL, FIRST OF ALL, PATIENTS -- THE STANDARDS ARE THAT PATIENTS SHOULD BE EXAMINED IN AN APPROPRIATE SETTING THAT AFFORDS PRIVACY, AN EXAM ROOM WHERE YOU HAVE AN EXAM TABLE, A SINK, MEDICAL EQUIPMENT, AND SUPPLIES.  YOU HAVE PRIVACY.  THE STAFF PERSON SHOULD HAVE THE MEDICAL RECORD PRESENT SO THAT THEY CAN REVIEW THE PATIENT'S MEDICAL HISTORY AND KNOW WHAT MEDICAL PROBLEMS THAT THEY HAVE.  AND AS I MENTIONED EARLIER, IS THIS A NEW COMPLAINT OR IS THIS A COMPLAINT THAT THEY HAVE HAD BEFORE.

THE SYSTEM AT LSP IS NOT APPROPRIATE BECAUSE YOU HAVE EMTS WHO ARE QUALIFIED TO RESPOND TO EMERGENCIES AND STABILIZE THE PATIENT AND TAKE THEM TO AN ATU.  THEY ARE DOING PRIMARY -- BASICALLY PRIMARY NURSING, IN A SENSE, WITH PATIENTS AND THAT THEY ARE NOT QUALIFIED TO DO.

THERE ARE INADEQUATE PROTOCOLS THAT THEY ARE SUPPOSED TO BE USING ON -- THEY ARE NOT APPROPRIATE, AND THE KEY THING IS THE LACK OF REFERRAL TO A MEDICAL PROVIDER WHEN CLINICALLY INDICATED.

**MS. MONTAGNES:**  AND MARTHA, COULD YOU PULL UP SLIDE 116.

**BY MS. MONTAGNES:**

**Q.**   AND MS. LAMARRE, CAN YOU WALK US THROUGH THE CARE OF PATIENT NO. 17?

**A.**   YES, I SHALL.

SO PATIENT NO. 17 WAS A 46-YEAR-OLD MAN WHOSE MEDICAL
HISTORY INCLUDED -- HE HAD LEUKEMIA, I BELIEVE.  YEAH, HE HAD
CHRONIC LEUKEMIA, AND HE WAS UNDER THE CARE OF ONCOLOGY
SERVICES, AND HE HAD A -- IN MAY OF 2012, HE HAD A CHEST CT
THAT SHOWED A SPICULATED LUNG NODULE THAT WAS SUSPICIOUS FOR
CANCER.  SO THIS WAS IN MAY OF 2012.  SO THE PATIENT WAS
REFERRED TO THE PULMONOLOGIST WHO SAID GET SPUTUM CYTOLOGY AND
REFER HIM TO THORACIC SURGERY SO THAT, YOU KNOW, CONSIDERATION
OF GETTING A BIOPSY OF THIS NODULE.  WELL, THAT RECOMMENDATION
WAS NOT FOLLOWED UP ON BY LSP PHYSICIANS.  ONCOLOGY CONTINUED
TO SEE THE PATIENT, BUT THEY ASSUMED THAT PULMONOLOGY WAS
FOLLOWING UP THIS LUNG NODULE, SO THERE WAS A DISCONNECT
BETWEEN ONCOLOGY AND PULMONOLOGY AND THE LSP PHYSICIANS.

FOR THE NEXT 18 MONTHS, THIS PATIENT COMPLAINED OF
CHEST PAIN, COUGH OR CHEST PAIN ABOUT 20 TIMES AND NEVER
RECEIVED A DIAGNOSIS FOR HIS CHEST PAIN.  YOU KNOW, OVER AND
OVER AGAIN, I'M HAVING CHEST PAIN, I'VE TAKEN THE TYLENOL, I'M
NOT BETTER, I'M NOT BETTER, AND OVER AND OVER AGAIN, HE DID NOT
GET A MEDICAL DIAGNOSIS FOR HIS CONDITION.  AND THEN, FINALLY,
IN JANUARY OF 2014, HE BECAME ACUTELY ILL AND HE WAS ADMITTED
TO THE HOSPITAL, DIAGNOSED WITH ADENOCARCINOMA OF THE LUNG AND
DIED A WEEK LATER.  BUT IT WAS STRIKING THE FREQUENCY WITH
WHICH HE COMPLAINED OF CHEST PAIN FOR WHICH HE WAS TREATED
SYMPTOMATICALLY, AND THEY CALLED IT CHEST WALL PAIN, HERE'S
SOME TYLENOL, HERE'S SOME THIS, AND THIS IS AN EXAMPLE OF A

1 PATIENT THAT DID NOT GET TIMELY DIAGNOSIS OF A SERIOUS MEDICAL

2 CONDITION.

3 Q.   AND DOES THIS CASE EPITOMIZE SOME OF THE CONCERNS YOU HAVE

4 ABOUT ACCESS TO CARE GENERALLY?

5 A.   IT DOES.

6 Q.   AND SINCE WE ARE DISCUSSING DELAY, JUST BRIEFLY, DID YOU

7 FREQUENTLY SEE EXAMPLES OF DELAY OF DIAGNOSIS?

8 A.   FREQUENTLY, YES.

9 Q.   WOULD YOU SAY IT WAS PERVASIVE?

10 A.   YES.  IF THE PATIENTS CAN'T GET FROM AN EMT WHO IS NOT

11 LICENSED TO MAKE A MEDICAL DIAGNOSIS TO A PHYSICIAN REPEATEDLY,

12 THAT'S ONE ACCESS TO CARE ISSUE.

13       THE OTHER THING IS WHEN PATIENTS DID SEE THE

14 PHYSICIAN, THE PHYSICIAN ALSO TREATED THE PATIENT FOR CHEST

15 WALL PAIN WITHOUT PURSUING FURTHER EVALUATION OR NOTICING IN

16 THE MEDICAL RECORD THAT THIS PATIENT HAD AN ABNORMAL CT SCAN A

17 YEAR AND A HALF AGO, OR NINE MONTHS AGO, OR HOWEVER OFTEN THE

18 PHYSICIAN SAW THE PATIENT.  THERE WAS JUST NO MEDICAL

19 EVALUATION OF THE PATIENT'S CONDITION.

20 Q.   AND HOW DOES DELAY OF DIAGNOSIS AND BACKLOG NUMBERS

21 INTERACT?

22 A.   I'M SORRY.  WOULD YOU REPEAT THAT, PLEASE?

23 Q.   HOW DOES FREQUENT DELAYS IN DIAGNOSIS RELATE TO THE

24 BACKLOG NUMBER AT A FACILITY?

25 A.   YOU MEAN IF THE PHYSICIANS HAVE A LONG WAITING LIST?

**Q.** YES.

**A.** WELL, CERTAINLY BACKLOGS COULD CONTRIBUTE TO AN ACCESS PROBLEM WITH THE PHYSICIAN, BUT IN THE CASES THAT I REVIEWED, IT WASN'T A PERTINENT FACTOR BECAUSE THE EMT FOR THESE CASES COULD HAVE ALWAYS PICKED UP THE PHONE AND CALLED A PHYSICIAN AND SAID, I NEED YOU TO SEE THIS PATIENT.

**Q.** YOU MENTIONED THAT SICK CALL IS ONLY AVAILABLE FIVE DAYS A WEEK. WHAT HAPPENS ON THE DAYS WHEN ROUTINE SICK CALL IS NOT OFFERED?

**A.** SO IF A PATIENT WANTS TO BE SEEN FOR A ROUTINE COMPLAINT, PERHAPS A MINOR COMPLAINT, THEY HAVE TO DECLARE AN EMERGENCY. THAT'S THE ONLY WAY TO GET SEEN ON THE DAYS THAT THERE ARE NO SICK CALL REQUESTS OR SICK CALL CONDUCTED.

**Q.** AND WHY IS THAT A PROBLEM?

**A.** WELL, IT DOESN'T PROVIDE DAILY ACCESS TO CARE, WHICH IS IMPORTANT, AND IT'S A STANDARD BY ACA AND NCCHC, AND IT HAS POTENTIAL TO DELAY ACCESS AND DIAGNOSIS TO A PROBLEM.

**Q.** AND WERE THERE ANY OTHER CONCERNS YOU HAD ABOUT THE RULES THAT EMTS PLAY IN THIS SICK CALL PROCEDURE?

**A.** ASIDE FROM THEIR PRACTICING OUTSIDE THEIR SCOPE OF PRACTICE, EMTS ARE CORRECTIONAL OFFICERS. AND WHAT YOU HAVE IS A SYSTEM AT A PRISON WHERE ALL THE FRONT LINE STAFF FOR ACCESS TO CARE OR MEDICATIONS ARE CORRECTIONAL OFFICERS. YOU DON'T HAVE HEALTHCARE PROFESSIONALS -- WELL, EMTS DO HAVE A HEALTHCARE BACKGROUND, BUT THERE'S A ROLE CONFLICT. SO AN

EMT -- IF AN INMATE STARTED A FIGHT -- WOULD HAVE TO HELP TAKE

DOWN THE INMATE AND THEN TREAT THEM A MINUTE LATER.  THAT'S A

REAL CONFLICT THAT GENERALLY SYSTEMS SHOULD AVOID.

**Q.**   DO CO-PAYS ACT AS A BARRIER TO ACCESS TO CARE AT LSP?

**A.**   THEY CAN ACT AS A BARRIER BECAUSE IF PATIENTS DON'T

RECEIVE TIMELY DIAGNOSIS FOR THEIR FIRST REQUEST, THEY ARE

CHARGED $3, AND THEN THEY PUT IN A SECOND REQUEST AND A THIRD

REQUEST AND A FOURTH REQUEST, THEY'RE CHARGED FOR EVERY ONE OF

THEM.  AND IN THAT SENSE, IT'S NOT FAIR TO THE PATIENT THAT

THEY CANNOT RECEIVE TIMELY DIAGNOSIS WITHOUT PAYING MULTIPLE

TIMES.

THE OTHER THING IS THAT ON THE DAYS THAT THERE'S NO

SICK CALL, IF THEY NEED TO BE SEEN, THEY HAVE TO DECLARE AN

EMERGENCY, AND THAT'S $6.  SO THE PRICE FOR NOT HAVING

SEVEN-DAY-A-WEEK SICK CALL IS $6 FOR SOME PATIENTS.

**Q.**   AND TURNING TO THIS DEMONSTRATIVE, WHICH IS SOURCE AT

PLAINTIFFS' EXHIBIT 6 AT 0033, CAN YOU TELL ME WHAT WE ARE

LOOKING AT HERE?

**A.**   IT IS A CALENDAR THAT SHOWS THE NUMBER OF DAYS THAT IT

WOULD TAKE AN INMATE TO PAY FOR A $2 CO-PAY FOR A PRESCRIPTION

MEDICATION IF THE PATIENT'S GETTING 12 CENTS AN HOUR WAGE, OR

THEY'VE GOT TO WORK 25 DAYS IN ORDER TO PAY FOR THE $3 CO-PAY,

OR THEY HAVE TO WORK 50 DAYS TO AFFORD THE $6 CO-PAY.

**Q.**   AND DID YOU SEE INSTANCES OF PATIENTS MAKING MULTIPLE

REQUESTS AND HAVING TO PAY FOR IT SEVERAL TIMES?

A.   YES.

Q.   AND DID YOU SEE INSTANCES OF PATIENTS DECLARING

EMERGENCIES ON DAYS WHEN REGULAR SICK CALL WASN'T AVAILABLE?

A.   I BELIEVE SO.

Q.   ALL RIGHT.

          **MS. MONTAGNES:**  MARTHA, CAN YOU PULL UP 10B-18965.

               THIS SHOULD NOT BE PUBLISHED TO THE GALLERY.

**BY MS. MONTAGNES:**

Q.   AND MS. LAMARRE, CAN YOU JUST WALK US THROUGH WHAT THIS

FORM IS?

A.   SO THIS IS THE SICK CALL -- THE HEALTHCARE REQUEST FORM

THAT THE INMATES USE TO DOCUMENT THEIR COMPLAINT.

Q.   SO LET'S JUST TAKE IT SECTION BY SECTION.  WHAT IS

GENERALLY PUT IN THIS TOP BOX?

A.    IN THE OFFENDER -- SO THE OFFENDER COMPLETES THAT SECTION

HIGHLIGHTED IN YELLOW, AND HERE THE PATIENT HAS MADE A

SELF-DECLARED EMERGENCY ABBREVIATED BY SDE, COMPLAINING OF PAIN

IN THE RIGHT UPPER JAW.

Q.   THAT NEXT BOX, WHO FILLS THAT OUT?

A.   SO THE EMT FILLS OUT THE NEXT BOX BY DOCUMENTING THE DATE

AND TIME AND THE LOCATION THAT THAT EVALUATION TOOK PLACE, AND

THEN THE EMT DOCUMENTS VITAL SIGNS AND THE ASSESSMENT.

Q.   AND IN THIS NEXT BOX WHERE IT SAYS HEALTHCARE PRACTITIONER

MEDS, WHO FILLS THAT OUT?

