1                    UNITED STATES DISTRICT COURT

2                    MIDDLE DISTRICT OF LOUISIANA

3

4    JOSEPH LEWIS JR., ET AL      *    CIVIL ACTION

5    VERSUS                       *    NO. 15-318

6    BURL CAIN, ET AL             *    OCTOBER 22, 2018

7    * * * * * * * * * * * * * * *

8

9                              DAY 8
                         BENCH TRIAL BEFORE
10                  THE HONORABLE SHELLY D. DICK
               UNITED STATES CHIEF DISTRICT JUDGE
11

12   APPEARANCES:

13   FOR THE PLAINTIFFS:          THE PROMISE OF JUSTICE
                                  INITIATIVE
14                                BY:  MERCEDES H. MONTAGNES, ESQ.
                                       AMANDA C. ZARROW. ESQ.
15                                     MEREDITH ANGELSON, ESQ.
                                       NISHI KUMAR, ESQ.
16                                636 BARONNE STREET
                                  NEW ORLEANS, LOUISIANA 70113
17
                                  ACLU OF LOUISIANA
18                                BY:  BRUCE W. HAMILTON, ESQ.
                                  P.O. BOX 56157
19                                NEW ORLEANS, LOUISIANA 70156

20                                COHEN MILSTEIN SELLERS & TOLL
                                  PLLC
21                                BY:  JEFFREY B. DUBNER, ESQ.
                                  1100 NEW YORK AVE NW, SUITE 500
22                                WASHINGTON, DC 20005

23                                THE CAPITAL APPEALS PROJECT
                                  BY:  ERICA L. NAVALANCE, ESQ.
24                                636 BARONNE STREET
                                  NEW ORLEANS, LOUISIANA 7013

25

```
 1                                    SOUTHERN POVERTY LAW CENTER
                                      BY:  JARED F. DAVIDSON, ESQ.
 2                                        JAMILA A. JOHNSON, ESQ.
                                      1055 ST. CHARLES AVE., SUITE 505
 3                                    NEW ORLEANS, LOUISIANA 70130

 4   FOR THE DEFENDANTS:             KANTROW SPAHT WEAVER &
                                     BLITZER
 5                                   BY:  RANDAL J. ROBERT, ESQ.
                                         CONNELL L. ARCHEY, ESQ.
 6                                       KEITH FERNANDEZ, ESQ.
                                     P.O. BOX 2997
 7                                   BATON ROUGE, LOUISIANA 70821

 8                                   SHOWS CALI & WALSH LLP
                                     BY:  MARY E. ROPER, ESQ.
 9                                       JOHN C. CONINE JR., ESQ.
                                         CAROLINE T BOND, ESQ.
10                                       JEFFREY K. CODY, ESQ.
                                     628 ST. LOUIS STREET
11                                   BATON ROUGE, LOUISIANA 70802

12   OFFICIAL COURT REPORTER:        SHANNON L. THOMPSON, CCR.
                                     UNITED STATES COURTHOUSE
13                                   777 FLORIDA STREET
                                     BATON ROUGE, LOUISIANA 70801
14                                   (225) 389-3567

15        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
               COMPUTER-AIDED TRANSCRIPTION SOFTWARE
16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2                                                        PAGE

3    DEFENDANTS' WITNESSES:

4     STAYCE FALGOUT

5      CROSS-EXAMINATION CONTINUED BY MS. ANGELSON      5

6     RANDY LAVESPERE, M.D.

7      DIRECT EXAMINATION BY MR. ROBERT                 8

8      CROSS-EXAMINATION BY MS. MONTAGNES               173

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              **(OCTOBER 22, 2018)**

3              **THE COURT:**  BE SEATED.

4                     TELL ME SOMETHING GOOD, COUNSEL.  WELL, IT'S A

5    GOOD SIGN TWO PEOPLE ARE UP, THAT'S GOOD.

6              **MS. MONTAGNES:**  WE HAD A VERY NICE LUNCH, JUDGE.

7              **THE COURT:**  OKAY.

8              **MS. MONTAGNES:**  UNFORTUNATELY, WE WEREN'T ABLE TO

9    RESOLVE ANYTHING.  WE DID HAVE SOME PRODUCTIVE CONVERSATIONS

10   AND MAYBE THE POSSIBILITY OF FURTHER CONVERSATIONS AFTER THE

11   TRIAL.

12             **THE COURT:**  YOU RESOLVED ZERO, NOTHING?  I WILL NEVER

13   GIVE YOU PEOPLE COOKIES AGAIN.

14             **MR. ROBERT:**  MY APOLOGIES, YOUR HONOR.  WE TRIED, WE

15   JUST COULDN'T GET THERE, YOU KNOW.

16             **MS. MONTAGNES:**  YEAH.

17             **THE COURT:**  I BELIEVE MS. FALGOUT WAS ON THE STAND;

18   IS THAT RIGHT?

19             **MS. MONTAGNES:**  YES, YOUR HONOR.

20             **THE COURT:**  IT WAS MY RECOLLECTION, THEN, SHE WAS ON

21   CROSS?

22             **MS. MONTAGNES:**  YES.

23             **THE COURT:**  MS. FALGOUT, YOU MAY TAKE THE STAND

24   AGAIN.

25                     MA'AM, YOU ARE STILL UNDER OATH.

1   **STACYE FALGOUT,**

2   HAVING PREVIOUSLY BEEN SWORN, TESTIFIED AS FOLLOWS.

3           **THE COURT:**  ALL RIGHT, GO AHEAD, MA'AM.

4           **MS. ANGELSON:**  GOOD MORNING, YOUR HONOR.  MEREDITH

5   ANGELSON FOR THE PLAINTIFFS.

6           **THE COURT:**  GOOD MORNING.

7                   **CROSS-EXAMINATION CONTINUED**

8   BY MS. ANGELSON:

9   **Q.**   GOOD MORNING, MS. FALGOUT.

10  **A.**   GOOD MORNING.

11  **Q.**   MS. FALGOUT, LAST WEEK YOU TESTIFIED ABOUT THE OVERSIGHT?

12  **A.**   THAT HEADQUARTERS DOES OF DOCTORS WITH RESTRICTED

13  LICENSES?

14  **A.**   YES.

15  **Q.**   AND YOU REFERRED TO THE FACT THAT HEADQUARTERS WOULD SEND

16  MONITORING REPORTS TO THE STATE MEDICAL LICENSING BOARD,

17  CORRECT?

18  **A.**   YES.

19  **Q.**   AND THAT YOU WOULD FAX THOSE REPORTS?

20  **A.**   I HAVE FAXED THEM BEFORE ON SPECIFIC PHYSICIANS.

21  **Q.**   OKAY.

22  **A.**   IT'S NOT ALL DOCTORS, WITH RESTRICTED LICENSES.

23  **Q.**   RIGHT.  OKAY.  THANK YOU FOR CLARIFYING.

24          BUT THAT WOULD HAPPEN ON A QUARTERLY BASIS, TO YOUR

25  RECOLLECTION?

**A.**   YES.

**Q.**   I JUST WANT TO CLARIFY THAT YOU ONLY SENT ONE REPORT FOR AN LSP DOCTOR BETWEEN THE YEARS OF 2010 AND 2016; IS THAT CORRECT.

**A.**   NO.   THERE WAS A DIFFERENT PHYSICIAN.

        **MS. ANGELSON:**   YOUR HONOR, WE HAVE ONE REPORT FOR DR. LAVESPERE IN 2014.

        **THE COURT:**   ASK THE WITNESS.   DON'T TELL ME.

        **MS. ANGELSON:**   OKAY.

        **THE COURT:**   YOU NEED TO ESTABLISH IT WITH EVIDENCE, NOT ARGUMENT.

        **MS. ANGELSON:**   OKAY.

**BY MS. ANGELSON:**

**Q.**   SO YOU RECALL MORE THAN ONE REPORT BEING FAXED FOR AN LSP DOCTOR?

**A.**   WELL, IT WASN'T -- YOU DIDN'T ASK IF IT WAS AN LSP DOCTOR.

**Q.**   I DID.

**A.**   IT WAS JUST OVERSIGHT.   OKAY.   THEN MY APOLOGY.

**Q.**   OKAY.

**A.**   IT WAS A DIFFERENT PHYSICIAN FROM A DIFFERENT FACILITY.

**Q.**   OKAY.   SO FOR LSP DOCTORS, YOU FAXED ONE REPORT IN THAT TIME FRAME THAT I REFERENCED; IS THAT RIGHT?

**A.**   THAT I CAN REMEMBER, YES.

**Q.**   OKAY.   THANK YOU.

        MS. FALGOUT, YOU HAVE BEEN A NURSE FOR MORE THAN 20

1   YEARS, CORRECT?

2   **A.**   YES.

3   **Q.**   AND DURING THAT TIME, WITH THE EXCEPTION OF SOME TIME AT,

4   I BELIEVE, A HOME HEALTHCARE INSTITUTION, YOU HAVE WORKED

5   EXCLUSIVELY AT DEPARTMENT OF CORRECTIONS OR HEADQUARTERS OR AT

6   ANGOLA, RIGHT?

7   **A.**   YES.

8   **Q.**   AND YOU'VE BEEN AT HEADQUARTERS SINCE 2011?

9   **A.**   YES.

10  **Q.**   AND BEFORE THAT, YOU WORKED AT ANGOLA FOR MUCH OF THE TIME

11  SINCE 1997, RIGHT?

12  **A.**   YES.

13  **Q.**   AND YOUR FATHER WORKED THERE, TOO?

14  **A.**   YES.

15  **Q.**   AND YOU LIVED AT ANGOLA FOR A TIME?

16  **A.**   YES.

17  **Q.**   AND YOU'RE MARRIED TO WARDEN TRACY FALGOUT, WHO IS ALSO A

18  DEFENDANT IN THE CASE, CORRECT?

19  **A.**   YES.

20  **Q.**   AND HE'S SITTING RIGHT HERE?

21  **A.**   YES.

22  **Q.**   THANK YOU.  NOTHING FURTHER.

23           **MS. ROPER:**  YOUR HONOR, I'M JUST GOING TO -- I'M NOT

24  REALLY SURE -- THIS GOES BEYOND THE SCOPE OF MY DIRECT, AND I'M

25  NOT REALLY SURE OF THE RELEVANCE, SO I'M GOING TO OBJECT ON

1  THAT BASIS.

2          MS. ANGELSON:  I'M DONE WITH MY QUESTIONS, YOUR

3  HONOR.

4          THE COURT:  EXCUSE ME?

5          MS. ANGELSON:  I HAVE NOTHING FURTHER.

6          THE COURT:  ALL RIGHT.  YOUR OBJECTION IS NOTED.

7  IT'S NOT EXACTLY TIMELY SO THE COURT IS NOT GOING TO RULE ON

8  IT.  IT'S NOTED.

9          ANY REDIRECT?

10          MS. ROPER:  I DIDN'T KNOW SHE WAS FINISHED.  I'M

11  SORRY.

12          NO REDIRECT, YOUR HONOR.

13          THE COURT:  MA'AM, YOU MAY STEP DOWN.

14          NEXT WITNESS?

15          MR. ROBERT:  YES, YOUR HONOR.  WE CALL DR. RANDY

16  LAVESPERE.

17                    RANDY LAVESPERE, M.D.,

18  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

19                  DIRECT EXAMINATION

20  BY MR. ROBERT:

21  Q.   GOOD MORNING, DR. LAVESPERE.

22  A.   GOOD MORNING.

23  Q.   COULD YOU STATE YOUR FULL NAME FOR THE RECORD?

24  A.   RANDY LANE LAVESPERE.

25  Q.   AND WHERE DO YOU LIVE?

**A.**   CURRENTLY I LIVE IN ST. FRANCISVILLE.

**Q.**   PRIOR TO LIVING IN ST. FRANCISVILLE, DID YOU LIVE AT ANGOLA?

**A.**   YES.

**Q.**   WHAT TIME PERIOD DID YOU LIVE AT ANGOLA?

**A.**   I LIVED AT ANGOLA FROM 2009 UNTIL THE TIME HERE THAT WE ARE TALKING ABOUT, SEPTEMBER OF '16.

**Q.**   OKAY.  DO YOU STILL MAINTAIN A RESIDENCE AT ANGOLA?

**A.**   I DO.

**Q.**   WHY IS THAT?

**A.**   WELL, I MAINTAIN A RESIDENCE FOR SEVERAL REASONS.  THE MOST IMPORTANT ONE IS FOR WHEN I'M ON CALL.

**Q.**   AND WHEN YOU'RE ON CALL, DO YOU STAY AT THAT RESIDENCE?

**A.**   SURE.

**Q.**   DO OTHER DOCTORS AT ANGOLA HAVE RESIDENCES THERE?

**A.**   ALL DOCTORS MAINTAIN RESIDENCES ON THE GROUNDS OF ANGOLA.

**Q.**   AND WHAT'S THE REASON FOR THAT?

**A.**   WELL, THERE ARE TIMES THERE WHEN THEY ARE ON CALL, BUT THERE ARE ALSO TIMES WHEN THE WEATHER IS BAD AND WE ALL NEED TO BE ON THE COMPOUND AND BE ACCESSIBLE.

**Q.**   GIVE US YOUR EDUCATIONAL BACKGROUND, PLEASE.

**A.**   I GRADUATED FROM LOUISIANA COLLEGE IN PINEVILLE, LOUISIANA, IN 19 -- A LONG TIME AGO.  I GRADUATED FROM LOUISIANA COLLEGE WITH A BS IN CHEMISTRY AND A MINOR IN BIOLOGY.  AND FROM THERE, I WENT TO WORK IN THE PHARMACEUTICAL

09:19    1    INDUSTRY, AND THEN FROM THERE, I WENT TO LSU MEDICAL SCHOOL IN

2    SHREVEPORT.

3    **Q.**    WHEN DID YOU GRADUATE, APPROXIMATELY, FROM LSU MEDICAL

4    SCHOOL IN SHREVEPORT?

5    **A.**    IN 1997.

6    **Q.**    OKAY.  AND DID YOU DO A RESIDENCY ANYWHERE?

7    **A.**    I DID.   I DID A FAMILY PRACTICE RESIDENCY AT UNIVERSITY

8    MEDICAL CENTER IN LAFAYETTE, LOUISIANA, FROM '97 TO 2000.

9    **Q.**    IS FAMILY PRACTICE YOUR PRIMARY FOCUS IN MEDICINE?

10    **A.**    YES, SIR.

11    **Q.**    TELL US A LITTLE BIT ABOUT YOUR EMPLOYMENT HISTORY,

12    PLEASE.

13    **A.**    WELL, AFTER MEDICAL SCHOOL, LIKE I SAID, I WENT TO WORK IN

14    THE PHARMACEUTICAL INDUSTRY FOR TWO DIFFERENT COMPANIES,

15    BRISTOL MYERS AND GENENTECH, AND FROM THERE, I WENT TO MEDICAL

16    SCHOOL.  AFTER MEDICAL SCHOOL AND RESIDENCY, I ESTABLISHED A

17    FAMILY PRACTICE IN MAURICE, LOUISIANA, FOR A SHORT TIME.  AND

18    THEN ONE OF THE HURRICANES CAME THROUGH AND TORE UP THE TOWN

19    AND I MOVED MY OFFICE TO BROUSSARD, LOUISIANA, UNTIL 2006.

20    **Q.**    DURING THAT TIME PERIOD, DID YOU DO OTHER WORK BESIDES THE

21    FAMILY PRACTICE WORK?

22    **A.**    SURE.  I WORKED IN OUR LADY OF LOURDES IN THE URGENT CARE

23    CENTER AT NIGHT.

24    **Q.**    AND WHEN DID YOU BEGIN WORKING AT ANGOLA?

25    **A.**    AT ANGOLA, IN 2009.

09:20  1   Q.   AND AT SOME POINT, DID YOU BECOME MEDICAL DIRECTOR?

2   A.   I BECAME THE MEDICAL DOCTOR TOWARDS THE MIDDLE TO THE END

3   OF 2014.

4   Q.   NOW IN GIVING US YOUR EMPLOYMENT HISTORY, THERE'S A LITTLE

5   THREE-YEAR GAP IN THERE, WHY IS THAT?

6   A.   WELL, IN 2006, I GOT ARRESTED BY THE DEA FOR POSSESSION

7   WITH INTENT TO DISTRIBUTE METHAMPHETAMINE AND HAD A LOSS OF

8   LICENSE AT THAT POINT.

9   Q.   OKAY.

10   A.   AND --

11   Q.   DID YOU SERVE ANY TIME FOR THAT?

12   A.   I DID.  HAD A 30-MONTH SENTENCE IN A FEDERAL COURT OUT OF

13   LAFAYETTE AND DID 13 MONTHS ON A 30-MONTH SENTENCE.

14   Q.   OKAY.  AS A RESULT OF THAT ARREST, DID YOU DETERMINE THAT

15   YOU HAD ANY ADDICTION PROBLEMS?

16   A.   I DID.

17   Q.   AND WHAT DID YOU DO ABOUT IT?

18   A.   I DETERMINED THAT I HAD AN ADDICTION FOR METHAMPHETAMINE,

19   AND I WENT TO PALMETTO ADDICTION RECOVERY CENTER IN RAYVILLE,

20   LOUISIANA.

21   Q.   HOW LONG DID YOU STAY THERE?

22   A.   95 DAYS.

23   Q.   OKAY.  DID YOU DO ANYTHING ELSE?

24   A.   WELL, AFTER RELEASE FROM PALMETTO ADDICTION RECOVERY

25   CENTER, I STAYED IN A HALFWAY HOUSE FOR SEVERAL MONTHS PRIOR TO

09:21     1    GETTING SENTENCED, AND ONCE I GOT SENTENCED AND WENT TO MY --

2    DID MY TIME, I WAS RELEASED AND STAYED AN ADDITIONAL SIX MONTHS

3    IN A HALFWAY HOUSE IN MONROE, LOUISIANA.

4    **Q.**    OKAY.

5    **A.**    PART OF THAT TIME BEING UNDER HOUSE ARREST.

6    **Q.**    HAVE YOU REMAINED IN ADDICTION RECOVERY SINCE 2006?

7    **A.**    SURE.  I AM FREE OF DRUGS AND ALCOHOL SINCE MAY 15TH OF

8    2006.

9    **Q.**    CONTINUOUSLY SINCE THAT TIME?

10    **A.**    YES, SIR.

11    **Q.**    HAVE YOU HAD ANY OTHER LEGAL PROBLEMS SINCE 2006?

12    **A.**    I HAVE NOT.

13    **Q.**    AND AS A RESULT OF YOUR LEGAL PROBLEMS, YOU HAD SOME

14    MEDICAL LICENSE RESTRICTIONS, CORRECT?

15    **A.**    TRUE.

16    **Q.**    WHY DON'T YOU TELL US ABOUT THAT.

17    **A.**    WELL, WHEN I GOT ARRESTED, WHEN I WAS AT PALMETTO, I GOT A

18    NOTE ONE DAY THAT SAID MY LICENSE HAD BEEN TAKEN, SO I SIGNED

19    THE PAPER.  WHEN I GOT OUT OF PALMETTO, I TRIED TO TALK TO THE

20    MEDICAL BOARD AND THE MEDICAL BOARD WOULDN'T RESPOND, SO I WENT

21    AND DID MY TIME.  AFTER I GOT OUT OF BEAUMONT CORRECTIONAL

22    FACILITY, AND WHILE I WAS IN THE HALFWAY HOUSE, I CONTACTED THE

23    MEDICAL BOARD AND THEY AGREED TO SPEAK WITH ME, AND SO WE

24    STARTED TALKING WHILE I WAS IN THE HALFWAY HOUSE AND THEY TOLD

25    ME THERE WERE CERTAIN THINGS THAT THEY WANTED ME TO DO.  THEY

09:23  1   WANTED ME TO GO BACK AND TAKE A RECERTIFICATION EXAM, THEY

2   WANTED ME TO GO BACK TO PALMETTO FOR ANOTHER EVALUATION.

3             AND AT THAT POINT IN TIME, I REALIZED THAT, YOU KNOW,

4   I HAD LOST ANY CONTROL OVER WHAT I -- WHAT I WAS DOING, AND I

5   NEEDED TO START FOLLOWING INSTRUCTIONS FROM THESE PEOPLE IF I

6   WANTED TO PRACTICE MEDICINE AGAIN, SO I DID.  I DID EVERYTHING

7   THAT THEY ASKED ME TO DO.

8   Q.   AND AS A RESULT OF DOING EVERYTHING THAT THEY ASKED YOU TO

9   DO, DID THEY GIVE YOU YOUR LICENSE BACK?

10  A.   INITIALLY, THEY GAVE ME A PROBATIONARY LICENSE TO WORK IN

11  INSTITUTIONS, TO WORK IN A HOSPITAL, TO WORK IN A REHAB,

12  ANYWHERE WHERE THERE WOULD BE SUPERVISION.

13  Q.   OKAY.  SO IT WAS NOT LIMITED TO JUST CORRECTIONAL

14  INSTITUTIONS; IS THAT CORRECT?

15  A.   THAT'S CORRECT.

16  Q.   YOU COULD HAVE WORKED IN A REHAB HOSPITAL, CORRECT?

17  A.   ACTUALLY, PALMETTO OFFERED ME A JOB TO WORK IN THEIR

18  REHAB.

19  Q.   AND YOU TURNED DOWN THE JOB WITH PALMETTO; YOU TOOK THE

20  ANGOLA JOB; IS THAT CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   AND WHY DID YOU DO THAT?

23  A.   OH, SEVERAL REASONS.  PROBABLY THE BIGGEST REASON, WHILE

24  YOU'RE INCARCERATED, YOU HAVE A LOT OF TIME TO REFLECT ON

25  THINGS.  YOU HAVE A LOT OF TIME TO REFLECT ON DECISIONS THAT

09:24  1  YOU HAVE MADE, AND FOR SOME REASON, I THOUGHT THAT I WAS SENT
2  TO THE PENITENTIARY TO LIVE THAT LIFE.  AND WHEN I GOT OUT AND
3  I STARTED GETTING READY TO GO BACK TO WORK, I HAD THESE JOB
4  OPPORTUNITIES.  AND WHEN I WENT TO ANGOLA, IT WAS KIND OF A
5  CALLING THERE, YOU KNOW.  IT WAS A CALLING THERE BECAUSE AFTER
6  TALKING WITH MY PARENTS, YOU KNOW, MY MOTHER, SHE ALWAYS TRIES
7  TO GIVE ME SOME GUIDANCE AND SUPPORT AND SHE, YOU KNOW, LIKE
8  MAYBE THERE'S -- YOU ARE BEING CALLED THERE BECAUSE YOU KNOW
9  WHAT THESE GUYS ARE GOING THROUGH AND BECAUSE YOU HAVE GONE
10  THROUGH WHAT YOU HAVE GONE THROUGH, MAYBE YOU'LL BE BETTER
11  EQUIPPED TO HELP THESE GUYS.
12          AND SO WHEN I FIRST WENT UP THERE, I TOLD THEM I
13  COULDN'T DO IT, YOU KNOW, I COULDN'T WORK THERE.  AS A MATTER
14  OF FACT, THE DAY THAT I WENT TO VISIT, THEY SHUT THE GATE
15  BEHIND ME AND I HAD CHILLS ALL UP AND DOWN MY SPINE BECAUSE I
16  DIDN'T REALIZE I WAS GOING TO GO GET TO GO HOME AGAIN, YOU
17  KNOW, SO I CALLED THE WARDEN, I SAID, LOOK, I CAN'T DO IT.  I
18  CAN'T DO IT, AND HE SAID, WELL, SON, THINK ABOUT IT, YOU KNOW,
19  AND SO I DID.  I THOUGHT ABOUT IT, AND I REALLY DO BELIEVE THAT
20  IT'S A CALLING THAT I'M AT ANGOLA.  SO I CALLED HIM BACK ABOUT
21  A WEEK LATER AND I TOLD HIM, I SAID OKAY, I'M READY.
22  Q.   SO WHEN YOU TOOK THE JOB AT ANGOLA IN 2009, WHAT WAS YOUR
23  POSITION?
24  A.   I WAS A STAFF PHYSICIAN.
25  Q.   AND AS A STAFF PHYSICIAN, WHAT DID YOU DO?

**A.**   WELL, I BASICALLY SAW CLINIC PATIENTS.  I MADE ROUNDS OF
THE WARD.  I DID MY TIME IN THE EMERGENCY ROOM, YOU KNOW, TOOK
CALL, EVERYTHING THAT A STAFF PHYSICIAN DOES, REVIEWED SICK
CALL.

**Q.**   AND WERE YOU PROMOTED FROM THE JOB AS A STAFF PHYSICIAN?

**A.**   SHORTLY THEREAFTER, I BECAME THE ASSISTANT MEDICAL
DIRECTOR, AND I WAS ASSISTANT MEDICAL DIRECTOR UNDER DR.
COLLINS FOR A SHORT TIME.

**Q.**   TELL ME ABOUT THE POINT WHERE YOU MOVED TO BE MEDICAL
DIRECTOR, CORRECT?

**A.**   WELL, DR. COLLINS MOVED ON IN HIS CAREER, AND BY THAT
TIME, I HAD MY LICENSE BACK, UNRESTRICTED LICENSE, AND THEY
ASKED ME TO BE THE MEDICAL DIRECTOR, I THINK, LATE 2/14.

**Q.**   AND WERE YOU PLEASED WITH THAT OFFER OF PROMOTION?

**A.**   WELL, IT'S SOMETHING THAT I ALWAYS WANTED TO DO, SO YES, I
WAS PLEASED.

**Q.**   AND WE TALKED ABOUT YOUR LICENSE RESTRICTIONS.  HAVE THOSE
LICENSE RESTRICTIONS BEEN LIFTED?

**A.**   YES.  CURRENTLY I HAVE NO LICENSE RESTRICTIONS.  IN FACT,
THE DEA THAT TOOK MY DEA NUMBER BACK WHEN I GOT ARRESTED AND
THE LOUISIANA STATE BOARD OF PHARMACY THAT TOOK MY CVS LICENSE
WHEN I GOT ARRESTED, BOTH OF THOSE ORGANIZATIONS HAVE GIVEN ME
BACK MY NUMBERS AND MY ABILITY TO WRITE CONTROLLED MEDICINES,
AND SO I'M CLEARED WITH THE MEDICAL BOARD, SO I HAVE NO
RESTRICTIONS.

09:27  1    **Q.**   WHEN WERE YOU CLEARED WITH THE MEDICAL BOARD?  WHEN WERE
2    YOUR RESTRICTIONS LIFTED WITH THEM?
3    **A.**   MY RESTRICTIONS WITH THE MEDICAL BOARD WERE LIFTED IN LATE
4    2/14.  MY RESTRICTIONS WITH THE DEA AND THE LOUISIANA BOARD OF
5    PHARMACY, MID '16.
6    **Q.**   WERE YOUR RESTRICTIONS LIFTED WITH REGARD TO THE MEDICAL
7    BOARD BEFORE YOU BECAME MEDICAL DIRECTOR?
8    **A.**   YES.
9    **Q.**   LET'S MOVE ON.  LET'S TALK ABOUT YOUR ROLE IN THE
10   ADMINISTRATION AT ANGOLA, AND WE'VE ESTABLISHED THAT YOU
11   CURRENTLY SERVE AS THE MEDICAL DIRECTOR.  TELL ME WHO DO YOU
12   REPORT TO AS MEDICAL DIRECTOR?
13   **A.**   WELL, I REPORT TO THREE PEOPLE.  I REPORT TO MY ASSISTANT
14   WARDEN, AND I REPORT TO THE WARDEN OF THE PENITENTIARY, AND
15   THEN I REPORT TO THE MEDICAL DIRECTOR AT HEADQUARTERS.
16   **Q.**   OKAY.  IN SEPTEMBER OF 2016, WHO WAS THE ASSISTANT WARDEN
17   OF HEALTHCARE?
18   **A.**   THAT WOULD BE WARDEN STEPHANIE LAMARTINIERE.
19   **Q.**   NOW, WHAT WAS YOUR INTERACTION WITH THE ASSISTANT WARDEN
20   OF HEALTHCARE?  WHAT INVOLVEMENT DID YOU HAVE WITH HER?
21   **A.**   WELL, I HAD DAILY INTERACTIONS WITH THE ASSISTANT WARDEN.
22   BASICALLY, HER JOB IS TO OVERSEE THE SECURITY ASPECTS OF THE
23   MEDICAL WARD.  MY JOB WAS TO OVERSEE THE MEDICAL ASPECTS.  SO
24   THERE'S A LOT OF OVERLAP THERE, AND SHE WOULD BE THE SECURITY
25   LIAISON WITH ALL THE OTHER ASSISTANT WARDENS, AND SHE WOULD

09:29  1  MAKE DECISIONS BASED ON THE SECURITY ASPECTS OF MEDICAL CARE.

2  **Q.**    DID YOU HAVE REGULAR MONTHLY MEETINGS WITH THE ASSISTANT

3  WARDEN AND OTHER MEDICAL PERSONNEL?

4              **MS. MONTAGNES:**  OBJECTION, YOUR HONOR, LEADING.

5              **THE COURT:**  OVERRULED.

6              **THE WITNESS:**  WE HAD DAILY MEETINGS, AND WE HAD

7  MONTHLY MEETINGS THAT WERE ON PAPER, BUT I TALKED TO HER EVERY

8  DAY.

9  **BY MR. ROBERT:**

10  **Q.**    I WANT TO SHOW YOU FIRST SOME MINUTES FROM ONE OF YOUR

11  MONTHLY MEETINGS, AND IT'S -- IT'S SIMPLY AN EXAMPLE OF WHAT IS

12  ALREADY IN THE RECORD, DOCUMENTS THAT ARE ALREADY IN THE

13  RECORD, BUT IT'S J3-00535.

14  **A.**    CAN YOU MAKE IT SMALLER?

15  **Q.**    I CAN TRY.  THERE WE GO.  IT SHOWS THE DEPARTMENT HEAD

16  MEETING 4/27/15.  DO YOU RECOGNIZE THIS DOCUMENT?

17  **A.**    I DO.

18  **Q.**    WHAT IS IT?

19  **A.**    THIS IS A MONTHLY DEPARTMENT HEAD MEETING.

20  **Q.**    UH-HUH.

21  **A.**    MY MEETINGS WITH THE WARDEN WERE USUALLY SHE AND I, BUT WE

22  ALSO HAD THESE MONTHLY DEPARTMENT HEAD MEETINGS.

23  **Q.**    DID SHE PARTICIPATE IN THESE DEPARTMENT HEAD MEETINGS?

24  **A.**    SHE DID.  SHE WAS ACTUALLY THE MODERATOR.

25  **Q.**    OKAY.  SO SHE KIND OF RAN THE MEETING?

**A.**   RIGHT.

**Q.**   TELL ME WHAT TYPE OF PEOPLE ATTEND THESE MONTHLY MEETINGS.

**A.**   WELL, BASICALLY, ALL THE DEPARTMENT HEADS ATTEND THE MEETING.  YOU HAVE ME BEING THE MEDICAL DIRECTOR, YOU'D HAVE THE HEAD OF MEDICAL RECORDS, WHICH WOULD BE KELLEY HAWKINS, YOU'D HAVE THE HEAD OF PHARMACY, MARY LABATTUT, THE NURSING DIRECTOR, SHERWOOD PORET, THE ASSISTANT NURSING DIRECTOR, KYLE EDWARDS, THE DIRECTOR OF THE DENTAL DEPARTMENT, THE DIRECTOR OF EMS, THE DIRECTOR OF THE LAB, AND THE DIRECTOR OF MENTAL HEALTH.

**Q.**   AND AS MEDICAL DIRECTOR, HAVE YOU REGULARLY ATTENDED THESE TYPES OF MONTHLY MEETINGS?  HAVE YOU DONE THAT ON A REGULAR BASIS?

**A.**   YES.

**Q.**   AND WHAT KIND OF SUBJECTS DO Y'ALL TYPICALLY DISCUSS AT THESE MONTHLY MEETINGS?

**A.**   WELL, BASICALLY, GO INTO THE MEETING ROOM AND EVERYBODY SITS AROUND.  IT'S A COUPLE OF TABLES, AND THE WARDEN STARTS OFF THE MEETING, AND THEN EVERYBODY GETS A CHANCE TO TALK ABOUT WHAT'S GOING ON IN THEIR DEPARTMENT.  AND IT'S A PRETTY BROAD MEETING.

            FOR EXAMPLE, I MIGHT SAY, I'M LOOKING AT HIRING TWO PHYSICIANS, OR I HAVE SOME PHYSICIANS COMING FOR AN INTERVIEW, CAN YOU CLEAR THEM THROUGH THE GATE?  I TALK ABOUT ANYTHING THAT'S GOING ON WITHIN MY PHYSICIAN GROUP AT THAT MEETING THAT

1   I MIGHT NEED HELP WITH, AND SO DOES EVERYBODY ELSE IN THEIR
2   DEPARTMENT.
3   **Q.**   I'VE HIGHLIGHTED ON THIS DOCUMENT THE SECTION THAT TALKS
4   ABOUT THE DEPARTMENT UPDATES, AND IT HAS DOCTORS.  IS THAT THE
5   TYPE OF INFORMATION THAT YOU WOULD DISCUSS AT THOSE MEETINGS?
6   **A.**   SURE.  AT THIS PARTICULAR MEETING, WE WERE HAVING SOME
7   ISSUES WITH BATON ROUGE RADIOLOGY IN THAT WE DISAGREED WITH A
8   LOT OF THEIR READS ON THE X-RAYS, AND SO I HAD CONTACTED THE
9   HEAD OF THEIR GROUP AND TOLD THEM THAT THERE WERE SOME READS
10  THAT WE HAD CONCERN ABOUT, AND THEY RE-READ THEM.
11          ALSO, THERE WAS A TIME WHEN I REALLY DIDN'T LIKE WHAT
12  WAS GOING ON WITH THE PHYSICAL THERAPY, AND SO I LET THOSE --
13  THROUGH THE ASSISTANCE OF THE WARDEN, I LET THEM GO AND WE HAD
14  A NEW GROUP THAT WAS INTERESTED IN COMING FOR PHYSICAL THERAPY.
15  SO THERE WERE THINGS CONSTANTLY IN MOTION, AND IT WAS JUST A
16  WAY OF EVERYBODY COMING TOGETHER AND SEEING WHAT'S GOING ON
17  WITH THEIR DEPARTMENT.
18  **Q.**   ARE THERE ANY ACTION ITEMS THAT ARE CREATED AS A RESULT OF
19  THESE MONTHLY MEETINGS?
20  **A.**   SURE.  WHEN YOU TALK ABOUT HIRING PHYSICIANS, THAT'S THE
21  WAY THAT MY ASSISTANT WARDEN GOES TO THE MAIN WARDEN, AND THEY
22  TALK ABOUT THE DIFFERENT -- ANY SECURITY ASPECTS OF PROCEEDING
23  FURTHER WITH THIS DOCTOR AND SO THINGS GET ROLLING.
24          WHEN IT COMES TO PHYSICAL THERAPY, THAT'S NOT
25  SOMETHING I CAN DO ON MY OWN.  SO WE PUT WHEELS IN MOTION.  SO

1   SURE, THERE ARE ACTIONS AS A RESULT OF THESE MEETINGS.

2   **Q.**   AND ALTHOUGH THE ASSISTANT WARDEN IS SOMEBODY WHO YOU

3   REPORT TO IN THE CHAIN OF COMMAND, DOES SHE HAVE -- OR AT THAT

4   TIME, IN SEPTEMBER OF 2016, DID SHE HAVE ANY ROLE IN THE

5   MEDICAL DECISIONS MADE BY YOU OR YOUR MEDICAL STAFF?

6   **A.**   SECURITY CANNOT MAKE A MEDICAL DECISION.   THAT'S JUST HOW

7   IT IS.   SECURITY IS INVOLVED IN SECURITY.   MEDICAL MAKES

8   MEDICAL DECISIONS.   THERE'S AN INTERACTION BETWEEN THE TWO

9   GROUPS, SURE, BECAUSE THEY OVERLAP, BUT SECURITY DOES NOT MAKE

10   MEDICAL DECISIONS.

11   **Q.**   AND THE ASSISTANT WARDEN AT THAT TIME DIDN'T HAVE ANY

12   MEDICAL BACKGROUND OR TRAINING, CORRECT?

13   **A.**   CORRECT.

14   **Q.**   WHAT INTERACTIONS DO YOU HAVE WITH THE MAIN WARDEN OF THE

15   PRISON?   AT ONE TIME IT WAS BURL CAIN.   NOW IT'S WARDEN VANNOY.

16   **A.**   I HAVE HAD SEVERAL INTERACTIONS WITH THE WARDEN.   WE

17   ALWAYS GET CALLED TO THE WARDEN MEETINGS WHERE THEY HAVE

18   MEETINGS WITH ALL OF THE WARDENS, OR AT LEAST THE MAIN

19   ASSISTANT WARDENS, BUT THERE ARE TIMES WHEN, AT LEAST EVERY

20   QUARTER, I HAVE ONE-ON-ONE WITH THE WARDEN.

21   **Q.**   AND I'LL SHOW YOU A DOCUMENT THAT'S ALREADY IN EVIDENCE,

22   IT'S J3-00520, AND TELL ME IF YOU RECOGNIZE THIS DOCUMENT.

23   **A.**   YES, THAT'S JUST A MEMO THAT SAYS WE HAD A -- THE WARDEN

24   AND I HAD A MEETING.

25   **Q.**   AND THESE ARE THE TYPES OF QUARTERLY MEETINGS THAT YOU

1  REGULARLY HAVE WITH THE WARDEN SINCE YOU HAVE BEEN THE MEDICAL

2  DIRECTOR?

3  **A.**   THEY ARE.  I WANT TO ADD THAT NORMALLY WHEN I HAVE THESE

4  MEETINGS WITH THE WARDEN, THERE ARE 20 PEOPLE THERE.  THIS

5  PARTICULAR MEETING, IT'S JUST HE AND I, AND THAT'S WHEN HE GETS

6  TO KNOW ME AND I GET TO KNOW HIM FROM A STANDPOINT OF HE ASKS

7  ME, SON, WHAT IS IT THAT YOU NEED?  SON, ARE YOU HAVING ANY

8  PROBLEMS?  AND THIS IS A MEETING THAT DEFINITELY RESULTS IN

9  ACTION.

10  **Q.**   AND DURING YOUR QUARTERLY MEETINGS WITH THE WARDEN, DOES

11  HE HAVE ANY INPUT?  DOES HE TELL YOU HOW TO RUN YOUR MEDICAL

12  DEPARTMENT?

13  **A.**   HE DOES NOT.

14  **Q.**   WHY ARE YOU INTERACTING HIM?  WHY ARE YOU LETTING HIM KNOW

15  WHAT'S GOING ON IN THE MEDICAL DEPARTMENT?

16  **A.**   WELL, THE MAIN REASON IS BECAUSE HE'S THE MAN, HE RUNS THE

17  PENITENTIARY, AND YOU KNOW, HE WANTS TO KNOW WHAT'S GOING ON IN

18  HIS PENITENTIARY, AND MEDICAL BEING A BIG PART OF IT, YOU HAVE

19  TO -- LIKE YOU TALK ABOUT CHAIN OF COMMAND, THAT'S THE HIGHEST

20  CHAIN OF COMMAND, AND SO YOU HAVE TO RESPECT THAT.

21  **Q.**   DOES THE WARDEN OF ANGOLA PLAY ANY ROLE IN THE MEDICAL

22  DECISIONS OF YOU OR ANY OF YOUR MEDICAL STAFF?

23  **A.**   THEY DO NOT.

24  **Q.**   DURING YOUR TIME AS MEDICAL DIRECTOR, HAS THE WARDEN EVER

25  PLAYED ANY ROLE IN THE ACTUAL MEDICAL DECISIONS THAT ARE MADE?

09:36   1   **A.**   YES.  ONE TIME THAT HAPPENED.

2   **Q.**   OKAY.  TELL ME ABOUT IT.

3   **A.**   WELL, THERE WAS A CASE, I THINK IT'S IN THE FEDERAL COURT,

4   THAT THERE WAS A GENTLEMAN THAT -- OR AN OFFENDER THAT HAD AN

5   ISSUE WITH A CPAP AND THINGS WERE BEING IN LINE, AND WE HAD HIM

6   RETESTED AND HE DIDN'T NEED THE CPAP AND, YOU KNOW, THINGS WERE

7   GOOD.

8          WELL, WE HAD A COURT CASE ABOUT IT, AND I THINK

9   WARDEN CAIN AT THE TIME CAME TO COURT AND HE SAID THAT HE MADE

10   THE DECISION NOT TO GIVE THE MAN A CPAP, AND I THINK THE COURT

11   FINED HIM, AND HE HAD TO PAY, I THINK, TO THE OFFENDER.  AND

12   THAT WAS AN EXAMPLE OF SECURITY DOESN'T MAKE MEDICAL DECISIONS.

13   **Q.**   HAS THAT SITUATION -- THAT SINGLE SITUATION, HAS THAT

14   SINCE BEEN REMEDIED AT ANGOLA?

15   **A.**   SURE.  THAT'S AN ISOLATED EVENT.

16   **Q.**   LET'S TALK ABOUT YOUR JOB RESPONSIBILITIES AND WHAT YOU DO

17   AS THE MEDICAL DIRECTOR AT ANGOLA ON A DAILY BASIS.  TELL ME A

18   LITTLE ABOUT THAT.

19   **A.**   WELL, BASICALLY, MY JOB RESPONSIBILITY IN A NUTSHELL IS TO

20   ADDRESS ANYTHING IN THAT TREATMENT CENTER THAT HAS TO DO WITH

21   MEDICAL.  I BASICALLY OVERSEE THE EMS DEPARTMENT, THE ATU, I

22   OVERSEE THE X-RAY DEPARTMENT, I OVERSEE THE LAB, I DETERMINE

23   FROM A CLINIC STANDPOINT WHICH PHYSICIANS I WANT TO KEEP AT THE

24   CLINIC, WHICH PHYSICIANS I WANT TO SEND TO THE OUTCAMP, I WORK

25   WITH MY TRIP OFFICE ON A DAILY BASIS.

09:38   1        I'M BASICALLY THE LIAISON WITH ALL THE OUTSIDE

2   PROVIDERS.  I TAKE ALL THE TRIP PAPERWORK, I LOOK AT ALL THE

3   RECOMMENDATIONS AND FIT THOSE INTO THE WORKING MOM OF ANGOLA.

4   I OVERSEE THE NURSING UNITS.  IN PARTICULAR, I ASSIGN DOCTORS

5   TO SPECIFIC PATIENTS ACCORDING TO THEIR ABILITY.  I OVERSEE THE

6   PHARMACY FROM A STANDPOINT OF ME AND MARY INTERACT ON A REGULAR

7   BASIS TO TALK ABOUT MEDICATIONS AND WHAT WE CAN DO TO MAKE THE

8   PHARMACY MORE EFFICIENT.  AND PROBABLY THE BIGGEST THING THAT I

9   DO IS MY MORNING MEETINGS WITH THE DOCTORS AND ALL THE

10   PERSONNEL THAT ARE AROUND US.

11   **Q.**  WELL, LET'S TALK ABOUT THE DOCTORS AND THE SUPERVISION

12   THAT YOU PROVIDE TO THE DOCTORS.  WHAT SUPERVISION DO YOU

13   PROVIDE?

14   **A.**  WELL, I'M CONSTANTLY IN CONTACT WITH MY DOCTORS ON A DAILY

15   BASIS, MULTIPLE TIMES THROUGH THE DAY.  YOU KNOW,

16   SUPERVISION-WISE, LIKE I SAY, WE HAVE A MORNING MEETING, AND WE

17   GO OVER EVERYTHING ABOUT MEDICAL FROM A PATIENT STANDPOINT,

18   FROM A CLINIC STANDPOINT AT THAT MEETING.  I ALSO REVIEW THEIR

19   CHARTS.  I DO DUTY STATUS REVIEWS.  I DO CHART REVIEWS, AND IN

20   THAT DUTY STATUS AND CHART REVIEW, I GET TO SEE WHAT THEIR WORK

21   IS.  I ALSO REVIEW CHARTS ON THE MEDICAL BOARD.  SO DURING THAT

22   REVIEW, I GET TO SEE WHAT THEIR WORK IS.  I GO OVER NUMEROUS

23   PATIENTS EVERYDAY ON A MEDICAL WARD, AND I ASK MY DOCTORS, WHAT

24   IS YOUR GAME PLAN WITH THIS GUY?  ARE YOU MOVING TOWARDS THIS

25   END POINT?  YOU KNOW, AND OVER THE COURSE OF TIME, YOU GET TO

09:40  1    LEARN HOW THOSE DOCTORS THINK AND HOW THEY WORK.

2    **Q.**    DO YOU REVIEW, WHEN AN OUTSIDE SPECIALTY CLINIC IS

3    RECOMMENDED, A REFERRAL IS RECOMMENDED, DO YOU DO ANYTHING WITH

4    RESPECT TO THAT?

5    **A.**    WHEN MY PHYSICIANS REFER TO THE OUTSIDE?

6    **Q.**    RIGHT.

7    **A.**    SURE.  WHEN MY PHYSICIANS REFER TO THE OUTSIDE, THERE'S A

8    REFERRAL FORM, AND I REVIEW ALL REFERRAL FORMS, SO I HAVE TO

9    SIGN OFF ON THESE REFERRAL FORMS IN ORDER FOR THAT APPOINTMENT

10   TO MOVE FORWARD.

11   **Q.**    DO YOU PERFORM ANY ANNUAL REVIEW OF THE DOCTORS?

12   **A.**    WE DO.  WE HAVE AN ANNUAL REVIEW AT THE END OF EACH YEAR,

13   AND THAT REVIEW HAS BEEN GOING ON EVER SINCE I HAVE BEEN AT

14   ANGOLA.  I HAVE BEEN REVIEWED BY MY MEDICAL DIRECTOR, AND I

15   REVIEWED THE PHYSICIANS THAT I SEE.

16   **Q.**    IS THAT A BIG PROCESS, A LOT OF PAPERWORK, OR HOW DOES

17   THAT WORK?

18   **A.**    WELL, THERE IS A LOT OF PAPERWORK INVOLVED IN IT, AND IT'S

19   IMPORTANT BECAUSE NO. 1, IT'S MANDATED; NO. 2, IT TELLS THE

20   PHYSICIAN ON PAPER WHAT I REALLY THINK ABOUT THE JOB THAT THEY

21   ARE DOING; AND NO. 3, IT CAN HAVE AN IMPACT ON PERFORMANCE

22   RAISES.  SO IT'S A VERY IMPORTANT PIECE OF INFORMATION.

23   **Q.**    OKAY.  LET'S TALK ABOUT THE HIRING OF DOCTORS AT ANGOLA.

24   HOW ARE HIRING DECISIONS MADE AT ANGOLA?

25   **A.**    WELL, HIRING DECISIONS ARE MADE AFTER WE FIND POTENTIAL

09:41  1   CANDIDATES.  THERE'S A FLOWCHART THAT TELLS ME HOW MANY

2   PHYSICIANS I HAVE, BOTH DOCTOR AND NURSE PRACTITIONERS, AND SO

3   I ACTIVELY TRY TO RECRUIT PHYSICIANS.  I CALL THE MEDICAL BOARD

4   ON A REGULAR BASIS.  I CALL THE PHYSICIANS HEALTH FOUNDATION ON

5   A REGULAR BASIS.  THERE ARE TIMES WHEN THERE ARE ADS IN THE

6   PAPER, AND HEADQUARTERS ARE ALWAYS CONSTANTLY ON THE LOOK FOR

7   NEW PHYSICIANS.

8            SO WHEN WE FIND A POTENTIAL CANDIDATE, YOU KNOW, I

9   CALL THEM, TALK TO THEM.  THEY SEND ME THEIR INFORMATION, AND

10   IF IT'S SOMETHING THAT WE THINK THAT CAN WORK AT OUR

11   PENITENTIARY, YOU KNOW, WE CALL THEM IN FOR A VISIT.

12   **Q.**   ARE THERE ANY CHALLENGES FACING THE HIRING OF DOCTORS AT

13   ANGOLA?

14   **A.**   SURE.  THE THREE BIGGEST CHALLENGES ARE NO. 1, OUR

15   LOCATION; AND NO. 2, THE MONEY THAT WE PAY OUR PHYSICIANS; AND

16   NO. 3, WOULD BE THE CALL.  OUR CALL IS NOT THE MOST WELL-LIKED

17   PART OF OUR JOB.

18   **Q.**   WHEN YOU SAY "OUR CALL IS NOT THE MOST WELL-LIKED PART OF

19   OUR JOB," WHAT DOES THAT MEAN?

20   **A.**   WELL, YOU KNOW, PHYSICIANS NOW CAN GET JOBS OUT IN THE

21   FREE WORLD WITHOUT HAVING TO TAKE CALL, AND YOU KNOW, CALL

22   IMPACTS YOUR FAMILY LIFE, IT IMPACTS THE WAY YOU LIVE, AND OUR

23   CALL IS PRETTY DEMANDING.

24   **Q.**   OKAY.

25   **A.**   I MEAN, YOU NEVER, WHEN YOU'RE ON CALL, SLEEP THROUGH THE

NIGHT, YOU KNOW.  AND WHEN YOU'RE ON CALL, AFTER YOUR CALL DAY,

YOU HAVE TO WORK THE NEXT DAY.  THERE'S WEEKENDS WHEN YOU HAVE

TO TAKE CALL.  SO THAT'S A PART OF OUR JOB THAT SOME

PHYSICIANS -- A LOT OF PHYSICIANS IN THE FREE WORLD DON'T HAVE

TO DO ANYMORE BECAUSE NOW THERE ARE HOSPITALISTS, NOW THERE'S

DIRECT ADMITS TO THE ER, FROM THE ER.  SO FOR PHYSICIANS TO

TAKE CALL, ESPECIALLY TAKE ON A PSYCHE CALL, IT'S A LITTLE

DIFFERENT THAN IT IS IN THE FREE WORLD.

Q.   AND HOW OFTEN ARE THE DOCTORS ON CALL AT ANGOLA?

A.   WELL, IT DEPENDS ON HOW MANY WE HAVE.  AT THE TIME OF 9/16

WE HAVE FIVE DOCTORS AND A NURSE PRACTITIONER, SO WE HAD CALL

EVERY FIFTH NIGHT AND EVERY SIXTH NIGHT AND EVERY SIXTH

WEEKEND.

Q.   TELL ME ABOUT THE DOCTORS AND THE NURSE PRACTITIONER THAT

YOU HAD IN SEPTEMBER OF 2016.  I THINK YOU INDICATED YOU HAD,

WHAT, FIVE DOCS AND ONE NURSE PRACTITIONER?

A.   AT THE TIME WE HAD FIVE DOCS AND ONE NURSE PRACTITIONER,

INCLUDING MYSELF.

Q.   TELL ME WHO THE DOCTORS ARE.

A.   WE HAD DR. MACMURDO, WE HAD DR. TOCE, WE HAD DR. MCCAIN,

WE HAD DR. COLON, AND WE HAD NURSE PRACTITIONER CINDY PARK.

Q.   OKAY.  LET'S START WITH YOURSELF.  WHAT IS YOUR KIND OF

BACKGROUND FOCUS AREA?

A.   MY BACKGROUND IS IN FAMILY PRACTICE.

Q.   WHAT ABOUT DR. MACMURDO?

**A.**   WELL, DR. MACMURDO HAD A BACKGROUND IN REHAB MEDICINE, AND
HIS RESIDENCY WAS IN TENNESSEE, AND HIS FIRST YEAR OF HIS
RESIDENCY WAS NOT REHAB.  IT'S ACTUALLY INTERNAL MEDICINE.
SO HE HAS A COMBINATION OF INTERNAL MEDICINE KNOWLEDGE AND
REHAB KNOWLEDGE.

**Q.**   AND WHAT ABOUT DR. MCCAIN?

**A.**   WELL, DR. MCCAIN HAS 12 TO 13 YEARS OF ER EXPERIENCE PRIOR
TO COMING WITH ANGOLA, AND PRIOR TO THAT, HE DID TWO YEARS OF
ANESTHESIA, AND WHAT WAS TERMED A "NEEDLE JOCKEY" IN THE WORLD.
HE WAS A PAIN MANAGEMENT DOCTOR AND NOT ONE THAT PRESCRIBED A
LOT OF PILLS BUT ONE THAT DID INJECTIONS.

**Q.**   OKAY.  AND I THINK YOU SAID DR. COLON, WHAT IS HIS
BACKGROUND?

**A.**   WELL, DR. COLON WAS TRAINED IN INTERNAL MEDICINE, BUT HE
WENT AND SPECIALIZED IN CARDIOLOGY, SO HE'S A BOARD-CERTIFIED
CARDIOLOGIST.

**Q.**   AND I THINK THE LAST WAS DR. TOCE?

**A.**   DR. TOCE.  DR. TOCE IS AN INTERNAL MEDICINE DOCTOR THAT
HAD HIS TRAINING IN CALIFORNIA.

**Q.**   AND FOR THE BENEFIT OF THE COURT REPORTER, THAT'S T-O-C-E;
IS THAT CORRECT?

**A.**   CORRECT.

**Q.**   OKAY.  DOES IT CONCERN YOU IN ANY WAY THAT THESE DOCTORS
KIND OF COME FROM A FAIRLY DIVERSE GROUP OF PRACTICE AREAS?

**A.**   ACTUALLY, I THINK THAT BENEFITS US IN THAT THE PATIENTS WE

1   HAVE AT ANGOLA ARE A DIVERSE GROUP OF PATIENTS, AND BEING ABLE
2   TO DRAW ON EACH PRACTITIONER'S EXPERIENCE ALLOWS US TO TAKE
3   CARE OF THAT DIVERSE GROUP.
4   **Q.**   DO THOSE DOCTORS HAVE THE TRAINING TO SEE -- WE ARE GOING
5   TO TALK ABOUT CLINIC A, BUT GENERAL PRACTICE MEDICINE, DO THEY
6   HAVE THE TRAINING TO DO THAT AS WELL?
7   **A.**   EVERY DOCTOR THAT WE HAD ON STAFF AT THAT TIME HAD THE
8   CAPABILITY TO SEE GENERAL CLINIC PATIENTS.
9   **Q.**   AND I THINK YOU SAID YOU HAD ONE NURSE PRACTITIONER IN
10  SEPTEMBER OF 2016, CORRECT?
11  **A.**   YES, CINDY PARK.
12  **Q.**   AND TELL ME ABOUT NURSE PRACTITIONER PARK'S FOCUS
13  BACKGROUND, WHAT HAVE YOU?
14  **A.**   WELL, CINDY HAD A -- SHE HAS A CERTIFICATION IN ADULT
15  MEDICINE.  SHE HAD A WIDE RANGE OF EXPERIENCE IN THE ICU AND
16  THE EMERGENCY ROOM, AND SHE HAS BEEN WITH CORRECTIONS AT THAT
17  TIME LONGER THAN ALL MY PHYSICIANS PUT TOGETHER.  SHE ACTUALLY
18  HAD 25 YEARS OF EXPERIENCE WITHIN THE DEPARTMENT OF
19  CORRECTIONS.
20  **Q.**   AND WHAT DOES NURSE PRACTITIONER PARK DO AT ANGOLA?
21  **A.**   SHE DOES EVERYTHING THAT I EXPECT MY DOCTORS TO DO.  THE
22  ONLY THING SHE CAN'T DO, ACCORDING TO HER GUIDELINES, ARE SHE
23  CANNOT PRONOUNCE A PERSON DECEASED.
24  **Q.**   WHERE DID SHE WORK?  SHE WORKED IN CLINIC A?  WHERE DOES
25  SHE WORK?

**A.** WELL, CINDY IS A GO-GETTER.  SHE LIKES TO STAY BUSY, AND
SHE WORKS ALL OVER THE COMPOUND.  BESIDES HER CERTIFICATION IN
ADULT MEDICINE, SHE DOES HAVE A LOT OF -- QUITE A BIT OF
KNOWLEDGE IN HIV.  SHE'S DONE A LOT OF THOSE CLINICS AT HUNT
WHERE SHE WAS PRIOR TO HER COMING HERE.  SHE ALSO VOLUNTEERED
AND WAS ADAMANT ABOUT TAKING CARE OF UNIT 2.  SHE WANTED TO BE
THE ONLY DOCTOR AT UNIT 2, AND THAT WAS MOSTLY FOR CONTINUITY
OF CARE, AND I ALSO HAD HER OUT AT CAMP D, WHICH IS ONE OF THE
OUTER CAMPS AT THE ANGOLA PRISON.

**Q.** OKAY.

**A.** SHE ALSO OVERSAW HOSPICE WHICH ME AND DR. MACMURDO WERE
DOING THAT PRIOR, BUT SINCE SHE TOOK OVER UNIT 2, WE HAD HER
TAKE OVER HOSPICE AS WELL.

**Q.** IN SEPTEMBER OF 2016, WERE THERE ANY OPEN DOCTOR OR NURSE
PRACTITIONER POSITIONS THAT YOU WERE TRYING TO FILL AT ANGOLA?

**A.** WE WERE TRYING TO FILL TWO DOCTOR POSITIONS AND A NURSE
PRACTITIONER POSITION.

**Q.** OKAY.

**A.** ACTUALLY, LET ME CORRECT THAT.  WE ONLY HAD ONE DOCTOR
PHYSICIAN AT THAT TIME BECAUSE ONE OF OUR DOCTOR POSITIONS HAD
BEEN CONVERTED TO A DENTAL PHYSICIAN.  WE HAD ONE DOCTOR
POSITION AND ONE NURSE PRACTITIONER POSITION.

**Q.** OKAY.  AND AS OF -- IN 2016, DO YOU FEEL YOU WERE ABLE TO
MEET YOUR PATIENT NEEDS WITH THE LEVEL OF DOCTORS AND STAFFING
THAT YOU HAD?

**A.**   I DO.

**Q.**   HOW MANY RNS ARE EMPLOYED?  AGAIN, IN SEPTEMBER '16, HOW MANY RNS WERE EMPLOYED AT ANGOLA?

**A.**   WELL, I THINK AT THAT TIME THERE WERE 22 RNS.

**Q.**   AND THERE'S RNS AND THEN THERE'S LPNS, RIGHT?

**A.**   RIGHT.

**Q.**   AND THOSE HAVE DIFFERENT LEVELS OF SKILL; IS THAT CORRECT?

**A.**   RIGHT.  THE RNS ARE MORE SKILLED THAN YOUR LPNS.

**Q.**   OKAY.  WHAT CAN THE RNS DO THAT THE LPNS CAN'T?

**A.**   WELL, RNS, YOU KNOW, START IVS, HANG IV BAGS, THEY DISTRIBUTE CERTAIN TYPES OF MEDICATIONS THAT WE HOLD IN HIGH REGARD.  THEY ARE USUALLY THE MANAGERIAL -- THEY ARE USUALLY IN A MANAGERIAL ROLE, BUT THEY ARE MORE SCHOOLED AND THEY ARE MORE WELL-TRAINED THAN AN LPN.

**Q.**   AND THE LPNS THAT YOU HAD, HOW MANY OF THOSE DID YOU HAVE IN SEPTEMBER OF 2016?

**A.**   I THINK AT THAT TIME THERE WERE 30.

**Q.**   AND WHOSE RESPONSIBLE FOR THE DIRECT SUPERVISION OF THE NURSES?

**A.**   THAT WOULD BE THE NURSING DIRECTOR.

**Q.**   AND WHO WOULD THAT BE?

**A.**   SHERWOOD PORET.

**Q.**   IN SEPTEMBER OF 2016, DO YOU BELIEVE YOU WERE ABLE TO MEET THE PATIENT NEEDS WITH THE NUMBER OF NURSES THAT YOU HAD AT ANGOLA?

**A.**   YES.

**Q.**   AND I ASSUME THAT THERE WERE OPEN POSITIONS FOR NURSES
THAT YOU WERE TRYING TO FILL AS WELL IN SEPTEMBER OF 2016?
WOULD I BE CORRECT ON THAT?

        **MS. MONTAGNES:**  OBJECTION.  MR. ROBERT IS TESTIFYING.

        **MR. ROBERT:**  JUDGE, I'M JUST TRYING TO MOVE IT.  I
CAN NOT LEAD IT.

        **THE COURT:**  JUST REPHRASE IT, PLEASE.

        **MR. ROBERT:**  OKAY.

BY MR. ROBERT:

**Q.**   WERE THERE ANY OPEN POSITIONS THAT YOU WERE TRYING TO
FILL?

**A.**   SURE.  THERE WERE RN POSITIONS THAT WERE -- THAT COME AND
GO, BUT FROM TIME TO TIME, THERE ARE POSITIONS THAT NEED TO BE
FILLED, AND WE'VE NEVER BEEN ABLE TO TRULY MAINTAIN OUR LEVEL
OF LPN STAFF.

**Q.**   THE NURSING CHALLENGES, WOULD THOSE BE SIMILAR TO THE
DOCTOR CHALLENGES THAT YOU TALKED ABOUT?

**A.**   THEY ARE VERY SIMILAR, EVEN MORE -- MUCH MORE DIFFICULT
BECAUSE THERE'S A LOT OF HOSPITALS OUT THERE THAT ARE NOW
GIVING NURSES SIGN-ON BONUSES.  YOU KNOW, THERE ARE A LOT OF
HOSPITALS OUT THERE THAT ARE PROVIDING THEM EXTRA INCENTIVES TO
WORK AT THESE HOSPITALS, AND WE'RE JUST NOT ABLE TO DO THAT,
SO IT'S DIFFICULT FOR US TO KEEP UP WITH WHAT'S AVAILABLE IN
THE COMMUNITY.

09:51  1   **Q.**   AND WHEN WE TALKED ABOUT CHALLENGES IN FINDING DOCTORS,

2   ARE THERE ANY DIFFICULTIES GENDER-WISE TO GET DOCTORS AND

3   NURSES AT ANGOLA?

4   **A.**   I'M NOT UNDERSTANDING WHAT YOU ARE ASKING.

5           **THE COURT:**   GENDER-WISE?

6           **MR. ROBERT:**   YEAH.

7           **THE COURT:**   SORRY.   I JUST DIDN'T HEAR YOU.

8   **BY MR. ROBERT:**

9   **Q.**   DO YOU FIND IT MORE DIFFICULT, LET'S SAY, IN A MAXIMUM

10  SECURITY ALL-MALE PRISON TO GET FEMALE NURSES AND FEMALE

11  DOCTORS?

12  **A.**   NOT NECESSARILY.

13  **Q.**   OKAY.   HOW MANY EMTS DID YOU HAVE AT ANGOLA IN SEPTEMBER

14  OF 2016?

15  **A.**   I THINK AT THAT TIME THERE WERE 22 EMTS.

16  **Q.**   AND WHO IS RESPONSIBLE FOR THE DIRECT SUPERVISION OF EMTS

17  OR WHO WAS?

18  **A.**   DARREN CASHIO.

19  **Q.**   IN SEPTEMBER OF 2016, DO YOU FEEL YOU WERE ABLE TO MEET

20  THE NEEDS -- THE PATIENT NEEDS AT ANGOLA WITH THE NUMBER OF

21  EMTS THAT YOU HAD?

22  **A.**   YES.

23  **Q.**   DOES ANGOLA HAVE A -- I THINK YOU MENTIONED IT BEFORE

24  ABOUT MONTHLY MANAGEMENT MEETINGS.   IS THAT SOMETHING THAT

25  TAKES PLACE AT ANGOLA THAT YOU PARTICIPATE IN?

1    **A.**    YES.

2    **Q.**    LET ME SHOW YOU A DOCUMENT.  IT'S IDENTIFIED AS J-2, BATES

3    NO. 00679, DO YOU RECOGNIZE THAT DOCUMENT?

4    **A.**    YES.

5    **Q.**    WHAT IS IT?

6    **A.**    WELL, THIS IS A REPORT THAT COMES UNDER THAT MONTHLY

7    MANAGEMENT MEETING, AND THIS BASICALLY IS WHERE THE WHOLE

8    FACILITY IS DISSECTED, YOU KNOW.  THE REPORTS THAT COME OUT OF

9    THIS ARE VALUABLE FROM A STANDPOINT OF IT'LL GO OVER HOW MANY

10   PATIENTS DID YOU SEE THAT MONTH IN YOUR DENTAL CLINIC, HOW MANY

11   PATIENTS WERE SEEN IN THE GENERAL MEDICINE CLINIC, HOW MANY

12   SUB-SPECIALTY APPOINTMENTS DID WE HAVE.  IT EVEN GOES BACK TO

13   HOW MANY PEOPLE CAME INTO THE FACILITY, HOW MANY PEOPLE LEFT

14   THE FACILITY.  IT GOES --

15   **Q.**    LET ME STOP YOU FOR A SECOND.

16   **A.**    OKAY.

17   **Q.**    BECAUSE WE'RE GOING TO GET TO THAT.

18   **A.**    OKAY.

19   **Q.**    I WANT TO TALK ABOUT FIRST WHO PARTICIPATES IN THIS

20   MEETING?

21   **A.**    THE DEPARTMENT HEADS.

22   **Q.**    OKAY.  AND WHO WOULD THAT BE?

23   **A.**    BASICALLY, THE SAME PEOPLE THAT WOULD BE COMING TO THE

24   DEPARTMENT HEAD MEETING.

25   **Q.**    OKAY.  AND AS MEDICAL DIRECTOR, HAVE YOU REGULARLY

09:54  1  PARTICIPATED IN THIS MONTHLY MEETING DURING YOUR TIME AT

2  ANGOLA?

3  **A.**    YES.

4  **Q.**    OKAY.  LET'S TAKE A LOOK AT -- AND I'LL SHOW YOU -- AND

5  THIS IS ALL WITHIN THIS SAME MONTHLY MEETING OF SEPTEMBER OF

6  2016.  THE NEXT PAGE IS JOINT EXHIBIT 2-00680, AND I'M SHOWING

7  YOU THE MIDDLE OF THE PAGE I'VE HIGHLIGHTED SOME STUFF.  IS

8  THIS THE TYPE OF INFORMATION THAT YOU DISCUSS AND THAT IS

9  REVIEWED AT THAT MONTHLY MANAGEMENT MEETING?

10  **A.**    SURE.

11  **Q.**    TELL ME ABOUT THAT.

12  **A.**    WELL, THE PART THAT YOU HAVE HIGHLIGHTED REFERENCES THE

13  CLINIC A SCHEDULES AND WHAT WOULD BE CONSIDERED OUR BACKLOG.

14  **Q.**    OKAY.

15  **A.**    THIS PARTICULAR MONTH THERE WERE 19 -- THERE WERE 913

16  OFFENDERS SCHEDULED FOR CLINIC A, AND 160 WERE RESCHEDULED, SO

17  753 OFFENDERS WERE ACTUALLY SEEN FOR THAT MONTH.

18  **Q.**    DOES THE DOCUMENT GIVE YOU AN INDICATION AS TO WHY THAT

19  OCCURRED?

20  **A.**    WELL, THE BACKLOG STILL EXISTS BECAUSE THERE ARE TWO

21  POSITIONS SHORT, AND THERE WERE FIVE OFFICE CLOSURE DAYS DUE TO

22  SOME FLOODING.

23  **Q.**    AND THAT'S THE KIND OF THING THAT YOU WOULD TRACK ON A

24  MONTHLY BASIS AT ANGOLA?

25  **A.**    SURE.

09:55    1    **Q.**    AND YOU WANT TO KEEP THAT INFORMATION AVAILABLE TO THE

2    MEDICAL PERSONNEL AS TO HOW MANY PEOPLE YOU ARE SEEING AND HOW

3    MANY PEOPLE YOU NEED TO SEE AND ALL THAT GOOD STUFF?

4    **A.**    YES.

5    **Q.**    AND THAT INFORMATION IS TRACKED AND IS DISCUSSED, CORRECT?

6    **A.**    THAT INFORMATION IS TRACKED AND DISCUSSED.

7    **Q.**    I WANTED TO SHOW YOU -- AND THIS IS ALL WITHIN THE SAME

8    MONTHLY REPORT, AND THIS IS J2-00682, AND TELL US ABOUT THE

9    INFORMATION THAT'S TRACKED THERE.

10    **A.**    WELL, LIKE I SAID, IT'S BASICALLY A SECTION OF THE

11    DEPARTMENT, AND THE TOP SECTION TALKS ABOUT THE DOCTORS' CLINIC

12    AND CHRONIC DISEASE AND TALKS ABOUT STAFFING, AND THEN THE

13    NURSING STAFFING FOR THE CLINIC AREA.  THERE WAS ONE RN MANAGER

14    WHICH SHE PRETTY MUCH STAYS AROUND THE WHOLE DAY.  WE'VE GOT 11

15    FULL-TIME LPNS THAT WORK WITHIN THAT DEPARTMENT AND ONE MEDICAL

16    ASSISTANT.

17    **Q.**    AND THIS ENCAPSULATES WHAT'S GOING ON IN SEPTEMBER OF

18    2016, CORRECT?

19    **A.**    IT DOES.

20    **Q.**    DOES THE DOCUMENT INDICATE THAT YOU GOT A NEW DOCTOR

21    COMING ON AS OF THAT DATE, CORRECT?

22    **A.**    IT DOES.  AT THE BOTTOM -- TOWARDS THE BOTTOM IT SHOWS

23    THAT DR. BUNCH HAS JOINED OUR PHYSICIAN GROUP.

24    **Q.**    AND DR. SYLVEST -- I DON'T THINK WE TALKED ABOUT HIM

25    BEFORE.  HE WAS ALSO INVOLVED WITH ANGOLA AT THAT TIME?

**A.** YES.  DR. SYLVEST WAS A PHYSICIAN THAT WE TRIED TO GET ON STAFF AT LSP BECAUSE OF OUR ORTHOPEDIC NEEDS, AND WE WERE UNABLE TO GET HIM ON STAFF BECAUSE OF HIS ORTHOPEDIC SPECIALTY. SO HEADQUARTERS LOOKED AT IT AND THEY SAID, WELL, WE DON'T REALLY WANT HIM ON YOUR STAFF BECAUSE HE DOESN'T HAVE PRIMARY CARE EXPERIENCE, BUT WE'RE GOING TO GIVE HIM TO YOU AS A CONTRACT PHYSICIAN TO COME IN AND DO ORTHOPEDICS.  SO THEY ENDED UP GIVING US WHAT WE ASKED FOR IN A DIFFERENT ROUTE THAN WHAT WE ASKED FOR IT.

**Q.** LET'S LOOK AT THE NEXT PAGE, WHICH IS J2-00683, AND SIMILAR INFORMATION ABOUT ENCOUNTERS AND SO ON AND SO FORTH, CORRECT?

**A.** AGAIN, A COMPLETE DISSECTION OF THE MEDICAL DEPARTMENT.

**Q.** AND THAT'S THE KIND OF INFORMATION THAT YOU DISCUSS AND YOU REVIEW ON A MONTHLY BASIS?

**A.** IT'S REVIEWED, YES.

**Q.** DR. LAVESPERE, LET ME ASK YOU:  DOES ANGOLA HAVE ANY FORMAL PEER REVIEW PROCESS FOR THEIR DOCTORS?

**A.** WE DO HAVE A PEER REVIEW PROCESS.

**Q.** TELL ME ABOUT THAT PROCESS.

**A.** THAT PROCESS OCCURS EVERY TWO YEARS.  AND USUALLY, IT'S A DOCTOR FROM WITHIN THE DEPARTMENT OF CORRECTIONS, A MEDICAL DIRECTOR FROM ANOTHER FACILITY THAT COMES IN ALONG WITH THE DENTAL DIRECTOR OR A NURSE, AND THEY LOOK AT THE MEDICAL DEPARTMENT AS A WHOLE.

09:59

1    FOR THE DOCTORS SPECIFICALLY, WE HAVE ONE OF THE

2   MEDICAL DIRECTORS FROM THE OUTSIDE FACILITIES, ANOTHER DOC

3   FACILITY, THAT COMES TO OUR PLACE, AND THEY REVIEW ANYWHERE

4   FROM 12 TO 15 OF OUR CHARTS AND BASICALLY GIVE US SOME

5   INDICATION OF HOW THEY THINK WE'RE DOING.

6   **Q.**   OKAY.  I WANT TO SHOW YOU A DOCUMENT THAT'S BEEN ALREADY

7   IN EVIDENCE, J2-00690, AND ASK YOU IF YOU RECOGNIZE THAT

8   DOCUMENT?

9   **A.**   YES.

10  **Q.**   WHAT IS THAT?

11  **A.**   YES.

12  **Q.**   WHAT IS THAT?

13  **A.**   WELL, THIS IS THE REVIEW DONE BY DR. PREJEAN, JOHNNY

14  PREJEAN, WHO'S THE INTERNAL MEDICINE DOCTOR AT THE WOMEN'S

15  PRISON, LCIW, AND HE CAME TO ANGOLA ON 10/13 OF '14 AND

16  REVIEWED OUR FACILITY.

17  **Q.**   OKAY.  AND IS THIS THE REPORT THAT HE PROVIDED AS A RESULT

18  OF HIS REVIEW?

19  **A.**   IT IS.

20  **Q.**   OKAY.  AND WHAT DID HE FIND IN HIS REPORT?

21  **A.**   WELL, BASICALLY, HE REVIEWED 12 CHARTS, AND IN

22  CONVERSATION WITH JOHNNY, AS WELL AS ON THIS REPORT, IT

23  BASICALLY SAYS, LOOK, EVERYTHING LOOKS PRETTY GOOD, JUST

24  TIGHTEN UP ON YOUR CHRONIC CARE GUIDELINES.

25  **Q.**   AND YOU HAD A CONVERSATION WITH DR. PREJEAN AFTER HE

1   COMPLETED THAT PEER REVIEW?

2   **A.**   SURE.

3   **Q.**   OKAY.  AND I ASSUME YOU GOT A COPY OF THIS TO REVIEW,

4   CORRECT?

5   **A.**   I DID.

6   **Q.**   WHAT, IF ANYTHING, DID YOU DO WITH IT ONCE YOU GOT IT?

7   **A.**   WELL, AGAIN, I BROUGHT IT TO THE MORNING MEETING AND

8   TALKED ABOUT IT WITH THE PHYSICIANS, AND WE BROUGHT OUT A SET

9   OF GUIDELINES AND WE LOOKED AT OUR GUIDELINES AND WE TALKED

10   ABOUT IT.

11   **Q.**   OKAY.  DID YOU ATTEMPT TO DO ANYTHING TO ADDRESS THE

12   CRITICISMS IN THE REPORT?

13   **A.**   SURE.  WE BROUGHT OUT THE GUIDELINES IN THE MEETING AND WE

14   TALKED ABOUT THE IMPORTANCE OF THESE GUIDELINES WITH OUR

15   PHYSICIANS AND MADE THEM AWARE OF WHAT THE REPORT SAID.

16   **Q.**   LET ME SHOW YOU ANOTHER DOCUMENT, IT'S MARKED FOR

17   IDENTIFICATION, J2-00693, AND DO YOU RECOGNIZE THIS DOCUMENT?

18   **A.**   CAN YOU RAISE IT UP JUST A LITTLE?

19   **Q.**   I SURE CAN.  I CAN TRY.

20   **A.**   OKAY.

21   **Q.**   THERE WE GO.  OKAY.

22   **A.**   OKAY.  YEAH, I RECOGNIZE THIS DOCUMENT.  THIS IS FROM '16,

23   WHEN PREETY SINGH, WHO IS THE WARDEN -- OR NOT THE WARDEN, THE

24   MEDICAL DIRECTOR AT HUNT, SHE CAME TO LSP AND DID OUR PEER

25   REVIEW.

10:02

1   **Q.**   OKAY.  AND THAT WOULD HAVE BEEN THE TWO-YEAR PERIOD --
2   THAT WOULD HAVE BEEN THE NEXT REVIEW AFTER THE ONE IN '14.
3   WOULD THAT BE CORRECT?
4   **A.**   YES.
5   **Q.**   OKAY.  AND TELL ME WHAT WAS THE RESULT?  WHAT HAPPENED
6   DURING -- WHAT WAS THE RESULT OF THIS REPORT?
7   **A.**   WELL, BASICALLY, SHE MADE SOME SUGGESTIONS, THAT, YOU
8   KNOW, AND AS YOU GO THROUGH MEDICAL SCHOOL, YOU LEARN TO DO A
9   PHYSICAL EXAM UNDER THE SOAP NOTE FORMAT, AND THAT S IS FOR
10  SUBJECTIVE, O IS FOR OBJECTIVE, A IS FOR ASSESSMENT, AND P,
11  FOR PLAN.  AND SO SHE SAW WHERE SOME OF THE PHYSICIANS WEREN'T
12  ACTUALLY USING THE SOAP FORMAT, AND SO SHE SAID YOU MIGHT WANT
13  TO TAKE A LOOK AT THAT.
14  **Q.**   SO THIS WOULD BE 9/19/2016, RIGHT BEFORE THE CUTOFF THAT
15  WE ARE TALKING ABOUT HERE, RIGHT?
16  **A.**   RIGHT.
17  **Q.**   AND WHEN YOU TALK ABOUT THE SOAP FORMAT, EXPLAIN THAT TO
18  THE COURT.
19  **A.**   WELL, AS YOU GO THROUGH YOUR TRAINING, YOU KNOW, YOU GO
20  THROUGH A LEARNING CURVE, WHERE YOU LEARN HOW TO DO HISTORIES,
21  PHYSICALS, ASSESSMENTS AND PLANS, AND PART OF THAT IS THEY GIVE
22  YOU THIS ACRONYM CALLED SOAP, SOAP NOTE, WHERE S WOULD BE
23  SUBJECTIVE, YOU TALK TO THE PATIENT, YOU WRITE DOWN WHAT THEY
24  SAY SUBJECTIVE.  OBJECTIVE, WHAT DO YOU FIND, YOUR PHYSICAL
25  EXAM; ASSESSMENT, WHAT'S YOUR ASSESSMENT BASED ON THE ABOVE

1  TWO, AND WHAT IS YOUR PLAN.

2  Q.   AND WAS HER CONCERN THAT THIS WASN'T BEING PROPERLY

3  DOCUMENTED?

4  A.   YES, SHE WANTED US TO REVIEW THE GUIDELINES AND TO START

5  LOOKING AT THE SOAP NOTES A LITTLE CLOSER.

6  Q.   AND THAT'S WHAT -- YOU'VE BEEN SITTING IN HERE WATCHING

7  THIS TRIAL.  IS THAT PART OF THE CRITICISM THAT YOU'VE SEEN

8  FROM PLAINTIFFS' EXPERTS?

9  A.   SURE.

10  Q.   OKAY.  AND DID YOU DO ANYTHING IN 2016 TO ADDRESS THAT

11  ISSUE IN SEPTEMBER OF 2016?

12  A.   AGAIN, WHEN THESE THINGS HAPPEN LIKE THIS, EVERY MORNING

13  WE HAVE OUR MEDICAL MEETING AND WE BRING THESE THINGS TO THE

14  TABLE AND WE HAVE ALL OF OUR PHYSICIANS THERE.  AND WE HAVE A

15  PHYSICIAN DISCUSSION ABOUT THESE TYPE OF IMPROVEMENTS THAT WE

16  NEED TO LOOK AT.

17  Q.   OKAY.  LET'S MOVE ON.  LET'S TALK ABOUT THE FORMULARY

18  COMMITTEE.  DO Y'ALL HAVE A FORMULARY COMMITTEE?

19  A.   WE DO.  WE HAVE A P&T COMMITTEE.

20  Q.   OKAY.  AND WHO PARTICIPATES IN THAT?

21  A.   WELL, A FEW OF THE MEDICAL DIRECTORS FROM ACROSS THE STATE

22  ARE ON THE COMMITTEE AS WELL AS THE TWO PHARMACISTS THAT ARE

23  INVOLVED WITH THE DOC.

24  Q.   OKAY.  AND I'LL SHOW YOU A DOCUMENT --

25          JOHN, WHAT EXHIBIT NUMBER IS THAT?  IT'S A DEFENDANT

1    TRIAL EXHIBIT.  IT'S GOT A BATES NUMBER OF O2565.

2              **MR. CONINE:**  8.

3    **BY MR. ROBERT:**

4    **Q.**   IT'S DEFENDANTS' EXHIBIT D-8.  TELL ME IF YOU RECOGNIZE

5    THAT DOCUMENT.

6    **A.**   I DO.

7    **Q.**   WHAT IS IT?

8    **A.**   WELL, IT'S THE MINUTES FROM OUR FORMULARY COMMITTEE

9    MEETINGS, AND THESE MINUTES ARE USUALLY SENT TO EACH MEMBER OF

10   THE COMMITTEE AFTER THE MEETING.

11   **Q.**   OKAY.  AND WHAT DOES THE FORMULARY COMMITTEE DO?

12   **A.**   WELL, BASICALLY, WE SIT DOWN AND DISCUSS IN GENERAL THE

13   FORMULARY, WHICH ARE MEDICATIONS THAT ARE AVAILABLE TO THE

14   PHYSICIANS WHO WORK WITHIN THE DOC, AND IF ONE OF THE

15   PHYSICIANS WANTS TO ADDRESS THE COMMITTEE TO HAVE A MEDICINE

16   ADDED, HE BRINGS UP -- HE OR SHE BRINGS UP THE ARGUMENT AT THAT

17   TIME.

18              THERE ARE A LOT OF THINGS THAT CHANGE WITHIN THE

19   PHARMACY, PRICES CHANGE, YOU KNOW, DIFFERENT MEDICATIONS GO UP

20   IN PRICE.  SOME GO DOWN IN PRICE, AND SO THERE'S A CONSTANT

21   TRACKING OF THESE MEDICINES THAT MAKES IT IMPORTANT TO MEET.

22   SOME MEDICINES QUIT BEING MADE.  SO YOU HAVE TO CONSTANTLY

23   MANEUVER WITHIN THE PHARMACEUTICAL INDUSTRY TO MAKE YOUR

24   FORMULARY SOMETHING THAT IS NOT ONLY USER FRIENDLY BUT ALSO

25   COST EFFECTIVE.

10:06

1    **Q.**    AND YOU TALK ABOUT COST EFFECTIVE.  WHAT ROLE DOES COST

2    PLAY IN TRYING TO MAKE THESE DECISIONS AS TO WHAT SHOULD BE ON

3    YOUR FORMULARY?

4    **A.**    WELL, YOU KNOW, EFFICACY IS THE MOST IMPORTANT THING, AND

5    WE REALIZE THAT.  HOWEVER, SOMETIMES COST DOES PLAY A FACTOR,

6    IN THAT A LOT OF THESE NEW PILLS THAT COME OUT ON THE MARKET OR

7    THESE NEW INHALERS THAT COME OUT ON THE MARKET, THEY ARE

8    COMBINATION THERAPIES.  YOU KNOW, COMBINATION THERAPIES ARE

9    NOTORIOUSLY MORE EXPENSIVE, AND WE FIND THAT WE CAN GET THE

10   SAME EFFICACY BY USING THE INDIVIDUALIZED DRUGS RATHER THAN THE

11   COMBINATION DRUGS.

12            FOR EXAMPLE, SOME OF THE BLOOD PRESSURE PILLS ARE

13   COMBINATION PILLS, A CALCIUM CHANNEL BLOCKER WITH A DIURETIC ON

14   IT OR AN ARB WITH A DIURETIC, BUT WE CAN USE THE SAME ARB AND

15   THE SAME DIURETIC, WITHOUT THE COMBINATION AND GET IT FOR A

16   MUCH MORE REASONABLE PRICE.

17   **Q.**    LET ME SHOW YOU THIS NEXT PAGE, I BELIEVE, OF THIS SAME

18   DOCUMENT, D8-02566 AND ITEM NO. 8 ON THAT TALKS ABOUT SMOKING

19   CESSATION PLAN, CAN YOU TELL ME ABOUT THAT?

20   **A.**    WELL, THERE WAS A TIME BEFORE THE CUTOFF PERIOD OF 9 OF

21   '16, I REALLY DON'T KNOW EXACTLY WHEN, BUT WE GOT SOME FEDERAL

22   MONEY FOR A SMOKING CESSATION PROGRAM, AND ONE OF THE

23   PHARMACISTS -- I THINK IT WAS MARY -- TAPPED INTO THAT PROGRAM,

24   AND THEY REALIZED THAT THERE WAS MONEY OUT THERE AVAILABLE FOR

25   SMOKING CESSATION FOR OFFENDERS, AND SO THEY TAPPED INTO THIS.

10:08

1    AND WE WERE GETTING PATCHES FOR THESE OFFENDERS AS -- BECAUSE

2    OUR FACILITY WAS BECOMING A NONSMOKING FACILITY, WE WERE

3    GETTING PATCHES FOR THESE OFFENDERS AHEAD OF TIME TO ENSURE

4    THAT THEY WOULD HAVE A SMOOTH TRANSITION GOING FROM A SMOKING

5    FACILITY TO A NONSMOKING FACILITY.

6    **Q.**    IS ANGOLA A NONSMOKING FACILITY NOW?

7    **A.**    IT IS.

8    **Q.**    AND THAT INCLUDES ALL OFFENDERS AS WELL AS PERSONNEL?

9    **A.**    YES.

10   **Q.**    OKAY.  AND IS THAT SOMETHING THAT'S FROM A MEDICAL

11   STANDPOINT THAT YOU SUPPORT?

12   **A.**    I DO.

13   **Q.**    OKAY.  AND YOU SEE BULLET POINT 9, IT TALKS ABOUT 340B

14   PROGRAM, WHAT'S THAT?

15   **A.**    340B PROGRAM IS A FEDERAL PROGRAM THAT ALLOWS US TO OBTAIN

16   MEDICATIONS AT A MUCH DISCOUNTED RATE.  FOR EXAMPLE, JUST WITH

17   THIS 340B PROGRAM ALONE, WE PROBABLY SAVE 5 MILLION ON HIV

18   MEDICINES A YEAR, AND A LOT OF OUR CANCER TREATMENTS WE CAN GET

19   THROUGH 340B.  A LOT OF OUR SPECIALIZED ANTIBIOTICS WE CAN GET

20   THROUGH 340B.

21   **Q.**    AND THESE FORMULARY COMMITTEE MEETINGS, HOW OFTEN DO THEY

22   OCCUR?

23   **A.**    THEY USUALLY OCCUR QUARTERLY.

24   **Q.**    DO YOU REGULARLY PARTICIPATE IN THOSE MEETINGS?

25   **A.**    SURE.

10:09   1  **Q.**   TURN NOW TO ACCREDITATION.   DOES ANGOLA PARTICIPATE IN ANY

2  KIND OF A NATIONAL ACCREDITATION PROCESS?

3  **A.**   WE PARTICIPATE IN THE ACA ACCREDITATION PROCESS.

4  **Q.**   AND DOES THAT ACCREDITATION PROCESS INCLUDE REVIEWS OF THE

5  MEDICAL CARE PROVIDED AT ANGOLA?

6  **A.**   YES.   EVERY THREE YEARS -- I THINK ACA, AMERICAN

7  CORRECTIONAL ASSOCIATION, COMES TO ANGOLA AND THEY REVIEW THE

8  PRISON, BUT I'M NOT AWARE OF WHAT THEY DO IN THE OUTSKIRTS OF

9  THE MEDICAL DEPARTMENT, BUT THEY DO ALSO REVIEW THE MEDICAL

10  DEPARTMENT.

11  **Q.**   OKAY.   DO YOU PARTICIPATE IN THAT?

12          **MS. MONTAGNES:**   AND YOUR HONOR, I'M JUST GOING TO

13  LODGE AN OVERALL OBJECTION TO THIS LINE OF QUESTION.

14  ACCREDITATION IS NOT AT ISSUE.   YOU KNOW, WE KNOW THEY ARE

15  ACCREDITED.   WE DON'T THINK IT'S RELEVANT AS TO THE ISSUES IN

16  THIS CASE.

17          **MR. ROBERT:**   I MEAN, JUDGE, I THINK IT'S VERY

18  RELEVANT.   WE'VE HEARD EXPERTS TALK ABOUT THE DIFFERENT

19  ACCREDITATION PROCESSES, AND I THINK WE OUGHT TO BE ABLE TO PUT

20  ON EVIDENCE THAT WE ARE ACCREDITED, WE ARE REVIEWED, AND OUR

21  MEDICAL DEPARTMENT IS REVIEWED REGULARLY.

22          **THE COURT:**   OKAY.   THE OBJECTION IS OVERRULED.

23  **BY MR. ROBERT:**

24  **Q.**   LET ME SHOW YOU A DOCUMENT THAT HAS BEEN -- IT'S D16 AND

25  BATES NO. IS 02950.   CAN YOU TELL ME IF YOU RECOGNIZE THIS

1  DOCUMENT?

2  **A.**   THAT'S THE REPORT OF THE ACA VISIT FROM AUGUST 29TH

3  THROUGH 31ST OF 2016.

4  **Q.**   OKAY.  THAT'S THE VISIT THAT TOOK PLACE RIGHT BEFORE OUR

5  CUTOFF DATE, CORRECT?

6  **A.**   YES.

7  **THE COURT:**  WHAT'S YOUR EXHIBIT NUMBER?

8  **MR. ROBERT:**  I'M SORRY.  THE EXHIBIT NUMBER, IT IS

9  D-16.

10  **THE COURT:**  GO AHEAD, CARRY ON.

11  **MR. ROBERT:**  YOU GOT IT, OKAY.

12  **BY MR. ROBERT:**

13  **Q.**   I'LL SHOW YOU AGAIN WITHIN D-16, NO. 02951, DO YOU

14  RECOGNIZE THIS?

15  **A.**   I DO.

16  **Q.**   AND I'VE HIGHLIGHTED THE AUDITORS.  WHO ARE THOSE FOLKS?

17  **A.**   WELL, I DON'T KNOW THEM PERSONALLY, BUT THERE'S NANCY

18  BAILEY, BYRAN REICKS, GERALD ELLSWORTH.

19  **Q.**   ARE THOSE PEOPLE WHO WORK WITHIN THE DEPARTMENT OF

20  CORRECTIONS IN LOUISIANA?

21  **A.**   I DON'T KNOW.

22  **Q.**   DO YOU KNOW OF ANY ASSOCIATION THAT THEY HAVE WITH THE

23  DEPARTMENT OF CORRECTIONS IN LOUISIANA?

24  **A.**   I DON'T KNOW.

25  **Q.**   OKAY.  AND THERE'S A TALLY THERE, A

10:12  1   MANDATORY/NON-MANDATORY.  CAN YOU TELL ME WHAT THAT IS?

2   **A.**   WELL, THERE'S CERTAIN MANDATORY CRITERIA THAT YOU HAVE TO

3   MEET IN ORDER TO PASS THE ACA.  AND WE WERE 100 PERCENT

4   COMPLIABLE WITH THE MANDATORY STANDARDS, AND OF THE

5   NON-MANDATORY, WHICH THERE ARE OVER 450 OF THOSE, I THINK THE

6   DOCUMENTS SUPPORT 463 THAT WE WERE 99.3 PERCENT COMPLIANT WITH

7   THOSE.

8   **Q.**   SO DOES THAT INDICATE TO YOU THAT ANGOLA PASSED?

9   **A.**   IT INDICATED TO ME THAT ANGOLA PASSED.

10   **Q.**   WITH FLYING COLORS?

11   **A.**   I WOULD TAKE THAT GRADE IN A TEST.

12   **Q.**   ALL RIGHT.  WITHIN THIS SAME DOCUMENT, LET'S LOOK AT WHAT

13   IS PAGE 13 OF THE DOCUMENT, AND IT'S BROKEN OUT FOR PURPOSES OF

14   THE EXHIBITS IN EVIDENCE.  THIS REPORT HAS GOT A WHOLE BUNCH OF

15   OTHER STUFF IN IT, BUT THIS IS LIMITED TO THE MEDICAL PORTION

16   OF IT.  TAKE A LOOK AT THAT.  IS THIS THE TYPE OF INFORMATION,

17   SOME OF THE INFORMATION THAT THE ACA REVIEWS WHEN THEY COME IN?

18   **A.**   IT IS.

19   **Q.**   LOOK AT THE PRESCRIPTIONS FILLED, THE NUMBER OF OFFENDER

20   PRESCRIPTIONS AND ALL THAT STUFF WITH RESPECT TO THE PHARMACY,

21   CORRECT?

22   **A.**   THAT IS, AND TO BE CLEAR, OUR PHARMACY NOT ONLY FILLS

23   SCRIPTS FOR ANGOLA PHARMACY, BUT TWO OF THE OUTLYING

24   PENITENTIARIES WITHIN -- THEY FILL PRESCRIPTIONS FOR AVOYELLES

25   AND THEY ALSO FILL PRESCRIPTIONS FOR DCI, SO THAT'S ANGOLA PLUS

1  TWO OTHER FACILITIES.

2  Q.   AND WE WILL LOOK AT WHAT'S NUMBERED 02955, AND THERE'S

3  DISCUSSION THERE ABOUT OFFENDER SICK CALL EACH MONTH AND SO ON

4  AND SO FORTH, CORRECT?

5  A.   RIGHT.

6  Q.   LET ME ASK YOU SOMETHING.  WHAT EXACTLY -- WHEN THE ACA

7  COMES IN, DO THEY LOOK AT MEDICAL CHARTS?  WHAT EXACTLY DO THEY

8  DO?

9  A.   WELL, THEY REVIEW EVERYTHING IN MEDICAL.  THEY LOOK AT

10 CHARTS.  THEY -- I USUALLY GIVE THEM A TOUR AND, YOU KNOW, SHOW

11 THEM WHAT WE HAVE GOING ON THERE, AND THEY ASK ME QUESTIONS FOR

12 20, 30 MINUTES, AND THEN THEY GO ABOUT SPLITTING UP AND GOING

13 TO EACH INDIVIDUAL DEPARTMENT.  AND SO THEY GO THROUGH THE

14 NURSING UNIT, BOTH OF THEM.  THEY GO THROUGH THE MENTAL HEALTH

15 DEPARTMENT.  THEY GO THROUGH THE PHARMACY.  THEY GO THROUGH THE

16 MEDICAL RECORDS.  THEY GO THROUGH THE CLINIC.  THEY GO THROUGH

17 THE EMERGENCY ROOM.  THE PHARMACY -- I MEAN, THE LAB AS WELL AS

18 THE DENTAL AND X-RAY, SO THEY PRETTY MUCH MAKE A VISIT THAT

19 ENCOMPASSES EVERY DEPARTMENT.

20 Q.   DO YOU HAVE DISCUSSIONS WITH THE REVIEWERS WHEN THEY COME

21 IN TO DO THE REVIEW?

22 A.   WELL, BESIDES MY INITIAL CONTACT WITH THEM, WHERE I

23 BASICALLY GIVE THEM A TOUR, AND AFTER OUR MEETING, WHERE THEY

24 ASK ME SPECIFIC QUESTIONS ABOUT THE MEDICAL DEPARTMENT, ONCE

25 THEY FINISH, I DON'T HAVE AN EXIT INTERVIEW WITH THEM.  THAT'S

10:15    1    USUALLY SOMETHING THAT THE WARDENS WOULD DO.

2    **Q.**    AND AFTER THE ACA REPORT IS ISSUED, DO YOU REVIEW IT?

3    **A.**    I SEE IT.

4    **Q.**    OKAY.  DO YOU ADDRESS ANY CRITICISMS THAT MIGHT BE IN

5    THOSE REPORTS?

6    **A.**    I NEVER HAVE BECAUSE THE REPORTS ARE USUALLY FAIRLY GOOD.

7    **Q.**    OKAY.  AND HOW LONG, TO YOUR KNOWLEDGE, HAS ANGOLA BEEN

8    ACCREDITED BY THE ACA?

9    **A.**    WELL, I HAVE BEEN THERE NINE YEARS, AND WE'VE BEEN

10    ACCREDITED SINCE I'VE BEEN THERE.

11    **Q.**    OKAY.  LET ME ASK YOU:  DO YOU HAVE ANY INVOLVEMENT IN THE

12    ANNUAL BUDGETING FOR HEALTHCARE AT ANGOLA?

13    **A.**    I DO NOT.

14    **Q.**    OKAY.  WHO'S RESPONSIBLE FOR THE BUDGET?

15    **A.**    WELL, THAT'S A HEADQUARTERS RESPONSIBILITY.

16    **Q.**    DOES YOUR LACK OF INVOLVEMENT IN THE BUDGET CAUSE YOU ANY

17    CONCERNS OR PROBLEMS?

18    **A.**    IT DOES NOT.  WHEN YOU GO TO MEDICAL SCHOOL, THERE'S TWO

19    SIDES OF MEDICINE.  THERE'S THE BUSINESS OF MEDICINE, AND THEN

20    THERE'S THE PRACTICE OF MEDICINE, AND I LEARNED FROM OPENING MY

21    PRIVATE PRACTICE, THAT THE BUSINESS OF MEDICINE IS A HEADACHE,

22    YOU KNOW, AND ONE OF THE THINGS THAT REALLY STIMULATED ME ABOUT

23    ANGOLA IS I DIDN'T HAVE TO WORRY ABOUT THE BUSINESS OF

24    MEDICINE.

25            NOW, DON'T GET ME WRONG, I AM COST CONSCIOUS AND COST

10:17

1  EFFECTIVE, BUT THERE'S NEVER BEEN A TIME AT ANGOLA THAT I

2  NEEDED SOMETHING THAT I DIDN'T GET, NEVER.  SO TO SAY THAT I

3  WORK UNDER A BUDGET, IT'S AN ARBITRARY BUDGET AT BEST, BECAUSE

4  I GET OFFENDERS COMING BACK FROM THE HEMATOLOGY CLINIC ALL THE

5  TIME.  I HAD ONE OFFENDER DURING THIS TIME FRAME THAT CAME BACK

6  AND THEY WANTED TO GIVE HIM A HALF MILLION DOLLARS OF CHEMO,

7  THAT WAS A PALLIATIVE CHEMO, SO ANGOLA GOT IT.

8        WELL, A HALF MILLION DOLLARS CAN REALLY ALTER YOUR

9  BUDGET IF YOU'RE TRYING TO STICK TO A BUDGET, SO THIS OFFENDER

10 COMES BACK, HE NEEDS A HALF MILLION DOLLARS WORTH OF CHEMO.

11 THAT'S NOT GOING TO CURE HIS DISEASE, IT'S JUST GOING TO KEEP

12 HIM GOING FOR A WHILE, BUT WE GET IT.

13        SO I SEND THOSE REQUESTS UP.  ANYTHING OVER $5,000, I

14 SEND UP TO THE HEADQUARTERS, OKAY, BUT I HAVE NEVER BEEN TOLD

15 NO ON ANYTHING THAT I NEED.  SO I CONCENTRATE MY TIME ON THE

16 PRACTICE OF MEDICINE AND LET THE PEOPLE THAT ARE PAID TO DO THE

17 BUSINESS OF MEDICINE DO THE BUSINESS OF MEDICINE.

18 **Q.**   OKAY.  LET'S SWITCH GEARS.  LET'S GO TO THE OVERALL

19 HEALTHCARE OPERATIONS AND WHAT IS PHYSICALLY PROVIDED AT

20 ANGOLA.  LET'S START OUT.  WHY DON'T YOU GIVE ME A GENERAL

21 DESCRIPTION OF WHAT THE PHYSICAL PLANT IS LIKE OVER THERE, OR

22 WHAT IT CONSISTS OF?

23 **A.**   WELL, ALMOST RIGHT IN THE MIDDLE OF THE PENITENTIARY

24 THERE'S A BUILDING THAT WE CALL THE R.E. BARROW TREATMENT

25 CENTER, AND THAT TREATMENT CENTER IS KIND OF CONNECTED ON THE

1    BACK END TO WHAT'S CALLED THE MAIN PRISON.  WELL, WHEN YOU WALK

2    INTO THE TREATMENT CENTER, IF YOU WALK IN FROM THE BACK WAY,

3    THE FIRST THING YOU RUN INTO IS WHAT'S CALLED THE ATU, AND THE

4    ATU IS THE AREA WHERE ALL THE URGENT NEEDS OF THE OFFENDERS ARE

5    MET.

6    **Q.**    AND WHAT DOES ATU STAND FOR?

7    **A.**    IT STANDS FOR THE ASSESSMENT AND TRIAGE UNIT.

8    **Q.**    AND HOW LONG IS THE ATU -- WHAT IS THE ATU'S WORKING

9    HOURS?

10    **A.**    IT NEVER CLOSES.  IT'S 24 HOURS A DAY, 7 DAYS A WEEK.

11    **Q.**    OKAY.

12    **A.**    AND SO THE -- YOU WANT ME TO CONTINUE?

13    **Q.**    GO AHEAD.

14    **A.**    SO THE ATU CONSIST OF TWO ROOMS.  THE FIRST ROOM ON THE

15    LEFT WOULD BE A ROOM THAT'S SET UP FOR TRAUMA, CODES, THAT KIND

16    OF THING.  IT HAS FOUR BEDS IN IT, BUT REALLY DURING THE CODE

17    TIME OR TRAUMA TIME THAT ONE MAIN BED IS THERE AND ALL THE --

18    **Q.**    LET ME STOP YOU, BECAUSE WE'RE GOING TO GO INTO A LITTLE

19    MORE DETAIL ABOUT THE VARIOUS AREAS.  I KIND OF WANT TO GET A

20    PICTURE OF THE OVERALL.  WE TALKED ABOUT YOU COME IN AND YOU

21    GET THE ATU.

22    **A.**    OKAY.  ALL RIGHT.

23    **Q.**    WHAT OTHER FACILITIES ARE PROVIDED?

24    **A.**    SO YOU COME IN AND YOU HAVE TWO ROOMS, ONE ON THE LEFT,

25    ONE ON THE RIGHT FOR THE ATU.  THERE'S A STATION BACK THERE

10:20   1   WHERE THEY ANSWER PHONES, THAT'S BEHIND THE GLASS, THEN IF YOU

2   WALK DOWN THE HALL RIGHT NEXT TO THE ATU IS OUR X-RAY

3   DEPARTMENT, YOU KNOW, AND IF YOU KEEP GOING DOWN THE HALL, YOU

4   ARE GOING TO RUN INTO THE LAB.  ACROSS THE HALL FROM THE LAB IS

5   GOING TO BE THE DENTAL CLINIC AND THE EYE CLINIC.  AND AS YOU

6   ARE COMING BACK THROUGH, YOU ARE GOING TO RUN INTO THE CLINIC

7   AREA WHERE WE HAVE CLINIC A AND SUBSPECIALTY CLINICS, AND

8   THERE'S SEVEN ROOMS THAT WE USE THERE.

9           CONNECTED TO THE CLINIC AREA IS GOING TO BE THE

10   MEDICAL RECORDS AREA.  SO THE MEDICAL RECORDS AREA IS CONNECTED

11   NOT ONLY TO THE CLINIC AREA, BUT ALSO TO THE ATU, AND THAT'S

12   WHERE THAT CONNECTION STOPS.  AS YOU MOVE FURTHER DOWN THE

13   HALL, GOING TOWARDS THE BACK OF THE FACILITY, THERE'S A TRIP

14   OFFICE.  THAT'S WHERE ALL THE TRIP -- ANYBODY WHO LEAVES ANGOLA

15   OR COMES BACK INTO ANGOLA THAT HAS A MEDICAL ISSUE GOES THROUGH

16   THAT OFFICE.

17           IF YOU TOOK A RIGHT AT THAT POINT, YOU ARE GOING TO

18   GO DOWN WHAT'S CALLED THE WARDEN'S WING.  THE WARDEN'S WING

19   CONSIST OF THE SECURITY OFFICES, IT CONSIST OF CENTRAL SUPPLY

20   AND ALL THE ADMINISTRATIVE OFFICES.  THAT'S IN THAT AREA OF THE

21   HOSPITAL.

22           IF YOU COME BACK UP THE HALL TO WHERE THE TRIP OFFICE

23   IS AND YOU GO STRAIGHT, YOU ARE GOING TO BE HEADING TOWARDS THE

24   NURSING UNITS, AND THERE ARE TWO NURSING UNITS.  NURSING UNIT 1

25   FOR ACUTE CARE AND NURSING UNIT 2 FOR, YOU KNOW, MORE CHRONIC

1   CARE.

2   Q.   AND WE'VE HEARD DISCUSSION, PEOPLE HAVE CALLED THAT AN

3   INFIRMARY, A WARD, IS THAT ALL THE SAME THING?

4   A.   WELL, IT'S AN INFIRMARY.  IT'S NOT CONSIDERED A HOSPITAL

5   NOR IS OUR ATU CONSIDERED AN EMERGENCY ROOM, BUT IT'S MORE OF

6   AN INFIRMARY THAN IT IS A HOSPITAL.

7   Q.   OKAY.  AND THERE'S TWO, NURSING UNIT 1 AND NURSING UNIT 2,

8   CORRECT?

9   A.   CORRECT.

10  Q.   GO ON.  I'M SORRY.  I DIDN'T MEAN TO INTERRUPT YOU.

11  A.   OKAY.  SO WHEN YOU PASS THE NURSING UNITS, WE HAVE AN AREA

12  THAT IS SET UP FOR INFECTIOUS CONTROL.  AT THE END OF THAT

13  HALLWAY IS THE CAFETERIA, THE KITCHEN, THAT FEEDS THE HOSPITAL,

14  AND THEN ON EITHER SIDE OF THE CAFETERIA, ON THE LEFT SIDE OF

15  THE CAFETERIA WOULD BE THE MENTAL HEALTH DEPARTMENT, AND ON THE

16  RIGHT SIDE WOULD BE OUR PHARMACY.  AND AS YOU COME BACK UP THE

17  HALL AND EXIT THE BUILDING, THERE'S A NEW BUILDING THAT WE

18  BUILT OUTSIDE AND WE CALL IT KIND OF -- AFFECTIONATELY CALL

19  THAT OUR PROCEDURE ROOM.  AND IN THAT ROOM WE DO TELEMED, WE DO

20  COLONOSCOPIES, WE DO PHYSICAL THERAPY, WE DO RESPIRATORY, SO

21  THAT'S ONE OF OUR NEW ADDITIONS.

22  Q.   AND WE'VE KIND OF TALKED ABOUT THE TREATMENT CENTER

23  PROPER.  IS THERE ALSO MEDICAL AREAS OUTSIDE THE ACTUAL BARROW

24  TREATMENT CENTER?

25  A.   SURE.  WELL, AT THE TIME OF SEPTEMBER OF '16, THERE WERE

THREE OUTCAMPS.  THERE WAS AN OUTCAMP AT CAMP J, WHICH ONE OF
THE OUTCAMPS, AN OUTCAMP AT CAMP C AND AN OUTCAMP AT CAMP D,
AND WE WOULD SEND -- WE WOULD SEND PHYSICIANS OUT TO THOSE
CAMPS BECAUSE IT'S A LOT EASIER TO SEND THEM OUT TO THE CAMPS
RATHER THAN TO BRING THE OFFENDERS TO US.  SO FOR YEARS,
THEY'VE BEEN HAVING CLINICS OUT AT THESE CAMPS.
Q.    AND HOW OFTEN DO THEY HAVE CLINICS OUT AT THE CAMPS?
A.    WELL, DEPENDING ON THE NEED.  WE TRACK THE BACKLOG.  WE
TRACK THE SICK CALL REQUESTS, AND SOMETIMES WE WILL HAVE TWO
CLINICS AT CAMP D, BUT TWICE A WEEK A NURSE WILL GO OUT THERE,
YOU KNOW, SO IT DEPENDS ON THE NEED.  AND WE TRY TO SATISFY THE
NEED WITH THE PRACTITIONER THAT WE SEND OUT THERE.
Q.    IN ADDITION TO THE -- CLINICS AT THE CAMPS, IS THERE
ANYTHING ELSE OUT THERE FOR MEDICAL RELATED PATIENTS?
A.    WELL, OUT IN THE MAIN PART OF THE PRISON THERE'S WHAT'S
CALLED ASSISTANT LIVING DORMS.  NOW, TO GET A LAYOUT, IF YOU
WENT OUT THE BACK SIDE OF WHAT'S CALLED THE R.E. BARROW
TREATMENT CENTER, THERE'S A CONCRETE AREA THAT'S KNOWN AS "THE
WALK," AND THAT WALK EXTENDS ALL THE WAY BACK THROUGH THE MAIN
PRISON.  IN THAT MAIN PRISON, THERE ARE TWO ASSISTED LIVING
DORMS THAT WE HAVE, AND THAT'S THE EXTENSION OF THE MEDICAL
DEPARTMENT OUT INTO THE MAIN PRISON.
Q.    OKAY.  I WANT TO -- LET ME ASK YOU BEFORE I GET OFF THAT,
THE ASSISTED LIVING DORMS THAT YOU MENTIONED, WHAT TYPE OF
OFFENDERS WOULD STAY IN THAT ASSISTED LIVING DORM?

**A.**   WELL, THOSE ARE OFFENDERS THAT MAY BE CONVALESCENT FROM INJURY OR SURGERY, OFFENDERS THAT CAN -- THAT MAY NEED ASSISTANCE WITH ACTIVITIES OF DAILY LIVING BUT DON'T NEED NURSING CARE OR PHYSICIAN CARE ON A DAILY BASIS.

**Q.**   OKAY.  WE'VE KIND OF GOT THE LAYOUT.  NOW, LET'S TALK ABOUT THE DIFFERENT SERVICES THAT ARE BEING PROVIDED.  I WANT TO START OUT WITH THE SICK CALL PROCESS, AND I WANT YOU TO DESCRIBE THE SICK CALL PROCESS FOR ME.

**A.**   WELL, THE SICK CALL PROCESS STARTS WITH THE OFFENDER, AND THE OFFENDER WOULD FILL OUT A SICK CALL REQUEST AND --

**Q.**   BEFORE WE TALK ABOUT THE REQUEST, HOW OFTEN IS SICK CALL PERFORMED?

**A.**   SUNDAY THROUGH THURSDAY, SICK CALL IS PERFORMED IN ALL HOUSING UNITS, AND USUALLY THEY DO SICK CALL IN THE MORNING, YOU KNOW, BEFORE 6:00 BECAUSE THERE'S WORK CALL, AND PEOPLE GO TO WORK.  SO BY DOING IT EARLY IN THE MORNING, THEY CATCH NOT ONLY THE PEOPLE THAT ARE STILL IN THE DORM, BUT THEY'RE ABLE TO CATCH THE PEOPLE THAT GO TO WORK.  SO EMS PULLS THE SICK -- TAKES THE SICK CALLS AND THEY LOOK AT THEM.

**Q.**   WAIT, BEFORE YOU GET TO THAT, I'M SORRY.

**A.**   OKAY.

**Q.**   I HATE TO KEEP CUTTING YOU OFF, BUT I WANT TO MAKE SURE WE COVER EVERYTHING.  YOU TALKED ABOUT THE SICK CALL DURING THE WEEK.  WHAT HAPPENS ON WEEKENDS?  HOW ARE PATIENTS WHO ARE SICK SEE PEOPLE ON THE WEEKENDS?

**A.**   WELL, AT ANY POINT IN TIME, 24 HOURS A DAY, SEVEN DAYS A WEEK, AN OFFENDER CAN DECLARE HIMSELF AN EMERGENCY, AND SO THERE'S THAT OPTION THAT ALWAYS EXISTS, AND THAT'S HOW THEY DO IT.

**Q.**   OKAY.  NOW, LET'S TALK ABOUT THE FORM.  I'M SORRY.

**A.**   OKAY.  SO WE HAVE A SICK CALL FORM, AND THOSE SICK CALL FORMS, THE EMTS GO OUT IN THE MORNING TO THE DIFFERENT HOUSING AREAS, AND THEY COLLECT THE SICK CALL FORMS.  THEY DO AN ASSESSMENT AT THAT TIME, AND THERE ARE DIFFERENT WAYS THAT THEY CAN HANDLE THAT SICK FORM -- SICK CALL FORM.  IF IT'S SOMETHING THAT CAN BE FIT WITHIN TO ONE OF OUR PROTOCOLS, THEN THEY CAN PROTOCOL THAT PATIENT, AND THEY CAN ADDRESS THOSE MEDICAL NEEDS THROUGH PROTOCOL.

**Q.**   AND WHAT DO YOU MEAN BY PROTOCOL THAT PATIENT?  JUST TELL ME HOW THAT WORKS.

**A.**   FOR EXAMPLE, IF THEY GO OUT THERE AND THEY SEE THAT A GUY HAS A SORE THAT IS CONSISTENT WITH WHAT WOULD BE A BOIL, AND IF IT FITS THE CRITERIA, THEN THERE'S AN ABILITY FOR THEM TO GO TO THIS PROTOCOL, LOOK AT WHAT THE MEDICATIONS ARE THAT ARE RECOMMENDED BY THE MEDICAL DEPARTMENT, AND FIT THAT PATIENT WITHIN THAT PROTOCOL AND TREAT THAT PATIENT ACCORDINGLY.

**Q.**   ARE THE EMTS TRAINED IN THE USE OF THOSE PROTOCOLS?

**A.**   I PERSONALLY DON'T TRAIN THEM IN THE USE OF THE PROTOCOLS BUT WHEN WE WRITE THE PROTOCOLS, THE EMS DIRECTOR IS THERE, AND THE EMS DIRECTOR TRAINS HIS PEOPLE ON THE PROTOCOLS.

10:27   1   **Q.**   SO THE EMS DIRECTOR CAN GIVE US MORE ABOUT WHAT TRAINING

2   THEY RECEIVE?

3   **A.**   SURE.

4   **Q.**   OKAY.  AND LET ME ASK YOU, HAVE THOSE PROTOCOLS IMPROVED

5   OVER TIME?

6   **A.**   WELL, WE HAVE SIMPLIFIED THOSE PROTOCOLS.  WHEN I FIRST

7   GOT THERE AND WE STARTED LOOKING AT THEM, THERE WERE MULTIPLE

8   ANTIBIOTIC CHOICES, THERE WERE MULTIPLE ALGORITHMS, AND WE JUST

9   REALLY WANTED TO MAKE IT SIMPLE.  I THINK I USED THE WORD

10  "IDIOT-PROOF" IN MY DEPOSITION WHICH IN NO WAY AM I CALLING MY

11  EMTS IDIOTS.  THAT'S JUST A TERM THAT I USED TO SAY THAT'S AS

12  SIMPLE AS WE CAN MAKE IT.

13  **Q.**   AND DO YOU BELIEVE THAT THE PROTOCOLS ARE SUFFICIENT FOR

14  THE EMTS TO ACT?

15  **A.**   I DO.  YOU KNOW, FOR A MOMENT PRIOR TO ME BECOMING THE

16  MEDICAL DIRECTOR, I RAN THE EMERGENCY ROOM ON A CONTINUAL BASIS

17  AND WE USED THAT TIME NOT ONLY TO TREAT PATIENTS BUT TO ALSO

18  WORK WITH OUR PARAMEDICS, OUR EMTS, AND TRAIN THEM ON WHAT WE

19  SEE, WHAT WE SEE WHEN WE DIAGNOSE THINGS, AND IT'S KIND OF A

20  TRAINING ON-THE-JOB TYPE OF DEAL THAT WE USE WITH THEM.

21  **Q.**   SO WE TALKED ABOUT THE DIFFERENT THINGS IN SICK CALL THAT

22  ONCE AN EMT ASSESSES THE PATIENT THEY CAN DO, THE FIRST ONE IS

23  ACT PURSUANT TO A --

24  **A.**   A PROTOCOL.

25  **Q.**   -- A DESIRED PROTOCOL.  OKAY.  WHAT ELSE CAN THEY DO, OR

10:29   1   WHAT ELSE DO THEY DO?

2   **A.**   WELL, THE EMS, THEY HAVE ACCESS TO THE COMPUTER WHEN THEY

3   GET BACK TO THEIR WORK STATION, SO THEY CAN PULL UP IN THE

4   COMPUTER AND SEE IF THE OFFENDER HAS AN UPCOMING APPOINTMENT.

5   IF HE'S GOT AN UPCOMING APPOINTMENT, THEY CAN DOCUMENT KEEP

6   YOUR UPCOMING APPOINTMENT.   THEY CAN ACTUALLY REFER THAT FORM

7   TO AN M.D. FOR REVIEW, OR THEY CAN ACTUALLY SCHEDULE AN

8   APPOINTMENT.   THEY CAN MAKE A CATEGORY APPOINTMENT BASED ON

9   WHAT THEY SEE.

10   **Q.**   IN ADDITION TO MAKING AN APPOINTMENT, IS THERE ANYTHING

11   ELSE THAT THEY CAN DO?

12   **A.**   THEY CAN REFER THEM TO THE ATU.

13   **Q.**   AND IS THAT SOMETHING THAT THEY DO?

14   **A.**   THEY DO.

15   NOW, TOWARDS THE END OF '16, WE KIND OF CUT OUT THE

16   ABILITY FOR THEM TO MAKE AN APPOINTMENT, OKAY.   SO WHAT WE

17   STARTED DOING --

18   **MS. MONTAGNES:**   OBJECTION, YOUR HONOR.   YOU KNOW,

19   WE'RE FINE WITH HIM TESTIFYING.   WE JUST -- WE'VE GOT NO

20   DISCOVERY ON THIS.   WE HAVE NO BASIS FOR ANY OF THIS.   THIS IS,

21   HE'S ALREADY SAID, THE END OF '16.

22   **BY MR. ROBERT:**

23   **Q.**   IS IT -- WAS IT -- ARE YOU TALKING ABOUT AFTER SEPTEMBER

24   OF 2016?

25   **A.**   RIGHT PRIOR TO THAT CUTOFF OF '16, WE STARTED LOOKING AT

10:30    1    HOW WE WERE --

2         **MR. ROBERT:**  I'M SORRY.  I'M SORRY.  I WAS JUST

3    TRYING TO CLARIFY.  I'M WAITING ON YOUR RULING.

4         **THE COURT:**  YES, ADDRESS THE OBJECTION.

5         **MR. ROBERT:**  OKAY.  I ASSUME, JUDGE, THAT IF IT'S

6    WITHIN THE SEPTEMBER OF 2016, HE CAN TALK ABOUT WHAT THEY'RE

7    DOING.  THAT'S ALL I'M ASKING, AND I DON'T THINK HE'S

8    REFERRING TO ANY DOCUMENT.

9         **THE COURT:**  OKAY.  I'M GOING TO OVERRULE THE

10    OBJECTION.

11         **THE WITNESS:**  PRIOR TO THE SEPTEMBER OF '16, WE

12    STARTED LOOKING AT WAYS WE COULD BECOME MORE EFFICIENT BECAUSE

13    OR OUR CLINIC.  SO INSTEAD OF THE EMTS BEING ABLE TO MAKE A

14    CLINIC APPOINTMENT, WE STARTED GETTING THEM TO WRITE M.D.

15    REFERRAL, IF THEY WANTED TO MAKE A CLINIC APPOINTMENT, THAT WAY

16    IT WENT TO THE M.D. FOR THE M.D. TO MAKE THE CLINIC REFERRAL.

17         **THE COURT:**  SO BEFORE THAT, THOUGH, THE EMTS WERE

18    MAKING THE CLINIC REFERRALS?

19         **THE WITNESS:**  AT ONE POINT THEY WERE ABLE TO DO THAT,

20    YES, YOUR HONOR.

21         **THE COURT:**  AND WHEN YOU SAY CLINIC REFERRALS, THAT'S

22    NOT TO AN LSP CLINIC, THAT WOULD BE TO AN OUTSIDE CLINIC?

23         **THE WITNESS:**  NO, MA'AM.  THAT WOULD ONLY BE TO AN

24    LSP CLINIC.

25         **THE COURT:**  OKAY.

10:31 1        **THE WITNESS:**  NOBODY CAN MAKE A REFERRAL TO AN

2    OUTSIDE CLINIC BUT A DOCTOR.

3        **THE COURT:**  OKAY, THANK YOU.

4    BY MR. ROBERT:

5    **Q.**    HOW DOES THE EMT COMPLETE THE SICK CALL PROCESS?

6    **A.**    OKAY.  WELL, LIKE I SAY, THEY GO, THEY PICK UP THE FORMS,

7    THEY READ THE COMPLAINT, THEY MAKE AN INDEPENDENT ASSESSMENT AT

8    THE HOUSING UNIT, AND THEY CAN EITHER GO PROTOCOL THE PATIENT,

9    M.D. REFER THE PATIENT, SEND THEM TO THE ATU, OR TELL THEM TO

10    KEEP THE APPOINTMENT.  THEY SIGN THE FORM, AND THAT FORM IS PUT

11    INTO THE BOXES OF THE DOCTORS, AND THE DOCTORS REVIEW THOSE

12    FORMS.

13    **Q.**    OKAY.  AND HOW OFTEN ARE THEY REVIEWED OR SHOULD THEY BE

14    REVIEWED?

15    **A.**    WELL, THEY SHOULD BE REVIEWED MONDAY THROUGH FRIDAY, AND

16    THEN, OF COURSE, IF YOU'RE ON CALL ON THE WEEKEND, YOU SHOULD

17    REVIEW THEM, BUT THEY SHOULD BE REVIEWED EVERY DAY.

18    **Q.**    AND HOW IS IT DETERMINED WHAT DOCTOR REVIEW WHAT SICK CALL

19    FORMS, ET CETERA?

20    **A.**    WELL, EACH PHYSICIAN HAS A HOUSING ASSIGNMENT THAT THEY

21    REVIEW SICK CALLS FOR, AND THAT ALLOWS FOR SOME CONTINUITY OF

22    CARE.  SO I HAVE SOME PHYSICIANS THAT ARE ASSIGNED TO THE MAIN

23    PRISON.  THE DOCTORS THAT WORK THE OUTCAMPS, I HAVE THEM

24    ASSIGNED TO REVIEW THE SICK CALLS FROM THEIR CAMPS.  SO IT IS

25    SOMETHING THAT WE DO TO MAINTAIN SOME CONTINUITY OF CARE.

1    Q.    AND WHAT KIND OF NUMBERS ARE WE TALKING ABOUT?  HOW MANY
2    SICK CALL FORMS DOES THE DOCTOR HAVE TO REVIEW, APPROXIMATELY,
3    ON A DAILY BASIS?
4    A.    YOU KNOW, THERE ARE 10 TO 20 A DAY FOR EACH PHYSICIAN.
5    Q.    AND ABOUT HOW MANY WOULD YOU SAY SICK CALLS VISITS ARE IN
6    A GIVEN MONTH, APPROXIMATELY HOW MANY SICK CALL VISITS FOR THE
7    ENTIRE MONTH?
8    A.    YOU KNOW, THERE'S ANYWHERE FROM 800 TO 1300, DEPENDING,
9    YOU KNOW, I THINK IF YOU AVERAGE THAT, IT'S AROUND 1,000, 900
10   TO 1,000.
11   Q.    WHAT IS THE REASON TO HAVE THE DOCTORS REVIEW THE SICK
12   CALL FORMS?
13   A.    WELL, THE DOCTORS ARE GOING TO HAVE THE FINAL SAY ON
14   ANYTHING MEDICAL, AND IF THE INFORMATION IS CORRECT AND YOU
15   REVIEW IT, AND YOU AGREE WITH IT, YOU CAN SIGN OFF ON IT.  IF
16   YOU HAPPEN TO DISAGREE WITH THE DISPOSITION MADE BY THE EMT,
17   YOU ALWAYS HAVE THE OPTION OF OVERRULING THE EMT, MAKING A
18   CLINIC APPOINTMENT OR CALLING THE PATIENT TO THE ATU.
19           THE COURT:  MR. ROBERT, WE ARE GOING TO TAKE A
20   TEN-MINUTE RECESS.
21           MR. ROBERT:  THANK YOU, YOUR HONOR.
22           THE COURT:  SO WE WILL BE BACK IN TEN.
23                   (RECESS.)
24           THE COURT:  BE SEATED.
25           WE'LL STAY ON THE RECORD UNTIL ABOUT 11:30 OR A

10:47   1   FEW MINUTES AFTER.  WE ARE GOING TO BREAK A LITTLE EARLY FOR

2   LUNCH.

3                    GO AHEAD.

4            **MR. ROBERT:**  THANK YOU, YOUR HONOR.

5   **BY MR. ROBERT:**

6   **Q.**   DR. LAVESPERE, I THINK I WAS CLOSE TO WRAPPING UP THE SICK

7   CALL PROCEDURE WHEN WE TOOK A BREAK.  TELL ME ABOUT THE

8   SCHEDULING OF APPOINTMENTS ONCE THE FORMS ARE REVIEWED.  HOW

9   DOES THIS SCHEDULING TAKE PLACE?

10   **A.**   WELL, ONCE THE PHYSICIAN MAKES A DETERMINATION THAT AN

11   APPOINTMENT IS NEEDED, THERE'S SEVERAL CATEGORIES THAT THEY CAN

12   USE.  IF AN APPOINTMENT IS NEEDED WITHIN THE FIRST WEEK, THEY

13   THINK THAT, THEY WILL MAKE A CATEGORY ONE.  IF AN APPOINTMENT

14   IS NEEDED WITHIN TWO WEEKS, THEY CAN ADDRESS THAT AS A CATEGORY

15   TWO, ON DOWN TO THREE AND FOUR, WHICH CATEGORY FOUR WITHIN A

16   MONTH OR SIX WEEKS.  USUALLY WITHIN A MONTH.  BUT FROM THAT

17   POINT, THOSE FORMS GO TO THE MEDICAL RECORDS DEPARTMENT WHERE

18   THE MEDICAL RECORDS DEPARTMENT WILL SCHEDULE APPOINTMENTS.

19   **Q.**   AND WHEN THOSE APPOINTMENTS ARE SCHEDULED, ARE THEY SEEN

20   BY THE CLINICS?

21   **A.**   ARE THE APPOINTMENTS SEEN BY THE CLINICS?

22   **Q.**   YEAH.

23   **A.**   ARE YOU MEANING DO THOSE PATIENTS COME BACK TO CLINIC A?

24   **Q.**   YEAH.

25   **A.**   SURE, THEY COME BACK TO CLINIC A.

10:49  1   **Q.**   ALL RIGHT.   THAT'S KIND OF THE SICK CALL PROCEDURE IN A

2   NUTSHELL.

3            LET'S GO ON TO URGENT CARE ACCESS AND HOW URGENT CARE

4   IS PROVIDED AT ANGOLA, AND I THINK WE START OUT, YOU TALKED

5   ABOUT THE ATU.   TELL ME ABOUT THE ATU.

6   **A.**   WELL, THE ATU IS WHERE ALL THE URGENT NEEDS OF THE

7   OFFENDERS ARE TAKING PLACE.   THERE'S TWO ROOMS IN THE ATU.   IF

8   YOU'RE COMING IN FROM THE OUTSIDE, THE FIRST ROOM TO THE LEFT

9   IS THE ROOM THAT'S SET UP AS THE TRAUMA ROOM, CODE ROOM, I

10  THINK EVERYTHING THAT YOU NEED FOR THOSE TYPES OF SITUATIONS

11  SHOULD BE IN THAT ROOM.

12  **Q.**   AND WHEN YOU SAY "EVERYTHING YOU NEED," WHAT TYPE OF

13  EQUIPMENT ARE WE TALKING ABOUT?

14  **A.**   WELL, INTUBATION EQUIPMENT, SUCTION EQUIPMENT,

15  DEFIBRILLATORS, THAT KIND OF THING.   THEY ARE ALL IN THAT ROOM.

16  AND THEN THE ROOM ON THE RIGHT IS THE ROOM THAT'S USED FOR

17  WOUND CARE, BREATHING TREATMENTS, ASSESSMENTS BY PHYSICIANS,

18  THOSE KINDS OF THINGS.   SO THE ROOM ON THE RIGHT IS USED MORE

19  WIDELY THAN THE ROOM ON THE LEFT, AND IT IS IN DIRECT VISUAL

20  SIGHT OF THE PARAMEDIC WORK STATION.

21  **Q.**   OKAY.   AND HOW IS THE AT -- AS OF IN SEPTEMBER OF 2016,

22  HOW WAS THE ATU STAFFED?

23  **A.**   WELL, MONDAY THROUGH FRIDAY, THERE'S ALWAYS A PHYSICIAN

24  ASSIGNED TO WORK THE ATU.   NORMALLY, DURING THAT TIME IT WOULD

25  HAVE BEEN ME, AND I'M EITHER IN THE ATU OR I'M RIGHT ACROSS THE

10:50   1   HALL IN THE CLINIC ENVIRONMENT MAKING MYSELF AVAILABLE FOR
2   BOTH.
3           SO DURING THE DAY, THERE'S A PHYSICIAN ASSIGNED TO
4   WORK THE ATU AND THERE'S ALSO A PARAMEDIC THAT'S ASSIGNED TO
5   WORK THE ATU, ALONG WITH EITHER AN INTERMEDIATE OR A BASIC.
6   **Q.**   WHEN YOU SAY AN INTERMEDIATE OR A BASIC WHAT?
7   **A.**   AN EMT.
8   **Q.**   OKAY.
9   **A.**   AND THEN ON NIGHTS AND WEEKENDS, THE ATU IS STAFFED BY THE
10   PARAMEDICS, USUALLY TWO PARAMEDICS, AND WITH A THIRD ONE
11   AVAILABLE IF THEY ARE NEEDED, AND THEY STAFF THE ATU FROM, SAY,
12   5:00 AT NIGHT TILL 7:00 IN THE MORNING AND DURING THE WEEKEND.
13   **Q.**   TELL ME HOW THE PROCESS WORKS.  HOW DOES SOMEBODY COME TO
14   THE ATU?  THEY OBVIOUSLY -- I SAY OBVIOUSLY, MAYBE IT'S NOT
15   OBVIOUSLY -- AND GENERALLY, I WOULDN'T THINK THEY CAN WALK IN.
16   HOW DO THEY COME TO THE ATU?
17   **A.**   WELL, THEY WALK IN ALL THE TIME.
18   **Q.**   I DID GET THAT.
19   **A.**   BUT THERE ARE SEVERAL WAYS THAT THEY CAN COME.  THEY CAN
20   COME BY PATROL, WHICH MEANS THE PATROL DRIVER CAN BRING THEM.
21   THEY CAN COME BY AMBULANCE, YOU KNOW, OR THEY CAN WALK IN OR BE
22   ROLLED IN IN A WHEELCHAIR, BUT DIFFERENT MODALITIES.
23           THE ONES FROM THE MAIN PRISON, IT'S EASIER FOR THEM
24   TO WALK IN BECAUSE, LIKE WE TALKED ABOUT THAT WALK, IT'S
25   CONNECTED TO THE BACK SIDE OF THE TREATMENT CENTER, AND THEY

10:52

1    CAN WALK FROM THEIR HOUSING ASSIGNMENT.  IF YOU'VE EVER BEEN TO

2    ANGOLA, YOU KNOW HOW LARGE THE PLACE IS.  PEOPLE FROM THE

3    OUTCAMP CAN'T WALK TO THE EMERGENCY TREATMENT AREA.  THEY JUST

4    CAN'T DO IT SO THEY HAVE TO EITHER BE BROUGHT BY PATROL OR

5    AMBULANCE.

6    **Q.**    SO PEOPLE IN THE MAIN PRISON GENERALLY HAVE THE ABILITY

7    JUST TO WALK IN IF THEY ARE HAVING A PROBLEM?

8    **A.**    THEY CAN, YES.

9    **Q.**    WHAT KIND OF NUMBERS ARE WE TALKING ABOUT IN THE MAIN

10   PRISON?  DO YOU KNOW?

11   **A.**    HOW MANY PEOPLE LIVE IN THE MAIN PRISON?

12   **Q.**    YEAH.

13   **A.**    THERE'S CLOSE TO 2,500, 2,600.

14   **Q.**    I DON'T THINK THERE'S ANY LOCKDOWN; THOSE ARE OPEN DORMS;

15   WOULD THAT BE RIGHT?

16   **A.**    THERE'S SOME CELLBLOCK AREAS IN THAT MAIN PRISON AS WELL.

17   **Q.**    EXPLAIN TO US WHAT THE EMTS DO AT THE ATU.

18   **A.**    WELL, THE EMTS OR THE PARAMEDICS, WHICH ARE YOUR UPPER

19   LEVEL OF YOUR EMT, THEY -- WHEN THE PATIENT COMES IN, THEY WILL

20   TAKE A HISTORY.  IF YOU HAVE SEEN ONE OF THE FORMS, YOU KNOW

21   THAT THERE'S A TIME WHEN THEY ARRIVE, AND THERE'S GENERALLY A

22   CHIEF COMPLAINT, AND THEY WILL TAKE THAT CHIEF COMPLAINT AND

23   THEN THEY WILL DO AN ASSESSMENT.  THAT'S USUALLY WITHIN THEIR

24   SCOPE OF PRACTICE.

25              AND IF IT'S SOMETHING THAT THEY FEEL COMFORTABLE WITH

1    WITHIN THEIR SCOPE OF PRACTICE, AND THEY CAN FIT THAT INTO,

2    SAY, ONE OF THE PROTOCOLS THAT WE HAVE, WELL, THEN, THEY START

3    A TREATMENT PLAN FOR THAT PATIENT.  IF IT'S SOMETHING THAT'S

4    URGENT OR OUTSIDE THE SCOPE OF WHAT THEY FEEL THEY CAN DO, THEY

5    WILL CALL THE PHYSICIAN.

6    **Q.**    WHAT HAPPENS WHEN THEY CALL THE PHYSICIAN?

7    **A.**    WELL, THE PHYSICIAN CAN DO SEVERAL THINGS.  THEY CAN ASK

8    FOR MORE HISTORY AND TRY TO GIVE THEM SOME DIRECT ORDERS OVER

9    THE TELEPHONE, OR THEY CAN COME SEE THE PATIENT.

10   **Q.**    AND WHO MAKES THE DECISION WHETHER TO DO THAT?

11   **A.**    WHETHER TO CALL THE PHYSICIAN?

12   **Q.**    NO, WHETHER TO COME IN OR PHONE IN ORDERS OR WHAT HAVE

13   YOU?

14   **A.**    WELL, THE PHYSICIAN WILL MAKE THAT DECISION.

15   **Q.**    OKAY.

16   **A.**    KEEP IN MIND THAT THE MOST THINGS THAT ARE SEEN IN THE

17   ATU, FOR THE MOST PART, THEY ARE VERY SIMPLE THINGS.  YOU KNOW,

18   A PATIENT MIGHT HAVE ORTHOSTATIC HYPERTENSION, MIGHT NEED A

19   LITTLE FLUID, YOU KNOW, A GUY MIGHT NEED AN EVALUATION FOR A

20   DRESSING CHANGE.  THERE MAY BE AN UPPER RESPIRATORY TYPE

21   SITUATION WHERE HE'S GOT A COUGH.  SO THE MAJORITY OF THINGS

22   THAT ARE SEEN IN THERE ARE READILY AND EASILY TREATED.

23   **Q.**    OKAY.  YOU TALKED ABOUT DURING THE WEEKDAYS THAT YOU WERE

24   BASICALLY THE PERSON ASSIGNED TO THE EMERGENCY ROOM, THE DOCTOR

25   WHO WAS RESPONSIBLE FOR EMERGENCY ROOM.  CORRECT?

**A.**   RIGHT.

**Q.**   WERE THERE ALSO OTHER DOCUMENTS -- OTHER DOCTORS NEARBY

WHO PARTICIPATED OR COULD PARTICIPATE IN EMERGENCIES?

**A.**   WELL, AS THE MEDICAL DIRECTOR, I THINK IT'S IMPORTANT TO

BE VISIBLE, SO INSTEAD OF STAYING IN MY BACK OFFICE, I HAVE ME

A CLINIC ROOM UP IN THE FRONT WHERE I REVIEW CHARTS, DID DUTY

STATUSES, LOOKED AT INMATE LETTERS, AND I WAS IN THAT CLINIC

AREA SO THAT I WOULD BE AVAILABLE TO THE CLINIC, BUT I ALSO HAD

ASSIGNMENT TO WORK IN THE EMERGENCY ROOM.

BUT NORMALLY IN THAT CLINIC AREA, I KEEP TWO

PHYSICIANS IN THAT CLINIC AREA, AND BOTH OF THOSE PHYSICIANS

ARE ABLE TO WALK ACROSS THE HALL.  IT'S NOT EVEN A -- AS FAR AS

FROM ME TO YOU AND GET TO THE ATU TO TREAT ANYBODY.

**Q.**   AND NIGHTS AND WEEKENDS, TELL US ABOUT HOW THAT WORKS.

**A.**   WELL, NIGHTS AND WEEKENDS, LIKE WE DISCUSSED, THE

PARAMEDICS USUALLY STAFF THE ATU, AND WHEN PEOPLE COME IN TO

THE ATU, THEY MAKE A GENERAL ASSESSMENT; HOPEFULLY, WITHIN

THEIR SCOPE OF PRACTICE, AND THEY CAN PROTOCOL A PATIENT.  IF

THEY FEEL THAT WHAT THEY ARE DOING FITS WITHIN THAT PROTOCOL,

THEY DEVELOP A TREATMENT FOR THAT PATIENT.  IF IT'S SOMETHING

THAT THEY DON'T FEEL COMFORTABLE WITH, THEY HAVE EVERY REASON

AND RIGHT TO CALL THE PHYSICIAN, AND WE'RE THERE 24 HOURS A

DAY.

**Q.**   ARE ATU VISITS, ARE THOSE DOCUMENTED IN WRITING?

**A.**   THEY'RE DOCUMENTED IN WRITING.

10:56   1   Q.   AND ON NIGHTS AND WEEKENDS, IS SOMEBODY ASSIGNED TO

2   REVIEW THOSE ATU VISITS TO SEE WHAT TRANSPIRED?

3   A.   WELL, THE ON-CALL DOCTOR THAT'S ASSIGNED TO THE ATU FOR

4   THAT WEEKEND, EVERY DAY THEY SHOULD COME IN AND MAKE A HOSPITAL

5   ROUND AND THEY SHOULD -- THERE'S A BOX THAT ALL THE TREATMENTS

6   GO INTO.  ALL THE PATIENTS THAT HAVE BEEN EVALUATED THE NIGHT

7   BEFORE, THERE'S A BOX THAT THEY GO INTO, AND THAT PHYSICIAN

8   SHOULD PULL FROM THAT BOX AND LOOK AT WHAT'S BEEN COMING

9   THROUGH THE ATU, AS WELL AS GO MAKE A HOSPITAL ROUND.

10   Q.   DOES ANGOLA SOMETIMES SEND PATIENTS WITH EMERGENCIES TO

11   OUTSIDE PROVIDERS?

12   A.   SURE.

13   Q.   TELL ME ABOUT THAT, HOW DOES THAT HAPPEN?

14   A.   WELL, USUALLY, WHEN THE NEEDS OF THE PATIENT EXCEEDS WHAT

15   WE CAN DO AT THE PENITENTIARY, JUST LIKE ANY OTHER LITTLE SMALL

16   INFIRMARY OR COMMUNITY HOSPITAL, THEN YOU NEED A LARGER SET OF

17   TESTS THAT ARE AVAILABLE, YOU NEED MORE SOPHISTICATED MEDICAL

18   CARE, AND WHEN THOSE PATIENTS EXCEED WHAT WE CAN DO AT ANGOLA,

19   WE SHIP THEM OUT TO DIFFERENT FACILITIES.

20   Q.   OKAY.  AND WHO MAKES THAT DECISION?

21   A.   USUALLY THE DOCTOR.

22   Q.   OKAY.

23   A.   WELL, ALWAYS THE DOCTOR.

24   Q.   OKAY.  AND WHERE DO YOU SEND THEM?

25   A.   WELL, IT DEPENDS, AND ALL THIS HAPPENED WITH THE

10:58   1   RESTRUCTURING OF EARL K. LONG, BUT PRIOR TO EARL K. LONG, WE
2   SENT THEM ALL TO EARL K. LONG.  BUT WE HAD TO MODIFY OUR GAME
3   PLAN AFTER EARL K. LONG, SO THE NEAREST -- THE NEAREST FACILITY
4   WITH THE TERTIARY -- THE NEAREST TERTIARY FACILITY WITH A CATH
5   LAB WAS LANE.  SO WE SEND ALL OUR CARDIACS TO LANE BECAUSE
6   THE --
7   **Q.**   WHERE IS LANE?
8   **A.**   WELL, IT'S IN ZACHARY, MAYBE 45 MINUTES TO AN HOUR AWAY.
9   **Q.**   UH-HUH.
10   **A.**   BECAUSE LANE IS LIMITED, AND THEY REALLY DON'T HAVE A
11   PULMONOLOGY AND THEY DON'T HAVE DIFFERENT THINGS, NEUROLOGY, SO
12   WE CAN'T SEND NEUROLOGY AND PULMONOLOGY THERE, SO WE SEND THEM
13   TO THE LAKE.  SO ANY ACUTE STROKE, ANY ACUTE RESPIRATORY
14   COMPROMISE, ANY ACUTE NEUROLOGICAL EVENT, WE SEND TO OUR LADY
15   OF LAKE.  AND EVERYTHING ELSE NOW WE SEND DOWN TO NEW ORLEANS.
16          HOWEVER, PRIOR TO 9/16, WE STARTED DEVELOPING A
17   RELATIONSHIP WITH ST. FRANCISVILLE HOSPITAL.  ST. FRANCISVILLE
18   HOSPITAL DEVELOPED A PARTNERSHIP WITH OUR LADY OF THE LAKE IN
19   ADVANCE OF A STROKE PROTOCOL, AND SO OUR ST. FRANCISVILLE
20   HOSPITAL WAS INTERCONNECTED BY TELEMED WITH OUR LADY OF THE
21   LAKE.
22          SO TOWARDS THE END OF '16, WE STARTED SENDING OUR
23   STROKE PATIENTS TO ST. FRANCISVILLE BECAUSE THAT'S THE NEAREST
24   CT SCAN, AND THEY CAN SEND THE INFORMATION ON TO THE LAKE.
25   **Q.**   LET'S SWITCH GEARS, LET'S TALK A LITTLE BIT ABOUT

10:59 1    INPATIENT CARE AT ANGOLA.  DO YOU PROVIDE INPATIENT CARE?

2    **A.**    WE DO.

3    **Q.**    OKAY.  AND TELL US ABOUT WHAT YOU PROVIDE.

4    **A.**    WELL --

5    **Q.**    AND, AGAIN, THIS IS AS OF SEPTEMBER OF 2016.

6    **A.**    RIGHT.

7            NURSING UNIT 1 IS WHERE OUR ACUTE CARE PATIENTS GO,

8    AND THEY ARRIVE THERE BY SEVERAL DIFFERENT MANNERS.  THEY CAN

9    BE DIRECTLY ADMITTED FROM THE CLINIC.  THEY CAN BE ADMITTED

10   FROM THE ATU.  THEY CAN COME BACK FROM A HOSPITAL TRIP, OR THEY

11   CAN JUST COME BACK FROM A HOSPITAL, OFFSITE HOSPITAL VISIT, BUT

12   SOME KIND OF WAY, THEY ARE ADMITTED INTO THAT UNIT.

13           ONCE THEY ARE ADMITTED INTO THAT UNIT, THERE ARE

14   CERTAIN DOCTORS, THE DOCTORS ARE ASSIGNED TO THAT UNIT, SO

15   DOCTORS ARE ASSIGNED TO THOSE PATIENTS.  I DO THAT BASED ON

16   WHAT THEY -- WHAT THEIR REQUIREMENTS ARE.

17           FOR EXAMPLE, WHEN WE HAD DR. COLON ON STAFF, HE WAS A

18   CARDIOLOGIST, SO ANYBODY THAT HAD BEEN SEEN OUTSIDE BY A

19   CARDIOLOGIST OR ANYBODY THAT HAD A WORKUP FROM A CARDIOLOGY

20   STANDPOINT, WE LET DR. COLON SEE THAT PATIENT.

21           DR. MACMURDO WAS A REHAB DOCTOR WITH INTERNAL

22   MEDICINE EXPERIENCE.  ANYBODY THAT CAME BACK WITH A STROKE, OR

23   ANYBODY THAT CAME BACK WITH SOME PHYSICAL DEFICIENCIES THAT

24   INVOLVED MOVEMENT AND MOBILITY, WE LET DR. MACMURDO ASSESS

25   THOSE PATIENTS.

11:01

1           PATIENTS THAT NEEDED INTERNAL MEDICINE NEEDS, WE LET

2    DR. TOCE SEE THOSE PATIENTS.

3           AND PATIENTS THAT HAD A LOT OF PAIN REQUIREMENT,

4    POST-SURGICAL PATIENTS, THOSE KINDS OF THINGS, WE LET DR.

5    MCCAIN SEE THOSE PATIENTS.

6           SO ALTHOUGH IT WAS ONE BIG NURSING UNIT, THE CARE WAS

7    INDIVIDUALIZED BASED ON WHAT PHYSICIANS WE HAD.

8    Q.   AND WHAT'S THE CAPACITY OF NURSING UNIT 1?

9    A.   WE NORMALLY OPERATE 23 BEDS OUT OF THAT NURSING UNIT WITH

10   SEVEN TO EIGHT LOCKED ROOMS.

11   Q.   AND HAVE YOU HAD ANY PROBLEMS WITH CAPACITY-WISE MEETING

12   THE NEEDS OF PEOPLE WHO NEED TO BE IN NURSING UNIT 1?

13   A.   NO.

14   Q.   AS OF SEPTEMBER OF 2016, HOW WAS NURSING UNIT 1 STAFFED?

15   A.   WELL, NURSING UNIT 1 IS ALWAYS STAFFED WITH TWO RNS AND AN

16   LPN AND A MEDICAL ASSISTANT.  AND THAT RN, ONE OF THOSE RNS, IS

17   REALLY A FLOATING RN THAT GOES BACK AND FORTH FROM NURSING UNIT

18   1 TO NURSING UNIT 2 AND THAT'S A --

19   Q.   THAT'S 24/7?

20   A.   THAT'S 24/7.

21          AND THEN WE HAVE -- WELL, THE MEDICAL ASSISTANT

22   DOESN'T WORK AT NIGHT.

23   Q.   OKAY.

24   A.   JUST DURING THE DAY.  AND THEN WE HAVE ORDERLIES, OF

25   COURSE, ANYWHERE FROM TWO TO THREE ORDERLIES ON EACH SHIFT.

11:02

1   Q.   AND WHAT ABOUT THE DOCTORS, DO THEY MAKE ANY VISITS TO

2   NURSING UNIT 1?

3   A.   WELL, DOCTORS ARE MANDATED TO MAKE ROUNDS EVERY DAY IN

4   NURSING UNIT.   NOW, WE TYPICALLY WRITE NOTES MONDAY, WEDNESDAY

5   AND FRIDAY, UNLESS THE PATIENT IS CRITICAL, BUT WE MAKE ROUNDS

6   EVERY DAY, INCLUDING THE WEEKEND.   AND WE ALWAYS HAVE A VISIBLE

7   PRESENCE IN THE NURSING UNIT.

8   Q.   DO YOU FEEL THE STAFFING IS ADEQUATE IN NURSING UNIT 1?

9   A.   I DO.

10  Q.   ARE YOU HAVING ANY PROBLEM MEETING THE HEALTHCARE NEEDS IN

11  NURSING UNIT 1?

12  A.   I DON'T, AND I WANT TO ADD THAT THE NURSES THAT WE HAVE IN

13  NURSING UNIT 1, DURING THIS TIME FRAME RIGHT HERE, ALL OF THEM,

14  AGAIN, NOT ONLY WHEN EARL K. LONG CLOSED, BUT THERE WAS ANOTHER

15  CLOSURE IN ALEXANDRIA CALLED HUEY P. LONG, SO THE NURSES THAT

16  MIGRATED TO ANGOLA ALL HAD ICU EXPERIENCE, ER EXPERIENCE,

17  MENTAL HEALTH EXPERIENCE.   SO AT THAT POINT IN TIME, WE HAD

18  SOME OF THE MOST TOPNOTCH NURSES THAT WOULD BE AVAILABLE IN THE

19  STATE.

20  Q.   LET'S TALK ABOUT NURSING UNIT 2.

21  A.   OKAY.

22  Q.   TELL US ABOUT THAT NURSING UNIT.

23  A.   WELL, NURSING UNIT 2, THE BEST WAY TO DESCRIBE THAT IS

24  TYPICALLY LIKE A NURSING HOME.   YOU KNOW, THOSE ARE THE OLDER

25  PATIENTS, THE PATIENTS WITH DEMENTIA, PATIENTS THAT HAVE HAD

11:04  1  STROKE, PATIENTS THAT MAY HAVE CHRONIC WOUNDS, THOSE TYPES OF

2  PATIENTS THAT NEED LONG-TERM CARE, KIND OF LIKE IN A NURSING

3  HOME, AND IT'S USUALLY STAFFED WITH TWO LPNS.  AND, AGAIN, THE

4  ROTATING NURSE, THE ROVING NURSE, THE RN, GOES OVER THERE AND

5  STARTS THE IV LINES, STARTS THE IV BAGS, YOU KNOW, DOES

6  ANYTHING THAT THE RNS SHOULD BE DOING ON A REGULAR BASIS.

7  Q.   AND WHAT ABOUT THE OVERSIGHT OF THAT UNIT?  WHO IS

8  RESPONSIBLE FOR THAT?

9  A.   WELL, CINDY PARK, DURING THE TIME FRAME, 9 OF '16, SHE WAS

10  OVERSEEING THAT UNIT.  AND, AGAIN, WE GO OVER THOSE PATIENTS IN

11  THE MORNING, AT OUR MORNING MEETING, AND THEN AT ANY POINT IN

12  TIME, IF ANY ONE OF THOSE PATIENTS DEVELOP AN ACUTE CARE NEED,

13  THAT PATIENT WOULD BE TRANSFERRED OVER TO UNIT 1.

14  Q.   OKAY.  AND WHAT IS THE CAPACITY OF NURSING UNIT 2?

15  A.   THEY USUALLY RUN 29 TO 30 BEDS OVER THERE ON THAT UNIT.

16  Q.   OKAY.  AND DO YOU BELIEVE THE STAFFING IS ADEQUATE AT

17  NURSING UNIT 2 TO MEET THE NEEDS OF THE PATIENTS?

18  A.   I DO.  ALSO ON NURSING UNIT 2, THERE ARE LOCKED ROOMS --

19  EACH ONE OF THE UNITS HAVE LOCKED ROOMS, AND NURSING UNIT 2, WE

20  USE SOME OF THOSE LOCKED ROOMS FOR HOSPICE PATIENTS, AND I

21  WANTED TO ADD THAT FOR THE RECORD.

22  Q.   OKAY.  DO YOU HAVE ANY PARAPLEGIC PATIENTS IN NURSING UNIT

23  1 OR NURSING UNIT 2?

24  A.   WE DO.

25  Q.   OKAY.  AND HOW ARE THEY CARED FOR?

11:05 1   **A.**   WELL, THEY ARE CARED FOR LIKE ANY OTHER PATIENT ON THE

2   NURSING UNIT.  THE NURSES GIVE THEM THEIR MEDICINES, THE NURSES

3   TAKE CARE OF THE NURSING NEEDS, AND THE ORDERLIES HELP THEM

4   TURN, HELP THEM BATHE, AND DO THOSE TYPE OF THINGS.

5   **Q.**   WHO HANDLES THE CLEANING OF THE NURSING UNITS?

6   **A.**   THE ORDERLIES.

7   **Q.**   AND HOW OFTEN ARE THEY CLEANED?

8   **A.**   THEY SHOULD BE CLEANED EVERY SHIFT.

9   **Q.**   AND HOW LONG ARE THE SHIFTS?

10  **A.**   12-HOUR SHIFTS.

11  **Q.**   AND I THINK WE TALKED A LITTLE BIT ABOUT THE ASSISTED

12  LIVING DORMS THAT ARE OUTSIDE OF THE ACTUAL TREATMENT CENTER.

13  HOW MANY DO WE HAVE, AND WHERE ARE THEY LOCATED?

14  **A.**   WELL, WE HAVE TWO DORMS, ASH 2 AND CYPRESS 2, AND THOSE

15  DORMS ARE ON THE MAIN PRISON AND, BASICALLY, THOSE ARE PATIENTS

16  THAT DON'T NEED HOSPITALIZATION BUT STILL MAY REQUIRE SOME

17  ASSISTANCE WITH ACTIVITIES OF DAILY LIVING, OR THEY MAY REQUIRE

18  A SITUATION WHERE THEY NEED AN ELECTRICAL OUTLET FOR A

19  BREATHING MACHINE OR A CPAP MACHINE.  AND THOSE ARE THE

20  PATIENTS THAT LIVE OUT THERE.

21  **Q.**   AND HOW IS THAT -- HOW ARE THE ASSISTED LIVING DORMS, HOW

22  ARE THEY STAFFED?

23  **A.**   WELL, THEY'RE STAFFED WITH ORDERLIES.  THERE ARE NO

24  NURSES, NO DOCTORS.  ORDERLIES TEND TO THOSE PATIENTS' MEDICAL

25  NEEDS FROM -- AND ALL THEY REALLY DO IS HELP THEM WITH THE

11:07

1  ACTIVITIES OF DAILY LIVING.  THEY ARE NOT OUT THERE CHANGING

2  WOUNDS.  THEY ARE NOT OUT THERE DOING ANYTHING.  THEY COME TO

3  THE ATU FOR WOUND CARE.

4  **Q.**   WHY ARE THERE NO MEDICAL STAFF ASSIGNED TO THOSE ASSISTED

5  LIVING DORMS?

6  **A.**   WELL, BECAUSE THOSE ARE FOLKS THAT HAVE GRADUATED FROM THE

7  NEEDS OF THE MEDICAL DEPARTMENT AND ARE BASICALLY LIVING

8  INDEPENDENTLY ON THEIR OWN, BUT WE KEEP THEM IN THOSE DORMS

9  BECAUSE THEY STILL MAY NEED HELP WITH THEIR ACTIVITIES OF DAILY

10 LIVING.  THEIR MEDICINES ARE BROUGHT TO THEM.  THEIR MEALS ARE

11 BROUGHT TO THEM.  WE TRY TO GIVE THEM EVERY ADVANTAGE TO KEEP

12 THEM FROM GETTING SICK.

13 **Q.**   AND WHO MAKES THE DECISION AS TO WHETHER A PERSON IS ON

14 NURSING UNIT 1 OR NURSING UNIT -- OR THE ASSISTED LIVING DORMS?

15 **A.**   USUALLY, I DO.

16 **Q.**   AND WHAT FACTORS DO YOU CONSIDER IN THAT DECISION?

17 **A.**   WELL, I CONSIDER A LOT OF FACTORS, AND FIRST, SOME OF

18 THEM, YOU JUST HAVE TO KNOW THE OFFENDER.  YOU KNOW, SOME OF

19 THESE OFFENDERS THAT HAVE BEEN AT ANGOLA, THEY'VE BEEN THERE

20 FOR 30-PLUS YEARS, AND THEY HAVE PEOPLE AROUND THEM OUT IN THE

21 COMMUNITY THAT ARE CONSIDERED THEIR FAMILY.  AND SO THEY WANT

22 TO GO BE WITH THEIR FAMILY.  SO IF A PERSON CAN GRADUATE FROM

23 NURSING UNIT 2 AND GO TO ASH 2 OR CYPRESS 2, WE WILL ALLOW THAT

24 FOR THEM BECAUSE WE KNOW THEY ARE GOING TO BE WELL TAKEN CARE

25 OF BY THE PEOPLE THAT ARE AROUND THEM BECAUSE THAT'S WHAT

11:08

1  INMATES DO, YOU KNOW, THEY WATCH OUT AFTER EACH OTHER.

2  ANYBODY WHO'S EVER WORKED IN CORRECTIONS CAN TELL YOU THAT, BUT

3  WE KEEP AN EYE ON THEM.  SO WE PUT THEM IN THE MEDICAL DORM SO

4  WE CAN KEEP A CLOSER EYE ON THEM.  SO I USUALLY MAKE THOSE

5  DECISIONS, AND I LOOK AT ALL THINGS.  YOU KNOW, THEIR MOBILITY,

6  CAN THEY FEED THEMSELVES?  CAN THEY BATHE THEMSELVES?  YOU

7  KNOW, WHAT ARE THE TENDENCIES FOR THEM TO HAVE A RELAPSE, SAY,

8  OF CONGESTIVE HEART FAILURE?  YOU KNOW, SO WE LOOK AT A LOT OF

9  THINGS AND THOSE DECISIONS ARE MADE AFTER EVERYTHING IS

10  EVALUATED.  AND WE USUALLY BRING THEM TO THE TABLE EVERY

11  MORNING IN OUR MORNING MEETING, WE DISCUSS THESE PATIENTS WITH

12  ALL DOCTORS.

13  Q.   LET'S SHIFT GEARS NOW FROM THE INPATIENT CARE TO THE

14  NONURGENT CLINICAL CARE PROVIDED AT ANGOLA.  DO YOU PROVIDE

15  NONURGENT CLINICAL CARE?

16  A.   WE DO.

17  Q.   OKAY.  TELL US ABOUT THE CLINICAL CARE.

18  A.   WELL, WE CALL OUR LSP CLINIC, WE CALL THAT CLINIC A, AND

19  THAT'S TWO AREAS THAT WE LOOK AT THERE.  WE HAVE WHAT'S CALLED

20  PROBLEM FOCUS VISITS AND WE HAVE CHRONIC CARE CLINIC.

21  Q.   OKAY.  AND HOW MANY EXAMINATION ROOMS ARE THERE?

22  A.   WELL, THERE'S SEVEN OVER THERE THAT ARE USEABLE.

23  Q.   AND THAT'S IN THE BARROW TREATMENT CENTER?

24  A.   RIGHT.  THERE WERE SIX OVER THERE THAT WERE USEABLE DURING

25  THE TIME FRAME WHEN I WAS WORKING THE ATU AND USING ONE OF

1  THOSE ROOMS FOR CHART REVIEW, BUT NORMALLY, WHEN I'M NOT THERE,

2  THERE'S SEVEN.

3  **Q.**   AND WE HEARD SOME DISCUSSION FROM PLAINTIFFS' EXPERT ABOUT

4  THE ADEQUACY OF THOSE EXAM ROOMS AND WHETHER IT HAD PROPER

5  EQUIPMENT AND SO FORTH.  CAN YOU SHED SOME LIGHT ON THAT?

6  **A.**   WELL, I THINK OUR EXAM ROOMS ARE ADEQUATE.  YOU KNOW, I

7  THINK OUR EQUIPMENT IS ADEQUATE.  I MEAN, THERE'S OTOSCOPES IN

8  EVERY ROOM.  THE REASON THERE'S NOT OPHTHALMOSCOPES IN EVERY

9  ROOM IS THAT THEY WENT MISSING, AND SO THEY KEPT GOING MISSING,

10  AND SO WE KEPT OUR OPHTHALMOSCOPE IN THE MINOR SURGERY ROOM,

11  WHICH IS RIGHT ACROSS THE HALL, BECAUSE THEY'RE QUITE

12  EXPENSIVE, AND THERE'S NO WAY TO GLUE THEM TO THE APPARATUS

13  BECAUSE YOU HAVE TO CHANGE THE BULBS ALL THE TIME.  SO BECAUSE

14  THEY WENT MISSING AND THEY KEPT GOING MISSING, WE JUST KEEP

15  THEM ACROSS THE HALL AS A CONVENIENCE.

16  **Q.**   AND WE SAW PICTURES OF SINKS BEING BLOCKED AND THE

17  DISCUSSION OF A CONCERN ABOUT WHETHER OR NOT THE DOCTORS ARE

18  WASHING THEIR HANDS BETWEEN PATIENTS, CAN YOU ADDRESS THAT FOR

19  US?

20  **A.**   WELL, I KEEP MY HAND SANITIZER ON MY DESK USUALLY, AS DO A

21  LOT OF THE PHYSICIANS, AND YOU PUT THAT UP EVERY DAY BECAUSE

22  THERE'S PEOPLE THAT ROTATE THROUGH THERE AND -- BUT THE SINKS

23  ARE ACCESSIBLE, YOU KNOW.  USUALLY THERE'S BAR SOAP THAT'S

24  AVAILABLE, BUT THINGS ARE AVAILABLE AND PHYSICIANS USE STERILE

25  TECHNIQUES.  NINE TIMES OUT OF TEN, WHEN YOU ARE SEEING

1  PATIENTS AND YOU'RE EXAMINING, YOU'RE USING GLOVES.  BUT EVERY

2  PHYSICIAN OVER THERE THAT I KNOW OF HAS SOME FORM OF HAND

3  SANITIZER.

4  **Q.**   DO YOU HAVE ENOUGH GLOVES AVAILABLE TO CHANGE GLOVES

5  BETWEEN PATIENTS?

6  **A.**   YES.

7  **Q.**   LET ME ASK YOU THIS.  DISCUSSION ABOUT CLUTTERED

8  EXAMINATION ROOMS AND PLAINTIFFS' COUNSEL PUT UP A BUNCH OF

9  PICTURES OF WHAT SHE REPRESENTED TO BE CLUTTERED EXAMINATION

10  ROOMS.  CAN YOU TELL ME ABOUT THAT?

11  **A.**   THAT WAS MY ROOM.  I MEAN, EVERY MORNING WHEN I WALK INTO

12  THIS ROOM, THERE ARE CHARTS FROM FLOOR TO CEILING, AND THAT'S

13  THE ROOM THAT I CHOSE TO MAKE MYSELF AVAILABLE TO THE CLINIC

14  AND TO THE ER, BUT AT THE SAME TIME, I CAN STILL CARRY ON MY

15  MEDICAL DIRECTOR DUTIES OF ANSWERING PATIENT LETTERS, REVIEWING

16  DUTY STATUSES, LOOKING AT CHARTS, ANSWERING SECURITY, SOME

17  QUESTIONS FROM SECURITY ABOUT PATIENTS.  THAT'S THE ROOM THAT I

18  USED, AND THAT'S MY DAILY WORK, YOU KNOW, SO SURE, CHARTS WERE

19  STACKED UP EVERYWHERE, BUT THAT'S WHAT I WALK INTO EVERY DAY.

20  **Q.**   WERE PATIENTS BEING EXAMINED IN YOUR ROOM?

21  **A.**   NO.

22  **Q.**   OKAY.  I'M GOING TO SHOW YOU -- LET ME SHOW YOU A

23  PHOTOGRAPH, ONE OF THE PHOTOGRAPHS THAT WAS USED, SHOWN TO THE

24  COURT, AND TELL ME IF YOU CAN IDENTIFY WHAT ROOM THAT IS.

25  **A.**   YEAH, THAT'S MY ROOM.

1    Q.    WERE ANY PATIENTS BEING SEEN IN THAT ROOM?

2    A.    NO.

3    Q.    DID ANYBODY ASK YOU WHETHER THIS IS A ROOM THAT PEOPLE SAW

4    PATIENTS IN?

5    A.    NO.

6    Q.    LET ME SHOW YOU ANOTHER PICTURE.  I'M TRYING TO GET TO

7    DEMONSTRATIVE EXHIBIT 053.  WHAT ROOM IS THIS?

8    A.    THAT'S MY ROOM.

9    Q.    IS THAT THE SAME ROOM WE ARE TALKING ABOUT?

10    A.    YES, YOU CAN SEE THE BLACK TABLE IN THE BACKGROUND.

11    THAT'S NOT EVEN TYPICAL OF A NORMAL DAY OF CHARTS FOR REVIEW.

12    BUT THOSE CHARTS ARE TO BE REVIEWED.

13    Q.    ARE THOSE CHARTS JUST SITTING THERE FOR ANY LENGTHY PERIOD

14    OF TIME, OR WHAT'S THE STORY ON THAT?

15    A.    WELL, THE TRUTH BE KNOWN, THAT THAT'S WHAT WAITS ON ME

16    EVERY MORNING BEFORE I GET THERE, SO THAT WOULD HAVE TO BE SOME

17    TIME BETWEEN -- USUALLY, THE CHARTS ON THE TABLE ARE ALREADY

18    DONE.  SO THAT MAY HAVE BEEN SOMETIME BETWEEN THE MORNING

19    MEETING, HOSPITAL ROUNDS, AND ME BACK AND FORTH FROM THE

20    EMERGENCY ROOM, YOU KNOW, SO . . . BUT NO PATIENTS ARE SEEN IN

21    THAT ROOM.

22    Q.    LET ME SHOW YOU ONE MORE.  PLAINTIFFS' DEMONSTRATIVE

23    NO. 54, IS THAT YOUR ROOM, TOO?

24    A.    THAT'S MY ROOM.

25    Q.    NO PATIENTS BEING SEEN IN THERE, RIGHT?

1  **A.**   NO PATIENTS BEING SEEN, AND I CHOSE TO DO THAT.  I THINK

2  IT'S IMPORTANT THAT I MAKE MYSELF AVAILABLE TO THE CLINIC AREA.

3  YOU KNOW, I COULD HAVE DONE THIS BACK IN MY OFFICE, BUT MY

4  OFFICE IS WAY IN THE BACK OF THE BUILDING.  SO I CHOSE TO CLAIM

5  THAT ROOM, AND TO MAKE THAT ROOM THERE SO THAT I WOULD BE

6  ACCESSIBLE.  AND I THINK IT'S WORKED OUT WELL.

7  **Q.**   LET'S MOVE ON.  LET'S TALK ABOUT CLINIC A.  TELL ME ABOUT

8  CLINIC A.  I THINK YOU'VE MENTIONED WHO YOU SEE, BUT TELL ME

9  ABOUT IT.

10  **A.**   CLINIC A OCCURS, NOT ONLY IN THE MAIN PRISON, BUT THE

11  OUTCAMPS THAT WE TALKED ABOUT, THAT'S ALSO CONSIDERED CLINIC A,

12  AN EXTENSION OF CLINIC A, AND WE SEE EITHER CHRONIC CARE

13  PATIENTS IN THERE OR PEOPLE THAT HAVE PROBLEM FOCUS VISITS.

14  **Q.**   OKAY.  AND WHAT ARE THE HOURS OF OPERATION FOR CLINIC A?

15  **A.**   THE HOURS OF OPERATION ARE USUALLY FROM 8:00 UNTIL YOU GET

16  FINISHED.

17  **Q.**   AND HOW MANY DOCTORS ARE WORKING IN THERE USUALLY AS OF --

18  IN SEPTEMBER OF 2016, HOW MANY DOCTORS WERE WORKING CLINIC A?

19  **A.**   WELL, IT'S VARIABLE BASED ON THE NEEDS OF THE OUTCAMP, BUT

20  NORMALLY AT LEAST TWO.

21  **Q.**   OKAY.  AND WHAT ABOUT OTHER STAFFING IN CLINIC A?

22  **A.**   WELL, THERE'S USUALLY FIVE NURSES, A MEDICAL ASSISTANT,

23  AND ON NUMEROUS DAYS, THAT'S WHERE THE SUBSPECIALISTS ALSO GO

24  AND SEE THEIR PATIENTS.

25  **Q.**   AND I MEAN, CLINIC A, IS IT LIKE A WALK-IN CLINIC KIND OF

1   THING THAT YOU'D SEE ON THE OUTSIDE WHERE PATIENTS WITH A COLD

2   OR WITH WHATEVER GO AND SEE THEIR DOCTOR?

3   **A.**    NO.

4   **Q.**    THEIR PRIMARY CARE?

5   **A.**    NO, THOSE ARE SCHEDULED APPOINTMENTS.

6   **Q.**    OKAY.  HOW DO THOSE APPOINTMENTS GET SCHEDULED?

7   **A.**    WELL, THEY GET SCHEDULED THROUGH A VARIETY OF WAYS.  THEY

8   CAN GET SCHEDULED AS A FOLLOW-UP THROUGH THE ATU.  THEY CAN GET

9   SCHEDULED THROUGH SICK CALL.  THEY CAN BE RETURNED FOLLOW-UP

10  PATIENTS, ROUTINE FOLLOW-UP THROUGH CHRONIC CARE OR WHEN I DO

11  INMATE LETTERS, OFFENDER LETTERS, I MAKE CLINIC APPOINTMENTS.

12  **Q.**    AND TELL US ABOUT THE CHRONIC DISEASE MANAGEMENT THAT'S

13  DONE IN CLINIC A.

14  **A.**    WELL, WE HAVE SEVERAL CHRONIC CARE CLINICS THAT WE RUN IN

15  CLINIC A, IF I CAN NAME THEM ALL, HYPERTENSION, HYPERLIPIDEMIA,

16  HEPATITIS C, HIV, SEIZURE DISORDER, DIABETES, ASTHMA, COPD,

17  JUST TO NAME A FEW, BUT THERE ARE QUITE A FEW CHRONIC CARE

18  DISEASES THAT WE LOOK AT IN THAT CLINIC.

19  **Q.**    AND HOW ARE CHRONIC DISEASES TRACKED AND MONITORED?

20  **A.**    WELL, THEY'RE TRACKED AND MONITORED NOT ONLY BY THE CLINIC

21  DIRECTOR, BUT ALSO THROUGH THE MEDICAL RECORDS DEPARTMENT.

22          **MR. ROBERT:**  YOUR HONOR, IF I MAY APPROACH, I'D

23  LIKE TO -- I'VE GOT AN ORIGINAL CHART HERE.  THIS IS ONE OF THE

24  DOCUMENTS THAT'S ALREADY IN EVIDENCE, BUT I'D LIKE FOR HIM TO

25  USE THAT CHART IN ORDER TO BE ABLE TO TALK ABOUT THE MEDICAL

1  RECORDS ITSELF AND THE INFORMATION PROVIDED IN THE MEDICAL

2  RECORD.

3      **MS. MONTAGNES:**  YOUR HONOR, IF I CAN HAVE AN

4  OPPORTUNITY TO LOOK AT IT BEFORE HE --

5      **THE COURT:**  SHOW IT TO OPPOSING COUNSEL.

6      **MS. MONTAGNES:**  YOUR HONOR, WE WOULD JUST OBJECT TO

7  THE EXTENT THAT THIS CONTAINS DOCUMENTS WHICH ARE OUTSIDE THE

8  DISCOVERY PERIOD WHICH I REALIZE IS BECAUSE IT'S THE CURRENT

9  VOLUME, AND ALSO TO THE EXTENT THAT WE JUST DON'T HAVE THE SAME

10  OPPORTUNITY TO REVIEW THE ACTUAL PHYSICAL FILE THAT THE

11  DEFENDANTS HAVE.

12      **THE COURT:**  CAN YOU RESPOND?

13      **MR. ROBERT:**  YOUR HONOR, I'M NOT PLANNING ON TALKING

14  ABOUT ANY SPECIFIC DOCUMENT, YOU KNOW, THE CONTENT OF ANY

15  SPECIFIC DOCUMENT.  I MEAN THE WHOLE PURPOSE IS JUST TO ALLOW

16  THE WITNESS TO TALK ABOUT HOW THESE THINGS ARE ORGANIZED AND

17  HOW THINGS ARE TRACKED.

18      **THE COURT:**  OKAY.  THE COURT WILL ALLOW IT, OVERRULE

19  THE OBJECTION.

20      YOU ARE GOING TO IDENTIFY THE DOCUMENT FOR THE

21  RECORD, I TAKE IT, MR. ROBERT?

22      **MR. ROBERT:**  YES, YOUR HONOR.

23  **BY MR. ROBERT:**

24  **Q.**   THIS IS AN ORIGINAL CHART BUT A COPY OF THE MEDICAL

25  RECORDS THROUGH SEPTEMBER 30, 2016, WILL BE -- AND CAN BE FOUND

1:20  1   AT J10-056942 TO 57069, THAT WOULD BE THE LAST VOLUME OF WHAT

2   WE HAVE THAT'S ACTUALLY IN THE RECORD.

3         **THE COURT:**  OKAY.  AND IS THE DOCUMENT AT J10 IN

4   SUBSTANTIALLY THE SAME ORDER AS THE CHART GIVEN TO DR.

5   LAVESPERE?  I MEAN, IS THAT GOING TO BE PART OF YOUR

6   EXAMINATION, THE ORDER OF THE WAY THINGS ARE FILED IN THERE?

7         **MR. ROBERT:**  JUST HOW IT'S LAID OUT.

8         **THE COURT:**  OKAY.

9         **MR. ROBERT:**  I DON'T KNOW EXACTLY THROUGH THE COPYING

10   PROCESS HOW IT WAS EXACTLY COPIED, BUT I DON'T THINK THAT'S

11   GOING TO BE VERY SIGNIFICANT TO THE -- WHAT WE TALK ABOUT.

12         **THE COURT:**  OKAY, GO AHEAD.

13   BY MR. ROBERT:

14   **Q.**  OKAY.  CAN YOU IDENTIFY THIS DOCUMENT FOR ME?  WHAT IS IT?

15   **A.**  THIS IS A MEDICAL CHART, A REGULAR MEDICAL CHART.

16   **Q.**  OKAY.  DISCUSS FOR US THE LAYOUT OF THIS CHART.  TELL US

17   ABOUT IT.

18   **A.**  OKAY.  WELL, WHEN YOU FIRST LOOK AT THIS CHART, YOU KNOW,

19   THERE'S USUALLY A STICKER ON THE OUTSIDE, A PINK STICKER, THAT

20   TELLS YOU HOW MANY VOLUMES THAT THE OFFENDER HAS IN HIS MEDICAL

21   CHART.  THIS ONE IN PARTICULAR SAYS FOUR OF FOUR, SO THIS IS

22   THE CURRENT VOLUME OF FOUR.  THERE ARE ALSO STICKERS ON THE

23   OUTSIDE THAT DENOTE WHETHER THERE'S CHRONIC DISEASE, SO THIS IS

24   A CHRONIC DISEASE PATIENT.  THERE'S ALSO A STICKER THAT WILL

25   SHOW ANY ALLERGIES THAT THE OFFENDER MAY HAVE.  SO JUST SOME

1    IDENTIFYING INFORMATION.  AND THEN, OF COURSE, THE STICKER WITH
2    THE NAME.
3            **MS. MONTAGNES:**  YOUR HONOR, WHILE I DON'T HAVE TIME
4    TO GO THROUGH THOUSANDS OF PAGES, I AM JUST GOING TO OBJECT TO
5    THE EXTENT THAT THAT WAS NOT PRODUCED IN THE COPIED VOLUMES
6    THAT WE RECEIVED.
7            **MR. ROBERT:**  YOUR HONOR, THESE DOCTORS REVIEWED THESE
8    CHARTS ON SITE.  SOME OF THE CHARTS THAT THEY REVIEWED WERE THE
9    ORIGINAL CHARTS LIKE THAT.  THEY DIDN'T JUST REVIEW COPIES OF
10   THE DOCUMENTS PROVIDED.  WHEN THEY WERE ON SITE AND DID THEIR
11   INSPECTION, THEY REVIEWED DOCUMENTS, AND THIS IS THE TYPICAL
12   CHART.  THIS IS WHAT IS LAID OUT THERE.  I DON'T KNOW IF THE
13   COVER WAS COPIED OR NOT, I AM GOING TO BE HONEST WITH YOU, BUT
14   I DON'T THINK THAT'S REALLY WHAT WE'RE TRYING TO GET AT.
15           **THE COURT:**  ALL RIGHT.  SO THE OBJECTION IS THAT THE
16   CHART THAT YOU HAVE GIVEN THE DOCTOR IS NOT REPRESENTATIVE OF
17   THE ACTUAL COPY OF THAT PARTICULAR CHART, WHICH IS J10 AND THE
18   NUMBERS YOU'VE PREVIOUSLY GIVEN OF WHAT'S IN THE RECORD.  THE
19   COURT WILL NOTE THE OBJECTION FOR THE RECORD.  YOU KNOW, I'M
20   GOING TO ALLOW YOU TO CONTINUE TO ASK THE QUESTIONS.  LET'S
21   JUST SEE HOW -- I THINK I WILL COUNT ON -- AND I'M SURE THE
22   PLAINTIFFS WILL BE HAPPY TO POINT OUT ANY OTHER DIVERGENCES
23   BETWEEN THE CHART THAT THE DOCTOR IS REVIEWING AND WHAT'S IN
24   THE RECORD.
25           **MR. ROBERT:**  OKAY, YOUR HONOR.

1         **THE COURT:**  BECAUSE AT THE END OF THE DAY, WHAT THE

2   COURT HAS IS WHAT'S IN THE RECORD.

3         **MR. ROBERT:**  I GOTCHA, YOUR HONOR.

4         **THE COURT:**  SO . . .

5         **MR. ROBERT:**  AND I'M NOT -- THIS IS NOT SOME -- I

6   MEAN, THESE ARE -- THIS CHART IS IN THE RECORD.  AS COUNSEL

7   SAID, THINGS THAT HAVE HAPPENED SINCE SEPTEMBER OF 2016 ARE IN

8   THAT CHART AS WELL, BUT WE ARE NOT GOING TO GO INTO ANY DETAIL

9   OF ANY OF THAT.  THE ACTUAL CHART ITSELF, AS IT EXISTED IN

10  SEPTEMBER OF 2016, IS IN THE RECORD.  NOW, I CAN'T STAND HERE

11  AND SAY THAT THEY COVERED THE -- THEY COPIED THE OUTSIDE COVER

12  OF IT OR NOT BECAUSE I DON'T KNOW THAT.

13        **THE COURT:**  OKAY.

14        **MR. ROBERT:**  BUT OTHER THAN THAT, IT SHOULD BE

15  INTACT.

16        **THE COURT:**  OKAY, CARRY ON.

17  **BY MR. ROBERT:**

18  **Q.**  TELL ME ABOUT THE SECTIONS OF THE CHART, HOW IT'S LAID

19  OUT.

20  **A.**  WELL, WHEN YOU OPEN THE CHART, THERE'S SOME IDENTIFYING

21  INFORMATION, IN CASE AN OFFENDER GETS SICK, A CONTACT

22  INFORMATION SECTION, THEN THERE'S SOME INTAKE INFORMATION ABOUT

23  WHEN THE OFFENDER CAME TO THE PENITENTIARY, ANY PAST INTAKES

24  THAT WERE AT PREVIOUS INSTITUTIONS.  AND AS YOU GET FURTHER

25  INTO THE CHART, THERE'S USUALLY A MAR, MEDICATION

1   ADMINISTRATION RECORD, BUT THE BODY OF THE CHART, WHEN YOU FLIP

2   TO THE BODY OF THE CHART, THERE'S USUALLY A PROBLEM FOCUS LIST,

3   A MASTER PROBLEM LIST.  UNDER THAT MASTER PROBLEM LIST, USUALLY

4   YOU'LL HAVE YOUR LABORATORIES, YOU'LL HAVE YOUR EKGS, YOU'LL

5   HAVE YOUR RADIOLOGY, AND YOU'LL HAVE ANY SPECIALIZED TEST THAT

6   SHOULD BE AVAILABLE, LIKE A CT SCAN, AN MRI, MAYBE EVEN A

7   PULMONARY FUNCTION TEST.  THAT SHOULD BE IN THAT AREA.

8          THE CLINIC SECTION IS THE NEXT SECTION, AND THAT

9   CLINIC SECTION IS DIVIDED WITH SEVERAL DIFFERENT COLORS OF

10  PAPER, AND THOSE DIFFERENT COLORS OF PAPER HAVE SIGNIFICANT

11  MEANING.

12  **Q.**   TELL ME WHAT COLORS OF PAPER DO YOU HAVE.

13  **A.**   WELL, THERE ARE BORDERS AROUND A WHITE PAPER, AND THERE'S

14  RED BORDERS, THERE'S PURPLE BORDERS, THERE'S ORANGE BORDERS,

15  AND THOSE ARE USUALLY THE MAIN BORDERS, AND THEN THERE'S PLAIN

16  WHITE PAPER.

17  **Q.**   OKAY.

18  **A.**   SO DEPENDING ON THE BORDER, THAT TELLS THE LSP PHYSICIAN

19  SEVERAL THINGS.

20         **MS. MONTAGNES:**  AND YOUR HONOR, WE ARE JUST GOING TO

21  OBJECT TO THE EXTENT THAT WE RECEIVED BLACK AND WHITE COPIES OF

22  THESE, AND SO TO THE EXTENT HE'S NOW TESTIFYING ABOUT CONTENT

23  IN THE MEDICAL RECORD, WE DIDN'T HAVE ACCESS TO.

24         **THE COURT:**  WELL, YOU HAD ACCESS TO IT, YOU JUST HAD

25  ACCESS TO IT IN BLACK AND WHITE, CORRECT?

1  **MS. MONTAGNES:**  CERTAINLY.  I BELIEVE HE'S ABOUT TO

2  TESTIFY THAT THAT HAS SOME SIGNIFICANCE AND WE WOULD BE

3  UNABLE --

4  **THE COURT:**  NOTED.  OVERRULED BUT NOTED.

5  **BY MR. ROBERT:**

6  **Q.**  OKAY.  TELL ME ABOUT THE PURPLE BORDERS.  WHAT DOES THAT

7  MEAN?

8  **A.**  WELL, THE PURPLE BORDER DENOTES A SPECIALTY CLINIC VISIT,

9  AND, SAY, IF THERE WAS AN OFFENDER THAT WAS BEING FOLLOWED IN

10  ORTHOPEDICS AND YOU WANTED TO SCAN THROUGH AND LOOK WHAT HIS

11  ORTHOPEDIC CLINIC VISITS HAD SHOWN, IT WOULD BE NOTHING FOR YOU

12  TO GO THROUGH AND JUST FLIP THROUGH THE PURPLE SECTIONS OF THE

13  CHART AND TO FIND HIS ORTHOPEDIC VISITS, A VERY QUICK

14  REFERENCE, AND IN A MATTER OF MINUTES, YOU CAN NARROW DOWN

15  WHAT'S BEEN HAPPENING TO THAT OFFENDER IN AN ORTHOPEDIC CLINIC.

16  **Q.**  AND WHEN YOU TALK ABOUT A SPECIALTY CLINIC, IS THAT ANGOLA

17  IN-HOUSE OR OUTSIDE CLINICS?

18  **A.**  WELL, BOTH.  WE HAVE SPECIALTY CLINICS THAT COME ON SITE,

19  A NEUROLOGY CLINIC, WE HAVE HIV CLINIC, WE HAVE A GENERAL

20  SURGERY CLINIC, WE HAVE DERMATOLOGY, AND WE HAVE ORTHO.  NOW,

21  THE ORTHO AND DERMATOLOGY AND GENERAL SURGERY, THEY COME FROM

22  LSU.  IN-HOUSE SPECIALTY CLINIC, WE HAVE OUR NEUROLOGIST, HIV

23  AND A UROLOGIST, THEY ARE ALL IN-HOUSE DOCTORS THAT ARE ON

24  CONTRACT.

25  SO ANY SPECIALTY VISIT, YOU'RE VERY EASILY ABLE TO

1  TRACK IT BY JUST FLIPPING THROUGH THE PURPLE COLORED SECTIONS

2  OF THE CHART.

3  Q.   AS A PHYSICIAN TREATING THE PATIENT, DOES THAT HELP YOU TO

4  HAVE THAT PURPLE BORDER?

5  A.   SURE.

6  Q.   HOW DOES IT HELP YOU?

7  A.   WELL, IF YOU KNOW WHAT YOU'RE LOOKING FOR, YOU'RE ABLE TO

8  MAKE A QUICK DETERMINATION OF WHERE THE PATIENT IS IN HIS

9  TREATMENT REGIMEN AND HIS TREATMENT PLAN.

10  Q.   NOW, LET'S LOOK AT THE RED BORDER PAGES.  TELL ME WHAT

11  THOSE ARE.

12  A.   OKAY.  THE RED BORDER PATIENTS ARE PATIENTS THAT ARE IN

13  CHRONIC CARE CLINIC.  THESE ARE PATIENTS THAT WHEN THE

14  PHYSICIAN THAT SEES THIS PATIENT IN CLINIC A GETS A RED

15  BORDERED SHEET, IT TELLS THEM THAT, HEY, YOU OUGHT TO LOOK AT

16  THIS PATIENT FROM A CHRONIC CARE CLINIC STANDPOINT AND NOT JUST

17  A PROBLEM FOCUS VISIT, SO THAT'S WHAT THE RED SHEETS ARE FOR.

18  Q.   AND WHAT TYPES OF CHRONIC CARE VISITS DO YOU HAVE AT

19  ANGOLA?

20  A.   WELL, WE'VE TALKED ABOUT THEM, ASTHMA, COPD, HIV,

21  HEPATITIS, HYPERTENSION, DIABETES, JUST TO NAME A FEW.

22  Q.   OKAY.  AND HOW DOES THAT HELP THE TREATING PHYSICIAN WHEN

23  HE HAS SOMEBODY COME IN AND HE LOOKS AT A CHART THAT'S GOT A

24  RED BORDER ON IT?

25  A.   WELL, YOU'RE ABLE TO TRACK THE CHRONIC CARE.  YOU CAN GO

THROUGH AND SEE, WELL, DID THEY HAVE LABS?  DID THEY REVIEW THE

LABS?  DID THEY LOOK AT THE LABS?  YOU ALSO HAVE THE CHART

RIGHT HERE IN FRONT OF YOU WHERE YOU CAN GO TO THE LAB SECTION.

IT'S SET UP AND IT'S A SYSTEM UNIQUE TO DOC BUT IT'S VERY

SIMPLE AND IT'S VERY EASY.

Q.    OKAY.  WHEN A PHYSICIAN SEES A RED BORDER, ARE THERE ANY

GUIDELINES THAT HE LOOKS AT FROM A CHRONIC CARE STANDPOINT IN

TREATING THAT PATIENT?

A.    WELL, IN EVERY ROOM ABOVE EVERY DESK, THERE'S A CORKBOARD

THAT HAS THE CHRONIC CARE GUIDELINES FOR THE PHYSICIAN TO LOOK

AT, SO SURE.

Q.    ALL RIGHT.  AND DOES HAVING THE RED BORDER, DOES THAT HAVE

ANYTHING TO DO WITH HOW FOLLOW-UPS ARE SCHEDULED?

A.    WELL, THEY CAN SCHEDULE THE FOLLOW-UPS ACCORDING TO HOW

WELL THE OFFENDER IS DOING WITHIN THAT CHRONIC CARE CLINIC.

Q.    OKAY.  NOW, LET'S TALK ABOUT THE ORANGE BORDER PAGES.

A.    THE ORANGE BORDER PAPER IS PAPER THAT'S IN THIS DOCUMENT

THAT DENOTES A RETURN FROM AN OUTSIDE TRIP, EITHER A

HOSPITALIZATION OR A CLINIC VISIT, AND SO LIKE WE TALKED ABOUT

EVERY MORNING, I REVIEW THESE ORANGE BORDER PAPERS WITH OUR

TRIP OFFICE.  WE LOOK AT THE RECOMMENDATIONS MADE BY THE

OUTSIDE PHYSICIANS, AND WE FIT THOSE RECOMMENDATIONS INTO THE

MODEL OF ANGOLA.

          AND IT'S EASY FOR ME TO GO THROUGH -- NOW, THIS IS A

VERY SMALL CHART.  SOME OF THEM ARE PRETTY BIG, BUT IT'S EASY

1   FOR ME TO FLIP THROUGH THE ORANGE BORDERS IN THIS CHART AND TO

2   FIND OUT HOW OFTEN THIS OFFENDER HAS BEEN SEEN IN AN OUTSIDE

3   CLINIC OR AN OUTSIDE HOSPITAL.

4   **Q.**   NOW, DOES LSP ACTUALLY KEEP THE RECORDS FROM THE OUTSIDE

5   PHYSICIAN?  IS THAT TYPICALLY KEPT IN THE MEDICAL RECORD

6   ITSELF?

7   **A.**   LANE, FOR EXAMPLE, HAS A TENDENCY TO SEND US THEIR

8   RECORDS.  OUR LADY OF THE LAKE, WE HAVE TO CALL AND CALL AND

9   CALL, AND SOMETIMES WE STILL CAN'T GET THE COMPLETE RECORD.

10  LSU, WE HAVE AN EPIC SYSTEM THAT EVERYBODY IS ABLE TO TRACK

11  THEIR PATIENTS THROUGH.  SO EACH ONE OF MY PHYSICIANS HAVE

12  ACCESS TO THAT EPIC SYSTEM.

13  **Q.**   WELL, TELL ME ABOUT THE EPIC SYSTEM.  WHAT IS THAT?

14  **A.**   EPIC SYSTEM IS A COMPUTER PROGRAM THAT LSU USES, AND YOU

15  CAN TRACK YOUR PATIENT FROM THE TIME THEY HIT THE DOOR, EVERY

16  LAB, EVERY X-RAY, EVERY CLINIC VISIT.  AND YOU CAN TRACK THAT

17  PATIENT ON THAT EPIC.

18  **Q.**   ARE THE DOCTORS IN THE CLINIC, DO THEY HAVE ACCESS TO THAT

19  EPIC --

20  **A.**   SURE.

21  **Q.**   -- SOFTWARE?

22  **A.**   SURE.

23  **Q.**   AND CAN THEY REVIEW THE PATIENT'S TREATMENT BY THE OUTSIDE

24  PROVIDER BY USING THAT?

25  **A.**   SURE.  I USE IT EVERY DAY.

**Q.**   OKAY.  NOW, LET ME ASK YOU ABOUT THE VISIT THAT
PLAINTIFFS' EXPERTS DID.  THEY CAME AND SPENT SEVERAL DAYS AT
ANGOLA, DIDN'T THEY?

**A.**   YES.

**Q.**   AND THEY TALKED TO YOU, DIDN'T THEY?

**A.**   VERY BRIEFLY.

**Q.**   BUT DR. PUISIS TESTIFIED THAT HE ACTUALLY SAT IN YOUR
OFFICE AND TALKED TO YOU FOR AT LEAST SOME PERIOD OF TIME,
RIGHT?

**A.**   ABOUT 20 TO 30 MINUTES.

          **THE COURT:**  MR. ROBERT, THIS SEEMS LIKE IT MIGHT BE A
LOGICAL BREAKING POINT SINCE YOU ARE NOW GETTING INTO --

          **MR. ROBERT:**  I'M LIKE --

          **THE COURT:**  OH, GO AHEAD.

          **MR. ROBERT:**  -- THREE QUESTIONS --

          **THE COURT:**  ALL RIGHT.

          **MR. ROBERT:**  -- AND I'LL BE A GOOD BREAKING POINT.
GREAT.

          **THE COURT:**  THEN GO AHEAD.  GOOD.

**BY MR. ROBERT:**

**Q.**   DID DR. PUISIS, OR ANY OF THE OTHER EXPERTS, WHEN THEY SAT
DOWN WITH YOU, TALK TO YOU AND ASK YOU ABOUT HOW THOSE CHARTS
WERE LAID OUT?

**A.**   WELL, FIRST OFF, NO OTHER EXPERT TALKED TO ME.

**Q.**   OKAY.

1   **A.**   AND NO, THEY DIDN'T ASK ME ABOUT THE CHARTS.

2   **Q.**   THEY DIDN'T ASK YOU ABOUT THESE BORDERS AND HOW THAT'S

3   LAID OUT AND WHY THAT'S THE WAY IT IS?

4   **A.**   NO.

5   **Q.**   AND IF THEY HAD ASKED YOU, WOULD YOU HAVE TOLD THEM?

6   **A.**   SURE.

7   **Q.**   OKAY.  AND WERE YOU AVAILABLE FOR THEM, IF THEY WANTED TO

8   ASK YOU ABOUT THAT?

9   **A.**   I WAS AVAILABLE.

10  **Q.**   OKAY.  AND I THINK YOU INDICATED -- BUT LET'S JUST WRAP IT

11  UP BEFORE WE TAKE LUNCH.  IS THIS SYSTEM WITH THE BORDERS AND

12  SO FORTH, IS THAT UNIQUE TO THE DEPARTMENT OF CORRECTIONS?

13  **A.**   I'VE NEVER SEEN IT OUTSIDE THE DEPARTMENT OF CORRECTIONS.

14  I DIDN'T USE IT IN MY PRIVATE OFFICE, SO I WOULD ASSUME THAT

15  IT IS UNIQUE TO THE DEPARTMENT OF CORRECTIONS.

16  **Q.**   AND HOW LONG AS A DOCTOR AT ANGOLA, YOU'VE BEEN THERE

17  SINCE 2009, HAVE Y'ALL BEEN USING THAT SYSTEM SINCE THEN?

18  **A.**   YES.

19  **Q.**   DOES IT WORK?

20  **A.**   IT WORKS VERY EASILY AND VERY WELL.

21          **MR. ROBERT:**  YOUR HONOR, THIS IS A GOOD BREAKING

22  POINT.

23          **MS. MONTAGNES:**  AND YOUR HONOR, WE WOULD JUST ASK

24  THAT WE BE ALLOWED TO EXAMINE THE VOLUME ON THE BREAK WHILE WE

25  ARE HAVING LUNCH.

11:12  1          THE COURT:  ANY OBJECTION TO THAT, MR. ROBERT?

2          MR. ROBERT:  I DON'T HAVE A PROBLEM WITH THAT, YOUR

3     HONOR, AS LONG AS THEY DON'T LOSE MY RECORDS.

4          THE COURT:  JUST REVIEW IT AT THE BREAK AND GET IT

5     BACK TO THE WITNESS BEFORE WE COME -- WHEN WE COME BACK FOR

6     LUNCH.  WE WILL BE IN RECESS UNTIL 1:30.

7          MR. ROBERT:  THANK YOU, YOUR HONOR.

8          MS. MONTAGNES:  THANK YOU, YOUR HONOR.

9          THE COURT:  THANK YOU.

10                    (RECESS)

11          THE COURT:  BE SEATED.

12              MR. ROBERT, YOU MAY CONTINUE.

13          MR. ROBERT:  THANK YOU, YOUR HONOR.

14     BY MR. ROBERT:

15     Q.   GOOD AFTERNOON, DR. LAVESPERE.

16     A.   GOOD AFTERNOON.

17     Q.   I'D LIKE TO SWITCH GEARS NOW AND TALK A LITTLE BIT MORE

18     ABOUT CHRONIC CARE.  WE'VE HEARD A LOT ABOUT CHRONIC CARE SO

19     FAR IN THIS CASE, AND I WANT TO KNOW DOES LSP HAVE A CHRONIC

20     CARE MANUAL?

21     A.   WE HAVE A CHRONIC CARE MANUAL.

22     Q.   OKAY.  AND IS IT UPDATED AND REVIEWED?

23     A.   IT IS UPDATED.

24     Q.   OKAY.

25     A.   AND REVIEWED.

01:29   1   **Q.**   I WANT TO SHOW YOU A DOCUMENT WHICH IS IN THE RECORD, IT'S
2   J8-02691, AND ASK YOU IF YOU RECOGNIZE THAT DOCUMENT.
3   **A.**   I DO.
4   **Q.**   WHAT IS IT?
5   **A.**   THAT'S THE COVER OF THE CHRONIC CARE MANUAL.
6   **Q.**   IS YOUR SIGNATURE ON THAT?
7   **A.**   IT IS.
8   **Q.**   OKAY.  AND WHAT DOES THAT REPRESENT?
9   **A.**   THAT REPRESENTS THAT THAT MANUAL WAS REVIEWED.
10   **Q.**   OKAY.  AND IT SAYS "REVIEWED JULY OF 2016."  WOULD THAT
11   HAVE BEEN THE LAST TIME THAT YOU REVIEWED THE MANUAL PRIOR TO
12   SEPTEMBER 30, 2016?
13   **A.**   YES, IT WOULD.
14   **Q.**   OKAY.  I SHOW YOU ANOTHER DOCUMENT THAT'S BEEN MARKED AS
15   J8-02692.  DO YOU RECOGNIZE THAT DOCUMENT?
16   **A.**   I DO.
17   **Q.**   WHAT IS THAT?
18   **A.**   THAT'S A SIMILAR DOCUMENT, BUT IT WAS DATED MARCH OF 2015
19   AND REPRESENTS THE FACT THAT THAT MANUAL WAS REVIEWED.
20   **Q.**   OKAY.  SO THAT WOULD HAVE BEEN YOUR ANNUAL REVIEW FOR
21   2015?
22   **A.**   YES, SIR.
23   **Q.**   I SHOW YOU ANOTHER DOCUMENT, IT'S MARKED AS J8-02693, SAME
24   QUESTION.
25   **A.**   IT'S A SIMILAR DOCUMENT.  THIS ONE'S DATED AUGUST OF 2014,

01:30    1    AND IT'S A REPRESENTATION OF THE FACT THAT THAT MANUAL HAD BEEN

2    REVIEWED.

3    **Q.**    OKAY.  AND THAT'S WHEN YOU WOULD HAVE BECOME MEDICAL

4    DIRECTOR, IN 2014?

5    **A.**    YES.

6    **Q.**    OKAY.  TO YOUR KNOWLEDGE, HAS THAT MANUAL BEEN REVIEWED

7    PRIOR TO YOU BECOMING THE MEDICAL DIRECTOR?

8    **A.**    I REMEMBER HEARING DR. COLLINS AND DR. ROUNDTREE TALKING

9    ABOUT IT, BUT I DON'T HAVE THE PAPERS THAT SHOW THAT THEY DID

10    REVIEW IT.

11    **Q.**    LET ME SHOW YOU A DOCUMENT THAT'S MARKED AS J8-02698, AND

12    ASK YOU IF YOU CAN TELL ME WHAT THAT DOCUMENT IS.

13    **A.**    THAT'S JUST A PAGE OUT OF THAT CHRONIC CARE MANUAL WHERE

14    IT LISTS THE CHRONIC DISEASES THAT WE FOLLOW.

15    **Q.**    OKAY.  AND WHAT ARE THE CHRONIC DISEASES THAT YOU FOLLOW?

16    **A.**    WELL, WE FOLLOW HYPERTENSION, DIABETES, CONGESTIVE HEART

17    FAILURE, HYPERLIPIDEMIA, ASTHMA, COPD, SEIZURE, HEPATIS, HIV,

18    AND THEN COUMADIN.

19    **Q.**    OKAY.  ARE THOSE THE CHRONIC DISEASES THAT ARE GENERALLY

20    TRACKED AT ANGOLA?

21    **A.**    THEY ARE.

22    **Q.**    YOU BELIEVE IT FAIRLY REPRESENTS THE CHRONIC DISEASES THAT

23    NEED TO BE TRACKED AT ANGOLA?

24    **A.**    I THINK IT'S A FAIR REPRESENTATION.

25    **Q.**    LET'S GO IN AND TALK ABOUT THE DIFFERENT CHRONIC DISEASES

1   AND WHAT THEY ARE AND HOW THEY'RE TRACKED AND WHAT YOU DO AS A

2   DOCTOR THERE AT ANGOLA.

3           THE FIRST ONE, I'M GOING TO SHOW YOU JOINT EXHIBIT

4   8-02701, AND I'D LIKE FOR YOU TO TELL ME IF YOU RECOGNIZE THAT

5   DOCUMENT?

6   **A.**   YES.

7   **Q.**   WHAT IS IT?

8   **A.**   IT'S A LIST OF THE CHRONIC CARE GUIDELINES FOR DIABETES.

9   **Q.**   OKAY.  AND ARE THESE CHRONIC CARE GUIDELINES, ARE THEY

10  USED BY YOU AND OTHERS AS A PHYSICIAN AT ANGOLA?

11  **A.**   YES.

12  **Q.**   TELL ME HOW IT'S USED.

13  **A.**   WELL, WHEN THERE ARE PATIENTS THAT PRESENT IN THE CHRONIC

14  CARE CLINIC WITH DIABETES, THE PROVIDER ARE TO BE AWARE OF

15  THESE GUIDELINES IN ORDER TO TREAT THE PATIENTS IN ACCORDANCE

16  WITH THESE GUIDELINES.

17  **Q.**   AND HOW IS THE PROVIDER AWARE OF THOSE GUIDELINES?

18  **A.**   WELL, LIKE WE SAID PREVIOUSLY, THEY'RE ON A CORKBOARD IN

19  FRONT OF EVERY DESK IN THE CLINIC A SETTING.

20  **Q.**   OKAY.  WHAT IS DIABETES?

21  **A.**   DO WHAT?

22  **Q.**   WHAT IS DIABETES?

23  **A.**   PUT VERY SIMPLY, DIABETES IS EITHER AN UNDERPRODUCTION OR

24  UNDERUTILIZATION OF INSULIN WHEREBY THE BODY CANNOT METABOLIZE

25  SUGAR, AND THE BLOOD SUGARS ARE CONTINUALLY HIGH.

1   **Q.**   AND ITEM 1 UNDER THE DIABETES GUIDELINES IS SEEN AT LEAST

2   EVERY SIX MONTHS, AND THEN IT GOES ON.  WHY IS A PATIENT WITH

3   DIABETES NEED TO BE SEEN EVERY SIX MONTHS?

4   **A.**   WELL, AT LEAST EVERY SIX MONTHS.  JUST FOR TRACKING

5   PURPOSES, YOU WANT TO MAINTAIN SOME TYPE OF TRACKING ON THESE

6   PATIENTS BECAUSE IT'S IMPORTANT TO KEEP DIABETES UNDER CONTROL.

7   **Q.**   AND THEN ITEM 2 TALKS ABOUT LABS AND LABS THAT NEED TO BE

8   DONE ANNUALLY.  TELL US ABOUT THOSE LABS AND WHY THAT'S UNDER

9   YOUR CHRONIC CARE GUIDELINES.

10  **A.**   WELL, YOU JUST WANT TO FOLLOW THESE PATIENTS BASICALLY FOR

11  KIDNEY FUNCTION, LIVER FUNCTION.  YOU WANT TO MAKE SURE THAT

12  THEIR HEMOGLOBIN AND HEMATOCRIT'S ARE UNDER CONTROL.  YOU WANT

13  TO DO CHEST X-RAYS.  YOU WANT TO DO WHITE BLOOD CELL COUNTS.

14  YOU WANT TO DO EKGS.  YOU WANT TO HAVE ALL THESE ITEMS IN LINE

15  IF THE PATIENTS EVER BECOME SICK, NO. 1, YOU CAN ALWAYS REFER

16  BACK TO THEM AND SEE IF THERE'S A CHANGE IN THAT DATA, AND NO.

17  2, IT TELLS YOU BASICALLY THE CHRONIC STATE OF THE HEALTH OF

18  THE PATIENT.

19  **Q.**   AND DO YOU DO THESE LABS AT LEAST ANNUALLY ON YOUR

20  DIABETES PATIENTS?

21  **A.**   AT LEAST ANNUALLY.

22  **Q.**   OKAY.  AND THE NEXT ITEM IS A LAB THAT NEEDS TO BE DONE

23  BIANNUALLY.  TELL ME WHAT THAT IS.

24  **A.**   WELL, THAT SHOULD BE DONE AT LEAST BIANNUALLY.  IT'S A

25  HEMOGLOBIN A1C.  BASICALLY IT'S A THREE-MONTH MEASURE OF HOW

01:34  1   YOUR BLOOD SUGAR IS AND HOW CONTROLLED IT IS WITHOUT DOING

2   DAILY ACCU CHECKS.

3   **Q.**   AND ITEM 4 TALKS ABOUT EDUCATION.  DOES ANGOLA PROVIDE ANY

4   EDUCATION TO PATIENTS WITH DIABETES?

5   **A.**   SURE.  WE HAVE A DIABETIC TEACHING NURSE THAT'S ON OUR

6   STAFF THAT EDUCATES PATIENTLY ROUTINELY.

7   **Q.**   AND HOW DOES THE TEACHING NURSE COME TO EDUCATE THESE

8   PATIENTS?

9   **A.**   WELL, YOU WOULD WRITE A REFERRAL IN THE CHART FOR A

10   DIABETIC TEACHING.

11   **Q.**   ITEM 5 SAYS AN ANNUAL FOOT EXAM.  WHAT IS THAT ABOUT?

12   **A.**   WELL, ESPECIALLY IN THE DIABETIC POPULATION, THEY'RE PRONE

13   TO GET WHAT'S CALLED NEUROPATHY WHICH IS A PROBLEM WITH THE

14   NERVES, AND SOME OF THEM EVEN GO SO FAR AS DEVELOP A NEUROPATHY

15   TO THE POINT TO WHERE THEY CAN'T REALLY FEEL THEIR EXTREMITIES.

16   AND A SMALL ULCER THAT'S NOT BEING ADEQUATELY ASSESSED DOESN'T

17   HURT AND SO A SMALL ULCER CAN TURN INTO A LARGE ULCER WHICH CAN

18   TURN INTO MAJOR INFECTION.  SO AT LEAST WE HAVE THESE OFFENDERS

19   SEE THE FOOT DOCTOR ON A YEARLY BASIS.

20   **Q.**   AND THEN NO. 7 SAYS AN ANNUAL DILATED RETINAL EXAM.  WHY

21   IS THAT IMPORTANT?

22   **A.**   WELL, YOU KNOW, THERE'S A CONDITION CALLED DIABETIC

23   RETINOPATHY, SO YOU KNOW, WE TRY TO COVER ALL OUR BASES, THE

24   FEET, THE EYES, AND AGAIN, THE LABS FOR YOUR KIDNEYS.  AND, OF

25   COURSE, THE LAST ONE IS YOUR FLU/PNEUMONIA VACCINE BECAUSE THEY

1   ARE AT SUCH A STATE THAT IF THEY GET SICK, THEY COULD HAVE

2   MAJOR ISSUES.  WE TRY TO DO PREVENTATIVE VACCINES AS WELL.

3   **Q.**   WHAT KIND OF MEDICATIONS DO PATIENTS WITH DIABETES TAKE?

4   **A.**   WELL, THEY EITHER TAKE ORAL MEDICINES OR THEY TAKE

5   INJECTABLE MEDICINES.

6   **Q.**   WHAT KIND OF ORAL MEDICINES ARE WE TALKING ABOUT?

7   **A.**   WELL, WE USE METFORMIN AS ONE OF OUR ORAL MEDICINES AND WE

8   USE A MEDICINE CALLED ACTOS ALONG WITH THAT MEDICINE.

9   **Q.**   AND WHAT KIND OF INJECTABLE MEDICINES DO YOU USE?

10  **A.**   WE USE TWO FORMS OF INSULIN.  WE USE -- WELL, REALLY

11  THREE.  WE USE A 70/30 INSULIN WHICH IS A MIXTURE OF INSULIN.

12  WE USE A DIFFERENT INSULIN, WHICH IS INSULIN-N, AND THEN WE USE

13  A REGULAR INSULIN.

14  **Q.**   AND THE PATIENTS THAT YOU SEE AT THE CLINIC WITH DIABETES,

15  IS IT IMPORTANT THAT THEY ARE COMPLIANT WITH THEIR MEDICATION?

16  **A.**   IT IS.

17  **Q.**   OKAY.  AND WHAT HAPPENS WHEN THEY'RE NOT COMPLIANT WITH

18  THEIR MEDICATION?

19  **A.**   WELL, ISSUES WILL ARISE, YOU KNOW.  I MEAN, IF YOU DON'T

20  KEEP YOUR DIABETES UNDER CONTROL, YOU'RE GOING TO HAVE

21  COMPLICATIONS.  YOU MAY HAVE COMPLICATIONS WITH YOUR VISION.

22  YOU MAY HAVE COMPLICATIONS WITH YOUR KIDNEYS.  YOU MAY HAVE

23  COMPLICATIONS WITH YOUR NERVOUS SYSTEM.  YOU KNOW, THERE ARE A

24  WEALTH OF COMPLICATIONS THAT YOU CAN HAVE FROM DIABETES.

25  **Q.**   NOW WHAT ABOUT YOUR FEET AND ANKLES?

01:37  1   **A.**   WELL, THAT'S YOUR NERVOUS SYSTEM.   YOU DEVELOP NEUROPATHY.

2   **Q.**   OKAY.  LET'S TALK ABOUT -- I WANT TO TALK JUST BRIEFLY

3   ABOUT ONE OF THE PATIENTS THAT'S ON THE LIST THAT HAS BEEN A

4   SUBJECT OF DISCUSSION IN THIS CASE, PATIENT NO. 12.  DO YOU

5   KNOW WHO PATIENT NO. 12 IS?

6   **A.**   YES.

7   **Q.**   OKAY.  I WANT TO SHOW YOU A DOCUMENT, IT'S BEEN MARKED AS

8   J10-53259.  DO YOU RECOGNIZE THIS DOCUMENT?

9   **A.**   I DO.

10   **Q.**   OKAY.  AND WHAT IS THIS DOCUMENT?

11   **A.**   THAT'S A NURSING UNIT NOTE THAT'S DATED 3/18 OF '16.

12   **Q.**   OKAY.  AND I'VE HIGHLIGHTED SOME PORTIONS TO TRY TO MOVE

13   US ALONG HERE.  AND WHAT DOES THAT HIGHLIGHTED PORTION INDICATE

14   TO YOU?

15   **A.**   WELL, THE NOTE SAYS NONCOMPLIANT PRIOR TO NURSING UNIT 1,

16   NONCOMPLIANT, CONTINUE SLIDING SCALE, AND WILL RE-ADJUST 70/30.

17          **MS. MONTAGNES:**   YOUR HONOR, WE'RE GOING TO OBJECT TO

18   THE EXTENT THAT DR. LAVESPERE IS TESTIFYING ABOUT MEDICAL CARE

19   RENDERED BY ANOTHER PHYSICIAN.  HE IS NOT AN EXPERT IN THIS

20   MATTER.  HE HAS NOT BEEN DESIGNATED AS EITHER A TREATING

21   PHYSICIAN EXPERT OR AN EXPERT OF ANY KIND, AND I DON'T BELIEVE

22   THIS NOTE WAS WRITTEN BY HIM.

23          **MR. ROBERT:**   JUDGE, HE'S NOT TESTIFYING TO ANYTHING

24   OTHER THAN THE FACTUAL STATEMENTS THAT ARE MADE IN THE RECORD

25   AS A MEDICAL DIRECTOR.  WE HAVE A DOCUMENT THAT'S ALREADY IN

01:39   1   EVIDENCE.  IT'S A BUSINESS RECORD, AND HE'S SIMPLY TESTIFYING

2   AS TO THE STATEMENTS THAT HAVE BEEN MADE IN THAT RECORD IN

3   FACTUAL STATEMENTS, FACTUAL TREATMENT THAT IS RECORDED IN THE

4   RECORD.  HE'S NOT GIVING ANY OPINIONS, AND HE OUGHT TO BE ABLE

5   TO TESTIFY TO THAT.

6           THE COURT:  I'LL ALLOW IT.

7   BY MR. ROBERT:

8   Q.   SO HE INDICATES THAT HE'S NOT COMPLIANT WITH HIS

9   MEDICATION, CORRECT?

10  A.   RIGHT.

11  Q.   OR HE HAD NOT BEEN UNTIL BEING ON NURSING UNIT 1?

12  A.   HE HAD NOT BEEN COMPLIANT, AND THAT HE'S NOW COMPLIANT AND

13  WILL CONTINUE WITH A SLIDING SCALE, AND YOU CAN SEE IN THE

14  RIGHT-HAND CORNER, UPPER RIGHT-HAND CORNER, HE HAD AN EARLY

15  MORNING CBG, BLOOD GLUCOSE, OF 171, AND THAT MORNING IT WAS

16  244.

17  Q.   AND WHY WOULD HE BE ON NURSING UNIT 1?

18          MS. MONTAGNES:  OBJECTION, YOUR HONOR.  BEFORE HE --

19          MR. ROBERT:  I'LL WITHDRAW IT.

20          THE COURT:  OKAY, NEXT QUESTION.

21  BY MR. ROBERT:

22  Q.   PATIENTS WITH DIABETES, AS YOU INDICATED THAT THEY TEND TO

23  HAVE FOOT PROBLEMS, CORRECT?

24  A.   YES.  PATIENTS WITH UNCONTROLLED DIABETES MORE THAN

25  PATIENTS WITH CONTROLLED DIABETES.

01:40  1   **Q.**   RIGHT.   THE ONES THAT AREN'T PROPERLY TAKING THEIR

2   MEDICATIONS, CORRECT?

3   **A.**   RIGHT.

4   **Q.**   I WILL SHOW YOU A DOCUMENT THAT'S MARKED AS EXHIBIT -- AND

5   IT'S KIND OF CUT OFF SO LET ME READ IT OUT -- J10-53170.   DO

6   YOU SEE THAT DOCUMENT?

7   **A.**   I DO.

8   **Q.**   DO YOU RECOGNIZE IT?

9   **A.**   THAT'S A SICK CALL.

10   **Q.**   OKAY.   AND WHAT IS BEING REFERENCED HERE IN THIS SICK

11   CALL?

12   **A.**   THAT SDE IS SELF-DECLARED EMERGENCY, AND IT'S FOR LEG AND

13   FOOT PAIN.

14   **Q.**   OKAY.   SO THIS PATIENT IS SUFFERING FROM LEG AND FOOT PAIN

15   AT THE ATU, CORRECT?

16   **A.**   WELL, ACTUALLY, THIS IS OUT AT THE DORM.

17   **Q.**   OH, OKAY.

18   **A.**   AND THE EMT WENT OUT TO THE DORM AND MADE SICK CALL, LIKE

19   WE TALKED ABOUT THIS MORNING.

20   **Q.**   OKAY.   I THINK I'M ONE DOCUMENT AHEAD OF MYSELF.

21            I HAVE ANOTHER DOCUMENT, AND I THINK IT'S EXHIBIT

22   J10-53171.   CAN YOU TELL ME WHAT THIS DOCUMENT IS?

23   **A.**   RIGHT.   THE DISPOSITION ON THE SICK CALL WAS ATU, AND SO

24   THIS IS THE ATU VISIT FROM THAT SICK CALL.

25   **Q.**   OKAY.

01:41  1         **MS. MONTAGNES:**  YOUR HONOR, HE HAS NO WAY TO KNOW --

2    OBJECTION.  HE HAS NO WAY TO KNOW THAT THIS IS THE DISPOSITION

3    FROM THAT SICK CALL.  HE WAS NOT THE TREATING PHYSICIAN.  THESE

4    ARE NOT HIS DOCUMENTS.  THESE ARE FROM ANOTHER DOCTOR AND HE'S

5    GETTING INTO THE CARE THAT WAS DELIVERED.

6         **THE COURT:**  I MEAN, IT MAY NOT HAVE BEEN YOUR

7    QUESTION, BUT THAT WAS HIS ANSWER.  I WOULD SUSTAIN THAT

8    OBJECTION UNLESS YOU'VE GOT SOMETHING THAT YOU WANT TO TRY TO

9    CHANGE MY MIND ABOUT.  I MEAN, HE'S GIVING OPINION TESTIMONY AS

10   TO WHAT OCCURRED AND HE WASN'T THE TREATING PHYSICIAN.

11        **MR. ROBERT:**  OKAY.  AND I DON'T WANT HIM TO DO THAT.

12   IF THAT'S THE CASE, I'LL WITHDRAW IT AND WE'LL ASK ANOTHER

13   QUESTION, OKAY.

14        **THE COURT:**  ASK ANOTHER QUESTION.

15   BY MR. ROBERT:

16   **Q.**  ALL RIGHT.  BASED ON YOUR REVIEW OF THIS DOCUMENT, DOES IT

17   INDICATE THAT THIS PERSON WAS TREATED IN THE -- OR WAS SEEN IN

18   THE ATU?

19   **A.**  IT DOES.  HE WAS SEEN IN THE ATU ON 3/10 OF '16.

20   **Q.**  OKAY.  AND THE BOTTOM OF THE DOCUMENT THAT I HAVE

21   HIGHLIGHTED, WHAT DOES THAT STATE?

22   **A.**  WELL, DR. MACMURDO SAW HIM ON THAT DATE AND NOTICED THAT

23   HE HAD CELLULITIS OF HIS LEFT FOOT AND HE ADMITTED HIM TO

24   NURSING UNIT 1.

25   **Q.**  OKAY, THANK YOU.

01:42

1          NOW, THE NEXT DOCUMENT I HAVE IS DOCUMENT NO.

2   J10-53157, AND CAN YOU TELL ME WHAT THIS DOCUMENT REPRESENTS?

3   **A.**   THIS IS AN X-RAY REQUEST FROM 3/10 OF '16 ORDERED BY DR.

4   MACMURDO OF DENNIS SAWYER'S LEFT FOOT.

5   **Q.**   OKAY.  AND THAT'S 3/10/16, THE SAME DATE THAT WE JUST

6   LOOKED AT, CORRECT?

7   **A.**   CORRECT.

8          **MS. MONTAGNES:**  AND JUST TO REMIND THE WITNESS TO

9   REFER TO THIS AS PATIENT 12.

10         **MR. ROBERT:**  MY APOLOGIES, COUNSEL.  I'LL DO BETTER

11  ABOUT THAT.

12  **BY MR. ROBERT:**

13  **Q.**   THE NEXT DOCUMENT, J10-53156, TELL ME WHAT THAT DOCUMENT

14  REPRESENTS?

15  **A.**   WELL, THIS IS ACTUALLY AN X-RAY REPORT FROM PATIENT 12

16  FROM 3/10 OF '16.

17  **Q.**   SO DOES THIS INDICATE THAT HE HAD AN X-RAY THE SAME DAY?

18  **A.**   RIGHT.  AT ANGOLA, WE HAVE A DIGITAL X-RAY, AND NOT ONLY

19  ARE OUR X-RAYS READ BY OUR PHYSICIANS, WE ALSO HAVE AN OVERREAD

20  BY AN OUTSIDE RADIOLOGY GROUP THAT WE USE ON EVERY X-RAY.

21         **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  HE DOESN'T

22  KNOW WHAT HAPPENED.  HE WAS NOT THE TREATING PHYSICIAN.  HE

23  CANNOT GIVE TESTIMONY ABOUT HOW THIS X-RAY WAS REVIEWED.

24         **MR. ROBERT:**  JUDGE, HE'S NOT GIVING TESTIMONY ABOUT

25  HOW IT WAS REVIEWED.  HE'S SIMPLY GIVING TESTIMONY SAYING THAT

01:44   1   THIS IS THE EQUIPMENT WE HAD, THIS IS WHAT WE DO.  I MEAN, HE'S

2   GOT KNOWLEDGE OF THAT.  HE'S THE MEDICAL DIRECTOR OF THE

3   FACILITY.

4              **THE COURT:**  OVERRULED.

5              **THE WITNESS:**  CAN YOU PUT THAT BACK UP?

6              **MR. ROBERT:**  NO.  I DON'T NEED TO.

7   **BY MR. ROBERT:**

8   **Q.**   LET'S LOOK AT THE NEXT ONE, J10-53167, CAN YOU TELL ME

9   WHAT THAT DOCUMENT REPRESENTS?

10  **A.**   OKAY.  THIS IS A REFERRAL TO PODIATRY DATED 3/10 OF '16

11  FROM PATIENT 12 FOR --

12  **Q.**   OKAY.  SO THE SAME DAY, HE'S SEEN IN THE ATU, HE GETS AN

13  X-RAY AND HE'S -- SAME DATE, THIS INDICATES THAT HE'S REFERRED

14  TO PODIATRY, CORRECT?

15  **A.**   IT DOES.

16  **Q.**   ONE MORE.  DOCUMENT NO. J10-53166, AND TELL ME WHAT THAT

17  DOCUMENT REPRESENTS.

18  **A.**   THIS IS AN ORTHOPEDIC VISIT, 3/14 OF '16 FOR PATIENT 12,

19  AND HE'S TO THE ORTHO CLINIC FOR LEFT FOOT DIABETIC

20  NEPHROPATHY.

21  **Q.**   SO FOUR DAYS LATER, HE'S SEEN IN ORTHO.  IS THAT AN

22  IN-HOUSE CLINIC OR AN OUTSIDE CLINIC?

23  **A.**   THIS IS AN IN-HOUSE CLINIC.

24  **Q.**   WHO IS THE DOCTOR IN THE ORTHO CLINIC?

25  **A.**   WELL, THIS WOULD BE AN LSU DOCTOR THAT CAME FROM THE

1  OUTSIDE.

2  **Q.**    OKAY.

3  **A.**    I CAN'T QUITE READ HIS SIGNATURE.

4  **Q.**    SO IT'S NOT AN LSP DOCTOR, IT WOULD BE AN LSU SPECIALIST?

5  **A.**    THIS IS AN LSU OUTSIDE DOCTOR, YES.

6  **Q.**    LET'S MOVE ON.  LET'S TALK ABOUT THE NEXT CLINIC, CHRONIC

7  CARE CLINIC THAT ANGOLA HAS, AND THAT'S THE COUMADIN CLINIC,

8  CORRECT?

9  **A.**    COUMADIN CLINIC.

10  **Q.**    OKAY.  AND WHAT IS THIS DOCUMENT THAT I PUT IN FRONT OF

11  YOU?  FOR THE RECORD, IT'S J8-02702, CAN YOU TELL ME WHAT THAT

12  DOCUMENT IS?

13  **A.**    THESE ARE THE GUIDELINES FOR COUMADIN CLINIC, THE CHRONIC

14  CARE GUIDELINES FOR COUMADIN CLINIC.

15  **Q.**    OKAY.  AND WHAT IS COUMADIN THERAPY?

16  **A.**    BASICALLY, IN A NUTSHELL, IT'S AN ANTI-COAGULATION

17  THERAPY.  IT KEEPS THE BLOOD THIN.

18  **Q.**    WHY WOULD SOMEBODY NEED COUMADIN THERAPY?

19  **A.**    WELL, YOU WOULD NEED TO KEEP YOUR BLOOD THIN IN SOME

20  MEDICAL CASES LIKE IF YOU HAD ATRIAL FIBRILLATION, IF YOU HAD A

21  DVT, IF YOU HAVE PULMONARY EMBOLISM.  AND WE HAVE A LOT OF THAT

22  AT ANGOLA, SO THERE ARE CERTAIN MEDICAL CONDITIONS THAT REQUIRE

23  YOU TO KEEP YOUR BLOOD THINNER THAN THE NORMAL POPULATION.

24  **Q.**    AND WHY IS COUMADIN CLINIC SINGLED OUT FOR ITS OWN CHRONIC

25  CARE GUIDELINES?

**A.**   BECAUSE IT'S VERY IMPORTANT TO MANAGE THESE PATIENTS.

**Q.**   OKAY.  AND, AGAIN, ITEM NO. 1 SAYS, SEEN AT LEAST EVERY
SIX MONTHS, RIGHT?

**A.**   RIGHT.

**Q.**   AND WHY IS THAT?

**A.**   WELL, YOU WANT TO MANAGE THE PATIENT.  IT'S VERY
IMPORTANT.  THERE'S SOME DATA THAT YOU NEED TO LOOK AT IN A
TIMELY MANNER TO MAKE SURE THAT THESE PATIENTS ARE CONTROLLED.

**Q.**   AND LET ME ASK YOU, Y'ALL ARE TRACKING THESE PATIENTS AND
MAKING SURE THAT THEY GET SEEN EVERY SIX MONTHS?

**A.**   I DON'T KNOW ANYBODY ON COUMADIN THAT GETS SEEN EVERY SIX
MONTHS.  THESE PEOPLE GET SEEN EVERY TWO TO THREE WEEKS TO
EVERY TWO TO THREE MONTHS.

**Q.**   OKAY.  BUT Y'ALL ARE TRACKING THEM, ARE YOU NOT?

**A.**   WE ARE TRACKING THEM, YES.

**Q.**   IT TALKS ABOUT THE LABS THAT NEED TO BE DONE ANNUALLY.
WHY IS THAT?

**A.**   WELL, YOU JUST WANT TO MAINTAIN AN OVERALL IMPRESSION OF
HOW THE PATIENTS ARE DOING.  THE MOST IMPORTANT ONES ON THAT
PAGE WOULD BE THE PT AND THE I&R THAT ACTUALLY TELLS YOU THE
LEVEL OF ANTI-COAGULATION THAT YOU'RE ACHIEVING WITH YOUR
COUMADIN THERAPY.

**Q.**   OKAY.  AND EDUCATION AGAIN, IS THAT SOMETHING THAT'S DONE
AT ANGOLA?

**A.**   YES.

01:48    1    **Q.**    AND IS THAT DONE SIMILARLY TO WHAT WE'VE DESCRIBED WITH

2    RESPECT TO DIABETES?

3    **A.**    IT IS.

4    **Q.**    OKAY.  AND THEN, AGAIN, WE HAVE AN ANNUAL FLU AND

5    PNEUMONIA VACCINE.  WHY IS THAT?

6    **A.**    FOR THE SAME REASONS.  MOST OF THESE OFFENDERS THAT HAVE

7    THESE TYPE OF -- THAT NEED THIS TYPE OF THERAPY HAVE SOME

8    COMORBID CONDITIONS AND IT'S A PREVENTATIVE.

9    **Q.**    OKAY.  AND THIS ONE HAS SOMETHING DIFFERENT THAN DIABETES.

10    IT'S GOT CONSIDERATION FOR SPECIAL DUTY STATUS.  WHAT IS THAT

11    ABOUT?

12    **A.**    WELL, THIS IS ONE OF THE WAYS WHEN I WOULD COME IN, ALL

13    THESE OFFENDERS THAT ARE TAKING COUMADIN ARE AT RISK FOR

14    BLEEDING, AND YOU KNOW, SO I HAVE TO KEEP THEM OUT OF

15    SITUATIONS WHERE THERE MAY BE TOOLS, THERE MAY BE MACHINERY,

16    THERE MAY BE WAYS THAT THEY CAN CUT THEMSELVES.  BECAUSE IF

17    YOUR BLOOD IS REALLY THIN AND YOU CUT YOURSELF, YOU CAN HAVE

18    SOME ISSUES.

19    **Q.**    OKAY.  AND THE LAST ONE TALKS ABOUT SPECIAL DIET

20    CONSIDERATIONS.  WHAT KIND OF SPECIAL DIET CONSIDERATIONS IS

21    THERE FOR SOMEBODY ON COUMADIN?

22    **A.**    WELL, KEEP IT REAL SIMPLE.  BASICALLY THESE PEOPLE SHOULD

23    NOT BE EATING GREEN LEAFY VEGETABLES, AND AT ANGOLA, WE HAVE A

24    WIDE VARIETY OF GREEN LEAFY VEGETABLES THAT ARE SERVED AND SO

25    WE NEED TO EDUCATE THESE PEOPLE ACCORDINGLY.

01:49   1   **Q.**   AND PATIENTS THAT ARE ON COUMADIN THERAPY, WHAT KIND OF

2   CONDITIONS, WHAT CONCERNS DO YOU HAVE ABOUT THOSE PATIENTS

3   THAT -- THE KIND OF MEDICAL CONDITIONS THAT THEY MIGHT DEVELOP?

4   **A.**   WELL, THE ONES THAT WE TREAT, THERE ARE SOME DEEP VENOUS

5   THROMBOSIS, DVTS, PATIENTS WITH HEART CONDITIONS LIKE ATRIAL

6   FIBRILLATION, PATIENTS THAT HAVE HAD STENTS THAT REQUIRE

7   ANTI-COAGULATION, PATIENTS WITH PULMONARY EMBOLISMS.  JUST TO

8   NAME A FEW.

9   **Q.**   OKAY.  AND DVTS, I THINK YOU MENTIONED THAT, CORRECT?

10  **A.**   RIGHT.

11  **Q.**   YOU'VE HEARD THAT DISCUSSED IN THIS CASE SO FAR, HAVEN'T

12  YOU?

13  **A.**   YES.

14  **Q.**   OKAY.  LET'S LOOK AT PATIENT NO. 21 THAT HAD A DVT.  AND

15  AGAIN, I GOING TO -- I WANT TO KEEP IT STRAIGHTFORWARD.  I

16  DON'T WANT YOU TO GIVE ME OPINIONS.  I JUST WANT YOU TO TALK

17  ABOUT THE DOCUMENT ITSELF AND WHAT TREATMENT IS BEING GIVEN

18  HERE.  OKAY?

19  **A.**   YES.

20          **MS. MONTAGNES:**  AND YOUR HONOR, WE WOULD JUST OBJECT

21  AS TO HIM BEING ABLE TO TESTIFY THAT THIS TREATMENT WAS GIVEN.

22  HE CAN TESTIFY AS TO WHAT IS WRITTEN ON THE RECORD, BUT THAT'S

23  IT.

24          **THE COURT:**  OKAY.  I'M GOING TO TAKE IT AS WHAT IS

25  WRITTEN ON THE RECORD.  HE'S DESCRIBING WHAT WAS WRITTEN ON THE

1    RECORD.

2              YOU MAY PROCEED.

3    **BY MR. ROBERT:**

4    **Q.**    DOCUMENT J10-40838, AND TELL ME WHAT THIS DOCUMENT

5    REPRESENTS.

6    **A.**    THIS DOCUMENT IS A SICK CALL DATED 6/24/13.  WHAT'S THE

7    PATIENT NUMBER AGAIN?

8    **Q.**    PATIENT NO. 21.

9    **A.**    FROM PATIENT NO. 21.

10   **Q.**    DO YOU KNOW WHO PATIENT NO. 21 IS BECAUSE I CAN GIVE YOU

11   THAT LIST IF YOU NEED IT.

12   **A.**    I DO.

13   **Q.**    OKAY, GO.

14   **A.**    AND THIS IS A SICK CALL COMPLAINING OF PAIN IN THE LEFT

15   LEG AND ANKLE AND HE SAYS CAN'T PUT PRESSURE.

16   **Q.**    OKAY.  AND WHAT'S THE DATE OF THAT SICK CALL?

17   **A.**    6/24/13.

18   **Q.**    ALL RIGHT.  I'M GOING TO SHOW YOU THE NEXT DOCUMENT,

19   J10-40836.  DO YOU RECOGNIZE THIS DOCUMENT?

20   **A.**    I DO.  THAT'S A SICK CALL FROM PATIENT 21 DATED 6/30 OF

21   '13, COMPLAINED OF -- SELF-DECLARED EMERGENCY COMPLAINING OF A

22   SWOLLEN LEG.

23   **Q.**    OKAY.

24   **A.**    AND THE HIGHLIGHTED AREA, IT SAYS FOOT AND LEG SWELLING

25   SECONDARY TO BASKETBALL INJURY OVER A WEEK AGO.

1    Q.    OKAY.

2    A.    AND SO THIS PATIENT WAS SENT TO THE ATU.

3    Q.    OKAY.  NEXT DOCUMENT, J10-40834, WHAT DOES THIS DOCUMENT

4    REPRESENT?

5    A.    THIS IS AN EMERGENCY ROOM VISIT FROM 6/30 OF '13 FOR

6    PATIENT 21.  THE PARAMEDIC SAYS THE PATIENT INJURED LEG PLAYING

7    BASKETBALL TWO WEEKS AGO.

8    Q.    WHEN YOU SAY EMERGENCY ROOM VISIT, IS THIS AN OUTSIDE OR

9    IS IT AN ATU?

10    A.    IT'S AN ATU VISIT.

11    Q.    OKAY.  SO WE SAW THE SICK CALL DATED 6/30, SAME DAY HE'S

12    IN THE ATU, CORRECT?

13    A.    CORRECT.

14    Q.    THE NEXT DOCUMENT I HAVE IS J10-40833, AND TELL ME WHAT

15    THAT DOCUMENT REPRESENTS.

16    A.    THIS IS A CLINIC A VISIT, A PROBLEM FOCUSED VISIT, IT'S A

17    FOLLOW-UP FROM THE ATU LEG PAIN.

18    Q.    OKAY.  AND WHAT'S THE DATE OF THAT VISIT?

19    A.    7/8 OF '13.

20    Q.    OKAY.  AND WHO WOULD HAVE SEEN HIM ON THIS VISIT?

21    A.    WELL, THAT'S MY WRITING.  IT'S FOLLOW-UP LEFT LEG PAIN

22    FROM THE ATU, HURT HIS LEG WHILE PLAYING BASKETBALL.  THE

23    NAPROSYN THAT WAS GIVEN BACK THEN WAS INEFFECTIVE AND HE WAS

24    COMPLAINING OF PAIN IN THE MIDDLE LOWER LEG AND LATERALLY.

25    Q.    OKAY.  AND WHAT DID YOU DO?

**A.**   AND BASICALLY I ASSESSED HIM, AND I DIDN'T REALLY SEE ANY

SWELLING IN HIS KNEE, FROM HIS KNEE TO HIS ANKLE.  HE WAS

TENDER TO PALPATION ON HIS MID SHIN AND IT WAS LATERAL.  HE HAD

GOOD DORSAL FLEXION AND PLANTAR FLEXION OF HIS ANKLE, WAS

WITHIN NORMAL LIMITS.  AND HE HAD SOME PAIN WITH THE LATERAL

MOVEMENT OF HIS LEG -- OF HIS ANKLE, CONSISTENT WITH WHAT YOU

WOULD FIND SOMEBODY HAVING AN INJURY FROM BASKETBALL.

**Q.**   OKAY.  AND WHAT WAS YOUR PLAN WITH IT?

**A.**   WELL, I PUT HIM ON A MODIFIED MEDROL DOSE PACK, WHICH IS A

LITTLE STRONGER THAN NAPROSYN, AND IT'S AIMED AT -- THE

TREATMENT AIM IS TO GET THE INFLAMMATION OUT OF THE JOINTS IN

THE BODY.

**Q.**   OKAY.  I SHOW YOU THE NEXT ONE.  WE WERE AT JULY 8, 2013.

NOW WE'RE AT JULY 15, 2013.  TELL ME WHAT THIS DOCUMENT

REPRESENTS.

**A.**   THIS IS A CLINIC A FOLLOW-UP, PROBLEM FOCUSED VISIT, FROM

7/15 OF '13.

**Q.**   OKAY.  SO YOU WOULD HAVE SCHEDULED THAT FOLLOW-UP WHEN YOU

SAW HIM ON THE 8TH, WOULD THAT BE RIGHT?

**A.**   I DON'T KNOW.  I DIDN'T GET TO SEE.  YOU TOOK IT OFF FAST.

**Q.**   ALL RIGHT.  I CAN GO BACK TO IT AND SHOW IT TO YOU.

**A.**   I WOULD HAVE SCHEDULED A FOLLOW-UP, LIKE, SIX WEEKS.

**Q.**   SO HE'S ACTUALLY BACK A WEEK LATER?

**A.**   RIGHT.

          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  HE HAS NO

1   KNOWLEDGE OF WHY HE WAS SEEN IN THIS CLINIC WHEN HE WAS SEEN.

2   WE DON'T KNOW WHAT HAPPENED IN BETWEEN THOSE TWO THINGS.

3            **MR. ROBERT:**  AND I'M NOT ASKING HIM THAT, YOUR HONOR.

4            **THE COURT:**  OVERRULED.

5   **BY MR. ROBERT:**

6   **Q.**   OKAY.  HE'S SEEN AGAIN IN CLINIC A ON THE 15TH, AND WHAT

7   DOES THE NOTE INDICATE THERE?

8   **A.**   OKAY.  THIS IS DR. MACMURDO FROM CLINIC A.  HE SAYS "HE

9   STATES HE SPRAINED HIS ANKLE A MONTH AGO PLAYING BASKETBALL,"

10  AND HE REVIEWED THE X-RAYS IN THE ATU AND THEY WERE NEGATIVE.

11  THE PREDNISONE TAPER REALLY DIDN'T HELP HIM.

12  **Q.**   ALL RIGHT.  I DON'T WANT YOU TO GO INTO TOO MUCH DETAIL AS

13  FAR AS -- OR ANY DETAIL AS FAR AS THE TREATMENT IS CONCERNED.

14  **A.**   OKAY.

15  **Q.**   I JUST WANTED TO KNOW WHAT -- I THINK YOU'VE ANSWERED MY

16  QUESTION, SO I'M GOING TO STOP YOU.

17  **A.**   OKAY.

18  **Q.**   THE NEXT DOCUMENT I HAVE IS J10-40824, AND HERE WE ARE AT

19  8/21, AND TELL ME WHAT THIS INDICATES.

20  **A.**   THIS IS AN ULTRASOUND REQUEST FORM, AND IT SAYS REPEAT

21  ULTRASOUND IN FOUR WEEKS, LEFT LOWER EXTREMITY CALF DVT.

22  **Q.**   SO IT ENDS UP REPEAT IT IN FOUR WEEKS, CORRECT?

23  **A.**   RIGHT.

24  **Q.**   AND AT THIS POINT, IT INDICATES THAT DVT ON THERE, RIGHT?

25  **A.**   RIGHT.

Q.   THE NEXT ONE, J10-40823, AND TELL ME WHAT THIS DOCUMENT
REPRESENTS.
A.   THIS IS AN ULTRASOUND REPORT THAT'S DONE ON THE GROUNDS OF
ANGOLA, AND THE IMPRESSION WAS A DEEP VENOUS THROMBOSIS THAT
REMAINS LIMITED TO THE CALF.
Q.   OKAY.  THE NEXT ONE I HAVE IS A VISIT A COUPLE OF WEEKS
LATER, AND I THINK THAT'S YOUR INITIALS AT THE BOTTOM, ISN'T
IT?
A.   YES.
Q.   ALL RIGHT.  SO YOU WOULD HAVE SEEN THIS PATIENT, CORRECT?
A.   YES.
Q.   AND WHAT KIND OF VISIT WAS THIS?
A.   THIS WAS A FOLLOW-UP VISIT FROM THE WARD DISCHARGE, AND IT
SAYS RECENTLY SEEN ON THE WARD FOR DVT.
Q.   OKAY.  AND WHAT, IF ANYTHING, DID YOU DO?
A.   WELL, HE HAD A SUBTHERAPEUTIC COUMADIN LEVEL AT THAT TIME.
THEORETICALLY YOU'D LIKE TO KEEP THE INR BETWEEN PERFECTLY AT
TWO AND A HALF.  TWO TO THREE WOULD BE ACCEPTABLE.  BUT HIS INR
WAS 1.9, SO I GAVE HIM A BOOSTER DOSE OF COUMADIN.
Q.   OKAY.  AND JUST FOR THE RECORD, THAT'S JOINT EXHIBIT
10-40820.
        TWO WEEKS LATER, 9/17/13, THIS IS JOINT EXHIBIT
10-40814.  WHAT DOES THIS DOCUMENT REPRESENT?
A.   IT'S A CLINIC VISIT, A CLINIC A VISIT.  DR. MACMURDO SEES
THE PATIENT ON 9/17 OF '13 AND HAS PATIENT WITH A LEFT DVT.

01:58    1    "DISCUSSED WITH PATIENT THE RESULTS OF THE DOCTORS' A.M.

2    MEETING AND WILL OBSERVE ON UNIT 1 AND GET INR THERAPEUTIC."

3    **Q.**   OKAY.  DO YOU RECALL DISCUSSING THIS AT THE DOCTORS'

4    MEETING?

5    **A.**   I DON'T.

6    **Q.**   OKAY.  DOES THIS DOCUMENT INDICATE THAT IT WAS DISCUSSED

7    AT THE MEETING?

8    **A.**   IT DOES.

9    **Q.**   THE NEXT DOCUMENT, I THINK THIS HAS GOT YOUR NAME ON THE

10   BOTTOM OF IT.  DOES IT NOT?

11   **A.**   IT DOES.

12   **Q.**   AND WHAT IS THIS DOCUMENT?

13   **A.**   WELL, THIS IS A REFERRAL.  PATIENT WITH HISTORY OF DVT,

14   LEFT LOWER EXTREMITY, READMITTED FOR SWELLING.  NEEDS REPEAT

15   ULTRASOUND.  LIKE WE MENTIONED BEFORE, ALL REQUESTS FOR OUTSIDE

16   SERVICES NOT ONLY HAVE TO BE SIGNED BY THE DOCTOR, BUT THEY

17   HAVE TO BE CO-SIGNED BY ME.  AND SO THAT'S WHY MY SIGNATURE'S

18   ON THAT DOCUMENT.

19   **Q.**   OKAY.  AND WHY WOULD YOU APPROVE A REPEAT ULTRASOUND HERE?

20   **A.**   BECAUSE HE'S NOT COMPLETELY WELL YET.

21   **Q.**   THE NEXT DOCUMENT, J10-40805, AND IT'S DATED 9/29/13.

22   TELL ME WHAT THIS DOCUMENT IS ABOUT.

23   **A.**   THIS IS A DOCUMENT FROM LSU HOSPITAL IN NEW ORLEANS DATED

24   9/29 OF '13, AND IT SAYS "REASON FOR EVALUATION:  29-YEAR-OLD

25   MALE SEEN FOR LEG SWELLING.  PERTINENT H&P:  HE HAS A DVT IN

1  THE LEFT POPLITEAL VEIN THAT WAS DIAGNOSED A MONTH AGO."  IT

2  DOCUMENTS THAT HE'S ADEQUATELY ANTI-COAGULATED.  THE DVT IS NOT

3  SPREADING, NOT PROPAGATING.

4  **Q.**   OKAY.  WELL, THREE DAYS LATER, WE GOT ANOTHER VISIT, I

5  THINK.  TELL ME WHAT THIS IS.

6  **A.**   SO THIS IS A COUMADIN CLINIC VISIT ON 10/2 OF '13.  THIS

7  IS DR. TOCE SEEING THIS PATIENT.  LEFT LOWER EXTREMITY DVT.

8  8/21 OF '13.  GOAL IS TWO TO THREE.  NOW HE'S DISCUSSING HIS

9  INR.  THE GOAL IS TWO TO THREE FOR A YEAR, AND HE DOCUMENTS 9/3

10  OF '13, HIS INR WAS 1.9.  THAT'S WHEN WE GAVE HIM THE BOOSTER.

11  THEN 9/4 OF '13, IT WAS 2; 9/16 OF '13, IT WAS 2; 9/18 OF '13,

12  IT WAS 2.1; AND TODAY IN CLINIC, IT'S 1.4, WHICH IS VERY

13  SUBTHERAPEUTIC.

14  **Q.**   OKAY.  AND THAT'S JOINT EXHIBIT 10-40802.

15         ALL RIGHT.  WE'RE GETTING CLOSE TILL THE END OF THIS.

16  I APOLOGIZE FOR ALL THESE DOCUMENTS.

17         THE NEXT ONE IS J10-40801.  IT'S A FEW DAYS LATER ON

18  10/8/13.  I THINK YOUR NAME IS ON THE BOTTOM OF THIS ONE,

19  RIGHT?

20  **A.**   IT IS.

21  **Q.**   TELL ME WHAT THIS IS.

22  **A.**   WELL, THIS PARTICULAR DAY I WAS WORKING IN THE CLINIC AND

23  I SAW HIM ON A FOLLOW-UP AND SEE HE'S CURRENTLY ON 7 MILLIGRAMS

24  OF COUMADIN.  HE WAS STILL HAVING PAIN WITH WALKING.  I

25  MEASURED HIS LEGS.  HIS LEFT LEG WAS 18 INCHES.  THE SAME SPOT

02:01   1   ON HIS RIGHT LEG WAS 16 AND A HALF INCHES, BUT HIS INR AT THIS

2   TIME WAS THERAPEUTIC, AND SO I REFERRED HIM BACK TO THE

3   COUMADIN CLINIC THE NEXT DAY.

4   **Q.**   OKAY.  AND THE LAST DOCUMENT I HAVE ON THIS IS J10-40765,

5   AND TELL ME WHAT THIS DOCUMENT IS.

6   **A.**   THIS IS A DOCUMENT FROM LSU HOSPITAL DATED 10/28 OF '13.

7   **Q.**   OKAY.  AND WHAT DOES THIS DOCUMENT INDICATE?

8   **A.**   THIS IS A CLINIC VISIT WHERE HE WAS SENT BACK TO THE

9   HOSPITAL BECAUSE THERE WERE NO IMPROVEMENT, AND THEY DID A CT

10   SCAN AND THEY DISCOVERED THAT HE HAD POSSIBLE METASTASIS.

11   **Q.**   OKAY.  AND SO THIS ONE INDICATES THAT THERE'S POSSIBLE

12   CANCER, RIGHT?

13   **A.**   IT INDICATES THE POSSIBILITY OF CANCER.

14   **Q.**   ALL RIGHT.  AND THEN THE NEXT ONE IS, AND THIS IS I THINK

15   PART OF THE SAME DOCUMENT, IT'S DATED J10-40750.  WHAT DOES

16   THAT INDICATE?

17   **A.**   AGAIN, THIS IS THE FIRST PART OF THAT CLINIC VISIT WHERE

18   THEY DO THE SUBJECTIVE PART OF THE EXAM, AND WE SAY IT'S LIKELY

19   OSTEOSARCOMA ARISING FROM THE LEFT PROXIMAL TIBIA, WITH METS TO

20   THE LUNG AND BRAIN.

21   **Q.**   OKAY.  LET'S MOVE ON TO ANOTHER CHRONIC CARE GUIDELINE.

22   JOINT EXHIBIT 8-02703, AND TELL ME WHAT THAT DOCUMENT IS.

23   **A.**   BASICALLY THESE ARE CHRONIC CARE GUIDELINES FOR SEIZURES.

24   **Q.**   OKAY.  AND WHAT TYPES OF SEIZURES DOES THIS GUIDELINE

25   ADDRESS?

0 2 : 0 3

1   **A.**   THIS GUIDELINE ADDRESSES ALL SEIZURES.  AN IMPORTANT THING

2   TO REMEMBER IS THAT WE DO HAVE A NEUROLOGIST THAT COMES EVERY

3   WEEK TO ANGOLA, AND EVERY SEIZURE PATIENT THAT WE HAVE IS IN

4   HIS CLINIC.

5   **Q.**   AND WHY ARE SEIZURES SINGLED OUT AS SOMETHING THAT NEEDS

6   TO BE ADDRESSED AS A CHRONIC CARE ISSUE?

7   **A.**   WELL, BECAUSE SEIZURES NEED TO BE CONTROLLED AND SOME OF

8   THE MEDICINES THAT ARE USED TO CONTROL THOSE SEIZURES, THEY

9   NEED TO BE MONITORED.

10   **Q.**   OKAY.  AND ITEM 1 ON HERE SAYS THE PATIENT NEEDS TO BE

11   SEEN EVERY -- AT LEAST EVERY SIX MONTHS.  WHY IS THAT?

12   **A.**   WELL, YOU WANT TO MAINTAIN SOME LEVEL OF CONTROL OVER

13   THOSE PATIENTS, SEE HOW OFTEN THEY'RE HAVING SEIZURES, ARE THEY

14   HAVING ANY DIFFICULTIES WITH THEIR MEDICATIONS, JUST SOME

15   GENERAL OVERALL KNOWLEDGE YOU WOULD WANT ABOUT THE PATIENT.

16   **Q.**   OKAY.  AND ITEM 2 SAYS THAT LABS SHOULD BE DONE AT LEAST

17   ANNUALLY.  WHAT'S THE REASON FOR THAT?

18   **A.**   WELL, SOME OF THESE DRUGS AFFECT THE KIDNEYS, SOME OF THEM

19   AFFECT THE LIVER.  SOME OF THEM DON'T EVEN NEED TO BE

20   MONITORED, BUT YOU STILL WANT TO GET AN OVERALL IMPRESSION OF

21   HOW THE PATIENT'S DOING BY MONITORING THESE LAB TESTS.

22   **Q.**   OKAY.  AND ITEM NO. 4 TALKS ABOUT SPECIAL DUTY STATUS.

23   WHY WOULD THAT BE IMPORTANT?

24   **A.**   WELL, AGAIN, THIS IS WHERE I COME IN.  OFFENDERS THAT HAVE

25   SEIZURE DISORDERS NEED TO BE IN SITUATIONS WHERE IF THEY DO

02:05

1   HAVE A SEIZURE WHILE THEY'RE AT WORK, IT REALLY DOESN'T AFFECT

2   THEM.  SO BASICALLY OUR SEIZURE PRECAUTION DUTY STATUS WOULD

3   CONSIST OF AWAY FROM MOVING MACHINERY, NO KITCHEN, NO WORKING

4   OVER 3 FEET, YOU CAN'T CLIMB OVER 3 FEET, THEY HAVE TO HAVE A

5   BOTTOM BUNK, YOU KNOW, THINGS LIKE THAT, AWAY FROM THE ROAD.

6   THEY HAVE TO BE KEPT IN THE -- UNDER SUPERVISION WHILE THEY'RE

7   WORKING AS WELL, SO IF A GUY HAS A SEIZURE AND HE FALLS INTO A

8   SAW, WELL, THEN THAT WOULD NOT BE TOO GOOD OF A THING.  SO WE

9   KEEP THEM AWAY FROM THOSE KIND OF ENVIRONMENTS.

10  **Q.**    OKAY.  AND ARE SEIZURE PATIENTS SEEN, TREATED REGULARLY IN

11  THE CLINIC AS PART OF YOUR CHRONIC CARE FOLLOW-UP?

12  **A.**    THEY ARE.

13  **Q.**    THE NEXT CHRONIC CARE AREA THAT I HAVE IS J8-02704.  TELL

14  ME WHAT THIS IS.

15  **A.**    THAT'S A CHRONIC CARE GUIDELINE FOR COPD/CHF.

16  **Q.**    OKAY.  WHAT'S COPD?

17  **A.**    THAT'S CHRONIC OBSTRUCTIVE PULMONARY DISEASE.  BASICALLY A

18  DISEASE OF THE LUNGS WHERE THERE'S DIFFICULTY IN BREATHING AND

19  MAINTAINING YOUR OXYGEN SATURATION BECAUSE OF OBSTRUCTIVE

20  AIRWAYS.

21  **Q.**    AND WHAT'S CHF?

22  **A.**    THAT'S CONGESTIVE HEART FAILURE WHICH IS BASICALLY, IN A

23  NUTSHELL, THAT YOUR HEART IS YOUR PUMP AND IT BECOMES SO WEAK

24  THAT IT CAN'T PUMP THE BLOOD.  AND IF IT'S A FAILURE ON THE

25  LEFT SIDE, YOU GET BACK UP INTO THE LUNGS.  IF IT'S A FAILURE

02:06   1   ON THE RIGHT SIDE, YOU GET BACK UP INTO THE EXTREMITIES.  SO

2   CONGESTIVE HEART FAILURE.

3   **Q.**   AND WHY ARE THESE TWO CONDITIONS TREATED TOGETHER IN YOUR

4   CHRONIC CARE GUIDELINES?

5   **A.**   WELL, A LOT OF TIMES THESE GO TOGETHER.  AND WHEN PEOPLE

6   HAVE SHORTNESS OF BREATH AND THEY HAVE HEART ISSUES, THERE ARE

7   TIMES WHEN THEY INTERACT WITH EACH OTHER.

8   **Q.**   OKAY.  AND THE CHRONIC CARE GUIDELINES INDICATE THAT THE

9   PATIENT NEEDS TO BE SEEN AT LEAST EVERY SIX MONTHS; IS THAT

10   CORRECT?

11   **A.**   YES.

12   **Q.**   AND WHY IS THAT?

13   **A.**   AGAIN, THESE ARE PATIENTS THAT YOU WANT TO KEEP A CLOSE

14   EYE ON.

15   **Q.**   OKAY.  AND ARE YOU TRACKING THAT AT ANGOLA AND DOING THAT?

16   **A.**   YES.

17   **Q.**   OKAY.  AND IT SAYS THAT THE LABS SHOULD BE DONE AT LEAST

18   ANNUALLY.  WHY IS THAT?

19   **A.**   AGAIN, JUST LIKE THE OTHER CHRONIC CARE PATIENTS, THESE

20   PATIENTS HAVE A TENDENCY TO GET SICK IF THEY'RE NOT SICK AND

21   YOU WANT TO MAINTAIN A HANDLE ON THEIR LABORATORIES AND YOU

22   WANT TO HAVE A BASELINE IN CASE THEY DO GET SICK, YOU HAVE A

23   COMPARISON.

24   **Q.**   OKAY.  AND WHAT ABOUT FLU AND PNEUMONIA VACCINES, WHY IS

25   THAT?

02:07  1   **A.**    SURE.   AGAIN, THAT'S PREVENTATIVE.   IF THESE PATIENTS GET
       2   SICK, ESPECIALLY IF A COPD-ER GETS PNEUMONIA OR A CHF-ER GETS
       3   PNEUMONIA IT CAN THROW THEM INTO SOME BAD SITUATIONS THAT COULD
       4   BE DANGEROUS FOR THEM.
       5   **Q.**    OKAY.   AND WHY WOULD THEY HAVE SPECIAL DIET
       6   CONSIDERATIONS?
       7   **A.**    WELL, YOU KNOW, IT WOULD BE MORE INCLINED FOR A CHF-ER.
       8   THEY SHOULDN'T BE EATING A WHOLE LOT OF SALT.   YOU KNOW, SALT
       9   IS THEIR ENEMY, AND WE TRY TO COUNSEL THEM ON LIMITING THEIR
      10   DIET WITH SALT.
      11   **Q.**    OKAY.   AND THEN THE LAST ITEM IS DUTY STATUS.   IS THAT
      12   SOMETHING THAT IS REVIEWED?
      13   **A.**    I REVIEW THOSE.   I TEND TO BE A LOT MORE LENIENT ON THESE
      14   GENTLEMEN BECAUSE IF YOU CAN'T BREATHE, IT'S VERY LIKELY YOU
      15   CAN'T DO STRENUOUS JOBS, SO I LOOK AT THEIR CASES VERY CLOSELY
      16   AND I TRY TO BE FAIR WITH ALL OF THEM.
      17   **Q.**    LET ME ASK YOU, WHEN YOU'RE SEEING A PATIENT IN THE CLINIC
      18   AND HE COMES IN AND HE'S GOT COPD, HOW DO YOU INTERACT?   HOW DO
      19   YOU USE THESE GUIDELINES ON A TYPICAL VISIT WHEN YOU SEE THEM?
      20   **A.**    WELL, YOU JUST MAKE SURE THEIR LABS ARE UP-TO-DATE.   ONE
      21   OF THE ADVANTAGES THAT WE HAVE AT ANGOLA IS WE HAVE A
      22   RESPIRATORY THERAPIST THAT'S ON SITE FULL TIME, AND SO HE KNOWS
      23   EVERY ONE OF THESE PATIENTS INSIDE AND OUT.   HE'S DONE
      24   PULMONARY FUNCTIONS ON THEM SEVERAL TIMES, SO WE USE HIM ALSO
      25   AS A GUIDE TO TELL US HOW THEY'RE DOING IN THEIR DISEASE.   IF A

02:09  1  GUY IS NOT BEING COMPLIANT WITH HIS INHALERS, IT'S PROBABLY NOT

2  EXPECTED THAT HE'S GOING TO BE DOING VERY WELL.  SO WE USE

3  THESE GUIDELINES TO NOT ONLY TRACK THE PATIENT, BUT ALSO TO

4  EVALUATE THEM AS FAR AS THEIR INHALER USE, WE EVALUATE THEM AS

5  FAR AS WHAT THEIR RESPIRATORY CARE HAS BEEN AND WHAT'S

6  CONSIDERED ALONG THOSE LINES.

7  Q.   I WANT TO QUICKLY LOOK AT ONE OF THESE PATIENTS THAT WAS

8  IN -- WOULD HAVE BEEN IN YOUR COPD/CHP CLINIC -- CHF CLINIC.

9  MY APOLOGIES.  AND IT'S PATIENT NO. 13.  DO YOU KNOW WHO

10  PATIENT NO. 13 IS?

11  A.   I DO.

12  Q.   LET ME SHOW YOU A DOCUMENT DATED 10/21/14.  TELL ME WHAT

13  THIS DOCUMENT IS.

14  A.   WELL, THIS IS AN OUTSIDE LSU VISIT FOR THAT OFFENDER DATED

15  10/21 OF '14.

16  Q.   AND AT THE BOTTOM OF THE PAGE WE GOT HIGHLIGHTED, "ALREADY

17  ON MAX MEDICAL THERAPY."  DO YOU SEE THAT?

18  A.   I DO.

19  Q.   AND WHAT DOES IT INDICATE THAT THE -- WHAT THERAPY THE

20  PATIENT WAS ON.

21  A.   WELL, HE WAS ON ASTATIN, HE WAS ON ASPIRIN, AND HE WAS ON

22  PLAVIX.

23  Q.   OKAY.  AND WHEN PLAINTIFFS' EXPERT TESTIFIED, HE INDICATED

24  THAT THIS PATIENT'S HEART ATTACK WOULD BE PREVENTIBLE IF HE HAD

25  BEEN ON STATIN.  DO YOU RECALL HEARING THAT?

**A.**   YES.

          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  TO THE EXTENT

HE'S NOW GOING TO BE ASKED TO RENDER AN OPINION ABOUT THE

PLAINTIFFS' EXPERT'S CONCLUSION --

          **MR. ROBERT:**  I'M NOT.

          **MS. MONTAGNES:**  IT SOUNDS VERY CLOSE TO IT.

          **MR. ROBERT:**  I'M NOT GOING TO ASK HIM ANY OPINION.

          **THE COURT:**  YOU'RE A QUESTION OR TWO PREMATURE.

OVERRULED.

          CONTINUE.

**BY MR. ROBERT:**

**Q.**   DOES THIS DOCUMENT INDICATE THAT THIS PATIENT WAS ON

STATIN?

**A.**   IT DOES.

**Q.**   THANK YOU.

          THE NEXT DOCUMENT.

**A.**   THIS IS A REFERRAL TO OUR LADY OF THE LAKE HOSPITAL.

**Q.**   OKAY.

**A.**   AND IT SAYS "51-YEAR-OLD BLACK MALE, STATUS POST MI,

STEMI, WHICH STANDS FOR ST ELEVATION, MI, WHICH IS A HEART

ATTACK, ON 9/18 OF '14.  RETURNED TO LSP 9/19 OF '14, NOW

DEVELOPS EPIGASTRIC PAIN, LEFT NECK PAIN THIS A.M. WITH NO

RELIEF WITH NITROGLYCERIN AND OXYGEN.  EKG SHOWED PROBABLE

PERICARDITIS WITH A RUB OVER THE LEFT PERICARDITIS AREA."

**Q.**   OKAY.

1    **A.**    AND SO THEY SENT HIM TO OUR LADY OF THE LAKE.

2    **Q.**    AND SO THIS DOCUMENT IS, FOR THE RECORD, J10-61535.

3            THE NEXT ONE IS J10-61323.  TELL ME WHAT THIS

4    DOCUMENT REPRESENTS.

5    **A.**    THIS IS A REFERRAL TO THE CARDIOLOGY CLINIC THAT IS DATED

6    1/3 OF '15.  IT SAYS "THE PATIENT IS STATUS POST STEMI, WHICH

7    IS A HEART ATTACK, 12/17 OF '14 WITH STENT PLACED.  HE'S ALSO

8    HAD A HISTORY OF MI IN '13, NOW WITH TWO STENTS.  HE'S GOT

9    SIGNIFICANT P-A-D AND HE SMOKES.  PLEASE EVALUATE HIM."

10   **Q.**    AND WHOSE SIGNATURE IS THAT ON THERE?

11   **A.**    THAT'S MINE.

12   **Q.**    SO YOU WOULD HAVE DONE THIS REFERRAL?

13   **A.**    I DID.

14   **Q.**    THE NEXT ONE, J10-61255, TELL ME WHAT THIS DOCUMENT

15   REPRESENTS.

16   **A.**    WELL, I KNOW THIS IS A TELEMED DOCUMENT.  IT SAYS "CHECK

17   ECHO FOR SYSTOLIC FUNCTION, MAY BE HAVING SYMPTOMS OF HEART

18   FAILURE."

19   **Q.**    OKAY.

20   **A.**    THEY CONTINUED HIS MEDICATION, COREG AND LOSARTAN, AND

21   THEY RECOMMENDED CONTINUE SMOKING CESSATION.

22   **Q.**    OKAY.  AND DOES THIS DOCUMENT INDICATE WHETHER THIS

23   PATIENT WAS ON STATIN OR NOT?

24   **A.**    IT DOES.  IT SAYS "STABLE ON ASPIRIN, STATIN, AND PLAVIX."

25   **Q.**    OKAY.  AND IS SMOKING CESSATION, IS THAT WHAT WE TALKED

1  ABOUT EARLIER ABOUT WHAT ANGOLA HAS DONE TO TRY TO HELP THESE

2  OFFENDERS GET OFF OF TOBACCO?

3  **A.**   YES.

4  **Q.**   AND THAT WAS BEING DONE WITH RESPECT TO THIS PATIENT,

5  CORRECT?

6  **A.**   WELL, THIS PATIENT HAD TWO THINGS GOING ON.  HE HAD THE

7  SMOKING CESSATION PATCHES, BUT HE WAS ALSO BEING TREATED BY

8  MENTAL HEALTH WITH A MEDICATION CALLED WELLBUTRIN WHICH HAS

9  ALSO BEEN SHOWN TO BE EFFECTIVE FOR SMOKING CESSATION.

10  **Q.**   JUST A COUPLE MORE AND WE'LL GET ON WITH IT.  JOINT

11  EXHIBIT 10-61252, TELL ME WHAT THIS DOCUMENT IS.

12  **A.**   WELL, THIS IS A DOCUMENT THAT WAS WRITTEN BY DR. COLON.

13  REMEMBER WE TALKED ABOUT DR. COLON.  AT THIS TIME ON OUR STAFF,

14  WE HAD A CARDIOLOGIST.  AND SO WE REFERRED THIS PATIENT TO DR.

15  COLON, AND HE SAYS "51 YEAR OLD WITH ISCHEMIC CARDIOMYOPATHY,

16  PERIPHERAL ARTERIAL DISEASE, AND HE MAY NEED A DEFIBRILLATOR."

17  SO HE WANTED ANOTHER ECHO ON THE OFFENDER.

18  **Q.**   OKAY.  AND THEN THE NEXT DOCUMENT, JOINT EXHIBIT 10-61240,

19  CAN YOU TELL ME WHAT DOCUMENT IS?

20  **A.**   THAT'S A ECHOCARDIOGRAM REPORT.

21  **Q.**   OKAY.  AND YOUR NAME IS ON THERE?

22  **A.**   MY NAME IS ON THERE AT THE BOTTOM WHERE I WENT OVER THAT

23  REPORT.

24  **Q.**   SO THIS WOULD HAVE INDICATED THAT YOU DID REVIEW THIS

25  REPORT?

1    **A.**    IT DOES.

2            **MR. ROBERT:**    YOUR HONOR, I DON'T WANT TO BE BORE THE

3    COURT GOING THROUGH -- THERE'S A WHOLE BUNCH OF SPECIALTY

4    VISITS.    IF I CAN JUST GIVE THE COURT THE BATES NUMBERS FOR

5    THOSE JUST SO THE RECORD WILL INDICATE IT FOR YOUR REVIEW,

6    WOULD THAT BE ACCEPTABLE TO YOU?

7            **THE COURT:**    YES.

8            **MR. ROBERT:**    OKAY.    BATES NO. J10-61207; NEXT ONE

9    J10-61189; NEXT ONE J10-61180; NEXT ONE J10-61086; NEXT ONE

10    J10-61136; NEXT ONE J10-61140.

11            YOUR HONOR, I ALSO HAVE A NUMBER OF CESSATION

12    SMOKING EFFORTS DONE BY LSP, AND IF YOU WOULD INDULGE ME IF I

13    COULD READ THOSE BATES NUMBERS INTO THE RECORD, I'D LIKE TO DO

14    THAT.

15            **THE COURT:**    PROCEED.

16            **MR. ROBERT:**    OKAY.    IT'S BATES NO. J10-61237; 610-J1

17    -- I MEAN, EXCUSE ME -- J10-61236; J10-61185; J10-61184;

18    J10-61211.

19    **BY MR. ROBERT:**

20    **Q.**    OKAY.    I HAVE ANOTHER PATIENT THAT'S IN THE COPD CLINIC,

21    AND I'D LIKE TO TAKE A MINUTE AND JUST GO OVER A FEW THINGS

22    WITH THIS PATIENT.    IT'S PATIENT NO. 14.    DO YOU KNOW WHO

23    PATIENT NO. 14 IS?

24    **A.**    I DO.

25    **Q.**    OKAY.    I SHOW YOU A DOCUMENT, J10-30187, CAN YOU TELL ME

1  WHAT THIS DOCUMENT IS?

2  **A.**   THAT'S A RETURN TRIP PAPERWORK DATED 3/4 OF '15.  IT SAYS

3  "THIS PATIENT DEVELOPED CHEST PAIN, WAS ADMITTED FOR ISCHEMIA,

4  HEART CATH DONE ON MONDAY WITH STENT PLACEMENT.  ADMITTED TO

5  NURSING UNIT 1 FOR OBSERVATION BUT HE SIGNED A REFUSAL."

6  **Q.**   OKAY.  SO THIS DOCUMENT INDICATES THAT HE WAS GOING TO BE

7  ADMITTED TO NURSING UNIT 1, BUT HE REFUSED, CORRECT?

8  **A.**   YES.

9  **Q.**   AND I SHOW YOU DOCUMENT J10-30188, DATED 3/3/15, TELL ME

10  WHAT THAT DOCUMENT REPRESENTS.

11  **A.**   THAT'S A SIGNED REFUSAL.  IT SAYS HE'S NOT STAYING ON THE

12  WARD.  "THEY KEPT ME LONG ENOUGH IN NEW ORLEANS."

13  **Q.**   OKAY.  IS THAT YOUR SIGNATURE DOWN ON THE BOTTOM THERE?

14  **A.**   THAT IS.

15  **Q.**   OKAY.  DOCTOR, WHAT IS THIS?

16  **A.**   THAT'S BASICALLY A SYNOPSIS OF OUTSIDE APPOINTMENTS THAT

17  THE OFFENDER HAD.

18  **Q.**   OKAY.  AND IT'S J10-30063.  CAN YOU TELL FROM LOOKING AT

19  THIS DOCUMENT WHY THIS PATIENT'S CATARACT SURGERY WAS DELAYED?

20  **A.**   WELL, IT WAS CANCELLED PER ILH, 5/5 OF '15.

21  **Q.**   AND WHAT IS ILH?

22  **A.**   THAT WOULD HAVE BEEN THE INTERIM HOSPITAL AT THAT TIME

23  THAT WOULD HAVE BEEN DOING THE CATARACT SURGERY.

24  **Q.**   OKAY.  THE NEXT DOCUMENT IS J10-30131, AND TELL ME WHAT

25  THIS DOCUMENT IS.

**A.**   THIS IS A MEDICINE CLINIC VISIT WITH DR. TOCE DATED 5/5 OF '15.

**Q.**   OKAY.  DOES THIS DOCUMENT INDICATE ANY ISSUES WITH COMPLIANCE WITH MEDICATION?

**A.**   IT'S HIGHLIGHTED AS QUESTIONABLE COMPLIANCE.

**Q.**   OKAY.

        **MS. MONTAGNES:**  AND YOUR HONOR, JUST FOR THE RECORD, I WOULD OBJECT TO THAT.  IT SAYS COMPLIANCE QUESTION MARK.

        **MR. ROBERT:**  ALL RIGHT.

        **THE COURT:**  NOTED.

**BY MR. ROBERT:**

**Q.**   OKAY.  NEXT DOCUMENT IS J10-30077, AND WHAT IS THIS DOCUMENT?

**A.**   AGAIN, THIS IS A GENERAL MEDICINE CLINIC APPOINTMENT WITH DR. TOCE.

**Q.**   OKAY.  AND DOES THIS DOCUMENT INDICATE A REFUSAL?

**A.**   IT DOCUMENTS A REFUSAL OF 6/18 OF '15.  "REFUSED TRIP FOR CTA, ABDOMINAL AORTOGRAM WITH WRITE-OFF."

**Q.**   WHAT'S A CTA?

**A.**   IT'S A SPECIAL CT SCAN WHERE THEY TRY TO EXAMINE THE BLOOD VESSELS A LOT CLOSELY USING A DYE.

**Q.**   AND WHAT, IF ANYTHING, DOES A CTA, HAVING THAT DONE PROVIDE -- WHAT INFORMATION DOES THAT PROVIDE TO YOU AS A PHYSICIAN?

**A.**   WELL, IF YOU HAVE PERIPHERAL VASCULAR DISEASE, IT COULD

02:21    1    TELL YOU THE EXTENT OF YOUR PERIPHERAL VASCULAR DISEASE.

2    **Q.**    OKAY.  I SHOW YOU DOCUMENT J10-30077, AND IT'S DATED

3    1/28/16, WHAT IS THIS DOCUMENT?

4    **A.**    AGAIN, THIS IS A GENERAL MEDICINE CLINIC APPOINTMENT WITH

5    DR. TOCE 1/28 OF '16.

6    **Q.**    OKAY.  DOES THIS DOCUMENT INDICATE ANYTHING ABOUT

7    REFUSALS?

8    **A.**    IT DOCUMENTS THAT HE REFUSED THE LAB, BUT HE CLAIMS IT WAS

9    DONE YESTERDAY.  DOCUMENTS THAT HE'S NOT TAKING ONE MEDICINE

10    CALLED ISOSORBIDE NITRATE, THAT ISDN.

11    **Q.**    OKAY.

12    **A.**    AND IT WAS DISCONTINUED.  AND IT DOCUMENTS HIS BLOOD

13    PRESSURE WAS MUCH BETTER, CONSISTENT WITH INCREASED COMPLIANCE,

14    AND THAT HE WAS UNABLE TO TAKE STATIN, WHICH IS WHAT WE'VE BEEN

15    TALKING ABOUT, AND SO THEY PLACED HIM ON FISH OIL.

16    **Q.**    OKAY.  DOCUMENT NO. --

17    **A.**    AND THIS IS --

18    **Q.**    WAIT, WAIT, WAIT.  LET ME GET THE NUMBER IN, J10-30026,

19    OKAY, AND TELL ME WHAT THIS DOCUMENT IS.

20    **A.**    THIS IS A DOCUMENT DATED 2/18 OF '16 WHERE PATIENT 21, IS

21    THAT WHAT HIS NUMBER IS?

22    **Q.**    YES.

23    **A.**    WHERE PATIENT 21 REFUSED HIS TRIP MEDICINES.

24    **Q.**    WAIT, LET ME CORRECT, PATIENT 14.

25    **A.**    PATIENT 14.

02:23    1        WHAT HAPPENS IS IN THE MORNING BEFORE THEY GO ON A

2    TRIP, IF THEY HAVE MORNING MEDICINES WHEN THEY GO TO THE ATU,

3    THEY GET THOSE MEDICATIONS BEFORE THEY GO ON THEIR TRIP, AND

4    THIS IS A REFUSAL FOR THOSE MEDICINES.

5        **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  HE HAS NO

6    IDEA WHAT HAPPENED THAT MORNING.  AND TO THE EXTENT THIS IS

7    CUMULATIVE, YOU KNOW, THEY'RE JUST GOING BACK THROUGH

8    EVERYTHING THEY WENT THROUGH WITH THE EXPERTS LAST WEEK.  IT'S

9    CUMULATIVE EVIDENCE.  YOU KNOW, HE HAS NO IDEA WHAT HAPPENED

10    THAT MORNING.

11        **MR. ROBERT:**  DO YOU WANT ME TO RESPOND?

12        **THE COURT:**  NO.  YOUR OBJECTION IS NOTED.  YOU MAY

13    PROCEED.

14    **BY MR. ROBERT:**

15    **Q.**    THIS DOCUMENT, DOES IT DOCUMENT THAT THIS PATIENT WAS

16    COUNSELED ABOUT THAT REFUSAL?

17    **A.**    SURE.  THIS IS WRITTEN BY SANDY MCCLURE, WHICH WAS ONE OF

18    MY PARAMEDICS.  IT SAYS THAT HE REFUSED HIS TRIP MEDS, SAID HE

19    ONLY TAKES HIS BLOOD PRESSURE MEDICINE AT NIGHT.  SHE SAYS THE

20    PATIENT ADVISED THE REFUSAL COULD LEAD TO FURTHER INJURY AND

21    POSSIBLE DEATH.

22    **Q.**    OKAY.  I GOT ONE MORE PATIENT, AND IT'S GOING TO BE REALLY

23    QUICK.  I PROMISE, YOUR HONOR, AT LEAST ON THIS SUBJECT MATTER,

24    PUT IT THAT WAY.

25        THIS IS PATIENT NO. 28, AND HE WAS A COPD/CHF CLINIC

02:25  1  PATIENT, AND I BELIEVE HE HAD EYE ISSUES, AS TESTIFIED BY THE

2  EXPERT.  LET ME LET YOU LOOK AT THIS DOCUMENT.  OH, IT'S NOT

3  EYE ISSUES, I'M SORRY.  THIS IS OXYGEN ISSUES.

4         TELL ME ABOUT THIS DOCUMENT AND WHAT IT SHOWS.

5  **A.**   THIS IS A CLINIC A CHRONIC CARE VISIT, AND THIS PATIENT

6  SEES DR. MACMURDO ON 7/29 OF '15.  DR. MACMURDO SAYS THAT HE

7  HAD FAILED A SIX-MINUTE WALK TEST, AND HE RECOMMENDED HIM FOR

8  AN O2 CONCENTRATOR IN HIS DORM.

9  **Q.**   OKAY.  AND IT SAYS P-E-R-M, CORRECT?

10  **A.**   PERMANENTLY.

11  **Q.**   AND THIS IS DOCUMENT J10-48790.

12         AND THE NEXT DOCUMENT I HAVE ON THIS IS J10-48785.

13  TELL ME WHAT THIS DOCUMENT IS.  I THINK YOU SIGNED THIS

14  DOCUMENT.

15  **A.**   I DID SIGN THIS DOCUMENT.  I REMEMBER THIS WELL BECAUSE I

16  KNOW THIS OFFENDER WELL.  I SAW THIS OFFENDER AND HAD HIM

17  CALLED OVER BECAUSE HE HAD MISSED A TRIP, AND I ASKED HIM WHY

18  DID YOU MISS A TRIP, AND HE SAYS, I GET SHORT OF BREATH ON MY

19  TRIP, I NEED OXYGEN, SO WE GAVE HIM OXYGEN.

20  **Q.**   OKAY.  LET'S MOVE ON TO HYPERLIPIDEMIA.  THIS IS DOCUMENT

21  NO. J8-02705, AND TELL ME WHAT THIS DOCUMENT IS.

22  **A.**   WELL, THIS IS A CHRONIC CARE GUIDELINE FOR HYPERLIPIDEMIA,

23  WHICH IS BASICALLY HIGH CHOLESTEROL OR HIGH TRIGLYCERIDES.

24  **Q.**   OKAY.  AND WHY DO YOU TRACK HYPERLIPIDEMIA AS A CHRONIC

25  DISEASE?

**A.**   WELL, HYPERLIPIDEMIA, YOU TRACK BECAUSE OF THE TENDENCY FOR THESE INDIVIDUALS TO DEVELOP ISSUES WITH THEIR CORONARY ARTERY DISEASE, WITH STROKE, THOSE KIND OF THINGS.

**Q.**   AND ITEM NO. 1 SAYS PATIENTS ARE SEEN EVERY SIX MONTHS, DEPENDING ON THE SEVERITY.  WHY WOULD YOU WANT TO SEE A PATIENT EVERY SIX MONTHS THAT HAS HYPERLIPIDEMIA?

**A.**   WELL, AGAIN, THE EARLIER YOU INTERVENE IN THESE TYPE OF INDIVIDUALS AS FAR AS CONTROLLING THEIR CHOLESTEROL OR CONTROLLING THEIR TRIGLYCERIDES, IT TENDS TO -- THE LITERATURE SHOWS THAT THERE'S A BETTER OVERALL EFFECT YEARS DOWN THE ROAD.

**Q.**   OKAY.  IS ANGOLA OR AS A CLINIC AT ANGOLA SEEING THESE PATIENTS AT LAST EVERY SIX MONTHS?

**A.**   SURE.

**Q.**   AND IT TALKS ABOUT LABS.  WHY ARE THE LABS DONE WITH RESPECT TO HIGH CHOLESTEROL?

**A.**   WELL, THIS IS EXTREMELY IMPORTANT BECAUSE YOU REALLY CAN'T SEE INSIDE THE BLOOD VESSELS, AND YOUR LABS KIND OF GIVE YOU AN INDICATOR OF WHAT'S GOING ON IN THERE.

**Q.**   OKAY.  AND IF A PATIENT REFUSES EITHER LABS OR REFUSES A MEDICATION, IT MAKES IT DIFFICULT TO CONTROL AND TREAT HIGH CHOLESTEROL, CORRECT?

**A.**   WELL, LIKE IN MANY OF THESE CASES, ALL THESE DRUGS ARE -- THEY WORK AND THEY DO GOOD AT WHAT THEY'RE SUPPOSED TO BE GIVEN FOR, BUT THERE ARE SIDE EFFECTS OF THEM.  AND IF YOU DON'T MONITOR SOME OF THESE IN PARTICULAR, YOU HAVE TO REALLY MONITOR

1    THE LIVER FUNCTION, AND SO LABS ARE NEEDED IF YOU'RE GOING TO

2    BE ON SOME OF THESE TYPES OF DRUGS.

3    **Q.**    OKAY.  LET'S MOVE ON TO NEXT CHRONIC CARE GUIDELINE WHICH

4    IS HIV.  IT'S J8-02706, AND TELL ME WHAT THIS DOCUMENT IS.

5    **A.**    COULD YOU FOCUS THAT A LITTLE BIT THERE?

6    **Q.**    I DON'T HAVE CONTROL OVER THAT, I DON'T THINK.

7    **A.**    OKAY.  WELL, I KNOW WHAT THE DOCUMENT IS.  IT'S A CHRONIC

8    CARE GUIDELINE FOR --

9    **Q.**    I'LL SEE IF I CAN MOVE IT.  THERE WE GO.  THERE WE GO.  I

10   THINK THAT'S BETTER.  IS THAT BETTER?

11   **A.**    THAT'S BETTER.

12   **Q.**    OKAY.

13   **A.**    THE DOCUMENT IS A CHRONIC CARE GUIDELINE FOR HIV.

14   **Q.**    ALL RIGHT.  AND WHY DO YOU HAVE CHRONIC CARE GUIDELINES

15   FOR HIV?

16   **A.**    WELL, 'CAUSE HIV IS A CHRONIC CONDITION.  IT'S BASICALLY A

17   VIRAL INFECTION THAT ATTACKS THE IMMUNE SYSTEM AND PEOPLE CAN

18   GET VERY SICK BECAUSE IT LIMITS THE RESPONSE OF THEIR IMMUNE

19   SYSTEM.  AND SOMETIMES IT TAKES AWAY THEIR COMPLETE IMMUNE

20   SYSTEM RESPONSE.

21   **Q.**    AND WHAT IS CLINIC W?

22   **A.**    CLINIC W IS OUR HIV CLINIC.

23   **Q.**    OKAY.  SO YOU'VE GOT A SPECIFIC CLINIC JUST FOR HIV,

24   CORRECT?

25   **A.**    YES.  WE HAVE LSU SPECIALISTS THAT COME IN FOR HIV.

02:30  1   **Q.**   OKAY.  SO IT'S OUTSIDE FOLKS WHO ARE BEING BROUGHT IN TO

2   TRACK AND TREAT THIS DISEASE, CORRECT?

3   **A.**   YES, CORRECT.

4   **Q.**   OKAY.  AND WHY IS A SPECIALIST FROM LSU BEING USED TO

5   TREAT HIV PATIENTS?

6   **A.**   WELL, THERE ARE PEOPLE THAT SPEND THEIR LIFE LEARNING

7   ABOUT HIV, AND WE HAVE TO -- WE HAPPEN TO BE IN A PARTNERSHIP

8   WITH AN INFECTIOUS DISEASE DOCTOR WHO HAS A VERY GOOD

9   DOCUMENTED HISTORY OF TREATING HIV, AND SO WE CHOSE -- I DIDN'T

10   CHOOSE, BUT THE HEADQUARTERS OFFICE CHOSE, TO USE THESE

11   PARTICULAR INDIVIDUALS BECAUSE THEY WERE SO SPECIALIZED.

12   **Q.**   OKAY.  LET ME ASK YOU TO TALK -- AT LEAST IN THE RECORD,

13   MAYBE NOT DIRECT TESTIMONY, BUT THERE'S SOME INDICATION THAT

14   THERE'S AN ISSUE ABOUT COST ASSOCIATED WITH HIV MEDICATIONS AND

15   THAT BECAUSE OF COST, PEOPLE AREN'T GETTING THEIR HIV

16   MEDICATIONS.  IS THAT A CONCERN OR A PROBLEM?

17       **MS. MONTAGNES:**  OBJECTION.  MR. ROBERT IS TESTIFYING

18   ON BEHALF OF HIS WITNESS.

19       **MR. ROBERT:**  JUDGE, IT'S HARD BECAUSE --

20       **THE COURT:**  OVERRULED.

21       **MR. ROBERT:**  AND I APOLOGIZE.

22       **THE COURT:**  OVERRULED.

23   BY MR. ROBERT:

24   **Q.**   OKAY, GO ON.

25   **A.**   WELL, CERTAINLY THERE ARE CONCERNS.  HIV MEDICINES ARE

02:31    1    VERY EXPENSIVE.  BUT LIKE WE DISCUSSED EARLIER, WHEN WE PUT UP
2    ONE OF THOSE MEETINGS, OUR PHARMACISTS, THROUGH THE
3    HEADQUARTERS OFFICE, WE'RE INVOLVED IN THIS 340B PROGRAM, AND
4    THE 340B PROGRAM ALLOWS US TO GET STATE OF THE ART MEDICATIONS
5    FOR HIV FOR THESE OFFENDERS AT A MUCH DISCOUNTED RATE.  SO
6    THESE OFFENDERS ARE GETTING MEDICATIONS THAT SOME OF THE
7    PRIVATE POPULATION CAN'T EVEN GET, AND THAT'S BECAUSE OF THAT
8    340B PROGRAM.
9    **Q.**    NOW LET ME ASK YOU ABOUT THE TREATMENT AND SO FORTH.  IF A
10    PATIENT REFUSES TREATMENT, DOES THAT COMPLICATE HIS ABILITY TO
11    GET BETTER?
12    **A.**    IT WOULD MAKE IT MORE DIFFICULT TO GET BETTER.
13    **Q.**    OKAY.  I WANT TO LOOK AT ONE OF THE PATIENTS THAT'S
14    AMONGST THE CONTROLLED GROUP THAT THE PLAINTIFFS LOOKED AT,
15    AND IT'S PATIENT NO. 25.  THIS IS A PATIENT WITH HIV.
16              AND I'LL TELL YOU WHAT, YOUR HONOR, THESE ARE
17    ALL REFUSALS.  IF YOU'LL LET ME JUST PUT THOSE NUMBERS IN THE
18    RECORD, I MIGHT BE ABLE TO SAVE US SOME TIME HERE.
19              **THE COURT:**  PUT THEM IN THE RECORD.
20              **MR. ROBERT:**  OKAY.
21              **THE COURT:**  AND THEY'RE ALL PATIENT 25?
22              **MR. ROBERT:**  THEY'RE ALL PATIENT 25, AND THEY'RE ALL
23    HIV RELATED.
24              **THE COURT:**  GO AHEAD.
25              **MR. ROBERT:**  J10-21837; J10-21830; J10-21800;

1  J10-21799; J10-21797; J10-21793; J10-21792; J10-21791;

2  J10-21789.  I THINK THAT'S IT.

3  **BY MR. ROBERT:**

4  **Q.**    LET'S MOVE ON.  LET'S TALK QUICKLY ABOUT PATIENT 18, AND

5  THIS IS A PATIENT WHO PLAINTIFFS' ATTORNEY -- PLAINTIFFS'

6  EXPERT QUESTIONED ABOUT THE TIMELINESS OF ADDRESSING HIS HIV

7  TEST, HIS POSITIVE HIV TEST.  SO I JUST WANT TO PUT ON THE

8  RECORD A FEW OF HIS VISITS SO THAT WE CAN SEE THE TIMELINE,

9  OKAY?

10          THE FIRST ONE IS J10-39595, AND CAN YOU TELL ME WHAT

11  THIS DOCUMENT IS?

12  **A.**    THIS IS A LAB REPORT FROM LABCORP WHICH IS THE LAB THAT WE

13  SEND OUR LAB TO THAT -- WHEN WE DON'T DO IT IN-HOUSE, AND THIS

14  WAS RECEIVED ON 11/20 AND REPORTED ON 11/22 OF '13, AND IT'S

15  PRESUMPTIVE POSITIVE FOR HIV.

16  **Q.**    WHAT IS THE SIGNIFICANCE OF PRESUMPTIVE POSITIVE?

17  **A.**    IT HADN'T BEEN CONFIRMED.

18  **Q.**    OKAY.  THE NEXT DOCUMENT IS J10-39720, AND CAN YOU TELL ME

19  WHAT THIS DOCUMENT IS?

20  **A.**    WELL, IT'S A MENTAL HEALTH REPORT THAT'S DATED 11/26 OF

21  '13 WHERE HE TELLS THE MENTAL HEALTH, THE SOCIAL WORKER, "THEY

22  SAY I MAY HAVE HIV."

23  **Q.**    OKAY.

24  **A.**    AND HE GOES ON FURTHER TO SAY HE DIDN'T BELIEVE THAT HE

25  HAD HIV.

Q.   OKAY.  THE NEXT DOCUMENT, J10-39587, AND WHAT IS THAT

DOCUMENT?

A.   AGAIN, THAT'S A PRESUMPTIVE POSITIVE FOR HIV.  THAT WAS

FROM LABCORP.  THAT WAS RECEIVED 11/26 AND REPORTED 11/27.

Q.   SO WE HAVE A SECOND TEST -- TESTIFIED THE FIRST ONE CAME

BACK ON THE 22ND, NOW WE HAVE A SECOND ONE ON THE 26TH, RIGHT?

A.   AND STILL WE'RE PRESUMPTIVE.

Q.   SO STILL PRESUMPTIVE?

A.   CORRECT.

Q.   ALL RIGHT.  THE NEXT ONE, J10-39650, AND THIS IS 12/2/13,

WHAT DOES THIS DOCUMENT INDICATE TO YOU?  I THINK YOUR NAME'S

ON THE BOTTOM OF THIS.

A.   RIGHT.

Q.   ALL RIGHT.

A.   I REMEMBER THIS WELL.  THIS IS A DOCUMENT, IF YOU NOTICE

THAT'S SIGNATURE AT THE BOTTOM THERE, THAT B TAPLIN.  BETTY

TAPLIN IS MY HIV NURSE.

Q.   OKAY.

A.   SHE RUNS THE HIV CLINIC.

Q.   OKAY.

A.   AND THEY SHOWED THAT ROOM WHERE I MAKE MYSELF AVAILABLE TO

THE CLINIC WHERE ALL THOSE CHARTS WERE.

Q.   UH-HUH.

A.   SHE CAME INTO THAT ROOM AND ASKED ME TO COME TALK TO THIS

OFFENDER WHO COULD POSSIBLY HAVE AN HIV TEST, A POSITIVE HIV

1    TEST, SO I WENT IN TO TALK TO HIM.  HE DIDN'T LOOK GOOD, AND I

2    TALKED TO HIM FOR JUST A SHORT TIME AND WAS, LIKE, YOU NEED TO

3    GO TO THE EMERGENCY ROOM, YOU NEED TO BE ADMITTED TO THE

4    HOSPITAL.  SO I JUST DOCUMENTED A BRIEF NOTE -- I SENT HIM FOR

5    A CHEST X-RAY -- WHILE HE WAS ON HIS WAY TO THE HOSPITAL --

6    WHILE HE WAS ON HIS WAY TO THE ATU, WHICH IS RIGHT ACROSS THE

7    HALL.

8    Q.   OKAY.  THE NEXT DOCUMENT, TWO DAYS LATER, 12/4/13, EXHIBIT

9    J10-39585, CAN YOU TELL ME WHAT THIS DOCUMENT REPRESENTS?

10   A.   WELL, THIS IS, AGAIN, THE LABCORP REPORT DATED 12/4 OF

11   '13, AND IF YOU COULD PULL IT UP A LITTLE HIGHER.

12   Q.   I THINK I'VE GOT THE VIRAL LOAD ON THE NEXT PAGE.

13   A.   OKAY.  THIS IS ONE THAT SHOWS HE'S GOT A CD4 COUNT OF 15

14   WHICH IS VERY SERIOUS.

15   Q.   OKAY.  AND THEN YOU'VE GOT A J10-39579, AND THIS IS A

16   CONTINUATION OF THE SAME REPORTING.

17   A.   RIGHT.

18   Q.   AND WHAT DOES THAT INDICATE?

19   A.   AND THEN HE'S GOT A SIGNIFICANT VIRAL LOAD.  SO A

20   SIGNIFICANT VIRAL LOAD WITH A VERY DIMINISHED CD4 COUNT IS NOT

21   ONLY PRESUMPTIVE FOR HIV, BUT HE'S GOT AIDS.

22   Q.   SO NOW YOU'VE GOT IT CONFIRMED?

23   A.   RIGHT.

24   Q.   THE SAME DATE, 12/4/13, WHAT DO YOU HAVE HERE?  EXCUSE ME,

25   IT'S 12/5, ONE DAY LATER.

1   **A.**   WELL, THIS IS A CLINIC W NOTE, BUT THIS IS DR. STUART.

2   DR. STUART IS AN INFECTIOUS DISEASE SPECIALIST THAT COMES TO

3   ANGOLA AND HE SPECIALIZES IN HIV.

4   **Q.**   OKAY.  SO HE'S SEEING HIM ON THIS DAY?

5   **A.**   HE SAW HIM IN THE MEDICAL WARD, BUT HE WROTE THE NOTE ON A

6   CLINIC NOTE.

7   **Q.**   OKAY.

8   **A.**   BECAUSE WE WENT TO HIM AND SAID, DR. STUART, WE HAVE ONE

9   WE NEED YOU TO SEE ON THE WARD, AND SO HE DID SEE HIM.

10           **MS. MONTAGNES:**  OBJECTION.  THIS ISN'T IN THE RECORD.

11           **MR. ROBERT:**  BECAUSE THERE'S NO DOCUMENT, YOUR HONOR.

12   I MEAN, HE'S TESTIFYING AS TO WHAT HE DID.

13           **THE COURT:**  THIS IS HIS RECORD?

14           **MR. ROBERT:**  IT'S HIS TESTIMONY.  THIS IS NOT BASED

15   ON THE RECORD.  IT'S HIS TESTIMONY AS TO WHAT HE DID.

16           **THE COURT:**  THE OBJECTION'S NOTED.  THE COURT WILL

17   CONSIDER THE OBJECTION.  YOU MAY PROCEED.

18           **MR. ROBERT:**  OKAY.

19   **BY MR. ROBERT:**

20   **Q.**   I DON'T KNOW IF I PUT THIS DOWN.  J10-39648, OKAY, AND

21   WHAT DOES THIS RECORD INDICATE WITH RESPECT TO WHETHER HIS HIV

22   WAS POSITIVE OR NOT?

23   **A.**   WELL, IT SAYS HE WAS HIV POSITIVE, BUT HE WAS -- HE HAD A

24   CLINICAL PICTURE THAT WAS CONSISTENT WITH PCP PNEUMONIA, SO DR.

25   STUART STARTED HIM ON SOME MEDICATIONS.  AND I BELIEVE IF YOU

0 2 : 4 0

1   RAISE IT UP A LITTLE FURTHER, HE EVEN STARTED HIM ON SOME ARV,

2   SOME HIV MEDICINES.

3   **Q.**   OKAY.  SO HE'S ON HIV MEDICINES AT THAT POINT?

4   **A.**   YES.

5          **MS. MONTAGNES:**  OBJECTION.  HE HAS NO KNOWLEDGE AS TO

6   WHETHER OR NOT HE WAS ON HIV.  HE KNOWS IT WAS PRESCRIBED BY

7   THE DOCTOR, THAT'S ALL HE KNOWS.

8          **MR. ROBERT:**  I'LL WITHDRAW THE QUESTION.

9          **THE COURT:**  SUSTAINED.

10  **BY MR. ROBERT:**

11  **Q.**   I THINK THE NUMBER IS ON THE BOTTOM OF THIS ONE.

12  J10-39814, AND WHAT IS THIS DOCUMENT?

13  **A.**   WELL, THIS IS A PHYSICIAN ORDER SHEET.  WHEN DR. STUART

14  SAW HIM IN THE NURSING UNIT, HE WROTE ORDERS, AND WE WERE THERE

15  WITH HIM WHEN HE DID IT.  AND HE WROTE THESE ORDERS IN THE

16  NURSING UNIT.

17  **Q.**   OKAY.  AND WHAT DOES THIS DOCUMENT INDICATE?

18  **A.**   WELL, FIRST, THE PATIENT WAS PLACED ON BACTRIM, ORDERED

19  BACTRIM.  HE WAS ORDERED PREDNISONE.  AND HE WAS ORDERED SOME

20  HIV MEDICINES.  HE WANTED TO COLLECT SOME SPUTUMS FOR SOME

21  DIFFERENT STAINS, AND HE ORDERED A COCKTAIL OF LABS.

22  **Q.**   OKAY.  AND THE DATE OF THIS IS 12/5/13, CORRECT?

23  **A.**   CORRECT.

24  **Q.**   ALL RIGHT.  ONE MORE QUICK ONE, ONE MORE QUICK HIV.  IT'S

25  PATIENT NO. 26.

1          **MS. MONTAGNES:**  WE WOULD JUST OBJECT TO THE

2    CUMULATIVE NATURE.  WE'VE HEARD THESE DOCUMENTS PUT IN FRONT OF

3    DOCTORS BEFORE.

4          **THE COURT:**  NOTED.

5          **MR. ROBERT:**  JUDGE, THIS --

6          **THE COURT:**  THE OBJECTION TO CUMULATIVE IS NOTED, BUT

7    IT'S OVERRULED.

8    **BY MR. ROBERT:**

9    **Q.**   PATIENT NO 26.  THERE WAS SOME DISCUSSION BY PLAINTIFFS'

10   EXPERT ABOUT WHETHER OR NOT THIS PERSON WAS ON THE RIGHT HIV

11   MEDS OR NOT.

12   **A.**   CORRECT.

13   **Q.**   DO YOU RECALL THAT?

14   **A.**   YES.

15   **Q.**   OKAY.  LET ME SHOW YOU A DOCUMENT.  THE EXHIBIT NUMBER IS

16   D-741, AND THE BATES NUMBER ARE 8300.  TELL ME WHAT THIS

17   DOCUMENT INDICATES AND WHERE IS IT -- DOES IT INDICATE WHERE

18   IT'S FROM?

19   **A.**   THIS IS A REPORT THAT'S GENERATED FROM LSU.

20   **Q.**   OKAY.

21   **A.**   AND WHEN THE PATIENT CAME BACK, THAT'S THEIR ASSESSMENT,

22   THAT HE WAS ON RITONAVIR AND ATAZANAVIR.

23   **Q.**   OKAY.  SO LSU DOCTORS INDICATE THERE WHAT MEDICATIONS HE

24   WAS ON, CORRECT?

25   **A.**   THAT HE WAS ON, YES.

0 2 : 4 2

1   Q.   IS THERE ANY INDICATION ON THIS DOCUMENT THAT THEY

2   REQUESTED THAT THE MEDICATION BE CHANGED IN ANY WAY, SHAPE OR

3   FORM?

4   A.   NO.

5   Q.   ONE MORE.  AND THIS DOCUMENT IS D-741, BATES NO. 8255, AND

6   TELL ME WHAT THIS DOCUMENT IS.

7   A.   WELL, THIS IS A DOCUMENT FROM LABCORP THAT IS -- THAT'S

8   PRETTY COMMON, WHEN DR. STUART ORDERS HIS LABS, THEY USUALLY

9   SEND HIM BACK WITH A GRAPH THAT TRACKS THE HIV VIRAL LOADS.

10  AND YOU CAN SEE FROM THIS GRAPH THAT FROM 2010 EXCEPT FOR JUST

11  A FEW SMALL BLIPS, THAT THE VIRAL LOAD IS VERY WELL CONTROLLED.

12          MS. MONTAGNES:  OBJECTION.  DR. LAVESPERE BY HIS OWN

13  ADMISSION IS NOT A SPECIALIST IN HIV.  HE CAN'T TESTIFY AND

14  READ THESE RESULTS.  IT'S OUTSIDE OF HIS SCOPE.

15          THE COURT:  OVERRULED.

16  BY MR. ROBERT:

17  Q.   MOVE ON TO HEPATITIS C, DOCUMENT NO. J8-02707, AND FIRST

18  OF ALL, WHAT IS THIS?

19  A.   THESE ARE THE CHRONIC CARE GUIDELINES FOR HEPATITIS C.

20  Q.   AND WHAT IS HEPATITIS C?

21  A.   WELL, BASICALLY HEPATITIS C IS A VIRAL INFECTION THAT

22  AFFECTS THE LIVER AND CAUSES SIGNIFICANT INFLAMMATION IN THE

23  LIVER AND IT CAN EVEN -- IF IT'S ADVANCED, CAN CAUSE SCARRING

24  OF THE LIVER AND YOU CAN HAVE A WEALTH OF PROBLEMS.

25  Q.   AND WHY DO YOU HAVE A CLINIC JUST FOR HEPATITIS C?

**A.**   WELL, WE HAVE A SPECIALTY CLINIC FOR HEPATITIS C.  WE FOLLOW SOME OF THESE CLINIC PATIENTS IN CLINIC A THAT ARE STABLE, BUT EVERY PATIENT WITH HEPATITIS C SEES OUR SPECIALIST.

**Q.**   OKAY.  AND, AGAIN, THERE'S A NUMBER OF ITEMS THAT ARE ON THE GUIDELINES THAT YOU'RE -- THAT THEY TELL YOU THAT YOU NEED TO DO, CORRECT?

**A.**   CORRECT.

**Q.**   AND WHAT'S THE SIGNIFICANCE OF THESE GUIDELINES?

**A.**   WELL, THE SIGNIFICANCE OF THESE GUIDELINES IS, LIKE OTHER CHRONIC CARE DISEASES, THE BETTER YOU KEEP THEM CONTROLLED, THE BETTER YOUR RESPONSE OF YOUR PATIENTS.

**Q.**   OKAY.  NOW YOU WERE HERE WHEN CHARLES BUTLER TESTIFIED ABOUT HIS HEP C, WEREN'T YOU?

**A.**   YES.

**Q.**   AND I BELIEVE MR. BUTLER TESTIFIED THAT HE WAS GIVEN INTERFERON TREATMENTS, CORRECT?

**A.**   CORRECT.

**Q.**   AND IS THAT A COMMONLY ACCEPTED TREATMENT FOR HEP C?

**A.**   IT IS A COMMONLY ACCEPTED TREATMENT, ESPECIALLY BACK IN THE DAY WHEN HE RECEIVED HIS TREATMENT.

**Q.**   OKAY.  AND DID THE INTERFERON TREATMENT GET HIS HEP C UNDER CONTROL?

**A.**   I CAN'T REMEMBER.

**Q.**   OKAY, FAIR ENOUGH.

**A.**   I CAN'T REMEMBER.

**Q.**   YOU DO RECALL HIM SAYING SOMETHING ABOUT HARVONI, DON'T YOU?

**A.**   I DO.

**Q.**   AND HE TESTIFIED THAT YOU TOLD HIM HE COULDN'T GET HARVONI BECAUSE OF THE COST.  DO YOU RECALL THAT?

**A.**   I DO.

**Q.**   DID YOU EVER TELL HIM THAT?

**A.**   I WOULD NEVER TELL A PATIENT THAT.

**Q.**   IS THAT THE CASE?  HAVE YOU EVER DENIED ANYBODY HARVONI BECAUSE OF THE COST?

**A.**   WHAT YOU HAVE TO REMEMBER IS WHEN THESE DRUGS FIRST CAME OUT, THERE WAS ONE DRUG ON THE MARKET, AND THERE WERE NO COMPETITORS.  NOBODY WAS USING HARVONI UNLESS YOU HAD MONEY TO PAY FOR IT, SO THERE WAS A BIG STIR WHEN THEY STARTED PUTTING THESE ADS ON THE PAPER -- ON THE TV, SO EVERYBODY WANTED HARVONI.

WHAT THE DOC DID WAS THEY REALIZED, HEY, HERE'S A MEDICATION THAT ACTUALLY CURES HEPATITIS C, WE NEED TO START PUTTING TOGETHER SOME GUIDELINES AND START LOOKING AT CAN WE TREAT SOME OF THESE PATIENTS, AND THAT'S EXACTLY WHAT WE DID. WHEN THESE MEDICATIONS STARTED COMING OUT ON THE MARKET, WE PUT TOGETHER A TASK FORCE WITH ELIZABETH GRITTON, WHO'S OUR NURSE PRACTITIONER.  BACK THEN IT WAS DR. CASSIDY, WHO'S NOW SENATOR CASSIDY.  AND THEY PUT TOGETHER SOME GUIDELINES FOR US FOR TREATING THESE PEOPLE WITH THESE NEW DRUGS.  OVER THE COURSE OF

1   TIME, WHEN THESE DRUGS BECAME AVAILABLE, WE STARTED USING THEM

2   AND WE'VE TREATED, AS OF THE CUTOFF DATE, MORE THAN 25.

3          **THE COURT:**  SO THE QUESTION WAS:  HAVE YOU EVER TOLD

4   SOMEONE THAT THEY COULDN'T GET HARVONI BECAUSE OF COSTS?

5          **THE WITNESS:**  NO.

6          **THE COURT:**  OKAY.

7          **MR. ROBERT:**  THANK YOU, YOUR HONOR.

8   **BY MR. ROBERT:**

9   **Q.**   LET'S LOOK AT ANOTHER CLINIC THAT YOU HAVE, HYPERTENSION.

10  DOCUMENT NO. J8-02708, TELL ME WHAT THAT DOCUMENT IS.

11  **A.**   THESE ARE THE CHRONIC CARE GUIDELINES FOR HYPERTENSION,

12  WHICH IS BASICALLY HIGH BLOOD PRESSURE.

13  **Q.**   OKAY.  AND WHY DO YOU HAVE CHRONIC CARE GUIDELINES FOR

14  HYPERTENSION?

15  **A.**   WELL, IT'S A WELL KNOWN FACT THAT UNCONTROLLED

16  HYPERTENSION CAN LEAD TO HEART ATTACK, STROKE, DEATH.  SO IT'S

17  IN THE BEST INTEREST -- THE NUMBERS HAVE BEEN STUDIED.  IT'S IN

18  THE BEST INTEREST OF ALL THESE OFFENDERS WITH HYPERTENSION TO

19  KEEP THEIR NUMBERS UNDER CONTROL.

20  **Q.**   AND IS MEDICATION IMPORTANT TO KEEPING HYPERTENSION UNDER

21  CONTROL?

22  **A.**   IT'S A PART OF THE EQUATION, YES.

23  **Q.**   WHAT ELSE IS PART OF THE EQUATION?

24  **A.**   WELL, DIET AND EXERCISE GO HAND IN HAND, BUT MEDICATIONS

25  PLAY A ROLE AS WELL.

Q.   OKAY.  I JUST WANT TO LOOK, AND THIS IS GOING TO BE PRETTY

QUICK, JUST A COUPLE OF THESE FOLKS.  PATIENT NO. 15, THIS IS

ONE OF THE PATIENTS THAT HAD -- WAS IN YOUR HIGH BLOOD PRESSURE

CLINIC.  AND LET'S LOOK AT THIS DOCUMENT, J10-19035, AND THIS

IS OLD.  BUT THIS IS IN 2010.  TELL ME WHAT THIS DOCUMENT IS.

A.   THIS IS A REFUSAL TO ACCEPT CARE.  WHAT PATIENT NUMBER IS

THIS AGAIN?

Q.   I'M SORRY.  IT'S PATIENT NO. 15.  DO YOU KNOW WHO THAT IS?

A.   I DO NOW.

Q.   OKAY.

A.   FROM PATIENT NO. 15, AND IT SAYS "THE OFFENDER WAS

INFORMED" --

          MS. MONTAGNES:  AND YOUR HONOR, WE'RE JUST GOING TO

OBJECT TO RELEVANCE.  THIS IS, YOU KNOW, NOT WITHIN THE TIME

PERIOD WE'RE FOCUSED ON, AND DOING A PARALLEL OBJECTION THAT

WAS MADE WHEN OUR EXPERTS TALKED ABOUT 2010.

          MR. ROBERT:  JUDGE --

          THE COURT:  OVERRULED.

          MR. ROBERT:  OKAY.

          THE COURT:  GO AHEAD.

BY MR. ROBERT:

Q.   WHAT DOES THIS INDICATE?

A.   WELL, IT INDICATES THAT HE HADN'T TAKEN HIS BLOOD PRESSURE

MEDICINE.  IT REMAINS ELEVATED AND IT COULD LEAD TO A

POSSIBILITY OF STROKE OR DEATH.  HE REFUSED FURTHER TREATMENT.

0 2 : 4 9

1   **Q.**   OKAY.  DOES IT ALSO INDICATE THAT HE WAS COUNSELED ABOUT

2   THE CONSEQUENCES OF REFUSAL?

3   **A.**   HE WAS.

4   **Q.**   I WILL SHOW YOU THE NEXT DOCUMENT, J10-18998, AND TELL ME

5   WHAT THIS DOCUMENT IS.

6   **A.**   THIS IS A CLINIC A APPOINTMENT FROM 10/6 OF '11.  DR.

7   MACMURDO SAW THE PATIENT.  AND, AGAIN, HE'S GOT ACCELERATED

8   HYPERTENSION.  HE'S 196/104.

9   **Q.**   OKAY.

10   **A.**   AND THE OFFENDER SAYS THAT HE'S TAKING HIS MEDICINES,

11   ACCORDING TO THIS DOCUMENT, AND DR. MACMURDO NOTES THAT HE

12   CALLED THE PILL CALL AND THE PATIENT IS NOT TAKING HIS

13   MEDICINES.  HE'S NONCOMPLIANT.

14   **Q.**   OKAY.  THE NEXT ONE I HAVE, J10-18996, AND WHAT IS THIS

15   DOCUMENT?

16   **A.**   THIS IS AN ATU VISIT FROM 12/14/11, THAT DOCUMENTS AGAIN

17   AN ELEVATED HIGH BLOOD PRESSURE, DANGEROUSLY ELEVATED HIGH

18   BLOOD PRESSURE.  AND DR. TOCE IS SEEING HIM AND HE WANTS TO

19   ADMIT HIM FOR MEDICATION COMPLIANCE.

20   **Q.**   WHEN YOU SAY --

21   **A.**   HE WANTS TO --

22   **Q.**   NEVERMIND.  NO, NO.  STOP.  WE'RE GOOD.

23         THE NEXT ONE IS -- TURNS INTO 10-18994, SAME DATE,

24   12/14/11, AND WHAT DOES THIS DOCUMENT INDICATE?

25   **A.**   THIS IS A REFUSAL TO ACCEPT MEDICAL CARE ON 12/14 OF '11.

02:51    1    OFFENDER WAS EXPLAINED THE RISK OF INCREASED BLOOD PRESSURE AND

2    THAT NOT TAKING MEDS ALONG WITH REFUSING TO STAY IN THE

3    HOSPITAL COULD BE -- I CAN'T MAKE OUT THAT WORD -- STILL

4    REFUSED TO BE ADMITTED.  STATES I DON'T WANT TO GO HERE.

5    **Q.**    SO HE'S REFUSING TO BE ADMITTED TO THE WARD?

6    **A.**    YEAH.  I DON'T WANT TO BE HERE.

7    **Q.**    THE NEXT ONE, J10-18965, AND TELL ME WHAT THIS DOCUMENT

8    IS.

9    **A.**    THIS IS A SICK CALL, A SELF-DECLARED EMERGENCY.  HE

10    COMPLAINS OF PAIN IN HIS RIGHT UPPER JAW, AND EMS SAW HIM AND

11    NOTED HIS BLOOD PRESSURE WAS 232/149.

12    **Q.**    OKAY.  WE'RE ON 6/18/13, AND WE'VE GOT JOINT EXHIBIT

13    10-18964, AND TELL ME WHAT THIS IS.

14    **A.**    THIS IS AN ATU VISIT FROM 6/8 OF '13.  BLOOD PRESSURE WAS

15    232/149, AND SO THEY CALLED DR. MACMURDO, DR. MACMURDO GAVE HIM

16    .3 OF CLONIDINE, WHICH IS A MEDICATION USED TO TRY TO GET THE

17    BLOOD PRESSURE DOWN.

18    **Q.**    OKAY.  AND WHAT INSTRUCTIONS DOES THIS INDICATE THAT THE

19    PATIENT WAS GIVEN?

20    **A.**    THEY SAID HE WAS INSTRUCTED TO SIT IN THE HALLWAY AND HAVE

21    HIS BLOOD PRESSURE RECHECKED.  BUT HE LEFT.

22    **Q.**    OKAY.  AND THEN FOLLOWING THAT UP WITH THE JOINT EXHIBIT

23    10-18960, IS THAT THE REFUSAL?

24    **A.**    THAT'S A REFUSAL ON 6/9 OF '13.  FURTHER TREATMENT AND/OR

25    ELEVATION OF SEVERE HYPERTENSION.  HE LEFT THE TREATMENT CENTER

1    AMA.

2    **Q.**    OKAY.

3    **A.**    AGAINST MEDICAL ADVICE.

4    **Q.**    ALL RIGHT.  ONE MORE.  IT'S ABOUT NINE DAYS LATER, EXCUSE

5    ME, YEAH, TEN DAYS LATER, JOINT EXHIBIT 10-18958, AND TELL ME

6    WHAT THAT DOCUMENT IS.

7    **A.**    THIS IS A CLINIC A VISIT FROM 6/19 OF '13 WHERE HIS BLOOD

8    PRESSURE IS 192/118 AND THEY GAVE HIM .2 OF CLONIDINE AT 1:25

9    P.M.

10   **Q.**    OKAY.  AND WHAT DOES THE PLAN INDICATE FOR THIS?

11   **A.**    WELL, THIS IS MY NURSE PRACTITIONER, MR. BRIGONDILE.  SHE

12   SAYS THAT HE MUST TAKE HIS MEDICINES.  WILL DISCUSS ADMIT FOR

13   BLOOD PRESSURE CONTROL IN THE A.M. MEETING.

14   **Q.**    OKAY.  ARE THERE OTHER CHRONIC OR OTHER DISEASES THAT YOU

15   GUYS TRACKED THAT'S NOT NECESSARILY WITHIN THE CHRONIC CARE

16   GUIDELINES?

17   **A.**    YOU KNOW, SPECIFICALLY I CAN'T THINK OF ANY RIGHT NOW, BUT

18   THERE ARE PATIENTS THAT ARE SEEN IN THE RHEUMATOLOGY CLINIC.

19   YOU KNOW, THERE ARE PATIENTS THAT ARE SEEN IN THE SPECIALTY

20   CLINICS THROUGH TELEMED THAT ARE TRACKED, BUT THROUGH CLINIC A,

21   I WOULD THINK THAT THESE ARE THE MAJORITY OF THE ONES THAT WE

22   TRACK.

23   **Q.**    AND PATIENTS, LET'S SAY WITH SOMETHING LIKE CROHNS

24   DISEASE, DOES THAT HAVE ITS OWN SPECIFIC GUIDELINES?

25   **A.**    WELL, EVERY PATIENT THAT WE HAVE THAT HAS CROHNS DISEASE

1    IS BEING SEEN BY A GI SPECIALIST.

2    **Q.**    AND HOW MANY CROHNS DISEASE PATIENTS, APPROXIMATELY, DO

3    YOU HAVE AT ANGOLA?

4    **A.**    OH, WE PROBABLY HAVE MAYBE 15.

5    **Q.**    AND JUST FOR THE RECORD, WHAT IS CROHNS DISEASE?

6    **A.**    WELL, CROHNS IS BASICALLY AN INFLAMMATORY DISEASE OF THE

7    BOWEL.  AND BECAUSE OF THE INFLAMMATION, IT'S WELL KNOWN THAT

8    THESE PATIENTS CAN HAVE FISTULAS, WHICH IS AN ABNORMAL TRACK IN

9    THE BOWEL.  AND THERE'S A WHOLE HOST OF COMPLICATIONS THAT CAN

10   RESULT FROM CROHNS DISEASE IF IT'S LEFT UNTREATED.

11   **Q.**    AND LET'S LOOK BRIEFLY AT ONE OF THE PATIENTS THAT IS

12   AMONGST THE SAMPLE THAT HAD CROHNS DISEASE, PATIENT NO. 11.

13   I'M GOING TO SHOW YOU A DOCUMENT, IT'S JOINT EXHIBIT 10-16176,

14   AND CAN YOU TELL ME WHAT DOCUMENT IS?

15   **A.**    YES.  THIS IS BASICALLY A SYNOPSIS OF CARE THAT HE HAS

16   RECEIVED FOR HIS CROHNS DISEASE.

17   **Q.**    OKAY.  AND WHAT KIND OF -- TELL ME ABOUT WHAT DOES THIS

18   DOCUMENT INDICATE REGARDING THE TREATMENT THAT HE RECEIVED?

19   **A.**    YOU WANT ME TO READ THROUGH THE --

20   **Q.**    YEAH.  BASED ON THE DOCUMENT ITSELF, WHAT CAN YOU TELL ME

21   AS TO WHAT KIND OF TREATMENT HE RECEIVED?

22   **A.**    OKAY.  WELL, ACCORDING TO THIS DOCUMENT, ON 3/6 OF '14 HE

23   WAS SCHEDULED FOR AN MRI OF THE ABDOMEN WITH AND WITHOUT

24   CONTRAST AT 8 A.M.  ON 7 OF '18, HE WENT TO GENERAL SURGERY

25   CLINIC.  ON 7/21 OF '14, CT SCAN OF THE ABDOMEN WITH AND

1    WITHOUT CONTRAST, AND ABDOMINAL ABSCESS, MAY REQUIRE DRAINING.
2    WILL REQUIRE FOLLOW-UP WITH GI, DR. ORANGIO, AFTER CT DONE.
3    8/28 OF '14, HE HAD AN APPOINTMENT WITH THE COLORECTAL CLINIC
4    THAT WAS SCHEDULED.  8/28 OF '14, THE APPOINTMENT WAS CANCELLED
5    AND RESCHEDULED FOR 10/02/14 PER ILH.  10/31 OF '14, SURGERY
6    FOR ILEOCOLIC RESECTION.  RETURN TO LSP ON 12/15 OF '14.  ON
7    12/16/14 RETURN FOLLOW-UP IN THE COLORECTAL CLINIC.  1/15 OF
8    '15, HE HAD AN APPOINTMENT SCHEDULED WITH COLORECTAL FOR
9    FOLLOW-UP.  1/16 OF '15, SIX WEEK GI COLORECTAL FOLLOW-UP.
10   2/27 OF '15, SURGERY CLINIC TWO-WEEK FOLLOW-UP.  3/15 OF '15,
11   APPOINTMENT SCHEDULED FOR COLORECTAL CLINIC FOLLOW-UP.  2/2 OF
12   '15, SENT TO ILH ER FOR CROHNS DIFFICULTIES.  FOLLOW-UP CROHNS
13   SURGERY CLINIC 3/5 OF '15, COLORECTAL FOLLOW-UP.  3/6 OF '15,
14   ONE MONTH FOLLOW-UP WITH COLORECTAL CLINIC TO SCHEDULE SURGERY
15   FOR MAY.  AND MAY 7TH OF '15, COLORECTAL TO SCHEDULE SURGERY.
16   **Q.**    OKAY.  SO THAT BRINGS US UP TO MAY 7TH OF 2015.  LET'S
17   LOOK AT A DOCUMENT THAT IS MARKED AS J10-16146, AND TELL ME
18   WHAT THAT DOCUMENT IS ABOUT.
19   **A.**    THIS IS A DOCUMENT THAT'S WOULD BE WRITTEN ON A PATIENT
20   THAT'S IN NURSING UNIT 1 TO RE-CLASS THEM TO NURSING UNIT 2.
21   **Q.**    OKAY.  WHY WOULD A PATIENT BE RE-CLASSED FROM NURSING UNIT
22   1 TO NURSING UNIT 2?
23   **A.**    WELL, IF A PATIENT WAS CONVALESCENT FROM SURGERY AND HE
24   WAS DOING WELL AND HE HAD A LONG WAY TO GO, WE WOULD PUT HIM ON
25   NURSING UNIT 2 BECAUSE WE TAKE CARE OF PATIENTS ON NURSING UNIT

02:59

1 1 THAT ARE IN THE ACUTE PHASE OF THEIR ILLNESS.  SO IF HE HAD

2 DONE REALLY WELL AND HE WAS PROGRESSING TOWARDS RECOVERY, WE

3 WOULD HAVE PUT HIM ON NURSING UNIT 2.

4 **Q.**   OKAY.  AND ABOUT A WEEK LATER ON 7/2/15, WE'VE GOT JOINT

5 EXHIBIT 10-16197, AND WHAT DOES THAT DOCUMENT INDICATE?

6 **A.**   THIS IS AN OUTSIDE VISIT FROM LSU DATED 7/2 OF '15, AND

7 BASICALLY SAYS "A 64-YEAR-OLD MALE WITH CROHNS DISEASE, STATUS

8 POST ILEOCECOSTOMY ON 10/31 OF '14 COMPLICATED BY POST-OP

9 ENTEROCUTANEOUS FISTULA."

10 **Q.**   OKAY.

11 **A.**   "HE WAS DISCHARGED FROM ILH ON 6/6 OF '15, FOLLOWING THE

12 FISTULA TAKEDOWN AND NEW FISTULA FORMULATION."

13 **Q.**   OKAY.

14 **A.**   IT WAS A SURGERY NOTE.

15 **Q.**   ALL RIGHT.  NEXT DOCUMENT IS 8/25/15, IS JOINT EXHIBIT

16 10-16150, AND TELL ME WHAT THIS DOCUMENT INDICATES.

17 **A.**   THIS IS A SURGERY CLINIC FROM LSP WHERE THE OUTSIDE

18 SURGEON COMES IN TO SEE PATIENTS, DATED 8/25 OF '15.

19 **Q.**   OKAY.  SO NOW HE'S BEING SEEN AGAIN BY THE SURGERY CLINIC

20 INSIDE LSP, CORRECT?

21 **A.**   CORRECT.

22 **Q.**   AND WHAT, IF ANYTHING, DOES THIS DOCUMENT INDICATE

23 REGARDING THE PATIENT'S CONDITION?

24 **A.**   IT SAYS THAT HE'S DOING WELL.

25 **Q.**   AND WHO IS THE DOCTOR WHO WOULD HAVE BEEN DOING -- AT THIS

1  PARTICULAR TIME PERIOD, WOULD HAVE BEEN SEEING HIM IN SURGERY

2  CLINIC?

3  A.   WELL, THAT'S DR. MORRISON'S HANDWRITING.

4  Q.   AND HE WAS NOT WITH THE DEPARTMENT OF CORRECTIONS AT THIS

5  TIME, CORRECT?

6  A.   CORRECT.

7  Q.   HE'S WITH LSU?

8  A.   HE'S WITH LSU.  A STAFF SURGEON AT LSU.

9  Q.   NEXT DOCUMENT IS JOINT EXHIBIT 10-16138, DATED -- IS THAT

10  10/21?  DOES THAT LOOK LIKE 10/21 TO YOU?  BAD COPY.

11  A.   MAYBE 11.

12  Q.   MAYBE 11.  OKAY, MY APOLOGIES.  TELL ME WHAT THIS DOCUMENT

13  IS.

14  A.   OKAY.  THIS IS A NOTE FROM DR. MORRISON AGAIN.  PATIENT

15  WITH CROHNS DISEASE AND FISTULA.  AND THE NOTE BASICALLY SAYS

16  HE'S DOING WELL, AND HIS PLAN WAS TO SPEAK WITH DR. ORANGIO WHO

17  WAS THE SURGEON, THE COLORECTAL SURGEON, AND POSSIBLY EVALUATE

18  THE PATIENT FOR CLOSURE OF THE FISTULA VERSUS CONTINUE WITH

19  TREATMENT.

20  Q.   OKAY.  AND THE NEXT DOCUMENT I HAVE IS ABOUT A MONTH

21  LATER, 12/16/15, AND WHAT IS THAT DOCUMENT?  WAIT, BEFORE I ASK

22  YOU THAT, LET ME PUT THE NUMBER ON, J10-16153.

23  A.   THIS IS AGAIN A SURGERY CLINIC NOTE FROM 12/16 OF '15, DR.

24  MORRISON.  IT SAYS HE SPOKE WITH DR. ORANGIO AND THERE IS NO

25  FISTULA SURGERY PLANNED, AND WOULD RECOMMEND GI EVALUATION FOR

MEDICAL TREATMENT.

**Q.** SO THIS IS THE OUTSIDE DOCTOR SAYING NO SURGERY PLANNED, RIGHT?

**A.** RIGHT.

**Q.** LET'S MOVE ON TO SOME OTHER TREATMENTS.  SICKLE CELL DISEASE, IS THAT SOMETHING THAT YOU HAVE A SPECIFIC CHRONIC CARE GUIDELINE FOR?

**A.** WE DON'T HAVE A SPECIFIC CHRONIC CARE GUIDELINE FOR SICKLE CELL.

**Q.** WHY NOT?

**A.** MOST OF THOSE PATIENTS ARE MANAGED EITHER THROUGH A SICKLE CELL CLINIC IN NEW ORLEANS OR THEY WERE MANAGED AT EARL K. LONG.

**Q.** OKAY.  ABOUT HOW MANY SICKLE CELL PATIENTS DO YOU HAVE?

**A.** AT THE TIME OF 9 OF '16, I THINK WE HAD FIVE.

**Q.** OKAY.  AND ARE SICKLE CELL PATIENTS SEEN REGULARLY IN YOUR CLINICS?

**A.** THEY SHOULD BE SEEN REGULARLY IN THE CLINICS.

**Q.** WE HEARD FROM ANTHONY MANDIGO WHO TESTIFIED IN THIS CASE HE HAD SICKLE CELL.  DO YOU RECALL THAT?

**A.** YES.

**Q.** OKAY.  HOW MANY SICKLE CELL EMERGENCIES HAS MR. MANDIGO HAD?

         **MS. MONTAGNES:** OBJECTION.  HE CAN TESTIFY AS TO HOW MANY HE'S TREATED, BUT HE CAN'T TESTIFY TO HIS OVERALL CARE.

0 3 : 0 3

1          THE COURT:  MR. ROBERT?

2          MR. ROBERT:  OKAY.  I'LL ACCEPT THAT ONE, YOUR HONOR.

3          THE COURT:  MOVE ON TO THE NEXT QUESTION.

4     BY MR. ROBERT:

5     Q.    HOW MANY SICKLE CELL EMERGENCIES HAVE YOU TREATED

6     REGARDING MR. MANDIGO?

7     A.    NONE.

8     Q.    OKAY.  LET ME ASK YOU THIS, AND I CAN ASK YOU THIS MORE

9     GENERALLY.  WHEN A PATIENT WITH SICKLE CELL IS IN AN EMERGENCY

10    CIRCUMSTANCE, IS HE PLACED ON THE WARD ON NURSING UNIT 1?

11    A.    NUMEROUS TIMES, THEY'RE PLACED ON THE WARD.

12    Q.    OKAY.  AND WHEN THEY'RE ON THE WARD, CAN THEY GET NARCOTIC

13    DRUGS?

14    A.    THEY CAN.

15    Q.    OKAY.  AND ARE THEY TREATED WITH NARCOTIC DRUGS IF THEY

16    HAVE SIGNIFICANT PAIN ISSUES?

17    A.    IF THEY HAVE SIGNIFICANT PAIN ISSUES, YES.

18    Q.    OKAY.  LET'S TALK A LITTLE BIT ABOUT CANCER.  WHAT TYPES

19    OF CANCER HAVE YOU TREATED WHILE YOU'VE BEEN AT ANGOLA?

20    A.    WELL, I GENERALLY DON'T TREAT CANCER.  GENERALLY, MY

21    MEDICAL STAFF IDENTIFIES THEM, AND WE GET THEM TO THE

22    APPROPRIATE SPECIALTY, BUT WE DON'T ACTUALLY TREAT THE CANCERS.

23    MOSTLY WHAT I DO WITH CANCER PATIENTS IS ARRANGE THEIR

24    FOLLOW-UPS TO OUTSIDE HOSPITALS, TALK WITH THEIR CHEMO DOCTORS,

25    DO THAT TYPE OF WORK IN MANAGING THEIR CANCER.

03:05   1   **Q.**   OKAY.   AND WOULD IT BE FAIR TO SAY TO DIAGNOSE PATIENTS

2   WITH CANCER AND TREAT THEM, THAT IT IS IMPORTANT THAT THEY

3   COOPERATE IN THE PROCESS?

4   **A.**   I THINK THAT WOULD BE FAIR.

5   **Q.**   OKAY.

6           **MR. ROBERT:**   JUDGE, I WANT TO -- AND I THINK I CAN

7   STREAMLINE THIS AS WELL BECAUSE THESE ARE ALL REFUSALS, AND

8   IT'S GOING TO BE PATIENT NO. 25.   I CAN EITHER GO THROUGH THESE

9   WITH HIM OR I CAN READ THEM INTO THE RECORD.

10          **THE COURT:**   YOU CAN READ THEM INTO THE RECORD AS

11   YOU'VE DONE IN THE PAST.

12          **MR. ROBERT:**   THIS IS PATIENT NO. 25, CANCER PATIENT,

13   I'VE GOT REFUSALS OF TREATMENT AT J10-21763; J10-21758;

14   J10-21718; J10-21712; J10-21700; J10-21740; J10-21637;

15   JT10-21636; JT10-21632; JT10-21617; J10-21577; J10-21576.   AND,

16   YOUR HONOR, I WANT TO CLARIFY BECAUSE I DON'T WANT THE RECORD

17   TO BE INCORRECT.   THE LAST THREE THAT I READ ARE NOT REFUSALS,

18   SO LET ME STRIKE J10-21617, J10-21577, AND J10-21576.

19   BY MR. ROBERT:

20   **Q.**   ALL RIGHT.   LET'S MOVE ON.   LET'S TALK ABOUT THE INTERNAL

21   SPECIALTY CLINICS AT LSP.   TELL ME ABOUT WHAT CLINICS YOU OFFER

22   AND JUST TELL ME A LITTLE ABOUT THEM.

23   **A.**   WELL, WE HAVE A VARIETY OF SPECIALTY CLINICS THAT COME TO

24   LSP.   LSU SENDS DERMATOLOGY.   LSU SENDS AN ORTHOPEDIST, AND LSU

25   SENDS SURGERY, GENERAL SURGERY.   WE HAVE AN OUTSIDE CONTRACT

03:07

1   WITH UROLOGY, WE HAVE A CONTRACT WITH NEUROLOGY, AND WE HAVE A

2   CONTRACT WITH HEPATITIS AND HIV.  AND THEN WE ALSO HAVE AN

3   OUTSIDE GROUP OF GI SPECIALISTS THAT COME IN AND DO

4   COLONOSCOPIES IN OUR TREATMENT BUILDING.

5   **Q.**   OKAY.  AND HOW ARE PATIENTS REFERRED TO THESE INTERNAL

6   SPECIALTY CLINICS AT ANGOLA?

7   **A.**   WELL, THOSE ARE THE REFERRALS WE TALKED ABOUT EARLIER

8   TODAY.  WHEN A PATIENT NEEDS A REFERRAL, MY STAFF PHYSICIANS

9   WILL MAKE A REFERRAL, AND IT'S SET UP IN A COLOR-CODED MANNER.

10  PINK REFERRALS ARE FOR IN-HOUSE REFERRALS AND WHITE REFERRALS

11  ARE FOR OUTSIDE REFERRALS.  SO I LOOK AT ALL THOSE REFERRALS

12  AND I EVALUATE THEM AND I SIGN OFF ON THEM IF I THINK THEY'RE

13  APPROPRIATE.

14  **Q.**   AND HOW OFTEN DO THESE OUTSIDE CLINICIANS HOLD THESE

15  INTERNAL CLINICS AT ANGOLA?

16  **A.**   THEY HOLD THEM QUITE OFTEN.  AND I FORGOT ONE OF THE

17  CLINICS.  IT WAS PODIATRY CLINIC.  WE HAVE AN OUTSIDE

18  SPECIALIST THAT COMES IN FOR PODIATRY.

19  **Q.**   OKAY.

20  **A.**   I FORGOT THAT.  BUT THEY COME IN QUITE OFTEN.  FOR

21  EXAMPLE, OUR LSU ORTHOPEDIC COMES IN TWICE A MONTH.  OUR

22  DERMATOLOGY COMES USUALLY ONCE OR SOMETIMES TWICE A MONTH, BUT

23  USUALLY ONCE A MONTH.  PODIATRY COMES THREE TIMES A MONTH.

24  NEUROLOGY COMES EVERY WEEK.  HE HAS AN AFTERNOON CLINIC EVERY

25  WEEK.  DR. BRUNNER, OUR UROLOGIST, COMES GENERALLY TWICE A

03:09

1    MONTH.  LET'S SEE, AND GI COMES ONCE A MONTH FOR SCOPES.

2    **Q.**   AND I RECALL YOU TALKING EARLIER ABOUT THIS PROCEDURES

3    BUILDING.  ARE THERE OTHER SERVICES, SPECIALTY-TYPE SERVICES

4    PROVIDED AT THAT BUILDING?

5    **A.**   WELL, PRIOR TO OUR DATE OF 9/16, WE DID HAVE A PAIN

6    MANAGEMENT DOCTOR COMING OVER THERE TO SUPPLY SOME SERVICES,

7    BUT WE USE PHYSICAL THERAPY IN THAT BUILDING, WE USE TELEMED IN

8    THAT BUILDING, WE USE THE GI ASSOCIATES IN THAT BUILDING, AND

9    WE USE RESPIRATORY.

10   **Q.**   WHAT ABOUT COLONOSCOPIES, DO Y'ALL DO THAT ON SITE?

11   **A.**   THAT'S WHERE THE GI ASSOCIATES COME IN AND THEY'LL DO

12   THOSE ON SITE.

13   **Q.**   I AM SHOWING MY LACK OF MEDICAL KNOWLEDGE RIGHT THERE.  MY

14   APOLOGIES.

15         NOW, SOMETIMES THERE'S A NEED TO REFER PATIENTS

16   OUTSIDE OF -- TO OUTSIDE SPECIALTY CLINICS, CORRECT?

17   **A.**   SURE.

18   **Q.**   AND WHEN DOES THAT OCCUR?

19   **A.**   OF COURSE, ANY SURGERY, MAJOR SURGERY THAT INVOLVES AN

20   OPERATING ROOM, WE REFER OUT.  BIOPSIES, LUNG BIOPSIES, LIVER

21   BIOPSIES.  SOMETIMES -- NOW WE CAN DO PFTS ON OUR COMPOUND BUT

22   SOMETIMES THE DOCTORS FROM LSU WANT THE PULMONARY FUNCTION

23   TESTS DONE DOWN IN NEW ORLEANS, SO SOMETIMES WE SEND THOSE OUT.

24   SOME OF THE HEART PROCEDURES LIKE CATHETERIZATIONS AND STENT

25   PLACEMENTS AND DEFIBRILLATOR PLACEMENTS AND PACEMAKER

1    PLACEMENTS, WE SEND ALL THAT OUT.  SO THERE'S A WIDE VARIETY

2    THAT WE DO SEND OUT.

3    **Q.**    OKAY.  AND THERE'S BEEN TESTIMONY ABOUT EARL K. LONG.  IS

4    THAT THE SPECIALTY PROVIDER THAT YOU USED PRIOR TO ITS CLOSING?

5    **A.**    YES.

6    **Q.**    OKAY.  AND WHEN EARL K. LONG CLOSED, DID THAT CAUSE ANY

7    PROBLEMS OR ANY ISSUES FOR ANGOLA IN GETTING THESE OUTSIDE

8    SPECIALTY SERVICES ADDRESSED?

9    **A.**    WELL, WITH THAT CLOSURE, WE LOST DERMATOLOGY FOR A WHILE.

10    WE LOST ORTHOPEDICS FOR A WHILE, AND WE LOST OUR GENERAL

11    SURGERY CLINIC FOR A WHILE.  I WANT TO SAY 14, 15 MONTHS MAYBE.

12    **Q.**    OKAY.  AND THAT'S THE INTERNAL CLINICS, RIGHT?

13    **A.**    THAT'S THE INTERNAL CLINICS.

14    **Q.**    WHAT ABOUT THE OUTSIDE, GETTING THESE PEOPLE TO OUTSIDE

15    SPECIALTY APPOINTMENTS AND SURGERIES AND STUFF, DID THE CLOSURE

16    OF EARL K. LONG AFFECT THAT?

17    **A.**    WELL, THAT WAS ONE OF OUR BIG ISSUES THAT WE HAD TO

18    OVERCOME, AND IT HAD A GREAT EFFECT ON THE WAY WE MANAGED CARE

19    AT ANGOLA.

20    **Q.**    TELL US ABOUT THAT.  WHAT HAPPENED?

21    **A.**    WELL, PRIOR TO EARL K. LONG CLOSING, I MEAN, WE HAD AN

22    OUTLET.  I MEAN, WE HAD A GOOD OUTLET.  WE HAD A RESIDENCY

23    HOSPITAL THAT WAS A TEACHING HOSPITAL THAT HAD RESOURCES, AND

24    ALL WE HAD TO DO WAS GET THESE PEOPLE TO BATON ROUGE, LESS THAN

25    AN HOUR AWAY, AND THEY HAD EVERY SERVICE THAT WE NEEDED.  AND

1  IT WORKED WELL.  WE HAD A SCHEDULING WHERE WE COULD SCHEDULE

2  DIRECTLY WITH EARL K. LONG.  WE COULD CALL, WE COULD SCHEDULE

3  APPOINTMENTS, AND WE DID NOT HAVE A PROBLEM.

4  **Q.**   AND AFTER EARL K. LONG CLOSED, HOW WERE THESE THINGS --

5  WHERE DID YOU SEND THESE FOLKS?

6  **A.**   WELL, WE SCRATCHED OUR HEAD FOR A WHILE BECAUSE WE DIDN'T

7  HAVE ANYWHERE TO SEND THEM.  THERE'S NOT A PRIVATE HOSPITAL IN

8  BATON ROUGE THAT WILL OPERATE ON AN OFFENDER UNLESS IT'S AN

9  EMERGENT -- AN EMERGENT OPERATION.  THEY JUST WON'T DO IT.

10  WE'VE HAD THEM DOWN THERE BEFORE AND THEY SENT THEM BACK.

11  THAT'S A PROBLEM FOR US.

12       SO WE STARTED DEVELOPING RELATIONSHIPS WITH SOME OF

13  THE CLOSER HOSPITALS LIKE LANE.  THAT'S WHEN WE STARTED USING

14  LANE FOR OUR CARDIAC PATIENTS.  OF COURSE, NO HOSPITAL CAN TURN

15  DOWN A CARDIAC PATIENT, AND LANE BEING THE CLOSEST HOSPITAL

16  WITH A TERTIARY, THE CLOSEST TERTIARY CENTER WITH A CATH LAB,

17  WE STARTED USING THEM.

18       CRITICAL PATIENTS THAT CAN'T MAKE IT TO NEW ORLEANS

19  FROM A RESPIRATORY OR TRAUMATIC BRAIN INJURY OR A TRAUMA, A

20  FIGHT, WE SEND THOSE TO OUR LADY OF THE LAKE BECAUSE THEY HAVE

21  THE RESOURCES THERE.

22       SO WE USED LANE, WE USED THE LAKE, AND AT THE END OF

23  THE PERIOD TOWARDS THE END OF, MIDDLE TO THE END OF 9 OF '16,

24  WE STARTING USING ST. FRANCISVILLE A LITTLE MORE BECAUSE WE HAD

25  MEETINGS WITH THEM AND WE TOLD THEM THAT WE HAD SOME NEEDS.

1   AND THEY WERE IN THE PROCESS OF BUILDING A NEW HOSPITAL AND

2   THEY SAID, YOU KNOW, WE MAY BE ABLE TO HELP Y'ALL WITH SOME OF

3   THOSE NEEDS, SO WE DEVELOPED A RELATIONSHIP WITH THEM.

4         WE STILL HAD A PROBLEM BECAUSE IN NEW ORLEANS, WHAT

5   WAS GOING ON, KATRINA HAD TAKEN OUT BIG CHARITY, SO THERE WAS

6   NO BIG CHARITY.  THEY WERE WORKING OUT OF AN INTERIM HOSPITAL

7   CALLED ILH, VERY SMALL.  THEY DIDN'T EVEN HAVE ENOUGH ROOM FOR

8   THEIR RESIDENTS TO GET ALL THEIR REQUIRED RESIDENCY

9   RECOMMENDATIONS SO THEY COULD GRADUATE.  THERE WERE NO

10   RESOURCES.  THAT WAS THE PROBLEM.  THERE WERE NO RESOURCES.  WE

11   HAD NO OUTLET.  SO FOR '13, '14, AND ON INTO THE LATE OF '14,

12   WE HAD PROBLEMS.  WE HAD NO OUTLET.  PEOPLE SAY, YOU SHOULD

13   HAVE SENT THEM.  PEOPLE WON'T TAKE THEM.  THEY WON'T TAKE THEM,

14   WE TRIED.  YOU KNOW, SO ELECTIVE SURGERIES WERE KIND OF PUT ON

15   THE BACK BURNER BECAUSE THEY'RE ELECTIVE SURGERIES.

16   **Q.**   AND WHAT ARE WE TALKING ABOUT?

17   **A.**   WELL, THINGS LIKE CATARACT, THINGS LIKE HERNIA REPAIR,

18   THINGS LIKE KNEE REPLACEMENTS, HIP REPLACEMENTS.  YOU KNOW,

19   UNLESS A HERNIA WAS INCARCERATED, WE COULDN'T GET THEM OPERATED

20   ON, BUT THEY OPERATED ON THE ONES THAT ARE INCARCERATED.  WE

21   NEVER KEPT PEOPLE TILL THEY WERE -- TILL THEY WERE CLOSE TO

22   DEATH BEFORE WE SENT THEM.  I MEAN, IF A HERNIA WAS

23   INCARCERATED, WE SENT IT.  THEY HAD TO OPERATE ON THAT, BUT AS

24   FAR AS THE ELECTIVE PROCEDURES, THERE WERE JUST NO OUTLETS AND

25   THERE WERE NO RESOURCES.

1  **Q.**   WHO WAS MAKING THE CALL AS TO WHETHER OR NOT THEY WOULD

2  SEE THESE HERNIAS AND CATARACTS, AND SO FORTH?

3  **A.**   WELL, WHAT LSU DID WAS THEY SET UP A TEAM BECAUSE THERE

4  WERE REFERRALS, OUT OF REFERRAL.  AND KEEP IN MIND, THIS ILH

5  HOSPITAL, IT NOT ONLY TOOK CARE OF THE INDIGENT OF NEW ORLEANS,

6  IT TOOK CARE OF THE ORLEANS PARISH PRISON, WHICH IS ABOUT 5,000

7  PEOPLE.  IT TOOK CARE OF ALL THE OTHER LITTLE PARISH PRISONS

8  THAT ARE AROUND THERE THAT HAD INDIGENT PEOPLE.  PLUS IT TOOK

9  CARE OF THE DEPARTMENT OF CORRECTIONS.  WE WERE NOT THE ONLY

10 USER OF THIS HOSPITAL.  THIS HOSPITAL WAS TRYING TO MANAGE THE

11 PATIENTS OF NEW ORLEANS.  YOU KNOW, AND WITHOUT THE BIG

12 CHARITY, YOU SHRINK THAT DOWN TO A TENTH OF ITS SIZE, YOU HAVE

13 ISSUES IN AND OF YOURSELF THERE.

14         SO THEY SET UP A TEAM, A PANEL, AND WE WOULD SEND OUR

15 REFERRALS DOWN THERE, AND THERE WAS A GATEKEEPER.  HER NAME WAS

16 DIANE ANGELICO, AND DIANE ANGELICO HAD CONTACT WITH THE MAIN

17 MEMBER OF THIS PANEL NAMED DR. KALKE, AND DR. KALKE SENT US

18 MESSAGE AFTER MESSAGE.  AND IT'S WELL DOCUMENTED IN THE CHART,

19 WE HAVE REVIEWED THIS SERVICE, BUT WE CAN'T PROVIDE IT AT THIS

20 TIME.

21         AND SO WE WERE IN A BIND.  WE WERE IN A BIND.  BUT

22 EVERYTHING WAS SET TO GO.  EVERYTHING WAS SET TO GO.  SO

23 WHEN -- AT THE END OF '14, BEGINNING OF '15 WHEN THAT NEW

24 HOSPITAL OPENED IN NEW ORLEANS, WE WERE SET TO GO.  AND WHEN

25 OUR RESOURCES OPENED UP, WE FLOODED THE GATE.  WE FLOODED THE

1    GATE, AND WE STARTED GETTING PEOPLE THE NEEDED PROCEDURES THAT

2    THEY REQUIRED.

3    **Q.**    LET ME STOP YOU FOR A SECOND.  ONCE THE NEW HOSPITAL IN

4    NEW ORLEANS OPENED UP, WERE YOU ABLE TO START GETTING THESE

5    HERNIAS REPAIRED AND THESE CATARACT SURGERIES DONE AND THOSE

6    KINDS OF THINGS?

7    **A.**    IT WAS AMAZING.  YOU KNOW, NOT ONLY DID THAT HOSPITAL OPEN

8    UP, WE STARTED HAVING A PARTNERSHIP WITH LALLIE KEMP, AND

9    LALLIE KEMP DID A LOT OF OUR HERNIA SURGERIES, THEY DID A LOT

10   OF OUR CARDIOLOGY.  BUT WHEN THE RESOURCES OPENED UP, YOU KNOW,

11   IT WAS UNBELIEVABLE THE AMOUNT AND THE NUMBER OF PEOPLE THAT WE

12   STARTED GETTING APPOINTMENTS FOR, WE STARTED GETTING PROCEDURES

13   FOR, YOU KNOW.

14   **Q.**    WHAT'S LALLIE KEMP?

15   **A.**    LALLIE KEMP IS A LITTLE HOSPITAL IN A TOWN CALLED

16   INDEPENDENCE, LOUISIANA.

17   **Q.**    AND WHO IS RUNNING THAT HOSPITAL?

18   **A.**    WELL, IT'S KIND OF AFFILIATED THROUGH LSU.  THEY USE A LOT

19   OF LSU PEOPLE TO RUN THAT HOSPITAL.

20   **Q.**    AND WHEN DID Y'ALL START BEING ABLE TO USE THAT AS AN

21   ADDITIONAL --

22   **A.**    ABOUT THE SAME TIME.  SO ALL OUR RESOURCES OPENED UP AT

23   THE SAME TIME.  AND THE THING ABOUT IT WAS, THE DEPARTMENT OF

24   CORRECTIONS, THE HEADQUARTERS OFFICE, THEY KNEW IT AND WE WERE

25   READY FOR IT, YOU KNOW, SO THESE GUYS WERE COMING UP TO ME, OH,

1   Y'ALL DON'T WANT TO PAY FOR MY SURGERY BECAUSE IT COST TOO --

2   THAT'S TOTAL BULL.  THERE NEVER WAS A DISCUSSION ABOUT WE WOULD

3   NOT PAY FOR A SURGERY BECAUSE OF COST.  IT HAD NOTHING TO DO

4   WITH COST.  IT HAD TO DO WITH RESOURCES.  AND WHEN OUR

5   RESOURCES OPENED UP, WE FLOODED THE GATE.

6            AND JUST PRIOR TO THE CLOSING OF OUR TIME PERIOD, I

7   THINK WE'VE HAD 80-SOME ODD HERNIA SURGERIES DONE.  I THINK

8   WE'VE HAD TEN OR SO KNEES DONE, SEVERAL HIPS, UNTOLD NUMBER OF

9   CATARACTS.  I MEAN, WE ARE -- THESE GUYS ARE GETTING TREATMENT.

10  **Q.**   LET'S SHIFT GEARS AND LET'S MOVE ON TO ANOTHER AREA,

11  PHARMACY AND THE MEDICAL ADMINISTRATION AREA AT ANGOLA.  TELL

12  ME ABOUT THE PHARMACY SERVICES THAT ANGOLA PROVIDES.

13  **A.**   WELL, BECAUSE IT'S MY PHARMACY, I THINK IT'S THE BEST ONE

14  AROUND, BUT I WORK VERY CLOSELY WITH MY PHARMACIST AND SHE

15  TAKES HER JOB VERY SERIOUSLY.  AND SHE FILLS PROBABLY 300,000

16  SCRIPTS A YEAR.  AND SHE NOT ONLY SUPPLIES MY POPULATION, BUT

17  SHE ALSO SUPPLIES THE DCI WHICH IS ANOTHER PENITENTIARY, AND

18  ONE CALLED AVOYELLES AT THAT TIME, WHICH THEY RENAMED TO

19  RAYMOND LABORDE.  SO SHE DOES THREE PENITENTIARIES.

20  **Q.**   AND WHO'S YOUR PHARMACIST?  WHAT'S HER NAME?

21  **A.**   HER NAME IS MARY LABATTUT.

22  **Q.**   AND YOU SUPERVISE HER?

23  **A.**   I DO.

24  **Q.**   OKAY.

25  **A.**   I LIKE TO THINK THAT I DO.  SOMETIMES I THINK SHE

1   SUPERVISES ME.

2   **Q.**   HOW OFTEN IS THE PHARMACIST ON CALL?

3   **A.**   WELL, MARY'S AVAILABLE 24 HOURS A DAY.  I CALL MARY ALL

4   THE TIME, BUT YOU KNOW, WE'VE DEVELOPED A PROGRAM WHERE WE HAVE

5   A 24-HOUR PHARMACIST ON CALL.

6   **Q.**   OKAY.  ARE YOU AWARE OR WERE YOU AWARE AS OF SEPTEMBER OF

7   2016 ANY ISSUES GETTING TIMELY MEDICATIONS THROUGH THE

8   PHARMACY?

9   **A.**   PRIOR TO '16?

10   **Q.**   RIGHT.

11   **A.**   SURE.

12   **Q.**   AND I DON'T WANT TO GO ALL THE WAY BACK TO PHARMACORR.

13   **A.**   OKAY.

14   **Q.**   WE DON'T EVEN NEED TO -- I'M TALKING ABOUT SINCE MARY

15   LABATTUT HAS BEEN IN THAT JOB.

16   **A.**   OH, ABSOLUTELY NOT.  ABSOLUTELY NOT.

17   **Q.**   TELL US ABOUT ANGOLA'S NARCOTICS POLICY.

18   **A.**   WELL, WE'RE A MAXIMUM SECURITY PENITENTIARY, AND WE DO NOT

19   SEND NARCOTICS OUTSIDE OF THE R.E. BARROW TREATMENT CENTER.

20   THAT'S OUR POLICY.

21   **Q.**   OKAY.  AND THE TREATMENT CENTER IS THAT AREA WE TALKED

22   ABOUT WHERE THE NURSING UNITS ARE, AND SO FORTH.  IT DOESN'T GO

23   OUT IN THE GENERAL POPULATION, CORRECT?

24   **A.**   CORRECT.

25   **Q.**   AND WHAT'S THE REASON FOR THE STRICT NARCOTICS POLICY?

**A.**   WELL, AGAIN, WE'RE A MAXIMUM SECURITY PENITENTIARY, AND WE

CAN'T HAVE NARCOTICS DISTRIBUTED BY THE MEDICAL DEPARTMENT

FLOATING AROUND OUT IN THE POPULATION FOR PEOPLE TO OVERDOSE

ON, FOR PEOPLE TO MODIFY THE PILL FORM AND SHOOT IT UP.  AND WE

JUST DON'T WANT TO BE A PART OF THAT AND WE CAN'T HAVE IT.

**Q.**   OKAY.  LET'S TALK ABOUT THE LAB AND RADIOLOGY.  DO YOU

OVERSEE THOSE AREAS?

**A.**   I DO.

**Q.**   TELL ME ABOUT THE LABORATORY SERVICES AT ANGOLA.

**A.**   WELL, OUR LAB IS UNIQUE.  WE'RE THE ONLY FACILITY IN DOC

WITH A LAB.  AND OUR LAB IS CLIA CERTIFIED WHICH IS THE

MONITORING BOARD FOR LABORATORIES, AND I THINK IT STANDS FOR

CLINICAL LABORATORY IMPROVEMENT AMENDMENTS OR SOMETHING LIKE

THAT.  BUT ANYWAY, IT'S A GOVERNING BODY THAT COMES AROUND TO

YOUR LAB AND IF YOU'RE NOT CLIA CERTIFIED, THEY CAN SHUT YOU

DOWN.  SO THE SAME STRINGENT GUIDELINES THAT ARE EXPECTED IN

THE FREE WORLD, OUR LAB UNDERGOES AND WE ARE CLIA CERTIFIED.

**Q.**   AND HOW OFTEN DOES THE -- WHAT'S THE HOURS OF THE LAB?

**A.**   WELL, OUR LAB IS OPEN FROM 7:30 TO 4:00, MONDAY THROUGH

FRIDAY.

**Q.**   AND ARE YOU ABLE TO GET SAME-DAY LABS?

**A.**   WE GET SAME-DAY LABS.

**Q.**   AND WHAT KIND OF LABS ARE PROVIDED THROUGH YOUR

LABORATORY?

**A.**   WELL, WE -- CURRENTLY WE SEND OUT -- WELL, NOT CURRENTLY.

0 3 : 2 2

1    AS OF 9 OF '16, WE SEND OUT VERY FEW LABS.  WE SEND OUT MOST OF

2    THE SPECIALTY LABS THAT ARE ORDERED BY THE RHEUMATOLOGY DOCTORS

3    AND THE HEMATOLOGY DOCTORS.  AND OUR TELEMED LABS SEEMS TO BE

4    THE ONES WE MOSTLY SEND OUT.  BUT WE CAN GET ROUTINE

5    CHEMISTRIES, WE CAN GET ROUTINE PSAS, WE CAN GET ROUTINE

6    THYROIDS, WE CAN GET THOSE ON SITE.

7    Q.    OKAY.  LABORATORY, DOES IT HAVE -- I MEAN, DOES THE LAB

8    HAVE A DIRECTOR?

9    A.    THE LAB HAS A DIRECTOR.  HIS NAME'S BRENDAN.  BRENDAN HAS

10    20-SOME ODD YEARS OF EXPERIENCE OUT IN THE FREE WORLD RUNNING

11    LABS.  AND WE'RE VERY LUCKY TO HAVE HIM.  HE'S COME INTO THE

12    LAB, HE'S LOOKED AT ALL THE POLICIES AND PROCEDURES, AND HE'S

13    GOT US ALL UP-TO-DATE.  AND AGAIN, WE HAVE A CLIA CERTIFICATE.

14    Q.    AND WHAT OTHER EMPLOYEES WORK IN THE LAB?  TELL ME ABOUT

15    HOW IT'S STAFFED.

16    A.    WELL, BRENDAN'S GOT TWO LAB TECHS AND A PHLEBOTOMIST, AND

17    THEN HE'S GOT AN ORDERLY IN THERE.

18    Q.    OKAY.  CAN YOU TELL US ABOUT THE RADIOLOGY SERVICES

19    PROVIDED AT ANGOLA?

20    A.    OUR RADIOLOGY SERVICE, I GUESS IT WAS ABOUT MAYBE '13,

21    '14, WE WENT TO DIGITAL.  I THINK IT WAS AROUND IN THAT AREA,

22    BUT WE WENT FROM THE OLD PLAIN FILM X-RAY TO DIGITAL X-RAY.

23    AND THAT DID SEVERAL THINGS FOR US.  NO.  1, WE WERE ABLE TO

24    SEND OUR X-RAYS FOR OVERREAD DIGITALLY TO A GROUP IN BATON

25    ROUGE, AND SO EVERY X-RAY WE TAKE, NOT ONLY IS IT READ BY

1  ANGOLA PHYSICIANS, IT'S OVERREAD BY A BATON ROUGE RADIOLOGY

2  GROUP.  SO OUR X-RAY IS DIGITAL.

3  WE DO IVPS OVER THERE WHICH IS A TEST, WE CAN INJECT

4  DYE INTO AN OFFENDER AND CHECK HIM FOR POSSIBLE KIDNEY STONES

5  OR BLADDER, KIDNEY ISSUES.  WE DON'T REALLY DO BARIUM SWALLOWS.

6  WE DO ESOPHAGRAMS.  BUT WE TRY TO KEEP IT SIMPLE.  AND THE

7  PEOPLE THAT ARE WORKING IN OUR LAB, IN OUR X-RAY DEPARTMENT,

8  SEVERAL OF THEM ARE FROM OLD CHARITY WHEN IT CLOSED DOWN, SO

9  THEY'RE VERY, VERY CAPABLE INDIVIDUALS.  AND I DON'T THINK WE

10  HAVE ANYBODY IN OUR X-RAY DEPARTMENT THAT HAS LESS THAN 15, 20

11  YEARS' EXPERIENCE.

12  **Q.**  WHAT'S THE AVAILABILITY OF RADIOLOGY AT ANGOLA?

13  **A.**  WELL, I REALLY DO HAVE 24-HOUR RADIOLOGY.  HOWEVER, THEY

14  ARE THERE FROM 7:00 TO 11:00, AND THEY ARE ON CALL.  THEIR CALL

15  ROOM IS RIGHT ACROSS THE STREET FROM THE TREATMENT CENTER.  SO

16  AT ANY POINT IN TIME IF I REALLY NEED TO GET AN X-RAY, I JUST

17  GO WAKE THEM UP.

18  **Q.**  OKAY.  THERE'S BEEN SOME DISCUSSION ABOUT MORTALITY REVIEW

19  AT ANGOLA.  TELL ME WHAT YOUR INVOLVEMENT IS IN MORTALITY

20  REVIEW.

21  **A.**  WELL, BASICALLY WHEN AN OFFENDER DIES IN ANGOLA, THERE'S A

22  DEATH SUMMARY THAT'S DONE, AND THOSE DEATH SUMMARIES ARE

23  GENERATED USUALLY BY THE PERSON THAT'S ON CALL OR BY ME.  AND

24  WE SEND THOSE DEATH SUMMARIES TO THE HEADQUARTERS OFFICE, AND

25  THEY ARE REVIEWED.  AND SOMETIMES THEY ASK FOR MORE INFORMATION

1   ON THE DEATH, SOMETIMES THEY'RE OKAY WITH WHAT WE SEND THEM.

2   BUT THAT'S GENERALLY HOW IT GOES.

3   **Q.**   AND WHAT HAPPENS ONCE YOU SEND THEM TO HEADQUARTERS?

4   WHAT, IF ANYTHING, IS DONE AFTER THAT?  DO YOU KNOW?

5   **A.**   WELL, THERE ARE TIMES WHEN IT WAS -- BACK THEN, IT WAS DR.

6   SINGH.  HE WOULD CALL AND HE WOULD ASK SOME MORE PERTINENT

7   QUESTIONS IF WE LEFT SOMETHING OUT OF THE DEATH SUMMARY THAT HE

8   THOUGHT WOULD BE VALUABLE FOR HIS UNDERSTANDING OF WHY THE GUY

9   DIED, BUT THAT'S PRETTY MUCH THE EXTENT OF IT.

10  **Q.**   WHEN THERE ARE SUSPICIOUS DEATHS AT ANGOLA, ARE AUTOPSIES

11  REQUESTED?

12  **A.**   ANY DEATH THAT'S UNEXPECTED, WE AUTOPSY, AND I MAKE THE

13  DECISIONS ON THE AUTOPSY.

14  **Q.**   AND WHO DOES THE AUTOPSIES?

15  **A.**   WELL, EAST BATON ROUGE PARISH DOES OUR AUTOPSY, AND I MUST

16  ADMIT, WE HAVE A VERY GOOD RELATIONSHIP WITH OUR CORONER IN ST.

17  FRANCISVILLE AND HE WORKS WITH US DILIGENTLY TO MAKE SURE

18  EVERYTHING IS DONE IN A MANNER THAT IT'S SUPPOSED TO BE DONE.

19  **Q.**   ALL RIGHT, DOCTOR, YOU'VE SAT HERE AND HEARD TESTIMONY

20  FROM DR. PUISIS ABOUT WHETHER OR NOT YOU THINK PATIENTS ARE

21  LYING, AND YOUR ATTITUDE TOWARD PATIENTS, AND I JUST WANT TO

22  ASK YOU IF YOU AGREE WITH HIS ASSESSMENT.

23  **A.**   YOU KNOW, DR. PUISIS SPOKE WITH ME FOR ABOUT 20 MINUTES,

24  OKAY.  HE NEVER CAME TO ONE OF OUR MORNING MEETINGS.  HE NEVER

25  FOLLOWED ME AROUND THE HOSPITAL.  HE NEVER SAW MY INTERACTION

1  WITH OFFENDERS.  HE READ A REPORT FROM THE MEDICAL BOARD, ONE

2  REPORT.  THERE'S SEVERAL RECORDS FROM THE MEDICAL BOARD.  HE

3  EXTRAPOLATED SOME SENTENCES THAT I SAID IN A DEPOSITION WHEN

4  I'M NOT PROFESSIONAL AT GIVING A DEPOSITION.  AND THAT'S HOW

5  YOU MAKE AN EXPERT OPINION.  I THINK IT'S VERY UNEXPERTLY.

6         MATTER OF FACT, HE SHOULD HAVE FOLLOWED ME AROUND.

7  HE SHOULD HAVE SEEN MY DAILY INTERACTION WITH OFFENDERS.  HE

8  DON'T KNOW ME.  HE DON'T KNOW ANYTHING ABOUT ME.  WHAT HE

9  SHOULD KNOW ABOUT ME IS THAT WHAT I'VE GONE THROUGH, I'M THERE

10 FOR A REASON, I'M THERE TO TAKE CARE OF THESE PATIENTS, RIGHT.

11 HE DON'T KNOW ME.  EXCUSE ME.

12 **Q.**   HAD -- OKAY, GO AHEAD.

13 **A.**   WE TAKE PRIDE IN OUR WORK, AND WE TAKE VERY GOOD CARE OF

14 THESE PEOPLE.  YOU DO A CHART REVIEW AND YOU DON'T KNOW WHAT

15 YOU'RE LOOKING AT, AND YOU'RE MAKING STATEMENTS ABOUT A CHART

16 REVIEW WHEN YOU DON'T HAVE THE FULL STORY.  IT'S NOT FAIR.

17 JUST GIVE US A FAIR SHAKE.  THAT'S IT, THAT'S ALL WE WANT.

18 YOU'RE NOT GIVING US A FAIR SHAKE.  YOU CAME IN THERE WITH A

19 SLANTED VIEW.  YOU WROTE SOME SLANTED DOCUMENTS, AND THEY'RE

20 NOT FAIR.  SOME OF THEM ARE FAIR.  I AGREE, SOME OF THEM ARE

21 FAIR, I DO.  OKAY, SO I'M GOING TO BE QUIET.

22 **Q.**   LET'S JUST FOCUS -- LET'S FOCUS ON THE MALINGERING ISSUES.

23 HAVE YOU EVER WRITTEN UP ANYBODY FOR MALINGERING?

24 **A.**   I'VE NEVER WRITTEN UP ANYBODY FOR MALINGERING.

25 **Q.**   HAVE YOU EVER TREATED A PATIENT OR BASED YOUR TREATMENT OF

03:29

1    A PATIENT ON WHETHER OR NOT YOU THOUGHT THEY WERE LYING TO YOU?

2    **A.**    I CLARIFIED THIS IN ONE OF THE DEPOSITIONS.  I GAVE SO

3    MANY OF THEM.  THE TOUGHEST PART OF MY JOB IS DETERMINING WHEN

4    IT COMES TO PAIN, WHO'S TELLING ME THE TRUTH.  THAT'S TRUE.  I

5    TALK ABOUT THIS WITH MY NEUROLOGIST ON A WEEKLY BASIS.  DR.

6    BARKMEYER'S BEEN AROUND 30, 40 YEARS AND WE TALK ALL THE TIME

7    ABOUT THIS, AND I USE A MULTITUDE OF FACTORS TO DETERMINE IF

8    SOMEBODY'S TELLING ME THE TRUTH, I DO.  PEOPLE USE THE WORD

9    "EXCRUCIATING" AT ANGOLA LIKE IT'S A DAILY TERMINOLOGY.  "I'M

10   IN EXCRUCIATING PAIN."

11            WELL, IF YOU GO BACK THROUGH THE CHART AND YOU KNOW

12   HOW ANGOLA WORKS, OKAY, IF YOU LOOK AT A GUY AND HE'S SPRAINED

13   HIS ANKLE PLAYING BASKETBALL, OKAY, FINE, WE SEE THAT ALL THE

14   TIME.  ALL OF A SUDDEN, HE GOES FROM A DORM TO A CELLBLOCK AND

15   HIS PAIN COMPLAINTS INCREASE.  WELL IF YOU KNOW HOW THE

16   PENITENTIARY WORKS, YOU JUST DON'T GO FROM THE DORM TO A

17   CELLBLOCK WITHOUT SOME TYPE OF ISSUE, AND SO IF A GUY -- IF I

18   SEND A GUY TO NEUROLOGY, IF I SEND A GUY TO ORTHOPEDICS, IF I

19   SEND A GUY THROUGH THE CLINIC THAT I HAVE AND I CAN'T CONFIRM

20   THAT COMPLAINT OF PAIN, THEN I HAVE PROBLEMS.  I HAVE TO MAKE

21   DECISIONS.  SO IS IT THE TOUGHEST PART OF MY JOB?  SURE, IT'S

22   THE TOUGHEST PART OF MY JOB.

23   **Q.**    I HAVE EVEN HEARD STORIES THAT YOU TOLD DYING PATIENTS

24   THAT --

25            **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  HE IS

1    LITERALLY TESTIFYING NOW.

2              **THE COURT:**  SUSTAINED.

3    **BY MR. ROBERT:**

4    **Q.**    OKAY.  DO YOU CARE ABOUT THESE PATIENTS?

5    **A.**    I DO.  AS A MATTER OF FACT, I'M ONE OF THEM, YOU KNOW.

6    THERE'S NO SECRET ABOUT THAT.  Y'ALL MAKE IT CLEAR.  I MEAN, I

7    DID DO PENITENTIARY TIME AND I AM CONSIDERED A CONVICT.  AND

8    I'M ONE OF THEM.  I KNOW WHERE I CAME FROM.  I NEVER FORGET

9    WHERE I CAME FROM AND THAT'S WHY I'M THERE.  THAT'S EXACTLY WHY

10   I'M THERE.  I'M THERE TO HELP THESE INDIVIDUALS.  AND I'M GOING

11   TO CONTINUE TO HELP THEM.

12   **Q.**    HOW MANY OF THESE PATIENTS HAVE YOU -- BELIEVE YOU HAVE

13   SEEN OVER THE YEARS THAT YOU'VE BEEN AT ANGOLA?

14   **A.**    THOUSANDS.

15   **Q.**    WHAT'S IT LIKE WHEN YOU TREAT A PATIENT AND THEY GET

16   BETTER?

17   **A.**    WELL, I'M GOING TO PUT IT TO YOU LIKE THIS.  WHEN THE

18   OFFENDERS AT THE PENITENTIARY HEARD THAT THEY WERE HAVING A

19   TRIAL AND I WAS BEING INVOLVED IN A TRIAL, THERE WERE BUS LOADS

20   WANTING TO COME UP HERE AS A CHARACTER WITNESS FOR ME, BUS

21   LOADS.

22              **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  HEARSAY.

23              **THE COURT:**  SUSTAINED.

24              **THE WITNESS:**  SO IT'S VERY SATISFYING.

25   **BY MR. ROBERT:**

**Q.**   DO YOU FIND YOUR JOB REWARDING?

**A.**   I DO.

**Q.**   DO YOU FEEL LIKE YOU DO IT WELL?

**A.**   I DO IT WELL AND MY STAFF DOES IT WELL.  NOW, WE ARE NOT PERFECT.  WE ARE NOT PERFECT.

**Q.**   OKAY.

**A.**   YOU KNOW, BUT WE DO IT WELL.

**Q.**   AND YOU'RE A DEFENDANT IN THIS LAWSUIT, CORRECT?

**A.**   YES.

**Q.**   OKAY.  AND AS A DEFENDANT, THERE'S ALLEGATIONS THAT YOU HAVE BEEN DELIBERATELY INDIFFERENT TO THE NEEDS OF YOUR PATIENTS.  YOU'RE AWARE OF THAT?

**A.**   I'M AWARE OF THAT.

**Q.**   HAVE YOU EVER INTENTIONALLY IGNORED THE HEALTHCARE NEEDS OF YOUR PATIENTS AT ANGOLA?

**A.**   I HAVE NOT.

**Q.**   WHEN AN ISSUE WAS BROUGHT TO YOUR ATTENTION, DO YOU TRY TO ADDRESS IT?

**A.**   I TRY TO.

**Q.**   ARE YOU PERFECT?

**A.**   I'M NOT PERFECT.

           **MR. ROBERT:**  THAT'S ALL I HAVE, YOUR HONOR.

           **THE COURT:**  OKAY.  WE ARE GOING TO TAKE A 15-MINUTE RECESS.  WE'LL BE BACK AT 3:45.

                           **(RECESS.)**

1          **THE COURT:**  BE SEATED.

2                  YOUR WITNESS, MS. MONTAGNES.

3          **MS. MONTAGNES:**  AND IF WE COULD HAVE ACCESS TO THE

4    COMPUTER SCREEN.

5                        **CROSS-EXAMINATION**

6    BY MS. MONTAGNES:

7    **Q.**   GOOD AFTERNOON, DR. LAVESPERE.

8    **A.**   GOOD AFTERNOON.

9    **Q.**   TO YOUR KNOWLEDGE, MEDICAL PERSONNEL HAVE NOT MADE ANY

10   JUDGMENT ERRORS IN THE PAST FIVE YEARS THAT CONTRIBUTED TO ANY

11   PATIENT'S DEATH?  THAT WAS FROM 2010 TO 1015, CORRECT?

12   **A.**   SAY THAT AGAIN.

13   **Q.**   TO YOUR KNOWLEDGE, MEDICAL PERSONNEL HAVE NOT MADE ANY

14   JUDGMENT ERRORS IN THE PAST FIVE YEARS THAT CONTRIBUTED TO ANY

15   PRISONER'S DEATH?

16   **A.**   IF I SAID THAT, I BELIEVED IT BACK THEN, YES.

17   **Q.**   AND THAT WAS AN INTERROGATORY ANSWER THAT YOU GAVE?

18   **A.**   YES.

19   **Q.**   AND YOU VERIFIED THAT INTERROGATORY?

20   **A.**   I DON'T KNOW HOW I WOULD HAVE VERIFIED IT.

21   **Q.**   AND YOU RESERVED THE RIGHT TO MODIFY THAT ANSWER, CORRECT?

22   **A.**   SURE.

23   **Q.**   AND YOU DIDN'T?

24   **A.**   I DIDN'T?

25   **Q.**   AND THIS IS THE VERIFICATION OF THAT INTERROGATORY.  DOES

1    THAT REFRESH YOUR RECOLLECTION?

2    **A.**    SURE.  BACK IN 2016, YES.

3    **Q.**    AND WHEN YOU DID YOUR DEPOSITION, YOU SAID THAT YOU DIDN'T

4    HAVE ANY PROBLEMS GETTING SURGERIES FOR YOUR PATIENTS?

5    **A.**    AT THE TIME OF MY DEPOSITION, THINGS HAD OPENED UP AND WE

6    WEREN'T HAVING ANY ISSUES.

7    **Q.**    YOUR LEADERSHIP STAFF IS PRETTY STABLE?

8    **A.**    SURE.

9    **Q.**    MANY OF YOU HAVE BEEN IN YOUR ROLES FOR SOME TIME?

10   **A.**    YES.

11   **Q.**    YOU'VE BEEN THERE SINCE 2009?

12   **A.**    I HAVE.

13   **Q.**    SHERWOOD PORET, YOUR DIRECTOR OF NURSING, HAS BEEN THERE

14   SINCE 2011?

15   **A.**    I THINK HE HAD SOME TIME BEFORE THAT THAT HE WAS THERE AND

16   HE WENT BACK TO NURSING SCHOOL AND CAME BACK.

17   **Q.**    AND TRACY FALGOUT, THE WARDEN OVER MEDICAL, HAS BEEN AT

18   ANGOLA SINCE 2000?

19   **A.**    I'M NOT SURE.

20   **Q.**    WOULD THAT SURPRISE YOU?

21   **A.**    IT WOULDN'T SURPRISE ME.

22   **Q.**    MARY ANNETTE DUPRY CARROLL, YOUR RN MANAGER, HAS BEEN

23   THERE SINCE 2003?

24   **A.**    THAT WOULDN'T SURPRISE ME EITHER.

25   **Q.**    TONIA FAUST, THE HEAD OF HOSPICE, HAS BEEN THERE SINCE

1    2001?

2    **A.**    IT WOULDN'T SURPRISE ME.

3    **Q.**    KELLEY HAWKINS, WHO RUNS THE MEDICAL RECORDS DEPARTMENT,

4    HAS BEEN THERE SINCE 1997?

5    **A.**    IT WOULDN'T SURPRISE ME.

6    **Q.**    PAUL TOCE, ANOTHER DOCTOR IN THE UNIT, HE'S BEEN THERE

7    SINCE 2001?

8    **A.**    NO.

9    **Q.**    WHEN DID HE ARRIVE?

10    **A.**    LET'S SEE, HE ARRIVED AFTER I DID.

11    **Q.**    OKAY.  MAYBE IT WAS 2010?

12    **A.**    MAYBE.

13    **Q.**    CINDY PARK, THE NURSE PRACTITIONER, HAS BEEN THERE SINCE

14    2014?

15    **A.**    AND PRIOR TO THAT, SHE WORKED AT HUNT FOR SEVERAL YEARS,

16    YES.

17    **Q.**    AND DARREN CASHIO, YOUR LEAD EMT, HE'S BEEN THERE SINCE

18    1999?

19    **A.**    YEAH, IT WOULDN'T SURPRISE ME, BUT I DON'T KNOW.

20    **Q.**    AND MARY LABATTUT, YOUR PHARMACIST, STARTED IN 1994?

21    **A.**    I WOULDN'T KNOW.

22    **Q.**    BUT THAT WOULDN'T SURPRISE YOU?

23    **A.**    IT WOULDN'T SURPRISE ME.

24    **Q.**    AND YOUR ADMINISTRATIVE RESPONSIBILITIES ARE RIDICULOUS?

25    **A.**    DO WHAT?

1   Q.   YOUR ADMINISTRATIVE RESPONSIBILITIES ARE RIDICULOUS?

2   A.   I DON'T THINK SO.

3   Q.   YOU DON'T THINK SO?

4           MARTHA, COULD WE BRING UP --

5           DO YOU RECALL TAKING A DEPOSITION IN THIS MATTER?

6   A.   I TOOK SEVERAL OF THEM.

7   Q.   DO YOU RECALL TAKING AN INDIVIDUAL DEPOSITION?

8   A.   I TOOK SEVERAL OF THEM.

9   Q.   OKAY.  WELL, DO YOU RECALL TAKING A DEPOSITION WITH ME IN

10  AUGUST OF 2016?

11  A.   AT MR. HILBURN'S OFFICE?

12  Q.   YES.

13  A.   YES.

14  Q.   OKAY.  I'M GOING TO THE DIRECT YOUR ATTENTION TO LINE

15  78 -- TO PAGE 78, LINE 16.

16          AND I ASKED YOU, "DO YOU CARRY A FULL PATIENT LOAD?"

17          AND YOU SAID, "I CAN'T."

18          AND I SAID, "ABOUT WHAT'S YOUR PATIENT LOAD?"

19          AND YOU SAID, "IT DEPENDS ON HOW MUCH LEGAL WORK I

20  HAVE TO DO.  I WAS IN COURT TODAY.  I'M HERE -- YESTERDAY.  I'M

21  HERE TODAY, SO YOU KNOW, IT DEPENDS."

22          AND THEN WE GO DOWN.  AND IF YOU GO TO PAGE 79, IT

23  SAYS, "BUT THE ADMINISTRATIVE DUTIES I CARRY RIGHT NOW ARE

24  RIDICULOUS."

25  A.   YES, I AGREE WITH THAT.

03:57   1   **Q.**   AND YOU'RE NOT ABLE TO CARRY A FULL PATIENT LOAD AS A
2   RESULT?
3   **A.**   NO, THAT'S NOT EXACTLY WHAT THAT MEANS AT ALL.  WHAT THIS
4   MEANS RIGHT HERE IS WHEN Y'ALL CAME IN AND Y'ALL STARTED ASKING
5   SO MUCH WORK OF US, IT TOOK ME AWAY FROM MY WORK.  BECAUSE THE
6   ATTORNEYS STARTED BEING IN CONTACT WITH ME AND WANTED ME TO
7   REVIEW CHARTS AND WANTED ME TO REVIEW ALL THIS DATA.  I DIDN'T
8   HAVE TIME TO DO THAT.  MY WORKLOAD WAS RIDICULOUS AT THAT TIME
9   BECAUSE I COULDN'T KEEP UP WITH IT BECAUSE EVERY DAY, Y'ALL
10   WERE ASKING FOR SOMETHING DIFFERENT.  Y'ALL WANTED ANOTHER
11   CHART.  Y'ALL WANTED DIFFERENT THINGS HERE.  Y'ALL WANTED
12   DIFFERENT THINGS THERE.  SO Y'ALL COMING INTO THE FACILITY TOOK
13   ME AWAY FROM MY WORK.  SO MY WORKLOAD DID BECOME RIDICULOUS,
14   BUT IT'S NOT A RIDICULOUS THING WITHOUT THE LEGAL WORK THAT I
15   HAVE TO DO.  IT'S VERY MANAGEABLE.  SO THAT'S TAKEN OUT OF
16   CONTEXT.
17   **Q.**   AND YOU'RE NOT ABLE TO CARRY A FULL PATIENT LOAD?
18   **A.**   NOW I DON'T, NO.
19   **Q.**   BUT YOU TRY TO HELP OUT IN THE UNITS AS YOU CAN?
20   **A.**   I HELP OUT IN -- A FULL PATIENT LOAD MEANS I'M NOT SEEING
21   CLINIC PATIENTS, OKAY.  I HELP OUT IN THE UNITS EVERY DAY, BUT
22   I DON'T CARRY A FULL CLINIC LOAD BECAUSE NOW, I HAVE A FULL
23   ADMINISTRATIVE LOAD.
24   **Q.**   ALL RIGHT.  AND YOU MENTIONED THAT YOU RECRUIT PHYSICIANS
25   FROM THE PHYSICIANS HEALTH FOUNDATION?

1   **A.**   I DO?

2   **Q.**   AND WHAT IS THE PHYSICIANS HEALTH FOUNDATION?

3   **A.**   THE PHYSICIANS HEALTH FOUNDATION IS THE MONITORING BOARD

4   AND THAT IS WHERE THE REPORTS ARE GOING TO BE SENT FROM THE

5   MEDICAL DIRECTORS.

6   **Q.**   AND THE PHYSICIANS HEALTH FOUNDATION IS AN ORGANIZATION

7   FOR IMPAIRED PHYSICIANS?

8   **A.**   IT'S AN ORGANIZATION FOR IMPAIRED PHYSICIANS THAT MONITORS

9   THEIR TREATMENT, IT MONITORS THEIR DRUG SCREENS, IT MONITORS

10  EVERYTHING ABOUT US.

11  **Q.**   AND YOU MENTIONED SEVERAL DOCTORS WHO WERE IN THE EMPLOY

12  IN SEPTEMBER OF 2016.  AND ALL OF THOSE DOCTORS HAD, AT ONE

13  TIME, A RESTRICTED LICENSE, RIGHT?

14  **A.**   NOT ALL OF THEM.

15  **Q.**   WHO DIDN'T?

16  **A.**   WELL, AT THE TIME, DR. COLLINS NEVER HAD A RESTRICTED

17  LICENSE.

18  **Q.**   SO YOU MENTIONED --

19  **A.**   OH, IN '15.

20  **Q.**   SEPTEMBER OF 2016, YOU LISTED DOCTORS?

21  **A.**   YES, YOU'RE RIGHT.

22  **Q.**   YOU ALSO MENTIONED THAT YOU HAVE -- THAT THE CALL

23  RESPONSIBILITIES REALLY PREVENT YOUR ABILITY TO RECRUIT DOCTORS

24  BECAUSE THE CALL SCHEDULE IS SO INTENSE?

25  **A.**   WELL, THERE'S OPPORTUNITIES FOR PEOPLE IN THE WORLD WHERE

04:00

1    THEY DON'T HAVE TO HAVE THAT ASPECT OF A MEDICAL PRACTICE.  AND

2    IT'S A VERY ATTRACTIVE ASPECT OF MEDICAL PRACTICE.  AS A

3    RESIDENT, WHEN YOU'RE GOING THROUGH SCHOOL AND YOU'RE GOING

4    THROUGH YOUR RESIDENCY PROGRAM, NOBODY LIKES TO TAKE CALL.

5    NOBODY DOES.  SO IF YOU'RE ALLOWED AN OPPORTUNITY IN THE

6    PRIVATE SECTOR WHERE YOU DON'T HAVE TO TAKE CALL, WOULD YOU

7    RATHER CHOOSE ONE WHERE YOU HAVE TO TAKE CALL AND PAYS YOU LESS

8    MONEY, OR ONE WHERE YOU DON'T HAVE TO TAKE CALL AND PAYS YOU

9    MORE MONEY.  TO ME, THAT'S A NO BRAINER.

10   **Q.**   DR. LAVESPERE, I APPRECIATE THE EXPLANATION, BUT THAT'S

11   NOT THE QUESTION I ASKED YOU.  WE'RE GOING TO BE HERE FOR A

12   VERY LONG TIME.

13   **A.**   WELL, THAT'S OKAY.

14   **Q.**   SO MY QUESTION TO YOU WAS:  YOU MENTIONED THAT THE CALL

15   SCHEDULE IS ONE OF THE THINGS THAT MAKES IT HARD TO RECRUIT

16   PHYSICIANS.

17   **A.**   SURE.

18   **Q.**   AND IF YOU HAD MORE PHYSICIANS, THE CALL SCHEDULE WOULD BE

19   LESS?

20   **A.**   IT WOULD.

21   **Q.**   YOU TALKED BRIEFLY ABOUT THE MEDICAL DORMS.  YOU MENTIONED

22   ASH 2 AND CYPRESS 2 AS THE MEDICAL DORMS?

23   **A.**   THEY'RE ASSISTED LIVING DORMS.

24   **Q.**   SURE.  ASSISTED LIVING DORMS.  THERE ARE NO ASSISTED

25   LIVING DORMS IN THE OUTCAMPS?

**A.**   NO.

**Q.**   OKAY.  YOU TALKED ABOUT SICK CALL.  YOU TALKED A BIT ABOUT HOW EMTS REFER SICK CALLS TO DOCTORS.  BUT MOST OF THE TIME, THEY DON'T REFER THEM TO DOCTORS, RIGHT?

**A.**   WELL, I DON'T HAVE STATISTICS ON THAT.

**Q.**   OKAY.

MARTHA, COULD YOU BRING UP PLAINTIFFS' EXHIBIT 41 AT 39-41.  ALL RIGHT.  AND IF WE COULD BLOW UP THAT BOX THAT SAYS "SICK CALL," IT'S ONE, TWO, THREE, FOUR BOXES DOWN.

CAN YOU READ THAT, DR. LAVESPERE?

**A.**   IT'S NOT BLOWN UP ON MY SCREEN.

**Q.**   OKAY.

**A.**   OKAY.  TOTAL SICK CALLS, EVALUATED 7/26.  TOTAL REFERRED TO THE ATU, 21.  REFERRED TO A PRIMARY HEALTHCARE CHART REVIEW, 235.  SO A THIRD, A LITTLE LESS THAN A THIRD.

**Q.**   OKAY.

AND MARTHA, CAN WE TURN TO PLAINTIFFS' EXHIBIT 6 AT 275.

YOU MENTIONED THAT THE PHYSICAL SPACE THAT WAS SHOWN IN THOSE DEMONSTRATIVES IS ACTUALLY AN OFFICE, A SECOND OFFICE THAT YOU'VE CREATED AT THE CLINICAL SPACE.  IS THIS PICTURE ON THE TOP RIGHT-HAND CORNER, IS THAT YOUR OFFICE?

**A.**   NO.

**Q.**   OKAY.

AND MARTHA, COULD YOU PULL UP AT 277.

1       AND ARE ANY OF THESE SPACES YOUR OFFICE?

2  **A.**    YES.

3  **Q.**    WHICH ONE?

4  **A.**    THE ONE ON THE LOWER LEFT.

5  **Q.**    THAT'S YOUR OFFICE?

6  **A.**    THAT'S ONE OF THE ONES THAT I USE, YES.

7  **Q.**    THAT'S ONE OF THE ONES THAT YOU USE.  THAT'S A THIRD

8  OFFICE?

9  **A.**    I USE -- IF WE HAVE A SPECIALTY DOCTOR THAT COMES IN, I

10  HAPPEN TO HAVE THE NICEST CHAIR, AND WE HAD A UROLOGY DOCTOR

11  THAT SLIPPED AND FELL AND BROKE HIS TAILBONE, AND SO I ALLOW

12  HIM TO USE MY OFFICE, NO.  1, BECAUSE IT HAS A BATHROOM IN IT,

13  AND NO. 2, BECAUSE IT HAS THE COMFORTABLE CHAIR.  SO FROM TIME

14  TO TIME, I ROTATE OFFICES, YES.

15  **Q.**    OKAY.  SO ON THE SAME DAY, YOU WERE USING THIS OFFICE AND

16  THE OTHER OFFICE?

17  **A.**    NO.

18  **Q.**    SO ALL THESE PHOTOS WERE TAKEN ON THE SAME DAY, DOCTOR.

19  **A.**    OKAY.

20  **Q.**    SO ON THAT BOTTOM LEFT CORNER, THAT'S A DAY WHEN YOU'RE

21  USING THAT FOR YOUR OFFICE?

22  **A.**    NOT NECESSARILY, BUT THAT'S TYPICAL OF WHAT I GO THROUGH.

23  SO --

24  **Q.**    BUT IT ALSO COULD BE TYPICAL OF --

25  **A.**    I DIDN'T KNOW THEY WERE TAKEN ON THE SAME DAY.

04:03   1   **Q.**   OKAY.  ALSO COULD BE TYPICAL OF HOW THE CLINICAL SPACES
2   LOOK?
3   **A.**   SURE.
4   **Q.**   AND YOU TALKED ABOUT AT LENGTH ABOUT THE LIMITED
5   INTERACTION THAT YOU HAD WITH PLAINTIFFS' EXPERTS DURING THE
6   EXPERT TRIP TO ANGOLA IN MARCH OF 2016?
7   **A.**   YES.
8   **Q.**   BUT ARE YOU AWARE THAT, IN FACT, YOUR COUNSEL LIMITED
9   THOSE INTERACTIONS?
10   **A.**   NO.
11   **Q.**   ARE YOU AWARE THAT STAFF WAS TOLD NOT TO INTERACT WITH US?
12   **A.**   STAFF WASN'T TOLD NOT TO INTERACT WITH YOU.
13   **Q.**   THAT WAS REPORTED TO PLAINTIFFS' EXPERTS.
14   **A.**   I DON'T REMEMBER TELLING THEM THAT.
15   **Q.**   ALL RIGHT.  TALKING ABOUT MEDICAL RECORDS' DEPARTMENT.
16   MEDICAL RECORDS' DEPARTMENT ARE RESPONSIBLE FOR MAKING SURE
17   POLICIES ARE FOLLOWED?
18   **A.**   WHICH KIND OF POLICIES?
19   **Q.**   DO YOU REMEMBER TAKING A DEPOSITION WITH ME?
20   **A.**   I DO, BUT IT'S, WHAT, THREE YEARS AGO?
21   **Q.**   YEAH.  SO LET'S PULL IT UP.  36, LINE 15 THROUGH 22.
22         SO HERE WE'RE TALKING ABOUT PRIMARY CARE GUIDELINES.
23   AND I SAY, "AND YOU FOLLOW THOSE POLICIES?"
24         YOU SAY, "WELL, WE TRY."
25         AND I SAID, "AND WHO TRACKS WHETHER OR NOT THOSE

1   POLICIES ARE BEING FOLLOWED?"

2          AND YOU SAID, "I GUESS THE MEDICAL RECORDS'

3   DEPARTMENT."

4   **A.**   BUT THAT'S NOT A POLICY.  THAT'S A GUIDELINE.

5   **Q.**   OKAY.  WELL, MY -- IT WAS MY LANGUAGE THAT WAS INCORRECT,

6   BUT IT WAS -- IT'S THE MEDICAL RECORDS --

7   **A.**   WELL, MEDICAL RECORDS HAS AN INPUT IN TRACKING THOSE AND

8   MEDICAL RECORDS, LIKE I SAID JUST A WHILE AGO, NOT ONLY MEDICAL

9   RECORDS, BUT THE NURSE, THE CLINIC NURSE SUPERVISOR TOGETHER,

10  THEY TRACK THOSE.

11  **Q.**   OKAY.  AND MEDICAL RECORDS ALSO TRACKS WHETHER OR NOT

12  PHYSICALS ARE TAKING PLACE?

13  **A.**   THEY DO.

14  **Q.**   OKAY.  YOU SPOKE SPECIFICALLY ABOUT HAVING DIFFICULTY

15  GETTING HERNIA AND CATARACT SURGERIES, DIDN'T YOU?

16  **A.**   I DID.

17  **Q.**   AND YOU'VE BEEN SUED SEVERAL TIMES RELATED TO HERNIA

18  SURGERIES AND CATARACT SURGERIES?

19  **A.**   BY YOUR HUSBAND.

20  **Q.**   YOU'VE BEEN SUED SEVERAL TIMES RELATED TO HERNIA SURGERIES

21  AND CATARACT SURGERIES, HAVEN'T YOU?

22  **A.**   I HAVE, BY YOUR HUSBAND.

23  **Q.**   AND OTHER ATTORNEYS AS WELL, RIGHT, DR. LAVESPERE?

24  **A.**   THAT WORK WITH YOUR HUSBAND.

25  **Q.**   YOU'VE BEEN SUED BY SEVERAL LAWYERS AND SEVERAL PLAINTIFFS

04:06 1    RELATED TO HERNIA SURGERIES?

2    **A.**   I HAVE.

3    **Q.**   AND CATARACT SURGERIES?

4    **A.**   YES.

5    **Q.**   DR. LAVESPERE, AT THE BREAK, DID YOU GO TO THE BATHROOM?

6    **A.**   DO WHAT?

7    **Q.**   DID YOU GO TO THE BATHROOM AT THE BREAK?

8    **A.**   I DID?

9    **Q.**   AND DID YOU HAVE A CONVERSATION WITH YOUR CO-DEFENDANT,

10   MR. FALGOUT, IN THE BATHROOM?

11   **A.**   I SPOKE TO HIM IN THE BATHROOM.

12   **Q.**   AND DID YOU SAY, "IF I SEE THAT COCKSUCKER, I'M GOING TO

13   WHIP HIS ASS"?

14          **MR. ROBERT:**  YOUR HONOR, WHAT'S THE RELEVANCE OF WHAT

15   WAS SAID OR POTENTIALLY SAID IN A BATHROOM?

16          **MS. MONTAGNES:**  THE RELEVANCE, YOUR HONOR, IS THAT HE

17   GOT UP HERE AND TALKED ABOUT HOW -- AND PUT HIS CREDITABILITY

18   ON THE LINE, AND HE MADE SEVERAL STATEMENTS ABOUT HIS

19   COMPASSION, AND THEN AT THE BREAK, HE WENT INTO THE BATHROOM

20   AND MADE A VERY -- A REMARK THAT WAS OVERHEARD BY MY

21   COLLEAGUES.

22          **THE COURT:**  BUT WAS IT DIRECTED AT SOMEBODY AT

23   ANGOLA?  WAS IT DIRECTED AT ONE OF THE PATIENTS OR AS HE REFERS

24   TO THEM, THE OFFENDERS?

25          **MS. MONTAGNES:**  WE BELIEVE IT WAS IN REFERENCE TO DR.

1   PUISIS.

2           **MR. ROBERT:**  WE BELIEVE.

3           **THE COURT:**  ALL RIGHT.  I THINK IT'S QUESTIONABLE

4   RELEVANCE.  YOU CAN ANSWER THE QUESTION.  I'LL JUST LET IT GO

5   TO THE WEIGHT.

6           **THE WITNESS:**  I'M VERY DISTURBED BY THE FACT THAT

7   WHAT YOU CALL AN EXPERT WOULD COME IN TO ANGOLA AND RENDER AN

8   OPINION LIKE HE DID.  I'M VERY INFURIATED BY THAT.  AND I DON'T

9   THINK MUCH OF DR. PUISIS.  AS A MATTER OF FACT, I DON'T THINK

10  HE SHOULD CALL HIMSELF AN EXPERT.  AND MY ANGER THAT I TRIED TO

11  WITHHOLD IN THIS COURTROOM, I CAN SHOW THAT ANGER TO MY

12  ASSISTANT WARDEN, AND THAT'S ABOUT WHAT I THINK OF THAT REPORT

13  AND WHAT HE DID AT ANGOLA.  SO SHOULD HE EVEN BE CALLED AN

14  EXPERT WITH THAT TYPE OF REPORT?  NO, HE SHOULDN'T.  AND I'M

15  VERY ANGRY WITH HIM.  YES, I SURE AM.

16  **BY MS. MONTAGNES:**

17  **Q.**   LET'S TURN TO PLAINTIFFS' EXHIBIT 6 AT 159.  I JUST WANT

18  TO DRAW YOUR ATTENTION HERE TO THE BOTTOM OF THE PAGE.  YOU

19  WENT OVER WITH YOUR ATTORNEY MANY THINGS THAT HAPPENED ON MARCH

20  10, 2016, DIDN'T YOU?

21  **A.**   THERE WERE SOME DATES THERE, MARCH 10TH OF 2016.

22  **Q.**   YEAH, AND YOU TALKED ABOUT A LABORATORY REPORT AND AN

23  X-RAY AND A REFERRAL TO PODIATRY AND A DOCTOR ORDERED CRUTCHES,

24  AND YOU TALKED ABOUT AN ENCOUNTER WITH AN EMT, RIGHT?

25  **A.**   YES.

04:08    1    Q.    AND ALL OF THOSE ARE DOCUMENTED IN THIS CHART REVIEW,

2    AREN'T THEY?

3    A.    THEY ARE.

4    Q.    OKAY.  AND COULD WE TURN TO PLAINTIFFS' EXHIBIT 6 AT 152.

5          AND SIMILARLY HERE, AS YOU WERE GOING THROUGH, THIS

6    IS JUST THE FIRST AND LAST PATIENT, BUT SIMILARLY, MANY OF THE

7    THINGS THAT YOU WERE REPORTING ABOUT, THAT DOCTOR'S EVALUATING

8    THE PATIENT ON 7/13, AND THEN THE LABS BEING REPORTED ON 7/23,

9    AND THEN A DOCTOR SAW THE PATIENT IN THE SURGERY CLINIC ON

10   8/25, ALL THAT, AGAIN, IS DOCUMENTED HERE IN THE CHART?

11   A.    WHICH PATIENT ARE YOU REFERRING TO?

12   Q.    THIS IS PATIENT 11.

13   A.    WHICH IS?

14   Q.    YOU COULD REMEMBER THE NAME WHEN YOU WERE DOING YOUR

15   DIRECT.

16   A.    WELL, BECAUSE --

17   Q.    WE CAN PROVIDE YOU WITH A PATIENT IDENTIFIER IF YOU WANT.

18   A.    WELL, I WILL NEED A PATIENT IDENTIFIER.

19   Q.    ALL RIGHT.  ONE SECOND.

20          MS. MONTAGNES:  MAY I APPROACH, YOUR HONOR?

21          THE COURT:  YOU MAY.

22          THE WITNESS:  I KNOW WHO IT IS NOW.  AND SO WHAT WAS

23   YOUR QUESTION?

24   BY MS. MONTAGNES:

25   Q.    MANY OF THE INSTANCES, THE ENCOUNTERS, THAT YOU WENT OVER

1    WITH YOUR ATTORNEY ON 7/13, ON 7/23, AND ON 8/25, THOSE ARE

2    NOTED HERE IN THAT CHART REVIEW?

3    **A.**   YES, THEY ARE, BUT THAT'S NOT THE TRUE STORY.  IT WAS

4    VERY, VERY PERTINENT INFORMATION THAT WAS LEFT OUT OF THIS

5    CASE.  DR. PUISIS SAT UP HERE AND MADE STATEMENT AFTER

6    STATEMENT THAT THIS PATIENT WASN'T FOLLOWED UP WITH GI FOR

7    THREE MONTHS, OVER AND OVER AGAIN.  ALL HE HAD TO DO WAS CHECK

8    THE RECORD.  THE RECORD SHOWS THAT THIS PATIENT WAS SEEN AT ILH

9    BY THE GI SPECIALIST AND MADE A DOCUMENTATION IN THE MEDICAL

10   RECORD TO COME SEE ME AFTER THE FISTULA IS FIXED.

11   **Q.**   DOCTOR, THAT'S NOT WHAT I ASKED YOU, DOCTOR.

12   **A.**   WELL, THAT'S THE TRUTH.

13   **Q.**   THAT'S JUST NOT WHAT I ASKED YOU.

14          CAN WE PULL UP JOINT EXHIBIT 2 AT 693.  SORRY, AT

15   688.

16          SO WE WERE GOING OVER PEER REVIEWS BEFORE.  AND THIS

17   ONE IS HARD TO READ, BUT AT THE BOTTOM, IT SAYS IN THE

18   SUGGESTION, IT WAS RECOMMENDED THAT DR. COLLINS REVIEW THE

19   CHRONIC DISEASE -- I CAN'T READ THAT WORD, BUT ESSENTIALLY,

20   THAT SUGGESTION AT THE BOTTOM IS THAT HE REVIEW THE CHRONIC

21   DISEASE GUIDELINES, CORRECT?

22          **MR. ROBERT:**  YOUR HONOR, I'M GOING TO OBJECT.  THIS

23   IS A 2012 DOCUMENT.  CERTAINLY WELL OUTSIDE THE PERIOD AND IT

24   RELATES TO DR. COLLINS.

25          **MS. MONTAGNES:**  YOUR HONOR, DR. LAVESPERE TESTIFIED

1   THAT HE WAS ADVISED OF CHANGING THE CHRONIC MANUAL AND HE DID,

2   AND WE'RE GOING TO DEMONSTRATE THAT ANGOLA HAD BEEN ON NOTICE

3   OF THAT FOR A VERY LONG TIME.

4            **THE COURT:**  OVERRULED.

5   **BY MS. MONTAGNES:**

6   **Q.**   AND IF WE COULD TURN TO JOINT EXHIBIT 2-690.  AND THIS IS

7   2014.  SORRY, I THINK IT'S 291.  I APOLOGIZE.  SORRY, SO SORRY.

8            IT SAYS HERE, "HOWEVER, RECOMMENDATIONS WERE MADE TO

9   BETTER IMPROVE HEALTHCARE SERVICES AT THE FACILITY.  RELATED TO

10  THE CHRONIC CARE SERVICES, DATING, INITIALING, AND TIMING ALL

11  ORDERS WHEN COORDINATING CARE WOULD ASSIST ALL PARTIES INVOLVED

12  AS THEY DELIVER EFFECTIVE SERVICES.  ALSO, OBTAINING LAB WORK

13  IN ACCORDANCE WITH POLICY AND BEYOND THAT MEASURES WHEN DEEMED

14  NECESSARY COULD FACILITATE A MORE ROBUST HEALTHCARE DELIVERY

15  SYSTEM.  THE CHRONIC CARE PLAN CURRENTLY IN PLACE IS

16  ACCEPTABLE.  HOWEVER, AN ANNUAL REVIEW AND REVISION OF POLICIES

17  AND PRACTICES IS NECESSARY TO REMAIN CONSISTENT WITH COMMUNITY

18  STANDARDS."

19           IS THAT RIGHT?

20  **A.**   THAT'S RIGHT.

21  **Q.**   AND THAT WAS FROM 2014?

22  **A.**   2014.

23  **Q.**   AND THEN IN JOINT EXHIBIT 2-693, AND THIS IS SIGNED BY DR.

24  PREETY SINGH, WHO IS THE MEDICAL DIRECTOR AT ELAYN HUNT.  AT

25  THE TIME, SHE WAS MARRIED TO THE DEPARTMENT OF CORRECTIONS

04:12  1  MEDICAL DIRECTOR, DR. RAMAN SINGH, CORRECT?

2  **A.**    CORRECT.

3  **Q.**    AND SHE, AGAIN, SUGGESTS A REVIEW OF THE CHRONIC CARE

4  HEALTH GUIDELINES?

5  **A.**    SHE DID.

6  **Q.**    OKAY.  NOW, YOU TESTIFIED THAT YOU PROVIDE EXTENSIVE

7  PHYSICIAN REVIEWS.  YOU SAID THERE'S QUITE A LOT OF PAPERWORK

8  INVOLVED IN THEM, I BELIEVE.  I'M GOING TO SHOW YOU ONE HERE

9  ACTUALLY IF I CAN GET THE ELMO.

10        **THE DEPUTY CLERK:**  OKAY.

11  **BY MS. MONTAGNES:**

12  **Q.**    IS THIS AN EXAMPLE OF ONE OF THOSE REVIEWS?

13  **A.**    NO.

14  **Q.**    THIS IS NOT AN EXAMPLE?

15  **A.**    IT MAY BE SOMETHING DIFFERENT THAN WHAT I WOULD WORK ON,

16  BUT THESE ARE NOT FORMS THAT I FILL OUT FOR THE PEER

17  PERFORMANCE REVIEWS.

18  **Q.**    SO YOU FILL OUT ANOTHER PHYSICIAN REVIEW OTHER THAN THIS

19  ONE?

20  **A.**    THERE'S A DIFFERENT FORM.  IT'S MULTIPLE PAGES.

21        **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME, I WOULD

22  MOVE TO STRIKE THAT TESTIMONY.  IN 1RFP-29, WE REQUESTED ALL

23  DOCUMENTS RELATED TO QUALITY ASSESSMENTS CONDUCTED, INCLUDING

24  PEER REVIEW PARTS, AND THEN IN THEN 5RP-2 AND -3, WE REQUESTED

25  ALL DOCUMENTS COMPRISING CREDENTIALING MATERIALS FOR ALL LSP

1    DOCTORS INCLUDING BUT NOT LIMITED TO JOB APPLICATIONS, REPORTS

2    FROM THE NATIONAL PRACTITIONERS' DATABANK, VERIFICATIONS OF

3    TRAINING BOARD CERTIFICATES, ALL LICENSES, INCLUDING SPECIFIC

4    TREATMENTS, PRIVILEGES, AND DEA LICENSES, ATTESTATIONS,

5    EVALUATIONS, PEER REVIEWS, ANY MATERIALS RELATED TO MEDICAL

6    MALPRACTICE FINDINGS.  AT THAT TIME, WE WERE GIVEN THESE FORMS

7    AND THESE FORMS ALONE.

8          THE WITNESS:  BUT THAT'S NOT DONE BY ME.

9          MR. ROBERT:  WAIT, WAIT, WAIT.

10          CAN I RESPOND TO THAT, YOUR HONOR?

11          THE COURT:  YOU MAY.

12          MR. ROBERT:  MY CO-COUNSEL TELLS ME THAT THESE ARE

13    THE FORMS THAT WERE PROVIDED, SO THAT THEY ARE FORMS THAT WERE

14    NOT PROVIDED.  THEY WERE NOT PROVIDED, SO WE HAVE NO OBJECTION

15    TO STRIKING THAT TESTIMONY IF WE DIDN'T PROVIDE THE DOCUMENT TO

16    THEM.

17          THE COURT:  ALL RIGHT.  TESTIMONY IS STRICKEN.

18    OBJECTION IS GRANTED.

19          MS. MONTAGNES:  AND I WOULD LIKE TO STRIKE HIS

20    EARLIER TESTIMONY AS TO THE EVALUATIONS HE PERFORMED ON DIRECT

21    AS WELL.

22          THE COURT:  WELL, THE COURT WILL CONSIDER WHAT HAS

23    BEEN STATED BY COUNSEL.  I'M NOT GOING TO ASK THE COURT

24    REPORTER TO GO BACK THROUGH THE RECORD TO STRIKE TESTIMONY.

25    IT'S NOTED FOR THE RECORD.

1    BY MS. MONTAGNES:

2    **Q.**    DR. LAVESPERE, YOU'RE NOT BOARD-CERTIFIED?

3    **A.**    I'M NOT.

4    **Q.**    AND YOU ARE THE MEDICAL DIRECTOR?

5    **A.**    I AM.

6    **Q.**    AND YOU MANAGE AT LEAST 40 PEOPLE?

7    **A.**    I DO.

8    **Q.**    AND YOU HAD SOME MANAGEMENT EXPERIENCE IN MEDICAL SCHOOL

9    OF OTHER RESIDENTS?

10    **A.**    AT ONE POINT IN TIME, YES.

11    **Q.**    AND YOU MANAGED YOUR OWN PRIVATE OFFICE FOR A FEW YEARS?

12    **A.**    I DID.

13    **Q.**    AND YOUR ONLY OTHER MANAGEMENT EXPERIENCE IS MANAGING YOUR

14    WIFE AND CHILDREN?

15    **A.**    SURE.

16    **Q.**    AND IN YOUR DEPOSITION, YOU SAID THAT MANAGING YOUR WIFE

17    AND CHILDREN WAS SUFFICIENT EXPERIENCE?

18    **A.**    IF I DID, THAT'S PROBABLY NOT ACCURATE.

19    **Q.**    AND YOU TESTIFIED THAT YOUR RESTRICTIONS GOT LIFTED IN

20    LATE 2014?

21    **A.**    SOME TIME IN 2014.  Y'ALL KNOW A LOT MORE THAN I DO ABOUT

22    THAT.  THE IMPORTANT THING TO ME WAS THAT THEY GOT LIFTED, NOT

23    WHEN.

24    **Q.**    AND YOU TESTIFIED THAT THAT HAPPENED IN LATE 2014?

25    **A.**    POSSIBLY, YES.

04:16   1   **Q.**   AND THEN YOU TESTIFIED THAT YOU WERE PROMOTED TO MEDICAL

2   DIRECTOR AROUND THE SAME TIME?

3   **A.**   AFTER DR. COLLINS LEFT THAT -- IF YOU FIND OUT THE DATE

4   THAT DR. COLLINS LEFT, ABOUT A WEEK LATER, I WAS PROMOTED TO

5   MEDICAL DIRECTOR.

6   **Q.**   AND THERE'S A LOT OF OVERLAP BETWEEN MEDICAL AND SECURITY?

7   **A.**   YES.

8   **Q.**   AND YOU DEPEND ON SECURITY A LOT?

9   **A.**   SOME.

10   **Q.**   SECURITY REPORTS TO YOU WHEN AN INDIVIDUAL WITH A DUTY

11   STATUS IS EXERCISING AND NOT IN COMPLIANCE WITH THEIR DUTY

12   STATUS?

13   **A.**   IT'S NOT THAT THEY REPORT TO ME.  THEY ASK ME TO LOOK INTO

14   IT.

15   **Q.**   AND WHEN AN INMATE IS ACCESSING CARE AND MAKING A

16   SELF-DECLARED EMERGENCY, SECURITY ASSESSES IF THEY'RE SICK

17   BEFORE THE PARAMEDICS ARE CALLED?

18   **A.**   NOT NECESSARILY.

19            **MS. MONTAGNES:**  MARTHA, COULD YOU BRING UP THE

20   DEPOSITION, PAGE 26, LINE 24.

21   **BY MS. MONTAGNES:**

22   **Q.**   SO I ASKED YOU, "WHEN A PATIENT IS SICK, WHAT IS THEIR

23   BEST COURSE OF ACTION?"

24            AND YOU SAY, "WELL, IF THEY'RE REALLY SICK, THEY CALL

25   SECURITY AND SECURITY SEES THAT THEY ARE" -- THEN TO THE NEXT

1    PAGE.  I APOLOGIZE.  "THEY ARE SICK, AND THEN THE PARAMEDICS

2    ARE CALLED IMMEDIATELY AND GO OUT AND ASSESS THEM."

3    **A.**    BUT THEY'RE NOT MAKING AN ASSESSMENT.  I MEAN, THEY'RE

4    MAKING A VISUAL OBSERVATION.  I MEAN, ANYBODY CAN DO THAT.  IF

5    YOU SEE SOMEBODY LAYING OVER THERE THROWING UP, IT DOESN'T TAKE

6    A PARAMEDIC TO SAY THAT GUY'S SICK.

7    **Q.**    AND SOME MEDICAL DECISIONS ARE MADE BY SECURITY?

8    **A.**    NO.

9    **Q.**    WELL, FOR EXAMPLE, THE WARDEN OVER HEALTHCARE DECIDED WHO

10   PERFORMED MEDICAL ADMINISTRATION IN DIFFERENT DORMS IN THE

11   PRISON?

12   **A.**    DO WHAT NOW?

13   **Q.**    THE WARDEN OVER MEDICAL DECIDED WHO GAVE OUT MEDICATIONS

14   IN VARIOUS PARTS IN THE PRISON?

15   **A.**    WELL, THEY DID THAT IN CONJUNCTION WITH THE PILL CALL

16   TEAM.

17   **Q.**    OKAY.  BUT WARDEN STEPHANIE MADE THAT DECISION?

18   **A.**    SHE WOULD HAVE A FINAL SAY IN IT.

19   **Q.**    OKAY.  AND OFFICERS AREN'T ALLOWED TO GIVE OUT

20   PSYCHOTROPIC MEDICATIONS?

21   **A.**    THEY'RE NOT.

22   **Q.**    AND THEY'RE NOT ALLOWED TO GIVE OUT CONTROLLED SUBSTANCES?

23   **A.**    THEY'RE NOT.

24   **Q.**    BUT THE WARDEN OVER MEDICAL IS BASICALLY THERE TO TAKE

25   CARE OF SECURITY ISSUES?

**A.**   THAT'S ONE OF HER MAIN PRIORITIES, OR HIS MAIN PRIORITIES.

**Q.**   OKAY.  AND YOU TESTIFIED ON DIRECT THAT YOUR BIGGEST

CHALLENGE IN YOUR JOB IS FIGURING OUT WHO'S LYING?

**A.**   NO, FIGURE OUT WHO'S TELLING ME THE TRUTH.

**Q.**   OKAY.  AND IN NOVEMBER WHEN YOU TESTIFIED IN FRONT OF THIS

COURT, YOU SAID THAT THAT WASN'T TRUE ANYMORE?

**A.**   IT'S NOT TRUE ANYMORE.

**Q.**   OKAY.  BUT THAT'S WHAT YOU SAID SEVEN TIMES IN YOUR

DEPOSITION.

**A.**   'CAUSE BACK THEN, I WAS WORKING THE ATU MORE, AND I WAS

INVOLVED WITH THE DAILY REALM OF DOING DUTY STATUSES.  BUT NOW

THAT I'M IN ADMINISTRATIVE WORK MORE, I DON'T DEAL WITH IT

NEARLY AS OFTEN, SO I DON'T HAVE THAT ISSUE THAT MUCH ANYMORE.

**Q.**   BUT DR. LAVESPERE, YOU JUST TESTIFIED THAT WHEN YOU WERE

DOING YOUR DEPOSITION, YOU HAD MORE ADMINISTRATIVE

RESPONSIBILITIES?

**A.**   I DID, BUT I HAD -- EVERYTHING.  I WAS DOING IT ALL.

**Q.**   OKAY.  SO NOW YOU HAVE LESS ADMINISTRATIVE

RESPONSIBILITIES?

**A.**   I HAVE THE SAME ADMINISTRATIVE RESPONSIBILITY.  AFTER THIS

TRIAL I WON'T HAVE Y'ALL, Y'ALL'S PART OF MY JOB WHICH TAKES UP

ABOUT 50 PERCENT OF IT, BUT I'VE MADE IT VERY CLEAR EVEN IN THE

RECERT THAT I DON'T THINK INMATES ARE COMING TO ME LYING.

**Q.**   OKAY.

**A.**   I HAVE NO IDEA THAT THEY ARE NOT LYING.

**Q.**   SO --

**A.**   IT HAS TO DO WITH WHEN IT'S WORK-RELATED ISSUES AND PAIN.
ANYTHING OTHER THAN PAIN -- I NEVER SAID ANYTHING ABOUT AN
INMATE LYING TO ME, AND FOR YOU TO USE THE WORD "ALL INMATES,"
THAT'S JUST NOT ACCURATE.  IT'S JUST NOT ACCURATE.

**Q.**   DR. LAVESPERE, I DIDN'T USE THE WORD "ALL INMATES."

**A.**   YOU SAID INMATES.  THAT MEANS -- BUT I HAVE A CERTAIN
SUBCLASS OF INMATES THAT I'M TALKING ABOUT WHEN I GAVE MY
DEPOSITION.

**Q.**   OKAY.  SO LET'S JUST SEE WHAT THE CONTEXT WAS.

**A.**   OKAY.

        **MS. MONTAGNES:**  MARTHA, CAN YOU TURN TO PAGE 17 OF
THE DEPOSITION.

**BY MS. MONTAGNES:**

**Q.**   SO I SAY, "I JUST WANT TO TALK BRIEFLY ABOUT SOME OF THE
CHALLENGES OF PROVIDING MEDICAL CARE TO INMATES, AND I WAS
WONDERING IF YOU COULD TALK TO ME ABOUT THE WAYS IN WHICH
PROVIDING MEDICAL CARE TO INMATES DIFFERS FROM PROVIDING
MEDICAL CARE ON WHAT WE CALL THE STREET, ON WHAT WE CALL FREE
PEOPLE."

        SOME OBJECTIONS.  AND YOU SAID, "WELL, THE BIGGEST
CHALLENGE IS PROVIDING MEDICAL CARE AT ANGOLA IS WHO'S TELLING
THE TRUTH.  THAT'S THE BIGGEST CHALLENGE, YOU KNOW."

        AND THEN ON PAGE 18, DOWN AT LINE 20 TO 22, I SAID,
"ARE YOU REFERRING TO WHAT WE KNOW AS MALINGERING?  IS THAT

1   WHAT YOU WOULD CALL IT?"

2            AND YOU SAID, "NO, NOT NECESSARILY.  YOU JUST ASKED

3   ME WHAT THE BIGGEST CHALLENGE IS AND THAT'S THE BIGGEST

4   CHALLENGE EVERY DAY IS, IS THIS GUY TELLING ME THE TRUTH OR

5   NOT."

6            AND THEN ON THE NEXT PAGE, PAGE 19, LINE 16 THROUGH

7   17, I SAY, "OKAY.  AND WOULD YOU SAY THAT THERE IS A HIGHER

8   PERCENTAGE OF PEOPLE, PATIENTS, LYING TO YOU AT ANGOLA THAN ON

9   THE STREET?"

10           AND YOU SAID, "I WOULDN'T SAY LYING.  THEY ARE TRYING

11  TO GET OVER ON YOU FOR SURE.  THEY ARE TRYING TO PLAY YOU FOR

12  SURE.  ARE THEY LYING?  I DON'T KNOW.  IT'S ALL AN ISSUE.  NOT

13  ALL OF IT, BUT SOME OF IT.  YOU ASKED ME WHAT THE BIGGEST

14  CHALLENGE WAS, AND MY BIGGEST CHALLENGE IS, YOU KNOW, WHO'S

15  TELLING ME THE TRUTH, YOU KNOW."

16           THAT'S WHAT YOU SAID, RIGHT?

17  **A.**   THAT'S WHAT I SAID.  AND I USED EVERY BIT OF MY EXPERIENCE

18  TO MAKE THAT JUDGMENT.  YOU MADE IT VERY CLEAR THAT I DID TIME

19  IN THE PENITENTIARY, OKAY.  PART OF THAT TIME IN THE

20  PENITENTIARY, I LEARNED THINGS THAT YOU DON'T LEARN BY READING

21  A BOOK OR WRITING A BOOK.  THE THINGS THAT I'VE LEARNED, I'VE

22  LEARNED FROM THE INSIDE.  AND I USE EVERY BIT OF THAT KNOWLEDGE

23  TO PRACTICE AS A MEDICAL DIRECTOR AT THE PENITENTIARY.  I HAVE

24  WITNESSED THIS FIRSTHAND IN THE FEDERAL PENITENTIARY.  I HAVE

25  WITNESSED IT.  I'VE SEEN IT OVER AND OVER.  AND IT'S THE SAME

04:22   1    AT ANGOLA.  THERE'S NO DIFFERENCE.  AND THIS EXPERIENCE DOES

2    NOT MEAN THAT EVERYBODY'S LYING, BUT I KNOW FROM THE INSIDE

3    WHAT THE NAME OF THE GAME IS.  AND THE NAME OF THE GAME IS TO

4    MAKE YOUR LIFE BETTER BY GETTING YOU A JOB THAT IS FAVORABLE

5    FOR YOU.  THAT'S NO SECRET.  AND IT'S WITH EVERY PENITENTIARY.

6    AND THAT I LEARNED FROM PERSONAL EXPERIENCE.

7    **Q.**   ALL RIGHT.  AND THEN IF WE COULD TURN TO PAGE 20.  AGAIN,

8    YOU REITERATE, "SO, YOU KNOW, THE BIGGEST CHALLENGE IS WHO'S

9    TELLING ME THE TRUTH."

10          RIGHT?

11   **A.**   IT IS.  WHEN IT COMES TO WORK-RELATED ISSUES.

12   **Q.**   YEAH.  AND THEN ON PAGE 28, AGAIN, ON LINE 21 THROUGH 23.

13          **MR. ROBERT:**  JUDGE, I'M GOING TO OBJECT.  SHE KEEPS

14   IMPEACHING HIM ON THE SAME THING.  HE'S ACKNOWLEDGED THAT HE

15   SAID THAT.  I MEAN, WHY ARE WE GOING TO KEEP IMPEACHING HIM,

16   READING HIS DEPOSITION WHEN HE'S ACKNOWLEDGED THAT HE SAID

17   THAT?

18          **THE COURT:**  HE DID ACKNOWLEDGE SOME OF THIS ON

19   DIRECT.  WHAT IS THE IMPEACHMENT VALUE OF THIS?

20          **MS. MONTAGNES:**  WELL, YOUR HONOR, HE KEEPS SAYING

21   THAT IT'S OUT OF CONTEXT AND THAT SOMEHOW IT ISN'T EXACTLY

22   WHAT -- THAT HE DIDN'T SAY THEY WERE LYING, OR HE DIDN'T SAY

23   THAT, BUT IN FACT, THE CONTEXT IS HIM VOLUNTEERING THIS

24   INFORMATION OVER AND OVER AGAIN.

25          **THE COURT:**  WELL, WHAT HE SAID ON DIRECT WAS THAT HIS

1    BIGGEST CHALLENGE IS TO KNOW WHO WAS TELLING THE TRUTH AND WHO

2    WAS NOT TELLING THE TRUTH.  HE CONCEDED THAT ON DIRECT.

3           **MS. MONTAGNES:**  OKAY.

4           **THE COURT:**  ALL RIGHT.  SO NEXT LINE OF QUESTIONING.

5    **BY MS. MONTAGNES:**

6    **Q.**   AND YOU THINK ABOUT HALF OF YOUR PATIENTS TELL YOU THE

7    TRUTH?

8    **A.**   THE SUBSET OF PATIENTS THAT I DEAL WHEN IT COMES TO PAIN

9    COMPLAINTS, THE PERCEPTION OF PAIN, AND THE COMPLAINT OF PAIN,

10   WHEN IT'S ALL SORTED OUT, I THINK ABOUT HALF OF THEM ARE REALLY

11   -- HAVE A VIABLE COMPLAINT ON PAIN.

12   **Q.**   BUT WHEN YOU GAVE YOUR 30(B)(6) TESTIMONY IN THIS MATTER,

13   YOU SAID YOU THOUGHT HALF OF YOUR PATIENTS TELL THE TRUTH?

14   **A.**   HALF OF THE PATIENTS THAT I DEAL WITH IN THE CONTEXT OF

15   PAIN, WHICH IS WHAT THIS WHOLE THING WAS ABOUT.  YOU KEPT

16   ASKING ME THINGS OVER AND OVER AND OVER AGAIN.  AND YOU KEPT

17   ASKING THEM OVER AND OVER AGAIN, I GUESS, TILL YOU GOT WHAT YOU

18   COULD USE.  BUT THE CONTEXT IS -- AND THE CONTEXT SHOULD HAVE

19   BEEN, AND IT WAS FROM THE BEGINNING, IN THE CONTEXT OF PAIN.

20   **Q.**   AND I DIDN'T ASK YOU THINGS -- IS IT YOUR TESTIMONY THAT I

21   ASKED YOU THE SAME THING OVER AND OVER AGAIN?

22   **A.**   WELL, IT'S IN THE DEPOSITION OVER AND OVER AGAIN.

23   **Q.**   DO YOU RECALL TAKING A 30(B)(6) DEPOSITION WITH ME?

24           **THE COURT:**  OKAY.  I THINK THE QUESTION IS -- Y'ALL

25   ARE BOTH DIGRESSING.  THE QUESTION IS, ARE MORE THAN 50 PERCENT

1    OF YOUR PATIENTS NOT TO BE BELIEVED WITH RESPECT TO THEIR PAIN

2    REPORTS.  I THINK THAT WAS ESSENTIALLY WHAT THE QUESTION WAS.

3              **THE WITNESS:**  THE ANSWER TO THAT WOULD BE NO.

4              **THE COURT:**  OKAY.

5    **BY MS. MONTAGNES:**

6    **Q.**   AND YOU TESTIFIED ON DIRECT THAT YOU'RE NOT AN EXPERT

7    DEPOSITION TAKER?

8    **A.**   NOT AT ALL.

9    **Q.**   BUT YOU TOOK 10 OR 12 DEPOSITIONS BEFORE YOU TOOK THIS

10   DEPOSITION, DIDN'T YOU?

11   **A.**   I COULDN'T -- DON'T KNOW.

12   **Q.**   WOULD IT REFRESH YOUR RECOLLECTION TO SEE THE DEPOSITION

13   TRANSCRIPT?

14             MARTHA, WOULD YOU PULL UP THE INDIVIDUAL DEPOSITION

15   AT PAGE 5.

16             **THE COURT:**  THE COURT WILL TAKE NOTICE HE'S TESTIFIED

17   IN THIS COURT A DOZEN TIMES.

18             MOVE ON, NEXT QUESTION.

19   **BY MS. MONTAGNES:**

20   **Q.**   AND YOU TESTIFIED THAT TAKING DEPOSITIONS IS NOT STRESSFUL

21   TO YOU?

22   **A.**   IT'S NOT THAT STRESSFUL.

23   **Q.**   NOBODY TRICKED YOU INTO SAYING IT?

24   **A.**   NO, BUT YOU KNOW AS WELL AS I DO, THE WAY YOU ASK

25   QUESTIONS IN A DEPOSITION, YOU KNOW, IT CAN SOMETIMES BE

MISLEADING.

**Q.**   AND YOU RUN THE MEDICAL DEPARTMENT AT ANGOLA?

**A.**   I DO.

**Q.**   AND YOU ARE THE CLINICIAN IN CHARGE?

**A.**   I AM.

**Q.**   AND THE PURPOSE OF THE MEDICAL DEPARTMENT IS TO CARE FOR PATIENTS?

**A.**   IT IS.

**Q.**   BUT YOU THINK PATIENTS DON'T WANT TO WORK?

**A.**   I DIDN'T SAY THAT.  I DIDN'T SAY -- YOU'RE TAKING THINGS OUT OF CONTEXT.  IF YOU LOOK AT WHAT I SAID IN THESE -- WHEN IT'S RELATED TO INJURIES.  I JUST CLARIFIED THAT.  IF A GUY HAS A SPRAINED ANKLE AND HE GOES FROM AN AREA IN A HOUSING AREA WHERE HE'S IN A DORM -- WELL, LET ME EXPLAIN, BECAUSE YOU'RE TAKING THINGS OUT OF CONTEXT AND MAKING THEM WHAT THEY'RE NOT -- AND I LOOK AT HIS CHART AND HE'S GOT AN ANKLE SPRAIN THAT'S LASTED SIX MONTHS.  I'VE PLAYED SPORTS, I HAD COLLEGE SCHOLARSHIPS IN SPORTS, I KNOW WHAT AN ANKLE SPRAIN IS AND I KNOW HOW TO REHAB ONE.  ANKLE SPRAINS DON'T LAST SIX MONTHS. BUT YET, YOU CONTINUALLY TELL ME YOU CAN'T WALK AND YOU CAN'T -- AND YOU SPECIFICALLY TELL ME, I CAN'T WALK ON UNLEVEL GROUND AND I CAN'T WALK IN THE FIELD.  AND I SEND YOU TO THE ORTHO DOCTOR, SOME PEOPLE DON'T WANT TO GET WELL BECAUSE IF THEY GET WELL, THEY HAVE TO GO DO THINGS.  THAT'S A TRUE STATEMENT.

04:26  1   **Q.**   AND YOU TESTIFIED IN YOUR DEPOSITION THAT YOUR PATIENTS

2   DON'T WANT TO WORK?

3   **A.**   SOME OF THEM DON WANT TO WORK.  I BELIEVE THAT.

4   **Q.**   AND YOU TESTIFIED IN YOUR DEPOSITION THAT SOME OF YOUR

5   PATIENTS DON'T WANT TO WELL?

6   **A.**   I BELIEVE THAT.

7   **Q.**   BECAUSE THEN THEY'D HAVE TO DO THINGS?

8   **A.**   THAT'S TRUE.

9   **Q.**   AND PATIENTS PRETEND THEY CAN'T GET OUT OF BED?

10   **A.**   I DIDN'T SAY THAT, I DON'T THINK.

11         **MS. MONTAGNES:**  MARTHA, WOULD YOU BRING UP THE

12   DEPOSITION AT PAGE 19, LINES 18 THROUGH 24.

13   **BY MS. MONTAGNES:**

14   **Q.**   YOU SAID, "YOU GOT GUYS THAT DON'T WANT TO GET OUT OF BED,

15   BUT THEY CAN WALK WHEN WE LEAVE THE UNIT.  THEY WALK AROUND THE

16   UNIT, YOU KNOW.  THEY DON'T WANT TO GET OUT OF BED WHEN WE'RE

17   THERE BECAUSE THEN WE'RE GOING TO, YOU KNOW, MAKE THEM GO BACK

18   AND DO WHAT THEY'RE SUPPOSED TO DO."

19   **A.**   I DIDN'T SAY THEY CAN'T GET OUT OF BED.

20   **Q.**   THAT'S NOT -- THE QUESTION WAS, YOU HAVE PATIENTS WHO

21   PRETEND THEY CANNOT GET OUT OF BED.

22   **A.**   YOU ASKED ME WERE THERE PATIENTS THAT CAN'T GET OUT OF

23   BED.

24   **Q.**   DR. LAVESPERE, THAT WASN'T MY QUESTION.

25   **A.**   CAN'T AND WON'T ARE TWO DIFFERENT THINGS.

04:27   1   **Q.**   DR. LAVESPERE, THAT WASN'T MY QUESTION.

2   **A.**   WELL . . .

3   **Q.**   MY QUESTION TO YOU WAS:  YOUR PATIENTS PRETEND THEY CANNOT

4   GET OUT OF BED?

5   **A.**   THERE ARE SOME TIMES THAT'S REPORT TO ME, YES.

6   **Q.**   AND YOUR PATIENTS PRETEND THEY CANNOT USE THEIR ARMS?

7   **A.**   THERE ARE SOMETIMES, YES.

8   **Q.**   AND YOUR PATIENTS PRETEND TO HAVE ASTHMA ATTACKS?

9   **A.**   SOMETIMES THEY REPORT ASTHMA ATTACKS THAT ARE A PERCEPTION

10   OF HAVING DIFFICULTIES BREATHING THAT ARE NOT CONFIRMED BY

11   MEDICAL REASONS.

12   **Q.**   AND YOUR EXPERIENCE HELPS YOU FIGURE OUT WHO'S LYING?

13   **A.**   WELL, WHEN IT COMES TO PAIN, MY EXPERIENCE DOES.  IT DOES

14   A LOT.

15   **Q.**   NOT NECESSARILY TESTING?

16   **A.**   WELL, I RUN THOSE GENTLEMEN THROUGH X-RAYS.  I RUN THOSE

17   GENTLEMEN THROUGH THE ORTHOPEDIC CLINIC.  I RUN THEM THROUGH

18   THE NEUROLOGY CLINIC.  I RUN THEM THROUGH NUMEROUS CLINICS TO

19   MAKE A THOROUGH EVALUATION.

20   **Q.**   AND YOU DON'T THINK A LACK OF PRIVACY IS REALLY A BIG

21   ISSUE FOR YOUR PATIENTS WHEN THEY ARE EXAMINED BY EMTS?

22   **A.**   WELL, I THINK ON CERTAIN THINGS PRIVACY IS NECESSARY,

23   BUT --

24   **Q.**   BUT YOU DON'T THINK IT'S A BIG ISSUE?

25   **A.**   I DON'T THINK, LIKE YOUR EXPERT SAID, THAT EVERY SICK CALL

04:28   1   NEEDS TO BE SEEN IN A PRIVATE SETTING, I DON'T THINK THAT.  I

2   MEAN, IN THE PENITENTIARY, PEOPLE WALK AROUND IN BOXERS 80

3   PERCENT OF THE TIME WITH NO SHIRT, AND THAT'S JUST THE WAY YOU

4   LIVE IN A PENITENTIARY.

5   **Q.**    YEAH AND IT --

6   **A.**    SO IF YOU HAVE AN ISSUE WITH A SORE ON YOUR ARM, I DON'T

7   SEE WHY IT'S A BIG DEAL YOU COULDN'T JUST SHOW THAT TO THE EMT.

8   **Q.**    AND YOU THINK THIS BECAUSE INMATES HAVE TO SHOWER AND GO

9   TO THE BATHROOM COMMUNALLY?

10   **A.**    WELL, THEY'RE USED TO THAT.  THAT'S THE WAY THEY LIVE.

11   **Q.**    IF AN INMATE REFUSES CARE THREE TIMES, YOU DON'T

12   RESCHEDULE THEM BECAUSE THEY'RE WASTING YOUR TIME?

13   **A.**    THEY'RE WASTING THE CLINIC TIME.

14   **Q.**    YOU TESTIFIED THAT THEY WERE WASTING YOUR TIME?

15   **A.**    WELL, WHICH IS CLINIC TIME.  THAT'S ANOTHER WAY OF SAYING

16   THAT.

17   **Q.**    AND YOU THINK SOME INMATES AREN'T THAT SMART?

18   **A.**    WELL, THERE'S DIFFERENT LEVELS OF EDUCATION WHEN YOU'RE

19   DEALING WITH SOME OF THESE INMATES.  I'VE HAD SOME INMATES THAT

20   CAN'T EVEN WRITE THEIR NAME, SO THERE ARE DIFFERENT LEVELS OF

21   EDUCATION WITHIN --

22   **Q.**    AND YOU THINK SOME OF YOUR PATIENTS DON'T TAKE THEIR MEDS

23   SO THEY CAN HAVE A STROKE AND BLAME YOU?

24   **A.**    NO, I DON'T THINK -- I THINK THAT'S TAKEN OUT OF CONTEXT.

25   **Q.**    WELL, LET'S LOOK AT THE CONTEXT THEN.  WOULD IT REFRESH

1  YOUR RECOLLECTION TO SEE THE CONTEXT OF IT?

2  **A.**    YES, AND THAT'S A FIGURE OF SPEECH.    WHEN YOU TAKE IT IN

3  FULL CONTEXT, THIS IS A SITUATION WHERE IF A PATIENT COMES TO

4  THE CLINIC AND THEY'RE NOT TAKING THEIR MEDICINES, I DON'T

5  ALLOW MY PHYSICIANS TO DISCONTINUE THEIR HYPERTENSIVE, THEIR

6  DIABETIC OR THEIR HYPERLIPIDEMIA MEDICINES, BECAUSE IF THEY

7  TAKE -- IF I DISCONTINUE THEIR MEDICINES AND THEY GO OUT THERE

8  AND HAVE A STROKE, THEY CAN BLAME THAT ON ME.

9  **Q.**    AND YOU THINK --

10  **A.**    SO THE REASON --

11  **Q.**    -- THERE ARE OFFENDERS WHO WANT YOU TO TAKE THEIR

12  MEDICATION SO THEY CAN HAVE A STROKE?

13  **A.**    I'M NOT SURE ABOUT THAT.    I DON'T THINK THAT'S CORRECT.

14  **Q.**    BUT THAT'S WHAT YOU SAID IN YOUR DEPOSITION.

15  **A.**    WELL, THEN I MISSPOKE.    BUT THE MEANING OF THIS RIGHT HERE

16  IS I DON'T ALLOW MY PHYSICIANS TO TAKE MEDICATIONS THAT HAVE AN

17  EFFECT ON HOW OFFENDERS' LIVES ARE MANAGED.    HYPERTENSION,

18  DIABETES, HYPERLIPIDEMIA, SEIZURE DISORDER.    WE DON'T

19  DISCONTINUE THOSE MEDICINES.    WE KEEP THOSE MEDICINES ON THE

20  CHART AND IN THE RECORD EVEN IF THEY DON'T TAKE THEM BECAUSE I

21  DON'T WANT TO BE ACCUSED OF ANYTHING DOWN THE ROAD ABOUT, "OH,

22  YOU TOOK MY SON'S MEDICINE AND HE HAD A STROKE."    I DON'T WANT

23  TO BE ACCUSED OF THAT.    SO THAT'S SOMETHING THAT WE DO TO KEEP

24  OUT OF TROUBLE.

25  **Q.**    AND YOU THINK SOME GUYS DON'T WANT TO BE BETTER?

1  **A.**   THERE IS A SUBSET OF POPULATION THAT DOES NOT WANT TO GET

2  BETTER, YES.

3  **Q.**   AND YOU'VE LOCKED GUYS UP FOR REFUSING THEIR MEDICATION?

4  **A.**   I HAVEN'T.

5  **Q.**   IS IT YOUR TESTIMONY THAT YOU HAVEN'T DONE THAT?

6  **A.**   THAT I LOCK THEM UP?

7  **Q.**   YES.

8  **A.**   I DON'T THINK I CAN LOCK THEM UP.

9  **Q.**   YOU ASK SECURITY TO LOCK THEM UP.

10  **A.**   WELL, CAN YOU REFRESH MY MEMORY?

11  **Q.**   SURE.  IF YOU LOOK ON PAGE 52 BEGINNING AT LINE 24.  YOU

12  SAID -- THIS MIGHT BE THE WRONG -- YOU SAY, "I PUT THEM IN A

13  LOCKED ROOM IN THE HOSPITAL.  I GIVE HIM HIS PILLS FOR THREE

14  DAYS.  YOU KNOW WHAT HAPPENS?  I TAKE HALF OF THEM AWAY BECAUSE

15  HIS BLOOD PRESSURE BOTTOMS OUT, YOU KNOW.  ROUTINELY WE DO

16  THAT, OKAY."

17  **A.**   AGAIN, TAKEN OUT OF CONTEXT.  THE PATIENTS I'M REFERRING

18  TO HERE ARE THE PATIENTS IN A CELLBLOCK.  IF A PATIENT IN A

19  CELLBLOCK COMES TO THE NURSING UNIT, THEY GET PUT IN A LOCKED

20  ROOM.  I DON'T CARE FOR WHAT REASON.  THEY CAN COME IN THERE

21  WITH CELLULITIS, THEY GO IN A LOCKED ROOM.  BUT A NORMAL

22  PATIENT FROM A NORMAL LIVING AREA, WE DON'T PUT THEM IN A

23  LOCKED ROOM.  I HAVE NO REASON TO PUT THEM IN A LOCKED ROOM.

24  BUT A PATIENT FROM THE CELL BLOCK, WHICH MOST OF THE ONES THAT

25  WE DO ADMIT FOR BLOOD PRESSURE MANAGEMENT TEND TO BE FROM THE

1    CELLBLOCK.  WE HAVE TO PUT THEM IN A LOCKED ROOM.  BUT I DON'T

2    LOCK PATIENTS UP BECAUSE THEY DON'T TAKE THEIR MEDICINE.

3    THAT'S ABSURD.

4    Q.    YOUR WORDS, DR. LAVESPERE.

5    A.    NO, IT'S NOT MY WORDS.  MY WORDS TAKEN OUT OF CONTEXT.

6    Q.    IF YOU DON'T THINK THAT A MEDICATION IS IMPORTANT, AND

7    YOUR PATIENT DOESN'T TAKE IT, YOU'LL DISCONTINUE IT?

8    A.    IF THEY'RE NOT TAKING CERTAIN MEDICATIONS SAY, FOR

9    EXAMPLE, LIKE NSAIDS, WE'LL DISCONTINUE THOSE MEDICATIONS, SURE

10   WE WILL.  IF THEY'RE NOT TAKING MUSCLE RELAXERS, WE'LL

11   DISCONTINUE THOSE.

12   Q.    AND --

13   A.    BUT IF THEY'RE TAKING HYPERTENSIVE MEDICINES, WE DON'T.

14   Q.    AND DR. LAVESPERE, THAT'S --

15   A.    SEIZURE MEDICINES, WE DON'T.

16   Q.    -- NOT MY QUESTION.

17   A.    WELL --

18   Q.    MY QUESTION WAS VERY SIMPLE.  SO YOU THINK THAT INMATES

19   HAVE A STRONG TENDENCY TO ABUSE DRUGS?

20   A.    I THINK THERE'S -- DRUG ABUSE IS A BIG DEAL AT ANGOLA.

21   Q.    AND IN FACT, YOU DRUG-TEST YOUR PATIENTS?

22   A.    SOME OF THEM.

23   Q.    TO MAKE SURE THEY'RE NOT SELLING THEIR MEDICATION?

24   A.    WHAT WE DO IS, CERTAIN MEDICATIONS THAT ARE COMMODITIES ON

25   OUR COMPOUND, WHICH THERE ARE ABOUT FIVE OF THEM, WE GIVE THEM

1    TO THESE PATIENTS.  AND WHEN THEY KEEP COMING BACK TO THE

2    DOCTOR AND THEY WANT MORE MEDICINES, MORE MEDICINES, MORE

3    MEDICINES, THAT SENDS UP RED FLAGS FOR MY DOCTORS, AND SO MY

4    DOCTORS WILL DRAW A BLOOD LEVEL ON THEM.  VERY OFTEN, IF NOT

5    MORE THAN NOT, THEY DON'T EVEN HAVE A DETECTABLE BLOOD LEVEL IN

6    THEIR SYSTEM, SO THEY'RE NOT TAKING THE MEDICINES.

7    **Q.**    AND YOU THINK YOUR PATIENTS INTIMIDATE DOCTORS IN NEW

8    ORLEANS?

9    **A.**    I DO.  YES, THEY DO.

10   **Q.**    AND YOU CAN TELL THAT FROM THE WAY THE NOTES ARE WRITTEN

11   BY THE DOCTORS?

12   **A.**    NO.  I TALK TO THE DOCTORS IN NEW ORLEANS.

13   **Q.**    AND YOU THINK YOUR PATIENTS ARE MANIPULATIVE?

14   **A.**    SOME OF THEM, YES.

15   **Q.**    AND YOU REALLY NEED TO USE ALL OF YOUR SENSES TO FIGURE

16   OUT WHEN THEY'RE LYING?

17   **A.**    I DO.

18   **Q.**    AND YOU RUN THIS DEPARTMENT?

19   **A.**    I DO.

20          MS. MONTAGNES, THIS IS THE PENITENTIARY THAT WE'RE

21   WORKING IN.  THIS IS A MAXIMUM-SECURITY PENITENTIARY.  YOU HAVE

22   TO BE ON GUARD WITH EVERYTHING YOU DO.  YOU HAVE TO MAKE

23   DECISIONS BASED ON YOUR EXPERIENCE, AND ALL THAT YOU HAVE JUST

24   MENTIONED EXISTS IN A PENITENTIARY.

25   **Q.**    AND YOU OFTEN DON'T WRITE DOWN PHYSICAL EXAMS IN THE ATU?

**A.**   SOMETIMES I DON'T.

**Q.**   YOU DON'T NEED TO WRITE EVERYTHING DOWN BECAUSE OF YOUR

EXPERIENCE?

**A.**   SOMETIMES I DON'T.

**Q.**   YOU DON'T NEED ALL THAT?

**A.**   WELL, IF I SAID THAT IN MY DEPOSITION AND THERE'S A

PATIENT THAT'S IN THE FILES THAT IF YOU WANT TO GO TO THAT, WE

CAN TAKE A LOOK.  IT'S A PRIME EXAMPLE.  IT'S FRANCIS --

          **MR. ROBERT:**  NO NAMES.

          **THE WITNESS:**  OKAY.  THERE'S A DOCUMENT THAT I

REVIEWED THAT'S A PRIME EXAMPLE OF THAT.  AND IT'S ONE OF THE

PATIENTS THAT ARE IN YOUR REPORT.  AND YOU WILL SEE THAT ON THE

ATU SHEET, I WROTE "ADMIT TO NURSING UNIT ONE," WHICH IS WHAT I

DO.  BUT IF YOU WOULD PULL UP THE HISTORY AND PHYSICAL FROM THE

NURSING UNIT, YOU WOULD SEE THAT IT'S WELL DOCUMENTED.

**BY MS. MONTAGNES:**

**Q.**   AND ONCE IN THE ATU, YOU SAW 76 PATIENTS IN A DAY?

**A.**   I DON'T SEE 76 PATIENTS IN A DAY.  MAYBE 76 HAVE RUN

THROUGH THERE.  AND THAT WOULD INCLUDE INSULIN, THAT WOULD

INCLUDE WOUND DRESSING CHANGES.  THAT WOULD INCLUDE ALL THOSE

TYPE OF THINGS.

**Q.**   WHAT IS ASHLEY RACHEL'S LICENSE LEVEL?

**A.**   WHO?

**Q.**   ASHLEY RACHEL.

**A.**   I DON'T KNOW WHO THAT IS.

04:36  1   Q.   IS IT POSSIBLE SHE'S AN EMT?

2   A.   I DON'T KNOW.

3   Q.   WHAT IS R.L. BOCKER'S LICENSE LEVEL?

4   A.   SHE'S A PARAMEDIC.

5   Q.   WHAT IS CASEY'S CLEVELAND'S LICENSE LEVEL?

6   A.   I THINK HE'S A BASIC.

7   Q.   WHAT IS BROOKE SUMMERS' LICENSE LEVEL?

8   A.   I THINK SHE'S AN INTERMEDIATE MAYBE.

9   Q.   WHAT IS ANTHONY SCHIRRA'S LICENSE LEVEL?

10   A.   HE'S A PARAMEDIC.

11   Q.   WHAT IS CHANEL STRODDER'S LICENSE LEVEL?

12   A.   SHE'S INTERMEDIATE.

13   Q.   AND JAMIE CASHIO IS AN ADVANCED EMT?

14   A.   I THINK JAMIE'S NOW AN ADVANCED.  WELL, I DON'T KNOW AS OF

15   '16, BUT I THINK NOW SHE IS.

16   Q.   AND KRISTI EPPINETTE, WHAT'S HER LICENSE LEVEL?

17   A.   SHE'S NOT WORKING THERE ANYMORE.

18   Q.   CHRISTY PHILLIPS, WHAT'S HER LICENSE LEVEL?

19   A.   I DON'T THINK SHE WORKS THERE ANYMORE.

20   Q.   JAMES SUMMERS, WHAT'S HIS LICENSE LEVEL?

21   A.   HE'S ONE OF THE CAPTAINS.  WELL, HE'S A MAJOR NOW OVER

22   THERE.  HE'S A PARAMEDIC.

23   Q.   KEVIN GRIFFIN, WHAT'S HIS LICENSE LEVEL?

24   A.   WELL, KEVIN IS AN INTERMEDIATE.  HE NOW RUNS THE FIRE

25   DEPARTMENT.

1    Q.    AND CHRISTINE DARBONNE IS A PARAMEDIC?

2    A.    YEAH, SHE'S A PARAMEDIC.

3    Q.    GEORGIA --

4              **MR. ROBERT:**  YOUR HONOR, I JUST WANT TO LODGE AN

5    OBJECTION TO THE EXTENT THAT IT -- WHAT TIME PERIOD ARE WE

6    TALKING ABOUT?  IS IT TODAY?  IS IT SEPTEMBER OF 2016?  WHEN?

7              **MS. MONTAGNES:**  SO YOUR HONOR, IN AN EFFORT NOT TO BE

8    CONFUSING, BECAUSE FOR HIM TO HAVE TO REMEMBER WHAT THE LICENSE

9    LEVEL IS OF HIS EMTS AND PARAMEDICS, WE JUST WANT TO GET THE

10   LICENSE LEVELS OF THE CURRENT EMTS.

11             **THE COURT:**  OKAY.  I'LL PERMIT IT.  WHAT'S THE

12   RELEVANCE OF IT, JUST THAT HE KNOWS?

13             **MS. MONTAGNES:**  THAT HE KNOWS, AND ALSO THAT THERE'S

14   MANY OF THEM THAT THE SPLIT BETWEEN EMTS, IT'S QUITE A

15   DIFFERENT JOB.

16             **THE COURT:**  OKAY.

17   BY MS. MONTAGNES:

18   Q.    WHAT IS GEORGIA GILLORY'S LICENSE LEVEL?

19   A.    WHO'S THAT?

20   Q.    GEORGIA GILLORY.

21   A.    SHE'S NOT THERE ANYMORE, BUT SHE WAS A PARAMEDIC.

22   Q.    JAKE CARMOUCHE?

23   A.    WE DON'T HAVE A JAKE CARMOUCHE.

24   Q.    LAUREN BERNARD?

25   A.    LAUREN'S GONE.  SHE DON'T WORK THERE ANYMORE.

1   **Q.**   LYNETTE JARVIS?

2   **A.**   SHE DON'T WORK THERE ANYMORE.

3   **Q.**   MARK PURPURA?

4   **A.**   HE DON'T WORK THERE ANYMORE.

5   **Q.**   RONALD PLAUCHE?

6   **A.**   RONALD PLAUCHE.

7   **Q.**   PLAUCHE.

8   **A.**   RONNIE IS AN ADVANCED.

9   **Q.**   MANDY BUTLER?

10  **A.**   SHE DON'T WORK THERE ANYMORE.

11  **Q.**   SANDY MCCLURE?

12  **A.**   WELL, SHE'S ACTUALLY -- SHE WAS A PARAMEDIC, BUT SHE WENT

13  BACK TO SCHOOL FOR NURSING AND NOW SHE'S AN RN AND WORKS IN THE

14  EMERGENCY ROOM.

15  **Q.**   MICHAEL BORDELON?

16  **A.**   MICHAEL'S A BASIC.

17  **Q.**   WILLIAM DOVER?

18  **A.**   DOVER'S A PARAMEDIC.

19  **Q.**   WILLIAM LACOSTE?

20  **A.**   BILL'S A PARAMEDIC.

21  **Q.**   SAM GASPAR?

22  **A.**   SAM DOESN'T WORK THERE ANYMORE.

23  **Q.**   WAYNE CHESNEY?

24  **A.**   HE DOESN'T WORK THERE ANYMORE.

25  **Q.**   MICHAEL THOMAS?

04:39    1    **A.**    HE DOESN'T WORK THERE.  HE RETIRED.

2    **Q.**    REBECCA CHILDS?

3    **A.**    CHILDS IS A PARAMEDIC.

4    **Q.**    RIVER KIRBY?

5    **A.**    RIVER'S A BASIC.

6    **Q.**    AND MICHELLE DIAZ?

7    **A.**    MICHELLE DOESN'T WORK THERE ANYMORE.

8    **Q.**    YOU TALKED ABOUT THE ACA AUDIT.  IT'S A LOT OF WORK TO DO

9    THE ACA AUDIT, ISN'T IT.

10    **A.**    I DON'T KNOW.

11    **Q.**    SEVERAL STAFF MEMBERS OF YOURS WORK ON IT?

12    **A.**    THEY DO.

13    **Q.**    TRACY FALGOUT WORKS ON IT?

14    **A.**    HE'S AN ACA AUDITOR.

15    **Q.**    AND IT'S QUITE A LOT OF WORK TO PREPARE FOR IT?

16    **A.**    NOT NECESSARILY.

17    **Q.**    IT'S MENTIONED IN ALL THE RABTC MINUTES.

18    **A.**    WELL, WE TRY TO KEEP OUR HOSPITAL THE SAME PRETTY MUCH

19    YEAR-ROUND SO WHEN THERE'S AN ACA AUDIT, THERE SHOULDN'T BE A

20    WHOLE LOT LEFT TO DO.

21         **MS. MONTAGNES:**  CAN WE PULL UP JX2-622.

22    **BY MS. MONTAGNES:**

23    **Q.**    AND THIS IS FEBRUARY 2016, CORRECT?

24    **A.**    OKAY.

25    **Q.**    AND THE ACA AUDIT HAPPENED IN AUGUST OF 2016.

**A.**   IF YOU SAY.

**Q.**   OKAY.  WE SAW THE AUDIT COMPLIANCES FOR --

**A.**   YEAH, BUT I DON'T REMEMBER THE DATE.

**Q.**   OKAY.  BUT IF I REPRESENTED TO YOU THAT THE ACA AUDIT

HAPPENED IN AUGUST OF 2016, WOULD YOU HAVE ANY REASON --

**A.**   I WOULDN'T HAVE ANY REASON NOT TO BELIEVE YOU.

**Q.**   OKAY.  AND IF WE COULD TURN TO THE NEXT PAGE, IT SAYS

"ACA, DOCUMENTATION HAS BEEN GATHERED FOR 2016 ACA FILES."

**A.**   OKAY.

**Q.**   AND IF WE COULD TURN TO FIVE PAGES LATER AT 628, JOINT

EXHIBIT 2-628.  QUALITY IMPROVEMENT.  IT SAYS WORKING ON LSP

ACA FILES.

**A.**   OKAY.

**Q.**   AND IF I WERE TO REPRESENT TO YOU THAT THERE ARE UPDATES

LIKE THIS IN EVERY RABTC MINUTES, WOULD THAT SURPRISE YOU?

**A.**   IT WOULD BUT THAT JUST MEANS THEY'RE WORKING ON IT.  THAT

DON'T MEAN THEY'RE WORKING 24-HOURS A DAY STRUGGLING TO GET

READY FOR AN ACA AUDIT.

**Q.**   BUT IN FACT, WHEN YOUR EXPERT, JACQUELINE MOORE, CAME TO

VISIT, SHE WASN'T ABLE TO SEE PARTS OF THE PRISON BECAUSE THE

ACA AUDIT WAS BEING PREPARED FOR.

**A.**   I DON'T KNOW.

**Q.**   IF SHE REPRESENTED THAT IN HER EXPERT REPORT, WOULD YOU

THINK SHE WAS LYING ABOUT THAT?

**A.**   I WOULDN'T.

**Q.** YOU ARE DR. TOCE'S DIRECT SUPERVISOR?

**A.** I AM.

**Q.** HE IS A DOCTOR UNDER YOU?

**A.** HE IS.

**Q.** AND IT'S IMPORTANT THAT YOU HAVE A HANDLE ON HIS QUALIFICATIONS?

**A.** SURE.

**Q.** AND IN 2016, YOU TESTIFIED THAT DR. TOCE'S RESTRICTION WAS ABOUT SEEING WOMEN?

**A.** IT IS.

**Q.** BUT THAT WASN'T HIS ONLY RESTRICTION?

**A.** I THINK HE HAD SOME ISSUES WRITING MEDICATIONS FOR HIS FAMILY, BUT THAT HAS BEEN RECTIFIED.

**Q.** BUT HE HAD OTHER RESTRICTIONS, DIDN'T HE?

**A.** HE HAD AN ISSUE ABOUT BEING ABLE TO SEE WOMEN, AND HE HAD AN ISSUE ABOUT WRITING DRUGS FOR HIS FAMILY, FROM WHAT I UNDERSTAND.

**Q.** OKAY. AND HE ALSO SHALL NOT PRACTICE MEDICINE IN THE FIELD OF MANAGEMENT OF CHRONIC PAIN, SHALL NOT HIMSELF, OUT OF BEING ENGAGED IN THE TREATMENT OF OR ACTUALLY UNDERTAKE TO TREAT EITHER INDIVIDUALLY OR IN CONJUNCTION WITH OTHER PHYSICIANS, ANY PATIENT FOR THE LONG-TERM MANAGEMENT OF CHRONIC PAIN WITH CONTROLLED SUBSTANCES.

**A.** THAT'S IN REFERENCE TO HIM RUNNING A PAIN MANAGEMENT CLINIC ON THE OUTSIDE, NOT IN ANGOLA.

1    Q.    BUT THAT WAS AN ADDITIONAL RESTRICTION ON HIS LICENSE?

2    A.    IF HE WAS TO WORK OUTSIDE OF ANGOLA, THAT WOULD HAVE BEEN

3    A RESTRICTION WHERE HE COULD NOT HAVE RUN A PAIN MANAGEMENT

4    CLINIC, YES.

5    Q.    SO IT IS YOUR POSITION THAT HE COULD DO PAIN MANAGEMENT

6    WITHIN ANGOLA?

7    A.    ABSOLUTELY.  WE CLEARED THAT WITH THE MEDICAL BOARD.  THAT

8    IS AN ABSOLUTE FACT.

9    Q.    AND HE SHALL NOT TREAT, INCLUDING THE PRESCRIBING OF

10   MEDICATION, ANY PATIENT FOR ATTENTION DEFICIT DISORDER, OR ANY

11   ASSOCIATED CONDITION OR DISORDER, UNLESS AND UNTIL THE

12   DIAGNOSIS OF ADD OR ASSOCIATED CONDITION HAVE BEEN CONFIRMED BY

13   A PSYCHIATRIST OR OTHER PHYSICIAN.

14   A.    MY PHYSICIANS DON'T TREAT ADD.

15   Q.    BUT THAT WAS AN ADDITIONAL RESTRICTION ON HIS LICENSE,

16   WASN'T IT?

17   A.    HAD HE BEEN WORKING IN THE OUTSIDE WORLD, THAT WOULD HAVE

18   BEEN AN ADDITIONAL RESTRICTION FOR HIM, YES.

19   Q.    AND HE HAD TO PARTICIPATE IN THE PEP CARE MONITORING

20   PROGRAM?

21   A.    SURE.

22   Q.    AND THAT WAS AN ADDITIONAL RESTRICTION ON HIS LICENSE?

23   A.    THAT'S NOT ON HIS LICENSE.  THAT'S JUST A QUALIFICATION

24   THAT HE HAD TO FULFILL AS PART OF HIS TREATMENT.

25   Q.    AND IN ORDER TO MAINTAIN HIS LICENSE, HE HAD TO DO THAT?

1   **A.**   YES.

2   **Q.**   AND HE HAD TO DO REGULAR REPORTING?

3   **A.**   HE DID.

4          **MS. MONTAGNES:**   IF WE COULD PULL UP PATIENT 17, 10-N

5   AT 13676.  SORRY, 10-N-13676.

6   **BY MS. MONTAGNES:**

7   **Q.**   AND I JUST WANT TO CONFIRM, DR. LAVESPERE, THIS IS YOUR

8   HANDWRITING?

9   **A.**   THAT IS.

10  **Q.**   AND DOWN THERE AT THE BOTTOM IN THE RIGHT-HAND CORNER,

11  THAT'S YOUR SIGNATURE?

12  **A.**   IT IS.

13         **MS. MONTAGNES:**   AND IF WE COULD PULL UP 10-JJ AT

14  39619.

15  **BY MS. MONTAGNES:**

16  **Q.**   AND THAT'S ALSO YOUR SIGNATURE THERE?

17  **A.**   IT IS.

18  **Q.**   ALL RIGHT.  AND YOU'VE BEEN IN HERE LISTENING TO EVIDENCE?

19  **A.**   I HAVE.

20         **MS. MONTAGNES:**   SO LET'S PULL UP 10-DDD-56892.

21  SORRY, 13-56892.

22  **BY MS. MONTAGNES:**

23  **Q.**   AND YOU'VE BEEN PASSING NOTES TO YOUR COUNSEL AS YOU'VE

24  BEEN HERE?

25  **A.**   I HAVE.

1   Q.   AND YOU WERE IN HERE WHEN MR. TONUBBEE TESTIFIED?

2   A.   I WAS.

3   Q.   AND YOUR COUNSEL PUT THIS SHEET UP, DIDN'T HE?

4   A.   YES.

5   Q.   AND HE REPRESENTED THAT THIS NOTE AT THE BOTTOM WAS FROM A

6   SPECIALIST?

7   A.   I DON'T REMEMBER THAT.  BUT IF HE DID, IT'S NOT FROM A

8   SPECIALIST?

9   Q.   AND HE REPRESENTED THAT THIS WAS WRITTEN BY DR. PALECKI TO

10  MR. TONUBBEE, DIDN'T HE?

11  A.   I DON'T KNOW, BUT IT'S WRITTEN BY DR. MCCAIN.

12  Q.   THIS NOTE AT THE BOTTOM?

13  A.   AT THE BOTTOM IS WRITTEN BY ME.

14  Q.   AND THAT NOTE, HE REPRESENTED TO MR. TONUBBEE WAS WRITTEN

15  BY MR. PALECKI?

16  A.   WELL, IF HE DID, HE WAS MISTAKEN.

17  Q.   AND YOU WERE IN HERE AND YOU DID NOT CORRECT HIM?

18  A.   MA'AM, I CAN'T STAND UP AND DISRESPECT THE COURT AND TRY

19  TO CORRECT HIM.

20  Q.   AND YOU DIDN'T PASS HIM A NOTE TELLING HIM HE WAS WRONG?

21  A.   I DIDN'T PASS HIM A NOTE.

22        MR. ROBERT:  YOUR HONOR, I'M GOING TO OBJECT.  HE

23  SAID HE DOESN'T EVEN RECALL THE TESTIMONY.  I MEAN --

24        MS. MONTAGNES:  YOUR HONOR, IT WAS THE SUBJECT OF

25  MANY QUESTIONS AND HE REPRESENTED HE WAS IN THE COURTROOM WHEN

1   IT HAPPENED.

2           THE COURT:  OKAY.  I WILL CONSIDER IT FOR THE WEIGHT.

3           MR. ROBERT:  FAIR ENOUGH.

4           MS. MONTAGNES:  THANK YOU.

5           MR. ROBERT:  YOUR HONOR, I DON'T HAVE ANY REDIRECT.

6           THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

7               IT'S 4:50.  RATHER THAN START ANOTHER WITNESS,

8   WE'LL ADJOURN FOR THE DAY.

9               THE SCHEDULE TOMORROW, COUNSEL, IS WE WILL

10  CONVENE AT 10:00 A.M.  THE COURT HAS A STATUS CONFERENCE AND A

11  PRETRIAL CONFERENCE BEFORE THAT, AND THEN WE WILL TAKE A LUNCH

12  BREAK FROM 1:30 TO 3:30, OKAY.

13              CAN YOU GIVE ME AN IDEA OF HOW MUCH MORE WE HAVE

14  TO GO, MR. ROBERT?

15          MR. ROBERT:  WE'VE GOT A LITTLE WAYS, YOUR HONOR.

16  THAT WAS BASICALLY OUR FIRST WITNESS.

17          THE COURT:  HOW MANY MORE WITNESSES DO WE HAVE?

18          MR. ROBERT:  I'M HOPEFUL THAT WE CAN GET DONE WITH

19  THIS BY THURSDAY, SOMETIME THURSDAY OR FRIDAY MORNING, THAT'S

20  MY HOPE.

21          THE COURT:  OKAY.  WE WILL BE IN RECESS UNTIL

22  TOMORROW MORNING AT 10:00.

23          MR. ROBERT:  THANK YOU, YOUR HONOR.

24          (PROCEEDINGS RECESSED UNTIL 10/23/2018.)

25                      * * *

1    **<u>CERTIFICATE</u>**

2        I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

3    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

4    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

5    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

6    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                            *Shannon Thompson*

9                            SHANNON THOMPSON, CCR,

10                           OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25