UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOSEPH LEWIS JR., ET AL | * | CIVIL ACTION |
| VERSUS | * | NO. 15-318 |
| BURL CAIN, ET AL | * | OCTOBER 23, 2018 |

* * * * * * * * * * * * * *

DAY 9
BENCH TRIAL BEFORE
THE HONORABLE SHELLY D. DICK
UNITED STATES CHIEF DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:          THE PROMISE OF JUSTICE
                             INITIATIVE
                             BY:  MERCEDES H. MONTAGNES, ESQ.
                                  AMANDA C. ZARROW. ESQ.
                                  MEREDITH ANGELSON, ESQ.
                                  NISHI KUMAR, ESQ.
                             636 BARONNE STREET
                             NEW ORLEANS, LOUISIANA 70113

                             ACLU OF LOUISIANA
                             BY:  BRUCE W. HAMILTON, ESQ.
                             P.O. BOX 56157
                             NEW ORLEANS, LOUISIANA 70156

                             COHEN MILSTEIN SELLERS & TOLL
                             PLLC
                             BY:  JEFFREY B. DUBNER, ESQ.
                             1100 NEW YORK AVE NW, SUITE 500
                             WASHINGTON, DC 20005

                             THE CAPITAL APPEALS PROJECT
                             BY:  ERICA L. NAVALANCE, ESQ.
                             636 BARONNE STREET
                             NEW ORLEANS, LOUISIANA 7013

```
 1                                    SOUTHERN POVERTY LAW CENTER
                                      BY:   JARED F. DAVIDSON, ESQ.
 2                                          JAMILA A. JOHNSON, ESQ.
                                      1055 ST. CHARLES AVE., SUITE 505
 3                                    NEW ORLEANS, LOUISIANA 70130

 4   FOR THE DEFENDANTS:             KANTROW SPAHT WEAVER &
                                      BLITZER
 5                                    BY:   RANDAL J. ROBERT, ESQ.
                                            CONNELL L. ARCHEY, ESQ.
 6                                          KEITH FERNANDEZ, ESQ.
                                      P.O. BOX 2997
 7                                    BATON ROUGE, LOUISIANA 70821

 8                                    SHOWS CALI & WALSH LLP
                                      BY:   MARY E. ROPER, ESQ.
 9                                          JOHN C. CONINE JR., ESQ.
                                            CAROLINE T BOND, ESQ.
10                                          JEFFREY K. CODY, ESQ.
                                      628 ST. LOUIS STREET
11                                    BATON ROUGE, LOUISIANA 70802

12   OFFICIAL COURT REPORTER:        SHANNON L. THOMPSON, CCR.
                                      UNITED STATES COURTHOUSE
13                                    777 FLORIDA STREET
                                      BATON ROUGE, LOUISIANA 70801
14                                    (225) 389-3567

15        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
               COMPUTER-AIDED TRANSCRIPTION SOFTWARE
16

17

18

19

20

21

22

23

24

25
```

1                            INDEX

2                                                    PAGE

3   DEFENDANTS' WITNESSES:

4     DAVID THOMAS, M.D., J.D.

5       DIRECT EXAMINATION OF QUALIFICATIONS BY MR. ARCHEY    4

6       CROSS-EXAMINATION OF QUALIFICATIONS BY MR. DUBNER     14

7       DIRECT EXAMINATION BY MR. ARCHEY                      17

8       CROSS-EXAMINATION BY MR. DUBNEY                       56

9       REDIRECT EXAMINATION BY MR. ARCHEY                    117

10    JACQUELINE MOORE, RN, PH.D, CCHP-A

11      DIRECT EXAMINATION OF QUALIFICATIONS BY MR. ARCHEY    126

12      CROSS-EXAMINATION OF QUALIFICATIONS BY MS. MONTAGNES  133

13      DIRECT EXAMINATION BY MR. ARCHEY                      135

14      CROSS-EXAMINATION BY MS. MONTAGNES                    150

15

16

17

18

19

20

21

22

23

24

25

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | **(OCTOBER 23, 2018)**                                       |
| 2  | **THE COURT:**  GOOD MORNING.  BE SEATED.                    |
| 3  | NEXT WITNESS?                                                 |
| 4  | **MR. ARCHEY:**  YOUR HONOR, THE DEFENSE WOULD CALL DR.      |
| 5  | DAVID THOMAS TO THE STAND.                                    |
| 6  | **THE COURT:**  DR. THOMAS.                                  |
| 7  | **THE DEPUTY CLERK:**  RAISE YOUR RIGHT HAND.               |
| 8  | **DAVID THOMAS, M.D., J.D.,**                                |
| 9  | HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.                |
| 10 | **DIRECT EXAMINATION ON QUALIFICATIONS**                    |
| 11 | **BY MR. ARCHEY:**                                          |
| 12 | **Q.**   GOOD MORNING, DR. THOMAS.                          |
| 13 | GO AHEAD AND STATE YOUR NAME FOR THE RECORD, PLEASE.        |
| 14 | **A.**   DAVID THOMAS.                                      |
| 15 | **Q.**   AND HOW ARE YOUR CURRENTLY EMPLOYED, SIR?         |
| 16 | **A.**   I AM PROFESSOR OF SURGERY AT THE NOVA SOUTHEASTERN |
| 17 | UNIVERSITY, COLLEGE OF MEDICINE.  I'M THE IMMEDIATE PAST     |
| 18 | CHAIRMAN OF SURGERY, AND I AM CURRENTLY CHAIRMAN OF THE      |
| 19 | DIVISION OF CORRECTIONAL MEDICINE AT THAT SAME UNIVERSITY.   |
| 20 | **Q.**   AND SO YOU ARE A MEDICAL DOCTOR; IS THAT CORRECT?  |
| 21 | **A.**   YES, SIR.                                          |
| 22 | **Q.**   WHEN DID YOU OBTAIN YOUR MEDICAL LICENSE OR DEGREE? |
| 23 | **A.**   MY DEGREE, IN 1970.                                |
| 24 | **Q.**   WHERE FROM, SIR?                                   |
| 25 | **A.**   UNIVERSITY OF MIAMI, COLLEGE OF MEDICINE.         |

10:18    1    **Q.**    AND WHAT DID YOU DO AFTER YOU OBTAINED YOUR DEGREE IN

2    1970?

3    **A.**    I STARTED A SURGICAL INTERNSHIP AND RESIDENCY.

4    **Q.**    IN GENERAL SURGERY?

5    **A.**    YES, SIR.

6    **Q.**    AND THEN AFTER THE GENERAL SURGERY RESIDENCY, WHAT DID YOU

7    DO?

8    **A.**    I WAS DRAFTED AND WENT TO VIETNAM.

9    **Q.**    WHAT DID YOU DO WHEN YOU WERE IN VIETNAM?

10    **A.**    I WAS A GENERAL SURGEON AND GENERAL MEDICAL OFFICER.

11    **Q.**    OKAY.  AND DID YOU HAVE EXPERIENCE RUNNING THE HOSPITAL

12    UNIT AT THAT TIME?

13    **A.**    YES, SIR, I DID.

14    **Q.**    OKAY.  WHEN THE ARMY RELEASED YOU, WHAT DID YOU DO?

15    **A.**    I WENT BACK TO THE UNIVERSITY OF MIAMI ON FACULTY IN

16    PHYSIOLOGY AND SURGERY, BUT I WAS UNHAPPY, SO I DID AN

17    OPHTHALMOLOGY RESIDENCY.

18    **Q.**    OKAY.  AND THEN AFTER THE OPHTHALMOLOGY RESIDENCY, DID YOU

19    GO INTO PRIVATE PRACTICE FOR A PERIOD OF TIME?

20    **A.**    YES, SIR.  I WAS IN PRIVATE PRACTICE FOR 17 YEARS.

21    **Q.**    OKAY.  ARE YOU BOARD CERTIFIED?

22    **A.**    YES, SIR.

23    **Q.**    IN WHAT AREA ARE YOU BOARD CERTIFIED?

24    **A.**    IN OPHTHALMOLOGY.

25    **Q.**    AND ARE YOU RECOGNIZED AS A FELLOW WITH THE AMERICAN

10:19   1   ACADEMY OF --

2   **A.**   YES, SIR.  I'M A FELLOW OF THE AMERICAN ACADEMY OF

3   OPHTHALMOLOGY AND OTOLARYNGOLOGY.

4   **Q.**   AND WHAT DOES IT TAKE TO BE RECOGNIZED AS A FELLOW?

5   **A.**   BOARD CERTIFICATION, ADVANCED TRAINING, AND DOCUMENTATION

6   OF SUPERIOR CARE.

7   **Q.**   OKAY.  IN ADDITION -- WELL, NOT IN ADDITION.  WHEN DID YOU

8   HAVE YOUR FIRST EXPERIENCE WITH CORRECTIONAL MEDICINE?

9   **A.**   I WAS IN THE LEGISLATURE FROM 1980 -- '82 TO --

10   **Q.**   '84 TO '94, MAYBE?

11   **A.**   YES, SIR, '84 TO '94, AND I SERVED ON THE CORRECTIONS

12   COMMITTEE IN THE FLORIDA LEGISLATURE.

13   **Q.**   ALL RIGHT.  AND THEN IN 1994, DID YOU THEN HAVE THE

14   OPPORTUNITY TO GO WORK IN CORRECTIONS IN FLORIDA?

15   **A.**   YES, SIR.  I THOUGHT IT WAS 1993, BUT I WORKED IN

16   ZEPHYRHILLS CORRECTIONAL FACILITY AS THE MEDICAL EXECUTIVE

17   DIRECTOR.

18   **Q.**   ALL RIGHT.  AND WAS THAT FOR A SPECIFIC FACILITY AT THAT

19   TIME?

20   **A.**   THAT WAS A SPECIFIC FACILITY.  I SAW PATIENTS AND THEN HAD

21   ADMINISTRATIVE DUTIES OVER, I THINK, SEVEN OTHER PHYSICIANS.

22   **Q.**   OKAY.  AND THEN I BELIEVE IN ABOUT 1995, YOU THEN MOVED UP

23   TO ANOTHER POSITION WITH THAT DEPARTMENT?

24   **A.**   YES, SIR.  I BECAME REGIONAL MEDICAL DIRECTOR FOR WHAT WAS

25   CALLED REGION 4.  ZEPHYRHILLS HAD SOME MAJOR PROBLEMS BEFORE I

1    GOT THERE.  WE STRAIGHTENED IT OUT.  THE SECRETARY WAS
2    IMPRESSED WITH THAT AND MOVED ME TO A REGIONAL POSITION IN
3    REGIONAL 4, WHICH HAD MAJOR PROBLEMS.
4    **Q.**    OKAY.  AND IN THAT POSITION, DID YOU CONTINUE TO BOTH
5    PRACTICE AND SUPERVISE AND DO ADMINISTRATIVE WORK?
6    **A.**    YES, SIR.
7    **Q.**    OKAY.  AND THEN DID YOU MOVE UP FROM THERE WITHIN THE
8    FLORIDA DEPARTMENT OF CORRECTIONS?
9    **A.**    YES, SIR.  I BECAME CHIEF OF HEALTH SERVICES FOR THE
10   CLINICAL SIDE AND WAS RESPONSIBLE FOR ALL THE CLINICAL CARE AND
11   REMAINED IN THAT POSITION FOR A SHORT TIME, AND THEN BECAME --
12   THE TITLE WAS ORIGINALLY ASSISTANT SECRETARY AND LATER BECAME
13   DEPUTY SECRETARY FOR HEALTH SERVICES.  AND I WAS RESPONSIBLE
14   FOR ALL CLINICAL ADMINISTRATIVE CARE IN THE DEPARTMENT OF
15   CORRECTIONS FOR HEALTH SERVICES.
16   **Q.**    ALL RIGHT.  WHEN YOU'VE USED THE WORDS "CLINICAL CARE,"
17   WHAT DO YOU MEAN BY "CLINICAL CARE"?
18   **A.**    THE CARE OF PATIENTS BY A PROVIDER.
19   **Q.**    OKAY.  AND THEN ULTIMATELY BETWEEN 1988 AND 2000, YOU WERE
20   IN CHARGE OF CLINICAL CARE FOR ALL OF THE FLORIDA DEPARTMENT OF
21   CORRECTIONS?
22   **A.**    TILL 2003.
23   **Q.**    OKAY.  AND HOW MANY PROVIDERS DID YOU SUPERVISE UNDER YOUR
24   CONTROL, YOUR DIRECTION, BUDGET?  DO YOU RECALL THAT ABOUT 550
25   DOCTORATE-LEVEL PROVIDERS AND A BUDGET OF $268 MILLION?

10:22  1  **A.**   THAT'S ABOUT RIGHT, YES, SIR.

2  **Q.**   AND YOU CONTINUED TO HAVE DIRECT INPATIENT CARE

3  RESPONSIBILITY AT THAT TIME AS WELL; IS THAT RIGHT?

4  **A.**   I HAD INPATIENT AND OUTPATIENT CARE RESPONSIBILITIES THAT

5  I ELECTED TO DO TO REMAIN SHARP.

6  **Q.**   AND WHY DID YOU ELECT TO DO THAT?

7  **A.**   TO GIVE MYSELF CREDIBILITY WITH THE OTHER PROVIDERS; THAT

8  I WAS NOT A TITCH FOR A FIGUREHEAD; THAT I TOOK CARE OF

9  PATIENTS AS WELL.

10  **Q.**   ALL RIGHT.  IN 2000, YOU LEFT THE FLORIDA DEPARTMENT OF

11  CORRECTIONS IN APPROXIMATELY 2000, AND WHERE DID YOU GO AT THAT

12  TIME?

13  **A.**   I BELIEVE IT WAS 2003, MR. ARCHEY, AND I WENT TO THE

14  UNIVERSITY, NOVA SOUTHEASTERN UNIVERSITY.

15  **Q.**   OKAY.  WHAT POSITION DID YOU GO TO AT THAT TIME?

16  **A.**   PROFESSOR AND CHAIR OF THE DEPARTMENT OF SURGERY AND

17  PROFESSOR OF CHAIR OF THE DIVISION OF CORRECTIONAL MEDICINE.

18  WHILE I WAS WITH THE DEPARTMENT OF CORRECTIONS IN 2000, I HAD A

19  VOLUNTARY APPOINTMENT WITH NOVA SOUTHEASTERN UNIVERSITY AND,

20  INDEED, I HAD A VOLUNTARY APPOINTMENT AT UNIVERSITY OF SOUTH

21  FLORIDA BEFORE THAT.

22  **Q.**   TELL ME ABOUT THE CORRECTIONAL MEDICINE PROGRAM AT NOVA

23  SOUTHEASTERN THAT YOU WERE INVOLVED WITH.

24  **A.**   WE HAVE A CORRECTIONAL MEDICINE FELLOWSHIP THAT LEADS TO

25  BOARD CERTIFICATION IN CORRECTIONAL MEDICINE.  IT WAS DEVELOPED

10:24   1   AT NOVA SOUTHEASTERN UNIVERSITY, AND WE'VE HAD SEVEN AND NOW

2   EIGHT FELLOWS FINISH THAT PROGRAM.

3   **Q.**   OKAY.  AND YOU ARE DIRECTLY OVER AND RUN THAT CORRECTIONAL

4   MEDICINE PROGRAM AT NOVA SOUTHEASTERN?

5   **A.**   YES, SIR, I'M THE INDIVIDUAL RESPONSIBLE FOR IT.  THERE IS

6   ALSO A PROGRAM DIRECTOR AND THERE'S ALSO A PSYCHIATRIST.

7   **Q.**   OKAY.  IN 1995, YOU OBTAINED YOUR J.D. TO PRACTICE LAW; IS

8   THAT CORRECT?

9   **A.**   YES, SIR.

10   **Q.**   AND IN 2013, YOU OBTAINED A DOCTORATE IN EDUCATION; IS

11   THAT RIGHT?

12   **A.**   YES, SIR.

13   **Q.**   LET ME ASK YOU SOME QUESTIONS.  YOU HAVE SOME AFFILIATION

14   WITH THE AMERICAN CORRECTIONAL ASSOCIATION?

15   **A.**   I AM CURRENTLY ON THE BOARD OF GOVERNORS OF THE AMERICAN

16   CORRECTIONAL ASSOCIATION.  I HAVE BEEN ON THE EXECUTIVE

17   COMMITTEE OF THAT ORGANIZATION.  PRIOR TO THAT, I WAS ON THE

18   BOARD OF GOVERNORS PREVIOUSLY BECAUSE YOU CAN'T SERVE

19   CONTINUOUSLY FOR A CERTAIN PERIOD OF TIME.  I HAD TO BE OFF FOR

20   A WHILE.  BEFORE THAT, I WAS ON THE COMMISSION ON ACCREDITATION

21   IN CORRECTIONS, AND WE ACCREDITED A TREMENDOUS NUMBER OF

22   INSTITUTIONS, AND THEN I WAS THE CHAIRMAN OF THE COMMISSION ON

23   ACCREDITATION FOR CORRECTIONS FOR TWO YEARS.

24   **Q.**   NOW, THIS COMMISSION OF ACCREDITATION THAT YOU JUST

25   REFERRED TO, WOULD YOU ACTUALLY GO TO FACILITIES AS PART OF THE

ACCREDITATION PROCESS?

**A.**   SOMETIMES.  MOSTLY AS CHAIRMAN, IT WAS A PAPER REVIEW, BUT AS A MEMBER AND AS AN EVALUATOR, I WOULD GO TO INSTITUTIONS. I'VE ALSO BEEN AN EVALUATOR FOR THE NATIONAL COMMISSION FOR A SHORT TIME.

**Q.**   OKAY.  HAVE YOU SERVED AS AN EXPERT IN CORRECTIONAL MEDICINE AREAS PREVIOUSLY?

**A.**   YES, SIR.

**Q.**   AND HAVE YOU SERVED AS AN EXPERT FOR BOTH PLAINTIFFS AND DEFENDANTS OVER THE YEARS?

**A.**   YES, SIR.

**Q.**   LET ME ASK YOU WHAT YOU DID TO PREPARE YOUR OPINIONS IN THIS CASE.  YOU WERE PROVIDED MATERIALS AHEAD OF TIME IN THE FORM OF POLICIES AND PROCEDURES, CHARTS TO REVIEW BEFORE YOU WENT TO THE SITE; IS THAT CORRECT?

**A.**   YES, SIR.  I SAW -- I ASKED FOR AND RECEIVED THE COMPLAINT, THE ANSWER TO THE COMPLAINT, THE POLICIES AND PROCEDURES, AND THEN A VARIETY OF MEDICAL RECORDS, ALL OF WHICH I REVIEWED BEFORE I WENT TO THE INSTITUTION, AND THEN I WENT TO THE INSTITUTION.

          I ARRIVED AT APPROXIMATELY 7:10 IN THE MORNING.  WAS MET BY A FEMALE LIEUTENANT.  I WENT AND I TALKED WITH DR. VANNOY, AND THEN I WENT AND TALKED WITH A CAPTAIN, AND I DON'T REMEMBER HER NAME, FOR DOCUMENTATION OF MINUTES OF MEETINGS AND THE ACA REPORT AND THINGS LIKE THAT.

10:27

1      AND I THEN WENT OVER TO THE BARROW TREATMENT CENTER.

2  BY THEN IT WAS ABOUT 8:00, AND MET WITH DR. LAVESPERE AND

3  TALKED WITH HIM FOR A LITTLE WHILE, BUT THEN I WALKED AROUND

4  WITH HIM.  I WAS VERY IMPRESSED THAT PATIENTS WOULD COME UP TO

5  HIM AND HE WOULD KNOW WHO THEY WERE AND THEY WOULD ENGAGE IN

6  HIM AND HE WOULD RESPOND AND KNEW THEIR COMPLAINTS.

7      **MR. DUBNER:**  OBJECTION.  HEARSAY.

8      **THE COURT:**  SUSTAINED.

9      **MR. ARCHEY:**  YOUR HONOR, MAY I RESPOND OR NO?

10     **THE COURT:**  YOU MAY RESPOND.

11     **MR. ARCHEY:**  YOUR HONOR, AN EXPERT CAN RELY UPON

12 HEARSAY STATEMENTS IF IT'S THE TYPE THAT THEY WOULD ORDINARILY

13 RELY UPON.

14     **THE COURT:**  YOUR QUESTION WAS:  WHAT DID HE DO TO

15 COME TO HIS CONCLUSIONS, AND HE LAUNCHED INTO -- I MEAN, IF YOU

16 WANT TO GET TO HIS OPINIONS AND YOU WANT HIM TO DRAW ON THAT

17 FOR HIS OPINIONS, BUT IT'S NOT RESPONSIVE TO YOUR QUESTION.

18 THE OBJECTION IS SUSTAINED.

19     **MR. ARCHEY:**  THANK, YOUR HONOR.

20 **BY MR. ARCHEY:**

21 **Q.**   ALL RIGHT.  LET'S GET BACK TO, YOU TOURED THE FACILITIES.

22 WAS ANYTHING THAT YOU NEEDED NOT PROVIDED TO YOU?

23 **A.**   NO, SIR.

24 **Q.**   WERE YOU ABLE TO SEE ALL THE FACILITIES THAT YOU NEEDED TO

25 SEE?

**A.**   YES, SIR.

**Q.**   DID YOU INTERVIEW THE STAFF OF LSP AND GET THE INFORMATION THAT YOU NEEDED FOR YOUR OPINIONS?

**A.**   YES, SIR.

**Q.**   AND YOU SPOKE WITH INMATES WHILE YOU WERE THERE AT THE SITE; IS THAT RIGHT?

**A.**   YES, SIR.

**Q.**   WHAT WAS THE REASON WHY YOU DID THAT?

**A.**   IT'S PART OF AN OBJECTIVE REVIEW.

        **MR. DUBNER:**  OBJECTION.  HIS TESTIMONY ABOUT THE INMATES WAS EXCLUDED IN THE COURT'S FIRST *DAUBERT* ORDER.

        **MR. ARCHEY:**  AND YOUR HONOR, MY READING OF YOUR RE-HEARING IS THAT WAS THEN ALLOWED SUBJECT TO THE WEIGHT AND SUBJECT TO BEING ALLOWED -- PRESENTED IN COURT FOR TESTIMONY.

        **THE COURT:**  IT WAS SUBJECT TO OBJECTION, AND YOU HAVE AN OBJECTION.

        **MR. ARCHEY:**  ALL RIGHT.  THEN I'M BACK TO WHAT I JUST SAID, WHICH IS THIS IS THE TYPE OF THING AN EXPERT RELIES UPON AND --

        **THE COURT:**  HE MAY RELY ON HEARSAY, BUT THERE'S ALSO AN OBLIGATION THAT THE UNDERLYING FACTS AND CIRCUMSTANCES ARE RELIABLE; THAT HE'S DRAWING UPON RELIABLE INFORMATION OR DRAWING UPON INFORMATION THAT PRODUCES A RELIABLE OPINION.

        **MR. ARCHEY:**  AT THIS POINT I'M JUST GOING THROUGH THE PROCESS OF WHAT HE DID, AND I'M FIXING TO TENDER HIM.

1   10:29    THE COURT:  OKAY.

2           MR. ARCHEY:  BUT I JUST WANTED TO ESTABLISH HIS --

3   BOTH HIS CREDENTIALS AND THE WORK THAT HE DID, THE METHODOLOGY.

4           THE COURT:  AND I THINK THAT'S WHERE THE PROBLEM IS

5   COMING IN, IS THAT YOU'RE ASKING HIM QUALIFICATION QUESTIONS

6   AND HE'S GIVING RESPONSIVE TESTIMONY THAT IS MORE IN THE NATURE

7   OF OPINION TESTIMONY.  I THINK THAT'S WHERE THE PROBLEM IS.  SO

8   THE OBJECTION IS SUSTAINED, BUT YOU MIGHT WANT TO REPHRASE YOUR

9   QUESTION.

10          MR. ARCHEY:  VERY WELL, YOUR HONOR.

11  BY MR. ARCHEY:

12  Q.   DOCTOR, DID YOU DO THE -- THE STEPS THAT YOU TOOK TO

13  PREPARE YOUR OPINION IN THIS CASE, WERE THEY THE SAME STEPS

14  THAT YOU'VE TAKEN IN OTHER CASES THAT YOU'VE OFFERED OPINIONS?

15  A.   YES, SIR.

16  Q.   AND DID YOU HAVE AN OPPORTUNITY TO REVIEW THE PLAINTIFFS'

17  EXPERT'S REPORT AS WELL?

18  A.   YES, SIR.  THAT WAS ONE OF THE THINGS I REVIEWED BEFORE I

19  CAME TO THE FACILITY.

20  Q.   FROM THE REVIEW OF THE REPORT, YOU DID A SIMILAR PROCESS

21  IN DEVELOPING YOUR OPINIONS AS WELL?

22  A.   YES, SIR.

23          MR. ARCHEY:  YOUR HONOR, AT THIS TIME WE WOULD TENDER

24  DR. THOMAS AS AN EXPERT IN CORRECTIONAL MEDICINE.

25          THE COURT:  IS THERE A CROSS ON THE TENDER?

10:30   1              **MR. DUBNER:**  BRIEFLY, YOUR HONOR.

2              **CROSS-EXAMINATION ON QUALIFICATIONS**

3    BY MR. DUBNER:

4    **Q.**   DR. THOMAS, WHEN DID YOU CONDUCT YOUR SITE VISIT FOR THIS

5    CASE?

6    **A.**   I DON'T REMEMBER THE DATE.  YOU'D HAVE TO REFRESH ME.

7              **MR. DUBNER:**  COULD YOU GIVE ME ONE MOMENT, YOUR

8    HONOR, TO PULL THAT UP?  I APOLOGIZE FOR NOT HAVING THAT AT

9    HAND.

10   BY MR. DUBNER:

11   **Q.**   AND DR. THOMAS, I TOOK YOUR DEPOSITION IN THIS CASE; IS

12   THAT RIGHT?

13   **A.**   YES, SIR.

14   **Q.**   AND IN THAT DEPOSITION, IF YOU TESTIFIED THAT YOU THINK IT

15   WAS SOMETIME IN AUGUST, YOUR SITE VISIT, DOES THAT SOUND RIGHT

16   TO YOU?

17   **A.**   I BELIEVE THAT'S WHAT I TESTIFIED TO.

18   **Q.**   AND IS THAT CORRECT?

19   **A.**   I DON'T REMEMBER AS WE SIT HERE; BUT YES, I WOULD EXPECT

20   SO.

21   **Q.**   WAS IT SUMMERTIME?

22   **A.**   YEAH.  WELL, IT WAS AUGUST.

23   **Q.**   I'M JUST ASKING TO MAKE SURE YOU'RE NOT JUST REMEMBERING

24   THE DEPOSITION.  YOU BELIEVE IT WAS IN AUGUST OF 2016?

25   **A.**   AS I MENTIONED, I DON'T REMEMBER, AND I DIDN'T -- I NEED

10:12  1  TO BE REFRESHED ON THE DATE, AND I'M CERTAIN IT'S AVAILABLE.

2  **Q.**   OKAY.  LET ME SHOW YOU YOUR DEPOSITION AND SEE IF THIS

3  REFRESHES YOUR RECOLLECTION.

4          **THE COURT:**  YES, YOU MAY APPROACH.

5          **MR. DUBNER:**  MAY I APPROACH?  THANK YOU, YOUR HONOR.

6          **MR. ARCHEY:**  CAN I SEE WHAT YOU'RE --

7          **MR. DUBNER:**  IT'S PAGE 41 OF HIS DEPOSITION.

8          **MR. ARCHEY:**  CAN I SEE, PLEASE?

9          **MR. DUBNER:**  DOWN AT THE BOTTOM OF IT.

10          **MR. ARCHEY:**  OKAY.

11  **BY MR. DUBNER:**

12  **Q.**   DO YOU NEED MORE TIME?

13  **A.**   NO, SIR, I DON'T.  THE DEPOSITION SAYS THAT I WAS THERE IN

14  AUGUST.

15  **Q.**   OKAY.  AND YOU JUST TESTIFIED THAT YOU REVIEWED

16  PLAINTIFFS' EXPERT REPORT BEFORE YOUR SITE VISIT?

17  **A.**   YES, SIR.

18  **Q.**   AND THEN JUST TO CLEAR UP ONE THING FROM YOUR TESTIMONY

19  BEFORE, YOU SAID THAT YOU STARTED A GENERAL SURGERY RESIDENCY.

20  YOU NEVER FINISHED THAT RESIDENCY, CORRECT?

21  **A.**   THAT'S CORRECT.

22  **Q.**   AND YOU'RE NOT BOARD CERTIFIED IN SURGERY?

23  **A.**   THAT'S CORRECT.

24  **Q.**   THE ONLY RESIDENCY YOU COMPLETED WAS IN OPHTHALMOLOGY?

25  **A.**   RIGHT, WHICH IS A SURGICAL SPECIALTY.

10:13     1            **MR. DUBNER:**  SO YOUR HONOR, WE HAVE NO OBJECTION TO

2      DR. THOMAS -- WELL, ONE OBJECTION TO RELIABILITY.  DR. THOMAS

3      HAS TESTIFIED --

4            **THE COURT:**  OKAY.  THIS IS REALLY ABOUT THE TENDER.

5            **MR. DUBNER:**  OKAY.

6            **THE COURT:**  SO THE QUESTION IS:  DOES HE HAVE THE

7      SCIENTIFIC, TECHNICAL, OR OTHERWISE SPECIALIZED KNOWLEDGE OR

8      SKILL IN THE FIELD OF -- THE TENDER HAS BEEN IN CORRECTIONAL

9      MEDICINE.

10            **MR. DUBNER:**  AND TO THAT I'LL SAY WE HAVE NO

11      OBJECTION TO HIM TESTIFYING ABOUT OPERATIONAL STANDARDS IN

12      CORRECTIONAL MEDICINE.

13                 FOR THE RECORD, WE RENEW OUR OBJECTION TO DR.

14      THOMAS TESTIFYING ABOUT CLINICAL STANDARDS OF CARE OUTSIDE OF

15      OPHTHALMOLOGY.  HE HAS NO TRAINING IN ANY RELEVANT MEDICAL

16      SPECIALTY, AND AS THE COURT HELD IN *SCARIM V. RYAN*, 2013

17      WESTLAW 12096528, DR. THOMAS IS NOT QUALIFIED TO TESTIFY ABOUT

18      THE STANDARD OF CARE FOR SPECIFIC ILLNESSES OUTSIDE OF

19      OPHTHALMOLOGY.  THAT SAID, WE RECOGNIZE THE COURT OVERRULED

20      THIS OBJECTION IN THE CLASS CERTIFICATION HEARING, AND SO WE

21      ARE JUST PRESERVING IT FOR THE RECORD.

22            **THE COURT:**  WITHOUT OBJECTION, DR. THOMAS WILL BE

23      ACCEPTED TO GIVE OPINION TESTIMONY IN THE FIELD OF CORRECTIONAL

24      CARE.

25            **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

10:34

1    **DIRECT EXAMINATION**

2  **BY MR. ARCHEY:**

3  **Q.**   DR. THOMAS, WHAT WERE YOU ASKED TO DO IN THIS CASE?

4  **A.**   I WAS ASKED TO REVIEW THE CARE PROVIDED AT ANGOLA PRISON,

5  LOUISIANA STATE PRISON IN ANGOLA.

6  **Q.**   AND WHAT IS YOUR OPINION AS TO THE CARE THAT IS PROVIDED

7  AT LOUISIANA STATE PENITENTIARY?

8  **A.**   I THINK THE CARE MEETS CONSTITUTIONAL STANDARDS.

9  **Q.**   OKAY.

10         **MR. DUBNER:**  OBJECTION.  HE DID NOT PROVIDE THAT

11  OPINION.  OUTSIDE THE SCOPE.

12         **THE COURT:**  SUSTAINED.

13         **MR. ARCHEY:**  I'M SORRY.  I MISSED.

14         **THE COURT:**  HE SAID -- THE ANSWER WAS THE CARE MEETS

15  CONSTITUTIONAL STANDARDS.  THE OBJECTION IS HE'S NOT QUALIFIED

16  TO GIVE THAT OPINION.  IT'S A LEGAL OPINION.  HE'S NOT

17  QUALIFIED.

18         **MR. ARCHEY:**  OKAY.  THAT'S WHAT I NEEDED.  THANK YOU,

19  YOUR HONOR.

20         **THE COURT:**  THAT'S NOT WHAT YOU ASKED HIM, BUT THAT'S

21  WHAT HE ANSWERED.

22         **MR. ARCHEY:**  UNDERSTOOD, JUDGE.  I WILL NEED TO KNOW

23  WHERE TO FOLLOW-UP.

24  **BY MR. ARCHEY:**

25  **Q.**   DOCTOR, ARE THERE SOME UNIQUENESS TO PRACTICING IN

1   CORRECTIONAL MEDICINE AREAS?

2   **A.**   IT'S AN EXTREMELY UNIQUE SPECIALTY.

3   **Q.**   ALL RIGHT.  WHY IS THAT?  WHAT MAKES IT UNIQUE?

4   **A.**   THERE ARE A VARIETY OF THINGS THAT OCCUR IN CORRECTIONS

5   THAT DON'T OCCUR OUTSIDE OF CORRECTIONS IN MULTI-FACILITIES

6   WHERE PHYSICIANS AND NURSES INTERACT WITH PATIENTS.  THEY ARE

7   DESIGNED FOR PATIENT INTERACTIONS.  THAT IS NOT TRUE IN

8   CORRECTIONS, WHICH IS DESIGNED FOR CARE AND CUSTODY OF PEOPLE,

9   OF INCARCERATED PEOPLE, AS A RESPONSE TO LEGAL REQUIREMENTS,

10  HEALTHCARE BECAME AN IMPORTANT PART OF THAT.

11          IN THE FREE WORLD, IF YOU AND I MAKE AN APPOINTMENT,

12  AS LONG AS YOU KEEP THE APPOINTMENT, WE'LL SEE ONE ANOTHER.  IN

13  A CORRECTIONAL ENVIRONMENT, IF I WISH TO SEE YOU AND THERE IS

14  AN INCIDENT ON THE COMPOUND THAT THE SECURITY SERVICES FEEL

15  SHOULD -- THAT THE COMPOUND SHOULD BE LOCKED DOWN, UNLESS IT'S

16  AN EMERGENCY AND I DEMAND TO SEE YOU AND THEY ASSIGN OFFICERS

17  TO BRING YOU TO ME, YOU WON'T BE SEEN UNTIL IT'S RESCHEDULED.

18          THERE ARE CERTAIN ITEMS THAT ARE UNIQUE.  IF YOU WERE

19  OPERATED ON AND YOU COME BACK WITH PRESCRIPTIONS FOR PAIN,

20  SPECIFICALLY DRUGS LIKE DILAUDID AND THINGS LIKE THAT, THAT

21  WON'T BE ADMINISTERED, THAT WILL BE CHANGED BECAUSE DILAUDID

22  HAS VALUE, ECONOMIC --

23          **MR. DUBNER:**  OBJECTION.  OUTSIDE THE SCOPE.

24          **MR. ARCHEY:**  OUTSIDE --

25          **MR. DUBNER:**  OF THE REPORT, I MEAN.

10:17  1          **MR. ARCHEY:**  NO, YOUR HONOR, THAT'S WELL WITHIN THE

2    REPORT.  HE GAVE AN OPINION ABOUT HOW IT'S --

3          **THE COURT:**  ABOUT HOW SECURITY TRUNCATES THE MEDICAL

4    STANDARD OF CARE OR THE MEDICAL PROVISION OF CARE.

5              HERE'S WHAT WE ARE GOING TO DO.  THAT IS NOT

6    PARTICULARLY HELPFUL TO THE TRIER OF FACT, AS THE COURT POINTED

7    OUT IN ITS TWO RULINGS IN RESPONSE TO THE MOTION IN LIMINE.

8    THE TRIER OF FACT, IN THIS CASE ME, CAN MAKE A COMMON SENSE

9    CONCLUSION THAT IN A CORRECTIONAL ENVIRONMENT, SECURITY

10   MEASURES SOMETIMES COLLIDE WITH THE PROVISION OF CARE.  SO MOVE

11   ON TO ANOTHER LINE OF QUESTIONING BECAUSE THAT'S NOT

12   PARTICULARLY HELPFUL TO THE TRIER OF FACT, AND UNDER 702, IT

13   NEEDS TO BE HELPFUL TO THE TRIER OF FACT.

14         **MR. ARCHEY:**  YOUR HONOR, THE OBJECTION, WHEN IT WAS

15   MADE, WAS ABOUT NARCOTICS AND THAT IS WITHIN THE SCOPE OF HIS

16   OPINION, AND THAT IS A DIFFERENT AREA.

17         **THE COURT:**  BUT THAT WASN'T THE QUESTION YOU ASKED

18   HIM.  I MEAN, HERE'S THE PROBLEM THAT WE'RE HAVING.

19              DR. THOMAS, WITH ALL DUE RESPECT, SIR, I'M

20   ANXIOUS TO HEAR YOUR OPINIONS TO THE EXTENT THAT YOU -- THAT

21   THEY ARE THE -- TO THE EXTENT THAT THEY ARE THE PRODUCT OF

22   SUFFICIENT FACTS AND DATA AND THAT YOU USED RELIABLE PRINCIPLES

23   AND METHODS TO COME UP WITH THOSE.  I'M ANXIOUS TO HEAR THOSE

24   AND WOULD CERTAINLY HEAR THOSE WITH GREAT INTEREST.  HOWEVER,

25   THE COURT IS GOING TO REQUEST THAT YOU PLEASE CONFINE YOUR

10:19   1   ANSWERS TO YOUR COUNSEL'S QUESTIONS BECAUSE YOU ARE TENDING TO

2   MAYBE ANTICIPATE WHAT THE NEXT QUESTION IS AND GO ON A LITTLE

3   BIT FURTHER.

4          SO WITH THAT SAID, MAYBE THE BEST WAY TO PROCEED

5   NOW, MR. ARCHEY, IS TO ASK ANOTHER QUESTION.

6          **MR. ARCHEY:**  VERY WELL, YOUR HONOR.

7   BY MR. ARCHEY:

8   **Q.**   DOCTOR, ON PAGES 17 AND 18 AND 19 OF YOUR REPORT, YOU

9   TALKED ABOUT WAYS THAT CORRECTIONAL MEDICINE IS UNIQUE, AND I

10  WANT TO COVER A FEW OF THOSE.  YOU JUST WERE REFERENCING

11  NARCOTICS.  WHAT IS IT ABOUT NARCOTICS THAT MAKES CORRECTIONAL

12  MEDICINE DIFFERENT FROM MEDICINE IN THE FREE WORLD OR

13  COMMUNITY?

14  **A.**   THEY HAVE VALUE ON THE COMPOUND.  THEY ARE --

15         **MR. DUBNER:**  AND, AGAIN, I HAVE TO OBJECT AS OUTSIDE

16  THE SCOPE.  YOU KNOW, MR. ARCHEY JUST POINTED THE DOCTOR TO

17  PAGES 17 THROUGH 19.  THIS IS CERTAINLY NOT THERE.  AS FAR AS I

18  CAN FIND, HE DIDN'T SAY ANYTHING ABOUT THE VALUE OF NARCOTICS

19  IN A PRISON.  HE DOES TALK ABOUT NARCOTIC DRUGS ON PAGE 12 OF

20  HIS REPORT, BUT NOTHING RESEMBLING THIS TOPIC.

21         **THE COURT:**  SIR?

22         **MR. ARCHEY:**  AND YOUR HONOR, THIS IS WITHIN THE SCOPE

23  OF WHAT HE SAID AND HE WAS DEPOSED ON THIS.  THIS WAS HIM

24  EXPLAINING --

25         **THE COURT:**  WHERE IS THE REPORT?  I'M ASSUMING THAT'S

1   IN EVIDENCE?

2          **MR. ARCHEY:**  IT'S D-14.

3          **MR. DUBNER:**  AND PAGE 17 BEGINS AT D-2888.

4          **THE COURT:**  JUST GIVE ME A MINUTE WHILE I PULL IT UP.

5   "D" WHAT, MR. ARCHEY?  I'M SORRY.

6          **MR. ARCHEY:**  D-14 IS WHAT I'M BEING TOLD.  I BELIEVE

7   THAT TO BE CORRECT, JUDGE.

8          **THE COURT:**  THAT'S BEEN PREVIOUSLY ADMITTED; IS THAT

9   CORRECT?

10          **MR. ARCHEY:**  YES, YOUR HONOR.

11          **THE COURT:**  OKAY.  I'M LOOKING AT THE RULE 26(A)(2)

12   DISCLOSURE AND YOU'RE TALKING ABOUT -- WHERE IS IT?  PAGE WHAT?

13          **MR. ARCHEY:**  17, 18, AND 19 IS THE SECTION WHERE HE

14   DISCUSSES HOW MEDICINE IN A CORRECTIONAL FACILITY IS UNIQUE AND

15   TALKS ABOUT SOME OF THAT.

16              I WOULD ADD THAT IN HIS DEPOSITION, HE EXPOUNDED

17   ON THIS AND WAS ASKED ALL THE REST OF THESE QUESTIONS.  THIS IS

18   FAIR NOTICE, AND THIS IS THE DETAILS OF THE DISCLOSURES THAT

19   WERE MADE HERE.

20          **THE COURT:**  WELL, I'VE LOOKED AT PAGES 16 THROUGH 20,

21   JUST TRYING TO BE THOROUGH, AND I DON'T SEE ANYTHING ABOUT

22   NARCOTICS.

23          **MR. ARCHEY:**  NARCOTICS ARE NOT MENTIONED,

24   SPECIFICALLY UNDER THE TOPIC OF THEY ARE BEING UNIQUE.  AT THE

25   DEPOSITION THEY WENT INTO THIS, AND THIS ISSUE WAS COVERED

10:43 1  THOROUGHLY, YOUR HONOR.

2        **THE COURT:**  THE OBJECTION IS SUSTAINED.  IT'S NOT

3  PART OF HIS REPORT.

4  **BY MR. ARCHEY:**

5  **Q.**   ALL RIGHT, DOCTOR, LET ME GO BACK TO THE -- YOUR

6  CONCLUSION.  I ASKED YOU, WHAT YOU WERE ASKED TO DO AS TO

7  WHETHER THE MEDICAL CARE PROVIDED BY LOUISIANA STATE

8  PENITENTIARY WAS WITHIN THE STANDARD OF CARE, AND WHAT DID YOU

9  FIND?

10  **A.**   IT WAS.

11  **Q.**   ALL RIGHT.  AND I WANT TO GET TO THE JUDGE'S ISSUES ON HOW

12  DID YOU GET TO THAT OPINION.  WHAT ALL DID YOU DO TO GET TO

13  THAT OPINION?

14  **A.**   WELL, I DON'T KNOW HOW TO RESPOND WITHOUT --

15  **Q.**   LET ME ASK A BETTER QUESTION.  DID YOU LOOK AT CHARTS AS

16  PART OF THE -- DEVELOPING YOUR OPINION -- MEDICAL CHARTS?

17  **A.**   YES, SIR.

18  **Q.**   AND DID YOU EVALUATE THE CLINICAL CARE AS REFLECTED IN

19  THOSE MEDICAL CHARTS?

20  **A.**   YES, SIR.

21  **Q.**   AND DOES THAT FORM THE BASIS FOR YOUR OPINION THAT THE

22  CARE WAS WITHIN THE STANDARD OF CARE?

23  **A.**   PARTLY.

24  **Q.**   OKAY.  IN ADDITION TO THE POLICIES AND PROCEDURES THAT YOU

25  LOOKED AT AND REVIEWED; IS THAT CORRECT?

**A.**    IN ADDITION TO THAT.

**Q.**    OKAY.  IN ADDITION TO YOUR TOUR OF THE FACILITIES?

**A.**    YES, SIR.

**Q.**    AND YOUR DISCUSSIONS WITH THE PERSONNEL DURING THAT TOUR OF THE FACILITIES; IS THAT RIGHT?

**A.**    YES, SIR.

**Q.**    ALL RIGHT.

**A.**    AND WITNESSING INTERACTIONS BETWEEN PROVIDERS AND PATIENTS.

**Q.**    AND INCLUDING SOME MEDICAL CARE AS IT WAS BEING PROVIDED; IS THAT RIGHT?

**A.**    YES, SIR.

**Q.**    DESCRIBE WHAT SPECIFIC INSTANCES THAT YOU WERE ABLE TO OBSERVE.

**A.**    THERE WERE TWO, I THINK.  THEY INVOLVED THE ATU.  A PATIENT HAD A SEIZURE AND WAS GIVEN VALIUM OUTSIDE AND THEN BROUGHT OUTSIDE ON THE COMPOUND AND THEN BROUGHT TO THE ATU. AND THEN I WITNESSED A PARAMEDIC AND AN EMT EVALUATING THE PATIENT.  HE HAD ANOTHER SEIZURE.  THEY REPEATED THE VALIUM, AND THEN IMMEDIATELY WENT AND TALKED TO DR. LAVESPERE ABOUT THAT, AND I WAS -- ACCOMPANIED THEM TO DR. LAVESPERE'S OFFICE.

**Q.**    OKAY.  AND AS YOU OBSERVED THIS INCIDENT, DID YOU FIND THAT THE SERVICES THAT WERE BEING PROVIDED WERE APPROPRIATE AND WITHIN THE STANDARD OF CARE?

**A.**    VERY APPROPRIATE.

10:45

1   **Q.**   DOCTOR, YOU WERE IN THE COURT YESTERDAY WHEN DR. LAVESPERE

2   TESTIFIED; IS THAT RIGHT?

3   **A.**   YES, SIR.

4   **Q.**   AND YOU HEARD HIM GO THROUGH ALL THE VARIOUS SERVICES AND

5   ASPECTS OF CARE OUT AT LOUISIANA STATE PENITENTIARY; IS THAT

6   RIGHT?

7   **A.**   YES, SIR.

8   **Q.**   AND YOU, YOURSELF, TOURED AND OBSERVED THOSE FACILITIES;

9   IS THAT RIGHT?

10  **A.**   YES, SIR.

11  **Q.**   AND YOUR REPORT ADDRESSED THOSE FACILITIES FROM THE

12  OUTPATIENT CLINICS, THE ATU, THE NURSING UNITS, SPECIALTY

13  CLINICS.  YOU ADDRESS ALL THAT IN YOUR REPORT, RIGHT?

14  **A.**   YES, SIR.

15  **Q.**   AND WHAT WAS YOUR CONCLUSION AS TO THE RANGE OF MEDICAL

16  SERVICES THAT WAS PROVIDED BY LSP?

17  **A.**   A PRETTY BROAD RANGE, COMPLETE MEDICAL SERVICES.

18  **Q.**   LET'S TALK ABOUT CREDENTIALING FOR A MOMENT.  WHAT IS YOUR

19  OPINION AS TO WHETHER THE PHYSICIANS AT LSP WERE PROPERLY

20  CREDENTIALED?

21  **A.**   MY OPINION IS THEY WERE PROPERLY CREDENTIALED.

22  **Q.**   OKAY.  AND WHAT DO YOU BASE THAT OPINION ON?

23  **A.**   THEY WERE ALL LICENSED BY THE STATE OF LOUISIANA.

24  **Q.**   WHAT IS YOUR OPINION ABOUT PHYSICIANS WHO ARE PRACTICING

25  WITH RESTRICTIONS?

10:47   1   **A.**   IT DEPENDS ON WHAT THE RESTRICTIONS ARE, BUT QUITE A FEW

2   GOOD PHYSICIANS HAVE RESTRICTIONS ON THEIR LICENSE.

3   **Q.**   DO YOU HAVE EXPERIENCE FROM YOUR HISTORY AND IN FLORIDA OF

4   PHYSICIANS PRACTICING WITH PHYSICIANS?

5   **A.**   YES, SIR.

6   **Q.**   I MEAN, PHYSICIANS PRACTICING WITH RESTRICTIONS?

7   **A.**   WITH RESTRICTIONS, YES, SIR.

8   **Q.**   OKAY.

9   **A.**   FLORIDA HAS A UNIQUE LICENSURE OTHER STATES HAVE, SO IT'S

10   NOT THAT UNIQUE, WHERE THERE ARE AREAS OF CRITICAL NEED

11   LICENSES THAT PERMIT THOSE PRACTITIONERS TO PRACTICE ONLY IN

12   CORRECTIONS OR PUBLIC HEALTH UNDER SUPERVISION, AND THAT COMES

13   ABOUT FROM DISCIPLINARY ACTIONS WITH THE BOARD OF MEDICINE

14   USUALLY.

15   **Q.**   OKAY.  NOW, IS THERE A REQUIREMENT THAT PHYSICIANS IN

16   CORRECTIONAL MEDICINE BE FAMILY CARE PHYSICIANS?

17   **A.**   NO.

18   **Q.**   HAVE YOU SEEN EXCELLENT CARE PROVIDED BY PROVIDERS OTHER

19   THAN THOSE WITH FAMILY CARE BACKGROUNDS?

20   **A.**   ABSOLUTELY.  ONE OF MY BEST PROVIDERS WAS AN

21   ANESTHESIOLOGIST, A BOARD-CERTIFIED ANESTHESIOLOGIST.  I,

22   MYSELF, AM AN OPHTHALMOLOGIST, AND YET I MOVED IN BOTH

23   INDIVIDUAL CORRECTIONAL FACILITIES AND A CORRECTIONAL COMMUNITY

24   TO THE HIGHEST LEVELS OF THAT, AS WELL AS IN THE ACADEMIC

25   CENTER.

10:48
1    Q.    OKAY.   AND, IN FACT, ARE THERE BENEFITS FROM HAVING A

2    RANGE OF DOCTORS COVERING A RANGE OF SERVICES?

3    A.    ABSOLUTELY.

4    Q.    DOCTOR, DID YOU HAVE ANY CONCERNS WITH THE NURSES OUT AT

5    LSP ON HOW THEY WERE UTILIZED OR ANY CONCERNS WITH NURSING AT

6    ALL OUT THERE?

7    A.    NO, SIR.

8    Q.    OKAY.  LET'S TURN TO -- I'M SORRY.  OH, I THOUGHT I

9    HEARD -- LET'S TURN TO THE EMTS FOR A MOMENT.  NOW EMTS, THERE

10   ARE THREE LEVELS WITH TIERED CARE; IS THAT RIGHT?

11   A.    YES, SIR.

12   Q.    AND THAT'S WHAT YOU OBSERVED IN THE ATU THAT YOU WERE

13   REFERENCING?

14   A.    YES, SIR.  PARAMEDICS SEEMED TO LEAD THE TEAM AND EITHER

15   AN ADVANCED OR A BASIC WAS A SUPPLEMENTARY PART OF THE TEAM.

16   Q.    OKAY.  AND WHAT IS YOUR UNDERSTANDING FROM YOUR TOUR AND

17   YOUR STUDY AS TO HOW THE EMTS OPERATE?

18   A.    I DON'T UNDERSTAND YOUR QUESTION, MR. ARCHEY.

19   Q.    BAD QUESTION.  LET ME ASK IT OVER AGAIN.  DID YOU SEE THAT

20   THEY OPERATED PURSUANT TO PROTOCOLS?

21   A.    YES, SIR.

22   Q.    AND DID YOU FIND THAT TO BE APPROPRIATE?

23   A.    YES, SIR.

24   Q.    AND WHY DO YOU FIND THAT TO BE APPROPRIATE?

25   A.    PROTOCOLS WERE PHYSICIAN DRIVEN.

10:49    1        **MR. DUBNER:**  OBJECTION.  OUTSIDE THE SCOPE OF THE
    2   REPORT.  HE DIDN'T SPEAK ABOUT THE EMT PROTOCOLS IN THE REPORT
    3   AT ALL.
    4        **MR. ARCHEY:**  GIVE ME A SECOND, JUDGE.  I'M UNDER A
    5   MISUNDERSTANDING.  I THOUGHT HE REALLY DID DISCUSS THE
    6   PROTOCOLS.  YOUR HONOR, I DON'T SEE IT SPECIFICALLY IN THE
    7   REPORT OTHER THAN IN THE EMT DISCUSSION AND THE SICK CALL
    8   DISCUSSION, SO I WILL WITHDRAW THE QUESTION AND MOVE ON.
    9        **THE COURT:**  THE QUESTION IS WITHDRAWN.  GO AHEAD.
   10   BY MR. ARCHEY:
   11   **Q.**   WHAT IS YOUR OPINION AS TO LSP USING EMTS TO CONDUCT SICK
   12   CALL?
   13   **A.**   I THOUGHT IT WAS A CREATIVE WAY TO USE PEOPLE.  MOST
   14   PLACES SICK CALL IS DONE BY EITHER RNS OR LPNS, BUT MANY PLACES
   15   DON'T HAVE THAT OPPORTUNITY, AND SO LSP USES THE EMTS, THE
   16   PARAMEDICS, THE INTERMEDIATES, AND THE BASICS TO EVALUATE SICK
   17   CALL AND ACTUALLY DO HANDS-ON EVALUATION OF THE PATIENTS.  MOST
   18   PLACES, THE SICK CALL SLIPS ARE REVIEWED, AND THEN ONLY LATER
   19   ARE THEY, IF IT'S FELT NECESSARY BY THE REVIEWER, ONLY LATER
   20   ARE THE PATIENTS SEEN.  THIS WAS A VERY GOOD SUPPLEMENT TO THAT
   21   SYSTEM BECAUSE THEY ACTUALLY WENT AND SAW THE PATIENTS.
   22        **MR. ARCHEY:**  YOUR HONOR, ON PAGE 8 OF THE REPORT HE
   23   DOES REFER TO PHYSICIANS OPERATING PURSUANT TO PROTOCOL, AND
   24   THAT'S IN THE DISCUSSION OF THE EMTS AND HOW THEY OPERATE.
   25        **MR. DUBNER:**  YES, YOUR HONOR, HE SAYS "UNDER

10:52   1   PROTOCOL, THE PARAMEDIC BEGAN AN INTRAVENOUS INFUSION," ET
2   CETERA, ET CETERA.  HE DOESN'T ANYWHERE TALK ABOUT THE
3   APPROPRIATENESS OF THE PROTOCOLS WHICH WAS THE QUESTION THAT
4   MR. ARCHEY WAS IN THE PROCESS OF ASKING HIM OF THAT OBJECTION.
5           **THE COURT:**  THAT IS CORRECT.  PAGE 8 HAS TO DO WITH
6   HIS OBSERVATIONS OF THE TREATMENT OF A PARTICULAR PATIENT, NOT
7   ABOUT THE USE OF EMTS PURSUANT -- OR EMTS' APPLICATION OF
8   PROTOCOLS.  IT'S NOT ADDRESSED IN HIS REPORT.  THE OBJECTION
9   WOULD BE SUSTAINED IF THERE WERE AN OBJECTION, BUT THIS WAS
10   KIND OF -- THERE'S REALLY NOT AN OBJECTION AT THIS POINT.
11           **MR. ARCHEY:**  RIGHT.
12           **THE COURT:**  GO AHEAD.
13           **MR. ARCHEY:**  VERY GOOD, YOUR HONOR.
14   **BY MR. ARCHEY:**
15   **Q.**   WHAT DID YOU OBSERVE AS TO EMTS OPERATING OUTSIDE THE
16   SCOPE OF THEIR PRACTICE?
17   **A.**   I SAW NO EMT OPERATING OUTSIDE THE SCOPE OF THEIR
18   PRACTICE.  I WAS ADVISED THAT ONE BASIC EMT WAS OUTSIDE THE
19   INSTITUTION AND A PATIENT WAS GOING INTO ANAPHYLACTIC SHOCK AND
20   THE DOCTOR SPECIFICALLY SAID TO ADMINISTER EPINEPHRINE WHICH IS
21   A VERY APPROPRIATE TREATMENT FOR THAT, AND THE EMT REPORTEDLY
22   SAID, "I'M A BASIC EMT AND SHOULDN'T DO THAT."  AND THE DOCTOR
23   REPLIED, "YOU NEED TO SAVE THE PATIENT'S LIFE.  GO AHEAD AND
24   GIVE THE EPINEPHRINE INJECTION," AND HE DID.  AND I THOUGHT
25   THAT REFLECTED THE CONSCIENTIOUSNESS ON THE PART OF BOTH THE

1  EMT AND THE PHYSICIAN.

2  **Q.**   LET'S TALK ABOUT THE USE OF ORDERLIES AT LSP.  DID YOU

3  DEVELOP SOME OPINIONS ABOUT THE USE OF ORDERLIES AT LSP?

4  **A.**   YES, SIR.

5  **Q.**   AND WHAT ARE THOSE OPINIONS?

6  **A.**   THE ORDERLIES SERVE ONLY TO PROVIDE ACTIVITIES OF DAILY

7  LIVING.  THEY TAKE A PROGRAM, WHICH I REVIEWED THE CURRICULUM

8  OF, AND SAW SOME DOCUMENTATION OF PATIENTS OR PEOPLE THAT HAD

9  BEEN IN THAT MEETING, TRAINING PROGRAM, AND I TALKED TO TWO

10  ORDERLIES IN THE NURSING IN --

11  **Q.**   IN THE SICK CALL -- LET ME GO BACK AND PICK UP ONE AREA

12  THERE.  DID YOU SEE THAT LSP CHARGES A $3 CO-PAY?

13  **A.**   YES, SIR.

14  **Q.**   DO YOU HAVE ANY ISSUE WITH THAT?

15  **A.**   NO, SIR.  $5 IS USUALLY THROUGHOUT THE COUNTRY WHAT THE

16  CO-PAY IS.  NOBODY IS NOT SEEN BECAUSE THEY CAN'T DO THE

17  CO-PAY.

18        WHEN WE INITIATED IT IN THE FLORIDA DEPARTMENT OF

19  CORRECTIONS, IT WAS $5 AND IT COST US $186,000 TO COLLECT IT.

20  **Q.**   AND, OF COURSE, EVEN IF AN OFFENDER CANNOT PAY, ARE THEY

21  DENIED CARE?

22  **A.**   NO, SIR, THEY'RE NOT DENIED CARE.  THEY'RE SEEN.

23        **MR. DUBNER:**  OBJECTION.  FOUNDATION.  TO THE EXTENT

24  HE'S TALKING ABOUT LSP RATHER THAN FLORIDA.

25        **MR. ARCHEY:**  I GUESS I NEED TO ASK ANOTHER QUESTION,

1  JUDGE.

2         THE COURT:  WHAT ARE THE FACTS OR DATA THAT UNDERLIE

3  HIS OPINION THAT THE CO-PAY IS NOT A BARRIER TO CARE?

4         MR. ARCHEY:  I'LL ASK A FOLLOW-UP.

5         THE COURT:  YES.

6         MR. ARCHEY:  OKAY.

7         THE COURT:  IF IT GETS TO THAT, WHAT ARE THE FACTS

8  AND DATA THAT UNDERLIE HIS OPINION?

9         MR. ARCHEY:  UNDERSTOOD, JUDGE.

10  BY MR. ARCHEY:

11  Q.   ALL RIGHT.  AS YOU EVALUATED, DID YOU DETERMINE HOW THIS

12  $3 CO-PAY WAS ADMINISTERED?

13  A.   NO, SIR.

14  Q.   OKAY.  LET ME MOVE ON.  ALL RIGHT.  YOU FOUND THAT LSP SAW

15  1000 INMATES PER MONTH FOR SICK CALL?

16  A.   ABOUT THAT, YES, SIR.

17  Q.   OKAY.  SICK CALL IS OFFERED SATURDAY THROUGH -- I'M SORRY

18  -- SUNDAY THROUGH THURSDAY?

19  A.   YES, SIR.

20  Q.   IS THAT TYPICAL AND APPROPRIATE?

21  A.   IT'S APPROPRIATE.  TYPICAL IS MONDAY THROUGH FRIDAY.

22  THEY'VE ELECTED SATURDAY THROUGH -- OR I MEAN, SUNDAY THROUGH

23  THURSDAY.

24         THE COURT:  DR. THOMAS, WILL YOU PUSH THAT MICROPHONE

25  BACK JUST A TAD?  YEAH, JUST PUSH IT.  YOU CAN PUSH IT BACK.

1   YOU CAN PUSH IT BACK.

2           **THE WITNESS:**  OKAY.  I'M SORRY, YOUR HONOR.

3           **THE COURT:**  OH, THAT'S ALL RIGHT.  GO AHEAD.

4           **THE WITNESS:**  THE LAST TIME YOU HAD ME MOVE IT

5   CLOSER.

6           **THE COURT:**  YES.  THANK YOU.

7   **BY MR. ARCHEY:**

8   **Q.**   DR. THOMAS, AND AFTER THE TRIAGE OCCURS, THERE ARE

9   PRIORITY APPOINTMENTS MADE BY THE EMT AND THE PHYSICIAN?

10  **A.**   YES, SIR.  THERE ARE FOUR LEVELS OF APPOINTMENTS THAT THEY

11  CAN MAKE.

12  **Q.**   YOU'VE TALKED ABOUT WHAT YOU SAW IN THE ATU WHEN YOU WERE

13  THERE.  DID YOU FIND THAT ATU OPERATED CONSISTENT WITH

14  STANDARDS OF CARE?

15  **A.**   YES, SIR.

16  **Q.**   NURSING UNIT 1, THIS IS THE NURSING UNIT WITH THE ACUTE

17  CARE PATIENTS.  DID YOU OBSERVE AND EVALUATE NURSING UNIT 1?

18  **A.**   YES, SIR.

19  **Q.**   AND DID YOU FIND THAT THE NURSING UNIT 1 WAS WITHIN THE

20  STANDARD OF CARE?

21  **A.**   YES.

22  **Q.**   DID YOU SEE WHERE THE NURSES HAD SIGHT AND/OR SOUND OF THE

23  PATIENTS THAT THEY WERE CHARGED WITH?

24  **A.**   HAD SIGHT OF ALL THE PATIENTS IN THE WARD.  THEY HAD SOUND

25  OF THE PATIENTS IN THE CELLS.

10:57  1   Q.   OKAY.  AND A PROVIDER COVERS THAT UNIT?

2   A.   YES, SIR.  WHEN --

3   Q.   I'M SORRY.  GO AHEAD.

4   A.   WHEN I WAS THERE, DR. LAVESPERE WAS ALSO MAKING ROUNDS IN

5   THAT UNIT.

6   Q.   OKAY.  YOU ALSO OBSERVED THE NURSING UNIT 2 WHICH IS THE

7   LONG CARE UNIT; IS THAT RIGHT?

8   A.   YES, SIR.

9   Q.   DO YOU FIND THAT NURSING UNIT 2 IS WITHIN THE STANDARD OF

10   CARE?

11   A.   YES, SIR.

12   Q.   AND WHO HAD OVERSIGHT OF NURSING UNIT 2 WHEN YOU WERE

13   THERE?

14   A.   I DON'T REMEMBER HER NAME, BUT SHE INTRODUCED HERSELF AS A

15   NURSE PRACTITIONER.

16   Q.   OKAY.  SO YOU FOUND A NURSE PRACTITIONER HAD OVERSIGHT OF

17   NURSING UNIT 2; IS THAT RIGHT?

18   A.   YES, SIR.

19   Q.   ALL RIGHT.  PHYSICIAN CLINICS, DID YOU EVALUATE PHYSICIAN

20   CLINICS WHEN YOU WERE AT LSP?

21   A.   YES, SIR.

22   Q.   AND DID YOU FIND THAT THEY WERE APPROPRIATE WITHIN THE

23   STANDARD OF CARE?

24   A.   YES, SIR, I DID.

25   Q.   ALL RIGHT.  LET'S TALK ABOUT THE PHYSICIAN NOTE TAKING.

10:58    1    AND THERE'S BEEN TESTIMONY AND OPINIONS GIVEN HERE ABOUT SOAP
2    AND HOW NOTES ARE TAKEN.   FIRST OFF, WHAT IS THE SOAP METHOD OF
3    TAKING NOTES?
4    **A.**   IT'S A METHOD TAUGHT CURRENTLY TO MEDICAL STUDENTS AND
5    INTERNS AND RESIDENTS, AND IT INDICATES THAT THE "S" IS A
6    SUBJECTIVE COMPONENT, AND THAT'S WHAT THE PATIENT TELLS YOU.
7    THE "O" IS AN OBJECTIVE COMPONENT, AND THAT'S WHAT YOU FIND ON
8    THE PATIENT.   THE "A" IS AN ASSESSMENT AND THE "P" IS A PLAN.
9    YOUR ASSESSMENT IS BASED ON THE SUBJECTIVE AND OBJECTIVE, AND
10    YOUR PLAN IS BASED ON YOUR ASSESSMENT.   SOME PEOPLE ADD AN "E"
11    TO THAT WHICH IS AN EDUCATIONAL COMPONENT.
12    **Q.**   NOW, IF YOU FOUND THAT LSP DID NOT ROUTINELY COMPLY WITH
13    THE SOAP FORMAT, DO YOU FIND THAT TO BE A VIOLATION OF THE
14    STANDARD OF CARE?
15    **A.**   NO, SIR.
16    **Q.**   AND WHY NOT?
17    **A.**   MANY GOOD PHYSICIANS DON'T USE THE SOAP FORMAT.   IN FACT,
18    I, MYSELF, MIGHT, LIKE ON THE THIRD POST-OP OR FOURTH POST-OP I
19    HAVE OF A PATIENT, I WRITE "PATIENT PASSING GAS, REMOVE
20    NASOGASTRIC TUBE" AS A COMPLETE NOTE.   ALSO, AS YOU TEND TO
21    KNOW YOUR PATIENTS MORE AND MORE, YOUR NOTE GETS TERSER BECAUSE
22    YOU DON'T NEED THE -- A MORE COMPLETE EVALUATION EACH TIME.
23    AND IF IT'S FOLLOWED BY ANOTHER PHYSICIAN, USUALLY OVER A LONG
24    PERIOD OF TIME, LIKE IN PRISON, YOU CAN FOLLOW -- EASILY FOLLOW
25    WHAT'S GOING ON.

11:00   1   **Q.**   ALL RIGHT.  LET'S TALK ABOUT THE PHYSICAL PLANT AND THE

2   EXAMINATION ROOMS.  DID YOU FIND THAT THE EXAMINATION ROOMS

3   WERE WITHIN THE STANDARD OF CARE?

4   **MR. DUBNER:**  OBJECTION.  OUTSIDE THE -- OH, WITHDRAW.

5   **THE WITNESS:**  THE EXAMINATION ROOMS WERE LARGER THAN

6   WHAT MOST ARCHITECTS AND ENGINEERS RECOMMEND FOR PHYSICIAN'S

7   OFFICES.  THE ONES THAT I MEASURED WERE AROUND 100 TO 120

8   SQUARE FEET.  MOST EXAMINING ROOMS ARE 48 TO 60 SQUARE FEET.

9   THEY WERE EQUIPPED.  SOME DID NOT HAVE SINKS WITH RUNNING

10   WATER, BUT AS WAS DISCUSSED YESTERDAY, I DID WITNESS PHYSICIANS

11   AND PROVIDERS USING ALCOHOL DISINFECTANT.

12   BY MR. ARCHEY:

13   **Q.**   OKAY.  DID YOU EVALUATE OFFSITE SPECIALTY CARE THAT WAS

14   BEING PROVIDED BY LSP?

15   **A.**   I EVALUATED THE FACILITIES WHERE OFFSITE SPECIALTY CARE IS

16   DONE.  I DON'T REMEMBER SEEING ANY PARTICULAR OFFSITE

17   SPECIALIST COMING IN.

18   **Q.**   DID YOU MAKE NOTES OF THE NUMBER OF OFFSITE SPECIALTY

19   VISITS THAT WERE BEING ARRANGED THROUGH LSP?

20   **A.**   I DID.  AS I SIT HERE, WITHOUT BEING REFRESHED, I DON'T

21   REMEMBER WHAT IT WAS.

22   **Q.**   YOU FOUND IN THE PREVIOUS 12 MONTHS THAT THERE WERE 2000

23   OFFSITE SPECIALTY --

24   **A.**   YES, SIR, THAT'S RIGHT.

25   **Q.**   ALL RIGHT.  DID YOU LOOK AT MEDICATION AND PILL CALL AS

1   PART OF YOUR OPINION?

2   **A.**   YES, SIR.

3   **Q.**   AND DID YOU FIND THAT THE MEDICATION AND PILL CALL

4   PROCEDURES WERE WITHIN THE STANDARD OF CARE?

5   **A.**   YES, SIR.

6   **Q.**   YOU FOUND THAT THERE WERE 4000 OFFENDERS AT LSP WHO WERE

7   PRESCRIBED MEDICATIONS; IS THAT RIGHT?

8   **A.**   YES, SIR.

9   **Q.**   DO YOU HAVE ANY ISSUE WITH CORRECTIONAL OFFICERS BEING

10  USED TO PROVIDE OR TO RUN PILL CALL IN SOME PLACES?

11  **A.**   DO I HAVE ANY ISSUE WITH IT?  NOT REALLY.  I'D PREFER THAT

12  IT WAS NOT DONE.  HOWEVER, IT IS PART OF CORRECTIONAL MEDICINE.

13          INDEED IN CALIFORNIA, WHEN I WAS INVOLVED IN

14  _PLATA VS. SCHWARZENEGGER_, THE CORRECTIONAL OFFICERS GAVE

15  PSYCHOTROPIC MEDICATIONS IN ALMOST ALL FACILITIES THAT HAVE

16  WORK CAMPS AND OTHER ASSOCIATED CAMPS CORRECTIONAL OFFICERS

17  HOLD AND DISTRIBUTE THE MEDICATIONS, SO IT'S NOT UNUSUAL.  IT'S

18  NOT A TYPICAL PART OF CORRECTIONS.

19  **Q.**   ALL RIGHT, DOCTOR, LET'S LOOK AT A FEW OF YOUR CHART

20  REVIEWS YOU WENT THROUGH.  YOU LABELED THESE BY LETTERS, SO WE

21  HAVE CHART REVIEWS GOING "A" THROUGH "R", AND THEN IN ADDITION

22  TO THAT, THERE WERE SOME OTHER OF THE --

23          **MR. DUBNER:**  I JUST WANTED TO SAY -- I DIDN'T MEAN TO

24  INTERRUPT -- BUT THOSE ARE ALL NAMED PLAINTIFFS, AND SO WE CAN

25  USE THEIR NAMES.

1        **MR. ARCHEY:**  THANK YOU.

2    **BY MR. ARCHEY:**

3    **Q.**    IN ADDITION, YOU DID MAKE SOME NOTES ON SOME OF THE OTHER

4    NAMED OR NUMBERED CHARTS THAT THE PLAINTIFFS HAD LOOKED AT AS

5    WELL; IS THAT RIGHT?

6    **A.**    THAT CORRECT.

7    **Q.**    LET'S GO THROUGH JUST A COUPLE OF YOUR NAMED CHARTS THAT

8    ARE IN YOUR RECORD.  LET'S BEGIN WITH MR. ALTON ADAMS.

9        **MR. ARCHEY:**  IS THE ELMO ON?

10        **THE DEPUTY CLERK:**  YES.

11    **BY MR. ARCHEY:**

12    **Q.**    THE FIRST DOCUMENT I'M GOING TO SHOW YOU, DOCTOR, IS JOINT

13    EXHIBIT 10-00022, A MASTER PROBLEM LIST FOR MR. ALTON ADAMS.

14    CAN YOU JUST SORT OF GIVE US AN OVERVIEW OF ALL THE MAJOR

15    HEALTH ISSUES THIS GENTLEMAN HAS?

16    **A.**    SURE.

17        **MR. DUBNER:**  OBJECTION, YOUR HONOR.  THE ONLY HEALTH

18    ISSUE HE TALKED ABOUT FOR MR. ALTON ADAMS IS PERIPHERAL

19    VASCULAR DISEASE.

20        **MR. ARCHEY:**  YOUR HONOR, HE EVALUATED MR. ALTON

21    ADAMS' CONDITION AND GAVE AN OPINION, I THINK, AND HE WENT

22    THROUGH THE CHARTS AS SHOWN EXACTLY BY HIS REPORTS, SO --

23        **THE COURT:**  HIS REPORT, I'M READING FROM HIS REPORT.

24    HIS REPORT ON PAGE 23 -- AND THIS IS ONE OF THE PROBLEMS THAT

25    THE COURT HAD WHEN DR. THOMAS WAS CHALLENGED WITH THE MOTION IN

1   LIMINE.  ALTON ADAMS.  MR. ADAMS SUFFERS FROM SEVERE PERIPHERAL

2   VASCULAR DISEASE.  AS THIS DISEASE PROGRESSED, ET CETERA, ET

3   CETERA, AND THEN HE TALKS ABOUT THE TREATMENT OF PERIPHERAL

4   VASCULAR DISEASE AND ONLY PERIPHERAL VASCULAR DISEASE.  YOU MAY

5   ASK HIM ABOUT HIS EVALUATION OR HIS REVIEW OF MR. ADAMS'

6   CHARTS, AS IT RELATES TO WHAT HE OBSERVED, WHICH WAS PERIPHERAL

7   VASCULAR DISEASE.  THE OBJECTION IS SUSTAINED.

8   **BY MR. ARCHEY:**

9   **Q.**   HIS PERIPHERAL VASCULAR DISEASE, ONE OF THE PROBLEMS

10  LISTED ON MR. ADAMS MASTER CHART, MASTER PROBLEM LIST?

11  **A.**   NO. 2.

12  **Q.**   THANK YOU.

13          AND YOU OBSERVED THAT MR. ALTON ADAMS REFUSED CARE

14  THROUGHOUT THE COURSE OF THIS TREATMENT; IS THAT FAIR?

15  **A.**   YES, SIR.

16  **Q.**   LET ME SHOW YOU -- THE FIRST DOCUMENT I'M GOING TO SHOW

17  WHICH IS JOINT EXHIBIT 10-01302, DATED APRIL 16, 2009.  DOCTOR,

18  YOU SEE THIS REFUSAL TO ACCEPT MEDICAL CARE DOCUMENT?

19  **A.**   YES, SIR.

20  **Q.**   AND AT THE BOTTOM THERE'S AN EXPLANATION OF SOME OF THE

21  RISKS OF REFUSING CARE.  DO YOU SEE THAT?

22  **A.**   YES, SIR.

23  **Q.**   AND DO YOU FIND THAT DOCUMENT TO BE APPROPRIATE TO ADVISE

24  A PATIENT OF THE CONCERNS WITH REFUSING CARE?

25  **A.**   YES, SIR.

11:06  1   **Q.**   DOCTOR, WHAT ARE SOME OF THE COMPLICATIONS THAT A PERSON

2   WITH PERIPHERAL VASCULAR DISEASE MAY HAVE IF HE REFUSES CARE

3   AND MEDICATIONS?

4   **A.**   WELL, THE DISEASE PROGRESSES, AND IT PROGRESSES SOMEWHAT

5   AGGRESSIVELY AND YOU WILL DEVELOP GANGRENE, AND YOU REQUIRE A

6   -- YOU MAY REQUIRE AN AMPUTATION, AND IF YOU CONTINUE TO

7   REFUSE, YOUR AMPUTATION AREA MAY GET INFECTED, AS HAPPENED WITH

8   MR. ADAMS.

9   **Q.**   DOCTOR, I'M NOT GOING TO GO THROUGH ALL THESE WITH YOU,

10   BUT THERE ARE AT LEAST 23 DOCUMENTED REFUSALS OF CARE IN THIS

11   CHART AND IT'S CONSISTENT WITH WHAT YOU FOUND AS MR. ALTON

12   ADAMS REFUSED CARE?

13   **A.**   YES, SIR, INCLUDING IN ADDITION TO THE INFIRMARY.

14   **Q.**   ALL RIGHT.  AND LET ME SHOW YOU THE NEXT DOCUMENT, WHICH

15   IS JOINT EXHIBIT 10-00869.  THIS IS FEBRUARY 7, 2016, ANOTHER

16   NOTE WHERE THE PROVIDER DOCUMENTS NOTE WELL-DOCUMENTED

17   NONCOMPLIANCE WITH HIS MEDICATIONS?

18   **A.**   YES, SIR.

19   **Q.**   ALL RIGHT.  LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS

20   JOINT EXHIBIT 10-00851.  THIS DOCUMENT REFERENCES A GUILLOTINE

21   AMPUTATION OF THE RIGHT LOWER EXTREMITY BELOW THE KNEE.  NOW,

22   WHAT IMPACT DID MR. ADAMS' REFUSAL TO ACCEPT CARE AND

23   MEDICATIONS HAVE ON THIS CONDITION?

24   **A.**   WELL, EVENTUALLY IF YOU DON'T PROTECT THE STUMP, THE STUMP

25   WILL GET INFECTED.  IF YOU DON'T IMPROVE THE VASCULARITY, THE

1  STUMP BECOMES NECROTIC.

2  Q.   SO IS THIS AN EXPECTED OUTCOME FOR SOMEONE WHO IS REFUSING

3  CARE?

4         MR. DUBNER:   AND I'LL OBJECT, YOU KNOW.  HE SAID THAT

5  THIS WAS THE NATURAL PROGRESSION OF HIS PERIPHERAL -- OF THE

6  DISEASE, NOT THE REFUSAL.  HE'S TESTIFYING AGAINST HIS REPORT.

7         MR. ARCHEY:   YOUR HONOR, THAT'S -- WE'RE PARSING

8  WORDS NOW.  THIS IS FAIRLY ADDRESSED IN HIS OPINION.  HE SET

9  THIS FORTH.  HE SET FORTH REFUSAL OF CARE.  HE SET FORTH THAT

10  THERE IS NO BREACH OF THE STANDARD OF CARE AND HE -- THE

11  WITNESS SHOULD BE ALLOWED TO TESTIFY BEYOND THE BLACK AND WHITE

12  WORDS ON THIS REPORT.  AND THIS IS BEING UNDULY HARSH.  THIS IS

13  MORE THAN FAIR NOTICE.  IT COMPLIES WITH RULE 26.  I'VE STAYED

14  WITHIN THE COURT'S RULING AND AM ENDEAVORING TO DO SO.

15         MR. DUBNER:   AND I'LL JUST POINT --

16         THE COURT:   THE NATURE OF YOUR OBJECTION IS?

17         MR. DUBNER:   HE'S TESTIFYING BOTH BEYOND THE SCOPE OF

18  THE REPORT AND CONTRARY TO IT.  THE ONLY TIME HE MENTIONED

19  REFUSALS IS ONCE WHEN HE REFUSED A SURGICAL PROCEDURE.  HE'S

20  NOW SAYING THE REFUSALS ARE THE REASON FOR THE AMPUTATION.

21         THE COURT:   THEN CROSS HIM.

22         MR. DUBNER:   CROSS-EXAMINE.

23         THE COURT:   OVERRULED.

24         MR. DUBNER:   THANK, YOUR HONOR.

25  BY MR. ARCHEY:

11:09  1  **Q.**   DOCTOR, LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS JOINT

2  EXHIBIT 10-02129.  THIS IS A DISCHARGE NOTE ON JULY 26, 2013.

3  AS I MOVE IT UP, IT REFERS TO SOME PROCEDURES THERE, DOCTOR.

4  I'M GOING TO NOT SAY THOSE CORRECTLY, SO WHY DON'T YOU TELL US

5  WHAT THOSE PROCEDURES ARE?

6  **A.**   SUCCESSFUL LEFT PROFUNDAPLASTY AND ENDARTERECTOMY

7  PERFORMED ON 7/22/13.

8  **Q.**   AND WHAT ARE THOSE PROCEDURES, DOCTOR?

9  **A.**   PROFUNDAPLASTY IS WHEN YOU REMOVE A CLOT.  SOMETIMES YOU

10  WILL PUT A VASCULAR GRAFT OVER THE AREA WHERE YOU REMOVE THE

11  CLOT, AND SOMETIMES YOU WON'T.  AND THEN AN ENDARTERECTOMY IS

12  REMOVING A CLOT FROM AN ARTERY.

13  **Q.**   OKAY.  LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS JOINT

14  EXHIBIT 10-02049.  THIS IS DATED MARCH 18, 2014, AND THE

15  PROVIDER NOTED THAT REFUSED ADMISSION IN NU 1, DOING OWN WOUND

16  CARE IN DORM.  NOW, DOCTOR, IS IT ADVISABLE FOR A PATIENT TO DO

17  HIS OWN WOUND CARE IN A NONMEDICAL SETTING, A PATIENT WITH

18  THESE CONDITIONS?

19  **A.**   MR. ADAMS WAS SMOKING AT THE TIME AND THAT MADE HIM A

20  SETUP FOR INFECTIONS, AND HE WOULD HAVE BEEN MUCH BETTER SERVED

21  IF HE HAD PERMITTED HIMSELF TO BE ADMITTED TO THE NURSING UNIT

22  1.

23  **Q.**   DOCTOR, LET ME SHOW YOU MY NEXT DOCUMENT, WHICH IS JOINT

24  EXHIBIT 10-01997.  IT'S OCTOBER 30, 2014.  AGAIN, IT REFERS TO

25  THIS PATIENT BEING OFF OF HIS MULTI-MEDS.  DO YOU SEE THAT?

1    **A.**   YES, SIR.

2    **Q.**   AGAIN, THIS IS NOT A GOOD SETUP FOR THIS PATIENT TO HAVE A

3    GOOD OUTCOME, IS IT?

4    **A.**   NO, SIR.

5    **Q.**   DOCTOR, LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS JOINT

6    EXHIBIT 10-01946, OCTOBER 12, 2015.  THIS DOCUMENT INDICATES

7    THAT HIS WOUND HAS OPENED UP OVER THE PAST COUPLE OF DAYS WITH

8    HIM TAKING CARE OF HIS OWN WOUND CARE IN THE DORM, NOT BEING

9    UNDER MEDICAL CARE, AND WITH THIS CONDITION, NOT ON

10   MEDICATIONS.  IS THIS ALMOST AN EXPECTED OUTCOME?

11   **A.**   YES, SIR.

12   **Q.**   IS THIS ANYTHING ATTRIBUTABLE DIRECTLY TO LSP OR ITS CARE

13   PROVIDED BY ITS PROVIDERS?

14   **A.**   NO, SIR.

15   **Q.**   AND AT THE BOTTOM DO YOU SEE WHAT THE PROVIDER -- THE

16   RECOMMENDATION FOR THIS PATIENT AT THAT TIME?

17   **A.**   YES, SIR, THEY WANTED A VASCULAR SURGEON TO SEE HIM.

18   **Q.**   SENT HIM OUT TO LSU VASCULAR FOR TREATMENT?

19   **A.**   YES, SIR.

20   **Q.**   DOCTOR, THIS IS JOINT EXHIBIT 10-01913.  IT'S DATED

21   NOVEMBER 23, 2015, AND DOCTOR, THE NOTE ON THE LEFT THERE, I'LL

22   READ IT.  IT SAYS "THE PATIENT HAS BEEN EDUCATED TO THE

23   CONSEQUENCES OF NOT EATING A LOW SALT DIET AND CONTROLLING HIS

24   BLOOD PRESSURE.  PATIENT WANTS A REGULAR DIET."  NOW, WHAT IS

25   THE IMPORTANCE OF THIS PATIENT HAVING AN APPROPRIATE DIET?

1  **A.**   IN PERIPHERAL VASCULAR DISEASE, HYPERTENSION COMPROMISES

2  THE SMALL VESSELS, AND YOUR GOAL IS TO NOT HAVE THAT HAPPEN.

3  IF THEY REFUSE OPENING UP THE VESSELS, YOU HAVE TO TREAT IT

4  MEDICALLY, AND ONE OF THE WAYS IS TO GET THE BLOOD PRESSURE

5  REASONABLY LOW.

6  **Q.**   DOCTOR, DID YOU FIND THAT THE CARE FOR THIS PATIENT WAS

7  APPROPRIATE?

8  **A.**   YES, SIR.

9  **Q.**   WITHIN CLINICAL STANDARDS?

10 **A.**   YES, SIR.

11          **MR. DUBNER:**  OBJECTION.  HE DIDN'T TESTIFY TO THE

12 STANDARD OF CARE OF THIS PATIENT.  IT WAS SPECIFICALLY

13 MENTIONED AND EXCLUDED IN THE COURT'S OCTOBER 23, 2017 ORDER AT

14 PAGES 7 TO 9.

15          **MR. ARCHEY:**  YOUR HONOR, THERE WAS A RE-HEARING.  ON

16 THE RE-HEARING, YOU ALLOWED THE TESTIMONY SUBJECT TO WEIGHT AND

17 SUBJECT TO SHOWING THE --

18          **THE COURT:**  SUBJECT TO OBJECTION.

19          **MR. ARCHEY:**  SUBJECT TO OBJECTION.

20          **THE COURT:**  AND HERE'S THE THING ABOUT WEIGHT.  THIS

21 COURT HAS AN ABSOLUTE OBLIGATION TO DETERMINE THE ADMISSIBILITY

22 OF EXPERT TESTIMONY, AND WITHOUT SUFFICIENT FOUNDATIONAL FACTS,

23 THE OPINION IS NOT ADMISSIBLE.

24          **MR. ARCHEY:**  YOUR HONOR, I'VE GIVEN -- IF I MAY

25 RESPOND.  I'VE GONE THROUGH BOTH IN THIS REPORT AND THE

1   DOCUMENTS WHAT HE DID, AND THE WHOLE -- IF YOU LOOK ON PAGE 23,

2   HE SAYS "WE HAVE GOOD OUTCOMES," AND THEN HE GOES TO THESE

3   PATIENTS, AND SO HE IS GIVING THAT OPINION, AND THIS IS THE

4   BASIS FOR THE OPINION.

5           THE COURT:  SO THE BASIS FOR THE STANDARD OF CARE

6   OPINION IS GOOD OUTCOMES.  SO AS LONG AS THERE IS A GOOD

7   OUTCOME, THEN THERE'S SUFFICIENT STANDARD OF CARE.  IS THAT

8   WHAT -- ARE THOSE THE DOTS THAT YOU ARE TRYING TO CONNECT?

9           MR. ARCHEY:  NO.  I'M SAYING THAT HE PUT THEM ON

10  NOTICE, THAT HE HAS LOOKED AT THESE CHARTS, AND BASED ON THESE

11  CHARTS, HE FOUND THAT THESE WERE WITHIN THE STANDARD OF CARE.

12          THE COURT:  THIS IS NOT ABOUT NOTICE.  THIS IS ABOUT

13  702.

14          MR. ARCHEY:  WELL, IT'S -- AND I'M SUGGESTING TO YOUR

15  HONOR THAT IT IS THERE WHEN YOU START ON PAGE 23 AND THE LEAD

16  IN PARAGRAPH, AND THEN FROM THERE YOU GO TO THE DESCRIPTION OF

17  THE CHART, THAT THAT IS WITHIN 702 AND WITHIN THE OPINION

18  THAT'S BEEN PROVIDED.

19          THE COURT:  HIS OPINION HAS TO BE BASED ON SUFFICIENT

20  FACTS OR DATA.  HIS OPINION HAS TO BE THE PRODUCT OF RELIABLE

21  PRINCIPLES AND METHODS.  THEN HE HAS TO TAKE THOSE RELIABLE

22  PRINCIPLES AND METHODS AND APPLY THEM TO THE FACTS OF THIS

23  CASE.

24          WITH RESPECT TO THIS PATIENT, THAT HE DID NOT

25  OPINE AS TO THE STANDARD OF CARE AS TO THIS PARTICULAR PATIENT

1    THAT YOU'RE ASKING ABOUT, HOW DOES HE MEET THE 702(B),(C) OR

2    (D) REQUIREMENTS?

3            **MR. ARCHEY:**  THESE ARE THE FACTS OF WHICH HE LOOKED

4    AT.  IT'S IN HIS REPORTS, IN THE DOCUMENTS THAT WE'VE GONE

5    THROUGH WITH THE PATIENT, ALL RIGHT, SO THAT'S THE FACTS.  HIS

6    OPINION IS EXPRESSED WITHIN 23 AND THEN CONTINUING THROUGH

7    HERE.  THAT'S HIS OPINION BASED ON THOSE FACTS.  HE CERTAINLY

8    HAS THE EXPERTISE TO DO THAT, AND SO I THINK HE MEETS THE

9    CRITERIA, JUDGE.

10           **THE COURT:**  REPHRASE YOUR QUESTION.  GIVE ME YOUR

11   QUESTION AGAIN SO THAT I CAN MAKE SURE THAT I SPECIFICALLY

12   UNDERSTAND THE POINT OR THE QUESTION THAT YOU ARE RAISING.

13           **MR. ARCHEY:**  YES, JUDGE.

14   **BY MR. ARCHEY:**

15   **Q.**   DOCTOR, AFTER YOUR REVIEW OF THIS PATIENT'S MEDICAL

16   RECORDS, DID YOU FIND THAT THE CARE WAS WITHIN THE STANDARD OF

17   CARE FOR CORRECTIONAL MEDICINE?

18           **MR. DUBNER:**  SAME OBJECTION.

19           **THE COURT:**  SUSTAINED.

20           **MR. ARCHEY:**  YOUR HONOR, ON PAGE 23, I'M LOOKING

21   DIRECTLY AT -- THAT'S THE WORDS I WAS PULLING FROM.  THIS IS

22   DONE FROM THE PERSPECTIVE OF BOTH A CORRECTIONAL STANDARD OF

23   MEDICAL CARE, AS WELL AS THE CONSTITUTIONAL REQUIREMENTS OF

24   ACCESS TO CARE.  I'M LEAVING THE CONSTITUTIONAL REQUIREMENTS

25   ASIDE.

1    **THE COURT:** THERE'S NO OPINION THERE. OKAY. WHAT

2    YOU'RE QUOTING FROM SAYS "THE FOLLOWING IN NO PARTICULAR ORDER

3    REPRESENTS AN EXPERT EVALUATION OF EACH OF THE PLAINTIFFS,

4    THEIR EVALUATION AND TREATMENT AS WELL AS THEIR OUTCOMES. THIS

5    IS DONE FROM THE PERSPECTIVE OF THE CORRECTIONAL STANDARD OF

6    MEDICAL CARE AS WELL AS THE CONSTITUTIONAL REQUIREMENTS OF

7    ACCESS TO CARE." THE COURT HAS ALREADY RULED THAT HE IS NOT

8    GOING TO TESTIFY TO CONSTITUTIONAL REQUIREMENTS. "A

9    PROFESSIONAL MEDICAL OPINION, AND HAVING THAT OPINION CARRIED

10   OUT WITHOUT ARBITRARY BOUNDARIES." THEN HE GOES INTO EACH OF

11   THE NAMED PLAINTIFFS.

12   THE ONE THAT WE'RE TALKING ABOUT RIGHT NOW IS

13   STILL ALTON ADAMS; IS THAT CORRECT?

14   **MR. ARCHEY:** IT IS, YOUR HONOR.

15   **THE COURT:** HE DOES NOT EXPRESS AN OPINION AS TO THE

16   STANDARD OF CARE WITH RESPECT TO MR. ADAMS. THE OBJECTION IS

17   SUSTAINED.

18   **BY MR. ARCHEY:**

19   **Q.** DOCTOR, LET'S TALK ABOUT -- LET ME MAKE SURE I'M CORRECT.

20   **MR. ARCHEY:** ALL THESE I CAN REFER TO BY NAME, EVEN

21   IF THERE ARE NUMBERS; IS THAT RIGHT?

22   **MR. DUBNER:** THAT'S CORRECT.

23   **MR. ARCHEY:** OKAY.

24   **MR. DUBNER:** OH, WAIT, THE NUMBERED PATIENTS 15, 16

25   AND 18, NO.

1          **MR. ARCHEY:**  RIGHT.  THE ONES HERE, YES.

2    **BY MR. ARCHEY:**

3    **Q.**    OKAY.  LET'S TALK ABOUT MR. REGINALD GEORGE FOR A SECOND.

4    THIS IS THE INDIVIDUAL THAT PLAINTIFFS' EXPERTS CONTEND THAT

5    HIS HIV WAS PERMITTED TO DETERIORATE.  WHAT DID YOU FIND AS TO

6    WHY HIS HIV DISEASE DETERIORATED?

7    **A.**    MR. GEORGE REFUSED CARE, REFUSED TO TAKE MEDICATION, AS

8    ONE CERTIFIED BY THE AMERICAN ACADEMY OF HIV PROVIDERS.  IT IS

9    WELL KNOWN THAT IF YOU TAKE MEDICATION INTERMITTENTLY, YOU WILL

10   CREATE RESISTANCE TO MANY MEDICATIONS IN HIV.  SO MOST

11   PROVIDERS DON'T PERMIT THEIR PATIENTS TO HAVE INTERMITTENT

12   THERAPY.  THE PATIENT HAS TO BE ON THERAPY CONTINUOUSLY AND

13   AGREE TO REMAIN ON THERAPY CONTINUOUSLY; OTHERWISE, THEY

14   DEVELOP A MASSIVE INABILITY FOR THE MEDICATIONS TO BE

15   EFFECTIVE, MASSIVE RESISTANCE.

16   **Q.**    OKAY.  LET ME JUST SHOW YOU JUST A COUPLE OF DOCUMENTS.

17   THE FIRST ONE IS JOINT EXHIBIT 10-21811.  THIS IS DATED

18   JUNE 16, 2010.  IT'S A NOTE BY THIS PATIENT, WHICH HE

19   SPECIFICALLY STATES THAT, "I REFUSE ANY FURTHER MORE CHECKUPS

20   AND LAB WORK.  DON'T PLACE ME ON NO CALL-OUTS.  HAVE A GOOD

21   DAY."  SO THIS IS DOCUMENTING, AMONG MANY OTHERS, REFUSAL OF

22   CARE BY THIS PATIENT?

23   **A.**    YES, SIR.

24   **Q.**    AND DOCTOR, I'M JUST GOING TO SHOW YOU A COUPLE.  I'M NOT

25   GOING TO GO THROUGH ALL THE REFUSALS IN THE RECORD.  THE NEXT

1   ONE IS JOINT EXHIBIT 10-21792, ANOTHER REFUSAL TO ACCEPT CARE.

2   IT SAYS AT THE BOTTOM "I AM DOING FINE.  I WILL SEE YOU SOON.

3   THANK YOU."  DO YOU SEE THAT?

4   **A.**   YES, SIR.

5   **Q.**   AND FOR AN HIV PATIENT, IT'S VERY BAD TO GO ON AND OFF

6   MEDICINES; IS THAT RIGHT?

7   **A.**   YES, SIR.

8   **Q.**   NOW, MR. GEORGE HAD A SECOND ISSUE, WHICH WAS ELEVATED PSA

9   AND PROSTATE CANCER, IN WHICH PLAINTIFFS' EXPERTS OPINED THAT

10  HE DID NOT HAVE TIMELY AND APPROPRIATE CARE FOR HIS PROSTATE

11  CANCER.  WHAT DID YOU FIND AS TO WHY THIS PATIENT'S PROSTATE

12  CANCER WAS NOT TREATED?

13  **A.**   THE SAME ISSUE.  HE HAD MULTIPLE REFUSALS.

14  **Q.**   OKAY.  LET ME SHOW YOU THE FIRST DOCUMENT, WHICH IS JOINT

15  EXHIBIT 10-21712, AND THIS IS DATED JULY 26, 2013.  THE BOTTOM,

16  I'M GOING TO READ IN YELLOW, THE SECOND LINE, IT SAYS KNOWN CAN

17  HAVE C-A-P, WHICH IS CANCER OF THE PROSTATE; HENCE, EMPHASIS

18  FURTHER EVALUATION, PATIENT DECLINES.

19  **A.**   AND JUST ABOVE THAT, D-R-A IS A DIGITAL RECTAL -- EXCUSE

20  ME -- D-R-E IS A DIGITAL RECTAL EXAM, WHICH HE REFUSED.

21  **Q.**   OKAY.  AND WHAT IS THE REASON FOR A DIGITAL RECTAL EXAM

22  WITH THIS PATIENT?

23  **A.**   TO DETERMINE IF THERE ARE WHAT ARE KNOWN AS HARD AREAS OF

24  THE PROSTATE.

25  **Q.**   OKAY.

11:22   1  **A.**   AND HOW EXTENSIVE THEY ARE.

2  **Q.**   ALL RIGHT.  LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS

3  JOINT EXHIBIT 10-21636, AND THIS DOCUMENT NOTES IT'S DATED

4  JULY 14, 2014.  IT NOTES THE INCREASED PSA, BIOPSY RECOMMENDED

5  AND REFUSED MULTIPLE TIMES.  DOES NOT WANT TO ADDRESS.  JUST

6  C/C, AND THEN, QUOTE, "TOO MANY MEDS," CLOSE QUOTES, OPEN

7  QUOTES, "I DON'T NEED NO BIOPSY," CLOSE QUOTES, CLAIMS HE WOULD

8  NOT TREAT CANCER, IF FOUND.

9  **A.**   YES, SIR.

10  **Q.**   ALL RIGHT.  AND BASED ON THESE RECORDS, WAS LSP AT FAULT

11  FOR NOT PROVIDING TREATMENT FOR THIS CANCER?

12         **MR. DUBNER:**  OBJECTION.  OUTSIDE THE SCOPE OF THE

13  REPORT.  AS THE COURT NOTED IN ITS SECOND ORDER ON THE *DAUBERT*

14  ISSUES.

15         **MR. ARCHEY:**  YOUR HONOR, HE SAYS THAT IT'S BECAUSE

16  THIS PATIENT REFUSED THE CARE.

17         **THE COURT:**  AND YOUR QUESTION WAS?

18         **MR. ARCHEY:**  THAT THE REASON WHY HE'S -- THE

19  PLAINTIFFS' EXPERTS HAVE SAID THAT WE FAILED TO TREAT THIS

20  GENTLEMAN AND ALLOWED HIS CANCER TO PROGRESS.  NOW WE'RE

21  SHOWING IT WASN'T BECAUSE OF WHAT WE DID, IT'S BECAUSE OF THE

22  REFUSALS.

23         **THE COURT:**  BUT YOUR QUESTION AS TO HIS OPINION WAS?

24         **MR. ARCHEY:**  THAT WHY HIS CANCER PROGRESSED.

25         **MR. DUBNER:**  WE'LL WITHDRAW THE OBJECTION.

1          **THE COURT:**  ALL RIGHT.

2          **MR. ARCHEY:**  OKAY.

3          **THE COURT:**  THE OBJECTION IS WITHDRAWN.

4   BY MR. ARCHEY:

5   **Q.**   OKAY.  AND WHAT DID YOU FIND AS TO WHY THIS PATIENT'S

6   CANCER PROGRESSED?

7   **A.**   PATIENT REFUSED MEDICAL CARE.

8   **Q.**   LET ME SHOW YOU THE LAST DOCUMENT, WHICH IS JOINT EXHIBIT

9   10-21617.  IT'S DATED SEPTEMBER 8, 2014.  IT SAYS "FOLLOW-UP

10  FOR INCREASED PSA.  REFUSAL FOR BIOPSY.  REFUSED TRIP 7/3/14,"

11  AND THEN IN QUOTES IT SAYS "I OWE YOU AN APOLOGY."  AND THEN IT

12  LOOKS LIKE THERE WAS CONSULT FOR A BIOPSY AT THAT TIME.

13  **A.**   YES, SIR.

14  **Q.**   SO FROM THIS POINT, THE PATIENT THEN ELECTED TO BE TREATED

15  FOR HIS CANCER?

16  **A.**   IT APPEARS THAT WAY, YES, SIR.  THAT'S THE WAY I WOULD

17  INTERPRET THAT.

18  **Q.**   IT WAS REALLY VERY UNFORTUNATE THAT THE PATIENT CHOSE TO

19  REFUSE TO BE EVALUATED AND TREATED FOR HIS CANCER; IS THAT

20  RIGHT?

21  **A.**   YES, SIR.

22  **Q.**   ALL RIGHT, DOCTOR, LET'S TALK ABOUT KENTRELL PARKER FOR A

23  MOMENT.  THIS IS THE PATIENT THAT WAS PARALYZED IN A FOOTBALL

24  GAME, AND THEN TREATED IN NU 1 AND NU 2.  WHAT DID YOU FIND AS

25  TO WHETHER THIS PATIENT HAD ANY DECUBITUS ULCERS?

11:25  1    **A.**   HE HAD NO DECUBITUS ON THE RECORD.

2    **Q.**   AND WHAT DOES THAT INDICATE TO YOU, THAT HE HAD NO

3    DECUBITUS ULCERS?

4    **A.**   THAT HE WAS BEING TREATED APPROPRIATELY, HE WAS BEING

5    TURNED, WAS NOT PERMITTING ANY PRESSURE SORES OR ANYTHING LIKE

6    THAT.

7    **Q.**   AND DID YOU FIND THAT THIS PATIENT HAD ANY REAL PROBLEMS?

8    **A.**   WELL, YES, HE WAS PARAPLEGIC, BUT HE HAD NO REAL PROBLEMS

9    IN HIS MEDICAL CARE.

10    **Q.**   THANK YOU.

11          JUDGE, I WALKED INTO THAT ONE.  MY APOLOGIES.

12          LET'S TALK ABOUT MR. FARRELL SAMPIER.  MR. SAMPIER

13    HAD TRAVERSE MYELITIS?

14    **A.**   CORRECT.  IF I MAY, TRANSVERSE MYELITIS.

15    **Q.**   THANK YOU.

16          AND HE WAS TREATED IN NURSING UNIT 2.  DID YOU FIND

17    THAT TO BE APPROPRIATE?

18    **A.**   YES, SIR.

19    **Q.**   OKAY.  AND THERE WAS AN ISSUE WITH HIS CATHETER.  EXPLAIN

20    THE ISSUE WITH HIS CATHETER, THE SUPRAPUBIC CATHETER.

21    **A.**   WELL, HE HAD A TRADITIONAL FOLEY INTRA-URETHRAL URINARY

22    CATHETER, WHICH WAS LEAKING, AND THAT WILL EVENTUALLY LEAD TO

23    AN INFECTION, AND SO THEY PUT IN A SUPRAPUBIC CATHETER BECAUSE

24    HE WAS OBVIOUSLY GOING TO BE CATHETERIZED FOR A VERY LONG

25    PERIOD OF TIME.  NOW MR. FARRELL DID NOT LIKE THAT, BUT THAT

1  WAS THE APPROPRIATE TREATMENT.

2  **Q.**    OKAY.  DID YOU SEE WHERE MR. FARRELL SAMPIER HAD ANY

3  ULCERS?

4  **A.**    HE HAD NO DECUBITI.

5  **Q.**    AND DID YOU FIND THAT MR. SAMPIER'S CARE WAS WITHIN GOOD

6  MEDICAL AND CORRECTIONAL MEDICAL PRACTICE?

7  **A.**    YES, SIR.

8  **Q.**    DOCTOR, I'M LOOKING AT MR. EDWARD WASHINGTON.  HE HAD A

9  HISTORY OF BEING TREATED FOR HEPATITIS C, AND HE HAD SOME HEART

10  CONDITIONS AS WELL.  I WANT TO GET TO YOUR OPINION ON PAGE 46.

11  DID YOU FIND THAT HIS CARE WAS GOOD AND WITHIN THE ACCEPTED

12  STANDARDS OF CARE FOR CORRECTIONAL MEDICINE?

13  **A.**    COULD YOU GO TO THE PAGE BEFORE THAT?  I THINK WE MAY BE

14  TALKING ABOUT A DIFFERENT PATIENT.  THAT'S RUFUS WHITE.

15  **Q.**    OH, MY APOLOGIES.  I SKIPPED A PAGE.  SO THAT'S RUFUS

16  WHITE.  I'M SORRY.

17  **A.**    YES, SIR.  HIS CARE WAS WITHIN THE ACCEPTED STANDARD OF

18  CARE.

19  **Q.**    OKAY.  AND NOW I WANT TO GO TO MR. EDWARD WASHINGTON,

20  WHICH IS AT THE TOP OF PAGE 45.  YOU ALSO FOUND HIS CARE WAS

21  APPROPRIATE, TIMELY WITHIN THE GOOD PRACTICE OF MEDICINE?

22  **A.**    YES, SIR.

23  **Q.**    LET ME ASK YOU ABOUT MR. SHANNON HURD.  THIS IS THE

24  GENTLEMAN THAT DEVELOPED RENAL CELL CARCINOMA.  DID YOU FIND

25  THAT HIS MEDICAL CARE WAS APPROPRIATE?

1  A.  YES, I DID.

2  Q.  AND, DOCTOR, WHEN YOU RENDERED THAT OPINION, THAT WAS

3  AFTER GOING THROUGH THE CHART AND LOOKING AT HIS MEDICAL

4  RECORDS IN DETAIL?

5  A.  YES, SIR.

6        MR. ARCHEY:  YOUR HONOR, MAY I HAVE A MOMENT, PLEASE?

7        THE COURT:  YOU MAY.

8        MR. ARCHEY:  YOUR HONOR, IT MAY BE A LITTLE EARLY BUT

9  IF I CAN EVEN HAVE A SHORT BREAK THAT WOULD EXPEDITE MATTERS

10  FOR ME.

11        THE COURT:  LET'S TAKE A 15-MINUTE RECESS.  AND JUST

12  SO THAT COUNSEL IS REMINDED OF THE PLAN FOR TODAY, LET ME JUST

13  DOUBLE-CHECK MY CALENDAR TO MAKE SURE I'M CORRECT, WE WILL

14  BREAK FOR AN EXTENDED LUNCH FROM 1:30 TO 3:30 FOR THE COURT TO

15  HANDLE SOME OTHER MATTERS, BUT WE'LL PLOW THROUGH TILL THEN.

16  SO WE'LL BE IN RECESS.

17                      (RECESS.)

18        THE COURT:  ANYTHING FURTHER, MR. ARCHEY?

19        MR. ARCHEY:  JUST A LITTLE BIT, YOUR HONOR.

20  BY MR. ARCHEY:

21  Q.  DOCTOR, LET ME ASK YOU ABOUT OTTO BARRERA, WHICH BEGINS ON

22  PAGE 26 OF YOUR REPORT WHICH IS IN EVIDENCE AS D-14.  ON

23  PAGE 28, YOU CONCLUDED THAT MR. BARRERA WAS UNDER ADEQUATE CARE

24  AFTER REVIEWING HIS CHART; IS THAT FAIR?

25  A.  YES, SIR.

11:53   1  **Q.**   AND YOU WENT THROUGH HIS CHART AND REVIEWED ALL THE CARE

2  THAT WAS PROVIDED, AS REFLECTED IN THAT CHART?

3  **A.**   YES, SIR.

4  **Q.**   AND WHEN YOU ARE DOING THAT, YOU ARE DOING IT FROM A

5  CLINICAL MEDICINE PERSPECTIVE?

6  **A.**   YES, SIR.

7  **Q.**   NOW, I WANT TO TURN TO MR. LIONEL TOLBERT, WHICH BEGINS ON

8  PAGE 40 OF YOUR REPORT, AND I WANT TO SPECIFICALLY GO TO PAGE

9  41.   AND WHAT WAS YOUR OPINION, AFTER REVIEWING MR. TOLBERT'S

10  CHART?

11  **A.**   THAT HE HAD ACCEPTABLE MEDICAL CARE, EVALUATION, TREATMENT

12  AND ACCESS.

13  **Q.**   OKAY.   AND, AGAIN, AFTER REVIEWING THE CHART AND APPLYING

14  YOUR CLINICAL EXPERIENCE TO THAT CHART; IS THAT FAIR?

15  **A.**   YES.

16  **Q.**   OKAY.   NEXT IS PAGE 46 OF YOUR REPORT, BEGINNING WITH --

17  OR TALKING ABOUT MR. EDWARD GIOVANNI.

18  **A.**   UH-HUH.

19  **Q.**   AND AFTER REVIEWING MR. GIOVANNI, WHAT WAS YOUR OPINION AS

20  TO HIS CARE?

21  **A.**   THAT IT WAS QUITE CONSISTENT WITH THE STANDARD OF CARE.

22  **Q.**   NOW, DOCTOR, IN ADDITION TO THESE, YOU DID REVIEW THE

23  PLAINTIFFS' EXPERT REPORT AND THE RECORDS THAT THEY REFERENCE

24  IN THEIR REPORT; IS THAT FAIR?

25  **A.**   YES, SIR.   AND I NEED TO CORRECT ONE THING I SAID EARLIER.

11:55

1    I READ THE PLAINTIFFS' REPORT BEFORE I WROTE MY REPORT, NOT

2    BEFORE I WENT TO THE CORRECTIONAL INSTITUTION.

3    **Q.**    OKAY.  SO YOU JUST HAD YOUR DATES OFF THERE?

4    **A.**    YES, SIR.

5    **Q.**    ALL RIGHT.  BUT BEFORE YOU WROTE YOUR REPORT, YOU HAD THE

6    BENEFIT OF THE PLAINTIFFS' REPORT?

7    **A.**    YES, SIR.

8    **Q.**    ALL RIGHT.  AND YOUR OPINIONS, BASED ON THE RECORDS AND

9    THE CHARTS YOU REVIEWED, WERE THAT THE MEDICINE PROVIDED AT LSP

10   WAS WITHIN THE STANDARD OF CARE?

11   **A.**    YES, SIR.

12   **Q.**    ALL RIGHT.  NOW, YOU DO HAVE A COUPLE OF RECOMMENDATIONS

13   FOR IMPROVEMENTS FOR LSP; IS THAT RIGHT?

14   **A.**    YES, SIR.

15   **Q.**    YOU RECOMMENDED THAT THE MALINGERING PROTOCOL BE REMOVED

16   AS A DISCIPLINARY PROTOCOL?

17   **A.**    ABSOLUTELY.

18   **Q.**    ALL RIGHT.  AND TALK ABOUT THE MALINGERING PROTOCOL.  IS

19   MALINGERING A RECOGNIZED CONDITION IN MEDICINE?

20   **A.**    IT CERTAINLY IS A DSM, AT LEAST IV.  I HAVEN'T REVIEWED

21   DSM-V, BUT IT'S A DSM-IV RECOGNIZED DIAGNOSTIC CONDITION.  I

22   DID NOT LIKE THE USE OF THE WORD "MALINGERING" WHEN I WAS WITH

23   THE FLORIDA DEPARTMENT OF CORRECTIONS BECAUSE ONCE A PATIENT

24   GETS LABELED AS A MALINGERER, HE MAY SLIP INTO REAL MEDICAL

25   PROBLEMS ONLY BECAUSE HE HAS THAT (INAUDIBLE) ON HIM.

11:56   1   **Q.**   ALL RIGHT.  YOU MADE ANOTHER RECOMMENDATION THAT THE

2   QUALITY IMPROVEMENT/QUALITY CONTROL PROCEDURES COULD BE

3   ENHANCED?

4   **A.**   YES, SIR.

5   **Q.**   ALL RIGHT.  AND WHAT IS YOUR OPINION AS TO HOW THAT

6   SHOULD -- COULD BE MADE BETTER?

7   **A.**   I THINK IT COULD BE MADE MORE ROBUST.  THEY HAD A QI/QM

8   MEETING, BUT I THOUGHT IT SHOULD BE MORE ROBUST FROM THE

9   MINUTES OF THE MEETING THAT I REVIEWED.  I THINK THEY SHOULD

10   DRILL DOWN INTO AREAS DEEPER.

11   **Q.**   OKAY.  AND THEN ANOTHER RECOMMENDATION IS THAT FOR

12   MORTALITY REVIEWS.  YOU RECOMMENDED THAT A PHYSICIAN OUTSIDE OF

13   THE LSP PERFORM THE MORTALITY REVIEW; IS THAT FAIR?

14   **A.**   YES, SIR.

15   **Q.**   AND WHY IS THAT, DOCTOR?

16   **A.**   WELL, ALL PHYSICIANS ARE VERY PROTECTIVE OF WHEN PATIENTS

17   DIE AND WHAT HAPPENS, AND SO MOST HOSPITALS, MOST FACILITIES,

18   MANY CORRECTIONAL INSTITUTIONS BRING IN AN OUTSIDE PHYSICIAN TO

19   LOOK AT THE DEATH, TO GET A MORE OBJECTIVE EVALUATION.

20   **Q.**   OKAY.  AND NOTWITHSTANDING THOSE RECOMMENDATIONS FOR

21   IMPROVEMENTS, AFTER YOUR REVIEW OF THE MATERIALS, INCLUDING THE

22   CLINICAL CARE PROVIDED, YOUR CONCLUSION IS THE CARE PROVIDED BY

23   LSP WAS WITHIN THE STANDARD OF CARE APPLICABLE TO THE LSP; IS

24   THAT FAIR?

25   **A.**   THAT'S A FAIR STATEMENT.

**Q.**   THANK YOU, DOCTOR.  THOSE ARE MY QUESTIONS.

          **THE COURT:**  CROSS?

          **MR. DUBNER:**  AND MS. ALCON, IF WE COULD SWITCH TO THE

SCREEN.

                        **CROSS-EXAMINATION**

**BY MR. DUBNER:**

**Q.**   GOOD MORNING, DOCTOR.

**A.**   GOOD MORNING.

**Q.**   I'D LIKE TO START BY TALKING ABOUT YOUR SITE VISIT.  AS

PART OF YOUR WORK ON THIS CASE, YOU VISITED ANGOLA FOR ONE DAY?

**A.**   DEFINE A "DAY."  I WAS THERE FOR 16 AND A HALF HOURS.

**Q.**   BEGINNING AT 7:10 IN THE MORNING, I THINK YOU SAID?

**A.**   YES, SIR.

**Q.**   AND DURING THAT VISIT, YOU TOURED THE TREATMENT CENTER?

**A.**   YES.

**Q.**   AND YOU TOURED THE TWO NURSING UNITS?

**A.**   YES.

**Q.**   AND YOU TOURED FIVE HOUSING UNITS?

**A.**   FOUR OR FIVE, YES.

**Q.**   AND YOU OBSERVED SICK CALL AND EMERGENCY PROCEDURE?

**A.**   I OBSERVED AN EMERGENCY PROCEDURE.  SICK CALL BACK THEN

WAS DONE AT -- BETWEEN 4 AND 5 A.M. BEFORE THE PRISONERS GOT

OUT AND WENT TO WORK, AND I DID NOT ARRIVE IN TIME TO WITNESS

SICK CALL.

**Q.**   SO YOU DIDN'T WITNESS SICK CALL?

12:00  1    **A.**   I DIDN'T WITNESS SICK CALL IN THE CELLS.

2    **Q.**   AND DID YOU TESTIFY IN YOUR DEPOSITION YOU DID WITNESS

3    SICK CALL?

4    **A.**   I WITNESSED SICK CALL WHEN IT WAS DONE BUT NOT AT THE 4 TO

5    5 A.M. IN THE CELLS.

6    **Q.**   SO YOU DIDN'T TESTIFY -- DID YOU TESTIFY IN YOUR

7    DEPOSITION THAT YOU DID WITNESS THE 4 OR 5 A.M. SICK CALL?

8    **A.**   NO, SIR.

9    **Q.**   DID YOU TESTIFY THAT YOU WANTED TO MAKE SURE YOU GOT THERE

10   SO YOU COULD OBSERVE IT?

11   **A.**   YES, SIR.

12   **Q.**   BUT NOW YOU'RE SAYING THAT YOU DIDN'T ACTUALLY OBSERVE IT?

13   **A.**   I DIDN'T OBSERVE IT IN THE OUTLYING UNITS.

14   **Q.**   AND YOU DIDN'T ACTUALLY GET THERE AT 4 OR 5 IN THE

15   MORNING?

16   **A.**   NO, SIR.

17   **Q.**   AND YOU ALSO, WHILE YOU WERE THERE, YOU REVIEWED THREE OR

18   FOUR MEDICAL RECORDS SHOWING SPECIALTY CONSULTATIONS?

19   **A.**   I THINK IT WAS MORE THAN THAT; BUT YES, I REVIEWED MEDICAL

20   RECORDS WITH SPECIALTY CONSULTATIONS.

21   **Q.**   AND YOU REVIEWED SOMEWHERE MORE THAN FIVE RECORDS OF

22   INMATES WITH CHRONIC CONDITIONS?

23   **A.**   YES, SIR.

24   **Q.**   AND FOUR OR FIVE INFIRMARY CHARTS?

25   **A.**   YES, FOUR OR FIVE, MAYBE MORE THAN THAT.

Q.   SOME SICK CALL REQUESTS, MEDICATION ADMINISTRATION
RECORDS?

A.   YES.

Q.   AND YOU SPENT SEVERAL HOURS WITH DR. LAVESPERE?

A.   WELL, CUMULATIVE, YES.

Q.   AND WITHOUT GETTING INTO THE DETAILS AT ALL, YOU
INTERVIEWED OVER 100 INMATES?

A.   YES.

Q.   BUT YOU TOOK NO NOTES OF ANY OF THAT?

A.   THAT'S CORRECT.

Q.   AND SO NOW YOU CAN'T REMEMBER WHAT MEDICAL RECORDS YOU
LOOKED AT DURING YOUR SITE VISIT?

A.   NO.

Q.   YOU CAN'T REMEMBER ANY OF THE DETAILS OF THE CHRONIC CARE
AND THE CHARTS YOU REVIEWED?

A.   DETAILS, YES, I -- DETAILS, NO.  EVALUATION IN GENERAL,
YES.

Q.   BY EVALUATION, YOU MEAN YOUR CONCLUSION THAT THE CHARTS
GENERALLY SHOWED ADEQUATE CARE?

A.   YES.

Q.   BUT THE ACTUAL CARE YOURSELF, YOU DON'T REMEMBER?

A.   THE SPECIFICS OF INDIVIDUALS, I DON'T REMEMBER.

Q.   AND THE SPECIFICS OF THE CARE PROVIDED TO THOSE
INDIVIDUALS, YOU DON'T REMEMBER?

A.   THAT'S CORRECT.

12:02  1   **Q.**   AND THE SPECIFICS OF THEIR MEDICAL NEEDS, YOU DON'T

2   REMEMBER?

3   **A.**   THAT'S CORRECT.

4   **Q.**   AND IT'S THE SAME WITH SICK CALL REQUESTS, YOU CAN'T

5   REMEMBER WHAT SICK CALL REQUESTS YOU REVIEWED?

6   **A.**   NO.

7   **Q.**   YOU CAN'T REMEMBER WHAT MORTALITY REVIEWS YOU LOOKED AT?

8   **A.**   THAT'S CORRECT.

9   **Q.**   YOU CAN'T REMEMBER THE CAUSE OF DEATH OF THE PATIENTS IN

10   THOSE MORTALITY REVIEWS?

11   **A.**   THAT'S CORRECT.

12   **Q.**   AND, AGAIN, WITHOUT GETTING INTO DETAILS, YOU CAN'T

13   REMEMBER ANY OF THE INMATES THAT YOU SPOKE TO?

14   **A.**   ANY OF THE NAMES, THAT'S CORRECT.

15   **Q.**   AND THEN IN ADDITION TO YOUR SITE VISIT, YOU REVIEWED SOME

16   POLICIES, PROCEDURES, DIRECTIVES AND GUIDELINES?

17   **A.**   YES, SIR.

18   **Q.**   BUT YOU CAN'T IDENTIFY WHICH POLICIES, PROCEDURES,

19   DIRECTIVES AND GUIDELINES YOU REVIEWED?

20   **A.**   THE ONES INVOLVING HEALTHCARE.

21   **Q.**   AND DO YOU REMEMBER GIVING A DEPOSITION IN THIS CASE?

22   **A.**   OF COURSE.

23   **Q.**   AND YOU WERE UNDER OATH, RIGHT?

24   **A.**   OF COURSE.

25   **Q.**   AND YOU WERE TRYING TO BE ACCURATE, TO THE BEST OF YOUR

1   MEMORY?

2   **A.**   TO THE BEST OF MY MEMORY.

3   **Q.**   THAT WAS DECEMBER OF 2016.  DOES THAT SOUND RIGHT?

4   **A.**   YOU HAVE THE DOCUMENTATION, I DON'T.  I DON'T REMEMBER.

5           **MR. DUBNER:**  CAN YOU BRING UP THE FIRST PAGE OF THE

6   DEPOSITION, MARTHA.

7   **BY MR. DUBNER:**

8   **Q.**   DOCTOR, I'M SHOWING YOU YOUR DEPOSITION.  IF I CAN DRAW

9   YOUR ATTENTION TO THE DATE, SAY, AROUND LINE 19, 20.  IT SAYS

10  TUESDAY, DECEMBER 20, 2016?

11  **A.**   YES, SIR.

12  **Q.**   AND YOU SUBMITTED YOUR REPORT IN NOVEMBER OF 2016.  DOES

13  THAT SOUND RIGHT?

14  **A.**   I PRESUME SO.  YOU WOULD HAVE BETTER KNOWLEDGE OF THAT

15  THAN I DO.

16  **Q.**   BUT PRETTY CLOSE IN TIME TO THIS?

17  **A.**   YES.

18  **Q.**   JUST A MATTER OF MONTHS AT MOST.

19  **A.**   YES, SOMETHING LIKE THAT.

20  **Q.**   AND SO YOUR MEMORY WAS PROBABLY FRESHER THEN THAN IT IS

21  TODAY?

22  **A.**   I DON'T KNOW.

23  **Q.**   AND IN THAT DEPOSITION, I ASKED YOU IF YOU COULD IDENTIFY

24  ANY OF THE POLICIES YOU REVIEWED, RIGHT?

25  **A.**   I DON'T REMEMBER.  I PRESUME YOU DID.

Q.   WHY DON'T I SHOW YOU --

A.   I'LL ACCEPT THE FACT THAT YOU DID.

Q.   AND WE CAN JUST SHOW THE DEPOSITION, PAGE 7, IF I COULD
DRAW YOUR ATTENTION TO LINE 17 THROUGH 24.  I ASKED YOU:  "AND
THEN IN TERMS OF THE POLICIES, PROCEDURES, DIRECTIVES AND
GUIDELINES, DO YOU HAVE ANY RECOLLECTION OF WHAT SPECIFICALLY
YOU REVIEWED IN THOSE CATEGORIES?"

        YOU ANSWERED:  "NO."

        I ASKED YOU:  "CAN YOU IDENTIFY ANY OF THE POLICIES
AND PROCEDURES YOU REVIEWED?"

        YOU ANSWERED:  "NO."

        IS THAT ACCURATE?

A.   YES.

Q.   AND THEN IN ADDITION TO THESE POLICIES, YOU REVIEWED THE
PATIENTS WHO WERE IN PLAINTIFFS' EXPERT SAMPLE; IS THAT RIGHT?

A.   YES.

Q.   AND YOU THOUGHT THAT YOU HAD REVIEWED THIS BEFORE YOUR
SITE VISIT, BUT YOU NOW REMEMBER THAT IT'S AFTER.  I'M JUST
REFERRING TO THE CORRECTION YOU GAVE A LITTLE BIT EARLIER.

A.   YES, SIR.

Q.   AND IN YOUR EXPERT REPORT, YOU IDENTIFIED ALL OF THE
PLACES WHERE YOU BELIEVED THAT THEIR FACTS WERE WRONG, CORRECT?

A.   I IDENTIFIED SOME OF THE PLACES WHERE I THINK THE FACTS
WERE WRONG, OR THAT THEY WERE FACTS THAT WERE IGNORED, LIKE
MANY, MANY REFUSALS THAT WAS JUST NOT ADDRESSED.

12:05   1   **Q.**   SO ALL OF THE PLACES WHERE YOU BELIEVE THERE WERE REFUSALS
2   THEY SHOULD HAVE COMMENTED ON, THOSE ARE ADDRESSED IN YOUR
3   REPORT?
4   **A.**   NO, SIR.
5   **Q.**   AND SO YOU'RE SAYING THAT NOT ALL THE PLACES WHERE YOU
6   BELIEVE THEIR FACTS WERE WRONG ARE IN YOUR EXPERT REPORT?
7   **A.**   THAT'S CORRECT.
8   **Q.**   AND IF WE GO TO PAGE 41 OF YOUR DEPOSITION, IF I COULD
9   DRAW YOUR ATTENTION TO LINE 13 THROUGH 15 OF PAGE 41.  NOW, I
10   ASKED YOU AT YOUR DEPOSITION:  "ALL THE PLACES WHERE YOU
11   BELIEVE THE FACTS WERE WRONG, ARE THOSE IN YOUR EXPERT REPORT?"
12   AND WHAT WAS YOUR ANSWER?
13   **A.**   I WOULD HAVE TO GO BACK AND READ SOME OF THE PARAGRAPHS
14   BEFORE THAT.  YOU MAY BE TAKING IT OUT OF CONTEXT.
15   **Q.**   AND DR. THOMAS --
16   **A.**   MY ANSWER THEN WAS:  "YES, I COMMENTED ON THEM."
17   **Q.**   THANK YOU.  I APPRECIATE YOU ANSWERING THE QUESTION.
18             AND WE CAN GO BACK BEFORE THAT, IF YOU WOULD LIKE.
19             CAN YOU BRING UP PAGE 40 NEXT TO IT AS WELL.
20             SO LET'S START AT PAGE, SO PAGE 40, STARTING AT LINE
21   8.  I ASKED YOU:  IF THERE WERE CRITICISMS IN THE PLAINTIFFS'
22   EXPERT REPORT THAT YOU HOLD THAT YOU DIDN'T PUT IN YOUR REPORT,
23   AND I'M GOING TO PARAPHRASE FOR TIME.  IF YOU SEE ANYTHING THAT
24   I'M LEAVING OUT, PLEASE ABSOLUTELY CORRECT ME.  YOU SAID THAT
25   YOU DIDN'T RELY ON A SUBORDINATE PERSON TO EVALUATE OR WRITE

12:07   1   YOUR REPORT, AND YOU WEREN'T CRITICIZING BUT YOU WEREN'T

2   COMMENTING ON DR. PUISIS USING MS. LAMARRE TO ASSESS AND

3   GENERATE, YOU SAID, MOST OF THE REPORT, AND YOU DIDN'T KNOW IF

4   THAT WAS APPROPRIATE; IS THAT CORRECT?

5   **A.**   YES, SIR.  AND IF YOU READ LINE 22, YOU ASKED:  "ARE THERE

6   OTHER CRITICISMS BEYOND THAT WHICH STATE IN YOUR REPORT THAT

7   YOU HOLD IN THAT REPORT?"

8         AND I SAID:  "I DON'T KNOW.  AS WE SIT HERE, I DON'T

9   RECALL."

10   **Q.**   RIGHT.

11         AND THEN I ASKED YOU:  "IF THERE WERE ANY YOU COULD

12   THINK OF?"

13         AND YOU SAID:  "NONE THAT YOU COULD THINK OF."

14         CORRECT?

15   **A.**   THAT'S CORRECT.  AND YOU DID NOT ELECT TO REFRESH ME.

16   **Q.**   AND I THINK WE'VE SEEN ENOUGH OF THE CONTEXT ON THIS.  IN

17   TERMS OF OTHER DISAGREEMENTS YOU MIGHT HAVE HAD, IN YOUR REPORT

18   YOU IDENTIFIED ALL OF THESE AGREEMENTS THAT YOU BASED YOUR

19   OPINION ON, RIGHT?

20   **A.**   NO, I IDENTIFIED SOME OF THEM.  I DID NOT WRITE EVERYTHING

21   IN MY REPORT THAT I FOUND.

22   **Q.**   AND IF WE COULD BRING UP PAGES 70 AND 71 OF HIS

23   DEPOSITION, AND LET'S START AT LINE 17.  I WANT TO MAKE SURE WE

24   GET THE FULL CONTEXT FOR YOU, DOCTOR.  LINE 17 OF PAGE 70, I

25   ASKED YOU:  "SO, DR. THOMAS, BEFORE THE BREAK, YOU WERE SAYING

12:08  1    THAT YOU RECEIVED THE CHARTS FOR THE MEDICAL RECORDS FOR ALL OF

2    THE INMATES NAMED IN THE PLAINTIFFS' EXPERT REPORT; IS THAT

3    RIGHT?"

4    **A.**    YES.

5    **Q.**    I ASKED YOU:  "DID YOU REVIEW ALL OF THOSE?"

6              YOU ANSWERED:  "YES."

7              AND THEN I SAID:  "AND THEN I KNOW YOU EXPRESSED

8    DISAGREEMENTS WITH THE EXPERT'S SUMMARY OF SOME OF THOSE

9    REPORTS?"

10             AGAIN, YOU ANSWERED:  "YES."

11             THEN I ASKED:  "DID YOU HAVE OTHER DISAGREEMENTS WITH

12   THEIR CHART REVIEWS THAN WHAT YOU IDENTIFIED?"

13             ANSWER:  "I DON'T RECALL.  I DON'T KNOW."

14             QUESTION:  "NONE THAT YOU REMEMBER OFFHAND?"

15             ANSWER:  "NONE THAT I REMEMBER OFFHAND."

16             QUESTION:  "AND NONE CERTAINLY THAT YOU'RE BASING

17   YOUR OPINION ON?"

18             ANSWER:  "THAT'S CORRECT."

19             DID I ASK YOU THOSE QUESTIONS AND DID YOU GIVE THAT

20   TESTIMONY?

21   **A.**    YOU ASKED ME THOSE QUESTIONS, AND I GAVE THAT TESTIMONY.

22   **Q.**    OKAY.

23   **A.**    I DON'T KNOW IN REFLECTION NOW THAT THE ANSWER ON ITEM 10

24   OF PAGE 71 IS CORRECT.

25   **Q.**    AND I'LL ASK YOU JUST TO ANSWER THE QUESTION, AND IF THERE

12:09  1    ARE THINGS YOUR COUNSEL WANTS TO ASK YOU TO FLESH OUT ON

2    REDIRECT, YOU'LL BE PERFECTLY ABLE TO DO SO.

3    **A.**    THANK YOU, MR. DUBNER.

4    **Q.**    LET'S TALK A LITTLE BIT MORE ABOUT THE PLAINTIFFS'

5    EXPERTS.  THEY REVIEWED A SAMPLING OF HEALTHCARE RECORDS AMONG

6    PATIENTS WITH SERIOUS NEEDS, INCLUDING COMPLEX AND CHRONIC

7    CARE; IS THAT RIGHT?

8    **A.**    YES.

9    **Q.**    AND THAT'S WHAT MOST ACCREDITATION BODIES DO AND WHAT MOST

10   EXPERTS DO?

11   **A.**    YES.

12   **Q.**    AND IN YOUR REPORT, OR IN YOUR DEPOSITION, I ASKED IF

13   THERE WAS ANYTHING THAT THEY DIDN'T DO OR ANYTHING YOU WEREN'T

14   SURE WHETHER THEY DID THAT MADE THEIR METHODOLOGY FLAWED; IS

15   THAT RIGHT?

16   **A.**    I DON'T RECALL, BUT I'LL ACCEPT THE FACT THAT YOU ASKED

17   THAT.

18   **Q.**    AND AT LEAST AS OF DECEMBER 2012 AT THAT DEPOSITION THERE

19   WAS SOMETHING THAT YOU KNEW OF; IS THAT RIGHT?

20   **A.**    NOTHING THAT I RECALLED.

21   **Q.**    OKAY.  LET'S MOVE INTO SUBSTANCE FOR A BIT.  LET'S TALK

22   ABOUT THE SPECIALTY CONSULTATION.  YOU SAID ON THE STAND

23   EARLIER THIS MORNING THAT THERE WERE APPROXIMATELY 2000

24   SPECIALTY VISITS IN THE PREVIOUS 12 MONTHS AT THE TIME OF YOUR

25   REPORT?

**A.**   YES, SIR.

**Q.**   AND IN YOUR REPORT, YOU SAID THERE WERE APPROXIMATELY 3100 SPECIALTY CONSULTATIONS ORDERED IN THAT 12-MONTH PERIOD; IS THAT RIGHT?

**A.**   YES, SIR.

**Q.**   SO THERE WERE APPROXIMATELY 1100 THAT HADN'T BEEN COMPLETED?

**A.**   YES, SIR.

**Q.**   AND SOME OF THOSE CONSULTATIONS WERE PENDING AS LONG AS SEVEN OR EIGHT MONTHS?

**A.**   YES, SIR.

**Q.**   THERE CAN BE NEGATIVE CONSEQUENCES FROM DELAYING SPECIALTY CONSULTATIONS, RIGHT?

**A.**   THERE CAN BE IF YOU DELAY URGENT OR TRULY NECESSARY ONES FOR A LENGTH OF TIME, BUT IF YOU DELAY ROUTINE ONES, THE CONSEQUENCES ARE LIMITED.

**Q.**   AND ONE OF THE CONSEQUENCES OF DELAYING ROUTINE ONES IS THEY COULD EVENTUALLY BECOME URGENT ONES; IS THAT CORRECT?

**A.**   YES, SIR.

**Q.**   AND ANOTHER ONE OF THE CONSEQUENCES OF DELAYING SPECIALTY CONSULTATIONS CAN INCLUDE CONDITIONS BECOMING MORE SEVERE?

**A.**   YES.  YOU'D HAVE TO BE VERY SPECIFIC, BUT YES.

**Q.**   OF COURSE.  AND ONE OF THE CONSEQUENCES OF DELAYING SPECIALTY CONSULTATIONS CAN BE CONTINUED PAIN?

**A.**   YES.

**Q.**   AND ONE OF THE CONSEQUENCES OF DELAYING SPECIALTY
CONSULTATIONS CAN BE DEATH?

**A.**   WELL, THAT WOULD BE UNUSUAL FOR DELAYING ROUTINE ONES.

**Q.**   BUT --

**A.**   VERY UNUSUAL.  YOU COULD HYPOTHETICALLY POSTULATE THAT,
YES.

**Q.**   AND IN TERMS OF THE URGENT ONES, THE CONSEQUENCES OF
DELAYING THOSE CAN BE DEATH, CORRECT?

**A.**   YES.

**Q.**   BUT YOU DIDN'T EXAMINE THE MEDICAL RECORDS TO DETERMINE IF
THE DELAYS AT ANGOLA, SPEAKING OF THE CHARTS THAT YOU REVIEWED
ON SITE, YOU DIDN'T EXAMINE MEDICAL RECORDS TO DETERMINE IF THE
DELAYS AT ANGOLA HAD NEGATIVE CONSEQUENCES, DID YOU?

**A.**   I DON'T REMEMBER REVIEWING CHARTS THAT HAD SPECIALTY
CONSULTATIONS THAT WEREN'T SEEN, SO I PRESUME THE ANSWER
SPECIFICALLY WOULD BE NO.

**Q.**   YOU DID REVIEW SPECIALTY CHARTS WHERE THE CONSULTATIONS
HAD BEEN DELAYED SEVEN OR EIGHT MONTHS, CORRECT?

**A.**   YES.

**Q.**   AND YOU DIDN'T LOOK TO SEE IF THERE WERE NEGATIVE
CONSEQUENCES OF THOSE DELAYS?

**A.**   I DON'T KNOW THAT THAT'S CORRECT.  I WOULD HAVE COMMENTED
ON NEGATIVE CONSEQUENCES IF THEY WERE PRESENT.

          **MR. DUBNER:**  AND ALEXANDER, CAN YOU PULL UP PAGES 53
AND 54 OF HIS DEPOSITION.

1  **BY MR. DUBNER:**

2  **Q.**   AND SO IF WE START AT LINE 20 ON PAGE 53, I ASKED YOU:

3  "DID YOU LOOK TO SEE WHETHER THE DELAYS IN CONSULTATIONS YOU

4  SAW HAD ANY OF THOSE CONSEQUENCES?"

5         AND YOU ANSWERED:  "I HAD ASSURANCES."   AND YOU

6  SAID:  "DID I LOOK TO SEE?  I MADE INQUIRIES AND PEOPLE WHO HAD

7  DELAYED CONSULTS, IF THE DELAY GOT TOO LONG WHERE -- I DON'T

8  REMEMBER WHETHER INVITED OR INSTRUCTED TO DO SICK CALL

9  FOLLOW-UPS TO MAKE SURE THEY WEREN'T GETTING INTO DIFFICULTY

10 BECAUSE OF THEIR DELAY.

11        "I DON'T BELIEVE I CHECKED THAT PERSONALLY, BUT TWO

12 PEOPLE THAT I INQUIRED ABOUT THAT SAID THAT WAS -- THREE

13 PEOPLE, ACTUALLY, SAID THAT IS WHAT HAPPENED."

14        IS THAT AN ACCURATE REFLECTION OF THE WORK THAT YOU

15 DID?

16 **A.**   I BELIEVE SO.

17 **Q.**   AND YOU DIDN'T DO ANY OTHER EXAMINATION TO DETERMINE IF

18 THERE WERE NEGATIVE CONSEQUENCES FROM THE DELAYS?

19 **A.**   OTHER THAN THE CHARTS THAT I REVIEWED, AND I DIDN'T SEE

20 ANY.

21 **Q.**   BUT YOU DIDN'T REVIEW THOSE CHARTS SPECIFICALLY TO LOOK

22 FOR WHETHER THERE WERE NEGATIVE CONSEQUENCES IN THE DELAYS, DID

23 YOU?

24 **A.**   THAT'S CORRECT.  NOT SPECIFICALLY FOR NEGATIVE

25 CONSEQUENCES OF DELAYED CONSULTATIONS.

1  Q.   AND YOU DIDN'T DO IT BECAUSE IT WOULD BE AWKWARD AND WOULD

2  TAKE TOO LONG, CORRECT?

3  A.   THAT'S CORRECT.

4  Q.   LET'S TALK ABOUT REFUSALS.  YOU TESTIFIED ABOUT A COUPLE

5  OF PATIENTS TODAY AND THE MANY REFUSALS THAT ARE PRESENT IN

6  SOME OF THE RECORDS.  AND I THINK YOU SAID -- I DON'T WANT TO

7  PUT WORDS IN YOUR MOUTH -- I THINK IN ONE CASE THE REFUSALS --

8  BECAUSE THE REFUSALS -- THE OUTCOMES OF THE PATIENTS WERE NOT

9  RELATED TO THE CARE PROVED AT LSP; IS THAT ACCURATE?  I DON'T

10 WANT TO BE PARAPHRASING.  I DON'T HAVE A TRANSCRIPT.

11 A.   INMATES HAVE A RIGHT TO REFUSE CARE.  THAT GENERALLY LEADS

12 TO, IN MANY CIRCUMSTANCES, POOR OUTCOMES.  IF THAT'S YOUR

13 QUESTION, THEN THE ANSWER IS YES.

14 Q.   AND THOSE POOR OUTCOMES BECAUSE THE REFUSALS ARE, IN YOUR

15 VIEW, NOT THE RESPONSIBILITY OF THE INSTITUTION, NO MATTER HOW

16 UNFORTUNATE THEY MAY BE; IS THAT FAIR?

17 A.   I THINK THAT'S FAIR, IF I MAY GIVE AN EXAMPLE.

18 Q.   YES.  GO AHEAD.

19 A.   I HAD A YOUNG MAN IN ZEPHYRHILLS CORRECTIONAL INSTITUTION

20 THAT WOULD GET ANGRY WITH THE CORRECTIONAL STAFF AND REFUSE TO

21 TAKE HIS INSULIN, AND I ADVISED HIM TIME AND TIME AGAIN THAT HE

22 WAS GOING TO DEVELOP RETINOPATHY AND LEAD TO BLINDNESS, AND

23 INDEED, HE DID THAT IN ONE EYE BECAUSE HE REFUSED CARE NO

24 MATTER WHAT I DID OR HOW I EDUCATED HIM.

25 Q.   AND SO --

**A.**   I DON'T FEEL ANY PERSONAL CULPABILITY.  I FEEL SORRY FOR
HIM, BUT WE TRIED OUR BEST.

**Q.**   AND IT'S THE SAME WITH ANGOLA IN YOUR VIEW, THAT THEY
TRIED THEIR BEST, THE REFUSALS, SO THEY ARE NOT RESPONSIBLE FOR
THE POOR CARE?

**A.**   THAT'S A PART OF CORRECTIONS.  PEOPLE REFUSE CARE, AND
THERE ISN'T MUCH YOU CAN DO ABOUT IT.

**Q.**   AND SO THAT'S YOUR TESTIMONY FOR THE DEFENDANTS IN THIS
CASE, BUT YOU REPRESENT PLAINTIFFS IN SOME OTHER CASES; ISN'T
THAT CORRECT?

**A.**   YES, SIR.

**Q.**   AND YOU'VE TESTIFIED FOR PLAINTIFFS THAT PROVIDERS ARE
RESPONSIBLE AND HAVE FALLEN BELOW THE STANDARD OF CARE EVEN
WHEN PATIENTS REFUSED ALL MEDICAL TREATMENT, HAVEN'T YOU?

**A.**   I DON'T REMEMBER.  YOU'D HAVE TO REFRESH ME.

**Q.**   YOU'RE A WITNESS RIGHT NOW IN A CASE IN INDIANA, AREN'T
YOU?

**A.**   I DON'T REMEMBER.

**Q.**   ARE YOU FAMILIAR WITH A MAN NAMED CEDELL WRIGHT?

**A.**   I REMEMBER CEDELL -- I REMEMBER THE CASE OF CEDELL WRIGHT.

**Q.**   AND IN CEDELL WRIGHT'S CASE, YOU ARE TESTIFYING FOR HIS
ESTATE, AND YOU -- I'M REFERRING TO YOUR REPORT, I DON'T WANT
TO MISSPEAK WHEN I SAY TESTIMONY.  IN YOUR REPORT, YOU NOTED
THAT MR. WRIGHT REFUSED ALL MEDICATIONS FOR BOTH HIS PHYSICAL
AND MENTAL HEALTH CARE, CORRECT?

**A.** YES.

**Q.** AND YOU NOTED THAT THE RECORDS SHOWED A CONTINUOUS PATTERN OF WEIGHT LOSS, DECLINING PHYSICAL CONDITION, AND DETERIORATING MENTAL STATUS WHILE MR. WRIGHT CONTINUED TO REFUSE ALL FORMS OF TREATMENT?

**A.** YES.

**Q.** YOU NOTED THAT HE HAD INDICATIONS OF PNEUMONIA THAT HE WASN'T TREATED FOR DUE TO -- LEAVE IT AT THAT, CORRECT?

**A.** I DON'T RECALL, BUT I PRESUME THAT'S CORRECT.

**Q.** AND YOUR OPINION IN THAT CASE, TO A REASONABLE DEGREE OF MEDICAL CERTAINTY, WAS THAT THE HEALTHCARE PROVIDERS ESSENTIALLY TURNED A BLIND EYE TO MR. WRIGHT'S MEDICAL NEEDS, WASN'T IT?

**A.** THAT'S VERY, VERY, FACT SPECIFIC AND I DON'T REMEMBER THE FACTS THAT I EVALUATED.  I DON'T KNOW WHY HE REFUSED -- WELL, WHETHER THE REFUSALS WERE CONTINUOUS, WHETHER HE WAS EDUCATED WHEN HE REFUSED.  THAT'S VERY, VERY FACT SPECIFIC, AND I WOULD HAVE TO REVIEW THE FACTS AGAIN BECAUSE I SIMPLY DON'T REMEMBER THEM, AS I SIT HERE NOW.

**Q.** AND YOU ALSO DON'T KNOW THE REASON FOR ALL OF THE REFUSALS THAT YOU'VE COMMENTED ON TODAY, DO YOU?

**A.** NO.

**Q.** AND YOUR ULTIMATE CONCLUSION IN MR. WRIGHT'S CASE WAS THAT MR. WRIGHT MAY HAVE COMPLICATED HIS CARE BY REFUSING TREATMENT EARLY ON, AND LATER BY HIS DETERIORATED MENTAL HEALTH STATE,

1   BUT THE FAILURE OF THE HEALTHCARE PROVIDERS TO MAKE REASONABLE
2   ATTEMPTS TO PROVIDE MEDICAL AND MENTAL HEALTH CARE FOR HIM FELL
3   WELL BELOW THE STANDARD FOR APPROPRIATE CARE.  WAS THAT YOUR
4   OPINION?
5   **A.**   PROBABLY.  BUT THAT WOULD BE, AS I MENTIONED, VERY, VERY
6   FACT SPECIFIC.
7   **Q.**   AND WHY DON'T I REFRESH YOUR RECOLLECTION.  JUST TO HAVE
8   THE RECORD CLEAR, WHEN YOU SAY "PROBABLY," YOU JUST DON'T
9   REMEMBER SITTING HERE TODAY?
10  **A.**   THAT'S CORRECT.
11         **MR. ARCHEY:**  YOUR HONOR, HE SAID THAT.  I MEAN, I
12  DON'T THINK THIS IS APPROPRIATE FOR IMPEACHMENT.  I MEAN, HE
13  SAID YEAH.  I MEAN, ARE WE GOING TO GO DOWN THE RABBIT TRAIL OF
14  THAT?
15         **THE COURT:**  DID HE ADMIT IT?
16         **MR. DUBNER:**  HE SAID THAT HE -- THAT WAS PROBABLY HIS
17  CONCLUSION.  IF HE WANTS TO SAY THAT IS HIS CONCLUSION, THEN I
18  WON'T REFRESH HIS RECOLLECTION.
19         **THE COURT:**  WAS THAT YOUR CONCLUSION OR NOT?  BECAUSE
20  IT DEPENDS ON WHETHER HE'S GOING TO BE ABLE TO ASK YOU MORE
21  ABOUT IT, SIR.
22         **THE WITNESS:**  I WILL ACCEPT THAT AS MY CONCLUSION.
23         **MR. DUBNER:**  OKAY.
24         **THE COURT:**  CARRY ON.
25         **MR. DUBNER:**  AND JUST FOR THE RECORD, THAT'S THE CASE

1   OF *CEDELL WRIGHT V. LAKE COUNTY, INDIANA*, PENDING IN THE

2   NORTHERN DISTRICT OF INDIANA, CASE NO. 13-CV-333, FROM

3   DOCUMENT 144-17 FILED ON FEBRUARY 15, 2017.

4   **BY MR. DUBNER:**

5   **Q.**   AND ON REFUSALS, WHEN YOU WERE TALKING ABOUT YOUR PATIENT

6   IN, I THINK, ZEPHYRHILLS, WAS IT?

7   **A.**   YES, SIR.

8   **Q.**   YOU DESCRIBED THE EDUCATION THAT YOU GAVE HIM.  EDUCATION

9   IS IMPORTANT FOR PATIENTS WHO ARE REFUSING CARE, CORRECT?

10  **A.**   YES, SIR.

11  **Q.**   YOU WROTE IN YOUR REPORT THAT ONE OF THE REQUIREMENTS OF

12  NECESSARY CORRECTIONAL HEALTHCARE IS A PROFESSIONAL MEDICAL

13  OPINION; IS THAT RIGHT?

14  **A.**   THAT'S CORRECT.

15  **Q.**   AND MOST CORRECTIONAL SYSTEMS HAVE A GRADED SYSTEM OF

16  TRIAGE BY LICENSED PROFESSIONAL FOR A PROFESSIONAL MEDICAL

17  OPINION?

18  **A.**   PLEASE SAY THAT AGAIN, MR. DUBNER.

19  **Q.**   ABSOLUTELY.  MOST CORRECTIONAL SYSTEMS HAVE A GRADED

20  SYSTEM OF TRIAGE BY LICENSED PERSONNEL FOR A PROFESSIONAL

21  MEDICAL OPINION, CORRECT?

22  **A.**   TELL ME WHAT YOU MEAN BY "GRADED SYSTEM OF TRIAGE."

23  **Q.**   HAVE YOU EVER USED THAT PHRASE, DOCTOR?

24  **A.**   POSSIBLY.  PROBABLY.

25  **Q.**   DID YOU WRITE AN ARTICLE CALLED "WHO WINS IN A LAWSUIT FOR

1   CORRECTIONS TODAY?"

2   **A.**   YES.

3   **Q.**   AND DO YOU RECALL TALKING ABOUT THE GRADED SYSTEM OF

4   TRIAGE FOR GIVING PROFESSIONAL MEDICAL OPINIONS IN THAT

5   ARTICLE?

6   **A.**   I DON'T RECALL, BUT I PROBABLY DID.  I KNOW WHAT I MEANT

7   BY A GRADED SYSTEM OF TRIAGE.  I'M NOT CERTAIN WHAT YOU MEAN BY

8   A GRADED SYSTEM OF TRIAGE.

9   **Q.**   AND SO IF YOU COULD EXPLAIN WHAT IT IS THAT YOU MEANT BY A

10  GRADED SYSTEM OF -- SURE, YEAH, WHY DON'T YOU EXPLAIN WHAT YOU

11  MEANT BY A GRADED SYSTEM OF TRIAGE, DOCTOR?

12  **A.**   EVALUATION BY A LOWER LEVEL PERSON AND THEN A PROTOCOL

13  RESPONSE, IF THAT'S NECESSARY, IF THAT'S APPROPRIATE, AND THEN

14  AN EVALUATION BY A HIGHER LEVEL PERSON AS IS DONE IN ANGOLA TO

15  SIGN OFF ON THOSE AND TO EVALUATE THEM, AND THEN POSSIBLY A

16  REFERRAL TO A PHYSICIAN OR A VERY HIGH LEVEL PERSON.

17  **Q.**   AND SO YOU TESTIFIED A LOWER LEVEL PERSON.  ARE YOU

18  INCLUDING EMTS IN THAT DESCRIPTION TODAY?

19  **A.**   YES, SIR.

20          **MR. DUBNER:**  PERMISSION TO APPROACH, YOUR HONOR?

21          **THE COURT:**  YOU MAY.  SHOW YOUR OPPOSING COUNSEL.

22          **MR. DUBNER:**  OF COURSE.

23  **BY MR. DUBNER:**

24  **Q.**   AND I'VE HANDED YOU WHAT'S BEEN MARKED FOR IDENTIFICATION

25  AS PLAINTIFFS' 410.  IS THIS THE "WHO WINS IN A LAWSUIT

1   ARTICLE"?

2   **A.**   YES.

3   **Q.**   THIS IS THE ARTICLE THAT YOU WROTE?

4   **A.**   YES.  IN CONJUNCTION WITH MS. KELLEY, DR. THOMAS, DR.

5   KENNEDY, AND DR. EDMONDS.

6   **Q.**   OKAY.

7       ALEXANDER, COULD YOU PUT THAT UP ON THE SCREEN.  IF

8   WE COULD GO TO THE THIRD PAGE OF THE DOCUMENT.

9       I'D LIKE TO DRAW YOUR ATTENTION TO THE PARAGRAPH THAT

10  SPLITS THE COLUMNS, THAT BEGINS WITH "A PROFESSIONAL MEDICAL

11  OPINION."

12      ALEXANDER, IF YOU COULD BLOW THAT UP, THAT WOULD BE

13  WONDERFUL, AND WE ARE GOING TO NEED THE SECOND PAGE AS WELL,

14  THE SECOND PART OF THE PARAGRAPH.  THANK YOU.

15      SO I'D LIKE TO DRAW YOUR ATTENTION TO WHERE YOU BEGIN

16  "TO APPROACH THIS BROADLY."  YOU SAY, "TO APPROACH THIS

17  BROADLY, MOST CORRECTIONAL MEDICAL PROFESSIONALS HAVE A GRADED

18  SYSTEM OF TRIAGE BY LICENSED PERSONNEL FOR A PROFESSIONAL

19  MEDICAL OPINION TO INCLUDE:  FIRST, A LICENSED PROFESSIONAL

20  NURSE, OR IN SOME JURISDICTIONS, REFERRED TO AS A LICENSED

21  VOCATIONAL NURSE, FOLLOWED BY A LICENSED REGISTERED NURSE, THEN

22  A LICENSED MID-LEVEL PROVIDER WHICH COULD EITHER MEAN A

23  PHYSICIAN'S ASSISTANT OR AN ADVANCED REGISTERED NURSE

24  PRACTITIONER, THEN FINALLY, A LICENSED PHYSICIAN."

25      DID I READ THAT CORRECTLY?

1  A.   YES, SIR.

2  Q.   AND DID YOU INCLUDE EMTS IN THAT?

3  A.   I DID NOT INCLUDE EMTS IN THIS.

4  Q.   THANK YOU, DOCTOR.

5            MR. DUBNER:  AND WE WOULD OFFER 410 INTO EVIDENCE

6  JUST FOR THE CONTENTS, NOT FOR THE TRUTH OF THE MATTER

7  ASSERTED.

8            MR. ARCHEY:  NO OBJECTION, YOUR HONOR.

9            THE COURT:  ADMITTED.

10  BY MR. DUBNER:

11  Q.   SO LET'S CONTINUE TO TALK ABOUT EMTS.  THE CORRECTIONAL

12  STANDARD OF CARE REQUIRES ALL MEDICAL PERSONNEL TO STAY WITHIN

13  THEIR SCOPE OF PRACTICE, RIGHT?

14  A.   YES, SIR.

15  Q.   IN YOUR REPORT AND TODAY ON THE STAND, YOU DID CONCLUDE

16  THAT EMTS STAY WITHIN THEIR SCOPE OF PRACTICE, RIGHT?

17  A.   YES, SIR.

18  Q.   AND THAT YOU EXPLAINED THAT THAT WAS BASED ON OBSERVATIONS

19  OF A COUPLE -- AMONG OTHER THINGS, ON OBSERVATIONS OF A COUPLE

20  OF INCIDENTS?

21  A.   YES, SIR.

22  Q.   AND ONE OF THOSE -- SO YOU SAID YOU OBSERVED TWO, AND

23  THERE WAS ONE THAT YOU WERE ADVISED OF.  THAT WAS THE

24  ADMINISTRATION OF AN EPIPEN?

25  A.   YES, SIR.

1  Q.   AND YOU WROTE IN YOUR REPORT AS WELL THAT THAT WAS

2  SOMETHING THAT WAS RELATED TO YOU, CORRECT?

3  A.   YES, SIR.

4  Q.   BUT AT YOUR DEPOSITION YOU TOLD ME THAT YOU WITNESSED

5  THAT, DIDN'T YOU?

6  A.   NO, SIR.  IF I DID, I MISSPOKE, THAT WAS RELATED TO ME.

7  Q.   AND DO YOU REMEMBER WHETHER OR NOT YOU DID TELL ME THAT?

8  A.   NO, SIR.

9  Q.   SO LET'S FIRST GO TO PAGE 85 OF YOUR DEPOSITION, SO IF WE

10 START AT LINE 11 TO 20, THIS IS YOUR TESTIMONY, YOU SAID:

11 "AND I WITNESSED AN EMERGENCY INTERACTION WITH EMTS, WHICH I

12 REPORT IN HERE, AND THEY ARE VERY, VERY CIRCUMSPECT ABOUT

13 KEEPING WITHIN THEIR TRAINING.  AND INDEED, I CITE AN INCIDENT

14 WHERE THE PHYSICIAN HAD TO TELL ONE OF THE BASIC EMTS, BECAUSE

15 OF THE EXTREMELY DEADLY CONDITION THAT THE PATIENT HAD, THAT IT

16 WAS OKAY TO GO AHEAD AND INJECT THE MEDICATION."

17         AND I ASKED:  "RIGHT.  AND THAT WAS THE USE OF THE

18 EPIPEN?"

19         AND YOU SAID:  "YES."

20         SO, DOCTOR, DOES THAT REFRESH YOUR RECOLLECTION?

21 A.   IT INDEED DOES.  IT SAYS INDEED, I CITE AN INCIDENT.

22 I DIDN'T WITNESS IT.  I CITE AN INCIDENT WHERE A PHYSICIAN HAD

23 TO TELL ONE OF THE BASIC EMTS.

24 Q.   AND THEN, DOCTOR, YOU WENT ON AND GAVE ME MORE DETAILS OF

25 WHAT YOU HAD WITNESSED, HADN'T YOU?

**A.**   SAY AGAIN NOW.

**Q.**   YOU GAVE -- IT'S NOT ON THE TRANSCRIPT YET, BUT YOU WENT ON AND GAVE ME MORE DETAILS OF WHAT YOU WITNESSED, DIDN'T YOU?

**A.**   I DON'T RECALL.

**Q.**   YOU TOLD ME THAT IT WAS DISTRESSING, NOT TO YOU, BUT TO THE PEOPLE AT -- BUT TO THE OTHERS AROUND THE PATIENT?

**A.**   POSSIBLY.  I DON'T RECALL THAT.

**Q.**   IF WE GO TO PAGES 87 TO 88, STARTING AT LINE 22 AND CONTINUING TO 88, LINE 2, I ASKED YOU:  "WERE THERE ANY -- FROM WHAT YOU OBSERVED, WERE THERE ANY CIRCUMSTANCES THAT MADE THIS A MORE DIFFICULT THAN USUAL TREATMENT, THE USE OF AN EPIPEN?"

AND YOU SAID:  "WELL, POSSIBLY.  I MEAN, IT WAS DISTRESSING.  I THINK -- I WAS NOT DISTRESSED, BUT I THINK THE PEOPLE AROUND THE PATIENT WERE QUITE DISTRESSED."

DID I READ THAT CORRECTLY?

**A.**   YES.

**Q.**   OKAY.  AND THEN THIS INCIDENT, IT WAS PART OF YOUR CONCLUSION THAT EMTS ARE KNOWLEDGEABLE ABOUT THEIR SCOPE OF PRACTICE, RIGHT?

**A.**   YES.

**Q.**   BUT YOU DON'T KNOW WHETHER THE USE OF AN EPIPEN IS WITHIN AN EMTS' SCOPE OF PRACTICE, DO YOU?

**A.**   IT'S GENERALLY NOT.

**Q.**   AND AT THE TIME OF YOUR DEPOSITION, DID YOU KNOW WHETHER IT WAS?

**A.**   IT'S GENERALLY NOT, AND THE EMT WAS SPECIFICALLY DIRECTED
BY A PHYSICIAN TO GIVE -- TO ADMINISTER IT, AND HE SAID, "I'M
NOT SUPPOSED TO," AND THE PHYSICIAN SAID -- IT WAS REPORTED TO
ME THAT THE PHYSICIAN SAID, "GO AHEAD AND GIVE THE EPIPEN."

**Q.**   AND THAT WAS INDICATIVE OF THE EMT BEING WELL-ADVISED OF
THEIR SCOPE OF PRACTICE; IS THAT CORRECT?  BEING WELL-ADVISED
OF -- LET ME REPHRASE.

          IN YOUR OPINION, THAT WAS INDICATIVE OF THE EMT
HAVING A GOOD FAMILIARITY WITH HIS SCOPE OF -- HIS OR HER SCOPE
OF PRACTICE, CORRECT?

**A.**   YES.

**Q.**   AND IF WE COULD BRING UP DX-14, WHICH IS IN EVIDENCE.  I'M
SORRY, DX-15.  DO YOU RECOGNIZE THIS DOCUMENT?

**A.**   YES, I THINK I'VE SEEN THIS.

**Q.**   AND WHAT IS IT?

**A.**   IT'S A PRACTICE MATRIX FOR LICENSED EMS PROVIDERS.

**Q.**   AND SO IF WE COULD TURN TO DEFENDANTS' 15 AT 2947, THE
SECOND PAGE, UNDER "SKILL/PROCEDURE," COULD YOU READ THE SECOND
ITEM IN THAT CHART?

**A.**   "EPINEPHRINE, AUTO-INJECTOR."

**Q.**   IS THAT AN EPIPEN?

**A.**   IT COULD BE, YES.

**Q.**   AND COULD YOU TELL ME WHAT LEVELS OF EMT ARE AUTHORIZED TO
GIVE AN AUTO-INJECTOR OF EPINEPHRINE?

**A.**   ALL LEVELS.

1   Q.   AND SO THE USE OF AN EPIPEN DOES APPEAR TO BE WITHIN THE

2   SCOPE OF PRACTICE FOR EMTS WITHIN LOUISIANA, CORRECT?

3   A.   IN LOUISIANA, THAT'S CORRECT.

4   Q.   LET'S TALK ABOUT PHYSICIANS.   WHEN YOU WERE AT THE FLORIDA

5   DEPARTMENT OF CORRECTIONS, ALL PHYSICIANS HAD TO UNDERGO A

6   SPECIFIC TRAINING PROGRAM BEFORE THEY SAW PATIENTS, CORRECT?

7   A.   YES.

8   Q.   AND THAT TRAINING COVERED INFECTIOUS DISEASES THAT

9   PHYSICIANS MIGHT NOT HAVE DEALT WITH LIKE HIV AND HEPATITIS,

10  CORRECT?

11  A.   YES.

12  Q.   AND YOU THOUGHT THIS TRAINING WAS NECESSARY AND

13  APPROPRIATE, CORRECT?

14  A.   I THOUGHT IT WAS VERY APPROPRIATE, YES.

15  Q.   AND NECESSARY, CORRECT?

16  A.   FOR MANY PHYSICIANS IT WAS NECESSARY.   FOR SOME, IT

17  PROBABLY WASN'T.

18  Q.   AND YOU DON'T KNOW OF A SIMILAR TRAINING PROGRAM AT

19  ANGOLA, DO YOU?

20  A.   NO, SIR.

21  Q.   YOU TALKED ABOUT THE ATU AND PHYSICIANS BRIEFLY.   YOU SAY

22  IN YOUR REPORT THAT PHYSICIANS ARE READILY AVAILABLE AFTER

23  NORMAL DUTY HOURS, RIGHT?

24  A.   YES.

25  Q.   BUT YOU DON'T KNOW WHETHER DOCTORS ARE PRESENT IN THE ATU

1   OUTSIDE OF THE ADMINISTRATIVE SHIFT, DO YOU?

2   **A.**   NO.

3   **Q.**   AND ASIDE FROM WHAT STAFF TOLD YOU, YOU DIDN'T SEE ANY

4   EVIDENCE THAT PHYSICIANS COME TO THE ATU AT NIGHTS OR ON

5   WEEKENDS, DO YOU?

6   **A.**   I DON'T SEE ANY EVIDENCE THAT THE -- I DIDN'T WALK THE

7   PERIMETER OF THE INSTITUTION TO KNOW THAT IT'S 26 MILES, BUT I

8   HAD RELIABLE PEOPLE TELLING ME THAT THAT'S WHAT HAPPENED.  SAME

9   THING IS TRUE OF THE ATU.  PEOPLE -- RELIABLE PEOPLE, MULTIPLE

10  RELIABLE PEOPLE TOLD ME THAT WAS VERY COMMON.

11  **Q.**   AND BY RELIABLE PEOPLE, YOU MEAN STAFF OF THE DEFENDANTS,

12  THE DEPARTMENT OF CORRECTIONS?

13  **A.**   YES.

14  **Q.**   AND HAD YOU MET THOSE PEOPLE WHO TOLD YOU THAT PRIOR TO

15  THAT SITE VISIT?

16  **A.**   NO.

17  **Q.**   AND YOU ALSO, IN ADDITION TO TALKING WITH THEM, LOOKED

18  AT -- YOU'VE DESCRIBED SEVERAL MEDICAL RECORDS, CORRECT?

19  **A.**   I DIDN'T UNDERSTAND YOUR QUESTION, MR. DUBNER.

20  **Q.**   IN ADDITION TO TALKING TO THE STAFF OF THE DEFENDANT, YOU

21  ALSO LOOKED AT MEDICAL RECORDS, RIGHT?

22  **A.**   YES.

23  **Q.**   AND IN THOSE MEDICAL RECORDS, YOU DIDN'T SEE ANY EVIDENCE

24  THAT PHYSICIANS COME INTO THE ATU ON NIGHTS OR WEEKENDS, DID

25  YOU?

**A.**   I DID NOT LOOK FOR THAT, NO.

**Q.**   YOU DIDN'T LOOK FOR IT, YOU ALSO DIDN'T SEE IT?

**A.**   THAT'S CORRECT.

**Q.**   AND THEN TO TALK ABOUT CREDENTIALING AND DISCIPLINARY HISTORIES A BIT.  YOU LOOKED AT THE CREDENTIALING FILES AT LSP, RIGHT?

**A.**   YES.

**Q.**   AND THOSE FILES HAVE LITTLE IN THEM?

**A.**   THEY HAVE LITTLE IN THEM EXCEPT LICENSURES.

**Q.**   AND THAT DIDN'T CONCERN YOU BECAUSE YOU THOUGHT THAT THERE WAS MORE COMPLETE CREDENTIAL FILES AT THE DOC HEADQUARTERS, CORRECT?

**A.**   YES, SIR, I DID.

**Q.**   IF THE BOARD OF MEDICAL EXAMINERS DETERMINES THAT A DOC PHYSICIAN REQUIRES MONITORING, THEN THE DOC SHOULD PROVIDE IT, RIGHT?

**A.**   THAT WOULD DEPEND ON THE BOARD AND WHAT THEIR REQUIREMENTS ARE.  I DON'T THINK THE DOC SHOULD MONITOR THEIR PHYSICIANS FOR DRUG USE, FOR INSTANCE.  THAT SHOULD BE DONE BY AN OUTSIDE PERSON THAT THE PHYSICIAN REPORTS TO.  IT WOULD DEPEND.  IT'S SITUATIONALLY DEPENDENT.

**Q.**   BUT IF A PHYSICIAN HAS BEEN DETERMINED BY THE BOARD OF MEDICAL EXAMINERS TO REQUIRE MONITORING OR DIRECT MONITORING OR DIRECT SUPERVISION, THEN THEY HAVE TO PROVIDE THAT, CORRECT?

**A.**   YES.

1  Q.   AND YOU REVIEWED HOW MONITORING AND SUPERVISION TOOK PLACE

2  AT ANGOLA?

3  A.   YES.

4  Q.   AND WHAT YOU FOUND WAS THAT THEY USE THEIR PEER-REVIEW

5  PROCESS AND THEIR MORTALITY REVIEW PROCESS, CORRECT?

6  A.   YES.

7  Q.   AND YOU NEVER SAW ANY OTHER MONITORING PLANS FOR

8  PHYSICIANS AT ANGOLA, DID YOU?

9  A.   THAT'S CORRECT.

10 Q.   AND SO YOU DON'T KNOW WHETHER THEY WERE FOLLOWING

11 MONITORING PLANS FOR OTHER PHYSICIANS, DO YOU?

12 A.   I DON'T KNOW BUT THE BOARD WOULD CERTAINLY INTERDICT THAT

13 IF THEY WEREN'T.

14 Q.   AND YOU REFERRED -- STRIKE THAT.

15      THE ONLY FACILITIES YOU KNOW OF THAT ARE OF SIMILAR

16 SIZE TO ANGOLA IN WHICH MOST OR ALL OF THE PHYSICIANS HAVE

17 DISCIPLINARY HISTORIES ARE SOME CALIFORNIA FACILITIES, CORRECT?

18 A.   YES.

19 Q.   AND THAT WAS THE CASE PRIOR TO THE COURT ORDER IN *PLATA*?

20 A.   YES.

21 Q.   AND THAT'S NO LONGER THE CASE TODAY?

22 A.   I DON'T KNOW.  I HAVEN'T BEEN BACK TO CALIFORNIA SINCE

23 THEN.  I HAVE NO DESIRE TO GO.

24 Q.   YOU ALSO TALKED ABOUT CALIFORNIA IN THE CONTEXT OF

25 MEDICATION ADMINISTRATION?

**A.**   YES.

**Q.**   AND THERE AGAIN, YOU SAID THAT IN CALIFORNIA IN SOME

FACILITIES, CORRECTIONS OFFICERS ADMINISTER MEDICATION.  THAT'S

ALSO PRIOR TO THE ENTRY OF THE COURT ORDERS IN THE *PLATA* CASE,

CORRECT?

**A.**   I WAS THERE PRIOR TO THE ENTRY OF THE COURT ORDERS, SO

YES.

**Q.**   SO THAT WAS A CONDITION BEFORE THE COURT FOUND THE CARE

UNCONSTITUTIONAL, CORRECT?

**A.**   IT MAY BE, IT MAY BE AFTER.  I DON'T KNOW WHAT -- I DIDN'T

READ THE COURT ORDER.

**Q.**   YOU DON'T KNOW WHETHER OR NOT IT WAS THE CASE AFTER, YOU

ONLY KNOW THAT IT WAS THE CASE BEFORE?

**A.**   YES, SIR.

**Q.**   AND YOU ALSO SAID TODAY THAT CORRECTIONS OFFICERS

ADMINISTRATE MEDICATION IN WORK CAMPS, ROAD PRISONS, AND

HALFWAY HOUSES?

**A.**   YES.

**Q.**   AND NONE OF THOSE ARE MAXIMUM SECURITY PRISONS WITH

THOUSANDS OF PATIENTS, ARE THEY?

**A.**   THAT'S CORRECT.  THEY ALSO DO IT IN SMALL JAILS WHERE YOU

MAY HAVE --

**Q.**   THERE'S NO QUESTION PENDING, DOCTOR, BUT THANK YOU.

**A.**   I WAS JUST EXPLICATING YOUR QUESTION.

**Q.**   YOU SPOKE ABOUT ORDERLIES BRIEFLY.  IT'S NOT TYPICAL FOR

1   CORRECTIONAL INSTITUTIONS TO PUT INMATE ORDERLIES IN A POSITION

2   WHERE IF THEY DID SOMETHING WRONG, IT WOULD CONSTITUTE

3   NEGLIGENCE, RIGHT?

4   **A.**   I DON'T KNOW THAT I OUGHT TO RESPOND TO THAT, MR. DUBNER.

5   INMATE ORDERLIES ARE USED FOR ACTIVITIES OF DAILY LIVING.  THEY

6   ARE FREQUENTLY USED IN INFIRMARIES AND THINGS LIKE THAT.  COULD

7   LIABILITY ARISE FROM ANY OF THEIR ACTIONS?  SURE.  LIABILITY

8   CAN ARISE FROM ANY OF OUR ACTIONS.

9   **Q.**   IN YOUR DEPOSITION I ASKED YOU THE SAME QUESTION, RIGHT,

10  WHETHER IT WAS TYPICAL FOR INMATE ORDERLIES TO BE PUT IN A

11  POSITION WHERE IF THEY DID SOMETHING WRONG, IT WOULD BE

12  NEGLIGENCE?

13         **MR. ARCHEY:**  YOUR HONOR, ARE WE INTO A LEGAL AREA

14  HERE?  HE'S ASKING HIM QUESTIONS WHICH SEEM TO HAVE THE LEGAL

15  THAT THE COURT HAS BEEN FAIRLY CLEAR THAT WE'RE NOT GOING TO BE

16  TESTIFYING AS TO LEGAL OPINIONS.

17         **MR. DUBNER:**  AND I APPRECIATE THAT.  LET ME CLARIFY

18  THE QUESTION A LITTLE BIT BECAUSE I'M CERTAINLY NOT TRYING TO

19  ASK HIM FOR HIS LEGAL OPINION ABOUT WHAT WOULD BE NEGLIGENCE.

20         **THE COURT:**  ASK A DIFFERENT QUESTION.

21  BY MR. DUBNER:

22  **Q.**   YOU THINK THAT AS LONG AS ORDERLIES STICK TO WHAT'S IN

23  LSP'S TRAINING PROGRAM, THEY'D BE WITHIN APPROPRIATE

24  BOUNDARIES, RIGHT?

25  **A.**   YES.

1   12:16   **Q.**   BUT YOU DON'T KNOW WHETHER DEFENDANTS DO ANYTHING TO MAKE

2   SURE THE ORDERLIES UNDERSTAND THE TRAINING PROGRAM, DO YOU?

3   **A.**   WELL, I SAW THE CURRICULUM AND THE DOCUMENT OF THE

4   ATTENDEES, AND MY RECOLLECTION IS IN THE CURRICULUM THERE WAS

5   AN EXAMINATION.

6   **Q.**   I'M SORRY.  AN EXAMINATION OF WHAT?

7   **A.**   THE CURRICULUM OF WHAT THEY COULD AND COULD NOT DO, AND

8   THINGS LIKE THAT.

9   **Q.**   BUT THE CONTENTS OF THE TRAINING PROGRAM, AS LONG AS

10   ORDERLIES STICK TO THOSE CONTENTS, THEY WOULD BE WITHIN

11   APPROPRIATE BOUNDARIES IN YOUR MIND?

12   **A.**   MY RECOLLECTION, AS WE SIT HERE, WAS THE CONTENT OF THE

13   CURRICULUM WAS DIRECTED TOWARDS ACTIVITIES OF DAILY LIVING, AND

14   THAT'S WHAT I WITNESSED WHEN I WAS THERE AND WHEN I ASKED THE

15   INMATE ORDERLIES WHAT THEY DO.

16          **MR. DUBNER:**  AND I'LL JUST MOVE TO STRIKE ABOUT WHAT

17   THE INMATE ORDERLIES MAY OR MAY NOT HAVE TOLD HIM.

18          **MR. ARCHEY:**  YOUR HONOR, HE'S ON CROSS-EXAMINATION.

19   HE WAS ASKED THE QUESTION.  HE GAVE THE ANSWER AND HE'S AN

20   EXPERT.  THAT WAS A FAIR RESPONSE.

21          **THE COURT:**  MOTION TO STRIKE IS DENIED.

22   **BY MR. DUBNER:**

23   **Q.**   BUT YOU DON'T KNOW SPECIFICALLY WHETHER DEFENDANTS MAKE

24   SURE ORDERLIES DEMONSTRATE COMPETENCE BEFORE THEY BEGIN WORKING

25   AS AN ORDERLY, DO YOU?

1  **A.**    I WOULDN'T KNOW HOW TO ASSESS THAT.

2  **Q.**    AND YOU DON'T KNOW WHETHER THE ORDERLY TRAINING

3  ACCOMMODATED INMATES' EDUCATION LEVELS, DO YOU?

4  **A.**    I DON'T RECALL.

5  **Q.**    BUT YOU DO KNOW THAT ORDERLIES PROVIDE ACTIVITIES OF DAILY

6  LIVING IN THE INFIRMARY, RIGHT?

7  **A.**    YES.

8  **Q.**    LET'S TALK ABOUT SOME OF THE PATIENTS IN YOUR REPORT, SOME

9  OF THEM YOU'VE DISCUSSED TODAY.  I DON'T WANT TO SPEND A LOT OF

10  TIME GOING THROUGH THESE, BUT IF WE COULD GO THROUGH A FEW

11  EXAMPLES.  YOU TALKED ABOUT MR. OTTO BARRERA AND YOU SAID THAT

12  HE RECEIVED ADEQUATE CARE, CORRECT?

13  **A.**    YES.

14  **Q.**    YOU STATED IN YOUR REPORT THAT MR. BARRERA HAS BEEN SEEN

15  REGULARLY IN THE ORAL AND MAXILLOFACIAL CLINIC FOLLOWING HIS

16  INJURY, CORRECT?

17  **A.**    YES.

18  **Q.**    AND HIS INJURY WAS SOMETIME IN 2012 OR 2013, CORRECT?

19  THEREABOUTS.

20  **A.**    I THINK THAT'S WHEN HE SHOT HIMSELF, THEREABOUTS, YES.

21  **Q.**    AND HE ARRIVED IN 2013 AT LSP?

22  **A.**    I DON'T REMEMBER.

23  **Q.**    AND I'M NOT EVEN GOING TO TOUCH IT.  HE WENT TO THE ORAL

24  AND MAXILLOFACIAL CLINIC ON FEBRUARY 12, 2014, RIGHT?

25  **A.**    I WOULD HAVE TO ACCEPT YOUR WORD FOR THAT.  I DON'T KNOW.

1  Q.   WE CAN PULL UP SOME MEDICAL RECORDS, DOCTOR.  IF WE COULD

2  HAVE JOINT EXHIBIT 10-D1 AT PAGE 03741.  DOCTOR, DOES THIS

3  APPEAR TO BE A NOTE FROM THE ORAL AND MAXILLOFACIAL CLINIC?

4  A.   IT DOES.

5  Q.   AND THE DATE ON IT, IS THAT FEBRUARY 12, 2014?

6  A.   YES.

7  Q.   AND THE PROVIDER ASKED TO SEE MR. BARRERA AGAIN IN TWO

8  WEEKS, CORRECT?

9  A.   THAT'S CORRECT.

10 Q.   DO YOU KNOW WHEN THE PROVIDER OR ANY ORAL MAXILLOFACIAL

11 PROVIDER SAW HIM NEXT?

12 A.   NO, I DO NOT, AND THE PROVIDER HAS CIRCLED "GREATER THAN

13 TWO WEEKS TIME."

14 Q.   HE'S ALSO CIRCLED "LESS," CORRECT?

15 A.   YES.

16 Q.   AND THEN HE SPECIFICALLY SAID "IN TWO WEEKS"?

17 A.   YES.

18 Q.   AND IF WE COULD GO TO PAGE 04065.  THIS IS THE SAME DATE,

19 SAME APPOINTMENT.  DOES THAT LOOK CORRECT?

20 A.   YES, IT APPEARS TO BE.

21 Q.   AND THERE AGAIN, IF WE LOOK AT THE BOTTOM UNDER "PLAN," IT

22 SAYS "FOLLOW-UP IN TWO WEEKS FOR SURGICAL WORKUP," CORRECT?

23 A.   YES.

24 Q.   SORRY.  "FOLLOW-UP IN APPROXIMATELY TWO WEEKS FOR SURGICAL

25 WORK UP."

1  **A.**   YES.

2  **Q.**   AND HE WAS THEN LOST TO FOLLOW-UP FOR ABOUT TWO YEARS,

3  WASN'T HE?

4  **A.**   I DON'T RECALL.  YOU'D HAVE TO DEMONSTRATE THAT TO ME.

5  **Q.**   OKAY.

6  **A.**   WHEN YOU SAY "LOST TO FOLLOW-UP," I DON'T REMEMBER, AS WE

7  SIT HERE, WHETHER MR. BARRERA REFUSED TREATMENT OR WHETHER HE

8  DIDN'T COME BACK TO CLINIC OR THE PHYSICIANS TAKING CARE OF HIM

9  FELT HE WAS DOING WELL ENOUGH THAT HE DIDN'T NEED FURTHER

10 EVALUATION AT THIS TIME.

11 **Q.**   IS THE PHRASE "LOST TO FOLLOW-UP" SOMETHING THAT'S USED IN

12 THE MEDICAL WORLD?

13 **A.**   YES.

14 **Q.**   AND WHAT DOES IT MEAN?  STRIKE THAT.

15        LET'S LOOK AT PAGE 04062.  THE DATE OF THIS REQUEST

16 IS JANUARY 15, 2016, RIGHT?

17 **A.**   YES.

18 **Q.**   AND IF YOU LOOK AT THE NAME BELOW UNDER "PRINT NAME," I

19 BELIEVE THAT'S CINDY PARK; IS THAT RIGHT?

20 **A.**   YES.

21 **Q.**   AND THAT'S THE NURSE PRACTITIONER WHO YOU MET?

22 **A.**   YES.

23 **Q.**   BUT WHOSE NAME YOU COULDN'T REMEMBER?

24 **A.**   YES.

25 **Q.**   IF YOU LOOK AT THE SECOND LINE UNDER "CLINICAL HISTORY,"

1    SHE SAID, "LOST TO FOLLOW-UP.  SEEN 2/20/14," CORRECT?

2    **A.**   YES.  AND AS I MENTIONED, THERE'S A LOT OF REASONS FOR

3    BEING LOST TO FOLLOW-UP.

4    **Q.**   AND, AGAIN, MY ONLY QUESTION WAS IS THAT CORRECT, DOCTOR.

5    IF YOUR COUNSEL WANTS TO ASK ABOUT THE REASONS, THEY ARE

6    WELCOME TO DO SO.

7            LET'S TALK ABOUT MR. ADAMS BRIEFLY.  YOU SPOKE ABOUT

8    ALTON ADAMS.  YOU REFERRED TO HIS SMOKING, CORRECT?

9    **A.**   YES, SIR.

10   **Q.**   YOU DIDN'T MENTION THAT IN YOUR REPORT, DID YOU?

11   **A.**   I DON'T RECALL.  IT'S SOME OF THOSE THINGS THAT YOU

12   CAN'T -- I DON'T MENTION EVERY SINGLE ITEM IN MY REPORT WHEN

13   WE'RE TALKING ABOUT OVER 20 PATIENTS, AND I HAVE A DEADLINE.

14   **Q.**   SO YOU'RE SAYING YOUR REPORT WAS NOT AS THOROUGH AS YOU

15   MIGHT HAVE WANTED IT TO BE?

16   **A.**   MY REPORT WAS NOT AS EXPLICATIVE AS I WOULD HAVE LIKED IT

17   TO HAVE BEEN, CONSIDERING THE DEADLINE THAT I WAS WORKING

18   UNDER.

19   **Q.**   AND YOU MAY HAVE MISSED SOME THINGS THAT MIGHT HAVE BEEN

20   IMPORTANT TO YOUR CONCLUSIONS?

21   **A.**   I DON'T BELIEVE I DID.  THAT'S NOT WHAT I SAID.

22   **Q.**   OH, AND I'M JUST ASKING.

23   **A.**   I DID NOT WRITE EVERYTHING I SAW.

24   **Q.**   AND SO WITH MR. ADAMS, SOME OF THE THINGS THAT YOU -- BUT

25   YOU DID TRY TO WRITE THE IMPORTANT THINGS, RIGHT?

1    **A.**   YEAH, I TRIED TO WRITE THE -- HIT THE HIGHLIGHTS, YES.

2    **Q.**   AND HERE TODAY, YOU TRIED TO TESTIFY ABOUT THE IMPORTANT

3    THINGS, RIGHT?

4    **A.**   YES.

5    **Q.**   BUT THE SMOKING THAT YOU TESTIFIED ABOUT, THAT'S NOT IN

6    THE REPORT, IS IT?

7    **A.**   IT'S IN HIS MEDICAL RECORD.

8    **Q.**   BUT IT'S NOT IN YOUR REPORT, IS IT, DOCTOR?

9    **A.**   THAT'S CORRECT.

10   **Q.**   AND IN TERMS OF REFUSALS, YOU MENTIONED ONE REFUSAL IN

11   YOUR WRITE-UP OF MR. ADAMS, CORRECT?

12   **A.**   AS A REPRESENTATIVE SAMPLE, YES.

13   **Q.**   AS A REPRESENTATIVE SAMPLE.

14          COULD YOU PULL UP PAGES 23 THROUGH 24 OF MR. ADAMS --

15   OF DR. THOMAS' REPORT, WHICH IS DX-14, AND THE BATES NUMBERS OF

16   THESE ARE 2894 AND 2895.  IT'S GOING TO GO ONTO A THIRD PAGE,

17   BUT WE CAN GO ONTO THAT IN A MOMENT.

18          DOCTOR, IF YOU SEE ON THE BOTTOM OF PAGE 23,

19   REFERRING TO A SPECIFIC STENT THAT WAS OSTENSIBLY OFFERED TO

20   MR. ADAMS, YOU SAY THAT HE REFUSED THIS SURGICAL PROCEDURE,

21   CORRECT?

22   **A.**   THAT'S CORRECT.

23   **Q.**   AND THEN YOU DON'T MENTION ANYWHERE ELSE ANY OTHER

24   REFUSALS, CORRECT?

25   **A.**   NO.  BUT I GO ON TO SAY AFTER APPROXIMATELY TWO YEARS AS A

1   NATURAL COURSE OF INTERIOR -- OF INCREASE IN ARTERIAL BLOCKAGE,

2   THE STUMP BECAME INFECTED.  IF HE HAD NOT REFUSED CARE, THAT

3   PROBABLY WOULD NOT HAVE HAPPENED.  IT'S IMPLICIT IN THERE, MR.

4   DUBNER.

5   **Q.**   OKAY.  YOU ALSO SPOKE ABOUT DIET TODAY.

6   **A.**   YES.

7   **Q.**   YOU DIDN'T MENTION DIET ANYWHERE IN YOUR REPORT EITHER,

8   DID YOU?

9   **A.**   I DON'T REMEMBER.  PROBABLY NOT.

10  **Q.**   AND YOUR COUNSEL SAID SOMETHING ABOUT GOOD OUTCOMES.

11  WOULD YOU SAY THAT MR. ADAMS HAD A GOOD OUTCOME?

12  **A.**   CONSIDERING MR. ADAMS' DISEASE AND HIS LACK OF CARE FOR

13  HIMSELF AND HIS REFUSALS, I THINK HE HAD THE BEST OUTCOME

14  POSSIBLE, BUT NO, I WOULDN'T CONSIDER IT A GOOD OUTCOME.  I

15  WOULDN'T WANT IT TO HAPPEN TO ME OR MY CHILDREN.

16  **Q.**   LET'S TALK ABOUT IAN CAZENAVE.  YOU STATE IN YOUR REPORT

17  THAT MR. CAZENAVE HAD BEEN FREQUENTLY AND REGULARLY SEEN IN

18  SPECIALTY CLINICS, RIGHT?

19  **A.**   YOU'LL HAVE TO REFRESH ME ON THAT ONE.

20  **Q.**   ABSOLUTELY.  MR. CAZENAVE IS A PATIENT WITH SICKLE CELL

21  DISEASE.  DOES THAT REFRESH OR WOULD YOU LIKE TO SEE THE

22  REPORT?

23  **A.**   I REMEMBER MR. CAZENAVE HAVING SICKLE CELL DISEASE AND

24  BEING EVALUATED FOR A SPLENECTOMY, BUT IT'S VAGUE, IF YOU WOULD

25  REFRESH ME, I WOULD APPRECIATE IT.

1   Q.   ABSOLUTELY, ABSOLUTELY.  IF WE COULD PULL UP PAGES --
2   START WITH PAGE 30 OF HIS REPORT, WHICH IS 2901 OF D-14, JUST
3   SO YOU CAN SEE THE FIRST LINE.  IT'S THE ONLY THING ON PAGE 30,
4   AND THEN WE'LL SHOW YOU 31 AND 32.
5            MR. ARCHEY:  YOUR HONOR, I'M GOING TO OBJECT.  I DID
6   NOT ASK HIM ABOUT MR. CAZENAVE, AND SO THIS IS OUTSIDE THE
7   SCOPE OF MY DIRECT.
8            MR. DUBNER:  IT GOES TO THE CREDIBILITY AND THE
9   RELIABILITY OF HIS REPORT.  I'LL ALSO JUST NOTE THAT THIS IS
10  THE SAME THING THAT MR. ARCHEY DID WITH EVERY ONE OF OUR
11  PLAINTIFFS.  MY ONLY OBJECTION WAS CUMULATIVENESS, AND IF I GET
12  CUMULATIVE, PLEASE LET ME KNOW AND I WILL STOP.
13           THE COURT:  IF IT GOES TO THE WITNESS'S RELIABILITY,
14  I'LL ALLOW IT.  THE OBJECTION IS OVERRULED.
15           MR. DUBNER:  SO IF WE COULD GET 31 AND 32.
16  BY MR. DUBNER:
17  Q.   SO YOU SAY AT THE BOTTOM OF 31, MR. CAZENAVE HAS BEEN
18  FREQUENTLY, REGULARLY AND RECENTLY SEEN IN SPECIALTY CLINICS
19  INCLUDING PLASTIC SURGERY (WOUND CARE) WHO RECOMMENDED FREQUENT
20  DRESSING CHANGES WHICH HE UNDERGOES?
21  A.   YES.
22  Q.   HEMATOLOGY IS A SPECIALTY THAT PEOPLE WITH SICKLE CELL
23  DISEASE FREQUENTLY SEE, CORRECT?
24  A.   YES.
25  Q.   AND CAN YOU TELL THE COURT HOW OFTEN MR. CAZENAVE SAW A

1  HEMATOLOGIST BETWEEN 2010 AND 2016?

2  **A.**   I DON'T KNOW.

3  **Q.**   IN FACT, HIS RECORDS SAY AS OF 2016, THAT HE HADN'T BEEN

4  SEEN BY A HEMATOLOGIST SINCE THE 1990S; IS THAT CORRECT?

5  **A.**   I DON'T KNOW.

6  **Q.**   LET'S LOOK AT JOINT EXHIBIT 10-K1.  FIRST, LOOKING AT PAGE

7  103 -- SORRY -- 10347, AND THIS IS A NOTE FROM MARCH 2ND OF

8  2016; IS THAT CORRECT?

9  **A.**   YES.

10  **Q.**   AND IT SAYS "PATIENT HAS NOT BEEN FOLLOWED BY A

11  HEMATOLOGIST SINCE THE 1990S"; IS THAT CORRECT?

12  **A.**   THAT'S WHAT IT SAYS, YES.

13  **Q.**   AND THE FIRST TIME THAT MR. CAZENAVE SAW A HEMATOLOGIST

14  WAS IN 2016, AFTER HE WAS HOSPITALIZED FOR AN INFECTION IN THE

15  BLOOD STREAM, AND THEN A NON-LSP PHYSICIAN SAW THE CARE HE WAS

16  GETTING; IS THAT CORRECT?

17  **A.**   YES.

18  **Q.**   AND THE HEMATOLOGIST, WHEN HE FINALLY SAW ONE, REFERRED

19  HIM TO A WOUND CARE CLINIC IN FEBRUARY OF 2016; IS THAT RIGHT?

20  **A.**   YES.

21  **Q.**   AND DEFENDANTS DIDN'T SEND HIM TO THE WOUND CARE CLINIC

22  FOR AT LEAST SIX MONTHS, DID THEY?

23  **A.**   I WOULD HAVE TO -- I DON'T RECALL THAT.  I DO RECALL THAT

24  SICKLE CELL DISEASE IS ONE OF THOSE DISEASES THAT CAN BE

25  TREATED BY ALMOST ANY PHYSICIAN.  YOU DON'T REQUIRE A

1    HEMATOLOGIST EVERY TIME.  NOW, AS HE WAS PROGRESSIVELY GETTING

2    WORSE, IT WAS APPROPRIATE TO SEND HIM TO A HEMATOLOGIST WHO

3    STARTED HIM ON MODERN TREATMENT, WHICH IS HYDROXYUREA AND FOLIC

4    ACID.

5         I DON'T REMEMBER, AS WE SIT HERE NOW, AND I'D HAVE TO

6    LOOK AT MY STUFF, WHETHER HIS WOUND CARE WAS BEING TREATED AT

7    LSP IN NSU 2 WHERE HE WAS LOCATED OR THEN EVENTUALLY SENT TO

8    LSU.

9    Q.    IF SPECIALISTS WERE REPEATEDLY REFERRING HIM TO THE WOUND

10   CARE CLINIC AND HE WASN'T BEING SENT, IS THAT SOMETHING YOU

11   WOULD HAVE COMMENTED ON IN YOUR REPORT?

12   A.    I THINK SO.

13   Q.    SO OUTSIDE DOCTORS, SPECIALISTS, DID REFER HIM TO THE

14   WOUND CARE CLINIC AT LEAST FIVE TIMES BETWEEN FEBRUARY AND MAY

15   OF 2016, DIDN'T THEY?

16   A.    I DON'T KNOW.  I DON'T REMEMBER.

17   Q.    LET'S LOOK AT THAT.  LET'S START WITH PAGES 10341 AND

18   10344.  THIS IS STEPPING BACK TO FEBRUARY 8, 2016, AND IF WE

19   LOOK ON THE SECOND PAGE UNDER "FOOT WOUND," IT SAYS, "PLEASE

20   SCHEDULE FOLLOW-UP TELEMED WITH WOUND CARE AND DERM (TWO

21   WEEKS.)"  IS THAT CORRECT?

22   A.    YES, I SEE WHERE YOU'RE SAYING THAT.

23   Q.    AND DO YOU KNOW WHETHER THAT HAPPENED?

24   A.    I DO NOT KNOW WHETHER THAT HAPPENED BECAUSE THEY HAVE

25   THEIR OWN PODIATRIST THAT COMES IN AND THEY ARE ALSO EXPERTS IN

FOOT AND WOUND CARE.

Q.    YOU REVIEWED THE MEDICAL RECORDS IN THIS CASE, CORRECT?

A.    YES.

Q.    AND DID YOU SEE ANY RECORDS OF THIS PATIENT BEING SENT TO THE WOUND CARE CLINIC?

A.    TO A WOUND CARE CLINIC OUTSIDE OF LOUISIANA STATE PRISON?

Q.    TO ANY WOUND CARE.

A.    IS THAT YOUR QUESTION?

Q.    TO ANY WOUND CARE CLINIC.

A.    I DON'T REMEMBER.

Q.    AND SPECIFICALLY TO AN OUTSIDE CLINIC?

A.    NO, HE WAS NOT SENT TO AN OUTSIDE CLINIC.

Q.    AND HE WAS NOT SEEN BY TELEMEDICINE WITH OUTSIDE WOUND CARE SPECIALISTS?

A.    I DON'T BELIEVE THAT.  I BELIEVE WHAT YOU STATED IS CORRECT.

Q.    AND LET'S LOOK, SO THIS WAS FEBRUARY 8TH.  LET'S LOOK AT PAGES 10331 AND 10333, AND THIS IS FROM MARCH 24, 2016.  IF YOU LOOK AT THE BOTTOM OF THE HPI SECTION, WHAT DOES HPI STAND FOR?

A.    HISTORY OF THE PRESENT ILLNESS.

Q.    THAT'S A TYPICAL PART OF MEDICAL CHARTS?

A.    YES, SIR.

Q.    IT SAYS "HE HAS NOT SEEN WOUND YET"; IS THAT CORRECT?

A.    THAT'S WHAT IT SAYS.

Q.    AND THEN IF YOU LOOK AT THE BOTTOM OF PAGE 10333, IT SAYS

1  "REFER TO WOUND CARE WITH ASAP APPOINTMENT DUE TO INCREASED

2  RISK OF INFECTION."  DO YOU SEE THAT?

3  A.   YES.

4  Q.   AND DO YOU RECALL WHETHER ANYTHING IN THE MEDICAL RECORDS

5  SHOWS THAT HAPPENING?

6  A.   NO, I DO NOT RECALL THAT.

7  Q.   AND THEN LET'S LOOK AT 10324.  THIS IS APRIL 4, 2016, AND

8  HERE AGAIN, IF WE LOOK AT THE NEXT-TO-LAST LINE, IT SAYS

9  "CONSULT TO AMBULATORY WOUND CARE CLINIC FOR WOUND CARE."  DO

10  YOU SEE THAT?

11  A.   YES.

12  Q.   AND DO YOU KNOW WHETHER THAT HAPPENED?

13  A.   NO, I DO NOT.

14  Q.   DO YOU KNOW WHETHER THERE'S ANY EVIDENCE IN THE RECORD

15  THAT THAT HAPPENED?

16  A.   I DO NOT KNOW THAT.

17  Q.   AND IF WE LOOK AT 10669, THIS ALSO, IF WE COULD FOCUS ON

18  THE BOTTOM OF THE PAGE, FIRST, THE ENCOUNTER DATE, THIS IS

19  MAY 26TH; IS THAT CORRECT?

20  A.   YES.

21  Q.   AND CAN YOU READ THE LAST LINE UNDER NO. 2?

22  A.   "REFER TO WOUND CARE ASAP.  PATIENT HAS OSTEOMYELITIS."

23  AND YOU'RE LOOKING AT THE EVALUATION FROM A MEDICAL CENTER.  IF

24  THIS PATIENT WERE IN MY CARE, I WOULD BE VERY CONCERNED ABOUT

25  HIS OSTEOMYELITIS AND WOULD FEEL THAT HIS WOUND COULD BE

HANDLED LOCALLY.

**Q.**    AND YOU HAD SAID IN YOUR REPORT THAT THE -- YOU SAID THAT

HE WAS RECENTLY SEEN IN SPECIALTY CLINICS, INCLUDING PLASTIC

SURGERY, AND THEN YOU PUT IN PARENTHESES, WOUND CARE.  ARE YOU

SAYING THAT PLASTIC SURGERY AND WOUND CARE ARE THE SAME THING?

**A.**    PLASTIC SURGEONS DO WOUND CARE, A LOT OF WOUND CARE.

**Q.**    AND IF WE COULD GO --

**A.**    THAT'S NOT THE SAME THING.

**Q.**    AND IF WE COULD GO TO 10313, I MAY HAVE SKIPPED THIS ONE

BY ACCIDENT.  THIS IS AN APRIL 20, 2016 CHART.  AND THIS IS BY

THE PLASTIC SURGEON, CORRECT?  OR BY A PLASTIC SURGEON?

**A.**    YES.

**Q.**    AND EVEN THE PLASTIC SURGEON IS SAYING "REFERRAL TO WOUND

CARE," CORRECT?

**A.**    YES.

**Q.**    OKAY.  YOU ALSO STATED IN YOUR REPORT THAT MR. CAZENAVE'S

MOST RECENT STUDIES SHOWED A NEW CARDIOMEGALY; IS THAT CORRECT?

**A.**    I BELIEVE THAT'S CORRECT.

**Q.**    CARDIOMEGALY IS AN ENLARGED HEART?

**A.**    YES.

**Q.**    AND YOU WROTE IN YOUR REPORT IN 2016?

**A.**    YES.

**Q.**    THAT CARDIOMEGALY WASN'T NEW?  IT SHOWED UP ON AN X-RAY AS

EARLY AS OF OCTOBER 24, 2013, DIDN'T IT?

**A.**    YES.

1  Q.   AND THERE'S NO EVIDENCE THAT BETWEEN 2013 AND 2016,
2  ANYBODY AT LSP IDENTIFIED THE CARDIOMEGALY AS A PROBLEM,
3  CORRECT?
4  A.   IT FREQUENTLY IS A PART OF SICK CELL DISEASE.
5  Q.   AND I'LL ASK AGAIN.  IS THERE ANY EVIDENCE IN THE MEDICAL
6  RECORDS THAT YOU REVIEWED THAT SHOWS THAT ANYBODY AT LSP
7  IDENTIFIED THE CARDIOMEGALY AS A PROBLEM BETWEEN 2013 AND 2016?
8  A.   I DON'T KNOW.
9  Q.   SO I'D LIKE TO TALK ABOUT ONE MORE OF THE NAMED
10  PLAINTIFFS, SHANNON HURD, IF WE COULD GO TO PAGE 50 OF YOUR
11  REPORT, WHICH IS D-14 AT 2921.  YOU SAY THAT MR. HURD IS A
12  43-YEAR-OLD BLACK MALE, WHO PRESENTED IN DECEMBER OF 2015 WITH
13  GENERALIZED COMPLAINTS OF A PROGRESSIVE DECLINE IN HIS
14  PERFORMANCE STATUS OVER THE PAST SEVERAL MONTHS.
15  A.   YES.
16  Q.   AND YOU SAY A RELATIVELY RAPID AND EXTENSIVE EVALUATION
17  REVEALED HE WAS SUFFERING FROM A LEFT RENAL CELL CARCINOMA?
18  A.   YES.  THAT ENCAPSULATED A LOT OF WHAT HAPPENED WITH MR.
19  HURD.
20  Q.   AND YOUR RECOLLECTION IS THAT WHEN YOU SAY GENERALIZED
21  COMPLAINTS, HE COMPLAINED OF GENERAL MALAISE, WHICH IS
22  GENERALLY NOT FEELING WELL, AND THEN HE COMPLAINED ABOUT NOT
23  BEING ABLE TO DO THINGS, CORRECT?
24  A.   YES.
25  Q.   IN FACT, MR. HURD STARTED MAKING SICK CALL REQUESTS WELL

1  BEFORE DECEMBER OF 2015, DIDN'T HE?

2  **A.**   I DON'T RECALL.

3  **Q.**   WOULD IT SURPRISE YOU TO LEARN THAT HE MADE MORE THAN 30

4  SICK CALL REQUESTS ABOUT SYMPTOMS LIKE COUGH, CHEST PAIN,

5  LEFT-SIDED PAIN, WEIGHT LOSS, NUMBNESS, SHORTNESS OF BREATH,

6  COUGHING UP BLOOD, TESTICULAR RASH, TESTICULAR SWELLING OVER

7  THE COURSE OF TWO YEARS?

8  **A.**   WOULD NOT SURPRISE ME, AND I REMEMBER READING SOME OF

9  THAT.

10  **Q.**   YOU DON'T ACKNOWLEDGE ANY OF THEM IN YOUR REPORT, DO YOU?

11  **A.**   NO.

12  **Q.**   AND SO LET'S LOOK AT SOME OF THE COMPLAINTS THAT HE

13  PRESENTED WITH.  IF WE COULD GO TO JOINT 10-CC2 AT 25719, AND

14  THIS IS FROM SEPTEMBER 25TH OF 2013, HE COMPLAINED OF HURTING

15  ALL OVER; IS THAT CORRECT?

16  **A.**   YES.

17  **Q.**   AND COULD YOU READ WHAT'S WRITTEN IN THE HEALTHCARE

18  PRACTITIONER NOTE SECTION?

19  **A.**   40-YEAR-OLD --

20  **Q.**   I'M SORRY.  THE HEALTHCARE PRACTITIONER NOTES' SECTION.

21  **A.**   "VP," I DON'T KNOW WHAT THAT IS AND THEN "MB."

22  **Q.**   AND CAN YOU TELL ME WHAT DATE THE HEALTHCARE PROVIDER

23  REVIEWED AND SIGNED THIS RECORD?

24  **A.**   NO.

25  **Q.**   AND IF WE LOOK AT 25718, THIS IS TWO DAYS LATER,

1   SEPTEMBER 27, 2013, HE IS COMPLAINING OF SIDE PAIN; IS THAT

2   CORRECT?

3   **A.**   YES.

4   **Q.**   AND IF WE LOOK AT THE SECOND LINE OF THE ASSESSMENT

5   COMMENTS, THE EMT WROTE "SIDE PAIN ONE MONTH"; IS THAT CORRECT?

6   **A.**   YES.

7   **Q.**   AND "STATES HE FEELS AS IF HIS SIDE IS ON FIRE," CORRECT?

8   **A.**   YES.

9   **Q.**   AND, AGAIN, THERE'S NO EVIDENCE OF WHEN THE HEALTHCARE

10  PRACTITIONER REVIEWED OR DID ANYTHING WITH THIS?

11  **A.**   THAT'S CORRECT.

12  **Q.**   AND IF WE GO TO 25715, OCTOBER 4, 2013, HE SAID, "I'M

13  COMING DOWN WITH THE FLU.  MY CHEST FEELS LIKE IT'S ON FIRE.

14  MY BACK IS HURTING"; IS THAT CORRECT?

15  **A.**   YES.

16  **Q.**   AND THE DISPOSITION BY THE EMT WAS TO GIVE HIM

17  OVER-THE-COUNTER ROBITUSSIN?

18  **A.**   YES.

19  **Q.**   AND THE HEALTHCARE PRACTITIONER, AGAIN, DIDN'T WRITE

20  ANYTHING, DIDN'T DATE IT?

21  **A.**   THAT'S CORRECT.

22  **Q.**   AND IF WE GO TO 25714, THIS IS FROM OCTOBER 5, 2013,

23  SELF-DECLARED EMERGENCY, COMPLAINS OF SORE THROAT AND COUGH.

24  **A.**   YES.

25  **Q.**   AND HERE AGAIN, HEALTH PRACTITIONER DOESN'T WRITE

1  ANYTHING, DOESN'T DATE IT?

2  **A.**   THAT'S CORRECT.

3  **Q.**   AND IF WE GO TO 25706.

4  **A.**   IF I CAN MODIFY WHAT I SAID.  THE DISPOSITION WITH THROAT

5  LOZENGES GIVEN AND THROAT SPRAY GIVEN, HE DIDN'T MAKE ANY

6  NOTES.

7  **Q.**   AND THE DISPOSITION, YOU CAN GO BACK TO THAT, ALEXANDER,

8  IF YOU DON'T MIND.  OH, SORRY.  IT'S 25714.  SO THE DISPOSITION

9  SECTION, IS IT YOUR UNDERSTANDING THAT PHYSICIANS FILL IN THAT

10 SECTION ON SICK CALL REQUESTS?

11 **A.**   NO, SIR.

12 **Q.**   THAT'S AN EMT?

13 **A.**   THAT'S AN EMT, YES.

14 **Q.**   AND JUST FOR THE RECORD, DO YOU KNOW WHAT SCPRN MEANS?

15 **A.**   COME BACK AS NEEDED, SICK CALL AS NEEDED.

16 **Q.**   THANK YOU, DOCTOR.

17        LET'S GO TO THE NEXT ONE, 25706, DECEMBER 8, 2013.

18 HE SAYS "I WOULD LIKE TO GET SOMETHING FOR A CHEST COLD," AND

19 THEN OTHER SYMPTOMS THAT WE DON'T NEED TO GET INTO.  HERE

20 AGAIN, DISPOSITION IS SICK CALL AS NEEDED, RIGHT?

21 **A.**   YES.

22 **Q.**   AND NO NOTES FROM THE HEALTHCARE PRACTITIONER, NO DATE?

23 **A.**   YES.

24 **Q.**   AND IF WE GO TO 25703, THIS IS FROM JANUARY 23, 2014,

25 CORRECT?

01:02  1    **A.**    YES.

2    **Q.**    IT'S COMPLAINING OF THE FLU, CORRECT?

3    **A.**    YES.

4    **Q.**    SAME THING.  DISPOSITION, OVER-THE-COUNTER MEDICATION, NO

5    DATE, NO NOTES FROM THE HEALTHCARE PRACTITIONER?

6    **A.**    YES.

7    **Q.**    AND IF WE GO --

8    **A.**    OTHER THAN THE NEW MEDICATIONS ORDERED ARE ALL

9    OVER-THE-COUNTER DRUGS, YES.

10    **Q.**    YES, THANK YOU.

11            AND IF WE GO TO 25525, THIS IS FROM MAY 14, 2014.

12    HE'S COMPLAINING OF SHORTNESS OF BREATH AND MIGRAINE, CORRECT?

13    **A.**    YES.

14    **Q.**    AND THIS TIME THERE ARE SOME NOTES FROM THE HEALTHCARE

15    PRACTITIONER.  CAN YOU TELL ME HOW LONG IT TOOK FOR THE

16    HEALTHCARE PRACTITIONER TO SIGN OFF ON THIS?

17    **A.**    FIVE DAYS.

18    **Q.**    AND IF WE GO TO 25512, WE'RE NOW IN OCTOBER OF 2014,

19    OCTOBER 5, 2014, "I WOULD LIKE TO SEE THE DOCTOR BECAUSE I AM

20    LOSING WEIGHT.  I WAS 247.  NOW IN NO TIME I'M DOWN TO 203.  I

21    WOULD LIKE TO GET ON SOMETHING THAT COULD HELP ME GAIN MY

22    WEIGHT BACK."  IS THAT CORRECT?

23    **A.**    THAT'S WHAT IT SAYS.  IT'S NOT CORRECT.

24    **Q.**    DID I READ IT CORRECTLY?

25    **A.**    YOU READ IT CORRECTLY.

**Q.**    THANK YOU, DOCTOR.

**A.**    THAT'S WHAT IT SAYS.  IT'S NOT THE FACTS.

       **THE COURT:**  YOU SHOULD GO FOR THAT.

       **MR. DUBNER:**  I WAS JUST MAKING THAT DECISION, YOUR

HONOR.

       **THE COURT:**  BECAUSE I'M GOING TO, IF YOU DON'T.

**BY MR. DUBNER:**

**Q.**    AND ON WHAT DO YOU BASE YOUR STATEMENT THAT THAT'S NOT THE

FACTS?

**A.**    HIS MEDICAL RECORD.

**Q.**    AND WHAT SPECIFICALLY IN HIS MEDICAL RECORD?

**A.**    MR. HURD STARTED OUT -- AND I'D HAVE TO LOOK AT THE

MEDICAL RECORD, BUT HIS WEIGHT FLUCTUATED AND HE DID LOSE

WEIGHT, BUT HE HAD A WEIGHT OF 220.  I DON'T REMEMBER THE

HIGHEST WEIGHT, BUT HE AT NO POINT IN TIME, THAT HE

CONSISTENTLY LOST WEIGHT, AND PARTICULARLY 44 POUNDS, BECAUSE

HE'D LOSE WEIGHT AND THEN HE'D GAIN WEIGHT AGAIN, AND THEN HE'D

LOSE WEIGHT.

**Q.**    YES, WE HEARD SOMETHING VERY SIMILAR FROM DEFENSE COUNSEL

A COUPLE WEEKS AGO.  WHEN HE DID GAIN WEIGHT, THAT WAS USUALLY

A COUPLE OF POUNDS, RIGHT?

**A.**    AS WE SIT HERE, I'D HAVE TO LOOK, AND MAYBE MR. ARCHEY

WILL BRING THAT OUT.  IT WAS MORE THAN A COUPLE POUNDS.

**Q.**    AND IS THAT THE ONLY FACT THAT YOU WERE REFERRING TO WHEN

YOU SAY THAT THIS ISN'T THE FACTS?

**A.**   I --

         **THE COURT:**  IN OTHER WORDS, WHAT IS THE BASIS FOR
YOUR CONCLUSION THAT WHAT IS STATED THERE IS NOT FACTUALLY
ACCURATE?

         **THE WITNESS:**  WELL, THE MAJOR THING WAS A 44-POUND
WEIGHT LOSS IN A YEAR.

         **THE COURT:**  SO WHAT IS YOUR -- WHAT IS THE BASIS FOR
YOUR OPINION TO THIS COURT THAT THAT IS AN INACCURATE FACTUAL
STATEMENT?

         **THE WITNESS:**  HIS MEDICAL RECORD THAT SHOWS WEIGHT
LOSS THEN WEIGHT GAIN AND SIGNIFICANT WEIGHT GAIN AND THEN
WEIGHT LOSS AGAIN.

**BY MR. DUBNER:**

**Q.**   AND IS IT YOUR TESTIMONY THAT THE 247 POUNDS IS
INACCURATE?  HE SAYS "I WAS 247."  IS THAT INACCURATE?

**A.**   I DON'T REMEMBER.  I'D HAVE TO LOOK AT HIS RECORD.  I
DON'T THINK HE WAS EVER THAT OBESE, BUT HE MAY HAVE BEEN.

**Q.**   AND HE SAYS "I'M DOWN TO 203."  IS IT YOUR OPINION THAT
THAT'S INACCURATE?

**A.**   I'D HAVE TO LOOK AT THE MEDICAL RECORD.  HE WENT DOWN AND
THEN WENT UP AGAIN, AND THEN WENT DOWN.

**Q.**   AND --

**A.**   HE DID NOT HAVE A CONSISTENT WEIGHT LOSS.

**Q.**   AND LEAVING ASIDE YOUR TESTIMONY THAT THERE WERE
FLUCTUATIONS IN THE TRAJECTORY, ARE YOU DENYING THAT HE WAS, AT

1    ONE POINT, 247 POUNDS AND THEN WAS 203 POUNDS?

2    **A.**   I'M NOT CERTAIN THAT HIS HIGHEST WEIGHT WAS 247, BUT IT

3    PROBABLY WAS.   I'LL ACCEPT YOUR WORD FOR IT.

4            **THE COURT:**   WELL, LET ME ASK YOU THIS:   REGARDLESS OF

5    WHETHER IT'S TRUE OR NOT TRUE, IF A PATIENT COMES TO YOU -- IF

6    YOU WALKED INTO A ROOM TO SEE A PATIENT AND THE PATIENT SAID TO

7    YOU, "DOCTOR, SEVEN MONTHS AGO I WEIGHED 45 POUNDS MORE THAN I

8    WEIGH NOW," WOULD THAT PROVOKE YOU TO DO SOME SORT OF ANALYSIS

9    OR SOME SORT OF EXAMINATION INTO WHAT'S HAPPENING WITH THAT

10   PATIENT?

11           **THE WITNESS:**   YES, MA'AM, IT WOULD.

12           **THE COURT:**   AND IS THAT SOMETHING THAT YOU WOULD

13   EXPECT WOULD BE A ROUTINE MEDICAL PROTOCOL WHEN PRESENTED WITH

14   A HISTORY SUCH AS DOCUMENTED IN THIS RECORD?   WHETHER THE

15   HISTORY IS TRUE OR NOT, IF A PATIENT GIVES YOU THIS HISTORY AND

16   SAYS THIS IS WHAT HAS HAPPENED TO ME, YOU WOULD EXPECT, UNDER

17   ROUTINE MEDICAL PROCEDURE, THAT THAT WOULD BE EXAMINED BY A

18   PHYSICIAN?

19           **THE WITNESS:**   YES, MA'AM, I WOULD.

20           **THE COURT:**   THANK YOU.

21   **BY MR. DUBNER:**

22   **Q.**   AND LET'S GO TO ANOTHER SICK CALL.

23           I APOLOGIZE FOR THE LENGTH OF THIS, YOUR HONOR.   I'M

24   ACTUALLY CUTTING OUT QUITE A FEW.

25           IF WE COULD GO TO 25508.

01:07

1  **A.**   DO YOU KNOW, ON THIS LAST ONE, THAT IT WAS REFERRED TO AN

2  M.D., DID MR. HURD KEEP THAT, OR DID HE REFUSE THAT?  IF YOU GO

3  TO THE LAST ONE THAT YOU SHOWED ME, IT SAYS "KEEP APPOINTMENT

4  WITH M.D."  DO YOU KNOW IF MR. -- IS THIS ONE OF THE ONES MR.

5  HURD REFUSED TO GO TO?

6  **Q.**   AND WHAT'S YOUR RECOLLECTION OF WHAT MR. HURD REFUSED,

7  DOCTOR?

8  **A.**   MR. HURD REFUSED A LOT OF TREATMENTS AND A LOT OF

9  EVALUATIONS.  HE DID NOT WANT BLOOD WORK DONE.

10  **Q.**   AND IS IT YOUR RECOLLECTION THAT AFTER HE COMPLAINED OF

11  WEIGHT LOSS, HE THEN REFUSED TREATMENT ABOUT THAT SYMPTOM, FOR

12  ONE?

13  **A.**   AS I RECALL, THERE WERE MANY REFUSALS, YES.

14  **Q.**   BUT ABOUT THAT SYMPTOM IN PARTICULAR?

15  **A.**   I DON'T REMEMBER THAT.

16  **Q.**   AND YOU DON'T REMEMBER SPECIFICALLY, ASIDE FROM GENERALLY

17  BLOOD WORK, WHAT SPECIFICALLY HE REFUSED, DO YOU?

18  **A.**   AS WE SIT HERE, NO, YOU'D HAVE TO REFRESH ME.

19  **Q.**   OKAY.  AND TO FOLLOW-UP ON THE COURT'S QUESTION, IF THIS

20  PATIENT WAS SEEN IN -- BY A PHYSICIAN AFTER THIS SICK CALL, YOU

21  WOULD WANT THE PROVIDER TO TAKE A HISTORY OF -- THAT WAS

22  RELEVANT TO WEIGHT LOSS, RIGHT?

23  **A.**   YES.

24  **Q.**   THANK YOU.

25          LET'S GO TO 25508, OCTOBER 31, 2014, I WOULD -- AND I

1   THINK THE WORD "LIKE" IS MISSING.  I WOULD LIKE TO GET
2   SOMETHING FOR A SORE THROAT AND A CHEST COLD, AND, AGAIN, OTC
3   AND THE PROVIDER REVIEWED IT WITHOUT MAKING ANY NOTES SEVEN
4   DAYS LATER; IS THAT CORRECT?
5   **A.**   YES.
6   **Q.**   AND IF WE GO TO 25501, APRIL 6, 2015, "I'M REQUESTING TO
7   SEE THE DOCTOR FOR WEIGHT LOSS, AND I WOULD LIKE TO GET
8   SOMETHING FOR A CHEST COLD, AND I'M HAVING CHEST PAIN, BUT NOT
9   BAD," AND THE DOCTOR DIDN'T DATE THIS ONE EITHER; IS THAT
10  CORRECT?
11  **A.**   THERE IS NO DATE ON IT.  IT SAYS UPCOMING APPOINTMENT AND
12  OTHER OVER-THE-COUNTER DRUGS AND RETURN TO SICK CALL PRN, BUT
13  HE HAD AN UPCOMING APPOINTMENT.
14  **Q.**   AND YOU DON'T KNOW, SITTING HERE TODAY, WHAT HAPPENED IN
15  THAT UPCOMING APPOINTMENT?
16  **A.**   NO, SIR, I DON'T REMEMBER AND YOU DIDN'T REFRESH ME.
17  **Q.**   AND IF WE COULD GO TO 25490, MAY 27, 2015.  YOU WROTE,
18  "HANDS AND FEET ARE NUMB," AND IT WAS ABOUT NINE DAYS LATER
19  THAT A PRACTITIONER SIGNED OFF ON THIS; IS THAT CORRECT?
20  **A.**   YES.
21  **Q.**   AND HERE AGAIN, IT SAYS SICK CALL PRN, OR S/C PRN, SICK
22  CALL AS NEEDED, AND KEEP UPCOMING APPOINTMENT, CORRECT?
23  **A.**   YES.
24  **Q.**   YOU DON'T KNOW WHEN THE UPCOMING APPOINTMENT WAS, DO YOU?
25  **A.**   NO.

01:11  1  **Q.**   YOU DON'T KNOW WHETHER THE EMT KNEW WHEN THE UPCOMING

2  APPOINTMENT WAS, DO YOU?

3  **A.**   I HAVE NO KNOWLEDGE OF THAT.

4  **Q.**   AND IF WE LOOK AT -- AND ACTUALLY WHY DON'T WE PUT THIS UP

5  NEXT TO IT, 25491 -- I'M SORRY -- 25489.  THIS IS THE NEXT DAY,

6  MAY 28, 2015.  HE, AGAIN, "MY FINGER AND TOE ARE GONE NOW."

7  ALSO SAYS, "S/C, KEEP UPCOMING APPOINTMENT," CORRECT?

8  **A.**   YES.

9  **Q.**   THIS WAS ALSO NOT REVIEWED UNTIL JUNE 5TH, CORRECT?

10  **A.**   YES.

11  **Q.**   AND, AGAIN, THERE ARE NO NOTES FROM THE PROVIDER, CORRECT?

12  **A.**   THAT'S CORRECT.

13  **Q.**   AND IF YOU LOOK AT JUNE 2, 2015, WHICH IS, I THINK, ABOUT

14  FIVE DAYS AFTER THE SECOND ONE HERE, THIS IS JOINT EXHIBIT

15  25488.  SAME THING.  "I WOULD LIKE TO SEE THE DOCTOR ABOUT THE

16  NUMBNESS IN MY FINGERS AND MY TOES AND I'M BECOMING

17  LIGHTHEADED," AND, AGAIN, WE SEE, "S/C, KEEP UPCOMING

18  APPOINTMENT," CORRECT?

19  **A.**   YES.  YES.

20  **Q.**   AND IT WAS REVIEWED IN THAT SAME JUNE 5TH, THREE DAYS

21  AFTER THIS ONE?

22  **A.**   YES.

23  **Q.**   AND IF WE GO TO JULY 8, 2015, 25474.  JULY 8TH, MR. HURD

24  SAID, "I HAVE A CHEST COLD AND A SORE THROAT.  I NEED SOMETHING

25  FOR MY SKIN, I'M ITCHING ALL THE TIME."  NO HEALTHCARE

1    PRACTITIONER NOTES, NO DATE, CORRECT?

2    **A.**    JUST KEEP APPOINTMENT.

3    **Q.**    AND ON JULY 26, 2015, PAGE 25475, THIS ONE'S A LITTLE HARD

4    TO READ.  I BELIEVE HE SAYS "I WOULD LIKE TO SEE A DOCTOR.  I

5    BELIEVE THAT I HAVE SUGAR DIABETES BECAUSE OF MY WEIGHT LOSS,

6    AND MY TOES AND FINGERS ARE NUMB AND FEEL LIKE THEY ARE ON

7    FIRE.  I'M HAVING CHEST PAIN AND BAD SHORTNESS OF BREATH AND

8    I'M LIGHTHEADED."  THAT WAS REVIEWED BY A DOCTOR ONE DAY LATER,

9    BUT THERE ARE NO NOTES, CORRECT?

10    **A.**    THERE ARE NO NOTES EXCEPT THERE'S A REQUEST FOR A

11    URINALYSIS.

12    **Q.**    AND WHERE DO YOU SEE THAT, DOCTOR?

13    **A.**    UNDER "DISPOSITION:  U/A."  THAT'S A TYPICAL MEDICAL

14    REQUEST FOR A URINALYSIS.

15    **Q.**    AND AS WE SAID BEFORE, THE DISPOSITION SECTION IS

16    COMPLETED BY EMTS, CORRECT?

17    **A.**    I'M SORRY.  SAY THAT AGAIN.

18    **Q.**    AS WE SAID BEFORE, THE DISPOSITION SECTION OF HEALTHCARE

19    REQUEST FORMS AT LSP IS COMPLETED BY EMTS, CORRECT?

20    **A.**    YES.

21    **Q.**    AND IF WE GO TO 25470, AUGUST 27, 2015, HE COMPLAINS OF

22    RASH ON TESTICLES; IS THAT CORRECT?

23    **A.**    YES.

24    **Q.**    AND THAT WAS REVIEWED BY A PHYSICIAN FOUR DAYS LATER?

25    **A.**    YES.

1    **Q.**   AND THE EMT PROVIDED OVER-THE-COUNTER OR A REQUEST WITH

2    PHARMACY FOR ZINC OXIDE?

3    **A.**   YES.

4    **Q.**   AND TESTICULAR RASH IS A SYMPTOM OF -- IS A SYMPTOM OF

5    RENAL CELL CARCINOMA, CORRECT?

6    **A.**   IT CAN BE.  IT'S NOT A COMMON ONE, BUT IT CAN BE.

7    **Q.**   AND I HAVEN'T ASKED YOU THIS ABOUT THE OTHER THINGS THAT

8    I'VE BEEN TALKING ABOUT, BUT NUMBNESS, SORE THROAT, CHEST COLD,

9    CHEST PAIN, LOSING WEIGHT, FLU, SIDE PAIN, THOSE CAN ALL BE

10   SYMPTOMS OF RENAL CELL CARCINOMA, AMONG OTHER THINGS?

11   **A.**   PAIN IN THE ABDOMEN, WEIGHT LOSS, BLOOD IN THE URINE, AND

12   AN ABDOMINAL MASS ARE THE HALLMARKS OF RENAL CELL CARCINOMA,

13   AND THOSE ARE THE THINGS THAT IF A PATIENT PRESENTS WITH, YOU

14   SHOULD EVALUATE FOR RENAL CELL CARCINOMA.

15   **Q.**   THANK YOU, DOCTOR.

16   **A.**   ARE THERE OTHER THINGS THAT ARE ASSOCIATED WITH IT LIKE A

17   TESTICULAR RASH, COULD BE.  LIKE A COUGH, COULD BE.

18   **Q.**   THANK YOU.

19           AND IF WE LOOK AT 25469, SEPTEMBER 15, 2015.  WE'RE

20   GETTING CLOSE TO YOUR DECEMBER 2015 DATE IN YOUR REPORT.

21   SELF-DECLARED EMERGENCY, COUGHING UP BLOOD, INTERMITTENT

22   SHORTNESS OF BREATH.  S-O-B MEANS SHORTNESS OF BREATH; IS THAT

23   CORRECT?

24   **A.**   YES, SIR.

25   **Q.**   FOR ONE WEEK.  FINGERS AND TOES NUMB.  THIS WAS REFERRED

1    TO AN M.D.?

2    **A.**    YES.

3    **Q.**    IS THIS THE FIRST ONE THAT YOU RECALL SEEING AN EMT REFER

4    IT TO AN M.D. IN THE CHARTS THAT I SHOWED YOU?

5    **A.**    NO, SIR.  THERE WERE SEVERAL OTHERS.

6    **Q.**    WHERE IT SAID M.D., RATHER THAN KEEP UPCOMING APPOINTMENT?

7    **A.**    WELL, YES.

8    **Q.**    LET ME REPHRASE THE QUESTION.  YOU SAW OTHER REPORTS WHERE

9    IT SAID "KEEP UPCOMING APPOINTMENT," CORRECT?

10   **A.**    YES.

11   **Q.**    DID YOU SEE OTHERS WHERE IT SAID "M.D."?

12   **A.**    I DON'T RECALL.

13   **Q.**    AND DID YOU SEE OTHERS WHERE THE EMT SAID "M.D. SHOULD

14   REVIEW IMMEDIATELY"?

15   **A.**    NO, I DON'T RECALL SEEING THAT.

16   **Q.**    THANK YOU.

17           AND IF WE GO TO 25462, OCTOBER 28, 2015, SDE, THAT'S

18   ANOTHER SELF-DECLARED EMERGENCY, CORRECT?

19   **A.**    YES.

20   **Q.**    HE SAYS "LEFT SIDE PAIN, LEG PAIN FOR TWO MONTHS," AND THE

21   DOCTOR WRITES "S/C" FOR SICK CALL, CORRECT?

22   **A.**    YES.

23   **Q.**    AND THEN IF WE LOOK AT 25457.

24   **A.**    WELL, ON THIS ONE HE STATES HE FELL.  UNDER DISPOSITION,

25   "PATIENT SEEN HAVING FELL ON THE LEFT SIDE."

**Q.**   YES.  SO HE'S NOW BEEN SUFFERING FROM SIDE PAIN AND LEG

PAIN FOR TWO MONTHS AND HE FELL DOWN; IS THAT CORRECT?  AFTER

TWO MONTHS OF SIDE AND LEG PAIN.  IS THAT WHAT YOU'RE

EXPLAINING?

**A.**   I DON'T SEE A CLEAR INDICATION EXCEPT ON ONE TIME OF WHERE

HE COMPLAINED OF ABDOMINAL PAIN OR SIDE PAIN, BUT I DON'T

REMEMBER IF IT WAS TWO MONTHS AGO.

**Q.**   AND IF --

**A.**   HE HAD COMPLAINTS OF UPPER RESPIRATORY PROBLEMS AND OTHER

THINGS.

**Q.**   AND WHERE IT SAYS "THE TOP LEFT SIDE PAIN, LEG PAIN X TWO

MONTHS, THAT X MEANS, IS USED IN THE MEDICAL PRACTICE TO MEAN,

IT'S BEEN GOING ON FOR ROUGHLY SPEAKING?

**A.**   TWO MONTHS.

**Q.**   THANK YOU.

         AND THE DISPOSITION -- NOT DISPOSITION -- BUT WHAT

THE HEALTHCARE PRACTITIONER WROTE AFTER THIS PATIENT REPORTED

HAVING SIDE PAIN AND LEG PAIN FOR TWO MONTHS AND THEN FALLING

DOWN IS SICK CALL AS NEEDED?

**A.**   SICK CALL.

**Q.**   THANK YOU.

         AND THEN ONE MORE, NOVEMBER 3, 2015, REPORTED BOTH

LEGS SWOLLEN; IS THAT RIGHT?

**A.**   YES.

**Q.**   AND THIS ONE DOES HAVE THAT M.D.; IS THAT CORRECT?

1    **A.**    YES.

2    **Q.**    IT WAS REVIEWED TWO DAYS LATER?

3    **A.**    YES.

4    **Q.**    OH, I'M SORRY.  IT WAS REVIEWED 12 DAYS LATER?

5    **A.**    YES.

6    **Q.**    AND DOCTOR, IF WE COULD GO BACK TO YOUR REPORT AT PAGE 50,

7    YOU STATED IN YOUR REPORT, "MR. HURD IS A 43-YEAR-OLD BLACK

8    MALE WHO PRESENTED IN DECEMBER OF 2015 WITH GENERALIZED

9    COMPLAINTS OF A PROGRESSIVE DECLINE IN HIS PERFORMANCE STATUS

10   OVER THE PAST SEVERAL MONTHS," WOULD YOU LIKE TO CHANGE THAT IN

11   ANY WAY?

12   **A.**    COULD I SEE THE NEXT PAGE, PLEASE.

13   **Q.**    SURE.

14           IF YOU COULD BRING UP 51 AS WELL.

15           THAT PARAGRAPH IS THE ONLY THING YOU WROTE ABOUT MR.

16   HURD, ISN'T IT, DOCTOR?

17   **A.**    OKAY.  AND WHAT WAS YOUR QUESTION, PLEASE?

18   **Q.**    I'LL MOVE ON TO ANOTHER QUESTION.

19           YOU SAY IN THE NEXT SENTENCE THAT "A RELATIVELY RAPID

20   AND EXTENSIVE EVALUATION REVEALED THAT MR. HURD WAS SUFFERING

21   FROM A LEFT RENAL CELL CARCINOMA."  WHEN YOU SAY "A RAPID

22   EVALUATION," YOU'RE REFERRING TO THE CT SCAN THAT WAS PERFORMED

23   ON DECEMBER 16, 2015?  DOES THAT SOUND RIGHT?

24   **A.**    I WOULD PRESUME SO, YES.

25   **Q.**    AND I CAN PULL IT UP.  THIS IS JOINT EXHIBIT 10CC2 AT

25450.  THE DATE ON THIS IS DECEMBER 16TH.  DOES THIS APPEAR TO
BE A REPORT FROM A CT SCAN?

**A.**    YES.

**Q.**    AND IF WE LOOK AT THE IMPRESSION SECTION, NO. 1, LARGE
HETEROGENOUS ENHANCING MASS ARISING FROM THE UPPER POLE.  THE
LEFT KIDNEY IS STRONGLY CONCERNING FOR A RENAL CELL CARCINOMA.

NO. 2, NUMEROUS NONCALCIFIED SOFT TISSUE NODULES OF
VARYING SIZE THROUGHOUT BOTH LUNGS ARE FELT TO REPRESENT
METASTATIC NEOPLASM.  IS THAT CORRECT?

**A.**    YES.

**Q.**    AND THOSE ARE FINDINGS THAT SHOULD BE RAPIDLY FOLLOWED UP
ON AND EVALUATED?

**A.**    YES.

**Q.**    NOBODY AT LSP ACKNOWLEDGED THOSE FINDINGS AS FAR AS THE
MEDICAL RECORD'S REPORT OR SAW MR. HURD UNTIL JANUARY 11, 2016,
NEARLY A MONTH LATER; ISN'T THAT CORRECT?

**A.**    I PRESUME YOU HAVE DOCUMENTATION, THAT -- I DON'T RECALL
THAT AS I SIT HERE.

**Q.**    YOU HAVE NO BASIS FOR DISPUTING IT?

**A.**    I HAVE NO BASIS FOR DISPUTING IT, THAT'S CORRECT.

**Q.**    AND THE LONGER THAT RENAL CELL CARCINOMA GOES WITHOUT
BEING DETECTED, THE MORE LIKELY IT IS IT WILL BE TERMINAL?

**A.**    WITH NUMEROUS SOFT TISSUE NODULES THROUGHOUT BOTH LUNGS
AND A METASTATIC NEOPLASM, IT'S PROBABLY TERMINAL AT THIS
POINT.

01:21   1   **Q.**   AND THE LONGER THAT RENAL CELL CARCINOMA GOES WITHOUT

2   BEING DETECTED, LEAVING THIS REPORT ASIDE, THE MORE LIKELY IT

3   IS THAT IT WILL BE TERMINAL, CORRECT?

4   **A.**   YES.

5         **MR. DUBNER:**   COULD I HAVE A MOMENT, YOUR HONOR?

6         **THE COURT:**   YOU MAY.

7         **MR. DUBNER:**   THANK YOU.

8   **BY MR. DUBNER:**

9   **Q.**   DOCTOR, YOU ACKNOWLEDGE THAT SOME PATIENTS AT ANGOLA HAVE

10   DIED BECAUSE OF THEIR PHYSICIAN'S INDIVIDUAL APPROACH TO THEIR

11   ILLNESSES, CORRECT?

12   **A.**   I ACKNOWLEDGE THAT SOME PATIENTS AT ANGOLA DIED BECAUSE

13   AND I LOST THE REST OF YOUR SENTENCE.

14   **Q.**   BECAUSE OF THEIR PHYSICIAN'S INDIVIDUAL APPROACH TO THEIR

15   ILLNESSES?

16   **A.**   YES.

17   **Q.**   AND WOULD YOU AGREE THAT WITH THE EXCEPTION OF A FEW

18   VISIONARIES, CONDITIONS OF CONFINEMENT IN CORRECTIONS IMPROVE

19   LARGELY AS A RESULT OF LITIGATION?

20   **A.**   YES.

21   **Q.**   THANK YOU, DOCTOR.  NO FURTHER QUESTIONS.

22         **THE COURT:**   YOU THINK YOU'LL BE MORE THAN TEN

23   MINUTES, SIR?

24         **MR. ARCHEY:**   IF I HAD TO GIVE YOU A REALISTIC

25   ESTIMATE, PROBABLY ABOUT 20, AND I'M NOTORIOUSLY BAD ON TIME

1    ESTIMATES, BUT THAT'S --

2         **THE COURT:**  WELL, LET'S BREAK NOW AND WE'LL BE IN

3    RECESS UNTIL 3:30, AND WE'LL GO FROM 3:30 TO 5:30 TODAY.  WE

4    WILL BE IN RECESS.

5                        **(RECESS.)**

6         **THE COURT:**  BE SEATED.

7              APOLOGIZE FOR THE DELAY.

8              YOUR WITNESS, MR. ARCHEY.

9         **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

10                   **REDIRECT EXAMINATION**

11   **BY MR. ARCHEY:**

12   **Q.**   DR. MOORE, I'D LIKE TO BEGIN BY TALKING ABOUT MR.

13   CAZENAVE, IF I'M SAYING HIS NAME CORRECTLY.  THIS IS THE -- YOU

14   WERE SHOWN DOCUMENTS ABOUT WOUND CARE IN FEBRUARY, MARCH, APRIL

15   OF 2016.  I'D LIKE TO SHOW YOU DOCUMENT NO. 10-10144 SHOWING

16   WOUND CARE TREATMENTS THAT MR. CAZENAVE RECEIVED THROUGHOUT

17   MARCH OF 2016.

18         AND JOHN, MAYBE GO DOWN TO THE BOTTOM, IF WE CAN BLOW

19   THAT UP A LITTLE BIT, MAYBE.

20         DOCTOR, YOU SEE WHERE THIS GENTLEMAN IS RECEIVING

21   WOUND CARE REGULARLY?

22   **A.**   YES, SIR.

23         **MR. ARCHEY:**  AND JOHN, NOW IF YOU COULD SHOW DOCUMENT

24   NO. J10-10140.

25   **BY MR. ARCHEY:**

03:46   1   **Q.**   AGAIN, THIS IS SHOWING THE WOUND CARE THROUGHOUT APRIL OF
2   2016.  IF WE GO DOWN TO THE BOTTOM, THIS DOCUMENT ALSO SHOWS
3   REGULAR WOUND CARE FOLLOW-UP AS ORDERED BY THE OUTSIDE
4   PROVIDERS, CORRECT?
5   **A.**   YES, SIR.
6          **MR. ARCHEY:**  MS. BARBARA, IF WE COULD SWITCH TO THE
7   ELMO WHILE I SET UP WITH MY NEXT --
8   **BY MR. ARCHEY:**
9   **Q.**   DOCTOR, LET ME ASK YOU JUST A COUPLE OF QUESTIONS ABOUT
10  MR. BARRERA.  THIS IS WHERE COUNSEL SUGGESTED THAT HE WAS
11  ORDERED BACK TO ORAL AND MAXILLOFACIAL CLINIC.
12          THEY'RE LAUGHING AT ME, JUDGE, 'CAUSE I CAN'T SAY IT
13  RIGHT.
14          THE FIRST DOCUMENT I WANT TO SHOW YOU IS JOINT
15  EXHIBIT 10-04066, AND THE DATES THAT THEY WERE USING WAS FROM
16  FEBRUARY 12, 2014.  THEY SAY THERE WAS NO CARE.  THIS IS THE
17  RECORD FROM THE ORAL MAXILLOFACIAL CLINIC.  THERE'S YOUR
18  DENTIST SHOWING THAT HE WENT IN MARCH 10, 2014, HAD TEETH
19  EXTRACTED.  DO YOU SEE THAT?
20  **A.**   YES, SIR.
21  **Q.**   ALL RIGHT.  SO, AND ONE MORE, THIS IS DOCUMENT NO. JOINT
22  EXHIBIT 10-03709.  THIS IS APRIL 9, 2014, AGAIN, BEING SEEN
23  OFFSITE AT THE MAXILLOFACIAL CLINIC, HAD A PROCEDURE DONE.
24  DOCTOR, AT THE VERY BOTTOM, "RTC PRN," WHAT DOES MEAN?
25  **A.**   RETURN TO CLINIC AS NEEDED.

**Q.** ALL RIGHT, DOCTOR, LET'S TALK ABOUT MR. SHANNON HURD NOW.
I WANT TO START WITH JOINT EXHIBIT 10-25512.  THIS IS THE
OCTOBER 5, 2014, NOTE WHERE THIS PATIENT COMPLAINS OF -- STATES
THAT HE WAS 247 POUNDS AND NO TIME HE WAS DOWN TO 203 POUNDS.
ALL RIGHT.  THIS WAS A POINT OF CONTENTION IN YOUR
CROSS-EXAMINATION, CORRECT?

**A.** YES, SIR.

**Q.** AND THIS IS WHAT YOU SAID, THIS DOCUMENT WAS INCORRECT?

**A.** YES, SIR.

**Q.** WAS THAT YOUR RESPONSE?

**A.** YES, SIR.

**Q.** LET'S DRILL DOWN ON THAT.  TO GET HIS WEIGHT AT THAT TIME,
LET ME GO TO DOCUMENT NO. JOINT EXHIBIT 10-25511.  THIS IS
OCTOBER 13, 2013, SO EIGHT DAYS AFTER THE PREVIOUS, SHOWS HIM
AT 208 POUNDS.  DO YOU SEE THAT?

**A.** YES, SIR.  HE'S COMPLAINING OF SHOULDER PAIN.

**Q.** OKAY.  SO HE GOT TO SEE A PHYSICIAN AFTER THE PREVIOUS
SICK CALL, AND THERE HE'S COMPLAINING OF SHOULDER PAIN, NO
WEIGHT LOSS.  BUT HIS WEIGHT LOSS IS NOTED AS 208 POUNDS?

**A.** RIGHT.

**Q.** ALL RIGHT.  I NOW WANT TO SHOW YOU -- THIS IS OCTOBER OF
2014, IS THE DOCUMENT WE'RE COMPARING TO.  NOW I WANT TO GO
BACK TO SEPTEMBER 29 OF 2012.  THIS IS JOINT EXHIBIT 10-25774,
AND WHAT IS THE WEIGHT REFLECTED ON THAT DOCUMENT?

**A.** 220 POUNDS.

Q.   OKAY.  LET ME MOVE FORWARD NOW TO MAY 12 OF 2012.  THIS IS
JOINT EXHIBIT 10-25526, SO WE'RE NOW FIVE MONTHS BEFORE THE
DOCUMENT.  WHAT'S THE WEIGHT REFLECTED THERE?

A.   206 POUNDS.

Q.   LET ME GO TO SEPTEMBER 22, 2014, SO WE'RE THE MONTH
BEFORE, AND THIS IS JOINT EXHIBIT 10-25513.  WHAT IS THE WEIGHT
REFLECTED THERE?

A.   206 POUNDS.

Q.   SO THIS PATIENT'S WEIGHT HAD BEEN CONSTANT THROUGHOUT
2014, BASED ON THE RECORDS?

A.   REASONABLY CONSTANT.

Q.   ALL RIGHT.  LET ME MOVE FORWARD NOW TO APRIL 15, 2015.
THIS IS JOINT EXHIBIT 10-25499.  THIS SHOWS A WEIGHT OF
197 POUNDS, CORRECT?

A.   THAT'S CORRECT.

Q.   ALL RIGHT.  AND THE PROVIDER APPARENTLY WENT THROUGH THE
RECORDS AND WROTE DOWN A WEIGHT FROM 2007 OF 249; IS THAT
RIGHT?

A.   YES, SIR.

Q.   SO WE'RE TALKING ABOUT EIGHT YEARS BEFORE, AND THE
PROVIDER NOTES COMPLAINT OF WEIGHT LOSS OVER THE LAST FOUR OR
FIVE MONTHS, CORRECT?

A.   YES, SIR.

Q.   AND HE NOTES IN HIS PLAN ON THE WEIGHT LOSS, AND WHAT IS
THE PLAN ON THE WEIGHT LOSS?

**A.**    TO GET THE APPROPRIATE LABORATORY TESTS.

**Q.**    OKAY.  WOULD THAT BE THE APPROPRIATE FIRST STEP TO ADDRESS THIS SITUATION?

**A.**    YES, SIR.

**Q.**    LET ME SHOW YOU THE NEXT DOCUMENT, WHICH IS JOINT EXHIBIT 10-25482.  THIS IS JUNE 11, 2015, INDICATES THAT MR. HURD REFUSED HIS LABS?

**A.**    YES, SIR.

**Q.**    LET ME SHOW YOU THE NEXT PROVIDER NOTE, WHICH IS JOINT EXHIBIT 10-25483, JUNE 24, 2015.  THIS PROVIDER NOTES THAT MR. HURD REFUSED HIS LABS AND RESCHEDULED THEM.  DO YOU SEE THAT?

**A.**    YES, SIR.

**Q.**    HE'S ALSO NOTING THE WEIGHT LOSS IS STILL NOTED AND HE NEEDS THE LABS, RIGHT?

**A.**    HE NEEDS THE LABS AND HE'S SEEN BACK IN TWO WEEKS.

**Q.**    OKAY.  LET ME SHOW YOU JOINT EXHIBIT 10-25481.  THIS IS JUNE 26, 2015.  ONCE AGAIN, DID HE GET THE LABS DONE THAT DAY?

**A.**    NO, SIR.  HE REFUSED.

**Q.**    ALL RIGHT.  HE SAID BECAUSE HE DID NOT FAST; BUT REGARDLESS, HE DID GET THE LABS, RIGHT?

**A.**    THAT'S CORRECT.

**Q.**    LET ME GO TO THE NEXT PROVIDER NOTE, WHICH IS JULY 8, 2015, JOINT EXHIBIT 10-25479.  THIS WAS A PHYSICIAN CLINIC APPOINTMENT AND INDICATES THAT MR. HURD DID NOT SHOW UP FOR THAT APPOINTMENT THAT DAY, CORRECT?

**A.**   THAT'S CORRECT.

**Q.**   THAT WOULD BE THE TWO-WEEK FOLLOW-UP FROM THE PREVIOUS PHYSICIAN APPOINTMENT?

**A.**   YES, SIR.

**Q.**   LET ME GO TO JULY 17, 2015.  THIS IS JOINT EXHIBIT 10-25477, INDICATES AGAIN THAT HE'S A NO-SHOW TODAY, REFUSED LABS ON JUNE 11 AND AT LEAST TWO CALL-OUTS.  DO YOU SEE THAT?

**A.**   YES, SIR.

**Q.**   SO THEY'RE TRYING TO GET HIM THE LABS AND TRYING TO GET HIM SEEN, BUT HE'S NOT SHOWING UP, RIGHT?

**A.**   THAT'S CORRECT.

**Q.**   LET ME GO TO THE NEXT PROVIDER NOTE, AUGUST 19, 2015. THIS IS JOINT EXHIBIT 10-25473.  ALL RIGHT.  THIS TIME HIS WEIGHT IS NOTED TO BE 183 POUNDS, IT NOTES THE REFUSALS, NOTES THE WEIGHT LOSS.  THE PROVIDER NOTES, AS COMPARED TO HIS BMI I THINK IT'S ALL RIGHT, BUT HE ORDERS MORE LABS AGAIN, DOESN'T HE?

**A.**   YES, HE DOES.

**Q.**   WE'RE STILL TRYING TO GET THE LABS THAT ARE NEEDED TO ASSESS THIS PATIENT'S CONDITION, RIGHT?

**A.**   RIGHT.

**Q.**   LET ME GO TO THE NEXT PROVIDER NOTE, WHICH IS OCTOBER 21, 2015, JOINT EXHIBIT 10-25340.  THE PROVIDER NOTES THE WEIGHT LOSS AND EVEN NOTES HOW MUCH HE'S LOST SINCE THE LAST TIME HE WAS SEEN, MINUS 7.  PROVIDER NOTES A WEIGHT BLOOD TEST WITH AN

03:54   1   EXCLAMATION POINT.  STILL NEEDS THESE BLOOD TESTS, RIGHT?

2   **A.**    YES, SIR.

3   **Q.**    AND DOWN AT THE BOTTOM UNDER "ASSESSMENTS, WEIGHT

4   LOSS-NEEDS WORKUP," RIGHT?

5   **A.**    YES, SIR.

6   **Q.**    NOW DOCTOR, YOU WERE SHOWN THESE LEFT-SIDED PAIN DOCUMENTS

7   AT THAT SAME TIME, OCTOBER 27.  THIS IS JOINT EXHIBIT 10-25463,

8   AND THEN THERE'S FOLLOW-UP DOCUMENTS WITH THAT.  THIS IS THE

9   FIRST TIME THAT THIS INDIVIDUAL HAS HAD ABDOMEN PAIN SINCE ONE

10  TIME ON THE RIGHT IN SEPTEMBER OF 2013; ISN'T THAT TRUE?

11  **A.**    YES, SIR.

12  **Q.**    ONE OF THE SYMPTOMS OF THIS TYPE OF CANCER IS BLOOD IN THE

13  URINE, RIGHT?

14  **A.**    YES, SIR.

15  **Q.**    THIS IS JOINT EXHIBIT 10-25216.  THIS IS NOVEMBER 3, 2015.

16  WHAT DOES IT SHOW AS TO WHETHER THERE'S ANY BLOOD IN HIS URINE?

17  **A.**    IT'S NEGATIVE, THERE'S NO BLOOD IN HIS URINE.

18  **Q.**    ALL RIGHT.  LET ME SHOW THE NOVEMBER 6, 2015, THIS IS

19  JOINT EXHIBIT 10-25460.  WE FINALLY GOT THE BLOOD TEST RUN OR

20  BLOOD TEST RETURNED AND THEY SHOW THAT HE NOW HAS A PROBLEM; IS

21  THAT FAIR?

22  **A.**    YES, SIR.

23  **Q.**    AND THEY ARE -- NOTE THAT HE HAS ANEMIA AND THERE'S A TALK

24  ABOUT DOING A TRANSFUSION ON HERE, RIGHT?

25  **A.**    THAT'S CORRECT.

**Q.**   DOCTOR, MY NEXT DOCUMENT I WANT TO SHOW YOU IS JOINT
EXHIBIT 10-25455, WHERE HE IS REFERRED OUT TO GET A CT SCAN.
WOULD THAT BE THE NEXT -- ONE OF THE NEXT APPROPRIATE STEPS?

**A.**   IT'S ONE OF THEM.  I WOULD PROBABLY HAVE GOTTEN A CHEST
X-RAY AND A KUB BEFORE THAT.

**Q.**   AND DOCTOR, I DON'T HAVE IT IN FRONT OF ME, BUT THERE IS A
CHEST X-RAY ON NOVEMBER 9 AND OCTOBER 20.

         **MR. DUBNER:**  OBJECTION.  COUNSEL IS JUST TESTIFYING
NOW.

**BY MR. ARCHEY:**

**Q.**   ARE YOU AWARE THAT THERE ARE TWO CHEST X-RAYS IN THE
CHART?

**A.**   YES, SIR.  THE FIRST ONE WAS READ OUT AS DIFFICULT TO
DETERMINE BECAUSE THEY DIDN'T KNOW WHETHER IT WAS A NIPPLE
SHADOW OR NOT, AND SO THEY HAD THE PATIENT TURN A LITTLE BIT,
WHICH IS COMMON, AND REMOVED THE NIPPLE SHADOW.

**Q.**   OKAY.  I SHOW YOU THE NEXT RECORD, WHICH IS JOINT EXHIBIT
10-25452, THIS IS DECEMBER 4, 2015, PROVIDER SAYS "RESCHEDULE
FOR ASAP CT OF CHEST AND ABDOMEN," CORRECT?

**A.**   YES, SIR.

**Q.**   HERE'S THE ACTUAL SCHEDULING DOCUMENT DATED THAT DAY,
DECEMBER 4, 2015.  IT'S NOTED BOTH URGENT AND ASAP AT THE TOP.
DO YOU SEE THAT?

**A.**   YES, SIR.

**Q.**   AND THEN FROM THERE HE IS DIAGNOSED WITH THE CARCINOMA AND

0 3 : 5 7  1  THE TREATMENT IS JUST AS YOU STATED IN YOUR CHART, AGGRESSIVELY

2  PERCEIVED, CORRECT?

3  **A.**   THAT'S CORRECT.

4  **Q.**   IS THERE ANYTHING IN THAT CHART THAT SHOWS THESE PROVIDERS

5  WERE SOMEHOW NEGLIGENT IN ADDRESSING THIS PATIENT'S RENAL

6  CANCER PRIOR TO THAT FALL OF 2015?

7          **MR. DUBNER:**  OBJECTION, CALLS FOR A LEGAL CONCLUSION.

8          **MR. ARCHEY:**  THAT'S NOT A LEGAL CONCLUSION, JUDGE.

9  MAYBE I NEED TO REPHRASE IT.  I'LL REPHRASE IT.

10          **THE COURT:**  REPHRASE.

11          **MR. ARCHEY:**  BUT I'M ASKING FROM HIS MEDICAL

12  PERSPECTIVE.

13          **THE COURT:**  PLEASE REPHRASE.

14          **MR. ARCHEY:**  I'LL REPHRASE.

15  **BY MR. ARCHEY:**

16  **Q.**   DR. THOMAS, I'M ASKING FROM A MEDICAL PERSPECTIVE IF YOU

17  FOUND THAT THE CARE WAS APPROPRIATE AFTER THE SUMMER OF 2015

18  AND THROUGHOUT THE END OF 2015 AS TO THIS PATIENT.

19  **A.**   YES, SIR.  HE HAD NO REAL INDICATIONS PRIOR TO THAT FOR AN

20  EVALUATION FOR RENAL CELL CARCINOMA, AND THEN WHEN HE STARTED

21  TO SHOW SIGNS THAT NEEDED A WORKUP, HE GOT IT, EXCEPT THAT HE

22  REFUSED.

23  **Q.**   DR. THOMAS, THOSE ARE MY QUESTIONS.  THANK YOU, SIR.

24  **A.**   THANK YOU.

25          **THE COURT:**  YOU MAY STEP DOWN, SIR.

1    **MR. DUBNER:**  A VERY BRIEF REDIRECT, YOUR HONOR --

2    RECROSS, YOUR HONOR, IF THAT WOULD BE ALL RIGHT?

3    **THE COURT:**  NO.

4    **MR. DUBNER:**  THANK YOU, YOUR HONOR.

5    **MR. ARCHEY:**  YOUR HONOR, AT THIS TIME WE CALL DR.

6    JACQUELINE MOORE TO THE STAND.

7    **JACQUELINE MOORE, RN, PH.D., CCHP-A,**

8    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS.

9    **DIRECT EXAMINATION OF QUALIFICATIONS**

10   BY MR. ARCHEY:

11   **Q.**   ALL RIGHT.  GOOD AFTERNOON, DR. MOORE.  HOW ARE YOU DOING?

12   **A.**   FINE, THANK YOU.

13   **Q.**   GOOD.

14       HOW ARE YOU CURRENTLY EMPLOYED, MA'AM?

15   **A.**   I'M SELF-EMPLOYED, I'M A NURSE CONSULTANT IN CORRECTIONAL

16   HEALTHCARE.

17   **Q.**   AND I WANT TO DISCUSS YOUR CAREER IN CORRECTIONAL

18   MEDICINE, IF WE CAN, AND LET'S GO ALL THE WAY BACK TO THE

19   BEGINNING, IF YOU WILL.  WHEN DID YOU BECOME AN RN?

20   **A.**   IN 1967.

21   **Q.**   OKAY.  AND DID YOU OBTAIN AN UNDERGRADUATE DEGREE

22   THEREAFTER?

23   **A.**   NO.  IT WAS A DIPLOMA, AND THEN I WENT BACK AND OBTAINED A

24   BSN IN 1975.

25   **Q.**   OKAY.  FROM UNIVERSITY OF DELAWARE?

**A.**    FROM THE UNIVERSITY OF DELAWARE.

**Q.**    OKAY.  DID YOU CONTINUE YOUR EDUCATION THEREAFTER?

**A.**    I DID, I RECEIVED A MASTER'S FROM THE UNIVERSITY OF

PENNSYLVANIA IN 1979, AND THEN I COMPLETED MY PH.D. WORK AT THE

UNIVERSITY OF MARYLAND IN 1990.

**Q.**    AND YOUR MASTER'S AND YOUR PH.D., IN WHAT AREAS WERE

THOSE?

**A.**    NURSING.

**Q.**    OKAY.  AND SINCE YOU COMPLETED YOUR DOCTORATE IN 1990,

HAVE YOU CONTINUOUSLY WORKED IN THE FIELD OF CORRECTIONAL

MEDICINE?

**A.**    I HAVE.

**Q.**    ALL RIGHT.  LET ME TAKE YOU ALL THE WAY BACK TO YOUR

EXPERIENCE WORKING.  I UNDERSTAND THAT YOU BEGAN AT SACRED

HEART HOSPITAL IN PENNSYLVANIA AND HAD YOUR FIRST EXPOSURE TO

CORRECTIONAL MEDICINE?

**A.**    I DID, THAT'S CORRECT.

**Q.**    AND ABOUT APPROXIMATELY WHAT YEAR ARE WE TALKING ABOUT

THERE?

**A.**    IT WAS ABOUT 1974.

**Q.**    OKAY.  AND WHAT EXPOSURE, INVOLVEMENT DID YOU HAVE AT THAT

TIME?

**A.**    I WAS SENT TO A PRISON KNOWN AS DELAWARE COUNTY PRISON AND

ASKED TO PUT SYSTEMS OF HEALTHCARE INTO PLACE THERE.  AN INMATE

HAD COMMITTED AN OVERDOSE WHERE HE HAD OBTAINED DRUGS FROM

1    WITHIN THE PRISON, AND THE PRISON WAS UNDER LITIGATION TO

2    IMPROVE THEIR SERVICES.

3    **Q.**    OKAY.  THEREAFTER YOU FORMED A COMPANY CALLED PRISON

4    HEALTH SERVICES, INCORPORATED?

5    **A.**    THAT'S CORRECT.

6    **Q.**    AND WHEN DID YOU FORM THAT COMPANY APPROXIMATELY?

7    **A.**    1979.

8    **Q.**    OKAY.  AND WHAT DID THAT COMPANY DO?

9    **A.**    IT ACTED LIKE AN HMO.  IT HIRED PHYSICIANS, PSYCHIATRISTS,

10   NURSES, SOCIAL WORKERS AND OTHER PROVIDERS.  WE TOOK CARE OF

11   THE INMATES FROM THE TIME THEY WERE BOOKED INTO THE FACILITY

12   UNTIL THEY WERE RELEASED.

13   **Q.**    SO YOU, AS A PRIVATE COMPANY, PROVIDED THE MEDICAL CARE

14   FOR THE PRISONS THAT YOU CONTRACTED WITH; IS THAT FAIR?

15   **A.**    RIGHT.  IT WAS LIKE AN HMO, BUT I ONLY WORKED WITH

16   INMATES.

17   **Q.**    OKAY.  AND HOW LONG DID YOU WORK WITH PRISON HEALTH

18   SERVICES?

19   **A.**    UNTIL 1988.

20   **Q.**    OKAY.  AND WHY DID YOU LEAVE PRISON HEALTH SERVICES AT

21   THAT TIME?

22   **A.**    WE WERE GETTING READY TO GO PUBLIC AND WE BROUGHT IN SOME

23   VENTURE CAPITALISTS, AND THE VENTURE CAPITALISTS WANTED TO

24   CHANGE SOME OF THE SYSTEMS THAT WE HAD IN PLACE.  AND AS ONE OF

25   THE FOUNDERS OF THE COMPANY AND THE OPERATIONAL MANAGER, IT WAS

1    VERY DIFFICULT FOR ME TO SEE THEM CUT SERVICES IN ORDER TO

2    MAINTAIN PROFITS.

3    **Q.**    OKAY.  SO WHERE DID YOU GO TO WORK AFTER YOU LEFT PRISON

4    HEALTH SERVICES?

5    **A.**    I WENT TO A COMPANY KNOWN AS WACKENHUT.  I HAD A TWO-YEAR

6    NONCOMPETE AND SO I WENT WITH THEM.  THEY WERE JUST STARTING

7    THEIR COMPANY.  THEY DO -- BUILD, DESIGN, MANAGE ENTIRE PRISONS

8    AND I DID THEIR HEALTHCARE.

9    **Q.**    SO VERY SIMILAR TO WHAT YOU HAD DONE WITH PRISON HEALTH

10    SERVICES?

11    **A.**    EXACTLY.

12    **Q.**    OKAY.  HOW LONG WERE YOU WITH WACKENHUT?

13    **A.**    ABOUT TWO YEARS.

14    **Q.**    OKAY.  AND THEN I THINK YOU WENT TO A COMPANY CALLED

15    COASTAL CORRECTIONS HEALTHCARE, INC.?

16    **A.**    YES, IN NORTH CAROLINA.  THEY WANTED TO START A NEW

17    DIVISION OF CORRECTIONAL HEALTHCARE AND SO I WENT, AND AT THIS

18    POINT, I WAS NO LONGER DOING OPERATIONS BUT MARKETING.

19    **Q.**    OKAY.  AND THEN YOU SPENT SOME TIME AFTER THAT WORKING

20    WITH NCCHC; IS THAT RIGHT?

21    **A.**    THAT IS CORRECT.

22    **Q.**    WHAT IS NCCHC, FIRST?

23    **A.**    IT'S THE NATIONAL COMMISSION ON CORRECTIONAL HEALTHCARE.

24    **Q.**    OKAY.  WHAT DID YOU DO FOR NCCHC?

25    **A.**    I WAS THEIR VICE-PRESIDENT OF OPERATIONS.  I PERFORMED

04:03    1    TECHNICAL ASSISTANCE OUT IN THE FIELD, AND I WAS RESPONSIBLE

2    FOR THE ACCREDITATION PROGRAM.

3    **Q.**    SO THE PROGRAM THAT WOULD GO OUT AND ACCREDIT PRISONS?

4    **A.**    PRISONS, JAILS, AND JUVENILE FACILITIES.

5    **Q.**    WHAT ELSE DID YOU DO FOR THEM, HELP WRITE SOME STANDARDS?

6    **A.**    I WORKED ON THE STANDARDS COMMITTEE BOTH WHEN I WORKED

7    THERE AND THEN AFTER I LEFT.  AND I CONTINUED TO WORK FOR THEM

8    EVEN AFTER I LEFT.  I DID ONE WEEK OF SURVEYS A MONTH UP UNTIL

9    MY MOTHER BECAME ILL, WHICH WAS A FEW YEARS AGO.

10    **Q.**    OKAY.  AND WHEN YOU LEFT -- AND TO BE CLEAR, WHEN YOU

11    WORKED FOR NCCHC, DURING THAT PERIOD OF TIME, THAT WAS A

12    FULL-TIME JOB?

13    **A.**    IT WAS A FULL-TIME JOB.

14    **Q.**    WHEN YOU LEFT NCCHC, WHY DID YOU LEAVE NCCHC?

15    **A.**    IT WAS A NONPROFIT ORGANIZATION.  MY SALARY AT THAT TIME

16    WAS $50,000.  I WAS LIVING IN CHICAGO.  IT WAS TOO DIFFICULT

17    FOR ME TO LIVE ON THAT SALARY.  I WAS ACTUALLY TAKING MONEY OUT

18    OF MY PERSONAL FUNDS AND I COULDN'T CONTINUE TO DO THAT, SO I

19    TALKED TO THE PRESIDENT.  HE OFFERED ME A $10,000 RAISE, BUT

20    THAT STILL WASN'T ENOUGH.  SO WE DECIDED THAT I WOULD WORK

21    JOINTLY ALONGSIDE OF THEM.  AND A MATTER OF FACT, UNTIL THEY

22    HIRED SOMEONE, I STILL WOULD GO BACK AND REVIEW ACCREDITATION

23    REPORTS AND HELP THEM.

24    **Q.**    OKAY.  AND YOU WOULD TEACH SEMINARS FROM TIME TO TIME?

25    **A.**    I TAUGHT SEMINARS, I TAUGHT STANDARDS.  WHATEVER THEY

1   ASKED ME TO DO, I WAS ALWAYS WILLING TO DO IT.

2   **Q.**   OKAY.  ALL RIGHT.  AND THEN YOU WENT TO WORK AT THE COOK

3   COUNTY JUVENILE DETENTION CENTER FOR A PERIOD OF TIME?

4   **A.**   I WENT THERE FOR ABOUT FOUR YEARS.  THEY WERE VERY CLOSE

5   TO GOING UNDER A MEMORANDUM WITH THE ACLU, AND THEY ASKED ME IF

6   I WOULD COME THERE.  THE FIRST THREE TIMES I DECLINED, AND THEN

7   FINALLY I MET WITH THE SUPERINTENDENT AND MEDICAL DIRECTOR AND

8   I THOUGHT, OH, MY GOODNESS, THEY KNOW WHERE I LIVE, MY TAXES

9   ARE GOING TO GO UP.  SO I WENT THERE AND I WAS THERE FOR FOUR

10  YEARS.  A YEAR AND A HALF AFTER I GOT THERE, WE WERE ACCREDITED

11  BY NCCHC.  WE DIDN'T GET IT, BUT WE WERE NOMINATED FOR THE

12  FACILITY OF THE YEAR.

13  **Q.**   OKAY.  AND THEN THEREAFTER -- WE'RE UP TO ABOUT 2005.  YOU

14  WENT TO WORK FOR CORRECTIONAL HEALTHCARE MANAGEMENT; IS THAT

15  RIGHT?

16  **A.**   I DID.  IT WAS A SMALL COLORADO COMPANY.  THEY TOLD ME

17  THAT THEY WERE GOING TO BE A NICHE COMPANY.  I WAS IN A GRANT

18  POSITION AT COOK COUNTY AND SO I KNEW THE GRANT WAS GOING TO BE

19  EXPIRING SOON.  AND SO WHEN THIS COMPANY APPROACHED ME -- AND

20  THEY HAD APPROACHED ME OVER A PERIOD OF TIME, FOR EIGHT YEARS.

21  I FINALLY DECIDED THAT I WOULD GO THERE.  SOON AFTER I WENT

22  THERE, ABOUT SIX MONTHS AFTER I WENT THERE, THEY WERE THINKING

23  ABOUT BRINGING IN VENTURE CAPITALISTS, AND A YEAR AND A HALF

24  LATER THEY DID BRING IN VENTURE CAPITALISTS AND I LEFT.

25  **Q.**   AND WHEN YOU LEFT THAT COMPANY, YOU CONSULTED ON YOUR OWN

1    SINCE THAT TIME?

2    **A.**    I HAVE.

3    **Q.**    OKAY.

4    **A.**    AND IN BETWEEN OTHER PROJECTS.

5    **Q.**    SO EVEN WHEN YOU WERE WORKING AT THESE OTHER COMPANIES,

6    YOU WERE STILL DOING SOME CONSULTING FOR YOURSELF AS WELL?

7    **A.**    YES.  NOT AT NCCHC AND NOT AT COASTAL BUT AT OTHER TIMES.

8    **Q.**    ALL RIGHT.  YOU HAVE BEEN APPOINTED AS A COURT MONITOR FOR

9    VARIOUS SYSTEMS OVER THE YEARS; IS THAT FAIR?

10   **A.**    THAT IS CORRECT.

11   **Q.**    AND CAN YOU NAME SOME OF THESE SYSTEMS THAT YOU'VE BEEN

12   APPOINTED?

13   **A.**    ONE WAS KENTUCKY, ONE IS CURRENTLY JACKSON COUNTY IN

14   MISSISSIPPI.  I CAN'T THINK OF ALL OF THEM.

15   **Q.**    MAYBE GEORGIA?

16   **A.**    GEORGIA.

17   **Q.**    CALIFORNIA?

18   **A.**    CALIFORNIA, I WORKED ON THE _COLEMAN_ CASE, YES.

19   **Q.**    OKAY.  DID SOME WORK IN PUERTO RICO?

20   **A.**    IN PUERTO RICO.  I WASN'T APPOINTED AS A MONITOR THERE, IT

21   WAS AN EVALUATION.  I'VE DONE EVALUATIONS OF HEALTHCARE IN

22   DELAWARE, MAINE.  I WAS THE MONITOR IN INDIANA FOR SIX YEARS.

23   I WORKED IN SEATTLE AS AN INTERIM HEALTH ADMINISTRATOR AND

24   ACTUALLY LIVED THERE WITH THEM FOR NINE MONTHS AND GOT THE

25   FACILITY ACCREDITED AND THEN WENT BACK FOR TWO YEARS LATER TO

1    MAKE SURE THAT THEY CONTINUED THE PROCESSES THAT I PUT IN

2    PLACE.

3    **Q.**    YOU DID SOME WORK FOR TEXAS?

4    **A.**    I DID A STUDY FOR THE AUDITOR IN THE STATE OF TEXAS.  I

5    LOOKED AT THE QUALITY AND COST OF INMATE HEALTH BEFORE AND

6    AFTER PRIVATIZATION WITH THE UTMB IN TEXAS TECH.

7    **Q.**    YOU'VE BEEN RETAINED BY THE DEPARTMENT OF JUSTICE TO

8    ASSIST THEM IN PROSECUTING CASES A NUMBER OF TIMES?

9    **A.**    BOTH IN GEORGIA AND NOW IN -- IN HINDS COUNTY I'M WORKING

10   WITH DOJ.

11   **Q.**    HINDS COUNTY, MISSISSIPPI?

12   **A.**    HINDS COUNTY, MISSISSIPPI.

13         **MR. ARCHEY:**  YOUR HONOR, WE OFFER DR. MOORE AS AN

14   EXPERT IN ADMINISTRATION OF CORRECTIONAL HEALTHCARE.

15         **THE COURT:**  CROSS ON THE TENDER?

16         **MS. MONTAGNES:**  VERY BRIEF, YOUR HONOR.

17              **CROSS-EXAMINATION ON QUALIFICATIONS**

18   BY MS. MONTAGNES:

19   **Q.**    GOOD AFTERNOON, NURSE MOORE.

20         YOU ARE A REGISTERED NURSE, CORRECT?

21   **A.**    CORRECT.

22   **Q.**    YOU ARE NOT A PROVIDER?

23   **A.**    I AM NOT A PROVIDER.  I HAVE A PH.D. IN NURSING.

24   **Q.**    YOU DO NOT HAVE ANY ADVANCED CLINICAL TRAINING?

25   **A.**    I DO NOT.

04:09   1        **MS. MONTAGNES:**  YOUR HONOR, WE DON'T OBJECT TO HER

2   BEING ADMITTED AS EXPERT IN --

3        **THE COURT:**  ADMINISTRATION OF CORRECTIONAL

4   HEALTHCARE.

5        **MR. ARCHEY:**  THAT'S CORRECT, YOUR HONOR.

6        **MS. MONTAGNES:**  YES, PROVIDED THAT HER TESTIMONY WILL

7   NOT DELVE INTO ANYTHING REQUIRING ADVANCED CLINICAL TRAINING,

8   EVALUATION OF PHYSICIAN, QUALITY, THINGS LIKE THAT.

9        **MR. ARCHEY:**  I THINK THAT WILL BE ACCEPTABLE, JUDGE.

10   SHE'S GOING TO TALK ABOUT THE SYSTEMS AND THE METHODOLOGY AND

11   THE ADMINISTRATION OF THE HEALTHCARE SYSTEM.  FOR INSTANCE, SHE

12   WILL NOT OFFER ANY TESTIMONY AS TO CHARTS OR THINGS LIKE THAT.

13        **THE COURT:**  OR THE STANDARD OF CARE.

14        **MR. ARCHEY:**  OR THE -- WELL, EXCEPT AS TO WHETHER THE

15   SYSTEMS THAT THEY ARE USING COMPORT WITH THE STANDARD OF CARE

16   FOR ADMINISTRATION OF CORRECTIONAL HEALTHCARE.

17        **MS. MONTAGNES:**  WE WOULD OBJECT TO THAT, YOUR HONOR.

18   AND JUST TO BE -- MY UNDERSTANDING IS THAT NURSE MOORE COMPARED

19   IT AGAINST THE ACA STANDARDS ANYWAY AND THERE WAS NO COMPARISON

20   TO STANDARD OF CARE IN HER REPORT.

21        **MR. ARCHEY:**  YOUR HONOR, THE --

22        **THE COURT:**  I LOOKED AT HER REPORT, AND WHAT I -- AND

23   I'M HAVING IT PRINTED RIGHT NOW JUST SO THAT I HAVE IT EASILY

24   AVAILABLE TO ME.  BUT ORGANIZATION, MANAGEMENT STRUCTURE,

25   NURSING STRUCTURE, EMTS, MEDICAL ASSISTANCE, STAFFING LEVELS,

04:10  1   PATTERNS, CREDENTIALING, HEALTHCARE -- HEALTH SCREENS,

2   APPRAISALS, ALL WITH RESPECT TO WHETHER OR NOT THERE IS A GOOD

3   ORGANIZATION OR ADMINISTRATIVE STRUCTURE THAT SUPPORTS THE

4   DELIVERY OF CARE, THAT'S KIND OF THE -- IS THAT CORRECT, MR.

5   ARCHEY?

6            **MR. ARCHEY:**  I THINK THAT'S VERY MUCH CORRECT, YOUR

7   HONOR.

8            **THE COURT:**  OKAY.  ALL RIGHT.  THE COURT WILL ADMIT

9   DR. MOORE IN THE FIELD OF ADMINISTRATION OF CORRECTIONAL

10   HEALTHCARE.

11            **MS. MONTAGNES:**  THANK YOU.

12            **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

13                        **DIRECT EXAMINATION**

14   BY MR. ARCHEY:

15   **Q.**   ALL RIGHT.  DR. MOORE, LET'S BEGIN VERY SPECIFICALLY.

16   WHAT WERE YOU ASKED TO DO IN THIS CASE?

17   **A.**   I WAS ASKED TO REVIEW THE SYSTEM OF HEALTHCARE AND TO LOOK

18   AT THE POLICIES AND PROCEDURES AND SEE IF THEY WERE ADEQUATE.

19   **Q.**   OKAY.  AND THE JUDGE KIND OF JUST STOLE MY THUNDER, BUT

20   SHE WENT THROUGH ADMINISTRATION, STAFFING, CREDENTIALING,

21   GRIEVANCES AND HEALTH ASSESSMENTS; IS THAT FAIR?

22   **A.**   CORRECT.

23   **Q.**   ALL RIGHT.  AND AS FAR AS A METHODOLOGY, YOU REVIEWED THE

24   ALLEGATIONS IN THE LAWSUIT THAT WERE MADE IN THIS CASE, AND

25   THEN YOU TOOK A TOUR; IS THAT RIGHT?

**A.**    CORRECT.

**Q.**    DID YOU GET TO SEE THE THINGS THAT YOU WANTED TO SEE ON THE TOUR?

**A.**    I TOOK A TOUR OF THE MEDICAL UNIT.  I WOULD HAVE LIKED TO HAVE TAKEN A TOUR OF THE HOUSING UNITS; IT JUST WASN'T FEASIBLE AT THE TIME THAT I WAS THERE.

**Q.**    YEAH, YOU CAME IN, THE FLOODS WERE GOING ON, IN AUGUST OF 2016?

**A.**    THERE WERE FLOODS GOING ON IN 2016.  I WAS LATE GETTING IN BECAUSE PRESIDENT OBAMA HAD FLOWN TO BATON ROUGE.  WE COULDN'T LAND; WE WERE NOT ALLOWED IN HIS AIRSPACE.  AND THEY -- A FEW DAYS LATER THEY HAD THEIR ACA AUDIT, AND SO THEY WERE DOING SOME LAST-MINUTE TWEAKING OF THEIR FILES.

**Q.**    ALL RIGHT.  BUT YOU DID TOUR THE CLINICS, THE SPECIALTY CLINICS, THE INFIRMARY, THE ACUTE -- OR THE ASSESSMENT AND TREATMENT UNIT AND THE PHARMACY, AMONG OTHER THINGS, CORRECT?

**A.**    YES.  AND I DID INTERVIEW THE HEADS OF ALL THE DEPARTMENTS OF RADIOLOGY, LAB, QI, QM.

**Q.**    THAT WAS MY NEXT QUESTION.

**A.**    AND DR. LAVESPERE.

**Q.**    OKAY.  AND YOU OBSERVED RESPONSE -- EMERGENCY RESPONSE IN THE ASSESSMENT AND TREATMENT UNIT; IS THAT RIGHT?

**A.**    I DID.

**Q.**    AND YOU ALSO REVIEWED THE EMT PROTOCOLS?

**A.**    I DID.

Q.   AND THE CHRONIC CARE GUIDELINES?

A.   I DID.

Q.   YOU OBSERVED PHYSICIAN SICK CALL?

A.   I DID.

Q.   YOU REVIEWED THE HEALTHCARE RECORDS, THE MANNER IN WHICH THEY WERE MAINTAINED?

A.   YES.

Q.   OKAY.  YOU REVIEWED RECORDS OF CHRONIC CARE PATIENTS?

A.   YES.

Q.   AND YOU REVIEWED INFIRMARY RECORDS?

A.   I DID.

Q.   AND IN ADDITION TO ALL THAT, YOU LOOKED AT THE LAW GOVERNING THE PRACTICES OF NURSING AND EMTS IN LOUISIANA?

A.   YES, SIR.

Q.   OKAY.  YOU WOULD'VE LIKED TO HAVE GOTTEN OUT TO THE HOUSING UNITS BUT JUST BECAUSE OF THIS CONFLUENCE OF ALL THOSE  --

          MS. MONTAGNES:  OBJECTION, YOUR HONOR.  HE'S TESTIFYING.

          THE COURT:  JUST TRY TO -- I MEAN, YOU CAN LEAD YOUR EXPERT A LITTLE BIT, BUT TRY TO ASK A LITTLE BIT OF A DIRECT QUESTION.

          MR. ARCHEY:  I'LL DO SO, YOUR HONOR.

          THE COURT:  SO GO AHEAD.  LET'S TRY TO MOVE IT ALONG, THOUGH.  GO AHEAD.

BY MR. ARCHEY:

Q.   LET ME GO TO YOUR OVERALL OPINION.  LET ME JUMP STRAIGHT THERE.  WHAT IS YOUR OVERALL OPINION AS TO LSP AFTER ALL THAT METHODOLOGY?

A.   THEY WERE MEETING ACA STANDARDS OF ACCREDITATION, WHICH IS THE POLICY THAT THEY SUBSCRIBE TO.  THEY WERE DOING A GREAT VOLUME OF SERVICES AT THE FACILITY.  AND THE STAFF THAT I MET WAS VERY, VERY DEDICATED.

          MS. MONTAGNES:  OBJECTION, YOUR HONOR.  FOUNDATION.

          MR. ARCHEY:  YOUR HONOR, THIS IS AN EXPERT WITNESS. SHE JUST GAVE YOU THE METHODOLOGY.

          THE COURT:  IT'S THE FOUNDATION TO -- I MEAN, I DON'T KNOW THAT SHE HAS THE REQUISITE EXPERTISE.  OR IT'S SIMPLY NOT HELPFUL, THE OPINION TESTIMONY THAT THE STAFF IS QUALIFIED, BUT I CAN CONSIDER THAT IN THE HOPPER WITH EVERYTHING ELSE.  YOU CAN ASK YOUR NEXT QUESTION.

          MR. ARCHEY:  THANK YOU, JUDGE.

BY MR. ARCHEY:

Q.   ALL RIGHT.  LET ME DISCUSS SOME OF THESE HEALTHCARE STANDARDS.  FIRST OFF, IS LSP AN ACCREDITED FACILITY?

A.   IT'S AN ACA ACCREDITED FACILITY.

Q.   OKAY.  IS THAT A GOOD THING?

A.   IT IS A GOOD THING.  THEY'VE BEEN ACCREDITED FOR TEN YEARS.

Q.   AND DID THAT LEAD YOU TO CONSIDER THE ACA STANDARDS AS YOU

1   REVIEWED LSP AND WHETHER THEY COMPLY WITH THE STANDARDS?

2   **A.**   IT DID.   THAT'S -- I LOOKED AT THEIR POLICIES.   THEIR

3   POLICIES REFERENCE THE ACA STANDARD.   AND I LOOKED TO SEE IF

4   THEIR POLICY WAS ADEQUATE WITH THE STANDARD.   I ACTUALLY MADE

5   SURE I BOUGHT A NEW COPY OF THE ACA STANDARDS SO I WOULD HAVE

6   IT.

7   **Q.**   AND LET ME TALK ABOUT OR DISCUSS THE HEALTHCARE

8   ORGANIZATION, THE OVERALL ORGANIZATION OF THE STAFF AT LSP.   I

9   WANT TO ASK THE -- START ON THE OTHER END.   DID YOU FIND ANY

10  PROBLEMS WITH THE OVERALL ORGANIZATION OF THE HEALTHCARE?

11  **A.**   I DID.   I FELT THAT THERE WAS TOO MUCH RESPONSIBILITY FOR

12  DR. LAVESPERE; HE HAD TOO MANY DEPARTMENTS AND TOO MANY PEOPLE

13  REPORTING TO HIM.   I THOUGHT THAT HE SHOULD HAVE AN

14  ADMINISTRATOR.   HE WAS REPORTING TO A DEPUTY WARDEN.   WHILE SHE

15  WAS NOT INTERFERING IN THE HEALTHCARE DECISIONS, SHE WAS MORE

16  OF A LIAISON WITH SECURITY.   I JUST FELT THAT A HEALTH

17  ADMINISTRATOR WOULD BE A GOOD COMPLEMENT TO THE STAFFING

18  MATRIX.

19  **Q.**   AND WHY DID YOU THINK A HEALTHCARE ADMINISTRATOR WOULD BE

20  A GOOD IDEA?

21  **A.**   BECAUSE THEY WOULD BE ABLE TO DEAL WITH STAFFING,

22  RADIOLOGY, NONCLINICAL ISSUES THAT DR. LAVESPERE WAS DEALING

23  WITH.

24  **Q.**   OKAY.   AND IT WOULD ALLOW DR. LAVESPERE TO SPEND MORE TIME

25  ON CLINICAL MATTERS?

04:16   1   **A.**   EXACTLY.

2   **Q.**   OKAY.  LET'S TALK ABOUT THE NURSES AT LSP.  DID YOU FIND

3   ANY PROBLEMS WITH THE NURSES AT LSP, IN YOUR OVERALL REVIEW?

4   **A.**   NO, I DID NOT.

5   **Q.**   ALL RIGHT.  LET'S TALK ABOUT THE EMTS VERY QUICKLY.  YOU

6   REVIEWED THE WAY LSP USES ITS EMTS?

7   **A.**   THEY UTILIZE THEIR EMTS AND WERE BROADLY SAYING EMTS, BUT

8   THERE ARE THREE CLASSES OF THEM.  I DIDN'T SPECIFY THAT IN MY

9   REPORT, BUT I KNOW THAT THERE ARE EMTS AND THEN ADVANCED EMTS

10  AND PARAMEDICS.  THEY USE THEM TO TRIAGE THEIR CALL AND DEAL

11  WITH EMERGENCY CARE.

12  **Q.**   NOW, HOW SIMILAR ARE TRAUMA TRIAGE AND SICK CALL TRIAGE?

13  **A.**   TRAUMA TRIAGE IS WHEN --

14          **MS. MONTAGNES:**  OBJECTION.  THIS IS NOT IN HER

15  REPORT.

16          **MR. ARCHEY:**  JUDGE, I MIGHT HAVE BEEN CAUGHT

17  FLATFOOTED.  IT'S IN HER DEPOSITION; I HAVE A CITE FOR THAT.

18  IT'S -- LET ME SEE.

19          **THE COURT:**  IT NEEDS TO BE IN HER REPORT.

20          **MR. ARCHEY:**  JUDGE, I THINK IT'S ON 2947.  LET ME

21  GRAB MY COPY, PLEASE.  MY APOLOGIES, YOUR HONOR, TOO MUCH

22  PAPER.  YOUR HONOR, I'M GOING TO MOVE ON.  I THINK IT'S THERE,

23  BUT I'M GOING TO MOVE ON.

24  BY MR. ARCHEY:

25  **Q.**   DID YOU REVIEW THE PROTOCOLS THAT THE EMTS WERE OPERATING

1    UNDER?

2    **A.**    I DID.

3    **Q.**    AND WOULD YOU FIND -- WHAT WAS YOUR OPINION AS TO THE

4    PROTOCOLS?

5    **A.**    MOST OF THE PROTOCOLS USED OVER-THE-COUNTER MEDICINE.

6    THERE WERE A FEW PROTOCOLS THAT USED ANTIBIOTICS, AND THERE

7    WERE A COUPLE THAT USED EPINEPHRIN OR ASTHMA MEDICINES FOR AN

8    ACUTE DISORDER.

9    **Q.**    ALL RIGHT.  AND DID YOU REVIEW HOW LSP USES ITS INMATE

10    ORDERLIES?

11    **A.**    I LOOKED AT THE DESCRIPTION OF WHAT THEY WERE DOING; I

12    READ THE POLICY; AND THEN I ACTUALLY OBSERVED SOME ORDERLIES

13    WHILE I WAS IN THE INFIRMARY.  I WAS IN THE INFIRMARY FOR ABOUT

14    TWO HOURS.

15    **Q.**    OKAY.  AND DID YOU LOOK AT THEIR TRAINING AND WHAT THEY

16    DO?

17    **A.**    THEY HAVE A TRAINING THAT NURSING HAS DEVELOPED THAT THE

18    ORDERLIES GO THROUGH BEFORE THEY ARE ALLOWED TO WORK IN THE

19    INFIRMARY.

20    **Q.**    OKAY.  AND DID YOU FIND ANY PROBLEMS WITH LSP'S USE OF

21    ORDERLIES?

22    **A.**    NO, I DID NOT.

23    **Q.**    LET'S TALK ABOUT STAFFING LEVELS AT LSP.  HOW EASY OR HARD

24    IS IT TO DETERMINE APPROPRIATE STAFFING LEVELS FOR A FACILITY?

25    **A.**    IT'S VERY DIFFICULT.  YOU HAVE TO LOOK AT A VARIETY OF

04:20   1   THINGS.  YOU HAVE TO LOOK AT THE FACILITY LAYOUT, HOW THE

2   INMATES ARE BROUGHT TO SICK CALL, THE ACUITY AND THE AGE OF THE

3   INMATES, THE AMOUNT OF CHRONIC CARE THAT YOU'RE DOING, THE

4   DEMOGRAPHICS OF THE INMATE POPULATION.  IT'S NOT JUST SIMPLY A

5   GAME OF NUMBERS THAT YOU CAN JUST RANDOMLY ASSIGN.

6   **Q.**   OKAY.  DID YOU LOOK AT LSP'S HEALTH SCREENS, APPRAISALS

7   AND EXAMINATIONS FOR INMATES COMING IN?

8   **A.**   I DIDN'T -- YES, I DID.  I SAW IT IN THE CHART.  THEY CAME

9   FROM EVELYN [SIC] HUNT CENTER; HOWEVER, THE DEATH ROW INMATES

10   CAME DIRECTLY INTO LSP.

11   **Q.**   DID YOU OBSERVE ANY PROBLEMS WITH THE INTAKE -- THE

12   SCREENING AND INTAKE PROCEDURES?

13   **A.**   NO, I DID NOT.

14   **Q.**   ALL RIGHT.  CREDENTIALING, DID YOU LOOK AT CREDENTIALING

15   FILES OF LSP'S PHYSICIANS?

16   **A.**   I DID.

17   **Q.**   AND WHAT DID YOU FIND AS TO THE CREDENTIALING OF LSP'S

18   PHYSICIANS?

19   **A.**   THERE WAS A REVIEW FROM THE MEDICAL BOARD.  THERE WERE

20   EVIDENCE THAT THE PHYSICIANS HAD HAD THEIR LICENSE, CONTINUING

21   EDUCATION AND ADVANCED CARDIO SUPPORT SERVICES.

22   **Q.**   AS FAR AS THESE RESTRICTIONS, IS THAT SOMETHING THAT YOU

23   SEE REGULARLY IN INSTITUTIONS THROUGHOUT THE COUNTRY?

24   **A.**   I HAVE.  I SAW -- WHEN I DID A STUDY FOR THE STATE OF

25   KENTUCKY, THE MEDICAL DIRECTOR IN THE STATE OF KENTUCKY HAD A

1   RESTRICTED LICENSE.

2   **Q.**   OKAY.  PERIODIC HEALTH APPRAISALS, DID YOU OBSERVE THAT

3   LSP WAS DOING PERIODIC HEALTH APPRAISALS?

4   **A.**   IN MY REPORT I SAID NO, BUT THEN AFTERWARDS --

5              **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.

6              **MR. ARCHEY:**  YOUR HONOR, CAN SHE BE ALLOWED TO

7   EXPLAIN?

8              **THE COURT:**  PERIODIC HEALTH APPRAISALS, IT'S IN THE

9   REPORT AT 14.  I DIDN'T --

10             **MS. MONTAGNES:**  AND SHE SPECIFICALLY FOUND THAT THEY

11  WEREN'T PRESENT IN ANY OF HER CHARTS AND THEN TESTIFIED TO

12  THAT.

13             **THE COURT:**  I'M SORRY.  I DIDN'T HEAR WHAT YOU SAID.

14  THAT SHE SPECIFICALLY FOUND?

15             **MS. MONTAGNES:**  THAT THEY WERE NOT PRESENT IN THE

16  CHARTS.

17             **MR. ARCHEY:**  AND CAN SHE EXPLAIN, YOUR HONOR?  THAT'S

18  EXACTLY WHAT SHE'S SAYING, IF SHE WOULD BE ALLOWED TO SAY TWO

19  WORDS OUTSIDE OF THE REPORT WITHOUT COUNSEL STANDING UP.  SHE'S

20  GOING TO BE -- I'M SORRY, YOUR HONOR.  MY BAD.

21             **THE COURT:**  OKAY.

22             **MR. ARCHEY:**  I APOLOGIZE.  I APOLOGIZE, YOUR HONOR.

23             **THE COURT:**  THE REASON THAT WE HAVE RULE 26 AND THE

24  REASON THAT WE HAVE EXPERT REPORTS IS SO THAT THE EXPERTS WILL

25  TESTIFY IN KEEPING WITH THEIR REPORT, AND IT DOES US NO GOOD IF

THE EXPERTS SAY ONE THING IN THEIR REPORT AND THEN SAY

SOMETHING ELSE ON THE STAND.

        **MR. ARCHEY:**  MY APOLOGIES, YOUR HONOR.

        **THE COURT:**  OKAY.

        **MR. ARCHEY:**  SERIOUSLY.

        **THE COURT:**  ALL RIGHT.  SO ASK ANOTHER QUESTION.

        **MR. ARCHEY:**  YES, YOUR HONOR.

**BY MR. ARCHEY:**

**Q.**  ALL RIGHT.  LET'S TALK ABOUT DUTY STATUS.  DID YOU ANALYZE

DUTY STATUS ISSUES WITH LSP?

**A.**  I DID.

**Q.**  YOU WERE HERE WHEN DR. LAVESPERE TESTIFIED YESTERDAY; IS

THAT RIGHT?

**A.**  I WAS.

**Q.**  AND THERE'S THIS WHOLE ISSUE ABOUT DR. LAVESPERE, WHETHER

HE BELIEVES THAT PATIENTS ARE TELLING THE TRUTH OR NOT.  ARE

YOU FAMILIAR WITH THAT ISSUE?

**A.**  I NEED TO CLARIFY THAT ANSWER.  HE SAID IT WAS ONLY UNDER

CERTAIN CONDITIONS WHEN INMATES HAD PAIN AND WHEN THEY WANTED A

DIFFERENT DUTY STATUS.

        **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS IS NOT

IN THE REPORT, AND I ACTUALLY DON'T KNOW WHAT SHE'S TALKING

ABOUT.

        **THE COURT:**  I DON'T THINK THE ANSWER WAS RESPONSIVE

TO THE QUESTION.  ASK ANOTHER QUESTION.

1       **MR. ARCHEY:**  I'LL BE GLAD TO, YOUR HONOR.

2  **BY MR. ARCHEY:**

3  **Q.**    MA'AM, IS IT IMPORTANT TO KNOW TO ASSESS WHETHER A

4  COMPLAINT IS LEGITIMATE SO THAT YOU CAN PROVIDE APPROPRIATE

5  CARE?

6  **A.**    YES.

7  **Q.**    LET'S MOVE ON TO SICK CALL.  YOU OBSERVED THE MANNER

8  THAT -- IN WHICH LSP CONDUCTS SICK CALL; IS THAT RIGHT?

9  **A.**    YES.

10  **Q.**    LSP USES THE PROTOCOLS WHICH YOU REFERRED TO EARLIER; IS

11  THAT CORRECT?

12  **A.**    CORRECT.

13  **Q.**    AND SICK CALL, WHAT DAYS OF THE WEEK IS IT, DOES IT TAKE

14  PLACE?

15  **A.**    SUNDAY THROUGH THURSDAY.

16  **Q.**    AND AFTER A SICK CALL REQUEST, HOW DOES THE PROVIDER, THE

17  EMT, HOW DOES HE ASSESS WHEN THAT PATIENT IS TO BE SEEN?

18  **A.**    THEY ASSIGN THEM CATEGORIES ONE THROUGH FOUR, DEPENDING

19  UPON THE URGENCY OF THE SICK CALL.  THEY PUT THEM IN A

20  PHYSICIAN'S BOX FOR THE PHYSICIAN TO REVIEW.

21  **Q.**    OKAY.  ALL RIGHT.  DO YOU HAVE ANY ISSUE WITH THE CO-PAYS

22  THAT LSP CHARGES PATIENTS FOR SICK CALL?

23  **A.**    NO.

24  **Q.**    WHY NOT?

25  **A.**    MOST CASES THAT I'VE SEEN A CO-PAY IS $5 AT LEAST.

**Q.**   OKAY.  WERE YOU ABLE TO OBSERVE THE SPECIALTY CLINICS AT

LSP?

**A.**   I DIDN'T OBSERVE THE SPECIALTY CLINICS; I RECEIVED A LIST

OF THEM.  I DID OBSERVE AN ORTHOPOD THERE.  ACTUALLY, THAT'S

INCORRECT.  I DID OBSERVE AN ORTHOPEDIC CLINIC.

**Q.**   OKAY.  AND AS FAR AS FROM A STRUCTURAL STANDPOINT, IS IT A

VERY GOOD THING FOR LSP TO UTILIZE THESE OFFSITE SPECIALISTS

THROUGH SPECIALTY CLINICS?

**A.**   I THOUGHT IT WAS VERY WISE, CONSIDERING THE LOCATION OF

WHERE THEY WERE AND THE DISTANCE THAT THEY HAD TO TRAVEL TO

OBTAIN SPECIALTY CARE.

**Q.**   OKAY.  YOU OBSERVED THE INFIRMARY CARE AS PART OF YOUR

TOUR; IS THAT RIGHT?

**A.**   I DID.  I REVIEWED SOME RECORDS WITH THE NURSE IN CHARGE

OF THE INFIRMARY.

**Q.**   THEY WERE WHAT?  I'M SORRY.

**A.**   I REVIEWED CHARTS.

**Q.**   OKAY.

**A.**   AT LEAST THREE CHARTS.

**Q.**   ALL RIGHT.  AND DID YOU FIND THE CARE IN THE INFIRMARY TO

BE APPROPRIATE?

**A.**   YES, I DID.

**Q.**   LET ME ASK YOU ABOUT --

         **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  FOUNDATION.

         **THE COURT:**  THERE IS NO QUESTION.

04:26   1           **MS. MONTAGNES:**  SORRY, IT WAS LATE.

2           **THE COURT:**  CARRY ON.

3           **MR. ARCHEY:**  THANK YOU, JUDGE.

4    BY MR. ARCHEY:

5    **Q.**    CHRONIC CARE, DID YOU REVIEW CHRONIC CARE THROUGH YOUR

6    PROCESSES AND PROCEDURES?

7    **A.**    I LOOKED TO SEE IF THEY WERE FOLLOWING THE CHRONIC CARE

8    GUIDELINES.  I DIDN'T REVIEW CHRONIC CARE PER SE.  I REVIEWED

9    THE THINGS THAT I COULD CERTAINLY REVIEW FROM MY OWN KNOWLEDGE

10   OF REVIEWING CHARTS, YOU KNOW, DID THEY DO A HEMOGLOBIN A1C,

11   DID THEY DO A CMP.  AND I LISTED WHEN THEY DID THOSE THINGS,

12   DID THEY SEE THE PATIENTS WITHIN THE TIMEFRAMES.  AND I USED

13   THEIR OWN CHRONIC CARE GUIDELINES AS MY GUIDE.

14   **Q.**    OKAY.  AND ULTIMATELY, WHAT WAS YOUR OPINION AS TO THE

15   LSP'S CHRONIC CARE GUIDELINES?  WERE THEY SUFFICIENT OR WHAT

16   HAVE YOU?

17   **A.**    THE GUIDELINES WERE SUFFICIENT.  I THOUGHT THAT THEY COULD

18   BE ENHANCED IF THEY JUST REFERENCE THE AMERICAN DIABETIC

19   ASSOCIATION AND SOME OF THE OTHER ASSOCIATIONS THAT HAVE PUT

20   OUT CHRONIC CARE GUIDELINES.

21           THEY WERE THE NORMAL CHRONIC CARE GUIDELINES THAT I

22   SEE FROM OTHER COMPANIES.  THERE WAS NOTHING UNIQUE OR

23   DIFFERENT ABOUT THEM.  THAT'S THE ANSWER TO THE QUESTION.

24   **Q.**    OKAY.  LET ME ASK YOU ABOUT PHARMACY SERVICES.  DID YOU

25   EVALUATE THE PHARMACY SERVICES AT LSP?

**A.**   I DID.

**Q.**   AND WHAT WAS YOUR OPINION AFTER EVALUATING THE PHARMACY SERVICES AT LSP?

**A.**   THEY FILL A GREAT MANY PRESCRIPTIONS.  THEY DON'T STOP THE PRESCRIPTIONS; THEY DON'T SUBSTITUTE THE PRESCRIPTIONS WITHOUT TALKING TO THE DOCTOR ABOUT IT.

　　　　　**MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  FOUNDATION.

　　　　　**THE COURT:**  OVERRULED.

　　　　　**MR. ARCHEY:**  THANK YOU, JUDGE.

BY MR. ARCHEY:

**Q.**   MEDICATION ADMINISTRATION AT PILL CALL, DID YOU REVIEW LSP'S MEDICATION ADMINISTRATION PROCEDURES?

**A.**   I DIDN'T SEE THE OFFICERS GIVING THE PILL CALLS, BUT I DID REVIEW THE TRAINING RECORDS THAT THE PHARMACIST HAD DEVELOPED FOR THEM.

**Q.**   ALL RIGHT.  AND WHAT WAS YOUR OPINION AS TO WHETHER THE USE OF THE CORRECTIONAL OFFICERS FOR PILL CALL WAS A GOOD PROCESS OR NOT?

**A.**   THERE WAS NOTHING IN THE ACA STANDARDS THAT PROHIBITED THEM FROM DOING WHAT THEY WERE DOING.  MATTER OF FACT, THERE HAVE BEEN SEVERAL SMALL JAILS AND FACILITIES IN INDIANA WHERE I HAVE SEEN OFFICERS DO THAT.  AND WHAT THEY MAY SAY IS THAT THEY MAKE THE MEDS AVAILABLE TO THE INMATE.  THERE WERE A GREAT NUMBER OF MEDS THAT WERE KEEP ON PERSON THAT THE INMATES HAD THEMSELVES.

04:29  1   Q.   DR. MOORE, YOU CITED A STUDY SHOWING THAT MEDICATION

2   ERRORS ARE ACTUALLY GREATER AMONG LPNS AND RNS THAN THEY ARE

3   WITH THE CORRECTIONAL OFFICERS?

4   A.   THAT WAS A STUDY I FOUND IN THE LITERATURE, YES, I DID.

5   Q.   ALL RIGHT.  THE QUALITY IMPROVEMENT PROGRAM, WHAT ARE YOUR

6   OPINIONS ABOUT LSP'S QUALITY IMPROVEMENT PROGRAM?

7   A.   I THOUGHT THAT IT COULD BE MORE ROBUST.  THERE WAS NO

8   PHYSICIAN INVOLVEMENT IN THE QUALITY IMPROVEMENT PROGRAM.  THEY

9   WERE PRIMARILY DIRECTORS OF NURSING OR NURSING ADMINISTRATION.

10              THE STUDIES THAT THEY STUDIED WERE SIMILAR STUDIES

11  THAT THEY STUDIED OVER AND OVER AGAIN.  I FELT THAT THEY SHOULD

12  BE LOOKING AT DIFFERENT ASPECTS, AND IF ONE STUDY WAS IN

13  COMPLIANCE, THEN THEY SHOULD MOVE ON TO ANOTHER STUDY.

14  Q.   ALL RIGHT.  SO USING YOUR YEARS OF EXPERIENCE, YOU HAD

15  SOME RECOMMENDATIONS FOR HOW LSP COULD IMPROVE WHAT IT'S DOING;

16  IS THAT RIGHT?

17  A.   I DID.

18  Q.   AND WITH THAT, WHAT IS YOUR OVERALL OPINION AS TO THE

19  POLICIES AND PROCEDURES AND ADMINISTRATION OF LSP, BASED ON

20  YOUR REVIEW AND YOUR WORK IN THIS CASE?

21  A.   I THOUGHT THE POLICIES AND PROCEDURES WERE ADEQUATE AND

22  THAT THEY MET THE STANDARDS OF THE ACA, THAT THEY CONFORMED

23  WITH THE ACA STANDARDS.

24  Q.   OKAY.  DR. MOORE, THOSE ARE MY QUESTIONS, THANK YOU,

25  MA'AM.

1            **THE COURT:**  CROSS?

2            **MS. MONTAGNES:**  APOLOGIES.

3                          **CROSS-EXAMINATION**

4    BY MS. MONTAGNES:

5    **Q.**   ROUGHLY 32 MEDICAL ASSOCIATIONS ARE INVOLVED IN THE NCCHC?

6    **A.**   APPROXIMATELY, YES.

7    **Q.**   MEDICAL PROFESSIONALS SET THE STANDARDS?

8    **A.**   YES.

9    **Q.**   AND NOT CORRECTIONAL OFFICERS?

10   **A.**   THERE IS SOMEONE FROM THE NATIONAL SHERIFF'S ASSOCIATION,

11   SO YES, THERE COULD BE A CORRECTIONAL OFFICER.

12   **Q.**   DO THEY SET THE MEDICAL STANDARDS?

13   **A.**   THEY PARTICIPATE ON THE COMMITTEES.

14   **Q.**   DO YOU RECALL DOING A DEPOSITION WITH ME?

15   **A.**   YES, I DO.

16            **MS. MONTAGNES:**  IF WE COULD PULL UP PAGE 24, 9

17   THROUGH 12.

18   BY MS. MONTAGNES:

19   **Q.**   AND YOU SAID YOU'RE NOT -- AND DO YOU RECALL SAYING -- ME

20   ASKING YOU, GENERALLY CORRECTION -- ARE CORRECTIONAL OFFICERS

21   INVOLVED IN THIS?  AND YOU SAID, I'M NOT AWARE OF A

22   CORRECTIONAL OFFICER, BUT THEY COULD BE, I'M JUST NOT AWARE OF

23   IT.

24            **MR. ARCHEY:**  YOUR HONOR, THIS IS IMPROPER.  THIS IS

25   NOT A PROPER IMPEACHMENT.  SHE ANSWERED THE QUESTION.  IT'S

1    VERY CONSISTENT WITH WHAT SHE SAID BEFORE.

2              **THE COURT:**  ACTUALLY, IT'S NOT CONSISTENT.  SHE SAID

3    CORRECTIONAL OFFICERS ON COMMITTEES AND NOW SHE'S SAYING I AM

4    NOT AWARE OF CORRECTIONAL OFFICIALS, BUT THEY MIGHT BE.

5              **MR. ARCHEY:**  COULD BE.

6              **THE WITNESS:**  I'LL STAND BY THE DEPOSITION.  I'M NOT

7    AWARE.

8    **BY MS. MONTAGNES:**

9    **Q.**    AND YOU THINK THE NCCHC STANDARDS ARE GOOD?

10   **A.**    YES, OF COURSE, I DO.

11   **Q.**    AND YOU THINK THEY REPRESENT A MINIMAL LEVEL OF CARE?

12   **A.**    YES, JUST A MINIMAL LEVEL.

13   **Q.**    AND THEY'RE USEFUL?

14   **A.**    YES, OF COURSE.

15   **Q.**    AND AUTHORITATIVE?

16   **A.**    YES.

17   **Q.**    AND THEY ARE NOT ASPIRATIONAL?

18   **A.**    NO, I DON'T THINK THEY'RE ASPIRATIONAL.

19   **Q.**    IN FACT, WHEN I ASKED YOU THAT IN THE DEPOSITION, YOU

20   LAUGHED AT THAT IDEA.

21   **A.**    IF THAT'S WHAT YOU SAY.

22   **Q.**    AND YOU RELY ON THE NCCHC FOR CREDITS EVERY YEAR, FOR YOUR

23   CONTINUING EDUCATION CREDITS?

24   **A.**    I DO.

25   **Q.**    AND YOU TRUST THEM?

**A.**   EXPLICITLY.

**Q.**   YOU THINK THEY ARE MORE STRINGENT THAN THE ACA?

**A.**   IN CERTAIN AREAS, YES, I DO.

**Q.**   AND THE ACA MEASURES NUMBERS, NOT NECESSARILY THE QUALITY OF CARE?

**A.**   WHEN I DID MY AUDITS -- WELL, WHEN I LOOKED AT THE PERFORMANCE STANDARDS, THEY WERE ASKING FOR NUMBERS OF THINGS.

**Q.**   AND WHEN I ASKED YOU ABOUT THEM, YOU SAID, THEY PUT EVERYTHING IN A FOLDER AND THEN PEOPLE LOOK AT THE FOLDER AND MAKE SURE THAT IT'S CORRECT?

**A.**   THAT WAS MY IMPRESSION, BUT I'D ONLY EVER DONE TWO ACA AUDITS AND THEY WERE LIKE FOUR OR SIX YEARS AGO.

**Q.**   AND MEDICAL STAFF WOULD PRESELECT THE MATERIALS THAT THE ACA AUDITORS WOULD LOOK AT?

**A.**   THAT IS CORRECT.

**Q.**   IN FACT, YOU DECLINED TO PERFORM ANY MORE ACA AUDITS AFTER YOU DID TWO?

**A.**   THERE ARE A COUPLE OF REASONS FOR THAT.  ONE WAS BECAUSE OF THERE WAS A CONFLICT.  NCCHC DIDN'T WANT YOU TO WORK FOR BOTH ORGANIZATIONS; YOU HAD TO CHOOSE ONE OR THE OTHER.  AND THE SECOND ONE WAS IT WASN'T A VERY GOOD EXPERIENCE FOR ME.  IT COULD HAVE BEEN BECAUSE OF THE LEAD AUDITOR.

**Q.**   YOU WERE DISAPPOINTED?

**A.**   I WAS DISAPPOINTED BUT FOR A VARIETY OF REASONS.

**Q.**   AND YOU THINK THE ACA IS MORE POLITICAL?

**A.**    THAT WAS MY INDEPENDENT THOUGHT.  I REALLY DON'T KNOW

THAT.  I CAN'T ATTEST TO THAT.

**Q.**    IN YOUR OPINION, WITH RESPECT TO THE POLICIES AT LSP, IS

THAT THEY CONFORMED WITH THE ACA STANDARDS?

**A.**    YES.

**Q.**    YOU'VE WORKED IN CASES INVOLVING PRISONS CLOSE TO THE SIZE

OF LSP?

**A.**    CERTAINLY THE PRISONS IN CALIFORNIA WERE LARGE.  THE

PRISON IN INDIANA WAS LARGE, YES.

**Q.**    AND YOU'VE WORKED IN OTHER PRISONS THAT HAVE AMBULATORY

SERVICES?

**A.**    YES.

**Q.**    AND YOU'VE WORKED IN OTHER FACILITIES THAT HAVE HOSPICE

CARE?

**A.**    YES.

**Q.**    AND YOU'VE WORKED IN OTHER FACILITIES THAT HAVE THE SAME

OR HIGHER LEVELS OF INFIRMARY CARE?

**A.**    YES, CERTAINLY IN TEXAS.

**Q.**    AND THE DEMOGRAPHICS AT LSP ARE NOT PARTICULARLY UNUSUAL?

**A.**    NO.  THERE IS A DISPROPORTIONATE OF BLACK AND HISPANIC

INDIVIDUALS IN ALL OF OUR PRISONS.

**Q.**    IN FACT, ALMOST ALL PRISONS AND JAILS HAVE THE SAME

DEMOGRAPHICS THAT LSP HAVE?

**A.**    I CAN'T SAY THAT.

**Q.**    BUT YOU MIGHT HAVE TESTIFIED TO THAT IN YOUR DEPOSITION?

1    **A.**    I COULD HAVE.  I DON'T THINK THAT THAT'S IMPORTANT.

2    **Q.**    MOST PRISONS ARE BUILT IN REMOTE LOCATIONS?

3    **A.**    THAT'S TRUE.

4    **Q.**    AND CHALLENGES WITH STAFFING PRISONS IS A PRETTY NORMAL

5    THING?

6    **A.**    IT'S VERY CHALLENGING.

7    **Q.**    AND IT'S VERY COMMON TO HAVE BOTH ON-SITE AND OFF-SITE

8    SPECIALTY CARE?

9    **A.**    YES.

10   **Q.**    EMTS ARE USED AT ANGOLA MORE THAN YOU'VE EVER SEEN?

11   **A.**    CORRECT.

12   **Q.**    SOME OF THE PROTOCOLS THAT YOU LOOKED AT WERE NOT

13   COMPLETE?

14   **A.**    I THOUGHT THAT THEY COULD BE ENHANCED.

15   **Q.**    AND YOU AGREED WITH MANY OF THE CONCERNS IDENTIFIED WITH

16   THE PLAINTIFFS' EXPERTS ABOUT THE EMT PROTOCOLS?

17   **A.**    I DIDN'T SAY THAT I AGREED WITH ALL OF THEM.  I CERTAINLY

18   AGREE WITH ONE THAT COMES TO MY MIND, THAT THEY SHOULD DO A

19   URINALYSIS BEFORE THEY TREAT A URINARY INFECTION.  THAT'S THE

20   ONLY ONE I CAN THINK OF RIGHT NOW.

21   **Q.**    OKAY.  BUT IN GENERAL, WITH REGARD TO THE EMT PROTOCOLS,

22   YOU AGREED WITH PLAINTIFFS' EXPERTS' CONCERNS?

23   **A.**    CAN YOU SHOW ME THAT?

24   **Q.**    SURE.  LET'S PULL UP 160.  LOOKING AT LINE 18 THROUGH -- 8

25   THROUGH 19, BUT SPECIFICALLY, I SAID:  "DO YOU HAVE ANY

1   SPECIFIC EXAMPLES OF THAT?"

2            AND YOU SAID:  "I THINK THE PLAINTIFFS DID A FAIRLY

3   GOOD JOB OF MENTIONING THE PROTOCOLS THAT THEY FELT NEEDED TO

4   BE DONE SO I DIDN'T NEED TO -- SEE ANY NEED TO REITERATE IT."

5   **A.**   THEN THAT'S WHAT I FELT.

6   **Q.**   CELL SIDE EXAMINATIONS ARE A CONCERN FOR LACK OF PRIVACY?

7   **A.**   YES, THAT'S TRUE.

8   **Q.**   AND MOST FACILITIES USE NURSES TO PERFORM SICK CALL?

9   **A.**   THEY USE LPNS MOST OF THE TIME.

10  **Q.**   AND WHEN YOU FORMULATED YOUR OPINION ABOUT LSP, IT WAS ON

11  THE BELIEF THAT EMTS COULD NOT PRESCRIBE ANYTHING THAT WASN'T

12  OVER-THE-COUNTER MEDICATION?

13  **A.**   THAT WAS MY INITIAL OPINION.  LATER ON, I LEARNED THAT

14  THEY COULD PRESCRIBE LIMITED ANTIBIOTICS.

15  **Q.**   AND WHEN YOU EVALUATED THE SICK CALLS, YOU FOUND THAT THEY

16  WERE NOT FOLLOWED UP ON TIMELY?

17  **A.**   NOT FOLLOWED UP TIMELY BY THE PHYSICIANS, YES.

18  **Q.**   THERE WAS CONFUSION ABOUT YOUR SCOPE OF WORK IN THIS CASE?

19  **A.**   INITIALLY THEY WANTED ME TO DO CHART REVIEWS, AND THEN AS

20  WE GOT INTO IT, WE DECIDED THAT I SHOULD TAKE A MORE GLOBAL

21  APPROACH.

22  **Q.**   AND YOU DIDN'T REVIEW THE ATU VISITS BECAUSE YOU THOUGHT

23  DR. THOMAS WOULD PERFORM THOSE?

24  **A.**   YES.  I JUST -- I REVIEWED THE SERVICES THAT THEY WERE

25  PROVIDING AND HOW THEY WERE PROVIDING THEM.

**Q.**   YOU WOULD'VE DONE A MORE THOROUGH REVIEW OF CHRONIC CARE
IF YOU KNEW THAT DR. THOMAS WAS NOT DOING INDEPENDENT CHART
REVIEWS?

**A.**   I WOULD HAVE -- I WOULD NOT HAVE REVIEWED THE PHYSICIAN
SERVICES.  I COULD HAVE REVIEWED AND SAID, WELL, WERE THE
HEMOGLOBIN A1C'S, WERE THEY IN CONTROL, WERE THE CMP'S DONE,
DID THEY DO CHEST X-RAYS.  I WOULD'VE LOOKED AT PEAK
FLOWMETERS.  I WOULD'VE LOOKED AT THOSE THINGS, AND THOSE ARE
THINGS THAT I ROUTINELY LOOK AT WHEN I MONITOR OTHER
FACILITIES.

**Q.**   AND YOU DIDN'T FEEL THAT YOUR REVIEW WAS LONG ENOUGH?

**A.**   I WISH THAT I COULD HAVE BEEN THERE LONGER, YES, I WISH
THAT I --

**Q.**   YOU DIDN'T GET TO EVERYTHING YOU WANTED TO?

          **MR. ARCHEY:**  YOUR HONOR, CAN YOU ALLOW HER TO PLEASE
FINISH?

          **MS. MONTAGNES:**  I APOLOGIZE.

          **THE COURT:**  SLOW DOWN A LITTLE BIT.  OKAY.  ASK YOUR
QUESTION AGAIN.

**BY MS. MONTAGNES:**

**Q.**   YOU DIDN'T GET TO EVERYTHING YOU WANTED?

**A.**   I GOT TO EVERYTHING THAT I WANTED; I DIDN'T GET TO THE
HOUSING UNITS, AND I WOULD'VE LIKED TO HAVE INTERVIEWED THE
INMATES.

**Q.**   THEY DIDN'T HAVE ANYONE TO TAKE YOU TO THE HOUSING UNITS

1    BECAUSE SHERWOOD AND TRACY WERE IN MEETINGS ABOUT THE ACA?

2    **A.**    THAT IS CORRECT.

3    **Q.**    AND WHEN YOU DO A REVIEW, YOU DO A SELECTIVE REVIEW?

4    **A.**    NO, I DO A SELECTIVE REVIEW OF CHARTS, NOT A SELECTIVE

5    REVIEW.  I PULL CHARTS OF PEOPLE THAT HAVE GONE TO THE

6    EMERGENCY ROOM OR CHARTS OF PEOPLE THAT HAVE HAD CHRONIC CARE.

7    THERE'S NO POINT IN JUST PULLING TEN RANDOM CHARTS IF NO ONE

8    HAS DIABETES.

9    **Q.**    AND YOU DIDN'T KEEP TRACK OF ALL THE CHARTS YOU LOOKED AT?

10   **A.**    I KEPT TRACK OF ALL THE CHARTS THAT I LOOKED AT EXCEPT FOR

11   THE ONES ON THE PHYSICAL EXAM.  AND THEY WERE THE FIRST FIVE

12   THAT I LOOKED AT, AND I THINK WE WERE SO BUSY LOOKING FOR A

13   PHYSICAL EXAM THAT I DID NOT WRITE THOSE NAMES OR NUMBERS DOWN.

14   BUT THE OTHER ONES I DID.

15   **Q.**    AND YOU DIDN'T KEEP TRACK OF THE CHARTS YOU LOOKED AT IN

16   THE INFIRMARY?

17   **A.**    NO, I DIDN'T, BUT -- NO, I DIDN'T WRITE THEM DOWN.

18   **Q.**    AND --

19   **A.**    I DID KEEP TRACK, BUT I DIDN'T WRITE THEM IN MY REPORT.

20   **Q.**    AND YOU DIDN'T WRITE THEM IN YOUR NOTES?

21   **A.**    WELL, I GUESS I DIDN'T.

22   **Q.**    AND YOU DIDN'T KEEP NOTES FROM ALL OF YOUR INTERVIEWS?

23   **A.**    I KEPT NOTES FROM MOST OF MY INTERVIEWS.

24   **Q.**    OKAY.  AND YOU DID ABOUT AN HOUR INTERVIEW WITH DR.

25   LAVESPERE, BUT HIS PHONE WAS RINGING A LOT?

**A.**   HE WAS VERY BUSY.

**Q.**   AND YOU FOUND THAT THERE WAS INSUFFICIENT SPACE AVAILABLE IN THE MEDICAL UNIT?

**A.**   I FELT THEY COULD USE MORE EXAMINATION ROOMS.

**Q.**   IN THE SAMPLE YOU DID REVIEW, YOU FOUND THAT THEY WERE MISSING PERIODIC HEALTH ASSESSMENTS?

**A.**   I'D LIKE TO CLARIFY THAT ANSWER, IF I MAY.

**Q.**   DR. MOORE, WHEN YOU WROTE YOUR REPORT, YOU FOUND THAT THEY WERE MISSING PERIODIC HEALTH ASSESSMENTS?

     **MR. ARCHEY:**   YOUR HONOR, THE WITNESS HAS ASKED TO BE ABLE TO ANSWER THE QUESTION AND I THINK SHE OUGHT TO BE ALLOWED TO ANSWER THE QUESTION.

     **MS. MONTAGNES:**   YOUR HONOR, THAT WASN'T THE QUESTION.

     **THE COURT:**   OKAY.  OBJECTION IS SUSTAINED.  ASK YOUR QUESTION AGAIN, PLEASE.

**BY MS. MONTAGNES:**

**Q.**   WHEN YOU WROTE YOUR REPORT, DR. MOORE, YOU FOUND THAT THEY WERE MISSING PERIODIC HEALTH ASSESSMENTS?

**A.**   THAT WAS WHAT I BELIEVED AT THE TIME I WROTE MY REPORT. I'VE SINCE LEARNED SOMETHING DIFFERENT.

**Q.**   WHEN YOU WERE REVIEWING THE CHARTS, YOU FOUND THAT THERE WERE TB CHARTS IN ALL OF THE CHARTS, DIDN'T YOU?

**A.**   YES.

**Q.**   AND YOU WERE PLEASANTLY SURPRISED BY THAT?

**A.**   I WAS.

**Q.** YOU RECOMMEND THAT LSP ESTABLISH A CLEAR STAFFING PLAN
THAT INCLUDES ALL STAFF EMPLOYED ARE CONTRACTED AT LSP?

**A.** I HAD TWO OR THREE DIFFERENT STAFFING PLANS THAT THEY
PRESENTED TO ME, AND THEY WERE ALL A LITTLE BIT DIFFERENT.  AND
SO I THOUGHT THAT THEY NEEDED ONE CLEAR POSITION CONTROL.

**Q.** AND WHEN YOU REVIEWED CHRONIC CARE, YOU FOUND SOME
PROBLEMS IN IT?

**A.** I FOUND SOME PROBLEMS WITH DOCUMENTATION.

**Q.** IN YOUR REPORT YOU FOUND THAT THE STAFF POSSESSES THE
SKILLS TO HANDLE EMERGENCY CARE?

**A.** I FELT THAT THE EM STAFF HAD THE SKILLS TO HANDLE
EMERGENCY CARE.

**Q.** AND YOU DID NOT BASE THAT ON ANY INDEPENDENT AUDIT OF THE
QUALITY OF CARE DELIVERED THERE?

**A.** I BASED IT ON MY OBSERVATION OF THE CARE THAT CAME INTO
THE ATU WHILE I WAS THERE.

**Q.** AND ON THE STATISTICS?

**A.** AND ON THE STATISTICS.

**Q.** BUT YOU DIDN'T REVIEW ANY CHARTS OR ANY ATU CARE?

**A.** I WAS THERE, I OBSERVED IT.  I THINK OBSERVATION IS
PROBABLY BETTER THAN A CHART REVIEW.

**Q.** ON THE DAY OF THE AUDIT, THERE WAS AN OFFENDER BEING SEEN
FOR AN OVERDOSE OF ILLEGAL MEDICINE?

**A.** YES.

**Q.** AND YOU FELT THAT THAT WAS A MISUSE OF THE ATU BECAUSE THE

1    SUBSTANCE WAS ILLEGAL AND THE SITUATION WAS CREATED BY THE

2    OFFENDER?

3    **A.**    THAT'S CORRECT.

4    **Q.**    BUT ON DEPOSITION YOU TOOK THAT BACK?

5    **A.**    THE OFFENDER WAS SEEN, HE WAS TREATED.  WHETHER OR NOT

6    THEY MISUSE IT OR THEY SELF HARM THEMSELVES, THERE'S STILL A

7    PREREQUISITE FOR THEM TO BE SEEN.

8    **Q.**    YOU'VE NEVER SEEN MEDICATION ADMINISTERED BY CORRECTIONAL

9    OFFICERS IN A MAXIMUM SECURITY FACILITY OTHER THAN LSP?

10    **A.**    I CAN'T REMEMBER ALL THE FACILITIES THAT I'VE GONE TO, BUT

11    I'VE GONE TO ALMOST MOST OF THE STATES IN THE UNITED STATES AND

12    DONE SOME TYPE OF AN AUDIT OR AN INDEPENDENT MONITORING, AND I

13    COULDN'T TELL YOU RIGHT NOW.  I KNOW THAT IN INDIANA THERE WERE

14    SOME PRISONS; I DON'T THINK THEY WERE MAX FACILITIES THOUGH.

15    THEY WERE MAYBE WORK RELEASE FACILITIES OR SMALLER FACILITIES.

16    **Q.**    SO YOU CAN'T RECALL ANOTHER MAXIMUM SECURITY FACILITY THAT

17    USED CORRECTIONAL OFFICERS TO DELIVER MEDICATION?

18    **A.**    NO, BUT I DON'T THINK IT WOULD BE MUCH DIFFERENT IF YOU

19    HAD AN LPN THERE.

20    **Q.**    YOU DON'T THINK THAT USING INMATE ORDERLY CARE IS THE BEST

21    THING?

22    **A.**    I THINK THAT USING INMATE ORDERLY CARE FOR PEER REVIEW --

23    OR NOT PEER REVIEW BUT FOR BATHING, TOILETING, TURNING, I DON'T

24    SEE ANYTHING WRONG WITH THAT.  MATTER OF FACT, I'VE SEEN INMATE

25    ORDERLIES IN OREGON IN THEIR INFIRMARY AND IN TEXAS IN THEIR

04:45  1   INFIRMARY.  AND I HAVE SEEN ORDERLIES IN TEXAS IN HOSPICE.

2   **Q.**   SO NURSE MOORE, WE'RE GOING TO -- WE'RE GOING TO -- I

3   ASKED YOU A VERY SIMPLE QUESTION.

4   **A.**   AND I ANSWERED IT.

5   **Q.**   SO LET'S JUST TRY TO KEEP WHAT WE CAN MOVE THROUGH THIS.

6          SO LET'S TAKE UP PAGE 98 OF THE DEPOSITION.  DO YOU

7   REMEMBER TAKING A DEPOSITION WITH ME?

8   **A.**   UNFORTUNATELY, I DO.

9          **MS. MONTAGNES:**  ACTUALLY, COULD WE PULL UP 97 AS

10   WELL.

11   **BY MS. MONTAGNES:**

12   **Q.**   SO I ASKED YOU, AT THE END OF THIS, YOU MAKE NO

13   RECOMMENDATION OR CONCLUSION OR OBSERVATION.  IS THERE ANYTHING

14   YOU WOULD SAY GENERALLY ABOUT THE USE OF MEDICAL ASSISTANTS?

15   AND YOU SAID, I'VE SEEN IT IN PRISONS, ORDERLIES.  I'VE SEEN IT

16   USED A LOT IN HOSPICE CARE.  I'VE SEEN IT ON THE SUICIDE WATCH

17   AS A COMPANION.  IT'S NOT ALWAYS THE BEST THING, BUT PEOPLE

18   HAVE DONE THAT, ESPECIALLY IN THE SOUTH.

19   **A.**   YES, THAT'S EXACTLY WHAT I SAID NOW.

20   **Q.**   WHEN YOU SPOKE WITH THE NURSES, SOME OF THEM FELT THAT

21   THERE WERE SOME STAFFING ISSUES?

22   **A.**   THEY FELT THAT THERE -- IT TOOK A LONG TIME TO GET A

23   NURSE, IF A NURSE HAD LEFT, THAT IT TOOK A LONG TIME TO HIRE.

24   **Q.**   AND THEY FELT -- AND YOU OBSERVED THAT THERE WAS A

25   STAFFING SHORTAGE WHEN YOU WERE THERE?

**A.**    I DIDN'T SAY THAT THERE WAS A STAFFING SHORTAGE.

             **MS. MONTAGNES:**    CAN WE GO TO PAGE 83 OF THE

DEPOSITION.

**BY MS. MONTAGNES:**

**Q.**    YOU'RE RIGHT, I APOLOGIZE.    BUT YOU DID NOTE THAT THEY

WERE TWO PHYSICIANS DOWN WHILE YOU WERE THERE?

**A.**    I DID SAY THAT.

**Q.**    OKAY.

**A.**    BUT THAT'S NOT A STAFFING SHORTAGE, IS IT?

**Q.**    YOU'RE RIGHT.    NURSE PORET AND FALGOUT EXPRESSED THAT THEY

HAD DIFFICULTY ENFORCING CHRONIC CARE POLICIES?

**A.**    THEY HAD DIFFICULTY GETTING THE PHYSICIANS TO CHART ON THE

CHRONIC CARE FORMS, NOT THAT THEY DIDN'T FOLLOW THE POLICY, BUT

THEY DIDN'T FOLLOW THE FORM.    IF THEY HAD FOLLOWED THE FORM,

THE INFORMATION WOULD HAVE BEEN THERE ON A FLOW SHEET.

**Q.**    AND ANGOLA WAS NOT KEEPING TRACK OF SOME BASIC HEALTHCARE

DATA?

**A.**    CAN YOU ELABORATE ON THAT?

**Q.**    YOU FOUND THAT THEY WEREN'T KEEPING TRACK OF NURSING

ENCOUNTERS, I BELIEVE?

**A.**    I DID HAVE A SECTION IN MY STATISTICS THAT SAID HCP, WHICH

MEANS HEALTHCARE PROVIDERS, AND I DID LIST THAT.    BUT SINCE

THAT -- BUT NOW THEY ARE KEEPING TRACK OF EVERY NURSING

ENCOUNTER.    AT THE TIME THAT I WAS THERE THEY WERE NOT.

             **MS. MONTAGNES:**    YOUR HONOR, I'M GOING TO OBJECT.

1  THIS IS UNRESPONSIVE.

2          THE COURT:  SHE HAS ANSWERED THE QUESTION.  ASK YOUR

3  NEXT QUESTION.

4  BY MS. MONTAGNES:

5  Q.   ONE OF THE DANGERS OF NOT HAVING A HEALTH ADMINISTRATOR IS

6  THAT INCOMPETENT -- THERE CAN BE INCOMPETENT PROVIDERS AND THE

7  PRISON WON'T KNOW ABOUT IT?

8  A.   THAT COULD BE TRUE.

9  Q.   AND IN FACT, DR. LAVESPERE TOLD YOU THAT THE PREVIOUS

10  DOCTOR, DR. COLLINS, WAS ASKED TO LEAVE?

11  A.   THAT IS ALSO TRUE.

12          MR. ARCHEY:  YOUR HONOR, I OBJECT TO THE RELEVANCE

13  OR -- I MEAN, IT IS OUT OF THE TIMEFRAME.

14          THE COURT:  WHAT'S THE RELEVANCE?

15          MS. MONTAGNES:  YOUR HONOR, IT GOES TO WHY IT'S

16  IMPORTANT TO HAVE A HEALTHCARE ADMINISTRATOR, AND IT WAS AN

17  OPINION SHE EXPRESSED IN HER DEPOSITION ABOUT WHY IT'S

18  IMPORTANT THAT THERE BE A DESIGNATED HEALTH AUTHORITY.

19          THE COURT:  THE OBJECTION IS SUSTAINED ON RELEVANCE.

20  BY MS. MONTAGNES:

21  Q.   IN REVIEWING THE CREDENTIALING FILE, YOU FOUND NO EVIDENCE

22  OF SUPERVISION OF PHYSICIANS WITH RESTRICTED LICENSES?

23  A.   I SAW THAT THEY HAD AN EVALUATION PERFORMED.

24  Q.   IN REVIEWING THE CREDENTIALING FILES, YOU SAW NO EVIDENCE

25  OF SUPERVISION OF PHYSICIANS WITH RESTRICTED LICENSES?

1    **A.**   YOU WOULD HAVE TO SHOW THAT TO ME.

2            **MR. ARCHEY:**   YOUR HONOR, SHE ANSWERED THE QUESTION.

3    I MEAN, ASKING IT AGAIN BECAUSE SHE DIDN'T LIKE THE ANSWER, BUT

4    I MEAN, SO I OBJECT TO THE QUESTION BEING REASKED.

5            **MS. MONTAGNES:**   YOUR HONOR, IT WAS UNRESPONSIVE.

6            **THE COURT:**   THE OBJECTION IS OVERRULED.  ASK THE

7    QUESTION AGAIN.

8    **BY MS. MONTAGNES:**

9    **Q.**   WHEN YOU REVIEWED THE CREDENTIALING FILE, YOU DIDN'T SEE

10   ANY EVIDENCE THAT THERE WAS MONITORING OF PHYSICIANS WHO WERE

11   UNDER RESTRICTED LICENSES?

12   **A.**   I DON'T KNOW WHAT YOU MEAN BY "MONITORING."  DO YOU MEAN

13   ANOTHER PHYSICIAN COMING IN FROM THE OUTSIDE, SOMEONE FROM THE

14   BOARD OF MEDICAL EXAMINERS?

15   **Q.**   LET'S PULL UP THE DEPOSITION AT 117.  I ASKED YOU:  "WHEN

16   YOU LOOKED AT THE CREDENTIALING FILES, DID YOU SEE EVIDENCE OF

17   SUPERVISION OR ANYTHING THAT WOULD INDICATE THAT THE DEPARTMENT

18   HAD UNDERTAKEN THAT IN THE FILE?"

19           AND YOU SAID:  "NO, WHAT I SAW WAS WHAT'S THERE, BUT

20   THEY DIDN'T EVEN MENTION THAT."

21   **A.**   OKAY.  THAT'S CORRECT.

22   **Q.**   AND WHEN YOU REVIEWED THE CREDENTIALING FILE, YOU ONLY SAW

23   EVIDENCE THAT ONE PHYSICIAN HAD EVER BEEN DISCIPLINED?

24   **A.**   AT THE TIME THAT I WAS THERE, YES, AND --

25   **Q.**   THERE WAS NO FORM THAT YOU REVIEWED -- THE EVALUATION FORM

1   THAT YOU REVIEWED DIDN'T HAVE CLINICAL CRITERIA?

2   **A.**   IT DID TALK ABOUT KNOWLEDGE OF THE FACILITY AND KNOWLEDGE

3   OF THEIR JOB, THINGS LIKE THAT.

4   **Q.**   BUT IT HAD NO CLINICAL CRITERIA?

5   **A.**   THE ONE THAT I -- THAT YOU PUT ON THE SCREEN WAS THE ONE

6   THAT I SAW YESTERDAY, AND NO, THERE WAS NO CLINICAL CRITERIA.

7   **Q.**   AND JUST SO WE ARE CLEAR, THE ONE THAT YOU WERE PROVIDED

8   WITH WAS THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND

9   CORRECTIONS UNCLASSIFIED PERFORMANCE?

10   **A.**   I DON'T RECALL THE NAME OF THE FORM.

11   **Q.**   BUT IT WAS THE ONE I PUT UP ON THE SCREEN YESTERDAY?

12   **A.**   YES, IT WAS.

13   **Q.**   AND YOU SAID THAT THE MEDICAL RECORDS WERE VERY ORGANIZED

14   ON THE DAY THAT YOU SAW THEM?

15   **A.**   YES, THEY WERE.

16   **Q.**   AND THEY ORGANIZED THOSE IN ADVANCE OF YOUR VISIT, DIDN'T

17   THEY?

18   **A.**   I WOULDN'T KNOW THAT.

19   **Q.**   IN FACT, THEY WORKED VERY, VERY HARD ON IT, DIDN'T THEY?

20   **A.**   I DON'T KNOW THAT.

21        **MS. MONTAGNES:**  CAN WE TURN TO PAGE 189 OF THE

22   DEPOSITION.  I MIGHT BE IN THE WRONG PLACE.  LET'S GO TO THE

23   NEXT PAGE.  188, MY APOLOGIES.

24   **BY MS. MONTAGNES:**

25   **Q.**   AND I ASKED YOU:  "IN REVIEWING THE MEDICAL RECORDS, DID

04:52    1    YOU HAVE ANY CONCERN ABOUT THE ORGANIZATION OR . . ."

2              AND YOU SAID:  "THE RECORDS WERE ORGANIZED WHEN I SAW

3    THEM.  THEY HAD WORKED VERY, VERY HARD ON GETTING THOSE RECORDS

4    ORGANIZED."

5              AND I SAID:  "IN ADVANCE OF YOUR VISIT?"

6              AND YOU SAID:  "YEAH."

7    **A.**  WELL, YES, THEY WERE ORGANIZED IN ADVANCE OF MY VISIT.

8    NOW, WHETHER THEY WERE ORGANIZED TWO DAYS BEFORE OR THEY HAD

9    BEEN ORGANIZED, I CAN'T TELL YOU THAT.  MY ANSWER STANDS.

10   **Q.**  AND WHEN YOU EVALUATED, YOU COULDN'T FIGURE OUT LSP'S

11   BUDGET WHEN YOU WERE LOOKING AT IT?

12   **A.**  NO, I COULDN'T.  AND I'M USUALLY VERY GOOD WITH BUDGETS.

13   **Q.**  AND YOU DID NOT AGREE WITH DR. THOMAS THAT THE STANDARD OF

14   CARE IS DIFFERENT IN PRISONS THAN IT IS IN THE COMMUNITY?

15             **MR. ARCHEY:**  YOUR HONOR, I OBJECT.  FIRST OFF, IT'S A

16   LEGAL QUESTION; SECOND OFF, I DON'T THINK IT'S APPROPRIATE.

17   AND WHAT WAS THE FULL QUESTION AGAIN?

18             **THE COURT:**  AND THE QUESTION WAS:  THE STANDARD OF

19   CARE IS NOT DIFFERENT IN CORRECTIONAL FACILITIES.

20             **MR. ARCHEY:**  AND SHE'S NOT QUALIFIED AS WELL.

21             **THE COURT:**  YOU OBJECTED TO HER GIVING THE STANDARD

22   OF CARE OPINION.

23             **MS. MONTAGNES:**  YOU'RE RIGHT, YOUR HONOR, I WITHDRAW.

24             **THE COURT:**  SUSTAINED.

25             **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

0 4 : 5 3

1    BY MS. MONTAGNES:

2    Q.   YOU FREQUENTLY RELIED ON DR. PUISIS' WORK IN YOUR REPORTS?

3    A.   I RELIED ON DR. PUISIS' WORK ON MY REPORTS?

4    Q.   YOU'VE RELIED ON HIS TEXTBOOK IN YOUR REPORTS.

5    A.   IN MY OTHER REPORTS, YES, I'VE RELIED ON DR. PUISIS'

6    TEXTBOOK, YES, I HAVE.

7    Q.   AND YOU THINK THAT --

8    A.   NOT IN THIS REPORT.

9    Q.   I UNDERSTAND.  AND YOU THINK HIS TEXTBOOK IS GOOD?

10   A.   I THINK IT IS.

11   Q.   AND YOU DID SOME EDITING -- WELL, ACTUALLY, WE'LL LEAVE

12   THAT.

13          IN YOUR REPORT, WHEN YOU SAY THAT DR. LAVESPERE IS

14   THE BEST CLINICIAN, THAT WASN'T AN EXPERT OPINION, THAT WAS

15   YOUR PERSONAL OPINION?

16   A.   IT WAS AN EXPERT OPINION.  YOU CHANGED IT TO BE MY

17   PERSONAL OPINION.  I OBSERVED WHEN I SAW HIM IN THE CLINIC AND

18   IN HIS INTERACTION WITH PATIENTS, IN TALKING TO OTHER PEOPLE

19   AND INFORMING PEOPLE OF WHAT THEY NEEDED TO DO.

20   Q.   AND LET'S JUST TURN UP PAGE 59 OF THE --

21   A.   YOU CHANGED IT.  YOU SAID, OH, SO THAT'S A PERSONAL

22   OPINION.  BUT THAT WAS IN MY REPORT, I SAID THAT HE WAS AN

23   EXCELLENT CLINICIAN.  AND IN MY DEPOSITION, YOU BADGERED ME

24   UNTIL YOU GOT TO WHAT YOU WANTED ME TO SAY.

25   Q.   SO THE QUESTION WAS:  "BUT YOU DID NO INDEPENDENT EXPERT

1  REVIEW OF HIS CLINICAL PRACTICE?"

2             AND YOU SAID:  "I'M NOT QUALIFIED TO DO THAT."

3             AND THEN I ASKED YOU:  "AND SO WHEN YOU SAY THAT HE'S

4  THE BEST CLINICIAN THAT THEY HAVE, THAT'S NOT AN EXPERT

5  OPINION, THAT'S A PERSONAL OPINION?"

6             AND THEN YOU SAID:  "IT'S A PERSONAL OPINION."

7  A.    IT'S BOTH.

8  Q.    AND WHEN YOU SAID THAT STEPHANIE LAMARTINIERE IN YOUR

9  REPORT WAS A TRUE PROBLEM SOLVER AND LEADER, THAT WAS ALSO A

10 PERSONAL OPINION, WASN'T IT?

11 A.    THAT WAS NOT MY OPINION, THAT CAME FROM DR. SINGH.

12 Q.    AND WHEN YOU SAID THAT DARREN CASHIO WAS AN ACCOMPLISHED

13 EMT, THAT WAS ALSO NOT AN EXPERT OPINION?

14 A.    THAT CAME FROM SHERWOOD PORTA.

15 Q.    PORET.

16 A.    PORET.  THANK YOU.

17 Q.    AND WHEN YOU SAID THAT DR. LAVESPERE IS A CLINICAL

18 RESOURCE TO THE DEPARTMENT, AGAIN, THAT WASN'T BASED ON ANY

19 EXPERTISE?

20 A.    YES, IT WAS.  IT WAS BASED ON MY INTERVIEW, WHERE HE TOLD

21 ME WHERE PATIENTS WERE.  WHEN I ASKED HIM ABOUT VARIOUS CHARTS

22 THAT I REVIEWED, HE KNEW EACH AND EVERY ONE OF THOSE CHARTS.

23 Q.    AND WHEN YOU SAID THAT DR. LAVESPERE WAS AN ADVOCATE FOR

24 HIS PATIENTS, AGAIN, THAT WASN'T BASED ON ANY CLINICAL

25 EVALUATION BUT RATHER ON YOUR PERSONAL OPINION?

**A.**   THAT WAS BASED ON MY OBSERVATION AT THE TIME THAT I WAS IN HIS OFFICE AND HE WAS ADVOCATING FOR A PATIENT TO GO TO A SPECIALIST.  AND HE WAS ACTUALLY TALKING TO THE SPECIALIST HIMSELF.

**Q.**   YOU WERE IN THE COURTROOM YESTERDAY WHEN DR. LAVESPERE SPOKE ABOUT HAVING TOO MUCH LEGAL WORK TO DO?

**A.**   THAT'S PROBABLY TRUE.

          **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO OBJECT TO THE RELEVANCE OF THAT.  I MEAN, THIS LINE OF QUESTION HAS NO RELEVANCE.

          **MS. MONTAGNES:**  IT ACTUALLY DOES.  YOU SPOKE EXPLICITLY ABOUT THE ADMINISTRATIVE RESPONSIBILITIES AND HIS ROLE IN THE ADMINISTRATION.  SHE'S MADE AN OPINION ABOUT -- SHE'S AUTHORED AN OPINION ABOUT IT AND I JUST SIMPLY WANT TO -- THIS IS VERY SHORT.  IT'S ONE QUESTION, AND IT GOES TO THE ADMINISTRATIVE DIVISION OF RESPONSIBILITY.

          **MR. ARCHEY:**  WELL, THAT'S NOT THE QUESTION SHE ASKED THOUGH.  SHE ASKED ABOUT HIS LEGAL AND HAVING TO DEAL WITH LEGAL MATTERS.

          **THE COURT:**  REPHRASE YOUR QUESTION.

          **MS. MONTAGNES:**  ALL RIGHT.

BY MS. MONTAGNES:

**Q.**   IN OTHER FACILITIES, DO MEDICAL DIRECTORS UNDERTAKE AS MUCH LEGAL WORK AS DR. LAVESPERE DOES?

**A.**   IN A LOT OF FACILITIES, THE CARE IS PRIVATIZED, AND SO THE

04:57 1    WORK IN LEGAL FACILITIES IS DONE BY THEIR CORPORATE OFFICE OR

2    THEIR CORPORATE LEGAL TEAM.

3          IN OTHER STATE FACILITIES THAT ARE PRIVATELY RUN,

4    THERE IS GENERALLY A MEDICAL DIRECTOR THAT IS OUTSIDE OF THE

5    INSTITUTION THAT TAKES ON THAT LEGAL RESPONSIBILITY.

6    **Q.**   I WANT TO TURN TO THE EXPERT REPORT, TO DX-13, AT PAGE 16,

7    A TABLE THAT YOU'VE DONE, AND I'M GOING TO PASS YOU COPIES OF

8    YOUR NOTES THAT I'VE MADE, IF THAT'S OKAY.

9          **MS. MONTAGNES:**  YOUR HONOR, MAY I APPROACH?

10          **THE COURT:**  YOU MAY.

11   **BY MS. MONTAGNES:**

12   **Q.**   I WILL PUT IT UP ON THE SCREEN.  AND THESE ARE YOUR NOTES,

13   RIGHT?

14   **A.**   YES.

15          **MS. MONTAGNES:**  CAN YOU PULL BACK UP TABLE 1?

16          YOUR HONOR, WE SEEM TO BE ONE COPY SHORT.

17          **THE COURT:**  DID YOU WORK IT OUT?

18          **MR. ARCHEY:**  EXCUSE ME?

19          **THE COURT:**  DID YOU WORK IT OUT?

20          **MS. MONTAGNES:**  YES, MA'AM.

21   **BY MS. MONTAGNES:**

22   **Q.**   AND NURSE MOORE, THESE ARE THE NOTES THAT YOU PROVIDED TO

23   US, CORRECT?

24   **A.**   YES.

25          **MR. ARCHEY:**  YOUR HONOR, I DON'T HAVE ACCESS TO THEM.

05:00  1            MS. MONTAGNES:  OH, SORRY, I MEANT TO GIVE THESE TO

2    YOU.  I DON'T THINK WE'VE WORKED IT OUT.  LET ME GRAB MY

3    LAPTOP.  ONE SECOND.

4            THE COURT:  WE NEED TO TAKE A RECESS.  APPARENTLY

5    YOUR CLIENT NEEDS TO USE THE FACILITIES.  IT'S 5:00.  HOW LONG

6    DO YOU HAVE?

7            MS. MONTAGNES:  I COULD PROBABLY DO IT IN FIVE

8    MINUTES, TEN MINUTES.

9            THE COURT:  CAN WE WAIT FIVE MINUTES, SIR?

10           ALL RIGHT.  GO AHEAD.

11   BY MS. MONTAGNES:

12   Q.   SO NURSE MOORE, TURNING TO PAGE 30 OF THE NOTES THAT I

13   PROVIDED YOU -- AND I THINK I ONLY PROVIDED YOU 30 AND 31.  I

14   JUST WANT TO LOOK AT THIS CHART.  I THINK THIS CHART, THE NOTES

15   THAT I'VE GIVEN YOU ARE THE NOTES THAT CORRESPOND TO THIS CHART

16   THAT YOU CREATED IN YOUR REPORT.

17   A.   YES.

18   Q.   ALL RIGHT.  AND SO THE FIRST ONE ON THE BOTTOM OF PAGE 30

19   APPEARS TO BE CORRECT, BUT WHEN YOU LOOK AT THE SECOND CHARTING

20   THAT YOU DID, IT APPEARS FROM YOUR NOTES THAT THE ORIGINAL SICK

21   CALL WAS MADE ON 6/23; IS THAT RIGHT?

22   A.   THERE WERE SEVERAL SICK CALLS THAT WERE IN HERE, AND THERE

23   WAS ONE ON 6/23.  BUT THERE WAS ALSO ONE ON 7/16.

24   Q.   ALL RIGHT.

25   A.   SO I'M NOT SURE WHICH ONE YOU'RE SPEAKING OF.  YOU KNOW, I

05:03  1   WENT THROUGH THE CHART AND LOOKED AT SICK CALL.  I CAN'T SAY --

2   I MEAN, THE ONE THAT I WAS TALKING ABOUT WAS THE ONE WHERE HE

3   COMPLAINED OF TESTICULAR PAIN AND WAS GIVEN MOTRIN.  THAT WAS

4   NOT THE ONE ON 6/23.

5   Q.   YES.  BUT YOU NOTE THREE SICK CALLS:  ONE ON 6/23; ONE ON

6   7/13; AND ONE ON 7/16, AND YOU DON'T NOTE ANY FOLLOW-UP CARE IN

7   THE INTERIM PERIOD?

8   A.   I NOTE WHEN HE WAS SEEN AND I SAID THAT IT WAS BEYOND A

9   MONTH REFERRAL.  I DID.

10   Q.   AND THEN ON PATIENT 3, IT APPEARS THAT HE WASN'T SCHEDULED

11   UNTIL 8/22.

12   A.   HE WAS TRIAGED ON 7/31.  HE WAS SCHEDULED ON 8/11 FOR A

13   HEAT RASH.  SO THE ORTHOPEDIC CONSULT HAS ACTUALLY NOTHING TO

14   DO WITH THE SICK CALL THAT I WAS REFERRING TO.

15   Q.   SO --

16   A.   IT'S A DIFFERENT ISSUE.

17   Q.   SO HE WAS SCHEDULED FOR A HEAT RASH?

18   A.   ON 8/11, HE HAD ATHLETE'S FEET, THAT'S WHAT WAS THE

19   DIAGNOSIS AND THAT'S WHAT'S WRITTEN IN MY CHART.

20   Q.   OKAY.

21   A.   YOU'RE TRYING TO MAKE SENSE OF MY NOTES WHEN YOU DIDN'T

22   WRITE THEM, AND YOU'RE JUST ASSUMING THAT YOU KNOW WHAT THEY

23   MEAN.  IT'S UP TO ME TO INTERPRET THEM, I BELIEVE.

24   Q.   ALL RIGHT.  AND PATIENT 4, IT APPEARS THAT HE FIRST MADE A

25   COMPLAINT FOR A HEARING PROBLEM ON 7/2.

**A.**   YES.

**Q.**   AND IN YOUR CHART, IT SAYS 8/3/26, WHICH I ASSUME IS JUST

A TYPO.

**A.**   IT COULD BE.  8/3/16 WAS THE SAME COMPLAINT AS ABOVE.

**Q.**   BUT THE ORIGINAL COMPLAINT WAS 7/2?

**A.**   IT COULD BE.  I CAN'T REALLY TELL YOU THAT AT THIS POINT.

**Q.**   ALL RIGHT.  AND I ASSUME WHEN YOU SAY DATE SEEN 8/22/18,

YOU MEAN 8/22/16?

**A.**   YES, OF COURSE, I DO.

        **MS. MONTAGNES:**  YOUR HONOR, I WOULD ASK THAT WE COULD

ADMIT PAGES 30 AND 31 OF NURSE MOORE'S NOTES INTO THE RECORD AS

PX-411.

        **MR. ARCHEY:**  I'VE BEEN HANDED FIVE PAGES.  IS THERE A

REASON WHY THERE'S ONLY TWO?

        **MS. MONTAGNES:**  THOSE ARE JUST THE RELEVANT PAGES

THAT WE'VE DISCUSSED.  THEY WERE HANDED -- THEY WERE GIVEN TO

US AS INDEPENDENT PDFS.

        **MR. ARCHEY:**  JOINT EXHIBIT 17, IT'S ALREADY IN,

THAT'S WHAT I'M HEARING, JUDGE.

        **MS. MONTAGNES:**  OH, OKAY.

        **MR. ARCHEY:**  THESE ARE PART OF JOINT EXHIBIT --

        **MS. MONTAGNES:**  OH, I APOLOGIZE, I DIDN'T KNOW THAT.

        **THE COURT:**  JOINT EXHIBIT 17, THEY ARE ALREADY IN

EVIDENCE?

        **MR. ARCHEY:**  THAT'S WHAT I UNDERSTAND, JUDGE.

05:06  1          THE COURT:  ALL RIGHT.

2          MS. MONTAGNES:  MY MISTAKE.  THAT WOULD HAVE MADE IT

3  A LOT EASIER.

4  BY MS. MONTAGNES:

5  Q.    AND YOU ESTIMATE THAT THERE ARE ABOUT 600 SICK CALLS A DAY

6  AT LSP?

7  A.    I ESTIMATE ABOUT 10 PERCENT OF THE POPULATION REQUESTS

8  SICK CALL.

9  Q.    EVERYDAY.  OKAY.  AND YOU DOCUMENT THAT NURSES PERFORM

10  SICK CALL, BUT THAT WAS JUST IN THE INFIRMARY UNITS; IS THAT

11  RIGHT?

12  A.    I THINK THERE WAS TWO UNITS WHERE THEY PROVIDE MEDICATION

13  AS WELL.

14  Q.    OKAY.  AND WHEN YOU WROTE YOUR REPORT, YOU DIDN'T KNOW

15  THAT THERE WAS A CHARGE FOR MALINGERING?

16  A.    I STILL DON'T KNOW THAT.

17  Q.    AND THE ATU STATS IN YOUR REPORT THAT SAY 11 TO 16,000,

18  THAT'S FOR A YEAR, NOT FOR A MONTH?

19  A.    YES.

20          MS. MONTAGNES:  THANK YOU, YOUR HONOR.

21          MR. ARCHEY:  YOUR HONOR, IN A VERY FEEBLE ATTEMPT TO

22  GET BACK IN YOUR GOOD GRACES, I HAVE NO QUESTIONS.

23          THE COURT:  OKAY.  YOU MAY STEP DOWN.  THANK YOU,

24  MA'AM.

25          THE WITNESS:  THANK YOU.

05:07  1      **THE COURT:**  LADIES AND GENTLEMEN, IT SEEMS LIKE THIS

2    MIGHT BE A GOOD TIME TO BREAK FOR THE DAY.  IT'S 5:07.  LET ME

3    GIVE YOU THE SCHEDULE FOR THE REMAINDER OF THE WEEK.  TOMORROW

4    WE NEED TO CONVENE AT 10:00.  THE COURT HAS -- YOU MAY BE

5    SEATED.  THE COURT HAS TWO CRIMINAL MATTERS IN THE MORNING THAT

6    THE COURT SET FOR 9:00, SO WE WILL CONVENE AT 10:00, WORK UNTIL

7    NOON, WORK AGAIN FROM 1:00 UNTIL 5:00 OR 5:30.  SO TOMORROW

8    WILL BE PRETTY MUCH A FULL DAY ON THE RECORD.

9              THURSDAY WE WILL CONVENE AT 9:30.  THE COURT

10   HAS, AGAIN, CRIMINAL MATTERS.  WE WILL WORK FROM 9:30 TO 11:30

11   AND THEN FROM 1:30 TO 5:30.

12             WE WILL NOT HAVE COURT ON FRIDAY.  IF WE ARE NOT

13   COMPLETED WITH THIS CASE, WE WILL HAVE COURT ON SATURDAY, SO

14   MAKE YOUR PLANS.  ALL RIGHT.  ANY QUESTIONS?  IF NOT, WE ARE IN

15   RECESS UNTIL IN THE MORNING.

16             ALL RISE.

17        **(PROCEEDINGS RECESSED UNTIL OCTOBER 24, 2018)**

18                        **CERTIFICATE**

19        I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

20   UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

21   CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

22   THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

23   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

24

25        _____  *Shannon Thompson*

1    SHANNON THOMPSON, CCR,

2    OFFICIAL COURT REPORTER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25