UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, | * | CIVIL ACTION |
| FARRELL SAMPIER, REGINALD | * | |
| GEORGE, JOHN TONUBBEE, OTTO | * | NO. 3:15-cv-00318 |
| BARRERA, CLYDE CARTER, CEDRIC | * | |
| EVANS, EDWARD GIOVANNI, RICKY D. | * | JUDGE SHELLY D. DICK |
| DAVIS, LIONEL TOLBERT, and RUFUS | * | |
| WHITE, on behalf of themselves and all | * | MAGISTRATE JUDGE |
| others similarly situated, | * | RICHARD L. BOURGEOIS |
| | * | |
| VERSUS | * | |
| | * | |
| BURL CAIN, Warden of the Louisiana State | * | |
| Penitentiary, in his official capacity; | * | |
| STEPHANIE LEMARTINIERE, Assistant | * | |
| Warden for Health Services, in her official | * | |
| Capacity; JAMES M. LEBLANC, Secretary of | * | |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS | * | |

*************************************************************************

## POST-TRIAL BRIEF FILED ON BEHALF OF DEFENDANTS

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

KANTROW, SPAHT, WEAVER & BLITZER
(A PROFESSIONAL LAW CORPORATION)
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 383-4703
Facsimile: (225) 343-0630

By: /s/ Randal J. Robert
    Randal J. Robert (#13800)
    Connell L. Archey (#29992)
    Keith J. Fernandez (#33124)
    George P. Holmes (#36501)
    *Special Assistant Attorneys General*
    Email: randy@kswb.com

connell@kswb.com
keith@kswb.com
george@kswb.com

**SHOWS, CALI & WALSH, L.L.P.**
Jeffrey K. Cody, La. Bar Roll No. 28536
Caroline T. Bond, La. Bar Roll No. 34120
John C. Conine, Jr., La. Bar Roll No. 36834
*Special Assistant Attorneys General*
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
Email: jeffreyc@scwllp.com
       caroline@scwllp.com
       coninej@scwllp.com

Patricia Wilton (La. Bar Roll No. 18049)
Elizabeth Murrill (La. Bar Roll No. 20685)
Angelique Freel (La. Bar Roll No. 28561)
*Assistant Attorneys General*
Louisiana Department of Justice
1885 North 3rd Street
P.O. Box 94005
Baton Rouge, Louisiana 70804-9005
Telephone: (225) 326-6200
Facsimile: (225) 326-6297
Email: WiltonP@ag.louisiana.gov
       MurrillE@ag.louisiana.gov
       FreelA@ag.louisiana.gov

Counsel for Defendants

# TABLE OF CONTENTS

Table of Contents ............................................................................................................... i

Table of Authorities ......................................................................................................... vi

I.    Introduction ............................................................................................................ 1

II.   Factual Background ................................................................................................ 3

      A.  The Defendants .............................................................................................. 3

      B.  Prior Related Litigation ................................................................................. 4

      C.  Medical Facilities at Angola ........................................................................... 5

          1.  R.E. Barrow Treatment Center ............................................................... 6

          2.  Out Camp Clinics and Assisted Living Dorms ....................................... 6

      D.  Medical Administrative, Supervision and Staff ............................................. 7

          1.  Physicians ............................................................................................... 7

          2.  Nurses ..................................................................................................... 8

          3.  Emergency Medical Technicians ............................................................. 9

          4.  Healthcare Orderlies ............................................................................... 9

          5.  Medical Administration ........................................................................... 10

      E.  Medical Services Provided by LSP ................................................................ 10

          1.  Sick Call ................................................................................................. 10

          2.  Urgent Care ............................................................................................ 11

          3.  Infirmary Care ........................................................................................ 12

          4.  Non-Urgent Clinical Care ....................................................................... 12

          5.  Specialty Services - Consultations .......................................................... 13

          6.  Pharmacy, Medication Administration and Diagnostic Services ............ 14

i

III.  Law and Argument – Eighth Amendment Claims ......................................................15

    A.  Applicable Law .........................................................................................................15

        1.  The Objective Prong ...........................................................................................18

        2.  The Subjective Prong ..........................................................................................19

    B.  Defendants Have Not Been Deliberately Indifferent ................................................24

        1.  Adequacy of Clinical Care ..................................................................................24

            a.  The Selection of Charts to Review Was Deliberately Done to Make LSP Look as Bad as Possible ..............................................................24

            b.  Plaintiffs' Experts Were Biased, slanted, Unfair, Wrong and Not Worthy of Being Trusted ..................................................................25

            c.  Plaintiffs' Experts Applied the Wrong Standard of Care ...............................28

            d.  An Overview of the Individual Charts Refutes the Suggestion That LSP Provided Constitutionally Deficient Health Care ....................................30

                &bull;  Patient Number 1 ..................................................................................31
                &bull;  Patient Number 2 ..................................................................................32
                &bull;  Patient Number 3 ..................................................................................32
                &bull;  Patient Number 4 ..................................................................................33
                &bull;  Patient Number 5 ..................................................................................33
                &bull;  Patient Number 6 ..................................................................................35
                &bull;  Patient Number 7 ..................................................................................36
                &bull;  Patient Number 8 ..................................................................................37
                &bull;  Patient Number 9 ..................................................................................37
                &bull;  Patient Number 10 ................................................................................38
                &bull;  Patient Number 11 ................................................................................39
                &bull;  Patient Number 12 ................................................................................40
                &bull;  Patient Number 13 ................................................................................40
                &bull;  Patient Number 14 ................................................................................43
                &bull;  Patient Number 15 ................................................................................44
                &bull;  Patient Number 16 ................................................................................46
                &bull;  Patient Number 17 ................................................................................46
                &bull;  Patient Number 18 ................................................................................48
                &bull;  Patient Number 19 ................................................................................49
                &bull;  Patient Number 20 ................................................................................50
                &bull;  Patient Number 21 ................................................................................52
                &bull;  Patient Number 22 ................................................................................54

- Patient Number 23 (Ferrell Sampier) ................................................................55
- Patient Number 24 (Kantrell Parker) ................................................................56
- Patient Number 25 (Reginald George) ..............................................................56
- Patient Number 26 ..........................................................................................60
- Patient Number 27 ..........................................................................................60
- Patient Number 28 ..........................................................................................61
- Patient Number 29 ..........................................................................................61
- Patient Number 30 ..........................................................................................63
- Patient Number 31 ..........................................................................................64
- Patient Number 32 ..........................................................................................64
- Patient Number 33 ..........................................................................................65
- Patient Number 34 ..........................................................................................65
- Patient Number 35 ..........................................................................................66
- Patient Number 36 ..........................................................................................66
- Patient Number 37 ..........................................................................................66
- Patient Number 38 ..........................................................................................67
- Patient Number 39 ..........................................................................................67
- Patient Number 40 ..........................................................................................68
- Patient Number 41 ..........................................................................................69
- Patient Number 42 ..........................................................................................70
- Patient Number 43 ..........................................................................................70
- Patient Number 44 ..........................................................................................71
- Patient Number 45 ..........................................................................................72
- Adams, Alton ..................................................................................................72
- Barrera, Otto ..................................................................................................74
- Batiste, Alton ..................................................................................................75
- Cazenave, Ian ..................................................................................................76
- Davis, Ricky ....................................................................................................78
- Evans, Cedric ..................................................................................................79
- Giovanni, Edward ............................................................................................79
- Hurd, Shannon ................................................................................................79
- Parks, Lionel ..................................................................................................84
- Tolbert, Lionel ................................................................................................85
- Tonubbee, John ..............................................................................................87
- Washington, Edward ........................................................................................89
- White, Rufus ..................................................................................................91

e.  Clinical Care Provided by LSP Does Not Violate the Eighth Amendment .....91

2. Administration of Policies and Practices ...........................................................93

a.  Adequacy of Budget ..................................................................................93

b.  Adequacy and Appropriateness of Staffing ...................................................96

  c. Adequacy of Leadership ...................................................................98

 3. Clinical Practices at LSP........................................................................100

  a. Adequacy of Sick Call ...............................................................100

  b. Adequacy of Urgent Care ..........................................................103

  c. Adequacy of Chronic Disease Management................................105

  d. Adequacy of Infirmary Services .................................................107

  e. Adequacy of Medication Administration ....................................109

  f. Adequacy of Specialty Care .......................................................112

  g. Adequacy and Cleanliness of Facilities......................................115

  h. Peer Review, Mortality Review and QA/QI ...............................117

 4. Subjective Knowledge Requirement Lacking ......................................120

 5. Evidence in Record Does Not Reflect Current Conditions .................123

IV. Law and Argument – ADA and RA Claims ....................................................125

 A. The involvement of the United States Department of Justice
  necessitates pretermission of Plaintiffs' ADA claims .............................126

 B. Plaintiffs failed to meet their burden of proving a violation of the ADA.................127

  1. LSP provides disabled inmates access to programs, services and activities. ......128

   a. The testimony of Plaintiff's architectural expert does not establish
   that LSP denies disabled inmates access to services, programs, and
   activities because LSP achieves program access through alternative
   methods of compliance. ..............................................................128

   b. LSP provides reasonable accommodations to allow disabled inmates
   to access its programs, services and activities. .............................133

    i. LSP provides auxiliary aid and assistance devices to inmates
    with disabilities. ...............................................................136

    ii. Trained healthcare orderlies are used to provide assistance
    to disabled inmates..........................................................143

iii. Inmates with disabilities are accommodated in work assignments ......147

iv. LSP accommodates special dietary needs of disabled inmates ...........152

v. LSP accommodates the limitations of disabled inmates in transportation to medical appointments. ................................................154

vi. Disabled inmates are accommodated in the enforcement of prison procedures........................................................................158

2. LSP integrates individuals with disabilities........................................................160

3. LSP does not use discriminatory methods of administration ............................164

a. Plaintiffs' allegation that Defendants fail to inform individuals of their rights and procedures............................................................................165

b. Plaintiffs' claim that LSP has inadequate procedures for requesting accommodations..................................................................166

c. Plaintiffs' perception that LSP fails to identify and track disabilities ..........168

d. Plaintiffs' complaint that inmates may be charged medical co-payments to request accommodations ....................................................169

e. Plaintiffs' belief that LSP inadequately trains its staff respecting the ADA ......................................................................................................170

f. Plaintiffs' claim that LSP has failed to maintain a qualified ADA Coordinator ...............................................................................................170

g. Plaintiffs' criticism that Defendants have failed to maintain an advisory committee........................................................................................171

4. Plaintiffs failed to establish that LSP discriminates against individuals with disabilities by reason of their disability ......................................................172

a. Hobby Craft ...............................................................................................173

b. Work Assignments......................................................................................175

c. Work Release..............................................................................................176

V. Conclusion ............................................................................................................177

# TABLE OF AUTHORITIES

**STATUTES**                                                                          **Page**

Eighth Amendment, United States Constitution.................................................................. 15-24

29 U.S.C. § 701..................................................................................................................125

42 U.S.C. § 12102..............................................................................................................139

42 U.S.C. § 12102(1).................................................................................................140, 152

42 U.S.C. § 12102(4)(E)(ii)...............................................................................................141

42 U.S.C. § 12131, *et seq.*.......................................................................................... 125-126

42 U.S.C. § 12132........................................................................................................127, 161

28 C.F.R. §§ 35.105–107.............................................................................................170-171

28 C.F.R. §§ 35.107............................................................................................................170

28 C.F.R. § 35.130..............................................................................................................172

28 C.F.R. § 35.130(b)(3).....................................................................................................165

28 C.F.R. § 35.130(d)....................................................................................................160-161

28 C.F.R. § 35.150(a)..........................................................................................................130

28 C.F.R. § 35.150(b)(1)...........................................................................131, 133, 143, 162

28 C.F.R. § 35.151..............................................................................................................129

28 C.F.R. § 35.160(b)(1).....................................................................................................136

28 C.F.R. § 35.160(b)(2).....................................................................................................138

Fed. R. Evid. 703................................................................................................................160

La.R.S. § 15:574.4(3B)............................................................................................................1

**JURISPRUDENCE**

*Acielli v. Torres*, 2015 WL 4380772 (C.D. Cal. July 16, 2015)..............................16, 28

vi

*Adames v. Perez*, 331 F.3d 508 (5th Cir.2003) ....................................................23

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) ..................................................123

*Anderson v. County of Kern*, 45 F.3d 1310 (9th Cir. 1995)........................17, 66, 105

*Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015) ...................................................139

*Ball v. LeBlanc*, 881 F.3d 346 (5th Cir. 2018) .....................................................19

*Barrow v. Shearing*, 2017 WL 3866818 (S.D. Ill. Sept. 5, 2017) ...............16, 28, 29

*Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977) ....................................................21

*Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005)...............133

*Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565 (E.D. Tex. 2014)..........................159

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 1382 (1997) ....................15

*Brauner v. Coody*, 793 F.3d 493 (5th Cir. 2015).........................18, 31, 33, 117

*Brewster v. Dretke*, 587 F.3d 764 (5th Cir. 2009) ................................................15

*Broadus v. Chapdelaine*, 2018 WL 899254 (D. Colo. Feb. 15, 2018) ............17, 35, 39

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207 (D.C. Cir. 1997)...............142

*Californians for Disability Rights, Inc. v. Cal. DOT*, 249 F.R.D. 334 (N.D. Cal. 2008) ...........171

*Calloway v. Gusman*, 2006 WL 2710475 (E.D. La. Sept. 20, 2006) ........................24

*Carlucci v. Chapa*, 884 F.3d 534 (5th Cir. 2018) ................................................18

*Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25 (1st Cir. 2010).............................149

*Castro v. Local 1199*, 964 F. Supp. 719 (S.D.N.Y. 1997)......................................149

*Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850 (10th Cir. 2003) ...............................171

*Chafin v. Chafin*, 568 U.S. 165 (2013) ...........................................................127

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1982) ...............................................123

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982).............................127

*Criollo v. Milton*, 414 F. App'x 719 (5th Cir. 2011) ...................................................20, 98

*Dailey v. Byrnes*, 605 F.2d 858 (5th Cir. 1979)...............................................................21

*Davis v. Sutley*, 2009 WL 773261 (C.D. Cal. Mar. 20, 2009) ...................................16, 29

*DeLeon v. City of Alvin Police Dep't*, 2011 WL 43432 (S.D. Tex. Jan. 6, 2011) ...............170-171

*Dickson v. Colman*, 569 F.2d 1310 (5th Cir. 1978) .........................................................22

*Doe v. Wooten*, 747 F.3d 1317 (11th Cir. 2014).............................................................125

*Domino v. Texas Dep't of Crim. Justice,* 239 F.3d 752 (5th Cir. 2001)............................ 15-16, 20

*Duffy v. Freed,* 2010 U.S. Dist. LEXIS 98860 (D.N.J. Sept. 17, 2010) ......................................171

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006) .........................................................17, 71

*Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721 (6th Cir. 1994).........................................160

*Estelle v. Gamble*, 429 U.S. 97 (1976) ......................................... 15-17, 21, 29, 66, 105

*Farmer v. Brennan,* 511 U.S. 825 (1994) ................................................ 19, 22-23, 124

*Flynn v. Burns*, 289 F.Supp.3d 948 (E.D. Wis. 2018) .................................................124

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) ..........................................127

*Garrett v. Thalen,* 560 F.App'x 375 (5th Cir.) 2014)....................................................163

*Garrett v. Wohler*, 2013 WL 12125743 (D. Ariz. Apr. 30, 2013) .............................16, 28

*Green v. City of Mission*, No. 2018 WL 2200094 (S.D. Tex. May 14, 2018)............................171

*Green v. McKaskle*, 788 F.2d 1116 (5th Cir. 1986).......................................................22

*Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006) ................................................. 16-20

*Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 746 (N.D. Tex. 2010), *aff'd,*
472 F. App'x 287 (5th Cir. 2012) ................................................................ 129-132

*Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216 (5th Cir. 2011) ......................................140, 152

*Grogan v. Kumar*, 873 F.3d 273 (5th Cir. 2017) ................................................. 15-17, 20, 37, 39, 61

*Guillen v. Thompson*, 2010 WL 1266828 (D. Az. Mar. 29, 2010) .............................................124

*Hacker v. Cain, et al.,* No. 14-063-JWD-EWD (M.D. La. 2017)................................................150

*Hacker v. Cain, et al.,* No. 17-30879 (5th Cir. 12/27/18)....................................................150

*Hale v. King*, 642 F.3d 492 (5th Cir. 2011) .........................................................................128

*Harris v. Epps*, 523 Fed.Appx. 275 (5th Cir. 2013) .............................................................24

*Helling v. McKinney*, 509 U.S. 25 (1993).........................................................................18-19

*Henderson v. Thomas*, 913 F. Supp. 2d 1267 (M.D. Ala. 2012) .......................................163, 176

*Hernandez v. Tex. Dep't of Prot. And Reg. Servs.*, 380 F.3d 872 (5th Cir. 2004).........................23

*Hessbrook v. Lennon*, 777 F.2d 999 (5th Cir. 1985)..............................................................21

*Hinojosa v. Livingston*, 807 F.3d 657 (5th Cir. 2015) .........................................17, 20, 98, 105

*Holmes v. Godinez*, 311 F.R.D. 177 (N.D. Ill. 2015) ..............................................................134

*Houston v. Rio Consumnes Corr. Facility*, 2017 WL 2972609 (E.D. Cal. July 12, 2017) .....16, 28

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992)............................................................................19

*Iverson v. City of Bos.*, 452 F.3d 94 (1st Cir. 2006) ...............................................................171

*Jensen v. Minnesota Dep't of Human Servs.,* 138 F. Supp. 3d 1068 (D. Minn. 2015)...............163

*Jin Choi v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 633 F. App'x 214 (5th Cir. 2015)...133

*Johnson v. Treen*, 759 F.2d 1236 (5th Cir. 1985) ..........................................................15-16, 22

*Kemp v. Holder*, 610 F.3d 231 (5th Cir. 2010) .....................................................................125

*Legate v. Livingston*, 822 F.3d 207 (5th Cir 2016)............................................................19, 96

*Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992) ..................................................................21

*McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006).........157

*McCracken v. Jones*, 562 F.2d 22 (10th Cir. 1977)..................................................17, 35, 39, 105

*McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992)......................................................17, 66, 105

*McMahon v. Beard*, 583 F.2d 172 (5th Cir. 1978).................................................................21

*Mendoza v. Lynaugh*, 989 F.2d 191 (5th Cir. 1993) ........................ 17-18, 31, 33

*Miller v. Chapman*, 2014 WL 2949287 (M.D. La. June 30, 2014) ............................154

*Monmouth Cty. Correctional Institutional LSP Patients v. Lanzaro*, 834 F.2d 326
(3d Cir. 1987)........................................................................................................16

*Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242 (5th Cir. 2013)........................140

*Norton v. Dimazana*, 122 F.3d 286 (5th Cir.1997)........................18, 31, 33

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)......................161, 163

*Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984)........................160

*Plans Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901 (6th Cir. 2004)............171

*Presley v. Commercial Moving & Rigging, Inc.*, 25 A.3d 873 (D.C. 2011)................159

*Ragsdale v. Turnock*, 841 F.2d 1358 (7th Cir. 1988) ........................124

*Rosa v. 600 Broadway Partners, LLC*, 175 F. Supp. 3d 191 (S.D.N.Y. 2016) ............130

*Rogers v. Boatright*, 709 F.3d 403 (5th Cir. 2013) ........................20, 63, 98

*Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir. 1982)........................21

*Sama v. Hannigan*, 669 F.3d 585 (5th Cir. 2012)........................20, 98

*Simons v. Clemens*, 752 F.2d 1053 (5th Cir. 1985) ........................17, 36, 70

*Shadrick v. Hopkins Cnty.*, 805 F.3d 724 (6th Cir. 2015)........................15

*Shariff v. Coombe*, 2002 WL 1392164 (S.D.N.Y. June 26, 2002) ........................124

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009)........................124

*Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999)........................18

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) ........................139-140

*Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155 (5th Cir. 1996)........................133, 156

*Tennessee v. Lane*, 541 U.S. 509 (2004)........................129, 163

*Tompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987)............................................................21

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) .......................140

*Varnado v. Lynaugh*, 920 F.2d 320 (5th Cir. 1991)..................................................21, 23

*Waldrip v. Gen. Elec. Co.*, 325 F.3d 652 (5th Cir. 2003) .....................................140, 152

*Walker v. Butler*, 967 F.2d 176 (5th Cir. 1992)............................................................21

*Watson v. Briscoe*, 554 F.2d 650 (5th Cir. 1977) ..........................................................21

*Wells v. Thaler*, 460 F. App'x 303 (5th Cir. 2012) ...................................... 141-142, 151

*Wesson v. Oglesby*, 910 F.2d 278 (5th Cir. 1990) ...........................................17, 22, 36, 70

*Windham v. Harris Cty., Texas*, 875 F.3d 229 (5th Cir. 2017).................................... 133, 155-156

*Whitley v. Albers*, 475 U.S. 312 (1986) ........................................................................22

*Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)..................................15, 18, 23

*Williams v. Certain Individual Employees of Texas Dep't of Criminal Justice-Institutional Div. at Jester III Unit, Richmond, Texas*, 480 F. App'x 251 (5th Cir. 2010)............20

*Williams v. Hampton*, 797 F.3d 276 (5th Cir. 2015)......................................................19

*Williams v. Kelley*, 624 F.2d 695, 697 (5th Cir. 1980) ..................................................21

*Williams v. Stalder*, No. 92-001 (M.D.La. 1992) ................................................... 1, 4-5

*Young v. Gray*, 560 F.2d 201 (5th Cir. 1977) ...............................................................22

*Zatuchni v. Richman*, 2008 WL 3408554 (E.D. Pa. Aug. 12, 2008) ...........................161

## OTHER AUTHORITIES

Unjustified Institutionalization of Individuals with Disabilities as Violation of
Federal Antidiscrimination Provisions—Post-Olmstead Cases, 90 A.L.R. Fed. 2d 1
(Originally published in 2014)...........................................................................................161

Damon Martin, Comment, *State Prisoners' Rights to Medical Treatment: Merely
Elusive or Wholly Illusory?*, 8 BLACK L.J. 427, 433 (1983) ..................................... 23-24

**MAY IT PLEASE THE COURT**:

Now into Court, through undersigned counsel, come Defendants, the Louisiana Department of Public Safety and Corrections ("DOC"); Darrel Vannoy in his official capacity as Warden of the Louisiana State Penitentiary; Stephanie Lamartiniere, in her official capacity as Assistant Warden of the Louisiana State Penitentiary; James M. Leblanc, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, John E. Morrison, MD, in his official capacity as Medical Director for DOC; Stacye Falgout, in her official capacity as the Chief Nursing Officer for DOC; Randy Lavespere, MD, in his official capacity as the Medical Director for the Louisiana State Penitentiary; Sherwood Poret, RN, in his official capacity as the Director of Nursing for the Louisiana State Penitentiary; and Cynthia Park, ACNP, in her official capacity as an Acute Care Nurse Practitioner at the Louisiana State Penitentiary, who file this Post-Trial Brief pursuant to this Court's order dated October 25, 2018 [R. Doc. 536].

## I.  INTRODUCTION

The Louisiana State Penitentiary ("LSP") is one of largest maximum-security prisons in the United States. It sits on 18,000 acres, occupies 28-square-miles, houses over 5,000 offenders, and employs approximately 1,800 staff members.  Offender populations in Louisiana are now aging as a natural consequence of "life means life" sentencing that was legislatively imposed in 1968—some 50 years ago. *See* La. R.S. § 15:574.4(B).  As these realities take hold, medical care at LSP has undergone significant changes.

In 1998, pursuant to the Consent Decree that resolved *Williams v. Stalder*, No. 92-001, United States District Court, Middle District of Louisiana (the "*Williams* litigation"), LSP undertook numerous court supervised changes to its healthcare delivery system.  LSP was found

1

in substantial compliance in 1999—and the *Williams* litigation was dismissed. LSP continues to operate its healthcare delivery with many of the same policies and procedures that were adopted pursuant to that consent decree. In fact, LSP has built on that foundation making substantial improvements to its care.

Since that consent decree, however, DOC and LSP had to deal with the challenges created by changes in Louisiana. In the aftermath of Hurricane Katrina, DOC and LSP had to deal with the eventual closing of Earl K. Long Hospital and a complete change in Louisiana's charity hospital system.

As a result of LSP rising to the challenges of its health care realities, it became one of the few facilities in the country to have its own ambulance service, broadened its care capabilities, forged new strategic partnerships with outside providers, initiated creative solutions to federal funding of health care, developed a nationally recognized hospice and palliative care program, and implemented telemedicine to reduce geographic barriers to specialists, among many innovations.

LSP extensively trains its personnel to care for the men that are in its custody. Less glamourous, LSP has updated its systems, bolstered and streamlined the scheduling of its outside care, and implemented electronic medication administration records. The DOC has fought for resources during a time that the State was dealing with significant budgetary problems. Secretary James LeBlanc spoke to whoever would listen, telling them that a $100 million cut to corrections was not right. Through his fighting for the men in DOC custody, his department only sustained a $14 million cut, none of which was absorbed by health care.

The Defendants in this case have been accused of being deliberately indifferent to serious medical needs to the point that it amounts to cruel and unusual punishment within the meaning of

the Eighth Amendment of the U.S. Constitution. In reality, the record shows that health care providers at LSP work hard to ensure the care of the men who are stakeholders in their system. LSP employs talented, compassionate people in often thankless positions to care for the imprisoned. They work tirelessly to care for the men that are in their custody.

As discussed in detail below, the evidence in this case clearly shows that the Defendants provide constitutionally adequate health care to the men at LSP. The particulars of the care given and the healthcare delivery system at LSP demonstrate concerned care—not callous indifference. The Defendants submit this brief in support of their position that the Plaintiffs have failed to carry their burden as to violations of the Eighth Amendment, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

## II.    **FACTUAL BACKGROUND**

### A.    <u>The Defendants</u>

DOC is a division of the State of Louisiana charged with overseeing the custody and care of offenders in state prisons, including the Louisiana State Penitentiary at Angola. James Leblanc is the Secretary of the DOC. Dr. John E. Morrison is the Mental and Medical Health Director of DOC.[1] Stacye Falgout has served as the Chief Nursing Officer for the DOC since October 2011. Darrell Vannoy is the Warden of LSP and makes all hiring and firing decisions with respect to employees at LSP. Stephanie Lamartiniere was the Assistant Warden for Health Services at LSP from June 2013 through September 30, 2016.[2] Randy Lavespere became Medical Director of LSP on November 13, 2014, and continues to serve in that position. Sherwood Poret has served as the Director of Nursing at LSP since January 2013.

---

[1] Dr. Morrison replaced Dr. Raman Singh who served as Mental and Medical Health Director of DOC from November 2007 through November 2017.
[2] Tracy Falgout became Assistant Warden for Health Care at LSP beginning November 2016.

**B.  Prior Related Litigation**

In the early 1990s, the Department of Justice filed a complaint against LSP and others alleging that health care at LSP was constitutionally deficient.[3] The plaintiffs in the *Williams* litigation retained Plaintiffs' expert, Dr. Michael Puisis, D.O., as its primary expert witness. Dr. Puisis opined that medical care provided by LSP was inadequate in numerous areas including: (i) medical care had no separate budget; (ii) correctional officers administered medications; (iii) EMTs were supervised by correctional staff; (iv) EMTs conducted sick call; (v) chronic disease management was deficient; (vi) contagious and infectious disease programs were inadequate; and (vii) physicians were on probation and/or had restricted licenses.[4]

In 1998, the parties entered into a Consent Decree to resolve the *Williams* litigation[5]. The Consent Decree provided that the experts, Dr. Puisis for the plaintiffs and Dr. George Karam for the LSP, would monitor the agreement annually and advise the court annually if LSP was in compliance.[6] Among other things, the Consent Decree provided that EMTs would be trained in order to perform sick call, and that sick call encounter notes would be reviewed by a physician within twenty-four hours of the call encounter, but in no event more than 72 hours after the encounter.[7] On January 4, 1999, Dr. Puisis submitted a monitoring report which concluded that LSP was not in compliance and should not be released from the Consent Decree.[8] On January 5, 1999, and February 7, 1999, Dr. Karam issued two letters regarding the status of LSP's compliance and in the latter letter he concluded that LSP was in substantial compliance.[9] On

---

[3] Previously referred to supra as the *Williams* litigation.
[4] D 502
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] D 502-05873–84.
[9] D 502-05885–90.

4

March 26, 1999, the parties filed a joint motion to dismiss the *Williams* litigation.[10]

LSP continues to operate with many of the same policies and procedures approved and adopted pursuant to the Consent Decree as part of the *Williams* litigation and have substantially improved the delivery of healthcare since the release from the Consent Decree.

## C.    Medical Facilities at Angola

LSP provides a large spectrum of medical services to offenders from initial intake through hospice care at the end of life. Medical care includes: (i) intake; (ii) infectious disease prevention; (iii) routine health maintenance including annual physicals for patients over the age of 50; (iv) vision care; (v) dental care; (vi) mental health; (vii) radiology on site; (vii) a full service laboratory on site; (viii) a full service pharmacy on site; (ix) an ambulance service; (x) an assessment and triage unit; (xi) physician clinics; (xii) a nursing unit for acute care patients; (xiii) another nursing unit for patients who need long-term care; (xiv) numerous specialty clinics on site manned with contracted physicians; (xv) tele-med clinic manned by contracted physicians; (xvi) specialty and surgical services available off site; (xvii) contractual arrangements with outside hospitals for emergency services; and (xviii) nationally recognized hospice services.[11] All of this care is assessed through a combination of 24/7 emergency care, sick call conducted five days a week, and regularly scheduled appointments through any of the various clinics and providers.

LSP is also accredited by the American Correctional Association ("ACA").[12] The ACA conducts an audit of LSP's healthcare facilities and its delivery of medical care every three years.[13] The last such audit was completed in August 2016.[14]

---

[10] D 502-05860–63.
[11] Specific record cites relating to these various healthcare components are set forth below.
[12] Day 8, pp.44–45.
[13] *Id.*

5

1.    **R. E. Barrow Treatment Center**

LSP's medical facilities are primarily housed at the R.E. Barrow Treatment Center (the "Treatment Center"), a centralized treatment center located within the LSP facility. The Treatment Center includes an assessment and triage unit ("ATU") which sees patients needing emergency care.[15] The ATU is open 24 hours a day, seven days a week.[16]

The Treatment Center also operates clinic spaces which include six examination rooms, one triage room and a minor surgery room.[17] The clinics also provide various specialty clinics staffed by outside contract physicians who see patients on a regularly scheduled basis at the Treatment Center.[18] The facilities also include a new procedures building, where colonoscopies, physical therapy, tele-medicine, and respiratory therapy take place.[19]

The Treatment Center also houses two nursing units for inpatient care.[20] The Nursing Units operate with a large open ward containing hospital beds along with lockable rooms (to accommodate high security patients) around the exterior of each Nursing Unit. Nursing Unit 1 houses acute care patients and Nursing Unit 2 houses patients who need long-term care.[21]

The Treatment Center also houses an on-site, full-service pharmacy, a laboratory that is certified by Clinical Laboratory Improvement Amendments (CLIA), and a digital radiology department.[22]

2.    **Out Camp Clinics and Assisted Living Dorms**

In addition to the Treatment Center, LSP also operates three out-camp clinics located at

---

[14] D 16-02950–63.
[15] Day 8, p. 50.
[16] Day 8, p. 50.
[17] Day 8, pp. 51, 75.
[18] Day 8, pp. 155–56.
[19] Day 8, p. 52.
[20] Day 8, 51–52.
[21] Day 8, pp. 69–70.
[22] Day 8, pp. 51, 165–67.

Camp C, Camp D, and Camp J.[23]  These clinics are manned by either a doctor or a nurse practitioner and provide non-urgent clinical appointments and regularly scheduled chronic care appointments to patients housed outside the main prison approximately 2 days per week.[24]

LSP also maintains two assisted-living dorms within the general population housing.  The assisted living dorms are referred to as Ash II and Cypress II.[25]  The assisted-living dorms are provided to LSP patients that require assistance with the activities of daily living. [26]

### D.    Medical Administrative, Supervision, and Staff

#### 1.    Physicians

In September 2016, LSP employed five full-time physicians and one nurse practitioner.[27] Medical services at LSP are overseen by the LSP Medical Director, Dr. Randy Lavespere.  Dr. Lavespere has worked at LSP since 2009, and has served as its Medical Director since 2014.[28] Dr. Lavespere is a qualified physician who graduated from LSU Medical School in 1997, with a primary focus in Family Practice.[29]  Dr. Lavespere's duties and responsibilities as Medical Director include: a) daily meetings with physicians and nursing staff; b) setting weekend call schedules; c) review of all outside trip paperwork; d) liaising with outside physicians and hospitals; e) overseeing lab, pharmacy, paramedics, and nursing units; f) year-end revised protocols; g) performing annual evaluations of physicians; h) and responding to LSP patient complaints.[30]

As Medical Director of LSP, Dr. Lavespere regularly supervises other physicians.  That supervision includes, but is not limited to:  a) assigning doctors to patients based on expertise; b)

---

[23] Day 8, pp. 52–53.
[24] Day 8, p. 53.
[25] Day 8, pp. 53–54.
[26] *Id.*
[27] Day 8, p. 26.
[28] Day 8, pp. 10–11.
[29] Day 8, pp. 9–10.
[30] Day 8, pp. 22–25.

daily meetings with doctors; c) reviewing all duty status recommendations made by doctors; d) reviewing doctors' charts when they have a duty status issue (approximately 20 per day); e) reviewing doctor recommendations regarding any outside specialty appointments; and f) annual review of doctors.[31]

Dr. Lavespere reports to both the Assistant Warden for Medical Services and the DOC Medical Director.[32] In September 2016, Stephanie Lamartiniere served as Assistant Warden for Medical Services at LSP.[33] During this time period, the Assistant Warden of Medical Services handled administrative and security matters relating to healthcare at LSP, but did not make medical decisions.[34] All medical decisions are left to physicians or other qualified healthcare professionals.[35] The Assistant Warden of Medical Services holds department head meetings to regularly review activities and challenges in providing medical services at LSP.[36] Department head meetings are usually attended by the Assistant Warden of Medical Services, Medical Director, Dental Director, Medical Records Director, EMS Director, X-Ray Director, Lab Director, Pharmacy Director, Mental Health Director, Assistant Nursing Director, and Director of Nursing.[37] Monthly management reports are created reviewing all aspects of medical care.[38]

## 2. Nurses

In September 2016, LSP employed 22 registered nurses (RNs) and 30 licensed practical nurses (LPNs).[39] Sherwood Poret, a registered nurse and longtime superviser at LSP, is the

---

[31] *Id.*
[32] Day 8, p. 16.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] Day 8, p. 17.
[37] Day 8, p. 17; J 3-00527–39.
[38] J 2-00001–00696.
[39] Day 8, p. 30.

Director of Nursing and supervises all nurses at LSP.[40]   His supervision and training responsibilities include, but are not limited to, ensuring that all nursing services at LSP adhere to the appropriate standards and regulations, determining and filling the nurse staffing needs of the institution to provide coverage of all assigned supervisory area, and overseeing the Assistant Director of Nursing and program managers in the development and maintenance of specialized nursing programs such as Quality Improvement, Hospice, Education/Staff Development, Infection Control, Administrative Remedy Procedure, Chronic Health Program, Acute Nursing Unit, Chronic Nursing Unit, Pill Call, Central Supply Warehouse, and Central Supply Sterile.[41]

### 3.   Emergency Medical Technicians

In September 2016, LSP employed 22 emergency medical technicians (EMTs).[42]   Darren Cashio supervises and trains all EMTs at LSP.[43]   Cashio has been a paramedic for 20 years.[44] Cashio's supervision and training responsibilities include managing, staffing, and training EMT shifts; quality assurance for EMS recordkeeping; ordering of EMS equipment; and monitoring EMS registration, licensure, and certification.[45]

### 4.   Healthcare Orderlies

Tracy Falgout, a registered nurse, supervises and trains all healthcare orderlies at LSP.[46] The training of healthcare orderlies encompasses a class on basic anatomy, including body systems and mechanics, as well as the proper techniques for assisting with activities of daily living.[47]   The class is conducted with an extensive PowerPoint presentation, allowing for

---

[40] *Id.*
[41] *See generally* Deposition of Sherwood Poret, J 4-xx and J 4-zz.
[42] Day 8, p. 32.
[43] Day 10, p. 6.
[44] *Id.*
[45] Day 10, pp. 6–8.
[46] Day 10, p. 192.
[47] Day 10, pp. 192–211, J 15-00001, *et seq.*

question and answer about the subjects being presented, followed by testing of comprehension.[48] If a trainee exhibits an inability to function properly in this role during the course of the training, he is removed from the training program.[49]

### 5. Medication Administration

Tami Willis supervises and trains pill call nurses and officers at LSP.[50] Her supervision and training responsibilities of pill call nurses include: supervising Camp J pill call; training staff on and overseeing the usage of the EMAR system; supervising Central Supply, training staff and LSP patients on pill call and the keep-on-person medicine program; and performing weekly inspections of medicine administration.[51]

### E. Medical Services Provided by LSP

#### 1. Sick Call

Sick call is performed Sunday through Thursday at all offender housing facilities at LSP.[52] Sick call is performed by licensed EMTs that go out to the cell blocks and dormitories to see LSP patients.[53] Patients desiring sick call fill out a form describing their condition.[54] Completed sick call forms are provided to EMTs who then triage the LSP patient.[55] EMTs follow specifically designed protocols and are qualified to provide medical assistance within those protocols.[56] Patients who cannot be treated per protocols are either sent to the ATU for immediate care or are scheduled for follow-up appointments with physicians.[57] EMTs complete

---

[48] *Id.*
[49] Day 10, pp. 211–12.
[50] Day 10, pp. 63–64.
[51] Day 10, pp. 63–68.
[52] LSP patients are seen on the weekends by declaring themselves an emergency or going to the ATU.
[53] Day 8, pp. 54–55; Day 10, p. 15.
[54] *Id.*
[55] Day 10, p. 15.
[56] Day 8, pp. 55–56; Day 10, p. 17; J 8-00001–00056.
[57] Day 8, pp. 55-57; Day 10, pp. 26–27.

sick call forms for each patient seen and each form is reviewed by a doctor.[58] The patients' charts are pulled and placed with the sick call forms when they are reviewed by a doctor, which normally occurs within 24 hours of the sick call.[59] Doctors are assigned to review sick call forms based upon the housing location where the sick call took place.[60]

## 2. Urgent Care

Urgent care is provided at LSP through the ATU.[61] The ATU consists of two separate rooms.[62] The first contains four beds and is used for trauma patients.[63] The trauma room is equipped with a crash cart, intubation equipment, and other trauma-related equipment.[64] The second ATU room is used for more routine emergency care.[65] This room is generally used for wound care, IVs, and similar routine emergency care.[66]

In life-threatening urgent care situations, the patient is usually stabilized at the ATU and then sent to St. Francisville Hospital (stroke), Lane Memorial Hospital (cardiac emergencies), Our Lady of the Lake Medical Center (acute respiratory, neurologic and head trauma emergencies), or University Medical Center New Orleans for emergency care.[67] LSP also employs a "scoop and run" policy which allows EMTs responding to life-threatening emergencies to bypass the ATU and to transport the patient directly to outside emergency facilities at Lane Memorial, Our Lady of the Lake Medical Center or other contracted facilities should the situation warrant.[68]

---

[58] Day 8, pp. 59–60.
[59] Day 8, p. 59; Day 10, p. 19.
[60] Day 8, p. 59.
[61] Day 8, pp. 50, 62.
[62] Day 8, p. 62.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] Day 8, p. 68.
[68] Day 10, p. 18.

### 3. Infirmary Care

Infirmary Care is provided at two Nursing Units located within the Treatment Center.[69] Nursing Unit 1 houses acute care patients, including: patients post-surgery, patients transported from the ATU with serious conditions, and patients returning from outside specialty care.[70] Nursing Unit 1 includes 23 open beds and 7-8 lockable rooms.[71] Nursing Unit 1 is staffed by two RNs, one LPN, one medical assistant, and two to three orderlies.[72] LSP doctors make daily rounds at Nursing Unit 1.[73]

Nursing Unit 2 houses patients who need long-term care, including: patients post-stroke, dementia patients, patients with chronic wounds, and paraplegics.[74] Nursing Unit 2 has 24 open beds and 10 lockable rooms. Nursing Unit 2 is staffed with an RN supervisor, two LPNs, and two orderlies.[75] Nurse Practitioner Cindy Park is assigned to handle medical needs in Nursing Unit 2.[76]

### 4. Non-Urgent Clinical Care

Non-urgent clinical care is provided at the clinical facilities located at the Treatment Center. Clinical care includes what is referred to as "Clinic A" which schedules periodic specific focus doctor visits for non-urgent treatment.[77] Clinic A also schedules and manages chronic care patients.[78] Clinic A appointments are scheduled through sick call referrals, emergency care follow-ups, and doctor-scheduled follow-ups of prior Clinic A visits.[79] Clinic A operates

---

[69] Day 8, p. 69.
[70] Day 8, pp. 69–70.
[71] Day 8, p. 70.
[72] Day 8, pp. 70–71.
[73] Day 8, pp. 71.
[74] Day 8, pp. 71–72.
[75] Day 8, p. 72.
[76] *Id.*
[77] Day 8, p. 75.
[78] *Id.*
[79] Day 8, p. 80.

weekdays from 8:00 a.m. until all patients are seen.[80] It is staffed by two to four LSP physicians, along with five nurses and one medical assistant.[81]

In addition to Clinic A, LSP also provides LSP patients with various in-house specialty clinics.[82] These specialty clinics are operated by contract physicians who are hired through LSU and other medical services providers. Specialty clinics that regularly see patients at LSP include: neurology clinic, hepatology clinic, urology clinic, dermatology clinic, HIV clinic, general surgery clinic, orthopedic clinic, and podiatry clinic.[83] Additionally, the new procedure building is used to provide physical therapy, colonoscopies, tele-medicine, and respiratory therapy—all of which is provided through outside contract physicians who come to LSP on a regular basis.[84]

### 5. Specialty Services – Consultations

LSP refers many specialty services and most surgical care to outside facilities.[85] Prior to 2013, LSP primarily used Earl K. Long Hospital ("EKL") for its specialty care and surgical procedures.[86] EKL was owned by the State and operated by LSU. LSP had its own scheduling coordinator and worked directly with EKL to schedule specialty appointments.

In 2010, the Legislature approved the closure of EKL and the transition of services provided by EKL to Our Lady of the Lake Regional Medical Center.[87] LSP was notified that EKL would be closed by 2013.[88] When EKL closed in April 2013, LSP, through contracts entered by the Louisiana Department of Corrections, began to use LSU Health Services as its

---

[80] Day 8, p. 79.
[81] *Id.*
[82] Day 8, pp. 155–56.
[83] *Id.*
[84] Day 8, pp. 52, 157.
[85] Day 8, p. 157.
[86] Day 8, p. 158.
[87] Day 7, p. 127.
[88] *Id.*

primary specialty services and surgical provider.[89]

LSU Health Services' primary facilities are located at the University Medical Center New Orleans.[90] In addition, LSP sends referrals to Lallie Kemp Regional Medical Center ("Lallie Kemp") in Independence, Louisiana.[91] Lallie Kemp handles outside referrals for cardiology, urology, and general surgery and was instrumental in eliminating LSP's backlog of hernia repairs.[92] LSP has also entered into contracts with Lane Memorial Hospital for cardiac care and Our Lady of the Lake Hospital in Baton Rouge for certain categories of emergency care including acute respiratory, neurologic, and head trauma cases. LSP has also greatly expanded its tele-medicine services which are provided through a contract with outside providers. LSP has also staffed its internal, on-site specialty clinics through contracts with outside health care providers.[93]

### 6. Pharmacy, Medication Administration and Diagnostic Services

LSP provides full on-site full service pharmacy services. The pharmacy is staffed with a full time pharmacist and various other assistants.[94] A pharmacist is on call 24 hours a day, 7 days a week.[95] The pharmacy fills about 300,000 prescriptions a year.[96] LSP uses multiple daily pill calls to provide certain LSP patients with their prescribed medications. Medications are distributed through the use of pill call officers who are specifically trained to perform this task.[97]

LSP services also include an on-site, full-service laboratory that is CLIA certified.[98] The laboratory is manned by a laboratory director with 20 years of experience, along with one lab

---

[89] Day 7, p. 132–33.
[90] Day 8, p. 161.
[91] Id.
[92] Id.
[93] Day 8, pp. 155–56.
[94] Day 8, p. 163.
[95] Day 8, p. 164.
[96] Day 8, p. 163.
[97] Day 10, p. 64; D 3-01896, *et seq.*
[98] Day 8, pp. 51, 165; J 8-01299–01409.

technician and two lab assistants.[99]  Additionally, LSP provides digital radiology services staffed
by an x-ray director and four x-ray technicians.[100]

## III.  LAW AND ARGUMENT – EIGHTH AMENDMENT CLAIMS

### A.  Applicable Law

The constitutional right that is alleged to have been violated in this case is the Eighth
Amendment's prohibition on cruel and unusual punishment.  "Prison officials [may] violate the
Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious
medical needs." *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter*,
501 U.S. 294, 297, 111 S. Ct. 2321, 2323 (1991)).  "Deliberate indifference is an 'extremely
high' standard to meet." *Id.* at 770 (5th Cir. 2009); see also *Domino v. Texas Dep't of Crim.
Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  "Deliberate indifference 'is a stringent standard of
fault, requiring proof that a municipal [or state] actor disregarded a known or obvious
consequence of his [, her or its] action.'" *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 737 (6th Cir.
2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382
(1997)).

To establish liability in connection with a claim for deliberate medical indifference, a
prisoner-plaintiff must prove that appropriate medical care has been denied and that the denial
constitutes "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97,
106 (1976); *Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017); *Brewster*, 587 F.3d at 769;
*Johnson v. Treen*, 759 F.2d 1236, 1237 (5th Cir. 1985).  To meet his burden, "the plaintiff must
show that the officials 'refused to treat him, ignored his complaints, intentionally treated him
incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for

---

[99] Day 8, pp. 165–66.
[100] Day 8, pp. 166–67.

any serious medical needs.'" *Domino v. Tex. Dep't. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson*, 759 F.2d at 1238).

"Deliberate indifference to serious medical needs of prisoners" constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment, actionable under Section 1983. However, "an inadvertent failure to provide adequate medical care" does not amount to a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). Instead, the operative test requires deliberate indifference on the part of the prison officials (a subjective inquiry), and that the prisoner's medical needs be serious (an objective inquiry). *Monmouth Cty. Correctional Institutional LSP patients v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

Evidence which shows only that an offender disagrees with a diagnosis or the course of treatment for him is inherently not sufficient. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Grogan v. Kumar*, 973 F.3d 273, 278 (quoting *Domino*, 239 F.3d at 346). The Eighth Amendment does not require optimal medical care or even medical care that comports with the community standard of care. *Acielli v. Torres*, 2015 WL 4380772 at. 4 (C.D. Cal. July 16, 2015); *Houston v. Rio Consumnes Corr. Facility*, 2017 WL 2972609, at *9 (E.D. Cal. July 12, 2017); *Garrett v. Wohler*, 2013 WL 12125743, at *8 (D. Ariz. Apr. 30, 2013); *Barrow v. Shearing*, 2017 WL 3866818, at *3 (S.D. Ill. Sept. 5, 2017). "Whether the treatment defendant provided comported with the community standard of care is not the issue before the Court. As the Supreme Court has held, 'a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.'" *Davis v. Sutley*, No. EDCV 07-1415CBM, 2009 WL 773261, at *8 (C.D. Cal. Mar. 20, 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). "Prisoners are not entitled to demand specific care or even 'the best care possible;' rather, they are entitled only to 'adequate medical care.'" *Barrow v. Shearing*, 2017 WL 3866818, at *3

(S.D. Ill. Sept. 5, 2017).

Moreover, a disagreement between medical professionals about the appropriate treatment of a prisoner cannot be the basis of Eighth Amendment liability. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Grogan v. Kumar*, 973 F.3d 273, 278. *See also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977) ("defendants did not have to bear the risk arising from the variations in the views of the doctors"); *Broadus v. Chapdelaine*, No. 15-CV-0182-WJM-KLM, 2018 WL 899254, at *5 (D. Colo. Feb. 15, 2018) (disagreement between an entity's procedure-approval policies and the community standard of care cannot be the basis of Eighth Amendment liability). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Anderson v. County of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995); *McGuckin*, 974 F.2d at 1059. "[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Hinojosa v. Livingston*, 807 F.3d 657, 689 (5th Cir. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 293.).

Mere delay in receiving care is not in and of itself a constitutional violation. *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990), *Simons v. Clemens*, 752 F.2d 1053, 1056 (5th Cir. 1985). Delay in medical care can constitute an Eighth Amendment violation but only "if there has been deliberate indifference [that] results in substantial harm." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). However, "an inadvertent failure to provide adequate medical care" does not amount to a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976).

Active treatment of a prisoner's serious medical condition, which ultimately resulted in

death, does not constitute deliberate indifference, even if treatment was negligently administered. *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999). A showing of an extended history of examinations, diagnoses, and medications rebuts allegations of deliberate indifference. *Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993). "Deliberate indifference is not established when 'medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials[.]'" *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quoting *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir.1997)).

The Supreme Court has established a two-prong analysis that is used in analyzing Eighth Amendment claims based on conditions of confinement. *See Wilson v. Seiter*, 501 U.S. 294 (1991). Such claims must establish both an objective component—"Was the deprivation sufficiently serious to merit constitutional protection?" and a subjective component—"Did the officials act with a sufficiently culpable state of mind?" *Wilson*, 501 U.S. at 298. The Fifth Circuit has articulated this two-prong test as requiring the plaintiff to prove: (1) "objective exposure to a substantial risk of serious harm"; and (2) "that prison officials acted or failed to act with deliberate indifference to that risk." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (citing *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006)). This two-prong test is discussed below.

### 1. The Objective Prong

The Supreme Court first explained the objective prong of the deliberate indifference test in *Helling v. McKinney*, 509 U.S. 25, 36 (1993). The court emphasized that the objective component required consideration of whether the risk is so grave that it violates contemporary standards of decency. The Court stated:

> Also with respect to the objective factor, determining whether McKinney's conditions
> of confinement violate the Eighth Amendment requires more than a scientific and

statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Helling*, 509 U.S. at 36 (emphasis in original).

Fifth Circuit case law has continued to refine the standard set forth in *Helling*. Recently, in *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir 2016), the court explained the test, stating:

To establish an Eighth Amendment violation, the inmate must show that the alleged deprivation posed a "substantial risk of serious harm" and the defendant acted or failed to act with deliberate indifference to the risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Gobert v. Caldwell,* 463 F.3d 339, 345–46 (5th Cir. 2006). Moreover, the court must **"assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36, 113 S.Ct. 2475**

*Legate*, 822 F.3d at 210 (emphasis added).

The Fifth Circuit has also made it clear that the Eighth Amendment does not protect against any and all risk of harm; rather, it protects against "extreme" conditions, *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995 (1992), that present an "unreasonable risk" of harm, *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475 (1993)." *Ball v. LeBlanc*, 881 F.3d 346, 356 (5th Cir. 2018) (Higginson, J., *concurring in part and dissenting in part*).

## 2. The Subjective Prong

"The Supreme Court's seminal decision as to what constitutes deliberate indifference is *Farmer v. Brennan,* [511 U.S. 825(1994)]." *Williams v. Hampton*, 797 F.3d 276, 280 (5th Cir. 2015). Since at least 1976, the Court's decisions had reflected that "deliberate indifference describes a state of mind more blameworthy than negligence," *Id.* at 280–81 (citing *Farmer v. Brennan*, 511 U.S. 825, 835, (1994)). In fact, the cases on this issue are legion.

19

*Grogan v. Kumar*, 873 F.3d 273, 278 (5th Cir. 2017) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). "A showing of deliberate indifference requires the prisoner to submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' "

*Hinojosa v. Livingston*, 807 F.3d 657, 689 (5th Cir. 2015) (quoting *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). "Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."

*Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."

*Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012). "We have held that unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with her medical treatment, absent exceptional circumstances."

*Criollo v. Milton*, 414 F. App'x 719, 720 (5th Cir. 2011). "In the context of medical treatment, an inadvertent failure to provide adequate medical care does not constitute deliberate indifference."

*Williams v. Certain Individual Employees of Texas Dep't of Criminal Justice-Institutional Div. at Jester III Unit, Richmond, Texas*, 480 F. App'x 251, 256 (5th Cir. 2010) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). "In the medical care context, '[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference.' "

*Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Texas Dep't. of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. 'Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." ' "

*Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."

*Walker v. Butler*, 967 F.2d 176, 178 (5th Cir. 1992). "Deliberate indifference is a legal conclusion which must rest on facts evincing wanton actions on the part of the defendant. . . . Wantonly means having a reckless disregard for the rights of others."

*Tompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). "It is only deliberate indifference—'an unnecessary and wanton infliction of pain' . . . [or acts ] 'repugnant to the conscience of mankind,'—that constitutes conduct proscribed by the Eighth Amendment."

*Hessbrook v. Lennon*, 777 F.2d 999, 1005–06, n.12 (5th Cir. 1985) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). "[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind."

*Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir. 1982). "[N]either inadvertent failure to provide adequate medical care, nor carelessness, nor even deliberate failure to conform to the standards suggested by experts is cruel and unusual punishment. The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have themselves, nor the therapy that Medicare and Medicaid provide for the aged and needy."

*Williams v. Kelley*, 624 F.2d 695, 697 (5th Cir. 1980) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."

*Dailey v. Byrnes*, 605 F.2d 858, 860 (5th Cir. 1979). "Although there is no doubt that the plaintiff did not receive immediate responses to his requests for medical attention, it cannot be said that jail officials were deliberately indifferent to [serious] medical needs, the standard by which any Eighth Amendment violation must be measured."

*McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978). Estelle does not require "optimum" or the "best" medical treatment.

*Watson v. Briscoe*, 554 F.2d 650, 652 (5th Cir. 1977). "Medical malpractice [is] not to be cognizable as a 1983 cause of action, absent 'deliberate indifference.' "

*Bass v. Sullivan*, 550 F.2d 229, 230-231 (5th Cir. 1977). The court validated the use by the Alabama district court of the "barbarous/shocks the conscience" test noting that the Supreme Court in Estelle felt that this standard was "in essential agreement" with the one it enunciated.

See also *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992); *Varnado v. Lynaugh*, 920 F.2d 320 (5th

Cir. 1991); *Wesson v. Oglesby*, 910 F.2d 278 (5th Cir. 1990); *Green v. McKaskle*, 788 F.2d 1116, 1126-1127 (5th Cir. 1986); *Johnson v. Treen*, 759 F.2d 1236, 1237 (5th Cir. 1985); *Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1978); *Young v. Gray*, 560 F.2d 201 (5th Cir. 1977).

Deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Williams*, 797 F.3d at 281 (citing *Farmer*, 511 U.S. at 835, and quoting *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). "The Supreme Court noted in *Farmer* that Courts of Appeals had 'routinely equated deliberate indifference with recklessness,' but that did not 'fully answer the . . . question about the level of culpability deliberate indifference entails, for the term recklessness is not self-defining.'" *Williams*, 797 F.3d at 281 (citing *Farmer*, 511 U.S. at 836). The Court explained that the civil law generally employs an objective standard in determining recklessness. "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* By contrast, the criminal law employs a subjective standard. It "generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." *Williams*, 797 F.3d at 281 (citing *Farmer*, 511 U.S. at 837).

The Supreme Court refused to adopt an objective test for deliberate indifference. *Id.* The Court held that "Eighth Amendment suits against prison officials must satisfy a 'subjective' requirement." *Williams*, 797 F.3d at 281 (quoting *Farmer*, 511 U.S. at 838). The Court explained "that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Williams*, 797 F.3d at 281 (quoting *Farmer*, 511 U.S. at 837). There are two necessary components: (1) "the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists," and (2) "he must also draw the inference." *Id. (see also Adames v. Perez,* 331 F.3d 508, 512 (5th Cir.2003)). "Subjective recklessness as used in the criminal law is the test for deliberate indifference under the Eighth Amendment." *Williams,* 797 F.3d at 281 (citing *Farmer,* 511 U.S. at 839-40).

The Supreme Court reasoned that this subjective test flows from the punishment aspect of the Eighth Amendment. "[I]n the Eighth Amendment context . . . a subjective approach isolates those who inflict punishment." *Williams,* 797 F.3d at 281 (quoting *Farmer,* 511 U.S. at 839). "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Williams,* 797 F.3d at 281 (quoting *Farmer,* 511 U.S. at 837). Accordingly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Williams,* 797 F.3d at 281 (quoting *Farmer,* 511 U.S. at 838).

The plaintiffs must establish that the defendants possessed a culpable state of mind. *Farmer v. Brennan,* 511 U.S. 825, 838 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). "Mere negligence, neglect, or medical malpractice" does not constitute deliberate indifference. *Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir. 1991). Even "gross negligence" does not establish deliberate indifference. *Hernandez v. Tex. Dep't of Prot. And Reg. Servs.,* 380 F.3d 872, 882 (5th Cir. 2004). Rather, "subjective recklessness as used in the criminal law" is the appropriate standard for "deliberate indifference" under the Eighth Amendment. *Farmer,* 511 U.S. at 839–40.

If a prisoner did not receive any treatment or only received inadequate treatment, the subjective motivation of the responsible prison official for denying or delaying medical treatment must be examined. Damon Martin, Comment, *State Prisoners' Rights to Medical Treatment:*

*Merely Elusive or Wholly Illusory?*, 8 BLACK L.J. 427, 433 (1983). "[D]isagreement with the speed, quality or extent of medical treatment or even negligence" does not give rise to a claim of deliberate indifference. *Calloway v. Gusman*, 2006 WL 2710475 at *8 (E.D. La. Sept. 20, 2006); see also *Harris v. Epps*, 523 Fed.Appx. 275 (5th Cir. 2013).

### B.   Defendants Have Not Been Deliberately Indifferent

#### 1.   Adequacy of Clinical Care

There is one area in which Defendants agree with the Plaintiffs' experts. Clinical care is an important aspect of this case[101] as it shows that the Defendants are not deliberately indifferent to the offenders' medical needs. Unfortunately in assessing that care, Plaintiffs' experts began by hand selecting medical records intended to distort the evaluation of clinical care at LSP. Then. they were biased, slanted, unfair, and just plain wrong in their assessment of the care reflected by their hand-picked charts. Finally, they applied an incorrect standard of care to render their opinions. A fair overview of the individual charts refutes the suggestion that the health care provided by LSP is cruel and unusual punishment under the Eight Amendment.

##### a)   The Selection of Charts to Review Was Deliberately Done to Make LSP Look as Bad as Possible

The charts presented to the Court by Plaintiffs' experts were in no way randomly selected. In fact, to the contrary, Plaintiffs' approach was to review medical care provided to patients who died and patients with serious medical conditions.[102] Even with those criteria, Plaintiffs' experts' selection of charts showed greater bias. Plaintiffs' experts reviewed the charts of 28 patients who died. Even though more than 28 patients died in the relevant time frame of 2016, Plaintiffs' experts selected charts of patients who died going back as far as 2010. Plaintiffs' primary expert had no explanation for why they decided to review charts going all the

---

[101] Day 1, p. 104.
[102] Day 2, pp. 142–43.

way back to 2010 when there were charts of deceased patients available to review from 2016.[103] Indeed, only 16 of the 45 charts selected for review were even within the relevant time period. The reason why Plaintiffs' experts selected charts going all the way back to 2010 is that they did not want to provide a fair and unbiased evaluation of the medical care at LSP.

    b) <u>Plaintiffs' Experts Were Biased, Slanted, Unfair, Wrong, and Not Worthy of Being Trusted</u>

Respectfully, Plaintiffs' experts have shown themselves to be biased, slanted, unfair, wrong, and not worthy of being trusted. This is obvious based upon the grossly unfair chart reviews undertaken by Plaintiffs' experts. Below are some of the most egregious examples.

As to patient number 25, Plaintiffs' experts made two indefensible claims contradicted by the record. First, Plaintiffs' experts state that the patient's HIV disease was "permitted to deteriorate" before antiretroviral therapy was resumed.[104] That statement shows the level of bias, slant, and unfairness of Plaintiffs' experts. In fact, the patient refused care for HIV on many, many occasions. There are no less than 17 refusals of care in the record, including a statement in the patient's own handwriting refusing care.[105] Plaintiffs' experts never acknowledge that the patient refused care for years. Accusing LSP of permitting the patient's HIV to deteriorate without acknowledging the patient's refusal to accept care is indefensible and a misrepresentation of the facts to the Court. Second, and similarly, Plaintiffs' experts state that LSP physicians repeatedly failed to assess and treat the patient's high PSA level. In reality, the record is full of refusals of care, including notations of statements by the patient that he did not

---

[103] Day 3, pp. 39–40.
[104] Day 7, p. 71; P 006.0246.
[105] Day 8, pp. 134–35; Day 8, p. 155; Day 9, p. 46–47; J 10-21841 (7/1/09); J 10-21837 (7/24/09); J 10-21835 (8/13/09); J 10-21830 (11/6/09); J 10-21811 (6/16/10); J 10-21810 (8/11/10); J 10-21801 (12/11/10); J 10-21800 (1/4/11, 1/14/11); J 10-21799 (1/14/11); J 10-21797 (1/21/11); J 10-21793 (2/9/11, 2/17/11); J 10-21792 (2/17/11); J 10-21794 (2/17/11); J 10-21791 (2/28/11); J 21789 (3/22/11).

need a biopsy because he would not treat the cancer if found.[106]

As to patient number 15, Plaintiffs' experts accuse LSP of inadequate medical care of his hypertension. In reality, the medical record documents that the patient refused to take medications and refused treatment, notwithstanding efforts by LSP providers.[107] LSP physicians called to check on the patient's medication compliance and wanted to admit the patient to the ATU for medication non-compliance.[108] Probably recognizing that the record shows proactive care—the exact opposite of deliberate indifference—Plaintiffs' expert testified that it was inexplicable that LSP did not notice or address patient number 15's incredibly abnormal blood pressure of 232/149 on 6/8/13.[109] In reality, on 6/8/13, in response to the high blood pressure reading, the patient was instructed to sit in the hallway by the ATU and have his blood pressure rechecked and the patient left against medical advice.[110] The patient's high blood pressure was identified, and LSP took action in response thereto, completely contrary to the expert's testimony. Eager to save face and continue to criticize the Defendants, Plaintiffs' expert then stated that she "would have expected, given that blood pressure . . . they would have obtained another informed refusal of care."[111] In fact, LSP did obtain a refusal to accept medical care from the patient.[112] When confronted with the records, the expert had to retreat and acknowledge that she "perhaps misspoke."[113] We submit that this testimony is symptomatic of the Plaintiffs' experts' efforts to paint the Defendants as unfairly as possible, without regard to

---

[106] Day 8, p. 155; Day 9, pp. 46–48.
[107] J 10-19033 (3/17/10); J 10-19031 (4/7/10); J 10-19015 (3/4/11); J 10-19010 (4/8/11); J 10-18998 (10/6/11); J 10-18996 (12/14/11); J 10-18994 (12/14/11); J 10-18970 (3/14/13); J 10-18969 (3/25/13); J 10-18968 (4/8/13); J 10-18964 (6/8/13); J 10-18960 (6/9/13); J 10-18958 (6/19/13); J 10-18953 (7/31/13); J 19-18954 (7/23/13); J 10/18949 (1/14/14); J 10-18947 (1/24/14).
[108] Day 7, pp. 26–28; J 10-18996; J 10-18998.
[109] Day 6, p. 194.
[110] Day 8, pp. 147–48; J 10-18964.
[111] Day 7, p. 30.
[112] J 10-18960.
[113] Day 7, p. 31.

the actual facts.

As shown with patient number 25 (HIV) and patient number 15 (hypertension), Plaintiffs' experts repeatedly ignored documents contrary to their opinion, documents that show care was being provided by LSP. For instance, with patient number 29, Plaintiffs' experts noted a 3/26/14 a chest x-ray that showed the development of pneumonia compared to previous x-rays.[114] However, they ignored a 4/7/14 chest x-ray that was stable.[115] Similarly, as to Shannon Hurd, the Plaintiffs' experts blame LSP for a seven-month delay in securing needed lab work without ever referencing the fact that Hurd refused two labs and missed two appointments during that seven months. These are just some of the many examples of the experts simply ignoring records that do not support their narrative.

In addition, Plaintiffs' experts' opinions are shown by the medical record to be factually incorrect. For instance, as to patient number 13, Plaintiffs' expert report states that smoking cessation using nicotine replacement was not utilized.[116] In reality, the medical record contains multiple smoking cessation forms, prescriptions for Nicoderm CQ patches, mental health counseling, and a prescription for Wellbutrin, which is effective for smoking cessation.[117]

As to patient number 18, Plaintiffs' experts assert that the patient was not assessed or treated for HIV between the initial tests on 11/20/13 until 12/12/13.[118] In reality, the patient was seen on 11/26/13, 12/2/13, 12/4/13, 12/5/13, admitted to the NCU on 12/2/13, and additional testing was performed on 11/26/13 and 12/4/13.[119] It is inexplicable how the Plaintiffs' experts' opined that the patient was not treated for HIV between 11/20/13 and 12/12/13 in light of the

---

[114] Day 6, p. 30; P 006.0256.
[115] Day 6, p. 31; J 10-09540.
[116] P 006.0171.
[117] Day 8, p. 124–25; J 10-61184; J 10-66185; J 10-61211; J 10-61236; J 10-61237.
[118] Day 6, p. 178; Day 7, p. 37.
[119] Day 6, p. 181; Day 7, p. 41; Day 8, p. 137; J 10-39720. J 10-39821; J 10-39650; J 10-39651.J 10-39648.

medical record.

Plaintiffs' experts' bias is clearly shown in testimony pertaining to DNR orders. As to patient number 9, Plaintiffs' experts criticized the fact that the patient's mother and sister were involved in the decision to execute a DNR.[120] However, in connection with patient number 9's signing of a DNR, Plaintiffs' expert testified that a chaplain or family member should have participated in signing the DNR.[121] This obvious contradiction shows that Plaintiffs' experts were out to find fault with LSP, no matter the course of action taken.

Plaintiffs' experts question whether care was even provided, when it is clearly reflected in the medical records. For instance, in two separate cases, the medical record shows that the patient received care from LSU specialists. Because LSP's sending patients to specialists at LSU undermines the Plaintiffs' case, Plaintiffs' experts must cast doubt on such visits. Thus, Plaintiffs' experts, without any basis, question visits to the LSU specialists by stating that the patients "apparently" saw LSU specialists.[122] The medical record in both cases verifies that the visits occurred.

The trial record shows that Plaintiffs' experts were biased, slanted, unfair, wrong, and not worthy of being trusted.

### c) Plaintiffs Experts Applied the Wrong Standard of Care

As stated previously, the Eighth Amendment does not require optimal medical care or even medical care that comports with the community standard of care. *Acielli v. Torres*, 2015 WL 4380772 at. 4 (C.D. Cal. July 16, 2015); *Houston v. Rio Consumnes Corr. Facility*, 2017 WL 2972609, at *9 (E.D. Cal. July 12, 2017); *Garrett v. Wohler*, 2013 WL 12125743, at *8 (D. Ariz. Apr. 30, 2013); and *Barrow v. Shearing*, 2017 WL 3866818, at *3 (S.D. Ill. Sept. 5, 2017)

---

[120] P 006.0133.
[121] Day 1, pp. 178–79.
[122] P 006.0121; P 006.0168.

(asking the Court to order "community standard of care treatment" goes beyond what is required by the Eighth Amendment). "Whether the treatment defendant provided comported with the community standard of care is not the issue before the Court. As the Supreme Court has held, 'a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.'" *Davis v. Sutley*, No. EDCV 07-1415CBM, 2009 WL 773261, at *8 (C.D. Cal. Mar. 20, 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Prisoners are not entitled to demand specific care or even "the best care possible;" rather, they are entitled only to "adequate medical care." *Barrow v. Shearing*, 2017 WL 3866818, at *3 (S.D. Ill. Sept. 5, 2017).

Here, Plaintiffs' experts purported to judge Defendants by the community standard of care. Their expert report and testimony consistently referred to the community standard of care which LSP purportedly did not meet.[123] In fact, some of the very last testimony at trial was:

> Q. As you assessed the care for LSP, you compared it to the community standard of care, isn't that true?

> A. The standard of care that I'm applying when I look at the medical care at LSP is the standard of care that I expect for patients with the medical conditions which the LSP patients have to be treated. So is it a community standard? Yes, it is.[124]

The foundation of the Plaintiffs' experts' analysis of this case upon which the Plaintiffs built their case was flawed. The applicable standard is the Eight Amendment, not the community standard of care.

The Plaintiffs' experts' errors went far beyond applying the community standard of care though. The record shows that the Plaintiffs' experts actually judged LSP by a much higher standard, testifying that Defendants should conform to contemporary trends in medicine and the latest and best practices.[125] Applying a *contemporary* standard of care would require LSP to stay

---

[123] P 006.010; P 006.042–P 006.043; Day 2, p. 19; Day 2, pp. 119–20; Day 11, p. 91.
[124] Day 11, p. 91.
[125] Day 1, p. 103; P 006.016.

on the cutting edge of medicine, a standard far, far removed from an Eight Amendment analysis. The Plaintiffs' experts' testimony reinforced this fact. They expected LSP to apply standards issued by national associations as those standards are updated online.[126] They expected LSP to follow the *trends* in medicine for administering medications.[127] Indeed, one expert, who worked at Bellevue emergency room in New York City for the last twenty years, teaches at New York University, and at the University of Texas,[128] was critical of LSP for not changing the Coumadin regimen, notwithstanding that Coumadin is still used in the community in Louisiana.[129] LSP was also judged by the best practices set forth in a textbook written by one of the experts.[130] Even the purported application of the community standard of care was actually the application of some evolving national standard of care. This is shown by the fact that the experts who admitted not being experts in the community standard of care did nothing to assess the community standard of care in Louisiana and equated the community standard of care to the national standard of care.[131]

In short, Plaintiffs' experts' opinions should be rejected as they applied a standard of care that is inapplicable to this case.

d) <u>An Overview of the Individual Charts Refutes the Suggestion That LSP Provided Constitutionally Deficient Health Care</u>

Here, we provide the Court with an overview of the care of each of the 45 patients hand-selected by the Plaintiffs' experts to make the Defendants look as bad as possible[132] and the named Plaintiffs themselves. The Court is assessing the level of care during the period of 05/20/15 to 09/30/16. The Court will note that the majority of care in the 45 hand-selected charts was prior to the relevant time period, in many cases, as much as six years prior to the relevant

---

[126] Day 1, p. 103; Day 7, p. 93.
[127] Day 7, pp. 14–15.
[128] Day 6, p. 66.
[129] Day 11, pp. 90–91.
[130] Day 2, p. 82.
[131] Day 2, pp. 78–79, 81, & 119.
[132] Day 3, pp. 39–40.

time period. Indeed, only 16 of the 45 hand-selected charts involved care during the relevant period of time.

Every chart shows that every patient received an immense amount of care. The records of patient care are long and consist of hundreds and hundreds of pages (with the records generally limited to approximately two years of care). A showing of an extended history of examinations, diagnoses, and medications rebuts allegations of deliberate indifference. *Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993). Deliberate indifference is not established when "medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials[.]" *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (citing *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). As to many, many charts, there is no legitimate criticism.

A fair review of the care provided to patients reveals that the Defendants were not deliberately indifferent to patients' serious medical needs.

## PATIENT NUMBER 1

This patient's medical condition included obesity (378.5 pounds at his death),[133] hypertension, diabetes, and kidney problems.[134] The patient was non-compliant and refused to take his medication.[135] The patient saw a provider no less than 15 times over the two years prior to his death.[136] This obese patient who refused to comply with recommended medications died on 2/5/14 of a massive pulmonary embolism, i.e., a heart attack.[137] This death was not preventable.[138] The care provided to this patient was more than constitutionally adequate.

---

[133] J 10-51285.
[134] Day 2, pp. 145 & 148.
[135] Day 2, pp. 145–49; J 10-51364, J 10-51361; J 10-51351; J 10-51341; J 10-51347; J 10-51339; J 10-51338; J 10-51335; J 10-51309.
[136] J 10-51335 (2/2/12); J 10-51333 (3/5/12); J 10-51331 (3/26/12); J 10-51328 (5/29/12); J 10-51325 (5/31/12); J 10-51324 (6/14/12); J 10-51322 (6/19/12); J 10-51320 (6/22/12); J 10-51319 (8/27/12); J 10-51313 (4/4/13); J 10-51312 (4/5/13); J 10-51311 (4/17/13); J 10-51310 (9/19/13); J 10-51308 (10/24/13); J 10-51300 (2/3/14).
[137] J 10-51284.
[138] P 006.0094.

**PATIENT NUMBER 2**

This patient suffered from high blood pressure and high cholesterol. The patient refused treatment and was non-compliant with taking prescribed medications.[139] He was seen for annual physicals in 2012, 2013, and 2014.[140] On 2/27/15, the patient had a heart attack and died.[141] This patient's death was not preventable because he refused treatment and refused to take his medications.[142] Indeed, even the Plaintiffs' expert specifically testified that, "You can't blame the providers for his death."[143]

**PATIENT NUMBER 3**

This patient's medical history included diabetes, peripheral vascular disease, prior coronary bypass surgery, hypertension, and hepatitis C.[144] This was a complex patient with many specialty care needs.[145] The medical records show that the patient regularly refused to take his medications.[146] During 2010, providers saw and treated the patient regularly.[147] On 5/14/10, the patient refused an insulin injection.[148] On 6/1/10, the patient was admitted to EKL.[149] On 6/5/10, the patient was transferred back to LSP as a hospice patient.[150] On 6/13/10, this 71 year old patient died.[151] There is nothing to suggest that the Defendants were deliberately indifferent to this elderly, very sick patient who eventually died of complications from his maladies. Moreover, this death in 2010 is irrelevant to consideration of conditions during 2015 and 2016.

---

[139] Day 2, pp. 150–54; J 10-24625; J 10-24641; J 10-24623; J 10-24624; J 10-24650; J 10-24648; J 10-24647; J 10-24635; J 10-24654.
[140] J 24654 (3/30/12); J 10-24650 (4/9/13); J 10-24635 (5/2/14).
[141] P 006.0095.
[142] Day 2, pp. 154–55; P 006.0095.
[143] Day 2, p. 155.
[144] P 006.0096.
[145] Day 2, p. 155.
[146] Day 2, pp. 157–60; P 006.0098-0101.
[147] Day 2, pp. 160–69; J 10-55034 (2/23/10); J 10-55027 (4/23/10); J 10-55024 (5/9/10); J 10-55023 (5/11/10); J 10-54925 (5/13/10); J 10-55017 (5/27/10); J 10-55003 (5/28/10).
[148] J 10-54934.
[149] J 10-54958.
[150] P 006.0104.
[151] J 10-54926.

## PATIENT NUMBER 4

This patient was 70 years old, suffered from emphysema, bronchiectasis, angina, and was a smoker.[152] This patient refused care regularly.[153] One of the patient's problems was a lipoma. A general surgeon advised against removal of the lipoma.[154] Plaintiffs' experts acknowledged not being critical of the treatment of the lipoma.[155] On 5/16/10, the patient died while being managed by a nurse practitioner.[156]

There is nothing in this 2010 death that would support an argument that LSP's medical care was cruel and unusual under the Eighth Amendment. Again, this record relates back to care that occurred some eight years prior to trial, well outside any remotely relevant time period.

## PATIENT NUMBER 5

This patient was diagnosed with lung disease and stage 4 cancer prior to his death. The criticisms seem to focus upon the providers' failure to note that the patient had progressive weight loss and abdomen pain. This case is a good example of an instance where the Plaintiffs' experts offer an unfair assessment of treatment provided with the benefit of hindsight.

This plaintiff was assessed 22 times during the two years prior to his death.[157] He was being seen and being provided with care. A showing of an extended history of examinations, diagnoses, and medications rebuts allegations of deliberate indifference. *See Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993). Deliberate indifference is not established when "medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials[.]" *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (citing *Norton v. Dimazana*,

---

[152] Day 2, pp. 172–73; Day 6, p. 67.
[153] J 10-40383 (8/10/09); J 10-40378 (10/07/09); J 10-40376 (10/14/09); J 10-40366 (01/22/10); J 10-40365 (1/22/10).
[154] Day 6, p. 69; J 10-40364.
[155] Day 6, p. 114.
[156] Day 6, p. 69; J 10-40351.
[157] Day 2, pp. 177–78.

122 F.3d 286, 292 (5th Cir. 1997). The record refutes any suggestion that LSP failed to provide care.

As to the patient's complaints of abdomen pain, LSP did not ignore those complaints. Medications were issued and tests were run. On 6/7/13, LSP performed a radiological study which revealed a nonspecific gas bowel pattern and "no soft tissue or osseous abnormality."[158] On 7/25/14, a second radiological study for abdomen pain was normal.[159] On 10/25/14, a third radiological study was abnormal and noted a possible bowel obstruction.[160]

As to the alleged progressive weight loss, the records show that the patient's weight was stable for more than two years prior to his death. The patient was noted with the following weights on the following days:

| Date | Weight | Document No. |
| --- | --- | --- |
| 08/22/12 | 174 | J 10-55666 |
| 12/10/13 | 176 | J 10-55660 |
| 01/06/14 | 172 | J 10-55658 |
| 05/08/14 | 175 | J 10-55655 |
| 07/16/14 | 170 | J 10-55649 |
| 10/30/14 | 136 | J 10-55627 |

In October of 2014, LSP was presented with a documented weight loss and a radiological study noting a possible bowel obstruction. With these new findings in October of 2014, labs and other appropriate tests were ordered.[161] On 11/3/14, the patient was diagnosed with pancreatic and colon cancer.[162] After being admitted briefly to NU1, the patient was sent to the Interim LSU Public Hospital ("ILH").[163] ILH performed emergency surgery for a small bowel

---

[158] J 10-55560.
[159] J 10-55555.
[160] J 10-55550.
[161] J 10-55635.
[162] J 10-55630.
[163] J 10-55630; J 10-55612.

obstruction.[164]   After developing wound dehiscence (as a result of the surgery by ILH physicians),[165] the patient had a second surgery on 12/3/14; the patient died two days later of a stroke sustained after the second surgery.[166]

The Plaintiffs' experts' criticisms are merely made as litigation experts with the benefit of hindsight.  A reasonable review of the record shows that once the symptoms came together in October of 2014, the patient was provided with appropriate care.  At worse, this case involves a difference in medical opinion as to how the patient should have been evaluated prior to October of 2014.  *See McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Broadus v. Chapdelaine*, No. 15-CV-0182-WJM-KLM, 2018 WL 899254, at *5 (D. Colo. Feb. 15, 2018).  There is no legitimate argument that the Defendants were deliberately indifferent to the patient's serious medical needs.

## PATIENT NUMBER 6

This patient's medical history included coronary heart disease, hypertension, diabetes, and chronic kidney disease.[167]   Between 10/24/10 and 4/25/15, the patient was seen at least 9 times by outside heart specialists.[168]  Plaintiffs' expert was even reluctant to accept records and diagnoses provided by the outside heart specialists.  Specifically, the expert stated that:

> On 12/11/13, the patient was *apparently* evaluated by LSU cardiology.  A consultant communication form documented that the patient was diagnosed with symptomatic SVT with no recurrence since being on Amiodarone.  The consultant did not appear to recognize the prior atrial fibrillation.[169]

(Emphasis added.)   The expert attempted to state that there is a difference between a

---

[164] J 10-55607.
[165] Day 2, p. 181; J 10-55597.
[166] P 006.115.
[167] Day 2, pp. 181–82.
[168] Day 2, pp. 182–86; J 10-08438 (12/24/10); J 10-08378 (4/12/12); J 10-08321 (3/8/13); J 10-08352 (6/5/13); J 10-08245 (8/23/13); J 10-08306 (10/2/13); J 10-08294 (12/11/13); J 10/08263 (3/17/15); J 10-08270 (4/25/15).
[169] P 006.0121.

communication report and an actual visit.[170]   The record shows an actual visit, not a communication report.[171]   Note the Plaintiffs' experts are also critical of care provided by the consultant who did not appear to recognize the prior atrial fibrillation.  This is a good example of the Plaintiffs' experts negating evidence favorable to the Defendants and attempting to make the Defendants appear as bad as possible, i.e., in a false light.

On 5/15/15, this 73 year old patient with an extensive documented history of heart disease and other co-morbidities died of a heart attack while in the hospital.[172] This case does not show that the Defendants were deliberately indifferent or ignored this patient's medical needs.

## PATIENT NUMBER 7

This patient had a stroke in 2012 and suffered from high blood pressure.[173]  On 10/03/12, a CT scan showed a 2.5 diameter nodule.[174]  On 10/23/12, a referral to ILH thoracic oncology was requested.[175]  On 01/25/13, there was follow up as to why the request had not occurred.[176] On 02/19/13, an ILH consultant saw the patient and recommended a repeat CT scan and a referral for a biopsy.[177]   The CT scan was performed on 2/22/13.[178]   On 8/28/13, an ILH consultant requested a biopsy.[179]  A handwritten note on the record indicates that the referral for the biopsy was made on 8/29/13.[180]  On 10/14/13, a biopsy noted adenocarcinoma.[181]   On 12/21/13, patient died.[182]  The biopsy should have been ordered sooner that it was.  *See Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990); *Simons v. Clemens*, 752 F.2d 1053, 1056 (5th Cir.

---

[170] Day 3, pp. 11–12.
[171] J 10-08294.
[172] J 10-08248.
[173] J 10-02601.
[174] J 10-02587.
[175] J 10-02670.
[176] J 10-02670.
[177] J 10-02813.
[178] J 10-02638.
[179] J 10-02631.
[180] J 10-02631.
[181] J 10-02539–02534.
[182] J 10-02569.

1985). However, an inadvertent failure to provide care or mere negligence does not constitute deliberate indifference to a patient's medical needs. *Grogan v. Kumar*, 873 F. 2d 273, 278 (5th Cir. 2017). This one-time instance of delayed treatment does not support an argument that the Defendants were deliberately indifferent to the medical needs of patients. Moreover, the treatment referred to by Plaintiffs' experts took place some three years prior to the relevant period.

## PATIENT NUMBER 8

This patient was sent to LSP for hospice care for end-stage liver disease.[183] Plaintiffs have no criticisms of the care provided to this patient.[184]

## PATIENT NUMBER 9

This patient was transferred from Hunt to LSP in February of 2014 with cirrhosis due to Hepatitis C, hypertension, and low back pain.[185] The patient had a very poor prognosis upon arriving at LSP.[186] The patient died on 4/2/14.

The biased and unfair nature of Plaintiffs' experts' opinions is abundantly shown in this chart review. The patient elected to sign a DNR order. The experts noted that the patient's mother and sister were "in on decision for DNR."[187] The experts further state that it was not clear "why the mother and sister had to contribute to a DNR discussion."[188] However, previously, Plaintiffs' expert testified that:

> In my experience, we would have a witness who was independent such as a chaplain or a family member participate [in signing a DNR] so that there was no possibility that there was any prejudice toward the patient.[189]

---

[183] LSP's hospice care program has been nationally recognized.
[184] Day 3, p. 14.
[185] Day 3, p. 16.
[186] Day 3, p. 16.
[187] P 006.0133.
[188] P 006.0133-0134.
[189] Day 1, pp. 178–79.

This obvious contradiction shows that Plaintiffs' experts were out to find fault with LSP in any way possible. Nothing in the chart supports any claim that LSP's care was constitutionally deficient.

## PATIENT NUMBER 10

This patient suffered from hypertension, benign prostatic hypertrophy (BPH), gastro-reflux disease, and Hepatitis C.[190] On 10/23/13, the patient had a sudden onset of jaundice.[191] That very day, the patient had a CT scan performed which revealed a Grade IV prostatomegaly with changes in urinary bladder consistent with chronic bladder outlet obstruction.[192] After being advised of the poor prognosis and the possibility of palliative care, the patient requested and was given time to discuss how to proceed with his "fly."[193] This is all good practice.[194]

On 11/2/13, the patient declared an emergency after he missed pill call.[195] The patient was sent from sick call to the ATU where the ATU gave him a dose from the ATU stock.[196] This was an example of the sick call system working very well.[197]

Although the prognosis for pancreatic cancer is poor, the patient decided to proceed with treatment.[198] LSP thereafter drew blood weekly to assess whether he was a candidate for chemotherapy.[199] The expert agreed that LSP was doing a good thing for the patient.[200] Outside consultants ultimately determined that the patient was not a candidate for chemotherapy.[201] On

---

[190] Day 3, p. 20; P 006.0137.
[191] Day 3, p. 20; J 10-60541.
[192] Day 3, pp. 20–21; J 10-60475; J 10-60476.
[193] Day 3, pp. 21–22; J 10-60862; J 10-60857.
[194] Day 3, p. 22.
[195] J 10-60534.
[196] J 10-60535.
[197] Day 3, p. 23.
[198] J 10-60538.
[199] J 10-60521.
[200] Day 3, p. 24.
[201] Day 3, p. 23; J 10-60480.

1/24/14, the patient died from pancreatic cancer.[202]

Nothing in the chart supports any claim that LSP's care was constitutionally deficient.

## PATIENT NUMBER 11

This patient suffered from Crohn's disease with a fistula[203] that opened. Unfortunately, the patient was "mostly a no show for his Azulfidine, an important medication."[204] Missing his Azulfidine would understandably make his Crohn's disease worse.[205] This patient was consistently evaluated and treated by surgeons, and his fistula was cleaned daily throughout the relevant time period.[206] As of 6/24/15, the patient was progressing and was transferred to NU2.[207] On 7/2/15, he had a follow up visit with an outside specialist after surgery for his fistula.[208] On 8/25/15, the patient was seen by an outside surgical specialist with LSU who found that the patient was "doing well."[209] On 10/21/15 or 11/21/15, Dr. Morrison noted that he would speak with Dr. Orangio, the colorectal surgeon, to discuss evaluation for closure of the fistula versus continued treatment.[210] LSP documented that the outside consultant advised that no further surgery was recommended.[211] While Plaintiffs' experts may have taken a different course of action (See *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Broadus v. Chapdelaine*, No. 15-CV-0182-WJM-KLM, 2018 WL 899254, at *5 (D. Colo. Feb. 15, 2018)), the fact of the matter is that LSP treated this patient's condition and had him regularly evaluated by outside specialists. A disagreement as to appropriate treatment does not constitute deliberate indifference. *See Grogan v. Kumar*, 873 F. 3d 273, 278 (5th Cir. 2017).

---

[202] J 10-60445.
[203] A fistula is an abnormal opening or passage.
[204] Day 3, p. 26; P 006.1043.
[205] Day 3, p. 27.
[206] Day 8, pp. 149–50; J 10-16176; J 10-16185; J 10-16226; J 10-16147; J 10-16214.
[207] Day 8, p. 150; J 10-16146.
[208] Day 8, p. 151; J 10-16197.
[209] Day 8, pp. 151–52; J 10-16156.
[210] Day 8, p. 152; J 10-16138; J 10-16153.
[211] Day 8, pp. 152–153; J 10-16153.

**PATIENT NUMBER 12**

This patient was a diabetic who would not take his medications.[212]  Dr. Lavespere testified that the patient was non-compliant with taking his diabetes medication until he was transferred to NU1 on 3/18/16.[213]  Once the patient became compliant and took his medications, his diabetes improved.[214]  LSP further ordered capillary blood glucose test to be performed twice daily for a year.[215]

This patient also demonstrates how sick call worked effectively.  On 3/10/16, the patient declared an emergency for leg and foot pain, a known complication of diabetes.[216]  On that same day, the patient was seen in the ATU[217] and had a diagnostic radiological study on his foot.[218]  Upon finding a broken bone, the patient was given a consultation to podiatry, again on the same day.[219]  On 3/14/16, four days later, the patient saw the podiatrist who provided a detailed write up.[220]  All of this care was ultimately conceded to be good care.[221]

There is certainly nothing in this chart that supports any argument that the Defendants failed to provide constitutionally adequate care.

**PATIENT NUMBER 13**

This patient had a long history of peripheral arterial disease, a failed bypass surgery, a stent placed in 2012, an occluded femoral artery, a second stent placed on 12/17/14, and he continued to smoke.[222]  LSP had this patient evaluated by outside specialists 11 times from

---

[212] Day 3, pp. 28–29; P 006.0156-0162; J 10-53186; J 10-53181; J 10-53259; J 10-53258.
[213] Day 8, pp. 99–100; J 10-3259.
[214] Day 8, p. 100; J 10-53259; J 10-53258.
[215] Day 3, p. 31; J 10-53163.
[216] Day 3, p. 29; Day 8, p. 101; J 10-53170.
[217] Day 3, p. 29; Day 8, p. 104; J 10-53171.
[218] Day 3, p. 30; J 10-53156.
[219] Day 3, p. 30; J 10-53167.
[220] Day 3, pp. 30–31; Day 8, p. 104; J 10-53166; J 10-53159.
[221] Day 3, pp. 29–31.
[222] Day 3, p. 27.

October of 2014 through December of 2015.[223] LSP provided multiple heart medications to the patient including statin, Plavix, aspirin, and Zocor.[224] The patient was regularly having lab work performed and heart tests performed.[225] On 12/17/14, the patient had a heart attack; he was immediately transferred to a hospital where he had a stent placed.[226] LSP counseled the patient that he needed to stop smoking.[227] On 1/3/15, Dr. Lavespere referred the patient to cardiology outside of LSP.[228] This patient was seen by outside specialists on numerous occasions.[229]

The Plaintiffs' expert report on this patient is long and contains many pejorative, conclusory and slanted attacks, many of which are contradicted by the record. We provide a few examples for the Court's consideration.

- Plaintiffs' expert testified that the patient's heart attack would have been preventable if the patient had been on statin.[230] The patient was in fact on statin.[231] The plaintiffs' expert's statement that the patient was not on statin is incorrect.

- Plaintiffs' expert report states that smoking cessation using nicotine replacement was not utilized.[232] On 8/11/15, 8/20/15, 9/10/15, 9/23/15 and 9/17/15, the patient signed smoking cessation forms and was prescribed Nicoderm CQ patches.[233] In addition, the patient was treated with mental health and a medication called Wellbutrin, which is effective for smoking cessation.[234] The criticism in the report is demonstratively wrong.

- Plaintiffs' expert report states that the 10/21/14 vascular surgery note was not reviewed by the primary doctor.[235] This statement is not true. The return trip note dated 10/21/14 includes initials and orders by multiple providers, including Dr. Lavespere.[236] In addition, the 10/29/14 record specifically references the recent trip to ILH.[237] The record

---

[223] Day 3, p. 27.
[224] P 006.0163; J 10-61102.
[225] P 006.0163–0164; J 10-60967–61022 (These 55 pages are labs drawn from September of 2014 through January of 2016.).
[226] P 006.0164.
[227] Day 3, pp. 27–28; J 10-61184.
[228] Day 8, p. 123; J 10-61323.
[229] J 10-61207; J 10-61189; J 10-61180; J 10-61086; J 10-61136; J 10-61140.
[230] Day 1, pp. 141–43.
[231] Day 8, pp. 122–23; J 10-61561; J 10-61255.
[232] P 006.0171.
[233] Day 8, p. 125; J 10-61184; J 10-66185; J 10-61211; J 10-61236; J 10-61237.
[234] Day 8, p. 124.
[235] P 006.0171.
[236] J 10-61560.
[237] J 10-61557.

shows that Dr. Lavespere and others reviewed the 10/21/14 note, contrary to the assertion otherwise.

- Plaintiffs' expert report states that the patient appeared to have been discharged from the hospital on 12/23/14.[238] The record clearly shows that the patient was discharged and returned to LSP on 12/20/14 and was admitted to NU1.[239] This type of error is consistent with the Plaintiffs' experts' practice of assuming a mistake by LSP.

- Plaintiffs' expert report states that the physician who saw the patient on 1/5/15 did not review the recent hospitalization.[240] Again, the records show that this statement is not true. Dr. Lavespere signed off on the return trip when the patient returned from the hospital on 12/20/14.[241]

- Plaintiffs' expert report states that the failure to take appropriate histories and manage the patient's heart failure resulted in another hospitalization on 9/13/15.[242] The record does not support this incredible statement. Instead, the hospital record states that the patient developed shortness of breath a couple of days prior to the admission and that it became progressively worse.[243] The last encounter prior to 9/13/15 was 9/3/15 when the patient was seen by an outside specialist.[244] The record actually shows that LSP sent the patient to a heart specialist for treatment once his condition worsened.

- Plaintiffs' expert report states that "on 9/23/15 a cardiologist *apparently* saw the patient (the full report was not present and the clinic type was not present) and noted PVD stable and CAD with stent in 2014 . . ."[245] The record contains a progress note documenting that Dr. Prashanthi Atluri with University Medical Center – New Orleans ("UMCNO") saw the patient on 9/23/15.[246] The reason why the report has to characterize the visits with outside heart specialists as questionable is that the record shows that the patient was followed regularly by outside heart specialists as he was seen 11 times over 14 months.

- Plaintiffs' expert report states that on 10/14/15, an EKG and chest x-ray were ordered but not reviewed.[247] In fact, the EKG was initialed by a physician who noted no change from the 9/13/15 EKG.[248] The 10/14/15 chest x-ray was also initialed by a physician.[249] The statement in the expert report is demonstratively wrong.

The extensive ongoing care provided to this patient for his severe heart condition was not

---

[238] P 006.0164.
[239] J 10-61521.
[240] P 006.0171.
[241] J 10-61521.
[242] P 006.0172.
[243] J 10-61198.
[244] J 10-61207.
[245] P 006.0168.
[246] J 10-61180.
[247] P 006.0172.
[248] J 10-61034.
[249] J 10-61089.

constitutionally deficient.

## PATIENT NUMBER 14

This patient was 74 years old in 2016 and had problems with cataracts and eye trauma.[250] He had two surgeries for his cataract issues.[251] The delay in cataract surgery was because ILH cancelled the surgery.[252] The patient was treated appropriately for his cataracts.[253]

As with earlier patients, this patient's problem with his high blood pressure was due to non-compliance for which he was counseled.[254] On 3/4/15, the patient returned from having a heart catherization with a stent and refused to be admitted into NU1.[255] He signed a refusal of care document.[256] On 5/5/15, the patient's compliance was questioned.[257] On 6/18/15, the patient refused a trip for a specialized CT that would have assessed the extent of the patient's peripheral arterial disease.[258] On 1/28/16, the record shows that the patient refused labs, was not taking his ISDN medication and that he was statin intolerant.[259] On 2/18/16, the patient was counseled regarding his noncompliance and advised that his refusal could lead to further injury and possible death.[260]

The Plaintiffs' experts' report accuses the Defendants of failing to control the patient's high blood pressure without ever acknowledging that the patient was non-compliant with taking his high blood pressure medications. The care provided to this 74 year old patient with cataracts and high blood pressure was not constitutionally deficient.

---

[250] Day 3, p. 32.
[251] Day 3, p. 32; J 10-30063.
[252] Day 8, p. 126; J 10-30063.
[253] Day 3, p. 32.
[254] J 10-30026.
[255] Day 8, p. 126; J 10-30187.
[256] Day 8, p. 126; J 10-30188.
[257] Day 8, p. 127; J 10-30131.
[258] Day 8, pp. 127–128; J 10-30111.
[259] Day 8, p. 128; J 10-30077.
[260] Day 8, p. 129; J 10-30026.

**PATIENT NUMBER 15**

This patient had high blood pressure that was uncontrolled.[261] The record notes that the patient was noncompliant and refused to take his medications.[262] For example, on 2/19/10, a refusal to accept medical care document signed by the patient states:

> Offender was informed that even though he has taken his B/P meds, his B/P remains elevated and could lead to possibly stroke and or death. He refused further TX to lower B/P to safe limits.[263]

Plaintiffs' expert acknowledged that this refusal of care document was a good document.[264] Of course, Plaintiffs' expert did not cite this good document in her write up that was critical of LSP's care of this patient.[265] The documents consistently show that the patient refused to take medications and refused treatment.[266] In fact, in response to suspicions that the patient was not taking his medications, on 10/6/11, Dr. Lavespere called pill call to confirm that the patient was not taking his medications.[267] It is a good thing that the doctor called to check on the patient's medication compliance.[268] Then, on 12/14/11, Dr. Toce wanted to admit the patient because of medication non-compliance.[269] Plaintiffs' expert agreed (in her testimony, but not in her report) that admitting the patient for medication non-compliance was a "very good thing."[270] The patient nonetheless refused to be admitted even after being explained the risk of high blood pressure and not being admitted to the hospital.[271] A 3/14/13 note summarizes that the patient

---

[261] Day 7, p. 24.
[262] Day 7, p. 25.
[263] Day 8, pp. 145–46; J 10-19035.
[264] Day 7, p. 26.
[265] Day 7, p. 27.
[266] J 10-19033 (2/17/10); J 10-19031 (4/7/10); J 10-19015 (3/4/11); J 10-19010 (4/8/11); J 10-18998 (10/6/11); J 10-18996 (12/14/11); J 10-18994 (12/14/11); J 10-18970 (3/14/13); J 10-18969 (3/25/13); J 10-18968 (4/8/13); J 10-18964 (6/8/13); J 10-18960 (6/9/13); J 10-18958 (6/19/13); J 10-18953 (7/31/13); J 19-18954 (7/23/13); J 10-18949 (1/14/14); J 10-18947 (1/24/14).
[267] Day 8, p. 146; J 10-18998.
[268] Day 7, pp. 27–28.
[269] Day 8, p. 146; J 10-18996.
[270] Day 7, p. 28.
[271] Day 8, pp. 146–47; J 10-18994.

had a history of "well documented non-compliance."[272]

A physician calling to check on a patient's medication non-compliance (Dr. Lavespere) and seeking to admit the patient for medication non-compliance (Dr. Toce) is the exact opposite of deliberate indifference.

The record of treatment on 6/8/13 is incredibly important to this case. On direct examination, Plaintiffs' expert testified regarding the 6/8/13 note. She stated that the patient's blood pressure of 232/149 was incredibly abnormal which presented the patient at risk for stroke, heart attack, and death in a very short period of time. She said that it was:

> Inexplicable that there would be this kind of blood pressure measurement for which it was not noticed or addressed and not noticed or addressed by the doctor, like, I want to bring this patient to the clinic as soon as possible.[273]

What is inexplicable is not LSP's treatment, but the expert's failure to tell the Court the whole story. The record shows that on 6/8/13, in response to the high blood pressure reading, that the patient was instructed to sit in the hallway by the ATU and his blood pressure would be rechecked in thirty minutes.[274] The patient's high blood pressure was noticed, and LSP took action in response thereto, completely contrary to the expert's testimony. However, the patient chose to leave against medical advice.[275] Eager to save face and continue to criticize the Defendants, the expert then stated that she "would have expected, given that blood pressure . . . they would have obtained another informed refusal of care."[276] In fact, LSP did obtain a refusal to accept medical care for the patient.[277] When confronted with the records, the expert had to retreat and acknowledge that she "perhaps misspoke."[278]

---

[272] J 10-18970.
[273] Day 6, p. 194.
[274] Day 8, p. 147; J 10-18964.
[275] Day 8, pp. 147–48; J 10-18964.
[276] Day 7, p. 30.
[277] J 10-18960.
[278] Day 7, p. 31.

Care continued thereafter. On 6/28/13, the patient was seen in Clinic A. He was administered clonidine for his high blood pressure, counseled that he "must take meds," and that he should be admitted for blood pressure control.[279]

This patient had high blood pressure for which he refused to take his medication and refused treatment. The Plaintiffs' criticisms of LSP's care are completely unfounded in truth and fact.

## PATIENT NUMBER 16

This patient's medical history included GERD, removal of his right kidney, and multiple orthopedic complaints.[280] On 6/14/13, the patient refused care, and on 10/26/13, he was noted to have no problems.[281] Plaintiffs' expert asserts that the patient did not receive timely medical evaluation when he presented to the clinic on 12/14/13. On 12/14/13, he was sent to the ATU after being assessed with flu-like symptoms and was given three days bed rest with no duty.[282] On 12/16/13, the patient was again seen and referred to the ATU.[283] On 12/18/13, the patient was sent to an outside hospital.[284] Although there was some confusion, the Plaintiffs' expert testified that the patient died quickly, possibly the next day, after being transported to the hospital.[285] Actually, the plaintiff died on 2/14/14 notwithstanding two months of treatment in the hospital.[286] Plaintiffs' expert's criticisms are invalid. LSP's care of this patient was not deliberately indifferent or constitutionally inadequate.

## PATIENT NUMBER 17

This patient was diagnosed with chronic lymphocytic leukemia and completed six cycles

---

[279] Day 8, p. 148; J 10-18958.
[280] P 006.0190.
[281] J 10-57925; J 10-57924.
[282] J 10-57922; J 10-52721; J 10-57920.
[283] J 10-57918; J 10-57919.
[284] J 10-57914; J 10-57915.
[285] Day 6, pp. 198–99.
[286] Day 7, p. 35; J 10-57910.

of chemotherapy in January of 2011.[287] Plaintiffs' expert asserts that the patient was not appropriately medically evaluated and treated for 18 months after May of 2012. To the contrary, the patient was regularly seen by outside specialists during that period of time.[288] The records show that from May through July of 2012, the patient regularly refused medications.[289] On 8/8/13, Dr. Lavespere saw the patient. He noted that the patient had been to UMCNO and that he continued to smoke.[290] On 11/6/13, the patient was sent to ILH where he underwent chemotherapy through 11/12/13.[291] Upon returning to LSP, the patient refused to stay in NU1.[292] On 12/4/13, the patient was sent to an outside hospital.[293] On 1/6/14, the patient was sent to ILH; he returned to LSP on 1/8/14 after refusing treatment.[294] Upon returning to LSP on 1/8/14, he refused to stay at NU1 because he was "feeling a whole lot better."[295] On 1/15/14, he was treated at ILH pursuant to a consultation request by LSP.[296] On 1/21/14, LSP referred the patient to an outside consultant.[297] The patient was seen at ILH on 1/23/14 and again on 2/1/14.[298] As admitted by Plaintiffs' expert, the death was not preventable.[299] This patient received extensive care and treatment throughout the course of his illness. The fact that there may have been a disconnect between oncology, pulmonology, and LSP physicians[300] as asserted by Plaintiffs' expert is not a basis for concluding that the Defendants were deliberately indifferent to this patient. Additionally, the time period of treatment spans back to approximately five years prior

---

[287] P 006.0193; J 10-13582.
[288] Day 7, p. 36; see J 10-13671 – J 10-13738.
[289] J 10-13421–J 10-13431.
[290] J 10-13676.
[291] J 10-13664; J 10-13665.
[292] J 10-13657; J 10-13665.
[293] J 10-13581.
[294] J 10-13572; J 10-13580.
[295] J 10-13580.
[296] J 10-13565; J 10-13560.
[297] J 10-13550; J 10-13551.
[298] J 10-13528; J 10-13525.
[299] P 006.0199.
[300] Day 6, p. 187.

to the relevant time period.

## PATIENT NUMBER 18

This patient developed HIV and then died. The Plaintiffs' expert had issues with how quickly the patient was assessed and treated for his HIV infection. The record shows that the Plaintiffs' expert criticism is without merit.

The patient sought no medical care between 9/29/12 and 8/7/13.[301] Beginning on 11/28/13, the patient's weight loss was noted, although it was noted that the patient was starving himself.[302] An HIV test performed on 11/20/13 was presumptively positive, meaning that the positive had not been confirmed.[303] Plaintiffs' expert asserts that the patient was not assessed or treated for HIV until 12/12/13.[304] This criticism is simply wrong. In reality, on 11/26/13, the patient saw a social worker who noted that the patient reported that "they say I might have HIV."[305] The social worker noted that more blood was being drawn and that the patient did "not yet accept the HIV diagnosis as he is placing hope that the blood work just drawn today will bring different results."[306] The patient obviously knew the results of the HIV test by 11/26/13.[307] Plaintiffs' expert testified that the second HIV test suggested that no one looked at the previous test.[308] The record refutes the expert's criticism. The results of the second test came back on 11/27/13 as presumptively positive.[309] On 12/2/13, the HIV nurse, Betty Taplin, saw the patient.[310] Nurse Taplin asked Dr. Lavespere to see the patient (presumably because he was not

---

[301] P 006.0200; J 10-39667; J 10-39666.
[302] J 10-39720.
[303] Day 8, p. 135; J 10-39595.
[304] Day 6, p. 178; Day 7, p. 37.
[305] Day 8, p. 135; J 10-39720.
[306] J 10-39720.
[307] Day 7, p. 39.
[308] Day 6, p. 181.
[309] Day 8, p. 136; J 10-39587.
[310] Day 8, p. 136.

accepting the diagnosis).[311]   Dr. Lavespere saw the patient that same day on 12/2/13 and after

talking to him ordered him to be admitted to the NCU.[312]   Before starting treatment, a viral load

blood test is typically performed.[313]   The viral blood test was performed on 12/2/13, and the

results came back on 12/4/13.[314]   This test confirmed that the patient had AIDS.[315]   The

physician's orders on 12/4/13 state, "please be sure pt is scheduled for Dr. Stuart's next

clinic."[316]   The very next day, 12/5/13, the patient saw Dr. Stuart, the outside consultant that

comes to LSP to treat HIV patients.[317]   Dr. Stuart was called from his HIV clinic to the ward to

specifically see this patient.[318]   Dr. Stuart started the patient on the anti-retroviral medications

and treatments for HIV and did not send him to the hospital.[319]   On 12/13/13, the patient was sent

to ILH.[320]   The patient died on 1/10/14 at ILH.[321]

The suggestion that LSP failed to assess and treat this patient's HIV is simply wrong.

The HIV test was administered on 11/20/13.   On 11/26/13, a second HIV test was administered

at the patient's request.   A viral load study was performed on 11/26/13.   The patient saw

physicians on 12/2/13 and 12/4/13.   On 12/5/13, full scale treatment began.   Instead of being

deliberately indifferent, providers in this case were proactive in treating this patient.   This

patient's care was well within the constitutional standards for providing health care.

## PATIENT NUMBER 19

This patient's medical history included tobacco abuse, diabetes, hypertension, coronary

---

[311] Day 8, p. 136.
[312] Day 8, p. 137; J 10-39821; J 10-39650; J 10-39651.
[313] Day 7, p. 40.
[314] J 10-39585.
[315] Day 8, p. 138.
[316] Day 7, p. 41; J 10-39814.
[317] Day 7, p. 41; J 10-39648.
[318] Day 8, p. 137.
[319] Day 7, pp. 41–42; Day 8, p. 139; J 10-39814.
[320] J 10-39644.
[321] J 10-39636.

heart disease, s/p STEMI, s/p RCA stent, chronic kidney disease, gout, hypothyroidism, polycythemia and BPH.[322] Over the last six months of his life, the patient was seen twelve times by outside specialists for renal, nephrology, rheumatology, and orthopedic issues.[323] Over the last several months of his life, the patient had many, many encounters with LSP physicians.[324] From 1/8/14 to 1/15/14, the patient had six encounters with LSP physicians before being sent to the outside hospital. On 1/15/14, the patient was sent to the hospital; he died on 1/23/14 at the hospital. This very sick patient died notwithstanding the care provided. Nothing about the voluminous care provided to this patient shows deliberate indifference or constitutionally inadequate care.

## PATIENT NUMBER 20

This patient's medical history included bipolar disorder, HIV infection, GERD, abdominal pain, and low back pain.[325] Plaintiffs' experts argue that LSP was deliberately indifferent to the patient's abdomen pain. The record shows otherwise.

This patient had a lot of no-shows for care.[326] In addition, the patient was not seen in the HIV clinic from before 2010 until 3/28/14.[327] A patient with serious diseases that refuses care is at risk of organ damage.[328] The record indicates that as of 6/20/13 the patient had refused labs twice more and that the psychiatrist could not prescribe a higher dose of Depakote without

---

[322] Day 7, pp. 44–45.
[323] Day 7, p. 45.
[324] J 10-44238 (10/4/13); J 10-44237 (10/7/13); J 10-44232 (10/8/13, initialed by Dr. Lavespere); J 10-44227 (10/10/13, outside specialist); J 10-44220 (10/22/13, initialed by Dr. Lavespere); J 10-44218 (10/29/13); J 10-44215 (11/6/13); J 10-44208 (11/12/13, outside specialist); J 10-44213 (11/12/13); J 10-44205 (11/14/13); J 10-44203 (11/15/13); J 44202 (11/21/13); J 10-44200 (11/26/13, outside specialist); J 10-44199 (11/26/13); J 10-44198 (12/13/13); J 10-44195 (12/16/13); J 10-44192 (12/17/13); J 10-44191 (12/18/13); J 10-44188 (12/26/13); J 10-44185 (12/31/13); J 10-44182 (1/2/14); J 10-44177 (1/6/14, outside specialist); J 10-44145 (1/13/14); J 10-44142 (1/15/14).
[325] Day 7, p. 45.
[326] Day 7, p. 46.
[327] Day 7, p. 47; J 10-40035.
[328] Day 7, pp. 47–48.

knowing the blood level.[329]  The patient was a no-show for the orthopedic clinic on 9/22/14[330] and refused to accept care from the HIV clinic on 9/29/14.[331]  On 11/17/14, the patient was again a no show at the HIV clinic.[332]  The patient's H Pylori level (to test bacteria for an ulcer) was negative as of 11/3/14.[333]  A chest x-ray on 11/22/14 was also normal.[334]  Surprisingly, the expert initially was "not sure" that an x-ray could disclose air in the chest as a result of a perforated ulcer.[335]  In response to his symptoms, an LSP physician ordered the patient's chart to be pulled on 12/22/14.[336]  Obviously, taking the extra step of pulling the file is a good thing, not deliberately indifferent to the patient's needs.[337]  Another x-ray on 1/12/15 found "no evidence of intraperitoneal air."[338]  In fact, every time that the patient was seen, he was provided with treatment for his abdomen complaints.[339]  The expert then acknowledged that free air under the diaphragm would be an indication of a perforated gastric ulcer.[340]  The very next day the patient died of a massive bleed.[341]

The record refutes the argument that the Defendants were deliberately indifferent to this patient's needs.  Instead, the Defendants were attempting to treat a patient with serious illnesses who was medically non-compliant.  The lab work and chest x-rays did not reveal a perforated ulcer of which the patient ultimately died.  This care was not constitutionally deficient.

---

[329] Day 7, p. 48; J 10-40075.
[330] Day 7, p. 49; J 10-40018.
[331] Day 7, pp. 49–50; J 10-40015.
[332] Day 7, p. 50; J 10-40010.
[333] Day 7, p. 50; J 10-40010.
[334] Day 7, p. 51; J 10-39976.
[335] Day 7, p. 51.
[336] Day 7, p. 52; J 10-40005.
[337] Day 7, p. 52; J 10-40005.
[338] J 10-39974.
[339] Day 7, pp. 51–52; J 10-40014 (9/23/14); J 10-40017 (9/24/14); J 10-40011 (11/3/14); J 10-40008 (11/24/14); J 10-40006 (12/15/14); J 10-40004 (12/22/14); J 10-39993 (12/23/14); J 10-39990 (1/12/15).
[340] Day 7, p. 52.
[341] Day 7, p. 53.

**PATIENT NUMBER 21**

Plaintiffs' experts complain that there was a two-month delay from the time of injury until a deep vein thrombosis ("DVT") was assessed.[342] During the alleged two-month delay, LSP was treating the patient for a basketball injury; the DVT was diagnosed after the basketball injury was excluded.[343] After receiving treatment for the DVT, cancer was identified.[344] He was followed by LSU oncology thereafter until his death.[345]

The details begin on 6/24/13, when the patient went to sick call stating that he injured his left ankle and lower leg during basketball practice.[346] Dr. Lavespere initialed the sick call form that same day.[347] On 6/30/13, the patient complained of foot and leg swelling secondary to basketball injury over one week ago. He denied chest pain, shortness of breath, nausea, vomiting, diarrhea and had no other complaints at that time.[348] He was referred to the ATU that same day; the physician ordered an x-ray of the leg at that time.[349] The x-ray taken that day was normal.[350] On 7/8/13, Dr. Lavespere saw the patient in the ATU for follow up for leg pain.[351] Dr. Lavespere noted that the patient claims to have hurt his leg while playing basketball. Dr. Lavespere prescribed a Medrol dosepak, a steroid treatment, and Keppra.[352] On 7/15/13, the patient was seen in Clinic A for leg and ankle pain from playing basketball.[353] On 8/14/13, LSP secured another ankle x-ray to ensure nothing had been missed.[354] On 8/21/13, LSP secured an

---

[342] Day 7, p. 58.
[343] Day 7, p. 58.
[344] Day 7, p. 59.
[345] Day 7, p. 59.
[346] Day 7, p. 54; Day 8, p. 109; J 10-40838.
[347] J 10-10838.
[348] J 10-40836.
[349] Day 7, p. 54; Day 8, p. 110; J 10-40834.
[350] Day 7, p. 54; J 10-40672.
[351] Day 8, p. 110.
[352] Day 8, p. 111; J 10-40833.
[353] Day 8, p. 112; J 10-40832.
[354] Day 7, p. 56; J 10-40670.

x-ray of the patient's foot that was normal.[355]  On 8/21/13, there is a referral for an ultrasound of a calf for a DVT.[356]  On 9/3/13, the ultrasound was positive for a DVT.[357]  For some unknown reason, on 9/3/13, the patient reported that the ultrasound was inconclusive.[358]  In response, Dr. Lavespere ordered a repeat ultrasound.[359]  Regardless, Dr. Lavespere noted that the patient's INR level was low and ordered a booster dose of Coumadin.[360]  Ordering a repeat test and giving a booster shot is not deliberate indifference.  On 9/17/13, treatment was discussed.[361]  On 9/29/13, the patient was referred to UMCNO for evaluation.[362]  The patient was actually seen at UMCNO that same day.[363]  The record from UMCNO confirmed that the patient was adequately anti-coagulated and that the DVT was not spreading.[364]  This is an example of the referral system working well.[365]

On 10/2/13, the patient was seen in the Coumadin clinic at LSP.[366]  The physician provided a second booster shot of Coumadin to get his INR to a proper level.[367]  On 10/8/13, Dr. Lavespere saw the patient.[368]  Dr. Lavespere found his Coumadin level to be therapeutic and referred the patient back to the Coumadin clinic.[369]

After receiving treatment, on 10/28/13, the patient was sent to UMCNO because he was not improving.[370]  UMCNO found lesions that were worrisome for metastasis.[371]  On 10/31/13,

---

[355] Day 7, p. 56; J 10-40668.
[356] Day 7, p. 57; Day 8, p. 112; J 10-40824.
[357] Day 7, p. 57; Day 8, p. 113; J 10-40822.
[358] J 10-40820.
[359] J 10-40820.
[360] Day 8, p. 113; J 10-40820.
[361] J 10-40814.
[362] Day 8, p. 114; J 10-40806.
[363] J 10-40805.
[364] Day 8, p. 115.
[365] Day 7, p. 58.
[366] J 10-40802.
[367] Day 8, p. 115.
[368] Id.
[369] Day 8, p. 116.
[370] Id.

UMCNO noted that the patient has a suspected left proximal tibial osteosarcoma with lung metastasized.[372] At that point, the patient was facing a very serious condition.[373] He was followed by LSU oncology and palliative chemotherapy was started thereafter.[374] On 12/28/13, the patient died. This death was not preventable.[375]

There is nothing in this chart to support an argument that the Defendants were deliberately indifferent or otherwise failed to provide constitutionally appropriate care. The patient was treated for an injury to his ankle/leg from playing basketball initially. After that condition was ruled out, the DVT was found. During the course of treating the DVT, the cancer was found. The care was appropriate. There is nothing that shows that the Defendants were deliberately indifferent or failed to provide constitutionally adequate care. Moreover, the treatment of this patient, like so many others, falls well outside the relevant time period established by this Court.

## PATIENT NUMBER 22

This patient's medical history included AIDS, GERD, and H. Pylori. He died on 12/17/12 of non-Hodgkin's lymphoma and AIDS. Plaintiffs' experts contend that this care was not appropriate, although it is admitted that the death may not have been preventable.[376] This criticism is without basis in fact.

From August of 2011 until 8/28/12, there is no record that the patient complained of abdomen pain.[377] Between 10/3/11 and 8/23/12, the patient lost one pound (166 lbs. to 165

---

[371] J 10-40765.
[372] Day 8, p. 116; J 10-40753.
[373] Day 7, p. 59.
[374] Day 7, pp. 59–60.
[375] P 006.0233.
[376] P 006.0240.
[377] Day 7, pp. 60–61. The record erroneously states the wrong year, but the medical records confirm the fact that the patient never complained of abdomen pain between August of 2011 and 8/28/12.

lbs.).[378]  As of 10/10/12, the patient was newly diagnosed with HIV and was not dealing with it well.[379]  On 10/11/12, the patient was seen by a psychiatrist.[380]  Dr. Collins requested the psych consultation:

> Due to repeated exaggerated pain complaints, reluctance to return to his dorm. Dr. Macmurdo [*sic*] speculates that peers are harassing him due to new diagnosis of HIV, but he denied peer problems. He may have a lover that was transferred to Hunt CC, but I decided not to address that yet.[381]

Mental health issues complicate care.[382]  As of 12/2/12, the provider suspected that the patient was non-compliant with his medications.[383]  This patient's death on 12/17/12 was not preventable.[384]

The truth is that there were no complaints until late August of 2012.  From late August until December, the patient was diagnosed with HIV and treated.  This chart does not support a claim of deliberate indifference or constitutionally inadequate care.  Moreover, this is another example of treatment that occurred many years before the relevant period.

## PATIENT NUMBER 23 – FERRELL SAMPIER

This patient is Farrell Sampier.  He came to LSP with transverse myelitis[385] and a decubitus ulcer, which cleared after he arrived at LSP.[386]  Sampier's only potential complaint related to the manner in which healthcare orderlies assist him.  Plaintiffs' expert was not aware of a single instance where an orderly abused Sampier.[387]  Sampier's care was within good

---

[378] Day 7, pp. 61–62.
[379] Day 7, p. 64; J 10-57422.
[380] J 10-57420.
[381] J 10-57420.
[382] Day 7, p. 62.
[383] J 10-57335.
[384] P 006.0240.
[385] Day 7, p. 66.
[386] Day 7, p. 70.
[387] Day 2, p. 72; Day 7, p. 70.

medical standard of care.[388] Plaintiffs' experts had no opinion as to whether care provided to Sampier was deficient in any manner. Nothing about the care provided to Sampier supports a claim that the Defendants were deliberately indifferent or provided constitutionally inadequate care.

## PATIENT NUMBER 24 – KENTRELL PARKER

This patient is plaintiff Kentrell Parker. He was paralyzed playing football.[389] He has never developed decubitus ulcers at LSP, one of the main complications of being paralyzed.[390] Parker's only complaint was that that he was being assisted by offender orderlies.[391] Even though Plaintiffs' expert would not admit same, the fact that Parker did not develop decubitus ulcers necessarily means that he was being cared for appropriately, i.e., he was being turned and moved so as to not develop ulcers.[392] In fact, it appears that Parker had no real problems with his medical care.[393] Nothing about the care provided to Parker supports a claim that the Defendants were deliberately indifferent or provided constitutionally inadequate care.

## PATIENT NUMBER 25 – REGINALD GEORGE

This patient is plaintiff, Reginald George. His medical history includes HIV/AIDS diagnosed in 1992, Hepatitis C infection diagnosed in 1998, peripheral neuropathy, hypertension, hyperlipidemia, latent TB infection, and prostate cancer Gleason 7.[394] Plaintiffs' experts have two primary criticisms of the care provided to this patient, i.e., that he did not receive timely and appropriate care for his HIV disease or his prostate cancer. The record definitively refutes both criticisms.

---

[388] Day 9, p. 51.
[389] Day 7, p. 70.
[390] Day 7, pp. 70–71.
[391] Day 2, p. 73.
[392] Day 9, p. 50; Day 7, p. 71.
[393] Day 9, p. 50.
[394] P 006.0242.

As to HIV/AIDS, Plaintiffs' experts contend that the patient's HIV disease was "permitted to deteriorate" before antiretroviral therapy was resumed.[395] That contention is demonstrably incorrect. In fact, the patient refused care for HIV on many, many occasions. There are no less than 17 refusals of care in the record.[396] For instance, on 6/16/10, the patient wrote in his own handwriting that, "I refuse any further more checkups and lab work. Do not place me on no call outs, have a good day."[397] The patient's blood must be monitored in order to properly administer HIV medications.[398]

It is well known that HIV medications cannot be taken intermittently.[399] The record shows that the patient refused labs throughout 2010, 2011, and 2012.[400] The patient's unwillingness to comply is critical with HIV medications because it is bad to start and stop HIV medications since, by doing so, the patient will develop resistance to the medications.[401] A patient who takes HIV medications intermittently will develop resistance to the medications which makes the medications ineffective.[402]

In this case, once the patient decided to comply, HIV medications were started.[403] There is nothing in the record to support the allegation that the patient's HIV medications were withheld from him as punishment.[404] In light of these records showing that the patient repeatedly refused to take his medications, the criticism that LSP *permitted* the patient's HIV to deteriorate is indefensible.

---

[395] Day 7, p. 71; P 006.0246.
[396] Day 8, pp. 134–35; Day 8, p. 155; Day 9, pp. 46–47; J 10-21841 (7/1/09); J 10-21837 (7/24/09); J 10-21835 (8/13/09); J 10-21830 (11/6/09); J 10-21811 (6/16/10); J 10-21810 (8/11/10); J 10-21801 (12/11/10); J 10-21800 (1/4/11, 1/14/11); J 10-21799 (1/14/11); J 10-21797 (1/21/11); J 10-21793 (2/9/11, 2/17/11); J 10-21792 (2/17/11); J 10-21794 (2/17/11); J 10-21791 (2/28/11); J 10-21789 (3/22/11).
[397] J 10-21811.
[398] Day 7, p. 71.
[399] Day 9, p. 46.
[400] J 10-21811; J 10-21799; J 10-21797; J 10-21792; J 10-21794.
[401] Day 7, p. 71; Day 9, p. 46.
[402] Day 9, p. 46.
[403] Day 7, p. 72.
[404] Amended Complaint [Doc. 71] ¶ 38.

The Plaintiffs' experts' criticism as to the patient's prostate cancer is even more indefensible. Plaintiffs' expert stated that:

> The patient had an abnormally high prostate specific antigen (PSA) test indicating potential prostate cancer for over two years before the patient was seen by a urologist and diagnosed with prostate cancer. LSP physicians repeatedly failed to note or address the patient's abnormal test results, including an increased alkaline phosphatase level that might indicate bone metastasis. A LSP provider documented that the patient previously refused evaluation for prostate cancer, however, we do not find signed, informed refusals in the medical record. A prostate biopsy was not performed for over 7 months after it was determined to be medically indicated, and although the biopsy results were suggestive of adenocarcinoma of the prostate, for reasons that are unclear a decision was made to perform another biopsy in 4 months however this repeat biopsy did not take place for six months.[405]

The medical record shows that the patient consistently refused care, in some cases, with sarcasm.[406] On 6/18/12, the patient refused a digital rectal examination; the medical record documents the increased PSA which included prostate cancer.[407] On 6/21/12 and 7/13/12, the patient refused labs to check his PSA.[408] On 6/26/13, the patient again refused labs to check his PSA.[409] On 7/26/13, that patient again refused treatment for PSA. The record indicates that the patient "knows can have CAP – emphasize further eval. Pt declines."[410] On 8/28/13, the patient again refused care.[411] On 7/3/14, the patient again refused to accept care.[412] Then, on 3/21/14, a consultation note states that, "51 y/o ♂ with ↑PSA has refused eval in past – now consents."[413] A 7/14/14 note documents that:

> ↑PSA – biopsy rec'd & refused multi times – does not want to address, just c/o "too many meds" "I don't need no biopsy" Claims he would not treat Ca if

---

[405] P 006.026–P 006.0247.
[406] Day 8, p. 155; Day 9, pp. 46–48.
[407] Day 7, p. 77; J 10-21763.
[408] Day 7, p. 77–78; J 10-21719; J 10-21758.
[409] Day 7, p. 78; J 10-21718.
[410] Day 7, pp. 78–79; J 10-21712.
[411] Day 7, pp. 79–80; J 10-21700.
[412] Day 7, p. 81; J 10-21637.
[413] Day 7, p. 80; J 10-21640.

found[414]

On 9/1/14, the patient yet again refused care.[415] On 9/8/14, the record indicates "F/U ↑PSA Refusal for bx – refused trip 7-3-14 'I owe you an apology . . . now [unknown] agrees to Bx.'"[416] That very same day, 9/8/14, the patient is referred for a biopsy. That record indicates that the patient had refused the biopsy six times in the past.[417] The fact that the patient refused biopsy in the past is further documented in the record.[418] The biopsy was performed on 10/20/14.[419] The biopsy was suspicious for carcinoma; however, the LSU provider concluded that a "repeat biopsy will be helpful."[420] An 11/11/14 record requests the repeat biopsy in four months.[421] On 2/20/15, the provider noted that the patient was to have the repeat biopsy in March.[422] On 4/27/15, the patient had a second biopsy.[423] The patient objected to surgery.[424] On 5/12/15, an LSP provider discussed the pros and cons of surgery and radiation with the patient.[425] The patient completed radiation by January of 2016.[426] The fact is that the patient's cancer progressed because he refused care.[427] Contrary to the outlandish assertions by Plaintiffs' expert, any delay in care in this case was due to the patient refusing care.

There is nothing in this chart that supports any suggestion that the Defendants were deliberately indifferent or failed to provide constitutionally adequate care to this patient.

---

[414] Day 7, p. 82; J 10-21636.
[415] Day 7, p. 83; J 10-21632.
[416] Day 7, p. 83; J 10-21617.
[417] Day 7, p. 84; J 10-21616.
[418] Day 7, p. 84; J 10-21615.
[419] Day 7, p. 84; J 10-21577.
[420] Day 7, p. 84; J 10-21577.
[421] J 10-21576.
[422] J 10-21566.
[423] J 10-21934.
[424] Day 7, p. 85; J 10-21528.
[425] Day 7, p. 85; J 10-21522.
[426] Day 7, p. 85.
[427] Day 9, p. 49.

## PAITENT NUMBER 26

This patient's medical history includes HIV, hypertension, stroke, severe lumbar stenosis, right hip replacement, right knee osteoarthritis, GERD, benign prostate, and diabetes.[428] The Plaintiffs' experts' criticism of care of this patient had to do with administration of his HIV medication.[429] Plaintiffs' experts were critical that the patient was only on one HIV medication, not multiple medications from different classes of medications as is the usual course of treatment.[430] According to the expert, the treatment was "definitely absolutely not in compliance with the guidelines."[431] The record shows that an LSU HIV specialist prescribed the medications for this patient.[432] The Plaintiffs' experts are now critical of the LSU HIV specialist.[433] While not conceding that the medications were improper, the medications were prescribed by an HIV specialist at LSU. Moreover, the lab test showed that the patient's viral load was well controlled.[434] LSP cannot be criticized or found deliberately indifferent for following the recommendations of an outside specialist.

## PATIENT NUMBER 27

This patient had knee pain as a result of an altercation with another offender.[435] He was provided crutches,[436] assigned to a bottom bunk,[437] assigned no duty,[438] had an MRI, was given a knee brace,[439] and was given physical therapy.[440] Plaintiffs' experts contend that LSP failed to

---

[428] P 006.0247.
[429] Day 7, p. 86.
[430] Day 6, pp. 216–17.
[431] Day 6, p. 217.
[432] Day 7, p. 86.
[433] Day 7, p. 87; Day 8, p. 140.
[434] Day 8, p. 141.
[435] J 10-09292.
[436] J 10-09213.
[437] J 10-09212.
[438] J 10-09221.
[439] J 10-09271; J 10-09254.
[440] J 10-09326–J 10-09333.

provide surgery[441] recommended by outside providers. That statement is wrong and based upon an incorrect reading of a key document. On 3/9/15, Dr. Lavespere referred the patient to LSU orthopedics with the specific question, "Does he need Sx referral to New Orleans?"[442] The LSU orthopedic specialist replied, "No – 56 yo not a candidate for ALC R."[443] Plaintiffs' experts did not know and understand the significance of this key document. The Defendants were not deliberately indifferent to this patient's care. This is, at most, a simple difference of opinion as to the need for an elective surgery. *See Grogan v. Kumar*, 873 F. 3d 273, 278 (5th Cir. 2017).

## PATIENT NUMBER 28

This patient's medical history includes hypertension, severe COPD, pulmonary nodules, hepatitis C, Crohn's disease, s/p colon resections x 2, failure to thrive, ventral hernia, and ankylosing spondylosis.[444] Plaintiffs' experts stated that this patient refused trips to outside providers because he was short of breath and not provided continuous oxygen.[445] On 7/28/15, the patient refused a trip to an outside provider because he could not breathe in the van.[446] Upon hearing that the patient refused the trip, Dr. Lavespere called the patient in and asked why he refused the trip. When the patient stated that he gets short of breath and needs oxygen, Dr. Lavespere prescribed oxygen for trips outside of LSP.[447] Instead of being deliberately indifferent, Dr. Lavespere proactively addressed this patient's need.

## PATIENT NUMBER 29

This patient had a history of hypertension, hepatitis C, left ventricular dysfunction, atrial fibrillation, kidney failure, asthma, mild pulmonary hypertension, cardiac double bypass surgery

---

[441] The surgery was elective. J 10-09255.
[442] J 10-09240.
[443] J 10-09240.
[444] JP 006.0252.
[445] Day 6, p. 208.
[446] J 10-48792.
[447] Day 7, p. 88; J 10-48785.

and spinal fusion.[448]  He was also obese.[449]  The record shows consistent and regular treatment in March and April of 2014.[450]  The record refutes any suggestion that the Defendants failed to provide treatment to this patient.

Plaintiffs' experts noted that on 3/26/14, a chest x-ray showed the development of pneumonia compared to previous x-rays.[451]  On 4/7/14, the patient had another chest x-ray that was stable.[452]  Plaintiffs' experts ignored the second x-ray.  This is yet another example of the experts' practice throughout their report of ignoring records that do not support their narrative.

Plaintiffs' experts opined that the patient should have been transferred to a hospital due to episodes of shortness of breath between 5/9/14 and 5/30/14.[453]  On 5/15/14, the patient was seen at an outside hospital.[454]  On 5/19/14, four days later, Dr. Lavespere referred the patient to cardiology at ILH.[455]  ILH cardiology responded to the referral, "After careful consideration of the information available this service cannot be authorized . . . Dr. States f/u in Tele med."[456]  On 5/21/14, the patient was seen by LSU telemed.[457]  On 5/23/14, LSP secured another chest x-ray for the patient.[458]  On 5/30/14, the patient was seen by ILH ER, exactly as the experts wanted.[459]  It is truly astounding that Plaintiffs' experts ignored the fact that patient was actually taken to the hospital and seen by multiple providers during that three-week period of time.

In addition, Plaintiffs' experts never note that the patient was non-compliant with his

---

[448] Day 6, p. 30; P 006.0256.
[449] J 10-09594.
[450] J 10-09615; J 10-09659; J 10-09542; J 10-09657; J 10-09656; J 10-09654; J 10-09655; J 10-09653; J 10-09651; J 10-09652; J 10-09650; J 10-09646; J 10-09648; J 10-09647; J 10-09649; J 10-09645; J 10-09540; J 10-09643; J 10-09642; J 10-09641; J 10-09640; J 10-09639; J 10-09638; J 10-09637; J 10-09635; J 10-09636; J 10-09634.
[451] Day 6, p. 30; P 006.0256.
[452] Day 6, p. 31; J 10-09540.
[453] Day 6, pp. 31–32; P 006.0256-0257.
[454] Day 6, pp. 32–33; J 10-09614 (5/15/14).
[455] Day 6, pp. 34–35; J 10-09622.
[456] Day 6, p. 35; J 10-09622.
[457] Day 6, pp. 34–35; J 10-09605.
[458] Day 6, p. 37; J 10-09538.
[459] Day 6, pp. 38–39; J 10-09587.

medications. For instance, on 4/6/14, the patient refused further treatment.[460] LSP had the patient sign a refusal to accept medical care form warning him of the consequences of his refusal.[461] On 5/8/14, it was noted that the patient was "not on med."[462] On 5/24/14, the record indicates that the patient "wasn't taking med."[463] The ILH ER record on 5/30/14 notes that the patient "presented in A-fib @ 108 due to not taking his metoprocal."[464] On 6/17/14, the patient refused a PFT/ABG test.[465] Plaintiffs' experts noted none of these instances that would have been detrimental to the patient's care. Plaintiffs' expert's criticisms of the care of this patient are invalidated by the records and are without factual basis.

## PATIENT NUMBER 30

This patient's medical history included seizure disorder, high blood pressure and mental health issues.[466] The records show that the patient received care regularly. The Plaintiffs' expert's primary criticism as to this patient is that he was treated for DVT for twelve days when ultimately the patient was found to not have a DVT.[467] The LSP physicians diagnosed a DVT based upon swelling in the leg.[468] Ultimately, it turned out that the patient did not have a DVT. This is just an example of a physician making an erroneous diagnosis.[469] Medical errors do occur in the practice of medicine.[470] There is certainly nothing in a physician making an erroneous diagnosis that rises to the level of an Eighth Amendment claim for deliberate indifference. *See Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013).

---

[460] J 10-09649.
[461] J 10-09645.
[462] J 10-09634.
[463] J 10-09596.
[464] Day 6, p. 39; J 10-09587.
[465] J 10-09562.
[466] Day 6, p. 40; P 006.09257.
[467] Day 6, pp. 40–41.
[468] Day 6, p. 44.
[469] Day 6, p. 44.
[470] Day 6, p. 45.

## PATIENT NUMBER 31

This patient had a history of hepatitis C with cirrhosis and end stage liver failure.[471] Plaintiffs' experts were critical that LSP had the patient sign a DNR order and choosing palliative care only.[472] On 8/22/14, LSP spoke with the patient about DNR and the fact that he was not in favor of heroics; he was not ready to sign the papers because he was dealing with his mortality.[473] After a day to consider the decision, the next day the patient was in favor of a DNR.[474] Another provider also spoke with the patient about the DNR decision.[475] After these discussions, the patient signed a DNR declaration.[476] After signing the DNR, the patient was started on a fentanyl patch.[477] The patient thereafter died from his very serious illnesses.[478] There is no deficiency in the care provided to this patient.

## PATIENT NUMBER 32

The patient had a long history of heart disease, and he continued to smoke.[479] It is stipulated that smoking is bad (particularly with heart disease).[480] Plaintiffs' experts' criticisms were that the patient should have been seen by outside providers between 6/12/10 and 6/21/10— the day he died.[481] LSP in fact referred the patient to cardiology on 6/18/10.[482] Plaintiffs' expert could not speak to this document because she did not review it.[483] Again, the Defendants were not deliberately indifferent to this patient. This 2010 death is far outside the relevant time period and does not prove any of the Plaintiffs' allegations.

[471] Day 6, p. 47; P 006.0261.
[472] P 006.0261.
[473] J 10-47916.
[474] Day 6, p. 47; J 10-47916.
[475] Day 6, p. 48; J 10-47924.
[476] Day 6, p. 48; J 10-47942.
[477] Day 6, p. 48; J 10-47912.
[478] Day 6, p. 48.
[479] Day 6, p. 49.
[480] Day 6, p. 49.
[481] Day 6, p. 50.
[482] Day 6, p. 51; J 10-27236.
[483] Day 6, p. 51.

**PATIENT NUMBER 33**

This patient's medical history includes renal disorder, hypertension, diabetes, hyperlipidemia, and glaucoma.[484] Plaintiffs' experts were critical that there was a lack of a transfer to the hospital for the patient's serious medical condition.[485] Yet, on 2/7/16, the patient was transferred to Lane Regional Medical Center with acute decompensation of chronic CHF.[486] The hospital saw the patient and sent him back to LSP.[487] On 3/31/16, the patient was seen by LSU cardiology.[488] On 4/5/16, the patient was seen by renal telemed.[489] Then, on 4/14/16, the patient was sent to Lane Regional Medical Center and was admitted for three days.[490] During that same period of time, the patient was seen by five LSP providers.[491] The record refutes any suggestion that the Defendants were deliberately indifferent, refused to treat the patient, or ignored his complaints.

**PATIENT NUMBER 34**

On 6/20/12, this patient fell playing football and complained of flank pain.[492] The patient was alert and ambulated without difficulty; LSP providers assessed that the patient had broken ribs.[493] Pain medication was prescribed, and x-rays were ordered on 6/20/12.[494] The record indicates that the x-rays were seen on 6/21/12.[495] On 6/24/12, this patient is seen by an ambulance run.[496] The patient's vital signs were normal, and the patient was able to sit up, stand

---

[484] Day 6, p. 51; P 006.0266.
[485] Day 6, p. 52; P 006.0266.
[486] Day 6, p. 53; J 10-54127.
[487] Day 6, p. 54.
[488] Day 6, p. 54; J 10-54109.
[489] Day 6, pp. 54–55; J 10-54101.
[490] Day 6, p. 55; J 10-54069-54072.
[491] Day 6, p. 56; J 10-54121 (2/18/16); J 10-54120 (2/23/16); J 10-54118 (3/16/18); J 10-54116 (3/23/16); J 10-54101 (4/5/16).
[492] Day 6, p. 57; J 10-28688.
[493] Day 6, p. 58; J 10-28689.
[494] Day 6, p. 58; J 10-28686.
[495] Day 6, p. 58; J 10-28685.
[496] Day 6, p. 59; J 10-28684.

without assistance, and his gait was normal.[497]  The patient denied shortness of breath and his

lung examination was normal.[498]  The patient denied any other complaints at that time.[499]  With

those reported assessments, the EMTs called Dr. Lavespere.[500]  After receiving a full report, Dr.

Lavespere gave a no transport order.[501]  On 6/27/12, the patient died unexpectedly.

Notwithstanding Plaintiffs' expert's hindsight, Dr. Lavespere's decision not to transport

the patient on 6/24/12 was a reasonable professional judgment based upon the medical evidence

presented to him. *See Estelle*, 429 U.S. at 106; *Anderson v. County of Kern*, 45 F.3d 1310, 1316

(9th Cir.1995); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992.).  This is at most an

instance where an unexpected issue occurred; not an instance of failure to provide care.  Nothing

about this instance rises to deliberate indifference.

## PATIENT NUMBER 35

This patient was electrocuted in the kitchen in an unfortunate accident.  The Plaintiffs'

experts found that the resuscitation efforts were taken immediately and were appropriate.[502]

There are no criticisms of LSP related to this patient.

## PATIENT NUMBER 36

This is the same patient as patient number 4.  See patient number 4 for an assessment of

the care provided to this patient.

## PATIENT NUMBER 37

Plaintiffs' experts criticized care provided to this patient in the expert report without an

individualized review of this patient's care.[503]  On 7/21/10, this patient had a seizure; he had

---

[497] Day 6, p. 59; J 10-28684.
[498] Day 6, p. 60; J 10-28684.
[499] *Id.*
[500] *Id.*
[501] Day 6, p. 61; J 10-28684.
[502] Day 6, p. 67; P 006.0268.
[503] Day 6, p. 71.

never had a seizure previously.[504]  The records show that the seizure occurred at 10:47 a.m., that he was in the ATU by 11:20, and that he was at EKL by 3:48 p.m., after being treated at the ATU.[505]  The autopsy report states that the patient had "new-onset of seizures" and that he was pronounced dead "despite vigorous medical attention."[506]

Nothing in this 2010 incident supports any argument that the Defendants were deliberately indifferent, that they ignored his complaints, or intentionally mistreated him.  It represents another circumstance where Plaintiffs have attempted to use stale evidence to support their claim.

## PATIENT NUMBER 38

This patient fell and sustained head trauma.[507]  The patient was first seen in the ATU at 0900 on 2/5/11.[508]  A doctor was present in the ATU during that consult.[509]  He was sent to EKL at 1005.[510]  The patient arrived at EKL hospital at 1059.[511]  Plaintiffs' expert conceded that LSP's response was prompt.[512]  There is nothing in this chart to support any argument that LSP's care, which, again, occurred some 7½ years before trial, was constitutionally deficient.

## PATIENT NUMBER 39

Plaintiffs' experts criticized care provided to this patient in the expert report without an individualized review of this patient's care.[513]  This patient had diabetes, severe coronary artery disease and heart failure, and was obese—weighing 310 lbs.[514]  On 7/16/11, the patient presented

---

[504] Day 6, p. 71; D 742, pp. 113 & 119 of 315.
[505] D 742, pp. 121–22 of 315.
[506] D 742, p. 113 of 315.
[507] Day 6, p. 75; J 10-33443.
[508] Day 6, p. 76; J 10-33443.
[509] Day 6, p. 77; J 10-33443.
[510] Day 6, p. 76; J 10-33443.
[511] Day 6, p. 77; J 10-33440.
[512] Day 6, p. 77.
[513] Day 6, p. 77.
[514] Day 6, pp. 77–78.

to the ATU with chest pain and dizziness.[515]  The record indicates that the patient was not wearing his nitro patch because he "don't want to."[516]  The patient was sent to Ash II, a nursing unit, in response to this visit.[517]  On 7/19/11, Dr. Lavespere saw the patient and noted that his labs were within normal limits and that he was the same as he had been throughout the day.[518]  On 7/21/11, a physician's progress notes states that the patient was "much more alert – carrying on regular conversation."[519]  In fact, the record indicates that the patient was masturbating earlier that day.[520]  As of 7/27/11, the patient had been refusing his medications for two days.[521]  On 8/2/11, the patient died.

Plaintiffs' expert's criticisms of the care of this patient are non-specific.  The record shows that this obese patient suffered from many illnesses, was noncompliant with his medications, and eventually died notwithstanding care provided.[522]  This chart does not support the argument that the Defendants were deliberately indifferent to this patient's health needs by refusing to treat him or ignoring his complaints.  Again, the care referenced by Plaintiffs' experts occurred some seven years prior to trial.

## PATIENT NUMBER 40

Plaintiffs' experts criticized care provided to this patient in the expert report without an individualized review of this patient's care.[523]  One of the Plaintiffs' expert's criticisms is that laboratory testing was not available on the weekend which could contribute the harm.[524]  The

---

[515] J 10-34752.
[516] J 10-34752.
[517] Day 6, p. 79; J 10-34752.
[518] Day 6, p. 79; J 10-36469.
[519] Day 6, p. 79; J 10-36667.
[520] Day 6, p. 80; J 10-36667.
[521] Day 6, p. 80; J 10-36466.
[522] Day 6, pp. 80–81.
[523] Day 6, p. 81.
[524] Day 6, p. 82.

problem is that the record was dated 2/16/10, and 2/16/10 was a Tuesday.[525] Actually, the patient got a urinalysis on 2/16/10 and labs on 2/17/10.[526] The Plaintiffs' expert report was simply wrong.[527] Nothing in this patient's care from 2010 supports any argument that the Defendants were deliberately indifferent to medical needs in 2016.

## PATIENT NUMBER 41

This patient suffered from hypertension, COPD, Hepatitis C infection, GERD, and health conditions.[528] The Plaintiffs' expert's criticisms are that LSP should have transported the patient to the hospital on 8/23/10. However, the record shows that the patient refused to be transported three times prior thereto. On 3/12/10, the patient refused to be transported to the ATU for care.[529] On 6/25/10, the patient refused to be transported a second time.[530] On 6/29/10, the patient refused all medications and insulin, despite being warned that his decision could cause him great harm.[531] On 8/17/10, the patient again refused to be transported for medical care.[532] A mere six days later, the patient is treated in the ATU.[533] He is treated for two hours in the morning and released. He then returns in the afternoon. As the patient became more combative, the doctor was called at 1646.[534] The doctor was present when the patient coded and died at 1735.[535]

This 2010 death of a very sick patient under a physician's care adds nothing to the argument that the Defendants were purportedly deliberately indifferent to medical needs of

---

[525] Day 6, pp. 82–83.
[526] Day 6, p. 83.
[527] Defendants recognize that the error was stated in the autopsy report. That said, the basis for the Plaintiffs' expert's criticism was faulty.
[528] Day 6, p. 84.
[529] Day 6, pp. 84–85; J 10-07720.
[530] Day 6, p. 85; J 10-07712.
[531] Day 6, p. 85; J 10-07709. The plaintiffs' expert had to concede that this was a good refusal of care document.
[532] Day 6, p. 85; J 10-07697.
[533] Day 6, p. 86; J 10-07695.
[534] Day 6, p. 86; J 10-07692.
[535] Day 6, p. 87; J 10-07693.

patients in 2016. At most, this case involves a difference in medical opinion which is not a basis for a claim of deliberate indifference. *See Gragan v. Kumar*, 873 F. 3d 273, 278 (5th Cir. 2017). Like so many others, it also relates to treatment far outside the relevant time period.

## PATIENT NUMBER 42

This patient presented to that ATU on 7/26/15 at 2331.[536] Dr. Lavespere believed that he was presented with an offender who had overdosed on "Mojo."[537] Mojo is synthetic marijuana.[538] Synthetic marijuana can present in many ways because the exact make-up of the synthetic marijuana may vary.[539] There is no dispute that Mojo is a problem at LSP.[540] Once it became apparent that the patient was not suffering from Mojo, he was transported to OLOL.[541] Ultimately, this case presents, at most, a delayed diagnosis based upon a reasonable medical belief. *See Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990); *Simons v. Clemens*, 752 F.2d 1053, 1056 (5th Cir. 1985). Even if it is accepted that the diagnosis was wrong, a misdiagnosis is not a basis for a finding of a constitutional deprivation of medical care.

## PATIENT NUMBER 43

This patient suffered from a lump in his right calf. On 11/25/14, LSP obtained an ultrasound of the lump which was not expected to represent a hematoma.[542] On 3/27/15, an MRI found the soft tissue lesion and suggested clinical correlation and biopsy.[543] On 11/23/15, the patient was referred to ortho after having a biopsy.[544] An MRI on 1/27/16 found that the mass

---

[536] J 10-15239.
[537] Day 6, pp. 89–90; J 10-15235.
[538] Day 6, p. 89.
[539] *Id.*
[540] Day 6, p. 90.
[541] J 10-15237.
[542] Day 6, pp. 90–91; J 10-17907.
[543] Day 6, p. 91; J 10-17906.
[544] Day 6, p. 92; J 10-17934.

was "well-encapsulated."[545]  A biopsy on 3/24/16 noted a benign lesion.[546]

The various tests over the period of time at issue indicated all along that the lesion was benign in nature, exactly as ultimately determined.   Even if the biopsy should have been performed sooner, this one instance of delay did not result in substantial harm because the lesion appeared and ultimately was benign.  This instance does not show any constitutional violation of the duty to provide constitutionally required healthcare. *See Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006)  (Delay in medical care can constitute an Eighth Amendment violation but only "if there has been deliberate indifference [that] results in substantial harm.").

## PATIENT NUMBER 44

On 3/18/16, Plaintiffs' expert witnessed LSP respond to an offender who attempted to hang himself while the expert was at LSP.[547]   Plaintiffs' expert found that the care was inadequate and stated that "it was likely that the patient had brain injury from the hanging with subsequent lack of oxygen to his brain."[548]  A later record from 5/5/16 indicated that the patient was alert, attentive with no cognitive deficits and without a spinal cord injury.[549]  This record shows that LSP provided care and saved the patient's life.[550]

One final point in this chart is the significance of a note made by OLOL.  On 3/21/16, while recovering from the hanging, OLOL noted that the patient was "overtly manipulative, atypical symptoms of psychosis, possibly malingering."[551]   In their haste to criticize LSP, the Plaintiffs' experts never acknowledge the difficulty of treating offenders who seek to manipulate and have cause for secondary gain.  This chart shows the good care that LSP provides to the

---

[545] J 10-17931.
[546] J 10-17897.
[547] Day 6, p. 93.
[548] P 006.0061.
[549] Day 6, p. 95; D 744, p. 23.
[550] Day 6, p. 95.
[551] D 744, p. 45.

patients at LSP.

## PATIENT NUMBER 45

Plaintiffs' experts criticized care provided to this patient in the expert report without an individualized review of this patient's care.[552] Plaintiffs' experts were critical that LSP used four-point restraint on a patient in response to a suicide attempt.[553] Plaintiffs' expert agreed that LSP should respond to attempted suicides and preclude a patient from further harming himself.[554] Plaintiffs' expert ultimately acknowledged that the use of four-point restraint is acceptable for brief periods of time.[555] Plaintiffs' expert assumed that the patient was kept in four-point restraint for a long period of time without knowing exactly how long the patient was in four-point restraint.[556] Nothing in this chart supports any criticism of care provided by the Defendants.

## ADAMS, ALTON

Plaintiffs allege that because of Defendants' deliberate indifference, Adams had multiple amputations on his right leg that may have been avoidable.[557] Plaintiffs' initial expert report did not address Adams. On the other hand, Dr. Thomas, Defendants' expert, addressed Adams' condition. Adams suffered from many serious conditions, including peripheral artery disease.[558] As to the peripheral artery disease, Dr. Thomas noted that:

> As the disease progressed the blood supply to the lower legs became compromised. Eventually this caused his lower leg to become necrotic and he required a Below Knee Amputation. At this time, it was recommended that he have a stent put in to slow the progression of the peripheral arterial disease. He refused this surgical procedure. After approximately two years as a natural course

---

[552] Day 6, p. 96.
[553] P 006.0065.
[554] Day 6, p. 96.
[555] Day 6, p. 97.
[556] Day 6, p. 96 & 98. This is an example of the plaintiffs' experts assuming the worst without a basis in fact in an attempt to make LSP look bad.
[557] Second Amended Complaint [Doc. 71] ¶¶ 22 & 112(b).
[558] J 10-00022.

of increasing arterial blockage the stump became infected.[559]

From there, Dr. Thomas set forth that Adams was aggressively treated with antibiotics both orally and intravenously, but that the infection was unremitting in the face of the very poor blood supply. Adams was seen regularly by both LSP and referral physicians.

In addition, the record shows that Adams regularly refused care.[560] The medical record contains more than 23 documented instances where Adams refused care.[561] Indeed, the record specifically notes on 2/7/13 that Adams has a well-documented history of non-compliance.[562] A person with peripheral arterial disease that refuses care and medications may develop gangrene and require an amputation; if the patient continues to refuse treatments, the amputation may get infected.[563] That is exactly what occurred with Adams as he refused to care and refused to comply with medical advice.[564]

Adams received much care for his peripheral artery disease and his stump. On 7/22/13, he underwent a successful left profundaplasty and endarterectomy.[565] Thereafter on 3/18/14, Adams refused to be admitted in NU1 and chose to do his own wound care.[566] His already tenuous condition was made worse as he continued to smoke.[567] By 10/12/15, Adams' wound opened up which was an expected outcome as a result of his non-compliance and him providing

---

[559] D 14, pp. 23–24.
[560] Day 9, p. 37.
[561] J 10-01302 (4/16/109); J 10-01261 (8/1/09); J 10-01259 (8/4/09); J 10-01178 (6/27/11); J 10-00879 (9/15/12); J 10-00878 (10/29/12); J 10-00869 (2/7/13); J 10-02095 (7/26/13); J 10-02084 (12/2/13); J 10-02083 (12/3/13); J 10-02050 (3/12/14); J 10-02048 (3/16/14); J 10-02049 (3/18/14); J 10-02014 (6/24/14); J 10-02003 (7/10/14); J 10-01997 (10/30/14); J 10-01897 (2/13/15); J 10-01960 (9/27/15); J 10-01913 (11/23/15); J 10-00082 (1/6/16); J 10-00074 (3/8/16); J 10-00075 (3/23/16); J 10-00066 (4/5/16); J 10-00041 (6/24/16); J 10-00042 (6/24/16); J 10-00038 (6/25/16); J 10-00039 (6/25/16); J 10-00040 (6/25/16); J 10-00036 (6/26/16); J 10-00037 (6/26/16).
[562] Day 9, p. 38; J 10-00869.
[563] Day 9, p. 38.
[564] Day 9, p. 38.
[565] Day 9, p. 40; J 10-02129.
[566] Day 9, p. 40; J 10-02049.
[567] Id.

his own would care.[568]  After the wound opened, LSP sent Adams to an LSU vascular surgeon for treatment.[569]

Plaintiffs' experts did not assess Adams in their rebuttal expert report.[570]  In short, Plaintiffs' experts rendered no expert opinion on Adams.  The Plaintiffs have not proven the allegations that the Defendants were deliberately indifferent to Adams' medical needs.

## BARRERA, OTTO

Barrera suffers from a self-inflicted gunshot wound to the face.[571]  His complaints are either that LSP refused to approve his reconstructive surgery as cosmetic[572] or that he was lost to follow up for almost two years.[573]  The record explains the reason for the delay in treatment.

Throughout 2013 and 2014, Barrera was seen regularly by the Maxillofacial ("OMFS") clinic.[574]  On 4/9/14, Barrera went to OMFS for a tooth extraction.[575]  The record ends with a notation of "RTC prn," i.e., return to clinic as needed.[576]  Dr. Thomas observed that it was unclear whether OMFS' return to clinic as needed order was appropriate.[577]  On 11/3/15, an LSP provider noted that, "I referred him to OMFS to see if they had anything to offer Pt...."[578]  To the extent that Barrera was lost to care, the fault lies with OMFS, not LSP.

Barrera's other complaints are without basis as well.  On 1/14/14, he was sent to Lallie Kemp for a modified barium swallow test which Lallie Kemp could not perform.[579]  On 2/18/14,

---

[568] Day 9, p. 41.
[569] Day 9, p. 41; J 10-01946.
[570] P 028.007.
[571] P 028.007.
[572] Second Amended Complaint [Doc. 71] ¶¶ 41 & 111.
[573] P 028.007–008.
[574] J 10-03725; J 10-04116; J 10-03742; J 10-03729; J 10-04065; J 10-03703; J 10-04066; J 10-03709.
[575] J 10-04112.
[576] J 10-04112.
[577] D 14, p. 27.
[578] J 10-04106.
[579] J 10-03743.

he had a normal barium swallow test.[580]   On 12/21/15, LSP noted that Barrera's pharyngeal swallowing was within normal limits.[581]   A second barium swallow test performed on 12/29/15 was normal as well.[582]   Even though he was prescribed a soft diet, Barrera elected to discontinue his soft diet on his own.[583]   While he purported not to be able to eat and made some vague complaints about his diet, the fact of the matter is that he ordered the following items from the commissary: chips, oatmeal raisin cookies, honeybuns, jalapenos, Cheetos, beef stew, crackers, toaster pastries, tortillas, hot sauce, peppermint twist, Little Debbie's, peanut butter, and chewing tobacco.[584]   The record shows that Barrera remained sated, i.e., that he had enough to eat.[585]

LSP placed Barrera on the medical ward when he arrived at LSP.[586]   Barrera stayed on the ward until December of 2015 when he was moved to Ash, an assisted living dorm.[587] Barrera found that the orderlies that assisted him were good.[588]

The record shows that the delay in surgical evaluation was due to OMFS, not LSP.   In addition, while Barrera may have desired the surgical reconstruction of his jaw, the record shows that he was able to eat and that his health did not suffer.   The record does not support the allegation that LSP was deliberately indifferent to Barrera.

**BATISTE, ALTON**

Batiste was a 70 year old who became blind while at LSP.   He complained that LSP did not provide him with a tapping cane and that he had to rely upon orderlies to assist him.   Batiste

---

[580] J 10-03734; J 10-03731.
[581] J 10-04083.
[582] J 10-04160.
[583] Day 5, p. 40–41 J 10-03749.
[584] Day 5, pp. 43–45.
[585] Day 5, p. 41; J 10-03749.
[586] Day 5, p. 48.
[587] Day 4, p. 212; Day 5, pp. 36–37.
[588] Day 5, p. 38.

in fact did have a cane and offenders helped Batiste get around.[589] Batiste never requested a tapping cane from LSP.[590] There is nothing that rises to the level of a constitutional deprivation as to Batiste.

## CAZENAVE, IAN

Cazenave has sickle cell anemia and chronic leg wounds which the Plaintiffs allege are not being managed properly.[591] Complaints regarding this patient have more to do with his disease rather than the lack of care from LSP. The medical record shows that Cazenave received regular treatment from LSP physicians and outside referrals. Specifically during 2016, Cazenave was evaluated regularly by specialists.[592]

Secondary to his sickle cell anemia, he has had an ulcer on his right ankle for over 20 years, even before he arrived at LSP.[593] The ulcer has been treated with multiple split thickness skin grafts and a latissimus muscle flap graft, all of which failed.[594] LSP provides regular wound care to Cazenave for the ulcer.[595] He has had at least two blood transfusions while at LSP.[596] On 8/19/15, Cazenave reported that he was not interested in seeing the vascular surgeon if amputation was the only option.[597]

As of 2/4/16, Cazenave developed an infection associated with the ulcer.[598] Plaintiffs' experts contend that as of February of 2016 it was recommended that Cazenave go to UMCNO

---

[589] Day 4, p. 152.
[590] D 14, p. 26.
[591] Amended Complaint [Doc. 71] ¶ 28.
[592] J 10-10616.
[593] D 14, p. 31; J 10-10318. See also the testimony of Anthony Mandigo who also testified to having ulcers on his ankle, that he was seen in the podiatry clinic, that he was provided with dressing changes and ointments for his ulcers. Day 3, pp. 93–95.
[594] J 10-10318.
[595] Day 9, p. 117–18; J 10-10137–J 10-10240.
[596] J 10-10331.
[597] J 10-10304.
[598] J 10-10331; J 10-10340.

wound clinic but LSP physicians did not timely address this recommendation.[599]  In fact, he was

transferred to UMCNO for treatment.[600]

Plaintiffs' experts are critical of LSP for not treating Cazenave with hydroxyurea.[601]

However, as is the case many times in medicine, the issue is not that simple.  The LSU outside

physician noted that hydrea can impact wound healing.[602]  He continued that:

> Please attach prior medical records to verify frequency of VOC in order to justify
> hydroxyurea as patient did not require this prior to his infection induced VOC.  If
> patient is symptomatic anemia or >3 moderate to severe pain episodes he qualifies
> for therapy with hydrea.  Please get asap repeat CBC to assess for impact of
> hydrea on bone marrow.[603]

This note verifies that Cazenave did not "require" hydroxyurea previously.  Thus, either

plaintiffs' experts are wrong (as they attempt to make LSP look bad) or there is a difference in

medical opinion.  In either instance, the criticism as to hydroxyurea is not deliberate indifference.

The Plaintiffs complain that Cazenave does not have access to opioid pain medications.

Dr. Puisis' own textbook recognizes that narcotic medications are severely limited in

correctional facilities throughout the country.[604]  Dr. Lavespere testified that patients such as

Cazenave can receive narcotic medications while on NU1.[605]  In addition, he has been prescribed

Keppra, Motrin, and Ibuprofen for pain.[606]

On 10/24/13, Cazenave had x-rays which showed cardiomegaly.[607]  Plaintiffs' experts

contend that LSP did not acknowledge the problem.[608]  In reality, an LSP physician signed the

---

[599] P 028.009.
[600] J 10-10340.
[601] P 028.009.
[602] J 10-10347.
[603] J 10-10347.
[604] Day 2, p. 128.
[605] Day 8, p. 154.
[606] J 10-10248–J 10-10259.
[607] J 10-10305.
[608] P 028.010.

results of the x-ray.[609]  On 3/23/16, an echocardiogram was performed which again identified the same condition.[610]  Plaintiffs' experts do not contend that anything specific needed to be done in response to the condition.

The bottom line with Cazenave is that he suffers from sickle cell disease, and it is a related complication of a foot ulcer.  Throughout 2016, he was treated and managed.  There is nothing to suggest that his care has been constitutionally deficient.

## DAVIS, RICKY

Davis suffers from low back pain.  The complaints as to Davis are rather non-specific. Davis had a laminectomy surgery on 2/2/14.[611]  He was provided with physical therapy thereafter.[612]  As of 8/30/14, Davis refused physical therapy because of the transportation.[613]  As Davis continued to complain of low back pain, on 9/22/14, an LSU provider recommended that Davis have a face-to-face evaluation for consideration of further decompression back surgery.[614] A 9/26/14 record quotes Davis as stating that "I've been all right for the most part," and "I can manage it."[615]  On 10/4/14, Davis was discharged from physical therapy for multiple no shows.[616]  A trip to ILH/neurosurgery on 1/12/15 states that "pt wants to avoid further surgery."[617]  He was set up for a six month follow up. He continues to take Neurontin for pain.[618] Repeated health care provider visits, surgery, and Davis' lack of cooperation in his treatment do not show that the Defendants were deliberately indifferent.

---

[609] J 10-10305.
[610] J 10-10618.
[611] J 10-17306.
[612] J 10-17255.
[613] J 10-17253.
[614] J 10-17249.
[615] J 10-17223.
[616] J 10-17236.
[617] J 10-17209; J 10-17210.
[618] J 10-16976 *et al.*

## EVANS, CEDRIC

The amended petition alleges that Cedric Evans sustained a broken collar bone that was not treated properly.[619] Dr. Thomas assessed Evans and found that his treatment was appropriate.[620] Plaintiffs' experts did not assess Evans.[621] There is no proof that the Defendants were deliberately indifferent as to Evans.

## GIOVANNI, EDWARD

Giovanni was 62 years old and suffered from severe chronic obstructive pulmonary disease which was at the end stages of the disease process and Hepatitis C and hypertension.[622] He executed a DNR Order.[623] Dr. Thomas found that the care that LSP provided to Giovanni was consistent with the standard of care for correctional medicine.[624] Plaintiffs' experts did not assess Giovanni.[625] Thus, care provided to this patient does not support allegations that LSP's care is below the constitutionally required level.

## HURD, SHANNON

The Plaintiffs contend that the care provided to Hurd was deficient. They assert that his medical needs were ignored and that he was allowed to deteriorate. The Plaintiffs' position is based upon an unfair, slanted, and biased reading of the medical record. Of course, unfair, slanted, and biased chart reviews creates bad opinions.[626] Upon being challenged on opinions on Hurd on Day 2, Plaintiffs' expert testified that he did not review that record.[627] He denied that Plaintiffs' expert report mentioned Hurd by name in his expert report until being shown

---

[619] Amended Complaint [Doc. 71] ¶ 60.
[620] D 14, p. 34.
[621] P 028.007.
[622] D 14, p. 46; J 10-22530.
[623] D 14, p. 46; J 10-23886.
[624] D 14, p. 47.
[625] P 028.007.
[626] Day 2, p. 71.
[627] Day 2, p. 55.

otherwise.[628]  After denying knowledge as to Hurd for a lengthy examination on Day 2, on Day 3, Plaintiffs' expert had to recant and admit that he actually did do the write up on Hurd.[629]  This testimony was another attempt by Plaintiffs' experts to paint Defendants in a false light.  The reality, based upon a fair reading of the medical records, without the benefit of hindsight, is that Hurd received care prior to developing renal cancer.  Hurd's cancer was diagnosed once the symptoms materialized and Hurd submitted to necessary lab tests.  The care was appropriate.

The hallmarks or primary symptoms of renal cancer are weight loss, pain in the abdomen, blood in the urine, and an abdominal mass.[630]  Defendants will address what the records show as to each.

*Weight Loss.*  By 4/15/15, LSP noted Hurd's weight loss and ordered labs to attempt to assess the reasons for the weight loss.[631]  The issue is when Hurd developed weight loss and whether LSP ignored his alleged complaints of weight loss prior to 4/15/15.  The record refutes the Plaintiffs' claims that LSP ignored Hurd's weight loss.  Hurd's weight is noted in the medical records as follows:

| Date | Weight | Cite |
|---|---|---|
| 03/19/12 | 233 | J 10-25787 |
| 09/24/12 | 220 | J 10-25774 |
| 01/23/13 | 228 | J 10-25763 |
| 04/01/13 | 229 | J 10-25753 |
| 04/09/13 | 230 | J 10-25751 |
| 04/07/13 | 232 | J 10-25750 |
| 04/24/13 | 238 | J 10-25747 |
| 05/01/13 | 235 | J 10-25746 |
| 05/08/13 | 237 | J 10-25744 |
| 05/20/13 | 231 | J 10-25742 |
| 06/06/13 | 226 | J 10-25741 |
| 07/25/13 | 233 | J 10-25730 |

---

[628] Day 2, pp. 61–63.
[629] Day 3, pp. 4–5.
[630] Day 9, p. 111.
[631] J 10-25483.

| 08/09/13 | 235 | J 10-25729 |
| 11/04/13 | 218 | J 10-25708 |
| 01/06/14 | 225 | J 10-25704 |
| 05/12/14 | 206 | J 10-25526 |
| 09/22/14 | 206 | J 10-25513 |
| 10/13/14 | 208 | J 10-25511 |
| 04/15/15 | 197 | J 10-25499 |
| 06/24/15 | 185 | J 10-25483 |
| 08/19/15 | 183 | J 10-25473 |
| 10/21/15 | 176 | J 10-25430 |
| 11/06/15 | 177 | J 10-25460 |
| 11/19/15 | 178 | J 10-25456 |
| 12/04/15 | 172 | J 10-25452 |

This record shows that Hurd's weight throughout 2014 was in a consistent range of 206 to 208. Prior to 2014, Hurd's weight fluctuated. For instance, between 2/24/12 and 5/8/13, Hurd's weight increased from 220 to 237. The fluctuations in Hurd's weight were not identified as problematic until 4/15/15. Indeed, to the contrary, the record shows that Hurd likely needed to lose weight considering his BMI.[632]

The Plaintiffs cited records which they knew (or should have known) were demonstratively wrong. The Plaintiffs presented a 10/5/14 sick call note to the Court in which Hurd wrote that, "I was 247 and in no time down to 203."[633] When presented with that document, Defendants' expert correctly noted that the record was factually incorrect.[634] In reality, as of 10/13/14 (eight days after the 10/5/14 note), Hurd weighed 208 pounds.[635] On 5/12/14, Hurd's weight was 206.[636]

Beginning on 4/15/15, LSP noted Hurd's weight loss and ordered the appropriate labs to assess the weight loss.[637] Unfortunately, Hurd chose not to comply. On 6/11/15, he refused

---

[632] J 10-25473.
[633] Day 9, p. 103.
[634] Day 9, pp. 103–04.
[635] J 10-25511.
[636] J 10-25526.
[637] Day 9, p. 121.

labs.[638]  On 6/24/15, Hurd saw another LSP physician who noted that Hurd refused labs on 6/11/15, and rescheduled labs for 6/26/15.[639]  Once again, Hurd refused the labs.[640]  On 7/8/15 and 7/17/15, Hurd was a no show for a Clinic A appointments.[641]  On 8/19/15, an LSP physician noted the "numerous refusals" and once more ordered the labs.[642]  On 10/21/15, an LSP physician noted yet again that Hurd needed a work up and that he was waiting blood tests.[643]  Plaintiffs' experts ignored the numerous refusals in the record as they attempted to blame LSP for the delay in obtaining the blood tests.[644]  The blood tests were finally performed on 11/3/15.[645]

Plaintiffs' experts' bias is further reflected in the criticism that LSP delayed seven months from 4/15/15 in getting blood test performed to address Hurd's serious medical condition.[646]  Incredibly, the criticism ignores the fact that Hurd refused blood tests that were offered to him and missed appointments, as set forth above.  Plaintiffs' experts ignored these records in an attempt to show failure attributable to LSP.

*Pain in the Abdomen.*  On 9/27/13, Hurd complained of right sided pain after a fight.[647]  On 2/24/15, Hurd reported that it felt like he pulled something on his left side; he described being thrown against the bars in a fight with another offender.[648]  On 10/28/15, Hurd reported for the first time left sided pain with no explanation.[649]

*Blood in the Urine.*  Plaintiffs' experts were was very critical of LSP physicians for not

---

[638] J 10-25482.
[639] J 10-25483.
[640] J 10-25481.
[641] J 10-25479; J 10-25477.
[642] J 10-25473.
[643] J 10-25340.
[644] Day 3, pp. 7–8.
[645] J 10-25213.
[646] Day 2, p. 68.
[647] J 10-25718.
[648] J 10-25504.
[649] J 10-25462.

addressing a 4/15/15 urinalysis which showed trace blood.[650] There are numerous problems with this criticism. First, there is no 4/15/15 urinalysis. The fact of the matter is that the urinalysis with trace blood was on 4/17/14.[651] Second, there are many reasons why there could be trace blood in the urine.[652] Plaintiffs' experts did not consider any of the other many reasons for trace blood in the urine. Third, and most importantly, a urinalysis performed on 11/3/15 was negative for blood in the urine.[653] The expert-crafted criticism of LSP's care did not mention that the later urinalysis which was negative for blood.[654] The criticism regarding the treatment of the blood in the urine to present the impression that LSP ignored a critical medical finding, contrary to the facts, is an example of the completely slanted, biased, and unfair approach taken by the plaintiffs' expert witnesses.

A fair assessment of Hurd's care shows that LSP provided care, and the care was constitutionally adequate. Hurd's weight fluctuated and never fell into a critical area until 2015. When the weight was noted as low on 4/15/15, LSP ordered lab tests. The lab tests were not performed because Hurd failed to appear for lab tests and subsequent follow up visits. Hurd had no abdomen pain on the left side until 2015. Hurd had no blood in the urine at all in 2015. Hurd never had an abdomen mass. Only in late 2015, after Hurd submitted to the necessary lab tests, was LSP in a position to diagnose Hurd's condition. The suggestion that LSP allowed Hurd's condition to deteriorate is without factual foundation.

The Plaintiffs further assert that Hurd presented for repeated sick calls for cold and chest symptoms which were ignored. This is simply a "red herring." The record refutes that allegation. Hurd was provided with treatment of some kind every time he presented to sick

---

[650] Day 2, pp. 64–65.
[651] Day 2, pp. 64–65; J 10-25217.
[652] Day 2, p. 65.
[653] J 10-25216.
[654] Day 2, p. 65.

call.[655]

The only reasonable and unbiased conclusion is that once Hurd's weight loss was medically significant, lab tests were ordered. Once Hurd agreed to the lab test, the cancer was identified and treatment was started. Prior to the lab tests, LSP had no reason to suspect that Hurd had developed cancer. The Plaintiffs' experts assessed the medical record with the benefit of hindsight and with an agenda to paint LSP in a poor light. Dr. Thomas testified that the care provided to Hurd was within the standard of care.[656] The reality is that LSP provided medical care to Hurd and assessed his cancer once he submitted to lab tests that were ordered.

## PARKS, LIONEL

Parks was a 74 year old with a history of hypertension, blindness secondary to glaucoma, peripheral artery disease, and elevated PSA. Plaintiffs' experts did not address Parks in their primary report. Dr. Thomas opined in his report that it was unclear what Parks' major complaints were or why he joined the lawsuit.[657] In their rebuttal report, Plaintiffs' experts assert that care to Parks was deficient, particularly pertaining to an incident on 6/30/14. Initially, we contend that this is improper rebuttal and should be excluded on that basis. The criticisms are without basis or overstated in any event.

Plaintiffs' experts report misrepresents the physicians' involvement in the incident.[658] On 6/29/14 at 0106 (AM), an ambulance went to Parks who was located in a medical dorm.[659] Parks was complaining of itching at that time.[660] Parks was taken to the ATU by 0125.[661] At the ATU, Parks was evaluated and treated. Providers spoke with Dr. Lavespere initially and then again at

---

[655] The individual sick call forms are too voluminous to cite herein.
[656] Day 9, pp. 51–52; D 14, p. 50.
[657] D 14, p. 39. Parks was never a named plaintiff in the lawsuit.
[658] P 028.012–P 028.013.
[659] J 10-47425.
[660] J 10-47425.
[661] J 10-47425.

0330.[662] This document confirms that Dr. Lavespere was available to the ATU at night when needed. As the patient appeared stabilized (eating breakfast with no distress), he was returned to his medical dorm at 0515.[663] At 10:22 on 6/29/14, a second ambulance run was made to Parks in his medical dorm.[664] He was taken to the ATU at 10:43.[665] Dr. Lavespere again was involved in his care.[666] He remained at the ATU until 3:25 PM when he was returned to his medical dorm.[667] A referral slip was completed for Parks for 10:00 on 6/30/14.[668] On 6/30/14, Parks was taken to the ATU where he was seen by Dr. MacMurdo at least twice.[669] At 6:12 pm, Parks was en route to ILH in an ambulance.[670]

The record shows that Parks received care and that physicians were directly involved in that care. At most, there is a difference of opinion as to how soon the patient should have been sent to an outside hospital. Thereafter, the patient continued to receive care. He was given physical therapy.[671] He was offered palliative care and a DNR Order.[672] This elderly patient ultimately died years after suffering a stroke. LSP was not deliberately indifferent. The care provided to this patient was constitutionally proper.

## TOLBERT, LIONEL

Tolbert suffers from coronary artery disease, diabetes, hypertension, hyperlipidemia, bilateral claudication of lower limb, and ischemic rest pain of lower extremity.[673] While at LSP,

---

[662] J 10-47424.
[663] J 10-47424.
[664] J 10-47428.
[665] J 10-47427.
[666] J 10-47427.
[667] J 10-47427.
[668] J 10-47426.
[669] J 10-47423.
[670] J 10-47422.
[671] J 10-47381–J 10-47394.
[672] J 10-47265; J 10-47267.
[673] J 10-56068.

he received four stents between 2005 and 2014.[674]  He also has severe arterial blockages in his legs that cause extreme pain, swelling, and discoloration.  He has difficulty walking and experiences severe burning in his muscles because of inadequate blood flow.  He has been diagnosed with diabetes, for which he takes Metformin.[675]  Plaintiffs allege that Tolbert's blood should be monitored more frequently for diabetes, that Tolbert has noticed arbitrary changes in his medications such as different colored pills for the same medication, and that he is not receiving the special diet that he is supposed to receive.[676]  Tolbert further alleges that he has been denied surgery to resolve arterial blockage in his legs.[677]

Plaintiffs' experts did not assess Tolbert's care.[678]  Dr. Thomas, on the other hand, did assess Tolbert's care.  Initially, it is undisputed that LSP has provided Tolbert with four stents for his heart.[679]  Dr. Thomas found that Tolbert has significant peripheral vascular disease for which he had undergone outside testing.  The testing showed femoral arteries with 50-60% occlusion that was not an indication for surgery.[680]  Indeed, an LSU physician found that Tolbert's conditions were not consistent with peripheral arterial disease and that a significant portion of his pain was likely due to lumbosacral disease.[681]  He was evaluated thereafter and found to have spinal stenosis on a lumbar MRI (with a recommendation of conservative management).[682]  As explained by Dr. Thomas, the allegations pertaining to medications are likely simply a change to generic medications.[683]

---

[674] J 10-56067.
[675] This description of Tolbert's condition is taken from the Amended Complaint [Doc 71 ¶ 71] ¶ 48.
[676] Amended Complaint [Doc 71 ¶ 71] ¶ 48.
[677] Amended Complaint [Doc 71 ¶ 71] ¶ 111(d).
[678] P 028.007.
[679] D 14, p. 40; J 10-56067.
[680] D 14, p. 40.
[681] J 10-56499.
[682] J 10-56568.
[683] D 14, p. 41.

As to his diabetes, Tolbert's A1C was 5.8% and 6.1% on 8/19/14 and 11/06/15,[684] both

below the goal of 7%. There is no indication of any deficiency with his diabetes treatment.

Finally, as to diet, the record shows that Tolbert has been placed on a permanent diet.[685] There is

no evidence to suggest that Tolbert did not receive his diet. The record of treatment of Tolbert

shows that he has received more than constitutionally adequate care.

## TONUBBEE, JOHN

Tonubbee suffers from chronic knee pain. He claims that he has been denied surgery for

his knee pain and that LSP has not provided his orthopedic shoes.[686]

With regard to his knee complaints, Tonubbee has been given regular injections which

provide relief to him.[687] A 10/29/14 record documents injections on 10/7/13, 4/7/14, and

10/6/14.[688] A 2/8/16 record documents that he was referred for a total knee replacement in

October 2015, but that the medical director denied the referral based upon inadequate physical

therapy.[689] Tonubbee was provided with physical therapy on 2/22/16, 3/1/16, 3/7/16, 3/16/16,

3/22/16, 3/29/16, 4/26/16, and 5/3/16.[690] On 5/3/16, he was discharged from physical therapy

with good results.[691] On 6/13/16, the total knee replacement was deferred in favor of an

injection.[692] He received another injection on 10/3/16.[693] Although Plaintiffs may disagree with

the manner of treatment, Tonubbee's knee has been treated. LSP was not deliberately indifferent

to Tonubbee's knee complaints.

Tonubbee's second primary complaint is that LSP purportedly did not provide him with

---

[684] J 10-56041; J 10-56087.
[685] J 10-56255; J 10-56256.
[686] Amended Complaint [Doc. 71] ¶¶ 39, 103, & 122(d.)
[687] J 10-56676.
[688] J 10-56669.
[689] J 10-56819.
[690] J 10-56815; J 10-56814, J 10-56813, J 10-56812, J 10-56811, J 10-56809; J 10-58603; J 10-56925.
[691] J 10-56925.
[692] J 10-57034.
[693] J 10-57003.

orthopedic shoes. The record shows otherwise. On 9/14/10, an LSP physician provided Tonubbee with a prescription for Spenco full length arch support shoes.[694] On 12/30/10, Tonubbee picked up his shoes.[695] On 2/25/13, an LSP physician provided Tonubbee with another prescription for Spenco full length arch support shoes.[696] Tonubbee's history of receiving orthopedic shoes was noted in a medical record on 8/7/14.[697] On 10/24/14, Tonubbee signed for a pair of Apex biomechanical shoes.[698] On 2/5/15, he complained that the shoes that were issued caused pain in both feet and knees.[699] On 2/13/15, he asked an LSP physician for new shoes; the physician responded that he would need to get the warden's permission.[700] On 4/6/15, an LSP physician addressed Tonubbee's complaints about the shoes.[701] On 5/6/15, an LSP physician referred Tonubbee to podiatry to address his shoe complaints.[702] On 8/7/15, podiatry addressed his complaints and requested that he bring his shoes to next visit to be checked; Tonubbee was argumentative.[703] On 2/26/16, LSP issued another pair of orthopedic shoes to Tonubbee.[704] The suggestion that Tonubbee was denied orthopedic shoes is without basis in fact.

The record does not support the claim that LSP was deliberately indifferent or failed to provide constitutionally adequate care to Tonubbee.

---

[694] J 10-56699.
[695] J 10-56694.
[696] J 10-56680.
[697] J 10-56672.
[698] J 10-56670.
[699] J 10-56668.
[700] J 10-56667.
[701] J 10-56665.
[702] J 10-56663.
[703] J 10-56840.
[704] J 10-56912.

**WASHINGTON, EDWARD**

Washington suffered from Hepatitis C, a 2014 heart attack, hypertension, and diabetes.[705] Plaintiffs' experts have no criticisms of the care provided for the Hepatitis C; their primary criticisms are directed at diabetes care and, secondarily, toward his hypertension and heart issues.

Dr. Thomas opined that Washington's care was within the accepted standard of care.[706] Washington was first diagnosed with diabetes and an A1C level of 16% on 3/22/11.[707] By 7/20/11, his A1C level was brought under good control, down to an acceptable level of 6.3%.[708] On 8/31/11, his A1C level remained at an acceptable level of 5.9%, representing good control.[709] On 2/7/14, his A1C level rose above the "good control" level when it was noted to be 8.8%.[710] On 4/9/14, Washington's A1C level was 13.5%, a high level.[711] On 5/21/14, an LSP physician noted that Washington's diabetes was not a goal.[712] On 5/29/14, an LSP physician noted his diabetes was uncontrolled by his current medication and ordered new medications.[713] On 5/30/14, Dr. MacMurdo ordered that Washington was to have accu-checks twice a day A.M. and P.M. for two weeks.[714] On 6/17/14, the reason for Washington's lack of control of his diabetes became clear when he reported that he "stopped using his insulin because his 'sugar went down.'"[715] On 6/17/14, Dr. MacMurdo again ordered accu-checks every AM and PM for two weeks.[716] To further address Washington's lack of compliance, LSP again educated Washington

---

[705] D 14, pp. 43–44.
[706] Day 9, p. 51.
[707] P 028.0014; J 10-58460.
[708] P 028.0014; J 10-58457.
[709] J 10-58454.
[710] J 10-58449.
[711] J 10-58444.
[712] J 10-58626.
[713] J 10-58624.
[714] J 10-58162.
[715] J 10-58622.
[716] J 10-58159.

on diabetes compliance and had him sign a Diabetes Education Verification document.[717]   On 10/4/14, Washington's A1C level was at 7.4%, right at goal.[718]   On 11/12/14, Dr. MacMurdo again ordered accu-checks twice a day A.M. and P.M. for two weeks.[719]   On 11/21/14, Washington's A1C level was 6.8%, below goal.[720]   On 8/6/15, his A1C level was at 6.9%, and on 8/26/15, his A1C level was 6.3%, both below goal.[721]   On 10/2/15, an LSP physician noted that Washington's diabetes was well controlled.[722]

On 1/28/16, an LSP physician noted that Washington had been missing medications.[723] Unsurprising, on 2/15/16 and 2/22/15, his A1C level was above goal at 8.7% and 8.8%.[724]   On 4/13/16, Dr. Lavespere ordered an accu-check.[725]   On 5/19/16, an LSP physician noted that Washington's diabetes was controlled.[726]   On 7/13/16, Washington was a no show for a telemed appointment.[727]   On 7/28/16, Washington's A1C level increased to 9.0%.[728]   The record thereafter contains daily CBG checks for Washington from 7/1/16 through 9/15/16.[729]

As to Washington's hypertension and heart issues, LSU cardiology directed his treatment.   On 1/20/16, an LSU cardiologist saw Washington and adjusted his medications for his hypertension.[730] On 1/28/16, an LSP provider noted that his hypertension was under fair control.[731]   Plaintiffs' experts complain that Washington should have been prescribed statin. LSU cardiology did not prescribe statin.   LSP treated this patient's heart issues and referred him

---

[717] J 10-58623.
[718] J 10-58438.
[719] J 10-58158.
[720] J 10-58437.
[721] J 10-58426; J 10-58423.
[722] J 10-58548.
[723] J 10-58537.
[724] J 10-58420; J 10-58419.
[725] J 10-58535.
[726] J 10-58533.
[727] J 10-59051.
[728] J 10-59044.
[729] J 10-59097–J 10-59092.
[730] J 10-58541.
[731] J 10-58537.

to outside cardiologist with LSU. LSP's treatment was consistent with the direction it received from the LSU's cardiologist.

The record refutes the suggestion that the Defendants were deliberately indifferent to this patient.

## WHITE, RUFUS

White suffered from, among other things, hypertension, asthma, and GERD, and he smoked.[732] Like many other patients, White refused care on numerous occasions.[733] The complaints as to White are non-specific. Dr. Thomas opined that White's care was within the standard of care.[734] Plaintiffs' experts did not assess White.[735] Thus, the evidence does not support any claim that care provided to White was constitutionally deficient.

e) Clinical Care Provided by LSP Does Not Violate the Eighth Amendment

Plaintiffs' opening statement featured the purported circumstances of Shannon Hurd, Ferrell Sampier and Kentrell Parker. As discussed above and below, the Plaintiffs reliance upon those three patients demonstrates the weakness of their case. When the record is reviewed fairly, Hurd presented in need of labs and a work up when he experienced unusual weight loss as of April of 2015. The labs did not occur over the next seven months due to Hurd's refusals, not LSP's actions. Hurd was treated for cancer once he submitted to labs which were used to diagnose the cancer. Besides suffering from unfortunate paralysis, Sampier and Parker had no real complaints. The three patients that the Plaintiffs' highlighted in their opening do not establish that the Defendants were deliberately indifferent to the medical needs of these individuals or any other patient,

---

[732] J 10-59486.
[733] J 10-59478 (2/3/15); J 10-59991 (9/17/15); J 10-60033 (8/8/16); J 10-60032 (8/19/16).
[734] Day 9, p. 51; D 14, p.46.
[735] P 028.007.

In a vain effort to support the Plaintiffs claim of deliberate indifference, Plaintiffs' experts hand-selected the sickest patients. Even after this hand-selection, the experts, in many cases, were demonstrably wrong in their assessment of the record. At best, they applied the wrong standard; at worst, their attacks on LSP's medical care were unfair, slanted, and biased.

The reality is that LSP provides an incredible amount of health care to the patients housed there. The offenders have 24-hour access to health care and pharmacies. Physicians are either on site or on call. In addition to six full time providers, LSP has specialty clinics manned by outside providers. Finally, offenders are regularly provided access to outside specialists at UMCNO and LSU. The Defendants are not deliberately indifferent to the medical needs of patients housed at LSP.

The Plaintiffs also adduced the testimony of Drs. Catherine Jones and Monica Dhand in an attempt to show that outside care is not followed up on at LSP, and their patients are sicker than other patients. Their testimony was non-specific, based largely on hearsay and, in actuality, was an attempt to garner opinions more appropriately in the domain of experts. Jones, for instance, offered non-specific, sweeping conclusions about system-wide experiences with unnamed and unidentified LSP offenders.[736] Dhand similarly offered nonspecific, sweeping conclusions about system-wide experiences with unidentified LSP offenders as well.[737]

The testimony of Jones was called into question when she was ultimately forced to concede that she is friends with plaintiffs' counsel.[738] In fact, Jones' involvement in this case

---

[736] *See, e.g.*, Day 3, pp. 116–18 (offering general testimony on types of presentation of patients and protocols followed at her hospital); 120 (offering testimony regarding trends in LSP patients); 121 (offering testimony on why symptoms are allegedly globally more severe among LSP patients); 122 (offering testimony on delay trends at LSP); 143 (offering testimony on the standard of care).
[737] *See, e.g.*, Day 3, pp. 162 (offering testimony about the types of diseases she sees from LSP); 164 (offering global testimony about delayed treatment for patients from LSP); 165 (offering global testimony about issues accessing follow up care).
[738] Day 3, pp. 139–40.

came about as a result of a social conversation with plaintiffs' counsel.[739] Jones offered global hearsay testimony about what she is told by unidentified offenders about what LSP provides.[740] It should be noted that Jones has never been to LSP and is not familiar with what options are available there.[741] ("Q: Have you ever been to the treatment center at Angola? A: I have not.") *Id.*

As to Dhand, she similarly admitted to a friendship with plaintiffs' counsel.[742] Dhand offered superficial testimony about follow-up but could not substantiate it with any factual specifics.[743] Dhand has never been to LSP and does not know what services are offered there.[744]

The Plaintiffs put on the stand friends of their counsel to give non-specific and glib testimony about alleged interactions with patients they could not identify. When pressed on details, the duo could not point to concrete specifics as to when and who. Both Jones and Dhand had to admit that they did not even know the names of the persons whose anecdotes they attempted to share. Jones and Dhand offered little to enlighten the Court on the issues raised in this case. Their non-specific testimony was based on hearsay and lack of knowledge of crucial underlying facts.

## 2.     Administration Policies and Practices

### a)  Adequacy of Budget

Plaintiffs contend that the budget at LSP is less than would be expected for a facility of its size. Secretary LeBlanc provided undisputed testimony regarding the size and adequacy of the budget. LeBlanc agreed that providing medical care was challenging, but denied that

---

[739] Day 3, p. 140.
[740] *See, e.g,* Day 3, p. 150 (hearsay about what patients tell Jones they are provided as to physical therapy).
[741] Day 3, pp. 141 & 143.
[742] Day 3, p. 169.
[743] *See, e.g.,* Day 3, p. 171.
[744] Day 3, p. 172.

medical care was under-resourced.[745] LeBlanc said that the department spends about $120 million per year on medical.[746] He said that the medical budget has continued to increase annually, even during times of overall budget cuts for corrections.[747]

LeBlanc testified that the budget at LSP has increased significantly over the last several years. For example, he said that the budget for supplies at LSP has increased from $3.1 million in 2012 to over $8 million during the relevant period.[748] He testified that in 2012, LSP had a total of 87 medical positions and that number has since increased to 116 medical positions.[749] He said that the budget increases reflect a department that cares about providing adequate medical care and is applying resources to medical care.[750]

LeBlanc testified that there has never been a time that treatment was needed for LSP patients but denied for lack of budget.[751] He also noted that there are a number of off budget items that are being spent on healthcare at LSP.[752] As an example, he explained that there are 48 medical positions that are not included as medical expenditures because those employees are budgeted under security.[753] He also testified that LSP had overtime expenses that amount to another 28 positions that were not reflected in the budget.[754]

Stacye Falgout ("S. Falgout") also testified about the budget.[755] She testified that the budget does not limit the ability to provide healthcare services at LSP.[756] She explained that if LSP needs to purchase medication for a patient that costs $900,000 a year, they buy it regardless

---

[745] Day 4, p. 188.
[746] Id.
[747] Id.
[748] Id.
[749] Id.
[750] Id.
[751] Day 4, p. 197; see also Day 8, p. 49.
[752] Day 4, p. 198.
[753] Id.
[754] Id.
[755] Day 7, pp. 138–42.
[756] Day 7, p. 138.

94

of any budgeted amount.[757] She testified that the department has never failed to purchase medicine or equipment needed for a patient because of costs.[758]

S. Falgout also testified that the department has taken advantage of several Federal programs that have allowed for drastic reductions in costs to the State.[759] One example is the Medicaid 340B program.[760] This program has allowed the department to purchase expensive drugs (like HIV medications) at a greatly reduced cost.[761] S. Falgout noted that another efficient and cost-saving measure has been the addition of numerous onsite specialty clinics at LSP.[762] In 2015, DOC was able to enroll offenders in Medicaid which covers inpatient hospital stays with outside providers.[763]

Plaintiffs also complain that medical leadership at LSP is not involved in the budgeting process. Defendants do not dispute that, as of September 2016, budgeting was being done at the DOC headquarters level.[764] Dr. Lavespere testified that his lack of input into the budget has not been problematic. He testified that there has never been a time when a request for a medical need was turned down.[765] He specifically recalled an incident where he obtained approval for payment of one-half a million dollars for chemotherapy drugs for an LSP patient.[766]

DOC has a reasonable and adequate budget for medical services provided by LSP. In 2016, the department spent some $120 million on healthcare and that number continues to increase annually. Multiple witnesses testified that budget does not affect the ability to provide adequate medical care at LSP. Moreover, LSP's budget certainly does not violate

---

[757] *Id.*
[758] Day 7, p. 139.
[759] *Id.*
[760] *Id.*
[761] *Id.*
[762] Day 7, p. 141.
[763] Day 7, pp. 141–42.
[764] Day 7, p. 138; Day 8, p. 48.
[765] Day 8, pp. 48–49.
[766] Day 8, p. 49.

"contemporary standards of decency" and does not demonstrate deliberate indifference. *See Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016).

  b) Adequacy and Appropriateness of Staffing

Plaintiffs contend that LSP lacks sufficient staffing. Plaintiffs' experts opined that LSP providers' caseloads were excessive. Defendants note that Plaintiffs' experts did their caseload calculations based upon LSP having a total of five providers. In fact, LSP had a total of six providers in September 2016.[767] Using six providers instead of five changes the overall raw caseload numbers significantly.

In addition to the six providers, LSP also had two open provider positions in September 2016.[768] The reality of the matter is that despite active recruitments, there are challenges to hiring physicians at LSP.[769] These challenges include the remote location, lower pay and demanding on-call responsibilities.[770] Dr. Lavespere indicated that, while he would certainly like to fill the two open provider positions at LSP, LSP is able to meet patient needs with the providers on staff.[771]

Plaintiffs also complain about the lack of credentialing files and contend that LSP providers are not qualified to provide primary care at LSP. While Defendants do not dispute that credentialing files could be improved, the contention that LSP providers are not qualified to provide primary care is pure nonsense. In any event, LSP's credentialing files are not tantamount to constitutional deliberate indifference under the Eighth Amendment.

In September 2016, LSP employed Dr. Lavespere, Dr. MacMurdo, Dr. Toce, Dr.

---

[767] Day 8, p. 26.
[768] Day 8, p. 29.
[769] Day 8, p. 25.
[770] Day 8, pp. 25–26.
[771] Day 8, pp. 29–30.

McCain, Dr. Colomb and NP Cindy Park.[772] Dr. Lavespere's medical background is in family practice.[773] Dr. MacMurdo's medical background is in internal medicine.[774] Dr. McCain had 12–13 years of experience as an emergency room doctor before being hired by LSP.[775] Dr. Colomb was trained in internal medicine, but ended up specializing in cardiology.[776] Dr. Toce's medical background is in internal medicine.[777] NP Cindy Park is certified in adult medicine with a wide range of experience in the ICU and the ER.[778]

Dr. Lavespere testified that every provider on his staff had the training and experience to see primary care patients.[779] He added that the diverse background of LSP providers benefits the patients. He is able to draw on each practitioner's unique abilities in assigning treatment responsibilities.[780] Finally, Lavespere noted that LSP does make its hiring decisions based on the provider's ability to provide primary care. He noted that Dr. Sylvest was not hired as part of LSP's full time staff because he did not have primary care experience.[781]

Plaintiffs also complain because the doctors at LSP have had, at one time or another, restrictions on their medical licenses. Plaintiffs' contend that restricted licenses which limit doctors to working only in correctional institutions are inappropriate. All providers at LSP are licensed by the Louisiana Medical Board and are authorized to provide medical services to the public. Restricted medical licenses are not limited to correctional institutions, but include any institutional setting, including private and public hospitals, and rehabilitation facilities.[782]

---

[772] Day 8, p. 26.
[773] Id.
[774] Day 8, pp. 26–27.
[775] Day 8, p. 27.
[776] Id.
[777] Id.
[778] Day 8, p. 28.
[779] Id.
[780] Day 8, pp. 27–28.
[781] Day 8, pp. 35–36.
[782] Day 8, p. 13.

Although the doctors may have had restricted licenses upon being employed by LSP, many have been restored to unrestricted status.[783]  Moreover, the restrictions relate to matters such as substance abuse, not the quality of medical services provided.[784]

Plaintiffs have not shown that understaffing or the quality of staffing rises to the level of deliberate indifference.  The sheer volume of encounters documented in the medical records in evidence shows that LSP providers are providing a tremendous quantity of care.  As for quality, the medical providers at LSP are all trained in primary care and are all licensed by the Louisiana Medical Board.  Even if Plaintiffs can demonstrate individual instances of unsuccessful treatment or negligence, this does not establish deliberate indifference.  Unsuccessful medical treatment, acts of negligence or medical malpractice do not constitute deliberate indifference.  *See Hinojosa v. Livingston,* 807 F.3d 657, 689 (5th Cir. 2015); *Rogers v. Boatright,* 709 F.3d 403, 410 (5th Cir. 2013); *Sama v. Hannigan,* 669 F.3d 585, 590 (5th Cir. 2012); *Criollo v. Milton*, 414 F.Appx 719, 720 (5th Cir. 2011).

### c) Adequacy of Leadership

Plaintiffs complain about the adequacy of leadership at LSP.  They make much of the fact that the Assistant Warden of Healthcare, Stephanie Lamartiniere, has no background in medicine.  Defendants do not dispute that this former Assistant Warden does not have a medical background.[785]  However, in September 2016, Ms. Lamartiniere's job was to oversee security aspects of the medical ward.[786]  She did not make medical decisions and did not oversee the medical treatment provided at LSP.[787]

---

[783] Day 8, p. 15.
[784] Day 8, pp. 11–12.
[785] Defendants note that Tracy Falgout, a registered nurse, testified at the trial that he is the current Assistant Warden of Healthcare. (Day 10, p. 156). Due to constraints to the September 2016 time period, Falgout was not able to testify as to changes made to this position since September 2016.
[786] Day 8, p. 16.
[787] *Id.*

Since 2014, Dr. Lavespere has served as the Medical Director at LSP.[788] He reports to the Medical Director at DOC Headquarters.[789] As Medical Director, Dr. Lavespere participates in regular monthly meetings with the Assistant Warden and various medical department supervisors.[790] These monthly meetings give the various department heads an opportunity to discuss issues arising in connection with medical care.[791] Action items are created at these monthly medical department head meetings.[792] Dr. Lavespere also has regular contact with the Warden of LSP to keep him apprised of the needs of the medical department at LSP.[793]

The LSP Medical Director oversees all aspects of medical care at the facility.[794] This includes medical staff, the nursing units, clinical operations, the EMS department, the ATU and diagnostic services.[795] Dr. Lavespere engages in daily supervision of the medical providers at LSP. This supervision includes daily morning meetings,[796] review of provider medical charts, review of outside referrals made by providers and review of duty status assignments.[797] Additionally, the Medical Director does formal performance reviews with LSP providers annually.[798] During these annual performance reviews, Dr. Lavespere gives each provider input on their performance and his reviews impact performance raises.[799]

Dr. Lavespere has done an admirable job as Medical Director at LSP since 2014. He is a dedicated professional who takes great pride in his work.[800] Dr. Lavespere cares greatly about

---

[788] Day 8, p. 15.
[789] Day 8, p. 16.
[790] Day 8, p. 17; J3-00527–00539.
[791] Day 8, p. 18; J3-00527–00539.
[792] Day 8, p. 19; J3-00527–00539.
[793] Day 8, pp. 20–21; J3-00510–00526.
[794] Day 8, p. 22.
[795] Day 8, pp. 22–23.
[796] J 3-00883–01734.
[797] Day 8, pp. 23–24.
[798] Day 8, p. 24.
[799] Day 8, p. 24.
[800] Day 8, pp. 168–69.

his patients and has demonstrated his dedication throughout his employment.[801] Plaintiffs' experts have made unwarranted and unsupported attacks on Dr. Lavespere's character based primarily on a 20-minute interview with him.[802] Dr. Lavespere has acknowledged flaws in his now distant past, but Plaintiffs' personal attacks on his character are, at best, improper.[803]

Plaintiffs have not shown any lack of leadership at LSP which would amount to deliberate indifference. Could improvements be made? That is probably true for most medical facilities. However, opportunities for improvement are not tantamount to constitutional deliberate indifference. In fact, LSP leadership has not been deliberately indifferent to the medical needs of patients at LSP.[804] Any purported leadership deficiencies certainly do not meet the standard for deliberate indifference established by the jurisprudence.[805]

### 3. Clinical Practices at LSP

#### a) Adequacy of Sick Call

Plaintiffs incorrectly contend that the sick call process at LSP is inadequate and results in barriers to access to care. Plaintiffs' primary complaint is that LSP uses licensed paramedics and intermediary/basic EMTs to perform the initial phase of the sick call process. Defendants submit that the use of EMTs is appropriate and does not in itself cause harm. Sick call at LSP does not amount to constitutional deliberate indifference.

Sick call is performed Sunday through Thursday at all offender housing facilities at LSP.[806] Sick call is performed by licensed EMS staff that go out to the cell blocks and dormitories to see LSP patients.[807] Patients desiring to participate in sick call fill out a form

---

[801] Day 8, p. 171.
[802] Day 8, pp. 168–69.
[803] Day 8, pp. 11–13.
[804] Day 8, p. 28.
[805] See Section IIA, *supra.*
[806] LSP patients are seen on the weekends by declaring themselves an emergency.
[807] Day 8, pp. 54-55; Day 10, p. 15.

describing their condition.[808]  Completed sick call forms are provided to EMTs who then triage the LSP patients.[809]  There are usually 5 EMTs dispatched each day to do sick call rounds.[810]  Sick call EMTs are staffed with a combination of paramedics and basic EMTs.[811]  EMTs follow specifically - designed protocols and are qualified to provide medical assistance within those protocols.[812]  If the EMTs performing sick call need additional resources to address patient needs, they can call the on-call doctor for input.[813]  Patients who cannot be treated per protocols are either sent to the ATU for immediate care or are scheduled for follow-up appointments with physicians.[814]  EMTs complete sick call forms for each patient seen and each form is reviewed by a doctor.[815]  The patients' charts are pulled and placed with the sick call forms when they are reviewed by a doctor, which normally occurs within 24 hours of the sick call.[816]  Doctors are assigned to review sick call forms based upon the housing location where the sick call took place.[817]  Each doctor typically reviews about 10–20 sick call forms per day.  Total sick call visits at LSP range in the neighborhood of 1,000 per month.[818]

The sick call process described above provides patients with timely and appropriate access to care.  All EMTs employed by LSP hold national registry certifications and a State of Louisiana license.[819]  All EMTs must complete mandatory continuing education requirements and must be re-certified every two years.[820]  The protocols used by EMTs comply with State of

---

[808] Id.
[809] Day 10, p. 15.
[810] Id.
[811] Day 10, p. 16.
[812] Day 8, pp. 55–56; Day 10, p. 17, J 8-00002; J 8-00001-00056; D 15-02946-02949.
[813] Day 10, pp. 26–27.
[814] Day 8, pp. 55–57; Day 10, pp. 26–27.
[815] Day 8, pp. 59–60.
[816] Day 8, p. 59; Day 10, p. 19.
[817] Day 8, p. 59.
[818] Day 8, p. 60.
[819] Day 10, p. 7.
[820] Day 10, p. 8.

Louisiana requirements and are reviewed and approved by East Feliciana Parish authorities.[821] EMTs are trained in the use of protocols.[822] All new EMTs are shadowed by a supervisor and are instructed on use of protocols by the supervisor.[823] EMT performance is tracked through regular review of sick call evaluations. Daily sick call paperwork generated by EMTs is reviewed not only by an assigned doctor, but also by nurses, and the EMT shift supervisor.[824] The use of EMTs to preform initial sick call evaluations was approved by Judge Polozola in the *Williams* litigation, a prior case involving healthcare at LSP.[825] The overall process, including physician review, follow-up appointments and the ability to send patients directly to the ATU is a reasonable and adequate method of providing sick call services. Defendants' expert reviewed the sick call process and found it to be adequate.[826] The use of EMTS to initially assess sick call patients certainly does not offend any sense of "decency" as is required under Eighth Amendment jurisprudence to establish deliberate indifference.

Plaintiffs also complain about certain alleged barriers to access to care. Those include: (i) that sick call is performed only five days a week; (ii) patients are charged a co-pay of three dollars; and (iii) LSP has a malingering policy.[827] None of these policies create any constitutionally deficient barrier to access care. Although sick call is only performed five days a week, patients can and do declare themselves an emergency and can are readily seen by medical personnel 24-hours a day and seven days a week.[828] Patients declaring themselves an emergency

---

[821] Day 10, p. 7, 11.
[822] Day 10, p. 11.
[823] Day 10, p. 12.
[824] Day 10, p. 21.
[825] It should be noted that Dr. Puisis objected to this sick call procedure in the *Williams* litigation and is now seeking again to impose his view on LSP.
[826] Day 9, p. 27.
[827] DOC no longer has a malingering policy. Because of constraints on the relevant time period, this fact has escaped review. It should be noted, however, that Plaintiffs' contention has been mooted.
[828] Day 8, p. 55.

are usually transported to the ATU by security or, if necessary, by ambulance.[829]  Additionally, patients who are ambulatory can simply walk into the ATU and request treatment anytime of the day or night.[830]  The three dollar co-pay charged to patients is not unusual or high.  Plaintiffs' own experts acknowledge that the standard co-pay rate in most correctional institutions is at least five dollars.[831]  The malingering policy is rarely used at LSP.  It has been applied in less than one percent of the encounters with patients.[832]  These matters are not barriers to access to care and certainly do not rise to the level of deliberate indifference under the Eighth Amendment case law.

> b) Adequacy of Urgent Care

Plaintiffs contend that urgent care provided through the ATU violates the Eighth Amendment.  Plaintiffs complain that the ATU is not staffed with a full time doctor and that EMTs assigned to the ATU are making decisions beyond their scope of practice.  They also complain that the ATU is not a full service emergency room, and they question the judgment decisions of the doctors at LSP regarding when a patient should be sent to an outside facility.

Initially, it is noted that LSP has never contended that the ATU is a full service emergency room.  However, the ATU is equipped with a crash cart, intubation equipment and other trauma-related equipment.[833]  The ATU also has access to onsite laboratory and radiology services to assist with patient evaluation and treatment.  In life-threatening urgent care situations, the patient is usually stabilized at the ATU and then sent to one of several outside facilities for further emergency care.[834]

---

[829] Day 8, p. 63.
[830] Id.
[831] Day 2, pp. 104–05.
[832] Day 10, p. 23.
[833] Id.
[834] Day8, p. 68.

In September 2016, the ATU was staffed Monday through Friday with a physician and two EMTs (a paramedic and an intermediate or basic).[835] During nights and weekends, the ATU was usually staffed with two paramedics.[836] The ATU is also assigned an on-call doctor on nights and weekends, that is available to respond to urgent care needs of patients.[837] Patients in need of urgent care are generally transported to the ATU by ambulance when an emergency at an out camp arises.[838] Patients may also arrive at the ATU through a sick call referral or by declaring themselves an emergency. Patients are never more than 10 minutes away from the ATU.[839] Paramedics at the ATU follow specifically-designed protocols and are qualified to provide medical assistance within those protocols.[840] Patients who cannot be treated according to the protocols are treated through communications with the on-call physician who may give orders via phone, may personally see the patient at the ATU, and/or may direct that the patient be immediately transported to an off-site emergency room facility.[841] On-call doctors stay in housing located on the grounds of LSP so they are readily available when the need arises.[842] Defendants submit that the ATU is adequately staffed and operated. Doctors are readily available 24 hours a day, seven days a week to handle the emergent needs of LSP patients. Defendants' experts found that the ATU operated within the standard of care and that EMTs were acting within their level of training.[843]

Plaintiffs' experts spent much time questioning the judgment decisions of the doctors at LSP regarding when a patient should be sent to an outside facility. As the court is well aware,

---

[835] Day 8, pp. 62–63.
[836] Day 8, p. 63.
[837] Day 8, p. 66.
[838] Day 8, p. 63.
[839] Day 10, p. 33
[840] Day 8, pp. 64–65, Day 10, pp. 25–28; J 8-00057-00541.
[841] Day 8, pp. 65–67.
[842] Day 8, p. 9.
[843] Day 9, pp. 23, 31, 159; D 13-02857–58.

judgment decisions by physicians are not actionable Eighth Amendment violations. A disagreement between medical professionals about the appropriate treatment of a prisoner cannot be the basis of Eighth Amendment liability. *See McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977) ('defendants did not have to bear the risk arising from the variations in the views of the doctors'). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *See Estelle,* 429 U.S. at 106; *see also Anderson v. County of Kern,* 45 F.3d 1310, 1316 (9th Cir. 1995); *McGuckin,* 974 F.2d at 1050. The decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Hinojosa v. Livingston*, 807 F.3d 657, 689 (5th Cir. 2015) (citing *Estelle [v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 293, 50 L.Ed.2d 251 (1976).].

c) Adequacy of Chronic Disease Management

Plaintiffs contend that chronic diseases management at LSP is inadequate. Plaintiffs' primary complaints are that LSP does not have an adequate tracking system for chronic diseases and that the chronic disease guidelines are inadequate. Both of these contentions are false.

Clinic A operates several chronic care clinics.[844] These include chronic care clinics for hypertension, diabetes, congestive heart failure, hyperlipidemia, asthma, COPD, seizure disorder, Hepatitis, HIV, and Coumadin.[845] Chronic diseases are tracked and monitored through the clinic director and also through the medical records department.[846] All medical charts have a sticker on the outside to denote whether the patient has a chronic disease and the nature of the chronic

---

[844] Day 8, p. 80.
[845] *Id.*
[846] *Id.*

disease.[847]

The pages in the clinic section of the medical chart are bordered with red, purple, and orange borders and then plain white paper.[848] Red border pages in the chart denote patient chronic care clinic visits.[849] The treating physician can easily determine that the patient is being followed in the chronic care clinic and the nature of his prior visits by looking at the red bordered pages in the medical chart.[850] The red bordered pages also make it easy to track the chronic care history and prior treatment of the patient.[851] When a physician sees a red border, he knows to follow the chronic care guidelines for the patient. The system of using bordered paper is unique to the DOC. The system works very well.

LSP also maintains a chronic care manual that is regularly updated and reviewed.[852] The last review of the chronic care manual (prior to the September 30, 2016 cut-off) occurred in July 2016.[853] The chronic care manual lists the diseases that are regularly tracked in the chronic care clinic.[854] They include hypertension, diabetes, congestive heart failure, hyperlipidemia, asthma, COPD, seizure disorder, Hepatitis, HIV, and Coumadin.[855] This list fairly represents the chronic diseases that need to be tracked at LSP.[856]

The chronic care manual includes guidelines for the systematic monitoring and treatment of the listed chronic diseases. These guidelines are posted in each patient room at Clinic A.[857] A review of the guidelines shows that they are complete and adequate. For example, the diabetes

---

[847] Day 8, p. 82.
[848] Day 8, p. 85.
[849] Day 8, p. 87.
[850] *Id.*
[851] *Id.*
[852] Day 8, p. 93; J8-02691.
[853] *Id.*
[854] Day 8, p. 94; J 8-02691–02711.
[855] *Id.*
[856] Day 8, p. 94.
[857] Day 8, p. 95.

guidelines indicate that the patient needs to be seen at least every 6 months.[858] This is necessary to maintain a regular tracking of the illness and to keep it under control.[859] The diabetes guidelines also indicate labs that need to be done annually.[860] These labs check kidney and liver function and other indicators to make sure that the diabetes is under control.[861] The labs listed on the diabetes guidelines are done annually on every diabetes patient.[862] The guidelines also provide for education of diabetes patients.[863] LSP has a diabetic teaching nurse who routinely educates patients.[864] The diabetes guidelines also prescribe an annual foot exam.[865] This is important for the assessment of diabetic patients.[866] Chronic care guidelines for other conditions provide similar monitoring and treatment recommendations and LSP has implemented these guidelines into their regular clinic operations.[867]

Plaintiffs have not shown that LSP's chronic disease tracking system or guidelines are inadequate. Moreover, any alleged deficiencies do not rise to the level of deliberate indifference.

### d) Adequacy of Infirmary Services

Plaintiffs also complain about the adequacy of infirmary services provided at LSP. Infirmary Care is provided at two Nursing Units located within the Treatment Center.[868] Nursing Unit 1 houses acute care patients.[869] Nursing Unit 1 is staffed by two RNs, one LPN, one medical assistant, and two to three healthcare orderlies.[870] LSP doctors make daily rounds at

---

[858] Day 8, p .96; J 8-027010
[859] Day 8, p. 96.
[860] Id.
[861] Id.
[862] Id.
[863] Day 8, p. 97.
[864] Id.
[865] Id.
[866] Id.
[867] See e.g., J8-02703, J8-02704, J8-02706, J8-02707 and J8-02708.
[868] Day 8, p. 69.
[869] Day 8, pp. 69–70.
[870] Day 8, pp. 70–71.

Nursing Unit 1.[871]

Nursing Unit 2 houses patients who need long-term care.[872] Nursing Unit 2 is staffed with an RN supervisor, two LPNs, and two healthcare orderlies.[873] Nurse Practitioner Cindy Park is assigned to handle medical needs in Nursing Unit 2.[874]

The use of inmate orderlies is an accepted correctional practice. Both the NCCHC and the ACA approve of the use of inmate orderlies to provide assistance with activities of daily living.[875] Defendants' expert observed healthcare orderlies working in the infirmary and found that their activities were appropriate.[876] LSP's healthcare orderly program trains offenders to provide assistance to offenders living in the nursing units with activities of daily living, such as bathing, toileting, transfers, feeding, and personal hygiene.[877] The healthcare orderly training program was created based on a Certified Nursing Assistant ("CNA") course.[878] The training program consists of a multi-day classroom presentation and hands-on training.[879] The classroom presentation is guided by a lengthy PowerPoint, a copy of which is provided to each offender for notetaking, and the offenders are encouraged to ask questions.[880] The topics covered during training include Abuse and Neglect, Negligence, Activities of Daily Living, Patient Safety, Ambulation, Bathing the Patient, and Feeding a Patient.[881] Not every offender who completes the training course is able to become a healthcare orderly.[882] As Warden T. Falgout testified, "I've had guys that voluntarily say this is not for me, through the training. And that's fine . . . .

[871] Day 8, pp. 71.
[872] Day 8, pp. 71–72.
[873] Day 8, p. 72.
[874] Id.
[875] See P 243, p. 0063-0064 (NCCHC); D 499, p. 05523 (ACA).
[876] Day 9, pp. 145–46.
[877] Day 10, pp. 192–93, 205. See also J 4-ii, Deposition of Tracy Falgout, August 8, 2016, p. 10, lines 7–23.
[878] Day 10, p. 193.
[879] Day 10, pp. 194  195, 210–11.
[880] Day 10, pp. 194-195. See J 15 for the healthcare orderly training materials, including the PowerPoint.
[881] J 15, p. 10 (Abuse and Neglect); p. 5 (Negligence); p. 104 (Activities of Daily Living); p. 107 (Patient Safety); p. 158 (Ambulation); p. 164 (Bathing the Patient); p. 182 (Feeding a Patient).
[882] Day 10 pp. 211–12.

We'll have guys that during the training just are not appearing to take it as seriously as they did coming into it, and there's no room for that in the program, so I've excused guys for that purpose as well."[883]

Former offender Aaron Brent testified via deposition that he worked as a healthcare orderly for nine years.[884] He was trained by Warden T. Falgout prior to becoming an orderly.[885] He testified that Warden T. Falgout did a good job of training him and found Warden T. Falgout to be helpful and compassionate.[886] Brent described the training as follows:

> [W]e had to go through CPR. We had to learn how to lift patients from the bed, how to turn them over in the bed. How to deal with guys like we had that were 500 pounds. And then sit down and be able to counsel them when they had problems.[887]

The healthcare orderlies at LSP are properly trained and are providing nothing more than assistance with activities of daily living. Plaintiffs' complaints about the use of offender orderlies in infirmaries are technical at best, and certainly do not constitute deliberate indifference under applicable law.

e) Adequacy of Medication Administration

Plaintiffs contend that medication administration at LSP is improper. Plaintiffs' primary complaint relates to the use of pill call officers to distribute medications to offenders in the general population who are not receiving medication through the Keep on Person ("KOP") program. Plaintiffs argue that pill call officers are not properly trained or supervised resulting in errors in medication administration. Plaintiffs' contentions are not supported by the record.

LSP uses multiple daily pill calls to provide certain LSP patients with their prescribed

---

[883] *Id.*
[884] J 4-c, Deposition of Aaron Brent, p. 37.
[885] J 4-c, Deposition of Aaron Brent, pp. 49–50.
[886] J 4-c, *id.*
[887] J 4-c, Deposition of Aaron Brent, p. 35.

medications pursuant to numerous policies and procedures.[888]    Medications are distributed

through the use of pill call officers who are specifically trained to perform this task.[889]  Pill call

officers initially undergo a five hour training course.[890]  This training is repeated annually.[891]

The training is performed by the pharmacist and a registered nurse.[892]  The training includes

instruction in both proper medication administration and use of the electronic medical

administration record (EMAR) system.[893]    LSP also adopted new training materials and

implemented plans to increase training from five to twenty hours by October 2016.[894]

Pill call officers are employed full time to facilitate the distribution and recordation of

medications.  Each pill call room contains "post orders" that provide information and direction to

pill call officers.[895]  There are three daily pill call times at the main prison designed to coincide

with daily meals.[896]  LSP patients line up at the pill call window and show proof of identification

before receiving medications.[897]  The pill call officer verifies the ID, gives the medication to the

patient and watches him take it.[898]

Pill call officers are generally supervised by security personnel, but medication

administration compliance is overseen by a registered nurse.[899]  Medication administration and

compliance is documented in LSP's EMAR system.  Pill call officers are specifically trained in

the use of the EMAR system.[900]  A registered nurse oversees administration.  She performs

inspections and conducts EMAR audits weekly by reviewing ten EMAR records from each pill

---

[888] D 2-01728–01894.
[889] Day 10, p. 64; D 3-01895–02197.
[890] Day 10, p. 64.
[891] Day 10, p. 65.
[892] Day 10, p. 64.
[893] Day 10, p. 64; D 3-01951–01982.
[894] Day 10, p. 65; D 3-02198–02329.
[895] Day 10, p. 69; D 4-02330–02336.
[896] Day 10, pp. 79–80.
[897] Day 10, p. 68
[898] *Id.*
[899] Day 10, pp. 65–66
[900] Day 10, p. 64.

call location.[901] When problem records are identified, the supervisory nurse re-educates pill call officers.[902]

LSP also administers KOP program for qualifying LSP patients.[903] Patients who qualify attend mandatory training providing information on the nature of the medications and the need to take them as prescribed.[904] Patients are given a 30 or 60 day supply of their medications to keep on their person and administer themselves either daily or as needed.[905] KOP patients refill their prescriptions by notifying the pill call officer 7–10 days before the prescription runs out.[906]

The KOP program is another area where Plaintiffs' experts' opinion was shown to be unfair, biased, and untrustworthy. Plaintiffs' experts represented to the Court as to Patient Number 18 that LSP correctional staff continued to document that the patient received medications *four days after the patient died.*[907] (emphasis in original.) This statement is false, and it should have been apparent to Plaintiffs' experts that the statement was false. In reality, the EMAR system populates the field showing that LSP gave a 30 or 60 day supply of KOP medications to a patient. (Since no one observes the patient take his KOP medications, there is no other reasonable way to document the KOP medications.)[908] Indeed, Patient Number 18's EMAR shows that he stopped taking medications administered to him daily when he was transported from LSP to an outside hospital on 12/12/13.[909] The EMAR after 12/13/13 shows that the patient is receiving only his KOP medications.[910] The patient died on 1/10/14, and his

---

[901] Day 10, p. 67.
[902] Day 10, p. 77.
[903] Day 10, p. 78.
[904] Day 10, p.74–75; D 645-07587.
[905] Day 10, pp. 88–89.
[906] Day 10, p. 86.
[907] PX 006.053.
[908] Day 7, p. 42.
[909] Day 7, p. 42.
[910] Day 7, pp. 42–43.

KOP medication supply continued through 1/14/14.[911] It is inexcusable that Plaintiffs' experts would represent to the Court that LSP is documenting that the patient received medications after he died without acknowledging that KOP medications are given in 30 or 60 day supplies ahead of time.

LSP's medication administration program is reasonable and adequate and cannot by any stretch of the imagination be considered cruel and unusual punishment. Both the ACA and the NCCHC allow for correctional officers to administer pill call.[912] Defendants' expert found that the use of pill call officers was appropriate and cited a study that showed that medication errors are actually greater among LPNs and RNs than they are with correctional officers.[913] Plaintiffs own expert acknowledged that she is not aware of any actual or direct harm that has occurred as a result of LSP's practice of using correctional officers to deliver pill call.[914]

f) Adequacy of Specialty Care

Plaintiffs contend that LSP fails to provide timely access to specialty care. This contention is false. While LSP did, at one time, encounter difficulties in its ability to refer LSP patients to outside providers, those difficulties have been resolved.

LSP refers many specialty services and most surgical care to outside facilities.[915] Prior to 2013, LSP primarily used EKL for its specialty care and surgical procedures.[916] EKL was owned by the State and operated by LSU. LSP had its own scheduling coordinator and worked directly with EKL to schedule specialty appointments.

In 2010, the Legislature approved the closure of EKL and the transition of services

---

[911] Day 7, p. 43.
[912] Day 7, p.16
[913] Day 9, pp. 148-149
[914] Day 7, p. 17
[915] Day 8, p. 157
[916] Day 8, p. 158

provided by EKL to Our Lady of the Lake Regional Medical Center.[917] LSP was notified that EKL would be closed by 2013.[918] Indeed, EKL did begin to discontinue its specialty services and non-emergency surgical procedures.[919] EKL also stopped sending physicians that ran many of the in-house specialty clinics at LSP.[920] When EKL closed in April 2013, LSP, through contracts entered by into DOC, began to use LSU Health Services as its primary specialty services and surgical provider.[921]

LSU Health Services' primary facilities are located at the University Medical Center in New Orleans.[922] In 2013, after the closure of Charity Hospital due to Hurricane Katrina, LSU operated through a temporary hospital in New Orleans known as Interim LSU Hospital ("ILH").[923] In order to transition all specialty and surgery care from EKL to ILH, all pending LSP referrals were reviewed by a Medical Review Board to determine whether immediate intervention was required.[924] Although all pending referrals were eventually scheduled, ILH could not initially absorb all specialty care appointments and/or surgeries referred by LSP at the time of the closure of EKL.[925] As a result, during the period 2013–2014, LSP had a backlog of various non-emergency surgical referrals due to the resource problems at ILH. The backlog included hernias, cataracts, knee replacements, hip replacements, and basic surgical procedures.[926]

The issues caused by the closure of EKL began to be resolved in late 2014 with the

---

[917] Day 7, p. 127
[918] Id.
[919] Day 8, p. 158
[920] Id.
[921] Day 7, p. 132-33
[922] Day 8, p. 160
[923] Id.
[924] Day 8, p. 161
[925] Day 8, pp. 160-62
[926] Id.

opening of the new University Medical Center at New Orleans.[927] The opening of this facility improved LSU's ability to meet LSP's referral demands for specialty services and allowed LSU to timely schedule surgical procedures.[928] In addition, LSP, through DOC, was able to contract with other outside medical facilities. LSP sends referrals to Lallie Kemp in Independence, Louisiana.[929] Lallie Kemp handles outside referrals for cardiology, urology, and general surgery and was instrumental in eliminating LSP's backlog of hernia repairs.[930] As of late 2016, Lallie Kemp had performed some 80 hernia surgeries for LSP.[931] LSP, through DOC, has also entered into contracts with Lane Memorial Hospital for cardiac care and Our Lady of the Lake Hospital in Baton Rouge for certain categories of emergency care including acute respiratory, neurologic, and head trauma cases.

LSP has also greatly expanded its tele-medicine services which are provided through a contract with outside providers. LSP has also staffed its internal, on-site specialty clinics through contracts with outside health care providers.[932] Internal specialty clinics include dermatology, orthopedics, general surgery, urology, neurology, Hepatitis, and HIV.[933] Additionally, an outside group of GI specialists regularly comes to LSP to do colonoscopies.[934]

Plaintiffs also complain about problems with the scheduling of specialty appointment. Those complaints are unfounded. As a result of the closure of EKL in 2013, DOC developed a new statewide scheduling system for outside specialty care. Scheduling is administered centrally through DOC headquarters using an automated scheduling system called "Eceptionist."[935]

---

[927] Day 8, p. 161
[928] Day 8, p. 162
[929] Id.
[930] Id.
[931] Day 8, p. 163.
[932] Day 8, pp. 155–56.
[933] Id.
[934] Id.
[935] Day 7, pp. 133–34; see generally J 9-0001, et seq.

Eceptionist is the electronic system that LSU Health Services uses to schedule appointments.[936] Since LSU Health Services is DOC's primary provider of specialty services, DOC elected to adopt this scheduling system.[937]

DOC hired staff specifically to handle specialty scheduling. There was a learning curve when the system first came online.[938] However, DOC worked diligently to work out any bugs in the system and to properly train staff at both the headquarters and LSP in the use of the system.[939] LSP patients are referred for specialty care by LSP physicians.[940] Referral requests are placed into Eceptionist by LSP medical staff.[941] DOC staff does not make any independent determination regarding whether to grant or deny the referral.[942] Referral requests are only reviewed by registered nurses at DOC headquarters to ensure that all necessary documentation, such as lab work, is submitted with the referral.[943] Once all documentation has been submitted, DOC requests the specialty appointment from the outside provider.[944] If referral requests are accepted by the outside provider, appointments are then scheduled based on the availability of the outside provider and the urgency of the referral.[945] After these changes, the backlog of specialty care appointments at LSP significantly improved as of September 30, 2016, and beyond.[946]

g) Adequacy and Cleanliness of Facilities

Plaintiffs complain about the adequacy and cleanliness of the medical facilities at LSP.

---

[936] *Id.*
[937] *Id.*
[938] Day 7, p. 134.
[939] Day 7, pp. 133–34.
[940] Day 7, p. 135.
[941] *Id.*
[942] Day 7, p. 136.
[943] Day 7, p. 135.
[944] *Id.*
[945] Day 7, pp. 136–37
[946] Day 7, pp. 137–38; Day 8, pp. 160–63.

Plaintiffs claim that the clinical spaces are too small, lack necessary equipment, and are cluttered. Plaintiffs experts attached multiple pictures that they claims showed medical records stacked up in various examination rooms.

Plaintiffs' contentions are false. Defendants' expert measured the size of the examination rooms and found them to be larger than those typically found in the private sector.[947] Dr. Lavespere directly addressed the issue of purportedly cluttered examination rooms and equipment in those rooms. He noted that the photos were totally misleading. He testified that the room that the Plaintiffs' experts took pictures of was actually his workroom.[948] This room contains numerous medical charts that are reviewed by Dr. Lavespere daily, but it is not being used to see patients.[949] Dr. Lavespere explained that he uses one of the patient rooms to review charts so that he is accessible to doctors and patients while clinic is being conducted.[950] Plaintiffs' experts never bothered to ask Dr. Lavespere if patients were being examined in that particular room before making these false representations.[951] Dr. Lavespere also testified that the examination rooms are properly equipped. He said that there are otoscopes in every room.[952] Dr. Lavespere said that LSP did not maintain ophthalmoscopes in every exam room because this expensive piece of equipment "kept going missing."[953] After this occurred multiple times, he decided to keep the ophthalmoscopes in the minor surgery room "right across the hall."[954]

Plaintiffs' complaints about cleanliness of the facility included photographs of purportedly obstructed sinks and statements by Plaintiffs' experts that they did not observe soap

---

[947] Day 9, p. 34.
[948] Day 8, p. 77.
[949] Id.
[950] Day 8, p. 79.
[951] Day 8, p. 78.
[952] Day 8, p. 76.
[953] Id.
[954] Id.

at sink locations. Dr. Lavespere testified that the physicians carry hand sanitizers with them.[955] However, he noted that the sinks are accessible.[956] He also testified that physicians use gloves when they are examining patients.[957] LSP maintains a sufficient inventory of gloves to afford physicians the opportunity to change gloves between patients.[958]

With respect to general cleanliness of the facility, multiple witnesses testified that the treatment center is cleaned twice daily by janitorial orderlies.[959] Many of the plaintiff class members who testified by deposition admitted that the medical facilities were clean.[960] One of Plaintiffs' primary witnesses on the purported unsanitary conditions was Francis Brauner. This is not the first time that Brauner has made these unfounded accusations. He previously filed a federal suit claiming that unsanitary conditions at LSP violated the Eighth Amendment. His suit was dismissed by summary judgment and was appealed to the Fifth Circuit. The Fifth Circuit affirmed the dismissal finding the record to reflect that showers at LSP were regularly cleaned. *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). The Court further noted "[e]ven if Brauner's facts are taken as true, the most that can be said is that the prison failed to maintain perfectly germ free showers, which is not cruel and unusual punishment." *Id.* Likewise, Plaintiffs' contention in this case about purported unsanitary conditions does not establish cruel and unusual punishment.

h) Peer Review, Mortality Review and QA/QI

Plaintiffs' contend that monitoring and quality assurance techniques used by LSP are inadequate. They specifically complain about the quality of peer review, mortality review, and

---

[955] *Id.*
[956] *Id.*
[957] Day 8, p.77.
[958] *Id.*
[959] Day 8, p. 73; Day 10, p. 206; Day 10, p. 212–13.
[960] Michael Davis depo, J 4-g, p. 34–35; Adrian Dunn dep, J 4-h, p. 25; James Marsh depo, J 4-l, p. 59–60; Albert Pierre depo, J 4-p, p. 43.

QA/QI.

LSP does have a peer review process.[961] Every two years, an outside reviewer comes to LSP and reviews medical records at the facility.[962] The reviewer is usually a physician or medical director from another DOC facility.[963] At the completion of the review, a report is generated.[964] The LSP medical director usually meets with the peer reviewer after completion of the report to discuss the findings.[965] The LSP medical director thereafter meets with LSP providers to discuss the peer review findings and to implement any necessary changes.[966]

LSP also conducts mortality reviews. A death summary is prepared whenever an offender dies at LSP.[967] The death summary is generally prepared by the physician on call at the time of death, or by the LSP medical director.[968] The death summary is then sent to DOC headquarters for review and comment by the DOC medical director.[969] Additionally, autopsies are undertaken for any suspicious deaths.[970] Autopsies are done by the East Baton Rouge Parish Coroner's office.[971]

The QA/QI process is spearheaded by a registered nurse, Asst. Warden T. Falgout.[972] T. Falgout meets with the various medical department heads to determine quality improvement or quality assurance issues that need to be addressed.[973] Once identified, he is responsible for initiation of the QA/QI studies.[974] The purpose of the QA/QI studies is to make sure that medical

---

[961] Day 8, p. 36.
[962] Id.
[963] Id.
[964] Day 8, p. 37; J 2-b-00687–93.
[965] Day 8, pp. 37–38.
[966] Day 8, p. 38.
[967] Day 8, p. 167.
[968] Id.
[969] Day 8, pp. 167–68.
[970] Day 8, p. 168.
[971] Id.
[972] Day 10, p. 178.
[973] Id.
[974] Id.

services are efficient, functional, and to improve on the process going forward.[975] The QA/QI committee meets quarterly and regular minutes are maintained.[976] The department heads from various departments participate in these meetings. They include the assistant warden of health services, the medical director, director of nursing, assistant director of nursing and various other representatives.[977] Some QA/QI subjects are required and some are voluntary. EMS and hospice have state licensing requirements which mandate certain mandatory QA/QI studies.[978] LSP also regularly monitors and tracks infection control and holds quarterly committee meetings for that purpose.[979] Voluntary topics are brought about by issues raised through LSP physicians and other medical staff.[980] One of the studies was a topic in the first quarter of 2016 and included reviewing the number of deaths and suicides at LSP.[981] Another study involved the review of EMS forms to make sure that the forms were being adequately completed per policy and procedure.[982] LSP uses the "Focus PDCA Method" in their studies.[983] This involves getting statistical data to determine compliance and to monitor each study.[984] Information from the quarterly meetings is shared with administrators, including the warden and the DOC medical director.[985]

LSP medical department heads also participate in monthly management meetings that review all aspects of medical care. A monthly report is generated as a result of those meetings setting forth the status of matters relating to the various aspects of medical care and creating

---

[975] Day 10, p. 179.
[976] Day 10, p. 179; J3-a-00001–509.
[977] Day 10, p. 180.
[978] Day 10, p. 181.
[979] J 3-00540–00674.
[980] Day 10, pp. 181–82.
[981] Day 10, p. 182.
[982] Day 10, p. 183.
[983] Day 10, p. 183–84.
[984] *Id.*
[985] Day 10, p. 184.

action items to be addressed.[986]

The record reflects that LSP is actively engaging in monitoring and quality assurance and any purported inadequacy does not amount to deliberate indifference. Can monitoring and quality assurance be improved? Defendants do not purport to argue that their efforts are perfect by any means. However, opportunities for strengthening LSP's current practices do not rise to the level of an Eighth Amendment violation.

### 4. Subjective Knowledge Requirement Lacking

Plaintiffs have not established the subjective knowledge prong which is vital to proving any Eighth Amendment violation. As discussed in detail *infra*, Plaintiffs face a very high standard in establishing the subjective prong.[987] The Plaintiffs must establish that the Defendants possessed a culpable state of mind.[988] Mere negligence, neglect, or medical malpractice does not constitute deliberate indifference. Rather, subjective recklessness as used in the criminal law is the appropriate standard for deliberate indifference under the Eighth Amendment.[989]

Plaintiffs have, in reality, produced no evidence to support the subjective knowledge test. At trial, Plaintiffs briefly questioned Secretary LeBlanc about the so-called "Wexford Report" in an effort to demonstrate subjective knowledge.[990] LeBlanc did not believe that DOC even hired Wexford Consulting in 2009 to provide any services.[991] He believed that Wexford Consulting generated this document in 2009 because it was trying to get a contract with DOC to provide medical consulting services.[992] He did not even remember ever reading the document.[993]

---

[986] J 2-20001–20686.
[987] See Section III.A.2. (Subjective Prong), pp. 21-26, *supra.*
[988] *Id.*
[989] *Id.*
[990] Day 4, pp. 171–81.
[991] Day 4, pp. 171–73.
[992] Day 4, p. 193.
[993] Day 4, p. 200.

The Wexford Report does not establish any subjective knowledge by LeBlanc, or any other defendant, which would support a claim for deliberate indifference. At most, the document discusses areas for possible improvement in the delivery of medical services at LSP. However, rather than condemning the state of healthcare at LSP, the report is overall complementary of efforts with respect to improved access to care and quality of care. Contrary to Plaintiffs' claims of deliberate indifference, the Wexford Report concludes:

> Throughout our visit, WCG could see that over the past few years Dr. Raman Singh has led the DPS&C clinical services staff in achieving tremendous progress in both the quality and cost efficiency of the Department's health care delivery system. It is clear to us that DPS&C is working hard to improve its infrastructure and put resources into place to improve access to care – as well as quality of care – well into the future."[994]

The so-called Wexford Report does not establish subjective knowledge or any "culpable state of mind" by the Defendants.

In pre-trial filings, Plaintiffs have also cited to the prior *Williams* litigation as purported evidence of subjective knowledge in this case. The prior *Williams* litigation does not show subjective knowledge. At most, it shows that LSP was previously under court supervision in the 1990s which required it to implement certain changes in its delivery of healthcare. LSP in fact implemented those required changes and the *Williams* litigation was dismissed.[995] LSP continues to operate with many of the same policies and procedures approved and adopted in the *Williams* litigation and has improved upon those changes over time. The *Williams* litigation does not establish the subjective knowledge requirement in this case.

Finally, Plaintiffs have cited to a handful of emails in pre-trial filings that they claim support the subjective knowledge prong. They cite a document generated by Dr. Singh in 2007, requesting an exemption from a State hiring freeze for healthcare positions, as purported

---

[994] P 265.0015 (Wexford Report, p. 13).
[995] See discussion of Williams litigation in Section II.B. at pp. 6-7, *supra*.

evidence of subjective knowledge of dire staffing issues at LSP.[996] A simple review of this 2007 document shows that Defendants were actually being proactive in attempting to hire additional staff.[997] It does not show deliberate indifference as Plaintiffs wrongly conclude. These proactive efforts have also produced results. Secretary LeBlanc testified that since 2012, medical positions at LSP have increased from a total of 87 to a total of 116.[998] This is not evidence of deliberate indifference.

Plaintiffs have also cited to an email from the LSP Stroke Coordinator to DOC regarding offenders presenting with stroke symptoms.[999] Dr. Singh testified by deposition that DOC was, in fact, proactive in addressing this matter. Dr. Singh testified that he sat down with West Feliciana medical providers and set up a telestroke program.[1000] He said that this program was implemented because there was a need for quick decisions with respect to the treatment of stroke patients.[1001] Again, the evidence shows proactive efforts by the Defendants to meet the needs of its patient population. It does not show any deliberate effort to expose patients to a substantial risk of serious harm.

Plaintiffs have also cited an email written in 2012 relating to the cancellation of specialty visits by outside providers.[1002] A review of the email string shows that DOC was actively monitoring appointment cancellations during the tumultuous closing of the EKL facility and was again being proactive in efforts to remedy the situation. In fact, the document states that:

> Secretary Leblanc and Dr. Singh have expressed their concerns to Secretary Greenstein and the Governor's office regarding delay in care. DHH and the Governor's office are in agreement that delay in care is not acceptable. DOC will

---

[996] P 67.
[997] *Id.*
[998] Day 4, p. 188.
[999] P 12-0001-03.
[1000] J 4, Deposition of Raman Singh, pp. 59–60.
[1001] *Id.*
[1002] P 152-0001–02

continue to keep the lines of communication open between LSU, DHH and the Governor's office.[1003]

This document certainly does not demonstrate any "culpable state of mind" by the Defendants.

The sparse evidence that Plaintiffs have presented on the issue of knowledge falls woefully short of the standard required under the cases cited *supra*. In fact, the evidence cited by Plaintiffs shows just the opposite of deliberate indifference. It shows that time and time again Defendants have engaged in proactive efforts to provide adequate healthcare to patients at LSP despite sometimes trying circumstances. Defendants have testified that they have never intentionally ignored the healthcare needs of patients at LSP.[1004] The evidence in this case supports that testimony.

### 5. Evidence in the Record Does Not Reflect Current Conditions

The case law is clear that the court must look at current conditions to determine whether injunctive relief is appropriate for a purported Eighth Amendment violation. The current conditions at LSP go to the threshold question of whether Plaintiffs have alleged an actual case or controversy under Article III of the Constitution. In determining whether a case or controversy exists in an action seeking prospective relief for allegedly unconstitutional practices, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1982). As the Supreme Court has repeatedly held, an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013).

The Supreme Court has also held that current conditions are necessary in establishing whether relief should be granted under circumstances very similar to those before this Court:

---

[1003] *Id.*
[1004] See Day 4, pp. 198–200; Day 7, pp. 176–77; Day 8, p. 172; Day 11, p. 31.

[If a prisoner] seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, the subjective factor, deliberate indifference, should be determined in light of the prison authorities' **current attitudes and conduct**, their attitudes and conduct at the time suit is brought and **persisting thereafter**. An inmate seeking an injunction on the ground that there is a contemporary violation of a nature likely to continue, must adequately plead such a violation[.]

*Farmer v. Brennan*, 511 U.S. 825, 845–46 (1994) (internal quotations and citations omitted) (emphasis added). In order to meet this burden, the offender may rely "on developments that post-date the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction." *Id.*; *see also Shariff v. Coombe*, 2002 WL 1392164 at *2 (S.D.N.Y. June 26, 2002) ("Plaintiffs are not entitled to injunctive relief for those claims that are now moot because they have been addressed by prison officials."); *Guillen v. Thompson*, 2010 WL 1266828 at *5 (D. Az. Mar. 29, 2010) ("Because the treatment that Plaintiff requested in his underlying motion for injunctive relief has now been provided, his request for an injunction is moot."); *Flynn v. Burns*, 289 F.Supp.3d 948, 970 (E.D. Wis. 2018) (finding claim against prison moot because the policy sought to be enjoined was no longer in place).

Moreover, courts must expressly consider voluntary cessation of possibly wrongful conduct before finding any Eighth Amendment violation. The Fifth Circuit has expressly held that "courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity[.]" *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009). The Fifth Circuit also noted that "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." *Id.*; *see also Ragsdale v. Turnock*, 841

F.2d 1358 (7th Cir. 1988) (stating that cessation of "allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties" because "self-correction [by the government] provides a secure foundation for a dismissal based on mootness"); *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) (stating that government actors are given "more leeway than private parties in the presumption that they are unlikely to resume illegal activities").

In this case, the Court set a cut-off date of September 2016, limiting the presentation of evidence to a time period of more two years prior to the trial date of October 19, 2018. Defendants submit that the cut-off period of September 2016 did not reflect the current conditions at LSP at the time of trial. Moreover, the vast majority of the medical care referenced by Plaintiffs' experts goes back five to ten years prior to the trial date. Plaintiffs have asked this Court to find deliberate indifference based upon treatment that undisputedly occurred in 2008, 2009, 2010, 2011, 2012, 2013, and 2014. This stale evidence cannot serve at the basis for a deliberate indifference claim. Thus, the Court cannot, under applicable case law, find a violation of the Eighth Amendment based on conditions that existed as much as ten years prior to trial but have since been ameliorated.

## IV. Law And Argument – ADA And RA Claims

In addition to their claims arising under the Eighth Amendment, Plaintiffs have asserted claims of disability discrimination arising under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*[1005]

---

[1005] "The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts. Jurisprudence interpreting either section is applicable to both." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) [internal citations omitted]. Although Defendants' brief refers to Plaintiffs' claims as ADA claims, the following analysis applies to Plaintiffs' RA claims as well.

A. **The Involvement of the United States Department of Justice Necessitates pretermission of Plaintiffs' ADA Claims.**

In May of 2010, representatives from the United States Department of Justice ("DOJ") conducted a site visit at LSP to determine whether LSP complied with Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.,* and its implementing regulations, 28 CFR part 35.[1006] Even though DOJ and LSP had not entered into a final settlement agreement as of the close of discovery in this matter,[1007] the evidence presented at trial established that LSP had been working since DOJ's site visit to complete the items identified by DOJ in its review.[1008]

Despite LSP's cooperation with DOJ, Plaintiffs seek the unnecessary involvement of this Court. The purpose of the trial of this matter in October of 2018 was to determine the liability, if any, of Defendants for alleged violations of the Eighth Amendment and the Americans with Disabilities Act.[1009] If liability is established, the Court will proceed with a remedy phase, at which time the Court will determine the appropriate injunctive relief based on the current conditions at LSP. Due to DOJ's involvement, however, any consideration of Plaintiffs' ADA claims prior to the remedy phase is an inefficient use of judicial resources.

Any potential determination by the Court regarding a violation of the ADA is subsumed within DOJ's findings, as DOJ's review was much more extensive than that by Plaintiffs' architectural expert, Mark Mazz. As Mazz admitted, DOJ reviewed more physical spaces than he did and also considered program access, unlike Mazz.[1010] Mazz did not disagree with any of DOJ's findings.[1011] Furthermore, since DOJ created the implementing regulations for Title II,

---

[1006] P 7, p. 0008.
[1007] *See* Day 1p. 23, line 8 through p. 25, line 2.
[1008] *See* J 12-e for a list of items completed as of May 2016. While Defendants do not admit that the items identified by DOJ constitute violations of the ADA, Defendants acknowledge that LSP has been working to complete the items identified by DOJ's accessibility review.
[1009] Rec. Doc. 419.
[1010] Day 4, pp. 60; 76–77.
[1011] *Id.,* p. 76.

DOJ's review is entitled to more deference than the review by Plaintiffs' expert. *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011). In short, any factual finding by this Court will prove to be duplicative of DOJ's efforts at best.

Consequently, Plaintiffs' ADA claims are likely to be moot should the remedy phase commence. A case becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). The evidence at trial indicated that the conditions at LSP regarding accessibility were constantly evolving as of the close of the discovery period.[1012] If the remedy phase of this matter commences, any remedy that Plaintiffs request will, more likely than not, have already been addressed by LSP pursuant to DOJ's involvement. Due to DOJ's involvement, the principle that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" does not apply to the present case. Thus, it will not be possible for the Court to grant any effectual relief. *Contra, City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice"). Therefore, it is an unnecessary use of judicial resources for this Court to consider Plaintiffs' ADA claims at this time.

**B.** **Plaintiffs failed to meet their burden of proving a violation of the ADA.**

Should the Court decide to consider Plaintiffs' ADA claims at this time, Defendants submit that Plaintiffs failed to establish a violation of the ADA. The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Claims against public

---

[1012] *See* J 12-e.

entities for discrimination under the ADA and RA require that the plaintiff prove that: (1) plaintiffs have qualifying disabilities; (2) plaintiffs are being excluded from participation in or "being denied the benefits of services, programs, or activities for which the public entity is responsible, or [are] otherwise discriminated against by the public entity;" and (3) the discrimination is by reason of their disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

Plaintiffs claim that Defendants violated the ADA as follows: (1) LSP fails to provide disabled offenders access to its programs, services, and activities; (2) LSP fails to integrate disabled offenders; (3) LSP uses discriminatory methods of administration; and (4) LSP overtly discriminates against disabled offenders by reason of their disabilities. The evidence presented at trial, however, failed to establish that Defendants violated the ADA.

### 1. LSP provides disabled offenders access to its programs, services, and activities.

Plaintiffs claim that disabled offenders are excluded from participation in or are denied the benefits of LSP's services, programs, and activities because LSP's facilities are not accessible to offenders with disabilities and further claim that LSP fails to provide reasonable accommodations to allow disabled offenders to access programs, services, and activities. As discussed below, Plaintiffs have failed to meet their burden of proof.

a) The testimony of Plaintiffs' architectural expert does not establish that LSP denies disabled offenders access to services, programs, and activities because LSP achieves program access through alternative methods of compliance.

Plaintiffs claim that architectural barriers at LSP deny disabled offenders access to programs, services, and activities. At trial, Plaintiffs presented the testimony of their architectural expert, Mark Mazz. Mazz visited LSP on July 6, 2016, to review limited areas of the prison to

determine whether those areas complied with the ADA accessibility standards.[1013]  Mazz

determined that the areas he reviewed "did not comply with the ADA standards."[1014]  It is based

on this finding that Plaintiffs claim that LSP denies disabled offenders access to programs,

services, and activities.  Mazz's testimony, however, does not establish that LSP denies disabled

offenders access to programs, services, and activities.

The ADA requires public entities to make reasonable modifications in order to ensure

that disabled persons can access the services, programs, and activities provided by the public

entity.  *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).  "[T]he reasonable modification

requirement can be satisfied in a number of ways.  In the case of facilities built or altered after

1992, the regulations require compliance with specific architectural accessibility standards.  But

in the case of older facilities, for which structural change is likely to be more difficult, a public

entity may comply with Title II by adopting a variety of less costly measures, including

relocating services to alternative, accessible sites and assigning aides to assist persons with

disabilities in accessing services."  *Id.* at 532.

Mazz testified that he applied the 1991 ADA Accessibility Guidelines (ADAAG) ("1991

ADAAG standards") to determine whether the areas he reviewed complied with the ADA.[1015]

The ADAAG "articulate minimum technical requirements for ADA compliance by new

construction or alterations to existing facilities" and <u>apply to facilities constructed or altered after</u>

<u>January 26, 1992</u>.  *Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 746, 752 (N.D. Tex.

2010), *aff'd*, 472 F. App'x 287 (5th Cir. 2012); 28 C.F.R. § 35.151.  Although there was no

evidence that LSP's facilities were constructed or altered after January 26, 1992, Mazz indicated

---

[1013] Day 4, pp. 11, 15.

[1014] *Id.*, p. 11.

[1015] Day 4, pp. 13–14. During his testimony, Mazz indicated that the date of construction of LSP's facilities was
inconsequential to his analysis because he would apply the 1991 ADAAG standards to a facility built prior to 1992.
*Id.,* p.13–15. As will be discussed, this is an improper analysis.

that the date of construction and/or alteration was inconsequential to his analysis because it is his practice to apply the 1991 ADAAG standards to facilities that predate 1992.[1016]  Additionally, Plaintiffs have the burden of proving an alteration. *Rosa v. 600 Broadway Partners, LLC*, 175 F. Supp. 3d 191, 206 (S.D.N.Y. 2016), While Mazz's report states that "most of the toilet rooms and showers and flooring in the cafeteria/visiting area that I surveyed appear to have been altered since January 26, 1992," he did not provide any testimony to substantiate this statement.[1017] Nevertheless, Mazz testified that his report was based on the assumption that he "couldn't tell what was altered" and that his opinion would not change if he learned that the facilities he reviewed had not been altered since 1988.[1018]  This, however, is an improper application of the standards and, thus, renders his analysis legally invalid.

Facilities constructed prior to January 26, 1992 are considered existing facilities under the ADA. "The accessibility requirements for existing facilities are less stringent and more flexible than for new facilities." *Greer*, 472 F. App'x at 291.  A public entity is not required to make all of its existing facilities accessible to persons with disabilities, nor is it required to take any action that would result in an undue burden on the public entity.  28 C.F.R. § 35.150(a). Rather, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Id.* (emphasis added).  This is known as the program access requirement.

Mazz did not evaluate whether LSP complied with the program access requirement. Mazz testified that he "looked at the technical requirements for compliance with the spaces that

---

[1016] Day 4, p. 13–15.
[1017] P 7, p. 8.
[1018] Day 4, pp. 44–45; 47.

[LSP] used for program access. I did not ask beyond that."[1019] Although Mazz agreed that program accessibility requires review of the program as a whole, he did not review LSP's programs as a whole.[1020] His review was limited to areas pre-selected by Plaintiffs' counsel.[1021] Since Mazz was not able to testify about program access in other areas of the prison, his testimony failed to establish that LSP, when viewed in its entirety, denies program access to offenders with disabilities.[1022]

Moreover, Mazz did not consider whether LSP achieves program access through alternative methods of compliance. "A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving" program access. 28 C.F.R. § 35.150(b)(1). Mazz testified, "I didn't look at items like providing somebody with a cane because they're blind; I didn't look whether you're providing people with the proper auxiliary aids; I didn't look at alternative ways of being able to read in the law library. I looked at the physical aspects of the spaces that [LSP] used for program access."

Mazz's singular focus on the physical aspects of limited areas of LSP's facility improperly conflates the 1991 facility standards with the program accessibility requirement and does not establish that LSP fails provide program access to offenders with disabilities. *Greer*, 472 F. App'x at 293. In *Greer v. Richardson Indep. Sch. Dist.*, the plaintiff, who used a wheelchair, claimed that she was discriminated against because she was unable to access the Berkner High School stadium bleachers and had to watch a football game from an accessible paved area next to the bleachers. *Id.* at 288–89. Although the stadium was built in 1968 and thus, not subject to the 1991 ADAAG standards, the school district was required to provide

---

[1019] Day 4, p. 67.
[1020] *Id.,* pp. 62–63.
[1021] *Id.,* pp. 15; 61.
[1022] *Id.,* pp. 63–65.

program access to persons with disabilities. *Id.* at 291.

The Fifth Circuit affirmed the district court's finding that the plaintiff failed to establish a *prima facie* case of discrimination under the program access standard. *Greer*, 472 F. App'x at 298. The Fifth Circuit noted that "much of Greer's argument focuses on the actual state of ADAAG compliance at the facility and conflates these observations about *facility* deviations from ADAAG standards, which are applicable to newly constructed or modified facilities, with RISD's obligation to provide *program* access at an existing facility." *Id.* at 293 (internal citations omitted; emphasis in original.) The Court stated that the proper focus of the review is, instead, "the accessibility of the program and not technical compliance with ADAAG in an existing facility." *Id.* at 295. The Court further stated,

> Greer has failed to demonstrate how minor deviations from the ADAAG requirements in various parts of the stadium identified by her expert, such as a quarter-inch variance in 'maximum beveled slope' on one designated wheelchair viewing area or bathroom mirrors that are mounted seven inches too high, prevent her or other disabled individuals from accessing the program at Berkner B, i.e., watching a football game. *Id.*

Similarly, Mazz's testimony was limited solely to LSP's technical compliance with the 1991 ADAAG standards. [1023] As the Fifth Circuit determined in *Greer*, this is not the proper inquiry when reviewing an existing facility to determine whether it denies disabled persons access to or the benefits of services, programs, or activities. Mazz's failure to review LSP's programs, services, and activities as a whole and failure to consider alternative methods of compliance renders his analysis irrelevant to the determination that LSP provides disabled offenders access to programs, services, and activities.

LSP has made its programs, services, and activities readily accessible and useable by offenders with disabilities through alternative methods of compliance, which is a lawful means

---

[1023] Day 4, pp. 66–67.

of meeting its ADA and RA obligations. "A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving" program access. 28 C.F.R. § 35.150(b)(1). A public entity may comply with the program access requirement "through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities." *Id.*

b) LSP provides reasonable accommodations to allow disabled offenders to access its programs, services, and activities.

"[B]oth the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005). "A claim for failure to accommodate under the ADA has the following elements: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered institution; and (3) the covered institution failed to make reasonable accommodations for such known limitations." *Jin Choi v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015). The ADA requires that *limitations* be accommodated, not disabilities. *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996). Thus, "[a] critical component of a Title II claim for failure to accommodate…is proof that the disability and its consequential limitations were known by the entity providing public services." *Windham v. Harris Cty., Texas*, 875 F.3d 229, 236–37 (5th Cir. 2017). "[T]he burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in

direct and specific terms." *Id.*

"In the prison context, whether accommodations are reasonable must be judged in light of the overall institutional requirements, including security concerns, safety concerns, and administrative exigencies. Determining the reasonableness of a particular accommodation, especially in the prison context, is highly fact-specific and determined on a case-by-case basis." *Holmes v. Godinez*, 311 F.R.D. 177, 226 (N.D. Ill. 2015) [internal citations omitted].

LSP has a process whereby an offenders may request an accommodation for any limitations he may have as a result of a disability.[1024] At intake, every offender is asked whether he requires an accommodation for a physical limitation.[1025] As Assistant Warden T. Falgout testified at trial,

> We ask the questions on everyone coming in, do you have any physical limitations, do you have any issues as far as being able to ambulate. Some of it is quite evident. If they come in with a wheelchair or a cane or walker, we know that. We'll take that into consideration. We also, like I said, we'll ask them questions if they have any physical limitations.[1026]

If the offender cannot read, write, or suffers from a cognitive impairment, the information is reviewed verbally with him.[1027] "If in the process of doing medical intake, there appears to be that there is some type of cognitive deficit as far as this offender's ability to understand, we will take our time and slow things down, read it for them. If there's still that issue, we bring mental health in on that...to help him as much as possible comprehend what's going on with the intake process and make sure he gets the information."[1028]

During intake, the offender is provided with a Request for Accommodation form and is

---

[1024] *See* J 7-a.
[1025] J 4-jj, p. 19; *see also* J 4-ii, p. 95.
[1026] Day 10, p. 163.
[1027] J 4-ii, pp. 98–99.
[1028] Day 10, p. 169.

advised that he can request an accommodation at a later date, if necessary.[1029] Warden Falgout testified at trial that "[w]e assure them that what they have currently when they sign this document at intake is just that, at intake. At any point in time past this initial signature, if they have a need for any adaptive device, then they can make the request, and we'll assess the need for it at that time."[1030]

Although Request for Accommodation forms are available at all housing areas, the form "is not a necessity for access."[1031] Instead, offenders can request an accommodation verbally, through a sick call form, or even "on a blank piece of paper."[1032] "Any means of communication" suffices to initiate a request for an accommodation.[1033] In fact, accommodations are often made upon the suggestion of someone other than the offender, such as a correctional officer.[1034]

LSP considers any request for an accommodation and provides reasonable accommodations on an individualized, case-by-case basis.[1035] A request for an accommodation is evaluated from a medical perspective by the Medical Director and/or other disciplines that may have input, such as physical therapy or optometry.[1036] The request is thereafter evaluated from a classification standpoint and as to whether the requested accommodation would pose an undue hardship on LSP or its employees or would constitute a danger to the offender or

---

[1029] J 4-jj, p. 20; J 12-a, p. 1, Request for Accommodation Form. E.g. Class member Otto Barrera testified at trial that he was presented with a Request for Accommodation Form at intake. Trial Transcript, Day 5 (October 15, 2018), p. 49; J 10-d-1, p. 03748.
[1030] Day 10, p. 172.
[1031] J 4-jj, pp. 19–20; 22–23; Day 10, pp. 174–75.
[1032] J 4-jj, pp. 19–20.
[1033] Id., p. 29.
[1034] Id., p. 29. See also J 4-ii pp. 89, 175 ("It's unlimited as far as who can request an accommodation, either themselves or for that offender," and staff communicates well regarding accommodations.).
[1035] J 4-ii, p. 86–87. See also, J 4-jj pp. 17–18; 23.
[1036] J 12-a, p. 00002-00003, Form B-08-010-A; J 4-jj pp. 12–13. At the time of his October 2016 deposition, T. Falgout had been in the position of ADA Coordinator for approximately one and a half months. Id., p. 7.

others.[1037]  All findings are documented using DOC Form B-01-10-A.[1038]  The ADA Coordinator makes the final determination, taking into account the findings related to medical, classification, and undue hardship.[1039]  If the offender is not satisfied with the response to his request for an accommodation, he may appeal the determination in accordance with the Second Step of the Administrative Remedy Procedure ("ARP") process or through the United States Department of Justice.[1040]

As discussed below, LSP provides reasonable accommodations to disabled offenders through the use of auxiliary aid and assistive devices, the use of trained offenders to provide assistance, the assignment of a duty status, dietary changes, appropriate transportation, and in prison procedures.

   i.   *LSP provides auxiliary aid and assistive devices to offenders with disabilities.*

"A public entity shall furnish appropriate auxiliary aids and services <u>where necessary</u> to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1) [emphasis added].  LSP offers auxiliary aid and assistive devices to offenders with disabilities. Signs are posted throughout the penitentiary informing offenders that auxiliary aid is available upon request.[1041]  Offenders are provided with adaptive devices as necessary on a case-by-case basis.[1042]  Offenders are permitted to keep any adaptive device with which they enter LSP, provided that the device is supported by

---

[1037] J 12-a, pp. 00004–00005, Form B-08-010-A.
[1038] *See id.*, p. 00002–00005, Form B-08-010-A; J 4-jj pp. 12–13.
[1039] J 7-a, p. 7.
[1040] J 7-a, p. 8; J 4-jj, pp. 24; 28.
[1041] J 4-jj, pp. 29–30; J 12-h, ADA signage.
[1042] J 4-jj, pp. 17–18.

the order of a healthcare provider.[1043]  Below are examples of auxiliary aid and assistive devices provided to disabled offenders at LSP.

Offenders with mobility issues may be provided with wheelchairs, walkers, canes, or specialty footwear in accordance with physicians' orders.[1044]  An offender who develops a need for a wheelchair while at LSP is provided safety training for use of the wheelchair.[1045]  Depending on the device and the offender's disability, training may also be provided through physical therapy or by nursing staff.[1046]  Wheelchair repairs and replacements are handled through LSP Central Supply.[1047]  LSP has provided offenders with orthopedic braces, splints, and crutches.[1048]  Offenders with paralysis may be given adaptive braces to assist with eating.[1049]  In short, LSP will "do whatever needs to be done to provide as much independence as possible."[1050]

Visually impaired offenders are followed by optometrists and/or ophthalmologists, depending on need.[1051]  Visually impaired offenders are issued glasses in accordance with physician's orders.[1052]  Visually impaired offenders may also be provided with a cane, which they are trained to use in physical therapy.[1053]  LSP has engaged Lighthouse Louisiana to provide mobility and accessibility training at the request of a visually impaired offender.[1054]  Visually impaired offenders are able to request audiobooks from the library.[1055]

Like visually impaired offenders, hearing impaired offenders are monitored annually.[1056]

---

[1043] J 4-ii, pp. 62–64, line 19; Day 10, pp. 170–71.
[1044] J 12-b, p. 12.
[1045] J 4-ii, pp. 122–23.
[1046] J 11-c, Response to Interrogatory No. 12, p. 00261.
[1047] J 4-ii, p. 122.
[1048] *Id.*
[1049] *Id.*, p. 120.
[1050] *Id.*
[1051] *Id.*, p. 114.
[1052] J 12-b, p. 12.
[1053] J 4-ii, pp. 116–18.
[1054] J 4-jj, pp. 34–35.
[1055] J 4-ii, pp. 114–15.
[1056] *Id.*, pp. 100–01.

LSP performs hearing tests onsite, but offenders may be referred to an offsite audiologist, if ordered by a physician.[1057] Hearing impaired offenders are provided with assistive listening devices and have access to closed captioned television, FM adapters to listen to television through the radio, and amplified telephone headsets in each housing area.[1058] TTY phones are available for offenders for whom the amplified telephone headsets are insufficient.[1059] If an offender arrives at LSP with a hearing aid, LSP will continue to provide batteries for the hearing aid.[1060] If the hearing aid becomes damaged while at LSP, the offender will be provided with an assistive listening device.[1061] If an offender's assistive listening device becomes damaged, LSP will either repair or replace it.[1062] Offenders can request replacement batteries for their assistive listening devices or hearing aids through sick call.[1063]

In addition to amplification devices, LSP also provides communication assistance. "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). LSP offers courses in American Sign Language taught by a professional sign language interpreter, Dr. Daniel Burch.[1064] Offenders who have completed the course are available to assist hearing impaired offenders in population.[1065] Since

---

[1057] *Id.*, pp. 110–12.
[1058] *Id.*, pp. 101–02; p. 104. *See also* J 7-a, p. 6.
[1059] J 4-ii, p. 102. As of August of 2016, no LSP offender had a level of hearing impairment that required the use of the TTY phones, instead of the amplified telephone headsets. As Warden T. Falgout explained in his deposition, offenders must meet a certain decibel threshold to qualify for use of a TTY phone. For persons who can hear below the decibel threshold, an amplified telephone headset is sufficient.
[1060] J 4-ii, p. 108. *See also* J 7-a, p. 7.
[1061] J 4-ii, p. 108.
[1062] *Id.*, pp. 109–10.
[1063] *Id.*, p. 101.
[1064] J 4-ii, pp. 104–05. Warden T. Falgout recalled at his October 2016 deposition that Dr. Burch had been assisting with hearing impairment at LSP since 2008. J 4-jj, pp. 52–53. Dr. Burch was under contract to provide sign language training at LSP for the period of August 2015 through August 2018. *See* J 12-c, p. 00166–00171.
[1065] J 4-ii, p. 105.

offender interpreters are not used for medical or legal services, LSP hires a third-party, independent interpreter to assist the offender.[1066] As of August of 2016, however, LSP only had one hearing impaired offender who could benefit from a trained sign language interpreter, and he usually "waive[d] his option for the interpreter," since he was able to communicate effectively using an assistive listening device.[1067]

Plaintiffs failed to establish that LSP does not provide necessary auxiliary aids and assistive devices to disabled offenders. Plaintiffs presented no evidence of a visually or hearing impaired offender who was not provided with a necessary auxiliary aid or assistive device. Plaintiffs contend that class member Adrian Dunn was denied diabetic test strips. Although Defendants maintain that Dunn has been provided appropriate medical care, and "[t]he ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012). While diabetes may be a qualified disability under the ADA, Plaintiffs presented no evidence to establish that it is a qualified disability for Dunn.

To prevail on a claim of ADA discrimination, the party must prove that he has a disability. *Ball v. LeBlanc*, 792 F.3d 584, 597–98 (5th Cir. 2015). Defendants do not deny that there are disabled offenders at LSP. Rather, Defendants submit that Plaintiffs' purported examples of ADA discrimination do not establish as much because the alleged victims have not been shown to be disabled, a required element of a claim of ADA discrimination. A disability under the ADA requires "a physical or mental impairment that *substantially limits* one or more major life activities." 42 U.S.C. § 12102 [emphasis added]. "[W]hether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483

---

[1066] *Id.,* pp. 105–106.
[1067] *Id.,* pp. 99–100, line 4; p. 106; *see also* J 4-jj, p. 52 ("[W]e only have one offender that uses sign language. He also has a pocket talker. He is able to communicate with the pocket talker, so he doesn't utilize the sign language.).

(1999), *overturned due to legislative action* (2009). *See also Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002), *overturned due to legislative action* (2009) ("That the Act defines 'disability' 'with respect to an individual,' 42 U.S.C. § 12102(2) [now, 42 U.S.C. § 12102(1)], makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner."). Although *Sutton* and *Toyota* were overturned by the ADA Amendments Act of 2008, the definition of "disability" was not substantially modified, and thus, the requirement of an individualized, case-by-case inquiry still applies. *See* 42 U.S.C. § 12102(1). *See also Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013) ("[T]hough the ADAAA makes it *easier* to prove a disability, it does not *absolve* a party from proving one." (Emphasis in original)). "[N]either the Supreme Court nor [the Fifth Circuit] has recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies." *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 656 (5th Cir. 2003).

Diabetes is not inherently a disability under the ADA. *See e.g., Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) ("the district court properly concluded that Griffin is not disabled within the meaning of the ADA."). There is no evidence that Dunn is substantially limited in any major life activities as a result of his diabetes.[1068] Although Dunn testified that he had trouble with his vision, this does not constitute a substantial limitation in any major life activity because he has eye glasses.[1069] "The ameliorative effects of the mitigating measures of ordinary eye glasses or contact lenses shall be considered in determining whether an

---

[1068] *See* J 4-h, p. 37 ("I have a little back pain, my legs and my feet, but that's been kind of recently because of the diabetes, so I'm not in bad physical shape.").
[1069] *Id.* at 38.

impairment substantially limits a major life activity."[1070] Dunn's testimony does not show any substantial limitation in any major life activities, with or without his glasses, as he reported that he is able to get around without his glasses.[1071] Thus, Plaintiffs failed to establish that he has a qualified disability, which is necessary to prove a violation of the ADA.

Similarly, Plaintiffs contend that class member Derrick Woodberry was denied a donut and a sitz bath for hemorrhoids. Hemorrhoids are a medical condition. To the extent that hemorrhoids could be considered a qualified disability under the ADA, Plaintiffs failed to submit any evidence showing that Woodberry is substantially limited in one or more major life activities as a result of his hemorrhoids. In fact, Woodberry did not consider his hemorrhoids to be a disability.[1072] In the event that Woodberry is considered to have a qualified disability, however, he also testified that he receives relief from his hemorrhoids in the shower -- "If I use the bathroom and I feel discomfort, I hop into the hot water of the shower."[1073]

As will be discussed later, the ADA does not require the individual to be provided with the accommodation of his choice, only a reasonable accommodation.[1074] Thus, not only did Plaintiffs fail to establish that he has a qualified disability, which is necessary to prove a violation of the ADA, they also failed to establish that he was not provided with a reasonable accommodation for his purported disability.

At trial, former offender Francis Brauner testified that while at LSP, he requested a slide board, gloves, and orthopedic shoes but never received these items.[1075] Brauner provided no explanation as to why he thought he needed a slide board, so Plaintiffs failed to establish that a

---

[1070] 42 U.S.C. § 12102(4)(E)(ii).
[1071] *Id.*
[1072] J 4-t, p. 47.
[1073] *Id.*, p. 46.
[1074] *See* Wells v. Thaler, 460 F. App'x 303, 313 (5th Cir. 2012).
[1075] Day 4, p. 104–05.

slide board was a necessary auxiliary aid or assistive device. Brauner testified that he did not receive gloves because "they said it wasn't in the budget."[1076] However, assuming the gloves to be a necessary auxiliary aid or assistive device, gloves were available for Brauner to purchase in the commissary.[1077] Finally, Brauner testified that he requested orthopedic shoes to prevent foot drop.[1078] Yet, there is no evidence that Brauner suffered from foot drop or was at risk of developing foot drop. Thus, Plaintiffs failed to establish that orthopedic shoes were a necessary auxiliary aid or assistive device and thus, a reasonable accommodation denied by LSP.

Class member Farrell Sampier testified that he requested wheelchair gloves, a trapeze bar, and a new wheelchair.[1079] There was no evidence that he was denied a necessary auxiliary aid or assistive device. Sampier received the trapeze bar as requested.[1080] Sampier also received a new wheelchair and was able to purchase gloves in the commissary.[1081] Even though Sampier was not provided with the specific items requested, this does not constitute a violation of the ADA.[1082] "[N]othing in the ADA itself or its implementing regulations dictates that a disabled individual *must* be provided with the type of auxiliary aid or service he requests and that deference to the requests is by no means required." *Wells*, 460 F. App'x at 313, citing *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) [internal citations omitted]. Aside from Sampier's self-serving testimony that he would have preferred different accommodations, there was no evidence that the accommodations provided to Sampier were not reasonable.

---

[1076] *Id.*
[1077] Day 1, p. 59. There was no evidence that Brauner required specialty gloves.
[1078] Day 4, p. 105.
[1079] Day 1, pp. 59–60; 85.
[1080] *Id.* at. 60.
[1081] There was no evidence that gloves were a necessary auxiliary aid or assistive device for Sampier. At the time that he requested gloves, he was still confined to his bed and had only just begun getting into his wheelchair. *See Id.* at 85.
[1082] *Id.* at 59; pp. 81–82.

Class member John Tonubbee, who has a bunion, testified that he has been denied the opportunity to purchase shoes from outside of LSP.[1083] This, too, is not evidence of denial of a reasonable accommodation by LSP. Tonubbee medical records indicate that he was provided with a pair of Apex shoes.[1084] Tonubbee was not happy with this accommodation because he wanted custom shoes, which were not medically warranted.[1085] Custom shoes were not a necessary auxiliary aid or assistive device for him. Aside from Tonubbee's self-serving testimony that he would have preferred different shoes, there was no evidence presented that the shoes provided to him were not a reasonable accommodation.

> ii.  *Trained healthcare orderlies are used to provide assistance to disabled offenders.*

In addition to issuing auxiliary aid and assistive devices, LSP accommodates offenders with disabilities through the use of trained healthcare orderlies. The assignment of aides to qualified individuals is a permissible accommodation under the ADA. *See* 28 C.F.R. § 35.150(b)(1). The use of offender orderlies is an accepted correctional practice. Both the NCCHC and the ACA approve of the use of offender orderlies to provide assistance with activities of daily living.[1086]

LSP's healthcare orderly program trains offenders to provide assistance with activities of daily living, such as bathing, toileting, transfers, feeding, and personal hygiene to offenders living in the assisted living dorms and the nursing.[1087] Warden T. Falgout testified at trial that the healthcare orderly training program was created based on a Certified Nursing Assistant ("CNA") course.[1088] The training program consists of a multi-day classroom presentation and a

---

[1083] Day 4, pp. 148–49.
[1084] J 10-ddd-3, p. 56892.
[1085] *Id.*
[1086] *See* P 243, p. 0063–0064 (NCCHC); D 499, p. 05523 (ACA).
[1087] Day 10, pp. 192–93; p. 205. *See also* J 4-ii, p. 10.
[1088] Day 10, p. 193. The healthcare orderly training program is not a full CNA course "because there are certain

hands-on training component.[1089]  The topics covered during training include Abuse and Neglect, Negligence, Activities of Daily Living, Patient Safety, Ambulation, Bathing the Patient, and Feeding a Patient.[1090]

A copy of the training PowerPoint is provided to each offender for notetaking and reference purposes.[1091]  Offenders are encouraged to ask questions.[1092]  Warden T. Falgout offered the following testimony regarding the hands-on training portion of the course:

> Yes, there's a day, and it lasts as long as it lasts, I will say that, that I bring hospital beds, I bring canes, I bring walkers, I bring assistive devices into the Hospice Chapel, and we go through how do you make a bed, how do you make an occupied bed…how to assist with a patient that has a walker, with a wheelchair, that sort of thing, how to do proper transfers in and out of a bed, so we do that. I utilize some of the older offenders that have been in the program for a while, I use them in the capacity to assist with those things like bed-making throughout. It's a big open room, I'm always moving around and in contact with these stations, but they also play patient for me as well.[1093]

Not every offender who completes the training course is able to become a healthcare orderly.[1094]  As Warden Falgout testified, "I've had guys that voluntarily say this is not for me, through the training. And that's fine. . . . We'll have guys that during the training just are not appearing to take it as seriously as they did coming into it, and there's no room for that in the program, so I've excused guys for that purposes as well."[1095]  During the relevant time period of this matter, Warden Falgout was conducting the healthcare orderly training program on an as-

---

things within a CNA's scope [of practice] that [offenders] could not do inside the penitentiary." *Id.* at 193. The course is narrowed down to the information necessary to be able to provide assistance with activities of daily living. *Id.*

[1089] *Id.* at pp. 194–95; 210–11.

[1090] J 15, p. 10 (Abuse and Neglect); p. 5 (Negligence); p. 104 (Activities of Daily Living); p. 107 (Patient Safety); p. 158 (Ambulation); p. 164 (Bathing the Patient); p. 182 (Feeding a Patient).

[1091] Day 10, pp. 194–95. *See* J 15 for the healthcare orderly training materials, including the PowerPoint.

[1092] Day 10, pp. 194–95.

[1093] *Id.*, pp. 210–11.

[1094] *Id.*, pp. 211–12.

[1095] *Id.*

needed basis.[1096]

Former offender Aaron Brent testified via deposition that he worked as a healthcare orderly for nine years.[1097] He was trained by Warden Falgout prior to becoming an orderly.[1098] He testified that Warden Falgout did a good job of training him and found Warden Falgout to be helpful and compassionate.[1099] Brent described the training as follows:

> [W]e had to go through CPR. We had to learn how to lift patients from the bed, how to turn them over in the bed. How to deal with guys like we had that were 500 pounds. And then sit down and be able to counsel them when they had problems.[1100]

Likewise, class member Danny Prince testified that prior to becoming an orderly he completed "a two-day hands-on and video class with [Warden Falgout]," as well as a course in CPR.[1101] He testified that the training he received was sufficient for his job assignment.[1102]

The use of healthcare orderlies depends on the needs of the individual offender. For example, healthcare orderlies may assist visually impaired offenders with mobility, delivery of food and/or medication, and assistance with completing sick call forms.[1103] Prince worked as a healthcare orderly in Ash 2 and testified at trial regarding his job duties and responsibilities:

> I care for the patients in the dorm, for one. Any need that they have that they cannot do on their own, I assist them with it. I try to give them as much -- keep them as much independent on themselves as possible without having them really suffer. I, with the crew, help feed them in the dorm. If they have to go on any hospital callouts or any other trips around the prison, I have to push them where they need to go -- if they want to go on the yard. Some of them I have to help out the wheelchair; some of them I have to help into chairs and into the shower; some, you know, I have to clean their beds if they stool on the bed or urine in the bed or on their clothes, themselves; some I've had to bring oxygen bottles back to the hospital for them. You know, it's just the things that they cannot do for

---

[1096] Id., p. 212.
[1097] J 4-c, p. 37.
[1098] Id., p. 49.
[1099] Id., pp. 49–50.
[1100] Id., p. 35.
[1101] Day 5, p. 105.
[1102] Id., p. 115.
[1103] J 4-ii, pp. 114; 118–119. J 4-jj, p. 34.

themselves, I help them do it.[1104]

Prince testified that he "give[s] [his] patients the best that [he] can give" and that he does his job well.[1105]  He further testified that he does his best to be responsive to his patients' needs but admits that a patient may sometimes have to wait ten to fifteen minutes for him to finish tending to another patient.[1106]  Although he has witnessed fights between offenders and orderlies, security has already stepped in before Prince can even report it.[1107]

Brent testified regarding his duties as a healthcare orderly in Ash 2: "We bathed them. We took care of their beds and linens. We took them to all of the necessary callouts they needed to go to…You had hospital callouts. You had churches. All of the callouts they had . . . We assist the blind from their bed to the bathroom areas."[1108]  As the most experienced orderly, Brent was eventually assigned as the healthcare orderly coordinator to help new orderlies become oriented to the position, in addition to the training that they received.[1109]  He enjoyed serving as an orderly and felt that he was able to do a lot of good in the position.[1110]  Brent found that the healthcare orderlies in Ash 2 did their best to be attentive to the needs of the offenders.[1111]  There were, however, a couple of occasions where Brent felt that an orderly was not fulfilling his duties.[1112]  On such occasions, Brent would report it security, and the orderly would be removed from the program and replaced.[1113]

Class member Hymel Varnado testified via deposition that he works as a healthcare orderly in Cypress 2.  He testified that he assists the offenders "in getting around, like getting to

---

[1104] Day 5, pp. 115–16. *See also id.*, p. 96.
[1105] *Id.*, pp. 116; 121.
[1106] *Id.*, pp. 116–19.
[1107] *Id.*, p. 118.
[1108] J 4-c, p. 34.
[1109] *Id.*, pp. 37–38.
[1110] *Id.*, p. 38.
[1111] *Id.*, p. 45.
[1112] *Id.*, pp. 46–47.
[1113] *Id.*

the treatment center, to the canteen. I assist them in making their bed, making sure they are fed, things like that."[1114] Varnado stated that he takes pride in his work as a healthcare orderly and has never had an offender complain about his work.[1115]

Plaintiffs contend that LSP relies on untrained offenders to provide assistance to disabled individuals. Yet, Plaintiffs presented evidence of only one instance of a non-healthcare orderly providing assistance to a disabled offender. At trial, class member John Tonubee testified that he would assist a visually impaired offender with getting around the facility and was never trained by LSP to provide such assistance.[1116] This singular instance does not substantiate Plaintiffs' assertion that LSP relies on *untrained* offenders as a means of providing assistance to offenders with disabilities. In fact, as Tonubee acknowledged, this offender also used a cane.[1117] Contrary to Plaintiffs' assertions, the evidence overwhelmingly shows that the use of healthcare orderlies is a well-established program at LSP, not a system of informal assistance by willing third persons in the vicinity.[1118]

### iii. *Offenders with disabilities are accommodated in work assignments.*

Another form of accommodation provided to disabled offenders by LSP is through duty status, which is used to determine work assignments. Duty status is a classification given to each inmate setting forth the level of work activity the inmate is medically capable of performing.[1119] LSP healthcare providers assign and modify duty status.[1120] Jobs and work locations are

---

[1114] J 4-s, p. 28.

[1115] *Id.*, p. 28–29.

[1116] Day 4, pp. 152–53; 154.

[1117] *Id.*, p. 152.

[1118] In fact, LSP created the healthcare orderly program to ensure that the offenders who were already voluntarily helping other offenders "were doing what they needed to be doing to properly care for them." Day 10, p. 192–93. Additionally, the position of healthcare orderly is a work assignment, which gives rise to consequences for an orderly who fails to perform his job duties.

[1119] J 6-oo, p. 00202.

[1120] *Id.*, pp. 00203–00204. Onsite specialists and EMS may issue or extend a temporary duty status to allow the offender to be evaluated by an LSP healthcare provider. *Id.*

assigned by security and classification based on duty status restrictions.[1121]  Thus, when assigning duty status, LSP healthcare providers "try to be as specific as possible, depending on the physical condition of the inmate."[1122]

Assignment of duty status begins at intake.[1123]  When an offender arrives at LSP from another DOC facility (an intra-system transfer), he is scheduled for an evaluation by an LSP healthcare provider.[1124]  He is not assigned a duty status or a job until he is evaluated by an LSP healthcare provider, regardless of any duty status he may have had at another DOC facility.[1125]  When an offender arrives at LSP from a non-DOC facility (an inter-system transfer), he is evaluated by an LSP healthcare provider at intake and thereafter assigned a duty status.[1126]  No LSP offender is assigned a job until he has been given a duty status by an LSP healthcare provider.[1127]

Offenders are required to carry documentation of their assigned duty status on their persons while performing their job.[1128]  If there is ever a question as to an offender's duty status, security may call to verify a duty status.[1129]  If an offender feels that his duty status is being violated, he may file an ARP, a process "used frequently by the offenders."[1130]

Plaintiffs have not proven that LSP violates the ADA by failing to accommodate disabled offenders in work assignments.  Plaintiffs did not present any evidence of an offender with a qualified disability who was denied an accommodation in his work assignment.  Therefore, Plaintiffs failed to establish that LSP does not accommodate disabled individuals in work

---

[1121] J 4-jj, p. 46.
[1122] Id., pp. 45–46.
[1123] Day 10, p. 216.
[1124] J 4-ii, p. 94.
[1125] Day 10, p. 216.
[1126] Id., p. 216.
[1127] Id., p. 216.
[1128] J 6-oo, p. 00204, no. 8.
[1129] J 4-jj, p. 46.
[1130] Id., p. 46.  See e.g., P 231 for examples of ARPs field by offenders.

assignments.

Plaintiffs assert that class member Adrian Dunn is disabled because he suffers from asthma and diabetes. Asthma and diabetes are not inherently disabilities under the ADA. *See e.g., Castro v. Local 1199*, 964 F. Supp. 719, 723 (S.D.N.Y. 1997) ("The requirement of individualized analysis is particularly appropriate in the context of disability claims relating to asthma . . . The severity of asthma varies a great deal among individuals. . . . Thus, individualized inquiries are especially useful when determining whether asthma constitutes a disability under the ADA."); *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34 (1st Cir. 2010) ("The analysis of when and under what conditions diabetes is considered a disability for ADA purposes is a matter of degree. We recognize that living with diabetes may result in a complex calculus balancing food intake, activity level, and the amount of insulin administered. An individual living with diabetes may or may not experience a substantial limitation in his or her ability to eat as contrasted with the rest of the population."). These conditions must substantially limit one or more major life activities of the individual in order to be considered disabilities. Aside from Dunn's self-serving testimony that working in the field would hurt him, there is no evidence that his asthma and diabetes substantially limit one or more of his major life activities.[1131]

Similarly, Plaintiffs assert that class members Karl Clomberg and Michael Johnson are disabled but presented no evidence to show that their respective ailments, a foot blister and blacking out, substantially limit one or more major life activities.[1132] Finally, Plaintiffs assert

---

[1131] *See* J 4-h, p. 27. Dunn's medical records are not in evidence.
[1132] Like Dunn, the medical records of Clomberg and Johnson are not in evidence. Additionally, Clomberg and Johnson's issues occurred outside of the relevant time period of this case. Johnson was transferred from Hunt to LSP in 2010. *See* J 4-j, pp. 10; 24. Clomberg's blister developed in 2007 and was an "active problem" until 2011. *See* J 4-f, p. 28. It should be noted that Clomberg never filed an ARP related to his foot blister and assigned duty status. *Id.* at pp. 30–31.

that class member Jason Hacker is disabled based on a medical determination that he was blind. Hacker's purported disability, however, was the subject of a lawsuit filed by him against LSP and other defendants. After a trial on the merits in 2017, the jury found that Hacker did not suffer from a qualified disability under the ADA. *Hacker v. Cain, et al.,* No. 14-063-JWD-EWD (M.D. La.), Rec. Doc. 278. This determination was affirmed by the Fifth Circuit. *Hacker v. Cain, et al.,* No. 17-30879 (5th Cir. 12/27/18) (The jury also found that defendants did not act with deliberate indifference to his medical needs in violation of the Eighth Amendment which Hacker did not appeal). Hacker did not appeal this determination. Although the *Hacker* trial and appeal occurred after the time period at issue in this case, the facts giving rise to Hacker's claims are the very facts relied upon by Plaintiffs to support their assertion that LSP fails to accommodate disabled offenders in work assignments. The foregoing examples do not establish a violation of the ADA because a crucial element is absent—the existence of a disability.

Likewise, the testimony at trial did not establish that LSP violates the ADA by failing to accommodate disabled individuals in work assignments. With the exception of Anthony Mandigo and Charles Butler, the class members who testified at trial did not offer any testimony that they have not received any necessary accommodations in their work assignments.[1133]

Mandigo testified at trial that he suffers from sickle cell disease, which causes ulcers to develop on his legs and ankles.[1134] The ulcers cause him to experience pain and fatigue while walking.[1135] Mandigo works as a tier walker but has a duty status of, *inter alia,* "out of field"

---

[1133] Class member Farrell Sampier and former offender Francis Brauner, both of whom are confined to wheelchairs, testified that they have a "No Duty" duty status. Day 1, p. 63; Day 4, p. 105. Lawrence Jenkins works at the gymnasium. Day 3, p. 181. John Tonubbee works as an outdoor dorm orderly. Day 4, p.150. Daniel Prince works as a healthcare orderly. Day 5, p. 94. Otto Barrera lived in the medical dorm and did not work. Day 4, p. 212. The Defendants do not admit that these class members are, in fact, disabled under the ADA, rather, the Defendants simply point out to the Court that they offered no testimony related to work assignment accommodations.

[1134] Day 3, pp. 82–83.

[1135] *Id.* at 83.

and "no prolonged walking," which allows him to have intermittent rest.[1136]    Although he testified that his shift as a tier walker is from six in the morning until four in the afternoon, he is not required to walk constantly during his shift.[1137]    There is no evidence that Mandigo was not granted the intermittent rest permitted by his duty status.    Mandigo also testified that whenever he complained of pain while working as a tier walker, he received an accommodation: "I might get a duty status of no duty, and go see the clinic every day to get a dressing change."[1138]    The fact that his complaints may not have resulted in a change in his work assignment does not mean that LSP has not accommodated him.    *See Wells*, 460 F. App'x at 313 ("[N]othing in the ADA itself or its implementing regulations dictates that a disabled individual *must* be provided with the type of auxiliary aid or service he requests and that deference to the requests is by no means required.").

Plaintiffs also failed to establish that security staff do not respect duty status restrictions. At trial, class member Charles Butler testified that he was injured while hanging drywall at DOC Headquarters.[1139]    Butler suggested that this work contravened his Squad A duty status, as it required him to lift sheetrock weighing twenty to twenty-five pounds.[1140]    An offender with Squad A duty status, however, is permitted to lift objects weighing less than thirty pounds.[1141] Thus, this work assignment did not violate Butler's duty status restrictions.    Plaintiffs presented no other purported evidence of security staff's failure to respect duty status restrictions.[1142]

---

[1136] *Id.* at 85; J 6-oo, p. 00203.

[1137] Day 3, p. 85.

[1138] *Id.* at pp. 85–86.

[1139] Day 5, p. 65.

[1140] *Id.* at 64.

[1141] J 6-oo, p. 00205.

[1142] Plaintiffs also claim that class member Hymel Varnado was required to lift heavy locker boxes as part of his job as a cellblock walk orderly.    Varnado's testimony, however, indicates that this occurred in 2010. *See* J 4-s, p. 19. During the time period relevant to this matter, Varnado was a healthcare orderly and reported no physical difficulties performing his job duties. *Id.* at pp. 27; 29.

Similar to their argument regarding work assignments, Plaintiffs claim that LSP fails to accommodate the dietary needs of disabled offenders. Plaintiffs contend that class members Adrian Dunn and Karl Clomberg are examples of such alleged failure.[1143]   Yet, Plaintiffs presented no evidence to establish that Dunn and Clomberg are disabled, which is necessary to show that LSP fails to accommodate *disabled* offenders with special dietary needs. As stated above, there is no such thing as a *per se* disability under the ADA. *See Waldrip*, 325 F.3d at 656. The mere fact that Dunn is apparently diabetic or that Clomberg reportedly takes blood thinners does not establish that they are disabled without evidence that their conditions substantially limit one or more major life activities. *See* 42 U.S.C. § 12012(1). "We must carefully separate those who have simple dietary restrictions from those who are truly disabled. At the same time, we must permit those who are disabled because of severe dietary restrictions to enjoy the protections of the ADA." *Griffin*, 661 F.3d at 224, citing *Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003).

At trial, former LSP offender Francis Brauner testified that while at LSP, he had a double portion meal status "to get more meat and things like that, to bring my protein levels up."[1144]   He also testified that receipt of his double portion meals was "far and few in between."[1145]   No further support for this assertion was provided, nor is there any evidence that Brauner filed an ARP regarding alleged non-receipt of his double portion meals.[1146]

Otto Barrera also testified at trial that he was not provided the mechanical soft diet that was prescribed to him at LSP.[1147]   The evidence, however, is not consistent with his testimony.

---

[1143] *See* J 4-h, p. 22; J 4-f, pp. 58–59.
[1144] Day 4, pp. 105–06.
[1145] *Id.*, p. 106.
[1146] *Id.*, p. 125 (Brauner indicated on cross examination that he *may* have filed a complaint regarding non-receipt of his double portion meals, but he was not certain if he did. There is no evidence of such a complaint.).
[1147] *Id.* at pp. 225–27; Day 5, p. 41.

When Barrera arrived at LSP from Elayn Hunt Correctional Center in November of 2013, he had already self-discontinued the mechanical soft diet that had been prescribed to him at Hunt, choosing instead to cut up his own food.[1148] He continued this practice at LSP and reported no difficulties with receiving a regular meal tray.[1149] He also received Ensure twice daily, which was eventually increased to three times daily.[1150]

Barrera underwent two modified barium swallow studies, the results of which were normal.[1151] However, he was advised by doctors to maintain a liquid diet with some pureed or soft foods.[1152] Just as he did with his soft diet at Hunt, Barrera ignored doctors' recommendations.[1153] Dr. Lavespere testified that he received reports that Barrera "meanders around the unit and . . . hustles food from other offenders on a regular basis," despite the specific diet prescribed to him.[1154] For example, in March of 2015, it was reported that Barrera was eating freely and taking food from the trays of other offenders.[1155] On May 15, 2015, it was noted that he was "eating lots of regular trays."[1156] On May 26, 2015, Barrera was observed to be eating fried chicken.[1157] Additionally, Barrera's commissary list is consistent with his pattern of ignoring recommendations that he maintain a liquid and/or soft diet.[1158]

Barrera's alleged experience is not evidence of failure by LSP to accommodate his dietary limitations. On the contrary, Barrera's behavior indicates that he was able to and chose

---

[1148] J 10-d-1, p. 03749. *See* Day 5, pp. 40–41.
[1149] J 10-d-1, p. 03972 (11/20/13 – "states able to eat soft/pureed/chopped food to swallow;" 11/29/13 – "He's doing ok [with] reg. tray – pulverized or soft foods"); J 10-d-1, p. 03971 (12/4/13 – "states able to tolerate regular food as long as it's cut up or pureed").
[1150] J 10-d-1, p. 03783; p. 03779; J 10-d-4, p. 04449. Day 5, p. 38.
[1151] J 10-d-3, p. 04165; J 10-d-1, p. 03731.
[1152] J 10-d-3, p. 04165; J 10-d-2, p. 04081. As stated above, as part of his diet, Barrera received Ensure on a daily basis.
[1153] J 4-pp, pp. 20–21.
[1154] *Id.*, pp. 22–23.
[1155] J 10-d-1, p. 03967.
[1156] *Id.*
[1157] *Id.*, p. 03966.
[1158] *See* Day 5, pp. 42–45.

to consume regular food. While the recommended liquid or soft diet was available to him, he often eschewed this diet in favor of other food, against the advice of his doctors. As Dr. Lavespere testified, "When he goes around to other offenders and takes their food, you can't really change . . . a whole lot . . . All you can do it write a specific diet for him."[1159] Indeed, even after Barrera's non-compliant conduct, LSP continued to prescribe him a specific diet.[1160] The accommodation was made available by LSP, and it was incumbent upon Barrera to accept it.

Former offender Aaron Brent testified regarding the distribution of special diets to offenders in the assisted living dorms.[1161] As the healthcare orderly coordinator, he was advised by LSP's dietitian to create a list of "exactly who gets the diets and who gets the regular [food], who get [sic] double portions" and send it to the kitchen.[1162] Brent compiled the list based on the offenders' duty statuses.[1163] He felt that this system worked well and that the offenders were able to get their appropriate meals.[1164]

> v.   *LSP accommodates the limitations of disabled offenders in transportation to medical appointments.*

Plaintiffs have not established that LSP fails to accommodate the limitations of disabled offenders in transportation. As of the close of discovery, LSP maintained a twenty (20) vehicle fleet to transport offenders, including a handicap accessible van and a handicap accessible bus.[1165] There is no affirmative obligation under the ADA to transport disabled persons in handicap-accessible vehicles. *See Miller v. Chapman*, No. CIV.A. 13-00367-SDD, 2014 WL 2949287 (M.D. La. June 30, 2014). Rather, the ADA requires the accommodation of known

---

[1159] J 4-pp, p. 22. Dr. Lavespere also testified that he and other medical staff counseled him about the risks of this behavior. *Id.* pp. 21–23.
[1160] In addition to Ensure, Barrera was also issued a permanent mechanical soft diet on June 18, 2015. J 10-d-2, p. 04056.
[1161] J 4-c, pp. 43–44.
[1162] *Id.* p. 43–44.
[1163] *Id.*
[1164] *Id.*
[1165] J 11-a, p. 7–8, Response to Interrogatory No. 7.

limitations. For many disabled individuals, a regular vehicle may sufficiently accommodate their limitations.

Plaintiffs provided four examples related to transportation, but none establish a failure to accommodate by LSP. Both Farrell Sampier and Otto Barrera complained at trial about the restraints used during transport them to outside appointments.[1166] The incidents about which Sampier and Barrera testified, however, occurred outside of the relevant time period.[1167] Nevertheless, these incidents do not establish a failure to accommodate by LSP. There is no evidence that either Sampier or Barrera requested an accommodation regarding the restraints, nor even a request that the restraints be repositioned to alleviate the alleged discomfort. As stated above, "the burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms." *Windham*, 875 F.3d at 236–37. In fact, evidence from the relevant time period shows that both Sampier and Barrera were accommodated in the use of restraints during transport.[1168] On February 19, 2015, Dr. Lavespere ordered that Sampier "be placed on flex cuffs with side restraints and handicap van for all trips," permanently.[1169] On December 29, 2015, Dr. MacMurdo ordered that Barrera be transported using flex cuffs and side restraints.[1170]

Similarly, the testimony of class member Benny Prine does not establish a failure to

---

[1166] Day 1, p. 66 (Farrell Sampier); Day 5, pp. 9–10 (Otto Barrera).
[1167] Sampier testified that the ride he described occurred when he was first diagnosed with transverse myelitis, which was in 2013. J 10-ww-2, p. 52433. Barrera testified that the ride he described was for an appointment for a barium swallow test at Lallie Kemp. Day 5, p. 9. Since Lallie Kemp no longer performed barium swallow tests, the appointment was rescheduled to ILH in New Orleans for February 18, 2014. J 10-d-1, p. 03703. Day 5, pp. 11; 28–30.
[1168] The accommodations provided to Sampier and Barrera do not evidence that such accommodations were necessary for the aforementioned transports outside of the relevant time period. Aside from their self-serving testimony, there is no evidence that such accommodations were indicated at that time.
[1169] J 10-ww-2, p. 52597.
[1170] J 10-d-2, p. 04016.

accommodate by LSP.[1171]  Prine, who is able to walk but uses a wheelchair, was transported to two outside appointments in a regular, non-handicapped van.[1172]  He reported in his deposition that the rides caused discomfort to his knee.[1173]  However, Prine never requested an accommodation or even reported his discomfort.[1174]

Although LSP was aware of Prine's condition, this was insufficient to put LSP on notice that an accommodation may be necessary.  "For purposes of proving ADA discrimination, it is important to distinguish between [a public entity's] knowledge of an [individual's] disability versus [a public entity's] knowledge of any limitations experienced by the [individual] as a result of that disability." *Taylor*, 93 F.3d at 164.  "Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced *as a result* of that disability." *Windham*, 875 F.3d at 236, citing *Taylor*, 93 F.3d at 164.  "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent…, the initial burden rests primarily upon the [disabled individual], or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Taylor*, 93 F.3d at 165.  Healthcare providers at LSP often identify the limitations and order reasonable accommodations. *See, e.g.*, the restraints accommodations for Sampier and Barrera, cited above.

There is no evidence that Prine suffered any substantial limitations as a result of his knee or that such limitations were open, obvious, or apparent.[1175]  Thus, the burden was on Prine to

---

[1171] J 4-q, pp. 84–86.  It is not clear whether the experience described by Prine occurred during the relevant time period.
[1172] *Id.* pp. 84–85.
[1173] *Id.* p. 85.
[1174] *Id.* p. 85–86.
[1175] The only evidence offered regarding Prine's knee was his statement that "back then, I really had this leg out . . . and, like, the seat is, like this close.  Your knees is [sic] up against the other seat in front of you." J 4-q, p. 85.  Prine's stated preference that he keep his leg extended does not, *per se*, constitute a limitation, nor is it sufficient evidence of an open, obvious, or apparent limitation.

identify his limitations and to request an accommodation "in direct and specific terms." "[T]he accommodation provisions of the ADA and RA do not require public entities to 'guess' an individual's need for an accommodation." *McCoy v. Texas Dep't of Criminal Justice*, No. C.A.C 05 370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006). Prine failed to do so.

Hymel Varnado also complained in his deposition that "he was transported to the hospital in a regular van, handcuffed and shackled, while suffering from a ruptured spleen and internal bleeding."[1176] Varnado's complaints arise out of the alleged treatment of his medical needs and thus, do not establish a violation of the ADA. *Nottingham*, 499 F. App'x at 377. Defendants maintain that LSP appropriately responded to Varnado's medical needs. Assuming, *arguendo*, that this emergency medical condition rendered Varnado disabled under the ADA, there is no evidence that he suffered from any limitations that would preclude transport in a regular van or the use of restraints per protocol. Again, the ADA requires that *limitations* be accommodated, not disabilities. The simple assertion that Varnado was transported to the hospital in a regular van while restrained does not establish a violation of the ADA.

Varnado also complained at his deposition that after surgery on his spleen, he was transported back to LSP in the back of a car.[1177] He said that he drowsy and "was mostly out of it" during the ride and was in some pain, but there is no evidence that he suffered from any limitations that would have precluded transport via car.[1178] Varnado never filed an ARP related to this transport.[1179] Like his testimony regarding his transport to the hospital, Varnado's testimony does not establish a violation of the ADA.

---

[1176] J 4-s, pp. 31–33, line 1. It is not clear whether the experience described by Varnado occurred during the relevant time period.

[1177] J 4-s, pp. 33–34.

[1178] *Id.* p. 34. In fact, if Varnado were not incarcerated, it is likely that he would have been transported home in a car as well.

[1179] *Id.*, p. 34.

As discussed above, LSP provides reasonable accommodations to disabled offenders on an individualized, case-by-case basis pursuant to their known limitations. Accommodations are not "one size fits all." Plaintiffs contend that prison procedures, such as pill call, sick call, head count, and filing an ARP, do not accommodate disabled offenders.[1180] Plaintiffs, however, presented no evidence of an offender with a qualified disability who was not provided with a reasonable accommodation in prison procedures. It is essential that Plaintiffs *prove* a failure to accommodate in order to establish that LSP denies disabled offenders access to programs, services, and activities. A blanket assertion that prison procedures do not accommodate disabled offenders, without evidence of such a failure, is insufficient to establish a violation of the ADA.

LSP does, in fact, accommodate disabled offenders in prison procedures, including discipline. As set forth above, ADA Coordinator T. Falgout testified extensively about LSP's intake procedure and the accommodations provided to disabled offenders during the process. Disabled offenders are also accommodated in the event of an evacuation based on the needs at the time.[1181] "If they are in restrictive housing, in a cell block, then security has processes in place to evacuate those cells safely, whether he be hearing impaired or not. There are practices in place to make sure that's done safely."[1182] Additionally, the fire alarm systems have an audio and visual component.[1183]

Plaintiffs claim that LSP does not accommodate the limitations of disabled offenders in

---

[1180] E.g., Plaintiffs claim that Assistant Warden Donald Barr, who was ADA Coordinator for <u>less than two months</u>, was not aware of any accommodations for deaf inmates during pill call, sick call, or head count. *See* J 4-z, pp. 50–51; 9–10. Plaintiffs also claim that Warden T. Falgout was not aware of any accommodations provided for blind inmates during pill call or in filing an ARP. *See* J 4-ii, pp. 119–20. It should be noted that T. Falgout testified that blind offenders are placed in the medical dorms, so their medications are brought to them and orderlies are available to provide assistance. *See id.* p. 114.

[1181] J 4-ii, p. 114.

[1182] *Id.*

[1183] *Id.*

disciplinary procedures. Yet, Plaintiffs, again, did not present any evidence of such. Warden

Falgout testified that accommodations are provided to disabled offenders in disciplinary

proceedings as necessary.[1184] For example, "[f]or the hearing impaired, it would be to have the

interpreters[,] have the amplification. There is always offender counsel with them as well that

represent them in the disciplinary board . . . If they are blind, they have offender counsel as

well."[1185] Plaintiffs presented no evidence of an offender who was not provided with a necessary

accommodation during a disciplinary proceeding.

At LSP, discipline is imposed and enforced by the Disciplinary Board and security.[1186]

Plaintiffs contend that as a result of this policy, the limitations of disabled offenders are not

accommodated in the type of discipline imposed. Plaintiffs, however, presented no evidence of a

disabled offender whose known limitations were not accommodated in the type of discipline

imposed.[1187]

At trial, Plaintiffs' expert, Dr. Puisis, referred to a quadriplegic offender who was

reportedly placed in an isolation room in the nursing ward.[1188] This assertion by Dr. Puisis is not

substantive evidence that such an event occurred. To the extent it was offered to prove the truth

of the matter asserted therein, it is inadmissible as hearsay. "Although expert witnesses are

permitted to rely on hearsay to form their opinions, their testimony is not a vehicle by which

evidence that is otherwise inadmissible may be introduced." *Bianco v. Globus Med., Inc.*, 30 F.

Supp. 3d 565, 570 (E.D. Tex. 2014), citing *Presley v. Commercial Moving & Rigging, Inc.*, 25

---

[1184] *Id.*, p. 120.
[1185] *Id.*
[1186] J 4-jj, pp. 14–15 ("That's because that's the job of security and the process of the disciplinary board."); J 4-ii, p. 123 ("Again, that's out of my realm. That's going to be security.").
[1187] At trial, former offender Francis Brauner, a paraplegic, claimed that he was locked in a cell for thirty days in 2005, which is far outside of the relevant time period. Day 4, pp. 87–88.
[1188] Day 2, p. 13 (Dr. Puisis testified that the offender's "trach tube . . . became clogged," but that is not what is noted in the expert report. P 6, p. 81, Patient #24, ". . . and no way to notify the nurses *if* his trach tube became clogged." [emphasis added]).

A.3d 873, 893 (D.C. 2011). *See* Fed. R. Evid. 703 ("But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.").

"When inadmissible materials are admitted for explanatory purposes, the opposing party is entitled to a limiting instruction to the jury that <u>the evidence may be considered solely as a basis for the expert opinion and not as substantive evidence.</u>" *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 729 (6th Cir. 1994), citing *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261– 62 (9th Cir. 1984) [emphasis added]. Since this matter was a bench trial, no instruction was necessary. There is no other evidence in the record regarding this alleged incident with the quadriplegic offender.

On the contrary, Nursing Unit manager Karen Hart showed that the known limitations of disabled offenders are accommodated in the imposition of discipline. Nurse Hart provided the example of a wheelchair-bound offender who hit a guard, and when disciplined, he was transferred to the nursing unit "so that there could be a wheelchair accessible place to lock him up."[1189] Nurse Hart also testified that if an offender is in a locked room in the nursing units, he is able to communicate with staff verbally, and security makes rounds.[1190]

### 2. LSP integrates individuals with disabilities.

Plaintiffs claim that individuals with disabilities are "clustered" in the medical dormitories and Ward II, while the services they receive in those areas do not justify them being placed there. Plaintiffs contend that this practice violates 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").

---

[1189] J 4-ll, p. 34.
[1190] *Id.* at 34–35.

Inasmuch as Plaintiffs have based their criticism upon the supposed violation of 28 C.F.R. § 35.130(d), it deserves noting that at least one court has determined that no private action exists based on this regulation. *Zatuchni v. Richman*, No. CIV.A. 07-CV-4600, 2008 WL 3408554, at *11 (E.D. Pa. Aug. 12, 2008) (Defendant argues, and we agree, that these regulations are not enforceable; they merely require a public entity to administer its programs and services to integrate disabled persons in an environment with disabled and non-disabled persons where appropriate and possible. These regulations both "focus on the person regulated rather than individuals protected," and have an "aggregate focus," instead of an individual one.) Nevertheless, Defendants concede that in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540, 9 A.D. Cas. (BNA) 705 (1999), the Supreme Court determined that the unjustified institutionalization of the disabled is a form of discrimination under the Title II of the ADA, 42 U.S.C.A. §§ 12131 et seq. (ADA), and that community-based treatment is required where appropriate and unopposed. 90 A.L.R. Fed. 2d 1 (Originally published in 2014). Defendants submit that the *Olmstead* principle is not violated by placement of disabled offenders in the medical dorms or on Ward II.

Plaintiffs have directed their criticism mostly at LSP's medical dormitories, claiming that they are not accessible and that no medical services are performed there. The medical dormitories are also sometimes referred to as "assisted living dorms" or "offender assistance dorms," which are defined by policy as:

> [a]n area within Main Prison that provides housing for offenders who have special needs. The dorm will be handicap accessible. Basic services provided will include assistance with personal care, meals, and medication administration.[1191]

Due to their placement in the Main Prison, these dorms are within close proximity of LSP's treatment center. Dr. Lavespere testified that the offenders housed in theses dorms "need some

---

[1191] J 6-eee, p. 00269

type of medical assistance, help with activities of daily living, [they are] offenders that have a difficult time making it to the pill call, [and] offenders that have a difficult time making it to the chow hall."[1192]  These dorms are staffed with orderlies who work there 24 hours per day and provide the offenders with their pills and food.[1193]  While Dr. Lavespere testified that he renders medical care in these dorms about every 3 to 6 months, he also noted that "[m]ost of those [offenders] have chronic care issues and they are seen so often in the clinic we don't need to go down there."[1194]  Offenders housed in these dorms also use nebulizers, CPAP machines, and undergo wound care.[1195]

Dr. Lavespere stated that the medical dorms are also handicapped accessible.[1196] Plaintiffs contend the dorms are nonetheless out of compliance with the facilities requirements of the ADA, yet they fail to take into account that health care orderlies are assigned to the offender assistance dorms and provide assistance to the disabled offenders housed there.  Thus, because the buildings housing the offender assistance dorms are considered "existing facilities" under the ADA, it is not required that they be physically altered to become handicapped accessible as long as LSP utilizes other methods that result in making its programs, or activities readily accessible to and usable by individuals with disabilities.  *See* 28 C.F.R. § 35.150(b)(1) ("A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible

---

[1192] J 4-qq, 40–41.
[1193] *Id.* p. 41.
[1194] *Id.* pp. 41–42.
[1195] *Id.* p. 43.
[1196] Id. p. 43.

to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.") ."); *see also, Tennessee v. Lane, supra*, at 531 (Assigning aides to assist persons with disabilities in accessing services may also be an appropriate accommodation.); and <u>*Garrett v. Thaler*</u>, 560 F. App'x 375, 383 (5th Cir. 2014) (Finding that less costly measures undertaken by the facility constituted reasonable accommodations to enable offender's safe use of the bathroom and shower facilities). By utilizing health care orderlies, LSP has made a lawfully suitable arrangement to make the housing area usable for disabled offenders.

Aaron Brent, a healthcare orderly assigned to work in one of LSP's assisted living dorms, testified that out of approximately 43 offenders that were housed in the dorm to which he was assigned, about 30 were in wheelchairs.[1197] His job entailed taking offenders to all of their callouts, which included hospital callouts and church callouts.[1198] While it is true that doctors and nurses do not make rounds in the medical dorms, EMTs do make sick call there every day.[1199]

"The goal of placing individuals with disabilities in the most integrated setting must be balanced against what is appropriate and desirable *for the individual*." *Jensen v. Minnesota Dep't of Human Servs.*, 138 F. Supp. 3d 1068, 1075 (D. Minn. 2015) (Emphasis in original). "In making determinations as to particular prisoners' qualifications for integration, [the department of corrections] is entitled to rely on the reasonable judgments of its medical professionals." *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1297 (M.D. Ala. 2012), relying upon *Olmstead*, 527 U.S. at 602, 119 S.Ct. 2176; see also, , *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. at 288, 107 S.Ct. 1123 ("[C]ourts normally should defer to the reasonable medical judgments of

---

[1197] J 4-c, p. 74.
[1198] J 4-c, p. 34.
[1199] J 4-c, p. 74.

public health officials."). Per applicable LSP policy, "[o]nly a staff physician may admit an offender to the Offender Assistance Dorm for help with activities of daily living."[1200] Thus, the determination of whether the Offender Assistance Dorm is suitable for a particular disabled offender is to be made by a physician, and that decision should be given significant deference in determining whether disabled offenders have been assigned the most integrated setting. Also, Plaintiffs did not offer any evidence to show that disabled offenders are not already integrated within the "medical dormitories" along with other offenders who are not disabled.

Plaintiffs also claim that offenders who are otherwise healthy are sometimes placed in isolation cells on the nursing wards due to a lack of accessible cells elsewhere in the prison. However, the specific example provided by Plaintiffs is addressed by the testimony of Karen Hart, who noted in her deposition that she recalled one time when a wheelchair-bound offender who had hit a guard was placed in the lockable cell on one of the wards.[1201] She guessed, but could not confirm, that this offender was from one of the medical dorms.[1202] Plaintiffs offer no other examples of inappropriate housing of offenders on either ward. In any event, temporary housing of a disabled offender in isolation does not support Plaintiffs' argument that Defendants fail to house disabled offenders in the most integrated setting appropriate.

### 3. LSP does not use discriminatory methods of administration.

Plaintiffs contend that Defendants have employed discriminatory methods of administration of the ADA. Particularly, Plaintiffs maintain that Defendants are in violation of the following regulation:

> A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

---

[1200] J 6-eee, p. 1.
[1201] J 4-II, 32:3-9.
[1202] *Id.*

[or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3), in part.

Plaintiffs seek to establish that Defendants are in violation of the above provision of law in seven key respects, as discussed below. Defendants maintain that none of the purported failures alluded to by Plaintiffs prior to trial were established by the evidence adduced at trial and they are not supported by applicable law.

a) <u>Plaintiffs' allegation that Defendants fail to inform individuals of their rights and procedures.</u>

Offenders are made aware of their rights under the ADA and the procedures for making a request for accommodation when they first arrive at the facility. Per policy, "[d]uring the Offender Orientation Program, which is usually held on Tuesday following intake, the Classification Officer will advise offenders of the institution's obligations to them under the ADA."[1203] Offenders are also asked at intake to review the form for requesting an accommodation (discussed further below).

Following intake, Assistant Warden Tracy Falgout testified as to how offenders are made aware of their rights under the ADA and how to request an accommodation, noting the following:

> There is [sic] copies all over this penitentiary. There is a sheet that's on every bulletin board. There is a 1-800 number, and they also know that Warden Peabody is the ADA coordinator.[1204]

Indeed, there is signage that informs offenders that they should contact the ADA Coordinator, Richard Peabody, should they need an auxiliary aid.[1205] Mr. Peabody was the ADA Coordinator for the majority of the relevant period for purposes of this Court's review (*i.e.*, May 20, 2015–

---

[1203] J 7-a, p. 5.
[1204] J 4-ii, p. 88.
[1205] J 12-00444.

September 30, 2016), having served in that role up until sometime before July 2016, when he went on sick leave.[1206] As for the forms utilized for making a request for accommodation (discussed below), LSP policy requires that Unit Wardens make these forms available to offenders in all housing areas.[1207] Although Plaintiffs have claimed that "multiple Class members" testified that they were not aware of the process for requesting accommodations, the only evidence cited to support that statement is a reference to the deposition of a single offender, Adrian Dunn. Clearly, there is sufficient evidence to show that Defendants do inform offenders of their rights under the ADA and the applicable procedures.

>   b) Plaintiffs' claim that LSP has inadequate procedures for requesting accommodations.

As testified to by Assistant Warden T. Falgout, offenders are initially screened at intake whenever they first arrive at LSP.[1208] Any disability and/or auxiliary device is noted by LSP staff at that time.[1209] LSP utilizes Form A-02-017-A, entitled "Request for Accommodation", in which the offender is asked to complete Sections 1, 2, and 3.[1210] This form is completed by the offender in order to note whatever disability he is claiming at that time.[1211] Section 1 thereof requests the offender's name, address, and the date of the request.[1212] In Section 2 the offender notes the category of the accommodation request that is being made – "Personal Disability Accommodation"; "Program Participation"; "Structural Accessibility"; or "Other – Specify." Section 3 of that form then asks the offender to briefly state the problem and the proposed solution.[1213] The offender is even prompted to use additional pages if the space provided is

---

[1206] J 4-z, p. 10.
[1207] J 7-a, p. 7.
[1208] J 4-ii, p. 94.
[1209] *Id.*, p. 95:.
[1210] J 12-a, p. 00001.
[1211] J 4-ii, p. 88.
[1212] J 12-a, p. 00001.
[1213] *Id.*

insufficient.[1214]  The bottom portion of Form A-02-017-A is where the facility documents the response to the request.[1215]

Pursuant to LSP's policy, a registered nurse is to provide Form A-02-017-A to each offender to review and sign during intake processing.[1216]  Plaintiffs put forth no evidence at trial to show that this policy was not followed for the relevant period.  After the form is completed, it is provided to the Assistant Warden/Health Services and then is referred to the Medical Director or designee in order to determine if the offender has an impairment.[1217]  The Medical Director or designee will then forward his written recommendation to the ADA Coordinator.[1218]

There is also another form that is completed by Assistant Warden T. Falgout and a physician in order to determine if the issue is a physical or mental impairment and whether it is long-term or short-term.[1219]  This is Form B-08-010-A, entitled "Inquiry in Response to an Offender Accommodation Request."[1220]  The first portion of this form requires the facility to determine whether the offender making the request has a disability under the ADA (*i.e.*, whether the person has an impairment that substantially limits one or more major life activities).[1221]  The next portion of the form seeks to determine whether the requested accommodation is necessary because of the disability.[1222]  Finally, assuming that the offender has both a disability and is determined to need an accommodation, the last portion of Form B-08-010-A explores whether a reasonable accommodation would cause undue hardship.[1223]  In this way, the forms utilized by LSP track the legal analysis employed in determining whether a request for accommodation

---

[1214] *Id.*
[1215] *Id.*
[1216] J 7-a, p. 5.
[1217] *Id.*
[1218] *Id.*
[1219] J 4-ii, p.88.
[1220] J 12-a, pp. 00002–00005.
[1221] *Id.*, pp. 00002–00003.
[1222] *Id.*, pp. 00004–00005.
[1223] *Id.*, 12-00005.

should be granted. Per policy, Form B-08-010-A is also utilized for any dialogue between the requester and the ADA Coordinator concerning the resolution of the problem.[1224] Ultimately, the ADA Coordinator will make the final determination of accommodation, after which any orders for equipment needed for the approved accommodation will be initiated.[1225]

Following intake, should any offender thereafter make a request for an accommodation relative to a perceived disability, there is also a system by which those requests are documented, evaluated, and then followed by the appropriate LSP staff.[1226] The forms for that process are the same as noted already hereinabove and the evaluation and decision process follows the same pattern as it would for a request for an accommodation made at intake.

### c) Plaintiffs' perception that LSP fails to identify and track disabilities.

Plaintiffs maintain that Defendants are required to implement some form of disability tracking system but have failed to do so. As a matter of fact, Defendants do have a system in place at LSP for tracking disabilities. Whenever a request for accommodation is made, LSP utilizes an additional form, Form B-08-010-B, entitled "Offender ADA Tracking Form,"[1227] which is used to document the outcome of the request, including whether the response requires periodic follow-up or was appealed by the offender.[1228] As noted on this form, it is to be submitted to the ADA Coordinator upon completion.[1229] A database is maintained to track LSP's requests for accommodation, which includes the offender's name, DOC #, the date of the request, and the type of accommodation being requested.[1230] Accordingly, there is a system in place at LSP for identifying and tracking offenders' disabilities.

---

[1224] J 7-a, p. 5.
[1225] *Id.*
[1226] *Id.*, p. 7.
[1227] *Id.*, 12-00006.
[1228] *Id.*
[1229] *Id.*
[1230] *Id.*, 12-00016–28 (Printout from ADA Tracking Database).

d) Plaintiffs' complaint that offenders may be charged medical co-payments to request accommodations.

Plaintiffs complain that an offender *may* be charged a medical co-payment in the course of requesting an accommodation. Importantly, Plaintiffs do not even allege, nor have they proven, that a co-payment is a mandatory requirement before an offender can initiate the process for requesting and, if needed, obtaining an accommodation for a qualifying disability. And the accommodation form (Form A-02-017-A) discussed above does not state on its face that any co-payment is required to be paid in order for an offender to complete and submit the form.[1231] Plaintiffs produced no evidence at trial to show that co-payment is required for submission of the accommodation form. Plaintiffs' claim is also inconsistent with the testimony of Assistant Warden T. Falgout, who confirmed that "anybody can request an initial evaluation for accommodation for an offender"; it can even be done by another offender or LSP staff.[1232] The fact that anyone may request an accommodation reflects that a co-pay is plainly not requisite to that process.

Moreover, as noted on the Offender ADA Tracking Form (Form B-08-010-B), a request for accommodation can arise in various ways—through an "Accommodation Form"; a "Grievance"; an "ARP"; a "Lawsuit"; a "Verbal" request; or through some "Other" means.[1233] In truth, Plaintiffs' criticism is directed at the fact that LSP charges a co-pay for accessing medical care, which is a practice accepted in other correctional facilities throughout the country and which Defendants address elsewhere herein. While a request for accommodation could also arise in the context of a medical encounter initiated by an offender via a sick call request, that is clearly not the sole avenue for making the request.

---

[1231] *Id.*, 12-00001.
[1232] J 4-ii, p. 81.
[1233] J 12-a, p. 00006.

e) <u>Plaintiffs' belief that LSP inadequately trains its staff respecting the ADA.</u>

LSP staff receive ADA training. Assistant Warden Falgout noted, for instance, that staff are provided training with regard to ADA requests for accommodations in the intake setting.[1234] He also stated that all staff have the ability to review the ADA policy.[1235] There are also records noting ADA training provided to staff.[1236] As for the sufficiency of that training, Plaintiffs have not pointed to any established authority for what amount of training or specific content is legally required or sufficient in order to familiarize correctional staff with ADA policies as well as the procedure for making a request for accommodation.

f) <u>Plaintiffs' claim that LSP has failed to maintain a qualified ADA Coordinator.</u>

As previously noted, Richard Peabody was the ADA Coordinator for the majority of the relevant period. Moreover, Plaintiffs have not cited any authority to support the proposition that not having an ADA Coordinator in place or not having one that is considered "qualified" is necessarily actionable under the ADA.

Plaintiffs further claim that Title II mandates public entities to satisfy the requirements of 28 C.F.R. §§ 35.107, requiring the designation of a responsible employee and adoption of a grievance procedure, which Plaintiffs contend Defendants have violated. This portion of Plaintiffs' claim arises out of the self-evaluative procedures required by 28 C.F.R. §§ 35.105– 107. As noted by one district court in our Circuit,

> The Fifth Circuit has not specifically ruled on whether there is a private cause of action under 28 C.F.R. § 35.105(a). However, no Fifth Circuit district court has found a private cause of action and at least one has ruled that no such cause of action exists. *See DeLeon v. City of Alvin Police Dep't*, No. H–09–1022, 2011 WL 43432, at *5, 2011 U.S. Dist. LEXIS 1354 at *17 (S.D. Tex. Jan. 6, 2011). The Court notes that the First, Sixth and Ninth Circuits

---

[1234] J 4-jj, 31–32:9.
[1235] J 4-ii, 93.
[1236] J 12-g.

have ruled against finding a private cause of action under this
section of the statute. *See Iverson v. City of Bos.*, 452 F.3d 94, 101
(1st Cir. 2006); *Plans Ability Ctr. of Greater Toledo v. City of
Sandusky*, 385 F.3d 901, 914 (6th Cir. 2004); *Californians for
Disability Rights, Inc. v. Cal. DOT*, 249 F.R.D. 334, 342 (N.D.
Cal. 2008). However the Tenth Circuit, viewing the requirements
of the statute as a whole, did find a private cause of action. *See
Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850 (10th Cir. 2003).

*Green v. City of Mission*, No. 7:18-CV-00049, 2018 WL 2200094, at *11 (S.D. Tex. May 14,

2018).

In *DeLeon v. City of Alvin Police Dep't*, wherein the plaintiff had claimed that the

County was liable for failing to provide the plaintiff notice of the identity of Brazoria County's

ADA coordinator, the district court determined the plaintiff was not entitled to relief because no

private right of action existed under the applicable provisions, 28 C.F.R. §§ 35.105–107. *Supra*;

*see Duffy v. Freed,* Civil No. 09–2978 (JBS/JS), 2010 U.S. Dist. LEXIS 98860, at *12 (D.N.J.

Sept. 17, 2010) ("The failure of a Title II public entity to adequately implement or abide by

internal complaint procedures does not itself state an ADA claim, because the statute does not

require these procedures." (internal citations omitted)). Hence, there is no legal basis for

determining that Plaintiffs' claim is actionable under the ADA.

g) Plaintiffs' criticism that Defendants have failed to maintain an advisory
committee.

It is undisputed that Defendants did not have an ADA advisory committee in place during

the relevant period which is the focus of Plaintiffs' lawsuit, nor is it disputed that LSP had a

policy in place setting forth the establishment of this committee. However, the ADA does not

appear to require the creation of an ADA advisory committee, and Plaintiffs have not cited any

regulation or other authority to support the proposition that the failure to maintain an advisory

committee is itself actionable under the ADA. As noted in *Duffy v. Freed*, "[t]he public entity's

obligation is to not discriminate. Such entities make additional efforts to resolve any potential

discrimination by implementing proactive internal procedures according to the Department of Justice regulations, but the adequacy of these procedures is not itself an ADA concern." *Id.* at *4. Thus, while it may be true that establishment of the ADA advisory committee is set forth in LSP's policy, nonadherence to that internal policy is not a basis for Plaintiffs to obtain relief under the ADA.

### 4. Plaintiffs failed to establish that LSP discriminates against individuals with disabilities by reason of their disability.

Plaintiffs claim that Defendants enforce particular policies that overtly discriminate against individuals with disabilities. They have pointed to three such policies and challenge them on the grounds that a disabled offender's duty status should not present a bar to engaging in the following services/programs/activities: 1) hobby craft; 2) work assignments; and 3) work release. According to 28 C.F.R. § 35.130,

> A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

Defendants submit that neither LSP's policy nor its practice respecting the assignment of duty status discriminates against disabled offenders.

LSP's policy regarding its duty status classification system is found within Directive 13.063.[1237] The stated purpose of the directive is "[t]o provide written communication to the offender, as well as to security and classification personnel, regarding the level of work activity an offender is medically capable of performing at Louisiana State Penitentiary."[1238] The policy underlying this directive notes the "[a]ssignment of a permanent or temporary duty status will be ordered based on objective evidence of physical defects, injuries, or illness." Another pertinent

---

[1237] J 6-oo.
[1238] *Id.* at p. 6-00202.

provision of the same directive states as follows:

> Duty status will be assigned by a Louisiana Department of Public Safety and Corrections health care provider **based on the individual health care needs of the offender, to ensure he does not engage in activities that are detrimental to his basic health and/or safety**. Thus, the duty status is a risk management issue facilitating the safe management of offenders. Even though the duty status is often an element of the treatment plan, it is neither invasive nor ingestive; therefore, refusal will not be allowed without the consent of the Medical Director. A duty status issued by a LSP health care provider supersedes any prior duty status.[1239]

    a) Hobby Craft

Plaintiffs claim that Defendants enforce a policy whereby an offender who has a restricted duty status is *automatically* barred from participating in hobby craft, even activities such as painting. First, it deserves noting that not every offender at LSP, disabled or otherwise, is guaranteed an opportunity to participate in hobby craft. As stated in the applicable policy, any offender who wishes to participate in hobby craft is required to submit a written request to the Unit Major, after which his name is then placed on a waiting list that is administered on a *first come/first serve basis*.[1240]

Moreover, LSP maintains a policy governing hobby craft which is intended to ensure the safety of offenders who utilize the hobby shop while also maintaining the necessary level of security.[1241] That policy "include[s] the temporary interruption of an inmate utilizing the hobby shop *when under medical care and/or treatment, requiring a duty status*, until such time as the inmate is returned to regular duty without restrictions."[1242] Thus, "[n]o inmate receiving medical care and/or treatment *requiring a restriction* in the inmate's regular duties will be allowed to utilize the hobby shops, until such time the inmate is returned to regular duty without

---

[1239] Emphasis added.
[1240] J 7-d, p. 00015.
[1241] J 7-c, p. 00004.
[1242] J 7-c, p. 00004. (Emphasis added.)

restrictions."[1243]

Directive 13.063 contains the following language concerning the application of restrictions upon recreational activities such as hobby craft:

> Offenders assigned restrictive duty will not be allowed to participate in sports and/or recreational activities, ***unless specified by the treating health care provider***. *Participation in these activities could worsen or cause a recurrence of an injury or other medical condition.* If medically indicated, the treating provider may also restrict sports activities of an offender on regular duty.[1244]

Far from being imposed as a means to discriminate against disabled offenders, the above policy reflects that the prohibition preventing offenders with restrictive duty status from partaking in recreational activities is imposed to protect them against the recurrence of an injury or other medical condition. Yet, the policy specifically permits the ban against recreational activities to be lifted where specified by the health care physician.

One of LSP's medical providers, Cynthia Park, APRN, testified that she looks at the entire picture of the patient when determining whether a duty status should be made less restrictive or more restrictive.[1245] She also stated that she will sometimes recommend that the hobby craft restriction be waived for an offender "based on his situation," but it is ultimately Dr. Lavespere's decision whether that is possible.[1246]

Dr. Lavespere testified that he assigns duty statuses to offenders and tries to be objective and fair with every offender he is evaluating to determine an appropriate duty status.[1247] He noted that he will at times require "no hobby craft" as a restriction because he thinks that, for

---

[1243] J 7-c, p. 00005. (Emphasis added.)
[1244] J 6-oo, p. 00204. (Emphasis added.)
[1245] J 4-uu, p. 29–30.
[1246] J 4-uu, p. 32.
[1247] J 4-qq, p. 15.

example, a person with a bad shoulder should not be around tools like saws and drills.[1248]  He tries to keep such offenders out of positions where they can hurt themselves.[1249]  However, he would permit an offender to participate in a hobby such as leatherworking, if appropriate.[1250]  Dr. Lavespere also confirmed that he would restore to someone the ability to make jewelry if he had a foot injury because it is fair.[1251]  Thus, despite Plaintiffs' characterization, the hobby craft restriction is not a wholesale ban but is assessed by medical staff and applied with due consideration for the particular offender's needs and the situation involved.  Safety is the guiding principle for the policy respecting disabled offenders' access to hobby craft, and it is not blindly adhered to but is instead based upon a medical determination.

> b) Work Assignments

Plaintiffs also complain that LSP does not offer work assignments to individuals with certain disabilities.  Yet, Plaintiffs have not offered any evidence wherein a disabled offender with a "no duty status" or an otherwise restricted duty status had requested to change his duty status in order to perform a particular job but was denied.  At trial, Farrell Sampier, who is a paraplegic, testified that "he would love to get back to the kitchen" as he had purportedly worked as a professional chef before becoming incarcerated;[1252] however, his testimony did not adduce nor was any other evidence submitted to show that he had ever previously made a request to Defendants for that particular job or had requested a change to his duty status.  Moreover, according to Dr. Lavespere, the most desirable work assignment at LSP is "no duty status,"[1253] and Plaintiffs offered no evidence tending to contradict that statement.

---

[1248] J 4-qq, p. 15–16.
[1249] J 4-qq, p. 16–17.
[1250] J 4-qq, p. 16.
[1251] J 4-qq, p. 19.
[1252] Day 1, p. 63.
[1253] J 4-qq, 20.

c) <u>Work Release</u>

Finally, Plaintiffs complain that Defendants deny offenders with disabilities access to work release programs. As explained by Assistant Warden Falgout, work release is a program that allows offenders with two years left in their sentence, assuming they meet the criteria, to go into a work release program where they go into another facility and work a job to assist them with integration back into the community.[1254] He also noted that an offender must have a regular duty status before he may be considered for the work release program and that this is for offender safety.[1255]

Plaintiffs' argument assumes that offenders with disabilities meet the other criteria or are otherwise eligible for DOC's work release program but have been denied access to same on the basis of their disability. Obviously, given the number of offenders at LSP with life sentences or equivalent life sentences, not every offender at LSP is even qualified to participate in the work release program. "[B]ecause the ADA's protections extend to only qualified individuals with disabilities, the plaintiffs must also show that at least some of the class members on whom the criteria were imposed are otherwise qualified for work release." *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1310 (M.D. Ala. 2012). The record is devoid of any evidence that an offender with a qualifying disability who was eligible for work release was nevertheless denied access to that program on the basis of his disability. As such, Plaintiffs have not shown that the requirement of regular duty status in order to participate in the work release program is tantamount to overt discrimination against disabled offenders. Moreover, as noted above, an offender is able to request a modification of his duty status by a medical provider.

Clearly, none of the LSP policies highlighted by Plaintiffs reflects a pattern of overt

---

[1254] J 4-jj, 59.
[1255] J 4-jj, 22–23.

discrimination toward disabled offenders.

## V.    Conclusion

For the foregoing reasons, Defendants respectfully submit that the Plaintiffs have failed to carry their burden as to violations of the Eighth Amendment, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. Plaintiffs' suit should be dismissed in its entirety.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

KANTROW, SPAHT, WEAVER & BLITZER
(A PROFESSIONAL LAW CORPORATION)
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 383-4703
Facsimile: (225) 343-0630

By: /s/ Randal J. Robert
     Randal J. Robert (#13800)
     Connell L. Archey (#29992)
     Keith J. Fernandez (#33124)
     George P. Holmes (#36501)
     *Special Assistant Attorneys General*
     Email: randy@kswb.com
            connell@kswb.com
            keith@kswb.com
            george@kswb.com

**SHOWS, CALI & WALSH, L.L.P.**
Jeffrey K. Cody, La. Bar Roll No. 28536
Caroline T. Bond, La. Bar Roll No. 34120
John C. Conine, Jr., La. Bar Roll No. 36834
*Special Assistant Attorneys General*
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467

Email: jeffreyc@scwllp.com
       caroline@scwllp.com
       coninej@scwllp.com

Patricia Wilton (La. Bar Roll No. 18049)
Elizabeth Murrill (La. Bar Roll No. 20685)
Angelique Freel (La. Bar Roll No. 28561)
*Assistant Attorneys General*
Louisiana Department of Justice
1885 North 3rd Street
P.O. Box 94005
Baton Rouge, Louisiana 70804-9005
Telephone: (225) 326-6200
Facsimile: (225) 326-6297
Email: WiltonP@ag.louisiana.gov
       MurrillE@ag.louisiana.gov
       FreelA@ag.louisiana.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of April, 2019, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Randal J. Robert
Randal J. Robert

#376077