# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, and RUFUS WHITE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,<br><br>Defendants. | CIVIL ACTION NO. 3:15-cv-00318<br><br>CHIEF JUDGE: Hon. Shelly D. Dick<br><br>MAGISTRATE JUDGE:<br>Richard L. Bourgeois, Jr. |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## REMEDY

Plaintiffs have proven that the pervasive, systemic deficiencies in the provision of medical care at Angola expose Class members to a substantial risk of serious harm, and that Defendants were deliberately indifferent to that risk. Plaintiffs have also proven that Defendant DOC's policies and practices violate the rights of the ADA Subclass under the ADA and the RA.

Defendants' health care system and treatment of inmates with disabilities are hereby **DECLARED** constitutionally inadequate due to the systemic inadequacies described herein. These systemic inadequacies include, but are not limited to, inadequate and inappropriate staffing; inadequate access to care, including delayed and denied diagnosis and treatment; inadequate chronic disease programs; failure to provide specialty care; failure to follow the recommendations made by referring specialists; inadequate internal follow-up care; inadequate dietary plans; inadequate work requirements; inadequate cell/housing conditions and other aspects of confinement; inadequate treatment of emergency conditions; inadequate nursing and infirmary care; inadequate medication administration; inadequate diagnostic services; inadequate policies and procedures; inappropriate budget practices; inappropriate medical facilities and equipment; and inadequate monitoring and quality assurance. As a result, every class member who has or develops a serious medical need faces a substantial high risk of receiving inadequate diagnosis or treatment and/or being denied meaningful diagnosis or treatment, exposing them to a substantial risk of serious and even life-threatening harm.

Defendant Louisiana Department of Public Safety and Corrections is further **DECLARED** to be in violation of the ADA, as amended by the Americans with Disabilities Amendments Act ("ADAAA") and the RA due to architectural and other barriers to programs, services, and activities; the failure to integrate individuals with disabilities; and the utilization of methods of administration that result in discrimination against patients with disabilities, including the systemic failure to provide reasonable accommodations or modifications. Accordingly, Defendants are enjoined to remedy the substantial risk of serious harm to Class members and the violation of Subclass members' rights under the ADA and the RA.

**IT IS HEREBY ORDERED** that Defendants shall create a plan to correct the violations of the Eighth Amendment, ADA, and RA as identified herein. Given that the violations involve a substantial risk of serious of harm and loss of life, and that Defendants have been aware that their policies and practices were constitutionally deficient for more than 20 years,[1] it is essential that the parties move swiftly to begin to correct the systemic deficiencies. Defendants shall submit their proposed plan to the Court within 30 days of the issuance of this Order, along with a timeline for completing each item listed in the plan. The proposed relief must be both immediate and long-term. Plaintiffs shall comment on, propose alternatives to, or oppose any part of Defendants' proposal within 30 days. The Court shall thereafter evaluate the parties' submissions, conduct any further proceedings it deems necessary, and order any remedy it deems appropriate and consistent with the PLRA in order to correct the violations.[2]

---

[1] *See* PX 17 (Settlement Agreement in *Williams v. Lynn*, No. 92-001 (M.D. La.)).

[2] *See* 18 U.S.C. § 3626(a)(1)(A); *Plata*, 563 U.S. at 530-34.

Defendants' proposed plan shall include four components: a medical staffing component; a clinical component; a monitoring component; and an ADA component. These components shall be developed to include the specific information detailed below, in order for the court to be in the best position to order relief that is narrowly drawn, and that extends no further than necessary to correct the violation of the Eighth Amendment and the ADA.

1. The medical staffing component shall include:

1.1      a plan to identify and revise all the policies, directives, protocols, and regulations implicated by this order, and to provide appropriate training for all staff on all revisions;

1.2      a plan to ensure sufficient staffing of both physicians and mid-level providers, in light of the size and medical acuity of the inmate population, in order to provide Plaintiffs with timely and appropriate access to qualified and competent providers for routine, urgent, emergent, and specialty health care;

1.3      a plan to substantially increase nursing staff, particularly on the Nursing Units;

1.4      a plan for reviewing staffing within 30 days of any material change in the inmate population that is expected to be sustained for more than six months, and a plan to create any necessary new positions within 60 days;

