UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, | * | CIVIL ACTION |
| FARRELL SAMPIER, REGINALD | * | |
| GEORGE, JOHN TONUBBEE, OTTO | * | NO. 3:15-cv-00318 |
| BARRERA, CLYDE CARTER, CEDRIC | * | |
| EVANS, EDWARD GIOVANNI, RICKY D. | * | JUDGE SHELLY D. DICK |
| DAVIS, LIONEL TOLBERT, and RUFUS | * | |
| WHITE, on behalf of themselves and all | * | MAGISTRATE JUDGE |
| others similarly situated, | * | RICHARD L. BOURGEOIS |
| | * | |
| VERSUS | * | |
| | * | |
| BURL CAIN, Warden of the Louisiana State | * | |
| Penitentiary, in his official capacity; | * | |
| STEPHANIE LEMARTINIERE, Assistant | * | |
| Warden for Health Services, in her official | * | |
| Capacity; JAMES M. LEBLANC, Secretary of | * | |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS | * | |

**POST-TRIAL REPLY BRIEF**

**MAY IT PLEASE THE COURT**:

**I.    PLAINTIFFS HAVE NOT PROVEN AN EIGHTH AMENDMENT VIOLATION**

Plaintiffs have not met the "extremely high" "stringent standard of fault" for showing that

health care provided by LSP violates the Eighth Amendment's prohibition on cruel and unusual

punishment.   Prison officials may violate the Eighth Amendment when they demonstrate

deliberate indifference to a prisoner's serious medical needs.   The Fifth Circuit has equated

deliberate indifference to callous disregard. *Gardner v. Cato*, 841 F.2d 105, 106 (5th Cir. 1988).

To show an Eighth Amendment violation for conditions of confinement, the Plaintiffs

must prove an objective prong, i.e., a deprivation sufficiently serious to merit constitutional

protection; and, a subjective component, i.e., action with a sufficiently culpable state of mind.

The Eighth Amendment does not protect against any and all risk of harm; rather, it protects

against "extreme" conditions presenting an "unreasonable risk" of harm. To prove the objective prong, the Plaintiffs had to prove a risk so grave that it violated contemporary standards of decency. To establish the subjective prong, the Plaintiffs had to prove that (1) LSP officials were aware of facts from which an inference of a substantial risk of serious harm could be drawn, and (2) that LSP officials actually drew such an inference. To establish the subjective component, the Plaintiffs must prove subjective recklessness as the term of art is used in the criminal law context. Recent Fifth Circuit cases have consistently demonstrated the very high burden required to establish such a violation. See *Tustin v. Livingston,* 2019 WL 1512605 (5th Cir. April 5, 2019); *Young v. McCain,* 2019 WL 192411 (5th Cir. January 14, 2019); *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019); *Delaughter v. Woodall*, 909 F.3d 130 (5th Cir. 2018).

A.    **Plaintiffs' Experts Allowed Their View of Being Prisoners' Rights Advocates to Produce Opinions that Were Biased, Slanted, Unfair, Wrong, and Not Worthy of Being Trusted**

Plaintiffs' entire case is built on a false foundation provided by expert witnesses who have shown themselves to be biased, slanted, unfair, wrong and not worthy of being trusted. Numerous examples of instances where Plaintiffs' experts were wrong or clearly biased stand unrefuted:

- As to Patient No. 25, Plaintiffs' experts state that the patient's HIV disease was "permitted to deteriorate" before antiretroviral therapy was resumed. At trial, Defendants produced evidence that the patient refused care for HIV on many, many occasions. Plaintiffs did not address this obvious erroneous accusation by Plaintiffs' experts.

- As to Patient No. 25, Plaintiffs' experts state that the Defendants did not treat his PSA without acknowledging that the patient refused treatment with sarcasm.

- As to Patient No. 15, Plaintiffs' experts accuse LSP of inadequate medical care of his hypertension. In reality, the medical record documents that the patient refused to take medications and refused treatment, notwithstanding efforts by LSP providers to get the patient to comply. Plaintiffs also did not address the 6/8/13 record where Plaintiffs' experts strongly accused LSP of not noticing or treating the patient's incredibly abnormal blood pressure of 232/149. Of course, as shown in Defendants' original brief, LSP

providers in fact noticed the blood pressure and took action, only to be rejected by the patient, completely contrary to Plaintiffs' experts' testimony.  This evidence stands unrefuted.

- As to Patient No. 29, Plaintiffs' experts noted a 3/26/14 a chest x-ray that showed the development of pneumonia compared to previous x-rays, while ignoring a 4/7/14 chest x-ray that was stable.

- As to Shannon Hurd, the Plaintiffs' experts blame LSP for a seven-month delay in securing needed lab work without ever referencing the fact that Hurd refused two labs and missed two appointments during that seven months.

- As to Patient No. 13, Plaintiffs' experts' report states that smoking cessation using nicotine replacement was not utilized, directly contrary to the record.

- As to Patient No. 18, Plaintiffs' experts assert that the patient was not assessed or treated for HIV between the initial tests on 11/20/13 until 12/12/13 when the record shows that the patient was seen on 11/26/13, 12/2/13, 12/4/13, and 12/5/13, admitted to the NCU on 12/2/13, and additional testing was performed on 11/26/13 and 12/4/13.

