# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., *et al.*, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

        v.

BURL CAIN, Warden of the Louisiana State
Penitentiary, in his official capacity, *et al.*,

        Defendants.

CIVIL ACTION NO. 3:15-cv-00318

JUDGE SDD

MAGISTRATE RLB

## PLAINTIFFS' REPLY TO DEFENDANTS' POST-TRIAL BRIEF

Defendants misunderstand their constitutional and statutory obligations to Plaintiffs and the Class, asserting a legal standard that would render the constitutional right to adequate medical care "wholly illusory"[1] and relying on outdated law reversed by statutory changes. They continually miss the forest for the trees, offering the same blunderbuss impeachment of Plaintiffs' experts as at trial,[2] contradicting the documentary record and their own employees' sworn testimony, and ignoring countless inconvenient facts. None of this overcomes Plaintiffs' clear showing that Defendants' "system of delivery taken as a whole … presents a serious risk of harm"[3] to Class Members and produces discriminatory results for subclass members with disabilities.

## I.    EIGHTH AMENDMENT CLAIM

### A.    Defendants Misstate and Misapply the Relevant Legal Standards

At the most fundamental level, Defendants misunderstand the law and the nature of this suit. Defendants rely almost exclusively on cases involving individual damages claims seeking compensation for specific past acts of deliberate indifference, most of them brought *pro se*. In their

---

[1] Damon Martin, *State Prisoners' Rights to Medical Treatment: Merely Elusive or Wholly Illusory*, 8 Nat'l Black L.J. 427 (1983) (cited in Defs.' Br., Rec. Doc. 556, at 23-24); *cf. id.* at 447 ("This line of reasoning would virtually eliminate complaints about the quality of prisoners' medical care … .").
[2] *See* Pls.' FF&CL, Rec. Doc. 558-2, at 19-32; Pls.' App'x A, Rec. Doc. 558-3.
[3] Oct. 17 Decision on Rule 52(c) Mot. at 122:18-19.

section purporting to present the applicable law, they cite just three cases related to systemic injunctive relief, none of which involves similar claims or otherwise aids their case—and one of which was vacated in pertinent part by the Fifth Circuit.[4] These cases shed no light on the relevant question for the Court, which is not whether "deficiencies in care [were] provided on any one occasion," but rather whether "systemwide deficiencies in the provision of medical [care] . . . , taken as a whole subject sick . . . prisoners in [Angola] to 'substantial risk of serious harm' and cause the delivery of care in [Angola] to fall below the evolving standards of decency that mark the progress of a maturing society."[5] This misstatement of the law renders much of Defendants' brief irrelevant; they are, often misleadingly, describing the law for a different type of claim.

Even then, Defendants do not seriously contest that Plaintiffs satisfied the objective test by showing that they have been "incarcerated under conditions posing a substantial risk of serious harm."[6] While they suggest some patients received reasonable care in some cases, the question is not whether any one act, omission, or policy exposed Plaintiffs to harm, but whether the conditions combine to create a significant risk of serious harm[7]—a question they never directly address.

Instead, Defendants focus almost exclusively on the subjective test. Defendants offer two basic defenses. First, they argue that they took steps to maintain a medical system, as if any action suffices. But where a defendant points to responsive actions, the question is whether that response is objectively reasonable in light of the risk of harm,[8] including but not limited to whether there are

---

[4] *See generally* Defs.' Br. at 15-24; *see particularly Ruiz v. Estelle*, 679 F.2d 1115, 1149, *vac'd in pertinent part*, 688 F.2d 266, 267 (5th Cir. 1982) (vacating portion of injunction requiring facility to meet specific hospital accreditation standards); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346-49 (3d. Cir. 1987) (holding that policy prohibiting "elective" abortions violated Eighth Amendment); *Anderson v. Cty. of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995) (reversing injunction requiring joint exercise for prisoners held in administrative segregation).
[5] *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *accord, e.g., Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1190 (M.D. Ala. 2017) ("In other words, plaintiffs are not seeking adjudication of demands for particular individualized treatment… ." (internal quotation marks omitted)).
[6] *Farmer*, 511 U.S. at 834.
[7] *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004).
[8] *See, e.g., Farmer*, 511 U.S. at 832 (prison officials "must take *reasonable* measures to guarantee the safety of the inmates" (emphasis added and internal quotation marks omitted); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was so

"systemic and gross deficiencies in staffing, facilities, equipment, or procedures."[9] Defendants never directly address this fundamental question or provide any reason to view their response—which allowed similar problems to recur as late as the discovery record goes[10]—as reasonable.

Defendants' second defense is even further misplaced: that there may have been *some* instances where care was, at worst, negligent or the product of a difference in medical opinion.[11] Defendants make no effort beyond unsupportable *ipse dixit* to explain why they were merely negligent and not beyond the pale of recklessness.[12] But even assuming *arguendo* Defendants were merely negligent on some occasions, Defendants cannot escape liability; "although one-off negligent treatment is not actionable, … frequent negligence, just like a single instance of truly egregious recklessness, may allow the court to infer subjective deliberate indifference."[13] Even then, Plaintiffs have shown far more than just repeated examples of negligence. The experts' sample (to say nothing of the named Plaintiffs' history and the documentary evidence beyond the medical records) reveals myriad examples of unconscionable treatment well outside the bounds of tolerable medical care, most of which Defendants never address. Defendants denied Patient #22 any examination or diagnosis for severe and worsening abdominal pain for four straight months, because they preferred (without any recorded explanation) not to believe his complaints—leaving undetected an abdominal

---

blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." (internal quotation marks omitted)); *Braggs*, 257 F. Supp. 3d at 1251 ("Eighth Amendment liability may be found if a defendant with subjective awareness of a serious need provides 'an objectively insufficient response to that need.'" (quoting *Taylor v. Adams*, 221 F. 3d 1254, 1258 (11th Cir. 2000)).

[9] *Braggs*, 257 F. Supp. 3d at 1251 (internal quotation marks omitted).

[10] *See* Pls.' FF&CL at 18-19, 61 & n.470.

[11] *See, e.g.*, Defs.' Br. at 35, 37, 39, 61, 63, 66, 70, 85, 87.

[12] *See Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011) (finding that an assertion without any supporting evidence is insufficient to overcome credible expert testimony); *Berkshire v. Dahl*, No. 12-12038, 2017 WL 3276466, at *9-10 (E.D. Mich. Aug. 2, 2017) (court properly relied on plaintiffs' expert's medical opinion regarding inadequate care where defendant failed to offer any expert opinion specifically rebutting that opinion).

