# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., KENTRELL
PARKER, FARRELL SAMPIER,
REGINALD GEORGE, JOHN TONUBBEE,
OTTO BARRERA, CLYDE CARTER,
CEDRIC EVANS, EDWARD GIOVANNI,
RICKY D. DAVIS, LIONEL TOLBERT, and
RUFUS WHITE, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

        v.

BURL CAIN, Warden of the Louisiana State
Penitentiary, in his official capacity;
STEPHANIE LAMARTINIERE, Assistant
Warden for Health Services, in her official
capacity; JAMES M. LEBLANC, Secretary of
the Louisiana Department of Public Safety
and Corrections, in his official capacity; and
THE LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS,

        Defendants.

CIVIL ACTION NO. 3:15-cv-00318

CHIEF JUDGE: Hon. Shelly D. Dick

MAGISTRATE JUDGE:
Richard L. Bourgeois, Jr.

---

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT .................................................................1

BACKGROUND .........................................................................................1

I.     CLASS MEMBERS ..........................................................................1

II.    DEFENDANTS ................................................................................1

III.   OVERVIEW OF DISCOVERY .......................................................3

IV.    OVERVIEW OF MEDICAL CARE PROVIDED BY DEFENDANTS...3

V.     THE PARTIES' WITNESSES .........................................................7

   A.   Plaintiffs' Medical Experts ...........................................................7

      (1)   Credentials and Summary of Findings of Plaintiffs' Medical Experts............7

      (2)   Reliability and Credibility of Plaintiffs' Experts.............................14

         a.   Plaintiffs' Experts' Sampling Methodology Was Reliable ...............14

         b.   Plaintiffs' Experts' Chart Reviews Were Reliable............................19

         c.   Plaintiffs' Experts Applied Reliable Standards................................32

         d.   Plaintiffs' Experts Are Qualified in the Areas They Testified.......35

         e.   Plaintiffs' Experts Did Not Demonstrate Any Bias........................37

   B.   Defendants' Medical Experts..........................................................38

      (1)   David Thomas....................................................................................38

      (2)   Dr. Jacqueline Moore ......................................................................44

   C.   Trial Witnesses ...............................................................................47

EIGHTH AMENDMENT CLAIM.............................................................61

I.     DEFENDANTS' POLICIES AND PRACTICES SUBJECT THE
       CLASS TO A SUBSTANTIAL RISK OF SERIOUS HARM ..................61

   A.   Defendants' Medical System Creates a Substantial Risk of Delayed Diagnosis,
        Delayed Treatment or Mistreatment, Needless Pain and Suffering, and
        Preventable Death ...........................................................................62

      (1)   Findings of Plaintiffs' Medical Experts .........................................62

      (2)   Corroborating Evidence of a Substantial Risk of Serious Harm .................68

         a.   Testimony from Treating Providers .................................................68

         b.   Named Plaintiffs' Medical Records.................................................70

     c.  Class Member Witnesses' Testimony ................................................. 72

     d.  Contemporaneous Documentation of Deficiencies in Medical Care and Harm to Patients ................................................................... 74

     e.  Testimony and Contemporaneous Admissions by Current and Former DOC Employees .................................................................. 75

     f.  Testimony of Defendants' Experts ................................................. 76

     g.  Mortality Statistics ......................................................................... 76

B.   Specific Practices Contributing to Substantial Risk of Serious Harm ................ 78

  (1)  Staffing Practices Contributing to the Substantial Risk of Serious Harm .... 80

     a.  Providers ......................................................................................... 80

     b.  Nurses ............................................................................................. 88

     c.  EMTs .............................................................................................. 89

     d.  Correctional officers ...................................................................... 94

  (2)  Clinical Practices Contributing to the Substantial Risk of Serious Harm ..... 94

     a.  Sick Call and Access to Care ........................................................ 94

     b.  Inadequate Treatment of Medical Emergencies ........................... 104

     c.  Inadequate Chronic Disease Management Program ...................... 111

     d.  Failure to Provide Timely Access to Specialty Care ..................... 118

     e.  Inadequate Inpatient Care .............................................................. 129

     f.  Inadequate Medication Administration and Pharmacy Services ................ 138

     g.  Inadequate Diagnostic Services ..................................................... 149

     h.  Failure to Create, Maintain, and Use Adequate and Reliable Medical Records ................................................................................ 150

     i.  Inadequate and Unsanitary Facilities ............................................ 153

  (3)  Administrative Policies and Practices Contributing to the Substantial Risk of Serious Harm ................................................................... 154

     a.  Inadequate Leadership ................................................................... 154

     b.  Inadequate Funding and Inappropriate Budget Management ..................... 159

  (4)  Inadequate Monitoring and Quality Assurance ............................................. 164

     a.  Inadequate Peer Review ................................................................. 164

      b. Inadequate Mortality Review ............................................................ 167

      c. Inadequate Continuous Quality Improvement Program............................ 169

  C. Defendants' Counterarguments ............................................................ 172

    (1) Refusals of Care ............................................................................... 172

    (2) Examples of Care in the Record ....................................................... 179

    (4) ACA Accreditation ........................................................................... 183

II.   **DEFENDANTS HAVE SUBJECTIVE KNOWLEDGE OF THEIR POLICIES AND PRACTICES, THEIR INADEQUACIES, AND THE RISK OF SERIOUS HARM**................................................................... 185

  A. Defendants Received Repeated Warnings About Deficiencies......................... 186

    (1) Warnings from the DOJ ................................................................... 186

    (2) Warnings from Consultants .............................................................. 190

    (3) Warnings from Outside Providers .................................................... 191

  B. Defendants' Own Documents and Testimony Demonstrate Defendants' Knowledge.......................................................................................... 192

  C. Defendants Received Thousands of Complaints and Grievances from Class Members............................................................................................. 194

  D. Defendants Have Been Willfully Blind to the Deficiencies of Their Policies and the Risk of Serious Harm to Class Members ......................................... 195

**AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT CLAIM**............................................................................................... 196

I.   **THE DOC'S POLICIES AND PRACTICES DENY PROGRAMMATIC ACCESS TO AND DISCRIMINATE AGAINST INDIVIDUALS WITH DISABILITIES** ................................................................................. 196

  A. The Subclass Consists of Individuals with a Range of Disabilities................... 197

  B. Patients with Disabilities Are Denied Access to Angola's Programs, Services, and Activities. ...................................................................................... 198

    (1) Architectural Barriers to Angola's Programs, Services, and Activities....... 198

      a. Plaintiffs' Evidence...................................................................... 198

      b. Defendant's Arguments................................................................ 206

    (2) Enforcement of Exclusionary Policies ............................................... 215

C.  Poor Training and Practices Result in Discrimination Against Patients with Disabilities................................................................................. 217

   (1)  Failure to maintain a qualified ADA Coordinator............................... 217

   (2)  Failure to maintain an advisory committee....................................... 220

   (3)  Inadequate staff training................................................................. 221

   (4)  Failure to inform patients of rights and procedures........................... 222

   (5)  Inadequate procedures for processing accommodation requests and grievances......................................................................................... 225

   (6)  Failure to identify and track disabilities and accommodation requests...... 229

   (7)  Charging copays for evaluation of accommodation requests.................... 231

D.  Angola Fails to Accommodate the Needs of its Disabled Patients................. 231

   (1)  Denial of Assistive Devices and Auxiliary Aids............................... 231

   (2)  Failure to Accommodate Disabilities in Work Assignments...................... 235

   (3)  Failure to Accommodate Dietary Needs ........................................... 236

   (4)  Failure to Accommodate Disabilities When Transporting Patients........... 237

   (5)  Lack of Accommodations in Prison Procedures.................................. 238

   (6)  Lack of Accommodations in Discipline.............................................. 238

E.  Patients with Disabilities Are Segregated Without Adequate Justification...... 239

**CONCLUSIONS OF LAW** .......................................................................... 240

**I.  EIGHTH AMENDMENT CLAIM** ........................................................ 240

A.  Legal Standard................................................................................ 240

   (1)  The Objective Test......................................................................... 241

      a.  Serious Medical Needs................................................................. 241

      b.  Substantial Risk of Serious Harm................................................. 243

   (2)  The Subjective Test........................................................................ 244

B.  Individual Practices That Can Violate the Eighth Amendment...................... 246

   (1)  Inadequate and Inappropriate Staffing.............................................. 246

   (2)  Inadequate Access to Care ............................................................. 247

   (3)  Inadequate Chronic Disease Program ............................................... 247

   (4)  Failure to Provide Specialty Care .................................................... 248

(5) Delay or Denial of Necessary Medical Care for Non-Medical Reasons .... 248

(6) Inadequate Maintenance of Medical Records ................................................. 249

(7) Inadequate Monitoring and Quality Control System .................................... 249

(8) Inadequate Access to Emergency Care .......................................................... 249

(9) Inadequate Medication Management and Lack of Access to Medically Necessary Medication ...................................................................................... 249

C.  Defendants' Policies and Practices Violate the Eighth Amendment .............. 250

(1) Applying the Objective Test, Plaintiffs Have Demonstrated the Existence of Serious Medical Needs and a Substantial Risk of Serious Harm............ 250

a. Plaintiffs Have Proven That Serious Medical Needs Exist on a Widespread Basis. .................................................................................................... 250

b. Plaintiffs Have Demonstrated that Defendants' Policies and Practices Create a Substantial Risk of Serious Harm to the Class. ............................. 250

(2) Applying the Subjective Test, Plaintiffs Have Proven that Defendants Are Deliberately Indifferent to their Serious Medical Needs. ............................. 259

a. Applying the Subjective Test, Plaintiffs Have Also Proven that Defendants are Deliberately Indifferent to the Serious Medical Needs of HCV-Positive Patients. .................................................................................................... 261

II.   THE DOC'S PRACTICES VIOLATE THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT .......................... 263

A.  The Subclass consists of individuals with qualifying disabilities. ..................... 264

B.  Angola Denies Programmatic Access to and Discriminates Against Individuals with Disabilities .................................................................................................... 265

(1) Architectural Barriers to Angola's Programs, Services, and Activities ....... 267

(2) Enforcement of Exclusionary Policies ........................................................... 275

(3) Discriminatory Methods of Administration .................................................. 276

(4) Failure to Provide Reasonable Accommodations or Modifications ........... 280

(5) Failure to Integrate Individuals with Disabilities ......................................... 281

C.  The Discrimination Against Plaintiffs is By Reason of Their Disabilities ....... 282

III.  PERMANENT INJUNCTION FACTORS ................................................. 283

REMEDY ................................................................................................................. 284

<u>**PROPOSED FINDINGS OF FACT**</u>

**BACKGROUND**

### I.    CLASS MEMBERS

1.    Louisiana State Penitentiary at Angola ("Angola" or "LSP") is a maximum-security men's prison in Angola, Louisiana that housed between 6200-6400 men throughout the discovery period.[1]

2.    On February 26, 2018, the Court certified a class consisting of "all inmates who [are] now, or will be in the future, incarcerated at LSP," and a Subclass of "all qualified individuals with a disability, as defined by the [Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA")], who are now, or will be in the future, incarcerated at LSP."[2]

3.    The Class is represented by Otto Barrera, Clyde Carter, Ian Cazenave, Ricky Davis, Reginald George, Kentrell Parker, Lionel Tolbert, John Tonubbee and Edward Washington.[3]

### II.    DEFENDANTS

4.    Defendant Louisiana Department of Public Safety and Corrections ("DOC") is a division of the State of Louisiana charged with overseeing the custody and care of individuals in state prisons, including Angola.[4]

5.    Defendant Darrel Vannoy is the current Warden of Angola and has served in that position since approximately January 1, 2016. From February 1, 1995 to December 31, 2015, Burl Cain served as Warden. The Warden is responsible for, among other things, assigning people to manage the medical care and then being sure that they do what the policies and procedures say.[5]

6.    Defendant Randy Lavespere is the current Medical Director of Angola and has served in that position since approximately May 2014. This position is responsible for managing, among other things, Angola's doctors, nurses, patients, relationship with headquarters, and

---

[1] Undisputed Facts ("UF") ¶ 1, First Amended Joint Pretrial Order ("JPTO"), Rec. Doc. 242-2;.PX 6 at 0017; DX 14 at 02876.

[2] Rec. Doc. 394 at 30.

[3] *Id.* at 1, 30. Farrell Sampier testified at trial, but passed away in March 2019 after a stroke. Rufus White was released from custody in March 2019 as well.

[4] UF ¶ 2.

[5] *Id.* ¶ 3; *see also* JX 4-bb, B. Cain Depo. at 6:13-25; JX 4-ccc, D. Vannoy Depo. at 21:16-22:7, 23:25-24:14.

relationships with administration. Prior Medical Directors of Angola have included Jason Collins and Raman Singh.[6]

7.     Defendant John Morrison is the current statewide Chief Medical and Mental Health Director ("Statewide Medical Director") of the DOC and has held that position since approximately April 2018. He was preceded by Raman Singh, who held the position from November 2007 to November 2017. The Statewide Medical Director's job is to "run healthcare operations ... find out the challenges and to go and find the solutions."[7]

8.     Defendant James LeBlanc is the Secretary of the DOC. He supervises the Statewide Medical Director and is "responsible for whatever goes on in this department."[8]

9.     Defendant Tracy Falgout is the Assistant Warden for Health Services ("Assistant Warden") at Angola and has served in that position since approximately November 2016. He was preceded by Stephanie Lamartiniere, who held the position from June 2013 until approximately November 2016. Prior to Ms. Lamartiniere's tenure, Kenneth Norris held the position. The Assistant Warden has "operational control over the medical unit at LSP. This includes, among other responsibilities, budgeting, hiring of certain classes of employees, medical records, and any kind of staffing issues."[9]

10.     Defendant Stacye Falgout is the Chief Nursing Officer for the DOC and has held that position since approximately October 2011. She reports directly to the Statewide Medical Director (previously Dr. Singh) and served as the "No. 2 in the headquarters realm." Prior to becoming Chief Nursing Officer, she served as Assistant Director of Nurses at Angola.[10]

11.     Defendant Sherwood Poret has been the Director of Nursing at Angola since January 2013 and was the infection control supervisor before that. He supervises all nurses working at Angola.[11]

12.     Defendant Cynthia Park is a Nurse Practitioner at Angola and has held that position since October 2014. She is responsible for the medical care of the patients in the outcamps, as well as Nursing Unit 2 and all HIV, cancer, and hospice patients.[12]

---

[6] UF ¶¶ 4-7; *see also* JX 4-rr, R. Lavespere Depo. at 11:7-12:9; JX 4-ff, J. Collins Depo. at 10:16-11:6, 129:3-6; JX 4-bbb, R. Singh Depo. at 8:15-20.

[7] UF ¶ 4; *see also* JX 4-bbb, R. Singh Depo. at 24:15-22.

[8] UF ¶ 5; JX 4-ss, J. Leblanc Depo. at 23:9-24:5.

[9] UF ¶ 6; JX 4-nn, S. Lamartiniere Depo. at 9:4-17, 10:13-16; Oct. 24 Testimony of Tracy Falgout at 156:19-22.

[10] JX 4-hh, S. Falgout Depo. at 7:12-22, 9:3-5, 13:10-18; Oct. 17 Testimony of Stacye Falgout at 124:22-126:5; *see also* UF ¶ 8.

[11] UF ¶ 9; *see also* JX 4-yy, Poret Depo. at 4:15-19.

[12] JX 4-uu, C. Park Depo at 6:5-8, 8:5-9:17.

## III. OVERVIEW OF DISCOVERY

13. Plaintiffs filed suit on May 20, 2015.[13]

14. Discovery in this case took place from mid-2015 until September 2016 except for a few enumerated documents.[14]

15. In the fall of 2015, Defendants produced to Plaintiffs a list of inmates who had died, which was supplemented in January 2016.[15]

16. Plaintiffs requested medical records for all patients with chronic illnesses and all patients who had passed away between particular dates.[16] Defendants refused, leading to a compromise in which Defendants produced medical records for several dozen current and former Class members, largely produced in spring 2016.[17]

17. Plaintiffs' site visit took place in March 2016.[18]

18. Defendants' site visits took place in August 2016.[19] Expert reports were exchanged in late 2016 and all expert discovery concluded in December of 2016.[20]

19. Because of this schedule, the majority of the medical records were requested in late 2015 and early 2016, and produced in spring 2016.[21] Records of deceased inmates largely ended in January 2016.[22]

## IV. OVERVIEW OF MEDICAL CARE PROVIDED BY DEFENDANTS

20. Class members are housed in the following locations:[23]

    a. The main prison, which houses Class members in cell blocks as well as dormitories and houses approximately 3216 individuals.

---

[13] Rec. Doc. 1.

[14] Rec. Docs. 24, 63, 127.

[15] Oct. 15 Testimony of Susi Vassallo at 140:2-9.

[16] *See generally* Rec. Doc. 80-1.

[17] *See generally* Rec. Doc. 80-1.

[18] PX 6 at 0004

[19] DX 13 at 02842; *see also* DX 14 at 02876; Oct. 23 Testimony of David Thomas at 14:14-20.

[20] *See generally* Rec. Doc. 166 and PX 6 at 1.

[21] Rec. Doc. 116

[22] *See* Oct. 15 Testimony of Susi Vassallo at 140:2-9.

[23] PX 6 at 0011, 17-18, 50-51, 84; Oct. 15 Testimony of Danny Prince at 94:15-95:8; UF ¶ 11-12.

b. Inside of main prison, three "medical dormitories," named Ash 2, Cypress 2, and Hickory 4, which generally house persons with significant disabilities or major ongoing medical needs.

c. Two infirmaries, named Nursing Unit 1 and Nursing Unit 2. Nursing Unit 1 is an infirmary for acute care patients. Nursing Unit 2 is an infirmary for patients requiring long-term nursing care and hospice patients. They house approximately 44 beds between the two.

d. Four remote "outcamps," named Camps C, D, F, and J.

e. Death row and administrative management. The outlying camps and death row combined house 3041 individuals.

21. DOC is responsible for providing or arranging all medical care for all Class members.[24] Due to their incarcerated status, Class members have no ability to obtain medical care other than that which DOC provides or arranges.

22. DOC provides medical care through DOC personnel, as well as by contracting with third-party medical professionals to provide specialty services on-site at Angola, via telemedicine, and off-site at Louisiana hospitals.[25]

23. The principal places that DOC delivers on-site medical care are:[26]

a. The R.E. Barrow Treatment Center ("REBTC" or "TC"), which contains seven clinical examination rooms; a procedure center in which telemedicine and certain procedures or specialty visits occur; the Acute Treatment Unit ("ATU"); the two infirmaries; administrative offices; the laboratory; the pharmacy; and the medical records office.

b. Individual cells and dormitories, including the medical dormitories, where, as discussed below, Emergency Medical Services ("EMS") personnel perform sick call.

c. Pill call stations in each outcamp and cell block, where medication is distributed and administered and medication administration records ("MARs") created, as discussed below. Pill call also occurs in the medical dormitories.

---

[24] See *West v. Atkins*, 487 U.S. 42, 56 (1988) (recognizing that the state has an "affirmative obligation" to provide adequate medical care to prisoners and that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody").

[25] See UF ¶ 10; PX 6 at 0027, 29, 57, 71-72, 74; Oct. 9 Testimony of Mike Puisis at 195:21-24; *see also generally* Oct. 11 Testimony of Catherine Jones and Monica Dhand.

[26] PX 6 at 0011, 28-30; UF ¶¶ 11-14.

24.     Medical staff at Angola includes the following personnel. Staffing numbers are current as of the Plaintiffs' medical experts' site visit, unless otherwise noted:

    a.  Medical providers:[27] At the time of Plaintiffs' expert site visit, Angola had only four physicians and one nurse practitioner, in addition to Dr. Lavespere, the Medical Director, which is largely consistent with what Angola's table of organization permits for medical staffing.[28] The exact number of providers fluctuated slightly during the discovery period due to the death of one physician and the resignation of another, but typically was comprised of Dr. Lavespere, four other physicians, and one nurse practitioner.[29]

    b.  Nurses: Angola has 53 permanent nursing positions and four temporary positions. This comprises approximately 22 registered nurses ("RNs"), 30 licensed practical nurses ("LPNs"), two certified nurse assistants ("CNAs"), and one respiratory therapist.[30]

    c.  Emergency Medical Services ("EMS") personnel: Angola has approximately 35 emergency medical technicians ("EMT") positions, and employed 22 as of September 2016.[31] EMS personnel generally have three levels of training and licensure: basic EMTs; advanced EMTs; and paramedics.[32] EMTs at Angola are designated as security staff and report administratively to the Assistant Warden, although they are nominally under the clinical supervision of the Medical Director.[33]

    d.  Correctional officers: Defendants use correctional officers (i.e., prison guards) to administer medication in most housing units, including the so-called medical dormitories.[34]

25.     As relevant to this case, Class members most commonly access medical care through the following methods:

    a.  "Routine sick call": Class members write their complaint on a Health Services Request form ("HSR," also called a "sick call form"). EMS personnel visit each

---

[27] The term "providers" encompasses both physicians and nurse practitioners. For all purposes relevant to this case, nurse practitioners are qualified and licensed to provide the same types of care as physicians.

[28] PX 6 at 0017; JX 1 at 00002.

[29] Oct. 22 Testimony of Randy Lavespere at 26:14-18; PX 6 at 0017; UF ¶ 10; JX 1 at 00001-02.

[30] Oct. 22 Testimony of Randy Lavespere at 30:2-17; PX 6 at 0018-19; JX 1 at 00001-02.

[31] JX 1 at 00002; Oct. 22 Testimony of Randy Lavespere at 32:13-15.

[32] Except where the Proposed Findings of Fact and Conclusions of Law specifically distinguish between EMS levels, Plaintiffs will use "EMT" to refer to all three levels together. *See also* Oct. 15 Testimony of Susi Vassallo at 144:1-5; DX 14 at 02878.

[33] PX 6 at 0015; JX 1 at 00001-2; JX 4-dd, D. Cashio Depo. at 73:18-74:18.

[34] PX 6 at 0008, 15, 20.

housing unit, beginning around 4:30 a.m., to collect HSRs. EMS personnel typically review HSRs during sick call, examine patients at their cell or dormitory, or in a hallway outside their dormitory, and may prescribe treatment at that time. EMS personnel write observations on the sick call form and decide whether a patient should be transported at that time, and they then put the HSR in a box for the provider responsible for the relevant housing unit. Class members are typically charged $3.00 for routine sick call.[35]

b. "Self-declared emergency" ("SDE" or "emergency sick call"): Class members can inform a correctional officer or EMT that they believe they have an emergency medical need, or, if they reside in the main prison and are both permitted and able to travel to the ATU, can present themselves for emergency treatment at the ATU. Class members declaring an SDE are initially, and often only, examined and treated by an EMT. Class members are often charged $6.00 for an SDE.[36] Class members risk discipline if EMTs do not believe that their complaints are actually emergent.[37]

c. Chronic disease clinics: As discussed in more detail *infra* ¶¶ 246-257, Class members with diagnosed chronic illnesses are seen by providers in chronic disease clinics with varying frequency.[38]

d. Specialist care: Angola providers can refer Class members to specialists. Specialist appointments occur in three ways:

    i.    1) DOC has contracted with some specialists to hold occasional clinics at Angola.[39]

    ii.    2) Some specialty appointments occur via telemedicine, in which a doctor in another location has a videoconference with a Class member, who may or may not be accompanied by an LPN.[40]

    iii.    3) Some specialist appointments occur off-site. All referrals for off-site care, including all major surgical procedures, are scheduled through DOC headquarters in Baton Rouge, using a computer database called Eceptionist. All referrals in Eceptionist are approved by the Statewide Medical Director, who reviews referrals to determine whether the

---

[35] PX 6 at 0031-32; DX 14 at 02883; JX 4-dd, D. Cashio Depo. at 29:15-30:22, 33:6-11; 44:20-45:25, 54:8-55:8, 60:4-6 (describing sick call process); JX 5-a at 00023; Oct. 9 Testimony of Mike Puisis at 110:9-111:3.

[36] PX 6 at 0033; JX 5-a at 00023; JX 4-gg, A. Cowan Depo. at 8:18-9:4, 64:7-22; JX 4-rr, R. Lavespere Depo. at 26:22-27:15; Oct. 15 Testimony of Danny Prince at 100:10-13, 101:14-21.

[37] JX 4-gg, A. Cowan Depo. at 43:21-25; PX 6 at 0033.

[38] PX 6 at 0042-47.

[39] PX 6 at 0029, 71, 74; JX 4-aa, M. Benedict Depo. at 9:14-10:10.

[40] PX 6 at 0029, 71, 74; JX 4-aa, M. Benedict Depo. at 9:14-10:10.

provider has adequately substantiated that the referral is "medically necessary."[41] While DOC maintains an official definition of "medically necessary procedure,"[42] the Medical Director does not use that definition.[43]

    e. Infirmary care: When there is space available in the infirmary units, providers can assign patients to one of those units. In theory, the infirmary allows for heightened observation, nursing care, and provider evaluation, although this typically does not occur in practice, as discussed *infra* ¶¶ 278-293.[44]

26. While Defendants use the ATU to provide emergency care, it lacks several diagnostic and treatment capabilities necessary in an emergency room.[45] Accordingly, for actual emergency care, Defendants must transport patients to an outside hospital.[46]

27. Angola is approximately 150 miles from University Medical Center in New Orleans ("UMC" or "UMC-NO"), 60 miles from Our Lady of the Lake Hospital in Baton Rouge ("OLOL"), 50 miles from Lane Regional Medical Center in Zachary ("Lane"), and 25 miles from West Feliciana Parish Hospital in St. Francisville ("West Feliciana"). Prior to the opening of UMC, Defendants sent patients to Interim LSU Hospital ("ILH") in New Orleans, and to Earl K. Long Hospital before that. Defendants use UMC as their hospital of choice.[47]

## V. THE PARTIES' WITNESSES

### A. Plaintiffs' Medical Experts

#### (1) Credentials and Summary of Findings of Plaintiffs' Medical Experts

28. Plaintiffs submitted testimony and joint expert reports from three medical experts:

    a. <u>Dr. Michael Puisis</u>: Dr. Puisis is a board-certified internist who has worked as a physician, health care administrator, or consultant in correctional environments for over 30 years. He served as Assistant Medical Director, Medical Director, and Chief Operating Officer for Cook County Jail, one of the largest jails in the country. He served as Regional Medical Director for the state of New Mexico prison system,

---

[41] JX 4-aa, M. Benedict Depo. at 14:9-17:16 (describing the review process of Eceptionist referrals by DOC headquarters), 20:7-17; DX 13 at 02861 (Dr. Moore: referrals are "transferred to … utilization management at Headquarters. The referral is approved by the DOC Medical Director, Dr. Singh.").

[42] JX 5-a at 00284-85.

[43] PX 6 at 0071-79; JX 4-bbb, R. Singh Depo. at 151:3-25.

[44] PX 6 at 0079-84.

[45] *See* Oct. 15 Testimony of Susi Vassallo at 143:12-25; Oct. 9 Testimony of Mike Puisis at 109:5-10; PX 6 at 0033-34, 65.

[46] PX 6 at 0065; Oct. 9 Testimony of Mike Puisis at 109:11-22; *see also generally* Oct. 11 Testimony of Catherine Jones and Monica Dhand.

[47] PX 6 at 0072, 256, 264; DX 14 at 02881; Oct. 22 Testimony of Randy Lavespere at 68:1-2; 158:3-5, 160:6-7.

working through a contract medical vendor called Correctional Medical Services. He was the Medical Director of correctional facilities for a private company called Addus Health Care. He edited both editions of *Clinical Practice in Correctional Medicine*, the only textbook of correctional medicine, and has authored numerous other publications related to correctional and internal medicine. He has participated in the development or revision of numerous standards related to correctional medical care, including the American Diabetes Association's standards of care for diabetics in correctional facilities and the medical standards of the National Commission on Correctional Health Care ("NCCHC") and the American Public Health Association ("APHA"). He has been an expert, consultant, or monitor in numerous cases and for a wide range of parties, most notably serving as a Court-appointed expert in *Plata v. Davis*, which concerned the medical care provided throughout the California correctional system; as an expert for the Department of Justice; as a consultant to the Department of Homeland Security in reviewing its own facilities; and as a post-trial medical monitor in several correctional facilities.[48] Numerous courts have relied on his opinions, including the Fifth Circuit.[49]

b. <u>Dr. Susi Vassallo</u>: <u>Dr. Susi Vassallo</u>: Dr. Vassallo is a board-certified emergency room physician and medical toxicologist. She actively practices as an attending physician in the emergency room of Bellevue Hospital, a large urban emergency department in New York City , and frequently practices at various sites in rural Texas. She is Clinical Professor of Emergency Medicine at the New York University School of Medicine, and previously taught emergency medicine at the University of Texas – Austin. She is certified as a correctional health professional by NCCHC. She

---

[48] JPTO at 9-10; Oct. 9 Testimony of Mike Puisis at 94-96.

[49] *See, e.g.*, *Shepherd v. Dall. Cty.*, 591 F.3d 445, 450-51, 456 (5th Cir. 2009) (relying on Dr. Puisis' report in affirming Plaintiff's verdict in a conditions of confinement suit); *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 937-38, 943-45, 949-54 (N.D. Cal. 2015) (relying extensively on Dr. Puisis' report, as a neutral expert jointly retained by both parties, in issuing a preliminary injunction and granting summary judgment in favor of Plaintiffs); *Plata v. Schwarzenegger*, No. 01-cv-1351, 2005 WL 2932253, at *3-4 (N.D. Cal. Oct. 3, 2005) (relying on "extensive and disturbing findings" in reports by Dr. Puisis and Ms. LaMarre, as court-appointed-experts, to determine that a receivership was required to remedy constitutional violations across the California prison medical care system); *Benjamin v. Fraser*, No. 75-cv-3073, 2002 WL 31845111, at *5, *9, *13-14 (S.D.N.Y. Dec. 16, 2002) (relying on Dr. Puisis' testimony to find Defendants in contempt of the courts' previous order in respect to use of enhanced restraints on pre-trial detainees); *McDonald v. Dall. Cty.*, No. 06-cv-0771, 2008 WL 918286, at *2, *7 (N.D. Tex. Mar. 31, 2008) (relying on Dr. Puisis' report in denying Defendants' motion for summary judgment); *Loftis v. Dall. Cty.*, No. 10-cv-0116, 2011 WL 4090965, at *6-7, *9 (N.D. Tex. July 27, 2011) (same); *Hall v. Cty. of Fresno*, No. 11-cv-2047, 2015 WL 13236882, at *3 (E.D. Cal. Dec. 11, 2015) (noting Dr. Puisis' report was used in connection with settlement negotiations between parties and drafting of proposed consent decree); *Farrell v. Allen*, 2004 Cal. Super. LEXIS 2978, *2 (Cal. Super Ct. 2004) (relying on a report by Dr. Puisis and Ms. LaMarre, as neutral experts jointly selected by both parties in issuing consent decree).

has evaluated correctional health care systems in nine states, including Louisiana, Mississippi, Texas, and New York. She has also been retained by the Department of Homeland Security to review medical care delivery at its detention facilities.[50] The Fifth Circuit has relied on her reports in three separate cases, as have numerous other courts.[51]

c.  Nurse Practitioner Madeleine LaMarre: Ms. LaMarre is a nurse practitioner who has more than 30 years of experience working as a nurse practitioner, administrator, and consultant in correctional facilities. She worked in the Georgia Department of Corrections for more than two decades, serving as a nurse practitioner, Nursing Director, and Statewide Clinical Services Manager. She is the associate editor of *Clinical Practice in Correctional Medicine* and the author or coauthor of numerous other publications related to correctional medicine and nursing. She was a consultant to the Centers for Disease Control and Prevention ("CDC") regarding HIV testing implementation and the management of Hepatitis C in correctional settings. She has also served as an expert or monitor in numerous cases regarding correctional medicine, including serving as a Court-appointed expert in *Plata* and serving as a monitor at the Dallas, Cook County, and Passaic County Jails.[52] Numerous courts have relied on her opinions.[53]

---

[50] JPTO at 10; Oct. 15 Testimony of Dr. Susi Vassallo at 131:23-36:11.

[51] *See, e.g.*, *Yates v. Collier*, 868 F.3d 354, 363-64 (5th Cir. 2017) (noting that the Fifth Circuit has, on at least two previous occasions, upheld district court findings that "relied heavily on Dr. Vassallo's testimony"); *Ball v. LeBlanc*, 792 F.3d 584, 593 (5th Cir. 2015) (affirming trial court findings of deliberate indifference that were "[b]ased mainly on Dr. Vassallo's testimony"); *Gates v. Cook*, 376 F.3d 323, 339-40 (5th Cir. 2004) (relying on Dr. Vassallo's testimony in affirming finding of deliberate indifference and upholding injunctive relief); *Cole v. Collier*, No. 14-CV-1698, 2017 WL 3049540, at *14-15 & n.16 (S.D. Tex. July 19, 2017) (relying on Dr. Vassallo's expert report and testimony as "credible" and "extremely thorough"); *McCollum v. Livingston*, No. 14-cv-3253, 2017 WL 608665, at *22-23, *37 (S.D. Tex. Feb. 3, 2017) (relying on Dr. Vassallo's testimony in denying Defendants' motion for summary judgment); *Cole v. Livingston*, No. 14-cv-1698, 2016 WL 3258345, at *22 (S.D. Tex. June 14, 2016) (relying on Dr. Vassallo's expert testimony and noting it to be "helpful").

[52] JPTO at 9; Oct. 16 Testimony of Madeleine LaMarre at 129:16-34:14.

[53] *See, e.g.*, *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 735-36 (6th Cir. 2015) (relying on Ms. LaMarre's findings to reverse the district court's grant of summary judgment to a private corporation that provided medical services to inmates); *Plata*, 2005 WL 2932253, at *3-19 (relying on "extensive and disturbing findings" in reports by Ms. LaMarre and Dr. Puisis, as court-appointed experts, to determine that a receivership was required to remedy constitutional violations across the California prison medical care system); *Jimenez v. Hopkins Cty.*, No. 11-cv-00033, 2014 WL 176578, at *9-10 (W.D. Ky. Jan. 13, 2014) (relying on Ms. LaMarre's report in denying Defendants' motion for summary judgment); *Flynn v. Doyle*, 672 F. Supp. 2d 858, 862-63 (E.D. Wis. 2009) (relying on Ms. LaMarre's findings to deny Defendants' motion for summary judgment); *Henderson v. Thomas*, 913 F.

29. Plaintiffs' medical experts conducted a four-day in-person site visit (two days in the case of Dr. Vassallo), during which they evaluated all relevant parts of Angola's facilities, interviewed numerous Angola staff members and patients, and observed Defendants' medical care in practice. They also reviewed the medical records of 47 patients,[54] selected to represent a sample of patients who had died and/or had chronic medical conditions that required recurring medical care. Across these 47 patients, they reviewed thousands of encounters between Class members and Defendants' medical personnel.[55] In addition to their sample, they reviewed the medical records of ten Named Plaintiffs, in response to Defendants' experts' reports.[56]

30. During their site visit and in their analysis of Defendants' practices, each expert focused on subtopics relevant to their particular expertise. Specifically, the experts divided their focuses and testimony along the following lines:

   a. Dr. Puisis was principally responsible for evaluating LSP's chronic care, specialty care, infirmary care, organizational structure, staffing, budget, healthcare operations, medical records, laboratory, mortality review, and quality improvement.[57]

   b. Dr. Vassallo was principally responsible for evaluating emergency care and the work performed by EMTs.[58]

Supp. 2d 1267, 1302 (M.D. Ala. 2012) (finding that Ms. LaMarre's testimony "merits substantial weight" given breadth of experience); *Farrell*, 2004 Cal. Super. LEXIS 2978, *2 (relying on a report by Ms. LaMarre and Dr. Puisis, as neutral experts jointly selected by both parties, in issuing a consent decree).

[54] This comprises 40 non-named-plaintiff patients discussed in the opening report and seven non-named-plaintiff patients in the supplemental chart reviews submitted with the rebuttal report. *See* PX 6; PX 410. One patient in the opening report was inadvertently reviewed by both Dr. Puisis (as Patient #4) and Dr. Vassallo (as Patient #36), with both making similar observations and conclusions. Plaintiffs are only counting this patient once in all numbering in this brief. Additionally, four of the patients given anonymized numbers in the opening report were named plaintiffs and do not count toward the sample, as were three patients discussed in the rebuttal supplement. These patients are not counted in all references to the experts' sample.

[55] *See* Oct. 9 Testimony of Mike Puisis at 122:24-23:19; Oct. 11 Testimony of Mike Puisis at 56:13-58:9; Oct. 16 Testimony of Madeleine LaMarre at 148:17-24; Oct. 15 Testimony of Susi Vassallo at 139:1-12.

[56] *See* PX 28 at 0007-23.

[57] Oct. 9 Testimony of Mike Puisis at 101:8-13.

[58] Oct. 15 Testimony of Susi Vassallo at 138:21-25.

c. Ms. LaMarre was principally responsible for evaluating access to care, chronic disease management, pharmacy, medication administration, policies and procedures, clinical spaces and sanitation, and health information management.[59]

31. Although the experts divided up the principal responsibilities for these topics, there was substantial overlap across their observations. Each expert reviewed the complete medical histories of more than a dozen patients, and therefore each expert reviewed hundreds or thousands of encounters spanning sick call requests, chronic care, specialty care, inpatient care, nursing care, and emergency care.[60]

32. Plaintiffs' medical experts produced a 90-page principal report,[61] accompanied by 183 pages of chart reviews; two rebuttal reports, totaling 38 pages;[62] and 24 pages of supplemental chart reviews produced prior to the rebuttal deadline.[63] Over the course of these reports they also reviewed the records of 10 named plaintiffs whose charts were consistent with the random sample.[64] Defendants deposed all three experts after the conclusion of these productions.

33. All three experts testified at the trial. Dr. Puisis testified for the better part of three days, and Dr. Vassallo and Ms. LaMarre each testified for approximately a day. Dr. Vassallo also provided brief rebuttal testimony after Defendants' case. The Court also had the opportunity to observe and evaluate Dr. Puisis's testimony at the November 2017 class certification hearing.

34. The key findings and conclusions of Plaintiffs' experts are incorporated into the Findings of Fact below and discussed therein, but are summarized in their principal report as follows:

> Our review showed serious and systemic problems with access, timeliness and quality of care at Louisiana State Prison. LSP lacks the infrastructure necessary to provide an adequate health care system for patients with serious medical needs. This includes lack of an adequate organizational structure, health care budget, staffing types and numbers, credentialing and peer review processes, health care policies and procedures, clinic space, medical equipment and supplies, and quality improvement program. In addition to these infrastructure deficiencies, health care processes are broken, including access to care, medication administration, chronic care management and infirmary care.

---

[59] Oct. 16 Testimony of Madeleine LaMarre at 152:12-153:3.

[60] *See* Oct. 16 Testimony of Madeleine LaMarre at 148:19-24 ("It's hard to estimate, but I would say that within each individual record, I could have reviewed … more than a hundred different encounters of different types. If you include reviewing medication records, which sort of expands that number exponentially, … probably more than a thousand different encounters of different kinds."); *see also* Oct. 9 Testimony of Mike Puisis at 122:24-23:11; *see also generally* PX 6.

[61] PX 6.

[62] PX 28; PX 244.

[63] PX 410.

[64] *See* PX 28 at 0007-22; Oct. 10 Testimony of Mike Puisis at 11:7-25.

LSP patients do not have timely access to a medical professional who is qualified to diagnose and treat their serious medical needs. LSP patients are not provided the most basic and essential elements of adequate health care access. This includes timely access to a qualified medical professional who has access to the patient's medical record, and examines the patient in an adequately equipped and supplied examination room that provides privacy and confidentiality. Inmates are also punished for seeking medical care.

At LSP, emergency medical technicians (EMTs) and paramedics are front line staff for screening and treatment of patients with routine (sick call) and urgent health care needs. However, instead of conducting sick call in a medical setting, EMTs openly conduct sick call in inmate housing units without the patient's medical record, adequate medical equipment or supplies, and without privacy or confidentiality. Thus, it is not surprising that virtually all EMT assessments are inadequate. Moreover, EMTs are not licensed to diagnose and treat medical conditions and patients are not provided access to a professional medical judgment. Physicians are supposed to clinically supervise EMTs, however this does not meaningfully occur.

With respect to urgent care access, we found that EMTs and paramedics independently manage patients with acute and life-threatening conditions and in most cases, a physician never examined the patient during the acute event. As a result, these patients did not receive timely diagnosis and treatment, including being sent to an outside hospital. This resulted in many preventable deaths.

With respect to chronic disease management, we found that LSP chronic disease guidelines are completely inadequate and not based upon nationally recognized clinical practice guidelines. LSP physicians do not perform history and physical examinations pertinent to the patient's diseases, timely address abnormal laboratory tests, assess medication adherence, and monitor the patient in accordance with the patient's disease control. In fact, in many records we reviewed, the physician did not examine the patient. Predictably, this resulted in patients' chronic diseases being poorly controlled and increasing their risk of harm.

The medication administration process does not ensure that patients timely receive their medications. Health care understaffing has resulted in correctional officers administering medications, for which they are not trained and licensed. Medication administration records are unreliable and even show that staff document administering medications to patients after they have died. In medical housing units, inmates are used to administer medications to other inmates.

With respect to infirmary care, LSP does not have clinical criteria for admission to the infirmaries. This has resulted in medically unstable inmates being admitted to the infirmary instead of being sent to a hospital, resulting in preventable deaths. Physicians do not perform adequate medical evaluations. Health care understaffing has resulted in inmates being used to provide direct patient care in the infirmary and medical housing units, in violation of correctional standards.

…

In summary, the LSP health care delivery system fails to provide adequate care to the population and places inmates at significant risk of serious harm. In our collective experience of over 60 years in correctional medicine, the Louisiana State Penitentiary's delivery of medical care is one of the worst we have ever reviewed.[65]

35. The experts reiterated these findings at trial. As Ms. LaMarre summarized:

[W]hat was really, really striking about LSP is the … lack of an adequate comprehensive healthcare program that ensured that patients got timely care for their serious medical problems. I was struck by just the sheer number of encounters where patients presented with signs and symptoms of serious medical conditions and were not seen by a physician. I was struck by the number of encounters in which patients presented with life-threatening vital signs in which they were not evaluated by a physician and they were not sent to a hospital.

I was struck by the fact that EMTs, who are very good at emergency response, are basically the gate-keepers for care. They not only respond to emergencies, but they do routine sick call. In the ATU, they're making decisions about whether to contact the doctor or not, and so there was this gatekeeper system by the EMTs that was highly inappropriate in terms of their scope of practice.

I was struck by a medication system that did not ensure that patients timely received their medications. And the medication administration records are, I think, highly inaccurate. They're unreliable. You really can't tell whether patients are getting their medications or not.

I was struck by the lack of adequate staffing such that they're using correctional officers to administer medications. They are using inmates in the infirmary to deliver hands-on care which is not appropriate, and it's a sign that they have inadequate healthcare staffing.

And it was also hard to miss what I perceive to be a punitive attitude towards inmates, … punishing them for seeking healthcare. … [I]f they put in a health request saying they have an emergency and an EMT decides it's not an emergency, that they can be charged with a disciplinary for malingering, and that's really not appropriate for any healthcare professional to be doing.[66]

---

[65] PX 6 at 0007-09.

[66] Oct. 16 Testimony of Madeleine LaMarre at 149:16-150:24; *see also* Oct. 9 Testimony of Dr. Mike Puisis at 123:20-124:10 (summarizing conclusions); Oct. 10 Testimony of Mike Puisis at 46:16-48:17 (same); Oct. 15 Testimony of Susi Vassallo at 141:23-143:25 (same); Oct. 16 Testimony of Susi Vassallo at 19:2-22:24 (same).

36.     Plaintiffs' experts testified reliably and credibly about Defendants' medical practices and their implications for the risk of harm to Plaintiffs.

37.     Each expert testified knowledgably about the subjects on which they focused and the patients they had examined or reviewed. Their testimony was corroborated by the medical records underlying their review, which were introduced in full into the record.

38.     Similarly, each expert testified reliably and credibly about the standards within the medical profession for the types of care on which they opined. Their testimony was amply supported by reference to clinical guidelines, published practice standards, textbook guidance, and, where appropriate, their own experience and observations as professionals in correctional medicine.

39.     Defendants did not move to exclude any of Plaintiffs' experts under Rule 702. Nor did Defendants' experts dispute the vast majority of Plaintiffs' evaluations of the records they reviewed; as discussed *infra* ¶¶ 132-133, of the 47 patients in Plaintiffs' experts' sample, Defendants' experts commented on only three, and did not seriously dispute Plaintiffs' experts' analysis even there.

40.     Instead, Defendants' questions and arguments, as well as their experts' testimony, suggest five principal criticisms of Plaintiffs' experts. None of these criticisms have merit.

         a.   *Plaintiffs' Experts' Sampling Methodology Was Reliable*

41.     First, Defendants assert that Plaintiffs' experts "cherry-picked" their sample of class members.[67] However, the sample employed a standard, reliable methodology known as "judgment sampling" or "targeted sampling." As Dr. Puisis explained:

         We chose records of people who had serious medical conditions or potentially serious medical conditions. And the reason for doing that is that we want to test the program to ensure that people with a serious medical condition would be appropriately treated, under the assumption that if someone with a serious medical condition was appropriately treated, then others probably would also be so appropriately treated.[68]

42.     Or, as Ms. LaMarre put it:

---

[67] Oct. 17 Defs.' Oral Rule 52(c) Mot. at 111:5-21.
[68] Oct. 9 Testimony of Mike Puisis at 98:3-21; *see also* PX 6 at 0010 (experts "selected records of patients with chronic diseases and other serious medical conditions because these are the patients who use the health care system most regularly and are at risk of harm").

What I do is select records that would most likely inform me about patients who use the healthcare system regularly. So I select patients with chronic diseases, because I know there will be medical provider visits, they'll get medications. In many cases they'll get specialty services. I'll select records of patients who have been hospitalized. I will request to review mortality records to see what happened preceding their death, to see if care was timely and appropriate.[69]

43.    Judgment sampling has been recognized as reliable in numerous cases, including cases about correctional practices in particular.[70] These "non-randomized qualitative research methods are both 'accepted and mainstream in the scientific community,' and, in the view of some experts, 'more applicable to a proper evaluation of the delivery of health care at a prison.'"[71] As explained by an expert in a prior case:

When sampling from people (patients, staff) and documents in qualitative research, random samples are to be avoided. Instead, the gold standard for sampling is "judgment sampling" or "purposeful sampling". Instead of using random number generators to select samples, a judgment sample is chosen based on the expertise and judgment of a subject matter expert with knowledge of the system or process being assessed. The goal is to obtain a sample which is as broad, rich, and representative of the diversity of operational conditions as possible. Such a process for collection of data usually requires appropriate expertise in the relevant disciple: "At the same time, the choice of which data to examine, or how best to model a particular process, could require subject matter expertise that a statistician lacks." Judgment samples are appropriate because ensuring that all potential observational units in a population and sampling time frame have equal probability of selection is often not the most desired or beneficial strategy. Rather, we look to the subject matter experts to guide which areas, times of day, or segments of the population are most important to study and understand.[72]

44.    Both of Defendants' experts endorsed this methodology. Dr. Moore explained that she "pull[s] charts of people that have gone to the emergency room or charts of people that have had chronic care. There's no point in just pulling ten random charts if no one has diabetes."[73] Dr. Thomas conceded that most accreditation bodies and most experts do what Plaintiffs' experts did in reviewing a sampling of records among patients with serious needs.[74]

45.    Moreover, Defendants themselves use, and have endorsed, the basic methodology underlying Plaintiffs' medical experts' sample. As Dr. Singh, then a defendant and the

---

[69] Oct. 16 Testimony of Madeleine LaMarre at 142:8-16.

[70] *See Braggs v. Dunn*, 317 F.R.D. 634, 645-46 (M.D. Ala. 2016) (collecting cases).

[71] *Id.* at 646 (quoting *Dockery v. Fisher*, 253 F. Supp. 3d 832, 844 (S.D. Miss. 2015)).

[72] *Dockery*, 253 F. Supp. 3d at 844.

[73] Oct. 23 Testimony of Jacqueline Moore at 157:5-8.

[74] Oct. 23 Testimony of David Thomas at 65:4-11; *see also id.* at 13:20-22 (claiming that his process in developing his opinions was similar to Plaintiffs' experts' process).

DOC's statewide Medical Director, explained when describing his approach to reviewing the quality of care at Angola:

> It's not random selection. … [I]t's about selecting the target population smartly. And this [is] not something we created … . The whole industry grapples with this question, how to make the random selection very efficient. But the target population cannot be the all population. You have to be wise in selecting your denominator, that is chronic patients with chronic diseases. … Because if we take good actions, good care is being delivered, then hopefully there will be less complications down the record. That's how you select[,] the chronic disease, not all offenders.[75]

46.     This is exactly what Plaintiffs' medical experts did. They reviewed patients selected at random from within the population of patients with chronic diseases or who had passed away. This is, in Dr. Singh's words, "efficient" and "wise in selecting [the] denominator."[76]

47.     Given Defendants' own use of judgment sampling, their experts' approval of the methodology, and Defendants' decision not to bring a *Daubert* challenge to Plaintiffs' expert opinions, it does not appear that Defendants are challenging the judgment sampling methodology itself. At most, they appear to be asserting that Plaintiffs' experts misused it: that Plaintiffs' experts misapplied their judgment in creating their judgment sample, and sought out particularly sick individuals rather than merely individuals with chronic diseases or who had died.[77]

48.     This argument is not advanced by Defendants' experts and there is no factual basis to support it. It is undisputed that the only information Plaintiffs' experts had when choosing records to review was names on a list of inmates with chronic diseases and hospitalizations and, for deceased inmates, the name, age, date of death and cause of death (e.g., "Natural Expected/Chronic Illness with Normal Progression," "Natural Unexpected/Acute Event," "Suicide," etc.).[78] This information would not allow the kind of "cherry-picking" Defendants assert, and there is no evidence whatsoever that Plaintiffs' experts used (or even had available) any other information that would allow cherry-picking.

49.     Rather, as Dr. Vassallo explained:

> I had no idea what the care was going to be when I chose the chart. … I want to know when somebody gets to the hospital, why they got there and how they got there. My choice of charts could have resulted in a completely different finding that patients were appropriately and necessarily sent quickly to the hospital. I had no idea

---

[75] JX 4-bbb, R. Singh Depo. at 228:24-231:16.

[76] *Id.* at 231:1-7.

[77] *See* Oct. 17 Defs.' Oral Rule 52(c) Mot. at 111:5-21.

[78] *See* Oct. 16 Testimony of Madeleine LaMarre at 142:17-25; PX 233 at 1-19 (a subsequently updated version of the list from which Plaintiffs' experts chose death records); Oct. 11 Testimony of Mike Puisis at 39:20-21..

what I was going to find, and what it found is that the patients went to the hospital because they had gotten poor care and had go to the hospital[,] except in the cases that we've discussed where that was not the case.[79]

50.     Indeed, aside from having the age and cause of death for patients who died, it is undisputed that the selection from the pool of individuals with chronic diseases was "random," as Ms. LaMarre explained.[80]

51.     Moreover, Defendants' assertions are belied by the sample itself. Defendants assert that Plaintiffs' experts found "tough cases" by "picking ages that are young" from the "people that died."[81] As a preliminary matter, Defendants' argument is misplaced. As already explained, judgment sampling entails identifying "segments of the population" that are most important to understand,[82] and the selection of, as Defendants put it, "tough cases" helps observe the quality of care when the risks to patients from deficient care are at their highest. In any event, among deceased patients in the experts' chart reviews, the sample includes four patients younger than 40, seven patients between 40 and 49, eleven patients between 50 and 59, and six patients 60 or older.[83]

52.     Defendants also suggested during cross-examination that Plaintiffs' experts should have simply selected the 28 most recent deaths at the time of their visit.[84] However, reviewing records over a relatively broad period of time was necessary to determine that the problems were longstanding and not a momentary lapse in an otherwise well-performing system. The sample included ample evidence that the problems continued to the end of the discovery period, with at least 26 reviews of medical records from 2015-2016.[85] Had Plaintiffs' experts limited themselves to *only* that time period, they would have reduced the reliability of their conclusion that these problems were longstanding and systemic.[86]

53.     Although Defendants do not challenge the robustness of the sample, and present no statistical or other expert basis on which to do so, it bears noting that the sample is more than robust enough to shed light on the care that Defendants provide at a systemic level. As

---

[79] Oct. 16 Testimony of Susi Vassallo at 127:22-128:8.

[80] Oct. 16 Testimony of Madeleine LaMarre at 142:21-25.

[81] Oct. 17 Defs.' Oral Rule 52(c) Mot. at 111:5-21.

[82] *Dockery*, 253 F. Supp. 3d at 844.

[83] *See* PX 6 at 0082-273; PX 233 at 0011, 15, 35, 49, 61, 68, 281, 345, 441, 484. Specifically, Patients # 18, 20, 21, 35 were younger than 40; Patients # 1, 15, 16, 17, 22, 37, and 40 were between 40 and 49; Patients # 2, 5, 7, 8, 9, 19, 31, 32, 34, 38, and 41 were between 50 and 59; and Patients # 3, 4, 6, 10, 36, and 39 were 60 or older.

[84] Oct. 11 Testimony of Mike Puisis at 39:12-40:7.

[85] *See* PX 6 (Patients # 2, 6, 11, 12, 13, 14, 20, 23, 24, 25, 26, 27, 28, 30, 33, 42, 43, 44, and 45); PX 410 (Patients # 46, 51, 52, 53, 54, 55, 56).

[86] *See infra* n.1980-1985 (discussing Fifth Circuit and Supreme Court case law holding that the long duration of a problem is evidence of deliberate indifference).

explained above, Plaintiffs' medical experts looked at hundreds or even thousands of pages of medical records for each patient in their sample. In some cases, the evidence they reviewed stretched back more than a decade. They reviewed thousands of encounters between patients and medical personnel—sick call examinations, chronic disease visits, diagnostic test results, emergency treatment, specialists' findings, and every other type of encounter that a patient has with medical care. They reviewed these thousands of encounters in context, chronicling patients' care from appointment to appointment and sick call to sick call. This allowed them to observe whether Defendants provided adequate care over multi-year periods or consistently made similar mistakes and omissions, as well as the impact that Defendants' care has on the course of patients' medical needs and conditions over time.

54.     To the extent Defendants implied that care might have materially improved over the course of the discovery period, all three experts testified that they saw no change in the inadequate care over time.[87] As Ms. LaMarre concluded, "During the period of time that [the experts] reviewed, care remained poor. ... My assessment is that it's an inadequate system and it really hasn't improved."[88]

55.     Finally, allegations of cherry-picking are undermined by the records of one patient whom Plaintiffs' experts could not possibly cherry-pick: Patient #44, who required medical care in the ATU while Dr. Vassallo was conducting her site visit.[89] Patient #44 had attempted suicide by hanging and was brought to the ATU. Although Dr. Vassallo found that paramedics had done a "good job" in intubating the patient during transport to the ATU, the doctor who received the patient failed to recognize that the patient needed "bagging"— that is, external ventilation to inflate his lungs—and the patient was without proper ventilation for 10 to 15 minutes until Dr. Lavespere arrived.[90] Dr. Vassallo documented other errors as well, including failure to promptly transport the patient to a hospital; failure to conduct a neurologic examination; conducting an x-ray that was not indicated rather than transporting the patient; failure to document properly the medical care in the ATU and the associated observations; and failure to properly sedate the patient during transport.[91] Neither Defendants nor their experts disputed any of Dr. Vassallo's conclusions; at most, they pointed out on cross that Patient #44 survived the mistreatment without deficits.[92]

56.     But it is what happened to Patient #44 upon his return from the hospital that is most troubling, and most confirmatory of the findings in the remainder of the sample. On May 23, 2016, Patient #44 tested positive for hepatitis-C antibodies.[93] Even though he saw an

---

[87] *See* Oct. 9 Testimony of Mike Puisis at 167:20-68:1, 194:11-95:12; Oct. 15 Testimony of Susi Vassallo at 165:1-6; Oct. 16 Testimony of Madeleine LaMarre at 150:25-51:11, 225:4-7.
[88] Oct. 16 Testimony of Madeleine LaMarre at 225:4-7.
[89] *See* Oct. 15 Testimony of Susi Vassallo at 166:1-173:9; DX 744; PX 6 at 0061-63.
[90] Oct. 15 Testimony of Susi Vassallo at 166:1-167:10.
[91] *Id.* at 168:14-173:9.
[92] Oct. 16 Testimony of Susi Vassallo at 95:4-5.
[93] DX 744 at 3.

LSP physician a week later,[94] and even though Dr. Lavespere initialed the lab results at an undated time,[95] there is no evidence anywhere in the record that the positive finding was discussed with the patient, that he received CDC-recommended follow-up tests,[96] or that he received *any* treatment or education for this highly contagious disease. Patient #44's records go as late as September 26, 2016[97]—some of the very latest medical records produced by Defendants—and as of that time, more than five months had passed without any acknowledgment or follow-up of his apparent Hepatitis C, much less treatment.

57. Given that medical records that could not plausibly be alleged to be cherry-picked show multiple kinds of poor care and are wholly consistent with the findings throughout the sample, Defendants would need strong evidence of cherry-picking to disregard the remainder of the findings. They provided none, and their argument is thus unavailing.

**b.** *Plaintiffs' Experts' Chart Reviews Were Reliable*

58. The most emphatic part of Defendants' cross-examinations was an attempt to impeach the experts' assessment of their case studies by asking them about specific pages in the medical records. While the implication of the individual line of inquiries was often unclear, the general purpose appeared to be to suggest that the case studies were "bad, unfair, slanted, and biased,"[98] or, at a minimum, that Plaintiffs' experts "lack[ed] proficiency with the specific details of the case[s]" they reviewed,[99] and had misstated or omitted exculpatory details from the medical records.[100]

59. These interrogations did absolutely nothing to undermine the credibility of the experts' testimony and the reliability of their assessment of the medical records. As set forth in detail herein, Defendants' lines of inquiry suffered from numerous flaws. Some dealt with incidental items completely irrelevant to the episodes of care that mattered to the experts' conclusions. Many of them dealt with facts that the experts themselves had acknowledged in their report. Others merely illustrated the unsurprising fact that some patients sometimes refused some care.[101] Some of Defendants' assays even misrepresented the records they proffered outright.

---

[94] *Id.* at 19.

[95] *Id.* at 3.

[96] *Id.* (laboratory informing Defendants that "[t]he CDC recommends that a positive HCV antibody result be followed up with a HCV Nucleic Acid Amplification test").

[97] *Id.* at 2.

[98] Oct. 10 Testimony of Mike Puisis at 71:10-11.

[99] Oct. 17 Defs.' Oral Rule 52(c) Mot. at 111:8-9.

[100] Defendants also suggested that the cross-examinations showed that patients are "getting clinical care. They're getting taken to outside providers, they're getting seen." Oct. 10 Statement of Defs.' Counsel at 187:16-19. This argument is addressed *infra* at ¶¶ 426-431.

[101] For a broader discussion of Defendants' arguments about refusals, see *infra* ¶¶ 409-425.

60. Moreover, the method of examination greatly detracted from its probative value. On most occasions, Defendants' counsel would put up a portion of a page without context and without giving the experts an opportunity to situate the page in the context of the voluminous medical records. These demonstrations were accompanied by rapid-fire, medically inexact and often flatly inaccurate questions that often limited the possibility of meaningful answers. As an attempt to show what was really going on in the medical records, it was too disconnected and inaccurate to persuade; as an attempt to portray the experts as unfamiliar with the records or unreliable narrators, it was far too unreasonable to fault the witnesses for any supposed misstatements.

61. Appendix A provides a patient-by-patient response to Defendants' questions about the experts' sample. The following examples are representative of the countless errors, omissions, misstatements, and irrelevancies in that questioning:[102]

    a.  Patient #1: Dr. Puisis's case study focused primarily on an episode of diabetic ketoacidosis (DKA) that led to the patient's death, as well as (to a lesser extent) poor management of the patient's high blood pressure across multiple years.[103] Defendants did not ask about the DKA episode or the patient's death at all. Instead, they asked about sporadic refusals of medical care over a several-year period, such as a refusal of treatment after a motor vehicle accident and a decision not to take anti-inflammatories after a minor knee injury.[104] One of the refusals involved medical care at a different facility, before Patient #1 was even housed at LSP—a fact that was not disclosed by Defendants when they used the incident at trial.[105] These add nothing whatsoever to Defendants' argument. Defendants also identified four times over an 18-month period when EMTs or providers noted that Patient #1 missed or had been missing his blood pressure medication.[106] But these records show that "long pill call lines" were responsible for his failure to receive his medication.[107] As discussed infra ¶ 415, this shows fault not on the part of Patient #1 but on the part of LSP, which made no effort to address the issue.[108]

    b.  Patient #5: Defendants focused first on the patient's weight loss, showing that in the course of a progressive weight loss of 22 pounds, there was one record where his weight went up two pounds between visits.[109] This shows nothing more than the fact that in progressive, wasting weight loss, there may be momentary upticks from

---

[102] Appendix A summarizes the flaws in questioning for each patient discussed at trial.

[103] *See* PX 6 at 0091-94; Oct. 11 Testimony of Mike Puisis at 60:5-25; *see infra* ¶ 229.

[104] Oct. 10 Testimony of Mike Puisis at 145:2-147:5; *see* JX 10-w at 51339, 51351.

[105] *See* Oct. 10 Testimony of Mike Puisis at 145:16-19; *see* JX 10-w at 51364-65.

[106] Oct. 10 Testimony of Mike Puisis at 146:14-147:24; *see* JX 10-w at 51335, 51338, 51341, 51347.

[107] Oct. 10 Testimony of Mike Puisis at 147:7-23; JX 10-w at 51335, 51338.

[108] Oct. 10 Testimony of Mike Puisis at 148:16-149:13.

[109] Oct. 10 Testimony of Mike Puisis at 178:5-179:23.

appointment to appointment. (Indeed, it may show even less; it may simply show that Defendants have multiple scales that are calibrated slightly differently.) Moreover, Defendants' portrayal of the weight loss story was significantly misleading, as it inexplicably stopped just before a record showing that the patient had lost an additional 34 pounds—even though Defendants proffered a different record from the same date.[110] Defendants also highlighted that the patient died of a complication from a surgery performed by an outside provider,[111] but Dr. Puisis had not suggested the immediate cause of death was LSP's fault. Rather, he faulted the two-year failure to investigate the patient's worsening weight loss and abdominal pain, which left the patient's cancer undiagnosed until it was terminal.[112]

c. Patient #11: Defendants identified and Dr. Puisis acknowledged that on one occasion the records document communication between an LSP provider and an outside specialist.[113] Defendants' counsel asserted that Dr. Puisis's "write-up ignores that, doesn't it?," and that Dr. Puisis "never told the Court or any of the parties in your report that there were communications with the outside providers."[114] This is demonstrably false: Dr. Puisis's chart review explicitly discusses this exact document and states "The doctor spoke with another physician [presumably a surgeon] who said that no further surgery was planned."[115] Indeed, Dr. Puisis specifically discussed the specialist appointments in his direct testimony.[116] Defendants also elicited that the patient was "mostly a no-show" for a Crohn's disease medication, which Dr. Puisis admitted would "make his condition much worse."[117] This, too, was explicitly acknowledged in Dr. Puisis's report, although Dr. Puisis also noted that many MARs were missing and that providers did not discuss medication compliance with the patient.[118] Defendants did not contradict any of the findings in the case study, which included failures to appropriately examine the patient, failure to follow up on specialists' recommendations and test referrals, a two-year failure to initiate necessary immunotherapy, an 18-month failure to send the patient to a GI specialist, and misdosage of a key drug.[119]

---

[110] *See* JX 10-bbb at 55581 (Oct. 30, 2014 Physician's Clinic note); *compare* Oct. 10 Testimony of Mike Puisis at 179:24-180:8 (asking about a different Oct. 30, 2014 record that did not show the patient's weight).

[111] Oct. 10 Testimony of Mike Puisis at 181:2-19.

[112] *See* PX 6 at 0075-76, 112-17; *see infra* ¶ 275.

[113] *Id.* at 0024-25; *see* JX 10-r at 16153.

[114] Oct. 11 Testimony of Mike Puisis at 25:11-21.

[115] PX 6 at 0152 (brackets in original).

[116] Oct. 9 Testimony of Mike Puisis at 138:3-15.

[117] Oct. 11 Testimony of Mike Puisis at 26:19-27:4.

[118] PX 6 at 0143-44.

[119] *Id.* at 0044-45, 155; Oct. 9 Testimony of Mike Puisis at 133:6-139:9.

*d.* Patient #15: Defendants focused first on refusal notes in 2010 and 2011 that were not mentioned in the written report.[120] In response to Ms. LaMarre's explanation that she "focused [her] review more on the 2013 to 2016 period," Defendants' counsel inaccurately stated that her "chart review spends three days going through 2009, 2010, '11, and '12."[121] In fact, these years were barely a page of the chart review, and not mentioned at all in Ms. LaMarre's assessment.[122] Defendants next discussed a June 2013 episode in which the patient left the ATU against medical advice ("AMA"), asserting that Ms. LaMarre "didn't cite these records in this chart review."[123] This was also false; the chart review explicitly cites and quotes these exact records.[124] Defendants then proffered another record where the provider writes that he will discuss admitting the patient for blood pressure monitoring in a subsequent meeting;[125] this was also discussed in the expert report, as was the lack of any evidence that the provider actually did so.[126] Finally, in response to Ms. LaMarre's explanation that Defendants failed to refer the patient to a specialist for an evaluation for curable secondary hypertension, Defendants' counsel said "I just showed you where they got a no-show where he refuses to go. I mean, get him to the clinic where they've got the specialist coming in, he says he didn't show up, he says I'm not coming."[127] Even this was false; none of the records Defendants' counsel showed had anything to do with a specialist referral.

*e.* Patient #18: Defendants made three points about this patient, who tested positive for HIV on November 22, 2013 and had been exhibiting symptoms of full-blown AIDS for some time, but received no treatment or examination by a physician for nearly two weeks.[128] First, they pointed out that a mental health note on November 26 recorded the patient saying "they say I might have Hiv. [sic][129] There is nothing surprising about the patient being aware that he might have HIV, however, as he had requested an HIV test at least as early as August 26, 2013—which Defendants

---

[120] Oct. 17 Testimony of Madeleine LaMarre at 26:3-28:17.

[121] *Id.* at 27:7. Presumably "three days" is a mistranscription or slip of the tongue for "three pages."

[122] *See* PX 6 at 0183-90; *see id.* at 0183-84 (discussing 2000-2012); *id.* at 0190 (presenting assessment).

[123] Oct. 17 Testimony of Madeleine LaMarre at 28:18-31:5 (discussing JX 10-v at 18960, 18964-65).

[124] PX 6 at 0185 ("The EMT documented that the patient left AMA … ." "[A]n EMT completed a Refusal to Accept Medical Care form documenting that the patient … left the treatment center AMA.").

[125] Oct. 17 Testimony of Madeleine LaMarre at 31:6-12; JX 10-v at 18958.

[126] PX 6 at 0185; *see also* Oct. 17 Testimony of Madeleine LaMarre at 31:13-15 ("I think the record shows that no further follow-up took place following that plan to discuss it in the meeting in the morning.").

[127] Oct. 17 Testimony of Madeleine LaMarre at 31:22-32:25.

[128] *See* PX 6 at 0037-39, 83-84, 86, 200-08.

[129] Oct. 17 Testimony of Madeleine LaMarre at 38:6-39:14; JX 10-jj at 39720.

delayed for three months.[130] Moreover, Ms. LaMarre mentioned the psychiatrist's note—including the exact quote Defendants implied she ignored—multiple times in her report.[131] Second, Defendants asserted that the patient saw Dr. Stuart, an infectious disease specialist, on December 5.[132] It is not clear that this is correct, as the physician's note that Defendants proffered says "follow up with Dr. Stuart," which would be an odd thing for Dr. Stuart to write.[133] But even assuming that is correct, that does not explain the nearly two weeks the patient went with treatment by EMTs only, despite abnormal vitals, a new positive HIV test, and months of weight loss, chest pain, and shortness of breath.[134] Third, Defendants disputed Ms. LaMarre's explanation that the patient's MARs showed him receiving medication after he died, claiming that it simply indicated that he had a month's supply of KOP medication and Ms. LaMarre "just [doesn't] understand how LSP does [things]."[135] Ms. LaMarre's interpretation was confirmed, and defense counsel's interpretation explicitly rejected, by the testimony of defense witness Tammi Willis, who testified that a correctional officer or nurse documenting medication the way defense counsel described it would get "reeducate[d]."[136]

f.  Patient #20: Defendants established that this patient, who had serious mental health needs, sometimes refused care.[137] This was acknowledged in Ms. LaMarre's chart review, which specifically said that "[d]ocumentation in the record shows that in some instances the patient refused HIV specialty care."[138] The report then went on to say that "[t]here is no documentation that the patient was ever counseled on the benefits of HIV treatment and risks of refusing care"[139]—and, indeed, Defendants' lengthy presentation on the patient's refusals did not show any evidence of counseling. Defendants also seemed to suggest that, under defense counsel's interpretation of an x-ray and a test result, there was no indication that the patient was suffering the massive internal bleeding from which he died on January 13, 2015.[140] Ms. LaMarre rejected this interpretation,[141] and Defendants presented no medical evidence to suggest that it was correct—much less that it accounted for the patient being treated

---

[130] *Id.* at 39722; *see also* PX 6 at 0086, 208.
[131] *See* PX 6 at 0039, 203.
[132] Oct. 17 Testimony of Madeleine LaMarre at 40:23-41:6.
[133] JX 10-jj at 39648; *see* Oct. 17 Testimony of Madeleine LaMarre at 41:3-8.
[134] *See* PX 6 at 0201-03.
[135] Oct. 17 Testimony of Madeleine LaMarre at 43:15-44:14.
[136] Oct. 24 Testimony of Tammi Willis at 100:17-101:1.
[137] Oct. 17 Testimony of Madeleine LaMarre at 45:21-50:11.
[138] PX 6 at 0227.
[139] *Id.*
[140] Oct. 17 Testimony of Madeleine LaMarre at 52:11-53:24
[141] *Id.*

solely by EMTs overnight when found to be severely anemic, with severe abdominal pain and three days of blood-black stool, as well as other life-threatening abnormal vital signs.[142]

g.  Patient #22: Defendants sought to make three points with this patient. First, they asserted that the patient made no complaints of abdominal pain between August 2012 and September 2013.[143] In fact, the patient complained of abdominal pain in August, September, October, November, and December of 2012, before dying in December 2012 after a CT scan showed a "huge mass in the abdomen … with extensive adenopathy," which was "encasing the aorta and compressing the vena cava"—that is, crushing the man's heart.[144] Second, Defendants asserted that the patient recorded only one pound weight loss between October 3, 2011 and August 23, 2012.[145] But the weight loss LSP failed to evaluate *began* in August 2012, as the patient proceeded to lose 40 pounds in the next four months.[146] The timeframe Defendants highlighted is simply irrelevant.[147] Third, Defendants noted that multiple LSP doctors believed the patient was exaggerating his symptoms and sent him to a psychiatrist rather than attempting to diagnose or treat his worsening symptoms.[148] Far from undermining Plaintiffs' experts' findings, this tragically illustrates their concern that Defendants' staff do not believe their patients;[149] after all, the patient's symptoms were not psychosomatic but the product of an undiagnosed cancer that was rapidly and torturously killing him.[150]

h.  Patient #28: Defendants showed two notes: an August 4, 2015 note in which a specialist prescribes oxygen for the patient "during exertion" (which for the patient meant as little as six minutes of walking), and an August 28, 2015 note in which Dr. Lavespere allowed the patient to have "portable $O_2$ bottle for trips only."[151] The apparent implication was that Defendants promptly provided the oxygen the specialist recommended. This presentation was highly misleading, as the specialist had made the same recommendation at least as early as March 24, 2015—meaning

---

[142] PX 6 at 0034-35, 85, 225-27.

[143] Oct. 17 Testimony of Madeleine LaMarre at 60:9-61:19.

[144] PX 6 at 0234-39; JX 10-eee at 57278, 57288, 57290, 57300, 57303-04, 57307-11.

[145] Oct. 17 Testimony of Madeleine LaMarre at 61:23-62:6.

[146] *See* PX 6 at 0234-39.

[147] *Cf.* Oct. 17 Testimony of Madeleine LaMarre at 65:24 (defense counsel: "You can play games with those numbers, can't you?").

[148] *Id.* at 62:7-65:2.

[149] *See infra* at ¶ 360.

[150] *See* Oct. 17 Testimony of Madeleine LaMarre at 101:9-20.

[151] *Id.* at 88:1-20.

that Defendants delayed the prescription by more than five months, and then only allowed for oxygen on trips, not during exertion.[152]

i. Patient #29: Defendants primarily sought to show that this patient had three hospital visits during a period when Dr. Vassallo concluded he should have been hospitalized.[153] This was false: two of the three "hospital visits" were merely telemedicine consultations.[154] The third hospitalization did actually happen, as Dr. Vassallo explained in her chart review: a trip to the emergency room for renal failure and atrial fibrillation, among other serious symptoms that developed after weeks of untreated pneumonia.[155]

j. Patient #36: Defendants proffered two documents that purportedly showed Patient #36 refusing care at an outside hospital.[156] Defendants did not include the previous page of the medical records, which reveals that the *hospital*—not the patient—refused to perform the surgery because the patient's blood pressure was too low.[157] They also asked about a decision not to remove a lipoma, which Dr. Vassallo did not criticize in her report.[158] Finally, they noted that a nurse practitioner was present in the ATU when the patient died.[159] The purpose of this point was unclear, as it shows only that the patient—who one day previous had been in the ATU with wildly unstable vital

---

[152] JX 10-tt-2 at 48809; *see also* PX 6 at 0252-55; Oct. 17 Testimony of Madeleine LaMarre at 88:11-20 ("This is about five months after the initial recommendation … .").

[153] Oct. 16 Testimony of Susi Vassallo at 32:7-40:5; *see id.* at 40:2-4 (defense counsel: "[T]hese records show that during this period of time, there were three outside hospital visits for this individual.").

[154] *Compare id.* at 32:14-18 (defense counsel describing JX 10-j at 09614: "This is where he's seen at the hospital for, among other things, the shortness of breath.") *with* JX 10-j at 09612 (telemedicine consent for appointment recorded in 09614); *compare* Oct. 16 Testimony of Susi Vassallo at 35:21-23 (discussing JX 10-j at 09605) *with* JX 10-j at 09604 (telemedicine consent for appointment recorded in 09605); *see also* PX 6 at 0256-57 (acknowledging telemedicine notes).

[155] *See* PX 0256-57. Defense counsel also attempted to show that ILH turned down a referral request, Oct. 16 Testimony of Susi Vassallo at 34:25-35:7, but it Is not clear that this is correct. The reason the referral was denied ("Dr. [s]tates f/u in Tele med," JX 10-j at 09622) is equally consistent with the interpretation that ILH turned down the referral because the condition Dr. Lavespere placed on it—that follow-up could only be done in telemedicine—was viewed as unacceptable, presumably because it would not allow ILH physicians to ensure the patient's health after treating him.

[156] *Id.* at 67:20-68:16; *see* JX 10-ll at 40365-66.

[157] JX 10-ll at 40364.

[158] *Id.* at 68:17-69:5; *compare* PX 6 at 0269-70.

[159] Oct. 16 Testimony of Susi Vassallo at 69:9-70:1.

signs, "rocking back and forth from pain" and saying he was "gonna die"[160]—was treated by medics alone for more than two hours in the middle of a heart attack.[161]

    *k.* Patient #39: Defendants elicited that this patient didn't wear a nitroglycerine patch on one particular day two weeks before his death, and was masturbating a week before his death.[162] It is unclear what this has to do with Dr. Vassallo's concerns: that he was not examined by a provider for three consecutive days in the infirmary, and that, when he was found lying on the floor unresponsive and vomiting two days after his discharge, Dr. Lavespere and Dr. MacMurdo ordered EMTs to leave him in his cell.[163]

    *l.* Patient #41: Defendants claimed that "[t]his patient refused to be transported off site from LSP three different times."[164] This is incorrect, as at least one of documents they pointed to for support was a refusal to be transported *to the ATU*.[165] The other two are unclear about the destination and could have been an off-site trip, but the nature of the refusals—first, that they were transporting this oxygen-dependent patient without his oxygen supply, such that he "couldn't breathe";[166] and second, that they were forcing him to wear black-box restraints for transport, even though he was confined to a wheelchair[167]—simply shows how Defendants' failure to accommodate patients with disabilities impedes Subclass members' access to medical care.[168]

62.    Defendants also made much of Dr. Puisis's initial failure to remember that he reviewed the records of Shannon Hurd.[169] This was understandable, as Defendants' questions were misleading from the beginning. Defendants' counsel claimed that Dr. Puisis "[g]ave lots of opinions about him yesterday and today" and "closed by talking about him,"[170] when in fact Dr. Puisis had not mentioned him once in his testimony. Defendants' counsel repeatedly portrayed the case study he was talking about as being in the experts' report, when in fact it was in their rebuttal report.[171] Dr. Puisis repeatedly asked for the patient's number because

---

[160] JX 10-ll at 40352.

[161] *Id.* at 40351.

[162] Oct. 16 Testimony of Susi Vassallo at 79:9-80:4.

[163] PX 6 at 0063-64; *see infra* at ¶ 283.

[164] Oct. 16 Testimony of Susi Vassallo at 84:21-85:12.

[165] JX 10-g at 07720.

[166] *Id.* at 07712.

[167] *Id.* at 07697; *see* Oct. 15 Testimony of Otto Barrera at 9:17-11:3 (describing black-box restraints).

[168] *See infra* ¶¶ 575-585 (discussing failures to accommodate).

[169] *See* Oct. 10 Testimony of Mike Puisis at 51:5-70:25; Oct. 11 Testimony of Mike Puisis at 4:8-11:3.

[170] Oct. 10 Testimony of Mike Puisis at 51:21-22.

[171] *See, e.g., id.* at 54:15-19; *see also* Oct. 11 Testimony of Mike Puisis at 40:25-41:1 ("I thought he was talking about the—you know, the summary investigative report.").

of his understandable misunderstanding that defense counsel was asking about one of the patients in the anonymized sample.[172] Defendants' counsel did not give Dr. Puisis an opportunity to review Mr. Hurd's summary in the rebuttal report, and repeatedly took down documents before Dr. Puisis had had a chance to review them.[173]

63. Dr. Puisis credibly testified that he realized his error "immediately" upon beginning to read the writeup of Mr. Hurd after the second day of trial concluded.[174] He explained on both cross-examination and redirect that he had not reread the rebuttal report in preparation for trial, because he "was paying attention to the patients in the main report."[175] Given that the experts did not consider the named Plaintiffs as part of their sample, so that they could test the adequacy of care without relying on patients selected by Plaintiffs' counsel, and that Dr. Puisis wrote up Mr. Hurd's care only in rebuttal to Dr. Thomas's report, this seems entirely reasonable.[176] Finally, the idea that Dr. Puisis would remember by name every one of the patients whose charts he reviewed two years before trial, when he had reviewed "[w]ell over a couple hundred" patients since then, is unrealistic.[177] In sum, Dr. Puisis's failure to realize that Defendants' counsel was asking about a patient he had reviewed for the rebuttal report is eminently understandable in the circumstances.

64. On the substance, nothing Defendants pointed out about Mr. Hurd's records materially undermined the reliability of Dr. Puisis's assessment. Dr. Puisis found that Mr. Hurd's treatment "was a significant departure from standard of care and demonstrates multiple systemic deficiencies that caused the patient harm," without which he "could have had a much earlier diagnosis" and "much better prognosis."[178] Defendants discussed four of Mr. Hurd's symptoms and signs—weight loss, side pain, abdomen pain, and urinalysis results—

---

[172] *See, e.g.*, Oct. 10 Testimony of Mike Puisis at 51:8 ("Can you—is that one of the first 14?" … "If you can refer to the patient number."); *id.* at 54:17 ("If you give me the number, I would know for sure … ."). It appears that Dr. Puisis may have misheard "Page 18" as "Patient 18," further adding to the confusion. *See id.* at 51:18-20 (Q: "It'd on page 18 of your chart review. You don't know who I'm talking about?" A: "That record was reviewed by Ms. LaMarre."). Ms. LaMarre reviewed Patient 18.

[173] *See, e.g., id.* at 65:14-16 (The Court: "Counsel, he said he wanted to look at the medical records. If you want him to look at the medical records and you want to cross-examine him, you can."); *id.* at 67:20-22 (Plaintiffs' counsel: "If he's going to be doing this … he should be giving Dr. Puisis the full document."); *id.* at 67:25-68:1 (The Court: "He said he wanted to look at the record before testifying as to this gentleman … ."); *id.* at 69:15-16 (The Court "Leave [the document] on there; let the man answer the question, for heaven's sakes."); Oct. 11 Testimony of Dr. Mike Puisis at 41:8-11 (Q: "Before Mr. Archey asked you questions about the discussion of Mr. Hurd in the rebuttal report, did you have the opportunity to read what he was showing you?" A: "No.").

[174] Oct. 11 Testimony of Mike Puisis at 41:15-19.

[175] *Id.* at 41:20-25; *see also* Oct. 10 Testimony of Mike Puisis at 57:5-6.

[176] Oct. 11 Testimony of Mike Puisis at 42:1-43:23.

[177] *Id.* at 44:19.

[178] PX 28 at 0022; *see generally id.* at 0018-22.

as well as certain refusals of care.[179] Many of their assertions regarding these topics were false or contradicted by their own 30(b)(6) testimony, and those that were accurate were insubstantial at best.

a. *Weight loss*: Defendants asserted that Plaintiffs' experts "took the highest weight that Mr. Hurd had and used that as [a] comparison as opposed to what he had prior to that."[180] Defendants asserted that the record showed that Mr. Hurd "starts out on September 24, 2012, at 220 pounds" and that Plaintiffs' experts improperly ignored that in favor of a subsequent "record of 235 pounds" to make Mr. Hurd's weight loss seem more extreme.[181] This accusation is exactly backward. Defendants' timeline is wrong: the March 24, 2012 weighing that Dr. Puisis uses as a starting point is the first weight in the records, and the September 24, 2012 weighing that Defendants focused on came six months later.[182] Defendants' entire argument appears to be premised on a failure to recognize that the March 19, 2012 weighing came before the lower September 24, 2012 weighing.[183] Dr. Puisis quite appropriately used the first weight in Mr. Hurd's as his starting point—exactly what Defendants seem to be saying he should have done.

b. Defendants' plain inaccuracies cloud a deeper problem with their assertions. Dr. Puisis never suggested that Mr. Hurd's weight between May 2012 and September 2013 should have prompted an examination of Mr. Hurd's symptoms and an attempt to diagnose them. Rather, the first time Dr. Puisis expresses concern is November 4, 2013, when Mr. Hurd had so far lost 15 pounds and was about to begin two years of a nearly unremitting decline of another 50 pounds.[184] Defense counsel claimed that

---

[179] *See* Oct. 10 Testimony of Mike Puisis at 55:22-70:25; Oct. 11 Testimony of Mike Puisis at 4:23-11:3.

[180] Oct. 10 Testimony of Mike Puisis at 60:19-21; *see generally id.* at 57:19-61:2; Oct. 11 Testimony of Mike Puisis at 5:22-6:9.

[181] Oct. 10 Testimony of Mike Puisis at 60:23-61:2; *see also* JX 10-cc-2 at 25774.

[182] *See* JX 10-cc-2 at 25774, 25787.

[183] Even without that mistake, Defendants' accusation that Dr. Puisis "took the highest weight that Mr. Hurd had" would be wrong; Dr. Puisis started with the earliest, March 29, 2012 weight of 233 pounds, but in mid-2013 he recorded weights of 238, 234, 237, and 235 pounds. *See* Oct. 10 Testimony of Mike Puisis at 59:1-60:4; *see* JX 10-cc-2 at 25729, 25744, 25746-47. Defendants are also wrong that Dr. Puisis started "from a March 19, 2012 record of 235 pounds," Oct. 10 Testimony of Mike Puisis at 60:23-25; in fact, the rebuttal report correctly stated that his weight at that time was recorded at 233 pounds. PX 28 at 0019; JX 10-cc-2 at 25787.

[184] PX 28 at 0019-22; *see* JX 10-cc-2 at 25708 (11/4/13: 218 pounds); *id.* at 25704 (1/16/14: 225 pounds); *id.* at 25526 (5/12/14: 206 pounds); *id.* at 25513 (9/22/14: 206 pounds); *id.* at 25511 (10/13/14: 208 pounds); *id.* at 25499 (4/15/2015: 197 pounds); *id.* at 25483 (6/24/15: 185 pounds); *id.* at 25473 (8/19/15: 183 pounds); *id.* at 25460 (11/06/15: 177 pounds).

Mr. Hurd "had no weight loss until at least the middle of 2015,"[185] but that is demonstrably untrue.[186]

c. *Side pain*: Defendants next asserted that Mr. Hurd never complained of left-sided pain prior to October of 2015.[187] Mr. Hurd complained of left-sided pain stretching from his arm to his foot, specifically referencing his lower torso, repeatedly in January 2012, July 2013, and August 2013.[188]

d. *Abdomen pain*: Defendants similarly claimed that "the first report of abdomen pain is October 21, 2015."[189] This is again wrong; Mr. Hurd complained of side pain—that is, abdominal pain—in September 2013.[190] Indeed, at this time, Dr. Lavespere appears to have written "onc"—the medical abbreviation for oncology—on Mr. Hurd's sick call form, but did nothing to follow up on his apparent recognition that an oncology follow-up was indicated for two more years.[191]

e. *Urinalysis*: Defendants finally hit on a correct line of attack by pointing out that Dr. Puisis had misread the date of an April 17, 2014 urinalysis result, and thought that it was associated with an April 15, 2015 referral for a urinalysis.[192] This misreading is understandable, given the unclear handwriting on the document[193] and the expectation that the first urinalysis in the record might logically follow the first urinalysis referral in the record. Certainly a single misread date does not undermine Defendants' extensive findings.

f. Defendants also fault Dr. Puisis for not mentioning that the urinalysis was negative for blood when it was finally conducted nearly seven months after the referral, on November 3, 2015.[194] But this test was accompanied by blood tests that showed

---

[185] Oct. 11 Testimony of Mike Puisis at 5:22-24; *see also id.* at 6:1-8.

[186] *See supra* n.184.

[187] Oct. 10 Testimony of Mike Puisis at 61:3-11; *see also id.* at 63:22-64:5.

[188] *See* JX 10-cc-2 at 25794 (describing "body pain" including "L lower lumbar area"); *id.* at 25793 (describing "L wrist pain and pain to both ankles. [Patient] also [complains of] pain to lower back … L 2/3 area"); *id.* at 25792 (describing "L side foot arm pain" with "body aching"); *id.* at 25791 (describing "pain to L side chest … been hurting x4 days" and "L side hip pain"); *id.* at 25730 (describing "L leg 'giving out'"); *id.* at 25729 (describing "L leg pain")

[189] Oct. 11 Testimony of Mike Puisis at 10:3-5.

[190] *Id.* at 45:23-46:7; JX 10-cc-2 at 25718.

[191] JX 10-cc-2 at 25718; *see* Oct. 11 Testimony of Mike Puisis at 46:16-21.

[192] *See* Oct. 10 Testimony of Mike Puisis at 64:10-24; PX 28 at 0019; JX 10-cc-2 at 25217.

[193] *See* JX 10-cc-2 at 25217.

[194] Oct. 10 Testimony of Mike Puisis at 65:23-19; *see* JX 10-cc-2 at 25216.

significant anemia, at a level that "patients are typically transfused."[195] Dr. Puisis understandably focused on this far more important result in his chart review, rather than including every single test result no matter the significance.[196] A urinalysis showing no trace blood is of vanishingly small relevance when the patient is showing such a critical value, and Defendants put forward no medical evidence suggesting there was any way that omitting the urinalysis made the case study misleading.[197] Notably, that critical anemia was not addressed for three days, with no action taken except a repeat blood count and a brief observation in the infirmary.[198]

g. *Refusals*: Finally, Defendants noted that Mr. Hurd "refused" lab work on at least two occasions in mid-2015.[199] The only refusal forms that they showed, however, were a blank June 11, 2015 refusal form with no evidence that Mr. Hurd was informed what he was "refusing," and a June 26, 2015 refusal where Mr. Hurd could not give the lab work because he had not fasted.[200] From these two refusals, Defendants assert that Mr. Hurd "refused those labs over that seven-month period."[201] This is not borne out by the records. On even the most Defendant-friendly reading of the medical records, accepting unexplained notes that Mr. Hurd did not show up for appointments around this time,[202] Mr. Hurd's refusals lasted just one month, not seven months.[203] There is no explanation in the medical records whatsoever for Defendants' failure to take these blood tests over the following six months, despite Mr. Hurd's numerous, increasingly dire requests for help.[204] Indeed, the undisputed evidence shows that Mr. Hurd asked Defendants to reschedule the bloodwork after missing the June 11 and June 26 tests—which he had missed because he was "too weak to go" on June 11 and because Defendants never told him he needed to fast before the June 26 test.[205]

---

[195] PX 28 at 0021; *see* JX 10-cc-2 at 25213.

[196] PX 28 at 0021.

[197] *See also* Oct. 11 Testimony of Mike Puisis at 47:2-12 (explaining why the urinalysis results did not give Dr. Puisis reasons to doubt his conclusions).

[198] PX 28 at 0021; *see* JX 10-cc-2 at 25460, 25601-02.

[199] Oct. 10 Testimony of Mike Puisis at 68:11-70:25.

[200] JX 10-cc-2 at 25481, 25486.

[201] Oct. 11 Testimony of Mike Puisis at 7:17-20.

[202] JX 10-cc-2 at 25477, 25479. On the interpretation of "no-shows" and "refusing callouts" more generally, *see infra* ¶ 415.

[203] *See* JX 10-cc-2 at 25477, 25479, 25481, 25486.

[204] *See* PX 28 at 0020-22; *see generally* JX 10-cc-2 at 25461-80.

[205] JX 4-u at 50:8-52:11.

h.  Dr. Puisis's omission of two refusals that could not possibly explain the delay in performing the indicated tests is thus entirely reasonable.[206] Moreover, Defendants' insinuation that Mr. Hurd's refusals caused his delayed diagnosis is directly contradicted by Dr. Lavespere's binding 30(b)(6) testimony, in which he explicitly stated that Mr. Hurd's refusals did not affect the course of his treatment or his conditions.[207] Thus this supposed omission takes nothing away from the reliability of Dr. Puisis's analysis.

65.  Thus, aside from misreading a single test date by a single digit, Defendants did not identify any errors or unreasonable omissions from Dr. Puisis's review of Mr. Hurd's care. Nor do they address the numerous other troubling signs and symptoms that Dr. Puisis explained were ignored—much less the failure to address critical test results in November and December 2015, including a nearly month-long delay before following up on a CT scan "showing a large renal mass with multiple lung nodules consistent with metastases."[208]

66.  Finally, to the extent that there may have been a handful of technical errors somewhere in the dozens of charts that Plaintiffs' experts reviewed, Defendants have not come close to showing that they call the reliability of Plaintiffs' assessments into question. The medical records in this case stretch over tens of thousands of pages and seven years of care. Many of the records are disorganized, hard to read, and missing relevant documents.[209] Most records include dozens if not hundreds of encounters with EMTs, correctional officers, nurses, physicians, and outside specialists. It would be remarkable if Plaintiffs' experts managed to synthesize these tens of thousands of pages into two hundred pages of reports without missing a single detail.

67.  These hypothetical small errors would do nothing to take away from the mountain of evidence showing inadequate care that the medical records contain and Plaintiffs' experts reliably evaluated. The experts identified literally hundreds of encounters and medical decisions or omissions that they concluded fell below the standard of care that were not disputed in *any* way by Defendants—neither factually nor as a difference of expert interpretation.[210] As Plaintiffs' experts explained, neither sporadic examples of good care, nor

---

[206] *Cf.* Oct. 11 Testimony of Mike Puisis at 48:5-7 ("[W]e put items that had impact or potential impact on patient care or that demonstrated systemic issues at the facility.").

[207] *See* JX 4-pp at 7-9. Notably, Dr. Thomas did not mention these refusals at all in his report, much less connect them to Mr. Hurd's overall care or outcome.

[208] PX 28 at 0019-22; *see also infra* ¶ 141.

[209] *See, e.g.,* Oct. 11 Testimony of Mike Puisis at 58:10-59:4; *see also* Oct. 16 Testimony of Susi Vassallo at 110:20-11:8 ("[S]ometimes we had a record of one date; 60 pages later, we were back to the same episode of care.").

[210] *See infra* ¶¶ 132-133 (discussing Defendants' experts failure to dispute the vast majority of case studies in Plaintiffs' experts' sample).

isolated minor errors in chart reviews, can overshadow the myriad evidence of substandard care discussed below.[211]

c. *Plaintiffs' Experts Applied Reliable Standards*

i.   Clinical Standards

68.   To evaluate the adequacy of care in the records they reviewed, Plaintiffs' experts used what they referred to interchangeably as "contemporary standards," "clinical standards," and "community standards."[212] As Dr. Puisis explained, "for diabetes, we would use as a benchmark the American Diabetes Association standards of diabetic care; for hypertension, the National Heart, Lung, and Blood [Institute] hypertension standards, et cetera."[213] Such standards provide guidelines for medical treatment of the relevant condition, from the signs and symptoms for use in diagnosis to recommended testing to the appropriate range for medication dosage.

69.   It is undisputed that these standards are the standard of care among professionals in the field.[214] Defendants presented no expert testimony or evidence to the contrary, but did suggest during cross-examination of Dr. Puisis that the standard of care may be lower in Louisiana than it is in another part of the country.[215]

70.   Without any evidentiary support, this suggestion cannot be accepted. Dr. Puisis testified without challenge that he is unaware of any reputable authority that suggests that clinical standards of care vary by location.[216] While Defendants' expert Dr. Thomas suggested that there are some unique aspects of correctional medicine that affect how care is delivered—a general proposition Plaintiffs do not dispute—neither he nor Dr. Moore suggested that the actual medical content of minimally acceptable care varies from place to place, or even from a carceral setting to a non-carceral setting.

71.   Thus there is no serious dispute that the clinical standards Plaintiffs' experts used are reliable and appropriate. Nor did Defendants assert in even a single instance that Plaintiffs' experts

---

[211] *See, e.g.*, Oct. 11 Testimony of Mike Puisis at 51:3-6, 57:16-58:9; Oct. 16 Testimony of Susi Vassallo at 111:16-112:1.

[212] *See* Oct. 10 Testimony of Mike Puisis at 80:2-13 ("[W]e see it as the same."); Oct. 9 Testimony of Mike Puisis at 103:4-104:20; *see also, e.g.*, Oct. 10 Testimony of Mike Puisis at 82:3-18; PX 6 at 0042-43.

[213] Oct. 9 Testimony of Mike Puisis at 103:8-11. The Court took judicial notice of several such standards on September 25, 2018. *See, e.g.*, Rec. Doc. 517-1 (CENTERS FOR DISEASE CONTROL AND PREVENTION: VIRAL HEPATITIS, HEPATITIS C QUESTIONS AND ANSWERS FOR THE PUBLIC, https://www.cdc.gov/hepatitis/hcv/cfaq.htm (last visited Aug. 1, 2018)).

[214] *See* Oct. 9 Testimony of Mike Puisis at 103:14-18.

[215] Oct. 10 Testimony of Mike Puisis at 77:9-82:1.

[216] *Id.* at 78:22-82:1.

misapplied those standards or incorrectly identified places in which Defendants' care fell short of them.

ii.    Correctional Guidelines

72.    Plaintiffs' experts also occasionally referred to standards issued by the National Commission on Correctional Healthcare ("NCCHC") and the American Correctional Association ("ACA").[217] As Dr. Puisis explained, such standards are "not clinical standards" but rather "recommendations for how the process of healthcare should be conducted, and they give guidance on processes as opposed to clinical care."[218] Following such guidelines can help a correctional facility increase its chances of delivering adequate care, but the relevant constitutional question is whether standards of *clinical* care are met because such standards alone "determine[] whether someone with a serious medical condition actually receives appropriate management."[219] Facilities can comply with the NCCHC or ACA standards but still not provide care that meets clinical standards.[220]

73.    Defendants criticize Plaintiffs' experts for citing NCCHC standards in addition to ACA standards, arguing that Defendants have been accredited by the ACA and implying that substantial compliance with those standards would suffice to provide constitutional care. They assert that NCCHC guidelines are "aspirational" standards rather than actually prevailing standards.[221] This argument is unpersuasive, for several reasons.

a.    First and most importantly, the ultimate question is not whether Defendants comply with privately created guidelines, but whether they provide constitutionally adequate clinical care as measured by the clinical standards discussed above. As detailed at length *infra* ¶¶ 150-405, Plaintiffs have proven that Defendants frequently do not provide constitutionally adequate care. The NCCHC and ACA standards are useful aids in identifying practices that contribute to those inadequacies, but they are not dispositive of any issue in this case.[222]

b.    Second, it is undisputed that the NCCHC guidelines are widely looked to and relied upon by experts in correctional medicine.[223] Indeed, experts on both sides of the case have opined that NCCHC standards are superior to ACA standards. Dr. Puisis

---

[217] The NCCHC standards are in the record as PX 243. The ACA standards are in the record as DX 499 at 05631-34.

[218] Oct. 9 Testimony of Mike Puisis at 104:2-6; *see also* Oct. 16 Testimony of Madeleine LaMarre at 223:5-224:10.

[219] Oct. 9 Testimony of Mike Puisis at 104:19-20.

[220] *Id.* at 104:21-24.

[221] *See* DX 14 at 02923-24.

[222] *See Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004) ("While compliance with ACA standards may be a relevant consideration, it is not *per se* evidence of constitutionality.").

[223] Oct. 9 Testimony of Mike Puisis at 105:2-25.

testified that he believes that the NCCHC "is a better standard set."[224] Defendants' expert Dr. Moore testified that NCCHC standards are "authoritative," and represent "a minimal level" of care; indeed, she stated that she trusts NCCHC "explicitly [sic]."[225] She further contradicted Defendants' other expert in her opinion that they are "not aspirational."[226]

c. Third, the provenance of the two sets of standards suggests that the NCCHC is more reliable. The NCCHC grew out of a survey by the American Medical Association and is "principally dedicated to healthcare."[227] The ACA, by contrast, is "principally a custody organization."[228] Its accreditation reviews focus mainly on custodial aspects, rather than medical aspects.[229] The ACA is comprised of correctional personnel; Warden Cain served on its executive committee, and Secretary LeBlanc served on its Standards Committee and Commission of Accreditation.[230] Without any aspersion of motives, an association of personnel who could be held accountable for falling short of reigning standards has a natural incentive to err on the side of setting standards too low, rather than too high. Indeed, even Dr. Moore believes that the ACA is "more political" than the NCCHC.[231]

d. Fourth and finally, any suggestion that Plaintiffs' experts cherry-picked "aspirational" standards is belied by the fact that Plaintiffs' experts did *not* cite the American Public Health Association's ("APHA") Standards for Health Services in Correctional Institutions, which "are probably a higher level of standard."[232] Dr. Puisis has served on the APHA committee revising its standards, but he and the other experts chose not to rely on them at all in this case because "the NCCHC is probably more universally implemented."[233] The fact that Plaintiffs' experts chose not to advance a plausibly applicable set of standards that is stricter (and thus presumably harder for Defendants to satisfy) lends significant credibility to the rigor and impartiality of their analysis.

---

[224] *Id.* at 106:11-13.

[225] Oct. 23 Testimony of Jacqueline Moore at 151:9152:1.

[226] *Id.* at 151:17-18.

[227] Oct. 9 Testimony of Mike Puisis at 105:1-106:13.

[228] *Id.* at 106:3-4.

[229] *See* Oct. 25 Testimony of Tracy Falgout at 32:5-11.

[230] Oct. 12 Testimony of James LeBlanc at 190:2-24; JX 4-ss, J. LeBlanc Depo. at 33:9-16.

[231] Oct. 23 Testimony of Jacqueline Moore at 152:25-153:1; *but see id.* at 153:1 ("That was my independent thought. I really don't know that. I can't attest to that.").

[232] Oct. 9 Testimony of Mike Puisis at 106:17-18; *see id.* at 106:22-25.

[233] *Id.* at 106:21.

**d.** *Plaintiffs' Experts Are Qualified in the Areas They Testified*

74.     By and large, Defendants do not challenge Plaintiffs' experts' qualifications. Nor could they, as their credentials are impeccable. Dr. Puisis and Ms. LaMarre are among the most experienced correctional health professionals in the country and have quite literally written the book on correctional medicine, while Dr. Vassallo is a nationally recognized toxicologist and emergency room physician who has practiced everywhere from rural Texas to New York's largest public hospital.[234] All three have been relied on by numerous courts, including the Fifth Circuit and the district courts within it.[235]

75.     Defendants did raise two limited criticisms of the experts' qualifications at trial. While these issues would have more properly been raised through pretrial *Daubert* motions, they are in any event immaterial.

76.     First, Defendants did not object to Dr. Vassallo's testimony as an expert in emergency medicine and medical toxicology, but did object to accepting Dr. Vassallo as an expert in correctional medicine.[236] Defendants did not offer any reasoning for this objection and acknowledged that "she certainly has some training in that."[237] Based on Defendants' brief voir dire of Dr. Vassallo, the gist of the criticism seemed to be that Dr. Vassallo's previous work evaluating corrections facilities has principally dealt with the medical effects of temperature, or concerned medical care at prisons and jails where inmates tend to be incarcerated for shorter periods of time than at Angola.[238]

77.     The Court correctly declined to sustain Defendants' unreasoned objection. Among her other qualifications, Dr. Vassallo treats "at least 20 to 30" incarcerated patients every day; is certified in correctional medicine by the NCCHC; and has evaluated conditions at no fewer than 10 prisons and jails.[239] While Defendants suggested that many of those facilities were small, the list includes the Mississippi State Penitentiary (also known as Parchman Farm), which, like LSP, is a working farm with a capacity of several thousand prisoners.[240] Although Defendants also suggested that Dr. Vassallo's other work principally dealt with temperature,

---

[234] *See supra* ¶ 28.

[235] *See supra* nn.49, 51, 53.

[236] Oct. 15 Testimony of Susi Vassallo at 138:5-12.

[237] *Id.* at 138:10.

[238] *Id.* at 136:15-138:4.

[239] *See id.* at 134:2-3, 135:9-11, 135:12-136:4; *see also* PX 6 at 0006.

[240] *See* Oct. 15 Testimony of Susi Vassallo at 136:24-137:1. The Court can take judicial notice of Parchman's approximate size and farm setting from *Mississippi Dep't of Corr.*, *The Mission of the Mississippi State Penitentiary*, https://www.mdoc.ms.gov/Institutions/Pages/State-Prisons.aspx#msp (last visited Apr. 15, 2019). ("MSP has a capacity of approximately 3,590 beds, which consist of fifty-eight (58) support buildings and seven (7) different housing units, ranging in size from fifty-six (56) beds at Unit 42 (Hospital) to 1,568 beds at Unit 29."). *See* Fed. R. Evid. 201(b).

Dr. Vassallo testified that her work at Parchman "was broader—was all the conditions."[241] Thus Defendants' concerns, such as they can be gleaned from their questions, are unfounded.

78. Second, Defendants did not object to Ms. LaMarre's qualifications as an expert in correctional medicine, but did object to her giving opinions "as to the physician standard of care," in view of the fact that she is a nurse practitioner rather than a physician.[242] The Court overruled the objection and accepted Ms. LaMarre as an expert in correctional healthcare.[243]

79. As the Court observed during trial, Defendants' objection was based on medical malpractice cases against physicians.[244] In such cases, the question is whether a particular physician met the standards of physicians in a particular case. Here, the question is a different one: whether the institution as whole provides care that exposes patients to a serious risk of substantial harm. The relevant question for which Ms. LaMarre provided testimony to aid the factfinder is whether patients are likely to receive care that meets the national clinical standards discussed above, and whether they are likely to suffer harm if not—not whether any particular physician made an error in a particular situation.

80. Defendants provided no basis to doubt Ms. LaMarre's qualifications to provide expert testimony directed at this question, and her credentials and testimony dispel any doubt. More generally, nurse practitioners are "mid-level providers," who provide care comparable to that of a physician in many settings.[245] Family nurse practitioners, like Ms. LaMarre, are "qualified to medically evaluate, diagnose, and treat common occurring illnesses like hypertension, diabetes, et cetera."[246]

81. Indeed, Defendants employ a nurse practitioner as the principal provider for nearly 1100 inmates, in addition to Ward 2, and all HIV, cancer, and hospice patients.[247] Dr. Lavespere testified that he "absolutely [does] not" treat the nurse practitioner any different from the doctors, aside from some general supervision.[248] It is hard to understand how Defendants can argue that a nurse practitioner is incapable of opining on whether clinical standards are met while simultaneously relying on a nurse practitioner to provide care that meets those standards.

---

[241] Oct. 15 Testimony of Susi Vassallo at 137:3.
[242] *See* Oct. 16 Testimony of Madeleine LaMarre at 136:17-137:13.
[243] *Id.* at 140:14-141:4.
[244] *Id.* at 140:17-25.
[245] Oct. 9 Testimony of Mike Puisis at 123:6-9; *see also id.* at 207:23-208:2; Oct. 16 Testimony of Madeleine LaMarre at 129:16-130:3.
[246] Oct. 16 Testimony of Madeleine LaMarre at 129:24-130:1.
[247] Oct. 9 Testimony of Mike Puisis at 209:12-15.
[248] JX 4-pp, Depo. of R. Lavespere at 29:24-30:10.

82.  Defendants also accused Plaintiffs' experts of being "advocates." They argued that

> [W]hat we saw in Plaintiffs' case was three experts who self-identify as advocates. That's what they are, that's what they say, and that's [sic] not necessarily anything wrong with that but their testimony has to be viewed through the [prism] of an advocate. They're here because they want to see change. They're not here necessarily because they think it's constitutional or not. They write books and they write papers about how they believe prisoners should be treated.[249]

83.  As an initial matter, the experts' credentials belie this characterization. Each expert has been retained by both inmates and corrections systems; each has worked in, or worked closely with, correctional medical systems.[250] They have been relied upon by courts, correctional systems, the Department of Justice, and the Department of Homeland Security for their expertise in their fields.[251]

84.  That said, the first sentence of Defendants' argument is partly correct. Ms. LaMarre did testify that she is "an advocate for patients in any setting" and that it is "fair" to describe herself as an advocate for prisoners in a correctional setting.[252] Dr. Puisis testified that he believes correctional physicians should advocate for Defendants' patients "in the same sense that a civilian physician should advocate for their patients," in that they should "be concerned for their patients" and "tak[e] care of the patients"; physicians should adhere to "the best practices model"; that physicians acting as patient and public health advocates "should try to improve" medicine in prisons; and that he has tried to improve medicine in prisons.[253] (Defendants did not elicit any such testimony from Dr. Vassallo, or present any other evidence that she "self-identif[ies] as [an] advocate[]."[254])

85.  But this lens does not undermine the reliability or usefulness of the experts' testimony. Their testimony rises or falls on the quality of their analyses—and the Court is able to compare those analyses against a full record that includes tens of thousands of pages of medical records, detailed standards from medical authorities, and numerous other corroborating materials. The question is not whether any of the experts is an advocate or has a view on what should happen either in this specific case or as a general matter, but whether they have provided an accurate assessment of the facts and scrupulously applied appropriate standards to those facts.

86.  On this count, as already explained, Plaintiffs' experts' testimony more than withstands scrutiny. Whether or not Dr. Puisis and Ms. LaMarre view themselves as advocates for their

---

[249] Oct. 17 Defs.' Oral Rule 52(c) Mot. at 112:16-23.

[250] *See* Oct. 9 Testimony of Mike Puisis at 94:11-95:25; Oct. 15 Testimony of Susi Vassallo at 133:16-134:6; Oct. 16 Testimony of Madeleine LaMarre at 130:5-131:5.

[251] *See supra* nn.49, 51, 53; PX 6 at 0005-06.

[252] Oct. 17 Testimony of Madeleine LaMarre at 88:21-89:4.

[253] Oct. 10 Testimony of Mike Puisis at 74:2-75:1.

[254] *See* Oct. 17 Defs.' Oral Rule 52(c) Mot. at 112.

patients, all three experts proved themselves fair and conscientious evaluators of the matters on which they opined. The general credibility of their testimony through several days of examination and fierce cross-examination, combined with the fit between their observations and the record evidence available to the Court for review, overcomes any possible concern Defendants might raise about their personal views.

87. Defendants' claim that the experts' writings—principally, it appears, the textbook edited by Dr. Puisis and to which Ms. LaMarre (as well as Dr. Moore) has contributed—evince bias is also contradicted by their own efforts to rely on Dr. Puisis's textbook. During Dr. Puisis's cross-examination, they repeatedly portrayed it as embodying substantially more lenient standards than Plaintiffs' experts applied here.[255] While Defendants' reliance on the textbook is unavailing, as discussed *infra* ¶¶ 315, 361, the fact that they view it as support for their position is hard to square with their argument that it reveals its authors to be biased against them. Moreover, their own expert, Dr. Moore, thinks the textbook is good and has relied on it in her own reports.[256] And in the one place where one of Plaintiffs' experts has helped write standards that may be stricter than those followed throughout the country, the APHA standards, they chose *not* to apply them here, as discussed above.

88. The experts' overall conclusion—that "[i]n [their] collective experience of over 60 years in correctional medicine, the Louisiana State Penitentiary's delivery of medical care is one of the worst [they] have ever reviewed"[257]—is stark and emphatic. But the evidence overwhelmingly supports a finding that this dire assessment is the product of conscientious, reliable, and learned expert analysis, not bias. Defendants presented no evidence that any of the experts had a history of reaching similarly scathing conclusions in other cases, despite their extensive track records. Rather, all signs suggest that their conclusions were dramatic because the problems they discovered were extreme by the standards of the countless facilities they have worked in, evaluated, and managed.

## B. Defendants' Medical Experts

89. Defendants submitted testimony from two experts: Dr. David Thomas, and Dr. Jacqueline Moore.

### (1) David Thomas

90. Dr. Thomas is an ophthalmologist who worked in the Florida Department of Corrections from 1994 to 2003, serving as Medical Executive Director, Regional Health Services Director, Deputy Assistant Secretary for Health Services, and Chief of Health Services.[258] He serves on the Board of Governors of the American Correctional Association ("ACA"), a trade association, and is a former Chairman of its Commission on Accreditation in

---

[255] Oct. 10 Testimony of Mike Puisis at 99:15-101:12, 104:3-25, 128:12-130:7.
[256] Oct. 23 Testimony of Jacqueline Moore at 167:2-6.
[257] PX 6 at 0009.
[258] Oct. 23 Testimony of David Thomas at 6:13-7:22.

Corrections.[259] From 2000 to present, he has been is a professor at Nova Southeastern University.[260]

91. Dr. Thomas conducted a one-day site visit to Angola and reviewed the Named Plaintiffs' medical records and the medical records of the patients in Plaintiffs' experts' sample.[261] He testified at the class certification hearing and trial and produced a 74-page report. The Court previously excluded portions of his testimony under Federal Rule of Evidence 702.[262]

92. Broadly speaking, Dr. Thomas opined that the care provided at LSP was within the standard of care, based on his review of medical records and LSP's policies and procedures, his observations during his site visit, and his conversations with staff.[263]

93. Dr. Thomas's testimony was wholly unreliable and almost entirely unhelpful to the trier of fact.

94. At the most fundamental level, his opinions were entirely divorced from any testable foundation in fact. For example, he testified that the ATU, nursing units, and physician clinics were all within the standard of care, without any meaningful attempt to specify the facts that supported these conclusions.[264] He testified that his opinion that LSP's care was within the standard of care was based in part on his evaluation of medical charts,[265] but could not remember what records he looked at or even the medical needs and care documented in those charts.[266] By and large, his opinions were completely untestable—unlike the Plaintiffs' experts, whose testimony was based entirely on documents in the record and available for the Court to compare against their conclusions. Because "it is impossible for the Court to learn what data [Dr. Thomas] relied on, it is impossible for the Court to evaluate whether there is an adequate 'fit' between the data and the opinion proffered."[267] Indeed, courts have previously criticized Dr. Thomas for this exact practice.[268]

---

[259] *Id.* at 9:13-23.

[260] *See* JPTO at 11.

[261] Oct. 23 Testimony of David Thomas at 56:9-11; DX 14 at 17.

[262] Rec. Docs. 322, 343.

[263] *See, e.g.*, Oct. 23 Testimony of David Thomas at 22:6-23:12.

[264] *Id.* at 31:12-32:24.

[265] *Id.* at 22:15-17.

[266] *Id.* at 58:6-59:3.

[267] Rec. Doc. 322 at 8 (quotation omitted).

[268] *See, e.g., Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 946 (E.D. Cal. & N.D. Cal. 2009) (three-judge panel) (criticizing Dr. Thomas because "he took no notes during or after those tours; did not make any audio or video recordings during the tours; reviewed fewer than ten medical records at each prison and could not recall any details of any of the medical files he reviewed; and did not recall how many staff members he talked to at each prison or whether he asked the staff members at each prison any of the same questions.").

95. Similarly, significant portions of Dr. Thomas's testimony were based on conversations with Defendants' staff, without any apparent effort to verify their statements. For example, he observed that out of 3100 specialty consultations ordered in the year before his visit, only 2000 had been completed—leaving more than a third of them unfilled, some of them for as long as seven or eight months.[269] He acknowledged that delaying consultations can have negative consequences, including pain, exacerbation of illnesses, and death.[270] But rather than examining medical records to determine whether delayed consultations had negative consequences, he simply "had assurances" from staff members at LSP.[271] To do a more thorough review of records to determine negative consequences of delayed treatment would, he testified, "be awkward and would take too long[.]"[272] Or, on the question of whether physicians came to the ATU on nights or weekends (which, as discussed below, the documentary evidence suggests is rare if not non-existent) he relied exclusively on "reliable people telling me that's what happened"—by which he meant DOC staff whom he had never previously met.[273]

96. In part, this superficial analysis may have been a product of insufficient time spent evaluating the matters at hand. Dr. Thomas spent a single day at LSP.[274] As Dr. Puisis credibly testified, "there's no way … you can reasonably do [a thorough review of LSP] in one day."[275] Dr. Thomas claimed that in that one day, he toured the REBTC, the two nursing units, and four or five housing units; observed sick call in some areas and at least one emergency procedure; reviewed at least three or four medical records showing specialty consultations, more than five records of inmates with chronic conditions, and at least four or five infirmary charts, along with sick call requests and MARs; spent several hours with Dr. Lavespere; and interviewed over 100 inmates.[276] Even assuming all this activity actually occurred—which can only be taken on faith, given Dr. Thomas's choice not to take any notes and inability to remember virtually any details—it was necessarily and evidently performed at a cursory level that severely detracts from the rigor and reliability of Dr. Thomas's findings.

97. Dr. Thomas's testimony was also troublingly inconsistent with his deposition and his report. During cross-examination, inconsistencies on significant topics were repeatedly pointed out. In his trial testimony, he testified that he arrived at the prison at 7:10 am and saw everything he wanted to; but in his deposition he testified that he wanted to make sure he got to the prison at 4 or 5 to observe sick call, and implied that he did in fact arrive in time to do so.[277] At trial, he claimed that he knew which policies and procedures he had reviewed, but in his

---

[269] Oct. 23 Testimony of David Thomas at 65:21-66:11.

[270] *Id.* at 66:12-67:9.

[271] *Id.* at 67:17-68:25.

[272] *Id.* at 69:1-3.

[273] *Id.* at 80:21-81:16.

[274] Oct. 23 Testimony of David Thomas at 56:9-11.

[275] Oct. 9 Testimony of Mike Puisis at 97:16-19.

[276] Oct. 23 Testimony of David Thomas at 56:14-58:8.

[277] *Id.* at 10:21-12:1, 57:2-16.

deposition said he couldn't identify them.[278] In his deposition, he testified that he was not basing his opinions on any disagreements with the Plaintiffs' experts' chart reviews that were not in his report; at trial he refused to say the same.[279] Perhaps most glaringly, he testified at trial and stated in his report that he was *told* about an incident involving an EMT's use of an Epi-Pen, while in his deposition he testified that he witnessed it and even described its "distressing" nature to the people around him.[280]

98.    In at least one significant regard, Dr. Thomas's testimony also appeared to be materially inconsistent with his opinion in a previous case. A significant focus of his testimony on direct examination was patients' refusals of medical care.[281] His view, as affirmed on cross-examination, was that "poor outcomes because [of] the refusals are, in [his] view, not the responsibility of the institution, no matter how unfortunate they may be."[282] But in an opinion submitted in federal court on behalf of a plaintiff in 2017, Dr. Thomas opined that providers had fallen below the standard for appropriate care notwithstanding the patient's refusals of treatment.[283] He testified in this case that the appropriateness of care is fact-specific and depends on why the patient refused, but conceded that he didn't know those reasons for the refusals that he opined on here.[284]

99.    Similarly, Dr. Thomas's opinion on the stand conflicted with his published writing. At trial he asserted that it was appropriate for EMTs to conduct and triage sick call.[285] But in an article Dr. Thomas published in 2014, he described a graded system of triage that *omitted* EMTs.[286] These stark inconsistencies beg the question of whether Dr. Thomas's testimony is that of a neutral expert or the proverbial "hired gun."

100.   Dr. Thomas's willingness to provide opinions without investigating important facts was apparent throughout his testimony. For example, Dr. Thomas presented the Epi-Pen incident, in which an EMT was reluctant to administer an Epi-Pen, as evidence that EMTs and physicians were familiar with and "conscientious" about their scope of practice[287] In

---

[278] *Id.* at 59:15-61:13.

[279] *See id.* at 61:21-64:22.

[280] *Id.* at 28:15-29:1, 76:15-78:15.

[281] *See id.* at 37:16-42:5, 46:3-49:21.

[282] *Id.* at 69:14-17.

[283] *See id.* at 70:12:-72:23; *see Wright v. Lake Cty., Ind.*, No. 13-cv-333, Doc. No. 144-17 (N.D. Ind. Feb. 15, 2017) at 4 ("In my opinion to a reasonable degree of medical certainty, the jail health care providers essentially turned a blind eye to Mr. Wright's serious medical needs. Mr. Wright may have complicated his care by refusing treatment early on and later by his deteriorated mental health state, but the failure of the health care providers to make reasonable attempts to provide medical and mental health care for him falls well below the applicable standard of care."); *see generally id.* at 2-4.

[284] Oct. 23 Testimony of David Thomas at 71:10-22.

[285] *Id.* at 27:11-21.

[286] *Id.* at 73:11-76:4; *see* PX 411 at 25.

[287] *See id.* at 28:25, 78:21-79:11.

actuality, however, EMTs *are* authorized to administer Epi-Pens, meaning that the incident Dr. Thomas described actually *undermines* his conclusions once the relevant documents are consulted.[288]

101.   Dr. Thomas's standards were similarly dubious. In his report and on the stand, he almost completely eschewed reference to published standards or other secondary sources. On the rare occasions when he did, his sourcing was far from scientific. For example, in his report, he suggested that it was appropriate for providers to assume that half of their patients were lying, citing to two books, two internet websites and unspecified "journal articles."[289] The books, however, say no such thing, and the websites are simply message boards where a few anonymous commenters (some apparently nurses, some apparently corrections officers) talked generally about manipulation.[290] None of them provided advice for providers, and the websites in particular do not come close to a proper source for an expert opinion.

102.   Rather than being rooted in any identifiable sources that are appropriate for an expert to rely on, most of Dr. Thomas's standards seemed to be his own beliefs. Indeed, his views were sometimes directly contradicted by Defendants' other expert, Dr. Moore. Dr. Thomas asserted that the NCCHC standards Plaintiffs cited were "aspirational";[291] Dr. Moore denied that they were aspirational, described them as "authoritative" and representing "a minimal level" of care, and stated that she trusts NCCHC "explicitly [sic]."[292] Dr. Thomas asserted that it is "frequently the situation in a correctional setting" for the "administrator responsible for medical services [to not be] trained in any area of medical care";[293] Dr. Moore thought that LSP needed "a health administrator" who "would be able to deal with staffing, radiology, [and] nonclinical issues."[294]

103.   In addition, Dr. Thomas's written case studies of the named Plaintiffs are demonstrably inaccurate in numerous key regards. Unlike the inconsistencies Defendants attempted to show with Plaintiffs' experts, these omissions and misstatements went to the heart of Dr. Thomas's analyses, rendering them of little value. For example:

---

[288] *See id.* at 79:12-80:3; DX 15 at 02947.

[289] *See* DX 14 at 02922-23.

[290] DX 14 at 02922-23 (citing Gary F. Cornelius, *The Correctional Officer: A Practical Guide* (Carolina Academic Press 2001); Bill Elliot & Vicki Verdeyen, *Game Over! Strategies for Redirecting Inmate Deception* (Am. Corr. Ass'n. 2002); *Nat'l Inst. of Corr., Forums: Public Forums: General Topics: Inmate Manipulation*, https://community.nicic.gov/forums/p/6649/13213.aspx; *AllNurses.com, Nursing Specialties: Correctional Nursing: Questions About Caring for Inmates*, https://allnurses.com/questions-caring-444154.html).

[291] DX 14 at 02923.

[292] Oct. 23 Testimony of Jacqueline Moore at 151:9-152:1.

[293] DX 14 at 02926.

[294] *See* Oct. 23 Testimony of Jacqueline Moore at 139:7-23.

a. Dr. Thomas wrote and testified that named Plaintiff Shannon Hurd "presented in December of 2015 with generalized complaints of a progressive decline in his performance status over the past several months," complaining of "general malaise," which was followed by "[a] relatively rapid and extensive evaluation."[295] In actuality, Mr. Hurd had filed more than 30 sick call requests prior to this time, with numerous symptoms suggestive of renal cell carcinoma.[296] Moreover, the records reveal that the "rapid and extensive evaluation" began with nearly a month's delay in LSP responding to a CT scan showing renal cell carcinoma that had metastasized to Mr. Hurd's lungs.[297]

b. Dr. Thomas wrote and testified that Named Plaintiff Ian Cazenave was "frequently, regularly, and recently seen in specialty clinics," but omitted to mention that he had not been seen in hematology—a critical specialist for individuals with sickle cell disease—for at least 16 years.[298] To rebut Plaintiffs' assertion that Mr. Cazenave did not see a wound care *specialist* despite repeated at least five referrals from outside specialists,[299] Dr. Thomas proffered medical records showing that Mr. Cazenave received wound care—without acknowledging that the records showed only dressing changes by Dr. Lavespere, not a visit to a wound care specialist.[300] And Dr. Thomas stated in his report that Mr. Cazenave's "most recent [radiological] studies" showed a "new cardiomegaly," when the cardiomegaly was actually observed in 2013—nearly three years earlier—and Dr. Thomas was unaware of anybody at LSP identifying it as a problem in that time.[301]

c. Similarly, Dr. Thomas opined that named Plaintiff Otto Barrera "has been seen regularly in the Oral and Maxillofacial clinic," when LSP's records themselves say that he had been "lost to follow-up" since early 2014.[302] On redirect, Dr. Thomas proffered a record that presumably represented the basis for his original opinion, which showed only that Mr. Barrera was last seen in April 2014[303]—meaning that Mr. Barrera had not been seen for more than 18 months, contradicting Dr. Thomas's report.[304]

---

[295] DX 14 at 2921; Oct. 23 Testimony of David Thomas at 99:9-19.

[296] *See* Oct. 23 Testimony of David Thomas at 99:25-116:3.

[297] *See id.* at 114:19-115:20; JX 10-cc-2 at 25450.

[298] *See* Oct. 23 Testimony of David Thomas at 93:17-94:20; DX 14 at 02902; JX 10-k-1 at 10347.

[299] *See* Oct. 23 Testimony of David Thomas at 94:13-98:15; JX 10-k-1 at 10313, 10324, 10331, 10333, 10341, 10344.

[300] *See* Oct. 23 Testimony of David Thomas at 117:12-118:5; JX 10-k-1 at 10140, 10144.

[301] Oct. 23 Testimony of David Thomas at 98:16-99:8; DX 14 at 02903; JX 10-k-1 at 10305.

[302] DX 14 at 02898; Oct. 23 Testimony of David Thomas at 87:11-90:1; JX 10-d-2 at 04062.

[303] Oct. 23 Testimony of David Thomas at 118:14-25; JX 10-d-1 at 03709; JX 10-d-2 at 04066.

[304] *See* JX 10-d-1 at 04062.

d. Dr. Thomas's case studies also simply ignored critical episodes of care for numerous patients. For example, in describing Lionel Parks' care, he entirely omitted LSP's failure to diagnose a stroke despite Mr. Parks' repeated attempts to get treatment from the ATU over three days, described *infra* ¶ 141.d.[305]

104. Dr. Thomas's report and testimony are thus unreliable in nearly every significant aspect.

105. While Dr. Thomas's criticisms are almost wholly unreliable, there were a few areas where Dr. Thomas *bolstered*, rather than contradicted, Plaintiffs' case.

106. Most notably, Dr. Thomas conceded that "some patients at LSP had died because of their physicians' individual approach to their illnesses."[306] This appeared to be connected to Dr. Thomas's limited rebuttal to Plaintiffs' experts' sample, which discussed only three of the experts' several dozen case studies.[307] Even on these three, as discussed *infra* ¶¶ 132-133, the points raised by Dr. Thomas do not contradict Plaintiffs' experts' findings. And as already noted, Dr. Thomas testified in his deposition that those were the *only* disagreements with Plaintiffs' experts' review of their sample that he was basing his opinion on.[308]

107. Second, Dr. Thomas acknowledged some deficiencies with LSP's practices—including that malingering should be removed as a disciplinary charge, the quality improvement and quality control process could be improved, and mortality reviews should be conducted by an outside physicians.[309]

108. Finally, Dr. Thomas acknowledged that "conditions of confinement in corrections improve largely as a result of litigation,"[310] contradicting the assertion in his report that improvements at LSP are "best brought about by incremental administrative action."[311]

### (2) Dr. Jacqueline Moore

109. Dr. Moore holds a Ph.D. in nursing and has been certified by the NCCHC as a registered nurse and correctional health professional.[312] She has previously overseen the NCCHC accreditation program and has worked on the NCCHC standards committee.[313] She has

---

[305] *See* DX 14 at 02909-10.
[306] Oct. 23 Testimony of David Thomas at 116:9-16; *see* DX 14 at 02941.
[307] *See* DX 14 at 02938-40.
[308] Oct. 23 Testimony of David Thomas at 63:16-64:22.
[309] *Id.* at 54:12-55:19.
[310] *Id.* at 116:18.
[311] DX 14 at 02944.
[312] JPTO at 11-12.
[313] Oct. 23 Testimony of Jacqueline Moore at 129:24-130:8.

served as a Court-appointed monitor in several states, and been retained by the Department of Justice to assist them in prosecuting cases in Georgia and Mississippi.[314]

110. Dr. Moore conducted a three-day site visit and reviewed approximately one year of medical records for each of seven chronic care patients, five sick call encounters, and five sets of screening documents. She produced a 31-page report[315] and testified at trial.[316] The Court admitted Dr. Moore as an expert in the administration of correctional healthcare.[317]

111. Dr. Moore's conclusions were distinctly more limited than the other experts'. Dr. Moore's overall opinion was that LSP was "meeting ACA standards of accreditation" and "doing a great volume of services at the facility."[318] She did not (and, indeed, was not proffered to) opine on the quality of care provided at LSP or whether that care meets contemporary standards. As such, her testimony is principally helpful to determine whether the practices that Plaintiffs' experts concluded contributed to a risk of harm to patients (a) exist and (b) deviate from contemporary practices.

112. On this front, Dr. Moore corroborated Plaintiffs' experts' conclusions more than she contradicted them. Among her many findings supportive of Plaintiffs' conclusions:

  a. EMTs are used more at Angola than anywhere Dr. Moore has ever seen.[319]

  b. Most facilities use nurses to perform sick call, rather than EMTs.[320]

  c. Physicians did not timely follow up on sick call.[321]

  d. LSP's EMT protocols could be enhanced, and EMT Plaintiffs' experts did a fairly good job of identifying EMT protocols where that needed to be done.[322]

  e. Defendants do not properly document chronic care, which causes problems for nurses.[323]

---

[314] *Id.* at 132:8-133:12.
[315] DX 13.
[316] *See generally* Oct. 23 Testimony of Jacqueline Moore at 126:11-174:19.
[317] *Id.* at 134:22-135:10.
[318] *Id.* at 138:5-7.
[319] *Id.* at 154:10-11.
[320] *Id.* at 155:8-9.
[321] *Id.* at 155:15-17.
[322] *Id.* at 154:15-155:5.
[323] *Id.* at 159:6-8, 162:10-22.

f.  When drafting her report, Dr. Moore found that records were missing periodic health assessments.[324]

g.  LSP is the only maximum security facility, or facility of its size, that Dr. Moore has ever seen that uses security officers to distribute medication.[325]

h.  Use of orderlies is "not always the best thing."[326]

i.  LSP has insufficient examination rooms, and cell-side sick call examinations posed a concern for lack of privacy.[327]

j.  LSP's record-keeping has numerous problems; nursing encounters were not tracked, and both the staffing plan and budget were difficult to understand.[328]

k.  Dr. Moore saw no evidence that physicians with restricted licenses were being monitored, and no evaluation of physicians with clinical criteria.[329]

l.  LSP's quality improvement program lacked physician involvement, studied the same thing over and over again, and could have been more robust.[330]

m.  The medical department should have a healthcare administrator rather than a deputy warden.[331]

n.  LSP's demographics are not unusual, and most prisons are built in remote locations like LSP is.[332]

113.  By contrast, in the whole of Dr. Moore's testimony, there are few places where she disagreed with Plaintiffs' experts' findings in any material way. The only examples of note were:

a.  Dr. Moore testified that LSP's chronic care guidelines were "sufficient."[333] In her expert report, however, it is clear that she meant that the number of chronic diseases for which LSP maintained guidelines was sufficient—not that the guidelines

---

[324] *Id.* at 158:17-19; *but cf. id.* ("That was what I believed at the time I wrote my report. I've since learned something different.").

[325] *Id.* at 160:8-19

[326] *See id.* at 161:12-19.

[327] *Id.* at 155:6-7, 158:2-4.

[328] *Id.* at 159:1-5, 6-8, 162:19-22, 166:10-12.

[329] *Id.* at 164:9-21.

[330] *Id.* at 149:5-13.

[331] *Id.* at 139:9-23, 163:5-8.

[332] *Id.* at 153:1-154:3.

[333] *See id.* at 147:14-20.

themselves were sufficient.[334] On the guidelines' actual substance, she agreed with Plaintiffs' experts that they could be "enhanced."[335] Moreover, as noted above, she found that Defendants do not properly document chronic care and do not always follow chronic care policies.[336]

b. Dr. Moore testified that the staff she met were "very, very dedicated,"[337] and provided similar assessments in her report.[338] As the Court observed, that type of character judgment is "not helpful" to the trier of fact.[339] More importantly, Dr. Moore acknowledged that such statements were generally repeating the opinions of other Defendants.[340] Her praise for Ms. Lamartiniere, for example "was not [Dr. Moore's] opinion, that came from Dr. Singh," and her praise for Major Cashio "came from Sherwood [Poret]."[341] In contrast, Plaintiffs' experts' assessments of staff competency and attitudes, where relevant, were based not on secondhand statements by co-Defendants but on a review of their documented work performance and of specific statements or actions.

## C. Trial Witnesses

114. The Court had the opportunity to assess the credibility and demeanor of all witnesses at trial. Below are proposed credibility determinations for each of Plaintiffs' fact witnesses, as well as for one of Defendants' fact witnesses, Dr. Lavespere.

115. Proposed credibility determinations are omitted for Defendants' other fact witnesses. Generally, witnesses purported to testify as to what is always or generally done over the course of healthcare delivery at Angola. To the extent this testimony was intended to describe what is *supposed* to happen, much of it was credible. To the extent that it was intended to reflect what actually occurs in practice in all or most instances, it frequently lacked foundation and was not supported by any description of a percipient basis that would support the opinions.

116. The credibility of the parties' experts is discussed *supra* ¶¶ 36-113.

a. Farrell Sampier gave credible testimony about the conditions he encountered while housed on the hospital ward at Angola. Mr. Sampier testified that the ward was "dark" and "sad" with "a lot of death."[342] His testimony as to the unhygienic

---

[334] *See* DX 13 at 02865.
[335] *Id.*; Oct. 23 Testimony of Jacqueline Moore at 147.
[336] Oct. 23 Testimony of Jacqueline Moore at 159:6-8, 162:10-15.
[337] *Id.* at 138:7-8.
[338] *See id.* at 167:13-168:7.
[339] *Id.* at 138:13-14.
[340] *Id.* at 168:8-16.
[341] *Id.* at 168:8-11, 12-16.
[342] *See* Oct. 9 Testimony of Farrell Sampier at 45:9-15.

conditions on the infirmary, such as patients sitting in feces and soiled diapers thrown on the floor,[343] was also reflected in the testimony of Frances Brauner.[344] It is also corroborated by internal emails sent by staff at Angola who described the ward as "a dire situation"[345] in which "some of the beds are grossly dirty."[346] The insufficient hygiene practices used in the hospital report also reflected in the expert report.[347] He testified that the orderlies on the ward are tasked with cleaning patients, delivering medication, feeding patients, taking patients to the bathroom, and many other tasks.[348] This was corroborated by the testimony of Francis Brauner[349] and Plaintiffs' experts,[350] as well as Defendants' witnesses.[351] Mr. Sampier credibly testified that after he was diagnosed with transverse myelitis, a non-terminal disease, Defendants placed him on hospice and convinced him to sign a do-not-resuscitate order by describing in graphic details a worst-case scenario of what resuscitation might entail.[352] This was corroborated in the Plaintiffs' experts' report[353] and rebuttal report.[354] On cross-examination, counsel for Defendants tried to establish that Mr. Sampier had instead been put on palliative care, but Mr. Sampier had never heard of that program.[355] Mr. Sampier also testified that he was not given proper accommodations, such as hygiene wipes, protective gloves, a paraplegic-appropriate wheelchair, and other additional equipment.[356]

b.  <u>Anthony Mandigo</u> gave credible testimony about the lack of appropriate treatment for sickle cell anemia and its symptoms at LSP. Among other things, he testified about the severe discomfort he has experienced as a result of sickle cell pain, and the relief brought by access to prescribed narcotic medication.[357] He further testified that he has not been able to receive narcotic pain medication other than when he has been on the medical ward or hospitalized, and that has inhibited his ability to manage

---

[343] *See id.* at 46:9-16.

[344] *See* Oct. 12 Testimony of Francis Brauner at 97:5-21.

[345] PX 11 at 0002.

[346] PX 21 at 0001.

[347] PX 6 at 0080-82 (noting that "[i]nmates provide nursing care with respect to cleaning and bathing, dressing, feeding, and positioning . . . in violation of the ACA and NCCHC standards".).

[348] Oct. 9 Testimony of Farrell Sampier at 64:18-24.

[349] Oct. 12 Testimony of Francis Brauner at 98:5-99:2.

[350] *See* PX 6 at 0080-82.

[351] JX 4-ll, K. Hart Depo. at 50:1-53:19 (acknowledging that nurses rely on orderlies to change diapers, turn patients, assist with hygiene); JX 4-uu, C. Park Depo. at 90:15-22 (same); JX 4-yy, S. Poret Depo. at 61:9-63:13 (same).

[352] *See* Oct. 9 Testimony of Farrell Sampier at 50:25-51:18, 54:25-55:21.

[353] PX 6 at 240.

[354] PX 28 at 0013-14.

[355] Oct. 9 Testimony of Farrell Sampier at 73:13-74:17, 78:25-79:3.

[356] *See id.* at 58:24-60:14, 73:2-4, 81:22-82:14.

[357] *See* Oct. 11 Testimony of Anthony Mandigo at 79:7-24, 82:4-12.

his pain and avoid a sickle cell crisis.[358] This testimony was corroborated by Dr. Puisis, Dr. Jones and Dr. Dhand, who testified to the intensity of sickle cell pain, that narcotic pain medication is necessary for sickle cell patients to avoid a worsening of their symptoms, which can be fatal, and to the "cruelty" of failing to treat patients experiencing this pain.[359] Cross-examination merely served to emphasize that the effective treatment for pain management he was able to access before incarceration is not available to him at LSP.[360]

c. <u>Drs. Catherine Jones and Monica Dhand</u> also provided credible testimony regarding their personal experiences and observations treating Angola patients admitted to University Medical Center (UMC) in New Orleans. Both Drs. Jones and Dhand have worked at UMC for approximately ten years,[361] and each frequently treats patients from Angola.[362] The multiple trends in deficient care that they both described are supported by their substantial and long experience treating patients from Angola. In addition, both doctors provided consistent testimony regarding the defects in medical care that they have personally observed amongst their Angola patients. For example, both doctors testified observing problematic delays in accessing medical care amongst their patients from Angola.[363] Both doctors also testified consistently regarding Angola patients not accessing necessary follow-up care[364] and pain medications.[365] This testimony was consistent with some of the observations made by Plaintiffs' medical experts regarding poor quality of care at Angola, medical record and some contemporaneous concerns expressed in emails.[366] Although Drs. Jones

---

[358] *See id.* at 80:18-81:10, 99:12-14.

[359] *See* Oct. 10 Testimony of Mike Puisis at 18:11-16; Oct. 11 Testimony of Catherine Jones at 122:18-21, 132:14-133:16, 134:10-135:7,149:8-20; Oct. 11 Testimony of Monica Dhand at 167:4-6.

[360] *See* Oct. 11 Testimony of Anthony Mandigo at 98:14-24 (clarifying that he is given Tylenol for pain at LSP whereas he was prescribed the narcotic "Tylenol 3" before he was incarcerated).

[361] *See* Oct. 11 Testimony of Catherine Jones at 119:17-19; Oct. 11 Testimony of Monica Dhand at 160:8-10.

[362] Oct. 11 Testimony of Catherine Jones at 119:20-120:3; Oct. 11 Testimony of Monica Dhand at 160:11-13.

[363] Oct. 11 Testimony of Catherine Jones at 121:25-122:21; Oct. 11 Testimony of Monica Dhand at 162:21-164:18.

[364] Oct. 11 Testimony of Catherine Jones at 127:24-128:23; Oct. 11 Testimony of Monica Dhand at 165:24-166:3.

[365] Oct. 11 Testimony of Catherine Jones at 132:6-135:22; Oct. 11 Testimony of Monica Dhand at 166:4-167:6.

[366] *See, e.g.,* PX 6 at 0021 (discussing delays in accessing care); *id.* at 0038-39, 0074-78 (noting trends and examples of failure to provide and defects in follow-up care).

and Dhand testified had interacted socially with Plaintiffs' counsel, they also testified credibly that this relationship did not impact their testimony.[367]

    d.  <u>Lawrence Jenkins</u>, testified credibly about the state of hepatitis C treatment at LSP.[368] Mr. Jenkins, who is 62 years old and has been diagnosed with hepatitis C, volunteered in the facility's hospice program, looking after terminally ill inmates.[369] He observed the symptoms and signs of people dying from liver complications associated with hepatitis C, but testified LSP provided him no education on how hepatitis C is contracted or transmitted, the symptoms of the disease, or on the progression of the disease.[370] Mr. Jenkins received a course of treatment for hepatitis C that was ineffective.[371] He was subsequently told by the nurse at the hepatitis C clinic that he would have to wait in line for further treatment owing to the cost of the treatment and the number of other inmates with hepatitis C, and because he had previously received treatment.[372] Mr. Jenkins' testimony was uncontradicted by any other testimony or medical record. In fact, Mr. Jenkins' testimony was supported by that of class member witness Charles Butler who also testified he had been told he would not receive treatment because of costs.[373] While Defendants' counsel asked Mr. Jenkins questions about the progression of his hepatitis C, they introduced no evidence disputing that he had chronic hepatitis C or that Defendants did not treat it after the initial failed treatment regimen. Further, this inquiry is of limited relevance, as the American Association of Liver Disease recommends every patient with chronic hepatitis C be treated for hepatitis C.[374] Additional evidence supports Mr. Jenkins' testimony—particularly the logs of treatment of patients with hepatitis C which show that LSP treated only between 2.9% and 6.2% of its known hepatitis C population each year between 2013 and 2016 with direct acting antiviral medicine.[375]

---

[367] *See* Oct. 11 Testimony of Catherine Jones at 139:11-140:13, 158:15-17; Oct. 11 Testimony of Monica Dhand at 169:11-19, 178:12-14.

[368] *See generally* Oct. 11 Testimony of Lawrence Jenkins at 180-202.

[369] *Id.* at 181:11-182:15.

[370] *Id.* at 187:10-19, 184:13-23; *see also* Rec. Doc. 517-4 at 16 (AM. ASS'N FOR THE STUDY OF LIVER DISEASES & INFECTIOUS DISEASES SOC'Y OF AM., RECOMMENDATIONS FOR TESTING, MANAGING, & TREATING HEPATITIS C (2015)) ("All persons with HCV [hepatitis C] infection should be provided education on how to avoid HCV transmission to others.").

[371] Oct. 11 Testimony of Lawrence Jenkins, 185:5-17.

[372] *Id.* at 186:8-187:3; 198:12-19.

[373] Oct. 15 Testimony of Charles Butler at 57:10-58:3.

[374] Rec. Doc. 517-4 at 31 ("Treatment is recommended for all patients with chronic HCV infection, except those with short life expectancies owing to comorbid conditions.").

[375] Between July 2013 and June 2014, an average of 711 people in population at LSP were known to be positive for hepatitis C, but only 22 were treated. JX 2-c at 00768-69. Between July 2014 and June 2015, an average of 776 were known to have hepatitis C but only 23 were treated. *Id.* at 00756-57.

e. <u>Francis Brauner</u> testified credibly about the ten years he spent on the hospital wards at Angola between 2005 and 2015.[376] He described the unsanitary conditions on the hospital ward as "deplorable," and recalled open garbage cans, dirty bathrooms, and dirty bandages left on the floor.[377] This testimony is consistent with the findings of Plaintiffs' medical experts, who discussed the inadequate staffing and hygiene on the hospital wards in their report.[378] This is also consistent with the testimony of other Plaintiff witnesses who spent time as patients on the hospital wards.[379] Mr. Brauner also testified credibly as to his own experience arriving at Angola paralyzed from the waist down, and being locked in an isolation room off the nursing ward, which Defendants do not dispute.[380] Mr. Brauner also testified credibly, and Defendants did not dispute, that he developed an infected bedsore while in the isolation room, which led to his emergency hospitalization for septic shock thirty days later.[381] Defendants did not dispute his testimony that his bedsore was stage 4, the size of "the bottom of a liter bottle," and open "to the bone" at the time he left Angola,[382] nor his testimony that the bedsore improved "like night and day" when he started receiving appropriate specialty care for his wounds after his release.[383] Counsel for Defendants tried to point out on cross-examination that Mr. Brauner still had open wounds 7-8 months after receiving that treatment, but he clarified his testimony to include the fact that his wounds had significantly decreased in size and become stage

---

Between June 2015 and July 2016, an average of 834 people were known to have hepatitis C but only 52 were treated. *Id.* at 00746-47.

[376] *See* Oct. 12 Testimony of Francis Brauner at 86:20-22. *See generally id.* at 86:20-132:8.

[377] *Id.* at 97:4-21.

[378] PX 6 at 0081-82.

[379] *See, e.g.*, Oct. 9 Testimony of Farrell Sampier at 45:9-47:3; Oct. 15 Testimony of Charles Butler at 70:5-14.

[380] Oct. 12 Testimony of Francis Brauner at 87:23-88:22. On cross-examination, counsel for Defendants tried to establish that Mr. Brauner was locked in that room when he arrived at Angola due to a classification he had received while being treated at Charity Hospital. Mr. Brauner clarified, however, that he was actually free to move about at Charity Hospital and that that classification must have been put in his chart in the confusion of Hurricane Katrina, during which time he was evacuated to Angola. *Id.* at 116:5-117:11. Regardless, the fact remains that medical staff allowed security to place a recently-paralyzed man – who had just been evacuated from the hospital – in a locked isolation room, out of sight and sound from the nurses and without the ability to call for help if needed.

[381] *Id.* at 88:21-90:2. On cross-examination, Defendants tried to inaccurately establish that Mr. Brauner had been instructed about turning before arriving at Angola and being placed in the isolation room. *Id.* at 112:20-113:16. In fact, as Mr. Brauner clarified on re-direct, he did not receive instructions about turning until *after* he was hospitalized with the infected bedsore and had gone into sepsis. *Id.* at 128:18-22.

[382] *See id.* at 91:20-92:2, 129:22-130:7.

[383] *Id.* at 93:13-15.

3 sores during that several-month period, in contrast to 10 years of inadequate treatment at Angola.[384]

    f.  <u>John Tonubbee</u>'s testimony was credible in a number of ways. Notably, the 76-year-old Mr. Tonubbee has been a Class A Trustee at the prison since 1982.[385] This means that Defendants have considered him trustworthy enough to grant him the lowest security class for over thirty years.[386] He testified about several persistent medical issues, including his need for knee replacements, a bunion that causes severe pain in state-issued shoes, and the hernia he had been living with for over a decade. Mr. Tonubbee's medical records support his testimony that his knees had been swollen and painful since at least 2005.[387] On an October 19, 2015 form, an orthopedic doctor indicated that all non-operative treatments have been exhausted and the condition affects activities of daily life.[388] Though Mr. Tonubbee acknowledged that there was a single "Refusal to Accept Medical Care" document in his medical records,[389] Mr. Tonubbee explained this discrepancy at trial. Mr. Tonubbee credibly testified that his "refusal" was because security or medical staff informed him that the specialists had an emergency elsewhere and would be "late if they come [sic] to Angola at all."[390] Mr. Tonubbee explained that he would have been locked in a holding cell for several hours if he had not signed the refusal.[391] Knowing that the doctors would not be there in time for him to receive that surgery, Mr. Tonubbee decided to return to Camp F.[392] The remainder of Mr. Tonubbee's medical records well-document his testimony at trial regarding his long-term, chronic health issues, and do not contain another refusal form.[393] Even under pressure during cross-examination to assent to incorrect information, Mr. Tonubbee testified truthfully. Mr. Tonubbee testified that Dr. Polecki, an outside specialist contracting with LSP, told him that he was not allowed to prescribe Mr. Tonubbee any shoes that are not on the list of approved LSP shoes, even if they were medically indicated.[394] On cross-examination, Defense counsel pointed out to Mr. Tonubbee a notation in his medical records, which read "do not think custom fit shoes are warranted."[395] Defense counsel insisted this was written by Dr. Polecki, which would have undermined Mr. Tonubbee's assertion that the doctor blamed LSP for his inability to

---

[384] *Id.* at 112:14-19, 114:4-12, 129:19-30:18.

[385] Oct. 12 Testimony of John Tonubbee at 139:8-17.

[386] *See id.*

[387] *Id.* at 141:3-9; JX 10-ddd-1 at 56733.

[388] JX 10-ddd-2 at 56823.

[389] Oct. 12 Testimony of John Tonubbee at 144:15-145:25, JX 10-ddd-1 at 56703.

[390] Oct. 12 Testimony of John Tonubbee at 144:22-145:2. *See* JX 10-ddd-1 at 56703.

[391] Oct. 12 Testimony of John Tonubbee at 146:8-15.

[392] *Id.*

[393] *See generally* JX 10-ddd-1, JX 10-ddd-2, JX 10-ddd-3, JX 10-ddd-4.

[394] Oct. 12 Testimony of John Tonubbee at 161:14-21.

[395] JX 10-ddd-3 at 56892. *See* Testimony of John Tonubbee at 160:21-161:4.

get custom fit shoes. But Mr. Tonubbee was adamant that Dr. Polecki had never told him that.[396] Days later, during Dr. Lavespere's testimony, Dr. Lavespere confirmed that he had written that note, not Dr. Polecki.[397]

g. <u>Otto Barrera</u> testified that he needed facial reconstructive surgery of his jaw, tongue, and teeth when he arrived at Angola.[398] It was difficult for him to speak and be understood.[399] It was also difficult for him to eat and take his medication.[400] Before his incarceration, surgeons told him that he would need about five years of surgery.[401] Although Mr. Barrera's injury left him unable to chew solid foods or speak properly, and required him to keep a 4" x 4" piece of gauze in his mouth,[402] Dr. Toce informed him that LSP would not approve his maxillofacial surgery because it was considered "cosmetic."[403] By the time of his deposition in August 2016, three years after he arrived at Angola, he still had not undergone reconstructive surgery.[404] Mr. Barrera also provided uncontroverted testimony about Defendants' failure to accommodate the needs produced by his disability. During Mr. Barrera's intake at Angola, no one discussed the ADA with him, asked him whether he needed any accommodations for his disability, or instructed him how to receive one; nor did anyone discuss his medical needs with him.[405] As of the day of his testimony, he had never received any speech therapy, had never seen any signs posted at LSP regarding the ADA, nor had any instructions about obtaining an accommodation.[406] Mr. Barrera also testified credibly and without contradiction that he was unable to attend church or anger management and substance-abuse classes while housed on the medical ward.[407] Although he was prescribed a mechanical soft diet because he could not chew solid food, he typically received regular trays of food, which he would chop up using his hands or ID card, then push the food to the back of his throat.[408] Indeed, he testified that an officer "smirked and walked off" when he reported his dietary restriction.[409]

---

[396] Oct. 12 Testimony of John Tonubbee at 161:5-162:14.

[397] Oct. 22 Testimony of Randy Lavespere at 217:1-21.

[398] Oct. 12 Testimony of Otto Barrera at 207:7-14.

[399] *Id.* at 207:17-18.

[400] *See id.* at 225:5-11.

[401] *See id.* at 207:7-208:1.

[402] *See* JX 10-d-1 at 3749.

[403] Oct. 12 Testimony of Mr. Barrera at 219:15-22.

[404] Oct. 15 Testimony of Mr. Barrera at 20:25-21: 3.

[405] *See* Oct. 12 Testimony of Mr. Barrera at 210:5-23.

[406] *Id.* at 216:3-14.

[407] *Id.* at 213:8-214:1, 214:12-14.

[408] *Id.* at 226:1-227:5.

[409] *Id.* at 208:15-21.

Defendants' impeachment did not materially undermine any of this testimony. Most of their impeachment centered on medical records that Mr. Barrera was seeing for the first time.[410] Mr. Barrera's unfamiliarity with the dates and minute details in the records is unsurprising and does not affect his credibility. The implications Defense counsel appeared to draw from these records are not required by the records and are less plausible than Mr. Barrera's explanations. For example, while a medical record before he arrived at Angola states "[Mr. Barrera] denies any problems at this time,"[411] this appears to be referring solely to the side effects of drugs mentioned in the previous sentence; elsewhere in the same record, he describes numerous problems, such as "trouble controlling saliva and slobbering."[412]   He credibly explained that he lacked the equipment for a mechanical soft diet at the prison where he was housed at the time. Similarly, Defense counsel identified items on his commissary list that are inconsistent with a soft diet, but Mr. Barrera credibly testified that he was able to prepare some of that food such that it became soft and he was able to eat it himself,[413] and that he purchased some of that food for "more unfortunate guys in that medical dorm that … have nothing."[414]

h.  Charles Butler provided credible testimony regarding an array of problems he has encountered receiving medical care at LSP. For example, Mr. Butler credibly testified about various problems in his Hepatitis C treatment at LSP.[415] Mr. Butler testified that LSP medical staff informed him that he would not be provided Harvoni for treatment of his Hepatitis C due to the drug's high cost.[416] Mr. Butler's testimony in this regard was consistent with the testimony of Lawrence Jenkins, who likewise credibly testified that he was denied treatment with Harvoni due to the drug's expensive cost.[417] Mr. Butler also credibly testified that he never received adequate education regarding his Hepatitis C diagnosis.[418] Mr. Butler's testimony was also reflected in Mr. Jenkins's testimony about the lack of counseling for his Hepatitis C diagnosis.[419] In addition, Mr. Butler credibly testified about being forced to do intense manual labor at Angola notwithstanding the fact that his medical conditions

---

[410] *See* Oct. 15 Testimony of Otto Barrera at 28:16-25, 29:5-8; 29:13-18; 30:17-21; 31:13-15

[411] JX 10-d-1 at 3749. *See also* Oct. 15 Testimony of Otto Barrera at 40:1-21.

[412] *See id.*

[413] Oct. 15 Testimony of Otto Barrera at 43:4-45:18.

[414] *See id.* at 53:7-19.

[415] Oct. 15 Testimony of Charles Butler at 56:1-58:17.

[416] *Id.* at 57:17-25.

[417] Oct. 11 Testimony of Lawrence Jenkins at 186:8-87:3.

[418] Oct. 15 Testimony of Charles Butler at 58:4-13.

[419] Oct. 11 Testimony of Lawrence Jenkins at 184:16-23.

made such work inappropriate.[420] Mr. Butler's testimony in this regard was consistent with the experiences of other Angola patients.[421]

i.  Danny Prince testified credibly about the five and a half years he had spent at Angola and his work as a healthcare orderly in Ash 2, one of the assisted living dorms.[422] Mr. Prince described in detail the dirty and crowded conditions of Ash 2, the many medical needs of the patients that reside there, and the role of the medical orderlies in providing those patients with assistance for their daily needs.[423] His testimony was consistent with the findings of Plaintiffs' medical experts regarding Angola's three medical dorms, as documented in their expert report.[424] His testimony was also consistent with that of other Plaintiff witnesses and medical orderlies who resided on Ash 2.[425] Mr. Prince also testified credibly as to the medical issues he experienced while at Angola, as a result of injuries sustained during the rodeo.[426] On cross-examination, Defendants' counsel elicited testimony that Mr. Prince voluntarily participated in the rodeo and was aware of the risks associated with that participation, in an attempt to discredit his testimony.[427] However, on redirect, Mr. Prince clarified that he participated in the rodeo in order to support himself in prison and lessen the burden on his family, as the cash prizes were as high as $500 and Defendants paid him 4 cents an hour as a healthcare orderly.[428]

j.  Dr. Randy Lavespere, the Medical Director at Angola, testified at length regarding the medical care that he and his staff provided to patients at Angola. However, Dr. Lavespere's testimony lacked many important indicia of reliability and was overwhelmingly undermined on cross-examination. As made clear by Plaintiffs' counsel, much of Dr. Lavespere's testimony at trial directly contradicted his testimony at the hearing on Plaintiffs' Motion for Class Certification, his deposition testimony, and the evidence in the record.

Where Dr. Lavespere's testimony could be checked against record evidence, it was at times overstated, if not disingenuous. For instance, he testified that after EMTs perform sick call, they put the patients' completed forms in the doctors' boxes and

---

[420] Oct. 11 Testimony of Charles Butler at 58:19-61:25, 63:22-65:25.

[421] See, e.g., JX 4-b, F. Autrey Dep. at 52:5-7; JX 4-f, K. Clomburg Dep. at 26:4-30:7; PX 6 at 0007, 0249; Oct. 11 Testimony of Anthony Mandigo at 85:4-86:4.

[422] Oct. 15 Testimony of Danny Prince at 93:22-94:16.

[423] Id. at 95:25-96:24, 99:5-100:9.

[424] See PX 6 at 0084.

[425] See, e.g., JX 4-c, A. Brent Depo. at 32:3-34:19.

[426] See generally Oct. 15 Testimony of Danny Prince at 106:6-114:5.

[427] Id. at 122:3-18.

[428] Id. at 130:19-131:7.

those "10 to 20 [forms] a day for each physician" "should be reviewed every day."[429] However, the sick call forms themselves directly refute this statement, as explained in more detail below. Countless sick calls in the medical records have no date or signature from a provider whatsoever.[430] Those that do have a provider signature are often dated several days later, usually with no notes.[431]

Dr. Lavespere also testified that there was an annual review conducted at the end of each year since at least 2009, when he started working at Angola.[432] He testified that the evaluation process included "a lot of paperwork" and was "a very important piece of information," and that his review was performed "by [his] medical director."[433] Dr. Lavespere's testimony thus suggested that he performed an annual extensive evaluation of the medical performance of the physicians under his supervision.

However, the evidence in the record and Dr. Lavespere's deposition testimony shows that the "performance evaluation and review" that he is referring to more accurately resembles an elementary school report card.[434] The "performance evaluation and review" entails four pages of generic employee performance questions, none of which are specific to the duties of a physician, and requires only a rating (the three choices being "exceptional performance," "achieves expectations," and "unsatisfactory performance") with only cursory comments, if any, provided by the supervisor.[435] As reflected in the record and acknowledged by both Dr. Lavespere and Warden Lamartiniere, Dr. Lavespere's annual review, such as it was,

---

[429] Oct. 22 Testimony of Randy Lavespere at 59:13-60:4. Defendants' counsel also referred to Dr. Lavespere's assertion that sick call forms are reviewed by doctors the same day they are submitted repeatedly during the cross-examination of Plaintiffs' experts. Oct. 17 Testimony of Madeleine LaMarre at 9:7-11:19 ("Q: … [T]he EMT gets the Health Services Request and then a doctor signs off on it within 24 hours, correct?" … "Q: … Are you aware that the EMT takes the Health Services Request, puts it in the box, and the doctor signs off on it within that next day?" … "Q: So if every doctor comes in here and testifies that these Health Services Requests are placed in a box, I look at them that day and sign off on them, you have a basis to dispute that?").

[430] *See* Oct. 23 Testimony of David Thomas at 100:12-103:35, 107:25-114:5; JX 10-cc-2 at 25457, 25474, 25501, 25703, 25706, 25714-15, 25718-19; *see also* JX 10-a-1 at 00064 (no signature), 00081 (no date), 00100 (same); JX 10-zz at 53828 (same), 53831-32 (same); JX 10-b at 02532 (same), 02556 (same), 02596 (same).

[431] Oct. 23 Testimony of David Thomas at 99-114; JX 10-cc-2 at 10-25470, 25488, 25490-91, 25508, 25512, 25457.

[432] Oct. 22 Testimony of Randy Lavespere at 10:25, 24:12-14.

[433] *Id.* at 24:12-15.

[434] *See, e.g.,* JX 4-rr, R. Lavespere Depo. at 82:11-22; PX 63 at 0001-07.

[435] PX 63 at 0001-07. The "Employee Performance Tasks" reviewed include vague topic areas such as "Dependability," "Communication," "Productivity," "Teamwork," and "Planning and Organizing Effectiveness."

was conducted by Warden Lamartiniere, who has no medical background or expertise—not, as Dr. Lavespere suggested, "[his] medical director."[436]

In addition, Dr. Lavespere's testimony regarding the care he provided to specific patients in Plaintiffs' experts' sample lacked credibility and added little if anything to the contents of the paper record.[437] He has previously testified that he does not write down notes when he evaluate or treats patients because he does not "need all that," even when he sees up to 76 patients in one day.[438] Despite his practice of seldom taking notes, at trial, Dr. Lavespere purported to be intimately familiar with the medical records and medical history of each of the patients in the medical sample that Plaintiffs' experts had reviewed and attempted to undermine their findings.[439] To the extent this testimony was intended to reflect his actual recollection, rather than simply the contents of the documents, it strains credulity to believe that he could remember specific treatment provided on specific days, as he sometimes purported to do. Moreover, as was shown on cross-examination, the care that Dr. Lavespere testified to was also overwhelmingly reflected in the experts' chart reviews.[440]

Dr. Lavespere's candor regarding the interpretation of medical records was seriously undermined by his willingness to allow counsel to misrepresent medical records of his actions as those of other physicians on multiple occasions.[441] During the cross-examination of John Tonubbee, Defendants' counsel pressed Mr. Tonubbee to concede that a podiatrist, Dr. Polecki, had denied his request for custom-fit shoes, based on a note that counsel represented to be written by Dr. Polecki.[442] On cross-examination, Dr. Lavespere was forced to admit that he himself had written the note.[443] Similarly, during Dr. Thomas's examination, Plaintiffs showed that Plaintiff Ian Cazenave had not been sent to a wound care specialist despite repeated referrals from outside providers.[444] On re-direct, Defendants' counsel presented two

---

[436] JX 4-nn, S. Lamartiniere Depo. at 22:2-25; JX 4-rr, R. Lavespere Depo. at 82:11-22.

[437] *See* Oct. 22 Testimony of Randy Lavespere at 100:1-5 (Defendants' counsel: "[H]e's simply testifying as to the statements that have been made in that record in factual statements … . He's not giving any opinions … ."); *id.* at 102:9-11 (the Court: "[H]e's giving opinion testimony as to what occurred and he wasn't the treating physician."); *id.* at 108-09:24-109:1 (the Court: "I'm going to take it as what is written on the record. He's describing what was written on the record.").

[438] JX 4-qq, R. Lavespere Depo. at 60:3-61:4.

[439] *See, e.g.*, Oct. 22 Testimony of Randy Lavespere at 99:2-:20, 129:22-130:19, 138:1-39.

[440] Oct. 22 Testimony of Randy Lavespere at 185:17-187:3.

[441] To be clear, this is not to suggest that Defendants' counsel intentionally misrepresented the content of the records. These could have been honest oversights on the part of Defendants' counsel—but oversights that Dr. Lavespere should have observed and sought to correct, given that the documents involved his handwriting and his conduct.

[442] *See* Oct. 12 Testimony of John Tonubbee at 160:21-161:14; JX 10-ddd-3 at 56892.

[443] *See* Oct. 22 Testimony of Randy Lavespere at 216:4-217:21; JX 10-ddd-3 at 56892.

[444] *See* Oct. 23 Testimony of David Thomas at 95:13-98:15.

documents as showing "regular wound care follow-up as ordered by the outside providers."[445] In fact, the records did not show the wound care specialist visits ordered by outside providers, but wound care performed by EMTs *at Dr. Lavespere's direction.*[446] Despite the fact that Dr. Lavespere was in the courtroom when these records were discussed, had represented that he was extremely familiar with the care and the medical records of that patient, and was passing extensive notes to Defendants' counsel throughout trial, neither Dr. Lavespere nor Defendants' counsel felt the need to correct the record of their own accord on either occasion.

Another example of the unreliability of Dr. Lavespere's trial testimony is illustrated by his unsuccessful attempt to explain the state of the unsanitary and cluttered clinical exam rooms that were pictured in Plaintiffs' expert report. Initially, Dr. Lavespere tried to testify that all the pictures of the cluttered clinical rooms were actually of "his room," or a second office that he used (in addition to his 'actual' office) to perform his daily duties of being medical director, which is why there were charts "stacked up everywhere" including on the patient examination tables.[447] He testified that his actual office was "way in the back of the building" and he chose to turn a clinical room into a second office in order to be "accessible."[448] On cross-examination, Plaintiffs' counsel showed Dr. Lavespere a picture of a yet another cluttered clinical room and he attempted to claim that it was "one of the ones he use[d]" when he "rotate[d] offices" to accommodate a specialty doctor, but asserted that he would not have been using both clinical spaces as offices on the same day.[449] However, when confronted with the fact that all the pictures were in fact taken on the same day, Dr. Lavespere finally backed down and conceded that the pictures could in fact be "typical of how the clinical spaces look."[450] His original claim was further contradicted by Dr. Vassallo's credible testimony that she observed patient care in an examination room that "looked just like those pictures," where "the examination room bed was full of charts."[451]

Dr. Lavespere has also shown a willingness to contradict his prior testimony when it proves harmful. During his deposition, Dr. Lavespere testified no less than seven times that trying to figure which of the "offenders" was lying to him was the biggest challenge of his job as Medical Director, and that he believed roughly half of his patients were not telling him the truth.[452] He expressed his belief that some of his

---

[445] *Id.* at 117:12-118:5.

[446] *See* JX 10-k-1 at 10140, 10144.

[447] Oct. 22 Testimony of Randy Lavespere at 77:7-79:1.

[448] *Id.* at 79:1-6.

[449] *Id.* at 181:1-17.

[450] *Id.* at 181:19-182:3.

[451] Oct. 25 Testimony of Susi Vassallo at 83:9-13.

[452] JX 4-qq, R. Lavespere Depo. at 7:20, 12:14-14:7; JX 4-rr, R. Lavespere Depo. at 18:1-3, 18:6-8, 19:19-22, 19:3-17, 20:2-3. While Dr. Lavespere maintained at the class certification that he was "not

patients "don't want to be better."[453] This, in turn, led Plaintiffs' experts to characterize Dr. Lavespere's practice of disbelieving his patients as "the epitome of unprofessionalism."[454] At the class certification hearing, Dr. Lavespere tried to say that his deposition testimony "should have been placed in the context" of the subset of people working in the field lines because "that population there is very difficult in who's telling me the truth."[455] He went on to analogize the situation to "when you wake your kid up and they tell you they don't want to go to school."[456] This explanation was false, as Dr. Lavespere's deposition testimony about his offenders' supposed manipulativeness was not limited to patients working on the farm. For example, Dr. Lavespere testified in his deposition that "there are offenders out here that want you to take their medicine so their blood pressure will go up so they can have a stroke so they can say, You took my medicine."[457]

At trial, Dr. Lavespere tried yet a third version of this testimony. Now, his broad testimony about disbelieving his patients was limited to "determining when it comes to pain, who's telling me the truth."[458] He also tried to state that during the time Plaintiffs took his deposition he was working in the ATU more and had to figure out who was telling him the truth because he was involved in doing duty statuses, but that now he was on more administrative work so he didn't "have that issue much anymore."[459] When impeached with his deposition testimony, Dr. Lavespere fell back on his own time in prison as a last resort. He testified that in his role as a medical director he used "things" that he "learned from the inside," that he "witnessed firsthand," and that "you don't learn by reading a book or writing a book" to know "what the name of the game is."[460] Ultimately, the "name of the game" for Dr. Lavespere is to assume his patients are trying to get more favorable job assignments.[461]

Perhaps the most telling reflection on Dr. Lavespere's credibility was his blatant animosity and unprofessional demeanor towards Plaintiffs, Plaintiffs' counsel, and

an expert" in taking depositions, the Court itself acknowledged that "he's testified in this Court a dozen times." Oct. 22 Testimony of Randy Lavespere at 199:16-17.

[453] JX 4-rr, R. Lavespere Depo., at 52:7-8.

[454] PX 6 at 0014.

[455] Nov. 2 Class Certification Hearing at 39:24-25, 40:8-9.

[456] Id. at 40:10-18.

[457] JX 4-rr, R. Lavespere Depo. at 51:23-52:2.

[458] Oct. 22 Testimony of Randy Lavespere at 170:3-4.

[459] Oct. 22 Testimony of Randy Lavespere at 194:10-13. When confronted with the fact that he had just testified that he, in fact, had more administrative responsibilities at the time of his deposition and not less, Dr. Lavespere lashed out at Plaintiffs' counsel and claimed that "[a]fter this trial I won't have ya'll, y'all's part of my job which takes up about 50% of it." Id. at 194:20-23.

[460] Id. at 196:20-23.

[461] Id. at 197:1-6

Plaintiffs' experts throughout the entirety of trial.[462] On multiple occasions, he took the opportunity to express his anger towards Plaintiffs' counsel for doing nothing more than filing the complaint and serving discovery requests in the normal course of litigation.[463] He criticized Plaintiffs' experts for not observing his "daily interaction with offenders," when he himself instructed Plaintiffs' experts to stop observing clinic examinations.[464] And when asked whether he had been sued previously as a result of the difficulty getting hernia and cataract surgeries, Dr. Lavespere inexplicably began to verbally barrage Plaintiffs' counsel's about her husband's legal practice.[465] In particular, Dr. Lavespere exhibited untoward hatred of Plaintiffs' expert Dr. Puisis, whose report and testimony this Court has credited throughout the case. During a brief break in trial proceedings, Dr. Lavespere made an aggressive and troublesome threat regarding Dr. Puisis in the public bathroom of the Courthouse.[466] When asked about this threat on cross-examination, Dr. Lavespere angrily attacked Dr. Puisis' character and qualifications based simply on his disagreement with the report Plaintiffs' experts had authored.[467]

---

[462] Dr. Lavespere's visible presence, hostile demeanor, and constant note-taking throughout the entirety of trial may have been intended to intimidate class member witnesses—all patients still under his control and care. Francis Brauner, a witness for Plaintiffs who was no longer incarcerated, told the Court that he felt the responsibility to testify in part because he did not have to go back to Angola and face Dr. Lavespere and other Defendants afterwards. Oct. 12 Testimony of Francis Brauner at 84:4-8 ("I don't have to go back. I can sit here in front of Dr. Lavespere or Tracy [Falgout] or whoever 'cause I don't have to go back, and I don't have to face them and worry about retaliation. You know, so I can actually tell my story and let it be known without have any worries.").

[463] Oct. 22 Testimony of Randy Lavespere at 177:8-15 ("[E]very day, y'all were asking for something different. Y'all wanted another chart. Y'all wanted different things here. Y'all wanted different things there. So y'all coming into the facility took me away from my work.").

[464] *Compare* Oct. 22 Testimony of Randy Lavespere at 169:6-11 *with* Oct. 25 Testimony of Susi Vassallo at 83:3-7.

[465] Oct. 22 Testimony of Randy Lavespere at 183:19-184:1.

[466] *Id.* at 184:5-185:15.

[467] *Id.* at 185:6-15 ("I'm very disturbed by the fact that what you call an expert would come in to Angola and render an opinion like he did. I'm infuriated by that. And I don't think much of Dr. Puisis. As a matter of fact, I don't think he should call himself an expert. And my anger that I tried to withhold in this courtroom, I can show that anger to my assistant warden and that's about what I think of that report and what he did at Angola. So should he even be called an expert with that type of report? No, he shouldn't. And I'm very angry with him. Yes, I sure am.").

# EIGHTH AMENDMENT CLAIM

## I. DEFENDANTS' POLICIES AND PRACTICES SUBJECT THE CLASS TO A SUBSTANTIAL RISK OF SERIOUS HARM

117. The evidence overwhelmingly establishes that Defendants' policies and practices subject the Class to a systemic and substantial risk of serious harm.

118. The medical care that Defendants provide is grossly deficient, falling below clinical standards of care and routinely denying Class members access to a timely professional medical judgment and timely receipt of the care that the medical professional orders.

119. Every Class member who has or develops a serious medical need faces an egregious and unacceptably high risk of receiving inadequate diagnosis or treatment, being denied meaningful diagnosis or treatment altogether. The evidence presented at trial shows that there is also a likelihood of affirmative medical mistreatment. This risk is present across all types of medical needs, from longstanding chronic diseases to newly developed illnesses to immediate emergencies. These failures to provide constitutional care have resulted in preventable death and needless suffering for countless Class members in the past, and will continue to do so into the future absent fundamental changes to Defendants' system of providing medical care.

120. These problems go as far back as the discovery period goes, and were continuing as of the very end of the discovery period.[468] As Ms. LaMarre concluded, "During the period of time that [the experts] reviewed, care remained poor. … My assessment is that it's an inadequate system and it really hasn't improved."[469] Some of the very latest medical records reveal significant failures to provide timely access to a physician, appropriately treat chronic diseases, follow up on positive test results, or appropriately respond to medical emergencies.[470] The evidence proves that the risk of harm is persistent, long-standing, and ongoing.

---

[468] *See* Oct. 9 Testimony of Mike Puisis at 167:24-168:1, 195:12; Oct. 15 Testimony of Susi Vassallo at 164:25-165:6; Oct. 16 Testimony of Madeleine LaMarre at 150:25-151:11, 225:4-7.

[469] Oct. 16 Testimony of Madeleine LaMarre at 225:4-7.

[470] *See, e.g.*, PX 6 at 0142-55 (discussing persistent failure to appropriately treat Patient #11's chronic disease or provide adequate access to and coordination with specialists, continuing through 2016); *id.* at 0151-71 (discussing persistent failure to provide appropriate examinations and treatment for Patient #13's chronic diseases, continuing through 2016); *id.* at 0174-82 (discussing persistent failure to provide appropriate examinations, coordination with specialists, or physician care for Patient #14's chronic diseases, continuing through 2016); *id.* at 0247-48 (discussing failure to provide approved HIV medication regimen to Patient #26 in 2015 and 2016); Oct. 16 Testimony of Madeleine LaMarre at 216-17 (same); PX 6 at 0252-55 (discussing failure to appropriately treat Patient #28's chronic diseases, continuing through 2016); *id.* at 0261 (discussing failure to provide

121. Defendants' inadequate care and the risks to which it exposes Class members are the direct result of numerous deficiencies in Defendants' policies, practices, and procedures. Defendants' system is inadequate at all levels. Defendants do not provide sufficient provider and nursing staffing, and inappropriately use EMS personnel, correctional officers, and even Class members to make up for that understaffing. Defendants limit Class members' access to necessary specialists and emergency services, and systematically fail to ensure that personnel at Angola implement outside providers' recommendations. Defendants employ numerous practices that impede Class members' access to care, prevent identification and mitigation of problems, and even affirmatively harm patients. Each of these policies and practices directly contributes to the life-threatening risks that Class members face at all times.

## A. Defendants' Medical System Creates a Substantial Risk of Delayed Diagnosis, Delayed Treatment or Mistreatment, Needless Pain and Suffering, and Preventable Death

122. Through compelling expert, documentary, and first-hand testimony, Plaintiffs have shown that Defendants' deficient medical system places Class members at a substantial risk of delayed diagnosis, non-treatment or mistreatment of serious medical needs, needless pain and suffering, and preventable death.

123. The "most basic and essential elements of adequate health care access" is "timely access to a qualified medical professional who is qualified to diagnose and treat their serious medical needs," "access to a professional judgment," and "timely diagnosis and treatment, including being sent to an outside hospital.[471] Defendants routinely deprive Class members of these fundamental necessities, with predictably tragic results.

### (1) Findings of Plaintiffs' Medical Experts

124. Plaintiffs' medical experts reviewed medical records for 57 current and former Class members, 47 of whom were in their judgment sample and ten of whom were Named Plaintiffs. Each of the patients in the sample had a chronic medical condition, passed away while living at Angola, or required emergency medical treatment during Plaintiffs' medical experts' site visit. The results were systematic and stark: they "identified preventable deaths

---

appropriate diagnostics for head injury in 2016); *id.* at 0266 (discussing failure to provide physician care or timely transfer Patient #33 to the hospital for serious medical conditions); Oct. 16 Testimony of Susi Vassallo at 51-56, 109-10 (same); *supra* ¶ 56 (discussing failure to follow up on Patient #44's positive HCV laboratory finding); PX 410 at 4-5 (discussing failure to review or integrate pulmonologist's findings and recommendations into Patient #51's care from July 2015 to July 2016); *id.* at 5 (discussing prescribing medications with potentially life-threatening contraindications to Patient #52 in 2016).

[471] PX 6 at 0007-8.

and inadequate care in almost every medical chart [they] reviewed."[472] The problems were "numerous" and "varied" in "almost every record."[473] Of the 47 patients in the sample, they identified serious mistakes or omissions in the treatment of all but three patients.[474] Many of these case studies exhibited prolonged, even years-long courses of under-treatment, non-treatment, and mistreatment.

125.   As a whole, these case studies evinced "a similar pattern of inadequate medical evaluations and lack of timely monitoring and treatment."[475] Case after case follows a basic sequence: a patient reports symptoms that are indicative of chronic conditions or life-threatening emergencies, but is never properly examined by a medical provider or even a registered nurse. Instead, he is treated solely by Angola's EMTs, who provide superficial treatment for the patient's symptoms. When the patient sees a doctor, the doctor does not perform the basic steps necessary to diagnose the source of the patient's symptoms, including a focused physical examination, a relevant medical history, and medically indicated testing or referral. Diagnostic tests are delayed for months or years, and when they are performed they are not reviewed by a physician. Referrals to specialists are delayed, canceled by DOC headquarters, or thwarted by Defendants' failure to provide necessary testing—and once a specialist appointment occurs, the specialist's recommendations are delayed or ignored, going unreviewed by the patient's primary provider at Angola as the patient's medical need progresses.

---

[472] PX 6 at 0027; *see also, e.g.*, Oct. 9 Testimony of Mike Puisis at 123:20-124:10 ("We found inadequate care in almost every record that we reviewed. … The errors were pervasive."); Oct. 10 Testimony of Mike Puisis at 46:16-48:22 (summarizing findings); Oct. 16 Testimony of Susi Vassallo at 7:6-10 ("Multiple times … patients did not … receive a diagnosis and did not receive the proper workup for serious medical complaints that resulted in their death or a delayed transfer to the hospital, which resulted in significant harm."); *id.* at 22:12-24 ("[T]he care is not standard of care in America today."); Oct. 16 Testimony of Madeleine LaMarre at 149:16-25 ("I was struck by just the sheer number of encounters where patients presented with signs and symptoms of serious medical conditions and were not seen by a physician. I was struck by the number of encounters in which patients presented with life-threatening vital signs in which they were not evaluated by a physician and they were not sent to a hospital.").

[473] Oct. 17 Testimony Madeleine LaMarre at 89:18-21.

[474] The three exceptions were Patients # 2, 8, and 35. While Dr. Puisis found some failures to discuss medication refusals and delay in chronic care delivery with Patient #2, he did not think they amounted to a "significant problem." Oct. 11 Testimony of Mike Puisis at 56:11-12; *see also* PX 6 at 0094-95. Patient #8 was transferred to LSP for hospice care and resided at LSP for only five days before death, and Patient #35 died from an accidental electrocution. PX 6 at 0131, 268-69. Though Plaintiffs' experts noted some problems with testing and transport for Patient #35, they did not find any substantial problems with either patient's care. As Dr. Puisis said of the 14 charts he reviewed, "12 of 14 is considerable." Oct. 11 Testimony of Mike Puisis at 56:22.

[475] PX 6 at 0047.

126.    A similar pattern occurs in emergency situations. A patient presents with an emergent medical need, either a sudden onset or the product of a long-standing, untreated illness. EMTs manage the patient's emergency with little if any participation by a medical provider, doing little if anything to diagnose the source of the emergency. Abnormal vital signs indicating life-threatening crises are recorded without any apparent recognition of their critical nature. Diagnostic testing is not timely performed or performed at all, or is performed and unreviewed by a provider, leading the emergency to escalate over the course of a day or a week. Transport to an outside hospital that would be able to properly diagnose and treat the condition is delayed by hours, days, or weeks, until the patient's condition is irreversible. As Dr. Vassallo summarized, "multiple times … patients did not … receive a diagnosis and did not receive the proper workup for serious medical complaints that resulted in their death or a delayed transfer to the hospital, which resulted in significant harm.[476]

127.    To be sure, not every patient examined by Plaintiffs' experts suffered from every misstep outlined above. But Plaintiffs demonstrated many or all of these critical errors and omissions in literally dozens of cases, at a rate high enough to prove that the problems are pervasive throughout the care that Defendants provide. As Dr. Puisis concluded, it was not a close question whether clinical standards of care were met.[477] Rather, as Ms. LaMarre observed:

> [W]hat was really, really striking about LSP is the … lack of an adequate comprehensive healthcare program that ensured that patients got timely care for their serious medical problems. I was struck by just the sheer number of encounters where patients presented with signs and symptoms of serious medical conditions and were not seen by a physician. I was struck by the number of encounters in which patients presented with life-threatening vital signs in which they were not evaluated by a physician and they were not sent to a hospital.[478]

128.    Most disturbingly, Plaintiffs found major medical errors in diagnosis and treatment leading up to nearly every death they examined. Their sample included 28 patients who passed away. In all but two cases, the deaths were preceded by serious medical negligence, including significant delays in diagnosis, failures to provide necessary medical treatment, and/or failures to timely transport for hospital care. Disturbingly, Plaintiffs' experts found major medical errors—many of which likely led to preventable deaths[479]—in almost every chart they reviewed.

---

[476] Oct. 16 Testimony of Susi Vassallo at 7:6-10.

[477] Oct. 11 Testimony of Mike Puisis at 76:9.

[478] Oct. 16 Testimony of Madeleine LaMarre at 149:16-25.

[479] *See generally* Oct. 10 Testimony of Mike Puisis at 41:8-42:9 (defining "preventable death" as "if an intervention had occurred appropriately the death could have been preventable, or the patient's survival would have been extended to a reasonably significant degree."); Oct. 9 Testimony of Mike Puisis at 143:15-18 ("[Y]ou can't be 100 percent that … missing this particular drug caused that

129. Because Plaintiffs' experts' case studies are discussed at length below in the sections on specific deficient practices, they will not be repeated here. Suffice it to say, the case studies and the underlying records amply justify the experts' concern and their conclusion that LSP's medical system is one of the worst they have ever observed. They show year-plus delays in following up on test results suggesting cancer;[480] management of soon-to-be-fatal symptoms by EMTs for 24 hours without a physician ever seeing the patient;[481] prescription of medications that are affirmatively contraindicated and significantly increase the risk of harm;[482] and desultory care even in the infirmary, where the sickest patients are housed.[483]

130. As discussed above, Plaintiffs' experts' testimony about their findings was credible and reliable, and their report accurately represented the body of evidence in the tens of thousands of pages of medical records before the Court. While Defendants sought to undermine this evidence through cross-examination, their efforts were unpersuasive, as discussed above.

131. Stunningly, Defendants' experts did not seriously dispute the findings from Plaintiffs' medical experts' sample. Of Defendants' experts, only Dr. Thomas responds to Plaintiffs' case studies at all—and he disputes just *three* of the 38 case studies in Plaintiffs' experts' opening report in which they identified serious medical error.[484] The other 35 findings of serious harm and medical error in the opening report are simply unrebutted, as are the eight sample cases discussed in the supplemental chart reviews.[485]

132. Even where Dr. Thomas does discuss Plaintiffs' experts' case studies,[486] his comments underscore, rather than undermine, Plaintiffs' findings. He does not materially dispute any of Plaintiffs' medical experts' findings in any of them. Specifically:

   a. Patient #15 was a 40-year-old man who had severe, uncontrolled hypertension and passed away on January 25, 2014. According to Plaintiffs' medical experts, Defendants failed to provide adequate medical care for Patient #15's hypertension over a period of many years and in the months before his death. The day before his

---

heart attack, but I think you can for sure that it was ... either potentially [preventable] or preventable.").

[480] *See, e.g., infra* ¶ 275.a

[481] *See, e.g., infra* ¶ 229.

[482] *See, e.g., infra* ¶ 254.a-254.b.

[483] *See, e.g., infra* ¶ 283.

[484] DX 14 at 02938-40.

[485] *See* PX 410. Defendants did not respond to the supplemental case studies submitted with Plaintiffs' rebuttal report at all, even though the Court granted them the opportunity to depose Plaintiffs' experts on those chart reviews. *See* Rec. Doc. 353 at 6.

[486] Curiously, Dr. Thomas did not address Plaintiffs' experts' case studies, the core of their opinions, at trial. A two-page section of Dr. Thomas's report is Defendants' only expert response to Plaintiffs' experts' review of the sample. *See* DX 14 at 02938-40.

death, Patient #15 exhibited numerous signs and symptoms of acute coronary disease, including left-sided chest pain, rated 10 on a scale of 10, an EKG showing changes consistent with ischemia (inadequate blood supply to the heart), and an x-ray suggesting aneurysmal change. According to Plaintiffs' medical experts, this indicated immediate hospitalization. Instead, EMTs released Patient #15 to his housing unit. Less than three hours later, he presented with worsening symptoms, including hypoxia (oxygen deficiency) and tachycardia (abnormally rapid heart rate), but was not transported to a hospital until he became unresponsive some two and a half hours later. At that point, he was transported to Lane, where he was promptly diagnosed with a dissecting aortic aneurysm and airlifted to OLOL for emergency treatment. He died en route.[487]

b. Dr. Thomas does not dispute Plaintiffs' medical experts' finding that Defendants failed to provide adequate medical care for his hypertension for years. He also acknowledges that "[c]learly, in retrospect, this patient should have been sent to the hospital," but opines that "[t]his is at most a failure on the part of a single physician to recognize the seriousness of an internal abdominal hemorrhage from which the patient was suffering."[488] Far from controverting Plaintiffs' medical experts' findings in any material way, this corroborates their conclusion that Defendants' personnel erred in treating the patient.

c. Patient #16 was a 45-year-old man who presented to the ATU with a self-declared emergency, complaining of pneumonia- and tuberculosis-like symptoms on December 14, 2013. EMTs recorded some of his vital signs and sent him back to his housing unit without notifying a physician. He returned on December 16, at which point his fever had worsened, his blood pressure had plummeted, and his pulse had spiked—"critical findings that indicate a life threatening condition," according to Plaintiffs' medical experts. Nonetheless, EMTs did not contact a physician, instead treating the patient themselves in accordance with an unidentified protocol, and released him back to his housing unit without even referring him to a physician. He did not see a physician at all until December 18, four days after his initial presentation. Even at that time, the physician merely reviewed an x-ray. The patient was sent to a hospital for emergency treatment six hours after arriving at the ATU on December 18, where he was diagnosed with pneumonia and acute renal failure, and subsequently passed away of respiratory failure.[489]

d. Plaintiffs' medical experts concluded that Patient #16 "did not receive timely and appropriate care when he first presented with fever and respiratory symptoms," and that "[t]he failure of a physician to timely medically evaluate the patient likely directly

---

[487] PX 6 at 0046, 53, 69-71, 183-90.
[488] DX 14 at 02938.
[489] PX 6 at 0035-37, 190-93; PX 28 at 0023.

contributed to his death."[490] Dr. Thomas does not disagree with *any* of Plaintiffs' medical experts' findings, pointing out only that a physician provider was "involved in the care because of the chest x-ray."[491] He does not suggest that it was appropriate for a patient with Patient #16's symptoms to be treated solely by EMTs for four days, nor does he dispute that Patient #16 exhibited signs of "a life threatening condition" on December 16 that were ignored for another two days.

e. <u>Patient #18</u>, a 57-year-old man who requested an HIV test in August 2013 but didn't receive it for three months. By that time he was exhibiting abnormal vital signs, a six-month long cough, and 57-pound weight loss over the previous two years. The EMT who documented these signs and symptoms did not notify a physician, instead sending him back to his housing unit and referring him to the ATU the following day. Patient #18 tested positive for HIV twice, but no physician acknowledged these results for two weeks. During that time, he made several visits to the ATU, with no records of EMTs ever notifying doctors of his abnormal vital signs or of a physician clinically evaluating him. Dr. Lavespere saw Patient #18 almost two weeks after his positive tests, but he didn't examine him or note his new HIV diagnosis, instead simply sending him to the ATU. He was thereafter admitted to the infirmary. But even on the infirmary, where Defendants provide their highest level of care, medical providers did not perform virtually any physical examinations of the patient. Moreover, despite being severely immunosuppressed and exhibiting life-threatening vital signs, he was not started on antiretroviral therapy for another four days, and only inconsistently received medication. His fever rose to 101 on the infirmary, but nurses did not notify a physician and did not take his vital signs again until the following day. He was ultimately hospitalized, where he passed away.[492]

f. Plaintiffs' medical experts concluded that Defendants' failed to timely test, evaluate, and treat Patient #18—including their delays in providing an HIV test, addressing his two positive tests, providing antiretroviral therapy, and hospitalizing him. They further concluded that without these errors, "his death was likely preventable."[493] Here again, Dr. Thomas does not dispute any of Plaintiffs' medical experts' factual findings about the content, adequacy, or appropriateness of the patient's care. Instead, all he says is that Plaintiffs' experts "acknowledge no certainty when they use the term 'probably' to conclude that "his death would probably been preventable [sic]."[494] Of course, there is no requirement that Plaintiffs prove to a "certainty" that

---

[490] PX 6 at 0037.

[491] DX 14 at 02938-39.

[492] PX 6 at 0039-40, 53, 56, 83-84, 86, 200-208.

[493] *Id.* at 0039-40.

[494] While Dr. Thomas purports to be quoting from Plaintiffs' medical expert report, the purported quote does not actually appear. That said, Plaintiffs' medical expert's actual opinion—that "it is likely his death would have been prevented," PX 6 at 0086—is similar in substance, even if Dr. Thomas's actual quotation is inaccurate.

any particular death was caused by medical error; the point of the case studies is to show Defendants' recurrent delays and gross medical negligence.[495]

133.    In all three cases, Dr. Thomas's focus seems to be that a physician was involved in some way at some point during each patient's treatment, even if only by telephone and even if belatedly or without a recognition of the patient's needs. This does not in any way undermine Plaintiffs' compelling showing of deliberate indifference to Class members' serious medical needs. Plaintiffs have shown that physician involvement is inadequate in timeliness, frequency, and content.

134.    In summary, Plaintiffs' medical experts have compellingly and convincingly shown that Defendants provide grossly deficient care at a shockingly high rate. The experts' conclusion that the level of harm is one of the worst they have ever seen is more than backed up by their reliable, thorough examination.[496] This inadequate medical care denies Class members timely access to a professional medical judgment from a qualified medical professional, denies them timely diagnosis and appropriate treatment of serious medical needs, and—most importantly—places them at a substantial risk of experiencing serious harm any time they have or develop a serious medical need.

(2)   Corroborating Evidence of a Substantial Risk of Serious Harm

135.    The findings of Plaintiffs' medical experts are corroborated by a significant amount of credible evidence. This includes the first-hand testimony of doctors who treat Class members and Class members themselves; the medical records of the Named Plaintiffs; and documentary evidence produced in discovery.

136.    This evidence paints the same picture as Plaintiffs' medical experts' sample: a picture of pervasive and systemic medical neglect, causing serious harm to innumerable Class members and exposing all Class members to a substantial risk of serious harm.

137.    Some of the most significant pieces of that evidence include:

a.   *Testimony from Treating Providers*

138.    Two doctors from University Medical Center ("UMC") in New Orleans who regularly treat patients incarcerated at Angola, Dr. Catherine Jones and. Dr. Monica Dhand, both testified

---

[495] *See also* Oct. 9 Testimony of Mike Puisis at 143:15-18 ("[Y]ou can't be 100 percent that … missing this particular drug caused that heart attack, but I think you can for sure that it was … either potentially [preventable] or preventable.").

[496] *See, e.g.,* PX 6 at 0091-273; Oct. 16 Testimony of Madeleine LaMarre at 225:10-13 ("Unfortunately I have to say that it's really one of the worst prisons I have ever reviewed because of the level of harm that I found at this facility and that my colleagues found and we describe in our report.").

at trial.[497] They each credibly testified and detailed the harm that Defendants' inadequate medical care and mismanagement has done to many of their Angola patients, including rendering illnesses untreatable, causing significant unnecessary pain, and possibly shortening Class members' lives.

139.     Dr. Jones and Dr. Dhand have each worked at UMC for approximately ten years.[498] In that capacity, both doctors routinely treat patients from Angola.[499] In their numerous years treating Angola patients, Dr. Jones and Dr. Dhand have observed a number of trends, which substantiate Plaintiffs' claim that the Class is subjected to a substantial and systemic risk of serious harm. Specifically, and as set forth in more detail below, the doctors identified the following problematic trends evincing inadequate medical care at Angola:

   a.   *Delays in medical care.* Both Dr. Jones and Dr. Dhand testified that their patients from Angola are delayed in accessing necessary medical care.[500] Typically, these patients are already suffering from serious chronic illnesses, such as cancer, HIV, heart disease, Hepatitis C, sickle-cell disease.[501] When patients arrive at UMC from Angola, they are frequently presenting with symptoms so severe that they are "out of control."[502] Indeed, according to Dr. Jones, her patients from Angola present with symptoms so severe that she would normally expect a patient from the general population to have already sought treatment before reaching that level of severity.[503] Dr. Dhand likewise testified that "almost all" of her patients from Angola report experiencing delay in their treatment before arriving at UMC.[504] According to both doctors, such delays in treatment materially obstructs their ability to provide effective treatment and therefore may detrimentally impact the prognosis of their patients from Angola.[505]

---

[497] *See* Oct. 11 Testimony of Catherine Jones at 111 *et seq.*; Oct. 11 Testimony of Monica Dhand at 159 *et seq.*

[498] Oct. 11 Testimony of Catherine Jones at 113:15-19; Oct. 11 Testimony of Monica Dhand at 160:8-10.

[499] Oct. 11 Testimony of Catherine Jones at 115:19-116:3; Oct. 11 Testimony of Monica Dhand at 160:11-24.

[500] Oct. 11 Testimony of Catherine Jones at 121:13-123:25; Oct.11 Testimony of Monica Dhand at 162:21-163:18.

[501] Oct. 11 Testimony of Catherine Jones at 115:22-116:5, 122:7-21; Oct. 11 Testimony of Monica Dhand at 162:5-164:18.

[502] Oct. 11 Testimony of Catherine Jones at 116:14.

[503] *Id.* at 117:8-13.

[504] Oct. 11 Testimony of Monica Dhand at 162:21-163:5.

[505] Oct. 11 Testimony of Catherine Jones at 122:22-123:25; Oct. 11 Testimony of Monica Dhand at 163:19-164:10.

b.  *Failure to provide follow-up care.* As set forth in more detail below, Dr. Jones also credibly testified that their patients from Angola routinely do not receive the necessary specialty follow-up care that they prescribe upon discharge.[506]

c.  *Failure to provide medically necessary medications and treatments.* Both Dr. Jones and Dr. Dhand also testified that their patients from Angola are often denied necessary medications, such as opiates, notwithstanding the fact that those are the effective pain treatments for serious illnesses such as cancer and sickle cell disease, which may cause prolonged sickle-cell crises and detrimentally impact cancer prognosis.[507] Both doctors also testified that their patients from Angola do not receive necessary physical therapy upon discharge.

d.  *Inadequate medical records.* Dr. Jones also testified that the medical records sent from Angola with her patients' medical records are rarely complete, which can impair UMC doctors' ability to provide treatment.[508]

140.  In contrast to Defendants' witnesses and cross-examinations, which repeatedly sought to blame problems on Class members' supposed refusal of care, both Dr. Jones and Dr. Dhand also testified that patients from Angola are cooperative, that they do not refuse treatment, and that they have never observed a patient from Angola malingering.[509]

**b.  *Named Plaintiffs' Medical Records***

141.  In addition to their sample, Plaintiffs' medical experts reviewed the medical records of numerous Named Plaintiffs to respond to the incomplete (and often inaccurate) summaries in Dr. Thomas's report.[510] These records show the exact same patterns of neglect, mistreatment, and harm as the sample. For example:

a.  <u>Shannon Hurd</u>: From 2013 to 2015, Mr. Hurd made dozens of sick call requests for chest pain, lung symptoms such as shortness of breath, weight loss (more than 61 pounds, ultimately), left-sided pain, cough, numbness of his extremities, testicular swelling or rash, and coughing up blood. All of these symptoms are suggestive of renal cancer. Over a two-year period, physicians never conducted a proper physical examination or took a relevant history, because sick call request after sick call request stopped at the EMT level without any evidence of a provider reviewing it or taking any action and providers did not take appropriate steps when they did see Mr. Hurd. On November 3, 2015, a blood test ordered seven months earlier showed potentially life-threatening anemia at a level typically prompting transfusion, but doctors did not address the finding for days and did not work up the anemia for weeks. Even after a

---

[506] Oct. 11 Testimony of Catherine Jones at 123:14-127:23.

[507] Oct. 11 Testimony of Catherine Jones at 132:3-135:22; Oct. 11 Testimony of Monica Dhand at 166:4-167:6.

[508] Oct. 11 Testimony of Catherine Jones at 118:16-120:14, 129:7-132:2.

[509] Oct. 11 Testimony of Catherine Jones at 138:15-139:3; Oct. 11 Testimony of Monica Dhand at 167:18-22.

[510] PX 28 at 0007-22; *compare* DX 14 at 02894-921.

chest x-ray on November 21, 2015, showed nodules in Mr. Hurd's lung and a positive fecal occult blood test—indicating severe anemia and active bleeding—an Angola physician did not review the x-ray for two days, then merely requested a CT scan and scheduled him for a two-week follow-up rather than providing treatment. The CT scan was not performed until December 16, 2015, and showed a large renal mass with multiple lung nodules consistent with metastases. Even after that critical diagnostic test, no physician saw Mr. Hurd for nearly a month. As Plaintiffs' experts summarize: "Mr. Hurd had many of these signs and symptoms [of renal cell carcinoma] for an extended period before he was diagnosed. LSP physicians failed to review abnormal laboratory results, failed to identify longstanding weight loss, and failed to adequately evaluate the patient for years." This care was "was a significant departure from standard of care and demonstrates multiple systemic deficiencies that caused the patient harm. This patient could have had a much earlier diagnosis." As of the close of discovery, Mr. Hurd, just 41 years old, was in hospice care.[511]

b. <u>Joe Lewis</u>: Like Mr. Hurd, Mr. Lewis made years of sick call requests complaining of symptoms such as chronic cough, hoarseness, and loss of voice, even informing medics that he had a family history of cancer.[512] According to Plaintiffs' medical experts, these symptoms indicated "potentially serious medical conditions" that were "consistent with laryngeal cancer." Yet in response to these requests, Mr. Lewis was typically treated symptomatically by medics; when he did see providers, they failed to properly document Mr. Lewis's medical history, conduct diagnostic testing, or follow up on past treatment. In all, physicians' treatment of Mr. Lewis's concerns were "below standard of care."[513]

c. <u>Ian Cazenave</u>: Mr. Cazenave suffers from advanced sickle cell disease. Complications related to sickle cell disease may lead to heart disease, lung disease, retinal disease, and other illnesses. For two decades, Mr. Cazenave has suffered from leg ulcers, another common complication related to untreated sickle cell disease and an indicator of other concerns like anemia. In 2013, records indicated that Mr. Cazenave had an enlarged heart; despite this, physicians failed to provide adequate, competent care. Sickle cell disease is best managed in consultation with a hematologist, who specializes in treatment of blood diseases. Despite being imprisoned at Angola for 18 years, Mr. Cazenave did not meet with a hematologist until he was hospitalized in 2016. Plaintiffs' medical experts have noted that "[Mr. Cazenave] hadn't had a transfusion in 10 years and [had] never taken hydroxyurea both of which are . . . especially needed for persons with severe sickle disease and leg

---

[511] PX 28 at 0018-22; Oct. 23 Testimony of David Thomas at 99:11-116:5; *see generally* JX 10-cc (Shannon Hurd medical records). Defendants' efforts to rebut Plaintiffs' evaluation of Mr. Hurd's care are discussed *supra* ¶¶ 62-67, 103. Mr. Hurd passed away after the close of discovery. His preservation deposition is in the record before the Court, *see* JX 4-u through 4-y.

[512] *See* JX 10-gg-1 at 31263; *see generally id.* at 31263-82, 31289-96, 31306-07.

[513] PX 28 at 0017.

ulcers." Even once Mr. Cazenave saw specialists, prison physicians failed to properly document and act upon the specialists' recommendations, failing to send him to a wound care specialist despite numerous requests by physicians over a period of nearly six months.[514]

d. <u>Lionel Parks</u>: Defendants did not properly test Mr. Parks for peripheral artery disease ("PAD"), and failed to treat him with statin therapy. Mr. Parks had severe thrombocytopenia (i.e., abnormally low platelets) on multiple tests over two years without evaluation of this abnormality. On June 29, 2014, one week after an unaddressed thrombocytopenia finding, Mr. Parks had a stroke. But despite recording telltale signs of a stroke—including facial droop, weakness in his left arm, and slurred speech—and Mr. Parks' risk factors for stroke, EMTs sent Mr. Parks back to his housing unit without proper evaluation, diagnosis, and treatment. Physicians did not examine him for a day and a half, instead simply prescribing an IV and Benadryl by phone. It took three visits to the ATU over 42 hours before Defendants' medical personnel recognized Mr. Parks' stroke and sent him to a hospital. Plaintiffs' medical experts report that his "care was a significant departure from standard of care." Had Mr. Parks been properly and timely diagnosed and treated, his stroke may have been prevented; had he been timely sent to a hospital for stroke treatment, he might not have had severe deficits thereafter.[515] Indeed, Mr. Parks' care was so plainly deficient that it prompted ILH's Stroke Program Coordinator to warn the Executive Director of the Louisiana Emergency Response Network of Angola's delays in transporting patients with strokes for treatment.[516]

### c. *Class Member Witnesses' Testimony*

142. Nine current or former Class members testified at trial,[517] and Defendants designated the depositions of 19 more.[518] These witnesses credibly recounted similar experiences of delays, failures to diagnose, and an inability to get attention for serious issues. For example:

---

[514] PX 29 at 0008-10; *see generally* JX 10-k (Ian Cazenave medical records); *see also supra* ¶ 103 (evaluating Dr. Thomas's assessment of Mr. Cazenave's care).

[515] PX 28 at 0011-13; *see also* JX 10-qq-2 at 47423, 47424, 47427 (Lionel Parks ATU reports after his stroke).

[516] *See* PX 12 at 0001-02. While Mr. Parks' name is not given, the timing suggests that he is the patient of whom Ms. Rougeou says "One inmate had to go to the infirmary three days in a row until they believed that he was having a stroke. He had to basically be carried to the infirmary on the third day to his one sided weakness." *Id.* at 0002. She notes that this patient and two others were sent back to Angola with "pretty significant deficits" yet "only get physical therapy once a week." *Id.*

[517] *See supra* ¶ 116.

[518] JX 4-a through 4-u. Eight Class members testified live, and Plaintiffs submitted the preservation deposition of Shannon Hurd, taken shortly before his death. *See* JX 4-u through 4-y. That testimony is almost entirely unrebutted.

a. <u>Francis Brauner</u>: Mr. Brauner testified that when he arrived at Angola, he was paralyzed from the waist down as a result of a back injury.[519] Despite his paralysis, security placed him in a locked isolation room on the nursing ward, out of sight and sound of the nursing staff and without any way to call to them for assistance.[520] After 30 days in the isolation cell, Mr. Brauner went into septic shock from an infected bedsore on his tailbone and had to be rushed to the hospital for emergency surgery.[521] During his ten years at Angola, he developed additional bedsores that progressively got worse without appropriate wound care.[522] When he was released in 2015, his bedsores were stage four and bone was visible.[523] After leaving Angola, Mr. Brauner was able to access the proper types of treatment for his wounds with help from his family members.[524] Less than a year after being released, Mr. Brauner's wounds had shrunk significantly and improved to a stage three classification.[525]

b. <u>Anthony Mandigo</u>: Mr. Mandigo testified that he had been experiencing problems with his sinuses since 2014, which rendered him unable to smell or taste his food.[526] After making sick call, he was seen by telemedicine and by doctors at University Medical Center, who scheduled him for surgery.[527] As of the end of the discovery period, he had not received surgery.[528]

c. <u>Jason Hacker</u>: Mr. Hacker was repeatedly referred for cataract surgery by outside providers, with at least one doctor ordering immediate cataract removal. Providers at Angola delayed the surgery for years, rendering him legally blind. Angola forced him to work in the fields even after he was declared legally blind and injured himself.[529]

d. <u>James Marsh</u>: Mr. Marsh suffered bilateral knee injuries in 2005, days after Hurricane Katrina, including a torn right meniscus. As of the close of discovery more than a decade later, Defendants had not performed a knee replacement; he was not even sent for a surgical review for 10 years. At times, his anti-inflammatory medication for the resulting knee pain has been delayed for as long as a week. He also waited over a

---

[519] Oct. 12 Testimony of Francis Brauner at 84:13-18.

[520] *Id.* at 88:1-22.

[521] *Id.* at 88:21-90:7.

[522] *Id.* at 91:1-92:13.

[523] *Id.* at 91:20-92:2.

[524] *Id.* at 92:14-94:13, 121:1-16.

[525] *Id.* at 94:1-13, 120:1-16, 129:22-130:16; *see also id.* at 130:1-16 (stating that the wound had shrunk from the size of "the bottom of a liter bottle" to "about the size of a silver dollar," with the bone no longer exposed and the wound nearly reduced to a surface wound).

[526] Oct. 11 Testimony of Anthony Mandigo at 91:14-92:5.

[527] *Id.*

[528] *Id.* at 92:1-8.

[529] JX 4-i, J. Hacker Depo.at 20:2-13, 26:7-13; 36:2-37:19; 58:4-58:10.

year for hernia surgery, and received it only after his daughter contacted the warden's office.[530]

    e. <u>Marvin Tarver</u>: Mr. Tarver waited nearly two years for hernia surgery, as his hernia worsened to the point where he required a wheelchair. At one point, UMC providers were prepared to operate on the hernia, but Defendants refused to authorize the surgery. Mr. Tarver similarly waited years for rotator cuff surgery, cataract surgery, and a hearing aid—as long as 12 years for the hearing aid—as recommendations made by outside specialists were delayed or ignored. After receiving rotator cuff surgery, he never received physical therapy.[531]

    f. <u>Derrick Woodberry</u>: Outside specialists referred Mr. Woodberry for hemorrhoid surgery, but DOC providers told him it would not be provided due to budget cuts. He filed more than 20 sick call requests over four years for his hemorrhoid problems, but Defendants did not provide surgery until after he developed anal fissures.[532]

143. Notably, Defendants did not rebut the deposition testimony *at all*; it has gone completely unrefuted in their evidentiary presentation.

                    d. *Contemporaneous Documentation of Deficiencies in Medical Care and Harm to Patients*

144. As discussed in further detail in the section on Defendants' knowledge, Defendants received numerous warnings both from outside medical personnel and their own staff of the ongoing harm to patients and the practices that were contributing to that harm. These include:

    a. In August 2014, the Stroke Program Coordinator at Interim LSU Hospital alerted Defendants that "in the last month and a half . . . I have had three inmates from Angola that presented with obvious stroke symptoms. All of them were out of the window because it either took them a while to get here or the medical staff at Angola did not think the inmate was having a stroke." One patient (likely Lionel Parks, as discussed above) "had to go to the infirmary three days in a row until they believed that he was having a stroke." As the nurse explained, prompt emergent care for stroke victims was necessary to "prevent severe disability," and the failure to provide proper emergent care had given all three patients "pretty significant deficits."[533]

    b. That same week, the Interim Chairman of Oral Maxillofacial Surgery at LSU warned Angola about the "number of inmates who present to us with 3 week old fractures that are already infected and thus use a lot of resources to fix something that could

---

[530] JX 4-l, J. Marsh Depo. at 10:23-11:20, 14:7-15:1, 29:24-30:10, 40:7-41:19.
[531] JX 4-r, M. Tarver Depo. at 13:12-15, 16:2-30:25, 42:4-43:16, 44:25-46:21, 51:6-52:7, 54:16-65:6.
[532] JX 4-t, D. Woodberry Depo. at 14:22-17:13.
[533] PX 12 at 0001-02.

have been treated easily if diagnosed sooner."[534] Angola's response was to schedule "one educational training" to "train nurses to perform better exams and to refresh on some basic anatomy."[535]

    c.  Numerous documents show that Defendants were not providing crucial diagnostic services and medical procedures such as colonoscopies, CT scans, MRIs, hernia surgery, cataract surgery, and cancer treatment.[536]

          e.  *Testimony and Contemporaneous Admissions by Current and Former DOC Employees*

145.  Defendants and their current and former employees have repeatedly acknowledged that Class members receive delayed care and suffer harm. These include:

    a.  Former Assistant Warden for Healthcare Services Kenneth Norris, who testified that patients "did not get the timely treatment" because Defendants refused to authorize hernia surgery "until, you know, it becomes a life-threatening deal."[537]

    b.  Multiple Defendants acknowledged the substantial backlog of physician encounters.[538] This is verified by Defendants' expert Dr. Thomas, who acknowledged that more than one out of every three specialty consultations over the previous year had not been completed.[539]

    c.  Dr. Singh and Secretary LeBlanc, who informed the Louisiana Secretary of Health and Governor's Office that they were concerned about the "delay of critical care."[540]

---

[534] PX 13 at 0001-02.
[535] PX 274 at 0002.
[536] PX 36 ("mid-2012, Defendant Stacye Falgout was informed that cancer patients at Angola awaiting follow-up treatment were put on hold because the treatment center did not have a contract with the prison. ); PX 37 ("in January 2015, Defendant Poret sent a list of 65 hernia patients to DOC headquarters, which responded that only the top 10 could be scheduled for treatment. "); PX 2 (Dr. Singh on 12/13/13: "Some of the offenders at LSP were waiting for CT scan and MRI or cancer care since late 2011. … As far as I know no [colonoscopies] were done at LSP for 2 years or longer. Once access has been restored, even then we can not get all 600 colonoscopies done immediately."); PX 26 (Ms. Lamartiniere: "[W]e will temporarily suspend the entering of screening referrals [for colonoscopies] until notified by [headquarters] to resume."); PX 32 (cataract backlog).
[537] JX 4-tt, K. Norris Depo. at 37:13-38:5.
[538] *See, e.g.*, JX 4-nn, S. Lamartiniere Depo. at 69:2-16 (acknowledging that "at the end of March 2016, there were 820 offenders who were waiting to have an eye appointment").
[539] DX 14 at 02890.
[540] PX 152 ("documenting cancellations").

### f. *Testimony of Defendants' Experts*

146. As discussed *supra* ¶¶ 105-108, Defendants' experts corroborated Plaintiffs' findings in several regards. Most notably, Dr. Thomas conceded that "some patients at LSP had died because of their physicians' individual approach to their illnesses."[541] While he dismissed these instances as isolated misjudgments, that assessment was unreliable for the reasons discussed above, as well as belied by the dozens of similar, unrebutted examples Plaintiffs' experts presented.

147. While Dr. Moore did not opine on the standard of care or potential harm to patients, she did verify significant elements of the evidence that Plaintiffs' experts found contributed to a risk of harm. As discussed above, she found that physicians did not timely follow up on sick call or properly document chronic care, that EMTs followed protocols that needed improvement, and that medical records did not contain periodic health assessments.[542]

### g. *Mortality Statistics*

148. Finally, the substantial risk of serious harm to which Defendants expose Class members has manifested in a shockingly high mortality rate, as documented by the U.S. Department of Justice's Bureau of Justice Statistics in its Mortality in Local Jails and State Prisons report ("BJS Report").[543] This data, drawn from statistics self-reported by the DOC, shows that Louisiana's mortality rate has nearly doubled over a seven-year period, with no corresponding rise in the national average.

   a. As shown in the following chart summarizing the BJS Report, the DOC's prison mortality rate has risen dramatically since 2007, the year Dr. Singh became DOC's Medical Director.[544]

---

[541] Oct. 23 Testimony of David Thomas at 116:9-16; *see* DX 14 at 02941.
[542] *See supra* ¶ 112; Oct. 23 Testimony of Jacqueline Moore at 154:10-155:17, 158:2-159:8, 162:10-15.
[543] PX 466-9.
[544] PX 466-9 at 0026 (Table 26).



**U.S. State vs. LA Inmate Mortality (2001-2013)**
SOURCE: PX 346 AT 0026

b. As the chart shows, the DOC's mortality rate has shown an unmistakable upward trend. In the early 2000s, the DOC's mortality rate rose from the mid-300s (per 100,000) to the mid-400s. After a brief respite, it continued to rise—first into the 500s, territory that few states have reached in even a single year, and ultimately into the 600s. From 2008 to 2013, DOC's mortality rate ranged from 526 to 628 in every year. For comparison, only three other states recorded 500 or more deaths per 100,000 inmates for even a single year, with none surpassing 528 deaths.[545]

c. While a direct comparison with other states is of limited utility, as Dr. Puisis explained,[546] the difference in trends is instructive. Compared to Louisiana's upward trend, the national average has been essentially flat for more than a decade. Few other states exhibited anything remotely resembling the relentless rise in mortality

---

[545] *Id.* Notably, BJS says that the data point reporting 528 deaths per 100,000 inmates, Wyoming in 2008, should be "[i]nterpret[ed] with caution," because Wyoming had "too few cases to provide a reliable rate." *Id.* Only two states with sufficient data points for a reliable rate ever reached 500 deaths per 100,000 inmates, and the highest of those reached just 507—below the *best* year for Louisiana since 2008. *Id.*

[546] *See* Oct. 9 Testimony of Mike Puisis at 42:10-46:10.

that Louisiana has seen, and none of them exhibited an increase anywhere close in magnitude.[547]

d. While Defendants' counsel suggested that an aging population might be responsible for LSP's and Louisiana's high mortality rate,[548] Dr. Moore testified that LSP's demographics are not particularly unusual and other facilities have the same or higher levels of infirmary care.[549]

e. These statistics reinforce Plaintiffs' medical experts' conclusion "that there are many preventable deaths at LSP that contribute to this extraordinary prisoner mortality rate [and] that these preventable excess deaths are a consequence of the systemic inadequacies in the health program."[550]

149. In conclusion, the credible evidence points to the irrefutable conclusion that Defendants' practices expose Class members to a substantial risk of serious harm, including delayed diagnosis, non-treatment or mistreatment of serious medical needs, needless pain and suffering, and preventable death.

## B. Specific Practices Contributing to Substantial Risk of Serious Harm

150. In addition to establishing beyond any doubt that Angola's medical system exposes Class members to a substantial risk of serious harm, Plaintiffs have identified several policies, practices, and procedures that contribute directly to this risk.

151. To ensure adequate medical care, a correctional health care system must maintain administrative infrastructure (a table of organization, a budget, staffing, training, supervision, credentialing, etc.); integrated health care processes through which care is accessed and provided (sick call, chronic disease management, emergency care, medication administration, specialty services, etc.); and various forms of quality improvement activities designed to identify and correct problems (peer review, mortality review, and continuous quality improvement ("CQI")).[551]

152. The medical system at Angola is fundamentally deficient at each of these levels.[552]

153. At the administrative level, Angola is underfunded and understaffed. These deficits lead Defendants to assign critical aspects of medical care to staff who are unqualified to perform them. This manifests in EMTs providing independent medical care and determining which patients will receive a professional medical opinion; complex care being performed by

---

[547] PX 466-9 at 0026 (Table 26).
[548] Oct. 10 Testimony of Mike Puisis at 139:14-141:6.
[549] Oct. 23 Testimony of Jacqueline Moore at 153:6-21.
[550] PX 6 at 0085.
[551] *Id.* at 0007-0009; 0087-0088.
[552] *See, e.g., id.*; Oct. 16 Testimony of Madeleine LaMarre at 224 ("[R]eally almost every component of an adequate healthcare system needs to be addressed.").

physicians who could not be credentialed for that care outside of a correctional facility, both because of expertise and because of disciplinary history; correctional officers administering medication; and inmate orderlies caring for the prison's sickest patients in the infirmary. It also manifests in unqualified and overburdened leadership, both at the clinical and administrative levels. And it leads to policies, practices, and procedures that have the effect, and often the purpose, of interposing barriers between Class members and needed medical care, both within Angola (e.g., high copays, impractical sick call times, and disciplinary policies) and outside it (e.g., centralized headquarters review and approval of all external specialist appointments).

154.     These failings at the administrative level lead to a catastrophic breakdown of care at the clinical level. The use of EMTs in place of nurses and unqualified, overburdened physicians for care beyond their training results in utterly inadequate chronic disease management and emergency care.[553] The resistance to using outside providers leads to delayed consultation of specialists, failure to implement their recommendations or follow through on their care, and a failure to provide access to a hospital in the event of emergency.[554] The burdens of seeking medical care, combined with the reality that care will likely be inadequate anyway, dissuades patients from seeking necessary care to which they are constitutionally entitled. When patients refuse care because of the barriers placed around it or because of a lack of understanding, medical personnel generally do not attempt to remove the barrier or educate the patient.[555] And the medical use of correctional staff renders medication administration thoroughly unreliable.[556] These flaws produce neglect of patients with all types of serious medical needs, but most particularly patients who have chronic illnesses, need full-time nursing care, or experience medical emergencies.[557]

155.     These problems go unremedied in part because of DOC's wholly inadequate—and at times consciously inadequate—quality improvement processes. Their peer review process does not monitor the quality of providers' care; their mortality review does not investigate the contributing causes of the frequent deaths discussed above; and their CQI program, which lacks participation from anybody outside the nursing staff, does not seek to identify or reduce problems on an ongoing basis.[558] As a result, Angola's ailing medical system is incapable of diagnosing its own life-threatening conditions.

---

[553] *See e.g.,* PX 6 at 0047; Oct. 15 Testimony of Susi Vassallo at 142.

[554] *See e.g.,* PX 6 at 0071-79.

[555] Oct. 15 Testimony of Daniel Prince at 103; Oct. 16 Testimony of Testimony of Madeleine LaMarre at 43, 202-209.

[556] *See e.g.,* PX 6 at 0008, 49-52.

[557] *See e.g., id.* at 0047.

[558] *See e.g.,* PX at 0087-90.

156.   To maintain an adequate medical system, a facility must have "[a] sufficient number of health staff of varying types provid[ing] inmates with adequate and timely evaluation and treatment consistent with contemporary standards of care." All health care personnel must "have credentials and provide services in accordance with the licensure, certification and registration requirements of the jurisdiction."[559]

157.   Angola's medical staffing falls grossly short of this standard. Its staffing numbers at each level of the medical chain are insufficient to provide the medical care needed for a facility of Angola's size and acuity. To make up for these deficits, it uses the staff that it does have—and even the Class members themselves—to provide care that should be performed at a higher level of the chain.[560]

158.   Plaintiffs' experts were "struck by the lack of adequate staffing such that they're using correctional officers to administer medications. They are using inmates in the infirmary to deliver hands-on care which is not appropriate, and it's a sign that they have inadequate healthcare staffing."[561] They reliably concluded Angola's lack of "adequate healthcare staffing" denies patients "adequate access to care and access to a physician. Physicians do not evaluate patients even when they are notified."[562] Ms. LaMarre identified this as one of the primary issues making Angola "one of the worst prisons" she had ever reviewed because of the level of harm,[563] and Dr. Vassallo testified that the staffing practices "resulted in significant harm and even death."[564]

159.   As detailed *supra* ¶ 24, Angola's medical staff includes providers (both physicians and nurse practitioners), nurses, EMTs, and correctional officers. At each level, Defendants' staffing is inadequate and/or inappropriate and impedes Class members' ability to obtain timely, professional medical opinions and treatment.

a.   *Providers*

160.   In addition to Dr. Lavespere, Angola has five provider-level medical professionals: four physicians and one nurse practitioner.[565] With a population of approximately 6,400,[566] that

---

[559] PX 6 at 0016.
[560] *Id.* at 0016-0027.
[561] Oct. 16 Testimony of Madeleine LaMarre at 150.
[562] *Id.* at 225-26.
[563] *Id.*.
[564] Oct. 15 Testimony of Susi Vassallo at 142.
[565] PX 6 at 0017; UF ¶ 10.
[566] UF ¶ 1.

averages out to 1,280 patients per provider. As Plaintiffs' medical experts have credibly opined, "[t]ypically, a physician can reasonably provide care to approximately 600 to 800 inmates depending on medical acuity."[567] This is a "rough guideline, but … around 800 patients per provider is generally, in male facilities, a reasonable number."[568] In areas requiring significant care, such as medical dormitories and infirmaries, the number may be at the low end of the range or significantly lower.[569] The Angola providers' caseloads are "drastically high," which "contributes to poor quality" because "[w]hen physician patient load is too high, physicians have inadequate time to properly evaluate patients."[570]

161. Providers' caseloads appear even more concerning when looked at on the level of individual providers:[571]

   a. A single nurse practitioner covers an outcamp housing 1,067 Class members, which is already well above a reasonable caseload even for low acuity patients. But in addition, the nurse practitioner is responsible for Nursing Unit 2 and all HIV, cancer, and hospice patients. These groups are all complex patients, with Nursing Unit 2 in particular comprising patients with "complicated and serious medical conditions." Proper coverage of Nursing Unit 2 alone could require "as much as a half-time or full-time provider"—yet a single nurse practitioner covers it herself along with three other complex types of patients *and 1,067 more patients.*

   b. The other three outcamps, which house 1,713 inmates, are covered by a single physician. This on its own is more than double a reasonable caseload—and yet the physician is also assigned to the ATU and death row. The ATU, of course, features much of the prison's most urgent medical care, yet it comes on top of an already overwhelming caseload.

   c. The second physician is responsible for 16 dormitories in the main prison, including one of the three medical dormitories. All told, his caseload comprises 1,348 patients, nearly twice the average reasonable caseload. In addition to these clinical responsibilities, he serves as Assistant Medical Director, further detracting from the time he can spend on this excessive caseload. Moreover, as discussed further momentarily, this physician is a rehabilitation doctor, not a doctor trained in primary care—the principal need of the patients in his care.

---

[567] PX 6 at 0017.
[568] Oct. 9 Testimony of Mike Puisis at 208:3-212:13.
[569] *Id.* at 208:12-09:17; *see also* PX 6 at 0017.
[570] PX 6 at 0017.
[571] *Id.* at 0017-18; *see* Oct. 9 Testimony of Mike Puisis at 208:3-212:13. All numbers are as of Plaintiffs' medical experts' site visit.

d. The third physician covers the other 16 dormitories, including the other two medical dormitories, for a total of 1,241 inmates, approximately 50% to 100% higher than a typical caseload. He, too, lacks primary care training; his specialty is pain medicine.

e. The fourth physician is the only one whose caseload even approaches reasonable limits. He covers 841 patients in the main prison cellblocks in addition to the anticoagulation clinic and general medicine clinic—i.e., "all patients who have uncommon medical conditions."

f. Each provider is also responsible for patients from his or her housing units when they are admitted to Nursing Unit 1, the acute care infirmary, further burdening their caseload. Like Nursing Unit 2, Nursing Unit 1 on its own "is large enough to require a single physician to cover."

162. Plaintiffs' medical experts' opinion that these caseloads are excessive and leave providers with "inadequate time to properly evaluate patients"[572] is consistent with Plaintiffs' showing that providers are insufficiently involved in their patients' care, and that they do not perform adequate examinations, take adequate histories, timely review diagnostic results, or implement specialists' recommendations. The massive provider understaffing thereby contributes directly to the substantial risk of serious harm documented throughout the evidence.

163. Even Defendants acknowledge the need for more providers; as recently as a few days before Dr. Singh's deposition, Angola personnel told him that they needed more doctors.[573] This is a long-standing problem; Dr. Singh noted the inadequacy of staffing as early at 2010—and staffing levels since that time have stayed flat, even as the population of patients increased by roughly 1,000.[574]

164. Defendants' expert Dr. Moore similarly acknowledged "physician manpower shortages" and "backlogs … due to a shortage in physician staff.[575] While Dr. Moore testified that it is difficult to determine appropriate staffing levels for a facility,[576] Plaintiffs' experts did not

---

[572] PX 6 at 0017.

[573] JX 4-bbb, R. Singh Depo. at 263:5-9; *see also* JX 4-ff, J. Collins Depo. at 91:21-92:14 (former Medical Director Jason Collins acknowledging that Angola could use "a few more hands" on any given day).

[574] *See* PX 67; PX 6 at 0017; *see also* PX 147 (nursing director describing understaffing in 2010); DX 36 (only one health care provider per prison); DX 75 (requesting additional staffing); PX 127 (2010 email from the nursing director stating "we are extremely short staffed and are in desperate need").

[575] DX 13 at 02857, 02865.

[576] Oct. 23 Testimony of Jacqueline Moore at 141:23-142:5.

claim otherwise or purport to give any magic number for staffing.[577] On the basic question of whether staffing was insufficient, there appeared to be no real disagreement between the two sides' experts.

165. The risk created by Defendants' insufficient provider staffing is compounded by Defendants' nearly non-existent credentialing process and exclusive reliance on physicians who have been disciplined by the Louisiana State Board of Medical Examiners ("LSBME"). Angola's medical director testified at trial that he actively recruits physicians through the organization that monitors the treatment and compliance of impaired physicians who are under a LSBME consent order.[578]

166. Credentialing is "a process whereby a physician's qualifications are evaluated by reviewing their education, training, experience, licensure, malpractice history, and professional competence with respect to the work they will be expected to perform." The credentialing process looks at "whether the practitioner is trained properly and capable of providing safe and effective care to patients and whether the type of training of the candidate is sufficient given the expected assignment of the candidate." This process "protects safety by preventing incompetent, poorly trained, or impaired physicians from engaging in patient care."[579]

167. Credentialing files typically include a National Practitioner Data Bank report, verification of license and board certification, verification of training, and an attestation regarding prior malpractice, adverse actions, criminal offenses, or other adverse events affecting the physician's ability to practice.[580]

168. "In correctional facilities, the health care needs of patients are typically primary care," the provision of day-to-day medical care, treatment of common chronic conditions and coordination and implementation of specialists' recommendations. This "requires physicians who have residency training in internal medicine or family practice," or, in certain situations, "[e]mergency medicine physicians."[581]

169. For all intents and purposes, however, Angola does not have a credentialing process. Plaintiffs' medical experts found that credentialing was "inadequate and places patients at risk of harm."[582] Neither Angola nor DOC headquarters maintain any of the standard information identified above. DOC Chief Nursing Officer Stacey Falgout acknowledged that DOC headquarters did not keep credentialing information and that LSP should "keep the

[577] PX 244 at 0003.
[578] Oct. 22 Testimony of Dr. Lavespere at 24:23-25:11, 178:2-21.
[579] PX 6 at 0021-22.
[580] Id. at 0022-23.
[581] Id. at 0021.
[582] Id. at 0022.

file" and "review all the licenses, verification, have a CV on file, the application."[583] In fact, as Dr. Thomas admitted, "they have little in them except licensures."[584] Specifically, LSP's credentialing files contain only the state personnel application, in which "the only requirement … is a current medical license."[585]

170.    Even that information is lacking for most of Angola's physicians. As of the experts' site visit, only three providers were included in the credential files—including two providers who had since left Angola. Of Angola's six providers, only Dr. Lavespere had a credential file at all. This "lack of complete and current credential files demonstrates lack of organization and an indifference to the quality of physicians providing care to inmates at LSP."[586]

171.    Without meaningful credentialing, physicians at Angola "are hired without apparent consideration of their training."[587] Two of the five physicians are not trained in any form of primary care and would be unable to obtain privileges to practice primary care at any other facility. DOC, quite simply, "hires any physician who is willing to work at the prison."[588] As Dr. Singh, the former Statewide Medical Director, put it, "When I was new, I was told that 'we just need a body in that job.' Sometimes it's so desperate a situation, you just need a body in the job."[589] As Plaintiffs' medical experts explain, however, this attitude "results in hiring physicians not qualified to provide primary care." "This is a patient safety issue."[590]

172.    Dr. Thomas did opine that he believed LSP's physicians were "properly credentialed," but his comfort with the LSP credentialing files was based on his belief that DOC headquarters possessed more complete credentialing files.[591] As Ms. Falgout testified, this is not the case: the incomplete LSP files are the only files that exist.[592]

173.    Moreover, the only basis for Dr. Thomas's credentialing opinion was that all physicians were licensed by the State of Louisiana.[593] As Plaintiffs' experts explained, there is a difference

---

[583] Oct. 17 Testimony of Stacey Falgout at 160:8-17.
[584] Oct. 23 Testimony of David Thomas at 82:4-9. Dr. Thomas maintained that the lack of credentialing information at LSP was not concerning because he believed more complete files were at DOC headquarters. *Id.* at 82:10-13. In light of Ms. Falgout's testimony, Dr. Thomas's comfort with the credentialing files is clearly unfounded.
[585] PX 6 at 0021-23.
[586] *Id.* at 0023.
[587] *Id.*
[588] *Id.*
[589] PX 6 at 0024.
[590] PX 6 at 0023.
[591] *See* Oct. 23 Testimony of David Thomas at 82 at 82:10-13.
[592] Oct. 17 Testimony of Stacey Falgout at 160:8-17.
[593] Oct. 23 Testimony of David Thomas at 24:21-23.

between licensing and credentialing.[594] While a license certifies that you are qualified to practice medicine of some form, "[t]he credentials and training of a physician determine what privileges that physician should have. For example, … [a] physician trained and credentialed in obstetrics can obtain privileges to deliver babies [and] [p]hysicians trained and credentialed in internal medicine or family practice can obtain privileges to practice primary care," but "[p]hysicians trained and credentialed in internal medicine cannot typically obtain privileges to perform surgery (except for minor procedures)."[595] This is simple common sense: just as passing the bar does not ensure that a lawyer has the knowledge to practice admiralty law or capital defense, a licensed physician is not necessarily qualified to perform heart surgery or treat complex chronic diseases.

174.    In addition to their indifference to physicians' qualifications, Defendants show a tolerance—as discussed momentarily, perhaps even a preference—for physicians who have been sanctioned by the LSBME. *Every single physician* at Angola has had their license suspended or restricted by the LSBME—yet as of the site visit, there was no mention of this information in the physicians' credential files.[596] Many of these sanctions arose from criminal conduct or ethical misconduct relating to the physicians' medical practice, and often involved repeated episodes of substance or alcohol abuse that required their removal from practice "to ensure the health, safety and welfare of the citizens of this state against the unprofessional, unqualified and unsafe practice of medicine."[597]

175.    Despite the LSBME having determined that these physicians were a danger to the community, it allowed them to practice in a correctional facility, refusing to extend the same protection against "unprofessional, unqualified and unsafe" medical care to Class members. Moreover, DOC's decision to hire these physicians "places inmates at risk of serious harm." As Plaintiffs' medical experts note, "[t]his is particularly disturbing because inmates have no choice about their provider."[598] Outside of prison, patients choosing providers in the healthcare market would avoid physicians known to provide unprofessional, unqualified, or unsafe care, protecting themselves and creating a market incentive for providers to improve their practice; at Angola, where patients have no choice but to see a sanctioned physician, there is no such protection.[599] For this reason, the NCCHC standards "specifically state that

---

[594] *See* PX 6 at 0021-22; *see also, e.g.*, Oct. 9 Testimony of Mike Puisis at 216:2-11 ("[Y]ou really need to see not only the license, but the certificates, the National Practitioner Databank, et cetera."); *see generally id.* at 212-16 (discussing credentialing).
[595] PX 6 at 0023.
[596] *See* Oct. 9 Testimony of Mike Puisis at 214:22-223:19; PX 6 at 0024-25.
[597] PX 6 at 0024-25; UF ¶ 10; Rec. Doc. 247-2 (Angola physicians' licensure documents, including disciplinary judgments by Louisiana State Board of Medical Examiners); *see also* Rec. Doc. 349 (granting Plaintiffs' Motion Request of Judicial Notice of the licensure of Angola physicians).
[598] PX 6 at 0025.
[599] *See* Oct. 9 Testimony of Mike Puisis at 220:4-23.

hiring physicians with licenses restricted to practice in correctional institutions is not in compliance."[600]

176. It bears emphasizing that this is not an isolated occurrence; *every* physician at Angola has been sanctioned by the LSBME. This appears to be another cost-saving mechanism for Defendants: as Warden Vannoy testified, physician salaries at Angola are "considerably lower" than salaries outside the correctional setting.[601] As he acknowledged, "primary care doctors with clear licenses are not going to work for the salary that is being offered."[602] Defendants have defended their practices by arguing that it is difficult to find qualified physicians interested in working at Angola, but it could more accurately be said that it is difficult to find qualified physicians while paying 75 cents on the dollar. Dr. Singh maintained that hiring doctors with restricted licenses should be "a last resort," but this is belied by Defendants' willingness to fill their entire physician staff with disciplined physicians rather than pay market salaries.[603] Moreover, as Dr. Moore testified, staffing at prisons is generally "very challenging,"[604]

177. While both sides' experts agreed that disciplinary histories do not inherently disqualify a physician from practicing in a prison,[605] they also agreed that having an entire staff of disciplined physicians is rare if not non-existent.[606] The *only* example of another facility where all physicians had been disciplined that either side could name was in California—*prior* to the court's finding that the medical care there was constitutionally deficient.[607] As Dr. Puisis noted, having an entire staff of physicians who have required discipline makes it "much more difficult to ensure that … any difficulties with respect to the characterological issues that may arise are going to be addressed."[608]

---

[600] PX 6 at 0024-25.

[601] JX 4-ccc, D. Vannoy Depo. at 38:19-23.

[602] *Id.* at 38:24-39:2.

[603] JX 4-bbb, R. Singh Depo at 238:9-16; *see also* JX 4-ss, J. LeBlanc Depo. at 26:9-10 (acknowledging that "pay has a lot to do with" DOC's hiring of physicians with disciplinary histories).

[604] Oct. 23 Testimony of Jacqueline Moore at 154:4-6.

[605] *See* Oct. 9 Testimony of Mike Puisis at 218:18-25 ("I don't believe that that's necessarily an impediment."); Oct. 23 Testimony of David Thomas at 25:1-2 ("It depends on what the restrictions are, but quite a few good physicians have restrictions on their license.").

[606] *See* Oct. 9 Testimony of Mike Puisis at 220:24-22:7; Oct. 23 Testimony of David Thomas at 83:14-23.

[607] *See* Oct. 23 Testimony of David Thomas at 83:14-23; *see generally Plata*, 2005 U.S. Dist. LEXIS 43796, at *15.

[608] Oct. 9 Testimony of Mike Puisis at 219:12-15.

178. Defendants suggested at trial that LSBME's sanctions would have allowed these physicians to practice at a hospital.[609] It is unclear whether this is an accurate interpretation of the LSBME restriction of physicians to an "institutional, prison, or other structured setting pre-approved by the Board, in its sole discretion";[610] the word "institutional" could as easily be read through the canon of *noscitur a sociis* to mean prison-like facilities where persons are institutionalized, like certain mental health or rehabilitation facilities. But that ambiguity aside, the issue is largely academic, as the physicians would need to obtain privileges to practice at a hospital, placing a check on hiring that, in practice, prevents them from serving there.[611]

179. Finally, any pretense of concern for the quality of care that Angola's physicians provide is belied by the almost complete failure to monitor and supervise the sanctioned physicians, discussed *infra* ¶¶ 353-355 As Plaintiffs' medical experts found, "[t]he fact that every doctor at LSP has a significant disciplinary history makes the lack of adequate credential files and performance monitoring particularly troubling. Given these histories, it is particularly important that their compliance with medical standards, the terms of their restrictions, and their basic competencies be documented and monitored. There is no evidence that this occurs in any meaningful way."[612]

180. For instance, Dr. Lavespere was on indefinite probation for almost five years of his time as a practicing physician at Angola. One of the requirements of his probation included a written report from a supervising physician to the Louisiana Board of Medical Examiners concerning his clinical and professional competency and professionalism. These reports were supposed to be based on periodic observation of Dr. Lavespere's clinical practice, in addition to a review of multiple patient charts, and submitted to the Board quarterly for the first year and semi-annually thereafter. But while the discovery in this case stretched back to 2010, only one such report, based only on Dr. Singh's review of patient charts and a video conference with Dr. Lavespere, appears to have ever been submitted.[613]

181. In summary, Defendants employ too few physicians; hire them without regard to training, expertise, and disciplinary history; and do not monitor their performance in any meaningful way. This practice naturally and foreseeably contributes to the pervasive harm that countless

---

[609] *See* Oct. 10 Testimony of Mike Puisis at 123:1-124:19.

[610] PX 230 at 85.

[611] *See* Oct. 10 Testimony of Mike Puisis at 123:1-124:19..

[612] PX 6 at 0025.

[613] *See* Oct. 22 Testimony of Stacye Falgout at 6:2-5, 6:14-23. In response to concerns that Ms. Falgout may have been testifying about documents that were not, but should have been, produced in discovery, Defendants confirmed in an October 20, 2018 email that Defendants were aware of no other reports.

Class members have suffered and that all Class members risk any time they develop a serious medical need.

b. *Nurses*

182. Angola is staffed by 55 nurses, including 22 RNs, 30 LPNs, two medical assistants, and one respiratory therapist.[614] This is significantly below the number needed to deliver numerous aspects of an adequate medical system, resulting in unqualified staff performing infirmary care, medication administration, and telemedicine.[615]

183. First, Plaintiffs' medical experts have shown that the number of nurses assigned to the infirmary "is inadequate to provide adequate nursing care to this high acuity population that includes patients with quadriplegia, amyotrophic lateral sclerosis (ALS), stroke, etc." As discussed *infra* ¶¶ 285-289, Defendants instead deliver care through inmate orderlies supervised by custody staff. This places patients needing infirmary care—some of the most vulnerable among all Class members—at serious risk of substantial harm.[616]

184. Second, nurses administer medication in the two Nursing Units and at Camp J. In most of the rest of the prison, including the three medical dormitories, correctional officers administer medications. As discussed *infra* ¶¶ 300-304, correctional officers are not qualified to administer medication safely, leading to severe and documented errors in medication administration and depriving Class members of reliable, timely, and consistent access to necessary medication. These problems are the direct result of Defendants' decision to employ an insufficient number of nurses.[617]

185. Third, a single LPN serves as the presenter for nearly all telemedicine appointments. In a telemedicine appointment, a distant provider conducts a videoconference with a patient and a presenter, with the presenter performing tests and otherwise assisting the provider with tasks that cannot be conducted remotely. While it is appropriate for a nurse to serve as presenter, it should be an RN, because "[g]enerally, LPNs lack the requisite training to perform medical assessments required to adequately facilitate telemedicine."[618] Moreover, while telemedicine is "useful for most specialties," it is "not useful when you need to touch the patient … when you need to really examine, palpate, it's more difficult. It's nearly

---

[614] Oct. 22 Testimony of Randy Lavespere at 30:2-17.
[615] PX 6 at 0019-20.
[616] PX 6 at 0019.
[617] *Id.* at 0020.
[618] *Id.*; *see also* Oct. 9 Testimony of Mike Puisis at 155:3-8 ("[G]enerally people use registered nurses because they're higher level of training and can make independent assessments. And that's what most facilities use, most correctional programs.").

88

impossible with telemedicine."[619] This makes Defendants' heavy use of telemedicine and their reluctance to shoulder the costs of transporting patients for offsite care concerning.[620]

186.   In sum, the understaffing of nurses harms patient care in multiple ways that contributes to the substantial risk of serious harm to which patients are exposed.

### c.   EMTs

187.   With a severe shortage of providers and nurses, Defendants rely on EMTs for duties related to access to care and emergency care that require a higher level of medical professional. As a result, they are "assigned duties not commensurate with their training and licensure, exceed their scope of practice and are not adequately supervised."[621] This is a major contributor to the catastrophically inadequate care Class members frequently receive.

188.   EMTs are trained and licensed "to respond to medical emergencies and perform an initial triage of the patient."[622] While the four levels of EMTs have different amounts of training, even paramedics have significantly less training than doctors or registered nurses.[623]

189.   EMTs' typical function is "to provide stabilization and transportation in the pre-hospital setting."[624] They do not manage patients for extended periods of time, unless that is part of getting a patient to a hospital.[625] Nor is it common for EMTs to be the only medical personnel to see a patient for a month or months at a time.[626]

190.   Because their role outside of LSP is limited to pre-hospital stabilization and transportation, EMTs' training is limited: they cannot independently manage patients; they cannot perform differential diagnosis; and they cannot provide a professional medical opinion.[627] Their practice is strictly limited to defined procedures under a Scope of Practice Matrix issued by the Louisiana Bureau of Medical Services.[628]

191.   The evidence shows that Defendants employ EMTs far beyond this proper scope. As discussed *infra* ¶¶ 207-213 and 223-234, EMTs act without meaningful physician supervision

---

[619] Oct. 9 Testimony of Mike Puisis at 154:20-55:2.
[620] *See* JX 3-b at 00510 (discussing telemedicine in the context of "trying to cut down on costs and make fewer trips").
[621] PX 6 at 0020 (footnote omitted).
[622] *Id.* at 0021.
[623] Oct. 15 Testimony of Susi Vassallo at 144:1-10.
[624] Oct. 15 Testimony of Susi Vassallo at 142:17-25.
[625] *Id.* at 151:17-52:4, 160:13-25; *see also* Oct. 16 Testimony of Susi Vassallo at 13:19-14-2.
[626] Oct. 16 Testimony of Susi Vassallo at 5:22-6:17.
[627] PX 6 at 0020-21; Oct. 16 Testimony of Susi Vassallo at 144:15-46:7.
[628] DX 15 at 02946-49; *see* Oct. 15 Testimony of Susi Vassallo at 146:8-50:14.

and without meaningful reference to written protocols throughout the sick call process and when providing emergency care in the ATU. As Dr. Vassallo explained, "EMTs are used as primary providers."[629] Even Dr. Moore testified that EMTs are used at Angola more than she had ever seen.[630]

192.     As Dr. Vassallo testified, EMTs at Angola examine and assess patients and manage their care for extended periods of time without doctors ever examining the patient.[631] In emergencies, this results in hours or days of deterioration without examination by a physician; for chronic conditions, it results in patients being denied an opportunity at diagnosis for months or years.[632] On the whole, Dr. Vassallo credibly found, "the periods of time that occur at Angola are absolutely astonishing."[633]

193.     Angola's EMS Director, Darren Cashio, acknowledged that EMTs' practice is broader at LSP than is typical in the community.[634] Even Dr. Thomas recognizes LSP's use of EMTs as unusual, describing the use of EMTs to conduct sick call as "creative."[635]

194.     The consequences of using EMTs in place of qualified medical professionals for emergency care and sick call are discussed in detail *infra* ¶¶ 207-213 and 223234. In brief, however, it results in a wholesale denial of timely access to a professional medical opinion, diagnosis, and treatment: undertrained EMTs acting far beyond the scope of their qualifications perform front-line treatment that should be occurring at the nurse or provider level, while patients' access to a provider actually qualified to diagnose their conditions is delayed for days, weeks, or months. EMTs are not trained to figure out *why* a patient is experiencing their symptoms, and so using EMTs as "gatekeepers" to care denies patients any diagnosis and is "highly inappropriate in terms of their scope of practice."[636] As Dr. Vassallo summarized, "Multiple times … patients did not … receive a diagnosis and did not receive

---

[629] Oct. 15 Testimony of Susi Vassallo at 141:25-42:4.
[630] Oct. 23 Testimony of Jacqueline Moore at 154:10-11.
[631] *Id.* at 141:25-142:25, 151:1-52:18, 160:13-161:3, 184:2-23, 189:13-93:8; Oct. 16 Testimony of Susi Vassallo at 5:15-14:13, 18:2-23-9.
[632] *See id.*
[633] Oct. 15 Testimony of Susi Vassallo at 152:5-12.
[634] Oct. 24 Testimony of Darren Cashio at 31:14-33:8, 47:9-49.
[635] Oct. 23 Testimony of David Thomas at 27:11-21.
[636] Oct. 16 Testimony of Madeleine LaMarre at 150:1-7; *see also, e.g.,* Oct. 16 Testimony of Susi Vassallo at 6:21-7:3 ("EMTs don't have the knowledge or training and that's not their job to answer the question why is the chest pain there, why is the abdominal pain there. That's not their job or their training and it's not within their scope."); *id.* at 18:24-19:1 ("With respect to sick call, they should not be the gatekeeper … to healthcare. That is not their scope or their training.").

the proper workup for serious medical complaints that resulted in their death or a delayed transfer to the hospital, which resulted in significant harm."[637]

195.    Defendants' reliance on EMTs in the ATU for hours or days with little physician involvement is even more deficient. Due to the severe understaffing at the provider level, most patients are treated principally by EMTs, with physicians providing at most telephone orders in response to EMTs' reports and questions.[638] Dr. Lavespere testified in deposition that not all his physicians are "eager" to respond to call because they are "overworked" and often get called in for things like a "hunger strike," which "gets old."[639] Even when physicians are present in the ATU, they rarely perform and document physical examinations and take medical histories.[640] Patients are kept in the ATU under EMT management for hours on end, rather than stabilized and transported to physician care.[641] This "differs dramatically" from how EMTs are used in emergencies in the rest of the country.[642] These catastrophic failures are discussed *infra* ¶¶ 207-213 and 223-234, but for the purposes of this section it suffices to say that EMTs "are trained to be in the pre-hospital setting and not to render ongoing care for a number of hours" and that the care they provide at Angola, "because of their lack of knowledge and training and lack of oversight, resulted in significant harms and even death."[643]

196.    Moreover, EMTs lack clinical supervision not only at the level of individual patient encounters but globally. While the Medical Director is nominally responsible for clinical supervision of EMTs, "for all practical purposes, the EMTs receive no training or supervision."[644] Dr. Lavespere testified that he provides no formal training for EMTs and

---

[637] Oct. 16 Testimony of Susi Vassallo at 7:4-10.

[638] *See* JX 4-qq, R. Lavespere Depo. at 51:25-52:22 (describing how the EMTs do not need to "wake him up" every time they treat patients).

[639] JX 4-qq, R. Lavespere Depo. at 56:21-57:3

[640] *Id.* at 45:10-14 (testifying that EMTs "run the emergency room").

[641] Oct. 15 Testimony of Susi Vassallo at 160:13-61:1; *see also, e.g., id.* at 151:20-52:4 ("The problem at Angola is that the EMTs continue to manage the patient. Now, there are exceptions to that, but most commonly the EMTs will manage patients with calling to the doctors. They will be given verbal orders or telephone orders, and so the doctor is relying on the information they are given by someone who is observing something but not trained to make serial observations over many, many, many hours and to know what that means.").

[642] Oct. 16 Testimony of Susi Vassallo at 22:1-3.

[643] Oct. 15 Testimony of Susi Vassallo at 142:5-12; *see also* PX 6 at 0041, 60-71.

[644] PX 6 at 0015.

does not meet with them in any regular, formalized way.[645] While he testified that the EMS director, Major Cashio, trained EMTs on the use of protocols,[646] Major Cashio denied this.[647]

197.   Indeed, EMTs are not technically considered medical staff at all; they are designated as security staff and report through a custodial major to the Assistant Warden, and the custodial chain of command performs their evaluations.[648] Even Defendants' expert Dr. Thomas conceded that EMTs should be removed from the custodial chain of command and placed wholly under medical supervision.[649]

198.   This lack of supervision also manifests in the lack of adequate, updated protocols to guide EMT care and the lack of documentation regarding how EMTs employ those protocols. Much of EMTs' practice at LSP is performed "under protocol"; countless sick call requests and ATU records report that EMTs were practicing "according to protocol."[650] Angola's protocols, however, are wholly deficient: undated, unsigned documents that lack any indication that they have been authored or reviewed by any Angola medical authority,[651] or any guidance as to who may use them and when they may use them.[652] They form a disorganized document that fails to provide clear directions for EMTs to use, particularly bearing in mind the limited training and education required by Angola for this role. Major Cashio testified that there are too many protocols to remember, and that some were outdated and unused.[653] Plaintiffs' medical experts documented numerous defects in the protocols that prevent them from being responsibly used, requiring medical decision-making that would be "complicated even for emergency physicians with experience and critical care specialists"—"way out of scope for an EMT and even some doctors."[654]

---

[645] JX 4-qq, R. Lavespere Depo. at 53:6-25; 50:21-25.
[646] Oct. 22 Testimony of Randy Lavespere at 55:22-25.
[647] Oct. 24 Testimony of Darren Cashio at 50:6-10.
[648] JX 4-gg, A. Cowan Depo. at 9:20-10:20 (EMTs are part of security, and neither role is primary; "[i]t's basically whichever hat needs to be worn primarily at that time"); JX 4-dd, D. Cashio Depo. at 73:18-74:18; PX 6 at 0015.
[649] DX 14 at 02932.
[650] *See, e.g.,* JX 10-tt-2 at 48820; JX 10-fff at 57918.
[651] *See infra* ¶¶ 237-238
[652] *See generally* JX 8-a.
[653] Oct. 24 Testimony of Darren Cashio at 49:10-59:17.
[654] Oct. 15 Testimony of Susi Vassallo at 192:2-6; *see id.* at 180:7-93:8; Oct. 16 Testimony of Susi Vassallo at 8:3-11:6. For example, Defendants "abdominal pain protocol" requires EMTs to subjectively assess and diagnose symptoms of abdominal pain. JX 8-a at 8-00024. *See also* Oct. 23 Testimony of Jacqueline Moore at 154:12-155:5 (testifying that EMT protocols could be "enhanced" and that "Plaintiffs did a fairly good job of mentioning the protocols that they felt needed to be done").

199. Even if EMT protocols were medically adequate and accurate, EMTs rarely document what protocol they purported to follow, making it impossible for medical leadership at Angola to review their care even if they wanted to. As countless sick call and ATU records demonstrate, EMTs simply write "according to protocol" without identifying the protocol they chose, let alone how they chose it.[655] Given the complete impossibility of reviewing EMTs' medical performance, it is unsurprising that no EMT has ever been disciplined for incorrect treatment, according to Major Cashio,[656]—even though Plaintiffs' medical experts found that "in the majority of cases … EMT medical examinations are completely inadequate"[657] and Defendants' own providers have acknowledged that EMTs sometimes do not perform a thorough exam.[658]

200. Defendants attempt to reconcile the sweeping scope of EMTs' practice at LSP with the lawful scope of EMTs as specified in the Scope of Practice Matrix by reference to "trauma triage" and "treat and release protocols."[659] As Dr. Vassallo explained, neither of these permissions remotely resembles how EMTs practice at LSP. "Trauma triage" is triage within an emergency situation such as a multi-victim car crash; it is not the routine triage of patients in a non-trauma setting, which is how EMTs perform at LSP.[660] Treat and release protocols are for situations where a patient does not want transport to a hospital—not for situations where a patient seeks medical attention and an EMT decides that they do not need to see a doctor.[661] Neither function justifies anything like EMTs' practice at LSP.

201. On the whole, Dr. Vassallo credibly demonstrated that EMTs are not used in this manner anywhere else in medicine, even in disaster-level crises.[662] While she found that EMTs generally perform well when fulfilling their proper role, their use in sick call and prolonged emergency management "is not standard of care in America today."[663]

---

[655] PX 6 at 0041; *see* Oct. 16 Testimony of Susi Vassallo at 11:6-24.

[656] Oct. 24 Testimony of Darren Cashio at 50:14-51:7 (testifying that it's been years since he was notified about anyone in EMS failing to follow a protocol); JX 4-dd, Cashio Depo. at 72:21-73:16; JX 4-gg, A. Cowan Depo. at 98:22-99:4 (EMT testifying that she had never heard a doctor or nurse tell an EMT that he or she had made a mistake in 14-year career).

[657] PX 6 at 0032; *see also id.* at 0061 ("EMTs [are] typically managing medical emergencies that are beyond the scope of their training, resulting in harm including many deaths.").

[658] JX 4-uu, C. Park Depo. at 73:14-17 ("Q: Have you ever gotten a sick call from an EMT and thought they didn't do a very thorough exam? A: Yes.").

[659] DX 15.

[660] Oct. 15 Testimony of Susi Vassallo at 147:4-148:9.

[661] *Id.* at 148:17-49:9.

[662] Oct. 16 Testimony of Susi Vassallo at 21:7-22:3.

[663] *Id.* at 22:16-17.

#### d. *Correctional officers*

202. Due to Defendants' understaffing of nurses or other medical professionals licensed to administer medication, "LSP has inadequate health care staff to correctly administer medications," leading Defendants to use "unqualified correctional officers" to administer medication. This would fall below appropriate operational standards even with proper training and supervision, but Plaintiffs' medical experts found that correctional officers administering medications "are not meaningfully trained or supervised by medical staff." As discussed *infra* ¶¶ 300-304, this results in an unreliable, dangerous system of medication administration that places patients at risk.[664]

### (2) Clinical Practices Contributing to the Substantial Risk of Serious Harm

203. The staffing practices described above lead directly to a pervasive, systemic failure to provide clinically adequate, medically appropriate care. This manifests at every step of the health care process: at sick call, where patients attempt to access care; in the chronic disease program, where patients with long-term medical needs are treated; in specialty care, where patients seek diagnosis and treatment recommendations for complex conditions; in the ATU, where emergency treatment is provided; and in the infirmary, where long-term nursing care is provided. It is also reflected in incomplete and unheeded diagnostic services, unreliable and inconsistent medication administration, and unsanitary and inadequate medical facilities. Throughout the system of care, virtually every program that could break is broken.

#### a. *Sick Call and Access to Care*

204. To have a medically adequate health care system, inmates must have timely access to a medical professional, a professional medical judgment, and the care that medical professionals order.[665] This can be inhibited by underfunding, understaffing, and poor organization; it can also be impeded by unreasonable barriers, such as punishment, excessive fees, or impractical times for accessing the system.[666] All of these factors exist at Angola, and each contributes to the substantial risk of serious harm.

205. Sick call is the main process by which patients access the medical system at Angola. The standard practice at Angola is for EMTs to make rounds of each housing unit, typically beginning at 4:30 a.m. Class members write their medical complaint on an undated Health Service Request ("HSR" or "sick call form") and provide it to the EMT, who reviews the HSR and assesses the patient on the spot, typically in the patient's dormitory or cell. The EMT may prescribe treatment, transport the patient to the ATU, contact a provider for instructions, or do nothing. The EMT then writes their observations on the sick call form along with a recommendation of how soon the patient should see a doctor. After

---

[664] PX 6 at 0015, 49-54.
[665] PX 6 at 0031.
[666] *See generally* PX 406 (chapter from *Clinical Practice in Correctional Medicine* on sick call).

performing sick call, the EMT places the day's HSRs in a box for the physician responsible for the housing unit.[667]

206. As practiced at Angola, this system has numerous substantive and procedural flaws that deprive Class members of timely access to a professional medical judgment and corresponding treatment. It is a major contributor to the risk and reality of serious harm that Class members experience.

i. Inappropriate role of EMTs and inadequacy of sick call assessments

207. Plaintiffs' medical experts observed sick call and reviewed hundreds of HSRs as part of their sample. Their report concisely summarizes the fundamental deficits in Defendants' sick call practice:

> The EMT does not have the health record available to review the patient's past medical history or determine if the patient's complaint is a new or recurring complaint, and what if any previous treatment was provided to the patient. EMTs do not conduct assessments in examination rooms that are adequately equipped and supplied, afford privacy and confidentiality, or have access to handwashing. Moreover, the medical equipment and supplies that EMTs bring with them is not standardized. One EMT in Camp J had only a stethoscope, whereas another in the Transitional Unit brought a small bag with more equipment. Given the circumstances in which assessments take place, it is not surprising that in the majority of cases we reviewed, EMT medical examinations are completely inadequate. In addition, documentation reflected that EMTs usually do not directly communicate or consult with a physician regarding assessment findings at the time the patient assessment is performed. Therefore, the EMTs make independent assessments on a daily basis, which is beyond their scope of practice.

> After EMTs perform sick call, they place the patient's HSR in a physician's box. For the majority of HSRs we reviewed, physicians did not document any information regarding the assessment performed by the EMT or perform any independent evaluation. In most cases, the provider documented that the patient would be seen for sick call PRN (*as needed*) or scheduled the patient for a physician appointment in accordance with a priority system (e.g. category I, II or III). In the majority of forms reviewed, physicians did not legibly date, time or sign the form. Thus, the timeliness

---

[667] PX 6 at 0031-32; JX 5-a at 00019-21 (HC-01, DOC Access to Care and Clinical Services Policy); *see also, e.g.*, JX 4-dd, D. Cashio Depo. at 29:15-30:22, 44:20-45:9, 54:8-55:8, 60:4-6 (describing sick call process); JX 4-rr, R. Lavespere Depo. at 26:22-28:25. 29:16-30:14 (describing EMT decisions about whether to bring to ATU); *id.* at 38:1-12 ("if the EMS didn't think the person needed to be transported or didn't need to have anything urgently done, then those charts are put in a physician's room"; physicians change recommendation "if you think, you know, that they missed something").

of provider review of care provided by EMTs in most cases was unknown. There is no evidence of any physician supervision of the EMTs' practice.[668]

208. The evidence at trial proved that this assessment was reliable and credible. EMTs do not commonly consult doctors during sick call visits. As Major Cashio admitted, "[m]ost of the time" patients who submit an HSR do not see a doctor (at least not "immediately").[669] Internal statistics show that fewer than half of all sick call visits from April to June 2016 were even referred for provider review.[670] As the sick call requests themselves show, provider review rarely consists of more than initials.[671] While Dr. Lavespere and Defendants' counsel asserted that sick call requests are reviewed every day,[672] the evidence directly refutes this.[673] Plaintiffs' experts documented numerous instances in the medical records where "because that was happening, patients did not receive a diagnosis and did not receive the proper workup for serious medical complaints that resulted in their death or a delayed

---

[668] PX 6 at 0032; *see also, e.g.,* JX 4-mm, K. Hawkins Depo. at 23:24-24:4 (acknowledging that EMTs do not have access to medical records during sick call); JX 4-gg, A. Cowan Depo. at 32:8-18 (EMTs perform "a visual exam, you know, just looking at somebody" to determine whether they need to examine the inmate); *id.* at 30:23-32:3 (EMTs only pull charts if they think the chart needs to be reviewed by a doctor); *id.* at 80:17-23 (EMTs write their actions in the "physician assessment and treatment" section); JX 4-n, M. Murray Depo. at 21:11-13 ("Sick call responses vary from two days to never. There are times I do not ever see—you never see the doctor."); JX 4-q, B. Prine Depo. at 38:11-39:3 (describing sick call requests for shortness of breath where patient was never seen by a medic).
[669] Oct. 24 Testimony of Darren Cashio at 37:17.
[670] PX 41 at 0039-41.
[671] *See, e.g.,* Oct. 23 Testimony of David Thomas at 99:9-114:5 (acknowledging nine sick call requests where providers did not date or sign the sick call request at all); JX 10-cc-2 at 25469, 25474, 25501, 25703, 25706, 25714-15, 25718-19 (Shannon Hurd sick call requests discussed during Dr. Thomas's testimony); *see also, e.g.,* JX 10-a-1 at 00064 (no signature), 00081 (no date), 00100 (same); JX 10-zz at 53828 (same), 53831-32 (same); JX 10-b at 02532 (same).
[672] Oct. 22 Testimony of Randy Lavespere at 59:15-17 ("[T]he should be reviewed Monday through Friday, and then, of course, if you're on call on the weekend, you should review them, but they should be reviewed every day."); Oct. 17 Testimony of Madeleine LaMarre at 9:23-11:4 ("Q: … [T]he EMT gets the Health Services Request and then a doctor signs off on it within 24 hours, correct?" … "Q: … Are you aware that the EMT takes the Health Services Request, puts it in the box, and the doctor signs off on it within that next day?" … "Q: So if every doctor comes in here and testifies that these Health Services Requests are placed in a box, I look at them that day and sign off on them, you have a basis to dispute that?").
[673] *See, e.g.,* Oct. 23 Testimony of David Thomas at 99:9-114:5 (acknowledging seven sick call requests where providers dated them several days later, and even then usually wrote no notes); *see* JX 10-cc-2 at 25470, 25488, 25490-91, 25508, 25512, 25457, 25459 (Shannon Hurd sick call requests discussed during Dr. Thomas's testimony); *see also, e.g.,* JX 10-hhh-3 at 60032 (four days); JX 10-ll at 40485 (21 days).

transfer to the hospital, which resulted in significant harm."[674] Even Dr. Moore agreed that sick call requests were "not followed up timely by the physicians."[675]

209. Thus, the principal—and often only—medical attention Class members receive in response to sick call is a cursory and inadequate EMT assessment. As Dr. Vassallo and Ms. LaMarre aptly put it, EMTs are serving as "gatekeepers" to care, a chokepoint that frequently ends patients' access to care.[676] This does not qualify as a professional medical judgment, and denies or delays access to diagnosis and treatment.[677] As explained *supra* ¶¶ 188-190, EMTs have limited licenses and training, which render them qualified to perform specific medical tasks but not to independently manage patients or make diagnoses. The hundreds of HSRs in the medical records reviewed by Plaintiffs' medical experts show a consistent pattern of inadequate medical examinations and independent EMT decision-making that is not based on professional medical examination or judgment.

210. This frequently results in Class members receiving superficial, inadequate treatment for a symptom without any effort to diagnose its potential causes. As the experts concluded:

> Our review showed that patients submitted repeated HSRs for the same complaint. Because EMTs never have the health record with them when they conduct sick call, in many cases the patient is treated repeatedly with the same medication regimen even if it's failed in the past. This practice resulted in cases where patients complained repeatedly of chest pain, abdominal pain, and other symptoms of potentially serious medical conditions, and were not diagnosed and treated in a timely manner. These patients were later diagnosed with serious medical conditions resulting in adverse outcomes, including death … .[678]

---

[674] Oct. 16 Testimony of Susi Vassallo at 7:6-10.

[675] Oct. 23 Testimony of Jacqueline Moore at 155:17.

[676] Oct. 16 Testimony of Susi Vassallo at 18:24-19:1; Oct. 16 Testimony of Madeleine LaMarre at 150:1-2.

[677] *See* Oct. 23 Testimony of David Thomas at 74:3-76:4 (acknowledging he has previously described a "graded system of triage" for providing "professional medical judgments" that does not include EMTs); PX 411 at 25 (Dr. Thomas's *Who Wins in a Lawsuit* article); Oct. 23 Testimony of Jacqueline Moore at 155:8-9 (agreeing that most facilities use nurses to perform sick call). Defendants claimed that *Clinical Practice in Correctional Medicine*, Dr. Puisis's textbook, supported the use of "health-trained personnel in addition to nurs[es]" to evaluate clinical sick call complaints. Oct. 10 Testimony of Mike Puisis at 107:12-108:2. This misrepresents the textbook, which clearly explains that health-trained personnel below nurses can be used to separate non-clinical complaints (e.g., medication refills and requests for new shoes), but limits its discussion of evaluating health complaints to nurses and practitioners. *See* PX 406 at 55-57.

[678] PX 6 at 0032-33.

211. The experts' case studies—not to mention the Named Plaintiffs' medical histories—detail numerous such cases. For example:

   a. <u>Patient # 17</u> repeatedly complained of chest pain at sick call for over 16 months before he was ultimately tested and diagnosed with adenocarcinoma of the lung. He died a little over one week later. Even prior to complaining of chest pain in 2012, doctors had discovered a pulmonary nodule and even referred the patient to a thoracic surgeon for biopsy. Yet no biopsy took place until 2014—days before the patient died. For over sixteen months, the patient was seen at sick call but was only cursorily evaluated by EMTs and doctors, who failed to adequately document the progression of the patient's symptoms.[679]

   b. <u>Patient # 20</u> complained of significant abdominal pain for over four months. Evaluations by both EMTs and physicians were frequently cursory and failed to note that the patient was HIV positive. More than once, EMTs failed to refer the patient to a physician despite his severe symptoms. After months of complaining of "burning" pain, weight loss, and vomiting blood, the patient was admitted to a nursing unit. He died the following day.[680]

   c. In a single month, <u>Patient # 29</u> made ten sick calls for symptoms consistent with exacerbation of congestive heart failure. On these visits, EMTs were the primary providers of care and failed to conduct meaningful evaluations. It took over one month for the patient to be hospitalized despite acute worsening of symptoms.[681]

   d. <u>Patient # 18</u> requested an HIV test but was not tested and discovered positive for over two months, until he became acutely ill. On multiple occasions, the patient complained to EMTs of chest pain, shortness of breath, and a 55-pound weight loss, but there is no documentation that EMTs notified physicians of the patient's abnormal vital signs during a period when his symptoms worsened. Further, physicians failed to timely provide the patient with any meaningful clinical evaluation for his symptoms. The patient died a little over one month after his HIV diagnosis. Faster diagnosis of his HIV status and corresponding anti-retroviral intervention could have prevented his death.[682]

   e. Former Plaintiff Shannon Hurd (now deceased) repeatedly complained of substantial weight loss, testicular swelling and numerous other symptoms consistent with renal cell carcinoma, but Angola medical staff waited over two years before conducting the diagnostic testing that would uncover this fatal illness. During this period, Mr. Hurd saw doctors and EMTs on numerous occasions, but they routinely failed to conduct

---

[679] *Id.* at 0193-99.
[680] *See id.* at 0216-27.
[681] *See id.* at 0256-57.
[682] *See id.* at 0200-08.

meaningful testing or scrutinize his symptoms and medical history. Even when tests did occur, doctors failed to provide necessary follow up. From the time that he began showing symptoms until his ultimate diagnosis two years later, Mr. Hurd had lost 61 pounds.[683]

    f.    Former Plaintiff Joseph Lewis (now deceased) repeatedly complained for 33 months—nearly three years—of symptoms consistent with laryngeal cancer until testing was finally conducted to uncover the fatal illness. Despite the clear warning signs of worsening symptoms and frequent complaints, medical staff failed to conduct routine diagnostic testing that could have revealed his underlying condition and potentially prolonged his life. Instead, Mr. Lewis was mostly evaluated by unqualified EMTs at sick call who referred him to a physician on only a few occasions.[684]

212.    In some cases, EMTs do contact physicians to report assessments and request instruction. But there is significant evidence that physicians' participation often actively impedes care. When EMTs request instructions, physicians often give "no-transport" orders, which are "verbal orders given to the medics over the radio … advising that the patient not be transported from his cell."[685] These orders "result in delay in care, lack of evaluation by a physician and in some cases death."[686] Plaintiffs' medical experts identified several examples of such delays and inadequate care. For example:

    a.    <u>Patient # 39</u> was a 65-year-old man with "a history of diabetes, [and] severe coronary artery disease and heart failure."[687] In July of 2011, the patient was seen by EMTs seven times variously for "temperature of 103.6," "an altered mental status," "chest tightness," "breathing but unresponsive," and lying on the floor of his cell "'vomiting and won't move [sic].'"[688] No-transport orders were given three times. After the third order at the end of July, the patient died in his cell. The medical records do not explain or describe the reason for or circumstances of the death.[689]

    b.    <u>Patient # 34</u> made an emergency sick call for flank pain that may have been due to a possible rib fracture in a football game, which led to Dr. Toce prescribing an x-ray without seeing the patient.[690] He returned to the ATU the next day and saw Dr.

---

[683] *See* PX 28 0018-22; *see also* Oct. 23 Testimony of David Thomas at 99:9-116:4. Defendants' contrary description of Mr. Hurd's care is discussed *supra* ¶¶ 62, 67, 103.

[684] *See* PX 28 at 0017-18.

[685] PX 6 at 0063.

[686] *Id.*; *see also* Oct. 15 Testimony of Susi Vassallo at 150:24-151:9, 174:24-178:7.

[687] PX 6 at 0063.

[688] *Id.*

[689] *Id.* at 0063-0064.

[690] *Id.* at 0267; Oct. 16 Testimony of Susi Vassallo at 57:5-58:16; JX 10-ee at 28686. It is unclear when the patient actually had broken his ribs, and whether the rib fracture was related to his death;

Collins, who noted that there was no bruising or injury that could explain the pain.[691] Three days later, Dr. Lavespere gave a no-transport order when the patient could not get out of bed; three days after that the patient was non-responsive and died the following day—all without any attempt to diagnose the source of his pain or determine whether the possible rib fracture had caused any internal injuries.[692]

213. These examples have a troubling resonance with Dr. Lavespere's testimony that he doesn't believe patients,[693] and with the general understaffing and lack of qualifications at the provider level.[694] Doctors do not believe patients, so they do not bother to see patients; doctors are not qualified to perform primary care, so they do not understand when an assessment is incomplete or abnormal; and Defendants do not employ enough doctors, so they jump to the conclusion that patients do not need a doctor. Whatever the reason in a particular case, the harm to Class members—and the risk of additional harm at any time—is irrefutable.

ii. Policies and practices that impede access to care

214. In addition to the fundamental inadequacy of Defendants' system of EMT-led sick call, Defendants maintain numerous policies and practices that impede Class members' access to care.

215. First, Defendants do not follow their own policy for how frequently sick call should occur. Under DOC's Access to Care and Clinical Services Policy, patients are supposed to have daily access to routine and urgent services, with sick call requests triaged every day.[695] This does not occur in the outcamps and on death row, where sick call is only conducted Sunday to Thursday.[696]

216. Second, sick call occurs at unscheduled times, beginning as early as 4:30 in the morning in some housing units.[697] Many Class members are sleeping at this time, and may not wake up for sick call. Patients who miss sick call must wait until the next sick call, or declare an

---

the autopsy reports a "remote" fracture, suggesting it may have been distant in time and unrelated. *See* Oct. 16 Testimony of Susi Vassallo at 57:5-58:16.

[691] JX 10-ee at 28685.

[692] *Id.* at 28678-81; *see* Oct. 16 Testimony of Susi Vassallo at 112:9-114:1; *see also, e.g.*, PX 6 at 0201, 236, 238, 254, 257 (noting additional no transport orders).

[693] *See infra* ¶¶ 358-360.

[694] *See supra* ¶¶ 160-181.

[695] JX 5-a at 00020 (HC-01).

[696] PX 6 at 0031; *see also, e.g.*, JX 4-zz, S. Poret Depo. at 32:9-17 (no sick call Friday or Saturday).

[697] *See, e.g.*, JX 4-dd, D. Cashio Depo. at 31:9-32:15 (patients cannot use other Class members as proxies); *id.* at 33:6-13 (sick call runs from "4:30 in the morning to 4:30 in the evening usually" and has no schedule); Oct. 23 Testimony of David Thomas at 57:9-16 (testifying that he wanted to arrive at the prison at 4 or 5 a.m. to attend sick call but was unable to).

emergency; they are not permitted to have another Class member submit an HSR for them. This is an unreasonable barrier to care that lacks a clinical or operational justification.[698]

217. Third, Class members must pay $3.00 for sick call, and $6.00 for a self-declared emergency. While Defendants identified evidence that "it's common to see as much as $5 around the country,"[699] they did not compare this rate to the wages that other facilities pay. At LSP, the gap is dramatic. Most inmates make 12 cents an hour or less; for example, healthcare orderlies make just four cents an hour.[700] Given that Class members frequently do not receive medical attention from a provider even if they make sick call, this is an unreasonable barrier to care that "likely discourages inmates from accessing emergency care when they need it."[701] The disparity between sick call and emergency sick call, combined with Defendants' failure to provide routine sick call seven days a week, may lead Class members to defer seeking care for emergent services until routine sick call reopens.

218. Indeed, this is Defendants' acknowledged intent in maintaining the co-pay system at these rates: Major Cashio testified that the purpose of the co-pays is so patients "don't clog up the system."[702] If inmates are denied care, they may still be charged for repeat requests; Defendants will charge for every sick call request if an inmate "decide[s] … that I'm going to catch sick call every day until somebody sees me."[703] Defendants also charge $2.00 for a new prescription or even over-the-counter medication—even if they are receiving only a single dose. This further discourages medical care and provides Class members care well below the community standard.[704]

219. Fourth, Class members who seek medical care must face the possibility that they will be disciplined for malingering if medical personnel do not believe them. Every sick call form states "I am aware that if I declare myself a medical emergency and health care staff determine that an emergency does not exist, I may be subject to disciplinary action for malingering."[705] While Defendants claim that malingering charges are rare, they concede that medical personnel can "[a]bsolutely" threaten to write up Class members, and that they have

---

[698] PX 6 at 0033; Oct. 24 Testimony of Darren Cashio at 36:14-18 (if patients are asleep during sick call they have to wait until the next day); JX 4-gg, A. Cowan Depo. at 23:8-25:4.
[699] Oct. 17 Testimony of Madeleine LaMarre at 8:18-20.
[700] Oct. 15 Testimony of Daniel Prince at 131:2-3.
[701] PX 6 at 0033.
[702] JX 4-dd, D. Cashio Depo. at 86:21-23; *accord* Oct. 24 Testimony of Darren Cashio at 23:7-12.
[703] JX 4-dd, D. Cashio Depo. at 86:15-20; *see also* JX 4-s, H. Varnado Depo. at 38:11-19 (EMTs told Class member "they refused to take [sick call request] because they said [he] was filing too many").
[704] PX 6 at 0031-33; PX 53 *see also, e.g.*, JX 4-m, R. McCaa Depo. at 21:7-22 (Class member testifying that he has frequently not sought treatment due to co-pay); JX 4-l, J. Marsh Depo. at 54:3-55:11 (same); JX 4-d, C. Butler Depo. at 51:10-18 (same); JX 4-n, M. Murray Depo. at 66:6-12 (same); JX 4-s, H. Varnado Depo. at 40:6-17 (same).
[705] PX 53.

no statistics on the frequency of that threat.[706] As Plaintiffs' medical experts explain, "[t]his is unreasonable because patients in distress often cannot distinguish between a true medical emergency versus a non-emergency," and because it involves medical personnel "in initiating disciplinary action against inmates which is a role conflict."[707] Dr. Puisis expanded on this at trial:

> [T]he most striking item in my mind was the practice of what we were told is aggravated malingering, which is … actually a punishment issued to the inmate. When the inmate complains of a certain condition and is evaluated for that condition but the staff member who evaluates the patient determines that the patient does not have the condition, then the patient is punished, can be issued a citation. And there's two problems that we had with it. Number one, the medical staff should not be participating in punishment. Their purpose is professionally medical and clinical care, and so it's not punishment. So that's one problem.
>
> But the second one is that similar to an patient who would go to an emergency room, patients don't know what they have when they make a complaint. If I have chest pain and go to an emergency room and they do an evaluation and discovery I do not have heart disease or an ulcer, I feel very happy but I wouldn't be punished for that. In this case, the inmates are punished. So it's perverse, and it's an aberration of professional responsibility.
>
> So from our point of view, professionals should not participate in that, and the fact that the clinical leadership does not object to participation, I think, is a dereliction of their professional responsibility.[708]

220.    The evidence shows that this practice is, as Dr. Puisis says, an aberration; even Defendants' expert Dr. Thomas agrees that the malingering rules should be removed.[709]

---

[706] JX 4-dd, D. Cashio Depo. at 83:17-84:10; *see also, e.g.*, JX 4-zz, S. Poret Depo. at 42:15-43:7 (Mr. Poret acknowledging that when he provided direct care, he used malingering charges "often"); JX 4-gg, A. Cowan Depo. at 43:21-25 (EMTs can write people up for making an SDE declaration without an emergency or if they "continuously use sick call for not life-threatening problems"); JX 4-s, H. Varnado Depo. at 29:11-21, 30:23-31:2 (describing accusation of malingering); Oct. 15 Testimony of Danny Prince at 112:3-113:20 (explaining that an EMT at the ATU wrote him up for malingering after a security officer sent him there for treatment); JX 4-t, D. Woodberry Depo. at 43:6-9 ("[S]ometimes if you catch the wrong EMT, you're threatened with a write-up … for trying to make a sick call.").

[707] PX 6 at 0033.

[708] Oct. 10 Testimony of Mike Puisis at 14:19-15:17.

[709] DX 14 at 02943; *see also* Oct. 10 Testimony of Mike Puisis at 15:21 ("I haven't seen it at other facilities … .");

221.    Finally, at Angola the role of security trumps that of medical personnel, creating a barrier to
        accessing health care. The medical department at the Angola is controlled by security. The
        warden over the medical department is within the custody chain of command. Both
        Plaintiffs' and Defendants' experts agreed that this was not working.[710] Additionally, the
        orderlies and EMTS also report to the custody chain of command for supervision,[711] and
        correctional officers supervise the delivery of medications by other correctional officers.[712] In
        practice, this inhibits the medical staff from adequately advocating for patients with
        security.[713] Security carries out inappropriate medical tasks and decision making. For
        example, Dr. Lavespere indicated that security is the first one to assess whether or not an
        individual is "really sick" when they have a medical emergency[714] and that the Assistant
        Warden makes resource-allocation decisions like where nurses are required for pill call.[715]
        The Assistant Warden has a range of other medical responsibilities inappropriate for the
        custodial chain of command, from performing the medical director's annual evaluation[716] to
        deciding whether or not a patient will be tested for HIV when he is exposed to blood and
        bodily fluid.[717]

222.    The medical staff is also overly involved in the disciplinary aspects of their patients. In
        addition to the use of malingering,[718] the medical director gets reports from security staff
        about patients who are allegedly lying to him and he drug-tests his own patients to see if they
        are taking their medication.[719] These functions create "role conflicts"[720] that impede access to
        care.

---

[710] *See e.g.*, DX 13 at 02845-46 (Dr. Moore describing the leadership as "most unusual" and creating
"difficulties," including making the "success of the program [] primarily dependent on the good will
of the wardens.") She further explained that Wardens are not capable of assessing the quality of
medical care delivery. *See also* PX 6 at 0011-12.

[711]*Infra* ¶ 287; JX 4-gg, A. Cowan Depo. at 9:20-25, 10:16-20 (EMTs are part of security, and neither
role is primary; "[i]t's basically whichever hat needs to be worn primarily at that time"); JX 4-dd, D.
Cashio Depo. at 73:18-74:18 PX 6 at 0015; *Compare* JX 8-k at 02688 (Nursing Service Policy 20) *with*
JX 4-ii, T. Falgout Depo. at 17:23-25 (Warden Falgout testifying that security deals with staffing and
assigning orderlies).

[712] Oct. 24 Testimony of Tammi Willis at 96:4-8; *see also* JX 4-ddd, T. Willis Depo. at 11:20-12:2.

[713] *See, e.g.*, JX 4-uu, Park Depo. at 13:2-18 ("It's not [provider's] situation to intervene" when a
patient might be entitled to an accommodation).

[714] JX 4-rr, R. Lavespere Depo. at 26:24-27:4.

[715] Oct. 22 Testimony of Randy Lavespere at 193:9-18.

[716] JX 4-rr, R. Lavespere Depo. at 82:16-22.

[717] JX 8a at 00296.

[718] *Supra* ¶¶ 219-220.

[719] JX 4-rr, R. Lavespere Depo. at 20:5-13, 72:8-25.

[720] PX 6 at 0033.

**b.** *Inadequate Treatment of Medical Emergencies*

    i.    Inappropriate use of EMTs, lack of physician involvement, and failure to transfer to a hospital

223. Like sick call, Defendants' practices in medical emergencies deny Class members access to care and put them at risk of severe harm—but with the higher consequences that come from neglect and mistreatment in life-or-death situations.

224. As with sick call, "EMTs perform all emergency response."[721] The process begins with the appropriate use of EMTs to respond to medical emergencies on-site, such as in a cell or dorm.[722] EMTs then either transport the patient to the ATU, or contact a doctor to obtain a "no-transport" order. The heavy use of no-transport orders is a significant source of harm to patients, as Dr. Vassallo explained. The "ability to assess long distance by telephone is not the same as when [a doctor has] a patient in front of [her]."[723] The records reveal numerous instances of doctors instructing EMTs not to transport patients despite severe symptoms, without indication why—often resulting in the patient's swift death.[724]

225. Assuming EMTs do take the patient to the ATU, or the patient is able to take themselves to the ATU, long wait times often deter or prevent care. As many as 76 patients may be seen in a day in the ATU, according to Dr. Lavespere.[725] Wait times are often hours long, leading some patients to give up on seeking care and returning to their housing units.[726]

---

[721] PX 6 at 0061 (footnote omitted).

[722] *See, e.g.,* Oct. 15 Testimony of Susi Vassallo at 150:15-23, 166:1-24 (describing examples of appropriate EMT usage). Before the EMTs are called, however, patients typically have to go through security officers in order to access emergency care. Dr. Lavespere testified that if a patient is "really sick," he will call security and security will "mak[e] a visual observation" that that person is sick before calling the EMTs. Oct. 22 Testimony of Randy Lavespere at 192:22-193:6; *accord* JX 4-rr, R. Lavespere Depo at 26:22-27:23.

[723] Oct. 15 Testimony of Susi Vassallo at 151.

[724] *See supra* ¶ 212 (describing Patients # 39 and 34, both of whom died within days of no-transport orders); PX 6 at 0063-64 (same); *see also, e.g.,* PX 6 at 0201, 236, 238, 254, 257 (noting additional no transport orders); *see generally* Oct. 15 Testimony of Susi Vassallo at 150:24-51:16, 174:24-78:8.

[725] JX 4-rr, R. Lavespere Depo. at 44:4-7.

[726] JX 4-c, A. Brent Depo. at 67:22-70:8. The wait time for patients to be transferred to the ATU can also be long, particularly during the Angola prison rodeo when many patients who compete in the events for cash prizes are not permitted to wear protective gear and sustain serious injuries. At trial, class member Danny Prince testified that after a bull hit him in the chest during one of the events, an EMT dragged him to the side and he had to wait until after the rodeo was over to be transported to the ATU along with five or six other patients who had been injured during various events. Oct. 15 Testimony of Danny Prince at 107:1-108:14.

226. Within the ATU, "EMTs are used as primary providers," often for hours on end.[727] "Although a physician is assigned to provide on-call coverage to the ATU, physicians are not in the ATU at all times and do not consistently evaluate patients while they are in the ATU."[728] While Defendants claimed that the fact that most physicians live on Angola property allows them to come in to the ATU on nights and weekends, the records reveal that this is a rarity; instead, "the predominance of the care was provided by EMTs during the nighttime."[729]

227. Thus, "EMTs solely conduct most evaluations of patients presenting urgently. Physician participation is typically only to give orders, often by phone."[730] In the ATU, as on sick call, "EMTs do not consistently reference … protocols," and "in many cases, the EMTs in fact are acting independently."[731]

228. Instead of providing actual emergency care or transporting patients to a facility that will, Defendants have EMTs "continue to manage the patient" and "make serial observations over many, many, many, many hours," which is not within their training or scope of practice.[732] As explained *supra* ¶ 195, EMTs are not trained "to render ongoing care for a number of hours."[733] Functionally, all that EMTs can do in many situations is "record [that] the patient is dying in front of them."[734]

229. Examples of this practice are numerous and horrifying. Patient #1, for example, was managed by EMTs in the ATU for more than 24 hours in the middle of an episode of diabetic ketoacidosis and acute renal failure, leading to his death a day later.[735] Patient #15 was managed by EMTs in the ATU overnight despite acute coronary syndrome, and then discharged to his housing unit at 3:45 in the morning; he returned to the ATU later that morning and then died en route to the hospital.[736] Patient #20 was similarly managed by EMTs in the ATU overnight despite a physician's telephone order that he be admitted to the nursing unit, because there was no room in the nursing unit; the patient's symptoms suggested he was "internally bleeding and at risk of death," and indeed he died the following

---

[727] Oct. 15 Testimony of Susi Vassallo at 141:25-42:4. For examples, *see* PX 6 at 0069 (Patient #1), 0069-71 (Patient #15), 0035-36 (Patient #16), 0037-40 (Patient #18), 0211-12 (Patient #19), 0034-35 (Patient #20), 0043-44 (Patient #29), 0263-64 (Patient #31), 0068 (Patient #38), 0066 (Patient #40), 0069 (Patient #41).

[728] PX 6 at 0061.

[729] Oct. 16 Testimony of Susi Vassallo at 14:3-13.

[730] PX 6 at 0061.

[731] *Id.*

[732] Oct. 15 Testimony of Susi Vassallo at 151:20-152:2

[733] *Id.* at 142:8-10.

[734] Oct. 16 Testimony of Susi Vassallo at 18:16-17

[735] *See* PX 6 at 0069, 91-94; JX 10-vv at 51299-307

[736] *See* PX 6 at 0069-71, 187-90; JX 10-v at 18943-48 (only physician notes appear before 6 pm, *id.* at 18947, and after 8:30 am, *id.* at 18943).

day.[737] Patient #38 and #42 were also managed for eight hours or more by EMTs, despite symptoms suggestive of stroke (and, in Patient #38's case, a history of stroke); Patient #38 died the following day, while Patient #42 was left with long-term deficits.[738]

230. At the same time that Defendants provide substandard care in the ATU, they frequently decline to send patients to outside hospitals when indicated by urgent, life-threatening vital signs and symptoms. The ATU is not an emergency room; it lacks numerous forms of diagnostic testing (or lacks qualified operators much of the time), including ultrasound, stress testing, and echocardiograms, which are necessary to diagnose emergency conditions and determine a proper course of treatment.[739] Similarly, laboratory testing is often unavailable after hours or on the weekend, making it impossible to perform critical diagnostic tests.[740] The ATU is therefore "not equipped to diagnose and treat many serious medical problems."[741] Without this capacity, the ATU is insufficient to treat most emergent conditions and transport to a true emergency room at an outside hospital is necessary—but in numerous cases, it is delayed until the patient is beyond treatment, or foregone altogether.[742] The records reveal numerous cases where a patients' symptoms indicated immediate hospitalization or diagnostic tests that could not be provided in the ATU, but Defendants held the patient in the ATU for hours before transport off-site, or even discharged them to their housing unit.[743]

231. Class member testimony illustrated these deficiencies. Anthony Mandigo testified that when he was experiencing symptoms of pneumonia and made an emergency sick call, the EMTs at the ATU simply administered two breathing treatments and sent him back to his dorm. Several days later he had to be admitted to University Medical Center in New Orleans for diagnosis and treatment.[744] Danny Prince, a former healthcare orderly in Ash 2 explained how one of his patients had a cold that progressively got worse and repeatedly made emergency sick calls. Despite the fact that he was seen in the ATU and sent back to the dorm many times in the days leading up to his death, the patient died overnight from some sort of infection.[745]

---

[737] PX 6 at 0034-37, 56, 85, 225-27.

[738] PX 6 at 0270-71; (Patient #38); PX 233 at 0095 (same); Oct. 15 Testimony of Susi Vassallo at 153:6-164:24 (Patient #42); PX 6 at 0272-73 (same); JX 10-p at 15142, 15161-62, 15236-39 (same).

[739] See PX 6 at 0065-66; Oct. 15 Testimony of Susi Vassallo at 143:14-25.

[740] PX 6 at 0066.

[741] Id.

[742] Id. at 0065-71.

[743] See, e.g., Oct. 15 Testimony of Susi Vassallo at 151:20-152:12. See, e.g., PX 6 at 0069, 0092, 0094 (Patient # 1), 0070-71 (Patient # 15), 0036-37 (Patient # 16), 0056, 0223-24 (Patient #20), 0256-57 (Patient # 29), 0261-64 (Patient # 31), 0067 (Patient # 32), 0068 (Patient # 38), 0066 (Patient # 40), 0068-69 (Patient # 41), 0069 (Patient # 42).

[744] Oct. 11 Testimony of Anthony Mandigo at 89:2-91:13.

[745] Oct. 15 Testimony of Danny Prince at 101:14-102:5.

232. These many failings are perhaps best illustrated by the experiences of patients who have suffered strokes. As discussed above, ILH's Stroke Program Coordinator and the Director of the Louisiana Emergency Response Network notified Defendants in August 2014 that three patients in the past month and a half had arrived from Angola "with obvious stroke symptoms" but did not get "emergent care within the 4.5 [hour] window to attempt [to] prevent serious ability," resulting in "pretty significant deficits."[746] This included Lionel Parks, discussed *supra* ¶¶ 141, 144.[747]

233. Despite this urgent warning, the exact same problem recurred in the case of Patient #42 nearly a year later, in July 2015.[748] Patient #42 was found totally unresponsive at 11:18 at night.[749] He was brought to the ATU, where he was managed by EMTs without seeing a physician for more than ten hours.[750] This ten-hour delay, during which there was no attempt to diagnose the source of his symptoms, led to massive brain swelling.[751] During that delay, EMTs gave him four liters of intravenous saline without any apparent reason, which may have exacerbated the brain swelling.[752] As a result, the patient developed severe long-term deficits including aphasia (inability to remember words), dysphagia (difficulty swallowing), and hemiparesis (one-sided weakness).[753]

234. In addition to the abysmal care evidenced by the medical records, Plaintiffs' emergency medicine expert, Dr. Vassallo, was on hand in the ATU to witness a trauma emergency response, which exhibited many of these failings. Patient #44 attempted to hang himself in his cell, and was brought to the ATU with abnormal posturing indicating brain injury and bruising at the C spine, findings that warrant immediate hospitalization. Despite these significant findings, EMTs continued managing his care—even though Dr. Toce, an Angola physician, was present. Dr. Toce did not assess the airway or listen to the lungs, nor did he perform a primary or secondary survey or neurological examination, which are critical in trauma resuscitation. Nor, critically, did Dr. Toce recognize that the EMTs had failed to ensure proper ventilation by "bagging" the patient. About 15 minutes later, Dr. Lavespere entered and restarted the bagging, but due to the long delay, "[t]his level of inadequate ventilation most likely harmed the patient and promoted extension of his brain injury." This

---

[746] PX 12 at 0002.

[747] *See* PX 28 at 0011-13 (evaluating Mr. Parks' care); JX 10-qq-2 at 47422-28. *See also* PX 6 at 0068, 270-71 (describing delayed stroke care for Patient #38 in 2011); Oct. 16 Testimony of Susi Vassallo at 114:12-15:23 (same).

[748] *See* Oct. 15 Testimony of Susi Vassallo at 153:6-64:11; PX 6 at 0069; JX 10-p at 15236-39.

[749] JX 10-p at 15239; Oct. 15 Testimony of Susi Vassallo at 153:12.

[750] JX 10-p at 15237-38; Oct. 15 Testimony of Susi Vassallo at 156:2-162:16.

[751] Oct. 15 Testimony of Susi Vassallo at 163:13-164:23

[752] *Id.* at 157:7-21, 164:12-13.

[753] JX 10-p at 15021, 15142, 15302, 15450.

represented a "fail[ure] to understand major aspects of advanced life support" and one of multiple "significant departure[s] from standard of care" observed in this encounter.[754]

          ii.     Inappropriate procedures in emergency care

235.    In addition to these critical failures to provide competent care in the ATU, Defendants employ several wholly inappropriate practices in the ATU. As Dr. Vassallo reliably testified, "the care is not standard of care in America today."[755]

236.    First, Defendants presume that any patient with altered mental status (e.g., unconsciousness) is using drugs. Based on this presumption, Defendants routinely administer the anti-opioid drug Narcan, perform a urine toxicology test—often by forced catheterization, a painful and invasive process that may introduce infection—and even pump patients' stomachs (known as "lavage"). They do this regardless of whether the patient has symptoms of a serious condition that might explain his altered mental status, and even when the patient has symptoms that rule out the possibility of opioid use.[756]

237.    Notably, this routine application of lavage and urine toxicology does not appear in Defendants' written protocol for treating drug overdoses (or any other protocol), although staff apparently consider it a routine part of critical tasks such as stroke work-up.[757]

238.    Dr. Vassallo extensively and reliably explained why these practices are inappropriate and potentially harmful, and fall well below the standard of care.[758] As she explained, drug-testing patients in the emergency room is "a very junior kind of error to make" and is specifically warned against in EMS.gov protocols.[759] "[I]n current medical practice, there's no point to that" because it typically "ha[s] no bearing on the diagnosis."[760]

239.    Drug-testing patients in the emergency room delays necessary care in situations where every minute may be critical. Moreover, lavage and forced catheterization can affirmatively harm

---

[754] PX 6 at 0061-62; Oct. 15 Testimony of Susi Vassallo at 166:1-173:9.

[755] Oct. 16 Testimony of Susi Vassallo at 22:17; *see also id.* at 19:6 (describing the care as "frozen in time in the '80s"); Oct. 15 Testimony of Susi Vassallo at 190:21-191:23 (noting that a particular medical device in use at Angola has "been shown to be not useful and was taken out of the EMS systems" in the "'80s or '90s").

[756] PX 6 at 0064; *see also* Oct. 16 Testimony of Susi Vassallo at 8:13-15 ("When the patient had an altered mental status, it was in my review of the records more than half the time. I don't want to say universally, but it was extremely common.").

[757] PX at 0064; *compare* JX 8-a at 00087, 00145 (EMT Drug Overdose Treatment Protocols, which does not involve urine toxicology).

[758] *See* Oct. 15 Testimony of Susi Vassallo at 153:6-157:13, 159:6-160:10; Oct. 16 Testimony of Susi Vassallo at 8:22-11:5; *see also* PX 6 at 0064-65.

[759] Oct. 15 Testimony of Susi Vassallo at 156:6-157:1.

[760] *Id.* at 156:10-157:3.

the patient even beyond squandering precious time.[761] Lavage can perforate the esophagus or cause aspiration, while catheterization can introduce infection.[762] Even Narcan can cause a problem where not indicated, because it can induce opiate withdrawal and vomiting while a patient is suffering serious, immediate problems from other sources.[763]

240. Examples of these harmful practices include:

    a. <u>Patient #42</u> arrived unconscious at the ATU with a good respiratory rate, indicating that he was not suffering from an opiate overdose.[764] Nevertheless, Defendants applied Narcan, which would have only been indicated if he might have been suffering an opiate overdose, and immediately indicated that he was not.[765] Despite that negative indication, Defendants proceeded to catheterize the unconscious patient to perform urine toxicology.[766] As discussed above, the patient had in fact suffered a stroke, and went ten hours without treatment.[767]

    b. <u>Patient #37</u> presented to the ATU for new onset of seizures. Defendants subjected him to gastrointestinal lavage and naloxone, during which he developed decerebrate posturing and other symptoms indicating significant brain damage. He was eventually transported to a hospital, where a CT scan showed intracerebral bleeding before he expired in the hospital. As Plaintiffs' medical experts explain, "[l]avage for drugs and administration of naloxone for new onset of seizures shows a gross lack of knowledge of emergency care. Lavage of a patient with new onset seizures represents medical care with no basis in modern practice and delays transport to the hospital."[768]

    c. <u>Patient #30</u> presented to the ATU with focal motor seizures of the arm and face. He was given naloxone with a plan for gastrointestinal lavage, despite having no symptoms of opioid or any other overdose. As Plaintiffs' medical experts concluded, "this plan does not meet standard care" and was simply "incoherent."[769]

241. Second, Defendants inappropriately use restraints as a substitute for mental health treatment in the ATU for extended periods of time. One patient with a history of mental illness who

---

[761] PX 6 at 0064-65.

[762] Oct. 16 Testimony of Susi Vassallo at 9:24-11:2; PX 6 at 0071.

[763] Oct. 16 Testimony of Susi Vassallo at 9:4-23.

[764] Oct. 15 Testimony of Susi Vassallo at 155:1-21; *see generally id.* at 153:12-157:1, 159:12-160:10; JX 10-p at 15237-38; PX 6 at 0069.

[765] Oct. 15 Testimony of Susi Vassallo at 155:18-21.

[766] *Id.* at 156:6-157:5.

[767] *See supra* ¶ 233.

[768] PX 6 at 0064.

[769] *Id.* at 0065 ("[I]n all of the instances of gastric lavage … [Plaintiffs' medical experts] could see no indication for gastric lavage.").

presented to the ATU after cutting his forearms received no mental health treatment and instead was placed in four-point metal restraints with flex-cuff reinforcements—that is, strapped to a table by the arms and legs—as the sole form of care.[770] As Dr. Vassallo explained, physical restraint is only appropriate "for a brief period of time until you can get chemical restraint, being sedation."[771]

242.    Third, Defendants improperly use Do Not Resuscitate ("DNR") orders instead of providing actual medical treatment or transferring patients to hospitals where they can receive appropriate care. As Dr. Vassallo explained, signing a DNR order during a potentially fatal episode and immediately starting hospice care is "very unusual" and not a common practice in medicine, and "should happen when the patient has a clear mental status."[772]

243.    For example, Patient #31 was examined in a clinic on June 6, 2014, and found to be significantly hypotensive—but was discharged without his hypotension being addressed. Two months later he reported abdominal pain and was distended and jaundiced, but was again discharged. The next day, he was additionally vomiting, and was again discharged without treatment. Two days later he returned to the ATU complaining of worsening abdominal pain and tenderness in his abdomen. Instead of receiving an evaluation of his acute decompensation, he was asked to sign a DNR order, and only then began receiving significant pain medication.[773] Two days later he began vomiting blood and died in the prison—all without a diagnosis or treatment of his worsening abdominal pain.[774]

244.    Similarly, Defendants repeatedly tried to convince Patient #10 to sign an advanced directive, telling him that his prognosis was poor even before the prognosis had been determined by a biopsy.[775] They proceeded to provide minimal care and examinations without waiting for a decision, and even after the patient decided that he wanted to proceed with chemotherapy.[776] When the patient developed hypotension and altered mental status, an LSP physician again tried to convince him to sign an advance directive and held the patient in the ATU for five hours before sending him to a hospital, where he soon passed away.[777]

245.    These deficits in care and improper policies combine for a dire, often deadly situation. As the Plaintiffs' medical experts summarized:

> In summary, our review showed that urgent and emergent care is inadequate and has resulted in multiple deaths, many of which were likely preventable. In several cases, patients with serious medical conditions failed to be transported to the ATU for medical evaluation by a physician. Physicians do not evaluate patients in the ATU; medics manage patients and appear to be acting out of the scope of their licenses.

---

[770] Id.

[771] Oct. 16 Testimony of Susi Vassallo at 97:19-20.

[772] Id. at 106:19-107:9.

[773] See JX 10-rr at 47912; Oct. 16 Testimony of Susi Vassallo at 48:2-13.

[774] PX 6 at 0067.

[775] Id. at 0077.

[776] Id. at 0138-40.

[777] Id. at 0141-42; JX 10-iii at 60463.

Patients with life-threatening conditions are not timely transferred to a hospital. Serious medical conditions are mismanaged. Use of improper medic protocols (use of urinary catheters for obtaining specimens in persons capable of normal urination; use of gastric lavage; etc.) demonstrates lack of medical leadership. Repeated presentations to the ATU, or repeated calls for an ambulance, or repeated sick call requests for the same problem, are not perceived as a "red flag" warning for undiagnosed, undifferentiated or undertreated illness. Instead it is cynically perceived as a sign of inconsequential disease or malingering. A cynical attitude toward inmates is unprofessional. In the meantime, serious infection, stroke and other conditions are unrecognized. Mental illness manifesting as suicide attempts are seen as a cause for punishment by the medieval practice of 4-point restraints. Rather than offer the community standard of medical care, patients are made DNR, do not resuscitate and acute problems are left untreated. All of these deficiencies place inmates at risk of harm or actually cause harm.[778]

### c.   *Inadequate Chronic Disease Management Program*

246.   A chronic disease is "a condition that is present for at least six months or more and requires regular intermittent monitoring by a physician."[779] Chronic disease management is the long-term monitoring and treatment of patients with chronic diseases such as diabetes, HIV, hypertension, hypothyroidism, clotting disorders, or others. The goal of a chronic disease program is to decrease the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function.[780]

247.   Chronic disease management programs are "pretty standard in corrections in this day and age."[781] An adequate chronic disease management program has several basic minimum components:

    a.   Disease review, which includes identifying and evaluating each of the patient's chronic diseases at each visit and performing a pertinent history, including review of symptoms for each disease.

    b.   Examination, which includes referencing current laboratory results and performing a focused physical exam pertaining to each of the patient's medical conditions.

    c.   Medication review, which includes reviewing medication adherence and assessing obstacles to compliance, such as side effects.

    d.   Treatment, which includes assessing disease control for each of the patient's chronic diseases; developing and modifying, as needed, treatment plans related to each of the

---

[778] PX 6 at 0071 (footnote omitted).
[779] Oct. 9 Testimony of Mike Puisis at 124:15-17.
[780] PX 6 at 0042.
[781] Oct. 16 Testimony of Madeleine LaMarre at 209:10-11.

patient's chronic diseases; and scheduling clinical follow-up in accordance with the patient's disease control.[782]

248. Plaintiffs' experts reliably found that these aspects of a chronic disease management program "weren't working at all" at LSP.[783] Angola's chronic disease program is woefully inadequate, both on paper and in practice. HC-11, Angola's Chronic Care/Special Needs policy, "is generic and lacks sufficient operational detail to provide guidance to staff regarding the requirements of the program, including procedures for enrollment, tracking, frequency of monitoring visits, etc."[784] Defendants also lack "a true chronic disease tracking system that includes all patients with chronic diseases, their last appointment, next scheduled appointment and scheduled labs."[785] Even if it were correct, delegating care to non-clinical positions contributes to the failure to provide adequate care, as evidenced throughout these findings. Even Defendants' expert Dr. Moore noted a "lack of chronic care," which she attributed to "physician manpower shortages."[786]

249. Chronic disease guidelines are a critical component of ensuring a competent, adequate standard of care. As Ms. LaMarre explained:

> Chronic disease guidelines are important in a correctional agency to give guidance to clinicians about what standard the department expects them to meet in terms of delivering chronic disease care to patients at the facility, and they should be … evidence-based and based on national guidelines that are being updated all the time to basically give guidance about who should be enrolled in the clinic, what's the baseline evaluation for each patient, how often should patients be seen, how often should they be seen if they're well-controlled, and how often should they be seen if they are poorly controlled.[787]

250. Angola's chronic disease guidelines, however, are "very skeletal."[788] Angola's Chronic Care Manual[789] contains guidelines for only eight diseases, omitting major chronic diseases such as chronic kidney disease, thyroid disease, sickle cell disease, and lupus. Even the guidelines that do exist "are skeletal in nature" and "do not include the community standard of care."[790]

---

[782] PX 6 at 0043; *see also* Oct. 9 Testimony of Mike Puisis at 124:23-125:16; Oct. 16 Testimony of Madeleine LaMarre at 209:10-210:4.
[783] Oct. 9 Testimony of Mike Puisis at 125:20; *see generally id.* at 125:20-27:9; Oct. 16 Testimony of Madeleine LaMarre at 210:10 ("for the most part," components of a chronic disease management program did not exist).
[784] PX 6 at 0042.
[785] *Id.* at 0043.
[786] DX 13 at 02865.
[787] Oct. 16 Testimony of Madeleine LaMarre at 158:19-159:4.
[788] *Id.* at 159:5.
[789] JX 8-l (Chronic Care Manual).
[790] PX 6 at 0042-43.

They "provide no clinical criteria for inclusion in the chronic disease program, procedures for enrollment; components an adequate history and physical examination, definitions of disease control and medical treatments for each disease."[791] They are, simply put, "completely inadequate."[792] Even Dr. Lavespere's prepared testimony about chronic diseases demonstrated a failure to understand or observe modern practices for treating chronic diseases.[793]

251. Many of these observations were corroborated by Dr. Moore. In her report, she found that the "chronic care guidelines could be enhanced"; that "some providers documented a focused exam, pertinent medical history[,] medication compliance and laboratory results better than others"; that a chronic care nurse should be added "so that offenders with chronic care disease can be scheduled and tracked in chronic care clinic and when the patient is seen by the provider, the laboratory work is in the chart"; and that the number of chronic care visits in the six months before her assessment seemed low for Angola's population.[794]

252. Hepatitis C ("HCV") presents one example of Defendants' systemic failure to treat chronic disease:[795]

   a. HCV is a liver infection caused by the hepatitis C virus and spread when blood from a person infected with the virus enters the body of someone who is not infected.[796] Symptoms include fever, fatigue, dark urine, clay-colored bowel movements, abdominal pain, loss of appetite, nausea, vomiting, joint pain, and jaundice.[797]

   b. Acute HCV occurs within the first 6 months after someone is exposed to the virus: 75% to 85% of people with acute HCV develop a chronic HCV infection. Chronic HCV can lead to serious health problems including liver damage, cirrhosis, liver cancer, and death if left untreated.[798]

   c. The American Association for the Study of Liver Disease ("AASLD"), the Infectious Diseases Society of America, and the International Antiviral Society—USA have

---

[791] *Id.*; *compare, e.g.*, JX 8-l at 02708 (LSP hypertension guidelines) *with* Rec. Doc. 517-5 (Eighth Joint National Committee, 2014 Evidence-Based Guideline for the Management of High Blood Pressure in Adults). *See* Sept. 25, 2018 Minute Order (taking judicial notice).
[792] PX 6 at 0043; *see also* Oct. 16 Testimony of Madeleine LaMarre at 159:7-8 ("[I]t just wasn't really adequate to ensure that clinicians knew what they should be doing.");
[793] *See* Oct. 25 Testimony of Susi Vassalo at 86:2-87:3.
[794] DX 13 at 02865-66.
[795] *See* Oct. 16 Testimony of Madeleine LaMarre at 215:23-216:5.
[796] Rec. Doc. 517-1 at 1; *see* JX 6-iii at 00281 ("Hepatitis C virus (HCV) infection is a bloodborne pathogen and is transmitted primarily through large or repeated direct percutaneous exposures to blood.")
[797] Rec. Doc. 517-1 at 4-5.
[798] *Id.* at 5.

authored and published evidence-based, expert-developed recommendations for HCV management.[799] According to these sources, all persons who have a risk should be tested for HCV.[800] Being incarcerated is its own risk factor.[801]

d.  Ms. LaMarre—who was invited by the Centers for Disease Control and Prevention ("CDC") to be on a panel to make recommendations regarding prevention and control of HCV in correctional facilities[802]—testified that LSP's Chronic Care Guidelines did not meet national standards with regard to HCV testing.[803]

e.  Angola does not have mandatory HCV testing (also known as "opt-out" testing) for patients.[804] Instead, patients are tested if a healthcare practitioner at Angola has an undefined "clinical suspicion" that a patient is infected with HCV.[805] This inappropriately delays diagnosis for HCV and, consequently, early treatment interventions.

f.  Angola's chronic disease guidelines are not based on nationally recognized clinical practice guidelines.[806] Angola's physicians do not perform history and physical examinations pertinent to the patient's disease, timely address abnormal laboratory tests, assess medication adherence, and monitor the patient in accordance with the patient's disease control.[807]

g.  Angola's chronic care treatment guidelines provide no clinical criteria for inclusion in the chronic disease program, procedures for enrollment, components of an adequate history and physical examination, definitions of disease control, and medical treatments for each disease.[808]

---

[799] *See* Rec. Doc. 517-4.

[799] *Id.* at 11.

[800] *Id.*

[801] *Id.* at 12; *see also* Rec. Doc. 517-1 at 3-4 (identifying "[p]eople who are incarcerated" as being "at increased risk for having hepatitis C"); *id.* at 6 (noting that the "U.S. Preventive Services Task Force," a "group that helps set health policies in the United States, … recommends HCV testing for people in jails or prisons"); Sept. 25, 2018 Minute Order (taking judicial notice of Rec. Doc. 438-5 and requesting a highlighted copy be filed into the record at 517-1).

[802] Oct. 16 Testimony of Madeline LaMarre at 134:4-, 214:3-5.

[803] *Id.* at 214:6-11.

[804] JX 4-xx, S. Poret Depo. at 20:1-20:14.

[805] *Id.*; JX 8-l at 02707 (Chronic Care Guidelines); *see also* JX 6-iii at 00281-82 (draft Hepatitis C directive).

[806] *See* PX 6 at 0008.

[807] *Id.*

[808] *Id.* at 0043; *see also* JX 6-iii at 00281-84.

h. Even with limited testing, in 2016, almost 14% (873 patients) at Angola had a diagnosis of Hepatitis C.[809]

253. This inadequate program predictably produces catastrophically poor care. Without adequate guidance—and in some cases without relevant training, *see supra* ¶ 171. Defendants' medical staff appear not to recognize or know how to treat chronic illnesses in ordinary or critical states. In the Plaintiffs' medical experts' sample, "virtually every chronic disease record [the experts] reviewed showed a similar pattern of inadequate medical evaluations and lack of timely monitoring and treatment. In nearly all records [they] reviewed, patients' chronic diseases were poorly controlled or inadequately treated, increasing the risk of serious harm to these patients."[810] In many instances, some of which are discussed below, Defendants' physicians provided care that was affirmatively contraindicated, likely exacerbating the patients' conditions. This complete failure to provide an adequate chronic disease management program "brings harm to the patient. … [I]t harms the patient because their disease is not being managed and it causes morbidity and mortality. And the morbidity includes direct harm, hospitalization, and deterioration of disease."[811]

254. Plaintiffs' experts reviewed at least 33 patients with chronic diseases, and found major, prolonged delays and errors in care in every one.[812] For example:

a. Defendants use Coumadin (also known as warfarin), an outdated blood thinner,[813] as their principal anticoagulant, but exhibit a dangerous unfamiliarity with its appropriate use. Patients #51 and #53 received "booster" doses of Coumadin in 2015 and 2016, but use of a single extra dose of Coumadin "is not recommended therapy and is below standard of care and harms the patient by ensuring lack of therapeutic anticoagulation."[814] Defendants prescribed Coumadin for Patient #30 for a presumptive deep vein thrombosis ("DVT"; a blood clot in the legs) without performing an ultrasound to confirm the suspicion; after 12 days, an ultrasound was performed and revealed that he did not have a DVT and instead had a hematoma,

---

[809] DX 16 at 02960. Outside providers regularly see patients with HCV. *See* Oct. 11 Testimony of Dr. Dhand at 160:14-161:2.

[810] PX 6 at 0047; *see also* Oct. 11 Testimony of Lawrence Jenkins at 185:5-187:3 (explaining that the only HCV treatment he has received since he was given a failed course of HCV treatment 10 years ago is a once-a-year appointment with an outside provider); *id.* at 190:23-191:2 (testifying that his blood pressure is only checked "maybe once every three months or something like that" despite the fact that he has chronic hypertension and is at risk for strokes).

[811] Oct. 9 Testimony of Mike Puisis at 127:12-15.

[812] PX 6 at 0043-47; *see, e.g.,* Oct. 9 Testimony of Mike Puisis at 133:6-152:16 (discussing Patients #11 and 13); *id.* at 181:8-195:12 (discussing Patient #3); Oct. 16 Testimony of Madeleine LaMarre at 199:14-201:24 (discussing Patient # 20); *id.* at 216:10-218:14 (discussing Patients # 25 and 26).

[813] *See* Oct. 25 Testimony of Susi Vassallo at 86:18-87:3.

[814] PX 410 at 3-4; *see also* Oct. 22 Testimony of Randy Lavespere at 113:16-19, 115:10 (stating that he gave Patient #21 a "booster dose of Coumadin").

which are exacerbated by blood thinners.[815] Even if it had been a DVT, Coumadin would have been the wrong medication, as it takes several days to begin to work.[816] Doctors never asked Patient #52 whether he suffered any bleeding, even when his clotting ratio was twice the normal range in 2016, putting him at substantial risk.[817] Indeed, Defendants subjected him to treatment that exacerbated the risk of potentially life-threatening bleeding: medics provided him ibuprofen, which is contraindicated due to the risk of causing bleeding in patients on blood thinners; and Defendants shackled him in segregation, causing bleeding, then failed to check his clotting ratio.[818] And Defendants kept Patient #54 on warfarin for a year after an ablation procedure, placing him at heightened risk, until a cardiologist informed them that he should have been discontinued after two months.[819]

b. Patient #9 suffered from cirrhosis of the liver due to HCV and was transferred to Angola in February 2014.[820] Defendants failed to provide necessary diagnostic tests and maintained the patient on multiple hepatotoxins, drugs that are directly contraindicated for patients with compromised livers.[821] The patient died of a systemic infection possibly related to his weakened liver within two months.[822]

c. Defendants mismanaged Patient #11's severe Crohn's disease and ulcerative colitis from at least 2013 through 2016.[823] Among other problems, they provided him inadequate medication to prevent formation of fistulas,[824] failed to follow up on a test showing an abscess requiring immediate attention, failed to send him to a gastroenterologist for 15 months, and (as discussed in greater detail infra ¶ 283.d) showed no understanding of how to treat him in the infirmary after he returned from a partial colectomy.[825]

d. Patient #14 had out-of-control blood pressure and high blood lipids for more than two years between 2013 and 2015, during which providers saw him 13 times without addressing all of the patient's conditions, frequently leaving his blood pressure and blood lipids unaddressed, and only once performing a reasonably focused physical

---

[815] PX 6 at 0065-66; Oct. 16 Testimony of Susi Vassallo at 44:8-45:4.
[816] Oct. 16 Testimony of Susi Vassallo at 44:13.
[817] PX 410 at 5.
[818] Id.
[819] Id. at 1-2.
[820] PX 6 at 0131.
[821] Id. at 0135-36.
[822] Id.
[823] See generally Oct. 9 Testimony of Mike Puisis at 133:12-139:4; PX 6 at 0044-45.
[824] This was recognized not only by Plaintiffs' experts but by a gastroenterologist who the patient finally saw in January 2016. See JX 10-r at 16122; Oct. 9 Testimony of Mike Puisis at 136:17-138:15.
[825] Oct. 9 Testimony of Mike Puisis at 135:1-136:5; PX 6 at 0045.

examination.[826] This likely contributed to a coronary event requiring a coronary artery stent.[827] Providers did not address the patient's chronic kidney disease, and on one occasion diagnosed him with chronic obstructive lung disease without any clinical evidence for the disease.[828] In 2015, an LSP physician took the patient off Lipitor (a high-dose statin) without explanation and despite the clear indication of a high-dose statin for his conditions, placing the patient and harm and possibly contributing to a hospitalization in February 2016.[829]

    e.   Patient #31 had hepatitis C, but did not receive direct acting antiviral medicine.[830] Despite being followed in the hepatitis C clinic, the patient presented with symptoms of liver failure for at least six months without meaningful treatment, even during an infirmary stay.[831] Defendants consistently failed to recognize signs of infection or acute decompensation and failed to transfer him to a hospital as his condition deteriorated, leading to his death.[832]

    f.   Patient #33 suffers from chronic kidney disease, heart failure, diabetes, and other serious chronic conditions.[833] Both before and after a hospital stay was necessitated by decompensated heart failure, acute respiratory failure, and acute renal failure,[834] physicians exhibited little effort to care for the patient, primarily leaving care to EMTs and seemingly writing off the patient because they "[d]oubt[ed] this zebra can change its stripes."[835]

255.    In case after case, all of the elements of a chronic disease management program were missing.[836] Providers did not review each of the patient's diseases, perform a relevant examination, review and incorporate laboratory results, assess obstacles to medication compliance, or assess and develop a treatment plan appropriate for the patient's disease states. Specialty care was delayed or denied, and when it did occur it went without follow up. These systemic failures are directly responsible for the pervasive risk of delayed or withheld diagnosis and treatment, serious harm and suffering, and preventable death.

---

[826] *Id.* at 0044; 175.

[827] *Id.* at 0044.

[828] *Id.*

[829] *Id.* at 0178, 181-82. Here again, outside doctors apparently shared Plaintiffs' experts' concern, restarting the statin when they next saw the patient. *Id.* at 0182; JX 10-ff at 30045.

[830] PX 6 at 0261; *see generally* JX 10-rr.

[831] PX 6 at 0067, 261-63.

[832] *Id.*

[833] PX 6 at 0266; *see generally* JX 10-zz.

[834] JX 10-zz at 54087.

[835] PX 6 at 0266; JX 10-zz at 54120.

[836] *See generally* Oct. 9 Testimony of Mike Puisis at 126:2-127:20.

256. The substantial risk of serious harm stemming from these inadequacies in Angola's chronic care program was further corroborated by the testimony of Drs. Jones and Dhand, both of whom frequently treat Angola patients with a range of chronic diseases.[837] Dr. Jones credibly testified that her patients from Angola are generally experiencing acute exacerbations of their chronic illnesses—such as HIV, Hepatitis C, cancer, and sickle cell—which means that those illnesses have become "out of control" by the time they come to UMC.[838] According to Dr. Jones, her Angola patients with these acute exacerbations of chronic illness generally suffer symptoms with a "higher level of severity than what [she] would expect of the general population,"[839] suggesting a delay in treatment.[840]

257. For example, Dr. Jones observed that she has treated Angola patients with heart failure exacerbations with "significant amounts of extra fluid in their body" and significant other symptoms; for other patients with this same illness, she would have expected them to seek treatment before symptoms became so severe.[841] The same has been true for Dr. Jones's Angola patients with acute exacerbations of other chronic illnesses such as cancer and sickle cell disease.[842] Dr. Dhand likewise testified that her patients from Angola with chronic conditions present with severe symptoms[843] and that "almost all" of her Angola patients report delays in treatment before their arrival at UMC.[844]

d. *Failure to Provide Timely Access to Specialty Care*

258. To provide adequate medical care, a correctional system must make hospitalization and specialty care available to patients in need of these services. Off-site facilities or medical professionals must provide a summary of the treatment given and any follow-up instructions, which must be incorporated into the patient's medical records and reviewed by the patient's primary care provider.[845]

259. As the chronic disease management section makes clear, Defendants inappropriately limit Class members' access to specialty care. While these failings are, like the problems in chronic disease management, pervasive throughout the specialty care process, they fall into two basic categories: delayed or withheld access to specialists, and delayed or withheld implementation of care recommended by specialists.

---

[837] Oct. 11 Testimony of Catherine Jones at 114:21-15:2; Oct. 11 Testimony of Monica Dhand at 160:11-62:4-.
[838] Oct. 11 Testimony of Catherine Jones at 115:19-16:16.
[839] Oct. 11 Testimony of Catherine Jones at 117:10-13, 120:8-11.
[840] Oct. 11 Testimony of Catherine Jones at 121:25-22:6.
[841] *Id.* at 121:13-22.
[842] *Id.* at 122:11-21.
[843] Oct. 11 Testimony of Monica Dhand at 161:13-22.
[844] *Id.* at 162:21-63:5.
[845] PX 6 at 0071; *see also* Oct. 9 Testimony of Mike Puisis at 155.

i. Delays in obtaining specialty care

260. Numerous practices and procedures interfere with Class members' ability to access necessary specialty care.

261. First, Defendants' understaffing and reliance on underqualified personnel, detailed at length above, prevents providers from recognizing the need for specialty care and making appropriate referrals. Because of the limited participation and diagnostic examinations of physicians, and "the lack of training of physician staff, physicians do not always appreciate when patients need referrals for care."[846] This is seen most prominently in the management of chronic diseases, as just discussed. On numerous occasions, a test showed a critical result requiring evaluation by a specialist—such as a potentially malignant cancer or a treatable disease—and yet the test went unnoticed for months.[847]

262. Second, Defendants' process for reviewing and scheduling referrals creates significant delays and often prevents indicated consultations and procedures altogether. All referrals for off-site specialty care (and some on-site specialty care) are sent to LPNs in the Trip Office, which enters the referral into a computer database called Eceptionist.[848] Through Eceptionist, the Statewide Medical Director and other non-treating RNs review each referral to determine whether it is "medically necessary."[849] Unless the Statewide Medical Director determines that the referral is medically necessary, the consultation or procedure will not be scheduled.[850]

263. This frequently results in care being delayed or denied, as shown by Eceptionist records and the Plaintiffs' experts. Headquarters review often involves requests for substantiation of

---

[846] PX 6 at 0075.

[847] *See* Oct. 9 Testimony of Mike Puisis at 158:21-22 ("[D]octors aren't reviewing tests to see whether someone needs to be referred."); *see also* DX 13 at 02866 (Dr. Moore recommending that staff be added so that "when the patient is seen by the provider, the laboratory work is in the chart").

[848] *See* Oct. 9 Testimony of Mike Puisis at 157:5-7 ("[D]octors send referral paperwork to a trip office nurse who then takes over and sends that paperwork to the central office where the specialty referral is approved or not.").

[849] *See* JX 5-a at 00285 ("Non-medically necessary elective procedures are not routinely provided."); *id.* at 00284 (defining "elective procedure" as "[a]ny planned non-emergency procedure" and defining "medically necessary procedure" as "[t]reaments/procedures routinely prescribed by health care providers to maintain/preserve basic health and/or functionality").

[850] PX 6 at 0072-73; *see also, e.g.,* JX 4-nn, S. Lamartiniere Depo. at 28:11-28:23 (Ms. Lamartiniere testifying that Dr. Singh reviews and approves offsite surgeries); JX 4-rr, R. Lavespere Depo. at 63:22-64:15 (Dr. Lavespere testifying that scheduling requests go through headquarters and are sometimes denied); DX 13 at 0261 (Dr. Moore: "The [referral] is then transferred to another nurse that works in utilization management at Headquarters. The referral is approved by the DOC Medical Director, Dr. Singh."); Oct. 9 Testimony of Mike Puisis at 159 (in some instances, an LSP physician referred a patient but the referral never happened).

medical necessity that may take weeks to be completed, if it is completed at all. Moreover, while Defendants have a definition of "medically necessary procedure" on paper,[851] in practice they treat it as a discretionary, undefined term, with the Statewide Medical Director denying that any definition exists.[852] As a result, the critical "medically necessary" threshold is left wholly within the Statewide Medical Director's amorphous discretion—even though he is not a treating provider for the patients whose care is at issue.[853] As former Assistant Warden for Healthcare Services Kenneth Norris testified: "the treating physician has no control over the final scheduling of the surgery. He doesn't. We recommend this guy needs surgery, and it goes to Dr. Singh's office. You know, he decides, based on the doctors talking, who gets treated and who don't."[854]

264.    Additionally, Eceptionist does not track whether appointments are completed or rescheduled. This information often appears not to be transmitted back to facility providers, leading to interruptions in care instead of the referrals that providers originally intended. Eceptionist records are often left out of patients' paper medical record, so the reasons for the denial of a referral may not be incorporated into a patient's ongoing care.[855]

265.    Third, there are "frequent communication errors with respect to what needed to be done or what tests needed to accompany the patient on the consultation visit."[856] This results in patients going for specialty care visits without recommended tests, requiring the tests to be re-ordered and thereby delaying care of the patient. The medical experts noted that they saw this type of miscommunication "multiple, multiple times."[857] For example, at least three

---

[851] JX 5-a at 00284.

[852] JX 4-bbb, R. Singh Depo. at 151:20-21 (Dr. Singh: "[W]e don't have a definition of medically necessity. [sic]").

[853] PX 6 at 0073; *see also* JX 9-a at 00156; *see also, e.g.*, JX 4-cc, Carroll Depo. at 17:2-19:24, 23:17, 23:25-24:2, 24:8-25:8 (discussing Eceptionist records where Dr. Singh denied or altered referral requests); *id.* at 21:15-24, 27:22-28:1, 28:15-29:1 (acknowledging that headquarters does not see patients but reviews and closes requests).

[854] JX 4-tt, K. Norris Depo. at 40:15-21; *see also, e.g.*, JX 4-ff, J. Collins Lewis Depo at 23:2-9 (Former Medical Director Jason Collins: "[W]e sent these referrals to whatever the mechanism was at headquarters. They took it from there. … So every time we saw the problem my medical team would send the referral, and that's what our job was, and that's as far as we could take it.").

[855] PX 6 at 0073; *see also* Oct. 17 Testimony of Stacye Falgout at 183:14-17 (Eceptionist is "a communication tool," not "a medical record"); Oct. 11 Testimony of Mike Puisis at 73:16-24.

[856] PX 6 at 0073; *see also, e.g.*, JX 4-q, B. Prine Depo. at 23:22-24:2 (describing outside physician's refusal to perform procedure because Angola wouldn't "do all of the follow-ups that I need to see you" and "wasn't going to bring me to [outside facilities] to take the—take kind of therapy he would want me to take").

[857] Oct. 9 Testimony of Dr. Mike Puisis at 157:1-158:7; *see also, e.g.*, PX 6 (Patients # 6, 7, 11, 13, 17, 46); PX 28 (Patients # 51, 53, 54, 55).

patients had echocardiograms performed but not sent with the patient to the cardiologist, delaying treatment for serious cardiovascular conditions.[858]

266. Fourth, appointments are often canceled for patients who have disabilities requiring transport in a handicap-accessible vehicle, due to the unavailability or unusability of Angola's handicapped van. When the van is unavailable, inmates must either travel in a regular, ill-equipped van or reschedule their appointment.[859] Given that UMC, the primary location for specialty care, is approximately 150 miles away—a four- to five-hour drive each way—this places patients with disabilities in a Hobson's choice: undergo a dangerous, likely painful journey in an inappropriate vehicle, or delay the appointment indefinitely.[860]

267. All these problems combine to create "significant delays in obtaining specialty care."[861]

        ii.    Failure to follow up on specialty care and timely implement specialists' recommendations

268. When specialty consultations, procedures at outside facilities, or hospitalizations occur, patients frequently return with recommendations for medication or particular treatment plans. As Dr. Puisis explained, communication between specialists and primary care physicians is "critical" because "the doctor who is sending the patient to the specialist needs to review the specialty note, the entire note, but paying attention to the assessments and recommendations so that the care can be continuous and without interruption."[862] The referring physician also needs to "understand the recommendations so that the doctor can integrate that care into the care of the patient, because some drugs that might be prescribed might interact with drugs the patient is already on. Some recommendations may have already been done. And there needs to be coordination. So it's critical that the provider who refers needs to be in communication with the specialist."[863]

269. At LSP, however, Defendants' providers rarely maintain any continuity of care between these recommendations and patients' ongoing care. As Dr. Puisis summarized:

It's really awful. … [T]he Trip Office at Angola, those nurses, in my opinion, act more as the primary care doctor than the doctor himself or herself. And that Trip Office nurse is actually the intermediary between the specialists and the primary care doctor, and the primary care doctors are almost uninvolved. They make a referral,

---

[858] PX 6 at 0139-52 (Patient #13); *id.* at 0076, 117-26 (Patient #6); PX 410 at 0001 (Patient #51).
[859] *See* Oct. 15 Testimony of Danny Prince at 103:4-8.
[860] PX 6 at 0073; *see also, e.g.,* JX 4-l, J. Marsh Depo. at 52:7-20 (describing use of shackling during medical trips); JX 4-e, T. Clarke Depo. at 79:24-80:10 (describing returning from UMC in the back of a police car); *see also, e.g.,* JX 10-g at 07712 (Patient #41 refusing transport for medical care because Defendants could not or would not transport him with his oxygen supply).
[861] Oct. 9 Testimony of Mike Puisis at 158:24-25.
[862] *Id.* at 156:6-13.
[863] *Id.* at 156:14-23.

and that's pretty much the end of the story, at least what's documented in the record. …

[I]nformation back and forth, there's a system error and it is … profound is all I can say, because we saw it multiple, multiple times. It results in significant delays, tests not happening. It resulted in morbidity and so forth, and it's a breakdown. The communication between the provider and the specialist is not good. And there's very little evidence on any record we reviewed of the [LSP doctor] documenting a review of the consultation and acknowledgement in the documentation that they understood the recommendations and the plan of the consultant. … [A]nd that had effects on people, significant effects.[864]

270.    In most cases, "the doctors do not appear to be involved in managing specialty care at all."[865] It is often unclear whether a provider reviewed the results of the consultation at all, and "there is seldom a physician visit after an off-site visit (either hospitalization or specialty consultation) to address any change in plan based on the hospitalization or off-site consultation."[866] Patients' records at Angola seldom include the "[c]ompleted consultation requests," making it "difficult to determine what occurred at the consultation."[867] In all, the record suggests "that LSP providers [do not] review consultation or hospital discharge summary reports in order to synchronize their primary care efforts with efforts of the specialists."[868]

271.    As a result, the care that patients receive from specialists often goes without any follow-up. This undermines the purpose of sending patients to outside providers by leaving patients without follow-up, sometimes even after surgical procedures that require post-operative care. Follow-up appointments made by providers often do not occur, or, if they do, diagnostic studies that were requested by the consultant prior to follow up do not occur. This leads to ineffective appointments, as discussed in the previous section.[869]

272.    This tracks closely with the experience of UMC doctors, who testified that their recommendations for follow-up specialty treatment are frequently ignored by Angola providers; that follow-up appointments with specialists routinely do not occur; and that prescribed specialty treatments and medications are often not administered.

273.    For example, Dr. Catherine Jones testified that in order to follow the relevant standard of care, she routinely prescribes follow-up specialty care for Angola patients with a range of

---

[864] Oct. 9 Testimony of Mike Puisis at 157:22-158:6; *see also* PX 6 at 0074-75.
[865] PX 6 at 0074.
[866] *Id.*
[867] *Id.*
[868] *Id.*
[869] *Id.* at 0074-75.

serious conditions, including HIV, Hepatitis C, infectious diseases, and cancer.[870] Yet, in Dr. Jones's experience, it is not uncommon for her to learn that her Angola patients have not received that prescribed specialty treatment, such as seeing an oncologist.[871] As one example, Dr. Jones described a patient who, while incarcerated at Angola, had not received timely diagnosis and treatment for an aggressive form of squamous cell carcinoma.[872] Upon discharge from UMC, the patient was prescribed follow-up care with UMC oncologists, but these follow-up appointments did not occur.[873] Eventually, the patient was re-admitted to UMC with an even more advanced stage of illness and ultimately died.[874]

274. In addition, both Dr. Jones and Dr. Dhand testified that their Angola patients do not receive necessary prescribed medications and treatment upon discharge. For example, Dr. Dhand testified that Angola prohibits patients from receiving opioids for conditions such as cancer and sickle-cell disease notwithstanding the fact that they may be the most effective treatment for pain.[875] Dr. Jones likewise testified that when she prescribes her Angola patients physical therapy upon discharge, those orders are also ignored.[876]

275. Both of these categories of problems are illustrated in many of the case studies already described, as are their consequent harms. Additional examples include:

   a. Numerous patients exhibited an identical pattern of delayed cancer diagnosis due to the failure to consult specialists, follow specialists' recommendations, take adequate

---

[870] Oct. 11 Testimony of Catherine Jones at 123:14-126:3.

[871] *Id.* at 126:7-127:23.

[872] *Id.* at 123:1-7.

[873] *Id.* at 123:8-13.

[874] *Id.*

[875] Oct. 11 Testimony of Monica Dhand at 166:4-167:6.

[876] Oct. 11 Testimony of Catherine Jones at 137:5-9; *accord, e.g.,* Oct. 9 Testimony of Farrell Sampier at 49:11-19 (describing how his physical therapy was discontinued and he had to continue it on his own); *id.* 60:19-61:24 (describing how he only interacted a few times with the physical therapist); *id.* at 86:23-87:18 (explaining that the only therapy he has gotten for his legs was from a friend, not a physical therapist); *id.* at 90:6-8 (he went through "a lot of red tape" to get physical therapy); Oct. 12 Testimony of Francis Brauner at 87:6-22 (describing how more physical therapy could have helped him prevent the total paralysis of his lower body); JX 4-d, C. Butler Depo. at 15:16-19 (explaining that he received limited physical therapy for a fractured clavicle, but not for his osteoarthritis); JX 4-e, T. Clarke Depo. at 42:21-23 (clarifying that he did not receive physical therapy for his back condition, which prevented him from being able to walk); JX 4-j, M. Johnson Depo. at 40:1-10 (explaining that he did not receive physical therapy for his lower back injury for at least five years); *id.* at 40:19-25 (feels he needs more physical therapy); JX 4-n, M. Murray Depo. at 67:9-68:5 (waited six months to a year for physical therapy and then was only allowed a dozen treatments); JX 4-r, M. Tarver Depo. at 12:21-13:3 (twice was prescribed, and did not receive, physical therapy following rotator repair surgery on his right shoulder).

history, perform physical examinations, provide indicated diagnostic tests, or follow up on troubling test results, including:

    i.    Patient #5 complained for two years of weight loss and abdominal pain so severe he became unable to walk; only once he was hospitalized due to an emergent crisis was his colon cancer diagnosed.[877]

    ii.    Patient #7 showed two lung nodules on a June 2012 X-ray.[878] A follow-up CT scan was delayed for four months and showed a mass suspicious for cancer.[879] A delayed pulmonology consultation four months later recommended a biopsy, but Defendants failed to send the patient for a biopsy.[880] Another pulmonology consultation six months later again recommended an "[i]mmediate" biopsy.[881] By the time Defendants sent him for a biopsy a month later, in October 2013—15 months after the initial X-ray[882]—his lung cancer had advanced to the point that doctors performed a lobectomy immediately instead of merely biopsying the lung.[883] Defendants then failed to follow up upon the patient's return until a specialist called in November 2013 to ensure he was referred to an oncologist; by the time the consultation was scheduled to occur, in January 2014—three months after the confirmation of a cancer so advanced he received an immediate lobectomy—the patient had died.[884]

    iii.    Patient #17, who had previously undergone chemotherapy for leukemia, showed a suspicious lung nodule on a CT scan in May 2012.[885] An oncologist and pulmonologist both recognized it as possibly malignant and recommended follow-up diagnostics on multiple occasions, but Defendant never performed these tests.[886] From October 2012 through November 2013, the patient complained repeatedly of chest pain and leg pain without receiving a physician evaluation, even though he deteriorated to the point that he needed a

---

[877] PX 6 at 0075-76, 112-17.

[878] Oct. 9 Testimony of Mike Puisis at 159:1-14; *see generally* PX 6 at 0076-77, 126-31; JX 10-b.

[879] Oct. 9 Testimony of Mike Puisis at 160:10-20.

[880] *Id.* at 160-61; JX 10-b at 002651-52.

[881] Oct. 9 Testimony of Mike Puisis at 161:25-163:6; JX 10-b at 002601.

[882] *Compare* Oct. 9 Testimony of Mike Puisis at 159:10-14 ("[I]f I saw a patient who had a mass suspicious for malignancy, I would proceed immediately to get a CT scan within a week or two, and if the mass was evident on the CT scan, I would be referring that person for a biopsy to a pulmonologist as soon as possible.").

[883] Oct. 9 Testimony of Mike Puisis at 163:11-164:4.

[884] *Id.* at 164:5-166:3 (describing the three-month follow-up as "not particularly timely").

[885] PX 6 at 0078, 193; *see generally* JX 10-n.

[886] *Id.* at 0078.

wheelchair for ambulation.[887] His metastasized cancer was not acknowledged until November 2013; he died two months later.[888]

    iv.   Named Plaintiffs Joe Lewis and Shannon Hurd experienced an indistinguishable delay in diagnosis, despite making numerous sick calls.[889] Mr. Lewis complained of cough, hoarseness, and losing his voice for 33 months beginning in April 2012, explicitly stating on a February 2014 sick call form that "I have a history in my family of cancer,"[890] but Defendants did not refer him to an ENT specialist until November 2014, and he did not see a specialist until January 2015.[891] Mr. Hurd, as discussed in detail elsewhere, made dozens of sick call requests for symptoms of renal cell carcinoma between September 2013 and September 2015, but did not receive a CT scan until December 2015—and even when that scan showed a large renal mass with multiple lung nodules, physicians failed to follow up for nearly a month.[892]

    b.   An aortogram was requested for <u>Patient #13</u> on Nov. 20, 2013, but it was not performed until almost 10 months later, on Sept. 11, 2014. The patient was hospitalized for a heart attack, and Defendants did not review the hospital record or note the recommendations of the hospital physicians. Defendants failed to follow up after this hospitalization and failed to manage the patient appropriately, as Plaintiffs' experts noted, "resulting in heart failure requiring another hospitalization." After the patient returned from the hospital, Defendants failed to review the hospital discharge records. A cardiologist requested an echocardiogram on about Jan. 29, 2015, which was done, but it was not reviewed by Defendants; the recommendation wasn't documented as needed by the cardiologist, and it was not sent with the patient at a follow-up cardiology visit on May 7, 2015. The cardiologist again recommended an echocardiogram, and again it was performed but not reviewed by Defendants. Again the patient went to the cardiologist without the echocardiogram result, causing another request for an echocardiogram on Sept. 23, 2015. Consequently, the cardiologist was unable to assist in the management of the patient; between January and September of 2015, the patient was hospitalized twice for heart failure. As Plaintiffs' experts explained, "The failure to coordinate specialty care contributed to the harm to the patient."[893]

---

[887] *Id.* at 0078, 87, 194-96.

[888] *Id.* at 78, 87, 196-99.

[889] *See supra* ¶ 211.

[890] JX 10-gg-1 at 31263.

[891] PX 28 at 0017-18.

[892] *Id.* at 18-22; *see supra* ¶ 141.

[893] PX 6 at 0075; *see also id.* at 0162-74; Oct. 9 Testimony of Mike Puisis at 139:11-152:19.

c.   Patient #6 had hypertension and significant cardiac arrhythmia. The patient was evaluated by outside cardiologists, but "communication with consultants was poor and ineffective in describing the condition of the patient," Plaintiffs' experts found.[894] In 2013, a cardiology consultant recommended an echocardiogram and an event recorder test. The echocardiogram was done, but the event recorder was not. Because of this, the patient's atrial fibrillation was not treated with anticoagulation, as it should have been. Two years later, in April 2015, the patient developed another episode of atrial fibrillation and was hospitalized. During this hospitalization, the patient was anticoagulated at the hospital. When the patient returned to Angola, defendants did not evaluate the patient, and the patient failed to receive recommended anticoagulation for approximately 10 days. Within four days of returning to Angola, the patient developed critical symptoms. Instead of sending the patient to a hospital, Defendants ordered a next day follow-up. The patient then developed signs of serious heart failure. Instead of hospitalizing the patient, Defendants treated the patient on the infirmary without the benefit of diagnostic testing. For four more days the patient remained on the infirmary with poor and inadequate history and physical examinations. The anticoagulation was finally started, but the patient failed to improve, and he died. Plaintiffs' experts found the death was preventable, and it "was caused by lack of recognition of the need for anticoagulation over a two-year period and, finally, a lack of providing ordered anticoagulation medication for 10 days due to lack of review and acting on consultant recommendations."[895]

d.   Patient #7 developed an abnormal chest x-ray showing a mass suspicious for cancer. The patient was referred to a pulmonologist, who requested repeatedly that Defendants order a pulmonary function test and biopsy. The patient returned to the pulmonologist three times without the tests being done. The patient had lung cancer, but his diagnosis "was delayed for over a year and a half because of lack of coordination of specialty care," Plaintiffs' experts found.[896] Defendants who saw the patient failed to take adequate histories, failed to perform adequate physical examinations, and failed to review or acknowledge specialists' requests. After being diagnosed with lung cancer at a hospital, the patient returned to Angola, where his lung cancer was not recognized or acknowledged for weeks. Defendants who evaluated the patient failed to take adequate histories, failed to perform adequate physical examinations, and failed to coordinate follow up oncology care. Within approximately seven weeks after returning to the prison, the patient was sent to the hospital, where he died. As Plaintiffs' experts explained, "The lack of adequate provider care contributed to this patient's death."[897]

---

[894] PX 6 at 0076.
[895] PX 6 at 0076.
[896] *Id.* at 0077.
[897] *Id.*

e. Lab results for <u>Patient #10</u> indicated potentially life-threatening obstructive jaundice. A CT scan showed a mass in the pancreas. Instead of sending the patient to a hospital for a biopsy and to address the jaundice with a stent, Defendants kept him on the infirmary. The patient developed fever. Defendants told the patient the he had a poor prognosis and recommended palliative care before a diagnosis was made. The patient was discharged from the infirmary and was not sent to a hospital for over a month. As Plaintiffs' experts explained, the delay in definitive biopsy and treatment "was a significant departure from standard of care."[898] At the hospital, the patient's pancreatic cancer was diagnosed; Defendants placed him on the infirmary when he returned to Angola. Defendants seldom took a history or performed a physical examination, did not coordinate a follow up with an oncologist, failed to monitor the patient's condition, and did not review the hospital care. Defendants failed to take histories, perform physical examinations, monitor the patient's progress, or otherwise coordinate oncology care. After the patient developed hypotension, he was evaluated in the ATU, transferred to a hospital and died in the emergency room. As Plaintiffs' experts explained, Defendants "showed a lack of concern for this patient and appeared to promote a terminal prognosis and delay care before the patient had an adequate chance at treatment."[899]

f. <u>Patient #53</u>, who had had a heart valve replacement and chronically sub-therapeutic levels of anticoagulants, was on Tegretol, an anticonvulsant medication for which he had no documented indication.[900] A cardiologist pointed out the lack of indication for Tegretol in 2016, but this was never reviewed by physicians, leading the patient to remain on Tegretol for at least three more months.[901]

g. <u>Patient #51</u> suffers from, among other problems, COPD. While he has been followed by a pulmonologist, from July 2015 to July 2016 there is no evidence that his pulmonary consultation or the results of a diagnostic pulmonary function test were integrated into LSP providers' care, or even reviewed by an LSP provider.[902] His history, follow-up tests, and examinations lacked numerous indicated steps for monitoring and assessment of his COPD.[903]

h. <u>Patient #54</u> experienced numerous delays in seeing specialists and receiving the care they recommended between 2013 and 2016.[904] For example, ablation of the patient's atrial fibrillation was delayed by over a year, due to failures to schedule the patient for procedures, failure to provide echocardiogram results to the cardiologist, and

---

[898] *Id.*
[899] *Id.* at 0077.
[900] PX 410 at 3-4.
[901] *Id.* at 4; *see* JX 10-y-1 at 21012; JX 10-y-3 at 21377.
[902] PX 410 at 4.
[903] *Id.* at 4-5.
[904] *Id.* at 1-2.

failure to address the cardiologist's recommendations.[905] After the ablation, due to LSP providers' failure to document the cardiologist's recommendations, LSP physicians erroneously continued the patient on a blood thinner for a year, placing him at significant risk of stroke, hemorrhage, and other side effects.[906]

i.   Patient #55, who had suffered from undiagnosed ulcerative colitis for at least three years, was belatedly referred to a gastroenterologist in July 2015.[907] The gastroenterologist recommended a colonoscopy, which did not occur until July 2016, a full year later.[908] A biopsy indicated ulcerative colitis, consistent with the patient's years of symptoms, but as of the end of the medical records there was no follow-up by LSP physicians.[909]

j.   Otto Barrera testified at trial regarding the significant delays in surgery that he experienced since arriving at Angola in 2013. Mr. Barrera had been told by surgeons before he was incarcerated that he needed reconstructive surgery of his jaw, tongue, and teeth—roughly five years of surgery altogether.[910] At that time, he was feeding himself through a pec tube and hardly able to speak or take his medication due to his injuries.[911] For the next two years, Mr. Barrera was housed on the hospital ward, where he had some teeth pulled by the on-site dentist and by the providers at LSU dental.[912] A team of maxillofacial providers at LSU informed him again that he needed reconstructive surgery in 2015, but he was told by the doctor at Angola that it would not be approved because it was a cosmetic surgery.[913] In January 2016, LSP Nurse Practitioner Cindy Park acknowledged that he had been "lost to follow-up" since early 2014.[914] As of September of 2016, Mr. Barrera had yet to receive any surgery.[915]

---

[905] *Id.*

[906] *Id.* at 5.

[907] *Id.* at 4

[908] *Id.*

[909] *Id.*

[910] Oct. 12 Testimony of Otto Barrera at 207:7-14; *see also* PX 245-b (collecting photographs of Mr. Barrera's injuries).

[911] Oct. 12 Testimony of Otto Barrera at 206:1-207:22, 225:5-18, 229:5-19.

[912] *Id.* at 216:18-217:2.

[913] *Id.* at 217:3-219:22; Oct. 15 Testimony of Otto Barrera at 31:10-25.

[914] JX 10-d-2 at 4063.

[915] Oct. 15 Testimony of Otto Barrera at 25-21:4.

276. In addition to the evidence cited above, there are numerous email communications between defendants that reflect the same disregard for the access to and recommendations of specialists.[916]

277. On the whole, the record amply supported Plaintiffs' experts' conclusion that specialty services are "not timely. There's a significant lack of coordination between the primary care physicians at LSP and the specialists. Specialty recommendations are not reviewed. There's no documentation of the reports, and the coordination of care is very poor and results in morbidity and possibly even mortality.[917]

### c. Inadequate Inpatient Care

#### i. Inadequate provider care in infirmary.

278. Correctional facilities must "house people in the appropriate setting based on their condition, and when they can't be housed in general population, they should be moved up to a higher level of care."[918] Typically, the level above general population is specialized medical housing, followed by infirmary care, which is a step below a skilled nursing unit or hospital.[919]

279. Dr. Puisis laid out the standards for infirmary care:

> [T]he first thing is to make sure that the patient is housed appropriately so that the assignment of the patient is in the right place. So not placing people in the infirmary who should be in a hospital or not placing people in general population that need to be in an infirmary. So as a result, most correctional systems have criteria that define who should be admitted to their infirmary because they have a general sense … of what conditions can be cared for on the infirmary. So that's fundamental.

---

[916] See e.g. PX 8 ( Medical Director of DOC is "fine to cancel any surgery which is not absolutely necessary" despite specialist recommendation); PX 197 (Headquarters staff concerned about too many echocardiograms being ordered and advise that Statewide Medical Director counsel doctor on "medically necessary"); PX 25 and 26 (Headquarters stopping all colonoscopies); PX 114 (Eceptionist causing delays in diagnosis); PX 214 (denial of hernia surgery); PX 201 (Dr. Roundtree complaining about expensive tests ordered by new specialists); PX 284 (Statewide Medical Director advising staff not to acknowledge resource limitations in language around denial of care); PX 314 (provider advising Dr. Singh not send patients to them if they cannot afford the surgeries); PX 158 (showing DOC and LSP doctors changing specialist recommendations); JX 27 (LSP doctors changing specialist recommendation); JX 124 (Statewide Medical Director changing specialist recommendations); DX 367 at 04275 ("This cost conscious system will . . . avoid non-medically necessary care.").
[917] Oct. 9 Testimony of Mike Puisis at 166:7-17.
[918] *Id.* at 168:2-13.
[919] *Id.*

And then beyond that, the infirmary unit they have should be able to satisfy the requirements of the patient, whatever that is. If the requirements exceed the capacity of the infirmary, the patient should be sent to a higher level of care.[920]

280. Angola provides care to patients with acute or long-term nursing needs in its two infirmary units, Nursing Unit 1 and Nursing Unit 2. The two units house the highest-acuity patients among all Class members, including both patients with high-level disabilities and severe ongoing medical needs.[921]

281. Given the acuity of patients in the Nursing Units, regular provider and nursing rounds is crucial, as is the presence of a qualified health care professional who can see or hear patients at all times. But as with the rest of Angola's medical system, the Nursing Units are understaffed: Nursing Unit 2 is managed by a nurse practitioner who also oversees more than 1000 other patients, while Nursing Unit 1 is visited irregularly by providers responsible for patients from their housing units.[922] As a result, "providers on the infirmary seldom take adequate history and seldom perform physical examinations appropriate for the patient's condition. Laboratory and other diagnostic testing are seldom integrated into the care of the patient. Providers fail to properly manage patients [in ways] that cause harm, including managing patients in the infirmary that should be sent to the hospital."[923] Providers write only "episodic notes" that generally do not "identify all of the patient's problems," resulting in "less than adequate" care for patients with intensive medical needs.[924] Indeed, physicians often gave opinions over the phone rather than seeing patients, as they do in the emergency room.[925]

282. Defendants also treat patients in the infirmary when they should be hospitalized.[926] As shown below, this contributed to numerous potentially preventable deaths.

283. These failings were amply documented in the medical records and the expert testimony. Among the many examples of the substandard, often fatal care this produces:

---

[920] *Id.* at 168:16-169:4.
[921] PX 6 at 0080.
[922] *Id.* at 0017; *see also* Oct. 9 Testimony of Farrell Sampier at 67:6-14 (testifying that he is not regularly examined by doctors "unless something happen(s)"); *id.* at 91:14-23 (testifying that if the nurses are not passing out medication or doing dressing changes, they are in their office at the far end of the ward).
[923] PX 6 at 0082.
[924] Oct. 9 Testimony of Mike Puisis at 174:1-18.
[925] *Id.* at 186:7-187:1.
[926] *Id.* at 194:11-20.

a.  Patient #3 had diabetes, peripheral vascular disease, coronary artery disease, hypertension and Hepatitis C.[927] After two years of uncontrolled diabetes that required bilateral above-the-knee amputations, one of his stumps developed an eschar (external dead tissue) and became ecchymotic (cold and dark), a life-threatening danger that indicates severely compromised vascular circulation.[928] Rather than admitting him to the hospital, he remained in his housing unit for several weeks, before being admitted to the infirmary.[929] In the infirmary, his circulation was allowed to deteriorate for three more weeks without appropriate history, physical exam, or diagnostic tests, and without the eschar removed.[930] He was not sent to a hospital until he went into shock, at which point the hospital performed emergency surgery and discovered that the dead tissue now stretched from his stumps just above the knee to the perineum—an extent of dead tissue Dr. Puisis said he had never encountered—leaving the patient beyond saving.[931]

b.  Patient #39, an immunocompromised patient with a history of congestive heart failure and diabetes, was admitted to the infirmary on July 20, 2011 with a 103.6° fever and altered mental status, and placed in a "locked room" with the "hatch up."[932] After Dr. Lavespere noted that a nurse reported the patient masturbating on July 21 (a fact that Defendants elicited at trial for no clear reason[933]), doctors stopped visiting the patient altogether, doing nothing more than writing a one-line note claiming to have reviewed his chart (always at the exact same time each day) for the next three days, before discharging him to his housing unit on the fourth day.[934] Two days after discharge, the patient was found laying on the floor of his cell and vomiting; Dr. Lavespere ordered EMTs not to take him out of his cell for medical care that morning, and Dr. MacMurdo followed suit that evening.[935] The patient died the next morning.[936]

c.  Following multiple unaddressed positive tests for HIV, Patient #18 was admitted to the infirmary (rather than a hospital) with pneumocystis pneumonia and life-

---

[927] *See* Oct. 9 Testimony of Mike Puisis at 184:5-194:2; PX 6 at 0095; JX 10-aaa at 54042, 55094-95, 54970-71.

[928] Oct. 9 Testimony of Mike Puisis at 187:11-188:19.

[929] *Id.* at 188:19-189:13.

[930] *Id.* at 190:1-191:25.

[931] *Id.* at 193:1-194:20.

[932] JX 10-ii-1 at 36661, 36666; Oct. 16 Testimony of Susi Vassallo at 118:1-24.

[933] Oct. 16 Testimony of Susi Vassallo at 79:25-80:11.

[934] JX 10-ii-1 at 36664; *see* Oct. 16 Testimony of Susi Vassallo at 116:14-117:11.

[935] PX 6 at 0063; JX 10-ii-1 at 34748-49.

[936] PX 233 at 0112.

threatening abnormal vital signs on December 2, 2013.[937] Defendants then waited four days to start the patient on antiretroviral therapy.[938] Doctors then failed to make rounds for the next four days, and nurses took vital signs only once daily.[939] Even on the infirmary and with new prescriptions for life-threatening complications, Defendants failed to provide his antibiotics or antiretroviral medications two days after starting them.[940] Less than a week after starting antiretroviral therapy, the patient recorded a 101° fever at 6:00 in the morning, but nurses did not take his vital signs again for more than 24 hours.[941] The patient deteriorated in the infirmary and was finally hospitalized on December 13, 2013, and died a month later.[942]

d.  In December 2014, <u>Patient #11</u> was admitted to the infirmary after undergoing a partial colectomy (removal of part of the colon) due to Defendants' failure to properly treat his Crohn's disease.[943] The infirmary admission note did not include any history, physical examination, or follow-up plan.[944] From December 2014 through his discharge in April 2015, providers rarely took history, performed adequate physical examinations, or documented a treatment plan for the patient, and failed to provide indicated immunosuppressive therapy, nor did they provide a consultation with a gastroenterologist.[945] This likely resulted in "more episodes of fistula than necessary," which "leads to complications; it can lead to infections; it can lead to necessity for surgery and other pathology."[946]

e.  On April 25, 2015, <u>Patient #6</u> was hospitalized for atrial fibrillation and placed on anticoagulants.[947] When he returned to LSP, he was not evaluated by a physician and did not received any anticoagulation, despite a specialist's prescription.[948] Within several days, he developed critical symptoms of serious heart failure, but was sent to the infirmary instead of a hospital and denied necessary diagnostic tests.[949] Even on

---

[937] PX 6 at 0039; Oct. 16 Testimony of Madeleine LaMarre at 178:3-181:16; *see, e.g., id.* at 181:17-20 ("[H]e was so acutely ill and his vital signs unstable, it really raises the question as to that he should have been sent to the hospital then.").

[938] PX 6 at 0039-40; Oct. 16 Testimony of Madeleine LaMarre at 181:20-21.

[939] PX 6 at 0084.

[940] *Id.* at 0084; Oct. 16 Testimony of Madeleine LaMarre at 172:11-22; JX 10-jj at 39498.

[941] PX 6 at 0084.

[942] *Id.*

[943] PX 6 at 0045, 146; *see supra* ¶ 254 (describing failure to provide access to a gastroenterologist or appropriate medication); *see generally* Oct. 9 Testimony of Mike Puisis at 133:6-139:9; JX 10-r.

[944] PX 6 at 0146.

[945] *Id.* at 0146-51, 155.

[946] Oct. 9 Testimony of Mike Puisis at 138:7-139:9.

[947] PX 6 at 0122.

[948] *Id.*

[949] *Id.* at 0122-23

the infirmary, he was not started on anticoagulants for another day.[950] For four days, he remained on the infirmary with inadequate history and physical examinations.[951] He failed to improve once Defendants belatedly started anticoagulants, and died soon thereafter.[952]

ii. Inappropriate nursing, orderly, and custody practices in nursing unit

284. In addition to lacking sufficient provider care, the infirmary units lack sufficient nurses to properly attend to the patients. This produces numerous problems that deprive Class members of adequate medical care and increase their risk of serious harm.

285. First, due to the scarcity of nurses in the nursing units, major components of nursing care are provided by inmates themselves. Inmate orderlies clean, bathe, dress, feed, and position patients,[953] performing what even Dr. Thomas acknowledges are activities of daily living.[954]

286. NCCHC standards are explicit that inmates should not assist patients with activities of daily living in infirmaries.[955] Dr. Puisis explained the reasoning for this prohibition at length.[956] Giving inmate workers control over how and when patients with serious medical needs are cleaned, bathed, and positioned puts those patients at substantial risk of neglect and inadvertent or intentional mistreatment. Improper cleaning can lead to infections; improper positioning can lead to dangerous decubitus bed sores.[957] It also poses a high risk of abuse, as Nurse Falgout acknowledged.[958] Indeed, Defendants' own nursing expert admitted that this use of inmate orderlies is "not always the best thing."[959]

287. Moreover, inmate orderlies are not actively supervised by registered nurses, but rather security staff. Security staff alone select healthcare orderlies, even though DOC's policy

---

[950] Id. a 0126.
[951] Id.
[952] Id.
[953] JX 4-ll, K. Hart Depo. at 50:1-53:19 (acknowledging that nurses rely on orderlies to change diapers, turn patients, assist with hygiene); JX 4-uu, C. Park Depo. at 90:15-22 (same).
[954] Oct. 23 Testimony of David Thomas at 29:6-7, 87:2-7.
[955] PX 243 at 0064-65.
[956] Oct. 9 Testimony of Mike Puisis at 175:4-176:11.
[957] PX 6 at 0080-81.
[958] JX 4-ii, T. Falgout Depo. at 27:25-28:8; see also, e.g., id. at 33:22-9 ("That's why I'm continually training [new orderlies], because we do have that percentage of guys who don't play by the rules. They have an infraction. They get taken out of the program, so I'm training new ones to follow up.").
[959] Oct. 23 Testimony of Jacqueline Moore at 161:12-19.

requires a board of security and medical staff to select orderlies.[960] The custody department is responsible for determining showering and hygiene even for patients who cannot move and require total care. But given the medical needs and heightened vulnerability of these patients, "clinical staff must determine the frequency of showers and hygiene needs" to ensure that patients are properly cared for.[961]

288. Plaintiff Farrell Sampier credibly testified about some of the consequences of this practice. He reported observing "aggressiveness" from orderlies and related that both he and at least one other patient were "almost dropped."[962] Because the orderlies are often "stressed" and overworked, patients often rely on other nursing unit patients for help.[963] He further testified that it is orderlies and not nurses who monitor patients on a day-to-day basis and respond to problems in the unit.[964] Former Class member Frances Brauner credibly testified that Defendants use orderlies even beyond activities of daily living, performing dressing changes on some patients.[965]

289. The overbroad nature of orderlies' use on the wards is confirmed by their training, which Ms. LaMarre explained is "essentially … training inmates to provide nursing care."[966] This training is an abridged certified nursing assistant ("CNA") training PowerPoint, which is not adapted to account for orderlies who have difficulty reading or other limitations understanding the presentation.[967] Along with the training, they have "hands-on" training that is principally provided by other orderlies, rather than nurses or other medical professionals.[968] Some orderlies start their duties even before they are trained, and they neither take a test after training nor undergo annual reviews.[969] This training does not comply

---

[960] *Compare* JX 8-k at 02688 (Nursing Service Policy 20) *with* JX 4-ii, T. Falgout Depo. at 17:23-25 (Warden Falgout testifying that security deals with staffing and assigning orderlies).

[961] PX 6 at 0082; *see also, e.g.*, JX 4-ii, T. Falgout Depo. at 17:23-24, 78:23-79:2 (security manages orderly staffing and whether it's safe to assign an inmate as a healthcare orderly); *id.* at 36:14-16 (Tracy Falgout, who runs the orderly program, is sometimes not on the nursing unit for two weeks at a time); JX 4-c, A. Brent Depo. at 83:12-85:24 (orderlies don't know who their supervisor is or who they should contact with concerns about patients).

[962] Oct. 9 Testimony of Farrell Sampier at 65:3-11.

[963] *Id.* at 65:5-66:2.

[964] *Id.* at 65:14-20.

[965] Oct. 12 Testimony of Frances Brauner at 98:5-9.

[966] Oct. 16 Testimony of Madeleine LaMarre at 161:9-12.

[967] Oct. 25 Testimony of Tracy Falgout at 40:5-10; JX 4-ii, T. Falgout Depo. at 21:25-22:3.

[968] JX 4-ii, T. Falgout Depo. at 31:1-16; At trial, Warden Falgout attempted to cabin the training to teaching tasks such as bed-making, but his Rule 30(b)(6) deposition testimony directly contradicts that characterization and is controlling here. *See* Oct. 25 Testimony of Tracy Falgout at 39:12-15.

[969] JX 4-ii, T. Falgout Depo. at 19:15-17, 30:13-17, 31:2-6, 33:6-9, 80:16-21.

even with Angola's own policies, which require orderlies to be trained annually and requires 24 hours of classroom training and 24 hours of clinical training.[970]

290.    Second, the nursing units contain several single-patient rooms, which have solid, locking doors, lack any call system to reach nurses, and cannot be seen or heard from the nursing station.[971] Some of these rooms are used for hospice patients or dialysis—but others are used to discipline patients in the nursing units.[972] Placing patients with severe disabilities or medical needs in locked cells with solid doors and no system for calling for help exposes them to severe risk.[973] For this reason, "a person with an infirmary-level illness should not be housed in a room that is not within sight or sound of a nurse."[974] For example, Kentrell Parker, who is quadriplegic and uses a tracheostomy tube to help with breathing, has been locked in an isolation room facing away from the door, with no way to summon help and no way to get attention if his tracheostomy tube becomes clogged.[975]

291.    Third, as discussed above with emergency care, providers obtain DNR orders as a substitute for providing actual therapeutic care.[976] For example, when named Plaintiff Farrell Sampier arrived in the infirmary with transverse myelitis, an LSP doctor presented him with a DNR order to sign and told him "in pretty much graphic detail how I would have to have some ribs cracked and a lung punctured [to be resuscitated], and he was like, are you sure that's what you want to do?"[977] As Dr. Puisis explained, this is doubly inappropriate: it is

---

[970] JX 6-eee at 6-00270 (annual training); JX 8-k at 02688 (24 hours of classroom training and 24 hours of clinical training); *compare* JX 4-ii, T. Falgout Depo. at 29:22-30:9 (classroom training lasts from eight to three for 2.5 days, with breaks for lunch, pill call, etc.; practical component has "really no time frame on it").

[971] JX 4-ll, Hart Depo. at 33:14-35:7 (acknowledging that isolation rooms lack monitoring); *id.* at 38:12-24 (claiming that nurses have no control over locked rooms in Nursing Unit 1); *id.* at 74:25-75:13 (acknowledging that on-duty nurse can't see all patients); Oct. 12 Testimony of Francis Brauner at 88:1-11.

[972] *See, e.g.,* Oct. 12 Testimony of Otto Barrera at 215:8-17 (describing being locked up in an isolation room with no reason given); JX 10-ii-1 at 36661, 36666 (showing Patient # 39 placed in a "locked room" with the "hatch up" when admitted to the infirmary with a 103.6° fever and altered mental status).

[973] *See* Oct. 12 Testimony of Francis Brauner at 88:21-89:10 (explaining that he developed sepsis after 30 days in an isolation cell with no of accessing the nurses).

[974] PX 6 at 0082; *see also* PX 243 at 0130 (NCCHC standard: "Patients are always within sight or hearing of a qualified healthcare professional.").

[975] PX 6 at 0081-82. Plaintiff Kentrell Parker is referred to as Patient #24 in the expert report, but is not considered part of the experts' judgment sample.

[976] *Id.* at 0080-82. Patient #23, referred to on these pages, is plaintiff Farrell Sampier. He is not considered part of the experts' judgment sample.

[977] Oct. 9 Testimony of Farrell Sampier at 55:2-21.

inappropriate to discuss a DNR order with a patient who doesn't have a terminal condition, nor is it proper to "frighten a patient" by giving worst-case scenarios about resuscitation.[978]

292. Similarly, there is evidence that Defendants use DNR orders as a gateway to serious pain medication, essentially forcing patients to choose between salving their pain and continuing life-sustaining measures. With Patient #31, for example, Defendants began discussing a DNR with him as he entered a critical and painful state of decompensation, and did not begin meaningful pain medication until after he had signed the order.[979]

293. Third, Defendants do not maintain sanitary conditions in the infirmaries. As already noted, custody, rather than medical staff, determines how and when the infirmaries will be cleaned. Nurses have described it as "a dire situation" in which "some of the beds are grossly dirty."[980] Multiple class members testified at trial that patients lie in their beds covered in urine and feces, and that discarded, used sanitary materials and dirty diapers are left strewn about their rooms.[981] There are "fly traps hanging from the ceiling, over people's bed where you had to eat."[982] The bathrooms, outfitted with only "a shower curtain for a door," are also covered in feces, urine, and blood. Used bandages are left around the tub and sink, which are "black from … them bathing patients and never getting cleaned."[983] Given the

---

[978] Oct. 9 Testimony of Mike Puisis at 179:5-180:16.

[979] *See, e.g.*, Oct. 16 Testimony of Susi Vassallo at 47:17-48:21, 106-07; *see also* Oct. 9 Testimony of Mike Puisis at 180:17-20 (not appropriate to make narcotic medication available only to patients who are on palliative or hospice care); Oct. 10 Testimony of Mike Puisis at 20:15-20 (same).

[980] PX 21 at 0001-02 (RN Manager Karen Hart to Sherwood Poret, July 18, 2014: "I'm sorry to bring this up again, but it is an ongoing concern of mine and the nurses. The units, especially Unit 2 is not kept as clean as a nursing unit should be. Why is that? … Maybe the orderlies are not trained to clean every surface, because whoever is training them does not know. Or maybe the orderlies just don't want to and security doesn't make them because they don't know to make them … . On Nursing Unit 2 some of the beds are grossly dirty. … [T]o me it is bad. I would like for it to be as clean as a hospital and I think it should be."); PX 11 at 0002-03 (Hart to Poret, Nov. 12, 2014: "This is a dire situation. … The units could and should be a lot cleaner."). Defendants had been on notice for many years at this point that the staffing levels were inadequate and created a risk for patients. *See* PX 67 (Dr. Singh noting the inadequacy of staffing and the risks that it created in 2010); PX 147 (nursing director describing understaffing in 2010).

[981] Oct. 9, 2018 Testimony of Farrell Sampier at 46:9-16; Oct. 12, 2018 Testimony of Francis Brauner at 97:4-21.

[982] Oct. 12, 2018 Testimony of Francis Brauner at 97:8-10.

[983] *Id.*; s*ee also* Oct. 9 Testimony of Farrell Sampier at 46:9-16 ("But normally you gonna see guys that's been in feces for so many or in their urine… until the orderlies can get a chance to get to them. If a particular patient is getting cleaned, you know, guys are gonna throw their gloves, their dirty diapers, pads and whatnot on the floor. They might get called to another patient emergency and not have a chance to clean this up, and that was pretty common.").

heightened vulnerability of patients in the infirmaries, unsanitary conditions in the infirmaries place patients at a substantial risk of serious harm.

### iii.   Absence of care in the medical dormitories

294.   Finally, outside the infirmaries, many patients with serious medical needs or disabilities, but who do not need nursing care—or for whom there is simply no room in the infirmaries—are clustered in so-called "medical dormitories." These dormitories, however, are "no[] more suited to disabled men than … any other general population units," and are crowded and disorganized.[984] Indeed, Defendants themselves have acknowledged that the "medical dormitories" are actually "designed for general population" rather than being outfitted to provide services or treatment to individuals with disabilities or medical needs.[985]

295.   Medical staff do not make rounds of the medical dormitories; neither providers nor nurses visit the medical dormitories, and even medication administration is carried out by correctional officers.[986] The reality is that the healthcare orderlies in the medical dorms are relied upon to perform medical duties far beyond their very limited training and capacity.[987] Dr. Lavespere admitted as much when he testified in reference to the medical dorms that "orderlies tend to those patient's medical needs."[988] In Ash 2, there are only two to five orderlies per shift to assist approximately 43 sick and disabled patients, some of whom are completely incapacitated.[989] In addition to the assistance the orderlies provide the patients

---

[984] PX 6 at 0084.

[985] PX 15 at 0002 ("Louisiana State Penitentiary … [is] operating Medical Dorms in dormitories designed for general population."); *see also* Oct. 15 Testimony of Otto Barrera at 37:3-5 (responding, when asked if Ash 2 is an assisted living dorm by defense counsel, "I don't know where the assistance comes from."); Oct. 15 Testimony of Danny Prince at 99:6-22 (describing the extremely crowded conditions in Ash 2).

[986] JX 4-ii, T. Falgout Aug. Depo. at 12:22-13:15 (healthcare orderlies in medical dorms are not supervised by medical staff); Oct. 15 Testimony of Danny Prince at 98:20-24 (doctors and nurses don't come to Ash 2); JX 4-e, T. Clarke Depo. at 8:16-9:3 (there are no healthcare professionals of any kind in medical dormitory Ash 2 on a regular basis); JX 4-c, A. Brent Depo. at 40:24-41:18 (medical personnel deliver patients from infirmary to medical dormitory without telling orderlies what they need, what diet they should have, etc.); *id.* at 73:25-75:2 (doctors and nurses don't do rounds in medical dormitories, and patients aren't taken out regularly to see medical staff).

[987] Oct. 15 Testimony of Danny Prince at 98:6-19, 104:22-105:18, 116:19-117:2 (testifying that he began working as a healthcare orderly without receiving any training whatsoever, and later participated in a two-day class with Warden Tracy Falgout and a CPR class taught by other inmate orderlies); *id.* at 105:19-106:5 (explaining that he had never been given a job description or a list of the type of assistance he was or was not supposed to provide to his patients as a healthcare orderly, in violation of the ACA and NCCHC standards and Angola's own policies; *see infra* ¶ 286 and DX 467.

[988] Oct. 22 Testimony of Dr. Lavespere at 73:22-25.

[989] Oct. 15 Testimony of Danny Prince at 95:11-24, 96:6-9.

within the dorm—including feeding, bathing, and transferring them between their beds and wheelchairs—they are also tasked with transporting patients outside of the dorm, which often leaves them unable to meet the needs of other patients as they arise.[990] Further, the orderlies are supervised by security, which directly undermines the care they are able to provide.[991]

296.    In addition to being crowded and understaffed, the conditions in the medical dormitories are also unsanitary. Many of the patients are unable to clean up after themselves and the janitorial orderlies are only able to provide limited assistance.[992] The dormitories are also often dirty and moldy, particularly in the bathroom.[993] These "are not proper hygiene practices … to house very sick individuals."[994] In addition to the ADA violations discussed below, the medical dormitories present risks of developing infections or exacerbating injuries that subject Class members housed therein to the possibility of serious harm.[995]

f.    *Inadequate Medication Administration and Pharmacy Services*

297.    Angola's provision of medication is inadequate in both policy and practice. Defendants refuse to provide adequate pain medication; withhold treatment for hepatitis C; maintain a disorderly and unclean pharmacy that increases the risk of error and contamination; and use unqualified correctional officers to administer medication, leading to medication error, improper recordkeeping, and other serious consequences. All of these choices increase the risk of serious harm to Class members.

i.    Improper medication administration and medication administration records

298.    In a proper system of medication administration, medication is administered by persons properly trained and under the supervision of the health authority and facility or program administrator or designee. Proper medication administration procedure ensures that patients receive the "5 rights of medication administration": "the right medication[,] given to the right patient, at the right dose, by the right route at the right time." Consistent, accurate, and understandable records are kept, so that medical personnel can understand what medication

---

[990] *Id.* at 96:3-24, 98:6-19.
[991] *See, e.g., id.* at 97:15-98:5 (describing verbal and physical altercations between patients and orderlies).
[992] *Id.* at 99:23-100:9.
[993] Oct. 15 Testimony of Danny Prince at 99:23-100:9; JX 4-q, B. Prine Depo. at 76:14-78:15, 80:8-81:10; JX 4-n, M. Murray Depo. at 59:22-60:14.
[994] PX 6 at 0084.
[995] *Id.*

a given patient has taken, in what dose, and with what consistency.[996] LPNs or RNs should administer medication to ensure that "staff that administer medications have the adequate educational preparation and training to do what they are being asked to do."[997]

299.     Medication is a "high-risk area" in any healthcare setting, but LSP in particular has an "extraordinarily high volume and extraordinarily high potential for medication error."[998] Yet Defendants' medication administration system violates all of the requirements laid out above. Correctional officers and even inmate orderlies administer medication, leading to improper administration; pill call times are inconsistent and at improper times such as 3 a.m.; and medication administration records ("MARs") are demonstrably inaccurate and inadequate.[999]

300.     First, due to the shortage of nurses or other medical professional, LPNs administer medication only in the infirmary, the ATU, and some centralized pill call rooms.[1000] In the rest of the prison, correctional officers with no medical training deliver medication to the majority of patients, including in the so-called medical dormitories.[1001]

301.     While Defendants provide some training to correctional officers, the "level of training is simply inadequate for officers to safely administer medication to inmates" and "fails to meet NCCHC and ACA Standards."[1002] Tammi Willis, who supervised pill call and pill call training, confirmed the meager nature of pill call training. In 2015, when the case was filed, officers received just two hours of training.[1003] Ms. Willis then expanded training to five hours, including breaks and a multiple choice test.[1004] Even this expanded training included just 15 minutes apiece on numerous critical topics, such as "medication handling/proper use of punch cards," "medication measurements/dosing schedules," and "medication compliance/DOT."[1005] Defendants then planned to make the training even simpler and convert medical terms into "layman's terms" because corrections officers found the actual

---

[996] *Id.* at 0049, 51-52; Oct. 16 Trial Testimony of Madeleine LaMarre at 165; *see also* DX 3-a at 1910 (LSP medication training citing "6 Rights of Medication Administration," including the five above and "Right Documentation").

[997] Oct. 16 Trial Testimony of Madeleine LaMarre at 164:19-165:21; *see also* PX 243 at 0063 (NCCHC: healthcare staff should administer medication at facilities where healthcare staff are on site seven days a week for at least 16 hours a day).

[998] Oct. 16 Trial Testimony of Madeleine LaMarre at :163:13-164:11.

[999] PX 6 at 0049-51

[1000] PX 6 at 0049-50.

[1001] Oct. 24 Trial Testimony of Tammi Willis at 89:22-24 (confirming that LSP requires no medical training for pill call officers); PX 6 at 0049-50.

[1002] PX 6 at 0051.

[1003] Oct. 24 Trial Testimony of Tammi Willis at 90:3-25.

[1004] *Id.* at 90:21-91:20; *see* DX 3-a at 2070-71.

[1005] DX 3-a at 2070 (capitalization altered). "DOT" stands for "directly observed therapy," i.e., the distributing officer directly observing the patient taking the medication. *Id.* at 1908.

medical terminology confusing.[1006] While Defendants considered making this a 20-hour program, Ms. Willis testified that they ultimately gave a "more simplified" version that was only five hours.[1007] While training is conducted by a registered nurse and a pharmacist, the actual day-to-day administration of medication by correctional officers is overseen by other correctional officers.[1008]

302. Moreover, even if Defendants provided significantly more training, "correctional officers simply do not have the training to know medications and what they are for and what their side effects are, and they don't have the capacity to recognize if the pharmacy has filled a prescription that shouldn't be filled."[1009] This "creates a risk of harm to patients because officers are performing a function … that they do not have adequate knowledge for."[1010]

303. Plaintiffs' experts' concerns about using correctional officers with no medical training to administer medication are "validated by actual practice, showing that officers do not follow correct procedure and have no supervision by qualified health care professionals. This practice is dangerous and creates a systemic risk of harm to inmates at LSP."[1011] Officers do not use MARs to compare medications against what the patient was supposed to receive; do not sanitarily dispense medication; cannot answer questions about what medication was provided; and do not contemporaneously document administration to record what was given to each patient and when.[1012]

304. In the so-called medical dormitories, the situation is even worse. Correctional officers conduct pill call from one spot near the door to the dormitories. Because many patients in these dormitories have mobility or vision impairments, they may not be able to access the

---

[1006] Oct. 24 Trial Testimony of Tammi Willis at 91:21-93:6.

[1007] Id. at 93:17-22.

[1008] Id. at 96:13-18; see also JX 4-ddd, T. Willis Depo. at 11:20-12:2 (correctional officers' performance of pill call is overseen by other correctional officers).

[1009] Oct. 16 Trial Testimony of Madeleine LaMarre at 162:2-6.

[1010] Id. at 162:9-11.

[1011] PX 6 at 0051; see, e.g., Oct. 15 Testimony of Charles Butler at 65:20-67:9 (recounting an incident in which he was forced by pill officers to take all his medications for the day—15 to 18 different pills—before leaving Angola to work at DOC headquarters; lost consciousness and fell while hanging drywall eight feet off the ground; and was transported back to Angola in the back of a pick up truck, aggravating his fractured clavicle).

[1012] PX 6 at 0050-51; Oct. 16 Trial Testimony of Madeleine LaMarre at 162:21-23, 181:23-182:7; see also, e.g., JX 4-n, M. Murray Depo. at 56:19-24 (describing errors in medication administration); Oct. 15 Testimony of Charles Butler at 74:13-25 (describing problems refilling his medication and getting the wrong medication); Oct. 11 Testimony of Lawrence Jenkins at 189:11-190:11 (describing weeks-long periods of time in which he has not received refills for his blood pressure medication, despite the fact that he has chronic hypertension and is at risk for stroke); Oct. 15 Testimony of Danny Prince at 110:25-111:16 (describing incidents in which the pill call officer gave him the medication of another inmate with a similar name).

officers. Instead, Dr. Lavespere acknowledged, inmate orderlies deliver medication to these patients[1013] and "tend to those patients' medical needs."[1014] This prevents even correctional officers, even if properly trained, from ensuring that the five rights of medication administration are observed.[1015]

305.    Based on Plaintiffs' medical experts' observations, LPNs perform little better. LPNs do not always use MARs to determine what medication each patient is supposed to receive, and therefore do not ensure that the medication, dosage, and frequency match. Like correctional officers, LPNs do not contemporaneously document medication administration, instead waiting until after administration to recreate MARs from memory.[1016] "As LPNs may administer medications to more than 100 inmates, this renders MARs unreliable with respect to accuracy of medication administration."[1017] Defendants acknowledge that it is impossible to reliably record medication after distributing medication to dozens of patients.[1018]

306.    Predictably, this system of administration results in inconsistent receipt of medication and wholly inadequate and unreliable documentation.[1019] MARs document patients receiving medication in their housing units at times they were in a hospital or in the infirmary.[1020] They record medications that can only be given in person by a medical professional, such as IV antibiotics and nebulized treatments, as "keep-on-person" medications that are distributed to patients to take on their own.[1021] In one case, officers indicated on a written MAR that a patient received medication all month, but entered into the electronic MAR that the patient did not medication at all.[1022]

---

[1013] JX 4-qq, R. Lavespere Depo. at 40:23-41:12.

[1014] Oct. 22 Testimony of Randy Lavespere at 73:21-74:3.

[1015] PX 6 at 0051.

[1016] Id. at 0050; see also Oct. 16 Trial Testimony of Madeleine LaMarre at 162:21-23 ("[W]hat I observed is that actually neither the nurses nor the officers had the MAR present when they gave the medication which is a major risk to patients."); id. at 166:19-168:22.

[1017] PX 6 at 0050; see also, e.g., JX 4-zz, S. Poret Depo. at 51:16-53:4 (acknowledging that correctional officers do not complete MAR contemporaneously in cell blocks).

[1018] Oct. 24 Trial Testimony of Tammi Willis at 97:12-17; JX 4-ddd, T. Willis Depo. at 25:7-9 ("Q: Do they ever do it [at] the end of the whole— A. There is no way you can remember that."); id. at 26:2-5 ("Q: You said that's because they could not remember all of that? A. There is no way that they can. . . . They know they have to write it down . . . ."); JX 4, S. Poret Depo. at 52:16-25 (Mr. Poret testifying that it would be concerning if correctional officers weren't keeping notes and were just remembering who they had given pills to, because they might make mistakes); see also Oct. 24 Trial Testimony of Tammi Willis at 96:9-12 (officers may see hundreds of patients for pill call).

[1019] See Oct. 16 Trial Testimony of Madeleine LaMarre at 162:12-177:23.

[1020] PX 6 at 0052-53.

[1021] Id.

[1022] Oct. 16 Trial Testimony of Madeleine LaMarre at 168:16-22.

307.    In the most egregious example, Patient #18, medication administration records reported a patient who was acutely ill in the infirmary as simultaneously receiving medication in his housing unit and missing it in the infirmary.[1023] They then show the patient receiving an injectable controlled substance as a KOP medication in his housing unit while he was in an outside hospital.[1024] And they then show the patient receiving medication for several days after he dies in an outside hospital.[1025] While Defendants' counsel argued aggressively on cross-examination that the notation of daily administration was merely indicating the length of a KOP allotment,[1026] Ms. Willis directly refuted this assertion, explaining that KOP prescriptions are marked only on the day that they are given out and that completing a form the way Defendants' counsel suggested would require "reeducation."[1027]

308.    As Plaintiffs' experts summarized, "[t]his is essentially falsification of the health record" and shows that "LSP staff do not adhere to procedures to safely administer and document medication administration."[1028]

309.    As a result, "the program does not assure that patients get their medications."[1029] Moreover, health care providers cannot rely on the accuracy of MARs to make appropriate treatment decisions. Clinically appropriate provider decisions are based on knowing both the patient's current condition and the type, dosage, and consistency of medication the patient is currently taking. Without this information, providers cannot responsibly determine whether to increase or decrease dosage, add or subtract a medication, and the like.[1030]

310.    Similarly, when a patient appears to be noncompliant with their medication, clinically appropriate practice is for the provider to discuss obstacles to compliance with the patient, such as medication side effects, lack of understanding of the importance of the medication or the proper means to take it, or scheduling conflicts. This rarely happens, directly

---

[1023] *Id.* at 171:8-174:16; JX 10-jj at 39498, 39505.

[1024] Oct. 16 Trial Testimony of Madeleine LaMarre at 175:14-176:13; JX 10-jj at 39506.

[1025] Oct. 16 Trial Testimony of Madeleine LaMarre at 176-177:13; JX 10-jj at 39494.

[1026] Oct. 10 Trial Testimony of Mike Puisis at 159:9-160:4; Oct. 17 Trial Testimony of Madeleine LaMarre at 42:7-44:14.

[1027] Oct. 24 Trial Testimony of Tammi Willis at 100:17-101:1. This was not the only example of MARs showing medication administration after a patient's death. MARs stated that Patient #20 was a "no show" or "did not request" his medication for two weeks after his death. *See* PX 6 at 0226.

[1028] PX 6 at 0052-53; *see also* JX 4-ddd, T. Willis Depo. at 20:1-21:20, 22:7-23, 23:4-11, 24:2-25:1, 35:11-36:1 (acknowledging medication administration errors).

[1029] Oct. 16 Trial Testimony of Madeleine LaMarre at 183:3-4.

[1030] PX 6 at 0053; *see also* Oct. 16 Trial Testimony of Madeleine LaMarre at 160:16-161:1.

contributing to, among other things, the long-term uncontrolled states of many patients' chronic illnesses discussed above.[1031]

### ii. Refusal to provide adequate pain medication

311. Defendants maintain a policy that directly interferes with patients' ability to receive adequate pain medication. Patients can only receive narcotics at the REBTC—but many patients who need narcotic pain medication are not housed at the main prison, and have difficulty getting to the infirmary to receive it given the size of Angola and restrictions on travel. Being unable to get narcotics in general population is "an extreme barrier."[1032]

312. This denies Class members access to adequate medical care for severe pain and exposes them to needless suffering. For example, plaintiff Ian Cazenave has sickle cell disease, which produces chronic pain that, if not properly managed, can lead to leg ulcers, osteomyelitis, and other severe, debilitating symptoms.[1033] When Mr. Cazenave has been housed outside the REBTC, he must travel as much as several miles every day to get what should often be daily pain management. Given his leg ulcers and the frequent indication of bedrest for managing osteomyelitis, this is impractical and often impossible, and aggravates his pain rather than relieves it.[1034]

313. Instead of providing properly indicated pain management, Defendants "treat chronic pain with a combination of non-steroidal anti-inflammatory medications (NSAIDS), aspirin and acetaminophen.[1035] They also use Keppra, primarily an antiseizure medication, and Neurontin, for treatment of neuropathic and nonneuropathic pain. These medications are not the standard for treating non-neuropathic pain and can cause physical and mental side effects."[1036] Fully one of every ten Class members is prescribed Keppra, despite its *only* FDA

---

[1031] *Id.* at 0053-54; Oct. 16 Trial Testimony of Madeleine LaMarre at 183:1-184:9; JX 4-rr, R. Lavespere Depo. at 42:17-25; *see generally infra* ¶¶ 409-425 (discussing Defendants' failure to respond adequately to refusals and medication noncompliance).

[1032] Oct. 10 Testimony of Mike Puisis at 17:7-19; *id.* at 19:9-11 (it is uncommon for patients outside of Angola to have to travel several miles to obtain narcotic medication).

[1033] *See id.* at 17:20-18:20 (discussing role of pain management in sickle cell disease); PX 28 at 0008-10 (discussing Mr. Cazenave's medical care).

[1034] PX 28 at 0008-10; *see also* Oct. 10 Testimony of Mike Puisis at 17:20-18:20 (describing role of narcotics in managing sickle cell); Oct. 11 Testimony of Anthony Mandigo at 80:18-81:10, 84:13-16, 101:1-9 (explaining that, before he was incarcerated, he used to get Demerol or morphine shots when was having a sickle cell crisis, but at Angola he only receives Tylenol, Ibuprofen, or Keppra).

[1035] Oct. 12 Testimony of John Tonubbee at 142:23-143:22 (testifying that he has made multiple requests for treatment for the excruciating pain in his knees, and that all he has received are cortisone shots and an anti-inflammatory drug).

[1036] PX 6 at 0049; *see also, e.g.,* JX 4-q, B. Prine Depo. at 26:6-23 (Class member testifying that Keppra provided no relief from orthopedic pain).

indication being seizure treatment.[1037] As Plaintiffs' medical experts observe, "LSP's use of these medications appears to be excessive."[1038] The principal reliance on off-label use of a drug that does not treat non-neuropathic pain as the front-line form of pain management does not meet standard of care and leaves patients' serious pain untreated.[1039]

314. While Defendants will presumably try to justify their restrictions as necessitated by security concerns, "[y]ou should be able to administer medication anywhere. If a person is in a maximum security unit, they should be able to receive a narcotic. If they're on a general medicine unit, they should be able to receive a narcotic. The fact that that's not done is inappropriate. They don't have access to required medication."[1040] Like in the civilian community, narcotic pain medication is kept "in a locked cabinet within a locked pharmacy room," with a "strict accounting of every pill."[1041]

315. Defendants also claimed that Dr. Puisis's textbook showed that "[n]arcotics being administered … to inmates in the housing units … is prohibited generally in prisons across the country."[1042] The textbook says no such thing. The single sentence that Defendants cited is in a section on the ethics of "The Right to Die," and is part of a discussion about how physicians "must be honest with their patients regarding the extent to which palliative care is truly available" because "[i]n many correctional facilities, formularies either prohibit or severely limit the availability of narcotics and other pain medication."[1043] This passage has nothing at all to do with the availability of narcotic pain therapy; it solely concerns end-of-life palliative care. Moreover, it is discussing *formularies*, which determine which particular narcotics are available—not prison policies about who may access narcotic medication and how.[1044]

          iii.      Refusal to provide adequate HCV medication

316. Highly effective treatment is available for chronic HCV. There are several Food and Drug Administration ("FDA") approved medications available to treat chronic HCV, known as direct-acting antiviral agents ("DAAs"). These medications usually involve 8 to 12 weeks of oral therapy, cure over 90% of people who take them, and have few side effects.[1045]

317. Standards of care instruct that all persons infected with chronic HCV should receive treatment unless they have a limited life expectancy (less than 12 months) due to a non-liver-

---

[1037] *See* PX 75 at 0001.
[1038] PX 6 at 0049; *see also* Oct. 10 Testimony of Mike Puisis at 19:25-20:14.
[1039] *Id.*
[1040] Oct. 10 Testimony of Mike Puisis at 17:14-19.
[1041] *Id.* at 18:21-19:8.
[1042] Oct. 10 Testimony of Mike Puisis at 128:12-14; *see id.* at 128:12-130:16; PX 405 at 22.
[1043] PX 405 at 22.
[1044] *Id.*
[1045] Rec. Doc. 517-1 at 9.

related comorbid condition.[1046] Patients with advanced fibrosis or compensated cirrhosis should receive urgent initiation of treatment.[1047] Patients with chronic HCV should be treated with antiviral therapy early in the course of their chronic HCV infection before the development of severe liver disease and other complications.[1048]

318.    Earlier forms of treatment (Interferon, Ribavirin) are classified as *not* recommended for treating HCV.[1049] A regimen classified as "not recommended" is "clearly inferior" to other regimens or "deemed harmful" to the patient and should not be administered to patients with HCV.[1050] Regardless of whether the patient has previously been treated for chronic HCV, DAAs remain the standard of care for treatment over Interferon or Ribavirin.[1051]

319.    In 2016, Department of Corrections Secretary LeBlanc specifically requested that DOC Medical Director Dr. Singh input a line item budget funding request for HCV medicine in light of the high cost of contemporary HCV treatment medicines, DAAs.[1052] Secretary LeBlanc acknowledged that drug companies stopped making the earlier HCV medicines Interferon and Ribavirin. He also acknowledged that DAAs are now the only treatment option for HCV and that they are expensive.[1053] Rejecting the national expert consensus that Interferon and Ribavirin are "not recommended" and even "harmful," Secretary LeBlanc thinks that it is "crazy" that drug companies are no longer selling the outdated HCV treatment medications in lieu of the more expensive and contemporary HCV medications.[1054]

320.    As discussed *supra* ¶¶ 252-253, Angola's guidelines for treating HCV "are skeletal in nature" and do not include the community standard of care upon which they are based.[1055]

---

[1046] Rec. Doc. 517-4 at 30-31.

[1047] *Id.* at 30.

[1048] *Id.* at 31.

[1049] *Id.* at 53-62 (noting that for each genotype, the earlier forms of treatment, namely Interferon and Ribavirin, are not recommended).

[1050] *Id.* at 48 ("When a treatment is clearly inferior or is deemed harmful, it is classified as 'Not Recommended.' Unless otherwise indicated, such regimens should not be administered to patients with HCV infection.").

[1051] *Id.* at 72-89 (noting that for each genotype's previous HCV treatment regimen, DAAs are the recommended form of treatment).

[1052] JX 4-ss, J. LeBlanc Depo. at 65:9-17.

[1053] *Id.* at 65:9-25 ("I told him that this week for hep C, to make sure we need to show it as a line item, the request of funding for the hep C medicine. But, again, that's an area where I think drug companies are taking advantage of us when they shut down the other—I forget the name of them, but they shut down the one that was being used and was working, in some cases—in a lot of cases, actually, and they don't sell it anymore, so you have to buy the expensive stuff. That's crazy, but anyway.")

[1054] *Id.*

[1055] PX 6 at 0042; JX 6-iii at 00281-84.

321.    Ms. LaMarre testified that patients with HCV in her chart reviews were not medically evaluated and considered for treatment in accordance with current guidelines.[1056]

322.    The record evidence credibly shows that incarcerated patients with chronic HCV whose sentence is sufficiently long to complete a recommended course of DAAs should receive treatment for the chronic HCV according to the aforementioned standards.[1057] Yet at Angola, patients are not receiving timely treatment—and in some cases are not receiving treatment at all. For example:

   a.    Lawrence Jenkins was diagnosed with HCV while at Angola and received a year-long course of treatment with the older medications prior to FDA approval of DAAs.[1058] He had to take two shots a day, five days a week, for a year.[1059] Three months after completing the treatment, the HCV was determined to still be present, yet he has received no further treatment.[1060] When Mr. Jenkins asked a nurse practitioner about the possibility of taking the new DAA treatments that he had seen on TV, he was told that he could not get the new treatment because a large group of people needed it and he had already been treated—even though the treatment was unsuccessful.[1061] He was further told he had to wait in line so that other prisoners who had not been treated yet could get treated first.[1062] Lawrence Jenkins has not received any treatment for his HCV since the failed round of earlier treatment methods approximately eight years ago.[1063]

   b.    Charles Butler is also incarcerated at Angola and diagnosed with HCV.[1064] Angola treated Mr. Butler with Interferon around 2005. His treatment was discontinued before it finished because, as he was told, it was ineffective.[1065] After his treatment was discontinued, he spoke with doctors at Angola about pursuing alternative treatments.[1066] He recalls being told by Dr. Lavespere approximately two or three years ago that Harvoni is the standard accepted treatment nowadays but that it costs

---

[1056] Oct. 16 Testimony of Madeline LaMarre at 215:13-216:5.

[1057] *See* JX 6-iii at 00281.

[1058] Oct. 11 Testimony of Lawrence Jenkins at 185:5-13, 197:5-14.

[1059] *Id.* at 185:5-11

[1060] *Id.* at 185:12-17, 197:10-14.

[1061] *Id.* at 186:8-18, 186:19-187:3, 198:12-19.

[1062] *Id.*

[1063] *Id.* at 195:16-22.

[1064] *See* Oct. 15 Testimony of Charles Butler at 55:20-56:3.

[1065] *Id.* at 56:23-25, 77:10-12, 77:13-79:20; JX 4-d, C. Butler Depo. 9:21-11:3.

[1066] Oct. 15 Testimony of Charles Butler at 57:1-9-58:17.

too much.[1067] Charles Butler has never again been treated for his HCV since the initial failed round of Interferon over ten years ago.[1068]

323. Both Mr. Jenkins and Mr. Butler credibly testified that they received little to no education on HCV at LSP, despite the import on education expressed in the national standards.[1069] Mr. Jenkins testified that all of his knowledge of the disease came from his time working in hospice, where he sat with patients dying from HCV.[1070] Defendants did not even inform him that "hepatitis C could be transmitted to others."[1071] Mr. Butler received no education or courses on managing HCV or spreading HCV but did refer to being provided a pamphlet.[1072] Mr. Falgout spoke of the pamphlet in his testimony.[1073] A simple review of this pamphlet demonstrates clearly its deficiencies. While it is clear that all persons infected with chronic HCV should receive treatment,[1074] and that certain patients should receive treatment urgently,[1075] the pamphlet explicitly says no treatment will come until liver problems develop.[1076]

324. Patient #44 provides an equally troubling example of Defendants' failure to provide education and treatment for Class members who test positive for HCV. On May 23, 2016, Patient #44 tested positive for hepatitis-C antibodies.[1077] Even though he saw an LSP physician a week later,[1078] and even though Dr. Lavespere initialed the lab results at an undated time,[1079] there is no evidence anywhere in the record that the positive finding was discussed with the patient, that he received CDC-recommended follow-up tests,[1080] or that he received *any* treatment or education for this highly contagious disease. Patient #44's records go as late as September 26, 2016[1081]—some of the very latest medical records

---

[1067] *Id.* at 57:17-58:3

[1068] *Id.* at 56:10-58:13.

[1069] *See* Rec. Doc. 517-4 at 15-16 ("All persons with HCV infection should be provided education on how to avoid HCV transmission to others" and "Persons with current (active) HCV infection should receive education and interventions aimed at reducing progression of liver disease and preventing transmission of HCV").

[1070] *See* Oct. 11 Testimony of Lawrence Jenkins at 184:16-23, 187:4-14.

[1071] *Id.* at 184:20-23.

[1072] *See* Oct. 15 Testimony of Charles Butler at 58:4-10.

[1073] *See* Oct. 23 Testimony of Tracy Falgout at 165-168; JX 8-j.

[1074] *See* Rec. Doc. 517-4 at 30 ("Evidence clearly supports treatment in all HCV-infected persons, except those with limited life expectancy (less than 12 months) . . . .").

[1075] *See id.* at 30-34.

[1076] JX 8-j at 25.

[1077] DX 744 at 3.

[1078] *Id.* at 19.

[1079] *Id.* at 3.

[1080] *See id.* (laboratory informing Defendants that "[t]he CDC recommends that a positive HCV antibody result be followed up with a HCV Nucleic Acid Amplification test").

[1081] *Id.* at 2.

produced by Defendants—and as of that time, more than five months had passed without any acknowledgment or follow-up of his apparent Hepatitis C, much less treatment.

325. Further evidence of this deviation from national standards can be seen in DOC's policies.[1082] While "evidence clearly supports treatment in all HCV-infected persons, except those with limited life expectancy (less than 12 months),"[1083] DOC's policies prohibit treatment based on non-medical reasons. Specifically, HC-09B[1084] provides guidelines for the surveillance, diagnosis, and treatment of Viral Hepatitis in prisoner populations. HC-09B states that treatment is "absolute[ly] contraindicat[ed]" if a patient's "[r]emaining time left until earliest discharge date [is] less than two years" or if the patient has had a "[p]ositive illicit drug screen or Disciplinary Board Court conviction for drug paraphernalia within [the] previous 12 months."[1085] In other words, LSP's policies flatly deny treatment to anybody who *might* be released in the next two years (even if there is no guarantee of release), and to anybody who tested positive for any illicit drug or was convicted of merely possessing drug paraphernalia. There are no medically supported rationales for these policies and the result is only to delay or deny treatment to people suffering from a serious and ultimately terminal disease.

326. Between July 2013 and June 2014, 711 people had HCV at LSP, but only 22 were treated.[1086] Between July 2014 and June 2015, 778 had HCV but only 23 were treated.[1087] Between July 2015 and July 2016, 835 people had HCV but only 52 were treated.[1088] That national standards recommend treating every patient with HCV,[1089] and yet Angola only treats between 2% and 6% of its infected population, is strong evidence of deliberate denial and delay of treatment.[1090]Internal pharmacy problems

iv.    Internal pharmacy problems

327. Angola's pharmacy is cramped, cluttered, and dirty. Ms. LaMarre reliably found that LSP's "Angola's pharmacy is cramped, cluttered, and dirty. Ms. LaMarre reliably found that LSP's "pharmacy is … insufficient for its size," that the counters had "so much piled on top" that "it really wasn't possible to clean surfaces," and that "the floors were dirty because inmate orderlies who do sanitation were not allowed in the pharmacy."[1091] Because Class members provide all janitorial duties at the prison but are not allowed in the pharmacy, the floors are

---

[1082]JX 5-a; JX 4-hh, S. Falgout Depo. at 93.

[1083] Rec. Doc. 517-4 at 30.

[1084] JX 5-a at 00075-81.

[1085] *Id.* at 00079-80 (§§8(N), 8(N)(9), 8(N)(10)).

[1086] JX 2-c at 00768-69.

[1087] *Id.* at 00756-57.

[1088] *Id.* at 00746-47.

[1089] *See* Rec. Doc. 517-4 at 30-31.

[1090] JX 2-c at 00746-47, 56-57, 68-69.

[1091] Oct. 16 Trial Testimony of Madeleine LaMarre at 154:19-155:6.

not routinely cleaned and there is no schedule for sanitation and disinfection.[1092] Pharmacy technicians do not always wear gloves to pack medication, and inspection reports demonstrate numerous problems, from failing to record no-shows and refusals properly to corrections officers "ordering too much medication."[1093]

### g. *Inadequate Diagnostic Services*

328. As noted above, Angola has the ability to perform a limited number of laboratory tests and radiology examinations. However, as discussed *supra* ¶ 230, the availability of these tests is inconsistent—and when they are performed, they are often not timely reviewed by providers. This results in patients not receiving vital diagnostic tests, and in "egregious examples of physicians not addressing abnormal labs or treating patients timely for their serious acute and chronic medical conditions."[1094] As discussed earlier, Defendants' failure to transport patients to outside providers who can perform indicated diagnostic services in critical conditions exposes patients to a serious risk of severe harm.

329. In addition to these pervasive, life-threatening problems, there is evidence that Defendants are providing insufficient testing in non-critical, chronic contexts. For example, the number of capillary blood glucose tests (known as "Accu-checks") performed annually is troublingly low in light of the prison population, and is "insufficient to assess diabetics' disease control on a daily or weekly basis."[1095] Class member Adrian Dunn testified that he was denied Accu-checks when housed in Angola's outcamps and was "shooting [his] insulin blind."[1096] On multiple occasions he had to make sick call in order to obtain the strips, which would take approximately two weeks.[1097] At trial, Farrell Sampier, a Type 2 diabetic, also observed that patients often had no way of knowing their blood sugar levels.[1098]

330. Similarly, Defendants stopped performing screening colonoscopies altogether for a period of time, and still refuse to provide them for patients whose age puts them at risk of colon cancer and other serious conditions.[1099]

---

[1092] PX 6 at 0049.

[1093] *Id.*

[1094] PX 6 at 0055-57, 65-71; *see also, e.g.*, Oct. 15 Testimony of Charles Butler at 71:8-23 (explaining how he inadvertently learned that he had lung cancer from a resident at LSU who assumed he was being treated for it); JX 4-c, A. Brent Depo. at 71:3-73:10 (discussing that providers will not tell patient about abnormal results).

[1095] PX 6 at 0055.

[1096] JX 4-h, A. Dunn Depo. at 18:21-19:10.

[1097] *Id.* at 20:25-22:12.

[1098] Oct. 9 Testimony of Farrell Sampier at 66:19-67:3.

[1099] *See* PX 58 at 0001; PX 92; PX 93; PX 42 (Dr. Singh on 12/13/13: "Some of the offenders at LSP were waiting for CT scan and MRI or cancer care since late 2011. … As far as I know no [colonoscopies] were done at LSP for 2 years or longer. Once access has been restored, even then

331. Finally, as throughout LSP, refusals are often improperly recorded in the radiology clinic. This falls below standard of care and places patients at risk; "staff need to follow-up to determine whether the patient refused the appointment, or an event outside the inmate['s] control was responsible for not keeping the appointment."[1100]

### h. *Failure to Create, Maintain, and Use Adequate and Reliable Medical Records*

#### i. Inadequacies of Defendants' medical records system

332. Angola has a hybrid health record system, in which most records are kept on paper but MARs and Eceptionist scheduling are kept electronically. This chaotic system has numerous flaws that increase patients' risk of mistreatment and harm.

333. Individual patients' records are "jumbled" and "not orderly."[1101] As a result, "different sections of the record were in different areas and sometimes mixed up. [The experts] would find consultant reports with MARs; … MARs with refusals; … MARs in progress notes; … consultant reports in progress notes."[1102] This was not limited to the photocopies prepared for trial; when Plaintiffs' experts reviewed original records on site, they were "very chaotic" and "misfiled sometimes"; as Dr. Vassallo put it, "sometimes we had a record of one date; 60 pages later, we were back to the same episode of care."[1103]

334. As documented above, records from specialty consultations and hospitalizations are often missing, leaving follow-up recommendations unimplemented and leaving providers in the dark as to what treatment a patient received off-site.[1104] Similarly, because LSP's electronic and paper records are not properly integrated, providers are unable to readily search the record to review current medications or medication adherence, or to verify appointment scheduling and completion.[1105]

---

we can not get all 600 colonoscopies done immediately."); PX 26 at 0001 (Ms. Lamartiniere: "[W]e will temporarily suspend the entering of screening referrals [for colonoscopies] until notified by [headquarters] to resume."); *compare* JX 4-ff, J. Collins Depo. at 78:6-9 (Dr. Collins: "You had a screening colonoscopy when you hit 50. . . . That's basically the requirement."), *with* JX 4-c, A. Brent Depo. at 56:23-57:21 (61-year-old Class member requested colonoscopy and was denied by multiple doctors), *and* JX 4-f, K. Clomburg Dep. at 69:18-71:4 (similar).

[1100] PX 6 at 0057.

[1101] Oct. 11 Testimony of Mike Puisis at 58:10-59:11.

[1102] *Id.*

[1103] Oct. 16 Testimony of Susi Vassallo at 110:20-111:8.

[1104] *See supra* ¶¶ 269-277; *see also, e.g.,* JX 4-rr, R. Lavespere Depo. at 65:11-66:7 (noting that many records from outside hospitals do not become part of the paper record); *see also, e.g.,* JX 4-f, K. Clomburg Depo. at 39:12-40:6, 45:6-18 (describing providers not putting information about treatment or condition in medical records); JX 4-q, B. Prine Depo. at 41:25-42:25, 45:9-46:7 (same).

[1105] PX 6 at 0058-59; *see also, e.g.,* JX 4-mm, K. Hawkins Depo. at 14:9-15:16 (acknowledging possibility of records getting out of order and EMARs not being included in paper record).

335. Moreover, because many Class members are in Angola's care for years or decades, their paper records grow unwieldy, requiring records clerks to transfer "the current and most pertinent documentation" to a new medical record. Defendants' medical records policy, HC-33, provides no guidance on this, leading to a high risk—and high reality—of missing or misfiled documents.[1106]

336. HC-33 is also outdated and appears not to have been reviewed since 2011, suggesting inattention to and failure to review the adequacy of the records department's performance.[1107]

337. The proliferation of paper records is cumbersome, leading examination rooms to be full of records "in a manner that makes physical examination difficult to impossible."[1108] (This is documented in more detail *infra* ¶¶ 344-349) Dr. Lavespere claimed at trial that photographs proffered by Plaintiffs showing an examination room littered with stacks of records was not used for seeing patients, but was instead a second office in which he reviewed records,[1109] but this testimony was incredible. On cross-examination, shown pictures of yet another examination room stacked with records, he claimed that it was yet a *third* office that he sometimes used; when confronted with the fact that the pictures were taken on the same day, he conceded that the pictures could simply "be typical of how the clinical spaces look."[1110]

338. Additionally, because transportation to the outlying clinics is often impractical, sick call and urgent or walk-in evaluations at outcamp clinics are performed without benefit of access to the medical record. This "lack of timely and complete health information when providers and health care staff evaluate patients is a serious systemic issue that places the patients at risk of ongoing harm."[1111]

339. At trial, Dr. Lavespere explained that LSP uses a color-coding system that he had "never seen . . . outside the Department of Corrections" and believed was "unique to the Department of Corrections," and suggested that Plaintiffs' experts simply did not understand how to navigate the system.[1112] But as Dr. Vassallo credibly explained, this is a common and "very familiar" system that all facilities used—30 years ago.[1113] Plaintiffs' experts observed this system while reviewing the records on-site, and found that it did not rescue the records from being "very difficult to work with."[1114]

---

[1106] PX 6 at 0058-59; JX 5-a at 0169-80 (HC-33, Offender Medical Records Policy).

[1107] PX 6 at 0058; JX 5-a at 0169-80.

[1108] PX 6 at 0060, 277; *see* Oct. 9 Testimony of Mike Puisis at 115:18-117:9; Oct. 16 Testimony of Madeleine LaMarre at 154:3-13.

[1109] Oct. 22 Testimony of Randy Lavespere at 77:7-79:6.

[1110] *Id.* at 180:19-182:3.

[1111] PX 6 at 0060; *see also, e.g.*, JX 4-mm, K. Hawkins Depo. at 23:9-24:4 (EMTs don't bring medical records to sick call; records must be transported in vans).

[1112] Oct. 22 Testimony of Randy Lavespere at 84:18-91:20.

[1113] Oct. 25 Testimony of Susi Vassallo at 81:10-82:3.

[1114] *Id.*

151

340.    Plaintiffs' medical experts' record review identified instances of all of the problems that would be expected from this poorly managed system:

> Based on record review, there were multiple duplicate documents in the records, many misfiled paper documents, and failure to include off-site specialty and hospital discharge summaries in the medical record. Medication Administration Records (MAR) were seldom completely and consistently filed in the paper records. The MARs also frequently had no entries. These deficiencies made it impossible to determine whether the patient received medication. In many cases there were no meaningful notes; only signatures, verbal orders, telephone orders and orders for follow up appointments. Some notes written by physicians were not dated or timed and were illegible. These records were inadequate for use and place patients at risk of harm by reducing the ability of clinicians to understand the medical care being given to their patients.[1115]

ii.    Inadequate confidentiality and access policies

341.    Additionally, Defendants do not properly ensure confidentiality of records, nor do they allow patients to see their own records.

342.    As to confidentiality, HC-33 allows the Health Authority to share any "information regarding an offender's medical management with the Warden," with no restriction to situations that are necessary for medical or security purposes.[1116] In addition, the use of correctional officers to administer medications gives correctional officers access to the patients' personal medical information, a serious breach of confidentiality.[1117]

343.    By contrast, patients themselves cannot see their own medical record.[1118] Patients can only access their medical records if specifically authorized by the Warden. Placing patients' ability to review their own medical information at the discretion of a non-medical, custodial official inhibits Class members' ability to understand their own conditions and treatment, impairing their ability to comply with treatment plans and alleviate their symptoms.[1119]

---

[1115] PX 6 at 0059.

[1116] JX 5-a at 00171 (§ 6(C)).

[1117] PX 6 at 0049-52, 60.

[1118] Id. at 60; see, e.g., Oct. 9 Testimony of Farrell Sampier at 56:12-14; Oct. 15 Testimony of Otto Barrera at 20:7-9 ("I have never seen my medical records at Angola."); Oct. 12 Testimony of John Tonubbee at 165:18-21 (same); Oct. 15 Testimony of Charles Butler at 75:4-6 (same). Despite the fact that Defendants refuse to let their patients see their medical records, Defendants had no problem using those records—even those not in evidence—to cross-examine class member witnesses on specific numbers, names, and dates going back four or five years. See, e.g., id. at 80:22-82:6; Oct. 12 Testimony of John Tonubbee at 156:1-157:25, 159:19-161:11, 165:22-166:11.

[1119] PX 6 at 0060.

344. Finally, the facilities in which Defendants provide clinical care are inadequate and unsanitary, denying Class members adequate and confidential medical treatment.

345. Provider evaluations "mostly occur in poorly sized rooms with inadequate equipment and supplies; without adequate privacy; and without a means to sanitize hands between patients." As Plaintiffs' experts documented, examination tables are covered in medical records, blocked by doors, or lack sanitary paper. Patients are examined in chairs in some rooms, to the extent they are examined at all.[1120] While Dr. Lavespere disputed the photographic evidence of the state of the examination rooms, this testimony was patently incredible, as discussed *supra* ¶ 332.

346. These rooms are poorly equipped. Many of them lack critical functioning devices such as sphygmomanometers (blood pressure measures), otoscopes, ophthalmoscopes, and glucometers.[1121] While Dr. Lavespere testified that some if not all of these gaps were made up by portable devices carried by staff,[1122] this testimony was not supported by any other evidence and is less than compelling given Dr. Lavespere's questionable credibility. Moreover, Plaintiffs' experts observed the examination rooms being used in practice, and thus would have witnessed the use of portable devices if they were in significant use.

347. They are also unsanitary. Sinks are often obstructed, and lack soap or hand sanitizer; in one room, there was no sink at all. And examination rooms have food and cooking devices like blenders and microwaves. "Eating and cooking in clinical examination areas is typically prohibited in health care facilities for sanitation reasons."[1123]

348. Medical encounters are also rarely confidential. Doors typically remain open, depriving patients of confidential examinations. Sick call and other EMT assessments occur at patients' cells or dormitories, rather than clinical rooms where patients can disclose their medical complaints in private and confidential assessments can be performed.[1124] Both Plaintiffs' experts and Defendants' expert Dr. Moore found the lack of privacy is concerning.[1125] Yet Defendants openly dismiss the idea that Class members should be entitled to a confidential examination; in Dr. Lavespere's words, "I mean if you're in a cell with a guy, you're sitting

---

[1120] *Id.* at 0028-29, 274-78.

[1121] *Id.* at 0028, 30, 276-77.

[1122] *See* Oct. 22 Testimony of Randy Lavespere at 76:3-15.

[1123] PX 6 at 0030.

[1124] *Id.* at 0029, 32.

[1125] Oct. 23 Testimony of Jacqueline Moore at 155:6-7; Oct. 9 Testimony of Mike Puisis at 111:8-112:11; Oct. 10 Testimony of Mike Puisis at 16:5-24.

on a toilet next to him, you know, every time you use the bathroom. … So I mean privacy, you know, I mean I don't know that that's a really big issue."[1126]

349. Plaintiffs' experts reliably established that private examinations are the standard in correctional medical care, just as they are in community medical care. Dr. Puisis credibly testified that, while "arrangements are made" for "extremely violent" inmates, he had never seen a maximum security prison or jail "where you can't ensure confidentiality."[1127]

### (3) Administrative Policies and Practices Contributing to the Substantial Risk of Serious Harm

#### a. *Inadequate Leadership*

350. Angola's administrative and clinical leadership have tolerated or even promoted all of the deficient policies and practices documented throughout the evidence.

351. A medical program in a large prison is typically managed by "a responsible health authority, which is the person or entity responsible for all levels of health care and for ensuring quality, accessible and timely health care." Under NCCHC Standards, this role must be filled by "a person who by virtue of education, experience, or certification (e.g. MSN, MPH, MHA, FACHE, CCHP) is capable of assuming [that] responsibility."[1128]

352. While Dr. Lavespere is nominally the health authority, in practice the Assistant Warden "has operational control over all aspects of the medical program and directly supervises a significant portion of health care staff."[1129] At all times during the discovery period, this position was filled by Ms. Lamartiniere, Warden Cain's former secretary, who has no training in health care and no degree above high school.[1130] Both in an interview with Plaintiffs' medical experts and in her deposition, Ms. Lamartiniere exhibited "no knowledge about specific medical program operational issues" and disclaimed any knowledge of the budget or budgetary needs, let alone input into the budget or staffing levels. She had attended just two CQI meetings in the prior five years. In all, "her leadership involve[d] no real authority to manage the health program."[1131]

---

[1126] JX 4-rr, R. Lavespere Depo. at 33:13-19; *see also, e.g.,* JX 4-gg, A. Cowan Depo. at 34:4-25 (EMT not aware of any policy requiring private examination when medical issue involves patient's genitalia).

[1127] Oct. 10 Testimony of Mike Puisis at 16:17-19.

[1128] PX 6 at 0011.

[1129] *Id.* at 0012.

[1130] JX 4-nn, S. Lamartiniere Depo. at 5:24-6:2.

[1131] PX 6 at 0012, 16, 27, 88. After the close of discovery, Defendants moved Ms. Lamartiniere to another position within DOC and named Defendant Tracy Falgout as the Assistant Warden for Health Services. Because this occurred after the close of discovery, it is irrelevant to the liability

353.  Dr. Lavespere, Angola's Medical Director, "does not perform many of [the] typical functions" of a medical director. "The role of a Medical Director is typically to organize and implement the medical program; to provide clinical supervision to provider staff; and to be the final medical authority on all clinical decisions."[1132] But Dr. Lavespere does not perform any formal review of his clinical subordinates;[1133] does not formally supervise the EMT staff;[1134] does not participate in quality improvement efforts;[1135] and has no input into the budget.[1136] In an expert interview, Dr. Lavespere could not even estimate the types or frequency of chronic clinical conditions among the patients for which he is responsible.[1137] In all, "[h]e was unable to provide any specifics of how he spends his time in organizing or supervising the medical program."[1138]

354.  Similarly, Dr. Lavespere provides no training to doctors who come to Angola.[1139] All parties agreed that correctional medicine has unique aspects.[1140] Dr. Thomas, for example, made sure that all physicians underwent a specific training program before seeing any patients in the Florida correctional system when he worked there.[1141] Yet even though all physicians came to Angola shortly after significant disciplinary actions and several had no prior primary care experience,[1142] Defendants provide no comparable preparation.[1143] Dr. Lavespere is not even familiar with the restrictions placed by the LSBME on the physicians he ostensibly supervises.[1144]

355.  Nor does Dr. Lavespere provide formal supervision of the physicians. While he claimed at trial that he completed an annual review of each physician that involves "a lot of paperwork" and "tells the physician on paper what I really think about the job that they are doing,"[1145] at his deposition, he testified that the only formal review he provides is a civil service

---

portion of this case. *See* Rec. Doc. 419 at 3 ("[T]he evidence shall be limited to the healthcare conditions and the facility as they existed as of September 30, 2016.")

[1132] PX 6 at 0012-13.
[1133] JX 4-rr, R. Lavespere Depo. at 82:11-22.
[1134] *Id.* at 91:16-20.
[1135] *Id.* at 80:12-19.
[1136] *Id.* at 97:12-14.
[1137] PX 6 at 0012-13.
[1138] *Id.*; *see also, e.g.*, JX 4-rr, R. Lavespere Depo. at 97:12-14.
[1139] *See* JX 4-qq, R. Lavespere Depo. at 23:17-25:16.
[1140] *See* Oct. 9 Testimony of Mike Puisis at 104:12-15; Oct. 10 Testimony of Mike Puisis at 83:2-16; Oct. 23 Testimony of David Thomas at 17:25-18:17.
[1141] Oct. 23 Testimony of David Thomas at 80:4-20; *see* DX 14 at 02922 ("This program included disease specific entities more common in an incarcerated environment . . . .").
[1142] *See supra* ¶¶ 171-177.
[1143] Oct. 23 Testimony of David Thomas at 80:4-20.
[1144] *See* Oct. 22 Testimony of Randy Lavespere at 214:1-216:3.
[1145] *Id.* at 24:11-22.

evaluation that Warden Lamartiniere fills out for him.[1146] A human resources evaluation by an administrator with no medical training, of course, is far from a substantive review of a physicians' performance, as confirmed by the insubstantial detail in the annual reviews.[1147]

356.    Dr. Lavespere takes a similar approach to EMTs, even though they perform the lion's share of care at LSP. He does not train or provide any formal supervision of EMTs, and there is no documentation of any form of clinical supervision.[1148] Nor was he familiar with what training they received from the security personnel who oversee the EMT program; while he claimed that Major Cashio provided training on the EMT protocols, Major Cashio denied this.[1149]

357.    Dr. Lavespere's disengagement from operational aspects of the medical system is mirrored in his clinical care. Neither Dr. Lavespere nor the medical providers he supervises "document adequate examinations (e.g. history of the chief complaint, review of systems, past medical history and pertinent physical examination and labs) that support the patient's diagnosis and treatment plan."[1150] In case after case, Dr. Lavespere and his supervisees fail to perform or document the basic steps necessary to timely diagnose and treat Class members.[1151] If there is an absence of documentation in the medical records, the necessary assumption is that care did not take place. As Plaintiffs' experts explained, the standard in medical practice is "if you don't write all the details of it, you didn't do it."[1152] This is because "medical documentation is how we communicate our thoughts with the rest of the world,

---

[1146] JX 4-rr, R. Lavespere Depo. at 82:11-22; *see also* JX 4-nn, S. Lamartiniere Depo. at 22:10-12 ("There's a certain form setup through the Civil Service System that we evaluate yearly.").

[1147] *See, e.g.*, PX 63; PX 230 at 0013-74, 91-192 (examples of annual reviews).

[1148] *See* JX 4-rr, R. Lavespere Depo. at 81:12-16, 91:16-92:15; JX 4-qq, R. Lavespere Depo. at 51:19-52:6.

[1149] *Compare* Oct. 22 Testimony of Randy Lavespere at 55:22-56:3, *with* Oct. 24 Testimony of Darren Cashio at 50:6-10.

[1150] PX 6 at 0014.

[1151] *See, e.g.*, Oct. 10 Testimony of Mike Puisis at 158:17-22 (without documentation of administration of medication on the MAR, the administration cannot be verified); Oct. 10 Testimony of Mike Puisis at 176:20-177:4 (unable to decipher why a patient was denied surgery where the surgical notes were missing from those records); Oct. 11 Testimony of Mike Puisis at 18:2-19:17 (no documentation of whether a patient was oriented to his decision to approve a DNR order), 34:7-36:6 (unclear documentation of "keep on person" medications for patient who died several days after medications were noted administered); Oct. 16 Testimony of Madeline LaMarre at 150:8-12 (medication administration records are unreliable, making it unclear whether patients are receiving medications), 160:24-161:1 ("[T]he lack of … documented discussion of the provider with the patient was a major, major concern in the chronic disease records."), 183:11-13 (documentation of noncompliance of medication does not include any discussions of why the patient was not compliant), 218:1-14 (AIDS medication regimen changed without documentation of why).

[1152] Indeed, Dr. Singh sent an email to DOC employees, with instructions to share with their staff, stating that "'things not documented' are considered 'things not done.'" JX 35 at 00002.

how we communicate our decision-making, and how we communicate with others subsequently."[1153] It is particularly important at LSP, where several different doctors, nurses, and EMTs, along with outside providers, may see a given patient. Defendants' practice of not creating appropriate medical records does not "adhere to standards of medical practice" and results directly in the serious harm documented above.[1154]

358.  Equally disturbing, Dr. Lavespere, by his own admission, believes that his biggest challenge is determining which of his patients are lying to him.[1155] He believes that fully half of his patients do not tell the truth to their treating physician,[1156] and that many of his patients "don't want to be better" because "if they get well, then they have to do things" or because they want to "pin" a medical problem on DOC.[1157] For example, Dr. Lavespere claims that some patients "want you to take their medicine so their blood pressure will go up so they can have a stroke so they can say, You took my medicine."[1158]

359.  This attitude, as Plaintiffs' medical experts explain, is "not consistent with accepted standards of professionalism and medical practice. … For any physician, much less the Medical Director, to begin each encounter with a presumption that patients are not telling the truth is the epitome of unprofessionalism."[1159] This presumption of dishonesty puts the pervasive failure to perform proper examinations of patients' complaints in a dark light: in many cases, Class members do not receive necessary care for serious, even life-threatening medical needs because Dr. Lavespere and his clinicians do not believe them and do not take the medically necessary steps to determine the source of their symptoms.

360.  This disbelief has had devastating and even fatal consequences for Class members. In Patient #22's case, for example, Defendants preferred to believe the patient was exaggerating his pain, without any basis documented in the medical records.[1160] This unfounded assumption led Defendants to ignore the patient's symptoms, which were not an exaggeration but rather the outward indications of an undiagnosed lymphoma that was literally crushing his heart, from which he would soon die an excruciating death.[1161] Similarly, as discussed *supra* ¶ 224, it leads Dr. Lavespere and other physicians to direct EMTs not to transport patients to the ATU for treatment or to forcibly test and treat patients experiencing ongoing medical

---

[1153] Oct. 16 Testimony of Susi Vassallo at 13:8-11; *see also* Oct. 9 Testimony of Mike Puisis at 149:8-9 ("How does anyone know that you did it if you didn't document it?").

[1154] PX 6 at 0014.

[1155] JX 4-qq, R. Lavespere Depo. at 7:20, 12:14-14:7; JX 4-rr, R. Lavespere Depo. at 18:1-3, 18:6-8, 19:19-22, 19:3-17, 20:2-3.

[1156] JX 4-qq, R. Lavespere Depo. at 7:16-20.

[1157] JX 4-rr, R. Lavespere Depo at 17:25-19:2, 52:8-10.

[1158] *Id.* at 51:24-52:2.

[1159] PX 6 at 0014.

[1160] *See* Oct. 17 Testimony of Madeleine LaMarre at 62:7-65:2.

[1161] *See id.* at 101:9-20; PX 6 at 0234-40.

emergencies for drugs without indication, both of which have directly contributed to numerous preventable deaths.[1162]

361.   Defendants claimed at trial that *Clinical Practice in Correctional Medicine*, Dr. Puisis's textbook, supported Defendants' disbelief of their patients because of one sentence citing studies finding that "approximately 40% of the requests for health care attention were medically unnecessary or did not require a clinical evaluation."[1163] This plainly misreads the textbook, as Dr. Puisis explained.[1164] The textbook was discussing administrative ways to route non-medical requests (e.g., requests for things like long underwear) and non-clinical medical requests (e.g., dental floss) to the proper channels without burdening the medical system.[1165] It has no resemblance to Dr. Lavespere's affirmed disbelief in his patients. Quite to the contrary, the chapter talks about the problems when staff "come to view inmates as abusing their access to health care," and notes that data show that "inmate use of ambulatory care is not different from that of people in the community."[1166]

362.   Dr. Lavespere's attitudes toward treatment make it "likely that in his role of Medical Director he will tolerate substandard care from other medical providers."[1167] This fear is borne out by the pervasive appearance of Dr. Lavespere's inadequate clinical tendencies throughout all providers' records, as shown above.[1168]

363.   These failings put Defendants' failure to perform appropriate credentialing, exclusive reliance on disciplined physicians, and absent monitoring into perspective. Dr. Lavespere's license was suspended due to a conviction for possession with the intent to distribute methamphetamine, after which he acknowledged in an LSBME consent order, he was diagnosed with, among other things, "personality disorder NOS [not otherwise specified] with antisocial, narcissistic and avoidant features."[1169] The LSBME placed his suspension on probation upon a finding that he could potentially be fit to practice medicine *if* he were subject to strict monitoring. While the LSBME lifted these restrictions in 2014 (at Dr.

[1162] *Id.*; *see also, e.g.*, JX 4-bbb, R. Singh Depo. at 100:21-25 (former Statewide Medical Director Dr. Singh: "Q: If you[] were to treat patients with a presumption that the majority of patients were malingering, can you see ways that would cause problems for treatment and diagnosis? A: Absolutely."), 102:5-12 (if doctor thought 90 percent of patients were malingering, "I would lose my sleep and I will find a way to get him out. I can't work with people like that.").

[1163] Oct. 10 Testimony of Mike Puisis at 99:11-101:12.

[1164] *See id.* at 100:18-101:12; PX 406 at 55.

[1165] PX 406 at 55.

[1166] *Id.* at 56.

[1167] PX 6 at 0014.

[1168] *See also, e.g.*, JX 4-f, K. Clomburg Depo. at 62:12-63:2 (describing EMTs accusing patients of "faking," or laughing at broken bones).

[1169] *See* Rec. Doc. 349 (granting Plaintiffs' Motion Request of Judicial Notice of the licensure of Angola physicians, including disciplinary consent orders); *see also* Rec. Doc. 247-2 at 5.

Singh's request, so that Dr. Lavespere could serve as Medical Director), there is no evidence of proper monitoring either before or after that time.[1170] Indeed, Dr. Lavespere is not reviewed annually by another clinician; rather, he is reviewed by the Assistant Warden for Healthcare Services, who, as already noted, had no medical background during the discovery period.[1171]

364.    The problems in attitude and leadership are not limited to Dr. Lavespere. The medical director before Dr. Lavespere, Dr. Collins, was the only physician at LSP in the past decade without a history of disciplinary violations (albeit a gynecologist, rather than a practitioner with relevant experience).[1172] When he identified problems in other physicians' clinical judgment that concerned him enough to consider going to the LSBME, Dr. Singh viewed him as "vindictive" and treating his colleagues "like inmates," and sought to push him out of Angola.[1173]

365.    Dr. Thomas accuses Plaintiffs' medical experts of "disparaging the background of the physicians without concomitantly unequivocally demonstrating individual inadequacies of provider care."[1174] Of course, they *have* unequivocally demonstrated individual inadequacies of provider care, as demonstrated throughout the evidence. But more generally, Dr. Thomas's objection misses the point: Defendants' practice of relying on disciplined physicians who expose patients to a risk of "unprofessional, unqualified and unsafe" care[1175] contributes to a risk of serious harm—and Defendants knowingly subject Class members to that risk, without providing monitoring that could catch the risk when it manifests itself. To do so with one or two physicians would raise concerns; to have a physician with Dr. Lavespere's history and attitudes lead an entire staff of disciplined physicians elevates those concerns to a level unknown across the country. Given that Plaintiffs have conclusively shown that that harm has pervasively manifested itself throughout the Angola medical system merely proves the inappropriateness and inadequacy of Defendants' practice.

b.    *Inadequate Funding and Inappropriate Budget Management*

---

[1170] See Rec. Doc. 349 (granting Plaintiffs' Motion Request of Judicial Notice of the licensure of Angola physicians, including disciplinary consent orders); see also Rec. Doc. 247-2 at 10; PX 6 at 0013, 24.

[1171] JX 4-rr, R. Lavespere Depo. at 82:19-22; *see* PX 63.

[1172] JX 4-ff, J. Collins Depo. at 37:10-13.

[1173] JX 55 at 00001; *see also* JX 4-rr, R. Lavespere Depo. at 11:21-23 ("[A]ll I know is that [Dr. Collins] went to the administration office and they told us he wasn't working there anymore.").

[1174] DX 14 at 02891-92.

[1175] PX 6 at 0009, 24-25; UF ¶ 10; *see generally* Rec. Doc. 247-2 (Angola physicians' licensure documents, including disciplinary judgments by Louisiana State Board of Medical Examiners); *see also* Rec. Doc. 349 (granting Plaintiffs' Motion Request of Judicial Notice of the licensure of Angola physicians).

366. The credible evidence proves that Defendants base medical decisions on budgetary considerations. For example, the evidence includes meeting minutes (each just a sentence or two long) from three years of meetings between then-Warden Cain and the last two Medical Directors, Dr. Lavespere and Dr. Collins.[1176] Even these sparse notes show that budgeting concerns played a role in decisions at six of the ten meetings in the record. The most prominent topic in the minutes across the ten-year period was a desire to reduce trips to outside providers, often identified as a means of reducing costs. For example, minutes from March and May 2012 both say "Topics discussed: We are trying to cut down on costs and make fewer trips," and then discuss telemedicine clinics as a means of doing so.[1177] The May 2013 minutes report that the Medical Director and Warden discussed how a planned Surgical Center would "be an asset to our facility by that [sic] will cut down on trip costs and overtime worked."[1178] The minutes from April 2015 read "Topics discussed: Specific Offender surgeries such as joint replacement, cataract, and hernia repair and budgeting costs for these types of surgeries."[1179]

367. Other contemporaneous correspondence among Defendants, as well as sworn testimony, confirms that operational decisions for the medical program were frequently made with an eye to budget constraints.[1180] As Secretary LeBlanc testified, DOC has "maxed out" medical and mental healthcare on the existing budget.[1181]

368. Indeed, there is evidence of budgetary concerns affecting even individual treatment determinations. On one occasion, for example, an oncologist identified three possible

---

[1176] *See generally* JX 3-b.

[1177] *Id.* at 00510-11.

[1178] *Id.* at 00515.

[1179] *Id.* at 00521.

[1180] JX 46 at 00001; PX 55 at 0001; *see also* PX 84 at 0001-02 ("We are trying to make sure we keep costs down for services provided on site."); PX 87 at 0001-03 ("We believe the Department would realize both improved operational service and additional cost containment through the implementation of a hybrid system consisting of external pharmacy services along with two facility-specific stand-alone pharmacies."); DX 367 at 04275 (describing the offender healthcare system in a training presentation as "cost conscious); JX 4-tt, K. Norris Depo. at 36:10-38:5, 46:18-47:19, 48:16-19, 49:9-22 (refusals to provide hernia surgery was budgetary decision); JX 4-oo, J. Lanoue Depo. at 14:24-15:17 (when costs are too high in one area, it cuts into other areas); JX 4-ss, J. LeBlanc Depo. at 44:16-19 (admitting that "there is some incentive not to" send inmates out for trips "because of the cost of the correctional officers"); Oct. 15 Testimony of Charles Butler at 56:10-58:3 (Dr. Lavespere informed Class member that he would not receive medication for hepatitis C because interferon treatment had been ineffective and alternative treatment, Harvoni, was too expensive); JX 4-d, C. Butler Depo. at 9:21-11:3 (same); JX 4-q, B. Prine Depo. at 65:15-66:12 (Class member informed by orthopedist that rotator cuff surgery would not be performed "because of money"); DX 6 at 02413 (Roundtree memo to limit access to over the counter medication because it is "large monetary drain").

[1181] JX 4-ss, J. LeBlanc Depo. at 52:4-9.

courses of treatment for a patient with advanced cancer.[1182] In his recommendations, the oncologist noted that the best treatment regimen had already been ruled out "due to cost."[1183] He proceeded to lay out a second-best regimen—and then, if that regimen was "not covered by prison expenses," a third choice that "has been shown to be inferior in response and outcome."[1184] To avoid any confusion, he reiterated that the second-best regimen "is superior [for] response and overall survival."[1185] Despite this explicit and repeated warning that the cheapest regimen was inferior and posed the lowest chance of survival, Dr. Toce and Dr. Singh chose the cheapest one.[1186]

369.    In the face of this explicit documentary evidence, Dr. Lavespere's testimony that budget considerations never influence treatment determinations[1187] is flatly incredible and demonstrable false.

370.    The clear evidence of basing medical decisions on budget concerns goes hand-in-hand with Angola's leadership's disengagement from the budget. None of the medical leadership at Angola have any input into or knowledge of the content of the budget or the budgetary needs of the medical program.[1188] Dr. Puisis asked Assistant Warden Lamartiniere, Medical Director Lavespere, and Nursing Director Sherwood Poret about the budget, but "no one was familiar with it, and no one could answer any specific questions about the budget."[1189]

371.    This disengagement impairs Defendants' ability to provide adequate care. In a well-functioning system, "the medical leadership will develop the budget, they will determine what the needs are, and advocate for those needs[.] Whether they receive budgetary support to attain those needs or not is another question, but they would advocate and manage the program."[1190] To have no knowledge of the budget and not advocate for the program is "irresponsible," because "[t]he people who are responsible for the program have to have a way to identify what the problems are and correct the problems."[1191] Without understanding the budget, medical personnel will be unable to "advocate for any improvement in the program" and budget-setters "are going to make the wrong decisions."[1192] As might be

---

[1182] PX 158 at 0002.

[1183] *Id.*

[1184] *Id.*

[1185] *Id.*

[1186] *Id.* at 0001.

[1187] *See* Oct. 22 Testimony of Randy Lavespere at 48:25-49:3.

[1188] PX 6 at 0012, 27.

[1189] Oct. 10 Testimony of Mike Puisis at 24:4-8; *see also* Oct. 9 Testimony of Mike Puisis at 200:5-202:10.

[1190] Oct. 9 Testimony of Mike Puisis at 200:17-13.

[1191] *Id.* at 201:21-202:2.

[1192] *Id.* at 201:23-202:10.

expected when medical personnel do not advocate for their program, the evidence suggests that Defendants diverted money earmarked for correctional healthcare to budget cuts.[1193]

372. Defendants' budgeting practices do not even let them determine how much they are spending on any particular aspect of care, or whether those expenses are rising or falling. Jan Lanoue, Defendants' 30(b)(6) witness on the healthcare budget,[1194] testified that it is impossible to determine how much was spent on a given type of medical necessity (such as IV fluid or bandages) without reviewing "thousands of records" for each year.[1195] Even Defendants' expert Dr. Moore testified that Defendants' budget is incomprehensible.[1196] This missing data is necessary to give administrators "an idea on [their] spending administratively and whether there might be a problem in a certain area or not a problem."[1197]

373. Despite Defendants' lack of knowledge about their own budget and their thoroughly inadequate recordkeeping, Plaintiffs' experts were able to determine the overall size of Angola's budget. They demonstrated that Angola's budget is "drastically less than an amount that would be expected for a facility of this size."[1198] Based on budget documents provided by Defendants, they determined that "the total medical budget at LSP is $16,888,447," which, based on the contemporaneous population of 6,303 Class members, is approximately $2,679 per inmate per year.[1199] This is "an extremely low expenditure per inmate per year"— indeed, nearly $2,000 lower per inmate than the statewide average for correctional healthcare just two years earlier, not accounting for medical inflation.[1200] Given that the acuity and thus complexity of medical needs is higher than at other facilities, it is troubling that its funding is significantly *lower* than average.[1201]

[1193] JX 4-ss, J. LeBlanc Depo. at 43:7-9, 62:3-19.

[1194] JX 4-oo, J. Lanoue Depo. at 6:18-22.

[1195] *Id.* at 29:6-21.

[1196] Oct. 23 Testimony of Jacqueline Moore at 166:10-12 ("Q: And when you evaluated, you couldn't figure out LSP's budget when you were looking at it?" A: No, I couldn't. And I'm usually very good with budgets.").

[1197] Oct. 10 Testimony of Mike Puisis at 23:11-15.

[1198] PX 6 at 0027.

[1199] *Id.*; *see also, e.g.*, Oct. 10 Testimony of Mike Puisis at 24:19-22 ("[T]he budget looks low, and the question is, are services provided that should be. It's less likely, given the size of the budget, that appropriate services are being provided.").

[1200] PX 6 at 0027.

[1201] *Id.* If the Court considers the parties' proffers or takes judicial notice of the Pew Research Center's most recent "Prison Healthcare: Cost and Quality" report covering the discovery period, it will find that as of 2015 Louisiana spent the least of *any* state on healthcare, with $2,173 per inmate per year. PX Proffer 3 at 6. The next lowest state, Alabama, spent nearly 50% more than Louisiana, with $3,234 per inmate per year.

374. Moreover, the budget's allocation compounds these shortfalls. 74% of the budget is spent on salaried and contracted professionals—meaning that just 26% of the budget goes to pharmaceuticals, specialty services, off-site medical care, and other essential expenses of adequate medical care.[1202] Plaintiffs' medical experts explained that "[l]abor costs are typically 50% of a correctional medical program budget."[1203] The fact that these concrete and critical elements of medical care constitute an unusually small share of an unusually small budget is consistent with the many findings of inadequate outside care and medication.[1204] Indeed, even Dr. Moore identified "manpower shortages, legislative cutbacks and other salient budgetary issues affecting the Department" and recommended that "a healthcare administrative structure also be added to assist the clinical director with an analysis of non-clinical issues affecting the budget."[1205]

375. Defendants' counsel suggested that Plaintiffs' experts failed to account for Medicaid 340B pharmaceutical pricing.[1206] But as Dr. Puisis explained, LSP's budget is "very low" even given 340B pricing, and "most correctional facilities get [340B pricing]."[1207]

376. Given the obvious and well-documented role that budget constraints play in Defendants' decision-making, medical leadership's disengagement from the process of allocating and managing the budget is an abdication of Defendants' responsibility to ensure adequate medical care. This appears to contribute directly to the improper allocation identified by Plaintiffs' medical experts and the under-provision of critical medical care demonstrated throughout these Proposed Findings.

---

Judicial notice is appropriate because the Pew data "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Federal courts often rely on research from the Pew Charitable Trust and the Pew Research Center as part of their decisions. *See, e.g., Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2475 n.11 (2018) (Pew Charitable Trust); *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2230 n.8 (2016) (Pew Research Center); *Chamberlain v. Fisher*, 885 F.3d 832, 849 n.5 (5th Cir. 2018) (Pew Research Center). Indeed, Secretary Leblanc himself testified that he trusts and relies on Pew's data. Oct. 12 Testimony of James Leblanc at 187:8-21.

[1202] PX 6 at 0027.

[1203] *Id.*

[1204] *See id.*

[1205] DX 13 at 02846.

[1206] Oct. 10 Testimony of Mike Puisis at 126:14-127:19. "340B" is a federal program that requires drug manufacturers to provide outpatient drugs to eligible health care organizations at reduced prices. *See generally* 42 U.S.C. § 256b.

[1207] Oct. 10 Testimony of Mike Puisis at 126:14-127:19.

377.   The pervasive, systemic problems proven in this case persist in part because Defendants do not engage in appropriate monitoring or quality assurance.

378.   Defendants use three principal forms of monitoring and quality assurance: peer review; mortality review; and a continuous quality improvement ("CQI") program. None of the three is remotely adequate, allowing the problems demonstrated above to fester and significantly contributing to the risk of harm that Class members face.

### a.   *Inadequate Peer Review*

379.   Peer review is a means to monitor the quality of provider care and thereby protect patient safety. Correctional medical systems use two main types of peer review. The first is routine monitoring of each physician, known as a performance evaluation program ("PEP"), which typically occurs every year in correctional medical programs.[1208] The second is a quasi-legal investigation "when a member of the medical staff may have committed a serious error or exhibits a serious character or behavior problem and needs to be evaluated with respect to possible reduction of privileges."[1209]

380.   *Neither* of these types of peer review is performed at Angola—even though the entire physician staff has been under some license restriction and some are not trained in the primary care they are performing, and even though serious medical errors resulting in patient harm and death occurs on a regular basis.[1210]

381.   Instead of reviewing individual providers' performance, Angola's "peer review" is an audit of the facility as a whole, which occurs roughly every other year. To perform this review, the Statewide Medical Director or a doctor elsewhere in the DOC system reviews 15 randomly selected charts from the prison.[1211] Assuming 15 charts are reviewed, each provider will have on average just 2.5 records reviewed; in any given review, some physicians' work may not be reviewed at all. Moreover, although Dr. Singh testified that charts should be chosen from among the population with chronic conditions or other serious medical needs, this does not happen in practice: sentinel events and high acuity patients are not specifically sampled, so "potentially preventable outcomes are not assessed."[1212]

---

[1208] *See* PX 243 at 0058-59 (NCCHC standard for peer review).

[1209] PX 6 at 0026; Oct. 10 Testimony of Mike Puisis at 25:22-26:14

[1210] *Id.*; *see also* JX 4-bbb, R. Singh. Depo. at 233:9-234:5 (Dr. Singh acknowledging that DOC has no formal way of evaluating individual doctors' performance).

[1211] Oct. 22 Testimony of Randy Lavespere at 37:1-5.

[1212] PX 6 at 0026; PX 62 at 0003 (describing peer review process); JX 2-b; JX 4-bbb, R. Singh Depo. at 215:23-25 ("If this is being done for a physician, then the reviewer is expected to go and pull the chronic diseases … ."); *id.* at 229:5-231:16 (explaining why chronic diseases should be reviewed in particular).

382. As Plaintiffs' medical experts explain, this form of peer review does not identify individual physician problems; does not review a sufficient number of records; fails to address potentially preventable events or care of higher acuity patients; and fails to address patients who need specialty care but are not referred.[1213] Peer review also occurs only once every two years,[1214] which Plaintiffs' expert deemed insufficiently frequent to protect patient safety, especially given that all of the physicians at LSP have had license restrictions and many have limited relevant experience.[1215] Dr. Puisis testified, "[y]ou can't hire people who don't know how to do what they're supposed to be doing and then not monitor them and expect that care will be adequate."[1216]

383. Moreover the evidence at trial revealed that LSP has not been responsive to feedback during the peer review process. Dr. Lavespere testified that he made changes to the chronic care guidelines in late 2016 after a peer review suggested it (and after Plaintiffs' experts' site visit and Dr. Lavespere's depositions), but other documents raised on cross-examination revealed that LSP had been on notice of the deficiencies in the chronic care guidelines since at least 2012.[1217]

384. Dr. Puisis explained the relationship between the failure to conduct meaningful peer review and the risk of harm to patients:

> [Y]ou are not identifying problems and deficiencies. … For an example, as we went through record reviews, we repeatedly found long periods where people had been either referred for specialty appointments and they didn't happen or they weren't referred at all and they should have been referred. We found history and physicals not documented as being done, and you could obviously see that medics were acting independently and without supervision of physicians.
>
> When peer review is done, those can be identified or should be identified, and when they are identified, you would try to find established corrective actions to make the system safer, but it didn't appear that that was happening because we would see the same problems over years of record reviews. So there's no evidence that there is a system of monitoring and corrective action, and as a result, the same problems keep continuing.[1218]

385. There is also evidence that DOC personnel consciously refrain from identifying problems during peer review. When a peer reviewer recommended "additional medical personnel" at another DOC facility, the facility's warden urged to Dr. Singh and other DOC officials "that

---

[1213] PX 6 at 0027.

[1214] Oct. 22 Testimony of Randy Lavespere at 36:17-21.

[1215] Oct. 10 Testimony of Mike Puisis at 25:18-28:18.

[1216] Id. at 29: 15-18.

[1217] Oct 22. Testimony of Randy Lavespere at 187:16-189:5.

[1218] Oct. 10 Testimony of Mike Puisis at 28:3-18.

such remarks not be included in future peer reviews" because "[i]n a subsequent suit against the institution, an offender may use that opinion as a part of his argument."[1219] Sure enough, subsequent peer reviews produced by Defendants were noticeably tempered—noting only that chronic care guidelines needed to be updated.[1220] Peer reviewers gratuitously noted that it was a "privilege" to conduct their reviews, or that they "enjoyed" them.[1221] The review reports are less than a page, sometimes handwritten, and contain conclusory statements about the adequacy of care.[1222] Pre-printed chart review forms contain nine yes/no questions.[1223] Even when recommendations for improvements were made, there is no documentary evidence of any efforts to improve LSP's practices as a result.[1224]

386.    At trial, Dr. Lavespere testified that he conducts an annual review process of the providers on his staff.[1225] The record is clear that he was actually referring to a four-page generic personnel evaluation entitled "Unclassified Performance Evaluation and Review," which does not include a review of clinical work.[1226] Warden Lamartiniere, who has no medical background or expertise, completes this evaluation for Dr. Lavespere.[1227]

387.    As to the second form of review that correctional health care systems typically perform, a quasi-legal investigation "when a member of the medical staff may have committed a serious error or exhibits a serious character or behavior problem and needs to be evaluated with respect to possible reduction of privileges,"[1228] there is no evidence whatsoever of this having occurred even once—despite the documented evidence of persistent, catastrophic errors at all levels of staff.

---

[1219] PX 285. Defendants objected to this document as irrelevant, but it is relevant to the attitudes of DOC leadership and the Department's approach to peer review.

[1220] PX 285.

[1221] JX 2-b at 690, 693.

[1222] *Id.* at 687-88, 692-93.

[1223] *Id.* at 689, 691.

[1224] *See, e.g.,* JX 4-uu, C. Park Depo. at 65:20-67:3 (unaware of peer review ever resulting in improvement).

[1225] Oct. 22 Testimony of Dr. Lavespere at 24:12-15.

[1226] *See* PX 230 at 0016-20. The "Employee Performance Tasks" asks the supervisor to review broad topic areas such as "Dependability," "Communication," "Productivity," "Teamwork," and "Planning and Organizing Effectiveness." The reviewer need only rate each category "exceptional performance," "achieves expectations," or "unsatisfactory performance," with the option to add additional comments. Plaintiffs' experts found the evaluations an inadequate assessment of clinical performance. PX 244 at 0003.

[1227] JX 4-rr, R. Lavespere Depo. at 82; PX 230 at 0021-23; JX 4-nn, S. Lamartiniere. Depo. at 9:2-3.

[1228] PX 6 at 0026; Oct. 10 Testimony of Mike Puisis at 25:25-26:16.

388. This failure to review providers' performance and reluctance to honestly review institutional performance contributes directly to the pervasive neglect and mistreatment shown above. As Plaintiffs' medical experts summarize:

> Given the number of physicians with license problems and given that several LSP physicians are practicing primary care without primary care training, peer review needs to be thorough and rigorous. Instead, it is ineffective. We identified preventable deaths and inadequate care in almost every medical chart we reviewed. Yet, the current process does not appear to address existing problems with clinical care.[1229]

### b. *Inadequate Mortality Review*

389. As a matter of standard clinical practice, and under NCCHC and ACA standards, all deaths must be "reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted and to identify issues that require further study."[1230] It is usually performed by a group that "reviews the patient's problems, their medications, the course of treatment … as far back as is necessary to determine whether the presumed cause of death could actually have been modified by care that was provided."[1231] It is not performed by the treating providers, but rather an outside group that "interview[s] the clinicians, nurses, doctors, medics, mental health professionals who cared for the patient to determine what happened."[1232] "[I]t is not recommended to have the person who provided care perform the peer review because obviously they are less likely to identify problems with their own care."[1233] As Dr. Puisis testified, this is standard practice in correctional medicine and the subject of NCCHC standards.[1234]

390. Dr. Vassallo concisely summarized the purpose of mortality review: "[T]he idea is to get a root cause analysis, why did this happen to this patient? To look at the truth and the facts of what happened and say, where can we do better? … It's not an autopsy. It's to say, how could this have gone better? … It's a very organized matter."[1235]

391. Rather than perform mortality review, Defendants simply "perform a death summary" where "the physician who cared for the patient provides a paragraph or two summary of the

---

[1229] PX 6 at 0027.

[1230] *Id.* at 0084.

[1231] Oct. 10 Testimony of Mike Puisis at 30:5-9.

[1232] *Id.* at 30:2-5.

[1233] *Id.* at 30:15-18.

[1234] *Id.* at 35; *see also* PX 243 at 0039-0040 (NCCHC standards); Oct. 15 Trial Testimony of Susi Vassallo at 178-79 (testifying that she participates in morbidity and mortality review ("M&M") "almost every week").

[1235] Oct. 15 Trial Testimony of Susi Vassallo at 179:4-13.

circumstances surrounding the death, but it's not a critical review of the death."[1236] As Dr. Vassallo put it, "[t]hat's not a morbidity or a mortality review. That is a summary as the doctor who took care of the patient."[1237]

392.   Unsurprisingly, mortality review at Angola invariably reports no problems with patients' care—despite the serious errors and delays found in virtually every recorded death that Plaintiffs' medical experts reviewed.[1238] "LSP physicians conduct a Medical Summary Report for a Deceased Offender that is typically an incomplete summary of the patient's care and does not identify whether care for the patient was timely and appropriate, does not identify problems related to systems or quality, and does not determine whether the patient's death was preventable."[1239]

393.   This appears to be by design: there is evidence that Defendants consciously refrain from critically examining the medical care preceding inmates' deaths, knowing that they could be liable for fatal neglect and mistakes in care. When an inmate was found dead in his bed after mislabeled medication led to Defendants providing him the wrong dosage, Dr. Singh "recommended to [Secretary LeBlanc] to not dig too deep" because even though the pharmacy (at the time a contract service) "shares the blame, liability is still ours."[1240] He admitted to refraining from discussing it in a meeting for this reason as well.[1241]

394.   Dr. Vassallo highlighted another particularly troubling example in the case of Patient #34.[1242] This patient made emergency sick call for flank pain due to a possible rib fracture in a football game, which led to Dr. Toce prescribing an x-ray without seeing the patient.[1243] The patient returned to the ATU the next day and saw Dr. Collins, who noted that there was no bruising or injury that could explain the pain.[1244] Three days later, Dr. Lavespere gave a no-transport order when the patient could not get out of bed; three days after that, the patient was non-responsive and died the following day—all without any attempt to diagnose the source of his pain or determine whether the possible rib fracture had caused any internal injuries.[1245] Shockingly, the medical summary reports *none* of this: it states only what the patient presented with in the final hours of his life, describing his problem as beginning with

---

[1236] Oct. 10 Trial Testimony of Mike Puisis at 35:21-24.

[1237] Oct. 15 Trial Testimony of Susi Vassallo at 179:20-21; *see also* Oct. 9 Testimony of Mike Puisis at 199:25 ("[T]here was no mortality review to speak of.").

[1238] *See supra* ¶ 128.

[1239] PX 6 at 0085; *see also* See PX 233 at 0339-0340.

[1240] PX 66 at 0001.

[1241] *Id.*

[1242] Oct. 15 Testimony of Susi Vassallo at 177:15-178:20; Oct. 16 Testimony of Susi Vassallo at 57:3-62-7, 112:2-14:11; *see also* PX 6 at 0267-68; JX 10-ee at 28671-90; PX 233 at 0181-82.

[1243] Oct. 16 Testimony of Susi Vassallo at 57:3-58:18; JX 10-ee at 28686.

[1244] JX 10-ee at 28685.

[1245] *Id.* at 28678-81; *see* Oct. 15 Testimony of Susi Vassallo at 112:9-114:1.

"acute dehydration," and thus "didn't explain at all the progression of this illness."[1246] His week-long effort to get care and increasing symptoms are mentioned nowhere. This medical summary was written by Dr. Toce, who knew of the patient's symptoms from the beginning.[1247] As Dr. Vassallo testified, this summary "misrepresented the facts of the patient's death" something that she saw "in the death reviews too frequently."[1248]

395. As Dr. Puisis testified, "[a]ll the death reports were similar."[1249] Almost all of the 28 deaths in Plaintiffs' experts' sample "had some degree of problems, and a number were preventable"—but not one death summary ever acknowledged or identified any problem.[1250] In the entire corpus of Medical Summary Reports produced in discovery, covering four and a half years, there is not a single criticism of the care provided to the deceased patient.[1251]

396. The lack of a meaningful mortality review contributes to the persistent and pervasive risk of harm to patients. As Dr. Puisis explained, "if you don't look for problems, you don't find them. And if you don't find problems, you can't fix if there's anything wrong."[1252]

397. Even Defendants' expert Dr. Thomas concedes that the mortality review program is inadequate, recommending that a "non-institutional physician" be involved in the process.[1253]

c. *Inadequate Continuous Quality Improvement Program*

398. Finally, to monitor and improve health care, correctional medical facilities should maintain continuous quality improvement ("CQI"; also known as quality assessment/quality improvement, "QA/QI") programs. A CQI program "identifies health care aspects to be monitored, implements and monitors corrective action when necessary, and studies the effectiveness of the corrective action plan." This requires participation by "representatives from major program areas," including the responsible physician (i.e., the Medical Director).

---

[1246] PX 233 at 0181; Oct. 16 Testimony of Susi Vassallo at 178:17-18.

[1247] PX 233 at 0182.

[1248] Oct. 15 Testimony of Susi Vassallo at 178:18-20; *see also, e.g.*, PX 233 at 0095 (claiming that Dr. MacMurdo instructed staff "to observe [Patient #38] very carefully" after he had a likely stroke or traumatic brain injury at 1:00 am; this is not documented anywhere in the medical records); PX 233 at 0355-56 (claiming that Patient #1 "was treated appropriately for DKA [diabetic ketoacidosis]"; patient was managed by EMTs for more than 24 hours and received no treatment for DKA); PX 233 at 0380-81 (claiming that Patient #9 died of "cardiopulmonary arrest secondary to liver cancer"; patient did not have liver cancer and in fact died due to Defendants' inadequate treatment of a systemic infection, potentially connected to their having provided the patient contraindicated hepatotoxins, exacerbating his liver failure).

[1249] Oct. 10 Testimony of Mike Puisis at 32:20.

[1250] *Id.* at 34:8-9.

[1251] PX 233 at 0033-0487.

[1252] Oct. 10 Testimony of Mike Puisis at 34:21-23.

[1253] DX 14 at 72.

When the committee identifies a health care problem, it should conduct "a process and/or outcome quality improvement study." It also "completes an annual review of the effectiveness of the CQI program by reviewing CQI studies and minutes of CQI, administrative and/or staff meetings, or other pertinent CQI written materials." Without an operational CQI program, "there is a greater likelihood that quality concerns are not identified or corrected, with adverse patient outcomes."[1254]

399. Plaintiffs' medical experts evaluated all Quality Improvement minutes and determined that Defendants maintain a "minimal," "ineffective" quality program that falls far below these standards. Angola's CQI program "does not appear to have support of clinical leadership, is not adequately staffed, does not identify ongoing quality concerns, and includes only a small number of nursing staff as participants."[1255]

400. With rare exceptions, *only* nurses participate in CQI. In the five years of minutes produced in discovery, the Medical Director never participated in a CQI meeting or activity, nor did anyone from the medical department, EMS department, pharmacy, laboratory, radiology, or medical records departments.[1256] Even the Assistant Warden for Healthcare Services, Ms. Lamartiniere, attended just two meetings in the five-year period.[1257] Angola's nurse practitioner, one of only six providers, had never heard of QI/QA taking place at LSP, even though she had participated in it at previous DOC facilities.[1258]

401. This fundamentally undermines the possibility of an effective CQI program. As Dr. Puisis explained:

> [I]t has to have the support of the leadership. The leadership has to not only buy in, but they have to promote it. And if the leadership doesn't promote the fact that we're going to have a quality improvement program and we're going to try to improve continuously, it won't happen. So that's fundamental.[1259]

402. The content of the meetings was also wholly deficient. Rather than identifying problems, developing improvement plans, and monitoring their implementation, the CQI committee mainly performs an identical set of studies every year.[1260] The only improvement activities

---

[1254] PX 6 at 0087-88; *see also* PX 243 at 0029-33 (NCCHC standards for CQI program); Oct. 10 Testimony of Mike Puisis at 35:11-36:17.

[1255] PX 6 at 0088.

[1256] *Id.*

[1257] *Id.*; PX 6 at 0007; JX 4-rr, R. Lavespere Depo. 80:12-81:2 (Dr. Lavespere: "Q. And do you perform any quality improvement or quality—QA/QI is what Dr. Singh called it. Do you do any of that? A. I don't."); Oct. 10 Testimony of Mike Puisis at 36:22-38:4 (discussing lack of participation by Medical Director, Assistant Warden, EMTs, and pharmacy).

[1258] JX 4-uu, C. Park Depo. at 67:4-68:8.

[1259] Oct. 10 Testimony of Mike Puisis at 36:1-6.

[1260] PX 6 at 0088-89, DX 13 at 28-29.

that occurred were confined to nursing issues, due to the lack of participation by other departments.[1261] For the most part, these studies "were not really critical studies of identification of problems and trying to fix them, but were more observational ones such as looking at the data on death but not documenting any analysis of it."[1262] Even after urgent warnings, like the 2014 warning that patients with strokes were not being sent to the hospital in time, no CQI studies and improvement plans were added.[1263]

403.    As a result, Defendants fail to address obvious problems—even when warned by their own staff. For example, in November of 2014, the nurse supervisor over the infirmary reported that the dirtiness of the infirmary had become a "dire situation," with medical waste bags "full" and "leaking," beds and floors not cleaned every day, and similar problems.[1264] At the same time, six post-operative infections were reported in the infirmary—three of which resulted in death.[1265] The next quarter the QA/QI committee began recording the number of infections, but made no recommendation for improvement even though it identified infections that originated at LSP.[1266] Defendants closed the study after a year without recommending or making any changes.[1267]

404.    Even Defendants' expert Dr. Moore agrees that "[t]he CQI program is largely ineffective because it is felt that the staff doesn't understand the principles of CQI and those that are on the committee are powerless to make changes in the care provided."[1268]

405.    Defendants thus lack an appropriate program to identify and remediate problems. This directly contributes to the pervasive risk of severe harm—and the frequent manifestation of actual harm—that Class members consistently experience. As Dr. Puisis summarized:

> [I]t's pretty clear that they don't have a CQI program that's effective. It's a group of nurses who meet. They have a very limited perspective and agenda. There is no

---

[1261] PX 6 at 0088-89; JX 3-a; *see also, e.g.*, JX 4-zz, S. Poret Depo. at 101:13-102:14 (QA study on post-operative infections did not change behavior).

[1262] Oct. 10 Testimony of Mike Puisis at 37:11-15. Dr. Puisis also critiqued the studies for lacking a "fully dedicated position." *Id.* at 37:9-16. Indeed, given the myriad roles that Warden Tracy Falgout plays, the cursory nature of these reviews are perhaps inevitable. *See* Oct. 25 Testimony of Tracy Falgout at 33:5-37:2 (describing his many job responsibilities).

[1263] *Compare* PX 12 at 0001-02 *with* JX 4-bbb, R. Singh. Depo. at 61:20-62:2 (acknowledging that there had been no CQI study on stroke diagnosis).

[1264] PX 11 at 0002-03; *see also* PX 21 at 0001-02 ("[I]t is an ongoing concern of mine and the nurses. The units, especially Unit 2 is not kept as clean as a nursing unit should be. … On Nursing Unit 2 some of the beds are grossly dirty. … [T]o me it is bad. I would like for it to be as clean as a hospital and I think it should be.").

[1265] PX 34.

[1266] JX 3-a at 00391-92, 397.

[1267] *Id.* at 441; JX 4-zz at 64:12-22.

[1268] DX 13 at 29; *see also* Oct. 23 Testimony of Jacqueline Moore at 149:7-13.

participation from medical; as a result, the serious problems that exist in medical care. … Why don't records, reports from the specialists come back to the providers? Why don't the providers review those reports? Why does it take 12 months or 15 months to get a biopsy of a probable lung cancer? Those problems don't get identified. And when they don't get identified, there is discussion on how to improve it; and as a result of that, the same problems reoccur over and over, and it's harmful. It causes morbidity and mortality.[1269]

## C. Defendants' Counterarguments

406.    Defendants did little to factually rebut Plaintiffs' evidence of a risk of serious harm or the connection between their poor practices and that risk. As discussed *supra* ¶¶ 131-134, Defendants' experts did not controvert Plaintiffs' experts' record review in any significant way, and Defendants' attacks on cross-examination were insubstantial.

407.    Defendants left much of the documentary and deposition evidence unrebutted altogether. They had no response to the documents contemporaneously showing problems in critical subjects like timely diagnosis and treatment of strokes and infections;[1270] they declined to acknowledge the testimony of their former Medical Director Dr. Collins and their former Assistant Warden for Health Care Kenneth Norris, who both acknowledged failures to provide basic services to patients;[1271] and they left unaddressed the numerous documents about backlogs and staff shortages that could harm patients.[1272]

408.    Instead, Defendants' efforts to dispute Plaintiffs' showing involved four basic counterarguments: first, that some patients refused care; second, that some patients received multiple appointments with LSP providers or non-LSP specialists, multiple medications, and the like; third, that outside hospital services were inadequate for some or all of the time period; and fourth, that the facility was accredited by the ACA. None of these arguments does anything to rebut Plaintiffs' overwhelming showing that Class members are exposed to a substantial risk of serious harm.

### (1)    Refusals of Care

409.    First and most emphatically, Defendants emphasized at trial that some Class members do, on occasion or on a repeated basis, refuse medical care. While this may be true, it does not diminish Plaintiffs' showing of a substantial risk of harm for at least three reasons: because the vast majority of deficient care evidenced in the records was unrelated to refusals; because most of the refusals Defendants identified were irrelevant or justified; and because Plaintiffs identified serious deficiencies in Defendants' handling of refusals.

---

[1269] Oct. 10 Testimony of Mike Puisis at 38:24-39:11.

[1270] *See supra* ¶¶ 230-233.

[1271] *See* JX 4-tt, K. Norris Depo. at 37:13-38:5; JX 4-ee, J. Collins Depo. at 23:19-24:19, 123:12-125:15.

[1272] *See supra* ¶¶ 261-264.

410. *First*, while Defendants spent much time and energy at trial identifying specific instances in which patients in the Plaintiffs' experts' sample or named Plaintiffs had refused medical care, these refusals represented a tiny fraction of the encounters where Plaintiffs' experts identified problems. Even if all of the refusals Defendants identified were viewed as serious problems for Plaintiffs' experts' conclusions (which, as discussed below, they cannot be) most of the patients in the sample would still be entirely unaffected, as would the vast majority of relevant medical care for most if not all of the patients who did refuse care at one time or another.

411. *Second*, many of the refusals Defendants proffered had nothing at all to do with the deficiencies and harms that Plaintiffs' experts identified, or were readily explained by problems within Defendants' control, rather than the patient's.[1273]

412. These problems were well illustrated in the case of Patient #1, Defendants' very first cross-examination of Plaintiffs' experts on the sampled patients.[1274] Dr. Puisis had identified three basic and serious sets of deficiencies that had exposed Patient #1 to a risk of harm: the multi-year mismanagement of the patient's high blood pressure, including decreasing medication in direct contradiction of the doctor's prescription; the critical failure to address the patient's fatal diabetic ketoacidosis; and a medical summary identifying no problems with the patient's care despite major oversights in the days before his death.[1275]

413. Defendants identified several instances in which Patient #1 may have refused medical care over a period spanning more than five years. Two of these were for incidents wholly unrelated to Plaintiffs' concerns, such as a refusal of treatment after a motor vehicle accident and a decision to not take anti-inflammatories after a minor knee injury.[1276] A third occurred at a different facility, before Patient #1 was even housed at LSP, a fact that was not disclosed by Defendants when they used the incident at trial.[1277] These add nothing whatsoever to Defendants' argument.

---

[1273] *See, e.g.*, Oct. 9 Testimony of Farrell Sampier at 81:22-82:7(explaining why he refused a wheelchair that was not designed for paraplegics); Oct. 12 Testimony of John Tonubbee at 144:9-146:22 (explaining how after waiting in a locked holding room for more than two hours to see the orthopedist, he was required to sign a refusal form in order to go back to his camp, even though security or medical staff told him the orthopedist had been called out on an emergency and would arrive late, if at all); JX 10-ff at 10-30077 (Patient #14 had not fasted as required for lab work because he had not fasted the day before, presumably because he had not been informed when the labs would be performed).

[1274] *See* Oct. 10 Testimony of Mike Puisis at 144:11-149:13; *see generally* JX 10-w.

[1275] *See* PX 6 at 0069, 91-94.

[1276] Oct. 10 Testimony of Mike Puisis at 145:6-147:1; *see* JX 10-w at 51339, 51351.

[1277] *See* Oct. 10 Testimony of Mike Puisis at 145:20-46:3; *see* JX 10-w at 51361. This was not the only time that the records Defendants used simply did not show what Defendants' counsel claimed. For example, they claimed that one document showed Patient #41 refusing to be transported off-site,

414. Defendants also identified four times over an 18-month period when EMTs or providers noted that Patient #1 missed or had been missing his blood pressure medication.[1278] But the same records show that Patient #1 was not receiving his medication due to "long pill call lines."[1279] As Dr. Puisis explained, "when the doctors are saying that he is not getting his medication because the line is too long, there should be some investigation into that."[1280] Multiple pieces of evidence throughout the trial identified long pill call lines as an obstacle to patients outside the REBTC receiving medication, but there is no evidence that Defendants undertook any effort to address this problem.

415. Similarly, Defendants implied that Patient #1 was responsible for any harm he suffered because he was a "no show on call out" four months before his death for an unidentified medical appointment.[1281] But as multiple witnesses credibly explained, call-outs are mandatory and inmates are disciplined if they miss them.[1282] But as multiple witnesses credibly explained, call-outs are mandatory and inmates are disciplined if they miss them.[1283] Patients do not generally choose where to be when they are called out; if a patient missed a medical call-out, it was likely due to double-scheduling on the part of the prison, either for a work assignment or some other function. Indeed, Defendants identify patients as no-shows even when they are incapacitated and on the nursing unit—and even when they are dead.[1284] Given the unreliability of MARs as Defendants maintain them, they are of limited probative value. More to the point, once Patient #1 *was* seen the following week, the doctor's notes report "no problems" despite finding a blood pressure of 130/84, and documented virtually

---

when the actual document showed him refusing transport to the ATU. *Compare* Oct. 16 Testimony of Susi Vassallo at 84:21-85:4 (describing a record as showing the patient "refused to be transported off site from LSP") *with* JX 10-G at 7720; Oct. 16 Testimony of Susi Vassallo at 120:19-21:5.

[1278] Oct. 10 Testimony of Mike Puisis at 146:19-47:24; *see* JX 10-w at 51335, 51338, 51341, 51347.

[1279] Oct. 10 Testimony of Mike Puisis at 147:7-24; JX 10-w at 51335, 51338.

[1280] Oct. 10 Testimony of Mike Puisis at 149:4-7.

[1281] *Id.* at 147:25-148:4; JX 10-w at 51309.

[1282] Oct. 15 Testimony of Charles Butler at 73:5-18 (explaining that medical callouts are mandatory and failure to go to one results in a disciplinary action); Oct. 15 Testimony of Danny Prince at 103:9-18:(explaining that if a patient refuses to go to a medical call out, he could be written up or locked up); *see also* Oct. 16 Testimony of Madeleine LaMarre at 205:13-24 (discussing difference between no-shows and refusals).

[1283] Oct. 15 Testimony of Charles Butler at 73:5-18 (explaining that medical callouts are mandatory and failure to go to one results in a disciplinary action); Oct. 15 Testimony of Danny Prince (explaining that if a patient refuses to go to a medical call out, he could be written up or locked up); *see also* Oct. 16 Testimony of Madeleine LaMarre at 205:11-24 (discussing difference between no-shows and refusals).

[1284] *See, e.g.,* JX 10-qq-2 at 47087, 47408-47417 (listing Lionel Tolbert as a "No Show" in the eye clinic, when in fact he had had a stroke several days earlier and was a patient on Nursing Unit 1); PX 6 at 0226 (MARs stated that Patient #20 was a "no show" or "did not request" his medication after his death).

no examination.[1285] He was then not seen again for three months, until he entered an acute stage of diabetic ketoacidosis that went untreated and managed by medics for more than 24 hours, leading to his death.[1286]

416.   The vast majority of refusals Defendants identified with other patients were similarly irrelevant or isolated, and were seldom if ever accompanied by any medical testimony connecting them to the harm to the patient.[1287] For example, Defendants focused on Patient #4 declining a flu shot and possibly the removal of a benign lipoma[1288]—but did not address Plaintiffs' experts' finding of "significant departures from standard of care" over a ten-day period where the patient developed pneumonia and a systemic infection, leading to the patient's "preventable" death.[1289]

417.   Similarly, Defendants identified two instances in which Patient #39 was not taking medications—one of which was because he was unresponsive.[1290] Plaintiffs' experts' concerns regarding Defendants' treatment of Patient #39 were not about medication compliance, however—but rather that LSP physicians repeatedly ordered medics not to transport the patient from his cell to the Treatment Center on three separate occasions over the course of eleven days when medics found him "breathing but unresponsive" or "laying on the floor and vomiting."[1291] As Dr. Vassallo testified, this treatment is "a little bit shocking to the senses"[1292]—and neither Defendants nor their experts offered any defense of it. Nor did Defendants explain physicians' failure to do anything more than check the patient's chart for three days while he was in a "locked room" in the infirmary with the "hatch up."[1293]

418.   Notably, Defendants' focus on specific refusals was almost wholly unsupported by testimony from medical experts or treating physicians (or any other source) connecting the refusals to any harm. One of the rare exceptions was the case of Shannon Hurd, where Dr. Thomas suggested that his refusal of two appointments may have contributed to his delayed

---

[1285] JX 10-w at 51308; PX 6 at 0092.

[1286] *See* PX 6 at 0092-93.

[1287] *See, e.g., supra* ¶ 61 (discussing "refusals" that Defendants attributed to Patients #15, 29, 36, and 41); *see generally* App'x A (responding to each of Defendants' criticisms of Plaintiffs' experts' chart reviews).

[1288] *See* Oct. 10 Testimony of Mike Puisis at 174:19-23; JX 10-ll at 40376, 40380-83. The record does not support Defendants' assertion that the patient refused the lipoma removal; rather, the *hospital* refused to perform the removal due to the patient's uncontrolled blood pressure. *See* JX 10-ll at 40364-66.

[1289] PX 6 at 0111-12; *see generally supra* ¶¶ 58-67 (discussing Defendants' cross-examinations of each patient in the experts' sample).

[1290] Oct. 16 Testimony of Susi Vassallo at 0080:21-23.

[1291] PX 6 at 0063-64; *see* Oct. 16 Testimony of Susi Vassallo at 117:16-118:24.

[1292] Oct. 16 Testimony of Susi Vassallo at 118:15.

[1293] JX 10-ii-1 at 36664, 36666; *see* Oct. 16 Testimony of Susi Vassallo at 116:23-117:7.

diagnosis.[1294] As discussed *supra* ¶ 103, Dr. Thomas's analysis of Mr. Hurd's care is entirely unreliable—but on this point, it is not only unreliable but directly contradicted by Dr. Lavespere, who explicitly testified in a binding 30(b)(6) deposition that Mr. Hurd's refusals did not affect the course of his treatment or his conditions.[1295] Moreover, Mr. Hurd testified without contradiction that he did not refuse testing but that he was too sick to travel for the first appointment, and had not been told that he needed to fast for the second appointment—and that he requested that they reschedule the tests, which they did not do for five months.[1296]

419.     *Third*, Plaintiffs established that Defendants' handling of refusals was deficient in numerous ways. Plaintiffs' experts testified at length about the standard practices that should be followed when a patient refuses medical care. The standard practice when a patient refuses medical care is that "a refusal form is signed for each refusal, and for certain items, when patients refuse repeatedly, nurses will notify a physician who will meet with the patient and document a discussion to try to determine why the patient is refusing."[1297] The patient should "put a reason for a refusal" so that "whoever looks at that refusal understands why the refusal exists."[1298] Medication administration records should similarly document refusals.[1299] As Ms. LaMarre summarized:

> [W]hen patients refuse care for serious medical problems, you want to bring the patient to the clinic and sit down and discuss with them why they are refusing, … what their understanding of the disease is, what their understanding of the treatment options are, and be sure you thoroughly educate the patient, and then if they continue to refuse, you want to document that refusal.[1300]

420.     While this sometimes occur at Angola, the evidence suggests it is infrequent. Most of the time when a refusal was noted, it was "based on provider notes about what was happening to the patient," rather than a signed and informed refusal.[1301] While Defendants identified "good refusal to accept medical care note[s]" on a small handful of occasions,[1302] the vast majority provided no reason for the refusal if the patient even filled out a refusal form, and

---

[1294] *See* Oct. 23 Testimony of David Thomas at 125:16-22

[1295] *See* JX 4-pp at 7:14-9:2. Notably, Dr. Thomas did not mention these refusals at all in his report, much less connect them to Mr. Hurd's overall care or outcome.

[1296] JX 4-u at 50:8-52:11.

[1297] Oct. 10 Testimony of Mike Puisis at 12:5-8.

[1298] Oct. 16 Testimony of Susi Vassallo at 43:19-22.

[1299] Oct. 10 Testimony of Mike Puisis at 149:8-13.

[1300] Oct. 17 Testimony of Madeleine LaMarre at 103:9-15; *see also, e.g.*, Oct. 9 Testimony of Mike Puisis at 151:20-52:12; Oct. 16 Testimony of Madeleine LaMarre at 204:11-20.

[1301] Oct. 10 Testimony of Mike Puisis at 148:16-25.

[1302] Oct. 16 Testimony of Susi Vassallo at 85:18-19; *see* JX 10-g at 10-07712.

176

often did not state what the patient was refusing.[1303] Indeed, in many cases the form appeared to be filled out by Defendants' employees, and it was unclear whether the patient was present at all when the form was completed.[1304]

421. Equally troubling, discussions of the reason for refusal and attempts to counsel the patient appeared to be rare.[1305] In the usual case, "[w]hat was documented was patient refused, patient refused," without any indication of what if anything the provider discussed with the patient.[1306] Defendants' attitude was succinctly—and callously—summed up by Dr. Lavespere in his deposition: "Him not taking his medicine is him refusing to take care. … If he has a stroke but he's got blood pressure medicine and he's not taking them, they are not pinning that on DOC … ."[1307]

422. Moreover, the evidence reveals little effort to address the reasons for refusal even where Defendants documented a reason. As the cases of Patient #1 and Mr. Hurd illustrate and Ms. LaMarre explained, refusals can have many reasons that require addressing by a medical system:

> [S]ometimes there is an assumption that all refusals are bad. In other words, that patient doesn't want the care that's being offered. And what's really true is that sometimes the patient has a dilemma where they have to make a choice and the choice isn't good.[1308]

> In any … provider/patient relationship, when one prescribes medication for serious medical conditions, part of the evaluation is are you taking the medication. Providers need to know because if the patient's not taking the medication you want to find out why … . And again, is it because you don't understand how important it is, how it's going to help you, what the risks are of not taking the medication, is the medication making you sick, is there something about your schedule that makes it difficult for you to take the medication? Do you work the night shift and you're supposed to take it in the morning and you fall asleep, et cetera? So there are a lot of reasons that patients don't take the medication, and it's important to the treatment plan to assess whether they're taking their medications and, if not, why not.[1309]

---

[1303] *See, e.g.* JX-z-1 at 21837 (no reason noted), 21830 (same), 21800 (no refusal form); JX 10-v at 18969 (not stating what medical attention was refused); JX 10-cc-2 at 25846 (blank but signed form).
[1304] *See, e.g.*, JX-ccc-4 at 56572 (stating "PT has KOP and only needed his Neurontin"); JX 10-v at 19035 (filled out by EMT and patient did not sign).
[1305] *See, e.g.*, Oct. 16 Testimony of Madeleine LaMarre at 209:2-4 ("Q. And did you see documentation of counseling in those charts? A. In some charts, but the majority, no.").
[1306] Oct. 10 Testimony of Mike Puisis at 154:13-19.
[1307] JX 4-rr, R. Lavespere Depo. at 52:3-11.
[1308] Oct. 16 Testimony of Madeleine LaMarre at 206:19-24.
[1309] *Id.* at 182:11-25.

If you're scheduled for lab, you know, you might refuse your lab, but why? … [T]hings like, I'm refusing the doctor's appointment because I'm diabetic and I'm supposed to get my insulin and my blood sugar checked at this time and the doctor's appointment is the same time so I have to choose between one or the other. Or I have a mental health appointment and a doctor's appointment, I have to choose between one or the other. I have an attorney's visit that is scheduled and, therefore, I don't want to go to my doctor's appointment because I don't want to miss meeting with my attorney. Or I have a job, you know, where I'm making some money and I only make 12 cents an hour, so I don't want to miss out. Now, should all these other considerations outweigh the medical appointment? It really depends, but these are the kinds of circumstances that happen in corrections that lead patients to refuse care.[1310]

423. These barriers should prompt not just counseling at the patient level, but institutional consideration of whether practices need to be improved. As Dr. Puisis testified, "[i]f the objection is a true barrier to care, obviously that would be an identification of a problem that should be worked out through a quality committee."[1311] There is no evidence whatsoever of this occurring.

424. Defendants appeared to suggest that they could have provided counseling and simply not documented it, or that Plaintiffs' experts were applying too high a standard. Neither argument has merit. First, as Dr. Vassallo said, the standard in medical practice is "if you don't write all the details of it, you didn't do it."[1312] This is because "medical documentation is how we communicate our thoughts with the rest of the world, how we communicate our decision-making, and how we communicate with others subsequently."[1313]

---

[1310] *Id.* at 203:5-20; *see, e.g.*, JX 10-bb at 24658 (refusal form states "on church call-out"); JX 10-u at 18065 (refusal form states "I'm waiting to see my lawyer"); JX 10-hhh-1 at 59504 (refusal form states "Gotta finish taking important test!"); JX 10-dd at 27289 (refusal form states that patient is a diabetic and missed his morning medications and lunch because the food ran out at the hospital kitchen). The attitude that medical staff take towards refusals is especially problematic because scheduled hospital trips were often missed or cancelled at the last minute due to medical staff themselves failing to adequately prepare patients for their appointments—for example, by stopping Coumadin, which could cause fatal bleeding if continued during a procedure. *See* PX 142 (email from Melanie Benedict noting "many cancellations for scheduled procedures/surgery dates" and suggested more instructions to "staff").

[1311] Oct. 10 Testimony of Mike Puisis at 12:24-13:2.

[1312] Oct. 16 Testimony of Susi Vassallo at 13:7-18.

[1313] *Id.*; *see also* Oct. 9 Testimony of Mike Puisis at 149:8-9 ("How does anyone know that you did it if you didn't document it?"). Not only is there a lack of documentation surrounding refusals, Dr. Lavespere's approach towards refusals and any patients that refuse is readily apparent, and presumably guides the approach of his staff. He testified on several occasions that, after three

425.  As to the suggestion that a patient's refusal divests a medical system of responsibility, and that Plaintiffs' experts' expectations are too high, this contradicts not only common sense but Defendants' own expert testimony. Dr. Thomas agreed that "[e]ducation is important for patients who are refusing care."[1314] While he initially testified that it was just "a part of corrections" that "[p]eople refuse care, and there isn't much you can do about it,"[1315] he conceded that he had recently opined on behalf of a plaintiff who had refused "all forms of treatment" that "the failure of the healthcare providers to make reasonable attempts to provide medical and mental health care for him fell well below the standard for appropriate care."[1316] There is no thus evidence to support Defendants' suggestion that Plaintiffs' standards are inappropriately high, and ample evidence for rejecting it.

(2)  Examples of Care in the Record

426.  Next, Defendants suggested that the fact that some patients received numerous appointments with specialists or other off-site medical care mitigated the risk of harm. As Defendants' counsel put it, "it's all about clinical care, and … they're getting clinical care. They're getting taken to outside providers, they're getting seen."[1317]

427.  The question before the Court, however, is not whether Class members *never* see doctors and *never* see outside providers; it is whether the predominance of the evidence shows that Defendants' practices as a whole subject Class members to a substantial risk of serious harm when they develop serious medical needs.[1318] While it is undisputed that some Class members saw outside specialists and received some care related to ongoing issues, the question is whether Class members were exposed to a significant risk of *not* receiving appropriate care—not whether some patients received care in some instances. As Plaintiffs' experts showed, the record is replete with countless examples of patients *not* receiving indicated specialty care. Moreover, even when Class members are allowed to see specialists, Defendants' personnel frequently fail to coordinate their care with specialists' recommendations, often with tragic consequences.

428.  Patient #6 presents a good example of the inadequacy of Defendants' showing and argument. Patient #6 suffered from hypertension and significant cardiac arrhythmia, conditions that require treatment by a cardiologist.[1319] Defendants attempted to show at trial that the patient was seen "at least nine times by a[n] outside heart specialist" between 2010

---

refusals, he doesn't reschedule patients because they are "wasting [his] time." JX 4-rr, R. Lavespere Depo. at 42:23-25; *accord* Oct. 22 Testimony of Randy Lavespere at 203:11-16.
[1314] Oct. 23 Testimony of David Thomas at 73:8-10.
[1315] *Id.* at 70:6-22.
[1316] *Id.* at 71:2-72; *see Wright v. Lake Cty., Ind.*, No. 13-cv-333, Doc. 144-16 (N.D. Ind. Feb. 15, 2017).
[1317] Oct. 10 Trial Colloquy at 187:16-19.
[1318] *See infra* ¶¶ nn.1822-1863
[1319] PX 6 at 0076.

and 2015.[1320] This does not in any way controvert Plaintiffs' concerns about Patient #6's care. Plaintiffs' experts clearly explained that the problems in his case was not the quantity of cardiology appointments but that "[c]ommunication with consultants was poor and ineffective," leading to recommended tests going unperformed and prescribed medications unprovided; LSP physicians failing to evaluate the patient after his return from hospitalizations; and a delay of several days in responding to "signs of serious health failure."[1321] The "lack of review and acting on consultant recommendations" led to the patient's "preventable" death.[1322] The raw number of appointments that Plaintiff #6 had with specialists over a five-year period does not dispel these concerns, particularly without *any* medical expert testimony suggesting why this would suffice to treat his condition and mitigate his risks.[1323]

429.    Defendants' showing is also undermined by the frequency with which they misrepresented the records they highlighted at trial.[1324] For example, Defendants asserted that Patient #29 had "three outside hospital visits" during a crucial period of time.[1325] In fact, two of the three records Defendants showed at trial were for telemedicine visits where Patient #29 merely saw a specialist over a videoconference, rather than any offsite or in-person consultation.[1326] The only actual outside hospital visit is the one that Plaintiffs' experts discussed in their

---

[1320] Oct. 10 Testimony of Mike Puisis at 181:2-186:6. It is not clear that Defendants' assertion was correct, as some of the documents they used to support it appear to show emergency room visits rather than cardiology consultants. *See, e.g.*, JX 10-h at 08438. Several others are merely readings of electrocardiograms, without any evidence of in-person examinations. *See, e.g., id.* at 08263; Oct. 10 Testimony of Mike Puisis at 182:9-11, 185:22-186:16. Moreover, most of the off-site visits appear to be associated with emergent episodes, rather than ongoing specialty care. *See, e.g.*, JX 10-h at 08245, 08311-12. As Plaintiffs' experts explained, these episodes were the result of LSP physicians' failure to treat the patient with anticoagulation or coordinate care with specialists. *See* PX 6 at 0076. It is thus far from clear that the evidence supports Defendants' assertion, which was supported only by these documents and their lawyers' questions, rather than affirmative evidence. For the purpose of this analysis, however, it can be assumed that Patient #6 did in fact see a cardiologist nine times over the five year period.

[1321] PX 6 at 0076; *see also* Oct. 11 Testimony of Mike Puisis at 54:14-94 (having been seen nine times by a heart specialist wouldn't contradict experts' conclusion because "it was the coordination with the specialist, and information should have been provided to the specialist that was not. And that changed, I believe, the evaluation that the specialist could provide. The specialist didn't know that the patient had atrial fibrillation. It would change their opinion and their recommendations, and indeed I think it did.").

[1322] PX 6 at 0076

[1323] *See also supra* ¶¶ 268-277 (discussing failures to coordinate specialty care).

[1324] *See supra* ¶¶ 58-61 (discussing Defendants' cross-examinations on Plaintiffs' experts' case studies).

[1325] Oct. 16 Testimony of Susi Vassallo at 40:2-4.

[1326] *Compare* Oct. 16 Testimony of Susi Vassallo at 32:11-33 *with* JX 10-j at 09612-14; *compare* Oct. 16 Testimony of Susi Vassallo at 35:2-36:7.

report: a hospitalization for renal failure and atrial fibrillation after three weeks of treatment by medics without examination or assessment by an LSP physician.[1327]

430. Defendants also attempted to support their assertion of ample medical care through Dr. Thomas. As already explained, this testimony is wholly unreliable and directly contrary to Dr. Thomas's opinion in a prior case.[1328] The case of Ian Cazenave, one of the named Plaintiffs, illustrates why neither Dr. Thomas's opinion nor the conclusions Defendants draw from it can be accepted. Dr. Thomas opined that Mr. Cazenave, who suffers from sickle cell disease, "has been frequently, regularly and recently seen in specialty clinics including plastic surgery (wound care) who recommended frequent dressing changes which he undergoes."[1329] In fact, specialists referred Mr. Cazenave to a wound care specialist five times between February and May 2016, without Mr. Cazenave once seeing a wound care specialist,[1330] as Dr. Thomas admitted on cross-examination.[1331]

431. Moreover, as Plaintiffs' experts explained and the records confirm, Mr. Cazenave had not seen a hematologist for at least 16 years as of February 2016.[1332] The omission of a critical specialty from testimony that patients were "frequently" and "regularly" seen highlights the core flaw in Defendants' argument that the existence of any non-LSP care mitigates the risk of harm: the occasional access to certain specialists cannot make up for inadequate or nonexistent access to indicated care that would reduce the risk of harm.

### (3)   The Availability of Outside Providers

432. Defendants also suggested that, to the extent that there was any risk of harm to Class members, it was due to the lack of available outside providers, and was short-lived. Defendants focused in particular on the closure of Earl K. Long Hospital in April 2013, arguing that some backlogs developed and services were curtailed during the aftermath of the closure but the situation was returning to a safer level by the end of the discovery period. More generally, they noted that LSP is in a remote location far from hospital services.

433. As discussed *infra* n.1904, this is not a legally cognizable defense. Among other things, it is Defendants' choice to house Plaintiffs at LSP; nothing requires them to house the sickest

---

[1327] *See* PX 6 at 0256-57.

[1328] *See supra* ¶¶ 93-106.

[1329] DX 14 at 02902; *see* Oct. 23 Testimony of David Thomas at 93:17-21.

[1330] JX 10-k-1 at 10313, 10324, 10333, 10344; JX 10-k-3 at10669; *see* Oct. 23 Testimony of David Thomas at 93:17-98:15.

[1331] Oct. 23 Testimony of David Thomas at 96:9-16. On redirect, Defendants' counsel and Dr. Thomas claimed Mr. Cazenave was getting the wound care follow-up "ordered by the outside providers" by citing records of routine wound care by LSP staff overseen by Dr. Lavespere—not consultation with a wound care specialist. *See id.* at 117:20-18:5; JX 10-k-1 at 10140, 10144. It is undisputed that Mr. Cazenave never saw a wound care specialist in this time period.

[1332] *See* PX 28 at 9; JX 10-k-1 at 10347; Oct. 23 Testimony of David Thomas at 93:25-94:20.

patients in the DOC system at one of its most remote facilities. Indeed, nothing requires DOC to maintain a prison on a farm 60 miles from Baton Rouge. The government cannot choose to incarcerate individuals at an inaccessible location and then blame its inaccessibility for problems delivering medical care.

434.    Even if this theory were legally cognizable, however, the facts do not bear it out. The evidence showed that the risk of harm was present before the closure of Earl K. Long and persisted long after it. As already noted, Plaintiffs' experts reliably identified numerous instances of deficient practices exposing patients to severe harm as far back as 2010, when they began reviewing records, and as far forward as mid-2016, the close of discovery.[1333] They noted no changes in the quality of care throughout the time they reviewed records.[1334]

435.    Moreover, both the expert testimony and the nature of the deficits in care rule out the possibility that problems at outside providers—whether in their availability or the quality of their care—could account for the level of harm to which Defendants exposed Class members. As discussed above, the risk of harm came principally from practices within LSP: its staffing decisions, its practices for providing and coordinating care, its use of lower-level personnel in roles that required higher levels of medical expertise. As Dr. Puisis said, any difficulties at external hospitals are "unconnected. Unless an outside hospital was managing all the care, including the care at LSP, no, an outside hospital would not have made a differen[ce]."[1335]

436.    Even if the closure of Earl K. Long were somehow related to or a justification for these deficits, Defendants knew as early as 2010 that Earl K. Long would close in 2013, and that it would be a "long process" to "find good solutions to the inevitable public safety challenges when delivering [healthcare] in a private hospital setting."[1336] They had three years to prepare for those challenges, yet they did not have their first meeting about dealing with the closure until November 2012.[1337] And in 2012, even before Earl K. Long actually closed, Defendants

---

[1333] *See supra* ¶¶ 53-54.

[1334] *See* Oct. 9 Testimony of Mike Puisis at 167:20-168:1, 194:11-195:12; Oct. 15 Testimony of Susi Vassallo at 165:1-6; Oct. 16 Testimony of Madeleine LaMarre at 150:25-51:11, 225:4-9.

[1335] Oct. 9 Testimony of Dr. Puisis at 197:20; 198:5; Oct. 10 Testimony of Dr. Puisis at 40:4-41:3, 47:23-48:2.

[1336] *See* Oct. 12 Testimony of James LeBlanc at 184:14-25; DX 101.

[1337] PX 56 at 0001. At that meeting, less than six months before Earl K. Long's closure, Defendants were obviously not prepared to put any sort of plan in place. When an LSU doctor asked how many off-site visits the Angola patients needed, nobody was able to provide even an estimate. *Id.* at 0002. Notably, none of the Angola staff was present at that meeting. *Id.* Defendants also spent several months after the meeting trying to determine how much money they spent on healthcare. *See* PX 23. This process was made more cumbersome by the lack of an electronic record-keeping system. *Id.* at 0007.

knew the medical staff was "pick[ing] up way more work with lesser staff,"[1338] due to the closure of Phelps Correctional Center and the transfer of 1000 patients to Angola.[1339] Their failure to make alternate arrangements despite years of foreknowledge that Class members would lose a significant source of outside care amounts to deliberate indifference to the risk to patients of removing that care.

437. Moreover, the record shows that Defendants did not contemporaneously believe that the loss of EKL had nearly the long-lasting effect Defendants now claim. In September of 2013, five months after EKL closed, Defendants asserted they were 8 weeks away from being back to "normal."[1340] Dr. Lavespere and Defendants' expert confirmed that any problems caused by the closure of Earl K. Long were resolved in 2013.[1341] To suggest now that years of problems documented by Plaintiffs were caused by the closure of Earl K. Long defies the evidence in the record that it caused a roughly seven-month hiccup years before and after the consistent problems documented by Plaintiffs' experts.

438. Finally, as a general matter, Defendants' suggestion that the care available in the region is the source of any harm undersells this District and its medical practitioners. OLOL is just an hour away from LSP, and both Lane and St. Francisville are even closer.[1342] Defendants identify no problems in their services, let alone any that connect to the risk of harm demonstrated by Plaintiffs. As Dr. Vassallo testified, medical care is regularly provided in extremely isolated areas without the deficiencies or risks identified here.[1343] This is equally true of correctional health care; as Dr. Moore testified, most prisons are built in remote locations.[1344] Defendants provide no evidence to believe that the medical practitioners in this District are incapable of ensuring that adequate care is provided to people in Angola.

### (4) ACA Accreditation

439. Defendants also attempt to use their accreditation by the ACA as a shield protecting their practices from scrutiny. However, this accreditation lacks the indicia of reliability in several respects and is of limited legal significance.

---

[1338] PX 54. Secretary LeBlanc admitted that, in fact, there was "not a significant rise in care" despite the influx of patients from Phelps. *See* JX 4-ss, LeBlanc Depo. at 58:5-59:15.

[1339] PX 23 at 0008.

[1340] DX 271 at 03917.

[1341] *See* DX 13 at 02860 ("[i]nitially" there were issues getting specialty care, but that there was "vast improvement" after 2013); Oct. 22 Testimony of Randy Lavespere at 159:4-160:3.

[1342] DX 14 at 10.

[1343] *See, e.g.*, Oct. 15 Testimony of Susi Vassallo at 160:13-19; Oct. 16 Testimony of Susi Vassallo at 13:19-14:2.

[1344] Oct. 23 Testimony of Jacqueline Moore at 154:2-3.

440. First, the ACA's accreditation methodology is fundamentally flawed. As Dr. Moore explained, ACA allows facilities to select the files ACA auditors review.[1345] Auditees prepare the materials for review in advance and place them in folders for inspection.[1346] Because they are able to perfect their materials in advance, staff at LSP report work on ACA compliance and prepare for the audit for months before the audit takes place.[1347] Even Defendants' expert visit was limited because the staff were preparing for the audit by "tweaking" their files.[1348]

441. Second, the ACA is an organization made up of correctional officials, not a neutral third-party.[1349] Even Dr. Moore views it as "political."[1350] Moreover, it is "principally a custody organization."[1351] Its accreditation therefore focuses mainly on custodial aspects, rather than medical aspects,[1352] and primarily relies on numbers rather than quality of care.[1353] Experts on both sides view the standards it issues as inferior to NCCHC's standards.[1354]

442. Third, the Fifth Circuit has said that ACA's accreditation and its underlying "limited inspections" are of limited significance.[1355] As the court explained, "it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards."[1356] As Ms. LaMarre testified from her own experience, it is possible for a system to be "completely broken" but still "accredited."[1357]

---

[1345] *Id.* at 152:8-15.

[1346] *Id.*

[1347] *See* JX 2-a at 371 ("Medical Records have been reviewed for chart order and content, as well as dates in reverse chronological order."), 374 ("Assisted Major Boeker and Laborde with ACA file completion at Administration Building."), 629 ( referencing "the fact that we will be especially focused on ACA standards over the next six months"), 631 ("The ACA Audit was also conducted this month. The request for additional staff to help was requested and was approved."), 678 ("A handout was also given on 'ACA Info and Reminders.'"); *see also* JX 2-a at 11, 17, 73, 81, 87, 148, 149, 367, 372, 377, 402, 410, 451, 493, 550, 612, 620, 623, 628, 636, 661, 668, 677 (all referencing ACA audit preparation).

[1348] Oct. 23 Testimony of Jacqueline Moore at 136:7-13; *see also id.* at 156:23-157:2; DX 13 at 02842.

[1349] *See, e.g.*, Oct. 12 Testimony of James LeBlanc at 190:2-24; JX 4-ss, J. LeBlanc Depo. at 33:9-25.

[1350] Oct. 23 Testimony of Jacqueline Moore at 152:25-153:1.

[1351] Oct. 9 Testimony of Mike Puisis at 106:3-5.

[1352] Oct. 25 Testimony of Tracy Falgout at 32:5-11.

[1353] Oct. 23 Testimony of Jacqueline Moore at 152:4-7.

[1354] *See supra* ¶ 73.

[1355] *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004).

[1356] *Id.*

[1357] Oct. 16 Testimony of Madeleine LaMarre at 224:5-10.

## II. DEFENDANTS HAVE SUBJECTIVE KNOWLEDGE OF THEIR POLICIES AND PRACTICES, THEIR INADEQUACIES, AND THE RISK OF SERIOUS HARM

443. The risks of Defendants' woefully inadequate practices and policies are so long-standing, pervasive, and obvious that Defendants' knowledge cannot be in serious dispute. There is no question that Defendants know their own policies, practices, and procedures; and there is no dispute that they know about the many patients who pass away or suffer adverse events. In light of the obvious and pervasive nature of the deficiencies and the risks they create, Defendants' knowledge is well-established.

444. But even beyond the obvious and pervasive nature of the deficiencies proven by Plaintiffs, Defendants have repeatedly been warned of and acknowledged the various structural and clinical deficiencies that place Class members at risk, without taking reasonable steps to eliminate that risk.

445. Defendants have been aware for more than 25 years that their policies and practices expose inmates to a risk that they will receive inadequate health care. External investigations in 1991 and 1994 reported unconstitutional failures in the system, including most if not all of the problems that Plaintiffs' have proven today: failure to properly assess, diagnose, or treat medical problems; unacceptable delays in treatment; inadequate staffing, both in number and training; and failure to follow-up or properly refer patients for further treatment.[1358]

446. These findings were supplemented by later external reviews of Angola in 2009, by medical peer reviewers in 2012 and 2014, and by numerous warnings from individual medical personnel. Indeed, Dr. Singh, then the Statewide Medical Director, observed in 2009 that the Department of Corrections was "[a]lready operating with bare minimum staff" and not adding employees could "lead to compromised health care delivery" and affect DOC's "Constitutional obligation to provide optimal health care to inmate population."[1359] As Dr. Singh put it:

> By not hiring staff now, we will end up spending more down the line in costly lawsuits such as the class action lawsuits California has faced as well as an increase in overall health care costs for the management of complications for diseases that early treatment or detection would prevent. When we are stretched thin, chances for

---

[1358] *See infra* ¶¶ 150-405.
[1359] PX 67 at 0004 (also listing "high number of elderly inmates with cancer, heart disease, diabetes, HIV and other chronic diseases" and "[i]nfectious disease monitoring" as among things affected by understaffing).

errors are high and it is very possible for cancers and other diseases to be missed early on.[1360]

447. Nonetheless, LSP has *fewer* medical employees today, despite housing roughly 1000 more inmates.[1361]

448. Defendants' knowledge of the deficiencies in their practices and their disregard of the ongoing risks associated with them is established not only by these clear warnings, but by their own words and the observations of medical providers with whom they worked. On each of the issues at the heart of Plaintiffs' claim, the evidence irrefutably shows Defendants' awareness over the past several years.

449. In the face of these several sources of knowledge of the dire state of the Angola medical system, Defendants did not act to cure its deficiencies or protect Class members from its risks. Their failure to take reasonable steps to eliminate these long-standing, pervasive failures establishes deliberate indifference under the Eighth Amendment.

## A. Defendants Received Repeated Warnings About Deficiencies

450. Over the past 25 years, Defendants have repeatedly been warned about the inadequate, harmful care they provided to patients within their care. These warnings came from the Department of Justice; from consultants that Defendants retained; from outside providers; and from DOC personnel themselves.

### (1) Warnings from the DOJ

451. On August 8, 1989, the Civil Rights Division of the United States Department of Justice ("DOJ") began an investigation into conditions of confinement at Angola, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.[1362]

452. The investigation included tours of the prison with experts; observation of conditions in the cellblocks, dormitories, and infirmary; interviews with administrators, staff and inmates; and review of records.[1363]

---

[1360] *Id.*; *see also id.* (acknowledging that nursing turnover rate is double the rate in California before being put under court supervision); *id.* at 0001 (acknowledging "bare minimum staff"; "Current staff is stretched thin to the point that many times they are not willing to work even with overtime … .").
[1361] *See, e.g.*, PX 6 at 0016-17; PX 22 at 0002 (since 2011, "Nursing Unit Staff has not increased").
[1362] PX 239. To be clear, the facts in this section are discussed only to establish Defendants' knowledge of the risks caused by the practices described in the 1990s litigation. Plaintiffs are not seeking to (and do not need to) establish that those practices in fact existed at that time.
[1363] *Id.* at 0001.

453. On May 13, 1991, the DOJ issued a findings letter that concluded conditions at Angola deprived inmates of their constitutional rights, including the failure to provide adequate medical and psychiatric care.[1364]

454. The DOJ identified "serious flaws in the provision of medical care," beginning at the intake point in the prison's healthcare system and permeating the entire process. As a result, the DOJ concluded that "inmates who need medical care and attention are not receiving it." Among the deficiencies identified by the DOJ were delays in treatment; inadequate follow-up when diagnostic tests are ordered; "grossly inadequate" treatment of chronic illness; a lack of adequately trained and sufficient numbers of staff (physicians, nurses, and security); inadequate sick call procedures; a lack of safeguards to ensure inmates receive correct medication; and insufficient health-care policies.[1365]

455. The DOJ specifically found that an inmate "may wait three to five days to see a physician" because of staff shortages, and delays in treatment also occurred through scheduling errors and a failure to follow-up or refer patients to hospitals or off-site health care providers.[1366]

456. On January 2, 1992, inmates at Angola filed a class action lawsuit under 42 U.S.C. § 1983 against the prison warden and the DOC secretary, alleging medical care at the prison was unconstitutionally deficient. The DOJ intervened as a plaintiff under CRIPA, and the case was tried in September 1994.[1367]

457. In April 1994, Dr. Michael Puisis, acting as an expert on behalf of the DOJ, made the second of two investigatory visits to Angola. He found "serious problems in health care delivery," including "failure to follow up diagnostic testing; failure to properly examine patients; failure to perform indicated diagnostic testing; inappropriate treatment; lack of timely diagnostic testing or treatment; failure to treat in accordance with current standards … lack of review by an appropriately qualified health care person; ignorance of appropriate treatment for a given disease; and finally, callous treatment by health care personnel."[1368]

458. Dr. Puisis found the aging population at Angola had a significant chronic-disease burden, and his review of medical records "demonstrated [a] lack of follow up and lack of timely treatment of chronic diseases."[1369] Dr. Puisis specifically noted the number of physicians was "insufficient to provide appropriate care."[1370] During his visit, every prison staff member he

---

[1364] *Id.* at 0002.
[1365] *Id.* at 0002-04.
[1366] *Id.* at 0002-03.
[1367] *See* PX 17.
[1368] PX 19 at 0013.
[1369] *Id.* at 0011.
[1370] *Id.* at 0009.

spoke with acknowledged the number of health care personnel was "inadequate to serve the inmates."[1371]

459.    Dr. Puisis also noted that security officers were required to perform medical tasks; that emergency medical technicians worked "out of the scope of their training" and made medical decisions they were not trained or experienced in making;[1372] that unlicensed nursing assistants worked independently in examining patients and diagnosing illnesses;[1373] and that officers "illegally repackage[d] and dispense[d] medication."[1374]

460.    Also in 1994, the DOJ prepared a report of its finding based on its experts' investigations.[1375] The DOJ found significant delays in treatment because security decided the manner and time of patients' transportation,[1376] and inmates were forced to wait for excessive and unacceptable periods for elective and radiological services.[1377] Angola officials' practice of placing patients in the infirmary who should have been sent to the hospital also caused delay.[1378]

461.    The DOJ found that "no medical protocols exist at LSP to guide medical staff in how to recognize and treat chronic illnesses," that there was "no screening system to detect chronic illnesses, particularly for older inmates," and concluded that Defendants were "dangerously deficient in the treatment of chronic illnesses."[1379]

462.    The DOJ found the physician clinic was understaffed and consistently overcrowded,[1380] and that there were "critical" staffing shortages in (1) physicians, (2) licensed physician assistants (3) registered nurses, (4) licensed practical nurses, (5) a medical records professional, (6) a registered dietician, and (7) physical therapists."[1381]

463.    Staff physicians had "limited experience and training in recognizing and treating chronic conditions" and emergency medical technicians in charge of sick call had "no training in recognizing symptoms of chronic illnesses."[1382] The EMTs were "not adequately trained nor

---

[1371] *Id.* at 0010.
[1372] *Id.* at 0004-06.
[1373] *Id.* at 0009.
[1374] *Id.* at 0011.
[1375] PX 20.
[1376] *Id.* at 0014.
[1377] *Id.* at 0009.
[1378] *Id.* at 0006.
[1379] *Id.* at 0008.
[1380] *Id.* at 0005.
[1381] *Id.* at 0017.
[1382] *Id.* at 0008.

sufficiently experienced to recognize serious medical illness or triage sick call," and they could not differentiate "between acute, chronic, and minor illnesses."[1383]

464. Angola had "no policies or procedures specifically designed to guide health care practitioners in managing care on the infirmary unit."[1384]

465. There was "no quality assurance" at the prison; officials had no program "to review, identify, and correct medication errors or to control access to the medications."[1385] No quality assurance committee or peer review system existed to monitor the quality of medical care.[1386]

466. On September 24, 1998, District Court Judge Frank J. Polozola approved a settlement agreement resolving the 1992 lawsuit.[1387] The agreement required specific improvements to the system of medical care at Angola, including "sick call" reviews by physicians within 72 hours; the use of contemporary standards of care to diagnose, treat, monitor, and classify inmates with chronic illnesses; establishment of a mortality review committee and an effective quality assurance program; provision of physical therapy; reduction of backlogs; automatic referrals to external physicians; documentation of any deviations from outside provider orders and communication of those deviations to the outside provider; no longer disciplining inmates for malingering without an evaluation by an outside physician, and the provision of "adequate medical leadership" at Angola.[1388]

467. Strikingly, most of these same problems plague the medical care at Angola today, and DOC has abandoned many of the steps it took to reduce the risk to inmates. In other words, Defendants have been on notice for more than two decades of the risks caused by the deficiencies that Plaintiffs have proven exist today.

468. Defendants attempted to portray some elements of Dr. Puisis's post-settlement monitoring report as contradicting Dr. Puisis's testimony in this case.[1389] In fact, it showed the opposite. Defendants' counsel showed a paragraph where Dr. Puisis complimented the "initial steps" taken to create an EMT training program.[1390] According to Defendants' counsel, this showed that Dr. Puisis "approved the use of EMTs for doing sick calls in 1999 at LSP."[1391] In fact, Dr. Puisis criticized the sick call system on the next page, expressing similar concerns as he does today:

---

[1383] *Id.* at 0002.
[1384] *Id.* at 0007.
[1385] *Id.* at 0012.
[1386] *Id.* at 0016.
[1387] PX 17.
[1388] *Id.* at 0003-05.
[1389] *See* Oct. 10 Testimony of Mike Puisis at 108:3-13:8.
[1390] *Id.* at 111:6-112:23; *see* DX 502-ff at 05874.
[1391] Oct. 10 Testimony of Mike Puisis at 111:15-16.

Physician oversight of sick call requests is not working well. … It was clear from interviews and chart reviews that when medics refer charts to physicians intending the physician to see the patient, an examination does not routinely occur. This is causing repeat inmate visits to sick call. Additionally, when a medic asks a physician to review the sick call request along with the chart, information about the physician's evaluation is not getting back to either the medic or the inmate. Inmates, as well as medics, therefore, do not know whether the inmate may have a serious problem that needs to be addressed or whether the physician thinks that nothing further needs to be done. … All of this indicates that the current sick call process is still not adequately functioning.[1392]

### (2) Warnings from Consultants

469. In 2009, Defendants retained Wexford Consulting Group ("Wexford") to assess the medical care provided at Angola and two other DOC prisons. On December 23, 2009, Wexford issued a report titled "Summary of Observations and Recommendations" that provided its conclusions from two site visits earlier that fall.[1393]

470. The Wexford report noted that inmates suffered delays in health care provider appointments because of "a large number of backlogged encounters." The report suggested inmates were "not being seen in a timely fashion" and that "the sick call process would need to be examined closely"—and that "obviously this process would need intense intervention to bring it within [national] standards."[1394]

471. The Wexford report also noted that security officers were engaged in distributing medications. It warned Defendants that "National standards prefer that in facilities where health care staff is on duty 24/7, medications should be administered by health care staff. … Should the facility seek accreditation, the medication administration practices would need to be looked at very closely to ensure compliance with industry standards."[1395]

472. Wexford similarly noted that Defendants' Quality Management Program (a forerunner to the current CQI program) "has little structure, thus rendering it less functional than desired."[1396]

473. Secretary LeBlanc and Ms. Falgout, along with then-Warden Cain and then–Statewide Medical Director Singh, all received and reviewed the Wexford report. Their follow-up discussions with other DOC personnel included various acknowledgments of the "salient points" in the report and of problems with their practices—such as the fact that even

---

[1392] DX 502-ff at 05875; *see also* Oct. 11 Testimony of Mike Puisis at 68:3-70:25.
[1393] PX 265. Per the Court's ruling during trial, the Wexford report was admitted only for the recipients' knowledge, not for the truth of its contents. *See* Oct. 12 Colloquy at 181:16-183:17.
[1394] *Id.* at 0014.
[1395] *Id.*
[1396] *Id.*

certified Medical Assistants, who have state certification that DOC correctional officers lack, "are not certified to pass medication to a large volume of people."[1397]

### (3)   Warnings from Outside Providers

474. Outside providers have repeatedly warned Defendants of issues that were causing patient harm and delay.

475. In January 2014, for example, Defendants were notified that outside providers had to cancel many procedures and surgery dates "due to inadequate preparation and/or following of instructions," in a wide variety of settings, including cardiac catheterization labs, endoscopy, and surgical procedures.[1398] Defendant Stacye Falgout was specifically advised of the need for staff to "be aware of instructions and follow through with the specific time frames for preps, stopping [anticoagulants], adding [m]edications, etc...."[1399]

476. In August 2014, Defendant Singh received notice from the Director of the Louisiana Emergency Response Network and the Stroke Program Coordinator at ILH that Angola patients were arriving at ILH with "obvious stroke symptoms" "out of the window because it either took them a while to get [there] or the medical staff at Angola did not think the inmate was having a stroke."[1400] Defendants were specifically informed that stroke patients "need to get emergent care within [4.5 hours] to attempt [to] prevent severe disability," and that the patients arriving at ILH all suffered "pretty significant deficits" due to the lack of recognition and transport.[1401] Despite this warning, Defendants did not warn EMTs that they were failing to recognize signs of stroke.[1402]

477. Around the same time, Defendants Singh and Stacye Falgout received notice from LSU's Chairman of Oral Surgery that Angola had sent them a number of inmates "with 3 week old fractures that are already infected and thus use a lot of resources to fix something that could have been treated easily if diagnosed sooner."[1403] Despite this warning, Defendants did not warn EMTs that they were failing to recognize signs of infection.[1404]

478. In addition, Dr. Catherine Jones—a doctor at UMC who frequently treats Angola patients—testified that she has made multiple attempts to call Dr. Lavespere and inform him that her

---

[1397] PX 404 at 0001; PX 29 (Dr. Singh forwarding "salient points" to Secretary LeBlanc; *see also, e.g.*, PX 24 (Dr. Singh forwarding Wexford report to Warden Cain); PX 30 (Ms. Falgout discussing Wexford report).
[1398] PX 142 at 0001.
[1399] *Id.*
[1400] PX 12 at 0001-02.
[1401] *Id.* at 0002.
[1402] JX 4-dd, D. Cashio Depo. at 77:9-13.
[1403] PX 13 at 0001-02.
[1404] JX 4-dd, D. Cashio Depo. at 77:14-19.

Angola patients present with delayed diagnoses.[1405] However, those calls "have not always been answered."[1406] Notably, Dr. Lavespere did not dispute this sworn testimony.

## B. Defendants' Own Documents and Testimony Demonstrate Defendants' Knowledge

479. In addition to the warnings they received from outside entities, Defendants themselves repeatedly acknowledged and discussed various deficiencies and harms to Class members.

480. Indeed, far from denying knowledge, Defendants have held themselves out as being aware of the problems faced at Angola. Dr. Lavespere testified that Dr. Singh—then the Statewide Medical Director—"knows every challenge in DOC."[1407] Secretary LeBlanc testified that he is "responsible for whatever goes on in this department."[1408]

481. For example, in 2009, Dr. Singh noted that the entire DOC was operating with "bare minimum staff," which he acknowledged was "taking its toll."[1409] He knew that the inadequate staffing at Angola could lead to "compromised health care delivery and possible law suits which will cost millions of dollars," and that "[w]hen we are stretched thin, chances for errors are high and it is very possible for cancers and other diseases to be missed early on."[1410] Likewise, Angola's nursing director in 2010 informed a deputy warden that her department was "extremely short staffed," despite an increase in workload, which she said could cause patient care to suffer to the point of unsafe practice, including a greater risk of medication errors that could lead to patient deaths.[1411]

482. However, the staffing situation is *worse* today than it was in 2010: Angola now houses over 1000 more patients than it did in 2009 and 2010, but has approximately the same number of staff.[1412]

[1405] Oct. 11 Testimony of Dr. Catherine Jones at 145:6-15.

[1406] *Id.*

[1407] JX 4-rr, R. Lavespere Depo. at 24:4-5.

[1408] JX 4-ss, J. LeBlanc Depo. at 24:4-5; Oct. 12 Testimony of James LeBlanc at 171:4-8 ("I'm responsible for what happens in the department, yes."; "Q: The buck stops with you? A: Yes, ma'am.").

[1409] PX 67 at 0001.

[1410] *Id.* at 0004.

[1411] PX 127(requesting permission to use an untrained pill call officer because of they are "extremely short staffed" and in "desperate need."); PX 147.

[1412] PX 6 at 0017; *see also, e.g.,* PX 22 at 0001-02 (2015 email documenting an increase in inmate population and chronic conditions while "[t]he Nursing Unit staff has not increased").

483. In 2012, Secretary LeBlanc and Dr. Singh again recognized that funding and staffing shortages would result in "delay of critical care."[1413]

484. Defendants also recognized the risks of having correctional officers administering medication at least as early as August 2010. An Assistant Warden for Treatment who had trained as a nurse wrote to Dr. Singh that a nurse had caught a medication error. "Thank God a nurse found this," he wrote. "I am not as confident that a pill call officer would have even known to question this … Very serious adverse effects is an understatement. This could have been life threatening. … It is a matter of time before one of these slip through and we have a bad outcome."[1414]

485. Similarly, DOC personnel conducting peer review have repeatedly noted deficiencies in chronic care services.[1415] There is no sign of any changes made in response to these warnings.

486. Angola personnel have repeatedly documented such deficiencies as well. Numerous emails report backlogs, delays, and even full cessation of various types of treatment, including colonoscopies, hernia surgery, cataract surgery, CT scans, MRIs, and cancer treatment.[1416]

487. Defendants have even taken conscious steps to withhold information that could prove crucial to their patients' health. When educating patients about the dangers of dehydration, heat exhaustion, and heat stroke—serious risks for men required to work in the field in Louisiana summers, many of them with various medical vulnerabilities—Defendants chose to omit signs and symptoms to watch for, placing their desire to keep their patients working over their duty to ensure their patients' health.[1417]

488. Former DOC personnel have also acknowledged delays in treatment. Former Assistant Warden for Healthcare Services Kenneth Norris, who testified that patients "did not get the timely treatment" because Defendants refused to authorize hernia surgery "until, you know,

---

[1413] PX 152 at 0002.

[1414] PX 266. Because this incident took place at another DOC facility, Defendants object to it on the basis of relevance. It is relevant to DOC leadership's knowledge of the risk that using pill call officers creates.

[1415] PX 33 at 0001 PX 35; *see also* JX 4-rr, R. Lavespere Depo. at 85:2-21 (acknowledging that peer review said they needed to update chronic care guidelines).

[1416] PX 36 at 0001-04; PX 37 at 0001-02; PX 42 (Dr. Singh on 12/13/13: "Some of the offenders at LSP were waiting for CT scan and MRI or cancer care since late 2011. … As far as I know no [colonoscopies] were done at LSP for 2 years or longer. Once access has been restored, even then we can not get all 600 colonoscopies done immediately."); PX 26 (Ms. Lamartiniere: "[W]e will temporarily suspend the entering of screening referrals [for colonoscopies] until notified by [headquarters] to resume."); PX 32 (summary of the cataract backlog).

[1417] PX 132.

it becomes a life-threatening deal."[1418] Mr. Norris testified that both Dr. Singh and Warden Cain knew about the delay.[1419]

489. Defendants are also well aware of the high rate of chronic medical conditions within the prison, and the increasing number of chronic diseases their patients present with—and aware that their staffing and resources have not kept pace.[1420]

490. Similarly, Defendants are aware of the stunningly high and rapidly rising mortality rate discussed *supra* ¶ 148. Defendants have repeatedly cited the BJS statistics as an authoritative source of information on the mortality rate in Louisiana's prisons.[1421]

491. At the same time that they were aware of the high mortality rate and high rate of chronic disease, Defendants were aware that their health care spending was declining. Even beyond their obvious knowledge of their own budget, Defendants openly acknowledged that their health care spending declined between 2014 and 2015.[1422]

## C. Defendants Received Thousands of Complaints and Grievances from Class Members

492. Defendants were also put on notice of the dire state of their medical system by the sheer number of complaints and grievances they receive. The single largest category of administrative remedy procedure ("ARP") grievances filed at Angola is access to health care.[1423] Angola receives on average 500 to 525 medical ARPs a year.[1424] Between administrative remedy procedure ("ARP") filings and letters to the Assistant Warden of Health Services, Defendants receive as many as 2000 complaints a year about health care—nearly one complaint for every three Class members housed at Angola.[1425]

493. Class members also alerted Defendants to problems informally, in innumerable encounters, often without result, as discussed above.[1426]

---

[1418] JX 4-tt, K. Norris Depo. at 37:22-38:5.

[1419] *Id.* at 70:8-13, 71:23-25.

[1420] *See, e.g.*, PX 22; DX 16 at 02960.

[1421] *See, e.g.*, PX 286 at 0004-05; *see also* JX 4-bbb, R. Singh. Depo. at 286:8-11 ("Louisiana has the highest inmate death rate in the country. This has been my concern from day one when I got on this job.").

[1422] PX 286 at 0023-26.

[1423] DX 13 at 02870.

[1424] JX 4-kk, T. Foster Depo. at 15:14-18.

[1425] Rec. Doc. 194-8, 194-9. *See generally* JX 2-a listing complaints from patients and family members.

[1426] *See, e.g.*, JX 4-l, J. Marsh Depo. at 15:6-21, 18:3-15, 32:18-24 (discussing problems raised with Angola providers).

494. Similarly, Plaintiffs' counsel in this case raised the issues in this lawsuit before filing in an effort to seek voluntary improvement.[1427] These communications were circulated among Defendants, who reviewed them and determined not to do anything to fix the problems.[1428] Indeed, Ms. Lamartiniere acknowledged receiving "numerous letters" regarding patient concerns from the Advocacy Center, Louisiana's federally mandated and state-designated Protection and Advocacy agency, and acknowledged that none of those letters had ever caused Defendants to change their practices.[1429]

### D. Defendants Have Been Willfully Blind to the Deficiencies of Their Policies and the Risk of Serious Harm to Class Members

495. Finally, Defendants have repeatedly sought *not* to document or learn about the harms caused by their practices.

496. As noted above, both peer review and mortality review seem calculated to avoid explicitly identifying serious problems. Mortality reviews in particular exhibit glaring omissions that suggest conscious avoidance: not one Medical Summary Report reviewed by Plaintiffs' experts reported a problem with patients' care, despite the serious errors and delays found in virtually every death that Plaintiffs' medical experts reviewed.[1430] This is consistent with Dr. Singh's advice to Secretary LeBlanc not to "dig too deep" when it looks like DOC might be liable for a death.[1431] Their choice not to conduct true, industry standard mortality reviews, *see supra* ¶¶ 389-397, appears to be a form of willful blindness, trying to avoid creating a record of their problems and trying to maintain plausible deniability of their knowledge of those problems. This is further evidenced by the frequency of death summaries that "misrepresented the facts of the patient's death" despite the provider's knowledge to the contrary.[1432]

497. There is also evidence that DOC personnel consciously refrain from identifying problems during peer review. When a peer reviewer recommended "additional medical personnel" at another DOC facility, the facility's warden urged to Dr. Singh and other DOC officials "that

---

[1427] PX 275. Defendants objected to this exhibit as hearsay. Plaintiffs are introducing it only to establish Defendants' knowledge of the problems identified in the letter, not as evidence to prove those problems' existence.

[1428] *Id.*; *see also, e.g.*, JX 4-bb, B. Cain Depo. at 77:15-17 (Q: "Did you make changes after receiving the letter." A: "No, not particularly.").

[1429] JX 4-nn, S. Lamartiniere Depo. at 39:11-16, 39:25-40:3.

[1430] PX 6 at 0084-87; *see supra* ¶¶ 124-128.

[1431] PX 66 at 0001; *see supra* ¶ 393.

[1432] Oct. 15 Testimony of Susi Vassallo at 178:9-20; *see supra* ¶ 394.

such remarks not be included in future peer reviews" because "[i]n a subsequent suit against the institution, an offender may use that opinion as a part of his argument."[1433]

498. Additionally, some Defendants and DOC employees admitted that they are conscious of the need to avoid leaving a paper trail that could be used against them in litigation.[1434] Others admitted to deleting medical emails.[1435] This furtiveness suggests a desire to avoid liability and consciousness of guilt.

499. In summary, there is no serious dispute that Defendants were aware of their policies and practices, nor that they were aware of the harm that they caused. Nonetheless, the continued, long-standing, and dire situation persists. As former Medical Director Dr. Collins testified when explaining why he left Angola:

> A.     Well, my place wasn't here to fix DOC. … My place here was to take care of the patients.
>
> Q.     Huh-huh. So it's kind of like a patient with, say, a mental health problem, they've got to maybe want to change before you can help them and –
>
> A.     Exactly.
>
> Q.     Would you say that the DOC similarly didn't really want to change?
>
> A.     Well, if you have a cancer patient that's refusing chemo –
>
> Q.     Huh-huh.
>
> A.     – what are you going to do?[1436]

## AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT CLAIM

## I.     THE DOC'S POLICIES AND PRACTICES DENY PROGRAMMATIC ACCESS TO AND DISCRIMINATE AGAINST INDIVIDUALS WITH DISABILITIES

500. The evidence overwhelmingly shows that patients with disabilities are routinely denied access to Angola's programs, services, and activities, and are otherwise subject to discrimination in the following ways: First, Angola's physical plant contains hundreds of architectural barriers that make it impossible for many patients with disabilities to access a broad array of services ranging from toilets and showers to the prison's law library. Second, the DOC and Angola have implemented certain policies that overtly discriminate against individuals with disabilities by denying them the opportunity to participate in programming for which they

---

[1433] PX 285; *see also* JX 4-uu, C. Park Depo. at 65:20-66:3, 66:20-67:3 (unaware of peer review ever resulting in improvement).
[1434] *See, e.g.*, JX 4-uu, C. Park Depo. at 68:18-21; JX 4-zz, S. Poret Depo. at 138:25-139:9.
[1435] *See* JX 4-aa, M. Benedict Depo. at 41:13-42:3; *see also* PX 242 at 0002-05.
[1436] JX 4-ee, J. Collins Depo. at 124:20-125:9.

otherwise would be eligible. Third, Angola's policies, practices, and procedures regarding staff training and the identification, processing, and tracking of patients' disability-related grievances and requests for accommodations are inadequate and result in widespread failures to accommodate disabilities and to address claims of discrimination. Finally, patients with disabilities are often segregated from the able-bodied population when it comes to their housing assignments, yet they do not receive the types of medical services in those locations that would justify their segregation.[1437]

## A. The Subclass Consists of Individuals with a Range of Disabilities.

501. On February 26, 2018, the Court certified a Subclass of "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP."[1438]

502. There is no dispute that Subclass members have disabilities that affect their activities of daily living. Warden Donald Barr, who served as Angola's ADA Coordinator in the summer of 2016, testified that at Angola, "there is all sorts of disabilities [sic] . . . . You have prisoners who have hearing problems, prisoners who have limb problems, walking, hearing, and visual and things of those natures."[1439] Tracy Falgout, who assumed the role of ADA Coordinator after Warden Barr's retirement, similarly confirmed that Angola's population includes wheelchair-bound patients, including individuals who are paraplegic, as well as blind patients and patients suffering from dementia and other cognitive impairments.[1440] Aaron Brent, a former inmate health care orderly in one of Angola's so-called "medical dormitories," testified that his responsibilities involved caring for 29 or 30 patients in wheelchairs, as well as other patients who used walkers or had cognitive impairments.[1441] Danny Prince, another former health care orderly in the same dormitory, testified that the dorm houses stroke patients, cancer patients, patients with tracheostomy tubes and colostomy bags, patients who suffer from seizures, and patients with mental illnesses, among others.[1442] According to Mr. Prince, the patients require assistance transferring from beds to wheelchairs, moving about the prison, showering, and eating.[1443] The DOC's own tracking database reflects some 1445 auxiliary aids or other devices provided to patients at Angola who have disabilities.[1444]

---

[1437] Plaintiffs' ADA and Rehabilitation Act claims are pleaded only against the DOC, not the individual Defendants.
[1438] Rec. Doc. 394 at 30.
[1439] JX 4-z, D. Barr Depo. at 12:13-17.
[1440] JX 4-jj, T. Falgout Depo. at 17:10-14; Oct. 24 Testimony of Tracy Falgout at 208:3-4, 8-14.
[1441] JX 4-c, A. Brent Depo. at 76:5-23.
[1442] Oct. 15 Testimony of Danny Prince at 95:15-24.
[1443] *Id.* at 96:2-13.
[1444] JX 12-b at 00012-13 (ADA Tracking Database). Of the 2339 "auxiliary aids" in the database, 894 are listed as "none."

Additionally, several current and former plaintiffs and members of the Subclass testified regarding their disabilities.[1445]

## B. Patients with Disabilities Are Denied Access to Angola's Programs, Services, and Activities.

503.    At Angola, as in any prison setting, individuals with disabilities depend on the facility to provide essential services such as housing, toilets and showers, meals, transportation, and medical services, as well as various other programs and activities, including education classes, religious services, recreational facilities and programs, and hobby craft. The DOC's own orientation materials confirm that "[t]he ADA thus affects Corrections decisions regarding offender housing, indoor and outdoor recreations, shower and toilet facilities, access to the courts, medical services, disciplinary hearings, telephone and canteen privileges, visitation programs, education, vocation and counseling programs, as well as therapy, substance abuse treatment, and work release."[1446] Warden Richard Peabody, who served as ADA Coordinator until late 2015 or early 2016, described several of these services, including vocational training, religious services, medical services, access to inmate counsel, and recreational activities.[1447]

504.    The evidence shows that Angola has denied access to these services, programs, and activities by failing to remove over 190 architectural barriers identified by Plaintiffs' expert, Mark Mazz, and by enforcing policies that exclude patients with disabilities from programming for which they otherwise would be eligible.

### (1)    Architectural Barriers to Angola's Programs, Services, and Activities

#### a.    *Plaintiffs' Evidence*

505.    Plaintiffs' architectural accessibility expert, Mark Mazz, has over 30 years of experience as a licensed architect and architectural accessibility consultant, including eight years with the federal government, three of which were spent in the Department of Justice's Disability Rights Section.[1448] Since his licensure in 1983, only two years of his career have been devoted to issues other than accessible design, and he has focused exclusively on accessibility issues for the last 18 years.[1449] In his practice, Mr. Mazz regularly assesses facilities' compliance with

---

[1445] *See, e.g.,* Oct. 9 Testimony of Farrell Sampier at 44:5-10 (describing his paralysis resulting from transverse myelitis); Oct 12 Testimony of Francis Brauner at 84:9-18 (discussing his paralysis from the waist down); Oct. 12 Testimony of John Tonubbee at 152:3-152:14 (explaining that former Named Plaintiff Alton Batiste, who is now deceased, went blind while living at Camp F); Oct. 12 Testimony of Otto Barrera at 206:1-207:22 (describing facial injuries that limited his ability to speak and eat).
[1446] JX 12-f at 00302.
[1447] JX 4-ww, R. Peabody Depo. at 111:11-112:10.
[1448] PX 7 at 0002; *see also* Oct. 12 Testimony of Mark Mazz at 7:6-25.
[1449] Oct. 12 Testimony of Mark Mazz at 6:24-7:1, 7:6-8:6.

the "programmatic access" provisions of Title II of the ADA and Section 504 of the Rehabilitation Act, which require public entities to ensure that their programs, services, and activities are accessible to individuals with disabilities.[1450] His work for the government and as an independent consultant has included reviews of more than 30 correctional facilities in approximately ten states, as well as other Section 504 and ADA Title II barriers assessments and transition plans.[1451] Throughout his career, Mr. Mazz has served as a consultant or expert on behalf of the Department of Justice, local governments and private litigants in connection with approximately 100 projects.[1452]

506. Mr. Mazz testified credibly at trial regarding the accessibility of various programs, services, and activities to patients with disabilities who are housed on the ward, in two of the prison's medical dorms, in the Treatment Unit, and at Camp F. Defendant did not dispute Mr. Mazz's substantial qualifications,[1453] and Defendant's own expert corroborated each of the 190 violations of the 1991 ADA Standards for Accessible Design that were identified in Mr. Mazz's report.[1454] At no point did defense counsel question Mr. Mazz's veracity or the accuracy of his well-documented findings. Additionally, the report detailing Mr. Mazz's findings was admitted into evidence without objection.[1455]

507. Mr. Mazz conducted a site visit on July 6, 2016, in which he took measurements and photographs of specific areas within the prison.[1456] He was not told which parts of Angola's facilities were constructed or altered after the Uniform Federal Accessibility Standards went into effect on March 7, 1988, or after the 1991 ADA Standards for Accessible Design went into effect on January 26, 1992.[1457] As a result, he limited his survey to areas used by individuals with disabilities to access Angola's programs, services, and activities, as those areas would be subject to Title II and Section 504's programmatic access requirement, regardless of the dates of construction or alteration.[1458]

508. Specifically, he surveyed Dormitories Ash 2 and Cypress 2, focusing on the sleeping areas and shower and bathroom areas, as well as the accessible routes from those dormitories to

---

[1450] PX 7 at 0002.

[1451] *Id.*; *see also* Oct. 12 Testimony of Mark Mazz at 6:7-11, 8:10-21.

[1452] Oct. 12 Testimony of Mark Mazz at 9:14-21.

[1453] *See id.* at 10:22-11:1.

[1454] PX 18 at 0002.

[1455] *See* PX 7.

[1456] Oct. 12 Testimony of Mark Mazz at 11:13-19.

[1457] *Id.* at 15:1-7; PX 7 at 0008. Mr. Mazz noted, however, that most of the toilet rooms and showers and the flooring in the cafeteria and visiting area that he surveyed appeared to have been altered since 1992, *id.*, and Defendants' architectural expert, Brian Nolan, did not dispute this finding. *See* PX 18 at 0002.

[1458] PX 7 at 0009, 0005; Oct. 12 Testimony of Mark Mazz at 12:5-15, 14:15-15:22. Mr. Mazz explained that although the areas covered by his survey were pre-selected, he independently confirmed that each space was necessary for program access. *See id.* at 15:20-22, 81:6-9.

the public check-in desk, associated recreation yards, van transit parking, law library, and visiting area.[1459] He also surveyed portions of the visiting area and law library used by residents of those dormitories.[1460] Ash 2 and Cypress 2 are two of three dormitories at Angola that have been designated as "medical dormitories" or "offender assistance dormitories," and are used to house individuals with mobility impairments and other disabilities.[1461] Of the three dormitories, Ash 2 is reserved for patients who require the most assistance with the activities of daily living.[1462] Mr. Mazz also surveyed Dormitory 1 at Camp F, which is a trustee dorm that also has been used to house blind and otherwise vulnerable individuals.[1463] Additionally, Mr. Mazz reviewed various cells and showers in Angola's Transition Unit ("TU"),[1464] including in the Protection Tier and Mental Health Tier.[1465] The TU serves as a transitional housing area for individuals with severe mental illness or developmental disabilities,[1466] and it frequently houses individuals with both physical and mental disabilities, including blind patients[1467] and patients in wheelchairs, such as Named Plaintiff Reginald George.[1468] Finally, Mr. Mazz surveyed Wards I and II on the Nursing Unit at the R.E. Barrow Treatment Center.[1469] Ward I operates as Angola's infirmary, while Ward II houses patients requiring long-term nursing care and assistance with basic life functions, including Angola's hospice patients.[1470]

---

[1459] PX 7 at 0009; Oct. 12 Testimony of Mark Mazz at 18:7-19:15.

[1460] PX 7 at 0009; Oct. 12 Testimony of Mark Mazz at 20:13-21:1.

[1461] Oct. 15 Testimony of Danny Prince at 95:1-4 (identifying Ash 2, Cypress 2, and Hickory 4 as the three dormitories designated for patients with disabilities who require assistance); JX 4-c, A. Brent Depo. at 75:17-76:23 (identifying Ash 2 and Cypress 2 as the dormitories housing disabled individuals receiving care from inmate health care orderlies); JX 6-eee (LSP Directive 13.088) at 00269 (establishing offender assistance dormitories to provide housing "for offenders who require assistance with activities of daily living"). Hickory 4 was not part of Mr. Mazz's survey.

[1462] Oct. 15 Testimony of Danny Prince at 95:5-8.

[1463] PX 7 at 0009; Oct. 12 Testimony of Mark Mazz at 22:5-23:1; Oct. 12 Testimony of John Tonubbee at 139:4-5, 152:3-154:5 (describing his experience assisting former Named Plaintiff Alton Batiste around Camp F after he went blind).

[1464] In his report, Mr. Mazz identified the TU as the "Treatment Unit," consistent with the floor plans that were provided to him. JX 7 at 0009.

[1465] PX 7 at 0009; Oct. 12 Testimony of Mark Mazz at 20:7-10. At trial, Mr. Mazz explained that when he is reviewing a cell block, his methodology involves asking to see the most accessible cells, or any available cell if they all are identical. See Oct. 12 Testimony of Mark Mazz at 41:2-22.

[1466] See JX 6-y (LSP Directive 13.037 – Transitional Unit) (designating the TU as a housing area for "offenders with severe mental illness or developmental disabilities").

[1467] PX 85 at 0003 (internal email indicating that blind patient was being housed in Time Out Cell B until a cell on the Mental Health Tier became available).

[1468] PX 231 at 1354 (ARP paperwork reflecting that Mr. George was housed in the TU).

[1469] PX 7 at 0009; Oct. 12 Testimony of Mark Mazz at 19:24-20:5.

[1470] JX 6-v (LSP Directive 13.033 – REBTC Nursing Units) at 00130-33 (describing the purpose and admission criteria for Wards I and II); JX 7-b (LSP Directive 07.004 – Housing for the Disabled) at

509.    Mr. Mazz testified that in the correctional setting, he typically looks at access to services, programs, and activities ranging from toilets and showers to law libraries, visiting areas, and classrooms.[1471] At Angola, he specifically considered housing at various security levels, including toilets, showers, bathtubs and sinks; water fountains; mail services; meal services; medication administration; medical services; telephones; JPay stations;[1472] recreation areas; transportation services; the law library; and the visiting area.[1473]

510.    Mr. Mazz identified programmatic access barriers by noting instances in which the areas used by individuals with disabilities fall short of the 1991 ADA Standards for Accessible Design.[1474] As detailed in Attachment 2 to his report,[1475] Mr. Mazz identified 190 architectural barriers impeding independent access to a range of programs, services, and activities, including housing, toilets, showers, phones, JPay stations, common areas, drinking fountains, recreation areas, transportation, the law library, visiting areas, medication administration, meals, medical services, and mail services.[1476] Mr. Mazz's photographs documenting each violation were included in his report as Attachment 3.[1477] At trial, Mr. Mazz summarized his findings by highlighting specific examples of the barriers he encountered while displaying the corresponding photographs documenting each violation.[1478] As summarized in his report,[1479] Mr. Mazz found that:

   a.   The accessible route between dormitories and other facilities have many wide gaps that are not covered that can cause the caster wheels on wheelchairs to snag and spill an inmate onto the floor.[1480]

   b.   The accessible route between dormitories and other facilities have several abrupt changes in level which can trip inmates who have trouble lifting their feet and can snag a caster wheel on a wheelchair.[1481]

---

00002 (stating that "severely handicapped inmates" will be housed at the Treatment Center). *See also* Oct. 12 Testimony of Francis Brauner at 97:22-25 (explaining that Ward II houses "some of the worst cases of, you know, illnesses, stroke victims, cancer victims, heart problems, you name it, me, paralyzed, wounds.")

[1471] Oct. 12 Testimony of Mark Mazz at 12:16-13:4.

[1472] JPay stations are used by inmates at Angola to send and receive email, receive money from friends and family, and download music. *See* Oct. 12 Testimony of Mark Mazz at 34:14-23.

[1473] *See generally* PX 7.

[1474] *Id.* at 0008-09; Oct. 12 Testimony of Mark Mazz at 13:17-14:14.

[1475] PX 7 at 0018-39.

[1476] *See id.*; *see also* Oct. 12 Testimony of Mark Mazz at 23:2-10.

[1477] PX 7 at 0040-112; *see also* Oct. 12 Testimony of Mark Mazz at 27:8-14.

[1478] Oct. 12 Testimony of Mark Mazz at 27:15-44:18.

[1479] PX 7 at 0009-11; *see also id.* at 0018-39 (Attachment 2).

[1480] *See also* Oct. 12. Testimony of Mark Mazz at 28:2-15.

[1481] *See also id.* at 28:17-29:6.

c. Drinking fountains are not paired. Consequently, either the drinking fountain is too high for an inmate in a wheelchair or too low for an inmate who is unable to bend over.[1482]

d. The undersides of objects, such as counters, are too high and project too far from the wall for inmates with vision impairments to detect with their canes.[1483]

e. Sign-in desks and counters are out of reach for a person in a wheelchair.[1484]

f. The paved accessible routes to the recreation yards stop well before the recreation areas, preventing inmates in wheelchairs from independently using the facilities.[1485]

g. Many visitors in wheelchairs lack the use of a toilet room in that the toilets, lavatories, mirrors, and dispensers are inaccessible.[1486]

h. In the visiting area, many inmates in wheelchairs lack an accessible toilet room in that the door is too narrow, the space around the door is too constricted to open the door, and the lavatory and toilet have no accessible features.[1487]

i. Many ramps lack edge protection such that inmates in wheelchairs or using crutches may stumble at the sides of ramps.[1488]

j. Many ramps lack accessible handrails making it more difficult for an inmate with balance or stamina issues to use the ramps without falling.[1489]

k. Some ramps are too steep for many inmates in wheelchairs to use independently.[1490]

l. In some locations, mail slots are out of reach for many inmates in wheelchairs.[1491]

m. TTY's were not available in the dormitories of inmates with hearing impairments to use. Additionally, shelves were not provided for the TTY's.[1492]

---

[1482] *See, e.g.*, PX 7 at 0018 l.6, 19 l.17, 22 l.49.

[1483] *See, e.g., id.* at 0018 l.12.

[1484] *See, e.g., id.* at 0019, 25 l.74, 27 l.102.

[1485] *See also* Oct. 12. Testimony of Mark Mazz at 29:7-24.

[1486] *See, e.g.*, PX 7 at 0036-39 ll.187-197 and 204-225.

[1487] *See also* Oct. 12 Testimony of Mark Mazz at 29:25-30:11.

[1488] *See also id.* at 30:12-31:15.

[1489] *See also id.*

[1490] *See also id.* at 30:12-18; 31:19-32:3.

[1491] *See, e.g.*, PX 7 at 0025 l..77, 29 l.129.

[1492] *See, e.g., id.* at 0020 l.28, 22 l.50, 25 l.80.

n. In several locations, stools at the J-Pay stations blocked access for an inmate using a wheelchair.[1493]

o. In several medical dormitory bathrooms and nursing unit bathrooms:

   v. Ramps at the entrance were too steep for many inmates in wheelchairs to use.[1494]

   vi. Urinals were too high to use from a wheelchair.[1495]

   vii. Mirrors are too high for inmates in wheelchairs.[1496]

   viii. Lavatories are unusable for many inmates in wheelchairs because they lack any accessible features; lack adequate knee and toe space underneath; or lack pipe insulation to protect against abrasive edges.[1497]

   ix. Toilets are unusable for many inmates in wheelchairs and many inmates who have difficulties with balance or standing from a seated position because grab bars are missing, too short, or otherwise noncompliant; the toilets were too low or too close to the wall; or the space around the toilet is too constricted.[1498]

   x. Showers are unusable for many inmates in wheelchairs and many inmates who have difficulties with balance or standing from a seated position because seats are in the wrong place; grab bars are missing, too short, or otherwise noncompliant; controls are inaccessible; or the space adjacent to the shower is too small.[1499]

   xi. Bathtubs are unusable for many inmates in wheelchairs because they lack any accessible features including seats, noncompliant grab bars, or controls not within reach.[1500]

p. The Protection Tier shower is unusable for many inmates in wheelchairs because the controls are out of reach, grab bars are too short and missing on one wall, and there

---

[1493] *See also* Oct. 12 Testimony of Mark Mazz at 34:14-35:2.

[1494] *See, e.g.*, PX 7 at 0021 l.34, 23 l.57.

[1495] *See also* Oct. 12 Testimony of Mark Mazz at 35:10-17.

[1496] *See also id.* at 35:19-36:12.

[1497] *See also id.*

[1498] *See also id.* at 36:13-38:22.

[1499] *See also id.* at 39:1-40:10.

[1500] *See, e.g.*, PX 7 at 0030-31 ll.137-41, 34 ll.169-73.

q. The Extended Lockdown shower is unusable for inmates in wheelchairs because it lacks any accessible features.[1502]

r. The Extended Lockdown cell is unusable for many inmates in wheelchairs because the door is too narrow, the mirror is too high, the toilet and lavatory lack any accessible features, and the window control is out of reach.[1503]

s. The Protection Tier cells appear to be identical to the Extended Lockdown cells. Therefore, the Protection Tier cell is also unusable for many inmates in wheelchairs for the same reasons.

t. Time Out Cell B has no accessible features. Therefore, it is unusable for many inmates in wheelchairs.[1504]

u. The entry doors to Nursing Units 1 and 2 are not accessible because they are too narrow through one leaf for many inmates in wheelchairs to use independently.[1505]

v. The doors from Nursing Units 1 and 2 to the yard lack sufficient maneuvering space beside the latchside of the doors for many inmates in wheelchairs to use independently.[1506]

511. Viewing these areas in their totality, and based on his experience and understanding of the ADA and RA's programmatic access requirements, Mr. Mazz concluded that the programs, services, and activities identified in the course of his survey were not accessible to individuals with disabilities, or to visitors with disabilities.[1507]

512. Although the DOC denies liability, it presented no evidence to refute Mr. Mazz's conclusions. Its expert, Brian Nolan, reviewed Mr. Mazz's findings, including the photographs of each violation that were attached to his report.[1508] He "substantiate[d] the items recorded in the . . . Mazz report as being violations of the 1991 and 2010 ADA

---

[1501] *See also* Oct. 12 Testimony of Mark Mazz at 41:23-42:10.
[1502] *See also id.* at 42:11-21.
[1503] *See also id.* at 42:22-43:12.
[1504] *See also id.* at 43:13-25. Consistent with the TU floor plan, *see* JX 14 at 00001, it was Mr. Mazz's understanding that each of the Time Out Cells is identical. Oct. 12 Testimony of Mark Mazz at 44:1-4.
[1505] *See also* Oct. 12 Testimony of Mark Mazz at 44:5-16.
[1506] *See, e.g.*, PX 7 at 0030 l.130.
[1507] *Id.* at 0011; *see also* Oct. 12. Testimony of Mark Mazz at 44:19-23.
[1508] PX 18 at 0001.

Standards for Accessible Design."[1509] Mr. Nolan did not testify at trial, and he offered no opinion, in his report or otherwise, regarding the validity of Mr. Mazz's methodology or his overall conclusions regarding programmatic access. And Darryl Vannoy, the Warden of Angola, admitted that "Angola has a lot of work to do on a physical plant to be ADA, to meet the ADA requirements."[1510] Similarly, former ADA Coordinator Donald Barr acknowledged that there were "access problems for wheelchairs within the main prison" at the time the Department of Justice conducted a review of Angola's facilities.[1511] Finally, while Angola's own policies require the medical dormitories to be "handicap accessible,"[1512] Defendant has acknowledged that Angola is "operating Medical Dorms in dormitories designed for general population."[1513]

513. The testimony of several Named Plaintiffs and Class members confirms that Angola's programs, services, and activities are difficult to access in these spaces. Aaron Brent, a former health care orderly, testified that the showers in Ash 2 were not usable for patients with disabilities, in part because there were "showers you couldn't reach."[1514] At trial, Farrell Sampier testified regarding the difficulty he experienced navigating the paved walkways between the medical wards and other areas while in his wheelchair, explaining that traversing the sidewalks alone required him to perform "wheelies" and to maneuver over various humps and obstacles. Mr. Sampier normally would try to find someone who was willing to push him in his chair.[1515] And former patient Francis Brauner, who uses a wheelchair, described a host of problems with the accessibility of Ward II, all of which were consistent with Mr. Mazz's findings. For example, Mr. Brauner testified that he was unable to access the shower or bathtub.[1516] As a result, Mr. Brauner would give himself bed baths[1517] and would shave and wash his hair in the sink.[1518] However, the sinks were positioned above chest level for patients in wheelchairs, making them difficult to use.[1519] He also testified that he could not reach the mirrors or the water fountains.[1520]

---

[1509] Id. at 0002. See also Rec. Doc. 220-1 (Defs.' Response to Pls.' Statement of Undisputed Facts for Mot. for Partial Summ. J. on Pls.' ADA Claim) (admitting to the violations identified by Mr. Mazz).

[1510] JX 4-ccc, D. Vannoy Depo. at 71:18-20.

[1511] JX 4-z, D. Barr Depo. at 39:5-9.

[1512] JX 6-eee (LSP Directive 13.088) at 00269.

[1513] PX 15 at 0002 (Proposal to Open EHCC Building Four).

[1514] JX 4-c, A. Brent Depo. at 32:10-33:10.

[1515] Oct. 9 Testimony of Farrell Sampier at 63:11-19; 82:15-24.

[1516] Oct. 12 Testimony of Francis Brauner at 102:1-6.

[1517] Id. at 100:24-101:2.

[1518] Id. at 102:9-10.

[1519] Id. at 102:9-11.

[1520] Id. at 102:12-15.

### b. *Defendant's Arguments*

514. Rather than dispute the accuracy of Mr. Mazz's findings, defense counsel sought to undermine his conclusions by (1) questioning his methodology and implying that he failed to consider a nonexistent "transition plan;" (2) highlighting the prison's reliance on "inmate health care orderlies" to assist patients with mobility impairments; (3) suggesting that the DOJ's investigation into the accessibility of Angola's facilities somehow renders Mr. Mazz's findings moot; and (4) implying (without producing evidence) that there may be other accessible facilities elsewhere on the prison grounds. None of these arguments is persuasive.

### i. Criticism of Mr. Mazz's Methodology

515. Defense counsel criticized Mr. Mazz for relying on the 1991 Standards to identify architectural barriers without knowing the construction or alteration dates of the buildings he surveyed and without determining whether Angola had made the programs and services accessible through alternative means.[1521] Mr. Mazz readily agreed that in many cases, the regulations permit a facility to provide programmatic access through methods other than the removal of architectural barriers.[1522] He even provided some examples, such as the relocation of a prison's law library to the first floor of a building if the building does not have an accessible elevator.[1523]

516. However, Mr. Mazz made it clear that of the various violations he observed, he chose to include them in his report only when (1) the violation presented a clear barrier to programmatic access, and (2) the program, service, or activity could not be made readily accessible through alternative means.[1524] For example, Mr. Mazz observed that patients are provided with individual storage lockers, which are placed on the floor next to their beds. According to the 1991 standards, their location puts them out of reach for persons with disabilities. However, Mr. Mazz did not cite this violation, because the lockers were freestanding and could easily be lifted by a correctional officer onto a bench or other surface upon request.[1525] As another example, Mr. Mazz noted that he did not cite potential violations involving the placement of toilet flush buttons because they would not prevent a patient from actually accessing and using the toilet.[1526]

---

[1521] Oct. 17 Defendants' Rule 52(c) Argument at 113:17-23; Oct. 12 Testimony of Mark Mazz at 65:23-67:16. The only "alternative means" suggested by Defendants was the prison's reliance on inmate health care orderlies to provide assistance with the activities of daily living. Oct. 12 Testimony of Mark Mazz at 56:16-57:10. The sufficiency of that program as an alternative means of providing programmatic access is discussed below.

[1522] Oct. 12 Testimony of Mark Mazz at 55:8-12.

[1523] *Id.* at 55:23-56:15.

[1524] *Id.* at 81:10-16.

[1525] *Id.* at 23:11-24:2.

[1526] *Id.* at 24:4-22.

517. Additionally, Mr. Mazz offered unrebutted testimony, backed by 30 years of experience as an architectural accessibility consultant, that the accepted methodology in his field is to identify architectural barriers to programmatic access using the 1991 Standards.[1527] He further testified that the DOJ's Disability Rights Section employed the same methodology during his time there.[1528] Mr. Mazz also reviewed a letter from the DOJ detailing the results of its own assessment of Angola's compliance with the programmatic access requirement, which was conducted in 2010.[1529] He noted that the DOJ's analysis "follows the same methodology for determining whether spaces provide program access."[1530] Defendant offered no expert testimony—indeed, no evidence at all—to dispute this credible and reliable testimony about the methods commonly used to evaluate programmatic access.

518. In sum, the testimony confirms that Mr. Mazz considered the greater flexibility afforded a public entity under the programmatic access standard, and Defendant has failed to identify a more appropriate methodology for identifying architectural barriers to programmatic access.

519. While not pertinent to Mr. Mazz's conclusions regarding programmatic access, certain features of the buildings at issue have, in fact, been altered since the 1991 Standards went into effect. In 2016, Angola's facilities maintenance staff compiled a list of renovations completed at Main Prison and the outcamps between 2010 and May 2016.[1531] The list reveals that several alterations were made to the Ash 2 and Cypress 2 dormitories between September 2012 and December 2015, including (1) installation of Tru-Bro Lavatory Guards to supply lines and drainage pipes beneath the sinks, (2) lengthening of the ramp entrance to the Ash 2 restroom/shower area; and (3) installation of wall-mounted stools at every J-Pay station.[1532] Odis Ratcliff, an Assistant Facilities Maintenance Manager designated by the DOC to testify regarding the compliance of LSP's facilities with the ADA,[1533] confirmed that the list includes alterations made since 2010 to attempt to bring the facilities into compliance with the ADA and fire marshal regulations.[1534] Thus, the evidence shows that the bathrooms and JPay Stations in Ash 2 and Cypress 2 dormitories underwent alterations after the 1991 Standards took effect.[1535]

---

[1527] *Id.* at 13:17-14:6.

[1528] *Id.* at 14:7-12.

[1529] *Id.* at 24:23-25:22; *see also* PX 7 at 0008.

[1530] PX 7 at 0009; Oct. 12 Testimony of Mark Mazz at 25:21-26:4.

[1531] JX 12-e at 00297-99.

[1532] *Id.* at 00297.

[1533] JX 4-aaa, O. Ratcliff Depo. at 6:23-25.

[1534] *Id.* at 10:16-11:18. All of the alterations listed in the document were implemented before Mr. Mazz's July 6, 2016 site visit.

[1535] Other areas surveyed by Mr. Mazz appear to have been altered as well. In their motion for partial summary judgment, Plaintiffs offered a set of dated building plans as evidence of the construction or alteration dates of certain buildings. *See* JX 14. Defendant disputed the accuracy of those dates, arguing that "there is no indication on the documents of what those dates represent." Rec. Doc. 220

520. Finally, defense counsel sought to undermine Mr. Mazz's methodology by implying that he failed to review a transition plan developed by the prison.[1536] However, Defendant's counsel subsequently admitted that Angola does not have, and has not ever had, a transition plan.[1537]

ii.    Use of Health Care Orderlies

521. Angola assigns inmate health care orderlies to the medical dorms and Wards I and II. The orderlies are charged with assisting sick and disabled patients with the activities of daily living.[1538] Health care orderlies are not assigned to other areas of the facility that were surveyed by Mr. Mazz, such as the Camp F dormitories and the Transition Unit. At trial, defense counsel sought to elicit a legal conclusion from Mr. Mazz as to whether the use of orderlies would be an acceptable alternative method of providing programmatic access.[1539] Mr. Mazz did not evaluate the effectiveness of Angola's health care orderly program, but he explained that in his experience, forcing an otherwise self-sufficient patient to rely on another person to carry him into an inaccessible shower or onto an inaccessible toilet is not a practical or even workable alternative to removing architectural barriers.[1540] And indeed, Plaintiffs have presented ample evidence that the orderly program is an inadequate substitute

---

at 8. On the eve of trial, Defendant reversed course in its proposed findings of fact by acknowledging that the building plans do, in fact, represent the last construction or alteration dates of the buildings in question. *See* Rec. Doc. 497 at 25. Specifically, Defendant conceded that "[t]he last dates of construction, alteration, or renovation" for two of the buildings surveyed by Mr. Mazz were in the 2000s, well after the 1991 standards went into effect. *Id.* The first was Building C of the R.E. Barrow Treatment Center, which includes Ward I and Ward II. *Id.* Defendants listed August 20, 2001 as the relevant date, consistent with the building plans. *Id.*; *see also* JX 14 at 00008. The second was the Treatment Unit (also known as the Transition Unit, and referred to in Defendants' proposed findings of fact as the Treatment Center). Rec. Doc. 497 at 25. Defendant listed the alteration date as April 1, 2006, consistent with the building plans. *Id.*; *see also* JX 14 at 00001-02. (The relevant date is listed as April 10, 2006 in the plans. Defendant's reference to "4/01/2006," *see* Rec. Doc. 497 at 25, appears to be a typographical error.)

[1536] Oct. 12 Testimony of Mark Mazz at 72:3-73:11. Within six months of January 26, 1992, all public entities employing 50 or more persons were required to develop a transition plan setting forth the timeline and steps to complete any structural changes that would be necessary to achieve programmatic access. 28 CFR 35.150(d)(1). The transition plan was to be subject to public comment and inspection, *id.*, and it would (1) identify the architectural barriers, (2) set forth the method and schedule for removing each barrier, and (3) indicate the official responsible for the implementation of the plan. *Id.* at 35.150(d)(3).

[1537] Oct. 12 Tr. at 133:22-137:8.

[1538] JX 6-eee (LSP Directive 13.088 – Offender Assistance Dorm) at 00269-70; JX 6-vv (LSP Directive 13.076 – Use of Offenders in Health Care) at 0236-37.

[1539] Oct. 12 Testimony of Mark Mazz at 55:19-58:1.

[1540] *Id.* at 56:23-57:10.

for the removal of architectural barriers and has left patients vulnerable to neglect, exploitation, and abuse.

522.    First, the orderly program is grossly understaffed, making it impossible for the orderlies to provide patients with meaningful access to the facilities. Aaron Brent, a former health care orderly in Ash 2, testified that he and three other orderlies were responsible for 43 patients requiring assistance, including 29 or 30 in wheelchairs, and others who used walkers.[1541] In addition to providing patients with assistance in performing the activities of daily living, such as bathing, eating, and getting in and out of bed, Mr. Brent and the other orderlies were responsible for distributing meals; changing bed linens; counseling patients regarding their medication; providing emotional support to patients; delivering patients to religious services, scheduled medical appointments and unscheduled emergency visits to the ATU; and actually attending appointments with patients.[1542] Danny Prince, another former Ash 2 orderly, testified at trial that he had witnessed patients being neglected due to the orderlies being shorthanded. He explained that accompanying patients to their appointments often would require the full attention of two orderlies, leaving just one orderly in the dorm to look after the remaining patients.[1543] One patient complained in an ARP of being unable to access services such as the library due to his "wheelchair pusher" being unavailable, only to be told that he should push himself.[1544] Another patient's request for a wheelchair pusher went completely ignored.[1545] Mr. Prince also testified that some patients are forced to push themselves to their destination.[1546]

523.    Multiple witnesses credibly testified that the orderlies were short-staffed on the Wards as well, and that patients often were unable to rely on them for assistance. For example, Farrell Sampier testified at trial that the orderlies on Ward I were "overwhelmed," often leaving patients sitting in their own feces and urine.[1547] He explained that orderlies would throw dirty diapers or pads onto the floor and that it was "pretty common" for the orderlies to be called to another patient emergency without having an opportunity to properly dispose of the

---

[1541] JX 4-c, A. Brent Depo. at 75:18-76:23. Danny Prince, another former Ash 2 health care orderly, also testified at trial that the dorm housed 43 patients and 43 non-patients. Oct. 15 Testimony of Danny Prince at 95:11-12. He explained that two orderlies would cover the night shift, and during the day there could be anywhere from three to five orderlies, depending on whether the positions were fully staffed at the time. *Id.* at 96:19-24.

[1542] JX 4-c, A. Brent Depo. at 34:7-19; 35:16-36:10; 42:2-14; 68:7-70:8; 75:17-76:4; 76:24-77:15. *See also* Oct. 15 Testimony of Danny Prince at 116:3-13 (explaining that as an Ash 2 health care orderly, he would transport patients in wheelchairs to medical callouts and other areas of the prison, help patients in and out of their wheelchairs from the bed or shower, and clean up after patients who urinate or defecate in bed or on themselves, among other tasks).

[1543] Oct. 15 Testimony of Danny Prince at 98:6-19.

[1544] PX 231 at 1936-1940 (ARP of L.L.).

[1545] PX 231 at 1995-1996 (ARP of T.P.).

[1546] Oct. 15 Testimony of Danny Prince at 102:14-17.

[1547] Oct. 9 Testimony of Farrell Sampier at 46:9-12.

209

items.[1548] He testified that he personally observed the two orderlies on Ward I going from patient to patient without changing gloves, which he attributed to the stress they were under.[1549] He explained that the orderlies often seemed stressed and sometimes cursed and became aggressive, and on more than one occasion they almost dropped patients, including Mr. Sampier.[1550] On Ward II, former patient Francis Brauner described the pain he would experience attempting to transfer from his bed to his wheelchair unassisted, but he was reluctant to ask for help because "they had patients that needed [the orderlies] at lot more" than he did, and he felt he would be "stuck in the bed" if he relied on the orderlies for assistance.[1551] In some cases, patients were left to rely on other, untrained patients for assistance.[1552]

524. Even more troubling is the ample evidence of patient abuse and neglect at the hands of certain orderlies. Former orderly Danny Prince testified at trial that he had observed verbal and physical altercations between orderlies and patients.[1553] Mr. Brauner testified that he and others housed on Ward II regularly overheard an elderly patient attempting to defend himself from an orderly who molested him in the shower.[1554] Mr. Brauner further testified that he personally witnessed the same orderly fondling the patient in his bed.[1555] On another occasion, Mr. Brauner witnessed an orderly pour a bucket of bleach on an intellectually disabled patient who had defecated on himself.[1556] Mr. Sampier also alluded to his concerns regarding potential abuse during his trial testimony, explaining that relying on other inmates, especially for assistance with toileting and personal hygiene, was "not a position you want to be in in prison."[1557]

525. Additionally, several witnesses testified that many orderlies are simply unwilling to perform their duties. For example, Subclass member Benny Prine testified that he struggles to convince most of the orderlies in his medical dormitory to push him to his call-outs unless

---

[1548] *Id.* at 46:12-16.

[1549] *Id.* at 46:25-47:3.

[1550] *Id.* at 65:3-8.

[1551] Oct. 12 Testimony of Francis Brauner at 101:5-25.

[1552] Oct. 9 Testimony of Farrell Sampier at 65:21-66:2 (explaining that he and other patients on the ward would assist each other with feeding, covering up, and other tasks when the orderlies were not available).

[1553] Oct. 15 Testimony of Danny Prince at 97:15-23.

[1554] Oct. 12 Testimony of Francis Brauner at 99:17-25.

[1555] *Id.* at 100:1-8.

[1556] *Id.* at 100:9-21. Notably, this incident occurred at the direction of a correctional officer, further underscoring the dangers of placing orderlies under the supervision of security rather than medical staff.

[1557] Oct. 9 Testimony of Farrell Sampier at 59:8-10; *see also id.* at 62:1-12 (explaining his efforts to teach himself to use the toilet independently, because Angola was "not the place, you know, you want to have inmates doing that particular thing").

he gives them something, even though they are being paid for their work.[1558] On multiple occasions, he has attempted to push himself when no one would help him, only to be stopped by security.[1559] Deceased Named Plaintiff Shannon Hurd testified via video deposition that many orderlies on Ward II did not fulfill their responsibilities and were simply in the program for the air conditioning that was available on the ward.[1560] Mr. Brent testified that he had to report orderlies who did not perform their jobs and needed to be removed from the program.[1561] Mr. Prince, the other former Ash 2 health care orderly, testified at trial that while some orderlies go above and beyond their assigned duties, others seem to be looking for an easy job and are unwilling to assist patients.[1562]

526. Tracy Falgout, who runs the health care orderly training program and testified on behalf of the DOC regarding the training and qualifications of orderlies, acknowledged that orderlies may have "different angles" when joining the program and may try to "strong-arm" vulnerable patients.[1563] He further acknowledged a prison culture of "not being a rat," and that there may be consequences for patients or orderlies who report misconduct.[1564] Warden Falgout advises patients and orderlies to "figure out a way to get it to somebody who can take care of it," but admits that "sometimes it just is going to be what it is," if "somebody out there is not doing what they are supposed to be doing."[1565] Warden Falgout did not have a sense of the percentage of orderlies who are removed from the position for infractions (in part because he is not necessarily informed by security when this occurs),[1566] but he acknowledged that he is "continually training" new orderlies because "we do have that percentage of guys who don't play by the rules."[1567] Warden Falgout acknowledged that at least one orderly has been accused by a patient of sexual assault,[1568] while admitting that such complaints generally would go to security, such that he might not be aware of other allegations.[1569]

---

[1558] JX 4-q, B. Prine Depo. at 71:25-72:5, 74:10-14.

[1559] Id. at 74:19-75:1.

[1560] JX 4-u, S. Hurd Depo. at 60:25-61:4. Francis Brauner also testified that some orderlies take the job for the access to air conditioning and are unwilling to assist patients. Oct. 12 Testimony of Francis Brauner at 99:11-16.

[1561] JX 4-c, A. Brent Depo. at 46:5-22.

[1562] Oct. 15 Testimony of Danny Prince at 97:3-15.

[1563] JX 4-ii, T. Falgout Depo. at 27:25-28:7; see also Oct. 25 Testimony of Tracy Falgout at 41:8-14.

[1564] JX 4-ii, T. Falgout Depo. at 28:12-16; see also Oct. 25 Testimony of Tracy Falgout at 42:18-43:4.

[1565] JX 4-ii, T. Falgout Depo. at 28:17-25; see also Oct. 25 Testimony of Tracy Falgout at 43:5-7.

[1566] Oct. 25 Testimony of Tracy Falgout at 43:8-14. See also id. at 43:15-19 (explaining that he only becomes aware that orderlies have left the program when security gives him a new list of candidates to train).

[1567] JX 4-ii, T. Falgout Depo. at 34:2-4.

[1568] Id. at 41:4-14.

[1569] Id. at 33:12-18; 34:16-24; 42:1-13.

527.    Additionally, the evidence shows that the inaccessibility of the facilities puts patients at risk of injury, regardless of the availability of health care orderlies. Subclass member Benny Prine testified that he was being pushed down a ramp in his chair when a gap in the pavement caught one of the leg rests, bending it beyond repair and nearly flipping him out of the chair.[1570] One wheelchair-bound patient reported falling out of his chair on the ramp to the West Yard kitchen at Main Prison.[1571] Mr. Brent testified that multiple wheelchair-bound residents of Ash 2 had fallen off the raised walk along the side of the dormitory, requiring emergency transport to the hospital.[1572] Mr. Brent even drew up plans for a guard rail, but his suggestion was ignored.[1573] Similarly, patients who wish to shower or toilet independently may slip and fall, or an orderly rendering assistance may be unable to prevent a fall, placing both the orderly and patient at risk of injury. Mr. Prince described one such incident, in which a patient fell on top of him while he was assisting the patient in the shower.[1574] Numerous patients with disabilities have filed ARPs reporting injuries sustained in showers lacking accessible features throughout the prison, or expressing concerns about the potential for injury.[1575]

528.    Even setting aside the risks, the lack of accessible showers and toilets forces individuals who otherwise would be able to shower and toilet independently to rely on the assistance of other inmates in the performance of these highly personal functions. The prison's own policies appear to acknowledge the importance of providing facilities that enable patients with disabilities to perform self-care and personal hygiene with the same level of privacy afforded to other inmates within their security classification.[1576] But this goal simply is not attainable given the existing architectural barriers. In sum, the evidence clearly shows that the inmate health care orderly program has failed to make Angola's programs and services accessible to the patients housed on the medical wards and in Ash 2 and Cypress 2.

### iii.    The DOJ's Survey and Proposed Agreement

529.    As Mr. Mazz noted in his report and at trial, a letter and proposed settlement agreement produced by Defendants in discovery indicate that the Department of Justice conducted its own survey of Angola's facilities in 2010.[1577] The DOJ surveyed a broader array of facilities at the prison, including Camps C, D, and J; the prison museum; Death Row; the visitor's center

---

[1570] JX 4-q, B. Prine Depo. at 64:12-65:2.

[1571] PX 231 at 2263-2265 (ARP of J.W.).

[1572] JX 4–c, A. Brent Depo. at 78:4-80:21.

[1573] *Id.*

[1574] Oct. 15 Testimony of Danny Prince at 104:10-19.

[1575] *See, e.g.,* PX 231 at 2358-64, 2437-39 (ARP of J.W.); PX 231 at 1794-1809 (ARP of C.H.); PX 231 at 1609-13 (ARP of S.G.); PX 231 at 1846-55 (ARP of E.J.); PX 231 at 1887 (ARP of T.K.).

[1576] JX 7-b (LSP Directive 07.004 – Housing for the Disabled) at 1 ("Equipment and facilities and the support necessary for inmates with disabilities to perform self-care and personal hygiene in a reasonably private environment will be provided as allowed by security.").

[1577] *See* PX 7 at 0008.

at the main gate; and additional areas within Main Prison, such as the chapel, courtroom, hobby shop facilities, and other dormitories.[1578]

530. Plaintiffs relied on the letter not as evidence of liability, but to demonstrate that Mr. Mazz's methodology in identifying architectural barriers to programmatic access was consistent with the DOJ's methodology, and that Defendant has been aware of the issues identified by the DOJ since its investigation in 2010.[1579] Defendant, on the other hand, argues that the DOJ's survey and proposed settlement effectively render Mr. Mazz's findings moot, and that requiring Defendant to remediate both lists of violations could subject Defendant to inconsistent obligations.[1580]

531. These arguments are without merit. First, because Angola did not execute an agreement with the DOJ before the close of discovery in September 2016, Defendant merely argued—but did not present admissible evidence—that the lack of programmatic access "is being addressed" as a result of a final agreement.[1581] Consistent with the Court's order limiting the parties' presentation of evidence to the discovery period, evidence of any post-discovery remedial measures, including measures taken as a result of an agreement with the DOJ, will be addressed during the remedial phase of this matter.[1582] In any event, Defendant's own architectural expert indicated that there is very little overlap between the two lists of violations,[1583] and Defendant presented no evidence that Angola has remediated any of the violations identified in Mr. Mazz's report (and substantiated by Mr. Nolan).

532. Second, there is no risk whatsoever that Defendant will incur inconsistent obligations if required to remove the barriers identified in Mr. Mazz's report. To the extent his findings overlap with the DOJ's list, the Title II regulations indicate that the remedial alterations must comply with the 2010 Standards.[1584] Where they do not overlap, nothing in the draft DOJ

---

[1578] *See id.*

[1579] *See id.*; JX 4-aaa, 0. Ratcliff Depo. at 27:6-28:9.

[1580] *See,* Oct. 17 Defendants' Rule 52(c) Argument at 114:9-115:13; Oct. 12 Testimony of Mark Mazz at 76:8-11 ("If all of the areas that were mentioned in Attachment A to the Department of Justice Report were remedied, would that take care of all the things that you found to be needing to be remedied?").

[1581] Oct. 17 Defendants' Rule 52(c) Argument at 114:9-115:13.

[1582] *See* Rec. Doc. 419 at 3 ("If Plaintiffs prevail on their constitutional and ADA claims, evidence of subsequent conditions may be relevant at the remedy stage.").

[1583] As Mr. Mazz noted in his testimony, Defendant's expert, Mr. Nolan, conducted a review of both the DOJ's and Mr. Mazz's findings to identify areas of overlap. Of the 190 violations identified by Mr. Mazz, Mr. Nolan noted only 11 that also were cited in the DOJ's proposal. Oct. 12 Testimony of Mark Mazz at 80:15-81:5.

[1584] 28 C.F.R. § 35.151(c)(3); *see also* PX 7 at 0009 ("'Citation for Remediation' provides the 2010 ADA Standards citation for the alteration requirements, since remediation will occur after the effective date of March 15, 2012."), and 0018-39 (citing the applicable 2010 Standards in Attachment 2).

settlement agreement suggests that the steps that would remedy Mr. Mazz's findings would interfere with their remedy. In other words, remediation of Mr. Mazz's findings would be satisfied by the same measures where the findings overlap and additional measures where the findings do not overlap—but in no case would require conflicting remedies.

### iv. Consideration of Other Areas at Angola

533. During the cross examination of Mr. Mazz, defense counsel repeatedly implied that "programmatic access was being provided in areas of the prison that [Mr. Mazz] did not review," by asking if Mr. Mazz would have any basis to dispute that assertion.[1585] Defendant then criticized Mr. Mazz in its Rule 52(c) motion for failing to survey the entire prison.[1586] Counsel's hypotheticals to Mr. Mazz are perplexing, for as he observed, it would be "highly unusual" to house patients with the most severe disabilities on the ward and in the medical dorms if there were more accessible facilities elsewhere on the prison grounds.[1587] And indeed, Defendant presented no evidence of other, more accessible housing areas at the prison. As discussed above,[1588] Mr. Mazz did not survey a third medical dormitory known as Hickory 4, but he expressed no opinion regarding that building. Further, the accessibility or inaccessibility of Hickory 4 (or any other part of the prison, for that matter) has no bearing on whether Angola's programs and services are accessible to the many patients with disabilities living in Ash 2, Cypress 2, or the other spaces that formed part of Mr. Mazz's survey.[1589]

534. Indeed, defense counsel's suggestion that "programmatic access was being provided" elsewhere, which appears to be completely untethered from reality, evinces a fundamental misunderstanding of both the programmatic access requirement and the scope of Mr. Mazz's findings. Mr. Mazz repeatedly explained that he did not review every program, service, or activity offered at Angola, and he did not opine on the accessibility of facilities or programs that he did not review.[1590] Rather, because the regulations require that patients with disabilities be able to access the prison's programs and services, he focused on the spaces

---

[1585] Oct. 12 Testimony of Mark Mazz at 63:5-21. *See also id.* at 65:1-3 ("If Louisiana State Penitentiary implemented program access in other areas of the prison that you didn't review, would you be able to dispute that?").

[1586] Oct. 17 Defendants' Rule 52(c) Argument at 113:21-114:2.

[1587] Oct. 12 Testimony of Mark Mazz at 63:18-64:9; *see also id.* at 65:7-15.

[1588] *See supra* n.1461.

[1589] If anything, the pervasive architectural barriers throughout the prison's supposedly "accessible" housing areas raise an inference that other areas housing patients with disabilities suffer from the same problems. *Cf. Armstrong v. Davis*, No. 94-02307, Rec. Doc. 523 at 32 (N.D. Cal. Dec. 22, 1999) ("The inaccessibility of the SF and LA hearing locations raises an inference that there is a systemic problem, and that the BPT still needs to evaluate and determine the accessibility of all of its hearing locations.")

[1590] Oct. 12 Testimony of Mark Mazz at 65:4-6 ("As I already answered, I'm certain they've got programs in other parts of the prison that I didn't review and I'm not addressing those.").

where Angola chooses to house patients with the most profound disabilities, along with the ancillary sidewalks, recreation areas, and other services that have been designated for their use. As a result, he did not need to survey other areas of the prison to reach his conclusions.[1591] For example, Mr. Mazz testified that he did not need to see other parts of the prison to know whether the showers or toilets on the medical wards were accessible to the disabled patients living there.[1592] Thus, even if there *were* accessible living areas elsewhere at Angola, that fact would not have altered his opinion in any way.[1593]

535. For all its criticism of Mr. Mazz's failure to survey the entire prison, the DOC never actually disputed that Angola's most disabled patients reside in the areas discussed in Mr. Mazz's report. Even more importantly, Defendant presented no evidence whatsoever to rebut Mr. Mazz's conclusion that those patients lack access to the programs, services, and activities that are available to their able-bodied counterparts. The hypothetical questions and unsupported assertions of counsel during cross-examination, of course, are not evidence and cannot support Defendant's argument.[1594]

(2) Enforcement of Exclusionary Policies

536. Angola also enforces certain policies that discriminate against individuals with disabilities by excluding them from programming available to their able-bodied counterparts. For example, Angola maintains a hobby shop where men can participate in hobby craft such as leather work, woodwork, and painting. The participants sell their crafts at the Angola Rodeo, and they are permitted to keep a portion of the proceeds for personal items such as toiletries and food from the canteen or phone calls to family members.[1595] However, if an individual has a disability that necessitates a restricted duty status, Angola's policies automatically bar him from participating in all hobby craft, including low-risk activities such as painting, regardless of whether participation in the activity would present a risk of harm to himself or others.[1596]

---

[1591] *Id.* at 63:13-65:6; 77:12-78:8.

[1592] *Id.* Plaintiffs' counsel convincingly reiterated this point in her response to Defendant's Rule 52(c) motion. *See* Oct. 17 Plaintiffs' Rule 52(c) Argument at 119:14-21 ("In order to evaluate the programmatic access of those with wheelchairs living in the medical dorms, Mr. Mazz had to go no further than the dorms where they are housed and the bathrooms that they use. The patients in Ash 2 don't go to Camp D to go to the bathroom. The patients in Ash 2 don't go to Camp J for a shower. The patients in Ash 2 have a shower and go to the bathroom in the dorm where they live, and Mr. Mazz evaluated those dorms.").

[1593] Oct. 12 Testimony of Mark Mazz at 77:22-79:12.

[1594] *See United States v. Kane*, 887 F.2d 568, 572 (5th Cir. 1989) ("[S]tatements by counsel are not evidence at trial . . . .").

[1595] Oct. 12 Testimony of John Tonubbee at 165:3-17.

[1596] JX 7-c (LSP Directive 09.036 – Hobbyshop Operations) (prohibiting use of the hobby shop "until such time as the inmate is returned to regular duty without restrictions"); JX 7-d (LSP Posted Policy G-17 – Hobbyshop Operations) at 00016 (stating that "[n]o inmate receiving medical care and/or treatment requiring a restriction in the inmate's regular duties will be allowed to utilize the

Francis Brauner, a former patient at Angola, testified that he had prior experience with leather work and wanted to participate in hobby craft during his time at Angola. When he requested permission, he was told that because he had a restricted duty status, he could not participate.[1597] Another patient filed an ARP challenging his exclusion from the hobby shop, explaining that even with his restricted duty status, he received work assignments that required sweeping, mopping, scrubbing, and walking for eight hours; yet he was not permitted to sit in front of a canvas and do simple woodwork.[1598] His ARP was denied because "according to LSP Directive #09.036, when under medical care and/or treatment, requiring a duty status [sic], an offender utilizing the hobbyshop is interrupted until the offender is returned to regular duty without restrictions."[1599] In his appeal, the patient explained that his duty status was permanent and argued that Angola's policy discriminated against patients with disabilities by requiring them to either give up their duty status or forgo hobby shop privileges.[1600] The DOC denied his appeal, taking the position that "[t]his restriction is not discrimination and is in accordance with policy."[1601]

537. Similarly, Angola does not offer work assignments to individuals with certain disabilities. For example, all blind inmates are placed on "no duty."[1602] Farrell Sampier, a former chef who was paralyzed from the waist down, testified that he "would love" to get back in the kitchen but was not permitted to have a job due to his condition.[1603] Inmates on "no duty" are not permitted to work and are unable to earn incentive wages,[1604] yet they receive no discounts for phone calls or at the canteen.[1605] Additionally, if an individual has a duty status restriction, he is not permitted to participate in Angola's work release program, which enables individuals with less than two years left on their sentence to work outside the prison as part of their integration back into the community.[1606] Dr. Singh also issued a blanket prohibition on approving HIV-positive individuals for work release.[1607]

---

hobby shop until such time the inmate is returned to regular duty without restrictions"); JX 4-z, D. Barr Depo. at 44:14-16 (admitting that patients placed on "no duty" status are not permitted to participate in hobby craft); JX 4-ii, T. Falgout Depo. at 107:23-108:1 (explaining that hobby craft is a privilege, not a right); UF ¶ 20 (agreeing that "LSP Directive # 09.036 prohibits any inmate 'requiring a duty status' from utilizing the hobbyshop until such time as the inmate is returned to regular duty without restrictions").

[1597] Oct. 12 Testimony of Francis Brauner at 107:4-108:4.
[1598] PX 231 at 1462.
[1599] Id. at 1464.
[1600] Id. at 1513.
[1601] Id. at 1514.
[1602] JX 4-z, D. Barr Depo. at 44:6-13; JX 4-ww, R. Peabody Depo. at 53:22-54:7.
[1603] Oct. 9 Testimony of Farrell Sampier at 62:25-63:10.
[1604] JX 4-z, D. Barr Depo. at 44:6-13.
[1605] Id. at 47:3-6.
[1606] JX 4-jj, T. Falgout Depo. at 59:11-25.
[1607] PX 99 at 0001 (June 8, 2010 email from Sonya Bufalo to Amanda Amman).

538.    Angola also discriminates against disabled patients by denying them the opportunity to participate in educational, therapeutic, religious, and recreational programming. At trial, Mr. Sampier testified that when he was living on the medical wards, he was not allowed to attend any of the classes offered at the prison, including programs such as anger management, victim awareness, and substance abuse classes.[1608] Similarly, Mr. Brauner testified that he and other patients living on the ward were not permitted to attend church services or recreational sporting events that were available to other inmates.[1609] According to Mr. Brauner, this left him and other patients with essentially nothing to do all day.[1610] Named Plaintiff Otto Barrera, who was housed on Ward II until December 2015, also testified that he was not permitted to leave the ward to attend classes or church services. Mr. Barrera explained that he was required to take anger management and substance abuse courses in order to be eligible for release. When he asked if someone could come to the ward to teach the classes on location, he was told that there were not enough patients on the ward who needed the courses to warrant the accommodation. Mr. Barrera recalled at least five patients on Ward II who needed at least one of the courses.[1611]

## C.  Poor Training and Practices Result in Discrimination Against Patients with Disabilities.

539.    Both the DOC and Angola have adopted written policies and procedures addressing the prison's obligation to provide appropriate accommodations to patients with disabilities. However, the evidence shows that prison administrators, medical personnel, and security staff fail to comply with these policies, resulting in discrimination. The lack of appropriate training provided to both the prison's ADA Coordinator and its staff more generally has resulted in a chaotic system in which staff fail to recognize, document, and track patients' disabilities and needed accommodations; requests for accommodations are misrouted, mishandled or arbitrarily denied; and accommodations that are granted are misapplied by staff. The result is a system in which patients with both physical and mental disabilities are regularly denied even the most basic accommodations in almost every area of daily life, including personal mobility, transportation, communication, security procedures, work assignments, and even discipline.

### (1)  Failure to maintain a qualified ADA Coordinator

540.    Consistent with its obligation under the Title II regulations,[1612] Angola's internal policies provide for the appointment of an ADA Coordinator to oversee the prison's efforts to comply with and carry out its responsibilities under the ADA, including the provision of necessary accommodations. LSP Directive 01.016 states that "[t]he ADA coordinator shall

---

[1608] Oct. 9 Testimony of Farrell Sampier at 48:13-16; *see also id.* at 62:13-24.
[1609] Oct. 12 Testimony of Francis Brauner at 108:5-19.
[1610] *Id.* at 108:20-25.
[1611] Oct. 12 Testimony of Otto Barrera at 213:8-214:23.
[1612] *See* 28 C.F.R. § 35.107(a).

possess the educational background, experience and skills necessary to carry out all of the duties and responsibilities of the position, and have knowledge and experience in dealing with the legal rights of persons with disabilities and the obligations of public entities under Federal and State disability laws."[1613] However, the DOC has conceded that in practice, "[t]here are no specific qualifications of LSP's ADA Coordinator or interim ADA coordinator,"[1614] and the ADA Coordinator "do[es] not receive any formal ADA training upon taking office or on a regular basis."[1615] The evidence shows that during the relevant period, Angola's wardens paid lip service to the prison's obligation to maintain a coordinator by appointing a string of inexperienced administrators to the position without so much as explaining the role to them, much less providing them with the necessary training or education to execute their responsibilities.

541.     Deputy Warden Richard Peabody was appointed ADA Coordinator sometime after the Act's passage in 1991 and served in that role until he took sick leave in late 2015 or early 2016.[1616] Peabody indicated that the training he received to become ADA Coordinator was just "the basic training that we all went through."[1617] The only training he could identify was a four-hour refresher that all staff received, which "may have been" related to a resolution agreement with the DOJ regarding hearing-impaired inmates.[1618] He did not attend trainings regarding disability law,[1619] and when asked how he kept up with changes in the law, he admitted that he was not "kept in some sort of loop on that."[1620] The lack of training showed: he was unfamiliar with the assessment form used to evaluate requests for accommodations, even though he believed it was his responsibility to complete the form,[1621] and as discussed below, he routinely disregarded patients' disabilities as purely "medical" issues.[1622] Peabody did not even know the identity of the DOC's statewide ADA Coordinator.[1623]

542.     In July 2016, several months after Warden Peabody's departure, Warden Donald Barr, the Assistant Warden for Administrative Services, was tapped to replace Warden Peabody as

---

[1613] JX 7-a at 1.

[1614] PX 403 at 0004 (Defendants' Responses to Plaintiffs' Seventh Set of Requests for Production of Documents).

[1615] UF ¶ 15.

[1616] JX 4-ww, R. Peabody Depo. at 11:18-12:6; JX 4-z, D. Barr Depo. at 9:24-10:22.

[1617] JX 4-vv, R. Peabody Depo. At 17:9-11.

[1618] JX 4-ww, R. Peabody Depo. at 12:23-13:15.

[1619] *Id.* at 13:16-19.

[1620] *Id.* at 13:20-23.

[1621] JX 4-vv, R. Peabody Depo. at 19:25-20:12; 21:4-7.

[1622] *See, e.g., id.* at 22:6-24.

[1623] *Id.* at 23:16-19.

ADA Coordinator.[1624] Similarly, Warden Barr received no ADA training other than the annual hour that all officers receive at the training academy.[1625] He was not able to meet with his predecessor, Warden Peabody, to discuss the role;[1626] nor did he review any sort of manual.[1627] Warden Barr explained that "[t]he Warden just came to me and told me that he appointed me to that position and pretty much that was it."[1628] When he took on the role, nothing changed in terms of his workload; this position was just an "extra assignment."[1629]

543. Warden Barr was unaware of basic information such as the availability of materials in Braille, including books and the RFA form.[1630] He was not sure how a blind inmate would file an ARP,[1631] and was unsure whether deaf inmates were permitted to work.[1632]

544. Assistant Warden Tracy Falgout, Angola's current ADA Coordinator, was appointed to the position in September 2016, sometime after Warden Barr's retirement and just before the close of discovery.[1633] He received no training or manual when he took office and did not discuss the role with his Warden Barr.[1634] He was not familiar with the ADA Amendments Act or the Rehabilitation Act;[1635] the individualized response plans he was required to create for disabled patients pursuant to LSP Directive 01.016;[1636] or the concept of an ADA transition plan as defined in 28 C.F.R. § 35.150(d).[1637]

545. Additionally, the laundry list of responsibilities assigned to Warden Falgout during the relevant period calls into question his ability to effectively oversee facility-wide ADA compliance. At the time of his appointment, his duties included supervising a mental health nurse; overseeing Angola's Quality Improvement program, which involved formulating studies, collecting data for as many as six studies at a time, preparing reports, and leading

---

[1624] JX 4-z, D. Barr Depo. at 9:24-10:22. Barr was not certain when Warden Peabody first took sick leave but knew it was sometime before July 2016. *Id.*; UF ¶ 15 (agreeing that "Warden Peabody took ill . . . sometime before January 1, 2016 and was replaced by Warden Barr in July 2016).

[1625] *Id.* at 10:23-11:2, 16:13-17:3.

[1626] *Id.* at 11:3-4.

[1627] *Id.* at 11:7-9.

[1628] *Id.* at 11:15-17.

[1629] *Id.* at 12:20-23.

[1630] *Id.* at 43:14-24.

[1631] *Id.* at 45:19-23.

[1632] *Id.* at 49:5-9.

[1633] JX 4-jj, T. Falgout Depo. at 7:12-8:5, 16:13-14 (deposition taken on October 26, 2016; T. Falgout acknowledging having been in the position for a month and a half).

[1634] *Id.* at 8:2-19.

[1635] *Id.* 11:15-12:3.

[1636] *Id.* at 58:12-14. LSP Directive 01.016 requires the ADA Coordinator to develop individualized response plans to address the needs of patients with disabilities; to provide copies of those plans to various personnel; and to place a copy in the patient's medical record. *See* JX 7-a at 3-4.

[1637] *Id.* at 37:1-16; 28 C.F.R. § 35.150(d).

quarterly meetings; preparing and maintaining files to demonstrate compliance with the ACA's medical standards, both for annual internal audits and the triennial ACA audit; making level of care determinations for individuals being transferred from Angola to other facilities, which required thousands of record reviews every year; providing nursing staff training and continuing education; running the health care orderly and hospice volunteer training programs; leading re-entry classes; performing patient histories and assessments as part the intake process for transfers to Angola, at times on a weekly basis; teaching basic and advanced life support classes; processing and evaluating accommodation requests, and conducting as many as 50 or more hearing tests per month in connection with many of those requests.[1638] In addition to his responsibilities at Angola, Warden Falgout serves as a national auditor for the ACA, which requires him to participate in audits throughout the United States and Mexico.[1639]

546.    In sum, the evidence clearly shows that Angola has never had an ADA Coordinator with the training, qualifications, or capacity to effectively oversee compliance with the ADA's mandates relating to the accessibility of the prison's programs and services, the provision of accommodations, and the processing of grievances. This failure has greatly contributed to the discrimination that patients with disabilities have experienced at Angola.

(2)    Failure to maintain an advisory committee

547.    LSP Directive 01.016 also requires Angola to maintain an ADA Advisory Committee consisting of the ADA Coordinator, the Deputy Warden for Operations, a staff attorney, the Safety Director, and the Health Information Management Supervisor.[1640] The Committee is charged with reviewing ADA compliance on a monthly basis and recommending corrective action to the warden where appropriate.[1641] However, neither the prison's ADA Coordinator[1642] nor its past or present wardens[1643] were aware of the existence of such a committee, and Defendant has admitted that "no such committee existed during the pendency of this lawsuit."[1644] While the ADA does not expressly require such a committee, the prison's failure to follow its own policies regarding the monitoring of ADA compliance is concerning and speaks to a culture of disregard for the needs of disabled patients.

---

[1638] Oct. 25 Testimony of Tracy Falgout at 12:10-14:1, 32:15-36:16.

[1639] *Id.* at 36:20-37:2.

[1640] JX 7-a at 4.

[1641] *Id.*

[1642] JX 4-ii, T. Falgout Depo. at 93:23-25; JX 4-jj, T. Falgout Depo. at 36:1-9.

[1643] JX 4-ccc, D. Vannoy Depo. at 72:17-20; JX 4-bb, B. Cain Depo. at 48:24-49:18.

[1644] UF ¶ 18; *see also* PX 403 at 0003 (Defs.' Responses to Pls.' Seventh Set of Requests for Production of Documents)(admitting that Defendant has no documents relating to an advisory committee).

### (3) Inadequate staff training

548. LSP's Directive 01.016 states that "[c]omprehensive annual training shall be provided to all employees relevant to access to programs, services, and activities available to individuals with disabilities."[1645] It further requires that staff "be trained to identify individuals who would benefit from appropriate auxiliary aids and services."[1646] Regrettably, even a cursory review of the prison's training materials reveals that they are devoid of information that would enable staff to understand what qualifies as a disability; to recognize when a patient may require an accommodation; to assist patients with requesting accommodations; to process and track accommodation requests; to comply with duty status restrictions; or to generally understand the prison's legal obligations and its corresponding written policies.

549. At trial, Tracy Falgout testified that both security and medical staff receive an hour of training annually on "special needs offenders."[1647] Every year, this "training" is based on the same 12-page handout,[1648] three pages of which consist of instructions to determine if an inmate is using various types of illegal drugs.[1649] The remainder of the handout highlights just a small number of physical and mental conditions that may "cause problems for security staff," by, for example, requiring the patient to make frequent trips to the infirmary.[1650] The handout is almost entirely devoid of instruction as to the specific accommodations a patient with a disability might require and exhibits a troubling preoccupation with the possibility of patients faking symptoms or selling their prescribed medication. For example, the handout instructs security officers that "maximum security offenders often fake seizures just to get out of their cells and go to the infirmary," and emphasizes that the medication prescribed to epileptic patients must be "carefully monitored" to prevent the patients from bartering with it due to the "high" it purportedly produces.[1651] It further warns that "offenders can hide contraband in casts and prosthesis [sic] and may also use these items and the crutches as weapons."[1652] Additionally, this course was designed for security officers, and it is clear from Warden Falgout—who is a nurse in addition to Assistant Warden—that medical staff are offered no additional training beyond the one-hour course.

550. Perhaps even more troubling is the fact that Warden Falgout was unable to recall the existence of this training prior to his preparation for trial. At his August 2016 deposition, he testified that he was not aware of any formal ADA training for staff and simply noted that

---

[1645] JX 7-a at 8.

[1646] *Id.*

[1647] Oct. 25 Testimony of Tracy Falgout at 6:13-7:1; 8:18-24.

[1648] *See* DX 103.

[1649] *Id.* at 029485-87.

[1650] *Id.* at 029476-77(noting that diabetic or epileptic "offenders" may "cause some problems for security" by needing to "be seen by medical staff for regularly scheduled treatment").

[1651] *Id.* at 029476.

[1652] *Id.* at 029483.

"[a]ll staff have the ability to review the policy."[1653] Similarly the Director of Nursing, Sherwood Poret, stated that nursing staff do not receive training on the ADA.[1654] Assistant Facilities Maintenance Manager Odis Ratcliff, who testified as the DOC's 30(b)(6) witness regarding the accessibility of Angola's facilities, admitted that no one in his department receives training on the ADA's architectural accessibility requirements.[1655] To the extent the DOC's orientation materials address the ADA, they focus exclusively on issues relating to hearing-impaired patients,[1656] which appears to have been prompted by a resolution agreement with the Department of Justice concerning that population.[1657]

551. The inadequacy of Angola's training program is especially concerning as it relates to staff who are charged with responsibilities that require a more detailed understanding of the ADA, such as the security officials who are responsible for selecting work assignments for patients with duty status restrictions, or the administrative officer who is tasked with processing ARPs and determining whether the particular complaint implicates the ADA such that it should be routed to the ADA Coordinator's office. These issues are discussed at greater length below.

(4)    <u>Failure to inform patients of rights and procedures</u>

552. LSP Directive 01.016 states that the nurses assigned to the Initial Classification Board must provide each new patient with a Request for Accommodation form to review and sign during the intake process.[1658] If an accommodation is needed, the policy calls for the request to be evaluated by the Medical Director and a final decision to be rendered by the ADA Coordinator within 7 days.[1659] The patient's disability must be documented in his medical record,[1660] and the ADA Coordinator is responsible for developing an individualized response plan to address the patient's needs, which also must be included in the medical record.[1661] Additionally, during Offender Orientation, the classification officer is responsible for informing new patients of prison's obligations to them under the ADA.[1662] Finally, the policy states that information regarding the ADA and the services provided to patients with disabilities must be included in the informational materials provided to new patients.[1663] In practice, patients are provided with little to no information regarding their rights under the

---

[1653] JX 4-ii, T. Falgout Depo. at 93:16-22.
[1654] JX 4-zz, S. Poret Depo. at 13:17-14:3.
[1655] JX 4-aaa, O. Ratcliff Depo. at 9:4-11.
[1656] JX 12-f.
[1657] JX 4-ww R. Peabody Depo. at 12:23-13:15.
[1658] JX 7-a at 5.
[1659] *Id.*
[1660] JX 12-f at 00312-13.
[1661] JX 7-a at 3-4.
[1662] *Id.* at 5.
[1663] *Id.*

ADA or the process for requesting accommodations during the intake and orientation process.

553. Warden Richard Peabody, who served as Angola's ADA Coordinator until late 2015 or early 2016, testified that he did not know what, if anything, was explained to individuals regarding disability accommodations during intake at Angola, or whether individuals were given any literature explaining their rights or the process for requesting accommodations.[1664] He simply "assume[d]" that a disabled patient could ask around, and "someone is going to tell him what he needs to do."[1665] His successor, Warden Donald Barr, did not know how individuals are made aware of their right to request an accommodation.[1666] He suggested that individuals with disabilities should make sick call to find out what accommodations are available to them.[1667]

554. Warden Tracy Falgout, who replaced Warden Barr as ADA Coordinator in late 2016, testified that the nurse performing intake will ask each individual if he has any physical limitations or requires any assistive or adaptive devices.[1668] But Plaintiffs' medical experts did not find "clear documentation of disability accommodations" or "evaluations or assessments of needs in that respect" in a single chart they reviewed,[1669] notwithstanding the DOC's policies requiring that disabilities identified at intake be documented in the medical record,[1670] along with "individualized response plans in order to address the needs of specific offenders with disabilities."[1671]

555. Warden Falgout further testified that nursing staff performing intake will show each individual the ADA-specific request for accommodation form, complete the form indicating whether an accommodation is requested at that time, and inform the individual of the procedure for requesting an accommodation in the future.[1672] He stated that staff will assess patients for any cognitive or hearing impairments that might compromise their ability to understand the information being provided at intake and will take the necessary steps to assist with their comprehension.[1673] Despite these claims, multiple current and former

---

[1664] JX 4-ww, R. Peabody Depo. at 14:20-15:2.

[1665] *Id.* at 104:4-25.

[1666] JX 4-z, D. Barr Depo. at 14:19-24.

[1667] *Id.* at 48:9-15.

[1668] JX 4-ii, T. Falgout Depo. at 94:20-95:10; Oct. 24 Testimony of Tracy Falgout at 163:16-25.

[1669] PX 6 at 0059 n.74.

[1670] JX 12-f at 00312-13.

[1671] JX 7-a at 3-4(LSP Directive 01.016). Falgout was unfamiliar with the concept of an individualized response plan. JX 4-jj, T. Falgout Depo. at 58:12-14.

[1672] JX 4-ii, T. Falgout Depo. at 19:8-20:7; JX 4-jj, T. Falgout Depo. at 94:20-24; Oct. 24 Testimony of Tracy Falgout at 171:21-172:16.

[1673] Oct. 24 Testimony of Tracy Falgout at 169:5-170:20.

Subclass members credibly testified that after going through intake, they were not aware of the process for requesting accommodations.

556. For example, Francis Brauner testified that he was paralyzed from the waist down when he arrived at Angola. At intake, he was not informed of his rights under the ADA, and he was not told how to request an accommodation.[1674] When asked whether he knew how to make such a request, Mr. Brauner appeared to be unaware of the specialized request for accommodation form and procedures, indicating that a patient would need to use the prison's general Administrative Remedy Procedure ("ARP"), a process with which he became familiar at a previous DOC facility.[1675]

557. Named Plaintiff Otto Barrera, who had suffered severe facial injuries that compromised his ability to eat and communicate, also described his experience going through the intake process. Mr. Barrera testified that he signed an RFA form indicating that he did not request any accommodations at that time, but he did not understand the purpose of the form, as he was told he would be placed on the medical ward and assumed his needs would be met.[1676] Mr. Barrera maintained that he was not informed of the procedures to request an accommodation after intake.[1677]

558. Farrell Sampier also testified regarding his experience going through Angola's intake procedures. Mr. Sampier developed transverse myelitis while incarcerated at Elayn Hunt Correctional Center and lost the ability to walk just prior to his transfer to Angola.[1678] At intake, rather than being informed of the procedures for requesting accommodations, he was told that if he was not truly paralyzed, his wheelchair would be taken away and he would be locked up.[1679]

559. Warden Falgout testified that new arrivals to Angola are provided with a Health Information Pamphlet and another informational pamphlet titled "AU Board Handout."[1680] Neither pamphlet includes information regarding services available to patients with disabilities or the procedure for requesting accommodations,[1681] despite the fact that Angola's own policies

---

[1674] Oct. 12 Testimony of Francis Brauner at 84:9-86:2. *See also* JX 4-h, A. Dunn Depo. at 38:23-39:3 (stating that he was not aware of the procedure for requesting accommodations).

[1675] Oct. 12 Testimony of Francis Brauner at 106:12-19; 106:25-107:3.

[1676] Oct. 15 Testimony of Otto Barrera at 49:22-51:2.

[1677] *Id.* at 210:5-20.

[1678] Oct. 9 Testimony of Farrell Sampier at 51:16; 44:3-10.

[1679] *Id.* at 44:11-15. Mr. Sampier's experience stands in stark contrast to Warden Falgout's professed practice of seeking to put each individual at ease during the intake process, *see* Oct. 24 Testimony of Tracy Falgout at 163:25-164:13, and suggests that at a minimum, not all staff take the same approach.

[1680] JX 8-j; *see also* Oct. 24 Testimony of Tracy Falgout at 165:10-166:2; JX 4-ii, T. Falgout Depo. at 30:16-31:4.

[1681] JX 4-ii, T. Falgout Depo. at 30:16-22; 31:5-9; 32:10-33:6.

require the inclusion of this information.[1682] Additionally, Angola "does not provide braille versions" of the request for accommodation or ARP forms.[1683]

560.    Finally, signage placed throughout the prison is inadequate to inform patients of the procedures for requesting accommodations. The signs merely state that an "[a]uxiliary aid is available upon request" (without defining the term "auxiliary aid"),[1684] and list outdated contact information for a former ADA Coordinator.[1685] Mr. Brauner testified that he was not aware of an ADA Coordinator at the prison.[1686] Similarly, Mr. Barrera testified that during the period of time at issue, he did not know the identity of the ADA Coordinator, had never seen any signage explaining how to request an accommodation, and did not know the procedure for making a request.[1687]

(5)    Inadequate procedures for processing accommodation requests and grievances

561.    The evidence shows that Angola's procedures for processing and evaluating requests for accommodations and other disability-related grievances are inadequate, and staff involved in the process often fail to recognize when a patient's request relates to a disability and implicates the ADA. As a result, these requests and grievances are often routed to the wrong department or summarily denied without addressing the basis for the complaint.

562.    Per the DOC's own policies, a request for accommodation can take any form. An individual may—but need not—complete the DOC's official Request for Accommodation form,[1688] or he may file an ARP, write a letter, make sick call, or even make the request orally.[1689] In any case, the DOC is charged with knowledge of the request.[1690]

563.    According to LSP Directive 01.016, the initiation of a request for accommodation should trigger a process whereby (1) the formal RFA form is completed; (2) the ADA Coordinator forwards the request to the Assistant Warden for Health Services; (3) the requestor is scheduled for a clinic appointment to verify the impairment within two days; (4) the Medical

---

[1682] JX 7-a at 5(LSP Directive 01.016). Moreover, neither pamphlet is available in Braille. JX 4-ii, T. Falgout Depo. at 57:22-58:8.
[1683] UF ¶ 17.
[1684] An "auxiliary aid" is defined as a communication aid for deaf or blind individuals. *See* 28 C.F.R. § 35.104. Ironically, the signage regarding auxiliary aids is not available in Braille. JX 4-ii, T. Falgout Depo. at 57:22-58:8.
[1685] JX 12-h (ADA Signage); JX 4-ii, T. Falgout Depo. at 30:13-15.
[1686] Oct. 12 Testimony of Francis Brauner at 106:22-24.
[1687] Oct. 12 Testimony of Otto Barrera at 215:18-216:8.
[1688] *See* JX 12-a at 1 (Form A-02-017-A).
[1689] JX 5-d at 3; JX 4-vv, R. Peabody Depo. at 14:4-15:8; JX 4-ww, R. Peabody Depo. at 32:1-14; JX 4-jj, T. Falgout Depo. at 19:18-24, 29:12-18; Oct. 24 Testimony of Tracy Falgout at 174:18-175:1
[1690] JX 5-d at 0321.

Director or his designee conducts an evaluation and provides the ADA Coordinator with a written recommendation as to whether the requested accommodation is medically indicated; (5) either the physician or the ADA Coordinator completes a form titled "Inquiry in Response to an Offender Accommodation Request" (Form B-08-010-A), documenting the evaluation and recommendation; and (6) the ADA Coordinator initiates a dialogue with the requestor and ultimately communicates his final decision to the requestor through the ARP First Step Process.[1691]

564.  In practice, many requests for accommodation never make it through this process. Despite the existence of the RFA form, the DOC regulations indicate that requests for accommodation should be made using the standard ARP process.[1692] It does not reference the RFA form. Likewise, the DOC's training materials instruct LSP staff to direct inmates to the ARP process if they wish to request an accommodation.[1693] When Francis Brauner, a former patient at Angola, was asked whether he knew how to request an accommodation, he appeared to be unaware of the specialized RFA form and procedures, indicating that a patient would need to use the ARP system.[1694] Former ADA Coordinator Peabody acknowledged that "a lot" of requests for accommodations are filed as ARPs.[1695] Additionally, the ARP process is the only mechanism for filing ADA-related grievances, such as a claim of discrimination.

565.  When an individual files an ARP seeking an accommodation or lodging a grievance, it is up to the ARP screening officer in the Programs Office to determine that the request implicates the ADA and should be routed to the ADA Coordinator's office.[1696] Otherwise, the Coordinator's office will never see the request.[1697] Warden Peabody testified that during his time as ADA Coordinator, an ARP involving a request for accommodation would be "treated just like every other administrative remedy procedure,"[1698] and he never saw an ARP routed to his office.[1699] He admitted that ARPs or other complaints would not come to him unless they included "magic words" such as disability or ADA, even if they might be legitimate accommodation requests.[1700] He stated that there was "no excuse for it, other than we were not coordinating the two efforts together."[1701] However, he remained uncertain as

---

[1691] *See* JX 7-a at 7; JX 12-a at 2-5 (Form B-08-010-A); JX 4-ii, Falgout Depo. at 88:9-90:7; Oct. 24 Testimony of Tracy Falgout at 172:17-173:15 (describing his role in processing RFAs relating to hearing impairment).

[1692] JX 5-d at 0321-22.

[1693] JX 12-f at 0313.

[1694] Oct. 12 Testimony of Francis Brauner at 106:12-19; 106:25-107:3.

[1695] JX 4-vv, R. Peabody Depo. at 12:21-24.

[1696] JX 12-f at 14; JX 5-d at 4.

[1697] JX 4-vv, R. Peabody Depo. at 19:12-24.

[1698] JX 4-ww, R. Peabody Depo. at 62:5-15.

[1699] *Id.* at 63:2-4.

[1700] *Id.* at 75:23-77:1.

[1701] *Id.* at 62:20-24.

to how an officer would know that an ARP or informal request should be routed to him unless it explicitly mentioned the ADA.[1702] Similarly, when testifying as the DOC's 30(b)(6) witness on ADA implementation, Warden Falgout indicated that he did not know how ARPs were routed to his office, who was responsible for routing them, or whether that person had any familiarity with the ADA.[1703]

566.  Decision makers at all levels—from the ARP screening officer to the ADA Coordinator himself—fail to recognize requests as implicating the ADA. For example, one patient who suffered from a hernia that limited his mobility used the official RFA form to request an exemption from the rule requiring inmates to lift their locker boxes during inspections. His request was summarily denied without a medical review on the grounds that it was "not an ADA issue."[1704] Another patient filed an ARP complaining that the medical dorms were not wheelchair-accessible, only to be told that this was "not a medical issue and would be better addressed through the classification/security department," as "[m]edical does not assign housing areas or dormitory areas."[1705] Similarly, a third patient filed an ARP in which he claimed to have experienced a mental health crisis after his medication was not refilled for more than ten days. Specifically citing the ADA, he complained that after completing mental health treatment, he was stripped of his job as a Catholic inmate minister and forced to work in the fields, and was moved from the dorms to the cell blocks, despite never receiving a disciplinary write-up. His ARP was signed by a designee of Warden Peabody and was denied on the grounds that the patient's "housing concerns would be better addressed through a department other than mental health."[1706] And yet another patient, who self-identified as disabled, requested a bottom bunk assignment in light of his permanent duty status indicating no use of his left arm, only to have his request denied by both Angola and the DOC on the grounds that he suffered from "nerve problems" rather than a "disability."[1707]

567.  These responses are unsurprising, as even Angola's ADA Coordinators fail to recognize when medical issues implicate the ADA. For example, Warden Peabody testified that he does not consider it "a true ADA issue" when an inmate cannot walk over a certain distance.[1708] He admitted that "we're so used to inmates making medical requests for duty status based upon a medical condition that I don't necessarily see it as an ADA issue."[1709] He did not think requests for restricted duty statuses should come to him, even though they "could be" considered requests for accommodations.[1710] He indicated that "[t]his is a confusing issue for me and for staff as determining when something is an ADA request and

[1702] Id. at 32:15-33:12.
[1703] JX 4-ii, T. Falgout Depo. at 60:7-16.
[1704] JX 4-z, D. Barr Depo. at 19:16-22, 20:23-21:5, 21:15-22:3.
[1705] PX 231 (ARP of J.W.) at 2358-2364.
[1706] Id. (ARP of RK) at 1910-1920.
[1707] Id. (ARP of N.S.) at 2112-2149.
[1708] JX 4-vv, R. Peabody Depo. at 22:8-10.
[1709] Id. at 22:21-24.
[1710] JX 4-ww, R. Peabody Depo. at 55:3-12.

when it isn't. Generally speaking, it gets treated as an ADA request when the inmate puts in something about ADA in the request and basically says he wants an accommodation."[1711]

568.     Even if the screening officer recognizes the ADA issue and routes the request to the ADA Coordinator's office, it does not always trigger the review called for by Form B-08-010-A. As late as 2013, ADA Coordinator Peabody was not even familiar with the form.[1712] Many ARPs that were coded "ADA" do not include a completed Form B-08-010-A.[1713] Even when Form B-08-010-A *is* completed, there typically is no signature or other evidence indicating that a medical professional evaluated the request, and the request often is summarily denied, or the explanation accompanying the denial is not responsive to the request. For example, one patient filed an ARP complaining that he was unable to complete his education requirements for parole eligibility because (1) the required GED course was not designed to accommodate people with learning disabilities; (2) the computers were not equipped for hearing impaired students; and (3) the instructors were not trained to teach students with hearing impairments or learning disabilities. The Form B-08-010-A bears no signature, and the response merely indicates that the patient uses a pocket talker that can be plugged into the speaker jack on the classroom computers. His entire request was denied without ever addressing the issues surrounding his learning disability or the instructors' ability to teach hearing impaired students.[1714]

[1711] *Id.* at 58:11-17.

[1712] JX 4-vv, R. Peabody Depo. at 19:25-20:12.

[1713] *See, e.g.*, PX 231 (ARP of M.B.) at 2563-72 (denying request to use TTY phone and to have his duty status reinstated); PX 231 (ARP of J.T.) at 2200-11 (rejecting complaint that patient was denied access to TU's "handicap accessible shower" with one-sentence response); PX 231 (ARPs of B.A.) at 2604-40 (denying request for access to TTY phone and television with closed captioning). This patient's ARP was rejected on the grounds that he does not use a hearing aid (despite past audiogram results indicating profound hearing loss), which is unsurprising in light of Warden Falgout's testimony that the prison does not provide patients with hearing aids under any circumstances. *See infra* ¶ 577.a.

[1714] PX 231 at 1832-45 (ARP of T.J.). It is also worth noting that the patient waited approximately eight months to receive a first step response to his ARP. *See also, e.g.*, PX 231 at 1794-1809 (ARP of paraplegic patient C.H., who requested transfer to an accessible dorm after falling in the shower; first step response merely states that the patient was "receiving adequate accommodations and access to medical services," while second step response notes that fall was not witnessed, despite acknowledging that the patient required treatment); JX 4-z, D. Barr Depo. at 24:19-27:20, 27:25-28:3, 28:17-29:15, 30:8-14 (discussing C.H.'s ARP); PX 231 at 2087-2115 (ARP of R.R., claiming that doors to the "A" Building were not wide enough for wheelchairs; first step response merely states that the patient was "receiving adequate accommodations and access to medical services"); JX 4-z, D. Barr Depo. at 30:23-32:7 (discussing R.R.'s ARP).

569.   Both the DOC and Angola have policies in place that require prison staff to identify, document, and track patients' disabilities and accommodations, but the evidence shows that these policies are ineffective, if not altogether ignored.

570.   First, the DOC's policies state that "[s]taff who are aware of or have reason to believe that an offender has a disability for which he may need accommodation are required to advise the unit ADA Coordinator, who will evaluate the circumstances to determine if auxiliary aids and services and reasonable accommodations are required."[1715] However, in over ten years of serving as ADA Coordinator, Warden Peabody was not once contacted by an employee indicating that an inmate had a disability and required assistance.[1716]

571.   Second, as discussed above, DOC policy requires that the patient's disability be documented in his medical record,[1717] and the ADA Coordinator is responsible for developing an individualized response plan to address the patient's needs, which also must be included in the medical record.[1718] But Plaintiffs' medical experts did not find "clear documentation of disability accommodations" in a single chart they reviewed, or "evaluations or assessments of needs in that respect,"[1719] and Warden Falgout testified that he was not familiar with the concept of an individualized response plan.[1720]

572.   Third, the DOC requires Angola's ADA Coordinator to maintain a system for tracking all requests for accommodation,[1721] as well as to record information regarding all requests for accommodation in the DOC's ADA database using Form B-08-010-B.[1722] In practice, there appears to be no Angola-specific tracking system, and the DOC's database is woefully inadequate to effectively track individuals with disabilities, their requests for accommodation, the disposition of those requests, or the individual's duty status. The "database" shows the total number of each type of accommodation (such as wheelchairs, walkers, et cetera) granted to all patients at a given facility (including Angola), and separately, it lists the name of each individual who has received an accommodation.[1723] It does not clearly show (1) the nature of the individual's disability, (2) the date of any accommodation requests, (3) the disposition of those requests, (4) the type of accommodation granted, or (5) the duty status of the individual.[1724] Even after assuming the role of ADA Coordinator, Tracy Falgout did

---

[1715] JX 5-d at 0320.
[1716] JX 4-ww, R. Peabody Depo. at 39:5-40:16.
[1717] JX 12-f at 00312-13.
[1718] JX 7-a at 3-4.
[1719] PX 6 at 0059 n.74.
[1720] JX 4-jj, T. Falgout Depo. at 58:12-14.
[1721] JX 7-a at 3.
[1722] JX 5-d at 0323-24; 0329.
[1723] JX 12-b.
[1724] *Id.*

not recognize the first part of the list;[1725] as for the second half, he described it as "an alphabetized master list of everybody who has requested ADA for one reason or another."[1726] He admitted that the list would not give the viewer a full picture of each individual's disability and was not really a tracking database for individuals.[1727] He also acknowledged that the viewer would have no way of knowing whether an individual's needs were being met by looking at the list.[1728] Further, staff at DOC headquarters appeared to either be unaware of the database's existence, or unable to utilize it to determine the number of patients with various disabilities and accommodations at a given facility.[1729]

573.    Additionally, a large percentage of requests never make their way into the tracking database in any form. In 2014, DOC audits of LSP indicated that the ADA database was "not being used for offender request [sic]."[1730] During his tenure, Warden Peabody indicated that the database would not include any ARPs whatsoever.[1731] Warden Barr admitted that he was not involved at all in recording information in the database and did not know who was.[1732] He did not know if oral requests or ARPs would be included in the database.[1733] Similarly, Warden Falgout acknowledged that an ARP would not be recorded in the database if the screening officer did not recognize the request as involving an ADA issue.[1734]

---

[1725] JX 4-jj, T. Falgout Depo. at 37:17-38:4.

[1726] *Id.* at 40:8-17.

[1727] *Id.* at 41:8-42:6.

[1728] *Id.* at 44:15-23.

[1729] PX 306 at 2 (June 27, 2014 email from S. Falgout to staff at LSP and other facilities, asking if those facilities "keep up with the number of offenders that are blind, handicapped, in a wheelchair," and if they could provide those numbers).

[1730] JX 33 at 1. This March 25, 2014 report indicates that the failure to utilize the ADA database had been referenced in previous reports, and corrective action was still pending. *Id.*

[1731] JX 4-ww, R. Peabody Depo. at 65:10-66:15. This is likely because Warden Peabody did not follow the established procedures for processing accommodation requests even when ARPs *were* flagged as ADA issues and routed to him. For example, when patient L.L. filed an ARP complaining of his inability to access the law library without his wheelchair pusher, the request was flagged ADA (likely because he specifically cited the statute), reviewed by Dr. Lavespere, and ultimately denied by Warden Peabody. However, it appears Dr. Lavespere merely reviewed the patient's records without completing the RFA evaluation form, and there is no evidence that the RFA tracking form B-08-010-B was ever completed. Notably, the DOC did not issue a second step response denying the patient's ARP until some three years after his initial request, by which time the patient had passed away. *See* PX 231 at 1936-44.

[1732] JX 4-z, D. Barr Depo. at 23:20-24:12.

[1733] *Id.* at 24:13-17.

[1734] JX 4-jj, T. Falgout Depo. at 65:8-14.

Charging copays for evaluation of accommodation requests

574. LSP Directive 01.016, which establishes guidelines for requesting accommodations, requires a medical evaluation for all accommodation requests, regardless of the nature of the request.[1735] It further states that "medical co-payments may be assessed for medical services, and that "[o]ffenders may be assessed restitution to hold them responsible for the financial consequences of their actions . . . ."[1736] Warden Peabody acknowledged that patients are charged copays to access medical staff, and that requests for duty statuses, wheelchairs, and the like require patients to access medical.[1737]

## D. Angola Fails to Accommodate the Needs of its Disabled Patients

575. The DOC has acknowledged its obligation to provide assistive equipment and devices and make other reasonable accommodations. Regulation B-08-010 provides that "[a]ccess to housing, programs, and services includes the initiation and provision of reasonable accommodations including, but not limited to facility modifications, assistive equipment and devices and interpreter services."[1738] Warden Falgout, testifying on behalf of the DOC, acknowledged that this obligation extends to accommodations such as "amplification for hearing impairment, canes, walkers, [and] wheelchairs for physical disabilities."[1739] As explained above, however, inadequate staff training, coupled with the prison's practices regarding the identification, evaluation, and tracking of disability-related requests and grievances, have resulted in a system in which patients' legitimate accommodation requests are routinely and arbitrarily denied, often without the involvement of the ADA Coordinator. Several examples of those denials are discussed below. Additionally, the evidence shows that prison officials have given no consideration to the needs of patients with disabilities when establishing procedures for operations and services ranging from pill call to discipline to the prevention and reporting of prison rape.

(1) Denial of Assistive Devices and Auxiliary Aids

576. Subclass members' credible testimony illustrated Angola's routine failure to provide patients with the assistive devices, auxiliary aids, and adaptive training they require for mobility, effective communication, and self-care. For example:

   a. Farrell Sampier testified at trial that prison officials refused to provide him with a wheelchair designed for paraplegic patients such as himself. As a result, he relied on a chair left for him by a paraplegic patient who was granted parole.[1740] Mr. Sampier

---

[1735] JX 7-a at 7.

[1736] *Id.*

[1737] JX 4-vv, R. Peabody Depo. at 28:10-29:4; 30:1-4, 17-20.

[1738] JX 5-d at pp. 0319-20; *accord* JX 7-a at 2.

[1739] JX 4-jj, T. Falgout Depo. at 12:10-14.

[1740] Oct. 9 Testimony of Farrell Sampier at 81:18-82:11.

also testified that when his wheelchair would break, he would rely on fellow inmates with access to the hobby shop to repair it.[1741]

b. Similarly, another paraplegic patient, Francis Brauner, testified that prison officials refused to provide him with a wheelchair, leaving him confined to his bed until he asked a U.S. Senator to intervene.[1742] After finally providing a chair, prison officials replaced the pneumatic tires, which facilitated independent movement, with tires that required less maintenance but made the chair difficult to maneuver.[1743]

c. Mr. Sampier also testified that he requested specialized gloves to protect his hands while using his wheelchair. Prison officials would not even permit Mr. Sampier's mother to provide a pair of gloves purchased with her own money. Eventually, a fellow inmate who worked in the field gave Mr. Sampier a pair of old work gloves.[1744] Mr. Brauner similarly testified that he requested gloves to use with his chair and was told that "it wasn't in the budget."[1745]

d. Karl Clomburg, who developed a hole in the bottom of his foot, had a pair of healing sandals taken away from him and replaced with a pair of diabetic shoes in the wrong size.[1746] He also suffers from a hammer toe and requested toe spacers to help with his mobility. Mr. Clomburg was told by a nurse that the prison didn't carry them, but another patient in his dorm was given a set of spacers the same day.[1747] Similarly, Francis Brauner testified that he requested a pair of orthopedic shoes to prevent foot drop but was told they were not in the prison's budget.[1748] And Named Plaintiff John Tonubbee, who suffers from bunions, a hammer toe, and knee pain, testified that he is unable to wear the shoes issued by the prison without experiencing severe pain. Whether Tonubbee is permitted to purchase orthopedic shoes with his own money is left to the discretion of the warden who is supervising him at the time, which has resulted in extended periods of time in which he was unable to obtain the proper footwear.[1749] During cross-examination, defense counsel pressed Mr. Tonubbee to concede that a podiatrist, Dr. Polecki, had denied his request for custom-fit shoes, based on a note that counsel represented to be written

---

[1741] *Id.* at 58:15-17.

[1742] Oct. 12 Testimony of Francis Brauner at 103:1-15.

[1743] *Id.* at 103:23-104:12.

[1744] Oct. 9 Testimony of Farrell Sampier at 59:11-60:2.

[1745] Oct. 12 Testimony of Francis Brauner at 104:13-25.

[1746] JX 4-f, K. Clomburg Depo. at 34:6-17.

[1747] *Id.* at 63:14-64:20.

[1748] Oct. 12 Testimony of John Tonubbee at 105:5-17.

[1749] *Id.* at 147:7-149:13. The shoes cost Tonubbee between $70 and $100. Tonubbee testified that he earns 20 cents an hour working as a dorm orderly. *Id.* at 150:13-151:4.

by Dr. Polecki.[1750] Dr. Lavespere later admitted during his own cross-examination that he himself had written the note.[1751]

e.  Derrick Woodberry, who suffered from severe hemorrhoids, testified that he had been prescribed a donut pillow to enable him to sit upright, but when Nurse Cynthia Park called Central Supply, she was told that they would not order the pillow unless Mr. Woodberry was placed on the ward.[1752]

f.  At trial, Farrell Sampier testified that he requested a squeeze ball to perform the rehabilitation exercises designed to help with his mobility, but the request had not been granted as of the end of the discovery period.[1753] Similarly, after his first episode of transverse myelitis, Mr. Sampier had to rely on an exercise band given to him by another patient to perform his physical therapy exercises.[1754]

577.  In addition to this credible testimony, Defendant's own documents and witnesses confirmed the pervasive nature of their failures to accommodate:

a.  The DOC's own health care policies require the provision of hearing aids when medically necessary.[1755] However, testifying on behalf of the DOC, Tracy Falgout stated that Angola does not provide hearing aids in any circumstances.[1756] He also was unsure how often or when the last course in American Sign Language was offered at Angola.[1757]

b.  Both Warden Falgout and former ADA Coordinator Donald Barr testified that they were unaware of any materials available in Braille at the prison, including books, the Request for Accommodation form, informational materials provided at intake, and materials informing inmates of their rights under the Prison Rape Elimination Act.[1758] Indeed, the DOC has admitted that it "does not provide braille versions of forms such as sick call requests, Administrative Remedy Procedure forms, or forms to request accommodations."[1759] Nor could Warden Falgout remember Braille classes ever being offered at the prison.[1760]

---

[1750] *See* Oct. 12 Testimony of John Tonubbee at 159:16-162:14; JX 10-ddd-3 at 10-56892.

[1751] Oct. 22 Testimony of Randy Lavespere at 216-17; JX 10-ddd at 10-56892.

[1752] JX 4-u, D. Woodberry Depo. at 20:15-21:6, 41:6-42:15, 45:20-46:11.

[1753] Oct. 9 Testimony of Farrell Sampier at 74:18-75:3.

[1754] *Id.* at 85:24-86:1; 86:7-9.

[1755] JX 5-a, at 0109-10.

[1756] JX 4-jj, T. Falgout Depo. at 108:18-20.

[1757] *Id.* at 105:10-14.

[1758] JX 4-z, D. Barr Depo. at 43:14-24, 52:2-11; JX 4-jj, T. Falgout Depo.at 98:8-22, 115:7-14.

[1759] UF ¶ 17.

[1760] JX 4-jj, T. Falgout Depo. at 115:4-6.

c. Warden Peabody recalled only one blind patient who had received special accommodations, including adaptive training on the use of a tapping cane, and only after the patient retained the Advocacy Center and filed a lawsuit.[1761] Consistent with Warden Peabody's recollection, Warden Falgout knew of only one individual who had received this adaptive training and believed it was because the individual did not trust the orderlies to move him around the prison.[1762] For his part, Warden Barr was not aware of any adaptive training given to prisoners who become blind while at Angola,[1763] did not know the difference between a walking cane and a tapping cane, and was not sure if tapping canes were provided by the prison.[1764]

d. Rather than provide the adaptive training and devices that would enable blind patients to navigate the prison independently, prison staff leave these patients completely dependent on other inmates for assistance with tasks as basic as making the trip to the bathroom.[1765] For example, Named Plaintiff John Tonubbee testified that he lived in a Camp F dormitory with former Named Plaintiff Alton Batiste, who was blind and passed away just after the class certification hearing in this matter. Mr. Tonubbee testified that Mr. Batiste was unable to leave the dorm without assistance, so he and other men living at Camp F would lead Mr. Batiste from the dorm to the chow hall and back. Mr. Batiste was never given a tapping cane, and Mr. Tonubbee had received no training in how to assist him. Mr. Tonubbee never witnessed security or medical staff leading Batiste.[1766] Mr. Tonubbee's account is consistent with the testimony of Former ADA Coordinator Richard Peabody, who described a "fairly informal" system in which blind individuals "generally will have someone in the dorm that's willing to help them."[1767] Forcing individuals with disabilities to rely on other inmates—especially untrained ones—for assistance with basic functions such as navigating their dormitory limits their mobility and leaves them vulnerable to

---

[1761] JX 4-ww, R. Peabody Depo. at 21:1-3, 24:5-17, 28:24-29:19, 35:19-25.

[1762] JX 4-ii, T. Falgout Depo. at 34:15-20, 35:8-16.

[1763] JX 4-z, D. Barr Depo. 17:4-17

[1764] *Id.* at 42:24-43:7.

[1765] JX 4-c, A. Brent Depo. at 34:18-19 (describing his role in assisting blind patients from their beds to the bathroom); *see also* JX 4-ww, R. Peabody at 24:11-13 ("most of them seem to be able to function with assistance from other inmates").

[1766] Oct. 12 Testimony of John Tonubbee at 151:5-8; 152:3-154:13.

[1767] JX 4-ww, R. Peabody Depo. at 27:25-28:17. Warden Peabody stated that he had gained this understanding "just from talking to different inmates over time." *Id.* at 28:18-20.

neglect or abuse.[1768] Indeed, the use of untrained inmates violates Angola's own policies.[1769]

### (2) Failure to Accommodate Disabilities in Work Assignments

578. Individuals with disabilities may request a restricted "duty status," which establishes limitations on the types of work they may be required to perform.[1770] In practice, many individuals with disabilities face arbitrary denials or revocations of their duty status. For example, Adrian Dunn, who suffers from asthma and diabetes, had his out-of-field duty status revoked after 13 years, despite the fact that he continued to have regular asthma attacks that were exacerbated by dust.[1771] Karl Clomburg, who developed a blister on his foot that limited his mobility, was denied a restricted duty status despite the podiatrist's recommendation that he stay off the foot, which caused the blister to develop into an ulcer that took four and a half years to heal.[1772] Jason Hacker was denied a restricted duty status and forced to work in the field despite a medical determination that he was blind.[1773] Testifying on behalf of the DOC, former ADA Coordinator Richard Peabody admitted that this was "inappropriate" and that he had no explanation as to why Hacker was still in the field.[1774] Michael Johnson testified that he suffers from blackouts due to a head injury and was issued a permanent duty status at Elayn Hunt Correctional Center, only to have it taken away at Angola, where he was told he would be written up if he refused to work in the field.[1775]

579. Even when a patient is granted a restricted duty status, security officials, who determine job assignments, often misapply or fail to respect those restrictions. For example, Hymel Varnado testified that he was required to lift heavy locker boxes as part of his job, despite having a duty status restriction of no heavy lifting.[1776] At trial, Anthony Mandigo testified that he was required to work as a tier walker, which involved walking up and down a prison

---

[1768] For example, one blind patient had $600 stolen off his account after being moved into Ash 2. *See* PX 85 at 2-3.

[1769] JX 7-b at 2 (LSP Directive 07.004 Housing for the Disabled) ("Only appropriately trained staff and inmates will be assigned to assist a disabled inmate who cannot otherwise perform basic life functions").

[1770] JX 5-a at 0281-83 (HC-15 – Duty Status Classification System); JX 6-oo (LSP Directive 13.063 – Duty Status Classification System).

[1771] JX 4-h, A. Dunn Depo. at 27:10-23; 28:18-29:25.

[1772] JX 4-f, K. Clomburg Depo. at 26:14-30:7. Notably, DOC Medical Director Dr. Raman Singh directed Dr. Lavespere *not* to refer patients to specialists when evaluating the need for a duty status restriction. *See* PX 161 at 0001 (Sept. 23, 2015 Email from Tamrya Young to Ashli Oliveaux and Stacye Falgout).

[1773] JX 4-i, J. Hacker Depo. at 55:7-58:11.

[1774] JX 4-ww, R. Peabody Depo. at 87:14-21.

[1775] JX 4-j, M. Johnson Depo. at 10:5-21.

[1776] JX 4-t, H. Varnado Depo. at 21:8-23:23.

tier for shifts of ten hours, despite having a duty status that called for "no prolonged walking."[1777] Mr. Mandigo suffers from sickle cell anemia, which causes painful ulcers and swelling in his legs.[1778] He described experiencing pain as a result of the work and testified that he complained about the assignment to no avail.[1779] Charles Butler similarly testified that at 65 years old, his assigned job required him to stand—unsecured—atop scaffolding measuring eight feet high to hang sheets of drywall weighing 20 to 25 pounds, despite having a duty status restriction against lifting more than 10 pounds. In January 2016, Mr. Butler lost consciousness and fell off the scaffolding, suffering a concussion and fracturing his clavicle and ribs.[1780] He also described the prison's policy of requiring him to take all of his daily medication—some 15 to 18 pills—at one time before being transported to his assigned job site, rather than accommodating his regular medication schedule. Mr. Butler believes that he was overmedicated when he lost consciousness and sustained his injuries.[1781]

580. The consistent failure of security staff to properly interpret and apply duty statuses is unsurprising, as staff are not trained to properly interpret duty statuses when assigning jobs.[1782] Testifying on behalf of the DOC, Warden Falgout acknowledged that it was "always a possibility" that security could misunderstand the medical staff's intent in issuing the duty status.[1783] However, there are no checks on security to ensure that they are correctly interpreting and applying duty status restrictions.[1784] Nonetheless, an individual who fails to perform his work in a satisfactory manner can be written up for an aggravated work offense and placed in lockdown.[1785] Despite the potential for retaliation or discipline, Warden Falgout could not think of any reason why an individual might be hesitant to report that his duty status is being violated.[1786]

### (3) Failure to Accommodate Dietary Needs

581. Numerous patients testified that they either were denied necessary accommodations in their diets, or were prescribed special diets but did not receive those diets in practice. Adrian Dunn testified that he is prescribed a diabetic diet, but frequently has to eat regular food due to what he presumes are paperwork mix-ups.[1787] Mr. Clomburg testified that he rarely is able to eat vegetables, because the prison primarily serves cabbage and greens, which Defendants

---

[1777] Oct. 11 Testimony of Anthony Mandigo at 85:4-19.

[1778] *Id.* at 82:4-83:16.

[1779] *Id.* at 85:20-86:4.

[1780] Oct. 15 Testimony of Charles Butler at 63:22-67:6.

[1781] *Id.* at 66:4-67:6.

[1782] JX 4-jj, T. Falgout Depo. at 45:16-18 (testifying on behalf of the DOC that he was not aware of any such training).

[1783] *Id.* at 45:19-23.

[1784] *Id.* at 46:9-12.

[1785] JX 4-ww, R. Peabody Depo. at 88:14-19.

[1786] JX 4-jj, T. Falgout Depo. at 61:11-16.

[1787] JX 4-h, A. Dunn Depo. at 22:13-17.

have led him to believe are generally contraindicated for patients taking Coumadin.[1788] At trial, Francis Brauner testified that he was prescribed a double portion diet, but the instances in which he received a double portion were "far and few in between."[1789] Named Plaintiff Otto Barrera testified that he was prescribed a soft diet due to injuries that left holes in the roof of his mouth and rendered him unable to chew. Because he received a regular diet instead, he was forced to chop up the food with his I.D. card and place the smaller pieces at the back of his throat. Grains of rice and other small pieces of food would become lodged in the holes in his mouth, causing discomfort and presenting a risk of entering his respiratory system.[1790] Additionally, patients who are prescribed special diets have observed that the food is often identical to the regular diet.[1791]

### (4) Failure to Accommodate Disabilities When Transporting Patients

582. Angola fails to provide accommodations to patients with disabilities when transporting them to medical appointments, both by failing to transport wheelchair users in accessible vehicles and by refusing to accommodate other physical disabilities when restraining patients for transport. Benny Prine, who uses a wheelchair, testified at deposition that he has been transported off-site for medical appointments on two occasions. Both times, he was forced to sit in the back of a regular van with his knees bent, when he normally kept one leg extended in his chair.[1792] Hymel Varnado testified that he was transported to the hospital in a regular van, handcuffed and shackled, while suffering from a ruptured spleen and internal bleeding.[1793] After surgery, he was returned to Angola in the back of a car.[1794] Danny Prince, a former health care orderly in Ash 2, testified at trial that patients would have their appointments cancelled when the prison's accessible van was not available.[1795] Even when Farrell Sampier, who was a paraplegic patient, was transported in an ambulance, he was placed lying directly on a bedsore, with his hands shackled in a black box and the padlock underneath him. On the return trip, he was left lying in his own feces for the duration of the trip.[1796] The medical records from Plaintiffs' experts' sample similarly reflect that the failure

---

[1788] JX 4-f, K. Clomburg Depo. at 58:19-59:8; *see* Oct. 22 Testimony of Randy Lavespere at 107:22-25 ("Basically these people should not be eating green leafy vegetables … ."); *but see* Oct. 25 Testimony of Susi Vassallo at 86:2-13 (explaining that patients taking Coumadin should consume a consistent amount of leafy green vegetables, not none).

[1789] Oct. 12 Testimony of Francis Brauner at 105:20-106:11.

[1790] Oct. 12 Testimony of Otto Barrera at 225:5-228:8; *see also* Oct. 15 Testimony of Otto Barrera at 11:1-19 (discussing test results indicating that he would require a soft diet).

[1791] JX 4-d, C. Butler Depo. at 32:6-25.

[1792] JX 4-q, B. Prine Depo. at 84:3-86:6.

[1793] JX 4-t, H. Varnado Depo. at 31:21-33:1.

[1794] *Id.* at 33:11-34:13.

[1795] Oct. 15 Testimony of Danny Prince at 103:4-8.

[1796] Oct. 9 Testimony of Farrell Sampier at 66:3-18. During his trial testimony, Named Plaintiff Otto Barrera described the black box as a restraining device that is placed over handcuffs and holds the individual's arms close to his body, with one palm facing up and the other facing down. In his

to accommodate the needs of inmates with disabilities interferes with medical care. Multiple patients were unable to travel for medical care—but treated as having "refused" care—because they could not travel with the oxygen supplies they needed to breathe.[1797]

### (5)  Lack of Accommodations in Prison Procedures

583.  The testimony of Defendant's own employees reveals that Angola regularly fails to accommodate individuals with disabilities when establishing and enforcing prison procedures. Former ADA Coordinator Donald Barr could not identify any accommodations made for deaf prisoners during pill call, sick call, or head count.[1798] He further testified that no special consideration is given to individuals with disabilities in the prison's procedures for preventing and enabling the reporting of prison rape, and he did not believe inmates with disabilities would be at special risk of abuse.[1799] Testifying on behalf of the DOC, Tracy Falgout could not identify any accommodations made for blind individuals during pill call,[1800] and he did not know how a blind person would file an ARP.[1801] Subclass member Adrian Dunn testified that he was forced to administer his own insulin at pill call even though he had received no training on how to do it and could not see well due to his failing eyesight.[1802]

584.  Additionally, Angola's evacuation plans—including the plans for the medical dorms—contain no provisions regarding the safe evacuation of individuals with disabilities.[1803] Former health care orderly Aaron Brent described how patients in wheelchairs were at risk of falling off the ledge of the walk on Ash 2 during fire drills, and at least two patients had fallen off the ledge in the past.[1804]

### (6)  Lack of Accommodations in Discipline

585.  Angola's ADA Coordinators and medical staff testified that they do not intervene in disciplinary decisions made by security, even if an individual's disability is the cause of the infraction or the disciplinary measure poses a risk to the individual. Tracy Falgout testified that it is up to security to determine whether a particular disciplinary measure may be used with a paraplegic, blind, or deaf individual, and he was not aware of any disciplinary

---

experience, the black box causes swelling in his arms and tightens the chain around his waist. Barrera described how the black box would rub against his feeding tube, causing the insertion site to become raw and ooze blood. Oct. 15 Testimony of Otto Barrera at 9:12-10:25.

[1797] *See* JX 10-g at 07712 (Patient #41); JX 10-tt-2 at 48792 (Patient #28).

[1798] JX 4-z, D. Barr Depo. at 50:9-51:7.

[1799] *Id.* at 51:13-52:1.

[1800] JX 4-ii, T. Falgout at 119:22-24.

[1801] *Id.* at 119:25-120:1.

[1802] JX 4-h, A. Dunn Depo. at 16:23-18:6.

[1803] PX 16 at 1-14.

[1804] JX 4-c, A. Brent Depo. at 78:4-80:21.

measures that could not be imposed on individuals with disabilities.[1805] As ADA Coordinator, he was not involved in deciding whether or how an individual with a disability would be disciplined, "because that's the job of security and the process of the disciplinary board."[1806] Similarly, Warden Barr testified that he did not get involved in disciplinary proceedings involving mentally ill individuals and would not be aware of any such determinations unless the disciplinary board decided to alert him.[1807] Nurse Practitioner Cynthia Park likewise indicated that it is "not [her] situation to be able to intervene" in disciplinary decisions,[1808] and because she is not a member of the security staff, it is not up to her whether a patient gets placed in a locked room, regardless of his medical condition.[1809] This lack of oversight places individuals with disabilities at risk of harm. For example, internal emails show that one patient suffering from schizophrenia and total blindness due to glaucoma was "gassed" for refusing to shave.[1810] Plaintiffs' medical experts noted the case of a paraplegic patient who was placed in a locked isolation room on the ward with no call system and no way to identify the nurses if his tracheal tube became clogged.[1811] Similarly, Francis Brauner, another paraplegic patient, testified at trial that he was placed in a locked cell with an iron door on Ward II, out of the line of sight of the nurses and without any way to communicate with them. As a result, he developed a bedsore and eventually sepsis.[1812] Nurse Karen Hart testified that the prison has no rules or policies about isolating patients with physical disabilities, and she had no concerns about the practice of placing patients with serious physical disabilities in lockdown rooms on the ward.[1813]

### E. Patients with Disabilities Are Segregated Without Adequate Justification.

586.  At Angola, patients with disabilities are often segregated from the able-bodied population when it comes to their housing assignments. As previously stated, individuals with long-term physical disabilities are typically housed in the medical dormitories or on Ward II.[1814] But as discussed above, patients on the nursing wards are excluded from participation in classes, church services, and recreational activities attended by able-bodied inmates.[1815] Similarly, patients living in the medical dormitories do not receive the types of services in those

---

[1805] JX 4-jj, T. Falgout Depo. at 123:12-19.

[1806] JX 4-ii, T. Falgout Depo. at 14:20-15:13.

[1807] JX 4-z, D. Barr Depo. at 40:13-25, 41:15-24.

[1808] JX 4-uu, C. Park Depo. at 13:14-21.

[1809] *Id.* at 14:4-19.

[1810] PX 85 at 0002-03.

[1811] PX 6 at 0081.

[1812] Oct. 12 Testimony of Francis Brauner at 87:23-89:10.

[1813] JX 4-ll, K. Hart Depo. at 40:8-41:2.

[1814] JX 7-b at 2 (LSP Directive 07.004 – Housing for the Disabled); JX 6-eee at 0269-70 (LSP Directive 13.088 – Offender Assistance Dorm); *see also* JX 4-z, D. Barr Depo. at 49:10-18 (deaf inmates housed in medical dorms); JX 4-ii, T. Falgout Depo. at 119:3-7 (blind inmates housed in medical dorms).

[1815] *See supra* ¶ 508.

locations that purportedly justify their segregation. First, the dormitories were designed for the general population and lack most of the features that would make them accessible to patients with disabilities.[1816] Second, despite their name, Angola provides no actual medical services on site in the medical dorms. For example, Angola's policies indicate that routine medical services such as wound care are to be rendered in the medical dorms.[1817] In practice, orderlies transport patients to the ATU for these services.[1818] Neither doctors nor nurses make rounds in the medical dorms,[1819] and health care orderlies in the dorms receive no supervision from medical staff.[1820]

587.    Finally, individuals with disabilities who are otherwise healthy are sometimes placed in the isolation cells on the ward due to the lack of accessible cells elsewhere in the prison.[1821]

## CONCLUSIONS OF LAW

### I.    EIGHTH AMENDMENT CLAIM

#### A.  Legal Standard

Prisoners "must rely on prison authorities to treat [their] medical needs" because "if the authorities fail to do so, those needs will not be met."[1822] Accordingly, "[t]he Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide 'humane conditions of confinement,' ensuring that 'inmates receive adequate . . . medical care."[1823]

---

[1816] *See supra* ¶ 512 & n.1513.

[1817] JX 6-eee at 0270.

[1818] JX 4-c, A. Brent Depo. at 75:14-76:4; *see also* Oct. 22 Testimony of Randy Lavespere at 205:17-20, 208:17-21.

[1819] *Id.* at 73:25-76:4. *See also* Oct. 15 Testimony of Danny Prince at 98:20-24 (explaining that no doctors or nurses come to Ash 2 dormitory "unless there's like a tour or something coming through"). EMTs only visit the dormitories to conduct regular sick call. JX 4-c, A. Brent Depo. at 74:8-12.

[1820] JX 4-ii, T. Falgout Depo. at 12:13-13:15; 14:1-6 (explaining that security staff oversee the orderlies in the medical dorms and that no medical staff are involved in their supervision); Oct. 15 Testimony of Danny Prince at 98:25-99:4 ("[W]e pretty much supervise ourselves. We know what our job is, as far as what we were told and trained to do, and it's up to us to either do it or don't do it."). *See also* Oct. 24 Testimony of Tracy Falgout at 213:23-214:3 (stating that he was unable to recall visiting the medical dorms in 2015 or 2016). As a result, he was unable to confirm whether the health care orderlies in the medical dorms limited their scope of practice to activities of daily living. *See id.* at 215:9-16.

[1821] JX 4-ll, K. Hart Depo. at 31:15-33:3, 34:7-11.

[1822] *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[1823] *Palmer v. Johnson*, 193 F.3d 346, 351-52 (5th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

"In the context of medical care, a prison official violates the Eighth Amendment when he acts with deliberate indifference to a prisoner's serious medical needs."[1824] This inquiry consists of both an objective and a subjective test. The objective test requires showing that the prisoner has "serious medical needs,"[1825] and "either has already been harmed or been 'incarcerated under conditions posing a substantial risk of serious harm.'"[1826] The subjective test requires a showing that prison officials had requisite knowledge of the risk of harm and either (1) disregarded it or (2) failed to act reasonably to abate it.[1827] In assessing whether prison officials' actions are sufficiently reasonable to avoid liability, "efforts to correct systemic deficiencies that simply do not go far enough when weighed against the risk of harm also support a finding of deliberate indifference, because such efforts are not reasonable measures to abate the identified substantial risk of serious harm."[1828]

Importantly, Plaintiffs in the instant suit "do not base their case on deficiencies in care provided on any one occasion" to any single prisoner but instead contend that "systemwide deficiencies in the provision of medical . . . care . . . taken as a whole, subject sick prisoners in [Angola] to 'substantial risk of serious harm' and cause the delivery of care in [Angola] to fall below the evolving standards of decency that mark the progress of a maturing society."[1829] Thus, in order to prevail on their Eighth Amendment challenge, Plaintiffs must prove (1) the existence of serious medical needs among members of the Class and (2) that Defendants were deliberately indifferent to a substantial risk of serious harm stemming from the inadequacies in Angola's medical care system.[1830]

### (1) The Objective Test

#### a. *Serious Medical Needs*

The Fifth Circuit has described a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."[1831] Courts have recognized a wide range of conditions as constituting "serious medical needs" under the Eighth Amendment, including but not limited to broken bones,[1832] "injuries" that

---

[1824] *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 754 (5th Cir. 2001).

[1825] *Estelle*, 429 U.S. at 104.

[1826] *Braggs v. Dunn*, 257 F. Supp.3d 1171, 1189 (M.D. Ala. 2017) (quoting *Farmer*, 511 U.S. at 834).

[1827] *Farmer*, 511 U.S. at 844-45; *see also Braggs*, 257 F. Supp. 3d at 1250 ("To establish deliberate indifference, plaintiffs must show that defendants had subjective knowledge of the harm or risk of harm, and disregarded it or failed to act reasonably to alleviate it.").

[1828] *Braggs*, 257 F. Supp. 3d at 1252 (internal citations and quotation marks omitted).

[1829] *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011).

[1830] *See, e.g., Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *Lawson v. Dall. Cty.*, 286 F.3d 257, 262 (5th Cir. 2002); *Braggs*, 257 F. Supp. 3d at 1189.

[1831] *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

[1832] *Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999).

cause "severe pain,"[1833] ulcers,[1834] open wounds and infections,[1835] severe chest pain,[1836] HIV,[1837] Hepatitis C,[1838] cancer,[1839] tuberculosis,[1840] asthma,[1841] diabetes and its complications,[1842] arthritis,[1843] Crohn's disease,[1844] osteomyelitis,[1845] neurological disorders,[1846] serious back pain,[1847] a dislocated shoulder,[1848] serious ear infection,[1849] the need for post-surgical care,[1850] serious hemorrhoids,[1851] seizure disorders,[1852] and broken teeth.[1853]

Moreover, because this is a Rule 23(b)(2) class action challenging Defendants' actions "on a ground[ ] generally applicable to the class"—that is, Defendants' provision of inadequate medical

---

[1833] *See, e.g., Thomas v. Carter*, 593 F. App'x 338, 342-43 (5th Cir. 2014).

[1834] *Lawson*, 286 F.3d at 262-63.

[1835] *Gobert*, 463 F.3d at 346 n.17, 349.

[1836] *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005).

[1837] *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).

[1838] *See Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (classifying hepatitis C as "unquestionably a serious medical problem."); *Loeber v. Andem*, 487 F. Appx. 548, 549 (11th Cir. 2012) ("That Hepatitis C presents a serious medical need is undisputed."); *Postawko v. Missouri Dep't of Corrs.*, No. 16-cv-04219, 2017 WL 1968317, at *7 (W.D. Mo. May 11, 2017) ("Plaintiffs' chronic HCV condition is a serious and harmful medical condition, which risks increasingly serious liver damage, among other bodily harms, to those who have it."); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017) ("Plaintiffs (by diagnosis) and Plaintiffs' class (by definition) all fer from chronic HCV. As a consequence, Plaintiffs and Plaintiffs' class are faced with substantial risks of serious harm[.]").

[1839] *Rice v. Walker*, No. 06-3214, 2010 WL 1050227, at *6 (C.D. Ill. Mar. 16, 2010).

[1840] *Maldonado v. Terhune*, 28 F. Supp.2d 284, 290 (D.N.J. 1998).

[1841] *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005).

[1842] *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *Carrion v. Wilkinson*, 309 F. Supp. 2d 1007, 1014 (N.D. Ohio 2004).

[1843] *Christy v. Robinson*, 216 F. Supp. 2d 398, 413 (D.N.J. 2002).

[1844] *Woulard v. Food Service*, 294 F. Supp. 2d 596, 603-604 (D. Del. 2003).

[1845] *Gil v. Vogilano*, 131 F. Supp. 2d 486, 490-92 (S.D.N.Y. 2001).

[1846] *Kenney v. Paderes*, 217 F. Supp. 2d 1095, 1099 (D. Haw. 2002).

[1847] *Palermo v. Corr. Med. Servs., Inc.*, 133 F. Supp. 2d 1348, 1361 (S.D. Fla. 2001).

[1848] *See, e.g., Higgins v. Corr. Med. Servs. of Ill.*, 178 F.3d 508, 511 (7th Cir. 1999).

[1849] *See, e.g., Zentmyer v. Kendall Cty.*, 220 F.3d 805, 810 (7th Cir. 2000).

[1850] *Morales Feliciano v. Calderon Serra*, 300 F. Supp. 2d 321, 341 (D.P.R. 2004); *Boretti v. Wiscomb*, 930 F.2d 1150, 1151-52, 1155 (6th Cir. 1991).

[1851] *Jones v. Natesha*, 151 F. Supp. 2d 938, 944 (N.D. Ill. 2001).

[1852] *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998).

[1853] *Carlucci*, 884 F.3d at 538-39.

care at Angola—Plaintiffs must show that serious medical needs exist on a widespread basis, rather than on an individual basis.[1854]

### b. *Substantial Risk of Serious Harm*

To show that Defendants have acted with deliberate indifference to the Class's serious medical needs, Plaintiffs must also establish the Class's "exposure to a substantial risk of serious harm."[1855] "That the Eighth Amendment protects against future harm to inmates is not a novel proposition."[1856] As both the Supreme Court and Fifth Circuit have made clear, prisoners need not wait until they are actually harmed until they can obtain an injunction to remedy unsafe conditions.[1857] Nor must Plaintiffs show that the "likely harm [will] occur immediately."[1858] Rather, for purposes of the Eighth Amendment, Plaintiffs "need only show that there is a 'substantial risk of serious harm.'"[1859]

Moreover, in order to establish a substantial risk of serious harm, "it does not matter whether the risk comes from a single source or multiple sources."[1860] "[M]ultiple policies or practices that combine to deprive a prisoner of a 'single, identifiable human need,' such as [medical care], can support a finding of Eighth Amendment liability."[1861] As discussed more thoroughly below, courts have found that a substantial risk of harm may be found where there is inadequate staffing, access to care, chronic disease programs, specialty care, medical care exclusively for budgetary reasons, maintenance of medical records, monitoring and quality control systems, and access to emergency care.[1862] Indeed, the Fifth Circuit has long recognized that "the totality of circumstances concerning medical care" may violate the Eighth Amendment.[1863]

---

[1854] *See* Order Granting Class Certification, Rec. Doc. 394 at p. 2 (observing that "Plaintiffs request injunctive relief to abate the alleged systemic deficiencies in Defendants' policies and practices that subject all inmates to unreasonable risks of serious harm.").

[1855] *Gobert*, 463 F.3d at 345.

[1856] *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

[1857] *See, e.g., id.* at 33-34; *Ball*, 792 F.3d at 593 ("To prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred.").

[1858] *Helling*, 509 U.S. at 33.

[1859] *Ball*, 792 F.3d at 593 (quoting *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004).

[1860] *Farmer*, 511 U.S. at 843; *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise[.]" (emphasis in original)).

[1861] *Braggs*, 257 F. Supp. 3d at 1192 (quoting *Gates v. Cook*, 376 F.3d at 333).

[1862] *See supra* nn.1884-1900.

[1863] *Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977).

(2)   The Subjective Test

In order to prove an Eighth Amendment violation, Plaintiffs must also show that Defendants have a "sufficiently culpable state of mind."[1864] "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety."[1865]

"Deliberate indifference is itself a two-prong inquiry."[1866] "An official must both 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'he must also draw the inference.'"[1867] Even where awareness is shown, prison officials will not be liable "if they responded reasonably to the risk."[1868] However, prison officials cannot escape liability simply by demonstrating that they eventually took some form of "corrective action" in response to a risk of harm.[1869] Rather, as explained above, efforts to correct systemic deficiencies that "simply do not go far enough" when weighed against the risk of harm also constitute deliberate indifference,[1870] because such insufficient efforts are not "reasonable measures to abate" the identified substantial risk of serious harm.[1871]

Although "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."[1872] For example, even without any malicious intent by prison officials, "[i]nsisting upon a course of action that has already proven futile is not an objectively reasonable response under the deliberate-indifference standard" and therefore supports a finding of liability under the Eighth Amendment.[1873]

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a

---

[1864] *Farmer*, 511 U.S. at 834 (internal citation and quotation marks omitted).

[1865] *Id.* (internal citation and quotation marks omitted).

[1866] *Ball*, 792 F.3d at 594.

[1867] *Id.* (quoting *Farmer*, 511 U.S. at 837).

[1868] *Farmer*, 511 U.S. at 844.

[1869] *See Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998); *see also, e.g., Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995) (observing that deliberate indifference may be found where a prison official fails "to take reasonable measures to abate a known risk of harm" where "he knew of ways to reduce the harm but knowingly declined to act, or that he knew of ways to reduce the harm but recklessly declined to act" (internal quotation marks omitted)); *see also West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) ("Although the plaintiff has been provided with aspirin, this may not constitute adequate medical care. If deliberate indifference caused an easier and less efficacious treatment to be provided, the defendants have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care. (internal quotation marks omitted)).

[1870] *Laube v. Haley*, 234 F. Supp.2d 1227, 1251 (M.D. Ala. 2002).

[1871] *Farmer*, 511 U.S. at 847.

[1872] *Id.* at 835.

[1873] *Braggs*, 257 F. Supp. 3d at 1260.

factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[1874] Courts have found deliberate indifference in a variety of circumstances, including but not limited to "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."[1875] Deliberate indifference may also be established "by proving that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[1876] Willful blindness to the risk posed to inmates is not a valid defense to a deliberate indifference claims.[1877]

"In challenges to a correctional institution's provision of medical care, evidence of systemic deficiencies can also establish the 'disregard' element of deliberate indifference."[1878] "As an evidentiary matter, these systemic deficiencies may be identified by a 'series of incidents closely related in time' or '[r]epeated examples of delayed or denied medical care.'"[1879] "[A]lthough one-off negligent treatment is not actionable, . . . frequent negligence, just like a single instance of truly egregious recklessness, may allow the court to infer subjective deliberate indifference."[1880] Deliberate indifference may also be "demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them."[1881]

The "long duration" of unconstitutional conditions can also demonstrate correctional officials' knowledge of the deficiencies that cause a substantial risk of harm.[1882] In other words, if plaintiffs show that a substantial risk of unreasonable harm was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and that "the circumstances suggest that the [prison officials] . . . had been exposed to information concerning the risk . . . , then such

---

[1874] *Gates v. Cook*, 376 F.3d at 333 (citing *Farmer*, 511 U.S. at 842).

[1875] *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also, e.g., Carlucci*, 884 F.3d at 538 (noting that "delay" or "denial of recommended medical treatment" supports a finding of deliberate indifference); *Lawson*, 286 F.3d at 263-64 (affirming finding of deliberate indifference where prison staff knew of and disregarded instructions for follow-up care).

[1876] *Braggs*, 257 F. Supp. 3d at 1251 (internal citation and quotation marks omitted).

[1877] *See Farmer*, 511 U.S. at 843 n.8 ("a prison official . . . would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

[1878] *Braggs*, 257 F. Supp. 3d at 1251 (citing *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

[1879] *Braggs*, 257 F. Supp. 3d at 1251-52 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058-59 (11th Cir. 1986)).

[1880] *Dunn v. Dunn*, 219 F. Supp.3d 1100, 1129 (MD. Ala. 2016).

[1881] *Id.* at 1129.

[1882] *Alberti v. Sheriff of Harris Cty.*, 937 F.2d 984, 998 (5th Cir. 1991).

evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[1883]

## B. Individual Practices That Can Violate the Eighth Amendment

Courts have recognized a variety of practices that may rise to the level of deliberate indifference of serious medical needs. Although not exhaustive, these precedents provide useful guidance in assessing whether a substantial risk of serious harm exists at Angola and, if so, whether Defendants were aware of such a risk and failed to reasonable respond.

### (1) Inadequate and Inappropriate Staffing

Courts have repeatedly recognized that deliberate indifference may be established "by proving that there are 'such systemic and gross deficiencies in staffing, facilities, equipment, or procedure that the inmate population is effectively denied access to adequate medical care.'"[1884] This Circuit has stated "[t]he inexorable nonattention and delays in receiving treatment attributable to personnel shortages, the ill-conceived system for referrals of inmates…from other facilities, and the maladroitly operated 'emergency' referral system… present grave constitutional problems."[1885]

As the Third Circuit has observed, "where the size of the medical staff at a prison in relation to the number of inmates having serious health problems constitutes an effective denial of access to diagnosis and treatment by qualified health care professionals, the 'deliberate indifference' standard . . . has been violated. In such circumstances, the exercise of informed professional judgment as to the serious medical problems of individual inmates is precluded by the patently inadequate size of the staff."[1886] Where prison officials' "manifest inability to adequately train, supervise or retain health care personnel which results in rampant under-staffing and the consequent impossibility to adequately meet the needs of the inmate population," deliberate indifference is inherent.[1887] Further,

---

[1883] *Farmer*, 511 U.S. at 842-43; *see also Williams*, 547 F.2d at 1216 (concluding that the Eighth Amendment may be violated on a showing of "evidence of rampant and not isolated deficiencies").
[1884] *Harris v. Thigpen*, 941 F.2d at 1505 (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981)); *see also, e.g., Gates v. Collier*, 501 F.2d 1291, 1300-01 (5th Cir. 1974); *Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir. 1989); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)("[w]hen systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers").
[1885] *Newman v. Alabama*, 503 F.2d 1320, 1331 (5th Cir. 1974).
[1886] *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 763 (3rd Cir. 1979).
[1887] *Feliciano v. Gonzalez*, 13 F. Supp. 2d 151, 209 (D.P.R. 1998).

"difficulties in recruiting do not negate the fact that understaffing has caused [a] serious systemic deficiency,"[1888] even if a prison's remote location makes recruitment difficult.[1889]

### (2)   Inadequate Access to Care

Courts have also repeatedly recognized that barriers to meaningfully accessing medical care may violate the Eighth Amendment. For example, it is axiomatic that "[t]he denial or delay of treatment for serious medical needs violates the Eighth Amendment."[1890] Moreover, deliberate indifference may be established by a showing of "a decision to take an easier but less efficacious course of treatment."[1891] This is true whether the care is provided internally or at external facilities; where lack of personnel or transportation endangers the lives of inmates, the lack of access to care violates both professional standards and the Constitution.[1892] Prison officials "may not allow security or transportation concerns to override a medical determination that a particular inmate is in need of prompt treatment."[1893]

### (3)   Inadequate Chronic Disease Program

The failure to provide "comprehensive and coordinated care," including "centralized treatment protocols," for "complex, chronic illness" may also help support a finding of an Eighth Amendment violation.[1894] A failure to provide follow up treatments or months-long waits for chronic care visits also may support a violation.[1895]

---

[1888] *Braggs*, 257 F. Supp. 3d at 1256 n.81; *see also Wellman v. Faulkner*, 715 F.2d 269, 273 (7th Cir. 1983) (failure of a prison to fill authorized position weighs "more heavily against the state than for it," partly because the authorized salary was "woefully inadequate" and the prison's effort was insufficient); *Madrid v. Gomez*, 889 F.Supp. 1146, 1227 (N.D. Cal. 1995) (finding "recruitment difficulties do not excuse compliance with constitutional mandates.")

[1889] *See Madrid*, 889 F. Supp. at 1227 ("Nor is it a sufficient response to simply plead that recruitment of doctors is difficult" because "Defendants certainly knew before [the prison] opened that its remote location would present obstacles to attracting professional mental health staff.").

[1890] *Carlucci*, 884 F.3d at 538; *see also Galvan v. Calhoun Cty.*, 719 F. App'x 372, 376 (5th Cir. 2018) (holding that three-day delay in receiving necessary care for "excruciating pain" stated viable Eighth Amendment claim).

[1891] *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("We have also held that deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment").

[1892] *Feliciano*, 13 F. Supp. 2d at 209 (*citing Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990); *Inmates of Occoquan v. Barry*, 717 F. Supp. 854, 867 (D.D.C. 1989)).

[1893] *United States v. State of Michigan*, 1986 U.S. Dist. LEXIS 22782, at *9  (W.D.Mich. 1986).

[1894] *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 382 (7th Cir. 2017).

[1895] *Inmates of Occoquan,* 717 F. Supp. at 867.

(4)  Failure to Provide Specialty Care

Courts have also routinely recognized that the failure to provide time access to specialty care and treatment may constitute deliberate indifference to serious medical needs.[1896]

(5)  Delay or Denial of Necessary Medical Care for Non-Medical Reasons

Deliberate indifference may be supported by proof that "necessary medical treatment has been delayed for non-medical reasons."[1897] Accordingly, courts have also recognized that denying medically necessary treatment based on non-medical budgetary reasons may violate the Eighth Amendment.[1898] "Systemic mismanagement of resources" which lead to a denial, delay, or interference with prescribed healthcare can be deemed deliberate indifference.[1899] Indeed, if "financial considerations" alone were dispositive of whether prison officials provided medical care,

---

[1896] *See, e.g., Howell v. Evans*, 922 F.2d 712, 723 (11th Cir. 1991) (failure to provide access to a respiratory therapist could constitute deliberate indifference), *vacated as settled*, 931 F.2d 711 (11th Cir. 1991); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) (non-psychiatrist was not competent to evaluate significance of a prisoner's suicidal gesture; prison officials must "inform competent authorities" of medical or psychiatric needs), *reh'g denied*, 880 F.2d 421 (11th Cir. 1989); *Tillery v. Owens*, 719 F. Supp. 1256, 1307 (W.D.Pa. 1989) (services of cardiologist and dermatologist should be provided), *aff'd*, 907 F.2d 418 (3d Cir. 1990); *Inmates of Occoquan*, 717 F. Supp. at 867 (D.D.C. 1989) (Eighth Amendment violation found in part because "inmates wait months for appointments to specialty clinics"); *Morales Feliciano*, 13 F. Supp. 2d at 193 ("Delays in obtaining appointments in off-site subspecialty clinics threatens the continuity of a patient's medical care.").

[1897] *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

[1898] *Hoffer*, 290 F. Supp. 3d at 1300 ("[T]his court finds as a matter of fact that FDC's failure to treat was due to a lack of funding. . . . Here, funding is no excuse for FDC's failure to provide treatment."); *id.*, n. 15 ("Of course, this Court recognizes that issues of funding might excuse some delay. For instance, if DAAs were released yesterday, this Court would not expect FDC to wave a magic wand and suddenly treat thousands of inmates overnight. But that is not the case. FDC has had since late 2013 to respond to this problem, and it has only just recently started doing what it should have done years ago."); *see also Gates v. Collier*, 501 F.2d at 1320 ("It seems that the most onerous aspect of the district court's judgment, as far as the State of Mississippi is concerned, is that compliance will cost the State a considerable amount of money. *But the district court did not require that the legislature appropriate monies for prison reform; it simply held . . . that if the State chooses to run a prison it must do so without depriving inmates of the rights guaranteed to them by the federal constitution.*") (emphasis in original); *Ancata*, 769 F.2d at 705 ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates."); *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 161 (D. Mass. 2002) ("It is not, however, permissible to deny an inmate adequate medical care because it is costly. In recognition of this, prison officials at times authorize CAT scans, dialysis, and other forms of expensive medical care required to diagnose or treat familiar forms of serious illness.").

[1899] *Feliciano v. Gonzalez*, 13 F. Supp. 2d 151, 206 (D.P.R. 1998).

"such a rationale could ever be used by so-called 'poor states' to deny a prisoner the minimally adequate care to which he or she is entitled."[1900]

### (6) Inadequate Maintenance of Medical Records

"Medical records must be sufficiently organized and thorough to allow the provision of adequate care to inmates."[1901] Accordingly, courts have also recognized that the Eighth Amendment is "implicated when a prison's inadequate, inaccurate and unprofessionally maintained medical records give rise to the possibility for disaster stemming from a failure to properly chart medical care received by prisoners."[1902]

### (7) Inadequate Monitoring and Quality Control System

Courts have also recognized that lack of monitoring and meaningful quality control programs may contribute to a finding of a systemic Eighth Amendment violation.[1903]

### (8) Inadequate Access to Emergency Care

Courts have also recognized that the Eighth Amendment requires timely access to necessary emergency medical care.[1904]

### (9) Inadequate Medication Management and Lack of Access to Medically Necessary Medication

Courts have also held that failure to provide necessary medication may support a finding of deliberate indifference.[1905] Similarly, a prison's failure to have proper medication policies and practices in place to facilitate access to necessary medication may also support a finding of deliberate indifference.[1906]

---

[1900] *Harris v. Thigpen*, 941 F.2d at 1509.

[1901] *Madrid*, 889 F. Supp. at 1258; *see also Coleman v. Wilson*, 912 F. Supp. 1282, 1314 (E.D. Cal. 1995) ("A necessary component of minimally adequate medical care is maintenance of complete and accurate medical records.").

[1902] *Dawson v. Kendrick*, 527 F. Supp. 1252, 1306-07 (S.D.W.V. 1981) (quotation marks omitted) (quoting *Burks v. Teasdale*, 492 F. Supp. 650, 676 (W.D. Mo. 1980))..

[1903] *Madrid*, 889 F. Supp. at 1208 (finding Eighth Amendment violation where "medical staff and administrators have taken no effective steps to systematically review the care provided or to supervise the physicians providing it").

[1904] *See Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) ("If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison.").

[1905] *Natale*, 318 F.3d at 582-83; *see also, e.g., Scinto v. Stansberry*, 841 F.3d 219, 228-30 (4th Cir. 2016); *Hoffer*, 290 F. Supp. 3d at 1300-01.

[1906] *Natale*, 318 F.3d at 582-83.

## C. Defendants' Policies and Practices Violate the Eighth Amendment

Plaintiffs have proven that Defendants' policies and practices concerning medical care at Angola violate the Eighth Amendment.

### (1) Applying the Objective Test, Plaintiffs Have Demonstrated the Existence of Serious Medical Needs and a Substantial Risk of Serious Harm.

As explained above, in order to establish an Eighth Amendment violation for inadequate medical care, Plaintiffs must first present evidence establishing the existence of serious medical needs and a substantial risk of serious harm. "Put another way, plaintiffs must show that their serious medical need, if left unattended, poses a substantial risk of serious harm."[1907] Plaintiffs have presented overwhelming evidence to prove this objective element of their claim.

#### a. *Plaintiffs Have Proven That Serious Medical Needs Exist on a Widespread Basis.*

Plaintiffs have amply shown that they and the members of the Class suffer from "serious medical needs."[1908] Specifically, Plaintiffs presented substantial documentary, testimonial, and expert evidence—much of which is undisputed—demonstrating that they and the members of the Class suffer a litany of serious medical needs while imprisoned at Angola, including but not limited to cancer, HIV, Hepatitis C, hypertension, diabetes, cataracts, osteoarthritis, chronic pain, and fractured bones.[1909] The abundance of record evidence demonstrates the widespread nature of these needs, from the Plaintiffs' and Class Members' medical histories[1910] and the Plaintiffs' expert reports[1911] to Defendants' own internal records.[1912] Indeed, Defendants do not appear to dispute this element of Plaintiffs' claim.[1913]

#### b. *Plaintiffs Have Demonstrated that Defendants' Policies and Practices Create a Substantial Risk of Serious Harm to the Class.*

As reflected in the Proposed Findings of Fact, Plaintiffs have also submitted overwhelming evidence showing that the totality of Defendants' policies and practices conspire to create a

---

[1907] *Braggs*, 257 F. Supp. 3d at 1191 (internal quotation marks and citations omitted).

[1908] *Gobert*, 463 F.3d at 345 n.12 (defining a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required").

[1909] *See, e.g., supra* ¶¶ 254-257; PX 28 at 0007-22. *Cf.* Oct. 17 Decision on Rule 52(c) Motion at 121:3-12 ("[T]he Court finds there has been ample evidence of serious medical needs through the various patient charts that were reviewed extensively by the Plaintiffs' experts in this case, both on direct and on cross.").

[1910] *See* PX 28 at 0007-22.

[1911] PX 6; PX 28; PX 244.

[1912] *See, e.g.,* PX 22 (reporting statistics on chronic diseases); PX 150.

[1913] *See* JPTO at 8 (identifying disputed issues on Plaintiffs' Eighth Amendment claim).

substantial risk of serious harm to prisoners at Angola.[1914] The evidence and testimony compellingly demonstrates the following interrelated areas of inadequacy: (1) inadequate and inappropriate staffing; (2) failures to provide timely access to medical care; (3) inadequate chronic disease management; (4) failures to provide timely access to specialty care; (5) inadequate inpatient care; (6) inadequate medication administration; (7) inadequate diagnostic services; (8) failure to create, maintain and use adequate and reliable medical records; (9) inadequate facilities; (10) inadequate medical leadership; (11) inadequate funding and inappropriate budget management and (12) inadequate monitoring and quality assurance.[1915] Together, these inadequacies subject Plaintiffs and the Class to actual harm and to a substantial risk of serious harm—including worsening of symptoms, continued pain and suffering, and death.

### i. Inadequate and Inappropriate Staffing

Plaintiffs presented overwhelming evidence demonstrating that Angola has an inadequate number of qualified medical personnel, thereby further elevating the substantial risk of harm to the Class. Evidence showed that the excessively high caseloads of Angola doctors contributed to the poor quality of care and creates a risk that doctors have too little time to properly evaluate patients.[1916] In addition to Dr. Lavespere, Angola has five provider-level medical professionals: four physicians and one nurse practitioner, which averages out to 1280 patients per provider.[1917] The Angola providers' caseloads increase the risk that patients will receive poor quality care.[1918] The failure of Angola physicians to timely and adequately examine patients, review diagnostic results, and implement specialists' recommendations further exacerbates the risk of harm to the Class. Defendants' corresponding failure to provide a sufficient number of nurses compounds the risk of harm even further.

---

[1914] *Gates v. Cook*, 376 F.3d at 333 (recognizing that a combination of conditions may "have a mutually enforcing effect" that violates the Eighth Amendment); *see also, e.g.,* Williams, 547 F.2d at 1215; *Braggs*, 257 F. Supp. 3d at 1192. *Cf.* Oct. 17 Decision on Rule 52(c) Motion at 121:13-122:21 (finding that the evidence of "imprecise pill medication delivery," "EMTs delivering what the medical experts have basically concluded are medical services that are beyond the scope of stabilization and transport that is the recognized scope of practice for an EMT," "[t]he timeliness of referrals to specialists," "the adequacy … and the timeliness of follow-up and follow-through on recommendations made by referring specialists," and the "evidence of delays in diagnostics, delays in treatment" "taken together as a whole are sufficient in [the] Court's view to demonstrate, at least … until Angola has the chance to put on their case in chief, a system of delivery taken as a whole that presents a serious risk of harm to inmates …").

[1915] Rather than repeating verbatim the Findings of Fact regarding inadequacies in medical care, these Conclusions of Law incorporate those Findings by this reference and will summarize how those inadequacies contribute to a substantial risk of serious harm.

[1916] PX 6 at 0017; *See supra* ¶¶ 160-164 (each healthcare provider at Angola, on average, is responsible for 1280 patients; a reasonable number would be around 600 for a male facility).

[1917] *See supra* ¶¶ 160-165.

[1918] PX 6 at 0017-18.

In addition, the evidence amply demonstrates the serious risk of harm stemming from Defendants' practice of providing medical care through unqualified staff, or even through fellow Class members.[1919] This violates Defendants' Eighth Amendment obligation to ensure that prisoners receive timely, professional medical judgment from a qualified medical professional, and treatment recommended by a qualified medical professional for their serious medical needs. Defendants' exclusive reliance on doctors with restricted licenses and their concomitant failure to meaningfully supervise these doctors increases the likelihood of harm,[1920] as does Defendants' reliance on LPNs, EMTs, and correctional officers for medical functions outside the scope of their qualifications.[1921] That risk is compounded by Defendants' demonstrated failure to provide adequate supervision.[1922]

ii. Restrictions on and Inadequacies in Accessing Medical Care

Plaintiffs have also demonstrated the risk of substantial harm that stems from various policies and practices that impede access to competent medical care.[1923] Defendants' substantial reliance on EMTs to provide front-line medical evaluations during sick call—without timely access to nurses or providers or patients' medical records—increases the risk that Class members will not be properly diagnosed and treated, thereby resulting in needless and prolonged suffering.[1924] The documentary evidence, credible witness testimony, and reliable expert testimony demonstrate that this routine and consistent denial of access to a professional medical judgment and the treatment it would recommend contributes substantially to the risk of harm to Class members, with often catastrophic results.[1925]

Moreover, Defendants employ numerous policies and practices that impose unreasonable barriers to accessing needed medical care. As detailed throughout the Proposed Findings of Fact, these barriers include: often prohibitively expensive co-pays for sick call and prescriptions; impractical pill call times; the threat of disciplinary charges for alleged malingering; and a headquarters review system that delays and withholds medical care.[1926] Whether or not these practices on their own would suffice to cause a substantial risk of serious harm, the totality of these

---

[1919] *See supra* ¶¶ 187-202, 285-287; PX 6 at 0015, 19-20, 40-41, 49-54.

[1920] *See supra* ¶¶ 353-363; PX 6 at 0023-25.

[1921] *Cooper v. City of Cottage Grove*, No. 6:13-cv-551-TC, 2014 WL 4187558, *6 (D. Or. Aug. 21, 2014) (observing that EMTs "are not the equivalent of a physician or other medical professional").

[1922] PX 6 at 0040-41.

[1923] *See supra* ¶ 192-201.

[1924] *See, e.g., Cooper*, 2014 WL 4187558, at *6 (observing that EMTs "are not the equivalent of a physician or other medical professional").

[1925] *See supra* ¶¶ 204-213.

[1926] *See supra* ¶¶ 214-222.

barriers (along with the other inadequacies described herein) unquestionably increases the likelihood that Class members will not receive crucial medical care and treatment.[1927]

### iii. Inadequate Treatment of Medical Emergencies

Defendants' inadequate treatment when medical emergencies arise demonstrate the risk of substantial harm to class members. Again, Defendants' substantial reliance on EMTs to staff the ATU and respond to medical emergencies increases the risk that class members will be neglected, mistreated, and not timely transported to facilities equipped to handle medical emergencies.[1928] Defendants' practice of having EMTs conduct patient evaluations on-site in emergency situations and convey the information to the doctors increases the risk that patients exhibiting severe symptoms will not by transported to the ATU for treatment.[1929] Though the ATU is not equipped to handle most emergent situations or perform many types of diagnostic testing, the practice of EMTs and providers is to hold patients in the ATU for "observation" over the course of many hours instead of transport them off-site immediately.[1930] The medical records, credible testimony of Plaintiffs' witnesses, and reliable expert testimony demonstrate that these practices place patients at immediate risk of serious harm and can cause or contribute to preventable deaths.[1931]

Defendants' also utilize inappropriate practices in the ATU that were demonstrated to heighten the risk of serious harm to patients presenting with emergent conditions. As detailed throughout the Proposed Findings of Fact, these procedures include administering anti-opioids, or performing catheterization or lavage whenever a patient presents with an altered mental state, which further delays care and can cause harm to the patient, as well as using inappropriately using restraints for extended periods of time and having patients sign DNRs.[1932] As is made clear by the medical records and expert testimony, these practices exacerbate the already poor provision of emergency care.

### iv. Inadequate Chronic Disease Management

Although "[o]ne does not need to be an expert to know that [a] complex, chronic illness requires comprehensive and coordinated care,"[1933] Defendants fail to maintain a meaningful chronic disease management program.[1934] As shown throughout the medical records, Defendants' physicians do not examine patients and monitor their chronic conditions properly, fail to understand how to manage their chronic illnesses, prescribe inadequate or affirmatively harmful treatments, ignore

---

[1927] *See, e.g., Wilson*, 501 U.S. at 304 (noting that conditions of confinement may have a "mutually enforcing effect" resulting in a violation of the Eighth Amendment).
[1928] *See supra* ¶¶ 223-238.
[1929] *See supra* at ¶¶ 223-224.
[1930] *Cf. Hoptowit*, 682 F.2d at 1253.
[1931] *See, e.g., supra* ¶¶ 228-245.
[1932] *See supra* ¶¶ 235-245.
[1933] *Glisson*, 849 F.3d at 382.
[1934] *See supra* ¶¶ 246-257; PX 6 at 0008, 42-43, 47.

specialists' recommendations, and generally allow treatable conditions to deteriorate until they become intractable or precipitate crises (at which point Plaintiffs suffer from the deficits in emergency care).[1935] The deficiencies in Angola's chronic disease management increase the likelihood that Class members' symptoms will persist and worsen; that their underlying diseases will unnecessarily progress and become more complicated or even untreatable; and that their ability to complete daily functions will not improve or will deteriorate.[1936]

Far from remote, these potentially devastating consequences are tragically real and omnipresent at Angola, which is laid bare by Plaintiffs' experts' findings. As reliably detailed in their reports and testimony, Plaintiffs' experts "identified preventable deaths and inadequate care in almost every medical chart [they] reviewed,"[1937] and that chronic diseases in particular were inadequately controlled and treated on a system-wide basis, in many cases leading to patients' untimely deaths.[1938] The medical records, the credible testimony of Plaintiffs' witnesses, Defendants' documents, and the reliable expert testimony combine to show that Defendants' chronic disease management program is profoundly broken and exposes Class members to a substantial risk of serious harm.

v.   Failure to Provide Timely Access to Specialty Care

Defendants' policies and practices that delay and restrict access to specialty care further exacerbate the risk that Class members will not receive necessary treatment.[1939] As detailed above, such practices include but are not limited to (i) understaffing and reliance on unqualified personnel, which delays recognizing the need for specialty care and the appropriate specialists to provide it; (ii) relying on DOC Headquarters both to schedule and review the "medical necessity" of specialty care; (iii) failing to track appointments; (iv) failing to ensure that prerequisite testing is timely completed and provided to specialists; and (v) failing to provide disabled patients with proper transportation.[1940]

The evidence also proves that Defendants routinely fail to ensure that specialists' and other outside providers' follow-up instructions are properly executed,[1941] which further compounds the

---

[1935] *See supra* ¶¶ 246-257.

[1936] PX 6 at 0042.

[1937] *Id.* at 0027.

[1938] *See, e.g.,* PX 6 at 0033, 39-40, 47, 76; *see also supra* ¶¶ 254-257.

[1939] *See Morales Feliciano*, 13 F. Supp.2d at 193 ("Delays in obtaining appointments in off-site subspecialty clinics threatens the continuity of a patient's medical care.").

[1940] *See supra* ¶¶ 258-267; PX 6 at 0072-75; *see also Inmates of Occoquan*, 717 F. Supp. at 867 (Eighth Amendment violation found in part because "inmates wait months for appointments to specialty clinics"); *United States v. Michigan*, 680 F. Supp. 928, 1002 (W.D. Mich. 1987) (concluding that prison officials "may not allow . . . transportation concerns to override a medical determination that a particular inmate is in need of prompt treatment and must be transported to an appropriate facility"); *Morales Feliciano*, 13 F. Supp.2d at 178 (concluding that Eighth Amendment violation was supported by evidence that prison failed to provide necessary transportation to specialty clinics).

[1941] *See supra* ¶¶ 246-267; PX 6 at 0074-75.

risk of unnecessary pain, suffering, and poor prognosis.[1942] From delaying or forgoing appropriate follow-up appointments to failing to prescribe the medication prescribed by specialists to leaving critical diagnostic tests unperformed,[1943] Defendants deny needed medical care even when they do allow a patient to see an appropriate specialist. The copious record evidence, the credible witness testimony, and the reliable expert testimony all show in dramatic form the resulting harm to Class members.

### vi. Inadequate Inpatient Care

Deficiencies also infect Defendants' provision of inpatient care at Angola. Despite housing patients with the most severe medical needs, Angola's infirmary units are insufficiently and inadequately staffed by both providers and nurses,[1944] thereby increasing the risk that the most debilitated patients will not receive necessary treatment.[1945] In lieu of sufficient provider and nursing care, Defendants employ inmate orderlies, supervised by custodial staff, to provide medically crucial services such as bathing, cleaning, and positioning, subjecting the most vulnerable Class members to a substantial risk of abuse and neglect.[1946] Even here, where Class members' needs are most critical, Defendants do not provide appropriate examinations, fail to provide indicated medication, and allow conditions to deteriorate to often fatal extents.[1947] This risk of harm is enhanced by Defendants' failure to provide safe and sanitary conditions in the infirmary. [1948]

### vii. Inadequate Pharmacy Services and Medication Administration

As detailed in the Proposed Findings of Fact above, Defendants' policies and practices regarding the provision of medication at Angola further contribute to the substantial risk of serious harm. Plaintiffs established that Defendants' medication administration protocols create a substantial risk of serious harm. For instance, Defendants' reliance on correctional officers without adequate

---

[1942] *See, e.g., Lawson*, 286 F.3d at 262-63 (failing to properly execute follow-up medical instructions constituted Eighth Amendment violation); *Gil v. Reed*, 381 F.3d 649, 661-62 (7th Cir. 2004) (failure of prison doctor to follow outside providers' instructions could support a jury finding of Eighth Amendment violation); *Blankenship v. Obaisi*, 443 F. App'x 205, 209 (7th Cir. 2011) (collecting cases finding that rejecting follow-up care instructions may support an Eighth Amendment violation).

[1943] *See supra* ¶¶ 246-257.

[1944] *See supra* ¶¶ 284-298; PX 6 at 0079-82.

[1945] *See Anderson v. City of Atlanta*, 778 F.2d 678, 686 n.12 (11th Cir. 1985) (holding that Eighth Amendment violation "may be shown by proving a policy of deficiencies in staffing"); *White v. Cooper*, No. 08–CV–1321, 2009 WL 1230008, *4-5 (W.D. La. May 5, 2009) (holding that inmate stated a viable claim under the Eighth Amendment where prison understaffed medical infirmary); *cf Braggs*, 257 F. Supp. 3d at 1212 (noting that understaffing of mental health care workers "created a substantial risk of serious harm," including a "greater risk for continued pain and suffering").

[1946] *See supra* ¶¶ 284-296; PX 6 at 0081-82.

[1947] *See supra* ¶¶ 278-283.

[1948] *See supra* ¶ 293; PX 6 at 0081-82.

training to dispense medication creates a risk that patients will receive the wrong medication, will not receive medication at the appropriate time, or that other errors may occur that negatively impact the Class's health.[1949]

Defendants' effective prohibition on prescribing narcotics to many patients for whom narcotics are medically necessary increases the likelihood that those patients will continue to experience unnecessary pain, suffering, and exacerbation of their chronic illnesses.[1950] Similarly, Defendants' policy of prohibiting many HCV-positive patients from receiving antiviral therapy increases the likelihood that those patients will not only experience unnecessary pain and suffering but also an untimely death;[1951] indeed, courts have recognized that "it is important to treat patients with HCV as soon as possible so that they can be cured of the virus before their liver becomes significantly diseased."[1952] Defendants' failure to create appropriate medication administration records further harms Class members, by failing to ensure that medication is consistently received and preventing providers and specialists from making informed treatment decisions.[1953]

### viii.  Inadequate Diagnostic Services

Defendants' systemic failure to provide and review diagnostic testing contributes to the substantial risk of serious harm for Class members. As countless examples in the record and the experts' findings reveal, indicated diagnostic tests such as biopsies and CT scans are frequently delayed by months or years.[1954] Similarly, in emergency situations, Defendants forgo critical testing to determine the appropriate response, and delay or outright decline to transport patients to facilities capable of performing needed tests.[1955] Moreover, the evidence shows that Defendants fail to provide sufficient testing, such as glucose tests for diabetics[1956] and colonoscopies of at-risk

---

[1949] *See supra* ¶¶ 300-304; PX 6 at 0050-51; *see also, e.g.,* JX 4-n, M. Murray Depo. at 56:19-24 (describing errors in medication administration); JX 4-d, C. Butler Depo. at 34:11-35:13, 36:18-37:2, 40:8-41:10 (describing Angola running out of medication and providing wrong medication); *Baker v. Litscher*, No. 17-CV-1275-JPS, 2017 WL 6001783, *5 (E.D. Wis. Dec. 4, 2017) (holding that Plaintiff stated a claim for Eighth Amendment violation where prison warden "knew of the risks inherent" to the policy of "using correctional officers to distribute medication . . . but nevertheless did not alter it").

[1950] *See supra* ¶¶ 311-314; PX 6 at 0084; *see, e.g., Grawcock v. Hodges*, No. 1:10–CV–345–RLM, 2012 WL 3245977, *3 (N.D. Ind. Aug. 6, 2012) ("Strict adherence to a policy that bans narcotic medications raises a question of fact as to whether the denier was deliberately indifferent to a serious medical need and whether having a policy against narcotic medications violates constitutional rights.").

[1951] *See supra* ¶¶ 316-326; *see, e.g,* Rec. Doc. 517-4 at 30-31.

[1952] *Hoffer*, 290 F. Supp. 3d at 1304.

[1953] *See supra* ¶¶ 298-310.

[1954] *See supra* ¶¶ 230-234, 328-331.

[1955] *See supra* ¶¶ 235-255.

[1956] PX 6 at 0055.

patients.[1957] These failures to provide necessary diagnostic testing increase the likelihood of delayed diagnosis and treatment.[1958]

ix.     Failure to Create, Maintain and Use Adequate and
Reliable Medical Records

Courts have recognized that "inadequate, inaccurate and unprofessionally maintained medical records" pose a "grave risk of unnecessary pain and suffering."[1959] Yet, Defendants' chaotic hybrid record system results in missing and unfiled records.[1960] Defendants also maintain a practice of failing to ensure medical records are available during sick call, urgent, and walk-in evaluations.[1961] Similarly, Defendants fail to transmit medical records to specialists seeing Class members, as shown in the medical records and testified to by doctors who treat Class members at UMC, often making it impossible for them to render effective care.[1962]

Courts have recognized the risk of harm caused when "medical records are not always available at sick call" and when those records "do not always have the appropriate or required documentation of assessment of medical problems."[1963] Defendants' policy of refusing to allow patients to see their own medical records further increases the risk of harm, because the prohibition impairs patients from understanding their conditions such to alleviate their own symptoms[1964] and to provide outside providers with information about their condition when those providers lack access

---

[1957] *See* PX 42 (Dr. Singh on 12/13/13: "Some of the offenders at LSP were waiting for CT scan and MRI or cancer care since late 2011. … As far as I know no [colonoscopies] were done at LSP for 2 years or longer. Once access has been restored, even then we can not get all 600 colonoscopies done immediately."); PX 26 (Ms. Lamartiniere: "[W]e will temporarily suspend the entering of screening referrals [for colonoscopies] until notified by [headquarters] to resume."); *compare* PX 4, J. Collins Depo. at 78:6-9 (Dr. Collins: "You had a screening colonoscopy when you hit 50. … That's basically the requirement."); PX 4-c, A. Brent Depo. at 56:23-57:21 (61-year-old Class member requested colonoscopy and was denied by multiple doctors); PX 4, K. Clomburg Dep. at 69:18-71:4 (similar).

[1958] *Brown v. Coughlin*, 758 F. Supp. 876, 882 (S.D.N.Y 1991) (finding Eighth Amendment violation where, *inter alia*, prisoners' "condition was one which could easily be remedied by diagnostic testing").

[1959] *Burks v. Teasdale*, 492 F. Supp. 650, 676, 678 (W.D. Mo. 1980).

[1960] PX 6 at 0058-59; *see also, e.g.*, PX 4, K. Hawkins Depo. at 14:9-15:16 (acknowledging possibility of records getting out of order and EMARs not being included in paper record); *see also, e.g.*, PX 4, R. Lavespere Depo. at 65:11-66:7 (noting that most records from outside hospitals do not become part of the paper record); *see also, e.g.*, PX 4-f, K. Clomburg Depo. at 39:12-40:6, 45:6-18 (describing providers not putting information about treatment or condition in medical records); PX 4-q, B. Prine Depo. at 41:25-42:25, 45:9-46:7 (same).

[1961] PX 6 at 0060; *see also, e.g.*, PX 4, K. Hawkins Depo. at 23:9-24:4 (EMTs don't bring medical records to sick call; records must be transported in vans).

[1962] *See supra* ¶¶ 332-343.

[1963] *Casey v. Lewis*, 834 F. Supp. 1477, 1503 (D. Az. 1993).

[1964] PX 6 at 0060.

to records. Combined with the other inadequacies described herein,[1965] Defendants' failure to maintain an adequate and readily accessible medical record system increases the likelihood of a substantial risk of harm.

### x.  Inadequate Facilities

As explained in the Proposed Findings of Fact, the credible evidence at trial also showed deficiencies in Angola's medical facilities, such as unsanitary and un-confidential examination rooms as well as a lack of necessary medical equipment.[1966] While these poor conditions might not establish constitutional harm in isolation, the evidence demonstrated that such inadequacies increase the potential harm to the Class by preventing adequate examinations.[1967]

### xi.  Inadequate Medical Leadership

Deficient oversight and administration of the provision of medical care at Angola also increases the likelihood of a substantial risk of serious harm to the Class. As detailed in the Proposed Findings of Fact *supra* ¶¶ 352, 355, Defendants have placed operational control over significant aspects of Angola's medical program in an Assistant Warden with no health care training and no degree above the high school level.[1968] Further, the evidence demonstrates that Defendants have permitted Angola's putative Medical Director, Dr. Lavespere, to disclaim any meaningful oversight function, such as supervision or quality control.[1969] Making matters worse, to the extent that Dr. Lavespere provides supervision to Angola's medical staff, his admitted skepticism of the medical problems reported by prisoners increases the likelihood that he will tolerate substandard care from other medical providers, which is evidenced by the inadequacies in both his and his providers' clinical care.[1970] In sum, Plaintiffs have shown that Defendants' practice of maintaining deficient leadership over Angola's medical care increases the likelihood that the problems in medical care will persist.

### xii.  Inadequate funding and inappropriate budget management

The credible evidence established that budgetary concerns frequently dictate decision-making regarding access to medical care and improvement in quality of care.[1971] Moreover, Angola's

---

[1965] For example, the potential for harm stemming from lack of access to medical records during sick call is compounded by Defendants' reliance on unqualified EMTs to conduct sick call.

[1966] PX 6 at 0029-32.

[1967] *See supra* ¶¶ 344-349.

[1968] *Hartman v. Correctional Med. Servs., Inc.*, 960 F. Supp. 1577, 1582-83 (M.D. Fla. 1996) ( holding medical provider could be found deliberately indifferent based on evidence that it permitted a person with only a master's degree and no processional licenses to have substantial authority over mental health system).

[1969] PX 6 at 0012-14; *see supra* ¶¶ 350-357.

[1970] PX 6 at 0013-14.

[1971] *See supra* ¶¶ 366-369.

budget for medical care is extremely low even in comparison to the low amount spent at other Louisiana correctional institutions[1972]—even though Angola is one of the DOC's highest-acuity prisons, meaning that its population has a greater and more acute need for medical care than the population of other prisons. These budgetary problems are further compounded by the fact that Angola's medical leadership has no meaningful involvement in budget allocation and management such to ensure that the budget reflects the medical needs of the facility.[1973] Combined with the other deficiencies described herein, these inadequacies contribute to a substantial risk of serious harm.

xiii.     Inadequate Monitoring and Quality Assurance

Finally, Defendants' failure to provide adequate monitoring and quality assurance in their provision of medical care at Angola contributes to and perpetuates a culture where deficient care goes unnoticed and unrectified.[1974] The evidence at trial demonstrated that Defendants lack effective protocols to monitor and review provider care[1975] and patient mortality.[1976] Defendants' do not employ standard means of evaluating providers' care and examining the circumstances that led to patients' death; to the contrary, the documentary evidence shows that Defendants affirmatively seek to avoid creating records that recognize problems in care.[1977] This prevents Defendants from improving on their mistakes, ensuring that problems will recur time and again. Defendants' abdication of their responsibility to provide such meaningful monitoring threatens patient safety and increases the likelihood that deficient care will persist.[1978]

(2)     Applying the Subjective Test, Plaintiffs Have Proven that Defendants Are Deliberately Indifferent to their Serious Medical Needs.

The obviousness and severity of the risks to prisoner health and safety that are created by Defendants' medical policies and practices manifest Defendants' deliberate indifference. As explained *supra* n.1864-1883, deliberate indifference can be satisfied by showing that the risk to prisoner safety is so apparent as to impute actual knowledge of that risk to prison officials.[1979] This

---

[1972] *See supra* ¶ 373; PX 6 at 0027.

[1973] *See supra* ¶¶ 370-372; PX 6 at 0012, 27.

[1974] *Madrid*, 889 F. Supp. at 1209 ("Failure to institute quality control procedures has had predictable consequences: grossly inadequate care is neither disciplined nor redressed.").

[1975] PX 6 at 0026-27; *See supra* ¶¶ 379-388.

[1976] PX 6 at 0084; DX 14 Thomas Rep. at 72; *see supra* ¶¶ 389-397.

[1977] *See supra* ¶¶ 393-397.

[1978] *See, e.g., Madrid*, 889 F. Supp. at 1209 ("Similarly, a system for review of the numerous avoidable inmate illnesses, as well as inmate deaths, would have underscored the systemic deficiencies in the [prison's] health care system."

[1979] *See Farmer*, 511 U.S. at 842 (deliberate indifference can be from the very fact that the risk was obvious"); *Gates v. Cook*, 376 F.3d at 343 (noting that the "obvious and pervasive nature" of various deficient prison supported the conclusion that prison officials were deliberately indifferent").

inference may be further buttressed by evidence that unconstitutional conditions have persisted for a "long duration."[1980]

Such are the circumstances here. As the record evidence lays bare, the deficiencies in the provision of nearly all aspects of medical care at Angola are "long-standing, pervasive, [and] well-documented" such that Defendants must have recognized those deficiencies and their concomitant dangers to the thousands of people in their custody and care.[1981] Indeed, defendants have been made aware of their significant deficiencies due to the DOJ's lawsuit, outside consultants, and the thousands of annual healthcare complaints made by patients for thirty years.[1982] The unmistakable severity of the recurring harms that result should have (and often did) give Defendants notice that their medical system was deeply flawed, from a patient living without a bottom jaw and half a tongue for at least three years before receiving surgery;[1983] to a patient developing a bone-deep ulcer the width of a liter bottle of soda;[1984] to a patient showing up in the ATU three days in a row with obvious stroke symptoms before providers recognized his condition;[1985] to a patient necrotizing from the waist down.[1986] These diverse and pervasive problems, and hundreds more like them, have caused Louisiana's mortality rate to skyrocket at a time when mortality in America's prisons is flat elsewhere.[1987]

In cases involving similarly severe risks to prisoner safety, courts have found officials to be deliberately indifferent even where plaintiffs did not present any additional evidence showing officials had actual knowledge of the risks to prisoner safety beyond the deplorable conditions themselves.[1988] But Plaintiffs do not rely exclusively on the obviousness of the risk of harm in order to prove Defendants' deliberate indifference. Rather, as outlined in the Proposed Findings of Fact, Plaintiffs presented substantial, credible documentary and testimonial evidence demonstrating that Defendants had actual knowledge of the risk of harm.[1989] For decades, warnings of deficient care from a variety of different sources—the Department of Justice, outside consultants, and outside providers—put Defendants on notice of the same overarching concern: deficiencies in the provision

---

[1980] *Wilson*, 501 U.S. at 300.

[1981] *Farmer*, 511 U.S. at 842.

[1982] *See supra* ¶¶ 450-468.

[1983] Oct. 12 Testimony of Otto Barrera at 206:14-20.

[1984] Oct. 12 Testimony of Francis Brauner at 130:2-7

[1985] *See supra* ¶ 141.

[1986] Oct. 9 Testimony of Mike Puisis at 192:23-194:2.

[1987] *See supra* ¶ 148.

[1988] *See, e.g., Gates v. Cook*, 376 F.3d at 333 (affirming trial court's findings that the long-standing and obvious nature of several deficient prison conditions demonstrated prison officials' deliberate indifference to such conditions)' *Alberti*, 937 F.2d at 998 (holding that "there is little doubt" that officials were aware of unconstitutional conditions given decades of court involvement on the issue); *Ramos*, 639 F.2d at 572 (holding that prison officials were deliberately indifferent to the safety needs of inmates because officials provided inadequate levels of correction officer staffing).

[1989] *See supra* ¶¶ 138-139, 469-477.

of medical care at Angola place prisoners at a substantial risk of serious harm.[1990] Far from vague, these warnings detailed specific inadequacies that placed prisoners in harm's way: delays in treatment, inadequate follow-up care, deficient treatment of chronic illnesses, inadequate sick call procedures, lack of adequately trained and sufficient numbers of staff, deficiencies in medication protocols, among others.[1991] And yet, as the evidence unquestionably shows, these inadequacies and their corresponding risks of substantial harm persist to the present day.

The evidence goes even beyond these repeated warnings, showing that Defendants recognized the risk of harm in their own communications and records. As explained in the Proposed Findings, Defendants were aware of inadequate staffing, the potential risks of relying on unqualified staff, backlogs in treatment, and high patient mortality.[1992] Moreover, Defendants were aware of how these deficiencies detrimentally impacted Angola's population, as evidenced by patients' frequent complaints about the quality of medical care.[1993]

Yet, despite their awareness of the risks of harm, Defendants have failed to implement reasonable measures to abate that risk as required by the Eighth Amendment.[1994] To the extent that the evidence shows that Defendants have taken any remedial measures whatsoever, the evidence also demonstrates that those measures "simply do not go far enough" when weighed against the risk of harm to Class members.[1995] Thus, such efforts do not constitute the constitutionally required "reasonable measures to abate" the risk of harm.[1996]

In sum, the record is clear that Defendants "know[ ] of and disregard[ ] [the] excessive risk to inmate health [and] safety" at Angola, have failed to reasonably respond to that risk, and are thus deliberately indifferent in violation of the Eighth Amendment.[1997]

        a.    *Applying the Subjective Test, Plaintiffs Have Also Proven that Defendants are Deliberately Indifferent to the Serious Medical Needs of HCV-Positive Patients.*

Defendants' deliberate indifference to the needs of patients with HCV, one of the most common yet undertreated conditions at LSP, deserves special note. When prison officials know that prisoners are diagnosed with HCV, "there is no question that [they have] knowledge of a risk of serious harm."[1998] Thus, if a defendant prison official knows that a prisoner has HCV, the only remaining

---

[1990] *See supra* ¶¶ 450-477.

[1991] *See supra* ¶¶ 450-477.

[1992] *See supra* ¶¶ 479-491.

[1993] *See supra* ¶¶ 492-494.

[1994] *Cf. Gates v. Cook*, 376 F.3d at 329-331.

[1995] *Laube v. Haley*, 234 F. Supp.2d 1227, 1251 (M.D. Ala. 2002).

[1996] *Farmer*, 511 U.S. at 847.

[1997] *Id.*

[1998] *Hoffer*, 290 F. Supp. 3d at 1299 ("There is no question that Defendant has knowledge of a risk of serious harm—Defendant knows that Plaintiffs and Plaintiffs' class are diagnosed with HCV.").

analysis to establish deliberate indifference asks whether the Defendant disregarded the risk of serious harm to inmate health by more than mere negligence.[1999]

When prison officials are aware of: (1) the availability and efficacy of DAA drugs for treating HCV, (2) that the standard of care for treating HCV requires treatment of *all* patients suffering from chronic HCV with DAA drugs, and (3) that failing to treat HCV increases the risks of medical issues while decreasing the efficacy of DAAs, but yet categorically deny DAA treatment to prisoners, they are acting with deliberate indifference.[2000]

Because chronic HCV is a progressive disease, and delays in treating it with DAAs reduce the benefits associated with treatment, prison officials who deny DAA treatment to prisoners with chronic HCV on the basis of nonmedical factors engage in the unnecessary and wanton infliction of pain to prisoners, increasing the risk of serious damage to their health.[2001] This constitutes a deliberate disregard of the serious medical need of prisoners for DAA treatment.[2002] Moreover, lack of funding is "no excuse" for failing to provide HCV-infected prisoners with DAA treatment.[2003]

Plaintiffs have established that Defendants routinely and systemically failed to properly assess, diagnose and treat HCV for people who are incarcerated at LSP.[2004] Indeed, Defendants do not even consistently inform Class members when they test positive for HCV, nor teach them how the virus is transmitted so they can reduce the risk of spreading it.[2005] Defendants' delay and denial of care for HCV thus subjects Class members with HCV to a substantial risk of harm and places Class members without HCV at an enhanced risk of contracting HCV, violating the Eighth Amendment.

---

[1999] *Id.*

[2000] *See Postawko v. Missouri Dept' of Corrs.*, No. 2:16-cv-04219, 2017 WL 1968317, at *6 (W.D. Mo. May 11, 2017) (finding that plaintiffs plausibly alleged that defendants deliberately disregarded their serious medical need for DAA treatment of their HCV in light of the knowledge defendants had about DAAs and their refusal to treat HCV-infected prisoners with DAAs);

[2001] *Postawko v. Missouri Dept' of Corrs.*, No. 2:16-cv-04219, 2017 WL 1968317, at *7 (W.D. Mo. May 11, 2017).

[2002] *Id.*

[2003] *Hoffer*, 290 F. Supp. 3d at 1300 ("[T]his court finds as a matter of fact that FDC's failure to treat was due to a lack of funding . . . . Here, funding is no excuse for FDC's failure to provide treatment."); *id.*, n. 15 ("Of course, this Court recognizes that issues of funding might excuse some delay. For instance, if DAAs were released yesterday, this Court would not expect FDC to wave a magic wand and suddenly treat thousands of inmates overnight. But that is not the case. FDC has had since late 2013 to respond to this problem, and it has only just recently started doing what it should have done years ago."); *see Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates.")

[2004] *See* ¶¶ 316326.

[2005] *See supra* ¶¶ 252, 316-326.

## II.    THE DOC'S PRACTICES VIOLATE THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT

"The ADA is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."[2006] Title II of the ADA focuses on disability discrimination in the provision of public services. Specifically, Title II, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[2007] A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[2008] State prisons such as LSP are "public entities" within the purview of the ADA.[2009]

Congress directed the Department of Justice to elucidate Title II's prohibition on discrimination with implementing regulations.[2010] The Attorney General issued those regulations at Title 28, part 35, of the Code of Federal Regulations, for "all services, programs, and activities provided or made available by public entities."[2011] "[T]o the extent Title II's implementing regulations 'simply apply' Title II's substantive ban on disability discrimination and do not prohibit conduct that Title II permits, they too are enforceable through Title II's private right of action."[2012] "This is because when Congress intends a statute to be enforced through a private right of action, it also intends the authoritative interpretation of the statute to be so enforced as well."[2013] Although the regulations flesh out public entities' statutory obligations with more specificity, a public entity may violate the ADA even if no regulation expressly proscribes its particular conduct.[2014]

---

[2006] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (quotation marks omitted) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)); *see also* 42 U.S.C. § 12101(b)(1), (2) (stating that the ADA is meant to provide a "clear and comprehensive national mandate" for eliminating disability discrimination as well as "clear, strong, consistent, enforceable standards" addressing such discrimination).

[2007] 42 U.S.C. § 12132.

[2008] 42 U.S.C. § 12131(1)(B).

[2009] *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that "[s]tate prisons fall squarely within the statutory definition of 'public entity'").

[2010] *See* 42 U.S.C. § 12134(a).

[2011] 28 C.F.R. § 35.102(a).

[2012] *Frame*, 657 F.3d at 224 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 285 (2001)); *see also Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 935 (N.D. Cal. 2015) ("Violations of Title II are largely defined by its implementing regulations, which flesh out public entities' statutory obligations with more specificity, and are controlling authority unless they are arbitrary, capricious, or manifestly contrary to the statute.") (quotation marks omitted) (quoting *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014)).

[2013] *Frame*, 657 F.3d at 224 (quotation marks omitted) (quoting *Sandoval*, 532 U.S. at 284).

[2014] *Cohen*, 754 F.3d at 695 (citing *Barden v. City of Sacramento*, 292 F.3d 1073, 1076-78 (2002)).

"Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding."[2015] For all relevant purposes, Title II of the ADA and Section 504 of the RA are identical.[2016] Because the DOC receives federal financial assistance,[2017] it also must comply with the RA.

In order to make out a claim against a public entity under Title II, the plaintiff must show: (1) that he or she has a qualifying disability; (2) that he or she is being denied the benefit of services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity, and (3) that the discrimination is by reason of his or her disability.[2018] Because Plaintiffs in this case are not seeking damages, they need not show that the discrimination was intentional.[2019]

## A. The Subclass consists of individuals with qualifying disabilities.

The ADA and RA protect individuals with "qualifying disabilit[ies]."[2020] A person has a qualifying disability if he or she has a physical or mental impairment that substantially limits one or more major life activities.[2021] "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[2022] A major life activity also "includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."[2023]

---

[2015] *Frame*, 657 F.3d at 223.

[2016] *See id.* ("The ADA and the Rehabilitation Act generally are interpreted *in pari materia*."); *see also* JPTO at 8 n.8 ("The parties agree that all disputed elements of Plaintiffs' ADA/ADAAA and RA claims are materially identical and that either both claims will succeed, or both will fail.").

[2017] UF ¶ 21 (agreeing that "Louisiana State Penitentiary and DOC receive some federal funding"); Rec. Doc. 220-1 (Defs.' Response to Pls.' Statement of Undisputed Facts for Mot. for Partial Summ. J. on Pls.' ADA Claim) at 4 ¶ 16 (admitting that "[t]he DOC is a recipient of federal funds").

[2018] *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (citing *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)).

[2019] *Cf. Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 575 (5th Cir. 2002) (explaining that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA," but "in order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination") (citing *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984)).

[2020] *Hale*, 642 F.3d at 499.

[2021] 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 35.108.

[2022] 42 U.S.C. § 12102(2)(A).

[2023] *Id.* § 12102(2)(B).

The record clearly reflects—and indeed, Defendant does not dispute[2024]—that the Subclass consists of individuals with qualifying disabilities.[2025] Angola's current and former ADA Coordinators described a patient population living with an array of conditions including blindness, hearing impairments, paraplegia, and dementia, as well as numerous other conditions limiting patient mobility and, in many cases, requiring the use of a wheelchair.[2026] Indeed, the stated purpose of Angola's inmate health care orderly program is to address the needs of the numerous patients who require assistance with activities of daily living such as eating, bathing, and toileting.[2027] Two former orderlies, Aaron Brent and Danny Prince, confirmed that their responsibilities included caring for dozens of patients using wheelchairs and walkers, as well as stroke and cancer patients, patients with tracheostomy tubes and colostomy bags, patients who suffer from seizures, and patients with mental illnesses and cognitive impairments.[2028] This evidence, coupled with the credible testimony of several current and former patients regarding their own disabilities,[2029] clearly demonstrates that Angola has a sizable population of patients living with qualifying disabilities.

## B. Angola Denies Programmatic Access to and Discriminates Against Individuals with Disabilities

The ADA does not define the "services, programs, or activities of a public entity." The Rehabilitation Act, however, defines a "program or activity" as "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State."[2030] The Fifth Circuit interprets Title II and the Rehabilitation Act *in pari materia* and has applied this broad definition under both statutory schemes.[2031]

---

[2024] *See* Rec. Doc. 220-1 (Defs.' Resp. to Pls.' Statement of Undisputed Facts for Mot. for Partial Summ. J. on Pls.' ADA Claim) at 2 (admitting "that there are inmates at LSP who suffer from disabilities"); Rec. Doc. 174 (Mem. in Opp'n to Pls.' Mot. for Class Certification) at 8 ("Defendants do not contest that Plaintiffs have satisfied the numerosity required in order for them to establish the . . . purported ADA Subclass *as that . . . subclass [has] been identified by Plaintiffs*") (emphasis in original); JPTO at 7 (not including the issue of whether Subclass members have qualifying disabilities among "Disputed Issues of Fact Related to Plaintiffs' ADA/RA Claim").

[2025] *See also* Rec. Doc. 394 (Ruling on Pls.' Mot. for Class Cert.) at 13, 30 (finding that the numerosity requirement was satisfied with respect to a Subclass of "all qualified individuals with a disability, as defined by the ADA/RA, who now, or will be in the future, incarcerated at LSP").

[2026] *See supra* ¶ 502.

[2027] *See, e.g.,* Oct. 24 Testimony of Tracy Falgout at 204:11-21; JX 6-eee (LSP Directive 13.088 – Offender Assistance Dorm) at 00270 (stating that orderlies will assist "impaired offenders with activities of daily living").

[2028] *See supra* ¶ 502.

[2029] *See id.*

[2030] 29 U.S.C. § 794(b)(1)(A).

[2031] *See Frame,* 657 F.3d at 225 (holding that sidewalks constituted a program, service, or activity offered by the city); *see also Cohen,* 754 F.3d at 695 ("We have explained that the broad language of

265

In *Pennsylvania Department of Corrections v. Yeskey*, the Supreme Court held that Title II applied to correctional facilities, recognizing that "[m]odern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."[2032] Since *Yeskey*, courts across the country have recognized that,

> [b]ecause of the unique nature of correctional facilities, in which jail staff control nearly all aspects of inmates' daily lives, most everything provided to inmates is a public service, program or activity, including sleeping, eating, showering, toileting, communicating with those outside the jail by mail and telephone, exercising, entertainment, safety and security, the jail's administrative, disciplinary, and classification proceedings, medical, mental health and dental services, the library, educational, vocational, substance abuse and anger management classes and discharge services.[2033]

Title II's implementing regulations similarly acknowledge that

> [D]etention and correctional facilities are unique facilities under title II. Inmates cannot leave the facilities and must have their needs met by the corrections system, including needs relating to a disability. If the detention and correctional facilities fail to accommodate prisoners with disabilities, these individuals have little recourse, particularly when the need is great (e.g., an accessible toilet; adequate catheters; or a shower chair). It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices such as a bed transfer

---

Title II brings within its scope 'anything a public entity does.'" (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)).

[2032] 524 U.S. 206, 210 (1998).

[2033] *Hernandez*, 110 F. Supp. 3d at 935-36; *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) (noting that jails provide inmates "with various positive opportunities, from educational and treatment programs, to opportunities to contest their incarceration, to the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication"); *Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009) (collecting cases holding that in the prison setting, "services, programs, and activities" include facilities such as showers, toilets, and sinks); *Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 672 (7th Cir. 2012) (same); *Arce v. La. State*, 226 F. Supp. 3d 643, 650 n.7 (E.D. La. 2016) (holding that "[t]he use of prison telephones is a service or activity protected by the ADA.") (citing *Spurlock v. Simmons*, 88 F. Supp. 2d 1189, 1195 (D. Kan. 2000)).

or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities.[2034]

In this case, Plaintiffs have identified a broad array of services, programs, and activities to which they have been denied meaningful access. Specifically, Plaintiffs' architectural accessibility expert, Mark Mazz, evaluated Plaintiffs' access to housing at various security levels, including the associated toilets, showers, bathtubs and sinks; water fountains; mail services; meal services; medication administration; medical services; telephones; JPay stations; recreation areas; transportation services; the law library; and the visiting area.[2035] Plaintiffs also showed that members of the Subclass have been denied access to hobby shop, work release, and various types of educational, therapeutic, religious, and recreational programming.[2036] Within the prison setting, these are precisely the types of services, programs, and activities contemplated by the statute. For the reasons discussed below, individuals with disabilities are denied the benefits of these services, programs, and activities, and are subjected to discrimination.

(1)  Architectural Barriers to Angola's Programs, Services, and Activities

Title 28, Part 35 addresses the accessibility of government "facilities," which are defined to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."[2037] The Title II regulations provide that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[2038] Public entities such as correctional facilities must "take reasonable measures to remove architectural and other barriers" that deny access to the entity's services, programs, or activities.[2039] "[E]limination of architectural barriers was one of the central aims of the Act . . . ."[2040]

The Title II regulations also include specific requirements for correctional facilities. Specifically, jails and prisons must "ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[2041] As part of that commitment, facilities

---

[2034] 28 C.F.R Part 35, App. A.

[2035] *See supra* ¶ 509.

[2036] *See supra* ¶¶ 536-538.

[2037] 28 C.F.R. § 35.104; *see also id.* §§ 35.149-35.151.

[2038] *Id.* § 35.149.

[2039] *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (citing 42 U.S.C. § 12131(2)).

[2040] *Alexander v. Choate*, 469 U.S. 287, 297 (1985) (discussing the Rehabilitation Act, which preceded Title II).

[2041] 28 C.F.R. § 35.152(b)(1)

must "implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 Standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing."[2042]

Under its ADA rulemaking power, the DOJ has promulgated rules requiring public entities such as prisons to comply with certain architectural accessibility standards.[2043] More specifically, construction or alterations that began after July 26, 1992, but prior to September 15, 2010, must comply with either the 1991 ADA Standards for Accessible Design ("1991 Standards") or the Uniform Federal Accessibility Standards ("UFAS").[2044] If physical construction or alterations commenced on or after September 15, 2010 and before March 15, 2012, the new construction or alterations must comply with either the 2010 ADA Standards for Accessible Design ("2010 Standards"), UFAS, or the 1991 Standards.[2045] Finally, if physical construction or alterations commenced on or after March 15, 2012, the new construction or alterations must comply with the 2010 Standards.[2046]

If an existing facility has not been altered since these architectural standards first took effect, it nonetheless must operate each service, program, or activity so that, when viewed in its entirety, the service, program, or activity is readily accessible to and usable by individuals with disabilities.[2047] A public entity may fulfill this "programmatic access" mandate by constructing new facilities or altering its existing facilities to bring them into compliance with the accessibility requirements of Section 35.151, or through alternative methods such as "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, [or] delivery of services at alternate accessible sites."[2048]

There are a few caveats to this general principle of affording existing facilities greater flexibility in meeting their programmatic access obligations. First, in choosing among methods of compliance, the facility must give priority to methods that provide program access in the most integrated setting appropriate.[2049] Second, it is not enough for the entity to provide *some* access to individuals with disabilities; rather, it must provide "meaningful access" to the programs and services

---

[2042] *Id.* § 35.152(b)(3).

[2043] *See* 42 U.S.C. § 12134(a) (requiring Attorney General to promulgate regulations).

[2044] 28 C.F.R. § 35.151(c)(1). The 1991 Standards were based on the Americans with Disabilities Act Accessibility Guidelines (1991 ADAAG) published by the Architectural and Transportation Barriers Compliance Board on the same date. *See Nondiscrimination on the Basis of Disability in State and Local Government Services*, 75 Fed. Reg. 56,164, 56,165 (Sept. 15, 2010). Courts often refer to the 1991 Standards and the ADAAG interchangeably.

[2045] 28 C.F.R. § 35.151(c)(2).

[2046] *Id.* § 35.151(c)(3).

[2047] *Id.* § 35.150(a).

[2048] *Id.* § 35.150(b)(1).

[2049] *Id.*

that are offered.[2050] For example, in *Ford v. New Orleans Regional Transit Authority*, the Court held that the plaintiff had sufficiently pleaded that he was denied "meaningful access" to the defendant's bus system, where he was able to physically access the bus, but its drivers failed to properly use the safety harness for his wheelchair.[2051]

Third, as the regulation clearly states, the facility's programs and services must be "readily accessible." As the Tenth Circuit observed in *Chaffin*,

A violation of Title II "does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity. . . . If a [facility's] wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the [facility] is 'readily accessible.'"[2052]

As discussed above, Plaintiffs' architectural expert, Mark Mazz, did not have access to the construction or alteration dates of Angola's facilities. As a result, he assumed that all facilities would be subject to the more flexible programmatic access requirement that applies to existing constructions.[2053] Accordingly, his survey was limited to spaces that he independently concluded were being used to provide programmatic access to patients with disabilities.[2054] He then relied on the 1991 Standards to identify architectural barriers to specific programs, services, and activities offered in and around those spaces.[2055] His survey revealed nearly 200 violations of the standards, which impeded access to a range of programs, services, and activities including toilets, showers, medical care, communication devices, drinking fountains, and most programs outside the

---

[2050] *See, e.g.*, *Melton*, 391 F.3d at 672 ("Supreme Court precedent suggests that denial of "meaningful access" is equivalent to a full denial of access under the ADA.") (citing *Choate*, 469 U.S. at 301 (stating in the context of the Rehabilitation Act that a benefit cannot be offered in a way that "effectively denies" otherwise qualified handicapped individuals the "meaningful access" to which they are entitled)); *Wright v. N.Y. State Dep't of Corr. & Cnty. Supervision*, 831 F.3d 64, 73 (2d Cir. 2016) (recognizing that "meaningful access" requires the provision of accommodations that overcome structural impediments limiting access to a prison's services); *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003) (collecting cases holding that ADA requires more than mere physical access, and concluding that barriers to accessible dining, restrooms, and parking prevented "meaningful access" to state fairgrounds, even though wheelchair users were able to attend).

[2051] No. 17-10175, 2018 U.S. Dist. LEXIS 10429, at *9 (E.D. La. Jan. 23, 2018).

[2052] 348 F.3d at 861 (alterations in original) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001)). In *Chaffin*, the Court held that "the 'individual elements' that [were] not handicap accessible add[ed] up to a wholesale exclusion of disabled individuals from buildings, restrooms, dining areas, and seating areas across the entire fairgrounds." *Id. See also Saunders v. Horn*, 959 F. Supp. 689, 697 (E.D. Pa. 1996) (allegation that prison did not provide "readily accessible bathroom and shower facilities" stated a claim under Title II's program access requirement).

[2053] *See supra* ¶¶ 507-510.

[2054] *Id.*

[2055] *See supra* ¶ 509-510.

dormitories themselves.[2056] Defendant's accessibility expert corroborated each and every violation,[2057] and Defendant has not otherwise disputed the existence of these architectural barriers.

Defendant has criticized Mr. Mazz for relying on the 1991 Standards while evaluating the facilities under the more flexible "programmatic access" standard. But Defendant presented no evidence—in the form of expert testimony or otherwise—to refute Mr. Mazz's credible testimony that he followed the industry-standard methodology for evaluating programmatic access.[2058] And even Defendant acknowledges that courts routinely rely on the 1991 Standards for guidance in determining whether a facility's programs are accessible.[2059] For example, in *Falls v. Board of Commissioners of the New Orleans Regional Transit Authority*, the court concluded that evidence of widespread noncompliance with the architectural standards, coupled with the plaintiffs' anecdotal evidence of difficulties accessing the bus stops at issue, was sufficient to prove that plaintiffs had been denied programmatic access.[2060] And in *Pierce v. County of Orange*, the plaintiffs' architectural accessibility expert also relied on the federal accessibility standards, while limiting his survey to the areas in which patients with disabilities were housed.[2061] The plaintiffs also presented evidence that patients with disabilities were forced to rely on fellow inmates for assistance when faced with inaccessible bathroom facilities.[2062] The court held that relief for the plaintiffs was proper.[2063]

Here, as in *Falls* and *Pierce*, Plaintiffs' evidence of noncompliance with the architectural standards is supported by Defendant's own admissions of accessibility problems throughout Main Prison, as well as the testimony of numerous witnesses who recounted difficulties navigating the prison's facilities or who personally witnessed other patients encountering such problems.[2064]

---

[2056] *Id.*

[2057] *See supra* ¶ 512.

[2058] *See supra* ¶¶ 512-520.

[2059] Rec. Doc. 497 (Defs.' Proposed Findings of Facts (As of September 30, 2016)) at 40 (citing *Greer*, 472 F. App'x at 292 n.3); *see also, e.g., Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999) ("[E]ven though only new construction and alterations must comply with the Standards, those Standards nevertheless provide valuable guidance for determining whether an existing facility contains architectural barriers."); *Flynn v. Doyle*, 672 F. Supp. 2d 858, 879 (E.D. Wis. 2009) (holding that "evidence regarding the alleged failure to meet the UFAS/ADAAG standards could still be relevant in the context of a 'program accessibility' case" because "[a] program could be rendered inaccessible if it is held in an inaccessible facility"); *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 435 F. Supp. 2d 1217, 1226 (N.D. Ga. 2005) (concluding that in existing constructions, the existence of architectural barriers should be determined using the standards as a guide, although the defendant may have more flexibility in determining how to address the barrier); *Brown v. Cty. of Nassau*, 736 F. Supp. 2d 602, 616-18 (E.D.N.Y. 2010) (evidence of violations of the standards, in conjunction with other evidence, created issue of fact as to the accessibility of hockey arena's programs).

[2060] No. 16-2499, 2017 U.S. Dist. LEXIS 98071, at *10-12 (E.D. La. June 21, 2017).

[2061] 526 F.3d 1190, 1217-18 (9th Cir. 2008).

[2062] *Id.* at 1219.

[2063] *Id.* at 1220.

[2064] *See supra* ¶¶ 512-513.

Plaintiffs also presented ample evidence that Angola has failed to make its programs, services, and activities accessible to individuals with disabilities through alternative methods. Because Mr. Mazz limited his survey to areas specifically designated for individuals with disabilities—in other words, the prison's *most* accessible areas—his methodology foreclosed the possibility that the DOC reassigns services for patients with disabilities to other, more accessible buildings, or delivers those services at alternative accessible sites. As discussed above, Defendant presented no evidence that would suggest otherwise.[2065] Nor can the programs, services, and activities identified in his survey be brought to the disabled individual. For example, the outdoor recreation areas cannot be moved to where the sidewalks end, and the JPay stations, which are mounted to the wall,[2066] cannot be moved to accessible areas for use by individuals in wheelchairs. And Mr. Mazz credibly testified that he excluded from his findings those violations that easily could be resolved through alternative methods such as placing a patient's personal locker box on a raised surface (even though the prison had not, in fact, taken such measures).[2067]

Finally, the assignment of inmate health care orderlies to the ward and medical dormitories is insufficient to render Angola's programs "readily accessible." Plaintiffs presented extensive evidence showing that orderlies are understaffed and unable to attend to the needs of their patients in a timely fashion.[2068] As a result, patients are left in the unenviable position of attempting to navigate the prison's inaccessible sidewalks and facilities on their own.[2069] Even more concerning, Plaintiffs clearly demonstrated that forcing patients to rely on orderlies for assistance has left them vulnerable to neglect and abuse.[2070] Many wheelchair-bound patients recalled orderlies who refused to transport them to appointments or who demanded some form of payment in exchange for assistance, while another former patient described personally witnessing an orderly sexually abusing a patient.[2071] Even the prison's ADA Coordinator acknowledged the potential for abuse.[2072]

When asked by defense counsel, Mr. Mazz expressed his opinion that requiring patients to rely on other individuals to access basic services such as toilets and showers is infeasible and robs them of the independence that the ADA is intended to guarantee.[2073] Though counsel suggested that Mr. Mazz's views were merely the product of his personal ideology,[2074] his opinions were entirely consistent with the case law interpreting the ADA's requirements. For example, in *Wright v. New York State Department of Corrections & Community Supervision*, the court concluded that that a prison's "mobility assistance program" failed to provide the plaintiff with meaningful access to the prison's services, programs, and activities, because it required disabled individuals to "seek out and rely upon

---

[2065] *See supra* ¶¶ 533-535.
[2066] PX 7 at 0055 (depicting JPay station in photo titled DSC05698.PJG).
[2067] *See supra* ¶ 516.
[2068] *See supra* ¶¶ 521-523.
[2069] *See id.*
[2070] *See supra* ¶¶ 524-525.
[2071] *See id.*
[2072] *See supra* ¶ 526.
[2073] Oct. 12 Testimony of Mark Mazz at 56:16-57:10.
[2074] *Id.* at 59:8-15.

the cooperation of other inmates," exposed disabled inmates to a risk of neglect, and was "fundamentally in tension with the ADA and RA's emphasis on independent living and self-sufficiency," even in the prison setting.[2075] And in *Armstrong v. Brown*, the court observed that "[r]eliance on other prisoners for access to basic services, such as food, mail, showers and toilets by prisoners with disabilities leaves them vulnerable to exploitation and is a dangerous correctional practice."[2076]

Here, as in *Wright*, Defendant's orderly program exposes members of the Subclass to abuse and neglect, deprives them of their independence, and is not an adequate substitute for making the prison's facilities accessible. The nearly 200 undisputed architectural barriers identified by Mr. Mazz and described by various witnesses combine to deprive Subclass members of meaningful access to Angola's services, programs, and activities in ways that are not and cannot be corrected by provision of orderlies, either in theory or as used by Defendant. From bathrooms to recreational areas to medical facilities, Defendant has failed to make its programs readily and meaningfully accessible to patients living with disabilities.[2077]

Defendant argued that its agreement with the Department of Justice, which was not executed until well after the close of discovery, effectively moots Mr. Mazz's findings. As discussed above, the Court will consider evidence of any post-discovery remedial measures at the remedial phase. But the evidence shows, and Defendant does not dispute, that there is only partial overlap between Mr. Mazz's and the DOJ's findings.[2078] As such, even full remediation of the violations identified by the DOJ would not moot the majority of Mr. Mazz's findings. And Defendant presented no evidence that even a single violation identified by Mr. Mazz has been remediated.

In *Hernandez v. County of Monterey*, the court was faced with similar arguments from the defendants, who urged that the plaintiffs' disability access claims were moot in light of several changes to their access policies and practices. Specifically, the defendants had changed the location of certain programs, including exercise, that were offered to patients who could not climb stairs. They also had adopted a new policy for patients with hearing impairments. The court rejected defendants' argument, noting that

---

[2075] 831 F.3d at 73-75. The court further observed that "[u]nderstandably, a mobility-impaired inmate—who must rely in large part on his fellow prisoners for basic assistance—may hesitate to report instances of neglect." *Id.* at 74.

[2076] 857 F. Supp. 2d 919, 933 (N.D. Cal. 2012). *See also Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008) (noting that the RA's "emphasis on independent living and self-sufficiency ensures that, for the disabled the enjoyment of a public benefit is not contingent upon the cooperation of third persons") (collecting cases); *Pierce*, 526 F.3d at 1220 (holding that staffing limits made it "unreasonable to expect to address all structural deficiencies through deputy assistance"); *Flynn*, 672 F. Supp. 2d at 878-79 (E.D. Wis. 2009) (plaintiff could state ADA claim even if she availed herself of the assistance of wheelchair pushers to traverse treacherous paths on prison grounds).

[2077] 28 C.F.R. § 35.150(a).

[2078] *See supra* ¶ 531.

Defendants have not produced any evidence that these changes have resulted in the accommodation of some or all inmates with disabilities; that any funding has been provided for these changes; that staff have been trained on the changes; that Defendants are monitoring staffs compliance with the changes or that the changes are permanent. A more fundamental problem is that the new policies are incomplete. They only address access for women inmates but not similarly disabled male inmates—for whom education, rehabilitation and religious programs are still offered up the same, inaccessible flight of stairs.[2079]

Here, unlike in *Hernandez,* there is no evidence that *any* of Mr. Mazz's findings have been addressed. Instead, there is only defense counsel's claim, unsupported by admissible evidence, that certain of the *DOJ's* findings in a draft settlement agreement are being addressed. At best, this process would eventually remediate only a small number of the violations Mr. Mazz identified and could not, as a factual matter, render his uncontroverted findings moot.

Finally, although irrelevant to the Court's opinion regarding programmatic access, the evidence regarding the construction or alteration dates of Angola's facilities shows that many of the violations identified by Mr. Mazz pertained to portions of the facilities that were altered after September 2012. As a result, the altered portions were required to strictly comply with the 2010 Standards.

The Title II regulations provide that

[e]ach facility or part of a facility altered by . . . a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992."[2080]

The regulations further state that "alterations subject to this section" must comply with the applicable architectural standards.[2081] The standards themselves also define alterations to include any changes that affect or could affect usability, and provide illustrative examples. Specifically, the 1991 Standards state that alterations "include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement of the structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height

---

[2079] 110 F. Supp. 3d at 955-56.

[2080] 28 C.F.R. § 35.151(b)(1). *See also Frame*, 657 F.3d at 232 ("With respect to altered sidewalks, the 'altered portion' must be made 'readily accessible' 'to the maximum extent feasible' if it 'could affect the usability of the facility.').

[2081] 28 C.F.R. § 35.151(c)(1).

partitions."[2082] They exclude things such as normal maintenance and wallpapering that do not affect the usability of the facility.[2083]

Courts have adopted a broad interpretation of "usability" that includes any change affecting the usability of the facility in any way, including, but not limited to, changes that relate to access to individuals with disabilities.[2084] For example, in *Kinney v. Yerusalim*, the Third Circuit held that the resurfacing of a street affected its usability and qualified as an alteration under Title II, triggering the city's obligation to install curb ramps onto the street.[2085] And in *Tatum v. Doctor's Associates*, the court held that the repainting of two parking spaces to convert them from conventional to handicap-accessible spaces qualified as an alteration under Title III of the ADA, which applies to places of public accommodation.[2086]

As discussed above, Defendant's records reflect that several alterations were made to the Ash 2 and Cypress 2 dormitories between September 2012 and December 2015, including (1) installation of Tru-Bro Lavatory Guards to supply lines and drainage pipes beneath the sinks, (2) lengthening of the ramp entrance to the Ash 2 restroom and shower area; and (3) installation of wall-mounted stools at every JPay station.[2087] Each of these alterations clearly affects the usability of the facilities for patients with disabilities, triggering Defendant's obligation to bring the sinks, bathroom ramps, and JPay stations into compliance with the 2010 Standards. However, Mr. Mazz noted that these portions of the facilities were not compliant with the 1991 or 2010 Standards.[2088]

---

[2082] 28 C.F.R. Pt. 36, App. D. The Standards are codified in Part 36, which applies to places of public accommodation governed by Title III of the ADA, but apply equally to public entities, which are addressed in Part 35 and governed by Title II. *See Information and Technical Assistance on the Americans with Disabilities Act*, ADA.gov, https://www.ada.gov/2010ADAstandards_index.htm (last visited April 15, 2019) ("The 1991 ADA Standards for Accessible Design, printed as Appendix A of the title III regulation in the Code of Federal Regulations, July 1, 1994 could be used for new construction and alterations under Titles II and III until March 14, 2012.").

[2083] 28 C.F.R. Pt. 36, App. D.

[2084] *See, e.g.*, *Kinney v. Yerusalim*, 812 F. Supp. 547, 550-51 (E.D. Pa. 1993); *Tatum v. Doctor's Assocs.*, No. 14-2980, 2016 U.S. Dist. LEXIS 27764, at *11 (E.D. La. Mar. 4, 2016) (interpreting comparable language under Title III, which applies to places of public accommodation). *See also* 28 C.F.R. Pt. 36, App. B (stating that under an almost identical provision in Title III, "'usability' is to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities.").

[2085] *Kinney v. Yerusalim*, 9 F.3d 1067, 1072–74 (3d Cir. 1993).

[2086] 2016 U.S. Dist. LEXIS 27764, at *12. Like Title II, Title III also defines alterations to include changes that affect or could affect the usability of the facility or any part thereof. *See* 28 C.F.R. § 36.402(b).

[2087] *See supra* ¶ 519.

[2088] *See* PX 7 at 0020, line 31 (Ash 2 JPay Station); *id.* at 0021, lines 34-35 (Ash 2 lavatory pipes and bathroom ramp); *id.* at 0022, line 53 (Cypress 2 JPay Station); *id.* at 0023, line 58 (Cypress 2 lavatories). *See also* Rec. Doc. 220-1 (Defs.' Response to Pls.' Statement of Undisputed Facts for

Angola also denies patients with disabilities access to its services, programs, and activities through the enforcement of exclusionary and discriminatory policies. In addition to the statutory prohibition against such conduct,[2089] Title II's implementing regulations state that "[a] public entity, in providing any aid, benefit, or service, may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service."[2090]

Courts construing Title II have uniformly recognized that a prison may not deny patients with disabilities the opportunity to participate in its educational, therapeutic, vocational, religious, and recreational programs on the basis of their disabilities. For example, in *Hale v. King*, the Fifth Circuit held that the plaintiff had sufficiently alleged a denial of access to the prison's services, programs, and activities, where he alleged that the defendants "prevented him from using community work centers, accessing satellite and regional prison facilities, working in the prison kitchen, and attending school."[2091] Numerous courts have held that a prison violates Title II when it denies prisoners access to job assignments, including work release programs, on the basis of disability.[2092] And in *Armstrong v. Brown*, the court held that the defendants violated the ADA by adopting criteria that excluded individuals with disabilities from participation in their In-Custody Drug Treatment Program.[2093]

Plaintiffs in this case presented ample, uncontroverted evidence that patients with disabilities are, as a matter of policy, denied access to the prison's hobby shop, where other inmates are permitted to make and ultimately sell their crafts;[2094] to job assignments and the prison's work release program, which allow inmates to earn money and help to prepare them for reintegration back into society;[2095] and to educational, therapeutic, religious, and recreational programming, including the

---

Mot. for Partial Summ. J. on Pls.' ADA Claim) at ¶¶ 35, 37, 38, 48 (admitting that Ash 2 ramp, lavatory, and JPay station, as well as Cypress 2 JPay station, were not compliant with the standards). As discussed *supra* n.1535, other areas surveyed by Mr. Mazz appear to have been altered as well.

[2089] *See* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

[2090] 28 C.F.R. § 35.130(b)(1).

[2091] *Hale*, 642 F.3d at 499.

[2092] *See, e.g.*, *Holmes v. Godinez*, 311 F.R.D. 177, 227 (N.D. Ill. 2015) (collecting cases); *Jaros*, 684 F.3d at 673 (permitting plaintiff to proceed with his Rehabilitation Act claim that IDOC prevented him from participating in work release program because he used a cane); *Neisler v. Tuckwell*, No. 13-CV-821, 2015 U.S. Dist. LEXIS 26996, at *11-14 (E.D. Wis. Mar. 5, 2015) (allowing prisoner to pursue an employment-related claim under Title II of the ADA); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (affirming verdict under the ADA in favor of prisoner who was denied access to the prison's work programs).

[2093] *Armstrong v. Brown*, 857 F. Supp. 2d 919, 933 (N.D. Cal. 2012).

[2094] *See supra* ¶ 536.

[2095] *See supra* ¶ 537.

anger management, victim awareness, and substance abuse classes that many inmates are required to take as a condition of their release.[2096] The record clearly establishes that Defendant's policies deny members of the Subclass access to many of the prison's services, programs, and activities in violation of Title II.

### (3)   Discriminatory Methods of Administration

"A public entity may not . . . utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; . . ."[2097] The so-called "methods of administration" regulation permits plaintiffs to "challenge a policy or practice—whether it is one described in another regulation or simply one articulated by the plaintiffs themselves—if it causes the public entity to discriminate against them, including by failing to accommodate them."[2098]

Some of the practices identified by Plaintiffs are, in fact, the subject of specific implementing regulations. For example, 28 C.F.R. § 35.107(a) requires a public entity that employees 50 or more people to "designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities" under the Title II regulations, "including any investigation of any complaint communicated to it alleging its noncompliance" with the regulations. The entity must "make available to all interested individuals the name, office address, and telephone number of the [designated] employee or employees."[2099] It also must "make available to . . . interested persons information regarding the provisions of" the Title II regulations, their "applicability to the services, programs, or activities of the public entity," and their protections against discrimination.[2100] And public entities must "ensure that interested persons, including persons with impaired vision or hearing, can obtain information as to the existence and location of accessible services, activities, and facilities."[2101] The entity must ensure that the communication of all this information to patients with disabilities is as effective as its communications with others.[2102]

Additionally, public entities employing 50 or more people must "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part."[2103] Finally, "[a] public entity may not place a surcharge on a particular individual with a disability . . . to cover the costs of measures, such as the provision

---

[2096] *See supra* ¶ 538.
[2097] 28 C.F.R. § 35.130(b)(3).
[2098] *Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016).
[2099] 28 C.F.R. § 35.107(a).
[2100] *Id.* § 35.106.
[2101] *Id.* § 35.163.
[2102] *Id.* § 35.160(a)(1).
[2103] *Id.* § 35.107(b).

of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part."[2104]

The "methods of administration" regulation "applies to written policies as well as actual practices, and is intended to prohibit both blatantly exclusionary policies or practices as well as policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate."[2105] An omission or failure to act can give rise to an actionable methods of administration claim.[2106]

In *Dunn*, the court held that the methods of administration regulation "neatly encapsulated" the plaintiffs' allegations that the Alabama Department of Corrections

> (1) employ[ed] no system or an inadequate system for identifying and tracking prisoners with disabilities, (2) employ[ed] no system or an inadequate system for prisoners to request accommodations and submit grievances regarding non-accommodation, (3) fail[ed] to appoint or train ADA coordinators or other administrators responsible for oversight of compliance with the ADA, (4) fail[ed] to train staff regarding the requirements of the ADA, (5) fail[ed] to promulgate policies and procedures regarding the treatment of prisoners with disabilities, and (6) fail[ed] to draft a plan for identifying and addressing areas of non-compliance with the requirements of the ADA.[2107]

Here, Plaintiffs presented overwhelming evidence of nearly identical practices, many of which were found to violate the ADA in a series of opinions arising out of similar litigation in California.[2108] Specifically, Plaintiffs here demonstrated that Defendant (1) fails to maintain a

---

[2104] *Id.* § 35.130(f).

[2105] *Dunn*, 318 F.R.D. at 664 (quoting *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 995 (N.D. Cal. 2010)).

[2106] *Id.* at 665 (citing *Conn. Office of Protection & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (holding that plaintiffs stated a methods of administration claim by alleging that defendants "failed to adequately assess and identify the long-term care needs of Plaintiffs and the Class they represent and to determine whether those needs could be appropriately met in integrated, community-based settings"); *Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F. Supp. 2d 460, 471 (E.D. Pa. 1998) (concluding that defendant had "utilized methods of administration . . . which have resulted in discrimination against class members . . . . through its failure to initiate plans sufficiently in advance to ensure the necessary placements in the community within a reasonable time after it was determined that a member of [the class] had become appropriate for community placement")).

[2107] *Id.*

[2108] In *Armstrong v. Davis*, a class of disabled prisoners and parolees sued the Department of Corrections and Rehabilitation and the Board of Parole Hearings, alleging that the defendants failed to accommodate their disabilities in parole and parole revocation hearings, as well as in various aspects of prison life. A series of decisions by the district court and Ninth Circuit ordered injunctive

qualified and adequately trained ADA Coordinator;[2109] (2) fails to maintain an ADA advisory committee as required by its own policies;[2110] (3) inadequately trains its staff regarding the ADA;[2111] (4) fails to inform patients of their rights and the procedures for requesting accommodations;[2112] (5) fails to appropriately process accommodation requests and disability-related grievances;[2113] (6) fails to

---

relief after establishing that the defendants' policies and procedures with regard to disabled prisoners and parolees were inadequate and violated the ADA and RA. Among other things, the defendants were ordered to create and implement an adequate disability grievance system, as well as a computerized system for tracking prisoners' and parolees' disabilities and accommodations; to provide accessible housing and necessary assistive devices and auxiliary aids; and to train staff regarding the ADA, effective communications with patients with disabilities, and the provision of accommodations. *See Armstrong v. Brown*, 857 F. Supp. 2d 919 (N.D. Cal. 2012), for a summary of the litigation.

[2109] *See supra* ¶¶ 540-546; *cf., e.g., Armstrong v. Davis*, 275 F.3d 849, 858 (9th Cir. 2001) (affirming injunction requiring defendant to hire a "full-time ADA coordinator"); *Armstrong v. Schwarzenegger*, No. 94-2307, Rec. Doc. 1045 at 5 (N.D. Cal. Jan. 18, 2007) (noting that full-time ADA Coordinator at each facility should work only on ADA compliance matters, with a supervising correctional counselor as an assistant).

[2110] *See supra* ¶ 547.

[2111] *See supra* ¶¶ 548-551; *cf., e.g., Armstrong v. Davis*, No. 94-2307, Rec. Doc. 523 at 74-76 (N.D. Cal. 1999) (finding violation where some staff received a one-hour training that many employees could not recall, while others received "virtually no general training pertaining to the identification and accommodation of disabled prisoners and parolees," because "[w]ithout training, even when staff have sufficient information before them to identify and accommodate disabilities, they do not do so because they lack the necessary skills"); *Armstrong v. Davis*, 275 F.3d at 859 (affirming in relevant part the district court's order requiring all personnel with relevant roles to undergo training "in the general requirements of the ADA, disability awareness, the appropriate method of determining whether a prisoner adequately understands written and verbal communications, and other relevant policies and procedures").

[2112] *See supra* ¶¶ 552-560; *cf., e.g., Armstrong v. Davis*, 275 F.3d at 858 (affirming district court's conclusion that notice was "insufficient to apprise prisoners and parolees of the ADA's 'applicability to the services, programs, or activities' of the BPT or to 'apprise such persons of the protections against discrimination assured them by' the ADA"); *id.* at 859 (affirming order requiring defendant to provide alternative formats for all forms used by prisoners and parolees); *id.* at 862 (noting that defendant did not "train its officials or employees to communicate with disabled individuals" regarding the accommodation forms "and does not evaluate their ability to do so").

[2113] *See supra* ¶¶ 561-568; *cf., e.g., Armstrong v. Brown*, 857 F. Supp. 2d at 933 (holding that class members' ADA rights were violated where they lacked access to "functional and timely grievance procedures at county jails to request and obtain disability accommodations"); *Armstrong v. Davis*, 275 F.3d at 863 (holding that accommodations procedures violated ADA where practice was "to rely primarily on Department employees untrained in issues of disability to determine whether an individual is disabled or not, what accommodations are appropriate if he is, and whether those accommodations will be provided").

identify and track patients' disabilities and accommodation requests;[2114] and (7) charges patients to evaluate their accommodation requests.[2115]

Additionally, Plaintiffs clearly demonstrated that these policies and practices have resulted in discrimination against patients with disabilities. In addition to Defendant's widespread failures to provide reasonable modifications and accommodations, which are discussed in more detail below, the record includes numerous examples of patients whose legitimate accommodation requests were ignored, untimely processed,[2116] or arbitrarily denied, often because untrained staff failed to recognize patients' disabilities or understand when their requests implicated the ADA.[2117]

In conclusion, Defendant's methods of administration have the effect of discriminating against members of the Subclass by denying them a transparent, functional system for requesting and obtaining appropriate accommodations. As discussed below, this results in widespread failures to provide appropriate modifications and accommodations, which in and of themselves constitute discrimination.

---

[2114] *See supra* ¶¶ 569-573; *cf., e.g., Armstrong v. Davis*, 275 F.3d at 876 ("Because the regulations implementing the ADA require a public entity to accommodate individuals it has identified as disabled, some form of tracking system is necessary in order to enable the Board to comply with the Act."); *Armstrong v. Schwarzenegger*, No. 94-02307, 2006 U.S. Dist. LEXIS 101119, at *14 (N.D. Cal. May 30, 2006) (finding ongoing ADA/RA violation where system for tracking prisoner disabilities was "unreliable, non-comprehensive, and insufficient," and resulted in failures to provide accommodations to prisoners and parolees with disabilities); *Armstrong v. Schwarzenneger*, No. 94-2307, Rec. Doc. 1045 at 6 (N.D. Cal. Jan. 18, 2007) (requiring defendants to "develop, implement, and begin to use a state-wide, computerized, networked real-time tracking system to track prisoners with disabilities," which should "include prisoners' disability designations and the disability accommodations they require, including but not limited to lower bunks, ground floor housing, assistive devices, and effective communication needs such as sign language interpreters, large print, and scribes"); *Hernandez*, 110 F. Supp. 3d at 960 (requiring defendants to propose a remedial plan that would include a "system for identifying and tracking all inmates who are qualified individuals with disabilities," as well as "a system for identifying and tracking the reasonable accommodations necessary for qualified inmates with disabilities to participate in programs, services and activities offered by Defendants at the jail").

[2115] *See supra* ¶ 574.

[2116] *Cf. Armstrong v. Schwarzenegger*, No. 94-cv-02307, Rec. Doc. 1045 at 4 (N.D. Cal. Jan. 18, 2007) (finding ongoing ADA violation where facilities were "chronically late" in responding to disability grievances).

[2117] *See supra* ¶¶ 566, 568, 570.

(4)  Failure to Provide Reasonable Accommodations or Modifications

Title II requires public entities to make reasonable accommodations or modifications for disabled persons, including prisoners.[2118] The implementing regulations further state that public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."[2119] In the prison setting, reasonable accommodations or modifications include, but are not limited to, the provision of mobility aids and assistive and medical devices such as walking canes,[2120] wheelchairs,[2121] bed transfers,[2122] tapping canes,[2123] catheters,[2124] and shower chairs;[2125] the provision of auxiliary aids such as sign language interpreting services and TDD/TTY phones,[2126] access to a lower bunk bed,[2127] and the provision of accessible transportation.[2128]

---

[2118] *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (per curiam) (citing *Lane*, 541 U.S. at 531; *Yeskey*, 524 U.S. at 213).

[2119] 28 CFR 35.130(b)(7)(i).

[2120] *See, e.g., Armstrong v. Brown*, 857 F. Supp. 2d at 932.

[2121] *See, e.g., id.* at 931-32; *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 746-47 (M.D. La. 2016) (holding that plaintiff's allegation that his request for a wheelchair was ignored, thereby impeding his access to prison programs, lent plausibility to his ADA claim "without an iota more of evidence"). Ordinarily, a public entity is not required "to provide to individuals with disabilities personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting, or dressing." 28 C.F.R. § 35.135. This regulation, however, "does not apply 'in special circumstances, such as where the individual is an inmate of a custodial or correctional institution.'" *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 651 (S.D.N.Y. 2013) (quoting 28 C.F.R. Part 35, App. B (2005)). *See also Purcell v. Pa. Dep't of Corrs.*, No. 95-6720, 1998 U.S. Dist. LEXIS 105, at *25-26 (E.D. Pa. Jan. 9, 1998) (holding that in the prison setting, where a plaintiff has no other means of obtaining personal devices, the prison must provide such devices in order to comply with its obligation to provide reasonable accommodations).

[2122] 28 C.F.R Part 35, App. A.

[2123] *Armstrong v. Brown*, 857 F. Supp. 2d at 932-33.

[2124] 28 C.F.R Part 35, App. A.

[2125] *See, e.g., id.; Armstrong v. Brown*, 857 F. Supp. 2d at 932; *Schmidt v. Odell*, 64 F. Supp. 2d 1014, 1032-33 (D. Kan. 1999).

[2126] *See, e.g., Armstrong v. Brown*, 857 F. Supp. 2d at 933. *See also* 28 C.F.R. § 35.160(b)(1) ("A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."); *id.* § 35.104 (defining "auxiliary aids" as including TTY phones and interpreting services).

[2127] *See, e.g., Armstrong v. Brown*, 857 F. Supp. 2d at 932.

[2128] *See, e.g., Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) ("Gorman's allegations that the defendants denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework of both Title II of the ADA and § 504 of the Rehabilitation Act.");

Here, as in the *Armstrong* litigation, Defendant's failure to implement appropriate policies and procedures to identify, track, and accommodate the needs of patients with disabilities has resulted in systemic, persistent discrimination against members of the Subclass. Plaintiffs provided numerous examples of Defendant's failure or refusal to (1) provide assistive devices and auxiliary aids ranging from wheelchairs and wheelchair gloves to tapping canes and informational materials in Braille;[2129] (2) accommodate disabilities in work assignments;[2130] (3) accommodate patients' dietary needs relating to their disabilities;[2131] (4) accommodate disabilities when transporting patients;[2132] (5) accommodate disabilities in prison procedures ranging from medication administration to evacuation plans to the filing of ARPs;[2133] and (6) accommodate patients' disabilities when imposing discipline.[2134]

### (5) Failure to Integrate Individuals with Disabilities

Title II's implementing regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities"[2135] In the correctional setting, facilities must "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals."[2136] Specifically, prisons must not "place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment."[2137] The goal is to "enable[] individuals with disabilities to interact with nondisabled persons to the fullest extent possible."[2138]

Plaintiffs take no position as to whether any specific patient should be housed on the ward or in the medical dorms. Nor do they challenge the prison's general policy of housing most patients with disabilities in those spaces. However, Plaintiffs take issue with the prison's policy of excluding patients on the ward—particularly Ward II, which operates not as an infirmary but as a long-term nursing care unit—from participation in programming available to the general population.[2139] This policy not only deprives those patients of programmatic access, but also prevents them from being able to learn, worship, work, and interact with members of the prison's general, nondisabled population.

---

*Armstrong v. Davis*, No. 94-02307, Rec. Doc. 523 at 34 (N.D. Cal. Dec. 22, 1999) (finding ADA violations where a patient was forced to "crawl" into a van to be transported to his hearing because the van was not equipped with a wheelchair lift).

[2129] *See supra* ¶¶ 575-577.

[2130] *See supra* ¶¶ 578-580.

[2131] *See supra* ¶ 581.

[2132] *See supra* ¶ 582.

[2133] *See supra* ¶¶ 583-584.

[2134] *See supra* ¶ 585.

[2135] 28 CFR § 35.130(d).

[2136] *Id.* § 35.152(b)(2).

[2137] *Id.* § 35.152(b)(2)(ii).

[2138] 28 C.F.R Part 35, App. B.

[2139] *See supra* ¶ 538.

Plaintiffs also challenge Defendant's decision to warehouse patients with disabilities in the medical dorms without providing any actual medical services in those areas and without making those dormitories accessible. They presented evidence that neither doctors nor nurses visit the medical dorms, and patients have to visit the ATU for routine care such as dressing changes.[2140] The placement of patients with disabilities in designated medical dormitories without providing medical care on site violates § 35.152(b)(2). Similarly, Angola's practice of placing healthy patients with disabilities in isolation cells on the medical ward due to the lack of accessible cells elsewhere in the prison[2141] also violates § 35.152(b)(2).

## C. The Discrimination Against Plaintiffs is By Reason of Their Disabilities

In order to establish entitlement to relief under Title II, Plaintiffs must show that the discrimination they have experienced is "by reason of" their disabilities.[2142] This is not a difficult standard to meet. In *Hale*, the plaintiff alleged "that the Appellees prevented him from using community work centers, accessing satellite and regional prison facilities, working in the prison kitchen, and attending school because he has Hepatitis C, chronic back problems, and psychiatric conditions (including post-traumatic stress disorder)."[2143] The Fifth Circuit held that these allegations, if true, were sufficient establish that the discrimination against Hale was "by reason of" the conditions from which he claimed to suffer.[2144] Similarly, in *Falls*, the court concluded that the discrimination against the plaintiffs—namely, "the denial of safe use of or accessible bus stops—was caused solely by the fact that the Plaintiffs [were] disabled," where "[t]he problems they encountered using the stops held their origin in the fact that they were confined to wheelchairs while attempting to use the bus stops."[2145]

Here, the evidence establishes that the discrimination the Subclass experiences occurs by reason of their disabilities. For example, with respect to the inaccessibility of Angola's facilities, the credible testimony and documentary evidence demonstrates that Subclass members have difficulty accessing showers and bathrooms and navigating the sidewalks because of substantial mobility impairments requiring the use of wheelchairs and other assistive devices.[2146] The evidence clearly

---

[2140] *See supra* ¶ 586.

[2141] *See supra* ¶ 587.

[2142] *Hale*, 642 F.3d at 499. Although the RA requires that the exclusion or discrimination occur "solely by reason of [the plaintiff's] disability," 29 U.S.C. § 794, while Title II looks to whether the plaintiff's disability was a "motivating factor," *Pinkerton v. Spellings*, 529 F.3d 513, 518 (5th Cir. 2008), the Fifth Circuit has described the prima facie case under both statutes as "operationally identical," *Melton*, 391 F.3d at 676 n.8, and Defendant does not argue that the claims should be treated differently in this case. *See supra* n.2016; *see also Falls*, 2017 U.S. Dist. LEXIS 98071, at *13 (addressing causation under both statutes simultaneously).

[2143] 642 F.3d at 499.

[2144] *Id.*

[2145] *Falls*, 2017 U.S. Dist. LEXIS 98071, at *13. *Accord Ford*, 2018 U.S. Dist. LEXIS 10429, at *11-12.

[2146] *See supra* ¶¶ 510, 513, 522.

showed that Defendant enforces blanket policies excluding patients with disabilities from programs and activities such as hobby craft and work release based on the fact that they are disabled.[2147] As for Angola's failure to integrate patients with disabilities, the evidence shows that Subclass members are warehoused in the medical dorms without receiving medical services, or on the ward without access to classes and other programming, precisely because it is Angola's policy to house patients with disabilities in those spaces.[2148] Were it not for their disabilities, Plaintiffs would be housed elsewhere. The evidence also clearly shows that Defendant's methods of administration relating to the identification, tracking, and accommodation of disabilities have resulted in discrimination against numerous patients who would not have been affected by Defendant's policies and practices but for their disabilities and legitimate need for accommodations.[2149]

## III.   PERMANENT INJUNCTION FACTORS

"To obtain permanent injunctive relief, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[2150] The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion.[2151]

Consistent with the Court's prior order[2152] and the agreement of the parties,[2153] no final injunction shall issue until the parties proceed to the remedial phase of this matter. However, the evidence presented by the parties during the liability phase proves that Plaintiffs will be entitled to an injunction, with the only question remaining being the terms of that relief.

First, as explained above, Defendants have violated Plaintiffs' constitutional and statutory rights. "When an alleged deprivation of a constitutional right is involved, … most courts hold that no further showing of irreparable injury is necessary."[2154] The evidence conclusively demonstrates that Plaintiffs have suffered—and, more importantly, face an ongoing risk of suffering—irreparable injury. Specifically, all Class members face a risk of being irreparably deprived of their rights under

---

[2147] *See supra* ¶¶ 536-538.

[2148] *See supra* ¶¶ 586-587.

[2149] *See supra* ¶¶ 539-585.

[2150] *ITT Educ. Servs. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) (quotation marks omitted) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

[2151] *eBay Inc.*, 547 U.S. at 391 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)).

[2152] *See* Rec. Doc. 419 (Order on Pls.' Mot. to Exclude Evidence of Post-Discovery Conditions) at 3 (bifurcating trial into liability and remedy phases).

[2153] JPTO at 15 ("The parties agree that all liability issues should be tried in a single trial. The parties agree that injunctive relief, if any, should be determined in post-trial proceedings.")

[2154] 11A Wright & Miller, Fed. Prac. & Proc., § 2948.1 (3d ed. 1998); *accord, e.g., Cole v. Collier*, No. 14-cv-1698, 2017 U.S. Dist. LEXIS 112095, at *140-41 (S.D. Tex. July 19, 2017) (Eighth Amendment violation is irreparable injury).

the Eighth Amendment; and all Subclass members face a risk of being irreparably deprived of their rights under the ADA and RA.

Second, remedies available at law, such as monetary damages, are inadequate to compensate for these injuries. Class members' past injuries have included preventable death, unremitting pain, and the progression of treatable medical conditions, and their ongoing injuries include a substantial risk of those harms. Subclass members' injuries include, among other things, the inability to access crucial programs and services ranging from medical care to religious worship to safe bathrooms. Monetary damages cannot adequately compensate these irreparable injuries and would not ensure that similar violations would not be committed in the future.[2155]

Third, the balance of hardships weighs decisively in favor of Plaintiffs. Defendants expose all Class members to an ongoing risk of life-altering, irreversible harm to their health, extreme suffering, and death; they also deny Subclass members their rights under federal law to be free from discrimination on the basis of disability, and to obtain reasonable accommodations for their disabilities. Defendants' financial interests do not outweigh Class members' rights under the Eighth Amendment and the ADA and RA,[2156] and the relief that Class members request does not entrench upon Defendants' cognizable interests in any way.

Finally, the evidence suggests that the public interest will be served by a permanent injunction. The public has a strong interest in enforcing the protections of the Eighth Amendment, the ADA, and the RA for all individuals, regardless of their carceral status.[2157] The principle that all people shall be free from cruel and unusual punishment is one of the defining principles of our civil society. A system that subjects people within the custody of the government to medical practices that fall grotesquely short of contemporary standards of care and denies timely access to diagnosis and treatment of serious medical needs subverts that principle and injures the public as a whole. Moreover, the public interest is always served by government officials following the law, as the injunction in this case will ensure.

## REMEDY

Plaintiffs have proven that the pervasive, systemic deficiencies in the provision of medical care at Angola expose Class members to a substantial risk of serious harm, and that Defendants were deliberately indifferent to that risk. Plaintiffs have also proven that Defendant DOC's policies and practices violate the rights of the ADA Subclass under the ADA and the RA.

---

[2155] *Cf., e.g.*, *Ball v. LeBlanc*, 988 F. Supp. 2d 639, 688 (M.D. La. 2013) (finding that monetary damages "undoubtedly" were inadequate to compensate plaintiffs for ongoing violation of Eighth Amendment rights), *aff'd in rel. part*, 792 F.3d 584 (5th Cir. 2015).

[2156] *Cf., e.g.*, *Ball*, 988 F. Supp. 2d at 688 (explaining that defendant's purported financial hardships "can never be an adequate justification for depriving any person of his constitutional rights") (quoting *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986)).

[2157] *See, e.g.*, *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.")).

Defendants' health care system and treatment of inmates with disabilities are hereby **DECLARED** constitutionally inadequate due to the systemic inadequacies described herein. These systemic inadequacies include, but are not limited to, inadequate and inappropriate staffing; inadequate access to care, including delayed and denied diagnosis and treatment; inadequate chronic disease programs; failure to provide specialty care; failure to follow the recommendations made by referring specialists; inadequate internal follow-up care; inadequate dietary plans; inadequate work requirements; inadequate cell/housing conditions and other aspects of confinement; inadequate treatment of emergency conditions; inadequate nursing and infirmary care; inadequate medication administration; inadequate diagnostic services; inadequate policies and procedures; inappropriate budget practices; inappropriate medical facilities and equipment; and inadequate monitoring and quality assurance. As a result, every class member who has or develops a serious medical need faces a substantial high risk of receiving inadequate diagnosis or treatment and/or being denied meaningful diagnosis or treatment, exposing them to a substantial risk of serious and even life- threatening harm.

Defendant Louisiana Department of Public Safety and Corrections is further **DECLARED** to be in violation of the ADA, as amended by the Americans with Disabilities Amendments Act ("ADAAA") and the RA due to architectural and other barriers to programs, services, and activities; the failure to integrate individuals with disabilities; and the utilization of methods of administration that result in discrimination against patients with disabilities, including the systemic failure to provide reasonable accommodations or modifications. Accordingly, Defendants are enjoined to remedy the substantial risk of serious harm to Class members and the violation of Subclass members' rights under the ADA and the RA.

**IT IS HEREBY ORDERED** that Defendants shall create a plan to correct the violations of the Eighth Amendment, ADA, and RA as identified herein. Given that the violations involve a substantial risk of serious harm and loss of life, and that Defendants have been aware that their policies and practices were constitutionally deficient for more than 20 years,[2158] it is essential that the parties move swiftly to begin to correct the systemic deficiencies. Defendants shall submit their proposed plan to the Court within 30 days of the issuance of this Order, along with a timeline for completing each item listed in the plan. The proposed relief must be both immediate and long-term. Plaintiffs shall comment on, propose alternatives to, or oppose any part of Defendants' proposal within 30 days. The Court shall thereafter evaluate the parties' submissions, conduct any further proceedings it deems necessary, and order any remedy it deems appropriate and consistent with the PLRA in order to correct the violations.[2159]

Defendants' proposed plan shall include four components: a medical staffing component; a clinical component; a monitoring component; and an ADA component. These componentes shall be developed to include the specific information detailed below, in order for the court to be in the best position to order relief that is narrowly drawn, and that extends no further than necessary to correct the violation of the Eighth Amendment and the ADA.

    <u>1.</u>  The medical staffing component shall include:

---

[2158] *See* PX 17 (Settlement Agreement in *Williams v. Lynn*, No. 92-001 (M.D. La.)).
[2159] *See* 18 U.S.C. § 3626(a)(1)(A); *Plata*, 563 U.S. at 530-34.

1.1     a plan to identify and revise all the policies, directives, protocols, and regulations implicated by this order, and to provide appropriate training for all staff on all revisions;

1.2     a plan to ensure sufficient staffing of both physicians and mid-level providers, in light of the size and medical acuity of the inmate population, in order to provide Plaintiffs with timely and appropriate access to qualified and competent providers for routine, urgent, emergent, and specialty health care;

1.3     a plan to substantially increase nursing staff, particularly on the Nursing Units;

1.4     a plan for reviewing staffing within 30 days of any material change in the inmate population that is expected to be sustained for more than six months, and a plan to create any necessary new positions within 60 days;

1.5     a plan for only hiring providers who are appropriately trained and credentialed for the type of care they will be privileged to provide, with a particular emphasis on hiring providers with appropriate specialties to treat patients with chronic diseases and other common primary care conditions;

1.6     a plan for the timely completion of annual written health care staff performance evaluations conducted by appropriately trained medical personnel and evaluating performance of clinical duties, including appropriate measures to address unsatisfactory evaluations;

1.7     a plan to provide substantially increased monitoring and supervision of physicians and nurses with disciplinary histories in the short term;

1.8     a plan to eliminate the hiring of physicians and nurses with disciplinary histories;

1.9     an organizational chart and detailed job descriptions for all medical staff positions, including the position of a health services administrator to oversee all health care services at LSP, who will have input in development of the health care budget and approval authority over health care spending;

1.10    a plan for training applicable health care and custodial staff on all portions of the plan relevant to their job duties;

1.11    a plan to require all EMS Personnel to report through the medical chain of command rather than the security chain of command, except to provide security during medical transport;

1.12    a plan to require all inmate health care orderlies to report through the medical chain of command rather than the security chain of command in the performance of their job duties; and

1.13    a plan to ensure that medical staff play no role in the enforcement of security measures, except where ensuring that Class members' medical needs or disabilities are respected in disciplinary proceedings.

2. The clinical component shall include:

2.1    a plan for creating a health care delivery system where all medical complaints and conditions are timely reviewed by an appropriate and qualified medical professional;

2.2    a plan for creating a health care delivery system where every patient presenting to the ATU receives a physical examination, review of recent medical records, and thorough medical assessment by a provider;

2.3    a plan to have registered nurses (RNs) with access to Plaintiffs' complete medical records perform all sick call other than requests solely for a duty status or medication renewal;

2.4    a plan to re-evaluate and lower the cost of sick call and emergency sick call such that it is aligned with the wages earned by inmates;

2.5    a plan to test all patients for hepatitis-C infection;

2.6    a plan to eliminate the practice of overruling any recommendation from an outside specialist, which is not required by the reasonable use of a formulary, and to ensure the specialist recommendations and any other medically appropriate follow up care is provided;

2.7    a plan to develop new pain management procedures and policies;

2.8    a plan to ensure that there is no delay in sending patients to the hospital when it is medically necessary;

2.9    a plan to adopt appropriate stroke protocols;

2.10    a plan to create a database to track patient complaints and a mechanism for ensuring complaints are followed by a physical exam and not only a record review;

2.11    a plan to timely review and make a determination as to all requests for routine and urgent specialty care;

2.12    a plan that brings any denials of requests for routine and urgent specialty care into accordance with community standards, and ensures the denial and the reason for the denial are documented in the patients' medical records and

communicated in writing to the patient and the requesting physician;

2.13    a plan to ensure approved specialty services are delivered timely and as clinically indicated;

2.14    a plan to ensure that specialist recommendations are reviewed by primary care providers and incorporated into primary care treatment plans, with recommendations, diagnostic tests, and any other medically appropriate follow-up care provided promptly;

2.15    a plan to revise the chronic care protocols to align with current national standards for chronic care, including chronic care guidelines for all major chronic conditions;

2.16    a plan to completely overhaul the treatment of all major chronic conditions in accordance with the revised protocols, for example:

    2.16.1    with regards to HIV treatment, the DOC will arrange for its contracted medical provider to implement a new protocol for the testing, evaluation, and treatment of HIV. All class members with HIV will be treated with protocols that align with national standards.

    2.16.2    with regards to hepatitis-C treatment, the DOC will arrange for its contracted medical provider to implement a new protocol for the testing, evaluation, and treatment of hepatitis-C. All presently hepatitis C-infected patients with fibrosis levels F1-F4 will be treated with direct acting antiviral medicine within six months, and all future patients within three months after the determination of their fibrosis level with untreated patients being retested for eligibility every six months. DOC will test all inmates for hepatitis C on intake and every two years thereafter.

    2.16.3    with regards to the "Coumadin clinic," the DOC will update its protocols to be in line with national standards for treating, monitoring, and counseling patients using Coumadin, and correct any deficiencies in the use of Coumadin to treat patients with chronic conditions.

    2.16.4    with regards to diabetes, the DOC will ensure that all patients with diabetes have the access and ability to test their blood sugar levels twice a day.

    2.16.5    with regards to sickle cell disease, all patients with sickle cell disease will have access to narcotic medication as indicated for sickle cell-related pain in their housing unit. DOC will provide training to all staff that participate in the care of patients with sickle cell disease about the disease and the appropriate reponse to a sickle cell crisis, consistent with national standards. The training will be conducted regularly by a medical professional from outside DOC who has experience treating patients

with sickle cell disease.

2.16.6    with regards to all chronic care patients who require special diets, the DOC will ensure they have access to those special diets and that they are tailored to each patient's condition and invidual medical needs. The evaluation, prescription, and provision of the special diets will be well-documented to facilitate review by the monitors.

2.17    a plan to have nursing staff rather than security officers distribute medication and to document medication administration contemporaneously;

2.18    a plan to provide patients with information and education on all changes in medication;

2.19    a plan to bring the roles and performance of all EMS Personnel into conformance with the Louisiana Board of Emergency Medical Services Scope of Practice Matrix, including the requirement that EMS Personnel practice under the supervision of a physician and that the facility maintain documentation of biennial training on any optional modules performed by any EMS Personnel;

2.20    a plan to ensure basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, particularly on the nursing wards and in the medical dormitories;

2.21    a plan for providing medically suitable examination rooms that ensure privacy, sanitation, and sufficient space and supplies for physical examination;

2.22    a plan to permanently eliminate the use of malingering as a security charge;

2.23    a plan to provide medical providers and Plaintiffs with supplies necessary for medically adequate care;

2.24    a plan to have nursing staff provide sick call and pill call on site for Plaintiffs in the medical dormitories, and to conduct daily rounds in the medical dormitories to examine patients and provide supervision, instruction, and assistance to the inmate health care orderlies;

2.25    a plan to ensure that inmate health care orderlies in the medical dormitories are not used to provide services other than assistance with Activities of Daily Living;

2.26    a plan to have all inmate health care removed from the infirmary and nursing units, unless there to provide Hospice support, and for qualified medical personnel to assist with Activities of Daily Living on those units;

2.27    a plan to ensure that all patients in the nursing wards are within sight and/or sound of a provider or nurse at all times;

2.28    a plan to ensure that vulnerable patients or patients incapacitated in any ways have a mechanism by which to communicate emergencies to medical staff;

2.29    a plan to cease the use of gastrointestinal lavage ("stomach pumping") and forced catheterization in emergency medical situations, unless indicated by specific evidence of drug overdose beyond the patient's symptoms, which must be documented in writing;

2.30    a plan to ensure Do Not Resuscitate orders are properly discussed with patients and not proposed to patients with altered mental status in the midst of life-threatening emergencies;

2.31    a plan to revise policies in order to ensure timely and adequate mortality reviews by an unaffiliated physician, that include sufficient detail as to the cause of death and the relevant medical and treatment history;

2.32    a plan to implement an electronic medical records system that includes adequate documentation of all medical encounters, including records from outside providers and medication administration records, and that makes medical records readily accessible to Class members upon request; and

2.33    a plan to reform LSP's Continuous Quality Improvement ("CQI") program to include participation by the Medical Director, Assistant Warden for Health Services, and all medical departments, and to empower the CQI program to develop, implement, and monitor the effectiveness of quality improvement plans.

3.   A monitoring component that includes:

3.1    a plan to develop a database that tracks all patient complaints or requests for medical care, including any requests for routine and urgent specialty care;

3.2    a plan to develop a mechanism to ensure patient complaints are followed by a physical exam by medical personnel, not just a record review of the patient's history and recent care;

3.3    a plan to educate all medical personnel on appropriate procedures for responding to and documenting patients' refusals of care;

3.4    a plan to develop an annual written review of the current status and treatment plan for all patients with chronic conditions, including a written review of the results of any laboratory or other diagnostic tests; and

3.5    a plan to develop an organizational system for the electronic medical

records that facilitiates the ability for medical providers and the monitor to review and track patients' medical conditions.

4. An ADA component that includes:

4.1     a plan for the creation of an effective and comprehensive system for tracking individuals with disabilities and ensuring that they are accommodated appropriately in all aspects of their incarceration, including, but not limited to, their dietary needs, work assignments, mobility, communication, housing, and discipline;

4.2     a plan to ensure that all patients are informed of their rights under the ADA, the identity of and contact information for the ADA Coordinator, and the various methods of and procedures for requesting accommodations and filing disability-related grievances;

4.3     a plan for the creation of a comprehensive database that reliably captures all requests for accommodations (including letters, ARPs, RFAs, and verbal requests), as well as their status, disposition and any reasons therefor, and supporting documentation;

4.4     a plan to remove all barriers to requesting accommodations, including the policy of charging copays for the evaluation of accommodation requests;

4.5     a job description for an ADA Coordinator and a plan to ensure that the individual has the necessary qualifications, training and time to meet the job requirements

4.6     a plan to ensure that all requests for accommodation, including letters, ARPs, RFAs, and verbal requests, are referred to and evaluated by the ADA Coordinator or by appropriately trained and qualified designees acting under his or her direct supervision, with all final determinations made by the ADA Coordinator;

4.7     a plan to provide training for all staff and health care orderlies about the ADA and compliance therewith by a qualified outside vendor;

4.8     a plan to eliminate the architectural barriers to LSP's programs, services, and activities as identified by Plaintiffs' ADA expert or the ADA monitor;

4.9     a plan for revising the duty status policy to provide for individually tailored restrictions, a more robust classification system, and a process by which inmates can request a new or modified duty status without relying on the sick call system;

4.10    a plan to train security personnel on the proper application of and compliance with duty status restrictions;

4.11    a plan to revise all other policies that result in the exclusion of patients with disabilities from LSP's services, programs, and activities, including, but not limited to, hobby craft, educational, rehabilitative, and therapeutic programming, work assignments, work release, religious services, and recreational activities;

4.12    a plan to ensure that patients with disabilities are able to access and benefit from LSP's services, programs, and activities in the most integrated setting appropriate to their needs;

4.13    a plan to ensure that patients with disabilities are provided with on-site medical services to the extent they are placed in designated medical areas such as the nursing wards and medical dormitories;

4.14    a plan to ensure individuals with disabilities are transported safely in vehicles that adequately accommodate their disabilities both within and outside the facility; and

4.15    an evacuation and emergency response plan that accommodates all inmates with disabilities in all facilities where such inmates are housed or receive any programs, benefits, or services.

**IT IS FURTHER ORDERED** that within two weeks of the issuance of this order, the Defendants will produce a report detailing all relevant material changes that have occurred at LSP and/or the DOC since the close of discovery. The report must be supported with documentation of such changes. Plaintiffs will be provided with an opportunity to conduct limited and speedy discovery regarding any alleged changes. The Court will schedule a hearing regarding those changes shortly thereafter.

**IT IS FURTHER ORDERED** that the parties will formulate and agree to a plan for information-sharing, which will enable Plaintiffs to have ongoing and thorough access to the Class members and to obtain the information needed in order to evaluate the plan produced by Defendants and the implementation thereof.

**IT IS FURTHER ORDERED** that the Court will appoint three monitors to evaluate the implementation of the plan: one doctor, one nurse, and one ADA monitor. The monitors will visit the facility regularly, but at least three times per year, to conduct thorough reviews of the facility and of records selected by the monitors. The monitors shall have unfettered access to staff, Class members, documents, and anything else necessary for them to complete their review. The monitors shall also schedule regular conference calls with LSP staff between these visits in order to gather information and monitor compliance. The parties will have two weeks from the date of this Order in which to come up with agreed-upon candidates, subject to the Court's approval. If they are unable to agree, each party will submit a list of no more than three names per monitor position with resumes to the Court within two weeks and the Court will select the monitors. After the entry of the Court's remedial order, any disputes between the parties regarding the adequacy of any

current or revised policies, procedures, protocols, training programs, staffing plans, or other items required by this Order will be submitted to the appropriate monitor for resolution, if the parties cannot reach agreement. In the event that either party is dissatisfied with the monitor's written resolution of any such dispute, that party may move the Court for relief. All costs incurred by the Parties in the enforcement of the Court's order will be paid by Defendants.

**IT IS FURTHER ORDERED** that Plaintiffs are the prevailing party in this case, and have leave to submit an initial Motion for Attorneys' Fees within 30 days of this order.

Respectfully submitted by:

/s/ Mercedes Montagnes

Mercedes Montagnes, La. Bar No. 33287
Jamila Johnson, La. Bar No. 37953
Nishi Kumar, La. Bar No. 37415
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Jeffrey B. Dubner (*pro hac vice*)
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 656-2722
Email: Jeffrey.dubner@gmail.com

Daniel A. Small (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com

Bruce Hamilton, La. Bar No. 33170
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
Email: bhamilton@laaclu.org

Ronald K. Lospennato, La. Bar No. 32191
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
Telephone: (504) 208-4679
Facsimile: (504) 335-2890
Email: rlospennato@advocacyla.org

Jared Davidson, La. Bar No. 37093
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
Email: jared.davidson@splcenter.org

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

<u>/s/ Nishi Kumar</u>

Nishi Kumar