UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, and RUFUS WHITE, on behalf of themselves and all others similarly situated, <br><br>VERSUS <br><br> BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LEMARTINIERE, Assistant Warden for Health Services, in her official Capacity; JAMES M. LEBLANC, Secretary of THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS | CIVIL ACTION <br><br> NO. 3:15-cv-00318 <br><br> JUDGE SHELLY D. DICK <br><br> MAGISTRATE JUDGE RICHARD L. BOURGEOIS |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
TO RESTRAIN DEFENDANTS FROM TRANSFERRING
COVID-19 CARRIERS TO LOUISIANA STATE PENITENTIARY**

**MAY IT PLEASE THE COURT:**

The defendants respectfully request that the Court deny the plaintiffs' motion to restrain plaintiffs from transferring COVID-19 carriers to Louisiana State Penitentiary for the reasons set forth below.

**I. INTRODUCTION**

The COVID-19 pandemic is obviously a serious public health crisis, and Louisiana is certainly one front in the nationwide fight against the pandemic. First responders are struggling with capacity and are being exposed.[1] The crisis has the capacity to overwhelm medical capacity

---

[1] Chris Finch, *New Orleans first responders struggle as personnel exposed to COVID-19, some test positive*, WAFB9 (updated March 25, 2020 at 9:49 am), https://www.wafb.com/2020/03/25/new-orleans-first-responders-struggle-personnel-exposed-covid-some-test-positive; Jeff Adelson and Chad Calder, *With 1 in 6 workers under quarantine,*

1

within the state.[2] Personal protective equipment has been scarce.[3] Consistent with these concerns, the Louisiana Department of Health has ordered that any and all medical procedures shall be postponed until further notice, except for emergency procedures, "to preserve Personal Protective Equipment (PPE) and to utilize hospital staffing, equipment, and bed capacity for the transition to the COVID-19 emergency."[4]

With this background in place, the Louisiana Department of Corrections ("DOC") and Louisiana State Penitentiary ("LSP") have taken steps to protect both offenders and staff. Below is a detailed description of the efforts being coordinated Statewide to address this serious issue and to provide for the health and welfare of offenders at LSP and all DOC facilities. Plaintiffs now seek to interfere with these efforts and seek injunctive relief based on an affidavit by their own hand picked "expert" who spent all of two days at LSP some four (4) years ago. Plaintiffs' motion is filled with pure speculation and conjecture and should be denied by this Court.

## II. FACTUAL BACKGROUND

### A. DOC's coordination of efforts to respond to COVID-19 pandemic

In response to the COVID-19 pandemic, DOC has a developed a plan to protect the health and safety of all offenders within the DOC system.[5] As part of its infection control

---

*New Orleans EMS to run lower-level ambulances*, THE NEW ORLEANS ADVOCATE (March 24, 2020) https://www.nola.com/news/coronavirus/article_f8440d22-6e3e-11ea-a2d2-f3fae48a0854.html..
[2] *New COVID-19 Forecasts: US Hospitals Could Be Overwhelmed in the Second Week of April by Demand for ICU Beds, and US Deaths Could Total 81,000 by July*, INSTITUTE FOR HEALTH METRICS AND EVALUATION (March 26, 2020) http://www.healthdata.org/news-release/new-covid-19-forecasts-us-hospitals-could-be-overwhelmed-second-week-april-demand-icu.
[3] Jeanne Whalen, Tony Romm, Aaron Gregg, and Tom Hamburger, *Scramble for medical equipment descends into chaos as U.S. states and hospitals compete for rare supplies*, THE WASHINGTON POST (March 24, 2020) https://www.washingtonpost.com/business/2020/03/24/scramble-medical-equipment-descends-into-chaos-us-states-hospitals-compete-rare-supplies/.
[4] Healthcare Facility Notice/Order Notice #2020-COVID19-ALL-17 (available at http://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/LDH_Updated_Medical_Surgical_Procedures_032120 20.pdf). Even cancer and heart surgeries are being delayed. Marilyn Marchione, *Cancer, heart surgeries delayed as coronavirus alters care*, CHRON (March 20, 2020) https://www.chron.com/news/medical/article/Cancer-heart-surgeries-delayed-as-coronavirus-15140536.php.
[5] Affidavit of Secretary James LeBlanc at para. 2, attached as Ex. 1.

