**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**


JOSEPH LEWIS, JR., ET AL.                    CIVIL DOCKET NO.: 3:15-CV-318

VERSUS                                        JUDGE: SHELLY DICK

BURL CAIN, ET AL.                              MAGISTRATE: RICHARD BOURGEOIS


**OPINION**

I.    **GENERAL ALLEGATIONS AND PROCEDURAL BACKGROUND**

 This suit was originally brought by several inmates incarcerated at the Louisiana

State Penitentiary ("LSP").  The LSP at Angola (sometimes referred to as "Angola") is a

maximum-security men's prison in Angola, Louisiana that housed between 6200-6400

men throughout the discovery period.[1]  Plaintiffs claim that the medical care provided at

LSP violates the Eighth Amendment prohibition of cruel and unusual punishment.

Plaintiffs also claim that, through various general practices and policies, LSP systemically

violates the rights of disabled inmates covered by the Americans with Disabilities Act

("ADA")[2] and the Rehabilitation Act ("RA").[3]

 The Plaintiffs sought to represent a class of all prisoners who are now, or will in

the future, be confined at LSP (the "Class"), as well as an ADA Subclass of inmates with

---

[1] Undisputed Facts ("UF") ¶ 1, First Amended Joint Pretrial Order ("JPTO"), Rec. Doc. No. 242-2; PX 6 at
0017; DX 14 at 02876.  The relevant time period in this matter was confined to May 20, 2015 (the date of
filing) and September 30, 2016 (the close of the discovery period).
[2] 42 U.S.C. § 12101, *et seq.*
[3] 29 U.S.C. § 701.
Document Number: 52892

disabilities who are now, or will in the future, be confined at LSP (the "ADA Subclass").[4] Plaintiffs seek injunctive relief to abate the alleged systemic deficiencies in Defendants' policies and practices that subject all inmates to unreasonable risks of serious harm.[5]

On February 26, 2018, following a class certification hearing and subsequent briefing by the Parties, the Court certified a class consisting of "all inmates who [are] now, or will be in the future, incarcerated at LSP," and a Subclass of "all qualified individuals with a disability, as defined by the [Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA")], who are now, or will be in the future, incarcerated at LSP."[6]  The Class and Subclass are represented by Otto Barrera, Clyde Carter, Ian Cazenave, Ricky Davis, Reginald George, Kentrell Parker, Lionel Tolbert, John Tonubbee and Edward Washington.[7]

This matter came before the Court for an eleven-day non-jury trial on the merits beginning October 9, 2018.  The undersigned also made a site visit to LSP on February 5, 2020.[8]  The Court has considered the Parties' pre-trial and post-trial submissions, the evidence admitted at trial, and the arguments presented, and the Court finds that Plaintiffs have satisfied their burden of proving that Defendants have been deliberately indifferent to the inmates' serious medical needs in the means and manner of the delivery of health care, in violation of the Eighth Amendment to the United States Constitution.  The Court also finds that Plaintiffs have met their burden of establishing, in part, that Defendants

---

[4] Rec. Doc. No. 140 at 2.
[5] *Id.*
[6] Rec. Doc. No. 394.
[7] *Id.* at 1, 30. Farrell Sampier testified at trial, but he passed away in March 2019 after a stroke. Rufus White was released from custody in March 2019.
[8] The Court issued an electronic notice that it found constitutional violations in the delivery of medical care at LSP.  At the Parties' request, the Court delayed the issuance of these written reasons to permit the Parties to explore an amicable resolution, which was unsuccessful.
Document Number: 52892

violated the Americans with Disabilities Act, as modified by the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973.

The Court's credibility findings, findings of fact, and conclusion of law are set forth below pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II.    FINDINGS OF FACT

### A. Stipulated Facts

The Parties stipulated to the following facts by written submission prior to trial. Stipulated facts that had changed as of the time of trial are noted.

<u>Facts Related to Medical Care</u>

1.    Louisiana State Penitentiary at Angola ("Angola" or "LSP") is a maximum security prison in Angola, Louisiana that currently houses approximately 6400 inmates.

2.    Defendant Louisiana Department of Public Safety and Corrections ("DOC") is a division of the State of Louisiana charged with overseeing the custody and care of inmates in state prisons, including LSP.

3.    Defendant Burl Cain was the Warden of Angola from February 1, 1995 through December 31, 2015. He was succeeded by Defendant Darrel Vannoy, who is currently the Warden of Angola. The Warden's duties include, among other things, assigning people to manage the medical care and then being sure that they do what the policies and procedures say.

4.    Defendant Raman Singh was the Chief Medical and Mental Health Director of the DOC since November 2007, which included managing several departments such as

Document Number: 52892

nursing, dental and mental health.[9] Before November 2007, he served as Medical Director of Angola, where his duty was to manage offender healthcare for LSP inmates.[10]

5.  Defendant James LeBlanc is the Secretary of the DOC. In that capacity, he supervises Dr. Singh as well as the rest of the employees of the Department. Although he has authority over the entire Department in a supervisory capacity, he has delegated authority for certain tasks and responsibilities to subordinate employees.

6.  Defendant Stephanie Lamartiniere was the Assistant Warden for Health Services at Angola from June 2013 until sometime in 2016. She was succeeded by Defendant Tracy Falgout, who was the Assistant Warden at the time of trial. The Assistant Warden has operational control over the medical unit at LSP. This includes, among other responsibilities, budgeting, hiring of certain classes of employees, medical records, and any kind of staffing issues.

7.  Defendant Randy Lavespere is the current Medical Director of Angola. This position is responsible for managing, among other things, Angola's doctors, nurses, patients, relationship with headquarters, and relationships with administration.

8.  Defendant Stacye Falgout has been the Chief Nursing Officer for the DOC since October 2011. Prior to that time, she was Assistant Director of Nurses at Angola. She reported to Dr. Singh and is the number two medical employee at DOC headquarters.

9.  Defendant Sherwood Poret has been the Director of Nursing at Angola since January 2013 and was the infection control supervisor before that. He supervises all nurses working at LSP.

---

[9] JX 4-bbb, R. Singh Depo at 9.
[10] As of the date of trial, Dr. Singh had been terminated from this position.
Document Number: 52892

10. LSP's medical staff currently includes five doctors and one nurse practitioner. Each of the doctors on LSP's staff was disciplined by the Louisiana State Board of Medical Examiners prior to being employed at LSP. Each of the doctors on LSP's staff had a restricted license or was restricted to practicing in institutional settings at the time they were hired by LSP. Some LSP medical staff have completed requirements imposed by the Medical Board and are no longer under restriction.

11. LSP mainly provides medical care at R.E. Barrow Treatment Center (often called "REBTC" or the "Treatment Center"), which comprises the Acute Treatment Unit ("ATU"), an infirmary, and seven examination rooms.

12. The infirmary has two units: "Unit 1," which treats acute care patients, and "Unit 2," which treats patients requiring long-term nursing home care and hospice patients.

13. Outside of the infirmary, medication is administered cell side by correctional officers.

14. Outside of the infirmary, inmates can request to see a doctor by submitting "sick call" requests, which are triaged cell side by Emergency Medical Technicians ("EMTs").

<u>Facts Related to ADA Claims</u>

15. At the time this lawsuit was filed, Warden Peabody was the ADA Coordinator at LSP. Warden Peabody became ill sometime before January 1, 2016 and was replaced by Warden Barr in July 2016. Defendant Tracy Falgout succeeded Warden Barr and has been the ADA Coordinator at LSP since September 2016.

16. ADA Coordinators do not receive any formal ADA training upon taking office or on a regular or recurring basis.

17. LSP does not provide braille versions of forms such as sick call requests, Administrative Remedy Procedure forms, or forms to request accommodations.

Document Number: 52892

18. DOC Directive No. 01.016(B) requires LSP to maintain an "ADA Advisory Committee." No such committee existed during the pendency of this lawsuit.

19. LSP Directive 07.004 provides that all "[s]everely handicapped inmates requiring medical care and/or assistance with basic life functions shall be housed at" REBTC or Medical Dorms.

20. LSP Directive # 09.036 prohibits any inmate "requiring a duty status" from utilizing the hobbyshop until such time as the inmate is returned to regular duty without restrictions.

21. Louisiana State Penitentiary and DOC receive some federal funding.

**B.    Court's Findings of Fact**

The following findings of fact are supported by the evidence in the record.  Where a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

22.    Prior to the trial of this matter, Plaintiffs' medical experts, Dr. Michael Puisis, D.O. (Dr. Puisis) and Nurse Practitioner Madeleine LaMarre, ("NP LaMarre"), conducted a four-day in-person site visit at LSP, and Dr. Susi Vassallo, M.D. ("Dr. Vassallo") conducted a two-day site visit.[11]    NP LaMarre and Dr. Vassallo observed Angola's facilities, interviewed numerous Angola staff members and patients, observed medical care in practice, and reviewed the medical records of 47 patients, in addition to the medical records of the ten named Plaintiffs.[12]

23.    Dr. Puisis was principally responsible for evaluating LSP's chronic care, specialty care, infirmary care, organizational structure, staffing, budget, healthcare operations,

---

[11] Rec Doc. 573 at 16, #29.
[12] *Id.* at
Document Number: 52892

medical records, laboratory, mortality review, and quality improvement.[13] Dr. Vassallo was principally responsible for evaluating emergency care and the work performed by EMTs.[14] NP LaMarre was principally responsible for evaluating access to care, chronic disease management, pharmacy, medication administration, policies and procedures, clinical spaces and sanitation, and health information management.[15]

24.    The Court had the opportunity to evaluate the credibility of Plaintiffs' experts and finds them to be credible.  All three experts testified at trial. Dr. Puisis testified for the better part of three days, and Dr. Vassallo and NP LaMarre each testified for approximately a day.  Dr. Vassallo also provided brief rebuttal testimony after Defendants' case. The Court also had the opportunity to observe and evaluate Dr. Puisis's testimony at the November 2017 class certification hearing.

25.    Prior to the trial of this matter, Plaintiff's architectural accessibility expert Mark Mazz ("Mazz") conducted a site visit to LSP on July 6, 2016 to assess ADA accessibility in specific areas at LSP used by disabled inmates in accessing  programs, services, and activities, as those areas would be subject to Title II and Section 504's programmatic access requirement, without respect to the dates of construction or alteration.[16]  Mazz issued a report of his findings, which was admitted into evidence without objection.[17]

---

[13] Rec. Doc. No. 544, Testimony of Puisis at 101:8-13.
[14] Rec. Doc. No. 547, Testimony of Vassallo at 138:21-25.
[15] Rec. Doc. No. 548, Testimony of LaMarre at 152:12-153:3.
[16] Rec. Doc. No. 546, Testimony of Mark Mazz, at 11:13-19 12:5-15, 14:15-15:22; *see also*, P Exh. 7 at 0009 & 0005.  Mazz was not advised which areas of LSP's facilities were constructed or altered after the Uniform Federal Accessibility Standards went into effect on March 7, 1988, or after the 1991 ADA Standards for Accessible Design went into effect on January 26, 1992.  Rec. Doc. No. 546 at 15:1-7; PX 7 at 0008.
[17] PX 7.
Document Number: 52892

26.    The Court found Mazz's testimony credible, and Defendants' expert Brian Nolan ("Nolan"), who reviewed Mazz's report setting forth the ADA violations findings and photographs, did not controvert or contradict Mazz's report; rather, Nolan opined he could "substantiate the items recorded" in the Mazz report "as being violations of the 1991 and 2010 ADA Standards for Accessible Design."[18]

27.    The Court rejects Defendants' attack on Mazz's methodology and analysis because he applied the 1991 standards to his findings; Mazz reviewed a letter from the DOJ regarding its investigation results and noted that the DOJ's analysis applied the same methodology.[19]  Defendants offered no evidence or testimony to rebut this.

Facts Relating to Medical Care

28.    Generally, the Court concludes that LSP lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs.  This includes a lack of adequate organizational structure, credentialing and peer review processes, health care policies and procedures, clinic space, and a quality control program.  Further, the Court finds the following aspects of inmate access to health care is constitutionally inadequate in the following ways: clinical care, specialty care, infirmary care, and emergency care.  The Court further finds that overwhelming deficiencies in the medical leadership and administration of health care at LSP contributes to these constitutional violations.

---

[18] PX 18.
[19] Rec. Doc. No. 546 at 24:23-25:22; 25:21-26:4; PX 7 at 0008 & 0009.
Document Number: 52892

1.    <u>Clinical Care</u>

29.    At LSP, emergency medical technicians ("EMTs") and paramedics are front line staff for screening and treatment of patients with routine (sick call) and urgent health care needs. EMTs conduct sick calls in inmate housing units **without** the patient's medical record, adequate medical equipment, or supplies.  Pursuant to both LSP Policy and applicable Standards of Care, physicians are required to clinically supervise EMTs; yet, this does not meaningfully or consistently occur at LSP.

30.    Clinic exam rooms lack privacy and standardized, typically required, equipment, *i.e.* blood pressure cuffs and glucometers.[20]  Dr. Puisis testified, and the Court observed on its site visit, that the outlying camps at LSP likewise lack standardized supplies.[21]

31.    Medics who see patients cell side lack access to medical records.[22]

32.    There are serious hygiene deficiencies in clinic spaces.  The condition of the clinic exam rooms indicates that the exam rooms are not used for patient examinations. For example, the exam tables are covered with medical records and cannot possibly accommodate a patient exam.[23] Clinic spaces are also cluttered with microwaves, refrigerators, and food items.[24]  Further, there is a lack of usable handwashing facilities in clinic rooms[25]  and a lack of paper covering on exam tables.[26]

33.    LSP physicians routinely fail to identify patient diseases and are focused on episodic complaints rather than the underlying state of disease.[27]  Physicians routinely

---

[20] Rec. Doc. No. 544 at 111:23-112:16; 114:10-24; observed by the Court during its site visit.
[21] *Id.* at 117:8-25.
[22] *Id.*at 116:5-8.
[23] *Id.* at 116:9-22
[24] *Id.* at 118:1-6.
[25] *Id.* at 119:18-120:2; PX 6 at 278.
[26] Rec. Doc. No. 544 at 120:12-18; PX 6 at 274.
[27] Rec. Doc. No. 544 at 126:2-9.
Document Number: 52892

fail to adequately obtain information regarding a patient's medical history upon evaluation.[28]  Physicians routinely fail to perform a meaningful physical examination, read and monitor testing, and monitor and manage medications, including educate patients regarding medications.[29]  Further, physicians inappropriately allow medics to triage patients and evaluate health requests.[30]

34.    Dr. Puisis concluded that the consequence of the inadequacy of the clinical care results in an inadequate therapeutic plan, and the associated risk of harm includes increased morbidity, unnecessary hospitalization, and deterioration of disease.[31]

<u>Patient #11</u>[32]

35.    Patient #11 suffers from Crohn's disease and was referred for a colonoscopy. A diagnostic colonoscopy was not performed until six months after the referral.  The colonoscopy findings resulted in a referral to a gastroenterologist, and the specialty consultation was not completed for another three months.

36.    The gastroenterologist recommended additional testing of the intestines which later revealed an abscess, resulting in inpatient emergency treatment to drain the abscess.  Ultimately, this patient required five subsequent surgical interventions and two hospitalizations.

37.    Dr. Pusis concluded that the delay in treatment and the failure to coordinate specialty care resulted in the patient requiring a higher level of treatment.  The failure of

---

[28] *Id.*at 126:21 – 127:9; 153:1-2.
[29] *Id.* at 153:2-10.
[30] Rec. Doc. No. 545 at 108:10-13.
[31] Rec. Doc. No. 544 at 127:10-15.
[32] *Id.* at 133:6-139:9.
Document Number: 52892

the coordination of care is evidenced by the fact that the patient was treated by surgeons for almost two years without being managed by a gastroenterologist.

38.    Following stabilization of Patient #11's acute conditions, LSP physicians prescribed Humira, but the patient was started on the wrong dose.  Dr. Puisis concluded that "it is likely that the patient had more episodes of fistula than necessary."[33]

<u>Patient #13</u>[34]

39.    Patient #13 suffers with high blood lipids and peripheral vascular disease and is at risk for stroke.  This patient required Statin drugs to prevent heart disease, yet the stroke review of the patient's record showed no evidence of statin medication administration other than a four-month duration.

40.    On December 17, 2014, Patient #13 had a heart attack, which according to Dr. Puisis was "likely that was preventable."[35]    Plaintiff's heart attack resulted in his hospitalization, and he was followed by a cardiologist who recommended an echocardiogram, which was completed on February 8, 2015. However, there is no evidence in the chart that any LSP provider referred to the echocardiogram and no evidence that the test results were provided to the outside cardiologist.  Thus, lacking any report from the first echocardiogram, the cardiologist ordered a second echocardiogram; meanwhile, Patient #13 had two additional hospitalizations for heart failure.

41.    On March 17, 2015, Patient #13 presented with slurred speech and aphasia (inability to speak), and he was seen by EMTs and sent to the ATU. The only notation by

---

[33] *Id.* at 138:14-15.
[34] *Id.* at 139:10-152:19; JX 10-JJJ.
[35] *Id.* at 141:21.
Document Number: 52892

an LSP provider is: "patient brought in for brief episode of slurred speech and expressive aphasia."  No neurological exam was charted.[36]  Dr. Puisis testified that:

> Strokes express themselves in terms of a neurological exam.  So you would have to see if the patient has any motor problem with their arms, legs, whether they have facial paralysis, whether they still have that, whether they can hear, whether their cranial nerves are intact.  And that requires a neurological exam, which was not done."[37]

A LSP physician ordered the patient to be seen "this week and [he] needs a CT."[38] However, a CT scan was not completed until 3 months later, revealing that the patient had suffered a stroke.

## 2.    Specialty Care Services

42.    Specialty care is provided at LSP in one of two ways:  either a panel of specialists who come to LSP or outside specialists to whom LSP refers patients.  Based on the following, the Court finds that inmates at LSP experience unnecessary and harmful delays in the assessment for and receiving of specialty medical care; harmful failure to follow specialty care recommendation; and failure to coordinate care. Referrals of patients for specialty care is untimely. There are systematic and recurring failures by LSP providers to follow-up on specialty care recommendations. There are repeated breakdowns in communication between the specialty care providers and the LSP medical providers. In sum, the timeliness of referrals to specialists, and the coordination of care between specialists and LSP physicians, is seriously flawed and constitutionally inadequate.

---

[36] Rec. Doc. 544 at 145:15-25.
[37] *Id.* at 145:18-23.
[38] *Id.*at 146:4.
Document Number: 52892

<u>Patient #5</u>

43.     Patient #5 complained for two years of weight loss and abdominal pain.  This patient's abdominal pain worsened to the point that he could not walk, and he developed diarrhea and vomiting.  After a two-year delay, he was finally hospitalized, and diagnosed with advanced colon cancer.  Surgery was performed after which the patient developed complications and died.  Plaintiffs' experts concluded that, "His death was preventable as an earlier diagnosis would have most likely prolonged his life."[39]   Further, this patient was seen on 10/25/14 for a bowel obstruction, a potentially life-threatening issue.   The provider who saw this patient did not evaluate the x-ray.  This patient required an immediate transfer to the hospital but was not sent, which constitutes a "significant departure from standard of care and placed the patient at risk of harm."[40]   Plaintiffs' experts concluded that this patient medically required hospitalization on 10/27/14, 10/30/14, and 11/1/14, but he was never sent, further delaying his diagnosis.[41]

<u>Patient #17</u>

44.     Patient 17 was a 46- year old man who arrived at LSP in 2006 and died on February 1, 2014 due to pneumonia, lung adenocarcinoma, respiratory failure, and septic shock.

45.     After undergoing chemotherapy for leukemia, this patient developed a suspicious lung nodule identified on a CT scan in May 2012.  Two specialists, an oncologist and a pulmonologist, noted possible malignancy and recommended that follow-up diagnostics be performed.   However, no follow-up diagnostics were ever received.   Patient 17's

---

[39] PX 6 at 0075-76; 0112-117.
[40] *Id.* at 0116, #7.
[41] *Id.* at 0016.
Document Number: 52892

condition worsened through November 2013 at which time he could no longer walk and became wheelchair-bound.[42]

46.    By the time Patient #17 was finally diagnosed in November 2013, he had metastasized cancer.  He died three months later.[43]

Patient #13

47.    Patient #13 was seen by a vascular specialist on November 20, 2013, who recommended a CT angiogram, but the test was not done for ten months.[44]  During this ten months, the patient was not being followed by a vascular surgeon although he was at risk for peripheral vascular disease and had been identified as having the disease.[45]

48.    Patient #13 was hospitalized after having a heart attack on December 17, 2014, and on January 29, 2015, he was seen by an outside cardiologist who recommended an echocardiogram.[46]  The echocardiogram was completed on February 8, but the LSP doctor failed to document that the echocardiogram had been done and failed to chart the findings.   When this patient returned to the cardiologist, the cardiologist did not have the echocardiogram to review or any chart notes of findings, which impaired the cardiologist's ability to provide proper medical care and advice.  The failure to coordinate and document was not an isolated incident. Patient #13 had three follow-up cardiology appointments in which the cardiologist was not provided the echocardiogram to review.[47]

---

[42] PX 6 at 0078, 0086-87, 0193-199.
[43] *Id.*
[44] Rec. Doc. No. 544 at 141:9-11.
[45] *Id.* at 141:12-16.
[46] *Id.* at 141:18-24.
[47] *Id.* at 142:13-23; 157:16-24.
Document Number: 52892

<u>Patient #7</u>

49.     The care and treatment of Patient #7 is further evidence of a failure to chart and

make appropriate medical notes and demonstrates repeated failures to coordinate care

that resulted in harm. Patient #7 was a 58-year old male who had an x-ray in February

2013 which revealed a potential malignancy for which the patient was not referred for a

CT scan for three months.[48]  When a CT scan was performed, it revealed a suspicious

lesion, and the patient was referred to a pulmonologist.  However, this patient did not see

a pulmonologist for approximately four months, which was seven or eight months from

the initial abnormal x-ray.  Upon seeing Patient #7, the pulmonologist recommended a

biopsy.[49]

50.     At trial, Dr. Puisis emphasized the difference between the pulmonologist's exam

notes and those of LSP with respect to this patient:

> So this is a note of the specialist.  Now it's a pulmonologist's note, but I
> would draw attention to just the presentation of the note itself as an example
> of how someone should write a note, recognizing that this is a specialist, I
> grant that, but he's an internist who also is a pulmonologist.  And to a certain
> extent, the notes at LSP should look more like that than not, and you'll note
> that there's a history, that there's a physical exam section, and that there's
> an assessment and recommendations.[50]

When referring to the LSP physician notes on the same patient, Dr. Puisis explained:

> Okay. So this is the [LSP] physician's note after the specialty visit, and this
> occurred, I believe, a month after the visit, approximately. So that already is
> a little tardy for a post-specialty visit. Nevertheless, the doctor -- there's no
> specific history, there's no examination, there's no assessment, but the
> doctor does write the conditions one, two, three, hypertension, chronic
> vertigo, and left upper lobe mass. But on the left upper lobe mass, the doctor
> writes: pulmonary plan equals CT-guided biopsy, question mark, bronc,

---

[48] *Id.* at 158:19-21; JX 10-b.
[49] JX 10-b at 02651-52.
[50] Rec. Doc. No. 544 at 160:25-161:8.
Document Number: 52892

question mark. the specialist was not questioning whether the test needed to be done. He had specific recommendations.

My interpretation of this note is that the doctor wasn't sure what the pulmonologist recommended. What should have occurred on this note is the doctor should have documented, reviewed pulmonogist's [sic] note, recommendation for biopsy. And it appears that the doctor wasn't sure what was recommended, and that just verifies to us that the coordination between the specialist and the primary care doctor was poor and, in our opinion, resulted in the delays that occurred.[51]

51.    The trial evidence established that Patient #7 was recommended for a biopsy on February 19, 2013, he was seen by a LSP physician in March 2013, and on August 28, 2013 – seven months from the recommendation and one year after the initial x-ray – the patient was seen by the pulmonologist who noted: "the biopsy didn't occur, what gives?", and he recommended another biopsy.[52]   The pulmonologist also noted on that date, "strongly suggest immediate IR [interventional radiology], FNA [fine needle aspiration] of left upper lobe nodule."[53]

52.    On September 25, 2013, a biopsy had still not been completed.  The pulmonologist again recommended a biopsy.  Eventually, having never undergone a biopsy, this patient underwent a lobectomy to remove a "portion of the lung that was infested with cancer."[54]

53.    This patient was returned to LSP on October 14, 2013 and was first referred to oncology to begin chemotherapy on November 19, 2013; however, records show that chemotherapy was delayed and not scheduled to begin until January 8, 2014.[55]

54.    After his return to LSP, the patient made a health care request on November 21

---

[51] *Id.* at 161:19-162:12 (explaining JX 10-b at 02656).
[52] *Id.* at 162:13-21.
[53] JX 10-b at 02601.
[54] Rec. Doc. No. 544 at 164:2-3.
[55] *Id.* at 164:20-24.
Document Number: 52892

complaining of tongue and mouth swelling and vomiting. An EMT evaluated and treated these complaints with coal tablets and cough syrup. Dr. Puisis testified that, given the patient's medical history and return from a lobectomy with chemotherapy to follow, a physician should have seen and evaluated these complaints.[56]  Before Patient #7 began chemotherapy, he died.[57]

<u>Patient #6</u>

55.    Patient #6 was evaluated by an outside cardiologist for hypertension and significant cardiac arrhythmia.  In 2013, the cardiologist ordered an echocardiogram and an event recorder test.[58] The echocardiogram was performed, but the event recorder was not.    As a result, the patient's atrial fibrillation was not treated with necessary anticoagulation.

