# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, *et al.*,<br><br>Defendants. | CIVIL ACTION NO. 3:15-cv-318<br><br>JUDGE SDD<br><br>MAGISTRATE RLB |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAVID M. MATHIS IN PART

The Fifth Circuit has explicitly held that accreditation by the American Correctional Association ("ACA") is not "proof that the conditions in question don't violate the Eighth Amendment," calling the argument "absurd."[1] Despite this plain and controlling law, Defendants proffer the testimony of an expert who believes that if a prison is accredited by the ACA, "in those areas where the ACA is looking … it exceeds the standard of care" and, at an organizational level, the prison cannot be below the standard of care.[2] Indeed, Dr. Mathis goes even farther than the proposition rejected by the Fifth Circuit, asserting that Defendants' personnel—here, Dr. Lavespere—can choose the standard of care themselves. An opinion that is based on a proposition squarely rejected by controlling precedent cannot "help the trier of fact to understand the evidence or to determine a fact in issue" and is not "the product of reliable principles and methods."[3] Accordingly, Dr. Mathis's testimony regarding the adequacy of Defendants' procedures and organizational structure should be excluded.

---

[1] *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004).
[2] Ex. 1, Dep. of David M. Mathis ("Mathis Dep.") at 86:2-3, 87:12-16.
[3] Fed. R. Evid. 702(a), (c).

1

In addition to this fatal flaw, several discrete portions of Dr. Mathis's opinions should be excluded. First, he espouses standards regarding the use of orderlies, mortality review, and the treatment of patients with altered mental status that the Court expressly rejected in the liability opinion. Such opinions should be excluded under the law of the case. Second, he directly contradicts Defendants' experts in the first trial regarding sampling methods and the standards of the National Commission on Correctional Health Care ("NCCHC"). While Defendants were entitled to choose new experts if they were dissatisfied with their original experts' opinions, they are not entitled to bog down the remedy phase by contradicting their own concessions in the liability phase. Third, he relies on unrecorded observations of patient care where Defendants intentionally prevented Plaintiffs from learning the identities of the patients, as well as observations of morning meetings that Defendants prohibited Plaintiffs from observing and documents that Defendants withheld from Plaintiffs in discovery. This inequitable conduct prevents Plaintiffs and the Court from determining whether the resulting opinions are based on sufficient facts, requiring the exclusion of those assertions. Fourth, several of the "chart reviews" in his Rule 26 report merely quote Defendants' medical summary verbatim and say that the care was adequate, without providing analysis sufficient to allow the Court to determine whether his opinion is reliable. These chart reviews should be excluded under Federal Rule of Evidence 702(c) and (d).

Accordingly, Dr. Mathis should be allowed to testify to whether the care provided to 32 of the patients in Plaintiffs' sample met the standard of care. The remainder of the opinions in his report should be excluded.

## BACKGROUND

### I. Liability Phase

During the liability phase, Plaintiffs proffered an expert report by Dr. Michael Puisis, nurse practitioner Madeleine LaMarre, and Dr. Susi Vassallo. Defendants produced expert reports by Dr.

David Thomas and Dr. Jacqueline Moore. As relevant here, (1) Dr. Thomas and Dr. Moore acknowledged that Plaintiffs' experts' methodology in selecting medical charts for review by sampling patients who died or were hospitalized was the standard method for reviewing a facility's care;[4] and (2) Dr. Moore testified that NCCHC standards were "authoritative," reflected "just a minimal level," and were not "aspirational."[5]

**II.     Remedial Phase**

A.  Plaintiffs' Expert Report

In the remedial phase, Plaintiffs again proffer a report by Dr. Puisis, Ms. LaMarre, and Dr. Vassallo, joined by nurse Angela Goehring.[6] The report uses the same methodology as the first report, most notably that Plaintiffs sampled the medical records of "patients with chronic diseases and other serious medical conditions," which they selected "by reviewing the lists of patients who had been hospitalized from January 2019 to January 2022, and mortality reviews of patients who had died between January 2019 and January 2022, and selecting a sample of representative records."[7]

Plaintiffs' experts also conducted a three-day site visit. Unlike the site visit during the liability phase, Defendants' counsel prohibited Plaintiffs' experts from speaking with staff during their site visit.[8] Defendants' counsel also prohibited Plaintiffs' experts from observing LSP medical staff's "morning meeting" during the site visit. And they required that defense counsel be present for any medical care Plaintiffs' experts observed and receive the names of any patients whose care was observed.

