# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., *et al.*, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, *et al.*,

Defendants.

CIVIL ACTION NO. 3:15-cv-318

JUDGE SDD

MAGISTRATE RLB

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO ADMIT EVIDENCE FROM POST-DISCOVERY PERIOD

"Deadlines are deadlines for a reason."[1] On the eve of the remedy hearing, Defendants seek to evade this Court's deadlines and introduce evidence of post-discovery conditions at (and possibly beyond) the remedial hearing in this case, much of it contradicting their sworn discovery responses. Admitting this evidence would not only prejudice Plaintiffs and burden the fair administration of justice; it would also pave the way for never-ending litigation that deprives Plaintiffs of equitable relief and renders future prison condition cases entirely unmanageable. For the reasons that follow and those set forth by Plaintiffs in their affirmative motions in limine,[2] Defendants' motion should be denied.

## BACKGROUND

At a status conference on December 15, 2021, this Court set various discovery deadlines in advance of the upcoming June 6, 2022 remedial hearing.[3] The parties had an opportunity to weigh in on the deadlines and neither party objected to the schedule laid out by the Court. Shortly thereafter,

---

[1] *David v. Signal Int'l, L.L.C.*, No. 08-cv-1220, 2014 U.S. Dist. LEXIS 162890, at *13 (E.D. La. Nov. 19, 2014).
[2] *See* Rec. Doc. 693-1 at 2-17.
[3] Rec. Doc. 629.

in an effort to reduce discovery burdens and focus discovery on current conditions at LSP, the Parties stipulated that "for the remedy phase of trial, January 1, 2019 begins the relevant and appropriate time period ("Relevant Period") for the Court to assess whether constitutional deficiencies listed in the Court's March 31, 2021 opinion (R. Doc. 594) have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[4] The Court extended the March 18, 2022 discovery deadline to April 1, 2022.[5] Defendants did not seek an extension of the April 1, 2022 deadline.

Despite a stipulation that the past three years of evidence are relevant and a clearly delineated discovery cutoff set for just nine weeks before the hearing begins, Defendants made clear that they intended to rely on new evidence (such as policies created or updated after the close of discovery) at the remedy hearing.[6] Although Plaintiffs disagreed with Defendants' view of the law, they offered to accommodate Defendants' desire for supplementation by proposing a reasonable supplementation schedule that would have enabled Defendants to introduce new changes up through the conclusion of the remedy hearing, while providing Plaintiffs with a minimally sufficient opportunity to examine and respond to those newly asserted changes through limited supplemental depositions and expert reports.[7] Even though Defendants flatly stated they were "not interested" in Plaintiffs' proposal,[8] Plaintiffs renewed their request to negotiate a supplementation protocol[9] after the Court encouraged the parties to seek compromise in its Order denying Defendants' motion for a protective order.[10]

Defendants counter-offered their own proposal, which provided Plaintiffs with no opportunity to probe newly asserted changes and gave Defendants carte blanche to withhold new, post-discovery evidence until 48 hours before ambushing Plaintiffs at the hearing.[11] Plaintiffs

---

[4] Ex. A, Jan. 18, 2022 Stipulation.
[5] Rec. Doc. 652.
[6] *See, e.g.*, Ex. B (Feb. 9, 2022 Email from Jeffrey Cody).
[7] Ex. C at 2 (Feb. 11, 2022 Email from Jeffrey Dubner).
[8] Ex. C at 1 (Feb. 11, 2022 Email from Randy Robert).
[9] *Id.* at 1 (Feb. 18, 2022 Email from Jeffrey Dubner).
[10] Rec. Doc. 645 at 14.
[11] Ex. D at 2 (Mar. 8, 2022 Email from Randy Robert).

proposed yet another compromise,[12] and Defendants expressed an unwillingness to negotiate further.[13] During a meet-and-confer on May 11, 2022, Defendants similarly rejected Plaintiffs' proposal to simply agree to proffer post-discovery evidence at the conclusion of the remedy hearing, as the Parties agreed to at the liability trial.

At the April 11, 2022 status conference, the Court made clear that the existing discovery deadlines set the relevant boundaries for evidence to be presented at the remedial hearing.[14] Defendants did not request reconsideration or any other relief.

Throughout this time, Plaintiffs and their experts relied on the Court-ordered deadlines and Defendants' discovery responses regarding the Relevant Period to write their expert reports, conduct depositions, craft their arguments, draft prehearing briefing, and prepare for the remedy hearing.

## ARGUMENT

### I. Evidence from the Agreed-Upon Relevant Period for Discovery Is Sufficient Evidence of Current Conditions

Plaintiffs do not dispute that the Court should consider evidence of current conditions to determine what remedy is "narrowly drawn" and "the least intrusive means necessary" to correct the harm done by Defendants' violation of Class members' rights.[15] By stipulating to the Relevant Period, Defendants explicitly conceded that evidence dating back to January 1, 2019 was "relevant and appropriate" for the Court to assess whether the violations it found "have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[16] Conversely, by agreeing to the schedule laid out by the Court, they tacitly agreed that trial management and litigation fairness required a cut-off date that allowed the Court and Plaintiffs to test a defined factual record.

