# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, *et al.*,<br><br>Defendants. | CIVIL ACTION NO. 3:15-cv-318<br><br>JUDGE SDD<br><br>MAGISTRATE RLB |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO LIMIT SCOPE OF TESTIMONY AND EVIDENCE

Defendants seek to reduce the Court's 124-page liability opinion to several discrete and narrow findings. Although the Court relied on a complex network of facts to reach its conclusion that "LSP lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs," resulting in "constitutionally inadequate" access to clinical care, specialty care, infirmary care, and emergency care,[1] Defendants argue that many of those facts should be off-limits at the upcoming remedial hearing. Under Defendants' reading, none of the practices evaluated in the Liability Opinion are relevant to the remedial hearing unless the Court explicitly held that those practices were independently unconstitutional. Even several practices that the Court specifically said contribute to or illustrate Defendants' constitutionally inadequate system are beyond the scope of the remedial hearing, according to Defendants. This reads the Liability Opinion far too narrowly.

At the remedial hearing, the principal question will be what injunctive relief is narrowly drawn to eliminate the risk of serious harm and ADA violations created by the deficiencies identified by the Court. Defendants will apparently take the position that *no* remedy is needed, and that there is no

---

[1] Rec. Doc. No. 594 (the "Liability Opinion") at 8.

1

longer a significant risk to Class and Subclass members. To determine whether the risk presently exists or is likely to recur, the subsidiary facts that the Court relied upon as illustrations of LSP's broken system or contributors to the risk of harm are well within the proper scope for the remedial hearing. Moreover, to the extent that certain aspects of Defendants' system have gotten *worse* since the liability discovery, that may be relevant to the Court's finding that "LSP lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs"[2] even if the specific shortcomings are not subject to direct remediation in this case. Thus, while there is no dispute that unchanged practices that the Court found were not unconstitutional and did not contribute to the ultimate violation of Class members' rights are beyond the scope of the hearing, Defendants' motion inappropriately constrains Plaintiffs' ability to present evidence and should be denied.

Similarly, Defendants' motion misstates the facts regarding certain findings made by Plaintiffs' architectural expert, Mark Mazz, during his 2016 and 2022 site visits. Of the four sets of findings that Defendants say should be excluded from the remedial trial, one concerns an area newly used for overflow for people with disabilities, substituting for previous accessible housing; one concerns barriers that exist at facilities where Defendants' discovery responses claim they made changes to fix the violations found in 2016; and one concerns an area that Defendants mistakenly believe was absent from Mr. Mazz's 2016 report. Only one of the four sets of findings is actually what Defendants represent it to be (an area that was not evaluated prior to the merits trial and was not substituted by LSP for areas previously evaluated), and Plaintiffs agree not to introduce evidence on that area.

## BACKGROUND

To facilitate negotiation, the parties exchanged expected motion in limine topics on May 10, 2022. Defendants stated that they intended to file a "Motion in Limine to Limit Scope of Plaintiffs'

---

[2] *Id.*

Experts addressing matters not found to be unconstitutional."[3] During a meet and confer the following day, Plaintiffs asked what specific matters Defendants believed were at issue, and Defendants identified co-pays, Do Not Resuscitate orders, chronic care, laboratory services, the restriction of narcotics to infirmary patients, infection control, and medication administration. Plaintiffs agreed not to challenge the restriction of narcotics to infirmary patients, and stated that they would not challenge Defendants' policies or overall practices regarding DNRs, laboratory services, or infection control, but "reserve[d] the right to bring in evidence that touch[es] on these areas as they relate to provision of clinical care, emergency care, infirmary care, or specialty care in specific instances, as they relate to hygiene and sanitation, or as they relate to organizational structure."[4] Plaintiffs disagreed that co-pays and medication administration were beyond the scope of the liability hearing, and said that while chronic care policies were not at issue, chronic conditions are treated in clinical care, specialty care, infirmary care, and emergency care, and would be discussed accordingly.

At no point prior to the filing of the motion in limine did Defendants indicate that they intended to move for relief regarding malingering, staffing levels, medical records administration, or architectural barriers.

## ARGUMENT

### I. Eighth Amendment Claim

Defendants argue that "all evidence and testimony" related to ten aspects of care at LSP should be excluded from the remedial hearing.[5] As discussed above, Plaintiffs have already agreed on one of those nine and agree in part on three others. Beyond those areas of agreement, Defendants' arguments

---

[3] Ex. 1 (May 10, 2022 email from Connell Archey) at 1.
[4] Ex. 2 (May 11, 2022 email from Jeffrey Dubner) at 1-2.
[5] Defs.' Mem. in Supp. of Mot. to Limit Scope of Testimony & Evidence ("Defs.' Mot."), Rec. Doc. 695-1 at 2.

