Page 3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
CIVIL ACTION NO. 3:15-cv-318

JUDGE SDD        MAGISTRATE RLB

JOSEPH LEWIS, JR., ET AL, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

BURL CAIN, Warden of the Louisiana State
Penitentiary in his official capacity, et al,
Defendants.

Deposition of DR. DAVID MATHIS,
given the above-entitled cause, pursuant to
the following stipulation, before Lori L.
Marino, Certified Shorthand Reporter, in and
for the State of Louisiana, via Zoom
videoconference on Monday, April 25,2022,
commencing at 8:58 a.m.

REPORTED BY:
Lori L. Marino
Certified Court Reporter

1  EXAMINATION   INDEX
2
DR. DAVID MATHIS
3  4107 CASPER WAY
   NAPA, CALIFORNIA  94558
4
5  TITLE                          1
6  APPEARANCES                    2
7  WITNESS INDEX                  3
8  AGREEMENT OF COUNSEL              4
9  EXAMINATION BY MR. DUBNER         5
10 WITNESS'S CERTIFICATE        316
11 REPORTER'S CERTIFICATE       317
12
13
14
15  E X H I B I T      I N D E X
16  EXHIBIT 1              10
17  EXHIBIT 2              20
18  EXHIBIT 3             230
19  EXHIBIT 4             300
20
21
22
23
24
25

Page 2

1  APPEARANCES:
2  (ALL PARTICIPANTS PRESENT VIA ZOOM
   VIDEOCONFERENCE:)
3
4  JEFFREY B. DUBNER
   P.O. BOX 34553
5  WASHINGTON, DC  20043
   TELEPHONE: (202) 656-2722
6
   BY: JEFFREY B. DUBNER, ESQ.
7  jeffrey.dubner@gmail.com
   REPRESENTING THE PLAINTIFFS
8
9  PROMISE OF JUSTICE
   1024 ELYSIAN FIELDS AVENUE
10 NEW ORLEANS, LOUISIANA  70117
   TELEPHONE: (504) 529-5955
11
   BY: ELENA MALIK, ESQ.
12 elena.malik14@gmail.com
   REPRESENTING THE PLAINTIFFS
13
14 BUTLER SNOW LLP
   445 NORTH BOULEVARD, SUITE 300
15 BATON ROUGE, LOUISIANA  70802-5747
   TELEPHONE: (225) 325-8700
16
   BY: CONNELL L. ARCHEY, ESQ.
17 connell.archey@butlersnow.com
   REPRESENTING THE DEFENDANT
18
19
20
21
22
23
24
25

Page 4

1     S T I P U L A T I O N
2        It is stipulated and agreed by and
3  between Counsel for the parties hereto that
4  the deposition of DR. DAVID MATHIS is hereby
5  being taken pursuant to the Federal Rules of
6  Civil Procedure for all purposes in accordance
7  with law;
8        That the formalities of
9  certification and filing are specifically
10 waived;
11       That the formalities of reading and
12 signing are specifically not waived.
13       That all objections, save those as
14 to the form of the question and/or
15 responsiveness of the answer, are hereby
16 reserved until such time as this deposition or
17 any part thereof is used or sought to be used
18 in evidence.
19       * * * * * * * *
20       LORI L. MARINO, Certified Court
21 Reporter, in and for the State of Louisiana,
22 officiated in administering the oath to the
23 witness.
24
25

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

EXHIBIT
2

Page 5

1    MR. DUBNER:
2        Jeffrey Dunbar for the
3    plaintiffs, along with Elena Malik.
4    MR. ARCHEY:
5        This is Connell Archey. I
6    represent the defendants. We do have
7    the issue of feedback so I will not
8    be speaking much, and I'm also
9    stepping out of the room.
10   (The witness was duly sworn.)
11       EXAMINATION
12   BY MR. DUBNER:
13   Q   Good morning, Dr. Mathis. Again, my
14   name is Jeff Dubner. I know you've been
15   deposed before. Have you ever taken a video
16   deposition?
17   A   Yes.
18   Q   So if you have any trouble hearing me
19   at any point or you have any technical issues,
20   you'll let me know?
21   A   Yes.
22   Q   Is there anyone in the room with you
23   other than Mr. Archey?
24   A   No.
25   Q   Do you have anything up on your

Page 6

1    computer screen other than the Zoom window?
2    A   I have the capability of looking -- I
3    have three screens, and I have the capability
4    of looking at all of the discovery that you've
5    received.
6    Q   Okay, and by discovery that we
7    received, you mean the materials that were
8    supporting your report that you produced?
9    A   Yes. It would be the patient charts,
10   as well as your exhibit -- your report, and
11   currently, it's my CV and testimony history
12   and a number of things. I mean, I have access
13   to everything I used.
14   Q   And access to your report, as well?
15   A   Yes.
16   Q   Do you have any paper documents with
17   you today?
18   A   No. I don't keep paper.
19   Q   Do you have any -- have you marked up
20   the version of your report that you're looking
21   at in any way, or is it what was produced --
22   A   I did. I changed it. So my report
23   is listed with the numbers of the patients, of
24   the patient inmates, where yours was numbers
25   and patients; and so what I did was, I ordered

Page 7

1    the bookmarks so that they correspond to each
2    other. So they're in order by patient number,
3    since ultimately that's what we're going to be
4    doing is having them be masked by numbers.
5    Q   Okay. So other than changing the,
6    you know, the names and numbers of the
7    patients, were there any other changes you
8    made?
9    A   No.
10   MR. DUBNER:
11       Just for the record, the
12   deposition is being recorded.
13   BY MR. DUBNER:
14   Q   I wanted to talk about your, first
15   off, just the overall opinions you're
16   offering. You're providing opinions on
17   whether the medical care provided at LSP meets
18   the standard of care and on the medical
19   leadership and organizational structure. Is
20   that correct?
21   A   Largely.
22   Q   Are there any other subjects on which
23   you're opining?
24   A   We'll have to see what your questions
25   are.

Page 8

1    Q   Are there any subjects in which you
2    opine in your report?
3    A   Repeat that, please.
4    Q   Are there any other subjects on which
5    you opine in your report?
6    A   I can go through my report if you'd
7    like and tell you what I opined about.
8    Q   Did you opine on peer review in your
9    report?
10   A   No.
11   Q   Did you opine on quality improvement?
12   A   No.
13   Q   Did you opine on medication
14   administration?
15   A   No.
16   Q   Did you opine on copays?
17   A   No.
18   Q   Okay. So is there anything else that
19   comes to mind that you recall opining on in
20   your report besides whether the medical care
21   provided at LSP meets the standard of care and
22   the medical leadership and organizational
23   structure?
24   A   Would you break that question down a
25   little bit, please?

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 9

1    Q   Sure. So the two things that you
2  said you opined on in your report are these --
3  whether the medical care provided at LSP meets
4  the standard of care and the medical
5  leadership and organizational structure. Is
6  that correct?
7    A   Largely.
8    Q   And then, sitting here, is there
9  anything else that you recall opining on in
10 your report?
11   A   No.
12   Q   Do you have expertise in practicing
13 correctional medicine?
14   A   Yes.
15   Q   You say that you are familiar with
16 the standard of care and skills ordinarily
17 exercised by prudent medical professionals
18 providing care of the inmates in jails and
19 prisons. That's right?
20   A   Yes.
21   Q   Are you holding yourself out as
22 having any other areas of expertise relevant
23 to your opinions in this case?
24   A   I'm board certified in family
25 medicine.

Page 10

1    Q   So family medicine and correctional
2  medicine?
3    A   Yes.
4    Q   Are you any other areas in which
5  you're holding yourself out as having relevant
6  expertise?
7    A   No.
8    Q   Now, on page six of your report, you
9  refer to Judge Dick's opinion based on facts
10 determined by the Court at the time of the
11 trial in 2018. You say many of these facts
12 are now outdated and are addressed in this
13 report. What specific facts do you believe
14 are outdated?
15   A   Sorry. I have to look at page six.
16   Q   Absolutely.
17     MR. DUBNER:
18       Just for the record, why don't
19 we designate your expert report as
20 Exhibit 1.
21     THE WITNESS:
22       Okay. So as far as on my page
23 12, line seven, the facts are
24 outdated are regarding clinical care,
25 which I talk about pretty extensively

Page 11

1  in the report.
2  BY MR. DUBNER:
3    Q   What facts regarding clinical care
4  are you referring to?
5    A   My report is a couple of hundred
6  pages long. I can't summarize that for you.
7    Q   What are the critical differences
8  between the practices or policies for clinical
9  care today and in 2016 to your mind?
10   A   We'll need to go through the
11 questions for that. I can't summarize that
12 for you in one question.
13   Q   There's nothing that comes to mind as
14 some of the most important things that stand
15 out to you as different practices today from
16 what they did in '20, what was reported on in
17 the Court's opinion?
18   A   We'll need to go through the
19 deposition, please.
20   Q   We are going through the deposition,
21 sir. Let's start, I suppose, with specialty
22 care. What specific facts do you believe are
23 outdated when it comes to specialty care?
24     THE WITNESS:
25       I thought that the specialty

Page 12

1  care was --
2    MR. ARCHEY:
3       Let me enter my objection. I've
4  been getting in another room getting
5  set up so I wouldn't get feedback. I
6  object to these questions as,
7  basically, unanswerable. Like the
8  doctor said, you go got to go through
9  his report. He can answer the best
10 way he can, but I don't think you can
11 ask those questions in a rational
12 way.
13   MR. DUBNER:
14       And object to form will be
15 perfectly fine if you think the
16 question is ambiguous or otherwise
17 problematic. We don't need speaking
18 objections. Objection noted.
19   MR. ARCHEY:
20       I will object to form. I will
21 object to form, and I don't intend to
22 be having speaking objections, but,
23 Jeff, you got to be rational and
24 reasonable.
25   MR. DUBNER:

3 (Pages 9 to 12)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 13

1       Object to form is on the record.
2       That's all we need.
3  BY MR. DUBNER:
4       Q  So, okay, Dr. Mathis, what has
5  changed in LSP's specialty care practices
6  between the time of trial and today as far as
7  you're aware?
8       A  My testimony and report are based on
9  the current practices at LSP, and the current
10 practices at LSP, as I saw them for specialty
11 care, comport with the standard of care and
12 exceed the standard of care in many respects.
13      Q  In terms of the specific processes or
14 policies, do you have any view on how those
15 are different today from what they were at the
16 time of trial?
17      A  Please stay with noncompound
18 questions.
19      Q  What about that was compound?  Strike
20 that.  And so in terms of --
21      A  Policies and processes.  I'm sorry.
22      Q  Dr. Mathis, in terms of policies, how
23 are the policies from specialty care different
24 today from at the time of the trial?
25      A  The policies for specialty care

Page 14

1  probably haven't changed much.  It's just that
2  they're instituted better than they were
3  previously.
4       Q  And in terms of the practices, are
5  there any differences to their procedures for
6  administering specialty care that you're aware
7  of?
8       A  Well, differences is difficult.  As I
9  said, what I'm here about is what's currently
10 happening at LSP, and that's what my
11 interpretation of Judge Dick's opinion is
12 about, the current practices and whether there
13 should be injunctions.  My opinion about the
14 way that specialty care is handled at LSP
15 currently is that it's within the standard of
16 care and exceeds at many respects.
17      Q  So here's what I'm trying to
18 understand.  You say many of these facts are
19 now outdated.  Are you saying that the Court's
20 conclusions and the specifics of the care that
21 the Court opined on or concluded each findings
22 on are outdated, or are you saying that the
23 practices and procedures are outdated?
24      A  My opinion about this case is that --
25 or this matter is that the care that I looked

Page 15

1  at at LSP is not -- I have difficulty
2  understanding how a Court could currently call
3  it deliberately indifferent.
4       Q  Did you do any evaluation of the
5  facts at the time of the Court's opinion?
6       A  That was primarily done in
7  interaction with retaining counsel about what
8  happened previously versus what I witnessed
9  and the research for my report.
10      Q  So is it fair to say that your
11 opinions are based principally on the care
12 that you reviewed rather than on looking at
13 differences between the facts that the Court
14 found and the facts today?
15      A  Yes.
16      Q  So your statement that many of these
17 facts are now outdated, aside from the quality
18 of the care that you looked at versus the
19 quality of the care that the Court looked at
20 previously, are there any facts that come to
21 mind as being particularly important for your
22 conclusions?
23      A  If we look at the interrogatories and
24 the supplement to interrogatories -- and I can
25 share that with you -- we can go through it,

Page 16

1  because I think that's particularly important
2  if you're ready for that, or unless you want
3  to stay with this broad summary query.
4       Q  Okay, and we can come back to that.
5  Let's talk about your site visit.  You visited
6  LSP on March 14th and March 15th of this year.
7  Is that correct?
8       A  I think actually it was the 14th and
9  16th.  I was there two days.  I think it was
10 Monday and Wednesday.
11      Q  I was going to ask about that.  Your
12 notes refer to a visit 3/16.  So there was no
13 3/15 visit?
14      A  I was at headquarters that day.
15      Q  So you visited LSP on March 14th,
16 headquarters on March 15th and LSP again on
17 March 16th?
18      A  Yes.
19      Q  If you go to page 13 and 14 of your
20 report.  Is it easier for you if I use the
21 page number at the bottom or the PDF page
22 number?
23      A  It's going to be easier at the top,
24 if you would, the PDF number.  Thank you.
25      Q  So for today's purposes, we'll use

4  (Pages 13 to 16)

Page 17

1  the PDF number, which is six higher than the
2  page number.  So if you'll look at page 19 and
3  20.
4      A  Thank you.  I'm there.
5      Q  At the bottom of page 19 and the top
6  of page 20, you describe places that you
7  visited at your site visit.  You say you
8  visited the Robert E. Barrow Treatment Center,
9  which includes among other things, the general
10  medicine clinics, the new building where
11  procedures are performed, radiology, pharmacy,
12  laboratory, medical records, Nursing Unit #1,
13  Nursing Unit #2 and the assessment and triage
14  unit.  Are all of the areas that you visited
15  identified in that sentence?
16      A  I think I -- well, on that day, on
17  the 14th, and then, on the -- actually, I
18  don't like those dates, because I made a
19  mistake here, because we visited on -- the
20  header says 3/14 through 3/16, but it's 3/14
21  to 3/16 when we were at Angola.  So I also
22  went out to all the camps and I don't believe
23  that's included.
24      Q  Okay.  Which camps was that?
25      A  I think it's J, C and the death row.

Page 18

1      Q  Any others?
2      A  None that I remember.
3      Q  Did you visit any other housing
4  units?
5      A  In Camp J and C and all of the
6  housing units at the main building.
7      Q  Okay.  So you did visit the housing
8  units at main prison?
9      A  Right.
10      Q  Specifically what housing units there
11  did you visit?
12      A  Well, I was in Ash 1, 2, 3 and 4 and
13  then walked around the housing units and went
14  to many of the other programming areas with
15  Dr. Lavespere, as well as the things that are
16  listed in this on page 13 and 14.
17      Q  How long did you spend at the general
18  medicine clinic?
19      A  Maybe an hour, hour and a half.
20      Q  How long did you spend at the new
21  building?
22      A  An hour.
23      Q  How long did you spend in radiology?
24      A  Ten minutes.
25      Q  How long did you spend at pharmacy?

Page 19

1      A  Probably 20 minutes.
2      Q  How long did you spend in medical
3  records?
4      A  That was another 20 minutes.
5      Q  How long did you spend in Nursing
6  Unit #1?
7      A  Half an hour.
8      Q  How long did you spend in Nursing
9  Unit #2?
10      A  Twenty minutes.
11      Q  How long did you spend at the ATU?
12      A  Half an hour.
13      Q  Then, the outcamps that you visited,
14  about how long did you spend at those on
15  average?
16      A  Forty-five minutes.
17      Q  Ash 1 through 4?
18      A  Probably 15 to 20 minutes per -- in 1
19  and 2 and 10 minutes in 3 and 4.
20      Q  How did you take notes during your
21  site visit?
22      A  I -- let me see.  I dictated some
23  notes and then had them transcribed when I
24  went back to the room.
25      Q  So you were speaking into some sort

Page 20

1  of dictation program?
2      A  Yes, my digital handset.
3      Q  Were all of the notes that you
4  dictated produced?
5      A  Yes.
6      Q  Your notes -- I'm just going to
7  share --
8          MR. DUBNER:
9              So I'm going to mark this as
10          Exhibit 2.  It is your notes titled,
11          "03142022 LSP Site Visit."
12  BY MR. DUBNER:
13      Q  It says, "Patients that we need to
14  see charts on."  Why did you think you needed
15  to see charts on these patients?
16      A  That was a consideration when we did
17  the visit; and after discussing with retaining
18  counsel, we elected to stay within the charts
19  that you selected as relevant to the class.
20      Q  Okay.  So you didn't review these
21  charts in the end?
22      A  I did not review Campbell, nor Marsh.
23      Q  During your site visit, you met with
24  Jacob Johnson.  Is that right?
25      A  Yes.

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 21

1    Q   Did you take any notes on that
2  conversation?
3    A   You have all of the notes that I
4  produced -- or that I have as a result of the
5  site visit.
6    Q   You met with Dr. Toce, as well.  Is
7  that right?
8    A   Yes.
9    Q   Did you discuss specific patient
10 charts with Dr. Toce?
11   A   No.
12   Q   Now, you met with Dr. Lavespere, as
13 well?
14   A   Yes.
15   Q   Did you talk with him about some of
16 the medical charts you were reviewing?
17   A   No.
18   Q   Did he give you any notes on any of
19 the charts?
20   A   No.
21   Q   So he didn't give you any information
22 about any of the patients in the charts?
23   A   No.
24   Q   You also say in your notes
25 Dr. Lavespere is working generally two days a

Page 22

1  week at LSP.  What's your basis for that
2  statement?
3    A   That's what I understood.
4    Q   Is that something Dr. Lavespere told
5  you?
6    A   It's a combination of understanding
7  from Lavespere, Johnson and retaining counsel,
8  Archey.
9    Q   Is that relevant to your opinion?
10   A   It's relevant --
11   Q   Let me rephrase that.  Is it
12 important to you that Dr. Lavespere is working
13 generally two days a week at LSP?
14   A   I think Lavespere is helpful in his
15 work at LSP.  So his involvement is relevant.
16   Q   Do you understand him to be still
17 seeing patients?
18   A   I don't think he sees patients except
19 in unusual circumstances.  He's not a primary
20 care provider there.
21   Q   So you visited the morning meetings.
22 How long did they last each day?
23   A   Forty-five minutes to an hour.
24   Q   Do you know how they're run when
25 Dr. Toce is not present?

Page 23

1    A   Without Dr. Toce.
2    Q   Um-huh (affirmative expression).
3    A   That's how they're run.
4    Q   Does somebody in particular run them?
5    A   Not to my knowledge.  I didn't -- he
6  was there at both mornings.
7    Q   You say there's an interactive
8  discussion about the status of these inmates.
9  What specific discussion took place at the
10 meeting you attended?
11   A   They talked about essentially every
12 patient that went out over the weekend and was
13 in Nursing Unit #1 and 2 and those that were
14 hospitalized.
15   Q   Now, there are no details of the
16 content of these discussions in your notes.
17 Is that correct?
18   A   You know, I think I produced the
19 notes that were distributed at the meetings,
20 but I am not certain what you have; and if you
21 do have those, well, then, I had written a
22 couple of handwritten notes on them.
23   Q   So yeah, on the copies of the nursing
24 unit roster that was produced, those
25 handwritten notes are yours?

Page 24

1    A   Yes.
2    Q   Thank you.
3    A   I mean, if you show them to me, I'll
4  confirm whether or not it appears to be my
5  handwriting, but I will concede that I did
6  make several notes.
7    Q   You say the discussion results
8  improved patient care for all the providers.
9  What's your basis for that statement?
10   A   My training and experience in
11 correctional medicine.  To be able to have
12 everyone of the providers at a meeting, as
13 well as the administration is valuable to
14 support patient care.  I have been in a lot of
15 morning meetings in my career, and this was an
16 impressive morning meeting, particularly with
17 Dr. Johnson present and Lieutenant Cashio, and
18 I think even the IT guy was there, and the DON
19 and ADON.  Although -- I'm sorry.  They
20 weren't there on Monday.  On Wednesday, one of
21 the DONs was there, but having that
22 involvement really supports patient care, and
23 I was impressed, and I believe it exceeds the
24 standard of care.  In fact, I believe that
25 even approaches the NCCHC requirements, if not

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 25

1  exceeds NCCHC requirements.
2      Q   And so you saw it on two days.  Is
3  that correct?
4      A   Yes.
5      Q   Do you have any evidence of which you
6  can say that staffing is, you know, there
7  everyday?
8      A   Only by discussion with Toce and
9  Lavespere and retaining counsel.  Are you
10  questioning me whether or not people don't
11  come on some days?  I don't understand your
12  question.
13      Q   Going back to your statement the
14  discussion results in improved patient care
15  for all the providers, did you conduct any
16  follow-up investigation to determine how the
17  morning meeting affected patient care?
18      A   No.
19      Q   Did you conduct any follow-up
20  investigation to determine how it affected
21  provider's activity over the course of the
22  day?
23      A   No.  Well, I didn't do any
24  follow-ups, but I understood at the end of the
25  meeting how the nurse practitioners divided up

Page 26

1  their rounds on the different nursing units
2  and how they were going to handle the day, but
3  I wasn't doing an accreditation.  I was doing
4  an involvement in the morning meeting and
5  using the standard of care determination.
6      Q   So it's entirely based on your
7  observations during the morning meeting?
8      A   My observations and interpretations.
9  So it's not just observation; it's my
10  background and experience and qualifications
11  to be able to determine that that morning
12  meeting was valuable and exceeded the standard
13  of care.
14      Q   Let's talk about the general medicine
15  clinic.  Did you observe patient care in the
16  general medicine clinic?
17      A   Yes.
18      Q   What care did you observe?
19      A   I observed the patients waiting,
20  being seen by nurse practitioners, and I was
21  also there for the sick call that was being
22  conducted by telemedicine.
23      Q   Okay, let's come back to the sick
24  call in a minute and focus on the general
25  medicine plan.  You watched clinic visits

Page 27

1  between nurse practitioners and patients?
2      A   Yes.
3      Q   What patients did you observe?
4      A   I thought that was not to be
5  divulged.
6      Q   Why did you think that?
7      A   Because we're hiding the names for
8  the entire class.  How would I know what their
9  names were?
10      Q   So you don't know what patients you
11  were observing?
12      A   No, and I didn't think that was
13  something that was part of this matter.
14  That's protected information.
15      Q   I'll just explain this for your
16  understanding.  If there is a court order
17  regarding HIPAA that allows you to discuss
18  patient names with us and us to discuss
19  patient names with you, as well as with your
20  counsel -- and, Mr. Archey, correct me if you
21  have a different understanding, but just so we
22  don't have that issue here, that is something
23  that's been handled by a court order.
24          MR. ARCHEY:
25              Well, I don't know that I

Page 28

1          completely agree with you, because
2          we're going to refer to the patients
3          by numbers at trial, --
4          MR. DUBNER:
5              Exactly.
6          MR. ARCHEY:
7              -- and so they are being
8          protected.
9          MR. DUBNER:
10              Yeah, so at trial, we're going
11          to be using -- and in all the stuff
12          that is produced, you know, that can
13          be public, we're going to be using
14          numbers so that it stays private from
15          the public matter, but counsel and
16          the experts in this case are able to
17          know and discuss the names; but when
18          we're at trial or for anything else
19          that is going to be publicly
20          disseminated, we're using the
21          anonymous numbers.  Does that make
22          sense to you, Dr. Mathis?
23          MR. ARCHEY:
24              Object.  I don't agree with that
25          assessment.  I think we are going to

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 29

1    maintain the confidentiality of the
2    inmates. We can -- Dr. Mathis is
3    certainly entitled to know names, but
4    we had to maintain the
5    confidentiality of them.
6    BY MR. DUBNER:
7        Q    So to get back to my question, you
8    don't know what patients you were observing in
9    the general medicine clinic. Correct?
10       A    Correct.
11       Q    Did you ask the patients for consent
12   before observing care?
13       A    No.
14       Q    Were any attorneys for defendants
15   present when you were observing care?
16       A    Mr. Archey was with me the entire
17   time except when I went off with Dr. Lavespere
18   on Wednesday.
19       Q    In the general medicine clinic,
20   though, Mr. Archey was there the entire time?
21       A    Yes.
22       Q    Were you in the clinic room with the
23   patients?
24       A    Yes.
25       Q    Are you basing your opinions in part

Page 30

1    on the adequacy of the general medicine clinic
2    care that you observed?
3        A    I'm basing my opinions primarily on
4    the patients that you selected to be part of
5    this matter and my chart interpretations.
6        Q    Understanding that, are your
7    observations of walk-in care in the general
8    medicine clinic also apart of the basis for
9    your opinion?
10       A    Yes. I looked at those patients. I
11   looked at the site. I observed what was
12   happening, and I included that in my report.
13       Q    Did you take any notes on the patient
14   care that you observed in the general medicine
15   clinic?
16       A    We've already discussed that. You
17   have all of the notes that I took.
18       Q    So if there's no description of that
19   care in your notes, then, there are no notes?
20       A    There are no notes. Any description
21   of the care is included in my report.
22       Q    Did you observe how long patients
23   wait for appointments in the general medicine
24   clinic?
25       A    No.

Page 31

1        Q    You say the medical provider can
2    close or partially close the door. Did you
3    observe whether or not it was actually closed
4    during appointments?
5        A    This is one of those areas that I'm
6    having difficulty with. As a correctional
7    medical provider -- now, can I speak about
8    this? It's also in my report.
9        Q    Let's first just answer the question
10   I was asking, which is did you observe whether
11   or not the door was actually closed during the
12   appointments that you watched?
13       A    Yes.
14       Q    Yes, it was closed?
15       A    No. Yes, I observed.
16       Q    Was the door closed in the
17   appointments you watched?
18       A    No.
19       Q    You also say LSP providers have
20   computer access to inmate medical information
21   including allergies, duty status, diet,
22   location, the medication list showing reorder
23   dates-compliance, current and past
24   appointments, EKGs, x-ray results and lab
25   results. Is all that information in the paper

Page 32

1    medical record?
2        A    No. Well, it might be in the paper
3    medical record, but it was on the computer.
4        Q    Do you know which parts of that
5    information is and is not in the paper medical
6    record?
7        A    We'll need to go through one by one.
8    I looked at the paper medical record. Would
9    you ask me one by one?
10       Q    Sure, and if it's easy this will be
11   on page PDF page 22 of your expert report.
12   Beginning at line 10, "Currently, LSP
13   providers have computer access to inmate
14   medical information, including allergies." Do
15   you know if that's in the paper medical
16   record?
17       A    Yes.
18       Q    Duty status?
19       A    I'm not certain about duty -- I doubt
20   that duty status is there.
21       Q    Diet?
22       A    Probably.
23       Q    And just why do you doubt that duty
24   status is there?
25       A    Because it's a -- it changes a lot,

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 33

1    and I don't remember seeing any custody notes
2    in the medical chart. After all, it is a
3    medical chart. It's kind of a different area.
4    If you -- even with electronic medical
5    records, duty status is sometimes and often
6    excluded from medical records. Custody has a
7    different record than medical.
8        Q    And location?
9        A    I don't believe location is in the
10    chart, paper chart, except episodically when
11    they come in for their visits. So location is
12    something that's more dynamic and again, would
13    be in their computer access but not
14    necessarily in the chart. Location can change
15    from hour to hour, and certainly, the medical
16    chart doesn't.
17        Q    The medication list showing reorder
18    dates-compliance, is that in the paper
19    records?
20        A    I didn't prepare anything about MARs,
21    but reordering is available on the computer.
22        Q    Do you know if the medication list
23    showing reorder dates is in the paper records?
24        A    I don't believe so.
25        Q    Do you know if the medication

Page 34

1    administration records are in the paper
2    records?
3        A    I didn't look. As I said a couple of
4    statements ago, I did not look at medication
5    administration records. I did not prepare an
6    opinion about that.
7        Q    Current and past appointments, should
8    those be in the paper records?
9        A    Well, they're in the paper record as
10    far as the documentation is concerned, but
11    more of a summary is available on the
12    computer.
13        Q    Are EKGs in the paper records?
14        A    Yes.
15        Q    X-ray results?
16        A    Yes.
17        Q    And lab results?
18        A    Yes.
19        Q    Did you observe what medical staff do
20    when somebody refuses an appointment?
21        A    I have the documentation for the
22    patients that you wanted us to review.
23        Q    Understanding that, when you were
24    observing general medicine, did you observe
25    what --

Page 35

1        A    Just a minute. I need to close the
2    window. Are you getting any noise?
3        Q    No. It's fine on my end.
4        A    Okay, good.
5        MR. DUBNER:
6            Ms. Court reporter, is it fine
7        for you?
8        THE COURT REPORTER:
9            Yes.
10    BY MR. DUBNER:
11        Q    When you were observing general
12    medicine clinic, did you observe what medical
13    staff do when somebody refuses an appointment?
14        A    No.
15        Q    When you were observing general
16    medicine clinic, did you observe what medical
17    staff do when somebody refuses particular
18    treatment?
19        A    No.
20        Q    Moving forward through your report,
21    if you look at page 27 on the PDF, page 21 by
22    the page numbers, that's on the bottom.
23        A    Yes.
24        Q    That top picture, who is in that
25    picture.

Page 36

1        A    That is the certified physical
2    therapy assistant. He is an inmate.
3        Q    What was he doing in that picture?
4        A    Looks to me like he's stretching the
5    hamstring on that patient.
6        Q    What else did you observe him doing
7    during your visit?
8        A    I observed him walking around in the
9    hallway under the direction of the physical
10    therapist.
11        Q    Any other patient care that you
12    observed?
13        A    No.
14        Q    Moving to your --
15        A    Excuse me. I may have observed him
16    in the hallway with some fellow who had a
17    prior stroke, and he was helping him through
18    some exercises. So I will testify to that. I
19    saw him at another occasion. Sorry.
20        Q    Thank you. Referring to specialty
21    care, you say on page 34 of the PDF, 28 by
22    page number, "Since the private physicians'
23    group arrived, any inmate with one (1)
24    positive FOBT receives a colonoscopy." What's
25    your basis for asserting that?

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 37

1      A    That was, I believe there's a policy.
2   I'd have to search for it, because I don't
3   remember it specifically, but that's one of
4   the changes that apparently has occurred since
5   these GI guys came on in 2019.
6      Q    So that's based on your review of
7   policies rather than your review of records?
8      A    I think that was a result of
9   conversations with Dr. Lavespere.
10     Q    Okay, and so just to be clear, are
11  you telling me you're not sure that there's a
12  policy?
13     A    No.  I said I'd have to search for
14  the policy, and I can if you'd like to take
15  the time.
16     Q    No.  I'm just trying to understand.
17  So it's based on your understanding that
18  there's a policy, as well as your conversation
19  with Dr. Lavespere.  Is that fair to say?
20     A    Well, policy may not be the right
21  word.  It may be a memo.  It may be a
22  contract, but there is documentation that now,
23  they're doing this differently than they did
24  back in the time of the Court ruling about
25  deliberate indifference.

Page 38

1      Q    You said that's been since 2019?
2      A    Correct.  Line nine.  And then, the
3   Eceptionist colonoscopies, we can go there if
4   you'd like.  That's the citation for it.  You
5   did ask me about it.  So let's go there since
6   --
7      Q    Dr. Mathis, Dr. Mathis, you've
8   answered my question.  You also pointed to
9   Eceptionist.  We'll look at that if we want to
10  look at that.  You refer to something called
11  Correct Care software.  What is that?
12     A    Correct Care is a software, as I
13  described; in that, Melanie Benedict has,
14  where she puts together summaries -- she and
15  her staff put together summaries of what's
16  happening in the hospitalized patients.  It's
17  a little redundant I think, because the EPIC
18  also does the same thing, but she feels more
19  comfortable about having a summary in a single
20  location.
21     Q    What do they use the summaries in?
22  What do they use the summaries that they put
23  in Correct Care for?
24     A    I didn't understand you.  Repeat
25  that, please.

