MICHAEL PUISIS

May 06, 2022

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, AND RUFUS WHITE, on behalf of themselves and all others similarly situated

CIVIL ACTION NO.: 15-CV-318

JUDGE: SHELLY D. DICK

VERSUS

MAGISTRATE JUDGE: RICHARD L. BOURGEOIS, JR.

BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

* * * * * * * * * * * * * * * * * * * * * * * * * *

The deposition testimony of
MICHAEL PUISIS,
taken on Friday, May 6th, 2022
commencing at 8:59 a.m.
via Zoom

REPORTED BY: ELICIA H. WOODWORTH, C.C.R.

****************************************************

Page 2

I N D E X

| EXAMINATION | PAGE |
|---|---|
| By Mr. Archey .................................. | 5 |
| By Mr. Dubner .................................. | 265 |
| By Mr. Archey .................................. | 271 |
| WITNESS' CERTIFICATE .......................... | 274 |
| REPORTER'S CERTIFICATE ........................ | 275 |

Page 3

APPEARANCES:

REPRESENTING JOSEPH LEWIS, JR., KENTRELL PARKER, FARRELL SAMPIER, REGINALD GEORGE, JOHN TONUBBEE, OTTO BARRERA, CLYDE CARTER, CEDRIC EVANS, EDWARD GIOVANNI, RICKY D. DAVIS, LIONEL TOLBERT, AND RUFUS WHITE, on behalf of themselves and all others similarly situated:

Jeffrey B. Dubner, Esquire
VIA ZOOM
Democracy Forward Foundation
P.O. BOX 34553
Washington, DC 20005

Elena Malik, Esquire
Nishi Kumar, Esquire
Bruce Hamilton, Esquire
VIA ZOOM
Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, Louisiana 70117

REPRESENTING BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity; STEPHANIE LAMARTINIERE, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

Connell L. Archey, Esquire
VIA ZOOM
Butler Snow, LLP
445 North Boulevard, Suite 300
Baton Rouge, Louisiana 70802

REPORTED BY: ELICIA H. WOODWORTH, C.C.R

Page 4

STIPULATION

It is stipulated and agreed by and between all parties that the deposition of Michael Puisis is hereby being taken under the Louisiana Code of Civil Procedure for all purposes.

The witness has not waived the right to read and sign the deposition. The original is to be retained by Connell L. Archey, Esquire for proper filing with the Clerk of Court.

All objections, except those as to the form of the question and the responsiveness of the answer, are hereby reserved until the time of the trial of the cause.

* * * *

Elicia H. Woodworth, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

TRA

TORRES REPORTING & ASSOCIATES, INC.
COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

EXHIBIT
5

MICHAEL PUISIS
May 06, 2022
Pages 21..24

Page 21

someone with a professional experience and training of an RN degree or greater see a patient in privacy in a clinical setting with the record, with the medical record, and see them, that that health request be triaged within 24 hours for urgency and that the review of the nurse occur -- currently, by NCCHC standards, within 24 hours. And if a follow up is to occur with a provider, that that be scheduled as it's clinically needed.

Q. All right. Understood all of that. What I'm really asking is you've got experience in looking at other places. Are there other places that run routine sick call Monday through Friday and then rely upon a system of self-declared emergencies and that type of thing for the weekends?

A. I've never seen -- I've never seen it. To be fair, no. They pick up sick call requests daily and they triage them and then they refer them.

Q. Okay. And do you know anything about on weekends the referral can be 72 hours after the initial 24-hour triage?

A. Well, so NCCHC changed the standard to 24 hours for nurse sick call, that you have to do a face-to-face in 24 hours, but in the past, the -- based on the triage, the follow up might be 72 hours.

Page 22

So, for example, if someone says that they wanted a refill of Mylanta or they had a problem with their toenail or a little toe fungus, and the nurse scheduled them for 72 hours, that would not be seen as a problem.

But in circumstances where someone had chest pain or shortness of breath, under any circumstances, they would be seen promptly.

Q. Okay. Fair enough.

So you say in the past. What are we talking about? Are you saying --

A. Well, I'm just -- I'm sorry to interrupt.

I'm just referencing the NCCHC. You know, recently, I think it was a year ago or so, they changed their standards somewhat, and it stated that, you know, nurses should do a face-to-face within 24 hours.

Q. All right. Are you familiar with the NCCHC standards?

A. Yeah. I mean, I have a copy here too. I can reference it.

Q. Okay. Do you know what the mission of the NCCHC is?

A. To be honest, I'm not sure if they have a mission statement. I don't know. They set standards.

Q. Their mission is to improve the quality of healthcare in correction facilities. Does that sound

Page 23

like something you would know or have heard?

A. I'm -- like I say, I'm not sure what their mission statement is.

Q. Okay. So if a practice is not in compliance with NCCHC, you think it's below the standard of care?

A. Well, NCCHC does not evaluate clinical care. They set -- their standards are compliance based. In other words, they basically say you have to have clinic space that's appropriate, you have to have a person who's in charge to the health authority who is a medical person who's responsible for the program, et cetera, you have to have policy and procedures. They do not say that the diabetics needs to be treated in a certain way.

And so the standards are related to compliance requirements, and NCCHC alone, therefore, is not a standards-based organization that can determine whether the clinical quality of a program is appropriate. And, furthermore, the process issues are sometimes -- they do not address fully either. Sometimes their standards do, but often they don't.

