1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF LOUISIANA

3

4    JOSEPH LEWIS JR., ET AL    *    CIVIL ACTION

5    VERSUS                    *    NO. 15-318-SDD

6    BURL CAIN, ET AL          *    JUNE 7, 2022

7    * * * * * * * * * * * * * *

8

9                            DAY 2
                          BENCH TRIAL
10          BEFORE THE HONORABLE SHELLY D. DICK
           UNITED STATES CHIEF DISTRICT JUDGE
11

12   APPEARANCES:

13   FOR THE PLAINTIFFS:       THE PROMISE OF JUSTICE INITIATIVE
                              BY:  MERCEDES MONTAGNES, ESQ.
14                                 NISHI KUMAR, ESQ.
                                   REBECCA RAMASWAMY, ESQ.
15                                 ELENA MALIK, ESQ.
                                   SAMANTHA BOSALAVAGE, ESQ.
16                            1024 ELYSIAN FIELDS AVENUE
                              NEW ORLEANS, LOUISIANA 70117
17
                              COHEN MILSTEIN SELLERS & TOLL,
18                            PLLC
                              BY:  JEFFREY B. DUBNER, ESQ.
19                                 BRENDAN R. SCHNEIDERMAN, ESQ.
                              1100 NEW YORK AVE N.W., SUITE 500
20                            WASHINGTON, D.C. 20005

21                            SOUTHERN POVERTY LAW CENTER
                              BY:  BRUCE HAMILTON, ESQ.
22                                 EMILY LUBIN, ESQ.
                              201 ST. CHARLES AVE., SUITE 2000
23                            NEW ORLEANS, LOUISIANA 70170

24

25

```
 1   FOR THE DEFENDANTS:        BUTLER SNOW, LLP
                                BY:  RANDAL J. ROBERT, ESQ.
 2                                   CONNELL L. ARCHEY, ESQ.
                                     ALLENA W. MCCAIN, ESQ.
 3                              445 NORTH BOULEVARD, SUITE 300
                                BATON ROUGE, LOUISIANA 70802
 4
                                SHOWS, CALI & WALSH, LLP
 5                              BY:  JEFFREY K. CODY, ESQ.
                                     CAROLINE M. TOMENY, ESQ.
 6                                   JOHN C. CONINE, JR., ESQ.
                                628 ST. LOUIS STREET
 7                              BATON ROUGE, LOUISIANA 70802

 8
     OFFICIAL COURT REPORTER:   SHANNON L. THOMPSON, CCR
 9                              UNITED STATES COURTHOUSE
                                777 FLORIDA STREET
10                              BATON ROUGE, LOUISIANA 70801
                                (225) 389-3567
11
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
12              COMPUTER-AIDED TRANSCRIPTION SOFTWARE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2                                                      <u>PAGE</u>

3   **PLAINTIFFS' WITNESSES:**

4   **DORA B. SCHRIRO, ED.D, J.D. (CONTINUED)**

5      CROSS-EXAMINATION BY MR. CODY               5

6      REDIRECT EXAMINATION BY MS. RAMASWAMY       37

7   **MARK J. MAZZ, AIA**

8      VOIR DIRE BY MR. SCHNEIDERMAN               46

9      DIRECT EXAMINATION BY MR. SCHNEIDERMAN      48

10     CROSS-EXAMINATION BY MS. TOMENY             62

11     REDIRECT EXAMINATION BY MR. SCHNEIDERMAN    81

12  **MADELEINE LAMARRE, MN, FNP-BC**

13     VOIR DIRE BY MS. MONTAGNES                  86

14     VOIR DIRE BY MR. ARCHEY                     88

15     DIRECT EXAMINATION BY MS. MONTAGNES         91

16     CROSS-EXAMINATION BY MR. ARCHEY            190

17     REDIRECT EXAMINATION BY MS. MONTAGNES      256

18

19

20

21

22

23

24

25

1    **(JUNE 7, 2022)**

2    **(CALL TO THE ORDER OF COURT)**

3    **THE COURT:**  OKAY.  GOOD MORNING.

4    BE SEATED.

5    I DON'T KNOW WHAT ALL OF THAT IS.  OKAY.  DR.

6    SCHRIRO WAS ON THE STAND.  WE ARE HAVING TROUBLE WITH THE AUDIO

7    LINK; THAT'S WHY WE ARE A LITTLE BIT LATE STARTING.  OUR I.T.

8    DEPARTMENT IS TROUBLESHOOTING IT.

9    PLEASE TAKE THE STAND.

10   JUST A SECOND.  OKAY.  WE ARE ALMOST HOOKED UP.

11   OKAY.  SO WHO DO WE HAVE ON AUDIO?  DO WE KNOW?  WE DON'T.

12   AND WHO DO WE HAVE ON ZOOM?

13   **THE DEPUTY CLERK:**  WE HAVE DR. RANDY LAVESPERE AND

14   RICKY DAVIS.

15   **THE COURT:**  OKAY.  DR. LAVESPERE IS GOING TO BE A

16   WITNESS?

17   **MR. ROBERT:**  NO.

18   **THE COURT:**  ALL RIGHT.

19   **MR. ROBERT:**  AND THAT'S WHAT I WANTED TO TALK TO YOU

20   ABOUT AS WELL.  ONE MORE QUICK HOUSEKEEPING.

21   DR. LAVESPERE AND SECRETARY LEBLANC WOULD LIKE

22   TO MONITOR SOME AS WELL, IF HE CAN.  HE HAS BEEN DESIGNATED BY

23   DEPOSITION TESTIMONY.  HE IS NOT GOING TO BE LIVE AS A WITNESS.

24   HE'S -- AND HE'S A PARTY.  I TALKED TO COUNSEL AND THEY DIDN'T

25   HAVE ANY OBJECTION TO IT.

09:08  1          **THE COURT:**  OKAY.

2          **MR. ROBERT:**  SO I JUST WANTED TO KNOW IF THE COURT

3  WAS OKAY.

4          **THE COURT:**  COUNSEL HAS NO OBJECTION?

5          **MS. MONTAGNES:**  NO OBJECTION, YOUR HONOR.

6          **THE COURT:**  OKAY.  DR. LAVESPERE AND DR. LEBLANC CAN

7  MONITOR --

8          **MR. ROBERT:**  SECRETARY LEBLANC.

9          **THE COURT:**  -- THE PROCEEDINGS OR CAN WATCH THE

10  PROCEEDINGS EITHER BY THE ZOOM VIDEO LINK OR BY AUDIO.

11          **MR. ROBERT:**  THANK YOU.

12          **THE COURT:**  ALL RIGHT.  DO WE HAVE A STIPULATION AS

13  TO WHERE WE STAND ON TIME?

14          **MS. MONTAGNES:**  GOOD MORNING, YOUR HONOR.

15          MERCEDES MONTAGNES ON BEHALF OF THE PLAINTIFFS.

16          WE HAVE CONFERRED WITH THE PARTIES AND OUR

17  CURRENT COUNT IS -- FOR THE PLAINTIFFS, TWO HOURS AND TWELVE

18  MINUTES AND FOR THE DEFENDANTS, ONE HOUR AND SIX MINUTES.

19          **THE COURT:**  OKAY.  THANK YOU.

20          ALL RIGHT.  DR. SCHRIRO IS ON THE STAND, IS

21  STILL UNDER OATH.

22          MR. CODY, YOU MAY BEGIN YOUR CROSS-EXAMINATION.

23          **MR. CODY:**  THANK YOU, YOUR HONOR.

24                **CROSS-EXAMINATION**

25  **BY MR. CODY:**

09:09 1   **Q.**   GOOD MORNING, DR. SCHRIRO.

2   **A.**   GOOD MORNING.

3   **Q.**   AGAIN, MY NAME IS JEFF CODY; I REPRESENT THE DEFENDANTS IN

4   THIS MATTER.

5         DR. SCHRIRO, YOU SAID QUITE A FEW THINGS YESTERDAY.

6   ONE THING I WANT TO START OFF WITH IN THE BEGINNING IS JUST A

7   POINT OF CLARIFICATION.

8         **THE COURT:**  I'M SORRY, MR. CODY.

9         **MR. CODY:**  OKAY.  I'LL PROCEED.

10   **BY MR. CODY:**

11   **Q.**   YOU SAID YESTERDAY THAT IN ONE OF YOUR PRIOR POSITIONS --

12   I DON'T RECALL WHICH -- THAT YOU HAD OCCASION TO HIRE SOMEONE

13   THAT KIND OF HAD A REALLY GOOD PORTFOLIO, I BELIEVE, AND WAS

14   ABLE TO HANDLE ADA MATTERS FOR YOU.  IS THAT CORRECT?

15   **A.**   THAT IS CORRECT.

16   **Q.**   OKAY.  WHAT WAS THAT PERSON'S ACTUAL TITLE?

17   **A.**   I MENTIONED THAT YESTERDAY, SIR.  SHE WAS FIRST HIRED AS

18   DIVISION DIRECTOR FOR HUMAN RESOURCES, AND THEN SHE WAS -- I

19   LATER PROMOTED HER TO THE DEPUTY DIRECTOR, THE NUMBER TWO

20   POSITION IN THE DEPARTMENT.

21   **Q.**   OKAY.  AT WHAT POINT DID SHE ACTUALLY OVERSEE ADA ISSUES?

22   **A.**   THAT WAS PART OF THE PORTFOLIO.  SO FROM THE POINT THAT

23   SHE WAS HIRED.

24   **Q.**   OKAY.  SO WHEN SHE WAS HIRED AT -- WAS IT H.R.?

25   **A.**   SHE WAS THE DEPUTY -- THERE ARE FOUR DIVISION DIRECTORS --

09:10 1   OR THERE WERE AT THE TIME ANYHOW FOUR DIVISION DIRECTORS, AND

2   SHE HAD THE WHOLE HUMAN RESOURCES PORTFOLIO.

3   Q.   OKAY.  SO SHE HANDLED HUMAN RESOURCES, BUT SHE ALSO

4   HANDLED ADA MATTERS?

5   A.   WELL, WE INCLUDED THAT UNDER THAT UMBRELLA, YES.

6   Q.   GOTCHA.  THANK YOU.

7        OKAY.  AND YESTERDAY YOU TESTIFIED THAT LSP'S ADA

8   COORDINATOR SHOULD BE PERFORMING ONLY THAT SPECIFIC ROLE AND NO

9   OTHER DUTIES.  CORRECT?

10  A.   I WAS SPEAKING SPECIFICALLY ABOUT LSP, YES.

11  Q.   RIGHT.  SO YOU THINK THAT LSP SHOULD HAVE EXCLUSIVELY AN

12  ADA COORDINATOR TO ONLY OVERSEE THOSE DUTIES?

13  A.   I DO.  AND I EXPLAINED YESTERDAY THAT GIVEN THE

14  DEMOGRAPHICS, THE VERY LARGE PORTION OF THE INMATE POPULATION

15  THAT WERE OR COULD BE IN THAT CATEGORY AT SOME POINT DURING

16  THEIR INCARCERATION AND GIVEN THE CURRENT STATE OF AFFAIRS,

17  THAT IT WAS IMPORTANT.

18  Q.   AND YOU REVIEWED THE REQUEST FOR ACCOMMODATION THAT LSP

19  RECEIVES.  CORRECT?

20  A.   YES.

21  Q.   ALL RIGHT.  AND DO YOU UNDERSTAND WHAT I MEAN WHEN I SAY

22  "RELEVANT PERIOD," FOR PURPOSES OF THIS CASE, THE RELEVANT

23  PERIOD?

24  A.   WHY DON'T YOU RESTATE IT FOR ME.

25  Q.   2019 --

1  **A.**   OKAY.

2  **Q.**   -- TO THE PRESENT.

3        OKAY.  SO BASED ON YOUR REVIEW OF THE REQUEST FOR

4  ACCOMMODATION AND THE OTHER MATERIALS, RELATED MATERIALS YOU

5  DISCUSSED YESTERDAY, HOW MANY REQUESTS FOR ACCOMMODATIONS WERE

6  ACTUALLY SUBMITTED AT LSP DURING THE RELEVANT PERIOD?

7  **A.**   I CANNOT TELL YOU THAT, SIR.

8  **Q.**   ALL RIGHT.  IF I TOLD YOU THE NUMBER OF REQUESTS FOR

9  ACCOMMODATION FOR 2019 TO 2021, THE MATERIALS YOU LOOKED AT,

10  WAS 84, WOULD YOU HAVE ANY REASON TO DISAGREE WITH THAT?

11  **A.**   I WOULD HAVE REASON AT LEAST TO QUESTION THAT.

12  **Q.**   OKAY.  WELL, I MEAN, WE DON'T REALLY HAVE TIME FOR YOU TO

13  GO THROUGH AND COUNT THEM.  BUT, I MEAN, YOU DID REVIEW THESE

14  MATERIALS.  CORRECT?

15  **A.**   RIGHT, I DID.

16  **Q.**   OKAY.

17  **A.**   BUT THE -- IF I CAN ADD, PLEASE.

18  **Q.**   OF COURSE.

19  **A.**   THE REASON THAT I SAY IS THERE WERE THE QI/QA REPORTS AND

20  THEY HAD ONE SET OF NUMBERS; BUT WHEN COMPARED TO THE ACTUAL

21  QA/QI DOCUMENTS THAT WERE SUBMITTED, THAT WAS A DIFFERENT

22  TALLY.

23  **Q.**   AND I'M SPEAKING HERE JUST OF THE REQUESTS FOR

24  ACCOMMODATION, THE MATERIALS THAT YOU WENT OVER YESTERDAY WITH

25  MS. RAMASWAMY.

1    **A.**    RIGHT.

2    **Q.**    OKAY.  AND SO IF WE TAKE IT THAT WE HAVE 84 FOR THE

3    ENTIRETY OF THOSE THREE YEARS, THAT AVERAGES OUT TO ABOUT 20 OR

4    30 REQUESTS PER YEAR.  CORRECT?

5            AND WE CAN ROUND UP TO 90.  LET'S SAY WE HAD 90.

6    THAT WOULD BE ABOUT 30 ON AVERAGE PER YEAR.  CORRECT?

7    **A.**    CORRECT.

8    **Q.**    ALL RIGHT.  SO WE HAVE 30 REQUESTS FOR ACCOMMODATIONS

9    SUBMITTED ANNUALLY AT LSP.  THAT ONLY ADDS UP TO BEING 2.5 PER

10   MONTH.  DOES THAT SOUND RIGHT?

11   **A.**    WELL, AGAIN, ASSUMING THAT THE NUMBERS THAT YOU PROVIDED

12   ARE THE ACCURATE NUMBERS.

13   **Q.**    AND, OF COURSE, I MEAN -- AND I'M SURE COUNSEL WILL GO

14   OVER THESE REQUESTS FOR ACCOMMODATION AFTERWARD AND MAKE SURE

15   THAT I'M RIGHT.  BUT ASSUMING THAT THE NUMBER IS 84 REQUESTS

16   FOR ACCOMMODATION, I MEAN, THESE NUMBERS WOULD BE RIGHT TO YOU

17   THEN?

18   **A.**    YEAH.  I MEAN, THE MATH --

19   **Q.**    OKAY.

20   **A.**    -- GIVEN THE ASSUMPTIONS, THEY ARE ACCURATE.

21   **Q.**    AND IT'S YOUR TESTIMONY THAT THE PRESENT VOLUME OF

22   REQUESTS FOR ACCOMMODATION REQUIRES A FULL-TIME ADA COORDINATOR

23   AT LSP?

24   **A.**    NO.  MY REPRESENTATION IS THAT THE SCOPE OF WORK OF THE

25   ADA COORDINATOR GOES BEYOND EVALUATING THOSE SPECIFIC REQUESTS.

09:13 1   Q.   SO LET'S TALK ABOUT THE ADA TRACKING DATABASE.

2            YOU PREVIOUSLY ADMITTED IN YOUR DEPOSITION YOU'RE NOT

3   AWARE OF HOW LSP'S ADA DATABASE OPERATES.   ISN'T THAT SO?

4   A.   THAT IS CORRECT.

5   Q.   OKAY.

6   A.   WELL, YOU KNOW, MAY I SEE WHERE IN THE DEPOSITION IT

7   STATES THAT?

8   Q.   CERTAINLY.

9   A.   WHAT THE QUESTION IS AND THE ANSWER?

10           **MR. CODY:**   MS. RAGUSA, IF YOU COULD PULL UP

11   DR. SCHRIRO'S DEPOSITION AT PAGE 101, 1 THROUGH 3.

12   **BY MR. CODY:**

13   Q.   DO YOU SEE WHAT'S HIGHLIGHTED THERE ON THE SCREEN?

14   A.   CORRECT.

15   Q.   OKAY.   IS THAT YOUR TESTIMONY FROM YOUR DEPOSITION?

16   A.   YES.

17   Q.   OKAY.

18   A.   BUT IT ALSO CONTINUES TO THE NEXT SEVERAL LINES.

19   Q.   I UNDERSTAND THAT.

20           YOU DID NOT SEE THE ADA TRACKING DATABASE DURING YOUR

21   RECENT SITE VISITS.   ISN'T THAT CORRECT?

22   A.   THAT IS CORRECT.

23   Q.   OKAY.   YOU DID NOT REQUEST TO SEE THE ADA TRACKING BASE

24   DURING YOUR SITE VISIT?

25   A.   WE WERE ONLY PERMITTED TO MAKE AN INSPECTION OF THE

09:14 1  FACILITIES AND SPEAK WITH INMATES, AND THE ONLY QUESTIONS WE
      2  COULD PUT TO STAFF WERE LOGISTICAL.
      3  **Q.**   AND I'M NOT TALKING ABOUT QUESTIONS PUT TO STAFF.  I
      4  JUST -- I'M TALKING ABOUT -- THIS IS A DATABASE.  CORRECT?
      5  **A.**   IT IS.  WELL, IT'S SUPPOSED TO BE.
      6  **Q.**   RIGHT.  YOU'RE VERY CRITICAL OF THE DATABASE, I GET THAT.
      7  BUT EVERYTHING RELATED TO THE DATABASE THAT YOU'RE CRITICIZING
      8  IS BASED ON -- IS JUST DOCUMENTS.  RIGHT?
      9  **A.**   THAT'S CORRECT.
     10  **Q.**   OKAY.  AND WHILE YOU ARE UNSURE HOW THE SYSTEM OPERATES,
     11  YOU CONTEND THAT THE DATABASE IS NOT ARRANGED CHRONOLOGICALLY.
     12  CORRECT?
     13  **A.**   THAT'S ONE OF THE ISSUES.
     14  **Q.**   OKAY.  WOULD IT SURPRISE YOU TO KNOW THAT THE DATABASE
     15  ACTUALLY CAN BE ARRANGED CHRONOLOGICALLY?
     16  **A.**   AGAIN, BECAUSE I HAVE NO INFORMATION, I'M MAKING MY
     17  OPINION BASED ON WHAT I KNOW.
     18  **Q.**   YOU'RE NOT AWARE OF ANY PARTICULAR REQUEST FOR
     19  ACCOMMODATION THAT HAS NOT BEEN HANDLED PROPERLY BECAUSE OF
     20  LSP'S ADA TRACKING SYSTEM.  RIGHT?
     21  **A.**   MY INFORMATION IS QUITE LIMITED.  BUT LET ME ADD AS WELL,
     22  A POINT THAT I MADE YESTERDAY, THAT THE SUFFICIENCY OF THE
     23  DATABASE BASED ON THE MATERIALS THAT DEFENDANTS PROVIDED IS, AT
     24  BEST, ABBREVIATED IN SOME -- IN MOST INSTANCES.  IT'S JUST
     25  SEVERAL WORDS.  IT'S NOT ANYTHING MORE THAN A MEMORY FOR

09:16 1   SOMEONE WHO ENTERED IT.

2   **Q.**   AND I APPRECIATE ALL THE EXTRA EXPOSITION ON THIS.  I

3   JUST -- REALLY, I JUST WANT YOU TO ANSWER THE QUESTION.  I DID

4   ASK YOU THIS IN YOUR DEPOSITION AND YOU DID ADMIT THIS.  AND SO

5   I JUST WANT TO -- I'LL REPEAT IT.

6           YOU ARE NOT AWARE OF ANY PARTICULAR REQUEST FOR

7   ACCOMMODATION THAT HAS NOT BEEN HANDLED PROPERLY BECAUSE OF

8   LSP'S ADA TRACKING SYSTEM.  CORRECT?

9   **A.**   THAT IS CORRECT.

10  **Q.**   OKAY.  DON'T YOU BELIEVE THAT ONE WAY TO ENSURE ADA

11  COMPLIANCE IS BY HAVING SOMEONE AT HEADQUARTERS REVIEW REQUESTS

12  FOR ACCOMMODATION TO ENSURE THAT THE NEEDS OF DISABLED INMATES

13  ARE BEING MET?

14  **A.**   IT WOULD HELP.

15  **Q.**   OKAY.  YOU'VE READ THE OPINION FROM THE LIABILITY PHASE.

16  CORRECT?

17  **A.**   I'M SORRY.

18  **Q.**   YOU READ THE OPINION FROM THE LIABILITY PHASE?

19  **A.**   I HAVE.

20  **Q.**   THE COURT'S OPINION?

21  **A.**   YES.

22  **Q.**   OKAY.  WASN'T ONE OF THE COURT'S PRIOR CONCERNS REGARDING

23  THE ADA'S TRACKING BASE THAT IT APPEARED HEADQUARTERS WAS

24  UNABLE TO ACCESS THE DATABASE?  DOES THAT SOUND FAMILIAR?

25  **A.**   AS I RECALL, THEY WEREN'T AWARE THAT IT EXISTED.

09:16 1  **Q.**   OKAY.  WOULD THAT BE ALSO UNABLE TO ACCESS IT TO DO

2  WHATEVER, NOT KNOWING ABOUT IT?

3  **A.**   I'M NOT GOING TO INTERPRET WHAT SOMEONE ELSE MEANT.

4  **Q.**   OKAY.  AND YOU'RE AWARE THAT THE ADA DIRECTOR AT

5  HEADQUARTERS DOES, IN FACT, HAVE THE ABILITY TO ACCESS THE ADA

6  DATABASE.  CORRECT?

7  **A.**   YES.  I SAW THAT IN HER DEPOSITION.

8  **Q.**   ALL RIGHT.  AND THE DEPOSITION YOU'RE REFERRING TO, IS

9  THAT MS. SHARITA SPEARS' DEPOSITION?

10  **A.**   THAT IS CORRECT.

11  **Q.**   OKAY.  AND THOUGH YOU'VE NOT READ -- OR YOU HAVE READ IT

12  NOW, BUT YOU DID NOT READ IT AT THE TIME YOU PREPARED YOUR

13  REPORT.  IS THAT CORRECT?

14  **A.**   THAT IS CORRECT.

15  **Q.**   OKAY.  AND SO IF MS. SPEARS SAYS THAT SHE HAS NO TROUBLE

16  ACCESSING THE ADA DATABASE, YOU WOULD HAVE NO BASIS TO REFUTE

17  THAT?

18  **A.**   THAT IS CORRECT.

19  **Q.**   AND IF MS. SPEARS TESTIFIES THAT SHE ACCESSES THE DATABASE

20  TO REVIEW INDIVIDUAL REQUESTS FOR ACCOMMODATION, YOU WOULD HAVE

21  NO BASIS FOR REFUTING THAT EITHER?

22  **A.**   I'M SORRY.  YOU'RE READING VERY QUICKLY.  WOULD YOU

23  PLEASE --

24  **Q.**   I'LL READ MORE SLOWLY.  I APOLOGIZE.

25        AND IF MS. SPEARS TESTIFIES THAT SHE ACCESSES THE

09:17 1  DATABASE TO REVIEW INDIVIDUAL REQUESTS FOR ACCOMMODATION, YOU

2  WOULD HAVE NO BASIS FOR REFUTING THAT?

3  **A.**   THAT IS CORRECT.

4  **Q.**   OKAY.  AND SINCE YOU'VE READ HER DEPOSITION, YOU KNOW THAT

5  MS. SPEARS REVIEWS THE ADA DATABASE TWICE PER WEEK.  CORRECT?

6  **A.**   THAT IS WHAT SHE SAID.

7  **Q.**   OKAY.  ISN'T THIS A SUFFICIENT FREQUENCY OF TIME TO CHECK

8  THE DATABASE?

9  **A.**   DEPENDING ON WHAT THE VOLUME IS, YES.

10  **Q.**   OKAY.  WELL, IF WE GO WITH WHAT I SAID EARLIER, 2.5

11  REQUESTS FOR ACCOMMODATION PER MONTH, WOULD THAT BE PRETTY

12  SUFFICIENT?  TWO TIMES PER WEEK?

13  **A.**   PROBABLY.

14  **Q.**   OKAY.  AND YOU KNOW THAT MS. SPEARS IS ALSO INVOLVED IN

15  REVIEWING ARPS THAT ARE ADA RELATED.  CORRECT?

16  **A.**   YES.

17  **Q.**   DO YOU KNOW WHAT I MEAN WHEN I SAY "ARP"?

18  **A.**   IT'S THE GRIEVANCE PROCESS.

19  **Q.**   OKAY.  AND YOU DON'T KNOW WHAT PORTION OF MS. SPEARS' TIME

20  IS SPLIT BETWEEN HER ADA ROLE AND HER OTHER DUTIES.  CORRECT?

21  **A.**   FROM WHAT I UNDERSTAND, SHE HAS TWO PRIMARY

22  RESPONSIBILITIES:  ONE IS ADA, AND THE OTHER IS THE PRE-CLASS

23  LITIGATION.

24  **Q.**   OKAY.  AND, AGAIN, DO YOU UNDERSTAND HOW THAT TIME IS

25  DIVIDED UP BETWEEN THOSE TWO?

09:18 1    **A.**   SHE DID NOT SPECIFY.

2    **Q.**   OKAY.  AND HAVING READ MS. SPEARS' DEPOSITION, ARE YOU

3    AWARE OF HER PLANS FOR THE FUTURE CONCERNING ADA COMPLIANCE?

4    **A.**   SHE IDENTIFIED THAT SHE HAD TWO PRIORITIES.

5    **Q.**   OKAY.  AND WHAT WERE THEY?

6    **A.**   IT WAS TO WORK ON A TRANSITION PLAN, WHICH SHE DID NOT

7    ENUMERATE, AND TRAINING.  AND SHE WAS NOT SPECIFIC WITH THAT.

8    **Q.**   OKAY.  WELL, LET'S TALK ABOUT TRAINING.  WAS SHE TALKING,

9    FIRST OFF, ABOUT STAFF TRAINING, ADA STAFF TRAINING?

10   **A.**   AS SHE DESCRIBED IT, THERE WAS GOING TO BE A CONVENING OF

11   SENIOR STAFF AND SOME PRESENTATION, WHICH WOULD THEN INFORM

12   WHAT TRAINING WOULD BE.

13   **Q.**   OKAY.  SO THERE WERE EFFORTS TOWARD SOME ADA TRAINING?

14   **A.**   YES.

15   **Q.**   OKAY.  AND WHAT ABOUT REQUIRED TRAINING, ADA TRAINING, FOR

16   THE ADA COORDINATORS?

17         **MS. RAMASWAMY:**  OBJECTION, YOUR HONOR.  HE'S ASKING

18   HER TO RECITE SOMEONE ELSE'S TESTIMONY.

19         **MR. CODY:**  YOUR HONOR, SHE SAID YESTERDAY SHE

20   REVIEWED IT.  I'M NOT ASKING HER TO RECITE VERBATIM, BUT I

21   THINK SHE WOULD BE FAMILIAR WITH IT ENOUGH TO RESPOND TO THE

22   QUESTIONS.

23         **THE COURT:**  AND THE QUESTION WAS?

24         **MR. CODY:**  DID SHE ALSO SAY ANYTHING ABOUT MANDATED

25   ADA TRAINING FOR THE ADA COORDINATORS.

09:20 1          **THE COURT:**  SO WHAT'S YOUR --

2          **MR. CODY:**  I'M ASKING HER IF SHE RECALLS FROM HER --

3     SHE SAID -- WE TALKED ABOUT WHAT SHE REMEMBERED FROM

4     SHARITA SPEARS' DEPOSITION.  AND I WAS TRYING TO GET HER TO --

5     ASK HER WHETHER OR NOT SHE RECALLED ANYTHING REGARDING MANDATED

6     ADA TRAINING FOR ADA COORDINATORS.  IF SHE DOESN'T REMEMBER,

7     THAT'S FINE.  I'M JUST TRYING TO SEE WHAT SHE REMEMBERS.

8          **THE COURT:**  OKAY.  THE COURT IS GOING TO OVERRULE THE

9     OBJECTION.  HOWEVER, THE COURT WOULD NOTE THAT -- WELL, I AM

10    NOT GOING TO NOTE ANYTHING.  OBJECTION OVERRULED.

11          RE-ASK YOUR QUESTION.  BUT, FRANKLY, WHEN I ASK

12    YOU WHAT YOUR QUESTION WAS, I DON'T REALLY NEED TO KNOW WHAT

13    THE REASONS FOR YOUR QUESTION ARE.

14          **MR. CODY:**  I'M SORRY, YOUR HONOR.

15          **THE COURT:**  UNLESS YOU WANT TO MAKE AN ARGUMENT THAT

16    CLUES YOUR WITNESS IN, BUT IT'S NOT NECESSARY.  I REALLY AM

17    TRYING TO RULE ON THE OBJECTION, AND I WANT TO KNOW PRECISELY

18    WHAT THE QUESTION IS SO I CAN RULE ON THE OBJECTION.

19          **MR. CODY:**  I APOLOGIZE, YOUR HONOR.

20          **THE COURT:**  GO AHEAD.

21    BY MR. CODY:

22    **Q.**  ALL RIGHT.  DO I NEED TO REPHRASE THE QUESTION,

23    DR. SCHRIRO?

24    **A.**  YEAH.  WOULD YOU, PLEASE.

25    **Q.**  OKAY.  YOU READ SHARITA SPEARS' DEPOSITION?

09:21 1    **A.**   YES.

2    **Q.**   DO YOU RECALL HER SAYING ANYTHING WITH REGARD TO MANDATING

3    ADA TRAINING FOR ADA COORDINATORS?

4    **A.**   SHE TALKED ABOUT A ZOOM-TYPE INSTRUCTION THAT FOLKS WOULD

5    BE EXPECTED TO COMPLETE IN THE NEXT YEAR.  FROM WHAT I

6    UNDERSTAND, THERE WAS NO FUNDING FOR THAT AND SHE HAD NOT

7    WORKED THAT OUT YET.

8    **Q.**   SO AT THE TIME OF HER DEPOSITION, IT HAD NOT HAPPENED YET?

9    **A.**   THAT IS CORRECT.

10    **Q.**   OKAY.  DO YOU REQUIRE -- DO YOU RECALL ANYTHING REGARDING

11    A MINIMUM NUMBER OF HOURS OF ADA TRAINING?

12    **A.**   WITH REGARD TO WHAT OR WHO?

13    **Q.**   THE ADA COORDINATORS.

14    **A.**   THE WAY THAT YOU'RE PHRASING IT, I DON'T KNOW THAT THAT'S

15    WHAT SHE HAD IN MIND.  SHE WAS DESCRIBING THE RESOURCE THAT SHE

16    HAD IDENTIFIED, AND I BELIEVE IT WAS A 40-HOUR TRAINING

17    PROGRAM.  I DON'T KNOW THAT THAT TRANSLATES TO THE SAME THING

18    AS REQUIRING 40 HOURS.

19    **Q.**   OKAY.  YOU REALIZE THAT MS. SPEARS IS LOOKING TO HAVE AN

20    OUTSIDE ORGANIZATION REVIEW DOC'S POLICIES, PROCEDURES, AND

21    PRACTICES REGARDING ADA?

22    **A.**   YES.  THAT WAS IN THE --

23    **Q.**   OKAY.  AND IS THAT A GOOD IDEA?

24    **A.**   IN GENERAL, I HAVE CONCERNS ABOUT WHAT IT IS THAT SHE

25    DESCRIBED.  SHE -- WOULD YOU LIKE ME TO EXPLAIN?

09:22 1  **Q.** I MEAN, THAT'S -- NO. ACTUALLY, YOU CAN GO THROUGH THAT
     2  WITH YOUR COUNSEL'S EXAMINATION.
     3  **A.** OKAY.
     4  **Q.** OKAY. SO LET'S TALK ABOUT REQUESTS FOR ACCOMMODATION.
     5       YOU CONTEND IN YOUR EXPERT REPORT THAT MANY REQUESTS
     6  FOR ACCOMMODATION ARE NOT RECORDED AT LSP. IS THAT RIGHT?
     7  **A.** THAT'S CORRECT.
     8  **Q.** OKAY. AND WHEN YOU SAY "RECORDED," DO YOU MEAN LOGGED
     9  INTO THE ADA TRACKING DATABASE?
    10  **A.** THAT IS CORRECT.
    11  **Q.** ALL RIGHT. AND THIS IS AN ASSUMPTION YOU'RE MAKING.
    12  RIGHT?
    13  **A.** NO.
    14  **Q.** OKAY. AND SO YOU DO NOT ACTUALLY KNOW HOW MANY REQUESTS
    15  FOR ACCOMMODATIONS ARE NOT BEING --
    16  **A.** NO.
    17  **Q.** -- RECORDED?
    18  **A.** I DO KNOW. THAT'S WHY IT'S NOT AN ASSUMPTION.
    19  **Q.** AND HOW DO YOU KNOW THAT?
    20  **A.** AGAIN, AS I WAS TESTIFYING BEFORE, THERE IS A LACK OF --
    21  THERE ARE DIFFERENCES IN THE NUMBER OF FORMS THAT YOU PROVIDED
    22  VERSUS WHAT THE QI/QA QUARTERLY REPORTS INDICATE. AND THE
    23  REPORTS UNDER-REPORT THE NUMBER OF THE FORMS THAT WERE
    24  SUBMITTED.
    25  **Q.** AND I'M NOT ASKING ABOUT QA/QI.

09:23 1        I'M ASKING -- YOU LOOKED AT SEVERAL REQUESTS FOR

2  ACCOMMODATION.  CORRECT?

3  **A.**   I DID.

4  **Q.**   AND YOU'RE SAYING THAT THEY ARE NOT ALL LOGGED INTO THE

5  ADA DATABASE?

6  **A.**   THAT'S CORRECT.

7  **Q.**   AND YOUR BASIS FOR THAT IS BECAUSE OF SOMETHING WITH THE

8  QA/QI REPORT?

9  **A.**   WELL, THESE ARE ALL YOUR DOCUMENTS.  SO THE -- ALL THE

10  FORMS THAT YOU'VE SUBMITTED THAT INMATES OR OTHERS ON THEIR

11  BEHALF HAD CREATED IS ONE NUMBER, AND THEN YOU LOOK AT THE

12  QI/QA REPORTS AND THEY HAVE DIFFERENT NUMBERS FOR ALL BUT ONE

13  QUARTER FOR THE LAST SEVERAL YEARS.

14  **Q.**   AREN'T YOU BASING THIS ON THE COURT'S PRIOR FINDINGS?

15  **A.**   NO, SIR.  THIS IS -- THIS IS -- THIS IS -- THIS IS A

16  SEPARATE ANALYSIS BASED ON THE RAW MATERIAL THAT YOU PROVIDED

17  TO US.

18  **Q.**   YOU REALIZE THAT IN THE COURT'S PRIOR RULINGS THAT SHE HAD

19  SAID THAT THERE WAS EVIDENCE THAT THE ADA -- SOME ADA REQUESTS

20  FOR ACCOMMODATION WERE NOT BEING RECORDED.  CORRECT?

21  **A.**   YES.

22  **Q.**   OKAY.  AND DO YOU ALSO REALIZE THAT THAT WAS PARTLY BASED

23  ON AN AUDIT PERFORMED IN 2014 BY DOC THAT HAD THAT OUTCOME?

24  **A.**   YES.

25  **Q.**   THIS IS NOTED IN THE RULING.

09:24 1    **A.**   BUT I'M REFERRING TO DATA THAT IS -- THAT REFERENCES THE

2    PERIOD IN QUESTION, AS YOU DEFINED IT, FROM 2019 FORWARD.

3    **Q.**   SO JUST TO MAKE SURE I UNDERSTAND, YOUR SOLE BASIS FOR

4    SAYING THAT THERE'S UNDER-REPORTING OF ADA REQUESTS FOR

5    ACCOMMODATIONS IS THE QA/QI REPORT?

6    **A.**   NO.  IT'S THE ACTUAL DOCUMENTS AND THEN HOW IT'S

7    TRANSLATED OR NOT TRANSLATED INTO THE REPORT.

8    **Q.**   I'M JUST TRYING TO MAKE SURE I UNDERSTAND.

9                SO THERE ARE REQUESTS FOR ACCOMMODATIONS.  THEY ARE

10   SUBMITTED.  YOU REVIEWED THESE?

11   **A.**   RIGHT.

12   **Q.**   AND YOU'RE SAYING THERE ARE SOME OUT THERE THAT ARE NOT

13   BEING SUBMITTED?

14   **A.**   NO.  I'M SAYING THAT NOT ALL THAT ARE SUBMITTED ARE MAKING

15   THEIR WAY INTO THE -- INTO THE -- INTO THE QUARTERLY REPORTS.

16   **Q.**   AND I'M NOT ASKING YOU ABOUT THAT.  I'M ASKING YOU ABOUT

17   THE DATABASE, THE TRACKING DATABASE, THE ADA TRACKING DATABASE,

18   NOT THE QI/QA REPORTS.  I'M ASKING YOU DO THE REQUESTS FOR

19   ACCOMMODATION, AS FAR AS YOU KNOW, ALL GET LOGGED INTO THE ADA

20   TRACKING DATABASE?

21   **A.**   ALL I KNOW IS WHAT I KNOW; AND THAT IS, THAT ALL OF THE

22   RAW DATA IS NOT BEING TRANSLATED INTO DOCUMENTS THAT DOC IS

23   PRODUCING.

24   **Q.**   OKAY.  SO YOU HAVE NO ANSWER?

25   **A.**   ALL MY ANSWERS ARE BASED ON THE INFORMATION THAT

09:26 1   DEFENDANTS HAVE PROVIDED TO US.

2   **Q.**   AND A MOMENT AGO I MENTIONED A DOC AUDIT FROM 2014, NOTING

3   THAT THERE WAS UNDER-REPORTING OF REQUESTS FOR ACCOMMODATIONS.

4        YOU'RE NOT AWARE OF ANY CURRENT AUDIT THAT HAS THAT

5   FINDING.  CORRECT?

6   **A.**   AN AUDIT?  NO.

7   **Q.**   OKAY.  AND YOU'RE NOT AWARE OF ANY SPECIFIC REQUESTS FOR

8   ACCOMMODATION MADE AT LSP DURING THE RELEVANT PERIOD THAT HAVE

9   GONE UNANSWERED?

10  **A.**   I'M SORRY.  YOU'RE READING VERY QUICKLY.

11  **Q.**   YOU ARE NOT AWARE OF ANY SPECIFIC REQUESTS FOR

12  ACCOMMODATION MADE AT LSP DURING THE RELEVANT PERIOD THAT HAVE

13  GONE UNANSWERED.  CORRECT?

14  **A.**   WELL, NOT -- NOT IN TERMS OF THE FORMS.  AND CERTAINLY IN

15  THE COURSE OF MY CONVERSATIONS, INTERVIEWS WITH THE INDIVIDUALS

16  WITH WHOM I SPOKE DURING MY INSPECTION, THERE WERE A NUMBER OF

17  COMPLAINTS ABOUT ISSUES THAT THEY HAD THAT REMAINED

18  UNADDRESSED.  WE HEARD FROM ONE GENTLEMAN YESTERDAY.

19  **Q.**   OKAY.  YEAH.  I MEAN, WE CAN GET INTO THAT LATER.  I JUST

20  WANT TO MAKE SURE -- SO THAT'S YOUR ANSWER TO THE QUESTION.

21        AND YOU SAID IN YOUR DEPOSITION THAT YOU TALKED TO A

22  NUMBER OF INMATES WHO, IT APPEARED, HAD NOT BEEN ACCOMMODATED

23  CORRECTLY.  ISN'T THAT TRUE?

24  **A.**   YES.

25  **Q.**   ALL RIGHT.  AND YOU ADMITTED THAT THIS ASSUMPTION WAS

09:27 1  BASED ENTIRELY UPON WHAT THE INMATES TOLD YOU?

2  **A.**   YES.  AND, AGAIN, THAT'S BECAUSE WE WERE NOT PERMITTED TO

3  REVIEW ANY FILES.

4  **Q.**   OKAY.  THANK YOU.

5       AND BASED ON THE DOCUMENTATION REVIEWED,

6  APPROXIMATELY HOW MANY REQUESTS FOR ACCOMMODATION WERE DENIED?

7  DO YOU KNOW?

8  **A.**   I WOULDN'T BE ABLE TO TELL YOU THAT NOW.  I WOULD SAY THAT

9  A NUMBER OF THE DETAINEES -- EXCUSE ME -- OF THE INMATES HAD

10  REQUESTS THAT HAD NOT BEEN ADDRESSED.

11  **Q.**   OKAY.  AND I'M TALKING ABOUT THE REQUESTS FOR

12  ACCOMMODATION YOU ACTUALLY REVIEWED.  OF THOSE, HOW MANY WERE

13  DENIED?

14  **A.**   I DON'T HAVE A TALLY FOR YOU.

15  **Q.**   IF IT WERE 15, WOULD THAT SOUND LIKE A REASONABLE NUMBER,

16  BASED ON YOUR REVIEW?

17  **A.**   WELL, I REVIEWED SEVERAL HUNDRED, IF I RECALL CORRECTLY.

18  **Q.**   OKAY.  WELL, I DOUBT THAT.

19       THE REQUESTS FOR ACCOMMODATION FORMS WERE AT THE

20  BEGINNING OF THE DOCUMENTS YOU WERE LOOKING AT.

21  **A.**   RIGHT.  YEAH.  I'M SORRY.  I DON'T REMEMBER WHAT THE --

22  **Q.**   OKAY.

23  **A.**   I DON'T REMEMBER WHAT THAT TOTAL NUMBER WAS.

24  **Q.**   ALL RIGHT.  VERY GOOD.

25       WOULD THE DENIAL OF A REQUEST FOR ACCOMMODATION

09:28 1   NECESSARILY MEAN THAT THE INMATE'S RIGHT --

2                **THE COURT REPORTER:**  YOU HAVE TO SLOW DOWN.

3                **MR. CODY:**  I'M SORRY.  I'M SORRY.

4   **BY MR. CODY:**

5   **Q.**   WOULD THE DENIAL OF A REQUEST FOR ACCOMMODATION

6   NECESSARILY MEAN THAT THE INMATE'S RIGHTS ARE BEING VIOLATED?

7   **A.**   NOT NECESSARILY.

8   **Q.**   YOU WOULD AGREE THAT THERE CAN BE A LEGITIMATE REASON FOR

9   DENYING A REQUEST FOR ACCOMMODATION?

10  **A.**   THERE MAY BE.

11  **Q.**   NOW, YESTERDAY COUNSEL ASKED YOU HOW YOU SELECTED THE POOL

12  OF INMATES YOU INTERVIEWED DURING THE SITE VISIT.  DO YOU

13  RECALL THAT?

14  **A.**   I'M SORRY.  REPEAT THAT, PLEASE.

15  **Q.**   YESTERDAY YOUR COUNSEL ASKED YOU HOW YOU SELECTED THE POOL

16  OF INMATES THAT YOU INTERVIEWED DURING THE SITE VISIT?

17  **A.**   YES.

18  **Q.**   OKAY.  YOU INDICATED IN YOUR DEPOSITION THAT THE INMATES

19  YOU SELECTED TO INTERVIEW DURING YOUR SITE VISIT WERE PARTLY

20  BASED ON WHETHER THEIR REQUESTS FOR ACCOMMODATION HAD BEEN

21  DENIED.  IS THAT CORRECT?

22  **A.**   YES.

23  **Q.**   OKAY.  WOULD IT SURPRISE YOU TO LEARN THAT OF THE INMATES

24  YOU LIST IN YOUR SITE VISIT NOTES, ONLY THREE OF THOSE INMATES

25  HAD SUBMITTED ANY REQUEST FOR ACCOMMODATION?

09:29 1    A.    I DON'T KNOW.

2    Q.    OKAY.  AND, AGAIN, THIS IS BASED ON THE DOCUMENTS THAT

3    WERE SUPPLIED IN DISCOVERY?

4    A.    YES.

5    Q.    OKAY.  AND IF I WERE TO TELL YOU THAT OF THOSE THREE

6    INMATES WHO YOU INTERVIEWED, ONLY ONE OF THEM ACTUALLY HAD A

7    REQUEST FOR ACCOMMODATION DENIED, WOULD THAT SURPRISE YOU?

8    A.    I DON'T KNOW.

9    Q.    YOU DON'T KNOW IF IT WOULD SURPRISE YOU?

10   A.    WELL, I DON'T KNOW.

11   Q.    OKAY.  BUT YOU DON'T REFUTE THAT?

12   A.    I DON'T HAVE ENOUGH INFORMATION TO DO EITHER.

13   Q.    WELL, YOU DID HAVE THE REQUEST FOR ACCOMMODATION.  RIGHT?

14   A.    YES.

15   Q.    OKAY.  AND YOU DID REVIEW THOSE?

16   A.    YES.

17   Q.    OKAY.  AND ACCORDING TO WHAT COUNSEL ASKED YOU ABOUT, THAT

18   WAS PARTLY WHAT -- YOU KNOW, HOW YOU CAME UP WITH THE LIST OF

19   INMATES FOR YOU TO TALK TO WHEN YOU WERE AT YOUR SITE VISIT?

20   A.    THAT'S CORRECT.

21   Q.    OKAY.  LET'S TALK ABOUT ORDERLIES.

22         YOU DID NOT OBSERVE ANY INSTANCES OF ABUSE BY

23   ORDERLIES DURING YOUR SITE VISIT.  CORRECT?

24   A.    I DID NOT.

25   Q.    YOU DID NOT OBSERVE ANY INSTANCES OF NEGLECT BY ORDERLIES

09:30 1  DURING THE SITE VISIT?

2  **A.**   I DID NOT.

3  **Q.**   YOU DID NOT OBSERVE ANY INSTANCES OF MISCONDUCT BY

4  ORDERLIES DURING THE SITE VISIT?

5  **A.**   I DID NOT.

6  **Q.**   YOU DID NOT OBSERVE ORDERLIES PROVIDING WOUND CARE TO

7  PATIENTS?

8  **A.**   I'M SORRY.

9  **Q.**   YOU DID NOT OBSERVE ORDERLIES PROVIDING WOUND CARE TO

10  PATIENTS?  DO YOU KNOW WHAT I MEAN WHEN I SAY "WOUND CARE"?

11  **A.**   YEAH.  ACTUALLY, I DID.

12  **Q.**   OKAY.  AND WHAT DID YOU SEE?

13  **A.**   I BELIEVE I MENTIONED THIS YESTERDAY.  THERE WAS A YOUNG

14  MAN, HE WAS IN NURSING 2.  HE EVIDENCED BOTH EMOTIONAL

15  DIFFICULTIES AS WELL AS PHYSICAL CONCERNS, AND HE HAD BEDSORES

16  OR WOUNDS OF SOME SORT ON HIS POSTERIOR.  AND THOSE WERE

17  INMATES WHO WERE ATTENDING TO HIM.

18  **Q.**   AND WERE THEY DEBRIDING THE TISSUE?  WHAT WERE THEY DOING

19  EXACTLY?

20  **A.**   I COULDN'T DESCRIBE IT FOR YOU.  IT LOOKED LIKE THEY WERE.

21  **Q.**   OKAY.

22  **A.**   THEY WERE DOING NURSE WORK, I THOUGHT.

23  **Q.**   AND, AGAIN, YOU'RE NOT A MEDICAL EXPERT?

24  **A.**   NO, I'M NOT.

25  **Q.**   OKAY.  AND DID YOU SEE ANYBODY -- ANY ORDERLIES DISPENSING

09:31 1 MEDICATIONS TO PATIENTS DURING YOUR SITE VISIT?

2 **A.**   I BELIEVE THAT I DID.  I CAN'T SPEAK TO THAT SPECIFICALLY,

3 BUT I BELIEVE THAT I DID.

4 **Q.**   WHAT ABOUT BREATHING TREATMENTS?

5 **A.**   NO, NOT AT THAT TIME.

6 **Q.**   ALL RIGHT.  AND YESTERDAY YOU STATED THAT YOU HAD SPOKEN

7 WITH APPROXIMATELY TEN HEALTH CARE ORDERLIES DURING YOUR SITE

8 VISIT.  IS THAT CORRECT?

9 **A.**   YEAH.

10 **Q.**   YOU SAID THAT THE MAJORITY OF THEM WERE NAMED IN YOUR SITE

11 VISIT NOTES.  CORRECT?

12 **A.**   I BELIEVE SO.

13 **Q.**   YET DO YOU REALIZE THAT YOUR CONTEMPORANEOUS NOTES FROM

14 THE SITE VISIT REFLECT ONLY THE NAMES OF TWO CURRENT ORDERLIES?

15 **A.**   I KNOW I SPOKE TO MORE THAN THAT.

16 **Q.**   OKAY.  AND THEY JUST MIGHT NOT HAVE BEEN IDENTIFIED IN

17 YOUR SITE NOTES, I SUPPOSE?

18 **A.**   CORRECT.

19 **Q.**   OKAY.  AND I KNOW YOU SPOKE ABOUT ONE IN PARTICULAR:

20 BRUCE HINES?

21 **A.**   YES.

22 **Q.**   OKAY.  SO HE IS NOTED IN YOUR SITE NOTES.  ALL RIGHT.

23        NOW, LET'S TALK ABOUT BRUCE HINES.  YOUR NOTES FROM

24 THE SITE VISIT INDICATE THAT MR. HINES TOLD YOU THAT ORDERLIES

25 RECEIVE NO TRAINING EVER.  DOES THAT SOUND CORRECT?

09:32 1  A.   NOT WITHOUT SEEING MY NOTES, I DON'T RECALL.

2  Q.   AND I DON'T KNOW IF YOU HAVE ACCESS TO YOUR NOTES.

3  A.   I DID NOT BRING THEM.

4  Q.   WE CAN PULL THOSE UP ON THE SCREEN.  I THINK THOSE ARE

5  SEALED SITE NOTES.

6          **THE DEPUTY CLERK:**  THE WHAT?  THEY ARE SEALED OR NOT?

7          **MS. MONTAGNES:**  THEY ARE.

8          **MR. CODY:**  SITE NOTES ARE SEALED, YES.

9  **BY MR. CODY:**

10  Q.   OKAY.  CAN YOU LOOK AT PAGE 19 OF THE SITE VISIT NOTES,

11  PLEASE.

12  A.   OKAY.

13  Q.   AND DO YOU SEE -- I GUESS THAT LAST PARAGRAPH, THE TOP

14  LINE, CAN YOU READ THAT?

15  A.   YEAH.

16  Q.   OKAY.  SO DOES THAT SEEM TO SAY WHAT I JUST ASKED YOU THE

17  QUESTION ABOUT:  NO TRAINING EVER?

18  A.   YEAH.

19  Q.   OKAY.  AND YOU HAD NOT READ MR. HINES' --

20          **MR. CODY:**  YOU CAN TAKE THAT DOWN, MS. RAGUSA.

21  THANK YOU.

22  **BY MR. CODY:**

23  Q.   YOU HAD NOT READ MR. HINES' DEPOSITION WHEN YOU WROTE THIS

24  -- WROTE YOUR EXPERT REPORT.  RIGHT?

25  A.   THAT IS CORRECT.

1    Q.    BUT SINCE THEN YOU HAVE NOW READ IT?

2    A.    THAT'S RIGHT.

3    Q.    OKAY.  SO IF MR. HINES SAID IN HIS DEPOSITION THAT THE

4    ORDERLY TRAINING TOOK PLACE OVER THE COURSE OF FOUR TO FIVE

5    DAYS, WOULD YOU HAVE ANY BASIS TO DISPUTE THAT?

6    A.    NOT NECESSARILY.

7    Q.    OKAY.  AND IF MR. HINES TESTIFIED IN HIS DEPOSITION THAT

8    THE TRAINING HE RECEIVED COVERS ALL THE THINGS THAT HE DOES AS

9    A HEALTH CARE ORDERLY, YOU ALSO CANNOT DISPUTE THAT.  CORRECT?

10   A.    I CANNOT.

11   Q.    OKAY.  AND IF HE TESTIFIED THAT THE ORDERLY TRAINING WAS

12   GOOD, I SUPPOSE YOU DON'T DISPUTE THAT, EITHER?

13   A.    I DO NOT.

14   Q.    AND IF MR. HINES ALSO STATED UNDER OATH IN HIS DEPOSITION

15   THAT THE NURSES GIVE HIM INSTRUCTION AT TIMES, CAN YOU DISPUTE

16   THAT?

17   A.    I CANNOT.

18   Q.    YOU HAVE NOT READ DONALD MURRAY'S DEPOSITION.  RIGHT?

19   A.    I --

20   Q.    I'M SORRY.  YOU HAVE READ IT SINCE YOUR EXPERT REPORT?

21   A.    THAT'S RIGHT.

22   Q.    OKAY.  AND MR. MURRAY SAID A LOT OF POSITIVE THINGS ABOUT

23   THE ORDERLY PROGRAM AT LSP?

24   A.    YES, HE DID.

25   Q.    OKAY.  BUT YOU SAID YESTERDAY THAT HIS SWORN DEPOSITION

09:34 1   TESTIMONY DOES NOT CAUSE YOU TO CHANGE ANY OF YOUR OPINIONS

2   REGARDING ORDERLY CARE.  CORRECT?

3   **A.**   THAT IS CORRECT.

4   **Q.**   OKAY.  NOW, IN YOUR REPORT YOU SAY THAT "LSP MADE A LOT OF

5   BLATANTLY TEMPORARY IMPROVEMENTS PRIOR TO THE SITE VISIT IN

6   EARLY APRIL."  CORRECT?

7   **A.**   YEAH.

8   **Q.**   ALL RIGHT.  AND WHEN I ASKED YOU IN YOUR DEPOSITION TO

9   IDENTIFY WHAT THESE "BLATANTLY TEMPORARY IMPROVEMENTS" WERE,

10   THE ONLY THING THAT YOU COULD RECALL WAS THE PAPERS ON THE

11   NURSING STATION WINDOWS.  CORRECT?

12   **A.**   I BELIEVE I ENUMERATED MORE THAN THAT.

13   **Q.**   WELL, LET'S LOOK AT -- LET'S TALK ABOUT PARAGRAPH 45 OF

14   YOUR REPORT.

15        OKAY.  SO YOU HAD FOUR STORIES THAT YOU NOTED IN YOUR

16   REPORT THAT I GUESS -- IS IT FAIR TO SAY -- HIGHLIGHT ALL THE

17   DEFICIENCIES THAT YOU NOTED?

18   **A.**   WELL, THEY WERE ENDEMIC OF THE CONCERNS THAT I EXPRESSED.

19   **Q.**   OKAY.  VERY GOOD.

20        AND SO DO YOU RECALL ME ASKING YOU IN YOUR DEPOSITION

21   ABOUT 45_D, THE ONE THAT DEALT WITH THE SUICIDE WATCH?  DO YOU

22   RECALL THAT ONE?

23   **A.**   WHEN YOU SAY "45_D" --

24   **Q.**   OKAY.  SO 45, SUBPARAGRAPH D, I GUESS.

25   **A.**   OH, ALL RIGHT.

09:35 1    **Q.**   THAT WOULD HAVE BEEN THE PARTICULAR ACCOUNT OF SUICIDE

2    WATCH.

3    **A.**   OKAY.

4    **Q.**   AND WE CAN PULL IT UP ON THE SCREEN IF YOU NEED IT FOR

5    REFERENCE.

6    **A.**   NO, NO.  I'M GOOD.

7    **Q.**   OKAY.  BUT DO YOU RECALL ADMITTING THAT THAT ACTUALLY DID

8    NOT IMPLICATE ANY ADA ACCOMMODATION ISSUES?

9    **A.**   OH, I ACKNOWLEDGE THAT.

10   **Q.**   OKAY.  VERY GOOD.

11           AND THEN THE OTHER PARAGRAPHS, 45-A, B, AND C, YOU

12   DID NOT ACTUALLY OBSERVE ANY OF THOSE EVENTS.  CORRECT?

13   **A.**   YOU'RE GOING TO HAVE TO SHOW ME THAT SLIDE.  I DON'T

14   RECALL WHAT THOSE --

15   **Q.**   OKAY.  AND THAT'S FINE.  WE CAN DO THAT.  LET'S SEE.

16           **MR. CODY:**  MS. RAGUSA, IF YOU CAN PULL UP THE EXPERT

17   REPORT, PARAGRAPH 45.

18   **BY MR. CODY:**

19   **Q.**   OKAY.  SO YOU SEE THAT ON YOUR SCREEN?

20   **A.**   I SEE "A" AND "B."

21   **Q.**   OKAY.

22   **A.**   AND THEN PART OF "C" BELOW.

23   **Q.**   AND THEN YOU SEE PART OF "C."

24           OKAY.  SO "D" WE TALKED ABOUT.

25           DOES THIS REFRESH YOUR MEMORY?

09:36 1   **A.**   YEAH.

2   **Q.**   OKAY.  SO, AGAIN, SAME QUESTION:  THE EVENTS IN PARAGRAPHS

3   45-A, B, AND C, YOU DID NOT ACTUALLY WITNESS ANY OF THESE

4   OCCUR.  CORRECT?

5   **A.**   NO.  BUT I -- WELL, "C," HE WAS -- TO THE -- PART OF THE

6   -- THE CURRENT CONDITION AT THE TIME, I -- HE WAS GOING THROUGH

7   THAT WHEN I SPOKE WITH HIM.

8          THE TWO -- THE OTHER TWO, I SAW THE AFTERMATH; THAT

9   THE FIRST INDIVIDUAL, THE FIRST INMATE, IS NOW DEPENDENT ON A

10   WHEELCHAIR.

11          AND THE OTHER INMATE, I SAW THAT HIS LEG HAD, IN

12   FACT, BEEN AMPUTATED.

13   **Q.**   OKAY.  BUT I'M JUST TRYING TO MAKE SURE, YOU DID NOT

14   ACTUALLY WITNESS WHAT OCCURRED AS DETAILED IN THESE ACCOUNTS?

15   **A.**   ONLY AS I MENTIONED IN "C":  THAT HIS THROAT AT THAT POINT

16   WAS SWOLLEN.  HE COULD NOT SWALLOW AND HE HAD -- HE COMPLAINED

17   OF BEING -- HAVING DIFFICULTY BREATHING.

18   **Q.**   BUT YOU DON'T KNOW WHETHER THAT OCCURRED AS A RESULT OF

19   THE TRANSPORTATION ISSUE NOTED EARLIER IN THAT SAME

20   SUBPARAGRAPH?

21   **A.**   I DO NOT KNOW THAT.

22   **Q.**   RIGHT.  OKAY.  AND THEN WHAT YOU MENTIONED IN 45-A, IS

23   THAT THE GENTLEMAN THAT TESTIFIED YESTERDAY?

24   **A.**   I BELIEVE SO.

25   **Q.**   OKAY.  AND YOU'RE AWARE THAT YOUR SITE NOTES INDICATE THAT

09:38 1   THAT OCCURRED IN 2018.  CORRECT?

2   **A.**   I DON'T KNOW WHAT THE NOTE SAYS.

3   **Q.**   OKAY.  BUT IF IT DOES SAY THAT, WOULD YOU -- I CAN SHOW IT

4   TO YOU, BUT, I MEAN --

5   **A.**   NO, IF YOU SAY THAT'S WHAT IT IS.

6   **Q.**   OKAY.  ALL RIGHT.  AND YOU UNDERSTAND THE RELEVANT PERIOD

7   IN THIS CASE IS 2019 TO PRESENT?

8   **A.**   RIGHT.

9   **Q.**   OKAY.  AND AS FAR AS THE TRANSPORTATION ISSUE, YOU

10   UNDERSTAND THAT TRANSPORTATION OF DISABLED INMATES IS NOT AN

11   ISSUE THAT HAS SURVIVED FOR THE REMEDY PHASE.  RIGHT?

12   **A.**   RIGHT.

13   **Q.**   OKAY.  YESTERDAY YOU MENTIONED -- YOU DISCUSSED BRIEFLY

14   ABOUT THE DOC'S BRIEFING BOOK.  DOES THE FACT THAT THE BRIEFING

15   BOOK NOT MENTION ADA COMPLIANCE AS A GOAL MEAN THAT LSP IS NOT

16   TRYING TO COMPLY WITH ADA?

17   **A.**   IT'S INDICATIVE OF WHAT THE DEPARTMENT INDICATES IS

18   IMPORTANT TO REPORT AND WHAT IT DOESN'T REPORT.

19   **Q.**   OKAY.  BUT, AGAIN, I MEAN, DOC COULD BE TRYING TO BECOME

20   ADA COMPLIANT WITHOUT ACTUALLY NOTING IT IN THEIR BRIEFING

21   BOOK?

22   **A.**   I SUPPOSE SO.

23   **Q.**   OKAY.

24   **A.**   BUT IF IT'S IMPORTANT, I WOULD EXPECT IT TO BE THERE.

25   **Q.**   AND THE SAME THING WITH THE FIVE-YEAR STRATEGIC PLAN:  ADA

09:39 1  COMPLIANCE CAN OCCUR, REGARDLESS OF WHETHER OR NOT IT'S NOTED
2  IN THE FIVE-YEAR STRATEGIC PLAN?
3  **A.**   WELL, WE WOULD KNOW BY READING THE REPORT THAT IT WAS NOT
4  IDENTIFIED AS ANY OF THE TOP TEN ISSUES.
5  **Q.**   OKAY.  BUT YOU'RE JUST SPECULATING THAT THE ABSENCE OF IT
6  BEING NOTED MEANS THEY'RE NOT PRIORITIZING IT?
7  **A.**   WELL, IT'S AN INFORMED OPINION AS A CORRECTIONS
8  ADMINISTRATOR WHO HAS GENERATED FIVE-YEAR REPORTS THROUGHOUT
9  HER CAREER.  IT WOULD BE HIGHLY UNUSUAL FOR IT NOT TO BE THERE
10  IF IT WAS, IN FACT, BEING AN AREA OF FOCUS.
11  **Q.**   AND LET'S TALK ABOUT TRAINING.
12        SO YOU'RE NOT QUALIFIED TO DETERMINE WHAT ACTUALLY IS
13  SUFFICIENT ADA TRAINING.  CORRECT?
14  **A.**   NOT -- WELL, AGAIN, AS A CORRECTIONAL ADMINISTRATOR I CAN
15  EVALUATE TRAINING PROGRAMS AND SPEAK TO THEIR OVERALL ADEQUACY.
16  **Q.**   TRAINING PROGRAMS IN GENERAL?
17  **A.**   YEAH.
18  **Q.**   OKAY.  BUT, AGAIN, YOU'VE NOT UNDERGONE ANY FORMAL ADA
19  TRAINING, YOU SAID YESTERDAY?
20  **A.**   THAT'S CORRECT.
21  **Q.**   AND YOU'VE ALSO NEVER ADMINISTERED ANY FORMAL ADA
22  TRAINING, YOU SAID YESTERDAY?
23  **A.**   NOT DIRECTLY.
24  **Q.**   OKAY.  ALL RIGHT.  AND SO YOU CAN'T SAY WHETHER
25  MS. OLIVEAUX'S TRAINING THAT SHE HAS HAD IS SUFFICIENT OR NOT?

09:41 1    **A.**   I DON'T BELIEVE THAT SHE HAD ANY.

2    **Q.**   OKAY.  AND YEAH, AT THE TIME OF HER DEPOSITION, THAT IS

3    CORRECT.

4         I THOUGHT YOU SAID YESTERDAY YOU HAD REVIEWED SOME

5    MATERIALS MAYBE SINCE THEN?

6    **A.**   DO YOU HAVE YESTERDAY'S TRANSCRIPT?

7    **Q.**   WELL, WE DON'T HAVE TO GET INTO IT THAT DEEPLY.  IF YOU

8    DON'T RECALL, THAT'S FINE.

9         BUT YOU'RE NOT AWARE, THEN, OF WHAT TRAINING SHE MAY

10   HAVE -- MS. OLIVEAUX MAY HAVE HAD SINCE HER DEPOSITION.  IS

11   THAT FAIR?

12   **A.**   SO WE'RE TALKING ABOUT THE NEW DEPUTY WARDEN --

13   **Q.**   YES, MA'AM.

14   **A.**   -- AT LSP.  WELL, MY RECOLLECTION IS SHE SAID SHE WOULD

15   HAVE THE SAME TRAINING THAT DEPUTY WARDEN FALGOUT HAD HAD.  AND

16   DEPUTY WARDEN FALGOUT NEVER HAD ANY TRAINING.

17   **Q.**   OKAY.  IS IT ACTUALLY TRUE THAT HE DID HAVE SOME TRAINING

18   BUT MAYBE YOU DON'T THINK IT WAS SUFFICIENT?

19   **A.**   MY RECOLLECTION FROM HIS DEPOSITIONS -- AND THERE WERE

20   SEVERAL -- IS THAT HE NEVER HAD TRAINING.

21   **Q.**   HE NEVER HAD ANY TRAINING WHATSOEVER?

22   **A.**   THAT IS -- THAT IS MY RECOLLECTION FROM HIS DEPOSITION.

23   **Q.**   SO IF HIS DEPOSITION REFLECTS HE HAD SIX HOURS OF

24   TRAINING, EVEN THOUGH A FEW -- SEVERAL YEARS AGO, YOU WOULD

25   DISAGREE WITH THAT?

09:42 1    **A.**   I'M TELLING YOU IT'S MY BEST RECOLLECTION.

2    **Q.**   OKAY.

3    **A.**   I'M NOT ARGUING WITH YOU.

4    **Q.**   THAT'S FINE.  THAT'S FINE.

5              AND AS FAR AS MS. SHARITA SPEARS, ARE YOU AWARE IF

6    SHE'S HAD TRAINING SINCE HER DEPOSITION WAS TAKEN?

7    **A.**   WELL, MS. SPEARS, I BELIEVE, HAS STARTED THAT 40-HOUR

8    PROGRAM, IF I RECALL CORRECTLY FROM HER DEPOSITION.  OR SHE WAS

9    ABOUT TO.  I DON'T RECALL.

10             **MR. CODY:**  OKAY.  ONE MOMENT, YOUR HONOR.

11             **THE COURT:**  OKAY.

12             **MR. CODY:**  ALL RIGHT.  THAT'S ALL I HAVE.

13                THANK YOU, DR. SCHRIRO.

14             **MR. ARCHEY:**  YOUR HONOR, IF I MAY?

15             **THE COURT:**  REDIRECT.

16             **MR. ARCHEY:**  I'M SORRY TO INTERRUPT.

17             **THE COURT:**  GO AHEAD.

18             **MR. ARCHEY:**  THE AUDIO AND EVERYTHING, IT'S STILL NOT

19   WORKING.  SO WE'RE GETTING CALLS THAT THEY CAN'T HEAR, THE

20   PEOPLE THAT ARE TRYING TO OBSERVE THE TRIAL.

21             **THE COURT:**  OKAY.  I HEARD THE FIRST PART OF THAT,

22   BUT I DID NOT HEAR --

23             **MR. ARCHEY:**  I'M SORRY.

24             **THE COURT:**  I JUST TOTALLY BLANKED ON THE SECOND --

25   THE AUDIO IS STILL NOT WORKING AND --

09:43 1        **MR. ARCHEY:** THAT'S IT. THAT THEY ARE TRYING TO
2 MONITOR THE TRIAL AND THEY ARE NOT ABLE TO. THAT'S ALL.
3        **THE COURT:** OKAY. THANK YOU FOR BRINGING THAT TO OUR
4 ATTENTION. LET'S SEE WHAT WE CAN FIND OUT FROM I.T.
5        **THE DEPUTY CLERK:** I HAVE PEOPLE LISTENING.
6        **MR. VINING:** SECRETARY LEBLANC AND DR. LAVESPERE ARE
7 NOT ABLE TO HEAR. THEY ARE LOGGED ON SEPARATELY. I'M NOT
8 SURE.
9        **THE DEPUTY CLERK:** ARE THEY IN THE VIDEO, YOU MEAN?
10        **MR. VINING:** THEY ARE ON THE ZOOM.
11        **THE DEPUTY CLERK:** RIGHT. AND THEY CAN'T HEAR?
12        **MR. VINING:** THEY CANNOT.
13        **THE DEPUTY CLERK:** OKAY.
14        **MR. ARCHEY:** I APOLOGIZE, YOUR HONOR.
15        **MS. MONTAGNES:** YOUR HONOR, IF I MAY, OUR STAFF ARE
16 CALLING INTO THE OUTSIDE LINE AND THAT'S WORKING FINE. SO I
17 MIGHT SUGGEST THEY CALL INTO THE OUTSIDE LINE, AND THEY CAN
18 HAVE THE VISUAL SIDE BY SIDE.
19        **THE COURT:** SO THE AUDIO LINE IS WORKING. IT'S JUST
20 THE AUDIO THAT'S CONNECTED TO THE VIDEOCONFERENCE APPARENTLY IS
21 NOT FUNCTIONAL. SO AS A WORK-AROUND, IF THEY COULD CALL INTO
22 THE AUDIO LINE, I'LL HAVE I.T. LOOK AT WHAT THE ZOOM SETTINGS
23 ARE. IT MAY BE THAT -- IT MAY BE THAT WHEN WE MUTE IT THAT IT
24 MUTES IT ON BOTH SIDES. I'M NOT SURE.
25        OKAY. REDIRECT.

09:44  1              MS. RAMASWAMY:  YOUR HONOR, IF WE COULD HAVE THE

       2     COURT'S INDULGENCE FOR A MINUTE?

       3              THE COURT:  TAKE A SECOND.

       4                   MR. CONINE, WHY ARE YOU STANDING UP?  YOU ARE

       5     JUST STRETCHING YOUR LEGS?

       6              MR. CONINE:  THAT'S RIGHT.

       7              THE COURT:  FEEL FREE.

       8              THE DEPUTY CLERK:  I MADE A CHANGE.  THAT'S NOT

       9     RIGHT.  THAT WASN'T IT.  I DON'T KNOW.

      10              THE COURT:  YOU KNOW, I TRY TO HELP YOU PEOPLE AND IT

      11     JUST BITES ME EVERY TIME.  I AM NOT GOING TO BE HELPFUL

      12     ANYMORE.

      13              MS. MONTAGNES:  NO MORE COOKIES, JUDGE?

      14              THE COURT:  NO MORE COOKIES.  I HAVE COOKIES.  YOU

      15     PEOPLE ARE NOT GETTING COOKIES.

      16                   SO WHAT'S THE STORY, SUZIE?  DO WE KNOW WHAT WE

      17     ARE --

      18              THE DEPUTY CLERK:  I AM CHECKING IN.  KELL IS GETTING

      19     ON MY COMPUTER TO SEE WHAT'S GOING ON.

      20              THE COURT:  OKAY.  ALL RIGHT.  REDIRECT.

      21                        REDIRECT EXAMINATION

      22     BY MS. RAMASWAMY:

      23     Q.   HI, DR. SCHRIRO.

      24     A.   GOOD MORNING.

      25     Q.   HAVE YOU BEEN ALLOWED TO VIEW THE DATABASE AT LSP, THE ADA

09:45 1  DATABASE?

2  **A.**   YES.

3  **Q.**   HAVE YOU BEEN ALLOWED TO VIEW THE DATABASE AT LSP?

4  **A.**   OH, I'M SORRY.  NO.

5  **Q.**   WHY NOT?

6  **A.**   WE WERE JUST -- IT WAS DISALLOWED.

7  **Q.**   IN YOUR REVIEW OF THE ADA REQUESTS FOR ACCOMMODATION THAT

8  WERE PRODUCED BY DEFENDANTS, DO YOU REMEMBER WHETHER YOU SAW

9  ANY ARPS LOGGED IN THERE?

10  **A.**   I DID.

11  **Q.**   YOU DID?  ARPS?

12  **A.**   I'M SORRY.  ASK THE QUESTION AGAIN.

13  **Q.**   WERE THERE ARPS INCLUDED IN THE DOCUMENTS PRODUCED BY

14  DEFENDANTS FOR REQUESTS FOR ACCOMMODATION?

15  **A.**   I BELIEVE SO.  NO?

16  **Q.**   WE CAN PULL IT UP.

17  **A.**   OKAY.

18  **Q.**   THAT IS PLAINTIFFS' EXHIBIT 36, I THINK, BUT I CAN

19  DOUBLE-CHECK.  YEAH, 36.  AND THAT'S SEALED.

20          CAN YOU JUST PULL IT UP AND SCROLL A LITTLE BIT.

21          SO IN THESE DOCUMENTS ARE THERE ARPS IN HERE?

22          **THE DEPUTY CLERK:**  IT'S SEALED?

23          **MS. RAMASWAMY:**  IT'S SEALED, YES.

24          **THE DEPUTY CLERK:**  OKAY.

25  **BY THE WITNESS:**

09:47 1  **A.**   YOU KNOW, I'M A BIT CONFUSED BECAUSE THE -- BECAUSE THE

2  ARP IS THE -- IN THE TRAINING IS IDENTIFIED AS THE MEANS FOR

3  SUBMITTING THE WRITTEN REQUEST.

4  **Q.**   ARE THERE RECORDS OF ARPS IN THIS DOCUMENT?

5  **A.**   NOT BY THAT NAME, NO.

6  **Q.**   OKAY.  DOES THE ADA REQUIRE INMATES TO MAKE REQUESTS FOR

7  ACCOMMODATION IN ANY FORMAL WAY?

8  **A.**   NO.  IT ALLOWS FOR ANY MEANS POSSIBLE.

9  **Q.**   AND DOES LSP'S TRACKING DATABASE APPEAR TO CONTAIN

10  REQUESTS NOT MADE THROUGH FORMAL CHANNELS?

11  **A.**   IT'S DIFFICULT TO TELL BECAUSE THEY ARE IN A COMPUTERIZED

12  OR A TYPED FORMAT.  SO I DON'T KNOW WHAT THE ACTUAL SOURCE IS.

13  **Q.**   DID DEFENDANTS ALLOW YOU TO REVIEW ANY FILES DURING THE

14  SITE VISIT?

15  **A.**   THEY DID NOT.

16  **Q.**   IN YOUR REVIEW OF THE DEPOSITION OF SHARITA SPEARS, WAS

17  SHE TALKING ABOUT CURRENT CONDITIONS AND CURRENT THINGS THAT

18  WERE HAPPENING WITH RESPECT TO ADA COMPLIANCE AT LSP, OR WAS

19  SHE TALKING ABOUT PLANS FOR THE FUTURE?

20  **A.**   THOSE WERE PLANS FOR THE FUTURE.

21  **Q.**   AS ADA COORDINATOR OF LSP, DO ASHLI OLIVEAUX'S DUTIES ALSO

22  INCLUDE STAFF ACCOMMODATION REQUESTS?

23  **A.**   YEAH.

24  **Q.**   DO HER DUTIES ALSO INCLUDE VISITOR ACCOMMODATION REQUESTS?

25  **A.**   YES.

09:48 1  **Q.**  AND IS SHE ALSO RESPONSIBLE FOR MAKING SURE THAT LSP IS IN

2  COMPLIANCE WITH THE PHYSICAL BARRIER ASPECTS OF THE ADA?

3  **A.**  YES.

4  **Q.**  YOU MENTIONED DURING YOUR CROSS-EXAMINATION WITH MR. CODY

5  THAT YOU HAVE CONCERNS ABOUT THE OUTSIDE CONSULTANT MENTIONED

6  IN SHARITA SPEARS' DEPOSITION.  DO YOU WANT TO SAY MORE ABOUT

7  THAT?

8  **A.**  I DO.  THANK YOU.  THE GROUP IS CALLED ACCESSOLOGY.  AND

9  IT APPEARS THAT THEY ARE GOING TO MAKE A ZERO-BASED REVIEW,

10  WHICH WOULD START WITH ALL OF THE PHYSICAL PLANT-TYPE BARRIERS,

11  AND THAT WAS GOING TO BE THE FIRST AREA OF THEIR FOCUS.

12  **Q.**  AND WHY IS THAT CONCERNING TO YOU?

13  **A.**  WELL, IT'S DUPLICATIVE OF ALL THE WORK THAT'S BEEN GOING

14  ON IN THE LAST SEVERAL YEARS, AND IT SPEAKS TO ME THAT SHE IS

15  UNAWARE OF ANYTHING THAT'S HAPPENED IN THE MATTER, CERTAINLY IN

16  THE MOST -- SINCE THE 2019 PERIOD.

17       AND RELATED TO THAT, I RECALL ALSO IN HER DEPOSITION

18  THAT SHE HAD ONLY READ ONE SECTION OF THE COURT'S RULING, AND

19  THAT HAD TO DO WITH PHYSICAL BARRIERS.  SO SHE WAS LARGELY NOT

20  CONVERSANT AT THE TIME OF HER DEPOSITION ABOUT ANY OF THE WORK

21  THAT HAD BEEN DONE AND ANY OF THE AREAS OF -- THAT REQUIRED

22  REMEDY.

23       **MS. RAMASWAMY:**  RACHEL, CAN WE PULL UP WHAT'S BEEN

24  ENTERED INTO EVIDENCE AS JOINT EXHIBIT 75_A?  OKAY.  AND WE'RE

25  ON PAGE 8.

09:51 1  **BY MS. RAMASWAMY:**

2  **Q.**   OKAY, DR. SCHRIRO.  THIS IS THE DEPOSITION OF BRUCE HINES.

3  SO YOU REVIEWED THIS DEPOSITION.  RIGHT?

4  **A.**   I DID.

5  **Q.**   CAN YOU READ, STARTING AT THE TOP OF THE PAGE?

6  **A.**   I START AT LINE 24?

7  **Q.**   YES, PLEASE.

8  **A.**   OKAY.

9          "QUESTION:  OKAY.  DID YOU -- HAVE YOU HAD ANY

10  TRAINING WHILE YOU'VE BEEN AT LSP ON HOW TO DO YOUR DUTIES AS

11  AN INMATE ORDERLY?

12          "ANSWER:  I JUST -- WE JUST GRADUATED A CLASS, WHAT,

13  THREE, FOUR DAYS AGO.  BUT --

14          "QUESTION:  OKAY.  TELL ME ABOUT -- I'M SORRY.  GO

15  AHEAD.

16          "ANSWER:  WE JUST GRADUATED A CLASS THREE OR FOUR

17  DAYS AGO.

18          "QUESTION:  TELL ME ABOUT THE CLASS THAT YOU JUST

19  GRADUATED THREE OR FOUR DAYS AGO.

20          "WHAT WAS IT?

21          "ANSWER:  IT WAS A HEALTH CARE ORDERLY TRAINING

22  CLASS.

23          "QUESTION:  OKAY.

24          "ANSWER:  IT WAS NEEDED -- IT WAS NEEDED BECAUSE SOME

25  OF THE GUYS THAT CAME, THEY NEEDED SOME TRAINING."

09:52 1   **Q.**   WHAT DO YOU THINK ABOUT THAT?

2   **A.**   WELL, IT SPEAKS TO THE CONDITIONS THAT I OBSERVED:  THAT

3   MANY ORDERLIES ARE EITHER GETTING NO TRAINING OR GETTING

4   TRAINING SOME CONSIDERABLE TIME AFTER THEY'VE ALREADY STARTED

5   TO ASSUME THEIR DUTIES.

6          **MS. RAMASWAMY:**  CAN WE PULL UP NOW, RACHEL, WHAT'S

7   BEEN ENTERED AS JOINT EXHIBIT 73_A?

8   **BY MS. RAMASWAMY:**

9   **Q.**   SO, DR. SCHRIRO, THIS IS FROM THE DEPOSITION OF

10   WARDEN TRACY FALGOUT.  CAN YOU READ THE HIGHLIGHTED PORTION?

11   **A.**   YEAH.  "QUESTION" -- EXCUSE ME.

12          "ANSWER:  NO.  I MEAN, THE WEBSITE, THE ADA WEBSITE

13   COVERS EVERYTHING.

14          "QUESTION:  DO YOU DO ANYTHING TO KEEP TRACK OF

15   UPDATES TO ADA GUIDELINES?

16          "ANSWER:  I KEEP MYSELF FAMILIARIZED WITH WHAT'S

17   CURRENT AS BEST I CAN.

18          "QUESTION:  HOW?

19          "ANSWER:  JUST WITH REVIEWING THE GUIDELINES ON THE

20   ADA WEBSITE."

21          KEEP READING?

22   **Q.**   NO.  ACTUALLY, CAN YOU SKIP TO LINE 25?  SORRY ABOUT THAT.

23   NO.  GO BACK.  YEAH, SO LINE 25, PAGE 46.

24   **A.**   OKAY.  AT THE BOTTOM THEN?

25   **Q.**   YES.

09:53 1   **A.**   "QUESTION:  OKAY.  DID YOU RECEIVE ANY FORMAL" --

2   **Q.**   KEEP GOING.

3   **A.**   -- "IN-PERSON TRAININGS UPON BECOMING AN ADA COORDINATOR?

4       "ANSWER:  NO."

5       KEEP GOING?

6   **Q.**   YEP.  THREE MORE LINES.

7   **A.**   "QUESTION:  HAVE YOU EVER RECEIVED ANY FORMAL IN-PERSON

8   TRAINING ON THE ADA?

9       "ANSWER:  NO."

10   **Q.**   OKAY.  THANK YOU.

11       WE CAN TAKE THAT DOWN.

12       SO COUNSEL WAS ASKING YOU ABOUT YOUR REVIEW OF THE

13   DEPOSITION OF DONALD MURRAY, AND YOU TESTIFIED YESTERDAY THAT

14   HIS DEPOSITION -- READING HIS DEPOSITION -- AFTER YOU SUBMITTED

15   YOUR REPORT DIDN'T CHANGE YOUR OPINION AT ALL?

16   **A.**   CORRECT.

17   **Q.**   CAN YOU EXPLAIN WHY THAT IS?

18   **A.**   YEAH.  'CAUSE ALL THE CONDITIONS THAT I HEARD ABOUT FROM

19   THE VARIOUS ORDERLIES IS CONSISTENT WITH HIS STATEMENTS AND

20   THAT OF THE OTHER INMATE.

21       I HAVE ANOTHER OBSERVATION.  OR WOULD YOU LIKE TO ASK

22   ANOTHER QUESTION FIRST?

23   **Q.**   NO.  GO AHEAD.

24   **A.**   OKAY.  ONE OF THE THINGS THAT STRUCK ME ABOUT THOSE TWO

25   DEPOSITIONS:  ONE OF THE INMATES WAS MORE FORCEFUL THAN THE

09:54 1   OTHER, BUT BOTH ARE OF CONCERN TO ME.  THERE'S A GOLDEN RULE IN
2   CORRECTIONS THAT YOU NEVER ALLOW INMATES -- ANY ONE OR MORE
3   INMATES TO BE IN CHARGE OR OVER OTHERS.  AND THE LACK OF
4   SUPERVISION THAT I DISCUSSED YESTERDAY BY ANY STAFF OF THE
5   ORDERLIES AS THEY PERFORM THEIR DUTIES WAS OF CONCERN FOR
6   VARIOUS REASONS.
7          BUT WHAT REALLY STOOD OUT WITH THOSE TWO DEPOSITIONS,
8   ESPECIALLY -- I BELIEVE IT WAS MR. MURRAY, IS THAT -- IS THEY
9   WERE TALKING ABOUT WHEN THEY SAW SOMEBODY WHO WASN'T DOING
10   SOMETHING RIGHT, THEY WERE GOING TO REPORT IT AND THEY WERE
11   GOING TO GET THEM REMOVED.
12          AND I UNDERSTAND THERE WAS A LITTLE PROBABLY BOAST
13   GOING ON IN ALL OF THIS, BUT NO INMATE SHOULD BE CONVEYING TO
14   ANYONE THAT THEY -- THAT THEY HAVE CONTROL OVER OTHERS IN THE
15   SAME GROUP.  AND IT REALLY SPEAKS TO -- IF YOU'LL EXCUSE THE
16   PARDON -- THE LACK OF, YOU KNOW, ADULTS IN THE ROOM, THE LACK
17   OF ADULT SUPERVISION, A LACK OF SUPERVISION OF INDIVIDUALS WHO
18   ARE TASKED TO DO A JOB PURPORTEDLY UNDER THE SUPERVISION OF
19   QUALIFIED PERSONNEL.
20   **Q.**   DR. SCHRIRO, MR. CODY REPRESENTED THAT THERE ARE ONLY TWO
21   AND A HALF REQUESTS PER MONTH AT LSP.  GIVEN YOUR KNOWLEDGE,
22   YOUR EXPERIENCE, AND YOUR SITE VISIT AND THE SIZE OF LSP, DOES
23   THAT SEEM PLAUSIBLE TO YOU?
24   **A.**   IT REALLY SEEMS TO BE AN EXCEPTIONALLY LOW NUMBER.
25   **Q.**   THANK YOU.

09:56  1              MS. RAMASWAMY:  I HAVE NO FURTHER QUESTIONS,
       2   YOUR HONOR.
       3              THE COURT:  OKAY.  YOU MAY STEP DOWN.
       4              IS SHE RELEASED FROM HER SUBPOENA?  DO YOU
       5   REQUIRE HER -- I MEAN, SHE'S YOUR EXPERT.  SHE CAN STAY AS LONG
       6   AS SHE WANTS.
       7              MS. RAMASWAMY:  UNLESS YOUR HONOR HAS ANY QUESTIONS,
       8   THEN WE'RE READY TO RELEASE HER.
       9              THE COURT:  I HAVE NO QUESTIONS.
      10              THANK YOU, MA'AM.
      11              OKAY.  NEXT WITNESS.
      12              MS. MONTAGNES:  YOUR HONOR, WE DO WANT TO RESERVE OUR
      13   RIGHT TO CALL HER ON REBUTTAL.
      14              THE COURT:  OKAY.  NOTED.
      15              THE DEPUTY CLERK:  WHO IS THE NEXT WITNESS?
      16              THE COURT:  SIR, JUST A SECOND.  SHE IS GOING TO
      17   SWEAR YOU IN.
      18                      MARK J. MAZZ, AIA,
      19   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
      20              THE COURT:  COUNSEL, MAKE AN APPEARANCE, AND HAVE
      21   YOUR WITNESS STATE HIS NAME, PLEASE.
      22              MR. SCHNEIDERMAN:  GOOD MORNING, YOUR HONOR.
      23              BRENDAN SCHNEIDERMAN FOR THE PLAINTIFFS.
      24              PER THE COURT'S ORDER, WE WOULD LIKE TO MOVE TO
      25   ADMIT PLAINTIFFS' EXHIBIT 4 INTO THE RECORD.

09:58 1      **MS. TOMENY:** GOOD MORNING, YOUR HONOR.

2              CAROLINE TOMENY ON BEHALF OF THE DEFENDANTS.

3              AND WE DON'T HAVE AN OBJECTION TO THAT.

4      **THE COURT:** EXHIBIT 4 IS ADMITTED.

5                          **VOIR DIRE**

6  **BY MR. SCHNEIDERMAN:**

7  **Q.** GOOD MORNING, MR. MAZZ.

8              **THE DEPUTY CLERK:** WOULD YOU HAVE HIM STATE AND SPELL

9  HIS NAME, FOR THE RECORD?

10             **MR. SCHNEIDERMAN:** YEAH.

11 **BY MR. SCHNEIDERMAN:**

12 **Q.** COULD YOU PLEASE STATE AND SPELL YOUR FULL NAME, FOR THE

13 RECORD?

14 **A.** MARK MAZZ. M-A-Z-Z.

15 **Q.** AND HAVE YOU BEEN RETAINED BY PLAINTIFFS IN THIS CASE?

16 **A.** YES, I HAVE.

17 **Q.** AND WHAT WAS YOUR ASSIGNMENT IN THE REMEDIAL PHASE OF THIS

18 CASE?

19 **A.** TO REVIEW WHAT I'VE DONE, WHAT I SURVEYED IN 2016, AND

20 ASSESS WHETHER IT HAS BEEN CORRECTED OR NOT.

21 **Q.** AND WHAT KIND OF -- WHAT WERE YOU REVIEWING?

22 **A.** I WAS REVIEWING THE ACCESSIBILITY OF THE SPACES THAT ARE

23 USED FOR PROGRAM -- ACCESS FOR THE PROGRAMS THAT WE WERE

24 LOOKING AT.

25 **Q.** AND WERE YOU ABLE TO FORM AN OPINION?

09:58 1    **A.**    YES.

2    **Q.**    AND WHAT WAS THAT OPINION?

3    **A.**    THEY ARE NOT COMPLIANT WITH THE ADA.

4    **Q.**    DID YOU WRITE A REPORT TO SUPPORT AND EXPLAIN THAT

5    OPINION?

6    **A.**    I DID.

7    **Q.**    AND HAVE YOU HAD A CHANCE TO REVIEW THAT REPORT SINCE YOU

8    WROTE IT?

9    **A.**    YES.

10    **Q.**    DO YOU FEEL COMFORTABLE WITH THE CONCLUSIONS THAT YOU

11    REACHED?

12    **A.**    YES.

13    **Q.**    DID YOU FIND THAT -- ANY VIOLATIONS IN THE SPACES THAT

14    WERE SUBSTITUTED FOR SPACES YOU HAD ALREADY SURVEYED?

15    **A.**    YES, I DID.

16          **MR. SCHNEIDERMAN:**  YOUR HONOR, I'D MOVE TO TENDER

17    MR. MAZZ AS AN EXPERT IN ARCHITECTURAL BARRIERS UNDER THE ADA.

18    MR. MAZZ WAS PREVIOUSLY ACCEPTED AS AN EXPERT IN ARCHITECTURAL

19    BARRIERS UNDER THE AMERICANS WITH DISABILITIES ACT.  I AM HAPPY

20    TO RE-QUALIFY HIM NOW, BUT I KNOW WE'VE GOT A LOT TO GET

21    THROUGH.

22          **THE COURT:**  ANY OBJECTION TO THE TENDER, MS. TOMENY?

23          **MS. TOMENY:**  NO, YOUR HONOR.

24          **THE COURT:**  OKAY.  DOCTOR -- OR MR. MAZZ WILL BE

25    ACCEPTED AS AN EXPERT UNDER THE ADA IN THE FIELD OF

09:59 1 ARCHITECTURAL BARRIERS.

2                    YOU MAY PROCEED.

3                    **DIRECT EXAMINATION**

4 **BY MR. SCHNEIDERMAN:**

5 **Q.**   SO I WANT TO TALK JUST BRIEFLY ABOUT YOUR METHODOLOGY.

6         WHEN DID YOU LAST VISIT LSP?

7 **A.**   I VISITED IN APRIL OF 2022.

8 **Q.**   AND WHAT WAS THE PURPOSE OF THAT TRIP?

9 **A.**   IT WAS TO CHECK TO SEE IF THEY HAD REMEDIED ANY OF THE

10 BARRIERS THAT I HAD FOUND IN 2016.

11 **Q.**   AND HOW, IF AT ALL, DID THAT METHODOLOGY DIFFER FROM THE

12 METHODOLOGY YOU EMPLOYED WHEN YOU VISITED LSP FOR THE LIABILITY

13 PHASE?

14 **A.**   IT WAS THE SAME METHODOLOGY.

15 **Q.**   COULD YOU BRIEFLY REFRESH THE COURT'S MEMORY ON WHAT THAT

16 METHODOLOGY ENTAILS, JUST GENERALLY?

17 **A.**   USING THE ADA STANDARDS, THE ONE THAT'S MOST APPLICABLE, I

18 WOULD SURVEY -- I MEASURED THE VARIOUS ITEMS THAT ARE USED IN

19 THE PROGRAM ACCESS AREA.  SO I WOULD MEASURE THE TOILETS, THE

20 SINKS, AND STUFF LIKE THAT, THE DOORWAYS, MOVING SPACE OF

21 DOORS, AND SO ON, AND COMPARE IT TO THE STANDARDS.

22 **Q.**   CAN YOU EXPLAIN A BIT MORE ABOUT WHAT YOU MEAN BY "PROGRAM

23 ACCESS"?

24 **A.**   PROGRAM ACCESS IS YOU HAVE NEW CONSTRUCTION, YOU HAVE

25 ALTERATIONS; BOTH HAVE TO COMPLY WITH THE ADA STANDARDS.  THE

10:00 1   AREAS THAT HAVEN'T BEEN ALTERED IN THE LAST 30 YEARS SINCE THE

2   ENACTMENT OF THE ADA, IF YOU STILL NEED THEM FOR YOUR PROGRAMS,

3   YOU MUST ALSO MAKE THEM ACCESSIBLE.

4   **Q.**   AND JUST GENERALLY, I'D LIKE TO GO THROUGH SOME OF THE

5   PLACES YOU VISITED AND WHY.

6   **A.**   OKAY.

7   **Q.**   IN YOUR REPORT YOU LAY OUT SEVERAL DIFFERENT GEOGRAPHIC

8   AREAS THAT YOU SURVEYED.  LET'S START WITH THE ASH 2 DORM.

9        WHY DID YOU SURVEY ASH 2?

10   **A.**   BECAUSE THAT WAS THE DORM THAT THEY IDENTIFIED AS ONE

11   WHERE PERSONS WITH DISABILITIES ARE HOUSED.

12   **Q.**   AND YOU VISITED ASH 2 IN YOUR FIRST VISIT.  IS THAT RIGHT?

13   **A.**   YES.

14   **Q.**   AND WHY DID YOU VISIT ASH DORMS 1, 3, AND 4?

15   **A.**   BECAUSE PROGRAM ACCESS, THEY CAN SHIFT IT TO A DORM THAT

16   IS MORE ACCESSIBLE THAN OTHERS.  I WAS INFORMED THAT WARDEN

17   FAL --

18   **Q.**   FALGOUT.

19   **A.**   -- FALGOUT MENTIONED THAT THEY HAD SWITCHED THE HICKORY

20   AND CYPRESS DORMS TO THE ASH 1, 3, AND 4 DORMS.  SO I SURVEYED

21   THOSE INSTEAD THIS TIME.

22   **Q.**   SO THESE WERE SUBSTITUTIONS FOR ACCESSIBLE DORMS?

23   **A.**   YES.

24   **Q.**   AND WHY DID YOU VISIT THE TRUSTEE CAMP?

25   **A.**   THAT I UNDERSTAND TO BE THE MINIMUM-SECURITY AREA FOR

10:01 1  PERSONS WITH DISABILITIES.

2  **Q.**  SO THERE ARE INMATES WITH DISABILITIES THERE?

3  **A.**  YES.

4  **Q.**  AND WHY DID YOU VISIT THE TREATMENT SEGREGATION CELLBLOCK

5  NO. 28?

6  **A.**  BECAUSE I UNDERSTOOD THAT'S WHERE THEY HOUSED INMATES WITH

7  DISABILITIES WHO BELONG IN THAT SECTION.

8  **Q.**  AND THAT'S A MENTAL HEALTH WARD.  IS THAT RIGHT?

9  **A.**  YES.

10  **Q.**  AND WHY DID YOU CHOOSE THE CELLS THAT YOU SURVEYED IN

11  CELLBLOCK 28?

12  **A.**  I CHOSE THE CELLS THAT WARDEN FAL -- I HAVE TROUBLE WITH

13  THAT NAME.  SORRY.

14  **Q.**  IT'S ALL RIGHT.

15  **A.**  -- THE WARDEN IDENTIFIED AS THE ONES BEING THE ACCESSIBLE

16  CELLS.

17  **Q.**  OKAY.  AND WHY DID YOU VISIT THE NURSING UNITS IN THE

18  TREATMENT CENTER?

19  **A.**  BECAUSE THAT'S WHERE THE INMATES WITH DISABILITIES ARE

20  HOUSED.

21  **Q.**  AND WHY DID YOU SURVEY CELL NO. 4 IN NURSING UNIT 1?

22  **A.**  THAT WAS THE ONE THAT THEY IDENTIFIED AS THE ONE TO BE

23  ACCESSIBLE.

24  **Q.**  WHY DID YOU VISIT THE VISITOR'S CENTER?

25  **A.**  INMATES HAD -- PART OF THE PROGRAM SERVICES AND ACTIVITIES

10:03 1    INVOLVE ALSO BEING ABLE TO GO SEE VISITORS, AND WHEN THE

2    VISITORS COME, THAT'S WHERE YOU GO.  SO THE VISITOR AREA HAD TO

3    BE ACCESSIBLE AS WELL.

4    **Q.**   SO THAT GOES BACK TO THAT PROGRAM ACCESS POINT YOU WERE

5    TALKING ABOUT?

6    **A.**   YES, IT DOES.

7    **Q.**   OKAY.  LET'S LOOK AT THE REPORT ITSELF.

8          **MR. SCHNEIDERMAN:**  ALEXANDRA, CAN WE PULL UP

9    PLAINTIFFS' EXHIBIT 4?

10    **BY MR. SCHNEIDERMAN:**

11    **Q.**   I'M SHOWING YOU WHAT'S BEEN MARKED AS PLAINTIFFS'

12    EXHIBIT 4 IN EVIDENCE.

13          IS THIS YOUR REMEDY REPORT?

14    **A.**   YES.

15    **Q.**   AND CAN YOU DESCRIBE GENERALLY HOW THE REPORT IS

16    STRUCTURED?

17    **A.**   I BRIEFLY -- RIGHT IN THE FRONT IS THE PROCESS I DID, WHAT

18    I RELIED ON, AND THEN IDENTIFY IN SORT OF -- IT'S ACTUALLY IN A

19    SUMMARY STYLE WHAT WAS NON-COMPLIANT.  AND THEN BEHIND THAT I

20    BACKED IT UP WITH MY RÉSUMÉ, THE CHART IDENTIFYING THE BARRIERS

21    THAT I ACTUALLY IDENTIFIED WHERE THEY WERE, AND SO ON, BACKED

22    UP BY PHOTOS.

23    **Q.**   OKAY.

24          **MR. SCHNEIDERMAN:**  ALEXANDRA, COULD WE PULL UP

25    PAGE 11?

1    BY MR. SCHNEIDERMAN:

2    **Q.**    WHAT IS ATTACHMENT 2 TO YOUR REPORT?

3    **A.**    ATTACHMENT 2 IS THE CHART OF THE BARRIERS THAT I FOUND IN

4    THE AREAS THAT I LOOKED AT.

5    **Q.**    AND WHO DRAFTED THIS?

6    **A.**    I DID IT.

7    **Q.**    IT LOOKS LIKE IT'S ORGANIZED BY GEOGRAPHIC AREA IN LSP.

8    IS THAT RIGHT?

9    **A.**    THAT'S RIGHT.

10   **Q.**    SO I'D LIKE TO JUST TALK ABOUT WHAT EACH COLUMN MEANS.  WE

11   CAN TAKE THEM ONE BY ONE.

12   **A.**    OKAY.

13   **Q.**    I GUESS THE FIRST TWO, IGNORING THE LINE COLUMN,

14   "CITATION FOR REMEDIATION" AND "CITATION FOR NON-COMPLIANCE."

15   **A.**    UH-HUH.

16   **Q.**    WHAT ARE THOSE COLUMNS FOR?

17   **A.**    ANYTHING THAT WAS NOT ALTERED AFTER MARCH 15, 2012, AND IS

18   USED FOR PROGRAM ACCESS WOULD NEED TO COMPLY WITH THE 1991 ADA

19   STANDARDS.  ANYTHING THAT WAS ALTERED SINCE THEN WOULD HAVE TO

20   COMPLY WITH THE 2010 ADA STANDARDS.

21            SO WHAT I DID WAS -- AND I IDENTIFIED IN THE SECOND

22   COLUMN -- ACTUALLY THE THIRD COLUMN, WHAT THE -- IF IT DIDN'T

23   COMPLY WITH THE 1991 ADA STANDARDS, I IDENTIFIED THE CITATION

24   THERE WHERE I FOUND IT.  AND IF IT WAS ALTERED AFTER MY

25   PREVIOUS SITE VISIT OR -- YEAH, AFTER MY PREVIOUS SITE VISIT --

10:05 1    I WOULD HAVE IDENTIFIED IT IN THE 2010 ADA STANDARDS COLUMN

2           AND THE REASON I DO THIS IS I WANT TO MAKE SURE THAT

3    I NEVER GO BEYOND WHAT'S REQUIRED BY THE STANDARDS SO I CAN --

4    I ALWAYS FIND THE CITATION TO TAKE IT BACK TO THAT POINT SO

5    THAT PEOPLE CAN TRACK THAT BACK.

6    **Q.**   SO DOES EVERY ITEM IN YOUR REPORT CITE TO SOMETHING IN THE

7    ADA?

8    **A.**   YES.

9    **Q.**   OKAY.  AND THEN THIS "DESCRIPTION/ISSUE/REQUIREMENT"

10   COLUMN, YOU TALKED ABOUT THAT A BIT.

11   **A.**   THE "DESCRIPTION" COLUMN TELLS YOU WHAT IT IS REQUIRED TO

12   BE.  SO IF YOU TAKE LINE 3, CHANGES IN LEVEL THAT ARE NO MORE

13   THAN A QUARTER INCH MUST BE BEVELED, MEANING THAT HAS TO BE

14   SLOPED.

15           THE NEXT COLUMN, "BARRIERS," IDENTIFIES WHAT IS WRONG

16   WITH IT, HOW IT DOESN'T COMPLY WITH THAT; AND THAT BEING THE

17   EXPANSION JOINT COVERS ARE LOOSELY FITTING.  THEY ARE TALLER

18   THAN A QUARTER OF AN INCH AND THEY ARE NOT BEVELED.  SO THAT'S

19   WHERE I IDENTIFIED THAT, THEN I BACK IT UP WITH PHOTOS.

20   **Q.**   I WAS GOING TO ASK ABOUT THE "PHOTOS" COLUMN.

21   **A.**   OKAY.

22   **Q.**   SO GO AHEAD.

23   **A.**   SO I TRY TO BACK EVERYTHING UP WITH PHOTOS.  OCCASIONALLY,

24   PARTICULARLY IN PRISONS, YOU CAN'T GET THE SHOT WITHOUT INMATES

25   IN THE WAY, AND I VALUE PRIVACY.  I DON'T ALWAYS GET THE SHOT.

10:06 1          **MR. SCHNEIDERMAN:**  ALEXANDRA, COULD YOU PULL UP

2    PAGE 28?

3    **BY MR. SCHNEIDERMAN:**

4    **Q.**   AND THESE ARE THE PHOTOS YOU'RE TALKING ABOUT?

5    **A.**   YES.

6    **Q.**   AND THIS IS ATTACHMENT 3?

7    **A.**   YES.

8    **Q.**   AND WHO TOOK THESE PHOTOS?

9    **A.**   I TOOK THE PHOTOS.

10          **MR. SCHNEIDERMAN:**  ALEXANDRA, IF WE CAN GO BACK TO

11   PAGE 11.

12   **BY MR. SCHNEIDERMAN:**

13   **Q.**   SO YOU'VE GOT ANOTHER COLUMN, "DOJ SETTLEMENT LINE

14   NUMBER"?

15   **A.**   YES.

16   **Q.**   WHAT IS THAT REFERRING TO?

17   **A.**   LSP HAD A SETTLEMENT WITH DOJ.  AND IT'S COME UP A COUPLE

18   OF TIMES EITHER IN MY DEPOSITION OR JUST TALKING ABOUT THINGS.

19   SO I DECIDED TO COMPARE WHAT WAS REQUIRED IN THAT SETTLEMENT TO

20   WHAT I FOUND AND WHETHER THEY HAD TAKEN CARE OF THE ISSUES.

21   AND IF YOU SEE, IT'S -- I NOTE IN THAT COLUMN THERE, YOU'LL SEE

22   THAT NOT ONLY DID I IDENTIFY IT AS A BARRIER, BUT DOJ HAD

23   IDENTIFIED IT AS A BARRIER, AND IT'S STILL A BARRIER.

24   **Q.**   HOW, IF AT ALL, DID THAT SETTLEMENT IMPACT YOUR APPROACH

25   TO YOUR ASSIGNMENT IN THIS CASE?

10:07 1    A.    IT DID NONE.  IT DIDN'T AFFECT IT.

2    Q.    HOW, IF AT ALL, DOES THAT SETTLEMENT IMPACT YOUR FINDINGS

3    IN YOUR REPORT?

4    A.    IT DOES NOT.

5    Q.    OKAY.  I'D LIKE TO REVIEW JUST A FEW OF THE FINDINGS, JUST

6    TO ILLUSTRATE FOR THE COURT SOME OF THE ALLEGED VIOLATIONS THAT

7    YOU FOUND.

8         **MR. SCHNEIDERMAN:**  ALEXANDRA, CAN WE GO TO PAGE 2?

9    **BY MR. SCHNEIDERMAN:**

10   Q.    SO IF I CAN TURN YOUR ATTENTION TO NO. 1 UNDER "FINDINGS,

11   THE ACCESSIBLE ROUTES BETWEEN DORMITORIES AND OTHER FACILITIES

12   HAVE SEVERAL ABRUPT CHANGES IN LEVEL."  DO YOU REMEMBER THAT

13   FINDING?

14   A.    YES.

15   Q.    OKAY.  LET'S LOOK AT PICTURE DSC04656, WHICH IS AT

16   PLAINTIFFS' PAGE 48.

17        SO THIS IS A PICTURE OF ITEM 15 IN YOUR REPORT.

18   A.    OKAY.

19   Q.    IS THAT IN THE ASH 1 DORMITORY?

20   A.    YES.

21   Q.    AND YOU TESTIFIED EARLIER THAT YOU SURVEYED ASH 1 BECAUSE

22   IT'S ONE OF THE DORMS DEFENDANTS USE AS AN ACCESSIBLE DORM?

23   A.    YES.

24   Q.    SO HOW IS THIS AN EXAMPLE OF AN ABRUPT CHANGE IN LEVEL

25   UNDER THE ADA STANDARDS?

10:08 1    **A.**   THE THRESHOLD IN ANY CHANGE IN LEVEL CAN'T BE MORE THAN

2    THREE-QUARTERS OF AN INCH UNLESS IT'S RAMPED.  IF IT'S TALLER

3    THAN A QUARTER OF AN INCH, IT MUST BE BEVELED.  AND THIS IS

4    BECAUSE WHEN YOU APPROACH IT IN A WHEELCHAIR, THE WHEELS IN THE

5    FRONT, THE CASTER WHEELS, CAN BIND UP AGAINST THAT AND HAVE

6    TROUBLE GETTING OVER THE TOP OF IT.

7           THE INMATES GO THROUGH THIS DOOR TO GO OUT TO THE REC

8    YARDS, AND THEY COME BACK IN WHEN THEY WANT TO.  THAT BLOCKS A

9    PERSON WITH A WHEELCHAIR FROM BEING ABLE TO GET OUT THAT DOOR.

10   IT ALSO CAN INTERFERE WITH PEOPLE WHO HAVE TROUBLE LIFTING

11   THEIR LEGS AND MUST SHUFFLE THEIR FEET.

12   **Q.**   SO HOW IS THIS AN EXAMPLE OF A BARRIER TO PROGRAM ACCESS?

13   **A.**   INMATES GO IN AND OUT INDEPENDENTLY.  A PERSON IN A

14   WHEELCHAIR SHOULD ALSO BE ABLE TO GO OUT -- IN AND OUT

15   INDEPENDENTLY.

16          **MR. SCHNEIDERMAN:**  ALEXANDRA, CAN WE GO BACK TO

17   PAGE 2, AND IF WE SCROLL DOWN TO FINDING 13 ON THE NEXT PAGE.

18   **BY MR. SCHNEIDERMAN:**

19   **Q.**   YOU FOUND THAT CELLS ARE UNUSABLE FOR MANY INMATES IN

20   WHEELCHAIRS.  SO LET'S LOOK AT PICTURE DSC04941, WHICH IS ON

21   PLAINTIFFS' EXHIBIT -- PAGE 72 OF EXHIBIT 4.  AND THEN WE ALSO

22   HAVE PICTURE DSC05956, WHICH IS FROM THE LIABILITY TRIAL.  THAT

23   WAS AT PLAINTIFFS' EXHIBIT 7 ON PAGE 84.

24          DO YOU RECOGNIZE THE PICTURE ON THE RIGHT?

25   **A.**   I DO.

10:10 1  **Q.**   AND WHERE IS THAT FROM?

2  **A.**   IT'S CELLBLOCK 28, CELL NO. 1, SEGREGATION UNIT.

3  **Q.**   AND THIS IS FROM YOUR MOST RECENT SITE VISIT?

4  **A.**   YES.  IT'S FROM -- YEAH, 2022.

5  **Q.**   SO HOW IS THIS AN EXAMPLE OF AN UNUSABLE CELL UNDER THE

6  ADA STANDARDS?

7  **A.**   THESE PICTURES ARE FOCUSING IN ON CONTROLLING THE WINDOW.

8  THERE'S NO AIR CONDITIONING, SO YOU NEED TO OPEN THE WINDOW AND

9  CLOSE THE WINDOW FOR VENTILATION OR IF YOU GET COLD.

10       MANY QUADRIPLEGICS AND PARAPLEGICS HAVE TROUBLE

11  MAINTAINING BODY TEMPERATURE, THE WAY THAT SOMEBODY WHO HAS GOT

12  A COMPLETE SPINAL CORD CAN REGULATE THEIR OWN.  SO IT'S

13  IMPORTANT THAT THEY BE ABLE TO OPEN AND CLOSE THE WINDOW WHEN

14  NECESSARY.  AND IT WOULD BE JUST OVERLY BURDENSOME AND JUST NOT

15  PRACTICAL, NOT POSSIBLE TO HAVE SOMEBODY COME IN AND OPEN AND

16  CLOSE IT EVERY TIME THEY NEED IT DONE.

17  **Q.**   AND WHAT IS THE PICTURE ON THE LEFT?

18  **A.**   THAT'S ANOTHER CELL.  THAT WAS CELL 13 IN THE SAME AREA.

19  **Q.**   AND DID YOU TAKE THAT PICTURE?

20  **A.**   I TOOK THAT PICTURE.

21  **Q.**   DO YOU KNOW WHEN YOU TOOK THAT PICTURE?

22  **A.**   IN 2016.

23  **Q.**   SO THESE PHOTOS ARE ALMOST SIX YEARS APART?

24  **A.**   UH-HUH.  YES.

25  **Q.**   IS THE NATURE OF THE VIOLATION THE SAME AS IT WAS SIX

10:11 1  YEARS AGO?

2  **A.**   YES.

3  **Q.**   AND WHAT, IF ANYTHING, HAS LSP DONE TO AMELIORATE THAT

4  BARRIER?

5  **A.**   THEY HAVE DONE NOTHING.

6          **MR. SCHNEIDERMAN:**  ALEXANDRA, CAN WE GO BACK TO

7  PAGE 2 OF THE REPORT?  THANK YOU.

8  **BY MR. SCHNEIDERMAN:**

9  **Q.**   AND LET'S HAVE A LOOK AT FINDING 16:  "THE DORMS FROM ASH

10  1, 2, 3, AND 4, NURSING UNITS 1 AND 2 TO THE YARD LACK

11  SUFFICIENT MANEUVERING SPACE BESIDE THE LATCH SIDE OF THE DOORS

12  FROM ANY INMATES IN WHEELCHAIRS TO USE INDEPENDENTLY."  DO YOU

13  RECALL THAT FINDING?

14  **A.**   YES.

15  **Q.**   LET'S LOOK AT PICTURES DSC04660, WHICH IS AT PLAINTIFFS'

16  EXHIBIT 4, PAGE 49, AND PICTURE DSC06037 FROM THE LIABILITY

17  TRIAL, WHICH WAS AT PLAINTIFFS' EXHIBIT 7, PAGE 93.

18          DO YOU RECOGNIZE THIS PICTURE ON THE RIGHT?

19  **A.**   I DO.

20  **Q.**   AND WHERE DOES THAT COME FROM?

21  **A.**   I TOOK THAT PICTURE APRIL OF 2022.

22  **Q.**   AND HOW IS THIS AN ADA VIOLATION?

23  **A.**   THE MANEUVERING SPACE AT THE DOOR.  IN ORDER TO OPEN THAT

24  DOOR FROM THE OUTSIDE, A PERSON IN A WHEELCHAIR IS GOING TO

25  COME UP TO THE HANDLE, PULL IT OPEN, AND THE WHEELCHAIR WILL

10:12  1  KICK OUT TO ONE SIDE.  THAT'S WHERE THAT COLUMN IS.  AND YOU

2  NEED 18 INCHES TO MAKE THAT ALL WORK SO THEY CAN OPEN THE DOOR

3  AND GET THROUGH THE DOOR.

4  **Q.**  AND --

5  **A.**  IT'S --

6  **Q.**  SORRY.

7  **A.**  THE COLUMN BLOCKS THE ABILITY TO DO THAT.

8  **Q.**  AND DO YOU RECOGNIZE THE PICTURE ON THE LEFT?

9  **A.**  YES.

10  **Q.**  WHERE IS THAT FROM?

11  **A.**  THAT'S THE NURSING UNIT.  AND I TOOK THAT PICTURE IN 2016.

12  **Q.**  SO THESE PICTURES ARE ALSO ALMOST SIX YEARS APART?

13  **A.**  YES.

14  **Q.**  IS THE NATURE OF THE VIOLATION THE SAME IN BOTH PICTURES?

15  **A.**  YES.

16  **Q.**  AND HOW ARE THESE TYPES OF BARRIERS TYPICALLY AMELIORATED?

17  **A.**  WELL, IF YOU -- THE DOOR RIGHT NOW, IT'S HINGED ON THE

18  RIGHT WHEN YOU SWING IT OPEN TO YOU.  IF YOU HINGED IT ON THE

19  LEFT TO SWING IT OPEN, YOU'LL NOTICE THERE'S ENOUGH CONCRETE

20  OFF TO THE SIDE TO GET THE 18 INCHES IN, SO JUST RE-SWING THE

21  DOOR.

22  **Q.**  FLIPPING THE SIDE THAT THE HINGES ARE ON WOULD DO IT?

23  **A.**  YES.

24       **MR. SCHNEIDERMAN:**  ALEXANDRA, CAN WE GO BACK TO

25  PAGE 2, AND IF WE GO TO FINDING 2.

10:13 1 **BY MR. SCHNEIDERMAN:**

2 **Q.** "DRINKING FOUNTAINS ARE NOT PAIRED." DO YOU RECALL THAT

3 FINDING?

4 **A.** I DO.

5 **Q.** LET'S LOOK AT PICTURE DSC04643, WHICH IS AT PLAINTIFFS'

6 EXHIBIT 4, PAGE 46, AND PICTURE DSC05569 FROM THE LIABILITY

7 TRIAL, WHICH IS AT PLAINTIFFS' EXHIBIT 7, PAGE 41.

8 DO YOU RECOGNIZE THE PICTURE ON THE RIGHT?

9 **A.** I DO.

10 **Q.** WHERE DOES THAT COME FROM?

11 **A.** I TOOK THAT PICTURE THIS YEAR.

12 **Q.** SO THIS PICTURE IS FROM THE PILL CALL WINDOW NEAR ASH?

13 **A.** YES.

14 **Q.** AND YOU TESTIFIED EARLIER THAT YOU VISITED THAT DORM

15 BECAUSE INMATES WITH DISABILITIES LIVE THERE?

16 **A.** YES.

17 **Q.** SO HOW IS THIS AN ADA VIOLATION?

18 **A.** THE ADA REQUIRES DRINKING FOUNTAINS TO HAVE SPOUTS AT TWO

19 HEIGHTS. ONE HAS TO BE THE HEIGHT FOR A STANDARD -- A STANDARD

20 HEIGHT BECAUSE PERSONS WHO HAVE DIFFICULTY BENDING OVER STILL

21 WANT ACCESS TO THE WATER. AND THEN YOU HAVE TO HAVE AN

22 ACCESSIBLE HEIGHT.

23 **Q.** SO IT'S A REQUIREMENT UNDER THE ADA TO PAIR THE DRINKING

24 FOUNTAINS?

25 **A.** YES.

10:14 1    Q.    AND WHEN WAS THE PICTURE ON THE LEFT TAKEN?

2    A.    THAT WAS TAKEN IN 2016, THE SAME AREA.

3    Q.    SO WHAT, IF ANYTHING, HAS LSP DONE TO AMELIORATE THIS

4    BARRIER?

5    A.    THE PICTURE ON THE LEFT SHOWS THE STANDARD HEIGHT DRINKING

6    FOUNTAIN, NOT AN ACCESSIBLE FOUNTAIN.  SO WHAT I CALLED OUT WAS

7    THE FACT THAT IT DIDN'T HAVE AN ACCESSIBLE DRINKING FOUNTAIN.

8    WHAT THEY DID WAS THEY TOOK AWAY ONE THING THAT WAS, YOU KNOW,

9    ONE -- ONE HALF OF THE COMPLIANCE AND SUBSTITUTED THE OTHER

10   HALF OF THE COMPLIANCE AND BASICALLY TRADED ONE BARRIER FOR

11   ANOTHER.

12             **MR. SCHNEIDERMAN:**  OKAY.  THANKS, ALEXANDRA.

13   **BY MR. SCHNEIDERMAN:**

14   Q.    MR. MAZZ, HOW LONG DOES IT TAKE TO INSTALL A GRAB BAR?

15   A.    IT MIGHT TAKE 10 TO 15 MINUTES.

16   Q.    OKAY.  IN CLOSING, WE LOOKED AT A FEW ILLUSTRATIVE

17   PERSISTING VIOLATIONS THAT YOU FOUND.  ABOUT WHAT PERCENT OF

18   VIOLATIONS THAT YOU FOUND FROM YOUR FIRST VISIT WOULD YOU SAY

19   LSP REMEDIED?

20   A.    I'M SORRY.  SAY THAT AGAIN.

21   Q.    SO WE LOOKED AT A FEW ILLUSTRATIVE PERSISTING VIOLATIONS.

22   A.    YES.

23   Q.    BUT I'M WONDERING:  BROADLY ABOUT WHAT PERCENT OF THE

24   VIOLATIONS THAT YOU FOUND AT YOUR FIRST VISIT DID YOU FIND WERE

25   REMEDIED IN YOUR SECOND VISIT?

10:15 1   **A.**   JUST LOOKING AT THE NUMBER OF LINES IN THE REPORT, THEY

2   ADDRESSED ONLY 19 TO 20 PERCENT OF THEM.

3   **Q.**   OKAY.  AND GIVEN YOUR UNDERSTANDING OF THE AREAS YOU

4   INSPECTED, WOULD REMEDYING ANY OF THE BARRIERS YOU IDENTIFIED

5   FUNDAMENTALLY ALTER THE NATURE OF THE SERVICE PROGRAM OR

6   ACTIVITY?

7   **A.**   NO.

8   **Q.**   WOULD REMEDYING ANY OF THE BARRIERS YOU IDENTIFIED REQUIRE

9   LSP TO PROVIDE NEW SERVICES OR PROGRAMS FOR DISABLED PRISONERS?

10   **A.**   I'M BASING -- EVERYTHING THAT I REVIEWED IS BASED ON THE

11   PROGRAMS THEY HAVE THERE.

12   **Q.**   IS MAINTAINING ANY OF THESE BARRIERS YOU IDENTIFIED

13   LOGISTICALLY NECESSARY?

14   **A.**   NO.

15   **Q.**   IN YOUR EXPERTISE, WOULD REMEDYING THE ADA VIOLATIONS

16   YOU'VE IDENTIFIED IMPOSE ANY UNDUE FINANCIAL AND ADMINISTRATIVE

17   BURDEN ON LSP?

18   **A.**   NO.

19   **Q.**   I DON'T HAVE ANY FURTHER QUESTIONS RIGHT NOW.  THANKS.

20          **THE COURT:**  CROSS.

21                    **CROSS-EXAMINATION**

22   **BY MS. TOMENY:**

23   **Q.**   GOOD MORNING, MR. MAZZ.

24          CAROLYN TOMENY HERE FOR THE DEFENSE.

25          ALL RIGHT.  YOU TESTIFIED THIS MORNING THAT YOU USED

10:16 1  THE SAME METHODOLOGY THAT YOU USED FOR YOUR 2016 REPORT.  IS

2  THAT CORRECT?

3  **A.**   YES.

4  **Q.**   OKAY.  SO IS IT FAIR TO SAY THAT IN YOUR 2020 REVIEW OF

5  LSP, YOU LOOKED ONLY AT THE PHYSICAL ASPECTS OF THE SPACES USED

6  FOR PROGRAM ACCESS AND THE TECHNICAL REQUIREMENTS FOR

7  COMPLIANCE?

8  **A.**   YES.

9  **Q.**   AND I BELIEVE YOU TESTIFIED THAT YOU -- THAT FOR AREAS OF

10  LSP THAT HAD NOT BEEN ALTERED WITHIN THE LAST -- YOU DETERMINED

11  HAD NOT BEEN ALTERED WITHIN THE LAST 30 YEARS, YOU DEFAULTED TO

12  THE PROGRAM ACCESS STANDARD.  IS THAT CORRECT?

13  **A.**   CORRECT.

14  **Q.**   OKAY.  AND FOR THESE AREAS, THE TECHNICAL COMPLIANCE WITH

15  THE ADA GUIDELINES IS NOT REQUIRED.  IS THAT CORRECT?

16  **A.**   THE BEST WAY TO LOOK AT THIS IS TO SEPARATE THE -- THE

17  PROGRAM ACCESS HAS TWO COMPONENTS TO IT AND IT'S BEST TO TRY

18  AND DIVIDE THEM INTO THOSE TWO COMPONENTS.  THE FIRST IS THAT

19  IF YOU HAVE A PROGRAM -- IF YOU CAN'T MAKE EVERYTHING

20  ACCESSIBLE -- AND I ASSUME THE STATE OF LOUISIANA DOESN'T HAVE

21  ACCESSIBILITY THROUGHOUT ALL THEIR JAILS -- YOU CAN CONSOLIDATE

22  THE PROGRAM TO CERTAIN AREAS, AND THOSE AREAS ALONE ARE THE

23  ONES THAT YOU HAVE TO MAKE ACCESSIBLE.  EVEN THOUGH ALTERATIONS

24  AND ADDITIONS OF NEW CONSTRUCTION STILL MUST COMPLY, THE AREAS

25  THAT YOU'VE IDENTIFIED FOR PROGRAM ACCESS MUST ALSO COMPLY.

10:18 1        SO WHEN YOU LOOK AT THE SWITCH FROM DORMITORIES --

2    THE HICKORY AND CYPRESS DORMITORIES INTO THE ASH DORMITORIES,

3    THOSE ARE THE ONES YOU'RE IDENTIFYING AS BEING THE ONES THAT

4    ARE GOING TO BE FOR PROGRAM ACCESS.  THEY HAVE TO COMPLY WITH

5    THE ALTERATION PROVISIONS OF THE ADA STANDARDS.

6        IN ADDITION TO THAT, IF A PERSON WITH A DISABILITY

7    NEEDS AN ADDITIONAL GRAB BAR OR SOME AUXILIARY AID OR SERVICE,

8    THAT IS ALSO CALLED "PROGRAM ACCESS," AND THAT'S OVER AND ABOVE

9    THE ALTERATION STANDARD.

10   **Q.**   OKAY.  BUT UNDER THE PROGRAM ACCESS STANDARD, YOU WOULD

11   AGREE THAT A PUBLIC ENTITY IS NOT REQUIRED TO ALTER ITS

12   EXISTING FACILITIES TO MEET THE ADA GUIDELINES?

13   **A.**   ONLY THE AREAS THAT THEY ARE USING AS THE AREAS FOR

14   PROGRAM ACCESS.  IN OTHER WORDS, THAT'S WHY I DID NOT LOOK AT

15   HICKORY AND CYPRESS IN APRIL.

16        **THE COURT:**  IN OTHER WORDS, THAT'S WHY YOU DID NOT

17   LOOK AT HICKORY AND CYPRESS?  IS THAT WHAT YOU SAID?

18        **THE WITNESS:**  YES, MA'AM.

19        **THE COURT:**  BECAUSE THEY ARE NOT BEING USED FOR

20   HOUSING OF DISABLED INMATES?

21        **THE WITNESS:**  YES.

22        **THE COURT:**  OKAY.  SORRY.  I JUST WANT TO MAKE SURE I

23   UNDERSTOOD.

24            GO AHEAD, MA'AM.

25   **BY MS. TOMENY:**

1    **Q.**   OKAY.  BUT ISN'T IT TRUE THAT THE PUBLIC ENTITY CAN ALSO

2    EMPLOY ALTERNATIVE METHODS OF COMPLIANCE TO ACHIEVE PROGRAM

3    ACCESS INSTEAD OF ALTERING ITS EXISTING FACILITIES?

4    **A.**   IF YOU'RE SAYING THAT AS OPPOSED TO ALTERING THE AREAS

5    THAT YOU'VE IDENTIFIED FOR PROGRAM ACCESS, NO.

6    **Q.**   ONE ACCEPTABLE -- AND ONE ACCEPTED ALTERNATIVE METHOD OF

7    COMPLIANCE IS TO REASSIGN SERVICES TO ACCESSIBLE BUILDINGS.

8    CORRECT?

9    **A.**   YES.

10   **Q.**   OKAY.  AND LSP HAS DONE THAT SINCE 2016.  CORRECT?

11   **A.**   BASED ON THE DORMS THAT I SAW THAT THEY SWITCHED TO BE

12   IDENTIFIED AS THE ACCESSIBLE ONES, NO, THEY HAVEN'T.

13   **Q.**   OKAY.  IN YOUR REPORT THERE ARE ITEMS LISTED ON YOUR 2016

14   REPORT THAT ARE NOT LISTED ON YOUR 2022 REPORT.  IS THAT

15   CORRECT?

16   **A.**   THAT'S CORRECT.

17   **Q.**   OKAY.  DID YOU CREATE A COMPREHENSIVE LIST OF THESE TYPES

18   OF ITEMS?

19   **A.**   I'M SORRY.  I DON'T UNDERSTAND THE QUESTION.

20   **Q.**   DO YOU HAVE A LIST SOMEWHERE THAT -- YOU KNOW, FOR

21   EXAMPLE, LET'S SAY ITEM NO. 6 ON YOUR 2016 REPORT, YOU WENT OUT

22   TO LSP AND YOU DETERMINED THAT THAT -- THAT THAT WAS NO LONGER

23   A BARRIER.  DO YOU HAVE A LIST SOMEWHERE OR --

24   **A.**   NO.

25   **Q.**   OKAY.  SO IS IT FAIR TO SAY THAT THE ITEMS THAT ARE

10:21 1 IDENTIFIED IN YOUR 2016 REPORT THAT ARE NOT CITED IN YOUR 2022

2 REPORT HAVE EITHER BEEN REMEDIATED OR ARE NO LONGER RELEVANT

3 FOR PROGRAM ACCESS?

4 **A.** YES.

5 **Q.** OKAY. IN YOUR 2022 REVIEW SITE VISIT OF LSP, DID YOU

6 CONSIDER WHETHER LSP DOES EMPLOY ALTERNATIVE METHODS THAT ARE

7 EFFECTIVE IN ACHIEVING PROGRAM ACCESS?

8 **A.** AS AN ARCHITECT AND DEALING WITH ACCESSIBILITY AS IT

9 COMPLIES WITH THE ADA STANDARDS, LOOKING INTO AUXILIARY AIDS

10 AND APPLIANCES AND OTHER WAYS TO ASSIST A PERSON WITH A

11 DISABILITY OVER AND BEYOND WHAT IS REQUIRED BY THE ADA

12 STANDARDS IS -- THAT GOES BEYOND WHAT I WAS DOING OUT THERE.

13 **Q.** OKAY. SO YOUR OPINION IS LIMITED TO IDENTIFYING

14 VIOLATIONS OF THE ADA ACCESSIBILITY GUIDELINES. CORRECT?

15 **A.** 2010 ADA STANDARDS AND 1991. THE APPLICABLE ADA

16 STANDARDS, YES.

17 **Q.** OKAY. OKAY. I WANT TO ASK YOU -- MR. SCHNEIDERMAN ASKED

18 YOU ABOUT THE DIFFERENT COLUMNS IN YOUR REPORT.

19 **A.** YES.

20 **Q.** SO I WANTED TO ASK YOU ABOUT THE CITATION FOR

21 NON-COMPLIANCE FOR AN ITEM.

22 SO IF THE CITATION FOR NON-COMPLIANCE IS TO THE 1991

23 STANDARDS, IS IT FAIR TO SAY THAT YOU DETERMINED THAT THIS ITEM

24 HAD NOT BEEN ALTERED AFTER MARCH 15TH OF 2012?

25 **A.** YES.

10:23  1  **Q.**   OKAY.  AND IF AN ITEM LIKE THAT HAD NOT BEEN ALTERED SINCE

2  MARCH 15TH OF 2012, THIS ITEM WOULD HAVE BEEN THE SAME AS WHEN

3  YOU VISITED LSP IN 2016.  CORRECT?

4  **A.**   YES.

5       **MS. TOMENY:**  MS. RAGUSA, COULD YOU PLEASE PULL UP

6  PLAINTIFFS' EXHIBIT 4 AT PAGE 14?

7  **BY MS. TOMENY:**

8  **Q.**   OKAY.  ALL RIGHT, MR. MAZZ.  I WANT TO ASK YOU ABOUT ITEM

9  37.

10       **MS. TOMENY:**  AND ACTUALLY, MS. RAGUSA, IF YOU COULD

11  GO UP TO PAGE 13.

12  **BY MS. TOMENY:**

13  **Q.**   ITEM 37 IS LOCATED IN THE ASH 2 DORMITORY.  IS THAT

14  CORRECT?

15  **A.**   YES.

16  **Q.**   OKAY.  AND YOU DETERMINED THAT ITEM 37 HAD NOT BEEN

17  ALTERED SINCE MARCH 15TH.  IS THAT CORRECT?

18  **A.**   YES.

19  **Q.**   OKAY.  AND YOU REVIEWED -- THE ASH 2 DORM WAS ONE OF THE

20  AREAS YOU REVIEWED IN 2016.  IS THAT CORRECT?

21  **A.**   THAT'S CORRECT.

22  **Q.**   OKAY.  AND YOU DID NOT NOTE THIS ITEM AS A BARRIER IN

23  2016.  IS THAT CORRECT?

24  **A.**   THAT'S CORRECT.

25  **Q.**   OKAY.  BUT THIS ITEM WOULD HAVE BEEN THERE AT THE TIME OF

10:24 1 YOUR SITE VISIT IN 2016.  CORRECT?

2 **A.**   I'M RELIANT ON THE PERSONS SHOWING ME AROUND AS TO HOW THE

3 PRISON WORKS PROGRAMMATICALLY.  SO IN 2016 I WAS UNDER THE

4 IMPRESSION THAT PERSONS GOING INTO THE REC YARDS CAME OUT INTO

5 THE MAIN CORRIDOR, WALKING DOWN TO A DIFFERENT RAMP AND ALL

6 USED THAT RAMP.

7        BUT IT WAS OBVIOUS WHEN I SURVEYED THIS YEAR THAT THE

8 INMATES GO BACK AND FORTH OUT OF WHAT IN 2016 I THOUGHT WAS

9 JUST AN EXIT POINT OUT OF THE DORMS.  AND THAT'S THE DORM --

10 THAT IS THE DOOR THAT IS USED TO ACCESS THE REC YARDS.  SO

11 THAT'S WHY IT SHOWED UP IN THE 2022 REPORT AND WASN'T THERE

12 PREVIOUSLY.

13 **Q.**   OKAY.

14        **MS. TOMENY:**  ALL RIGHT, MS. RAGUSA.  IF WE COULD,

15 PLEASE, TURN TO PAGE 17.

16 **BY MS. TOMENY:**

17 **Q.**   OKAY.  ITEMS 78 AND 79, THESE ARE -- THOSE ARE LOCATED IN

18 THE TRUSTEE CAMP.  IS THAT CORRECT?

19 **A.**   YES.

20 **Q.**   AND YOU DETERMINED THAT THESE ITEMS HAD NOT BEEN ALTERED

21 SINCE MARCH 15TH OF 2012.  CORRECT?

22 **A.**   YES.

23 **Q.**   AND YOU REVIEWED THE TRUSTEE CAMP IN 2016.  CORRECT?

24 **A.**   YES.

25 **Q.**   AND YOU DID NOT NOTE THESE TWO ITEMS AS BARRIERS IN 2016.

10:26 1   IS THAT CORRECT?

2   **A.**   YES.  AND IT'S BECAUSE IN 2016 THEY SHOWED ME A PILL CALL

3   WINDOW THAT WAS INTERIOR TO THE BUILDING.  THE ONES THAT THEY

4   SHOWED ME IN TWO THOUSAND -- IN APRIL WAS AN EXTERIOR PILL CALL

5   WINDOW.  SO I ASSUMED THAT THE PILL CALL WINDOW GOT MOVED WHERE

6   IT'S MOVED TO.  THERE'S A DRINKING FOUNTAIN RIGHT NEXT TO IT,

7   WHICH IS THAT SAME AREA.  THAT'S WHY I TOOK A LOOK AT THAT AND

8   ASSESSED THOSE TWO ISSUES.

9   **Q.**   DID ANYONE TELL YOU THAT PILL CALL HAD BEEN MOVED?

10   **A.**   I BELIEVE THAT WARDEN FALGOUT SAID THAT -- WE COULDN'T

11   FIND WHERE IT WAS BEFORE.  SO IT HAD TO HAVE BEEN MOVED OVER

12   THE SIX YEARS.

13   **Q.**   OKAY. ALL RIGHT.  LET'S SEE.  YOU ALSO TESTIFIED TODAY

14   THAT YOU REVIEWED CELLBLOCK 28 DURING YOUR APRIL 2022 SITE

15   VISIT.  IS THAT CORRECT?

16   **A.**   YES.

17   **Q.**   OKAY.  AND THIS IS ALSO NOT AN AREA THAT YOU REVIEWED IN

18   2016.  CORRECT?

19   **A.**   YES.

20        **MS. TOMENY:**  ALL RIGHT, MS. RAGUSA.  IF WE COULD TURN

21   TO PAGES 19 THROUGH 20.

22   **BY MS. TOMENY:**

23   **Q.**   AND, AGAIN, YOU DETERMINED THAT THIS AREA HAD NOT BEEN

24   ALTERED SINCE MARCH 15TH OF 2012.  CORRECT?

25   **A.**   YES.

1  **Q.**   OKAY.  AND I BELIEVE IT'S YOUR TESTIMONY THAT IF YOU --

2  THAT IN THIS CASE IT'S YOUR METHODOLOGY TO DEFAULT TO THE

3  PROGRAM ACCESS STANDARD.  CORRECT?

4  **A.**   YES.

5  **Q.**   OKAY.  ALL RIGHT.  WHICH ALLOWS THE PUBLIC ENTITY TO

6  EMPLOY ALTERNATIVE METHODS OF COMPLIANCE TO ACHIEVE PROGRAM

7  ACCESS.  CORRECT?

8  **A.**   PROGRAM ACCESS -- WHEN YOU'RE NOT MAKING YOUR ENTIRE

9  PRISON COMPLETELY ACCESSIBLE, PROGRAM ACCESS -- THE AREAS YOU

10  IDENTIFY FOR PROGRAM ACCESS MUST COMPLY WITH THE ALTERATION

11  PORTIONS -- THE ALTERATION STANDARDS AND THE ADA STANDARDS.

12  ONCE YOU GET TO THAT, ANY ADDITIONAL STUFF THAT YOU NEED FOR

13  INDIVIDUAL INMATES IS ALSO CONSIDERED PROGRAM ACCESS.

14       SO I'M NOT SURE WHETHER YOU'RE ASKING FOR THE FIRST

15  PIECE FOR ME TO REPEAT EVERY TIME OR ASKING IF I DID THE SECOND

16  PIECE, WHICH I SAID I DON'T KNOW.

17  **Q.**   OKAY.  SO LET ME MAKE SURE I UNDERSTAND YOU.

18       SO YOU ARE TESTIFYING THAT YOU DID NOT CONSIDER

19  WHETHER LSP EMPLOYS ALTERNATIVE METHODS OF COMPLIANCE AT THIS

20  LOCATION?

21  **A.**   WHAT I'M TESTIFYING IS THAT IF YOU'RE USING IT FOR PROGRAM

22  ACCESS, IT MUST COMPLY WITH THE ADA STANDARDS IN THOSE AREAS.

23  **Q.**   OKAY.  BUT, AGAIN, YOU DID NOT CONSIDER ARE THERE ANY

24  ALTERNATIVE METHODS OF COMPLIANCE.  THAT WASN'T PART OF YOUR

25  METHODOLOGY FOR THIS.  CORRECT?

10:29 1   **A.**   AS I SAID BEFORE, NO.

2   **Q.**   OKAY.  ALL RIGHT.  LET'S TALK ABOUT ASH 1, 3, AND 4.

3        YOU VISITED THESE AREAS IN APRIL OF 2022.  CORRECT?

4   **A.**   CORRECT.

5   **Q.**   AND YOU DID NOT VIEW THESE AREAS IN 2016.  CORRECT?

6   **A.**   CORRECT.

7   **Q.**   OKAY.  NOW, AS I UNDERSTAND FROM REVIEWING YOUR REPORT,

8   YOU DETERMINED THAT CERTAIN PARTS OF ASH 1, 3, AND 4 HAD BEEN

9   ALTERED --

10   **A.**   YES.

11   **Q.**   -- SINCE MARCH 15, 2012.  CORRECT?

12   **A.**   YES.

13   **Q.**   BUT THERE WERE AREAS OF ASH 1, 3, AND 4 THAT YOU

14   DETERMINED HAD NOT BEEN ALTERED SINCE MARCH 15, 2012.  CORRECT?

15   **A.**   I'D HAVE TO STUDY MY REPORT TO KNOW.

16        **MS. TOMENY:**  ALL RIGHT, MS. RAGUSA.  IF YOU COULD

17   PULL UP -- YES, PLAINTIFFS' EXHIBIT 4, PAGE 12.  OKAY.  LET'S

18   SEE.  AND ACTUALLY IF YOU COULD GO UP TO THE TOP OF 11 -- I'M

19   SORRY -- THE BOTTOM OF 11.

20   **BY MS. TOMENY:**

21   **Q.**   OKAY.  SO WHAT I'M SHOWING YOU HERE, MR. MAZZ, IS ASH 1

22   DORMITORY.  CORRECT?

23   **A.**   OKAY.

24   **Q.**   THIS IS JUST AN EXAMPLE.

25        NOW, ITEMS 11 THROUGH 16, THOSE ITEMS YOU HAD

10:30 1  DETERMINED HAD NOT BEEN ALTERED SINCE MARCH 15, 2012.  CORRECT?

2  **A.**   CORRECT.

3  **Q.**   AND, AGAIN, YOU DEFAULTED TO PROGRAM ACCESS FOR THESE

4  AREAS.  CORRECT?

5  **A.**   CORRECT.

6  **Q.**   OKAY.  AND I TAKE IT THAT, AGAIN, YOU DID NOT CONSIDER

7  WHETHER LSP EMPLOYS ANY ALTERNATIVE METHODS OF COMPLIANCE TO

8  ACHIEVE PROGRAM ACCESS IN THESE UNALTERED AREAS OF ASH 1, 3,

9  AND 4?

10  **A.**   I'M SAYING I STOPPED AT THE POINT WHERE THE AREA WAS

11  REQUIRED TO COMPLY WITH THE STANDARDS.  I DID NOT DO THE

12  SUPPLEMENTAL PIECE OF ALTERNATIVE STUFF ON TOP OF THAT.

13  **Q.**   OKAY.  AND THAT WAS TRUE THROUGHOUT YOUR REVIEW OF LSP.

14  CORRECT?

15  **A.**   YES.

16       **MS. TOMENY:**  MS. RAGUSA, IF YOU COULD, PLEASE, GO TO

17  PAGE 20 -- I'M SORRY -- PAGE 22.

18  **BY MS. TOMENY:**

19  **Q.**   ALL RIGHT, MR. MAZZ.  I WANT TO ASK YOU A FEW QUESTIONS

20  ABOUT ITEM 135.

21       **MS. TOMENY:**  AND I APOLOGIZE.  AGAIN, MS. RAGUSA,

22  IF YOU COULD SCROLL BACK UP TO THE BOTTOM OF 21 SO WE COULD SEE

23  WHERE WE ARE.

24  **BY MS. TOMENY:**

25  **Q.**   OKAY.  ITEM 135 IS IN THE NURSING UNIT 2 BATHROOM.  IS

1  THAT CORRECT?

2  **A.**  YES.

3  **Q.**  OKAY.  ALL RIGHT.  AND I SEE THAT YOU DETERMINED THAT THIS

4  TOILET HAD NOT BEEN ALTERED SINCE MARCH 15TH OF 2012.  CORRECT?

5  **A.**  I'M SORRY.

6  **Q.**  SO FOR ITEM 135, IS IT TRUE THAT YOU DETERMINED THAT THIS

7  TOILET HAD NOT BEEN ALTERED SINCE MARCH 15TH OF 2012?

8  **A.**  ACTUALLY, IT HAD BEEN ALTERED, BUT -- IT WAS ALTERED,

9  ACTUALLY.

10  **Q.**  OKAY.  WHERE IS THAT NOTED IN YOUR REPORT?

11  **A.**  I SHOULD HAVE TAKEN THE CITATION OUT AT THAT POINT.  THAT

12  ENTIRE BATHROOM WAS ALTERED.

13  **Q.**  OKAY.  SO YOU WOULD AGREE THAT ITEM 135 IS NOT A BARRIER

14  TO ACCESS.  IS THAT CORRECT?

15  **A.**  135?

16  **Q.**  YES.

17  **A.**  IT WAS ALTERED, AND IT DOES NOT COMPLY.

18  **Q.**  BUT I BELIEVE -- I THOUGHT YOU JUST TESTIFIED THAT YOU

19  SAID THAT YOU SHOULD HAVE TAKEN THAT CITATION OUT?

20  **A.**  THE CITATION TO THE 1991 ADA STANDARDS AS OPPOSED TO JUST

21  HOLDING IT TO THE 2010 ADA STANDARDS.

22  **Q.**  OKAY.  I UNDERSTAND.

23  **A.**  THE REASON IS BECAUSE WHEN I FLIPPED THROUGH MY PHOTOS THE

24  OTHER DAY, I NOTICED THAT THE TOILET THERE THAT IS NOW 14 AND

25  THREE-QUARTERS OF AN INCH HIGH --

1   **Q.**   UH-HUH.

2   **A.**   -- WAS ACTUALLY 17 INCHES HIGH IN 2016, SO THAT REALLY

3   CONFUSED ME. BUT I CAN'T SEEM TO PULL UP THAT PHOTO RIGHT NOW.

4   **Q.**   OKAY. NOW, YOU WOULD AGREE, THOUGH, THAT INDEPENDENT

5   ACCESS TO THE TOILET IS THE OVERALL OBJECTIVE. RIGHT?

6   **A.**   I'M SORRY.

7   **Q.**   WOULD YOU AGREE THAT INDEPENDENT ACCESS TO THE TOILET IS

8   THE OBJECTIVE?

9   **A.**   YES. THE ADA STANDARDS GIVE VERY PRESCRIPTIVE WAYS OF HOW

10   TO MAKE IT HAPPEN AND HOW TO MAKE IT ACCESSIBLE TO THE VAST

11   MAJORITY OF PEOPLE WITH DISABILITIES. SO YOU USE THE STANDARDS

12   THAT WAY IN ORDER TO GET TO MOST -- MAKE IT ACCESSIBLE TO MOST.

13   ANYTHING IN ADDITION THAT YOU NEED BEYOND THAT, YOU WOULD ALSO

14   DO.

15   **Q.**   OKAY. NOW -- SO ARE -- BUT THERE ARE WAYS THAT -- TO

16   AFFORD INDEPENDENT ACCESS TO A TOILET WITHOUT RIPPING OUT THE

17   EXISTING TOILET AND INSTALLING A NEW ONE. IS THAT RIGHT?

18   **A.**   WHAT DO YOU MEAN?

19   **Q.**   WELL, IS THE ONLY OPTION -- THE ONLY OPTION IS NOT TO RIP

20   OUT THE EXISTING TOILET AND INSTALL A NEW ONE. CORRECT?

21   **A.**   IF THE TOILET -- IF WE'RE LOOKING AT LINE 135 AND IGNORING

22   LINE 134 THAT SAYS "THE TOILET IS TOO FAR FROM THE SIDEWALL,"

23   AND IGNORING THE GRAB BARS THAT ARE UP ABOVE THAT, ALL THOSE

24   ISSUES, AND JUST FOCUSING IN ON JUST THE TOILET BEING TOO

25   SMALL, YES, YOU CAN PUT A TOILET SEAT ON IT AND IT WILL COMPLY

10:34 1    IF YOU GET IT TO 17 OR 19 INCHES.  BUT I THINK YOU OUGHT TO

2    LOOK AT IT WITH THE OTHER BARRIERS AS WELL.

3    **Q.**    OKAY.  SO IF THERE WAS SOMETHING -- SO YOU'RE SAYING IF

4    YOU COULD PUT ANOTHER TOILET SEAT THAT WOULD GET IT TO THE

5    REQUIRED HEIGHT ON TOP OF THE EXISTING TOILET SEAT, THAT --

6    **A.**    THAT WOULD SATISFY LINE 135.

7    **Q.**    OKAY.

8         **MS. TOMENY:**  ALL RIGHT, MS. RAGUSA.  IF WE COULD TURN

9    TO PAGE 21.

10   **BY MS. TOMENY:**

11   **Q.**    OKAY, MR. MAZZ.  I'M GOING TO ASK YOU ABOUT TWO ITEMS AT

12   THE SAME TIME, BUT THE FIRST ONE IS ITEM 120.

13        DO YOU RECALL THIS ITEM?

14   **A.**    YES, I DO.

15   **Q.**    OKAY.

16        **MS. TOMENY:**  AND THEN, MS. RAGUSA, IF WE COULD GO TO

17   PAGE 24.

18   **BY MS. TOMENY:**

19   **Q.**    AND ITEM 155, DO YOU RECALL THIS ITEM, MR. MAZZ?

20   **A.**    YES.

21   **Q.**    OKAY.  AND JUST GENERALLY, WHAT ARE THESE DOORS?  THESE

22   ARE SECURITY DOORS.  CORRECT?

23   **A.**    THESE ARE SECURITY DOORS WHICH LEAD FROM THE NURSING UNITS

24   1 AND 2 INTO A GENERAL CORRIDOR, YES.

25   **Q.**    OKAY.  AND YOU DETERMINED THAT THESE DOORS HAVE NOT BEEN

1  ALTERED SINCE MARCH 15TH OF 2012.  CORRECT?

2  **A.**   CORRECT.

3  **Q.**   OKAY.  SO, AGAIN, YOU DEFAULTED TO THE PROGRAM ACCESS

4  STANDARD FOR THESE.  CORRECT?

5  **A.**   YES.

6  **Q.**   OKAY.  AND THESE DOORS ARE MANNED BY CORRECTIONAL

7  OFFICERS.  CORRECT?

8  **A.**   YES.

9  **Q.**   OKAY.  SO THERE'S NO INDEPENDENT ACCESS TO THESE DOORS

10  REGARDLESS OF ONE'S ABILITY.  CORRECT?

11  **A.**   YES.

12  **Q.**   SO SINCE CORRECTIONAL OFFICERS ALWAYS OPEN THESE DOORS FOR

13  EVERYBODY GOING THROUGH, IS IT FAIR TO SAY THAT THESE DOORS DO

14  NOT IMPEDE PROGRAM ACCESS?

15  **A.**   WHEELCHAIRS CAN BE AS WIDE AS -- I'VE MEASURED THEM -- AS

16  WIDE AS 31 AND A HALF INCHES.  WHEELCHAIRS FOR LARGE PEOPLE

17  WILL BE MORE THAN 27 AND A HALF INCHES WIDE.  SO BOTH DOORS

18  WOULD NEED TO BE OPENED AT THE SAME TIME, MEANING THAT YOU

19  WOULD NEED TO HAVE TWO CORRECTIONAL OFFICERS OPEN THE DOORS

20  WHEN SOMEBODY IN A WHEELCHAIR IS COMING THROUGH.

21          I'D NEVER NOTICED THAT -- IN THE TIMES THAT I'VE BEEN

22  THERE, I HAVE NOTICED TWO CORRECTIONAL OFFICERS READY TO OPEN

23  THE DOORS WHEN SOMEBODY IN A WHEELCHAIR IS COMING THROUGH.  SO

24  TO THAT EXTENT, I THINK THAT YOU NEED TO HAVE THE CLEAR OPENING

25  THROUGH ONE DOOR SO THAT EVERYTHING IS DONE THE SAME WAY.

10:36  1   **Q.**   OKAY.  WELL -- NOW, IF THERE WERE TWO CORRECTIONAL

2    OFFICERS ALWAYS THERE TO OPEN THE DOORS FOR EVERYBODY, IS IT

3    FAIR TO SAY THAT IN THAT CASE IT WOULD NOT IMPEDE PROGRAM

4    ACCESS?

5    **A.**   I WOULD SAY THAT AFTER TWO OR THREE YEARS AND IF YOU

6    COMPARE YOUR COST, IT'S CHEAPER TO FIX THE DOOR THAN TO MAKE

7    SURE THAT YOU CONTINUALLY HAVE TWO CORRECTIONAL OFFICERS THERE.

8    **Q.**   OKAY.  BUT IF LSP HAS TWO CORRECTIONAL OFFICERS ALWAYS

9    THERE AT THOSE DOORS, THAT WOULD ACHIEVE PROGRAM ACCESS.

10   CORRECT?

11   **A.**   THAT COULD, YES.

12   **Q.**   OKAY, MR. MAZZ.  I'D LIKE TO --

13           **MS. TOMENY:**  MS. RAGUSA, ACTUALLY IF YOU COULD TURN

14   TO PAGE 23.

15   **BY MS. TOMENY:**

16   **Q.**   ALL RIGHT.  AND I'D LIKE TO ASK YOU ABOUT ITEM 146, WHICH

17   IS LOCATED IN CELL 4 OF NURSING UNIT 1.  SO THE VIOLATION THAT

18   YOU -- OR THE BARRIER THAT YOU NOTE HERE IS THAT THE PIPES

19   UNDER THE ACCESSIBLE LAVATORY ARE NOT INSULATED.  IS THAT

20   CORRECT?

21   **A.**   YES.

22   **Q.**   BUT ISN'T IT TRUE THAT BOTH THE 1991 STANDARDS AND THE

23   2020 -- I'M SORRY -- AND THE 2010 STANDARDS REQUIRE THAT PIPES

24   UNDER THE SINK BE INSULATED OR OTHERWISE CONFIGURED TO PROTECT

25   AGAINST CONTACT?

1   **A.**   MEANING PUT SOMETHING UP THERE TO BLOCK YOUR ACCESS TO THE

2   PIPES.

3   **Q.**   DOESN'T THE STANDARD REQUIRE INSULATION OR CONFIGURATION

4   TO PROTECT AGAINST CONTACT?  CORRECT?

5   **A.**   YOU HAVE YOUR CLEAR FLOOR SPACE, YOUR KNEE AND TOE SPACE

6   THAT GOES UNDERNEATH THE SINK.  THOSE AREAS HAVE TO BE CLEAR OF

7   ALL PIPES REGARDLESS.  THAT WAY YOU CAN GET UNDER THERE AND YOU

8   CAN USE THE SINK.

9        TO PROTECT YOU FROM BUMPING INTO THE PIPES, PEOPLE

10   CAN -- A PERSON IN A WHEELCHAIR IS NOT -- NOTHING STOPS THEM

11   FROM GOING FURTHER UNDERNEATH THE SINK THAN THE EIGHT INCHES

12   NECESSARY AT THE KNEES.  THEY CAN GO FURTHER UNDER AND THEY CAN

13   BUMP INTO OR MAKE CONTACT WITH THE PIPES.  SO YOU CAN EITHER

14   INSULATE THE PIPES OR YOU CAN PUT A BARRIER UP IN FRONT OF IT

15   TO KEEP YOU FROM BUMPING INTO THE PIPES.  SO THAT'S WHAT IT'S

16   TALKING ABOUT.  IT'S NOT SAYING DON'T INSULATE.  JUST PUT THE

17   PIPES OFF SO THERE'S NONE IN THE SPACE.  OTHERWISE IT WOULD BE

18   -- LET ME START THAT OVER.

19        YOU HAVE YOUR KNEE AND TOE CLEARANCE.  PIPES ARE NOT

20   ALLOWED THERE.  BUT IF IT'S A QUESTION OF KEEPING THE PIPES OUT

21   OF THAT KNEE AND TOE CLEARANCE OR INSULATING, THEN YOU HAVE A

22   SITUATION WHERE THE RULE MEANS NOTHING BECAUSE YOU CAN'T BE

23   THERE; SO THEREFORE, WE'D NEVER HAVE TO INSULATE.  THE

24   NON-INSULATING ALTERNATIVE MEANS JUST PUTTING ANOTHER TYPE OF

25   BARRIER IN THE WAY SO THAT YOU CAN'T ACTUALLY GET THAT FAR

1  UNDER.

2  **Q.**   OKAY.  SO INSULATION -- INSULATING THE PIPES IS NOT THE

3  ONLY WAY TO MEET THE GUIDELINES.  IS THAT CORRECT?

4  **A.**   YOU CAN USE -- EVEN IN PRISON FIXTURES, THERE'S -- THEY

5  HAVE THE PROTECTIVE SHIELDS UNDERNEATH THAT KEEP YOU FROM

6  BUMPING INTO THE PIPES.  IF THAT'S THERE, THEN YOU DON'T HAVE

7  TO INSULATE THE PIPES.

8  **Q.**   OKAY.  AND YOU DID NOT CONSIDER THE CONFIGURATION OF THE

9  PIPES WHEN YOU REVIEWED THIS LABORATORY.  CORRECT?

10  **A.**   I DID TO THE EXTENT IF THERE WERE ANY KNEE AND TOE

11  CLEARANCES, YES.

12  **Q.**   I'M SORRY.  COULD YOU SAY THAT AGAIN?

13  **A.**   I DID TO THE EXTENT -- TO CHECK TO SEE IF THEY WERE IN THE

14  KNEE AND TOE CLEARANCES.

15  **Q.**   OKAY.  ALL RIGHT.  YOU WERE ASKED THIS MORNING ABOUT THE

16  DEPARTMENT OF JUSTICE ADA SETTLEMENT AGREEMENT FOR LSP.  IS

17  THAT CORRECT?

18  **A.**   YES.

19  **Q.**   OKAY.  AND YOU'RE FAMILIAR WITH THAT AGREEMENT.  CORRECT?

20  **A.**   NO.  I HAVE SEEN THE CHART.

21  **Q.**   OKAY.  YOU HAVE SEEN THE CHART.  OKAY.

22         AND IT'S YOUR UNDERSTANDING THAT DOJ CONDUCTED ITS

23  OWN SITE VISIT TO LSP IN ORDER TO CREATE THAT CHART.  CORRECT?

24  **A.**   YES.

25  **Q.**   AND DOJ USES THE SAME METHODOLOGY TO DETERMINE

10:41  1  ACCESSIBILITY AS YOU DO.  CORRECT?

2  **A.**    YES.

3  **Q.**    AND YOU WOULD AGREE THAT YOUR METHODOLOGY AND THE

4  METHODOLOGY USED BY DOJ IS THE ACCEPTED METHODOLOGY?

5  **A.**    YES.

6  **Q.**    AND YOU DON'T HAVE ANY CRITICISM OF THE METHODOLOGY USED

7  BY DOJ.  CORRECT?

8  **A.**    NO.

9  **Q.**    SO IN YOUR 2022 REPORT, YOU NOTED SEVERAL ITEMS OF OVERLAP

10  WITH THE ITEMS REVIEWED BY DOJ AT ITS SITE VISIT, TOO.

11  CORRECT?

12  **A.**    YES.

13  **Q.**    AND IF THERE WERE A DISCREPANCY BETWEEN YOU AND DOJ AS TO

14  WHETHER ANY OF THOSE OVERLAPPING ITEMS HAVE NOW BEEN REMEDIED,

15  THERE'S NO REASON THE COURT SHOULD NOT ACCEPT DOJ'S

16  DETERMINATION.  CORRECT?

17  **A.**    I WOULD HAVE TO BE PRIVY TO ANY NEGOTIATIONS THAT WENT ON

18  AND WHAT DOJ DECIDED THEY WANTED TO DO.  I DON'T HAVE ANY OF

19  THAT KNOWLEDGE.  I CAN'T TELL YOU WHY THEY WOULD ACCEPT

20  SOMETHING OR NOT ACCEPT SOMETHING.  I'M JUST NOT PART OF THAT

21  CASE.

22  **Q.**    OKAY.  BUT IT'S THE SAME METHODOLOGY, THOUGH.  CORRECT?

23  **A.**    THE METHODOLOGY IS THE SAME.  THE DECISION-MAKING DURING

24  NEGOTIATIONS OR SETTLEMENTS ARE COMPLETELY DIFFERENT STUFF.

25  **Q.**    MR. MAZZ, YOU'RE NOT OFFERING AN OPINION TODAY AS TO ANY

10:43 1    OF THE PROPOSED REMEDIES FOR THE BARRIERS THAT YOU NOTED IN

2    ATTACHMENT 2.  IS THAT CORRECT?

3    **A.**    I'M SORRY.  CAN YOU ASK THAT AGAIN?

4    **Q.**    YOU'RE NOT OFFERING AN OPINION TODAY AS TO ANY PROPOSED

5    REMEDIES FOR THE BARRIERS THAT YOU NOTED IN ATTACHMENT 2.  IS

6    THAT CORRECT?

7    **A.**    CORRECT.

8         **MS. TOMENY:**  OKAY.  ALL RIGHT.  ONE MOMENT, PLEASE.

9         ALL RIGHT.  I HAVE NOTHING FURTHER.  THANK YOU.

10        **THE COURT:**  IS THERE ANY REDIRECT?

11        **MR. SCHNEIDERMAN:**  JUST A COUPLE OF QUESTIONS.  JUST

12   A COUPLE OF QUESTIONS, YOUR HONOR.

13                    **REDIRECT EXAMINATION**

14   **BY MR. SCHNEIDERMAN:**

15   **Q.**    MR. MAZZ, COULD YOU SAY A BIT MORE ABOUT WHY YOU REVIEWED

16   CELLBLOCK NO. 28 THIS TIME AROUND?

17   **A.**    I REVIEWED CELLBLOCK 28 BECAUSE THE WARDEN TOOK ME TO THAT

18   SAYING THAT THEY WERE USING THAT AREA FOR THE MENTAL HEALTH

19   ISSUES AS OPPOSED TO THE TREATMENT AREA THAT I WAS IN, IN 2016.

20   **Q.**    AND YOU'RE REFERRING TO EXTENDED LOCKDOWN IN THE

21   PROTECTION TIER, WHICH IS HOW IT'S REFERRED TO IN YOUR PREVIOUS

22   REPORT?

23   **A.**    YES.

24   **Q.**    OKAY.  JUST TO CLARIFY THE RECORD --

25        **MR. SCHNEIDERMAN:**  ALEXANDRA, CAN WE PULL UP FROM THE

1 | LIABILITY REPORT PLAINTIFFS' EXHIBIT 7, PAGE 47?

2 | **BY MR. SCHNEIDERMAN:**

3 | **Q.**   ON THIS ISSUE OF THE OLDER TOILET, I JUST WANT TO CLARIFY

4 | IF THIS PICTURE DSC05974 IS THE PICTURE YOU WERE LOOKING FOR.

5 | **A.**   YES.  AND THAT'S THE PICTURE I WAS LOOKING FOR.  AND THE

6 | TOILET CLOSEST TO THE URINAL IS NOTICEABLY TALLER THAN THE

7 | OTHER TWO.  IT'S A TALL-SEAT TOILET.  THAT MEANS IT'S BETWEEN

8 | 17 AND 19 INCHES.

9 | **Q.**   AND DURING YOUR SITE VISIT -- GOING BACK TO ITEM 155, THE

10 | DOUBLE SECURITY DOORS.

11 | **A.**   YES.

12 | **Q.**   DURING YOUR SITE VISIT, DID YOU WITNESS TWO CORRECTIONAL

13 | OFFICERS PULLING THOSE DOORS OPEN AT ANY POINT?

14 | **A.**   NO.

15 | **MR. SCHNEIDERMAN:**  OKAY.  NO FURTHER QUESTIONS.

16 | **THE COURT:**  OKAY.  YOU MAY STEP DOWN.

17 | OKAY, COUNSEL.  ONE MATTER OF HOUSEKEEPING, AND

18 | WE WILL TAKE A LITTLE BIT OF A RECESS.

19 | BECAUSE WE ARE NOT ABLE TO DETERMINE WHO IS ON

20 | THE AUDIO CALLS, I AM GOING TO ASK THAT YOU ALL ADVISE THE

21 | COURT WHO IS OBSERVING OR -- I SHOULDN'T SAY "OBSERVING" --

22 | WHO IS LISTENING BY AUDIO SO THAT WE CAN VERIFY THAT WE ARE NOT

23 | GOING TO HAVE A PROBLEM WITH THE SEQUESTRATION ORDER.  IF WE

24 | CAN'T VERIFY WHO IS PARTICIPATING BY AUDIO, I AM GOING TO

25 | DISCONNECT THE AUDIO.  I JUST DON'T WANT ANY PROBLEMS COME UP

10:45 1    LATER THAT SOMEBODY -- THAT WE DIDN'T REALIZE AND DIDN'T KNOW

2    THAT THEY WEREN'T SUPPOSED TO LISTEN BY AUDIO -- IS A WITNESS

3    IN THIS CASE AND IS LISTENING BY AUDIO.  OKAY.

4            SO DO WHAT YOU CAN TO IDENTIFY WHO IS ON AUDIO

5    SO THAT WE CAN PUT THAT ON THE RECORD.

6            ALL RIGHT.  WE ARE GOING TO TAKE A 15-MINUTE

7    RECESS.

8            **THE LAW CLERK:**  ALL RISE.

9            THE COURT IS IN RECESS.

10           **(WHEREUPON, THE COURT WAS IN RECESS.)**

11           **THE COURT:**  ALL RIGHT.  BE SEATED.

12           OKAY.  DO WE HAVE SOME UNDERSTANDING OF WHO IS

13   ON THE AUDIO?

14           **MR. ARCHEY:**  YOUR HONOR, FROM THE DEFENSE SIDE, THERE

15   IS NO ONE ON THE AUDIO.  WE HAVE SOME ON ZOOM, BUT NO ONE ON

16   THE AUDIO.

17           **THE COURT:**  OKAY.

18           **MS. KUMAR:**  YOUR HONOR, WE HAVE CONFIRMED ALL BUT ONE

19   OF THE PHONE NUMBERS FROM PLAINTIFFS' SIDE.  IT'S ALL EITHER

20   CO-COUNSEL OR PEOPLE WHO ARE WORKING WITH CO-COUNSEL IN THEIR

21   OFFICES OR FAMILY MEMBERS OF PLAINTIFFS' COUNSEL.

22           **THE COURT:**  WHICH PHONE NUMBER WAS NOT VERIFIED?

23           **MS. KUMAR:**  (323)896-8911.  AND WE'RE WORKING ON

24   VERIFYING IT.  I TRIED TO CALL IT.  IT'S A CALIFORNIA AREA

25   CODE, SO IT'S UNLIKELY TO BE A PARTY.

11:08 1          **THE DEPUTY CLERK:**  WAIT, WAIT.  SAY THAT AGAIN.

2          **MR. ARCHEY:**  YES.

3          **MS. KUMAR:**  (323)896-8911.

4          **THE DEPUTY CLERK:**  1511?

5          **MS. KUMAR:**  8915.

6          **THE DEPUTY CLERK:**  896-1511, AREA CODE 323.

7          **MS. KUMAR:**  SO I'LL JUST WORK ON GETTING VERIFICATION

8   FOR THAT ONE.

9          **THE COURT:**  AND THAT IS A CALIFORNIA -- OKAY.

10              TO THE EXTENT THAT THIS PERSON IS HEARING US, I

11  AM GOING TO NEED YOU TO RESPOND WHEN PLAINTIFFS' COUNSEL CALLS

12  YOU SO THAT WE CAN VERIFY YOUR IDENTITY.  OKAY.  THANK YOU.

13              ALL RIGHT.  NEXT WITNESS.

14          **MS. MONTAGNES:**  YOUR HONOR, MERCEDES MONTAGNES ON

15  BEHALF OF THE PLAINTIFFS.

16              I CALL NURSE PRACTITIONER MADELEINE LAMARRE TO

17  THE STAND.

18              **MADELEINE LAMARRE, MN, FNP-BC,**

19  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

20          **THE DEPUTY CLERK:**  PLEASE STATE YOUR NAME AND SPELL

21  IT, FOR THE RECORD.

22          **THE WITNESS:**  MADELEINE LAMARRE, WHICH IS SPELLED

23  M-A-D-E-L-E-I-N-E.  AND LAMARRE IS L-A-CAPITAL-M-A-R-R-E.

24          **MS. MONTAGNES:**  AND ALL OF THE EXHIBITS THAT WE'RE

25  GOING TO BE CALLING UP DURING THIS WILL BE SEALED TO THE COURT.

11:09 1           AND, YOUR HONOR, AT THIS TIME PLAINTIFFS WOULD

2  MOVE TO ADMIT PLAINTIFFS' EXHIBIT 1, PURSUANT TO THE COURT'S

3  RULING IN RECORD DOC. 721, WHERE THE COURT RULED THAT IT WOULD

4  ENTER ALL EXPERT REPORTS AND ATTACHMENTS AS IT DID IN THE

5  LIABILITY TRIAL.

6         **THE COURT:**  IS THERE ANY OBJECTION?

7         **MR. ARCHEY:**  YOUR HONOR, I DO MAINTAIN MY OBJECTION

8  AND RECOGNIZE THE COURT'S RULING, BUT --

9         **THE COURT:**  AND YOUR OBJECTION IS AS TO THE

10  ATTACHMENTS, NOT AS TO THE EXPERT REPORT?  OR ARE YOU OBJECTING

11  TO THE EXPERT REPORT?

12         **MR. ARCHEY:**  I WOULD AGREE TO THE EXPERT REPORT.  IF

13  THE ATTACHMENT SIDE -- IF IT'S ALL OR NOTHING, THEN IT WOULD BE

14  NOTHING.  BUT THAT WOULD BE THE WAY I WOULD RESPOND.

15         **THE COURT:**  SO THE EXPERT REPORT -- THERE IS NO

16  OBJECTION AS TO HEARSAY.  THE EXPERT REPORT IS STIPULATED AS

17  ADMITTED FOR SUBSTANTIVE EVIDENCE.

18           I WANT TO MAKE SURE I UNDERSTAND YOUR OBJECTION.

19  THE DEFENDANTS' OBJECTION IS AS TO THE APPENDICES TO THE

20  REPORT, WHICH IS THE DATA UPON WHICH THE REPORT IS BASED.

21  CORRECT?

22         **MR. ARCHEY:**  YES, MA'AM.

23         **THE COURT:**  OKAY.  OBJECTION OVERRULED.  PLAINTIFFS'

24  EXHIBIT 1 IS ADMITTED.

25         **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

**VOIR DIRE**

BY MS. MONTAGNES:

**Q.**   SO FOR THE PURPOSES OF THIS EXAM, I'M GOING TO CALL YOU MS. LAMARRE.  IS THAT OKAY?

**A.**   THAT'S FINE.

**Q.**   OKAY.  WHAT IS YOUR CURRENT POSITION?

**A.**   I AM A FAMILY NURSE PRACTITIONER AND A CONSULTANT.  I EVALUATE AND MONITOR HEALTH CARE IN CORRECTIONAL FACILITIES, JAILS AND PRISONS ACROSS THE UNITED STATES.

**Q.**   AND IF YOU DON'T MIND, MS. LAMARRE, CAN YOU BRIEFLY GIVE US A SUMMARY OF YOUR EXPERIENCE IN CORRECTIONS?

**A.**   YES.  I'VE BEEN IN CORRECTIONS FOR ABOUT 40 YEARS.  IN 1982 I STARTED AS A NURSE PRACTITIONER AT A PRISON CLINIC IN THE STATE OF GEORGIA.  I WORKED FOR A FEW YEARS IN THE CLINIC. AND THEN I JOINED THE DEPARTMENT OF -- GEORGIA DEPARTMENT OF CORRECTIONS IN THEIR DOWNTOWN HEADQUARTERS, WHICH WAS RESPONSIBLE FOR OVERSEEING THE HEALTH CARE IN THE STATE PRISON SYSTEM -- IN THE GEORGIA STATE PRISON SYSTEM.

        AT THAT TIME THERE WERE APPROXIMATELY SEVEN LAWSUITS, MOSTLY INVOLVING MEDICAL CARE, AND OVER THE NEXT -- OVER THE COURSE OF 20 YEARS WAS RESPONSIBLE FOR DEVELOPING AND MONITORING HEALTH CARE IN THE GEORGIA DEPARTMENT OF CORRECTIONS TO, YOU KNOW, ESTABLISH AN ADEQUATE HEALTH CARE SYSTEM AND RESOLVE THE LITIGATION AGAINST THE DEPARTMENT.

**Q.**   AND WERE YOU ABLE TO RESOLVE THAT LITIGATION?

11:12 1   **A.**   ALL OF THE LITIGATION WAS RESOLVED AT THE TIME THAT I LEFT

2   THE DEPARTMENT IN 2004.

3   **Q.**   AND CAN YOU BRIEFLY DESCRIBE YOUR EXPERIENCE AS A

4   COURT-APPOINTED MONITOR?

5   **A.**   YES.   SO IN 2002 I WAS APPOINTED BY JUDGE HENDERSON IN THE

6   FEDERAL COURT IN CALIFORNIA TO BE ONE OF THREE COURT EXPERTS IN

7   THE *PLATA V. BROWN* [SIC] CASE.   AND SO FOR 20 YEARS -- THE PAST

8   20 YEARS I'VE BEEN INVOLVED IN MONITORING EITHER APPOINTED BY

9   THE COURT OR AGREED TO BY THE PLAINTIFFS AND DEFENDANTS IN

10   OTHER CASES TO MONITOR SETTLEMENT AGREEMENTS AND CONSENT

11   DECREES IN STATES SUCH AS OHIO, DELAWARE, TEXAS, ILLINOIS.

12           SO THE BULK OF MY CAREER FOR THE LAST 15 YEARS OR SO

13   HAS BEEN MONITORING AND ASSISTING CORRECTIONAL INSTITUTIONS TO

14   ESTABLISH AND IMPROVE HEALTH CARE IN THEIR FACILITIES.

15   **Q.**   AND HAVE YOU ENJOYED THAT WORK?

16   **A.**   OH, I LOVE THE WORK AS AN INDEPENDENT MONITOR BECAUSE I

17   CAN HELP.   YOU KNOW, I'M NOT WORKING FOR EITHER SIDE.   I'M

18   HELPING MOSTLY THE DEFENDANTS TRY TO IMPROVE THEIR HEALTH CARE

19   SYSTEM.

20           **MS. MONTAGNES:**   YOUR HONOR, AT THIS TIME WE'D LIKE TO

21   TENDER NURSE PRACTITIONER MADELEINE LAMARRE AS AN EXPERT IN

22   CORRECTIONAL HEALTH.   AND SHE'S PREVIOUSLY BEEN ADMITTED AND

23   RELIED ON BY THIS COURT DURING THE LIABILITY TRIAL.

24           **THE COURT:**   ANY OBJECTION OR CROSS ON THE TENDER?

25           **MR. ARCHEY:**   I HAVE THREE OR FOUR QUESTIONS, IF I

11:13 1  MAY, YOUR HONOR?

2          **THE COURT:**  YOU MAY CROSS ON THE TENDER.

3                  **VOIR DIRE**

4  **BY MR. ARCHEY:**

5  **Q.**  MS. LAMARRE, I HAVE PRONOUNCED YOUR NAME WRONG IN THE

6  PAST, AND I APOLOGIZE.

7          MS. LAMARRE, GOOD TO SEE YOU AGAIN.  CONNELL ARCHEY.

8          THE LAST TIME YOU ACTUALLY PRACTICED AS A NURSE

9  PRACTITIONER WAS APPROXIMATELY 15 YEARS AGO.  RIGHT?

10  **A.**  NO.  THE MOST RECENT PRACTICE WAS IN TWO THOUSAND -- IN

11  TERMS OF SEEING PATIENTS WAS IN 2020, RIGHT BEFORE THE

12  PANDEMIC.  I WAS DOING SOME CLINICAL WORK IN THE MISSISSIPPI

13  DEPARTMENT OF CORRECTIONS, BUT MY WORK INVOLVES SEEING PATIENTS

14  WHILE I'M MONITORING BUT IN A CONSULTING CAPACITY.  SO I HAVE

15  TREATED PATIENTS.

16          IN REFERENCE TO YOUR POINT, I WAS TREATING HIV

17  PATIENTS AND PATIENTS WITH HEP C BACK IN 2005 TO 2007 ON BEHALF

18  OF THE MEDICAL COLLEGE OF GEORGIA FOR THE GEORGIA DEPARTMENT OF

19  CORRECTIONS.  BUT I HAVE PRACTICED AS PART OF MY CONSULTING

20  WORK.

21  **Q.**  AND DOING YOUR CONSULTING WORK FOR THE LAST 15 YEARS,

22  THAT'S WHAT YOU'VE DONE IS CONSULTING, MONITORING, ET CETERA,

23  LIKE YOU'VE EXPLAINED TO THE COURT?

24  **A.**  YES.  AND IT DOES SOMETIMES INVOLVE SEEING PATIENTS IN THE

25  CONSULTING ROLE.

11:15 1  Q.   YOUR OPINIONS IN THIS CASE AT THIS TIME ARE LIMITED TO

2  CLINICAL CARE, CLINICAL SPACE, HEALTH RECORDS, MEDICATION

3  MANAGEMENT, AND ADMINISTRATION.  IS THAT RIGHT?

4  A.   IT ALSO INCLUDES UNPROFESSIONAL ATTITUDES AND PUNITIVE

5  BEHAVIOR TOWARDS PATIENTS, THE ACCESS TO CARE SYSTEM, WHICH IS

6  PART OF THE CLINICAL CARE.  AND I BELIEVE THAT'S -- IF I CAN

7  JUST -- YES.

8  Q.   MA'AM, DO YOU HAVE THE REPORT IN FRONT OF YOU?

9  A.   I DO.

10  Q.   OKAY.  IF YOU LOOK ON PAGE 4, PLEASE.

11  A.   YES, SIR.

12  Q.   WHERE YOU'VE GOT LISTED ON WHO -- WHAT ALL EXPERTS DID

13  WHAT.  CORRECT?

14  A.   YES.

15  Q.   ALL RIGHT.  YOUR AREAS ARE CLINICAL CARE, CLINICAL SPACE,

16  HEALTH CARE RECORDS, MEDICATION MANAGEMENT, AND ADMINISTRATION.

17        THAT'S WHAT YOU'RE LISTED FOR.  RIGHT?

18  A.   WELL, YES.  BUT I WOULD CLARIFY THAT THESE ARE THE

19  SECTIONS THAT WE WERE RESPONSIBLE FOR WRITING FOR THE REPORT,

20  BUT EACH OF US FOUND EXAMPLES OF PROBLEMS.

21        FOR EXAMPLE, I FOUND PROBLEMS WITH SPECIALTY CARE,

22  WHICH I COMMUNICATED TO AND SHARED, AND EMERGENCY CARE, WHICH I

23  SHARED WITH MY COLLEAGUES, FOR THE PURPOSES OF WRITING THE

24  REPORT.

25  Q.   MA'AM, I ASKED YOU AT YOUR DEPOSITION WERE THESE YOUR

11:16 1  AREAS, AND YOU SAID, "YES"?

2  **A.**   I DID.

3  **Q.**   THOSE ARE YOUR AREAS.  RIGHT?

4  **A.**   YES.  BUT I WOULD CLARIFY THAT THIS WAS A COLLABORATIVE

5  REPORT WHERE WE SHARED EXAMPLES WITH EACH OF OUR COLLEAGUES.

6  SO I'M PREPARED TO SPEAK TO THE SPECIFIC CASES IN WHICH I FOUND

7  PROBLEMS WITH SPECIALTY CARE OR EMERGENCY CARE.

8         **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO HANDLE THAT --

9  THE OBJECTIONS AT A LATER TIME BECAUSE THERE WERE MANY

10  OBJECTIONS AND COMMUNICATIONS ABOUT WHO DID WHAT ON THE REPORT

11  PREVIOUSLY.

12         YOUR HONOR, WE WILL HAVE NO OBJECTION TO

13  MS. LAMARRE AS AN EXPERT, LIMITED TO THE AREAS THAT SHE STATED

14  IN HER REPORT, WHICH --

15         **THE COURT:**  WELL, SHE HAS BEEN TENDERED IN

16  CORRECTIONAL HEALTH.  SO YOU CAN CERTAINLY OBJECT LATER IF HER

17  TESTIMONY OR HER REPORT EXCEEDS THE TENDER.

18         BUT THE QUESTION TO YOU AT THIS POINT, SIR, IS:

19  ARE YOU GOING TO ACCEPT MS. LAMARRE AS AN EXPERT IN

20  CORRECTIONAL HEALTH?

21         **MR. ARCHEY:**  AND I WOULD ANSWER THAT, I GUESS, BY

22  SAYING, YES, MA'AM, YOUR HONOR, LIMITED TO THOSE AREAS.  AND IF

23  THE COURT SAYS IT'S WIDE OPEN, THEN OKAY.

24         **THE COURT:**  OKAY.  THE COURT ACCEPTS

25  MADELEINE LAMARRE, NURSE PRACTITIONER, IN THE FIELD OF

11:17 1  CORRECTIONAL HEALTH.  YOU MAY GIVE OPINION TESTIMONY IN THAT

2  FIELD.

3  **DIRECT EXAMINATION**

4  **BY MS. MONTAGNES:**

5  **Q.**   MS. LAMARRE, WERE YOU TASKED WITH EVALUATING THE HEALTH

6  CARE AT ANGOLA?

7  **A.**   I WAS.

8  **Q.**   AND WHAT DID YOU UNDERSTAND THAT TO INCLUDE?

9  **A.**   IT INCLUDED AN ASSESSMENT OF HEALTH CARE SYSTEMS AT ANGOLA

10  AND THE QUALITY OF MEDICAL CARE.  AND WE WERE PARTICULARLY

11  ATTENTIVE TO THE FINDINGS OF THE COURT IN THEIR -- IN THEIR --

12  IN HER OPINION, IN THE JUDGE'S OPINION, IN MARCH 31, 2021, OF

13  THE FINDINGS OF THE COURT.  SO WE ORGANIZED OUR REPORT

14  CONSISTENT WITH THE ORGANIZATION OF THE JUDGE'S FINDINGS.

15  **Q.**   AND HOW DID YOU CONDUCT YOUR REVIEW?

16  **A.**   WE CONDUCTED OUR REVIEW IN A MANNER SIMILAR AS WE DID FOR

17  OUR REPORT IN 2016.  WE REVIEWED MEDICAL RECORDS; WE CONDUCTED

18  AN ON-SITE VISIT; WE SPOKE TO INMATES; WE OBSERVED HEALTH CARE

19  PROCESSES, LIKE SICK CALL, MEDICATION ADMINISTRATION, INFIRMARY

20  CARE, EMERGENCY CARE.  SO WE COMBINED A COMBINATION OF

21  STRATEGIES TO TRY TO GATHER DATA TO, YOU KNOW, COME TO SOME

22  CONCLUSIONS.

23  **Q.**   AND DID YOU REVIEW ANY DOCUMENTS?

24  **A.**   YES.  WE REVIEWED MULTIPLE DOCUMENTS, INCLUDING, YOU KNOW,

25  DEPOSITIONS AND DATA.  THEY ARE LISTED IN OUR REPORT.  BUT WE

11:19 1  REVIEWED A NUMBER OF DOCUMENTS.

2  **Q.**  ALL RIGHT.  AND IN SELECTING YOUR PATIENTS TO REVIEW, HOW

3  DID YOU DO THAT PROCESS?

4  **A.**  SO WHAT WE SEEK TO DO IS REVIEW RECORDS OF PATIENTS THAT

5  HAVE USED THE HEALTH CARE SYSTEM.  SO WE ARE LOOKING FOR

6  PATIENTS THAT HAVE MEDICAL PROBLEMS.  WE USED THE METHODOLOGY

7  THAT WE DID IN 2016.  WE GOT A LIST OF DEATHS OF INMATES WHO

8  DIED DURING THE REMEDY PHASE OF THIS CASE, FROM JANUARY 1,

9  2019, UP TO THE PRESENT TIME -- WHICH I BELIEVE THAT -- THAT

10  WHEN THE RECORDS WERE PRODUCED WAS EARLY 2022 -- AS WELL AS A

11  LIST OF HOSPITALIZATIONS DURING THE SAME REVIEW PERIOD.

12       AND WE SELECTED SAMPLES OF RECORDS FROM EACH OF THE

13  YEARS, FROM 2019, 2020, AND 2021, SO WE CAN EVALUATE CARE OVER

14  TIME AND DETERMINE WHETHER CARE HAD IMPROVED SINCE OUR LAST

15  REPORT OR NOT.  AND SO WE WANTED TO GET A REPRESENTATIVE SAMPLE

16  OVER THE REMEDY PHASE.

17       WE DID SEEK TO, AS MUCH AS POSSIBLE, EVALUATE RECENT

18  CARE TO GET A SENSE OF WHERE THINGS STAND TODAY, BUT MANY OF

19  THE IMPROVEMENTS WERE NOT -- THE IMPROVEMENTS MADE WERE VERY

20  RECENT IMPROVEMENTS IN NOVEMBER OF 2021.  AND SO THERE WASN'T A

21  LOT OF DATA TO BE ABLE TO ASSESS RECENT CARE.  WE DIDN'T HAVE A

22  VERY LARGE SAMPLE, BUT WE MADE AN EFFORT TO TRY TO FIND OUT

23  WHAT'S GOING ON TODAY.

24  **Q.**  AND GIVEN YOUR INTENTIONS WITH THAT SAMPLE, DO YOU FEEL

25  THAT YOU WERE ABLE TO ACHIEVE A REPRESENTATIVE SAMPLE OVER

11:21 1  TIME?

2  **A.**    YES.

3  **Q.**    AND WHAT LEADS YOU TO THAT CONCLUSION?

4  **A.**    WELL, WE EVALUATED THE HEALTH CARE PROCESSES AND QUALITY

5  OF CARE FROM 2019 UP TO EARLY 2022, AND THE FINDINGS WERE

6  CONSISTENT ESSENTIALLY OVER THAT TIME PERIOD.  SO IN MULTIPLE

7  RECORDS, IN HUNDREDS OF ENCOUNTERS IN EACH RECORD, EVALUATING.

8          AND WHAT WE DO IS WE EVALUATE HOW THE TIMELINESS AND

9  APPROPRIATENESS OF CARE IS AND WHETHER ALL THE SYSTEMS ARE

10  WORKING TOGETHER.  LIKE WHEN DOCTORS ORDER MEDICINES, DO THE

11  PATIENTS GET IT TIMELY?  DO THE PATIENTS GET TIMELY FOLLOW-UP

12  FOLLOWING TREATMENT BEING ORDERED?  SO WE -- ARE THE MEDICAL

13  RECORDS, YOU KNOW, ORGANIZED?  ARE THE MEDICATIONS DOCUMENTED?

14          WE TRY TO LOOK AT THE SYSTEM AS A WHOLE.  AND IF

15  THERE ARE PROBLEMS WITH MEDICAL CARE, WE ACTUALLY TRY TO

16  IDENTIFY WHERE THOSE PROBLEMS ARE.

17  **Q.**    AND WHAT, IF ANYTHING, WAS UNIQUE ABOUT THIS SAMPLE FROM

18  2019 TO PRESENT THAT WAS DIFFERENT FROM THE LAST SAMPLE?

19  **A.**    SO ONE THING THAT WAS DIFFERENT IS THAT, FOR EXAMPLE, IF

20  WE SELECTED RECORDS OF A PATIENT THAT DIED IN 2019, WE'RE ONLY

21  ABLE TO LOOK AT THE CARE IN 2019, WHICH WAS THE REMEDY PHASE OF

22  THE CASE.  SO WE COULDN'T GO BACK AND LOOK FURTHER TO SEE WAS

23  THE CARE PRIOR TO 2019 TIMELY AND APPROPRIATE.  SO WE DIDN'T --

24  WE DIDN'T HAVE AS LONG A PERIOD TO LOOK BACK AS WE DID WITH

25  THE -- DURING THE LIABILITY PHASE.

11:23 1    Q.   AND HAVE YOU USED THIS METHODOLOGY BEFORE?

2    A.   IN VIRTUALLY ALL THE INVESTIGATION AND MONITORING CASES

3    THAT I'VE BEEN INVOLVED WITH.

4    Q.   AND YOU MENTIONED *BROWN V. PLATA*?

5    A.   I DID.

6    Q.   THAT CASE WAS A CASE THAT WENT ALL THE WAY TO THE

7    SUPREME COURT, AS I UNDERSTAND?

8    A.   IT DID.

9    Q.   AND IS THIS THE METHODOLOGY THAT YOU USED IN THAT CASE?

10   A.   IT IS.

11   Q.   AND IS IT YOUR UNDERSTANDING THAT THE ORDER THAT THE

12   SUPREME COURT ISSUED RELIED, AT LEAST IN PART, ON YOUR REPORTS

13   USING THIS METHODOLOGY?

14   A.   YES.

15   Q.   ALL RIGHT.  LET'S TALK ABOUT THE AREAS THAT YOU FOCUSED

16   ON.

17          WHAT AREAS OF CARE DID YOU FOCUS ON?

18   A.   AS REFERENCED EARLIER, I FOCUSED ON CLINICAL CARE.  BUT

19   CLINICAL CARE CONSISTS OF SPECIALTY CARE, INFIRMARY SERVICES

20   AND EMERGENCY SERVICES AND ACCESS TO CARE.  SO I LOOKED AT

21   ESSENTIALLY ONE COMPONENT OF IT AS MY RESPONSIBILITY FOR THE

22   PURPOSES OF THE REPORT.

23          BUT AS I MENTIONED EARLIER, I FOUND -- UNDER THE

24   CLINICAL CARE SECTION, I FOUND ISSUES IN THE INFIRMARY, ISSUES

25   IN SPECIALTY CARE, AND ISSUES IN EMERGENCY CARE AS WELL.

11:24 1    **Q.**   AND ARE THOSE ISSUES NOTED IN THE CHART REVIEWS THAT YOU

2    PROVIDED?

3    **A.**   YES.

4    **Q.**   OKAY.  AND TO YOUR KNOWLEDGE, WERE -- THE CHART REVIEWS

5    THAT YOU REVIEWED, WERE THE DEFENDANTS INFORMED OF THE CHARTS

6    THAT YOU WERE RESPONSIBLE FOR?

7    **A.**   YES.

8    **Q.**   OKAY.

9    **A.**   AND JUST TO ADD, AND SO I ALSO LOOKED AT MEDICATION

10   ADMINISTRATION OR THE MEDICATION MANAGEMENT SYSTEM, HEALTH

11   RECORDS, AND CLINIC SPACE.

12   **Q.**   OKAY.  AND YOU MENTIONED EARLIER DURING THE CROSS OF THE

13   TENDER THAT YOU ALSO LOOKED AT PUNITIVE ATTITUDES OF STAFF.  IS

14   THAT NOTED IN ANY SECTION OF THE REPORT?

15   **A.**   YES.

16   **Q.**   WHAT SECTION IS THAT?

17   **A.**   I BELIEVE THAT'S IN OUR "CLINICAL CARE" SECTION AS WELL.

18   **Q.**   AND THAT'S AN AREA YOU NOTED AS BEING RESPONSIBLE FOR?

19   **A.**   YES.

20   **Q.**   OKAY.  THANK YOU.

21           DO YOU FEEL CONFIDENT IN PROVIDING A -- SORRY.

22   EXCUSE ME.

23           GIVEN EVERYTHING YOU HAVE REVIEWED AND THE

24   METHODOLOGY, DO YOU FEEL CONFIDENT PROVIDING THIS COURT WITH AN

25   OPINION AS TO THE STATE OF THE SYSTEMS THAT YOU WERE

11:25 1 RESPONSIBLE FOR?

2 **A.** YES.

3 **Q.** AND IF YOU DON'T MIND, TO JUST HIGHLIGHT SOME OF THE

4 BIGGEST AND MOST STRIKING FINDINGS THAT STUCK WITH YOU AFTER

5 YOUR REVIEW.

6 **A.** SO THE OVERALL IMPRESSION FROM THE REVIEW IS THAT LSP

7 PATIENTS CONTINUE TO SUFFER SERIOUS HARM AND PREVENTABLE HARM,

8 INCLUDING HOSPITALIZATIONS AND DEATHS AS A RESULT OF LACK OF

9 TIMELY AND APPROPRIATE MEDICAL CARE. SO THAT'S THE BIG

10 PICTURE.

11 WITH RESPECT TO THE CLINICAL CARE DURING THE

12 LIABILITY PHASE, FOR THE MAJORITY OF THE LIABILITY PHASE THE

13 SICK CALL SYSTEM WAS THE SAME AS IT WAS. IT WAS UNCHANGED FROM

14 THE TIME OF OUR REPORT.

15 MEDICS FOR THE MAJORITY OF THAT PERIOD CONTINUED TO

16 DO SICK CALL; PATIENTS DIDN'T RECEIVE ADEQUATE MEDICAL

17 EVALUATIONS AND DIAGNOSIS; AND MANY CASES WERE NOT SEEN AT ALL

18 BY A MEDICAL PROVIDER WHO WAS QUALIFIED TO DIAGNOSE THEIR

19 CONDITIONS.

20 WITH RESPECT TO SELF-DECLARED EMERGENCIES, WHICH IS

21 THE WAY THAT THE INMATES CAN CALL FOR HELP, IT WAS THE SAME

22 THING. NOTHING WAS CHANGED.

23 AND AS OF OUR SITE VISIT, THAT WAS STILL TRUE.

24 MEDICS WERE INDEPENDENTLY HANDLING SELF-DECLARED EMERGENCIES

25 AND THEN WERE PASSIVELY REFERRING IT TO A MEDICAL PROVIDER WHO

11:27 1 WOULD JUST SAY "SIGN UP FOR SICK CALL." AND THAT WAS REALLY

2 STRIKING. BUT THAT, YOU KNOW, GIVEN THE OPINION OF THE JUDGE

3 LAST -- YOU KNOW, A YEAR AGO, THAT THAT WAS UNCHANGED.

4 THE OTHER REALLY STRIKING FINDING IS THE MEDICATION

5 MANAGEMENT SYSTEM IS COMPLETELY BROKEN, FROM ORDERING THE MEDS,

6 TO GETTING THEM TO THE PHARMACY, TO TIMELY DISPENSING THE MEDS,

7 TO ADMINISTERING THE MEDS, TO DOCUMENTING THE MEDS IN THE

8 MEDICATION ADMINISTRATION RECORD.

9 **MR. ARCHEY:** YOUR HONOR, I'M GOING TO OBJECT AS THIS

10 BEING OUTSIDE THE SCOPE OF THE COURT'S RULING. THERE IS NO

11 FINDING AS TO MEDICATION MANAGEMENT OR MEDICATION

12 ADMINISTRATION. THAT ISN'T ONE OF THE AREAS THAT THE COURT

13 FOUND WAS A PROBLEM THAT THEY WE WERE ADDRESSING.

14 **MS. MONTAGNES:** YOUR HONOR, THAT'S SIMPLY UNTRUE.

15 YOU MADE A FINDING DIRECTLY AS TO THE MANAGEMENT BY -- THE

16 MISMANAGEMENT OF MEDICATION BY PHYSICIANS. YOU ALSO MADE A

17 FINDING AS TO THE CORRECTIONAL OFFICERS' MANAGEMENT OF THE

18 MEDICATION ADMINISTRATION IN YOUR OPINION. I CAN PULL THE

19 CITATIONS.

20 **THE COURT:** YOU DON'T NEED TO PULL THE CITATIONS.

21 OKAY.

22 YOU WANT TO ADDRESS THE OBJECTION, MS.

23 MONTAGNES?

24 **MS. MONTAGNES:** ABSOLUTELY, JUDGE. IN YOUR OPINION

25 YOU FOUND THAT PHYSICIANS ROUTINELY FAILED TO MONITOR AND

11:29 1  MANAGE MEDICATIONS; YOU FOUND THAT PHYSICIANS ROUTINELY FAILED

2  TO EDUCATE PATIENTS REGARDING MEDICATION; AND YOU MADE A

3  SPECIFIC FINDING AS TO CORRECTIONAL OFFICERS DELIVERING

4  MEDICATION.  THOSE ARE EXACTLY THE SAME ISSUES THAT NURSE

5  PRACTITIONER LAMARRE IS SPEAKING TO.

6           **THE COURT:**  OBJECTION IS OVERRULED.

7  **BY MS. MONTAGNES:**

8  **Q.**    YOU CAN GO AHEAD.  AND IF YOU WOULD LIKE, WE MIGHT BE ABLE

9  TO PROVIDE YOU WITH WHERE YOU WERE, BECAUSE HE INTERRUPTED YOU

10  MID-ANSWER.

11  **A.**    SO I THINK I DO RECALL.

12  **Q.**    OKAY.

13  **A.**    SO I WAS TALKING ABOUT THE FACT THAT THE MEDICATION SYSTEM

14  IS VERY COMPLEX AND CERTAIN STEPS OF THE PROCESS ARE NOT

15  WORKING.  AND I WAS GOING TO ADD THE MEDICATION REFILL PROCESS

16  AND THE MEDICATION REORDER PROCESS.  THESE PROCESSES ARE NOT

17  ADEQUATELY ADDRESSED IN POLICY.  THERE'S LACK OF CLEAR GUIDANCE

18  ABOUT WHAT'S SUPPOSED TO HAPPEN.

19           AND WE FOUND THAT IN PARTICULAR THE MEDICATION

20  ADMINISTRATION RECORDS CANNOT BE RELIED UPON FOR A MEDICAL

21  PROVIDER TO MAKE A DECISION ABOUT:  IS THE PATIENT GETTING THE

22  MEDICATION?  IS THE PATIENT NOT GETTING THE MEDICATION?  AND,

23  THEREFORE, THE TREATMENT DECISIONS ARE AFFECTED BY THE LACK OF

24  ACCURATE INFORMATION ABOUT WHAT MEDICATIONS THE PATIENT IS

25  RECEIVING.

11:30 1  **Q.**  AND NURSE PRACTITIONER LAMARRE, THE LAST TRIAL WE WALKED

2  THROUGH SORT OF THE COMPONENTS OF AN ADEQUATE HEALTH CARE

3  SYSTEM.

4       IN THE INTEREST OF MOVING THIS ALONG AND BEING

5  RESPECTFUL OF JUDICIAL ECONOMY, DO YOU STAND BY YOUR SORT OF

6  DESCRIPTION OF WHAT MAKES UP AN ADEQUATE HEALTH CARE SYSTEM

7  FROM THE PREVIOUS TRIAL?

8  **A.**  I DO.

9       **MS. MONTAGNES:**  OKAY.  SO, YOUR HONOR, AT THIS POINT

10  WE'RE GOING TO MOVE AHEAD RIGHT THROUGH IT, ASSUMING THAT

11  YOU'VE HEARD THIS BEFORE.

12  **BY MS. MONTAGNES:**

13  **Q.**  LET'S START BY TALKING ABOUT SOME PATIENTS WHO STOOD OUT

14  TO YOU.  HOW DID YOU SELECT SOME PATIENTS TO FOCUS ON TODAY?

15  **A.**  WELL, AS I MENTIONED, WE -- AND MY COLLEAGUES JUST DIVIDED

16  UP THE RECORDS FROM THE LIST.  WE EACH HAD A SAMPLE AND

17  SELECTED THEM FROM THE LIST OF DEATHS AND HOSPITALIZATIONS.

18  **Q.**  AND HOW DID YOU PICK WHO YOU WANTED TO TALK ABOUT TODAY?

19  **A.**  SO I WANTED TO PICK OUT SOME RECORDS THAT DEMONSTRATED THE

20  SYSTEM ISSUES BUT ALSO THE LACK OF MEDICAL QUALITY OF CARE.

21  AND, AGAIN, WE -- I WANTED TO TALK ABOUT RECENT CARE AS WELL AS

22  CARE OVER -- THROUGHOUT THE LIABILITY PERIOD.  BUT THOSE ARE

23  THE RECORDS I SELECTED.

24  **Q.**  OKAY.  SO WE'RE GOING TO START BY TALKING ABOUT PATIENT

25  16.

11:32 1          CAN YOU TELL ME A BIT ABOUT PATIENT 16?

2    **A.**    ONE MOMENT.  SO PATIENT 16 IS A 43-YEAR-OLD PATIENT WITH A

3    HISTORY OF HYPERTENSION AMONG HIS MEDICAL PROBLEMS.  HE DIED OF

4    CARDIAC ARREST ON MARCH 17, 2021.  AND WHAT'S STRIKING ABOUT

5    THIS CASE IS THAT THIS PATIENT HAD SEVERELY UNCONTROLLED HIGH

6    BLOOD PRESSURE FOR WHICH, WHEN HE WOULD COME FOR CLINIC VISITS,

7    MEDICAL PROVIDERS PERFORMED NO MEDICAL EVALUATION, TO SPEAK OF,

8    AND DID NOT TREAT HIS SEVERE HYPERTENSION.

9          AND IN ONE CASE, THE PATIENT WENT TO THE HOSPITAL FOR

10   A SCHEDULED TEST AND WHEN HE GOT THERE, HIS BLOOD PRESSURE WAS

11   200 OVER A HUNDRED AND SOMETHING, AND THE HOSPITAL STOPPED WHAT

12   THEY WERE DOING.  THEY DEFERRED THE TEST AND THEY SENT HIM TO

13   THE EMERGENCY DEPARTMENT, TREATED HIM FOR HIS HYPERTENSION, DID

14   A COMPLETE EVALUATION.

15         AND WHAT WAS NOTABLE ABOUT IT TO ME IS THAT THEY GAVE

16   HIM -- HE HAD NOT TAKEN HIS MEDICATION THAT DAY.  SO THEY GAVE

17   HIM HIS MEDICATION AND HIS BLOOD PRESSURE DIDN'T GO DOWN, AND

18   SO THEY HAD TO START AN IV DRIP TO MAKE HIS BLOOD PRESSURE GO

19   DOWN.  AND WHAT THAT IS ILLUSTRATIVE OF IS THAT SOMETIMES EVEN

20   WHEN YOU GIVE PATIENTS THEIR SCHEDULED MEDICAL TREATMENT, IT

21   MAY NOT LOWER THEIR BLOOD PRESSURE AND YOU HAVE TO GO A STEP

22   FURTHER.

23         WHEN HE WAS RETURNED TO THE INSTITUTION, HE CONTINUED

24   TO HAVE EPISODES OF VERY HIGH BLOOD PRESSURE IN WHICH, YOU

25   KNOW, THE MEDICAL PROVIDERS ESSENTIALLY DID NOTHING.

11:34 1    Q.    AND I'M GOING TO STOP YOU THERE FOR A SECOND, MS. LAMARRE,
2    AND ASK THAT WE PULL UP JX_16, PAGE 101.  THIS IS JOINT
3    EXHIBIT 16, BATES STAMPED 101.
4            YOU MENTIONED, YOU KNOW, AN EXAMPLE OF LSP -- OF AN
5    INCIDENT WHERE HE GOES TO CLINIC AND HE HAS HIGH BLOOD
6    PRESSURE.  IS THIS AN EXAMPLE OF THAT?
7    A.    YES.
8    Q.    OKAY.  AND CAN YOU TELL ME WHAT'S GOING ON HERE?
9    A.    OKAY.  SO IN THIS CASE A NURSE PRACTITIONER SEES THE
10    PATIENT.  HE WAS RECENTLY SEEN IN THE EMERGENCY ROOM.  THE
11    PATIENT TOLD THE E.R. DOCTOR HE WAS MISSING PILL CALL, BUT THE
12    PATIENT WAS ASSIGNED TO TAKE HIS MEDICATION KOP.  AND SO WHAT
13    THEY WERE POINTING OUT IS THAT THE PATIENT HAD THE ABILITY TO
14    TAKE HIS MEDICATION HIMSELF, AND HE WASN'T TAKING HIS MEDS,
15    ACCORDING TO THE NURSE PRACTITIONER.
16            SO WHAT'S REMARKABLE ABOUT THIS IS THAT THE NURSE
17    PRACTITIONER DOESN'T ASK THE PATIENT WHETHER HE'S HAVING
18    SYMPTOMS OF, WHAT WE CALL, END ORGAN DAMAGE.  SO WHEN SOMEONE'S
19    BLOOD PRESSURE IS THAT HIGH --
20    Q.    AND CAN YOU -- AND JUST TO STOP YOU.  CAN YOU TELL US HOW
21    HIGH IS HIS HIGH BLOOD PRESSURE?
22    A.    176/118.
23    Q.    AND WHAT IS CONSIDERED NORMAL?
24    A.    LESS THAN 130/80, I THINK, IS THE CURRENT RECOMMENDATION
25    BY THE AMERICAN HEART ASSOCIATION.

11:35  1          SO HIS BLOOD PRESSURE IS EXTREMELY HIGH.  AND WHAT
2   YOU WANT TO DO WHEN SOMEONE'S BLOOD PRESSURE IS THAT HIGH IS
3   ASK THEM, ARE YOU HAVING A HEADACHE?  WHICH MIGHT BE A SYMPTOM
4   OF A STROKE.  ARE YOU HAVING CHEST PAIN OR SHORTNESS OF BREATH?
5   THAT COULD BE A SYMPTOM OF A HEART ATTACK.  AND THOSE QUESTIONS
6   WERE NOT ASKED, AND THE PATIENT WASN'T TREATED.

7          IN OTHER WORDS, THE PATIENT WASN'T SENT TO THE ATU TO
8   GET MEDICATIONS TO LOWER THE BLOOD PRESSURE AND MONITOR THE
9   PATIENT UNTIL THE BLOOD PRESSURE WAS -- YOU KNOW, HAD COME
10  DOWN.  IT'S JUST:  *TAKE YOUR MEDICINES AND COME BACK IN A*
11  *MONTH.*

12  **Q.**   SO THIS ENCOUNTER HAPPENED ON OCTOBER 18TH OF 2019.  WE'RE
13  GOING TO PULL UP JX_16, PAGE 64.

14          SO THIS IS AN ENCOUNTER FROM JUNE 3, 2020.  IS THAT
15  RIGHT?

16  **A.**   THAT'S CORRECT.

17  **Q.**   AND WHAT IS HIS BLOOD PRESSURE DURING THIS ENCOUNTER?

18  **A.**   IT'S 173/115.  AND THEN TEN MINUTES LATER IT WAS REPEATED,
19  AND IT WAS 173/110.

20  **Q.**   AND HOW WOULD YOU DESCRIBE THAT BLOOD PRESSURE?

21  **A.**   OH, SEVERELY ELEVATED.

22  **Q.**   OKAY.

23          **THE COURT:**  I'M SORRY.  WHAT WAS THE DATE OF
24  JX_16_101?  I DIDN'T NOTE THAT.

25          **MS. MONTAGNES:**  SORRY.  THAT WAS 10/18/2019.

11:37 1          **THE COURT:** OKAY. GO AHEAD.

2    **BY MS. MONTAGNES:**

3    **Q.**   AND SO OVER TIME HIS BLOOD PRESSURE HAS -- THERE HAVE BEEN

4    INCIDENTS -- SEVERAL INCIDENTS OF HIGH BLOOD PRESSURE?

5    **A.**   YES.

6    **Q.**   AND IN YOUR REVIEW OF THE RECORD, DID YOU SEE OTHER

7    INSTANCES?

8    **A.**   YES.

9    **Q.**   OKAY.  SO THEN WHAT HAPPENS NEXT FOR THIS PATIENT?

10   **A.**   THE PATIENT WAS SEEN -- AND I THINK WE HAVE A --

11   **Q.**   YES.

12          **MS. MONTAGNES:**  COULD WE BRING UP JX_16, PAGE 59.

13   HIGHLIGHT THE DATE AT THE TOP.

14   **BY THE WITNESS:**

15   **A.**   OKAY.  SO THIS WAS AN ENCOUNTER ON JUNE 30, 2020, WHERE

16   THE EMTS RESPONDED TO THE PATIENT'S LOCATION FOR ALTERED MENTAL

17   STATUS AND POSSIBLE INTOXICATION.  THE PATIENT HAD SLURRED

18   SPEECH, AND HE ADMITTED TO TAKING TWO HITS OF MOJO.  HIS VITAL

19   SIGNS WERE NOT EXCEEDINGLY ELEVATED AT THAT TIME, AND HE WAS

20   TRANSPORTED TO THE ATU.  AND AT THAT POINT -- SO THIS IS JUST

21   THE EMTS INITIAL RESPONSE.

22          DO WE HAVE THE JUNE 30TH PROGRESS NOTE?

23   **Q.**   WE DON'T.

24   **A.**   OKAY.  WELL, THEN LET ME DESCRIBE IT FOR THE COURT.  SO HE

25   WENT TO THE ATU AND THE PROVIDER DID NOT DIAGNOSE IT --

11:38 1  DOCUMENT A DIAGNOSIS OR A TREATMENT PLAN, AND HE WAS DISCHARGED

2  BACK TO HIS HOUSING UNIT.

3  **Q.**   OKAY.

4       **MS. MONTAGNES:**  AND CAN WE BRING UP JX_16_58?

5  **BY MS. MONTAGNES:**

6  **Q.**   AND WHAT'S GOING ON IN THIS NOTE?

7  **A.**   SO I THINK THAT THIS IS NOT THE PATIENT -- I'M SORRY.

8  YES.  I'M SORRY.  THIS IS THE PATIENT WE WERE TALKING ABOUT.

9  **Q.**   YES.

10       **MS. MONTAGNES:**  YOUR HONOR, WE HAVE TWO PATIENTS WITH

11  THE EXACT SAME NAME, AND SO IT CAN GET A LITTLE BIT CONFUSING.

12  BUT THIS IS PATIENT 16.

13  **BY THE WITNESS:**

14  **A.**   SO IN THIS DOCUMENT, HE -- THE PATIENT JUMPED OFF A BRIDGE

15  AND HE INJURED HIMSELF.  AND HE WAS SEEN IN THE CLINIC AND

16  DETERMINED TO HAVE CHRONIC PAIN WITH HIS KNEE.  AND I DON'T SEE

17  ANY VITAL SIGNS RECORDED HERE.

18  **Q.**   AND WHAT IS REMARKABLE ABOUT THIS ENCOUNTER IN THE CONTEXT

19  OF HIS OVERALL CARE?

20  **A.**   WELL -- SO THE DATE IS 8/31/20.  AND WHENEVER YOU SEE A

21  PATIENT, YOU -- FOR ANY CLINICAL ENCOUNTER, YOU WANT TO TAKE A

22  SET OF VITAL SIGNS TO -- PARTICULARLY GIVEN THE FACT THAT HIS

23  BLOOD PRESSURE HAD BEEN EXTREMELY ELEVATED.  AND SO THAT'S WHAT

24  YOU WANT TO DO.  AND IT'S JUST AN EXAMPLE OF NOT ATTENDING TO

25  THE PATIENT AS A WHOLE.  LIKE WHAT ARE THIS PATIENT'S MEDICAL

11:40 1  PROBLEMS?  THIS IS JUST AN ISOLATED INCIDENT.  HE JUMPED OFF

2  AND HE HURT HIS KNEE.

3        **MS. MONTAGNES:**  AND CAN WE BRING UP JX_16_56?

4  **BY MS. MONTAGNES:**

5  **Q.**  AND, MS. LAMARRE, WHAT'S HAPPENING IN THIS DOCUMENT?

6  **A.**  SO THE PATIENT WAS FOUND TO BE -- SO THIS IS NINE MONTHS

7  AFTER HIS BLOOD PRESSURE WAS EXCEEDINGLY HIGH.  AND HE HAS NOT

8  BEEN SEEN FOR HIGH BLOOD PRESSURE/HYPERTENSION FOLLOW-UP SINCE

9  JUNE OF 2020.  AND HE HAS A CARDIAC ARREST, AND CPR WAS IN

10  PROGRESS WHEN THE EMTS ARRIVED.

11        AND WHAT'S NOTABLE ABOUT THIS IS THAT WHEN YOU HAVE A

12  CARDIAC ARREST, THE STAFF NEEDS TO RESPOND WITHIN A FOUR-MINUTE

13  TIME FRAME BECAUSE BRAIN DEATH OCCURS, YOU KNOW, AFTER ABOUT

14  SIX TO SEVEN MINUTES.  YOU WANT TO START CPR AND YOU WANT TO

15  BRING THE AUTOMATIC EXTERNAL DEFIBRILLATOR WITH YOU TO APPLY IT

16  TO THE PATIENT'S CHEST AND TRY TO SHOCK THE PATIENT IF THE AED

17  SAYS TO SHOCK THE PATIENT TO SAVE THE PATIENT'S LIFE.

18        IN THIS CASE, THE STAFF DID NOT BRING THE AED TO

19  APPLY IT.

20  **Q.**  AND SO WHAT HAPPENED TO THIS PATIENT?

21  **A.**  AND THE PATIENT PASSED AWAY.

22  **Q.**  OKAY.  SO ZOOMING OUT, YOU KNOW, WHAT IS YOUR MAJOR

23  FINDING WITH RESPECT TO THIS PATIENT AND THE CARE OF HIS HIGH

24  BLOOD PRESSURE?

25  **A.**  SO THE MAJOR FINDING IS THAT THIS PATIENT HAD SEVERE

11:42 1  HYPERTENSION THAT WAS VERY POORLY CONTROLLED.  THERE WAS A
      2  QUESTION ABOUT WHETHER HE WAS TAKING HIS MEDICATION.  AND, YOU
      3  KNOW, ONE OF THE SORT OF RESPONSIBILITIES OF MEDICAL PROVIDERS
      4  IS TO -- YOU KNOW, IS TO EVALUATE IF PATIENTS ARE TAKING --
      5  FIRST OF ALL, YOU WANT TO KNOW ARE THEY TAKING THE MEDICATIONS
      6  OR NOT.  YOU WANT TO LOOK AT THE MARS TO FIND OUT.  IF THE
      7  PATIENT IS NOT TAKING THEIR MEDICATIONS, YOU WANT TO TALK WITH
      8  THE PATIENT ABOUT WHY ARE YOU -- HOW ARE YOU TAKING YOUR
      9  MEDICATIONS?  DOES IT MATCH THE LIST THAT -- OF WHAT I'VE
     10  PRESCRIBED FOR YOU?  DO YOU HAVE THOSE MEDICATIONS FROM THE
     11  PHARMACY?  HOW ARE YOU TAKING THEM?  IF YOU'RE NOT TAKING THEM,
     12  TELL ME WHY YOU'RE NOT TAKING THEM?
     13         WELL, THIS MEDICATION MAKES ME SICK.  OKAY.  WELL,
     14  THEN, WE CAN DEAL WITH THAT.
     15         BUT WHAT'S REALLY REMARKABLE HERE IS THE LACK OF
     16  FOLLOW-UP AND A LACK OF ATTENTION TO WHAT THEY IDENTIFIED AS
     17  THE PATIENT NOT BEING COMPLIANT WITH THEIR MEDICATIONS AND
     18  ADDRESSING THOSE FACTORS.  IT HAPPENS IN EVERY CORRECTIONAL
     19  INSTITUTION THAT I MONITOR; THAT THERE ISN'T ATTENTION TO THE
     20  PATIENT COMPLIANCE IN ADDRESSING THOSE OBSTACLES.
     21         **MS. MONTAGNES:**  AND CAN WE BRING UP JX_16_97?
     22  **BY MS. MONTAGNES:**
     23  **Q.**  AND, IN FACT, IN THIS CASE, WE HAVE ONE EXAMPLE OF WHAT
     24  THAT SHOULD LOOK LIKE.  ISN'T THAT RIGHT?
     25  **A.**  YES.

11:43 1  Q.   AND WHAT IS THIS?

2  A.   WELL, I WAS -- THIS IS A NOTE WRITTEN BY A NURSE WHERE THE

3  PATIENT WAS CALLED FOR A BLOOD -- TO SEE THE NURSE FOR A BLOOD

4  PRESSURE CHECK AND COUNSELING.  AND THIS WAS GREAT TO SEE IN

5  THE RECORD, BUT I HAVE TO SAY THIS IS THE ONLY NOTE IN ALL THE

6  RECORDS I HAVE LOOKED AT THAT LOOKED -- THAT CONTAINED THIS

7  INFORMATION, WHERE THE NURSE SAYS, "YOU NEED TO, YOU KNOW,

8  DECREASE YOUR SODIUM INTAKE.  YOU NEED TO TAKE YOUR MEDICATIONS

9  CONSISTENTLY.  AND IF YOU DON'T TAKE YOUR MEDICATIONS, YOU

10  COULD HAVE A STROKE."  SO SHE'S EDUCATING THE PATIENT ABOUT THE

11  RISK, THE COMPLICATIONS OF HIGH BLOOD PRESSURE.  SHE WRITES,

12  "THE OFFENDER VERBALIZED UNDERSTANDING."  SO SHE CHECKED IT OUT

13  WITH THE PATIENT:  DO YOU UNDERSTAND WHAT I'M TELLING YOU?  AND

14  "WILL RECHECK ON WEDNESDAY."

15          SO THIS IS WHAT SHOULD HAPPEN.  THE PROVIDER IS

16  PRIMARILY RESPONSIBLE FOR COUNSELING THE PATIENT.  BUT

17  OFTENTIMES THERE'S A TEAM APPROACH.  AND NURSES ARE VERY GOOD

18  AT EDUCATING PATIENTS, AND THERE SHOULD BE A RE-CALL SYSTEM

19  THAT PERMITS THIS TO HAPPEN.

20  Q.   OKAY.  AND THIS HAPPENED ON NOVEMBER 4, 2019.  IS THAT

21  RIGHT?

22  A.   YES.

23  Q.   OKAY.  AND BETWEEN JUNE 30TH -- JUNE 3, 2020, WHEN HE HAD

24  THAT HIGH BLOOD PRESSURE THAT WAS NOTED IN THE AMBULANCE RUN

25  AND MARCH 17, 2021 -- SO THAT'S A NINE-MONTH PERIOD -- WAS HE

11:45  1  EVER SEEN BY ANYONE WITH RESPECT TO HIS BLOOD PRESSURE AT LSP?

2  **A.**   NOT THAT I COULD FIND.  AND I HAVE TO MAKE A COMMENT ABOUT

3  THAT.  BECAUSE THE STATE OF THE MEDICAL RECORDS WAS IN SUCH

4  DISORGANIZATION AND OUT OF CHRONOLOGY, IT'S POSSIBLE THERE WAS

5  A NOTE THERE AND THAT I MISSED IT.  BUT I WAS UNABLE TO FIND

6  ANY EVIDENCE THAT HE WAS MONITORED.

7  **Q.**   ALL RIGHT.  LET'S TURN AND TALK A BIT ABOUT PATIENT 13.

8         **MS. MONTAGNES:**  AND ACTUALLY, YOUR HONOR, I WONDER --

9  IT'S QUARTER TO 12.  THIS PATIENT IS ACTUALLY GOING TO TAKE

10  QUITE A WHILE TO DISCUSS.  IT WOULD MAKE SENSE TO TAKE A BREAK

11  NOW.

12         **THE COURT:**  ALL RIGHT.  WE WILL BE IN RECESS UNTIL

13  1:00.

14         **THE LAW CLERK:**  ALL RISE.

15             THE COURT IS AT RECESS.

16         **(WHEREUPON, THE COURT WAS IN RECESS.)**

17         **THE COURT:**  OKAY.  BE SEATED.

18             ALL RIGHT.  YOU MAY CONTINUE.

19         **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

20             BEFORE I CONTINUE, I JUST WANTED TO NOTE FOR THE

21  RECORD THAT WHEN WE ADMITTED PLAINTIFFS' EXHIBIT 1, THERE ARE

22  FOUR SUBSECTIONS THAT INCLUDE THE ATTACHMENTS THAT YOU

23  ADMITTED, SO IT'S 1-A, B, C, AND D.  AND I JUST WANTED TO GET

24  THAT CLEAR ON THE RECORD.

25         **THE COURT:**  OKAY.  SO NOTED.

01:02 1    **BY MS. MONTAGNES:**

2    **Q.**   ALL RIGHT, MS. LAMARRE.  WE HAD JUST FINISHED TALKING

3    ABOUT PATIENT 16 WHEN WE TOOK A BREAK, AND NOW I WAS HOPING WE

4    COULD MOVE TO TALK ABOUT PATIENT 13.

5          CAN YOU TELL ME A LITTLE BIT ABOUT THIS PATIENT AND

6    YOUR REVIEW OF HIS RECORDS?

7    **A.**   YES.  FIRST OF ALL, WHAT I'D LIKE TO REPORT IS THAT IN

8    PREPARING FOR TRIAL, I REALIZED THAT THERE WERE TWO MEDICAL

9    RECORD VOLUMES FOR THIS PATIENT, BUT I HAD ONLY REVIEWED ONE

10   MEDICAL RECORD VOLUME BECAUSE THEY WERE PRODUCED AT DIFFERENT

11   TIMES.

12         IN REVIEWING THE SECOND VOLUME -- OR BOTH VOLUMES, I

13   REALIZED THAT EACH -- THAT BOTH VOLUMES WERE BASICALLY FOR THE

14   SAME CHRONOLOGICAL PERIOD.  BOTH VOLUMES CONTAINED DOCUMENTS

15   FROM THE SAME TIME PERIOD, EXCEPT THAT ONE VOLUME CONTAINED

16   SOME DOCUMENTS THAT WERE NOT IN THE OTHER VOLUME.  THERE WERE

17   SOME DUPLICATE DOCUMENTS.  THEY WERE NOT IN CHRONOLOGICAL

18   ORDER; AND THEREFORE, THERE ARE SOME -- WHILE MY OVERALL

19   OPINIONS REMAINED THE SAME, THERE ARE A FEW FACTUAL STATEMENTS

20   MADE IN MY REPORT THAT I WOULD LIKE TO CORRECT.  SO I'D JUST

21   LIKE TO MENTION THAT BEFORE I TESTIFY ABOUT THIS CASE.

22   **Q.**   SURE.  CAN YOU GIVE US SOME EXAMPLES OF WHAT THOSE ARE?

23   **A.**   OF WHAT?

24   **Q.**   OF THE TYPE OF CORRECTIONS YOU HAD MADE.

25   **A.**   YES.  I HAD SAID THAT CERTAIN CONSULTS, SUCH AS A UROLOGY

01:03 1 CONSULT, DIDN'T TAKE PLACE, BUT IT ACTUALLY OCCURRED DURING A

2 HOSPITALIZATION THAT WAS NOT -- THE COPY OF THE HOSPITALIZATION

3 WAS NOT IN THE RECORD THAT I REVIEWED. AND THE PATIENT HAD --

4 WAS TREATED FOR PNEUMONIA; THAT I WAS NOT AWARE HE WAS TREATED

5 FOR PNEUMONIA BECAUSE IT ALSO HAPPENED WHILE HE WAS IN THE

6 HOSPITAL. AND I THINK THAT THOSE ARE THE MAIN CORRECTIONS I

7 WOULD LIKE TO MAKE.

8 Q. AND WHAT, IF ANY, OPINION DO YOU HAVE REGARDING THE

9 EXISTENCE OF THESE TWO VOLUMES?

10 A. WELL, IT'S AN ILLUSTRATION OF THE SYSTEMATIC ISSUES

11 INVOLVING THE MEDICAL RECORDS. WHEN YOU HAVE TWO SEPARATE

12 MEDICAL VOLUMES THAT ARE COVERING THE -- YOU KNOW, THAT ARE NOT

13 CHRONOLOGICAL AND COMPLETE, THEN THE PROVIDERS DON'T KNOW

14 WHAT'S HAPPENING WITH THE PATIENT, EITHER. SO THEIR ABILITY TO

15 BE UP TO DATE AND CURRENT AND KNOW THE LATEST -- HAVE A COPY

16 OF THE LATEST DOCUMENTS AND CONSULTS AND HOSPITAL REPORTS IS

17 IMPAIRED BY THE LACK OF A COMPLETE AND CHRONOLOGICAL RECORD,

18 AND IT LEADS TO ERRORS IN TREATMENT.

19 Q. ALL RIGHT. SO WHAT ARE SOME OF THE MAJOR ISSUES? AND

20 LET'S START BY JUST GIVING A GENERAL OVERVIEW OF LIKE THE AGE

21 AND THE GENERAL CONDITIONS OF THIS PATIENT, AND WE CAN WALK

22 THROUGH SOME OF THOSE ERRORS.

23 A. YES. SO PATIENT 13 WAS A 61-YEAR-OLD MAN WITH -- WHO WAS

24 VERY MEDICALLY COMPLEX. HE HAD A NUMBER OF HEALTH PROBLEMS,

25 INCLUDING HIV, CHRONIC KIDNEY DISEASE; HE HAD CIRRHOSIS; HE HAD

01:05 1  HAD A HEART ATTACK.  AND SO HE WAS VERY, VERY MEDICALLY

2  COMPLEX.

3         AND THE -- DURING THIS -- THE REMEDY REVIEW, WHAT THE

4  RECORDS SHOWED IS THAT HE WAS UNDER THE CARE OF SPECIALISTS, A

5  NEPHROLOGIST, FOR TREATMENT OF HIS CHRONIC KIDNEY DISEASE, AND

6  THE NEPHROLOGIST FOLLOWED HIM REGULARLY.  BUT THE PRIMARY CARE

7  PROVIDERS AT THE INSTITUTION DIDN'T MEET WITH THE PATIENT AFTER

8  MEETING WITH -- AFTER THE SPECIALTY SERVICES TO DISCUSS THE

9  FINDINGS AND RECOMMENDATIONS WITH THE PATIENT TO MAKE SURE THE

10  PATIENT UNDERSTOOD WHAT -- THE TREATMENT PLAN.  SO THAT'S ONE

11  OF THE ISSUES.

12         THE PATIENT'S BLOOD PRESSURE WAS NOT WELL-CONTROLLED

13  AND THE PROVIDERS DIDN'T ADDRESS THAT.  THERE WERE SOME

14  CRITICAL MEDICATION ERRORS WITH THIS PATIENT, WHICH ARE SORT OF

15  THE MAIN -- ONE OF THE MAIN SYSTEMATIC ISSUES IN HIS RECORD.

16  THE SPECIALIST SAID STARTING -- ACTUALLY, BACK IN 2000 --

17  EXCUSE ME.

18  Q.  LET'S STOP.  WE'LL GET THERE.

19  A.  OKAY.

20  Q.  LET'S WALK THROUGH IT.

21  A.  ALL RIGHT.  ALL RIGHT.

22  Q.  SO LET'S TALK ABOUT SOME OF THOSE MEDICATION ERRORS.

23  A.  OKAY.

24         **MS. MONTAGNES:**  CAN WE BRING UP JX_13, PAGE 158?

25  THERE WE GO.

01:07  1          **THE DEPUTY CLERK:**  IS THIS SEALED OR NOT SEALED?

       2          **THE COURT:**  IT IS.

       3          **MS. MONTAGNES:**  SEALED.

       4          **THE DEPUTY CLERK:**  I MEAN, I HAVE IT TURNED ON.  IS

       5  IT NOT SHOWING?

       6          **THE COURT:**  IT'S NOT ON MINE, EITHER, SUZIE.

       7          **MS. MONTAGNES:**  I'M NOT SEEING IT.  OKAY.  THERE WE

       8  GO.

       9  **BY MS. MONTAGNES:**

      10  **Q.**  AND CAN YOU TELL ME WHAT THIS IS?

      11  **A.**  YES.  THIS IS A -- THIS PATIENT HAD A URINALYSIS AND A

      12  CULTURE.  AND THIS IS THE CULTURE REPORT THAT SHOWS WHICH

      13  ANTIBIOTICS THE ORGANISM IS SENSITIVE TO, MEANING WILL WORK FOR

      14  THE PATIENT, AND WHICH ANTIBIOTICS THE ORGANISM IS RESISTANT

      15  TO.

      16  **Q.**  ALL RIGHT.  I'M GOING TO POINT YOU TO THE BOTTOM OF THE

      17  LIST.  CAN YOU TELL ME WHAT THAT IS?

      18  **A.**  SO AT THE BOTTOM OF THE LIST -- SO THE WAY IT WORKS IS

      19  THAT THE REPORT LISTS ALL THE ANTIBIOTICS.  AND AT THE VERY

      20  BOTTOM THE REPORT SAYS THAT THE PATIENT -- OR THE ORGANISM IS

      21  RESISTANT TO TRIMETHOPRIM/SULFA.

      22  **Q.**  AND WHAT'S THE OTHER NAME FOR THAT MEDICATION?

      23  **A.**  BACTRIM.

      24  **Q.**  OKAY.  SO THIS IS A URINALYSIS.  AND THIS WAS TAKEN ON --

      25  **A.**  IT WAS COLLECTED ON 1/9.

01:08 1    **Q.**   1/9.

2    **A.**   AND IT'S THE CULTURE.

3            **MS. MONTAGNES:**  OKAY.  AND CAN WE BRING UP

4    JX_68_02321?

5    **BY MS. MONTAGNES:**

6    **Q.**   AND WHAT IS THIS?

7    **A.**   SO THIS IS THE PATIENT'S MEDICATION ADMINISTRATION RECORD

8    FOR JANUARY 2020, IN WHICH IT SHOWS THAT A PROVIDER ORDERED

9    BACTRIM, THAT THE PATIENT WAS -- THE ORGANISM THAT WAS

10    RESISTENT TO FOR THIS PATIENT, WHICH IS NOT AN APPROPRIATE

11    CLINICAL DECISION.

12    **Q.**   OKAY.  SO JUST SPELL IT OUT FOR US.

13    **A.**   SO THE PROBLEM IS THIS PATIENT HAS SEVERE KIDNEY DISEASE

14    AND HE'S GOT A URINARY TRACT INFECTION, AND THE ANTIBIOTIC

15    BEING ORDERED FOR HIM IS NOT EFFECTIVE.  AND THIS SORT OF

16    REFLECTS A LACK OF ATTENTION BY THE MEDICAL PROVIDERS TO THE

17    LAB REPORT AND NOTING THAT, YOU KNOW, THIS IS NOT AN

18    APPROPRIATE ANTIBIOTIC FOR THIS PATIENT.

19    **Q.**   AND, IN FACT, NOT APPROPRIATE; IT WON'T WORK ON THIS?

20    **A.**   IT LIKELY WILL NOT WORK.

21    **Q.**   OKAY.  LET'S GO AHEAD AND PULL UP JX_13_58.

22            AND I WANT TO PARTICULARLY DRAW YOUR ATTENTION TO THE

23    SORT OF JANUARY 13TH, 14TH AT THE BOTTOM HERE.

24            WHAT IS THIS MEDICATION ADMINISTRATION RECORD TELLING

25    US?

01:09 1  **A.**   SO THIS IS PATIENT 13'S MEDICATION ADMINISTRATION RECORD

2  IN JANUARY 2020.  AT THE TIME HE WAS IN THE INFIRMARY --

3  ALTHOUGH THE MAR IS LABELED CAMP F, SO IT'S A LITTLE MISLEADING

4  AS TO WHERE THE PATIENT ACTUALLY IS.  THE PATIENT IS IN THE

5  INFIRMARY, AND IT SHOWS THAT ON JANUARY 13TH AND 14TH, HE DID

6  NOT GET HIS HIV MEDICATIONS.

7  **Q.**   AND WHY IS THAT NOTABLE?

8  **A.**   WELL, FIRST OF ALL, HE'S IN THE INFIRMARY, AND THE NURSES

9  SHOULD BE GIVING THE PATIENT ALL THEIR MEDICATION.  IT'S NOT A

10  MATTER OF THE PATIENT BEING NON-COMPLIANT.  THE PATIENT IS IN A

11  BED IN THE INFIRMARY.

12       BUT THE CLINICAL ISSUE IS THAT PATIENTS WITH HIV NEED

13  TO GET THEIR MEDICATIONS EVERY DAY SO THAT THE VIRUS DOESN'T

14  REPLICATE AND DEVELOP RESISTANCE TO THE MEDICATION.

15       SO FOR HIV PATIENTS, IT'S PARTICULARLY IMPORTANT THAT

16  THEY MISS NO DOSES OF THEIR MEDICATION, 'CAUSE OTHERWISE THEIR

17  CONDITION DETERIORATES.

18  **Q.**   ALL RIGHT.  AND LET'S GO AHEAD AND PULL UP JX_13_755.

19       AND WHAT IS THIS?

20  **A.**   THIS IS A MEDICATION ADMINISTRATION RECORD FOR MAY OF 2019

21  THAT SHOWS ALL OF THE HIV MEDICATIONS.

22  **Q.**   AND WHAT DOES IT SHOW HAPPENS ON THE 4TH?

23  **A.**   SO THIS IS 2019.  AND SO WHAT IT DOES, IT LISTS THE

24  PATIENT AS BEING ON KOP MEDICATIONS.

25  **Q.**   AND THEN AFTER THE 4TH IT APPEARS TO RUN OUT?

01:11 1  **A.**   YES.   THE MEDICATION ORDER EXPIRES.   YOU CAN SEE THAT AT

2  THE VERY TOP UNDER "D/C."   THE MEDICATION HAS EXPIRED ON

3  MAY THE 4TH, AND -- SO WHICH IS A DISRUPTION OF THE

4  PRESCRIPTION.

5  **Q.**   ALL RIGHT.

6          **MS. MONTAGNES:**   AND CAN WE PULL UP JX_68_2252?

7  **BY MS. MONTAGNES:**

8  **Q.**   ALL RIGHT.   AND WHAT DOES THIS SHOW US?

9  **A.**   SO THIS IS THE SAME MONTH, AND IT SHOWS US THAT

10  APPROXIMATELY THREE WEEKS LATER THE MEDICATION WAS RENEWED,

11  SO -- WAS REORDERED.   SO THE HIV MEDICATIONS WERE REORDERED ON

12  THE DATE SHOWING THAT THERE WAS AN APPROXIMATE THREE-WEEK LAPSE

13  IN THE PATIENT'S HIV MEDICATIONS.

14  **Q.**   SO THOSE LAST TWO EXAMPLES, ARE THOSE ISOLATED INCIDENTS

15  IN YOUR REVIEW OF MEDICATION ADMINISTRATION?

16  **A.**   NOT AT ALL.   NOT AT ALL.   I HAVE TO EMPHASIZE THIS POINT:

17  THE MEDICATION ADMINISTRATION SYSTEM AT ALL LEVELS IS BROKEN,

18  BASICALLY.   THERE'S NOT A RELIABLE SYSTEM FOR REORDERING THE

19  MEDICATIONS.

20          **MS. MONTAGNES:**   CAN WE LOOK AT JX_68_2321 AGAIN?

21  **BY MS. MONTAGNES:**

22  **Q.**   AND THIS IS -- WE HAD ALREADY REVIEWED THIS FOR THE

23  BACTRIM THAT WAS ORDERED.   BUT ABOVE THAT, THERE ARE -- THE

24  FIRST TWO ITEMS, CAN YOU DESCRIBE WHAT THESE ARE AND WHY IT'S

25  REMARKABLE IN THIS RECORD?

01:12  1  **A.**   OKAY.  YES.  SO THIS IS JANUARY 2020.  THE FIRST TWO

2  MEDICATIONS THAT ARE LISTED ARE IV -- ARE MEDICATIONS TO BE

3  GIVEN IV.  AND WHAT THE -- WHAT THE MAR SAYS IS THAT THE

4  PATIENT TOOK THEM KOP, THAT THE PATIENT HAD THEM KEEP ON

5  PERSON, WHEN, IN FACT, THAT IS SIMPLY NOT POSSIBLE THAT THE

6  PATIENT IS GOING TO GIVE HIMSELF HIS, YOU KNOW, MEDICATION IV.

7        AND THIS IS ILLUSTRATIVE OF THE FACT THAT THE

8  OFFICERS IN THE DORMITORIES ARE DOCUMENTING THAT THE PATIENT IS

9  GETTING MEDICATION THAT THEY DON'T REALLY KNOW HOW THAT PATIENT

10  IS GETTING THE MEDICATION, AND IT RENDERS THE -- FURTHER

11  RENDERS THE MARS COMPLETELY INACCURATE.

12  **Q.**   ALL RIGHT.

13        **MS. MONTAGNES:**  CAN WE PULL UP JX_13_134?

14  **BY MS. MONTAGNES:**

15  **Q.**   AND IF YOU COULD CALL YOUR ATTENTION TO THE 3/16/20, IT'S

16  DOCUMENTED AS A REFUSAL.  I WONDER IF YOU COULD JUST TALK TO ME

17  ABOUT THIS REFUSAL.

18  **A.**   SO THERE'S A LOT OF DISCUSSION ABOUT PATIENTS REFUSED

19  CARE; AND THEREFORE, IT'S THEIR OWN FAULT THAT THEY -- YOU

20  KNOW, THAT THEY GET SICK BECAUSE THEY REFUSED SCHEDULED CARE.

21  THIS IS AN EXAMPLE OF A REFUSAL THAT'S APPROPRIATE.  THE

22  PATIENT'S BLOOD SUGAR IS LOW; AND THEREFORE, THE PATIENT

23  SHOULDN'T TAKE INSULIN.  AND IN SOME CASES IT'S THE -- WELL, IF

24  IT WERE A NURSE GIVING THE MEDICATION, THE NURSE WOULD SAY, FOR

25  EXAMPLE, IF THE -- IF IT WAS -- THE BLOOD SUGAR WAS REALLY LOW,

01:14 1   "I'M NOT GOING TO GIVE THIS MEDICATION."

2         LET'S SAY, I'LL -- JUST AS AN EXAMPLE, IF THE BLOOD

3   SUGAR WAS 50 AND THE PATIENT WAS SCHEDULED FOR INSULIN, "I'M

4   NOT GOING TO GIVE IT BECAUSE IT'S UNSAFE."  THE OFFICERS DON'T

5   KNOW ABOUT WHAT WOULD BE UNSAFE OR NOT UNSAFE.

6         IN THIS CASE THE PATIENT SAYS, "I DON'T WANT THIS,"

7   BECAUSE MAYBE -- PERHAPS THE PATIENT KNOWS THAT, WHEN MY BLOOD

8   SUGAR IS THIS LOW, IF I TAKE MY INSULIN, THEN I'M GOING TO GET

9   HYPOGLYCEMIA.  AND SO IT'S AN EXAMPLE OF AN APPROPRIATE REFUSAL

10   OF CARE.  SOME -- YOU DON'T WANT THE PATIENT TO -- SOME

11   TREATMENT ASPECTS, YOU DON'T WANT THE PATIENT TO REFUSE, BUT IN

12   SOME CASES IT IS APPROPRIATE.

13   **Q.**  ALL RIGHT.  SO ALL THESE -- FROM BACTRIM AND ALL THESE

14   EXAMPLES -- AGAIN, I JUST WANT TO HIGHLIGHT -- IN YOUR VIEW,

15   ARE THESE KINDS OF THINGS ISOLATED IN THE RECORDS THAT YOU

16   REVIEWED?

17   **A.**  NOT AT ALL.

18   **Q.**  OKAY.  NOW, LET'S TALK A BIT ABOUT THE SPECIALTY CARE THAT

19   PATIENT 13 RECEIVED.

20         **MR. ARCHEY:**  YOUR HONOR, I OBJECT.

21         **THE COURT:**  TO THE SCOPE OF SPECIALTY CARE?

22         **MR. ARCHEY:**  CORRECT.

23         **THE COURT:**  DO YOU WANT TO ADDRESS THE OBJECTION?

24         **MS. MONTAGNES:**  YES, YOUR HONOR.  MS. LAMARRE DID

25   CHART REVIEWS.  WE'VE REPRESENTED FROM THE BEGINNING THAT THEY

01:15 1  ARE ALL INDEPENDENTLY RESPONSIBLE FOR THEIR CHART REVIEWS.  WE

2  PROVIDED THEM WITH A LIST OF THE CHART REVIEWS.  HE ACTUALLY

3  CROSS-EXAMINED HER ON HER CHART REVIEWS IN DEPOSITION AND --

4  SORRY.

5              IS THE OBJECTION TO MS. LAMARRE TESTIFYING TO

6  SPECIALTY OR --

7          **THE COURT:**  RIGHT.  YES.  YOU ARE NOT ADDRESSING THE

8  OBJECTION.  HE'S SAYING THAT THAT'S BEYOND THE SCOPE OF THE

9  COURT'S LIABILITY FINDING, THE SPECIALTY CARE.

10          **MS. MONTAGNES:**  OH, THE COURT'S LIABILITY FINDING.

11          **THE COURT:**  IS THAT WHAT YOUR OBJECTION IS?

12          **MR. ARCHEY:**  THAT'S PART OF IT.  THE OTHER PART --

13  WELL, NO.

14          **THE COURT:**  WHAT IS YOUR OBJECTION?

15          **MR. ARCHEY:**  MY OBJECTION IS --

16          **THE COURT:**  OH, NO.  SPECIALTY CARE WAS DEFINITELY

17  PART OF THE RULING.

18          **MR. ARCHEY:**  THAT'S RIGHT.

19          **THE COURT:**  GO AHEAD.

20          **MR. ARCHEY:**  NO, THAT'S NOT THE OBJECTION.

21              THE OBJECTION IS:  THIS IS AN AREA THAT'S

22  ADDRESSED BY DR. PUISIS.  THEY IDENTIFIED IT WAS ADDRESSED BY

23  DR. PUISIS.  I ASKED HER AT HER DEPOSITION:

24                  "ARE YOU TESTIFYING ABOUT SPECIALTY CARE?"

25                  SHE SAYS:  "NO.  DR. PUISIS."

01:16 1         THAT'S THE BASIS OF MY OBJECTION.  PAGE 259 OF
2     THAT DEPOSITION.
3         **MS. MONTAGNES:**  AND SO THE CHART -- SO WHAT WE HAVE
4     MAINTAINED ALL ALONG IS THAT EACH EXPERT IS RESPONSIBLE FOR A
5     SECTION OF THE EXPERT REPORT, AND THEN THEY ALL HAVE THEIR
6     CHART REVIEWS.  HE ACTUALLY CROSSED HER ON THIS PATIENT AND
7     THIS CARE, THIS EXACT CARE.  IN DEPOSITION HE QUESTIONED HER
8     EXTENSIVELY.  HE QUESTIONED EVERY SINGLE EXPERT ABOUT ALL OF
9     THEIR CHARTS.  HE WAS WELL AWARE THAT THEY WOULD EACH BE
10    TESTIFYING ABOUT THE CONTENT OF THEIR INDEPENDENT CHART
11    REVIEWS.
12        **THE COURT:**  WELL, IT'S NOT A QUESTION OF WHETHER HE
13    WAS AWARE.  THE QUESTION IS, IS THAT YOU HAVE IN THE REPORT
14    INDICATED WHO WAS GOING TO BE RESPONSIBLE FOR WHAT, AND YOU ARE
15    HELD TO THE FOUR CORNERS OF YOUR REPORT.
16        **MS. MONTAGNES:**  ABSOLUTELY.
17        **THE COURT:**  IS THIS IN HER REPORT?  DID SHE REVIEW
18    SPECIALTY --
19        **MS. MONTAGNES:**  IT IS IN THE ATTACHMENTS TO THE
20    REPORT.
21        **THE COURT:**  NO.  IS IT IN HER REPORT?  THE
22    ATTACHMENTS TO HER REPORT ARE THE BASIS FOR HER OPINIONS.  IS
23    IT IN THE OPINIONS STATED IN THE REPORT?  IF IT'S NOT -- WELL,
24    ANSWER THAT QUESTION.
25        **MS. MONTAGNES:**  MS. LAMARRE IS TELLING ME IT IS.

01:17 1          **THE WITNESS:**  YES.  I BELIEVE, YOUR HONOR, THAT MY

2     OPINIONS ABOUT -- MY CONCLUSIONS ABOUT SPECIALTY CARE ARE IN

3     THE REPORT.

4          **MS. MONTAGNES:**  RIGHT.  I THINK WHAT SHE'S ASKING --

5     SO TO BE CLEAR, THIS OPINION IS IN THE REPORT, AND IT IS IN THE

6     CHART REVIEWS THAT WERE ATTACHED.  EACH EXPERT DID A THOROUGH

7     ANALYSIS OF PATIENTS.

8          SORRY.  LET ME BACK UP FOR A SECOND.  SO THE WAY

9     THAT WE DID IT THIS TIME -- BECAUSE MR. ARCHEY WAS CONCERNED

10    ABOUT ENSURING THAT HE WOULD HAVE SOMEONE WHO WAS RESPONSIBLE

11    FOR THE FINDINGS AND FOR THE CHART REVIEWS.  AND TYPICALLY HOW

12    THIS HAS GONE THROUGHOUT THE DURATION OF THE CASE IS THAT THE

13    EXPERTS HAVE TESTIFIED ABOUT THE CASES THAT THEY REVIEWED AND

14    THE SYSTEMATIC ISSUES THAT HAVE COME UP IN THERE, AND THEN THEY

15    HAVE BEEN PRIMARILY RESPONSIBLE FOR THE CONCLUSIONS IN THEIR

16    SECTIONS.  SO SHE IS NOT TESTIFYING OVERALL ABOUT THE SPECIALTY

17    CARE.  SHE'S TELLING THE STORY OF THIS ONE PATIENT.

18         EACH PATIENT IS GOING TO TOUCH MULTIPLE SYSTEMS.

19    AND SO FOR US, WE THOUGHT THE MOST ACCURATE WAY TO PRESENT THE

20    COURT WITH THE DATA ABOUT WHAT IS HAPPENING AT LSP IS TO GIVE

21    THE COURT A WINDOW INTO DIFFERENT PATIENTS, WHICH HE WAS WELL

22    AWARE ABOUT.  HE ACTUALLY HAS A DOCUMENT SAYING "PATIENT 13,

23    LAMARRE" ON HIS TABLE -- RIGHT?  HE KNOWS THIS IS COMING --

24    WHERE THEY EACH GIVE AN ANALYSIS OF THAT PATIENT, BECAUSE THESE

25    CHARTS HAVE HUNDREDS OF ENCOUNTERS.  AND WE HAVE ALWAYS

01:18 1   MAINTAINED THAT MS. LAMARRE PROVIDED EXAMPLES TO OTHER SECTIONS

2   IN THE REPORT BASED ON HER FINDINGS.  HE WAS AWARE OF THAT.  HE

3   WAS AWARE OF WHICH PARTS OF THE REPORT PATIENTS CAME UP IN.

4            SO PATIENT 13 COMES UP IN THE "SPECIALISTS"

5   SECTION, AND HE WAS AWARE THAT SHE CONTRIBUTED THAT EXAMPLE TO

6   THE REPORT FROM THE BEGINNING.

7            **THE COURT:**  BUT DR. PUISIS HAS BEEN DESIGNATED TO

8   GIVE THE OPINION TESTIMONY AS TO SPECIALTY CARE.  IS THAT

9   CORRECT?

10           **MS. MONTAGNES:**  AS TO THE CONCLUSIONS, AND HE WILL,

11  YES.

12           **THE COURT:**  THEN HE CAN GIVE THOSE.

13           **MS. MONTAGNES:**  SO SHE CAN'T FIND -- SHE CAN'T

14  TESTIFY AS TO ANY OF THE FACTUAL UNDERPINNINGS OF THAT?

15           **THE COURT:**  YOU HAVEN'T DESIGNATED HER AS AN OPINION

16  ON THE SPECIALTY CARE.

17           **MS. MONTAGNES:**  WELL, WE -- WE -- ALL OF THE -- ALL

18  OF THEM ARE AUTHORS OF THE REPORT.  RIGHT?  THEY ARE ALL LISTED

19  ON THE FRONT OF THE REPORT.  AND WE'RE VERY CLEAR IN THE

20  METHODOLOGY, THEY ARE PRIMARILY RESPONSIBLE FOR THE DRAFTING.

21  BUT THEY CONTRIBUTED TO EACH SECTION THROUGH COMMUNICATION WITH

22  EACH OTHER.

23           **THE COURT:**  MR. ARCHEY?

24           **MR. ARCHEY:**  YOUR HONOR, THIS WHOLE ISSUE BEGAN WITH

25  ME EXPRESSING MY OBJECTIONS TO THEM DOING A JOINT REPORT, AND I

01:19 1  NEED TO KNOW WHO DID WHAT THAT LED TO THEM LISTING OUT WHO DID

2  WHAT.  AT THE DEPOSITION I ASKED EACH OF THEM, "WHAT'S YOUR

3  AREA, AND ARE YOU TESTIFYING" --

4  AND IN HER CASE I ASKED SPECIFICALLY, "ARE YOU

5  TESTIFYING ABOUT SPECIALTY CARE?"

6  SHE SAYS, "NO.  DR. PUISIS."

7  AND SO BETWEEN ALL THAT, THAT -- THIS IS OUT OF

8  BOUNDS.  I MEAN, DR. PUISIS, YES.  IF HE WANTS TO SAY WHAT HE

9  WANTS TO SAY ABOUT SPECIALTY CARE, CERTAINLY.  WE'LL HEAR FROM

10  HIM LATER IN THE WEEK, I'M SURE.

11  BUT AS TO RIGHT NOW, THIS IS NOT SOMETHING THAT

12  SHE HAS BEEN DESIGNATED FOR, AND IT'S OUTSIDE HER AREA.

13  **MS. MONTAGNES:**  YOUR HONOR, IT'S IN THE REPORT, PLAIN

14  AS DAY.  "TO AVOID DUPLICATION AND MAKE OUR EVALUATION MORE

15  COHESIVE, WE HAVE COMBINED OUR EXPERT REPORTS.  EACH OF US WAS

16  PRINCIPALLY RESPONSIBLE FOR INITIALLY DRAFTING VARIOUS SECTIONS

17  AS DESIGNATED BELOW BASED ON OUR INDIVIDUAL AREAS OF EXPERTISE.

18  EACH OF US HAS REVIEWED, DISCUSSED, AND ENDORSED THE CONTENTS

19  OF THE REPORT, WHERE CHART REVIEWS OR SITE-VISIT OBSERVATIONS

20  MADE BY ONE EXPERT WERE RELEVANT TO A SECTION FOR WHICH A

21  DIFFERENT EXPERT HAD PRINCIPAL RESPONSIBILITY, THE EXPERTS

22  CONSULTED WITH EACH OTHER AS NECESSARY."

23  THIS IS NOT A SURPRISE.  HE KNOWS ABOUT THIS.

24  THIS IS ABSOLUTELY WITHIN THE FOUR CORNERS OF THE REVIEW.

25  **THE COURT:**  EXCEPT THAT YOU'RE GOING TO HAVE HER

01:20 1   GIVE -- I MEAN, THE REASON THAT SHE'S ON THE STAND IS TO GIVE

2   OPINION TESTIMONY, AND YOU'RE GOING TO HAVE HER GIVE OPINION

3   TESTIMONY FOR A PERSON -- ON A PATIENT WHO HAS BEEN -- WELL,

4   WHOSE SPECIALTY CARE OPINIONS HAVE BEEN DESIGNATED TO

5   DR. PUISIS.

6           **MS. MONTAGNES:**  SO, YOUR HONOR, THIS IS A COPY OF

7   WHAT WE GAVE THEM.  IT LISTS THE PATIENT AND IT LISTS EXACTLY

8   WHICH EXPERT REVIEWED THAT PATIENT.  SO THE CHART -- HE KNOWS

9   THAT THE OPINIONS AS IT RELATED TO PATIENT 13 CAME FROM

10  NURSE LAMARRE.  HE HAS KNOWN THAT FROM THE BEGINNING.

11          **THE COURT:**  WELL, YOU'VE GOT AN EXPERT TO TESTIFY TO

12  SPECIALTY CARE.  THE OBJECTION IS SUSTAINED.

13  **BY MS. MONTAGNES:**

14  **Q.**   ALL RIGHT.  WELL, LET'S TALK ABOUT SOME MEDICATION ERRORS

15  THEN.  LET'S PULL UP JX_13_1080 TO 1082.  JX_13, START WITH

16  1080.  ALL RIGHT.  SO LET'S GO DOWN TO THE LISTING OF THE

17  MEDICATIONS HERE.

18          ALL RIGHT.  AND LET'S SPECIFICALLY LOOK AT THE

19  HYDRALAZINE.  WHAT IS THIS MEDICATION, MS. LAMARRE?

20  **A.**   SO HYDRALAZINE IS A BLOOD PRESSURE MEDICATION.

21  **Q.**   OKAY.  AND WHAT IS THE DOSAGE THAT'S LISTED HERE?

22  **A.**   50 MILLIGRAMS, FOUR TIMES A DAY.

23  **Q.**   AND WHAT IS YOUR UNDERSTANDING OF WHAT THIS NOTE MEANS?

24  **A.**   SO THIS WAS A REPORT OF THE CONSULTANT IN WHICH THE

25  MEDICATION LIST WAS GIVEN TO THE CONSULTANT TO INDICATE WHAT

01:22 1    THE PATIENT WAS PRESCRIBED AT THE PRISON SO THE CONSULTANT

2    WOULD HAVE THE INFORMATION AND BE ABLE TO MAKE TREATMENT

3    RECOMMENDATIONS.

4    **Q.**    OKAY.  AND LET'S GO AHEAD AND PULL UP JX_68_2222.

5         AND THIS IS -- WHAT IS THIS?

6    **A.**    SO THIS IS A MEDICATION ADMINISTRATION RECORD FOR

7    FEBRUARY 2019, WHICH COVERED THE PERIOD THAT THE PATIENT SAW

8    THE SPECIALIST AND THE PATIENT -- THE DOSE OF APRESOLINE WAS

9    DIFFERENT THAN WHAT WAS LISTED ON THE CONSULTANT'S REPORT IN

10    MARCH OF 2019.

11    **Q.**    AND WHY IS THAT IMPORTANT?

12    **A.**    IT'S IMPORTANT BECAUSE THE SPECIALIST, IN TREATING HIM FOR

13    HIS KIDNEY DISEASE, NEEDS TO KNOW EXACTLY WHAT MEDICATIONS THAT

14    HE'S TAKING SO THAT IF THE PATIENT'S BLOOD PRESSURE IS NOT

15    WELL-CONTROLLED, THE SPECIALIST CAN MAKE RECOMMENDATIONS AS TO

16    WHAT THE PATIENT SHOULD BE TAKING.

17    **Q.**    OKAY.  AND SO WHAT MIGHT -- WHAT COULD HAPPEN, FOR

18    EXAMPLE?  THAT A SPECIALIST -- BASED ON THAT WRONG INFORMATION,

19    WHAT COULD HAPPEN?

20    **A.**    SO FOR ANY TREATING PHYSICIAN, WHETHER IT'S A SPECIALIST

21    OR A PRIMARY CARE DOCTOR, IF YOU BELIEVE THAT THE PATIENT IS

22    GETTING A CERTAIN DOSAGE OF A MEDICATION AND THE BLOOD PRESSURE

23    IS NOT WELL-CONTROLLED, THEN YOU'RE GOING TO INCREASE THE DOSE

24    OF THE MEDICATION OR ADD ANOTHER MEDICATION.

25         AND IN THIS CASE THE PATIENT'S BLOOD PRESSURE WAS NOT

01:23 1  CONTROLLED; AND THEREFORE, THE SPECIALIST SAID, "WELL, LET'S

2  INCREASE THE DOSAGE TO GET HIM UNDER BETTER CONTROL."  BUT THE

3  PATIENT WAS ALREADY PRESCRIBED THAT DOSAGE BECAUSE THE

4  SPECIALIST DID NOT HAVE AN ACCURATE LIST OF THE MEDICATIONS.

5  AND IT WASN'T JUST APRESOLINE, IT WAS SEVERAL OTHER OF THE

6  BLOOD PRESSURE MEDICATIONS.

7  Q.   OKAY.  LET'S PULL UP JX_13_883.  I WANT TO HIGHLIGHT THE

8  SECTION THAT'S LABELED "DM2."

9       WHAT DO YOU UNDERSTAND THIS TO BE?

10  A.   SO THIS IS A TREATMENT PLAN BY ONE OF THE SPECIALISTS.

11  AND IT SAYS FOR, THE PROBLEM OF DIABETES, HE TAKES INSULIN

12  70/30 AT HOME, MEANING THE PRISON, REPORTEDLY USES 40 UNITS IN

13  THE MORNING AND 20 UNITS AT NIGHT.  THE SPECIALIST CALLED

14  ANGOLA TO SEE WHAT HE WAS RECEIVING AND WAS TOLD HE GETS 15

15  UNITS IN THE MORNING AND 10 AT NIGHT.

16       SO IN THIS CASE THE SPECIALIST WAS CONSCIENTIOUS

17  ABOUT VERIFYING THE MEDICATION LIST, BUT THE INFORMATION THAT

18  WAS -- THAT THE SPECIALIST WAS TOLD WAS INCORRECT.

19  Q.   AND WHAT DOES THE SPECIALIST PRESCRIBE?

20  A.   SO LET'S SEE.  SO THE SPECIALIST, GIVEN THE FACT THE

21  PATIENT IS NOT WELL-CONTROLLED, WANTS TO CHANGE HIM TO

22  LONG-ACTING INSULIN, 10 UNITS, TWICE DAILY.

23  Q.   OKAY.  AND LET'S PULL UP JX_13_919.

24       AND WHAT IS THIS?

25  A.   SO THIS IS THE -- THIS IS A TRIP NURSE REPORT.  SO WHEN

01:25 1  PATIENTS RETURN TO ANGOLA, THE RECOMMENDATIONS ARE GIVEN TO THE

2  TRIP NURSE, WHO WORKS IN THE SPECIALTY SERVICES OFFICE, AND THE

3  NURSE WRITES DOWN THE RECOMMENDATIONS FROM THE SPECIALIST.

4          AND IN THIS CASE THE SPECIALIST WROTE -- OR WHAT SHE

5  WROTE WAS TO GET LONG-ACTING INSULIN, 30 UNITS IN THE MORNING

6  AND 20 UNITS AT NIGHT.

7  Q.   OKAY.

8          **MS. MONTAGNES:**  AND THEN CAN WE PULL UP JX_13_1152,

9  AND THEN CAN WE JUST HIGHLIGHT THE NOTE ON 9/18.

10 **BY MS. MONTAGNES:**

11 Q.   AND WHAT IS HAPPENING HERE?

12 A.   SO WHEN THE PATIENT RETURNED TO ANGOLA, THE PATIENT WAS

13 PLACED IN THE INFIRMARY.  THE INSTITUTION HAD THE CONSULTANT'S

14 RECOMMENDATIONS FOR THE MEDICATION CHANGE, AND THE PROVIDER

15 JUST SWITCHED THE PATIENT RIGHT BACK TO WHAT THE PATIENT WAS

16 PRESCRIBED BEFORE.

17 Q.   AND DISCONTINUED THE LONG-ACTING INSULIN?

18 A.   AND DIDN'T ORDER THE LONG-ACTING.

19         NOW, THE SIGNIFICANCE OF THIS IS THAT SOMETIMES

20 PATIENTS CAN BE CHANGED -- THEIR MEDICATION CAN BE CHANGED.

21 THE RECOMMENDATIONS CAN BE CONSIDERED, BUT IF YOU'RE NOT GOING

22 TO FOLLOW THEM, THERE NEEDS TO BE A NOTE TO SAY "I'M NOT GOING

23 TO FOLLOW THIS RECOMMENDATION BECAUSE," AND IT NEEDS TO BE FOR

24 CLINICAL REASONS.

25         THIS PATIENT WAS NOT WELL-CONTROLLED FOR HIS

01:27 1  DIABETES.  IT WAS DAMAGING -- IT WAS FURTHER DAMAGING HIS

2  KIDNEYS; AND THEREFORE, THE RECOMMENDATION WAS MADE TO CHANGE

3  THE MEDICATION.  AND IT WAS ESSENTIALLY SUMMARILY DISREGARDED.

4  **Q.**  AND DO YOU KNOW WHICH PROVIDER DID THIS?

5  **A.**  IT WAS DR. TOCE, THE MEDICAL DIRECTOR.

6  **Q.**  OKAY.

7  **A.**  THE OTHER THING IS THAT -- THE OTHER CONSIDERATION IS THAT

8  PRESUMABLY THE SPECIALIST INFORMED THE PATIENT:  "THIS IS WHAT

9  I WANT TO DO."  AND THEN THE PATIENT RETURNS AND THE PLAN IS

10  CHANGED.  BUT THERE'S NO DOCUMENTATION IT'S DISCUSSED WITH THE

11  PATIENT.  AND THAT'S HOW CONFUSION COMES IN ON THE PART OF THE

12  PATIENT AS TO WHAT THEY'RE SUPPOSED TO DO OR WHAT THEY'RE

13  SUPPOSED TO RECEIVE.

14  **Q.**  OKAY.  LET'S TALK ABOUT JX_13_1.

15      CAN YOU TELL ME WHAT WE'RE LOOKING AT?

16  **A.**  THIS IS THE COVER OF THE -- THE MEDICAL RECORD COVER FOR

17  PATIENT NO. 13.

18  **Q.**  AND WHAT DOES IT SAY IN THAT ORANGE SQUARE STICKY RIGHT

19  THERE?

20  **A.**  "NO TORADOL TO BE GIVEN."

21  **Q.**  OKAY.

22  **Q.**  LET'S GO TO THE JX_13_1035.

23      CAN YOU TELL ME WHAT THIS IS?

24  **A.**  THIS IS A NOTE.  IF YOU COULD HIGHLIGHT?  OKAY.  SO THIS

25  IS A SPECIALTY NOTE AND IT SAYS "AVOID NSAIDS," WHICH IS

01:29 1  NONSTEROIDAL ANTI-INFLAMMATORY DRUGS.

2  **Q.**   IS TORADOL AN NSAID?

3  **A.**   IT IS.

4  **Q.**   AND WHY DO YOU THINK THAT THEY WERE ADVISING AGAINST

5  NSAIDS AND TORADOL?

6  **A.**   BECAUSE TORADOL -- BECAUSE NSAIDS DAMAGE THE KIDNEYS.

7  AND IT'S VERY IMPORTANT THAT ANY PATIENT WITH KIDNEY DAMAGE

8  DOESN'T TAKE NSAIDS AT ALL.

9  **Q.**   OKAY.  LET'S ZOOM BACK OUT.

10         AND WE'RE ON JX_13_1035.  THERE WE GO.

11         WHAT IS THE DATE OF THIS ENCOUNTER?

12  **A.**   THIS IS MAY 29, 2018.

13  **Q.**   OKAY.  LET'S GO TO JX_35_1085.

14         AND WHAT IS THE DATE OF THIS ENCOUNTER?

15  **A.**   FEBRUARY 12, 2019.

16  **Q.**   OKAY.  AND LET'S GO DOWN TO THE BOTTOM WHERE IT SAYS

17  "AVOID NSAIDS."

18         CAN YOU TELL ME WHAT THAT IS?

19  **A.**   SO THE SPECIALIST IS SAYING AVOID NSAIDS.  HE'S BOLDING

20  IT.  "PATIENT RECEIVED TORADOL WHEN VISITING THE ORTHO OR

21  EMERGENCY ROOM FOR BACK PAIN; THIS WILL WORSEN HIS KIDNEY

22  FUNCTION."

23  **Q.**   AND THIS IS IN FEBRUARY OF 2019?

24  **A.**   YES.

25  **Q.**   OKAY.  LET'S GO TO JX_13_1074.

01:30 1          WHAT IS THIS?

2    **A.**   THIS IS A HANDWRITTEN PRESCRIPTION FOR THE PATIENT IN

3    WHICH TORADOL HAS BEEN ORDERED.

4    **Q.**   AND WHAT'S THE DATE ON THIS?

5    **A.**   THE DATE IS MARCH 27, 2019.

6    **Q.**   SO THIS IS A MONTH AND A HALF AFTER THEY HAVE SAID:  "YOU

7    HAVE GIVEN HIM TORADOL.  PLEASE STOP."

8    **A.**   THIS IS A MONTH AFTER -- A MONTH AND A HALF AFTER THE

9    NEPHROLOGIST RE-EMPHASIZED NOT TO GIVE THE PATIENT TORADOL,

10   BECAUSE THE PATIENT HAD RECEIVED TORADOL.

11   **Q.**   OKAY.  AND NOW CAN WE GO TO JX_13_402.

12          CAN YOU TELL ME WHAT THIS IS?

13   **A.**   THIS IS AN ATU, AN ACUTE TREATMENT UNIT NOTE.  THIS IS

14   APPROXIMATELY A YEAR LATER.  ON MARCH 13, 2020, THE PATIENT

15   CAME TO THE ATU COMPLAINING OF BACK PAIN AND HIS BLOOD PRESSURE

16   IS EXTREMELY ELEVATED:  190/119.  AND THE PHYSICIAN -- AND I

17   BELIEVE THIS WAS -- THE SAME PHYSICIAN WHO ORDERED THE TORADOL

18   A YEAR EARLIER HAS ORDERED TORADOL FOR THE PATIENT AGAIN.

19   **Q.**   AND DID THE PHYSICIAN ADDRESS HIS BLOOD PRESSURE?

20   **A.**   NO.  THERE'S NO -- THERE WAS NO MEDICAL EVALUATION FOR THE

21   PATIENT'S BLOOD PRESSURE, AND IT WAS TAKEN OVER A SEVERAL-HOUR

22   PERIOD AND STAYED HIGH, AND THE DOCTOR DID NOTHING.

23   **Q.**   OKAY.  LET'S GO OVER TO JX_13_405.

24          AND WHAT IS THIS?

25   **A.**   SO THIS IS THE SAME DAY.  SO SEVERAL HOURS AFTER THE

01:32  1  PATIENT WAS GIVEN THE TORADOL, THE PATIENT DECLARES A

2  SELF-EMERGENCY BECAUSE HE'S UNABLE TO URINATE.  THE PATIENT

3  SAYS, UNABLE TO URINATE FOR EIGHT HOURS, STATES HE GOT A SHOT

4  THIS MORNING AND EVER SINCE HAS BEEN UNABLE TO URINATE.

5  **Q.**  OKAY.  AND LET'S GO TO JX_13_4 --

6  **A.**  AND HIS BLOOD PRESSURE IS 204/115.

7  **Q.**  AND LET'S GO TO JX_13_404.

8      AND WHAT IS THIS?

9  **A.**  SO THIS IS LATER -- I MEAN, SO THIS IS -- THE PATIENT IS

10  TAKEN TO THE ATU.  HIS BLOOD PRESSURE IS EXTREMELY ELEVATED.

11  AND THE PATIENT IS SEEN BY AN RN.  THE PATIENT IS NOT MEDICALLY

12  EVALUATED BY A PHYSICIAN, AND IT LOOKS -- YOU KNOW, ONE OF THE

13  ISSUES -- ONE OF THE MEDICAL RECORD ISSUES I WANT TO BRING TO

14  ATTENTION IS THAT WHEN STAFF CALLED THE DOCTOR OR WHEN STAFF DO

15  CERTAIN THINGS, THEY DON'T -- THE STAFF DO NOT DOCUMENT THE

16  TIME THAT THEY PERFORM CERTAIN FUNCTIONS AS A RULE; AND

17  THEREFORE, THERE IS NO SENSE OF THE CHRONOLOGY OF THE EVENTS.

18      SO AT SOME POINT UNKNOWN, IT SAYS AT THE TOP, UNDER

19  "PHYSICIAN ASSESSMENT AND TREATMENT, TO/RB," WHICH MEANS

20  TELEPHONE ORDER READ BACK FROM NURSE PRACTITIONER PARK, AND

21  APPARENTLY A URINALYSIS WAS ORDERED AND THEN THEY CATHETERIZED

22  THE PATIENT.  AND THEY TREAT THE PATIENT FOR A URINARY TRACT

23  INFECTION WITH AN ANTIBIOTIC THAT THE PATIENT HAS PREVIOUSLY --

24  THE ANTIBIOTIC HAS BEEN SHOWN TO -- THE ORGANISM IS RESISTANT

25  TO.  AND THEN PATIENT IS ADVISED TO TAKE BLOOD PRESSURE MEDS

01:34 1    WHEN HE GETS TO THE DORM, SO...

2    **Q.**    AND HE WASN'T GIVEN ANY BLOOD PRESSURE MEDICINE AT THE

3    ATU?

4    **A.**    CORRECT.  AND LIKE PATIENT NO. 16, WHERE WHEN PATIENT

5    NO. 16 HAD A BLOOD PRESSURE OF 200 OVER -- YOU KNOW, ELEVATED

6    DIASTOLIC, THEY KEPT THAT PATIENT; THEY GAVE THE PATIENT HIS

7    HOME MEDICATIONS FIRST.  THE --

8    **Q.**    SORRY.  JUST TO BE CLEAR, WHO DID THIS?

9    **A.**    AT THE HOSPITAL FOR PATIENT NO. 16 --

10    **Q.**    AT THE OUTSIDE HOSPITAL?

11    **A.**    AT THE OUTSIDE HOSPITAL, WHEN A PATIENT PRESENTED WITH

12    SEVERE BLOOD PRESSURE, THEY TREATED THE PATIENT; THEY KEPT THE

13    PATIENT TILL THE PATIENT'S BLOOD PRESSURE CAME DOWN.

14          AND HERE IS A VERY MEDICALLY COMPROMISED PATIENT

15    AND -- WHOSE BLOOD PRESSURE IS ELEVATED.  IT'S NOT EVEN CLEAR

16    THAT HAD THE PATIENT TAKEN HIS BLOOD PRESSURE MEDS WHEN HE GETS

17    BACK TO HIS DORMITORY THAT IT'S GOING TO LOWER HIS BLOOD

18    PRESSURE, PARTICULARLY SINCE HE HAS BEEN GIVEN TORADOL, WHICH

19    IS A FURTHER DAMAGE TO HIS KIDNEYS.

20          SO THIS IS INDIFFERENT CARE.  THIS IS JUST -- YOU

21    KNOW, WE'VE SEEN -- I'VE SEEN MULTIPLE EXAMPLES OF CARE THAT IS

22    JUST INDIFFERENT TO THE SERIOUS MEDICAL NEEDS OF PATIENTS.  AND

23    THIS IS A PRIME EXAMPLE.  AND THEN THEY ORDER A CLINIC

24    FOLLOW-UP IN ONE WEEK.

25    **Q.**    WHY IS THAT SIGNIFICANT?

01:35 1    **A.**   THAT'S NOT APPROPRIATE.  THIS PATIENT NEEDED TO BE SEEN

2    NOW; IF THE BLOOD PRESSURE COULDN'T BE BROUGHT DOWN, NEEDED TO

3    GO TO THE HOSPITAL AND -- BUT AT THE VERY LEAST, NEEDED TO BE

4    SEEN BY A MEDICAL PROVIDER WHO WOULD ASK, "ARE YOU HAVING

5    HEADACHES?"  ARE YOU HAVING CHEST PAIN?  ARE YOU HAVING

6    SHORTNESS OF BREATH?"  THE FACT THAT HE COULDN'T URINATE AND

7    THE AMOUNT OF URINE THAT THEY WERE ABLE -- THE 150 MILLILITERS

8    DRAINED FROM HIS BLADDER AFTER, YOU KNOW, ALL DAY LONG ALSO

9    INDICATES, YOU KNOW, THAT HIS KIDNEYS AREN'T WORKING PROPERLY.

10    **Q.**   AND WHAT HAPPENED TO THIS PATIENT AFTER THIS?

11    **A.**   WITHIN A WEEK THE PATIENT -- HIS CONDITION DETERIORATED.

12    HE HAD ALTERED MENTAL STATUS.  HE BECAME HYPOTENSIVE.  HE WAS

13    ADMITTED TO THE HOSPITAL.  HE HAD SEPSIS, WHICH IS AN INFECTION

14    IN THE BLOODSTREAM, WHICH MAY VERY WELL HAVE COME FROM AN

15    IMPROPERLY TREATED URINARY TRACT INFECTION.  I CANNOT SAY THAT

16    FOR SURE BECAUSE THE HOSPITAL RECORDS WERE NOT IN THE MEDICAL

17    RECORD, BUT HE DIED OF SEPSIS AND ACUTE RESPIRATORY FAILURE.

18    **Q.**   THANK YOU.

19            LET'S TURN NOW TO PATIENT 42.

20            **THE COURT:**  WHAT WAS YOUR QUESTION?

21            **MS. MONTAGNES:**  I WAS JUST FORMULATING IT.  I

22    APOLOGIZE, JUDGE.  I WAS TRYING TO TRANSITION.

23    **BY MS. MONTAGNES:**

24    **Q.**   LET'S LOOK NOW AT JX_42_76.

25            CAN YOU TELL US A LITTLE BIT ABOUT THIS PATIENT?

01:37 1  **A.**   YES.   THIS IS PATIENT 42.   HE'S A 25-YEAR-OLD MAN WITH A

2  HISTORY OF ASTHMA, AND HE WAS UNDER MENTAL HEALTH TREATMENT.

3  AND HE PRESENTED TO -- LET'S SEE THE DATE HERE.   ON APRIL 3,

4  2020, HE PRESENTED WITH A COMPLAINT OF SPITTING UP BLOOD.

5  **Q.**   OKAY.   AND WHAT HAPPENED?

6  **A.**   CAN YOU GO -- KIND OF GO BACK OUT?   SO HE WAS SEEN BY

7  THE -- AN EMT, WHO MADE A DOCTOR REFERRAL.   AND THERE IS NO

8  EVIDENCE THAT A PHYSICIAN REVIEWED THIS FORM, MUCH LESS SAW THE

9  PATIENT.

10  **Q.**   AND THIS -- SO THIS IS A SELF-DECLARED EMERGENCY.   IS THAT

11  RIGHT?

12  **A.**   THIS IS A SELF-DECLARED EMERGENCY.

13  **Q.**   AND HOW MUCH WAS THE PATIENT CHARGED FOR THIS?

14  **A.**   HE WAS CHARGED --

15         **MR. ARCHEY:**   YOUR HONOR, OBJECTION.   RELEVANCE,

16  CO-PAYS.

17         **THE COURT:**   YOUR OBJECTION IS TO CO-PAY?

18         **MS. MONTAGNES:**   YOUR HONOR CLEARLY FOUND THAT CO-PAYS

19  CONTRIBUTED TO UNCONSTITUTIONAL CARE, IN HER OPINION.   I MEAN,

20  THIS IS -- THIS IS CLEAR AS DAY.   YOU SAY IT IS NOT

21  INDEPENDENTLY ENOUGH, BUT IT CONTRIBUTED TO THE

22  UNCONSTITUTIONAL CARE.

23         **THE COURT:**   OVERRULED.

24  BY MS. MONTAGNES:

25  **Q.**   HOW MUCH WAS THE PATIENT CHARGED FOR THIS VISIT?

01:38 1    **A.**   SIX DOLLARS.

2    **Q.**   THANK YOU.

3           LET'S TURN TO JX_42_75.

4           CAN YOU TELL ME WHAT THIS IS?

5    **A.**   SO THIS IS THE PATIENT PRESENTING, AGAIN, WITH A COMPLAINT

6    OF SPITTING UP BLOOD.

7           MAY I SAY A FEW WORDS ABOUT THE FIRST COMPLAINT AND

8    WHAT -- A LITTLE BIT MORE ABOUT WHAT SHOULD HAVE HAPPENED?  CAN

9    WE GO BACK?

10   **Q.**   SURE.  WE CAN GO BACK.

11   **A.**   YEAH.

12   **Q.**   MY APOLOGIES.

13   **A.**   THAT'S OKAY.

14   **Q.**   JX_42_76.

15   **A.**   HERE IT IS.  SO I JUST WANT TO SAY THAT WHEN SOMEONE

16   COMPLAINS OF SPITTING UP BLOOD, THAT IS A RED-FLAG SYMPTOM.

17   THE PATIENT COULD HAVE TUBERCULOSIS; THE PATIENT COULD HAVE A

18   PULMONARY EMBOLISM; THE PATIENT COULD HAVE PNEUMONIA.  THOSE

19   ARE CRITICAL FINDINGS.

20          SO THE FACT THAT HE PRESENTED OR WAS SEEN -- AND WE

21   DON'T KNOW WHEN HE -- I WANT TO ALSO SAY ON THE -- WITH RESPECT

22   TO THE SICK CALL SYSTEM, THERE IS NO PLACE -- THIS WAS SEEN AS

23   AN EMERGENCY.  BUT I JUST WANT TO POINT OUT THAT THE FORM

24   DOESN'T HAVE ANY PLACE FOR THE PATIENT -- WHEN THE PATIENT

25   SUBMITS A HEALTH REQUEST, FOR THEM TO WRITE DOWN, "ON THIS DAY

01:39 1  I'M SUBMITTING MY REQUEST" SO THE TIMELINESS OF THAT PERSON
2  BEING SEEN CAN BE EVALUATED.  BUT WE'LL -- I'LL ADDRESS THAT
3  LATER.
4          BUT -- SO THIS PATIENT SHOULD HAVE BEEN SEEN RIGHT
5  AWAY BY A PHYSICIAN AND WAS NOT.
6  **Q.**   OKAY.  SO LET'S -- SO THEN THE NEXT DAY, LET'S TURN TO
7  JX_42_75.
8  **A.**   SO THE PATIENT DECLARES A -- I THINK HE DECLARES ANOTHER
9  SELF-EMERGENCY AND SAYS THAT HE IS SPITTING UP BLOOD.  AND,
10  ONCE AGAIN, THE DISPOSITION IS M.D. REVIEW.  AND THIS FORM
11  IS -- WAS -- THE PATIENT WAS SEEN ON APRIL 4TH.  BUT A
12  PHYSICIAN DOESN'T DOCUMENT ANY ACTION OR ACKNOWLEDGMENT OF THE
13  FORM UNTIL APRIL 6TH.  AND IT APPEARS THAT THE INITIAL RESPONSE
14  OF THE PHYSICIAN WAS SICK CALL, AS NEEDED, OR MEDICAL PROVIDER.
15          THAT MAY BE -- WE ACTUALLY DON'T KNOW WHO THAT IS.
16  WE DON'T KNOW IF IT'S A PHYSICIAN.  WE DON'T KNOW IF IT'S A
17  NURSE PRACTITIONER.  BECAUSE ONE OF THE MEDICAL RECORD ISSUES
18  IS THAT THE PROVIDERS DO NOT LEGIBLY DATE, TIME, SIGN, AND YOU
19  DON'T KNOW THEIR CREDENTIALS.  SO YOU DON'T KNOW WHO IS SEEING
20  THE PATIENT.  BUT AT ANY RATE, THEY -- THE PLAN IS CLINICAL
21  FOLLOW-UP IN EIGHT WEEKS.
22  **Q.**   OKAY.  AND SO NOW HE'S BEEN SPITTING UP BLOOD AT THIS
23  POINT FOR 24 HOURS, AND THERE HASN'T BEEN ANY ACTION?  AT LEAST
24  24 HOURS AND THERE HASN'T BEEN ANY ACTION?
25  **A.**   THERE'S BEEN NO MEDICAL EVALUATION.

01:41 1  **Q.**   OKAY.  SO LET'S GO TO JX_42_74.

2         WHAT IS THIS?

3  **A.**   SO THIS IS ANOTHER SELF-DECLARED EMERGENCY:  COUGHING UP

4  BLOOD FOR A WEEK; STATES BLOOD IS DARK RED; COMPLAINS OF SHARP

5  PAIN IN HIS RIGHT CHEST WALL WITH INSPIRATION; WORSENS WITH

6  DEEP INSPIRATION.  THE VITAL SIGNS WERE TAKEN.  HE'S GOT A

7  FEVER AT THIS POINT, 100.5.  AND THERE'S SOME OTHER NOTATIONS

8  ON THE NOTE.  AND THE DISPOSITION IS TO THE ATU, AND IT IS --

9  LET'S SEE.  THIS IS DATED ON APRIL 6TH.  AND A WEEK LATER, ON

10  APRIL 13TH, A PROVIDER PRESUMABLY HAS INITIALED THIS.

11  **Q.**   ALL RIGHT.  AND TO YOUR KNOWLEDGE, WHAT HAPPENS TO THE

12  PATIENT AFTER THIS THIRD SELF-DECLARED EMERGENCY?

13  **A.**   SO THE PATIENT WAS SENT TO THE HOSPITAL, AND HE WAS

14  DIAGNOSED WITH A CAVITARY PNEUMONIA.

15  **Q.**   AND CAN YOU TELL ME WHAT THAT IS?

16  **A.**   SO IT'S A TYPE OF PNEUMONIA.  SOME PNEUMONIAS ARE SORT OF

17  DIFFUSED IN THE LUNGS, AND OTHER PNEUMONIAS -- PARTICULARLY

18  WITH TUBERCULOSIS, THE WAY THE IMMUNE SYSTEM RESPONDS TO IT, IT

19   CREATES CAVITIES IN THE LUNGS.

20         IN THIS CASE THE PATIENT DID NOT HAVE PULMONARY

21  TUBERCULOSIS BUT COULD HAVE, AND HE WAS TREATED WITH --

22  ANTIBIOTICS WERE ORDERED FOR HIM AT THE HOSPITAL.  BUT THERE'S

23  NO DOCUMENTATION IN THE RECORD THAT HE ACTUALLY RECEIVED ALL

24  THE DOSES OF HIS MEDICATION -- OF HIS ANTIBIOTIC.

25  **Q.**   BUT WAS HE ADMITTED TO THE HOSPITAL?

01:43 1  **A.**   YES, HE WAS.

2  **Q.**   OKAY.  ALL RIGHT.  NOW, LET'S TURN TO JX_42_42.

3        SO THIS IS THE SAME PATIENT, BUT IT'S SOME TIME

4  LATER.  WHEN IS THIS HAPPENING?

5  **A.**   SO THIS PATIENT WAS SEEN --

6        **MR. ARCHEY:**  YOUR HONOR, I DO HAVE AN OBJECTION.  SHE

7  DID NOT DO THIS CHART REVIEW, AND THERE IS NO DISCUSSION OF

8  THIS NOTE IN HER SECTION.  THE OTHERS WERE.  AND SO THAT'S WHY

9  I DID NOT OBJECT THERE, BUT I DO OBJECT NOW AT THIS TIME.

10       **MS. MONTAGNES:**  YOUR HONOR, THIS IS IN THE REPORT,

11  AND SHE DID DO THIS CHART REVIEW.

12       **MR. ARCHEY:**  DR. PUISIS DID THIS CHART REVIEW.

13       **MS. MONTAGNES:**  SO, FIRST OF ALL, HE DIDN'T.  BUT

14  SECOND OF ALL, HE CAN'T HAVE IT BOTH WAYS.  SO EITHER SHE CAN

15  TESTIFY ABOUT ISSUES THAT COME UP IN THE CHARTS THAT ARE

16  RELEVANT TO HER SECTION OR SHE CAN'T.  RIGHT?  SO HE'S TRYING

17  TO PARSE IT SO WE ACTUALLY CAN'T TESTIFY ABOUT ANYTHING.

18       **THE COURT:**  WELL, SHE'S TESTIFIED ABOUT A LOT.  SHE

19  IS NOT TESTIFYING ABOUT ANYTHING -- THERE'S BEEN SIGNIFICANT

20  TESTIMONY.  BUT YOU ARE KIND OF BITING AT THE APPLE ON BOTH

21  SIDES.

22       **MR. ARCHEY:**  NO.  I'LL TELL YOU WHAT I'M DOING, IS

23  THAT IN HER SECTION THAT SHE DRAFTED, SHE REFERRED TO THIS

24  PATIENT AND TO THOSE RECORDS THEY WENT THROUGH.  WELL, THEN,

25  IT'S IN THE REPORT, SO THAT'S WHY I HAD NO OBJECTION.

01:44  1              SHE NOW HAS MOVED ON TO SOMETHING THAT IS NOT IN
       2   THAT REPORT, AND SHE DIDN'T DO THE REVIEW.
       3              **MS. MONTAGNES:**  WELL, FIRST OF ALL, SHE DID DO THE
       4   REVIEW.  PATIENT 42 WAS REVIEWED BY MADELEINE LAMARRE.  IT'S
       5   VERY CLEAR IN THE DOCUMENTS THAT WE PROVIDED TO THE DEFENDANTS.
       6   BUT SECOND OF ALL, THIS EXACT SECTION IS IN THE REPORT.
       7              **MR. ARCHEY:**  WELL, LET ME -- IF SHE DID THE REVIEW, I
       8   WILL WITHDRAW, BECAUSE I HAD IN MY NOTES IT WAS DR. PUISIS.  IF
       9   SHE ACTUALLY DID THE REVIEW, THEN WE HAVE NO OBJECTION.
      10              **THE COURT:**  ALL RIGHT.  WELL, THEN, WITH YOUR
      11   OBJECTION WITHDRAWN, I WILL ALLOW THE TESTIMONY.
      12              **MS. MONTAGNES:**  BUT, JUDGE, I ACTUALLY THINK WE HAVE
      13   TO CLARIFY THIS BECAUSE THIS IS NOW GOING TO GET OUT OF HAND.
      14   SO EITHER -- I MEAN, AT THIS POINT HE HAS TO HAVE IT ONE OR
      15   BOTH WAYS.  EITHER THEY CAN TESTIFY TO EVERYTHING THAT IS IN
      16   THEIR SECTION OR THEY CAN TESTIFY TO THEIR CHART REVIEWS, BUT
      17   THEY CAN'T -- WHAT WE'RE NOW SAYING IS SHE CAN'T TESTIFY TO
      18   STUFF THAT'S IN HER SECTION WHEN THE CHART REVIEW WAS DONE BY
      19   ANOTHER PROVIDER, BEARING IN MIND THAT HE ACTUALLY HAD A CHANCE
      20   TO DEPOSE THEM ON EACH OF THEIR INDIVIDUAL CHART REVIEWS.  THEN
      21   HE'S PARSING THIS OUT IN A WAY WHERE HE'S PULLING IT AT BOTH
      22   ENDS.  DO YOU SEE WHAT I'M SAYING?
      23              **THE COURT:**  I DO.  AND WE'LL GO OUT -- WE'RE GOING TO
      24   APPROACH IT.  WE'RE GOING TO EAT THIS APPLE.  I HATE TO KEEP
      25   USING THAT METAPHOR, BUT WE'RE GOING TO EAT IT ONE BITE AT A

01:45 1    TIME.  SO WE'RE GOING TO WAIT ON OBJECTIONS.

2                    ASK YOUR NEXT QUESTION.

3            **MR. ARCHEY:**  I WOULD CLARIFY -- AND I'LL SIT DOWN --

4    IF IT'S IN HER SECTION, I DIDN'T OBJECT.

5            **MS. MONTAGNES:**  IT'S IN HER SECTION.

6            **THE COURT:**  ALL RIGHT.

7            **MR. ARCHEY:**  BUT NOT THAT -- NOT WHAT SHE'S TALKING

8    ABOUT.

9            **THE COURT:**  ALL RIGHT.  LET'S ALL PLAY NICE.  ASK

10   YOUR NEXT QUESTION.  EXHIBIT 42 OF PATIENT 42.

11           **MS. MONTAGNES:**  YES.  HERE WE GO.

12   **BY MS. MONTAGNES:**

13   **Q.**   CAN YOU TELL ME WHAT THIS IS?

14   **A.**   SO THIS IS A SICK CALL REQUEST THAT WAS -- IN WHICH THE

15   PATIENT WAS SEEN ON JANUARY 14TH.  IT APPEARS TO BE A

16   SELF-DECLARED EMERGENCY, I BELIEVE.

17   **Q.**   OKAY.  AND WHAT IS -- WHAT'S GOING ON HERE?

18   **A.**   SO THE PATIENT SAYS THAT HE'S NOT FEELING WELL AND

19   COMPLAINING OF C.X., WHICH I'VE COME TO LEARN MEANS CHEST PAIN.

20   IT'S AN UNUSUAL ABBREVIATION.  PATIENT STATES STERNUM PAIN THAT

21   SOMETIMES COMES AND GOES AND STARTS IN HIS ABDOMEN AND IS A

22   SHOOTING PAIN.  AND HE'S GOT A NUMBER OF PAINS.  BUT THE

23   PATIENT STATES HE HAS NO HISTORY OF CHEST PAIN; DENIES

24   HEARTBURN; SPEAKING IN COMPLETE SENTENCES; APPEARS TO BE IN NO

25   ACUTE DISTRESS.  NOW -- AND VITAL SIGNS WERE TAKEN.  AND THE

01:47 1  PATIENT IS NOT SEEN BY A PHYSICIAN.

2  THE DISPOSITION BY THE MEDIC IS M.D., AND THE -- AND

3  FOUR DAYS LATER, ON THE 18TH, IT'S ILLEGIBLY SIGNED.  BUT

4  PRESUMABLY A PROVIDER SAID, "SICK CALL, AS NEEDED."

5  SO HERE'S A PATIENT COMPLAINING OF CHEST PAIN, WHO

6  HAS HAD A HISTORY OF CAVITARY PNEUMONIA THAT NO ONE SEEMS TO BE

7  AWARE OF, AND IT'S SICK CALL, AS NEEDED.

8  **Q.**   AND HOW MUCH WAS THE PATIENT CHARGED FOR THIS ENCOUNTER?

9  **A.**   SIX DOLLARS.

10 **Q.**   LET'S TURN TO JX_42_41.

11 **MS. MONTAGNES:**  AND I JUST WANT TO CLARIFY,

12 SELF-DECLARED EMERGENCIES IS NOT MS. LAMARRE'S SECTION.

13 MR. ARCHEY IS CORRECT ABOUT THAT.  BUT THIS IS HER CHART, SO I

14 APOLOGIZE.

15 **BY MS. MONTAGNES:**

16 **Q.**   THIS IS JX_42_41.

17 CAN YOU TELL ME WHAT'S HAPPENING HERE, MS. LAMARRE?

18 **A.**   SO THIS IS THE SAME PATIENT.  THIS IS FIVE DAYS LATER.

19 THE PATIENT SAYS "MY HEART HAS BEEN HURTING SINCE THE 6TH OF

20 THIS MONTH, GOING ON TWO WEEKS, AND I NEED IT CHECKED OUT

21 BEFORE I DIE.  I MADE AN EMERGENCY ON THE 14TH ABOUT THE SAME

22 PROBLEM.  NEED TO SEE A DOCTOR."

23 **Q.**   AND WHAT HAPPENED IN THIS ENCOUNTER?

24 **A.**   SO INITIALLY WHEN I REVIEWED THIS I THOUGHT THAT THE

25 PATIENT WAS SEEN BY AN EMT BECAUSE THERE'S NO LEGIBLE

01:48  1    SIGNATURE.  BUT I CAME TO APPRECIATE THAT A NURSE PRACTITIONER
      2    SAW THIS PATIENT ON THE 19TH AND --
      3    **Q.**    AND CAN I JUST STOP YOU?
      4          AND IS IT YOUR UNDERSTANDING THAT THIS IS UNDER THE
      5    NEW SICK CALL PROTOCOL?
      6    **A.**    THIS IS UNDER THE NEW SICK CALL PROTOCOL WHERE THE NURSE
      7    PRACTITIONERS ARE SEEING THE PATIENTS VIA TELEHEALTH WITH -- IN
      8    WHICH THEY'RE IN A ROOM WITH A CAMERA AND THE PATIENT IS IN
      9    ANOTHER ROOM WITH THE EMT, WHICH MAY BE FIVE OR TEN MINUTES
      10   AWAY, OR IT MAY BE IN A CAMP FURTHER AWAY.
      11         BUT THE NURSE PRACTITIONER SAW THE PATIENT, AND THE
      12   PATIENT'S BLOOD PRESSURE IS ELEVATED:  150/96.  AND THE NURSE
      13   PRACTITIONER WRITES, "LEFT L.W." OR "LEFT" -- MAYBE THAT'S L.U.
      14   IT'S A LITTLE HARD TO TELL -- "PAIN.  NO SHORTNESS OF BREATH,
      15   INTERMITTENT PAIN, INCREASED WHEN LAYING DOWN ON THE LEFT SIDE.
      16   ALERT AND ORIENTED AND REGULAR" -- "THE HEART RATE IS REGULAR
      17   RATE AND RHYTHM, BILATERAL CLEAR TO AUSCULTATION," WHICH
      18   IMPLIES THAT HE LISTENED TO HIS CHEST.
      19         NOW, IN TELEMEDICINE THE PATIENT IS NOT WITH THE
      20   NURSE PRACTITIONER, SO I'M NOT SURE EXACTLY HOW THAT GOT
      21   DOCUMENTED.  BUT IT'S AN INADEQUATE HISTORY FOR HEART PAIN:
      22   "WHEN DID IT START?  WHAT IS THE HEART PAIN LIKE?  DO YOU HAVE
      23   ANY ASSOCIATED SYMPTOMS?  DO YOU HAVE COUGH?  DO YOU HAVE
      24   PALPITATIONS?"  THERE DOES NOT APPEAR -- EVEN THOUGH THE
      25   MEDICAL RECORD SHOULD BE WITH THE NURSE PRACTITIONER, IT

01:50 1  DOESN'T APPEAR THAT THE NURSE PRACTITIONER LOOKED BACK AND SAW
2  WHAT HAD HAPPENED WITH THE PATIENT TO KNOW THAT IN THE PAST
3  HE'S HAD CAVITARY PNEUMONIA.  THERE'S --
4  **Q.**    AND COULD I STOP YOU THERE?
5         WHY IS IT RELEVANT?  CHEST PAIN AND CAVITARY
6  PNEUMONIA, WHY IS THAT RELEVANT TO THIS PATIENT?
7  **A.**    WELL, CHEST PAIN IS A SYMPTOM OF PNEUMONIA.  IT'S ONE OF
8  THE SYMPTOMS OF PNEUMONIA.  IF YOU'VE HAD PNEUMONIA -- AND
9  PARTICULARLY CAVITARY PNEUMONIA IN THE PAST -- IT'S POSSIBLE
10  YOU'LL GET PNEUMONIA AGAIN.  AND SO IT'S RELEVANT AND PERTINENT
11  TO THIS PATIENT'S HISTORY.  HE'S YOUNG.  YOU KNOW, HE'S A YOUNG
12  MAN, SO THE -- AND GETTING PNEUMONIA WHEN YOU'RE YOUNG, SO --
13  PARTICULARLY CAVITARY PNEUMONIA IS -- CAVITARY PNEUMONIA IS A
14  LITTLE BIT MORE UNUSUAL THAN REGULAR PNEUMONIA.
15         THE NURSE PRACTITIONER DOESN'T MAKE A DIAGNOSIS.
16  WHAT IS THIS PATIENT -- HE JUST SAYS HE GOT INTERMITTENT PAIN
17  WHEN LAYING DOWN.  NOT A PARTICULARLY RELEVANT MEDICAL
18  EVALUATION.  AND HE TREATS HIM WITH MOTRIN FOR TWO MONTHS.
19  **Q.**    OKAY.  LET'S GO TO JX_42_39.
20         CAN YOU TELL ME WHAT'S HAPPENING HERE?
21  **A.**    SO THIS IS ABOUT A WEEK LATER.  THE PATIENT HAS DECLARED
22  AN EMERGENCY.  HE SAYS "EVERYTHING IN MY BODY HURTS."  THIS IS
23  A LITTLE DIFFICULT TO READ.  "PATIENT IS ALERT AND ORIENTED.
24  HE'S AT THE CELL BARS."  SO THIS PATIENT IS BEING EVALUATED NOT
25  IN A CLINICAL SETTING BUT ON THE CELLBLOCK OR WHEREVER HIS

01:52  1    HOUSING UNIT IS, WHICH SHOULD ALSO TELL ME THAT THERE'S NO

2    MEDICAL RECORD PRESENT.  AND "HE IS IN NO DISTRESS, TALKS IN

3    COMPLETE SENTENCES.  PATIENT HAS BEEN SEEN ON SICK CALL."  AND

4    I -- THAT'S ILLEGIBLE.  I CAN'T READ IT.  PATIENT WANTS

5    SOMETHING FOR A LOT OF PAIN HE'S HAVING.  AND THEN HE WRITES,

6    "P-E-R-L," WHICH IS PRESUMABLY AN EXAMINATION OF HIS EYES,

7    "BELLY SOFT, NON-TENDER, NO DISTENSION, FREE RANGE OF MOTION OF

8    HIS EXTREMITIES."

9             NOW, I'LL JUST SAY THIS ABOUT THE EXAMINATION.

10   YOU'RE SEEING SOMEONE AT THE CELL BARS AND YOU'RE DOCUMENTING

11   THAT YOU'VE DONE AN ABDOMINAL EXAMINATION THROUGH THE BARS.

12   THOSE TYPES OF EXAMINATIONS ARE REALLY NOT CREDIBLE, IN TERMS

13   OF THEIR ACCURACY, TO EXAMINE SOMEONE THROUGH THE BARS.

14   AND HE SAYS THAT HIS BREATH SOUNDS ARE CLEAR.

15   **Q.**   OKAY.  AND SO WHAT WAS THE OUTCOME OF THIS VISIT?

16   **A.**   SO "M.D. DISPOSITION," AND IT LOOKS LIKE ON JANUARY 31ST,

17   ABOUT A WEEK LATER, "SICK CALL, PRN."

18   **Q.**   AND WHAT DOES THAT MEAN?

19   **A.**   I'M NOT SCHEDULING -- THE PROVIDER IS NOT SCHEDULING TO

20   SEE THE PATIENT.

21   **Q.**   AND HOW MUCH WAS THE PATIENT CHARGED FOR THIS VISIT?

22   **A.**   SIX DOLLARS.

23   **Q.**   OKAY.  SO THEN LET'S TURN NOW TO JX_42_38.

24   **A.**   SO IF I COULD JUST SUMMARIZE HERE?

25   **Q.**   YES.  OKAY.

01:54 1    **A.**   PATIENTS ARE STILL NOT GETTING APPROPRIATE MEDICAL

2    EVALUATIONS, WHETHER IT'S BY THE EMT SEEING THE PATIENT, GIVING

3    THE MEDICAL PROVIDER INFORMATION THAT "HERE'S WHAT THIS

4    PATIENT'S COMPLAINING OF," THE PROVIDER IS NOT SCHEDULING THE

5    PATIENT OR THE PROVIDER DOES SEE THE PATIENT UNDER THE NEW SICK

6    CALL SYSTEM AND DOESN'T PERFORM AN APPROPRIATE MEDICAL

7    EVALUATION.

8         AND THAT'S WHY, BASED ON THIS AND OTHER ENCOUNTERS, I

9    CONCLUDE THAT THE NEW SICK CALL SYSTEM DOES NOT YET RESULT IN

10   ADEQUATE MEDICAL EVALUATIONS FOR PATIENTS.

11   **Q.**   ALL RIGHT.  NOW, LET'S TURN TO JX_42_38.

12        YOU KNOW, WHAT HAPPENS HERE?

13   **A.**   SO THIS VISIT TOOK PLACE ON JANUARY 27TH.  SO ALTHOUGH

14   THERE WAS A SICK CALL PRN ORDER, IT APPEARS THAT THE PATIENT

15   DID GET -- WAS SEEN.  NOT SURE HOW THIS HAPPENED.  IT'S IN THE

16   PHYSICIAN'S CLINIC.  SO THE PATIENT -- THE NP NOTES THAT THE

17   PATIENT IS -- "CHEST HURTING, LEG NUMBNESS, ANXIOUS."  AND THE

18   NURSE -- AGAIN, WE DON'T KNOW WHO IS WRITING THIS -- WRITES A

19   MORE THOROUGH NOTE TALKING ABOUT THE HISTORY OF THE CHEST PAIN,

20   DENIES NAUSEA AND VOMITING, DENIES A HISTORY OF HEART PROBLEMS,

21   AND WRITES MORE INFORMATION BUT STILL DOES NOT NOTE THAT THE

22   PATIENT HAS A HISTORY OF CAVITARY PNEUMONIA IN THE PAST, WHICH

23   IS A RELEVANT HISTORY THAT THE PROVIDER SHOULD BE AWARE OF AS

24   THEY DEVELOP THEIR TREATMENT PLAN.

25        **MS. MONTAGNES:**  YOUR HONOR, CAN I HOLD FOR JUST ONE

01:56 1  MOMENT?  THE COURT'S INDULGENCE FOR JUST ONE MOMENT.

2         **THE COURT:**  YES.

3  **BY THE WITNESS:**

4  **A.**    I'D LIKE TO MAKE, IF I CAN, ONE OTHER COMMENT ABOUT THIS?

5  **Q.**    SURE.  SURE.

6  **A.**    SO WHAT'S NOTABLE ABOUT THIS IS THAT THE NURSE -- WELL,

7  THE PROVIDER ORDERS A SERIES OF TESTS BUT ORDERS FOLLOW-UP IN

8  TWO MONTHS TO DISCUSS THE LABS.  NOW, WHEN A PATIENT HAS TESTS

9  ORDERED, THEY SHOULD BE -- THE PATIENT SHOULD BE SCHEDULED

10  FOR -- AS SOON AS THE TEST RESULTS ARE BACK, TO REVIEW THEM

11  WITH THE PATIENT, GIVEN WHAT THIS PATIENT HAS EXPERIENCED.  AND

12  ANY PATIENT TO WAIT TWO MONTHS TO REVIEW THE LABS AND THE EKG

13  AND THE CHEST X-RAYS IS NOT TIMELY.

14  **Q.**    NOW, MS. LAMARRE, I JUST WANT TO TAKE YOU BACK TO YOUR

15  METHODOLOGY.  THE WAY THIS WORKED WAS -- YOU KNOW, AS YOU

16  DESCRIBED, YOU WERE GIVEN A LIST OF HOSPITALIZATIONS AND

17  DEATHS, AND YOU PICKED THE PATIENTS THAT YOU WANTED TO SEE.  DO

18  YOU REMEMBER ROUGHLY WHEN YOU DID THAT?

19  **A.**    I BELIEVE IT WAS JANUARY, CERTAINLY NO LATER THAN

20  FEBRUARY.

21  **Q.**    DO YOU RECALL IT WAS -- IF I WERE TO REPRESENT TO YOU IT

22  WAS MID-JANUARY, WOULD YOU HAVE ANY REASON TO DOUBT THAT?

23  **A.**    NO.

24  **Q.**    OKAY.  AND DID THIS VISIT HAPPEN AFTER MID-JANUARY?

25  **A.**    YES.

01:58 1       **MS. MONTAGNES:**  THANK YOU.  YOU CAN TAKE IT DOWN.

2     **BY MS. MONTAGNES:**

3     **Q.**   ALL RIGHT.  NOW I'M GOING TO DIG INTO SOME OF YOUR

4     FINDINGS.

5            SO WITH REGARDS TO CLINICAL SPACE -- AND THIS IS ON

6     PAGE 36 OF YOUR REPORT -- THE COURT FOUND THAT EXAM ROOMS

7     LACKED PRIVACY AND STANDARD MEDICAL EQUIPMENT.  THE COURT ALSO

8     FOUND THAT THERE WAS HYGIENE AND SPACING ISSUES THROUGHOUT THE

9     FACILITY AND THAT THERE WAS A FAILURE TO PROVIDE ADEQUATE

10    FACILITIES AND EQUIPMENT FOR NECESSARY MEDICAL CARE.  AND THE

11    CONDITION OF THE CLINIC EXAM ROOMS INDICATE THAT THE EXAM ROOMS

12    ARE NOT USED FOR PATIENT EXAMINATIONS.

13           WHAT, IF ANY, CONCLUSIONS WERE YOU ABLE TO MAKE WITH

14    REGARDS TO THESE THINGS AND THESE ITEMS IN THE CLINIC SPACE

15    DURING THE REMEDIAL PHASE?

16    **A.**   SO WE NOTED IMPROVEMENTS IN CLINICAL SPACE.  IT WAS GOOD

17    NEWS.  THE CLINIC AREAS WERE CLEAN.  THERE WAS PAPER ON THE

18    EXAM TABLES.

19           IN PREPARATION FOR OUR TOUR, WE RECEIVED REPORTS

20    FROM THE INMATES THAT THE FLOORS HAD BEEN RECENTLY BUFFED AND

21    THINGS PAINTED.  AND SO THERE WAS IMPROVEMENT IN THE CLINICAL

22    SPACES, WHICH WAS GOOD NEWS.

23           THERE WAS SOME SORT OF TEMPERING INFORMATION ABOUT

24    THE CLINIC SPACE, WHICH IS THAT WE WERE TOLD THAT THE CHANGES

25    HAPPENED RIGHT BEFORE WE CAME, THAT -- THINGS LIKE THERE WAS

01:59 1   PAPER COVERING THE NURSING -- THE INFIRMARY NURSES' WINDOW THAT

2   OBSTRUCTED THE NURSES' VIEW OF THE INFIRMARY AND THE CALL

3   LIGHTS THAT ARE ON THE OUTSIDE OF THE DOORS SO THAT THE NURSES

4   COULD READILY SEE.

5          WE WERE TOLD BY A PATIENT THAT WE INTERVIEWED, WHO

6   HAPPENED TO BE IN THE PHYSICAL THERAPY OFFICE GETTING PHYSICAL

7   THERAPY, THAT DR. JOHNSON CAME IN AND SAID -- THERE WAS CHARTS

8   AND THINGS ON THE EXAM TABLE.  THAT IS THE WEEK BEFORE WE CAME.

9   AND HE SAID, "TAKE THOSE DOWN.  THEY'RE COMING NEXT WEEK, AND

10  WHEN THEY LEAVE YOU CAN PUT EVERYTHING BACK."  AND THAT WAS A

11  QUOTE FROM A PATIENT REPORT WHO HAD BEEN IN THE PHYSICAL

12  THERAPY AREA WHEN HE CAME IN.

13         SO THAT'S CONCERNING BECAUSE IMPROVEMENTS WERE MADE,

14  BUT IT'S UNCLEAR WHETHER THERE'S A COMMITMENT TO SUSTAINING THE

15  IMPROVEMENTS.

16  Q.   AND WERE YOU ABLE TO DETERMINE WHETHER OR NOT THE MEDICAL

17  EQUIPMENT WAS WORKING?

18  A.   THERE WERE SOME MISSING OTOSCOPE HEADS.  I MEAN, THERE

19  WERE SOME FINDINGS, BUT -- AND I THINK THE CARDIAC MACHINE IN

20  THE ATU WASN'T READY FOR USE.

21  Q.   IS THAT THE AED?

22  A.   NO.  THIS WAS A CARDIAC MONITOR.

23  Q.   OKAY.

24  A.   IT MAY HAVE BEEN IN THE SPECIALTY SERVICES AREA.  SO THERE

25  MAY HAVE BEEN A COUPLE OF LIGHTS ON THE OPHTHALMOSCOPES THAT

02:01 1    WEREN'T WORKING, BUT WE DID NOT SYSTEMATICALLY TEST TO SEE IF

2    THE EQUIPMENT WAS WORKING.

3    **Q.**    AND WHAT, IF ANYTHING, DID YOU DETERMINE ABOUT THE ACCESS

4    TO AEDS?

5          OR, FIRST OF ALL, CAN YOU TELL ME WHAT AN AED IS?

6    **A.**    AN AED IS AN AUTOMATIC EXTERNAL DEFIBRILLATOR.

7          **MR. ARCHEY:**    YOUR HONOR, I'M GOING TO OBJECT.    THIS

8    IS BEYOND THE SCOPE AND IS NOT ANYTHING THAT'S AT ISSUE THAT

9    WAS FROM THE FIRST RULING OR ANYTHING THAT WE'VE HEARD PRIOR TO

10    THE REPORT AND THIS CURRENT --

11          **MS. MONTAGNES:**    SO, YOUR HONOR, IT GOES TO WHETHER OR

12    NOT THERE WAS NECESSARY MEDICAL EQUIPMENT IN THE FACILITY.

13          **THE COURT:**    OVERRULED.

14    **BY MS. MONTAGNES:**

15    **Q.**    WHAT, IF ANYTHING -- WERE YOU ABLE TO DETERMINE THE

16    LOCATION OF AEDS?

17    **A.**    SO WE NOTICED IN THE MEDICAL RECORD THAT AEDS WEREN'T USED

18    AT TIMES FOR SOME CARDIAC ARRESTS.    SO WE TOURED THE FACILITY

19    AND ASKED FOR THE LOCATION OF THE AEDS.    WE WERE ACCOMPANIED BY

20    DR. JOHNSON AND PHIL HAWKINS, THE DIRECTOR OF NURSES, AND THEY

21    COULD NOT READILY IDENTIFY.    THEY HAD TO ASK PEOPLE, "WHERE ARE

22    THE AEDS?"    AND IN ONE CASE THEY SAID, "WELL, IT'S OVER HERE."

23    BUT IT WAS NOT THERE.

24          AND THERE WAS AN AUDIT DONE BY, I THINK, THE

25    HEADQUARTERS, AND THEY LOOKED AT THE LOCATION OF THE AEDS AND

02:02 1  IDENTIFIED THAT STAFF DO NOT READILY KNOW WHERE THE AEDS ARE.

2  SO IT'S NOT ONLY -- IT'S IMPORTANT TO NOT ONLY HAVE THE

3  EQUIPMENT AVAILABLE BUT FOR STAFF TO KNOW WHERE IT IS SO THAT

4  IT CAN BE READILY AND QUICKLY OBTAINED.

5  **Q.**   AND WHY IS THAT, PARTICULARLY WITH AN AED?

6  **A.**   WELL, IT'S CRITICAL BECAUSE WHEN SOMEONE HAS HAD A CARDIAC

7  ARREST, YOU HAVE, YOU KNOW, ONLY MINUTES -- YOU KNOW, SIX

8  MINUTES, SEVEN MINUTES -- TO RESPOND IN ORDER FOR THE PATIENT

9  TO, YOU KNOW, SURVIVE WITHOUT BRAIN DEATH.  THAT'S ABOUT HOW

10  LONG IT TAKES.

11  **Q.**   ALL RIGHT.  LET'S TURN NOW TO PAGE 38 OF YOUR REPORT TO

12  DISCUSS THE HEALTH RECORDS.

13       THE COURT FOUND THAT "THE DEFENDANTS FAILED TO

14  PROVIDE CONSTITUTIONALLY ADEQUATE CLINICAL CARE, AND THE LACK

15  OF ADEQUATE MEDICAL RECORDS" --

16       **MS. MONTAGNES:**  WOW.  I CAN'T TALK TODAY, JUDGE.  I

17  APOLOGIZE.

18  **BY MS. MONTAGNES:**

19  **Q.**   -- "ADEQUATE MEDICAL RECORDS MANAGEMENT."  DO YOU FIND

20  THAT THAT PROBLEM PERSISTS?

21  **A.**   ABSOLUTELY.  IT WAS VERY PRONOUNCED IN ALMOST EVERY RECORD

22  I REVIEWED.

23  **Q.**   CAN YOU GIVE ME SOME EXAMPLES OF SOME OF THE PROBLEMS YOU

24  FOUND?

25  **A.**   OKAY.  SO, FIRST OF ALL, THE MEDICAL RECORDS THEMSELVES

02:03  1    ARE JUST GROSSLY DISORGANIZED.  DOCUMENTS ARE NOT KEPT IN THE

2    SAME SECTION CHRONOLOGICALLY, SO A PROVIDER OR A NURSE'S

3    ABILITY TO FOLLOW THE CARE AND KNOW WHAT THE CURRENT -- YOU

4    KNOW, THE CONDITION OF THE INMATE IS IMPAIRED.

5         THERE IS NO SINGLE LOCATION IN THE MEDICAL RECORD FOR

6    THE DOCTOR OR THE MEDICAL PROVIDERS TO DOCUMENT THEIR ORDERS.

7    ORDERS ARE DOCUMENTED ON THE PHYSICIAN'S SHEET.  THEY ARE

8    DOCUMENTED ON FLOWSHEETS.  THEY ARE DOCUMENTED IN VARIOUS PARTS

9    OF THE RECORD.

10         THE PROBLEM WITH THAT IS THAT THERE'S NO QUICK WAY TO

11    LOOK AT THE RECORD AND KNOW WHAT ARE ACTIVE ORDERS, WHAT SHOULD

12    BE BEING DONE FOR THE PATIENT, AND, VERY IMPORTANTLY, WHAT

13    MEDICATIONS THE PATIENT IS CURRENTLY ON.  THEY ARE IN TOO MANY

14    DIFFERENT PLACES IN THE MEDICAL RECORD.  AND IF A MEDICATION

15    ORDER WAS NOT TRANSCRIBED BY A NURSE AFTER A DOCTOR WROTE IT

16    AND SENT IT TO THE PHARMACY, THERE'S REALLY NO WAY TO KNOW THAT

17    BECAUSE IT WOULDN'T MAKE IT TO THE MAR.

18         SO ANOTHER REALLY CRITICAL ISSUE IS THAT NOT ALL

19    PATIENTS WHO ARE TAKING INSULIN ARE IN THE ORDERS WRITTEN IN

20    THE CHART, AS WELL AS IT'S NOT DOCUMENTED THAT THE PATIENT GETS

21    SLIDING-SCALE INSULIN.

22    Q.   SO LET'S BACK UP.  AND CAN YOU EXPLAIN TO -- REALLY WALK

23    US THROUGH THAT?  I KNOW IT'S OLD HAND TO YOU.

24    A.   OKAY.

25    Q.   BUT IT'S CONFUSING TO US.

02:05 **A.**   OKAY.  SO DIABETICS GET TREATED WITH ORAL MEDICATION; SOME
GET TREATED WITH INTERMEDIATE OR LONG-ACTING INSULIN.  THERE IS
SOMETHING KNOWN AS "SLIDING-SCALE INSULIN."  IT'S REGULAR
INSULIN, AND IT IS PRESCRIBED.

WHAT HAPPENS IS PATIENTS ARE TO CHECK THEIR BLOOD
SUGAR TWICE A DAY; AND IF IT'S ELEVATED, THEY ARE TO BE GIVEN
SOME SLIDING-SCALE INSULIN.  AND THE AMOUNT OF INSULIN THEY GET
IS BASED ON HOW HIGH THEIR BLOOD SUGAR IS.  THERE ARE NEVER ANY
ORDERS IN THE RECORD OF HOW MUCH INSULIN, SLIDING-SCALE
INSULIN, THE PATIENT IS TO GET, BASED ON HOW HIGH THE BLOOD
SUGAR IS.  THAT INFORMATION IS POSTED IN THE ATU, YOU KNOW,
WHAT THE PATIENT IS SUPPOSED TO GET.  IT'S NOT INCLUDED IN THE
MEDICAL RECORD.

**Q.**   NON-PATIENT SPECIFIC IN THE ATU?

**A.**   YES.  IN OTHER WORDS, THEY HAVE A GENERIC SLIDING-SCALE
ORDER FOR ALL THE DIABETICS AND THIS IS WHAT IT IS, BUT IT'S
NOT IN THE MEDICAL RECORD.

IN ADDITION TO THAT, WHEN PATIENTS GO TO GET THEIR
BLOOD SUGAR CHECKED FROM THE OFFICER AND THEY CHECK THEIR BLOOD
SUGAR AND IT'S HIGH, THE OFFICER HANDS THEM THEIR MEDICATION,
THEY GIVE THEM -- THEY SELF-INJECT THEIR MEDICATION, THEIR
INSULIN, BUT THEY NEVER -- THEY DO NOT REPORT TO THE OFFICER
HOW MUCH INSULIN THEY TOOK.  AND SO THE OFFICER DOESN'T -- THE
OFFICER ONLY WRITES DOWN THE BLOOD SUGAR, NOT THE INSULIN THAT
THE PATIENT RECEIVES.

02:07 1          SO IN THE MEDICAL RECORD, THERE IS NO DOCUMENTATION

2     OF HOW MUCH INSULIN THE PATIENT SHOULD GET BASED ON THEIR BLOOD

3     SUGARS, AND THERE'S NO DOCUMENTATION OF HOW MUCH SLIDING-SCALE

4     INSULIN THE PATIENT RECEIVED.  THAT'S -- YOU KNOW, ALL

5     MEDICATION SHOULD BE -- ALL MEDICATION ORDERS AND ALL

6     MEDICATION SHOULD BE DOCUMENTED IN THE MEDICAL RECORDS.  SO

7     THAT'S A PROBLEM.

8          ANOTHER ISSUE WITH THE MEDICAL RECORDS IS THAT THE

9     MEDICATION ADMINISTRATION RECORDS ARE NOT FILED IN THE MEDICAL

10     RECORDS.  AND WHEN WE DID OUR PRELIMINARY REVIEW, WE NOTICED

11     THAT THERE WERE NO -- WELL, THERE ARE VERY FEW -- VERY FEW

12     MEDICATION ADMINISTRATION RECORDS.  THERE WERE SOME.  THEY WERE

13     SCATTERED THROUGHOUT THE RECORD.  AND WE REQUESTED -- WE WERE

14     ABLE TO OBTAIN MEDICATION ADMINISTRATION RECORDS LATER.  BUT

15     THE FACT THAT THEY ARE NOT IN THE MEDICAL RECORD MEANS THAT

16     WHEN THE PROVIDER SEES THE PATIENT, THEY CAN'T LOOK IN THE

17     RECORD AND LOOK AT THE MARS TO SEE IS THIS PATIENT COMPLIANT

18     WITH THE TREATMENT PROGRAM OR NOT.

19          NOW, THERE'S ALSO AN ISSUE WITH THE RELIABILITY OF

20     THE MARS.  WE ALLUDED TO THAT A FEW MINUTES AGO, BUT THAT'S A

21     BIGGER ISSUE, EVEN THAN WE'VE YET DESCRIBED.

22          THE ISSUE OF -- MEDICAL RECORD ISSUE OF PROVIDERS NOT

23     DATING AND TIMING THEIR NOTES.  THEY ALSO DON'T DATE AND TIME

24     THEIR REVIEW OF LAB REPORTS.  THEY DON'T DATE AND TIME THE

25     REVIEW OF SPECIALTY SERVICES NOTES.  HOSPITAL REPORTS MAY OR

02:08 1    MAY NOT BE IN THE MEDICAL RECORD.

2              SO THE MEDICAL RECORDS ARE INCOMPLETE.  YOU CANNOT

3    FOLLOW THE CHRONOLOGY OF WHEN PROVIDERS AND MEDICAL STAFF

4    REVIEW DOCUMENTS AND WHAT ACTION THEY TAKE, BECAUSE OFTENTIMES

5    THE PROVIDER WILL INITIAL A LAB REPORT.  IT MAY BE ABNORMAL,

6    BUT THERE'S NO CORRESPONDING TREATMENT PLAN FOR THAT ABNORMAL

7    RESULT, AND THAT'S IMPORTANT; YOU KNOW, WHEN YOU SEE AN

8    ABNORMAL TEST REPORT, YOU WANT TO DOCUMENT WHAT YOU ARE GOING

9    TO DO ABOUT IT, AND THAT'S VERY UNUSUAL.

10   **Q.**   IN TERMS OF IDENTIFYING WHO IS WRITING WHAT NOTE, DID YOU

11   HAVE ANY TROUBLE WITH THAT?

12   **A.**   YES.

13   **Q.**   THE CREDENTIALS OF THE SIGNATURE?

14   **A.**   SOME.  THE PROVIDERS HAVE GROWN ACCUSTOMED TO JUST WRITING

15   THEIR INITIALS, AND SOMETIMES EVEN THE INITIALS AREN'T LEGIBLE.

16   **Q.**   ALL RIGHT.  WE'RE GOING TO TURN NOW TO PAGE 48 OF YOUR

17   REPORT TO CLINICAL CARE.

18             THE JUDGE MADE SEVERAL FINDINGS WITH REGARDS TO

19   CLINICAL CARE.  SO I'M GOING TO START BY JUST WALKING YOU

20   THROUGH THOSE AND ASKING IF YOU BELIEVE THOSE PERSIST.

21             SO JUDGE DICK FOUND THAT "PHYSICIANS ROUTINELY FAILED

22   TO PERFORM A MEANINGFUL PHYSICAL EXAM."  DID YOU FIND THAT THAT

23   CONTINUES?

24   **A.**   YES.

25   **Q.**   "PHYSICIANS ROUTINELY FAILED TO READ AND MONITOR TESTING."

02:10 1    DID YOU FIND THAT THAT CONTINUES?

2    **A.**    YES.

3    **Q.**    "PHYSICIANS ROUTINELY FAILED TO ADEQUATELY OBTAIN

4    INFORMATION REGARDING A PATIENT'S MEDICAL HISTORY UPON

5    EVALUATION."  DO YOU FIND THAT THAT CONTINUES?

6    **A.**    YES.

7    **Q.**    "LSP PHYSICIANS ROUTINELY FAILED TO IDENTIFY PATIENT

8    DISEASES AND ARE FOCUSED ON EPISODIC COMPLAINTS, RATHER THAN

9    THE UNDERLYING STATE OF DISEASE."  DO YOU FIND THAT THAT

10   PERSISTS?

11   **A.**    YES.

12   **Q.**    "PHYSICIANS ROUTINELY FAILED TO MONITOR AND MANAGE

13   MEDICATIONS."  DO YOU FIND THAT THAT PERSISTS?

14   **A.**    YES.

15   **Q.**    "PHYSICIANS ROUTINELY FAILED TO EDUCATE PATIENTS REGARDING

16   MEDICATION."  DO YOU FIND THAT THAT PERSISTS?

17   **A.**    YES.

18   **Q.**    TURNING NOW TO YOUR FINDINGS IN THIS REPORT.

19            WITH REGARDS TO CLINICAL CARE, WHAT IS ENCAPSULATED

20   WITHIN THAT?

21   **A.**    WELL, IN OUR REPORT, CLINICAL CARE HAS SEVERAL

22   SUBSECTIONS.  ONE IS ACCESS TO CARE ALL THROUGH THE SICK CALL

23   SYSTEM, SPECIALTY CARE, INFIRMARY CARE AND EMERGENCY CARE.

24   **Q.**    AND WE'RE GOING TO FOCUS TODAY ON ACCESS TO CARE.

25   **A.**    YES.

02:11 1    Q.   AND DOES THAT INCLUDE GENERAL MEDICINE AS WELL?

2    A.   IT DOES.

3    Q.   OKAY.  ALL RIGHT.  SO WE'RE GOING TO START WITH YOUR FIRST

4    TWO FINDINGS.

5         YOUR FIRST TWO FINDINGS IN THE REPORT ARE THAT THERE

6    IS A LACK OF TIMELY ACCESS TO A MEDICAL PROVIDER LICENSED TO

7    DIAGNOSE AND TREAT SERIOUS MEDICAL CONDITIONS, AND THERE IS A

8    LACK OF ADEQUATE MEDICAL EVALUATIONS AND A FAILURE TO TIMELY

9    DIAGNOSE AND TREAT PATIENTS WITH SERIOUS MEDICAL NEEDS.

10   CAN YOU TALK ABOUT THAT FINDING?

11   A.   SO WE'VE GIVEN A COUPLE OF EXAMPLES THUS FAR TODAY THAT

12   SHOW THAT.  FIRST OF ALL, IT'S THE ACCESS ISSUE.  FOR ALMOST

13   THREE YEARS OF THE REMEDY PHASE OF THIS CASE, NOTHING HAD

14   CHANGED WITH RESPECT TO ACCESS TO CARE.  IT WAS THE SAME.  IT

15   WAS THE MEDICS.  AND ENCOUNTER, AFTER ENCOUNTER, AFTER

16   ENCOUNTER IN ALL THE RECORDS SHOW WHAT WE PRESENTED JUST A

17   SAMPLE OF HERE TODAY IS THAT PATIENTS WERE NOT TIMELY SEEN BY A

18   PHYSICIAN AND SOMETIMES -- OR A NURSE PRACTITIONER, AND OFTEN

19   NOT SEEN AT ALL.

20   Q.   I'M GOING TO PULL UP WHAT WE'VE LABELED -- PREVIOUSLY

21   LABELED AS JOINT EXHIBIT 49, PAGE 288.

22        ALL RIGHT.  SO THIS IS A SICK CALL ENCOUNTER FOR

23   PATIENT 49 ON -- SOMETIME IN JANUARY, JANUARY 24, 2022.  CAN

24   YOU WALK US THROUGH THIS SICK CALL FORM?

25   A.   YES.  SO ON AN UNKNOWN DATE THE PATIENT SUBMITTED THIS

02:13 1 HEALTH REQUEST.

2 **Q.** YOU SAY UNKNOWN, CAN YOU EXPLAIN WHY YOU SAY THAT?

3 **A.** WELL, AS I ALLUDED TO EARLIER, THESE SICK CALL REQUEST

4 FORMS ARE DEFECTIVE IN THE SENSE THAT THEY DON'T HAVE A DATE

5 FOR THE PATIENT TO WRITE WHEN I WROTE THIS ENCOUNTER AND -- SO

6 THAT THE INSTITUTION CAN EVALUATE THE TIMELINESS OF THOSE --

7 THE ENCOUNTER FOLLOWING.

8 THERE'S ALSO NO PLACE TO DOCUMENT WHEN THE FORM WAS

9 RECEIVED AND WHETHER IT WAS REVIEWED IN TRIAGE TO DETERMINE

10 DOES THIS -- YOU KNOW, THIS IS A, YOU KNOW, ROUTINE SICK CALL,

11 BUT SOMETIMES PATIENTS NEED TO BE SEEN SOONER.  AND IT'S

12 IMPORTANT TO TRIAGE IT WHEN IT'S RECEIVED TO SEE, OH, HERE'S A

13 CHEST PAIN, HERE'S COUGHING UP BLOOD.  LET ME CALL THE PATIENT

14 DOWN NOW TO SEE THE PATIENT.

15 SO THERE -- THIS FORM AND THE SICK CALL PROCESS LACKS

16 THAT KEY COMPONENT OF A PROCESS TO ENSURE TIMELY CARE.

17 **Q.** AND, MS. LAMARRE, JUST SO I'M CLEAR, YOU KNOW, SICK CALL

18 IS HAPPENING FIVE DAYS A WEEK.  IS THAT RIGHT?

19 **A.** THAT'S CORRECT.

20 **Q.** SO THERE ARE SOME TIME PERIODS WHERE SOMEONE COULD GO

21 SEVERAL DAYS WITHOUT HAVING THEIR SICK CALL REVIEWED.  IS THAT

22 YOUR UNDERSTANDING?

23 **A.** YES.  AND THAT'S AN IMPORTANT POINT, BECAUSE THE NATIONAL

24 COMMISSION STANDARDS, WHICH ARE ACCEPTED STANDARDS IN

25 CORRECTIONS, STATE THAT HEALTH SERVICE REQUEST FORMS SHOULD BE

02:15 1  COLLECTED AND REVIEWED DAILY, AND THAT DOESN'T HAPPEN AT LSP.

2  THEY ARE REVIEWED FIVE DAYS A WEEK.

3  Q.   ALL RIGHT.  SO NOW LET'S GO TO THIS HEALTH CARE PERSONNEL

4  SCREENING, AND THERE'S A DATE THERE.

5           AND WHAT IS HAPPENING IN THIS SECTION?

6  A.   SO THAT SCREEN OR THAT DATE IS BEING USED FOR THE MEDICS

7  OR THE PROVIDERS TO DOCUMENT WHEN THE PATIENT IS ACTUALLY SEEN.

8  Q.   AND FOR OUR PURPOSES, THIS WAS A NURSE PRACTITIONER.  IS

9  THAT RIGHT?

10  A.   THIS IS A NURSE PRACTITIONER.

11  Q.   SO THIS WAS DOCUMENTED AT THE VISIT?

12  A.   AT THE VISIT.

13  Q.   OKAY.  SO WALK US THROUGH THIS VISIT.

14  A.   SO THE FIRST THING THAT IS NOTABLE IS THE PATIENT'S BLOOD

15  PRESSURE IS 180/112; THE PULSE IS 94; THE OXYGEN SATURATION IS

16  95 PERCENT; AND THE PATIENT TELLS THE NURSE PRACTITIONER THAT

17  HE'S REQUESTING SHOTS IN BOTH KNEES; STATES THE COLD WEATHER IS

18  HURTING THEM.  AND I'M NOT SURE QUITE WHAT THAT SAYS.  IT'S A

19  LITTLE ILLEGIBLE TO ME.

20           SO THERE'S NO HISTORY.  WHAT IS THE HISTORY OF THE

21  PATIENT'S KNEE PROBLEMS?  THERE IS NO EXAMINATION OF THE

22  PATIENT'S KNEES.  AND, OF COURSE, THIS IS TELEMEDICINE, I'M

23  ASSUMING, BECAUSE IT'S IN JANUARY.

24           AND SO THIS IS WHERE TELEMEDICINE -- WHICH IS USEFUL

25  FOR, YOU KNOW, YOU'VE GOT A COVID LOCKDOWN.  YOU'VE GOT SOMEONE

02:16 1   OUT AT A REMOTE CAMP.  YOU'VE GOT, YOU KNOW, A SITUATION, AN
      2   EMERGENCY, MAYBE THE INSTITUTION IS LIKE LOCKED DOWN.
      3   TELEMEDICINE CAN AT LEAST PROVIDE A FACE-TO-FACE ENCOUNTER
      4   WHERE THE PATIENT CAN TELL THE NURSE PRACTITIONER WHAT'S GOING
      5   ON, BUT TO USE THIS AS THE SOLE METHOD OF EVALUATING PATIENTS
      6   FOR ROUTINE SICK CALL IS PRODUCING THESE TYPES OF ENCOUNTERS
      7   WHERE THERE IS NO MEANINGFUL PHYSICAL EXAMINATION.
      8           AND THE IRONY IS -- AND I FEEL IT'S IMPORTANT TO MAKE
      9   THIS POINT, IS PARTICULARLY AT THE MAIN CAMP, THE MAIN PRISON,
     10   THERE IS A -- FIVE MINUTES AWAY, THERE'S A EXAM ROOM WHERE THE
     11   PATIENT IS.  AND SO IT'S NOT A BURDEN FOR THE PATIENT -- FOR
     12   THE NURSE PRACTITIONER TO GO EXAMINE THE PATIENT THERE OR FOR
     13   THE PATIENT TO BE BROUGHT UP TO WHERE THE NURSE PRACTITIONER
     14   IS.
     15           AND WHILE TECHNOLOGY CAN BE VERY HELPFUL SOMETIMES, I
     16   THINK THE WAY THAT TELEMEDICINE IS BEING USED AT THIS TIME IS
     17   NOT RESULTING IN ADEQUATE MEDICAL EVALUATIONS.  IT DOESN'T HAVE
     18   THE RIGHT EQUIPMENT ATTACHED TO IT.  IT DOESN'T HAVE A
     19   STETHOSCOPE SO THAT IF THE PATIENT IS IN -- REMOTE, THAT THE
     20   HEALTH CARE PROVIDER CAN LISTEN TO THE HEART SOUNDS, LISTEN TO
     21   THE LUNGS, LISTEN TO THE ABDOMEN.  IT'S JUST -- IT DOESN'T HAVE
     22   THE RIGHT EQUIPMENT IN ORDER TO REALLY -- TO PERFORM AN
     23   ADEQUATE EVALUATION.
     24           SO IN THIS CASE WE DON'T HAVE AN ADEQUATE HISTORY.
     25   WE DON'T KNOW IF THE PATIENT -- WHAT THE PATIENT'S PREVIOUS

02:18 1 DIAGNOSIS IS, IF HE'S GOT A DIAGNOSIS. THERE IS NO DIAGNOSIS
2 HERE. AND THE TREATMENT IS CELEBREX, TWICE DAILY FOR THREE
3 MONTHS, AND TO REFER TO ORTHO FOR AN INJECTION.
4 **Q.** AND WHAT IS CELEBREX?
5 **A.** IT'S AN ANTI-INFLAMMATORY. IT'S AN NSAID.
6 **Q.** SO WOULD THAT CELEBREX ADDRESS HIS BLOOD PRESSURE?
7 **A.** IT CAN -- TAKING NSAIDS CHRONIC -- LET'S SAY YOU DON'T
8 HAVE KIDNEY DISEASE, BUT IF YOU HAVE HIGH BLOOD PRESSURE OR IF
9 YOU DON'T HAVE HIGH BLOOD PRESSURE AND YOU TAKE NSAIDS
10 CHRONICALLY, IT CAN RAISE THE BLOOD PRESSURE.
11 **Q.** AND SO IN THIS PATIENT -- IN THIS CASE THIS PATIENT MAY
12 HAVE BEEN PRESCRIBED A MEDICATION THAT WOULD, IN FACT, HURT --
13 YOU KNOW, ELEVATE HIS BLOOD PRESSURE FURTHER?
14 **A.** WELL, YES, POTENTIALLY. BUT -- WHICH BRINGS US TO THE
15 FACT THAT AT THIS CLINIC VISIT THE PATIENT'S BLOOD PRESSURE IS
16 180/112, AND THE NURSE PRACTITIONER COMPLETELY IGNORES IT, DOES
17 NOT ASK ANY QUESTIONS. IS THIS A NEW INCREASE IN HIS BLOOD
18 PRESSURE? DOES HE HAVE A HISTORY OF HYPERTENSION? DOES HE
19 HAVE A HEADACHE, CHEST PAIN, SHORTNESS OF BREATH? IS THE
20 PATIENT TAKING ANY MEDICATIONS?
21 SO IT'S JUST ANOTHER EXAMPLE OF: THAT'S SOMETHING
22 THAT COULD BE TAKEN CARE OF RIGHT THEN AND THERE AND WAS NOT
23 ADDRESSED.
24 **Q.** AND A BLOOD PRESSURE THAT ELEVATED, WOULD YOU DESCRIBE
25 THAT AS A RED FLAG?

1   **A.**   YES.   THAT'S SEVERE HYPERTENSION, SYSTOLIC OF 180 OR

2   ABOVE.

3            NOW, THE NURSE PRACTITIONER DID REFER THE PATIENT TO

4   ORTHOPEDICS FOR AN INJECTION, SO THERE WAS A PLAN.   THERE WAS

5   NO PLAN FOR FOLLOW-UP AFTER THE INJECTION, SO --

6   **Q.**   AND WERE YOU ABLE TO OBSERVE SICK CALL DURING YOUR SITE

7   VISIT?

8   **A.**   YES.

9   **Q.**   AND DID YOU OBSERVE ANY ENCOUNTERS SIMILAR TO THIS ONE,

10  ANY ENCOUNTERS THAT WERE SIMILAR OR FOLLOWED THE SAME PATTERN?

11  **A.**   YES.

12  **Q.**   COULD YOU DESCRIBE SOME OF THOSE?

13  **A.**   SO THERE WAS ONE PATIENT OBSERVED WHO CAME IN WHOSE BLOOD

14  PRESSURE WAS 200/108.   THERE WERE TWO CASES WHERE THE PATIENT'S

15  BLOOD PRESSURE WAS EXTREMELY ELEVATED.   IN ONE CASE THE PATIENT

16  WAS REFERRED TO THE ATU; AND IN THE OTHER CASE THE PATIENT WAS

17  NOT.

18            SO FOR THE PATIENT WHO WAS NOT REFERRED, THE PATIENT

19  CAME IN TO SEE THE NURSE PRACTITIONER, WHO WAS AT THE OTHER END

20  OF THE CAMERA.   HE CAME IN FOR URINARY COMPLAINTS, AND HIS

21  BLOOD PRESSURE WAS 200 OVER -- I'M NOT SURE WHAT THE EXACT

22  NUMBER WAS.   AND HERE'S AN EXAMPLE WHERE THERE WAS SOME LACK OF

23  COORDINATION BETWEEN THE NURSE PRACTITIONER AT ONE END AND THE

24  EMT AT THE OTHER END.

25            BEFORE THE NURSE PRACTITIONER CAME ON THE CAMERA, THE

02:21  1   EMT ASKED THE PATIENT SOME QUESTIONS:  DO YOU HAVE A HEADACHE?

2   DO YOU HAVE CHEST PAIN?  YOU KNOW, DO YOU HAVE SHORTNESS OF

3   BREATH?  AND THE PATIENT DENIED THAT.

4          BUT WHEN THE NURSE PRACTITIONER CAME ON, THE EMT DID

5   NOT REPORT THAT TO THE NURSE PRACTITIONER AND THE NURSE

6   PRACTITIONER DID NOT ASK THE PATIENT HIMSELF.  SO THERE IS SOME

7   ISSUES OF COORDINATION WITH OBTAINING CLINICAL INFORMATION.

8   ULTIMATELY, THE NURSE PRACTITIONER IS RESPONSIBLE FOR, I THINK,

9   OBTAINING THE INFORMATION, BUT IT'S HELPFUL FOR THE EMT TO

10  REPORT IT SO THEN THE NURSE PRACTITIONER CAN FOLLOW UP ON IT.

11  BUT THAT DID NOT HAPPEN.

12  Q.   AND THE NURSE PRACTITIONER WAS AWARE OF THE BLOOD PRESSURE

13  OF 200/108?

14  A.   YES.  YES.  BUT THE KEY THING HERE IS THE NURSE

15  PRACTITIONER DIDN'T ADDRESS THE PATIENT'S ELEVATED BLOOD

16  PRESSURE.  THERE WAS A QUESTION, "DID YOU TAKE YOUR MEDICATION

17  THIS MORNING?"

18          AND THE PATIENT SAID, "NO, I DIDN'T BECAUSE I DIDN'T

19  WANT TO MISS SICK CALL, SO I CAME HERE."  BUT THE BLOOD

20  PRESSURE WAS SO HIGH THAT THE PATIENT SHOULD HAVE BEEN REFERRED

21  TO THE ATU, AND THAT DID NOT HAPPEN.

22  Q.   ARE THERE ANY OTHER ENCOUNTERS THAT FOLLOWED THIS PATTERN?

23  A.   WELL, I WOULD LIKE TO DESCRIBE THE OTHER CASE THAT -- WITH

24  THE PATIENT THAT HAD THE ELEVATED BLOOD PRESSURE.  THIS WAS A

25  SLIGHTLY DIFFERENT CASE WHERE THE PATIENT SAID -- HE PRESENTED

02:22 1  IN DISTRESS.  HE SAID, "I HAVE CHEST PAIN, SHORTNESS OF BREATH,

2  PALPITATIONS.  I CAN BARELY WALK WITHOUT SYMPTOMS AND" --

3  **MR. ARCHEY:**  YOUR HONOR, I OBJECT.  I NEED -- OR I

4  NEED SOME GUIDANCE.  I DON'T KNOW WHERE SHE IS IN HER REPORT.

5  SHE WAS ON PAGE 55 TALKING ABOUT 63 AND 64.  THESE ARE FROM

6  SITE VISITS.  I DON'T KNOW WHAT SHE'S TALKING ABOUT.  IF I CAN

7  GET A LITTLE HELP, I GUESS, IS ALL I'M ASKING.

8  **MS. MONTAGNES:**  YOUR HONOR, I DON'T HAVE TO -- I

9  MEAN --

10  **THE COURT:**  REFER US TO WHERE IN -- I MEAN, SHE IS AT

11  A SITE VISIT, AND SHE'S OBSERVING SICK CALL.

12  **MR. ARCHEY:**  RIGHT.  AND IT'S ON PAGE 55 AND THAT'S

13  63 AND 64, AND WE JUST DISCUSSED THAT.

14  NOW SHE'S TALKING ABOUT SOMETHING -- I DON'T

15  KNOW WHAT SHE'S TALKING ABOUT.

16  **THE COURT:**  SHE'S TALKING ABOUT PATIENTS THAT SHE

17  OBSERVED DURING HER SITE VISIT.

18  **MR. ARCHEY:**  AND THAT'S WHAT THIS IS.  AND I DON'T

19  KNOW --

20  **MS. MONTAGNES:**  YOUR HONOR, I DON'T HAVE TO --

21  **MR. ARCHEY:**  SO I GUESS IT'S OUTSIDE THE SCOPE --

22  **MS. MONTAGNES:**  -- DIRECT HIM.

23  **MR. ARCHEY:**  -- IS WHAT I'M TRYING TO SAY, THEN,

24  BECAUSE I DON'T KNOW WHERE IT IS.

25  **THE COURT:**  WELL, IS IT WITHIN THE SCOPE OF HER

02:23 1   REPORT IS THE QUESTION.  YOU DON'T HAVE TO POINT HIM TO IT.

2   JUST TELL ME IF IT'S IN THE SCOPE OF HIS REPORT.

3           **MS. MONTAGNES:**  YOUR HONOR, YES, SHE DOCUMENTS THE

4   PATIENT SHE SEES ON SICK CALL.

5           **THE COURT:**  OKAY.

6           **MR. ARCHEY:**  I DON'T EVEN HAVE A NUMBER OR ANYTHING.

7   THEY IDENTIFIED THE PATIENTS THEY SAW AT THE SITE VISIT BY

8   NUMBERS.  IT WAS 63 AND 64 WE WERE JUST TALKING ABOUT.  SHE

9   DIDN'T SAY THAT, BUT I KNOW THAT'S WHO THEY ARE.

10          **MS. MONTAGNES:**  PAGE 63 IS THE ONE.

11          **MR. ARCHEY:**  I DON'T KNOW WHERE WE ARE NOW.  AND I

12   DON'T -- I DON'T BELIEVE IT TO BE IN THE REPORT, BUT MAYBE I

13   STAND TO BE CORRECTED ONCE I GET SOME MORE INFORMATION.

14          **MS. MONTAGNES:**  SO THE PATIENT'S BLOOD PRESSURE WAS

15   182/92.  THIS IS PATIENT 63 SHE'S ABOUT TO TALK ABOUT.

16          **THE COURT:**  OKAY.  AND WE'RE GOING TO TAKE A BREAK.

17   THE COURT HAS SOMETHING IT NEEDS TO ATTEND TO.  WE ARE GOING TO

18   BE IN RECESS UNTIL 2:45.

19          **THE LAW CLERK:**  ALL RISE.

20              THE COURT IS AT RECESS.

21          **(WHEREUPON, THE COURT WAS IN RECESS.)**

22          **THE COURT:**  BE SEATED.

23              ALL RIGHT.  YOU MAY CONTINUE.

24          **MS. MONTAGNES:**  YES, YOUR HONOR.  I'VE IDENTIFIED THE

25   PATIENT AS PATIENT 65, AND I BELIEVE MR. ARCHEY HAS AN

02:49 1   OBJECTION.

2           **MR. ARCHEY:**  IT'S NOT IN THE REPORT, YOUR HONOR.  SHE

3   IS TALKING ABOUT A PATIENT THAT IS NOWHERE IN THE REPORT.

4           **MS. MONTAGNES:**  THE PATIENT IS IN THE SITE REVIEW

5   NOTES.  MR. ARCHEY WAS ACTUALLY PRESENT DURING THIS ACTUAL

6   ENCOUNTER ON THE SITE VISIT.  THIS IS NOT A SURPRISE.

7           **THE COURT:**  IS IT IN THE REPORT?  THAT'S THE

8   QUESTION.

9           **MS. MONTAGNES:**  IT IS NOT.

10          **THE COURT:**  THEN SUSTAINED.

11          **MS. MONTAGNES:**  OH, I APOLOGIZE.  OH, SORRY.  I

12  APOLOGIZE.  THIS EXACT THING IS IN THE REPORT.  MY MISTAKE.

13  PAGE 80.

14          **THE COURT:**  OVERRULED.

15          **MR. ARCHEY:**  WHAT?

16          **MS. MONTAGNES:**  PAGE 80.

17          **THE COURT:**  YOU CAN ASK HER THE QUESTIONS.

18  BY MS. MONTAGNES:

19  **Q.**   MS. LAMARRE, I BELIEVE YOU WERE DESCRIBING AN ENCOUNTER

20  WITH PATIENT 65?

21  **A.**   YES.

22  **Q.**   SO THIS WAS AN OBSERVATION DURING THE SITE VISIT.  A

23  PATIENT PRESENTED WITH RECURRENT HEART PALPITATIONS, SHORTNESS

24  OF BREATH, AND LIGHTHEADEDNESS.  HE SAID HE COULD BARELY WALK

25  WITHOUT SYMPTOMS, AND HIS BLOOD PRESSURE WAS EXTREMELY

02:50 1    ELEVATED, 205/137, AND HIS PULSE WAS IRREGULAR.

2              AND TO SHORTEN THE STORY, THE PROVIDER SENT HIM TO

3    THE ATU.  THE ISSUE WITH THIS IS THAT, GIVEN HIS HIGH BLOOD

4    PRESSURE AND SYMPTOMS, HE SHOULD HAVE BEEN PUT IN A WHEELCHAIR

5    AND TAKEN OVER TO THE ATU.  BUT WHEN WE GOT TO THE ATU AND

6    SPOKE WITH HIM, HE HAD WALKED ALL THE WAY BACK TO HIS DORM AND

7    THEN WALKED OVER TO THE ATU AND -- WHEN HE WAS IN THE MIDDLE OF

8    SOME VERY EXTREME CARDIAC SYMPTOMS.  SO THAT WAS THE ISSUE

9    THERE.

10             WHAT I WANTED TO REPORT IS THAT IT WAS GOOD NEWS THAT

11   THEY SENT HIM TO THE ATU.  AND SO ONE PATIENT WITH VERY HIGH

12   BLOOD PRESSURE WAS NOT TREATED APPROPRIATELY; THE OTHER WAS.

13   AND I WANTED TO GIVE THEM CREDIT FOR THAT.

14             WHAT WAS -- WHAT WAS REMARKABLE ABOUT HIM WAS THAT

15   WHEN HE -- HE SAID SEVERAL TIMES THAT "I DON'T WANT TO KEEP

16   COMING HERE BECAUSE YOU'RE GOING TO SAY THAT I'M MALINGERING,

17   BUT I'M NOT MALINGERING."  AND HE WAS CLEARLY FEARFUL OF BEING

18   ACCUSED OF MALINGERING, WHICH WAS SORT OF PART OF THE PUNITIVE

19   ATTITUDES TOWARDS PATIENTS.  OR THE SORT OF PERVASIVE ATTITUDE

20   IS THAT EVEN WHEN PATIENTS HAVE OBJECTIVE SIGNS AND SYMPTOMS OF

21   SERIOUS MEDICAL ILLNESS, THEY ARE WORRIED ABOUT BEING ACCUSED

22   OF MALINGERING.

23   Q.   NOW, MS. LAMARRE, ONE THING I WANT TO -- I DON'T THINK WE

24   TALKED ABOUT.  WHEN YOU WENT TO OBSERVE SICK CALL, CAN YOU JUST

25   DESCRIBE WHAT -- YOU KNOW, WHAT PARTS OF SICK CALL YOU OBSERVED

02:52 1  DURING YOUR SITE VISIT?

2  **A.**   SO WE DID IT BOTH WAYS.  WE WERE WITH THE NURSE

3  PRACTITIONER WHILE HE LOOKED AT THE CAMERA AND IN REVIEW OF THE

4  PATIENT.  AND THEN THE NEXT DAY WE WENT TO WHERE THE PATIENT

5  WAS WITH THE EMT AND SORT OF OBSERVED IT FROM THE OTHER SIDE,

6  FROM THE PATIENT'S SIDE.

7  **Q.**   OKAY.  AND SO BASED ON THE ENCOUNTERS THAT YOU REVIEWED

8  AND THE SICK CALLS THAT -- SINCE NOVEMBER THAT YOU WERE ABLE TO

9  REVIEW, WERE YOU ABLE TO FORM AN OPINION AS TO WHETHER OR NOT

10  THE CHANGES TO LSP'S SICK CALL HAVE CORRECTED THESE VIOLATIONS?

11  **A.**   THEY HAVE NOT.

12  **Q.**   AND CAN YOU -- AND WHAT DO YOU BASE THAT ON?

13  **A.**   I BASE THAT BOTH ON THE RECORD REVIEW AND ALSO THE

14  OBSERVATIONS.

15  **Q.**   AND YOU FEEL CONFIDENT IN THAT OPINION?

16  **A.**   I DO.

17  **Q.**   AND WHY IS THAT?

18  **A.**   BECAUSE THE EVIDENCE IS THERE IN THE RECORD THAT -- AND

19  THE WAY THEY'RE USING THE TECHNOLOGY UNFORTUNATELY IS NOT

20  CONTRIBUTING TO ADEQUATE EVALUATIONS.

21  **Q.**   ALL RIGHT.  I'M GOING TO TURN NOW TO -- DID YOU MAKE ANY

22  OBSERVATIONS ABOUT THE GENERAL MEDICINE CLINIC?

23  **A.**   I DID.

24  **Q.**   AND WHAT ARE THOSE?

25  **A.**   SO I DID NOT OBSERVE MANY ENCOUNTERS, PROBABLY MAYBE THREE

02:53 1    OR FOUR.  BUT WHAT I OBSERVED IS THAT THE NURSE PRACTITIONERS
2    WERE SEEING THE PATIENT IN THE SETTING OF PRIVACY, WHICH WAS
3    GOOD.  THE ROOMS WERE WELL ORGANIZED, AS I SAID.
4              ONE OF THE ISSUES WAS THAT WHEN THE NURSE
5    PRACTITIONER ASSESSED THE PATIENT, EVEN THOUGH THERE WAS AN
6    EXAM TABLE WITH THE PAPER, THE NURSE PRACTITIONER DID NOT
7    UTILIZE THE EXAM TABLE TO PERFORM HIS ASSESSMENTS, INCLUDING
8    ABDOMINAL EXAMS.
9              THERE WAS A PATIENT THAT WAS -- FROM WHICH -- THE
10   ENCOUNTER WHERE THE NURSE PRACTITIONER LISTENED TO HIS HEART
11   AND LUNGS OVER HIS CLOTHES, THEN HE LIFTED UP TO LISTEN UNDER
12   HIS CLOTHES.  HE PERFORMED AN ABDOMINAL EXAM, PALPATING FOR THE
13   TENDERNESS WITH THE PATIENT SITTING IN THE CHAIR.  HE EVALUATED
14   LEG AND FOOT EDEMA JUST BY RUNNING HIS HANDS OVER THE LOWER
15   LEG -- HIS PANTS, AND THEN HE DIDN'T TAKE THE PATIENT'S SHOES
16   OFF TO EVALUATE FOR SWELLING.
17             SO ON THE ONE HAND, EVEN THOUGH THE EXAM ROOMS HAD
18   BEEN MADE MORE SUITABLE FOR PATIENT EVALUATIONS, IT SEEMS THAT
19   THE PRACTICES, THE EXAMINATION PRACTICES, HAVEN'T SUBSTANTIALLY
20   CHANGED.
21             AND, YOU KNOW, MY EXAM SAMPLE WAS LIMITED, BUT WHAT
22   YOU -- WHEN YOU'RE OBSERVING A PROVIDER, YOU GET A SENSE OF HOW
23   DO THEY EXAMINE THEIR PATIENTS, AND THIS WAS CONCERNING.
24   Q.   AND WAS THAT CONSISTENT WITH YOUR CHART REVIEWS?
25   A.   YES.

02:55 1 **Q.** OKAY. I'M GOING TO MOVE TO YOUR THIRD FINDING IN THE
2 "CLINICAL" SECTION WHEN YOU SAY "THERE IS A FAILURE TO
3 RECOGNIZE RED FLAGS" AND PROFESSIONAL -- "POTENTIAL
4 LIFE-THREATENING SIGNS AND SYMPTOMS." WHAT, IF ANYTHING -- YOU
5 KNOW, WHAT CAN YOU SAY ABOUT THAT FINDING?
6 **A.** WHAT PAGE ARE YOU ON?
7 **Q.** WELL, THE FINDINGS ARE ON PAGE 49.
8 **A.** THANK YOU.
9 SO WE'VE TALKED ABOUT THE EXAMPLE TODAY WHERE A
10 PATIENT COUGHS UP BLOOD. AND THIS LIST OF FINDINGS IS A
11 COMBINATION OF EACH OF MY COLLEAGUES IN THE AREAS THAT THEY
12 REVIEWED, SO I CAN SPEAK TO THE ONE CASE IN PARTICULAR THAT I
13 REVIEWED. BUT MY COLLEAGUES WILL SPEAK TO THE OTHER EXAMPLES
14 OF MISSING RED-FLAG FINDINGS, SUCH AS STROKE, HEART ATTACK, ET
15 CETERA.
16 **Q.** OKAY. LET'S TURN NOW TO YOUR -- YOU KNOW, YOU MAKE A
17 GREAT DEAL OF FINDINGS. I'M NOT GOING TO GO THROUGH EVERY
18 SINGLE ONE HERE, BUT LET'S GO TO "FAILURE TO MONITOR AND
19 EVALUATION OF PATIENTS' ADHERENCE TO MEDICATION REGIMENS."
20 SO WHY IS -- YOU KNOW, WHAT ROLE DOES MEDICATION MANAGEMENT
21 PLAY IN PROVIDING MEDICAL CARE?
22 **A.** SO MEDICATIONS ARE THE PRINCIPAL THERAPY ORDERED FOR
23 PATIENTS. IT'S THE MOST COMMON THERAPY THAT'S -- THERAPEUTIC
24 REGIMEN. AND IT'S CRITICAL TO PATIENTS GETTING BETTER, TO
25 RECEIVE THEIR MEDICATIONS.

02:57 1      AND IN A CORRECTIONAL SETTING, ONE OF THE PRINCIPLES

2  OF, YOU KNOW, CONSTITUTIONAL CARE IS THAT PATIENTS HAVE A RIGHT

3  TO CARE THAT IS ORDERED.  AND WHAT I FOUND AND WHAT WE FOUND IS

4  THAT THE RECORDS ARE REPLETE WITH MEDICATION ERRORS, PATIENTS

5  NOT GETTING THEIR MEDICATIONS, PATIENTS NOT BEING INFORMED OF

6  WHAT THEIR MEDICATIONS WERE.

7      DURING THE SITE VISIT I HAD PATIENTS REPORT TO ME,

8  THEY DON'T EXPLAIN THINGS.

9      **MR. ARCHEY:**  YOUR HONOR -- YOUR HONOR, I DO OBJECT TO

10  THIS "PATIENTS REPORT TO ME."  I NEED MORE INFORMATION OR

11  SPECIFICS OR SOMETHING AS OPPOSED TO UNKNOWN, UNKNOWABLE

12  PATIENTS, SO I OBJECT.

13      **MS. MONTAGNES:**  YOUR HONOR, SHE'S FORMED AN OPINION

14  BASED ON HUNDREDS OF ENCOUNTERS, WHICH WE HAVE LAID OUT, AND

15  SHE IS ALLOWED TO TESTIFY AS TO THAT.

16      **THE COURT:**  OPINIONS CAN BE FORMED BASED ON THE SITE

17  VISIT AND BASED ON EVEN HEARSAY INFORMATION OBTAINED IN THOSE

18  SITE VISITS.  OVERRULED.

19  **BY THE WITNESS:**

20  **A.**   I WOULD POINT OUT THAT THESE COMMENTS ARE IN MY NOTES THAT

21  WERE PROVIDED --

22  **Q.**   IT'S ALL RIGHT.

23  **A.**   OKAY.  SO PATIENTS REPORTED TO ME JUST VERY SPONTANEOUSLY:

24  THEY DON'T EXPLAIN THINGS TO ME IN WAYS THAT I UNDERSTAND.

25  I'VE ONLY GOT A SIXTH GRADE EDUCATION.  THE DOCTOR ORDERS

02:58 1    MEDICATION FOR ME, BUT I DON'T KNOW THAT HE'S ORDERED THE

2    MEDICATION FOR ME.  THE DOCTOR CHANGED THE MEDICATION AND

3    DIDN'T TELL ME.

4           WHEN PATIENTS COME BACK FROM SPECIALISTS, THE

5    PROVIDERS DON'T MEET WITH THE PATIENT TO TELL THEM WHAT THE --

6    WHAT THE TREATMENT PLAN IS, INCLUDING WHAT MEDICATIONS THEY ARE

7    GOING TO GET, AND THE MEDICATION RECORDS DO NOT ACCURATELY

8    REFLECT WHAT PATIENTS ARE OR ARE NOT GETTING.

9           SO THOSE COMMENTS FROM PATIENTS ARE INDICATIVE OF THE

10    FACT THAT PROVIDERS DON'T INCLUDE THE PATIENTS WHEN THEY'RE

11    FORMULATING THE TREATMENT PLAN, AND PATIENTS CANNOT COMPLY WITH

12    THEIR TREATMENT PLAN UNLESS THEY KNOW WHAT IT IS.  AND THAT IS

13    JUST SUCH A CRITICAL FINDING AND A GLOBAL FINDING OF THIS -- OF

14    OUR REVIEW, WHICH IS THAT IF PATIENTS ARE NOT INCLUDED AND

15    EDUCATED ABOUT THE TREATMENT PLAN BY THE PROVIDERS MEETING WITH

16    THEM TO DISCUSS THE TREATMENT PLAN TO SEE IF THEY HAVE ANY

17    QUESTIONS.

18           AND WITH RESPECT TO MEDICATIONS, INFORMING THEM OF

19    WHAT THE SIDE EFFECTS ARE:  IF YOU HAVE THIS SIDE EFFECT, YOU

20    COME LET ME KNOW, OR I'M GOING TO BRING YOU -- AND I'M GOING TO

21    BRING YOU BACK TO TALK TO YOU, SEE HOW YOU'RE DOING.  I'M GOING

22    TO BRING YOU BACK IN, IN TWO WEEKS OR THREE WEEKS, TO TALK TO

23    YOU ABOUT HOW YOU'RE DOING ON THE MEDICATION.

24           THE OTHER THING ABOUT THE MEDICATION SYSTEM IS THAT

25    THE -- THERE'S NO CLEAR PROCEDURE IN THE POLICIES FOR

03:00 1    MEDICATION REFILLS AND --

2    **Q.**    I'M GOING TO STOP YOU, MS. LAMARRE, IF YOU DON'T MIND, AND

3    I'M JUST GOING TO ZOOM OUT AND SORT OF START FROM THE

4    BEGINNING.

5    **A.**    OKAY.

6    **Q.**    BECAUSE I THINK IT MIGHT HELP FOR US TO SORT OF SPEAK

7    ABOUT THAT.

8           SO YOU MENTIONED -- LET'S SORT OF START FROM THE

9    BEGINNING OF THE SYSTEM AND MAYBE YOU CAN WALK US THROUGH SORT

10    OF THE ERRORS OF EACH OF THE STEPS.

11           SO A PATIENT GOES TO SEE A PROVIDER.  THE PROVIDER

12    MAKES AN ORDER.  YOU KNOW, LET'S START FROM THERE.  SO WHAT

13    DOES THAT LOOK LIKE?

14    **A.**    SO IF YOU'RE SEEN IN THE GENERAL MEDICINE CLINIC, THE

15    PROVIDER IS GOING TO WRITE IT ON THAT CLINIC SHEET THAT THEY

16    EVALUATED THE PATIENT.  IT'S GOT THE PLAN THERE.  AND A NURSE

17    IS GOING TO TRANSCRIBE THAT ORDER AND IT SAYS "SENT TO THE

18    PHARMACY."  IT'S UNCLEAR FROM POLICY EXACTLY HOW THAT HAPPENS.

19           AS AN ASIDE, IF THERE WERE AN ELECTRONIC MEDICAL

20    RECORD, THAT ORDER WOULD BE COMMUNICATED DIRECTLY TO THE

21    PHARMACY WITHOUT RELYING ON ANY HUMAN INTERVENTION, BUT THAT'S

22    NOT WHERE THINGS ARE AT.

23           THE POLICIES DON'T ADDRESS THE TIME FRAME THAT

24    PATIENTS ARE SUPPOSED -- THEIR PRESCRIPTIONS ARE SUPPOSED TO BE

25    FILLED.  AND WE FOUND DELAYS IN PATIENTS GETTING THEIR

03:01 1  MEDICATIONS THAT RANGE FROM SEVERAL DAYS TO EIGHT DAYS TO

2  WEEKS.

3  **Q.**  AND WERE THERE ANY EXAMPLES THAT WERE PARTICULARLY

4  CONCERNING WITH RESPECT TO THAT?

5  **A.**  YES.  THERE WERE SEVERAL EXAMPLES IN THE RECORD REVIEW OF

6  PATIENTS WHO DIDN'T GET THEIR ANTIBIOTICS AND PATIENTS WHO

7  DIDN'T GET PAIN MEDICATION FOR EIGHT DAYS THAT WAS ORDERED FOR

8  THEM.

9  **Q.**  ALL RIGHT.  AND THEN LET'S TURN TO THE ADMINISTRATION OF

10  THE MEDICATION.  WERE YOU ABLE TO OBSERVE MEDICATION

11  ADMINISTRATION?

12  **A.**  ONLY IN THE MAIN SORT OF PRISON CLINIC.  WE ASKED TO

13  OBSERVE MEDICATION ADMINISTRATION IN THE ASSISTED LIVING UNITS

14  WHERE REALLY THE SICKEST PATIENTS ARE, BUT DR. JOHNSON DID NOT

15  TELL US, EVEN THOUGH WE MADE IT VERY CLEAR THIS IS A MEDICATION

16  ADMINISTRATION WE WANT TO WALK -- WATCH.  HE DIDN'T KNOW THE

17  CORRECT TIME, DIDN'T FIND OUT THE CORRECT TIME AND LET US KNOW

18  SO WE COULD WATCH IT.  WE WERE TOLD THAT THE MEDICATION

19  ADMINISTRATION PROCESS IN THE ASSISTED LIVING UNITS HAD NOT

20  CHANGED SINCE OUR LAST REPORT, SO I ENTERED THOSE FINDINGS IN

21  THE REPORT.

22        BUT WITH RESPECT TO WHAT I DID OBSERVE, THE OFFICERS

23  ARE NOT FOLLOWING WHAT WE CALL THE FIVE RIGHTS OF MEDICATION

24  ADMINISTRATION, WHICH IS IDENTIFYING THE CORRECT PATIENT WHEN

25  THE PATIENT --

03:02 1          **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO LODGE MY

2     OBJECTION.  I THINK THIS IS OUTSIDE THE SCOPE OF THE RULING.  I

3     THINK THE COURT MAY HAVE TOLD ME "NO," AND IF YOU DID, I JUST

4     WANT TO PRESERVE MY OBJECTION.  THAT'S ALL.  I'M SORRY.

5          **THE COURT:**  OVERRULED.

6          **MR. ARCHEY:**  YES, YOUR HONOR.

7     **BY THE WITNESS:**

8     **A.**   SO WHEN THE PATIENT COMES TO THE WINDOW AND THE OFFICER

9     DID NOT CONSISTENTLY ASK FOR THE I.D.  IN FACT, ONE TIME AN

10    INMATE SAID, "HERE'S MY I.D.  DO YOU WANT TO SEE IT?"

11         SHE SAID, "NO."

12         SO THE FIRST RESPONSIBILITY IS TO IDENTIFY THAT THIS

13    IS THE PATIENT.

14         THE SECOND RESPONSIBILITY IS TO MAKE SURE YOU'VE

15    RETRIEVED THE RIGHT MEDICATION AND YOU COMPARE IT AGAINST THE

16    MAR:  DOES THE BLISTER PACK ORDER MATCH WHAT'S ON THE MAR?  AND

17    NONE OF -- THE OFFICERS DIDN'T DO THAT AT ANY TIME.  AND WHY

18    THAT'S IMPORTANT IS BECAUSE MEDICATIONS ARE CHANGED FREQUENTLY,

19    LIKE WE SAW WITH THE BLOOD PRESSURE MEDICATION.  AND IF THE

20    ORDER HAS CHANGED, IF THE MEDICATION WAS, LET'S SAY,

21    DISCONTINUED, THE OFFICER WOULD NEED TO KNOW THAT TO NOT GIVE

22    THE PATIENT THE MEDICATION.  OR IF THERE WAS AN ERROR, IT WAS

23    THE WRONG DOSAGE ON THE -- THE BLISTER PACK WAS NOT THE SAME AS

24    WHAT WAS ORDERED.

25         THE OFFICERS WERE POURING KEPPRA, WHICH IS A SEIZURE

03:04 1  MEDICATION, FROM PATIENT-SPECIFIC BOTTLES.  SO EACH PATIENT HAD
2  THEIR OWN BOTTLE.  BUT THEY POURED THE MEDICATION IN THE
3  UNLABELED CUPS AND JUST SET IT ON THE COUNTER.  SO WHEN ANY
4  PATIENT WHO WAS ON KEPPRA CAME UP, THE OFFICER GAVE IT TO THE
5  PATIENT, WHICH IS NOT COMPLIANT WITH STANDARDS OF NURSING
6  PRACTICE TO -- YOU KNOW, PRE-POURING MEDICATION INTO UNLABELED
7  CUPS IS DANGEROUS.  SO THE OFFICERS DID NOT FOLLOW THE PROPER
8  PROCEDURE, AND IT'S PROBLEMATIC.
9  **Q.**  AND WHY ARE THESE PROCEDURES IN PLACE FOR MEDICATION
10  ADMINISTRATION?
11  **A.**  TO MAKE SURE THAT NO MEDICATION ERRORS ARE MADE.
12  **Q.**  AND WHAT IS THE RISK THERE?
13  **A.**  WELL, IT'S THE RISK OF HARM OF MEDICATION; THE PATIENT
14  GETS THE -- THE DRUG GOES TO THE WRONG PATIENT.  THE WRONG
15  MEDICATION GOES TO THE PATIENT.
16          AND I WOULD POINT OUT THAT IN THE NATIONAL COMMISSION
17  STANDARDS, WHICH ADDRESSES MEDICATION TRAINING FOR CORRECTIONAL
18  OFFICERS, THE STANDARDS -- YOU KNOW, THE COMMISSION RECOGNIZES
19  THAT THERE ARE MANY SMALL PRISONS THAT DON'T HAVE WEEKEND
20  COVERAGE, THEY DON'T HAVE EVENING COVERAGE; AND THEREFORE, FOR
21  PARTICULARLY SMALL PRISONS, IT'S A NECESSITY FOR OFFICERS TO
22  GIVE MEDICATIONS; AND THEREFORE, THERE SHOULD BE TRAINING.
23          THE STANDARD SAYS THAT ANY FACILITY THAT'S GOT
24  LICENSED PROFESSIONAL HEALTH STAFF SEVEN DAYS A WEEK FOR AT
25  LEAST TWO SHIFTS, THE MEDICATION SHOULD BE GIVEN BY LICENSED

03:05 1  NURSES.  AND THE TRAINING THAT THE OFFICERS DO GET IS
2  COMPLETELY INADEQUATE.  IT'S EIGHT HOURS OF TRAINING, AT MOST.
3  AND WE LOOKED AT THE CURRICULUM FOR THE LIABILITY PERIOD, AND
4  IT WAS COMPLETELY INADEQUATE.
5        NURSES GET YEARS OF TRAINING ABOUT HOW TO SAFELY
6  ADMINISTER MEDICATIONS, AND THE OFFICERS ARE NOT PROVIDED THAT
7  TRAINING.  AND THEY DON'T HAVE THE KNOWLEDGE TO RECOGNIZE EVEN
8  A MEDICATION ERROR.  LIKE IF SOMEONE IS ALLERGIC TO PENICILLIN
9  AND THE PHARMACY HAS FILLED AN ORDER FOR AMOXICILLIN, THE
10  OFFICER MAY NOT RECOGNIZE THAT THE PATIENT IS ALLERGIC TO THAT
11  AND SAY, I'M NOT GOING TO GIVE THAT TO YOU.  THEY DON'T KNOW
12  THE NORMAL DOSAGES TO RECOGNIZE THEM WHEN THEY LOOK AT THE
13  BLISTER PACK:  THIS DOSE IS NOT NORMAL; THIS IS TOO HIGH, AND
14  I'M NOT GOING TO GIVE THIS.
15        SO THEY CANNOT -- THEY DON'T HAVE THE EXPERIENCE,
16  TRAINING, EDUCATION TO RECOGNIZE WHEN THERE MAY BE A MEDICATION
17  ERROR IN PROCESS.
18  **Q.**   ALL RIGHT.  AND DID YOU -- YOU MENTIONED -- WE TALKED
19  ABOUT INSULIN A LITTLE BIT AND THE SLIDING SCALES.  IN YOUR
20  REPORT YOU MENTION ISSUES WITH THE TIMING OF THE MEDICATION
21  ADMINISTRATION.  DO YOU WANT TO SAY A BIT MORE ABOUT THAT?
22  **A.**   THIS IS A VERY SERIOUS ISSUE, AND IT'S A CHANGE SINCE OUR
23  LAST SITE VISIT.  WHEN WE WERE HERE PREVIOUSLY, MEDICATION
24  ADMINISTRATION WAS FOUR TIMES A DAY AND -- WHICH ALLOWED FOR
25  MEDICATIONS TO BE GIVEN WITH ENOUGH SPACE IN BETWEEN DOSES TO

03:07 1 BE THERAPEUTICALLY APPROPRIATE: YOU KNOW, ANTIBIOTICS GIVEN 12
2 HOURS APART, YOU KNOW, 10 HOURS APART. BUT THE MEDICATION
3 ADMINISTRATION TIMES HAVE BEEN REDUCED TO TWO A DAY AND THEY
4 ARE AT 8:00 A.M. AND 2:00 P.M. SO THERE'S NOT EVEN -- I MEAN,
5 THERE'S ONLY A SIX-HOUR WINDOW BETWEEN THOSE MEDICATION TIMES.
6 MEDICATIONS THAT ARE ORDERED TO BE GIVEN IN THE
7 EVENING OR AT BEDTIME CANNOT BE GIVEN BECAUSE THERE'S NO
8 MEDICATION TIME FOR THAT. AND THERE ARE DRUGS THAT SHOULD BE
9 GIVEN AT BEDTIME, LIKE COUMADIN AND STATINS AND OTHER
10 PSYCHOTROPIC MEDICATIONS.
11 BUT IN ADDITION TO THAT, THE PROBLEM IS THAT PATIENTS
12 ARE BEING GIVEN INSULIN TWICE DAILY WITH ONLY A SIX-HOUR WINDOW
13 SEPARATING THOSE TIMES, AND THE INSULIN KICKS IN -- HAS A
14 WINDOW OF KICKING IN, SO IT PEAKS. NPH INSULIN PEAKS IN SIX
15 HOURS AND THAT'S WHEN THE SECOND DOSE OF INSULIN IS BEING
16 GIVEN, AND THEN -- THEREFORE, IT WILL KICK IN.
17 AND I INTERVIEWED PATIENTS WHO COMPLAINED OF
18 HYPOGLYCEMIA, THAT THEIR BLOOD SUGARS JUST DROP OUT. AND IN
19 THE ASSISTED LIVING UNIT THERE, I SPOKE TO TWO ORDERLIES WHO
20 ARE LOOKING AFTER A TYPE 1 DIABETIC WHO I SPOKE TO. HE SAID,
21 "I CRASH TWO TO THREE TIMES DAILY. MY BLOOD SUGAR CRASHES."
22 THE ORDERLIES LOOK AFTER THIS INMATE BECAUSE HE HAS
23 HYPOGLYCEMIA AT NIGHT WHEN HE'S SLEEPING, AND THEY GO TO THE
24 OFFICERS TO GET GLUCOSE. THEY DON'T CALL THE EMTS FOR THIS
25 PERSON WHO IS HAVING A HYPOGLYCEMIC REACTION. THEY TREATED THE

03:09 1    PATIENT THEMSELVES.

2              AND I SAID, "WELL, WHY DON'T THE" -- "WHY DON'T YOU

3    NOTIFY THE OFFICERS TO CALL THE EMTS?"

4              AND THEY SAID, "WELL, IT HAPPENS SO OFTEN AND

5    SOMETIMES THE PATIENT IS DISORIENTED BECAUSE OF HIS

6    HYPOGLYCEMIA, AND HE GETS A LITTLE COMBATIVE AND THE EMTS GET

7    ROUGH WITH HIM.  AND SO WE JUST TAKE CARE OF IT OURSELVES,"

8    UNLESS THEY CAN'T AROUSE HIM.

9              NOW, THE PROBLEM WITH THIS, ASIDE FROM THE MEDICATION

10   TIMES, IS THAT STAFF DON'T KNOW ABOUT THIS TO MEASURE HIS BLOOD

11   SUGAR AND ADJUST HIS INSULIN.  THERE'S A PROBLEM WITH HIS

12   INSULIN DOSAGE AND THE TIME THAT HE'S BEEN GIVEN THE INSULIN.

13             THE OTHER PROBLEM WITH INSULIN IS THAT SPECIALISTS

14   RECOMMEND -- FOR TYPE 1 DIABETICS, IN PARTICULAR, THE STANDARD

15   OF CARE IS THAT THEY GET INSULIN WITH THEIR MEALS:  BREAKFAST,

16   LUNCH, AND DINNER.  AND THE -- THERE'S NO MEANS FOR TYPE 1

17   DIABETICS TO GET INSULIN WITH THEIR MEALS; AND THEREFORE, THEIR

18   DIABETES IS NOT WELL-CONTROLLED BECAUSE THERE IS NOT A

19   THREE-TIMES-A-DAY MEDICATION ADMINISTRATION.  AND IT'S A VERY

20   -- IT'S A VERY DANGEROUS SITUATION.

21             I SPOKE -- I SPOKE TO ANOTHER DIABETIC WHO SAID HE

22   HAS TO BE VERY CAREFUL ABOUT HOW MUCH HE EATS BECAUSE HE'S

23   GOING TO GO FROM 3 P.M. UNTIL 8 A.M. THE NEXT MORNING WITH NO

24   INSULIN, AND HIS BLOOD PRESSURE SPIKES, AND HE HAS FASTING

25   HYPOGLYCEMIA.

03:11 1          AND NIGHTTIME INSULIN, BEDTIME INSULIN, WOULD HELP

2      LOWER THE BLOOD SUGAR OVERNIGHT SO THAT YOU WOULDN'T HAVE THAT

3      MORNING FASTING HYPOGLYCEMIA THAT REPRESENTS POOR BLOOD SUGAR

4      CONTROL.  SO THAT'S A PARTICULARLY DANGEROUS SITUATION.  AND

5      IT'S A CHANGE.  AND ONE OF THE INMATES SAID, "WELL, THEY MADE

6      THAT CHANGE BECAUSE THEY DON'T HAVE ENOUGH CORRECTIONAL

7      OFFICERS SO THEY HAVE REDUCED THE NUMBER OF PILL CALLS."  SO

8      THAT'S A DECISION THAT'S NOT BEING MADE BY MEDICAL LEADERSHIP.

9          **MR. ARCHEY:**  YOUR HONOR, I OBJECT.  I MEAN, SHE CAN

10     SAY HEARSAY, BUT THERE'S NO BASIS FOR THIS DECISION BEING MADE

11     FOR SOME REASON.  NOW, THERE IS NO TESTIMONY FROM THE LSP

12     PEOPLE AND THAT TYPE OF THING, SO I OBJECT; LACK OF FOUNDATION.

13          **THE COURT:**  DO YOU WANT TO RESPOND?

14          **MS. MONTAGNES:**  I MEAN, YOUR HONOR, THAT'S IN HER

15     NOTES.  IT'S BEEN TURNED OVER.  IT'S BEEN DISCLOSED.  IT HELPS

16     FORM HER OPINION.

17          **THE COURT:**  OVERRULED.

18     **BY THE WITNESS:**

19     **A.**    SO WHAT'S CLEAR IS MEDICATION ADMINISTRATION HAS BEEN

20     TURNED COMPLETELY OVER TO CUSTODY.  IT IS A SECURITY OPERATION

21     WITH NO OVERSIGHT BY THE MEDICAL TEAM.

22          AS A MATTER OF FACT, IN DR. LAVESPERE'S DEPOSITION HE

23     SAID THEY WERE GOING TO HIRE A POSITION TO OVERSEE MEDICATION

24     ADMINISTRATION, AND IT'S A LIEUTENANT.  THERE'S SUCH GREAT

25     POTENTIAL AND ONGOING ERRORS GOING ON.  THE WHOLE MEDICATION

03:12  1   MANAGEMENT SITUATION NEEDS TO BE COMPLETELY UNDER THE AUTHORITY

2   AND SUPERVISION AND OVERSIGHT OF HEALTH CARE LEADERSHIP AND

3   MEDICAL.

4   Q.   ALL RIGHT.  WE'RE GOING TO TURN BRIEFLY TO DISCUSS THE

5   MARS, THE UNRELIABILITY OF THE MARS.

6          AND THIS WAS AS A PART OF THE SUPPLEMENTAL REPORT, SO

7   I'M GOING TO ASK THAT WE PULL UP JX_14_07.

8          **MR. ARCHEY:**  AND THIS IS SEALED?

9          **MS. MONTAGNES:**  YES, THIS IS SEALED.

10  **BY MS. MONTAGNES:**

11  **Q.**   NURSE LAMARRE, I WONDER IF YOU COULD JUST TELL ME WHAT

12  THIS IS.

13  **A.**   SO THIS IS A MEDICATION ADMINISTRATION RECORD.  I BELIEVE

14  IT'S PATIENT 14.  AND THIS PATIENT DIED OF CARDIAC ARREST, AND

15  THIS IS HIS JANUARY 2020 MAR.

16  **Q.**   ALL RIGHT.  AND JUST BRIEFLY TELL ME WHAT MEDICATIONS ARE

17  LISTED ON THIS MAR?

18  **A.**   THIS PATIENT WAS PRESCRIBED ELAVIL, TEGRETOL, AND

19  BENADRYL.

20  **Q.**   OKAY.  AND DOES HE APPEAR TO HAVE TAKEN THAT MEDICATION?

21  **A.**   YES.  IT LOOKS LIKE, WITH A FEW EXCEPTIONS, HE'S TAKEN THE

22  MEDICATION.

23  **Q.**   OKAY.

24          **MS. MONTAGNES:**  AND CAN WE PULL UP JX_68_3201.

25  **BY MS. MONTAGNES:**

03:14 1  **Q.**  CAN YOU TELL ME WHAT THIS IS?

2  **A.**  THIS IS A MAR PRODUCED IN THE SUPPLEMENTAL REPORT.  IT IS

3  A MAR FOR THE SAME PATIENT FOR THE SAME TIME FRAME, AND THIS

4  MAR SHOWS THAT THE PATIENT IS A NO-SHOW FOR EVERY ONE OF HIS

5  MEDICATIONS.

6  **Q.**  AND DID YOU TAKE SOME TIME TO MAKE SURE THAT THIS

7  REFLECTED THE SAME MEDICATIONS IN THE SAME -- THAT THIS IS, IN

8  FACT, REGARDING THE SAME MEDICATIONS?

9  **A.**  YES.

10  **Q.**  AND SO WHAT, IF ANY, CONCLUSION WERE YOU ABLE TO DRAW FROM

11  THIS?

12  **A.**  THAT THERE ARE DUPLICATE MARS, NO. 1, AND THE MARS ARE

13  COMPLETELY UNRELIABLE.  WE HAD ONE MAR IN THE MEDICAL RECORD,

14  AND THEN WE HAD THIS ONE PRODUCED AND IT'S A NO-SHOW.  AND IT'S

15  REALLY UNCLEAR WHAT'S HAPPENING, BUT THESE MARS SIMPLY AREN'T

16  RELIABLE AND CANNOT BE DEPENDED UPON.  AND IF A PROVIDER LOOKED

17  AT THIS MAR, HE WOULD SAY -- HE OR SHE WOULD SAY, OH, YOU'RE

18  NON-COMPLIANT.  AND THEN THERE'S ANOTHER MAR THAT SAYS THE

19  PATIENT IS COMPLIANT.

20  **Q.**  AND WAS THIS AN ISOLATED EVENT, THIS KIND OF ERROR?

21  **A.**  ABSOLUTELY NOT.  THIS WAS -- IT WAS NOT ISOLATED.

22  **Q.**  OKAY.  AND DID YOU SEE EPISODES IN THE RECORD WHERE A

23  PATIENT -- A REPORT THAT THEY WERE COMPLIANT TO THEIR DOCTOR

24  BUT THE DOCTOR WOULD SAY THEY'RE NON-COMPLIANT?

25  **A.**  YES.

03:15 1   **Q.** AND CAN YOU TALK A LITTLE BIT ABOUT WHAT RISK IS
2   ASSOCIATED WITH THAT?
3   **A.** WELL, IT'S IMPORTANT TO KNOW IF THE PATIENT IS TAKING THE
4   MEDICATION, BECAUSE IF THE PATIENT'S BLOOD PRESSURE IS
5   UNCONTROLLED AND THE PATIENT IS NOT TAKING THE MEDICATION, THEN
6   YOU COUNSEL THE PATIENT. YOU WANT TO MAKE SURE DOES THE
7   PATIENT UNDERSTAND THE TREATMENT PLAN, KNOW HOW TO TAKE THINGS,
8   AND COUNSEL THE PATIENT. BUT IF THE PATIENT IS TAKING THE
9   MEDICATION AND THE BLOOD PRESSURE IS NOT CONTROLLED, THEN THE
10   PROVIDER NEEDS TO INTENSIFY THE TREATMENT STRATEGY.
11       AND WHAT I FOUND IS THAT OVER AND OVER AND OVER AGAIN
12   IN THE RECORD THE PROVIDERS -- THE PATIENT'S BLOOD PRESSURE
13   WOULD BE POORLY CONTROLLED. THE PROVIDER WOULD WRITE,
14   "NON-COMPLIANCE," AND DO NOTHING. THEY WEREN'T LOOKING AT -- I
15   MEAN, EVEN GIVEN THIS, THEY WEREN'T EVEN LOOKING AT THE MARS.
16   THEY WERE JUST TALKING TO THE PATIENT. AND SOMETIMES PATIENTS
17   WILL ACKNOWLEDGE, I'VE NOT BEEN TAKING MY MEDICATION. BUT WHEN
18   THE PATIENT SAYS, "I AM TAKING MY MEDICATION," AND THEY SAY,
19   "NON-COMPLIANT" ANYWAY AND THEN THEY DON'T CHANGE THE TREATMENT
20   STRATEGY, IT'S JUST NOT APPROPRIATE.
21       AND YOU HAVE -- I CANNOT RECALL SEEING IN RECORD
22   AFTER RECORD SO MANY PATIENTS WITH SEVERE HYPERTENSION. I
23   MEAN, IT'S REALLY REMARKABLE IN THESE RECORDS.
24       I'VE MONITORED SYSTEMS, SO YOU ALWAYS SEE PATIENTS
25   WHO HAVE, YOU KNOW, POORLY CONTROLLED HYPERTENSION AND THEY'RE

03:17  1  BEING MONITORED.  BUT THE FREQUENCY OF THESE CASES IS -- I FIND
       2  REMARKABLE.  THERE IS SOMETHING TERRIBLY WRONG.  AND THE FACT
       3  THAT THERE ARE SO MANY -- THERE IS A PERCEPTION ON THE PART OF
       4  HEALTH CARE LEADERSHIP THAT NON-COMPLIANCE IS A PROBLEM
       5  SYSTEMATICALLY.
       6        IN THE DEPOSITION OF DR. LAVESPERE IN THE LIABILITY
       7  PHASE, HE WAS ASKED:
       8            "DO YOU WANT TO KNOW IF YOUR PATIENTS ARE
       9  NON-COMPLIANT?"
      10        HE SAID, "NO.  THERE ARE TOO MANY OF THEM."
      11        HE DOESN'T WANT TO KNOW.  BUT THIS IS A PROBLEM THAT
      12  SHOULD BE INVESTIGATED BY THE HEALTH CARE LEADERSHIP.  WHAT IS
      13  THE PROBLEM HERE?  TO WHAT EXTENT IS THE POOR CONTROL OF
      14  PATIENTS' ISSUES OF COMPLIANCE?  TO WHAT EXTENT IS IT A SYSTEM
      15  PROBLEM VERSUS AN EDUCATION PROBLEM VERSUS A NON-COMPLIANCE
      16  PROBLEM?  WE'VE EDUCATED THE PATIENT.  NO MATTER HOW MANY TIMES
      17  HAVE WE EDUCATED HIM, HE UNDERSTANDS, AND HE'S JUST NOT TAKING
      18  HIS MEDICATION.  YOU KNOW, THERE ARE SOME PATIENTS WHO ARE
      19  NOT -- ARE NON-COMPLIANT, DESPITE BEST EFFORTS.
      20        BUT THIS IS A SYSTEMATIC ISSUE THAT SHOULD BE
      21  INVESTIGATED BY THE QUALITY IMPROVEMENT PROGRAM, AND IT JUST
      22  LOOKS LIKE THERE'S INDIFFERENCE TO THIS PROGRAM:  I DON'T WANT
      23  TO KNOW ABOUT IT.  YOU KNOW, IT'S REALLY QUITE REMARKABLE.
      24  Q.   I'M GOING TO TURN NOW TO TRY TO SORT OF MOVE US ALONG SO
      25  WE CAN GET THROUGH EVERYTHING.

03:18 1        SO ONE OF YOUR FINDINGS -- ONE OF YOUR CONCLUSIONS IS

2    THAT SCHEDULING HEALTH CARE OPERATIONS ARE AT UNREASONABLE

3    TIMES, WHICH DETER ACCESS TO CARE.  YOU MENTIONED MEDICATION

4    ADMINISTRATION.  ARE THERE OTHER EXAMPLES OF THAT?

5    **A.**   WELL, THE MEDICATION ADMINISTRATION ISSUE IS A THERAPEUTIC

6    ISSUE.  WHAT'S HAPPENING IS THAT KOP MEDICATIONS ARE BEING

7    GIVEN OUT LIKE AT 2:50 IN THE MORNING AND PATIENTS ARE ASLEEP.

8    AND SO THIS IS A BARRIER.  YOU KNOW, IF YOU'RE ASLEEP AND

9    YOU'VE GOT CHRONIC ILLNESSES AND YOU DON'T WAKE UP TO GET YOUR

10   MEDICATION, WELL, IT'S THE TIME OF DAY IT'S GIVEN THAT

11   DISCOURAGES PATIENTS FROM RECEIVING THEIR MEDICATIONS.  AND

12   THEY SHOULD BE GIVEN WHEN PATIENTS ARE AWAKE.

13   **Q.**   AND WHAT ABOUT HEALTH SERVICE REQUESTS OR SICK CALLS?

14   **A.**   IN SEGREGATION, THE INMATES REPORTED THAT THE EMTS COME BY

15   AT 3:30 IN THE MORNING TO PICK UP HEALTH SERVICE REQUEST FORMS.

16   AND THERE'S NO OPERATIONAL REASON THAT IT NEEDS TO BE AT 3:30

17   IN THE MORNING.  BUT THEY TOLD ME THE SAME THING:  "SOMETIMES

18   I'M ASLEEP WHEN THE EMT COMES BY."

19   **Q.**   YOUR FINDING NO. 8 IS THAT "ASSESSING EXCESSIVE FEES FOR

20   ACCESSING HEALTH CARE."  I WONDER IF YOU COULD TALK A LITTLE

21   BIT ABOUT THIS.

22        **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO HAVE TO LODGE

23   MY OBJECTION HERE ABOUT THIS IS A CO-PAY ISSUE, SO I STILL

24   OBJECT.

25        **MS. MONTAGNES:**  YOUR HONOR --

03:20 1       **MR. ARCHEY:**  THIS IS DIFFERENT FROM MAYBE IN THE FLOW

2    OF A CHART OR WHATEVER.  THIS IS THE STRAIGHT-UP OPINION, AND I

3    OBJECT.

4          **THE COURT:**  AND THE OPINION IS -- I'M NOT -- I DON'T

5    HAVE IT PULLED UP.  WHAT'S THE OPINION?

6          **MS. MONTAGNES:**  YOUR HONOR, YOU FOUND THAT THE WAYS

7    THAT CO-PAYS ARE ASSESSED AT LSP CONTRIBUTES TO

8    UNCONSTITUTIONAL CARE.

9          **THE COURT:**  NO.  WHAT IS THE -- WHAT IS MS. LAMARRE'S

10   OPINION?

11         **MS. MONTAGNES:**  OH, SORRY.  ASSESSING EXCESSIVE FEES

12   FOR ACCESSING HEALTH CARE.  THEY FIND THAT LSP ASSESSES

13   EXCESSIVE FEES.

14         **THE COURT:**  IS THAT LSP IS CHARGING FEES FOR HEALTH

15   CARE, WHICH THE COURT FOUND WAS NOT, PER SE, UNCONSTITUTIONAL.

16   MAYBE IT CONTRIBUTES TO -- I'LL GIVE YOU SOME LEEWAY.  BUT I

17   THINK THE OBJECTION -- I AM GOING TO OVERRULE THE OBJECTION FOR

18   NOW.  YOU GET SOME LEEWAY, BUT IT'S NOT PART OF THE REMEDY, PER

19   SE.

20   **BY MS. MONTAGNES:**

21   **Q.**   GO AHEAD.

22   **A.**   SO JUST TO CLARIFY, THE NATIONAL COMMISSION STANDARDS

23   INDICATES ONE OF THE BARRIERS TO ACCESS TO CARE IS IF CO-PAYS

24   ARE EXCESSIVE.  IT'S NOT THE CO-PAY ITSELF.  IT'S JUST IF

25   THEY'RE EXCESSIVE.

03:21 1          AND WHAT WE FOUND IS, BECAUSE PATIENTS AREN'T GETTING
     2    TIMELY MEDICAL EVALUATIONS, THEY'RE NOT SEEN BY A MEDICAL
     3    PROVIDER TO EVALUATE THEM, THEY'RE HAVING TO PUT IN MULTIPLE,
     4    MULTIPLE HEALTH REQUESTS FOR WHICH THEY ARE BEING CHARGED FOR
     5    EVERY ONE WHEN THEY'RE NOT GETTING THE CARE.  SO THAT'S THE
     6    ISSUE.  IT'S EXCESSIVE; AND THEREFORE, PATIENTS MAY NOT SUBMIT
     7    A REQUEST WHEN THEY NEED TO BE SEEN BECAUSE THEY'RE GOING TO
     8    GET CHARGED AGAIN.
     9    **Q.**   ALL RIGHT.  AND, FINALLY, YOU FIND THAT THERE ARE
    10    UNPROFESSIONAL AND PUNITIVE ATTITUDES TOWARDS PATIENTS AT LSP
    11    THAT CONTRIBUTES TO THE UNCONSTITUTIONAL CLINICAL CARE.  I
    12    WONDER IF YOU COULD SPEAK A LITTLE BIT ABOUT THIS.
    13    **A.**   YES.  SO THIS IS AN OVERRIDING ISSUE AT LSP.  AND LET ME
    14    JUST SAY THAT, YOU KNOW, NURSE PRACTITIONERS, PHYSICIANS AND
    15    NURSES HAVE AN ETHICAL OBLIGATION TO ACT IN THE PATIENT'S BEST
    16    INTEREST AND BE THEIR ADVOCATE.  AND THE NURSING CODE OF ETHICS
    17    SAID THAT NURSES PROVIDE SERVICES WITH REGARDS TO SOCIOECONOMIC
    18    CIRCUMSTANCES, PERSONAL ATTRIBUTES, OR THEIR MEDICAL CONDITION.
    19          WHAT WE HAVE FOUND IN THE -- DURING THE LIABILITY AND
    20    REMEDY PHASE IS THAT THERE IS A PERVASIVE ATTITUDE OF -- A
    21    PUNITIVE ATTITUDE, A NEGATIVE ATTITUDE TOWARDS PATIENTS.
    22          DR. LAVESPERE IN HIS LIABILITY DEPOSITION SAID -- IN
    23    RESPONSE TO THE QUESTION, "WHAT IS YOUR BIGGEST CHALLENGE?"
    24          HE SAID, "DETERMINING WHO'S TELLING THE TRUTH."
    25          **MR. ARCHEY:**  YOUR HONOR, LIABILITY TESTIMONY HAS GOT

03:23 1    NO RELEVANCE HERE.  WE'RE TALKING ABOUT CURRENT CONDITIONS.

2    WE'RE TALKING ABOUT THE REMEDY.  THE REFERENCE TO "LIABILITY

3    TESTIMONY," ONCE AGAIN, I OBJECT; IT'S NOT RELEVANT.

4              **THE COURT:**  WHY IS IT RELEVANT?

5              **MS. MONTAGNES:**  YOUR HONOR, I BELIEVE, YOU KNOW, THAT

6    MS. LAMARRE IS GOING TO TESTIFY THAT THAT ATTITUDE CONTINUED

7    INTO HIS REMEDY DEPOSITION; THAT SHE SAW NO CHANGE IN ATTITUDE,

8    AND THAT IT HAS BEEN CONSISTENT THROUGHOUT.

9              **THE COURT:**  ASK THAT QUESTION.

10   **BY MS. MONTAGNES:**

11   **Q.**   MS. LAMARRE, DID YOU FIND THAT THAT ATTITUDE CONTINUED

12   WITH DR. TOCE AND DR. LAVESPERE INTO THE REMEDY PHASE?

13   **A.**   ABSOLUTELY.  THE RECORDS ARE REPLETE WITH DOCUMENTATION

14   THAT INMATES ARE MALINGERERS, THEY CANNOT BE BELIEVED; AND

15   THEREFORE, WHEN MEDICAL PROVIDERS MINIMIZE WHAT THE PATIENT IS

16   REPORTING THAT THEIR SYMPTOMS ARE, THEY -- AND THERE'S AN

17   ATMOSPHERE OF "I DON'T BELIEVE YOU," IT PREVENTS THE MEDICAL

18   PROVIDERS FROM ADEQUATELY MEDICALLY EVALUATING THE PATIENT

19   BECAUSE THEY DON'T BELIEVE WHAT THEY'RE TELLING THEM.  AND EVEN

20   WHEN PATIENTS HAD OBJECTIVE SYMPTOMS OF STROKE AND HEART

21   ATTACK, THERE IS THIS DOCUMENTATION THAT PATIENTS CAN'T BE

22   BELIEVED.

23             AS A MATTER OF FACT, IN HIS DEPOSITION DARREN CASHIO,

24   WHO IS IN CHARGE OF THE EMS SERVICES, TESTIFIED THAT THEY'RE

25   NOT GOING TO TAKE PATIENTS TO DO A SCOOP -- WHAT WE CALL --

03:24 1    THEY CALL A "SCOOP AND RUN."  IF SOMEONE IS HAVING A HEART

2    ATTACK OR A STROKE, THEY'RE NOT GOING TO TAKE THEM DIRECTLY TO

3    THE HOSPITAL.  THEY'RE NOT GOING TO BYPASS THE ATU, EVEN THOUGH

4    TIME IS OF THE ESSENCE, BECAUSE INMATES LIE AND THEY'RE

5    MALINGERERS.  AND ALTHOUGH PREVIOUS TO -- PREVIOUS IT USED TO

6    BE, HE TESTIFIED, THAT EMTS HAD DISCRETION WHETHER TO TAKE

7    PATIENTS TO THE HOSPITAL DIRECTLY FROM THE HOUSING UNIT; THAT

8    THEY'RE TAKEN THAT AWAY.  AND IT'S BECAUSE THEY'RE WORRIED THAT

9    THEY'RE MALINGERING AND MIGHT ESCAPE.

10           IT IS IN THE MORTALITY REVIEWS, WHICH DR. PUISIS WILL

11    SPEAK TO, THERE IS THIS --

12           **MR. ARCHEY:**  I OBJECT TO THIS IS OUTSIDE HER AREA.

13    SHE JUST SAID IT'S DR. PUISIS, IT'S NOT HER.

14           **THE COURT:**  SUSTAINED.

15           **MS. MONTAGNES:**  YOUR HONOR, MAY I BE HEARD?  MAY I BE

16    HEARD?

17           **THE COURT:**  YES.

18           **MS. MONTAGNES:**  SHE'S NOT TESTIFYING AS TO THE

19    QUALITY OF THE MORTALITY AND MORBIDITY REVIEWS.  SHE'S SAYING

20    HER REVIEW OF THOSE INFORMED HER OPINION ABOUT THE PUNITIVE

21    ATTITUDES.  I BELIEVE SHE WILL NOT TESTIFY AS TO THEIR

22    ADEQUACY.

23           **THE COURT:**  SUSTAINED.  THAT'S NOT THE QUESTION

24    YOU -- WELL, YOU MAY HAVE ASKED THE QUESTION, BUT HER RESPONSE

25    WAS NOT RESPONSIVE TO YOUR QUESTION.  SUSTAINED.

03:26 1  **BY MS. MONTAGNES:**

2  **Q.**   OKAY, NURSE LAMARRE, WITH -- MS. LAMARRE, WITHOUT

3  SPECIFYING AS TO THE ADEQUACY OF THE MORTALITY AND MORBIDITY

4  REVIEWS, CAN YOU TELL ME HOW THOSE HELPED YOU TO FORM YOUR

5  OPINION WITH REGARDS TO THE PUNITIVE ATTITUDE OF STAFF?

6  **A.**   COULD YOU CLARIFY THE QUESTION IN TERMS OF WHAT I'M

7  ALLOWED TO --

8  **Q.**   SO I DON'T WANT YOU TO OPINE ABOUT WHETHER OR NOT THEY

9  WERE ADEQUATE.  WHAT I WANT YOU TO DO IS SAY HOW THEY INFORMED

10  YOUR OPINION REGARDING THE PUNITIVE ATTITUDES OF STAFF.

11  **A.**   SO I READ A NUMBER OF THE MORTALITY REVIEWS FOR THE

12  PROCESS OF SELECTING RECORDS.  AND THE MORTALITY SUMMARIES THAT

13  I READ LARGELY -- INSTEAD OF LOOKING FOR ISSUES RELATED TO THE

14  CARE, THEY BLAMED THE PATIENTS FOR THEIR CONDITION.

15  **Q.**   ALL RIGHT, MS. LAMARRE.  WE'VE TALKED ABOUT A LOT OF

16  THINGS TODAY AND WE'RE NOT GOING TO BE ABLE TO GET TO

17  EVERYTHING IN THE REPORT, SO I THINK IT'S TIME WE TURNED TO

18  REMEDY.

19          CAN YOU REMIND THE COURT WHAT YOUR EXPERIENCE IS IN

20  REMEDYING UNCONSTITUTIONAL CARE IN PRISONS, WHAT ROLES YOU'VE

21  PLAYED?

22  **A.**   WHAT ROLES I HAVE PLAYED?

23  **Q.**   YES.

24  **A.**   SO STARTING WITH MY OWN SYSTEM WITH THE GEORGIA DEPARTMENT

25  OF CORRECTIONS, THE REMEDY IS TO ADDRESS ALL THE COMPONENTS OF

03:27 1   AN ADEQUATE HEALTH CARE SYSTEM, STARTING WITH THE STRUCTURE,

2   WHICH IS LEADERSHIP, STAFFING, TRAINING, POLICIES, QUALITY

3   IMPROVEMENT; ADDRESSING THE ADEQUACY OF ALL THE PROCESSES --

4   ACCESS TO CARE, SPECIALTY SERVICES, MEDICATION ADMINISTRATION,

5   INFIRMARY CARE, EMERGENCY SERVICES -- AND THEN HAVING A QUALITY

6   IMPROVEMENT PROGRAM, AN OVERSIGHT PROGRAM, THAT MONITORS THE

7   TIMELINESS AND APPROPRIATENESS OF CARE AND HOW WELL THE SYSTEMS

8   ARE WORKING.  AND YOU CANNOT -- AS WELL AS THE OUTCOMES, THE

9   PATIENT OUTCOMES THAT EXIST, AND THEN IDENTIFYING THE PROBLEMS.

10        WITHOUT ADDRESSING ALL THE MAJOR STRUCTURAL

11   PROCESSES, QUALITY IMPROVEMENT, AND COMPONENTS OF A HEALTH CARE

12   PROGRAM, THE SYSTEM CANNOT BE REMEDIED.

13   **Q.**   AND WHAT ON A BIG-PICTURE LEVEL DO YOU SUGGEST IN TERMS OF

14   REMEDY?

15   **A.**   SO, FIRST OF ALL, I THINK IT'S IMPORTANT THAT THE STATE

16   ACCEPT THE FINDINGS OF THE COURT, WHICH TESTIMONY SUGGESTED

17   THAT THEY DISAGREED WITH THE FINDINGS OF THE COURT.  AND UNLESS

18   THE STATE ACCEPTS THAT THERE ARE SERIOUS PROBLEMS THAT ARE

19   CAUSING HARM TO PATIENTS, INCLUDING HOSPITALIZATIONS AND DEATH

20   AND DISABILITY, UNLESS THEY EMBRACE THOSE FINDINGS, THEN THE

21   ATTITUDE TOWARDS THE CASE, THAT THINGS WON'T CHANGE.

22        THE SECOND VERY, VERY LARGE-PICTURE REMEDY IS THE

23   ATTITUDE TOWARDS THE PATIENTS AND INCLUDING THEM IN THEIR OWN

24   CARE BY MEETING WITH THEM AFTER SPECIALTY APPOINTMENTS,

25   EMERGENCY CARE, AND INCLUDING THEM IN THE TREATMENT PLAN AND

03:29 1  MAKING SURE THEY UNDERSTAND IT AND THAT THEY ARE GETTING WHAT
2  IS ORDERED AND THEY ARE NOT -- THAT IT'S ADDRESSED.
3          AND, FINALLY, I THINK THAT EVERY COMPONENT OF HEALTH
4  CARE DELIVERY AT LSP NEEDS TO BE RE-EVALUATED FROM THE GROUND
5  UP.  AND WE -- I KNOW THAT THE ELECTRONIC -- WE DIDN'T TALK
6  ABOUT THIS SPECIFICALLY.  BUT THE ELECTRONIC HEALTH RECORD, I
7  KNOW THAT THE STATE IS IN THE PROCESS OF IMPLEMENTING AN
8  ELECTRONIC HEALTH RECORD AT VARIOUS FACILITIES AND PLANS TO DO
9  SO AT LSP.  BUT THE SOONER THAT THAT'S IMPLEMENTED, IT WILL
10  GREATLY CONTRIBUTE TO REDUCED HARM, BECAUSE THE CURRENT MEDICAL
11  RECORDS SYSTEM IS KIND OF IN SHAMBLES.
12          **MS. MONTAGNES:**  THE COURT'S INDULGENCE?
13          **THE COURT:**  OKAY.
14          **MS. MONTAGNES:**  THAT'S ALL I HAVE, YOUR HONOR.
15          **THE COURT:**  CROSS.
16          **MR. ARCHEY:**  THANK YOU, YOUR HONOR.
17                    **CROSS-EXAMINATION**
18  BY MR. ARCHEY:
19  **Q.**  GOOD AFTERNOON, MR. -- MS. LAMARRE.  MY APOLOGIES.
20          LET'S TALK ABOUT SOME IMPROVEMENTS AT LSP, MA'AM.
21  PREVIOUSLY SICK CALL WAS CONDUCTED BY EMTS.  CORRECT?
22  **A.**  YES.
23  **Q.**  AND NOW, CURRENTLY, IT'S A POSITIVE CHANGE THAT SICK CALL
24  IS BEING CONDUCTED BY THESE NURSE PRACTITIONERS.  CORRECT?
25  **A.**  IT IS A POSITIVE CHANGE, PROVIDED THAT THEY CONDUCT

03:31 1  ADEQUATE MEDICAL EVALUATIONS.

2  **Q.**   THE STANDARD IN MOST INSTITUTIONS IS THAT AN RN CONDUCT

3  SICK CALL.  ISN'T THAT RIGHT?

4  **A.**   THAT'S WHAT I'M FAMILIAR WITH.  IT'S USUALLY AN RN THAT

5  DOES THE INITIAL TRIAGE.

6  **Q.**   SO THE USE OF A NURSE PRACTITIONER TO CONDUCT SICK CALL IS

7  ACTUALLY ABOVE THE STANDARD OF CARE.  ISN'T THAT RIGHT?

8  **A.**   I DON'T KNOW IF YOU'D CALL IT "ABOVE THE STANDARD OF

9  CARE," BUT IT'S PROVIDING DIRECT ACCESS TO SOMEWHAT -- TO A

10  PROVIDER THAT CAN DIAGNOSE THEM.  AND, AGAIN, THE CAVEAT BEING

11  PROVIDED THAT THEY DO THAT.

12  **Q.**   MA'AM, I'M GOING TO TRY IT AGAIN.

13       USING NURSE PRACTITIONERS TO CONDUCT SICK CALL IS

14  ABOVE THE STANDARD OF CARE, IS IT NOT?

15  **A.**   I WOULDN'T SAY IT'S ABOVE THE STANDARD OF CARE.

16  **Q.**   OKAY.  LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.  DO YOU

17  REMEMBER ME TAKING YOUR DEPOSITION?  I ASKED YOU THAT EXACT

18  SAME QUESTION.

19  **A.**   I ACTUALLY DIDN'T RECALL THAT.

20  **Q.**   LET'S LOOK ON PAGE 38.

21       **MR. ARCHEY:**  MS. RAGUSA, CAN YOU BRING THAT UP,

22  PLEASE?

23       **THE COURT:**  WE DON'T HAVE IT.

24       **MR. ARCHEY:**  AS SOON AS THAT --

25       **THE COURT:**  IT'S NOT ON THE SCREENS.  IT'S STILL NOT.

03:32   1         **MR. ARCHEY:** WE'RE ON PAGE 38, LINE 2, AS SOON AS IT

2   COMES UP. I DON'T KNOW, YOUR HONOR. THIS IS THE FIRST

3   GO-AROUND FOR US.

4         **THE COURT:** SHE'S WORKING ON IT. HOLD ON A MINUTE.

5   MAKE SURE YOUR LAPTOP IS PLUGGED INTO THE --

6         **MR. ARCHEY:** OH, OKAY. THERE WE GO. THANK YOU,

7   YOUR HONOR.

8   **BY MR. ARCHEY:**

9   **Q.** WE'RE ON PAGE 38, MS. LAMARRE.

10       "I WANT TO TALK ABOUT SICK CALL A LITTLE BIT. THE

11   USE OF NURSE PRACTITIONERS TO CONDUCT SICK CALL IS A

12   SUBSTANTIAL IMPROVEMENT. CORRECT?"

13   **A.** YES.

14   **Q.** YOU ANSWERED -- YOU ANSWERED, "IF DONE PROPERLY."

15       IT CONTINUES ON. "IN FACT, USING NURSE PRACTITIONERS

16   TO CONDUCT SICK CALL IS ABOVE THE STANDARD OF CARE. IS IT

17   NOT?"

18       YOUR ANSWER: "IT IS. I DON'T KNOW IF YOU'D CALL IT

19   ABOVE THE STANDARD OF CARE. IT CERTAINLY -- IT'S AN

20   IMPROVEMENT OVER RN'S, YOU KNOW, AND OTHER LESSER-TRAINED

21   MEDICAL PROFESSIONALS DO SICK CALL. IT'S GOING TO THE RIGHT

22   PERSON WHO IS LICENSED TO DIAGNOSE AND TREAT SOMEONE. SO IT'S

23   GOOD."

24       CORRECT?

25   **A.** WELL, I THINK THAT'S WHAT I JUST SAID.

03:34  1    **MS. MONTAGNES:**  YOUR HONOR, I'M GOING TO OBJECT TO

2    THE IMPROPER IMPEACHMENT.  AND IF WE'RE GOING TO DO THIS ALL

3    DAY WITH THE -- THAT'S EXACTLY WHAT SHE JUST SAID.

4         **THE COURT:**  HE ASKED HER IF IT WAS ABOVE THE STANDARD

5    OF CARE, AND SHE SAID, "NO."  AND HE'S TRYING TO SHOW HER THAT

6    PREVIOUSLY SHE SAID IT WAS.

7         **MS. MONTAGNES:**  SHE SAID, "NOT NECESSARILY," WHICH IS

8    WHAT HER ANSWER WAS.

9         **THE COURT:**  OKAY.  OVERRULED.  AND YOU CAN OBJECT

10    FROM YOUR TABLE.

11    **BY MR. ARCHEY:**

12    **Q.**    ALL RIGHT.  PREVIOUSLY THE EMTS CONDUCTED SICK CALL

13    WITHOUT MEDICAL RECORDS.  CORRECT?

14    **A.**    YES.

15    **Q.**    NOW, CURRENTLY, THE NURSE PRACTITIONER HAS THE PATIENT'S

16    MEDICAL RECORDS DURING THE SICK CALL ENCOUNTER.  CORRECT?

17    **A.**    YES.

18    **Q.**    LET'S LOOK AT A PHOTO, PLEASE.

19         **MR. ARCHEY:**  MS. RAGUSA, CAN YOU PULL UP DX_46_190,

20    PAGE 190?

21    **BY MR. ARCHEY:**

22    **Q.**    ALL RIGHT.  DO YOU RECOGNIZE THESE PHOTOGRAPHS?  ON THE

23    LEFT WE HAVE NURSE PRACTITIONER BORDELON.  DO YOU RECOGNIZE THE

24    ROOM HE'S IN BEING WHERE SICK CALL IS TAKING PLACE THROUGH

25    TELEMED?

03:35 1    **A.**    YES.

2    **Q.**    AND THOSE ARE SICK CALL OR MEDICAL RECORDS ON THE CART

3    THERE NEXT TO HIM.  DO YOU SEE THAT?

4    **A.**    YES.

5    **Q.**    AND ON THE SCREEN ON THE BOTTOM ON THE RIGHT SIDE, HE'S

6    LOOKING AT RECORDS AS HE'S WORKING.  DO YOU SEE THAT?

7    **A.**    YES.

8    **Q.**    THE NURSE PRACTITIONER HAVING ACCESS TO THE PATIENT'S

9    CHART IS AN IMPROVEMENT.  CORRECT?

10    **A.**    YES.

11    **Q.**    AND THE NURSE PRACTITIONER ALSO HAS THE SICK CALL SLIP

12    WITH HIM OR HER WHILE CONDUCTING THE SICK CALL ENCOUNTER?

13    **A.**    THAT'S CORRECT.

14    **Q.**    OKAY.  PREVIOUSLY THE EMTS CONDUCTED SICK CALL CELL SIDE.

15    CORRECT?

16    **A.**    YES.

17    **Q.**    NOW THE PATIENT IS TAKEN TO A TREATMENT ROOM IN PRIVACY.

18    CORRECT?

19    **A.**    YES.

20    **Q.**    HAVING THE PATIENT TAKEN TO A TREATMENT ROOM IS AN

21    IMPROVEMENT.  CORRECT?

22    **A.**    YES.

23    **Q.**    LET'S LOOK AT A COUPLE OF PHOTOGRAPHS IN EXHIBIT D_46.

24          **MR. ARCHEY:**  AND, YOUR HONOR, I'D LIKE TO OFFER THESE

25    INTO EVIDENCE AND MAYBE -- CAN I OFFER ALL OF D_46?  OR IS

03:36 1  COUNSEL GOING TO HAVE AN OBJECTION WITH THIS?  IT'S DX_46.

2       **MS. MONTAGNES:**  IS THIS THE --

3       **MR. ARCHEY:**  THESE ARE PHOTOGRAPHS.

4       **MS. MONTAGNES:**  WERE THEY ATTACHED TO AN EXPERT

5  REPORT, OR WHAT WERE THEY?

6       **MR. ARCHEY:**  THESE WERE PHOTOGRAPHS TAKEN BY THE

7  DEFENSE'S EXPERTS, YES.

8       **MS. MONTAGNES:**  AS LONG AS -- I MEAN, I'D NEED TO

9  REVIEW.  BUT AS LONG AS THESE ARE, IN FACT, THE ATTACHMENTS TO

10 THE EXPERT REPORT, WE HAVE NO OBJECTION.

11      **MR. ARCHEY:**  THEY ARE PROBABLY BROADER THAN THAT.  TO

12 BE -- TO MAKE SURE YOU UNDERSTAND, IT'S PROBABLY MORE.

13      **MS. MONTAGNES:**  WELL, THEN WE OBJECT.

14      **THE COURT:**  SHE HASN'T HAD A CHANCE TO LOOK AT THEM.

15      **MR. ARCHEY:**  VERY GOOD.

16      **THE COURT:**  MOVE TO ADMIT THEM LATER AFTER SHE'S HAD

17 A CHANCE TO LOOK AT THEM.

18      **MR. ARCHEY:**  YES, YOUR HONOR.

19          MS. RAGUSA, LET'S GO TO THE PHOTOGRAPH, WHICH IS

20 D_46, PAGE 4.

21 **BY MR. ARCHEY:**

22 **Q.**  MS. LAMARRE, DO YOU RECOGNIZE THIS AS THE TYPE OF OR ONE

23 OF THE ROOMS WHERE A PATIENT IS TAKEN TO DO SICK CALL MAYBE AT

24 ONE OF THE OUTCAMPS?

25 **A.**  YES.

03:37 1   Q.   CAN WE GO TO PAGE -- THERE'S ANOTHER COUPLE OF PICTURES
2   THERE.  DO YOU SEE THAT SAME PROCESS?
3   A.   CORRECT.
4   Q.   OKAY.  LET'S GO TO PAGE 5, PLEASE.
5         THIS IS ANOTHER OUTCAMP WHERE SICK CALL IS TAKING
6   PLACE UP AT THE TOP.  DO YOU SEE THAT?
7   A.   YES.
8   Q.   LET'S LOOK AT PAGE 66, PLEASE.
9         THIS IS ANOTHER SICK CALL.  I THINK THIS IS ON THE
10  MAIN PRISON CAMP.  DO YOU SEE THAT?
11  A.   YES.
12  Q.   OKAY.  AND THEN PAGE 100.  ONLY ONE MORE.
13        ALL RIGHT.  ANOTHER PLACE WHERE A PATIENT IS TAKEN TO
14  CONDUCT A SICK CALL WITH A NURSE PRACTITIONER.  RIGHT?
15  A.   YES.
16  Q.   AND WHEN THIS ENCOUNTER TAKES PLACE, THE EMT IS WITH THE
17  PATIENT IN THESE ROOMS.  RIGHT?
18  A.   CORRECT.
19  Q.   TELEMED IS AN ACCEPTED PRACTICE IN THE MEDICAL FIELD.
20  CORRECT?
21  A.   IT IS.
22  Q.   ALL RIGHT.  LET'S GO ON TO SOME OTHER IMPROVEMENTS.
23        PREVIOUSLY YOU FOUND THAT THE EXAM ROOMS WERE DIRTY
24  AND CLUTTERED BACK IN 2016.  CORRECT?
25  A.   THAT'S TRUE.

03:38 1 **Q.** IT'S ALL FIXED. CORRECT?

2 **A.** WELL, IT'S MOSTLY FIXED.

3 **Q.** THE CLINICAL EXAM ROOMS WERE CLEAN WITH GOOD HYGIENE.

4 CORRECT?

5 **A.** YES.

6 **Q.** AND THE CLEANLINESS OF THOSE EXAM ROOMS WAS AN

7 IMPROVEMENT. CORRECT?

8 **A.** CORRECT.

9 **MR. ARCHEY:** ALL RIGHT, MS. RAGUSA. IF YOU CAN GO TO

10 D_46, PAGE 13, PLEASE.

11 **BY MR. ARCHEY:**

12 **Q.** DO YOU RECOGNIZE THIS AS A PICTURE OF ONE OF THE GENERAL

13 MEDICINE EXAMINATION ROOMS?

14 **A.** YES.

15 **Q.** OKAY. PAGE 152, PLEASE.

16 AGAIN, DO YOU RECOGNIZE THIS AS A PICTURE OF THE -- I

17 BELIEVE THIS IS AN ORTHOPEDIC SPECIALIST THERE. BUT DO YOU

18 RECOGNIZE THAT?

19 **A.** I DON'T THINK I MET HIM, BUT --

20 **Q.** FAIR ENOUGH.

21 DO YOU RECOGNIZE HIS FACE, THOUGH?

22 **A.** I DIDN'T GO INTO THAT SPACE, BUT --

23 **Q.** OKAY. IT'S IN THE GENERAL MEDICINE WING. DO YOU KNOW

24 THAT?

25 **A.** YES, I DO.

03:39 1  **Q.**   LET'S GO TO PAGE 188.

2          AND ON THE BOTTOM RIGHT IS A PICTURE OF A NURSE

3  PRACTITIONER THERE IN ONE OF THE GENERAL MEDICINE EXAMINATION

4  ROOMS.  CORRECT?

5  **A.**   CORRECT.

6  **Q.**   ALL RIGHT.  PREVIOUSLY YOU FOUND THAT THE EXAMINATION

7  ROOMS DID NOT HAVE PAPER ON THE TABLES.  RIGHT?

8  **A.**   TRUE.

9  **Q.**   AT THIS TIME THEY DO.  RIGHT?

10 **A.**   YES.

11 **Q.**   PREVIOUSLY YOU FOUND THERE WAS NO SOAP AND SINKS WERE NOT

12 ACCESSIBLE IN THE EXAMINATION ROOMS.  CORRECT?

13 **A.**   YES.

14 **Q.**   NOW THE EXAMINATION ROOMS HAVE SOAP, SINKS, AND PAPER

15 TOWELS ACCESSIBLE.  CORRECT?

16 **A.**   YES.

17 **Q.**   HAVING ACCESS TO SOAP, SINKS, AND PAPER TOWELS IS AN

18 IMPROVEMENT.  CORRECT?

19 **A.**   IT IS.

20 **Q.**   MEDICAL SUPPLIES WERE AVAILABLE IN THE EXAMINATION ROOMS.

21 CORRECT?

22 **A.**   YES.

23 **Q.**   ALL RIGHT.  PREVIOUSLY THE ATU WAS STAFFED PRIMARILY BY

24 EMTS.  CORRECT?

25 **A.**   YES.

03:39  1  **Q.**  DID YOU OBSERVE THAT THE LSP NOW HAS RN STAFFING THE ATU
       2  24/7?
       3  **A.**  THERE WAS AN RN THERE, BUT IT'S NOT CLEAR TO US THAT IT'S
       4  ACTUALLY 24/7.
       5  **Q.**  OKAY.  DID YOU SEE RECORDS THAT SAID IT'S 24/7?
       6  **A.**  I DON'T KNOW WHAT YOU MEAN.  WHAT TYPE OF RECORDS?
       7  **Q.**  THE STAFFING RECORDS SHOWING WHEN PEOPLE ARE SCHEDULED TO
       8  WORK.
       9  **A.**  I DIDN'T LOOK AT THE STAFFING RECORDS TO VERIFY THAT, AND
      10  WE WERE TOLD THAT SOMETIMES THE NURSES CALL OUT AND ARE SICK.
      11  AND SO THAT -- IT'S UNCLEAR THAT LSP IS ABLE TO CONSISTENTLY
      12  STAFF THE ATU WITH RN'S.
      13  **Q.**  ALL RIGHT.  LET ME JUST ASK THIS QUESTION.  HAVING AN RN
      14  PRESENT 24/7 IS AN IMPROVEMENT OVER HAVING EMTS IN THE ATU.
      15  CORRECT?
      16        **MS. MONTAGNES:**  YOUR HONOR, I'M GOING TO OBJECT.
      17  THIS IS BEYOND THE SCOPE OF THE DIRECT.  MR. ARCHEY
      18  SPECIFICALLY DIDN'T WANT HER TO TESTIFY ABOUT ANY SECTIONS THAT
      19  SHE DIDN'T DO.  SHE DIDN'T DO EMERGENCY CARE.
      20        **MR. ARCHEY:**  I'LL MOVE ON, YOUR HONOR.
      21        **THE COURT:**  OKAY.  THE QUESTIONS ARE WITHDRAWN.  GO
      22  AHEAD.
      23        **MR. ARCHEY:**  OKAY.
      24  BY MR. ARCHEY:
      25  **Q.**  MS. LAMARRE, YOU ARE TESTIFYING ABOUT CLINICAL CARE.

1  CORRECT?

2  **A.**   YES.

3  **Q.**   AND SICK CALL IS PART OF CLINICAL CARE.  CORRECT?

4  **A.**   IT IS.

5  **Q.**   IT'S THE ACCESS TO CARE.  RIGHT?

6  **A.**   IT IS.

7  **Q.**   AND IT'S -- ONE OF THE MOST IMPORTANT PARTS OF CLINICAL

8  CARE IS TO HAVE ACCESS TO THE CARE BECAUSE IF YOU CAN'T GET IN

9  THE DOOR, YOU CAN'T GET CARE.  RIGHT?

10  **A.**   ABSOLUTELY.

11  **Q.**   ALL RIGHT.  SO ALL THESE IMPROVEMENTS TO SICK CALL HAVE

12  IMPROVED THE PROCESS OF CLINICAL CARE.  ISN'T THAT TRUE?

13  **A.**   IT ONLY IMPROVES CARE IF THE QUALITY -- ACCESS IS ONE

14  THING, BUT IT'S THE QUALITY OF THE MEDICAL EVALUATIONS THAT

15  MATTER.  SO ONE WITHOUT THE OTHER DOESN'T IMPROVE CARE.

16  **Q.**   I'M GOING TO GET TO PART TWO IN A SECOND.

17          LET'S TALK ABOUT PART ONE, WHICH IS ACCESS.  ACCESS

18  IS VERY, VERY IMPORTANT BECAUSE WITHOUT ACCESS YOU ARE NOT ABLE

19  TO GET CARE.  RIGHT?

20  **A.**   CORRECT.

21  **Q.**   SO THAT'S ONE OF THE THINGS THAT YOU WANT TO EVALUATE AND

22  PROCESS AS -- DO PATIENTS -- DO THESE INMATES HAVE ACCESS TO

23  CARE. RIGHT?

24  **A.**   SO JUST A POINT OF CLARIFICATION.  FOR SICK CALL, ACCESS

25  HAS IMPROVED.

03:42 1   **Q.**   ALL RIGHT.  AND YOUR OPINION, YOUR REPORT STATES THAT THE
      2   USE OF TELEMED IS NOT, IN YOUR WORDS, OPTIMAL.  CORRECT?
      3   **A.**   CORRECT.
      4   **Q.**   DOES THAT MEAN IT'S SUBSTANDARD?
      5   **A.**   IF THE EXAMINATIONS ARE NOT MEDICALLY APPROPRIATE, IT IS
      6   SUBSTANDARD.  THE USE OF TELEMEDICINE HAS POTENTIAL, BUT IF YOU
      7   DON'T HAVE THE EQUIPMENT TO GO WITH TELEMEDICINE -- WHICH THE
      8   EQUIPMENT AT LSP DID NOT.  IT DID NOT HAVE STETHOSCOPES; IT DID
      9   NOT HAVE OTOSCOPES.  AND IT HAS -- YOU'VE GOT TO HAVE THE WHOLE
     10   PACKAGE IN ORDER TO BE ABLE TO HAVE ADEQUATE MEDICAL
     11   EXAMINATIONS, AND THAT'S JUST NOT HAPPENING RIGHT NOW.
     12   **Q.**   THE EMT IS WITH THE PATIENT TO ASSIST THE EVALUATION BY
     13   THE NURSE PRACTITIONER.  CORRECT?
     14   **A.**   YES.  BUT THE EMT CANNOT LISTEN TO THE CHEST AND THE HEART
     15   FOR THE NURSE PRACTITIONER, AND THEY DON'T HAVE THE EQUIPMENT
     16   FOR THE NURSE PRACTITIONER TO DO THAT DIRECTLY.
     17   **Q.**   DID YOU OBSERVE THE NURSE PRACTITIONER -- THAT THE NURSE
     18   PRACTITIONER WOULD SEND A PATIENT TO THE ATU IF HE PHYSICALLY
     19   NEEDED TO SEE HIM?
     20   **A.**   YES, AT LEAST IN ONE CASE.  THERE WAS ANOTHER CASE WHEN
     21   THAT DID NOT HAPPEN.
     22   **Q.**   YOU SAW THAT IN THE MEDICAL RECORDS AS WELL WHERE THE
     23   NURSE PRACTITIONER SAID, "GO TO THE ATU," AND THEY MET THEM
     24   THERE AND THEY FOLLOWED UP THERE.  RIGHT?
     25   **A.**   I DON'T RECALL THAT FROM THE RECORDS THAT I REVIEWED.

03:43 1    **Q.**   ARE YOU AWARE THAT NURSE PRACTITIONER BORDELON, WHO IS THE

2    PRIMARY SICK CALL NURSE PRACTITIONER, DOES THAT, HAS THAT OCCUR

3    DAILY WHERE HE GOES AND MEETS SOMEBODY IN THE ATU AFTER A

4    TELEMED ENCOUNTER?

5    **A.**   HE REPORTED THAT HE DID REFER ON AVERAGE THREE PATIENTS

6    DAILY TO THE ATU.

7    **Q.**   OKAY.  ALL RIGHT.  LET'S TALK ABOUT THE PROCESS NOW ON

8    MONDAY THROUGH FRIDAY.  ON MONDAY THROUGH FRIDAY, THE INMATE OR

9    A PATIENT WILL SUBMIT A SICK CALL SLIP.  AND IF THEY SUBMIT IT

10   BEFORE NOON, THEY GET TO SEE THE NURSE PRACTITIONER THE NEXT

11   MORNING.  CORRECT?

12   **A.**   THAT'S THE PROCEDURE.

13   **Q.**   ALL RIGHT.  AND SICK CALL SLIPS -- STRIKE THAT.

14            **MR. ARCHEY:**  LET ME START OVER, YOUR HONOR.

15   **BY MR. ARCHEY:**

16   **Q.**   ARE YOU AWARE THAT THE SICK CALL SLIPS THEN GO TO THE ATU

17   WHERE THEY'RE TRIAGED FOR PRIORITY?

18   **A.**   THERE IS NO EVIDENCE WHATSOEVER THAT THOSE SICK CALL

19   REQUEST FORMS ARE TRIAGED.

20   **Q.**   HOLD THAT THOUGHT.

21            THEN AFTER THE TRIAGE, THAT INMATE IS SEEN THE NEXT

22   MORNING.  CORRECT?

23   **A.**   THERE'S NO TRIAGE.  WHAT HAPPENS -- THIS IS WHAT HAPPENS:

24   THE SICK CALL REQUESTS ARE PUT IN A BOX AND -- AT NOON, AND

25   THEY ARE -- THE SICK CALL REQUESTS ARE COLLECTED BY

03:45 1  CORRECTIONAL OFFICERS, SO IT'S NON-CONFIDENTIAL.  AN OFFICER
     2  COMPILES A LIST OF INMATES TO BE SCHEDULED FOR A SICK CALL THE
     3  NEXT DAY.  THE FORMS ARE TAKEN TO THE ATU, BUT THEY ARE NOT
     4  TRIAGED BY ANYONE.
     5  **Q.**   HOW DO YOU KNOW THAT?
     6  **A.**   BECAUSE THERE IS NO DOCUMENTATION ON THE HEALTH REQUEST
     7  FORM THAT ANYBODY HAS LOOKED AT IT.  THERE IS NO DOCUMENTATION
     8  OF WHEN IT WAS RECEIVED.  AND WITHOUT ANY DOCUMENTATION TO SHOW
     9  THAT NURSE SO-AND-SO --
    10  **Q.**   ALL RIGHT.
    11  **A.**   -- ON SUCH-AND-SUCH DATE REVIEWED IT AND THAT THIS IS A
    12  ROUTINE REQUEST OR IT'S AN URGENT REQUEST.
    13        **MR. ARCHEY:**  MS. RAGUSA, PULL UP EXHIBIT DX_10K_001,
    14  PLEASE.
    15  **BY MR. ARCHEY:**
    16  **Q.**   DO YOU RECOGNIZE THIS AS A SICK CALL OR, I GUESS, A
    17  REQUEST FOR MEDICAL TREATMENT FORM THAT YOU USED AT LSP?
    18  **A.**   IT LOOKS A LITTLE DIFFERENT FROM --
    19  **Q.**   IT'S GOT A DIFFERENT FORMATTING, I'LL GRANT YOU THAT.
    20  IT'S THE SAME BLOCKS, THOUGH.
    21        **MS. MONTAGNES:**  YOUR HONOR, WE'VE NEVER SEEN THIS
    22  BEFORE.
    23        **THE COURT:**  YOU ARE SHOWING HER SOMETHING THAT YOU
    24  ARE ADMITTING IS A DIFFERENT FORMAT THAN --
    25        **MR. ARCHEY:**  NO, IT'S NOT.  IT WAS PRODUCED.  IT

03:46 1  ACTUALLY WAS PRODUCED.  I JUST SAID THE FORMATTING OF THIS DOES

2  LOOK SLIGHTLY DIFFERENT, BUT THIS WAS PRODUCED IN DISCOVERY.

3  IT'S EXACTLY THE FORM.

4          **MS. MONTAGNES:**  YOUR HONOR, THIS IS A TWO-PAGE

5  DOCUMENT, WHICH IS TYPICALLY ONE PAGE.  THIS IS COMPLETELY

6  REFORMATTED.  THIS IS NOT WHAT A SICK CALL FORM LOOKS LIKE.

7          **MR. ARCHEY:**  ALL RIGHT.

8          **THE COURT:**  SHE SAID THAT IT LOOKS DIFFERENT FROM

9  WHAT SHE'S SEEN, SO...

10          **MR. ARCHEY:**  ALL RIGHT.  I'LL PULL UP AN ACTUAL FORM,

11  THEN, AND WE'LL GO FROM THERE.

12  **BY MR. ARCHEY:**

13  **Q.**  BELOW WHERE THE INMATE FILLS OUT HIS COMPLAINT, THERE'S A

14  BLOCK FOR HEALTH CARE PERSONNEL SCREENING, ISN'T THERE?

15  **A.**  YES.

16  **Q.**  AND THAT RIGHT THERE, IS THAT THE TRIAGE, TO YOUR

17  KNOWLEDGE?

18  **A.**  NO.

19  **Q.**  SO YOU DON'T UNDERSTAND THE PROCESS, THEN?

20  **A.**  NO.  I DO UNDERSTAND THE PROCESS.  THAT LINE -- AND IT

21  WOULD BE HELPFUL TO PULL UP AN ACTUAL FORM.

22  **Q.**  WELL, I DON'T HAVE ONE AT THE -- READY WITH THE PAGE

23  NUMBER.

24  **A.**  THEN I'M HAPPY TO EXPLAIN, SO --

25  **Q.**  WELL, WE'LL GET TO ONE.

03:47 1          **MS. MONTAGNES:**  NO, YOUR HONOR.  I'M SORRY.  HE CAN'T

2    INTERRUPT HER ANSWER.  YOUR HONOR, OBJECTION.

3          **THE COURT:**  OKAY.  YES.

4          **MS. MONTAGNES:**  SORRY.

5          **THE COURT:**  YOU NEED TO CONTROL YOURSELF AS WELL.

6          ALL RIGHT.  WHAT'S YOUR QUESTION?

7    **BY MR. ARCHEY:**

8    **Q.**    MY QUESTION IS -- I'M TALKING ABOUT THE SICK CALL FORMS.

9    WE'LL GET TO AN ACTUAL FORM IN A MINUTE.

10   **A.**    OKAY.

11   **Q.**    ALL RIGHT.  LET'S HOLD THAT UNTIL WE GET A FORM.

12         WHEN THE INMATE SUBMITS A FORM, DOWN AT THE BOTTOM HE

13   SIGNS AND DATES IT.  ISN'T THAT RIGHT?

14   **A.**    I BELIEVE THAT THE INMATE -- WELL, LET ME PUT IT THIS WAY:

15   IT'S UNCLEAR WHEN THE INMATE ACTUALLY SIGNS THAT PART OF THE

16   FORM BECAUSE IT'S AN ACKNOWLEDGMENT THAT, I'M GOING TO BE

17   CHARGED FOR SICK CALL, AND IT'S WITNESSED.

18         SO MY UNDERSTANDING IS THAT WHEN -- AFTER THE INMATE

19   IS SEEN, HE SIGNS THAT HE'S GOING TO BE CHARGED AND IT'S

20   WITNESSED BY STAFF, BUT IT'S NOT THE DATE THAT THE SICK CALL

21   REQUEST FORM WAS SUBMITTED.

22         AND I BELIEVE THAT DR. LAVESPERE WAS ASKED COULD THE

23   DATE BE PUT ON THE FORM FOR THE INMATE TO INDICATE WHEN HE --

24   WHEN HE SUBMITS THE FORM TO -- IN THE BOX.

25         AND DR. LAVESPERE SAID, "YES, IT COULD BE."  BUT HE

03:48 1    ACKNOWLEDGED IT WASN'T HAPPENING NOW.

2    **Q.**    ALL RIGHT.  IF THE ACTUAL PROCESS IS THE INMATE SIGNS AT

3    THE BOTTOM, THERE'S A DATE RIGHT NEXT TO HIS NAME, HE FILLS

4    THAT IN, THAT WOULD BE DATING WHEN HE SUBMITTED THE FORM.

5    RIGHT?

6    **A.**    NO.

7    **Q.**    ALL RIGHT.  LET'S TALK ABOUT THE WEEKEND.  ON A WEEKEND

8    PROCESS THE INMATE SUBMITS A SICK CALL SLIP, WHICH THEN GOES TO

9    THE ATU.  CORRECT?

10   **A.**    NO.  I'M NOT AWARE THAT ON THE -- SICK CALL IS CONDUCTED

11   FIVE DAYS A WEEK.

12   **Q.**    I UNDERSTAND.

13   **A.**    AND MY -- I AM NOT AWARE THAT SICK CALL REQUEST FORMS ARE

14   COLLECTED DAILY FROM THE BOXES, WHICH WOULD BE COMPLIANT WITH

15   THE NATIONAL COMMISSION STANDARDS, OR THAT ALL SICK CALL

16   REQUEST FORMS ARE COLLECTED DAILY AND TRIAGED BY QUALIFIED

17   HEALTH CARE PERSONNEL.  THAT'S NOT HAPPENING.

18   **Q.**    ALL RIGHT.  AND IF I SHOW YOU THROUGH TESTIMONY AT THIS

19   TRIAL THAT THAT ACTUALLY IS HAPPENING, THEN THAT WOULD SATISFY

20   THE STANDARD?

21   **A.**    I'M NOT SURE THAT THE TESTIMONY -- I HAVE NOT BEEN ABLE --

22   I'VE NOT BEEN ABLE TO VERIFY THAT THROUGH RECORD REVIEW OR THE

23   SITE VISIT.

24   **Q.**    OKAY.  BECAUSE THE STANDARD IS -- OR IT'S ACCEPTABLE TO

25   CONDUCT ROUTINE SICK CALL FIVE DAYS A WEEK.  CORRECT?

03:49 1 **A.** NO. THAT'S NOT THE STANDARD.

2 **Q.** THERE ARE MANY INSTITUTIONS YOU'RE AWARE OF WHERE SICK

3 CALL IS CONDUCTED FIVE DAYS A WEEK. RIGHT?

4 **A.** WHAT I'M SAYING IS THAT'S NOT THE STANDARD. LET ME

5 CLARIFY. THE NATIONAL COMMISSION STANDARD IS THAT HEALTH

6 REQUEST FORMS ARE COLLECTED AND PRIORITIZED DAILY AND THAT A

7 QUALIFIED HEALTH CARE PROVIDER SEES THE PATIENT WITHIN 24 HOURS

8 OF COLLECTING THE FORM.

9 **Q.** THERE ARE INSTITUTIONS WHERE SICK CALL IS CONDUCTED FIVE

10 DAYS A WEEK. CORRECT?

11 **A.** I DON'T KNOW WHAT INSTITUTIONS YOU'RE TALKING ABOUT. I AM

12 AWARE THAT, IN MY EXPERIENCE, PRIOR TO THE MOST RECENT

13 STANDARDS, NATIONAL COMMISSION STANDARDS, SICK CALL WAS

14 CONDUCTED FIVE DAYS A WEEK. IT'S A PREVIOUS STANDARD.

15 THERE IS A NEW STANDARD AS OF 2018.

16 **Q.** ALL RIGHT.

17 **A.** AND IT IS THAT THESE FORMS ARE TRIAGED AND PRIORITIZED

18 DAILY AND PATIENTS ARE SEEN WITHIN 24 HOURS.

19 **Q.** ALL RIGHT. SO PREVIOUS TO 2018, FIVE DAYS A WEEK WAS THE

20 STANDARD. YOU'RE SAYING IN 2018 IT CHANGED TO WHERE IT HAS TO

21 BE SEVEN DAYS A WEEK. IS THAT YOUR TESTIMONY?

22 **A.** I'M NOT SURE EXACTLY WHICH STANDARD -- WHICH REVISION

23 CHANGED IT TO -- FROM FIVE DAYS A WEEK, BUT I ACKNOWLEDGE THAT

24 PREVIOUSLY THAT WAS THE STANDARD.

25 **Q.** ALL RIGHT. NOW, YOU SAID 2018. I THINK YOU TOLD ME THAT

03:51 1 AT YOUR DEPOSITION AS WELL, BECAUSE THERE WERE CHANGES IN 2018.

2 RIGHT?

3 **A.** THAT'S CORRECT.

4 **Q.** ALL RIGHT. LET'S PULL UP D_55 NOW, PLEASE.

5 ALL RIGHT. AND I'D LIKE TO -- FIRST OFF, I SHOWED

6 YOU THIS AT YOUR DEPOSITION. THIS IS NCCHC'S CURRENT WEBSITE

7 --

8 **A.** UH-HUH.

9 **Q.** -- AS OF JUST PRIOR TO YOUR DEPOSITION. RIGHT?

10 **A.** YES.

11 **Q.** IF WE GO TO PAGE 2 OF THIS -- 2 OR 3. THERE IT IS. I'M

12 SORRY.

13 ALL RIGHT. THIS STANDARD SAYS THAT -- CATCH UP. ALL

14 RIGHT. I'M ON PAGE 3. IT SAYS, ABOUT HALFWAY THROUGH THAT TOP

15 PARAGRAPH, REQUEST THAT -- A NON-EMERGENT ARE REVIEWED EVERY

16 DAY IN A PROCESS CALLED "HEALTH CARE REQUEST" OR A "SICK CALL

17 TRIAGE." THAT'S THE TRIAGE YOU AND I HAVE BEEN DISAGREEING

18 ABOUT. RIGHT?

19 **A.** THAT'S WHAT WE HAVE BEEN DISCUSSING, YES.

20 **Q.** RIGHT. AND IF I HAVE TESTIMONY SHOWING THAT TRIAGE OCCURS

21 DAILY, THAT WOULD SATISFY YOUR CONCERN. RIGHT?

22 **A.** WELL, I FOUND NO EVIDENCE IN OUR REVIEWS. SO ALL I CAN

23 SAY IS IN -- DURING THE SITE VISIT AND RECORD REVIEW, THERE WAS

24 NO EVIDENCE OF -- SO BASED ON THE EVIDENCE I'VE REVIEWED, IT'S

25 NOT HAPPENING DAILY.

03:52 1    Q.   YOU WANT THINGS TO GET BETTER AT LSP.  RIGHT?

2    A.   ABSOLUTELY.

3    Q.   AND IF THE TRIAGE IS OCCURRING, THAT'S WHAT YOU WANT.

4    RIGHT?

5    A.   OF COURSE.

6    Q.   ALL RIGHT.  LET'S KEEP GOING WITH THIS WEBSITE HERE FROM

7    THE NCCHC.  IT SAYS, "TYPICALLY, CORRECTIONAL NURSES OR THE

8    HEALTH CARE PROFESSIONALS RESPONSIBLE FOR REVIEWING AND

9    RESPONDING TO REQUESTS FOR HEALTH CARE ATTENTION."  CORRECT?

10   A.   I'M SORRY.  WHERE ARE YOU LOOKING ON THE --

11   Q.   THAT WAS THE FOURTH LINE DOWN.  IT SAYS, "TYPICALLY,

12   CORRECTIONAL NURSES."  DO YOU SEE THAT?

13   A.   YES.  THANK YOU.

14   Q.   OKAY.  SURE.  AND, AGAIN, THIS IS NURSES, NOT NURSE

15   PRACTITIONERS.  RIGHT?

16   A.   CORRECT.

17   Q.   OKAY.  THEN IT GOES ON, "IF THE REQUEST DESCRIBES A

18   CLINICAL SYMPTOM, THE INDIVIDUAL MUST BE SEEN IN A FACE-TO-FACE

19   CALL, ENCOUNTER, WITHIN 24 HOURS ON WEEKDAYS AND NO LONGER THAN

20   72 HOURS ON WEEKENDS."

21   A.   YES.

22   Q.   THAT'S WHAT LSP IS DOING.  RIGHT?

23   A.   I THINK THAT THAT'S WHAT LSP IS DOING, BUT WHAT I'M SAYING

24   IS THAT'S NOT THE STANDARD.  THAT IS NOT -- THE MOST RECENTLY

25   PUBLISHED STANDARD IS 2018, AND THIS IS THE WEBSITE.  SO I'M

03:54 1    NOT SURE WHEN THEY UPDATED THEIR WEBSITE.

2              ALL I'M SAYING IS I RELY ON THE STANDARDS.  AND SO

3    THE STANDARDS HAVE NOT BEEN REPUBLISHED, TO MY KNOWLEDGE; AND

4    THEREFORE, THAT'S THE CRITERIA THAT I USED.

5    **Q.**   THE NCCHC'S OWN WEBSITE IS INCORRECT?

6    **A.**   COULD BE.

7    **Q.**   ALL RIGHT.  OKAY.  SO IF AN INSTITUTION SUCH AS LSP SAYS,

8    "I'M GOING TO GO TO THE NCCHC WEBSITE AND FOLLOW WHAT'S THERE"

9    --

10   **A.**   WELL, I'D RECOMMEND THAT THEY PURCHASE THE STANDARDS.

11   **Q.**   ALL RIGHT.  NOW, LET'S GO TO PART 2 OF THE CLINICAL CARE,

12   ACCESS TO CARE.

13             IT'S WHAT YOU'VE BEEN TALKING ABOUT SOME, WHICH IS

14   THE ACTUAL ENCOUNTER ITSELF.  RIGHT?

15   **A.**   YES.

16   **Q.**   OKAY.  IF I GO TO PAGE 52 OF YOUR REPORT, THAT'S WHERE YOU

17   LISTED THE SPECIFIC EXAMPLES OF WHAT YOU CONSIDERED TO BE THE

18   CURRENT SICK CALL SYSTEM PURPORTEDLY NOT WORKING.  RIGHT?

19   **A.**   WELL, THESE ARE THE EXAMPLES THAT I REVIEWED.

20   **Q.**   OKAY.  AND THE FIRST ONE YOU HAVE IS PATIENT NO. 39.

21   CORRECT?

22   **A.**   CORRECT.

23   **Q.**   AND YOU STATE THAT THIS IS SICK CALL --

24             **MR. ARCHEY:**  BROOKE, LET'S PULL UP THE SICK CALL

25   SLIP.  IT'S 39 -- JX_39_1254 AND IT NEEDS TO BE SEALED.  IT

03:55 1    WILL NEED TO BE SEALED WHEN IT'S PULLED UP.

2    **BY MR. ARCHEY:**

3    **Q.**    OKAY.  1254.  AND YOU STATE THAT -- IN YOUR REPORT -- THAT

4    "THIS SICK CALL IS AN EXAMPLE OF AN EMT BLOCKING ACCESS TO THE

5    PHYSICIAN AND DETERMINING WHETHER OR NOT A PATIENT NEEDS A

6    PRESCRIPTION REFILL OUTSIDE THE SCOPE OF THE EMTS SCOPE OF

7    PRACTICE."  THAT WAS YOUR OPINION.  RIGHT?

8    **A.**    WELL, I THINK I CLARIFIED IN MY DEPOSITION THAT BECAUSE

9    THIS -- THE PERSON WHO SIGNED THIS REPORT DID NOT PUT THEIR

10    INITIALS -- I BELIEVED INITIALLY IT WAS AN EMT, BUT THEN

11    REALIZED LATER THAT IT WAS NOT AN EMT.  SO I BELIEVE I

12    CORRECTED THAT DURING MY DEPOSITION.

13    **Q.**    SO YOUR CRITICISM AS TO NO. 39 HAS BEEN WITHDRAWN.  IS

14    THAT RIGHT?

15    **A.**    NO, IT'S NOT WITHDRAWN.  IT'S WITHDRAWN WITH RESPECT TO

16    THE EMT BLOCKING ACCESS TO CARE.  IT'S NOT WITHDRAWN, I THINK,

17    TO THE QUALITY OF THE EVALUATION.

18    **Q.**    ALL RIGHT.  THERE WERE TWO REQUESTS MADE BY THIS INMATE ON

19    THIS ENCOUNTER.  CORRECT?

20    **A.**    YES.

21    **Q.**    NO. 1 WAS HE NEEDED -- SAID HE NEEDED A PRESCRIPTION FOR

22    GLUCERNA OR NEEDED IT REORDERED.  CORRECT?

23    **A.**    YES.

24    **Q.**    AND THE DETERMINATION WAS HE DIDN'T QUALIFY FOR GLUCERNA?

25    **A.**    YES.  THERE WAS NO EVALUATION WITH THE PATIENT TO ASSESS,

03:57 1  YOU KNOW, WHAT -- IT HAD BEEN PREVIOUSLY ORDERED FOR THE

2  PATIENT, SO THE PATIENT SAID THERE WAS A CLINICAL REASON HE WAS

3  ELIGIBLE FOR IT.

4  AND THE CRITICISM IS SIMPLY THAT THE PROVIDER DIDN'T

5  EVALUATE THE PATIENT, TALK TO THE PATIENT, AND FIND OUT IF

6  THERE WERE ANY OTHER CONSIDERATIONS ASIDE FROM HIS BMI.

7  Q.   AS FAR AS THE GLUCERNA, DO YOU HAVE ANY BASIS TO SAY THAT

8  HE'S INCORRECT WHEN HE SAYS HE DOESN'T QUALIFY FOR GLUCERNA?

9  A.   WELL, THERE'S NO EVALUATION.  I CANNOT SPEAK TO THE

10  EVALUATION BECAUSE THERE ISN'T ANY.

11  Q.   OKAY.  NOW, LET'S GO TO PAGE 1249 OF JX_39.  THIS IS

12  ANOTHER NOTE ON FEBRUARY 19, 2022, SO WE'RE ABOUT SIX WEEKS OR

13  THEREABOUTS LATER.

14  AND, AGAIN, THIS IS THE DOCTOR, THE PROVIDER, SAYING

15  THAT HE DOES NOT QUALIFY FOR OR IS NOT INDICATED FOR GLUCERNA.

16  CORRECT?

17  A.   YES.  AND THIS IS THE EVALUATION I WOULD HAVE EXPECTED TO

18  HAVE SEEN SIX WEEKS EARLIER.  THIS IS THE EVALUATION THAT THE

19  PATIENT DIDN'T GET AT THAT TIME.

20  Q.   OKAY.  SO LET'S GO BACK TO THE SICK CALL SLIP ON 1254,

21  PAGE 1254.

22  THE SECOND REQUEST WAS AN EYE EXAM, AND HE WAS SET UP

23  WITH AN APPOINTMENT.  CORRECT?

24  A.   AN APPOINTMENT WAS REQUESTED.

25  Q.   OKAY.  AND PATIENT 39 WAS A DIFFICULT PATIENT TO MANAGE,

03:58 1  WITH A LOT OF REFUSALS.  CORRECT?

2  A.   HE WAS A CHALLENGING PATIENT.

3  Q.   OKAY.  LET'S GO TO THE NEXT EXAMPLE THAT YOU HAVE, WHICH

4  IS PATIENT NO. 56.

5        AND PATIENT NO. 56, HE SUBMITTED A SICK CALL SLIP --

6  IT'S JX_56_575.  HE SUBMITTED A SICK CALL SLIP ON NOVEMBER 2,

7  2021.  DO YOU SEE THAT?

8  A.   YES.

9  Q.   OKAY.  AND HE COMPLAINED OF SHOULDER, HIP, BACK OF NECK;

10  "MY HEAD IS HURTING, TOO."  CORRECT?

11  A.   YES.

12  Q.   OKAY.  AND THE NURSE PRACTITIONER SENT HIM TO THE ATU.

13  CORRECT?

14  A.   HE ULTIMATELY SENT HIM TO THE ATU FOR -- HE ORDERED

15  TREATMENT, BUT THE EVALUATION WASN'T ADEQUATE.

16  Q.   OKAY.  HE DID SEND HIM TO THE ATU.  CORRECT?

17  A.   YES, HE DID.

18  Q.   OKAY.

19  A.   BUT I DON'T WANT A -- THE POINT TO BE MISSED.  WHEN YOU'RE

20  ORDERING TREATMENT FOR SOMEONE, IT SHOULD BE BASED ON AN

21  ADEQUATE EVALUATION.  AND THERE WERE NO VITAL SIGNS HERE.

22  THERE WAS REALLY NO HISTORY, ADEQUATE HISTORY OF THE PATIENT'S

23  COMPLAINT.  THERE'S NOTHING ABOUT HOW LONG HAS HE HAD SHOULDER,

24  HIP, AND BACK PAIN AND NECK PAIN.  YOU KNOW, THERE'S NO --

25  Q.   DO YOU KNOW WHAT HAPPENED IN THE ATU?

04:00 1   **A.**   I COULD SPECULATE.

2   **Q.**   OKAY.

3           **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  HE

4   INTERRUPTED HER AGAIN.  I'M GOING TO ASK THAT SHE BE ALLOWED TO

5   FINISH HER ANSWERS.

6           **THE COURT:**  YOUR OBJECTION IS THAT SHE WAS

7   INTERRUPTED?

8           **MS. MONTAGNES:**  YES.

9           **THE COURT:**  HE HAS HER ON CROSS.  OVERRULED.

10           **MR. ARCHEY:**  I'LL TRY --

11           **THE COURT:**  YES.

12           **MR. ARCHEY:**  -- TO AVOID DOING THAT.

13   **BY MR. ARCHEY:**

14   **Q.**   ALL RIGHT.  NOW, YOU ALSO SAY IN YOUR WRITE-UP, IN YOUR

15   REPORT, THAT THERE WERE NO FOLLOW-UP APPOINTMENTS.  CORRECT?

16   **A.**   I'M NOT SURE WHERE YOU'RE REFERRING TO.

17   **Q.**   WELL, I'M ON PAGE 52 OF YOUR REPORT.

18   **A.**   WHAT I SAID WAS THERE WAS NO FOLLOW-UP APPOINTMENT

19   RECOMMENDED.

20   **Q.**   OKAY.

21   **A.**   OR DOCUMENTED, IF YOU WILL.

22   **Q.**   HE ACTUALLY DID HAVE A FOLLOW-UP APPOINTMENT, DIDN'T HE?

23   **A.**   WELL, IT WASN'T -- I DON'T KNOW IF HE HAD A FOLLOW-UP

24   APPOINTMENT.

25           WHAT I'M REFERRING TO IS THAT THERE'S NO DOCUMENTED

04:01 1   PLAN.  THE TREATMENT PLAN DOESN'T INCLUDE:  "AND I WILL SEE YOU

2   AGAIN IN TWO WEEKS."  SO IF THERE WAS A FOLLOW-UP, IT MAY HAVE

3   BEEN COINCIDENTAL.  IT MAY HAVE BEEN INITIATED BY THE PATIENT,

4   SO...

5   **Q.**  OR IT MAY HAVE BEEN SCHEDULED BY THE NURSE PRACTITIONER

6   THROUGH THE SYSTEM.  RIGHT?

7   **A.**  IT'S HARD TO KNOW, BECAUSE IT WASN'T PART OF THE

8   DOCUMENTED TREATMENT PLAN.

9   **Q.**  PULL UP JX_56.0574, PLEASE.

10       ALL RIGHT.  TWO WEEKS LATER HE HAS A FOLLOW-UP WITH

11   THE ORTHO THAT WAS SCHEDULED.  IT HAD TO BE RESCHEDULED DUE TO

12   -- IT LOOKS LIKE THE DOCTOR WAS ILL THAT DAY.

13   **A.**  UH-HUH.

14   **Q.**  BUT HE DID GET A FOLLOW-UP.  RIGHT?

15   **A.**  WELL, WHAT I DON'T KNOW IS IF THAT APPOINTMENT WAS RELATED

16   OR UNRELATED TO THE TREATMENT PLAN.

17       THE POINT I'M MAKING IS THAT WITH RESPECT TO WHEN

18   NURSE PRACTITIONERS OR ANY MEDICAL PROVIDER SEES A PATIENT,

19   THEY NEED TO DOCUMENT AN ADEQUATE SUBJECTIVE/OBJECTIVE

20   ASSESSMENT, MAKE A DIAGNOSIS, AND DOCUMENT A TREATMENT PLAN.

21   **Q.**  MA'AM, THE NURSE PRACTITIONER HAS THE ABILITY TO LOOK IN

22   THE CHART AND SEE IF THERE IS A FOLLOW-UP APPOINTMENT COMING

23   THAT'S APPLICABLE, DOESN'T HE?

24   **A.**  NORMALLY THAT WOULD BE DOCUMENTED.

25   **Q.**  OKAY.

04:02 1    A.    YOU KNOW, AN ORTHO APPOINTMENT PENDING --

2    Q.    OKAY.

3    A.    -- WOULD BE AN APPROPRIATE THING TO NOTE.

4    Q.    LET'S GO TO JX_56_0572 NOW.

5          TWO WEEKS LATER HE ACTUALLY HAS THE ORTHOPEDIC

6    APPOINTMENT WITH AN ORTHOPEDIC SPECIALIST.  RIGHT?

7    A.    YES.

8    Q.    OKAY.  NOW LET'S GO TO PATIENT NO. 54.

9          ALL RIGHT.  THIS IS A CHART THAT IS IN YOUR

10    SPECIALTY -- I MEAN, I'M SORRY -- IS IN YOUR "CLINICAL CARE"

11    SECTION, BUT IT'S NOT ONE YOU ACTUALLY LOOKED THROUGH.  RIGHT?

12    A.    I'M NOT SURE.

13    Q.    NO. 54.

14    A.    I'LL HAVE TO CHECK THE -- CORRECT, I DIDN'T LOOK AT THAT.

15    Q.    OKAY.  AND THE CHART IS 1,181 PAGES.  ARE YOU FAMILIAR

16    WITH THAT?

17    A.    WELL, I DIDN'T REVIEW THAT CHART, BUT I SEE THAT NOW.

18    Q.    OKAY.  LET'S GO TO PAGE -- OR DOCUMENT JX_54_0572.

19          THIS PATIENT COMES IN COMPLAINING, AND AS A RESULT OF

20    A SICK CALL SLIP, HE'S ACTUALLY SENT TO THE HOSPITAL FOR THREE

21    DAYS, ISN'T HE?

22    A.    LET'S SEE.  LET ME JUST REFRESH MY MEMORY.

23          YES, YES.  AND AT THAT TIME WHEN I -- AT THAT TIME HE

24    WAS STILL IN THE HOSPITAL, SO IT'S UNDERSTANDABLE THAT HE

25    WASN'T YET SEEN FOR FOLLOW-UP.

04:04 1    Q.   OKAY.  SO YOU WITHDREW YOUR COMPLAINTS OR CRITICISMS AS TO

2    PATIENT 54 AS WELL.  CORRECT?

3    A.   I DID.

4    Q.   SO THE FIRST TWO OUT OF THREE, YOU WITHDREW BOTH THE

5    COMPLAINTS.  RIGHT?

6    A.   I'M SORRY.

7    Q.   I'VE GONE THROUGH THREE SICK CALLS THAT YOU IDENTIFIED

8    YOU'VE WITHDRAWN THE COMPLAINTS ON TWO OF THEM.  RIGHT?

9         MS. MONTAGNES:  OBJECTION, YOUR HONOR.  MISSTATES HER

10   TESTIMONY.

11        THE COURT:  DO YOU WANT TO ADDRESS THAT?

12        MR. ARCHEY:  YOUR HONOR, IT'S EXACTLY WHAT I'VE GONE

13   THROUGH.  SHE WITHDREW THE COMPLAINT ABOUT THE EMT BLOCKING

14   ACCESS TO CARE, AND SHE'S WITHDRAWN THIS COMPLAINT.

15        MS. MONTAGNES:  YOUR HONOR, THAT'S NOT TRUE.  ON THE

16   FIRST SICK CALL, SHE WITHDREW SPECIFICALLY WITH REGARD TO THE

17   EMT, BUT HER COMPLAINT REMAINED THE SAME.

18        THE COURT:  OKAY.  THE RECORD WILL SPEAK FOR ITSELF.

19   IF SHE DIDN'T WITHDRAW IT, THEN I'M SURE THAT THAT'S WHAT WILL

20   BE REFLECTED IN THE TESTIMONY.  OVERRULED.

21        MR. ARCHEY:  THANK YOU.

22   BY MR. ARCHEY:

23   Q.   ALL RIGHT.  THE NEXT ONE YOU IDENTIFY IS PATIENT NO. 4,

24   THAT'S A SELF-DECLARED EMERGENCY SITUATION, NOT A ROUTINE SICK

25   CALL.  RIGHT?

04:05 1   **A.**   IF YOU WOULD -- DO YOU PLAN TO OPEN UP -- OR DO YOU JUST

    2   WANT TO POINT OUT --

    3   **Q.**   I WAS JUST GOING TO -- IT'S IN YOUR REPORT. IT'S A

    4   SELF-DECLARED EMERGENCY, AND I WANT TO ADDRESS THOSE.

    5   **A.**   I'M SORRY. WHICH -- WHERE ARE YOU?

    6   **Q.**   PAGE 52 OR -3. AND ALL I'M -- I WANT TO TALK ABOUT YOUR

    7   ROUTINE SICK CALL THAT YOU IDENTIFIED. AND THIS IS A

    8   SELF-DECLARED EMERGENCY. WE'RE GOING TO ADDRESS THAT NEXT.

    9   OKAY?

  10   **A.**   FINE.

  11   **Q.**   ALL RIGHT. OKAY. THE NEXT ONE I'D LIKE TO TALK ABOUT IS

  12   PATIENT NO. 49. YOU TALKED ABOUT THIS SOME IN YOUR DIRECT.

  13            LET'S PULL UP DOCUMENT NO. JX_49.0288.

  14   **A.**   DO YOU HAVE A PAGE NUMBER IN MY REPORT?

  15   **Q.**   FIFTY-THREE.

  16   **A.**   THANK YOU. YES.

  17   **Q.**   OKAY. YOU READY?

  18   **A.**   YES.

  19   **Q.**   OKAY. YOUR CRITICISMS -- OR ONE OF THEM WAS THAT THERE

  20   WAS NO PHYSICAL EXAMINATION PERFORMED ON THIS PATIENT. RIGHT?

  21   **A.**   EXCEPT IT'S GONE DOWN.

  22   **Q.**   OH, THERE YOU GO. SORRY.

  23   **A.**   YES.

  24   **Q.**   OKAY. YOU REALIZE THIS IS TELEMED. RIGHT?

  25   **A.**   THAT'S THE POINT.

04:06 1  **Q.**  AND THAT'S THE POINT OF HAVING AN EMT ON ONE SIDE, AND IF
2  YOU NEED TO, YOU SEND THEM TO THE ATU.  CORRECT?
3  **A.**  WELL, WHAT MATTERS AT THE END OF THE DAY IS THAT THE
4  PATIENT GETS AN ADEQUATE MEDICAL EVALUATION.  IF THEY GET IT
5  FROM THE NURSE PRACTITIONER, THAT'S FINE.  IF THEY'RE SENT
6  IMMEDIATELY TO THE ATU, THAT'S FINE.
7  **Q.**  PRESCRIBING CELEBREX FOR KNEE PAIN IS APPROPRIATE.
8  CORRECT?
9  **A.**  IT CAN BE.
10  **Q.**  OKAY.  NOW, YOU NOTED THE ELEVATED BLOOD PRESSURE.  RIGHT?
11  **A.**  YES.
12  **Q.**  AND YOU UNDERSTAND -- LET'S GO TO DOCUMENT NO. JX_49_0287.
13      SO FOUR DAYS AFTER THIS APPOINTMENT, THIS PATIENT
14  SEES A PROVIDER WHO ADDRESSES HIS HIGH BLOOD PRESSURE.
15  CORRECT?
16  **A.**  YES.  BUT IT WASN'T APPROPRIATE THAT THE NURSE
17  PRACTITIONER DIDN'T ADDRESS IT WHEN HE SAW THE PATIENT.
18  **Q.**  AND WHEN WE SEE WHAT THE -- I WANT TO LOOK ON PAGE 287.
19  PATIENT ADMITS TO NON-COMPLIANCE; EDUCATED PATIENT ON
20  IMPORTANCE OF MEDICAL COMPLIANCE; DECREASE N.A.  THAT'S SALT.
21  RIGHT?  DECREASED SALT DIET?
22  **A.**  YES.
23  **Q.**  EXERCISE AND INCREASE WATER INTAKE.  RIGHT?
24  **A.**  YES.
25  **Q.**  THAT'S ALL GOOD.  RIGHT?

04:07 1    A.    YES, IT IS.

2    Q.    NOW, IN ADDITION, THERE WERE --

3    A.    BUT I WOULD POINT OUT THAT THE PATIENT'S BLOOD PRESSURE

4    WAS 174/111, AND THE PATIENT WASN'T TREATED AT THAT TIME.

5    THAT'S EXTREMELY HIGH.

6    Q.    ALL RIGHT.  I'M GOING TO SKIP THE NEXT TWO BECAUSE THEY

7    ARE SELF-DECLARED EMERGENCIES.  I WANT TO TALK ABOUT THE SITE

8    VISIT ENCOUNTERS.  THERE WAS PATIENT NO. 63 AND PATIENT NO. 64.

9    CORRECT?

10    A.    YES.

11    Q.    ALL RIGHT.  PATIENT NO. 63, HE HAD A FOOT COMPLAINT.

12    CORRECT?

13    A.    YES.

14    Q.    AND HE WAS COMPLAINING OF A FOOT BUNION.  RIGHT?

15    A.    YES.

16    Q.    AND NURSE PRACTITIONER BORDELON WAS HANDLING THE SICK CALL

17    ENCOUNTER, AND HE LOOKED THROUGH THE PATIENT'S CHART TO SEE

18    WHAT WAS GOING ON, DIDN'T HE?

19    A.    HE DID.

20    Q.    OKAY.  AND THE PATIENT SAID HE HAD NOT SEEN A PODIATRIST.

21    CORRECT?

22    A.    HE REQUESTED TO SEE A PODIATRIST, I BELIEVE.

23    Q.    OKAY.  AND NURSE PRACTITIONER BORDELON EXPLAINED THAT THE

24    PATIENT HAD SIGNED A REFUSAL TO SEE THE PODIATRIST IN MAY OF

25    2021.  CORRECT?

1   **A.**   YES.   THAT'S WHAT THE NURSE PRACTITIONER SAID.   WE SPOKE

2   TO THE PATIENT, WHO SAID THAT BECAUSE OF HIS FOOT PAIN, THAT HE

3   WOULD NOT HAVE, YOU KNOW, SIGNED.   AND I'M JUST REPORTING.   WE

4   WEREN'T ABLE TO SEE HIS RECORD, BUT HE DID SAY THAT HE WOULD

5   NEVER HAVE SIGNED A REFUSAL.

6   **Q.**   DON'T YOU THINK NURSE PRACTITIONER BORDELON LOOKED IN THE

7   RECORD AND IS SAYING, "I'M LOOKING AT A SIGNED REFUSAL."

8   DON'T YOU THINK THAT'S CREDIBLE?

9   **A.**   WELL, I WOULD HAVE TO SEE THAT, BECAUSE THERE WERE MANY

10   REFUSALS THAT WERE FILLED OUT THAT WERE NOT SIGNED BY THE

11   PATIENT.   WE SAW THAT QUITE FREQUENTLY.   SO ALL I'M SAYING IS

12   THAT I CAN'T VERIFY THAT.

13   **Q.**   ALL RIGHT.   ALL WE CAN SAY IS WE KNOW NURSE PRACTITIONER

14   BORDELON SAID "YOU REFUSED TO SEE THE PODIATRIST"?

15   **A.**   THAT'S CORRECT.

16   **Q.**   ALL RIGHT.   AND THEN THE EMT HAD THE PATIENT TAKE OFF HIS

17   SHOES AND PLACE HIS FOOT ON THE TABLE SO THAT NURSE

18   PRACTITIONER BORDELON COULD SEE THE FOOT.   CORRECT?

19   **A.**   YES.

20   **Q.**   AND THE EMT PALPITATED [SIC] THE FOOT AS WELL.   CORRECT?

21   **A.**   YES.

22   **Q.**   OKAY.   AND NURSE PRACTITIONER BORDELON SET UP AN

23   APPOINTMENT WITH THE PODIATRIST FOR THE PATIENT.   CORRECT?

24   **A.**   HE PLANNED TO DO THAT.

25   **Q.**   OKAY.   NURSE PRACTITIONER BORDELON NOTED THE PATIENT HAD

04:10 1  HIGH BLOOD PRESSURE, TOO, DIDN'T HE?

2  **A.**   HE DID.  IT WAS QUITE HIGH:  182/192.

3  **Q.**   THAT WAS NOT A SPECIFIC COMPLAINT THAT THE PATIENT

4  PRESENTED WITH, WAS IT?

5  **A.**   NO.  PEOPLE DON'T USUALLY KNOW WHAT THEIR BLOOD PRESSURE

6  IS.

7  **Q.**   AND SO WHAT NURSE PRACTITIONER BORDELON DID WAS HE SET HIM

8  UP TO COME TO THE CLINIC THREE TIMES A WEEK FOR THE NEXT TWO

9  WEEKS FOR BLOOD PRESSURE CHECKS.  RIGHT?

10  **A.**   HE DID.

11  **Q.**   SO HE DID ADDRESS THE HIGH BLOOD PRESSURE THAT WAS

12  PRESENTED IN FRONT OF HIM?

13  **A.**   WELL, THE PATIENT SHOULD HAVE BEEN TREATED THAT DAY.

14  **Q.**   OKAY.  ALL RIGHT.  LET'S GO TO PATIENT NO. 64.

15       THIS PATIENT PRESENTED WITH AN EYE COMPLAINT.  RIGHT?

16  **A.**   YES.

17  **Q.**   AND, AGAIN, NURSE PRACTITIONER BORDELON ADDRESSED THAT

18  PATIENT'S EYE COMPLAINT THROUGH THE TELEMED'S MEANS.  CORRECT?

19  **A.**   HE DID.

20  **Q.**   AND IN ADDITION, NURSE PRACTITIONER BORDELON HAD THE

21  PATIENT GO TO THE ATU FOR FOLLOW-UP.  RIGHT?

22  **A.**   YES.

23  **Q.**   AND NURSE PRACTITIONER BORDELON NOTED THE PATIENT'S HIGH

24  BLOOD PRESSURE.  CORRECT?

25  **A.**   HE DID.

04:11   1    **Q.**    AND HE ASKED THE PATIENT WHY HE WASN'T TAKING HIS

     2    MEDICATIONS.    CORRECT?

     3    **A.**    HE DID.    WELL, HE SAID -- YEAH, "WHY AREN'T YOU TAKING

     4    YOUR MEDICATION?"

     5    **Q.**    OKAY.    AND YOU WEREN'T PRESENT AT THE ATU WHEN NURSE

     6    PRACTITIONER BORDELON MET WITH THE PATIENT IN PERSON IN THE

     7    ATU, WERE YOU?

     8    **A.**    CORRECT.

     9    **Q.**    THOSE ARE THE ENTIRETY OF YOUR ROUTINE SICK CALL

   10    CRITICISMS NOTED IN THE EXPERT REPORT, ISN'T IT?

   11    **A.**    WELL, I'D POINT OUT THAT THE TIME PERIOD THAT WE HAD AN

   12    OPPORTUNITY TO REVIEW THE NEW SYSTEM WAS FROM NOVEMBER UNTIL

   13    JANUARY.

   14    **Q.**    OKAY.

   15    **A.**    SO IN TERMS OF THE VOLUME OF SICK CALL REQUESTS UNDER THE

   16    NEW SYSTEM, THERE WERE NOT AN ABUNDANCE OF EXAMPLES.    SO THESE

   17    ARE THE EXAMPLES THAT WERE AVAILABLE DURING THE LIMITED TIME

   18    PERIOD SINCE LSP IMPLEMENTED THE NEW SYSTEM.

   19    **Q.**    OKAY. LET'S TALK ABOUT THE SELF-DECLARED EMERGENCY

   20    PROCESS NOW.    THE --

   21          **MS. MONTAGNES:**    YOUR HONOR, I'M GOING TO OBJECT TO

   22    THIS.    SHE DID NOT TESTIFY ABOUT THE SELF-DECLARED EMERGENCY

   23    POLICY.    THEY CAME UP IN SOME OF THE CHART REVIEWS, BUT THAT'S

   24    AN EMERGENCY ISSUE, AND THAT'S GOING TO BE ADDRESSED BY

   25    DR. VASSALLO.

04:12  1          THE COURT:  IT WASN'T ADDRESSED ON DIRECT, AND IT'S

2    SOMEBODY ELSE'S OPINION.  THAT WAS YOUR OBJECTION EARLIER.

3          MR. ARCHEY:  THIS IS IN HER SECTION.  I THOUGHT THIS

4    WAS HER ISSUE.  IT'S IN HER PORTION WHERE SHE SAYS "CLINICAL

5    CARE."  SHE'S GOT A WHOLE SECTION THERE OF SELF-DECLARED

6    EMERGENCIES.  IF SHE'S WITHDRAWING THOSE, I'LL MOVE ON, I

7    GUESS, BUT --

8          MS. MONTAGNES:  SHE'S NOT WITHDRAWING THEM.

9          THE COURT:  SHE TESTIFIED ABOUT SOME SELF-DECLARED

10   EMERGENCIES.

11          MS. MONTAGNES:  SHE DID TESTIFY ABOUT LIMITED

12   SELF-DECLARED EMERGENCIES.  BUT IT'S BEYOND THE SCOPE OF THE

13   DIRECT.  THE SELF-DECLARED EMERGENCIES IS IN DR. VASSALLO'S

14   SECTION AS WELL.  IT'S IN BOTH.  WE'RE NOT WITHDRAWING THE

15   OPINION ALTOGETHER.  BUT IT'S BEYOND THE SCOPE OF THE DIRECT.

16   WE DID NOT ADDRESS SELF-DECLARED EMERGENCIES IN THE DIRECT.

17          THE COURT:  OVERRULED.

18   BY MR. ARCHEY:

19   Q.   MS. LAMARRE, ARE YOU FAMILIAR WITH THE RECENTLY ENACTED

20   POLICY BY LSP REGARDING SELF-DECLARED EMERGENCIES?

21   A.   ON MARCH 3RD?

22   Q.   NO, MA'AM.  ON MAY 12TH.

23   A.   I DON'T BELIEVE THAT I'VE SEEN THAT.  I THINK THE LAST ONE

24   I SAW WAS MARCH 3RD, I BELIEVE.

25   Q.   ALL RIGHT.  WELL, LET ME PULL IT UP FOR YOU REAL QUICK AND

04:13  1   JUST -- IF YOU HAVEN'T SEEN IT, THEN MAYBE I'LL MOVE ON.  LET'S
       2   MAKE SURE YOU AND I ARE COMMUNICATING.
       3           PULL UP DX_50, PLEASE.
       4           **MS. MONTAGNES:**  WELL, YOUR HONOR, JUST FOR
       5   EXPEDIENCY, I WAS GOING TO RENEW MY OBJECTION.  YOUR HONOR,
       6   PLAINTIFFS OBJECT TO THIS EXHIBIT.  WE UNDERSTAND THAT IT'S
       7   INCLUDED UNDER THE EVIDENCE THAT THE DEFENDANTS WERE ALLOWED TO
       8   PRODUCE DURING THEIR MOTION IN LIMINE, BUT WE'RE JUST
       9   PRESERVING OUR OBJECTION, FOR THE RECORD, TO THE ENTRY OF THIS,
      10   WHICH WAS PRODUCED AFTER THE EXPERT REPORT.
      11           **THE COURT:**  OBJECTION'S NOTED, FOR THE RECORD.
      12           **MR. ARCHEY:**  ARE WE OKAY?  THERE WE GO.  IT DOESN'T
      13   HAVE TO BE SEALED.  IT CAN BE UNSEALED.
      14   **BY MR. ARCHEY:**
      15   **Q.**   ALL RIGHT.  I'LL GIVE YOU A SECOND.  HAVE YOU SEEN THIS
      16   DOCUMENT PREVIOUSLY?
      17   **A.**   ACTUALLY, I THINK I HAVE SEEN THIS.
      18   **Q.**   OKAY.
      19   **A.**   I THINK I HAVE SEEN THIS.
      20   **Q.**   SO THE REVISED CURRENT SICK CALL POLICY IS AN EMT WILL
      21   RESPOND, AND THEN THE EMT ACTS PURSUANT TO VERY SPECIFIC ITOS,
      22   WHICH IS ANOTHER WORD FOR A PROTOCOL -- INDIVIDUAL TREATMENT
      23   ORDERS, OR PROTOCOLS -- AND IF THERE'S NOT A SPECIFIC
      24   APPLICABLE PROTOCOL, THEN THE EMT NEEDS TO CALL A NURSE
      25   PRACTITIONER ON A STATE-ISSUED CELL PHONE AND CONDUCT A

04:15 1 FACETIME CALL OR GO TO THE ATU.  ARE YOU FAMILIAR WITH THAT?

2 **A.**   WELL, NO, I'M NOT FAMILIAR WITH THAT.  NO. 1, I HAVE NOT

3 REVIEWED THE INDIVIDUAL TREATMENT ORDERS AND DON'T KNOW WHETHER

4 OR NOT THEY ARE APPROPRIATE, BECAUSE IT WOULD APPEAR THAT THIS

5 IS GOING TO PERMIT THE EMTS TO INDEPENDENTLY TREAT PATIENTS,

6 WHICH IS THE PROBLEM OF IT BEING BEYOND THEIR SCOPE.

7               AND LET ME LOOK AT THE OTHER --

8 **Q.**   I'D LIKE TO FOLLOW UP WITH THAT POINT, UNLESS YOU WANT TO

9 CONTINUE.

10 **A.**   OKAY.  ONE MOMENT, PLEASE.

11 **Q.**   CERTAINLY.

12 **A.**   THIS LOOKS LIKE A VARIATION OF THE SAME THING THAT'S BEEN

13 HAPPENING, WHICH IS THAT THE BOTTOM LINE IS THAT PATIENTS WHO

14 DECLARE SELF-EMERGENCIES ARE NOT GOING TO BE SEEN BY A MEDICAL

15 PROVIDER WHO IS QUALIFIED TO DIAGNOSE AND TREAT THEIR

16 CONDITION.

17 **Q.**   ARE YOU AWARE UNDER LOUISIANA LAW THAT EMTS CAN OPERATE

18 PURSUANT TO PROTOCOLS?

19 **A.**   I'M NOT AWARE OF WHAT THE LAW SAYS.

20 **Q.**   ARE YOU AWARE UNDER LOUISIANA LAW THAT EMTS CAN OPERATE

21 PURSUANT TO VERBAL ORDERS WITH A PROVIDER?

22 **A.**   SO, AGAIN, THIS IS SOMETHING THAT I WOULD DEFER TO

23 DR. VASSALLO BECAUSE SHE IS GOING TO SPEAK TO THIS.  BUT MY

24 UNDERSTANDING IS THAT EMTS PRACTICE UNDER THE SUPERVISION AND

25 DIRECTION OF A PHYSICIAN.

04:17  1   **Q.**   SO DO YOU KNOW IF THE LOUISIANA LAW ALLOWS AN EMT TO

2   OPERATE PURSUANT TO VERBAL ORDERS?  YES OR NO.

3   **A.**   WELL, I AM NOT -- I HAVE NOT REVIEWED THE LOUISIANA LAW.

4   **Q.**   ALL RIGHT.  I WANT TO TALK ABOUT A FEW MORE.  AND LET'S GO

5   TO PATIENT NO. 42 NOW.  THIS IS ONE THAT YOU DID TALK ABOUT IN

6   YOUR DIRECT.  I WANT TO GO JX_42.0042.

7              **THE DEPUTY CLERK:**  IS THIS SEALED?

8              **MR. ARCHEY:**  IT IS.  I'M SORRY.  YES.  THANK YOU.

9   BY MR. ARCHEY:

10   **Q.**   ALL RIGHT.  SO THIS IS A SICK CALL, SELF-DECLARED

11   EMERGENCY WHERE THE PATIENT COMES IN.  LET'S TALK ABOUT THE

12   FORM FIRST SINCE WE HAVEN'T DONE THAT.  SO AT THE BOTTOM IS A

13   PLACE FOR THE PATIENT, THE INMATE, TO SIGN AND DATE.  CORRECT?

14   **A.**   YES.  THERE'S A PLACE FOR THEM TO SIGN AND DATE THAT THEY

15   UNDERSTAND THAT THEY'RE GOING TO BE CHARGED $3, AND THERE IS A

16   WITNESS SIGNATURE BY AN OFFICER.

17   **Q.**   OKAY.  GO UP RIGHT BELOW THE BLOCK AT THE TOP WHERE THE

18   OFFENDER FILLS OUT WHATEVER THIS PROBLEM IS.  BELOW THAT IT

19   SAYS "HEALTH CARE PERSONNEL AND SCREENING."  IT'S GOT A DATE

20   AND A TIME AND A PLACE TO NOTATE WHETHER IT'S AN EMERGENCY,

21   ROUTINE, OR WORK RELATED.  DO YOU SEE THAT?

22   **A.**   I DO.

23   **Q.**   OKAY.  AND IF THERE'S TESTIMONY IN THIS TRIAL SAYING THAT

24   THAT IS THE TRIAGE THAT OCCURS AFTER THE SICK CALL SLIP IS

25   TURNED IN EVERY DAY, THAT WOULD SATISFY YOUR TRIAGE CONCERNS.

04:19 1 RIGHT?

2 **A.** IT WOULD NOT. I HAVE SEEN NO EVIDENCE. I MEAN, THAT --

3 IN HUNDREDS OF RECORDS AND ENCOUNTERS THAT I'VE LOOKED AT, THAT

4 SPACE WAS ALWAYS FILLED OUT BY THE EMT WHO SAW THE PATIENT. IT

5 TAKES PLACE AT THE TIME OF THE SCREENING OF THE PATIENT, NOT

6 THE TRIAGE OF THE FORM.

7 **Q.** SO WHEN I HAVE TESTIMONY THAT'S DIFFERENT, YOU JUST --

8 YOU'RE NOT GOING TO BE ABLE TO REFUTE THAT THEN. RIGHT?

9 **A.** THERE'S NO EVIDENCE OF IT.

10 **Q.** ALL RIGHT. LET'S KEEP GOING. ON THIS PARTICULAR VISIT --

11 THIS IS ONE YOU TALKED ABOUT WHERE HE HAD SOME DIFFICULTIES --

12 HE WAS COMPLAINING OF SOME CHEST PAIN, ABDOMEN PAIN, WRIST

13 PAIN, THESE TYPES OF THINGS, AND HE IS SEEN AND REFERRED TO THE

14 MEDICAL DOCTOR AND SICK CALL. RIGHT?

15 **A.** YES.

16 **Q.** ALL RIGHT. LET'S GO TO --

17 **A.** AND I WOULD JUST POINT OUT THAT IT'S FIVE DAYS LATER THAT

18 A MEDICAL PROVIDER SIGNS A SICK CALL, PRN.

19 **Q.** NOW, LET'S GO JX_42.0038.

20 THERE IS A -- IT'S 13 DAYS AFTER HE SEES A PROVIDER.

21 CORRECT?

22 **A.** YES.

23 **Q.** DO YOU KNOW HOW THIS APPOINTMENT GOT SET UP?

24 **A.** NO.

25 **Q.** OKAY. YOU THINK MAYBE IT GOT SET UP FROM THE SICK CALL

04:20 1  ENCOUNTER?

2  **A.**  I DON'T KNOW.

3  **Q.**  OKAY.  UNDER OUR CURRENT SICK CALL POLICY THIS PATIENT

4  WOULD EITHER -- IF THERE'S AN APPLICABLE PROTOCOL OR A CALL

5  WITH THE NURSE PRACTITIONER, A FACETIME, OR TO THE ATU, THAT

6  WOULD SOLVE YOUR RESPONSE OR YOUR INSISTENCE THAT THEY GET TO A

7  PROVIDER.  RIGHT?

8  **A.**  I'M SORRY.  WOULD YOU REPEAT THAT, PLEASE?

9  **Q.**  YEAH, THERE WAS A LOT THERE, AND I'LL TRY TO BREAK IT

10  DOWN.

11      BUT UNDER THE CURRENT SICK CALL POLICY, IF THERE'S

12  NOT A PROTOCOL THAT APPLIES, THEN HE'S AGREED THEY ARE GOING TO

13  HAVE A FACETIME CALL WITH THE NURSE PRACTITIONER OR HE'S GOING

14  TO GO TO THE ATU.  RIGHT?

15  **A.**  I'M NOT SURE WHAT YOU'RE SAYING WITH THE EMT.  WHAT I'M

16  SAYING IS THAT THE PATIENT NEEDS TO TIMELY GET TO A MEDICAL

17  PROVIDER WHO CAN DIAGNOSE THEIR CONDITION.  AND EMTS CAN'T

18  DIAGNOSE.

19  **Q.**  RIGHT.  BUT AN EMT GETTING A NURSE PRACTITIONER ON A

20  FACETIME CALL WOULD FACILITATE THAT ENCOUNTER WITH A PROVIDER.

21  RIGHT?

22  **A.**  WELL, I'VE SEEN NO EVIDENCE, SO THAT'S -- FOR ME, IT'S

23  JUST SORT OF SPECULATION ABOUT --

24  **Q.**  OKAY.

25  **A.**  IT'S JUST SPECULATION.  I HAVE SEEN NO EVIDENCE OF THAT.

04:21  1    **Q.**   ALL RIGHT.  AND LET'S GO -- CONTINUE WITH THIS PATIENT.
2    I WANT TO GO TO JX_42.076.
3           ALL RIGHT.  THIS PATIENT HAD ANOTHER SELF-DECLARED
4    EMERGENCY, SPITTING UP BLOOD.  THIS WAS AFTER HE HAD SMOKED
5    MOJO.  IS THAT RIGHT?
6    **A.**   YES, ACCORDING TO THE FORM.
7    **Q.**   AND WHAT IS MOJO?
8    **A.**   IT'S SYNTHETIC MARIJUANA.
9    **Q.**   OKAY.  YOUR REPORT NEVER ONCE ANYWHERE IN THE 124 PAGES
10   ADDRESSES ILLICIT DRUG USE, MOJO, OPIOIDS OF ANY KIND.  ISN'T
11   THAT TRUE?
12   **A.**   ARE YOU ASKING IF THE WHOLE REPORT ADDRESSES THAT?
13   **Q.**   DO YOU EVER ADDRESS ILLICIT DRUG USE IN THE REPORT EVEN
14   ONCE?
15   **A.**   I DIDN'T.
16   **Q.**   ALL RIGHT.  I'M GOING TO MOVE ON.  LET'S GO TO PATIENT
17   NO. 52.  NO.  STRIKE THAT.  I'M NOT GOING TO DO 52.  I DON'T
18   BELIEVE YOU DISCUSSED HIM.
19          SO, MA'AM, ISN'T IT TRUE WITH THE TELEMED AND THE
20   SICK CALL PROCESS THAT THESE PATIENTS NOW HAVE TIMELY ACCESS TO
21   A MEDICAL PROVIDER?
22   **A.**   FOR -- THE PROCEDURE FOR ACCESS TO A MEDICAL PROVIDER FOR
23   SICK CALL PROVIDES BETTER ACCESS.  THERE ARE SOME COMPONENTS OF
24   THE SICK CALL PROCESS, SUCH AS THE LACK OF THE DAILY TRIAGE OF
25   HEALTH REQUESTS, THAT DO NOT ENSURE TIMELY ACCESS TO A MEDICAL

04:23 1  PROVIDER.

2  **Q.**  IT'S IN THE REPORT WHERE YOU SAY "THERE'S A LACK OF TIMELY

3  ACCESS."  YOU FIRST OFF TALK ABOUT THE OLD SICK CALL PROCESS,

4  NOT THE CURRENT TELEMED WITH THE NURSE PRACTITIONER, AND YOU

5  TALK ABOUT SELF-DECLARED EMERGENCIES.

6  SO UNDER THE CURRENT SYSTEM LSP IS OPERATING UNDER,

7  THERE IS TIMELY ACCESS TO A PROVIDER FOR THESE --

8  **A.**  NO.  THE REPORT DISCUSSES THE SICK CALL POLICY THAT DOES

9  NOT ENSURE THAT HEALTH REQUESTS ARE TRIAGED DAILY IN ORDER TO

10  IDENTIFY PATIENTS WITH URGENT COMPLAINTS.  AND SO, THEREFORE,

11  IT'S -- THERE'S IMPROVED ACCESS, BUT IT'S NOT RESOLVED.

12  **Q.**  LET'S TALK ABOUT PATIENT NO. 16, WHICH IS ONE THAT YOU DID

13  DISCUSS ON DIRECT.

14  **A.**  UH-HUH.

15  **Q.**  AS YOU NOTED, THE PATIENT HAD HIGH BLOOD PRESSURE WHICH

16  WAS NOT CONTROLLED.  CORRECT?

17  **A.**  EXCUSE ME, SIR.  IS THERE A PARTICULAR PAGE YOU'RE ON AT

18  THIS --

19  **Q.**  YES, MA'AM.  LET'S BEGIN IN JX_16.0136.

20  IF YOU'RE ASKING ABOUT THE PAGE IN YOUR REPORT, I'LL

21  HAVE TO --

22  **A.**  I'VE PULLED IT UP IN MY CASE REVIEW FOR HIM.  THANK YOU.

23  **Q.**  ALL RIGHT.  OKAY.  I'M ON -- THIS IS AN ENCOUNTER OR A

24  TRIP RETURN -- I'M SORRY -- FROM A TRIP ON AUGUST 15, 2019,

25  WHERE IT SAYS "FOLLOW-UP PRIMARY CARE PCP" -- PRIMARY CARE

04:25 1 PROVIDER -- "IN REGARDS TO HIGH BLOOD PRESSURE."  DO YOU SEE
2 THAT?
3 **A.**   YES.
4 **Q.**   AND THERE'S A NOTE BEHIND IT SAYING "APPOINTMENT
5 SCHEDULED, CNA 9/20/19."  CORRECT?
6 **A.**   YES.
7 **Q.**   ALL RIGHT.  AND IF I HAVE ANOTHER TRIP RETURN, THIS WAS
8 JX_16.0102.
9        ALL RIGHT.  AND IF YOU LOOK AT THE BOTTOM, AFTER
10 COMING BACK FROM THE HOSPITAL, HE SAYS, "THE OFFENDER TOLD THE
11 DOCTOR AT UMCNO" -- ARE YOU WITH ME?
12 **A.**   YES.
13 **Q.**   OKAY.  -- "THAT HE MISSES MEDS IN HIS CELL BECAUSE HE IS
14 OUT OF CELL DURING MED PASS.
15        "OFFENDER IS" -- THE RESPONSE IS:  "OFFENDER IS KOP
16 AND NOT IN CELL AND IS NOT TAKING MEDS AS PRESCRIBED."
17        SO WHAT HE TOLD THE PROVIDER, THE DOCTOR, AT UMC WAS
18 CONTRARY TO WHAT WAS GOING ON.  CORRECT?
19 **A.**   MY COMMENT ON THAT IS THAT I BELIEVE THIS PATIENT HAD BEEN
20 RECENTLY PLACED ON KOP, AND IT'S UNCLEAR TO ME WHETHER THE
21 PATIENT WAS TELLING THE DOCTOR THAT WHEN HE WAS ON
22 STAFF-ADMINISTERED MEDICATION THAT THAT OCCURRED.
23        IT'S CLEAR THAT THE PATIENT IS ON KOP NOW.  IT WAS
24 SOMETHING DOCUMENTED BY THE HOSPITAL DOCTOR.  BUT I JUST HAVE A
25 QUESTION ABOUT WHETHER THERE WAS A MISCOMMUNICATION OF WHAT

04:27 1    THAT STATEMENT INVOLVED.

2    **Q.**    ALL RIGHT.  "AND BECAUSE OF THE PROBLEM WITH HIM NOT

3    TAKING HIS KOP, LSP ACTUALLY DISCONTINUED THE KOP."  THAT'S THE

4    LAST WORDS ON THAT MONITOR I'M READING.

5    **A.**    YES.

6    **Q.**    OKAY.  AND LSP WANTED TO ADMIT HIM INTO THE NURSING UNIT,

7    AND HE REFUSED.  CORRECT?  THERE IN THE MIDDLE.

8    **A.**    LET'S SEE.  YES.

9    **Q.**    NOBODY'S BEING INDIFFERENT TO HIS HIGH BLOOD PRESSURE

10    NEEDS, ARE THEY?

11    **A.**    WELL, I WOULDN'T GO THAT FAR, BUT I WOULD SAY ON THIS

12    OCCASION THEY WERE GOING TO PUT HIM IN THE NURSING UNIT, WHICH

13    IS THE RIGHT THING TO DO.

14    **Q.**    OKAY.  NOW WE GO TO JX_16.0101.

15          THIS IS A MONTH LATER.  THIS IS AN ENCOUNTER AT

16    CLINIC A, CAMP D, A FOLLOW-UP WHICH INCLUDES FOR HIGH BLOOD

17    PRESSURE.  RIGHT?

18    **A.**    YES.

19    **Q.**    OKAY.  AND, AGAIN, HE WAS RECENTLY SEEN IN THE ER

20    SECONDARY TO HIS HIGH BLOOD PRESSURE.  RIGHT?

21    **A.**    CORRECT.

22    **Q.**    AND HE NOTES THAT THE PATIENT TOLD THE DOCTOR, ER DOCTOR,

23    HE WAS MISSING PILL CALL, BUT PATIENT WAS ON KOP.  RIGHT?  SAME

24    STORY.  RIGHT?

25    **A.**    WELL, YES.  I MEAN, THAT'S CONSISTENT.  SHE'S DOCUMENTING

04:28 1 WHAT HAD HAPPENED, WHAT HAD BEEN TOLD.

2 **Q.** AND THEY NOTICED BLOOD PRESSURE. AND HE APPARENTLY TOLD

3 THEM, "DIDN'T TAKE MEDS TODAY." CORRECT?

4 **A.** CORRECT.

5 **Q.** AND THEY FOLLOW UP. THEY HAVE QUESTIONABLE MEDICAL

6 COMPLIANCE, AND THEY FOLLOW UP WITH HIM. THEY SAY, "COME BACK

7 IN ANOTHER MONTH FOR ANOTHER FOLLOW-UP." RIGHT?

8 **A.** THEY DO. THAT'S TOO LONG. I MEAN, FOR HIS BLOOD PRESSURE

9 TO BE 176/118 AND THE NURSE PRACTITIONER DIDN'T EVALUATE: ARE

10 YOU HAVING HEADACHES, SHORTNESS OF BREATH, CHEST PAIN? WHICH

11 HE WAS IN THE HOSPITAL -- AND "LET ME SEND YOU TO THE ATU TO

12 TREAT THIS HIGH BLOOD PRESSURE."

13 YOU KNOW, THAT'S ONE OF THE THINGS I OBSERVED, WHICH

14 IS THAT WHEN THE PATIENT'S BLOOD PRESSURE WAS HIGH, THEY WOULD

15 JUST SEND THE PATIENT BACK AND SAY, "GO TAKE YOUR MEDS,"

16 WITHOUT KNOWING WHETHER THAT WAS GOING TO LOWER THE PATIENT'S

17 BLOOD PRESSURE. THAT'S NOT APPROPRIATE.

18 **Q.** OR TELL HIM, "LET'S SUBMIT YOU INTO THE NURSING UNIT,"

19 WHICH HE REFUSED. RIGHT?

20 **A.** HE DID REFUSE THAT.

21 **Q.** OKAY. LET'S GO TO JX_16.097.

22 THIS WAS ONLY TWO WEEKS LATER. WE HAVE AN EDUCATION

23 NOTE WITH HIM. CORRECT?

24 **A.** YES.

25 **Q.** BECAUSE HE WAS CALLED OVER FOR BLOOD PRESSURE CHECKS.

04:29 1 RIGHT?

2 **A.** RIGHT. WE DISCUSSED THIS FORM EARLIER. VERY GOOD.

3 **Q.** OKAY. NOT INDIFFERENT, IS IT?

4 **A.** NOT TO THIS PATIENT.

5 **Q.** RIGHT.

6 **A.** IN THIS INSTANCE.

7 **Q.** AND NOT PUNITIVE?

8 **A.** NOT PUNITIVE.

9 **Q.** LET'S GO TO PAGE NO. JX_16.086.

10 THIS IS MORE FOLLOW-UP WHERE THEY'RE TELLING HIM TO

11 CHANGE HIS DIET TO A LOW-SODIUM DIET FOR ONE YEAR. CORRECT?

12 **A.** YES.

13 **Q.** AGAIN, THAT WOULD BE A GOOD THING TO BE DONE TO HELP THE

14 PATIENT. RIGHT?

15 **A.** YES.

16 **Q.** ALL RIGHT. LET'S GO TO JX_16.085.

17 THIS IS NOVEMBER 20, 2019. ANOTHER FOLLOW-UP FOR HIS

18 HIGH BLOOD PRESSURE?

19 **A.** YES.

20 **Q.** OKAY. AND THEY'RE RECHECKING HIS BLOOD PRESSURE, AND HIS

21 BLOOD PRESSURE HAS COME DOWN PRETTY SIGNIFICANTLY. NOW IT'S

22 146/94. CORRECT?

23 **A.** IMPROVED, YES.

24 **Q.** VERY IMPROVED. OKAY.

25 AND IF I GO BACK TO JX_16.097 -- CAN YOU DO THAT FOR

04:31 1   ME THERE? -- HIS BLOOD PRESSURE THERE IS 147/102.  STILL
2   IMPROVED. CORRECT?
3   **A.**   WELL, IT'S ABNORMAL FOR SURE.  IT'S HIGH.
4   **Q.**   BUT IT'S IMPROVED?
5   **A.**   WELL, IT'S IMPROVED OVER WHEN HE WAS IN THE HOSPITAL, YES.
6   **Q.**   OKAY.  ALL RIGHT.  NOW LET'S GO TO JX_16.084.
7          THIS IS DECEMBER 19, 2019.  HE IS, AGAIN, HAVING A
8   FOLLOW-UP FOR A BLOOD PRESSURE CHECK?
9   **A.**   YES.
10  **Q.**   OKAY.  AND UNDER "BLOOD PRESSURE," IT NOTES "HE'S
11  NON-COMPLIANT WITH HIS MEDS, SALT."
12  **A.**   SO --
13  **Q.**   ALL RIGHT.  SO --
14  **A.**   COULD WE --
15  **Q.**   GO AHEAD.
16  **A.**   -- TAKE A LOOK AT THAT AGAIN.  SO THE PATIENT SAYS HE'S
17  TAKING HIS MEDS.  HIS BLOOD PRESSURE IS 151/102, WHICH IS HIGH,
18  AND THEN THE PROVIDER WRITES, "HYPERTENSION, NON-COMPLIANT."
19  SO THE BASIS FOR THE PROVIDER TO DOCUMENT THAT HE'S
20  NON-COMPLIANT, AFTER THE PATIENT SAYS HE'S TAKING HIS MEDS, IS
21  INCONSISTENT.  AND THE FOLLOW-UP -- AND HE DOESN'T DO A REVIEW
22  OF SYSTEMS.  ONE WOULD EXPECT THEM TO EVALUATE THE
23  HYPERTENSION:  "ARE YOU HAVING HEADACHES, SHORTNESS OF BREATH,"
24  ET CETERA.  AND THE "RETURN TO CLINIC IN THREE MONTHS" IS NOT
25  AN APPROPRIATE FOLLOW-UP INTERVAL, GIVEN THAT HIS BLOOD

04:32 1 PRESSURE IS NOT WELL-CONTROLLED.

2 **Q.** THE DISCREPANCY BETWEEN WHETHER THE PATIENT IS TAKING HIS

3 MEDS OR NOT, DON'T YOU THINK THE PROVIDER LOOKED IN THE RECORDS

4 TO SEE WHAT HE SAW?

5 **A.** THERE ARE NO MEDICATION ADMINISTRATION RECORDS IN THE

6 HEALTH RECORDS, SO WHAT WOULD THE PROVIDER HAVE LOOKED AT?

7 **Q.** ARE YOU AWARE THAT THE PROVIDER CAN PULL UP THE MEDICATION

8 ADMINISTRATION RECORDS ON THE COMPUTER?

9 **A.** NO, THEY COULDN'T. WHEN WE WERE WITH MR. BORDELON AND

10 BILL HAWKINS, WE ASKED THEM TO PULL UP THE MAR ON THE COMPUTER

11 AND THEY COULDN'T DO IT, AND BORDELON SAID HE NEVER DOES IT.

12 **Q.** ALL RIGHT. FIRST OFF, THEY ARE AVAILABLE ON THE COMPUTER

13 TO THE PROVIDER. RIGHT?

14 **A.** I DON'T KNOW THAT.

15 **Q.** OKAY. SECOND OFF, THERE'S ALSO THE PROCESS BY WHICH THEY

16 CHECK AND SEE WHEN THE MEDS WERE LAST REORDERED. ARE YOU

17 FAMILIAR WITH THAT?

18 **A.** YES.

19 **Q.** OKAY. SO THAT'S ANOTHER METHOD FOR THE PROVIDER TO

20 DETERMINE WHETHER THIS PATIENT IS ACTUALLY BEING COMPLIANT OR

21 NOT. RIGHT?

22 **A.** WELL, THEY CAN -- YES, THEY CAN SEE WHEN THE LAST TIME IT

23 WAS REFILLED.

24 **Q.** RIGHT.

25 **A.** BUT THE INTERESTING THING IS THAT WHEN THE PATIENT -- WHEN

04:33 1  THEY TALK TO THE PATIENT ABOUT THAT, THEY DON'T REALLY ASK HIM,

2  "TELL ME ABOUT THAT.  HAVE YOU PUT IN YOUR" -- "HAVE YOU PUT IN

3  A REFILL REQUEST?  DID YOU GET YOUR MEDICATIONS?"

4  WE HAD PATIENTS REPORT TO US AT LEAST THAT THEY HAD

5  PUT IN A REQUEST FOR A REFILL AND THEY'D GO TO THE WINDOW EVERY

6  DAY TO SEE IF IT WAS THERE AND THAT SOMETIMES THEY WOULD STOP

7  CHECKING BECAUSE THEIR MEDICATION WASN'T THERE.

8  Q.   YOU EVER HAD AN OFFENDER, A PATIENT, TELL YOU SOMETHING

9  THAT WASN'T TRUE?

10  A.   YES.

11  Q.   OKAY.  ALL RIGHT.  THIS IS --

12  A.   BUT MANY TIMES PATIENTS TELL ME THE TRUTH.

13  Q.   AND SOMETIMES THEY DON'T?

14  A.   AND SOMETIMES THEY DON'T.

15  Q.   OKAY.

16  A.   BUT THE POINT IS THAT THE PROVIDER NEEDS TO LOOK INTO

17  THIS.

18  Q.   ALL RIGHT.

19  A.   THEY JUST -- THEY NEED TO INVESTIGATE.

20  Q.   YOU AWARE THAT THIS PATIENT HAS A HISTORY OF DRUG USE,

21  ILLICIT DRUG USE?

22  A.   NO.

23  Q.   OKAY.  LET'S TURN TO JX_16.059.

24  JUNE 30, 2000.  IT SAYS, "HE HAS POSSIBLE

25  INTOXICATION, ALTERED MENTAL STATUS, BUT HE ADMITS TO TAKING

04:35 1   TWO HITS OF MOJO."  CAN YOU SEE THAT ABOUT TWO-THIRDS OF THE

2   WAY DOWN?

3   **A.**   ONE MOMENT, PLEASE.

4   **Q.**   CERTAINLY.

5   **A.**   YES, I SEE WHERE HE SAYS THAT:  "ADMITS TO TAKING TWO HITS

6   OF MOJO."

7   **Q.**   OKAY.  AND HE'S TAKEN TO THE ATU AS A RESULT OF THIS

8   ENCOUNTER.  THAT'S A GOOD THING.  RIGHT?

9   **A.**   IT IS.  BUT MY QUESTION IS WHETHER HE WAS EVALUATED FOR --

10   HE HAD SLURRED SPEECH, WHICH CAN BE SIGNS -- EARLY SIGNS OF A

11   STROKE.  AND SO ONE QUESTION IS WHETHER THEY EVALUATED HIM FOR

12   ANY OTHER CONDITION OTHER THAN TAKING TWO HITS OF MOJO --

13   **Q.**   ALL RIGHT.

14   **A.**   -- WHICH WAS A PROBLEM IN OUR -- IDENTIFIED IN OUR REPORT.

15   **Q.**   THIS TIME FRAME WE'RE TALKING ABOUT -- DURING A DIFFICULT

16   TIME FRAME OF COVID IN JUNE OF 2000 [SIC], AREN'T WE?

17   **A.**   COVID IS PRESENT AT THIS TIME, YES.

18   **Q.**   AND THAT'S THE DIFFICULT TIME WHEN WE WERE FIGURING THINGS

19   OUT WITH COVID.  RIGHT?

20   **A.**   I'M NOT SURE WHAT YOU MEAN WHEN YOU SAY "FIGURING THINGS

21   OUT."  I MEAN, THE KEY THING IS THAT, REGARDLESS OF THE COVID

22   ENVIRONMENT, WHEN SOMEONE HAS A SERIOUS MEDICAL CONDITION, THEY

23   NEED TO BE TIMELY TREATED FOR IT.  AND THIS PATIENT WASN'T SEEN

24   FOR NINE MONTHS AFTER HE HAD BLOOD PRESSURES IN THE 170'S,

25   180'S; AND COVID CANNOT BE A RATIONALE FOR NOT SEEING PATIENTS

04:36 1   WHO NEED TO BE SEEN.

2   **Q.**   LET'S GO TO THE NEXT RECORD, WHICH IS JX_16.043.

3           THIS IS FEBRUARY 21 OF 2021; INDICATES HE SMOKED

4   MOJO.  CORRECT?

5   **A.**   ONE MOMENT, PLEASE.

6   **Q.**   CERTAINLY.

7   **A.**   IT LOOKS LIKE HE WAS IN A FIGHT, SMOKED MOJO, NO

8   COMPLAINTS.

9   **Q.**   OKAY.  AND THEN WHEN HE DIES ON MARCH 17, 2021, HE HAD A

10  WICK WITH A BLACKENED BURN HOLE IN HIS SOCK.  ARE YOU FAMILIAR

11  WITH THAT?

12  **A.**   YES.

13  **Q.**   LET'S GO TO JX_16.041.

14          DO YOU KNOW WHAT A WICK IS USED FOR?

15  **A.**   I'M NOT INTIMATELY FAMILIAR WITH WHAT THE WICKS ARE USED

16  FOR.

17  **Q.**   IT'S USED TO SMOKE ILLEGAL SUBSTANCES IN A PRISON, ISN'T

18  IT?

19  **A.**   I SAID I DON'T KNOW EXACTLY WHAT THE MECHANISMS THAT

20  INMATES USE TO SMOKE OR USE DRUGS.

21  **Q.**   WITH ALL YOUR CORRECTIONAL EXPERIENCE, YOU'RE NOT FAMILIAR

22  WITH THE SIMPLE CONCEPT OF A WICK?

23  **A.**   I'M NOT -- I'M NOT FAMILIAR WITH THAT -- WITH THAT

24  TERMINOLOGY.  I WOULD JUST POINT OUT, WHEN THIS PATIENT DIED, I

25  THINK A TOXICOLOGY STUDY WAS DONE AND THERE WAS NO EVIDENCE OF

04:38 1 SYNTHETIC CANNABINOIDS IN HIS SYSTEM.

2 **Q.** AND WHEN YOU DO A TOXICOLOGY STUDY, YOU HAVE TO ASK THE

3 RIGHT QUESTIONS. WHAT YOU TEST FOR IS WHAT YOU WILL FIND.

4 CORRECT?

5 **A.** I BELIEVE SO.

6 **Q.** OKAY. ALL RIGHT. NOW LET'S GO TO PATIENT NO. 13. THIS

7 IS SOMEONE THAT YOU HAD A LOT -- A LOT OF WRITE-UPS ON, A VERY

8 LONG WRITE-UP. YOU WITHDREW SOME OF YOUR COMMENTS, DIDN'T YOU?

9 **A.** I DID.

10 **Q.** AND THAT WAS BECAUSE OF MY QUESTION AT THE DEPOSITION

11 SHOWING YOU THAT THINGS WERE FALSE. RIGHT?

12 **A.** EXCUSE ME?

13 **Q.** BECAUSE I QUESTIONED YOU AT YOUR DEPOSITION AND SHOWED

14 YOU, YOU HAD THINGS IN YOUR WRITE-UP THAT WERE WRONG. RIGHT?

15 **A.** I DON'T KNOW WHAT YOU MEAN.

16 **Q.** WHY DID YOU WITHDRAW COMMENTS, THEN?

17 **A.** WELL, WHAT I WAS SPECIFICALLY REFERRING TO IN -- THE

18 ADDITIONAL DOCUMENTATION THAT I REVIEWED, SHOWED THAT THE

19 PATIENT GOT CARE IN THE HOSPITAL THAT WAS NOT DOCUMENTED IN THE

20 MEDICAL RECORD BY -- IN THE MEDICAL PERSONNEL.

21 AND LET ME JUST GIVE YOU AN EXAMPLE. SO THERE

22 WERE -- THERE WERE TESTS -- CT SCANS AND TESTS THAT SHOWED THE

23 PATIENT HAD PNEUMONIA, AND THESE WERE NOT INITIALED BY ANY

24 PROVIDER AT LSP IN ORDER TO INDICATE ABNORMAL TESTS, AND THE

25 PATIENT WAS -- YOU KNOW, HAS ALREADY BEEN TREATED WHILE HE WAS

04:39 1   IN THE HOSPITAL.

2   **Q.**   BEFORE I DO THIS, I WANT TO MAKE SURE THERE IS -- YOU HAD

3   LOTS OF COMPLAINTS ABOUT UROLOGY; HE WAS SUPPOSED TO BE

4   REFERRED TO UROLOGY.  AND BEFORE I GO DOWN THIS PATH, ARE THOSE

5   WITHDRAWN, BASED ON YOUR ADDITIONAL RECORDS?

6   **A.**   LET ME RESTATE; THAT I DID SAY A UROLOGY CONSULT WAS

7   DELAYED THAT ACTUALLY WAS ADDRESSED WHEN HE WAS IN THE

8   HOSPITAL, SO THAT'S WITHDRAWN.

9   **Q.**   ALL RIGHT.  ALL RIGHT.  YOU DO SAY THAT THERE WAS A

10  FINDING OF A POSITIVE E. COLI BACTERIA FOR WHICH THERE WAS NO

11  PLAN.  RIGHT?

12  **A.**   YES.  AND HE WAS TREATED -- THAT IS ADDITIONAL

13  DOCUMENTATION THAT WAS IN THE SECOND VOLUME THAT WASN'T IN THE

14  FIRST VOLUME FOR WHICH HE WAS TREATED FOR THE E. COLI.

15  **Q.**   LET'S GO TO JX_13.825.

16          ALL RIGHT.  THIS IS AN ATU VISIT WHERE IT'S NOTED

17  THAT THERE'S A BLOOD CULTURE, SPUTUM.  THIS IS WHAT YOU'RE

18  REFERRING TO.  RIGHT?

19  **A.**   YES.  SO THIS IS A CORRECTION THAT I WILL MAKE BASED ON

20  THE ADDITIONAL DOCUMENTATION THAT I REVIEWED.  THESE DOCUMENTS

21  WERE NOT IN CHRONOLOGICAL ORDER IN THE FIRST VOLUME I REVIEWED.

22  SO, YES, HE WAS TREATED FOR THE ABNORMAL SPUTUM.

23  **Q.**   AND, MA'AM, THE TREATMENT FOR THAT IS THAT ERTAPENEM?  DID

24  I GET THAT RIGHT?

25  **A.**   ERTAPENEM.

04:41 1  **Q.**  THANK YOU.

2        THAT'S THE TREATMENT.  THEY GIVE YOU AN IV OF THAT IN

3  THE ATU WHEN THEY DIAGNOSED THE E. COLI.  CORRECT?

4  **A.**  YES.

5  **Q.**  THAT'S REALLY GOOD, ISN'T IT?

6  **A.**  IT'S VERY GOOD.

7  **Q.**  AND YOU SAY THESE WERE SO OUT OF ORDER.  LET'S GO TO THE

8  NEXT PAGE, WHICH IS JX_13.0823, TWO PAGES OVER.

9        THIS IS THE NEXT DAY.  THEY BRING HIM BACK TO THE ATU

10  AND GIVE HIM ANOTHER IV OF THAT ANTIBIOTIC.  CORRECT?

11  **A.**  YES.  HE RECEIVED FOUR CONSECUTIVE DAYS OF IV ANTIBIOTICS.

12  **Q.**  AND IF I GO OVER JUST A FEW MORE PAGES, JX_13.0817, THAT'S

13  THE NEXT DAY.  CORRECT?

14  **A.**  YES.

15  **Q.**  AND THAT'S REALLY GOOD, ISN'T IT?

16  **A.**  IT'S VERY GOOD THAT HE WAS TREATED.

17  **Q.**  THE NEXT ONE IS ONE MORE PAGE OVER ON THE NEXT DAY, ON

18  JX_13.0816.  HE GOT THE FINAL IV OF THE ANTIBIOTIC.  RIGHT?

19  **A.**  YES, HE DID.

20  **Q.**  SO YOU MADE A CRITICISM.  YOU WROTE IT UP THAT NOBODY HAD

21  A PLAN OR TREATED HIM FOR THAT E. COLI.  THAT WAS WRONG?

22  **A.**  WELL, THE RECORDS WERE NOT CHRONOLOGICALLY IN THE RECORDS.

23  SO, YES, I MISSED THIS BECAUSE -- REALLY BECAUSE OF A MEDICAL

24  RECORDS ISSUE.  BUT HE DID GET THE TREATMENT.

25  **Q.**  THEY WERE ALL RIGHT THERE TOGETHER, ONE AFTER THE OTHER

04:42 1  RIGHT WHERE I SHOWED YOU, WITHIN TEN PAGES OF EACH OTHER.

2  **A.**   WELL, THEY WEREN'T IN -- THEY WERE NOT IN THE VOLUME THAT

3  HAD THE CHRONOLOGY OF HIS -- OF WHEN THE -- WHEN HE WAS

4  INITIALLY DIAGNOSED WITH THE PNEUMONIA.

5  **Q.**   OKAY.  I WANT TO -- ALL RIGHT.  YOU SAY THAT THERE IS

6  FALSIFICATION OF THE E-MAR RECORDS IN THIS FILE -- CORRECT? --

7  IN JANUARY OF 2020?

8  **A.**   THAT WAS BASED ON AN E-MAR THAT WAS LABELED THAT THE

9  PATIENT WAS IN CAMP C.  BUT THE PATIENT WAS NOT IN CAMP C, BUT

10  THE E-MAR SAID HE WAS.  SO IN ORDER FOR THAT TO HAVE BEEN

11  DOCUMENTED WHEN HE WAS IN CAMP C, IT COULD NOT HAVE BEEN

12  ACCURATE.

13  **Q.**   LET'S GO TO JX_13.058, PLEASE.

14       ALL RIGHT.  THIS IS THE RECORD THAT YOU CLAIM WAS,

15  QUOTE, FALSIFIED, MA'AM, FALSIFIED.  THAT'S A STRONG WORD,

16  ISN'T IT?

17  **A.**   YES, IT IS STRONG WORDS.  IT WAS BASED ON THE FACT THAT HE

18  WAS IN CAMP F WHEN THE PATIENT WAS IN THE INFIRMARY.  AND WHAT

19  I LATER REALIZED IS THAT THE INFIRMARY STAFF USED A CAMP F MAR

20  TO COMPLETE THEIR DOCUMENTATION.

21  **Q.**   SO IT'S JUST AS SIMPLE AS THEY DIDN'T PRINT ANOTHER FORM

22  AND CHANGE HIS LOCATION.  THAT'S ALL IT WAS.  RIGHT?

23  **A.**   WELL, I'M NOT SURE WHERE THEY GOT THE FORM, BUT IT IS --

24  THE PATIENT WAS NOT IN CAMP F.

25  **Q.**   AND THE INITIALS ON THIS ARE OF THE NURSES IN THE NURSING

04:44 1    UNIT WHO ARE ADMINISTERING THESE MEDICATIONS.  RIGHT?

2    **A.**   WELL, THERE ARE NO -- THERE ARE NO INITIALS OF THE NURSES.

3           KEEP IN MIND, MR. ARCHEY, THAT WHAT I HAVE SEEN WAS A

4    MARS THAT SHOW THE PATIENT GOT MEDICATION AND THEN THE SAME

5    MARS THAT SHOWED THAT THE PATIENT DIDN'T GET THE MEDICATION.

6    SO THE MARS ARE UNRELIABLE.  SO WHEN I LOOKED AT THIS --

7    **Q.**   THIS IS NOT A FALSIFIED RECORD, IS IT?

8    **A.**   NOT THAT I KNOW OF.  AND IT JUST SHOWS THAT THE PATIENT

9    DIDN'T GET ALL HIS MEDICATION.

10   **Q.**   OKAY.  YOU WERE AN EXPERT IN A CASE FILED IN EAST

11   CORRECTIONAL MISSISSIPPI AGAINST CENTURION, A CASE KNOWN AS

12   *DOCKERY VERSUS HALL*.  CORRECT?

13   **A.**   THAT'S CORRECT.

14   **Q.**   AND YOU TESTIFIED IN THAT CASE THAT THE MARS ARE SOME OF

15   THE MOST SERIOUS PROBLEMS AT THAT FACILITY THAT YOU'VE SEEN.

16   CORRECT?

17   **A.**   I HAVEN'T LOOKED AT THE RECORD RECENTLY, BUT THAT WOULD

18   NOT SURPRISE ME.

19   **Q.**   AND DO YOU KNOW WHAT THE COURT FOUND IN THAT CASE?

20   **A.**   I DON'T KNOW SPECIFICALLY WITH RESPECT TO THAT.

21   **Q.**   THE COURT FOUND -- LET'S PULL THIS UP.  DX_58, PAGE 102,

22   PLEASE.

23          THE COURT SAID, "TO THE EXTENT THE MISSED DOSES OR

24   UNTIMELY ADMINISTRATION OF MEDICATIONS EVIDENCED ON THE MARS

25   REFLECT HUMAN ERROR OR POOR RECORDKEEPING, THEY DO NOT AMOUNT

04:46  1    TO CONSTITUTIONAL VIOLATIONS."

2              MY QUESTION TO YOU IS:  SINCE THIS COURT REJECTED

3    YOUR TESTIMONY, HAVE YOU CHANGED YOUR STANDARD OF REVIEW ANY?

4    **A.**   NO.

5    **Q.**   ANGELA GOEHRING IS PLAINTIFFS' EXPERT, A NURSING EXPERT IN

6    THIS CASE.  SHE WORKED AT CENTURION AT THE TIME THAT WENT ON,

7    DIDN'T SHE?

8    **A.**   I'M SORRY.

9    **Q.**   SHE WORKED FOR CENTURION AT THE TIME OF THAT CASE, DIDN'T

10   SHE?

11   **A.**   I THINK FOR PART OF THE TIME, NOT ALL OF THE TIME.  IN

12   OTHER WORDS, CENTURION WAS NOT THE VENDOR FOR THE WHOLE TIME

13   THAT I WAS INVOLVED IN THAT CASE.

14   **Q.**   ARE YOU AWARE THAT LSP NOW --

15             **MR. ARCHEY:**  YOU CAN TAKE IT DOWN.

16   **BY MR. ARCHEY:**

17   **Q.**   ARE YOU AWARE THAT LSP NOW HAS ELECTRONIC MARS THAT HAVE

18   BEEN IMPLEMENTED JUST THIS PAST WEEK?

19   **A.**   I DON'T UNDERSTAND YOUR QUESTION.

20   **Q.**   OKAY.  ALL RIGHT.

21             **MS. MONTAGNES:**  YOUR HONOR -- YOUR HONOR, I'M JUST

22   GOING TO OBJECT.  THEY HAVEN'T EVEN TOLD US THIS.  THERE IS NO

23   WAY THAT MS. LAMARRE COULD KNOW THIS.  AND THIS IS SANDBAGGING.

24   I MEAN --

25             **THE COURT:**  OKAY.  HE ASKED HER THE QUESTION.  SHE

04:47 1   SAID SHE DIDN'T KNOW.  I MEAN, I ASSUME THAT HE WILL COME

2   FORWARD WITH SOME PROOF.  OVERRULED.

3   **BY MR. ARCHEY:**

4   **Q.**   TALK ABOUT UNPROFESSIONAL AND PUNITIVE ATTITUDES.  YOU

5   SAID ON DIRECT RECORDS WERE, QUOTE, REPLETE WITH MALINGERING.

6   THE WORD *MALINGERING* DOES NOT APPEAR IN THESE CHARTS, DOES IT?

7   **A.**   OH, THEY DO.

8   **Q.**   RARELY.  I THINK I SAW ONE DOCUMENT, ONE PAGE THAT USED

9   THE WORD *MALINGERING.*  ONE PAGE OUT OF THESE PROBABLY 30,000

10   PAGES OF PAPER.  ISN'T THAT RIGHT?

11   **A.**   WELL, I'M NOT SURE WHAT YOU'RE REFERRING TO SPECIFICALLY.

12   **Q.**   THESE RECORDS ARE NOT REPLETE WITH THE WORD *MALINGERING,*

13   ARE THEY?

14   **A.**   THEY ARE -- THE RECORDS DEMONSTRATE THAT PATIENTS ARE, YOU

15   KNOW, MANIPULATIVE, NOT -- YOU KNOW, AND MALINGERING.  I SAW IT

16   A NUMBER OF TIMES.

17   **Q.**   THE WORD *MALINGERING* IS USED EXACTLY ONE TIME.  ISN'T THAT

18   RIGHT?

19   **A.**   NO.

20   **Q.**   OKAY.  DID YOU SEE AN ENCOUNTER WITH NURSE PRACTITIONER

21   DEDEAUX WHERE HE WAS COUNSELING A PATIENT ABOUT HIS NEED TO

22   TAKE INSULIN AND GET ON WITH HIS LIFE?  DID YOU SEE THAT

23   ENCOUNTER?

24   **A.**   I'M NOT SURE WHAT YOU'RE REFERRING TO.

25   **Q.**   THE PATIENT EXPLAINS TO NURSE PRACTITIONER DEDEAUX THAT

04:48 1  HE'S UP FOR PAROLE NEXT YEAR, AND NURSE PRACTITIONER DEDEAUX

2  GIVES HIM A FIST PUMP.  ARE YOU FAMILIAR WITH THAT?

3  **A.**  I'M NOT SURE WHAT YOU'RE REFERRING TO.

4  **Q.**  OKAY.  NURSE PRACTITIONER DEDEAUX SPENT A LONG TIME

5  EDUCATING THE PATIENT WHY IT WAS IMPORTANT TO GO AHEAD AND GET

6  THESE SHOTS AND GET ON HIS INSULIN.  THAT WOULD BE APPROPRIATE,

7  WOULDN'T IT?

8  **A.**  IF THE PROVIDER DID THAT.  BUT, AGAIN, I'M NOT SURE WHAT

9  YOU'RE REFERRING TO SPECIFICALLY.

10  **Q.**  OKAY.  DID YOU HEAR INMATES COMPLIMENT LSP'S HEALTH CARE

11  DURING YOUR SITE VISIT?

12  **A.**  I REVIEWED MY NOTES AND I WROTE DOWN ONE COMPLIMENT THAT

13  ONE OF THE PATIENTS GAVE.

14  **Q.**  YEAH.  THERE WERE PATIENTS -- SEVERAL -- THAT COMPLIMENTED

15  LSP ON THEIR CARE AND THANKED THEM FOR WHAT THEY WERE DOING.

16  ISN'T THAT RIGHT?

17  **A.**  WELL, I ONLY RECALL ONE, WHICH I MADE A NOTE OF.

18  **Q.**  I WANT TO PULL UP JX_13.01015.  YEAH, 01015.  1015, THERE

19  YOU GO.

20  MA'AM, I WANT YOU TO LOOK AT THIS EMAIL.  HAVE YOU

21  SEEN THIS EMAIL BEFORE?

22  **A.**  I HAVE.

23  **Q.**  AND WHAT HAPPENED IS THIS PATIENT COMES BACK FROM

24  SPECIALTY CARE AND HE'S LISTED AS PRN; "JUST COME BACK AND SEE

25  US WHEN YOU NEED TO."  RIGHT?

04:50 1   **A.**   YES.

2   **Q.**   DR. LAVESPERE QUESTIONED THAT, DIDN'T HE?

3   **A.**   I THINK THE TRIP NURSE DID.

4   **Q.**   "IT SURPRISED MYSELF AND DR. LAVESPERE." DO YOU SEE THAT?

5   **A.**   YES. BUT WHAT I'M SAYING IS I THINK THAT IT WAS THE TRIP

6 NURSE WHO INITIATED IT, AND DR. LAVESPERE AGREED.

7   **Q.**   FAIR ENOUGH.

8       AND THEN AT THAT POINT THEY CONTACT A SPECIALIST AND

9 SAY, "HEY, IS THIS RIGHT? DON'T YOU WANT TO SEE HIM FOR A

10 FOLLOW-UP?" RIGHT?

11   **A.**   YES.

12   **Q.**   THAT'S REALLY GOOD CARE BY SOMEBODY THAT CARES, ISN'T IT?

13   **A.**   WELL, IT'S -- IT WAS PROACTIVE TO ADVOCATE FOR THE

14 PATIENT.

15   **Q.**   ARE YOU AWARE THAT THERE IS A -- IN ONE OF THE RECORDS

16 THAT YOU SELECTED, LSP HAD THE INMATE COMMITTED, LEGALLY

17 COMMITTED, SO THAT THEY COULD PROVIDE CARE TO HIM?

18   **A.**   I'M NOT AWARE OF WHAT YOU'RE REFERRING TO.

19   **Q.**   YOU'RE NOT AWARE ON PATIENT NO. 30 WHERE HE REFUSED TO

20 TAKE CHEMOTHERAPY OR ANY OF HIS TREATMENT; LSP HAD HIM LEGALLY

21 COMMITTED IN ORDER TO PROVIDE CARE TO HIM?

22       **MS. MONTAGNES:** OBJECTION, YOUR HONOR. THIS IS NOT A

23 PATIENT THAT MS. LAMARRE REVIEWED.

24       **THE COURT:** MR. ARCHEY?

25       **MR. ARCHEY:** I DON'T ACTUALLY KNOW OFF THE TOP OF MY

04:51 1    HEAD WHO DID THIS, YOUR HONOR, WOULD BE THE SHORT ANSWER.

2              **THE WITNESS:**  I BELIEVE THAT DR. VASSALLO REVIEWED

3    THIS CASE.

4              **THE COURT:**  SUSTAINED.  NEXT QUESTION.

5              **MR. ARCHEY:**  ONE MOMENT, YOUR HONOR, IF I MAY.

6              **THE COURT:**  OKAY.  GO AHEAD.

7              **MR. ARCHEY:**  YOUR HONOR, WE'RE ABOUT TO CONCLUDE.

8    BEFORE I DO, I'D LIKE TO OFFER INTO EVIDENCE DX_58, WHICH WE

9    REFERRED TO EARLIER FROM THE *DOCKERY* CASE.  I'D LIKE TO OFFER

10   INTO EVIDENCE DX_46.  I'D LIKE TO OFFER THEM ALL.  WE REFERRED

11   TO MANY OF THE PHOTOGRAPHS -- NOT QUITE ALL OF THEM, BUT WE DID

12   REFER TO MANY OF THEM.  AND THEN I'D LIKE TO OFFER INTO

13   EVIDENCE DX_55, WHICH IS THE NCCHC WEBSITE I ASKED HER ABOUT.

14             **THE COURT:**  58 IS THE *DOCKERY* CASE?

15             **MR. ARCHEY:**  YES, MA'AM.

16             **THE COURT:**  I MEAN, I CAN PULL THAT UP, BUT THAT'S

17   FINE.  ADMITTED.  DX_55 IS WHAT, AGAIN?

18             **MR. ARCHEY:**  THE NCCHC WEBSITE.

19             **MS. MONTAGNES:**  YOUR HONOR, WE WOULD OBJECT AS TO

20   BEST EVIDENCE.  THIS IS NOT THE STANDARD.  THIS IS A SUMMARY OF

21   THEIR POSITION ON A WEBSITE.  IT'S NOT THEIR OFFICIAL STANDARDS

22   IN ANY WAY.  IT HAS NO RELEVANCE IN THIS MATTER.

23             **THE COURT:**  YES, I WOULD AGREE WITH RESPECT TO

24   DX_55.  IF YOU REFERRED TO IT AND YOU WANT TO ARGUE IT, YOU CAN

25   CERTAINLY DO THAT, BUT IT'S NOT APPROPRIATE EVIDENCE, UNLESS I

04:52 1 CAN TAKE -- UNLESS IT'S SELF-AUTHENTICATING OR SOMETHING, WHICH
2 I DOUBT THAT IT IS.
3          **MR. ARCHEY:**  I DON'T THINK SO, YOUR HONOR.
4          **THE COURT:**  ALL RIGHT.  AND THEN DX_46, HAVE YOU
5 REVIEWED THE PHOTOGRAPHS?  ARE YOU PREPARED TO --
6          **MS. MONTAGNES:**  I HAVEN'T HAD A CHANCE TO REVIEW
7 THEM.  I'M JUST CONFERRING WITH MY COUNSEL, BECAUSE I THINK
8 SOMEONE HAS, SO LET ME JUST CHECK REAL QUICK.
9          **THE COURT:**  ALL RIGHT.
10         **MR. ARCHEY:**  OR WE CAN DEFER THAT TILL TOMORROW,
11 JUDGE.
12         **THE COURT:**  WE CAN.  AND IF YOU WANT TO INTRODUCE THE
13 ONES THAT YOU REFERRED TO TODAY, YOU CERTAINLY MAY DO THAT, BUT
14 I DON'T KNOW THAT YOU'VE -- THAT YOU'RE --
15         **MS. MONTAGNES:**  SORRY, YOUR HONOR.
16         **THE COURT:**  GO AHEAD.
17         **MS. MONTAGNES:**  I JUST WANT TO NOTE, DX_58 IS NOT
18 JUST -- OR 48 IS NOT MERELY THE OPINION IN *DOCKERY*.  IT'S
19 DEPOSITION TESTIMONY.  IT'S SEVERAL OTHER DOCUMENTS.  IT'S
20 ESSENTIALLY ALL OF THE *DOCKERY* CASE, OR HUGE EXCERPTS OF IT,
21 AND THAT'S SIMPLY NOT RELEVANT IN THIS MATTER.  I DON'T THINK
22 IT'S APPROPRIATE EVIDENCE.  AND FURTHERMORE, THE OPINION, AS
23 YOU'VE SAID, YOU CAN PULL IT UP YOURSELF.
24         **THE COURT:**  I MEAN, IT'S NOT EVIDENCE.  THE OPINION
25 IS NOT EVIDENCE.  IT'S ARGUMENT.  BUT IF YOU WANT TO PUT IT IN

04:53 1 THE RECORD, I GUESS IT WILL BE FINE.

2 BUT WHAT ABOUT THE OTHER STUFF? I MEAN, ARE

3 THERE DEPOSITIONS?

4 **MR. ARCHEY:** THERE IS HER EXPERT REPORT AND HER

5 DEPOSITION -- OR HER TRIAL TESTIMONY THAT I ASKED HER ABOUT.

6 **THE COURT:** NO, YOU'VE NOT IMPEACHED HER ON THAT.

7 NO, YOU CANNOT -- THAT IS NOT ADMISSIBLE.

8 **MR. ARCHEY:** YES, YOUR HONOR.

9 **THE COURT:** ALL RIGHT. AND THEN YOU'RE GOING TO

10 DEFER OR WAIT ON 46? ARE Y'ALL PREPARED TO --

11 **MS. MONTAGNES:** WE'RE FINE ON 46, YOUR HONOR. NO

12 OBJECTION.

13 **THE COURT:** 46 IS ADMITTED. SO 58 IS NOT ADMITTED;

14 55 IS NOT ADMITTED; 46 IS ADMITTED.

15 ANYTHING FURTHER?

16 **MR. ARCHEY:** TWO OR THREE MORE, AND I'LL BE DONE.

17 **THE COURT:** GO AHEAD. TAKE YOUR TIME. TAKE YOUR

18 TIME.

19 **BY MR. ARCHEY:**

20 **Q.** MS. LAMARRE, YOU MAKE A SIGNIFICANT PORTION OF YOUR INCOME

21 ACTING AS A MONITOR FOR COURTS. CORRECT?

22 **A.** YES.

23 **Q.** AND YOU'D BE MORE THAN HAPPY TO MAKE A MONITOR -- TO SERVE

24 AND BECOME A MONITOR IN THIS CASE, TOO, WOULDN'T YOU?

25 **A.** I WOULD CONSIDER IT.

04:54 1  **Q.**  AND YOU'D ONLY BECOME A MONITOR IF YOU CONVINCE THE COURT

2  THAT OUR CARE IS SUBSTANDARD.  RIGHT?

3  **A.**  I'M SORRY.  WOULD YOU REPEAT THAT?

4  **Q.**  YOU CAN ONLY BECOME A MONITOR IF YOU CONVINCE THE COURT

5  THAT OUR CARE IS SUBSTANDARD.  CORRECT?

6  **A.**  I CAN'T PREDICT WHAT THE COURT WILL DO OR -- I'M REALLY

7  NOT SURE ABOUT YOUR QUESTION.  I DON'T KNOW HOW TO ANSWER YOUR

8  QUESTION.

9  **Q.**  I'M JUST GOING TO THE BIAS AND MOTIVATION, MA'AM.  THAT'S

10  ALL.

11      **MR. ARCHEY:**  SO I'LL WITHDRAW IT, YOUR HONOR.  THAT'S

12  ALL MY QUESTIONS.

13      **THE COURT:**  OKAY.  DO WE HAVE ANY REDIRECT?

14      **MS. MONTAGNES:**  WE DO, YOUR HONOR.

15      **THE COURT:**  HOW LONG DO YOU THINK YOU ARE GOING TO

16  HAVE?

17      **MS. MONTAGNES:**  I MEAN, YOUR HONOR, WE WOULD REALLY

18  LIKE TO BE ABLE TO HAVE MS. LAMARRE -- YOU KNOW, I CAN TRY AND

19  BE HALF AN HOUR.

20      **THE COURT:**  OKAY.  I DIDN'T HEAR THE FIRST PART.

21      **MS. MONTAGNES:**  SORRY.

22      **THE COURT:**  YOU WANT TO GET --

23      **MS. MONTAGNES:**  I'M SKIPPING AHEAD FOR YOU.  I'M

24  SORRY, JUDGE.  I'M SAYING I WOULD LIKE TO BE ABLE TO GET

25  THROUGH IT PRETTY QUICKLY, SO WE CAN DO IT TODAY.

04:55 1                    THE COURT:  GO AHEAD.

2                    MS. MONTAGNES:  IF I COULD GO TO THE BATHROOM.

3                    THE COURT:  ALL RIGHT.  WE ARE GOING TO TAKE FIVE

4        MINUTES.

5                    MS. MONTAGNES:  I APOLOGIZE.

6                    THE COURT:  NO, DON'T APOLOGIZE.  FIVE MINUTES.

7                    THE LAW CLERK:  ALL RISE.

8                        THE COURT IS IN RECESS.

9                    **(WHEREUPON, THE COURT WAS IN RECESS.)**

10                   THE COURT:  BE SEATED.

11                       OKAY.  WE ARE GOING TO GO UNTIL 5:30.  YOU MAY

12       PROCEED.

13                   MS. MONTAGNES:  YOUR HONOR, JUST A COUPLE OF

14       HOUSEKEEPING MATTERS.  THE FIRST IS THAT I NEGLECTED TO ENTER

15       THE SUPPLEMENTAL REPORT WHEN I ENTERED THE PLAINTIFFS' EXPERT

16       REPORT, WHICH WAS PLAINTIFFS' EXHIBIT 5A AND B.  AND MR. ARCHEY

17       HAS INTIMATED THAT HE HAS AN OBJECTION.

18                   THE COURT:  ANY OBJECTION TO 5A AND B?

19                   MR. ARCHEY:  YES, YOUR HONOR.  JUST THE SAME AS FAR

20       AS HEARSAY AND MAINTAINING MY OBJECTION, SO WITH THAT...

21                   THE COURT:  WELL, THAT'S NOT THE OBJECTION THAT YOU

22       MADE TO THE LAST REPORT, SIR.  I SPECIFICALLY ASKED YOU IF YOU

23       HAD A HEARSAY OBJECTION, AND YOU SAID YOU DIDN'T; YOU HAD AN

24       OBJECTION TO THE ATTACHMENTS.

25                   MR. ARCHEY:  THAT IS CORRECT.  AS TO THAT REPORT,

05:04 1    THAT'S RIGHT.

2              **THE COURT:**  OKAY.  SO YOU'RE OBJECTING TO THE

3    SUPPLEMENTAL REPORT ON THE BASIS OF HEARSAY?

4              **MR. ARCHEY:**  YES.

5              **MS. MONTAGNES:**  YOUR HONOR, THE PARTIES HAD AN

6    AGREEMENT TO ENTER THE EXPERT REPORTS.  THE ONLY THING AT ISSUE

7    WAS THE CHART REVIEWS.

8              **THE COURT:**  ARE YOU GOING TO OFFER YOUR EXPERT

9    REPORTS?

10             **MR. ARCHEY:**  YES, MA'AM.

11             **THE COURT:**  THEN WHAT'S FINE FOR THE GOOSE IS FINE

12   FOR THE GANDER.  WHY ARE YOUR EXPERT REPORTS NOT HEARSAY AND

13   HERS ARE?  I MEAN, THEY'RE HEARSAY.  BUT FOR THE EXPEDIENCE OF

14   THE COURT, IT WOULD SEEM THAT THE REPORTS MIGHT BE USEFUL.

15             **MR. ARCHEY:**  AND I DON'T DISAGREE.  THAT WAS PART OF

16   WHAT I WAS TRYING TO TALK ABOUT.  BUT I DID HAVE OBJECTIONS TO

17   THE 427 PAGES OF ATTACHMENTS AND WHAT-ALL.

18             **THE COURT:**  AND THOSE WERE NOTED, FOR THE RECORD.

19   THE SUPPLEMENTAL REPORTS 5A AND B ARE ADMITTED.

20             **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

21              THE SECOND THING IS, YOUR HONOR, DEFENDANTS HAVE

22   INTIMATED THAT THEY HAVE A NEW MEDICATION ADMINISTRATION

23   RECORD.  AND ON THE BREAK DR. MATHIS INDICATED THAT HE HAS

24   VIEWED THAT NEW ADMINISTRATION RECORD.  WE ASKED IF WE COULD

25   BRING OUR EXPERT UP TOMORROW TO VIEW THE NEW MEDICATION

05:05 1  ADMINISTRATION RECORD THAT THEY PURPORT TO HAVE DEVELOPED.

2  THEY DECLINED.

3  AND WE'RE JUST WONDERING IF YOUR HONOR WOULD BE

4  OPEN TO A VERBAL MOTION TO HAVE MS. LAMARRE GO VIEW THE RECORDS

5  TOMORROW AT ANGOLA.

6  **THE COURT:**  WE WILL DEAL WITH IT IN THE MORNING.  NO.

7  **MS. MONTAGNES:**  OKAY.

8  **THE COURT:**  DO THE REDIRECT.  WE ARE GOING TO LEAVE

9  IT.  WE ARE GOING TO CLOSE COURT AT 5:30.

10  **MS. MONTAGNES:**  OKAY, YOUR HONOR.  I'M GOING TO TRY

11  REALLY HARD TO GET THROUGH IT.

12  **REDIRECT EXAMINATION**

13  BY MS. MONTAGNES:

14  **Q.**  MS. LAMARRE --

15  **THE COURT:**  IF YOU DON'T GET THROUGH, SHE CAN COME

16  BACK IN THE MORNING.

17  **MS. MONTAGNES:**  OKAY.

18  BY MS. MONTAGNES:

19  **Q.**  SO, MS. LAMARRE, AT LUNCHTIME DID YOU AND I GO FOR A WALK

20  TOGETHER?

21  **A.**  YES.

22  **Q.**  AND WHAT DID WE DISCUSS ON THAT WALK?

23  **A.**  MY RETIREMENT.

24  **Q.**  SO WHAT ARE YOUR FUTURE PLANS, MS. LAMARRE?

25  **A.**  I'M NOT TAKING ANY NEW WORK, ALTHOUGH I WOULD CONSIDER IT.

05:06 1  I DIDN'T WANT TO CLOSE OUT ANYTHING ABSOLUTELY.  BUT I DO HAVE
     2  PLANS FOR RETIREMENT IN THE NEXT YEAR OR TWO.
     3  **Q.**   THANK YOU.
     4          ALL RIGHT.  LET'S TALK A LITTLE ABOUT SICK CALL.  ON
     5  CROSS-EXAMINATION MR. ARCHEY INTIMATED THAT -- YOU KNOW, WE
     6  SPOKE ABOUT HOW IMPORTANT SICK CALL IS.  AND SICK CALL IS AN
     7  IMPORTANT POINT OF ACCESS FOR HEALTH CARE?
     8  **A.**   YES.
     9  **Q.**   IS IT THE ONLY POINT OF ACCESS FOR HEALTH CARE?
    10  **A.**   NO.
    11  **Q.**   OKAY.  I WANT TO -- DID YOU HAVE A CHANCE TO REVIEW THE
    12  DEPOSITION OF ROBERT BORDELON IN PREPARATION FOR YOUR --
    13  **A.**   I DID.
    14  **Q.**   AND DO YOU REMEMBER WHAT HE SAID IN HIS DEPOSITION ABOUT
    15  TRIAGE?
    16  **A.**   YES.  HE SAID HE FILLED OUT THE TOP OF THE FORM WHERE IT
    17  SAYS "SCREENED BY HEALTH CARE PERSONNEL."  THAT'S WHAT I
    18  RECALL.
    19  **Q.**   DO YOU RECALL WHEN HE SAID HE FILLED THAT OUT?
    20  **A.**   WHEN HE SAW THE PATIENT.
    21  **Q.**   OKAY.  AND ROBERT BORDELON IS THE PRIMARY NURSE
    22  PRACTITIONER WHO PROVIDES SICK CALL.  IS THAT RIGHT?
    23  **A.**   THAT'S CORRECT.
    24  **Q.**   OKAY.  AND SO IS IT YOUR OPINION THAT YOU WERE AWARE OF
    25  WHEN THAT SO-CALLED TRIAGE LINE IS FILLED OUT?

05:07 1    **A.**    YES.

2    **Q.**    AND YOU'VE OBSERVED IT BEING FILLED OUT BY THE NURSE

3    PRACTITIONER?

4    **A.**    YES.

5    **Q.**    AND WHEN IS IT FILLED OUT?

6    **A.**    AT THE TIME THE PATIENT IS SEEN.

7    **Q.**    OKAY.  AND SO THIS PRE-SICK CALL TRIAGE THING, YOU HAVE A

8    BASIS TO SAY THAT IS NOT WHAT'S HAPPENING?

9    **A.**    CORRECT.

10    **Q.**    OKAY.  THANK YOU.

11             AND THAT WAS -- WHEN WAS YOUR SITE VISIT?

12    **A.**    APRIL 6TH TO THE 8TH.

13    **Q.**    OF THIS YEAR?

14    **A.**    OF THIS YEAR.

15    **Q.**    THANK YOU.

16             LET'S TALK A BIT ABOUT THE NCCHC STANDARDS.  CAN WE

17    PULL UP PX_6354?

18             DO YOU RECOGNIZE THIS DOCUMENT?

19    **A.**    YES.

20    **Q.**    WHAT IS THIS?

21    **A.**    THIS IS THE CURRENT STANDARD, THE 2018 STANDARD, FOR

22    NON-EMERGENCY HEALTH CARE REQUESTS, WHICH IS ESSENTIALLY THE

23    SICK CALL.

24    **Q.**    OKAY.  AND I'M DOING THIS A LITTLE BIT ON THE FLY, SO LET

25    ME TRY AND MAKE SURE I FIND THE RIGHT NUMBER.

05:08 1          LET'S PULL UP NO. 3.  WHAT DOES THAT SAY?

2    **A.**    "HEALTH REQUESTS ARE REVIEWED, PRIORITIZED DAILY BY

3    QUALIFIED HEALTH CARE PROFESSIONALS OR THE HEALTH CARE LIAISON,

4    IF APPLICABLE," WHICH USUALLY MEANS IT'S A FACILITY THAT

5    DOESN'T HAVE A NURSE EVERY DAY.  SO IT HAS TO BE A CUSTODY

6    PERSON.

7    **Q.**    OKAY.  AND THEN WHAT HAPPENS IN NO. 4?

8    **A.**    "A FACE-TO-FACE ENCOUNTER FOR A HEALTH CARE REQUEST IS

9    CONDUCTED BY A QUALIFIED HEALTH CARE PROFESSIONAL OR HEALTH

10   CARE LIAISON WITHIN 24 HOURS OF RECEIPT BY HEALTH CARE STAFF."

11   **Q.**    AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT MEANS?

12   **A.**    THAT MEANS THAT EVERY -- THAT SICK CALL REQUESTS NEED TO

13   BE COLLECTED SEVEN DAYS A WEEK.  THEY NEED TO BE TAKEN, IN THIS

14   CASE, TO THE ATU AND TRIAGED BY A NURSE WHO DOCUMENTS THAT

15   TRIAGE, THE DATE AND TIME OF THE TRIAGE, AND MAKES A

16   DISPOSITION.  AND THEN THE PATIENT IS TO BE SEEN THE FOLLOWING

17   DAY.

18   **Q.**    ALL RIGHT.

19   **A.**    IF IT'S A SYMPTOM.

20   **Q.**    AND DID YOU REVIEW THE DEFENDANTS' SICK CALL POLICY IN

21   PREPARATION OF THIS REPORT?

22   **A.**    I DID.

23   **Q.**    OKAY.  CAN WE PULL UP PX_21?  WELL, LET ME JUST STOP.

24          **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME WE WOULD

25   MOVE TO ADMIT PX_63, WHICH IS THE NCCHC STANDARDS.

05:09 1    **MR. ARCHEY:**  SHE'S IDENTIFIED THEM.  I HAVE NO
       2    OBJECTION, YOUR HONOR.
       3          **THE COURT:**  ADMITTED.
       4    **BY MS. MONTAGNES:**
       5    **Q.**  ALL RIGHT.  NOW, LET'S TURN TO THE SICK CALL POLICY.  THIS
       6    IS PX_21_SSSS.  AND GO TO THE FIRST PAGE, PLEASE.
       7          DID YOU REVIEW THIS DOCUMENT
       8    **A.**  I DID.
       9    **Q.**  AND WHAT IS THE DATE OF THIS DOCUMENT?
      10    **A.**  THIS IS MARCH 3, 2022.
      11    **Q.**  AND WHAT IS YOUR UNDERSTANDING OF WHEN THE SICK CALL
      12    POLICY CHANGED?
      13    **A.**  I UNDERSTOOD IT TO CHANGE NOVEMBER 1, 2021.
      14    **Q.**  OKAY.  SO THIS IS ABOUT FOUR MONTHS AFTER THAT POLICY
      15    CHANGED?
      16    **A.**  THAT'S CORRECT.
      17    **Q.**  AND DID YOU REVIEW THIS DOCUMENT?
      18    **A.**  I DID.
      19    **Q.**  DID YOU SEE ANY REFERENCE TO TRIAGE HAPPENING OF ROUTINE
      20    SICK CALLS?
      21    **A.**  NO.
      22    **Q.**  DID YOU SEE ANY REFERENCE IN THIS DOCUMENT TO AN -- THAT
      23    DOCUMENTS WERE BEING TAKEN TO THE ATU TO BE TRIAGED?
      24    **A.**  THEY'RE TAKEN TO THE ATU, BUT NOT FOR THE PURPOSES OF
      25    TRIAGE.

05:10 1    **Q.**   WHAT IS THE PURPOSE OF THAT?

2    **A.**   GOING TO THE ATU?  SO THEY CAN BE DISTRIBUTED THE NEXT DAY

3    WHEN THE PATIENTS ARE SEEN BY A PROVIDER, IF IT'S A WEEKDAY.

4    **Q.**   OKAY.  AND IF, IN FACT, THERE WAS A TRIAGE SYSTEM

5    HAPPENING, WOULD YOU EXPECT IT TO BE NOTED IN THE POLICY?

6    **A.**   ABSOLUTELY.

7          **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME I WOULD MOVE

8    TO ADMIT PLAINTIFFS' EXHIBIT 21, SUBSECTION SSSS.

9          **THE COURT:**  ANY OBJECTION?

10          **MR. ARCHEY:**  THAT'S THE SICK CALL POLICY YOU JUST

11    ASKED ABOUT?

12          **MS. MONTAGNES:**  YES.

13          **MR. ARCHEY:**  NO OBJECTION, YOUR HONOR.

14          **THE COURT:**  ADMITTED.

15    **BY MS. MONTAGNES:**

16    **Q.**   DOES THIS DOCUMENT ALSO SAY HOW MANY DAYS A WEEK PATIENTS

17    ARE SEEN IN SICK CALL?

18    **A.**   IF YOU COULD JUST -- IT WOULD BE HELPFUL TO BE ABLE TO

19    LOOK AT IT.

20    **Q.**   ALL RIGHT.  TURN TO PAGE 3, PLEASE.

21          SO IF WE COULD JUST HIGHLIGHT 3(A), THAT WOULD BE

22    HELPFUL.

23    **A.**   SO --

24    **Q.**   I'M SORRY.  THIS IS THE WRONG SECTION.  I APOLOGIZE.

25          **MS. MONTAGNES:**  SORRY.  I APOLOGIZE, YOUR HONOR.  ONE

05:12 1  SECOND.  THE COURT'S INDULGENCE?

2              **THE COURT:**  GO AHEAD.

3  **BY MS. MONTAGNES:**

4  **Q.**   OKAY.  SO THIS IS THE SECTION.  I APOLOGIZE.  THIS IS

5  PAGE 3, SUBSECTION 1 AND SUBSECTIONS (F) AND (G).

6              WHAT IS YOUR UNDERSTANDING OF HOW OFTEN PATIENTS HAVE

7  AN OPPORTUNITY TO BE SEEN THROUGH SICK CALL?

8  **A.**   IT SAYS THAT "OFFENDERS WHO SUBMIT A REQUEST FOR MEDICAL

9  TREATMENT WILL BE SEEN BY A HEALTH CARE PROVIDER EITHER IN

10 PERSON OR THROUGH TELEMED, THE NEXT DAY MONDAY THROUGH FRIDAY."

11 **Q.**   AND SO WHAT IS YOUR UNDERSTANDING OF WHAT HAPPENS ON

12 SATURDAY AND SUNDAY?

13 **A.**   THERE IS NO -- PATIENTS ARE NOT SEEN, THEY'RE NOT TRIAGED

14 WITHIN 24 HOURS IF THEY SUBMIT THEIR REQUEST ON FRIDAY OR

15 SATURDAY.

16 **Q.**   OKAY.  AND THEN COULD WE PULL UP SUBSECTION 3(A).

17             AND WHAT DOES THIS DESCRIBE IN TERMS OF WHEN REQUESTS

18 ARE PROCESSED?

19 **A.**   SO THIS REFERS TO PATIENTS THAT ARE ON THE NURSING UNITS.

20 "FOR SECURITY REASONS, MAY INITIATE HEALTH REQUESTS AS FOLLOWS:

21             "ROUTINE REQUESTS (NON-EMERGENCY) WILL BE PROCESSED

22 FIVE DAYS A WEEK, SUNDAY THROUGH THURSDAY, BETWEEN THE HOURS OF

23 1 AND 9 P.M."

24             SO THIS IS REFERRING TO BEING PROCESSED, WHICH MEANS

25 THAT THERE IS NO PROCESSING OF THE HEALTH REQUEST ON FRIDAY AND

05:13 1    SATURDAY.  SO THEY CANNOT -- THEY ARE NOT BEING TRIAGED DAILY,

2    IN ACCORDANCE WITH THE STANDARDS.

3    **Q.**    SO MR. ARCHEY --

4            **MS. MONTAGNES:**  YOU CAN TAKE THAT DOWN.

5    **BY MS. MONTAGNES:**

6    **Q.**    -- DISCUSSED THE WORD *MALINGERING,* AND I BELIEVE HE SAID

7    THAT YOU SAID THE WORD *MALINGERING* APPEARED.  I DON'T KNOW.

8    WAS THAT YOUR TESTIMONY; THAT THE WORD *MALINGERING* APPEARED?

9    CAN YOU SORT OF EXPAND ON THAT?

10   **A.**    YES.  I MEAN, I SAW NOTES BY SEVERAL PROVIDERS, THE

11   PSYCHIATRIST FOR ONE, AND I CAN'T RECALL SPECIFICALLY WHERE

12   ELSE I SAW IT.  BUT IT -- ALSO THE TESTIMONY OF -- FOR EXAMPLE,

13   YOU KNOW, THE CHIEF OF THE EMS SERVICES WHO SAYS THAT PATIENTS

14   ARE MALINGERING.  YOU'VE GOT THE HEALTH CARE LEADERSHIP

15   ESTABLISHING, YOU KNOW, A SORT OF BELIEF, AND THEY'RE THE

16   LEADERS.  AND THAT MESSAGE, YOU KNOW, GOES DOWN TO THE STAFF.

17   IF THE LEADERSHIP -- THE HEALTH CARE LEADERSHIP IS SAYING

18   INMATES ARE MALINGERING AND NOT TO BE BELIEVED, THEN IT FILTERS

19   DOWN TO THE REST OF THE HEALTH CARE STAFF.

20   **Q.**    SO LET'S GO AHEAD AND PULL UP JX_16_102.  SORRY.

21           **MR. ARCHEY:**  THIS SHOULD BE SEALED, I ASSUME?

22           **MS. MONTAGNES:**  YEAH.  I APOLOGIZE.  THIS SHOULD BE

23   SEALED.

24   **BY MS. MONTAGNES:**

25   **Q.**    CAN YOU TELL ME WHAT IT SAYS UNDER "CHIEF COMPLAINTS"?

05:15 1    **A.**    "FOLLOW-UP, HYPERTENSION, DYSTHYMIA," I THINK IS WHAT IT'S
2    SUPPOSED TO SAY, AND "DRUG SEEKING."
3    **Q.**    AND WHAT IS THE COMPLAINT OF DRUG SEEKING?
4    **A.**    WHAT IS A COMPLAINT OF DRUG SEEKING?
5    **Q.**    YES.
6    **A.**    IT IMPLIES THAT THE PATIENT IS ILLICITLY DRUG SEEKING.
7    AND IT'S NOT ORDINARILY SOMETHING THAT I SEE LISTED AS A
8    PROBLEM; THAT SOMEONE IS DRUG SEEKING.
9    **Q.**    AND DOES THAT IMPLY THAT THE PATIENT IS LYING IN ORDER TO
10    GET DRUGS?
11    **A.**    WELL, IT CAN BE.  IT IMPLIES THAT THERE'S NO LEGITIMATE
12    MEDICAL REASON FOR THE PATIENT TO RECEIVE -- YOU KNOW, IT
13    DOESN'T SAY WHAT TYPE OF DRUGS, BUT I ASSUME IT'S PAIN
14    MEDICATION.
15    **Q.**    AND IS THIS PART DRAWN UP BEFORE THE PROVIDER SEES THE
16    PATIENT?
17    **A.**    YES.
18    **Q.**    THIS ATTACHED PART?
19    **A.**    YES.
20    **Q.**    SO GOING INTO THE ENCOUNTER, THERE'S AN ASSUMPTION THAT
21    THE PATIENT IS DRUG SEEKING?
22    **A.**    IN THIS CASE IT SORT OF IMPLIES THAT, YES.
23    **Q.**    OKAY.  AND, YOU KNOW, THEY NOTE HERE ABOUT THE PATIENT AND
24    THE MISCOMMUNICATION WITH THE HOSPITAL ABOUT KOP, AND
25    MR. ARCHEY NOTED THAT IN ANOTHER NOTE.  IS IT YOUR

05:17 1  UNDERSTANDING THAT THAT HAPPENED MORE THAN ONCE, OR JUST THAT

2  IT WAS NOTED MORE THAN ONCE?

3  **A.**   THAT WHAT WAS NOTED MORE THAN ONCE?

4  **Q.**   THAT THE PATIENT TOLD THE EMERGENCY ROOM THAT HE WAS

5  MISSING PILL CALL, BUT, IN FACT, HE WAS KOP.  DID THAT EVENT

6  HAPPEN MORE THAN ONCE, OR WAS IT NOTED SEVERAL TIMES?

7  **A.**   IT WAS JUST NOTED SEVERAL TIMES, IS MY UNDERSTANDING,

8  'CAUSE HE JUST MADE ONE VISIT TO THE HOSPITAL, AND THAT'S WHERE

9  HE SHARED THE INFORMATION.

10  **Q.**   OKAY.  AND THEN MR. ARCHEY INDICATED THAT HE -- LET'S GO

11  TO JX_16_101 -- 102.  I APOLOGIZE.

12         AND MR. ARCHEY NOTED THAT HE WAS TAKEN OFF OF KOP

13  AFTER HE WAS RETURNED FROM THIS TRIP.  IS THAT RIGHT?

14  **A.**   I BELIEVE THAT'S CORRECT.

15  **Q.**   OKAY.  AND NOW LET'S TURN TO JX_84 -- JX_16_84.  I

16  APOLOGIZE.

17         AND WHEN WE TALKED ABOUT THIS PATIENT IN PARTICULAR,

18  MR. ARCHEY SUGGESTED THAT THEY WOULD BE ABLE TO TELL THAT HE

19  WAS NON-COMPLIANT BECAUSE THEY WOULD BE ABLE TO SEE WHEN HE

20  LAST ORDERED HIS DRUGS.  IS THAT RIGHT?  HIS MEDICATION.

21  **A.**   YES.

22  **Q.**   BUT THAT WOULD ONLY BE TRUE IF HE WAS RECEIVING KOP DRUGS.

23  CORRECT?

24  **A.**   NO.  I DON'T BELIEVE.  LET'S BE CLEAR ABOUT WHAT THAT

25  STATEMENT REPRESENTED.  SO THEY CAN LOOK AT THE PHARMACY

05:18 1   PRINTOUT AND SEE WHEN THE LAST TIME THE PRESCRIPTION WAS
2   FILLED.  THE MARS, YOU CANNOT TELL WHEN THE PATIENT ACTUALLY
3   RECEIVED THE MEDICATION BECAUSE THE STAFF -- THERE DOESN'T --
4   THE STAFF IS NOT DOCUMENTING THE DAY THEY GAVE THE KOP
5   MEDICATION TO THE PATIENT.
6   Q.   RIGHT.  AND AS OF THIS VISIT, THE -- MISTER -- PATIENT 16
7   WAS NO LONGER ON KOP BECAUSE HE HAD BEEN TAKEN OFF OF KOP BY
8   THIS TIME?
9   A.   I BELIEVE SO.  BUT I DON'T RECALL THE EXACT DATE OF THAT
10  PREVIOUS ENCOUNTER, SO...
11  Q.   SORRY.  SO THIS ENCOUNTER HAPPENS AFTER HE WAS REMOVED
12  FROM KOP?
13  A.   YES.
14  Q.   AND WHEN YOU WERE GOING OVER THIS FORM AND YOU NOTED THAT
15  THE PATIENT SAID HE WAS COMPLIANT AND THE PROVIDER SAID HE
16  WASN'T, AND MR. ARCHEY INTIMATED THAT THEY WOULD BE ABLE TO
17  TELL THAT HE WAS NON-COMPLIANT BASED ON THE PREVIOUS ORDER, BUT
18  SINCE HE'S NO LONGER ON KOP, HE'S NOT RESPONSIBLE FOR MAKING
19  SURE THAT THE PHARMACY --
20  A.   THAT'S CORRECT.  THAT'S CORRECT.  SO ASSUMING THAT THE
21  PRESCRIPTION WAS FILLED AND HE'S NOW GOING TO THE PILL CALL
22  WINDOW TO GET HIS MEDICATION, THAT PARTICULAR POINT WOULD NOT
23  BE RELEVANT IN HIS CASE.
24  Q.   OKAY.
25  A.   THE PROVIDER, I.E. -- THE MEDICATION ADMINISTRATION RECORD

1    SHOULD BE IN THE -- IN THE RECORD OR THEY SHOULD BE ABLE TO

2    ACCESS IT, WHICH WE'RE NOT SURE THAT THEY CAN.

3    **Q.**    OKAY.  AND, YOU KNOW, MR. ARCHEY SHOWED YOU SEVERAL

4    ENCOUNTERS WITH THIS PATIENT WHERE HIS BLOOD PRESSURE DID

5    BECOME CONTROLLED.

6    **A.**    IMPROVED.

7    **Q.**    IMPROVED.  I APOLOGIZE.

8         LET'S GO UP AND PULL UP JX_16_64.

9         THIS IS IN JUNE OF 2020.  WHERE WAS HIS BLOOD

10   PRESSURE THEN?

11   **A.**    173/115 AND 173/110.

12   **Q.**    OKAY.  AND WOULD YOU CALL THAT BLOOD PRESSURE CONTROLLED?

13   **A.**    OH, NOT AT ALL.

14   **Q.**    AND THIS IS AFTER AN INCIDENT WHERE HE CUT HIS HAND.  IS

15   THAT RIGHT?

16   **A.**    CORRECT.  SO HE WASN'T BEING -- HIS COMPLAINT -- OR HIS

17   BEING SEEN WASN'T RELATED TO HIS BLOOD PRESSURE.  IT WAS

18   RELATED TO A SLIP-AND-FALL.

19   **Q.**    AND IS THERE ANY INDICATION IN THIS ENCOUNTER OF ILLICIT

20   DRUG USE?

21   **A.**    NO.

22   **Q.**    OKAY.  MR. ARCHEY NOTED THAT YOU DID NOT DISCUSS ILLICIT

23   DRUG USE IN ANY OF YOUR FINDINGS.  CAN YOU TELL ME WHY YOU

24   DIDN'T DISCUSS THAT?

25   **A.**    I DIDN'T SEE ANY CASES THAT -- WHERE THERE WAS AN OVERDOSE

05:21 1   OR ANY DISCUSSION OF DRUG USE, SO I'M NOT SURE WHAT THERE WAS

2   TO DISCUSS.

3   **Q.**   BUT PATIENTS USE DRUGS IN PRISONS.  RIGHT?

4   **A.**   YES, THEY DO.

5   **Q.**   THAT'S A REAL PROBLEM?

6   **A.**   OH, IT'S A PROBLEM IN -- ACROSS THE COUNTRY.  YOU KNOW,

7   DRUGS ARE A PROBLEM.

8   **Q.**   AND THEY ARE A PARTICULAR PROBLEM INSIDE OF FACILITIES?

9   **A.**   OH, ABSOLUTELY.

10   **Q.**   AND HOW DOES THE FACT THAT PATIENTS MAY USE DRUGS AFFECT

11   WHAT IS REQUIRED OF MEDICAL PROVIDERS?

12   **A.**   WELL, IF A PATIENT, FOR EXAMPLE, IS UNRESPONSIVE, IT'S

13   APPROPRIATE TO USE NARCAN TO, YOU KNOW, SEE IF THE PATIENT HAS

14   USED, YOU KNOW, SOME KIND OF OPIOID OR MORPHINE, AND THAT THEY

15   RESPOND TO IT.  SO THAT'S A CLINICAL SITUATION WHERE IT WOULD

16   BE APPROPRIATE.

17           ONE OF THE CONCERNS IS THAT WHEN PATIENTS PRESENT

18   WITH ALTERED MENTAL STATUS -- AND DR. VASSALLO WILL TALK ABOUT

19   THIS MORE -- THEY CAN -- THEY IMPLEMENT AN ALTERED MENTAL

20   STATUS PROTOCOL WHERE IF THE PATIENT GETS BETTER AND THEY

21   SUSPECT DRUG USE AND THEY TEST THE PATIENT -- BUT THEN THAT'S

22   THE ONLY CLINICAL -- THAT'S THE ONLY EVALUATION THE PATIENT

23   GETS.  AND I'M NOT SURE IF THAT ANSWERS YOUR QUESTION.

24   **Q.**   LET ME PUT IT TO YOU ANOTHER WAY.  ASSUMING PATIENT 16

25   USED DRUGS ON 6/30 AND 3/17, DOES THAT CHANGE YOUR OPINION

05:23 1  ABOUT WHETHER OR NOT HE RECEIVED ADEQUATE CARE?

2  **A.**   ABSOLUTELY NOT.

3  **Q.**   AND WHY NOT?

4  **A.**   IT'S IRRELEVANT.  IT'S IRRELEVANT.

5  **Q.**   ALL RIGHT.  LET'S TALK A LITTLE BIT ABOUT TELEHEALTH.

6  YOU, YOU KNOW, MENTIONED -- YOU MENTIONED THAT TELEHEALTH HAS A

7  PLACE.  CAN YOU TALK A LITTLE BIT ABOUT WHAT PLACE YOU THINK

8  TELEHEALTH HAS IN MEDICAL DELIVERY?

9  **A.**   WELL, AS WE DISCUSSED, TELEMEDICINE CAN BE AN ADJUNCT FOR

10  PROVIDING ACCESS TO CARE, FOR EXAMPLE, FOR SPECIALISTS WHO ARE

11  HOURS AWAY, AND IT'S A WAY TO PROVIDE ACCESS TO THE PATIENT.

12          AND FOR AN INSTITUTION LIKE LSP, IF THERE WAS ANY

13  REASON FOR LOCKDOWNS OR COVID OR EVEN REMOTE CAMPS TO USE

14  TELEMEDICINE TO PROVIDE ACCESS, THERE IS A PLACE FOR THAT,

15  PROVIDED THAT TELEMEDICINE EQUIPMENT IS ADEQUATELY -- HAS

16  ADEQUATE SUPPLIES TO ALLOW THE PRACTITIONER TO PERFORM

17  APPROPRIATE MEDICAL EVALUATIONS.

18          IN THE ABSENCE OF THAT IT'S -- IT -- WHEN YOU

19  CAN'T -- THE OUTCOME HAS TO BE ADEQUATE MEDICAL EVALUATIONS.

20  AND IF YOU CAN'T DO THAT, THEN YOU SHOULD SEE THE PATIENT IN

21  PERSON.

22  **Q.**   MR. ARCHEY ASKED YOU SOME QUESTIONS ABOUT THE ORTHOPEDIC

23  APPOINTMENTS THAT FOLLOWED UP FOR PATIENT 49.

24          WAS THAT A PATIENT THAT YOU REVIEWED THE RECORD FOR?

25  **A.**   PATIENT 49?  NO.

05:25 1          **MS. MONTAGNES:**  YOUR HONOR, BEFORE I GET INTO A WHOLE

2  OTHER PATIENT, I THINK MAYBE IT WOULD BE BEST TO TAKE A BREAK

3  HERE, IF THAT'S OKAY?

4          **THE COURT:**  OKAY.  WE WILL BE IN RECESS UNTIL

5  9:00 A.M.

6          **THE LAW CLERK:**  ALL RISE.

7          THE COURT IS AT RECESS.

8       **(WHEREUPON, THIS MATTER WAS RECESSED UNTIL 06/08/2022 AT**

9              **9:00 A.M.)**

10               * * *

11

12             **CERTIFICATE**

13     I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

14  UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

15  CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

16  THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

17  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19             *Shannon Thompson*

20             SHANNON THOMPSON, CCR

21             OFFICIAL COURT REPORTER

22

23

24

25