A.   THAT IS THE MEDICAL PROVIDER IS SUPPOSED TO, TYPICALLY A

PHYSICIAN, FILLS THAT OUT UPON REVIEW OF THE REQUEST FORM THAT
THE EMT PUTS IN THE PHYSICIAN'S BOX AFTER THE SICK CALL
ENCOUNTER IS COMPLETED.

**Q.** AND LOOKING AT THIS FORM, WHAT DAY WAS THE PATIENT SEEN?

**A.** ON JUNE 8TH, 2013.

**Q.** AND WHAT DAY DOES IT APPEAR THAT A PRACTITIONER REVIEWED
THIS NOTE?

**A.** ON JUNE 13TH OF 2013.

**Q.** AND HAVING REVIEWED THESE SICK CALLS, WAS IT UNUSUAL TO
SEE THAT THERE WERE SOME TIME BETWEEN WHEN THE EMT MADE THE
ASSESSMENT AND WHEN THE PRACTITIONER MADE THEIR NOTES?

**A.** WELL, TYPICALLY THE PROVIDER DIDN'T DATE WHEN THAT REVIEW
TOOK PLACE SO IT WASN'T POSSIBLE TO EVALUATE WHETHER THERE WAS
A DELAY IN THE REVIEW OR NOT. HERE THE PROVIDER DID DOCUMENT
THE DATE THAT HE REVIEWED IT AND IT'S NOT TIMELY. THESE REALLY
SHOULD BE REVIEWED BY THE PHYSICIAN THE NEXT DAY TO MAKE SURE
THAT WHAT THE EMT DID WAS APPROPRIATE AND THE DISPOSITION WAS
APPROPRIATE AND FOR THE PHYSICIAN TO DECIDE WHAT SHOULD HAPPEN
AFTER THAT.

**Q.** WHAT'S THIS BOX CALLED DISPOSITION? WHAT'S SUPPOSED TO GO
THERE, TO YOUR KNOWLEDGE?

**A.** WELL, AFTER THE EMT DOES THE ASSESSMENT IN THE GREEN BOX,
THE EMT SHOULD DOCUMENT WHAT THEY PLAN TO DO. I'M GOING TO
CALL THE DOCTOR, I'M GOING TO SEND THE PATIENT TO THE ATU, ET
CETERA.

**Q.** ALL RIGHT. AND TURNING TO THE VERY BOTTOM BOX AT THE
BOTTOM, WHAT IS THIS?

**A.** SO MY UNDERSTANDING IS THAT AFTER THE EMT ASSESSES THE
PATIENT, THAT THEY MAKE A CO-PAY DETERMINATION AND THEN THEY
HAVE THE INMATES SIGN IT TO DEMONSTRATE THAT HE UNDERSTANDS
THAT THIS IS -- HE'S GOING TO BE CHARGED.

**Q.** AND IS THERE ANY OTHER WARNING IN THIS BOX OF NOTE?

**A.** THERE IS A WARNING THAT SAYS THAT "I AM AWARE THAT IF I
DECLARE MYSELF A MEDICAL EMERGENCY AND HEALTHCARE STAFF FINDS
THAT AN EMERGENCY DOES NOT EXIST, I MAY BE GIVEN A DISCIPLINARY
REPORT FOR MALINGERING."

**Q.** IN YOUR OPINION, HOW DOES THAT PLAY INTO ACCESS TO CARE?

**A.** WELL, IT'S PUNITIVE AND DISCOURAGING BECAUSE WHEN PATIENTS
ARE IN DISTRESS, THEY DON'T ALWAYS KNOW WHETHER IT'S A TRUE
EMERGENCY OR NOT. I MEAN, THIS HAPPENS IN THE COMMUNITY TOO
WHERE PATIENTS -- YOU KNOW, SOMETHING HAPPENS, THEY'RE IN PAIN,
AND THEY DECIDE TO GO TO THE EMERGENCY ROOM AND IT'S NOT A TRUE
EMERGENCY, BUT THEY'RE SEEN, AND THERE IS NO PUNISHMENT
INVOLVED THERE. SO THE IDEA THAT IF IT'S NOT A TRUE MEDICAL
EMERGENCY, THAT MEANS YOU'RE MALINGERING IS A VERY PUNITIVE
POSTURE FOR A SYSTEM TO TAKE TOWARDS PATIENTS.

      **MS. MONTAGNES:** MARTHA, IF YOU COULD TAKE THAT CALL
LOG BACK.

**BY MS. MONTAGNES:**

**Q.** AND JUST TO TALK BRIEFLY ABOUT THIS PARTICULAR SICK CALL.

1   WAS THERE ANYTHING ON THIS SICK CALL THAT STOOD OUT TO YOU?

2   **A.**   YES.  THE PATIENT'S BLOOD PRESSURE, WHICH WAS 232/149.  SO

3   WHILE THE PATIENT -- THE PATIENT'S FOCUS WAS, I'M HAVING JAW

4   PAIN AND DENTAL PROBLEMS.  HERE IS THIS INCREDIBLY ABNORMAL

5   BLOOD PRESSURE WHICH PRESENTS THE PATIENT AT RISK FOR STROKE,

6   HEART ATTACK, AND DEATH IN A VERY SHORT PERIOD OF TIME.  AND

7   THERE'S NOTHING IN THE EMTS NOTE ABOUT THE PATIENT'S BLOOD

8   PRESSURE.  THIS PATIENT'S BLOOD PRESSURE IS VERY ABNORMAL AND

9   I'M GOING TO CALL THE DOCTOR RIGHT NOW.  THERE'S NOTHING.

10          NOW, I KNOW FROM REVIEW OF THIS RECORD THAT THE

11  PATIENT WAS TRANSPORTED TO THE ATU AND THEY STILL, AS I RECALL,

12  DID NOT ADDRESS THE PATIENT'S BLOOD PRESSURE.  IT'S

13  INEXPLICABLE THAT THERE WOULD BE THIS KIND OF BLOOD PRESSURE

14  MEASUREMENT FOR WHICH IT WAS NOT NOTICED OR ADDRESSED AND NOT

15  NOTICED OR ADDRESSED BY THE DOCTOR, LIKE, I WANT TO BRING THIS

16  PATIENT TO THE CLINIC AS SOON AS POSSIBLE.

17  **Q.**   MS. LAMARRE, I WONDER IF YOU COULD TALK ABOUT WHAT -- VERY

18  BRIEFLY, WHAT A GOOD SICK CALL PROCEDURE MIGHT LOOK LIKE?

19  **A.**   OKAY.  SO THERE NEEDS TO BE ADEQUATE POLICIES AND

20  PROCEDURES THAT DESCRIBE OPERATIONALLY THE PROCESS.  SICK CALL

21  STARTS AT SUCH AND SUCH TIME EACH DAY.  INMATES ACCESS IT IN

22  THIS WAY.  THIS IS THE TIMEFRAME FOR WHICH, YOU KNOW, WE WILL

23  CONDUCT SICK CALL SEVEN DAYS A WEEK.  THE FORMS WILL BE

24  COLLECTED EACH DAY.  THEY'LL BE TRIAGED ON THE SAME SHIFT.

25  URGENT HEALTH REQUESTS WILL BE SEEN TODAY.  ROUTINE HEALTH

REQUESTS CAN BE THE NEXT DAY. THE STAFF THAT CONDUCTS SICK
CALL ARE QUALIFIED TO DO IT, AND IN CORRECTIONS, THAT'S
TYPICALLY THAT'S A REGISTERED NURSE WHO, BY SCOPE OF PRACTICE,
CAN PERFORM INDEPENDENT ASSESSMENTS ACCORDING TO PROTOCOLS.

SO THERE IS A MEANS FOR NURSES TO DO THESE
INDEPENDENT ASSESSMENTS WITHIN THEIR SCOPE OF PRACTICE. THERE
ARE CRITERIA IN THE PROTOCOLS FOR A REFERRAL TO A PROVIDER AND
THE TIMELINESS IN CRITERIA. IF THE PATIENT HAS CHEST PAIN,
THEY NEED TO BE REFERRED RIGHT AWAY TO THE DOCTOR. IF THEY
HAVE A MINOR SKIN RASH THAT THE NURSE DOESN'T KNOW WHAT IT IS,
THAT CAN BE REFERRED ROUTINELY. THESE ASSESSMENTS NEED TO BE
PERFORMED IN A MEDICAL ENVIRONMENT WITH THE HEALTH RECORD
PRESENT.

SO TYPICALLY INMATES SUBMIT THEIR REQUESTS. THE LIST
OF PATIENTS THAT ARE GOING TO BE SEEN THE NEXT DAY IS CREATED,
THAT LIST IS GIVEN TO MEDICAL RECORDS. MEDICAL RECORDS
RETRIEVES THEIR RECORD AND THEY'RE THERE THE NEXT DAY FOR THE
NURSE TO SEE THE PATIENT AND DOCUMENT HIS OR HER FINDINGS IN
THE RECORD AT THE TIME SHE SEES THE PATIENT.

Q. ALL RIGHT. AND MS. LAMARRE, WE'RE GOING TO MOVE QUICKLY
THROUGH THE SECTION ON URGENT CARE BECAUSE I BELIEVE THAT DR.
VASSALLO COVERED MUCH OF THAT TESTIMONY, BUT I DID WANT TO TALK
BRIEFLY ABOUT TWO PATIENTS THAT YOU REVIEWED.

MARTHA, IF YOU COULD BRING UP SLIDE 108.

CAN YOU DESCRIBE BRIEFLY WHAT STOOD OUT TO YOU ABOUT

THIS CASE?  AND THIS IS FROM PLAINTIFFS' EXHIBIT 6.

**A.**   YES.  THIS IS PATIENT NO. 16.  THIS MAN WAS 45 YEARS OLD,
AND HE HAD A HISTORY OF REFLUX, ESOPHAGEAL REFLUX.  HE HAD HAD
HIS RIGHT KIDNEY TAKEN OUT IN THE PAST, AND HE HAD COMPLAINED
OF COUGHING UP BLOOD IN THE PAST.  THE CHEST X-RAY WAS NORMAL
IN THE PAST, BUT IT WASN'T REALLY FULLY PURSUED.  HE
PRESENTED -- AND IN MY NOTES, I'M UNDER THE IMPRESSION
INITIALLY, THIS IS ONE OF THE FIRST RECORDS THAT I REVIEWED,
THAT HE WAS BROUGHT TO THE ATU, BUT I THINK WHAT HAPPENED ON
DECEMBER 14TH, 2013, IS THAT AN EMT RESPONDED TO THE HOUSING
UNIT.  THE PATIENT COMPLAINED OF FEVER, CHILLS, BODY ACHES,
WEAKNESS, NAUSEA, AND DIARRHEA FOR THREE DAYS.  THE PATIENT WAS
FLUSHED, COVERED IN SWEAT, PALE, AND HOT TO TOUCH.  THE PATIENT
WAS FEBRILE WITH A TEMPERATURE OF 101.6.  HIS BLOOD PRESSURE
WAS 138/86 AND HIS PULSE WAS 86.  OXYGEN SATURATION WAS NOT
MEASURED IN THAT, I'M ASSUMING IN THE HOUSING UNIT.  AND THE
STAFF PERSON NOTED THAT HE HAD POOR SKIN TURGOR, DRY COUGH, AND
BREATH SOUNDS WERE CONGESTED BILATERALLY.  SO EVERYTHING WAS
ABNORMAL FINDINGS.

        I'M UNDER THE IMPRESSION THAT HE WAS REFERRED TO THE
ATU BECAUSE THERE WAS A SLIP OF PAPER FILLED OUT SAYING, YOU
KNOW, THIS PATIENT SHOULD GO TO THE ATU, BUT HE WASN'T
EVALUATED THAT DAY.  ON DECEMBER 14TH, THERE WAS NO DOCUMENTED
MEDICAL ELEVATION.

        TWO DAYS LATER, THE PATIENT WAS REFERRED TO THE ATU

FOR ABNORMAL VITAL SIGNS.  HE HAD A TEMPERATURE OF 102.5.  HE
WAS HYPOTENSIVE, HIS BLOOD PRESSURE WAS 98/62.  HE WAS
TACHYCARDIC, MEANING HIS HEART RATE WAS HIGH.  IT WAS 120 PER
MINUTE.  AND THIS INFORMATION WAS WRITTEN ON THE REFERRAL SLIP
FROM THE EMT TO THE ATU.  AND A MEDIC, AN EMT, SAW THE PATIENT
AT THE ATU NOTING HE WAS REFERRED, ABNORMAL VITAL SIGNS.  THE
EMT DOCUMENTED THAT HIS SYMPTOMS HAD STARTED A FEW DAYS BEFORE,
AND THAT HIS SYMPTOMS WERE NOW INCREASING.  THE PATIENT DENIED
CHEST PAIN, SHORTNESS OF BREATH, NAUSEA AND VOMITING, DIARRHEA,
AND ANY OTHER SYMPTOMS IS WHAT WAS DOCUMENTED, BUT IT'S REALLY
NOT CONSISTENT WITH HIS CONDITION.  THE MEDIC STARTED OXYGEN AT
4 LITERS PER MINUTE AND STARTED IV FLUIDS.  THE MEDIC DID NOT
CONTACT A MEDICAL PROVIDER BUT TREATED THE PATIENT IN
ACCORDANCE WITH AN UNSPECIFIED PROTOCOL.  THERE WERE SERIAL
VITAL SIGNS TAKEN WHILE THE PATIENT WAS IN THE ATU.  HIS PULSE
WAS WITHIN NORMAL LIMITS, BUT HE CONTINUED TO HAVE A FEVER
BETWEEN 101 AND 102.  THE MEDIC TREATED THE PATIENT WITH
BASICALLY WITH COUGH MEDICINE, NOTED HE ALREADY HAD TYLENOL,
AND GAVE THE PATIENT A LAY-IN, BUT HE DIDN'T CONTACT A
PHYSICIAN.  SO THAT'S ON THE 16TH.