1.5      a plan for only hiring providers who are appropriately trained and credentialed for the type of care they will be privileged to provide, with a particular emphasis on hiring providers with appropriate specialties to treat patients with chronic diseases and other common primary care conditions;

1.6      a plan for the timely completion of annual written health care staff performance evaluations conducted by appropriately trained medical personnel and evaluating performance of clinical duties, including appropriate measures to address unsatisfactory evaluations;

1.7      a plan to provide substantially increased monitoring and supervision of physicians and nurses with disciplinary histories in the short term;

1.8      a plan to eliminate the hiring of physicians and nurses with disciplinary histories;

1.9      an organizational chart and detailed job descriptions for all medical staff positions, including the position of a health services administrator to oversee all health care services at LSP, who will have input in development of the health care budget and approval authority over health care spending;

1.10    a plan for training applicable health care and custodial staff on all portions of the plan relevant to their job duties;

1.11    a plan to require all EMS Personnel to report through the medical chain of command rather than the security chain of command, except to provide security during medical transport;

1.12    a plan to require all inmate health care orderlies to report through the medical chain of command rather than the security chain of command in the performance of their job duties; and

1.13    a plan to ensure that medical staff play no role in the enforcement of security measures, except where ensuring that Class members' medical needs or disabilities are respected in disciplinary proceedings.

2.   The clinical component shall include:

2.1    a plan for creating a health care delivery system where all medical complaints and conditions are timely reviewed by an appropriate and qualified medical professional;

2.2    a plan for creating a health care delivery system where every patient presenting to the ATU receives a physical examination, review of recent medical records, and thorough medical assessment by a provider;

2.3    a plan to have registered nurses (RNs) with access to Plaintiffs' complete medical records perform all sick call other than requests solely for a duty status or medication renewal;

2.4    a plan to re-evaluate and lower the cost of sick call and emergency sick call such that it is aligned with the wages earned by inmates;

2.5    a plan to test all patients for hepatitis-C infection;

2.6    a plan to eliminate the practice of overruling any recommendation from an outside specialist, which is not required by the reasonable use of a formulary, and to ensure the specialist recommendations and any other medically appropriate follow up care is provided;

2.7    a plan to develop new pain management procedures and policies;

2.8    a plan to ensure that there is no delay in sending patients to the hospital when it is medically necessary;

2.9    a plan to adopt appropriate stroke protocols;

2.10   a plan to create a database to track patient complaints and a mechanism for ensuring complaints are followed by a physical exam and not only a record review;

2.11   a plan to timely review and make a determination as to all requests for routine and urgent specialty care;

2.12   a plan that brings any denials of requests for routine and urgent specialty care into accordance with community standards, and ensures the denial and the reason for the denial are documented in the patients' medical records and communicated in writing to the patient and the requesting physician;

2.13   a plan to ensure approved specialty services are delivered timely and as clinically indicated;

2.14   a plan to ensure that specialist recommendations are reviewed by primary care providers and incorporated into primary care treatment plans, with recommendations, diagnostic tests, and any other medically appropriate follow-up care provided promptly;

2.15   a plan to revise the chronic care protocols to align with current national standards for chronic care, including chronic care guidelines for all major chronic conditions;

2.16   a plan to completely overhaul the treatment of all major chronic conditions in accordance with the revised protocols, for example:

2.16.1   with regards to HIV treatment, the DOC will arrange for its contracted medical provider to implement a new protocol for the testing, evaluation, and treatment of HIV. All class members with HIV will be treated with protocols that align with national standards.

2.16.2   with regards to hepatitis-C treatment, the DOC will arrange for its contracted medical provider to implement a new protocol for the testing, evaluation, and treatment of hepatitis-C. All presently hepatitis C-infected patients with fibrosis levels F1-F4 will be treated with direct acting antiviral medicine within six months, and all future patients within three months after the determination of their fibrosis level with untreated patients being retested for eligibility every six months. DOC will test all inmates for hepatitis C on intake and every two years thereafter.

2.16.3   with regards to the "Coumadin clinic," the DOC will update its protocols to be in line with national standards for treating, monitoring, and counseling patients using Coumadin, and correct any deficiencies in the use of Coumadin to treat patients with chronic conditions.

2.16.4   with regards to diabetes, the DOC will ensure that all patients with diabetes have the access and ability to test their blood sugar levels twice a day.