- Plaintiffs' experts' bias is clearly shown in testimony pertaining to DNR orders.  As to Patient No. 9, Plaintiffs' experts criticized the fact that the patient's mother and sister were involved in the decision to execute a DNR.  However, Plaintiffs' experts previously testified that a chaplain or family member should have participated in signing the DNR.

- Plaintiffs' experts question whether care was even provided, when it is clearly reflected in the medical records.  For instance, in two separate cases, the medical record shows that the patient received care from LSU specialists.  Because LSP's sending patients to specialists at LSU undermines the Plaintiffs' case, Plaintiffs' experts must cast doubt on such visits.  Thus, Plaintiffs' experts, without any basis, question visits to the LSU specialists by stating that the patients "apparently" saw LSU specialists.

Defendants suggest to the Court that the Latin phrase, *falsus in uno, falsus in omnibus*, is the appropriate lens through which to view Plaintiffs' experts' testimony.  Plaintiffs' experts contorted the record as to Patient No. 25 and many other patients to try and prove a case—rather than providing an objective expert opinion.  With obvious evidence of bias, Plaintiffs' experts' opinions should be scrutinized as the product of their bias toward advocacy for a cause.

### B.    Plaintiffs' Experts Applied an Incorrect Standard of Care

The Eighth Amendment does not require optimal medical care or even medical care that

comports with the community standard of care. *Houston v. Rio Consumnes Corr. Facility*, 2017 WL 2972609, at *9 (E.D. Cal. July 12, 2017); *Acinelli v. Torres*, 2015 WL 4380772, at *4 (C.D. Cal. July 16, 2015); *Garrett v. Wohler*, 2013 WL 12125743, at *8 (D. Ariz. Apr. 30, 2013); and *Barrow v. Shearing*, 2017 WL 3866818, at *3 (S.D. Ill. Sept. 5, 2017) (asking the Court to order "community standard of care treatment" goes beyond what is required by the Eighth Amendment).    "Whether the treatment defendant provided comported with the community standard of care is not the issue before the Court.  As the Supreme Court has held, 'a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.'" *Davis v. Sutley*, 2009 WL 773261, at *8 (C.D. Cal. Mar. 20, 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).  Prisoners are not entitled to demand specific care or even "the best care possible;" rather, they are entitled only to "adequate medical care." *Barrow v. Shearing*, 2017 WL 3866818, at *3 (S.D. Ill. Sept. 5, 2017).

Here, Plaintiffs' experts purported to judge Defendants by the community standard of care, which is divorced from the applicable standard—the Eighth Amendment.  The Plaintiffs' experts' errors went far beyond just the erroneous application the community standard of care. The record shows that the Plaintiffs' experts actually judged LSP by contemporary trends in medicine and the latest and best practices in metropolitan areas far from Tunica Trace in West Feliciana Parish.  Applying a *contemporary* standard of care would require LSP's health care to be "optimal," a view that courts across the country have routinely rejected as not required by the Eighth Amendment.    The Plaintiffs provided a wish list masquerading as constitutionally required.  Their wish list should be rejected.

The very foundation of the Plaintiffs' case was built on the flawed analysis by their experts who are prisoners' rights advocates.  In short, Plaintiffs' experts' opinions should be

rejected as they are unrelated to the Eighth Amendment.

### C.    Plaintiffs Did Not Prove the Objective Prong of an Eighth Amendment Violation

Nothing about the quantity and quality of the medical care provided at LSP offends contemporary standards of decency.  Plaintiffs concede in their post-trial brief that Defendants provide much care, including access to specialists.[1]  The evidence shows that offenders at LSP receive a wide variety of treatments, therapies, and medications, including costly HIV medications, chemotherapy, and surgeries for a full range of conditions from heart surgery, joint replacements, cataract surgeries, and many, many more.  Defendants submit that the quantity and quality of care provided by Defendants clearly does not offend contemporary standards of decency.  No reasonable lay person could find on Plaintiffs' showing that the medical care at LSP is repugnant to the conscience of mankind.  Any deficiencies in medical care identified by Plaintiffs' biased experts (after hand selecting charts viewed through the incorrect standard of care) are (i) invalid after the fact criticisms; (ii) incidences of disagreements in medical care; (iii) the product of the injection of improper issue advocacy; or (iv) at most, isolated incidences of delays or medical malpractice.[2]

To be clear, this case is not about a failure to provide care to any one individual prisoner.  Indeed, Defendants suggest that any one claim could never pass the stringent standards for showing an Eighth Amendment violation.[3]  At least implicitly recognizing that Defendants provide much care, Plaintiffs argue that the system-wide deficiencies in the provision of medical

---

[1] Plaintiffs state that the medical "records include dozens if not hundreds of encounters with EMTs, correctional officers, nurses, physicians, and outside specialists." (Plaintiffs' Post-Trial Brief, p. 31).  Indeed, Plaintiffs concede that "it is undisputed that some Class members saw outside specialists and received some care related to ongoing issues . . ." (Plaintiffs Post-Trial Brief, p. 179)

[2] The United States Supreme Court has made clear that "society does not expect that prisoners will have unqualified access to health care," only that serious medical needs will be met. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