[13] *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1129 (M.D. Ala. 2016); *see generally* Pls.' FF&CL at 243-46. As Defendants' sole citation discussing analogous claims (inexplicably, a 36-year-old law review article) explains, "[i]n group medical 'conditions' cases … [t]he reviewing court focuses not on the defendant official's state of mind, but rather on the level of prison conditions the responsible official maintains." Martin, *State Prisoners' Rights*, at 451 (footnotes omitted). Courts can look at the "medical conditions" overall and "will impute the requisite […] state of mind." *Id.* Here, of course, Plaintiffs have demonstrated subjective deliberate indifference through multiple methods. *See* Pls.' FF&CL at 259-62.

mass that would soon become fatal.[14] Drs. Lavespere and MacMurdo prohibited EMTs from

transferring Patient #39 when they found him on the floor of his cell unresponsive and vomiting,

even though he had just been discharged from the infirmary two days earlier.[15] Plaintiff #3's

ecchymotic, eschar-ridden leg was ignored for weeks as he literally rotted away, leaving him with

nothing but dead tissue from the waist down by the time he died.[16] Plaintiff #42 was treated by

EMTs without seeing a physician for 10 hours after a stroke and pumped full of saline that may have

exacerbated his stroke.[17] The first three died in excruciating fashion; the fourth was left with severe

and life-altering neurologic deficits.

Defendants do not attempt to deny that treatment like this exposes patients to a substantial

risk of serious harm, nor that they were aware of the ways their system fostered it. In case after case,

patients tried to get medical care and were denied reasonable and timely examination, diagnosis, and

treatment by a medical professional. While this did not *invariably* happen, the question is not whether

patients on some occasions were lucky enough to receive adequate treatment; it is whether

Defendants have failed to respond reasonably to the substantial risk of systemically inadequate

care.[18] On this crucial question, Defendants are silent.

Because they cannot survive the actual question before the Court, Defendants argue that a

prison is immune from suit as long as it can show "an extended history of examinations, diagnoses,

and medications."[19] The Fifth Circuit has repeatedly held deliberate indifference claims cognizable

---

[14] *See* Pls.' FF&CL at 24; PX 6 at 0233-40; *cf.* Defs.' Br. at 54-55 (not denying that the patient's abdominal pain went without diagnosis or treatment).

[15] *See* Pls.' FF&CL at 26; PX 6 at 0063-64; *cf.* Defs.' Br. at 67-68 (neither denying nor justifying the no-transport orders).

[16] *See* Pls.' FF&CL at 131; PX 6 at 0044, 101-06; Oct. 9 Testimony of Mike Puisis at 184:5-194:2; *cf.* Defs.' Br. at 32 (not denying failure to respond to ecchymosis or eschar).

[17] *See* Pls.' FF&CL at 106-07, 109; PX 6 at 0272-73. Defendants claim "Dr. Lavespere believed that he was presented with an offender who had overdosed on 'Mojo'" and "[o]nce it became apparent that the patient was not suffering from Mojo, he was transported[.]" Defs.' Br. at 70. Leaving aside the problems with the handling of suspected drug use, *see* Pls.' FF&CL at 108-10, EMTs ruled out drugs within 12 minutes. *See* JX 10-p at 15238 (showing that the patient arrived at 23:38; "Toxcup + synthetic Both tests negitive [sic] @ 2350"). Dr. Lavespere did not give the order to transport him to the hospital for another eight hours. *Id.* at 15237 ("0729 to OLOL per Dr. Lavespere").

[18] *See, e.g., Plata*, 563 U.S. at 505 n.3.

[19] Defs.' Br. at 18.

even where plaintiffs were provided some treatment.[20] Moreover, patients frequently *do not* receive relevant examinations, diagnoses, and medications for their critical symptoms; much of the care that Defendants show has no connection to the deficits identified by Plaintiffs' experts, and Defendants are silent as to the most horrific episodes and glaring deficiencies. Similarly, Defendants suggest that sending patients to specialists absolves them.[21] But "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment"[22]—and ignoring specialists' instructions, as Defendants repeatedly did, demonstrates deliberate indifference.[23]

Defendants' contention that Plaintiffs' experts applied a "community standard" of care is likewise a red herring.[24] These cases stand for the uncontroversial proposition that the Eighth Amendment is not violated by medical negligence or the failure to provide "optimal care."[25] Plaintiffs' experts followed the well-established practice of evaluating the extent of providers' deviation from widely accepted clinical standards.[26] Defendants do not dispute that their practices substantially deviate from clinical standards, contributing to a substantial risk of serious harm.

**B. <u>Defendants' Attacks on Plaintiffs' Experts Are Meritless</u>**

Defendants double down on their scattershot attacks on Plaintiffs' medical experts.[27] Plaintiffs anticipated this fulmination and responded to it at length in the Proposed Findings of Fact,

---

[20] *See, e.g.*, *Carlucci v. Chapa*, 884 F.3d 534, 538-40 (5th Cir. 2018); *see also Lawson v. Dall. Cty.*, 286 F.3d 257, 262-63 (5th Cir. 2002). Defendants' principal case, *Mendoza v. Lynaugh*, 989 F.2d 191 (5th Cir. 1993) (cited at Defs.' Br. at 18, 33), does not establish their proposition. It involves a *pro se* claimant alleging negligence, *id.* at 193-95, and does not state the record showed an extended history of examination, diagnoses, and medications, much less that that rules out any claim.
[21] *See, e.g.*, Defs.' Br. at 60 ("LSP cannot be criticized or found deliberately indifferent for following the recommendations of an outside provider.").
[22] *West v. Atkins*, 487 U.S. 42, 56 (1988).
[23] *See, e.g.*, *Lawson*, 286 F.3d at 262-63; *see also, e.g.*, *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016).
[24] *See* Defs.' Br. at 16-17, 28-29.
[25] *See generally* cases cited *id.*
[26] *See, e.g.*, *Petties*, 836 F.3d at 729 (unnecessary risk can be shown by "a substantial departure from accepted professional judgment, practice, or standards" (citation omitted)); *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) ("While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm."); *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) (medical care may "be so substantial a deviation from accepted standards as to evidence deliberate indifference"); *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991), *reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994) ("[T]he contemporary standards and opinions of the medical profession … are highly relevant in determining what constitutes deliberate indifference to medical care."); *see generally* Pls.' FF&CL at 32-34; PX 6 at 0010.
[27] Defs.' Br. at 25, 28; *see also id.* at 24, 79, 83, 92, 111.

and little needs to be added here.[28] Defendants' "fair review"[29] of the medical records for the

patients in Plaintiffs' opening report and the Named Plaintiffs is nothing of the sort, continuing the

irrelevant and often flatly inaccurate nitpicking of their cross-examinations.[30] As at trial, they

misrepresent the content of medical records,[31] claim that Plaintiffs' experts omitted facts that they

specifically noted in their report or at trial,[32] criticize Plaintiffs' experts for errors that were produced

by Defendants' refusal to let them review documents during cross-examination,[33] and ignore the

episodes of care that Plaintiffs' experts found concerning.[34] Moreover, as already explained, even if

they had shown a handful of errors, that would not affect the reliability of the experts' opinions.[35]

    What comes through most clearly from Defendants' written critique is the complete lack of

*medical* support for Defendants' claims: they neither proffered nor cited expert evaluation of *any* of

the patients in Plaintiffs' experts' sample. Even Dr. Lavespere only discussed nine of them at trial,

and he did not opine on whether the care was within the bounds of acceptable medical practice or, if

not, why it was not reckless. All that Defendants offer is a lawyer's partisan interpretation of the