2

program, DOC's Influenza and Pandemic Viral Outbreaks regulation provides a formal policy and procedure concerning the planning, preparation, and management of a pandemic viral disease or an influenza outbreak. DOC recognized that a pandemic or an influenza outbreak may not follow an expected course and may present new challenges. DOC activated this regulation to the highest level, and DOC facility plans have been customized specifically to address COVID-19.[6]

Pursuant to the DOC regulation, each state prison has implemented a thorough and detailed Continuity of Operations Plan ("COOP"), which have been reviewed by DOC Headquarters Medical/Operations.[7] DOC is coordinating with the Governor's office and other state agencies to stay up to date on all COVID-19 related issues, developments, and discussions.[8] Secretary LeBlanc has engaged in daily phone calls with the Unified Command Group headed by the Governor. He along with all other Cabinet Secretaries, participate in these phone calls.[9] DOC is actively involved in the statewide management and response through the Governor's Office of Homeland Security and Emergency Preparedness.[10] Moreover, DOC leadership has conference calls every Monday, Wednesday, and Friday with all Wardens, Louisiana State Police, and the Louisiana Sheriff's Association. These phone calls discuss updates from each institution, medical reports and updates, institutional reports, and strategy for continued management related to COVID-19.[11]

In an effort to proactively deal with the COVID-19 pandemic and to protect the safety and welfare of offenders housed in DOC facilities, DOC has suspended visitation, volunteering,

---

[6] *Id.* at para. 3.
[7] *Id.* at para. 4. A copy of the COOP Plan for Angola and relevant amendments were provided to Plaintiffs' counsel prior to their filing of this motion. *See* R. Doc. 580-4.
[8] *Id.* at para. 5.
[9] *Id.* at para. 6.
[10] *Id.* at para. 7.
[11] *Id.* at para. 8.

tours, transfers between prisons/routine transfers from local level, and postponed the Angola spring rodeo, all in effort to minimize movement.[12] DOC has also limited new intakes to only those who must be housed in a state prison. Each intake is screened and assessed for symptoms, and then quarantined for 14 days before placed in general population.[13] DOC has created a COVID-19 webpage on its website and updates it frequently with the latest information. This has proven useful for staff and offenders' families during this pandemic.[14]

In an effort to educate and assist offenders during this difficult time, DOC has created two COVID-19 informational videos for offenders. These videos include an introduction by the Secretary and the onsite physician at Angola, an overview of the Department's response to the pandemic, and proactive ways offenders can reduce risk of infection. These videos are available in both English and Spanish. These videos are played on loop at all prisons and are also available on the Department's website for families to view.[15] DOC is also working in conjunction with Securus Technologies, Inc. to provide offenders in state-run prisons two (2) free 15-minute phone calls per week and two (2) free email stamps per week to allow offenders to maintain communication with family and friends during this event.[16] DOC has suspended medical visit co-payments in state prisons and has also ensured that ample hand sanitizer and anti-bacterial soap are readily available at all state prisons.[17]

DOC has been proactive in its fight against the COVID-19 pandemic and is following the guidelines of the United States Centers for Disease Control and Prevention ("CDC").[18] In addition to the CDC guidelines, DOC has instituted reverse isolation for the most vulnerable of

---

[12] *Id.* at para. 9
[13] *Id.* at para. 10.
[14] *Id.* at para. 11.
[15] *Id.* at para. 12.
[16] *Id.* at para. 13.
[17] *Id.* at para. 14-16.
[18] *Id.* at para. 17.

the inmate population. Approximately two weeks ago, DOC identified offenders most at risk for infection and began reverse isolation of those offenders.[19]