56.    Two years later, in April 2015, the patient was hospitalized after he developed another episode of atrial fibrillation.    During this hospitalization, the patient was anticoagulated at the hospital.  When the patient returned to LSP, the patient was not evaluated and did not receive recommended anticoagulation for approximately 10 days. Within four days of his return to LSP, this patient developed critical symptoms. Rather than send the patient to a hospital, Defendants ordered a next day follow-up. This patient soon developed signs of serious heart failure. Instead of hospitalizing the patient, he was treated in the infirmary without any diagnostic testing. It took four days in the infirmary

---

[56] *Id.* at 165:7-21.
[57] *Id.* at 159:7-166:3.
[58] Rec. Doc. No. 133-2 at 76; PX 6 at 0076.
Document Number: 52892

before anticoagulation was finally begun, but this patient failed to improve and subsequently died.[59]

57.    Plaintiffs' experts found Patient #6's death was preventable, and it "was caused by lack of recognition of the need for anticoagulation over a two-year period and, finally, a lack of providing ordered anticoagulation medication for 10 days due to lack of review and acting on consultant recommendations."[60]

<u>Patient #10</u>

58.    Lab results for this patient revealed obstructive jaundice that was potentially life-threatening.  A CT scan revealed a mass in the patient's pancreas.  Rather than being sent to the hospital for a biopsy, this patient was kept in the infirmary where he developed a fever.  The patient was ultimately sent to the hospital where he was diagnosed with pancreatic cancer.[61]

59.    Following this diagnosis, Patient #10 was returned to the infirmary where LSP providers "seldom took a history or performed a physical examination, did not coordinate a follow up with an oncologist, and failed to monitor the patient's bilirubin."[62]  LSP providers also failed to review the hospital care or the therapeutic plan established at the hospital, and the patient was discharged from the infirmary and placed back in general population.  LSP subsequently made no effort to coordinate oncology care.[63]

60.    Although this patient was eventually evaluated by an oncologist, the patient had developed an altered mental status and hypotension and refused the ATU doctors'

---

[59] *Id.*
[60] *Id.*
[61] Rec. Doc. No. 133-2 at 77;PX 6 at 0077.
[62] *Id.*
[63] *Id.*
Document Number: 52892

recommendations that he seek care.  The patient refused care and was transferred to the hospital where he died in the emergency room.[64]

61.    Plaintiffs' experts opined that the LSP providers "showed a lack of concern for this patient and appeared to promote a terminal diagnosis and delay care before the patient had an adequate chance at treatment."[65]

Patient #53

62.    Patient #53, who had previously had a heart valve replacement and chronically sub-therapeutic levels of anticoagulants, was prescribed Tegretol, an anticonvulsant medication.  A cardiologist noted the lack of indication for this drug in 2016, but this was never reviewed by LSP physicians, and the patient remained on Tegretol for at least three more months.[66]

Patient #54

63.    Patient #54 experienced numerous delays in receiving specialist care/recommendations between 2013 and 2016.[67]  Specifically, ablation of this patient's atrial fibrillation was delayed by over a year due to failures to schedule the patient for procedures, failure to provide echocardiogram results to the cardiologist, and failure to address the cardiologist's recommendations.[68]  Following the ablation, LSP providers failed to document the cardiologist's recommendations; thus, this patient was erroneously

---

[64] *Id.*
[65] Rec. Doc. No. 133-2 at 77-78; PX 6 at 0077-78.
[66] PX 410 at 3-4; JX 10-y-1 at 21012; JX 10-y-3 at 21377.
[67] PX 410 at 1-2.
[68] *Id.*

Document Number: 52892

continued on a blood thinner for a year, placing him at significant risk of stroke, hemorrhage, and other side effects.[69]

## Otto Barrera

64.    Otto Barrera testified at the bench trial about significant delays he experienced, since his incarceration at LSP in 2013, in obtaining necessary reconstructive surgeries to repair his jaw, tongue, and teeth, which would require numerous surgeries over five years altogether.[70]   At that time, Barrera was feeding himself through a pec tube and barely able to speak or take his medication due to his injuries.[71]

65.    For the next two years, Barrera was housed on the hospital ward where he had some teeth pulled by the on-site dentist and LSU dental providers.[72] The LSU maxillofacial providers reiterated their recommendation again in 2015 that he needed reconstructive surgery, but he testified that he was told by the LSP doctor that the surgery would not be approved because it was considered a cosmetic surgery.[73]

66.    In January 2016, LSP Nurse Practitioner Cindy Park admitted that Barrera had been "lost to follow-up" since early 2014.[74]   In September 2016, Barrera had still not received any surgery.[75]

## Joe Lewis

67.    Over a period of 33 months beginning in April 2012, Joe Lewis made numerous sick calls complaining of cough, hoarseness, and losing his voice.  He reported on a

---

[69] *Id.*
[70] Rec. Doc. No. 546, Testimony of Otto Barrera at 207:7-14; *see also* PX 245-b (photographs of Barrera's injuries).
[71] Rec. Doc. No. 546 at 206:1-207:22, 225:5-18, 229:5-19.
[72] *Id.* at 216:18-217:5.
[73] *Id.* at 217:3-219:22; Rec. Doc. No. 547 at 31:10-25.
[74] JX 10-d-2 at 04063.
[75] Rec. Doc. No. 547 at 21:9-11.
Document Number: 52892

February 2014 sick call that he had a family history of cancer; however, he was not referred by LSP to an ENT until November 2014, and he did not see an ENT until January 2015.[76]

Shannon Hurd

68.    Shannon Hurd made several sick call requests for symptoms of renal cell carcinoma between September 2013 and September 2015; yet, he did not receive a CT scan until December 2015, which revealed a large renal mass with multiple nodules. Despite this, LSP physicians failed to follow-up for nearly a month.[77]

3.    Infirmary/In-Patient Care

69.    LSP has two infirmaries, Infirmary 1 and Infirmary 2.  Infirmary 1 is the acute care infirmary for the treatment of patients with urgent or episodic conditions.  Infirmary 2 is the chronic care infirmary for patients with chronic disabilities or conditions that require long-term housing.[78]

70.    Nursing Unit (Infirmary) 2 is managed by a nurse practitioner who also oversees more than 1000 other patients.[79]

71.    Dr. Puisis opined that the infirmary/in-patient care provided by LSP is severely inadequate.[80]

72.    Dr. Puisis testified that, according to the National Commission on Correctional Health Care ("NCCHC") standards, every inmate patient should be within the sight and

---

[76] PX 28 at 0017-18.
[77] *Id.* at 0018-22.
[78] Rec. Doc. No. 544 at 172:25-173:13.
[79] *Id.* at 173:14-20.
[80] *Id.* at 123:20-124:10.
Document Number: 52892

sound of a nurse.[81]

73.    LSP infirmaries have individual rooms with steel doors which are separated from nursing staff by solid locking doors and no call system to reach nurses.   Dr. Puisis testified that there should be a way for the patient to communicate with the nursing staff, and the steel doors render adequate communication an impossibility.[82]   For example, Kentrell Parker was a quadriplegic whose breathing required a tracheotomy, and he was locked in an isolation room facing away from the door with no means to summon assistance.[83]

74.    Dr. Puisis testified that, in the general population, inmates may serve as orderlies and assist patients with activities of daily living; however, inmate orderly service is medically inappropriate in the infirmary setting.[84]

75.    LSP utilizes inmates as nursing assistants which is beyond the scope of the medically accepted use of orderlies. According to NCCH, inmates may assist with activities of daily living, but not in the inpatient environment because:  (1) inmates lack training, and (2) there is a potential for undue leverage, *i.e.*, an inmate declining to provide assistance unless receiving some gratuity from the patient.[85]

76.    The infirmaries at LSP are significantly understaffed, requiring inmate orderlies to clean, bathe, dress, feed, and position patients - all activities of daily living as acknowledged by LSP physician Dr. David Thomas.[86]

---

[81] *Id.* at 170:16-171:5 (citing PX 243 at 0130).
[82] Rec. Doc. No. 544 at 177:14-178:11.
[83] PX 6 at 0081-82.
[84] Rec. Doc. No. 544 at 174:25-175:22.
[85] *Id.* at 175:11-176:9.
[86] Rec. Doc. No. 552, Testimony of David Thomas at 29:6-7: 87:2-7.
Document Number: 52892

77.     It was established that inmate orderlies are not supervised by registered nurses; rather, they are supervised by security staff who lack medical training. Dr.Puisis testified at length about health care standards that strongly counsel against the use of inmate orderlies to assist inpatient inmates with activities of daily living.[87]

78.     Further, even if the use of inmate orderlies to assist with activities of daily living conforms to the minimum standards of the Eighth Amendment, the trial evidence showed that LSP failed to follow its own training policies with respect to inmate orderlies.[88]

## Patient #3

79.     This patient has underlying diabetes and peripheral vascular disease. Ulcers and disease to both legs required amputation above-the-knee. The patient subsequently developed serious infections to the stump in 2008, and he was sent to the hospital where he underwent emergency surgery to remove the dead tissue.  Doctors had to extend upward to the perineum to find live tissue. All tissue in this patient's penis and entire perineum was dead. He was returned to LSP and placed in hospice care.[89]

80.     Dr. Puisis credibly testified that this type of infirmary care is representative of the care he observed during the relevant time period; however, the Court finds that the facts surrounding Patient 3 which occurred in 2008 are not probative of the health care conditions at issue during the relevant time period of this lawsuit.

## Patient #39

81.     Patient #39 was immunosuppressed with a history of congestive heart failure and diabetes. He was admitted into the infirmary on July 20, 2011, presenting with a fever of

---

[87] Rec. Doc. No. 544, Testimony of Mike Puisis at 175:4-176:11.
[88] JX 6-eee at 6 (annual training).
[89] JX 10-AAA.
Document Number: 52892

103.6 degrees and altered status.  He was placed in a "locked room" with the "hatch up" after a nurse reported that the patient was masturbating on July 21, 2011. LSP physicians ceased visiting the patient altogether for 3 days. He was discharged back to his housing unit on the fourth day.  Two days after his discharge, this patient was found vomiting in his cell.  Both Dr. Lavespere and Dr. McMurdo ordered EMTs not to transport the patient to the hospital, and this patient died the next morning.[90]

## Patient #18

82.    Following multiple positive tests for HIV, Patient #18 was admitted to the infirmary on December 2, 2013, presenting with pneumocystic pneumonia and life-threatening abnormal vital signs.   Despite his condition, antiretrovirals therapy was not started for four days. Less than one week after starting antiretrovirals therapy, this patient developed a fever of 101 degrees, and he was transferred to an outside hospital on December 13, 2013, where he died one month later. While Patient #18 was in the infirmary at LSP, his vital signs were monitored only once daily, and his medications were, at best, irregularly administered.[91]

## Patient #11

83.    Patient #11 suffered from Chron's Disease, which Dr. Puisis testified requires chronic disease monitoring.[92]  This patient was admitted to the infirmary following a partial colectomy. This surgery was necessary due to the failure of LSP physicians to timely and properly monitor and treat his Crohn's disease.    The Court finds that the evidence

---

[90] PX 6 at 0063; JX 10-ii-1 at 34748-49; PX 233 at 0112.
[91] PX 6 at 0039 – 40, 0083-84; Rec. Doc. No. 548, Testimony of Madeleine LeMarre at 172:11-22; 181:20-21.
[92] Rec. Doc. No. 544 at 133:6-15.
Document Number: 52892

demonstrating LSP's failures to take Patient #11's history, perform adequate physical examinations, document a treatment plan, provide indicated immunosuppressive therapy, and failure to refer him to gastroenterologist resulted in a preventive death.[93]

4.    Sick Call

84.    Sick call is the main process by which patients access the medical system at Angola, and it is conducted cell side by EMTs.  EMTs do not commonly consult doctors during sick call visits, and the evidence shows that fewer than half of all sick call visits from April to June 2016 were referred for provider review.[94]

85.    Expert testimony at trial established that inmate patients submitted repeated Health Service Requests ("HSR") for the same complaint.[95]

86.    Evidence also demonstrated that EMTs routinely did not have access to the patient's health record when conducting sick calls, resulting in patients being treated repeatedly with the same medication regimen even if such regimens had failed in the past.  This was demonstrated by the following evidence at trial:

87.    Patient #17 complained of chest pain at sick call for over 16 months. Prior to these complaints, the patient's medical records indicated that he had a pulmonary nodule and had been referred to a thoracic surgeon for a biopsy. This patient was seen repeatedly by EMTs at sick call for complaints of chest pain for 16 months from 2102 to 2014. A biopsy of the pulmonary nodule was finally performed in 2014, and this patient was diagnosed with adenocarcinoma of the lung. He died a little over one week later.[96]

---

[93] PX 6 at 0044–45, 146; Rec. Doc. No. 544, Testimony of Mike Puisis at 133:6 – 139:9; JX 10-R.
[94] PX 41 at 0039-41.
[95] Rec. Doc. No. 548 at 185:15-186:10.
[96] PX 6 at 0193-99.
Document Number: 52892

88.    Patient #20 was seen by EMTs at sick call for over four months with repeated complaints of significant abdominal pain. More than once, EMTs failed to refer the patient to a physician despite his severe symptoms. After months of complaining of "burning" pain, weight loss, and vomiting blood, the patient was admitted to a nursing unit. He died the following day.[97]

89.    Patient #29 was seen 10 times by EMTs for sick calls in a one-month period.  This patient presented with symptoms consistent with exacerbation of congestive heart failure; however, it took over a month for this patient to be hospitalized despite acute worsening of symptoms.[98]

90.    Patient #18 was seen on multiple occasions by EMTs with complaints of chest pain, shortness of breath, and a 55-pound weight loss. There is no documentation that EMTs notified physicians of the patient's abnormal vital signs, precipitous weight loss, or the progressive worsening of his symptoms. The patient did not receive a timely or meaningful clinical evaluation for his symptoms by a physician. Ultimately, Patient #18 was diagnosed with HIV, and he died a little over one month after this diagnosis. According to the medical experts, a timely diagnosis of this patient's HIV status and corresponding anti-retroviral intervention could have prevented his death.[99]

91.    Plaintiff Shannon Hurd (deceased) repeatedly complained of substantial weight loss and testicular swelling. After 2 years of presenting to EMTs with consistent and worsening complaints, diagnostic testing revealed renal cancer. From the time that this patient began complaining of symptoms until his ultimate diagnosis two years later, Hurd

---

[97] PX 6 at 0216-27.
[98] PX 6 at 0256-57.
[99] PX 6 at 0200-08.
Document Number: 52892

lost 61 pounds. During this period, Hurd saw doctors and EMTs on numerous occasions, but they routinely failed to conduct meaningful testing or scrutinize his symptoms and medical history. Even when tests did occur, doctors failed to provide the necessary follow up.[100]

92.    Plaintiff Joseph Lewis (deceased) repeatedly complained for 33 months—nearly three years—of symptoms consistent with laryngeal cancer. Lewis was mostly evaluated cell side by EMTs at sick call who referred him to a physician on only a few occasions. After 33 months of constant complaints, diagnostic testing was obtained which revealed laryngeal cancer. Again, according to medical experts, timely diagnostics would likely have prolonged Lewis' life.[101]

93.    Regarding transport orders, the evidence showed that, when EMTs consulted LSP physicians to request increased care or for additional patient assessment, the physicians routinely gave "no transport" orders resulting in further diagnostic and treatment delays. According to the undisputed expert opinions presented, these "verbal orders given to the medics over the radio … advising that the patient not be transported from his cell,"[102] "result[ed] in delay in care, lack of evaluation by a physician and in some cases death."[103] Record examples of the consequences of these "no transport" orders are as follows:

94.    Patient # 39 was a 65-year-old man with "a history of diabetes, [and] severe coronary artery disease and heart failure."[104] In July of 2011, the patient was seen by EMTs seven times with symptoms including a "temperature of 103.6," "an altered mental

---

[100] PX 28 at 0018-22; *see also* Rec. Doc. No. 552, Testimony of David Thomas at 99:9-116:4.
[101] PX 28 at 0017-18.
[102] PX 6 at 0063.
[103] *Id.*; S*ee also* Rec. Doc. No. 547, Testimony of Susi Vassallo at 150:24-151:9, 174:24-178:7.
[104] PX 6 at 0063
Document Number: 52892

status," "chest tightness," and "breathing but unresponsive." On one occasion, Patient 39 was observed lying on the floor of his cell "'vomiting and won't move [sic].'"[105] Nevertheless, no-transport orders were given three times. After the third no transport order in July 2011, this patient died in his cell. The medical records do not explain or describe the reason for, or circumstances of, the death.[106]

95.     Patient # 34 made an emergency sick call for flank pain. LSP physician Dr. Toce ordered an x-ray without seeing the patient,[107] but he was subsequently seen by Dr. Collins in the ATU the next day. Dr Collins noted that there was no bruising or injury that could explain the patient's pain.[108] Three days later, Dr. Lavespere gave a no transport order when the patient could not get out of bed. Three days after this no transport order, the patient was found non-responsive in his cell. He died the following day.[109]

96.     Plaintiffs not only challenge the constitutionality of the medical response to sick calls at LSP but also the constitutionality of the sick call policies, generally. Pursuant to the DOC's Access to Care and Clinical Services Policy,[110] inmate patients are to have daily access to routine and urgent services, with sick call requests triaged every day. Sick Call carries a $3 co-pay, self-declared medical emergencies carry a $6 co-pay, and a new medication (OTC or RX) carries a $2 co-pay regardless of the number of doses.[111]

---

[105] *Id.*
[106] *Id.* at 0063-64.
[107] PX 6 at 0267; Rec. Doc. No. 548, Testimony of Susi Vassallo at 57:5-58:16; JX 10-ee at 28686. It is unclear when the patient suffered the broken ribs, and whether the rib fracture was related to his death; the autopsy reports a "remote" fracture, suggesting that the rib injury may have been distant in time and unrelated. *See* Rec. Doc. No. 548 at 57:5-58:16.
[108] JX 10-ee at 28685.
[109] *Id.* at 28678-81; *see* Rec. Doc. No. 548, Testimony of Susi Vassallo at 112:9-114:1; *see also, e.g.*, PX 6 at 0201, 0236, 0238, 0254, 0257 (noting additional no transport orders).
[110] JX 5-A at 00020 ( HC-01).
[111] *Id.* at 00023.
Document Number: 52892

Plaintiffs argue that this co-pay system presents an unconstitutional barrier to care. Based on the trial evidence submitted, the Court does not to find that these policies, in and of themselves, create an unconstitutional (cruel and unusual) barrier to health care. However, it is one factor that contributes to a delivery system that is, in this Court's view, woefully inadequate. Sick call policies requiring co-pays is not unconstitutionally cruel and unusual. Even though the malingering policy is unenforced, the fact that it is on the books arguably creates a disincentive for inmates to sick call. There was no evidence that the policy creates access hesitance. Inasmuch as the policy is disfavored and not used, in the Court's view, LSP should amend its written policy to conform to its practice.

97.    In requesting a "sick call," an inmate is required to acknowledge in writing: "I am aware that if I declare myself a medical emergency and health care staff determine that an emergency does not exist, I may be subject to disciplinary action for malingering."[112] In short, if an inmate is determined not to be "emergency" sick after complaining of symptoms, the inmate can be sanctioned for "malingering." Defendants contend the actual use of malingering write-ups is rare. However, even the Defendants' medical expert, Dr. Thomas, agreed that the malingering policy at LSP should be discontinued.[113] Plaintiffs' medical expert opined that a policy which permits medical providers to punish inmates for seeking access to care creates a conflict of interest and is a practice not seen in other correctional facilities.[114]

98.    After weighing all evidence regarding this policy, the Court finds that, although LSP's malingering policy exists on paper, it is not enforced in practice. Accordingly, the

---

[112] PX 53.
[113] DX 14 at 02943.
[114] Rec. Doc. No. 545, Testimony of Puisis at 14:16-16:4.
Document Number: 52892

Court finds that Plaintiffs have failed to carry their burden of proving harm regarding this policy.

99.     Nevertheless, although the Court finds that the unenforced malingering policy is not unconstitutional, it is evidence of systemic health care structures that the Court does find results in constitutionally infirm health care delivery.  As evidenced by the malingering policy, the medical department at LSP is controlled by LSP security rather than medical care providers. Both Plaintiffs' and Defendants' experts agreed that this organizational hierarchy, under which the medical department reports to security, is not working.[115] Moreover, orderlies and EMTS also report to the security chain of command for supervision,[116] and correctional officers supervise the delivery of medications by other correctional officers.[117]   Dr. Lavespere admitted that security personnel - not medical personnel -  are tasked with the initial assessment of whether an inmate is "really sick" when they purport to have a medical emergency.[118]   Additionally, the Assistant Warden makes resource-allocation decisions such as when nurses are required for pill call.[119] The Court finds that this system where health care decisions are largely made  by security rather than qualified health care providers is unconstitutional.

---

[115] *See e.g.*, DX 13 at 02845-46 (Dr. Moore describing the leadership as "most unusual" and creating "difficulties," including making the "success of the program [] primarily dependent upon the good will of the wardens."). She further explained that Wardens are not capable of assessing the quality of medical care delivery. *See also* PX 6 at 0011-12.

[116] JX 4-gg, A. Cowan Depo. at 9:20-25, 10:16-20; JX 4-dd, D. Cashio Depo. at 73:18-74:18 PX 6 at 0015; JX 4-ii, T. Falgout Depo. at 17:23-25 (Warden Falgout testifying that security deals with staffing and assigning orderlies).

[117] Rec. Doc. No. 553,Testimony of Tammi Willis at 96:4-8; *see also* JX 4-ddd.

[118] JX 4-rr at 26:24-27:4.

[119] Rec. Doc. No. 551, Testimony of Randy Lavespere at 193:9-18.

Document Number: 52892

5.    Emergency Care – Acute Treatment Unit ("ATU")

100.    The ATU is not an emergency room ("ER") and is, therefore, not equipped with some of the equipment necessary to diagnose and treat serious medical conditions.[120] Further, because the ATU does not operate as an ER, referral to outside hospitals becomes necessary in emergency situations.  However, the trial evidence demonstrates that LSP often fails to refer patients to an outside ER when necessary.  Addtionally, as with sick calls, LSP employs EMTs as primary care providers in the ATU.

101.    In addition to sick call assessments, EMTs "perform all emergency response."[121] Plaintiffs agree that it is an "appropriate use of EMTs to respond to medical emergencies on-site, such as in a cell or dorm."[122] However, Plaintiffs challenge the policy allowing EMTs to deliver care and serve as the "primary providers" for patients in the ATU.[123] It is admitted that only serious medical conditions are seen in the ATU, and according to Dr. Lavespere, as many as 76 patients may be seen in a day in the ATU.[124]

102.    Although a physician is assigned to provide on-call coverage to the ATU, the Court finds from the trial evidence that physicians do not regularly or consistently staff the ATU, and, as a result, patients in the ATU are not being consistently evaluated or treated by physicians. The Court finds as a matter of fact that it is EMTs who are routinely delivering patient care in the ATU, which "differs dramatically" from how prison EMTs are used in emergencies in the rest of the country, according to Plaintiffs' expert.[125]

---

[120] PX 6 at 0066.
[121] *Id.* at 0061.
[122] Rec. Doc. No. 573 at 110.
[123] Rec. Doc. No. 547, Testimony of Susi Vassallo at 141:25-142:4; Rec. Doc. No. 548 at 14:3-13.
[124] JX 4-rr, R. Lavespere Depo at 44:4-7.
[125] Rec. Doc. No. 548, Testimony of Susi Vassallo at 22:1-3.
Document Number: 52892

103.    The Court further finds that, regarding patients in the ATU, EMTs "continue to manage the patient" and "make serial observations over many, many, many, many hours," which is not within their training or scope of practice.[126] EMTs are simply not trained "to render ongoing care for a number of hours."[127] The following examples demonstrate the improper use of EMTs in the ATU.

104.    Patient #1 was managed by EMTs in the ATU for more than 24 hours for an episode of diabetic ketoacidosis and acute renal failure - conditions which led to his death one day later.[128]

105.    Patient #15 was managed by EMTs in the ATU overnight despite suffering from acute coronary syndrome, and then discharged to his housing unit at 3:45 in the morning; he returned to the ATU later that morning and then died en route to the hospital.[129]

106.    Patient #20 was managed by EMTs in the ATU overnight, despite a physician's telephone order that he be admitted to the nursing unit, because the nursing unit was full. The patient's symptoms suggested he was "internally bleeding and at risk of death," and he, in fact, died the following day.[130]

107.    Patients #38 and #42 were managed in the ATU for at least eight hours by EMTs, despite both having symptoms suggestive of a stroke.  Patient #38, who had a medical history of strokes, died the following day.  Patient #42 lived following this ATU stay but

---

[126] Rec. Doc. No. 547 at 160:13-161:1; *see also, e.g., id.* at 151:20-152:4 ("The problem at Angola is that the EMTs continue to manage the patient. Now, there are exceptions to that, but most commonly the EMTs will manage patients with calling to the doctors. They will be given verbal orders or telephone orders, and so the doctor is relying on the information they are given by someone who is observing something but not trained to make serial observations over many, many, many hours and to know what that means.").
[127] Rec. Doc. No. 547, Testimony of Susi Vassallo at 142:5-12; *see also* PX 6 at 0041, 60-71.
[128] *See* PX 6 at 0069, 0091-94; JX 10-w at 51299-307.
[129] *See* PX 6 at 0069-71, 0187-90; JX 10-v at 18943-48.
[130] PX 6 at 0034-35, 0056, 0085, 0225-27.
Document Number: 52892

was left with long-term deficits due to lack of proper treatment.[131]

108.   The trial evidence also demonstrated several examples of the consequences of delayed or failed emergency referrals.  For example, Anthony Mandingo presented with pneumonia.  EMTs in the ATU administered two breathing treatments and returned him to his dormitory. Several days later he was admitted to UMC New Orleans.[132]

109.   Danny Prince, who worked as a health care orderly on Ash 2 dormitory (an assisted living/recovery dorm) during the relevant time period, testified at trial and described an inmate with a tracheotomy in his throat who presented with a progressively worsening cold and made repeated emergency sick calls.  The inmate was seen in the ATU and returned to his dormitory multiple times and ultimately died.[133]

110.   Regarding stroke patients, in August 2014, LSP was put on notice by Interim LSU Hospital ("ILH") that that they were not receiving stroke patients within the 4.5-hour treatment window.   Three Angola inmates within 45 days prior had arrived at outside treatment facilities "with obvious stroke symptoms [but did not receive] emergen[cy] care within the 4.5 [hour] window to attempt [to] prevent serious disability."[134]  For example, Lionell Parks presented to the infirmary on 3 consecutive days with stroke symptoms before he was referred for emergency care.[135] While the remote location of LSP accounts for transportation delays, it is less than a one-hour drive to Baton Rouge, and the

---

[131] PX 6 at 0270-71 (Patient #38); PX 233 at 0095 (Patient #38); Rec. Doc. No. 547, Testimony of Susi Vassallo at 153:6-164:24 (Patient #42); PX 6 at 0272-73 (Patient #42); JX 10-p at 15142, 15161-62, 15236-39 (Patient #42).
[132] Rec. Doc. No. 551, Testimony of Mandingo at 89:2 – 91:13.
[133] Rec. Doc. No. 547, Testimony of Danny Prince at 101:14 – 102:5.
[134] PX 12 at 0002.
[135] PX 12 at 0001 – 02.
Document Number: 52892

transportation delay does not account for multi-day delays such as those experienced by Parks.