---

[4] Oct. 23 Trial Tr. at 65:4-11, 157:4-8.
[5] Oct. 23 Trial Tr. at 151:9-18.
[6] Ex. 2, Pls.' Med. Expert Report ("Pls.' Expert Rep.").
[7] *Id.* at 4.
[8] *Id.* at 3.

3

B. Dr. Mathis's Report

Defendants have not proffered either Dr. Thomas or Dr. Moore as experts in the remedial phase. Instead, they proffer reports from Dr. Mathis, Dr. Michael McMunn, and Dr. John Morrison.[9]

Dr. Mathis is a medical consultant in California Correctional Healthcare Services' Office of Legal Affairs, where he helps the California correctional department respond to lawsuits, complaints, and habeas corpus petitions filed by patients.[10] He previously practiced at the California Medical Facility for 10 years, while it was under the supervision of a court-appointed receiver, and served as medical director of a prison in Maryland for four years.[11] He has provided opinions in over 100 prison and jail medical care cases over the past five years, nearly all of which were individual cases about the medical care provided to a particular patient.[12] He has never served as an auditor for the ACA or NCCHC, a monitor over a prison's health care, or a court appointed expert.[13]

Dr. Mathis proffered an expert report opining on clinical care, specialty care services, infirmary and inpatient care, sick call, emergency care and the Assessment and Triage Unit ("ATU"), and medical leadership and organizational structure, including mortality reviews.[14] As part of the basis for his report, he reviewed 38 of the 60 charts in Plaintiffs' experts' sample. For most of these patients, his chart review consists of a "Narrative" and "Medical Summary" that are transcribed nearly verbatim from Dr. Lavespere's or Dr. Toce's mortality review (with edits for patients'

---

[9] Dr. McMunn's and Dr. Morrison's reports are the subject of concurrently filed *Daubert* motions. Dr. McMunn is not a medical doctor but a Nurse Practitioner with a Doctorate in Nursing. Dr. Morrison is the previous medical director of the Department of Corrections.
[10] Mathis Dep. at 301:8-13; *see also* Ex. 3, Correctional Medical Expert Report of David M. Mathis ("Mathis Rep.") at 11-12.
[11] *See* Ex. 4, Curriculum Vitae of David M. Mathis ("Mathis CV") at 1-2; *see generally Brown v. Plata*, 563 U.S. 493 (2011).
[12] Mathis Dep. at 149:24-150:12.
[13] *Id.* at 150:13-21.
[14] Mathis Rep. at 206-20.

4

anonymity and to spell out some medical terms), supplemented by a summary of Dr. Mathis's review of the medical chart and a summary of Dr. Mathis's opinion about the care provided.[15] For some patients, he included only LSP's mortality review, without providing his own chart review or analysis except to say conclusorily that LSP met the standard of care.[16]

## LEGAL STANDARD

"The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). An expert's testimony must satisfy Federal Rule of Evidence 702, which requires that

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

To make this showing, an expert must present "sufficient facts or reliable underlying data" *Sims*, 839 F.3d at 401. The court then "screen[s]" a party's expert evidence to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). *Daubert* assigns a gatekeeping role to the judge, wherein "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* To assess admissibility under Rule 702, courts look to a "five-factor, non-exclusive, flexible test": "(1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). A court may exclude "opinion evidence that is

---

[15] Mathis Rep. at 88-205; Mathis Dep. at 211:11-213:8. *Compare, e.g.*, Mathis Rep. at 88-90 *with* Ex. 5, LSP Mortality Review for Patient #35.
[16] *See, e.g.*, Mathis Rep. at pp. 100-04; *see infra* Part V.

connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The court's gatekeeping requirement is designed "to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). A district court considering whether to admit expert testimony therefore "must evaluate whether there is an adequate 'fit' between the data and the opinion proffered." *Moore*, 151 F.3d at 276. "[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. This requires some objective, independent validation of the expert's methodology." *Id.* "'[T]he expert's assurance[] that he has utilized generally accepted scientific methodology is insufficient' on its own to establish that his testimony is reliable." *Matosky v. Manning*, 428 F. App'x 293, 298 (5th Cir. 2011) (quoting *Moore*, 151 F.3d at 276). To allow a court to make this determination, an expert opinion "must have some *demonstrable* and reliable basis in underlying facts." *LeBlanc ex rel. Estate of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) (emphasis added). At a minimum, an expert must "provide[] a reasonable link between the information and procedures he uses and the conclusions he reaches." *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1248 (M.D. La. 1996).

**ARGUMENT**

**I. Dr. Mathis's Opinion on LSP's Procedures and Organizational Structure Is Based on a Premise the Fifth Circuit Has Rejected**

Much of Dr. Mathis's expert report opines on LSP's internal procedures and organizational structure, including the use of orderlies in the Nursing Units and "assisted living" dormitories; mortality reviews; LSP's practices for supervising nurse practitioners and other medical staff; LSP's

6

leadership and organizational structure; and the process of scheduling and obtaining specialty appointments. In each of these areas, he expresses opinions about whether Defendants' practices satisfy an unstated "standard of care."[17] While his opinion is largely silent as to the source of this "standard of care," he made it clear at his deposition that his standard is satisfied—indeed, exceeded—by anything that is accredited by the ACA. In Dr. Mathis's view, ACA accreditation "means that in those areas where the ACA is looking, having passed it, the ACA, means that it exceeds the standard of care."[18] While he acknowledged that an accredited institution could provide substandard care in a particular instance, he believes that at an organizational level, any prison accredited by the ACA is, "at the organizational level … above the standard of care."[19] In his view, deliberate indifference is based on the standard of the care—and the standard of care is somewhere below ACA accreditation.[20]

The Fifth Circuit has considered and rejected this exact proposition. Faced with the argument that "accreditation by the American Correctional Association ("ACA") is proof that the conditions in question don't violate the Eighth Amendment," the Fifth Circuit held that "it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards."[21] "While compliance with ACA standards may be a relevant consideration, it is not *per se* evidence of constitutionality."[22] Yet that is

---

[17] *See, e.g.*, Mathis Rep. at 219 ("It is my opinion that LSP comports with the standard of care for correctional facilities. LSP has been repeatedly accredited by the ACA, a higher standard."); *id.* at 218 ("The current LSP Death Reviews … are generally explicatory without focusing on the specific timing of the events and decisions by medical staff that preceded the death. This is the Standard of Care in correctional facilities in the United States."); *see generally id.* at 206-20.
[18] Mathis Dep. at 86:2-4.
[19] *Id.* at 87:12-17.
[20] *Id.* at 85:7-22.
[21] *Gates*, 376 F.3d at 337.
[22] *Id.*

exactly how Dr. Mathis treats it: as dispositive evidence that the practices ACA reviewed meet the standard of care and are therefore constitutional.

Indeed, Dr. Mathis's standard is even more extreme than what the Fifth Circuit rejected. Not only does he believe that ACA accreditation proves that a facility "exceeds the standard of care,"[23] he believes that correctional officials themselves can set the standard of care. Regarding how often blood tests should be performed, he opined that the standard of care can be "determined by people at the upper levels" of correctional system—in this case, Defendant Randy Lavespere, the DOC Medical Director (and formerly LSP's Medical Director) and Stacye Rodriguez, the DOC Chief Nursing Officer.[24] Similarly, regarding whether routine physicals should be given to people age 50 and up, he bases his standard of care solely on "the LSP directives" or the contract between a prison and its medical contractor.[25]