---

[12] *Id.* at 1-2 (Mar. 8, 2022 Email from Jeffrey Dubner).
[13] *Id.* at 1 (Mar. 9, 2022 Email from Randy Robert).
[14] *See also* Rec. Doc. 693-1 at 6 ("As the Court noted at the April 11, 2022 status conference, neither party suggested that deadlines for fact discovery were inappropriate or that they would need to rely on evidence postdating that period.").
[15] 18 U.S.C. § 3626(b)(3).
[16] Ex. A, Jan. 18, 2022 Stipulation.

In other words, pursuant to the parameters of the Parties' stipulation and the discovery deadlines set in the Court's exercise of discretion,[17] the Court will have over three years of relevant evidence of current conditions to consider in deciding what prospective relief is necessary to correct the violations of federal law. Yet Defendants contend that an assessment of current conditions at LSP would be constitutionally impermissible without evidence disclosed after discovery ended, after expert reports were exchanged, and in the weeks and days leading up to and even during the hearing.

The Supreme Court has squarely rejected this argument, affirming a court's discretion to set reasonable discovery deadlines in prison conditions cases. In *Brown v. Plata*, the district court established a cutoff date for discovery a few months before trial and excluded evidence of changes in the prisons that post-dated that cutoff.[18] The Supreme Court rejected defendants' argument that the district court erred by ruling "that evidence of 'changed prison conditions' after that date would not be admitted," deeming the decision to be "within the sound discretion" of the court.[19] As the Court explained, "[o]rderly trial management may require discovery deadlines."[20] This principle is reaffirmed by Defendants' own cases. As the Supreme Court said in *Farmer v. Brennan* and the Fifth Circuit reiterated in *Dockery v. Cain*, it is "in the district court's discretion" whether the parties can rely on "developments that postdate the pleadings and pretrial motions."[21]

Defendants have been fighting this settled law for years.[22] At the class certification hearing in November of 2017, Defendants attempted to offer evidence regarding alleged improvements in the delivery of medical care that had allegedly occurred since the September 16, 2016 close of discovery.[23]

---

[17] *See* Rec. Doc. 693-1 at 5-6 (explaining that the Court has discretion to limit evidence to the discovery period to ensure fairness, prevent surprise, and provide for an orderly disposition).
[18] 563 U.S. 493, 523 (2011).
[19] *Id.*
[20] *Id.*
[21] *Farmer v. Brennan*, 511 U.S. 825, 846 (1994); *accord Dockery v. Cain*, 7 F.4th 375, 379 (5th Cir. 2021).
[22] Not just in this case; in a prior case, the DOC was sanctioned for attempting to change the facts on the ground in the days before Court-ordered data collection was set to begin at LSP. *See Ball v. LeBlanc*, 300 F.R.D. 270 (M.D. La. 2013).
[23] Rec. Doc. 418.

The Court denied Defendants' request, reasoning that "[e]fficient time management and fundamental fairness require that both Parties' evidence be limited to a 'snapshot in time.'"[24]

Defendants next made this issue the sole basis of their motion for reconsideration of this Court's March 31, 2021 ruling, arguing that the Court improperly based its Eighth Amendment findings on outdated evidence.[25] The Court denied the motion for reconsideration and declined to certify its ruling for interlocutory appeal, explaining that the discovery period was a "reasonable response to the problems and needs confronting the court's fair administration of justice."[26] Defendants then sought mandamus in the Fifth Circuit based on the same argument.[27] The Fifth Circuit issued a *per curium* order denying Defendants' petition in a single sentence.[28]

Defendants' position has been consistently rejected because this Court has appropriately exercised its discretion to impose reasonable deadlines for the purposes of trial management. Every time it encountered Defendants' "current conditions" argument, this Court clarified that "evidence of subsequent conditions may be relevant at the remedy stage."[29] It will have three years of evidence that Defendants stipulated was relevant, ending just nine weeks before the remedial hearing.[30] If the court in *Plata* acted "within [its] sound discretion" to "establish[] a cutoff date for discovery a few months before trial" and exclude "evidence of 'changed prison conditions' after that date,"[31] there can be no serious argument that this Court cannot establish a cutoff date for discovery less than two months before the hearing.

---

[24] Rec. Doc. 419 at 2.

[25] Rec. Doc. 603-1.

[26] Rec. Doc. 623 at 5 (internal quotation omitted).

[27] *See* Petition for Writ of Mandamus, *In re Vannoy*, No. 21-30671 (5th Cir. Oct. 28, 2021). As in the instant motion, Defendants' argument in the Fifth Circuit relied heavily on *Valentine* and *Dockery*.

[28] Rec. Doc. 624.

[29] Rec. Doc. 419 at 3; *see also* Rec. Doc. 623 at 5 ("[T]his Court . . . has consistently stated that it would consider the current state of circumstances at LSP in crafting satisfactory injunctive relief."). Defendants have also made the same "current conditions" argument in other contexts, including in a recent unsuccessful attempt to challenge Plaintiffs' discovery request for patient medical records. *See, e.g.*, Rec. Doc. 645 at 8-12.

[30] The Court may also consider conducting another site visit after the completion of the remedial hearing, which will provide yet another opportunity to observe current conditions at LSP.

[31] 563 U.S. at 523.