3

misstate the Liability Opinion and would place inappropriate limitations on Plaintiffs' evidence in the remedial order. To address the ten topics in the order Defendants list them:

1. <u>Assessment of co-pays for accessing care</u>: Defendants claim that the Court found the assessment of co-pays "*not* constitutionally deficient."[6] This ignores much of the Court's discussion of co-pays. While the Court found that Defendants' co-pay policies do not "in and of themselves, create an unconstitutional (cruel and unusual) barrier to health care," it explicitly described the co-pay system as "one factor that contributes to a delivery system that is . . . woefully inadequate."[7] Defendants concede that this factor is unchanged from the liability period.[8] Excluding all evidence regarding co-pays would therefore prevent the Court from considering a fact that it has already found contributes to the unconstitutional care provided to Class members and the significant risk of serious harm that they face. Moreover, there is no risk that evidence regarding co-pays (or any of the other topics at issue in Defendants' motion) will unduly lengthen the trial, as the parties have already stipulated that they are unchanged from the liability period.[9]

2. <u>Malingering policy</u>: As with co-pays, Defendants' motion tells only half the story. While the Court found that "the unenforced malingering policy is not unconstitutional," it specifically found it to be "evidence of systemic health care structures that the Court does find results in constitutionally infirm health care discovery. As evidence by the malingering policy, the medical department at LSP is controlled by LSP security rather than medical care providers."[10] As Plaintiffs' experts will testify, the possibility of disciplinary action still looms over Class members; for example, while the experts observed care in the ATU, a Class member told the provider "I don't want to keep coming because

---

[6] *Id.*
[7] Liability Opinion at 29.
[8] *See* Joint Pretrial Order at 5 (Established Fact V.1.e).
[9] *Id.*
[10] Liability Opinion at 30.

4

you're going to say I'm malingering, but I'm not."[11] Plaintiffs are entitled to argue that this, among other facts, indicates that medical care at LSP continues to have a security-focused and even punitive cast, and the Court is entitled to evaluate that claim. Additionally, Defendants did not raise the malingering policy in the parties' meet and confer, and their argument can be rejected on that ground alone.

    3. <u>Use of Do Not Resuscitate ("DNR") orders</u>: Plaintiffs have already agreed not to challenge Defendants' policies or overall practices regarding DNRs. However, some patients' DNRs or similar documents may be relevant to the end-of-life treatment they received. Where that is the case, reference to the existence of the DNR may provide meaningful context for evaluating the medical care. In any event, carving out any mention of the fact of the DNR would be more cumbersome for the Court and the parties than simply allowing testimony about the facts of the patient and cabining it to individual care.

    4. <u>Chronic care</u>: Plaintiffs have already agreed not to challenge Defendants' chronic care policies (e.g., the adequacy of the Chronic Care Manual or Defendants' default protocol for treating patients with hepatitis C). But patients with chronic conditions receive clinical care, specialty care, infirmary care, and emergency care. Even Defendants recognize that these areas are squarely at issue in the remedial hearing.[12] The Court cannot evaluate whether and what remedy is necessary to eliminate the significant risk of serious harm in these areas without evaluating the treatment of Class members with serious medical needs, and those medical needs will sometimes be related to chronic conditions.[13] Accordingly, while Defendants' chronic care policies will not be the subject of Plaintiffs'

---

[11] Pls.' Medical Expert Rep. at 80.
[12] Joint Pretrial Order at 2 (Defendants' Claims).
[13] Indeed, the Court explicitly relied on cases involving chronic care to find LSP's healthcare unconstitutional. *See, e.g.*, Liability Opinion at 36. (noting "the Court's findings with respect to particular patients with chronic conditions").

evidence and are not the subject of their experts' recommendations,[14] discussion of the treatment of individual patients with chronic conditions in clinical care, specialty care, infirmary care, and emergency care is necessary and appropriate.