Page 39

1      Q    What do the staff at LSP use the
2   summaries that they put into Correct Care for?
3      A    For their background about how
4   they're treating patients.
5      Q    Is that information included in the
6   paper medical records?
7      A    No.
8      Q    You say LSP is the only Louisiana DOC
9   facility with 24-hour coverage, allowing
10  easier discharge scheduling.  Just to
11  understand, what do you mean by 24-hour
12  coverage in this context?
13     A    They have nurse practitioners on-site
14  24 hours a day.
15     Q    You mean they have nurse
16  practitioners at the treatment center 24-hours
17  a day?
18     A    No.  They have a nurse practitioners
19  on-site 24 hours a day.
20     Q    What do you mean by on-site?
21     A    They have housing, where the nurse
22  practitioners or the physician stays when
23  they're working overnight for the ATU.  The
24  ATU, like any emergency room, quiets down at
25  night.  In my experience in emergency room,

Page 40

1   about two o'clock in the morning is when
2   things slow up unless there's an accident or
3   some sort of assault.  So there's no need for
4   them to sit in the ATU if nothing's happening.
5      Q    Okay, so when you say 24-hour
6   coverage, you're including providers being on
7   call at their houses on B-Line.  Is that
8   right?
9      A    Yes.  It's not an emergency room.
10     Q    Staying with the trips, you say that
11  the telemedicine nurse writes orders to be
12  countersigned by the NPs or Dr. Toce.  What do
13  you mean when you say she writes orders?
14     A    What page, please?
15     Q    Absolutely.  Page 36 of the PDF.
16     A    Thank you.  And what line?
17     Q    Line 18 and 19.  You say, Sandra
18  Kaiser, RN, is the specialty telemedicine
19  nurse who coordinates all the speciality
20  telemedicine clinics.  She also performs, trip
21  referrals, makes appointments, writes orders
22  to be countersigned by the NPs or Dr. Toce and
23  works directly with Eceptionist."  What do you
24  mean when you say she writes orders?
25     A    She will -- as an RN, she writes an

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 41

```
 1   order to be countersigned by the nurse
 2   practitioner at Toce. So if she knows that
 3   something has to happen or is recommended to
 4   happen by the specialist, then, she will set
 5   that up so that she can take it to someone who
 6   has prescribing authority to be able to sign
 7   off on it.
 8       Q   So is she interpreting what the
 9   specialist recommends to write those orders?
10       A   I don't think that I would say that
11   she's interpreting. I think she's
12   transcribing what the specialist recommends.
13   Interpreting has an entirely different
14   understanding.
15       Q   So she should just be transcribing
16   the recommendations or orders that the
17   specialists prescribe. Is that right?
18       A   Yeah. She's an RN. I mean, that's
19   what RNs do.
20       Q   Do the trip office nurses change
21   orders that specialists recommend?
22       A   Well, the trip office is primarily
23   responsible for instituting those orders that
24   the specialists recommend. So if a specialist
25   recommends return -- can I go on?
```

Page 42

```
 1       Q   Yep.
 2       A   I mean, a specialist recommends
 3   follow-up in three months, then, the trip
 4   office is how -- operationally how that
 5   happens. It's not as easy as me telling you
 6   let's meet at the coffee shop in two days.
 7   Everything -- there are a lot of moving parts
 8   in there, and the trip office coordinates
 9   that.
10       Q   Let me see something that I may have
11   been slightly conflating. Is Kaiser, a
12   specialty telemedicine nurse, does she work in
13   the trip office?
14       A   No. She works in the specialty
15   telemedicine consultation room, but thank you
16   for asking, because sometimes, on the report,
17   I put in things that aren't accurate. If you
18   bring that up, that's fine.
19       Q   Yeah. It wasn't inaccurate, just
20   unclear to me. So thank you for the
21   clarification.
22       A   Okay.
23       Q   So to step back a minute, so the trip
24   office and Ms. Kaiser are the main places
25   where RNs are writing orders based on
```

Page 43

```
 1   specialist recommendations. Is that right?
 2       A   You know, I think that Melanie
 3   Benedict and her group may also be
 4   transcribing some of those orders. So what we
 5   have is we have a group of trained RNs who are
 6   interpreting -- sorry, not interpreting --
 7   transcribing the specialty orders so things
 8   get done as recommended by UMCNO or Lane
 9   Regional Medical Center or OLOL. You know, so
10   that's gets accomplished.
11       Q   RNs in that group, do they change
12   orders that specialists recommend?
13       A   I don't think an RN has a license to
14   change orders. That's not my understanding.
15   So they transcribe the orders, and if they're
16   changed, they're changed, because the trip
17   office can't coordinate something. You know,
18   it's difficult to get a patient to New Orleans
19   from Baton Rouge or way out in the country in
20   Angola, and you got to have transportation.
21   Who knows. There are a lot of things that get
22   in the way.
23       Q   Yeah, and to clarify that, so they
24   may change, you know, dates, things like that
25   for transportation purposes. Do they change
```