Q. Okay. I probably did not use the best choice of words there when I said standards of care, but if a facility is not in compliance with an NCCHC standard, are they below the minimum acceptable practice?

A. I mean, generally, yes. Yeah.

Page 24

Q. So when NCCHC changed their standard very recently, all of a sudden everybody that was within compliance with NCCHC's standard previously are now out of compliance and below the standards, the minimum standard that is acceptable; is that right?

A. Well, I mean, are you speaking with respect to NCCHC's perspective?

Q. I'm talking about the perspective you're bringing to the Court where you're saying that there are minimum standards, and are you saying that if we're out of compliance -- the facility that you're evaluating is not in compliance with NCCHC, are they below the minimally-accepted standards?

A. I think in situations as you're describing where something has changed, it really depends on a look at what the practice is, and it's not a legalistic one in this sense. And, in particular, with respect to our review, it's whether there's a risk to patients with respect to the system that you've set up.

So, yes, there's a standard, and, yes, in general, it's a benchmark against which care is measured. But also for people like ourselves who are directed by a Court or we're looking at your program with respect to the process of care, we have to look at what you're doing and, given the standards that exist,

TRA
TORRES REPORTING & ASSOCIATES, INC.
COURT REPORTING & LITIGATION SERVICES
www.torresreporting.com
1.866.982.6878 Toll Free
Baton Rouge, LA
225.751.0732
225.752.7308 FAX
New Orleans, LA
504.392.4791
504.392.4852 FAX

how you're applying them and whether it's a patient safety risk.
Q. Okay. And, look, I understand these are somewhat nuanced issues, and that's why people like you have to come to the Court and tell us about some things. But so there can be a practice that is not in compliance with NCCHC and still be above the minimally-acceptable standard; is that correct or not?
A. I mean, it's such a hypothetical, I'm not sure I can answer that.
In general, the NCCHC standards are reasonable, and they are a reasonable standard. And with respect to compliance, I've used them as a basic standard of care. So, I mean, I'm just not sure if there's a hypothetical circumstance where you could be, you know, have a reasonable program and not be totally in compliance with their standard. There might be, but, you know, I think it depends on the particular case.
Q. All right. But from Dr. Puisis' standard, you began with the presumption that to be in compliance, you need to be at the NCCHC standards; is that correct?
A. I think those are a reasonable group of standards for compliance and for policies, yes.
Q. Okay. What about the ACA standards, is it reasonable to be in compliance with the ACA standards?



A. I don't -- I've never used the ACA standards. They -- in the past, they were so similar to NCCHC. And the NCCHC was more of a medical organization, and the ACA is more of a -- it accredits the custody function, and so I've not paid considerable attention to ACA standards, no.
Q. Are there instances where the ACA standard is, for lack of a better word, less than or lower than the NCCHC standard as to medical issues?
A. I don't think I can reasonably answer that. I'm not an expert on ACA standards.
Q. Okay. Do you know how many facilities nation-wide are NCCHC accredited?
A. No, I do not.
Q. Okay. Did you see where our expert, Dr. McMunn, said it's 8 percent of the facilities are NCCHC accredited?
MR. DUBNER: Object to form.
BY MR. ARCHEY:
Q. Are you familiar with that?
A. No, I don't recall that.
Q. Okay. Do you have any basis or any other information that would say otherwise?
A. I mean, I just don't -- I don't know the data, so I can't answer that.



Q. Okay. LSP is accredited by the ACA; correct?
A. Actually, I don't know that, but if you tell me they are, I'll believe it.
Q. It's not something you looked at to see whether LSP's accredited by the ACA?
A. I did not look at it with respect to the areas I looked at, no.
Q. Okay. Did you look at expert reports by Dr. Mathis and Dr. McMunn?
A. I did not read them carefully, no.
Q. Did you read them at all?
A. Not much. I basically read the sections that were pertinent to specialty care, and I did a lot of record reviews.
Q. The record reviews that are reflected in your report, is that what you're referring to?
A. That's correct, yes.
Q. Understood. And that was a lot of work, I understand, so...
Did you look photographs from LSP that your other experts took during the site visit?
A. You know, I glanced at them. I didn't, you know, pour over them, but I did look at them, yes.
Q. Do you see any differences in those photographs from back in 2016?



A. I think it's a little cleaner, yeah. I mean, you could see that.
Q. Okay. Do you see any or are you aware of any changes in the ATU staffing?
A. Yes. I mean, obviously I don't know day-to-day, but what was told to us is that now you have a midlevel provider or a physician. It looks like, based on record reviews, that it's mostly a midlevel provider staffed in the ATU, and they don't work -- they're available around the clock, but they're not working around the clock, and there's now a nurse in the ATU. Yes.
Q. So that's an improvement from 2016 to current; correct?
A. Yes. Yes.
Q. That was awful hard for you to say "yes" that I I'm wondering why you --
A. I'm just saying it's a -- you know, the question is, you know, is it improvement, and I was going to say -- although I didn't want to, but, you know, provided that the nurse practitioners is doing what would be normally expected and are they thoroughly evaluating people, and, you know, some of the evaluations really aren't that thorough. But, yes, there is a body there, and that's good. It's good. Having a nurse is good, and I think it's commendable.