        AND THEN ON DECEMBER 18TH AT ABOUT 10:00 IN THE
MORNING, A MEDIC SAW THE PATIENT FOR COMPLAINTS OF WEAKNESS,
DIZZINESS, DIFFICULTLY WALKING, AND REACHING THE BATHROOM AND
HAVING DIARRHEA.  HE DENIED NAUSEA AND VOMITING.  THE PATIENT'S
TEMPERATURE AT THIS POINT WAS SUBNORMAL, WHICH IS A CLUE,

BECAUSE WHEN PATIENTS BECOME VERY TOXIC AND GO INTO SHOCK, A
SUBNORMAL TEMPERATURE SHOULD BE OF NOTE, AND THE OTHER VITAL
SIGNS WERE INITIALLY NORMAL, BUT THEN THE PATIENT WAS
HYPOTENSIVE AND HIS HEART RATE WAS 103 PER MINUTE.  THE MEDIC
DID NOT MEASURE THE PATIENT'S RESPIRATION, TEMPERATURE OR
OXYGEN SATURATION, SO THE EVALUATION WAS NOT COMPLETE, AND
THERE'S NO DOCUMENTATION THAT THE MEDIC NOTIFIED A PROVIDER.
SO HERE THE PATIENT CAME -- WAS ILL ON THE 14TH AND ON THE
16TH, AND NOW ON THE 18TH, AND THERE'S STILL NO DOCUMENTATION
THAT THE MEDIC CONTACTED A PROVIDER.

        LATER, THOUGH, AT AN UNDOCUMENTED TIME, I NOTICED A
PATTERN OF PROVIDERS WRITING NOTES ON OVER -- YOU KNOW,
ALONGSIDE THE MEDIC NOTES WITHOUT DOCUMENTING THE DATE AND TIME
THEY DOCUMENTED THIS NOTE.  THE PATIENTS, THEY GOT A CHEST
X-RAY.  IT WAS ABNORMAL, AND THE PATIENT'S OXYGEN SATURATION
WAS, LIKE, 50 PERCENT, WHICH IS HIGHLY ABNORMAL.  AT 4:00 IN
THE AFTERNOON, AN AMBULANCE WAS CALLED TO SEND THE PATIENT OUT
TO THE HOSPITAL.  IT WAS A LITTLE BIT UNCLEAR, BUT I THINK WHAT
HAPPENED IS THAT THE PATIENT TRAVELED IN THIS AMBULANCE FOR
THREE HOURS.  THE PATIENT'S VITAL SIGNS WERE EXTRAORDINARILY
ABNORMAL.  HIS RESPIRATIONS WERE 38 TO 52 A MINUTE, AND THE
PATIENT WAS TAKEN TO -- WAS DIVERTED FROM ONE HOSPITAL TO
ANOTHER.  THEY SAW THE PATIENT, AND HE WAS SO ACUTELY ILL, HE
WENT BACK TO THE MEDICAL CENTER OF NEW ORLEANS, AND HE DIED, I
THINK, WITHIN A WEEK OR SO.  SO THIS IS --

**Q.** IS IT POSSIBLE HE DIED THE NEXT DAY?

**A.** ONE MOMENT, PLEASE. I'M ACTUALLY NOT SEEING THAT. IT'S POSSIBLE AND I DON'T SEE WHERE I'VE DOCUMENTED ACTUALLY THE DAY HE DIED. SO THIS IS AN EXAMPLE OF A PATIENT WHO COMES IN ACUTELY ILL. THERE'S NOT A LONG HISTORY. THIS IS NOT A CASE WHERE A PATIENT WAS COMPLAINING FOR MONTHS, BUT STILL CAME IN ACUTELY ILL AND WAS NOT SEEN BY A PHYSICIAN AND DETERIORATED AND DIED.

      **MS. MONTAGNES:** MARTHA, COULD YOU PULL UP SLIDE 107.

**BY MS. MONTAGNES:**

**Q.** AND JUST FOR THE SAKE OF BREVITY, COULD YOU JUST DESCRIBE THIS CASE TO US, AND AS SUCCINCTLY AS POSSIBLE TO SORT OF DESCRIBE WHAT HAPPENED.

**A.** YES. PATIENT NO. 20 WAS 37 YEARS OLD. HE HAD A HISTORY OF HIV INFECTION. AND THE KEY ELEMENTS OF HIS CARE WAS THAT HE BEGAN TO COMPLAIN OF GASTROINTESTINAL PAIN AND NAUSEA AND UPSET, AND HE PERSISTENTLY COMPLAINED OF THIS GI UPSET AND -- LET ME SEE IF I CAN FIND IT. SO REALLY HIS SYMPTOMS STARTED TO ESCALATE IN SEPTEMBER OF 2014. HE SUBMITTED A SICK CALL REQUEST SAYING, THIS IS MY THIRD SICK CALL, I NEED TO SEE THE DOCTOR FOR ACID REFLUX. I CAN'T EAT BECAUSE IT HURTS SWALLOWING. I FEEL LIKE SOMETHING'S STUCK IN MY CHEST. I'VE LOST WEIGHT, AND THIS HAS BEEN GOING ON FOR TWO MONTHS. HE WAS SEEN BY AN EMT, AND REALLY TREATED SYMPTOMATICALLY.

      A PHYSICIAN SAW THE PATIENT ON SEPTEMBER 24TH, NOTED

CHEST PAIN, DIFFICULTY SWALLOWING, CHOKING.  THE PATIENT
COMPLAINED OF FOOD GETTING STUCK.  HE NOTICED THAT THE -- HE
DID NOT EXAMINE THE PATIENT'S ORAL CAVITY OR NOTE HE HAD A 10
POUND WEIGHT LOSS.  HE TREATED HIM FOR GERD AND ORDERED SOME
MEDICATION.

SO THE PATIENT KEPT COMING BACK SO THAT ON DECEMBER
13TH, ONCE AGAIN, THE PATIENT SAID HE'S GOT ACID REFLUX, HIS
MEDICATIONS WEREN'T WORKING.  HE'S GOT A SHARP PAIN IN HIS
CHEST, INABILITY TO EAT BECAUSE FOOD WON'T GO ALL THE WAY DOWN.
"IT GETS STUCK AND I HAVE TO THROW UP.  I'M IN BAD PAIN AND I
CAN'T EAT."  THAT WAS ON NOVEMBER 2ND.

A PROVIDER SAW THE PATIENT ON THE 3RD AND DIDN'T --
EXCUSE ME -- STRIKE THAT.

ON 11/20, THE PATIENT COMPLAINED OF COUGHING UP BLOOD
AND THAT HE HAD BEEN COUGHING UP BLOOD FOR THREE MONTHS, THIS
PROGRESSED.

ON DECEMBER 15TH, HE SAID I NEED TO DECLARE A MEDICAL
EMERGENCY, I HAVE AN ULCER AND ACID REFLUX FOR MONTHS.  IT'S
GOTTEN A LOT WORSE TO THE POINT I CAN'T TAKE THE PAIN.  I NEED
SOMEONE TO HELP ME TODAY.  I CAN'T EAT, I CAN'T SLEEP, I CAN
BARELY MOVE AROUND.  AND WITH THAT, THE EMT DID NOT CONTACT A
PHYSICIAN.  THIS IS ON DECEMBER 15TH.  AND TWO DAYS LATER, A
PHYSICIAN ORDERED ZANTAC, BUT DID NOT REQUEST TO SEE THE
PATIENT.

THE PATIENT RETURNS AGAIN ON DECEMBER 22ND WITH, ONCE

AGAIN, COMPLAINING OF BURNING IN THE STOMACH, IT'S LIKE FIRE.

I'M GOING TO TRY TO FAST-FORWARD.  ON JANUARY 12TH, THE PATIENT IS IN SEVERE PAIN.  HE'S BROUGHT TO THE ATU.  HIS BLOOD PRESSURE IS 80/63.  HIS PULSE IS 127 PER MINUTE.  THEY CONTINUE TO MONITOR HIM IN THE ATU.  AGAIN, HIS VITAL SIGNS CONTINUE TO BE ABNORMAL WITH A VERY RAPID PULSE.  AT ABOUT 9:45, AN EMT NOTIFIED ONE OF THE PHYSICIANS WHO GAVE AN ORDER FOR IV FLUIDS, AND THEY GOT A CBC, A COMPLETE BLOOD COUNT, TO CHECK FOR ANEMIA.  AND AT 10:00 AT NIGHT ON THE 12TH, HIS HEMOGLOBIN WAS 8.2.  NOW, THIS PATIENT HAD HAD A HEMOGLOBIN OF 14 SOME MONTHS PRIOR, SO IT'S CLEAR HE'S HAVING SOME INTERNAL BLEEDING.  AND THERE'S NO DOCUMENTATION THAT THE EMTS NOTIFIED A PHYSICIAN OR THAT A PHYSICIAN EVER SIGNED THIS REPORT.

THE NEXT MORNING, THE PATIENT WAS ADMITTED TO THE NURSING UNIT.  SO THESE VITAL SIGNS, THE PATIENT'S HYPOTENSIVE, HE'S GOT A RAPID HEART RATE, HE'S BEEN COMPLAINING OF SEVERE ABDOMINAL PAIN, AND HE'S GUARDING HIS ABDOMEN, HE'S GOT ABDOMINAL DISTENSION, AND HE'S PUT IN THE NURSING UNIT.  AND LATER THAT DAY AT 4:00, THEY FIND HIM DEAD IN HIS BED.  AND THIS IS JUST ANOTHER EXAMPLE OF SOMEONE WHO PRESENTS OVER TIME WITH SYMPTOMS OF A SEVERE MEDICAL CONDITION, NEVER REALLY MEDICALLY EVALUATED, THEN BECOMES ACUTELY ILL WITH ABNORMAL VITAL SIGNS, A LAB TEST THAT SHOWS THAT HE'S BLEEDING, AND HE'S PUT INTO THE INFIRMARY.

Q.    THANK YOU, MS. LAMARRE.  WE'VE HEARD QUITE A BIT OF

1  TESTIMONY ABOUT THE EMERGENCY RESPONSE AND THE ATU, SO I'M NOT

2  GOING TO GO INTO THAT, BUT IS IT YOUR OPINION THAT THE ATU

3  ADEQUATELY ADDRESSES URGENT MEDICAL NEEDS OF ITS PATIENTS?

4  **A.**  ABSOLUTELY NOT.