2.16.5   with regards to sickle cell disease, all patients with sickle cell disease will have access to narcotic medication as indicated for sickle cell-related pain in their housing unit. DOC will provide training to all staff that participate in the care of patients with sickle cell disease about the disease and the appropriate reponse to a sickle cell crisis, consistent with national standards. The training will be conducted regularly by a medical professional from outside DOC who has experience treating patients with sickle cell disease.

2.16.6   with regards to all chronic care patients who require special diets, the DOC will ensure they have access to those special diets and that they are tailored to each patient's condition and invidual medical needs. The evaluation, prescription, and provision of the special diets will be well-documented to facilitate review by the monitors.

2.17    a plan to have nursing staff rather than security officers distribute medication and to document medication administration contemporaneously;

2.18    a plan to provide patients with information and education on all changes in medication;

2.19    a plan to bring the roles and performance of all EMS Personnel into conformance with the Louisiana Board of Emergency Medical Services Scope of Practice Matrix, including the requirement that EMS Personnel practice under the supervision of a physician and that the facility maintain documentation of biennial training on any optional modules performed by any EMS Personnel;

2.20    a plan to ensure basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, particularly on the nursing wards and in the medical dormitories;

2.21    a plan for providing medically suitable examination rooms that ensure privacy, sanitation, and sufficient space and supplies for physical examination;

2.22    a plan to permanently eliminate the use of malingering as a security charge;

2.23    a plan to provide medical providers and Plaintiffs with supplies necessary for medically adequate care;

2.24    a plan to have nursing staff provide sick call and pill call on site for Plaintiffs in the medical dormitories, and to conduct daily rounds in the medical dormitories to examine patients and provide supervision, instruction, and assistance to the inmate health care orderlies;

6

2.25    a plan to ensure that inmate health care orderlies in the medical dormitories are not used to provide services other than assistance with Activities of Daily Living;

2.26    a plan to have all inmate health care removed from the infirmary and nursing units, unless there to provide Hospice support, and for qualified medical personnel to assist with Activities of Daily Living on those units;

2.27    a plan to ensure that all patients in the nursing wards are within sight and/or sound of a provider or nurse at all times;

2.28    a plan to ensure that vulnerable patients or patients incapacitated in any ways have a mechanism by which to communicate emergencies to medical staff;

2.29    a plan to cease the use of gastrointestinal lavage ("stomach pumping") and forced catheterization in emergency medical situations, unless indicated by specific evidence of drug overdose beyond the patient's symptoms, which must be documented in writing;

2.30    a plan to ensure Do Not Resuscitate orders are properly discussed with patients and not proposed to patients with altered mental status in the midst of life-threatening emergencies;

2.31    a plan to revise policies in order to ensure timely and adequate mortality reviews by an unaffiliated physician, that include sufficient detail as to the cause of death and the relevant medical and treatment history;

2.32    a plan to implement an electronic medical records system that includes adequate documentation of all medical encounters, including records from outside providers and medication administration records, and that makes medical records readily accessible to Class members upon request; and

2.33    a plan to reform LSP's Continuous Quality Improvement ("CQI") program to include participation by the Medical Director, Assistant Warden for Health Services, and all medical departments, and to empower the CQI program to develop, implement, and monitor the effectiveness of quality improvement plans.

3.    A monitoring component that includes:

3.1    a plan to develop a database that tracks all patient complaints or requests for medical care, including any requests for routine and urgent specialty care;

3.2    a plan to develop a mechanism to ensure patient complaints are followed by a physical exam by medical personnel, not just a record review of the patient's history and recent care;

3.3    a plan to educate all medical personnel on appropriate procedures for responding to and documenting patients' refusals of care;

7

3.4    a plan to develop an annual written review of the current status and treatment plan for all patients with chronic conditions, including a written review of the results of any laboratory or other diagnostic tests; and

3.5    a plan to develop an organizational system for the electronic medical records that facilitiates the ability for medical providers and the monitor to review and track patients' medical conditions.