[3] The Seventh Circuit in *Sellers v. Henman*, 41 F. 3d 1100, 1103 (7th Cir. 1994) correctly warned that "the presence of multiple acts of negligence is merely evidentiary; it is not an alternative theory of liability."

care taken as a whole subject the prisoners to a substantial risk of harm and cause the delivery of care at LSP to fall below the evolving standards of decency.[4]  Plaintiffs cite to *Brown v. Plata*, 563 U.S. 493 (2011) to support the contention of a system-wide violation through aggregation.[5] Initially, *Brown v. Plata* stands for nothing regarding a system-wide failure to deliver medical care because, there, the state *conceded* that there was an Eighth Amendment violation. Moreover, comparing this case to *Brown v. Plata* shows how the Plaintiffs have failed to make their case.  This case has been shown to be dissimilar to the conditions present in *Brown v. Plata*. In *Brown*, California's prisons had operated at 200% of design capacity; the photographs of the conditions validated that the conditions offended contemporary standards of decency.  *Id.* at 1924 and 1949.  Moreover, an independent commission found, and it was an uncontested fact that, on average, an inmate in one of California's prisons needlessly died every six to seven days due to constitutional deficiencies in the California prisons' medical delivery system.  In short, the conditions found present in *Brown* are completely dissimilar from the conditions at LSP.  Even with all that evidence and a conceded violation of the Eighth Amendment, the Supreme Court's decision was still a 5-4 split, highlighting the difficulty of the burden the Plaintiffs have to carry.[6]

Defendants submit that neither the Supreme Court nor the Fifth Circuit have ever found a system-wide deficiency in medical care on facts remotely similar to those present at LSP.  There is no dispute that prisoners at LSP receive a large amount of health care, including access through sick call, medications, specialists, and telemedicine, on a vast array of medical issues.

As to offender deaths, Plaintiffs' experts reviewed 28 deaths in their sample over seven years.  Contrary to Plaintiffs' representations, there is little evidence of preventable deaths.

---

[4] Plaintiff's Post-Trial Brief, p. 241.
[5] Plaintiffs' Post-Trial Brief, p. 241, n.1829.
[6] Plaintiffs further seem to cite to *Braggs v. Dunn*, 257 F. Supp.3d 1171 (M.D. Ala. 2017) and *Gates v. Cook*, 376 F. 3d 323 (5th Cir. 2004).  Neither case is like this case.  *Braggs* was a mental health case and *Gates* addressed conditions of confinement on death row (filthy conditions, heat, lighting, etc.).

Plaintiffs concede that four of the deaths were not preventable.[7]  Defendants showed that, with a non-biased reading of the charts, 21 of the deaths were not actually preventable.[8]  Patient No. 34's death after a rib injury playing football was an unexpected death.[9]  Patient No. 42 died of a stroke after being initially diagnosed as a suspected overdose from Mojo.[10]  Defendants acknowledge that Patient No. 7 should have had a biopsy sooner than he did, although his death from a very difficult lung cancer was only potentially preventable.[11]  Moreover, only one of the 28 deaths (patient No. 42) occurred within the relevant time frame of 5/20/15 through 9/30/16.

---

[7] Patient No. 1 (Day 2, p. 148); Patient No. 2 (Day 2, p. 154; Plaintiffs' Post-Trial Brief p. 63, fn. 474); Patient No. 8 (Plaintiffs' Post-Trial Brief p. 63, fn. 474); Patient No. 35 (Plaintiffs' Post-Trial Brief p. 63, fn. 474).  In their opening statements, Plaintiffs contended that only two of the deaths had serious medical errors and/or were not preventable. (Day 1, p. 37)