---

[28] *See* Pls.' FF&CL at 7-38; Pls.' App'x A. Because Defendants' claims about individual patients largely duplicate their cross-examination and have been addressed previously, Plaintiffs are not responding to the individual criticisms here. If the Court would like specific responses for any or all patients, Plaintiffs would be happy to supplement this response.
[29] Defs.' Br. at 31; *see id.* at 32-91.
[30] *See* Pls.' FF&CL at 19-32; Pls.' App'x A.
[31] *Compare, e.g.*, Defs.' Br. at 62 (claiming that Patient #29 was "seen at an outside hospital" on May 15, 2014) *with* JX 10-j at 09611-14 (showing telemedicine consult rather than hospital visit); *compare, e.g.*, Defs.' Br. at 56 (claiming that Kentrell Parker "never developed decubitus ulcers at LSP" *with* JX 10-oo-1 at 41766, 42371, 42513-14, 42563-64, 42568, 42661, 42666, 42672, 42678, 42681, 42694, 42721 (showing decubitus ulcers in 2011, 2012, and 2015, including a stage IV ulcer); *compare, e.g.*, Defs.' Br. at 60 (claiming without citation that "[t]he record shows that an LSU HIV specialist prescribed the medications for [Patient #26]") *with* DX 741 (nowhere stating who prescribed the non-standard regime).
[32] *Compare, e.g.*, Defs.' Br. at 65 (claiming Plaintiffs' experts omitted hospital visits for Patient #33 on 2/7/16 and 4/14/16) *with* PX 6 at 266 (specifically citing both hospital visits); *compare, e.g.*, Defs.' Br. at 41 (claiming Dr. Puisis testified Patient #13 was not on a statin at all) *with* Oct. 9 Testimony of Mike Puisis at 140:19-25, 141:19-22 (testifying that prescribed statin was not regularly provided) *and* PX 6 at 0171 (opining that the statin prescribed was insufficient).
[33] *Compare, e.g.*, Defs.' Br. at 45 (claiming Ms. LaMarre misrepresented Patient #15's care on 6/8/13) *with* Pls.' FF&CL at 22; *compare, e.g.*, Defs.' Br. at 64 (claiming Dr. Vassallo "could not speak to [JX 10-dd at 27236] because she did not review it") *with* Oct. 16 Testimony of Susi Vassallo at 51:21-22 (explaining that referral form, presented without record of the consultation, "has no meaning to me currently in the state it's been presented to me").
[34] *See, e.g.*, Defs.' Br. at 31 (saying nothing about the treatment of Patient #1's diabetic ketoacidosis); *id.* at 38 (saying nothing about providing hepatotoxins to Patient #9 despite his compromised liver, nor the mistreatment of an infection); *id.* at 65 (saying nothing about Patient #33's care after returning from the hospital). Patient #15 is particularly egregious; Defendants simply say "[c]are continued []after" June 2013 (citing records *in* June 2013), *id.* at 46 (citing JX 10-v at 18958), when virtually all of Ms. LaMarre's analysis *began* in July 2013, *see* PX 6 at 0046, 0069-71, 0185-90.
[35] *See* Pls.' FF&CL at 31-32 & n. 206.

medical records. Their assertions that the isolated records they excerpt undermine Plaintiffs' experts' conclusions—much less render the care reasonable—lack any support whatsoever from experts, medical treatises, or any other source of authority. Even Dr. Thomas, who was willing to contradict his own prior writings, testimony, and expert reports, could not opine that *any* of the details Defendants highlight from the sampled patients make a lick of difference to the adequacy of the care Defendants' provide.[36] The reasonableness of the care revealed in medical records is a quintessentially expert question—and on that score, *all* of the expert analysis is on Plaintiffs' side.[37]

One of the best illustrations of the shortcomings in Defendants' approach is their defense of not providing hydroxurea to Plaintiff Ian Cazenave. Defendants claim that a specialist's note "verifies that Cazenave did not 'require' hydroxurea previously."[38] This misunderstands the note, which shows not that hydroxurea was unindicated but that Defendants failed to provide medical records to specialists to allow them to provide informed care. The specialist explained that Mr. Cazenave would "qualif[y] for therapy with [hydroxurea]" if he had had ">3 moderate to severe pain episodes."[39] Mr. Cazenave exceeded this threshold every year as far back as the medical records go, with as many as ten emergent sickle cell crises a year.[40] Because Defendants did not send Mr.

---

[36] *See generally* Pls.' FF&CL at 7-38, 62-68; *cf.* Oct. 23 Testimony of David Thomas at 63:22-64:21 (acknowledging that at his deposition, he testified that his report included all disagreements he had with Plaintiffs' experts' chart reviews on which he was basing his opinion).

[37] So too with refusals: even setting aside Defendants' problematic approach to refusals of care, *see* Pls.' FF&CL at 172-79, they failed to identify even a single refusal for 40 out of the 57 patients that the experts reviewed. Defs.' Br. at 31-91. Defendants' discussion of Shannon Hurd's bloodwork "refusals" and Patient #25's HIV "refusals" are particularly misleading. For Mr. Hurd, Defendants' again assert that Mr. Hurd refused diagnostic tests for seven months when, in actuality, he "refused" bloodwork only twice in the first month of the period—once because he was too weak to travel and once because Defendants had not informed him he needed to fast—and immediately asked them to reschedule. *Compare* Defs.' Br. at 27, 81-82 *with* Pls.' FF&CL at 30-31, 175-76. For Patient #25, few of the "refusals" show any documented relationship to his HIV care, and virtually all predate February 2011. *Compare* Defs.' Br. at 57 *with* JX 10-z-1 (as cited in Defs.' Br. at 57 n.396). Regarding his "refusals" related to prostate cancer, *see* App'x A at 10.

[38] Defs.' Br. at 77 (citing JX 10-k-1 at 10347).

[39] *Id.* This explanation tracks the American Society of Hematology's recommendations for when hydroxurea is indicated. *See* Am. Soc'y of Hepatology, *Hydroxurea and Transfusion Therapy for the Treatment of Sickle Cell Disease* at 2, https://www.hematology.org/Clinicians/Guidelines-Quality/Quick-Ref/3468.aspx (recommending hydroxurea for patients with "three or more sickle cell-associated moderate to severe pain crises in a 12-month period"). The Court may take judicial notice of clinical guidelines. *See* Rec. Doc. 476.

[40] *See* JX 10-k-1 at 10376, 10384, 10497, 10409 (four crises in 2015); *id.* at 10440, 10443, 10446-47, 10458, 10522 (at least five crises in 2014); *id.* at 10468, 10470, 10472, 10479, 10492, 10495, 10498, 10503, 10506, 10511 (ten crises in 2013).

Cazenave to a hematologist for 16 years, the recurring crises went without proper treatment; because they did not transmit his records when they finally sent him to a hematologist, the hematologist could not provide informed care.[41] All that Defendants' post-trial brief shows is that having lawyers sling mud at the other side's expert opinions cannot substitute for expert analysis of the records.