DOC has obtained from the Louisiana Department of Health ("LDH") COVID-19 test sample collection kits, which have been issued to all prison facilities.[20] Inmate testing criteria guidelines have been issued to all state facilities, which are based upon the direction of LDH. The guidelines require that any inmate exhibiting symptoms of an influenza-like illness, such as fever or fever and a cough shall be tested for COVID-19 and influenza.[21] Personal Protective Equipment ("PPE") has been distributed to staff and offenders, as needed.[22] DOC has issued COVID-19-specific guidelines and trained all state prisons regarding screening, isolation, quarantine, housing, proper use of PPE, and precautionary measures. These guidelines are revised and updated as the CDC issues new information.[23] Each DOC facility has quarantine and isolation capabilities, which are used as needed.[24] DOC has implemented daily tracking of all inmate influenza and COVID-19 testing at each facility and delivers the COVID-19 test samples to LDH for laboratory testing.[25]

**B. LSP's coordination of efforts to respond the COVID-19 pandemic**

LSP has coordinated its efforts to comply with the guidance and direction of DOC to address the COVID-19 pandemic.[26] LSP has implemented its COOP plan and COOP isolation plan.[27] LSP is following the CDC guidelines. In addition to the CDC guidelines, LSP has instituted, per DOC directives, reverse isolation for the most vulnerable of the inmate population

---

[19] *Id.* at para. 18.
[20] *Id.* at para. 19.
[21] *Id.* at para. 20.
[22] *Id.* at para. 21.
[23] *Id.* at para. 22.
[24] *Id.* at para. 23.
[25] *Id.* at para. 24.
[26] See generally the Affidavit of Tracy Falgout, attached as Ex. 2.
[27] *Id.* at para. 5

in order to protect those offenders from unnecessary exposure to staff. Approximately two weeks ago, LSP identified offenders most at risk for infection and began reverse isolation. LSP staff in these areas are required to wear masks and only make contact when absolutely necessary.[28]

LSP's current procedures ensure that proper housing, housekeeping, nutrition, medical care, and sanitation requirements are met, despite the additional challenges to staff and the offender population. As the situation created by the pandemic evolves, LSP staff are prepared to adapt as necessary. LSP has restricted offender movement within the facility. LSP has suspended visitation, volunteering, tours, transfers between prisons, routine transfers from local level, most programming, and postponed the Angola spring rodeo, all in effort to minimize movement.[29]

DOC has limited new intakes to only those who must be housed in state prison and each intake sent to LSP is screened and assessed for symptoms, and then quarantined for 14 days before placed in general population.[30] Any LSP offender presenting with symptoms of an influenza-like illness is given both an influenza test and a COVID-19 test. The offender is then sent to the appropriate isolation area. Once test results are obtained, the offender is treated per Healthcare Practitioners Orders.[31] All employees entering the facility are screened daily through a series of questions regarding COVID-19 symptoms and recent travel. All staff entering the Treatment Center have their temperatures checked prior to entering.[32]

---

[28] *Id.* at para. 17-18.
[29] *Id.* at para. 7-9.
[30] *Id.* at para. 10.
[31] *Id.* at para. 20,
[32] *Id.* at para. 21.

6

## C. Camp J

Generally, DOC offenders housed at DOC facilities who test positive for COVID-19 will be isolated at the facility in which they are housed.[33] Camp J at LSP has been designated as a potential location for housing offenders from other DOC facilities should the need arise. Offenders housed in DOC facilities who test positive for COVID-19 will be transported to Camp J for isolation, only if they cannot be isolated at the facility in which they are housed.[34] Camp J is an isolated location on the sprawling LSP property and is miles away from any other offender housing at LSP.[35]

DOC medical personnel decided to take advantage of Camp J's unique properties to serve as a standalone facility to serve as overflow for offenders who test positive and who cannot be safely isolated at other facilities.[36] Camp J is intended only to serve as an isolation facility for offenders who have tested positive but are not displaying serious symptoms and who are not in medical distress.[37] Severe cases will not be housed at Camp J.[38] If an offender housed at Camp J begins to exhibit severe symptoms, he will be transport to an outside hospital. Offenders transferred to Camp J will not be sent to the ATU or the treatment center at LSP.[39]