111.    Patient #42 was found unresponsive in July 2015 at 11:18 p.m. He was brought to the ATU, where he was managed for more than 10 hours by EMTs without a physician consult. While in the ATU this patient was treated with four liters of intravenous saline without having received any prior diagnosis.  Patient #42 had suffered a stroke which caused brain swelling, which may have been exacerbated by the intravenous saline administered by EMTs.[136]

112.    Patient 44 attempted to hang himself in his cell. He was transported to the ATU with "abnormal posturing," which Dr. Vassallo testified is indicative of brain injury and bruising of the cervical spine. EMTs managed this patient's care in the ATU even though a physician, Dr. Toce, was present in the ATU. EMTs failed to ensure proper ventilation by failing to "bag" the patient. After about 15 minutes, Dr. Lavespere entered and started "bagging" this patient.  According to Dr. Vassallo, who witnessed this incident, this level of inadequate ventilation most likely caused harm to the patient and exacerbated his brain injury.[137]

113.    Trial evidence also established that some protocols repeatedly utilized in the ATU are inappropriate under national standards.[138]  For example, inmates who present with an altered mental status are routinely treated based on a presumption that they have

---

[136] Rec. Doc. No. 547, Testimony of Susi Vassallo at 164: 12-23.
[137] *Id.* at 165:19-173:9.
[138] Rec. Doc. No. 548, Testimony of Susi Vassallo at 22:8-17.
Document Number: 52892

ingested narcotics.[139] The evidence established that the following treatments are routinely administered without clinical indicators suggestive of illegal drug use: (1) routine treatment of patients presenting with altered mental status with Narcan; (2) routine subjecting patients who present with altered mental status to urine toxicology testing, often by catheterization; and (3) common use of "lavage," *i.e*., stomach pumping, on patients presenting with altered mental status.[140]   The following patient studies demonstrate this problem.

114.   Patient #42 presented to the ATU unconscious but with a normal respiratory rate. Although there were negative indications for an opiate overdose, the patient was treated with Narcan and catheterized to perform urine toxicology. In fact, the patient had suffered a stroke and went 10 hours without appropriate treatment.[141]

115.   Patient #37 presented to the ATU with seizures and was treated with gastrointestinal lavage (stomach pumping) and Naloxone. During this treatment, the patient developed decerebrate posturing and other symptoms indicative of brain damage. A subsequent CT scan revealed intracerebral bleeding, and this patient ultimately died. As Plaintiffs' medical experts explain, "[l]avage for drugs and administration of naloxone for new onset of seizures shows a gross lack of knowledge of emergency care. Lavage of a patient with new onset seizures represents medical care with no basis in modern

---

[139] PX 6 at 0064; *see also* Rec. Doc. No. 548 at 8:13-15 ("When the patient had an altered mental status, it was in my review of the records more than half the time. I don't want to say universally, but it was extremely common.").

[140] PX 6 at 0064; *compare* JX 8-a at 00087, 00145 (EMT Drug Overdose Treatment Protocols, which does not involve urine toxicology); *see also* Rec. Doc. No. 548 at 8:13-15 ("When the patient had an altered mental status, it was in my review of the records more than half the time. I don't want to say universally, but it was extremely common.").

[141] Rec. Doc. No. 547 at 155:9-157:6; *see also* JX 10-p at 15237-38; PX 6 at 0069.

Document Number: 52892

practice and delays transport to the hospital."[142]

116.    Patient #30 presented to the ATU with focal motor seizures of the arm and face. He was given naloxone with a plan for gastrointestinal lavage, despite having no symptoms of opioid or any other overdose. As Plaintiffs' medical experts concluded, "this plan does not meet standard care" and was simply "incoherent."[143]

117.    Plaintiffs also maintain that Defendants improperly attempt to obtain Do Not Resuscitate ("DNR") orders and offered Patients # 31 and #10 as proof of this.  The Court finds no constitutional violation as it relates to DNR orders in the ATU.

### 6.    Chronic Care

118.    Plaintiffs complain that LSP's chronic disease program is "woefully inadequate," arguing that Angola's chronic care policy[144] is vague and overly generic[145] and that LSP lacks a "true chronic disease tracking system." Plaintiffs argue there is a "lack of chronic care" attributed to "physician manpower shortages." [146]

119.    Notwithstanding the Court findings as to the unconstitutionality of care in Infirmary 2,[147] and the Court's findings with respect to particular patients with chronic conditions,[148] the Court does not find constitutional deficiencies in the chronic care. The principal evidence offered in support of the Plaintiff's contention that LSP's chronic care violates the Eighth Amendment is LSP's alleged failure to manage and treat patients with hepatitis

---

[142] PX 6 at 0064.
[143] *Id.* at 0065.
[144] JX 5-A at 00102-03 (HC – 11).
[145] Plaintiffs argue that LSP's chronic care manual (JX 8-L) contains guidelines for only 8 diseases and omits guidelines for significant chronic diseases such as kidney disease, thyroid disease, sickle-cell disease and lupus.
[146] DX 13 at 02865.
[147] *See supra.* pp. 20-24 of this Ruling.
[148] *See e.g, supra.* pp. 10-11 of this Ruling.
Document Number: 52892

C. The Court has previously reviewed numerous individual inmates' Eighth Amendment claims with respect to the care and management of Hep C at LSP. The Court declines to revisit or reverse its prior holdings in those cases.[149]

### 7.     Medical Leadership and Organizational Structure

120.    The Court also finds that Plaintiffs have demonstrated organizational and structural deficiencies in the LSP health care system which underpin and contribute to Eighth Amendment violations. The Court finds that the cumulative effect of leadership and organizational deficiencies demonstrate the subjective component of deliberate indifference.

121.    Regarding medical leadership, the Court finds that there is a lack of meaningful mortality review.  A mortality review entails reviewing the death of a patient to determine if any of the problems arose in the course of the patient's care that can be corrected in order to prevent future deaths.[150]   The trial evidence established that LSP does not conduct mortality reviews; rather, the physician who cared for the patient provides a short narrative summary of the circumstances surrounding the death.  There is no critical review of the death or the care which preceded the death.[151]   Plaintiffs' experts reviewed and evaluated 28 death charts and they describe LSP's review of death reports to be a "noncritical evaluation."  Dr. Puisis testified that LSP does not look for problems and, thus, finds none, which results in no process for continual improvement.[152]

---

[149] *See*, *inter alia*, *Cormier v. Edwards*, No. 17-241-SDD-EWD, 2019 WL 2438784 (M.D. La. June 11, 2019); *Henderson v. Tanner*, No. 15-804-SDD-EWD, 2019 WL 885914 (M.D. La. Feb. 22, 2019); *Peters v. Singh*, No. 16-842-SDD-RLB, 2020 WL 853517 (M.D. La. Feb. 20, 2020).
[150] Rec. Doc. No. 547 at 179:4-9.
[151] Rec. Doc. No. 545 at 30:19-24.
[152] *Id.* at 34:10-25.
Document Number: 52892

122.    In Louisiana, the inmate death rate nearly doubled from 361 deaths in 2001 to nearly 600 deaths in 2008.[153] The Court does not consider this statistic alone probative of the quality of care; however, the Court finds that LSP's failure to conduct meaningful mortality reviews, coupled with its failure to engage in a meaningful quality improvement program and analysis, in light of this statistic, is evidence of deliberate indifference.

123.    The Court finds that, while the failure to conduct meaningful and informative mortality reviews is not unconstitutional care, the reticence of LSP medical providers to conduct meaningful review as a means of quality control and improving care provides fertile ground for the constitutional deficiencies in health care delivery found by the Court and is demonstrative of wanton disregard.

124.    As discussed in previous sections of this opinion, the Court also finds that medical management by corrections, rather than physicians, is inappropriate and also contributes to the unconstitutional care provided. The Medical Department at LSP is managed by an assistant Warden;  the Deputy Warden, a layperson with no medical training, is the health authority.[154]

125.    There is also a lack of peer review in the medical department at LSP.  Dr. Puisis explained that "peer review is groups of peers who evaluate the care of another peer or colleague based on the clinical process that a certain individual has provided."[155]  Further, "there are two kinds of peer reviews. One is called professional evaluation program, or PEP, by which, a physician's practice is evaluated typically on an annual basis."[156]  This

---

[153] Rec. Doc. No. 573 at 82-83 (citing PX 466 at 26).
[154] PX 6 at 0012; Rec. Doc. No. 545 at 14:18.
[155] Rec. Doc. No. 545 at 25:8-10.
[156] *Id.* at 25:14-17.
Document Number: 52892

type of review evaluates the records of a physician's care to determine whether the treatment was appropriate.  "A second type of peer review is when there has been a sentinel event such as a death or an unusual morbid event that is unexpected and suggests that there may have been problems; that type of peer review is a -- more of a quasi-legal procedure where the physician may be reported for clinical actions that were inappropriate, and a group of senior physicians would review that care to determine if a reduction of privileges is necessary."[157]  Dr. Puisis explained that the peer review at LSP consists of the medical director coming in one time per year to review 15 records. The director does not review the delivery of health care by any single physician; rather, it is more akin to a facility review.  Also troubling, "[a]t LSP, since 2010, peer review of physician care has been performed only three times."[158]

126.    The Court finds that the repeated failure of any meaningful or systematic review of the medical care at LSP is evidence of wanton disregard and directly contributes to conditions which cause harm to patients.

127.    LSP also lacks a quality improvement ("QI") program.  Plaintiffs' experts reviewed minutes of QI meetings from 2010 to 2015 which revealed the following:  (1) the medical director, Dr. Lavespere, did not participate in QI meetings;[159] (2) nursing supervisors participated in QI meetings;[160] (3) there was no physician participation in QI meetings and no clinical evaluation.[161]

---

[157] *Id.* at 25:25-26:7.
[158] *Id.* at 27:17-18.
[159] *Id.* at 36:21-25.
[160] *Id.* at 37:5-6
[161] *Id.* at 37:14-16.
Document Number: 52892

128.    Evidence also established that there is an absence of medical personnel involvement in the development and allocations of the medical budget at LSP.[162]

129.    Finally, the Court finds that the LSP medical director, Dr. Lavespere, directly contributed to constitutionally infirm health care at LSP in the following ways: (1) failure to supervise; (2)  failure to perform peer review; (3) failure to be aware of the credentialing of physicians who worked for him; (4)  failure to review and analyze sentinel events (a serious episode that proceeded an adverse event); and (5) failure to conduct mortality review.[163]  Additionally, there was no evidence of medical supervision by the DOC central office.[164]  The buck stopped with Dr. Lavespere, and his medical supervision and quality review was woefully inadequate.

130.    Regarding staffing levels, the Court finds that Plaintiffs failed to carry their burden on this claim.  Plaintiffs maintain that the per-physician caseload at LSP is excessive, but this assertion was not supported by referencing documentation or other record evidence to establish the caseload per LSP physician.  Dr. Puisis testified that a reasonable staffing level is 800 patients per provider[165] and that staffing budgets at LSP are low compared to other states.[166]  The fact that LSP may have spent less money on staffing is not probative of constitutional care.

131.    As to credentialing, the Court finds that LSP fails to maintain provider credentialing documentation.  NCCHC standard number 4 requires that "the HRA maintains verification of current credentials for all qualified health care professionals at a readily accessible

---

[162] PX 6 at 0012, 16, 27, 88; JX 4-rr, R. Lavespere Depo. at 97:12-14.
[163] Rec. Doc. No. 544 at 202:24-217:5.
[164] *Id.* at 218:18-219:10.
[165] *Id.* at 208:12-23.
[166] Rec. Doc. No. 545 at 21:15-22:13.
Document Number: 52892

location."[167]  Pusis testified that he could not ascertain if providers were practicing within their proper credentials because "there were no credential files so I couldn't know what credentials people had."[168]

### 8.    Defendants' Subjective Knowledge

132. Considering the evidence discussed above, the Court finds that Defendants' knowledge of the constitutionally inadequate practices set forth herein is established.  The evidence demonstrates that Defendants have been put on notice regarding the serious risks of harm presented herein and have failed to take reasonable steps to address same.

133. On August 8, 1989, the Civil Rights Division of the United States Department of Justice ("DOJ") began an investigation into conditions of confinement at Angola, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.[169]

134. On May 13, 1991, the DOJ issued a findings letter that concluded that several conditions at LSP deprived inmates of their constitutional rights, including the failure to provide adequate medical and psychiatric care.[170]  The DOJ concluded that "serious flaws in the provision of medical care" existed system-wide at LSP such that "inmates who need medical care and attention are not receiving it," and identified deficiencies regarding, *inter alia*, staffing, sick call procedures, delays in treatment, and safeguards to ensure receipt of proper medication and treatment. [171]

135.  A class action lawsuit was filed against LSP in January 1992 alleging that the medical care provided by LSP was constitutionally deficient.  The DOJ intervened as a

---

[167] Rec. Doc. No. 544 at 215:19-21.
[168] *Id.* at 216:2-3.
[169] PX 239.
[170] *Id.* at 0002.
[171] *Id.* at 0002-04.
Document Number: 52892

plaintiff, and the case was tried in September 1994.[172]  In connection with this lawsuit, Dr. Puisis, acting as an expert for the DOJ, made investigatory visits to LSP and identified several deficiencies in the delivery of medical care that have been alleged in the current lawsuit, and the trial evidence established continue to persist.[173]

136.   The DOJ prepared a report of its findings, which included:  significant delays in treatment because security decided the manner and time of patients' transportation; inmates forced to wait for excessive and unacceptable periods for elective and radiological services; and delays in treatment caused by the practice of placing patients in the infirmary who should have been sent to the hospital.[174]  The report also criticized the use of EMTs, finding: EMTs were "not adequately trained nor sufficiently experienced to recognize serious medical illness or triage sick call," and they could not differentiate "between acute, chronic, and minor illnesses."[175]  The report concluded that LSP had "no policies or procedures specifically designed to guide health care practitioners in managing care on the infirmary unit;"[176] there was "no quality assurance"[177] and no peer review system to monitor the quality of medical care.[178]

137.   In 1998, a settlement was reached resolving the 1992 lawsuit.  The agreement required specific improvements be made to the system of medical care at LSP, including: sick call reviews; implementing contemporary standards of care; establishing mortality review and an effective quality assurance program; automatic referrals to external

---

[172] PX 17.
[173] *See* PX 19.
[174] PX 20 at 0006, 0009, & 0014.
[175] *Id.* at 0002.
[176] *Id.* at 0007.
[177] *Id.* at 0012.
[178] *Id.* at 0016.
Document Number: 52892

physicians; documentation of deviations from outside provider orders and communication of those deviations to the outside provider; removing discipline of inmates for malingering without an evaluation by an outside physician, and the provision of "adequate medical leadership."[179]

138.   Given the fact that many of the complaints in this lawsuit – and the deficiencies proven at trial - are the same as those "settled" in 1998, the Court finds that Defendants have been aware of these deficiencies in the delivery of medical care at LSP for decades.

139.   Defendants were also on notice of the very deficiencies shown at trial, as evidenced by a report of findings issued by the Wexford Consulting Group in 2009, an entity retained by LSP to assess the medical care provided by the DOC at LSP and other prisons.[180]

140.  On numerous occasions, outside providers also provided notice to LSP of medical care deficiencies.  In January 2014, Defendants were notified that outside providers had to cancel several procedures and surgery dates "due to inadequate preparation and/or following of instructions," in a wide variety of settings, including cardiac catheterization labs, endoscopy, and surgical procedures.[181]  Defendant Stacye Falgout was specifically advised of the need for staff to "be aware of instructions and follow through with the specific time frames for preps, stopping [anticoagulants], adding [m]edications, etc.…"[182]

141.  In August 2014, Defendant Singh received notice from the Director of the Louisiana Emergency Response Network and the Stroke Program Coordinator at ILH LSP patients were arriving at ILH with "obvious stroke symptoms" based on LSP staff failing to

---

[179] PX 17 at 0003-05.
[180] PX 265. The Court ruled during trial that the Wexford report was admitted only for the Defendants' knowledge, not for the truth of its contents. *See* Rec. Doc. No. 546 at 181:16-183:17.
[181] PX 142 at 0001.
[182] *Id.*

determine or realize that inmates were having strokes.[183]  Defendants were advised that stroke patients "need to get emergent care within [4.5 hours] to attempt [to] prevent severe disability," and that the patients arriving at ILH all suffered "pretty significant deficits" due to the lack of recognition and transport.[184]

142.  Also in 2014, LSUP received notice via written communication from LSU's Chairman of Oral Surgery to Dr. Singh and Stacye Falgout that LSP had sent a number of inmates "with 3 week old fractures that are already infected and thus use a lot of resources to fix something that could have been treated easily if diagnosed sooner."[185]

143.  Dr. Catherine Jones, a doctor at University Medical Center in New Orleans, who frequently treats patients from LSP, testified at trial about multiple attempts to contact Dr. Lavespere to discuss the delayed diagnoses of LSP inmate patients, but those calls are often unanswered.[186]

144.  Current and former LSP medical personnel also documented and/or testified regarding treatment backlogs and other deficiencies.[187]  Former Assistant Warden for Healthcare Services Kenneth Norris testified that patients "did not get the timely treatment" because Defendants refused to authorize hernia surgery "until, you know, it becomes a life-threatening deal."[188]

---

[183] PX 12 at 0001-02.
[184] *Id.* at 0002.
[185] PX 13 at 0001-0002.
[186] Rec. Doc. No. 550, Testimony of Dr. Catherine Jones at 145:6-16.
[187] PX 36; PX 37; PX 42 (Dr. Singh on 12/13/13: "Some of the offenders at LSP were waiting for CT scan and MRI or cancer care since late 2011. … As far as I know no [colonoscopies] were done at LSP for 2 years or longer. Once access has been restored, even then we can not [sic] get all 600 colonoscopies done immediately.") *id.* at 0001; PX 26 (Ms. Lamartiniere: "[W]e will temporarily suspend the entering of screening referrals [for colonoscopies] until notified by [headquarters] to resume." *Id.* at 0001); PX 32 (summary of the cataract backlog).
[188] JX 4-tt, Norris Depo at 37:22-38:4.
Document Number: 52892

145. The lack of meaningful, in-depth mortality review is further evidence of deliberate indifference by Defendants; by failing to critically review causes of death, Defendants avoid documenting existing deficiencies within the health care system that need to be addressed and corrected.  Indeed, not a single Medical Summary Report reviewed by Plaintiffs' experts noted a problem with patients' care, despite the serious errors and delays in treatment discovered in nearly every death these experts reviewed.[189]  This inference is supported by Dr. Singh's recommendation to Secretary LeBlanc that the DOC not "dig too deep" in investigating a death because "liability is still ours."[190]  Dr. Vassallo credibly testified at trial regarding the frequency of death summaries that "misrepresented the facts of the patient's death."[191]

### 9.    Laboratory Services

146.   The Court finds that Plaintiffs failed to carry their burden of demonstrating constitutional violations regarding the laboratory services provided at LSP.  According to Dr. Puisis, the laboratory is CLIA certified, and both the laboratory and radiology departments functioned properly during the relevant time period.[192]

### 10.    Pain Medication Management

147.   The Court also finds that Plaintiffs failed to carry their burden of demonstrating constitutional violations in the management of pain medicine provided at LSP.  The trial evidence demonstrated that narcotic pain management is not available to patients in the general population due to LSP's policy prohibiting the dispensation of narcotics in general

---

[189] PX 6 at 0084-87.
[190] PX 66 at 0001.
[191] Rec. Doc. No. 547 at 178:19.
[192] Rec. Doc. No. 544, Testimony of Puisis at 196:4-13.
Document Number: 52892

population.  However, LSP policy does allow for the availability of narcotics to hospice care patients.[193]

Facts Relating to ADA Claims

1.    Effect of DOJ ADA Investigation and Settlement with LSP

148.    In May 2010, the United States Department of Justice ("DOJ") conducted a site visit at LSP to assess whether LSP complied with Title II of the ADA and its implementing regulations.[194]  Although no settlement between the DOJ and LSP had been reached at the close of discovery in this matter, evidence was admitted at trial demonstrating that LSP had been working since the DOJ's 2010 site visit to address compliance issues identified by the DOJ.[195]

149.    Plaintiffs' architectural expert Mazz admitted that the DOJ conducted a far more expansive assessment of LSP facilities than he, as the DOJ reviewed the entire property for programmatic access.[196]  However, the Court rejects Defendants' argument that the DOJ's investigation renders Mazz's investigation and findings moot or that any facts found by this Court would be necessarily duplicative of the DOJ's investigation and findings.

150.    The Court limited the trial of this matter to the discovery period, and any post-discovery remedial measures are more appropriately addressed at the remedy phase; such measures do not inform the Court regarding liability in this matter.[197]  Furthermore, Defendants' architectural expert Nolan conducted a review of both the DOJ's findings and

---

[193] Rec. Doc. No. 545 at 20:15-17; 131:2-3.
[194] PX 7 at 0008.
[195] *See* JX 12-e.  The Court notes that, at the remedy phase of this matter, any remedial measures undertaken by LSP will certainly be recognized and credited where appropriate.
[196] Rec. Doc. No. 546 at 60:18-25; 76:25-77:4.
[197] Rec. Doc. No. 419 at 3.
Document Number: 52892

Mazz's findings and concluded there is little overlap – at most, 11 items out of 190.[198] Additionally, Defendants presented no evidence at trial to dispute or controvert Mazz's findings.

2.    <u>Architectural Barriers to LSP's Programs, Services, and Activities</u>

a.    *Facilities*

151.    Trial evidence demonstrated that certain areas of the buildings Mazz surveyed have been altered since the 1991 ADA Standards took effect.  In 2016, LSP's facilities maintenance staff compiled a list of renovations completed at Main Prison and the outcamps between 2010 and May 2016.[199]    Odis Ratcliff, an Assistant Facilities Maintenance Manager designated by the DOC to testify regarding the compliance of LSP's facilities with the ADA,[200] confirmed that the list includes alterations made since 2010 to attempt to bring the facilities into compliance with the ADA and fire marshal regulations.[201]    Notably, the bathrooms and JPay Stations in Ash 2 and Cypress 2 dormitories were modified after the 1991 Standards took effect.[202]

152.    Mazz surveyed Dormitories Ash 2 and Cypress 2, focusing on sleeping areas and shower and bathroom areas, as well as the accessible routes from those dormitories to the public check-in desk, associated recreation yards, van transit parking, law library, and visiting area.[203] He also surveyed portions of the visiting area and law library used by residents of those dormitories.[204]    Ash 2 and Cypress 2 are two of three dormitories

---

[198] Rec. Doc. No. 546 at 80:15-81:5.
[199] JX 12-e.
[200] JX 4-aaa, O. Ratcliff Depo. at 6:23-25.
[201] *Id.* at 10:16-11:18.
[202] JX 12-e.
[203] PX 7 at 0009; Rec. Doc. No. 546 at 18:7-19:15.
[204] *Id.*; Rec. Doc. No. 546 at 20:13-21:1.
Document Number: 52892

designated as "medical dormitories" or "offender assistance dormitories" and house inmates with mobility impairments and other disabilities.[205] Of the three dormitories, Ash 2 is reserved for patients who require the most assistance with the activities of daily living.[206] Mazz also surveyed Dormitory 1 at Camp F, a trustee dorm that has been used to house blind and otherwise vulnerable individuals.[207] Mazz also reviewed various cells and showers in LSP's Transition Unit ("TU"),[208] including in the Protection Tier and Mental Health Tier.[209] The TU operates as transitional housing for inmates with severe mental illness or developmental disabilities,[210] and it frequently houses inmates with physical and mental disabilities, including blind patients[211] and patients in wheelchairs, like Plaintiff Reginald George.[212] Mazz surveyed Wards I and II on the Nursing Unit at the R.E. Barrow Treatment Center.[213] Ward I operates as LSP's infirmary, while Ward II houses patients requiring long-term nursing care and assistance with basic life functions, including LSP's hospice patients.[214]

---

[205] Rec. Doc. No. 547, Testimony of Danny Prince at 95:1-4; JX 4-c, A. Brent Depo. at 75:17-76:23 (identifying Ash 2 and Cypress 2 as the dormitories housing disabled individuals receiving care from inmate health care orderlies); JX 6-eee (LSP Directive 13.088) at 00269 (establishing offender assistance dormitories to provide housing "for offenders who require assistance with activities of daily living").

[206] Rec. Doc. No. 547 at 95:5-8.

[207] PX 7 at 0009; Rec. Doc. No. 546 at 22:5-23:1; *id.* at 139:4-5, 152:3-154:5 (Tonubbee describing his experience assisting former Named Plaintiff Alton Batiste around Camp F after he went blind).

[208] In his report, Mr. Mazz identified the TU as the "Treatment Unit," consistent with the floor plans that were provided to him. *See* JX 7 at 0009.

[209] PX 7 at 0009; Rec. Doc. No. 546 at 20:7-10.

[210] *See* JX 6-y (LSP Directive 13.037) at 00140 (designating the TU as a housing area for "offenders with severe mental illness or developmental disabilities").

[211] PX 85 at 0003.

[212] PX 231 at 1354 (ARP paperwork reflecting that Mr. George was housed in the TU).

[213] PX 7 at 0009; Rec. Doc. No. 546 at 19:24-20:5.

[214] JX 6-v (LSP Directive 13.033) at 00130-32 (describing the purpose and admission criteria for Wards I and II); JX 7-b (LSP Directive 07.004) at 00002 (stating that "severely handicapped inmates" will be housed at the Treatment Center). *See also* Rec. Doc. No. 546, Testimony of Francis Brauner, at 97:22-25 (explaining that Ward II houses "some of the worst  cases of, you know, illnesses, stroke victims, cancer victims, heart problems, you name it, me, paralyzed, wounds.").

Document Number: 52892

153.    Mazz testified that, in the correctional setting, he typically looks at access to services, programs, and activities ranging from toilets and showers to law libraries, visiting areas, and classrooms.[215] At LSP, he specifically considered housing at various security levels, including toilets, showers, bathtubs and sinks; water fountains; mail services; meal services; medication administration; medical services; telephones; JPay stations;[216] recreation areas; transportation services; the law library; and the visiting area.[217]

154.    As detailed in Attachment 2 to his report,[218] Mazz identified 190 architectural barriers impeding independent access to a range of programs, services, and activities, including housing, toilets, showers, phones, JPay stations, common areas, drinking fountains, recreation areas, transportation, the law library, visiting areas, medication administration, meals, medical services, and mail services.[219] Photographs documenting each violation are included in his report as Attachment 3.[220]   Because Mazz's findings were uncontroverted by Defendants' expert Nolan and any other evidence presented by Defendants at trial, the Court adopts the findings of violations as detailed in Mazz's report.