In other words, Dr. Mathis would go beyond allowing the ACA to set the constitutional standard of care—a methodology the Fifth Circuit found "absurd"—and allow *the prison itself* to set the constitutional standard of care. This is not the application of "reliable principles and methods";[26] it is abdication. Where an expert's opinion is based on a principle and method that controlling precedent forecloses, it cannot "help the trier of fact to understand the evidence or to determine a fact in issue,"[27] and therefore is inadmissible.[28]

---

[23] Mathis Dep. at 86:2-4.
[24] *Id.* at 127: 4-23.
[25] Mathis Dep. at 107:10-108:9.
[26] Fed. R. Evid. 702(c)
[27] *Id.* 702(a).
[28] *See, e.g.*, *Dart v. Kitchen Brothers Manuf. Co.*, No. 03-cv-277, 2006 WL 8432369, at *1 (M.D. La. Apr. 28, 2006) (finding no material issue of fact where "the method used by plaintiff's expert … is contrary to well-settled law"); *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, No. 2006 WL 2109503, at *22 (N.D. Ala. July 28, 2006) (excluding expert report where expert "was not simply incorrect … his opinion was contrary to binding precedent").

## II. Dr. Mathis's Opinions Regarding the Standard for Care for Orderlies, Altered Mental Status, and Mortality Review Are Precluded by the Law of the Case

In its liability opinion, this Court resolved a number of disputed issues regarding the standard of care in correctional medicine. As relevant here, the Court found that (1) "utiliz[ing] inmates as nursing assistants … is beyond the scope of the medically accepted use of orderlies," including activities of daily living in an infirmary setting[29]; (2) it is "inappropriate under national standards" to routinely treat "inmates who present with altered mental status … based on a presumption that they ingested narcotics," including by "routine[ly] subjecting patients who present with altered mental status to urine toxicology testing"[30]; and (3) mortality reviews "entail[] reviewing the death of a patient to determine if any of the problems arose in the course of the patient's care that can be corrected in order to prevent future deaths."[31]

Dr. Mathis disagrees with each of these holdings:

Orderlies: Dr. Mathis acknowledges that changing, positioning, feeding, and cleaning patients in an infirmary is typically the role of certified nursing assistants, and that orderlies perform these roles in LSP's infirmary.[32] Even though this is exactly what the Court found impermissible, he opines that it is appropriate.[33] Indeed, he thinks it is acceptable that LSP uses orderlies to provide direct medical care in the form of wound care and physical therapy,[34] which (contrary to his belief)[35] even the ACA forbids.[36]

Altered mental status: Dr. Mathis believes that drug use "need[s] to be considered first and foremost with altered mental status" and that, along with a blood sugar determination, "using Narcan … first when you see altered mental status" is appropriate.[37] He believes urine toxicology should be done on all patients who come to the ATU with altered mental status "[u]nless you have other information that leads

---

[29] Rec. Doc. 594 at ¶¶ 74-76.
[30] *Id.* at ¶ 113.
[31] *Id.* at ¶ 121.
[32] Mathis Dep. at 47:23-49:14.
[33] Mathis Rep. at 211-13; Mathis Dep. at 170:22-171:5.
[34] Mathis Dep. at 171:21-173:1.
[35] Mathis Rep. at 213.
[36] *See* Ex. 6 (ACA standard 4-4393: "Offenders are not to be used for the following duties: Performing direct care patient services . . . .").
[37] Mathis Dep. at 109:6-19.

you in a different direction."[38] Only after you "rule out drugs" can you "go on further on your evaluation" and "start to think about the CVAs [i.e., strokes]."[39]

Mortality review: Dr. Mathis acknowledged that LSP's mortality reviews do not include a critical review of the care that preceded a patient's death,[40] even in situations where he views LSP's actions as falling below the standard of care.[41] He recognizes that this is a problem.[42] Nevertheless, he maintains that "the Standard of Care in correctional facilities" is for mortality reviews to be "generally explicatory without focusing on the specific timing of the events and decisions by medical staff that preceded the death."[43]

On each of these issues, Dr. Mathis's opinion squarely contradicts the Court's findings in the liability phase—not by saying the facts have changed, but by saying that he would apply a different standard.