## II. *Dockery* and *Valentine* Do Not Deprive Courts of Their Discretion to Set Reasonable Discovery Cutoffs

Contrary to Defendants' assertions, *Dockery*[32] and *Valentine*[33] do not "definitively establish"[34] that this Court must accommodate Defendants' efforts to change the terrain in the last steps before the finish line, much less contradict the clear Supreme Court precedent discussed above.[35] Defendants' misguided interpretation of these cases would undermine the viability of discovery deadlines, render orderly trial management impossible, prejudice plaintiffs, and empower defendants to sabotage the "just, speedy, and inexpensive determination"[36] of all cases about conditions of confinement.

### a. *Dockery* Reaffirms District Courts' Discretion to Determine When and Whether to Allow Supplementing the Evidentiary Record

*Dockery* does not mandate continuous supplementation of an up-to-date evidentiary record. In *Dockery*, after five years of pretrial motions and discovery, the district court conducted a five-week bench trial delayed by several continuances.[37] At that point, the record was years old; Plaintiffs experts had not visited the prison since nearly two years before trial and submitted their expert reports nearly 15 months before trial.[38] In response to Plaintiffs' motion in limine to exclude evidence of changes that postdated the discovery cut-off, defendants acknowledged that "orderly trial requirements dictate that some evidentiary cut-off date must be imposed"[39] and asked the court to "exercise its discretion select a more appropriate evidentiary cut-off."[40] Following trial, the district court stayed the case to

---

[32] 7 F.4th 375 (5th Cir. 2021).
[33] 993 F.3d 270 (5th Cir. 2021).
[34] Rec. Doc. 694-1 at 4.
[35] *See supra* Part I.
[36] Fed. R. Civ. P. 1.
[37] *Dockery v. Hall*, 443 F. Supp. 3d 726, 736 (S.D. Miss. 2019).
[38] Ex. 1 to Pls.' Am. Post-Trial Mem. Br., *Dockery*, No. 13-cv-326, Rec. Doc. 843-1 at 2, 6 (S.D. Miss. May 2, 2019).
[39] MDOC's Resp. in Opp. to Pls.' Mot. in Lim. Regarding Post-Discovery Changes, *Dockery*, No. 13-cv-326, Rec. Doc. 599 at 1 (S.D. Miss. Feb. 8, 2018).
[40] *Id.* at 3.

allow the parties to conduct additional post-trial discovery.[41] The court declined to issue injunctive relief.[42]

The Fifth Circuit affirmed, citing *Farmer* for the proposition explained above: that it is "in the district court's discretion" to determine whether the parties "may rely . . . on developments that postdate the pleadings and pretrial motions."[43] It explicitly declined to reach the question of whether the PLRA "positively forbids injunctive relief absent a 'current and ongoing' violation at the time of judgment."[44] *Dockery* thus reaffirms, rather than eliminates, the Court's discretion.

Moreover, this case differs from *Dockery* in two critical ways. First, *Dockery* is procedurally distinguishable because *Dockery* was not bifurcated into separate liability and remedial phases. This Court's decision to allow post-liability-trial discovery is more analogous to the *Dockery* district court's post-trial discovery than the endless post-remedial (or post-post-trial) discovery Defendants seek here.

Second, unlike in this case, the district court in *Dockery* was working with an outdated record when it decided to allow post-discovery evidence. Unlike the two-year-old expert record in *Dockery*, Plaintiffs' experts visited LSP less than two months ago. Their recent observations, along with photographs of the prison as it exists today and their review of up-to-date patient records, are reflected in their April 18, 2022 reports.

> **b.** *Valentine* **Involved Condensed Litigation About a Rapidly Evolving Crisis that Had Just Begun, not a Bifurcated Seven-Year Litigation Addressing Years of Systemic and Ongoing Violations**

As this Court has previously recognized, *Valentine* is not "particularly applicable to the facts of this case" because "it was entirely within the context of [a] prison's response to ever-changing health guidelines, CDC regulations, and recommendations in response to the novel COVID-19

---

[41] *Dockery*, 443 F. Supp. 3d at 736.
[42] *Id.* at 753.
[43] *Dockery*, 7 F.4th at 379 (quoting *Farmer*, 511 U.S. at 846).
[44] *Id.* at 380 n.4. As noted in Plaintiffs' motion in limine related to burden of proof, Rec. Doc. 692-1 at 7, district courts have concluded that the Fifth Circuit is likely to follow the majority rule, which is that plaintiffs need not prove a "current and ongoing" violation. *See Amos v. Cain*, No. 20-cv-7, 2021 WL 1080518, at *6 (N.D. Miss. Mar. 19, 2021).

pandemic sweeping through the country" and "prison officials were trying to respond to the rapid changes in general and prison health guidelines for addressing the pandemic."[45]

Specifically, *Valentine* addressed a permanent injunction issued after an 18-day bench trial in response to Texas Department of Criminal Justice ("TDCJ") officials' handling of the COVID-19 pandemic in a geriatric Texas prison.[46] The Fifth Circuit found that, because the TDCJ officials presented evidence at trial indicating that they had taken measures during the pendency of the litigation that demonstrated good-faith efforts to respond to the rapidly evolving threat of COVID-19, they were not deliberately indifferent and there was therefore no basis for a permanent injunction.[47]

Unlike this case, which involves more than a decade of entrenched and persisting constitutional and statutory violations at LSP, *Valentine* involved an acute crisis requiring fast and ever-changing action from the TDCJ. Scientific understanding of COVID-19 and corresponding government guidance were evolving rapidly over the compressed lifetime of that litigation. While the *Valentine* defendants were arguably learning in real time throughout the 18-day trial how best to mitigate the harm of an unprecedented, novel disease, Defendants in this case have spent years failing to provide basic care, meet well-established medical standards, and comply with longstanding federal law.