5. Staffing levels: While the Court found that Plaintiffs failed to carry their burden when arguing that "the per-physician caseload at LSP is excessive,"[15] it explicitly found "that inpatient/infirmary care at LSP is constitutionally deficient because it provides significantly inadequate staffing, which results in the inappropriate use of inmate orderlies."[16] The Court further stated that it "shall order injunctive relief regarding … [f]ailing to provide adequate, qualified staff in infirmary/inpatient care."[17] Defendants are thus plainly incorrect to say that the Court found that staffing levels were "*not* constitutionally deficient."[18] And even beyond the infirmary, staffing may be relevant to the extent that the Court (or a monitor appointed by the Court) concludes that remedial steps related to staffing are part of the least intrusive means necessary to correct the substantive violations that it found.[19] Additionally, Defendants did not raise staffing levels in the parties' meet and confer, and their argument can be rejected on that ground alone.

6. Laboratory services: Plaintiffs have already agreed not to challenge Defendants' policies or overall practices regarding laboratory services, but "reserve[d] the right to bring in evidence that touch[es] on these areas as they relate to provision of clinical care, emergency care, infirmary care, or specialty care in specific instances, . . . or as they relate to organizational structure."[20] Plaintiffs expect to discuss just one fact about laboratory services: that LSP's laboratory was closed for approximately

---

[14] *See* Pls.' Medical Expert Rep. at 126-36.
[15] Liability Opinion at 40.
[16] *Id.* at 90.
[17] *Id.* at 122-23.
[18] Defs.' Mot. at 2-3.
[19] *See* 18 U.S.C. § 3626(a)(1)(A).
[20] Ex. 2.

6

a year, from early 2021 until days before the close of discovery (if not later).[21] This fact may be relevant to the Court's evaluation of whether deficiencies continue to exist in Defendants' medical leadership and organization, and the effect of those deficiencies.

7. Pain medication management: Plaintiffs have already agreed not to challenge Defendants' policy restricting the use of narcotics to patients on the infirmary. While Plaintiffs' medical expert report does contain criticism of this policy, Plaintiffs have already agreed that testimony challenging the policy can be excluded.[22] Of course, to the extent that treatment of an individual patient's pain raises issues other than the policy restricting narcotics to the infirmary (and, in particular, illustrates deficiencies in clinical care, specialty care, infirmary care, or emergency care), there is no basis for excluding such evidence and Defendants have not suggested otherwise.

8. Medication administration: Defendants state that "the Court remained silent or tacitly accepted as adequate" Defendants' medication administration system, including the administration of medication by correctional officers.[23] In actuality, the Court found the fact that "correctional officers supervise the delivery of medications by other correctional officers" was part of an "unconstitutional" "system where health care decisions are largely made by security rather than qualified health care providers."[24] Moreover, this practice directly contributes to the Court's finding that "[p]hysicians routinely fail to . . . monitor and manage medications."[25] As Plaintiffs' experts show, this system of "[m]edication management is completely broken."[26] Correctional officers create medication administration records that are "completely unreliable and unable to be used to assess patient adherence to medications," which leads to providers "not us[ing] them when assessing patients" and

---

[21] *See* Ex. 3 (Mar. 10, 2022 Dep. of Randy Lavespere) at 19:5 – 20:18.
[22] *See supra* p. 3. Plaintiffs reserve the right to challenge the Liability Opinion's holding on the narcotics policy, and any other adverse findings, on appeal.
[23] Defs.' Mot. at 3.
[24] Liability Opinion at 30.
[25] *Id.* at 10.
[26] Pls.' Medical Expert Report at 10; *see generally id.* at 71-79.

7

"not consulting them during patient care."[27] The Court cannot fully evaluate the deficiencies in clinical care, LSP providers' management of specialty care recommendations, and LSP's medical records management, nor can it identify the most narrowly targeted remedies, if Plaintiffs cannot present evidence of the critical role played by the correctional administration of medication and the problems in Defendants' medication administration record-keeping. Moreover, here again, Defendants have conceded that their practices are largely unchanged,[28] so there is little reason to expect discussion of this fact and the appropriate remedy to take an inordinate amount of time at the remedial hearing.

9. Medical record maintenance: With little explanation, Defendants argue that evidence regarding medical record management should be excluded from the remedial hearing.[29] This directly contradicts the Liability Opinion, which specifically stated that "[t]he Court shall order injunctive relief regarding . . . lack of adequate medical records management."[30] Indeed, the Court found that "[t]he record is replete with evidence that Defendants have failed to maintain medical records in a manner that assists in providing constitutionally adequate health care at LSP," and explained that this failing is "identical or similar to matters that have been held to violate the Constitution."[31] Plaintiffs are therefore unclear what possible basis Defendants could have for excluding evidence of Defendants' medical recordkeeping practices—which, Defendants acknowledge, are essentially unchanged from the liability period.[32] Additionally, Defendants did not raise medical record maintenance in the parties' meet and confer, and their argument can be rejected on that ground alone.