Page 44

```
 1   orders beyond those scheduling issues?
 2       A   No. And see, you're also omitting
 3   the trip returns that are so -- that are
 4   documented in all of my chart reviews, because
 5   when a patient comes back from a speciality --
 6   if they come back from specialty clinic at
 7   UCMNO, not by telemedicine, well, then, you
 8   have one of the nurse practitioner or the
 9   doctor who is transcribing but also
10   interpreting what that specialist is
11   recommending.
12       Q   That was -- you're getting right to
13   my next question. You say if there's a trip
14   return and an inmate goes back to his unit and
15   a nurse practitioner sees him the next day, is
16   that something you personally observed?
17       A   I found that in the chart reviews
18   that you recommended. Now, it may not be the
19   next day. You said the next day. I may have
20   said the next day here, but it could be the
21   same day or the next day. Depends on whether
22   they go back to their house and what time they
23   get in at night.
24       Q   Right. So the provider should see
25   them no later than the next day. Is that
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 45

1  right?
2      A    That's correct. That's why they have
3  the nurse practitioners there 24-hours a day
4  and on the weekends, got these people coming
5  back.
6      Q    Let's talk about infirmary care. You
7  say the staffing level at Nursing Unit #1 is
8  one RN for every 10 patients. You also say
9  it's one for every 15 patients for Nursing
10  Unit #2. Do you know how often that staffing
11  ratio is met?
12      A    Page, please?
13      Q    Absolutely. Page 39 on PDF, 33 by
14  page number.
15      A    No. I did not look at the staffing
16  as far as the percentages that are filled, but
17  understanding that nurses are in shortage
18  everywhere, it wouldn't surprise me if
19  staffing wasn't a hundred percent. Even in
20  California, they've got a shortage of 40,000
21  nurses, and they pay pretty well out here.
22      Q    You say at the bottom of that page,
23  there's a 15-bed expansion underway in Nursing
24  Unit #2, as well as relocating the nursing
25  station so there will be a direct sight line

Page 46

1  of the entire unit. So is it correct that
2  currently there's not a sight line from the
3  nursing station for the entire unit in Nursing
4  Unit #2?
5      A    It's difficult to see the entire
6  unit from that nursing station, yes.
7      Q    You refer to a call bell in the
8  locked rooms. Is there an audible bell?
9      A    Call bell is a general term so that
10  they can notify the nurses.
11      Q    And that's the light switch that
12  turns on the light above the locked room?
13      A    Yes. I'm not certain about the call
14  bell, but I know there's notification for the
15  nurses, and I saw the handset for the inmates.
16  I think you said something about locked rooms?
17      Q    Um-huh (affirmative expression).
18      A    Now, looked room is a designation for
19  a single cell that can be locked. It doesn't
20  mean that they're locked all the time. So
21  let's get that straight. The hospice patients
22  are in locked rooms, too, but their doors are
23  more commonly kept open so they that visitors
24  and that sort of thing. So locked room
25  doesn't always mean it's locked. It's just

Page 47

1  can be locked.
2      Q    Right, and for the hospice patients,
3  it may or may not be locked. For some
4  patients, it is locked whether or not they
5  choose it to be. Correct?
6      A    Yes. Those would be patients that
7  have mental issues that assaultive or really
8  high custody levels and can be a danger to
9  others.
10      Q    If you look at page 46 of the PDF, 40
11  by the page number, --
12      A    Yes.
13      Q    -- this is the call bell that you
14  were referring to?
15      A    Yes. Oh, no, that's the handset for
16  the bed. That's an electric bed, which --
17      Q    Um-huh (affirmative expression).
18      A    -- exceeds the standard of care, and
19  the call bell was this switch.
20      Q    The call bell is just the light
21  switch. Correct?
22      A    Yes.
23      Q    What role do certified nursing
24  assistants typically play on infirmaries?
25      A    They change beds. They change

Page 48

1  patients. They help roll patients and that
2  sort of thing. They don't -- they can't
3  administer medications or decide on treatment
4  plans. They're totally at the designation of
5  whatever the RN wants.
6      Q    Okay, you said change beds, change
7  patients, roll patients. Are there other
8  tasks that come to mind?
9      A    Well, they can feed patients. They
10  can clean up incontinence on the floor.
11  Nursing -- certified nursing assistants are
12  really kind of at the bottom end. They're the
13  type of assistant that largely handles nursing
14  homes on the street. You might have a dozen
15  certified nursing assistants, maybe, a couple
16  of LPNs who are administering medications and
17  an RN who is there, one RN for maybe, a
18  hundred patients. So they really handle kind
19  of touching patients and moving patients and
20  handling things, that the RNs are handling
21  more difficult medical issues.
22      Q    Who changes beds in the infirmaries?
23  I'm sorry. At LSP.
24      A    Well, at LSP, I think that the
25  orderlies help change the beds.

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 49

1    Q   And the orderlies change patients, as
2    well?
3    A   Help change the diapers, I believe
4    they do.
5    Q   They roll patients.
6    A   They help to roll patients, yes.
7    They're trained in rolling patients, as you
8    know.
9    Q   And the orderlies feed patients?
10   A   They feed patients, yes, I believe
11   they help feed patients.
12   Q   And the orderlies clean up
13   incontinence?
14   A   Yes.
15   Q   You say the nurses supervise inmate
16   orderlies on Nursing Unit #1 and 2.  What's
17   your basis for that statement?
18   A   Well, first of all, it's their
19   training.  Secondly, it's the way that you
20   have a nurse, an RN, a charge nurse, someone
21   who's in charge of all of the treatment that
22   happens; and on a day-to-day basis, there's an
23   understanding among the charge nurse, the RN
24   and the orderly who's on site or more than one
25   orderly, as well as any LPN about who's going

Page 50

1    to do what during the day.  It's just how you
2    divide up what is happening.  It doesn't have
3    to be written.  It's an understanding among
4    those that are working.
5    Q   So your basis for saying that the
6    nurses supervise the inmate orderlies on
7    Nursing Unit #1 and 2 is the training they
8    received and the presence of the charge nurse.
9    Is that right?  Anything else?
10   A   The training they received, the
11   hierarchy of the correctional medical system
12   and medicine, because you have someone who is
13   in charge; that's the RN, and then, you have
14   someone like the certified nursing assistant
15   or an orderly who's down at the bottom, and
16   they're just handling incontinence and bed
17   changes and really the mundane things.
18   Q   And in your 30 minutes in Nursing
19   Unit #1, did you observe any interactions
20   between any of the nurses and the orderlies?
21   A   Yes.  I saw one -- there was one
22   fellow who was quadriplegic, and he was having
23   a dressing change.  So the RN was changing the
24   dressing, and the orderly is standing there,
25   and he was gowned up.  I think I have a

Page 51

1    picture of that.  He was gowned up, and the
2    screen is in place.  He was primarily handling
3    soiled dressings and that sort of thing and
4    putting them in a bag, whatever the nurse
5    asked him to do at the time.
6    Q   Did you see any interactions between
7    nurses and orderlies on the nursing units
8    besides that one?
9    A   No.
10   Q   If we can go to page 51 of your --
11   hold on one second.  In what way is security
12   involved with inmate orderlies on the nursing
13   units?
14   A   You've got custody officer inside the
15   nursing unit.
16   Q   How are they involved with the work
17   of the inmate orderlies?
18   A   There's supervising to make sure the
19   inmate orderlies aren't getting in trouble.
20   Q   What do you mean by that?
21   A   Well, custody officers observe
22   inmates to determine whether or not they're
23   doing things that are outside of what they're
24   capable of doing or what they should be doing.
25   They're not starting fights, or they're not

Page 52

1    goofing off, and they're following what the
2    nurses have to say.  If something comes up,
3    the custody officer is the, let's just say,
4    the muscle behind anything that doesn't seem
5    to be going well for a nurse.  Although, I
6    didn't observe that, but it's in my
7    experience, which is pretty large as far as
8    working with, let's just call them inmate
9    orderlies.  So you have a custody officer all
10   the time.
11   Q   What role does the custody officer
12   have in supervising the inmate orderly's
13   performance of their care duties?
14   A   That's medical care custody.  That
15   doesn't supervise medical care; they supervise
16   people, but they're not involved directly in
17   medical care.
18   Q   You say that LSP's health orderlies
19   can now earn up to 20 cents per hour.  Do you
20   know how many of the orderlies earn that much?
21   A   No.
22   Q   Do you know which orderlies earn that
23   much?
24   A   No.
25   Q   Do you know what the other orderlies

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 53

1  can earn?
2      A  No.
3      Q  Turning to Ash 1 through 3 and 4, on
4  page 51 PDF, forty-five of the page numbers,
5  you say these dormitories house 88 inmates who
6  cannot function in general population
7  dormitories. Where did you get that
8  information?
9      A  From discussion at the time that I
10  was in a dormitory with Dr. Johnson and
11  observing the wheelchairs and crutches and
12  that sort of thing that were in the
13  dormitories with the inmates.
14      Q  Who determines whether an inmate can
15  function in a general population dormitory?
16      A  The medical. It's a medical
17  determination in concert with the ADA officer,
18  and as you know, I'm not getting into ADA
19  issues in this report.
20      Q  Um-huh, (affirmative expression), but
21  what's your basis for saying it's done in
22  concert with the ADA officer?
23      A  Because if medical says, states,
24  writes that somebody requires an ADA
25  accommodation, custody still has to implement

Page 54

1  it. So if I write for someone to have a
2  brace, then, custody has to understand that
3  that inmate has the right to have a brace in
4  his possession; otherwise, it's contraband.
5      Q  Just to be clear, is that based on
6  your experience in correctional systems and as
7  a correctional medicine practitioner or based
8  on your understanding of LSP's practices
9  specifically?
10      A  Understanding my review, my review
11  was documented, where someone would change
12  housing or change -- or give TED hose or that
13  sort of thing. Well, then was sent to custody
14  so that custody has a list of what
15  accommodations or devices an inmate may have
16  on their possession. That was in the paper
17  chart.
18      Q  You call these assisted living
19  dormitories, because there are inmate
20  orderlies there. Is that right?
21      A  That's correct.
22      Q  Is there anything else that makes
23  them assisted living?
24      A  I think that they eat in, where the
25  other -- well, I know they eat in, because we

Page 55

1  were there during a meal. So they don't --
2  these inmates don't have to go to chow
3  somewhere else, because they don't move around
4  the same way. So that's a big accommodation
5  for them. They have air conditioning now, or
6  it was being instituted. In my experience in
7  a dormitory like that, you have custody
8  officers who are more likely to give someone
9  the benefit of the doubt, because of their
10  disability than they might in a general
11  population dorm where people are healthy.
12      Q  That last one is based on your
13  general experience, not your specific
14  observations at LSP?
15      A  Last one what?
16      Q  Well, you said you have custody
17  officers -- you said in your experience, you
18  have custody officers who are more likely to
19  give someone the benefit of the doubt. Is
20  that based on your general experience or
21  something you observed while at LSP?
22      A  It's my -- it's a result of my
23  qualifications.
24      Q  On the air conditioning, were Ash 1
25  and 2 air-conditioned when you visited?

Page 56

1      A  Yes.
2      Q  Do you know whether Ash 3 and 4
3  actually became air-conditioned after your
4  site visit?
5      A  They had the air conditioner units
6  were on the roof but hadn't yet been fully
7  connected. It's been an hour. Can we take a
8  three-minute break?
9      Q  Sure.
10      A  Thank you.
11          MR. DUBNER:
12              We'll be back at 11:03; 8:03, I
13          mean for those West Coast.
14              (Brief recess.)
15  BY MR. DUBNER:
16      Q  You say Ash 3 and 4 are now medical
17  dormitories, healthcare dormitories. What do
18  you mean by that? This is on page 52 of the
19  PDF, 46 of your report on line 10.
20      A  Thank you. The understanding that I
21  had as a result of my visit, that they were
22  now handicapped accessible.
23      Q  To your knowledge, what, if any,
24  medical care is provided in the medical
25  dormitories?

Page 57

1    A   I don't think there's medical care.
2  I think that -- I take that back. I think
3  that the orderlies, inmate orderlies assist in
4  ADLs, activities of daily living, with the
5  inmates who require that in Ash 3 and 4.
6    Q   So to your knowledge, aside from
7  inmate orderlies assisting in ADLs, is there
8  any medical care provided in the medical
9  dormitories?
10    A   I don't believe so.
11    Q   To your knowledge, what, if any,
12  medical staff come to medical dormitories?
13    A   I think that the nurse practitioners
14  go to Ash 1 and 2, but I think Ash 3 and 4
15  operate pretty well independently, and those
16  patients are brought to the clinics by the
17  inmate orderlies, as I discussed in this
18  report. The Assistant Warden said they acted
19  primarily as porters.  As you know from your
20  visit, there's a lot of territory to cover at
21  LSP.  So inmates get pushed in wheelchairs all
22  over the place.
23    Q   What's your basis for stating that
24  nurse practitioners go to Ash 1 and Ash 2?
25    A   Because of the -- I think that was

Page 58

1  listed on the memo from the morning report
2  that I produced for you.  We can go back and
3  look at that if you'd like.
4    Q   Now, is it possible that it said
5  Nursing Unit #1 and 2?
6    A   It's possible.
7    Q   Beyond the morning report, is there
8  anything that you have in mind as a basis for
9  your belief that nurse practitioners go to Ash
10  1 and Ash 2?
11    A   No.  I didn't see any nurse
12  practitioners in Ash 1 and 2.
13    Q   To your knowledge, who administers
14  medication in the medical dormitories?
15    A   I think that officers administer
16  medications there.
17    Q   Going back to the previous page,
18  where you say Jennifer Stickells, RN trained
19  the inmate orderlies with didactic lectures,
20  documentation of performance in body
21  mechanics, stand, pivot, transfer, patient
22  positioning, bed making, assistive devices and
23  ADLs, what do you mean by didactic lectures?
24    A   Patient -- page, please?
25    Q   Yes, it's page 51 of the PDF, page 45

Page 59

1  by page number.
2    A   All right.  Thank you.
3    Q   Beginning at line 11.  And the
4  question is what do you mean by didactic
5  lectures?
6    A   She lectured them.  Didactic is when
7  you have a lecturer, and then, you have people
8  who listen to the lecture, and so that's my
9  understanding of didactic.
10    Q   Did you observe this in practice?
11    A   No.
12    Q   What do you mean by documentation of
13  performance?
14    A   In the information -- I believe
15  that's also in my site visit notes -- she has
16  check boxes that they demonstrated the
17  capability of following her instruction and
18  handling body mechanics and rolling patients
19  and the types of things that I discussed
20  earlier about bed making, body mechanics,
21  standing, patient pivoting, transferring, bed
22  making, assisted devices and how to help
23  patients with those ADLs.
24    Q   Do you know how long the training is?
25    A   The number of hours?

Page 60

1    Q   Yes.
2    A   The answer is no.  I think it's more
3  topic-based, but I don't know the number of
4  hours.
5    Q   And did you review the content of the
6  training?
7    A   I did.
8    Q   Let me make that a little clearer.
9  There is a handout that goes with the
10  training.  Did you review that?
11    A   I can show you what I produced in
12  discovery.  I believe there's 20 pages or so
13  there.
14    Q   Okay, so yeah, we'll look in your
15  discovery then.  What you reviewed is in
16  there's what you're saying?
17    A   Um-huh (affirmative expression).
18    Q   At the time of your site visit,
19  orderlies don't have additional training after
20  the initial training.  Is that right?
21    A   That's correct.
22    Q   Were any other dorms being used as
23  assisted living during your visit?
24    A   Not to my knowledge.
25    Q   Then, on those assisted living

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 61

1 dormitories, on the next page, 52 of the PDF,
2 you say, "Custody officers closely watched the
3 orderlies." Did you observe this?
4    A   I discussed that with Assistant
5 Warden Nettles. I believe that Mr. Archey and
6 I were there at the same time, and I produced
7 that as part of my site visit notes, or I
8 summarized my site visit notes here if that
9 was something that was written down. I didn't
10 keep any paper, but I transcribed those so
11 that I could put it in my report that I was
12 more or less writing simultaneously during my
13 visit. I mean, I would do it at night.
14    Q   So your statement that custody
15 officer closely watched the orderlies, that's
16 based on your discussion with Warden Nettles?
17    A   Correct.
18    Q   Is that also true of your statement
19 that orderlies help the inmates get into and
20 out of the shower, but they do not actually
21 shower them?
22    A   Yes.
23    Q   That's not something that you
24 observed in person.
25    A   Correct.

Page 62

1    Q   Let's talk about sick call. Did you
2 observe sick call in practice?
3    A   Yes. I had a sick call -- remember,
4 I said earlier that I was watching
5 telemedicine sick call?
6    Q   Um-huh (affirmative expression). So
7 how many sick call appointments did you
8 observe?
9    A   I watched one.
10    Q   Were you sitting in the room with the
11 nurse practitioner?
12    A   I was standing in the doorway.
13    Q   Do you know the name of the patient
14 you observed?
15    A   No. You know, we talked about that
16 earlier, and retaining counsel told me that
17 everything was going to be hidden, and so I
18 didn't think that you guys were going to take
19 any patient names, nor was I.
20    Q   Not a criticism. Just trying to get
21 the answer. Did you ask the patient for
22 consent for observing care?
23    A   I've already answered that. No.
24    Q   Was Mr. Archey present?
25    A   Yes.

Page 63

1    Q   Do you remember what the sick call
2 visit was for?
3    A   That was a low back pain.
4    Q   Did you take any notes on it?
5    A   I've already told you all the notes
6 that I have, and the answer to that is no.
7    Q   To what extent are you basing your
8 opinion about the adequacy of sick call based
9 on your observation of this appointment?
10    A   Well, you know, this case is
11 primarily about your class and the subclass
12 that you produced. So it's about chart
13 reviews and what the outcomes of those chart
14 reviews are, and my observation of what was
15 happening during that interview with the
16 patient as he went through his range of motion
17 over the camera was that that was sufficient
18 to be able to make a determination that he
19 could use some physical therapy and might be
20 able to use a nonsteroidal drug for pain
21 relief; and then, there was further discussion
22 about whether or not he'd had past history
23 about the low back pain and what happened as a
24 result and what he might be able to expect
25 from physical therapy. It was what I

Page 64

1 considered to be a pretty good visit about low
2 back pain. It discussed sciatica, range of
3 motion, and he was observed to be walking. I
4 can't see what else could have been done
5 during that visit.
6    Q   Just to go back to my question, are
7 you basing your opinions -- to what extent are
8 you basing your opinions about the adequacy of
9 sick call based on your observation at this
10 appointment?
11    A   As I described the first time, I
12 based my determinations on the chart reviews
13 that your office recommended and my
14 understanding of what happened as a result of
15 those and the observation there and
16 understanding the processes that are in place
17 now with the nurse practitioners doing sick
18 call by telemedicine.
19    Q   Okay. Did you observe any sick call
20 from the EMT side of the sick call?
21    A   EMTs aren't doing sick call anymore.
22    Q   Is there anybody in the room with the
23 patient during sick call?
24    A   The EMT might be there, because the
25 EMT set the patient up at the camps for doing

16 (Pages 61 to 64)

Page 65

1  sick call with the nurse practitioners.
2     Q   Right, and did you observe sick call
3  from that side where the patient and the EMT
4  are?
5     A   No.
6     Q   What information, if any, did the EMT
7  provide to the nurse practitioner in the sick
8  call you observed?
9     A   Vital signs and the chief complaint.
10     Q   You referred to digital otoscopes,
11  stethoscopes and -- I knew I wasn't going to
12  be able to pronounce that one --
13  sphygmomanometers.  Did you see them in use
14  during sick call?
15     A   Well, that is a problem, and you've
16  pointed it out.  I pointed it out when I was
17  there.  They don't have all of the equipment
18  that they should have.  They should have an
19  otoscope, an opthalmoscope available; even
20  though the opthalmoscope is rarely, if ever,
21  used by non-ophthalmologists, and a digital
22  sphygmomanometer.  So those should be part of
23  the sick call process, particularly the
24  otoscope and the sphygmomanometer.  I can see
25  that it wasn't there all the time, and I have

Page 66

1  advised retaining counsel, as well as
2  Dr. Lavespere about that.
3     Q   Are sick call requests triaged
4  everyday?
5     A   Sick call requests to my
6  understanding are triaged everyday, and even
7  with NCCHC, that visit doesn't have to occur
8  for three days to accommodate for weekends,
9  where in jails and prisons where there's not
10  weekend coverage.  Whereas, at LSP, there is
11  weekend coverage.  So those patients that
12  urgently need to be seen can be seen on the
13  weekends by nurse practitioners.
14     Q   Do you recall any evidence that
15  people who put in sick calls on the weekend
16  were seen before Monday by nurse practitioners
17  if it was urgent?
18     A   I have no evidence of that.
19     Q   You say that telemedicine is accepted
20  nationally.  What do you mean by that?
21     A   Kaiser uses telemedicine.  Major
22  correctional medical, Corizon, will use
23  telemedicine.  California uses telemedicine,
24  and we have 33 prisons and 125,000 patients.
25  I mean, telemedicine is the -- and what

Page 67

1  happened during COVID.  I worked from home for
2  eight months running a hospice using
3  telemedicine.  I mean, I think that's -- I
4  don't think I need to site the sources for
5  that.
6     Q   Is telemedicine accepted for all
7  purposes?
8     A   Well, it would be hard to do an
9  internal ophthalmologic examination by
10  telemedicine.  It would be hard to do a pelvic
11  examination by medicine, but generally, by
12  taking history and watching a patient,
13  interacting with them, a great majority of
14  things can be determined by medicine; and at
15  LSP, when you can't determine them, well,
16  then, the NPs sends them to the ATU to be seen
17  face-to-face.
18     Q   Did you look at any statistics or
19  other information on how often patients are
20  sent to the ATU from sick call?
21     A   No.
22     Q   What vital signs should be taken at
23  sick call appointments?
24     A   You know, this is one of those things
25  that I wasn't happy with in some of these

Page 68

1  chart reviews.  I'd like to see a weight, and
2  nurses hate to do weights.  I think that you
3  need a blood pressure, temperature and
4  respirations at the least.
5     Q   Let's talk about self-declared
6  emergencies.  Why don't we go to, I think,
7  page 60 of the PDF, page 54 on the page
8  number.
9     A   Sixty?
10     Q   Yeah.  It's the bottom of page 60 and
11  the top of page 61.
12     A   Okay.
13     Q   For self-declared emergencies, you
14  say, "Inmates are then referred to the ATU for
15  immediate evaluation" -- sorry.  Just to take
16  it back, you say that, "Emergency medical
17  technicians and paramedics perform triage and
18  screening," and then, "Inmates are then
19  referred to the ATU for immediate evaluation
20  by the covering NP, reviewed by the Medical
21  Director Dr. Toce, or routine sick call."  The
22  EMT decides which of those three things to do.
23  Correct?
24     A   In some circumstances, they do, and I
25  don't like it.

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 69

1    Q    In what circumstances do they?
2    A    Do they what?
3    Q    Well, you say in some circumstances,
4    they decide which of those three things to do.
5    First off, just what do you mean by in some
6    circumstances?
7    A    In at least one of the chart reviews,
8    I noticed that we have a EMT practicing
9    outside of their license and making a
10    determination whether that patient needs to be
11    seen urgently or emergently by a nurse
12    practitioner or physician, and my opinions
13    covered it, and I talked with retaining
14    counsel about that, and LSP is making a change
15    as we speak about SDEs not being triaged any
16    longer without supervision by nurse
17    practitioners or physicians.
18    Q    And so when you said a moment ago,
19    you don't like it, it's that practice of EMTs
20    triaging sometimes without review by --
21    without consulting an NP or other provider?
22    A    Exactly.  They're not trained for
23    that.  They're not licensed for it, and that's
24    a holdover from the trial, and that's being
25    changed; and by the time of the trial, I

Page 70

1    believe it will be changed.  It will be policy
2    and instituted.
3    Q    Are you aware of any statistics
4    showing how often EMTs refer to the ATU versus
5    for MD review versus sick call as needed?
6    A    I think you asked that, and I told
7    you, no.
8    Q    Do you know how soon MD review occurs
9    when that's the EMT's determination?
10    A    You know, sometimes, it happens in a
11    day or two.  Sometimes, it's longer.  It kind
12    of depends on -- well, it depends but a day or
13    two seems to be what I see as far as those MD
14    sign offs.
15    Q    You say in your report, review by the
16    Medical Director Dr. Toce.  Are you just
17    saying because it says MD review, you're
18    assuming that's Dr. Toce?  Could MD review be
19    a nurse practitioner?
20    A    It can be either one, because I've
21    seen others do it, but as you're aware, those
22    signatures are hard to read.
23    Q    Where they refer to routine sick
24    call, how soon does routine sick call occur?
25    A    What page are you on?

Page 71

1    Q    At the very top of page 61, 55 on the
2    page numbers.
3    A    Routine sick call varies.  There are
4    criteria set up by the organization that your
5    reports seem to be following, which is NCCHC,
6    and routine sick call may take up to three
7    days routinely but may take longer depending
8    on circumstances.  Just like on the street,
9    where you can't get a doctor's visit for a
10    week or two weeks or 10 days or two months,
11    so, but routine sick call generally happens
12    within several days.
13    Q    Does the patient have to put in a
14    separate sick call request, separate from
15    their self-declared emergency?
16    A    They are two different things.  Sick
17    call request is routine.  Self-declared
18    emergency is an emergency that's triaged by
19    the -- well, is seen by an EMT if it's out in
20    one of the camps where the EMTs are handling
21    it.
22    Q    So the process where the EMT refers
23    the inmate to routine sick call will be the
24    inmate makes a self-declared emergency
25    request, and then makes a separate sick call

Page 72

1    request.  Is that right?
2    A    And then, the EMT can make a -- can
3    say sick call, or a lot of times what will
4    happen is that they will call, and then, the
5    NP will say routine sick call, or follow-up
6    PRN, that sort of thing.  This self-declared
7    emergency thing is kind of a misnomer, because
8    sometimes they are emergencies.  Sometimes,
9    they're unrecognized urgencies or emergencies,
10    and sometimes, they're garbage.  It's just
11    somebody wanting to get attention and wanting
12    to have something addressed that they don't
13    think is happening fast enough.
14    Q    I'm just trying to understand the
15    process of what we're talking about here.
16    Where it is sick call PRN is the outcome of
17    the SDE, because it's not actually an
18    emergency, does that get converted into a sick
19    call request, or does the inmate make a
20    different sick call request?
21    A    No, I believe that -- you know what
22    the answer is, I don't know that.  I don't
23    know whether they have to do a sick call, or
24    that it's routed to a sick call list.  That's
25    a good question.

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 73

1    Q   Did you observe the EMTs performing
2  medical rounds?
3    A   No.
4    Q   When a patient requests a
5  prescription refill, --
6    A   What do you mean by medical rounds?
7    Q   The process of going to see if there
8  are self-declared emergencies.  Let me take a
9  step back.  Is it your understanding that the
10  EMTs go to each housing unit to see if there
11  are self-declared emergencies?
12    A   Yes.  I believe a self-declared
13  emergency is a handwritten piece of paper,
14  where it says -- well, they may put an SDE,
15  but the inmate designates what their issue is
16  as a self-declared emergency; and then, the
17  EMT looks at that and should be taking all
18  those vital signs and writing a history, and
19  then, after that history, determining what is
20  going to happen with that patient; and in the
21  majority of times, contact someone who can --
22  who's licensed to make that decision, and in
23  the minority of time is making that
24  determination by themselves.
25    Q   What's the basis for you saying it's

Page 74

1  the majority of the times?
2    A   Because you see that when we go
3  through the chart reviews, we can look at that
4  individually, because that's really what you
5  designated, you wanted to have as part of this
6  report, and so we can look at that with each
7  one of the chart reviews; but what happens
8  then is that you'll have a telephone order.
9  You'll have the provider's name, the medical
10  provider, the nurse practitioner, physician
11  down in the bottom right and a sign off, and
12  it will say, sick call PRN on the MD reviews
13  over in the bottom left box of what the EMT is
14  recommending or paramedic is recommending.
15  For purposes of today, can we put EMTs and
16  paramedics in the same category even though
17  paramedics are more trained, highly-trained?
18    Q   Yeah, and if there's any purpose for
19  which it's important to distinguish them, just
20  let me know.
21    A   I'm going to say EMTs then.  So EMTs
22  will write that down, because I can see it in
23  my head.  I can see MD review in the bottom
24  left and sick call PRN in the bottom right and
25  follow-up PRN in the bottom right.

Page 75

1    Q   And so when you say the majority of
2  times, there is consultation with a provider,
3  are you including MD review?
4    A   No.  I'm looking at those requests,
5  those self-declared emergencies, and we can go
6  through them individually.  My -- majority may
7  not be correct, but we'll look at that.  I
8  think that's an important consideration, and
9  as I've said, I don't think a EMT should be
10  making a determination about whether something
11  is really an emergency.  That takes an RN who
12  can do assessments, or it takes a nurse
13  practitioner or physician.
14    Q   When a patient requests a
15  prescription refill is it appropriate for an
16  EMT to decide whether the patient needs a
17  prescription refill?
18    A   I don't think that's an issue.
19  Prescription refill can be sent up.  That's
20  really -- that's purely administrative, and to
21  have a self-declared emergency about a
22  prescription refill, unless it's long overdue,
23  is inappropriate.  That's one of those fluff
24  things that should not be an SDE.
25    Q   But to go back to my question, when a

Page 76

1  patient requests a prescription refill, is it
2  appropriate for the EMT to decide whether thea
3  patient needs a refill?
4    A   No.
5    Q   And then, to talk about the ATU, what
6  are the differences between the ATU and an
7  emergency room?
8    A   Let's go to my page.  I have to find
9  it.
10    Q   I think starting at page 76 of the
11  PDF.
12    A   Thank you.  Differences, do you want
13  me to go through my report and tell you this?
14    Q   Summarize it however you -- are all
15  of the differences that you would identify in
16  your report?
17    A   I think the majority of differences
18  are in the report.  You know, there are other
19  things that happen in the emergency room.
20  I've spent -- I was board qualified in
21  emergency medicine, having spent thousands of
22  hours working in an emergency room, but that's
23  been decades ago, and this ATU is not an
24  emergency room.
25    Q   What kind of care can be provided at

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 77

1  an emergency room that can't be provided at
2  the ATU?
3      A  I've detailed that. Let's go to the
4  report. They don't put in chest tubes. They
5  don't perform paracentesis. They don't repair
6  complex lacerations. They're not -- I don't
7  -- I didn't see any evidence of spinal taps
8  being done in the ATU. These are specialty
9  procedures that are done by board certified
10  emergency room physicians under most
11  circumstances. I mean, there are still places
12  where don't have board certified emergency
13  rooms, but the ER docs are doing advanced
14  trauma life support. ER docs have the
15  capability and knowledge to be able to do a
16  lot of things and have the support staff to be
17  able to take care of it. They've got blood
18  available. They go to the blood bank.
19  They've got laboratory available. I mean, I
20  described it here, but like I said, it's wrong
21  and naive to be able to assume that the ATU is
22  an emergency room.
23      Q  Just to be clear, you're not saying
24  that's an exhaustive list of the care that
25  can't be provided. That's just some examples.

Page 78

1  Right?
2      A  Yes.
3      Q  You use a phrase, if in doubt, send
4  him out. What does that mean?
5      A  That means that if you don't know
6  exactly what's going on or if you don't think
7  you can take care of him or you don't think
8  that they belong in the infirmary, then, you
9  send them out to the emergency room, because
10  you need a higher level of care. That's
11  the -- the whole thing about triage, whether
12  it's in corrections or in the field, you have
13  to have the capability to be able to send them
14  to somebody who can handle it.
15      If somebody needs to have -- has a
16  subdural hematoma, then, you need a
17  neurosurgeon, and the emergency room can call
18  the neurosurgeon on call to be able to come
19  down to the emergency room to take a look at
20  this guy, but the ATU has got to be able to
21  load this guy up on an ambulance and send him
22  off an hour and half to UMCNO or Lane or Our
23  Lady of the Lake. It's just so different.
24      Q  You say on page 76, "NPs triage
25  inmates to a higher level of care, e.g., one

Page 79

1  hospital or another depending on the need."
2  That's in your view the appropriate role for
3  nurse practitioners in the ATU?
4      A  Well, if somebody needs a higher
5  level of care, if they can be treated there,
6  because they have, let me see, localized chest
7  discomfort that's reproducible, or they have
8  constipation. So it's an assessment and
9  treatment area. Sometimes, they need to go
10  out, and then, the nurse practitioner can
11  decide where they go; and many times, they
12  don't need to go out, and so the nurse
13  practitioner can practice within their
14  licensure and their knowledge and expertise
15  and care for them right there but still the
16  highest level of acute care that's possible at
17  LSP or prisons in general.
18      Q  On page 78 of the PDF, you refer to
19  EMS response times. You say, "It is seven (7)
20  miles  to Camp C, Death Row, and takes 10-12
21  minutes." I just want to confirm, that is
22  from the ATU?
23      A  That's from the emergency -- the
24  building outside of the control. Because as
25  you remember, there's a building that holds

Page 80

1  the ambulances. So they get the call, and
2  then, they have to run to the camps or death
3  row.
4      Q  So if it's -- I see. So it's 10 to
5  12 minutes from the ambulance building to the
6  camps or death row.
7      A  It can be, yes.
8      Q  Do you know about how long it takes
9  to get from the camps to the ATU?
10      A  Basically, about the same period of
11  time, because you've got to go out from the
12  EMS housing where the ambulances are housed
13  out to a camp and then back through control
14  and into ATU. Maybe, it takes about the same
15  amount of time, a little longer. It really
16  depends.
17      Q  Did you in your record reviews or
18  your observations see any instances of
19  ambulances taking people directly from their
20  housing unit to an outside hospital, or do
21  they always go to the ATU first?
22      A  I didn't see any instances where they
23  went directly to the outside hospital.
24      Q  Is that appropriate in some
25  situations?

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 81

1    A   It might be.  It depends on what the
2  situation is.  I didn't see any to be able to
3  make a determination or an opinion about that.
4    Q   Did you watch care being provided at
5  the ATU?
6    A   Yes.  They --
7    Q   Go ahead.
8    A   Yes.
9    Q   Just in terms of the questions I've
10 asked before, you don't know who the patients
11 were, and you didn't get consent.  Is that
12 right?
13   A   Correct.
14   Q   And what care was provided while your
15 there?
16   A   There were a couple of guys laying in
17 the beds, and one of the nurse practitioners
18 was talking to them and examining them.  I
19 didn't see any trauma come in or any
20 ambulances that dropped patients off.
21   Q   And you didn't take any notes of that
22 care.  Correct?
23   A   No.  I can see it in my head.  I took
24 some pictures, but I didn't take any notes.
25   Q   To what extent are you relying on

Page 82

1  those observations as part of the basis for
2  your opinions?
3    A   I think that the basis for opinions
4  is largely based on the chart reviews and what
5  I saw, and I documented that in my site review
6  -- in my site visit.  And pictures, you know,
7  we did edit the number of pictures that I
8  included, because it seemed to be too many,
9  but I think these reasonably represent those
10 locations.
11   Q   Were there additional pictures that
12 you took that weren't provided?
13   A   Yes.  Some of them were duplicates,
14 or they just didn't seem to be necessary in
15 the flow of the report.  I took a lot of
16 pictures.
17     MR. ARCHEY:
18         Jeff, let me help when he said
19     provided, those have all been
20     produced.  He's talking about which
21     are made part of the report.
22     MR. DUBNER:
23         The ones that he took but
24     weren't in the report were produced
25     with the note and everything.  Great.

Page 83

1    Thank you.
2      MR. ARCHEY:
3        Thank you.
4  BY MR. DUBNER:
5    Q   Let's talk about the standard of
6  care.  So you say that corrections is a field
7  of medicine different from family medicine,
8  internal medicine or emergency medicine.  In
9  what ways do you see it as different?
10   A   It's inside the wall.  I practiced --
11 I was in solo practice and family medicine for
12 25 years and involved in health maintenance
13 organizations interacting with the insurance
14 companies.  That's one important thing is that
15 inmates aren't subject to the same
16 restrictions that health maintenance
17 organizations put on.  Inmates -- people on
18 the street can make their own appointments at
19 their own convenience.  Whereas, inmates have
20 to have appointments when it suits the
21 organization.  It may be subject to lockdown
22 or weather.  The specialty appointments are
23 subject to lockdown, weather, transportation
24 availability, availability at UMCNO or OLOL.
25 I mean, there's -- and understanding the

Page 84

1  difference between keeping the door open,
2  because you're a little concerned this guy
3  might whack you versus closing the door in
4  your private office is just one of the
5  understandings about the difference in
6  corrections.  In corrections, as well as on
7  the street, we have formularies.  We have
8  procedures that can be done in the office,
9  procedures that might need to go to the ATU or
10 the emergency room.  We have specialists that
11 we can call up if we need something or you
12 know, just to bounce it off of them, whether
13 or not this patient should be seen, how soon
14 he should be seen; but it's just an entirely
15 different milieu to be in corrections than it
16 is to be on the street.  Just like it's an
17 entirely different milieu to be in the
18 emergency room, and what I've said in this
19 report is emergency room doctors who don't
20 practice in corrections aren't qualified to be
21 determining what should be done in this ATU.
22   Q   To go back to one thing you said just
23 to make sure the record is clear, you said
24 there are formularies in both.  There are
25 procedures that can be done in the office or

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 85

1  might need to go elsewhere.  You can call up
2  specialist.  Those are things that exist both
3  inside and outside of prison.  Right?
4      A   But it's a different process in the
5  prison versus outside of prison.  It's a
6  different milieu.
7      Q   If a prison is accredited by the ACA,
8  does that mean that it's meeting the standard
9  of care?
10     A   Deliberate indifferences as
11 determined by the Court, what care that's
12 below the standard of care is, what the
13 standard of care is; and I've designated
14 both the ACA and NCCHC exceed the standard of
15 care.  So that's one of my issues with the
16 report.  As your people amalgamated their
17 opinions is that it sounds like an
18 accreditation report for the NCCHC, which
19 comprises only eight percent of those
20 institutions in the United States.  This is
21 not about -- this is about standard of care
22 and deliberate indifference.
23     Q   So you say the ACA exceeds the
24 standard of care.  So if a prison is
25 accredited by the ACA, does that mean that

Page 86

1  it's meeting the standard of care?
2      A   It means that in those areas where
3  the ACA is looking, having passed it, the ACA,
4  means that it exceeds the standard of care,
5  because the ACA, as you know, is more
6  prevalent -- it's accreditation is more
7  prevalent throughout the United States than
8  the NCCHC, which is kind of the platinum
9  standard; and so to satisfy the ACA takes a
10 lot of work, both medically, as well as in
11 what custody does.  I've been through the ACA
12 accreditation and understand the amount of
13 work that it took us to look and get the
14 policies in order for everybody to take a
15 look, what happens when the accreditors come
16 through, and it exceeds the standard of care
17 in those areas, but it doesn't look
18 specifically at patients.  Neither does NCCHC.
19 So that's what this report is about is looking
20 at the patients and whether or not what is
21 being provided by LSP currently is -- comports
22 with the standard of care.
23     Q   So in a specific example, an
24 organization accredited by the ACA could fall
25 below the standard of care.  Is that correct?

Page 87

1      A   Repeat that.
2      Q   In a specific instance, an
3  organization that's accredited by the ACA
4  could fall below the standard of care.  Is
5  that correct?
6      A   In a specific instance, yes; and as I
7  just alluded to, you may have a patient who's
8  care was below the standard of care, but the
9  ACA didn't look at that.  Nor would NCCHC,
10 because they're not looking at specific
11 patients; they're looking at the organization.
12     Q   But yes, so looking at organizational
13 level, if a prison is accredited by the ACA,
14 that means at the organizational level it's
15 above the standard of care.
16     A   Yes.
17     Q   In your opinion, are the NCCHC
18 standards something higher than a minimal
19 level of care?
20     A   I've said that in my report, and the
21 answer is yes.  I believe the NCCHC looks more
22 at medical care than the ACA does and is
23 stricter, if you will.  I think their
24 standards are more specific, and I use them
25 more commonly when I'm looking at this gold

Page 88

1  standard for correctional care in jails and
2  prisons, but we all need to remember that
3  NCCHC exceeds the standard of care.
4      Q   Do you think the NCCHC standards are
5  aspirational?
6      A   Sometimes.  They're aspirational for
7  a lot of jails in the southeast that the --
8  they're contracts have written in that
9  they're supposed to stay in line with NCCHC;
10 although, they don't require them to follow
11 NCCHC.  I'm sure that Armor is aspirational to
12 comply with all the NCCHC standards in it's
13 jails and prisons.
14     Q   Do you think that they're
15 aspirational for a prison like LSP?
16     A   For LSP, currently, I think to pass
17 NCCHC is aspirational, and it's something
18 that's brought up by the plaintiff as what
19 they consider to be standard of care, and I
20 think its inappropriate for NCCHC to be the
21 standard by which LSP is judged.
22     Q   So you don't view the NCCHC standards
23 as authoritative?
24     A   Authoritative means in a specific
25 circumstance, but you'll have to ask me a

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 89

1  specific circumstance. Authoritative about
2  for sick call, or what are you referring to?
3      Q   As applied to LSP, do you think the
4  NCCHC standards are authoritative for its, you
5  know, operational processes?
6      A   I can't answer the question.
7      Q   So ACA and NCCHC standards largely
8  focus on operational standards. Is that
9  right?
10     A   Yes. I believe in general, they're
11 more operational standards about how the
12 system is put together, how different things
13 are conducted, what happens in sick call, what
14 happens in receiving, screening, what happens
15 at the initial evaluation and like medical
16 clearance, that sort of thing. I think
17 they're great in that regard.
18     Q   Then, when you focus in on treatment
19 of certain conditions, the ACA and the NCCHC
20 don't provide standards for how medical staff
21 should treat certain conditions. Right?
22     A   That's correct.
23     Q   So where does the content of that
24 come from in your opinion for the standard of
25 care?

Page 90

1      A   Well, that comes from --
2      Q   And by that, just to be clear, where
3  does the content for clinical standards of
4  treatment come from?
5      A   Right. That comes from my
6  determination. That comes from the standard
7  of care as determined by experts who work in
8  the field about what should be appropriate;
9  and then, in circumstances, we have in these
10 charts, we've got ulcerative colitis. We've
11 got COPD, interstitial fibrosis, you know, a
12 number of things, and that's -- you know, I've
13 spent a lot of time with that, as you know.
14     Q   Yeah. So to what extent are you
15 drawing from your expertise, and to what
16 extent are you drawing from -- let me rephrase
17 that. In addition to your expertise, what
18 sources are you looking to for the standard of
19 care for specific conditions?
20     A   We'll have to look at my report. I
21 --
22     Q   Did you site UpToDate? Sorry. Go
23 ahead.
24     A   I'm sorry. I stepped on you. I did
25 describe UpToDate in some of the

Page 91

1  circumstances. Sometimes, I didn't.
2  Sometimes, it's just an operational thing,
3  largely about operational about how these guys
4  were taken care of by the specialists and what
5  LSP did as a result. Those are -- I can't
6  summarize everything. We'll have to go
7  patient by patient.
8      Q   I'm just trying to understand sort of
9  the general level. So, you know, where you
10 cited UpToDate, that's because you view
11 UpToDate as an authoritative source for how a
12 specific condition should be treated?
13     A   I can't say that I describe it as
14 authoritative. I think it's the best source
15 that's available for those NPs and MDs at LSP,
16 as well as people around the country. Most of
17 the correctional medical organizations,
18 Corizon and Wexford and Armor and Centurion,
19 they use -- they have UpToDate available to
20 their providers, just liked LSP does. I think
21 it's the best place to look. I like some of
22 the other -- I like InterQual to help as far
23 as workups are concerned, and then, but
24 UpToDate is really -- I think it's the best
25 source to look up information, at least to

Page 92

1  start to look up information, but UpToDate
2  doesn't work in a prison; and so you've got a
3  good guideline about what should be done, but
4  how you can get that guideline cared for in a
5  prison is different.
6      Q   What do you mean when you say
7  UpToDate doesn't work in a prison?
8      A   UpToDate, as you know, the people
9  that are peer reviewing the UpToDate are not
10 correctional medical providers.
11     Q   So you think in some places what
12 UpToDate says is impractical in a prison. Is
13 that -- am I understanding you right?
14     A   I think impractical is a good word.
15 I think it needs to be interpreted by medical
16 providers about how and if they could
17 institute this knowledge for this patient in a
18 prison situation.
19     Q   And are there any standards or
20 sources or literature that you would point to,
21 you know, that you would want to look to in a
22 specific case to determine how, you know,
23 clinical information somewhere like UpToDate,
24 should be interpreted and applied in a prison?
25     A   Maybe.

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 93

1    Q   Can you give me an example?
2    A   No.  We have to talk about the
3 patient.
4    Q   We'll get to the patients in a
5 moment, but I want to understand in general
6 what you're looking at for your standard of
7 care.  So where UpToDate doesn't -- where
8 UpToDate may be impractical in a prison, what
9 do you then turn to to determine what does and
10 doesn't meet the standard of care?
11    A   Well, standard of care and what
12 occurs in a prison are two different things.
13 Standard of care is what qualified experts
14 determine is reasonable and appropriate, what
15 a prudent correctional medical provider would
16 do in a similar circumstance.  Now, as far as
17 instituting what UpToDate suggests about a
18 particular circumstance, let's just say
19 ulcerative colitis, if there are any
20 questions, well, that's when you kick it up to
21 the medical director or the doctor with whom
22 you have a collaboration agreement and how I
23 can get this done, or you talk to one of your
24 colleagues.
25    Q   And then, for you as a reviewer, what

Page 94

1 are you looking at to determine whether that
2 met the standard of care?  Is there anything
3 in addition to UpToDate in your general
4 experience that you would look at?
5    A   I can't answer that.  It depends --
6 it's really patient specific.
7    Q   Are there any examples of any
8 material that you looked at in the course of
9 your review for this case?
10    A   No.  I think the only thing I looked
11 at in this case, and I've got those citations,
12 are the charts, NCCHC criteria, which your
13 people are using so much, and UpToDate.
14    Q   You also mentioned InterQual.  I know
15 LSP doesn't use it.  Could you just explain
16 briefly what that is?
17    A   You know, I questioned Melanie
18 Benedict about that at some length, and I
19 talked to Dr. Lavespere about it.  InterQual
20 is used by all of the major correctional
21 organizations, and what it is that -- for
22 instance, if you have a fellow who comes in
23 with back pain, and you look up low back in
24 InterQual.  Then, it would ask you whether or
25 not had physical therapy or whether there was

Page 95

1 any imaging done, what the outcome of physical
2 therapy was, and before, you would send the
3 patient off for orthopedic consultation.  So
4 you've got a background that's set up.  Now,
5 the way that LSP does it -- and Melanie has
6 this information, and I believe I've produced
7 it, too.  They have a number of things that
8 are done, recommendations for laboratory
9 studies or imaging that are done before they
10 see a specialist.  You go to a neurologist.
11 You have to have a MRI essentially before you
12 see the neurologist, and then, they take a
13 history.  It's just kind of to get in the door
14 to see these specialists, these things have to
15 be done.  InterQual is what I'm most familiar
16 with.  Eceptionist was new, but I was pretty
17 clear after talking to Melanie and the people
18 at LSP that Eceptionist was working pretty
19 well for them.  So I didn't make any
20 recommendations about changing that.
21    Q   And to understand InterQual, are
22 these questions to be asked only when you're
23 sending someone off for consultation or when
24 somebody presents with a complaint?  If
25 somebody comes in with back pain, a doctor

Page 96

1 hasn't decided whether or not they need a
2 consultation yet, these are the questions you
3 should ask.
4    A   Both.
5    Q   Is there anything comparable that
6 you're aware of LSP using for sick call and --
7 we'll start with sick call.  Anything
8 comparable here where LSP using for sick call
9 that says these are the questions you should
10 ask for this kind of complaint?
11    A   No.  That comes out of the NP's
12 training and experience, and then, if they
13 have questions further, well, then,
14 Eceptionist has it, and there's also those
15 protocols that Melanie brought up.
16    Q   The same thing for the general
17 medicine clinic?
18    A   Yes.
19    Q   In addition to UpToDate, medical
20 societies, like the American Thoracic Society
21 or American Diabetes Association, put out
22 practice guidelines for clinical treatment of
23 various conditions.  Do experts within the
24 field of medicine generally consider those
25 reliable?

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 97

1    A   You know, I was interested -- was it
2  Dr. Puisis that was talking about the thoracic
3  society, and also, I think, USPS something.
4  What happens is that there are organizations,
5  nationwide organizations or societies that put
6  together recommendations, but what happens is
7  then, for primary care doctors, the primary
8  care organizations then interpret those and
9  how they might be used for primary care
10  patients. Then, you have correctional states
11  and jails and what might work in their
12  circumstances. So if the American Thoracic
13  Society is talking about doing a, let me see,
14  source synthesis on every patient who has a
15  soft tissue chest wound, that's entirely
16  different than what a primary care doctor
17  would do. So the recommendations,
18  particularly when we started talking about --
19  I think Dr. Puisis was talking about
20  recommendations for screening of smokers with
21  the CT scans. That's something that might
22  happen on the national level, but it's not
23  happening in corrections, and I think he was
24  really out of bounds when he starts making
25  that as a standard of care recommendation for

Page 98

1  LSP.
2    Q   So in terms of those guidelines that
3  the nationwide societies put together, and
4  correct me if I'm misunderstanding; I don't
5  want to put words in your mouth. Are you,
6  basically, saying that they are generally
7  considered reliable but not necessarily
8  applicable in prisons?
9    A   You know, I think we'd have to look
10  at one individually, but let's go to the
11  Thoracic Society. So you got a bunch of
12  thoracic surgeons that get together at that
13  meeting in Miami and their congress or a
14  number of the big guys at the major
15  organizations put together their
16  recommendations, and then, they publish those
17  for other thoracic surgeons throughout the
18  United States. Or maybe, emergency medicine;
19  you've got it board certified emergency room
20  doctors who are saying well, this is what we
21  think that board certified doctors should do.
22  So they recommend that, but it's still
23  interpreted at every hospital to whether or
24  not it can be instituted at their hospital,
25  whether or not its appropriate. That filters

Page 99

1  down the same way for primary care. Remember,
2  we're talking about primary care at LSP, not
3  an emergency room, not thoracic patients, not
4  cardiac surgery patients.
5    Q   Under the standard of care as you say
6  it, should providers seeing patients in
7  clinical appointments perform a meaningful
8  physical examination?
9    A   Meaningful is not a word that we use.
10  There's kind of a general physical
11  examination, but there's also a directed
12  physical examination. On that low back pain,
13  I wouldn't have that nurse practitioner
14  looking in the guy's ears. I mean, you might
15  do that at Kaiser or somewhere on the street,
16  because your trying to get a CPT code of four
17  or five. You put down review of systems about
18  how often they're having bowel movements when
19  they're having low back pain. That's trying
20  to increase your bottom line as opposed to
21  having a directed examination.
22    Q   Good clarification. In many
23  situations, a directed physical exam is what
24  is appropriate when a provider sees a patient
25  in the general medicine clinic or sick call?

Page 100

1    A   Correct.
2    Q   And should providers seeing patients
3  in clinical appointments read and monitor
4  testing?
5    A   You'll need to be more specific.
6    Q   Should they review test results and
7  monitor what test results have been showing?
8    A   From 2016, 2018? I don't understand
9  your question.
10    Q   Should they read and monitor the most
11  recent test results?
12    A   Yes.
13    Q   Should providers seeing patients in
14  clinical appointments monitor and manage
15  medications?
16    A   Manage what?
17    Q   Medications.
18    A   Yes.
19    Q   And should providers seeing patients
20  in clinical appointments educate patients
21  regarding medications?
22    A   Medications?
23    Q   Yes. Sorry. I pronounced that very
24  strangely. Medications, yes.
25    A   Yes.

25 (Pages 97 to 100)

Page 101

1     Q    Now, I want to understand how the
2  standard of care applies in various
3  situations, and in some of these, I imagine
4  you'll say you need more information to make a
5  determination. If so, just tell me what
6  additional information you need. Are you
7  asking for time?
8     A    Yeah, it's been another hour. Take
9  three minutes?
10     MR. DUBNER:
11        Sure, that's perfect. We'll be
12        back at 9:03 your time, 11:03 court
13        reporter's time.
14        (Brief recess.)
15  BY MR. DUBNER:
16     Q    So, Dr. Mathis, I'm going to ask you
17  some questions about how the standard of care
18  applies in various situations. If there is
19  additional information you need or sources you
20  want to look at to help you answer it, just
21  let me know. Is there any standard for how
22  quickly emergency medical personnel should
23  arrive on the scene of an emergency at a
24  prison?
25     A    Well, you know, I think that may

Page 102

1  vary. In one of your -- in your report, you
2  suggested four minutes, which is just
3  inappropriate if it takes 10 to 12 minutes for
4  an ambulance to get to a camp and get back.
5  So as a general rule throughout medicine, you
6  want -- if somebody has a cardiac arrest, you
7  want to get to them before they're braindead,
8  but that's not possible necessarily at prisons
9  in general and particularly where you've got a
10  prison over 18,000 acres and camps, where you
11  have to send an ambulance out, or you have to
12  send an ambulance out to just one of the
13  housing units to get somebody to the ATU. So
14  I think it's inappropriate to be able to set
15  up a standard of four minutes as suggested in
16  your report if that's what you're referring
17  to.
18     Q    Is there any standard that you think
19  applies?
20     A    No. Well, it's one of the things we
21  look at, and it's one of the things that
22  should be in a death report about how long it
23  took to get somebody back to the ATU or to the
24  hospital. You know, I think that's perfectly
25  appropriate, but every -- the situations

Page 103

1  differ depending upon what the prison is like
2  and what transport can be like and what's
3  going on with the patient.
4     Q    If a patient has no pulse and isn't
5  breathing, is it standard of care to use a AED
6  or defibrillator?
7     A    If you have an AED, then, it would be
8  perfectly appropriate to use it. Not all
9  prisons have AEDs in all of the housing units,
10  and so to say that it's standard of care to
11  have one in every housing unit, I think is
12  ill-advised.
13     Q    But where a prison does have them,
14  they should be used if a patient has no pulse
15  and isn't breathing?
16     A    If you have personnel that know how
17  to use it, the answer is yes. As you know in
18  some of these circumstances, you've got inmate
19  orderlies or inmates that are directing care
20  before officers arrive, and I don't think it's
21  -- we can set a standard for what an inmate
22  orderly should be doing necessarily. AEDs are
23  helpful, but everybody has to be trained in
24  it. I mean, have you used an AED before?
25     Q    My next question: When a patient who

Page 104

1  has repeatedly refused medical care in the
2  past presents with emergency symptoms, are
3  provider's obligations different from if they
4  had never refused treatment?
5     A    It depends on what the symptoms are.
6  It depends on what your knowledge of that
7  patient is. One of the things that's really
8  important about corrections is that these
9  people are you with you all the time. You
10  have exposures to them in the hallway. You
11  understand what's happened through custody as
12  opposed to on the street, where somebody may
13  not even know where they live. You know where
14  this guy lives. You know what kind of
15  reputation he's got. You know how he carries
16  himself out on the yard. So we have all of
17  this knowledge that isn't necessarily
18  recorded, and as far as refusals are
19  concerned, which is where you started, a
20  refusal should not make a difference as far as
21  what the EMT is recording or assessing as far
22  as a self-declared emergency. I think you
23  need to have someone who's licensed and
24  qualified to be able to make those triage
25  determinations, and that's why I've opined

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 105

1  that in my report.
2      Q  To step past the EMT, if a provider
3  has somebody come into the ATU with emergent
4  signs or symptoms and they know that they have
5  repeatedly refused medical care, does that
6  fact affect the provider's obligations?
7      A  It needs to be taken in the context
8  of what the patient is presenting with.  It's
9  really a professional determination about how
10 to deal with the patient at the time.  To some
11 degree, it's like a mother who's got six kids
12 and she knows which kid cries wolf all the
13 time and which kid, whenever they cry, they
14 need to have help.
15     Q  So is it appropriate for providers
16 to say, I know this guy cries wolf when
17 presented with emergent signs or symptoms?
18     A  You'll have to show me the specific
19 circumstance.  I can't give you a general term
20 about that.  I gave you general information
21 about refusals, but you're going to have to
22 show me the chart.
23     Q  So is it sometimes appropriate?
24     A  Sometimes, it is.  It depends on what
25 they show up with.

Page 106

1      Q  So just as an example, let's say a
2  patient presents in the middle of diabetic
3  ketoacidosis with severe anemia, are previous
4  refusals relevant to the question of what care
5  should be provided?
6      A  No.
7      Q  And what care should be provided
8  under the standard of care?
9      A  With diabetic ketoacidosis?
10     Q  Yes.
11     A  At an ATU or at an emergency room?
12 Where are you talking about?
13     Q  At the ATU.
14     A  At the ATU, you hydrate them.  You
15 may give them insulin, and you get them out.
16     Q  What do you mean by "get them out?"
17     A  Send them to the emergency room.  You
18 can't follow them closely there.  You don't
19 have a laboratory.  You don't have -- you may
20 not even have pumps.  You don't have the
21 nursing that can observe them 24 hours a day.
22 You don't have monitors in the infirmary.  I
23 mean, it's not a place to be -- it's an ATU.
24 It's not an emergency room.
25     Q  Does the standard of care call for

Page 107

1  giving routine physicals to people age 50 and
2  up in a prison?
3      A  I would say that some prisons have
4  adopted that, but I can't say it's standard of
5  care.  And I don't think even NCCHC says that.
6  But I can look it up if you like.
7      Q  Is that where you -- is there
8  anywhere else besides NCCHC that you would
9  look to see if it's standard of care?
10     A  We'd look at ACA, but remember, I
11 don't say that NCCHC and ACA are standard of
12 care.  I say they exceed the standard of care.
13     Q  Right.
14     A  So otherwise, you'd look in the
15 contract or the directives, in the LSP
16 directives is what we're kind of moving
17 towards, but the contract is also one of the
18 things that happens particularly in jails or
19 may happen in like the major organizations
20 that are -- the states that are interacting
21 with the Corizon or Wexford, maybe, Armor,
22 Centurion.  It just depends on what state is
23 it is.
24     Q  Is the standard of care determined by
25 the contents of the prison's own contract and

Page 108

1  directives?
2      A  It's one of the considerations when
3  we look at what happens.  I like to base my
4  standard of care on my qualifications.  I will
5  support it by what the prison or jail uses
6  from the -- or whether it adheres to its
7  contract; and then, finally I'll bring out the
8  ace in the hole about whether or not it
9  adheres to the gold standard, the NCCHC.
10     Q  But certainly, if, you know, a prison
11 directive said, we don't provide medical care
12 at this prison, that, obviously, would not be
13 within the standard of care.  Correct?
14     A  You don't provide medical care at
15 this prison?  I don't understand your
16 question.
17     Q  So in understanding how you use
18 contracts and prison directives to determine
19 the standard of care, the contents of a
20 contract or a directive can be themselves
21 below the standard of care.  Correct?
22     A  Yes.  A circumstance might be where
23 some of the jails say we don't provide chronic
24 care for patients.  We only do acute care.  So
25 that's not uncommon at some of the jails.

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

Page 109

1  It's generally smaller jails who don't keep
2  patients as long -- or keep inmates as long,
3  but not providing care is -- I mean, you have
4  to provide care. You lock these people up.
5  It's what the Judge signed onto.
6     Q  Is it within the standard of care to
7  treat all inmates with altered mental status
8  based on a presumption that they have ingested
9  narcotics?
10    A  I think narcotics in a jail or a
11  prison need to be considered first and
12  foremost with altered mental status since
13  contraband use is so prevalent. So using
14  Narcan by officers or by medical providers
15  first when you see altered mental status, at
16  least coordinated with a blood sugar
17  determination. Those are the first two things
18  to be considered and instituted when you see
19  altered mental status without a history.
20    Q  Just to check, when you say blood
21  sugar determination, what is that intended to
22  look for?
23    A  To look for hypoglycemia or
24  hyperglycemia. Diabetes, as you know, is
25  prevalent in the United States. Maybe,

Page 110

1  20 percent, 30 percent of people have
2  diabetes, and they may or may not be taking
3  their medications appropriately or may have
4  had a bake sale, where they filled up on
5  sweets, and so their blood sugar may be highly
6  elevated, or they didn't take their medicine.
7  I mean, it's hard to say, but those are two
8  primary considerations when assessing altered
9  mental status.
10    Q  So in your view, then, it is within
11  the standard of care to treat inmates with
12  altered mental status based on a
13  presumption that they've ingested narcotics?
14    A  On a possibility that they -- you're
15  not presuming they did, but it's possible they
16  did. So you're getting that out of the way
17  right now. What's difficult about it is like
18  one of the patients we have here that they --
19  this Fentanyl is so potent that it takes a lot
20  of Narcan to be able to reverse it. In the
21  old days when we were just dealing with
22  heroin, we didn't -- it wasn't as difficult,
23  but Fentanyl is another story. It needs a lot
24  of Narcan. I'm not sure that a couple of many of
25  sprays of nasal Narcan is adequate in many of

Page 111

1  these patients; and then, you've got patients
2  that are altered because of the other drugs
3  they've ingested: The synthetic cannabinoids,
4  the mojo business that has been so common at
5  LSP, but you know, drugs are -- if you can
6  rule out drugs from the beginning, then, you
7  can go on further on your evaluation. Rule
8  out drugs and rule out blood sugar
9  abnormalities, well, then, you can start to
10  think about the CVAs that we're concerned
11  about in some of these patients, and they were
12  concerned about during the trial.
13    Q  But until they've ruled out drugs,
14  they should be -- I don't want to put words in
15  your mouth. You said you rule out drugs in
16  the beginning, and then, you can start to
17  think about CVAs. So until they've ruled out
18  drugs, that's what they should be sort of
19  focusing on frontline possibility?
20    A  Yes. Ruling out -- looking at blood
21  sugar and looking at drug ingestion are the
22  first things to be thinking about in the --
23  unless you have evidence of trauma, I mean,
24  that's a different story. If somebody is
25  squirting blood or their head is caved in,

Page 112

1  why, then, you know you've got a different
2  type of a patient, but drugs and blood sugar
3  are the first things you need to look at.
4     Q  When you say look at drugs, so
5  Narcan, also urine toxicology?
6     A  Pardon me?
7     Q  When you say look at drugs, what does
8  that involve, the use of Narcan, the use of
9  urine toxicology?
10    A  Well, Narcan is the only thing you've
11  got on-site immediately. Urine toxicology is
12  important, and sometimes, it can show you what
13  the patient ingested but not always,
14  particularly with the cannabinoids and the
15  Mojo business. Methamphetamine, it can help
16  you with, but Narcan doesn't help
17  methamphetamine. I don't see any of these
18  patients that were taking in Valium types of
19  drugs that -- so, you know, urine tox screen
20  is helpful, but that's by the time you get
21  it's initial triage, initial evaluation at the
22  site, and then, they're to the ATU or the
23  emergency room or ATU where you're getting
24  that information.
25    Q  So is it appropriate to do a urine

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 113

1    toxicology on all patients who come to the ATU
2    with altered mental status?
3        A    Unless you have other information
4    that leads you in a different direction.  So
5    we've just talked about what to do at the site
6    where you think -- you look at drugs.  You can
7    do the blood sugar, and then, by the time you
8    get to the ATU, you have other information.
9    You may have the information that this guy was
10   fine, and then, he started drooling and
11   couldn't move his left side.  Now, that, you
12   know, obviously, that's a CVA.  So then, your
13   urine tox screen is not going to be as helpful
14   then, because you're dealing with something
15   that's got to go out to a higher level of
16   care.
17       Q    Right.  So where there are signs of a
18   CVA, like you said, you know, facial droop or
19   -- I'm sorry.  You didn't say facial droop.
20   You said -- I forget the sign you gave.
21       A    Right.  Yeah, those people have to go
22   out.
23       Q    Let's move to another question.  Is
24   cooling part of the standard of care when
25   trying to stabilize a patient with significant

Page 114

1    hyperthermia?
2        A    Except for these guys that take the
3    synthetic cannabinoids with a temperature of
4    108 in the wintertime when it's only 60
5    degrees outside.  We're not gonna be dealing
6    with a heat stroke then.  That was a drug
7    ingestion.
8        Q    Do you know what the weather was on
9    that day?
10       A    No, I don't, but I'm talking about --
11   you asked me whether or not cooling with a
12   high temperature is appropriate, and I'm just
13   giving you the circumstances.
14       Q    Yeah, and so that actually -- yeah,
15   and so that's goes to another question I have.
16   So does the use of cooling change if a patient
17   is suspected to have used controlled
18   substances?
19       A    No.  They should be cooled, but they
20   need to get out.  I mean, that's a transfers.
21   It's like those heat case that Dr. Vassalo and
22   I were involved in Texas.  I mean, those guys
23   had a temperature of 108, because they were
24   cooking, and they were taking, you know,
25   taking major antipsychotics.  That was a

Page 115

1    different story than what we're dealing with
2    in the patients that I reviewed at LSP.
3        Q    Under the standard of care, when a
4    provider examines a patient with COPD in
5    general medicine clinic, what should that
6    examination consist of?
7        A    Vital signs, determination about
8    whether or not they're taking their
9    medication, history about how they're doing
10   and directed examination.
11       Q    Is there any data that they should
12   collect?
13       A    Well, I brought up whether they're
14   taking their medications.  One of the ways
15   that a nurse practitioners determine that is
16   to look at whether or not the refills were
17   done on time.  Now, the inhalers are a
18   difficult thing in corrections.  You've got
19   some guys that have got 15 or 20 inhalers
20   stuck in their cell, because they're not using
21   them everyday.  PRNs, I mean, you write it for
22   four times a day PRN, and then, they put in
23   for another prescription; and first thing you
24   know, they've got these large numbers of the
25   inhalers.  So that's one of the things that

Page 116

1    you look at is whether or not they were
2    refilled, and you can do that on the computer
3    at LSP, and you ask the patient are you using
4    it and finding out what their outcome is.
5        Q    And in terms of other data, is there
6    any tests that should be done when examining a
7    patient with COPD in a general medicine
8    clinic?
9        A    Well, peak flow is something that we
10   can commonly do.  It's more done in asthma,
11   which is a better indicator of what's going on
12   in asthma than in COPD, but some people will
13   use it in their COPD clinics; and then, there
14   are pulmonary function tests that you may do
15   from time to time, but for the large part,
16   it's just about asking about their symptoms.
17       Q    What should a provider due under the
18   standard of care when it's spirometry report
19   shows severe obstruction in a COPD patient?
20       A    Well, he should see what medications
21   they're taking, whether or not they're taking
22   the medications as previously prescribed.
23   Severe obstruction is one of those things that
24   can be treated, but maybe, it's already being
25   treated.  So we just need the history about

Page 117

1  what they've been through before. Severe
2  obstruction may be their baseline; and if it's
3  something that's new, then, different
4  medications could be administered or
5  consultation depending on their degree of
6  disability. One of the things they also do
7  there is that six-minute walk test to see
8  whether somebody desaturates. In other words,
9  for instance, someone may be having -- you or
10 I may have an oxygen saturation of 92 or
11 93 percent while we're sitting here talking;
12 but if we walk a hundred feet, well, then our
13 oxygen saturation could diminish, maybe, some
14 people who are sick down to 70 or 75. What
15 happens then is they're more subject to
16 cardiac arhythmias and complications. So
17 those are the patients that even Medicare
18 supports giving oxygen on a continuous basis
19 when they desaturate; and that's when also in
20 a prison where you might -- that would be a
21 reason to put somebody in a wheelchair. So a
22 porter is pushing them around rather than --
23 and they've got oxygen on their wheelchair.
24      Q   If a patient has been complaining
25 about back pain for a week and hasn't been

Page 118

1  able to get out of bed for three days and
2  becomes incontinent, what examination should
3  the provider do under the standard of care?
4      A   Well, I guess if they're in bed, it's
5  pretty hard to be -- to have them seen. You
6  need to be more clear about that. If they're
7  in bed, if they can't get out of bed, then,
8  they can't see the provider unless they're
9  taken there by a porter or taken to the ATU by
10 ambulance. I need a different hypothetical.
11     Q   And yeah -- no, that's a good
12 clarification. Should they been taken to see
13 a provider with those symptoms?
14     A   They should be presented to a
15 provider if they're incontinent, and they
16 can't get out of bed. They need to be
17 presented to a provider one way or the other,
18 whether it's by a self-declared emergency with
19 an EMT providing that information to a higher
20 level provider or somehow getting that patient
21 seen.
22     Q   Why is that important to do?
23     A   Incontinence is important. That
24 could be one of the red flags of cauda equina
25 syndrome or spinal cord compression, or it

Page 119

1  could be that they're just lazy and won't get
2  out of bed. That happens too. It kind of
3  depends on their age and the situation and
4  that sort of thing.
5      Q   You said red flag symptom. Can you
6  explain what that means?
7      A   In back pain, there are red flag
8  symptoms, which like perianal anesthesia,
9  where you don't feel anything around your
10 anus, around the mid-side of your buttocks,
11 where you're incontinent, or you may have a
12 bladder, because you've got overflow
13 incontinence, or you're not -- you can't --
14 your bowels aren't moving, because you've got
15 spinal cord compression; you've got a bowel
16 impaction. That really comes down to
17 observation and putting two and two together
18 as a provider.
19     Q   As a general matter, to step back,
20 when somebody has a red flag symptom, it's
21 important to you, you know, make a differential
22 diagnosis. Is that right?
23     A   Yes, and those people with red flag
24 symptoms should be -- let me see -- at least
25 should have a consultation somehow with a

Page 120

1  higher level of care.
2      Q   What do you mean by higher level of
3  care here?
4      A   Whether it would be by a nurse
5  practitioner or a doctor or the emergency room
6  or a neurosurgeon, orthopedist or whatever. I
7  mean, red flags, they're called red flag for a
8  reason. There's something going on here
9  that's got to be looked into, because this is
10 not by itself necessarily reversible.
11     Q   If a patient with diabetes complains
12 of burning left-side chest pain lasting three
13 days and radiating up his throat, what
14 examination should a provider make under the
15 standard of care?
16     A   Well, at least they should have an
17 electrocardiogram and vital signs. Burning
18 chest pain is not normally -- what I mean,
19 it's kind of a little different type of a
20 symptom. It might be more of a female symptom
21 rather than a male symptom, because they
22 perceive different -- their cardiac symptoms
23 differently; but burning is not -- I would say
24 not primarily associated with cardiac
25 discomfort but more commonly associated with

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 121

1  esophageal disorders.
2      Q   In an acute infirmary, like Nursing
3  Unit #1, does the standard of care require
4  nurses to take regular vital signs on all the
5  patients?
6      A   First of all, I disagree with acute
7  infirmary.
8      Q   You're right, not good -- what
9  terminology would you use?
10     A   Infirmary, that's what they use,
11 Nursing Unit #1, and yes, I think routine
12 vital signs are appropriate, and routine vital
13 signs, however, might only be done once a day.
14 These are not -- these are not -- they're
15 patients that need to have a nursing care and
16 follow-up care, but they don't -- they're
17 not -- it's not a hospital either.
18     Q   Right, and to go at that sort of
19 distinction between the word "acute," when
20 it's unclear if a patient is stable, is it
21 within the standard of care to observe them in
22 the infirmary?
23     A   I think that's not unreasonable.
24 There's that one guy that you've got that,
25 that FUO, 103.2, observing that guy in the

Page 122

1  emergency or in the infirmary was
2  inappropriate in my opinion.  That guy should
3  have been sent out.  103.2 with an altered
4  mental status requires a higher level of care
5  than could be provided by LSP.  That was a
6  violation of the standard of care.
7      Q   Is there any sort of general -- let
8  me make sure, because I think I had a double
9  negative in my question.  So I want to make
10 sure I understood your answer.  Is it
11 reasonable to put unstable patients in the
12 infirmary for observation?
13     A   Unstable in what regard?
14     Q   Patients who have had a red flag
15 symptom, let's say.
16     A   A red flag symptom of what?
17     Q   So this is how I'm trying to -- I
18 appreciate your problem with answering the
19 question.  What criteria would you use to
20 determine whether and when it's appropriate to
21 observe an unstable patient in the infirmary?
22     A   We need to understand unstable first.
23     Q   Um-huh (affirmative expression).
24     A   And that comes down to individual
25 patients and what the circumstance is.  It may

Page 123

1  vary about, you know, the day of the week or
2  how the patient is unstable, whether they've
3  been taken their medications.  There are a lot
4  of things that come together in that.  So we
5  really need to look at your patient charts.  I
6  can't answer that generally.
7      Q   We talked about differential
8  diagnoses a moment ago.  Where there is still
9  a need to make a differential diagnosis about
10 a potentially serious condition, is it
11 appropriate to observe somebody in the
12 infirmary?
13     A   It depends on what condition it is.
14     Q   And are there any sort of general
15 criteria you can apply to that question?
16     A   I think you're going to need to ask
17 me specific questions.
18     Q   Can you elaborate on what you mean
19 when you say it depends on what the condition
20 is?
21     A   Well, somebody that's having upper GI
22 bleeding, they're unstable.  I would not
23 observe those, nor recommend that LSP observe
24 them in the infirmary.  Somebody that's having
25 hemorrhoidal bleeding, I think following them

Page 124

1  in the infirmary would be not unreasonable,
2  but you need to have the involvement of your
3  medical provider first.  As far as, for
4  instance, blood pressure, blood pressure can
5  be followed in the infirmary, because you
6  don't know what they're -- whether they're
7  taking their medications, but they've got KOP
8  medications out on the yard or out in the
9  general housing.  So that's one of the things
10 that the nurses in the infirmary can
11 administer medications, and you can see what's
12 happening.  That's a good thing to do.
13     Q   Now, you said, going back to vital
14 signs, that routine vital signs might be once
15 a day.  The standard of care for how often
16 vital signs should be taken depends on the
17 patient's condition and diagnoses.  Is that
18 correct?
19     A   Yeah.  You got that quadriplegic guy
20 that lives in the nursing unit.  I mean,
21 unless he has something that's changed, he's
22 there primarily because he needs the help from
23 the nurses.  He needs the orderly help, and
24 taking his vital signs three times a day is
25 just an intrusion.

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 125

1    Q   Does the standard of care require the
2  nurses to note the time that they take vital
3  signs in the infirmary?
4    A   Yes.
5    Q   And if nurses in the infirmary have
6  orders about what to do when a vital sign
7  falls below a certain level, does the standard
8  of care require them to follow that order?
9    A   Yes.  Follow the order or call the
10  doctor.  I think you're talking about that guy
11  that had low blood pressure, and then,
12  Dr. Toce was involved.  I'd like to talk about
13  him specifically, because I reviewed the case.
14    Q   And we'll come back to the specific
15  patients a little bit later this afternoon or
16  afternoon for me.  It might still be morning
17  for you.  Under the standard of care, what
18  monitoring is recommend for people with
19  cirrhosis?
20    A   You know, that varies, because LSP is
21  one of those organizations now that's treating
22  their HCB patients.  That wasn't always the
23  case.  That's changed during the past five
24  years or decade.  I know that there have been
25  huge cases about that in Florida, about not

Page 126

1  being involved in the hepatitis C clinic.  So
2  that kind of sets the stage for following up
3  the cirrhosis patients also, but what we see
4  at LSP is they're trying to do an ultrasound
5  every six months to assess the possibility of
6  adenoma, or liver cancer; and as you know,
7  that wasn't perfect in the one case that we
8  reviewed, because it didn't show it --
9  necessarily show a tumor.  So CT scan could be
10  better when it's directed, but the ultrasound
11  is a triage treatment.  Now, following AFPs
12  can be helpful, because that can also give
13  you -- alpha-fetoprotein, AFP, can give you an
14  idea whether somebody is more likely to have
15  liver cancer in those patients with cirrhosis.
16  Other evaluations include just looking at
17  their degree of ascites and their peripheral
18  edema; and from what I saw, that was being
19  done at LSP.
20    Q   Are there any blood tests that should
21  be routinely done for people with cirrhosis?
22    A   Well, I said AFP.
23    Q   The AFP.
24    A   Right, and they can do that FIB-4.
25  I'm not sure they do that.  I think they do

Page 127

1  the -- they actually do the ultrasound
2  examination to look for the thickening of the
3  liver at LSP.
4    Q   And how often should those blood
5  tests occur?
6    A   Well, I think that varies from state
7  to state.  It's hard to -- I can't say what
8  the standard of care in New York City is the
9  same as standard of care at LSP.  That's
10  determined by people at the upper levels, what
11  they're going to do in their state.  It's
12  complicated.  That's like what Rodriguez and
13  Lavespere determine at the headquarters, and
14  then, they work with their medical directors
15  about what they're going to set at their
16  protocols.
17    Q   So when you say determined by people
18  at upper levels, you mean, you know, statewide
19  corrections medical director.
20    A   Yeah, the statewide corrections
21  medical director -- well, yes in this
22  circumstance, statewide medical director and
23  headquarters.
24    Q   Who was the other person you
25  mentioned, Rodriguez?

Page 128

1    A   Yes.  Stacye.
2    Q   Oh, Stacye Rodriguez.
3    A   She's the DON.  It was a little out
4  of context.  Sorry.
5    Q   Oh, no.  That's okay.  So there's no
6  standard of care for how often people with
7  cirrhosis should get blood tests?  It's just
8  determined by state correctional personnel?
9    A   You know, most of the states will set
10  up protocols for how they're going to follow
11  these people, but like at LSP, what changed
12  was it was more difficult to get some of these
13  tests done during COVID, and they've had
14  difficulty with their lab, and you know, how
15  often ultrasound was showing up at the site
16  and whether they could send people off-site
17  for follow-up.  So there are other
18  circumstances that come into play, but I
19  can't -- I am not willing and I'm unable to
20  give you what I think is a standard of care in
21  corrections for how often these people should
22  have it.  I did bring up the ultrasound
23  examination at least once a year, and AFP are
24  the two primary tests that I'm interested in
25  seeing.

Page 129