5  **Q.**  LET'S TURN AND TALK A LITTLE BIT ABOUT REFUSALS.  WE'VE

6  HEARD A LOT ABOUT REFUSALS OVER THE LAST FEW DAYS.  HOW DO

7  REFUSALS INTERACT WITH ACCESS TO CARE IN A CORRECTIONAL

8  SETTING?

9  **A.**  REFUSALS ARE CHALLENGING IN THE CORRECTIONAL ENVIRONMENT

10  BECAUSE OF THE VARIETY OF REASONS THAT PATIENTS WILL REFUSE.

11         AND JUST TO MAKE AN ANALOGY, IF A PATIENT GOES TO HIS

12  OR HER DOCTOR IN THE COMMUNITY AND THE DOCTOR SAYS YOU HAVE A

13  SERIOUS MEDICAL CONDITION AND I RECOMMEND THIS MEDICATION OR I

14  RECOMMEND THIS SURGERY AND THE PATIENT DOESN'T WANT TO PROCEED

15  AT THAT TIME, THE PHYSICIAN COUNSELS THE PATIENT ON, ALL RIGHT,

16  IF YOU DECIDE NOT TO DO THIS, THESE ARE THE RISKS OF NOT

17  PROCEEDING.  AND I'M DOCUMENTING THE RISKS OF THAT IN THE

18  MEDICAL RECORD, AND I'D LIKE YOU TO COME BACK IN A MONTH OR TWO

19  AND SEE HOW YOU'RE DOING AND LET'S TALK ABOUT IT AND SEE WHERE

20  YOU'RE AT.  AND WHETHER OR NOT THE PHYSICIAN ASKED THE PATIENT

21  TO SIGN ANYTHING IS NOT TYPICAL AS FAR AS I UNDERSTAND IT IF

22  YOU GO INTO A HOSPITAL AND YOU'RE CHECKING OUT AGAINST MEDICAL

23  ADVICE, THEY MIGHT ASK YOU TO SIGN A FORM SAYING, YOU KNOW, IF

24  YOU DECIDE TO LEAVE NOW, YOU COULD HAVE A HEART ATTACK, YOU

25  COULD HAVE -- YOU MIGHT DIE, AND THEY GET THE PATIENT TO SIGN.

IN CORRECTIONS, EVERYTHING IS MEDICALIZED.  SO IF THE
PATIENT -- BECAUSE THE PATIENT IS OFTEN NOT IN CONTROL OF THEIR
OWN HEALTHCARE, MAYBE THEY DON'T EVEN HAVE THE MEDICATIONS WITH
THEM, THEY HAVE TO GO SOMEWHERE, YOU REFUSE YOUR MEDICATION.
IF YOU'RE SCHEDULED FOR LAB, YOU KNOW, YOU MIGHT REFUSE YOUR
LAB, BUT WHY?  CONFLICTS, SO THINGS LIKE, I'M REFUSING THE
DOCTOR'S APPOINTMENT BECAUSE I'M DIABETIC AND I'M SUPPOSED TO
GET MY INSULIN AND MY BLOOD SUGAR CHECKED AT THIS TIME AND THE
DOCTOR'S APPOINTMENT IS THE SAME TIME SO I HAVE TO CHOOSE
BETWEEN ONE OR THE OTHER.  OR I HAVE A MENTAL HEALTH
APPOINTMENT AND A DOCTOR'S APPOINTMENT, I HAVE TO CHOOSE
BETWEEN ONE OR THE OTHER.  I HAVE AN ATTORNEY VISIT THAT IS
SCHEDULED AND, THEREFORE, I DON'T WANT TO GO TO MY DOCTOR'S
APPOINTMENT BECAUSE I DON'T WANT TO MISS MEETING WITH MY
ATTORNEY.  OR I HAVE A JOB, YOU KNOW, WHERE I'M MAKING SOME
MONEY AND I ONLY MAKE 12 CENTS AN HOUR, SO I DON'T WANT TO MISS
OUT.  NOW, SHOULD ALL THESE OTHER CONSIDERATIONS OUTWEIGH THE
MEDICAL APPOINTMENT?  IT REALLY DEPENDS, BUT THESE ARE THE
KINDS OF CIRCUMSTANCES THAT HAPPEN IN CORRECTIONS THAT LEAD
PATIENTS TO REFUSE CARE.  SOMETIMES THEY REFUSE MEDICATIONS,
HIV MEDICATIONS, REFUSING THEM OVER AND OVER AGAIN, AND THAT'S
NOT IN THE PATIENT'S BEST INTEREST, BUT THAT HAPPENS.  SO WE
UNDERSTAND THAT REFUSALS TAKE PLACE IN CORRECTIONS.
**Q.**   AND SO HOW SHOULD YOU ADDRESS THAT?  LET ME BACK UP.  WHEN
YOU WERE PRACTICING IN CORRECTIONS, DID YOU ENCOUNTER THIS

1    ISSUE?

2    **A.**    YES.

3    **Q.**    WOULD YOU SAY YOU ENCOUNTERED IT FREQUENTLY?

4    **A.**    I WOULD SAY I DID NOT -- IT WAS THE TYPE OF CORRECTIONAL

5    FACILITY I WORKED IN WAS A HALFWAY HOUSE WHERE INMATES WERE ON

6    WORK RELEASE, SO I DIDN'T ENCOUNTER IT AS MUCH AS I'VE

7    ENCOUNTERED IT IN MY WORK WITH THE GEORGIA DEPARTMENT OF

8    CORRECTIONS AND THROUGH MY MONITORING.  I'M VERY FAMILIAR WITH

9    ALL THE SCENARIOS IN WHICH PATIENTS REFUSE CARE.

10   **Q.**    AND SO HOW SHOULD A CORRECTIONAL SETTING ADDRESS REFUSALS?

11   **A.**    SO THERE ARE A COUPLE DIFFERENT THINGS, WAYS TO HANDLE IT.

12   WHEN IT COMES TO MEDICATIONS, THE PATIENT GOES TO THE NURSE, HE

13   SAYS, I WANT THOSE TWO MEDICATIONS, BUT I DON'T WANT THAT ONE.

14   AND SO THE NURSE WRITES THAT DOWN.  IF THAT HAPPENS, IF IT

15   HAPPENS ONCE AND IT'S NOT A CRITICAL MED, OKAY, THE PATIENT

16   REFUSED MEDICATION THAT DAY.  IF THE PATIENT REFUSES

17   REPEATEDLY, THE NURSE SHOULD REFER THE PATIENT TO THE PROVIDER

18   AND THE PROVIDER SHOULD SAY, TELL ME ABOUT YOUR MEDICATIONS,

19   WHY ARE YOU REFUSING THEM?  IS IT BECAUSE THEY MAKE YOU SICK OR

20   JUST TELL ME WHY.

21        **MR. ARCHEY:**  YOUR HONOR, I THINK THIS IS AT LEAST THE

22   THIRD TIME WE'VE HEARD THIS TESTIMONY, AT LEAST.  IT JUST KEEP

23   CIRCLING BACK TO THE SAME OVER AND OVER.

24        **THE COURT:**  SO YOUR OBJECTION IS TO CUMULATIVE?

25        **MR. ARCHEY:**  I AM, YOUR HONOR.

04:18  1    **MS. MONTAGNES:**  YOUR HONOR, NURSE LAMARRE DID

2    TESTIFY -- MS. LAMARRE DID TESTIFY REGARDING MEDICATION

3    NONCOMPLIANCE, BUT THIS IS THE FIRST TIME THAT WE'RE TALKING

4    ABOUT REFUSALS FOR MEDICAL APPOINTMENTS.

5            **THE COURT:**  YOU'VE HAD OTHER WITNESSES THAT HAVE

6    TALKED ABOUT IT.  I'LL GIVE YOU SOME LEEWAY, BUT IT IS A BIT

7    CUMULATIVE.

8            **MS. MONTAGNES:**  OKAY.

9            **THE COURT:**  GO AHEAD.

10   BY MS. MONTAGNES:

11   **Q.**   WELL, LET'S JUST TALK ABOUT THIS.  IN TERMS OF A NO --

12   COULD YOU DEFINE A NO-SHOW AS OPPOSED TO A REFUSAL?

13   **A.**   SO A NO-SHOW IS WHEN A PATIENT DOESN'T COME TO A SCHEDULED

14   MEDICAL FUNCTION, MEDICATION ADMINISTRATION, A DOCTOR'S

15   APPOINTMENT, LABS, X-RAY.  AND THE DIFFERENCE BETWEEN A NO-SHOW

16   AND A REFUSAL IS THAT WHEN THERE'S A NO-SHOW, USUALLY STAFF

17   DON'T KNOW WHY THE PATIENT HASN'T SHOWN UP, AND THERE TENDS TO

18   BE AN ASSUMPTION THAT THE PATIENT HASN'T SHOWN UP BECAUSE THE

19   PATIENT DOESN'T WANT TO COME.  BUT SOMETIMES THE PATIENT WAS

20   TRANSFERRED TO ANOTHER HOUSING UNIT, THE PATIENT MAY NOT HAVE

21   BEEN NOTIFIED THAT THEIR MEDICATION HAS ARRIVED, OR THAT THEY

22   HAVE THIS APPOINTMENT.  THERE ARE DIFFERENT SCENARIOS FOR A

23   NO-SHOW VERSUS A REFUSAL WHERE THE PATIENT ACTIVELY SAYS, I

24   DON'T WANT THIS.

25   **Q.**   AND JUST TO MOVE THINGS ALONG, WOULD IT BE FAIR TO SAY

THAT IT IS THE OBLIGATION OF THE PROVIDER TO COUNSEL A PATIENT
WHO REFUSES MEDICAL CARE?

**A.**   FOR SERIOUS, FOR POTENTIALLY SERIOUS OUTCOMES, I THINK IF
THE PATIENT HAS KNEE PAIN, DOESN'T WANT AN X-RAY, THAT IS NOT
LIFE THREATENING AND, THEREFORE, I WOULDN'T -- IT WOULDN'T BE
AS MUCH OF A CONCERN THAN IF A PATIENT IS REFUSING A DIAGNOSTIC
TEST OR LABS NEEDED TO MONITOR THEIR DISEASE.  THEN THE
PROVIDER SHOULD SAY, IF I'M GOING TO TAKE CARE OF YOU, I NEED
TO, YOU KNOW, HAVE THESE TESTS AND LET'S TALK ABOUT HOW THAT
COULD HAPPEN.

          **MS. MONTAGNES:**  AND MARTHA, COULD YOU BRING UP
10DD-27289.

**BY MS. MONTAGNES:**

**Q.**   AND THIS IS PATIENT NO -- THIS IS PATIENT NO. 34.

          SO MS. LAMARRE, YOU DID NOT REVIEW THIS CHART, BUT WE
SAW THIS THIS MORNING.  I WONDER IF YOU COULD JUST BRIEFLY TALK
ABOUT THIS REFUSAL.

**A.**   WELL, I REFERENCED THIS A FEW MINUTES AGO, THE TYPES OF
CIRCUMSTANCES IN WHICH PATIENTS REFUSE.  I THINK SOMETIMES
THERE IS AN ASSUMPTION THAT ALL REFUSALS ARE BAD.  IN OTHER
WORDS, THAT PATIENT DOESN'T WANT THE CARE THAT'S BEING OFFERED.
AND WHAT'S REALLY TRUE IS THAT SOMETIMES THE PATIENT HAS A
DILEMMA WHERE THEY HAVE TO MAKE A CHOICE AND THE CHOICE ISN'T
GOOD.  I EITHER HAVE THIS TEST OR, BECAUSE I'M A DIABETIC, AND
I MISSED MY 9:00 A.M. MEDS AND I NEED TO EAT BECAUSE I'M

1  GETTING INSULIN, THAT KIND OF THING.  THERE ARE DIFFERENT

2  SCENARIOS WHERE IT'S UNDERSTANDABLE WHY THE PATIENT MIGHT HAVE

3  REFUSED.

4  **Q.**    AND IN YOUR EXPERIENCE, IS THIS PRETTY COMMON?

5  **A.**    YES.

6  **Q.**    AND THIS IS PATIENT NO. 32, MY MISTAKE.  I APOLOGIZE.

7       AND MARTHA, COULD YOU BRING UP 10W-2-26425 -- 20245,

8  MY MISTAKE.  I APOLOGIZE.

9       IN LOOKING AT THIS REFUSAL, MS. LAMARRE, CAN YOU TELL

10  ME WHAT MORE INFORMATION YOU MIGHT WANT FROM A REFUSAL LIKE

11  THIS?

12  **A.**    SO THIS IS A PATIENT WHO SAYS, I'M NOT GOING FOR MY CHEST

13  X-RAY, AND SO ONE WOULDN'T WANT TO LET IT JUST REST THERE

14  BECAUSE IT'S POSSIBLE THE PATIENT HAD A POSITIVE TUBERCULOSIS

15  TB SKIN TEST, OR HAD SYMPTOMS OF SERIOUS MEDICAL CONDITIONS SO

16  YOU'D WANT THE PROVIDER TO KNOW ABOUT THIS AND CALL THE PATIENT

17  BACK AND TALK TO HIM.

18  **Q.**    AND HAVING REVIEWED THIS CHART, DID THAT HAPPEN IN THIS

19  CASE?

20  **A.**    I DON'T RECALL ACTUALLY WHETHER I REVIEWED THIS REFUSAL

21  SPECIFICALLY.

22  **Q.**    OKAY.  AND WAS THERE ANY PARTICULAR EXAMPLE OF THIS THAT

23  YOU SAW IN YOUR CHART REVIEWS?

24  **A.**    I'M SORRY?

25  **Q.**    WAS THERE ANY PARTICULAR EXAMPLE THAT STOOD OUT TO YOU

REGARDING REFUSALS THAT YOU SAW IN YOUR CHART REVIEW?

**A.**   SO THERE WAS ONE RECORD I REVIEWED OF A PATIENT THAT HAD

SEVERE COPD, CHRONIC OBSTRUCTIVE PULMONARY DISEASE, AND HE HAD

SEEN THE PULMONOLOGIST, AND BECAUSE OF HOW SHORT OF BREATH HE

WAS, THE PULMONOLOGIST RECOMMENDED OXYGEN, CONTINUOUS OXYGEN.

AND IT WASN'T INITIALLY GRANTED TO HIM, AND SO THE PATIENT

STARTED TO REFUSE TRANSPORTS ON THE VAN TO COME TO

APPOINTMENTS.

       **MR. ARCHEY:**   YOUR HONOR, MAY I GET A PATIENT NUMBER,

PLEASE?