4.    An ADA component that includes:

4.1    a plan for the creation of an effective and comprehensive system for tracking individuals with disabilities and ensuring that they are accommodated appropriately in all aspects of their incarceration, including, but not limited to, their dietary needs, work assignments, mobility, communication, housing, and discipline;

**4.2**    a plan to ensure that all patients are informed of their rights under the ADA, the identity of and contact information for the ADA Coordinator, and the various methods of and procedures for requesting accommodations and filing disability-related grievances;

4.3    a plan for the creation of a comprehensive database that reliably captures all requests for accommodations (including letters, ARPs, RFAs, and verbal requests), as well as their status, disposition and any reasons therefor, and supporting documentation;

4.4    a plan to remove all barriers to requesting accommodations, including the policy of charging copays for the evaluation of accommodation requests;

4.5    a job description for an ADA Coordinator and a plan to ensure that the individual has the necessary qualifications, training and time to meet the job requirements

4.6    a plan to ensure that all requests for accommodation, including letters, ARPs, RFAs, and verbal requests, are referred to and evaluated by the ADA Coordinator or by appropriately trained and qualified designees acting under his or her direct supervision, with all final determinations made by the ADA Coordinator;

4.7    a plan to provide training for all staff and health care orderlies about the ADA and compliance therewith by a qualified outside vendor;

4.8    a plan to eliminate the architectural barriers to LSP's programs, services, and activities as identified by Plaintiffs' ADA expert or the ADA monitor;

4.9    a plan for revising the duty status policy to provide for individually tailored restrictions, a more robust classification system, and a process by which

inmates can request a new or modified duty status without relying on the sick call system;

4.10    a plan to train security personnel on the proper application of and compliance with duty status restrictions;

4.11    a plan to revise all other policies that result in the exclusion of patients with disabilities from LSP's services, programs, and activities, including, but not limited to, hobby craft, educational, rehabilitative, and therapeutic programming, work assignments, work release, religious services, and recreational activities;

4.12    a plan to ensure that patients with disabilities are able to access and benefit from LSP's services, programs, and activities in the most integrated setting appropriate to their needs;

4.13    a plan to ensure that patients with disabilities are provided with on-site medical services to the extent they are placed in designated medical areas such as the nursing wards and medical dormitories;

4.14    a plan to ensure individuals with disabilities are transported safely in vehicles that adequately accommodate their disabilities both within and outside the facility; and

4.15    an evacuation and emergency response plan that accommodates all inmates with disabilities in all facilities where such inmates are housed or receive any programs, benefits, or services.

**IT IS FURTHER ORDERED** that within two weeks of the issuance of this order, the Defendants will produce a report detailing all relevant material changes that have occurred at LSP and/or the DOC since the close of discovery. The report must be supported with documentation of such changes. Plaintiffs will be provided with an opportunity to conduct limited and speedy discovery regarding any alleged changes. The Court will schedule a hearing regarding those changes shortly thereafter.

**IT IS FURTHER ORDERED** that the parties will formulate and agree to a plan for information-sharing, which will enable Plaintiffs to have ongoing and thorough access to the Class members and to obtain the information needed in order to evaluate the plan produced by Defendants and the implementation thereof.

**IT IS FURTHER ORDERED** that the Court will appoint three monitors to evaluate the implementation of the plan: one doctor, one nurse, and one ADA monitor. The monitors will visit the facility regularly, but at least three times per year, to conduct thorough reviews of the facility and of records selected by the monitors. The monitors shall have unfettered access to staff, Class members, documents, and anything else necessary for them to complete their review. The monitors shall also schedule regular conference calls with LSP staff between these visits in order to gather information and monitor compliance. The parties will have two weeks from the date of this Order in which to come up with agreed-upon candidates, subject to the Court's approval. If they are unable to agree, each party will submit a list of no more than three names per monitor position with resumes to the Court within two weeks and the Court will select the monitors. After the entry of the

Court's remedial order, any disputes between the parties regarding the adequacy of any current or revised policies, procedures, protocols, training programs, staffing plans, or other items required by this Order will be submitted to the appropriate monitor for resolution, if the parties cannot reach agreement. In the event that either party is dissatisfied with the monitor's written resolution of any such dispute, that party may move the Court for relief. All costs incurred by the Parties in the enforcement of the Court's order will be paid by Defendants.

**IT IS FURTHER ORDERED** that Plaintiffs are the prevailing party in this case, and have leave to submit an initial Motion for Attorneys' Fees within 30 days of this order.