[8] Patient No. 3 was a very sick, complex patient who was not compliant with his medications and died notwithstanding care by outside specialists. (Day 2, pp. 155–69) Patient No. 4 was a 70 year old patient who had emphysema, bronchitis, angina, and he smoked.  He regularly refused care and died in 2010. (Day 2, pp. 172–76) Patient No. 5 had lung disease and pulmonary edema and was seen by 22 specialists over two years.  He died from complications after surgery at ILH. (Day 2, pp. 177–81) Patient No. 6 was 73 years old and suffered from coronary heart disease, hypertension, diabetes and chronic kidney failure. He was seen regularly by outside specialists prior to his death. (Day 2, pp. 181–86)  Patient No. 9 had cirrhosis due to hepatitis C, hypertension, and low back pain.  He had a very poor prognosis when he was transferred from Hunt to LSP in February of 2014. He died in April of 2014. (Day 3, pp. 16–17)  Patient No. 10 had other issues when he developed sudden onset jaundice.  Evaluation that day found that he had grade 4 cancer with a very poor prognosis.  He died soon thereafter. (Day 3, pp. 20–21).  Patient No. 15 had a heart attack and died.  He had a long, documented history of refusing mediation and treatment for his high blood pressure. (Day 7, pp. 24–33)  Patient No. 16 developed flu-like symptoms on 12/13/13.  He was sent to UMCNO where he died two months later. (Day 7, p. 35)  Patient No. 17 was seen by 15 specialists over 18 months. (Day 7, pp. 36–37)  Plaintiffs' experts conceded that this death "may not have been preventable." (P 006.189)  Patient No. 18 tested positive for HIV, was treated at LSP, was sent to an outside hospital and died there, all less than two months after being tested. (Day 7, pp. 37–42).  Patient No. 19 suffered from coronary heart disease, had several stents, chronic kidney disease, gout, hypothyroidism, polyepithemia [sic], benign prostate cancer, and he smoked.  This very sick patient died notwithstanding being seen 12 times by outside specialists for the last six months of his life. (Day 7, p. 44–45)  Patient No. 20 had HIV which he refused to treat for years.  He died of a massive GI bleed which testing did not disclose. (Day 7, p. 53)  Patient No. 21 injured his ankle playing basketball.  He was thereafter found to have cancer in his leg that had metastasized. He was started on palliative care and then died. (Day 7, pp. 58-60)  Plaintiffs' experts admit that his death was not preventable. (P 006.223)  Patient No. 22 died in 2012 after developing AIDs and cancer.  His death was not preventable. (Day 7, pp. 65–66)  Patient 31 died of end-stage liver disease. (P 006.251)  Patient No. 32 had a long history of heart disease, and he continued to smoke. He died of a heart attack after three encounters with outside specialists the week before his death. (Day 6, pp. 49–51)  Patient No. 37 had a new onset seizure from which he died despite vigorous medical attention. (Day 6, p. 72)  Patient No. 38 had a stroke.  Plaintiffs' expert agreed that LSP's response was quick.  The patient nonetheless died. (Day 7, p. 77)  Page No. 39 was an obese patient with many illnesses who was noncompliant with his medications and eventually died. (Day 6, pp. 80–81)  Patient No. 40 sought no treatment between 2008 and 2010.  Upon presenting to the ATU on 2/16/10, he was diagnosed with AIDs, pneumonia and a lung mass. He died within three months. (P 006.066)  Patient No. 41 had hypertension, COPD, hepatitis C and refused to be transported to outside hospitals.  He died in the ATU under the active treatment of a doctor. (Day 6, p. 87)

[9] Day 6, pp. 57–62.

[10] Day 6, pp. 88–90.

[11] PX 006.0121.

Unlike the evidence in *Brown v. Plata*, evidence of deaths in this case does not support a finding of deliberate indifference under the Eighth Amendment. Plaintiffs' sensationalized suggestion that these deaths somehow establish deliberate indifference is factually unsupported and legally incorrect.

Plaintiffs further argue that DOC's death rate supports a constitutional violation. That contention is untrue and is the product of a demonstrably incorrect methodology. DOC's death rate reported to DOJ is approximately twice what it should be due to the manner in which DOC is required to report its numbers to the DOJ.[12] The full explanation of how this number is derived shatters the false impression the Plaintiffs are eager to paint. Approximately half of the offenders assigned to DOC are housed in local jails by agreement. DOC is required to report any offender death if the offender is assigned to DOC, regardless if the offender is housed at a DOC facility or at local facility. However, DOC is only allowed to report the number of prisoners actually housed at a DOC facility to calculate its total population. This discrepancy is crucial because it means that DOC's death rate reported to DOJ is artificially inflated by approximately a factor of two.[13] Moreover, even Plaintiffs' biased expert testified that the fact that Louisiana's death rate is higher than other states is not a "reliable indicator of a problem" because you have to account for differences in prison age and population.[14]

Finally, tacitly recognizing the reported death rate is facially inaccurate as a result of methodology required by the DOJ, Plaintiffs shifted tactics at trial and argued that the fact that DOC's death rate has increased supports their claim that Defendants do not provide constitutional care. Even this opportunistic change of positions was shown to be inadequate,

---

[12] Transcript of class certification hearing admitted into evidence (Day 11, pp. 68–70; see Doc. 374, pp. 65–69) explaining that DOC's death rate is about less than that actually reported due to nature in which the data is reported.
[13] *Id.*
[14] Day 2, p. 44.

8

however.  Plaintiffs' expert was unaware of the change in Louisiana law in 1968 that a life

sentence means life with no parole.[15]  Plaintiffs' expert did nothing to determine if the average

age of the prison population had increased over the last 12 years due to "life means life"

sentencing.[16]  The mortality statistics do not support Plaintiffs' arguments that the medical care

at LSP is constitutionally deficient.

The reality is that LSP provides an enormous amount of care to the prisoners in an aging

environment.  Defendants submit that, unlike the dissimilar *Plata v. Brown* where there was

200% overcrowding and unrefuted evidence of poor care, the rationale of *Ruiz v. Johnson*, 154 F.

Supp.2d 975 (S.D. Tex. 2001) is applicable.  There the court was presented with facts similar to

this case and found:

> Specifically, the experts commented on the system's dependence on non-
> physicians to make medical decisions, often beyond their expertise, and the low
> rate of physician review of those decisions; the inadequate evaluation and referral
> system which is often marked by unacceptable delays in treatment; a failure to
> follow-up with at-risk patients; general staff indifference to complaints; poor
> treatment of diabetes including the failure to perform basic preventive tests
> against common complications; inadequate access to medication and the lack of
> communication between treating hospitals and unit medical care facilities;
> incidents of medically-based work restrictions being ignored by correctional
> officers; and the general failure to self-monitor the quality of treatment being
> administered. With respect to psychiatric services, plaintiffs' experts again
> highlighted several deficiencies, including "not recognizing or minimizing
> symptoms indicative of major mental illnesses;" failing to recognize psychiatric
> needs; and a practice of unnecessarily changing diagnoses.
>
> The evidence presented, however, was insufficient to show that the defendants
> were deliberately indifferent to the prisoners' physical and mental health needs, as
> required to prove a violation of the Eighth Amendment. While the court remains
> deeply disturbed by the current sub-par level of medical treatment being provided
> by The TDCJ–ID to its inmates, a system-wide deliberate indifference to health
> needs has not been shown to exist.