Defendants also criticize Plaintiffs' experts for evaluating care prior to 2015. Defendants repeatedly assert a "relevant time period" of 2015-2016 as if care prior to 2015 is irrelevant.[42] This misunderstands the Court's instruction during trial to focus testimony on 2015-2016 where possible. That instruction was issued to streamline the proceedings for trial efficiency; it was not a ruling that earlier evidence was irrelevant. Defendants' effort to bar earlier evidence is incompatible with the Supreme Court's rule that the "long duration of a cruel prison condition may make it easier to *establish* knowledge and hence some form of intent."[43] The experts properly looked back in time to ensure that the problems were of a "longstanding, pervasive" nature.[44]

Finally, Defendants almost wholly ignore the other foundations of Plaintiffs' experts' opinion: their site visit, review of procedures and policies, and well-documented interviews.[45] Defendants do not even begin to refute these core elements of the experts' opinions.

### C.  Defendants Misrepresent the Evidence

Defendants' discussion of the evidence at trial is no more reliable than their attacks on Plaintiffs' experts. Defendants' recitation of the facts is inaccurate or misleading in numerous regards. They repeatedly contradict the testimony, documentary record, and even their own experts; credit testimony that contradicts documentary evidence; assert as fact things that are not in evidence; and make assertions that are meaningless without other facts that Defendants never showed. While

---

[41] *See* PX 28 at 0008-09.
[42] *See, e.g.*, Defs.' Br. at 25, 30, 33, 39, 48, 54, 64, 70, 144, 149, 155-57, 159.
[43] *Wilson v. Seiter*, 501 U.S. 294, 300 (1991); *accord Alberti v. Sheriff of Harris County, Tex.*, 937 F.2d 984, 998 (5th Cir. 1991).
[44] *Farmer*, 511 U.S. at 842; *see also* Pls.' FF&CL at 17-18.
[45] *See* PX 6 at 0010.

an exhaustive list of Defendants' errors is beyond the scope of this brief response,[46] several examples illustrate the problems in their summation of the evidence:

- Defendants credulously repeat testimony that contradicts the documentary record, like Dr. Lavespere's claim that doctors normally review sick call forms within 24 hours and Warden Falgout's claim that department heads participate in QA/QI meetings.[47] Documentary evidence proves both assertions false.[48]

- Defendants ignore their own employees' testimony where it is inconvenient. For example, they continue to insist that Ms. LaMarre "inexcusabl[y]" misinterpreted MARs recording medication administration four days after a patient's death,[49] even though Ms. Willis explicitly disavowed defense counsel's interpretation and testified that MARs work the exact way Ms. LaMarre said.[50]

- Defendants misleadingly suggest they satisfy NCCHC standards while eliding explicit restrictions that prohibit Defendants' practices. They assert that the NCCHC "approve[s] of the use of inmate orderlies to provide assistance with activities of daily living,"[51] when the actual standard is that "inmates may assist patients in activities of daily living (*except for infirmary patients*)."[52] They assert that "the NCCHC allow[s] for correctional officers to administer pill call,"[53] when the actual standard "recommend[s] that in facilities where health staff are on site 7 days a week for at least two shifts [as at Angola], qualified health care professionals administer the medications."[54]

- Defendants make assertions that imply facts absent from, or even contradicted by, the record.

---

[46] If the Court requires additional response to any particular point in Defendants' post-trial brief, Plaintiffs would be happy to supplement this filing on request.

[47] Defs.' Br. at 11, 119.

[48] *See* Pls.' FF&CL at 96 n.672 (collecting examples of delayed sick call review); *id.* at 170 (discussing participation at QA/QI meetings); JX 3-a (QA/QI minutes).

[49] Defs.' Br. at 111-12

[50] *See* Oct. 24 Testimony of Tammi Willis at 100:17-101:1; Pls.' FF&CL at 22-23.

[51] Defs.' Br. at 108.

[52] PX 243 at 0065 (emphasis added).

[53] Defs.' Br. at 112. Moreover, Defendants concede that orderlies deliver medications in the medical dorms. Defs.' Br. at 145, 162.

[54] PX 243 at 0063.

They cite the *possibility* of physicians coming to the ATU at night, and the *possibility* of EMTs bypassing the ATU and going straight to a hospital, without citing any evidence that either ever occurred or acknowledging the scores of incidents where they did not.[55] Similarly, they claim life-sentence practices explain Louisiana's astronomical and increasing death rate even though their internal analysis shows that nearly half of all deaths befall inmates who served five years or less.[56]

- Defendants disingenuously rewrite Dr. Lavespere's false testimony about the physicians he managed. Dr. Lavespere claimed that Drs. McCain and Colon worked at Angola as of September 2016.[57] Defendants' post-trial brief says instead that Drs. McCain and "Colomb" worked there as of that time.[58] Neither is correct. Dr. McCain left in July 2016, and Dr. Colon left in July 2015 after just five months.[59] There is no documentary evidence of a "Dr. Colomb" ever working at LSP. In actuality, LSP had just five providers including Dr. Lavespere as of September 2016, and only three had training in relevant fields.[60]

Two other inappropriate approaches to the evidence deserve special mention. First, Defendants repeatedly assert that evidence past the close of discovery September 2016 would have told a different story.[61] As the Court previously observed, the liability and remedy phases were bifurcated and such evidence was excluded from the liability phase out of "[e]fficient case management and fundamental fairness."[62] Any other rule would have prejudiced Plaintiffs, who could not obtain discovery into this period and thus would be unable to test Defendants' assertions,

---

[55] *Compare* Defs.' Br. at 104 *with* Pls.' FF&CL at 105.

[56] *Compare* Defs.' Br. at 1 *with* PX 175 at 0002. Nor do they explain how a legislative change in *1968* explains a sharp rise in mortality beginning in 2007. *See* Pls.' FF&CL at 77-78.

[57] Oct. 22 Testimony of Randy Lavespere at 26:14-21.

[58] Defs.' Br. at 97.

[59] *See* Ex. A at 2, 6. These government records were produced by Defendants in discovery and cannot reasonably be disputed by Defendants. Accordingly, the Court may take judicial notice of them. *See* Fed. R. Evid. 201(b). Defendants' decision in their post-trial brief to misstate Dr. Lavespere's testimony necessitated their post-trial submission.

[60] *See* Ex. A at 6, 10; PX 6 at 0017. Defendants' criticism of Plaintiffs' experts for supposedly not recognizing that Defendants had "a total of six providers," Defs.' Br. at 96, is absurdly misplaced; the experts explicitly said that at the time of their site visit in March 2016, Defendants had "4 physicians and 1 nurse practitioner in addition to Dr. Lavespere," which adds up to a total of six providers. PX 6 at 0017.

[61] *See, e.g.*, Defs.' Br. at 102, 125.

[62] Rec. Doc. 419 at 2.

or indefinitely delay the trial for discovery that would never be current enough for Defendants' liking. Defendants' attempt to circumvent the Court's ruling with uncited assertions is especially inappropriate because much of it is false, as proven by the parties' post-discovery proffers. For example, in their brief, Defendants claim that they "implemented plans to increase training from five to twenty hours by October 2016,"[63] but they previously swore that it was just six hours in 2018.[64] Moreover, even if Defendants have changed some practices, they cannot escape the "general rule [that] voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot"[65] without satisfying the "heavy burden" of making it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur"[66] and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."[67] They have not come close to meeting this heavy burden.