The current plan is for Camp J to be treated as a wholly separate facility.[40] Medical personnel attending to offenders at Camp J will not share duties at the ATU, the treatment center, the infirmary or any medical or housing facility at LSP.[41] The staff providing care to COVID positive offenders at Camp J will follow the guidelines provided by the CDC and will use the

---

[33] *Id.* at para. 23.
[34] *Id.* at para. 25.
[35] *Id* at para 24.
[36] Affidavit of Dr. Morrison at paragraphs 31-41; attached as Ex. 3
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*

proper Personal Protective Equipment ("PPE") while in contact with offenders.[42]  COVID positive offenders will be under strict cell isolation.  Every other cell will be utilized in order to maintain proper distancing.  All food will be served on disposable trays with disposable utensils.  All personal hygiene items will be provided to offenders in their cell, and the items will be disposable.[43] The medical director of DOC, Dr. Morrison was involved in the decision to use Camp J in this fashion.  In Dr. Morrison's opinion, this course of action is both medically appropriate and the most prudent course of action available to ensure the health and safety of DOC offenders and staff.[44]

### D. **Plaintiffs counsels' efforts to obstruct and interfere with response by the State, DOC and LSP**

On March 16, 2020, a "Call to Action" plan related to COVID-19 in Louisiana jails and prisons was initiated by The Promise of Justice Initiative, the ACLU of Louisiana, the Southern Poverty Law Center and other organizations.[45] Mercedes Montagnes, lead counsel for Plaintiffs, is the Executive Director of The Promise of Justice Initiative, and Plaintiffs are also represented by the ACLU of Louisiana and the Southern Poverty Law Center. This "Call to Action" publicly disseminated Secretary LeBlanc's email address, as well as the email addresses of DOC's General Counsel Jonathan Vining, and the Governor's Executive Counsel Matthew Block, among others. It encouraged persons to repeatedly forward an identical letter to the leadership of DOC and the State of Louisiana, which overwhelmed the email accounts of those employees. Instead of devoting all available time to the underlying emergency declaration, valuable

---

[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] LeBlanc affidavit at para 25.

resources have been devoted to evaluating hundreds of email forwards of the same chain letter each day since March 16.[46]

In fact, attorney Montagnes sent an email to her devoted follower beaming about the fact that the effort was crashing government email servers.[47] Ms. Montagnes adds that "personally, I am eager to see a comprehensive plan from DOC/Sheriffs and will continue to push in that directions [sic] among other things."[48] And push she did. Ms. Montagnes, through her co-counsel Jeff Dubner, directed a series of emails to undersigned counsel demanding any documented plans by DOC and LSP to respond to the COVID-19 virus.[49] Defendants agreed to provide plaintiffs with their COOP plan and pandemic response plan and did in fact provide this information to plaintiffs' counsel. Dissatisfied with the lengthy plan documents provided, plaintiffs' counsel then demanded that undersigned counsel participate in a "meet and confer" and that knowledgeable DOC officials must participate in the meet and confer.[50] When this invitation was declined, plaintiffs' counsel filed a motion seeking to reopen discovery in this matter.

Thereafter, plaintiffs' counsel demanded that defendants answer their discovery regarding proposed activities at Camp J despite there being no ruling from the Court authorizing plaintiffs to undertake such discovery. Defendants were hesitant to provide any further response at first, but after receiving numerous emails from plaintiffs' counsel, relented and agreed to provide additional information. Plaintiffs counsel's email made inquiries as to the status of any transfers to Camp J and stated: "if DOC does not in fact intend to transfer patients with COVID-19 to LSP, or does not plan to begin doing so imminently, then we would not need to file this

---

[46] *Id.*
[47] See attached Ex. 4.
[48] *Id.*
[49] See R. Doc. 580-4.
[50] *Id.*

9

motion."[51] Undersigned counsel responded to this email and advised that "I have spoken with DOC further about the matter and have confirmed that DOC has not transferred anyone with COVID-19 to Angola and there are no imminent plans to make any such transfers at this time."[52] Of course, plaintiffs' counsel was not satisfied with this direct response to his inquiry and sent yet another email seeking a guarantee that DOC would not transfer anyone to Camp J for the next 14 days. When undersigned counsel did not provide this guarantee, plaintiffs filed the instant motion for injunctive relief.