155.   Anecdotal evidence in the form of the testimony of Named Plaintiffs and Subclass Members generally confirmed Mazz's findings.  Aaron Brent, a former LSP health care orderly, testified that the showers in Ash 2 were not usable for patients with disabilities because there were "showers you couldn't reach."[221]   Farrell Sampier testified at trial about the difficulty he experienced navigating the paved walkways between the medical

---

[215] Rec. Doc. No. 546 at 12:16-13:4.
[216] Id. at 34:14-23.
[217] See PX 7.
[218] Id. at 0018-39.
[219] Id.; Rec. Doc. No. 546 at 23:2-10.
[220] PX 7 at 0040-112; Rec. Doc. No. 546 at 27:8-14.
[221] JX 4-c, A. Brent Depo. at 32:10-33:10.
Document Number: 52892

wards and other areas while in his wheelchair, stating that he had to perform "wheelies" to maneuver over various humps and obstacles to get across the sidewalk such that Sampier usually had to ask for someone to push him to get around the property.[222] Former inmate Francis Brauner, who uses a wheelchair, described problems regarding the accessibility of Ward II; for example, he was unable to access the shower or bathtub, which caused him to give himself bed baths and shave and wash his hair in the sink. However, the sinks were positioned above chest level for those in wheelchairs, making them difficult to use. Sampier also testified that he could not reach the mirrors or the water fountains.[223]

156.    Testimony from Subclass members also demonstrated that the physical barriers at LSP deny them access to a variety of programs.  At trial, Sampier testified that, while living on the medical wards, he was not allowed to attend any classes offered at the prison, including programs such as anger management, victim awareness, and substance abuse classes.[224]  Brauner testified that he and other patients living on the ward could not attend church services or sporting events available to other inmates.[225] Barrera, who was housed on Ward II until December 2015, also testified that he was not permitted to leave the ward to attend classes or church services.  Further, he was required to take anger management and substance abuse courses to be eligible for release; however, LSP would not come to the ward to teach the class because there were not enough patients on the ward who needed the courses to warrant the accommodation.[226]

---

[222] Rec. Doc. No. 544, Testimony of Farrell Sampier at 63:11-19; 82:15-24.
[223] Rec. Doc. No. 546 at 100:22-102:25.
[224] Rec. Doc. No. 544, Testimony of Sampier at 48:13-16; 62:13-24.
[225] Rec. Doc. No. 546, Testimony of Francis Brauner at 108:5-19.
[226] *Id.*, Testimony of Otto Barrera at 213:8-214:23.
Document Number: 52892

157.    Current and former officials at LSP also confirmed ADA noncompliance issues. LSP Warden Darryl Vannoy admitted that "Angola has a lot of work to do on a physical plant to be ADA, to meet the ADA requirements."[227]  Former LSP ADA Coordinator Donald Barr testified that there were "access problems for wheelchairs within the main prison" at the time the DOJ reviewed LSP's facilities.[228] Although LSP's own policies require the medical dormitories to be "handicap accessible,"[229] Defendants acknowledged that LSP is "operating Medical Dorms in dormitories designed for general, unimpaired population."[230]

### b.    Use of Inmate Orderlies as Alternative Means to Access

158.    LSP assigns inmate health care orderlies to the medical dorms and Wards I and II to assist sick and disabled patients with the activities of daily living.[231] Health care orderlies are not assigned to all areas Mazz surveyed, such as the Camp F dormitories and the TU.

159.    LSP's health care orderly program trains inmates to assist sick and disabled inmates with activities of daily living, such as bathing, toileting, transfers, feeding, and personal hygiene.[232]  This training program was modeled after a Certified Nursing Assistant ("CNA") course.[233]  Training topics include:  Abuse and Neglect, Negligence,

---

[227] JX 4-ccc, D. Vannoy Depo. at 71:18-20.
[228] JX 4-z, D. Barr Depo. at 39:5-9.
[229] JX 6-eee (LSP Directive 13.088) at 00269.
[230] PX 15 at 0002 (Proposal to Open EHCC Building Four).
[231] JX 6-eee (LSP Directive 13.088 – Offender Assistance Dorm) at 00269-70; JX 6-vv (LSP Directive 13.076 – Use of Offenders in Health Care) at 0236-37.
[232] Rec. Doc. No. 553, Testimony of Falgout at 192:8-193:18; 205:11-19; *see also* JX 4-ii at 10:9-22.
[233] *Id.* at 193:4-8.
Document Number: 52892

Activities of Daily Living, Patient Safety, Ambulation, Bathing the Patient, and Feeding a Patient.[234]

160.    The orderly program is severely understaffed.   Aaron Brent, a former health care orderly in Ash 2, testified that he and three other orderlies were responsible for 43 patients requiring assistance, including 29 or 30 in wheelchairs, and others who used walkers.[235] Brent and the other orderlies were responsible for distributing meals; changing bed linens; counseling patients regarding their medication; providing emotional support to patients; delivering patients to religious services, scheduled medical appointments, and unscheduled emergency visits to the ATU; and actually attending appointments with patients.[236] Disabled inmates suffer neglect because orderlies are shorthanded.[237] Evidence demonstrated inmates filed ARPs complaining about being unable to access LSP facilities without orderlies assisting by pushing their wheelchairs, to no avail.[238]

161.    Trial evidence and testimony also revealed that orderlies are often "overwhelmed" and spread too thin to provide proper assistance to disabled inmates.   Trial evidence showed that orderlies would sometimes leave inmates sitting in their own feces and

---

[234] JX 15 at 5, 10, 104, 107, 158, 164, 182.

[235] JX 4-c, A. Brent Depo. at 75:18-76:23. Danny Prince, another former Ash 2 health care orderly, also testified at trial that the dorm housed 43 patients and 43 non-patients. Rec. Doc. No. 547, Testimony of Danny Prince, at 95:11-12. He explained that two orderlies would cover the night shift, and during the day there could be anywhere from three to five orderlies, depending on whether the positions were fully staffed at the time. *Id.* at 96:19-24.

[236] JX 4-c, A. Brent Depo. at 34:7-19; 35:16-36:10; 42:2-14; 68:7-70:8; 75:17-76:4; 76:24-77:15. *See also* Rec. Doc. No. 547, Testimony of Danny Prince, at 116:3-13 (explaining that as an Ash 2 health care orderly, he would  transport patients in wheelchairs to medical callouts and other areas of the prison, help patients in and out of their wheelchairs from the bed or shower, and clean up after patients who urinate or defecate in bed or on themselves, among other tasks).

[237] Prince testified that that accompanying patients to their appointments often would require the full attention of two orderlies, leaving just one orderly in the dorm to look after the remaining patients.  Rec. Doc. No. 547 at 98:6-19.

[238] PX 231 at 1936-1940 (ARP of L.L.); *id.* at 1995-1996 (ARP of T.P.); Rec. Doc. No. 547 at 102:14-17. Document Number: 52892

urine;[239] it was common for orderlies to be called to respond to another emergency before properly completing assistance in changing disabled inmates, resulting in disposing of dirty diapers or pads on the floor of Ward I.[240]  Disabled inmates observed orderlies cursing at patients, becoming aggressive, and in some instances, nearly dropping patients they were assisting.[241]  Disabled inmates often had to transfer themselves from their beds to wheelchairs because the orderlies were assisting others and unavailable; disabled inmates often relied on other, untrained inmates for assistance.[242]

162.  Trial evidence also established that disabled inmates are often subjected to neglect and abuse by some orderlies.  Prince testified that he had observed verbal and physical altercations between orderlies and patients.[243] Brauner testified that he and others in Ward II regularly heard an elderly inmate attempt to defend himself from an orderly who molested him in the shower,[244] and Brauner personally witnessed the same orderly fondling the inmate in his bed.[245]  Brauner also testified that he witnessed an orderly pour a bucket of bleach on a mentally impaired inmate who had defecated on himself.[246]

163.   Some orderlies tasked with assisting sick and disabled inmates appear unwilling to perform their duties.  Subclass member Benny Prine testified that most of the orderlies demand a bribe to assist him in pushing him from his dorm to other locations.[247]

---

[239] *See* Rec. Doc. No. 544, Testimony of Farrell Sampier, at 46:9-12.

[240] *Id*. at 46:12-16.

[241] *Id*. at 65:5-8.

[242] *See* Rec. Doc. No. 546, Testimony of Francis Brauner, at 101:6-25; Rec. Doc. No. 544, Testimony of Farrell Sampier at 65:21-66:2 (explaining that he and other patients on the ward would assist each other with feeding, covering up, and other tasks when the orderlies were not available).

[243] Rec. Doc. No. 547 at 97:15-23.

[244] Rec. Doc. No. 546 at 99:17-25.

[245] *Id*. at 100:1-8.

[246] *Id*. at 100:9-21.

[247] JX 4-q, B. Prine Depo. at 71:25-72:5, 74:10-14.

Document Number: 52892

Deceased Named Plaintiff Shannon Hurd testified via video deposition that many orderlies on Ward II did not fulfill their responsibilities and were in the program only for the air conditioning available on the ward.[248] Brent testified that he had to report orderlies who did not perform their jobs and needed to be removed from the program.[249] Prince, testified at trial that, while some orderlies go above and beyond their assigned duties, others seem to be looking for an easy job and are unwilling to assist patients.[250]

164.    Trial testimony and evidence established that Tracy Falgout, who runs the health care orderly training program and testified on behalf of the DOC regarding the training and qualifications of orderlies, is aware of the deficiencies within this program. He acknowledged that orderlies may have "different angles" when joining the program and may try to "strong-arm" vulnerable patients;[251] there is a prison culture of "not being a rat," and there may be consequences for inmates or orderlies who report misconduct.[252] Warden Falgout advises patients and orderlies to "figure out a way to get it to somebody who can take care of it," but he admitted that "sometimes it just is going to be what it is," if "somebody out there is not doing what they are supposed to be doing."[253] Although Warden Falgout did not know the percentage of orderlies who are removed from the position for infractions,[254] he acknowledged that he is "continually training" new orderlies

---

[248] JX 4-u, S. Hurd Depo. at 60:25-61:4. Brauner also testified that some orderlies take the job for the access to air conditioning and are unwilling to assist patients. Rec. Doc. No. 546 at 99:11-16.
[249] JX 4-c, A. Brent Depo. at 46:5-22.
[250] Rec. Doc. No. 547 at 97:3-14.
[251] JX 4-ii, T. Falgout Depo. at 27:25-28:7; *see also* Rec. Doc. No. 554, Testimony of Tracy Falgout, at 41:8-14.
[252] *Id*. at 28:12-15; Rec. Doc. No. 554 at 42:18-43:4.
[253] *Id*. at 28:17-25; Rec. Doc. No. 554 at 43:5-7.
[254] Rec. Doc. No. 554 at 43:8-19 (explaining that he only becomes aware that orderlies have left the program when security gives him a new list of candidates to train).
Document Number: 52892

because "we do have that percentage of guys who don't play by the rules."[255] Warden Falgout knew that at least one orderly has been accused by a patient of sexual assault but admitted there could be other allegations of which he is unaware as such complaints generally go to security.[256]

165.    Trial evidence clearly demonstrated that the architectural barriers at LSP puts disabled inmates at risk of injury, notwithstanding health care orderly assistance. Evidence demonstrated falls from wheelchairs caused by gaps and/or other problems in walkways and ramps occur often, as do slips and falls in the showers and bathrooms of dorms.[257]

166.    The Court finds that LSP uses inmate orderlies to attempt to accommodate or work around the access barriers, but the orderly program creates an unnecessary risk of harm to disabled and vulnerable inmates.

### c.    Segregation without Justification

167.    Trial evidence also demonstrated that LSP unjustifiably segregates its disabled population as it relates to housing.   Inmates with long-term physical disabilities are typically housed in the medical dormitories or on Ward II.[258] As set forth above, this excludes inmates on nursing wards from participating in a host of activities and programs at LSP.

---

[255] JX 4-ii, T. Falgout Depo. at 34:2-4.
[256] *Id.* at 41:4-14; 33:12-18; 34:16-24; 42:1-13.
[257] JX 4-q, B. Prine Depo. at 64:12-65:2; PX 231 at 2263-65 (ARP of J.W.); JX 4–c, A. Brent Depo. at 78:4-80:21; Rec. Doc. No. 547, Testimony of Danny Prince, at 104:10-19; PX 231 at 2358-64, 2437-39 (ARP of J.W.); PX 231 at 1794-1809 (ARP of C.H.); PX 231 at 1609-13 (ARP of S.G.); PX 231 at 1846-55 (ARP of E.J.); PX 231 at 1887 (ARP of T.K.).
[258] JX 7-b (LSP Directive 07.004) at 00002; JX 6-eee (LSP Directive 13.088) at 0269-70; see also JX 4-z, D. Barr Depo. at 49:10-18 (deaf inmates housed in medical dorms); JX 4-ii, T. Falgout Depo. at 119:3-7 (blind inmates housed in medical dorms).
Document Number: 52892

168.    Disabled or impaired inmates housed in the medical dorms do not receive many of the services that are used to justify this segregation.  Defendants claim placing disabled inmates in the medical dorms is justified because these dorms are handicap accessible and allow for assistance with personal care, meals, and medication administration.  Also, the medical dorms are close in proximity to LSP's treatment center.[259]   Despite these claims, the trial evidence demonstrated that inmates are still transported to the ATU for services,[260] and neither doctors nor nurses make rounds in the medical dorms.[261]   That inmate orderlies are available to assist in the medical dorms is a justification that is not substantiated based on the Court's findings regarding the inmate orderly program.[262]

3.    Methods of Administration

169.    LSP has systemically failed to provide access and accommodations to disabled inmates by failing to follow both Title II's implementing regulations and its own policies and procedures relating to ADA compliance.

a.    ADA Coordinator

170.    LSP had a designated ADA Coordinator during the relevant time periods; however, evidence established that these Coordinators all lacked sufficient education, training, and qualifications to carry out the obligations with which the ADA Coordinator is charged.  Defendants concede that ""[t]here are no specific qualifications of LSP's ADA Coordinator

---

[259] JX 6-eee at 00269.

[260] JX 4-c, A. Brent Depo. at 75:14-76:4;  *see also* Rec. Doc. No. 551, Testimony of Randy Lavespere at 205:17- 20, 208:17-21.

[261] JX 4-c at 73:25-76:4. *See also* Rec. Doc. No. 547, Testimony of Danny Prince at 98:20-24 (explaining that no doctors or nurses come to Ash 2 dormitory "unless there's like a tour or something coming through"). EMTs only visit the dormitories to conduct regular sick call. JX 4-c, A. Brent Depo. at 74:8-12.

[262] The Court does not conclude that no justifiable reasons could exist for segregation; however, based on the evidence at trial, the Court finds that the offered justifications are unsubstantiated.  The Court is confident that the segregation issues will be addressed during the remedial phase.

Document Number: 52892

or interim ADA coordinator,"[263] and the ADA Coordinator "do[es] not receive any formal ADA training upon taking office or on a regular basis."[264]

171.    As ADA Coordinator from 2015-2016, Deputy Warden Peabody identified only a basic four-hour training course he received;[265] he did not attend trainings regarding disability law and acknowledged that he was not "kept in some sort of loop" on updates in disability law.[266]  Peabody showed a general lack of familiarity with assessment forms he was responsible for evaluating and approving, and often concluded that inmates' disabilities were purely medical conditions not in need of accommodations.[267]  The Court finds that Warden Peabody had an overall lack of knowledge and understanding of the ADA and its requirements, particularly regarding accommodations.

172.    Warden Barr, who followed Peabody as ADA Coordinator, was likewise insufficiently trained for this position.  Barr received no ADA training other than the standard annual hour that all staff receives;[268] received no training manual;[269] testified that "[t]he Warden came to me and told me that he appointed me to that position and pretty much that was it";[270] and, when he took on this role, his workload was unaffected as he viewed this position as simply an "extra assignment."[271]  The Court finds that

---

[263] PX 403 at 0004. However, LSP Directive 01.016 states: "The ADA coordinator shall possess the educational background, experience and skills necessary to carry out all of the duties and responsibilities of the position, and have knowledge and experience in dealing with the legal rights of persons with disabilities and the obligations of public entities under Federal and State disability laws." JX 7-a at 1.
[264] Rec. Doc. No. 242-2 at ¶ 16.
[265] JX 4-ww, R. Peabody Depo. at 12:23-13:11.
[266] *Id.* at 13:16-23.
[267] JX 4-vv, R. Peabody Depo. at 19:25-20:12; 21:4-7; 22:6-24.
[268] JX 4-z, D. Barr Depo. at 10:23-11:2, 16:13-17:3.
[269] *Id.* at 11:7-9.
[270] *Id.* at 11:15-17.
[271] *Id.* at 12:20-23. Barr was unaware of basic information such as the availability of materials in Braille, including books and the RFA form. *Id.* at 43:14-24. He could not say how a blind inmate would file an ARP, *Id.* at 45:19-23, and was unsure whether deaf inmates were permitted to work. *Id.* at 49:5-9.
Document Number: 52892

Warden Barr was likewise ill-informed and ill-equipped on matters of ADA compliance.

173.    Current ADA Coordinator Asst. Warden Falgout took on this role in September 2016.  At his October 2016 deposition, Falgout testified that he received no training or manual when he took office and did not discuss the role with Warden Barr.[272] He was unfamiliar with the ADA Amendments Act and the Rehabilitation Act;[273] as well as the individualized response plans he was required to create for disabled patients pursuant to LSP Directive 01.016;[274] and the need for an ADA transition plan as defined in 28 C.F.R. § 35.150(d).[275]

174.    The Court finds that Asst. Warden Falgout is juggling far too many competing responsibilities to adequately fulfill his obligations as ADA Coordinator for the LSP.[276] The Court also finds that LSP failed to provide adequate training and resources to any of its ADA Coordinators, and none of the ADA Coordinators during the relevant time period possessed the knowledge or experience necessary to oversee and ensure ADA compliance.

---

[272] JX 4-jj, T. Falgout Depo. at 8:2-19.
[273] *Id.* at 11:15-12:3.
[274] *Id.* at 58:12-14.
[275] *Id.* at 37:1-16; 28 C.F.R. § 35.150(d).
[276] Rec. Doc. No. 554, Testimony of Tracy Falgout at 12:10-14:1, 32:15-36:16.  During the relevant time period, Falgout was responsible for:  supervising a mental health nurse; overseeing LSP's Quality Improvement program, which involved formulating studies, collecting data for as many as six studies at a time, preparing reports, and leading quarterly meetings; preparing and maintaining files to demonstrate compliance with the ACA's medical standards, both for annual internal audits and the triennial ACA audit; making level of care determinations for individuals being transferred from LSP to other facilities, which required thousands of record reviews every year; providing nursing staff training and continuing education; running the health care orderly and hospice volunteer training programs; leading re-entry classes; performing patient histories and assessments as part the intake process for transfers to LSP, at times on a weekly basis; teaching basic and advanced life support classes; processing and evaluating accommodation requests, and conducting as many as 50 or more hearing tests per month in connection with many of those requests.
Document Number: 52892

### b.    ADA Advisory Committee

175.    Although not required by ADA regulations, LSP Directive 01.016 requires LSP to maintain an ADA Advisory Committee consisting of the ADA Coordinator, the Deputy Warden for Operations, a staff attorney, the Safety Director, and the Health Information Management Supervisor.[277] The purpose of this committee is to review ADA compliance on a monthly basis and recommend corrective action to the warden where appropriate.[278] Despite this Directive, neither LSP's ADA Coordinator[279] nor its past or present wardens,[280] were aware of the existence of such a committee, and Defendants have admitted that "[n]o such committee existed during the pendency of this lawsuit."[281]

### c.    Inadequate Training

176.    LSP staff are inadequately trained to assist with disabled inmates.  Falgout testified that both security and medical staff receive an hour of training, annually, on "special needs offenders,"[282] which is based upon the same 13-page handout that includes three pages of instructions relating to illegal drug use.[283]  The handout places far more emphasis on handling security concerns than evaluating and assisting with the accommodations and care necessary for disabled inmates.

177.    Several LSP representatives confirmed this lack of ADA training.  At his August 2016 deposition, Falgout testified that he was unaware of any formal ADA training for staff, stating simply: "[a]ll staff have the ability to review the policy."[284]  Assistant Facilities

---

[277] JX 7-a (LSP Directive 1.016) at 4.
[278] *Id.*
[279] JX 4-ii, T. Falgout Depo. at 93:23-25; JX 4-jj, T. Falgout Depo. at 36:1-9.
[280] JX 4-ccc, D. Vannoy Depo. at 72:17-20; JX 4-bb, B. Cain Depo. at 48:24-49:1.
[281] Rec. Doc. No. 242-2 at ¶ 18; *see also* PX 403 at 0003.
[282] Rec. Doc. No. 554, Testimony of Tracy Falgout at 6:13-7:1; 8:18-24.
[283] *See* DX 103 at 03275-77.
[284] JX 4-ii, T. Falgout Depo. at 93:16-22.
Document Number: 52892

Maintenance Manager Odis Ratcliff, who testified as the DOC's 30(b)(6) witness regarding the accessibility of LSP's facilities, admitted that no one in his department receives training on the ADA's architectural accessibility requirements.[285]   The DOC's orientation training materials focus almost entirely on hearing-impaired inmates.[286]

> d.   *Failure to Inform Disabled Inmates of ADA Rights/Procedures*

178.   Plaintiffs failed to carry their burden of demonstrating that LSP systemically fails to inform patients of their ADA rights and procedures.   Falgout testified at trial that, in accordance with LSP policy,[287] every new inmate is asked at intake if he has a physical limitation or need for accommodation:[288]

> We ask the questions on everyone coming in, do you have any physical limitations, do you have any issues as far as being able to ambulate.  Some of it is quite evident.  If they come in with a wheelchair or a cane or walker, we know that.  We'll take that into consideration.  We also, like I said, we'll ask them questions if they have any physical limitation.[289]

If the inmate is cognitively impaired or cannot read or write, the procedures are explained verbally.[290]  Falgout testified:

> If in the process of doing medical intake, there appears to be that there is some type of cognitive deficit as far as this offender's ability to understand, we will take our time and slow things down, read it for them.  If there's still that issue, we bring mental health in on that … to help him as much as possible comprehend what's going on with the intake process and make sure he gets the information.[291]

---

[285] JX 4-aaa, O. Ratcliff Depo. at 9:4-11.
[286] JX 12-f.
[287] *See* JX 7-a (LSP Directive 1.016).
[288] JX 4-jj at 19:2-17; *see also* JX 4-ii at 94:20-95:20.
[289] Rec. Doc. No. 553, Testimony of Falgout, 163:19-25.
[290] JX 4-ii at 98:20-99:3.
[291] Rec. Doc. No. 553, Testimony of Falgout, at 169:11-21.
Document Number: 52892

179.    During intake, an inmate is provided a Request for Accommodation form and advised that he may request an accommodation at that time or later, if necessary.[292] Class member Otto Barrera testified at trial that he received this form at intake, although he also testified he did not understand it.[293]

180.    While Request for Accommodation forms are available in all housing areas, Falgout testified that the form itself "is not a necessity for access."[294]  Rather, an inmate can request an accommodation verbally, through a sick call form, or even "on a blank piece of paper."[295]  "Any means of communication" satisfies the initiation of a request for accommodation, and a request may even be made by suggestion of a correctional officer on behalf of an inmate.[296]  This process was explained in detail by the documentary evidence submitted.[297]    Inmates whose accommodations requests are denied are allowed to appeal through the ARP process.[298]

e.    *Failure to Properly Handle Accommodation Requests*

181.    Although the request for accommodation process is explained in the above manner, Plaintiffs presented evidence that LSP does not comply with the steps set forth in this process; rather, nearly all accommodations requests are initiated through the ARP process.[299]  Defendants' training materials instruct LSP staff to direct inmates to the ARP process to request an accommodation.[300]  Former ADA Coordinator Peabody

---

[292] JX 4-jj at 20:5-15; JX 12-a at 00001.
[293] Rec. Doc. No. 547, Testimony of Otto Barrera, at 49:17-50:22; JX 10-d-1 at 03748.
[294] Rec. Doc. No. 553, Testimony of Falgout at 174:18-175:1; JX 4-jj at 19:18-20:23.
[295] JX 4-jj at 19:18-20:23.
[296] *Id.* at 29:5-18; *see also*, Rec. Doc. No. 553 at 175:2-12.
[297] JX 12-a; JX 7-a (LSP Directive 1.016).
[298] JX 7-a at 8; JX 4-jj at 24:8-13, 28:1-8.
[299] JX 5-d at 0321-22.
[300] JX 12-f at 00313.
Document Number: 52892

acknowledged that "a lot" of requests for accommodations are filed as ARPs.[301]  Despite

the prison policy and procedure requiring a specific routing process for accommodation-

request ARPs,[302] Warden Peabody testified that, during his time as ADA Coordinator, an

ARP involving a request for accommodation would be "treated just like every other

administrative remedy procedure,"[303] and he never saw an ARP routed to his office.[304]

He admitted that ARPs or other complaints would not come to him unless they included

"magic words" such as disability or ADA, even if they might be legitimate accommodation

requests.[305]  Indeed, he admitted that there was "no excuse for it, other than we were not

coordinating the two efforts together."[306]  When testifying as the DOC's 30(b)(6) witness

on ADA implementation, Warden Falgout similarly testified that he was unaware how

ARPs were routed to his office, who was responsible for routing them, or whether that

person had any familiarity with the ADA.[307]

182.    Trial evidence demonstrated that ADA Coordinators and medical staff routinely fail

to recognize when medical issues trigger the ADA.  Warden Peabody admitted that "we're

so used to inmates making medical requests for duty status based upon a medical

condition that I don't necessarily see it as an ADA issue."[308]  Warden Peabody did not

think requests for restricted duty statuses should come to him, even though they "could

be" considered requests for accommodations.[309] He stated that "[t]his is a confusing issue

---

[301] JX 4-vv, R. Peabody Depo. at 12:21-24.
[302] JX 12-f at 00313; JX 5-d at 00321-22.
[303] JX 4-ww, R. Peabody Depo. at 62:5-15.
[304] *Id*. at 63:2-4.
[305] *Id*. at 75:23-77:1.
[306] *Id*. at 62:20-24.
[307] JX 4-jj, T. Falgout Depo. at 60:7-16.
[308] JX 4-vv, R. Peabody Depo. at 22:21-24.
[309] JX 4-ww, R. Peabody Depo. at 55:3-12.
Document Number: 52892

for me and for staff as determining when something is an ADA request and when it isn't. Generally speaking, it gets treated as an ADA request when the inmate puts in something about ADA in the request and basically says he wants an accommodation."[310]

183.    Even when a screening officer recognizes an ADA issue and routes such a request to the ADA Coordinator, the LSP procedure is not utilized in addressing such a request.[311] Although DOC policies provide that "[s]taff who are aware of or have reason to believe that an offender has a disability for which he may need accommodation are required to advise the unit ADA Coordinator, who will evaluate the circumstances to determine if auxiliary aids and services and reasonable accommodations are required,"[312] Warden Peabody testified that, in over ten years of serving as ADA Coordinator, he was never contacted by a LSP staff member, rather than an inmate, indicating that an inmate had a disability and required assistance.[313]

184.    Although DOC policy requires that an inmate's disability be documented in his medical record,[314] and the ADA Coordinator is responsible for developing an individualized response plan which must be included in the medical record,[315] Plaintiffs' medical experts did not find "clear documentation of disability accommodations" in a single chart they reviewed, or "evaluations or assessments of needs in that respect,"[316]

---

[310] *Id.* at 58:11-17.
[311] JX 4-vv, R. Peabody Depo. at 19:25-20:12 (Warden Peabody was not familiar with Form B-08-010-A); *See, e.g.*, PX 231 (ARP of M.B.) at 2563-72 (denying request to use TTY phone and to have his duty status reinstated); PX 231 (ARP of J.T.) at 2200-11 (rejecting complaint that patient was denied access to TU's "handicap accessible shower" with one-sentence response); PX 231 (ARPs of B.A.) at 2604-40 (denying request for access to TTY phone and television with closed captioning); *id.* at 1832-45 (ARP of T.J.)(patient waited approximately 8 months to receive a first step response to his ARP.).
[312] JX 5-d at 00320.
[313] JX 4-ww, R. Peabody Depo. at 39:5-40:16.
[314] JX 12-f at 00312-13.
[315] JX 7-a at 3-4.
[316] PX 6 at 0059 n.74.
Document Number: 52892

and Warden Falgout testified that he was not familiar with the concept of an individualized response plan.[317]

### f.    Lack of Tracking System

185.    The DOC requires LSP's ADA Coordinator to maintain a tracking system for all accommodation requests[318] and to record such information in a database using Form B-08-010-B.[319] However, in practice, there appears to be no such tracking system, and the database is severely inadequate to effectively track disabled inmates' ADA needs.[320] After becoming ADA Coordinator, Warden Falgout did not recognize the first part of the list;[321] and he described the second part as "an alphabetized master list of everybody who has requested ADA for one reason or another."[322] He admitted this list does not provide a full picture of each individual's disability and was not really a tracking database for individuals,[323] and he acknowledged one would have no way of knowing whether an individual's needs were being met by looking at the list.[324] Further, staff at DOC headquarters appeared to be either unaware of the database's existence or unable to utilize it to determine the number of patients with various disabilities and accommodations at a given facility.[325]

---

[317] JX 4-jj, T. Falgout Depo. at 58:12-14.
[318] JX 7-a at 3.
[319] JX 5-d at 00324, 00329.
[320] JX 12-b.
[321] JX 4-jj, T. Falgout Depo. at 37:17-38:4.
[322] *Id.* at 40:8-17.
[323] *Id.* at 41:8-42:6.
[324] *Id.* at 44:15-23.
[325] PX 306 at 0002 (June 27, 2014 email from S. Falgout to staff at LSP and other facilities, asking if those facilities "keep up with the number of offenders that are blind, handicapped, in a wheelchair," and if they could provide those numbers).
Document Number: 52892

186.    Trial evidence demonstrated that many requests never get recorded into the tracking database. In 2014, DOC audits of LSP indicated that the ADA database was "not being used for offender request[s]."[326]  During his tenure, Warden Peabody noted that the database would not include any ARPs.[327]   Warden Barr admitted that he was not involved in recording information in the database and did not know who was.[328]  Likewise, Warden Falgout acknowledged that an ARP would not be recorded in the database if the screening officer did not recognize the request as indicating an ADA issue.[329]

> g.    Copays

187.    Plaintiffs failed to carry their burden of demonstrating that disabled inmates are required to pay co-pays for accommodation requests to be addressed.  To the extent co-pays are being charged based on LSP staff misidentifying or failing to recognize that a medical issue implicates the ADA, this issue can be addressed during the remedy phase of this matter.