The role of this remedial hearing is to determine what relief is appropriate based on the current conditions at LSP—not to relitigate the standard of care proven at the liability trial. The standard of care for the use of orderlies, the treatment of altered mental status, and mortality review (along with many other holdings) are the law of the case. "[A] court will follow a ruling previously made unless the prior ruling was erroneous, is no longer sound, or would work an injustice."[44] Defendants have not argued that the Court's rulings on these standards were erroneous, unsound, or unjust—not in their motion for reconsideration, not in their mandamus petition, and not in these remedial proceedings. Accordingly, while Defendants can introduce evidence that they *meet* the standards established at the liability trial, they are not entitled to relitigate questions regarding the standard of

---

[38] Mathis Dep. at 112:25-113:4.
[39] Mathis Dep. at 111:7-12.
[40] Mathis Dep. at 190:2-5, 192:15-24.
[41] Mathis Dep. at 242:20-243:3 (Patient #32); 257:4-14 (Patient #5); 275:2-9 (Patient #11); 284:17-20 (Patient #28); 284:21-285:2 (Patient #7).
[42] *See, e.g.*, Mathis Dep. at 242:20-243:3 ("Q ... You don't say on [Patient #32] whether you believe the mortality review was adequate. Do you think that it was? A No, because it doesn't go into what happened. ... It doesn't go into what they could have done differently. That's my primary concern about the death reviews.").
[43] Mathis Rep. at 218; *see also* Mathis Dep. at 189:1-9, 190:6-10.
[44] *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983).

care that this Court has already resolved, and proffering an expert to dispute that those standards even exist is inappropriate.[45]

### III. Dr. Mathis Should Not Be Permitted to Contradict Defendants' Liability Experts

In addition to disputing the Court's holdings in the liability phase, Dr. Mathis offers opinions that directly contradict Defendants' original experts. Here again, the remedial phase is an opportunity for Defendants to show that *LSP's practices* have changed—not to find a new expert who will advance standards that their previous experts would not.

There are two areas where Dr. Mathis contradicts Defendants' previous experts:

Sampling methodology: Both Dr. Moore and Dr. Thomas agreed that Plaintiffs' sampling methodology, in which they selected charts of people known to have had serious medical needs, was standard and appropriate. Dr. Moore explained that she "pull[s] charts of people that have gone to the emergency room or charts of people that have had chronic care," and that "[t]here's no point in just pulling ten random charts,"[46] while Dr. Thomas acknowledged that Plaintiffs' methodology is "what most accreditation bodies do and what most experts do."[47] Dr. Mathis, by contrast, claims that random sampling is more appropriate and that most accreditation bodies review charts at random.[48]

NCCHC standards: At the liability trial, Dr. Moore opined that NCCHC standards represented "just a minimal level" of care, are "authoritative," and are not "aspirational."[49] Dr. Mathis argues that it is inappropriate to consider NCCHC standards,[50] because he believes that those standards are "aspirational" and higher than a minimal level of care.[51]

---

[45] *See, e.g.*, *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 505 F. App'x 430, 436-37 (6th Cir. 2012) (affirming district court's exclusion of expert opinion because "it would be consistent with the law of the case to prohibit JGR's expert").
[46] Oct. 23 Trial Tr. at 157:4-8.
[47] Oct. 23 Trial Tr. at 65:4-11.
[48] Mathis Dep. at 145:1-146:10, 148:19-22; Mathis Rep. at 206-07
[49] Oct. 23 Trial Tr. at 151:9-18.
[50] Mathis Rep. at 220 ("It is my opinion that to hold LSP medical care up to NCCHC standards … exceeds the Standard of Care.").
[51] Mathis Dep. at 87:17-21, 88:4-21.