In addition to these critical factual distinctions, this case is procedurally distinguishable from *Valentine*. In *Valentine*, the district court did not bifurcate the trial into separate liability and remedial phases.[48] As explained in Plaintiffs' motion to confirm that Plaintiffs need not re-prove Defendants' deliberate indifference, under the PLRA, Plaintiffs need not re-prove deliberate indifference at the remedial stage of bifurcated litigation.[49] And even if that were not the case, the Court has discretion

---

[45] Rec. Doc. 623 at 4.
[46] *Valentine*, 993 F.3d at 277-79.
[47] *Id.* at 278 ("[T]he evidence at trial showed that TDCJ did respond to the pandemic in a number of ways both before and after suit was filed and during the pendency of the litigation . . . .").
[48] *Id.* at 277.
[49] See Rec. Doc. 692-1 at 4-8.

to determine what constitutes sufficient evidence of current conditions, as the Fifth Circuit and the Supreme Court have confirmed.[50] Accordingly, while evidence of "current conditions" may be appropriate to determine the necessity and scope of remedial measures, it is well within the Court's discretion to preclude Defendants from introducing evidence of conditions, policies, or practices that post-date discovery.

### c. Defendants' Interpretation of *Dockery* and *Valentine* Would Severely Hamper Courts' Ability to Manage Correctional Litigation

Courts must be able to manage the litigation over which they preside. This is particularly so in complex cases involving extensive discovery, such as this one. To this end, "the discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial. Properly used, they prevent prejudicial surprises and conserve precious judicial energies."[51]

If the facts elucidated in discovery can be rendered irrelevant at any time up to and through the hearing, then this crystallization of factual issues is impossible, as is a "just, speedy, and inexpensive determination" of correctional litigation.[52] Courts depend on the parties to present issues to them in a timely fashion, but endless post-discovery supplementation makes this impossible. This case is a perfect example: Defendants propose to rely on documents that they will first produce to Plaintiffs *after* the deadlines for motions in limine that the Court established six months ago. If the Court were required to allow those documents into evidence, it would have three unpalatable options: deny Plaintiffs their right to file a motion in limine regarding any evidentiary issues specific to those documents; hold another, accelerated round of motions in limine just as the Court's and parties' hearing preparations are at fever pitch; or reschedule the two-week evidentiary hearing.

---

[50] *See Brown*, 563 U.S. at 523-24; *Farmer*, 511 U.S. at 846; *Dockery*, 7 F.4th at 379.
[51] *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300, 304 (5th Cir. 1973).
[52] Fed. R. Civ. P. 1.

Similarly, consider the effect on expert testimony. Ordinarily, courts can expect experts to limit themselves to the "four corners" of their written reports,[53] a rule designed to ensure not only fairness to the parties but an adequate opportunity for judicial officers to familiarize themselves with the technical issues involved in experts' opinions. If defendants had carte blanche to rely on post-discovery facts, courts would have to choose between allowing experts to opine on matters not in their reports, eliminating the benefits of the "four corners" rule; denying parties a fair ability to present expert testimony on the facts before the court; or endlessly continuing trial to allow one party to supplement its expert reports in response to their opponents' post-discovery claims—at which point the supplementation process might begin all over again. And all this is to say nothing of the impact on the ordinary discovery tools of depositions, interrogatories, and the like.

The Supreme Court observed that "[o]rderly trial management may require discovery deadlines"[54] for a reason: Defendants' approach is as unworkable as it is unrequired. Accordingly, there is no reason to interpret *Valentine* and *Dockery* to curtail trial courts' well-established discretion.

### III.     Plaintiffs Will Be Highly Prejudiced by the Admission of New Evidence

While the evidence Defendants seek to introduce would not defeat Plaintiffs' entitlement to injunctive relief, its admission would nonetheless expose Plaintiffs to severe prejudice, justifying its exclusion under Federal Rule of Evidence 403.[55]

Defendants seek to introduce a multitude of supposed post-discovery changes to policy and documentation that Plaintiffs' experts were entirely unable to review when preparing their reports. Many of these changes contradict sworn interrogatory responses and binding Rule 30(b)(6) deposition

---

[53] *See, e.g.*, *PCL Civil Constructors, Inc. v. F.J. Burnell, Inc.*, No. 19-cv-195, 2020 WL 6304169, at *2 (W.D. La. June 11, 2020) (noting that "all experts [are] limited to the four-corners of [their] expert report when testifying at trial"); *see generally* Rec. Doc. 693-1 at 16-17 (Pls.' Mot. in the Alternative to Allow Expert Rebuttal Test. on Any Evid. Postdating Fact Disc.).

[54] *Brown*, 563 U.S. at 523.

[55] Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

testimony, which Plaintiffs and their experts necessarily relied on. Many of them exploit gaps in Defendants' production, allowing Defendants to supplement only the documents they choose while withholding other post-discovery documents and documents from the discovery period. Moreover, Plaintiffs learned of many of these new changes and documents well after the end of fact discovery, rendering it impossible for Plaintiffs to probe these documents through depositions of LSP's employees or expert analysis. Accordingly, Plaintiffs have not had—and will not have—a full and fair opportunity to interrogate Defendants' new evidence and evaluate its impact on patient care at LSP.[56] And while Plaintiffs will inevitably be forced to scramble to assess and respond to Defendants' purported changes, Defendants will be rewarded for approaching discovery in a manner that rewards selective production and incentivizes delays.