10. Infection control policies and procedures: Plaintiffs have already agreed not to challenge Defendants' policies or overall practices regarding infection control, but "reserved the right to bring

---

[27] *Id.* at 11.
[28] Joint Pretrial Order at 5 (Established Fact V.1.d).
[29] Defs.' Mot. at 3-4.
[30] Liability Opinion at 122.
[31] *Id.* at 86 & n.451.
[32] Joint Pretrial Order at 5 (Established Fact V.1.c).

8

in evidence that touch[es] on these areas as they relate to provision of clinical care, emergency care, infirmary care, or specialty care in specific instances, as they relate to hygiene and sanitation, or as they relate to organizational structure."[33] Plaintiffs expect to discuss infection control only insofar as it is illustrates that Defendants' policies on paper do not necessarily reflect their actual practices, and that security personnel do not necessary follow LSP's medical practices. Although LSP policy requires that all personnel wear masks when indoors, few if any security personnel were obeying this policy during the experts' site visit.[34] This illustrates that even where LSP may have an appropriate written policy, it is not necessarily proof that the policy is followed in practice; it is also evidence of the limited control that medical leadership has over security aspects of medical care. Moreover, discussion of specific patients' medical care may reference infection control practices (for example, isolation due to concerns about COVID-19), both providing context for Defendants' actions and making it more cumbersome to try to exclude any mention of infection control than simply allowing the testimony and cabining it to individual care.

\* \* \*

For the reasons explained above, Defendants' motion should be denied. Two additional points bear note. First, "courts must consider conditions together if 'they have a mutually enforcing effect that produces the deprivation of a single identifiable human need'" such as medical care.[35] Neither the Court's findings nor Plaintiffs' evidence can be balkanized in the way Defendants portray them without falling afoul of this requirement.

---

[33] Ex. 2.
[34] *See* Pls.' Medical Expert Rep. at 36.
[35] *Dockery v. Cain*, 7 F.4th 375, 378-79 5th Cir. 2021) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)); *see generally* Liability Opinion at 80-82.

9

Second, as Defendants' other motion in limine[36] (and their anticipated opposition to Plaintiffs' motion in limine regarding deliberate indifference[37]) makes clear, Defendants believe themselves entitled to relitigate everything that the Court found against them. At the same time, they seek to preclude Plaintiffs from even mentioning any topic on which Defendants believe the Court found against Plaintiffs. To Defendants, the first trial was a one-way ratchet: findings adverse to Plaintiffs limit their ability to proffer evidence of changed conditions, but findings adverse to Defendants have no preclusive effect on the upcoming hearing. That cannot be correct. If *improved* conditions are relevant to determining the appropriate remedy, then *deteriorating* conditions are relevant as well. Therefore, while the Court should rightly preclude either party from rearguing the constitutionality of practices that have not changed since the liability period, it should not altogether preclude evidence of facts that have grown worse since the liability period—such as Defendants' increased use of inmates to provide medical care,[38] decreased physician staffing,[39] and inability to consistently maintain a certified laboratory.[40]

## II.  Americans with Disabilities Act and Rehabilitation Act Claims

Defendants' motion in limine regarding aspects of ADA expert Mark Mazz's findings should be largely rejected for similar reasons. At the outset, Defendants did not raise any issues related to the ADA (whether physical barriers or otherwise) in the parties' meet and confer, and their argument can be rejected on that ground alone. As to the specific areas they cite:

---

[36] Defs.' Mot. in Limine to Admit Additional Evidence, Rec. Doc. 694.
[37] Mem. in Supp. of Pls.' Mots. in Limine Related to Burden of Proof, Rec. Doc. 692, at 4-8.
[38] *See* Pls.' Med. Expert Report at 11-12, 102.
[39] *Compare* Joint Pretrial Order at 4 (Established Fact II.5) (stating that LSP now has one physician) *with* First Amended Liability Trial Joint Pretrial Order, Rec. Doc. 242, at 5 (Undisputed Fact 10) (stating that LSP had five physicians in the liability period).
[40] *See supra* pp. 6-7