```
 1        Q   But no opinion on the frequency of
 2   the AFP test?
 3        A   No.  At least once a year.
 4        Q   At least once a year.  Thank you.
 5            And you referred to difficulty with
 6   the lab at LSP.  You're aware that the lab was
 7   closed for about a year.  Is that right?
 8        A   Yes.
 9        Q   The fact that the lab is closed, does
10   that change LSP's obligations under the
11   standard of care in your mind?
12        A   It doesn't change the standard of
13   care, but it changes how things can be done,
14   because like I've alluded to a number of times
15   before, if you have a laboratory that's
16   readily available, then, you can send the lab
17   out, but LSP had difficulty getting even their
18   stat labs picked up; and that's always an
19   issue, whether you're in family practice on
20   the street or at LSP.  You got to get the
21   laboratory to come pick this blood up, and
22   then, sometimes, it waits, like that guy with
23   the FUO, that 103.2, his white count didn't
24   get done, because they don't normally do that
25   as a prison laboratory, and they had to wait
```

Page 130

```
 1   until Monday.  I should have been sent out
 2   stat, but it didn't get done.
 3        Q   Is it fair to say when the laboratory
 4   closed, that didn't affect the standard of
 5   care for stat tests, like you were saying, but
 6   might have for more routine preventative lab
 7   work?  I just want to make sure I'm
 8   interpreting what you're saying.
 9        A   The laboratory has these i-STAT
10   things that they do, where they do a
11   hemoglobin and hematocrit and basic
12   chemistries.  So that's done on-site quickly,
13   but I don't think they had the laboratory open
14   at night.  I think it was just during the day.
15   Now, as far as sending things off, stat
16   laboratory tests, well, then you've got to get
17   Labcorp to come pick it up, and that's not
18   always reliable, particularly not out there in
19   the sticks like Angola.  Then, they sent them
20   to St. Francisville.  I mean, it's changed,
21   but currently, they have a functioning
22   laboratory that does the i-STAT, and they send
23   out more complicated lab tests, I believe, to
24   Labcorp.
25        Q   If a patient is 50 with cirrhosis has
```

Page 131

```
 1   blood in his stool, are there any diagnostic
 2   tests that are required by the standard of
 3   care?
 4        A   I think I need to see the specific
 5   patient.  Blood in his stool, or this is
 6   rectal bleeding, what do you mean?
 7        Q   Blood in the stool.
 8        A   Blood in the stool, hematochezia, so
 9   we've got blood that's mixed in the stool, or
10   blood coming from the anus?  I'm not sure
11   about the history.  I need to give me a little
12   more history.
13        Q   Sure.  Mixed in the stool.
14        A   Mixed in the stool, that sounds to me
15   like it's -- it's hard to say.  Now, there is
16   one patient that was triaged by an EMT at the
17   end of his life when his liver was failing, ad
18   you may be alluding to that patient.  That
19   patient should have been seen sooner and not
20   triaged by the EMT.  But I commented on that,
21   and I also gave you the causation on it, which
22   I don't think it would have made any
23   different, because he was in liver failure.
24        Q   Under the standard of care, what kind
25   of monitoring tests are used to determine if a
```

Page 132