       **MS. MONTAGNES:**   MY APOLOGIES.

       **MR. ARCHEY:**   IF I'M GOING TO BE ABLE TO RESPOND.

       **MS. MONTAGNES:**   MY APOLOGIES.

**BY MS. MONTAGNES:**

**Q.**   WHICH PATIENT WAS THIS?

**A.**   ONE MOMENT, PLEASE.  I BELIEVE IT'S PATIENT NO. 28.

**Q.**   KEEP GOING.

**A.**   SO THE PATIENT WAS REFUSING TO GET ON THE VAN BECAUSE

WITHOUT THE OXYGEN, HE BECAME SO SHORT OF BREATH THAT HE

COULDN'T TOLERATE IT.  I MEAN, HIS SYMPTOMS WERE REALLY QUITE

SEVERE.  SO THAT'S ANOTHER EXAMPLE WHERE A PATIENT ISN'T

NECESSARILY REFUSING THE CARE, BUT THEY JUST CAN'T TOLERATE THE

TRANSPORTATION.

**Q.**   AND DID YOU SEE ANY OTHER EXAMPLES OF PATIENTS WHO WERE

NONCOMPLIANT IN YOUR CHART REVIEW?

**A.**   YES.

**Q.**   AND DID YOU SEE DOCUMENTATION OF COUNSELING IN THOSE CHARTS?

**A.**   IN SOME CHARTS, BUT THE MAJORITY, NO.

**Q.**   THANK YOU.  WE'RE GOING TO TURN AND TALK A BIT ABOUT CHRONIC CARE MANAGEMENT.  YOU SAID YOU REVIEWED LSP'S CHRONIC DISEASE GUIDELINES, SO LET'S NOT GET INTO THAT.  LET'S TALK A LITTLE BIT ABOUT THE COMPONENTS OF A SUCCESSFUL CHRONIC DISEASE PROGRAM.  THIS IS SLIDE 118.  COULD YOU DESCRIBE THIS BRIEFLY?

**A.**   SURE.  SO CHRONIC DISEASE PROGRAMS ARE PRETTY STANDARD IN CORRECTIONS IN THIS DAY AND AGE.  THE FIRST THING THAT'S NECESSARY IS TO ENROLL THE PATIENT IN A CLINIC AND HAVE A TRACKING SYSTEM SO THAT THE PROVIDER, NURSES AND PROVIDERS HAVE A WAY TO KNOW WHEN WAS THE PATIENT FIRST SEEN, WHEN IS THEIR NEXT SCHEDULED VISIT, WHEN ARE THEIR LABS SCHEDULED FOR THE NEXT VISIT, ET CETERA.

AND FOR THE CLINIC VISITS, WHAT ONE WOULD TYPICALLY EXPECT IS THAT AT EACH CLINIC VISIT, THE PROVIDER WOULD ADDRESS EACH ONE OF THE PATIENT'S CHRONIC DISEASES, THEY WOULD PERFORM A PERTINENT MEDICAL HISTORY FOR THAT CHRONIC DISEASE FOR THAT PATIENT, ASK THEM IF THEY'RE HAVING SYMPTOMS OF THE DISEASE IN QUESTION, REVIEW ANY PERTINENT LAB TESTS, PERFORM A FOCUSED PHYSICAL EXAMINATION PERTINENT TO THEIR DISEASES, REVIEW MEDICATION ADHERENCE AND ADDRESS ANY OBSTACLES TO COMPLIANCE, ASSESS THEIR DISEASE CONTROL, IS IT WELL CONTROLLED, IS IT

POORLY CONTROLLED, AND DEVELOP OR MODIFY A TREATMENT PLAN FOR
EACH OF THE PATIENT'S DISEASES AND THEN SCHEDULE A FUTURE
CLINIC VISIT IN ACCORDANCE WITH THE PATIENT, HOW WELL THE
PATIENT'S DISEASES ARE CONTROLLED.

IT'S NOT REALLY ROCKET SCIENCE.  IT'S REALLY WHAT YOU
WOULD ANTICIPATE FOR MANAGEMENT OF ANYBODY WITH A SERIOUS
MEDICAL CONDITION.

**Q.**   AND IN YOUR REVIEW OF ANGOLA'S CHRONIC DISEASE MANAGEMENT,
DO YOU FIND THAT THESE COMPONENTS EXISTED?

**A.**   FOR THE MOST PART, NO.

**Q.**   WHAT, IF ANY, CONCLUSIONS DID YOU DRAW ABOUT THE CHRONIC
DISEASE MANAGEMENT THERE?

**A.**   THE ADEQUACY OF THE CLINICAL ASSESSMENTS, THERE WERE MANY
CASES IN WHICH THE PROVIDER JUST LISTED THE DISEASE AND WITHOUT
PERFORMING ANY EXAMINATION AT ALL RELATIVE TO THAT CONDITION.

**Q.**   AND WHEN WE WERE DISCUSSING THE CHRONIC DISEASE
GUIDELINES, YOU MENTIONED THAT THE CHRONIC DISEASE GUIDELINES
DIDN'T ADHERE TO THE NATIONAL STANDARDS.  WERE THERE ANY -- DID
YOU FIND THAT THE HEPATIS C GUIDELINES ADHERE TO NATIONAL
STANDARDS?

**MR. ARCHEY:**  YOUR HONOR, I OBJECT.  THIS IS NOT
CONTAINED IN THE EXPERT REPORT ANYWHERE.  SHE HAS A SLIDE SHE'S
HANDED OUT, HAS INFORMATION THAT WAS NOT DISCLOSED IN THE
EXPERT REPORT.  THIS IS A NEW OPINION THAT THERE'S BEEN NO
DISCOVERY ON, AND I OBJECT TO THE WITNESS OFFERING THESE

OPINIONS AT THIS TIME.

      **THE COURT:** CAN YOU POINT TO SOMEWHERE IN THE REPORT WHERE MS. LAMARRE ADDRESSED THIS?

      **MS. MONTAGNES:** JOINT EXHIBIT 6 AT 282, I BELIEVE.

      MARTHA, IF YOU COULD BRING UP PLAINTIFFS' EXHIBIT 6 AT 42 AND 43.

      SO IN ADDITION TO IT BEING MENTIONED IN THE REPORT, WE REFERENCE HERE SOME GUIDELINES THAT YOUR HONOR TOOK JUDICIAL NOTICE OF PRIOR TO THE BEGINNING OF TRIAL.

      **THE COURT:** MR. ARCHEY, YOU HAVE IT?

      **MR. ARCHEY:** GIVE ME A SECOND, YOUR HONOR.

      **MS. MONTAGNES:** SO WHILE IT'S TRUE, YOUR HONOR, WE DON'T SPECIFICALLY GO INTO THE DETAILS OF EACH OF THE STANDARDS, NURSE LAMARRE SPECIFICALLY MENTIONS THAT THEY'RE NOT BASED ON THESE NATIONAL STANDARDS, AND THEN WE SUBSEQUENTLY MOVED TO HAVE JUDICIAL NOTICE TAKEN OF THE HEPATITIS C STANDARDS. FURTHERMORE, WE GAVE THESE TO COUNSEL SEVERAL DAYS AGO; THEY DID NOT RAISE THIS OBJECTION IN ADVANCE OF TODAY.

      **THE COURT:** I MEAN, THE QUESTION WAS, WHAT'S HER OPINION OF THE CHRONIC DISEASE MANAGEMENT AND RIGHT HERE ON PAGE 43, SHE SAYS LSP'S CHRONIC DISEASE GUIDELINE LACK THESE ELEMENTS. THESE STEPS ARE NOT PERFORMED. THEY'RE BASICALLY PATTERNS, BLAH, BLAH, BLAH.

      **MR. ARCHEY:** WELL, MY OBJECTION MAY BE ONE QUESTION TOO EARLY THEN, JUDGE.

THE COURT:  OKAY.  WELL, THEN THIS ONE IS OVERRULED.
WE'LL SEE WHAT THE NEXT ONE BRINGS.

BY MS. MONTAGNES:

Q.   ALL RIGHT.  PULLING BACK UP SLIDE 104.  WHEN YOU REVIEWED
THE CHRONIC DISEASE GUIDELINES, NURSE LAMARRE, WERE YOU ABLE TO
--

MR. ARCHEY:  THIS IS WHERE I HAVE MY OBJECTION,
JUDGE.  THIS HAS NOT BEEN DISCLOSED.  THIS WASN'T IN THE
REPORT.  ALL THESE GUIDELINES, THIS TESTING, THIS WHATEVER THIS
IS SHE'S REFERRING TO, SHE'S NOT DISCLOSED ANY OF THIS.  THIS
WAS NOT AN OPINION THAT SHE GAVE OR ANYTHING LIKE THAT.  SHE
GAVE WHAT YOU NOTED WHICH WAS A BIG BROAD "I DON'T LIKE IT"
BASICALLY, BUT SHE DIDN'T GO INTO WHAT THE DETAILS OF HER
OPINION ARE LIKE SHE'S DOING HERE.

MS. MONTAGNES:  SO ON THE LEFT, YOUR HONOR, THIS WAS
TAKEN JUDICIAL NOTICE OF PRIOR TO THE START OF TRIAL.  THE
POLICIES -- AND POLICIES THAT ARE IN EVIDENCE THAT WERE
DISCLOSED BY THE DEFENDANTS.  THE NEXT BIT OF EVIDENCE IS A
DEPOSITION TAKEN OF THEIR DIRECTOR OF NURSING.  ALL OF THIS IS
IN EVIDENCE AND ALL OF THESE ARE THINGS THAT MS. LAMARRE, I
APOLOGIZE, NURSE PRACTITIONER LAMARRE REVIEWED IN PREPARATION
OF HER REPORT AND SHE STATES IN HER REPORT THAT THEY DON'T
ADHERE TO NATIONAL GUIDELINES, AND THIS IS SIMPLY ONE EXAMPLE
OF THAT.

THE COURT:  WHERE IN THE REPORT DOES IT SAY THAT THEY

1  DON'T ADHERE TO THE NATIONAL GUIDELINES?  WAS THAT ON PAGE 45?

2          MS. MONTAGNES:  IT WAS IN THE PREVIOUS PAGES.

3          THE COURT:  I CAN PULL IT UP FROM HERE.

4          MS. MONTAGNES:  I BELIEVE IT'S 42, 42 AND 43.

5          THE COURT:  I MEAN, I THINK MR. ARCHEY'S OBJECTION IS

6  THAT WHILE ALL THIS MAY BE IN EVIDENCE, YOU'RE ASKING HER TO

7  CONNECT THE DOTS BY AN OPINION, AND THAT THE CONNECTION OF THE

8  DOTS WAS NOT IN HER REPORT.

9          IS THAT HOW I UNDERSTAND YOUR OBJECTION?  DO I

10 UNDERSTAND YOUR OBJECTION, SIR?

11         MR. ARCHEY:  IT IS, YOUR HONOR.  THANK YOU.

12         MS. MONTAGNES:  SO WE CAN TALK ABOUT IT, BUT SHE DOES

13 SAY THAT THEY DON'T INCLUDE COMMUNITY STANDARDS OF CARE, BUT

14 THE GUIDELINES ARE BASED UPON SUCH AS THE AMERICAN DIABETES

15 ASSOCIATION, MEDICAL STANDARD OF CARE AND DIABETES, AND SHE

16 GOES ON TO CITE SOME EXAMPLES AND THIS IS JUST AN EXAMPLE.

17         THE COURT:  WELL, IF SHE DID NOT OPINE AS TO THE

18 GUIDELINES IN HER REPORT, I'M GOING TO SUSTAIN THE OBJECTION.

19 SO UNLESS YOU CAN POINT OUT TO ME YOU'RE TALKING ABOUT THE LSP

20 CHRONIC DISEASE GUIDELINES BUT YOU'RE NOT TALKING ABOUT ANY

21 KIND OF NATIONAL GUIDELINES, SO I'M GOING TO SUSTAIN THE

22 OBJECTION.  YOU CAN ASK OTHER QUESTIONS, BUT NOT THAT QUESTION.

23         MS. MONTAGNES:  ALL RIGHT.

24 BY MS. MONTAGNES:

25 Q.  JUST TO REMIND THE COURT, MS. LAMARRE, HAVE YOU EVER

PLAYED ANY ROLE IN FORMULATING STANDARDS, ANY NATIONAL

GUIDELINES?

**A.** AS I MENTIONED EARLIER, I PARTICIPATED AT THE REQUEST OF

CDC ON A PANEL TO MAKE RECOMMENDATIONS REGARDING PREVENTION OF

CONTROL OF HEP-C IN CORRECTIONAL FACILITIES.

**Q.** AND IN YOUR REVIEW OF LSP'S CHRONIC CARE GUIDELINES, DID

YOU FIND THAT THEIR GUIDELINES MET WITH NATIONAL STANDARDS?

**A.** NOT WITH RESPECT TO TESTING.

**Q.** NOT WITH RESPECT TO TESTING. AND THAT WAS SPECIFICALLY

RELATED TO HEPATITIS C?

**A.** CORRECT.

**Q.** AND DID YOU FIND THAT IN REVIEW OF THEIR GUIDELINES THAT

THEY -- THAT THEY WERE PROVIDING ADEQUATE EXAMINATIONS BASED ON

NATIONAL STANDARDS?

**A.** MY REVIEW SHOWED THAT WHEN I REVIEWED RECORDS OF PATIENTS

WITH HEP-C, THAT THEY -- THEIR HEP-C WAS NOT EVALUATED.

**Q.** WERE THERE OTHER PARTS OF THEIR CARE THAT FELL BELOW THE

STANDARD, THE NATIONAL STANDARD OF CARE?