*Id.* at 987–88 (citations and footnotes omitted).  The Court reiterated its conclusions from an

---

[15] Day 2, pp. 139–40.
[16] Day 2, p. 140.

earlier opinion.[17]    Just as in *Ruiz*, Plaintiffs have failed to prove system-wide deliberate indifference to health care needs at LSP.

**D.    Plaintiffs Did Not Prove the Subjective Prong of an Eighth Amendment Violation**

Similarly, the Plaintiffs did not prove that the Defendants possessed a subjectively culpable state of mind to establish deliberate indifference under the Eighth Amendment. Virtually the totality of the Plaintiffs' cited materials purporting to show a culpable state of mind are inadmissible for that purpose pursuant to Fed. R. Evid. 407.[18]

Though inadmissible, out of an abundance of caution Defendants will respond to the lack of merit of these materials.  Plaintiffs assert that the *Williams* litigation warned Defendants that their practices were deficient.  To the contrary, the *Williams* litigation negates any subjective intent.  At the conclusion of the *Williams* litigation, this Court released the Defendants and dismissed that suit.  The only reasonable conclusion is that the policies and procedures approved and adopted in the *Williams* litigation were constitutional.  Plaintiffs now contend that those same policies and procedures (which have been improved upon over time) show Defendants possessed a culpable state of mind.  In addition to running afoul of Fed. R. Evid. 407, the argument is without basis in fact or logic.

Plaintiffs also harp on the questionable Wexford report.  Secretary LeBlanc explained

---

[17] *See* Ruiz v. Johnson, 37 F. Supp. 2d 855, 907 (S.D. Tex. 1999):
> The court was deeply disconcerted by the inadequate and negligence medical and psychiatric treatment exposed by the plaintiffs and their experts. Plaintiffs demonstrated time and again fact patterns that would likely make winning malpractice suits in civil court. Regrettably, the Supreme Court has stated in no uncertain terms that for an inmate, this is not enough. The inmates must show a systemic pattern of intentional indifference to known medical needs.

[18] "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction."

10

that the Wexford consultants prepared their report to attempt to obtain a contract with DOC. While offering some suggestions for improvement, the Wexford report is overall complimentary of Defendants' efforts with respect to improved access to care and quality of care. A report congratulating DOC on achieving tremendous progress in the quality of DOC's health care delivery system does not establish subjective culpable state of mind.

Plaintiffs have also cited to an email from the LSU Stroke Coordinator to DOC regarding offenders presenting with stroke symptoms.[19] Dr. Singh testified by deposition that DOC was, in fact, proactive in addressing this matter. Dr. Singh testified that he sat down with West Feliciana medical providers and set up a telestroke program.[20] He said that this program was implemented because there was a need for quick decisions with respect to the treatment of stroke patients.[21] Again, this subsequent remedial measure shows proactive efforts by the Defendants to meet the needs of its patient population. It does not show any deliberate effort to expose patients to a substantial risk of serious harm.

Plaintiffs further cite to delays in providing hernia surgeries that occurred as a consequence of the closure of EKL. The undisputed evidence is that that situation was the result of the closure of EKL and the after effects of Hurricane Katrina—factors wholly outside of the control of the Defendants.[22] DOC was able to enter into contracts with other providers and the backlog of surgeries subsided upon the opening of UMNCO.

Finally, Plaintiffs have selected Dr. Lavespere as their villain *du jour* in this case. Dr. Lavespere has had to withstand unrelenting and unjustified attacks on his ability and character

---

[19] P 12-0001-03.
[20] J 4, Deposition of Raman Singh, pp. 59–60.
[21] *Id.*
[22] Incredibly, Plaintiffs' primary expert was unfamiliar with the closure of EKL, that ILH was unable to accept patients, and that LSP had a shortage of outside providers to treat patients in 2013. (Day 2, pp. 169–72) Without taking into account these critical facts, his opinion will obviously be wrong.

throughout this case.  This Court heard testimony from Dr. Lavespere for an entire day at trial. This Court is well aware that he is a qualified doctor who is dedicated to his work and to the patients at LSP.  This was made abundantly clear at trial when Dr. Lavespere rushed to the aid of Mr. Parker, a paraplegic patient that the Plaintiffs inadvisably had transported from LSP to the courtroom on the last day of trial for apparent theatrical purposes.  The Court ordered that "Mr. Parker will be returned to LSP where he can be appropriately cared for."[23]

In reality, Plaintiffs have no admissible evidence to establish that the Defendants have a culpable state of mind.  Without a finding of subjective knowledge, Plaintiffs' claim fails as a matter of law.