Second, Defendants raise evidentiary objections that they did not raise at trial. Specifically, they argue that the testimony of Drs. Dhand and Jones was "hearsay and … more appropriately in the domain of experts."[68] Objections not made at trial are waived.[69] More to the point, Defendants' arguments are wholly meritless. Their hearsay objection is frivolous; the hearsay rules explicitly exempt statements made for "medical diagnosis or treatment" that "describe[] medical history; past or present symptoms or sensations; their inception; or their general cause."[70] Their expert objection is equally misplaced, because treating physicians may testify to their own observations of their own

---

[63] Defs.' Br. at 110.
[64] *See* PX Proffer 12 at 4. While this document postdates discovery and is not currently in evidence, Defendants' willfully misleading post-trial briefing opened the door to its consideration. *See also* Oct. 24 Testimony of Tammi Willis at 63:24-25, 64:12-17, 93:19-22 (during Ms. Willis' time at LSP, which ended in January 2017, training was five hours or less).
[65] *Cty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation marks omitted).
[66] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000).
[67] *Cty. of L.A.*, 440 U.S. at 631.
[68] Defs.' Br. at 92.
[69] Fed. R. Evid. 103(a)(1).
[70] *Id.* at 803(4).

patients.[71] Indeed, the sole time Defendants made this objection at trial, Plaintiffs' counsel promptly withdrew their question—and Defendants never again lodged a similar objection.[72]

## II.     ADA/RA CLAIM

### A.     Defendants Fail to Rebut Evidence of Architectural Barriers to Programmatic Access

Defendants wrongly suggest that Plaintiffs' claim of architectural barriers to programmatic access is premised on the assumption that Angola's facilities must strictly comply with the 1991 Standards.[73] This was anticipated and addressed in Plaintiffs' Proposed Findings and needs little further discussion.[74] As Mr. Mazz explained at trial, he focused his survey on spaces used by patients with disabilities to access prison services and on barriers that could not be addressed through alternative methods.[75] The witness testimony and ARPs confirmed that these are not just technical violations but a denial of meaningful access to specific prison services.[76]

Defendants cite *Greer v. Richardson Independent School District,* an unpublished opinion, for the anodyne proposition that program access, rather than technical compliance with the 1991 Standards, is the question for the Court.[77] Far from aiding Defendants, however, *Greer* recognized that "an existing facility's compliance with the ADAAG regulations may be informative" of programmatic access and cited cases where courts have "rel[ied] on the ADAAG for guidance."[78] *Greer* is a useful contrast to this case: there, the plaintiff claimed barriers to accessing the "program" of viewing a football game, but the defendant proved that an accessible viewing area with unobstructed views of the game was available to the plaintiff.[79] Here, the programs at issue are essential services such as toilets, showers, and sinks—which Plaintiffs can only access where Defendants make them available.

---

[71] *See Morgan v. Chet Morrison Contractors, Inc.*, No. 04-2766, 2008 U.S. Dist. LEXIS 124237, at *5 (E.D. La. July 8, 2008).
[72] *See* Oct. 11 Testimony of Monica Dhand at 167:9-11.
[73] Defs.' Br. at 128-31.
[74] *See* Pls.' FF&CL at 199-201, 206-207, 268-70.
[75] *See id.* at 199-200, 206, 214-15.
[76] *See id.* at 205, 212.
[77] Defs. Br. at 131.
[78] *Greer*, 472 F. App'x 287, 291 & n.3 (5th Cir. 2012). *See also* FFCL at 270 n.2059 (collecting cases).
[79] *See* 472 F. App'x at 288-89, 295-96.

Unlike in *Greer*, where the plaintiff failed to take advantage of the school district's "delivery of services at alternate accessible sites,"[80] it is undisputed that the areas surveyed by Mr. Mazz *are* the purported "alternate accessible sites" for patients with disabilities.

Defendants assert that Angola has made its programs accessible through "alternative methods of compliance"[81] but Plaintiffs offered credible, unrefuted evidence that patients struggle to access the prison's services and that the only "alternative method" identified by Defendants—the reliance on inmate orderlies—is not a substitute for the removal of architectural barriers.[82] That evidence, with Mr. Mazz's unrebutted findings, establishes a denial of programmatic access.

Defendants also argue that Angola's response to the DOJ's settlement proposal "necessitates pretermission of Plaintiffs' ADA claims,"[83] purportedly because "the evidence presented at trial established that LSP had been working since DOJ's site visit to complete the items identified by DOJ in its review."[84] That evidence consists of a self-serving list of eight "ADA Items" purportedly completed at Main Prison between 2010 and 2016, prior to Mr. Mazz's site visit.[85] Of the four items falling within the scope of his survey, Mr. Mazz concluded, and Defendants' expert agreed, that three of the items were not compliant with the Standards even *after* the alteration.[86] More importantly, as explained in Plaintiffs' Proposed Findings, even complete remediation of the DOJ's list of architectural barriers would not moot Plaintiffs' claim given the limited overlap between the violations identified by the two parties.[87] Nor do Defendants suggest that Angola has taken steps to

---

[80] 28 C.F.R. § 35.150(b)(1).

[81] Defs.' Br. at 132-33.

[82] *See* Pls.' FF&CL at 205, 209-12, 271-72.

[83] Defs.' Br. at 126 (capitalization altered).

[84] *Id.* at 127.

[85] JX 12-e at 00297. The exhibit also includes several supposed alterations at outcamps that were not part of Mr. Mazz's survey and are not at issue in this case. *See id.* at 00298-99.

[86] *See* Pls.' FF&CL at 207, 274-75. This evidence does not come close to establishing voluntary cessation, for the same reasons noted above. *See supra* nn. 64-65.

[87] *See* Pls.' FF&CL at 212-13, 272. Contrary to Defendants' assertion, the Court should not "defer" to the DOJ's findings, *see* Defs.' Br. at 126-27, as they are statements made during compromise negotiations, *see* Fed. R. Evid. 408(a)(1), are not in evidence, and do not present a risk of inconsistent obligations. *See* Pls.' FF&CL at 213-14.

address the non-architectural barriers identified by Plaintiffs, such as the prison's exclusionary hobby shop policy or mishandling of accommodation requests. Defendants' suggestion that voluntary cessation moots Plaintiffs' ADA/RA claim is thus frivolous.