As discussed below, plaintiffs motion has no merit. It is nothing more than a vain effort to direct the response of the State, DOC and LSP, through the use of their hired gun litigation expert, Michael Puisis. The plaintiffs had Michael Puisis, D.O. submit an affidavit to allegedly support their motion. The affidavit is incredible in that it actually shows that DOC's and LSP's actions are in compliance with CDC guidelines and that no relief is necessary. Paragraph 11 of Dr. Puisis' affidavit acknowledges that:

> transfers into LSP have been suspended absent extenuating circumstances and if an inmate is transferred into LSP, they are supposed to be quarantined for a 14-day period. LSP screens visitors and new offenders with symptom screening and a temperature. **These measures are consistent with recommendations of the Center for Disease Control (CDC) correctional guidelines**.

(Emphasis added.) After stating his litigation position that LSP provides ineffective medical care (which is denied in the strongest terms possible), Dr. Puisis states that:

> While **CDC procedures are in place** I question the ability to effectively carry out the procedures as stated.

(Emphasis added.) Thus, plaintiffs' own expert witness admits that DOC and LSP measures and procedures are consistent with CDC recommendations and procedures. Instead, he relies on conjecture that LSP is either unwilling or unable to implement the guidelines.

---

[51] See attached Ex. 5.
[52] *Id.*

10

In his supplemental affidavit, Dr. Puisis gives the opinion that movement of prisoners to Camp J is not prudent. As discussed below, the basis of his opinion is fraught with unsupported assumptions, speculation and just plain falsities. Dr. Puisis' opinions are not based on fact. His opinions do not even take into consideration DOC efforts to protect all offenders, not just those housed at LSP. Dr. Puisis' opinions are being provided to this Court as the only grounds to usurp State powers and prohibit a plan that has been well thought out and vetted by Louisiana medical professionals who are doing everything in their power to safely respond to this crisis. Dr. Puisis, a hired gun expert, whose experience with LSP consists of a two day visit some four (4) years ago, should not be allowed to dictate how DOC, and State government as a whole, deals with the COVID-19 pandemic.

### III.   ARGUMENT

The United States Supreme Court in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376–77 (2008) held that:

> A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."

(Citations omitted.) Similar to the United States Supreme Court, the Fifth Circuit has noted that an injunction is an extreme remedy:

> A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four *Callaway* prerequisites. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). "The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally demonstrate the need for its issuance." *Valley v. Rapides Parish Sch. Bd.*, 118

11

F.3d 1047, 1050 (5th Cir. 1997). One district court captured the extraordinary nature of the remedy in stating that standard for granting an injunction

> "is a 'difficult' and 'stringent' standard for the movant to meet." *Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16–CV–2919–B, 2016 WL 6893629, at *11 (N.D. Tex. Nov. 21, 2016 (citing *Whitaker v. Livingston*, 732 F.3d 465, 469 (5th Cir. 2013) and *Janvey v. Alguire*, 647 F.3d 585, 591, 595 (5th Cir. 2011)).

*Texas v. Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018).

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24, 129 S. Ct at 365. Indeed, courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

The Fifth Circuit in *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) set forth the prerequisites for issuance of injunctive as:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

The plaintiffs cannot carry their burden of proving the elements necessary for the Court to grant the extraordinary remedy of issuance of an injunction. The request for a temporary restraining order and subsequent injunction should be denied as unproven and unnecessary.