> 4.    Failure to Accommodate

Plaintiffs argue they carried their trial burden of demonstrating that LSP systemically fails to accommodate disabled inmates in the following ways:  (1) providing assistive devices and auxiliary aids ranging from wheelchairs and wheelchair gloves to tapping canes and informational materials in Braille; (2) work assignments; (3) dietary needs (4) when transporting patients; (5) in prison procedures ranging from medication administration to evacuation plans to the filing of ARPs; and (6) when imposing discipline.

---

[326] JX 33 at 0001. The March 25, 2014 report indicates that the failure to utilize the ADA database had been referenced in previous reports, and corrective action was still pending. *Id.*
[327] JX 4-ww, R. Peabody Depo. at 65:10-66:15.
[328] JX 4-z, D. Barr Depo. at 23:20-24:12.
[329] JX 4-jj, T. Falgout Depo. at 65:8-14.
Document Number: 52892

a.    *Assistive Devices/Auxiliary Aids*

188.    Plaintiffs failed to establish that LSP systemically fails to provide auxiliary aids and assistive devices to disabled inmates.[330]  Further, Plaintiffs' evidence that LSP does not provide Braille for blind inmates does not satisfy their burden; rather, Plaintiffs must show specific instances where blind inmates required Braille and were not accommodated in this, or another appropriate, manner.

189.    Signs are posted throughout LSP advising that auxiliary aids are available on request.[331]  Inmates are provided adaptive devices on a case-by-case basis.[332]

190.    Inmates suffering with mobility impairment may be provided wheelchairs, walkers, canes, or specialty footwear according to physicians' orders.[333] LSP offers training in the use of adaptive devices.[334]

191.    Hearing-impaired inmates are accommodated through a variety of ways:  onsite hearing tests or referrals to off-site audiologists, where necessary;[335] assistive listening devices, access to closed captioned television, FM radio adapters, and amplified telephone headsets, and TTY phones;[336]  batteries for hearing aids if inmates arrived at LSP with a hearing aid;[337] American Sign Language training by a professional sign

---

[330] Plaintiffs claim that Falgout testified that LSP does not provide hearing aids under any circumstances in JX 4-jj, T. Falgout Depo. at 108:18-20.  However, in this deposition, Falgout testified that an accommodation could be a hearing aid.  *Id.* at 30:7.  Further, LSP is required to accommodate the needs of hearing-impaired inmates, but LSP may choose the manner in which it accommodates, as long as it is effective.
[331] JX 4-jj, T. Falgout Depo. at 29:19-30:8; JX 12-h.
[332] *Id.* at 17:11-18:1.
[333] JX 12-b at 00012-13.
[334] JX 4-ii at 122:23-23:7; JX 11-c at 00261.
[335] JX 4-ii at 110:22- 112:6.
[336] *Id.* at 101:23-102:13, 104:11-14; JX 7-a at 6.
[337] *Id.* at 108:11-13; JX 7-a at 7.
Document Number: 52892

language interpreter.[338]

192.    In the majority of inmates' experiences specified by Plaintiffs, the Court finds that the evidence does not demonstrate a failure to accommodate a disability under the ADA; rather, most incidents involve a disagreement by the inmate with the accommodation provided and/or the medical treatment dispensed.

193.    Sampier testified that prison officials refused to provide him the specific paraplegic wheelchair he requested along with specialized gloves to accompany this specific wheelchair.[339]   However, Defendants presented evidence establishing that Sampier was provided a wheelchair and a trapeze bar, and he was able to purchase gloves in the commissary.[340]   Sampier may have disagreed with his accommodation, but LSP is not required to provide an inmate's specific, preferred accommodation.

194.    Francis Brauner testified that LSP initially refused to provide him a wheelchair, but ultimately a wheelchair was provided that was hard to maneuver.[341]    Brauner also complained that he was denied his request for gloves because he was told "it wasn't in the budget."[342]    Again, the evidence reflects that Brauner was dissatisfied with his accommodation, but he was accommodated.

195.    The incidents regarding Karl Clomberg's foot and Michael Johnson's propensity to pass out occurred outside the relevant time period.   Further, the Court finds that the evidence surrounding these inmates' experiences demonstrates a disagreement with

---

[338] *Id.* at 104:20-105:9; Dr. Daniel Burch was under contract to provide sign language training at LSP for the period of August 2015 – August 2018.  *See* JX 12-c at 00166-71.
[339] Rec. Doc. No. 544, Testimony of Farrell Sampier at 81:18-82:11; 59:11-60:2.
[340] *Id.* at 60:4-10, 59:18-20, 81:22-24.
[341] Rec. Doc. No. 546, Testimony of Francis Brauner, at 103:1-104:12.
[342] *Id.* at 104:13-25.

Document Number: 52892

medical treatment, not a violation of the ADA.

196.    John Tonubbee, who claims he suffers from bunions, a hammer toe, and knee pain,[343] was provided a pair of Apex shoes rather than the specific shoes he requested.[344] Thus, Tonubbee was accommodated, disagreement notwithstanding.  Further, the Court finds that Tonubbee's complaint constitutes a disagreement with medical treatment rather than a violation of the ADA.

197.    Plaintiffs failed to demonstrate that Derrick Woodberry's hemorrhoids constitute a disability under the ADA.  Further, the evidence demonstrates a disagreement with medical treatment, not a violation of the ADA.

### b.    Work Assignments

198.    Plaintiffs failed to demonstrate that LSP systemically fails to accommodate disabled inmates in work assignments or duty statuses.

199.    At LSP, assignment of duty status begins at intake.[345]  When an inmate arrives at LSP, he is not assigned a duty status until he evaluated by a health care provider.[346]  If an inmate believes his duty status is being violated, he may utilize the ARP process.[347]

200.    Adrian Dunn, who suffers from diabetes and asthma, testified that his out-of-field duty status was revoked after 13 years even though he continues to have asthma attacks exacerbated by dust.[348]  Dunn's medical records were not admitted into evidence in this matter.

---

[343] Rec. Doc. No. 546, Testimony of John Tonubbee, at 147:7-149:13.
[344] JX 10-ddd-3 at 56892.
[345] Rec. Doc. No. 553, Testimony of Falgout at 216:10-14.
[346] *Id.* at 216:14-21; JX 4-ii at 94:1-19.
[347] JX 4-jj at 46:13-17.
[348] JX 4-h, A. Dunn Depo. at 27:5-24, 28:18-29:25.
Document Number: 52892

201.    The medical records of Karl Clomberg and Michael Johnson are not in evidence in this matter.  Additionally, the complaints of these inmates fall outside the relevant time period.[349]

202.    Jason Hacker was denied a restricted duty status and assigned field work despite a medical determination that he was blind.[350]  However, Hacker filed a separate lawsuit against these Defendants on the same complaints, and the Fifth Circuit affirmed a jury verdict finding that Hacker was not disabled.[351]

203.    Although Hymel Varnado testified that he was required to lift heavy locker boxes as part of his orderly duties, despite having a duty status restriction of no heavy lifting,[352] Varnado also testified this issue came up in 2010,[353] and he has reported no physical problems with his duty status during the relevant time period.[354]

204.    Anthony Mandigo, who suffers from sickle cell disease causing ulcers to develop on his legs and ankles,[355] testified at trial that he was assigned to be a tier walker, which involved walking up and down a prison tier for 10-hour shifts, despite having a duty status mandating "no prolonged walking."[356]  However, Mandigo's duty status provides for intermittent rest,[357] and he testified that if he complained of pain, "I might get a duty status of no duty, and go see the clinic every day to get a dressing change."[358]  Thus, evidence

---

[349] See JX 4-j at 10, 24; JX 4-f at 28 for dates of incidents.
[350] JX 4-i, Hacker Depo., at 55:7-58:11.
[351] Hacker v. Cain, 759 Fed. Appx. 212, 216-218 (5th Cir. 2018).
[352] JX 4-s at 21:8-23:23.
[353] Id. at 19:8-20:22.
[354] Id. at 26:19-25, 29:2-5.
[355] Rec. Doc. No. 550, Testimony of Anthony Mandigo at 82:4-24.
[356] Id. at 85:4-19.
[357] See JX 6-oo (LSP Directive 13.063) at 00203.
[358] Rec. Doc. No. 550 at 86:1-2.
Document Number: 52892

demonstrates that Mandigo's physical limitations were accommodated in his work assignment.

205.   Charles Butler testified that he was injured while hanging drywall pursuant to his Squad A duty status work assignment, and he was required to hang drywall sheets weighing 20 to 25 pounds, despite a lifting restriction of ten pounds.[359]   However, Defendants presented evidence that a Squad A duty status inmate is restricted to lifting "objects weighing <u>less</u> than 30 pounds."[360]   Thus, evidence demonstrated that Butler's duty status restrictions were not violated by this work assignment, as his lifting restriction was thirty pounds, not ten.

### c.    Dietary Accommodations

206.   Plaintiffs have failed to carry their burden of demonstrating that LSP systemically fails to accommodate dietary restrictions for disabled inmates.

207.   Plaintiffs offered testimony of four class members who claim their disabilities require dietary accommodations that have not been met by LSP.  Further, it was only established that one class member, Adrian Dunn, would require a dietary accommodation based on a disability – diabetes.[361]   Evidence relating to Clomberg, Brauner, and Barrera[362] failed to connect the purported dietary requirements to a disability as defined by the ADA.

---

[359] Rec. Doc. No. 547, Testimony of Charles Butler at 63:22-64:23.

[360] JX 6-oo (LSP Directive 13.063) at 00205 (emphasis in original).

[361] JX 4-h, A. Dunn Depo. at 22:13-20.

[362] Trial evidence established that Barrera preferred to receive a regular tray and cut up his own food.  JX 10-d-1 at 03971-03972. Further, evidence demonstrated that Barrera was accommodated by receiving Ensure protein drinks 2-3 times a day, *see id.* at 03783; 03779; JX 10-d-4 at 04449, and Barrera routinely ignored doctor's orders regarding his diet by eating freely and taking food off other inmates' trays, eating fried chicken, and purchasing commissary food items inconsistent with his dietary restrictions.  *See* JX 4-pp at 20:20-23:18; JX 10-d-1 at 03966 – 67; Rec. Doc. No. 547, Testimony of Otto Barrera at 42:23-45:18. Document Number: 52892

Further, no evidence was presented that these class members filed ARPs to complain about their dietary needs.

*d.    Lack of Handicapped-Accessible Transportation*

208.    Benny Prine, who is capable of walking but uses a wheelchair due to issues with his left knee and right hip,[363] testified that on two occasions, he was transported to an outside medical appointment in a regular van, which caused him pain due to the inability to keep his bad leg extended.[364]    However, Prine never requested an accommodation and did not answer the question whether he had reported his discomfort to anyone at LSP.[365]

209.    Hymel Varnado testified that he was transported to the hospital in a regular van, handcuffed and shackled, while he suffered from a ruptured spleen and internal bleeding.[366]    Following surgery, Varnado was transported back to LSP in the back of a car.[367]    There is no evidence that Varnado was disabled under the ADA; the evidence demonstrates that LSP provided poor medical care and transportation to a patient in need of surgery.

210.    The transport incidents involving Sampier and Barrera occurred outside of the relevant time period.

211.    Danny Prince, a former health care orderly, testified that, when the handicap van was not available, an inmate with a call-out appointment would "have their trip cancelled

---

[363] JX 4-q, B. Prine Depo. at 12:15-17.
[364] *Id.* at 84:3-85:20.
[365] *Id.* at 85:21-86:6.
[366] JX 4-s at 31:21-33:1.
[367] *Id.* at 33:11-34:13.
Document Number: 52892

or rescheduled."[368]    Prince's testimony demonstrates that LSP was mindful of the necessity to provide disabled inmates safe transportation.  This evidence, while probative of the failure to provide adequate care under the Eighth Amendment is not probative of an ADA violation.

212.    Plaintiffs failed to carry their burden of demonstrating a systemic failure to accommodate disabled inmates in providing safe transportation.  Instances described above fail to indicate a disability under the ADA and/or reference circumstantial scenarios where improper care was provided or where substandard or unavailable transportation impeded adequate care.

e.    *Accommodations in Prison Procedures/Discipline*

213.    Plaintiffs presented no evidence of a disabled inmate who was not accommodated in the prison procedures of pill call, sick call, or head count.[369]

214.    While the LSP evacuation plan does not explicitly set forth a protocol for the safe evacuation of disabled inmates, the plan describes how the evacuation should proceed in all buildings on the property, including those that house disabled inmates.[370]  To the extent architectural barriers, such as ramps and ledges, create an unsafe evacuation plan for disabled inmates, that issue is adequately addressed above regarding physical and architectural barriers to access.

---

[368] Rec. Doc. No. 547, Testimony of Danny Prince at 103:4-8.
[369] Plaintiffs offered testimony of Barr and Falgout that they could not identify a specific accommodation made during these procedures for deaf or blind patients; however, Plaintiffs failed to demonstrate an actual failure to accommodate a deaf or blind inmate in these procedures to the Court's satisfaction.
[370] PX 16.
Document Number: 52892

215.   All disciplinary decisions are left to the sole discretion of security personnel, without oversight by medical staff as to the appropriateness of discipline for disabled inmates.[371]

216.  In the case of one disabled inmate, evidence demonstrated that the inmate suffered from severe mental health issues, including schizophrenia, and total blindness due to glaucoma; however, this inmate was "gassed" for refusing to shave.  The email indicates that the nurse was "looking into this as security should had (sic) checked with MH first."[372] The Court finds that LSP fails to take disability into account in its disciplinary decisions.

217.   Plaintiffs' medical experts noted the case of Patient # 24, a quadriplegic with a tracheostomy tube who was disciplined by being placed in a locked isolation room with no call system.[373]  The experts opined that there was "no way to notify the nurses if his trach tube became clogged and he had trouble breathing.  The solid door is locked and the nurses cannot hear him even if he screams."[374]  The Court finds that isolated housing as a form of discipline fails to accommodate many disabled inmates.

218.   Defendants' evidence that both security and nurses perform rounds every couple of hours, and inmates can (only) verbally scream if they require assistance,[375] fails to persuade the Court that such procedures comply with LSP's ADA obligations.

---

[371] *See* JX 4-ii, T. Falgout Depo. at 123:12-19; JX4-jj, T. Falgout Depo. at 14:20-15:14; JX 4-z, D. Barr Depo. at 40:13-41:24; JX 4-uu, C. Park Depo. at 13:14-21, 14:4-19.
[372] PX 85 at 0002-03.
[373] PX 6 at 0081. The Court overrules Defendants' hearsay objection to this exhibit which was admitted at trial.
[374] *Id.*
[375] *See* JX 4-*ll*, K. Hart Depo. at 34:12-35:23, 40:8-41:9.
Document Number: 52892

5.    Exclusionary Policies

a.    *Hobby Craft*

219.    Participation in hobby craft[376] at LSP is a privilege, not a right,[377] and is operated on a "first come/first serve basis" after submission of a written request to participate.[378] Further, LSP maintains a policy of ensuring the safe and secure operation of hobby craft which includes "the <u>temporary</u> interruption of an inmate utilizing the hobbyshop when under medical care and/or treatment, requiring a duty status, until such time as the inmate is returned to regular duty without restrictions."[379]  The policy further provides:  "No inmate receiving medical care and/or treatment requiring a restriction in the inmate's regular duties will be allowed to utilize the hobbyshops, until such time the inmate is returned to regular duty without restrictions."[380]

220.    LSP Directive 13.063 does, however, provide a caveat to this exclusion: "Offenders assigned restrictive duty will not be allowed to participate in sports and/or recreational activities, unless specified by the treating health care provider.  Participation in these activities could worsen or cause a recurrence of an injury or other medical condition.  If medically indicated, the treating provider may also restrict sports activities of an offender on regular duty."[381]

221.    Nurse Cynthia Park, APRN, testified that she "look[s] at the entire picture of the patient" when making her recommendations for duty statuses to Dr. Lavespere.[382]  She

---

[376] The terms "hobby craft" and "hobby shop" are used interchangeably.
[377] JX 4-ii, T. Falgout Depo. at 107:23-108:1.
[378] JX 7-d at 00015.
[379] PX 7-c (LSP Directive 9.036) at 00004 (emphasis in original).
[380] *Id.* at 00005.
[381] JX 6-oo (LSP Directive 13.063) at 00204.
[382] JX 4-uu, C. Park Depo. at 30:8-9.
Document Number: 52892

acknowledged that she will sometimes recommend that a hobby craft restriction be waived for an inmate "based on [the] patient's situation."[383]

222.    Dr. Lavespere makes the final decision regarding an inmate's duty status.[384]  In evaluating an inmate's medical condition for purposes of assigning duty status, Dr. Lavespere testified that:  "I try to be as objective as I can without a punitive bone in my body, and try to be fair with every one of them."[385]  Dr. Lavespere emphasized that he considers the safety of the inmate in applying duty status restrictions.[386]

223.    Subclass member Brauner testified that he requested to participate in hobby craft but was denied and "told that anyone that has a duty status is not allowed to participate in hobby craft."[387]  Brauner testified that no other reason was given for this denial.[388]  However, on cross-examination, Brauner admitted that he never asked a doctor to adjust his duty status and never filed an ARP.[389]

224.    Another Subclass member (C.F.) filed an ARP to challenge his exclusion from the hobby shop based on his restricted duty status because he had a work assignment that required him to sweep, mop, scrub, and walk during the day.[390]  Plaintiffs suggest that, upon initial review and appeal, C.F. was summarily denied access to hobby craft based solely on citation to LSP Directive #09.036.[391]

---

[383] *Id.* at 32:12-21.
[384] *Id.* at 31:19-32:3.
[385] JX 4-qq, Lavespere Depo. at 15:12-14.
[386] *Id.* at 15:12-18:25.
[387] Rec. Doc. No. 546 at 107:15-20.
[388] *Id.* at 107:21-22.
[389] *Id.* at 126:10-128:12.
[390] PX 231 at 1462.  It should be noted that this incident occurred well before the designated relevant time period in this case.
[391] *Id.* at 1464, 1513-14.
Document Number: 52892

225.    C.F.'s medical records, reviewed in consideration of his hobby craft ARP, demonstrate that he suffers from "L5-S1 degenerative disc disease.  Moderately large right lateral recess at L5-S1 disc herniation with right S1 nerve root compression."[392] In his initial ARP denial, the First Step Response states:[393]

This is in response to your ARP 2011-2246.  After careful review of the pertinent volumes of your current medical record, I find the following:  The extensive documentation in your medical record indicates that you are followed on a regular basis in the Physician's Clinic and the Neurology Clinic.  You have a history of right sciatica pain with L5-S1 herniated nucleus pulposus and spondylolisthesis, grade 1 at L5-S1.  You had a right L5-S1 microdiskectomy and posterior lateral fusion with a pedicle screw fixation of L5-S1 at MCNO on 1-17-2008.
You were last seen in the Physician's Clinic by Dr. McMurdo on 7-18-2011 and you complained about the "no hobbycraft" restriction.  You continue on medications, Mobic and Parafon Forte for pain and discomfort.

You have failed to provide evidence to substantiate your allegation of discrimination or that your care has not met acceptable standards of care.  I find no evidence to support your claim of a violation of the Disabilty Act.

According to LSP Directive #09.036, when under medical care and/or treatment, requiring a duty status, an offender utilizing the hobbyshop is interrupted until the offender is returned to regular duty without restrictions.  Therefore, your request to have the "no hobbycraft" removed from your duty status is denied.  If you have job complaints, this matter would better addressed through the Classification Department, which handles job assignments and job changes.

C.F.'s medical records and First Step Response does not demonstrate a blanket denial citing only to the general LSP Directive; it includes a medical evaluation of his medical conditions which resulted in the denial.  That C.F. disagreed with the result does not establish that it was discriminatory.

226.    While the evidence presented demonstrates that medical staff are making individualized assessments to determine eligibility to apply for hobby craft, it also demonstrates that a blanket exclusion exists, and an inmate must challenge their classification via ARP to obtain relief.  However, the Court finds that the hobby craft

---

[392] Id. at 1506.
[393] Id. at 1512 (interlineation in original).
Document Number: 52892

privilege is not the same kind of program/activity/service as the others complained of because all inmates, disabled or not, must apply for hobby craft and are screened prior to allowing participation.  Further, evidence demonstrates that when a disabled inmate requests to be permitted to participate in hobby craft, LSP providers give thoughtful consideration to the inmate's medical conditions and/or impairments in determining the safety of participation in hobby craft.[394]

### b.    Duty Status/Work Release Program

227.    All blind inmates at LSP are placed on "no duty" status.[395]

228.    Inmates on "no duty" are not permitted to work and are unable to earn incentive wages,[396] but they receive no discounts for phone calls or at the canteen.[397]

229.    Inmates with duty status restrictions are excluded from participation in LSP's work release program, which allows inmates with less than two years left on their sentences to work outside the prison as part of their integration back into the community.[398]

230.    Dr. Singh issued a blanket prohibition on approving HIV-positive individuals for work release.[399]

231.    Dr. Lavespere's opinion that the most desirable work assignment at LSP is "no duty status"[400] is irrelevant to this issue and does not justify blanket denials and

---

[394] While LSP's requirement that a disabled inmate file an ARP to apply for hobby craft is not the best policy or practice, the Court does not find that it is a violation of the ADA because all inmates at LSP must apply, are subject to screening, and must gain approval before participation is allowed.
[395] JX 4-z, D. Barr Depo. at 44:6-10; JX 4-ww, R. Peabody Depo. at 53:22-54:7.
[396] JX 4-z, D. Barr Depo. at 44:11-13.
[397] Id. at 47:3-6.
[398] JX 4-jj, T. Falgout Depo. at 59:11-25.
[399] PX 99 (June 8, 2010 email from Sonya Bufalo to Amanda Amman).
[400] JX 4-qq at 20.
Document Number: 52892

prohibitions of access to programs that are not based on individualized medical determinations.

232.    Defendants did not refute the evidence presented by Plaintiffs on this issue wherein present and past ADA Coordinators acknowledged blanket denials of access regarding these programs.

## III.    CONCLUSIONS OF LAW

### A. Eighth Amendment Standard

As expressed by the Supreme Court in *Brown v. Plata*,

As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. "'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.'"[401]

Prisoners are dependent on the State for necessary medical care, and

A prison's failure to provide sustenance for inmates "may actually produce physical 'torture or a lingering death.'"[402] Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.[403]

If a State cannot meet this obligation, "the courts have a responsibility to remedy the resulting Eighth Amendment violation."[404] While "[c]ourts must be sensitive to the

---

[401] 563 U.S. 493, 510 (2011)(quoting *Atkins v. Virginia*, 536 U.S. 304, 311, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion))).
[402] *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890)); *see generally* A. Elsner, Gates of Injustice: The Crisis in America's Prisons (2004)).
[403] *Id.* at 510-511.
[404] *Id.* at 511 (citing *Hutto v. Finney*, 437 U.S. 678, 687 n. 9, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)).
Document Number: 52892

State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals,"[405] courts must "nevertheless … not shrink from their obligation to 'enforce the constitutional rights of all "persons," including prisoners.'"[406]   Indeed, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."[407]

Deliberate indifference to "serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."[408] This inquiry consists of both an objective and a subjective test. The objective test requires showing that the prisoner has "serious medical needs,"[409] and "either has already been harmed or been 'incarcerated under conditions posing a substantial risk of serious harm.'"[410]   To prove an Eighth Amendment violation, Plaintiffs must prove that prison officials "1) show[ed] a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate."[411] An official is not liable for deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[412] To

---

[405] *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 547–548, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).
[406] *Id.* (quoting *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam)).
[407] *Id.*
[408] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *see also Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989).
[409] *Estelle*, 429 U.S. at 104.
[410] *Braggs v. Dunn*, 257 F. Supp.3d 1171, 1189 (M.D. Ala. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).
[411] *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. at 833-34).
[412] *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994).
Document Number: 52892

meet his burden, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[413]

Whether or not officials knew of the risk is considered the subjective component of the deliberate indifference standard,[414] which requires a state of mind amounting to recklessness as used in criminal law.[415] The subjective test requires a showing that prison officials had requisite knowledge of the risk of harm and either (1) disregarded it or (2) failed to act reasonably to abate it.[416]  Willful blindness to the risk posed to inmates is not a valid defense to a deliberate indifference claim.[417]

Systemic deficiencies in a prison's health-care system can provide the basis for a finding of deliberate indifference at an institutional level.[418] The cumulative effect of different deficiencies can demonstrate the subjective component of deliberate indifference, as the Supreme Court acknowledged in *Wilson v. Seiter.*[419] In class actions challenging systemic health care deficiencies, deliberate indifference to inmates' health

---

[413] *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

[414] *Farmer, 5*11 U.S. at 848.