As with the standards of care discussed in the previous section, Defendants and their new expert are not providing information regarding a change in conditions at LSP; they are simply changing their litigation position.[52]

### IV. Dr. Mathis Should Not Be Allowed to Rely on Facts Defendants Prevented Plaintiffs from Obtaining Discovery Into

In several parts of his opinion, Dr. Mathis relies on matters into which Defendants prevented Plaintiffs from testing Dr. Mathis's opinions or obtaining discovery: Dr. Mathis's observations of patient care during his site visit; his observations of morning meetings at LSP; and documents that were not produced to Plaintiffs despite being responsive to discovery requests. Each of these portions of his opinion should be precluded.

1. Dr. Mathis's opinions rely in part on observations he made of patients seen in the General Medicine Clinic, ATU, and sick call during his site visit.[53] However, on defense counsel's instruction, he did not get the names of these patients[54] and took no notes regarding the care he observed.[55]

As the Court held in partially excluding Dr. Thomas during the liability phase, "if it is impossible for the Court to learn what data the expert relied on, it is impossible for the Court to evaluate whether there is an adequate 'fit' between the data and the opinion proffered."[56] Moreover, "[t]he adversarial system requires that the opponents have the opportunity to challenge the reliability of the opinion. Without, at least, minimal identifying information as to the sources of the empirical

---

[52] *Cf. Perdiemco, LLC v. Industrack LLC*, No. 15-cv-727, 2016 WL 8135379, at *3 (E.D. Tex. Nov. 8, 2016) (no triable issue of fact where party's arguments "come close to contradicting their own expert's … opinion"); *J.F. by Sifuentes v. Abbott Labs., Inc.*, No. 14-cv-847, 2017 WL 992781, at *3 (S.D. Ill. Mar. 15, 2017) ("The unavailability of [an expert] does not … grant [the proffering party] *carte blanche* to develop new theories after several years of litigation."); *Kaepplinger v. Michelotti*, No. 17-cv-5847, 2021 WL 2633312, at *6 (N.D. Ill. June 25, 2021) (collecting cases holding that a substitute expert may not contradict a previous expert).
[53] *See* Mathis Dep. at 30:6-12, 64:6-18.
[54] Mathis Dep. at 62:13-25; *see also id.* at 26:18-27:14, 29:30:21, 81:9-13.
[55] Mathis Dep. at 30:13-21.
[56] Rec. Doc. 322 at 8 (quoting *Moore*, 151 F.3d at 276).

and investigative information relied upon, the adversarial process is frustrated and the Court's gatekeeping function thwarted."[57]

Defendants' conduct here is particularly egregious because it is intentional. Dr. Mathis testified that Defendants' counsel "told [him] that everything was going to be hidden," so he didn't record the names of the patients he observed.[58] Yet during Plaintiffs' site visit, Defendants' counsel insisted that they not only be allowed to watch any patient care that Plaintiffs' experts observed, but that they be provided with the name of each patient. Indeed, defense counsel attempted to insist that any patient who Plaintiffs' experts observed sign a consent form and release allowing all details of their medical care—whether related to the observation or not—to be given to Defendants' lawyers,[59] yet Defendants and Dr. Mathis did not even ask the patients who Dr. Mathis observed for consent to the observation.[60] Defendants precluded Plaintiffs from learning the facts underlying Dr. Mathis's opinion, while insisting they receive a different set of information about all patients Plaintiffs observed. This inequitable conduct should not be rewarded.

2. Similarly, Dr. Mathis relies heavily on observing LSP staff's morning meeting during his site visit, but Defendants explicitly prohibited Plaintiffs' experts from observing that meeting during their site visit.[61] This barrier made it impossible for Plaintiffs to evaluate what happens in those meetings and to test the reliability of Dr. Mathis's conclusions drawn from them. Here again, Defendants knew the inequity of their position when they took it: when Defendants announced that they would not permit Plaintiffs' experts to observe the meetings, Plaintiffs argued that it would be unfair to allow one party but not the other to observe the meetings, and told Defendants that they

---

[57] *Id.*
[58] Mathis Dep. at 13-19.
[59] Plaintiffs declined to use the release form, but obtained express consent from every patient they observed.
[60] Mathis Rep. at 26:11-13, 62:20-23, 81:9-13.
[61] *See* Ex. 7 (Mar. 29, 2022, 8:42 PM Email from Jeffrey Dubner).