### a. Defendants' Voluminous Newly Asserted Evidence Conflicts with or Was Responsive to (But Not Produced in Response to) Plaintiffs' Discovery Requests

Defendants' supposedly "most relevant and significant changes" present four broad categories of documents and testimony cherry-picked by Defendants and either untimely produced or not at all produced to Plaintiffs.[57] Most of these contradict discovery responses on which Plaintiffs and their experts relied. As explained in Plaintiffs' motion in limine to exclude documents not produced to Plaintiffs during discovery, Federal Rule of Civil Procedure 37(c) prohibits Defendants from introducing any of these untimely produced documents at the hearing.[58]

---

[56] Of course, trial testimony—especially on rebuttal—is no substitute for the thorough inquiries conducted through discovery requests and depositions. Moreover, forcing Plaintiffs to digest and assess Defendants' newly asserted changes during Defendants' case-in-chief would bog down the remedial proceedings and necessitate an even more robust and lengthy rebuttal. *See* Rec. Doc. 693-1 at 16-17 (Pls.' Mot. in the Alternative to Allow Expert Rebuttal Test. on Any Evid. Postdating Fact Disc.).

[57] Rec. Doc. 694-1 at 5-8.

[58] *See* Rec. Doc. 693-1 at 14-16; *see also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

### i. Self-Declared Emergencies

Plaintiffs' and Defendants' experts agree that EMTs practice beyond their scope when responding to self-declared emergencies, which places patients at risk of red-flag symptoms being missed.[59] In discovery, Defendants repeatedly testified that they had no plans to change this process. On March 7, 2022, LSP's director of nursing testified that he was unaware of any planned changes to LSP's policies or practices related to sick call, including LSP's policy for how EMTs respond to self-declared emergencies ("SDEs").[60] On March 24, 2022, LSP's 30(b)(6) designee testified he was unaware of any planned changes to LSP's SDE policy.[61] Furthermore, Defendants did not mention the SDE policy in their response to Plaintiffs' interrogatory about any planned changes to medical care at LSP.[62]

Instead, over a month after the close of fact discovery, Defendants sent Plaintiffs a one-page "memorandum" outlining a purportedly forthcoming new policy.[63] Plaintiffs have had no opportunity to depose LSP's medical director or EMTs on the new policy, and Defendants have not offered to allow Plaintiffs to sample medical records of patients treated after the issuance of the memorandum. Neither Plaintiffs nor the Court will have any ability to evaluate how this new policy (whenever it is formally issued) is implemented and what effect it has on the adequacy of medical care, eliminating any probative value the memorandum may have for the issues before the Court.

---

[59] *See* Ex. E, Pls.' Medical Expert Report at 111-12; Ex. F, Mathis Dep. at 75:9-13 ("I don't think an EMT should be making a determination about whether something is really an emergency. That takes an RN who can do assessments, or it takes a nurse practitioner or physician.")

[60] Ex. G, Hawkins Dep. at 123:15-18 ("Q: Are any further changes to the sick call process planned that haven't been implemented? A: Not to my knowledge.").

[61] Ex. H, Lavespere 30(b)(6) Dep. at 36:1-22; 134:24-135:3. *See also* Ex. I, Lavespere Indiv. Dep. at 135:2-6 ("Q: Then on that self-declared emergencies, has the process for that changed at all? A: I don't think the process for that has changed at all. There is generally need for an EMS to go out and look at self-declared emergencies."). Dr. Lavespere adopted his individual testimony on sick call as his 30(b)(6) testimony. Ex. H, Lavespere 30(b)(6) Dep. at 135:4-10 .

[62] Ex. J, Defs.' Response to Pls.' Interrog. No. 3 ("Defendants note that there is no current plan for changing any practices, procedures, or policies for medical care.").

[63] Rec. Doc. 694-6 (May 12, 2022, Email from John Conine).

## ii. Staffing Changes

There is no dispute that Ms. Spears and Ms. Oliveaux will be able to testify at the hearing. Even though Defendants failed to disclose Ms. Spears and Ms. Oliveaux until weeks after the February 18, 2022 deadline for exchanging witness lists,[64] Plaintiffs agreed not to contest their untimely addition.[65] The dispute here is whether they will be able to testify to changes that Defendants made after discovery or hope to make sometime in the future, contrary to Defendants' 30(b)(6) testimony.

On March 24, Plaintiffs repeatedly asked Defendants' 30(b)(6) designee whether any changes were planned to various LSP policies related to the ADA. Defendants' 30(b)(6) designee, Deputy Warden Tracy Falgout (who had been LSP's ADA Coordinator until three days earlier) identified none.[66] The deposition continued on April 1, the last day of discovery, and Warden Falgout did not amend this testimony. Similarly, Defendants' interrogatory responses repeatedly stated that no changes had been made to virtually any aspect of their ADA practices.[67]

Despite Defendants' sworn 30(b)(6) testimony and interrogatory responses, Ms. Spears described several changes that were purportedly in the works for ADA administration and training for DOC facilities.[68] For example, she predicted that ADA training would be modified sometime *after* the close of discovery,[69] though she was unable to provide any timeline for when DOC staff would receive

---

[64] And over a month after Ms. Spears assumed the role of ADA Director at DOC headquarters. Rec. Doc. 694-1 at 6.