1. Trustee Camp Visitor Center: On this issue, Defendants' point is well-taken. This area existed in essentially the same form during the liability period, yet Mr. Mazz did not opine on it. Accordingly, Plaintiffs do not intend to seek relief regarding items no. 82-88 in Mr. Mazz's report.[41]

2. Treatment Unit ("TU") Cell Block #28:[42] Defendants implicitly concede that portions of their facilities that were "substituted by LSP for areas previously evaluated"[43] are properly before the Court. TU Cell Block #28 is such an area: during the site visit, former ADA Coordinator Tracy Falgout informed Mr. Mazz that that cell block is now used for overflow when additional accessible cells are needed.[44]

3. Visiting Areas:[45] Defendants assert that the Visiting Areas "were not evaluated prior to the merits trial."[46] This is incorrect; Mr. Mazz's liability report included several pages of findings regarding the Visiting Areas.[47] Accordingly, Defendants offer no basis for precluding his testimony on this issue.

4. "Additional purported barriers":[48] Finally, Defendants assert that "Mazz's report cites additional purported barriers that were present at the time of his 2016 visit but were note cited [sic] in his prior report."[49] They provide no evidence that these barriers were present at the time of his 2016 visit, and given that Defendants claim that they have made changes in each of these areas,[50] there is ample reason to believe that they may have arisen since 2016.

---

[41] Defendants did not attach Mr. Mazz's list of findings to their motion. A copy is attached as Exhibit 4.
[42] Ex. 4 at 9-11 (Findings No. 97-117).
[43] *See* Defs.' Mot. at 4.
[44] Ex. 5 (May 4, 2022 Dep. of Mark J. Mazz) at 13:14-24
[45] Ex. 4 at 15-17 (Findings No. 171-91).
[46] Defs.' Mot. at 4.
[47] Sept. 29, 2016 Expert Rep. of Mark Mazz ("2016 Mazz Rep."), Rec. Doc. 133-3, at Appx. 2, pp. 18-22 (Findings No. 183-229); *see also* Ex. 5 at 62:14 – 63:2 (discussing Mr. Mazz's inspection of the Visiting Areas in 2016 and 2022).
[48] Ex. 4 at 4, 7, 12 (Findings No. 36-41, 43, 78, 79, 135).
[49] Defs.' Mot. at 4.
[50] The violations Defendants cite are in Ash 2 Dormitory; Ash 2 Dormitory Bathroom; Trustee Camp, Camp F; and Nursing Unit 2 Bathroom. *See* Ex. 4 at 4, 7, 12 (Findings No. 36-41, 43 78, 79, 135). In an interrogatory response, Defendants claimed that they had "brought up to compliance" most items

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion in limine.

Respectfully submitted this 23rd day of May,

/s/ *Mercedes Montagnes*
Mercedes Montagnes, La. Bar No. 33287
Jamila Johnson, La. Bar No. 37953
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, La. Bar No. 39524
Elena Malik, La. Bar No. 39662
Samantha Bosalavage, La. Bar No. 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Jeffrey B. Dubner (*pro hac vice*)
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 656-2722
Email: jeffrey.dubner@gmail.com

Bruce Hamilton, La Bar No. 33170
Emily Lubin, La. Bar No. 38823
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Telephone: (504) 352-4398
Facsimile: (504) 486-8947
Email: bruce.hamilton@splcenter.org

Daniel A. Small (*pro hac vice*)
Brendan Schneiderman (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005

---

in Mr. Mazz's liability report, including all violations in the Nursing Unit 2 Bathroom and most in Ash 2 Dormitory and Ash 2 Dormitory Bathroom. *Compare* Ex. 6 (Defs.' Responses to Pls.' Second Set of Remedy Interrogatories), Interrogatory No. 17 *with* 2016 Mazz Rep. at 3-5, 13-14 (Findings No. 28-47, 132-46). Defendants' 30(b)(6) witness testified to changes in the Trustee Camp, which is Building E at Camp F. *See* Ex. 7 (April 1, 2022 30(b)(6) Dep. of Tracy John Falgout) at 20:21 – 33:15.

Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com

Nora Ahmed (*pro hac vice*)
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
Email: nahmed@laaclu.org

Ronald K. Lospennato, La. Bar No. 32191
Disability Rights Louisiana
8325 Oak St.
New Orleans, LA 700118
Telephone: (504) 522-0628
Facsimile: (888) 534-2996
Email: rlospennato@advocacyla.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ *Samantha Bosalavage*
Samantha Bosalavage, La. Bar No. 39808