```
 1   patient's diabetes is in good control?
 2        A   Hemoglobin A1C.
 3        Q   Under the standard of care, how often
 4   should a diabetic be monitored for diabetic
 5   retinopathy, neuropathy or nephropathy?
 6        A   They are three separate questions.
 7        Q   Sure.  Let's start with -- go ahead.
 8        A   Retinopathy, once a year, and
 9   nephropathy is covered when they come in, and
10   they get routine laboratory test, and that
11   depends on their degree of control; and the
12   peripheral neuropathy, peripheral neuropathy,
13   ideally, I'm not ready to the say the standard
14   of care, but that should be done when they're
15   doing their diabetes evaluation, doing their
16   monofilament testing, but it's usually done
17   from, particularly in prison -- the problem in
18   prison is the drugs that are helpful are also
19   contraband.  You know, people -- that's one of
20   the things that Gabapentin is useful for, but
21   it's also very useful for snorting, and that's
22   done in prison all the time.  So we have drugs
23   that we might be able to use in the street,
24   but a snorting and shooting it in prison is a
25   problem.
```

Page 133

1    Q   What expertise are you basing that
2   opinion on?
3    A   My training and my experience, and
4   I've seen it. I mean, I know what happens out
5   there in the yard. It's just like inhalers,
6   you can use an inhaler and spray it until it's
7   empty into a Kleenex and then, snort the
8   Kleenex or shoot the Kleenex, and then, you
9   get high off of it. These drugs are used
10  differently in prison than they are in the
11  street, or at least we know more about it in
12  prison.
13   Q   When a provider sees a patient
14  complaining of lower back pain that is
15  unbearable and radiating down their left leg
16  and saying that they've begun having
17  difficulty with the grip in their left hand,
18  what examination should the provider do to
19  comply with the standard of care?
20   A   I need more history on that patient.
21  I mean, it sounds like that could be a spinal
22  cord, but whether the grip in the left hand,
23  when it occurred, and the sciatica, I mean,
24  it's just -- I don't know. You didn't give my
25  enough information.

Page 134

1    Q   That's all right. Yeah, so what
2   additional information would you want? When
3   it occurred. Anything else?
4    A   Sure, when it occurred, how long it
5   -- if the sciatica is different, then, the
6   grip in the left hand. If it occurred at the
7   same time, what the blood pressure is, whether
8   they're having any -- demonstrating any
9   difficulty walking, whether or not they, at
10  that point, we talked about incontinence and
11  low back pain. You had a couple of questions
12  about low back pain and red flags, and so
13  going in that direction, see if there were any
14  red flags, something they're complaining
15  about.
16   Q   What specifically should be done to
17  assess the left-hand weakness?
18   A   First of all, to determine whether or
19  not it's actually weak. You can grip hands
20  grips and have them manipulate, let's say, a
21  pencil or whatever to see whether or not --
22  what they do with it. It kind of varies
23  about, you know, who the patient is, their age
24  and the presentation. So we've already gone
25  from like just this general question that you

Page 135

1   gave me down into really specifics, and that's
2   hard for me without knowing what the specifics
3   of this patient are; and to give you a
4   standard of care about that in general, I
5   can't do that.
6    Q   I appreciate the sort of specifics
7   that you are giving on what kind of questions
8   need to be asked to determine the standard of
9   care. That's very helpful. Assuming that the
10   grip is determined by, you know,
11  handgrip-type test to be weak, what
12  neurological assessment should be done?
13   A   So now, we're on a hypothetical.
14  Right?
15   Q   Um-huh (affirmative expression).
16   A   The hypothetical is this guy's got
17  sciatica and diminished grip in his left hand.
18   Q   Yes.
19   A   And the hypothetical then, now, I'm
20  going onto include that the hypothetical be --
21   Q   And the question is what neurological
22  assessment should be done?
23   A   Well, the first and foremost is to
24  assess the grip and look at sensation and make
25  a consideration about whether or not there's

Page 136

1   cervical disease, which is the most likely
2   cause of the grip abnormality rather than
3   stroke, and sciatica is involved with pain.
4   So that's not a stroke when there's pain
5   involved. So you're kind of getting -- I
6   mean, I'm having difficulty with this line of
7   questioning.
8    Q   Okay. I'll move onto another one.
9   Under the standard of care, what should
10  providers do when a patient's hypertension is
11  uncontrolled despite being prescribed
12  medication?
13   A   Well, sometimes, you can't control
14  somebody's medication. You may be alluding to
15  the fellow that was on three
16  antihypertensives, and his blood pressure
17  still wasn't controlled. So that would be an
18  excellent time to put somebody in the
19  infirmary to make sure they're getting their
20  medications; and then, there was at least
21  another patient who, once they put him in the
22  infirmary, well then, he got hypotensive,
23  because he was taking his medication. We're
24  dealing with, particularly with adults, KOP
25  medications are difficult, because you don't a

Page 137

1  hundred percent know whether they're taking
2  their medication, and so you question them.
3  You look at the, like the NPs do, see whether
4  or not they made the refills, and you put all
5  these things together to see whether or not it
6  was a fault of the patient compliance, or
7  because they've got -- maybe, they've got a
8  pheochromocytoma, some reason that's causing
9  to have such a high blood pressure; or another
10 circumstance, maybe, they just stroked, and
11 they've got -- the one guy's got -- we're
12 going to talk about who had systolic blood
13 pressure of 300. Well, should that be
14 lowered? We'll have to talk about that,
15 because not necessarily. That's a protective
16 mechanism for the body to try and get blood to
17 an area, and so we need more specific
18 questions.
19     Q   Let's say that, you know, the
20 provider determines that a patient is
21 non-compliant with, for example, hypertensive
22 medication, what should they do to assess the
23 reasons for non-compliance?
24     A   Could ask them about the side
25 effects. That's first and foremost things.

Page 138

1  All medications have side effects. If
2  suddenly their nature isn't working anymore or
3  they're sleepy, then, you investigate what
4  other drugs might be used instead. To have
5  somebody on three medicines, particularly
6  Hydralazine, and not have any response is --
7  something is fishy about that.
8      Q   Is there anything else that they
9  should assess when looking at reasons for
10 noncompliance besides side effects?
11     A   Well, noncompliance can be a result
12 of people trying to even selling their
13 medicines. I mean, it's a difficult
14 situation. We need to talk about more
15 specific patients. One of the -- the line of
16 questioning about trying to set up everything
17 that I think is standard of care before we go
18 into the specific patients is difficult for
19 me. I mean, we can talk all day about what I
20 think is standard of care, but I can't give
21 you every standard of care there is in
22 corrections.
23     Q   I understand that some of these, you
24 know, you will need more information to
25 answer. That's why I'm checking to see -- you

Page 139

1  know, some of them you will have an answer;
2  some of them you won't. In addition to asking
3  about side effects and whether they're selling
4  medications, should providers look at
5  potential obstacles to getting the medication
6  regularly?
7      A   Well, they do, because they can look
8  at whether or not they refilled it; and if
9  it's a KOP, the obstacles are the patients,
10 not the prescriber. Remember, they get the
11 drugs. If they refilled them, well, then,
12 they have the drugs in their possession; and
13 why they're not taking it may be -- maybe, a
14 prescribing practice. I mean, trying to take
15 a drug once a day is hard. Twice a day, yeah,
16 maybe. Three times a day, boy, it's getting
17 more difficult. So that's what, you know, a
18 mature provider looks at and tries to decide
19 what this patient might be able to comply
20 with. Maybe, a patch is necessary. If they
21 use patches there, Catapres or something like
22 that. It's just hard to say.
23     Q   In terms of medications that aren't
24 KOP that they need to go to, you know, pill
25 call for, what should providers ask about, if

Page 140

1  anything, to assess the reasons for
2  noncompliance with non-KOP medications?
3      A   Pill call's a pain. There's a lot
4  that can happen by the time you line up until
5  the time you get the drugs administered.
6  Maybe, it's you're afraid to come out of your
7  cell, because somebody is harassing you. It
8  may be that you're paranoid. It may be that
9  the pill call line is 45 minutes long. So
10 that's an obstacle, and sometimes, that
11 happens; but the fact that they're going to a
12 pill call line means that you have a MAR that
13 you can look at and see whether or not they're
14 coming up to the take their medication. So
15 you might have a patient go from KOP to the
16 pill call line, because they're not taking
17 their medication. So you put all these things
18 together to come up with a reason that may
19 have bearing on their medication
20 administration and their blood pressure
21 determination. Then, maybe, you put them in
22 the infirmary so they can be watched more
23 closely. I mean, it's -- there's -- I can't
24 answer that question generally.
25     Q   But just to sort of summarize it, and

Page 141

1  again, if I'm, you know, misinterpreting you,
2  please, let me know. I don't want to put
3  words in your mouth, but providers should ask
4  about obstacles to getting the medication and
5  should look at the MAR. Is that correct?
6      A   If they're on DOT, they should look
7  at the MAR. If they're on KOP, then, they
8  look at the medication refills, which is
9  available. The MAR, I don't believe is
10  available on their computer.
11     Q   And just -- you used the acronym DOT,
12  what is that?
13     A   Direct observed therapy, where you've
14  got somebody eye watch. You take your pills
15  now, or you watch me. This is DOT. Watch me
16  take a sip of water. Meaning, prisons will
17  vary. It may be nurse administered where you
18  have the nurse actually giving the drug where
19  you -- say you're giving that Gabapentin we
20  talked about earlier, and you have a patient
21  open up their mouth. That never seems to work
22  very well but you know, it's one level of
23  understanding whether the patient is actually
24  taking the medication or cheeking it and
25  giving it, selling it to somebody else.

Page 142

1      So I think that we're going to break
2  at 11 -- it's only 10 o'clock. I'm sorry.
3  This will just be another three-minute break.
4      MR. DUBNER:
5      Yeah, and you know, Ms. Marino
6      if you need a longer break at some
7      point, let me know. Otherwise, the
8      11:00 Pacific, 1:00 Central will work
9      for me.
10  BY MR. DUBNER:
11     Q   Couple of more questions before we
12  break here. Under the standard of care, when
13  a patient is repeatedly leaving appointments
14  because of how long he's waiting, what should
15  providers do in that circumstance?
16     A   Reschedule them.
17     Q   Under the standard of care, what
18  treatment is recommended for acute on chronic
19  hepatic failure in a patient with autoimmune
20  hepatitis?
21     A   Acute hepatic failure requires
22  hospitalization or hospice. This person is
23  dying, and they -- acute hepatic failure
24  cannot be managed in an infirmary at a prison
25  or an ATU. They need to go to an emergency

Page 143

1  room for immediate evaluation and
2  determination of whether or not they can be
3  treated reasonably or sent back for the
4  hospice care. Chronic liver failure is bad
5  enough, but to have acute liver failure on top
6  of that is usually a death sentence.
7      Q   When a provider has a clinical visit
8  with a patient with chronic interstitial lung
9  disease, what tests are appropriate to
10  determine whether the interstitial lung
11  disease is stable?
12     A   The six-minute walk test, I think is
13  what they use there to determine what their
14  oxygen saturation is, how they desaturate
15  when they move, the oxygen saturation at rest;
16  but remember, these people have low oxygen
17  saturations from the beginning. So it may be
18  they're running 85 percent or 80 percent even
19  on oxygen. So it really goes back to -- these
20  are people that have -- at least in the class
21  that you've identified, these people have
22  already been evaluated at UMCNO and every
23  circumstance, I believe. So they're not
24  normal anymore, but if there's a difference in
25  their oxygen saturation or their exercise

Page 144

1  capacity or desaturation, why then, that needs
2  to be either treated or referred.
3      MR. DUBNER:
4      Why don't we take our
5      three-minute break here. Come back
6      at 10 a.m. Pacific, noon Central.
7      THE WITNESS:
8      Great.
9      (Brief recess.)
10  BY MR. DUBNER:
11     Q   You say, "If I had reviewed 39 LSP
12  charts at random rather than chosen by
13  Plaintiff, it is my Opinion that the
14  violations would be significantly less." So
15  is it your belief that the best way to sample
16  the treatment of people with serious medical
17  needs is to review charts at random?
18     A   No. This is talking about your --
19  the memo that -- this goes back to the memo
20  that you and the defense discussed earlier
21  about the class and so, what we have at LSP
22  are 5,000 inmates. You choose patients,
23  because they were sick, and so sick patients
24  are more likely to come up with issues than
25  patients in general.

Page 145

1    Q   What do you believe is the best way
2    to sample the treatment of people with serious
3    medical needs in the Angola population?
4    A   That's a Court decision. I was
5    really looking more at the statistical
6    evaluation of this, and so for the Court to
7    look at the 60 patients out of 5,000 and to
8    determine that it was deliberate indifference
9    or there needs to an injunction made, when
10   maybe, that the majority of patients, those
11   patients aren't shown to be sick are doing
12   very well. So we're look at a smaller -- or
13   at a minority. So statistically was my
14   argument about this.
15   Q   So statistically, are you talking
16   about the size of the sample or the way the
17   sample was selected?
18   A   The way the sample was selected.
19   Q   Okay. So you don't have an issue
20   with the number of charts?
21   A   Well, we talked about that.
22   Retaining counsel and I talked about that.
23   The issue was that it took a lot of time to do
24   these charts, and I've noted some of the
25   numbers of pages in them. It took a lot of

Page 146

1    time to be able to do that, and -- so to have
2    more charts would have been difficult, if not
3    impossible, in the time considerations given.
4    But, you know, I have difficulty with the idea
5    that these 60 sick patients reasonably
6    represented the 5,000 patients at LSP. They
7    represented sick patients. So we're looking
8    at those, but to say that all of the care at
9    LSP requires change is that I don't believe is
10   the correct conclusion.
11   Q   Once again, let me know, if I'm
12   putting words in your mouth. You think the
13   sample that was chosen represents sick
14   patients; it just doesn't represent all
15   patients?
16   A   All patients and all patients to come
17   is what your class says. So I mean, all
18   patients to come includes those patients that
19   are going to be under the electronic medical
20   record. All patients at the time these were
21   chosen weren't cared for by nurse
22   practitioners in sick call or the ATU. So
23   it's difficult. I can show you -- I've done
24   my best to show the Court what's current at
25   LSP. In 2010, 2012 when the Judge made a

Page 147

1    determination, that's no longer current, and
2    those facts are no longer in evidence. And
3    that's the way we started out this deposition,
4    but for the Court to determine what's going to
5    happen in the future based on these 60
6    patients, unless we're only looking at --
7    unless we're looking at the current care is
8    hard. So I think to make a determination of
9    what the current care is at LSP and not have a
10   hypothetical about what it's going to be like
11   in 10 years is all that we can do; and so
12   currently, my report covers what's happening
13   on these patients.
14   Q   When you say currently, you mean
15   based on your review of the 39 charts you
16   reviewed and your observations?
17   A   Right. Except some of those patients
18   went back to 2019 before a lot of the changes
19   occurred. And that's what the Court wanted is
20   to go back to -- well, you wanted to go back
21   further, but the Court agreed that we'd only
22   go back to January 1, 2019.
23   Q   Did you do anything to -- strike
24   that. You decided not to look at charts
25   outside of the ones that plaintiff's experts

Page 148

1    selected. Correct?
2    A   That's correct.
3    Q   And you decided not to look at
4    additional charts from 2022, for example.
5    Correct?
6    A   There were some charts that went into
7    2022, those active patients. I think there
8    was maybe, a dozen of those. So I do have
9    several of those, and I labeled those
10   plaintiff-selected current inmates for review;
11   but when I reordered my report, I put those in
12   numbers so I could compare them to the numbers
13   and names that are on your report.
14   Q   You didn't look at -- aside from
15   those charts in your plaintiff-selected
16   current inmate section, you didn't look at
17   other charts from 2022. Correct?
18   A   Correct.
19   Q   Do most accreditation bodies review
20   charts at random when they are reviewing
21   medical care?
22   A   I believe they do. All of your
23   people have done NCCHC reviews. That's why
24   your report is so much like an NCCHC
25   accreditation review. I've never done an

Page 149

1  NCCHC accreditation review. Dr. McMunn has
2  done an NCCHC accreditations. So my report is
3  based on, you know, my qualifications and my
4  assessment of these patients, as well as the
5  care as opposed to that gold standard, the
6  NCCHC.
7      Q  Do you believe most experts
8  evaluating care at facilities -- at prisons
9  review charts drawn at random from the whole
10  population?
11      A  I didn't understand you. Sorry.
12      Q  Do you believe that most experts who
13  are evaluating the care at prisons review
14  charts at random drawn from the whole
15  population?
16      A  Now, well, now, see, a class action
17  is different than a tort. So class actions,
18  you know, I don't have as much experience with
19  class actions about how those charts are
20  drawn, and that the Court determines that
21  largely. A tort, of course is about a
22  specific chart, a specific patient, one,
23  maybe, as opposed to this class action.
24      Q  And so do you have experience -- take
25  that back. So most of your experience as an

Page 150

1  expert involves individual cases. Correct?
2      A  Yes. Individual federal cases.
3  Ninety-five percent of what I do are federal
4  cases throughout the United States in jails
5  and prisons.
6      Q  Do you have any experience looking at
7  the overall care in a prison rather than in a
8  specific instance?
9      A  No. None other than -- I do have a
10  class action in Tennessee, which is at a jail,
11  which is more of an overall. I'm not a NCCHC
12  or ACA reviewer looking at the overall care.
13      Q  You haven't served as a monitor over
14  a prison's health care?
15      A  That's correct. I've served as a
16  medical director but never a monitor, as
17  Dr. Puisis has.
18      Q  And you haven't been a
19  court-appointed expert in evaluating medical
20  care at a prison?
21      A  That's correct.
22      Q  So your review is that it's
23  preferable to look at a random sample of the
24  entire population rather than pulling charts
25  of people that have gone to the emergency room

Page 151

1  or charts of people that have had chronic
2  care?
3      A  Statistically, when you're looking at
4  an entire population, then, you have to look
5  at random to be able to make a determination
6  whether the care for the entire population is
7  reasonable, but what you did is you pulled out
8  specific charts that you wanted us to be able
9  to review that you knew -- well, had the idea.
10  I don't know how you actually chose them, but
11  you thought that this needed to be evaluated
12  by the Court, but whether that -- my argument
13  is whether that actually represents the entire
14  class.
15      Q  And do you have any expertise in
16  statistics?
17      A  No. I hated statistics, but I had to
18  take some statistics, and so I'm limiting my
19  argument to the random versus selected charts.
20      Q  And that's not based on your
21  expertise as a statistician?
22      A  I've already answered that question.
23      Q  Can you point to any literature or
24  written guidance that supports your view?
25      A  No. You know, that kind of goes back

Page 152

1  to what happens as a medical director and as
2  we're looking at the quality improvement say,
3  at the California Medical Facility or the
4  other locations where I've worked. You might
5  do death reviews that are directed at a
6  patient in situations that occurred, and we'll
7  talk about some of those death reviews and
8  Dr. McMunn will talk about it even more, but
9  in general, when you looking at the processes
10  involved, it's more random as opposed to just
11  the sickest people.
12      Q  If you believe that a more random
13  sample is more representative, why didn't you
14  review your own random sample?
15      A  I told you I didn't have time. I was
16  -- I was -- I had time to review the charts
17  that you designated that the Court wanted --
18  agreed to have us look at, but to pull another
19  60 charts or other random charts, there's just
20  no time.
21      Q  You say, "Plaintiff-chosen charts, by
22  intention, demonstrate more violations than
23  randomly chosen charts." What do you mean by
24  intention?
25      A  Let me ask you whether you've spent a

Page 153

1    lot of time looking at those charts and trying
2    to find well, young patients who weren't
3    taking any medications and never went to sick
4    call, or you looked for people that had
5    hospitalizations and emergency room visits. I
6    mean, really.
7        Q   And so what did you mean by
8    intention?
9        A   By intention, you're looking at
10   patients that you wanted the Court to examine.
11   You wanted experts to opine about, and you
12   wanted the Court to determine whether or not
13   an injunction was necessary to change the
14   practices at LSP or -- well, whatever the
15   Court might come up with.
16       Q   Did you and Dr. McMunn decide which
17   patients each of you should review?
18       A   I did the majority, but it was
19   largely based on time. Mr. Archey and I and
20   Michael worked on that together.
21       Q   Was there any sort of system that you
22   used for deciding which ones you would look at
23   and which ones Mr. McMunn would look at, or
24   was that just random?
25       A   I think I looked at more that had

Page 154

1    larger numbers in them, because I had a
2    different way of ordering them. They're
3    bookmarked differently, bookmarked visit by
4    visit, and so that lended itself more to a
5    better review of large charts.
6        Q   So when you said you had larger
7    numbers, you mean numbers of pages?
8        A   Yes.
9        Q   Do you think the Court should put
10   more stock in the opinions of people who've
11   practiced in corrections than people who
12   haven't?
13       A   I don't think people that don't
14   practice in corrections have the
15   qualifications to opine about what people in
16   corrections should do. I'm not opining about
17   what a thoracic surgeon should do. While an
18   emergency room doctor, he's -- at least in
19   this case, Dr. Vassalo sees the prisoners.
20   She doesn't practice in a prison. It's
21   entirely different. Now, she may have some
22   accreditation from having taken a course to be
23   accredited, but she's not a corrections
24   doctor. Everyone else in this case has
25   practiced in corrections.

Page 155

1        Q   Do you have any expertise in applying
2    the Daubert standard?
3        A   Attorneys apply Daubert standards.
4        Q   So you're not offering an opinion
5    about whether she's admissible under Daubert?
6        A   I have offered my opinion to
7    retaining counsel, but it's difficult to
8    determine by the way that you do your reports,
9    where it's hard to say when you've got four or
10   five people that are making a report, who's
11   responsible for what. So you can't -- she
12   doesn't -- she didn't specifically
13   demonstrate -- this is what I think. It's
14   what we think together. So you have reports
15   by Puisis and Vassalo, but then, you have it's
16   largely written by one of your nurse
17   consultants.
18       Q   Let's go -- why don't we pull up your
19   report. If you want to go to 214 of the PDF,
20   208 on the page number. Are you there?
21       A   Yes.
22       Q   You say that you've worked in
23   correctional facilities and consulted
24   regarding at least 100 more. However, LSP is
25   in many ways superior to those facilities. In

Page 156

1    what particular ways -- are the ways that
2    you're asserting that LSP is superior what you
3    then list in the rest of that section?
4        A   Yes. In this opinion, we're
5    talking about cleanliness, hygiene, equipment,
6    facility structure, organized and orderly
7    treatment, housing and program areas.
8        Q   So you're saying that LSP is superior
9    in all of those ways?
10       A   I said exceptional in these respects,
11   about the last bullet. Sorry. They weren't
12   numbered. I talked about programming, and
13   my -- when you've been in a lot of prisons and
14   somebody closes the gate, you've got an idea
15   how you feel when you walk in the gate, when
16   you walk in control. When you're walking down
17   the aisleways, about whether you feel safe,
18   how the inmates react to you, how many inmates
19   are out in the hallway. I mean, for instance
20   at Folsom Prison, Old Folsom, you go out in
21   the yard, and there are 500 inmates out there
22   and a couple of towers, I was scared, because
23   it's a scary place to be. Whereas, my
24   impression of Angola, LSP was it was
25   comfortable. I felt -- I didn't feel

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 157

1    threatened by inmates. I thought there was
2    enough custody around. The processes that I
3    saw going on were great, and the programming
4    was just unexcelled.
5        Q   So when you say it's superior, the
6    ways you're talking about are not specific to
7    medical. You're talking about in general
8    about the feeling?
9        A   Yes. That's what it says. It says
10   cleanliness, hygiene, equipment, facility
11   structure, organized treatment, housing and
12   programming areas.
13       Q   I'm just trying to understand which
14   of those relate to medical and which of those
15   relate to what you're talking about with the
16   feel of the organization, of the institution
17   and so on.
18       A   Well, the only one that specific --
19   well, I suppose you could say cleanliness and
20   the place was clean. I mean, you saw that.
21   Hygiene, it comported with the standard of
22   care. Equipment, well, maybe, they didn't
23   have an opthalmoscope in everyone of the
24   rooms, but that happens all over the place.
25   Like I said, people rarely use

Page 158

1    ophthalmoscopes. Facility structure, you
2    know, everything flowed pretty well. I mean,
3    there weren't any blind holes, like there were
4    at the like The Cut down in Baltimore, where
5    you got hallways where you can't see what's
6    going on and where people get what we say
7    "stabbed up." Orderly treatment, I mean,
8    people were showing up. There was a line like
9    in the general medical clinic, but that's what
10   happens. Everyone comes in at the same time,
11   and they wait. Housing, housing looked pretty
12   good. Maybe, it was hot there during the
13   summertime, but that's Louisiana. Programming
14   areas, I was really impressed, as I wrote
15   here, about the programming areas. I grew up
16   a farm and being able to see these guys out
17   there working, it's like their life has some
18   meaning. I can't say that about any other
19   prison I've visited.
20       Q   So to step back on a few of these
21   things, when you were talking about no blind
22   halls and the safety of the prison, you're not
23   offering an opinion as a custody or security
24   expert. Are you?
25       A   No. As I told you, I was taking a --

Page 159

1    it was my impression as I walked into the
2    prison, whether or not there were places that
3    I felt uncomfortable, and the blind holes
4    refers to hallways like in Baltimore where you
5    couldn't be seen by an officer, where things
6    happened out of the site of cameras.
7        Q   But just again, you're not offering
8    an opinion as a custody or a security expert.
9    Correct?
10       A   That's correct.
11       Q   Then, about the work, you say, "I was
12   impressed by the Angola inmates who are
13   allowed to work." Is it your understanding
14   that inmates choose whether to work at LSP?
15       A   I think there's some choice involved,
16   but there's also kind of like seniority. I
17   mean, it's my impression that someone who
18   determines they want to work in the concrete
19   area, as in any programming, they have to not
20   have a lot of writeups. They have to be able
21   to go out in the general population, and then,
22   they can apply or otherwise be admitted to be
23   able to work in the concrete or auto body shop
24   or maybe, they were a -- maybe, they needed to
25   be ASC certified. So they went to work in the

Page 160

1    automotive repair shop.
2        Q   The, you know, bullet points you have
3    at the bottom of 214 and top of 215 about the
4    farm equipment, head of cattle, automobile
5    repair, auto body repair, leather crafts and
6    so on, does that relate to the medical care at
7    LSP in your mind?
8        A   I think that when you look at the
9    whole person, having the opportunity to have a
10   meaningful life is important to one's
11   healthcare, and I really felt these things
12   when I was there; that this was -- if I was
13   going to be a lifer in a prison someplace, I
14   would rather be at LSP than at any other
15   prison I've been in before, because of the
16   opportunity to be able to do something as
17   opposed to sit in a cell all day or sit in a
18   dorm all day, and I wrote about that here,
19   because you know, they live as -- some areas
20   they live like they're on the street. They go
21   to work everyday, but they're -- you know,
22   they don't have intimate family relationships.
23   They're not free, and they're still behind the
24   razor wire, but there not thinking about razor
25   wire. They're thinking about am I going to

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 161

1     pass this test to be a certified automotive
2     mechanic, or am I gonna be able to get this
3     car repaired.
4        Q   Are you offering any expertise as a
5     psychiatrist or a psychologist in this case?
6        A   Well, as you know, family medicine
7     has an expertise in psychology and psychiatry;
8     and as correctional medical experts, we deal
9     with patients who have these mental health
10    issues all the time.  At California Medical
11    Facility, where I've -- I'm going to take my
12    coat off.  Is that okay?
13       Q   It's fine with me.
14       A   At the California Medical Facility,
15    at least 30 percent of the patients were on
16    mental health medications.  So it's something
17    that we deal with in corrections.  As the
18    primary care providers, these people that have
19    the mental health issues and, as primary
20    providers, it's incumbent on us to refer
21    patients when necessary; and frankly, in
22    corrections it's easier to refer somebody than
23    it is on the street, because you know you've
24    got a line of psychologists that are willing
25    to see this mental health patient or even come

Page 162

1     down to the ATU to be able to see this patient
2     if you think they're acute.  Or they may be
3     able to go to -- we had a -- beds that were
4     set aside for acutely suicidal patients or
5     needed to be under the direct care of
6     psychiatrists, single beds and that sort of
7     things.  I think we had a hundred beds at CMF.
8     So I mean, it's something that we as
9     correctional physicians do more of even though
10    we may be limited to the medications we
11    prescribe if we've got a psychiatrist that
12    would be prescribing them.
13       Q   Are you holding yourself out as an
14    expert in psychiatry and psychology in this
15    case?
16       A   No, I'm not.  I'm talking to you
17    about my qualifications and those of the
18    correctional experts or some correctional
19    experts in psychology and psychiatry.
20       Q   Now, you also say on this page the
21    LSP inmates were comfortable.  What do you
22    base that opinion on?
23       A   My observation of being in lots of
24    different prisons and watching these guys hang
25    around and what they were doing and working

Page 163

1     and -- as they were in the clinics and that
2     sort of thing.  There's a feel that you get.
3        I mean, think about what it's like
4     for you walking down in the street in DC
5     versus if you're walking down the street in
6     Baton Rouge or New Orleans.  You have a
7     feeling about what's going on with the people
8     around you.  So that's what I'm remarking
9     about here to some degree.
10       Q   So let's go onto your opinions about
11    specialty care services.  When you say that
12    patient number 13 best demonstrates the
13    capability of LSP to provide and manage
14    specialty consultations.  What do you mean by
15    provide and manage specialty consultations?
16       A   Trying to get these guys out 30 to 40
17    times within a year and a half, getting them
18    from LSP to UMCNO is a huge effort, and to be
19    able to accomplish that demonstrates the
20    capability of what LSP can do these days.  I
21    mean, I think this guy, I think 13 probably
22    had more specialty consultations than anyone
23    else.  So if --
24       I mean, think about a young mother
25    who's got three kids and she's trying to get a

Page 164

1     kid out to the doctors just to get his shots,
2     I mean, it's an uphill battle; but this system
3     was able to put together all of these
4     consultations, all of these trips returns, all
5     of the scheduling, all of the transportation;
6     and the guy, I thought had good care; that in
7     many circumstances exceeded the standard of
8     care, were appropriate and repeated visits
9     when necessary.
10       Q   What are the important elements of
11    providing and managing specialty
12    consultations?
13       A   Number one, the referral when it's
14    necessary.  Number two, following up when the
15    specialty consultant has a recommendation.
16    Number three, getting the coordination of
17    those referrals back and forth through the
18    system, setting up transportation, getting the
19    guy out of his house, like in the Ash units
20    where you've got those monitors to tell
21    somebody they've got to go out, getting the
22    patient up there and getting them out in a
23    timely fashion, getting them into New Orleans
24    an hour and a half away and avoiding traffic.
25    I mean, it's just a huge logistical issue, and

41  (Pages 161 to 164)

Page 165

1   the logistics of number 13 demonstrate that
2   they did a good job.
3       Q   Is part of managing specialty
4   consultations reviewing the specialist's
5   recommendations when the patient returns to
6   the prison?
7       A   Right, and exactly, and that's what I
8   talked about is trip returns.  The trip return
9   documentation up there in the first bullet.
10  Trip return documentation, and if you look at
11  the charts that we reviewed, they come back,
12  and they have a trip return visit with a nurse
13  practitioner or a doctor.
14      Q   What documentation should the nurse
15  practitioner or doctor make on those visits?
16      A   Well, it depends on visit to visit,
17  but if you -- when you have the review from
18  the -- when you the information from the
19  specialist, then, that's sitting in front of
20  you.  To rewrite it, I think that's just busy
21  work, but what should be done then is to make
22  sure that the recommendations can be
23  implemented as possible within the prison
24  system.
25      Q   If a provider determines not to

Page 166

1   implement a specialist recommendation, what
2   documentation should they make?
3       A   They should say why.
4       Q   If a specialist recommends blood
5   tests, should those be in the medical record?
6       A   Should they be in the medical record?
7       Q   Yes.
8       A   Should the trip return doctor write
9   it down, or should he --
10      Q   Let me rephrase.  If a specialist
11  recommends blood tests, should those tests
12  occur?
13      A   Yes.  As a general rule, they should.
14      Q   Should those be documented in the
15  medical record?
16      A   They should be ordered.  Whether
17  they're written down or not, I think that some
18  of that is busy work, particularly when we're
19  dealing with a paper medical record.  You
20  know, it's just -- it's not like you can copy
21  and paste like you can in an electronic
22  record, or you have it all in the electronic
23  record, and you have it scanned in, or you've
24  got EPIC, where you can go ahead and make
25  those into orders, or the trip return nurses,

Page 167

1   trips nurses are putting them into orders.  So
2   to write it at the same time isn't necessary.
3   To get it done is important though.
4       Q   Right.  That's -- I want to rephrase
5   my question.  If the blood tests occurs, it
6   should be recorded -- the results should be
7   recorded in the medical record.  Right?
8       A   Yeah.  If the blood test occurs, the
9   blood test should be in the medical record.
10      Q   If the specialist recommends sending
11  the patient to a different specialist, should
12  the medical record show that that happened or
13  explain why that recommendation was not
14  followed?
15      A   That's too complicated to be able to
16  answer.  You need to be more specific and show
17  me what you're talking about.
18      Q   Sure.  If the specialist recommends
19  sending the patient to a different specialist,
20  --
21      A   What kind of specialist?
22      Q   Let me finish the question.  If a
23  specialist recommends sending the patient to a
24  different specialist and a provider decides
25  not to do that, should there be an explanation

Page 168

1   of why the provider decided not to?
2       A   It depends on what specialist sending
3   to which specialist and then whether or not
4   something should be documented.  Like I said,
5   you need to set this up better for me if you
6   want me to answer.
7       Q   On the following page, 216 of your
8   PDF, you refer to conversations with Melanie
9   Benedict.
10      A   Yes.
11      Q   Specifically, what information from
12  Ms. Benedict contributes to your opinion?
13      A   I was really interested -- and we
14  talked earlier about this Eceptionist and the
15  recommendations from specialists to occur
16  before the visit occurred, and I talked to her
17  about InterQual and my experience in InterQual
18  throughout the United States, and we had an
19  exchange for maybe, an hour downstairs in her
20  office as she kind of showed me the list that
21  she had, as well as this Correct Care thing
22  that she'd put together with the summaries of
23  patients that occurred years back from UMCNO
24  and OLOL and that sort of thing.  So that
25  conversation and the conversation we also had

Page 169

1  upstairs where we were in Dr. Lavespere's
2  office discussing her functions in the system
3  and how LSP interfaced with the headquarters
4  and trips office and specialists and that sort
5  of thing.
6      Q   You describe the trips office and
7  your conversation with Major Juan Anthony
8  earlier in your report. You're referring to,
9  you know, what's documented earlier in your
10 report when you refer to those here?
11     A   I'm sorry. I don't understand your
12 question.
13     Q   You say understanding of the LSP
14 trips office and the conversation with Major
15 Juan Anthony are two of the things that you
16 based your opinion on. You described both of
17 those earlier. Is the earlier description
18 essentially what you're talking about?
19     A   Yeah. The trips office, I needed to
20 understand how Eceptionist interfaced with the
21 trips office and what they did to get these
22 guys out; and then, Major Anthony kind of ran
23 the transportation and how they got all -- I
24 mean, --
25         Let's go back to the mother with six

Page 170

1  kids who's trying to get one -- to get him in
2  the car to take one to the office to get his
3  shot. I mean, they might have 25 guys in the
4  bus, and how you can coordinate that when some
5  of the guys can't be in the same bus together,
6  because they're dangerous, and they're chained
7  to the floor, because they're felons. I mean,
8  it's a complicated process.
9      Q   Let's move to infirmary care. You
10 say, the inmate orderlies in Nursing Unit #1
11 and Nursing Unit #2 are managed by the RN on
12 shift. They do not work independently but in
13 partnership, under the direct instruction and
14 supervision of nursing with custody oversight.
15 What is that opinion based on?
16     A   It's based on the discussions with
17 Jennifer Stickells my observation of what the
18 guy was doing during that quadriplegic
19 dressing change, the discussion with Warden
20 Nettles and discussion with Lavespere,
21 Johnson, Toce and retaining counsel.
22     Q   You said earlier that orderlies in
23 the infirmary clean patients, bathe patients,
24 dress patients, feed patients and position
25 patients. Is it your view that these are all

Page 171

1  appropriate for inmate orderlies in an
2  infirmary?
3      A   Under the direct supervision and
4  direction -- or under the direction of an RN,
5  yes, I believe so.
6      Q   Sorry. Did you say direct
7  supervision or direction and supervision?
8      A   Direction and supervision, I think
9  that's a better way of saying it.
10     Q   So you're not saying they need direct
11 supervision by an RN?
12     A   Well, it depends on what they're
13 doing. If an RN says, go clean the poop up
14 off that floor, I think they can do that
15 without a nurse watching them clean that up;
16 but if they're going to gonna help a nurse
17 change the dressing on that quadriplegic
18 that's a different story. You got the RN
19 who's doing it, and he's just standing there
20 doing whatever the RN tells him to do.
21     Q   If orderlies were doing wound care,
22 would that be appropriate?
23     A   Not if they -- not unless they were
24 doing it as a direct interaction with an RN or
25 maybe, an LPN. I don't know. It depends on

Page 172

1  what kind of wound care it is. If it's just
2  like changing a soiled stockings, LPNs could
3  do that, or under the direction, why then an
4  orderly could do that.
5      Q   So it's your opinion that it's fine
6  for an orderly to change the dressing of
7  patient's wounds as long as they're being
8  directly supervised by an LPN or RN?
9      A   Well, no, I didn't have them doing
10 dressing changes, unless they had somebody who
11 was telling them here pull this down. This
12 can come off. Here help me. They shouldn't
13 be doing that by themselves.
14     Q   But it's okay for them to be doing
15 that together with an RN or LPN?
16     A   Yes. It's just an extra set of
17 hands, and largely, it's a set of hands to do
18 the dirty work.
19     Q   Is it appropriate for orderlies to
20 work as physical therapists?
21     A   Well, that was a particular
22 circumstance. This guy was a certified
23 physical therapy assistant. So he was working
24 as an orderly under the direct supervision of
25 the physical therapist. I thought -- I didn't

43 (Pages 169 to 172)

Page 173

1  see any problem with that. It's like he had
2  the training already. Why not implement him
3  and let him do what he knows how to do.
4      Q  Is it appropriate for orderlies to
5  empty catheter bags?
6      A  I believe so. That's part of the
7  incontinence. A catheter bag is just a bag of
8  urine. It's not that much different than a
9  diaper, unless they're having an input and
10 output determination. Then, a nurse should be
11 doing that, but emptying a bag full of urine,
12 I don't see why an orderly can't do that.
13     Q  Is it appropriate for an orderly to
14 change oxygen tanks?
15     A  An orderly may be necessary to change
16 oxygen tanks, but as far as doing the
17 connections -- I mean, these oxygen tanks can
18 be heavy. So if a nurse says, bring a new
19 tank in, then, an orderly should be able to do
20 that, a nurse should be doing the
21 connections.
22     Q  Is it appropriate for orderlies to
23 take x-rays?
24     A  No.
25     Q  Now, NCCHC and ACA have different

Page 174

1  standards for inmate orderlies. Is that
2  right?
3      A  Yes.
4      Q  What's your understanding of the
5  NCCHC guidelines on using inmate orderlies?
6      A  I think I discussed that. Let's go
7  to that portion of my report.
8      Q  Yeah, I think 218, which it's 212 of
9  the PDF.
10     A  Right. I spent a lot of time
11 thinking about this. I think that's what we
12 should discuss. I think it starts on line 23,
13 page 212.
14     Q  Yep.
15     A  So, you know, the plaintiff did not
16 want orderlies at LSP. The Court agreed with
17 the plaintiff; and as I said, it's consistent
18 with what the NCCHC says, or it said in 2009.
19 However, NCCHC -- even NCCHC knows that inmate
20 workers are used in prisons and jails in the
21 United States, and so while they are not going
22 to accredit that portion of the prisoner jail,
23 they go on further. They don't say, oh, no,
24 you can't use them ever, ever, and they're not
25 going to talk about it again. Now, they say

Page 175

1  they recognize that they're used; and if
2  they're used, they're trained in appropriate
3  methods for handling and disposing of
4  biohazardous materials and spills, emptying
5  catheter bags. If there's on-site palliative
6  care program, a hospice, workers or
7  volunteers, and they do have individual
8  volunteers for -- I think they have six
9  volunteers for each terminal hospice patient,
10 so who come in and sit vigil and talk with
11 them and may bring a book or whatever
12 providing services, if they're properly
13 trained and supervised, and I believe that
14 Jennifer Stickells and the nurses train and
15 supervise these guys, and NCCHC doesn't like
16 orderlies, but they can be used to clean the
17 services unit or handle biohazardous waste and
18 have appropriate training; and we already know
19 that the ACA let the orderlies go as being
20 okay at the LSP, and then, I went on further,
21 because I think there's some difficulty with
22 who's really in charge of these people.
23     Now, you got an RN who's in charge of
24 the unit, but the RNs change, and the
25 orderlies change. I think Dr. Johnson and the

Page 176

1  new Assistant Warden Oliveaux are the two
2  people that should be responsible for what
3  happens with the orderlies. I believe that
4  the inmate orderlies should continue to be
5  used at LSP. I believe they have an important
6  place. I believe there are times when there
7  have been difficulties with inmate orderlies,
8  like there are with LPNs or custody officers
9  or RNs or doctors or NPs. So there needs to
10 be somebody who's responsible for handling
11 these outliers, but inmate orderlies in
12 general, I think are a good idea for LSP.
13 They can't get enough staff otherwise, and
14 these inmate orderlies can do a great service.
15     Q  What limits does the ACA place on the
16 use of inmate orderlies?
17     A  I don't know. Let's look it up.
18     Q  You would just refer back to ACA
19 standards for that?
20     A  Right.
21     Q  NCCHC, you understanding is it
22 doesn't allow orderlies to be used for
23 activities of daily living at all. Is that
24 right?
25     A  I don't believe that I had an opinion

Page 177

1 about that. I believe as far as ADLs are
2 concerned that they don't have an inmate to
3 inmate policy about inmate to inmate helping
4 somebody eat. I mean, if you got somebody
5 next to you in a cell or you're in a dorm and
6 someone needs some help to spoon, that happens
7 all the time. I mean, you have inmates
8 helping old guys who can't get their stuff
9 done. You'd like it to be more organized than
10 that, but that's what happens in community.
11    Q   The thing I'm just trying to
12 understand, because you cite a few ways in
13 which NCCHC does, you know, approve of inmate
14 workers. You say, "My understanding and