**A.** WELL, PATIENTS WITH HEP-C SHOULD --

**MR. ARCHEY:** YOUR HONOR, I'M GOING TO MAINTAIN MY

OBJECTION OR OBJECT AGAIN. THIS IS OUTSIDE THE SCOPE. I MEAN,

SHE GAVE THE BIG BROAD OPINION, AND SHE'S GIVEN THAT, BUT NOW

THEY'RE JUST TRYING TO GET INTO THE DETAIL THAT WASN'T

DISCLOSED IN THE REPORT PREVIOUSLY, SO I OBJECT BECAUSE IT'S

NOT DISCLOSED BY THE REPORT.

1    **MS. MONTAGNES:**  SO YOUR HONOR, JUST TO BE CLEAR,

2  THERE WERE CHART REVIEWS IN WHICH THE REVIEW OF HEPATITIS C WAS

3  INVOLVED, AND SO WHILE IT'S NOT CONTAINED RIGHT THERE, THERE

4  ARE INDIVIDUAL CHARTS WHERE THE REVIEW OF HEPATITIS C TOOK

5  PLACE, AND I BELIEVE THAT MS. LAMARRE CAN DISCUSS WHAT SHE

6  OBSERVED IN THE CHARTS.

7    **THE COURT:**  OKAY.  I'M GOING TO ALLOW IT.  IT'LL JUST

8  GO TO THE WEIGHT.  GO AHEAD.

9    **MS. MONTAGNES:**  THANK YOU.

10  **BY MS. MONTAGNES:**

11  **Q.**  MS. LAMARRE, SORRY I'M GETTING A LITTLE DISCOMBOBULATED,

12  MY APOLOGIES.

13    IN YOUR REVIEW OF HEP-C, DID YOU MAKE ANY CONCLUSIONS

14  ABOUT THE OVERALL AVAILABILITY OF TREATMENT TO PATIENTS?

15  **A.**  I DID NOT MAKE A CONCLUSION BECAUSE I THINK THAT WHILE I

16  REVIEWED A FEW CHARTS OF PATIENTS WITH HEP-C IN WHICH THERE

17  DIDN'T SEEM TO BE ANY EVALUATION, I THINK IT WAS A SMALL NUMBER

18  OF CHARTS SO I CAN'T MAKE A BROAD CONCLUSION ABOUT THAT, BUT I

19  WOULD CERTAINLY BE CONCERNED THAT IN THESE CHARTS THAT PATIENTS

20  WEREN'T MEDICALLY EVALUATED AND CONSIDERED FOR TREATMENT IN

21  ACCORDANCE WITH WHATEVER CURRENT GUIDELINES WERE AVAILABLE AT

22  THAT TIME.

23  **Q.**  AND BASED ON YOUR REVIEW OF THE CHARTS AND YOUR REVIEW OF

24  THE CHRONIC CARE DISEASE GUIDELINES, WERE YOU ABLE TO ASSESS

25  WHETHER OR NOT THE TREATMENT OF HEPATITIS C APPEARS TO BE

WITHIN THE NATIONAL GUIDELINES?

**A.**   I SAW NO EVIDENCE THAT IT WAS IN TERMS OF OFFERING TREATMENT.

**Q.**   FROM BOTH THE POLICY AND YOUR CHART REVIEW?

**A.**   CORRECT.

**Q.**   WERE THERE ANY SPECIFIC PATIENTS THAT STOOD OUT TO YOU WHO FELL BELOW THE STANDARD OF CARE WITH REGARD TO CHRONIC DISEASE?

**A.**   YES.

**Q.**   COULD YOU DESCRIBE THOSE FOR ME?

**A.**   YES.  THERE WERE TWO PATIENTS.  PATIENT NO. 26 WAS THE FIRST.  SO THIS PATIENT WAS A 61-YEAR-OLD MAN WITH HIV INFECTION.  IN REVIEWING HIS CHART, HE WAS PRESCRIBED A TREATMENT REGIMEN THAT INITIALLY WAS COMPLIANT WITH THE NATIONAL GUIDELINES FOR TREATMENT OF HIV.  AND JUST TO SAY A FEW WORDS ABOUT THE PRINCIPLES OF HIV TREATMENT, IT'S IMPORTANT THAT THE SELECTION OF MEDICATIONS REPRESENT DIFFERENT CLASSES OF HIV MEDICATIONS THAT ATTACK THE VIRUS FROM DIFFERENT STAGES OF REPRODUCTION.  SO WHAT WE'VE LEARNED IS IF YOU TREAT PATIENTS WITH ONE MEDICATION, THE VIRUS WILL BECOME RESISTANT. IF YOU TREAT PATIENTS WITH TWO HIV MEDICATIONS, THE VIRUS WILL BECOME RESISTANT AND THEN YOU CAN'T USE MEDICATIONS IN THOSE CLASSES ANYMORE.  SO THE GUIDELINES FOR ABOUT 20 YEARS HAVE BEEN, YOU HAVE TO USE AT LEAST THREE MEDICATIONS FROM TWO DIFFERENT CATEGORIES OF CLASSES OF DRUGS.  THAT'S JUST BEEN A STANDARD PRINCIPLE IN ORDER TO MAINTAIN DISEASE CONTROL.

1    SO THIS PATIENT WAS ON TWO MEDICATIONS FROM ONE CLASS

2    AND ANOTHER MEDICATION FROM ANOTHER CLASS.  ACTUALLY HE WAS ON

3    TWO.  AND FOR REASONS THAT ARE COMPLETELY UNCLEAR, A PROVIDER,

4    AND IT MAY HAVE BEEN THE INFECTIOUS DISEASE PROVIDER,

5    DISCONTINUED TWO OF THE MEDICATIONS, LEAVING THE PATIENT ON ONE

6    MEDICATION THAT WAS CALLED A BOOSTED PROTEASE INHIBITOR SO HE

7    WAS ACTUALLY TAKING TWO PILLS, BUT IT WAS REALLY ONE

8    MEDICATION.  AND THE PATIENT HAS CONTINUED SINCE THEN, SINCE

9    2015, TO BE ON THE SINGLE MEDICATION.  THE PATIENT HAS NOT

10   DEVELOPED DRUG RESISTANCE AT THIS POINT, BUT IT'S LIKELY TO

11   OCCUR SOME POINT IN THE FUTURE AND IT'S NOT -- IT'S DEFINITELY

12   ABSOLUTELY NOT IN COMPLIANCE WITH THE GUIDELINES.

13       THE SECOND PATIENT, LET'S SEE, I'M HAVING TROUBLE

14   RECOLLECTING THE SECOND PATIENT -- I'M SORRY.  I'M HAVING

15   DIFFICULTY LOCATING THE SECOND PATIENT TO DISCUSS.

16   Q.   DO YOU HAVE BOTH THE PATIENT IDENTIFIER CHARTS UP THERE?

17       MR. ARCHEY:  WHILE SHE'S LOOKING FOR THAT, JUDGE,

18   LET'S TAKE CARE OF A HOUSEKEEPING MATTER.  THESE RECORDS WERE

19   OBJECTED TO FOR THIS PATIENT NO. 26.  THEY'VE BEEN OBJECTED TO,

20   SO SINCE THEY'RE NOW BEING REFERRED TO, WE'D LIKE TO HAVE THEM

21   ADMITTED INTO EVIDENCE AT THIS TIME.

22       MS. MONTAGNES:  NO OBJECTION.

23       THE COURT:  WHAT'S THE NUMBER?

24       MR. ARCHEY:  DEFENSE 741, YOUR HONOR.

25       THE COURT:  ADMITTED.

THE WITNESS:  I WILL TALK ABOUT PATIENT 25.  AND THIS PATIENT IS A 56-YEAR-OLD MAN WITH HIV AIDS, AND HE HAD A HISTORY OF REFUSING MEDICATIONS, AND HIS CONDITION DETERIORATED AND THEN WHEN HE WENT BACK ON TREATMENT AND WAS PLACED ON A MORE CURRENT REGIMEN, AN APPROVED REGIMEN, BUT FOR REASONS THAT WERE NOT DOCUMENTED IN THE RECORD, HE WAS CHANGED BACK TO A PREVIOUS REGIMEN THAT IS NO LONGER RECOMMENDED THAT HAS A HIGHER TOXICITY PROFILE.  ONE OF THE MEDICATIONS, ACT, CAUSED ANEMIA, AND HE WAS NOT MONITORED FOR ANEMIA AND THEN HAD TO BE HOSPITALIZED WITH A HEMOGLOBIN OF 2.7, A CRITICALLY LOW HEMOGLOBIN LEVEL AND RECEIVED BLOOD TRANSFUSIONS, AND THAT WAS A CONCERN BECAUSE HE WAS ON A REGIMEN THAT WAS WORKING FOR HIM AND WAS A MORE CURRENT REGIMEN AND THEN SWITCHED BACK TO A MUCH OLDER REGIMEN THAT'S, I BELIEVE, NO LONGER RECOMMENDED.

BY MS. MONTAGNES:

Q.   THANK YOU.

CAN WE TURN BRIEFLY BACK TO SLIDE 108 WHICH IS OF PATIENT 16.

I BELIEVE THAT I MISSPOKE BEFORE ABOUT THE DATE THAT THE PATIENT PASSED AWAY, AND YOU WERE GOING TO CORRECT ME AND I JUST WANTED TO CORRECT THAT NOW, IF WE COULD.  PATIENT 16, IF YOU WOULD TAKE A MINUTE AND REVIEW THAT, I BELIEVE THAT THIS SLIDE IS INCORRECT AS TO THAT DATE AS WELL.

A.   I BELIEVE THE PATIENT DIED ON FEBRUARY 1ST.  I'M SORRY.  THAT WAS PATIENT -- I APOLOGIZE, THAT'S NOT CORRECT.

Q.    PATIENT 16.

A.    16, YES.  I THINK THAT THIS WAS THE PATIENT THAT IN MY
NOTES, THAT ONCE HE WAS TRANSPORTED TO THE HOSPITAL, THAT I DID
NOT DOCUMENT THE DAY OF HIS DEATH IN MY NOTES, OF THE DAY HE
DIED AT THE HOSPITAL.

Q.    THANK YOU.

        NOW LET'S TALK A LITTLE BIT ABOUT THE HEALTHCARE
RECORD.  DID YOU REVIEW THE HEALTHCARE RECORDS, THE HEALTHCARE
INFORMATION MANAGEMENT SYSTEM?

A.    YES, I DID.

Q.    ALSO KNOWN AS A HIM?

A.    HEALTH INFORMATION MANAGEMENT.

Q.    YES.  WHY ARE ADEQUATE HEALTHCARE RECORDS IMPORTANT?

A.    THERE ARE ABSOLUTELY CRITICAL TO ENSURING THAT THE PATIENT
RECEIVES ADEQUATE CARE AND CONTINUITY OF CARE.  SO THE PURPOSE
OF THE MEDICAL RECORD OBVIOUSLY IS FROM A MEDICAL/LEGAL
DOCUMENTATION TO DEMONSTRATE WHAT WAS ORDERED FOR THE PATIENT,
WHAT THE PATIENT RECEIVED, AND TO COMMUNICATE WITH ALL THE
HEALTHCARE PROVIDERS SO THAT EVERYBODY WHO'S TREATING THE
PATIENT KNOWS, UNDERSTANDS WHAT THE TREATMENT -- WHAT THE
FINDINGS HAVE BEEN, WHAT THE TREATMENT PLAN IS, AND TO
PARTICIPATE IN THE DELIVERY OF HEALTHCARE BASED ON WHAT'S
DOCUMENTED IN THE RECORD.

Q.    AND WHAT ARE SOME OF THE IMPORTANT COMPONENTS OF A MEDICAL
RECORD?

**A.**   A TYPICAL MEDICAL RECORD HAS GOT A PROBLEM LIST THAT

DOCUMENTS THE MAJOR PROBLEMS, GOT HISTORY AND PHYSICAL FORMS,

PROGRESS NOTES, THERE'S A LAB SECTION, RADIOLOGY SECTION,

THERE'S AN INFIRMARY SECTION OF THE RECORD, A PLACE TO DOCUMENT

CONSENTS AND REFUSALS.  THERE ARE MULTIPLE DIFFERENT SECTIONS

OF THE MEDICAL RECORD.

**Q.**   AND IN ADDITION TO THE ELEMENTS OF A MEDICAL RECORD, WHAT

OTHER COMPONENTS ARE NECESSARY FOR A SUCCESSFUL HEALTH

INFORMATION MANAGEMENT SYSTEM?

**A.**   DOCUMENTS THAT GO INTO THE RECORD HAVE TO BE TIMELY

RETRIEVED SUCH AS SPECIALITY NOTES AND OUTSIDE HOSPITALIZATION

NOTES AND LAB REPORTS AND THEY NEED TO BE TIMELY REVIEWED AND

FILED IN THE RECORD SO THAT INFORMATION IS AVAILABLE TO ALL THE

STAFF.

**Q.**   AND WHAT ARE YOUR FINDINGS WITH REGARD TO THE HEALTH

INFORMATION MANAGEMENT AT LSP?