### E.    Plaintiffs Rely Heavily Upon Stale Evidence Far Outside the Relevant Time Period

The case law is clear that the Court must look at current conditions to determine whether injunctive relief is appropriate for a purported Eighth Amendment violation.  Pretermitting the argument that the trial should have considered conditions at the time of trial in 2018, Plaintiffs' evidence fails as even being outside the court-ordered period of 5/20/15 through 9/30/16.  The vast majority of the medical care referenced by Plaintiffs' experts goes back five to ten years prior to the trial date.  Plaintiffs have asked this Court to find deliberate indifference through aggregation based upon treatment that occurred in 2008, 2009, 2010, 2011, 2012, 2013, and 2014. Indeed, as stated herein, the Plaintiffs only presented one offender death that occurred during the relevant time period.  Stale evidence cannot serve at the basis for a deliberate indifference claim that must be based on current conditions.  Thus, the Court cannot, under applicable case law, find a violation of the Eighth Amendment based on conditions that existed as much as ten years prior to trial but have since been ameliorated.

---

[23] Day 11, p. 5.

To the contrary, there is much evidence of good care during the relevant time period. For instance, the care provided to patient No. 12 was exemplary. Patient No. 12 was a diabetic with a long history of non-compliance with medication. On 3/10/16, he went to sick call for leg and foot pain, a known complication of diabetes. He was sent from sick call to the ATU clinic that same day and had x-rays taken of the leg and foot that day. He was given a consultation for podiatry that day, and he saw the podiatrist four days later. On 3/13/16, the record noted that the patient was now compliant. LSP ordered CBGs twice a day for a year thereafter. Plaintiffs' expert had to concede that all of this care was good.[24] As to Patient No. 11, the record shows that an LSP provider proactively spoke with the outside provider about this patient's care. Plaintiffs' expert admitted that this was good.[25] Plaintiffs' experts observed good care first-hand when LSP saved the life of a patient who attempted to commit suicide by hanging.[26]

Since almost all of Plaintiffs' evidence is outside the relevant time frame, Defendants will highlight care as to Patient No. 10. On 10/23/13, Patient No. 10 had a sudden onset of jaundice. In response, he had a CAT scan performed that very day. The CAT scan revealed stage 4 pancreatic cancer. As LSP providers discussed how to proceed, the patient wanted to speak with his "fly." LSP appropriately allowed the patient to discuss how to proceed with his fly. Then on 11/2/13, the patient declared an emergency for sick call. He was taken to the ATU and after realizing that he had missed his medication, he was given a dose from the ATU stock. Then the patient elected to treat his cancer with chemotherapy. Unfortunately, outside providers determined that he was not to be a candidate for chemotherapy. In response, pursuant to the patient's desire to undergo chemotherapy, LSP drew blood weekly to assess the patient's

---

[24] Day 3, pp. 28–31.
[25] Day 3, pp. 24–25.
[26] Day 7, p. 95.

condition.   Even Plaintiffs' expert had to concede that this was all good care.[27]   Indeed,
Defendants suggest that the care provided to Patient No. 10 was the very opposite of deliberate
indifference.

### F.   Plaintiffs' "Wish List" of Improvements Are Not Required by the Eighth Amendment

In actuality, this case is about the Plaintiffs (through their advocate experts) attempting to
impose requirements on LSP not required by the Eighth Amendment.   Plaintiffs complain about
the use of pill call officers; yet, they were aware of no instance where a single offender was
harmed by pill call.[28]   Plaintiffs complain about the use of orderlies to assist with the activities of
daily living; yet, there is no credible evidence that orderlies harm prisoners.   To the contrary, the
evidence is that the orderly program is a success.   Plaintiffs complain about the use of EMTs to
perform sick call; yet, this Court in 1999 endorsed or at least allowed the use of EMTs to
perform sick call.   Further, the textbook Dr. Puisis edits allows for treatment by health trained
personnel other than nurses.[29]   Plaintiffs complain about the budget; yet there is no evidence that
care or medication has been denied due to the budget.   Plaintiffs complain about the credentials
of the providers; yet, they provide no evidence of actual harm as a result of credentialing
practices at LSP.

An analogy is appropriate.   If health care were a car, the Plaintiffs covet a Ferrari, Lexus,
or Tesla.   Plaintiffs complain because, rather than a luxury automobile, the health care at LSP is
more akin to a Chevrolet.   Plaintiffs' arguments lament that their car (medical system at LSP)
does not have the latest amenities.   The Eighth Amendment does not require that LSP's health
care be a luxury automobile with all the bells and whistles.   As long as the car gets the

---

[27] Day 3, pp. 21–22.
[28] Day 7, pp. 17–18.
[29] Day 2, pp. 107–08.

passengers to their destination, the Plaintiffs' complaints are without merit.  It does not matter that the car may need the occasional tune up.  It does not matter that the car does not have the latest extras such as a backup camera, built in GPS, and heated seats.  Even if the car is equipped with manual windows the passenger has to crank by hand, that does not make the car unfit for its essential purpose.  While the vehicle of health care may not be as luxurious as Plaintiffs desire and may not have all of the options available on the latest model, it performs the constitutionally mandated function of a health care system—namely, that prisoners' serious health care needs are being met.

## II.      PLAINTIFFS HAVE NOT PROVEN AN ADA VIOLATION

Defendants maintain that the involvement of the U.S. Department of Justice necessitates pretermission of Plaintiffs' ADA claims because such claims are likely moot.  Nevertheless, Plaintiffs failed to establish a violation of the ADA.  To succeed on their claims of ADA discrimination, Plaintiffs must prove that offenders with qualifying disabilities are excluded from or denied the benefits of services, programs, and activities by reason of their disabilities.  *See Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).  Plaintiffs failed to meet their burden.