**B. <u>Defendants Rely on Outdated, Statutorily Abrogated Law.</u>**

In suggesting that certain patients may not suffer from qualifying disabilities, Defendants rely on cases that predate the ADA Amendments Act of 2008 ("ADAAA") and contend that "the definition of 'disability' was not substantially modified" by the ADAAA.[88] This is flatly wrong: the ADAAA enacted sweeping changes to the definition and reversed the exact cases Defendants cite precisely because they improperly narrowed its scope.[89] As this Court has observed, the ADAAA added "major bodily functions" to the list of major life activities and defined "disability" to include "an impairment that is episodic or in remission if it would substantially limit a major life activity when active," such as diabetes, hypertension, and asthma.[90] Moreover, "mitigat[ing] measures (such as medications, medical devices and assistive technology) are ignored when assessing whether an impairment substantially limits a person's major life activities."[91] As a result, "certain types of impairments will be found, in virtually all cases, to constitute a 'disability' under the [ADAAA]."[92]

Defendants' contentions regarding the subclass members' disabilities are simply bad law after the ADAAA. For example, Defendants cite *Griffin v. United Parcel Services, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011), and *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34 (1st Cir. 2010), for the proposition that "[d]iabetes is not inherently a disability under the ADA" and requires an extensive analysis into

---

[88] Defs.' Br. at 140.
[89] Specifically, the ADAAA "singl[ed] out and supersed[ed]" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and *Toyota Motor Manufacturing Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013). *See also, e.g.*, *Cannon v. Jacobs Field Servs. N. Am.*, 813 F.3d 586, 590 (5th Cir. 2016) (explaining that the ADAAA made it easier for people with disabilities to obtain protection under the ADA by broadening the definition of "disability"); 28 C.F.R. § 35.101(b) (stating that the term 'disability' "shall be construed broadly in favor of expansive coverage," and "should not demand extensive analysis").
[90] *Blackard v. Livingston Par. Sewer Dist.*, No. 12-704-SDD-RLB, 2014 U.S. Dist. LEXIS 5490, at *4-7 (M.D. La. Jan. 14, 2014) (quoting *Garner v. Chevron Phillips Chemical Co., LP*, 834 F. Supp. 2d 528, 538-39 (S.D. Tex. 2011)).
[91] *Id.* at *6-7 (quoting *Garner*, 834 F. Supp. 2d at 539).
[92] *Id.* at *9-10 (citing 29 C.F.R. § 1630.2(j)(3)(ii)); *accord* 28 C.F.R. § 35.108(d)(2)(ii).

the patient's ability to eat.[93] Both opinions concerned pre-ADAAA conduct and expressly applied

the pre-ADAAA definition of disability.[94] Under the ADAAA, diabetes is one of many impairments

that "will, as a factual matter, virtually always be found to impose a substantial limitation on a major

life activity,"[95] and numerous courts have held "that a plaintiff can show she is disabled merely by

alleging that she suffers from diabetes and takes medication for it."[96] That is precisely what the

witnesses did here.[97] Similarly, because the Court may consider "pain experienced when performing

a major life activity,"[98] it is clear that Derrick Woodberry's condition substantially limited his ability

to sit,[99] while Karl Clomburg's impairments substantially limited his ability to walk.[100]

Defendants also contend—at times, falsely[101]—that various Subclass members failed to

"request an accommodation in direct and specific terms."[102] But "'where the defendant otherwise

had knowledge of the individual's disability and needs but took no action,' not even the failure to

---

[93] *See* Defs.' Br. at 140, 149, 152 (discussing Adrian Dunn).

[94] *See Griffin*, 661 F.3d at 222; *Carreras*, 596 F.3d at 33 n.7; *see also Cloutier v. GoJet Airlines, LLC*, 311 F. Supp. 3d 928, 938 (N.D. Ill. 2018) (rejecting post-ADAAA argument based on *Griffin* and *Carreras* because those cases "apply the more restrictive pre-ADAAA disability determination standards").

[95] 28 C.F.R. § 35.108(d)(2)(ii)-(iii).

[96] *Hensel v. City of Utica*, No. 6:15-CV-0374 (LEK/TWD), 2017 U.S. Dist. LEXIS 91267, at *9 (N.D.N.Y. June 14, 2017) (collecting cases). Even before the ADAAA, the Fifth Circuit observed that it was "clear beyond peradventure" that absent mitigating measures, an insulin-dependent diabetic would be substantially limited in one or more major life activities. *Gonzales v. City of New Braunfels*, 176 F.3d 834, 837 (5th Cir. 1999).

[97] *See, e.g.*, JX 4-h, A. Dunn Depo. at 16:18-17:20, 18:21-19:10, 22:13-20 (discussing medication and dietary restrictions). Defendants also dismiss Mr. Dunn's testimony regarding the effects of his asthma, *see id.* at 8:10-10:8, 12:3-15:20, 27:21-24, as "self-serving,"*see* Defs.' Br. at 149, but courts routinely find similar testimony sufficient. *See, e.g., Kennedy v. Parkview Baptist Sch., Inc.*, No. 13-478-SCR, 2014 U.S. Dist. LEXIS 176994, at *43-44 (M.D. La. Dec. 24, 2014) (crediting "plaintiff's testimony and statements about her asthma and treatment for asthma and the effects of the condition and treatment on her ability to breathe"); *Gonzalez v. Tex. HHS Comm'n*, No. 5: 13-CV-183-DAE, 2014 U.S. Dist. LEXIS 161706, at *19 (W.D. Tex. Nov. 19, 2014) (collecting cases).

[98] *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 995 (W.D. Tex. 2012) (quoting 29 C.F.R. § 1630.2(j)); *accord* 28 C.F.R. § 35.108(b)(3)(ii).

[99] *See, e.g.*, JX 4-t, D. Woodberry Depo. at 9:14-18, 18:12-22:10, 30:17-31:5, 41:6-42:15. *Cf. Molina*, 840 F. Supp. 2d at 994-96 (under state ADAAA counterpart, evidence of episodic and variable back pain sufficient to show that condition substantially limited plaintiff's ability to sit). That Mr. Woodberry experiences some relief from "hop[ping] into the hot water of the shower" after a painful bowel movement, *see* Defs.' Br. at 141, is hardly a "reasonable accommodation" that would excuse Central Supply's decision to refuse the prescribed donut pillow. *See* Pls.' FF&CL at 233.

[100] *See, e.g.*, JX 4-f, K. Clomburg Depo. at 12:22-13:7, 24:22-25:7, 32:21-33:4, 35:3-39:8, 49:25-50:13 (neuropathy contributed to development of a series of blisters that ultimately exposed bone and required wheelchair). Contrary to Defendants' assertion, *see* Defs.' Br. at 149 n. 1132, Mr. Clomburg's issues continued through 2016. *See* JX 4-f at 49:1-4.

[101] *Compare, e.g.*, Defs.' Br. at 156 (claiming Prine "never requested an accommodation or even reported his discomfort"), *with* JX 4-q, B. Prine Depo. at 85-86 (showing Defendants failed to obtain a response to their question on this issue).