### A. The Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits

The Defendants are facing numerous, unprecedented and sometimes intractable issues in responding to the COVID-19 crisis. The Defendants have proactively addressed the issues to develop the best approach to the difficult situation. The Plaintiffs and their experts should not be

12

allowed to have a veto right or to second guess the Defendants' efforts in this area reserved exclusively to the State of Louisiana.

### 1. The Defendants Have the Exclusive Power to Respond to the COVID-19 Crisis

Individual states are vested with police powers, which allow states to enact reasonable regulations established to protect the public health and public safety of its citizens. *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 25 S.Ct. 358, 361 (1905). States may also invest local bodies—such as the Department of Health or the Department of Corrections—with the authority to carry out such regulations and safeguard public health and safety.[53] *Id.*

Response to infectious disease outbreaks and epidemics has long been recognized as a function of the state's police power, and federal courts should not intervene in the state's response unless the response is deemed to be arbitrary or in violation of clearly established Constitutional law. *Morgan's La. & T.R. & S.S. v. Bd. of Health of State of La.*, 118 U.S. 455, 464–65, 6 S. Ct. 1114 (1886); *Jacobson*, 197 U.S. at 28, 25 S. Ct. at 361; *Hickox v. Christie*, 205 F. Supp. 3d 579, 594 (D.N.J. 2016). Indeed, the Supreme Court held that to intervene in the state's disease control measures

> would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case. We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.

*Jacobson*, 197 U.S. at 25; 25 S. Ct. at 361.

---

[53] Granted, all state action taken under the guise of police powers must yield to Constitutional protections and provisions. *Id.*

Louisiana has adopted administrative regulations advising the response to communicable diseases that may pose a serious threat to public health, including provisions for mandating isolation or quarantine of individuals who are suspected of being cases or carriers of disease. 51 La. Admin. Code II:117. The Supreme Court recognized the "authority of states to enact quarantine and health laws of every description" as early as 1905. *Jacobson*, 197 U.S. at 25, 25 S. Ct. at 361. The *Jacobson* court has been cited approvingly, even as recently as 2016 during the Ebola outbreak. *Hickox v. Christie*, 205 F.Supp.3d 579 (D.N.J. 2016). *Hickox* quoted *Jacobson* for the proposition that state-enacted measures to protect public health "will not be struck down unless it 'has no real or substantial relation to [that goal], or is, beyond all question, a plain, palpable invasion of rights' secured by the Constitution." *Hickox*, 205 F.Supp.3d at 591 (quoting *Jacobson*, 197 U.S. at 31).

In responding to outbreaks of disease, states must be entitled to latitude in its prophylactic efforts to contain a serious, highly contagious, and often fatal disease such as COVID-19. *Hickox*, 205 F.Supp.3d at 584. To permit the speculative and unsubstantiated claims of the plaintiffs to proceed in federal court "would be a judicial second-guessing of the discretionary judgments of public health officials acting within the scope of their (and not my) expertise." *Hickox*, 205 F. Supp. 3d at 594.

### 2. The Plaintiffs Cannot Show that the Defendants' Response to the COVID-19 Crisis Is Unconstitutional

The Plaintiffs have failed to establish that the DOC's response to the COVID-19 pandemic crisis is unconstitutional, an invasion of rights, or is unrelated to the goal of protecting public health. In fact, the Plaintiffs' own expert physician concedes that the defendants have implemented the measures recommended by the CDC. [R. Doc. 582-2 at ¶ 11]. That concession alone should be enough to deny the plaintiffs' request for injunctive relief.

The primary concern surrounds the Defendants' potential use of administrative segregation cells in Camp J to house offenders with COVID-19, if necessary. Although Camp J is located on LSP's property, it is remotely located away from other LSP facilities and is currently not being used. Camp J will be operated as a separate stand-alone facility. Medical staff provided to Camp J will be provided with appropriate PPE and will not interact with other facilities at LSP. This plan is imminently reasonable and a viable option in response to the COVID-19 crisis.