[415] *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc) (citing *Farmer,* 511 U.S. at 839–40); see also *Hacker v. Cain*, No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *10 (M.D. La. June 6, 2016) ("An intent to harm or animus towards a particular inmate is not itself required so long as such reckless disregard for his or her medical needs can be shown."); *Hall v. Johnson*, No. 12-00099-BAJ-RLB, 2013 WL 870230, at *3 (M.D. La. Mar. 6, 2013).

[416] *Farmer*, 511 U.S. at 844-45; *see also Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1250 (MD. Ala. 2017)("To establish deliberate indifference, plaintiffs must show that defendants had subjective knowledge of the harm or risk of harm, and disregarded it or failed to act reasonably to alleviate it.").

[417] *See Farmer*, 511 U.S. at 843 n.8 (a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

[418] *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .").

[419] 501 U.S. 294, 300 (1991) (rejecting a distinction between "one-time" or "short-term" conditions of confinement and "continuing" or "systemic" conditions).

Document Number: 52892

needs may be shown by proving "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff," or by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[420]

The fact that a risk is obvious is sufficient to allow a fact finder to conclude that prison officials knew of the risk.[421] Plaintiffs may also demonstrate knowledge through inference from circumstantial evidence.[422] If there is proof of a problem that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[423]

Plaintiffs herein have demonstrated that "systemwide deficiencies in the provision of medical . . . care . . . taken as a whole, subject sick prisoners in [LSP] to 'substantial risk of serious harm' and cause the delivery of care in [LSP] to fall below the evolving standards of decency that mark the progress of a maturing society."[424]  To prevail on their Eighth Amendment claim, Plaintiffs proved (1) the existence of serious medical needs among members of the Class and (2) that Defendants were deliberately indifferent to a

---

[420] *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted); *Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000); *see, e.g.*, *Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977).
[421]  *Farmer*, 511 U.S. at 842; *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015); *Gates*, 376 F.3d at 333; *Robinson v. Babin*, No. 12-00629-BAJ-RLB, 2014 WL 2769099, at *4 (M.D. La. June 18, 2014).
[422] *Farmer*, 511 U.S. at 842.
[423] *Hinojosa*, 807 F.3d at 665 (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted).
[424] Rec. Doc. No. 573 at 247 (quoting *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011)).
Document Number: 52892

substantial risk of serious harm stemming from the inadequacies in LSP's medical care system.[425]

Turning to the objective test, the Fifth Circuit has defined a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."[426]  Given that this is a class action, Plaintiffs must demonstrate that that serious medical needs exist on a widespread basis, rather than on an individual basis.  Plaintiffs must also show that Defendants acted with deliberate indifference to the serious medical needs of the class and must establish that Defendants exposed the Class to "a substantial risk of serious harm."[427]

To establish a substantial risk of serious harm, "it does not matter whether the risk comes from a single source or multiple sources."[428]  "[M]ultiple policies or practices that combine to deprive a prisoner of a 'single, identifiable human need,' such as [medical care], can support a finding of Eighth Amendment liability."[429]  Moreover, the Fifth Circuit has long recognized that "the totality of circumstances concerning medical care" may violate the Eighth Amendment.[430]  The Court of Appeals for the Fifth Circuit has defined that a "serious medical need" is one "for which treatment has been recommended or for

---

[425] *Id.* (citing *e.g., Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *Lawson v. Dall. Cty.*, 286 F.3d 257, 262 (5th Cir. 2002); *Braggs*, 257 F. Supp. 3d at 1189.).

[426] *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

[427] *Id.* at 345.

[428] *Farmer*, 511 U.S. at 843; *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise[.]" (emphasis in original)).

[429] *Braggs*, 257 F. Supp. 3d at 1192 (quoting *Gates v. Cook*, 376 F.3d at 333).

[430] *Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977).

Document Number: 52892

which the need is so apparent that even laymen would recognize that care is required."[431] The "seriousness" of an inmate's medical need may also be determined by reference to the effects of a delay in treatment.[432] "Serious medical needs" also include conditions that threaten to cause health problems in the future.[433]

As for the subjective test, Plaintiffs must demonstrate that Defendants have a "sufficiently culpable state of mind."[434] "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety."[435]  Even in situations where awareness is shown, prison officials will not be liable "if they responded reasonably to the risk."[436]  However, prison officials cannot escape liability simply by demonstrating that they eventually took some form of "corrective action" in response to a risk of harm.[437] Efforts to correct systemic deficiencies that "simply do not go far enough," when weighed against the risk of harm, also constitute deliberate indifference[438] because such insufficient efforts are not "reasonable measures to abate" the identified substantial risk of serious harm.[439]  Further, "[i]nsisting upon a course of action that has already proven futile is not an objectively reasonable response under the deliberate-indifference standard" and would support a finding of liability under the Eighth Amendment.[440]

---

[431] *Gobert*, 463 F.3d at 345 n. 12 (citing *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir.1994), *abrogated on other grounds by Hope*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).
[432] *Hill*, 40 F.3d at 1187.
[433]  *See Farmer*, 511 U.S. at 843.
[434] *Id.* at 834 (internal citation and quotation marks omitted).
[435] *Id.* (internal citation and quotation marks omitted).
[436] *Id.* at 844.
[437] *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998).
[438] *Laube v. Haley*, 234 F. Supp.2d 1227, 1251 (M.D. Ala. 2002).
[439] *Farmer*, 511 U.S. at 847.
[440] *Braggs*, 257 F. Supp. 3d at 1260.
Document Number: 52892

In this case, deliberate indifference may also be established "by proving that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[441]  "In challenges to a correctional institution's provision of medical care, evidence of systemic deficiencies can also establish the 'disregard' element of deliberate indifference."[442] "As an evidentiary matter, these systemic deficiencies may be identified by a 'series of incidents closely related in time' or '[r]epeated examples of delayed or denied medical care.'"[443] "[A]lthough one-off negligent treatment is not actionable, . . . frequent negligence, just like a single instance of truly egregious recklessness, may allow the court to infer subjective deliberate indifference."[444] Deliberate indifference may also be "demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them."[445]

The "long duration" of unconstitutional conditions can also demonstrate correctional officials' knowledge of the deficiencies that cause a substantial risk of harm.[446]  Thus, if Plaintiffs show that a substantial risk of unreasonable harm was "longstanding, pervasive, well[-]documented, or expressly noted by prison officials in the past" and that "the circumstances suggest that the [prison officials] . . . had been exposed to information concerning the risk . . . , then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[447]

---

[441] *Id.* at 1251 (internal citation and quotation marks omitted).
[442] *Id.* (citing *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).
[443] *Id.* at 1251-52 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058-59 (11th Cir. 1986)).
[444] *Dunn v. Dunn*, 219 F. Supp.3d 1100, 1129 (MD. Ala. 2016).
[445] *Id.*
[446] *Alberti v. Sheriff of Harris Cty*., 937 F.2d 984, 998 (5th Cir. 1991).
[447] *Farmer*, 511 U.S. at 842-43; *see also Williams*, 547 F.2d at 1216 (concluding that the Eighth Amendment may be violated on a showing of "evidence of rampant and not isolated deficiencies").
Document Number: 52892

Applying the law to the findings of fact set forth above, the Court concludes as a matter of law that Defendants have violated Plaintiffs' Eighth Amendment rights.  LSP's deficiencies as to medical health care are widespread; Defendants' manner and means of the delivery of health care to Plaintiffs creates a substantial risk of serious harm to Plaintiffs; and Defendants have been deliberately indifferent to the serious medical needs of Plaintiffs in failing to address and/or correct known deficiencies.  As the evidence demonstrates, Defendants have continuously acted with deliberate indifference toward the standards of care "within modern and prudent professional standards" by delaying or denying access to medical attention to serious and urgent medical needs of inmates.[448]  The record is replete with instances showing failure by Defendants to take the necessary steps to provide access or avoid delay in access to medical and health care.  Specifically, the trial testimony and evidence demonstrate constitutionally inadequate care and/or access to care as it relates to the following:  providing timely and adequate access to clinical, inpatient/infirmary, emergency, and specialty care and the lack of medical leadership, administration, and organizational structure.  Evidence at trial satisfied both the objective and subjective standards for deliberate indifference.

### 1.    Clinical Care

In *Gates v. Cook*, the Fifth Circuit recognized that a combination of conditions may "have a mutually enforcing effect" that violates the Eighth Amendment.[449]    This combination of conditions regarding clinical care is amply demonstrated by the evidence supporting the Court's findings of fact, generally, that: (1) exam rooms lack privacy and

---

[448] *Morales Feliciano v. Rossello Gonzales*, 13 F.Supp.2d 151, 208 (D. Puerto Rico 1998).
[449]  376 F.3d 323, 333 (5th Cir. 2004); *See also, e.g.*, *Williams*, 547 F.2d at 1215; *Braggs*, 257 F. Supp. 3d at 1192.
Document Number: 52892

standard medical equipment; (2) there are often no medical records available to the providers making cell side visits; (3) hygiene and spacing issues abound; and (4) physicians/providers treat complaints episodically rather than the underlying state of diseases.  Several specific practices or failings by LSP are identical or similar to matters that have been held to violate the Constitution. These include: (1) the failure to provide adequate facilities and equipment for necessary medical care;[450] (2) the failure to ensure that medical records are available to providers treating the inmate, which permeates numerous aspects of health care delivery;[451] and (3) the use of unqualified or untrained staff or inmate orderlies who provide medical care outside the scope of their qualifications.[452]

---

[450] *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989); *Inmates of Allegheny County Jail v. Wecht*, 874 F.2d 147, 153 (3d Cir.1989) (inadequate space for mental health facilities supported an order closing the jail), *vacated and remanded on other grounds*, 493 U.S. 948, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989); *Newman v. Alabama*, 503 F.2d 1320. 1331 (5th Cir.1974); *Tillery v. Owens*, 719 F.Supp. 1256, 1307 (W.D.Pa.1989) (condemning infirmary's lack of space, unsanitary conditions, and deficiencies in equipment and supplies), *aff'd*, 907 F.2d 418 (3d Cir.1990); *Coleman v. Schwarzenegger*, 922 F.Supp.2d 882, 887-88 (inmates "receive inadequate medical care in substandard facilities that lack the medical equipment required to conduct routine examinations or afford essential medical treatment").

[451] The record is replete with evidence that Defendants have failed to maintain medical records in a manner that assists in providing constitutionally adequate health care at LSP. In *Newman v. Alabama*, the Fifth Circuit found that, in the prison setting, medical records that are "incomplete, inaccurate and not standardized" contribute to constitutionally inadequate delivery of health care. 503 F.2d 1320, 1323 (5th Cir. 1974)("The consequences of inadequate medical records are manifest in two ways. First, because inmates transferred to and released from Mt. Meigs are accompanied by paltry records, personnel at the receiving institutions are unaware of the diagnosis, treatment previously rendered, and the treatment prescribed for the future. Second, there can be little or no monitoring of whether receiving facilities are complying with a physician's orders. Indeed, the evidence indicates that such noncompliance is rampant.") *Id.* at n 4.  *See also*, *Miranda v. Munoz*, 770 F.2d 255, 261 (1st Cir.1985) (prison officials' knowledge of continuing problem of prisoners arriving at hospital without their medical records cited as a basis for damage liability); *Brown v. Coughlin*, 758 F.Supp. 876, 882 (S.D.N.Y.1991) ( "failure to transfer necessary medical records in a timely fashion" supported a deliberate indifference claim); *see Burks v. Teasdale*, 492 F.Supp. 650, 676 (W.D.Mo.1980) and cases cited (noting that medical records are essential to continuity of medical care).

[452] *Cooper v. City of Cottage Grove*, No. 6:13-cv-551-TC, 2014 WL 4187558, *6 (D. Or. Aug. 21, 2014)("The essential function of EMTs is to stabilize an ill or injured person for transport to the emergency room, not to provide medical diagnosis or treatment. They are not the equivalent of a physician or other medical professional."); *Laaman v. Helgemoe*, 437 F.Supp. 269, 312-313 (D. N.H. 1977)(citations omitted)(" A failure to staff a prison around the clock with qualified personnel trained to identify and cope with medical emergencies and reliance upon unqualified and untrained inmates, civilians and employees of the prison

Document Number: 52892

2.    Sick Call

The failure to provide a sick call system that ensures that prisoners receive needed care violates the Constitution.[453]   The trial evidence established that Defendants have failed to provide a sick call system that ensures access to care and effectively handles emergencies, which results in the endangerment to the health of inmates by denying or delaying access to health care. Specifically, a combination of the following conditions "have a mutually enforcing effect" that violates the Eighth Amendment: (1) improper use of unqualified EMTs for diagnosis and treatment; (2) multiple requests by numerous inmates for treatment of the same problems; and (3) medical records being unavailable to the providers, which functionally impairs the provider's ability to evaluate and treat underlying conditions and instead promotes a "band-aid" approach to treating complaints episodically.   The Seventh Circuit and D.C. Circuit courts have held that this type of deficiency supports a finding of deliberate indifference.[454]

3.    Specialty Care

"A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[455]   This applies to failing to provide referrals to

---

to make medical decisions and to perform medical functions infringe upon the constitutional rights of prisoners.").

[453] *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1184–86 (7th Cir.1985) (known deficiencies in sick call system supported a finding of deliberate indifference).

[454] *See id.* at 1186; *see also Inmates of Occoquan v. Barry*, 717 F.Supp. 854, 867 (D.D.C.1989)(deliberate indifference shown by sick call system which relied heavily on medical technical assistants by allowing them to diagnose and dispense medication without proper supervision by trained medical staff).

[455] *Blackstock v. Corrections Corp. of America*, 660 F.Supp.2d 764, 769-70 (W.D. La. 2009)(citing *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir.2006)(citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001); *Chapman v. Johnson*, 339 Fed.Appx. 446, 448, 2009 WL 2391496, *2 (5th Cir.

specialty care providers, where medically necessary,[456] failing to implement follow-up treatment instructions of specialists,[457] and the general lack of medical records.  The Fifth Circuit has held that, "'[u]nder certain circumstances, allegations of deliberate indifference may be shown when prison officials deny an inmate recommended treatment by medical professionals.'"[458]

In *Hadix v. Caruso*, a case involving prison inmates' right to constitutionally adequate medical care, the district court for the Western District of Michigan noted that "specialty care referrals are not negligible matters. They relate to care for cancer, cancer diagnosis, HIV treatment, cardiology, ophthalmology and other serious medical conditions as to which a failure to treat timely will contribute toward unnecessary death, disease and suffering."[459]  Further, in *Morales Feliciano v. Rossello Gonzalez*, the court applied Eleventh Circuit jurisprudence and held that the failure to provide access to specialized care required by a prisoner's medical condition violates the Constitution.[460]

---

2009)(fact that defendant was aware that inmate had a serious injury and was instructed to provide pain relieve medication, but did not do so, could demonstrate an Eighth Amendment violation)).

[456] *See Oxendine v. Kaplan*, 241 F.3d 1272, 1277-79 (10th Cir. 2001)(finding the defendant deliberately indifferent where the plaintiff alleged he persistently informed the defendant about his worsening condition and requested a referral to a specialist, but the defendant only referred the plaintiff to a specialist after it was too late).

[457] *See Blackstock*, 660 F.Supp.2d at 770 (failure to follow neurologist's treatment recommendations); *Lewis v. Pacheco*, No. 08-cv-1151, 2010 WL 771227 at *4 (W.D. La. Mar. 2, 2010)(doctor's decision to ignore specialist's orders indicates possible deliberate indifference)(citing *Gil v. Reed*, 381 F.3d 649, 662-64 (7th Cir.2004)(reasonable fact-finder could infer deliberate indifference where prison doctor canceled specialist's prescriptions and substituted medication which specialist had specifically warned was dangerous for persons with plaintiff's condition) and *Jones v. Simek*, 193 F.3d 485, 491 (7th Cir.1999)(allegations that prison doctor refused to provide the specific treatments ordered by specialists alleges facts sufficient to survive a motion for summary judgment)).

[458] *Vanderhoff v. Prentice*, 251 Fed.Appx. 861, 862 (5th Cir. 2007)(quoting *Payne v. Lynaugh*, 843 F.2d 177, 178 (5th Cir.1988).

[459] No. 4:92-cv-110, 2007 WL 710136, * 4 (W.D. Mich., Mar. 6, 2007).

[460] 13 F.Supp.2d 151, 210 (D. P.R.1998)(citing *Howell v. Evans*, 922 F.2d 712, 723 (11th Cir.1991) (failure to provide access to a respiratory therapist could constitute deliberate indifference), *vacated as settled*, 931 F.2d 711 (11th Cir.1991); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989)(non-psychiatrist was not competent to evaluate significance of a prisoner's suicidal gesture; prison officials must "inform competent authorities" of medical or psychiatric needs), *rehearing denied*, 880 F.2d 421 (11th Cir.1989); Tillery v. Document Number: 52892

The Court concludes that Defendants have been deliberately indifferent to the serious risk of harm in failing to provide constitutionally adequate access to specialty care in failing to follow orders of specialty care providers.  The evidence and testimony at trial overwhelmingly demonstrated deficiencies in:  (1) timeliness and adequacy in evaluating the need for specialty care, (2)  scheduling and tracking appointments, (3) timely complying with testing and other diagnostic requirements, (4) executing appropriate follow-up directions from specialty care providers; and (5) general failure to coordinate care.

4.    Emergency Care

The Supreme Court has held that access to emergency medical care falls within the "minimal civilized measure of life's necessities."[461]  The Fifth Circuit holds that, when a gatekeeper to emergency care knowingly disregards a prisoner's complaints, he acts with deliberate indifference to that prison's medical needs.[462] The evidence in this case demonstrates that Defendants have been deliberately indifferent to Plaintiffs' care in emergency evaluation and treatment.  As set forth above, Defendants primarily rely on EMTs to staff the ATU and evaluate medical emergencies; they fail to consistently and adequately staff the ATU.  Patients are often not properly evaluated or timely transported to emergency facilities for proper treatment.  The Court observed during its site visit that the ATU is not a properly equipped emergency room capable of treating serious medical

---

Owens, 719 F.Supp. 1256, 1307 (W.D.Pa.1989) (services of cardiologist and dermatologist should be provided), *aff'd*, 907 F.2d 418 (3d Cir.1990).

[461] *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

[462] *See Rodrigue v. Morehouse Det. Ctr.*, No. 09-985, 2012 WL 4483438, at *6 (W.D. La. 2012), *aff'd*, 557 Fed.Appx. 341 (5th Cir. 2014) (prison officials were not entitled to qualified immunity where they ignored prisoner's requests for medical care for his obviously dire condition).

Document Number: 52892

emergencies; hence, referral and transport to an off-site emergency room is required but transportation and referral to outside emergency services is irregular and incompetent. Further, Plaintiffs demonstrated that it is the general practice at LSP for EMTs and providers to hold patients in the ATU for observation for several hours instead of transport them off-site immediately, where appropriate.   Such practices have inexorably led to preventable deaths and avoidable exacerbation of conditions.

### 5.    Inpatient/Infirmary Care

The Court concludes that inpatient/infirmary care at LSP is constitutionally deficient because it provides significantly inadequate staffing, which results in the inappropriate use of inmate orderlies.  Courts have held that deliberate indifference to serious medical needs may be shown by proving a policy of deficiencies in staffing or procedures such that the inmate is effectively denied access to adequate medical care.[463]

### 6.    Medical Leadership/Organizational Structure

The lack of "adequate organization and control in the administration of health services" in a prison can support the finding of an Eighth Amendment violation.[464]  The Court concludes that the cumulative effect of the lack of medical leadership and organizational structure of the health care system at LSP meets the subjective component of deliberate indifference based on a combination of the following deficiencies:  (1) lack

---

[463] *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir.1985); *see also Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir.1985); *White v. Cooper*, No. 08–CV–1321, 2009 WL 1230008, *4-5 (W.D. La. May 5, 2009)(holding that inmate stated a viable claim under the Eighth Amendment where prison understaffed medical infirmary); *cf Braggs*, 257 F. Supp. 3d at 1212 (noting that understaffing of mental health care workers "created a substantial risk of serious harm," including a "greater risk for continued pain and suffering").

[464] *See DeGidio v. Pung*, 920 F.2d 525, 529 (8th Cir.1990).

Document Number: 52892

of meaningful mortality review, quality control, and quality improvement of care;[465] (2) use of correctional personnel to manage medical decisions;[466] (3) lack of peer review;[467] (4) absence of medical personnel involvement in the development and allocation of medical budget funds;[468] (5) lack of medical supervision by Lavespere;[469] and (6) failure to maintain proper credentialing.[470]

Accordingly, Plaintiffs are entitled to injunctive relief to remedy the Eighth Amendment violations discussed above.

## B.    ADA

"The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to

---

[465] *See Braggs*, 257 F. Supp. 3d at 1257 (prison's "quality-control process is hopelessly inadequate in implementing corrective actions"); *see also*, *Madrid v. Gomez*, 889 F.Supp. 1146, 1258 (N.D. Cal. 1995)("First, '[a] primary component of a minimally acceptable correctional health care system is the implementation of procedures to review the quality of medical care being provided.' *Lightfoot*, 486 F.Supp. at 517–18. Reviews of records to evaluate the delivery of care are essential. *Capps*, 559 F.Supp. at 912 (lack of chart review is part of violation); *Lightfoot*, 486 F.Supp. at 517 (lack of chart review is element of violation); *Todaro*, 431 F.Supp. at 1160 (failure to audit system part of violation); *see also Palmigiano*, 443 F.Supp. at 975. In addition, peer review and death reviews should be instituted to improve the quality of care. *Capps*, 559 F.Supp. at 912 (lack of peer review part of violation); *Lightfoot,* 486 F.Supp. at 517–18 (noting lack of peer review and expressing court's "alarm[ ]" at the "lack of regular system of review of deaths").
[466] *See Hartman v. Correctional Med. Servs., Inc.*, 960 F. Supp. 1577, 1582-83 (M.D. Fla. 1996)(holding medical provider could be found deliberately indifferent based on evidence that it permitted a person with only a master's degree and no processional licenses to have substantial authority over mental health system); *see also Hernandez v. County of Monterey*, 110 F.Supp.3d 929, 949 (N.D. Cal. 2015)(granting summary judgment and injunctive relief where plaintiffs' expert found it a "major problem" that correctional officers were conducting intake screenings:  "Officers are not trained to identify persons at risk for withdrawal, to evaluate persons who appear to be intoxicated, or to make medical decisions with respect to isolation for this purpose. This should be done by medical professionals[,] not custody officers.").
[467] *See* fn 461, *supra*.
[468] *See Tillery v. Owens*, 719 F.Supp. 1256, 1293 (W.D. Pa. 1989)(the prison staff is not involved in the budgetary process and medical budget is prepared without any input from the hospital administrator).
[469] *See id.* at 1305-06; *Braggs*, 257 F.Supp. at 1257; *Madrid*, 889 F.Supp. at 1258.
[470] *See Plata v. Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932253, * 21 (N.D. Ca. Oct. 3, 2005)(high number of incompetent or unqualified doctors is due in part to failure to track physician credentials and board certifications); *Tillery*, 719 F.Supp.3d at 1306 (court recognized need for medical director to provide education and assess credentials for inhouse medical staff); *Laaman v. Helgemoe*, 437 F.Supp. 269, 289 (D. N.H. 1977)(staff of persons with "less than full academic credentials for their positions" contributed to constitutionally inadequate health care).
Document Number: 52892

integrate them into the economic and social mainstream of American life.'"[471] Title II, in particular, "focuses on disability discrimination in the provision of public services."[472] Section 504 of the RA complements Title II by "prohibit[ing] disability discrimination by recipients of federal funding."[473]  These laws "are judged under the same legal standards, and the same remedies are available under both."[474]

As another section of this Court so aptly explained in *George v. Louisiana Department of Public Safety and Corrections*:

> Under well-established precedent, prisoners may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the RA. *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 209-10, 118 S. Ct. 1952, 1954-55, 141 L.Ed. 2d 215 (1998); *see also, e.g., Frame v. City of Arlington*, 657 F.3d 215, 224-25 (5th Cir. 2011). Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state punitive institutions fall squarely within this statutory definition, *Yeskey*, 524 U.S. at 210. Typically, a plaintiff proceeding under Title II must "show that: (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity." *Douglas v. Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008).
>
> Beyond these general guiding principles, precedent establishes two other cardinal rules. First, while the ADA's reasonable accommodation requirement does not apply under Title II, its "reasonable modifications" requirement—"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7); 42 U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682, 121 S. Ct. 1879, 1893, 149 L.Ed. 2d 904 (2001)—has been held to apply in the prison context. *Garrett v. Thaler*, 560 Fed.Appx. 375, 382 (5th Cir.

---

[471] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)).

[472] *Id.* at 224.

[473] *Id.*

[474] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citing *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002)). Thus, the Court analyzes the ADA Subclass ADA and RA claims under one rubric. Document Number: 52892

2014). Consequently, while the ADA "does not require prisons to provide new services or programs for disabled prisoners," these same entities "do have an affirmative obligation to make reasonable modifications ... so that a disabled prisoner can have meaningful access to existing public services or programs." *Borum v. Swisher Cnty*., No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) (emphasis added). Second, the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA. *See, e.g., Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler,* 560 Fed.Appx. 375, 382 (5th Cir. 2014). A different kind of intent, in other words, governs in ADA cases. *See Garrett*, 560 Fed.Appx. at 385.[475]

In *Pennsylvania Department of Corrections v. Yeskey*, the Supreme Court held that Title II applied to correctional facilities, recognizing that "[m]odern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."[476]  In light of *Yeskey*, numerous courts have recognized that:

> [b]ecause of the unique nature of correctional facilities, in which jail staff control nearly all aspects of inmates' daily lives, most everything provided to inmates is a public service, program or activity, including sleeping, eating, showering, toileting,  communicating with those outside the jail by mail and telephone, exercising, entertainment, safety and security, the jail's administrative, disciplinary, and classification proceedings, medical, mental health and dental services, the library, educational, vocational, substance abuse and anger management classes and discharge services.[477]

---

[475] No. 3:14-00338-JWD-EWD, 2016 WL 3568109 at *8 -*9 (M.D. La. June 23, 2016).