13

would move to preclude any reliance on Defendants' experts' observations of those meetings based on the inequity. Defendants could allow the parties' experts to evaluate the morning meetings, or they could prohibit Plaintiffs' experts from viewing them, but they cannot have it both ways.

3. Additionally, Defendants provided Dr. Mathis with documents that they withheld from Plaintiffs, despite their plain responsiveness to Plaintiffs' discovery requests. Two are relevant here: (1) a document purporting to reflect procedures for LSP's healthcare orderly training program, which was not produced in response to Plaintiffs' request for "All documents related to updated training policies and procedures, including training of orderlies and training of staff";[62] and (2) information from Defendants' medical utilization database Eceptionist that was not produced in response to Plaintiffs' request for "All entries in the medical utilization database from September 30, 2016, to present."[63] Dr. Mathis relied on these documents in his opinions on orderly utilization and specialty care.[64] Because Defendants did not provide these documents to Plaintiffs despite a plainly applicable discovery request, yet simultaneously provided the documents to their expert, their expert should be precluded from relying on these documents under Rule 37(c)(1).[65] Reviewing the factors for determining the appropriate sanctions under Rule 37(c)(1),[66] while the importance of the evidence is relatively low, the other three factors all plainly weigh in favor of exclusion: (1) Plaintiffs would be prejudiced due to their inability to have their experts review and opine on this information; (2) the

---

[62] Ex. 8, Defs.' Resp. to Pls.' Second Set of Remedy RFPs, RFP No. 13 (capitalization altered).
[63] *Id.*, RFP No. 7.
[64] *See* Mathis Rep. at 211 & nn. 340, 342-43 (citing "LSP Confidentiality Form & Healthcare Orderly Training Program"); *id.* at 28 & n.22 (citing "Eceptionist™ colonoscopies-EGD 2019-2022").
[65] Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); *see, e.g.*, *ContentGuard Holdings, Inc. v. Amazon.com, Inc.*, No. 13-cv-1112, 2015 WL 6886957, at *2 (E.D. Tex. Nov. 7, 2015) (striking portions of expert report that relied on information that "could have, and should have, been produced prior to the close of discovery").
[66] *See Texas A & M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003); *Patterson v. Houston Indep. Sch. Dist.*, 570 F. App'x 367, 369 (5th Cir. 2014).

prejudice could not be cured by a continuance given the tight schedule and the importance of resolving the remedial hearing to ensure that the risk of harm to Class members is finally abated; and (3) there can be no justification for Defendants' failure to disclose, given that they gave most if not all of these documents to their *own* experts while withholding them from Plaintiffs.

**V.     Dr. Mathis's Expert Report Does Not Provide the Basis and Reasons for His Opinions Regarding Patients #14, 16, 34, 36, 54, and 57**

Beyond Dr. Mathis's opinions regarding administrative procedures and organizational structure, the heart of his report are his chart reviews of patients in Plaintiffs' experts' sample. For most of these patients, his report follows an unusual approach: he copies and pastes the text of LSP's mortality review (and sometimes autopsy or toxicology report), then provides a brief summary of the medical care he finds most relevant, followed by a statement of whether he found some or all of Defendants' actions within the standard of care.[67]

For six patients, however, he does not provide any independent chart review. For those who died, he simply copies and pastes LSP's mortality review and then says conclusorily that there were no standard of care violations.[68] For example, for Patient #36, he transcribes the LSP mortality review and then says only "I reviewed the entire chart of PATIENT #36 and found the LSP death review to be substantially accurate" and "It is my Opinion that there are no Standard of Care violations by LSP in their care for PATIENT #36."[69] For those who are still alive, he provides a paragraph stating their main medical needs and then says without explanation that medical providers appropriately treated those needs.[70] He produced no other written explanation of his analysis of these charts.[71]

---

[67] *See, e.g.*, Mathis Rep. at 109-11.
[68] *See* Mathis Rep. at 100-04 (Patient #36); 123-26 (Patient #14); 128-30 (Patient #34); 173-74 (Patient #16).
[69] *Id.* at 100-04.
[70] *Id.* at 191 (Patient #54); 192 (Patient #57).
[71] *Id.* at 233:18-22.