[65] Ex. K (Mar. 28, 2022, Email from Rebecca Ramaswamy).

[66] *See, e.g.*, Ex. L, Falgout 30(b)(6) Dep. at 54:4-8 ("Q Are there any current plans to make any changes to LSP's practices, policies or procedures related to access to programs and services? A Not that I'm aware of at this time."); *see also id.* at 44:1-20; 58:16-7.

[67] *See* Rec. Doc. 693-1 at 13 (quoting interrogatory responses acknowledging that Defendants had not changed their "practices, procedures, or policies related to ADA accommodations"; their "training materials and practices related to ADA accommodations"; their "training policies, procedures, practices, and materials for health care orderlies"; the "ADA Tracking Database"; or any "documents provided to Class members to advise them of their rights under the ADA and the procedures for requesting accommodations and/or filing disability-related grievances.").

[68] *See, e.g.*, Ex. M, Spears Dep. at 27:18-33:21.

[69] *Id.* at 28:4-9 ("Q: What's the timeline on the modification and updating of ADA trainings? A: I guess the Director -- I don't know what her title is -- over the Training Department contacted me earlier this week, and we have a meeting on April 12th.").

the modified ADA training.[70] Plaintiffs promptly followed up with Defendants requesting any documents related to these changes.[71] Defendants did not respond and never provided any such documents. Six days later, after the April 11, 2022 status conference, Plaintiffs made clear that they would object to any testimony offered by Ms. Spears or Ms. Oliveaux about the post-discovery period.[72] Defendants still never produced any supplemental information, nor even amended their interrogatory responses.

Defendants' Findings of Fact and Conclusions of Law indicates that Defendants intend to introduce post-discovery evidence of changes to ADA policies and practices through Ms. Spears and Ms. Oliveaux, Mr. Falgout's successor, over Plaintiffs' objection.[73] Because Plaintiffs were not timely notified of these planned changes and Plaintiffs' experts were unable to evaluate them when forming their opinions, Plaintiffs maintain their objection to testimony from Ms. Spears and Ms. Oliveaux regarding post-discovery changes and changes that are in the works.

### iii. Orderly Training

In the very last week of the discovery period, Defendants conducted training for healthcare orderlies. Defendants did not produce any documents related to this training; Plaintiffs only learned about them when Defendants deposed orderlies Bruce Hines and Donald Murray, and only received the training records after sending multiple emails requesting the exhibits.[74] Mr. Hines, a defense witness, is one of the subjects of Plaintiffs' motion to designate deposition transcripts, and his training records will be part of the record if his deposition transcript is admitted into evidence.[75]

---

[70] *Id.* at 30:5-16 ("Q: What about the training for the rest of the DOC staff, what's the timeline on that? A: So they have in-service training yearly, and the facilities do that in accordance with their training schedule, and I don't know that. They already currently have a ADA training that they're using for them. However, Ms. McCool did state that it would be updated, as well. Q: When is it supposed to be updated? A: That's something that I can't speak to, because I don't know.").

[71] Ex. N at 1-2 (April 5, 2022 Email from Rebecca Ramaswamy).

[72] *Id.* at 1 (April 11, 2022 Email from Rebecca Ramaswamy).

[73] *See* Rec. Doc. 690 at 9.

[74] Ex. O (Apr. 5, 2022 Emails from Nishi Kumar).

[75] Rec. Doc. 694-7; *see also* Rec. Doc. 693-1 at 18 (Pls. Mot. to Designate Dep. Test.).

However, to the extent Defendants seek to admit other "[d]ocuments and testimony regarding recent and continuing training of inmate orderlies,"[76] Plaintiffs object on the basis that they have never received any such documentation and are unable to test the facts therein. Defendants' interrogatory responses stated that orderly training had not changed since 2016,[77] which LSP's 30(b)(6) designee confirmed on March 24, 2022[78]—just days before LSP purportedly conducted "updated comprehensive trainings for all inmate orderlies."[79] If the materials have changed, Defendants were obligated to supplement their discovery responses and never did.

### iv. Additional Documents[80]

Defendants also request the right to supplement a variety of "continuously updated" healthcare tracking and status log documents that they claim "reflect the current state of healthcare services at LSP," as well as recent meeting minutes.[81] They fail to articulate why they have not previously supplemented these documents. Defendants produced older versions of these documents in response to Plaintiffs' requests for production, but they failed to supplement their discovery responses as required by Federal Rule of Civil Procedure 23(e).[82] These tracking and status log documents cut across several of the factual issues in this case (specialty care, referrals, backlogs, etc.) and Defendants admit that Plaintiffs' experts "reviewed some version of these documents in preparing their reports."[83] But Plaintiffs experts have not reviewed, and cannot review, the versions of these

---

[76] Rec. Doc. 694-1 at 7.

[77] Ex. P, Defs.' Response to Pls.' Interrog. No. 15.