15 discussion with retaining counsel are that the
16 Court completely rejected using inmate
17 orderlies. This determination is consistent
18 with the 2009 NCCHC Guidelines for the
19 Management of an Adequate Delivery System."
20 Is it your understanding that both the Court
21 and the NCCHC rejected the use of inmate
22 orderlies in the way they're used in the Ash 1
23 through 4 dorms?
24    A   My understanding was that the
25 plaintiff argued in the court that the

Page 178

1 orderlies should not be used and the Court
2 agreed, and then, the plaintiff used to a
3 large degree, like it does in all of its
4 opinions, NCCHC is the standard, and so that's
5 what this bullet addresses.
6    Q   You also review to a consultation
7 between Keith Knauf, the California Medical
8 Facility Hospice Chaplin, and LSP. Were you
9 present for those consultations?
10    A   No, I wasn't.
11    Q   Do you know when they occurred?
12    A   Yes. I think I wrote it. In 2004 or
13 something like that when Angola was first
14 setting up its hospice program.
15    Q   Okay, and do you --
16    A   Let me say for a minute. I worked
17 with Chaplin Knauf for 10 years. So we had
18 multiple conversations. We've had
19 conversations also about LSP since I became
20 involved in this case, because I wanted to
21 know what his experience was when he came to
22 help set up the program; and in the
23 circumstance at CMF, he's the one who's kind
24 of responsible for the training. I think they
25 have a hundred hours of training there, and

Page 179

1 you know, let me see, the supervision, even
2 though on the units, on the correctional
3 treatment unit or in the hospice, the nurses
4 are responsible for the medical care; but if
5 they're having trouble with a specific
6 orderly, PCS workers is what we call them at
7 CMF, then, they talk to Chaplin Knauf, and I
8 believe they should have something similar,
9 have someone in the hierarchy at LSP to
10 oversee them, and I think from knowing --
11 well, understanding the Dr. Johnson and what
12 AW Oliveaux is doing, I think they're the
13 perfect people to handle that.
14    Q   To your knowledge, has Mr. Knauf
15 returned to LSP since 2019?
16    A   Well, it was 2004.
17    Q   Okay.
18    A   Not since 2019. He was just there,
19 and he was there several times. Apparently,
20 he even went on his own, because he was
21 interested in how it went.
22    Q   Let's move on to sick call. You say,
23 "Using telemedicine, the LSP nurse
24 practitioners diagnose and treat the majority
25 of inmates reasonably and appropriately."

Page 180

1 Now, that's based on your chart reviews?
2    A   Yes.
3    Q   How many sick calls did you review in
4 the chart reviews with the new nurse
5 practitioner telemedicine system?
6    A   I can't answer that.
7    Q   Do you recall how many times the NPs,
8 the nurse practitioners, sent the inmates to
9 the ATU?
10    A   A few.
11    Q   By a few, do you mean around three,
12 or what do you mean by a few?
13    A   I can't answer that. I don't have an
14 answer for that. When we were there, during
15 the observation, we had a patient on sick call
16 who was sent to the ATU, and retaining counsel
17 and I discussed that, but as far as numbers, I
18 don't have the numbers on that.
19    Q   The patient you saw sent to the ATU,
20 that was the patient with back pain who you
21 referred to earlier?
22    A   No, it wasn't back pain. It was
23 another patient. Somebody who needed to be
24 evaluated in the ATU.
25    Q   You said earlier, you only saw one

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 181

1   patient in sick call.  Did you see more than
2   one?
3      A   I saw the one guy in sick call with
4   the low back pain, and then, we moved on.
5      Q   Who was this second patient that
6   you're referring to?  Where did you observe
7   him?
8      A   This was a discussion I had with
9   retaining counsel.
10     Q   That was a discussion.  Okay.  Thank
11  you.  For specialty care, you identify three
12  charts that you thought best reflected
13  specialty care.  Do you have a comparable
14  chart that you would point to for the current
15  sick call process?
16     A   No, we'll have to go through the
17  charts.
18     Q   Looking at the ATU, we've discussed
19  the standard of care that you say applies
20  there.  Let me just go back so I'm not
21  misquoting you.
22     A   Page 221?
23     Q   Yeah.  It will be page 221, 215 of
24  the page numbers.  You talked about the
25  importance of determining whether somebody

Page 182

1   needs a higher level of care and the if in
2   doubt, send them out mantra.  You would agree
3   it's important to be able to tell when inmates
4   need to be transferred to a higher level of
5   care?
6      A   Yes.
7      Q   It's your opinion that nurse
8   practitioners are capable of doing that.
9   Correct?
10     A   Yes.
11     Q   Is it your opinion that EMTs are
12  capable of doing that?
13     A   EMTs are not licensed to do that.
14     Q   Is it your opinion that LPNs are
15  capable of doing that?
16     A   LPNs are not licensed to make those
17  determinations.
18     Q   What about RNs?
19     A   RNs can assess and should be able to
20  send people out if there's an emergency where
21  they can't get the NP in.  They can -- but
22  they can assess patients.  So at LSP, it's NPs
23  making those determinations unless one of
24  those self-declared emergencies slips in.
25     Q   So just to make sure I understand,

Page 183

1   are you saying RNs should be able to make the
2   determination to send people out to another
3   hospital if there's an emergency, and they
4   can't get in touch with the NP?
5      A   Yes.  And that's pretty much the same
6   way that it is throughout the United States.
7   They just call emergency, and they get them
8   out, because it's pretty clear when
9   somebody -- say somebody is stabbed in the
10  neck and they're bleeding like crazy, you
11  can't do anything with them in the ATU.  So
12  they've got to go out if they're going to have
13  a chance to live.  Well, it's the same way
14  with this stroke.  So some things are readily
15  identifiable, and an RN should be able to make
16  that determination.  I think an RN should be
17  able to help a lot with these SDEs if we can't
18  get -- I mean, it could be part of what policy
19  they come up with to be able to have the SDEs
20  not under the auspices only of an EMT to make
21  the determination.
22     Q   So, you know, when it's urgent,
23  should RNs be sending people out without
24  waiting for the nurse practitioner to
25  authorize it?

Page 184

1      A   Depends on what the circumstance is.
2   I mean, they should always -- NP should always
3   be in touch with the ATU, the one who's on
4   call for the ATU, by telephone.  Everybody is
5   carrying cell phones at LSP.
6      Q   In this section, you don't express an
7   opinion here about whether LSP staff are
8   correctly determining whether to transfer
9   inmates to a higher level of care.  Correct?
10     A   Correct.  That's in the chart
11  reviews.
12     Q   And you don't express an opinion here
13  about whether LSP is timely determining
14  whether to transfer inmates to a higher level
15  of care.
16     A   Chart reviews.
17     Q   So when you say chart reviews, are
18  you saying that based on your chart reviews,
19  you have formed the conclusion and the opinion
20  that LSP staff are correctly determining
21  whether to transfer inmates to a higher level
22  of care?
23     A   It depends on the individual chart
24  review.  I did not set up a criteria that said
25  that a patient had to be seen within four

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 185

1  minutes of an emergency. I'm not doing an
2  accreditation review. I'm doing a standard of
3  care review. So if we go into the chart
4  reviews, we can talk about the standard of
5  care and my conclusions.
6      Q  So you have an opinion about in
7  specific charts that people were correctly and
8  timely sent out, but you don't have an opinion
9  about overall whether that's happening?
10     A  That's correct. That sort of
11 systematic review is something that the CQI
12 should be looking at, because it looks at
13 everybody who comes through and how fast they
14 get out and the circumstances and then
15 discusses with the administrators and the
16 medical director and that sort of thing.
17     Q  When you say CQI, you mean the
18 Continuous Quality Improvement Program?
19     A  Yes.
20     Q  So I've got probably about 10 more
21 minutes, give or take, before breaking on a
22 section. Do you want to stop for lunch now,
23 or do you want me to --
24     A  No. We could go through this
25 section. As you can tell, I'm not starving.

Page 186

1      Q  So we've discussed your opinion on
2  EMTs with self-declared emergencies. You say
3  on page 223 of the PDF, "If not transported,
4  an RN or NP in the ATU should decide, after
5  EMT contact, history, and vital signs, whether
6  to immediately transport that inmate, treat
7  that inmate at the site, or arrange for
8  reasonable and appropriate clinic follow-up."
9  To your understanding, how is that different
10 from what they do now?
11     A  Because the EMTs are sometimes making
12 those determinations by themselves without an
13 RN or NP input.
14     Q  We've already talked about that a
15 little bit. So we can move onto medical
16 leadership. You say here the commitment I
17 encountered in interviews demonstrate the
18 teamwork now present in the sick call and
19 specialty process, unlike trial.
20 Specifically, what are you basing your
21 assessment of their commitment on?
22     A  My discussions with them, and so we
23 spent probably an hour and a half with Warden
24 Hooper. We spent -- Dr. -- or Assistant
25 Warden Oliveaux was there. We spent probably

Page 187

1  an hour and a half just talking with
2  Dr. Johnson, too, as well as Lavespere and
3  Toce, I spent maybe, an hour with together.
4  Stacye Rodriguez was involved in the
5  Headquarters discussion, and I told you about
6  Melanie Benedict. I thought these were
7  dedicated people. I was pretty impressed by
8  them. I thought they were capable, and while
9  I think we can agree that there are some
10 outcomes that we would like to see better in
11 some circumstances, I think these people can
12 do it. They just need to have the time and
13 the structure to be able to do it. So much of
14 that is going to be based on that electronic
15 medical record when that thing gets put in.
16     Q  Are there specific statements that
17 any of these people made that you are relying
18 on for this opinion?
19     A  No. Not specific statements. Or
20 maybe, the Warden Hooper about, you know,
21 something about where medical gets what it
22 wants or gets what it needs, and he was really
23 committed to medical. I don't know what the
24 previous wardens were like, but Warden Hooper
25 to a large degree is responsible for the

Page 188

1  changes that have occurred, particularly
2  during the past couple of years, because it
3  takes money to do a lot of these things:
4  Hiring these nurse practitioners and chaining
5  the positions, being able to get Dr. Johnson
6  in place. Hooper really sets the mood for how
7  everything is occurring.
8      Q  And is that opinion based on any
9  documents you reviewed, or is that based on
10 your interview with Warden Hooper and your
11 general understanding of how changes are made
12 in prisons?
13     A  I think it's based on the
14 conversation but also the timeline that we --
15 I think that was Interrogatory 1 and what
16 occurred, and also how COVID affected those
17 timeline spots.
18     Q  Let's talk about mortality reviews.
19 You referred earlier, I think you said and
20 correct me if I'm wrong, something along the
21 lines of Mr. McMunn is, you know, looking at
22 this in more detail; but you are also
23 expressing an opinion on the adequacy of
24 mortality reviews. Right?
25     A  Yes.

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 189

1    Q   What do you believe is the standard
2    for an adequate mortality review?
3    A   Well, what I see around the country
4    is that administration will put together some
5    of the history and what happened when the
6    patient died, and the same sort of thing that
7    we see that occurred, and I put those
8    mortality reviews in my patient reviews. I
9    mean, that's pretty much the standard of care.
10   Q   You use a phrase, you say, the death
11   reviews are generally explicatory. What do
12   you mean by generally explicatory?
13   A   It just said generally what happened.
14   I don't think it was specific enough in some
15   circumstances, but then, a lot of what I do
16   these days is looking at the times that we
17   talked about it, when somebody arrives in the
18   emergency room, how long it took for the ATU,
19   how long it took to get them out, how long it
20   took to get them to get a -- whether there was
21   a delay in care and that sort of thing. I
22   think that LSP needs to do more work in this
23   regard, but I don't think it's necessarily
24   standard of care that they haven't done that
25   work. I would like to see more information in

Page 190

1    that mortality reviews though.
2    Q   Currently, the death reviews are a
3    short, narrative summary of the circumstances
4    surrounding the death. Is that right?
5    A   Yes. That's about it.
6    Q   Should mortality reviews include a
7    critical review of the care that preceded the
8    death?
9    A   I believe so, but I'm not convinced
10   that's the standard of care, and that's what
11   I'm saying here in this opinion.
12   Q   Do LSPs mortality reviews currently
13   include a critical review of the care that
14   preceded the death?
15   A   I think it's changing. I think since
16   Dr. Johnson came in, he's more involved in
17   these mortality reviews, but he just needs to
18   evolve a bit to be able to incorporate that,
19   because he's -- as the administrator, he's
20   kind of everybody's boss, and with he and --
21   with AW Oliveaux involved, why then, you've
22   got significantly more organization than
23   you've ever had before, and because they're
24   the administrators, they're looking for
25   different things than the doctors who are to

Page 191

1    some degree just saying, well, yeah, this is
2    what happened. You know, we did a good job,
3    and that's not always necessarily the case,
4    and Administrators Oliveaux and Johnson can be
5    helpful about that, but they need time.
6    Q   Do you recall seeing any mortality
7    reviews at LSP that included a critical review
8    of the care that preceded the death?
9    A   No.
10   Q   Do LSP's mortality reviews include
11   the information necessary to review whether
12   any problems arose in the course of a
13   patient's care that can be corrected in order
14   to prevent future deaths?
15   A   You know, I don't know about that,
16   because some of it is not written down.
17   Dr. Lavespere is not the best guy in the world
18   for writing stuff down. He talks to the
19   secretary about each one of these mortality
20   reviews, and I don't know what happens in
21   their discussions; and in the end, it may be
22   nothing happened. I know that discussion took
23   place or takes place with every one of the
24   mortalities. So those outcomes should be
25   involved, in my opinion and come back down to

Page 192

1    Toce at LSP so they can critically look at
2    changes that might be made to try and avoid.
3    I mean, you can't avoid all deaths, because
4    that's not life, but they can see if they can
5    make changes in their system that could be
6    helpful to do a better job next time.
7    Q   But you don't know whether that is a
8    part of Lavespere's discussion with the
9    secretary or the information that he
10   communicates with Dr. Toce. Correct?
11   A   That's correct, but if I were the
12   secretary, I would be asking Lavespere what
13   happened here. I mean, what happened. So I'm
14   not privy to those conversations.
15   Q   The mortality reviews that you
16   reviewed, do they ask whether any problems
17   that arose in the course of a patient's care
18   could be corrected?
19   A   No.
20   Q   Did you review the minutes from the
21   mortality review meetings?
22   A   Yes, I did in a cursory fashion, and
23   I didn't see anything that was critical review
24   there either.
25   Q   To talk about medical records, do you

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 193

1  have any expertise in computer infrastructure?
2      A  I spent a thousand hours as the
3  California system was converting from medical
4  records -- it looked exactly the same as the
5  ones I saw at LSP -- into the computerized
6  system.  So I was a medical consultant.  I've
7  always had some interest in the hardware, as
8  well as the software and even when they're
9  putting in the hardware at the California
10  medical facility, which was constructed
11  initially in 1955.  So I'm pretty well aware
12  of what the obstacles are.  So I do have some
13  experience in that regard.
14      Q  Will you be offering yourself as an
15  expert in IT?
16      A  No.
17      Q  Do you have any expertise that would
18  allow you to opine on how long it would take
19  to establish an electronic medical records
20  system at LSP?
21      A  Well, I've got some experience in
22  that, because that's what we did.  That's what
23  I was involved in from the time it was
24  conceived where we had Cerner come in, and we
25  tried to make their software system work in a

Page 194

1  largely outpatient facility in chronic care.
2  Then, we implemented it at the site level, and
3  we had trainings and that sort of thing to be
4  involved with nursing and physicians and
5  ongoing trainings to make sure that we were
6  able to document things well and to coordinate
7  the effort for the outcome to be the best it
8  could be given the software system.
9      Q  About how long did it take to get the
10  electronic health records system operational?
11      A  The hardware itself, getting the
12  hardware in is a relatively straightforward
13  situation, and that could be done in -- even
14  with the routers and the wiring and that sort
15  of thing, with intention, it should be done
16  within several months; but the training is
17  going to take several more months; and then,
18  the further implementation is going to take
19  several more months after that.  It depends on
20  how much dedication they put to training these
21  people to use it.  It's not just something you
22  walk into.  It's not EPIC, which is one of
23  those systems that everybody likes so much,
24  but it's this other, -- what's it?  "E"
25  something -- I don't remember the name of it.

Page 195

1  They have another software system that one of
2  the Louisiana health care organizations
3  recommended, and so they're following along
4  with that.
5      Q  I imagine that sort of
6  implementation, getting staff up to speed,
7  getting the records ready to use after the
8  hardware is in place, that's, I assume, is
9  especially complicated in a facility like
10  Angola with the complexity of medical records
11  that it has?
12      A  You know a decision needs to be made
13  about what to do with the current medical
14  records and whether to scan those in to some
15  big database.  The problem is when you scan
16  them into a big database, you can't find them
17  again.  So scanning them may not be helpful.
18  I think what's generally a better process is
19  to start from scratch, to bring people in and
20  there for the first few months or a year
21  while you're putting in all this information.
22  As much past medical history is important and
23  medication.  Now, arguably, is it important,
24  for instance, is it important for somebody to
25  know that I had a tonsillectomy at age five,

Page 196

1  or I had a fractured finger when I was in high
2  school?  I mean, some of the stuff that is in
3  medical records is no longer necessary, and
4  particularly, in a correctional system where
5  some of these guys have got several feet of
6  medical records.  It's not necessary to the
7  current and future care.  So that
8  determination needs to be made at the
9  Headquarters the level about the
10  implementation.  Like I said, I think it's
11  maybe, best to get a baseline on patients to
12  have them scheduled to come in for their
13  physical examinations or scheduled to come
14  in -- chronic care is not really a part of
15  this lawsuit but schedule their sick calls;
16  and at the sick calls, you'd spend more time
17  with them trying to record information that's
18  pertinent, and some information that just
19  needs to be used at another time.
20      Q  Now, moving onto your last opinion
21  here, you say, "New Court imposed obligations,
22  oversight, and requisite diversion of
23  attention from the task at hand will worsen
24  medical care at LSP, allowing less time for
25  inmate medical care."  What expertise are you

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 197

1  basing that statement on?
2       A   Just a factor of time. I'm looking
3  at what Johnson is doing. Lavespere is
4  pedaling as fast as he can. Toce is looking
5  forward to spending more time with the NPs,
6  but he needs another doctor or two, like other
7  facilities; and so when you would burden these
8  people with the plaintiff involvement or
9  plaintiff recommendations and Court
10 injunctions, what it does is it takes away
11 their capability to be able to do a better job
12 at where they're already started, or how are
13 they going to put in an electronic medical
14 record when they've got all the Court imposed
15 considerations. Plus, like every other
16 facility, they don't have every position
17 filled, and they're in the middle of nowhere.
18 I mean, how are you going to get people to go
19 out there to do these things?
20      Q   Just to go back to my question, what
21 expertise are you offering as the basis for
22 that statement?
23      A   Let me see. My expertise comes with
24 qualifications, and what I see, the time that
25 it takes to do the Court imposed

Page 198

1  obligations -- in California when we had a
2  receiver, what we did for the receiver that
3  wasn't necessary in the site level, but the
4  receiver wanted it. We've got the Plata
5  considerations, Coleman's considerations. So
6  we have attorneys that are coming into the
7  facility and taking administrators aside for
8  the day when they're looking through things.
9  It takes a lot of time for the implementation
10 of Court imposed mandates; and when you're
11 taking away time -- well, whatever. That's
12 where my experience comes in.
13      Q   Is it your view that in the
14 California system, the receivership worsened
15 care?
16      A   It what?
17      Q   Is it your view that the receivership
18 of the California system made care worse?
19      A   Made care more difficult, because of
20 the -- and I've already discussed that.
21 Sometimes, the receiver's asking for reports
22 and things that take time away from providers
23 and administration that didn't really affect
24 outcome, and that has to be seen depending
25 upon what a receiver is like or what the

Page 199

1  Coleman and Plata are like. They go on and on
2  and on, and you just never get out from under
3  it, because they always come up with something
4  else. It's like well, we'll come in, and
5  we'll look at 60 patients today and 60 charts.
6  So you come up with 60 charts that are
7  designated as having a more likelihood of
8  abnormality, and so it goes on for years and
9  years as opposed to well, let's get this done;
10 and then putting it to the people that who
11 have the biggest stake in it, and those are
12 the people that I've described up above.
13      Q   So it sounds like your opinion is
14 that the receivership made care more difficult
15 at the California Medical Facility. Did it
16 make it worse?
17      A   I think it made it more difficult for
18 the providers to handle it. I'm not convinced
19 that it made care worse except for diverting
20 the attention of the providers.
21      Q   Right, and so from a provider level,
22 it made it more difficult. From a patient
23 level, you not convinced -- you don't think
24 that it made care worse?
25      A   I'm not convinced that it helped the

Page 200

1  patients. I think that -- because the
2  receiver is looking at his reports. To go to
3  the patient level, I'm not convinced that made
4  a difference.
5           MR. DUBNER:
6              Let's break for you lunch here.
7           We'll be back here at 11:45.
8              (Lunch recess.)
9  BY MR. DUBNER:
10      Q   Dr. Mathis, your report doesn't
11 contain any opinion regarding whether COVID-19
12 had any effect on the medical care at LSP
13 prior to March 2020. Right?
14      A   That's correct.
15      Q   And does your --
16      A   I'm --
17      Q   Go ahead.
18      A   I'm just outlining what happened when
19 the Louisiana Department of Health got
20 involved.
21      Q   And your report doesn't contain any
22 opinion regarding whether COVID-19 had any
23 effect on the medical care at LSP after the
24 emergency order was lifted. Does it?
25      A   Well, I mean, I can say that it took

Page 201

1  awhile before UMNCO got -- was able to offer
2  appointments and stuff. Everything got --
3  it's -- they're a big organization that have
4  to take care of their backlogs, particularly
5  like the specialists, endocrinologists and
6  those specialty appointments that aren't
7  readily available.
8      Q   That's not discussed in your report
9  anywhere. Is it?
10     A   Only in the -- we may come upon it
11 depending upon which charts you want to talk
12 about this afternoon and scheduling, because
13 it does affect scheduling, especially for
14 those guys like the really superspecialists.
15     Q   Does your report contain any opinion
16 about what standards applied to LSP's
17 obligations to patients during the emergency
18 order?
19     A   Only what the emergency order has to
20 say, and that more directly affects what
21 happened when they were transferred out, what
22 the hospitals were not dealing with the
23 routine care or urgency. We're on the record
24 now. Right?
25     Q   Yes.

Page 202

1      A   So they would deal with -- let's look
2  at that, because I think that's pertinent if
3  you don't mind.
4          MR. ARCHEY:
5              Let's be clear everybody
6          understood. We are on the record and
7          formally. Correct?
8          MR. HAMILTON:
9              Correct. We are on the record.
10         MR. ARCHEY:
11             Thank you.
12         THE WITNESS:
13             So the COVID-19 delays in
14         treatment starts on page 90 and had
15         to do with the non-emergent care or
16         urgent care not being available,
17         actually shutting the state down for
18         medical care unless licensed medical
19         providers decided it was an
20         emergency. I can look for that
21         specific wording, which might be
22         helpful. Consider the entire
23         clinical picture when determining if
24         the service -- now, on I'm page 91,
25         line 6 -- when determining if a

Page 203

1      service can be safely postponed,
2      including the consequences to the
3      patient of postponement and the
4      consequences to the healthcare
5      system. Providers acting in good
6      faith shall not be found to be in
7      violation of this directive. So what
8      you've then is you've got a whole
9      bunch of health care providers,
10     whether it was on the street or at
11     LSP, that are trying to decide well,
12     does this guy really have to go out.
13     Maybe, in one extreme does his
14     hemoccult positive stool have to have
15     a colonoscopy, and we can talk about
16     that, and I think when I did the
17     reviews, at least in the chart
18     reviews, while I may not have put it
19     in the report, I will be cognizant
20     depending upon what questions you
21     ask, particularly regarding delays,
22     what did not occur during that time
23     or may have been delayed.
24 BY MR. DUBNER:
25     Q   To be clear what you were reading on

Page 204

1  page 90, page 91, that was the text of the
2  order, not your interpretation of the order.
3  Correct?
4      A   Yes. I almost completely quoted
5  that.
6      Q   Right. The one opinion that you put
7  in this section is at the bottom of page 92
8  and top of 93, correct, which is "Because the
9  Court has ordered review of care from 2019 and
10 not the current care, there is skewing of
11 results due to COVID-19 as well as ongoing
12 improvement efforts by Angola and LA DOC
13 staff?"
14     A   Yes.
15     Q   You've reviewed plaintiff's expert
16 report. Correct?
17     A   Yes. I mean, actually, there are two
18 reports there's Attachment B, and then,
19 there's the -- I'm sorry, my Acrobat just
20 stopped working. So I'm going to have to
21 close everything up and reboot.
22     Q   We can take a moment. You can go off
23 the record while you fix that.
24     A   It shouldn't take me long, I don't
25 think. (Brief pause.) So what I'm bringing

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 205

1  up is the 2014 medical expert report final,
2  and I bookmarked it, like I said. So I put it
3  in order of the patients, and I'm pulling up
4  the Attachment B, LSP chart reviews. I also
5  bookmarked those by the individuals and how
6  they were identified, and I'm also pulling up
7  my report; and then, as we go through this, I
8  will be pulling up my chart reviews and
9  looking at those as we discuss the patients.
10  So I am just on the last one. Okay, I'm up.
11     Q   My question is just so you've
12  reviewed plaintiff's expert report. Do you
13  intend to offer any opinions on that report
14  that are not contained in your report?
15     A   During the deposition, I'm certain
16  you'll ask me about opinions, but I'm not --
17  are you asking me if I'm going to do a
18  supplemental report?
19     Q   That was going to my next question.
20     A   We'll have see what Mr. Archey and I
21  discuss after the deposition and whether I
22  need to do anything before the trial. Some of
23  that, I'm sure, will depend upon what your
24  experts have to say.
25     Q   Have you begun work on any further

Page 206

1  report or declaration?
2     A   No. You know, this has been a
3  full-time job.
4     Q   So you said that whether you offer
5  opinions about their report at the deposition
6  depends on what I ask. Do you intend to offer
7  any opinions at trial about plaintiff's expert
8  reports that are not contained in your report?
9     A   I'm certain there will be, because I
10  will have retaining counsel asking questions
11  in addition to you. So unless you ask me
12  completely everything that you want to know
13  about my responses, you know, that retaining
14  counsel will go into it.
15     Q   In terms of your current report, all
16  of the sources you relied on are cited in your
17  footnotes?
18     A   Yes.
19     Q   Page 18 of the PDF, 12 of the report,
20  you cite an article saying that inmates age
21  faster than people not in prison. Correct?
22     A   Yes.
23     Q   In what way in your mind is this fact
24  relevant to this case?
25     A   Because of the illnesses at the LSP

Page 207

1  versus illnesses on the street. So if you've
2  got a 50-year-old-guy who's been in prison for
3  30 years, his body is more like that of a 60
4  year old or older depending upon what other
5  illnesses or injuries or whatever he brings
6  into prison. I think it's important to
7  discriminate -- again, once more, this is
8  about the difference in corrections and
9  difference in people in the street. You or I
10  are having a great day. We had a nice lunch.
11  We've got air conditioning, but that's not the
12  case about people in prison, and we're not
13  worried -- at least I'm not worried about
14  someone mugging me on the way to the car.
15  It's different in prison. This report or this
16  citation, I believe, helps the Court to
17  understand that.
18     Q   And the fact that people in prison
19  age faster means that they are more likely to
20  develop serious medical needs than people
21  outside prison. Is that correct?
22     A   I would say they're more likely to
23  develop serious medical needs sooner than
24  people on the outside.
25     Q   And are they more likely to have more

Page 208

1  comorbidities?
2     A   I believe they will collect more
3  comorbidities. For instance, that 50 year
4  old, if you're looking at a large population,
5  a class, of 50 years old, those that 50 year
6  olds at LSP are going to have more
7  comorbidities than 5,000 people on the street
8  in Baton Rouge.
9     Q   Looking at the next page, page 19 of
10  the PDF you say, "More Louisiana convicted
11  felons die in prison than in other due to the
12  Louisiana Legislature's determinations about
13  imprisonment." What's your basis for that
14  statement?
15     A   This was discussions with the
16  retaining counsel, too, but when Louisiana put
17  together the life without parole, that's what
18  they meant, and these guys are staying in
19  there. They have less chance to parole than
20  in other states.
21     Q   Is Louisiana the only state with that
22  form of life without parole?
23     A   I think they enforce it more than
24  other states. For instance, in California,
25  it's not uncommon to see somebody who's got a

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 209

1  seven to 30, and they've been there for 33
2  years, and they're 70 years old. In
3  Louisiana, it's more likely that they're in
4  there for the rest of their life, because we
5  do get people out. I've gotten lots of people
6  out for compassionate release. We do get out
7  medical paroles, but that's at a higher rate
8  than what happens in Louisiana.
9      Q   Did you do any research to determine
10  how the population at LSP differs from other
11  states?
12      A   Well, I did look a little bit into
13  the demographics, and I cited that yearly
14  report; but we've already decided that I
15  wasn't a statistician, and I'm also -- I
16  wasn't researching that. I wanted to put
17  these simple statements out there for
18  consideration.
19      Q   When you say that annual report, I
20  just want to make sure we're talking about the
21  same thing. Are you talking about the Bureau
22  of Justice statistics prisoners in 2007 and
23  prisoners in 2008?
24      A   I don't think so. There was another
25  citation. It might be LSP files.

Page 210

1      MR. ARCHEY:
2          I can help, or I can be quiet.
3      MR. DUBNER:
4          Yeah, if you know the answer to
5  this, Connell.
6      MR. ARCHEY:
7          He's talking about the bench
8  book, the briefing book produced by
9  DOC.
10     MR. DUBNER:
11         Louisiana Corrections Briefing
12 Book. Thank you.
13     MR. ARCHEY:
14         Did I do that well?
15     MR. DUBNER:
16         Is that correct, Dr. Mathis?
17     THE WITNESS:
18         Yeah. That's what I was looking
19 for.
20     MR. DUBNER:
21         Thank you.
22 BY MR. DUBNER:
23     Q   Are the demographics at LSP unusual?
24     A   Well, they skew towards older
25 patients, because they've got the life

Page 211

1  sentences. I mean, I don't think it applies
2  so much to the illnesses that we're going to
3  be talking about more, but I think that the
4  idea about inmates aging faster and that LSP
5  has older inmates than other prisons in the
6  state is important.
7      Q   So you do think that the demographics
8  at LSP are unusual?
9      A   Well, I think they're different.
10  Unusual, I don't think that's the right word.
11     Q   Let's talk first just generally about
12  your chart reviews to understand the way you
13  structured them. You include a narrative
14  section for each chart review. What is that?
15     A   That's essentially what Lavespere or
16  Toce put together as far as the death review
17  that they generated at LSP and presented to
18  the secretary. Go ahead.
19     Q   So that's the section that starts
20  narrative, as well as the section that starts
21  medical summary?
22     A   Yeah, I've got number seven open, and
23  I see LSP death review, narrative, medical
24  summary, medical conditions; and then, on some
25  of the patients, I'll put -- if I think

Page 212

1  something is more important or that wasn't
2  covered, I will do my own medical chart
3  review; and as you know, for the patients that
4  are alive, none of that -- I mean, it's only
5  my chart review and then the Mathis opinion.
6  Then, I'll add an autopsy if it's separate
7  from the chart, too. Sometimes, that wasn't
8  included in the LSP death review.
9      Q   So the narrative, medical summary
10  sections -- sorry. The narrative and medical
11  summary sections and autopsy or toxicology
12  report if you cite those, those are taken
13  verbatim from the death reviews or the autopsy
14  or toxicology report?
15     A   I wouldn't say verbatim, but that's
16  where they're taken from. Sometimes, I change
17  certain words, because they didn't make sense.
18  They're kind of written in medical shorthand,
19  and I want it to flow a little better, but I
20  didn't go through the grammar on that as much
21  as I did for what I wrote for myself.
22     Q   Right, and you change patient name
23  to, for example, patient number 35, things
24  like that. Correct?
25     A   Change patient names?

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 213

1     Q   Yeah, you replaced patient names
2  with the anonymous identifiers.
3     A   Exactly.  Exactly.
4     Q   But by and large, the text of those
5  sections is what's in the text of the
6  death review?
7     A   Yeah.  I think essentially the same
8  would approximate what happened of what I did.
9     Q   And then, for your chart review
10  section, how did you decide what to put in
11  each chart review?
12     A   The chart review that I did by
13  myself?
14     Q   Right.  The ones that you wrote.
15     A   What I thought was pertinent to the
16  cause of death or pertinent to the inmate, and
17  that varies from patient to patient.
18  Sometimes, you'll see that I say substantially
19  accurate, which means I just don't think
20  anything else is necessary.  As you know, your
21  experts are going into far more detail for the
22  most part looking for -- let me see.
23  Sometimes, very more detailed information than
24  I do, and of course, that's inherent in a
25  plaintiff expert.  So sometimes, though, I

Page 214

1  thought that degree of information was
2  necessary, and so that's in my Mathis chart
3  review.
4     Q   When you say that's inherent in a
5  plaintiff expert, is that something you
6  find -- since you work on both sides, are your
7  reviews more detailed when you're a plaintiff
8  expert than a defendant expert?
9     A   No, they're two different, from a
10  different point of view.  The plaintiff is
11  actually looking for things that they are
12  going to allege are violations of standard of
13  care and have the Court consider as being
14  unconstitutional.  Whereas, defense is looking
15  at it from a different point of view, and my
16  point of view on this case was whether or not
17  LSP improved it's clinical care or what the
18  current clinical care is and not looking at
19  the same detail to -- I mean, I don't think
20  that the Court really cares so much.  There
21  was one that lack of vital signs, where
22  somebody didn't have eye respiratory rate if
23  it wasn't relevant, and I brought up what I
24  thought were relevant considerations as it
25  related to my opinions.

Page 215

1     Q   So your chart reviews lists the facts
2  that you think are relevant to your opinions?
3     A   Yes.
4     Q   When you do your chart reviews, you
5  listed the relevant actions that LSP staff
6  took?
7     A   Sometimes.  Sometimes, I looked at
8  the entire case, and I said, whoa, I think --
9  like that fellow we talked about earlier with
10  all of his specialty reviews over an 18-month
11  period, when you had like 50 specialty
12  reviews.  I mean, how can that be bad when LSP
13  can put the systems together to be able to get
14  these specialists and get these trip returns
15  handled.  I mean, that's just overwhelming to
16  be able to handle all of that.
17     Q   Just to go back to my question, for
18  each of your chart reviews, you listed the
19  relevant actions that LSP staff took?
20     A   You'll have to look at each chart
21  review.  I can't say that specifically.
22  You'll have to look at the chart review,
23  because your experts are looking at the charts
24  differently.  They're looking at it from a
25  plaintiff point of view, and they're looking

Page 216

1  for things that can be brought up for maybe
2  the Court maybe to consider that oh, they
3  can't do this.  They need help.
4     Q   Just to be clear, I'm talking about
5  your chart reviews, Dr. Mathis, here, not
6  there's.  If I ask about plaintiff's chart
7  reviews, then, go into that, but otherwise,
8  we're just talking about your chart reviews?
9     A   Nicely said, yes.  My chart reviews,
10  have what I think is important in them.
11     Q   For each of the patients you
12  reviewed, you included -- strike that.  For
13  each of the patients you reviewed, did you
14  review the entire chart?
15     A   Yes.  Page by page --
16     Q   Go ahead.
17     A   I have every page that my paralegal
18  went through and put in the date and what
19  occurred on that date.  I went through every
20  page and then bookmarked them according to
21  relevance, sometimes according to a medical
22  problem that occurred, sometimes -- or just a
23  laboratory or imaging and that sort of thing,
24  and I think that was in discovery.  I'm not
25  sure.

Page 217

1    Q   We may talk about those bookmarks in
2    a little bit, as well.  For each of the
3    patients, you included all of your opinions in
4    the report?
5    A   Yes.
6    Q   You said earlier Dr. Lavespere didn't
7    give you any information about any of the
8    charts.  Is that right?
9    A   Yes, and you asked the question about
10   Lavespere giving me direct information, and
11   there was other information that retaining
12   counsel obtained from Lavespere I used, but I
13   wasn't talking to Dr. Lavespere directly
14   in getting -- I don't believe that I have
15   anything that I included in the report that he
16   specifically authored but rather information
17   that Dr. -- or that retaining counsel obtained
18   from him at my request sometimes.
19   Q   Okay.  So you considered the
20   information that Dr. Lavespere provided to
21   you?
22   A   Yes.
23   Q   Is that correct?
24   A   Yes.
25   Q   At times, you relied on information

Page 218

1    that Dr. Lavespere provided to you?
2    A   Yes.  We'll have to see what that is,
3    but I think I've already demonstrated that in
4    the report.
5    Q   Did you include the information
6    Dr. Lavespere provided to you with the
7    materials that you produced?
8    A   It was conversation.  I didn't
9    include any conversation with him.
10   Q   No, so you said, and correct me if
11   I'm wrong, it sounded like you said before
12   that he gave some information to counsel that
13   was then given to you.  Was that written
14   information?
15   A   I don't believe anything was written.
16   Most of it was questions about if I need to
17   find out about this, ask Dr. Lavespere, and
18   then, counsel would come back with an answer.
19   You know, Dr. Lavespere is busy, and retaining
20   counsel was giving him lots of questions.
21   Q   So you asked questions of counsel.
22   They asked Dr. Lavespere, and then, counsel
23   gave you those answers?
24   A   Yes.  Sometimes, that's what
25   occurred.

Page 219

1    Q   To prepare your chart review of each
2    patient, did you look at any information other
3    than the medical records, mortality reviews
4    and the autopsy or toxicology reports and the
5    answers you got from Dr. Lavespere?
6    A   I used what was produced, I mean, the
7    patient charts and you know, whether it would
8    be 90 pages or 1,800 pages.
9    Q   Did you go beyond that and look at
10   EPIC records, for example, for any of the
11   patients that weren't in the medical records?
12   A   Only those EPIC records that were
13   copied into the paper record, same thing that
14   you got.
15   Q   And the same thing with medication
16   administration records?
17   A   I didn't look at medication
18   administration records unless they showed up
19   as part of the chart, and I would say 99
20   percent of the time, I didn't use those at
21   all, because my understanding was that we were
22   not going into MARs.
23   Q   We're going to talk about some of the
24   individual chart reviews and your opinions.
25   Let's start at page 98 of the PDF, ninety-two

Page 220

1    on the page numbers.
2    A   It helps me if you just give me the
3    patient number.
4    Q   Yeah, so this is patient number 35.
5    A   I've got mine up now.  Now, I'm
6    getting yours up.  Okay.
7    Q   So you say, "It is my Opinion that
8    Dr. Bunch violated the Standard of Care by
9    admitting PATIENT #35 to the infirmary with
10   altered mental status and temperature
11   elevation of 103.2."  First, just to be clear,
12   you're talking about specifically on
13   April 13, 2019?
14   A   It's April.  I neglected to put in
15   April 13th.
16        MR. ARCHEY:
17        Is it April or March 13 of --
18   BY MR. DUBNER:
19   Q   And that's why I'm just checking,
20   because there's multiple different times when
21   he saw Dr. Bunch, and I wanted to see which
22   one you were talking about.  If you look at
23   page 97 of the PDF, it may help you answer the
24   question.
25   A   I'm looking at your report and

Page 221

1    they've got 3/13/19. No, actually, your
2    report says April 13, and mine says March 13.
3        Q    Then, if you look --
4        A    The next one is 4/13. The 4/13 is
5    the visit I have a problem with.
6        Q    That's all I was checking on. Can
7    you explain why you think that violated the
8    standard of care?
9        A    Because there was no way to work this
10   guy up. He had a temperature of 103. He had
11   altered mental status. His prior history of
12   having had seizures that had the similar sort
13   of altered mental status could be taken into
14   consideration, but that doesn't cause a
15   temperature of 103. And how are you going to
16   work this guy up in an ATU without CT scan,
17   spinal tap, white cell count, blood cultures,
18   urine cultures? I the thought this was a
19   violation of the standard of care.
20       Q    Do you consider the death review on
21   this one sufficient to let LSP identify and
22   improve its care in this regard?
23       A    No.
24       Q    Let's go to the next patient in your
25   report, which is patient number 38. Like we

Page 222

1    were saying before, for your medical chart
2    review here, you summarized all the
3    significant facts that the medical staff had
4    and the actions they took that you thought
5    were relevant to evaluating the care?
6        A    On this patient, I did my own medical
7    chart review, and then, I included the autopsy
8    opinion and then my opinions about him, yes.
9        Q    On page 102 of the PDF, you referred
10   to a chest x-ray that was ordered but not
11   completed, but you say that it wasn't
12   medically indicated without abnormal vital
13   signs. Are abnormal vitals the only thing
14   that can indicate the need for a chest x-ray?
15       A    In influenza, you can't x-ray
16   everybody that's got influenza, and that was
17   their working diagnosis.
18       Q    But could lab work indicate -- or lab
19   results indicate that a chest x-ray was
20   needed?
21       A    Might, but the working diagnosis was
22   still influenza and as long as that's it, why
23   it pretty much follows that you treat them for
24   influenza unless something else shows up. I
25   mean, there are millions of cases of influenza

Page 223

1    in the United States and not everybody gets
2    laboratory tests and chest x-rays, even in the
3    outpatient clinics, I mean in the doctor's
4    offices.
5        Q    So you say that "Lab work from 3/6/19
6    showed an elevated creatinine of 2.78, glucose
7    204, WBC of 6,500 with a left shift of 89 segs
8    and 4 bands." Does that lab work suggest a
9    possibility of a different diagnosis besides
10   influenza might be necessary?
11       A    I think that the white cell counts
12   supported influenza. The shift to the left
13   makes one think that it might not be
14   influenza, but the total white blood cell
15   count of 6,500 isn't really consistent with
16   lobar pneumonia either. So I'm not
17   criticizing them for not getting a chest x-ray
18   or looking further here. The creatinine
19   level, I don't think is relevant to influenza.
20       Q    So you don't think a differential
21   diagnosis was necessary at this time?
22       A    I think the working diagnosis was
23   influenza, and that's what they treated him
24   for.
25       Q    To rephrase my question, you don't

Page 224

1    think that they had an obligation at that time
2    to rule out other possibilities?
3        A    No. I thought that treating him for
4    influenza was the right thing to do.
5        Q    You also note on March 7th "within
6    one (1) hour of initial presentation and
7    nursing assessment, PATIENT #38 arrested in
8    the ATU, the highest level of care available
9    at LSP, with an unknown and unsuspected
10   diagnosis of pneumonia." Why is it important
11   to you in your mind that he arrested in the
12   ATU?
13       A    Because it's the highest level of
14   care available. If he's going to arrest
15   someplace, arrest where you've got the best
16   staff available. And -- I mean, I'm sure that