**A.**   WELL, IT'S INADEQUATE FOR A NUMBER OF REASONS.  ONE IS

THAT -- AND LSP IS VERY UNIQUE IN THAT THE RECORDS ARE VERY

LARGE AND VERY CUMBERSOME BECAUSE OF THE LENGTH OF STAY OF

INMATES AT LSP.  SO YOU CAN HAVE A PATIENT WHO'S BEEN THERE FOR

20 OR 30 YEARS, THEY HAVE MULTIPLE, MULTIPLE LARGE VOLUMES OF

RECORDS THAT WHEN THEY GET FILLED UP, THEY HAVE TO BE BROKEN

DOWN IN ORDER TO CREATE THE NEW VOLUME.  AND ONE OF THE

PROBLEMS IS THAT INFORMATION THAT SHOULD BE TRANSFERRED OVER TO

PROVIDE CONTINUITY OF CARE INTO THE NEW RECORD ARE OFTEN NOT

TRANSFERRED OVER.  IT'S DIFFICULT TO NAVIGATE THE RECORD
BECAUSE DOCUMENTS ARE OFTEN MISFILED, AND SO EVEN IN CONDUCTING
MY REVIEW, IT WAS HARD TO BE SURE THAT I WAS REVIEWING ALL
PERTINENT INFORMATION.

THERE MIGHT HAVE BEEN INFORMATION THAT I WOULD HAVE
WANTED TO SEE THAT COULD HAVE BEEN IN ANOTHER PART OF THE
RECORD.  THERE ARE DUPLICATE RECORDS IN THE MEDICAL RECORD.
SOME THAT ARE DATED AS TO WHEN THEY WERE VIEWED; SOME THAT WERE
NOT DATED AS TO WHEN THEY WERE VIEWED.  THAT'S A SIGNIFICANT
PROBLEM, IS THE LACK OF TIMELY -- WHEN PHYSICIANS IN PARTICULAR
ARE LOOKING AT REPORTS OR DOCUMENTS, THEY FAIL TO DOCUMENT WHEN
DID I LOOK AT THIS AND WHAT IS MY PLAN, AND THAT REALLY PLAYED
A ROLE IN A CHALLENGE TO EVALUATE, WHAT IS THE TIMELINESS OF
CARE WHEN YOU DON'T KNOW WHEN THE PHYSICIAN ACTUALLY SAW THIS
REPORT.  IT WAS AVAILABLE ONE DAY AND YOU DON'T KNOW EXACTLY
WHEN IT WAS REVIEWED.

SO ANOTHER ISSUE IS THE FACT THAT PART OF THE RECORD
IS ELECTRONIC, THE MEDICATION ADMINISTRATION RECORDS, AND PART
OF THE RECORD IS PAPER.  SO WHEN A PROVIDER IS SEEING A
PATIENT, IT IS NOT -- I DON'T KNOW IF THEY HAVE THE CAPACITY TO
DO IT, BUT WHAT'S NOT HAPPENING IS THE PROVIDERS DON'T BRING UP
THE ELECTRONIC MEDICAL -- I'M SORRY -- THE MAR TO SEE AND
CONFIRM WHETHER THE PATIENT IS RECEIVING MEDICATIONS, REFUSING
MEDICATIONS, NO-SHOWING OR GETTING THEM TIMELY.  SO THAT'S A
BIG PROBLEM IS THE FACT THAT IT'S A SPLIT SYSTEM.  THEY COULD

1  REALLY BENEFIT FROM AN ELECTRONIC MEDICAL RECORD.  THE NATURE

2  OF LSP WOULD REALLY BENEFIT FROM MOVING TO A TOTAL INSTEAD OF

3  JUST A PARTIAL ELECTRONIC MEDICAL RECORD.

4          **MS. MONTAGNES:**  AND CAN WE PULL UP 10-V-18949.

5  **BY MS. MONTAGNES:**

6  **Q.**   AND THIS IS UNDER SEAL.

7          SO YOU MENTIONED INADEQUATE DOCUMENTATION OF THE

8  MEDICAL RECORD.  I WONDER IF YOU COULD JUST TALK US THROUGH

9  THIS RECORD AND SOME OF THE PROBLEMS THAT YOU SEE.

10 **A.**   OKAY.  TO BE BRIEF, BECAUSE I'VE TALKED ABOUT THIS SOME

11 BEFORE, SO THIS IS A PATIENT THAT I REVIEWED WHO HAD

12 LONGSTANDING UNCONTROLLED HYPERTENSION.  HE COMES INTO THE

13 CLINIC -- THIS IS ON JANUARY 14TH, 2014.  HE COMES INTO THE

14 CLINIC WITH A BLOOD PRESSURE OF 216/113 AND THE EXTENT OF THE

15 EVALUATION IS A STATEMENT OF NONCOMPLIANCE WITH MEDS.  THERE'S

16 NO REVIEW OF SYSTEMS, ARE YOU HAVING CHEST PAINS, ARE YOU

17 HAVING A HEADACHE, ARE YOU HAVING SHORTNESS OF BREATH, ARE YOUR

18 ANKLES SWOLLEN.  THERE'S AN ABBREVIATED EXAM IN WHICH THE

19 PROVIDER DOCUMENTS THAT THE PATIENT HAS A MURMUR, WHICH IS A

20 NEW MURMUR, AND THE PROVIDER DOESN'T EXPLAIN THAT.

21         AND THERE'S A SINGLE DOSE OF TREATMENT FOR HIS BLOOD

22 PRESSURE AT THAT MOMENT, BUT THERE'S NO OTHER CHANGE IN

23 TREATMENT PLAN.  IT'S JUST A STATEMENT, HE'S GOT HYPERTENSION,

24 NOT THAT IT'S A CRITICALLY HIGH ONE.  AND SO THIS IS AN EXAMPLE

25 OF THE LACK OF ADEQUATE DOCUMENTATION IN THE RECORD FOR A GIVEN

PATIENT.  AND THIS IS A PATIENT THAT WAS NONCOMPLIANT WITH HIS

MEDICATION ACCORDING TO THE NOTES, ALTHOUGH, GIVEN THE

MEDICATION ADMINISTRATION RECORD, IT'S NOT REALLY CLEAR HOW

MUCH HE WAS OR WAS NOT, SO . . .

**Q.**   NURSE LAMARRE, HAVE YOU REVIEWED FACILITIES THAT WERE

APPROVED BY THE ACA OR NCCHC BEFORE?

**A.**   YES.  AND DO YOU MEAN ACCREDITED?

**Q.**   ACCREDITED, YES.

**A.**   YES.

**Q.**   IN YOUR REVIEW OF THOSE FACILITIES, DID YOU FIND THAT THEY

WERE ALWAYS CONSTITUTIONALLY ADEQUATE?  OR, SORRY, I WITHDRAW.

DID YOU FIND THAT THE CARE THAT THEY WERE DELIVERING

WAS ADEQUATE?

**A.**   JUST TO CLARIFY, YOU MEAN THE FACILITIES HAD RECEIVED

ACCREDITATION?

**Q.**   YES.

**A.**   OKAY.  NO.

**MR. ARCHEY:**  YOUR HONOR, IS SHE TESTIFYING AS TO THE

CONSTITUTIONALITY?  I MEAN, SHE IS AN EXPERT WITNESS.  IS SHE

GOING TO GIVE US A LEGAL OPINION?

**MS. MONTAGNES:**  I BELIEVE I --

**THE COURT:**  SHE DID WITHDRAW THAT QUESTION.  WHY

DON'T YOU ASK THE QUESTION AGAIN JUST SO WE ARE ALL ON THE SAME

PAGE.

**BY MS. MONTAGNES:**

**Q.**   AND IN YOUR REVIEW OF THOSE FACILITIES WHICH HAD
ACCREDITATION, DID YOU BELIEVE -- DID YOU ALWAYS FIND THAT THEY
WERE DELIVERING ADEQUATE CARE?

**A.**   NO.

**Q.**   AND COULD YOU SAY MORE ABOUT WHY OR WHY NOT?

**A.**   WELL, WHEN I WORKED FOR THE GEORGIA DEPARTMENT OF
CORRECTIONS, MOST OF OUR FACILITIES WERE ACCREDITED BY ACA AND
NCCHC AT THE TIME THAT THE COURT HAD TO INTERVENE, AND I KNEW
FROM PERSONAL EXPERIENCE THAT THE HEALTHCARE SYSTEMS WERE
COMPLETELY BROKEN AND YET WE WERE STILL ACCREDITED.

**Q.**   AND MS. LAMARRE, GIVEN ALL OF THE PROBLEMS THAT WE'VE
DISCUSSED HERE TODAY, DO YOU BELIEVE THAT THE PROBLEMS AT
ANGOLA COULD BE SOLVED IF, FOR EXAMPLE, THEY HAD UNLIMITED
ACCESS TO A GOOD PUBLIC HOSPITAL?

**A.**   IT WOULD HELP THEM TO HAVE ACCESS, QUICK ACCESS, BUT IT
WOULDN'T SOLVE THEIR PROBLEMS.

**Q.**   IS THERE ANY ONE THING THAT YOU THINK COULD CHANGE WHICH
WOULD FIX THE PROBLEMS THAT YOU OBSERVED AT ANGOLA?

**A.**   ANY SINGLE THING?

**Q.**   YES.

**A.**   NO.  THE CORRECTION TO ESTABLISHING AN ADEQUATE HEALTHCARE
SYSTEM ARE COMPREHENSIVE, AND REALLY ALMOST EVERY COMPONENT OF
AN ADEQUATE HEALTHCARE SYSTEM NEEDS TO BE ADDRESSED.

**Q.**   AND IN YOUR REVIEW OVER -- IN YOUR REVIEW OF CARE AT
ANGOLA, WERE THERE SOME YEARS WHEN THINGS THAT LOOKED BETTER

THAN OTHER YEARS?

**A.**  NO.

**Q.**  COULD YOU SAY MORE ABOUT THAT?

**A.**  DURING THE PERIOD OF TIME THAT I REVIEWED, CARE REMAINED POOR.  THERE WERE DIFFERENT PROCESSES THAT CHANGED LIKE HOW TO DOCUMENT MEDICATIONS, BUT IT REMAINED -- MY ASSESSMENT IS THAT IT'S AN INADEQUATE SYSTEM AND IT REALLY HASN'T IMPROVED.

**Q.**  AND HOW DOES YOUR REVIEW OF ANGOLA COMPARE TO OTHER REVIEWS YOU HAVE DONE?

**A.**  UNFORTUNATELY I HAVE TO SAY THAT IT'S REALLY ONE OF THE WORST PRISONS I HAVE EVER REVIEWED BECAUSE OF THE LEVEL OF HARM THAT I FOUND AT THIS FACILITY AND THAT MY COLLEAGUES FOUND AND WE DESCRIBE IN OUR REPORT.

**Q.**  COULD YOU JUST SUMMARIZE FOR US WHAT THE GENERAL REASONS FOR THAT REVIEW OF THAT ASSESSMENT IS?

**A.**  SURE.

     **MR. ARCHEY:**  YOUR HONOR, WE REALLY HAVE BEAT A HORSE ABOUT AS DEAD AS IT CAN BE.  IT'S PUSHING 5:00.  I OBJECT TO THE CUMULATIVE AND REPETITIVE NATURE OF THE TESTIMONY.

     **THE COURT:**  IT IS CUMULATIVE.  YOU CAN SUMMARIZE, BUT LET'S TRY TO BE BRIEF, MA'AM.

     **THE WITNESS:**  YES, YOUR HONOR.  I THINK THAT ONE OF THE PRIMARY ISSUES IS THEY DON'T HAVE ADEQUATE HEALTHCARE STAFFING SO THAT THERE'S HEALTHCARE PERSONNEL DELIVERING CARE. THERE'S NOT ADEQUATE ACCESS TO CARE AND ACCESS TO A PHYSICIAN.

PHYSICIANS DO NOT EVALUATE PATIENTS EVEN WHEN THEY ARE
NOTIFIED.  THE MEDICATION ADMINISTRATION SYSTEM IS COMPLETELY
BROKEN, AND THERE IS A PUNITIVE ATTITUDE TOWARDS INMATES THAT I
THINK AFFECTS THE QUALITY OF CARE ON A DAILY BASIS.

       **MS. MONTAGNES:**  COURT'S INDULGENCE?

       **THE COURT:**  TAKE FIVE.

       **MS. MONTAGNES:**  ACTUALLY, I HAVE NO MORE QUESTIONS
FOR MS. LAMARRE.

       **THE COURT:**  OKAY.  YOU MAY STEP DOWN, MA'AM.  THIS IS
GOING TO BE A GOOD TIME TO BREAK.  WE'LL COME BACK IN THE
MORNING FOR CROSS-EXAMINATION.

       CAN YOU ALL SHARE WITH US -- YOU CAN SIT DOWN.
THANK YOU.  THANK YOU, BUT YOU MAY SIT DOWN.  CAN YOU SHARE
WITH US -- YES, SIR?