### A.   LSP is Not Subject to the 1991 ADAAG Standards and Achieves Program Access Through Alternative Methods of Compliance

Plaintiffs claim that architectural barriers deny disabled offenders access to programs, services, and activities, citing purported violations of the 1991 ADAAG standards.  The standards, however, apply only to facilities constructed or altered after January 26, 1992.  28 C.F.R. § 35.151.  "A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving" program access.  28 C.F.R. § 35.150(b)(1).  Plaintiffs' expert, Mark Mazz, only considered LSP's technical compliance with the standards,

thereby rendering his entire analysis legally insufficient.  See *Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 746, 752 (N.D. Tex. 2010), *aff'd,* 472 F. App'x 287 (5th Cir. 2012).

Plaintiffs contend that the standards apply because they allege some of the buildings surveyed were altered after January 26, 1992, but not any alteration will trigger the new standards.[30]  An alteration must be shown to affect the usability of the facility.  *See* 28 C.F.R. § 35.151(b).  Plaintiffs failed to meet their burden of proving an alteration, as there was no evidence presented as to how the alterations identified by Plaintiffs affect the usability of the facilities.  *Rosa v. 600 Broadway Partners, LLC*, 175 F. Supp. 3d 191, 206 (S.D.N.Y. 2016).

At trial, Defendants presented evidence of alternative methods of compliance used to achieve program access at LSP, including the use of healthcare orderlies.  Although a permissible accommodation under the ADA and an accepted correctional practice, Plaintiffs contend that the use of healthcare orderlies is not a sufficient alternative method of compliance. Plaintiffs set forth several alleged deficiencies with LSP's healthcare orderly program, including unfounded assertions of patient abuse.  Plaintiffs' purported evidence of abuse is hearsay, secondhand, and speculative.  Similarly, Plaintiffs attempt to ascribe improper motives to offenders who become healthcare orderlies, contrary to the testimony of the orderlies whom Plaintiffs put forth as witnesses.  The healthcare orderly program at LSP includes robust training and supervision and provides assistance with activities of daily living to disabled offenders. Plaintiffs failed to establish that the use of healthcare orderlies is an insufficient alternative method of compliance.

## B. Plaintiffs' Claims of Discriminatory Methods of Administration and Failure to Accommodate Must Fail Together

Plaintiffs contend that Defendants' methods of administration have the effect of

---

[30] Day 4, pp. 47–49.

subjecting qualified offenders to discrimination on the basis of disability.[31]  In order to prove that

Defendants' methods of administration have such an effect, the Plaintiffs had to present evidence

of discrimination on the basis of disability.  The Plaintiffs contend that Defendants' methods of

administration result in disability discrimination through the denial of reasonable

accommodations.[32]

"A claim for failure to accommodate under the ADA has the following elements: (1) the

plaintiff is a qualified individual with a disability; (2) the disability and its consequential

limitations were known by the covered institution; and (3) the covered institution failed to make

reasonable accommodations for such known limitations." *Jin Choi v. Univ. of Texas Health Sci.*

*Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015).  Though Plaintiffs attempted to

demonstrate LSP's purported failure to accommodate,[33] their examples did not establish that LSP

fails to accommodate offenders with qualified disabilities.

First, Plaintiffs cannot meet their burden of proof by merely asserting that certain

offenders are disabled.  Instead, Plaintiffs must prove the existence of a disability.[34]

Additionally, medical conditions do not implicate the ADA without evidence that the medical

---

[31] Rec. Doc. 558-2, p. 285.  *See* 28 C.F.R. § 35.130(b)(3).

[32] Rec. Doc. 558-2, p. 223 ("The result is a system in which patients with both physical and mental disabilities are regularly denied even the most basic accommodations in almost every area of daily life, including personal mobility, transportation, communication, security procedures, work assignments, and even discipline.") and p. 237 ("As explained above, however, inadequate staff training, coupled with the prison's practices regarding the identification, evaluation, and tracking of disability-related requests and grievances, have resulted in a system in which patients' legitimate accommodation requests are routinely and arbitrarily denied, often without the involvement of the ADA Coordinator.")

[33] Rec. Doc. 558-2, p. 237-245. The following offenders were offered by Plaintiffs as examples of LSP's purported failure to accommodate disabled offenders: Farrell Sampier, Francis Brauner, Karl Clomberg, John Tonubbee, Derrick Woodberry, Alton Batiste, Adrian Dunn, Jason Hacker, Michael Johnson, Hymel Varnado, Anthony Mandigo, Charles Butler, Otto Barrera, Benny Prine, Patient No. 41, and Patient No. 28. Patient No. 41 is not relevant to this analysis, as his example of LSP's purported failure to accommodate occurred in 2010, outside of the relevant time period of this matter. *See* J 10-g, p. 07712.