[102] *See, e.g.*, Defs.' Br. at 155-56.

expressly request a specific accommodation (or modification) fatally undermines an ADA claim."[103] This is because the ADA "imposes on public entities an affirmative *obligation* to make reasonable accommodations for disabled individuals—including prisoners."[104] For example, whether Farrell Sampier explicitly requested an accommodation before being shackled, placed directly on his bedsore, and left to lie in his own feces during transport[105] is irrelevant, as his paraplegia and medical conditions were known to the medical staff at the prison.[106] In any event, Mr. Sampier raised the issue at least twice.[107] Similarly, Benny Prine's limitations with respect to transportation were apparent because he used a wheelchair and kept his leg extended.[108]

In advancing these arguments, Defendants fail to acknowledge that Plaintiffs' ADA claim is not a collection of individual claims regarding failures to accommodate. Rather, Plaintiffs have shown that Angola's methods of administration have resulted in the enforcement of discriminatory policies and produced a system in which legitimate accommodation requests are mishandled and arbitrarily denied.[109] Defendants do not contend that their written procedures were followed in

---

[103] *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 746 (M.D. La. 2016) (quoting *Greer*, 472 F. App'x at 296); *see also, e.g.*, *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) (request for accommodation was not necessary if the entity "had knowledge of [plaintiff's] hearing disability but failed to discuss related issues with him"); *Levy v. La. Dep't of Pub. Safety & Corr.*, No. 16-542-JWD-EWD, 2019 U.S. Dist. LEXIS 34219, at *25 (M.D. La. Mar. 4, 2019) ("[T]he Court finds unavailing the defendants' argument that the plaintiffs have not necessarily requested ASL interpreters 'at all interactions with Probation and Parole staff[,]' [a]s the plaintiffs are not required under the law to request an accommodation, . . ."); *McCoy v. Texas Dep't of Criminal Justice*, No. C-05-370, 2006 U.S. Dist. LEXIS 55403, at *26-28 (S.D. Tex. Aug. 9, 2006) (collecting cases from multiple circuits).

[104] *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *9 (N.D. Tex. Jan. 26, 2015) (emphasis in original) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998)). Although the "reasonable accommodation" language appears in Title I of the ADA, the Fifth Circuit recognizes "that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II." *Windham v. Harris Cty.*, 875 F.3d 229, 235 (5th Cir. 2017) (collecting cases).

[105] *See* Pls.' FF&CL at 237.

[106] Defendants acknowledge the role of a patient's health care provider in identifying his disability and suggesting reasonable accommodations. *See* Defs.' Br. at 156 (quoting *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996)).

[107] *See* PX 231 at 1283 (explaining that "the ride is very painful on [his] sacral wound and back"), 1284 (stating that the ride to chemotherapy was "just to [sic] painful" and asking that he "PLEASE be rescheduled") (emphasis in original).

[108] *See* Pls.' FF&CL at 237. *Cf. Windham*, 875 F.3d at 238 (suggesting that a wheelchair user's disability, limitation, and need for an accommodation would be "open, obvious, and apparent").

[109] *See* Pls.' FF&CL at 217-39. Defendants do not even confront this evidence, except by describing in general terms how their accommodation policies *should* function. *See, e.g.*, Defs.' Br. at 134-35, 164-68. *Cf. Holmes v. Godinez*, 311 F.R.D. 177, 228 (N.D. Ill. 2015) ("[T]he language in the ADA Directive and handful of anecdotal examples cited by Defendant is insufficient for us to conclude, as a matter of law, that IDOC has, and consistently employs, a system-wide policy of providing reasonable accommodations for these programs.").

response to a single request described by Plaintiffs' witnesses.[110] Nor do Defendants address the numerous ARPs in which accommodation requests were denied without the proper inquiry.[111] It is this failure to recognize and ensure meaningful review of patients' requests for accommodations that forms the basis of Plaintiffs' claim, not any single refusal to provide an accommodation.

### C. Defendants' ADA Arguments Are Replete with Factual and Legal Inaccuracies.

Rather than confront the evidence, Defendants seek to distract the Court with a series of inaccurate assertions. Again, an exhaustive list is beyond the scope of this response, but as the following examples illustrate, Defendants' characterization of the evidence is unreliable at best:

- Defendants assert that "Plaintiffs presented no evidence of a visually or hearing impaired offender who was not provided with a necessary auxiliary aid or assistive device."[112] Yet John Tonubbee testified that Alton Batiste was blind and unable to navigate his dormitory independently but was never provided with a cane for the visually impaired.[113] Defendants assert that Mr. Batiste used a cane, while failing to note that he was only able to obtain a normal walking cane, not an assistive tapping cane.[114] Defendants further state that LSP "has engaged Lighthouse Louisiana to provide mobility and accessibility training," but fail to note that this training was provided on just one occasion to a patient who sued the prison.[115]

- Defendants state that Farrell Sampier received a new wheelchair upon request, while omitting that prison staff refused his request for a wheelchair appropriate for paraplegics, forcing him to eventually obtain one from a patient who was granted parole.[116] Similarly, in response to Mr. Sampier and Francis Brauner's requests for wheelchair gloves, Defendants indicate that gloves

---

[110] In some cases, the decision to deny the request was not even made by a medical professional. *See, e.g.*, Pls.' FF&CL at 232 (ability to purchase orthopedic shoes left to discretion of security), 233 (denial of donut pillow by Central Supply).
[111] *See, e.g., id.* at 227-28.
[112] Defs.' Br. at 139.
[113] Pls.' FF&CL at 234. In their Proposed Findings, Plaintiffs also identified an ARP in which Defendants ignored a patient's complaint that his GED instructor was not trained to teach students with hearing impairments. *See id.* at 228.
[114] *See* Defs.' Br. at 147; Oct. 12 Testimony of John Tonubbee at 152:15-23.
[115] *See* Defs.' Br. at 137; Pls.' FF&CL at 234.
[116] *See* Defs.' Br. at 142; Pls.' FF&CL at 231.

were available for purchase in the commissary, while only obliquely acknowledging that the prison's standard-issue cotton gloves are not designed to protect the hands of a wheelchair user.[117] Defendants contend that there is no evidence that Mr. Brauner or Mr. Sampier required specialty gloves, even though both patients described developing callouses or painful blisters, and Mr. Sampier clearly explained that the cotton gloves provided no grip.[118]

- Defendants claim that Plaintiffs provided only one example of an untrained inmate—John Tonubbee—providing assistance to disabled patients.[119] In fact, Farrell Sampier testified that he and other patients on the ward would assist each other with feeding, covering up, and other tasks when the orderlies were not available.[120] Similarly, Defendants claim that only Adrian Dunn testified that he was not aware of the procedures for requesting accommodations, but Otto Barrera and Francis Brauner provided similar testimony.[121]

- Defendants claim that Anthony Mandigo, whose duty status required "no prolonged walking," was "not required to walk constantly" during his 10-hour shift as a tier walker.[122] Defendants cite Mr. Mandigo's testimony for this proposition, yet it contains no such assertion.[123] Defendants similarly claim that Charles Butler's job assignment, which required him to lift drywall weighing 20-25 pounds, did not violate his "Squad A" duty status, because Squad A status typically permits the patient to lift objects weighing less than 30 pounds.[124] But Mr. Butler testified that

---

[117] Defs.' Br. at 142 & n.1077; *see also* Oct. 12 Testimony of Farrell Sampier at 59:20-22. In any event, "[a] public entity may not place a surcharge on a particular individual . . . to cover the costs of measures, such as the provision of auxiliary aids or program accessibility." 28 C.F.R. § 35.130(f).

[118] Defs.' Br. at 142 n. 1077 & n. 1081; Oct. 9 Testimony of Farrell Sampier at 59:12-13, 20-22; Oct. 12 Testimony of Francis Brauner at 104:16-20. *Cf. Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1289 (M.D. Ala. 2012) ("[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . .") (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003)).