The Plaintiffs' counsel and Dr. Puisis assume, without factual basis, that the use of Camp J will infect all offenders at LSP. The Defendants show that while the COVID-19 virus has shown itself to be difficult such concerns are without factual basis. The Defendants have devised a plan which keeps Camp J as a separate facility to mitigate against spread of COVID-19 through LSP.

Moreover, neither the Plaintiffs nor their litigation expert, Dr. Puisis, address the broader impact of COVID-19 on the DOC statewide. As both sides readily admit and know, the spread of COVID-19 is an extraordinary event. The Defendants have responsibility for addressing the spread of COVID-19 at all DOC facilities. The considerations of all DOC facilities must be taken into account. In proactively deciding how to address the crisis, DOC determined that the use of Camp J would be a secure and effective means of responding if the crisis continues to grow.

Considering these facts, the Plaintiffs do not have a likelihood of success on the merits. Whatever the issues with healthcare are at LSP, the use of Camp J is an unrelated event that will be operated as a stand-alone facility as the best solution for a statewide problem. This Court

should defer to the expertise and authority of state officials in the execution of police powers as they act in accordance with CDC guidelines.

**B. The Plaintiffs cannot show a substantial threat of irreparable injury if the injunction is not granted**

Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). As stated above, the Plaintiffs admit that LSP has implemented measures and procedures in compliance with CDC guidelines. As to Camp J, the Defendants have shown that it will be a separate stand-alone facility with no interaction with LSP facilities. With these facts established, the Plaintiffs cannot show that they will suffer irreparable harm if the injunction is not granted. At most, the Plaintiffs have presented a speculative injury and unfounded fear that Camp J will harm them. That unfounded fear is an insufficient basis to grant injunctive relief.

**C. The Plaintiffs cannot show that the threatened injury to plaintiffs outweighs the threatened harm the injunction may do to Defendants and/or that granting the injunction will not disserve the public interest**

When the government is a defendant, the third factor (harm the injunction may do to defendant) and the fourth factor (granting the preliminary injunction will not disserve the public interest) merge into one. *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009).

The threat to the public if the injunction is not granted is significant. DOC will use Camp J only if there is a need based upon COVID-19 in other facilities. The Defendants have determined that the use of Camp J is medically necessary to mitigate the impact of COVID-19 throughout the DOC facilities statewide. Without Camp J, these other facilities throughout the state would be at an even greater risk of spread of COVID-19. In short, the use of Camp J is in further of the public health. Plaintiffs did not address the serious risk posed by COVID-19 in

other facilities or the overall public health concerns that the Defendants are attempting to address.

The United States Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008) addresses the state's public interest in this context. In *Winter*, environmental organizations sought injunctive relief to prevent the Navy's use of sonar in training exercises to prevent serious harm to various species of marine mammals. The district court granted injunctive relief and the court of appeal affirmed. Indeed, the district court concluded that the plaintiffs had established a "near certainty" of irreparable harm. *Id.*, 555 U.S. at 22; 129 S. Ct. at 376. Nonetheless, both courts held that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." *Id.*, 555 U.S. at 21, 129 S.Ct. at 375. The Supreme Court held that the "possibility" standard was too lenient and that the plaintiffs were required to demonstrate that irreparable injury is likely in the absence of an injunction. *Id.*, 555 U.S. at 22, 129 S. Ct. at 375. While acknowledging the seriousness of the environmental concerns, the Supreme Court held that:

> even if plaintiffs have shown irreparable injury from the Navy's training exercises, any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors.

*Id.*, 555 U.S. at 23, 129 S. Ct. at 376. The Supreme Court reversed the injunction against the Navy's use of sonar.