[476] 524 U.S. 206, 210 (1998).

[477] *Hernandez*, 110 F. Supp. 3d at 935-36; *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) (noting that jails provide inmates "with various positive opportunities, from educational and treatment programs, to opportunities to contest their incarceration, to the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication"); *Phipps v. Sheriff of Cook Cty*., 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009) (collecting cases holding that in the prison setting, "services, programs, and activities" include facilities such as showers, toilets, and sinks); *Jaros v. Ill. Dep't of Corrs*., 684 F.3d 667, 672 (7th Cir. 2012) (same); *Arce v. La. State,* 226 F. Supp. 3d 643, 650 n.7 (E.D. La. 2016) (holding that "[t]he use of prison telephones is a service or activity protected by the ADA.")(citing *Spurlock v. Simmons*, 88 F. Supp. 2d 1189, 1195 (D. Kan. 2000)).

Document Number: 52892

Title II implementing regulations note that:

> [D]etention and correctional facilities are unique facilities under Title II. Inmates cannot leave the facilities and must have their needs met by the corrections system, including needs relating to a disability. If the detention and correctional facilities fail to accommodate prisoners with disabilities, these individuals have little recourse, particularly when the need is great (e.g., an accessible toilet; adequate catheters; or a shower chair). It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities.[478]

It is generally undisputed[479] in this matter that the members of the ADA Subclass are qualified individuals with disabilities that substantially limit one or more major life activities and that LSP is a public entity. Thus, the necessary determination for the Court is whether Plaintiffs carried their burden of demonstrating that members of the Subclass are being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of their disabilities. Notably, as the law pertains to a class of disabled inmates, rather than separate individual claims, Plaintiffs' burden is to demonstrate a systemic failure; they are not required to demonstrate a failure of policies applied to each class member individually.[480]

---

[478] 28 C.F.R Part 35, App. A.

[479] Defendants do dispute that certain conditions complained of by specific Plaintiffs in this matter do not constitute disabilities under the ADA. The Court will address those below, where appropriate.

[480] *See P.V. ex rel. Valentin v. School Dist. of Philadelphia*, 289 F.R.D. 227, 233–34 (E.D. Pa. 2013) ("Defendants fail to recognize, however, that the central tenant of Plaintiffs' Complaint alleges a systemic failure, not a failure of the policy as applied to each member individually."); *see also Parsons v. Ryan*, 754 F.3d 657, 680 (9th Cir. 2014)(explaining that plaintiffs sufficiently proved the system-wide policies alleged with "formal [prison] policies, admissions by [prison] officials in discovery documents, declarations by the named plaintiffs ... and [plaintiffs'] expert report"); *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 219 (N.D.Ill.2014) (relying on class members' testimony to find "significant proof of the common question of whether a hostile work environment existed"); *Olson v. Brown*, 284 F.R.D. 398, 400 (N.D.Ind.2012) (finding that the named plaintiff showed that a jail's practices "caused inmates to suffer the same potential injury, which tie[d] all their jail standards claims together").

Document Number: 52892

1.    Architectural Barriers/Facilities/Segregation

Under its ADA rulemaking power, the DOJ has promulgated rules requiring public entities such as prisons to comply with certain architectural accessibility standards.[481] Construction or alterations that began after July 26, 1992, but prior to September 15, 2010, must comply with either the 1991 ADA Standards for Accessible Design ("1991 Standards") or the Uniform Federal Accessibility Standards ("UFAS").[482] If physical construction or alterations commenced on or after September 15, 2010, and before March 15, 2012, the new construction or alterations must comply with either the 2010 ADA Standards for Accessible Design ("2010 Standards"), UFAS, or the 1991 Standards.[483] If physical construction or alterations commenced on or after March 15, 2012, the new construction or alterations must comply with the 2010 Standards.[484]

If an existing facility has not been altered since these standards first took effect, it must still operate each service, program, or activity in a manner that, when viewed in its entirety, the service, program, or activity is readily accessible to and usable by individuals with disabilities.[485] A public entity may fulfill this "programmatic access" mandate by constructing new facilities or altering its existing facilities to bring them into compliance with the accessibility requirements of Section 35.151, or through alternative methods such as "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, [or] delivery of services at

---

[481] *See* 42 U.S.C. § 12134(a).
[482] 28 C.F.R. § 35.151(c)(1). Courts often refer to the 1991 Standards and the ADAAG interchangeably.
[483] 28 C.F.R. § 35.151(c)(2).
[484] *Id.* § 35.151(c)(3).
[485] *Id.* § 35.150(a).
Document Number: 52892

alternate accessible sites."[486]

There are, however, exceptions to the general principle of affording existing facilities greater flexibility in providing programmatic access.  In choosing among methods of compliance, the facility must give priority to methods that provide program access in the most integrated setting appropriate.[487] Further, the facility must provide "meaningful access" to the programs and services offered.[488]   Finally, the facility's programs and services must be "readily accessible."[489]

The implementation of Title II and the construction and access requirements, as it pertains to ensuring public facilities are accessible to individuals with disabilities, are articulated in the ADAAG regulations. These regulations provide the minimum technical requirements for ADA compliance for newly constructed facilities and for alterations made to existing facilities. 28 C.F.R. pt. 36 app. A.  In *Greer v. Richardson Independent School Dist.*, the Fifth Circuit explained:

> When enacting the ADA, Congress acknowledged that some public entities operating then-existing buildings and structures would be unable to comply with all technical aspects of the new ADAAG regulations. Accordingly, the

---

[486] *Id.* § 35.150(b)(1).

[487] *Id.*

[488] *See, Melton v. Dall. Area Rapid Transit,* 391 F.3d 669, 672 (5th Cir. 2004)("Supreme Court precedent suggests that denial of "meaningful access" is equivalent to a full denial of access under the ADA.")(citing *Choate,* 469 U.S. at 301 (stating in the context of the Rehabilitation Act that a benefit cannot be offered in a way that "effectively denies" otherwise qualified handicapped individuals the "meaningful access" to which they are entitled)); *Wright v. N.Y. State Dep't of Corr. & Cnty. Supervision,* 831 F.3d 64, 73 (2d Cir. 2016) (recognizing that "meaningful access" requires the provision of accommodations that overcome structural impediments limiting access to a prison's services); *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003) (collecting cases holding that ADA requires more than mere physical access, and concluding that barriers to accessible dining, restrooms, and parking prevented "meaningful access" to state fairgrounds, even though wheelchair users were able to attend).

[489] *See Chaffin*, 348 F.3d at 861 (quoting *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001)). In *Chaffin*, the Court held that "the 'individual elements' that [were] not handicap accessible add[ed] up to a wholesale exclusion of disabled individuals from buildings, restrooms, dining areas, and seating areas across the entire fairgrounds." *Id. See also Saunders v. Horn*, 959 F. Supp. 689, 697 (E.D. Pa. 1996) (allegation that prison did not provide "readily accessible bathroom and shower facilities" stated a claim under Title II's program access requirement).

Document Number: 52892

regulations promulgated by the United States Attorney General to implement the requirements of Title II differentiate between structures built prior to the Act taking effect in January 1992 ("existing facilities") and facilities built or altered after January 1992. *Tennessee v. Lane*, 541 U.S. 509, 531–32, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); 28 C.F.R. § 35.104. The accessibility requirements for existing facilities are less stringent and more flexible than for new facilities. "[I]n the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Lane*, 541 U.S. at 532, 124 S.Ct. 1978 …

When considering ADA compliance for such existing structures, the touchstone is thus not the facility's technical compliance with the ADAAG, but is instead "program accessibility." "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). Making a program or activity accessible under this standard does not require a public entity to make all of its existing facilities accessible to disabled individuals nor does it require a public entity to take an action that would place an undue burden on the entity. *Id.* at (a)(1), (3). Furthermore, the regulations do not provide any objective criteria for evaluating program accessibility. While an existing facility's compliance with the ADAAG regulations may be informative, program accessibility is ultimately a subjective determination by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the facility where the program is held.[490]

The Court acknowledges the requirement in *Greer* that program accessibility should be viewed in its entirety and not solely by evaluating individual elements of a facility. However, that Mazz did not survey LSP entirely does not undermine his findings and conclusions regarding the medical dormitories that house disabled inmates. Mazz testified that he did not have access to the construction or alteration dates of LSP's facilities; thus, he assumed that all facilities would be subject to the more flexible programmatic access requirement that applies to existing constructions.[491] Mazz

---

[490] 472 Fed.Appx. 287, 291-92 (5th Cir. 2012).
[491] Rec. Doc. No. 546 at 15:1-7; 12:5-15; 14:15-15:22. *See also* PX 7.
Document Number: 52892

followed the industry-standard methodology for evaluating programmatic access, and Defendants have acknowledged that courts routinely rely on the 1991 Standards for guidance in determining whether a facility's programs are accessible.[492]

Defendants maintain they have overcome architectural barriers in these facilities by way of alternative methods of compliance in the form of using trained health care orderlies to assist disabled inmates with their needs.

The Court rejects Plaintiffs' assertion that providing alternative methods of access to disabled inmates through health care orderlies does not comply with the law "in theory."[493]    As set forth above, "a public entity may comply with Title II by adopting a variety of less costly measures, including … assigning aides to assist persons with disabilities in accessing services.  Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes."[494] Further, courts must be "sensitive to the fact that prisons are unique environments with heightened security and safety concerns."[495]   However, "because the ADA and RA 'unmistakably' apply to State prisons and prisoners,[496] [DOC] is statutorily required to ensure that all of their inmates, including [plaintiffs], have the opportunity effectively to access the services and programs [DOC] provides."[497]

Applying this jurisprudence to facts found above, the Court finds that it is a generally acceptable and lawful practice to implement a health care orderly assistance

---

[492] Rec. Doc. No. 497 at 40 (citing *Greer*, 472 F. App'x at 292 n.3).
[493] Rec. Doc. No. 573 at 272.
[494] *Garrett v. Thaler*, 560 Fed. Appx. 375, 382 (5th Cir. 2014)(internal citations and quotations omitted).
[495] *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 75 (2d Cir. 2016)(citing  *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1216–17 (9th Cir. 2008)).
[496] *Id*. (quoting *Yeskey*, 524 U.S. at 209).
[497] *Id*.

Document Number: 52892

program to provide disability access.   However, Plaintiffs carried their burden of demonstrating that this program, in practice, is ineffective in achieving accessibility with respect to assistance in the dorms themselves (*i.e.*, bathing, showering, using bathrooms, transfers, and transport).   This is largely due to understaffing and the abuse/neglect/misconduct of the orderlies.   As to training, the Court finds the training program itself to be adequate in content but finds lacking the "as-needed" explanation for how often training occurs.   Further, the Court finds that more oversight of the orderlies in this program is glaringly necessary to prevent the too-often instances of abuse, neglect, and misconduct.

Certainly, where reasonable alternative methods achieve compliance, structural changes to existing facilities need not be made.[498]   However, where there is no evidence to conclude that such methods are shown to ameliorate barriers presented by structural deficiencies, alterations must be made.[499]   In *Pierce v. County of Orange*, the Ninth Circuit highlighted how the use of deputy or other inmate assistance cannot overcome all physical barriers to access:   "Plaintiffs …presented evidence to show that deficiencies were not remedied."[500]   Whether there was testimony that witnesses observed "detainees—not deputies—struggling to lift a fellow wheelchair-bound detainee over a foot-high retention wall in one of Ward C's inaccessible showers" and disabled inmates "forced to rely on fellow inmates for assistance when faced with inaccessible bathroom facilities," the court concluded that: "The impediment posed by such a barrier highlights

---

[498] 28 C.F.R. § 35.150(b)(1).
[499] *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008).
[500] *Id.* at 1219.
Document Number: 52892

the inadequacy of deputy or other inmate assistance."[501]  In this case, the Court finds that orderly assistance has been inadequate to overcome the structural barriers to access for disabled inmates.

Regarding segregation of disabled inmates, which denies them access to programs and services provided to non-disabled inmates at LSP, the Court finds that the manner in which disabled inmates are segregated violates the ADA.  Along with several other regulations promulgated under Title II of the ADA is the "integration regulation," which provides that: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[502]  "[T]he most integrated setting appropriate" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."[503]  Evaluating this regulation, the Supreme Court has concluded that: "Unjustified isolation ... is properly regarded as discrimination based on disability."[504]  Many courts thereafter have acknowledged that the unnecessary segregation of the disabled in institutions is a form of illegal discrimination against the disabled under the ADA.[505]  Unnecessary segregation of individuals with disabilities in the provision of public services is itself a form of "discrimination" within meaning of ADA and RA, independent of discrimination that arises when individuals with disabilities receive different services from those provided to individuals without disabilities.[506]  Based on the

---

[501] *Id.* at 1219-20.
[502] *Henderson v. Thomas*, 913 F.Supp.2d 1267, 1287 (M.D. Ala. 2012)(quoting 28 C.F.R. § 35.130(d)).
[503] 28 C.F.R. Pt. 35, App. B (2011).
[504] *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999).
[505] *See, e.g., Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175 (10th Cir. 2003)
[506] *Helen L. v. DiDario*, 46 F.3d 325, 335 (3rd Cir. 1995), *rehearing and rehearing in banc denied, certiorari denied*, 516 U.S. 813.
Document Number: 52892

findings of fact above, the Court concludes that Defendants have failed to demonstrate the necessity of, and justify the proffered reasons for, the segregation of disabled inmates in the manner LSP employs.  The proximity of the medical dorms to the ATU and purported availability of inmate orderly assistance does not overcome the general denial of access to various programs, activities, and services available to non-disabled inmates.

2.    Methods-of-Administration Claim

The Subclass Plaintiffs' methods-of-administration claim is comprised of the following allegations which, analyzed together, operate to deny programmatic access to, and discriminate against, disabled inmates: LSP (1) fails to maintain a qualified and adequately trained ADA Coordinator; (2) fails to maintain and ADA advisory committee as required by its own policies; (3) inadequately trains its staff regarding the ADA; (4) fails to inform patients of their rights and the procedures for requesting accommodations; (5) fails to appropriately process accommodation requests and disability-related grievances; (6) fails to identify and track patients' disabilities and accommodation requests; and (7) charges patients co-pays to evaluate their accommodation requests.[507]  The Court found that Plaintiffs carried their burden on all of the above, except (4) and (7).

"A public entity may not ... utilize criteria or methods of administration ... [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."[508] "In other words, a public entity cannot actively undercut the ability of a public program to benefit those with disabilities."[509]  Some of Plaintiffs' complaints regarding methods of

---

[507] Rec. Doc. No. 573 at 283-85.
[508] 28 C.F.R. § 35.130(b)(3)(ii).
[509] *Van Velzor v. City of Burleson*, 43 F.Supp.3d 746, 752 (N.D. Tex. 2014).
Document Number: 52892

administration trigger obligations imposed on LSP by Title II's self-evaluative regulations which, Defendants argue, as a court in the Southern District of Texas held, that "[t]he Fifth Circuit has not specifically ruled on whether there is a private cause of action under"[510] the "self-evaluative procedures required by 28 C.F.R. §§ 35.105-107."[511]   While not specifically addressing the numbered regulations at issue herein, the Fifth Circuit did hold, generally, in *Frame*:

> As mentioned, there is no question that Title II and § 504 are enforceable through an implied private right of action. Moreover, to the extent Title II's **implementing regulations** "simply apply" Title II's substantive ban on disability discrimination and do not prohibit conduct that Title II permits, **they too are enforceable through Title II's private right of action**. This is because when Congress intends a statute to be enforced through a private right of action, it also "intends the authoritative interpretation of the statute to be so enforced as well."[512]

In so ruling, the *Frame* court relied on the Supreme Court's decision in *Alexander v. Sandoval*, where it explained:

> Such regulations, if valid and reasonable, authoritatively construe the statute itself, *see NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.[513]

---

[510] Rec. Doc. No. 556 at 183 (quoting *Green v. City of Mission*, No. 7:18-CV-00049, 2018 WL 2200094, at *11 (S.D. Tex. May 14, 2018)).

[511] *Id.*

[512] *Frame*, 657 F.3d at 224 (internal citations omitted)(emphasis added).

[513] *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001)(citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). While this case addressed the implementing regulations for Title VI, the Court cited to cases involving the ADA and RA to support the general principle.

Document Number: 52892

Accordingly, the Court interprets the language in *Frame* to extend a private cause of action under Title II's implementing regulations where the claims relate to a systemic failure to comply with the ADA.

Alternatively, as the court stated in *Dunn v. Dunn*, assuming for the sake of argument that Defendants are correct that these regulations do not create a private right of action:

> This would not, however, have made them irrelevant. They are binding regulations promulgated by the Department of Justice (which would be empowered to bring an enforcement action). When courts have found them not to be privately enforceable, as in *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 913–14 (6th Cir.2004) (relying on *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)), they have reasoned that the regulations are designed to facilitate, but do more than merely describe, compliance with the ADA, such that "it is conceivable that a public entity could fully satisfy its obligations to accommodate the disabled while at the same time fail to put forth a suitable transition plan."
>
> All this means is that the Department's failure to implement a transition plan would not have constituted a *per se* violation; plaintiffs could not have shown liability merely by proving that the Department had no transition plan, without showing that the Department had, as a result, failed to accommodate prisoners with disabilities. That said, plaintiffs could have argued, and proven at trial, that the Department's failure to do the things required by these regulations had the effect of discriminating.[514]

Following this reasoning, even if Defendants are correct that no private cause of action exists to enforce the self-evaluation regulations at issue, clearly the violation(s) of such regulations can support a claim of general, system-wide noncompliance, and courts across the country have not been unwilling to order injunctive relief mandating compliance therewith.

---

[514] 318 F.R.D. 652, 663-64 (M.D. Al. 2016)(internal citations omitted).
Document Number: 52892

Furthermore, privately enforceable methods-of-administration regulation would give rise to the claims Plaintiffs have raised.  The *Dunn* court stated:

> Indeed, there is another—privately enforceable—ADA regulation which makes clear that policies and practices (or their absence) which result in discrimination against people with disabilities are actionable under the ADA, even if the policies and practices (such as the three regulations discussed above) are not themselves required by the statute. Under this regulation, plaintiffs in an ADA case can challenge a policy or practice—whether it is one described in another regulation or simply one articulated by the plaintiffs themselves—if it causes the public entity to discriminate against them, including by failing to accommodate them.[515]

Additionally, "an omission as well as a commission can be an actionable method of administration."[516]  The *Dunn* court noted:

> The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when plaintiffs can show that it has the effect of discriminating. As Justice Marshall explained in *Alexander v. Choate*, Congress designed the Rehabilitation Act, the predecessor statute to the ADA, to address not only "invidious animus," but also, more commonly, "thoughtlessness and indifference—[ ] benign neglect." 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Courts have consistently explained that "Title II [of the ADA] imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir.2004); *see also Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 200–01 (2d Cir.2014); *Toledo v. Sanchez*, 454 F.3d 24, 32 (1st Cir.2006); *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir.2005); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 488 (4th Cir.2005). Under the ADA, a public entity must be "proactive." *Clemons v. Dart*, 168 F.Supp.3d 1060, 1068–69, 2016 WL 890697, at *6 (N.D.Ill. Mar. 9, 2016) (Tharp, J.).[517]

A prison's failure to follow its own, internal procedures is also relevant to this overall determination.  In *Holmes v. Godinez*, an ADA class challenge brought by handicapped

---

[515] *Id.* at 664.
[516] *Id.* at 665.
[517] *Id.* at 665 n. 12.
Document Number: 52892

inmates against the prison, the plaintiffs alleged violations of the ADA by a system-wide policies and practices, including the prison's failure to follow its own, internal ADA directives and/or policies or failure of those policies to adequately remedy barriers to access: "Whether the ADA Directive—an express and undisputed statement of IDOC system-wide policy—satisfies IDOC's obligations under the ADA is indeed a common question apt to drive resolution of the litigation.[518]

Applying the foregoing law and jurisprudence to the facts found above, the Court finds that the LSP methods of administration at LSP violate the ADA and RA by failing to provide adequate access and accommodations to its disabled inmates due to neglect and/or failure to follow both Title II's implementing regulations and failure to follow some of LSP's own ADA Directives.  As the court noted in *Holmes v. Godinez*:

> Plaintiffs present a slew of different programs, activities, and services for which they contend IDOC fails to provide reasonable accommodations under the ADA. These include: (1) reception and classification; (2) orientation; (3) educational and vocational programs; (4) work programs; (5) counselor services; (6) medical, mental health, and rehabilitative services; (7) religious services; (8) telephones; (9) televisions; (10) library services; (11) disciplinary proceedings; (12) emergency and routine notification services; (13) grievance process; and (14) pre-parole services. (*See* Compl. ¶¶ 63–140.) **In conducting our analysis, we consider Plaintiffs' claims as to each one of these programs separately**. *See* Fed. R. Civ. P. 56(g); *Phipps*, 681 F.Supp.2d at 919 (ruling separately on wheelchair-bound plaintiffs' three claims that prison did not provide them shower chairs, shower bars, and accessible sinks). We reiterate that an ADA violation exists only if the defendant's action or inaction prevents the plaintiff from participating in a program, activity or service. Certain of Plaintiffs' complaints, such as IDOC's alleged failure to properly train its employees and centrally track hearing impaired offenders, do not specifically target programs, activities, or services, and thus cannot alone sustain a claim under the ADA. (See SJ Reply at 4, Dkt. 258.) **Despite this limitation, that evidence is still relevant to the extent such inaction contributed to a**

---

[518] 311 F.R.D. 177, 219 (N.D. Ill. 2015).
Document Number: 52892

**widespread denial of access to the programs, activities, and services that Plaintiffs do challenge**.[519]

        *a.*     *ADA Coordinator/Advisory Committee*

Public prisons are required by ADA implementing regulations to maintain an ADA Coordinator.  28 C.F.R. § 35.107 provides that:

> A public entity that employs 50 or more persons **shall** designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.[520]

Additionally, LSP Directive 01.016 states:

> The ADA coordinator shall possess the educational background, experience and skills necessary to carry out all of the duties and responsibilities of the position, and have knowledge and experience in dealing with the legal rights of persons with disabilities and the obligations of public entities under Federal and State disability laws.[521]

Although it is undisputed that LSP has maintained a designated ADA Coordinator for all time periods relevant to this litigation, the Court finds that the ADA Coordinators are mere "window dressing."  They have not been sufficiently trained and educated to effectively carry out their obligations under the ADA; in some instances, this role has been secondary to other roles at LSP, and oversight is lacking.  The lack of a qualified ADA Coordinator contributes to LSP's system-wide failure to comply with the ADA.  Likewise, the inexplicable ignorance of the LSP Directive requiring an ADA advisory committee, while not violative by itself, demonstrates and contributes to LSP's systemic failure to ensure compliance with the ADA.

---

[519] *Id.* at 226 (emphasis added).
[520] Emphasis added.
[521] JX 7-a at 1.
Document Number: 52892

b.    *Staff Training*

The Court found that LSP staff are not adequately trained to identify ADA issues within the disabled inmate population. This lack of training contributes to the systemic failure to accommodate disable inmates as required by the ADA.  In *Clark v. California*, the court found that staff training, including ADA training similar to the training exhibited in this case, was "essential to the provision of necessary services … and "apparently insufficient on its own to meet the statutory minimal levels of care."[522]   The court also stated that:  "The current training regimen is clearly inadequate to prepare staff members to adequately preserve Plaintiffs' rights," and the court ordered further injunctive relief regarding the training issue.[523]   Similarly, in *Armstrong v. Davis*, the district court found an ADA violation where some staff received a one-hour training that many employees could not recall, while others received "virtually no general training pertaining to the identification and accommodation of disabled prisoners and parolees," because "[w]ithout training, even when staff have sufficient information before them to identify and accommodate disabilities, they do not do so because they lack the necessary skills."[524] The Ninth Circuit affirmed in relevant part the district court's order requiring all personnel with relevant roles to undergo training "in the general requirements of the ADA, disability awareness, the appropriate method of determining whether a prisoner adequately understands written and verbal communications, and other relevant policies and procedures."[525]

---

[522] 739 F.Supp.2d 1168, 1231 (N.D. Cal. 2010).
[523] *Id.* at 1234.
[524] No. 94-2307 CW,1999 WL 35799705 at *31 (N.D. Cal. Dec. 22, 1999).
[525] 275 F.3d 849, 859 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005)).