15

This does not provide "a complete statement of all opinions the witness will express *and the basis and reasons for them*," as the Federal Rules require.[72] Dr. Mathis admitted at his deposition that the only way to find out what he found important in the medical charts is to ask him.[73] This frustrates the purpose of the requirement of a written expert report, which is intended to allow "objective, independent validation of the expert's methodology."[74] An expert who leaves his reasoning out of his report has not "provide[d] a reasonable link between the information and procedures he uses and the conclusions he reaches."[75]

At his deposition, Dr. Mathis argued that his reasoning could be identified by looking at bookmarks that he put in the medical record PDFs.[76] This falls far short of satisfying Rule 26. Dr. Mathis had his paralegal go through the medical records "and put in the date and what occurred on that date"; he then bolded some of these entries.[77] All that can be determined from these bolded bookmarks is that Dr. Mathis thought something was significant on those pages of the medical record. It provides no way to know *what* he thought was significant, how it related to the quality of LSP's care, and why he believes it satisfies the standard of care.

Because Dr. Mathis left the basis and reasons for his opinions about these patients out of his report, he deprived both Plaintiffs and the Court of a fair opportunity to test and evaluate his opinion. Accordingly, his opinions about these six patients should be excluded.

## CONCLUSION

For the foregoing reasons, the following portions of Dr. Mathis's opinions should be excluded:

---

[72] Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added).
[73] Mathis Dep. at 234:16-23.
[74] *Moore*, 151 F.3d at 276.
[75] *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1248 (M.D. La. 1996).
[76] *See* Mathis Dep. at 228:16-234:23.
[77] Mathis Dep. at 216:17-19, 230:13-231:18.

16

- Opinions about whether LSP complies with the standard of care at the organizational level or in internal procedures

- Opinions about the standard of care for orderlies, altered mental status, or mortality review

- Opinions about the appropriate sampling methodology or the applicability of NCCHC standards

- Observations of patient care

- Observations of LSP medical staff's morning meeting

- Opinions based on documents that were responsive to Plaintiffs' discovery requests but not produced to Plaintiffs

- Chart reviews of Patients #14, 16, 34, 36, 54, and 57

Subject to these limitations, he will still be able to testify regarding the adequacy of the medical care provided to the other 32 patients whose charts he reviewed.

Respectfully submitted this 13th day of May,

/s/ *Mercedes Montagnes*
Mercedes Montagnes, La. Bar No. 33287
Jamila Johnson, La. Bar No. 37953
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, La. Bar No. 39524
Elena Malik, La. Bar No. 39662
Samantha Bosalavage, La. Bar No. 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Jeffrey B. Dubner (*pro hac vice*)
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 656-2722
Email: jeffrey.dubner@gmail.com

Bruce Hamilton, La. Bar No. 33170
Emily Lubin, La. bar No. 38823

Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Telephone: (504) 352-4398
Facsimile: (504) 486-8947
Email: bruce.hamilton@splcenter.org

Daniel A. Small (*pro hac vice*)
Brendan R. Schneiderman (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com

Nora Ahmed (*pro hac vice*)
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
Email: nahmed@laaclu.org

Ronald K. Lospennato, La. Bar No. 32191
Disability Rights Louisiana
8325 Oak St.
New Orleans, LA 700118
Telephone: (504) 522-0628
Facsimile: (888) 534-2996
Email: rlospennato@advocacyla.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Samantha Bosalavage*
Samantha Bosalavage