[78] Ex. L, Falgout 30(b)(6) Dep. at 24:9-12 ("Q: Has the training provided to health care orderlies changed at all since the trial in this case in 2018? A: To the best of my knowledge, no."); *see also* Ex. Q, Stickells Dep. at 115:4-9 ("Q: . . . Has that training program changed at all since you've been at Angola? A: The material has not, no. The way -- no.").

[79] Rec. Doc. 694-1 at 6.

[80] Although Defendants' motion focuses on specific categories of evidence, they also state that "to the extent that fairness and justice so require, Defendants submit that *any evidence* of current conditions should be admitted and considered by the Court in determining what, if any, injunctive remedy is required in this case." Rec. Doc. 694-1 at 5 (emphasis added). Accordingly, the scope of Defendants' request is unclear. The arguments against admitting evidence that they have not even vaguely identified are even stronger than those against the categories described in their motion.

[81] Rec. Doc. 694-1 at 7.

[82] Fed. R. Civ. P. 23(e); *see also Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994) ("basic purpose" of Rule 23(e) supplementation requirement is "preventing prejudice and surprise")..

[83] Rec. Doc. 694-1 at 7.

documents on which Defendants seek to rely because *they have not been produced*. Defendants do not even say whether or when they plan to produce these documents in advance of the hearing.

In a similar vein, "more recent"[84] mortality review documents and meeting minutes, and quality assurance and quality improvement ("QA/QI") documents "generated in the first quarter of 2022"[85] were plainly responsive to Plaintiffs' requests for production, and they should have been produced in a timely fashion pursuant to federal discovery obligations.[86]

Not only are Defendants seeking to submit documents that they failed to produce during discovery, they are doing so selectively. For example, while Defendants apparently believe that QA/QI and mortality review minutes created in anticipation of the upcoming hearing would help them, they do not propose to supplement the Monthly Management Reports that each department head submits to the Long Term Care Health Administrator—which Plaintiffs specifically asked Defendants to supplement during fact discovery, since Defendants produced them only through December 2021.[87] Defendants never did so. Presumably this is because Defendants do not find them helpful, likely because they show the same deficiencies as the 2020-2021 Monthly Management Reports.[88] This shows the unfairness of Defendants' approach to post-discovery supplementation: Defendants can produce whatever they find helpful and withhold whatever they find unhelpful.

Defendants' last-ditch efforts to bypass the rules of discovery, even if ostensibly limited to the four categories selected by Defendants, subject Plaintiffs and the Court to precisely the prejudicial surprises and unnecessary expenditures that the rules exist to discourage.

---

[84] *Id.* at 8.
[85] *Id.*
[86] *See* Fed. R. Civ. P. 37(c)(1).
[87] *See* Ex. R, Johnson Dep. at 145:3-148:23.
[88] *See* Ex. E, Pls.' Medical Expert Report at 14-15.

### b. Defendants Will Not Be Prejudiced by Excluding Their Last-Minute Evidence

Defendants' contention that their "most relevant and significant" evidence arose during the weeks leading up to the hearing is misplaced. Federal Rule of Evidence 403 allows a court to exclude evidence where its probative value is substantially outweighed by a danger of "confusing the issues," "undue delay," and "wasting time."[89]

Here, the touchstone of the Eighth Amendment inquiry is what remedy is necessary to eliminate the substantial risk of serious harm currently faced by class members from deficiencies in patient care.[90] Similarly, the touchstone of the ADA inquiry is what changes must be made to improve accommodations and accessibility for individuals with disabilities at LSP. Both of these inquiries focus on the current and foreseeable risks to Class members.[91]

But Defendants seek to introduce new evidence that cannot be reliably evaluated for its potential impact on current conditions and patient care at LSP. For example, Defendants seek to introduce a *memorandum* about a potential new policy for self-declared emergencies without offering any indication of when, if ever, the new policy will be finalized and implemented.[92] Defendants do not articulate how the new SDE policy will, if at all, affect patient care at LSP or how, if at all, LSP will ensure consistent compliance with the new policy. Tellingly, this Court has found numerous instances of actual practices at LSP diverging from LSP's written policies,[93] and Plaintiffs will show that this trend continues. Given the realities of LSP's conduct, simply changing the words of a policy—let

---

[89] Fed. R. Evid. 403.

[90] *See* Rec. Doc. 692-1 at 4-8 (motion to confirm that Plaintiffs need not re-prove Defendants' deliberate indifference).

[91] *See also Los Angeles v. Lyons*, 461 U.S. 95, 102 ("Past wrongs [are] evidence bearing on 'whether there is a real and immediate threat of repeated injury.'").

[92] Rec. Doc. 694-1 at 5. Recall, for example, that Defendants claimed at trial that they were on the verge of implementing electronic medical records in 2018, but they have yet to do so. *See* Ex. S, Stacye Rodriguez Falgout Trial Test. at 188:24-189:13 (Oct. 17, 2018); *see also* Ex. T, Rodriguez Dep. at 132:8-22.