17   the plaintiff has questions about whether he
18   should have been treated differently, but this
19   is the best that LSP could provide at the ATU,
20   and I don't think he needed to be in an
21   emergency room or hospitalized someplace.
22       Q    Right. Given the conditions and the
23   information that staff had at the time, the
24   ATU was the appropriate place to treat him?
25       A    I believe so. They try and find out

Page 225

1    what was going on with him, and when he
2    arrested, take him to the ATU. What are they
3    gonna do? I guess that's my question. He
4    arrived at the ATU with CPR in progress. So
5    they do ACLS to the best of their ability. I
6    mean, it's not an emergency room.
7        Q   Let's move onto patient number 21.
8    You say on page 106 of the PDF, "PATIENT #21
9    planned his overdose with his refusal to enter
10   the hospice and transferred to his usual
11   housing where he could receive drugs from
12   other inmates to end his life." Is this
13   something that's stated in the medical
14   records?
15       A   No. It's on my training and
16   experience. The guy didn't want to go where
17   he could receive the infirmary care. He
18   wanted to go back to his house. That's the
19   best reason to go back to your house when
20   you're at the end of your life, and you want
21   to kill yourself, because he wouldn't have the
22   same opportunity in the infirmary.
23       Q   And so this is based on your
24   experience in correctional facilities, your
25   speculation of his behavior?

Page 226

1        A   I wouldn't -- I think speculation is
2    too strong a word. It's my experience running
3    a hospice for eight years what people do at
4    the end of their life.
5        Q   It's your experience that that's
6    probably what he did?
7        A   It's my medical opinion that's what
8    happened.
9        Q   Is this a case that you discussed
10   with Dr. Lavespere?
11       A   I don't think so.
12       Q   I'm sorry. Let me rephrase that,
13   because you didn't discuss directly. Is this
14   a case that you received information from
15   Dr. Lavespere about?
16       A   I don't think so. I didn't need
17   Lavespere to tell me what went on here. I
18   just read the chart.
19       Q   And now, for patient number 36,
20   what's the basis for your opinion that there
21   are no standard of care violations by LSP in
22   their care for patient number 36?
23           MR. ARCHEY:
24               Page, please?
25           THE WITNESS:

Page 227

1            It's on 110.
2    BY MR. DUBNER:
3        Q   Did Dr. Mathis break up, or are you
4    just pausing?
5        A   No. No. I'm thinking. In order to
6    do this I need to look back at the LSP death
7    review, and I need to pull up his chart, and
8    that's going to take a moment. If I look like
9    I'm not thinking, why, you're getting the
10   wrong impression.
11       Q   You just looked very still, which I'm
12   sure meant you were just thinking very deeply.
13       A   And this is -- we're on number 36.
14   So this is the guy that did in my chart
15   review, I had demonstrated that he had -- we
16   can look at this together if you want. You
17   want me to share?
18       Q   Why don't you tell me what you're
19   going to say first, and then, we can look at
20   it if we want to.
21       A   Well, this is the guy who went out to
22   OLOL, I believe. He had been diagnosed with
23   the interstitial lung disease. He had been at
24   UMCNO and diagnosed with interstitial lung
25   disease. He was known to have a serious

Page 228

1    medical illness. He was known to be short of
2    breathe. He was known to have all these
3    serious medical issues, and the specialists
4    dictated how he should be treated; and in my
5    opinion, he was treated that way at LSP.
6    Then, when he arrested on 5/2, he has that
7    he's hypertensive, and he's getting treatment,
8    and then, he arrests. And so it was my
9    opinion that what they did was complied with
10   the specialty recommendations, complied with
11   the standard of care as far as their emergency
12   medical report on page 106 of 227, and then
13   their arrest, ACLS, on page 107 appeared to to
14   comply with the standard of care. So that's
15   why I came to that conclusion.
16       Q   You say you demonstrated in your
17   chart review. Your chart review is only one
18   sentence long in the report. Is there
19   something else that you're calling your chart
20   review.
21       A   Can you allow me to share.
22       Q   Yeah. We can do that. I don't know
23   if you have the capacity. Let me see. Okay,
24   yes, you should be able to share.
25       A   Can you see this screen in the

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 229

1  center?
2      Q   Yes.
3      A   So this is my chart review, and we
4  discussed this before. I've got every page
5  that's numbered, and then, I go through the
6  like the emergency medical report and
7  everything that occurred there, admission to
8  the infirmary and what happened in the
9  infirmary; then, when he was transferred out
10  to UMCNO and then, when he was admitted from
11  UMCNO directly to the infirmary, when he
12  followed up at the physician's clinic, when he
13  had this emergency medical report and what
14  happen then and then when he arrested later
15  after that presentation on 5/2, after -- let's
16  see, two weeks after he had been seen at the
17  physician's clinic; and then he was seen at
18  the physician's clinic he was stable. So the
19  guy comes up within an acute illness, acute
20  serious medical illness, and he's seen in the
21  ATU, and then, he arrests, and he's taken care
22  of appropriately. That's why I say there's no
23  violation of the standard of care.
24          MR. DUBNER:
25              For the record, why don't we

Page 230

1              designate this version of patient
2              number 36's records as Exhibit
3              Number 3.
4              Mr. Archey, if you could, when
5              you get a chance provide this one to
6              Ms. -- actually, I assume this is the
7              exact same what was produced to us.
8              So we can provide it.
9  BY MR. DUBNER:
10      Q   This is the version that was produced
11  along with your report, Dr. Mathis?
12      A   I believe so.
13      Q   A couple of questions. First off,
14  some entries in the bookmarks are bolded, and
15  some are in red. Can you say what that means?
16      A   Yeah. In general, it kind of depends
17  on when I was reviewing things. Sometimes, I
18  make red bold marks, and sometimes, I make
19  black ones. I can see the black -- I mean, I
20  can see bolded better than I can see, for
21  instance, just a regular-typed face; and a lot
22  of times what I'll do is when I can open and
23  close them, let's see, I'll just go and modify
24  and open and close them all together and
25  expand or collapse them. So then, I can look

Page 231

1  at them according to what I thought were the
2  major turning points in the chart, and these
3  are the major turning points or the major
4  visits that I thought were important. So
5  that's how what my chart review is. I did not
6  feel that it was important to, as many of your
7  experts did, to put down every detail of the
8  patient information but rather the important
9  information that was related to his immediate
10  outcome.
11      Q   Just to make sure I understood, so
12  bold and red, those mean the same thing?
13      A   Sometimes. Red generally means more
14  important than bold, than just bolded black
15  but not always. I mean, sometimes, I'm always
16  putting everything in red, but if you see bold
17  and you see bold red, then, the bold red
18  carries more weight than just plain bold.
19          MR. ARCHEY:
20              You want to attach these? I
21          don't understand. The records are
22          going to be the records. You're not
23          going to pick up the bookmarks by
24          attaching them.
25          MR. DUBNER:

Page 232

1              Yeah. I mean, we'll have the
2          electronic version of it. We need to
3          know what all the exhibits are. It's
4          in the transcript. So we have it
5          collected in one place. I mean,
6          we're just designating this one
7          Exhibit 3 for this deposition.
8          MR. ARCHEY:
9              You don't think it's sufficient
10          just to refer to patient number?
11          What are we on, 38?
12          THE WITNESS:
13              Thirty-six.
14          MR. ARCHEY:
15              Thirty-six. Thank you. It's
16          just the records of charts that are
17          produced.
18          MR. DUBNER:
19              I don't understand your
20          question.
21          MR. ARCHEY:
22              My problem is, I think what I
23          appreciated you wanted was something
24          that was significant or manipulated
25          by Dr. Mathis. These bookmarks he

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 233

1  has created, I get that, but by
2  attaching the chart, you're not going
3  to get these. So I'm wondering why
4  we are attaching the chart. That's
5  what I'm talking about.
6  MR. DUBNER:
7      We can also have Exhibit 3, you
8  know, not produced electronic only,
9  something like that. We'll be
10  sending Ms. Marino the PDF. I don't
11  know if she's going to be printing it
12  or not, but we will have the
13  electronic version with this. We can
14  discuss this later. There's no
15  reason to discuss this now. We can
16  figure that out.
17  BY MR. DUBNER:
18  Q  Dr. Mathis, did you make any written
19  notes that have been produced about your
20  analysis of this chart other than what is in
21  your report?
22  A  No. My method is to go through the
23  chart and to bookmark it, and then, when I --
24  and the bookmarks will to some degree
25  demonstrate to me when I put together the

Page 234

1  report or this report or any report what I
2  think is important; and then, I may reproduce,
3  for instance, in this report, what I might
4  reproduce is the 1/3/19, you know, the bolded
5  bookmarks and what's relevant there; but when
6  the really important thing happens on 5/2, why
7  then, that's what I would concentrate on, but
8  this is a little different, because this is
9  not a -- my report had over 200 pages. I
10  thought designated what I thought was
11  important for the Court to understand and for
12  this deposition. If I would have gone in the
13  same sort of detail, the report would have
14  been thousands of pages, and then, so much of
15  that, I really believe is irrelevant.
16  Q  Understanding on these bookmark
17  things, so we can tell from the bold or red
18  markings that you found those to be important.
19  In terms of what you found important about
20  that, we either have to ask you -- the only
21  way to find out is to ask you if it's not in
22  your written chart review?
23  A  Yes.
24  Q  And so on page -- we can stop sharing
25  this one, I think.

Page 235

1      Moving next to page number 37 --
2  sorry. Patient number 37, if you look at page
3  111, 112 of PDF of your expert report, you
4  don't include a chart review here. Is there a
5  reason for that?
6  A  Well, it was pretty straightforward
7  what he died from, and he had a cause of death
8  was cardiac arrest due to a GI bleed. I
9  thought that when I looked at it, the LSP
10  death review and that information was
11  reasonably accurate, and then, I described why
12  I thought that underneath my Mathis opinion,
13  which is on page 112, beginning at line four.
14  The guy had a duodenal ulcer that he was
15  essentially being treated for. Whether it was
16  -- they didn't know that he had an ulcer. He
17  was already on ranitidine, which is an
18  accepted treatment. He had -- well, you can
19  read it.
20  Q  So I don't think we need to read all
21  that. As you said, we have it all there. You
22  don't say that the mortality review was
23  accurate, but from what you just said, it
24  sounds like you found it to be accurate. Is
25  that right?

Page 236

1  A  I think that the information was here
2  was substantially accurate, yes.
3  Q  Is there a reason you didn't mention
4  it in your opinion, or just didn't think to?
5  A  I neglected to mention it as being
6  pertinent. I mean, I know that sometimes I
7  did on other patients. So I didn't write
8  anything here. I don't think you can -- I
9  just neglected to put it in.
10  Q  And that's what I'm asking. I know
11  sometimes, you do. Sometimes, you don't. On
12  occasion, you say you think something was
13  missing from mortality review. So should I
14  assume -- is it correct to assume if you
15  didn't comment on the mortality review, you
16  found it to be substantially accurate?
17  A  Yes.
18  Q  Turning to patient number 27. If we
19  look at page 115 of the PDF, I want to focus
20  on that second opinion there. You say, LSP
21  medical staff reasonably and appropriately
22  demonstrated organized structure by executing
23  signed refusals for medical care. What
24  information should be on a signed refusal?
25  A  Ideally, what should be on a signed

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 237

1 refusal, ideally should be something that's
2 typed out, saying you're refusing this visit
3 for whatever it is, for blood pressure
4 control. You understand that blood pressure
5 control is important to help prevent you from
6 having stroke and heart disease and kidney
7 disease, but nobody, nobody ever writes all
8 that information. Maybe, I have in certain
9 circumstances when I met with patients,
10 because I really wanted to hammer it home to
11 them; but as a general rule, having a signed
12 refusal is sufficient.
13     Q   So understanding that, you know, what
14 you just described as sort of ideal world, is
15 there a minimal standard for what should be on
16 a refusal?
17     A   Yeah, that they refused and what the
18 care is, and inmate signed or somebody else
19 signed for them if they refused to sign.
20     Q   Is it appropriate to threaten a
21 patient with discipline if they refuse to
22 sign?
23     A   No.
24     Q   So with a patient like Mr. -- I'm
25 sorry, page number 27.

Page 238

1         MR. DUBNER:
2             Just for -- Connell, do you have
3         any objection to striking me saying
4         the patient's name from the record
5         there?
6         MR. ARCHEY:
7             No, that will be fine, Jeff.
8         MR. DUBNER:
9             Madam court reporter, can you
10         just omit when I started to say his
11         name.
12     BY MR. DUBNER:
13     Q   With a patient like number 27, what
14 counseling should medical staff attempt to do
15 when you have a patient with chronic
16 hypertension who repeatedly refuses medical
17 care?
18     A   Well, you need to -- I think I
19 actually responded to that a couple of minutes
20 ago, what I would like to see with what should
21 be on one of these refusals. Particularly, if
22 they do it repeatedly. They need to be able
23 to read it and say, look, Dr. Mathis is
24 telling me that it's important to have this
25 visit, because if I don't have this visit, I

Page 239

1 don't have - I'm not getting medical care,
2 which can help prevent that stroke or prevent
3 that heart attack, but it's hard to do that in
4 a clinical setting. But as I said, I think
5 the minimal should be that the patient
6 refuses, what the patient is refusing, what
7 the -- and the patient signs; the clinician
8 signs; and if the patient doesn't sign, then,
9 someone else signs in lieu of him.
10     Q   Let's move to patient number 15 for a
11 moment, if we look at page 116 of the PDF.
12 You say you reviewed patient number 15's chart
13 with attention to his care and treatment for
14 COPD. Why did you focus on COPD?
15     A   Because that was the cause of his
16 death. In general, when you're looking at
17 standard of care, you're looking at violations
18 and causation. So the causation in this
19 patient that could have been related to
20 standard of care was the cause of his death.
21 I mean, if you have a tort case and it's about
22 somebody who has COPD and dies as a result, to
23 talk about their toenails being trimmed by a
24 podiatrist is really superfluous.
25     Q   You know, prior to his death, was

Page 240

1 COPD the most important condition he suffered
2 from, the most significant one?
3     A   Well, it's the cause of his death. I
4 believe it was.
5     Q   Should providers have known that his
6 COPD was important?
7     A   Let me pull up his chart. (Brief
8 pause.) They knew that COPD was important,
9 and I found that in my chart review.
10     Q   Let's move to patient number 32, and
11 I think jump to probably pages 119 and 120 of
12 the PDF. We've already discussed your finding
13 that it's a violation of the standard of care
14 for EMT officers to triage inmates in
15 emergencies without transporting that inmate
16 to the ATU or contacting a NP or MD.
17     A   Let me pull his chart up.
18     Q   So this patient made three emergency
19 sick call requests in the month before his
20 death. Is that right?
21     A   I'm still pulling his chart up.
22     Q   Sure thing.
23     A   So 6/7, 6/24, 7/3, 7/6 are the ones
24 that I have highlighted, and I believe this is
25 one that retaining counsel and I discussed so

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 241

1  that we can change the EMTs making decisions
2  outside of their licensing.
3      Q   On all of those emergency sick call
4  requests, was he examined by a provider?
5      A   He was. Let's see. On 6/24, he
6  presented with chest pain, and that was with
7  an officer, and then -- so he was only seen by
8  an officer. On 7/3, he -- continuing medical
9  issues. Again, an officer. On 7/6, by an
10 officer, and -- well, 7/6 was an officer. So
11 three occasions, this guy is screened for --
12 well, for important visits. On 7/6, was
13 medication making his chest hurt. Denies
14 chest pain. Denies shortness of breath, and
15 then, on three occasions, he was seen by an
16 EMT. I am not happy about that.
17     Q   And those are all things where the
18 EMT -- for the EMT to practice what he did was
19 beyond the scope of practice?
20     A   That's right.
21     Q   You don't express any opinion about
22 how that affected this patient's overall
23 health. Do you have any opinion on that?
24     A   Well, that would have to be a
25 hypothetical. Right? So hypothetically, had

Page 242

1  he seen a nurse practitioner, he would have
2  been treated sooner, and his outcome may
3  hypothetically have changed.
4      Q   You also reference the ordering of an
5  EKG. Why was that important for this patient?
6      A   Where is that in the context of my --
7  what page?
8      Q   In the expert report, it is the
9  second bullet point on page 120 of the PDF.
10     A   Okay. Yeah. I think he should have
11 had an EKG when he's talking about chest
12 tightness and discomfort going down his arm.
13 I mean, that's standard of care, and an EMT --
14 I mean, you would hope that they would at
15 least put him on a monitor to see what was
16 happening, but EKG is standard of care when
17 you have chest pain.
18     Q   This one -- we may have to clarify
19 the conversation we had a few minutes ago.
20 You don't say on this one whether you believe
21 the mortality review in this case was
22 adequate. Do you think that it was?
23     A   No, because it doesn't go into what
24 happened. And it doesn't -- I mean, it's just
25 explicatory. It doesn't go into the EMTs

Page 243

1  screening this guy. It doesn't go into what
2  they could have done differently. That's my
3  primary concern about the death reviews.
4      Q   I'm sorry. Did somebody just say
5  something?
6      A   Yeah. Siri said something. I don't
7  know why. She said she found it on the web.
8  I didn't ask her to do anything.
9      Q   Patient number 33, if we go to page
10 124 of the PDF of your report, your opinion
11 that LSP medical staff reasonably and
12 appropriately cared for this patient. Am I
13 right to gather that that's based on LSP
14 arranging for specialty consultations and
15 everything else in that second bullet
16 reasonably and appropriately?
17     A   Yes.
18     Q   Is there anything else that that's
19 based on?
20     A   That's primarily it. Again, it's
21 about a causation opinion, about what they
22 should have done that would have made a
23 difference. This was a sick guy, and we've
24 talked about it earlier, chronic hepatic
25 failure due to hepatitis. Then, he's having

Page 244

1  acute issues. So he was an acute guy. I just
2  don't see how being at another prison -- I'm
3  sorry. Let me just take a second. Or
4  necessarily being at an outside clinic would
5  have changed his outcome, because he had a
6  terminal illness.
7      Q   That's something to ask about. Was
8  the purpose of your review primarily to -- was
9  the purpose of your review focused on outcomes
10 and whether changing LSPs practice would have
11 changed the outcomes that these patients
12 actually had?
13     A   Yeah. My -- as I said earlier, my
14 review was not to look for every possible
15 deficiency in a chart, the way it seems that
16 your expert reports did. My review was to try
17 to be cognizant of the important factors in
18 the outcome and causation, like we would do in
19 a standard of care case.
20     Q   So were you looking at where LSP's
21 medical staff's actions placed somebody at
22 higher risk even if that risk ultimately
23 wasn't the thing that killed them and wasn't
24 something that manifested?
25     A   You have to look at the chart. Do

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 245

1  you have a chart you want to talk about.
2      Q   I'm asking as a general matter, you
3  said that as a general matter you were looking
4  at how the care related to the outcome.  So
5  I'm asking, you know, in general, were you
6  also looking at whether the medical staff's
7  actions or inactions place people at a higher
8  risk even if that risk isn't one that
9  occurred?
10     A   It's always in the background when
11 I'm looking at it.  I mean, did they fail to
12 provide standard of care treatment; and if
13 they had, would there have been a different
14 outcome, and if I didn't write about it, then,
15 I didn't believe that it was necessary to
16 write about it.
17     Q   Okay.  So you only -- I'm just trying
18 to think, because you referred to outcome
19 again.  Were you only looking for things that
20 could have changed the outcome?
21     A   I can't answer that.  Only the
22 qualifier there.  It just doesn't work to
23 answer that question for me.
24     Q   What about the -- so the word only is
25 what's the problem in the question.  What were

Page 246

1  you looking for besides things that the
2  medical staff did that could have changed the
3  patient's outcome?
4      A   Like on the chart I showed you, I
5  looked at important milestones as far as the
6  specialty reports, physician clinic reports,
7  trips returns, infirmary admissions and
8  sending them out, what the issues they showed
9  up with; and I looked at the totality of it
10 and came up with these opinions.
11     Q   Let me give you -- so this will be a
12 hypothetical, but hopefully, it will be one
13 that is sort of targeted enough that it will
14 help us get to an answer here.  Let's say, you
15 know, you had a patient with -- let's go with
16 number 33 here who had a serious condition
17 that ultimately led to his death, autoimmune
18 hepatitis and also had, let's say, asthma.
19 Would you have also looked to see whether his
20 asthma was treated appropriately, or would you
21 have focused only on the hepatitis?
22     A   I would have focused on the hepatitis
23 in this patient.  If he had repeated visits
24 without reasonable care, without standard of
25 care or asthma, then, I might have brought

Page 247

1  that up, but I'm primarily looking at the
2  cause of death in these death patients.
3      Q   Okay.  So you would have brought it
4  up if it was something that was sort of
5  glaring that you saw, but it wouldn't be what
6  you were looking for?
7      A   Right, but we were also told by Judge
8  Dick that we're not talking about chronic
9  care, and so asthma is one of those chronic
10 care issues; and so for it to be talking
11 about -- hypothetically, to be talking about
12 asthma and chronic care visits when the guy
13 died from sepsis related to autoimmune
14 hepatitis is inappropriate in my review.
15     Q   Dr. Mathis, we've been going for
16 about an hour.  I just want to check to see if
17 you want a three-minute break or if we should
18 keep going?
19     A   Oh, I'm having a great time now.  I'm
20 starting to think I'm getting warm again,
21 because I'm gonna close the shade, because
22 I've got sun coming in from a different
23 window, but I can go on.
24     Q   Just you or Ms. Marino let us know if
25 you need a break.

Page 248

1      So the next patient in your report is
2  number 29.
3      A   Right.
4      Q   You say that to medical certainty, he
5  obtained the synthetic cannabinoids.
6      A   (Witness nods head affirmatively.)
7      Q   What do you mean by medical certainty
8  here?
9      A   There wasn't a good reason for him to
10 have a temperature of 108 without having taken
11 the cannabinoids, which caused hyperthermia,
12 terminal seizures and death.
13     Q   So you're saying in the absence of
14 any other explanation, that's the only
15 explanation?  Is that sort of how you arrived
16 at the medical certainty?
17     A   Because I've seen patients exactly
18 like this that came up to be my medical
19 opinion about why he died.
20     Q   Did you get any information from
21 Dr. Lavespere about this patient?
22     A   Not to my knowledge.  You know, what
23 I did on this patient is primarily look at his
24 temperature elevation and trying to think of
25 what causes that degree of temperature

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 249

1    elevation, and the only thing that comes up
2    repeatedly in the literature are these drugs
3    that don't always show up on tox screens.
4        Q   You reviewed the EMS response and
5    efforts, both at his cell and at the ATU.
6    Correct?
7        A   Yes.
8        Q   You found those to be appropriate?
9        A   Yes.  And I reviewed that -- probably
10   postmortem camera observation, that he was
11   smoking something hours before he became
12   unresponsive.
13       Q   Nicotine was found on the toxicology
14   screen.  Correct?
15       A   Yes.
16       Q   Nicotine is also something that is
17   sometimes smoked in prison.  Correct?
18       A   There's a lot -- let me just say,
19   there's a lot of secondhand smoke in prison,
20   whether it's from nicotine or marijuana; or
21   you know, you go down to the tiers sometimes,
22   and you get a contact high.
23       Q   Is that something that you observed
24   at LSP?
25       A   No.

Page 250

1        Q   Now, in terms of the EMS response and
2    efforts, you're not aware of any evidence that
3    they took other efforts other than those that
4    are listed in your chart review and the
5    medical summary.  Correct?
6        A   Let me pull up his chart.  The
7    specific questions are difficult without
8    looking at the chart.
9            No, what I see is that he had that
10   temperature 108.2, and they gave him Narcan in
11   route.  They give him the Epinephrine ET tube.
12   They put in an IO, and it looked to me like
13   they did a pretty good job.
14       Q   Going to patient number 13, we talked
15   about this one a little before when we were
16   discussing specialty care.  So you have
17   your -- so you reviewed the whole chart for
18   this patient?
19       A   I reviewed the whole chart for every
20   patient.
21       Q   You have no reason to believe that
22   the chart itself was inaccurate.  Correct?
23       A   Let me pull it up.  This was one of
24   those charts that was over 1,300 pages.
25       Q   Um-huh (affirmative expression).

Page 251

1        A   I don't remember anything that I
2    thought was missing out of this chart.  The
3    important things that I put together began on
4    4/4, which is 4/4/20 death due to sepsis.  HIV
5    respiratory failure and DNR, and that they
6    didn't do an autopsy.  They send him out to
7    OLOL and he changed to a DNR on 3/30.
8        Q   You in your chart review and also
9    when you're talking about him at the end of
10   your report in the section of specialty care,
11   you discussed the specialty consultations.
12   Did evaluate the clinical care provided to
13   this patient, as well?
14       A   Yes.
15       Q   Do you have any opinions on the
16   clinical care?
17       A   I wasn't uncomfortable with the
18   clinical care.  The clinical care that I have
19   listed is physician's clinics.  I probably
20   have a hundred different listings for
21   physician clinics and physician contacts,
22   emergency medical reports, all of that in one
23   tab.
24       Q   Just for the record to make things
25   clear, every time you're referring to bringing

Page 252

1    up something on your own of the charts, you're
2    referring to the bookmark versions of the
3    patient we're talking about that were produced
4    to us along with your report.  Correct?
5        A   Correct.
6        Q   In your opinion on this patient, you
7    say that LSP treated patient number 13 with
8    available hospice care.  Was that based on the
9    medical records?
10       A   The medical records demonstrated that
11   on 3/30/20, he changed his scope of treatment
12   for the Louisiana post.  He was referred to
13   hospice on 3/30/20 from OLOL; and then, he
14   arrived at LSP for his hospice care on 4/3/20
15   at 2300.  So the answer to that is yes.
16       Q   Now in the mortality review, if you
17   look at page 128 of your PDF of your expert
18   report, it says starting at line 16, "He could
19   not be officially admitted into hospice
20   because of his non-responsive disposition and
21   inability to make an informed decision.
22   However, he was treated as if he were a
23   hospice patient."  Aside from the mortality
24   review, what in the medical records show that
25   he was treated as if he were a hospice

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 253

1    patient?
2         A   If we go into his chart, he came
3    back to -- he came back to LSP, and we start
4    seeing the narrative nursing notes beginning
5    on when OLOL referred him to hospice on 3/30.
6    He comes into the TCU on 3/30. Narrative
7    nursing notes on 3/31. She's responding that
8    he's only responsive to touch. She's not
9    doing vital signs, which is consistent with
10   hospice care. The nursing flow sheet on 4/1
11   demonstrates similarly hospice care, end of
12   life care. At 1:05 on 4/1 somebody who's
13   indecipherable who says continue hospice-like
14   management. So they're kind of, let me see,
15   dancing around the actual hospice care, but
16   you know, sometimes, this happens. You can't
17   cross all the t's and dot all the i's, but you
18   still have the care available. So I think
19   whoever wrote up this death review, that's
20   what they're trying to say. He came back. He
21   got hospice care, but officially, he can't be
22   admitted to hospice.
23        Q   Let's go to number 14 on page 132 of
24   your PDF of your expert report. Your opinion
25   is that the ambulance run report and emergency

Page 254

1    ACLS administration were consistent with the
2    standard of care. Does your report include an
3    opinion about his care prior to that, you
4    know, the day of his death?
5         A   Primarily that he had multiple
6    episodes of altered mental status and was
7    treated for those, 8/28/19, 12/19/19, 1/6/20
8    and 1/9/20. So he had a history that was
9    consistent with the contraband ingestion, and
10   I thought those were treated reasonably.
11        Q   If we go over to page 134 of your
12   expert report, 134 on the PDF, so here your
13   opinions is, "It is my opinion there was no
14   violation of the standard of care by the LSP
15   medical staff who cared PATIENT # 17."
16        A   Yes.
17        Q   Is there any way for us to determine
18   the basis of that other than have you
19   walk-through the bookmarks in one of your
20   PDFs?
21        A   Well, you know, we are talking about
22   the guy dying from a pulmonary embolism. So
23   what I set up in this opinion is that there
24   was no indication that he had a pulmonary
25   embolism. I looked specifically looking for

Page 255

1    any lower extremity complications that were
2    found on autopsy that were consistent with the
3    changes that might suggest pulmonary embolism.
4    He had known venous stasis insufficiency, but
5    he hadn't complained about his leg being red
6    or hot or more swollen than previously, and so
7    I came to my medical opinion that he died of
8    an undocumented DVT that turned into a
9    pulmonary embolism. So then, I came to my
10   conclusion there wasn't a violation of the
11   standard of care.
12        Q   But just to be clear, you didn't
13   write up that sort of chain of thought
14   anywhere?
15        A   I wrote it up starting on line 10 of
16   134.
17        Q   Okay, so just that you reviewed his
18   chart with particular attention to a history
19   of left lower extremity complications from his
20   known venous stasis insufficiency, there are
21   no entries of complaints of treatment related
22   to this issue. That's the extent you sort of
23   wrote up to show your work so to speak on this
24   patient?
25        A   I think no --

Page 256

1         MR. ARCHEY:
2              Object to the form.
3         THE WITNESS:
4              I think no entries in this
5         circumstances pretty plainly
6         demonstrates that's what I thought.
7         I reviewed it. There weren't any
8         entries of complaints or to suggest
9         that he had a DVT. If I couldn't
10        find it, why should I write all the
11        negatives down? You can read this
12        anyway you want, but that's my review
13        and my opinion.
14        MR. DUBNER:
15             Why don't we take a break for a
16        few minutes, take a three-minute
17        break and be back at 1:08.
18             (Brief recess.)
19   BY MR. DUBNER:
20        Q   So turning to page 136 of the PDF of
21   your expert report, patient number 34, here
22   again, the basis for your opinion is what's
23   written in that paragraph above it under
24   "Chart Review?"
25        A   Correct.

64  (Pages 253 to 256)

Page 257

1    Q    Let's go to page 145 of the PDF, and
2    actually, sorry.  That's the beginning of it.
3    Page 150 to 151 of the PDF of your expert
4    report.  So for patient five, you did identify
5    deficiencies in the cardiologist's treatment
6    of this patient.  Is that correct?
7    A    I sure did.
8    Q    Did the mortality review discuss
9    these issues?
10    A    I doubt it.  Let me look.  Patient
11    number five.  You know, I don't think this
12    mortality review looked that deeply into the
13    chart, and it takes some intention to be able
14    to find this stuff out, but I think the
15    cardiologist really bears the brunt of
16    everything that happened here, because he
17    sets -- he sets the standard, if you will,
18    about how they treated him; and when he comes
19    up with a ejection fraction of 40 to
20    45 percent when it's really only 10 to
21    15 percent -- he signed off on it -- what he
22    does is tells these nurse practitioners and
23    any other clinicians that this guy's got a
24    good heart as opposed to the 10 or 15 percent,
25    which made him short of breath and have

Page 258

1    peripheral edema, and he said that himself
2    when he say him in follow-up.  This is
3    doctor -- this falls on Dr. Colon.
4    Q    Do you know what the relationship
5    between Dr. Colon and LSP is.  I'm sorry.  Let
6    me rephrase that.  Between Dr. Colon and the
7    DOC?
8    A    I don't know if he's under contract.
9    I mean, he's comes there as a cardiology
10    consultant, but I don't know if there's a
11    contract.
12    I think you also brought up that
13    he -- the experts or the specialists aren't
14    necessarily credentialed, but he's coming in
15    there as an expert in cardiology and doing
16    these consultations; and then, he's not
17    reading his own echo report and setting the
18    standard for all the care that follows from
19    that, when the guy really had more of a
20    cardiac problem than anyone was aware of
21    except for Colomb, when he mistakenly -- well,
22    I'm sure he didn't do it on purpose, but when
23    he mistakenly said that he had a good ejection
24    or reasonable ejection fraction as opposed to
25    a bad ejection fraction.

Page 259

1    Q    You also note "that anticoagulating
2    COVID outpatients such as PATIENT #5 was not
3    the Standard of Care in October of 2021."  Did
4    the mortality review discuss this issue?
5    A    No.
6    Q    You also at the bottom of the page --
7    A    Wait, let's talk about that for a
8    second.  Why would it discuss something that
9    wasn't standard of care?  I mean, your experts
10    may have suggested that.  UpToDate says it
11    wasn't in general use, but I don't see why a
12    mortality report would bring up well, we
13    didn't give him anticoagulation, because it
14    wasn't indicated at that time.
15    Q    I'm sorry.  I might be misremembering
16    or misunderstanding something here.  Did they
17    or did they not anticoagulate him?
18    A    LSP did not anticoagulate any
19    patients with COVID.
20    Q    Okay.
21    A    And it wasn't standard of care at the
22    time for outpatients except for those that
23    were under -- those that were hospitalized or
24    under some sort of a clinical protocol.
25    Q    I misunderstood.  I thought you were

Page 260

1    saying that that was something that they did
2    do.  It was without -- not within the standard
3    of care.  You're saying their choice not to
4    was within the standard of care.
5    A    Right.  I think you were talking
6    about the mortality -- was it in the mortality
7    review, and I said no, and then, why should it
8    be in the mortality review.
9    Q    Right.  Right.  Yeah.  That was my
10    misunderstanding there.  The other thing on
11    this patient, page 150 of the PDF, you said,
12    "PATIENT #5 had repeated refusals of his
13    cardiology appointments subsequent to this
14    echocardiogram."  Did you look at the reason
15    for those refusals?
16    A    I didn't.  I didn't think it was
17    relevant -- I mean important to bring up in
18    the report.  I just noted that he had
19    refusals.
20    Q    Did you see any evidence of
21    counseling for those refusals?
22    A    I can bring up his chart.  Hold on.
23    Q    Why don't -- so that we're all on the
24    same page, if you want to share your screen
25    when you bring one of these up.

Page 261

1      A   Okay. Let's look at this together
2   then and see if I can come up with -- all
3   right, can you see it?
4      Q   Yep.
5      A   So this is patient number five, which
6   is Buckenberger, and we've got the
7   telemedicine clinic and refusal. Feels bad
8   due too his blood pressure was one refusal.
9   That was, let me see, at least he said why at
10  that time. This is not a bad refusal. I
11  mean, it's signed off, and it's rescheduled.
12  So I mean, refused the echo times one, and
13  then, there's a question, reschedule, and they
14  said yes. So this is a pretty good example of
15  refusal, and then, 9/19, the trip return,
16  you've got somebody else, whoever signature
17  this is saying, that he refused and returned
18  to the TCU. Then, the refusal on 10/16,
19  refused twice, and then, they put it back in
20  Eceptionist to schedule him again. So this is
21  same signature; I think could be Lavespere. I
22  don't know. I kind of looked -- "L" kind of
23  looks like his, but they schedule him again.
24  Then, on 1/14, there is another refusal, and
25  this is when they're trying to get the Court

Page 262

1   order, because they recognize that he may not
2   be able to make decisions for himself. So
3   they've got -- again, this is a pretty good
4   refusal. They've got information on there
5   about what's going on and explained to him
6   that this is his second refusal, encourage him
7   to stay. He continued to refuse, and they
8   emailed headquarters to get Melanie and her
9   group involved to reschedule one more time but
10  only once. I guess one question would be if
11  somebody refuses three times and particularly
12  if they have good refusals like this, is it
13  reasonable to understand that they're grown
14  men, and they've declined three times? Then,
15  we have another refusal that this is not
16  filled out very well. He refuses is going to
17  court in the morning, and this is when he
18  walked out against medical advice. And so
19  he's gone, and they just write down he's AMA,
20  and they reschedule him back in two weeks,
21  3/23. There's more. Actually, I guess this
22  is part of 3/23. Both of these are on 3/23.
23  He said, there's too many people in a small
24  place.
25      So, you know, what happens in prison,

Page 263

1   again I talked earlier about assault of the
2   inmates, but you get a bunch of people in a
3   small place, you don't know who's looking at
4   you or if they're looking at you to try to be
5   mean. I mean, it can be scary. So Chris
6   Buckenberger is saying, well, it's too many
7   people in a small place. I'm leaving, I'm
8   elderly. So he's getting out of there.
9      Q   Given the date March 23, 2020, it's
10  possible that he was worried about COVID?
11     A   Well, that could be too. In a small
12  place, that's a good consideration in
13  addition. I don't know whether -- what the
14  mask rules were, whether mask were mandated
15  then, but I suspect they were. At least, they
16  were in all the prisons I was involved in at
17  that time in March of 2020. I don't think the
18  Louisiana Department of Health stated that was
19  necessary, but Dr. Toce and Dr. Lavespere or
20  maybe, even NPs can give us that information,
21  because I just don't know. Then, finally,
22  he's he was found unresponsive.
23     Q   Stop sharing on this one. For
24  patient number 30, if you go to page 156 of
25  the PDF, 150 by page numbers.

Page 264

1      A   156?
2      Q   Yes.
3      A   Okay.
4      Q   So your sentence, "It is my opinion
5   that the diagnosis, evaluation and treatment
6   of PATIENT # 30 complied with the Standard of
7   Care for a correctional institution" Here
8   again, you would just point us to the chart
9   review before that to understand the basis for
10  that opinion?
11     A   Yes. That's what I based it on. You
12  want to see my chart review?
13     Q   We've got it in the pages before
14  that. So we don't need to go detail now. I'm
15  just confirming.
16     A   You know, I think it's really
17  relevant to look at this guy's refusals,
18  because this is all lit up in red as far as --
19     Q   Dr. Mathis, if your attorney wants to
20  ask questions about that, you know, he
21  certainly can. In the interest of time, we
22  are gonna keep moving through for now.
23         MR. ARCHEY:
24            Hold on. You've asked him a
25         question. You've asked him a

Page 265

1    question. If he feels like he needs
2    to say more.
3    MR. DUBNER:
4        Actually, there was no question
5    pending at the time. The question
6    asked was if he based it on what was
7    before, not to go into the detail on
8    what was before.
9    THE WITNESS:
10       It's okay. We can show it at
11   trial. He didn't ask me a question.
12   I just tried to push it in.
13   MR. DUBNER:
14       I appreciate the effort.
15   MR. ARCHEY:
16       You'll hear it later. Go ahead.
17   BY MR. DUBNER:
18   Q   Looking at patient number six, and I
19   think turn to page 160 on the PDF, 154 by page
20   numbers. What's the relevance of this
21   patient's self-injury behavior to your opinion
22   about the care he was provided at LSP?
23   A   He kept cutting himself and caused
24   the blood-borne infection to cause the
25   abscess. I mean, can you -- think just for a

Page 266

1    minute about 140 cuts on where custody can't
2    see you, can't see it. He doesn't necessarily
3    have to show it off in the shower, and these
4    are in various stages of healing. So what
5    happens, this guy is a cutter, and you know,
6    they cut themselves for various reasons. This
7    guy is a cutter, and he's trying to hide it.
8    So it's my opinion that that pyogenic liver
9    abscess came from him cutting himself due to
10   his repeated self-injurious wounds. And
11   supported by the hematogenous spread in
12   UpToDate starting on line 15.
13   Q   What I'm trying to understand is once
14   the pyogenic liver abscess occurred and came
15   to the attention of the medical staff, what is
16   the relevance of the patient's self-injury
17   behavior to your opinion about the care
18   provided at LSP, not the cause of the
19   condition?
20   A   Well, you see, it was a clandestine
21   cause. I mean, and -- so they had no reason
22   to expect a liver abscess. As my discussion
23   about UpToDate is that usually, from bowel
24   leakage and peritonitis, a considerable
25   portion from portal vein pyemia, usually at

Page 267

1    the bowel leakage in peritonitis. He didn't
2    have any of that. Umbiliary infection, he
3    didn't have that. So then, what my opinion
4    demonstrates, occasionally, abscesses arise
5    from surgical or penetrating wounds, and it's
6    my medical opinion that that's the only reason
7    that I can come up with about how he got these
8    hematogenous seeding from his systemic
9    circulation. If you were a great medical
10   provider, maybe, an internal medical doctor or
11   an emergency room doctor saw this guy and saw
12   those cuts on his legs, they might have
13   thought, well, geez, I wonder where they came
14   from and could he have something, and they
15   might have found it. But he just had back
16   pain, and there wasn't any reason to think he
17   had back pain from anything else.
18   Q   You also note at the bottom of page
19   161 on the PDF, "In an emergency room, an
20   emergency room physician could have ordered a
21   CT scan readily and had the results
22   immediately." Do you think a CT scan was
23   indicated at that time?
24   A   Well, CT scan is what you get when
25   you go to the emergency room, and they

Page 268

1    wouldn't have been able to find it; but
2    because LSP doesn't have an emergency room,
3    then, they wouldn't have any reason to doing
4    that. Like I said earlier, the ticket to get
5    in a neurology office is an MRI. The ticket
6    to get in an emergency room is a CT scan,
7    because they've got the CT scan right there,
8    especially at these ivory tower emergency
9    rooms, like in New York.
10   Q   And so what I'm asking about is was a
11   CT scan indicated at this time?
12   A   CT scans in an emergency room
13   include -- back pain in an emergency room have
14   an indication for a CT scan. In primary care,
15   back pain does not indicate the need for a CT
16   scan, particularly in the upper levels, but in
17   an emergency room, he would have gotten it.
18   At a prison, he would not, and I don't believe
19   it was indicated. That was my opinion.
20   Q   Just to check what you meant, you
21   said upper levels, do you mean upper back, or
22   what do you mean by upper levels?
23   A   Upper back particularly, because the
24   liver goes higher in your back than you think
25   it does. So when we look at his autopsy that,

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 269

1  that abscess was -- let's see where is it.
2  I'm lost again. What patient was this? Was
3  it number seven.
4      Q   Six.
5      A   Six. I'm sorry. The autopsy found
6  it at the -- I don't think it even said which
7  level it was at.
8      Q   Okay, well, we can move on to patient
9  number four. So if you go to page 168 of the
10 PDF, 162 by page numbers. Now, you say, "that
11 LSP medical provider has exceeded the Standard
12 of Care in their treatment for PATIENT #4 for
13 his pulmonary diagnosis" and then give several
14 reasons. I just want to understand the
15 importance of these. Why is it important that
16 they arrange so many pulmonary consultations
17 and evaluations?
18     A   Because it would have been
19 indifferent if they hadn't. If they knew what
20 his issue was and they never arranged for a
21 pulmonary consultation, that would have been
22 -- the Court could interpret that as
23 indifferent. If they never provided oxygen,
24 the Court might believe that was
25 unconstitutional. They provided the

Page 270

1  recommended treatment. If they hadn't, it
2  might have been unconstitutional. So I think
3  that's really why I'm putting that in there,
4  to demonstrate to the plaintiff and the Court
5  that what they did was exceed the standard of
6  care.                            •
7      Q   You referred to him being transferred
8  to the highest level of medical care and
9  observation available at LSP. For this
10 patient, what observation was important to
11 have at the infirmary?
12     A   Let me look up his chart. I might
13 sound like a broken record, but that's what we
14 do as clinicians. We looked up the chart, and
15 so I have this patient. I have number six,
16 and --
17     Q   Not number six. Sorry, number four.
18     A   Sorry. Thank you for going in order
19 with these charts, counsel.
20     Q   I can't tell if you were being
21 sarcastic or not.
22     A   You can't?
23     Q   I'm just going in the order of your
24 report.
25     A   Now, you know, that could be, because

Page 271

1  I reordered them afterwards so that I was --