       **MR. ROBERT:**  YOU SAID IN THE MORNING.  I THINK WE'RE
SUPPOSED TO GO AGAIN IN --

       **THE COURT:**  THAT'S NOT UNTIL THURSDAY.

       **MR. ROBERT:**  WELL, THAT'S NOT WHAT WE HAD ON OUR
SCHEDULE.

       **MS. ROPER:**  WE HAVE NO COURT ON THURSDAY.

       **MR. ARCHEY:**  WE WERE OUT THURSDAY AND FRIDAY WE
THOUGHT.

       **THE COURT:**  I'M GOING TO TELL Y'ALL WHAT THE SCHEDULE
IS AND IF IT'S GOING TO POSE A PROBLEM, I'M GOING TO LET Y'ALL
TELL ME.  TOMORROW IS WEDNESDAY.  WE'VE ALWAYS BEEN SCHEDULED

1 FOR WEDNESDAY. WE WERE NOT SCHEDULED FOR THURSDAY AND FRIDAY.

2       **MR. ARCHEY:** WE HAD 1:00 IS WHAT WE UNDERSTOOD, BUT

3 WE'LL MAKE IT WORK.

4       **THE COURT:** 1:00 TOMORROW BECAUSE I HAD TWO

5 SENTENCINGS AND REENTRY COURT.

6       **MR. ARCHEY:** RIGHT.

7       **THE COURT:** I'VE MOVED THE SENTENCINGS, SO IF YOU ALL

8 CAN SHOW UP, I HAVE ONE SENTENCING AT 9:00. IF YOU CAN COME AT

9 9:30, I CAN GIVE YOU TWO HOURS BETWEEN 9:30 AND 11:30. IS THAT

10 GOING TO BLOW YOUR MIND?

11       **MR. ARCHEY:** JUDGE, I'VE HAD LESSER BLOW MY MIND

12 BEFORE, BUT I'M GOOD. THAT'S FINE, JUDGE.

13       **THE COURT:** I DON'T WANT TO SURPRISE YOU ALL. IF YOU

14 CAN'T BE PREPARED, WE WILL STICK WITH 1:00. I MEAN, I'M SURE

15 THE COURT STAFF WOULD LOVE THAT, BUT I KNOW THAT TIME IS OF THE

16 ESSENCE AND I'M TRYING TO GIVE Y'ALL AS MUCH COURT TIME AS

17 POSSIBLE.

18       **MR. ARCHEY:** WE CAN BE HERE FOR 9:30, JUDGE.

19       **THE COURT:** 9:30 TO 11:30 TOMORROW. WE'LL BREAK

20 BETWEEN 11:30 AND 1:30, WE'LL GO UNTIL 5:00. AND I'M SAYING

21 9:30 JUST TO BE -- IT MAY BE 9:40. I HAVE A 9:00 SENTENCING,

22 SO UNLESS, YOU KNOW, IF IT DOESN'T COME OFF THE RAILS, IT WILL

23 BE AT 9:30.

24       CAN I ASK THE PLAINTIFFS WITHOUT SHARING YOUR

25 WORK PRODUCT, IF YOU DON'T -- IF YOU CANNOT ANSWER THIS

1    QUESTION, I UNDERSTAND, HOW MUCH MORE DO YOU HAVE?

2            **MS. MONTAGNES:**  SO YOUR HONOR, NURSE PRACTITIONER

3    LAMARRE IS OUR FINAL LIVE WITNESS.  WE HAD INTENDED TO SHOW TO

4    THE COURT THE DEPOSITION OF SHANNON HURD, WHICH WAS A VIDEO FOR

5    PERPETUATION DEPOSITION TAKEN OF HIM BEFORE HE DIED.  I

6    UNDERSTAND THE COURT WANTS TO MOVE THINGS ALONG AND THAT THE

7    COURT MAY CHOOSE TO WATCH THAT SEPARATELY, AND THAT'S -- YOU

8    KNOW, I LEAVE THAT TO THE COURT HOW YOU WOULD WANT TO PROCEED

9    WITH THAT.  HIS VIDEO DEPOSITION IS PART OF JOINT EXHIBIT 2, I

10   BELIEVE.

11           **THE DEPUTY CLERK:**  IT'S 4.

12           **THE COURT:**  SO YOU WILL REST AFTER THE VIDEO

13   DEPOSITION OF SHANNON HURD?

14           **MS. MONTAGNES:**  YES, YOUR HONOR.

15           **THE COURT:**  OKAY.  THE COURT WILL REVIEW THE VIDEO

16   DEPOSITION OF SHANNON HURD.  IT'S ALREADY IN EVIDENCE, AT

17   ANOTHER TIME.  I MAY DO IT THURSDAY ON THE PLANE, BUT I WILL DO

18   IT PROBABLY BEFORE CLOSE OF EVIDENCE.

19           SO YOU'RE GOING TO HAVE A MOTION, I IMAGINE, I DON'T

20   KNOW, BUT I IMAGINE YOU WILL.  WHAT I WANT TO TELL YOU IS I

21   WANT THE DEFENDANTS TO BRING THEIR BEST GAME AT THE BEGINNING

22   OF THEIR -- I'M NOT SUGGESTING THAT YOU WON'T BRING YOUR BEST

23   GAME.  WHAT I'M SAYING IS DON'T PLAN ON A BIG CRESCENDO.  THE

24   REASON BEING, I WANT YOU TO COME OUT OF THE BOX AND I WANT YOU

25   TO SHOW THEM THE BEST THAT YOU HAVE, BECAUSE ON THURSDAY AND

FRIDAY, YOU ARE INVITED TO MY CONFERENCE ROOM TO DISCUSS
MATTERS AMONG YOURSELVES.  THURSDAY AFTERNOON AND FRIDAY I
WON'T BE HERE, BUT YOU WILL.  YOU WILL BE IN MY CONFERENCE
ROOM, SO PICK FOUR PEOPLE AMONG EACH TEAM, I MEAN, WE COULD
PROBABLY SQUEEZE IN FIVE, BUT IT'S GOING TO BE TIGHT.  BRING
GRANOLA BARS, BRING WATER.  WE WILL TRY TO FEED YOU SOME
COFFEE.  WE'LL KEEP THE AIR CONDITIONER ON.  YOU'LL HAVE AN
HOUR FOR LUNCH, BUT BE PREPARED TO MEET WITH YOUR OPPOSING
COUNSEL THURSDAY AFTERNOON, SAY, 1:00 OR -- WE CAN SAY 1:30,
LET Y'ALL HAVE A LITTLE BREAK, 1:30 TO 4:30 AND THEN AGAIN ON
FRIDAY 9:00 TO 4:00.  I'LL LET YOU ALL OUT EARLY ON FRIDAY.

           THE GOAL WOULD BE -- AND LET ME JUST SAY THIS.
THE COURT IS NOT EXPECTING, ALTHOUGH IT WOULD BE CERTAINLY
WELCOME, SOME SORT OF A GLOBAL RESOLUTION, THAT WOULD BE GREAT,
BUT IF YOU CAN CHIP AWAY AT THIS, I HAPPEN TO BELIEVE THAT
ANGOLA HAS PROBABLY MADE SOME CHANGES BETWEEN THE END OF THE
DISCOVERY PERIOD AND TODAY.  IF THOSE CHANGES ARE SATISFACTORY
AND CAN BE REDUCED TO SOME SORT OF A CONSENT DECREE WITH SOME
REASONABLE MONITORING OR WHATEVER, WHATEVER IS MUTUALLY
AGREEABLE TO YOU ALL, THAT SEEMS LIKE A REALLY OBVIOUS PLACE TO
START.  BUT IF WE CAN CHIP AWAY AT THAT SO THAT WHAT WE HAVE
LEFT ARE THE ISSUES THAT ARE REALLY, REALLY IN CONTENTION, THAT
WOULD BE EXTREMELY, I THINK, PRODUCTIVE.

           MAGISTRATE JUDGE BOURGEOIS IS NOT AVAILABLE ON
THURSDAY AND FRIDAY.  HE CAN CERTAINLY LOOK IN ON YOU, BUT HE'S

04:59   1   GOT A SETTLEMENT CONFERENCE ON FRIDAY AND SOMETHING IN COURT ON
         2   THURSDAY AFTERNOON SO HE'S REALLY NOT AVAILABLE.  HE'S
         3   AVAILABLE ON MONDAY.  I MEAN, I WILL JUST LEAVE THAT TO YOU
         4   ALL.  IF YOU WANT TO LET US KNOW ON FRIDAY AFTERNOON IF YOU'RE
         5   LIKE SUPER CLOSE TO SOME GLOBAL RESOLUTION AND YOU NEED THE
         6   MAGISTRATE JUDGE'S HELP, HE'S AVAILABLE ON MONDAY.  ONLY
         7   BECAUSE SOME THINGS CANCELLED AND HE JUST EMAILED ME A FEW
         8   MINUTES AGO SAYING THAT HE COULD DO MONDAY, BUT HE CAN'T DO
         9   THURSDAY AND FRIDAY.
        10              DO Y'ALL WANT TO MAKE ANY COMMENTS TO ANY OF
        11   THAT, MAKE ANY OBJECTIONS TO ANY OF THAT?  THROW A HISSY FIT?
        12   JUMP UP AND DOWN AND SAY YAY?
        13        MR. ARCHEY:  DO YOU WANT FOUR ATTORNEYS PER SIDE?  IS
        14   THAT WHAT YOU WERE SAYING?
        15        THE COURT:  I MEAN, YOU'RE GOING TO BE IN THE
        16   CONFERENCE ROOM, SO . . .
        17        MR. ARCHEY:  CAN WE REDUCE THAT DOWN MAYBE?
        18        THE COURT:  YEAH, WE CAN REDUCE THAT DOWN.  WHAT DO
        19   Y'ALL WANT?  I MEAN, I WANT IT TO BE THE MOST PRODUCTIVE THING
        20   POSSIBLE.
        21        MS. MONTAGNES:  FROM OUR PERSPECTIVE, YOUR HONOR, IN
        22   ORDER TO MAKE IT PRODUCTIVE, WE'RE HAPPY TO HAVE FOUR.  I WILL
        23   SAY THAT, JUST GIVEN MY PAST EXPERIENCE, IF DOC PERSONNEL ARE
        24   THERE, IT TENDS TO BE MORE PRODUCTIVE.
        25        THE COURT:  WELL, I MEAN, I WOULD CERTAINLY -- YOUR

05:00 1  DOC PEOPLE ARE AVAILABLE, SO I'M NOT GOING TO ORDER YOU TO HAVE

2  YOUR CLIENTS THERE BECAUSE THERE'S NOT GOING TO BE ANY JUDICIAL

3  REFEREES THERE.  SO I'M NOT GOING TO ORDER THAT.  I THINK IT

4  COULD GET OUT OF HAND, BUT THEY'RE AVAILABLE, THEY'RE ON THE

5  PHONE.  YOU CAN GET THEM ON THE PHONE.  YOU CAN GET THEM IN THE

6  COURTROOM TO MEET WITH THEM.  WE'LL MAKE THE ATTORNEY

7  CONFERENCE ROOM AVAILABLE TO YOU.  I MEAN, IF YOU WANT TO USE

8  MY OFFICE, YOU CAN USE MY OFFICE.  THAT'S HOW STRONGLY I FEEL

9  ABOUT THIS.  I MEAN, JUST DO WHAT YOU NEED TO DO.  THEY NEED

10  FOUR PEOPLE.  IF YOU ONLY WANT THREE, THAT'S OKAY WITH ME.

11        **MR. ARCHEY:**  YOU HAVE A LOVELY CONFERENCE ROOM,

12  JUDGE, SO WE'LL --

13        **THE COURT:**  WELL, WE'LL TRY TO MAKE IT AS COMFORTABLE

14  AS POSSIBLE FOR YOU.  YOU KNOW, I WILL SAY THAT OTHER PEOPLE

15  THAT ARE WAY SMARTER THAN ME THAT HAVE SAT IN THIS CHAIR BEFORE

16  ME WOULD HAVE TURNED THE AIR CONDITIONER OFF ON YOU, BUT I'M

17  NOT GOING TO DO THAT, AND THEY CERTAINLY WOULDN'T HAVE OFFERED

18  YOU COFFEE, OKAY, BUT . . .

19        **MR. ARCHEY:**  JUDGE POLOZOLA TRIED TO PUT ME AND MY

20  CLIENT IN JAIL ONE TIME TILL WE SETTLED, SO THERE YOU GO.

21        **THE COURT:**  I'M NOT GOING TO DO THAT AND I'M NOT

22  GOING TO ASK YOU WHAT YOUR AUTHORITY IS, AND I'M NOT GOING

23  TO -- YOU KNOW, Y'ALL ARE BIG BOYS AND GIRLS, TRY TO WORK OUT

24  WHAT YOU CAN, OKAY?  SO TOMORROW MORNING 9:30 TILL 11:30 AND

25  THEN 1:30 TO 5:00.

WE WILL BE IN RECESS UNTIL TOMORROW MORNING.

**(PROCEEDINGS RECESSED UNTIL OCTOBER 17, 2018.)**

**CERTIFICATE**

    I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

SHANNON THOMPSON, CCR,

OFFICIAL COURT REPORTER