[34] *See* Ball v. LeBlanc, 792 F.3d 584, 597–98 (5th Cir. 2015) ("'[N]either the Supreme Court nor [the Fifth Circuit] has recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies.' Waldrip v. Gen. Elec. Co., 325 F.3d 652, 656 (5th Cir. 2003).").

condition substantially limits one or more major life activities for the individual. 42 U.S.C. §
12102; see also *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012). Plaintiffs
failed to prove the existence of a disability as to Karl Clomberg (hammer toe and foot blister);
Derrick Woodberry (hemorrhoids); Adrian Dunn (asthma and diabetes); Jason Hacker (vision
problems); Michael Johnson (head injury); and Hymel Varnado (ruptured spleen and internal
bleeding).

Second, Plaintiffs did not prove that LSP failed to make reasonable accommodations for
the *known limitations* of offenders with qualified disabilities. "Mere knowledge of the disability
is not enough; the service provider must also have understood the limitations the plaintiff
experienced *as a result* of that disability." *Windham v. Harris Cty., Texas*, 875 F.3d 229, 236–37
(5th Cir. 2017), citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996).
Accordingly, "the burden falls on the plaintiff to specifically identify the disability and resulting
limitations, and to request an accommodation in direct and specific terms." *Windham*, 875 F.3d
at 236–37. Plaintiffs failed to present any evidence of a disabled offender who requested and
was denied a reasonable accommodation for his known limitations. For example, Benny Prine
testified that he was twice transported in a regular van, which required him to sit with his knees
bent, even though he preferred to keep one of his legs extended.[35] Prine, however, never
requested an accommodation or voiced any discomfort.[36] "[T]he accommodation provisions of
the ADA and RA do not require public entities to 'guess' an individual's need for an
accommodation." *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055, *7 (S.D. Tex.
Aug. 9, 2006). Since there is no evidence that Prine's purported limitation was known to LSP,
he does not serve as an example of a failure to accommodate by LSP.

---

[35] J 4-q, pp. 84–86.
[36] *Id.*

18

Moreover, evidence that an offender requested an accommodation is insufficient alone to establish a failure to accommodate.  Instead, Plaintiffs must prove that a disabled offender was denied *reasonable accommodations* for his known limitations.  Not every denial of a requested accommodation is a violation of the ADA.

Plaintiffs cite several examples of offenders who allegedly requested and were denied reasonable accommodations.  Plaintiffs contend that Farrell Sampier and Francis Brauner were denied the auxiliary aids that they requested.  Plaintiffs, however, presented no evidence that the auxiliary aids requested were necessary (*see* 28 C.F.R. § 35.160(b)(1)) or that the accommodations provided by LSP were not reasonable.[37]  Plaintiffs also contend that Anthony Mandigo and Charles Butler were denied the accommodations that they requested in their work assignments.   However, both offenders were provided with restricted duty statuses to accommodate their known limitations.  Plaintiffs claim that Otto Barrera was denied dietary accommodations, but the evidence established to the contrary and further showed that Barrera refused to comply with his dietary restrictions.  Plaintiffs also claim that Patient No. 28 was denied oxygen when transported for an offsite appointment.  At the time of the trip at issue, he did not have orders for portable oxygen, but it was ordered by Dr. Lavespere one month later.[38]  Thus, the foregoing examples do not establish a denial of reasonable accommodations by LSP.

Plaintiffs did not meet their burden of proving their claims of failure to accommodate under the ADA.  In the absence of evidence of a failure to accommodate, Plaintiffs failed to establish that Defendants' methods of administration result in discrimination of offenders on the basis of disability.

---

[37] *See* Wells v. Thaler, 460 F. App'x 303, 313 (5th Cir. 2012) ("[N]othing in the ADA itself or its implementing regulations dictates that a disabled individual *must* be provided with the type of auxiliary aid or service he requests and that deference to the requests is by no means required.")
[38] *See* J 10-tt-2, p. 48785.

## III. CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Plaintiffs have failed to carry their burden as to violations of the Eighth Amendment, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. This Court should rule in favor of the Defendants.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

KANTROW, SPAHT, WEAVER & BLITZER (APLC)
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 383-4703
Facsimile: (225) 343-0630

By: /s/ Randal J. Robert
       Randal J. Robert (#21840)
       Connell L. Archey (#20086)
       Keith J. Fernandez (#33124)
       George P. Holmes (#36501)
*Special Assistant Attorneys General*
       Email: randy@kswb.com
            connell@kswb.com
            keith@kswb.com
            george@kswb.com

**SHOWS, CALI & WALSH, L.L.P.**
Jeffrey K. Cody, La. Bar Roll No. 28536
Caroline T. Bond, La. Bar Roll No. 34120
John C. Conine, Jr., La. Bar Roll No. 36834
*Special Assistant Attorneys General*
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
Email: jeffreyc@scwllp.com
       caroline@scwllp.com
       coninej@scwllp.com

Patricia Wilton (La. Bar Roll No. 18049)
Elizabeth Murrill (La. Bar Roll No. 20685)
Angelique Freel (La. Bar Roll No. 28561)
*Assistant Attorneys General*
Louisiana Department of Justice
1885 North 3rd Street
P.O. Box 94005
Baton Rouge, Louisiana 70804-9005
Telephone: (225) 326-6200
Facsimile: (225) 326-6297
Email: WiltonP@ag.louisiana.gov
       MurrillE@ag.louisiana.gov
       FreelA@ag.louisiana.gov

Counsel for Defendants

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of May, 2019, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Randal J. Robert
Randal J. Robert

#376853

21