[119] Defs.' Br. at 147.

[120] Pls.' FF&CL at 210 n.1552.

[121] Defs.' Br. at 166; Pls.' FF&CL at 224.

[122] Defs.' Br. at 151.

[123] Oct. 11 Testimony of Anthony Mandigo at 85:11-86:4.

[124] Defs.' Br. at 151.

his duty status contained additional restrictions, including no lifting more than 10 pounds.[125]

- Defendants malign Otto Barrera for "ignor[ing] doctors' recommendations" by eating regular trays, when Mr. Barrera's *very complaint* is that he was receiving regular trays despite being prescribed a mechanical soft diet, leaving him no choice but to chop up the food and push the smaller pieces into the back of his throat.[126] Defendants claim that Mr. Barrera was "observed to be eating fried chicken," when the physician's notes merely state that a plate of fried chicken was observed by his bed.[127] Defendants assert that Mr. Barrera's barium swallow test was "normal,"[128] when the report clearly states that he exhibited "moderate oral phase dysphagia" with "significant anterior loss of liquids" and the inability even to swallow a pill.[129]

- Defendants' suggestion of a flexible approach to hobby shop restrictions is belied by the prison's own policy[130] and its application in practice.[131] Defendants claim that Dr. Lavespere "would" lift the restriction under appropriate circumstances but provide no evidence that he has ever done so.[132] Rather, Dr. Lavespere testified that he enforces the policy because "inmates want to sue [him] every day," and imposing tailored restrictions on the use of heavy tools or machinery would "leave things open to interpretation" and get him into trouble.[133]

- Rather than defend its work release policy, Defendants argue that Plaintiffs must "show that at

---

[125] Oct. 15 Testimony of Charles Butler at 61:14-17.

[126] *See* Defs.' Br. at 152-54; Oct. 12 Testimony of Otto Barrera at 225:24-227:9.

[127] *Compare* Defs.' Br. at 153 *with* JX 10-d-1 at 03966. It is equally plausible that Mr. Barrera was served the chicken with the regular tray and left it next to his bed because he could not eat it.

[128] Defs.' Br. at 151.

[129] JX 10-d-3 at 04165.

[130] Defendants previously agreed that "LSP Directive # 09.036 prohibits any inmate 'requiring a duty status' from utilizing the hobbyshop until such time as the inmate is returned to regular duty without restrictions." UF ¶ 20. *Cf. Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1282 n.9 (M.D. Ala. 2012) (observing that the Alabama DOC's representations were belied by its own written policies).

[131] *See* Pls.' FF&CL at 215-16 (discussing blanket enforcement of LSP Directive #09.036 in response to ARP).

[132] Defs.' Br. at 175.

[133] JX 4-qq, R. Lavespere Depo. at 17:20-18:20. Ironically, Dr. Lavespere does just that when he issues duty statuses with restrictions such as "no prolonged walking" or "no prolonged standing," which are left to security to interpret when assigning jobs. *See* Pls.' FF&CL at 235-36.

least some of the class members" are otherwise qualified for the program.[134] In the very case Defendants cite, the court concluded that this requirement was "easily satisfied" where the discriminatory criteria were imposed on "all HIV-positive prisoners who are considered for work release."[135] Here, the discriminatory criteria are imposed on all present and future Subclass members whose disabilities require a restricted duty status. Under *Henderson*, that is sufficient.[136]

Therefore, this Court should find that Defendants have violated the Eighth Amendment, ADA, and RA, and grant the relief requested for the reasons stated therein.[137]

Respectfully submitted by:

*/s/ Mercedes Montagnes*
Mercedes Montagnes, La. Bar No. 33287
Amanda Zarrow, La. Bar. No. 38105
Nishi Kumar, La. Bar No. 37415
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70116
Telephone: (504) 529-5955
Facsimile: (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Jeffrey B. Dubner (*pro hac vice*)
P.O. Box 34553

---

[134] Defs.' Br. at 175 (quoting *Henderson*, 913 F. Supp. 2d at 1310).

[135] *Henderson*, 913 F. Supp. 2d at 1310.

[136] *Cf. id.* at 1295 ("As for the precise circumstances that would render a prisoner qualified . . . , the court need not draw such lines now, at the liability stage. . . . [F]or the ADOC to escape liability, there must be not a single HIV-positive prisoner who is or could be qualified for, and thus has the right to, integrated housing.") (citation omitted).

[137] Defendants' reply makes three brand new points. Rather than file a sur-reply, Plaintiffs will briefly address them here. First, as to Kentrell Parker, Rec. Doc. 560 at 12, Plaintiffs scheduled his appearance weeks before trial, on a half-day that was not then scheduled to be the final day. Plaintiffs dispute Defendants' characterization of the entire event, and want to make clear that Mr. Parker had requested to attend; that Defendants were the ones who transported Mr. Parker that morning and knew of his condition at all times during the day; and that nothing was medically wrong with Mr. Parker, who was merely napping. Second, Defendants attempt to use Class Certification testimony as affirmative evidence to dispute the DOJ's mortality statistics, Rec. Doc. 560 at 8; this was not included in Plaintiffs' proffer, much less the admitted evidence, and was excluded in part at the class certification hearing. *See* PX Proffer 8. Even if it was in evidence, this testimony fails to establish Defendants' point. Third, Defendants' newfound and meritless objection regarding Fed. R. Evid. 407, Rec. Doc. 560 at 10, has never been raised before and is waived. See Fed. R. Evid. 103(a)(1). Plaintiffs also note some minor errors in their FF&CL citations that they would like to correct. Page 2 n.12 6:5-8 should be 15:22-23; Page 36 n.248 JX 4-pp should be JX 4-qq; Page 72 n.514 PX 29 should be PX 28; Page 75 n.536 PX 2 should be PX 42; Page 113 n.796 Rec. Doc. 517-1 at 1 should be 517-1 at 2; Page 121 n.858 PX 6 at 0139-52 should be 0162-74; Page 128 at n.915 25-21:4 should be 20:25-21:4; Page 131 n.927 JX 10-aaa at 54042 should be JX 10-aaa at 54842; Page 144 n.1045 Rec. Doc. 517-1 at 9 should be Rec. Doc. 517-1 at 7; Page 239, n.1805: JX 4-jj should be JX 4-ii.

Washington, DC 20043
Telephone: (202) 656-2722
Email: Jeffrey.dubner@gmail.com

Daniel A. Small (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com

Bruce Hamilton, La. Bar No. 33170
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
Email: bhamilton@laaclu.org

Miranda Tait, La. Bar No. 28898
Advocacy Center
600 Jefferson Street, Suite 812
Lafayette, LA 70501
Telephone: (337) 237-7380
Facsimile: (337) 237-0486
Email: mtait@advocacyla.org

Jamila Johnson, La. Bar No. 37953
Meredith Angelson, La. Bar No. 32995
Jared Davidson, La. Bar No. 37093
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
Email:  jamila.johnson@splcenter.org
           meredith.angelson@splcenter.org
           jared.davidson@splcenter.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ Mercedes Montagnes
Mercedes Montagnes