In *Winter*, the Supreme Court deferred to the decisions of Navy military officers as to the need for and importance of the sonar activity training. A similar deference is appropriate here involving prison. The Supreme Court has acknowledged that "courts are ill equipped to deal

with the increasingly urgent problems of prison administration and reform."[54] *Turner v. Safley*, 482 U.S. 78, 84–85; 107 S.Ct. 2254, 2259 (1987). Courts often find that "evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination."[55] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S. Ct. 2400, 2404 (1987) (internal citations omitted). "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Turner, supra.* Moreover, when a state penal system is involved, the federal court has an "additional reason to accord deference to the appropriate prison authorities." *Id.* These longstanding principles of separation of powers and deference must not be ignored, especially in the current crisis.

The Plaintiffs cite *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) throughout their brief to show that the COVID-19 crisis is serious. The Plaintiffs fail to state that notwithstanding the offender's fears of COVID-19, the court denied his request to be released pending trial. This penological interest prevailed notwithstanding the offender's concerns.

The Plaintiffs' concerns cannot override the public interest. In this case, the public interest is public health, probably the most serious concern there could be. Defendants decisions regarding DOC, the statewide administration of COVID-19 response, and Camp J made in the interest of public health outweigh plaintiffs' concerns.

---

[54] *Turner v. Safley*, 482 U.S. 78, 84–85; 107 S.Ct. 2254, 2259; 96 L.Ed.2d 64 (1987).
[55] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (internal citations omitted).

### D. The Plaintiffs' claims regarding the COVID-19 response are new claims not within the scope of this case

The Plaintiffs' complaints (assuming there is actually a real case and controversy that properly is before this Court) regarding the defendants' COVID-19 response are new claims not within the scope of this litigation. The Plaintiffs did not present evidence at trial that LSP's infectious disease policies and procedures were deficient. The Plaintiffs' lengthy expert report did not criticize LSP's infectious disease policies. Dr. Puisis testified that trial that he did not look at LSP's infectious disease policies very closely.[56] The Plaintiffs' even lengthier proposed findings of fact and conclusions of law did not state that LSP's infectious disease policies were inadequate. Thus, LSP's infectious disease policies are not being challenged.

More importantly though, the COVID-19 crisis did not exist in 2016. The fact that the Plaintiffs contend that the Defendants' health care is unconstitutional does not mean that they have *carte blanche* to explore any activity by the Defendants pertaining to medical care.

### IV. CONCLUSION

For the foregoing reasons, Defendants respectfully ask the Court to deny the relief sought by Plaintiffs' in the instant motion.

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: _s/Randal J. Robert_
    Randal J. Robert (#21840)
    Connell L. Archey (#20086)
    Keith J. Fernandez (#33124)

---

[56] Trial Tr. Day 2, p. 86.

>George P. Holmes (#36501)
>*Special Assistant Attorneys General*
>Email: randy.robert@butlersnow.com
>connell.archey@butlersnow.com
>keith.fernandez@butlersnow.com
>george.holmes@butersnow.com
>
>**SHOWS, CALI & WALSH, L.L.P.**
>Jeffrey K. Cody, La. Bar Roll No. 28536
>Caroline M. Tomeny, La. Bar Roll No. 34120
>John C. Conine, Jr., La. Bar Roll No. 36834
>*Special Assistant Attorneys General*
>628 St. Louis Street (70802)
>P.O. Drawer 4425
>Baton Rouge, Louisiana 70821
>Telephone: (225) 346-1461
>Facsimile: (225) 346-1467
>Email: jeffreyc@scwllp.com
>caroline@scwllp.com
>coninej@scwllp.com
>
>Patricia Wilton (La. Bar Roll No. 18049)
>Elizabeth Murrill (La. Bar Roll No. 20685)
>Angelique Freel (La. Bar Roll No. 28561)
>*Assistant Attorneys General*
>Louisiana Department of Justice
>1885 North 3rd Street
>P.O. Box 94005
>Baton Rouge, Louisiana 70804-9005
>Telephone: (225) 326-6200
>Facsimile: (225) 326-6297
>Email: WiltonP@ag.louisiana.gov
>MurrillE@ag.louisiana.gov
>FreelA@ag.louisiana.gov
>
>Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of April, 2020, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

>*/s/ Randal J. Robert*
>Randal J. Robert

52389333.v1