Document Number: 52892

c.    *Failures of Notice/Processing/Tracking*

While Plaintiffs failed to carry their burden of demonstrating that Defendants fail to provide notice of their ADA rights and LSP's procedures in widespread fashion, Plaintiffs did prove that Defendants do not follow their own procedures in practice, fail to appropriately process accommodation requests, and fail to track inmates' disabilities and accommodation requests, all of which contribute to LSP's systemic failure to comply with the ADA.  In *Armstrong v. Brown*, the Ninth Circuit affirmed the district court's finding that class members' ADA rights were violated where they lacked access to "functional and timely grievance procedures at county jails to request and obtain disability accommodations."[526]    Similarly, in *Armstrong v. Davis*, the Ninth Circuit held that the prison's accommodations procedures violated ADA where the practice was "to rely primarily on Department employees untrained in issues of disability to determine whether an individual is disabled or not, what accommodations are appropriate if he is, and whether those accommodations will be provided."[527]  The court also held that: "Because the regulations implementing the ADA require a public entity to accommodate individuals it has identified as disabled, some form of tracking system is necessary in order to enable the Board to comply with the Act."[528]

3.    Failure to Accommodate

"The    ADA    provides    for    reasonable    accommodation,    not    preferred

---

[526] 857 F.Supp.2d 919, 933 (N.D. Ca. 2012).
[527] 275 F.3d at 863.
[528] *Id.* at 876. *See also Hernandez*, 110 F. Supp. 3d at 960 (requiring defendants to propose a remedial plan that would include a "system for identifying and tracking all inmates who are qualified individuals with disabilities," as well as "a system for identifying and tracking the reasonable accommodations necessary for qualified inmates with disabilities to participate in programs, services and activities offered by Defendants at the jail").
Document Number: 52892

accommodation."[529] Even in a prison setting, "[t]he accommodation of the inmate's disability need not be ideal; instead, it need only be reasonable and effective.[530] Further, a correctional facility is afforded deference in its determination of an appropriate accommodation."[531]  However, in evaluating a disability for purposes of the ADA, courts should be cautious not to confuse a disagreement with, or inadequate medical treatment for, a disability with intentional discrimination because of a disability. Indeed, this Court held in *George v. Louisiana Dep't of Pub. Safety & Corr.*, "[g]enerally, the ADA prohibits discrimination because of disability, not inadequate treatment for disability. Thusly interpreted by sundry courts, the ADA is not violated by a prison failing to attend to the medical needs of its disabled prisoners."[532]

### a.    Availability of Assistive Devices and Auxiliary Aids

28 C.F.R. § 35.160(b)(1) requires that "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  Indeed, "[t]he ADA does not create a remedy for medical malpractice."[533]

---

[529] *Stafford v. King*, No. 11–242, 2013 WL 4833863, at *2 (S.D. Miss. Sept. 11, 2013) (citing *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)).
[530] *Arce v. Louisiana*, 226 F.Supp.3d 643, 651 (E.D. La. 2016)(citing *Wells v. Thaler*, 460 Fed.Appx. 303, 313 (5th Cir. 2012)).
[531] *Id.* (citing *Wells*, at 313).
[532] No. CV-3:14-00338-JWD-EWD, 2016 WL 3568109, at *10 (M.D. La. June 23, 2016).
[533] *Walker v. LeBlanc*, No. 13-553-JJB-RLB, 2015 WL 1276578, *8 (M.D. La. Mar. 19, 2015)(quoting *Brown v. Wilson*, 2012 WL 6719464, *3 (N.D.Tex. Dec. 27, 2012)(quoting *Moore v. Prison Health Services, Inc.*, 24 F.Supp.2d 1164, 1168 (D.Kan.1998), *affirmed*, 201 F.3d 448 (10th Cir.1999))(internal quotation marks omitted); *see also Nottingham v. Richardson*, 499 Fed. Appx. 368, 377 (5th Cir.2012)(finding that "[t]he ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners'"); *Hay v. Thaler*, 470 Fed. Appx. 411, 418 (5th Cir.2012) (finding no ADA violation where the plaintiff complained that prison officials refused to provide him with dentures but where the plaintiff made no showing that the refusal was "by reason of his disabilities"); *Moore v. Prison Health Services, Inc.*, 201 F.3d 448 (5th Cir.1999)(noting that the ADA "afford[s] disabled persons legal rights regarding access to programs
Document Number: 52892

Another section of this Court noted in *Hacker v. Cain* that "'[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability.'"[534] Thus, "neither the RA nor the ADA is violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."[535]  Just like in medical indifference cases, "it 'does not create a remedy for medical malpractice,'"[536] and "'purely medical decisions ... do not ordinarily fall within the scope of the ADA or the Rehabilitation Act.'"[537]  On the other hand, as the Court noted in *Cleveland v. Gautreaux*:

> Despite this body of law, however, a contrary principle controls in accommodations cases: in case after case, "the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA." *Hacker*, 2016 U.S. Dist. LEXIS 73014, at *40, 2016 WL 3167176, at *13 (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir.2004), and *Garrett v. Thaler*, 560 Fed.Appx. 375, 382 (5th Cir.2014)). As one court explained, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoner." *McCoy v. Tex. Dep't of Crim. Justice*, No. C–05–370, 2006 WL 2331055, at *7 (S.D.Tex. Aug. 9, 2006); *see also United States v. Georgia*, 546 U.S. 151, 157, 126 S.Ct. 877, 880–81, 163 L.Ed.2d 650, 658 (2006). In fact, "where the defendant otherwise had knowledge of the individual's disability and needs but took no action," not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim. *Greer v. Richardson Indep. Sch. Dist.*, 472 Fed.Appx. 287, 296 (5th Cir.2012); *see also Borum v. Swisher Cnty.*, No.

---

and activities enjoyed by all, not a general federal cause of action for challenging the medical treatment of their underlying disabilities")).

[534] No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *19 (M.D. La. June 6, 2016)(quoting *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010)).

[535] *Id.* (citing *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 121, 123 (7th Cir. 1997) (as to Section 504); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (as to the ADA); *see also, e.g., Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006) (emphasizing that "courts have differentiated ADA claims based on negligent medical care from those based on discriminatory medical care"); *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001) ("[A] plaintiff's showing of medical unreasonableness [under the Rehabilitation Act] must be framed within some larger theory of disability discrimination.")).

[536] *Id.* (quoting *Bryant,* 84 F.3d at 249).

[537] *Id.* (quoting *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005)).

Document Number: 52892

2:14–CV–127–J, 2015 WL 327508, at *9 (N.D.Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F.Supp.2d 840, 843–44 (S.D.Tex.2014).[538]

Plaintiffs failed to carry their burden in proving that LSP systemically fails to accommodate disabled inmates with auxiliary and/or assistive devices.  In light of the Court's findings of fact set forth above, the Court finds that most of the evidence Plaintiffs presented on this issue demonstrates a disagreement with medical treatment and/or dissatisfaction with not receiving a preferred accommodation, rather than blatant failures to accommodate in the provisions of such aids/devices.

>            *b.*    *Work Assignments/Duty Status*

"A 'duty status' is a written designation assigned by a prison medical doctor indicating an inmate's physical or mental ability to perform hard labor in accordance with his sentence. Duty statuses are generally assigned by physicians following a medical evaluation, and they are subject to change depending on changes in the medical condition of a particular inmate. Duty statuses may range from no duty (indicating a need for bed rest), to light duty or regular duty with restrictions, and finally to regular duty without restrictions (indicating the inmate is capable of performing any and all hard labor)."[539]

Although the inmate testimony and evidence presented by Plaintiffs regarding failures to accommodate disabled inmates in work assignments and duty statuses failed to demonstrate a violation of the ADA, the Court notes that this is not because Plaintiffs failed to establish that certain inmates suffered from a disability, as argued by Defendants regarding diabetes and asthma.  Notably, and contrary to Defendants' contentions and

---

[538] 198 F.Supp.3d 717, 746 (M.D. La. 2016).
[539] *Armant v. Stalder*, 287 Fed. Appx. 351, 352 n. 1 (5th Cir. 2008).
Document Number: 52892

outdated jurisprudence, both diabetes and asthma can be considered disabilities under the ADA. "The ADA Amendments Act of 2008 ("ADAAA") essentially broadened the definition of 'disability' to make it easier for an individual seeking protection under the ADA to establish that he or she has a disability.[540] The ADAAA did not alter the definition of disability, but it added provisions 42 U.S.C. § 12102(2)-(4) to supersede cases that interpreted the scope of 'disability' narrowly."[541]   Under these amendments, the term "'disability' now includes an impairment that is episodic or in remission if it would substantially limit a major life activity when active; examples include epilepsy, hypertension, **asthma**, **diabetes**, major depression, bipolar disorder, schizophrenia, and cancer."[542]  The Fifth Circuit has noted that diabetes is a qualifying disability affecting the endocrine system.[543]

Nevertheless, pursuant to the facts found above, Plaintiffs failed to demonstrate a systemic ADA violation in the failure to accommodate disabled inmates in work assignments and duty statuses.

### c. Dietary Accommodations

While the ADA clearly requires dietary accommodations where an inmate's disability warrants,[544] Plaintiffs failed to demonstrate more than two instances where such needs at LSP were ostensibly unmet.  Thus, the evidence presented failed to demonstrate

---

[540] *McNeal v. Louisiana Department of Public Safety and Corrections*, No. 20-312-JWD-EWD, 2021 WL 359737, at *13 (M.D. La. Feb. 2, 2021)(citing *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245–46 (5th Cir. 2013)).

[541] *Id.* (citing *Neely*, 735 F.3d 245).

[542] *Weed v. Sidewinder Drilling, Inc.*, 245 F.Supp.3d 826, 834 (N.D. Tex. 2017)(citing ADA Amendments Act of 2008, §§ 4, § 3(4)(D), 122 Stat. 3553, 3555; 29 C.F.R. § 1630(j)(5))(emphasis added).

[543] *Marlowe v. LeBlanc*, No. 18-00063-BAJ-EWD, 2020 WL 6276956, at *10 (M.D. La. Oct. 26, 2020)(citing *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578 n.15 (5th Cir. 2020)).

[544] *See e.g.*, *id.,* 2020 WL 6276956 at *10-*11.

Document Number: 52892

a general, systemic failure by LSP to accommodate disabled inmates' dietary restrictions. However, the Court rejects Defendants' contention that diabetes is not disability subject to a dietary accommodation as contradicted by the jurisprudence set forth above.

### d. Disability Accessible Transportation

"Because public entities must make modifications that are necessary to avoid discrimination on the basis of disability, liability does not depend on evidence of purposeful discrimination."[545]   Rather, "a plaintiff must simply show that 'but for' his disability, he would not have been deprived of the services or benefits he desired.[546]   In the prison context, failure to accommodate the needs of a disabled prisoner is discrimination if it causes the disabled prisoner to suffer more pain and punishment than non-disabled prisoners."[547]

Defendants misconstrue this Court's holding in *Miller v. Chapman*[548] by arguing that this Court held that "[t]here is no affirmative obligation under the ADA to transport disabled persons in handicap-accessible vehicles."[549]   What the Court actually held was that, at the Rule 12(b)(6) stage, the plaintiff's argument that "LSP has a responsibility under the law to provide a handicapped equipped van to transport handicapped inmates

---

[545] *Coker v. Dallas County Jail*, No. 3:05-CV-005-M (BH), 2009 WL 1953038, at *17 (N.D. Tex. Feb. 25, 2009)(citing *Patterson v. Kerr County*, No. SA-05-CA-0626-RF, 2007 WL 2086671, at *7 (W.D.Tex. July 18, 2007)).
[546] *Id.* (citing *Patterson* at *7)(citing *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir.2006))).
[547] *Id.* (citing *McCoy v. Tex. Dep't of Crim. Justice*, 2007 WL 2331055, at *7 (S.D.Tex. Aug. 9, 2006) (citing *U.S. v. Georgia*, 546 U.S. 151, 157, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) ("[I]t is quite plausible that the alleged deliberate refusal of prison officials to accommodate [the inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclu[sion] from participation in or ... deni[al of] the benefits of' the prison's 'services, programs, or activities.'"))).
[548] No. 13-00367-SDD, 2014 WL 2949287 (M.D. La. June 30, 2014).
[549] Rec. Doc. No. 556 at 167.
Document Number: 52892

safely" was "alone [] insufficient to support a claim of discrimination based on Plaintiff's disability arising under the ADA and the RA."[550]  The Court ruled so because the plaintiff failed to plead any supporting factual allegations with this statement; however, the Court granted the plaintiff leave to amend his complaint.[551]  Further, the Court disagrees with the notion that LSP does not have an affirmative obligation to accommodate disabled inmates in safe transportation, particularly when the need for such accommodation is readily known without the need for a request.

In *Reyes v. Razor*, a disabled, wheelchair-bound inmate sued the prison under the ADA and RA alleging he was discriminated against on the basis of his disability by the prison's failure to provide a handicap bus to transport him on one occasion.[552]  The court dismissed the plaintiff's ADA/RA claims, noting that he pled no facts to show that the prison "systemically denies handicap accessible transportation for inmates with disabilities."[553]

In *Allah v. Goord*, the court maintained a claim brought by an inmate against the prison that allegedly violated the ADA by transporting him in an unsafe vehicle.[554]  The plaintiff alleged that the prison knew or should have known of the dangers wheelchair-bound prisoners are exposed to when they are transported in an unsafe vehicle; yet, despite this knowledge, the prison allegedly failed to remedy the unsafe transportation conditions by providing training, supervision or new equipment to prison personnel. The plaintiff further argued that this policy was "motivated by ill will or animus towards

---

[550] *Miller*, 2014 WL 2949287, at * 3.
[551] *Id.*
[552] No. 3:16-CV-0314, 2018 WL 3632100, at *5 (S.D. Tex. July 30, 2018).
[553] *Id.*
[554] 405 F.Supp.2d 265 (S.D. N.Y. 2005).
Document Number: 52892

prisoners with disabilities who require a wheelchair for mobility"[555] because "prisoners who do not require a wheelchair for mobility are transported to outside medical providers in a safe manner."[556]  The court found that the plaintiff stated a claim under the ADA.

Nevertheless, based on the findings of fact set forth above, the Court cannot conclude that Plaintiffs herein carried their burden of demonstrating sufficient evidence to show a systemic denial of transportation accommodations that would support class-wide injunctive relief on this issue.  The Court maintains, however, that LSP does have the obligation under the ADA and RA to accommodate disabled inmates in transportation in instances where the need is readily known or knowable, without a formal request.[557] Danny Prince's testimony reinforces that LSP would not transport inmates in need of the handicap van if it was not available, and the inmates call-out would be rescheduled,[558] resulting in an unconstitutional delay of medical care under the Eighth Amendment but not disability discrimination.

### e.  Discipline Accommodations

The Court acknowledges that "[m]aintenance of prison security is a legitimate function of prison officials, who must be accorded broad discretion in that function."[559]

---

[555] *Id.* at 276.

[556] *Id.* at 279.

[557] The Court understands that this determination still requires evaluation on a case-by-case basis.

[558] The Court acknowledges this testimony cuts both ways – the lack of availability of a handicap van caused inmates in need of care to suffer delays; however, on the issue of accommodating disabled inmates in transportation, it demonstrates an acknowledgment that such an accommodation is mandated for disabled inmates.

[559] *Williamson v. Larpenter*, 2019 WL 3719761, at *12 (E.D. La. July 15, 2019)(citing *Waganfeald v. Gusman,* 674 F.3d 475, 485 (5th Cir. 2012), *petition for cert. filed,* 81 U.S.L.W. 3064 (U.S. July 18, 2012) (No. 12-85) (citing *Whitley v. Albers,* 475 U.S. 312, 322 (1986); *Bell v. Wolfish,* 441 U.S. 520, 546–47 (1979))("[S]ecurity considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (quotation omitted)).

Document Number: 52892

However, a prison must evaluate a disabled inmate's needs and the accommodations necessary to ensure reasonable access to prison services, and failure to do so violates the ADA and RA as a matter of law.[560]  This obligation to provide accommodations applies to the discipline of disabled inmates, as well:   "A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person. A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA[.]"[561]

> The Ninth Circuit has held that the second element of this test can be satisfied where a law enforcement officer could have used less force or no force during the performance of his law-enforcement duties with respect to a disabled person. *See Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232-33 (9th Cir. 2014), *rev'd on other grounds sub nom.*, *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015) (holding that a failure to reasonably accommodate a person's disability in the course of an investigation or arrest by using unnecessary force, causing the person to suffer "greater injury or indignity in that process than other arrestees," gives rise to a claim under § 12132, and that a reasonable jury could conclude that a police officer's failure to use less force or no force during an arrest of a person with mental illness could constitute a failure to provide a reasonable accommodation in violation of § 12132); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018), *cert. denied sub nom. City of Newport Beach, Cal. v. Vos*, 139 S. Ct. 2613 (2019) (same). When applied in the prison context, it follows that the second element of a § 12132 claim can be satisfied where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person.[562]

From the trial evidence, the Court concludes that the ADA Coordinator and medical staff at LSP employ a completely "hands off" approach to discipline, even as it relates to the discipline of disabled inmates.  In the Court's view, this violates the ADA and RA.  The

---

[560] *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 271–72 (D.D.C. 2015).
[561] *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021).
[562] *Id.* at *25.
Document Number: 52892

Court finds that the lack of medical oversight in disciplinary decisions for disabled inmates creates a serious risk that disabled inmates will be disciplined in the same manner as non-disabled inmates, without taking into consideration any accommodations in discipline that may be warranted by a disabled inmate's medical condition(s).

    4.   <u>Exclusionary Policies</u>

Numerous courts have held that prisons must provide disabled inmates access to work assignments and recreational services; they are not to be excluded simply because they are disabled.[563]

    *a.   Hobby Craft*

On its face, the hobby craft policy does constitute a blanket denial of access for disabled inmates; however, as applied, disabled inmates can apply for hobby craft, albeit through the ARP process.  The Court finds that this process does not violate the ADA because all inmates at LSP must apply for the privilege of hobby craft.  Thus, the Court does not find that the hobby craft program is discrimination because of an inmate's disability.  Defendants presented credible evidence that exceptions to the exclusionary policy can be made, and are made, where appropriate, after evaluation by medical staff. The two examples Plaintiffs presented are insufficient to carry their burden.  As to C.F., the ARP records regarding his request to participate in hobby shop undermine Plaintiffs'

---

[563] *See Holmes*, 311 F.R.D. at 227 ("Numerous other courts, including in this circuit, have permitted prisoners to bring Title II ADA claims related to job assignments. *See Jaros*, 684 F.3d at 673 (permitting plaintiff to proceed with his Rehabilitation Act claim that IDOC prevented him from participating in work release program because of his cane); *Hale v. King*, 642 F.3d 492, 499 (5th Cir.2011) (finding the plaintiff's allegation that the defendant prevented him from working in a prison kitchen because of his disability stated a claim under Title II of the ADA); *Neisler*, 2015 WL 998439, at *5 (allowing prisoner to pursue an employment-related claim under Title II of the ADA); *Muhammad v. Randle*, 9 C 1014, 2010 WL 2680708, at *2 (S.D.Ill. July 2, 2010) (allowing prisoner to pursue Title II ADA claim related to prison work); *see also Love*, 103 F.3d at 560 (affirming verdict under the ADA in favor of prisoner who was denied access to the prison's work programs))).

Document Number: 52892

argument that denials are perfunctorily given without medical assessment of safe participation.    Rather, the records indicated medical conditions for which it was reasonable for a medical professional to determine whether C.F.'s participation in hobby craft was appropriate, and the records demonstrate that the medical staff evaluated C.F.'s medical conditions when considering his request.    Thus, the Court finds that Plaintiffs failed to present sufficient evidence to establish an ADA violation as to access to hobby craft.    Further, the Court notes that it is not the role of the Court to second-guess the medical decisions and treatment protocols determined by medical staff for such programs; rather, under the ADA, the Court is only evaluating whether the entire sub class of disabled inmates were systemically denied access to hobby shop because of their disabilities.    This was not proven.

### b.  Duty Status/Work Release Program

In *Yeskey*, the Supreme Court noted that "[m]odern prisons provide inmates with many recreational activities, medical services, and educational and vocational programs, all of which at least theoretically benefit the prisoners and any of which disabled prisoners could be 'excluded from participation in."[564]  Another section of this Court denied summary judgment in *Guy v. LeBlanc*, where a hearing-impaired inmate asserted that the prison violated the ADA and RA by prohibiting him from (1) using the teletypewriter phone, (2) obtaining a paying job, (3) participating in sports, (4) participating in hobbycraft, and (5)

---

[564] 524 U.S. at 210 (internal quotation and parenthetical marks omitted).  *See also McGuire v. Lafourche Parish Work–Release Facility*, No. 09-6755, 2009 WL 4891914, *6 (E.D.La. Dec. 4, 2009)(deferring for further development the inmate plaintiff's claim regarding an alleged ADA violation arising from denial of participation in a work-release program).
Document Number: 52892

participating in rodeo."[565]    The Court noted that "[t]he implementing regulations of the ADA forbid the Department from

> impos[ing] or apply[ing] eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.[566]

In evaluating the plaintiff's complaint about access to the TTY phone, the Court noted that the defendant's policy regarding TTY phones excluded use "unless the prisoner shows 'profound hearing loss that keeps him from utilizing a telephone with an amplified headset.'"[567]    The Court ruled that "a reasonable jury could find that the Department's 'profound hearing loss' standard creates an 'eligibility criteria' that tends to 'screen out' a class of hearing-impaired persons whose impairments do not rise to the level of 'profound hearing loss.'"[568]

As to the plaintiff's exclusion from incentive pay, the Court rejected the defendant's argument that it denied the plaintiff's access to incentive pay jobs based on "classification decision" and not discrimination.[569]    The Court noted that "Louisiana law requires that the Department 'provide employment opportunities and vocational training for all inmates, regardless of gender, consistent with available resources, physical custody, and appropriate classification criteria.'[570] 'Classification of prisoners is a matter left to the

---

[565] 400 F.Supp.3d 536, 543 (M.D. La. 2019).
[566] 28 C.F.R. § 35.130(b)(8).  The Court notes that this section also applies to hobby craft where, on its face, the policy screens out all disabled inmates.  Nonetheless, as set forth above, because hobby craft is a privilege, ostensibly all inmates, disabled or not, must apply and are screened for participation.
[567] *Guy*, 400 F.Supp.3d at 543.
[568] *Id*. (quoting 28 C.F.R. § 35.130(b)(8)).
[569] *Id*. at 543-544.
[570] *Id*. at 544 (quoting La. Rev. Stat. § 15:832(A)).
Document Number: 52892

discretion of prison officials.'"[571]  The Court rejected the defendants' motion on this issue, finding:

> The record reflects that the Department housed Guy in "working cell blocks" because he received disciplinary violations. (Doc. 19-8 at p. 3). In a "working cell block," offenders are "automatically assigned to the field." (Doc. 19-4 at p. 154). Because of his "no field" duty status, Guy could not perform paying field work. (Doc. 18-10). But his duty status is attributable to his hearing impairment; so it is his impairment—not his history of disciplinary violations—that ultimately made him ineligible for a paying job, despite his undisputed ability to perform some paying work at Angola. (Docs. 21-2 at ¶ 13; 27-1 at ¶ 13).
>
> Accordingly, viewing the facts and drawing all reasonable inferences in Guy's favor, the Court concludes that a reasonable jury could find that the Department violated the ADA and RA by denying Guy incentive pay for a nine-month period from 2016–2017.[572]

Turning to sports, the defendant claimed it did not violate the ADA or RA in denying the plaintiff access to sports "because safety – not discrimination – accounts for the denial."[573]  The Court also rejected this argument, finding:

> As a public entity, the Department may "impose legitimate safety requirements necessary for the safe operation of... services, programs, or activities." 28 C.F.R. § 35.130(h). But it "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*
>
> The testimony of Angola's medical director, Dr. Randy Lavespere, tends to show that the Department's "safety requirements" are based on generalizations and speculation—not an individualized assessment of Guy's hearing impairment. See 28 C.F.R. § 35.130(h). For example, Dr. Lavespere testified, categorically, that he "won't make an adjustment for sports." (Doc. 19-4 at p. 69). Worse, he testified that Guy's hearing impairment places him at an "increased risk" playing the sport of "pickleball"—a non-contact sport he admitted not knowing. (Docs. 19-4 at pp. 71, 90).[574]

---

[571] *Id.* (quoting *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990)).
[572] *Id.*
[573] *Id.*
[574] *Id.*

Document Number: 52892

Similarly, the Court rejected the defendant's contention that it did not discriminate against the plaintiff in denying him access to hobbycraft because it argued "its medical director 'would potentially allow' Guy to participate in 'certain' hobbycraft activities."[575] The Court stated:  "The contention lacks merit. A public entity's assurance that it will not violate the ADA and RA in the future does not immunize it from liability for past violations."[576]

> Guy testified that he would like to participate in the prison's leather-working program. (Doc. 19-3 at pp. 50). To that end, he requested access to leather-working and other hobbycraft activities. (Doc. 19-7 at pp. 3–4). The Department denied the request without explaining why Guy cannot safely perform these activities. (Id. at p. 5). Angola's medical director, Dr. Lavespere, even testified that certain hobbycraft activities, such as leather work and painting, pose "no inherent danger to [Guy]." (Doc. 19-4 at p. 69). So it is unclear what motive—other than disability discrimination—drove the Department's denial of Guy's request to participate in hobbycraft activities.[577]

What is clear from the *Guy* decision is that a prison's implementation of policies that creates an "eligibility criteria" that tends to "screen out" a class of persons based solely on their medical conditions and/or disabilities is a violation of the ADA's implementing regulations.  Defendants cannot automatically exclude disabled inmates from various programs and activities based solely on their disabled or medical status and then justify such exclusion by arguing they will consider exceptions where the inmate makes a request.  This practice is the opposite of what the ADA and RA require.

Plaintiffs presented uncontroverted evidence that certain disabled inmates are issued "no duty" status work assignments based solely on their disabilities, which

---

[575] *Id.* at 545.
[576] *Id.* (citing 42 U.S.C. § 12132; 29 U.S.C. § 794(a)).
[577] *Id.*
Document Number: 52892

precludes them from participating in work release, work assignments, hobby craft, and other programs. The Court finds that this is a violation of the ADA and implementing regulations. The Court notes that it is not a violation of the ADA or RA for the prison's medical staff to properly evaluate and determine, on a individualized basis, that certain programs or activities are unsafe for certain inmates; however, a blanket denial or classification turns the regulations on their head and places the burden on disabled inmates to demand access to programs that the prison is obligated to provide in the first place.

## IV.    CONCLUSION/INJUNCTIVE RELIEF

For the reasons set forth above, the Court holds that the Defendants, in their official capacities, are violating the Eighth Amendment rights of the Plaintiff Class and the ADA and RA rights of the Plaintiff Subclass. Based on the overwhelming evidence presented at trial, judgment shall be entered in favor of Plaintiffs following the remedy phase. The Court shall order injunctive relief regarding the following deficiencies:

(1) Failing to provide constitutionally adequate clinical care in the following particulars: privacy in examinations; lack of routine medical equipment in exam rooms; lack of adequate medical records management; lack of clinical hygiene and spacing; episodic treatment of complaints;

(2) Failing to provide adequate medical care with qualified providers at sick call;

(3) Failing to provide access to medically necessary specialty care in a timely manner; failure to schedule and track specialty appointments; failure to comply with testing and diagnostic requirements; failure to execute appropriate follow-up care ordered by specialty care providers; and failure to coordinate care;

Document Number: 52892

(4) Failing to provide constitutionally adequate emergency care in the evaluation and assessment of emergencies by qualified providers and failing to timely treat and/or transport to hospital for emergent care;

(5) Failing to provide adequate, qualified staff in infirmary/inpatient care;

(6) Failing to provide medical leadership and organization in the following particulars: lack of meaningful mortality review; use of correctional personnel to manage medical decisions; lack of peer review; lack of medical staff involvement in budgeting; lack of medical supervision by Dr. Lavespere; and failure to maintain proper credentialing records;

(7) Failing to comply with the ADA and RA in providing disabled inmates access to programs and services due to physical and architectural barriers;

(8) Failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications have not been made to provide access; failure to provide proper oversight of health care orderlies;

(9) Failing to comply with LSP's own ADA Directives in maintaining a qualified ADA Coordinator and advisory committee to handle ADA issues;

(10)    Failing to make efforts to integrate disabled inmates within the spirit of the ADA implementing regulations;

(11)    Failing to adequately train medical staff regarding ADA compliance;

(12)    Failing to appropriately evaluate and address ADA accommodation requests and disability-related grievances;

(13)    Failing to identify and track disabilities and accommodation requests in a meaningful way;

Document Number: 52892

(14)    Failing to accommodate disabled inmates in applying discipline;

(15)    Maintaining blanket exclusionary policies for disabled inmates regarding access to various services, activities, and programs in violation of the ADA.

By separate notice, the Court will set a Status Conference to discuss proceeding to the remedy phase of this matter.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 31st day of March, 2021.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

Document Number: 52892