[93] *See, e.g.*, Rec. Doc. 594 at 9 ("Pursuant to both LSP Policy and applicable Standards of Care, physicians are required to clinically supervise EMTs; yet, this does not meaningfully or consistently occur at LSP."); *id.* at 23 ("'Further, even if the use of inmate orderlies to assist with activities of daily living conforms to the minimum standards of the Eighth Amendment, the trial evidence showed that LSP failed to follow its own training policies with respect to inmate orderlies.'").

alone drafting a barebones memorandum about a policy—cannot be reliable evidence that Defendants are poised to eliminate the substantial risk of serious harm from the long-standing constitutional deficiencies. And without a review of medical records—which Defendants tellingly have not offered to supplement—neither Plaintiffs nor the Court can have any confidence that this memorandum or any of Defendants' other changes make the risk to Class members today or in the future any different than it was during the agreed upon Relevant Period. Relying on post-discovery evidence of this nature would thus serve mostly to confuse the issues and impose undue burdens on judicial resources.

Defendants' suggestion that conditions this month are substantially different from conditions on April 1 is revealing. Defendants have been on notice about the claims in this litigation since it was filed on May 20, 2015.[94] LSP's current statewide Medical Director, Randy Lavespere, and its ADA Coordinator for nearly the entire Relevant Period, Tracy Falgout, were present throughout trial in October of 2018. And on March 31, 2021, this Court published a 124-page roadmap to the longstanding constitutional and statutory violations at LSP.[95] Yet in the few short weeks leading up to the remedial hearing, Defendants appear to be scrambling to fix a system that is far too broken to be fixed overnight. In seeking to rely on brand new changes conceived and implemented in the few weeks since April 1, 2022 (or merely planned for the future), Defendants reinforce that they have done too little too late to remediate the harm caused by years of inadequacy and inaction.

On the other hand, if Defendants' post-discovery changes do not reflect a last-ditch attempt to cover up for Defendants' lackadaisical approach to improving the conditions at LSP, then Defendants must have known about them before discovery ended just seven weeks ago. And if Defendants knew about these planned changes during the Relevant Period, then their interrogatory responses and 30(b)(6) testimony were incorrect and they were obligated to supplement their discovery

---

[94] Rec. Doc. 1.
[95] Rec. Doc. 594.

responses accordingly. But Defendants did not supplement their responses to Plaintiffs' interrogatories. They did not correct their binding 30(b)(6) testimony. And they did not respond to Plaintiffs' specific requests for supplementation of the same documents that they now seek to introduce.

Regardless of Defendants' motives, their race to the finish line will not result in evidence providing a firm basis for finding that the significant risk of harm and the ADA and RA violations have been remedied.

### c. The Only Way to Avoid Prejudice to Plaintiffs Would Be to Delay The Hearing—Which Would Harm Plaintiffs and Lead to Further Delay

For all the reasons explained above, Defendants' proposed supplementation would be deeply prejudicial to Plaintiffs. Without discovery into the changes or the opportunity for their experts to review and evaluate them, Plaintiffs will be operating at a plain and inequitable disadvantage. The only cure would be to continue the hearing—but this too would harm Plaintiffs, given the urgency of finally remedying the violations they first raised seven years ago.

And even continuance would not end the prejudice. If evidence through the end of the hearing were always admissible, defendants in this and all similar cases would have a strong incentive to delay all trials and remedial hearings as long as possible and then claim that they have new evidence of "certain current conditions which have resulted in substantial changes."[96] And any time that elapsed between the close of a hearing and the issuance of a considered opinion would be an opportunity for yet another argument that the court's findings was based on outdated evidence. To allow this litigation to disintegrate into cyclical evidentiary disputes would undermine the rules of discovery and the nature of equitable relief. Put simply, the buck must stop somewhere.

---

[96] Rec. Doc. 694-1 at 4.

Finally, equity requires consideration of the harmful consequences of allowing this litigation to proceed into perpetuity. During the pendency of this litigation, several Named Plaintiffs and hundreds of Class members have died. The rest remain at significant risk of serious harm as a direct result of the proven unconstitutional and unlawful conditions at LSP. While Defendants attempt to force Plaintiffs to play darts with a moving target, grave and serious harms continue to manifest at LSP. In sum, Defendants' motion serves only to throw a wrench in Plaintiffs' preparation for the hearing, unduly burden this Court's administration, and thwart "one of the most valuable features of equity jurisdiction, to anticipate and prevent a threatened injury. . . ."[97]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion in limine.

Respectfully submitted this 23rd day of May,

/s/ *Mercedes Montagnes*
Mercedes Montagnes, La. Bar No. 33287
Jamila Johnson, La. Bar No. 37953
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, La. Bar No. 39524
Elena Malik, La. Bar No. 39662
Samantha Bosalavage, La. Bar No. 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Jeffrey B. Dubner (*pro hac vice*)
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 656-2722
Email: jeffrey.dubner@gmail.com

Bruce Hamilton, La Bar No. 33170
Emily Lubin, La. Bar No. 38823
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000

---

[97] *Vicksburg Waterworks Co. v. Vicksburg*, 185 U.S. 65, 82 (1902).

New Orleans, Louisiana 70170
Telephone: (504) 352-4398
Facsimile: (504) 486-8947
Email: bruce.hamilton@splcenter.org

Daniel A. Small (*pro hac vice*)
Brendan Schneiderman (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com

Nora Ahmed (*pro hac vice*)
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
Email: nahmed@laaclu.org

Ronald K. Lospennato, La. Bar No. 32191
Disability Rights Louisiana
8325 Oak St.
New Orleans, LA 700118
Telephone: (504) 522-0628
Facsimile: (888) 534-2996
Email: rlospennato@advocacyla.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ *Elena Malik*
Elena Malik, La. Bar No. 39662