2  how do you record laughing at a deposition?
3  Oh, I know, laughing at a deposition.
4       We've got patient number four. Okay,
5  so this is the guy with interstitial lung
6  disease, multiple evaluations and influenza
7  and CT scan with contrast on 3/2/20. He saw
8  UMCNO pulmonary progress note on 12/2, and
9  they further diagnosed his usual interstitial
10 pneumonia as his histopathologic and
11 radiologic pattern of interstitial lung
12 disease, which is the hallmark for idiopathic
13 pulmonary fibrosis, and he desaturated. So
14 that's the indication for the oxygen that LSP
15 provided; and on 1/19/21, they put him in
16 the -- and when he's there, that's how they
17 can observe him more closely, make sure that
18 he's getting the oxygen that he needs. In
19 fact, that's what happened. He had an 02
20 level that went to 94 percent at 1:55 on 1/19.
21 At 2:30 was 94 percent. At that point, he was
22 on four liters of oxygen, which was necessary;
23 and then, he went back to UMCNO on 1/20/21,
24 and they demonstrated that he had these severe
25 pulmonary issues, interstitial lung disease,

Page 272

1  restrictive lung defect, chronic hypoxic and
2  hypercapnic respiratory failure episode, poor
3  pulmonary episode, and it goes on. In my
4  opinion, this guy was adequately diagnosed at
5  UMCNO. He was treated according to UMCNO
6  recommendations, and I thought they did a good
7  job of taking care of him. These are tough
8  patients no matter where you are.
9      Q   Now, that you've refreshed yourself
10 on the patient, what is the observation and
11 testing that he needed while he was at the
12 infirmary?
13     A   At the infirmary would be vital
14 signs, maintaining his oxygen, because the
15 high flow oxygen is tough to get. Those
16 little "E" tanks that are about the -- I don't
17 know -- they're about the size of your lower
18 leg. Those don't last very long when you're
19 above four liters. So you need the larger
20 tanks, or you need wall oxygen. That's tough
21 to get, and so -- wall oxygen might be
22 available at the newer facilities or at the
23 hospitals, but you can't get wall oxygen even
24 in, I would say, the great majority of
25 locations, because it's got some danger

Page 273

1  associated with it too. So it's, basically,
2  in the infirmary. What you can do is look at
3  his oxygen level, make sure he's getting it
4  and do vital signs and then have the nurse
5  practitioners follow up on him.
6      Q   Moving forward to patient number 11,
7  I'm gonna to jump to page 171 of the PDF, 165
8  on the page numbers.
9      A   On page 165?
10     Q   171 by the PDF number.
11     A   Got it.
12     Q   So when you say that Captain Cashio
13  violated the standard of care, just to make
14  sure, are you talking about the encounter on
15  April 27th that's described on the previous
16  page?
17     A   Let me bring that chart up.
18     Q   You can probably just seeing to going
19  to the page before it, because you do have a
20  chart review on this one.
21     A   Yeah, this is the guy -- I remember
22  this guy. This guy was end-stage, and he was
23  liver failure, and he's bleeding; and Captain
24  Cashio should know better, and he didn't. He
25  didn't do vital signs. He didn't send him

Page 274

1  into the ATU, and this is why I've been
2  pushing retaining counsel and administration
3  at LSP to get rid of EMTs who aren't licensed,
4  or it's not their scope of practice to be
5  making determinations like this on
6  self-declared emergencies or emergencies in
7  the housing units. You got to have somebody
8  who knows what they're doing going out there,
9  and they're licensed to do it. Now, it could
10  be RN, or it could be that you have to call in
11  on everyone of these to the ATU, but this is a
12  problem that is being addressed.
13     Q   *Did you say, you won't speculate
14  whether hospitalization at this time would
15  have affected a cure. You're saying you don't
16  have an opinion one way or another?
17     A   You know, I just don't what his
18  outcome would have been. He's bleeding
19  because his INR is low. His platelet count is
20  low, and whether or not they could have saved
21  him, I don't know. I'm not a hospitalist. I
22  think he was at the end of his life, but he
23  should have been taken care of sooner, and he
24  wasn't, because Cashio was making a
25  determination that was outside his scope of

Page 275

1  practice.
2      Q   Did the mortality review discuss this
3  issue?
4      A   Good question.
5      Q   I believe the mortality review is on
6  page 169 on the PDF --
7      A   I'm there.
8      Q   -- if you want to review it.
9      A   I doubt it. I don't believe so.
10     Q   Then, to go to patient number 25 page
11  174 in the PDF is probably the best page, sort
12  of top of that.
13     A   The pancreatic cancer guy?
14     Q   And actually, -- no. It's starting
15  on the previous page. It's starting on page
16  173 of the PDF, page number 25, the aortic
17  stenosis patient.
18     A   Oh, yeah, this was an interesting
19  one.
20     Q   Would you say the providers conformed
21  to the standard of care? Just to understand,
22  is that primarily based on your analysis of
23  the response to the syncope episode on page
24  168? Or sorry, that's on the last page you're
25  looking at?

Page 276

1      A   Yeah. This was kind of a complicated
2  patient, and in retrospect, it could be
3  consistent with aortic stenosis; but in the
4  prospective case, this was a guy who he
5  wasn't -- he stood up, felt dizzy. So it
6  wasn't exertional, and he sat down and woke up
7  on the floor. So EMS, you know, they did
8  orthostatic blood pressures, which made sense,
9  and he had one PVC, which you can't get too
10  excited about, and he refused transport; and
11  so, you know, that's kind of -- I think this
12  was -- prospectively, it was innocuous.
13  Retrospectively, yeah, maybe, he should have
14  been evaluated if you knew he had aortic
15  stenosis. This would have been the first
16  time, and that's what I tried to put together
17  in my opinion is that early symptoms are not
18  specific. Care must be taken in attributing
19  these symptoms to aortic stenosis since most
20  patients with these symptoms do not have
21  aortic stenosis, and that includes the dyspnea
22  exertion, exertional dizziness or syncope,
23  exertional angina; and so in retrospect, as I
24  say in 174, line three, in retrospect, or if
25  this guy came into an emergency room with

Page 277

1   syncope, they might have done more of an
2   evaluation. They might have put him on a
3   Holter monitor. They might have done a
4   carotid Doppler. All of that can be done for
5   a syncopal episode, but the guy wouldn't go to
6   the ATU, and it's speculation to know what
7   they would have done; but since it's not an
8   emergency room, they wouldn't have done an
9   emergency room evaluation at that time.
10      Q   Would an EKG have helped to determine
11  if the syncope was something more or
12  significant?
13      A   Well, he did an EKG. They did the
14  rhythm strip and only had the PVC.
15      Q   Did you see that EKG in the record?
16      A   No. They didn't print it, but I
17  think that's one of the things EMTs -- it is
18  within their scope of practice to be able to
19  look at a rhythm strip and determine whether
20  there's a PVC present, because that's, you
21  know, that's just one of the things they're
22  trained about. An EKG would have been nice,
23  but you don't do those in the housing units.
24  You do those in the ATU.
25      Q   So just to check, you said EKG is

Page 278

1   within the scope of practice for EMTs and to
2   look at the ribbon strip and determine if what
3   is present. It sounded like PVC?
4       A   Yeah. Premature ventricular
5   contraction is a PVC. So that's on page 173,
6   line 12.
7       Q   Great. So then, moving to patient
8   number 20, if you go to page 178 on the PDF,
9   172 by page number, in the bottom half, you
10  talked about a triage visit on August 31st
11  that you say where not having a nurse
12  practitioner or MD visit is of a violation of
13  the standard of care. Would you explain why?
14      A   Because he was jaundiced, and he was
15  having abdominal pain. That, by itself is --
16  well, painless jaundice is -- you know, in
17  other words if you're jaundice without having
18  abdominal pain is more commonly associated
19  with pancreatic cancer, but the guy is
20  jaundiced, and he needs to be evaluated. This
21  guy has -- I don't remember if this is the
22  same guy who had jaundice in the past, because
23  some of these guys will be jaundice all the
24  time; but if it's a new finding, why then that
25  should have been evaluated by an NP.

Page 279

1       Q   And the reason that jaundice requires
2   a provider examination is because it's a
3   symptom that can indicate the need for -- you
4   know, can indicate a potentially serious
5   condition that you need to rule out. Is that
6   a fair way to put it?
7       A   Yes.
8       Q   Going to number 16, if you look at
9   page, the bottom of page 179, top of page 180
10  on the PDF, 173, 174 by page numbers. What is
11  the basis for your opinion that this man
12  likely ingested synthetic cannabinoids?
13      A   He had a history of a contraband
14  ingestions, 6/30/20, 2/21/21 and likely on
15  3/17/21, and his death was consistent with
16  cannabinoids, and the autopsy failed to look
17  into it, and it was my opinion, based on my
18  experiences in prison, that's what happened.
19      Q   You then go onto say based on the
20  review of the emergency medicine report that
21  the LSP medical staff complied with the
22  standard of care. Is that --
23      A   The emergency medical -- medicine
24  report is what occurs when an inmate comes
25  into the ATU.

Page 280

1       Q   So did you explain your review of the
2   emergency medicine report in your report?
3       A   I just said that I reviewed it, and I
4   thought they complied with the standard of
5   care. I didn't go into detail about it, but I
6   can if you want to hold on.
7       Q   You don't need to do that right now.
8   Thank you, though.
9           And is this a patient who you got
10  information about from Dr. Lavespere?
11      A   Nope.
12      Q   Moving to patient number two, if you
13  go to page 184 of the PDF, 178 by page number,
14  your opinion is that LSP violated the standard
15  of care by not obtaining thyroid function
16  tests. Is that right?
17      A   Yeah. They were following this guy
18  for hypothyroidism, but they didn't get the
19  thyroid function test. I mean, this is pretty
20  weak, and you could say it's a standard of
21  care violation, and I did that, but it's not
22  really -- like I said on line 11, no
23  complications or causation related to
24  hypothyroidism.
25      Q   This sort of goes to what we were

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 281

1   saying before. This is something where they
2   may have made an error. It's not an error in
3   this man's case that caused any harm. Is that
4   fair to say?
5      A   I think that's fair to say.
6      Q   You sometimes listed those issues
7   when you saw them, and you sometimes didn't?
8      A   Yeah. I was concerned about this one
9   in trying to find out any sort of relationship
10  to what happened to him and how he developed
11  this mass, and so I was kind of following the
12  thyroid string, if you will; and I didn't find
13  anything at the beginning of the chart in
14  2019.
15     Q   So then, turning to the next page,
16  page 185 of the PDF, 179 on the page numbers,
17  his squamous cell carcinoma. Do I understand
18  right your opinion is until the
19  endocrinologist saw him, LSP had no reason to
20  suspect that there was an issue?
21     A   Yeah, because they didn't know he had
22  hoarseness. They had difficulty getting him
23  in for a routine evaluation, because of the
24  COVID between March and May, and as I said,
25  there wasn't any reason for an emergency room

Page 282

1   evaluation; and then, not until he was seen at
2   UMCNO when they scoped him, and I don't think
3   it's -- I do flexible fiberoptic nasal
4   endoscopies, but I don't think it's the
5   standard of care to do that. Then, when they
6   saw him in the ENT clinic, and they found
7   that, then, they kept him for a month or so
8   until he died.
9      Q   So the appropriate thing to do once
10  the EMT had observed that, had done that test,
11  was to admit him straight to the hospital?
12     A   Yeah, because he could get an acute
13  airway obstruction, and that's what the EMT
14  was thinking, or a bleed. I mean, these
15  things will bleed like crazy, and then, you
16  aspirate blood. So they wanted to admit him
17  emergently to see whether they were going to
18  try and operate or use radiation or whatever
19  they're going to do at the specialty center.
20     Q   Then, looking at patient number
21  seven, page 189 on the PDF, you note that
22  there is a standard of care violation here; in
23  that, the patient apparently refused
24  colonoscopy, but there was no refusal. Is
25  that right?

Page 283

1      A   Yeah. Dr. Toce should have done
2   something about this one. He testified that
3   the patient declined colonoscopy, and that's
4   negligent not to have documented that, but he
5   did testify about it; and if you had three
6   positive FOBTs, then, colonoscopy was
7   indicated certainly, but if the guy refuses,
8   you know, you got to have a refusal. Toce
9   didn't get one, and ultimately, he died as a
10  result of his colon cancer.
11     Q   And do you have any evidence of
12  whether any counseling was provided? Let me
13  strike that. What counseling should be
14  provided when a patient refuses a colonoscopy
15  that lab results suggest is needed?
16     A   You know, this is a circumstance
17  where you -- this is where I would write out a
18  refusal. I would say something like similar
19  to you've got three positive Hemoccults,
20  FOBTs, the same thing. That suggests that
21  there may be a color cancer. The only way for
22  us to find that or the best way to find that
23  is to do a colonoscopy. I want you to do
24  that. I think it's really important. If the
25  guy says no, then, you make him sign it. So

Page 284

1   that's a standard of care violation.
2      Q   Looking at patient number 28, if you
3   go to page 192 on the PDF, 186 by page
4   numbers, here again, you find a violation of
5   the standard of care. I just want to
6   understand what it is. Is the standard of
7   care violation -- well, why don't you tell me,
8   what the violation is that you found here?
9      A   I think I wrote it out. He failed on
10  two oral diabetic medications and had an
11  elevated hemoglobin A1C. I think it was in
12  the 11, 12, 13, range, and he should have
13  been put on insulin and wasn't; and if he
14  refused it, that should have been recorded,
15  and it wasn't. So that's my issues about this
16  case about patient number 28.
17     Q   Did the mortality review contain
18  sufficient information to let LSP identify and
19  improve this issue?
20     A   No.
21     Q   I'm sorry. I failed to ask that
22  about patient number seven, as well. Did the
23  mortality review for patient number seven
24  contain specific information to let LSP
25  identify and improve the issue you found

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 285

1  there?
2      A  No.
3      Q  So let's move forward to patient
4  number 48.
5      A  What page?
6      Q  Your opinions start at page 196 of
7  the PDF, 190 by page numbers. First off, are
8  you applying any medical expertise when you
9  assert that inmates use a wheelchair for
10  carrying articles and sometimes concealing
11  contraband, and the inmates use wheelchairs or
12  parts of wheelchairs as weapons.
13      A  What was your question?
14      Q  If you look at under Mathis opinions,
15  --
16      A  Line 13, and 14, but what am I basing
17  that on.
18      Q  What medical expertise are you
19  bringing to bear for that opinion?
20      A  Correctional medical expertise.
21  These are things that I've seen. So you don't
22  want an inmate to have a wheelchair unless
23  it's absolutely indicated. You know, so --
24  everybody wants a wheelchair. You got
25  something to sit down on. You can have -- you

Page 286

1  know, you can have a discussion. You can
2  carry stuff around, like I said, and you can
3  conceal contraband. I mean, you can be a
4  runner with this sort of thing. I've seen
5  inmates get clobbered with pieces of
6  wheelchair. They fight each other with
7  wheelchairs. So a wheelchair is something
8  that needs an indication. If it's not
9  indicated, then, it should be removed.
10      Q  Is that something that should
11  providers be considering with any patient who
12  requests a wheelchair, that possibility?
13      A  Yes, and that's where Dr. Lafleur
14  did a good job here, I think. He referred
15  them to physical therapy to determine whether
16  or not the guy really needed a wheelchair, but
17  then, the guy refused, because he understood
18  that if he didn't need it, then, it was going
19  to get taken away, and he did it. Lafleur did
20  it. It doesn't always happen.
21      Q  Would it be appropriate for a doctor
22  to assume that their patients were lying to
23  obtain medical care or equipment?
24      A  What kind of hypothetical patients
25  are you coming up with?

Page 287

1      Q  In a prison.
2      A  You must be talking about something
3  else. This is about as straightforward as it
4  gets as far as an inmate not needing a
5  wheelchair. The guy wanted his wheelchair,
6  and that's why he didn't go to physical
7  therapy. This isn't about lying. He had it
8  already, and he didn't want to lose it. I
9  don't know what he was doing with it, but he
10  could have been doing lines 13 and 14 with it.
11      Q  Then, moving down to the next bullet
12  point, your opinion that the LSP medical
13  providers complied with the standard of care
14  in their treatment for patient number 48's
15  SVT. Let's just go back up on your chart. So
16  if you go to page 194 on the PDF.
17      A  Yes.
18      Q  You say pulse is 116. Provider
19  requested patient number 48 past history from
20  2016 and 2017, which patient said was
21  pertinent. Provider referred patient number
22  48 to cardiology. That's all what you would
23  want to see if somebody presented with a pulse
24  rate that high for the first time?
25      A  Yes, if they're having heart racing

Page 288

1  and the pulse is documented to be elevated.
2  Palpitations are common, particularly when
3  somebody lays down at night. Some people have
4  a lot of palpations. The question is whether
5  or not it's a significant cardiac arhythmia,
6  atrial fibrillation, which would require a
7  consideration of anticoagulation, and so what
8  they did between lines seven and 11 is good.
9      Q  Why was the cardiology referral
10  important to do?
11      A  You know, it kind of depends on
12  whether or not the nurse practitioner was
13  willing to investigate this him or herself.
14  The cardiologist would take the history and
15  determine whether or not a ZIO Patch or Holter
16  monitor or echocardiogram was required. Since
17  they had a cardiologist on-site, it was a
18  reasonable thing to do, because basically,
19  it's treat or refer. Whether it's about this
20  sort of a history or something that happens in
21  the ATU, if you don't want to treat it, then,
22  you've got an obligation to go ahead and refer
23  it. So referring this patient at that time
24  was a consideration for a nurse practitioner
25  and not inappropriate.

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 289

1    Q    And then, to go down to the next
2    bullet point on August 30th, you say patient
3    number 48 was referred for MD evaluation.
4    This was one where the patient was treated by
5    an officer. Should a provider examine
6    somebody who makes an emergency sick call
7    request like that?
8        A    Well, what happened was the MD
9    review, and then, it was reviewed by whoever
10   makes that squiggle mark when you follow the
11   footnote, and they agreed that to give him
12   Ibuprofen OTC and MD review. So somebody
13   agreed on 9/2 for this headache that occurred
14   on 8/30. So a medical provider reviewed it
15   within several days.
16       Q    This might be a helpful place to
17   clarify. I'm just trying to compare this to
18   something like the incident with Mr. Cashio
19   that you referred to or the other times when
20   you've criticized the EMTs for not consulting
21   providers. Why is this one where just sending
22   the sick call request form to an MD for review
23   a few days later is fine as opposed to
24   contacting a provider at the time?
25       A    Well, I think they did provide a --

Page 290

1    well, let's see. I think you're right. I
2    think this guy should have been referred to
3    the ATU or at least for consultation with a
4    nurse practitioner at the time. Heart rate of
5    130. Now, one of the difficulties is with the
6    paper charts and even with the electronic
7    medical record, Captain Childs may not have
8    had, as a captain even -- he may not have had
9    access to the evaluation for SVT. So we can't
10   assume that he knew that SVT was a
11   possibility, but we do know that he had a
12   heart rate of 130. And the EMT made a
13   determination that that wasn't important, and
14   he was being treated for a headache, given the
15   Ibuprofen over-the-counter medication and MD
16   review. So this is another SDE evaluated by
17   someone who doesn't have the licensing to be
18   able to do that.
19       Q    And then, for the September 15th one
20   in the next bullet point, is that also a time
21   he should have been seen by a provider.
22       A    Hold on a second. Let me go to 273.
23   What happened here is he's in the ATU. He's
24   in the ATU now and via wheelchair, he is being
25   seen by -- telephone ordered Toce. I don't

Page 291

1    recognize the signatures down in the bottom
2    right. If you want to follow that yourself,
3    that could be helpful to follow the bookmark.
4    This one is -- he's in the ATU. He's got a
5    pulse rate of 122, comes down to 108. The
6    go-to stats are okay. He says his legs are
7    weak. His heart's racing. This would have
8    been a good time to do an EKG, and Toce
9    apparently didn't do an EKG. He ordered
10   mag Citrate and abdominal x-ray. This would
11   be one of those that I would be concerned
12   about.
13       Q    Just to check, so it says, TO
14   Dr. Toce, does that mean telephone order?
15       A    Yeah, telephone order. Looks to me
16   like Laura Ricard is an RN. Although, it's
17   hard to tell. It looks like an RN.
18       Q    So this is another place where you
19   think that there probably should have been
20   provider review. I'm sorry. Not provider
21   review. Let me rephrase that.
22       A    I think he should have had an EKG,
23   and Toce or one of the nurse practitioners
24   should have come down and seen this guy. That
25   heart rate, when he's complaining about his

Page 292

1    heart racing needs an EKG, and there's no
2    evidence of that.
3        Q    Then, if we move forward to next
4    page, 195 of the PDF, 189 on the page numbers,
5    October 2nd, the patient presented once more
6    to the ATU. An LSP medical provider evaluated
7    him and referred to UMCNO. Why was it
8    important to refer to UMCNO on this occasion?
9        A    Well, at that point -- we're on.
10   Let's see. I'm a little -- UMCNO -- which
11   line were we going from? I'm sorry.
12       Q    Line eight and nine on page 195.
13       A    Eight and nine, UMCNO, 279, 286. I
14   don't think my link is correct on this one,
15   because I don't see him going out from the --
16   I don't see that he was transferred to the
17   emergency room but on 10/2, the next note is
18   for the discharge summary from the hospital,
19   and the hospital discharge summary said he
20   came in on 10/3, and he came in for the
21   constipation proctitis. So that was on page
22   3387 of my report.
23       Q    So then, focusing on 10/2, why was it
24   important to send him to UMCNO at that point?
25       A    I can't conclude from seeing on 10/2

73 (Pages 289 to 292)

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 293

1  what transpired between 10/2 and 10/3, because
2  I think my link is wrong.  279 is wrong, but
3  then, I demonstrated that they had transferred
4  him, and we just discussed that.  He went to
5  UMCNO on 10/3.  So I don't know if it was late
6  at night on 10/2 when he ended up going out.
7  Maybe, there's a paper missing, or my review
8  didn't demonstrate it, but you know, sometime
9  between 10/2 and 10/3, he ended up at UMCNO.
10     Q   Yeah, and let's put it a different
11  way.  Looking at the assessment on 10/2,
12  should he have been sent to UMCNO at that
13  time?
14     A   From what occurred on 10/2, I don't
15  see that that was necessary.  I just don't --
16  his heart rate, his vital signs were okay.
17  The nursing evaluation was okay.  We have a
18  note from the medical provider, he was
19  constipated and having diarrhea, probably
20  around the a constipation.  His systolic blood
21  pressure was in the 80s, said he had a large
22  bowel movement last night.  Her examination or
23  his examination was okay.  So I really don't
24  see the direct continuation between that visit
25  and the transfer to 10/3 -- the transfer to

Page 294

1  UMCNO.  So something is missing.
2     Q   So just to close the loop on page 48,
3  so you said in your report, it's your opinion
4  that the LSP medical providers complied with
5  the standard of care in their treatment of for
6  patient number 48 SVT, would you amend that
7  given the two things that we looked at where
8  they only saw an EMT and should have seen a
9  provider?
10     A   Well, the EMT, I didn't care for
11  that, and I'm not -- you know, it's hard to
12  call the -- let's see.  What page are we on
13  now?
14     Q   I'm not referring to the 10/2 issue.
15  I'm referring to 8/30 and 9/15.
16     A   Yeah, those heart rates should have
17  been referred to the ATU E, and so that's a
18  violation, violation by EMTs, which we've
19  talked about at some length.  As far as 10/2
20  is concerned I don't see the link between 10/2
21  and 10/3, but he ended up at UMCNO.  So it's
22  hard to say that they did the wrong thing if
23  they sent him out.
24     Q   Moving forward to patient number 54,
25  which is on page 197 of the PDF, 191 by page

Page 295

1  numbers, is there anything else that you wrote
2  up about this patient?
3     A   No.  We can look at my chart review
4  though.
5     Q   Right.  So just without taking that
6  time right now, to determine what, you know,
7  why you think that they reasonably and
8  appropriate treated patient number 54's
9  coronary artery disease, we would have to ask
10  you about your review of the bookmarked items
11  in the chart review.  Is that right?
12     A   No.  I'm going to stand on my Mathis
13  review of the medical chart.  His primary
14  issue was severe coronary heart disease, and
15  he was in the ATU multiple times, multiple
16  infirmary observations, both directly related
17  to chest pain while waiting troponin results
18  to return and follow-ups from hospitalizations
19  where they sent him out and procedures.  He
20  required multiple on-site telemedicine
21  cardiology evaluations and off-site cardiology
22  evaluations.  So they're working him up,
23  primarily at the Lane Regional Medical Center.
24  He did have a past history of a coronary
25  bypass in 2017 and had coronary stenting.  So

Page 296

1  that's what happens with coronary patients.
2  They require multiple evaluations, which were
3  provided by LSP, and in my opinion consistent
4  with the standard of care.  I don't need to go
5  through minutia about this, because my Mathis
6  review above, I believe, gives a reasonable
7  assessment of what happened to this guy.
8     Q   If we go to the next page at patient
9  number 57, same thing with that, the paragraph
10  that you have starting there at line three is
11  the basis for your opinion at line 13?
12     A   Yes.
13     Q   And then, patient number 39, what's
14  the relevance to your opinion that patient
15  number 39 is a difficult patient?
16     A   The relevance?
17     Q   Um-huh (affirmative expression).
18     A   It's like an attorney who evaluates a
19  case that takes place over a month as opposed
20  to something that takes place over 10 years.
21  This guy weighed 400-pounds and trying to see
22  his penis is almost impossible sometimes,
23  because the penis goes away inside the fat.
24  So he had balanoposthitis that caused his
25  glans, penis and his prepuce to be reddened

Page 297

1  and inflamed. So he had -- I think he's the
2  one that asked for a circumcision. So he was
3  treated, and then, he was also -- his
4  underlying disorder was his diabetes, and that
5  was compounded by his weight and his behavior.
6  Dr. Toce reasonably wrote up, so that someone
7  has it on the record, what his experience was
8  with himself and his nurse practitioners
9  handling this guy. You know, I think
10 generally, that's not something to put in a
11 chart, but you know, it's just exasperating
12 when someone you have someone who's not
13 following medical recommendations, and you see
14 him deteriorating. So that's what Toce did.
15       And then, I documented -- in 1,300
16 pages. I mean, I could write out 1300 pages,
17 but I really thought that was superfluous. I
18 summarized what was present, and I gave my
19 standard of care opinion.
20     Q  You refer to some personality
21 disorder: Unspecified personality disorder
22 and antisocial personality disorder. Are
23 those relevant?
24     A  If an attorney hypothetically would
25 have a patient come into the office looking

Page 298

1  for help, they were anxious and shaking but
2  wouldn't look at you and had a personality
3  disorder. So they weren't able to describe
4  their situation, or they barked angry replies
5  to you when whenever you answered a question,
6  and they wouldn't sit even close to you in
7  front of your desk, and they -- the paraphilic
8  disorder is probably superfluous, but it means
9  that he had the gratification from other than
10 of heterosexual stimulation, they're difficult
11 patients to deal with. So I think it has a
12 lot to do with what happens when a
13 correctional medical provider sits across the
14 desk from this sort of a guy and finds him
15 difficult to treat, and he weighs 400 pounds.
16     Q  More generally, what about antisocial
17 personality disorder, what characteristics of
18 that are significant here?
19     A  It's hard for him to deal with
20 people. It's hard for him to deal with the
21 medical providers or nurses or officers. I
22 mean, these guys are tough.
23     Q  Does it also make him untrustworthy?
24     A  Untrustworthy?
25     Q  Um-huh (affirmative expression)?

Page 299

1      A  No. I don't think it necessarily
2  makes him untrustworthy. Do you have
3  something about him being untrustworthy you
4  want to put in front of me and ask an opinion
5  about?
6      Q  No. No. I was just asking a
7  question.
8         Then, looking at patient number 47,
9  if you go to the top of page 202 on the PDF,
10 196 by page numbers. Could you explain why
11 it's a violation of the standard of care to
12 assess that patient number 47's hematuria was
13 stable without follow-up with urinalysis?
14     A  There's no way to know whether he's
15 still bleeding unless you do a urinalysis.
16     Q  So moving past the chart reviews, you
17 say in the past five years, you've been a
18 correctional expert in over 100 prison and
19 jail cases?
20     A  Yes.
21     Q  In how many of those cases have you
22 testified either by deposition or at trial?
23     A  You know, I haven't had a trial --
24 well, maybe, I've had one or two, but trials
25 are rare, but the testimony history under Rule

Page 300

1  26 over the last four years is one of the
2  things we came up within discovery if you want
3  to talk about that.
4      Q  And so that should have all of the
5  cases on it?
6      A  Within the last four years by Rule
7  26.
8      Q  The thing I'm just trying to check is
9  so you say you've been a correctional medicine
10 expert in over a hundred prison and jail
11 cases. There are -- I'm just trying to pull
12 up the number here. I'll share this for a
13 moment.
14          MR. DUBNER:
15             So by my count -- we'll mark
16          this as Exhibit 4, which is the
17          testifying history produced with your
18          report.
19 BY MR. DUBNER:
20     Q  By my count, there are 12 cases
21 listed here. Is that, of those hundred prison
22 and jail cases, only those 12 in the last four
23 years have had testimony?
24     A  Yes.
25     Q  And you started as a retired medical

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 301

1   consultant in the Office of Legal Affairs in
2   June of 2021?
3       A   Let me pull up my CV.  If that's what
4   it says.
5       Q   Yes, I'll represent to you on your
6   CV, it says 2021.
7       A   Then, I will reply that that's true.
8       Q   Not testing you on that question.  In
9   that job, you helped the California
10  Correctional Health Care Services respond to
11  lawsuits filed by patients?
12      A   Lawsuits, complaints, habeas corpus,
13  whatever comes through the office.
14      Q   That sometimes involves providing
15  expert witness testimony, as well.  Right?
16      A   Yes.
17      Q   Have you ever been deposed in the
18  course of that job?
19      A   Not yet.
20      Q   So you also, I assume, have never
21  testified at trial in the course of that job.
22      A   Correct.
23      Q   Have you ever had an opinion excluded
24  in whole or part by a court?
25      A   No.  I've been certified in family

Page 302

1   medicine, pediatrics, emergency room and
2   correctional medicine over various stages of
3   my career as an expert since 1993.
4       MR. DUBNER:
5           Why don't we go off the record
6       for a few minutes.  I'm going to go
7       over my notes, and then, I'll let you
8       know if I can let you go.  We'll come
9       back at 2:25 or 4:25, Ms. Marino.
10          (Brief recess.)
11  BY MR. DUBNER:
12      Q   Dr. Mathis, you said earlier that you
13  have read the plaintiff's expert reports and
14  have some, obviously, disagreements with it.
15  Could you go over what your biggest criticisms
16  of that report are?
17      MR. ARCHEY:
18          I'm going to have to object to
19      the question and object to the form.
20      I don't think there's anyway he can
21      do that, but Dr. Mathis can go ahead
22      and answer anyway he can.
23      THE WITNESS:
24          Well, you know, one of the
25      things that I had difficulty with was

Page 303

1   the American Thoracic Society, using
2   that as a source for a primary care
3   clinic, I mean -- and I talked about
4   that earlier, American Diabetes
5   Association.  Even the American
6   Diabetes Association filters down to
7   primary care doctors, but just
8   because the ADA says something in
9   October doesn't mean that the primary
10  care doctors are doing it within the
11  next year.  Those are specialists.
12  Those are endocrinologists in the
13  American Diabetes Association.
14  Whether that's appropriate to primary
15  care doctors is another story.  The
16  issues that I had, each of us was
17  principally responsible for initially
18  drafting various sections, and then,
19  so you've got Dr. Vassalo and Dr.
20  Puisis who are not writing the entire
21  report, and then, somehow you got
22  everybody agreeing, and I had
23  difficulty understanding how you'd be
24  getting together the four or five
25  experts and then having them sign off

Page 304

1   on the report.  I don't see
2   signatures on the report.  What I see
3   is that somebody wrote this up,
4   whether it's Ms. LaMarre or Ms.
5   Goehring.
6           So I can go down on some more.
7       On page three of the expert medical
8       report, it says March 31, 2021 the
9       Court found that the defendants had
10      been deliberately indifferent.  Well,
11      it wasn't in March 2021.  That was
12      the opinion, and -- let me see.  I'm
13      concerned about the -- on page 14,
14      we've got the NCCHC language as the
15      basis for the opinion.  That's what
16      bothers me throughout this report.
17      We've got people who do NCCHC
18      accreditation basing their report on
19      deliberate indifference on NCCHC
20      standards.  Across the board that's
21      just -- it's inappropriate.
22          Also on page 20, where the
23      report suggests that the DOC should
24      require the physicians complete
25      residency training in family

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**

Page 305

1  practice, internal medicine or
2  emergency medicine. I wouldn't want
3  an emergency medicine working for me,
4  because those guys are looking for CT
5  scans on everybody that walks. I've
6  already talked about that. Primary
7  care doctors and internal medicine or
8  family practice, we could use them
9  but not emergency room doctors.
10  I have some concern about the
11  report where it suggests that Toce
12  and Lavespere have to be on-site in
13  order to be supervising physicians
14  for the nurse practitioners. Let me
15  see. I have -- on page 21, it
16  suggests that LSP provide UpToDate to
17  be used as a practice guideline.
18  It's in the computer for the NPs. I
19  don't know where you got that
20  information. I made a lot of
21  bookmarks on this, but those are
22  the -- let's see. And here where
23  findings on page 31, LSP with
24  individual directives do not meet
25  minimum standards published by the

Page 306

1  ACA and NCCHC. Why should they meet
2  minimal standards, when we've agreed
3  that NCCHC only accredits less than
4  10 percent, if not -- or it's eight
5  percent of correctional facilities in
6  the United States. I mean, how can
7  you as the plaintiff set the bar so
8  high for LSP, higher than over
9  90 percent of the correctional
10  facilities in the United States?
11 Q  Do you have any further criticisms?
12 A  I'm still looking.
13 Q  I wasn't sure.
14 A  The suggestion on page 40 -- well,
15  page 39 and 40 that health care leadership
16  should address deficiencies such as staff
17  failure. If California has 40,000 nurses that
18  it needs, how are we going to find more nurses
19  out in Angola? I mean, we went through this,
20  the process where they put the nurse
21  practitioners in place, is they couldn't find
22  docs. They couldn't find enough RNs, but they
23  were able to put together the nurse
24  practitioners, which really raised that sick
25  call level and the ATU level above the

Page 307

1  standard of care. So to ask the leadership to
2  look into staff failures, I think that's a
3  good idea, but I know that they're looking
4  into it, and I think it's really presumptuous
5  for whoever wrote this report to suggest that
6  nobody is looking into it.
7  When we go to page 48, NCCHC Standard
8  for Nonemergency Health Care Requests, again,
9  we've got standards for less than 10 percent
10  of facilities in the United States, and you're
11  trying to -- whoever wrote this report is
12  trying to put together that as the standard
13  for a case that calls for -- that said it was
14  deliberately in different in 2018; and I think
15  that's wrong and inappropriate.
16  So let's see. The self-declared
17  emergencies, unchanged from previous report.
18  Medics must be required to call a medical
19  provider for disposition. I fully agree with
20  that. We've talked about it, and by the time
21  of the trial, you'll see that's changed.
22  That's on page 50. You don't have line
23  numbers in this, which would be helpful. The
24  Harvard Business Review. That's a good
25  source, Harvard Business Review, said the

Page 308

1  average wait time is greater than one and a
2  half hours in the emergency room, and somehow
3  the NCCHC accreditation report typed that the
4  plaintiff wrote thinks that people shouldn't
5  have to wait in the ATU or even for sick calls
6  in prison, when it happens all the time on the
7  street. Why are prisons in general held to
8  such a higher level of care in these matters
9  than what happens on the street? People don't
10  understand that they might sit in the
11  emergency room for six or eight hours with
12  COVID.
13  I didn't really prepare an opinion
14  about this. I'm just running through the
15  bookmarks, but the last thing I want to talk
16  about is on page 51. Every effort should be
17  made to conduct sick call encounters in person
18  unless extenuating circumstances, places the
19  burden on the patient to travel to the clinic
20  location that's a good idea if you've got a
21  entire prison under one roof where they can be
22  transported, but LSP has got 18,000 acres and
23  all those camps. It's the suggestion of this
24  report that LSP should restructure it's entire
25  prison and put everything to erect a new

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 309

1  prison so that there can be sick call
2  encounters in person.
3      I mean, is it within the Court's
4  decision making to dismantle LSP as it
5  currently exists and get it to where they can
6  all have these in person responses, in person
7  sick call encounters, because I said earlier,
8  and I still believe that telemedicine is
9  reasonable and appropriate for -- to occur at
10  LSP.
11      Now, as far as the other
12  considerations -- let me get up to the
13  patient report, your addendum. I have some
14  concerns about the addendum being out of
15  bounds, and let's me see Attachment B LSP.
16  This will take me a minute. Thank you for
17  giving me the opportunity to answer your
18  question.
19      On page 156, the reviewer suggested
20  that a patient who showed up on 8/6/20 at 2213
21  presented with an altered mental status,
22  facial droop and left-sided weakness warranted
23  immediate transport to the hospital. However,
24  the physician ordered a workup for the
25  patient's facial injuries. This guy got

Page 310

1  whacked. He's got an injury to his face. Why
2  would you send him out to look for a CVA,
3  which I believe is what this reviewer is
4  looking for, when we've got a good history
5  that he had a facial injury.
6      On page 44, number 5, developed chest
7  pain, shortness of breath and diaphoresis, all
8  signs and symptoms of a serious cardiovascular
9  event. He had a stroke two months previously.
10  I don't know how that's relevant. It took 30
11  minutes for him to be transported to the ATU.
12  I've already talked about how long it could
13  take to get an ambulance to the ATU. I mean,
14  this is the standard of -- having somebody
15  there in four minutes is just inappropriate
16  for LSP, where you've got to take those
17  ambulances out of their housing, run to a
18  camp, bring it back to the ATU. You got to
19  stabilize the guy out at the camp. The EMTs
20  are licensed to do that. He was cold. Of
21  course, he -- I mean, he was sick. It takes
22  time to transport these people.
23      Now, the ambulance didn't depart
24  until 3:45, forty-five minutes after the
25  provider ordered it. I think this needs to be

Page 311

1  looked at more closely, because it can take
2  time in the ATU particularly. I don't know
3  what else happened in the meantime, whether
4  EMS couldn't get an ambulance going or they
5  needed to have a chase car. Remember, this
6  prison. This is not just an ambulance coming
7  to somebody's house. You got to get a chase
8  car, somebody's willing to go, what might last
9  for until overtime through over eight hours to
10  go to the emergency room. So the times on
11  these things need to be taken into
12  consideration that this is a prison.
13      On page 92, my understanding,
14  Dr. Puisis is talking about chronic care.
15  Patient's care demonstrates the problem with
16  management of chronic illnesses. I understand
17  that Judge Dick's opinion did not require
18  considerations about chronic care. If we were
19  going to write about chronic care or opine
20  about chronic care, I would have, but I was
21  advised by retaining counsel that chronic care
22  was not something that was going to be part of
23  this report.
24      Here, we've got that -- it's on page
25  95, where they didn't document about why they

Page 312

1  took his wheelchair away. Well, I went into
2  some length about why they took some guy's
3  wheelchair away after physical therapy
4  referral, and then, you suggested to me during
5  the deposition that maybe, the patient was
6  lying. I don't know where you're going with
7  that. That didn't make any sense.
8      Now, basically, that's all I've got,
9  because I didn't prepare this. Thank you for
10  giving me the brief opportunity to be able to
11  make these criticisms, but I think I'll quit
12  now.
13  Q   Okay. To just follow-up your
14  understanding that you didn't prepare to
15  address this, there are no other significant
16  criticisms as you sit here today that come to
17  mind?
18  A   Correct.
19  Q   I was thinking that you bookmarked in
20  your initial review.
21  A   None else did I bookmark?
22  Q   Did I understand right that you were
23  going through bookmarks when you put in your
24  PDF?
25  A   I just went through the red

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 313

1    bookmarks.  I didn't go through just the
2    bolded bookmarks.
3       Q    So those were the things that you had
4    red bookmarks to it?
5       A    Yes.  Yes.  These were the red ones.
6    I didn't have enough time to go through the
7    bolded ones to criticize differently.
8       MR. ARCHEY:
9          Jeff, I want to say it now that
10    we're going to reserve our rights to
11    not limit his testimony in anyway
12    based upon these questions.  It's
13    just not fair to ask him about every
14    criticism he may have on what is
15    essentially 500 plus pages when he
16    hasn't prepared and not able to do
17    that.
18       MR. DUBNER:
19          Connell, I mean, that is
20    something we want to talk with y'all
21    about afterwards is how we want to
22    handle the fact that there were no
23    rebuttal reports, you know, in the
24    schedule.  You know, I asked these
25    questions, because he said that he

Page 314

1    expected that he would be opining on
2    it at trial.  I certainly don't think
3    my asking a question changes what is
4    and isn't appropriate at trial, but
5    we recognize that is something that
6    we're going to have to discuss,
7    because you know, it's something both
8    sides, you know, will face, and
9    that's a just a question for us to
10    work out what we think is the most
11    appropriate way.
12       MR. ARCHEY:
13          Okay.
14       MR. DUBNER:
15          Give me one moment, I'm just
16    looking back.
17       MR. ARCHEY:
18          You've got 45 seconds.
19       MR. DUBNER:
20          Yeah.  I had she slightly more
21    on my clock, but it's pretty short.
22       MR. ARCHEY:
23          Go ahead, Jeff.  Finish up
24    whatever you need to.
25       MR. DUBNER:

Page 315

1          I think that that's all I have
2    for today.  So thank you, Dr. Mathis,
3    for your time.
4    THE WITNESS:
5          Are we off the record?
6    MR. ARCHEY:
7          Well, I want to make one more
8    comment.  My little comment about you
9    have 45 seconds, the record won't
10    show, I was grinning and making a
11    joke.  I was gonna give you ample
12    time to get to a reasonable stop
13    place.  So I didn't want that to be
14    used against me at a later point.
15    MR. DUBNER:
16          That's fine.  Thanks for the
17    clarification.  I agree with that.
18    MR. ARCHEY:
19          With that, I think we are done,
20    and we are off the record.
21          (Whereupon, the deposition was
22    concluded at 4:44 p.m.)
23
24
25

Page 316

1          WITNESS CERTIFICATE
2
3
4          I, DR. DAVID MATHIS, do hereby
5    certify that the foregoing testimony was given
6    by me, and that the transcription of said
7    testimony, with corrections and/or changes, if
8    any, is true and correct as given by me on the
9    aforementioned date.
10
11
12
13
      DATE SIGNED          DR. DAVID MATHIS
14
15
16
17    Signed with corrections as noted.
18
19    Signed with no corrections noted.
20
21
22
23
24
25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 317

```
 1              CERTIFICATE
 2
 3        I, LORI L. MARINO, Certified Court
      Reporter, in and for the State of Louisiana,
 4    as the officer before whom this testimony was
      taken, do hereby certify that DR. DAVID
 5    MATHIS, after having been duly sworn by me
      upon authority of R.S. 37:2554, did testify as
 6    hereinbefore set forth in the foregoing 316
      pages; that this testimony was reported by me
 7    in the stenotype reporting method, was
      prepared and transcribed by me or under my
 8    personal direction and supervision, and is a
      true and correct transcript to the best of my
 9    ability and understanding; that the transcript
      has been prepared in compliance with
10    transcript format guidelines required by
      statute or by rules of the board, that I have
11    acted in compliance with the prohibition on
      contractual relationships, as defined by
12    Louisiana Code of Civil Procedure Article 1434
      and in rules and advisory opinions of the
13    board; that I am not related to counsel or to
      the parties herein, nor am I otherwise
14    interested in the outcome of this matter.
15
16        Dated this 1st day of May, 2022.
17
18
19
20
21        LORI L. MARINO, CCR
          CCR #87069
22        STATE OF LOUISIANA
23
24
25
```

**SOUTHERN COURT REPORTERS, INC.**
**(504) 488-1112**