1        UNITED STATES DISTRICT COURT

2         MIDDLE DISTRICT OF LOUISIANA

3

4   JOSEPH LEWIS JR., ET AL     *    CIVIL ACTION

5   VERSUS                     *    NO. 15-318-SDD

6   BURL CAIN, ET AL           *    JUNE 8, 2022

7   * * * * * * * * * * * * * *

8

9                      DAY 3
                    BENCH TRIAL
10       BEFORE THE HONORABLE SHELLY D. DICK
         UNITED STATES CHIEF DISTRICT JUDGE
11

12  APPEARANCES:

13  FOR THE PLAINTIFFS:      THE PROMISE OF JUSTICE INITIATIVE
                            BY:  MERCEDES MONTAGNES, ESQ.
14                               NISHI KUMAR, ESQ.
                                 REBECCA RAMASWAMY, ESQ.
15                               ELENA MALIK, ESQ.
                                 SAMANTHA BOSALAVAGE, ESQ.
16                          1024 ELYSIAN FIELDS AVENUE
                            NEW ORLEANS, LOUISIANA 70117
17
                            COHEN MILSTEIN SELLERS & TOLL,
18                          PLLC
                            BY:  JEFFREY B. DUBNER, ESQ.
19                               BRENDAN R. SCHNEIDERMAN, ESQ.
                            1100 NEW YORK AVE N.W., SUITE 500
20                          WASHINGTON, D.C. 20005

21                          SOUTHERN POVERTY LAW CENTER
                            BY:  BRUCE HAMILTON, ESQ.
22                               EMILY LUBIN, ESQ.
                            201 ST. CHARLES AVE., SUITE 2000
23                          NEW ORLEANS, LOUISIANA 70170

24

25

```
 1   FOR THE DEFENDANTS:        BUTLER SNOW, LLP
                                BY:  RANDAL J. ROBERT, ESQ.
 2                                   CONNELL L. ARCHEY, ESQ.
                                     ALLENA W. MCCAIN, ESQ.
 3                              445 NORTH BOULEVARD, SUITE 300
                                BATON ROUGE, LOUISIANA 70802
 4
                                SHOWS, CALI & WALSH, LLP
 5                              BY:  JEFFREY K. CODY, ESQ.
                                     CAROLINE M. TOMENY, ESQ.
 6                                   JOHN C. CONINE, JR., ESQ.
                                628 ST. LOUIS STREET
 7                              BATON ROUGE, LOUISIANA 70802

 8
     OFFICIAL COURT REPORTER:   SHANNON L. THOMPSON, CCR
 9                              UNITED STATES COURTHOUSE
                                777 FLORIDA STREET
10                              BATON ROUGE, LOUISIANA 70801
                                (225) 389-3567
11
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
12              COMPUTER-AIDED TRANSCRIPTION SOFTWARE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         INDEX

2                                              PAGE

3  PLAINTIFFS' WITNESSES:

4  MADELEINE LAMARRE, MN, FNP-BC (CONTINUED)

5     REDIRECT EXAMINATION BY MS. MONTAGNES        5

6  SUSI VASSALLO, M.D., M.S.

7     VOIR DIRE BY MR. DUBNER                     10

8     VOIR DIRE BY MR. ARCHEY                     11

9     DIRECT EXAMINATION BY MR. DUBNER            14

10     CROSS-EXAMINATION BY MR. ARCHEY            116

11     REDIRECT EXAMINATION BY MR. DUBNER         198

12  JEAN PAUL CREPPEL

13     DIRECT EXAMINATION BY MS. MALIK            227

14     CROSS-EXAMINATION BY MS. MCCAIN            244

15     REDIRECT EXAMINATION BY MS. MALIK          259

16

17

18

19

20

21

22

23

24

25

**(JUNE 8, 2022)**

**(CALL TO THE ORDER OF THE COURT)**

**THE COURT:** GOOD MORNING.

BE SEATED.

OKAY. WE ARE BACK ON THE RECORD.

YOU INDICATED, MR. ARCHEY, THAT YOU WANT YOUR
EXPERT TO SIT IN THE JURY BOX SO THAT HE CAN SEE THE SEALED
DOCUMENTS. THAT'S PERMISSIBLE.

YOU MAY SIT IN THE JURY BOX, SIR, UNLESS YOU
WANT TO SIT THERE CROWDED ON THAT TABLE. YOU ARE PROBABLY
BETTER OFF IF YOU SIT IN THE JURY BOX.

**MR. ARCHEY:** WE WILL MOVE HIM AT THE BREAK, IF THAT'S
ACCEPTABLE?

**THE COURT:** THAT'S FINE.

ALL RIGHT. YOUR WITNESS CAN RETURN TO THE
STAND. NURSE LAMARRE CAN RETURN TO THE STAND.

BUT BEFORE WE GET STARTED, LET ME JUST GIVE YOU
SOME RULES OF ENGAGEMENT. THE COURT'S NOT GOING TO COUNTENANCE
ANY MORE COLLOQUY BETWEEN COUNSEL. IF YOU HAVE AN OBJECTION,
MAKE IT. SAY THE WORD "OBJECTION," STAND UP AND MAKE YOUR
STATEMENT UNDER THE RULES OF EVIDENCE. DO NOT ADDRESS EACH
OTHER. ADDRESS THE COURT.

ARE WE VERY CLEAR ON THAT? NO MORE.

**MR. ARCHEY:** YES, MA'AM.

**MS. MONTAGNES:** YES, YOUR HONOR.

09:04 1      **THE COURT:**  LET'S MOVE.

2           **MS. MONTAGNES:**  MS. LAMARRE, YOU CAN RETURN TO THE

3      STAND.

4                JUDGE, WOULD YOU LIKE TO PUT THE TIME THAT WE

5      HAVE AGREED UPON?

6           **THE COURT:**  YES, LET'S HEAR THE TIME.

7           **MS. MONTAGNES:**  OKAY.  SO YESTERDAY THE PLAINTIFFS

8      SPENT THREE HOURS AND 29 MINUTES.

9                APOLOGIES.  I HAVEN'T MADE MY APPEARANCE.

10               MERCEDES MONTAGNES ON BEHALF OF THE PLAINTIFFS.

11               THE TOTAL TIME FOR PLAINTIFFS THUS FAR IS FIVE

12     HOURS AND 41 MINUTES.  YESTERDAY THE DEFENDANTS SPENT TWO HOURS

13     AND 29 MINUTES.  AND THE TOTAL TIME FOR DEFENDANTS IS THREE

14     HOURS AND 35 MINUTES.  AND THAT'S BEEN AGREED ON BY THE

15     PARTIES.

16          **THE COURT:**  Y'ALL AGREE WITH THAT?  I SEE HEAD NODS.

17               OKAY.  YOU MAY PROCEED.

18               MS. LAMARRE, YOU ARE STILL UNDER OATH.  I KNOW

19     YOU KNOW THAT.

20          **THE WITNESS:**  YES, YOUR HONOR.

21          **THE COURT:**  GO AHEAD.

22               **REDIRECT EXAMINATION (CONTINUED)**

23     BY MS. MONTAGNES:

24     **Q.**   GOOD MORNING, MS. LAMARRE.

25               ON YOUR CROSS-EXAMINATION BY COUNSEL, YOU SPOKE ABOUT

09:05 1  SOME OF THE ENCOUNTERS THAT YOU HAD VIEWED ON THE MOST RECENT

2  SICK CALLS, MEANING FROM NOVEMBER 1ST FORWARD.  ABOUT HOW MANY

3  ENCOUNTERS BETWEEN YOUR RECORD REVIEW AND YOUR SITE VISIT DID

4  YOU SEE?

5  A.   FOURTEEN.

6  Q.   OKAY.  AND HOW MANY OF THOSE ARE CITED IN THE REPORT?

7  A.   FOURTEEN ARE CITED IN THE REPORT.  WELL, 11 ARE CITED IN

8  THE REPORT AND THREE ARE OBSERVATIONS.

9  Q.   OKAY.  AND DID ALL OF THOSE FORM THE BASIS OF YOUR OPINION

10  IN THIS MATTER?

11  A.   YES.

12  Q.   AND ARE THEY ALL EITHER NOTED IN THE RECORDS OR IN YOUR

13  SITE VISIT NOTES?

14  A.   YES.

15  Q.   OKAY.  AND COUNSEL SUGGESTED THAT -- AND I THINK YOU

16  AGREED -- THAT YOU HAD AMENDED YOUR OPINION OF ONE OF THOSE AND

17  THAT WAS PATIENT NO. 54.  IS THAT RIGHT?

18  A.   THAT'S CORRECT.

19  Q.   DID YOU AMEND YOUR OPINION AS TO THE SUFFICIENCIES OF THE

20  ENCOUNTER AS TO ANY OTHER PATIENTS?

21  A.   I DID NOT.

22  Q.   OKAY.  SO BASED ON YOUR REVIEW OF THOSE 14 ENCOUNTERS,

23  WERE YOU ABLE TO FORM AN OPINION ABOUT THE ADEQUACY OF THE NEW

24  SICK CALL PROCEDURE?

25  A.   I HAVE.

09:06 1    **Q.**   AND WHAT IS THAT OPINION?

2    **A.**   THE NEW SICK CALL PROCEDURE DOES NOT RESULT IN TIMELY

3    ACCESS AND ADEQUATE MEDICAL EVALUATIONS.

4    **Q.**   AND DID ANYTHING THAT CAME OUT DURING CROSS-EXAMINATION

5    CHANGE YOUR OPINION?

6    **A.**   NO.

7    **Q.**   WAS ANY OF IT NEW INFORMATION TO YOU?

8    **A.**   NO.

9    **Q.**   OKAY.  WE SPOKE A BIT -- COUNSEL SPOKE A BIT ABOUT THE

10   WORD "OPTIMAL" BEING USED IN YOUR REPORT.  DO YOU KNOW HOW MANY

11   TIMES IT'S USED IN YOUR REPORT?

12   **A.**   YES.  TWICE.

13   **Q.**   OKAY.  AND IS THAT WHAT YOU WERE REVIEWING?  WERE YOU

14   REVIEWING FOR OPTIMAL CARE AT LSP?

15   **A.**   NO, I WAS NOT.

16   **Q.**   OKAY.  WHAT WERE YOU LOOKING FOR WHEN YOU WERE EVALUATING

17   THE CARE?

18   **A.**   WE WERE EVALUATING -- AND I WAS EVALUATING -- WHETHER

19   PATIENTS WITH SERIOUS MEDICAL NEEDS RECEIVED ADEQUATE MEDICAL

20   CARE THAT PLACED THEM -- INADEQUATE MEDICAL CARE -- THAT PLACED

21   THEM AT SERIOUS RISK OF HARM, INCLUDING HOSPITALIZATIONS AND

22   DEATH.

23   **Q.**   ALL RIGHT.

24        **MS. MONTAGNES:**  I'M GOING TO ASK THAT WE PULL UP --

25   AND THIS IS GOING TO BE SEALED, SUZIE -- JX_1358.

09:07 1          I SHOULD REFER TO YOU AS MS. EDWARDS ON THE

2    RECORD.  I APOLOGIZE.

3    **BY MS. MONTAGNES:**

4    **Q.**    THIS DOCUMENT WAS SHOWN TO YOU ON CROSS-EXAMINATION.  IS

5    THAT RIGHT?

6    **A.**    THAT'S CORRECT.

7    **Q.**    AND WHAT IS THIS?

8    **A.**    THIS IS A MEDICATION ADMINISTRATION RECORD.

9    **Q.**    OKAY.  AND ON CROSS-EXAMINATION IT WAS SUGGESTED THAT YOU

10   SHOULD HAVE KNOWN THAT THIS WAS DONE IN THE INFIRMARY BECAUSE

11   THE INFIRMARY NURSES WERE THE ONES WHO SIGNED IT.  IS THAT

12   RIGHT?

13   **A.**    THAT'S CORRECT.

14   **Q.**    OKAY.  THE SIGNATURES, I BELIEVE, ARE ON THIS BOTTOM RIGHT

15   CORNER.  CAN WE PULL THAT OUT?

16          ARE YOU ABLE TO IDENTIFY MOST OF THESE NAMES, BASED

17   ON THE SIGNATURES?

18   **A.**    NO.  AND I'M NOT ABLE TO IDENTIFY THE CREDENTIALS, WHICH

19   IS THE KEY THING, WHICH IS THAT IF THE PATIENT WAS IN THE

20   INFIRMARY, YOU WOULD EXPECT TO SEE THE NURSES' CREDENTIALS,

21   WHICH I DON'T SEE.

22   **Q.**    OKAY.  THANK YOU.

23          NOW, COUNSEL SUGGESTED SOME CHANGES, YOU KNOW, TO THE

24   ELECTRONIC MEDICAL ADMINISTRATION RECORD; YOU KNOW, TECHNOLOGY

25   UPGRADES AND THE LIKES.  HE ALSO SUGGESTED SOME TWEAKS WITH

09:08 1  TRIAGE.  EVEN IF ALL THOSE WERE TRUE, DO YOU THINK THAT THAT
2  WOULD RESULT IN ADEQUATE MEDICAL CARE AT ANGOLA?
3  **A.**   NO.  THE IMPROVEMENTS THAT THEY'VE -- THE MODEST
4  IMPROVEMENTS THAT THEY'VE MADE HAVE NOT IMPACTED THE MEDICAL
5  QUALITY OF CARE BEING PROVIDED.
6  **Q.**   AND WHY IS THAT?
7  **A.**   WELL, THEY'RE IMPORTANT IMPROVEMENTS, BUT THEY DON'T --
8  THEY'RE REALLY, AS YOU SAY, TWEAKING THE SYSTEM WHEN LSP REALLY
9  NEEDS SORT OF A FUNDAMENTAL OVERHAUL OF MANY OF THEIR SYSTEMS,
10  THEIR POLICIES, THEIR PRACTICES.  AND, AGAIN, THE QUALITY OF
11  THE MEDICAL EVALUATIONS ARE COMPLETELY INADEQUATE.
12  **Q.**   AND, AGAIN, JUST TO PUT A FINE POINT ON IT, THAT'S TO
13  RESULT IN WHAT KIND OF CARE?  OPTIMAL CARE OR ADEQUATE CARE?
14  **A.**   WELL, LSP NEEDS TO PROVIDE ADEQUATE CARE FOR PATIENTS WITH
15  SERIOUS MEDICAL CONDITIONS, AND THAT'S NOT HAPPENING.
16  **Q.**   THANK YOU.
17       **MS. MONTAGNES:**  NO FURTHER QUESTIONS.  WE DO RESERVE
18  THE RIGHT TO RE-CALL MS. LAMARRE.
19       **THE COURT:**  THANK YOU.  YOU MAY STEP DOWN.
20       NEXT WITNESS.
21       **THE WITNESS:**  THANK YOU.
22       **THE DEPUTY CLERK:**  WHO IS THE NEXT WITNESS?
23       **MR. DUBNER:**  GOOD MORNING, YOUR HONOR.
24       JEFFREY DUBNER FOR THE PLAINTIFFS.
25       THE NEXT WITNESS IS GOING TO BE

09:09 1    DR. SUSI VASSALLO.

2           AND, MS. EDWARDS, MOST OF THESE EXHIBITS ARE

3    GOING TO BE SEALED.  AT A CERTAIN POINT WE'LL SWITCH TO THE

4    ONES THAT DON'T NEED TO BE SEALED.  I'LL LET YOU KNOW WHEN THAT

5    HAPPENS.

6         **THE COURT:**  IS THERE NOT ROOM UP THERE?

7         GO AHEAD.

8           **SUSI VASSALLO, M.D., M.S.,**

9    **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

10        **THE DEPUTY CLERK:**  WOULD YOU PLEASE STATE YOUR NAME

11    AND SPELL IT, FOR THE RECORD?

12        **THE WITNESS:**  SUSI VASSALLO.  SUSI IS SPELLED

13    S-U-S-I.  VASSALLO IS V- LIKE VICTOR -A-S-S-A-L-L-O.

14        **THE COURT:**  YOU MAY PROCEED.

15             **VOIR DIRE**

16    **BY MR. DUBNER:**

17    **Q.**  GOOD MORNING, DR. VASSALLO.

18        IN THE LIABILITY TRIAL YOU TESTIFIED THAT YOU

19    PRACTICED EMERGENCY MEDICINE FULL-TIME.  IS THAT STILL THE

20    CASE?

21    **A.**  YES.

22    **Q.**  HAVE YOU BEEN PRACTICING EMERGENCY MEDICINE IN HOSPITALS

23    THROUGHOUT THE COVID PANDEMIC?

24    **A.**  YES.

25    **Q.**  HAVE YOU TREATED INCARCERATED PATIENTS DURING THE COVID

09:11 1    PANDEMIC?

2    **A.**    YES.

3    **Q.**    ARE YOU STILL LICENSED TO PRACTICE IN TEXAS AND NEW YORK?

4    **A.**    YES, I AM.

5    **Q.**    ARE YOU STILL BOARD CERTIFIED IN EMERGENCY MEDICINE AND

6    MEDICAL TOXICOLOGY?

7    **A.**    YES.

8    **Q.**    AND ARE YOU STILL CERTIFIED AS A CORRECTIONAL PROFESSIONAL

9    BY THE NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE?

10   **A.**    YES, I AM.

11              **MR. DUBNER:**  YOUR HONOR, WE'RE HAPPY TO DO A MORE

12   EXTENSIVE VOIR DIRE ON DR. VASSALLO IF THE COURT BELIEVES IT

13   WOULD BE HELPFUL, BUT GIVEN THAT THE COURT HAS ALREADY ACCEPTED

14   HER AS AN EXPERT IN THE FIELDS OF EMERGENCY MEDICINE, MEDICAL

15   TOXICOLOGY AND CORRECTIONAL MEDICINE, WE'RE HAPPY TO KEEP IT

16   ABBREVIATED AND JUST TENDER HER IN THE SAME FIELDS.

17              **THE COURT:**  ANY CROSS ON THE TENDER?

18              **MR. ARCHEY:**  VERY SHORT, YOUR HONOR.

19              **THE COURT:**  OKAY.

20                          **VOIR DIRE**

21   **BY MR. ARCHEY:**

22   **Q.**    GOOD MORNING, DR. VASSALLO.

23              HOW ARE YOU TODAY?

24   **A.**    GOOD MORNING, MR. ARCHEY.

25   **Q.**    DR. VASSALLO, ALL OF YOUR EXPERIENCE IN THE MEDICAL FIELD

09:11 1   IS IN THE EMERGENCY FIELD.  IS THAT FAIR?

2   **A.**   EMERGENCY MEDICINE AND MEDICAL TOXICOLOGY, YES.

3   **Q.**   YES, MA'AM.

4           YOU'VE NEVER PRACTICED IN PRIMARY CARE AT ANY POINT

5   IN YOUR CAREER.  FAIR?

6   **A.**   WELL, EMERGENCY MEDICINE IS PRIMARY CARE TODAY.

7   **Q.**   YOU'VE NEVER PRACTICED AS A FAMILY CARE PHYSICIAN?

8   **A.**   I'M NOT A FAMILY CARE PHYSICIAN.

9   **Q.**   OKAY.

10  **A.**   BUT FAMILIES -- THAT KIND OF PROBLEM PRESENTS TO THE

11  EMERGENCY DEPARTMENT, VERY COMMONLY THERE'S NO MEDICAL CARE.

12  **Q.**   THE WORD "PRIMARY" IS NOWHERE IN YOUR C.V., IS IT?  IT

13  DOESN'T APPEAR?

14  **A.**   NO, IT DOES NOT APPEAR IN MY C.V.

15  **Q.**   NOW, YOUR CERTIFICATION IS AS A CORRECTIONAL HEALTH

16  PROFESSIONAL.  CORRECT?  YOU HAVE A CERTIFICATION FOR THAT.

17  RIGHT?

18  **A.**   YES, SIR.

19  **Q.**   ALL RIGHT.  WHAT DID YOU DO TO GET THAT CERTIFICATION?

20  **A.**   WHAT EVERYBODY DOES WHO GETS A CCHP:  YOU STUDY, YOU TAKE

21  A TEST AND THEN YOU PASS THE TEST.  AND THEN YOU PAY FEES EVERY

22  YEAR AND YOU DO A CERTAIN AMOUNT OF THIS KIND OF WORK IN ORDER

23  TO KEEP THAT CERTIFICATION.  THERE IS NO FURTHER TESTING AFTER

24  THAT.

25  **Q.**   THERE IS ANOTHER CERTIFICATION FOR A CCHP PHYSICIAN WITH A

09:13 1    "P" AFTER IT.  RIGHT?

2    **A.**    YES, THERE IS.

3    **Q.**    AND THAT REQUIRES THREE YEARS OF PRACTICE IN THE FIELD.

4    RIGHT?

5    **A.**    I DON'T KNOW WHAT IT REQUIRES.

6    **Q.**    OKAY.

7    **A.**    I HAVEN'T PURSUED IT.  I HAVEN'T LOOKED INTO IT.

8    **Q.**    BECAUSE YOU'VE NEVER PRACTICED IN A PRISON, HAVE YOU?

9    **A.**    NO, I HAVEN'T.

10   **Q.**    AND YOUR OPINIONS IN THIS CASE ARE LIMITED TO EMERGENCY

11   CARE.  CORRECT?

12   **A.**    WELL, MY OPINIONS ARE REGARDING EMERGENCY CARE AND THE

13   PATIENTS, YES.  I MEAN, I AM THE PERSON WHO IS GOING TO SPEAK

14   TO THE ATU EMERGENCY CARE AND ALL OF THE THINGS THAT RELATE TO

15   THAT, YES.

16   **Q.**    ALL RIGHT.

17             **MR. ARCHEY:**  YOUR HONOR, WE HAVE NO OBJECTION AS TO

18   THE TENDER FOR EMERGENCY CARE OR MEDICAL TOXICOLOGY.  WE DO

19   STILL OBJECT TO THE CORRECTIONAL EXPERTISE -- HOWEVER THAT WAS

20   STATED -- FOR LACK OF THE -- SHE'S NOT WORKED IN THE FIELD.

21   SHE'S NOT BEEN IN A PRISON.  SHE'S NOT WORKED THERE.  SHE

22   CERTAINLY IS QUALIFIED, HIGHLY QUALIFIED AS AN EMERGENCY

23   PHYSICIAN, NO QUESTION.  HER MEDICAL TOXICOLOGY WE DON'T

24   DISPUTE.

25             WHAT WE DO DISPUTE IS THE CORRECTIONAL

09:14 1  EXPERTISE, BECAUSE SHE DOESN'T HAVE IT.

2           THE COURT:  MR. DUBNER, THE TENDER IS EMERGENCY

3  PHYSICIAN, TOXICOLOGY AND CORRECTIONAL MEDICINE?

4           DID I WRITE THAT DOWN RIGHT?

5           MR. DUBNER:  THAT'S RIGHT.  AND I'M HAPPY TO ELICIT

6  MORE ON CORRECTIONAL MEDICINE IF YOUR HONOR THINKS IT WOULD BE

7  HELPFUL.

8           THE COURT:  I'VE LOOKED AT HER C.V.; I'VE HEARD HER

9  TESTIMONY BEFORE.  SHE'S TREATED COUNTLESS PATIENTS FROM

10  RIKERS.  THE COURT CONSIDERS AND WILL ACCEPT DR. VASSALLO AS AN

11  EXPERT IN EMERGENCY MEDICINE, TOXICOLOGY AND CORRECTIONAL

12  MEDICINE AND WILL HEAR OPINION TESTIMONY IN THOSE FIELDS.

13           PROCEED.

14           OOPS.  YOU COULDN'T HEAR ME?  DID YOU HEAR ME?

15  OKAY.  YOU GOT IT, THOUGH?

16           THE COURT REPORTER:  YES, MA'AM.

17           THE COURT:  ALL RIGHT.  CARRY ON.

18                    **DIRECT EXAMINATION**

19  BY MR. DUBNER:

20  **Q.**  DR. VASSALLO, WHAT WAS YOUR ASSIGNMENT IN THE REMEDY PHASE

21  OF THIS CASE?

22  **A.**  MY ASSIGNMENT WAS TO LOOK AT INDIVIDUALS WITH SERIOUS

23  MEDICAL NEEDS, TO LOOK AT THEIR TREATMENT IN THE EMERGENCY

24  SETTING, IN THE ASSESSMENT AND TREATMENT UNIT, TO REVIEW

25  MEDICAL RECORDS FOR THOSE PEOPLE.  AND TO THE EXTENT THAT OTHER

09:15 1  PARTS OF THEIR CARE AFFECTED THEIR PRESENTATION TO THE
2  EMERGENCY SERVICES, LET'S SAY, TO THE EMT OR TO THE ATU, I WAS
3  ASSIGNED TO LOOK AT THAT.
4  Q.    AND WHAT DID YOU DO TO PREPARE YOUR OPINIONS?
5  A.    WELL, FIRST OF ALL, WE CHOSE MEDICAL RECORDS BASED ON
6  THOSE PATIENTS WHO HAD SERIOUS MEDICAL NEEDS.  WE CHOSE THOSE
7  FROM PATIENTS WHO WERE HOSPITALIZED OR PATIENTS WHO DIED.  SO
8  THAT WAS -- THEN I ALSO, OF COURSE, HAD A SITE VISIT ON
9  APRIL 6TH, 7TH AND 8TH.  I REVIEWED MULTIPLE CHARTS -- MEDICAL
10  RECORDS, I SHOULD SAY, AND POLICIES AND PROCEDURES.  AND THAT
11  WAS, I THINK, WHAT I REVIEWED BEFORE MY -- THE EXPERT REPORT
12  WAS WRITTEN.  AND SUBSEQUENTLY I READ MOST OF THE DEPOSITIONS.
13  Q.    NOW, YOU SAID YOU PICKED YOUR CHARTS BY LOOKING AT
14  HOSPITALIZATIONS AND DEATHS.  WOULD SELECTING CHARTS AT RANDOM
15  HAVE GIVEN YOU AS USEFUL A SAMPLE OF THE EMERGENCY CARE AT LSP?
16  A.    NO.  BECAUSE WHAT I'M INTERESTED IN IS PATIENTS WITH
17  SERIOUS MEDICAL NEEDS.  A RANDOM SELECTION WOULD HAVE RESULTED
18  IN A LOT OF CHARTS IN WHICH PATIENTS DID NOT HAVE SERIOUS
19  MEDICAL NEEDS.
20  Q.    AND LET'S TALK ABOUT YOUR SITE VISIT.  WHAT DID YOU DO
21  WHILE YOU WERE AT LSP?
22  A.    I WENT AND SPENT TIME IN THE ATU.  I OBSERVED THE GENERAL
23  MEDICINE CLINIC.  I SPOKE TO PRISONERS IN THE UNITS THAT I --
24  THAT I VISITED, INCLUDING THE NURSING UNIT IN ASH.  I WAS NOT
25  ALLOWED TO SPEAK TO THE STAFF, AND I WAS NOT ALLOWED TO REVIEW

09:17 1    CHARTS ON-SITE.  AND THAT'S WHAT I DID.

2    **Q.**  WAS THERE ANYTHING YOU WANTED TO OBSERVE WHILE YOU WERE ON

3    YOUR SITE VISIT THAT YOU WEREN'T ALLOWED TO OBSERVE?

4    **A.**  WELL, YES.  AND, FIRST OF ALL, WE WERE LIMITED TO THE DAY

5    SHIFT.  WE WERE NOT ALLOWED TO STAY AFTER HOURS.  WE WERE NOT

6    ALLOWED TO COME BEFORE HOURS.

7         FOR SOME REASON WE WERE REMOVED FROM THE SITE AT 1:30

8    ON FRIDAY AFTERNOON, WHICH WAS INCONCEIVABLE TO ME WHY THAT WAS

9    NECESSARY.  I COULD NOT SEE MEDICAL CARE AFTER 4:30 P.M. -- OR

10   1:30 ON FRIDAY.  AND THAT'S WHEN A LOT OF MEDICAL CARE HAPPENS,

11   AS A PHYSICIAN WHO WORKS THE OVERNIGHT SHIFT IN THE EVENINGS

12   TILL 2:00 A.M. ALL THE TIME.  IT'S IMPORTANT TO KNOW WHAT'S

13   HAPPENING AFTER HOURS AND NOT JUST MONDAY THROUGH FRIDAY FROM

14   7:30 -- OR 8:00 TILL 4:00.

15   **Q.**  YOU ALSO SAID THAT YOU REVIEWED POLICIES AND PROCEDURES.

16   WERE THERE OTHER DOCUMENTS FROM THE DISCOVERY THAT YOU REVIEWED

17   AS WELL?

18   **A.**  I REVIEWED A LOT OF DOCUMENTS, POLICIES, PROCEDURES.  AND

19   THEN I FORGET WHAT OTHER ONES I LOOKED AT.

20   **Q.**  ARE THOSE LISTED IN YOUR REPORT?

21   **A.**  YES.

22   **Q.**  AND IN TERMS OF THE EXPERT REPORT ITSELF, DID YOU REVIEW

23   THE PARTS OF THE REPORT THAT WERE OUTSIDE THE AREAS THAT YOU

24   FOCUSED ON?

25   **A.**  YES.

09:18 1  **Q.**   DID ANYTHING THAT YOU OBSERVED, EITHER IN THE CHART

2  REVIEWS OR YOUR SITE VISITS, GIVE YOU ANY REASON TO THINK THAT

3  THE CONCLUSIONS IN THE OTHER SECTIONS WERE WRONG?

4  **A.**   NO.

5        **MR. ARCHEY:**   YOUR HONOR, I OBJECT, OUTSIDE THE SCOPE

6  OF HER REPORT.  SHE'S HERE ON THE EMERGENCY MEDICAL, PAGE 4.

7  THAT'S WHAT SHE'S IDENTIFIED FOR SOLELY, IS EMERGENCY MEDICAL.

8        **THE COURT:**   MR. DUBNER?

9        **MR. DUBNER:**   THE REPORT EXPLICITLY SAYS THAT THE

10 EXPERTS REVIEWED THE OTHER PARTS AND DISCUSSED TO ENSURE THAT

11 THEY WERE ALL IN AGREEMENT WITH -- THAT THEY ENDORSED THE

12 CONTENTS OF THE REPORTS.  I DON'T HAVE QUESTIONS BEYOND THIS.

13 I WAS JUST ASKING THE ONE QUESTION.

14       **THE COURT:**   OVERRULED.

15       **MR. DUBNER:**   AND THEN -- SORRY.  WHEN I SAID ONE

16 QUESTION, AND THEN THE FOLLOW-UP.

17 **BY MR. DUBNER:**

18 **Q.**   WERE THE RESULTS OF YOUR REVIEWS CONSISTENT WITH THE

19 FINDINGS OF THE OTHER EXPERTS?

20 **A.**   YES.

21 **Q.**   NOW, WHEN YOU REVIEWED THE EMERGENCY CARE AT LSP FOR THE

22 LIABILITY TRIAL, YOU FOUND THAT IT PUT CLASS MEMBERS AT A

23 SUBSTANTIAL RISK OF SERIOUS HARM.  IS THAT STILL THE CASE

24 TODAY?

25 **A.**   ABSOLUTELY, YES.

09:19 1    **Q.**   IN WHAT WAYS DO YOU FIND THAT THE EMERGENCY CARE CURRENTLY

2    PUTS PATIENTS AT A SUBSTANTIAL RISK OF SERIOUS HARM?

3    **A.**   ONE OF THE MOST IMPORTANT ONES IS THE DELAY TO TRANSFER TO

4    A LEVEL OF CARE THAT CAN TAKE CARE THAT -- OF SERIOUS MEDICAL

5    NEEDS.  THAT WOULD BE FIRST.

6            NO. 2, THEY ARE STILL HAVING EMTS DO SELF-DECLARED

7    EMERGENCIES.  THAT MEANS THAT PERSON HAS TO TAKE A SYMPTOM AND

8    MAKE A DECISION ABOUT THE SYMPTOM, AND THAT IS UNACCEPTABLE,

9    JUST AS IT WAS FOR SICK CALL.  THOSE ARE THE TWO PRIMARY

10    PROBLEMS THAT I SEE.

11    **Q.**   AND DID YOU ALSO FIND ANY PROBLEMS IN THE APPROPRIATENESS

12    OF THE CARE THAT WAS PROVIDED BY THE EMTS IN SITUATIONS WHERE

13    THEY DIDN'T TRANSFER PATIENTS?

14    **A.**   YES.  SO THE CARE THAT'S PROVIDED TO PATIENTS OFTEN IS

15    JUST COMPLETELY WRONG AND SOMETIMES IT'S PARTIALLY WRONG;

16    SOMETIMES IT TAKES TOO LONG.  AND THE -- BECAUSE THE ASSUMPTION

17    OR THE FIRST DIAGNOSIS IN THEIR DIFFERENTIAL DIAGNOSIS IS

18    SOMETHING SUCH AS MOJO USE, BUT ACTUALLY IT'S A STROKE IN

19    PROGRESS.

20            SO THE TREATMENT THAT'S HAPPENING AND THE TREATMENT

21    THAT DOESN'T HAPPEN -- FOR EXAMPLE, THE TEMPERATURE WITH 108

22    WHO WASN'T COOLED IS UNACCEPTABLE.

23            SO I SAW THE TREATMENT, THE LEVEL, ON THE OVERNIGHT

24    SHIFTS WHERE THERE'S A REGISTERED NURSE OR A LICENSED

25    PROFESSIONAL NURSE, A PRACTICAL NURSE, LPN.  THAT'S

09:20 1   UNACCEPTABLE.  IF YOU -- SO THOSE WERE SOME OF THE AREAS THAT

2   WE'LL SPEAK TO MORE.

3   **Q.**    OKAY.  AND BEFORE WE FOCUS ON THE CHART REVIEWS THAT LED

4   YOU TO THOSE CONCLUSIONS, LET'S JUST TALK ABOUT THE MAJOR

5   CHANGES THAT THE DEFENDANTS HAVE MADE.  IN WHAT WAYS HAVE

6   DEFENDANTS CHANGED THE ATU PRACTICES SINCE THE LIABILITY

7   PERIOD?

8   **A.**    WELL, THE BEST CHANGE IS THAT EMERGENCY MEDICAL

9   TECHNICIANS OR PARAMEDICS ARE NO LONGER IN THE -- IN THE ATU

10   MAKING ALL -- DOING ALL OF THE ASSESSMENTS AND ALL OF THE

11   TREATMENT.  THAT'S THE NO. 1 WAY.  THEY HAVE MUCH MORE NURSING

12   COVERAGE AS WELL.

13   **Q.**    AND WHAT IS YOUR UNDERSTANDING OF WHAT THE CURRENT

14   STAFFING PLAN IS FOR THE ATU?

15   **A.**    WELL, THERE IS A PROVIDER, WHICH I'M GOING TO USE THE WORD

16   "PROVIDER" FROM HERE ON OUT.  IT'S A NURSE PRACTITIONER OR A

17   PHYSICIAN.  PEOPLE WHO PROVIDE HEALTH CARE COULD BE REGISTERED

18   NURSES, LPNS, OR ALL KINDS OF OTHER PEOPLE.  WHEN I SAY "A

19   PROVIDER," I MEAN A NURSE PRACTITIONER OR A PHYSICIAN.  I'D

20   LIKE TO BE CLEAR, BECAUSE THERE'S SOME CONFUSION ABOUT THAT

21   SOMETIMES.

22        SO MY UNDERSTANDING OF THE STAFFING IS DURING THE

23   WEEK FROM 7:30 ON MONDAY MORNINGS UNTIL 4:30 ON FRIDAY

24   AFTERNOONS THERE IS A PROVIDER PRESENT.

25   **Q.**    AND JUST TO CLARIFY THAT, WHEN YOU SAY 7:30 A.M. MONDAY TO

09:22 1    4:00 P.M. FRIDAY, YOU DON'T MEAN ALL DAY MONDAY, ALL DAY

2    TUESDAY.  DO YOU MEAN -- WELL, DO YOU MEAN ALL DAY, OR DO YOU

3    MEAN UNTIL 4:00 P.M. ON MONDAY, TUESDAY, THURSDAY?

4    **A.**   SO AFTER HOURS.  AND LET'S JUST USE "AFTER HOURS" AT

5    4:35 P.M.  THERE IS NO LONGER NECESSARILY PRESENT SEEING THE

6    PATIENTS IN THE ATU A PROVIDER WITH THE ABILITY TO DIAGNOSE.

7    **Q.**   AND --

8    **A.**   AND ON THE WEEKEND THERE MAY NOT BE A PROVIDER SEEING THE

9    PATIENTS, WHICH IS WHAT I'D CALL IMPORTANT.

10   **Q.**   AND WHO IS SEEING THE PATIENTS WHEN THERE IS NO PROVIDER

11   THERE?

12   **A.**   A NURSE.

13   **Q.**   AND I THINK YOU SAID BEFORE EITHER A REGISTERED NURSE OR A

14   LICENSED PRACTICAL NURSE?

15   **A.**   AND TO BE COMPLETELY CLEAR, THEY ARE IN NO WAY EQUIVALENT,

16   THOSE TWO TRAININGS.  AND NEITHER OF THEM ARE ALLOWED TO

17   DIAGNOSE.

18   **Q.**   AND THEN ON THE WEEKENDS, WHAT'S YOUR UNDERSTANDING OF

19   WHAT THE STAFFING PLAN THE DEFENDANTS SAY IS IN PLACE CALLS

20   FOR?

21   **A.**   MY UNDERSTANDING IS THAT THERE IS A PROVIDER PRESENT,

22   PRESENT IN THE TREATMENT CENTER SOMEWHERE -- IS PRESENT 24

23   HOURS A DAY.

24   **Q.**   AND WHAT'S YOUR UNDERSTANDING OF WHEN THAT STAFFING PLAN

25   STARTED?

09:23 1   **A.**   RELATIVELY RECENTLY, BUT LAST YEAR.  I'M NOT EXACTLY SURE
2   WHEN RIGHT AT THIS MINUTE.  I THINK MAYBE EVEN 2018.  I'M NOT
3   SURE.  I'M SORRY.
4   **Q.**   IF I COULD POSSIBLY REFRESH YOUR RECOLLECTION ON THAT.
5           IF WE COULD PULL UP PLAINTIFFS' EXHIBIT -- I BELIEVE
6   IT'S 44F AT 13.
7           IF YOU LOOK AT LINE 1 OF THIS INTERROGATORY RESPONSE,
8   DOES THIS REFRESH YOUR RECOLLECTION ON WHEN THEY CLAIM THAT THE
9   STAFFING PLAN WENT INTO PLACE?
10  **A.**   YES.  THAT'S MARCH OF 2018.
11          **MR. DUBNER:**  OKAY.  YOU CAN TAKE THAT DOWN.
12  **BY MR. DUBNER:**
13  **Q.**   NOW, LET'S TURN TO SOME OF YOUR -- AND SO -- WELL, BEFORE
14  I MOVE AWAY FROM THAT, SO THAT STAFFING PLAN WAS IN PLACE FOR
15  ALL OF THE CARE YOU'RE GOING TO DISCUSS TODAY.  IS THAT RIGHT?
16  **A.**   CORRECT.
17  **Q.**   AND THAT'S THE SAME STAFFING THAT'S IN PLACE TODAY?
18  **A.**   YES.
19  **Q.**   THANK YOU.
20          NOW, LET'S TURN TO SOME OF YOUR CHART REVIEWS.  WE'RE
21  GOING TO START AT THE BEGINNING OF THE RELATIVE PERIOD, 2019,
22  AND MOVE FORWARD THROUGH THE PERIOD FROM THERE.
23          SO LET'S START WITH PATIENT NO. 38.
24          **MR. DUBNER:**  AND, RACHEL, IF YOU COULD BRING UP JX_38
25  AT 94.  THANK YOU.

09:24 1 **BY MR. DUBNER:**

2 **Q.**   NOW, DR. VASSALLO, YOU SAY IN YOUR REPORT "THIS PATIENT

3 WAS ADMITTED TO THE NURSING UNIT FOR LOVENOX BRIDGING."  COULD

4 YOU EXPLAIN WHAT THAT MEANS?

5 **A.**   YES.  THE PATIENT WAS GOING TO UNDERGO A DENTAL PROCEDURE.

6 THE PATIENT HAD AN ARTIFICIAL HEART VALVE, WHICH REQUIRED

7 ANTICOAGULATION SO THAT BLOOD CLOTS WOULD NOT ACCUMULATE ON TOP

8 OF THAT VALVE.  AND WHEN YOU'RE GOING TO GO IN FOR A DENTAL

9 PROCEDURE, YOU WOULD LIKE TO HAVE A SHORTER-ACTING

10 ANTICOAGULANT DRUG.  IN THIS CASE LOVENOX IS HEPARIN.  SO YOU

11 SLOWLY BACK DOWN ON THE COUMADIN AND YOU GIVE LOVENOX IN ORDER

12 THAT THE ANTI-COAGULATION PERSISTS, BUT YOU HAVE A

13 SHORTER-ACTING DRUG; THAT'S CALLED BRIDGING FROM LOVENOX --

14 FROM COUMADIN TO LOVENOX.

15 **Q.**   OKAY.  AND WHAT WERE THE MOST IMPORTANT DETAILS OF THIS

16 PATIENT'S MEDICAL CONDITION WHEN HE WENT ONTO THE NURSING UNIT?

17 **A.**   WELL, FIRST OF ALL, HE'S ANTICOAGULATED, SO HE'S AT RISK

18 OF BLEEDING, AND HE HAS AN ARTIFICIAL HEART VALVE.  THOSE ARE

19 THE MOST IMPORTANT PIECES.

20          AND NOW I'M GOING TO LOOK AT MY REVIEW FOR THIS

21 PATIENT 38.  HE ALSO HAD A HISTORY OF HYPERTENSION.

22 **Q.**   UH-HUH.

23 **A.**   AND DIABETES.

24 **Q.**   AND WHAT'S SIGNIFICANT ABOUT THE ARTIFICIAL HEART VALVE IN

25 THIS CASE?

09:26 1   **A.**   WELL, AN ARTIFICIAL HEART VALVE PUTS YOU AT RISK OF BLOOD

2   CLOTS FLYING OFF OF THAT HEART VALVE IF HE'S NOT

3   ANTICOAGULATED.

4          IN THIS CASE IT WAS A MECHANICAL HEART VALVE.  ALSO,

5   IT'S A WONDERFUL PLATFORM FOR WHICH BACTERIA CAN ATTACH TO.

6   SO ANYBODY WHO GETS A FEVER WITH A MECHANICAL HEART VALVE IS

7   AUTOMATICALLY AN EMERGENCY, IN OUR MINDS, BECAUSE WE WONDER IF

8   THAT BACTERIA HAS ATTACHED ITSELF TO THAT ARTIFICIAL HEART

9   VALVE AND IS EITHER -- AND IS CAUSE -- AND MAY BE CAUSING

10   ENDOCARDITIS, A VERY SERIOUS CONDITION.  AND WHAT HAPPENS IS

11   THE BACTERIA ARE THEN THROWN OFF INTO THE HEART, INTO THE BODY,

12   AND CAUSE INFECTION.

13   **Q.**   OKAY.  SO LET'S LOOK AT THE PAGE THAT'S UP ON THE SCREEN,

14   PAGE 94 OF JOINT EXHIBIT 38.

15          SO HE'S ALREADY IN THE NURSING UNIT.  WHAT SYMPTOMS

16   DOES HE START PRESENTING WITH?

17   **A.**   WELL, HE STARTS WITH WHEEZING IN HIS LUNGS.  HIS

18   SATURATION IS A LITTLE BIT LOW BUT NOT TOO BAD.  I'LL ACCEPT

19   THAT.  THEN TOWARDS THE LAST LINE, WHICH IS 20:00, HE DEVELOPS

20   A FEVER OF 102.4.  HIS RESPIRATORY RATE -- A NORMAL RESPIRATORY

21   RATE IS 12 TO 14.  HIS RESPIRATORY RATE IS 20.  THAT'S

22   ABNORMAL.  HIS SATURATION IS LOW, AT 94 PERCENT.

23   **Q.**   AND WHAT DOES THAT INDICATE, OR WHAT CONCERNS DOES THAT

24   RAISE AS A PHYSICIAN?

25   **A.**   WELL, THIS IS A DIABETIC PATIENT ON METFORMIN WITH AN

09:27  1   ARTIFICIAL HEART VALVE.  THIS IS AN EMERGENCY CONDITION, AND
       2   YOU NEED TO OBTAIN BLOOD CULTURES.  YOU NEED TO BE IN A PLACE
       3   WHERE YOU CAN GIVE INTRAVENOUS ANTIBIOTICS IF THOSE BLOOD
       4   CULTURES COME BACK POSITIVE.  AND YOU -- THE PATIENT HAS TO BE
       5   IN A PLACE WHERE ENDOCARDITIS OR A SEVERE INFECTION BEING
       6   THROWN OFF THAT HEART VALVE ALL OVER THE BODY CAN BE TREATED.
       7   **Q.**   AND HOW DID THEY TREAT THE PATIENT AT THIS TIME AT LSP?
       8   **A.**   THIS PATIENT WAS TREATED -- ONE MOMENT.  I'LL JUST LOOK TO
       9   MAKE SURE.  I DON'T WANT TO MISSPEAK.
      10   **Q.**   I KNOW THE LAST LINE IS A LITTLE BIT COVERED UP BY THE
      11   BATES NUMBER.
      12   **A.**   OH, YES.
      13   **Q.**   SORRY ABOUT THAT.
      14   **A.**   SO THE NEW ORDERS -- FIRST OF ALL, THIS PATIENT, WITH
      15   POTENTIALLY A LIFE-THREATENING ILLNESS, WAS MOVED TO A LOCKED
      16   ROOM AND GIVEN TYLENOL.
      17   **Q.**   AND WAS HE GIVEN ANY OTHER MEDICATION?
      18   **A.**   I BELIEVE HE WAS GIVEN AMANTADINE, BUT I DON'T SEE IT
      19   THERE.  MY MEMORY IS THAT HE WAS GIVEN AMANTADINE.
      20   **Q.**   YEAH, AND THAT IS COVERED UP BY THE BATES NUMBERS.  SO
      21   SORRY ABOUT THAT.
      22        **MR. DUBNER:**  BUT IF YOU COULD HIGHLIGHT.  THANK YOU.
      23   **BY MR. DUBNER:**
      24   **Q.**   AND WHAT IS AMANTADINE?
      25   **A.**   AMANTADINE IS AN ANTIVIRAL USED IN THE OLD DAYS FOR

09:29 1  INFLUENZA.

2  **Q.**    AND DID A PROVIDER SEE THE PATIENT?

3  **A.**    NO.

4  **Q.**    WAS THAT REASONABLE?

5  **A.**    NO.  FOR THE REASONS I SAID, WHEN YOU HAVE A PERSON IN --

6  WITH THESE MEDICAL COMORBIDITIES WHO SPIKES A FEVER, THAT

7  PATIENT NEEDS TO BE SEEN.

8  **Q.**    AND LET'S GO OVER TO THE NEXT DAY, SO IF YOU COULD GO TO

9  PAGE 90.

10          SO WHAT SYMPTOMS DOES THE PATIENT DEVELOP THE NEXT

11  DAY?

12  **A.**    SO NOW THE PATIENT IS -- WHO WAS WHEEZING AND IS NOW

13  BLEEDING, HE'S ANTICOAGULATED.  HE HAS NOW BLOOD-TINGED SPUTUM

14  AND HE'S BLEEDING.

15  **Q.**    IS BLOOD-TINGED SPUTUM CONCERNING IN AN ANTICOAGULATED

16  PATIENT?

17  **A.**    YES.  IT MEANS THEY'RE BLEEDING AND THEY DON'T HAVE THE

18  ABILITY TO COAGULATE OR TO HAVE A BLOOD CLOT FORM TO STOP THE

19  BLEEDING.

20  **Q.**    AND IT LOOKS LIKE IT SAYS "M.D. HERE TO EVALUATE," RIGHT

21  AFTER "BLOOD-TINGED SPUTUM."  DID YOU SEE ANY NOTES OF ANY

22  ASSESSMENT THAT AN M.D. DID?

23  **A.**    THERE WERE NONE.

24  **Q.**    IF WE GO TO PAGE 71.

25          HERE ON THE "PHYSICIAN'S ORDERS," I'LL DRAW YOUR

09:30 1    ATTENTION TO THE LINE TOWARDS THE BOTTOM AT 3:20 P.M.  IT SAYS

2    THAT "A CXR" -- IS THAT A CHEST X-RAY?

3    A.    YES.

4    Q.    -- "A CXR WAS ORDERED."  DID YOU SEE ANY EVIDENCE THAT HE

5    EVER GOT A CHEST X-RAY?

6    A.    NO.

7    Q.    WELL, LET'S MOVE TO THE FOLLOWING DAY, SO PAGE 86 OF JOINT

8    EXHIBIT 38.

9          WHAT SYMPTOMS IS THE PATIENT SHOWING THIS DAY?

10   A.    SO HE CONTINUES TO HAVE A PRODUCTIVE COUGH, MEANING IT'S

11   JUST NOT NOTHING COMING OUT, IT'S PRODUCING SOMETHING.  IN THIS

12   CASE ONE OF THE THINGS IT WAS PRODUCING WAS BLOOD, BLOOD-TINGED

13   MUCUS.  HE WAS CONGESTED, AND HE WAS GIVEN A NEBULIZER.  HIS

14   OXYGEN SATURATION, IN THE VERY LAST LINE, IS 95 TO -- 91 TO

15   95 PERCENT, WHICH IS DECREASED AND ABNORMAL.  I SHOULD SAY IT'S

16   NOT ONLY DECREASED, IT'S ABNORMAL.

17   Q.    AND WERE LABS TAKEN AROUND THIS TIME?

18   A.    YES.  I BELIEVE THEY WERE TAKEN.  SOMEWHERE IN HERE THEY

19   WERE ORDERED.  WHETHER OR NOT THEY WERE TAKEN, I'M NOT SURE AT

20   THIS MOMENT.

21   Q.    WE CAN GO TO THOSE.  IF YOU COULD PULL UP PAGE 22.

22          SO OBVIOUSLY I DON'T UNDERSTAND WHAT WE'RE LOOKING AT

23   HERE, BUT COULD YOU EXPLAIN WHAT THE SORT OF KEY FINDINGS ON

24   THIS LAB REPORT ARE?

25   A.    WELL, YOU SEE THE CREATINE IS 2.78, AND A FEW MONTHS

09:31 1 BEFORE -- I THINK IT WAS FEBRUARY -- HE HAD A NORMAL -- HIS
2 PREVIOUS CREATINE WAS ONE, WHICH IS NORMAL.  SO NOW HE'S MORE
3 THAN DOUBLED HIS CREATINE.
4         SO NOW YOU HAVE A PATIENT WITH AN ARTIFICIAL HEART
5 VALVE WHO IS BLEEDING, WHO HAS NOW DOUBLED THEIR CREATINE.  THE
6 GLUCOSE IS ELEVATED, BUT THAT'S IN KEEPING WITH THE -- AND THE
7 REINFORCEMENT OF THE FACT THAT THIS PATIENT HAS DIABETES, WHICH
8 WE ALREADY KNOW.  HIS BUN IS 71, SHOWING SOME SIGNS OF
9 DEHYDRATION.  AND IMPORTANTLY, HE HAS -- THE E-A-G-A-P, WHICH
10 IS THE ANION GAP, IS 25.
11        SO WHAT THAT IS, IS BECAUSE -- THAT IS AN INDICATION
12 OF ACIDOSIS.  ACIDOSIS OCCURS WHEN THE ORGANS ARE NOT RECEIVING
13 ADEQUATE OXYGEN OR WHEN THERE IS SEPSIS.
14        SEPSIS IS A BLOOD INFECTION OR A SEVERE INFECTION.
15 AND ACTUALLY THE CALCULATION OF A LACTATE, WHICH IS NOT
16 AVAILABLE HERE BUT THE ANION GAP IS, CAN BE A MARKER FOR
17 ABNORMAL LACTATE.  LACTATES AREN'T AVAILABLE, SO THE ANION GAP
18 IS VERY CRITICAL HERE TO BE RECOGNIZED AS HIGH.
19 Q.   AND I NOTICED THAT SOME OF THE NUMBERS AND LETTERS HERE
20 ARE IN RED.  WHAT DOES THAT INDICATE?
21 A.   WELL, IT INDICATES THERE'S SOME ABNORMALITY, AND SOME ARE
22 IMPORTANT WHEN THEY ARE MARKED LIKE THIS WITH RED AND SOME ARE
23 NOT.
24 Q.   OKAY.  ARE THE ONES THAT YOU POINTED OUT ALREADY LIKELY TO
25 BE IMPORTANT?

09:33 1   **A.**   YES.

2   **Q.**   OKAY.  AND THEN LOOK AT ONE MORE PAGE OF LAB WORK ON

3   PAGE 23.  WHAT'S THE -- IS THERE A CONCERNING FINDING ON THIS

4   LAB?

5   **A.**   SPECIFICALLY THE WHITE BLOOD CELL COUNT IS NORMAL, BUT

6   MORE IMPORTANT THAN THE 6.5 WHERE YOU SEE "WBC 6.5" IS THE

7   HANDWRITTEN NOTATION OFF TO THE SIDE.  "SEG" IS SEGMENTED

8   CELLS.  IT'S 89.

9           BANDS ARE EARLY.  SO WHEN THE BONE MARROW STARTS

10  KICKING OUT MORE WHITE BLOOD CELLS TO FIGHT A BACTERIAL

11  INFECTION, YOU GET WHAT'S CALLED A LEFT SHIFT.  IT MEANS

12  EARLIER, YOUNGER WHITE BLOOD CELLS.  THAT'S THE SEGMENTED AND

13  THE BANDS, THIS IS CONSISTENT WITH A BACTERIAL INFECTION.

14  **Q.**   SO BETWEEN ALL OF THESE LAB RESULTS THAT YOU'RE SEEING,

15  WHAT CONDITIONS WOULD YOU BE WORRIED ABOUT AS A PHYSICIAN?

16  **A.**   SO WHAT I HAVE NOW IS A PATIENT WHO IS ANTICOAGULATED AND

17  BLEEDING.  I HAVE A PATIENT WHO HAS DOUBLED HIS CREATINE, IS

18  PERHAPS GOING INTO KIDNEY FAILURE.  I HAVE A PATIENT WITH A

19  WHITE BLOOD CELL COUNT THAT'S SHOWING SIGNS OF A BACTERIAL

20  INFECTION.  I HAVE A PATIENT WITH A MECHANICAL HEART VALVE WHO

21  NOW HAS A FEVER AND IS A DIABETIC.  DIABETES IS AN

22  IMMUNOCOMPROMISING ILLNESS.

23           SO I HAVE FIVE SERIOUSLY WRONG PROBLEMS.  THIS

24  PATIENT NEEDS TO GO TO THE HOSPITAL.

25  **Q.**   SO LET'S LOOK AT THE FOLLOWING DAY, MARCH 7TH.  IF YOU

09:34 1  COULD GO TO PAGE 82.

2       **MR. DUBNER:** SO LET'S LOOK AT 6:20 A.M., AND IF YOU

3  COULD BLOW UP THE NURSING NOTES AT THE BOTTOM.

4  BY MR. DUBNER:

5  **Q.** WHAT WAS THE PATIENT'S CONDITION AT 6:20 A.M.?

6  **A.** SO NOW THE PATIENT HAS A BLOOD PRESSURE OF 65/40. HE'S IN

7  SHOCK, PROBABLY. IT COULD BE SEPTIC SHOCK HERE. WHATEVER,

8  HE'S IN SHOCK. HIS HEART RATE IS -- WHATEVER IT IS. I CAN'T

9  TELL. IT LOOKS LIKE 99 OR 49. IT DOESN'T MATTER. THE PATIENT

10  IS IN SHOCK. THE SATURATION IS NOW 79 PERCENT. AND THIS WAS

11  REPORTED TO DR. TOCE. HE WAS PLACED ON TWO LITERS OF NASAL

12  CANNULA, AND THEY HELD THE BLOOD PRESSURE MEDICINE BECAUSE THE

13  BLOOD PRESSURE WAS SO LOW.

14       AND YOU SEE THERE TO THE RIGHT, IT SAYS "BP LESS THAN

15  120." THAT WAS THE REASON THAT THE PERSON WHO WAS WRITING THIS

16  HELD THE BLOOD PRESSURE. THE PATIENT IS IN SHOCK. SO CLEARLY

17  YOU DON'T GIVE HIM SOMETHING TO LOWER HIS BLOOD PRESSURE, EVEN

18  IF IT'S THE DAILY MEDICATION, WHEN THEY'RE ALREADY IN SHOCK.

19  **Q.** WAS THERE ANY OTHER TREATMENT ORDERED OTHER THAN THE

20  OXYGEN AND NOT GIVING THE BLOOD PRESSURE MEDICATION?

21  **A.** NO.

22  **Q.** AND WAS THERE ANY EVIDENCE THAT DR. TOCE, OR ANY OTHER

23  PROVIDER, SAW THE PATIENT?

24  **A.** NO.

25  **Q.** WAS THERE ANY EVIDENCE THAT A PROVIDER ASSESSED THE

09:36 1  PATIENT AT THIS POINT?

2  **A.**   NO.

3  **Q.**   AND WHAT SHOULD HAVE BEEN DONE FOR THE PATIENT AT THIS

4  POINT?

5  **A.**   WELL, A PROVIDER SHOULD SEE THE PATIENT.  IF I HEAR THAT

6  BLOOD PRESSURE, THAT PATIENT NEEDS TO BE IN THE HOSPITAL AND

7  YOU CAN JUST SAY "CALL AN AMBULANCE."  THAT WOULD HAVE BEEN

8  GOOD, BUT A PROVIDER SHOULD SEE THE PATIENT.  AND IF THAT'S

9  GOING TO TAKE TOO MUCH TIME -- AND I HEAR 65/40 IN A DIABETIC

10  WITH 102 DEGREES WHO IS BLEEDING BLOOD-TINGED SPUTUM ON LOVENOX

11  OR COUMADIN OR BOTH AT THIS POINT, THAT PATIENT NEEDS TO GO TO

12  THE HOSPITAL.

13  **Q.**   AND INSTEAD OF THE HOSPITAL, WHERE WAS THE PATIENT?

14  **A.**   WELL, THE PATIENT WAS IN A LOCKED ROOM IN THE NURSING

15  UNIT.

16  **Q.**   AND LET'S THEN LOOK AT THE LAST ENTRY, 7:20 A.M, AN HOUR

17  LATER.  OH, NO.  IF YOU COULD GO BACK TO THE LAST ENTRY ON THIS

18  PAGE AT 7:20 A.M.

19         WHAT HAPPENED TO THE PATIENT?

20  **A.**   THE PATIENT HAD A CARDIAC ARREST.

21  **Q.**   AND DID THE PATIENT RECOVER FROM THE CARDIAC ARREST?

22  **A.**   NO.  AND HE WAS TAKEN TO THE ATU WITH A CARDIAC ARREST.

23  **Q.**   WAS THIS PATIENT'S CONDITION TREATABLE?

24  **A.**   TREATABLE?  ABSOLUTELY.  I MEAN, HE HAD PNEUMONIA.  RIGHT?

25  SO HE HAD PNEUMONIA.  HE BECAME INCREASINGLY SICK.  HE WAS

09:37 1    BLEEDING.  HE WAS ANTICOAGULATING.  HE HAD A HEART VALVE AND HE
2    HAD DIABETES.
3                **THE COURT:**  WHAT WAS HIS AGE?  I HAVEN'T SEEN IT.
4                **THE WITNESS:**  DATE OF BIRTH WAS 09/22/1960.  SO THIS
5    WAS 1960, SO THERE'S 40, 50 -- SOMEWHERE -- 50, 60 YEARS OLD.
6                **MR. DUBNER:**  I BELIEVE 59, BUT I'D HAVE TO
7    DOUBLE-CHECK.
8                **THE COURT:**  OKAY.
9                **MR. DUBNER:**  THANK YOU.  YEAH, 58.
10   **BY MR. DUBNER:**
11   **Q.**   AND SO DID THE LACK OF CARE CAUSE HIS DEATH?
12   **A.**   IT DID.
13   **Q.**   AND SO IF WE LOOK AT THE AUTOPSY, WHAT DOES THE AUTOPSY --
14   SORRY.  WHICH IS PAGE 37.  YES.  THANK YOU.
15               WHAT DID THE AUTOPSY SAY WAS THE CAUSE OF DEATH?
16   **A.**   "PNEUMONIA, LOBAR," WHICH MEANS -- THERE'S SEVERAL LOBES
17   IN THE DIFFERENT PARTS OF THE LEFT LUNG, AND IT WAS
18   CONSOLIDATED IN THE LEFT LUNG.  IT WAS PNEUMONIA OF THE LEFT
19   LOWER LUNG.
20   **Q.**   AND IF WE LOOK AT THE MORTALITY REVIEW THAT DR. TOCE WROTE
21   ABOUT THE PATIENT -- IF YOU GO TO PLAINTIFFS' EXHIBIT 8A AT 56
22   AND 57.
23               DOES THIS EVEN MENTION THAT HE HAD PNEUMONIA?
24   **A.**   NO.
25               **MR. DUBNER:**  AND I DON'T BELIEVE EXHIBIT 8A, WHICH IS

09:38 1   THE MORTALITY REVIEW, IS IN EVIDENCE YET.  WE'LL MOVE THAT INTO

2   EVIDENCE FOR THE CONTENTS, NOT THE TRUTH OF THE MATTER

3   ASSERTED.

4           **MR. ARCHEY:**  DO YOU MEAN ALL OF THEM OR JUST THAT

5   ONE?

6           **MR. DUBNER:**  WE'RE FINE WITH IT BEING ALL OF THEM IF

7   THAT'S EASIER.

8           **THE COURT:**  THE MOTION FOR ADMISSION IS WHAT?

9           **MR. DUBNER:**  IT'S TO ADMIT PLAINTIFFS' EXHIBIT 8A FOR

10  THE CONTENTS.

11          **THE COURT:**  OBJECTION?

12          **MR. ARCHEY:**  WE HAVE NO OBJECTION TO THE ADMISSION OF

13  ALL OF THOSE, YOUR HONOR.  WE DON'T NEED TO LIMIT IT TO THE ONE

14  PAGE.

15          **THE COURT:**  8A IS ADMITTED.

16  **BY MR. DUBNER:**

17  **Q.**  LET'S MOVE FORWARD TO THE NEXT PATIENT, PATIENT NO. 35.

18          **MR. DUBNER:**  RACHEL, IF YOU COULD BRING UP JOINT

19  EXHIBIT 35 AT 121.  OH, AND ACTUALLY IF WE COULD MOVE BACK TO

20  THE -- NO.  THAT'S FINE.

21  **BY MR. DUBNER:**

22  **Q.**  SO PATIENT NO. 35 PRESENTED TO THE ATU AT 5:16 P.M. ON

23  SATURDAY, APRIL 13, 2019.  WHAT WERE HIS SYMPTOMS AT THAT TIME?

24  **A.**  THE SYMPTOMS?  WELL, FIRST OF ALL, I MEAN, STARTING ON

25  THIS REPORT YOU SEE THAT THE LEVEL OF CONSCIOUSNESS, "LOC," WAS

09:40 1   CONFUSED.  THE PATIENT WAS CONFUSED WITH A 103.2 TEMPERATURE.

2   SO HE HAD AN ALTERED MENTAL STATUS, CONFUSION AND FEVER.

3   **Q.**  AND JUST TO PAUSE THERE.

4       ARE THOSE SERIOUS SYMPTOMS?

5   **A.**  YES.  THE REASON THEY'RE SERIOUS IS BECAUSE ANY CONFUSION

6   WITH FEVER IS AN EMERGENCY, WHETHER -- AND NEITHER MOJO,

7   OPIATES OR ANY OTHER DRUG CAN -- WILL -- THAT HAS BEEN

8   MENTIONED HERE, THESE ILLICIT DRUGS, ARE GOING TO CAUSE

9   CONFUSION AND 103 -- COCAINE COULD DO THAT IN SOME SETTINGS IF

10   YOU'RE WILDLY AGITATED, AND THAT'S THE CAUSE OF THE FEVER.

11       IN THIS CASE HE WAS NOT WILDLY AGITATED, LIKE THE

12   MOTOR MOVEMENT AND THE MOVEMENT IS CAUSING IT.  HE'S CONFUSED

13   WITH 103.2.

14   **Q.**  DID A PROVIDER SEE THIS PATIENT?

15   **A.**  WHAT I SEE HERE IS THAT THERE WAS A TELEPHONE ORDER BY THE

16   DOCTOR.  AT THIS POINT THERE'S SOME SIGNATURES TO THE SIDE THAT

17   I CANNOT -- BUT I DO NOT SEE ANY INDICATION THAT A PROVIDER SAW

18   THIS PATIENT.

19       I SEE THEY CATHETERIZED THE PATIENT, FOR SOME REASON,

20   TO OBTAIN A URINALYSIS.  TYLENOL WAS GIVEN, AN IV WAS

21   ESTABLISHED.  THE I-STAT, WHICH IS AN IMMEDIATE STAT OF A SET

22   OF ELECTROLYTES THAT WE JUST LOOKED AT AT THE FIRST PREVIOUS,

23   THAT'S SIMILAR TO AN I-STAT, AND NORMAL SALINE WAS GIVEN AT

24   50 MILLILITERS PER HOUR.  AND THEN HE WAS SENT TO THE NURSING

25   UNIT FOR A 23-HOUR OBSERVATION.

09:41 1   Q.   SO IF IT WAS A TELEPHONE ORDER -- SO THIS WAS A SATURDAY

2   AT 5:16 P.M.  UNDER DEFENDANTS' STAFFING PLAN, SHOULD THERE

3   HAVE BEEN A PROVIDER TO SEE THE PATIENT?

4   A.   YES, THE PROVIDER SHOULD SEE THE PATIENT.

5   Q.   AND IF YOU LOOK DOWN AT THE PHYSICIAN'S SIGNATURE ON THE

6   BOTTOM RIGHT, WHAT DAY WAS THE EMERGENCY MEDICAL REPORT

7   REVIEWED BY A PROVIDER?

8   A.   WELL, IT WAS SIGNED ON THE 15TH, WHICH IS TWO DAYS AFTER

9   THIS.

10   Q.   THAT'S THE FOLLOWING MONDAY?

11   A.   AFTER THIS PRESENTATION.

12   Q.   SORRY.

13   A.   EXCUSE ME.  IT SAYS 4/15, WHICH IS TWO DAYS AFTER 4/13.

14   Q.   THANK YOU.

15        SO YOU SAID THAT THEY ADMITTED HIM TO THE NURSING

16   UNIT FOR OBSERVATION.

17        COULD WE GO TO PAGE 111 OF JOINT EXHIBIT 35?

18        WHERE WAS HE SENT?  WAS HE SENT FROM THE NURSING UNIT

19   TO THE HOSPITAL SUBSEQUENTLY?

20   A.   YES.

21   Q.   AND WHEN WAS HE SENT TO THE HOSPITAL?

22   A.   ON THE FOLLOWING DAY.  THIS IS NOW APRIL 14TH AT 5:00,

23   5:25 WHEN THE AMBULANCE WAS ASSIGNED, AND HE ARRIVED AT THE

24   AMBULANCE -- EXCUSE ME.  HE ARRIVED AT THE HOSPITAL AT

25   8:10 P.M.

09:43 1    **Q.**   SO HE WAS SENT OUT ABOUT 24 HOURS LATER.  IS THAT RIGHT?

2    **A.**   TWENTY-FOUR HOURS AFTER HIS PRESENTATION:  CONFUSED WITH

3    FEVER.

4    **Q.**   AND WHAT WAS HE DIAGNOSED WITH AT THE HOSPITAL?

5    **A.**   MENINGITIS.

6    **Q.**   SO WHY WAS IT INAPPROPRIATE TO WAIT 24 HOURS BEFORE

7    TRANSPORTING HIM?

8    **A.**   SO FEVER AND CONFUSION IS AN EMERGENCY.  THE EMERGENCY

9    COULD BE THAT YOU HAVE A SEVERE URINARY TRACT INFECTION.  YOU

10    SEE THAT IN VERY OLD PEOPLE, USUALLY WOMEN.  IT COULD BE THAT

11    YOU HAVE AN INFECTION OF YOUR BRAIN.

12          BUT IN THIS CASE THIS FEVER AND THIS CONFUSION -- ONE

13    OF THE FIRST CONSIDERATIONS IS AN INFECTION IN THE BRAIN.

14    THAT'S THE MOST SERIOUS.  THIS IS A SERIOUS MEDICAL NEED.  AND

15    IT'S UNACCEPTABLE NOT TO SEND SOMEBODY WHO MAY NEED EVALUATION

16    OF AN INFECTION IN THE BRAIN.

17          IF THE URINALYSIS -- WHENEVER IT COMES BACK IN ONE OR

18    TWO HOURS, WHICH IS WHEN IT COMES BACK IN A MAJOR HOSPITAL,

19    DOES NOT SHOW INFECTION TO THE URINE, OR -- YOU MAY IMMEDIATELY

20    DO A LUMBAR PUNCTURE, WHICH IS A SPINAL TAP, TO SEE IF THERE'S

21    INFECTION IN THE BRAIN, BECAUSE THIS IS A CRITICAL SITUATION.

22    **Q.**   ARE THOSE THINGS THAT CAN BE DONE AT THE ATU?

23    **A.**   NO.  A URINALYSIS CAN BE DONE, BUT YOU CAN'T DO A LUMBAR

24    PUNCTURE IN THE ATU BECAUSE YOU CAN'T GET THE RESULTS.  YOU CAN

25    DO IT, BUT YOU CAN'T GET A RESULT.

09:44  1    **Q.**   LET'S MOVE TO PATIENT 36.

       2              SO IF YOU COULD PULL UP JOINT EXHIBIT 36 AT 106.

       3    THANK YOU.

       4              NOW, THIS PATIENT PRESENTED TO THE ATU ON THURSDAY,

       5    MAY 2ND AT 8:20 A.M.  WHAT WERE HIS RELEVANT SIGNS AND SYMPTOMS

       6    AT THAT POINT?

       7              AND IF YOU WANT TO PERHAPS BLOW UP THE "CHIEF

       8    COMPLAINT" SECTION AND THE VITAL SIGNS.

       9    **A.**   OKAY.  PATIENT 36 PRESENTED TO THE ATU WITH A COMPLAINT OF

      10    SHORTNESS OF BREATH FOR TWO DAYS.  HE WAS NOTED TO BE USING

      11    ACCESSORY MUSCLES; THAT'S BASICALLY WHEN YOU USE YOUR CHEST

      12    MUSCLES VOLUNTARILY TO SUCK IN A BREATH AND TO LET IT OUT.  HIS

      13    BREATH SOUNDS WERE DIMINISHED.

      14              IF YOU COULD SHRINK THAT DOWN, I'D LIKE TO -- THE

      15    FIRST RESPIRATORY RATE WAS 32.  AND I'VE ALREADY TESTIFIED THAT

      16    A NORMAL RESPIRATORY RATE IS 12 TO 14, AS WE ALL SIT HERE NOW.

      17    AND HIS BLOOD PRESSURE WAS 203/115, AND HIS TEMPERATURE WAS

      18    98.2.

      19              SO THE MAIN THING HERE IS THAT HE IS SUCKING AIR.

      20    HE'S TRYING TO BREATHE.  HE'S HAVING TO USE RESPIRATORY MUSCLES

      21    TO BREATHE ADEQUATELY TO GET ADEQUATE OXYGEN.

      22    **Q.**   AND SO HOW WAS HE TREATED AT THIS POINT IN TIME?

      23    **A.**   AT THIS POINT IN TIME IT WAS REASONABLE TO GIVE HIM A

      24    NEBULIZER.  NEBULIZERS -- IN GENERAL, THERE ARE TWO WAYS.  THIS

      25    IS A "DUO," MEANING THERE'S TWO MEDICATIONS IN THE NEBULIZER.

09:45 1 ONE OF THOSE IS MOST COMMONLY ALBUTEROL.  THERE IS A RECEPTOR

2 ON THE LUNG THAT IS A BETA RECEPTOR, AND ALBUTEROL STIMULATES

3 THAT BETA RECEPTOR TO OPEN UP THE LUNG PASSAGES.

4 AND THE OTHER ONE IS AN ANTICHOLINERGIC; IPRATROPIUM.

5 AND SO THAT'S THE SECOND.  SO "DUO" MEANS THERE'S TWO

6 MEDICATIONS IN THERE.  IT WAS FINE TO START WITH THAT.

7 THIS PATIENT WAS KNOWN TO HAVE COPD AND TO HAVE BEEN

8 HOSPITALIZED TWO TIMES PREVIOUSLY.  ONE OF THE FIRST THINGS WE

9 ASK SOMEBODY WHO PRESENTS WITH EITHER ASTHMA, EMPHYSEMA OR

10 CHRONIC OBSTRUCTIVE PULMONARY DISEASE IS:  "HAVE YOU EVER BEEN

11 HOSPITALIZED?  HAVE YOU EVER BEEN INTUBATED?"  THAT GIVES US AN

12 IDEA OF HOW SERIOUS THIS PATIENT CAN GET.  THOSE ARE WARNINGS

13 TO US AS A PHYSICIAN THAT THIS GUY, HE CAN GET PRETTY SICK.

14 THIS PATIENT HAD BEEN HOSPITALIZED TWO TIMES PREVIOUSLY.

15 Q.   BUT SO -- JUST TO MAKE SURE I UNDERSTOOD, YOU'RE SAYING

16 THAT AT THIS POINT THE TREATMENT OF HIM WAS APPROPRIATE.  IS

17 THAT RIGHT?

18 A.   YES.  WE USUALLY START -- I'VE SEEN HUNDREDS, IF NOT

19 THOUSANDS, IN 35 YEARS OF PATIENTS LIKE THIS.  YOU START BY

20 TREATING THE PATIENT'S RESPIRATORY DISTRESS WITH AN INHALATION

21 TREATMENT, YES.

22 Q.   OKAY.  SO LET'S MOVE FORWARD A COUPLE OF HOURS.  DID HIS

23 CONDITION IMPROVE OVER THE NEXT TWO HOURS?

24 A.   NOT ENOUGH.  SO HIS RESPIRATORY WENT TO 28.  THERE'S

25 REALLY NOT MUCH DIFFERENCE BETWEEN 28 AND 32.  HIS SATURATION

09:47 1    STAYED ABOUT 97 PERCENT.  AND SO HE WAS OXYGENATING.

2                THEN LET ME JUST LOOK DOWN A LITTLE BIT.  HE WAS

3    GIVEN A STEROID, WHICH IS APPROPRIATE.  HE RECEIVED AN

4    ANTIBIOTIC AND SOME -- AND HE HAD SOME LABS DRAWN.

5                AND THEN AT 10:40, WHICH IS NOW -- REMEMBER, HE CAME

6    IN AT 8:20, SO THIS IS TWO HOURS AND 20 MINUTES LATER, HIS

7    SATURATION HAS FALLEN TO 88 PERCENT.  AND YOU NOTICE THAT

8    THE -- IT'S 88 PERCENT ON ROOM AIR.  SO WE'RE INTERESTED IN

9    ROOM AIR, BECAUSE ROOM AIR IS WHAT WE'RE ALL BREATHING RIGHT

10   NOW.  IF YOU LOOK AT THE FIRST SATURATION UP IN THE UPPER-RIGHT

11   CORNER, THE PATIENT HAS GOT A 97 PERCENT SATURATION ON OXYGEN.

12               SO THIS IS IMPORTANT; THAT THIS PATIENT'S SATURATION

13   HAS FALLEN AND HE'S NOW -- THERE'S A VERBAL ORDER FROM

14   DR. CROOK, WHICH IS ADDING AN ANTIBIOTIC.  IT LOOKS LIKE

15   OXYGEN VANC STARTED.  SO IF IT SAYS "VANC," THAT'S VANCOMYCIN,

16   A SECOND ANTIBIOTIC.  I THINK IT'S "VANC."  OTHERWISE I DON'T

17   KNOW.

18               NO.  EXCUSE ME.  IT SAYS "OXYGEN VIA NC."  IT'S

19   "VIA," NOT "VANC."  SO THEY SAID TO GIVE OXYGEN.

20   **Q.**   AND SO YOU REFERENCED A TELEPHONE ORDER BY DR. CROOK

21   AND -- AT THE BEGINNING AND THEN A VOICE ORDER, ANOTHER

22   TELEPHONE ORDER, AT 10:40.  OVER THIS FIRST TWO HOURS AND 20

23   MINUTES PLUS IN THE ATU, DID A PROVIDER SEE THE PATIENT?

24   **A.**   SO JUST TO SAY THAT "V.O." IS A VERBAL ORDER.

25   **Q.**   UH-HUH.

09:49 1    **A.**    VERBAL ORDERS IN A SETTING OF A CARDIAC ARREST, I MAY TURN
2    TO THE NURSE AND SAY "DO THIS."  THAT'S A VERBAL ORDER.
3    **Q.**    UH-HUH.
4    **A.**    WHICH I FOLLOW UP LATER WITH A WRITTEN ORDER.  BUT IT'S
5    OKAY IN CRITICAL -- I DON'T -- I DON'T THINK -- FROM MY REVIEW
6    OF THIS RECORD, DR. CROOK WAS NOT PHYSICALLY PRESENT AND GAVE A
7    VERBAL ORDER.
8    **Q.**    AT SOME POINT DID DR. CROOK COME IN?
9    **A.**    WELL, THE BLUE WRITING HAS A SIGNATURE THAT I THINK IS
10    DR. CROOK'S.  SO I DON'T KNOW WHEN HE CAME, BUT HE DID COME IN
11    BECAUSE HE WROTE ON THIS CHART.
12    **Q.**    BUT DOES IT APPEAR THAT, FOR AT LEAST THE FIRST COUPLE OF
13    HOURS OF THIS PATIENT'S PRESENTATION, HE WAS NOT AT THE ATU?
14    **A.**    THAT'S CORRECT.
15    **Q.**    AND THIS WAS A THURSDAY, STARTING AT 8:20 IN THE MORNING.
16    IS THAT A TIME, WHEN UNDER DEFENDANTS' STAFFING PLAN, THERE IS
17    SUPPOSED TO BE A PROVIDER PRESENT?
18    **A.**    YES.
19    **Q.**    SO LET'S TALK ABOUT:  NOW THAT DR. CROOK IS IN THE ATU,
20    HOW WAS THE PATIENT TREATED AT THAT POINT?
21    **A.**    WELL, INTERESTINGLY HE WAS GIVEN SOME BLOOD PRESSURE
22    MEDICATION.  THAT MAY HAVE BEEN HIS DAILY BLOOD PRESSURE
23    MEDICATION.  I DON'T KNOW AT THIS MOMENT.  BUT HE WAS ALSO
24    GIVEN A BETA BLOCKER.  I'VE EXPLAINED THAT COAG- -- I'VE
25    EXPLAINED THAT BETA STIMULATION WITH ALBUTEROL TO THE BETA

09:50 1  RECEPTOR ON THE LUNG IS OPENING THE -- AND HE NOW RECEIVES A

2  BETA BLOCKER.  THAT MEANS THAT THE PATIENT'S HEART RATE, WHICH

3  IS LOW, 99 TO 100, IS NOW GOING TO SLOW.  IT'S A

4  BRONCHOCONSTRICTOR, MEANING IT TIGHTENS THE BRONCHIOLES, AND IT

5  TIGHTENS DOWN THE -- EXACTLY THE OPPOSITE OF WHAT WE NEED IN

6  THIS PATIENT.

7        NOBODY WOULD GIVE THIS PATIENT HIS BETA BLOCKER AT

8  THIS TIME WHERE HE'S WORSENING.  AND HE HAS BRONCHO, WHICH IS

9  THE BRONCHUS AND THE LUNGS ARE CONSTRICTED SO THAT HE IS HAVING

10  TROUBLE BREATHING.  HE'S SUCKING AIR, LIKE I SAID.  AND THEN

11  THE DOCTOR ALSO NOTICED THAT THE PATIENT WAS WHEEZING

12  THROUGHOUT BOTH LUNG FIELDS, AND THEN THEY SENT THE PATIENT TO

13  THE NURSING UNIT.  THE PATIENT NEEDED TO GO TO THE HOSPITAL.

14  Q.    AND IF WE GO TO PAGE 107 OF JOINT EXHIBIT 36.

15        WHAT HAPPENED TO THE PATIENT AFTER HE WAS SENT TO THE

16  NURSING UNIT?

17  A.    WELL, HE HAD A CARDIAC ARREST, PREDICTABLY SO.  YOU KNOW,

18  IF YOU -- ONE THING WE ALL HAVE TO DO IS WE HAVE TO BREATHE.

19  AND WHEN YOU CANNOT BREATHE AND OVER TWO HOURS YOU ARE GETTING

20  WORSE, YOU DON'T GO TO A PLACE WHICH CANNOT INTUBATE YOU AND

21  CANNOT DO WHAT YOU NEED, AND YOU DON'T GIVE A BETA BLOCKER AND

22  GET THAT PATIENT OUT OF YOUR SIGHT.  YOU HAVE TO KEEP THE

23  PATIENT IN YOUR SIGHT.

24  Q.    SO IT SAYS HERE AT 12:00 P.M. HE RETURNED TO THE ATU.

25  ABOUT HOW LONG AFTER BEING SENT TO THE NURSING UNIT DID HE GO

09:52 1    INTO CARDIAC ARREST?

2                IF WE GO BACK TO THE PREVIOUS PAGE TO 106 -- OH, I

3    GUESS THERE IS NO TIME.

4    A.    YEAH, THERE IS NOT A TIME.  I JUST KNOW THAT AT 8:20 HE

5    CAME IN.  AT 10:40, TWO HOURS AND 20 MINUTES LATER, HE WAS

6    WORSE.  HE WAS SENT TO THE NURSING UNIT, I DON'T KNOW WHAT

7    TIME, AND THEN HE HAD A CARDIAC ARREST.

8    Q.    AND IF WE LOOK -- SORRY.  IF YOU COULD STAY ON THAT PAGE,

9    ON --

10    A.    OH, SORRY.

11    Q.    -- 106.  AT THE LAST LINE OF THE "CHIEF COMPLAINT, HISTORY

12    AND ASSESSMENT," DOES THAT SAY 11:30?

13    A.    IT IS.  IT'S 11:30 A.M., BLOOD PRESSURE IS 228/112.  THE

14    PULSE IS 87, UNDERSTANDABLY SO BECAUSE HE WAS GIVEN A BETA

15    BLOCKER.  HE MAY HAVE BEEN ON BETA BLOCKERS.  AND HIS

16    RESPIRATORY RATE WAS -- IT APPEARS LIKE -- I DON'T KNOW --

17    MAYBE 24.  I DON'T REALLY KNOW, BUT IT DOESN'T REALLY MATTER.

18    Q.    BUT THE PROVIDER SENT HIM OUT OF THE ATU TO THE NURSING

19    UNIT WHEN HE WAS ABOUT 30 MINUTES AWAY FROM CARDIAC ARREST.  IS

20    THAT WHAT IT APPEARS TO SHOW?

21    A.    YES.

22    Q.    LET'S MOVE TO PATIENT NO. 29.

23                IF WE COULD GO TO JOINT EXHIBIT 29 AT 39.  LET'S

24    START ON THE MORNING OF MARCH 27TH.

25                NOW, WHAT DID THIS PATIENT COMPLAIN OF THAT MORNING?

09:53 1   **A.**   THE PATIENT WAS A SELF-DECLARED EMERGENCY FOR STOMACH AND

2   BACK PAIN.

3   **Q.**   AND WHO WAS HE SEEN BY?

4   **A.**   A MASTER SERGEANT, WOULD BE A MEDIC, AN EMT.

5   **Q.**   WHAT EXAMINATION DID THE EMT DO, IF ANY?

6   **A.**   YEAH.  WELL, HE OBSERVED THAT THE PATIENT SPOKE TO HIM IN

7   COMPLETE SENTENCES, LIKE I AM SPEAKING TO YOU RIGHT NOW IN

8   COMPLETE SENTENCES.  THE PATIENT WAS ALERT TO WHERE HE WAS, THE

9   TIME OF DAY AND THE CIRCUMSTANCES, AND THE PATIENT SAID THAT HE

10   HAD A RUNNY NOSE.

11   **Q.**   AND DID THE EMT MAKE ANY ASSESSMENT?

12   **A.**   NO.  THESE WERE THE PATIENT'S STATEMENTS.  THERE WAS NO

13   PHYSICAL EXAMINATION DONE.

14   **Q.**   AND WHAT WAS THE EMT'S DISPOSITION?

15   **A.**   "M.D."

16   **Q.**   WHAT DOES THAT MEAN IN THIS CONTEXT?

17   **A.**   IT USUALLY MEANS TO GO TO THE CLINIC AT SOME POINT.  IF

18   HE'S GOING TO THE ATU, THEN THEY WRITE "ATU."  IF IT CAN BE IN

19   THE CLINIC OR IN THE SICK CALL THE NEXT DAY, THAT IS THEN

20   WRITTEN AS "M.D."

21   **Q.**   AND WHEN YOU SAY IT CAN GO, DO YOU MEAN THE PATIENT CAN

22   GO, OR THIS REQUEST FORM CAN GO AND BE REVIEWED BY AN M.D.?

23   **A.**   EITHER.

24   **Q.**   OKAY.  NOW, HAVE YOU ALSO SEEN "M.D. REVIEW" IN THE

25   DISPOSITION FIELDS?

09:54 1    **A.**    YES.

2    **Q.**    IS IT YOUR UNDERSTANDING THAT THOSE ARE THE SAME THING?

3    **A.**    YES, THAT'S MY UNDERSTANDING.

4    **Q.**    SO THAT WAS AT 6:40 IN THE MORNING.

5              LET'S GO TO PAGE 37.

6              WHAT HAPPENED TO THE PATIENT THAT AFTERNOON?

7    **A.**    THAT AFTERNOON, IT SAYS HERE AT THE VERY TOP, "PER

8    SECURITY, PATIENT BOUNCING AROUND IN CELL."  THE PATIENT THEN

9    WAS NOTED TO HAVE A TEMPERATURE ON HIS TEMPLE WITH AN INFRARED

10   OF 108.2 DEGREES, WHICH IS OBVIOUSLY A HEAT STROKE.  HE WAS --

11   HE WAS UNDER HIS BED LAYING SUPINE -- THAT'S ON YOUR BACK -- ON

12   THE FLOOR WITH AGONAL RESPIRATIONS.  "AGONAL" MEANS THOSE ARE

13   THE KINDS OF RESPIRATIONS THAT YOU MAKE AS YOU'RE DYING.

14   THEY'RE AT THE END STAGE, KIND OF SUCKING AIR VERY SLOWLY.  IF

15   YOU SEE THAT, YOU KNOW YOUR PATIENT IS ABOUT TO DIE OR IS IN

16   CRITICAL -- A PROBLEM, 'CAUSE YOU CAN FIX IT.

17             SO HE HAD BEEN IN A TIME-OUT CELL, AND HE WAS

18   UNRESPONSIVE.  THEY CHECKED FOR A PULSE, AND IT WAS VERY WEAK.

19   AND IT WAS -- THEY ASKED TO SEND AN AMBULANCE.  AND THEY

20   CHECKED THE TEMPERATURE.  IT WAS 108.2.  HE WAS VERY WARM TO

21   THE TOUCH AND THEY STARTED COMPRESSIONS; THAT IS, CHEST

22   COMPRESSIONS.  AND THEY TURNED THE CARE OVER TO THE AMBULANCE.

23   **Q.**    AND JUST TO TOUCH ON ONE THING YOU SAID.  YOU SAID THAT HE

24   HAD HEAT STROKE.  AS A LAYPERSON, I AT LEAST THINK OF HEAT

25   STROKE AS YOU'RE EXPOSED TO TOO MUCH, YOU KNOW, HOT

09:56 1   TEMPERATURE.  IS THAT WHAT HEAT STROKE MEANS IN A MEDICAL
2   CONTEXT?
3   **A.**   NO.  THE DEFINITION OF "HEAT STROKE" IS A TEMPERATURE
4   ABOVE 104 AND A HALF OR 105 WITH AN ALTERED MENTAL STATUS;
5   THAT'S THE DEFINITION.
6   **Q.**   OKAY.
7   **A.**   AND THIS PATIENT WAS ALSO ON BENADRYL.  ONE OF THE WAYS
8   THAT YOU GET RID OF HEAT FROM THE BODY IS YOU SWEAT.  BENADRYL
9   IS AN ANTI-SWEATING -- IT'S ANTICHOLINERGIC, AND THE SWEAT
10  GLANDS ARE ENTIRELY CHOLINERGIC.  SO IF YOU BLOCK THE SWEAT
11  GLANDS, THAT'S ONE OF THE WAYS THAT YOU CAN GET HEAT STROKE.
12         ANY OF US COULD CREATE OUR OWN HEAT STROKE RIGHT NOW
13  BY STARTING TO HAVE A STATUS EPILEPTICUS IN THIS ROOM BECAUSE
14  OF THE MOTOR MOVEMENT.  NOW YOU ADD BENADRYL TO IT, AS LONG AS
15  YOU GO, THAT'S HEAT STROKE.  AND IT'S NICELY AIR-CONDITIONED IN
16  HERE.
17  **Q.**   AND SO LET'S GO LOOK AT THE ATU RECORD ON -- IMMEDIATELY
18  AFTER THAT, SO PAGE 34 OF JOINT EXHIBIT 29.
19         WHAT TREATMENT DID THIS PATIENT RECEIVE?
20  **A.**   WELL, HE GOT NARCAN, ALTHOUGH THERE'S NO SIGN OF OPIATES.
21  OPIATE DOES NOT CAUSE FEVER.  TO THE OPPOSITE, OPIATE SLOWS
22  DOWN EVERYTHING.  NARCAN REVERSES OPIATES.  OPIATES ARE A
23  SUBCLASS OF NARCOTICS.  IT'S OPIATE REVERSAL.  THERE'S NO SIGN
24  OF OPIATES HERE.
25         THE TEMPERATURE IS 108.2.  THEN HE GETS A REGULAR

09:58 1 CARDIAC RESUSCITATION, AND HE NEVER GETS COOLED.  THE TREATMENT
2 FOR HEAT STROKE FOR A TEMPERATURE OF 108 IS COOLING.
3 **Q.**   AND DID YOU SEE ANY EVIDENCE OF THAT?
4 **A.**   HE'S NOT COOLED.  IT'S INEXPLICABLE HOW YOU CANNOT TREAT
5 SOMEBODY IN CARDIAC ARREST WITH A TEMPERATURE OF 108.2.
6 **Q.**   AND YOU REFER TO THE NARCAN FOR OPIATE INTOXICATION.  WAS
7 THERE -- WAS THERE A SIGN THAT THEY DID OTHER THINGS TO SEE IF
8 -- RELATED TO THEIR CONCERN THAT IT MAY HAVE BEEN DRUGS?
9 **MR. DUBNER:**  AND WHY DON'T WE -- WE CAN ZOOM IN ON
10 THE RIGHT-HAND SIDE, THE BLUE NOTES.
11 **BY THE WITNESS:**
12 **A.**   OKAY.
13 **Q.**   AND I'LL DRAW YOUR ATTENTION TO JUST ABOVE WHERE IT SAYS
14 "BICARB @ 1427."
15 **A.**   YES.  SODIUM BICARBONATE.
16 **Q.**   AND RIGHT ABOVE THAT?
17 **A.**   A URINARY CATHETERIZATION.  "NO URINE IN" -- I MEAN, WHAT
18 IN THE WORLD DO YOU NEED TO CATHETERIZE THE PENIS FOR WITH A
19 GUY WITH 108 THAT YOU'RE NOT COOLING?  YOU'RE LOOKING AT HIS
20 URINE.  ARE YOU LOOKING TO SEE IF HE HAS A URINARY TRACT
21 INFECTION WHILE HE'S DYING?  ARE YOU LOOKING TO SEE IF HE USED
22 MOJO UP TO 18 DAYS BEFORE, 'CAUSE THAT'S HOW LONG MOJO STAYS
23 POSITIVE IN THE URINE?
24 WHAT IN THE WORLD IS THAT GOING TO DO TO HELP YOU?
25 WHAT IS THE POINT OF THAT?  THERE IS NO POINT.  ZERO POINT.

09:59 1 **Q.** AND WAS THAT WHILE THEY WERE ALREADY APPLYING THE ACLS

2 PROTOCOL IN TRYING TO RESUSCITATE THE PATIENT?

3 **A.** YEAH. THIS IS A HEAT STROKE WHO JUST HAD A CARDIAC

4 ARREST, AND THEY'RE STICKING -- YOU KNOW, THERE'S A RULE: YOU

5 CAN ONLY DO SO MANY THINGS RIGHT DURING A CARDIAC ARREST. YOU

6 TRY TO GET THE PATIENT'S AIRWAY ESTABLISHED, TRY TO RESTART THE

7 HEART; AND IF THERE'S A HEATSTROKE, YOU COOL THE PATIENT.

8 YOU DON'T STICK CATHETERS IN THE PENIS, BECAUSE THAT

9 TAKES SOMEBODY TO DO THAT. SOMEBODY HAS TO BE DOING THAT WHO

10 COULD BE RUNNING FOR ICE OR COULD BE PUTTING COLD PACKS OR

11 SPRAYING THE PATIENT DOWN OR TURNING ON A FAN OR DOING

12 SOMETHING, OR THEY COULD BE CALLING FOR AN AMBULANCE.

13 THERE'S ONLY SO MUCH ANYBODY -- EVEN IN MY SETTING,

14 IN A MAJOR EMERGENCY DEPARTMENT, WE CAN DO RIGHT, AND YOU HAVE

15 TO GET THREE OR FOUR THINGS RIGHT. AND TO CATHETERIZE THE

16 URINE FOR TOXICOLOGY OR A URINALYSIS -- A URINALYSIS WILL COME

17 BACK THE FOLLOWING DAY, OR TOXICOLOGY -- WHICH WE'LL GET MUCH

18 MORE INTO I HOPE -- WHICH MAY OR MAY NOT BE REFERABLE TILL NOW.

19 AND IF IT IS POSITIVE AND ACTUALLY HE DID USE SOMETHING, EVEN

20 COCAINE, THE TREATMENT IS STILL COOLING.

21 IT DOESN'T MATTER WHAT THE REASON FOR THIS HEAT

22 STROKE IS. FORTUNATELY WE TREAT THEM ALL THE SAME: WE COOL

23 THEM. IT'S REALLY SIMPLE.

24 **Q.** AND DID THIS PATIENT PASS AWAY AFTER THIS?

25 **A.** YES.

10:00 1  Q.   YES.

2            AND LET'S JUST GO TO PAGE 38.

3            AND IF WE COULD GO PUT THIS AND PAGE 39 UP AT THE

4  SAME TIME.

5            SO ON THE LEFT WE HAVE THE SELF-DECLARED EMERGENCY

6  THAT HE MADE THAT MORNING FOR STOMACH AND BACK PAIN.

7            ON THE RIGHT ON PAGE 38, THERE'S NOW BEEN AN ADDITION

8  MADE IN THE "HEALTH CARE PRACTITIONER NOTES."  CAN YOU SAY WHAT

9  THAT SHOWS?

10  A.   WELL, IT LOOKS LIKE IT SAYS "SICK CALL, AS NEEDED."  AND

11  IT APPEARS TO BE WRITTEN ON APRIL 3RD; WHEREAS THIS PATIENT'S

12  INITIAL CALL ON THE DATE OF HIS DEATH WAS, IT LOOKS TO ME ON

13  THE LEFT ONE, IS MARCH 27, '20.  AND SO THEN THERE IS THIS

14  ADDITION IN THE LOWER RIGHT THAT HE'S "SICK CALL, AS NEEDED."

15  Q.   AND "PRN" IS A MEDICAL ABBREVIATION FOR --

16  A.   AS NEEDED.  RIGHT, AS NEEDED.

17  Q.   AND WHAT WAS THIS PATIENT'S AGE?  AT THE TOP OF THE PAGE.

18  A.   HE WAS 28 YEARS OLD.

19  Q.   THANK YOU.

20            LET'S GO TO PAGE 25.  I'M SORRY.  PATIENT NO. 25.

21  LET'S START AT JX_25 AT PAGE 33.

22            SO WE'RE NOW INTO OCTOBER 2020.  THIS IS OCTOBER 2ND.

23  IF YOU COULD, TELL US WHAT HAPPENED TO THIS PATIENT ON

24  OCTOBER 2ND.

25  A.   SO ON OCTOBER 2ND AN AMBULANCE RUN REPORT THAT'S UP HERE

10:02 1 SHOWS THAT THE CALL WAS FOR "AN OFFENDER FEELING WEAK AND

2 DIZZY."

3    WHEN THE AMBULANCE PERSONNEL ARRIVED, THE PATIENT

4 SAID, "I STOOD UP A FEW MINUTES AGO, FELT DIZZY, SAT DOWN, THEN

5 WOKE UP ON THE FLOOR."  SO THE PATIENT FAINTED.

6 **Q.** AND WAS THE PATIENT TRANSPORTED TO THE ATU AT THAT POINT?

7 **A.** THE PATIENT REFUSED TRANSPORT.

8 **Q.** AND LET'S LOOK AT THE NEXT PAGE, PAGE 34.

9    THIS IS THE REFUSAL NOTE FROM WHEN THE PATIENT

10 REFUSED TRANSPORT?

11 **A.** THIS IS THE REFUSAL NOTE.  IT'S SIGNED AND THE CAPTAIN

12 HERE GAVE A -- DID A GOOD REFUSAL.  AND THE CAPTAIN RECOGNIZED

13 THE DANGERS OF FAINTING IN A 52-YEAR-OLD.  I THINK HE WAS 52 OR

14 57.  I DON'T REALLY REMEMBER, BUT WE CAN LOOK AT IT.  SO THE

15 CAPTAIN SAID, "POSSIBLE RESULTS OF REFUSAL, INCLUDING

16 INFECTION, DISEASE, COMA AND/OR DEATH."  SO THE CAPTAIN KNEW.

17 YOU DON'T SAY THIS ON EVERY REFUSAL.

18 **Q.** AND WOULD YOU SAY THIS IS A GOOD REFUSAL NOTE?  THIS IS

19 WHAT YOU WANT TO SEE?

20 **A.** THIS IS A GOOD REFUSAL.

21 **Q.** IS THIS GENERALLY WHAT YOU DO SEE?

22 **A.** NO.

23 **Q.** SO LET'S THEN LOOK AT OCTOBER 27, 2020 AT PAGE 32.

24    SO HE WAS SEEN IN THE GENERAL MEDICINE CLINIC.  GIVEN

25 WHAT HAD HAPPENED THREE WEEKS PREVIOUSLY, WHAT'S YOUR

EVALUATION OF THIS CLINICAL NOTE?

**A.**   SO HERE'S A 52-YEAR-OLD MAN WHO -- IT'S NOW OCTOBER 27TH -- WHO FAINTED ON THE 2ND OF OCTOBER.  WE HAVE -- IT SAYS THERE THAT HE HAD A NORMAL EKG AT THE TIME OF HIS FAINTING, I SUPPOSE, AND HE HAS HAD NO PROBLEMS SINCE.

ONE OF THE THINGS WE WORRY ABOUT -- AND THE AMERICAN COLLEGE OF CARDIOLOGY WORK SPEAKS SPECIFICALLY TO THIS WITH SYNCOPE, WHICH IS FAINTING, AND THE AMERICAN HEART ASSOCIATION -- IS THAT WHEN YOU FAINT ONCE OR TWICE, THAT'S MUCH MORE SERIOUS THAN SOMEBODY WHO FAINTS EVERY TIME THEY SEE THEIR BLOOD OR IF THEY GET THEIR BLOOD DRAWN.  THAT'S A HISTORY THERE.

SO YOU HAVE A 52-YEAR-OLD MAN WHO HAS A -- FAINTED A MONTH BEFORE.  THEY LISTEN TO THE CHEST, THE LUNGS.  THEY SAY THE HEART HAS REGULAR RHYTHM AND RATE, NO MURMUR.  AND, YOU KNOW, NOT HAVING A MURMUR MEANS THAT YOU CAN'T HEAR THE BLOOD GOING ACROSS THE VALVE.  BUT WHEN YOU GET A REALLY SMALL VALVE, AN AORTIC STENOSIS, WHICH THIS PATIENT HAD, A NARROWING OF THAT VALVE, YOU DON'T HEAR THE MURMUR.  SO A REALLY QUIET MURMUR OR AN UN-HEARABLE MURMUR IS VERY SERIOUS, TOO.  SO THE PRESENCE OF NO -- THE PRESENCE OF A MURMUR IS IMPORTANT, BUT SOMETIMES YOU DON'T HEAR A MURMUR.

BUT IN AORTIC STENOSIS, WHICH THIS PATIENT HAD, THE FACT THAT THE PATIENT FAINTED -- BY THE WAY, ON THE PREVIOUS IT SAID "THE ORTHOSTATIC VITALS SIGNS," BECAUSE I KNOW THAT

10:05 1  DR. MATHIS IN HIS REPORT SPOKE TO THE FACT THAT THIS IS

2  PROBABLY VASOVAGAL.  "VASOVAGAL" MEANS THAT THE VAGUS NERVE,

3  WHICH SLOWS US AND CALMS US HERE IN THE COURTROOM, IS

4  ACTIVATED.  IT LOWERS YOUR BLOOD PRESSURE.  IT LOWERS YOUR

5  PULSE; THAT'S VASOVAGAL.  AND HE DID NOT HAVE THE VITAL SIGNS

6  OF A VASOVAGAL EPISODE.  AND THAT'S IMPORTANT.

7  **Q.**   AND IT REFERS -- ON THE SECOND LINE I SEE THE LETTERS

8  "EKG."  COULD YOU SAY JUST WHAT THE CLINIC SEEMED TO NOTE ABOUT

9  THE EKG?

10  **A.**   IT SAYS HE HAD A NORMAL EKG.  I THINK THIS WAS ONE MONTH

11  BEFORE, BECAUSE I DON'T SEE ANY RECORD OF AN EKG ON THIS VISIT.

12  **Q.**   AND WAS THERE ANY REVIEW OF THE PATIENT'S CARDIAC OR

13  NEUROLOGIC HISTORY?

14  **A.**   NO.

15  **Q.**   SO NOW LET'S RETURN TO -- LET'S MOVE FORWARD, I GUESS, TO

16  JANUARY 22, 2021 ON PAGE 31 OF JOINT EXHIBIT 25.

17       WHAT HAPPENED TO THE PATIENT AT THAT POINT?

18  **A.**   WELL, YOU SEE HERE AT 6:05 A.M. HE HAD NO BLOOD PRESSURE

19  AND NO PULSE.  HIS RESPIRATIONS WERE AGONAL AND HE HAD A

20  CARDIAC ARREST.

21  **Q.**   AND IF WE LOOK AT THE BEGINNING OF THE NARRATIVE AT THE

22  BOTTOM, HOW WAS THE PATIENT TREATED INITIALLY?

23  **A.**   WELL, HE WAS GIVEN NARCAN.  AND IT'S INTERESTING THAT THE

24  SECOND SENTENCE THEREUNDER IS "AED WAS NOT ATTACHED."  WHAT

25  THEY MEANT THERE IS THAT THE AED WAS EVENTUALLY -- HAD NOT BEEN

ATTACHED BY THE BYSTANDERS UPON THIS PATIENT LOSING HIS PULSE,

2   AND THAT WOULD BE EXPECTED.  AND I THINK THE PRISON EXPECTS

3   THAT, BUT IT DIDN'T HAPPEN.

4           IT'S VERY UNUSUAL TO WRITE WHEN SOMETHING WAS NOT

5   DONE THAT SHOULD HAVE BEEN DONE, SO SOMEBODY WAS A LITTLE MAD

6   ABOUT IT.  THE PATIENT FELL AND HIT HIS HEAD ON THE WALL.  HE

7   HAD THE AGONAL RESPIRATIONS.  THE PADS WERE ATTACHED -- THAT'S

8   THE AED, THE PADS -- AND HE WAS IN VENTRICULAR FIBRILLATION.

9   AND THAT, BY THE WAY, SHOULD HAVE BEEN TREATED AT THE TIME THAT

10   THEY CALLED FOR AN AMBULANCE AT 5:57 A.M.  HE WAS EN ROUTE AT

11   5:57, AND FOUR OR FIVE -- AT 6:03 THEY WERE ON THE SCENE.

12           SO THAT'S THREE MINUTES FROM 6:00 AND THREE MINUTES

13   BEFORE.  THAT'S SIX MINUTES WHERE HE COULD HAVE AN AED

14   ATTACHED; THAT'S WHAT THEY EXPECT.  EVERYBODY'S TRAINED THERE,

15   IS MY UNDERSTANDING OF THEIR POLICIES AND PROCEDURES, AND THE

16   PATIENT COULD HAVE BEEN CARDIOVERTED.  THE AED WOULD HAVE SENT

17   A SHOCK ADVISED, AND IT WOULD HAVE DELIVERED A SHOCK.

18   Q.   AND YOU SAID "BYSTANDERS" BEFORE.  DO YOU MEAN THE

19   SECURITY OFFICERS?

20   A.   I DO.

21   Q.   BECAUSE IT DOES SAY TWO NASAL NARCAN DOSES GIVEN.  IS THAT

22   GIVEN BY -- I GUESS THE ONLY OTHER BYSTANDERS IN A PRISON WOULD

23   BE OTHER INMATES?

24   A.   YEAH.  SO SOMEBODY WAS GIVING NARCAN TO A GUY WHO WAS IN

25   VENTRICULAR FIBRILLATION AND SHOULD HAVE BEEN SHOCKED.  SO THIS

10:08 1  GOES BACK TO WHAT I SAY AS IN AN EMERGENCY, THERE ARE ONLY SO
2  MANY THINGS YOU CAN DO RIGHT AT THE SAME TIME.  AND IN THE
3  EMERGENCY WHERE SOMEBODY STOPS BREATHING, BLOOD PRESSURE,
4  PULSE, EVERYTHING IS DOWN AND THEY SLIP AND FALL AND ARE
5  UNRESPONSIVE, I DON'T CARE IF THEY HAVE NARCAN, BUT THEY HAVE
6  TO USE THE AED.
7  **Q.**   AND LET'S THEN -- AND DID THIS PATIENT PASS AWAY?
8  **A.**   YES.
9  **Q.**   LET'S MOVE OVER TO HIS AUTOPSY ON PAGE 15.
10       WHAT ARE THE -- AND SO WHAT WERE THE FINDINGS OF THE
11  PATIENT'S HEART CONDITION?
12  **A.**   SO THE CAUSE OF DEATH I'VE SPOKEN TO IS AORTIC STENOSIS.
13  IT IS A NARROWING OF THE AORTIC VALVE.  HE HAD ALSO
14  HYPERTENSION AND HARDENING OF THE ARTERIES, ATHEROSCLEROSIS,
15  CARDIOVASCULAR DISEASE AND OBESITY.
16       AND ON -- UNDER 1(B) YOU SEE THAT HE HAD A BIG HEART;
17  CARDIOMEGALY, IT'S LIKE A MEGALOMANIAC.  IT'S BIG, A BIG
18  THINKER OR A BIG HEART HERE.  SO "CARDIOMEGALY WITH LEFT
19  VENTRICULAR HYPERTROPHY."
20       THE EKG CANNOT BE NORMAL.  REMEMBER, OCTOBER 27TH IT
21  SAID "EKG NORMAL."  IT CANNOT BE NORMAL BECAUSE AN EKG SEES
22  CARDIOMEGALY.  THE EKG SHOWS THIS THING, AND IT WILL ALSO SHOW,
23  IN SOME CIRCUMSTANCES, THIS DILATION OF THE BILATERAL ATRIAL
24  CHAMBERS.  YOU'LL SEE ATRIAL ENLARGEMENT.
25       WHETHER YOU CAN OR CANNOT READ AN EKG TO SHOW

10:09 1  BILATERAL ATRIAL ENLARGEMENT, I DON'T CARE, BUT THIS IS NOT A
2  NORMAL EKG.  THE HEART IS TOO BIG, AND THE LEFT VENTRICULAR IS
3  HYPERTROPHY.
4  **Q.**  AND THAT EKG THAT THE PROVIDER SAID WAS NORMAL, IS THAT IN
5  THE RECORD ANYMORE?
6  **A.**  NO.
7  **Q.**  LET'S KEEP MOVING FORWARD TO PATIENT NO. 55.
8       IF WE COULD GO TO 55 -- JX_55 AT 69.
9       SO WE'LL START ON FEBRUARY 3, 2021.
10 **A.**  OKAY.  I'LL JUST GO TO THE PATIENT, IN CASE I NEED TO SEE
11 ANYTHING ELSE.
12 **Q.**  PLEASE DO.
13 **A.**  OKAY.
14 **Q.**  SO WHAT WAS HIS BLOOD PRESSURE ON THIS DAY?
15 **A.**  205/131.
16 **Q.**  AND IS THAT ELEVATED?
17 **A.**  YES.
18 **Q.**  AND THIS SAYS HE WAS NON-COMPLIANT WITH HIS BLOOD PRESSURE
19 MEDICATION.  IS THAT RIGHT?
20 **A.**  YES.
21 **Q.**  AND THEN IF WE GO TO PAGE 68.
22       SO THEY SAW HIM IN THE ATU.  IS THAT A REASONABLE
23 THING TO DO?
24 **A.**  YES.
25 **Q.**  AND LET'S FIRST JUST LOOK -- IF WE CAN LOOK AT THE

10:10  1   RIGHT-HAND SIDE IN THE "PHYSICIAN ASSESSMENT AND TREATMENT"
2   SECTION, IT SAYS "PT."  THAT'S AN ABBREVIATION FOR PATIENT?
3   **A.**   YES.
4   **Q.**   "PATIENT HAS NOT FILLED BLOOD PRESSURE MEDICATION SINCE
5   OCTOBER."  DID YOU LOOK AT THIS PATIENT'S MEDICATION
6   ADMINISTRATION RECORD?
7   **A.**   I DID.
8   **Q.**   AND DOES THAT SHOW THAT HE HADN'T FILLED HIS BLOOD
9   PRESSURE MEDICATION SINCE OCTOBER?
10   **A.**   NO.  THEY WERE KOP, AND IT WAS ALL THE TIME.
11   **Q.**   AND SO THERE WAS NO WAY FOR THE PROVIDER IN THE EMERGENCY
12   ROOM TO LOOK AT THE MEDICATION ADMINISTRATION RECORDS AND SEE
13   THAT THIS PATIENT HADN'T FILLED HIS BLOOD PRESSURE MEDICATIONS
14   SINCE OCTOBER.  IS THAT CORRECT?
15   **A.**   THAT'S TRUE.
16   **Q.**   NOW, WHAT TREATMENT DID THEY GIVE HIM AT THIS TIME?
17   **A.**   THEY GAVE AMLODIPINE, LOSARTAN, HYDRALAZINE AND
18   SPIRONOLACTONE, WHICH IN THE -- IS ACTUALLY -- THE BRAND NAME
19   IS ALDACTONE.  THESE WERE HIS DAILY MEDICATIONS, AND THAT'S
20   ACCEPTABLE.
21   **Q.**   SO IS THERE ANYTHING YOU WANT TO KEEP AN EYE OUT WHEN YOU
22   ARE LOWERING A PATIENT'S BLOOD PRESSURE SORT OF ALL AT ONCE?
23   **A.**   WELL, YOU DON'T WANT TO OVERSHOOT.  IT'S COMMON TO GIVE
24   THE DAILY MEDICATIONS, BUT YOU DON'T WANT TO OVERSHOOT, BECAUSE
25   A PERSON WHO HAS THESE ELEVATED TEMPERATURES AND A HISTORY OF

10:12 1    HYPERTENSION AND IS RUNNING HIGH NEEDS THAT PRESSURE HEAD TO

2    PERFUSE THEIR BRAIN.  SO IF YOU DROP IT TOO QUICKLY -- WE USED

3    TO DO THIS.  THIRTY YEARS AGO EVERYBODY WOULD GET A BLOOD

4    PRESSURE MEDICINE CALLED PROCARDIA IN THE ER UNTIL ALL THESE

5    PEOPLE STARTED -- PEOPLE WERE REPORTING DEATH AND STROKE

6    BECAUSE YOU DROPPED THE PERFUSION TO THE BRAIN, THE PRESSURE

7    HEAD TO THE BRAIN, AND THE PATIENT STROKES.

8         SO WE HAVE TO -- IT'S ACCEPTABLE TO DO THIS.  AND

9    THEY DID NOT GIVE CLONIDINE 0.2 MILLIGRAMS.  IT WAS HELD.  I

10    DON'T KNOW WHY THAT WAS.  MAYBE THEY JUST DECIDED THEY WANTED

11    TO BE LESS AGGRESSIVE BECAUSE THEY WERE CONCERNED ABOUT WHAT

12    I'VE JUST ELUCIDATED.  I DON'T KNOW.  THAT'S OKAY.  HOLD IT.

13    **Q.**   OKAY.  SO THEN LET'S NOW LOOK AT THE NEXT DAY.  IF WE

14    COULD GO TO PAGE 63.  I'M SORRY.  AND IF WE COULD GO TO JX_55

15    AT 63.  THANK YOU.  I THINK THAT'S 68 STILL.

16         **MR. DUBNER:**  ONE MOMENT, YOUR HONOR.

17         **THE COURT:**  THAT'S OKAY.  WE ARE GOING TO TAKE A

18    BREAK AFTER THIS PATIENT.

19    **BY MR. DUBNER:**

20    **Q.**   AND WE CAN TALK ABOUT THE PATIENT WHILE WE ARE PULLING

21    THIS UP.

22         DO YOU RECALL WHAT HAPPENED TO THE PATIENT ON THE

23    NEXT DAY?

24    **A.**   HE HAD A STROKE.  I DON'T KNOW IF IT WAS EXACTLY THE NEXT

25    DAY, BUT THE PATIENT CAME IN WITH A BLOOD PRESSURE OF -- WELL,

10:14 1    I THINK WE SHOULD LOOK IT UP BECAUSE I DON'T WANT TO MAKE A

2    MISTAKE.

3    **Q.**   WELL, WE CAN WAIT FOR THE RECORD, THAT'S FINE.  WE

4    WOULDN'T WANT TO --

5    **A.**   -- BECAUSE I DON'T WANT TO MAKE A MISTAKE.

6              **THE COURT:**  WAIT.  HOLD ON.  NONE OF THAT -- WE

7    CAUGHT NONE OF THAT.  YOU WERE BOTH TALKING.

8              **MR. DUBNER:**  I'LL WITHDRAW MY LAST QUESTION.

9              AND NOW THAT WE HAVE THE RECORD UP, WE CAN WORK

10   WITH THAT.  SO IF WE LOOK AT -- IT WAS THERE.  I'M SORRY, YOUR

11   HONOR.  GIVE US ONE MOMENT.  I CAN ALSO --

12             **THE WITNESS:**  THERE IT IS.

13             **MR. DUBNER:**  OKAY.

14             **THE COURT:**  YOU CAN PUT IT ON THE ELMO.

15             **MR. DUBNER:**  YEAH.  THANK YOU.

16             I'LL PUT IT ON THE ELMO.  I'VE GOT A COPY HERE.

17   YOU CAN LEAVE THAT THERE.  THAT'S FINE.

18   **BY THE WITNESS:**

19   **A.**   WELL --

20   **Q.**   YOU CAN LEAVE THAT THERE, THAT'S FINE.

21   **A.**   JUST LEAVE IT.  I CAN SEE IT.

22   **Q.**   YEAH.  IT'S OKAY.

23   **A.**   AND I REMEMBER IT.

24   **Q.**   OKAY.  YES.  SO THANK YOU.

25             **MR. DUBNER:**  APOLOGIES, YOUR HONOR, FOR THE

10:15 1    COMPLICATIONS.

2                     THANK YOU, RACHEL.

3    **BY MR. DUBNER:**

4    **Q.**   SO, DR. VASSALLO, IF YOU CAN TALK ABOUT WHAT HAPPENS THE

5    NEXT DAY.

6    **A.**   SO THE NEXT DAY THE PATIENT WAS FOUND SITTING UPRIGHT WITH

7    A BLOOD PRESSURE OF 102/79.  SO HE WAS 100 POINTS DOWN IN HIS

8    SYSTOLIC IN A DAY OR SO.

9                     NOW, WHAT DOES THAT -- HE HAD A HISTORY OF A PREVIOUS

10   STROKE.  HE HAD LEFT HEMIPARESIS.  THIS COULD -- THAT MEANS

11   THAT THE LEFT SIDE -- "PARESIS" MEANS IT'S NOT MOVED TO

12   NORMALLY.  IT'S NOT PARALYSIS, BUT IT'S WEAKNESS ON THE LEFT

13   SIDE.  AND THE CALL CAME IN AS A POSSIBLE SEIZURE AND THE

14   BYSTANDERS OR -- LET'S SEE.  THE BYSTANDERS SAID, HE JUST

15   STARTED DROOLING AND SLUMPED TO THE SIDE.

16                    "THE PATIENT WAS ANSWERING QUESTIONS APPROPRIATELY,"

17   MEANING HE WAS AWAKE.  SO WHEN YOU'RE AWAKE, YOU HAVEN'T USED

18   OPIATES TO CAUSE YOU TO SLUMP AND DROOL BECAUSE YOU'RE AWAKE.

19                    THE LEFT-SIDE GRIP WAS SLIGHT WEAKNESS.  HE SAID,

20   "I'M OKAY."  AND THEN THE -- IT WAS STATED THAT HE USES A CANE

21   AND I -- USUALLY USES A CANE.

22   **Q.**   OKAY.  AND SO YOU SAID THAT THIS PATIENT HAS A HISTORY OF

23   CVAS.  BETWEEN THAT AND THE SUBSTANTIAL LOWERING OF THE BLOOD

24   PRESSURE OVER THE LAST DAY, IS THERE ANYTHING THAT YOU WOULD BE

25   CONCERNED ABOUT AT THIS POINT FOR THE PATIENT?

1    **A.**    WELL, YOU KNOW, I DON'T -- I'M NOT REALLY CRITICIZING THE

2    ADMINISTRATION OF THE DAILY MEDICATION.

3    **Q.**    UH-HUH.

4    **A.**    BUT WHAT I AM -- I WONDER WHY HE FELL BY 100 POINTS, A 100

5    POINTS.  IS IT BECAUSE THEY STARTED HIM -- I DON'T KNOW.  IT

6    COULD BE.  I'M ALWAYS WORRIED ABOUT THAT.  AND THE RESIDENTS

7    ALWAYS WANT TO GIVE EVERYTHING.  I SAID, "LET'S NOT GIVE HIM

8    EVERYTHING IF HE HASN'T BEEN ON IT, OR IF HE HAS BEEN ON IT, WE

9    HAVE TO BE CAREFUL."

10    **Q.**    BUT -- SO AT THIS POINT AFTER THE MEDICATION HAS BEEN

11    GIVEN, ONCE HE DEVELOPS THESE SYMPTOMS, HE JUST STARTED

12    DROOLING AND SLUMPED TO THE SIDE; LEFT-SIDE GRIP SLIGHTLY

13    WEAKER.  WHAT CONCERNS WOULD YOU HAVE AT THIS POINT?

14    **A.**    I'M CONCERNED THAT THE PATIENT IS NOT GETTING BLOOD SUPPLY

15    TO THE PART OF THE BRAIN -- TO PART OF THE BRAIN.  AND IT'S

16    VERY DIFFICULT TO TELL WHEN SOMEONE HAS A PREVIOUS STROKE AND

17    THEY NOW HAVE LEFT-SIDED WEAKNESS.  IS THAT THE SAME LEFT-SIDED

18    WEAKNESS, OR IS THAT WORSENED BY THIS LOW BLOOD PRESSURE?  HE

19    HASN'T SEEN 102/79 IN A LONG TIME.  THE BRAIN IS NOT BEING

20    PERFUSED SUFFICIENTLY, SO I'M WORRIED.  IS THIS NEW LEFT-SIDED

21    -- HE JUST SLUMPED AND FELL OVER TO THE SIDE AND HE'S AWAKE.

22    I'M WORRIED THAT THE BRAIN IS NOT BEING PERFUSED SUFFICIENTLY.

23    **Q.**    OKAY.

24    **A.**    ANOTHER WAY OF SAYING THAT IS MAYBE HE'S HAVING A STROKE,

25    OR SOMETHING JUST PRIOR TO A STROKE.

10:17 1   **Q.** OKAY. SO LET'S NOW GO TO JOINT EXHIBIT 55 AT PAGE 64.
2   THANK YOU.
3         SO THEY TAKE HIM TO THE ATU. ARE THERE ADDITIONAL
4   DETAILS IN THE "CHIEF COMPLAINT, HISTORY AND ASSESSMENT" THAT
5   ARE SIGNIFICANT?
6   **A.** WELL, IT SAYS, AGAIN, THAT "HE WAS SITTING IN A CHAIR AND
7   SLUMPED OVER." THAT'S WHAT WE HEARD PREVIOUSLY. IT ALSO SAYS
8   THAT HE HAS WEAKNESS TO THE LEFT UPPER AND MAYBE LOWER
9   EXTREMITIES: "LU AND LE." HE HAS A HISTORY OF -- THE STROKE
10   WAS NOTED. AND THE WORDS "TELEPHONE ORDERS ADMINISTERED" -- I
11   MEAN, TELEPHONE ORDER WITH THE DOCTOR WAS GOTTEN AT 6:15.
12   **Q.** RIGHT. SO WE NOW KNOW THAT HE STARTED DROOLING, SLUMPED
13   TO THE SIDE, HAS WEAKNESS TO THE LEFT UPPER AND LOWER
14   EXTREMITY. AND DID A PROVIDER SEE HIM?
15   **A.** NO.
16   **Q.** WAS THERE ANY PHYSICAL EXAM OF THE PATIENT?
17   **A.** NOTHING IS RECORDED ON THIS CHART.
18   **Q.** AND THEN AT 7:30 P.M., 1930, WHAT DID THEY DO WITH THE
19   PATIENT AT THAT POINT?
20   **A.** WELL -- SO THE PATIENT CAME IN AT 1805, 6:05 P.M. AND NOW
21   IT'S ABOUT AN HOUR AND 25 MINUTES LATER. IT'S NOW 1930, 7:30
22   P.M. THEY SAY "NO CHANGE IN NEURO STATUS." IT WASN'T BETTER,
23   IT WASN'T WORSE. THAT'S WHAT "NO CHANGE" MEANS. AND THEY
24   DISCHARGED THE PATIENT.
25   **Q.** AND WHERE DID THEY DISCHARGE HIM TO?

10:19 1  **A.**   "RETURN" -- IN THE LOWER RIGHT CORNER, "RTQ," MEANS RETURN

2  TO QUARTERS.

3  **Q.**   AND WHAT DID HE NEED AT THIS POINT?

4  **A.**   I'M SORRY?

5  **Q.**   WHAT DID HE NEED AT THIS POINT?

6  **A.**   HE NEEDED TO GO TO THE HOSPITAL.  HOW DO YOU KNOW THAT THE

7  MAN IS HAVING A STROKE OR NOT HAVING A -- I DON'T KNOW, EXCEPT

8  THAT I KNOW WHAT HAPPENED.  WHEN I DON'T KNOW AND I CAN'T

9  PROVIDE THE CARE AND -- WITH A PATIENT WHO ALREADY HAD A

10  STROKE, THEN THE PATIENT HAS TO BE IN A PLACE WHERE A PROPER

11  STROKE WORKUP CAN BE DONE.

12  **Q.**   AND SO LET'S THEN LOOK AT THE NEXT DAY.

13      **MR. DUBNER:**  IF YOU COULD GO TO PAGE 61.  THANK YOU,

14  RACHEL.

15  **BY MR. DUBNER:**

16  **Q.**   WHAT DOES HE PRESENT WITH THE NEXT DAY?

17  **A.**   SO THE NEXT DAY HE SAID HE IS HAVING SHAKES FOR ONE DAY.

18  NOW, SHAKES ARE WHEN -- AND THEN IT ALSO SAYS THAT HE HAD A

19  HISTORY OF A STROKE AND HE HAD INCREASED WEAKNESS TO THE LEFT

20  LEG AND FOOT SINCE YESTERDAY.  AND THE SHAKES ARE A FOCAL

21  SEIZURE, SO IT CAN BE -- I DON'T KNOW.  MAYBE HE WAS SHAKING

22  FROM SOME OTHER REASON.  BUT THE SHAKES IS A -- AND REMEMBER

23  THAT FIRST CALL SAID, "AND POSSIBLE SEIZURE."

24      AND SO WHEN YOU'RE NOT PERFUSING PART OF YOUR BRAIN

25  AND YOU'VE ALREADY HAD A STROKE IN THE PAST, YOU CAN HAVE A

10:20 1  SEIZURE THAT DOES NOT RESULT IN UNCONSCIOUSNESS, WHAT WE CALL A

2  GRAND MAL SEIZURE.  IT CAN BE A FOCAL, JUST YOUR LEG IS KICKING

3  AROUND, BECAUSE THAT'S THE PART OF THE BRAIN THAT CONTROLS THE

4  LEG.

5  SO HE HAD NOW INCREASED WEAKNESS OF THE LEFT LEG AND

6  FOOT SINCE YESTERDAY.  AND WHAT I THOUGHT WAS THAT HE HAD

7  DIFFICULTY WALKING AND HE WAS NOW USING A WHEELCHAIR; WHEREAS

8  HE NORMALLY WALKS EASILY WITH A CANE.  THAT'S ALL YOU HAVE TO

9  HEAR.

10  Q.  AND SO HE WAS TAKEN TO THE ATU AT THIS POINT.  LET'S GO TO

11  PAGE 57.

12  AND AFTER HE WENT TO THE ATU, DID THEY SEND HIM TO

13  THE HOSPITAL?

14  A.  WELL, THEY SENT HIM FOR A CAT SCAN TO WEST FELICIANA

15  OUTPATIENT -- FOR AN OUTPATIENT CAT SCAN, YES.

16  Q.  AND IF WE LOOK AT THE BOTTOM LEFT, WHAT TIME DID THEY SEND

17  HIM TO WEST FELICIANA HOSPITAL?

18  A.  10:42.  IT LOOKS LIKE 10:42 A.M.

19  Q.  AND SO IF HE FIRST PRESENTED TO THE MEDIC AT 5:37 P.M. THE

20  NIGHT BEFORE, IS THAT ABOUT 17 HOURS?

21  A.  YES.

22  Q.  LET'S NOW LOOK AT WHAT THAT -- WHAT WEST FELICIANA

23  REPORTED ABOUT THE CT SCANS.  SO IF WE GO TO PAGE 60.

24  THANK YOU.

25  WHAT WERE THE -- WHAT WAS THE IMPRESSION AND THE

10:22 1  NOTES FROM THE RADIOLOGIST?

2  **A.**   IT SAYS, NO. 1, THAT "THERE IS NO ACUTE," MEANING AS OF A

3  FEW HOURS AGO OR YESTERDAY, "INTRACRANIAL ABNORMALITY."

4  THERE -- AND IT SAYS, VERY CLEARLY, ANYTHING THAT ANY

5  PRACTITIONER KNOWS TODAY, THAT THE FACT THAT A NON-CONTRAST, NO

6  IV CONTRAST IS GIVEN FOR THE CAT SCAN IN NO WAY EXCLUDES AN

7  ISCHEMIC STROKE.

8         AND AS YOU KNOW, "ISCHEMIC" MEANS WHEN THE -- IT'S

9  JUST A BLOCKAGE, BECAUSE THE CAT SCAN WON'T SHOW THAT.  THAT'S

10  WHY THAT IS NOT THE STANDARD OF CARE, A NON-CONTRAST.

11         WHAT IT DOES SHOW, AND THE REASON WE DO A

12  NON-CONTRAST EVERY TIME, IS IT SHOWS BLOOD.  SO IF THIS HAD

13  BEEN A HEMORRHAGIC STROKE, A BLEEDING STROKE, INTO THE BRAIN,

14  IT WOULD'VE SHOWN THAT.  IT WOULD HAVE BEEN A DAY LATE, BUT IT

15  WOULD'VE SHOWN IT.

16         AND CLEARLY HE WRITES THERE -- PLUS, THIS IS COMMON

17  KNOWLEDGE IN THE MEDICAL PROFESSION:  "IF THERE IS FURTHER

18  CLINICAL CONCERN OR PERSISTENT SYMPTOMS, FOLLOW UP WITH AN

19  MRI."  THIS IS THE STROKE CARE.  IF YOU THINK SOMEBODY MIGHT BE

20  HAVING A STROKE, YOU DON'T SEND THEM FOR A NON-CON.  UNLESS THE

21  NON-CON SHOWS BLOOD, YOU HAVE PROVEN AND SHOWN NOTHING.

22  **Q.**   AND SO YOU SAID IT -- FOLLOW UP WITH AN MRI.  SO THAT'S

23  JUST -- YOU'RE LOOKING AT THE LAST LINE ON THERE?

24  **A.**   YES.

25  **Q.**   IF THERE IS --

1   **A.**   BUT --

2   **Q.**   -- FURTHER CLINICAL CONCERN?

3   **A.**   I'M SORRY, MR. DUBNER.

4   **Q.**   YES, PLEASE.

5   **A.**   I ALSO WANTED TO SAY THAT YOU SEE THAT THERE WERE SEVERAL

6   PATCHY AREAS OF LOW DENSITY, MOST COMMONLY SEEN WITH CHRONIC,

7   SMALL VALVE ISCHEMIC DISEASE, AND HE HAD OLD INFARCTS IN THE

8   VASOVAGAL.  AND SO HE ALREADY HAD -- THE RADIOLOGIST IS TELLING

9   US:  THIS MAN HAS ALREADY HAD STROKES.

10   **Q.**   UH-HUH.

11   **A.**   IT'S -- PRESENT ON THE CAT SCAN WAS OLD STROKES WHERE THE

12   TISSUE BASICALLY DISSOLVES OR GOES AWAY.  YOU CAN SEE THAT.

13   BUT IT'S THE NEW STROKE -- UNLESS IT'S BLOOD, YOU WILL NOT SEE

14   IT ON A CAT SCAN UNLESS IT'S MASSIVE AND CAUSES SWELLING.

15   **Q.**   OKAY.  LET'S THEN LOOK AT PAGE 59 WHEN HE COMES BACK FROM

16   THIS TRIP.

17         NOW, THIS IS THE TRIP RETURN.  IT SAYS "SENT TO ATU."

18   DID YOU FIND ANY RECORD THAT HE SAW A PROVIDER OR EVEN A NURSE

19   IN THE ATU AFTER HE RETURNED?

20   **A.**   NO.

21   **Q.**   DID YOU FIND ANY EVIDENCE THAT ANY PROVIDER READ THE

22   RADIOLOGIST'S STATEMENT TO SEND FOR A FOLLOW-UP MRI IF THERE

23   WERE ANY CLINICAL CONCERNS OR PERSISTENT SYMPTOMS?

24   **A.**   WHAT I KNOW IS IT WASN'T DONE.  WHO READ IT AND WHAT THEY

25   DID, I CAN'T BE CERTAIN.

10:24 1    Q.   UH-HUH.

2    A.   IT SAYS "OBTAIN RESULTS."  AND IN THE RED IT SAYS "THE

3    RESULTS ARE ATTACHED."  SOMEBODY MAY HAVE READ IT.  WHAT

4    MATTERS IS THEY DIDN'T DO IT.

5    Q.   LET'S THEN GO FORWARD WITH A FEW MORE QUESTIONS WITH THIS

6    PATIENT.  I KNOW THAT THE COURT WANTS TO TAKE A BREAK.

7         THE COURT:  TAKE YOUR TIME.  NO, TAKE YOUR TIME.

8    BY MR. DUBNER:

9    Q.   SO IF WE COULD GO TO PAGE 56.

10        SO HE WAS THEN DUE TO BE SEEN IN GENERAL MEDICINE

11   CLINIC ON FEBRUARY 15, 2021.  THAT IS ABOUT TWO WEEKS LATER.

12   IT SAYS HERE, "RESCHEDULED DUE TO OFFICE CLOSURE.  RESCHEDULE

13   ONE WEEK."  DID YOU SEE ANY EVIDENCE THAT THAT WAS EVER

14   RESCHEDULED?

15   A.   NO.

16   Q.   LET'S THEN KEEP MOVING FORWARD TO MARCH 17TH ON PAGE 54 OF

17   THE RECORD.

18        WHAT WAS HIS -- HOW WAS HIS COMPLAINT DESCRIBED ON

19   THIS DAY?

20   A.   WELL, HE WAS IN THE ATU AND HE SAID, "I CAN'T WALK SINCE

21   YESTERDAY," AND THE PERSON PUSHING THE -- I THINK THE PUSHER IS

22   THE -- USUALLY SOMEBODY PUSHING THE WHEELCHAIR SAYS THAT "HE'S

23   BEEN URINATING ON HIMSELF LATELY," STATES "HE DIDN'T TAKE BLOOD

24   PRESSURE MEDICATIONS."  AND THEN IT -- THE MEDIC HERE -- I

25   THINK IT'S A MEDIC SIGNATURE -- "HE HAD NO FACIAL DROOP."  AND

10:26 1  IT APPEARS -- IT'S HARD TO KNOW BECAUSE HE HAS A ZERO WITH A
2  LINE THROUGH IT; MEANS NO FACIAL DROOP.  AND THEN THERE APPEARS
3  TO BE A COMMA "UNSTEADY WHILE STANDING" AND "NO SLURRED
4  SPEECH."
5         I'D JUST LIKE TO SAY ONE THING ABOUT SLURRED SPEECH.
6  IT HAS TO AFFECT PART OF YOUR BRAIN THAT SLURS YOUR SPEECH;
7  NOT ALL PARTS OF THE BRAIN AND NOT ALL STROKES CAUSE FACIAL
8  ASYMMETRY OR SLURRED SPEECH.  IT CAN JUST CAUSE DIZZINESS.  IT
9  CAN CAUSE JUST ONE SYMPTOM.  IT COULD JUST CAUSE ONE LEG TO BE
10 SHAKING WITHOUT ANY WEAKNESS, WITHOUT ANY CHANGE IN THE LEVEL
11 OF CONSCIOUSNESS.
12 Q.   AND YOU SAID YOU THINK THIS MAY HAVE BEEN A MEDIC.  IS IT
13 POSSIBLE THAT IT WAS AN RN?
14 A.   YES, IT IS.
15 Q.   CERTAINLY UNDER THE STAFFING PLAN, IT SHOULD HAVE BEEN
16 EITHER AN RN OR AN LPN.  CORRECT?
17 A.   OH, YEAH.  THAT LOOKS LIKE A "NO."  BUT IT DOES SAY "RN."
18 THANK YOU.
19 Q.   AND SO THEN WHAT DOES THE PROVIDER, NURSE PRACTITIONER
20 BORDELON -- WHAT DOES THE PROVIDER ASSESS?
21 A.   WELL, IT APPEARS TO BE A TELEPHONE ORDER, AND THERE IS THE
22 ORDER OF ADMINISTERING LOSARTAN, HYDRALAZINE, ALDACTONE, AND
23 NORVASC.  THOSE ARE BLOOD PRESSURE MEDICINES.  AND THEN THERE
24 IS WRITING ON THE RIGHT SIDE THAT JUST SAYS "THE BLOOD PRESSURE
25 IS ELEVATED, SECONDARY TO NON-COMPLIANCE."

10:27 1    I WOULD JUST LIKE TO SAY IF THE BLOOD PRESSURE IS
2    ELEVATED, IT'S A PROBLEM, WHETHER YOU TOOK THE MEDICINE, DIDN'T
3    TAKE THE MEDICINE.  THE HEALTH -- MY JOB AS A PHYSICIAN IS TO
4    TAKE CARE OF THE PERSON WITH THE HIGH BLOOD PRESSURE MEDICATION
5    EVERYWHERE IN THE WORLD.  THAT'S MY RESPONSIBILITY, MY
6    PROFESSIONAL DUTY.  BECAUSE PEOPLE DON'T TAKE THEIR MEDICATION,
7    I DON'T TREAT THEM DIFFERENTLY.  NOT ALL OF US TAKE OUR
8    MEDICATION ALL THE TIME.  THIS IRRITATES ME THAT THIS IS
9    CONSTANTLY REFERRING TO "NON-COMPLIANCE."  OKAY.  SORRY.
10    SO "HISTORY OF CDA, LEFT-SIDED WEAKNESS," AND "NO" --
11    THAT'S THE ZERO WITH A SLASH -- "SIGNS AND SYMPTOMS OF A NEW
12    STROKE."
13    **Q.**  AND --
14    **A.**  HE CAN'T WALK.  HE CAN'T WALK TODAY.  SO HOW CAN YOU SAY
15    THERE'S NO SIGNS AND SYMPTOMS OF A NEW STROKE?  AND HE'S
16    UNSTEADY ON HIS FEET.  HE CAN'T EVEN STAND UPRIGHT.  AND THEN
17    HIS -- THEY TALK ABOUT THE PUPILS AND THE NO DROOPING FACE, AS
18    IF YOU NEED TO HAVE A DROOP OF YOUR FACE TO HAVE A STROKE.  YOU
19    DON'T.
20    AND BECAUSE -- AND HE ADMITS TO NOT TAKING HIS
21    MEDICATIONS TWO TIMES.  HE SAYS THAT.  SO HE DIDN'T TAKE HIS
22    MEDICATION.  HE'S HAVING A STROKE.  ALL OVER AMERICA PEOPLE
23    HAVE A STROKE BECAUSE THEY DON'T TAKE THEIR MEDICATION, THEY
24    DON'T TAKE THEIR BLOOD PRESSURE, THEY DON'T SEE THE DOCTOR,
25    THEY DON'T GO TO SEE THE DOCTOR.  THIS IS UNACCEPTABLE.  AND

10:28 1    THEN HE GOES, YOU KNOW, "KEEP SCHEDULED APPOINTMENT."

2    **Q.**   AND WHERE DID HE SEND THE PATIENT, IF WE LOOK AT THE

3    "DESTINATION" IN THE BOTTOM RIGHT?

4    **A.**   OH, RETURN TO THE QUARTERS, "RTQ."

5    **Q.**   AND THE "KEEP SCHEDULED APPOINTMENT," YOU SAID THAT WAS

6    THE "KSA"?

7    **A.**   YEAH.  RIGHT.  CORRECT.

8    **Q.**   AND THE RADIOLOGIST AT WEST FELICIANA HOSPITAL SAID,

9    "CONSIDER MRI IF HE HAD CONTINUING SYMPTOMS."  WAS THERE ANY

10   EVIDENCE THAT THEY CONSIDERED AN MRI?

11   **A.**   THEY DID NOT DO AN MRI.  AND YOU KNOW WHAT?  THE OTHER

12   THING, THEY COULD HAVE JUST SENT HIM BACK TO THE HOSPITAL AND

13   DONE A CAT SCAN WITH INTRAVENOUS.  IT'S CALLED A CTA, A CT

14   ARTERIOGRAM.  YOU DON'T NEED AN MRI MACHINE FOR THAT.  YOU NEED

15   THE SAME CAT SCAN.  YOU INJECT DYE INTO THE VEINS AT A CERTAIN

16   RATE SO THAT YOU CAN SEE THE ARTERIES.  AND SO THAT'S WHAT A

17   CTA -- AND YOU ALSO -- STROKES HAPPEN BETWEEN THE NECK BECAUSE

18   THE CAROTID ARTERIES AND THE VERTEBRAL -- THERE'S FOUR BIG

19   ARTERIES THAT GIVE THAT OXYGEN TO YOUR BRAIN.  IT CAN HAPPEN

20   HERE, TOO.

21           SO WHENEVER WE ARE CONCERNED THAT SOMEONE IS HAVING A

22   STROKE, WE GET A CTA OF THE BIG VESSELS HERE AND THE BRAIN.

23   THAT DOES NOT REQUIRE MORE CONSULTATION OR OUR LADY OF THE LAKE

24   OR ANYTHING.

25           CTA IS SOMETHING THAT WHEN YOU HAVE A CT MACHINE, YOU

10:30 1  INJECT THE DYE AT A CERTAIN RATE AND YOU GET THE TEST YOU NEED.
     2  THAT'S PERFECTLY ACCEPTABLE.
     3  **Q.**    AND IS THERE ANY EVIDENCE THAT THEY EVER SENT THE PATIENT
     4  FOR ANYTHING LIKE THAT?
     5  **A.**    NO, HE DIDN'T GET THAT.  THAT COULD HAVE BEEN ORDERED THE
     6  FIRST TIME YOU SEE "CTA."  IF YOU KNOW THAT A CAT SCAN IS NOT
     7  GOING TO SHOW YOU ANYTHING BESIDES A HEMORRHAGE, YOU DO THE
     8  STUDY, YOU GET THE PLAIN FILM AND THEN YOU SAY, "PLEASE DO THE
     9  CTA AFTER -- OF THE NECK AND THE BRAIN."  THIS IS STANDARD FOR
    10  YEARS.
    11  **Q.**    AND IS IT THE DOCTOR AT LSP WHO ORDERS WHAT KIND OF CT IT
    12  IS, OR IS IT THE RADIOLOGIST WHO CHOOSES?
    13  **A.**    THE DOCTORS.  THE RADIOLOGISTS PERFORM THE TESTS AND THEY
    14  MAKE RECOMMENDATIONS ABOUT WHAT KIND OF TESTS WOULD BE HELPFUL
    15  FOR YOU BASED ON YOUR CONCERNS.
    16  **Q.**    OKAY.  SO NOW LET'S LOOK AT APRIL 26TH, THE LAST VISIT
    17  WE'RE GOING TO LOOK AT FOR THIS PATIENT, PAGE 450 OF THE
    18  RECORD.
    19          AND SO A MONTH LATER, ON APRIL 26TH, WHAT HAPPENED TO
    20  THE PATIENT?
    21  **A.**    HE CAME BACK TO THE ATU AND HE WAS -- IT SAYS HE HAD NEW
    22  ONSET OF LEFT UPPER EXTREMITY.  I DON'T KNOW EXACTLY THE NEXT
    23  WORD.  AND "HE HAD DROOLING AND NEW URINARY INCONTINENCE,"
    24  WHICH, AS WE KNOW, IT HAD BEEN REPORTED ON THE LAST RECORD.  HE
    25  WAS STABLE.  AND THEN "NEURO LEFT-SIDED WEAKNESS, LEFT UPPER

1    EXTREMITY RESTING TREMOR."  AND THEY SENT HIM -- SAID, "RULE

2    OUT SEIZURE, RULE OUT STROKE."

3    **Q.**    UH-HUH.

4    **A.**    AND THOSE CAN CO-EXIST.  I'VE EXPLAINED THAT.  AND HE WENT

5    TO OUR LADY OF THE LAKE.

6    **Q.**    OKAY.  IT ALSO SAID "NEW URINARY INCONTINENCE."  WAS THE

7    URINARY INCONTINENCE NEW?

8    **A.**    NO.  WE HAD ALREADY SEEN THAT IN THE RECORD IN THE

9    PREVIOUS VISIT WHERE HE COULDN'T -- YEAH, WHERE HE COULDN'T

10   STAND UP STEADILY.  HE COULDN'T STAND STEADILY.

11   **Q.**    AND WHAT DEFICITS WAS THIS PATIENT LEFT WITH?

12   **A.**    HE WAS LEFT WITH A DEVASTATING INABILITY TO SPEAK PROPERLY

13   -- DEVASTATING -- AT GREAT COST TO THE STATE OF LOUISIANA.

14   **Q.**    HOW OLD WAS THIS PATIENT?

15   **A.**    FIFTY-FOUR.

16   **Q.**    YOU SAID HE COULDN'T SPEAK.  WAS HE UNABLE TO EAT AS WELL?

17   **A.**    YES.  HE HAD DYSPHASIA, DIFFICULTY SWALLOWING.  AND THEN

18   THE PROBLEM WITH THAT IS IF YOU FEED THEM AND DON'T PUT A TUBE

19   IN THEIR STOMACH, THEY SWALLOW AND IT GOES INTO THE LUNGS, AND

20   THEN THEY GET PNEUMONIA AND THEY CAN GET SICK AND DIE.

21   **Q.**    AND WAS THERE A TUBE PLACED FOR THIS PATIENT THAT -- WELL,

22   YOU WERE JUST DESCRIBING SOMETHING THAT COULD HAPPEN?

23   **A.**    THAT'S RIGHT.

24   **Q.**    BUT NOT SOMETHING THAT DID HAPPEN?

25   **A.**    THAT'S RIGHT.

10:32 1  **Q.**   YEAH.

2  **A.**   I WAS JUST DISCUSSING WHAT CAN HAPPEN WHEN YOU HAVE A

3  STROKE.

4  **Q.**   YEAH.

5  **A.**   A DEVASTATING NEUROLOGICAL INJURY.

6        **MR. DUBNER:**  OKAY.  WE CAN TAKE A BREAK HERE, YOUR

7  HONOR.

8        **THE COURT:**  WE ARE GOING TO TAKE A 15-MINUTE RECESS.

9        **THE LAW CLERK:**  ALL RISE.

10           THE COURT IS IN RECESS.

11        **(WHEREUPON, THE COURT WAS IN RECESS.)**

12        **THE COURT:**  BE SEATED.

13           GO AHEAD, MR. DUBNER.

14  **BY MR. DUBNER:**

15  **Q.**   DR. VASSALLO, I WANTED TO TALK ABOUT ONE MORE PATIENT.  IF

16  WE COULD PUT UP JX_54 AT 666.  THIS IS PATIENT NO. 54.  I

17  THOUGHT THAT WAS BACK, BUT I CAN USE THE ELMO IF THAT IS NOT

18  GOING TO BE UP.  THIS IS STILL SEALED.  AND SO IF YOU COULD

19  GIVE US PAGE 666.

20           OKAY.  SO, DR. VASSALLO, THIS IS SATURDAY, MAY 1,

21  2021.  CAN YOU TELL US WHAT SYMPTOMS THIS PATIENT PRESENTED

22  WITH?

23  **A.**   THE AMBULANCE IS CALLED FOR THE COMPLAINT OF CHEST PAIN.

24  THE PATIENT WAS FOUND SITTING IN A CHAIR.  HE WAS SPEAKING

25  CLEARLY.

10:59 1          **MR. ARCHEY:**  YOUR HONOR --

2   **BY THE WITNESS:**

3   **A.**   AND --

4          **MR. ARCHEY:**  YOUR HONOR, MAY I?

5   **BY THE WITNESS:**

6   **A.**   -- HE COMPLAINED OF CHEST PAIN FOR 30 MINUTES.

7          **MR. ARCHEY:**  YOUR HONOR --

8          **THE COURT:**  YOUR OBJECTION IS?

9          **MR. ARCHEY:**  -- OBJECTION.  IT IS BEYOND THE SCOPE OF

10  THE REPORT, AND HER WRITE-UP HAS NO CRITICISMS OF THIS PATIENT.

11         **MR. DUBNER:**  YOUR HONOR, THIS IS A PATIENT THAT

12  DEFENSE COUNSEL TALKED ABOUT IN THEIR OPENING.  THIS IS THE

13  PATIENT WHERE THEY SAID THERE WAS NO HEART ATTACK.  WE'RE

14  LOADED FOR BEAR ON THIS ONE.

15         THE FIFTH CIRCUIT'S TEST IS WHETHER THE REPORT

16  PROVIDES SUFFICIENT DETAIL TO AVOID SURPRISE TO THE OPPOSING

17  PARTY.  THERE IS NO POSSIBLE SURPRISE HERE.  THEY KNEW FROM DAY

18  ONE THIS WAS A CHART DR. VASSALLO REVIEWED.  THIS IS IN A

19  SECTION TITLED "DR. SUSI VASSALLO, LSP CHART REVIEWS."  IT GOES

20  SQUARELY TO EMERGENCY CARE.

21         THE REPORT ALSO MADE IT ENTIRELY CLEAR THAT THE

22  SUMMARIES THAT DR. VASSALLO AND THE OTHER EXPERTS WERE USING IN

23  THE REPORT WERE EXAMPLES, AND THERE WERE ADDITIONAL EXAMPLES IN

24  THEIR APPENDIX.

25         DEFENDANTS CROSS-EXAMINED DR. VASSALLO ABOUT

11:00 1 THIS PATIENT FOR SEVEN OR EIGHT PAGES OF HER DEPOSITION.  THEY

2 CAN'T SIMULTANEOUSLY BE LOADED FOR BEAR AND UNFAIRLY SURPRISED.

3 THEIR COMPLAINT IS REALLY JUST THAT WE ORGANIZED OUR REPORT IN

4 A DIFFERENT WAY, WHICH IS NOT A SUFFICIENT GROUND TO EXCLUDE

5 THE TESTIMONY.

6 **THE COURT:**  OBJECTION DENIED, OR OVERRULED.

7 **BY MR. DUBNER:**

8 **Q.**   SO, DR. VASSALLO, IF YOU COULD, TALK ABOUT THIS PATIENT'S

9 SYMPTOMS.

10 **A.**   THE PATIENT COMPLAINED OF CHEST PAIN FOR 30 MINUTES.  HE

11 HAD A HISTORY OF ANGINA AND HE HAD CHEST PAIN.

12 **Q.**   AND THEY TOOK THE PATIENT TO THE ATU.  IS THAT RIGHT?

13 **A.**   YES.

14 **Q.**   DID THE EMTS TAKE AN EKG ON THE WAY TO THE ATU?

15 **A.**   YES.

16 **Q.**   LET'S LOOK AT PAGE 667.

17 NOW, I OBVIOUSLY CAN'T MAKE HEADS OR TAILS OF THIS.

18 CAN YOU TELL US WHAT THIS EKG SHOWS?

19 **A.**   THE TOP STRIP IS WHAT'S CALLED THE RHYTHM STRIP, LOOKING

20 AT THE ELECTRICAL ACTIVITY AND THE RHYTHM OF THAT ELECTRICAL

21 ACTIVITY.

22 THE BOTTOM IS A FULL ELECTROCARDIOGRAM.  YOU SEE THE

23 ROMAN NUMERALS I, II AND III TO THE FAR LEFT AND THEN OVER AVR,

24 AVL, AND ON AND ON IT GOES.  THESE ARE THE DIFFERENT VIEWS OF

25 THE HEART FROM THE LEADS, SO THIS IS THE EKG.

11:02 1  **Q.**   AND WHAT DOES THIS EKG SUGGEST?

2  **A.**   THE DEFINITION OF A MYOCARDIAL INFARCTION, AN M.I. OR

3  HEART ATTACK, IS IN TWO CONTIGUOUS LEADS.  THAT'S II, ROMAN

4  NUMERAL II, III/AVF1 IF THERE IS A ONE-MILLIMETER ELEVATION.

5       AND IN ADDITION TO THAT, THIS IS JUST A CLEAR -- THIS

6  IS A CLEAR EXAMPLE OF AN INFERIOR WALL MYOCARDIAL INFARCTION.

7  **Q.**   OKAY.  SO LET'S LOOK AT WHAT HAPPENED WHEN HE GOT TO THE

8  ATU.  IF WE GO TO PAGE 407 OF JOINT EXHIBIT 54.

9       NOW, WHO SAW THE PATIENT IN THE ATU?

10  **A.**   IT LOOKS LIKE THERE WAS EITHER A TELEPHONE ORDER FROM

11  NURSE PRACTITIONER WALLIS -- IT WAS MS. RICUARD.  I THINK SHE'S

12  AN LPN, MY MEMORY OF HER, SO THAT'S IT.  SO SHE SAW THE PATIENT

13  AND SHE EITHER TELEPHONED THE NURSE PRACTITIONER.

14  **Q.**   ARE LPNS TRAINED TO INTERPRET --

15       **MR. ARCHEY:**  YOUR HONOR, IF I -- I APOLOGIZE.  I'M

16  GOING TO HAVE TO OBJECT AGAIN.  AND SHE HAD NO CRITICISMS AT

17  HER DEPOSITION.  SHE SAID NO CRITICISMS.  SHE HAD ONE CRITICISM

18  THAT IS NOT THIS.  HER ONLY CRITICISM --

19       **THE COURT:**  CROSS-EXAMINE HER.  OVERRULED.

20  **BY MR. DUBNER:**

21  **Q.**   ARE LPNS TRAINED TO INTERPRET AN EKG?

22  **A.**   NO.

23  **Q.**   AND DID A PROVIDER SEE THE PATIENT?

24  **A.**   NO.

25  **Q.**   DID A PROVIDER REVIEW THE EKG?

11:03 1   **A.**  WELL, THERE'S NO EVIDENCE THAT THAT WAS DONE.  USUALLY

2   THAT'S CHARTED.  THAT'S ALWAYS CHARTED TO INDICATE YOUR REVIEWS

3   OF THE EKG.

4   **Q.**  AND NOW THIS IS 6:20 P.M. ON SATURDAY.  UNDER DEFENDANTS'

5   STAFFING PLAN, SHOULD A NURSE PRACTITIONER HAVE BEEN AVAILABLE

6   TO SEE THE PATIENT?

7   **A.**  YES.

8   **Q.**  SO IN THE TELEPHONE ORDER, DID THE PROVIDER ORDER AN EKG?

9   **A.**  YES.  THERE WAS AN EKG AT 6:30.  AND L.R., LAURA RICUARD,

10   DOCUMENTED THAT, YES.

11   **Q.**  AND LET'S LOOK AT THAT EKG ON PAGE 406.

12        AND NOW THE PREVIOUS EKG, I ASKED YOU TO INTERPRET

13   IT.  WE CAN ONLY TAKE YOUR WORD FOR THIS, BUT DOES THIS

14   SPECIFICALLY SAY ON THE EKG ITSELF ANYTHING ABOUT WHAT THE EKG

15   SHOWS?

16   **A.**  WELL, IT SAYS "PROBABLE INFERIOR WALL MYOCARDIAL

17   INFARCTION."

18   **Q.**  AND IS THERE ANY EVIDENCE THAT A PROVIDER EVER REVIEWED

19   THIS EKG?

20   **A.**  NO.  IT'S NOT SIGNED OR IT IS NOT IN THE CHART.  IT IS NOT

21   IN THE MEDICAL REPORT THAT HE -- ANYBODY REVIEWED IT.

22   **Q.**  AND WHAT DID THE PATIENT NEED AT THIS POINT?

23   **A.**  THE PATIENT NEEDED TO GO TO THE HOSPITAL.  YOU'RE HAVING A

24   HEART ATTACK, YOU SHOULD GO TO THE HOSPITAL.

25   **Q.**  AND WHERE WAS HE SENT INSTEAD?

11:04 1          IF YOU GO BACK TO PAGE 407, WE'LL SEE.

2  **A.**   OH, THAT'S WHY I DIDN'T REMEMBER.  HE WAS SENT FOR

3  OBSERVATION IN THE NURSING UNIT.

4  **Q.**   AND LET'S, IF WE COULD, PUT UP PAGE 407 AND PAGE 695 OF

5  JOINT EXHIBIT 54 TOGETHER.

6          DOES THIS APPEAR TO BE THE SAME NOTES FROM NURSE

7  RICUARD?

8  **A.**   WHAT HAPPENED HERE, AS FAR AS I CAN TELL, IS THAT WE HAD

9  SOMETHING THAT ENTERED THE MEDICAL RECORD WITHOUT THE BLUE

10  WRITING, AND THEN LATER ON WE HAVE THE BLUE WRITING AND THAT

11  ALSO ENTERED THE MEDICAL RECORD WHERE IT SAYS "ADMIT TO THE

12  NURSING UNIT."

13  **Q.**   AND IS THE EKG MENTIONED THERE?

14  **A.**   NO.  THE ORDER IS THERE BECAUSE THAT'S THE SAME.  NO,

15  THERE IS NO INTERPRETATION AND NO READ OF IT.

16  **Q.**   AND WE DON'T KNOW WHAT TIME THIS NOTE WAS WRITTEN, BUT WE

17  KNOW THAT IT WAS AFTER THE PATIENT WAS SENT TO THE NURSING

18  UNIT -- IS THAT RIGHT? -- BECAUSE THAT'S ON THE BLANK COPY AS

19  WELL.

20  **A.**   RIGHT.

21  **Q.**   SO IF WE LOOK AT PAGE 661, WHEN DID LSP FINALLY SEND THIS

22  PATIENT TO THE HOSPITAL?

23  **A.**   SO THE ADVANCED LIFE SUPPORT TRANSPORT WAS ON MAY 2ND.  IT

24  WAS CALLED AT 1:23, AND THEY ARRIVED AT THE HOSPITAL AT 3:30

25  A.M.

11:06  1    **Q.** SO THAT WAS ABOUT -- HE WAS SENT OUT ABOUT SEVEN HOURS

2    AFTER THE EKGS SHOWED THAT HE WAS HAVING AN ACUTE MYOCARDIAL

3    INFARCTION?

4    **A.** THAT'S RIGHT.

5    **Q.** AND WHAT TREATMENT DID HE ULTIMATELY NEED AT THE HOSPITAL?

6    **A.** WHAT DID HE RECEIVE?

7    **Q.** UH-HUH.

8    **A.** WELL, HE WAS TREATED WITH ANTI-PLATELET AGENTS.  IS THAT

9    WHAT YOU MEAN?

10    **Q.** WELL, WE CAN PULL UP PAGE 682.

11        BUT IF YOU RECALL, OF COURSE, FEEL FREE TO --

12        **MR. DUBNER:** I'M SORRY.  PAGE 682.  THERE WE GO.

13    THANK YOU.

14    **BY MR. DUBNER:**

15    **Q.** I'M SORRY.  WHAT TREATMENT DID THIS PATIENT NEED WHEN HE

16    WENT TO THE HOSPITAL?

17    **A.** WELL, WHEN YOU'RE HAVING A HEART ATTACK YOU CAN DO SEVERAL

18    DIFFERENT THINGS.  FIRST OF ALL, WE GIVE EVERY PATIENT ASPIRIN

19    IF THEY HAVEN'T TAKEN IT, 325 MILLIGRAMS.  WE GIVE THEM A

20    SECOND ANTI-PLATELET AGENT.  USUALLY IT'S PLAVIX, IT COULD BE

21    BRILINTA, ONE OF TWO USUALLY.  AND IF -- AND THEN YOU'RE OFTEN

22    TAKEN TO THE CATH LAB -- THAT'S THE CATHETERIZATION LAB -- TO

23    ACTUALLY LOOK AT WHERE THE BLOCKAGE IS.

24        AND LET ME JUST EXPLAIN THAT WE KNOW WHERE THE

25    BLOCKAGE IS BECAUSE THE EKG LOOKS AT THE HEART FROM DIFFERENT

11:07 1 ANGLES.  SO HERE I CAN TELL YOU, BASED ON THE MOST COMMON

2 ANATOMY OF THE ARTERIES FEEDING THE DIFFERENT PARTS OF THE

3 HEART, THIS IS THE INFERIOR WALL, A CERTAIN PART.  BUT WHEN

4 THEY GO IN THERE AND THEY SHOOT THE DYE AND THEY LOOK AT THE

5 HEART AND THEY CAN SEE THE BLOCKAGE.

6             AND THIS PATIENT HAD ALSO HAD A CORONARY ARTERY

7 BYPASS GRAFT, WHICH IS A CABG, WHICH IS YOU MAKE A BIG CUT,

8 YOU GO IN THERE -- AND I USED TO HARVEST THE LEG VESSELS -- AND

9 YOU ATTACH THE NEW VESSELS TO THE HEART TO OPEN THEM UP.

10             THIS PATIENT HAD A BIG HISTORY OF SEVERE CARDIAC

11 DISEASE, AND THAT WAS IMPORTANT FOR THEM TO REALIZE WHEN THE

12 PATIENT HAD CHEST PAIN.  THEN THE HEART ATTACK IS DEMONSTRATED

13 ON THE EKG, AND THEN THE PATIENT GOES TO THE HOSPITAL AND WOULD

14 EITHER GET A CLOT BUSTER AND IF YOU -- THE SAME CLOT BUSTER

15 THAT WE USE IN SOME CIRCUMSTANCES FOR A STROKE, OR THEY WOULD

16 GO TO THE CATH LAB AND GET IT OPENED UP DIRECTLY AND STENTED.

17 **Q.**   AND DID THIS PATIENT NEED TO BE STENTED?

18 **A.**   I BELIEVE HE DID.  I REMEMBER THAT HE HAD A CABG AND HE

19 HAD A TOTAL OF 11 STENTS BY THIS YEAR.  HE NEEDED -- YES.

20 **Q.**   OKAY.  SO LET'S MOVE ASIDE FROM THE CHART REVIEWS.

21             AND FIRST OFF JUST -- SO YOU GAVE, I THINK, SEVEN

22 EXAMPLES.  HOW MANY CHARTS DID YOU LOOK AT ALL TOLD?

23 **A.**   I THINK 27.

24 **Q.**   AND DID YOU FIND SIMILARLY SEVERE PROBLEMS IN MOST OF

25 THEM?

1   **A.**   IN MANY OF THEM, YES.

2   **Q.**   LET'S GO BACK TO THE CHANGES DEFENDANTS MADE, THE NEW ATU

3   STAFFING.  THAT WAS IN PLACE DURING ALL OF THE CASES WE JUST

4   DISCUSSED.  CORRECT?

5   **A.**   YES.

6   **Q.**   AND THAT'S WHAT THEY'VE SAID IS IN PLACE TODAY.  CORRECT?

7   **A.**   YES.

8   **Q.**   IN YOUR OPINION, HAS THAT STAFFING BEEN SUFFICIENT TO

9   ENSURE THAT PATIENTS WITH SERIOUS EMERGENT MEDICAL NEEDS ARE

10   GIVEN TREATMENT THAT DOESN'T PUT THEM AT SERIOUS RISK OF -- A

11   SUBSTANTIAL RISK OF SERIOUS HARM?

12   **A.**   NO.

13   **Q.**   WHY NOT?

14   **A.**   BECAUSE THEY DON'T SEE THE PATIENTS.  YOU'RE PAYING

15   SOMEBODY TO BE ON DUTY AND ATTEND TO PATIENTS' NEEDS IN THE

16   ATU.  THEY DON'T SEE THE PATIENTS.  THESE PATIENTS THEY DIDN'T

17   SEE.  WHY ARE YOU ON THE TELEPHONE?  WHY ARE YOU GIVING VERBAL

18   ORDERS OVER A TELEPHONE?  WHY DON'T YOU COME AND SEE THE

19   PATIENT?

20         WHEN I WORK OVERNIGHTS AND EVENINGS AND I'M IN THE

21   EMERGENCY DEPARTMENT, I DON'T TAKE THE WORD OF AN INTERN.  I GO

22   SEE THE PATIENT, BECAUSE THE QUALITY OF THE OBSERVATION OF AN

23   EMT OR LAURA RICUARD OR WHATEVER THE TRAINING IS, THE NURSE

24   PRACTITIONER AT THE BEDSIDE, BECAUSE OF THEIR TRAINING, WILL

25   HAVE A BETTER QUALITY OBSERVATION, HISTORY TAKING, ET CETERA.

11:10 1  THEY'RE BEING PAID TO WORK.  YOU SHOULD SEE THE PATIENTS AND

2  THAT'S WHAT'S NOT HAPPENING.  AND THAT'S WHY THESE PATIENTS ARE

3  SUFFERING SERIOUS HARMS:  THEY'RE NOT SEEN.

4  **Q.**  AND SO THERE ARE NOW NURSES IN THE ATU, IT APPEARS, MOST

5  OR ALL OF THE TIME.  FIRST OFF, IS THAT AN IMPROVEMENT FROM

6  EMTS, AS WAS DONE DURING THE LIABILITY PERIOD?

7  **A.**  IT IS.  A REGISTERED NURSE HAS MORE EXTENSIVE TRAINING, A

8  DIFFERENT KIND, BUT NEITHER OF THEM ARE TRAINED TO DIAGNOSE.

9  AND THE LICENSES OF -- LPNS ARE MUCH LESS TRAINED THAN A

10  REGISTERED NURSE.  AND THEY ALSO STAFF THE ATU AT TIMES.

11        LIKE LAURA RICUARD IS A LICENSED PRACTICAL -- OR A

12  LICENSED PRACTICAL NURSE.  THEIR TRAINING IS VERY DIFFERENT.

13  BUT NONE OF THOSE THREE -- EMT, REGISTERED NURSE, AND LPN --

14  ARE TRAINED TO DIAGNOSE.

15  **Q.**  AND IN TERMS OF EMERGENCY TRAINING, DO ANY OF THE

16  PROVIDERS WHO WORK IN THE ATU HAVE EMERGENCY TRAINING, TO YOUR

17  KNOWLEDGE, HAVE ANY SPECIFIC TRAINING IN EMERGENCY MEDICINE, TO

18  YOUR KNOWLEDGE?

19  **A.**  WELL -- SO LET ME JUST BREAK THAT DOWN FOR A SECOND.  THEY

20  ARE PROBABLY TRAINED IN ADVANCED CARDIAC LIFE SUPPORT.  I KNOW

21  THEY ARE; THAT IS, HOW TO TREAT A CARDIAC ARREST.

22  BUT EMERGENCY MEDICINE IS A VERY BROAD -- LIKE I SAID EARLIER

23  TODAY TO MR. ARCHEY, EVERY SPECIALTY ACROSS ALL SPECIALTIES,

24  THE MOST SERIOUS PROBLEMS WILL PRESENT TO AN EMERGENCY OR

25  ASSESSMENT UNIT ACROSS ALL SPECIALTIES.  AND THE REASON THERE

11:12 1  IS A THREE- OR A FOUR-YEAR TRAINING PROGRAM FOR PHYSICIANS TO

2  BE EMERGENCY PHYSICIANS IS BECAUSE IT'S VERY BROAD WITH

3  CRITICAL SERIOUS MEDICAL NEEDS PRESENTING TO THE EMERGENCY

4  DEPARTMENT.

5  SO WHAT I'M SAYING IS THAT IF YOU ARE TRAINED -- AND

6  WE HAVE A TRAINING PROGRAM FOR NURSE PRACTITIONERS IN OUR

7  EMERGENCY DEPARTMENT WHERE THEY SPEND ONE YEAR LEARNING AND

8  UNDERSTANDING HOW TO ASSESS A PATIENT WHO COMES IN COMPLAINING

9  OF SOMETHING THAT COULD BE A SERIOUS MEDICAL NEED LIKE CHEST

10  PAIN OR ALL THESE DIFFERENT THINGS THAT WE ARE SEEING.

11  SO IT IS A FELLOWSHIP.  IT IS A TRAINING PROGRAM.

12  AND THESE INDIVIDUALS HAVE NOT DONE THAT TRAINING.  BUT EVEN

13  MORE IMPORTANTLY, THERE IS NO SUPERVISION THAT TEACHES THEM

14  THIS THING.

15  LIKE IF I WAS TEACHING THESE GUYS, WE WOULD DO

16  REVIEWS.  WE WOULD LOOK AT THOSE EKGS.  WE WOULD LEARN TO READ

17  EKGS.  I WOULD TEACH THEM TO TAKE A PICTURE OF THE EKG AND SEND

18  IT TO ME.  IF I'M DEALING WITH AN EMERGENCY IN A CAMP.  YOU

19  TAKE A PICTURE OF THE EKG.

20  THIS IS 2022.  WE ALL HAVE A PHONE.  YOU TAKE A

21  PICTURE OF THE EKG, YOU SEND IT TO THE PRACTITIONER.  THAT

22  PRACTITIONER NEEDS TO KNOW HOW TO READ AN EKG.  SO THERE ARE A

23  LOT OF THINGS HERE THAT I'M CONCERNED ABOUT.

24  **Q.**  YOU ALSO REFERENCED EARLIER THE WAY THAT THEY TREAT PEOPLE

25  WITH ALTERED MENTAL STATUS.  DO YOU HAVE -- DO YOU STILL HAVE

11:13 1  CONCERNS ABOUT THAT PROTOCOL?

2  **A.**   YES.  BECAUSE THE PROTOCOL IS ONE THAT TAKES TIME.  SO

3  WHAT I'M SAYING IS THAT THE PATIENT PRESENTS WITH A

4  NEUROLOGICAL DEFICIT.  THEY THINK IT'S MOJO, WHICH IS A

5  HOMEMADE MARIJUANA -- RIGHT? -- SYNTHETIC.  IT'S BASICALLY MADE

6  FROM SCRATCH MARIJUANA.  IT'S NOT FROM THE PLANT.  SO IF YOU

7  THINK IT COULD BE THAT, THEN YOU WAIT A COUPLE OF HOURS AND SEE

8  IF THE PATIENT GETS BETTER.

9          IT'S LIKE DRIVING DRUNK.  NINE TIMES OUT OF TEN

10  NOTHING WILL HAPPEN, BUT THE TENTH TIME IT WAS A STROKE AND YOU

11  KILL THE PATIENT WHILE YOU'RE DRIVING DRUNK.  THAT DOESN'T MAKE

12  IT ALLOWABLE OR GOOD MEDICINE.

13          SO MAYBE IT'S MOJO AND MAYBE HE'S GOING TO GET

14  BETTER, BUT MAYBE HIS CARE AND HIS TRANSFER FOR THE STROKE --

15  HEMORRHAGIC STROKE OR ISCHEMIC STROKE, MENINGITIS OR WHATEVER

16  IT IS -- IS DELAYED BY TWO OR THREE HOURS WHILE THEY DO AN

17  ALTERED MENTAL STATUS PROTOCOL.  THAT'S UNACCEPTABLE.

18  **Q.**   AND WHEN YOU TESTIFIED BEFORE YOU SAW EVIDENCE OF LAVAGE,

19  STOMACH PUMPING, FOR PATIENTS SUSPECTED OF USING DRUGS, DID YOU

20  SEE THAT THIS TIME?

21  **A.**   NO.

22  **Q.**   IS THAT AN IMPROVEMENT?

23  **A.**   YES.

24  **Q.**   BEYOND THAT, HOWEVER, DOES THE ALTERED MENTAL STATUS

25  PROTOCOL APPEAR TO BE THE SAME?

11:14 1  **A.**   YES.  LET ME JUST SAY THAT THE WAY THAT IT'S USED IS THE

2  SAME.  WHETHER OR NOT THE WORDING IS DIFFERENT, IT'S USED THE

3  SAME WAY.  IT DELAYS DEFINITIVE CARE IN PATIENTS WHO HAVE

4  SOMETHING OTHER THAN MOJO OR SOME KIND OF ILLICIT DRUG.

5  **Q.**   AND I WANT TO BACK UP TO SOMETHING YOU SAID A MOMENT AGO.

6  I ASKED IF HAVING AN RN OR AN LPN WAS AT LEAST AN IMPROVEMENT

7  OVER AN EMT, AND I JUST THINK THAT WE SHOULD PROBABLY BREAK

8  THAT DOWN FOR A MOMENT.

9       WHILE YOU SAID THAT RN'S ARE NOT SUFFICIENT TO

10  DIAGNOSE AND ASSESS PATIENTS TO DETERMINE IF THEY NEED TO BE

11  TRANSFERRED, THEIR TRAINING IS MORE RELEVANT AND MORE -- DO

12  THEY HAVE MORE TRAINING THAN AN EMT FOR THESE PURPOSES?

13  **A.**   YES, THEY DO.

14  **Q.**   IS THAT TRUE OF AN LPN?

15  **A.**   NO.

16  **Q.**   AND --

17  **A.**   AND EXCUSE ME.  JUST TO BE CLEAR, I REALLY ADMIRE THE EMTS

18  AND THE PARAMEDICS AT LSP.  WHEN THEY'RE DOING THEIR JOB, WHICH

19  IS TAKING PATIENTS TO THE -- TO A HIGHER LEVEL OF CARE -- THEY

20  CAN INTUBATE, THEY CALL IN, THEY GIVE THE MEDICATIONS, THEY GET

21  THE PATIENTS STABILIZED.  THEY DO THEIR JOB EXCELLENTLY.  BUT

22  WHAT THEIR JOB SHOULD NOT BE AND WHAT THEY ARE NOT TRAINED TO

23  DO IS MAKING DIAGNOSES.  AND SO I ADMIRE THEM.  THEY ARE GOOD,

24  BUT THEY ARE NOT TRAINED IN WHAT'S REQUIRED HERE IN CERTAIN

25  AREAS.

11:16 1   **Q.**   AND IS YOUR CRITICISM OF THE NURSING CARE IN THE ATU A

2   CRITICISM OF THE NURSES OR OF THE POLICIES AND THE SYSTEM?

3   **A.**   IT'S NOT A CRITICISM OF THE NURSES.  THE CRITICISM OF IT

4   IS A SYSTEM THAT PUTS THEM AT THIS DISADVANTAGE WHERE THEY ARE

5   REQUIRED TO DO THINGS THAT IS OUT OF THEIR KNOWLEDGE BASIS.

6   THEY DON'T KNOW.  THEY ARE NOT TRAINED IN IT, AND THEY DON'T

7   KNOW.

8   **Q.**   LET'S TALK ABOUT SELF-DECLARED EMERGENCIES.  DID YOU

9   REVIEW DEFENDANTS' PRACTICES FOR SELF-DECLARED EMERGENCIES FOR

10  YOUR EXPERT REPORT?

11  **A.**   YES.

12  **Q.**   AND CAN YOU GIVE US AN OVERVIEW OF HOW AT THE TIME YOU

13  WERE DOING YOUR REVIEW EMTS PRACTICED WHEN HANDLING

14  SELF-DECLARED EMERGENCIES?

15  **A.**   WELL, THEY GO TO SEE THE PATIENT AND THEY ASSESS THE

16  PATIENT'S COMPLAINT.  AND BY THE WAY, THIS IS EXACTLY WHAT IT

17  IS, THE MOST RECENT SELF-DECLARED EMERGENCY.

18  **Q.**   WE WILL COME TO THAT IN A MOMENT.

19  **A.**   OKAY.  SO THEY GO SEE THE PATIENT; THEY LISTEN TO THE

20  SYMPTOMS; AND THEY HAVE TO DECIDE IF THE -- JUST LIKE IT USED

21  TO BE ON SICK CALL.  THEY HAVE TO DECIDE IF THE PATIENT WILL GO

22  FURTHER TO THE ATU.  THEY CAN MAKE A PHONE CALL TO MAKE THAT

23  DECISION.  AND THAT COMES DOWN, AGAIN, TO THE FACT THAT -- THE

24  QUALITY OF THE OBSERVER, THE KNOWLEDGE OF THE OBSERVER.  IT

25  RELATES BACK TO THE NURSE PRACTITIONER -- OR FOR MYSELF, AS A

11:17 1  PROFESSOR OF EMERGENCY MEDICINE, I GO SEE THE PATIENT, BECAUSE
2  WHEN SOMEONE HAS LESS TRAINING THAN I, IT TAKES -- THEY MAY NOT
3  OBSERVE OR TAKE THE HISTORY WITH THE DETAIL OF -- AND SO THE
4  EMTS -- I'M GOING TO SAY THAT THE NURSE PRACTITIONERS, THE
5  PROVIDERS, NEED TO SEE THE PATIENTS.
6  Q.   AND JUST TO FOCUS IN ON WHAT IT IS THAT THEY CURRENTLY --
7  WHAT EMTS CURRENTLY ARE AUTHORIZED TO DO ON A SELF-DECLARED
8  EMERGENCY CALL, WHAT OPTIONS DO THEY HAVE TO CHOOSE FROM?
9  A.   WELL, THEY CAN -- THEY CAN KEEP THE PATIENT THERE; THEY
10  CAN TALK TO THE NURSE PRACTITIONER.  IF IT'S SOMETHING SIMPLE
11  LIKE THE PATIENT WANTS LOTION, THEY CAN PROVIDE LOTION FOR A
12  SKIN COMPLAINT.
13  Q.   UH-HUH.
14  A.   THE EMTS DON'T HAVE THE MEDICAL RECORDS WHEN THEY GO TO
15  CELL SIDE OR WHEN THEY SEE THE PATIENT, UNLIKE SICK CALL, WHICH
16  IS WELL-ESTABLISHED THE NURSE PRACTITIONERS DO HAVE THE -- DO
17  HAVE IT.  SO THEY -- THAT'S WHAT THEY DO.  THEY GET A SYMPTOM,
18  AND THEY HAVE THE CHOICE TO TALK TO A PROVIDER OR NOT.  THEY
19  ARE A DOOR TO MEDICAL CARE RIGHT THERE.
20  Q.   SO THEY CAN TALK TO A PROVIDER; THEY CAN BRING THE PATIENT
21  TO THE ATU; OR THEY CAN TREAT THEM THEMSELVES.  IS THAT RIGHT?
22  A.   THAT'S RIGHT.
23  Q.   AND DO THEY TREAT PURSUANT TO PROTOCOLS WHEN THEY TREAT
24  THEM IN THE CELLS?
25  A.   YEAH.  THERE IS A NEW THING CALLED THIS INDIVIDUALIZED

1  PROTOCOL.

2  **Q.**   UH-HUH.  IS THAT ESSENTIALLY A REPLACEMENT FOR THE EMT

3  MANUAL, WHICH YOU TALKED ABOUT AT THE PREVIOUS TRIAL?

4  **A.**   YES.

5  **Q.**   AND WE'LL TALK ABOUT THAT A LITTLE BIT MORE IN A MOMENT.

6          SO YOU'VE TALKED ABOUT THIS A LITTLE BIT, BUT WHAT

7  SHORTCOMINGS DOES THIS SYSTEM HAVE?  AND LET ME ACTUALLY

8  REPHRASE THAT BECAUSE YOU'VE ALREADY TALKED ABOUT THAT A FAIR

9  AMOUNT.

10         DO YOU HAVE -- IN ADDITION TO THE PROBLEMS THAT YOU

11  IDENTIFIED, WHO SUPERVISES EMTS?

12  **A.**   WELL, THERE'S THE HEAD OF EMTS, WHICH IS DOCTOR -- I MEAN,

13  MR. CASHIO.

14  **Q.**   UH-HUH.

15  **A.**   HE'S THE SUPERVISOR OF THE EMTS.  IN GENERAL, A PHYSICIAN

16  SHOULD SUPERVISE THE PRACTICES OF AN EMT SO THAT IF AN EMT SEES

17  A PATIENT AND SOMETHING IS IDENTIFIED AS HAVING GONE WRONG,

18  THERE'S SOMEBODY -- EITHER THE EMT SUPERVISOR OR THE PHYSICIAN

19  -- WHO WILL HAVE TO ADDRESS THAT AND TEACH.

20  **Q.**   AND IS MR. CASHIO A CORRECTIONAL OFFICER?

21  **A.**   YES.

22  **Q.**   AND IS THERE ANY EVIDENCE OF ANYBODY IN THE MEDICAL

23  DEPARTMENT WHO SUPERVISES THE EMTS?

24  **A.**   I HAVE NOT SEEN ANY SIGN OF THAT.  THAT'S PROBABLY IN THE

25  POLICIES.

11:20 1  **Q.**   OVERALL HOW DOES THE CARE THAT EMTS PROVIDE IN EMERGENCY

2  SICK CALL COMPARE FROM YOUR REVIEW TO WHEN YOU REVIEWED IT IN

3  2016?

4  **A.**   DO YOU MEAN SELF-DECLARED EMERGENCIES?

5  **Q.**   SELF-DECLARED EMERGENCIES, YES.

6  **A.**   WELL, THE SIMILARITY IS THAT THEY STILL ARE MAKING THE

7  DECISION IF THE PATIENT IS GOING TO SEE A PROVIDER, SO THAT'S

8  WHAT'S UNCHANGED IN SELF-DECLARED EMERGENCIES AND EMTS.

9  **Q.**   AND HAVE YOU REVIEWED A MEMO ABOUT A NEW SELF-DECLARED

10  EMERGENCY POLICY THAT WAS ISSUED RECENTLY?

11  **A.**   YES.

12  **Q.**   LET'S PULL THAT UP.  THIS IS DEFENDANTS' EXHIBIT 50, AND

13  WE CAN PUT THIS ON THE SCREEN.

14        NOW, FIRST OFF, AT THIS TIME WHAT INFORMATION DO YOU

15  HAVE ABOUT THIS POLICY BESIDES THIS MEMORANDUM?

16  **A.**   THERE IS -- ACTUALLY THIS IS EXACTLY WHAT I HAVE.

17  **Q.**   RIGHT.  IS THERE ANYTHING ELSE?

18  **A.**   THIS IS IT.

19  **Q.**   YEAH.

20  **A.**   RIGHT.

21  **Q.**   SO IS THERE ANYTHING ELSE BESIDES THIS THAT YOU HAVE AT

22  THIS TIME?

23  **A.**   NO.  THE REASON I WAS HESITATING IS BECAUSE I KNEW THAT

24  THE WORDS "INDIVIDUAL TREATMENT ORDERS" WERE IN WHAT I HAD

25  READ.  AND THIS IS WHAT I HAVE, THIS IS WHAT I KNOW.

1  Q.   UNDERSTANDING THAT DEFENDANTS HAVEN'T TESTIFIED ABOUT THIS

2  POLICY YET AND THIS DOCUMENT IS THE ONLY INFORMATION YOU

3  CURRENTLY HAVE, DOES THIS LOOK LIKE IT WOULD MEANINGFULLY

4  REDUCE THE RISK TO PATIENTS?

5  A.   NO.  AND THIS IS THE REASON WHY:  BECAUSE THE INDIVIDUAL

6  TREATMENT ORDERS, WHICH I HAVE REVIEWED, ARE SYMPTOM BASED.  SO

7  IF A PATIENT HAS CHEST WALL PAIN, THE PATIENT IS A -- THE EMT

8  IS ALLOWED TO TREAT CHEST WALL PAIN.  PEOPLE WHO ARE HAVING

9  HEART ATTACKS HAVE CHEST WALL PAIN BECAUSE OF THE NERVE

10  DISTRIBUTION.

11  Q.   AND LET'S GO LOOK -- WE'LL COME BACK TO THIS IN A MOMENT

12  -- BUT PLAINTIFFS' EXHIBIT 22A AT PAGE 6.

13        IS THIS AN EXAMPLE OF ONE OF THE INDIVIDUAL TREATMENT

14  ORDERS THAT WE'RE TALKING ABOUT?

15  A.   YES, YES.

16  Q.   AND JUST TO BACK UP FOR A MOMENT.  THE NAME "INDIVIDUAL

17  TREATMENT ORDERS," IT DOESN'T MEAN IT IS SPECIFIC TO AN

18  INDIVIDUAL, DOES IT?

19  A.   NO.

20  Q.   OKAY.  SO WHAT IS YOUR CONCERN ABOUT THIS CHEST WALL PAIN

21  ORDER, FOR EXAMPLE?

22  A.   OKAY.  SO THE ABILITY TO DUPLICATE PAIN BY PALPATION HAS

23  TO DO WITH HOW HARD -- I BELIEVE IT'S GOING TO BE CHEST WALL

24  PAIN -- HOW HARD I PUSH AND AN UNDERSTANDING THAT CHEST WALL

25  PAIN IS WELL-DOCUMENTED IN MYOCARDIAL INFARCTIONS.  AND IF

11:22 1    IT -- IT HURTS MORE -- AND YOU CAN PUT ICE IF THERE'S RECENT

2    TRAUMA, I UNDERSTAND -- THEN THEY'RE GOING TO CALL THE HEALTH

3    CARE PROFESSIONAL, THAT'S GOOD.

4    **Q.**   AND IS THIS --

5    **A.**   AND EXCUSE ME. I JUST WANT TO -- BECAUSE I KNEW -- THIS

6    BOTHERS ME, TOO. IF YOU'RE HAVING A HEART ATTACK OR A

7    PNEUMOTHORAX OR IF YOU'RE HAVING A PULMONARY EMBOLISM OR YOU

8    HAVE AN INFECTION IN YOUR LUNG, NO MATTER HOW YOU MOVE, IT

9    HURTS. SO THE FACT THAT WHEN YOU MOVE SOMETHING HURTS, IF

10    YOU'RE NOT GETTING ENOUGH OXYGEN TO THE HEART OR IF YOU'RE

11    HAVING A PULMONARY EMBOLISM, NO MATTER WHERE I MOVE -- I CAN

12    MOVE EVERYWHERE -- IT STILL HURTS. I CAN LIE DOWN; I CAN SIT

13    UP; IT HURTS, EVERY POSITION.

14    **Q.**   IS THIS SORT OF ASSESSMENT WITHIN AN EMTS SCOPE OF

15    PRACTICE?

16    **A.**   WELL, WHAT IS REQUIRED IN THESE INDIVIDUAL TREATMENT

17    ORDERS IS A DIAGNOSIS. YOU TAKE A SYMPTOM AND YOU COME UP WITH

18    A DIAGNOSIS.

19    **Q.**   AND DOES THAT SORT OF -- TO REPHRASE MY QUESTION, IS THAT

20    SORT OF DIAGNOSIS WITHIN AN EMTS' SCOPE OF PRACTICE?

21    **A.**   NO. THAT'S -- NO.

22    **Q.**   SO NOW TO MOVE BACK TO THE POLICY, DEFENDANTS' EXHIBIT 50.

23    IN WHAT WAYS DOES THE POLICY -- DOES THE PRACTICE, THIS LAYOUT,

24    SEEM TO DIFFER FROM THE EXISTING SELF-DECLARED EMERGENCY

25    POLICY?

1  **A.**   I DIDN'T QUITE UNDERSTAND YOUR -- OR HEAR IT MAYBE.

2  **Q.**   YES.  IN WHAT WAYS DOES THE POLICY HERE DIFFER FROM WHAT

3  YOU REVIEWED IN THE CHARTS?

4  **A.**   OKAY.  SO WHEN I LOOKED AT THE SELF-DECLARED EMERGENCIES,

5  I THINK THE ONLY DIFFERENCE THAT I SEE -- THE EMTS HAVE ALWAYS

6  BEEN ALLOWED OR COULD MAKE PHONE CALLS.  THE INDIVIDUAL

7  TREATMENT ORDERS STILL DEMAND THAT THEY MAKE A DIAGNOSIS FROM A

8  SET OF SYMPTOMS.  AND SO THERE'S REALLY NO DIFFERENCE.  THERE'S

9  NO DIFFERENCE.

10  **Q.**   I SEE ONE THING TO ASK ABOUT.  THE EMT HEALTH CARE

11  PROFESSIONAL STAFF WILL THEN ATTACH THE SIGNED INDIVIDUAL

12  TREATMENT ORDERS TO THE REQUEST FOR MEDICAL TREATMENT FORM?

13  **A.**   YES.

14  **Q.**   IS THAT SOMETHING THEY CURRENTLY DO?

15  **A.**   RIGHT.  YEAH.

16  **Q.**   DOES THAT SEEM LIKE A SUBSTANTIAL DIFFERENCE THAT'S LIKELY

17  TO CHANGE THE QUALITY OF CARE TO YOU?

18  **A.**   IT'S NOT GOING TO CHANGE THE QUALITY OF THE CARE.

19  **Q.**   AND SO YOU SAID THAT THEY WERE ALWAYS ABLE TO CALL

20  PROVIDERS.  IT IS CURRENTLY THE PROVIDER WHO DETERMINES WHETHER

21  OR NOT THE PATIENT SHOULD GO TO THE ATU OR BE SEEN.  IS THAT

22  CORRECT?

23  **A.**   BASED ON THE INFORMATION THE EMT GIVES THAT PROVIDER.  AND

24  THAT'S THE WEAKNESS.

25  **Q.**   AND WILL THAT CONTINUE TO BE THE SAME UNDER THIS MEMO?

1  **A.**   YES.

2  **Q.**   NOW, IF THERE'S NEW INFORMATION ABOUT THIS POLICY THAT WE

3  LEARN OVER THE NEXT WEEK DURING DEFENDANTS' CASE-IN-CHIEF, ARE

4  YOU PREPARED TO CONSIDER THAT AND DETERMINE WHETHER IT AFFECTS

5  YOUR OPINION?

6  **A.**   OF COURSE.

7  **Q.**   SO TO CONCLUDE ON YOUR FINDINGS, IN THE COURT'S LIABILITY

8  OPINION IT FOUND THAT DEFENDANTS FAILED TO PROVIDE

9  CONSTITUTIONALLY ADEQUATE EMERGENCY CARE IN THE EVALUATION AND

10  ASSESSMENT OF EMERGENCIES BY QUALIFIED PROVIDERS AND FAILED TO

11  TIMELY TREAT AND/OR TRANSPORT TO THE HOSPITAL FOR EMERGENT

12  CARE.  BASED ON YOUR REVIEW, DID YOU FIND THAT THOSE FINDINGS

13  CONTINUE TO DATE?

14  **A.**   YES, THAT'S RIGHT ON THE NOSE.  THAT'S EXACTLY WHAT

15  HAPPENS TODAY.

16  **Q.**   AND BASED ON YOUR REVIEW, DID YOU FIND THAT THOSE FAILURES

17  EXPOSE PATIENTS WITH SERIOUS MEDICAL NEEDS TO A SUBSTANTIAL

18  RISK OF SERIOUS HARM?

19  **A.**   YES.

20  **Q.**   NOW, I'D LIKE TO TALK ABOUT YOUR RECOMMENDATIONS FOR HOW

21  TO REDUCE THAT RISK.  IN YOUR REPORT DID YOU LAY OUT

22  RECOMMENDATIONS FOR REDUCING THE RISK OF SERIOUS HARM?

23  **A.**   YES.

24  **Q.**   LET'S PULL THOSE UP.  IF WE COULD SEE PLAINTIFFS'

25  EXHIBIT 1A AT 127 AND 128.

11:26 1    COULD YOU WALK US THROUGH WHY YOU MAKE EACH OF THESE

2    RECOMMENDATIONS?

3    **A.**   YES.

4    **Q.**   STARTING AT -- SORRY -- 127.  THERE WE GO.

5    **A.**   SO THE LSP DIRECTIVE 13.007 DOESN'T REFLECT ALL OF THE

6    CURRENT PRACTICES AND SOME OF THE NEW, SO I WOULD LIKE TO SEE

7    THAT UPDATED.  IT'S NOT THAT IMPORTANT THAT IT BE UPDATED, BUT

8    IT'S KIND OF ASSUMED THAT IT SHOULD BE UPDATED TO CURRENT

9    PRACTICES.  I'M SURE THEY CAN DO THAT.

10    A HEALTH CARE PROVIDER SHOULD BE PRESENT IN THE ATU

11    AND SHOULD SEE THE PATIENTS.  THEY'RE GETTING PAID TO SEE THE

12    PATIENTS, TO TAKE CARE OF PATIENTS.  AND YOU HAVE TO SEE A

13    PATIENT TO KNOW WHAT'S GOING ON WITH THE PATIENT.

14    AS SOON AS POSSIBLE A NURSE SHOULD WORK -- SO

15    SOMEBODY WITH EMERGENCY TRAINING -- THESE ARE FAMILY PRACTICE.

16    NOW LET'S GET SOME EMERGENCY FOLKS IN THERE WHO SEE PROBLEMS

17    THAT ARE VERY, VERY SERIOUS.  IF YOU'RE A FAMILY NURSE

18    PRACTITIONER AND YOU SEE SOMEBODY WITH A BLOOD PRESSURE OF

19    230/150, YOU SEND THEM TO THE HOSPITAL.  THAT'S WHAT FAMILY

20    NURSE PRACTITIONERS DO.

21    AND SO THEY NEED TO HAVE SOMEBODY WHO IS BETTER

22    TRAINED, OR THERE CAN BE ON-THE-JOB TRAINING, I AGREE.

23    **Q.**   AND SO JUST TO PAUSE THERE FOR A MOMENT.

24    ARE YOU SAYING THAT EVERYBODY WHO PRACTICES IN THE

25    ATU NEEDS TO BE TRAINED IN EMERGENCY MEDICINE?

11:28

**A.** NO. BUT THEY CAN HAVE ONGOING TRAINING AS THEY GO TO -- BY MEDICAL REVIEW, BY THE PHYSICIANS LOOKING AT IT HONESTLY AND WITH FOCUS ON WHAT HAPPENED: HOW DID THIS GET MISSED OR WHY DID THIS HAPPEN? ON-THE-JOB TRAINING.

**Q.** AND IT'S YOUR BELIEF THAT THAT CAN BE ACCOMPLISHED BY HAVING A PERSON WHO IS SUPERVISING THE ATU WHO IS CREDENTIALED TO WORK IN AN EMERGENCY SETTING.

IS THAT -- IS THAT A FAIR INTERPRETATION OF YOUR RECOMMENDATION?

**A.** YOU DON'T HAVE TO BE EMERGENCY MEDICINE TRAINED TO DO A GOOD JOB. I MEAN, SPECIALTY EMERGENCY MEDICINE IS ONLY 30 YEARS OLD. MANY OF THE LEADERS OF EMERGENCY MEDICINE TODAY WERE TRAINED AS INTERNISTS. SO YOU DON'T -- BUT THEY DEVELOPED A SPECIALTY. THEY FOCUSED ON EMERGENCY MEDICINE, AND IT BECAME A SPECIALTY OVER THE LAST -- WHEN I WAS IN MEDICAL SCHOOL THE DEAN SAID THERE IS NO SPECIALTY EMERGENCY MEDICINE. SO THEY DO NOT HAVE TO BE EMERGENCY MEDICINE TRAINED.

WHAT I'M SAYING IS A NURSE PRACTITIONER WOULD BE MORE -- WOULD BE BETTER TRAINED IF THEY HAD SOME EITHER TRAINING IN EMERGENCY MEDICINE OR THEY HAD A SUPERVISOR WHO HAD -- WHO KNEW EMERGENCY MEDICINE.

**Q.** AND ARE YOU SUGGESTING THAT THEY NEED TO HAVE ALL THE SAME STAFFING AS AN EMERGENCY ROOM?

**A.** NO.

**Q.** IS THERE A WAY TO ELIMINATE THE SUBSTANTIAL RISK OF

11:29 1   SERIOUS HARM TO PATIENTS WITHOUT ONE OF THE OPTIONS THAT YOU
2   SUGGESTED; EITHER HAVING, YOU KNOW, THEM ALL BE CREDENTIALED OR
3   HAVING A SUPERVISOR WHO IS PROFICIENT IN EMERGENCY MEDICINE?
4   **A.**   WELL, THE FUNDAMENTAL UNDERSTANDING HAS TO BE IF YOU
5   CANNOT PROVIDE THE TREATMENT FOR A PATIENT, THAT PATIENT HAS TO
6   GO TO THE HOSPITAL.  YOU HAVE TO UNDERSTAND WHAT THE
7   DIFFERENTIAL DIAGNOSIS IS, WHAT COULD BE WRONG WITH THE -- WHAT
8   IS THE SERIOUS PROBLEM THAT IS WRONG WITH THIS PATIENT.  THEN
9   YOU HAVE TO SAY, THIS PATIENT NEEDS TO GO TO THE HOSPITAL
10  BECAUSE WE DON'T HAVE THE ABILITY TO TREAT SOMEONE WHO IS
11  ANTI-COAGULATING WHO IS COUGHING BLOOD.  WE DON'T HAVE MANY
12  THINGS THAT WE'VE GONE THROUGH THAT YOU'RE GOING TO HEAR FOR
13  TWO WEEKS.
14          SO THE PRACTITIONER HAS TO, NO. 1, SEE THE PATIENT.
15  BECAUSE I BELIEVE THAT -- I HAVE GREAT RESPECT FOR NURSE
16  PRACTITIONERS.  THEY'RE VERY WELL-TRAINED.  NOW, THEY HAVE A
17  COLLEGE DEGREE, AN ASSOCIATE'S DEGREE THESE DAYS.  THEY HAVE --
18  THEY'RE A NURSE, AND THEY DID ANOTHER YEAR OR TWO AND BECAME A
19  NURSE PRACTITIONER.
20          AND YOU HAVE TO SEE THE PATIENT TO KNOW WHAT'S GOING
21  ON WITH THE PATIENT.  BECAUSE WHEN YOU GET AN LPN INTERPRETING
22  THINGS FOR YOU, TAKING THE HISTORY AT THE QUALITY THAT SHE MAY
23  KNOW -- SHE MAY BE EXCELLENT IN HER FIELD, BUT YOU HAVE A NURSE
24  PRACTITIONER, YOU'RE PAYING THEM TO SPEND THE NIGHT -- THEY
25  NEED TO SEE THE PATIENTS.

11:30  1   **Q.**   SO LET'S CONTINUE ON WITH YOUR RECOMMENDATIONS.

       2            COULD YOU EXPLAIN YOUR SUBSEQUENT RECOMMENDATIONS?

       3   **A.**   I THINK IF I LOOK AT "D" LIKE DOG --

       4   **Q.**   UH-HUH.

       5   **A.**   WHY I SAID THAT THERE SHOULD BE A MEDICAL SAFETY OFFICER

       6   IS THAT I WOULD LIKE SOMEBODY TO LOOK AT WHAT GOES WRONG, TO DO

       7   A -- TO BRING THE GROUP TOGETHER WITH PATIENTS WHO WERE

       8   ADMITTED TO THE HOSPITAL AND SAY WHAT WAS HE ADMITTED FOR?  IS

       9   THERE ANYTHING WE COULD HAVE DONE DIFFERENTLY EITHER IN THE

      10   CLINICAL CARE?  IS THERE ANYTHING WE COULD HAVE DONE

      11   DIFFERENTLY?  WHAT IS THAT?  AND IF THERE'S A DIAGNOSTIC ERROR,

      12   THEY'RE -- IF YOU DO THAT, THERE GOING TO BE A LOT FEWER

      13   DIAGNOSTIC ERRORS.

      14            SO IN MEDICINE TODAY WE HAVE A MORBIDITY AND

      15   MORTALITY CONFERENCE.  YOU KNOW, SO LIKE MY DAD USED TO SAY,

      16   YOU DON'T -- YOU SHOULDN'T HAVE TO TOUCH THE FIRE TO KNOW IT'S

      17   HOT.  SO YOU SHOULDN'T HAVE TO MAKE THIS MISTAKE BECAUSE YOU'VE

      18   HEARD IT EVERY WEEK.  YOU GO OVER A CHART AND YOU UNDERSTAND

      19   THAT PEOPLE WHO HAVE A STROKE AND HAVE LEFT UPPER EXTREMITY

      20   WEAKNESS OR LEFT LOWER, THAT IT'S VERY DIFFICULT TO TELL IF

      21   THEY ARE EXTENDING THEIR STROKE OR WHAT'S GOING ON.  SO YOU

      22   COULD LEARN FROM THE MISTAKES AND FROM THE POLICIES AND THE

      23   TRAINING THAT HAPPENED IN MORTALITY AND MORBIDITY REVIEWS.

      24            SO THAT'S WHY A MEDICAL SAFETY OFFICER COULD BE THAT

      25   PERSON, BUT GOOD LEADERSHIP, A GOOD PHYSICIAN, WHERE THIS CAN

11:32 1 BE ESTABLISHED AND THEY CAN DO THIS, TOO.  SO I WOULD -- THE
2 JOB OF A MEDICAL SAFETY OFFICER IS THIS IS THEIR ENTIRE JOB.
3 BUT IF DR. JOHNSON WANTS TO DO IT -- I GUESS HE'S NOT A
4 PHYSICIAN, YOU KNOW, A MEDICAL PHYSICIAN.  SO IF ONE OF THE
5 PHYSICIANS WANTS TO DO THIS, THAT'S ACCEPTABLE.
6 **Q.**   THE IMPORTANT THING IS THAT IT BE DONE MORE THAN -- STRIKE
7 THAT.
8        AND DO YOU SEE A WAY TO ELIMINATE THE SUBSTANTIAL
9 RISK OF SERIOUS HARM TO PATIENTS WITHOUT DOING THAT KIND OF
10 ONGOING REVIEW OF THE CARE?
11 **A.**   WELL, THE WAY TO DO -- IF YOU'RE NOT GOING TO REVIEW AND
12 TRAIN ON THE JOB, THEN YOU'RE GOING TO HAVE TO SEND THE
13 PATIENTS TO THE HOSPITAL.  YOU MAY STILL HAVE TO KNOW THAT
14 THEY'RE GOING TO THE HOSPITAL, BUT YOU CAN -- YOU'RE BETTER
15 EDUCATED.
16        I REMEMBER ONE OF THE CHARTS HAD THE WORDS "KNOWLEDGE
17 DEFICIT," WHICH WE SHOWED TODAY IN COURT.
18        THE KNOWLEDGE -- YOU CANNOT HAVE -- THE DOCTORS, THE
19 PROVIDERS, CANNOT HAVE A KNOWLEDGE DEFICIT BECAUSE THEY CAN'T
20 TAKE CARE OF THE PATIENT.
21 **Q.**   AND LET'S MOVE TO YOUR NEXT TWO RECOMMENDATIONS.  THEY
22 INVOLVE EQUIPMENT THAT YOU RECOMMEND THAT THE ATU HAVE.  IS
23 THAT RIGHT?
24 **A.**   RIGHT.  SO THE STAT MACHINE IS -- WILL GIVE US THE
25 LACTATE.  LACTATE I'VE SPOKEN OF.  WHEN YOUR MUSCLES HURT, WHEN

11:33 1 | YOU RUN REALLY, REALLY HARD AND YOU -- THEY HURT AND YOUR
2 | LACTATE ACID ACCUMULATES, THE SAME THING, THAT MEANS THEY
3 | DIDN'T GET ENOUGH OXYGEN WHILE YOU WERE WORKING OUT BECAUSE YOU
4 | WORKED OUT SO HARD AND YOU WERE BREATHING HARD.

5 | THE POINT IS THAT THIS MACHINE WILL GIVE THESE
6 | PROVIDERS -- WHO I BELIEVE ARE FUNDAMENTALLY GOOD IN THEIR WISH
7 | TO DO THE RIGHT THING. THEY DON'T WISH PATIENTS TO HAVE
8 | STROKES AND NEVER SPEAK AGAIN. IT WOULD GIVE THEM A TOOL THAT
9 | THEY CAN USE. EVERYBODY USES IT. LITTLE URGENT CARES CAN HAVE
10 | THIS. THEY HAVE A TOOL. DO THEY HAVE TO HAVE THE TOOL? NO.
11 | BUT IF YOU DON'T HAVE THE TOOL AND YOU HAVE TO WAIT A DAY TO
12 | REALIZE THAT A PATIENT IS IN DIABETIC KETOACIDOSIS, WHICH YOU
13 | CANNOT DO WITHOUT THIS, YOU HAVE TO WAIT.

14 | WE SAW MANY EXAMPLES OF DKA; THAT THE DIAGNOSIS WAS
15 | DELAYED BECAUSE THE LAB DOESN'T COME BACK QUICKLY. THIS
16 | MACHINE WILL TELL YOU IF THERE'S SEPSIS BECAUSE OF THE LACTATE.
17 | IT WILL TELL YOU THE ANION GAP. IT WILL TELL YOU THINGS.

18 | SO THIS WILL MAKE -- THIS WILL MAKE MEDICAL CARE
19 | BETTER. IF IT'S TOO EXPENSIVE, THEY CAN'T DO IT, THEN THEY
20 | SEND THE PATIENT TO THE HOSPITAL. IF THEY CAN'T GET THE
21 | INFORMATION TO DIAGNOSE SOMETHING THAT'S HIGH UP IN THE
22 | DIFFERENTIAL DIAGNOSIS, YOU HAVE TO PUT THE PATIENT WHERE THAT
23 | DIAGNOSIS CAN BE DONE.
24 | **Q.** SO ESSENTIALLY -- AND CORRECT ME IF I'M PUTTING WORDS IN
25 | YOUR MOUTH, BUT IT SOUNDS LIKE ARE YOU SAYING THEY EITHER HAVE

1  THIS EQUIPMENT OR SEND PATIENTS OUT MORE WHEN YOU WOULD NEED
2  THIS KIND OF TESTING?
3  **A.**    WHEN YOU NEED -- WHEN A RESULT, A LAB RESULT, WILL MAKE A
4  DIFFERENCE TO YOUR TREATMENT, IF YOU CAN'T GET THAT LAB RESULT
5  QUICKLY WHEN IT'S A SERIOUS MEDICAL CONCERN, SUCH AS DIABETIC
6  KETOACIDOSIS, THEN YOU GET YOURSELF A MACHINE.
7        IF YOU CAN'T GET THE MACHINE -- WHICH THEY'RE NOT
8  THAT EXPENSIVE -- THEN SEND THE PATIENT TO THE HOSPITAL.  YOU
9  NEED THAT RESULT.  YOU CAN SEND THEM TO WEST FELICIANA, AND 30
10  MINUTES LATER YOU'LL HAVE THE RESULT.  FOR A WHILE THEY WERE
11  HAVING TO SEND THE LABS TO WEST FELICIANA, I -- THAT'S GREAT.
12        BUT IN THIS CASE, IF THEY DON'T DO THAT, 30 MINUTES,
13  SEND IT TO WEST FELICIANA.  BUT DON'T WAIT UNTIL THE NEXT DAY
14  TO DISCOVER SOMEBODY HAS DIABETIC KETOACIDOSIS.
15  **Q.**    AND ARE YOU SUGGESTING THAT THEY NEED TO HAVE ALL OF THE
16  EQUIPMENT THAT AN EMERGENCY ROOM HAS AT THE ATU?
17  **A.**    NO.  I'M SAYING THAT IF ONE IMPROVED THE CARE IN THE ATU
18  AND YOU WANT TO LET THE NURSE PRACTITIONER WORK TO HIS OR HER
19  CAPACITY, YOU HAVE TO GIVE LAB ANALYSIS.  WE USE LAB ANALYSIS
20  AND THIS WOULD GIVE IT.  THAT'S ALL I'M SAYING.  IF THEY DON'T
21  DO IT, THEY DON'T DO IT.
22  **Q.**    SO LET'S MOVE ON TO THE NEXT RECOMMENDATION.
23        CAN YOU EXPLAIN THAT ONE?
24  **A.**    WELL, ULTRASOUND NOW IS REALLY AN EXTENSION OF THE
25  PHYSICAL EXAM, SO YOU DON'T HAVE TO GET AN ULTRASOUND MACHINE.

11:36 1  NOT EVERY PLACE OUT IN THE WORLD HAS AN ULTRASOUND MACHINE.

2  BUT I -- FROM EXPERIENCE, PEOPLE LOVE ULTRASOUND.  NURSE

3  PRACTITIONERS LOVE IT.  THEY LOVE TO START IVS WITH IT.  IT'S

4  NOT THAT HARD TO TRAIN.  YOU CAN SEE TRAUMA.  THERE ARE A LOT

5  OF THINGS YOU CAN DO.  IT'S AN INTELLECTUAL STIMULATION.

6  SO IF YOU DON'T WANT TO PAY THE MONEY, I UNDERSTAND, AND YOU

7  CAN'T, YOU DON'T HAVE TO HAVE AN ULTRASOUND MACHINE.

8          WHAT I'M SAYING IS THERE ARE TWO THINGS IN MODERN

9  PRACTICE INSTEAD OF A STETHOSCOPE.  YOU CAN LOOK AT THE HEART

10  WITH AN ULTRASOUND.  YOU SEE IF THERE'S FLUID AROUND IT.  YOU

11  SEE IF THE AORTIC VALVE IS SMALL.  YOU SEE IF THERE IS A

12  VEGETATION OR A GROWTH ON IT.  YOU SEE THE SIZE OF THE

13  VENTRICLE.  SO YOU ADD THE EKG PLUS YOUR EARS.  AND THIS IS A

14  SONOGRAPHIC, IT'S A PICTURE.  YOU CAN GET A PICTURE, A PICTURE

15  OF THE HEART.  YOU CAN GET A PICTURE OF THE BLOOD VESSELS.  YOU

16  CAN GET A PICTURE OF THE LIVER, THE CHEST.  YOU CAN SEE

17  PNEUMONIA BETTER THAN AN X-RAY.  SO A LOT OF THINGS YOU CAN DO.

18          AND THE NURSE PRACTITIONERS COULD LEARN TO USE IT,

19  BUT THEY DON'T HAVE TO.  NOBODY HAS TO DO ANYTHING.  THIS IS

20  JUST MY IDEA TO MAXIMIZE THE QUALITY OF HEALTH CARE DELIVERY.

21  Q.   SO THESE TWO RECOMMENDATIONS ARE NOT THINGS THAT YOU'RE

22  SAYING THEY HAVE TO DO; THEY ARE THINGS THAT WOULD IMPROVE THE

23  CARE THAT ARE NOT NECESSARILY REQUIRED?

24  A.   THAT'S RIGHT.

25  Q.   BUT WITHOUT THOSE, THEY MAY NEED TO SEND MORE PEOPLE TO

11:37 1  THE HOSPITAL.  IS THAT RIGHT?

2  **A.**   WELL, IF YOU NEED THIS INFORMATION, THEN -- AND YOU CAN'T

3  GET IT -- THEN YOU NEED TO SEND THE PATIENT OUT TO GET IT.  YOU

4  NEED TO GET THE INFORMATION.

5  **Q.**   OKAY.  AND LET'S MOVE TO RECOMMENDATION G.

6          COULD YOU EXPLAIN THAT ONE?

7  **A.**   WELL, AN ELECTROCARDIOGRAM, AN EKG, HAS TO BE INTERPRETED.

8  I MEAN, SO IF YOU ORDER THE EKG, IT'S DONE IMMEDIATELY AT THE

9  BEDSIDE AND SOMEBODY HAS TO INTERPRET IT.

10         LIKE I ALREADY SAID, YOU CAN TAKE A PICTURE OF IT,

11  SEND IT TO THE DOCTOR.  AND EVEN THOUGH IT'S ONE PICTURE, AS WE

12  KNOW, WE CAN GO LIKE THIS, SPREAD OUR FINGERS AND WE CAN LOOK

13  AT ONE, TWO, AND THREE VERY CAREFULLY.

14         AND SO -- AND IF YOU HAVE THE MEDICAL RECORD IN FRONT

15  OF YOU, LET'S SAY WHOEVER IS AT THE BEDSIDE OR AT THE CHART,

16  YOU CAN COMPARE IT, TAKE A PICTURE OF THE PREVIOUS ONE, TAKE

17  PICTURES.

18         SO SOMEONE HAS TO INTERPRET IT.  AND YOU CAN SEND IT

19  TO THEM.  BUT THEY HAVE TO SAY -- WITHIN A FEW MINUTES THEY

20  SHOULD SAY IT'S NORMAL; IT'S TOTALLY UNCHANGED FROM LAST TIME;

21  THIS IS OKAY.

22  **Q.**   AND DO YOU SEE A WAY TO ELIMINATE THE SUBSTANTIAL RISK OF

23  SERIOUS HARM TO PATIENTS WITHOUT TAKING THAT STEP?

24  **A.**   NO.

25  **Q.**   AND THEN THERE'S A SECOND SENTENCE IN RECOMMENDATION G.

11:38 1  COULD YOU EXPLAIN THAT ONE AS WELL?

2  **A.**   WELL, VERBAL ORDERS FROM A HEALTH CARE PRACTITIONER SHOULD

3  BE ACCOMPANIED BY AN IN-PERSON EVALUATION OF THE PATIENT WITHIN

4  15 MINUTES.  IF THEY'RE SLEEPING -- I UNDERSTAND THAT SOMETIMES

5  THEY'RE GOING TO BE SOMEWHERE ELSE BECAUSE THEY MAY -- THAT'S

6  THE NATURE OF THIS LARGE PRISON.  THEY MAY BE DEALING WITH

7  ANOTHER EMERGENCY, BUT THEY HAVE TO SEE THE PATIENT.  IF

8  IT'S -- THERE ARE SOME THINGS THAT 15 MINUTES IS TOO LONG AND

9  SOME THINGS THAT 15 MINUTES IS PROBABLY FASTER THAN IT HAS TO

10  BE.

11         IF SOMEBODY IS AN INSOMNIAC AND COMES TO THE ATU

12  BECAUSE THEIR SKIN PROBLEM BOTHERS THEM, THE NURSE CAN TAKE A

13  PICTURE OF IT AND SAY THIS -- AND SHE MIGHT HAVE -- SHE MIGHT

14  HAVE THE HEALTH CARE RECORD AND SAY "THIS IS -- THE GUY JUST

15  CAN'T SLEEP AND HE WANTS TO GET SEEN FASTER AND SPEND THE $6."

16  THAT'S ONE THING.

17         BUT IF THE PATIENT HAS CHEST PAIN OR A HEADACHE OR

18  COLD SYMPTOMS OR -- THERE ARE A LOT OF THINGS THAT ARE SERIOUS

19  MEDICAL NEEDS THE PRACTITIONER SHOULD SEE THEM -- I MEAN, THE

20  PROVIDER.

21  **Q.**   AND DO YOU SEE A WAY TO ELIMINATE THE SUBSTANTIAL RISK OF

22  SERIOUS HARM TO PATIENTS WITHOUT THAT STUFF?

23  **A.**   NO.

24  **Q.**   NOW, YOUR NEXT RECOMMENDATION H, COULD YOU EXPLAIN THAT

25  ONE?

**A.**   YES.  SO RIGHT NOW IT'S -- TRANSFER TO THE HOSPITAL IS NOT STANDARDIZED.  SO THE TRANSFER TO THE HOSPITAL SHOULD BE SOMETHING -- FIRST OF ALL, I'LL GO THROUGH IT.

IF YOU HAVE UNSTABLE VITAL SIGNS, IT HAS TO BE -- THE PATIENT HAS TO BE TRANSFERRED.  REMEMBER THAT STABILITY IS A THING THAT HAPPENS OVER TIME.  SO WHEN SOMEBODY COMES TO ME AND SAYS, "THE VITAL SIGNS ARE STABLE," THAT'S ONE READING AT THAT TIME, THE TIME THAT IT TAKES TO TAKE A BLOOD PRESSURE, A TEMPERATURE AND A PULSE.  SO VITAL SIGNS CAN -- UNSTABLE MAY TAKE TIME.

SO WHAT I'M SAYING IS, WHEN YOU SEE A BLOOD PRESSURE OF 65/40 IN A GUY WHO IS BLEEDING OR WHATEVER, THAT'S UNSTABLE, AND THAT PATIENT SHOULD GO TO THE HOSPITAL BECAUSE WE CAN'T TREAT THOSE THINGS IN A PRISON.  NOT EVEN ALL EMERGENCY ROOMS CAN TREAT THIS.  BUT THEY CAN CERTAINLY GET STARTED IN THE WAY THAT THE ASSESSMENT TREATMENT UNIT CAN'T.

PATIENTS WHO PRESENT WITH CHEST PAIN AND HAVE A HISTORY OF DIABETES, HYPERTENSION, HIGH FATS, HIGH CHOLESTEROL, OBESITY, FAMILY HISTORY, SMOKING, PRIOR STROKE -- REMEMBER, STROKE IS A VASCULAR DISEASE.  IF YOU HAVE VASCULAR DISEASE IN YOUR BRAIN BECAUSE WE HAVE TOO MANY STEAKS AND WE DON'T TAKE OUR CHOLESTEROL MEDICINE AND WE HAVE HYPERTENSION, YOU HAVE IT IN YOUR HEART, IT'S CALLED CARDIOVASCULAR DISEASE.  THAT'S YOUR BRAIN.  SO IF YOU'VE HAD A STROKE -- OR A TRANSIENT ISCHEMIC ATTACK IS JUST AN ABORTED STROKE-TYPE OF SYMPTOM -- OR A

11:41 1 PERIPHERAL VASCULAR DISEASE, YOU HAVE TO CONSIDER THAT THE
2 PATIENT WITH -- MAY BE HAVING A SIMILAR VASCULAR EMERGENCY IN
3 ANOTHER PART OF THE BRAIN.  AND SO THAT'S IT.
4 **Q.**   OKAY.  AND THEN THERE ARE SOME OTHERS AS WELL.
5           BUT WHAT'S THE SORT OF GENERAL PRINCIPLE FOR YOU OF
6 THESE STANDARDS?
7 **A.**   THE GENERAL PRINCIPLE IS WHEN YOU ARE THINKING OF THE
8 POSSIBLE THINGS THAT ARE HAPPENING TO THE PATIENT, YOU MAY
9 CONSIDER MOJO, BUT MOJO -- IT COULD BE SOMETHING MUCH MORE
10 SERIOUS; THAT TIME IS OF THE ESSENCE.
11           IF YOU HAVE A DIFFERENTIAL DIAGNOSIS THAT INCLUDES
12 VERY SERIOUS MEDICAL CONDITIONS OR MEDICAL NEEDS, THEN THAT
13 PATIENT HAS TO BE WHERE THAT PATIENT'S SERIOUS MEDICAL NEEDS
14 CAN BE TREATED BY THE -- AND ALL THE -- EVERYBODY IN A
15 HOSPITAL.
16 **Q.**   AND WHEN YOU SAY "DIFFERENTIAL DIAGNOSIS," COULD YOU JUST
17 EXPLAIN FOR A MOMENT WHAT YOU MEAN BY THAT IN THIS CONTEXT?
18 **A.**   SO WHEN A PATIENT COMES IN WITH A COMPLIANT -- ABDOMINAL
19 PAIN, PROBABLY THE MOST COMMON COMPLAINT IN AMERICA IS
20 ABDOMINAL PAIN -- THEN YOU'RE THINKING SHOULD I JUST GIVE THIS
21 PERSON A GI?  MAYBE IT'S A STOMACH ACHE.  MAYBE IT'S A HEART
22 ATTACK.  RIGHT?  MAYBE IT'S A RUPTURED SPLEEN.  MAYBE IT'S AN
23 INFECTION.  MAYBE IT'S COLITIS.  MAYBE THEY HAVE SERIOUS
24 PROBLEMS.  THAT'S ALL THE THINGS I'M THINKING IT COULD BE.  AND
25 THOSE ARE THE THINGS THAT -- THAT'S THE DIFFERENTIAL DIAGNOSIS.

11:43 1   WHAT COULD IT BE?

2             AND HOW DO I RANK THEM?  AND I RANK THEM ACCORDING TO

3   THE RISK FACTORS OF THE PATIENT, ALL THE THINGS I'VE LISTED,

4   WHAT'S ALREADY HAPPENED TO THE PATIENT AND WHAT PUTS THEM AT

5   RISK.

6   **Q.**   AND SO ARE YOU SUGGESTING THAT THEY HAVE TO SEND EVERY

7   PATIENT WITH ABDOMINAL PAIN TO THE EMERGENCY ROOM?

8   **A.**   NO.  I'M SUGGESTING THAT THE PROVIDER WHO IS SEEING THE

9   PATIENT FORMULATE A DIFFERENTIAL DIAGNOSIS AND MAKE DECISIONS

10  ON WHAT THEY NEED AND DO HAVE AND MOST LIKELY -- AND SEND THE

11  PATIENT.  AND I THINK THAT THIS SHOULD BE ESTABLISHED BY THE

12  PHYSICIAN'S SUPERVISION AS TO WHAT -- WHAT ARE THE GUIDELINES

13  FOR SENDING A PATIENT OUT.

14  **Q.**   AND GIVEN THE CURRENT CARE AT LSP, DO YOU SEE A WAY TO

15  ELIMINATE THE SUBSTANTIAL RISK OF SERIOUS HARM TO PATIENTS

16  WITHOUT A STEP LIKE THAT?

17  **A.**   NO.

18  **Q.**   AND THEN LET'S GO TO YOUR RECOMMENDATION I.

19  **A.**   OKAY.  IF SOMEBODY HAS A TEMPERATURE ABOVE 105 -- AND YOU

20  HAVE TO BE AWARE THAT THERE'S MANY, MANY -- THAT A PATIENT

21  COULD BE AT 103.5 IN A HOT ENVIRONMENT AND WHEN THEY -- AND

22  STILL HAVE A HEATSTROKE.  THEY HAVE AN ALTERED MENTAL STATUS

23  AND 103.5.  THEY'RE IN A HOT ENVIRONMENT.  AND REMEMBER, THERE

24  IS NO AUTOPSY FINDING HEATSTROKE LIKE THERE IS AORTIC STENOSIS.

25  IT'S ALL CIRCUMSTANTIAL.

11:44 1          SO WHEN YOU TALK TO A MEDICAL EXAMINER AND YOU SAY,

2    HOW DO YOU DIAGNOSE THE -- IT'S THE CIRCUMSTANCES.  AND THE

3    PATIENT'S ON BENADRYL.  THEY CAN'T SWEAT.  SO YOU'RE SAYING

4    THIS MIGHT BE HEATSTROKE.  WHATEVER IS THE CAUSE, IT COULD BE

5    THAT YOU'RE AGITATED, DELIRIUM FROM WHATEVER.  IF THEY'RE HOT,

6    THEY NEED TO BE COOLED.  AND ONE OF THE FASTEST WAYS TO COOL

7    THEM IS ICE.  YOU ICE THEM DOWN.  YOU PACK THEM LIKE A SARDINE

8    IN ICE.  IF YOU CAN'T HAVE AN ICE MACHINE, WHICH IS -- THEN YOU

9    JUST BLOW FANS AND YOU COOL THEM.  YOU DO EVERYTHING YOU CAN.

10   BUT ICE IS THE FASTEST WAY.

11          SO IF YOU CAN'T AFFORD AN ICE MACHINE, I -- FROM MY

12   OWN EXPERIENCE, WE LIKE ICE MACHINES.  PEOPLE CAN USE A LITTLE

13   ICE IN THEIR DRINKS.  THEY CAN STICK THEIR DRINK IN THE ICE

14   MACHINE BECAUSE IT DOESN'T HAVE TO BE STERILIZED.  AN ICE

15   MACHINE IS GREAT.  AND YOU PUT 100 POUNDS OF ICE AND DUMP IT ON

16   THE PATIENT, THE TEMPERATURE COMES DOWN.  IN 20 MINUTES THEY

17   ARE BACK WHERE THEY SHOULD BE AND THE LIFE THREAT -- AND IF THE

18   PATIENT IS IN CARDIAC ARREST, YOU JUST -- YOU CAN TEND TO THAT

19   AT THE SAME TIME.

20   Q.   AND YOU TESTIFIED ABOUT ONE PATIENT WHO DIDN'T RECEIVE

21   COOLING WHEN THEY NEEDED IT.  WERE THERE OTHERS WHO YOU SAW ON

22   THE RECORD AS WELL IN THE CHART REVIEWS?

23   A.   WELL, THE GENTLEMAN WHO COLLAPSED OUT IN THE -- OUTSIDE,

24   HE SHOULD HAVE BEEN COOLED BECAUSE HE ALTERED HIS MENTAL

25   STATUS.  IT WAS 103.5.  I THINK HE SHOULD HAVE BEEN COOLED.

11:45 1   **Q.**  IS THERE A WAY TO ELIMINATE THE SUBSTANTIAL RISK OF

2   SERIOUS HARM TO PATIENTS WITHOUT HAVING SOME FORM OF COOLING

3   AVAILABLE?

4   **A.**  THOSE WITH HEATSTROKE?

5   **Q.**  YEAH, FOR THOSE WITH HEATSTROKE.

6   **A.**  NO.

7   **Q.**  OKAY.

8   **A.**  YOU HAVE TO BE ABLE TO COOL A HEATSTROKE.  IT'S HOT.

9   **Q.**  AND THEN LET'S LOOK AT RECOMMENDATION J, WHICH RUNS ON TO

10   PAGE 129.  SO IF WE COULD PUT UP PX_01A AT 128 AND 129.

11        BUT IF YOU WANT TO START TALKING ABOUT RECOMMENDATION

12   J.

13   **A.**  OH, SORRY.

14   **Q.**  SORRY.

15   **A.**  EXCUSE ME.  SO THE URINE TOXICOLOGY -- AND I KNOW THERE'S

16   ANOTHER PAGE COMING UP -- SHOULD NOT BE USED IN EMERGENCY

17   SITUATIONS.  CATHETERIZATION FOR THE PURPOSE OF OBTAINING YOUR

18   TOXICOLOGY IS NOT RIGHT.

19   **Q.**  AND YOU'VE TALKED ABOUT WHY -- YOU KNOW, WHY YOU BELIEVE

20   THAT OR WHY THAT'S THE CASE BEFORE.  IS THERE ANYTHING YOU'D

21   LIKE TO ADD ON THAT SUBJECT NOW?

22   **A.**  YOU KNOW, JUST TO BE CLEAR, THIS IS NOT A MATTER OF

23   OPINION.  THIS IS WELL LAID OUT IN THE MEDICAL LITERATURE,

24   URINE TOXICOLOGY.

25        LET'S START WITH MOJO.  MOJO CAN BE POSITIVE IN THE

11:46 1  URINE FROM THREE DAYS TO 18, AN AVERAGE OF EIGHT DAYS.  SO YOU
     2  GET A -- LET'S -- AND AS ALL MARIJUANA.  COCAINE CAN BE
     3  POSITIVE FOR DAYS -- OR COCAINE METABOLITES IS WHAT THEY'RE
     4  LOOKING FOR.  THEY'RE NOT LOOKING FOR THE PARENT ORDINATE OF
     5  COCAINE.  ALL OF THEM CAN STAY POSITIVE.  SO WHAT IT DOES IS IT
     6  MISLEADS YOU IF YOU HAVE A POSITIVE.  NOT TO SAY THAT WITH
     7  REGARDS TO SYNTHETIC HOME-BREWED CANNABINOIDS, MARIJUANA-TYPE
     8  OF THINGS, THEY CAN BE INTERFERED.
     9          THAT URINE TOXICOLOGY, ONE OF THE FALSE POSITIVES IS
    10  NONSTEROIDAL ANTI-INFLAMMATORY DRUGS THAT CAN RESULT IN A FALSE
    11  POSITIVE.  AND MORE THAN ANYTHING, EVEN THE TOX CUP THAT THEY
    12  USE -- I RESEARCHED THEIR TOXICOLOGY.  ALL OF THOSE SAY THIS
    13  CANNOT BE RELIED ON UNLESS IT'S CONFIRMED.  EMIT GAS
    14  CHROMATOGRAPHY IN ALL OF THE AUTOPSIES SAY THAT.  THAT'S WAY
    15  OUT OF WHAT I NEED TO KNOW.
    16          ALL I NEED TO KNOW IS IF I CAN HAVE A FALSE NEGATIVE,
    17  WHICH HAS BEEN DISCUSSED.  IT COULD BE THAT YOU DON'T FIND IT.
    18  BUT MORE IMPORTANT IS WHEN -- BECAUSE A FALSE NEGATIVE WILL AT
    19  LEAST ALLOW YOU TO STICK TO YOUR DIFFERENTIAL DIAGNOSIS.  IT
    20  COULD BE MOJO, BUT IT'S NEGATIVE.  I DON'T KNOW IF IT'S A TRUE
    21  NEGATIVE OR IT'S A FALSE NEGATIVE.  I DON'T KNOW.  BUT WHEN
    22  IT'S POSITIVE AND YOU DON'T KNOW HOW TO USE URINE TOXICOLOGY,
    23  YOU ARE GOING TO NOW SAY THIS GUY HAS A MOJO INTOXICATION WHEN
    24  HE MAY OR MAY NOT BE.  THERE ARE A LOT OF REASONS FOR
    25  INTERFERENCE IN URINE TOXICOLOGY AT THE BEDSIDE WITH THESE

11:48 1   LITTLE CUPS.  AND IF YOU REALLY WANT TO KNOW, YOU DO A PROPER

2   TEST.

3           AND ALSO, YOU MAY NOT FIND SOMETHING BECAUSE THIS

4   TEST THAT THEY'RE USING IS A BEDSIDE TEST.  BUT IF YOU SEND IT

5   OUT, YOU WILL FIND MOJO BECAUSE SYNTHETIC CANNABINOIDS WITH THE

6   RIGHT TESTS -- GC MASS SPEC OR ANY OF THE OTHERS -- EMIT WILL

7   BE FOUND.  SO WHEN IT SAYS IT IS OR IS NOT FOUND AND SOME TESTS

8   DO OR DO NOT, IT DEPENDS ON THE TEST, DOESN'T IT?  DOESN'T

9   EVERYTHING DEPEND ON THE TEST?  IT DOES.

10  **Q.**   I TAKE THAT TO BE TRUE.

11          SO IS YOUR RECOMMENDATION THAT THERE ARE NO

12  SITUATIONS IN WHICH THEY CAN TEST FOR TOXICOLOGY?

13  **A.**   DID YOU CALL IT A SHAKE HAND TEST?  I'M SORRY.

14  **Q.**   I SAID -- NO.  I SAID, "I TAKE THAT TO BE TRUE."  BECAUSE

15  YOU ASKED ME A QUESTION AND I DIDN'T KNOW HOW TO ANSWER.

16  **A.**   THERE IS NO SITUATION WHERE IN THE ATU THE URINE

17  TOXICOLOGY SHOULD BE PART OF THE DIAGNOSIS.  NOW, SOMETIMES I

18  DID A URINE TOXICOLOGY BECAUSE THE PSYCHIATRISTS WANT TO KNOW

19  -- AND IT GOES THROUGH THE HOSPITAL AND THEY UNDERSTAND THE

20  SHORTCOMINGS.  IF SOMEBODY IS USING AN ILLICIT SUBSTANCE THAT

21  MAY -- LIKE AMPHETAMINES, IT'LL STAY POSITIVE FOR A LONG TIME.

22  WE ARE NOT DEALING WITH AN EMERGENCY SITUATION.

23          IT COULD BE USED IN CHILD ABUSE SITUATIONS.  NEVER

24  WOULD THIS URINE TOXICOLOGY BE USED FOR A CHILD ABUSE

25  SITUATION.  BECAUSE AMPHETAMINES ARE CROSSING WITH A NUMBER OF

11:49 1    MEDICATIONS, OPIATES CROSS WITH FLUOROQUINOLONES, ANTIBIOTICS,
      2    THERE ARE SO MANY WAYS TO GO WRONG.
      3         SO PHYSICIANS KNOW THAT YOU CANNOT USE A URINE
      4    TOXICOLOGY TO MAKE A DIAGNOSIS, SO IT SHOULD BE ELIMINATED,
      5    YES, UNLESS IT IS SENT ALONG WITH THE PATIENT TO THE HOSPITAL
      6    AND THEY WANTED TO HAVE SOME INFORMATION FOR LATER ON.
      7    **Q.**   AND IS THERE A WAY TO ELIMINATE THE SUBSTANTIAL RISK OF
      8    SERIOUS HARM TO PATIENTS AS LONG AS THIS PROCEDURE IS IN PLACE?
      9    **A.**   NO.  WELL, I MEAN, THIS PROCEDURE IS LEADING TO HARM.
     10    IT'S UNNECESSARY AND IT SHOULDN'T BE DONE.
     11    **Q.**   AND THEN LET'S CONTINUE TO K.  YOU'VE GOT A FEW MORE
     12    RECOMMENDATIONS HERE.
     13         IF YOU COULD, EXPLAIN RECOMMENDATION K.
     14    **A.**   OH, THERE IT IS.  SO NO PERSON, PATIENT SHOULD BE
     15    TRANSFERRED TO THE ATU OR THE NURSING UNIT WITHOUT AN IN-PERSON
     16    EXAMINATION BY A PROVIDER AND A REVIEW OF THE LABORATORY
     17    RESULTS, UNDERSTANDING THAT SOME OF THE MOST CRITICAL
     18    LABORATORY RESULTS DON'T COME BACK FOR A DAY.  BUT A HEALTH
     19    CARE PROVIDER NEEDS TO DO AN EXAMINATION, BECAUSE WHEN YOU
     20    START RELYING ON A LESS EXPERIENCED, LESS KNOWLEDGEABLE
     21    OBSERVER, AND THE HISTORY AND PHYSICAL OF THAT OBSERVER YOU'RE
     22    GOING TO MAKE TERRIBLE MISTAKES.  THAT'S WHY WE HAVE A SYSTEM
     23    OF TRAINEES AND THE TRAINED.
     24         TRAINEES ARE SUPERVISED IN REALTIME.  NONE OF US WANT
     25    TO GO TO THE HOSPITAL AND SEE -- FOR CHEST PAIN AND BE SEEN BY

11:51 1    SOMEBODY WHO IS A TRAINEE WITHOUT SOMEBODY ELSE WHO LOOKS AT

2    THAT PATIENT AND SAYS, YOU KNOW, "THIS ISN'T ACTUALLY CHEST

3    PAIN.  THIS IS ACTUALLY THE BIG BOUNDING AORTA HERE.  I'M

4    FEELING THE ABDOMEN.  I FEEL A BIG PULSATILE AORTA."  THAT'S

5    SOMETHING THAT I KNOW TO FEEL FOR, OR LOOK FOR, ULTRASOUND FOR,

6    THAT A TRAINEE WON'T KNOW, OR SOMEBODY WHO IS TRAINED TO A

7    LESSER EXTENT.  LET'S PUT IT THAT WAY.

8    **Q.**    AND BASED ON THE CURRENT CONDITIONS THAT YOU REVIEWED AT

9    LSP, IT IS POSSIBLE TO ELIMINATE THE SUBSTANTIAL RISK OF

10   SERIOUS HARM TO PATIENTS WITHOUT TAKING THIS STEP?

11   **A.**    NO.

12   **Q.**    LET'S MOVE DOWN TO RECOMMENDATION L.

13   **A.**    FOR SELF-DECLARED EMERGENCIES, THE EMTS SHOULD ESCORT OR

14   TRANSPORT THE PATIENTS TO A CLINICAL EXAM ROOM FOR EVALUATION

15   BY A MEDICAL PROVIDER.

16          SO I'M NOT THAT INTERESTED IN THE PLACE.  YOU CANNOT

17   EXAMINE SOMEBODY THROUGH CELL BARS.   I MEAN, THAT'S LIKE

18   SAYING I CAN EXAMINE YOU AND YOU'RE FOUR FEET -- YOU KNOW, I

19   CAN'T TOUCH YOU.  I HAVE TO TOUCH YOU TO EXAMINE YOU.

20          AND THEN WE -- OBVIOUSLY IF I CAN'T -- WITHOUT

21   TALKING TO YOU ABOUT THE PAST MEDICAL HISTORY OR HAVING YOUR

22   PAST MEDICAL HISTORY -- AND IF I KNOW HOW TO -- I KNOW HOW TO

23   ASK QUESTIONS, BECAUSE YOU ASK THEM FIVE OR SIX DIFFERENT WAYS

24   AND YOU -- FINALLY THEY SAY, "OH, YEAH."  YOU KNOW, THAT IS A

25   PROBLEM FOR ME.

11:52 1  Q.   AND WHAT ABOUT THOSE TIMES WHEN, YOU KNOW, THE REQUEST IS

2  AS YOU SUGGESTED BEFORE; FOR A CREAM FOR A RASH OR SOMETHING

3  LIKE THAT?

4  A.   YEAH, SO THAT'S OKAY.  I MEAN, IF THE RASH -- I THINK MOST

5  PEOPLE KNOW WHAT SHINGLES LOOK LIKE, BUT YOU HAVE TO SOMETIMES

6  UNDRESS A PATIENT OR AT LEAST SEE THE ENTIRE LEG TO KNOW THAT

7  YOU'RE SEEING SHINGLES AND NOT TWO OR THREE BUG BITES.  SO

8  THERE ARE RASHES THAT ARE SERIOUS AND INDICATE -- BUT A LOT OF

9  THEM AREN'T.

10          AND AGAIN, IF YOU WANT TO TAKE A PICTURE OF THAT RASH

11  THAT YOU THINK IS NOTHING AND THE PROVIDER SAYS, "TAKE OFF HIS

12  PANTS SO I CAN -- HAVE HIM TAKE OFF HIS PANTS SO I CAN SEE IF

13  THIS RASH RUNS UP AND DOWN," THEN THAT'S OBVIOUSLY SHINGLES.

14  Q.   AND GIVEN THE CURRENT PRACTICE AT LSP, IS IT POSSIBLE TO

15  ELIMINATE THE SUBSTANTIAL RISK OF SERIOUS HARM TO PATIENTS

16  WITHOUT THIS STEP?

17  A.   WITHOUT HAVING -- A PROVIDER NEEDS TO SEE THE PATIENTS.

18  THAT'S WHAT I'M SAYING OVER AND OVER.  A PROVIDER, WHO IS

19  TRAINED TO TAKE A HISTORY AND AN EVALUATION AND MAKE A

20  DIAGNOSIS, NEEDS TO SEE THE PATIENTS.

21  Q.   AND SO GOING TO M, YOUR NEXT RECOMMENDATION, THAT SORT OF

22  GOES TO THE PROVIDER PART OF SELF-DECLARED EMERGENCIES.  WHY DO

23  YOU RECOMMEND THAT NO-TRANSPORT ORDER SHOULD BE ELIMINATED?

24  A.   BECAUSE WHAT'S HAPPENING IS PATIENTS ARE NOT TRANSPORTED

25  WITH SERIOUS MEDICAL NEEDS, WITH SERIOUS CONDITIONS.  WHY HAVE

11:54  1   THAT ORDER?  WHAT GOOD DOES THAT DO?  SOMEBODY FAINTS AND THEY

       2   SAY, "DON'T TRANSPORT THEM."  THEY MAY KNOW THAT HE'S GOT AN

       3   AORTIC STENOSIS, IN WHICH CASE THEY PROBABLY WOULD NOT SAY

       4   THAT.  BUT IF HE'S BEEN THERE THE LAST FOUR OR FIVE DAYS, THEY

       5   SAY, "HE KEEPS COMING IN HERE."  AND YOU KNOW WHAT?  REPEATED

       6   PRESENTATIONS MAY BE A SIGN OF SERIOUS MISSED ILLNESS.  THAT'S

       7   WHAT WE CALL IT IN EMERGENCY MEDICINE, A RED FLAG, TWO OR THREE

       8   VISITS.

       9        I UNDERSTAND THAT SOME PEOPLE KEEP VISITING BECAUSE

      10   THEY GET INTO AIR CONDITIONING, BUT THAT CYNICISM CAN RESULT IN

      11   TERRIBLE MISTAKES.  AND I'M WORRIED ABOUT CYNICISM WHEN I'M

      12   SEEING PRISONERS BECAUSE I CAN MISS STUFF BECAUSE OF MY

      13   ATTITUDE.

      14   **Q.**   AND GIVEN THE CURRENT PRACTICE AT LSP, CAN THE SUBSTANTIAL

      15   RISK OF SERIOUS HARM TO PATIENTS BE ELIMINATED WHILE LEAVING

      16   THE NO-TRANSPORT APPROACH IN PLACE?

      17   **A.**   NO.

      18   **Q.**   AND IS THAT SOMETHING THAT'S STILL PERMITTED UNDER THE NEW

      19   SELF-DECLARED EMERGENCY POLICY?

      20   **A.**   IT APPEARS SO.  IT DOESN'T SAY IT'S NOT.

      21   **Q.**   AND THEN RECOMMENDATION N, COULD YOU EXPLAIN THAT ONE?

      22   **A.**   SO STANDING ORDER SHOULD NOT BE USED WITHOUT AN EVALUATION

      23   OF THE PATIENT BY A HEALTH CARE PROVIDER.  I WILL AMEND THAT TO

      24   SAY THERE ARE CERTAIN SIMPLE THINGS, LIKE AN INGROWN TOENAIL

      25   THAT COULD LAST TILL THE NEXT DAY AND THEY MIGHT GET FIXED

11:55 1   DURING OFFICE HOURS.  INGROWN TOENAILS, CERTAIN RASHES,

2   CERTAIN -- REQUIRES THAT -- REQUIREMENTS FROM CERTAIN

3   MEDICATIONS.  LIKE LET'S SAY THE PATIENT SAYS, "I NEED TO

4   REFILL MY MEDICATION BECAUSE IT'S OUT IN THREE DAYS," BUT MY

5   OBSERVATION OF SELF-DECLARED EMERGENCIES IS THAT'S NOT WHAT THE

6   CALLS ARE FOR, BECAUSE IT COSTS $6 TO DO IT AND BECAUSE THAT'S

7   NOT WHAT THEY'RE CALLING FOR.

8       SO A STANDING ORDER SHOULD NOT BE USED WITHOUT AN

9   EVALUATION OF THE PATIENT BY A HEALTH CARE PROVIDER.  I'M GOING

10   TO AMEND THAT TO JUST SAY THAT WE'RE TALKING ABOUT SERIOUS

11   MEDICAL NEEDS.  THAT'S WHAT I'M TALKING ABOUT THE WHOLE TIME.

12   **Q.**  AND THEN YOUR -- AND, OF COURSE, IS THERE A WAY TO

13   ELIMINATE THE SERIOUS RISK OF -- A SUBSTANTIAL RISK OF SERIOUS

14   HARM TO PATIENTS WITHOUT TAKING A STEP LIKE THAT?

15   **A.**  NO.

16   **Q.**  AND THEN LET'S JUST GO TO YOUR LAST RECOMMENDATION.

17       COULD YOU JUST EXPLAIN THIS ONE?

18   **A.**  SO STAFF SHOULD BE REGULARLY TRAINED AND DRILLED IN THE

19   USE OF AED.  I'M REGULARLY TRAINED AND DRILLED.

20       RIGHT NOW IN THIS ROOM, I KNOW WHERE IT IS.  I KNOW

21   THAT IT'S ON THE FIRST FLOOR BEFORE -- WHERE WE EAT LUNCH AND

22   WHERE THE ELEVATOR IS BECAUSE THAT'S SOMETHING I KNOW BECAUSE I

23   SHOULD KNOW IT BECAUSE I'M THE ONLY PHYSICIAN PRACTICING

24   MEDICINE IN THIS ROOM.  AND IF SOMEBODY COLLAPSES, I AM GOING

25   TO SEND ONE OF THEM TO GO GET IT.  I KNOW WHERE IT IS.  AND I

11:57 1    KNOW HOW TO USE IT BECAUSE I REVIEW REGULARLY, AND THAT'S WHAT

2    HAS TO HAPPEN.  ONCE A YEAR IS NOT ENOUGH.  GET THE AED, PLAY

3    WITH IT, MAKE IT TURN AROUND, MAKE IT TALK TO YOU.  THIS NEEDS

4    TO BE TRAINED AND DRILLED BECAUSE THAT'S HOW YOU KNOW WHERE IT

5    IS AND HOW TO USE IT, HOW TO APPLY IT AND WHAT IT SAYS TO YOU.

6    BECAUSE EVERY ONE OF THEM IS A LITTLE BIT DIFFERENT, BUT MOST

7    OF THE THEM TALK TO THE PROVIDER NOW OR THE BYSTANDER AT THE

8    AIRPORT, FOR EXAMPLE.

9    **Q.**    AND DID YOU REVIEW THE TRAINING FOR THE EMTS ON THE

10   AEDS -- SORRY.  NOT FOR THE EMTS.  SORRY.  FOR LSP'S STAFF?

11   **A.**    I REVIEWED THAT THEY TRAINED ON IT.  OUTSIDE OF BEING

12   TRAINED ON IT, I DON'T WANT TO SAY IF IT'S ONCE A YEAR OR MORE.

13   I JUST DON'T REMEMBER.  I KNOW THEY'RE TRAINED ON IT.  I DO

14   REMEMBER THAT THE EXPECTATION IS THAT THE STAFF OUTSIDE OF

15   PROVIDERS AND HEALTH CARE PRACTITIONERS WILL RESPOND WITHIN

16   FOUR MINUTES.

17   **Q.**    OKAY.  AND BASED ON YOUR REVIEW OF THE CHARTS, DID YOU

18   REVIEW THAT THE TRAINING THAT'S BEEN HAPPENING SO FAR IS

19   SUFFICIENT TO ENSURE THAT THE AED IS USED WHEN IT SHOULD BE?

20   **A.**    WELL, I DON'T REMEMBER THE ANSWER TO THAT.  IF IT'S

21   SUFFICIENT TO BE -- COULD YOU ASK THE QUESTION AGAIN?

22   **Q.**    YES.

23   **A.**    MAYBE I WAS FOCUSED ON --

24   **Q.**    YES.  IT WAS A CONFUSING QUESTION, YES.

25          BASED ON YOUR REVIEW OF THE CHARTS, DID YOU SEE

11:58 1  ANYTHING THAT SUGGESTED TO YOU THAT, YOU KNOW, WHATEVER THE
      2  TRAINING IS TO DATE HAS NOT BEEN SUFFICIENT TO ENSURE THAT AEDS
      3  ARE USED APPROPRIATELY?
      4  **A.**   WELL, THE REASON I DON'T THINK IT'S SUFFICIENT IS BECAUSE
      5  IT'S NOT BEING USED WHEN IT SHOULD BE.  ANYBODY THAT GOES
      6  UNCONSCIOUS, THE AED SHOULD BE ATTACHED AND SOMEONE GRABS THE
      7  AED AND IF YOU WANT TO GIVE THEM NARCAN, BECAUSE EVERYBODY GETS
      8  NARCAN, I DON'T HAVE A PROBLEM WITH THAT, UNLESS YOU'RE NOT
      9  ATTACHING THE AED.  AND THE AED MAY NOT BE APPLIED OR HE MAY
     10  NOT FIRE OR THE GUY MAY WAKE UP.
     11          BUT THE THING IS, YOU DON'T KNOW WHICH ONES ARE
     12  GOING -- WHO GOES UNCONSCIOUS, WHO IS IN V-FIB, AND WHO'S NOT.
     13  YOU DON'T KNOW.  IN THE PERIOD OF TIME YOU GRAB THE AED AND
     14  ATTACH IT, IF THE GUY WAKES UP, FINE.  IN THE MEANTIME, IT'S
     15  ATTACHED, BECAUSE IT'S THE ONES THAT ARE NOT WAKING UP WHO ARE
     16  IN V-FIB THAT WE'RE CONCERNED ABOUT.  THAT'S THE SERIOUS
     17  MEDICAL NEEDS.  IT SHOULD BE DONE EVERY TIME SOMEONE FAINTS.
     18  IF THEY WAKE UP, YOU DIDN'T HAVE TIME TO ATTACH IT, BUT YOU HAD
     19  IT, THAT'S FINE.
     20  **Q.**   OKAY.  AND HERE AGAIN, IS THERE A WAY TO ELIMINATE THE
     21  SUBSTANTIAL RISK OF SERIOUS HARM IF STAFF ARE NOT REGULARLY
     22  TRAINED AND DRILLED ON THE AEDS?
     23  **A.**   NO.  THEY HAVE TO KNOW WHERE THEY ARE.
     24  **Q.**   AND SO JUST TO CONCLUDE, DR. VASSALLO, IF YOU WERE TO BOIL
     25  THESE RECOMMENDATIONS DOWN TO THE MOST IMPORTANT PRINCIPLES,

11:59 1  WHAT WOULD THOSE BE?

2  **A.**  WELL, NO. 1, PROVIDERS HAVE TO SEE THE PATIENTS AND THEY

3  HAVE TO -- IF YOU'RE GETTING PAID TO WORK IN THE ATU OR ON

4  THE -- YOU HAVE TO SEE THE PATIENTS.  OVERNIGHT IS JUST AS

5  IMPORTANT AS THE DAYTIME.  I WORK OVERNIGHT.  SERIOUS THINGS

6  COME IN OVERNIGHT, AND SOMETIMES THEY ARE EVEN MORE SERIOUS

7  BECAUSE ACTUALLY PEOPLE DON'T REALLY WANT TO GO TO THE ATU IN

8  THE MIDDLE OF NIGHT.  BUT THERE ARE SOME INSOMNIACS AND SOME

9  PEOPLE WHO WANT TO GO TO THE ATU FOR A VISIT IN THE MIDDLE OF

10  NIGHT, BUT THAT'S NOT THE ASSUMPTION.  THE ASSUMPTION IS

11  THERE'S SOMETHING SERIOUS GOING ON HERE.

12  SO NO. 1, A PROVIDER -- THE PATIENTS HAVE TO BE

13  TRANSFERRED FOR SERIOUS MEDICAL NEEDS WHEN THE TREATMENT THAT

14  MAY BE NEEDED FOR THE MOST SERIOUS MEDICAL NEED CANNOT BE

15  PROVIDED.  IF YOU CANNOT MAKE THE DIAGNOSIS BECAUSE YOU ONLY

16  HAVE A MACHINE THAT GIVES YOU THE INFORMATION THE FOLLOWING

17  DAY, THEN YOU NEED TO SEND THE PATIENT TO THE HOSPITAL.

18  IF A PATIENT HAS A -- HAS DIABETES AND THE BLOOD

19  SUGAR IS 300, YOU NEED TO KNOW IS THAT 300 DIABETIC

20  KETOACIDOSIS, BECAUSE IT CAN BE, ESPECIALLY WITH SOME OF THE

21  NEWER DRUGS THAT ARE NOT YET USED THERE.  BUT YOU HAVE TO KNOW

22  WHAT'S GOING ON.

23  SO NO. 1, YOU NEED TO TRANSFER PATIENTS IN A MORE

24  TIMELY WAY AND IT'S NOT BEING DONE FOR THE MOST SERIOUS

25  PATIENTS.  PROVIDERS NEED TO SEE THE PATIENTS.  AND EMTS CANNOT

12:01 1  BE DOING THESE SELF-DECLARED EMERGENCIES WITHOUT -- JUST BRING

2  THE PATIENTS TO THE ATU OR DO SOMETHING MORE, UNLESS IT'S VERY

3  SIMPLE.  AND CHEST PAIN IS NEVER SIMPLE BECAUSE THERE ARE A LOT

4  OF ORGANS IN HERE AND THERE ARE A LOT OF ORGANS IN THE -- FROM

5  HERE IS THE -- YOU KNOW, IN THE BRAIN AND IN THE ABDOMEN, AND A

6  LOT OF THINGS CAN GO WRONG.

7  Q.   THANK YOU, DR. VASSALLO.  THAT'S ALL OF MY QUESTIONS.

8  A.   OKAY.

9          THE COURT:  WE ARE GOING TO TAKE A BREAK FOR LUNCH.

10  WE WILL RESUME AT 1:30.

11          THE DEPUTY CLERK:  ALL RISE.

12              THE COURT'S IN RECESS.

13          (WHEREUPON, THE COURT WAS IN RECESS.)

14          THE COURT:  BE SEATED.

15              ALL RIGHT, MR. ARCHEY.  YOUR WITNESS.

16          MR. ARCHEY:  THANK YOU, YOUR HONOR.

17                  CROSS-EXAMINATION

18  BY MR. ARCHEY:

19  Q.   DR. VASSALLO, AS ALWAYS, GOOD TO SEE YOU AGAIN.

20  A.   GOOD TO SEE YOU, MR. ARCHEY.

21  Q.   YES, MA'AM.

22          DOCTOR, LET'S GO BACK TO OUR VERY BASICS, THE ATU.

23  WHAT DO THE INITIALS "ATU" STAND FOR?

24  A.   ASSESSMENT AND TREATMENT UNIT.

25  Q.   OKAY.  IT'S NOT AN EMERGENCY ROOM, IS IT?

01:31 1    **A.**   NO, SIR.

2    **Q.**   IT DOESN'T TRY TO BE AN EMERGENCY ROOM, DOES IT?

3    **A.**   NO, SIR.

4    **Q.**   ALL RIGHT.  IT'S NOT EQUIPPED WITH AN EMERGENCY ROOM --

5    LIKE AN EMERGENCY ROOM IS.  CORRECT?

6    **A.**   NOT TO THE EXTENT THAT AN EMERGENCY ROOM WOULD BE

7    EQUIPPED, NO.

8    **Q.**   RIGHT.  AND THERE ARE EVEN DIFFERENT LEVELS OF EMERGENCY

9    ROOMS.  YOU'RE IN A LEVEL I TRAUMA UNIT IN NEW YORK CITY.

10   RIGHT?

11   **A.**   WELL, I AM.  AND THERE ARE DIFFERENT LEVELS OF CARE.

12   **Q.**   RIGHT.  ALL RIGHT.  AND PREVIOUSLY WHEN WE WERE HERE

13   BEFORE, THE ATU WAS MANNED PRIMARILY BY THE EMTS.  CORRECT?

14   **A.**   YES.

15   **Q.**   OKAY.  THE POLICY NOW IS THERE IS AN RN IN THE ATU 24/7.

16   CORRECT?

17   **A.**   YES.

18   **Q.**   AND THAT'S AN IMPROVEMENT.  RIGHT?

19   **A.**   YES.

20   **Q.**   IN ADDITION, WE HAVE A NURSE PRACTITIONER THAT IS IN THE

21   ATU MONDAY THROUGH FRIDAY FROM 7:30 TO 4:00 P.M.  CORRECT?

22   **A.**   CORRECT.  THAT'S THE POLICY, YES, SIR.

23   **Q.**   ALL RIGHT.  IN ADDITION, THERE IS A NURSE PRACTITIONER IN

24   THE ATU ON FRIDAY NIGHT, SATURDAY NIGHT AND SUNDAY NIGHT AS

25   WELL.  CORRECT?

01:32  1  **A.**  NO, SIR.  THEY'RE NOT NECESSARILY IN THE ATU.

2  **Q.**  OKAY.

3  **A.**  THEY'RE ON THE PREMISES.  MAYBE IN THE TREATMENT BUT NOT

4  NECESSARILY JUST IN THE ATU, YES, SIR.

5  **Q.**  ALL RIGHT.  AND THE DISTANCE FROM THE ATU TO THAT --

6  ANYWHERE ELSE IN THAT ROBERT BARROW UNIT IS VERY -- WE'RE

7  TALKING ABOUT LESS THAN A HUNDRED YARDS, AREN'T WE?

8  **A.**  IT'S CLOSE, YEAH.  LESS THAN A HUNDRED YARDS, YES.

9  **Q.**  OKAY.  NOW, I UNDERSTAND YOUR OPINION IS THAT THE MINIMUM

10  STAFFING IN THAT ATU SHOULD BE A PROVIDER AT ALL TIMES.  IS

11  THAT YOUR OPINION?

12  **A.**  MY OPINION IS THAT THE PROVIDER WHO IS CURRENTLY ON DUTY

13  SHOULD SEE THE PATIENTS ON THE WEEKENDS WHEN THEY'RE ON-SITE

14  AND ON THE OVERNIGHTS WHEN THEY ARE ON-SITE.  THEY SHOULD SEE

15  THE PATIENTS.

16  **Q.**  OKAY.  BUT I BELIEVE I HEARD YOU SAY -- AND I WANT TO MAKE

17  SURE I'M CLEAR.  IS IT YOUR OPINION THAT THERE MUST BE A

18  PROVIDER IN THE ATU 24/7?  AND BY "A PROVIDER," YOU AND I ARE

19  UNDER THE UNDERSTANDING A NURSE PRACTITIONER OR A PHYSICIAN.

20  CORRECT?

21  **A.**  YES.

22  **Q.**  OKAY.  I DIDN'T MEAN TO MAKE THAT TWO QUESTIONS.

23  **A.**  NO.  YES, SO THAT WE UNDERSTAND A PROVIDER TO BE A NURSE.

24  **Q.**  OKAY.

25  **A.**  BUT IN THE ATU -- WHAT I'VE SAID IS THAT THEY SHOULD SEE

01:33 1   THE PATIENT.  SO IF THEY'RE LIKE NEXT -- LIKE IF THERE, FOR
2   EXAMPLE, WHERE WE ALL KEPT OUR STUFF AND THEY CAN RUN DOWN THE
3   HALL, OR IF THEY'RE IN THE MEDICAL CLINIC SLEEPING ON ONE OF
4   THOSE EXAMINATION ROOM TABLES UNTIL A PATIENT COMES IN, THAT'S
5   ACCEPTABLE.  SO THE ATU IS ONLY A PART OF THE TREATMENT CENTER.
6   SO THAT'S A MINOR DETAIL.  BUT THEY DON'T HAVE TO BE STANDING
7   IN THE ATU ALL NIGHT OR EVEN SLEEPING ON THAT STRETCHER.
8   **Q.**   THE STANDARD AS YOU SET FORTH IN YOUR REPORT IS THERE
9   SHOULD BE A PROVIDER ON CALL FOR THE ATU.  CORRECT?
10  **A.**   CAN YOU SHOW ME THAT?
11  **Q.**   YES, MA'AM.  IT'S ON PAGE 108 OF YOUR REPORT.
12  **A.**   AT PAGE 108 OF THE EMERGENCY -- OF THE REPORT.  RIGHT?
13  **Q.**   YES, MA'AM.
14  **A.**   CAN YOU POINT TO ME THE ICE'S STANDARD FINDINGS?
15  **Q.**   WELL, LET ME GET THERE, MAKE SURE I'M GIVING YOU THE
16  CORRECT CITE, MA'AM.  ALL RIGHT.  ON PAGE 108 YOU HAVE A
17  SECTION TITLED "STANDARDS."  DO YOU SEE THAT?
18  **A.**   YES.
19  **Q.**   OKAY.
20       **MR. ARCHEY:**  CAN WE GET -- THERE WE GO.
21  **BY MR. ARCHEY:**
22  **Q.**   AND THE STANDARD IS THAT THERE BE EMERGENCY ON-CALL
23  PHYSICIAN, IT SAYS, "DENTAL AND MENTAL HEALTH SERVICE WHEN THE
24  EMERGENCY HEALTH CARE FACILITY IS NOT NEARBY."  DO YOU SEE
25  THAT?

01:35  1  **A.**   I DON'T SEE THE WORD "ON-CALL" ANYWHERE.

2  **Q.**   IT'S HIGHLIGHTED ON THE SCREEN.

3  **A.**   OKAY.  LET ME LOOK AT THAT.  SO IT SPECIFICALLY REFERS TO

4  AN EMERGENCY ON-CALL PHYSICIAN.  AND WE ARE NOT TALKING ABOUT A

5  PHYSICIAN.  WE ARE TALKING ABOUT THE NURSE PROVIDERS RIGHT NOW.

6  **Q.**   OKAY.  AND A PROVIDER CAN STAND IN THE PLACE OF A

7  PHYSICIAN.  ISN'T THAT RIGHT?

8  **A.**   NO, SIR.

9  **Q.**   NO?

10  **A.**   A PROVIDER IS -- A PROVIDER IS -- A NURSE PRACTITIONER IS

11  A NURSE PRACTITIONER AND A PHYSICIAN IS A PHYSICIAN.

12  **Q.**   THE STANDARD THAT YOU CITE NEVER ADDRESSES WHEN THE

13  PROVIDER OR A NURSE PRACTITIONER IS TO BE ON THE PREMISES, DOES

14  IT?

15  **A.**   IT JUST DISAPPEARED.  IF WE'RE ON THAT PAGE, IF YOU COULD

16  PUT IT BACK UP.

17  **Q.**   WE WILL.

18  **A.**   WHAT IT SAYS HERE IS THAT WE EXPECT THERE TO BE 24-HOUR --

19  **Q.**   WE DIDN'T MEAN TO TAKE IT DOWN.

20  **A.**   IT WENT DOWN AGAIN.

21  **Q.**   YEAH.  SORRY.  WE DIDN'T -- WE DON'T KNOW WHAT THE

22  TECHNICAL -- THERE YOU GO, MA'AM.

23  **A.**   WE HAD THE SAME ISSUE.  WELL, I HAVE IT RIGHT HERE.

24  **Q.**   OKAY.

25  **A.**   I'M OPEN TO THE PAGE, SO LET'S GO WITH THAT.

01:37 1    **Q.**   ALL RIGHT.  WE'VE GOT IT UP ON THE SCREEN AT THE MOMENT,

2    SO PLEASE CONTINUE.

3    **A.**   SO I THINK THE SECOND SENTENCE MORE -- KIND OF MORE

4    CORRECTLY, I THINK, REPRESENTS MY POINT OF VIEW ON THIS, IS

5    THAT FACILITY CORRECTIONAL STAFF PROVIDE EMERGENCY SERVICES

6    UNTIL THE QUALIFIED HEALTH PROFESSIONALS ARRIVE.

7          SO A QUALIFIED HEALTH PROFESSIONAL, IN MY POINT OF

8    VIEW, IS A NURSE PRACTITIONER.

9    **Q.**   OKAY.

10    **A.**   AND THEN IT'S GOT A SEMICOLON:  EMERGENCY ON-CALL

11    PHYSICIAN, WHICH IS NOT A NURSE PRACTITIONER; DENTAL AND MENTAL

12    HEALTH SERVICES ARE SUPPOSED TO BE PRESENT, YEAH.  DID THAT

13    ANSWER YOUR QUESTION?

14    **Q.**   I DON'T KNOW THAT IT DID, 'CAUSE, I MEAN, THE STANDARD, AS

15    I READ WHAT YOU HAVE -- AND PARTICULARLY WHEN I TAKE THE SECOND

16    SENTENCE -- SOUNDS LIKE IT'S ACCEPTABLE TO HAVE ON-CALL A

17    PROVIDER -- WE'LL SAY A PROVIDER ON CALL.  RIGHT?

18    **A.**   AN "ON-CALL" MEANS SOMEBODY CAN SEE THE PATIENT, NOT THAT

19    THEY'RE AT THE TELEPHONE.  "ON-CALL" MEANS YOU'RE THERE TO SEE

20    THE PATIENTS.

21    **Q.**   BUT "ON-CALL," MEANING THEY CAN BE CALLED WITHIN 15

22    MINUTES IS WHERE WE WERE?

23    **A.**   NO, THAT'S NOT --

24    **Q.**   YOU DISAGREE WITH THAT?

25    **A.**   YES.  "ON-CALL" MEANS YOU'RE AT WORK.  YOU'RE AT WORK

01:38 1    DOING WHATEVER YOUR WORK IS TO SEE THE PATIENTS.

2    **Q.**   WHEN YOU HAVE ON-CALL COVERAGE OVER THE WEEKEND, AREN'T

3    YOU LITERALLY ON CALL?  THE OLD DAYS WITH A BEEPER; NOWADAYS

4    WITH A CELL PHONE?

5    **A.**   THE OLD DAYS WITH A BEEPER, THAT'S NOT PART OF MEDICAL

6    CARE ANYMORE.

7    **Q.**   I UNDERSTAND.

8    **A.**   YOU HAVE TO BE ABLE -- IF YOU'RE RESPONSIBLE FOR THE CARE

9    OF THE PATIENTS IN THE ATU, YOU SHOULD SEE THE PATIENTS IN THE

10   ATU.  THAT'S WHAT CALL -- BECAUSE THERE AREN'T THAT MANY

11   PATIENTS ALL NIGHT LONG.  THAT'S CALLED A BAD NIGHT WHEN THEY

12   ARE.  WE HAVE BAD NIGHTS.

13   **Q.**   SURE.

14   **A.**   BUT SOMETIMES YOU CAN SLEEP THREE OR FOUR HOURS.  BUT WHEN

15   THAT PATIENT COMES IN, YOU SHOULD SEE THEM.

16   **Q.**   BUT --

17   **A.**   THAT'S MY POINT OF VIEW.  AND THAT'S WHAT ON CALL IS

18   ABOUT.

19   **Q.**   DID YOU NOT SAY SOMETHING ABOUT 15-MINUTE ON CALL WOULD BE

20   ACCEPTABLE IN YOUR DIRECT?

21   **A.**   NO.  I SAID A 15-MINUTE RESPONSE TIME.

22   **Q.**   OH, OKAY.

23   **A.**   SO --

24   **Q.**   SO YOU CAN BE ON CALL WHEN THERE -- IF THEY HAVE A HOUSING

25   UNIT THAT'S LOCATED FIVE MINUTES AWAY?

01:39 1    **A.**   AS LONG AS THEY GET UP OUT OF BED AND COME TO SEE THE

2    PATIENT.

3    **Q.**   I UNDERSTAND.

4    **A.**   OKAY.

5    **Q.**   BUT THAT'S THE ON CALL.  RIGHT?

6    **A.**   YES.  I WANT THEM TO SEE THE PATIENTS.

7    **Q.**   ALL RIGHT.  ALL RIGHT.  LET ME TALK ABOUT THE

8    SELF-DECLARED EMERGENCY POLICY FOR A MOMENT.  WE HAVE A NEW

9    POLICY IN PLACE AS OF JUST RECENTLY.  THIS IS DX_50.  YOU

10   TALKED ABOUT THAT IN YOUR DIRECT.  CORRECT?

11   **A.**   YES.

12   **Q.**   OKAY.  AND THESE EMTS NOW WHEN THEY GO OUT IN RESPONSE TO

13   A SELF-DECLARED EMERGENCY, THEY HAVE THREE OPTIONS AVAILABLE TO

14   THEM:  THEY ACT PURSUANT TO A SPECIFIC ITO; THEY TAKE THE

15   INMATE TO THE ATU; OR THEY CALL ON A GOVERNMENT-ISSUED CELL

16   PHONE, MAKE A FACETIME CALL WITH A PROVIDER.  THOSE ARE THEIR

17   OPTIONS.  OKAY.  IS THAT -- DO YOU FIND THAT TO BE AN

18   ACCEPTABLE POLICY?

19   **A.**   WELL, FIRST OF ALL, THIS POLICY DOESN'T SAY THAT.  IT

20   DOESN'T SAY ANYTHING ABOUT FACETIME.

21   **Q.**   OKAY.

22   **A.**   OKAY.  SO WHAT I UNDERSTAND, NO. 1, IS THAT THE EMT WHO IS

23   SEEING THE PATIENT ON A SELF-DECLARED EMERGENCY CAN USE

24   INDIVIDUAL TREATMENT ORDERS TO MAKE A DECISION.

25   **Q.**   OKAY.

01:41 1    A.    OR AND -- AND/OR THEY CAN CALL A HEALTH PROVIDER.

2    Q.    OKAY.

3    A.    IT DOESN'T SAY ANYTHING HERE -- AND I DON'T KNOW ABOUT --

4    THE FACETIME.

5    Q.    ALL RIGHT.  ACCEPT THAT FOR ME FOR A MOMENT THAT THAT'S

6    THE POLICY OR THE GUIDANCE THAT LSP HAS ISSUED.  BUT EITHER

7    WAY, THEY CONTACT A NURSE PROVIDER, A NURSE PRACTITIONER, TO

8    DISCUSS WHAT'S PRESENTED IN FRONT OF THEM?

9    A.    NO, SIR, THEY MAY OR THEY MAY NOT.  I HAVE TROUBLE WITH

10    THE "MAY NOT," NOT THE "MAY."

11    Q.    ALL RIGHT.  IS IT OKAY FOR AN EMT TO OPERATE PURSUANT TO

12    AN INDIVIDUAL TREATMENT ORDER ALSO KNOWN AS A PROTOCOL?

13    A.    I DIDN'T UNDERSTAND YOUR -- I THINK YOU GOT -- A MOMENT

14    SLURRED.  I WAS CONCERNED.

15    Q.    ALL RIGHT.  I'LL SAY IT AGAIN.  IS IT ACCEPTABLE FOR AN

16    EMT TO OPERATE PURSUANT TO A PROTOCOL, WHICH LSP IS NOW CALLING

17    INDIVIDUAL TREATMENT ORDERS?

18    A.    THE PROBLEM WITH THE STATEMENT, AS YOU JUST SAID IT, IS

19    THAT THE INDIVIDUAL TREATMENT PROTOCOLS AND THE PROTOCOLS THERE

20    ALLOW FOR A SYMPTOM TO BE -- TO RESULT IN A DIAGNOSIS, AND THAT

21    MAKES THE EMT HAVING TO DIAGNOSE.  SO THEY ARE THE DOOR TO THE

22    HEALTH CARE PROFESSIONAL AND TO THE ATU.  I THINK THAT'S

23    UNACCEPTABLE.

24    Q.    ARE YOU AWARE THAT LOUISIANA LAW ALLOWS EMTS TO OPERATE

25    PURSUANT TO PROTOCOLS?

01:42 1    **A.**    I HEARD YOU SAY THAT YESTERDAY, AND THAT DOES NOT HAVE
2    ANYTHING TO DO WITH A PRISON SETTING WHERE IF YOU -- IF I SEE
3    AN EMT AND AN EMT TELLS ME, "LISTEN, YOU'RE FINE," WHICH THEY
4    CAN DO, THEN I HAVE THE OPTION TO WALK AROUND, TURN AROUND, GO
5    GET ON THE TELEPHONE, GET MYSELF TO THE HOSPITAL OR TO GO SEE A
6    DIFFERENT DOCTOR OR A DIFFERENT PROVIDER OR GO TO A DIFFERENT
7    EMERGENCY ROOM.
8         SO THE STATE PROTOCOLS THAT YOU'VE TOLD ME ABOUT
9    YESTERDAY DO NOT PERTAIN TO THIS.  THIS PATIENT DOES NOT HAVE
10    THE ABILITY OR THE FREEDOM TO MAKE DECISIONS.  ONCE THE DOOR IS
11    BLOCKED, HE'S BLOCKED.  THAT'S VERY DIFFERENT FROM THE MAN ON
12    THE STREET WHERE AN AMBULANCE GOES AND HE CAN GET TO THE --
13    'CAUSE YOU KNOW WHAT?  IF THE PATIENT DOESN'T THINK IT'S RIGHT
14    OR DOESN'T LIKE IT, HE CAN GO ANYWHERE.  HE CAN DO ANYTHING.
15    HE CAN CALL AN AMBULANCE FOR A SECOND TIME.
16    **Q.**    AND AN INMATE AT ANGOLA CAN SUBMIT A SELF-DECLARED
17    EMERGENCY FOR A SECOND TIME?
18    **A.**    THE MORE THEY SUBMIT THEM, THE MORE THEY'RE SEEN AS
19    MALINGERERS.  THAT IS JUST NOT THE -- THAT'S JUST NOT A
20    REASONABLE COMPARISON:  THE FREE MAN VERSUS THE PRISONER WHO
21    SEES AN EMT CELL SIDE THAT MAKES A DECISION THAT HE HAS NOTHING
22    WRONG WITH HIM.
23    **Q.**    EMTS CAN OPERATE PURSUANT TO VERBAL ORDERS.  CORRECT?
24    **A.**    YOUR QUESTION IS:  CAN EMTS OPERATE UNDER VERBAL ORDERS?
25    **Q.**    YES, MA'AM.

01:43  1   **A.**   IN THE FREE WORLD?

2   **Q.**   AT LSP.

3   **A.**   YEAH, I DO -- THAT'S RIGHT, THEY CAN.  YOU SAID, "CAN EMTS

4   OPERATE UNDER VERBAL ORDERS"?

5   **Q.**   YES, MA'AM.

6   **A.**   SO IF A HEALTH CARE PRACTITIONER GIVES AN EMT A VERBAL

7   ORDER, MEANING HE'S ALREADY ESTABLISHED A CONTACT WITH THE

8   HEALTH CARE PROVIDER, YES, HE CAN.

9   **Q.**   OKAY.  WHICH IS PART OF WHAT THIS NEW SELF-DECLARED

10   EMERGENCY POLICY STATES?

11   **A.**   THAT'S ALWAYS BEEN THE CASE.  EMTS COULD ALWAYS RESPOND TO

12   VERBAL ORDERS FROM HEALTH CARE PRACTITIONERS -- I MEAN,

13   PROVIDERS.

14   **Q.**   ALL RIGHT.  BUT NOW LSP HAS A POLICY IN WHICH THEY ARE

15   LIMITING THE EMTS' OPTIONS TO THESE NINE PAGES OF ITOS:  GO TO

16   THE ATU OR FOLLOW ORDERS FROM A NURSE PRACTITIONER THAT YOU

17   SPOKE TO.  RIGHT?

18   **A.**   PART ONE, YOU SAID NOW --

19   **Q.**   YES, MA'AM.

20   **A.**   -- THE EMTS CAN GO TO THE NINE PAGES OF ITUS AND MAKE

21   DECISIONS AND DIAGNOSES, THAT IS CORRECT.  AND I DON'T AGREE

22   WITH THAT.

23        NO. 2 PART TO YOUR QUESTION WAS?

24   **Q.**   THEY TAKE THE -- THEY CAN TAKE THE PATIENT BACK TO THE

25   ATU?

01:44 1    **A.**   YES.  AND THEY CAN ALSO NOT DO THAT, AND THAT'S THE

2    PROBLEM THAT I HAVE.

3    **Q.**   AND WHEN THEY DON'T DO THAT, THEN THEY HAVE TO CALL THE

4    NURSE PRACTITIONER OR HAVE AN APPLICABLE ITO THAT THEY'RE GOING

5    TO SIGN AND ATTACH TO THAT SICK CALL SLIP?

6    **A.**   IT DOESN'T SAY THAT HERE.

7    **Q.**   ALL RIGHT.  YOU DON'T UNDERSTAND THAT TO BE THE CASE?

8    **A.**   I DON'T UNDERSTAND THAT.

9    **Q.**   OKAY.  ALL RIGHT.  LET'S MOVE ON.  YOU'VE TOLD US HOW YOU

10   SELECTED THE CHARTS.  YOU AND YOUR OTHER TEAM WENT AND SELECTED

11   SOME OF THE SICKEST THAT YOU COULD FIND IN DEATH CHARTS TO MAKE

12   YOUR EVALUATION OF LSP.  CORRECT?

13   **A.**   NOT CORRECT.

14   **Q.**   YOU DID GO THROUGH DEATH CHARTS IN SOME VERY COMPLICATED

15   SICK INDIVIDUALS THAT YOU SELECTED?

16   **A.**   WHAT I DID IS WE WENT TO LOOK FOR SERIOUS MEDICAL NEEDS.

17   WE HAD NO IDEA WHAT WE WERE GOING TO FIND.  WE COULD FIND

18   PERFECT MEDICAL CARE.  BUT IN SOME CASES WE FOUND NOT PERFECT

19   MEDICAL CARE, CARE THAT WAS RISKY CARE, CARE THAT RESULTED IN

20   HARM.  THAT'S -- BUT I DIDN'T KNOW WHAT I WAS GOING TO FIND

21   BECAUSE I HAD NEVER SEEN THE CHART.

22   **Q.**   MEDICAL CARE IS NOT ABOUT PERFECTION, IS IT?

23   **A.**   I MEAN, REALLY WE ARE APPLYING THE LOWEST STANDARD.  THE

24   THINGS I'M TALKING TO IS THE LOWEST STANDARD OF MEDICINE TODAY.

25   **Q.**   ALL I ASKED WAS -- YOU USED THE WORD ABOUT PERFECT CARE.

01:46 1    **A.**   I DID.

2    **Q.**   AND MEDICINE IS NOT ABOUT PERFECTION IN ANY SETTING, IS

3    IT?

4    **A.**   WHEN DID I SAY THAT?

5    **Q.**   YOU SAID IT IN YOUR ANSWER RIGHT BEFORE THAT.

6    **A.**   WELL, READ IT BACK TO ME.

7    **Q.**   MA'AM, I'M NOT --

8    **A.**   I'M SORRY, SIR.  I DON'T REMEMBER.

9              **THE COURT:**  WELL, WHAT SHE SAID WAS THAT SHE DIDN'T

10   KNOW WHAT SHE WAS GOING TO SEE IN THE CHARTS.  SHE MIGHT HAVE

11   SEEN PERFECT CARE.

12             **MR. ARCHEY:**  RIGHT.

13             **THE COURT:**  SHE DIDN'T SAY THAT WAS THE STANDARD, MR.

14   ARCHEY.

15             **MR. ARCHEY:**  I DIDN'T SUGGEST SHE DID, BUT --

16             **THE COURT:**  WELL, ASK YOUR QUESTION.

17             **MR. ARCHEY:**  YES, MA'AM.

18   **BY MR. ARCHEY:**

19   **Q.**   I WANT TO TALK ABOUT STROKES NOW.  THERE IS A

20   FOUR-AND-A-HALF-HOUR WINDOW IN WHICH YOU WANT TO GET A PATIENT

21   CARE FOR THE LACTIC TREATMENT, THE CLOT BUSTER.  RIGHT?

22   **A.**   LET ME JUST EXPLAIN TO ANSWER YOUR QUESTION.

23   **Q.**   BUT ANSWER --

24   **A.**   THE ANSWER --

25   **Q.**   TELL ME "YES" OR "NO" AND THEN GO, PLEASE.

01:47 1  **A.**   OKAY.  ALL RIGHT.  SO I WILL.  YES, THE PATIENT SHOULD BE

2  AT STROKE CARE IN FOUR AND A HALF HOURS.  HOWEVER, IN SOME

3  CIRCUMSTANCES, TPA, WHICH IS THE LYTIC YOU'RE -- WILL BE USED

4  OUTSIDE OF THE 4.5 HOURS.  PREVIOUS IT WAS THREE HOURS.  IT'S

5  CURRENTLY A NATIONAL STANDARD AT 4.5.  YOU MAY GIVE IT AT FIVE.

6  AND MORE THAN ANYTHING, THAT IS NOT THE ONLY TREATMENT AND

7  SOMETIMES IT'S NOT THE TREATMENT WHATSOEVER.  IT MAY BE REMOVAL

8  OF A CLOT WITH A CATHETER.

9         SO WHEN WE REPRESENT STROKE CARE, WE SHOULDN'T JUST

10  TALK ABOUT 4.5 AND THE WINDOW AND THROMBOLYTICS.

11  **Q.**   ALL RIGHT.  UNDERSTOOD.  IN THE PREVIOUS TRIAL YOU WERE

12  VERY CRITICAL BECAUSE PATIENTS WERE NOT MAKING IT TO THE

13  EMERGENCY ROOM WITHIN THAT STROKE WINDOW OF 4.5 HOURS.  RIGHT?

14  **A.**   I DON'T REMEMBER THAT TESTIMONY FROM 2018.

15  **Q.**   OKAY.  LET'S GO THROUGH A NUMBER OF YOUR STROKE CASES.

16  YOU CITE FOUR IN YOUR REPORT.  THREE OF THEM MADE IT TO THE

17  EMERGENCY ROOM WITHIN THE WINDOW.  ISN'T THAT RIGHT?

18  **A.**   I DON'T KNOW.  WHAT I REMEMBER -- I CAN LOOK.  BUT I CAN

19  TELL YOU THAT THE PROBLEM WAS NOT THAT THEY MADE IT ON DAY TWO

20  OR THREE OF SYMPTOMS; WEAKNESS IN THE LEFT EXTREMITY, AS WE

21  TALKED ABOUT, FOR THIS GENTLEMAN RIGHT HERE, PATIENT 55.

22  **Q.**   WE'LL COME -- WE'RE GOING TO COME TO HIM.

23  **A.**   WELL, EXCUSE ME, MR. ARCHEY.  LET ME JUST FINISH, PLEASE.

24         **MR. ARCHEY:**  YOUR HONOR, I CAN'T -- IF I CAN'T

25  CONTROL THE QUESTIONING -- I MEAN, IF SHE WANTS TO GO JUST TALK

01:48 1  ABOUT A CHART THAT SHE WANTS TO TALK ABOUT, WE'RE GOING TO TALK
2  TO IT, BUT --
3           **THE COURT:**  AND YOU HAVE -- WHAT WE TALKED ABOUT
4  EARLIER -- AN OBJECTION?
5           **MR. ARCHEY:**  I HAVE AN OBJECTION, AS IT'S
6  NON-RESPONSIVE AND IT'S BEYOND THE SCOPE OF WHAT I ASKED.
7  THANK YOU, YOUR HONOR.
8           **THE COURT:**  OVERRULED.
9           YOU MAY CONTINUE YOUR ANSWER.
10          **THE WITNESS:**  THANK YOU, YOUR HONOR.
11  **BY THE WITNESS:**
12  **A.**    SO WHAT I WAS TRYING TO SAY IS THAT YOU'VE JUST
13  REPRESENTED THAT THE PATIENTS MAKE IT TO -- IN THREE OUT OF
14  FOUR PATIENTS MADE IT TO THE HOSPITAL WITHIN 4.5 HOURS.  THE
15  POINT I WAS TRYING TO MAKE IS THAT THESE PATIENTS HAD STROKE
16  SYMPTOMS SOMETIMES FOR TWO DAYS.  SO JUST BECAUSE ON THE LAST
17  DAY YOU'VE COMPLETED YOUR STROKE AND YOU CAN'T MOVE AND THEN
18  THEY "THIS IS A STROKE, LET'S GO," THERE WERE TWO OTHER DAYS
19  AND YOU WOULD NOT BE LEFT WITH THAT DEFICIT, WHICH IS YOU CAN'T
20  EAT OR TALK OR MOVE IF YOU HAD BEEN TAKEN THE PREVIOUS DAY, IF
21  YOU HAD HAD A CAT SCAN IN ONE PARTICULAR -- WITH IV CONTRAST AT
22  WEST FELICIANA THAT SHOWED A STROKE.
23          SO YOUR REPRESENTATION THAT THREE OUT OF FOUR MADE IT
24  WITHIN -- IS INACCURATE BECAUSE IT DOESN'T SHOW THE OTHER DAYS
25  THAT WE'RE SHOWING.

1    Q.   OKAY.  LET'S GO THROUGH THEM THEN BECAUSE YOU'RE TALKING

2    ABOUT 55 AND 55 ONLY.  LET ME GO TO THE FIRST ONE, WHICH IS

3    PATIENT NO. 26.

4    A.   WE'RE GOING TO DO PATIENT 26?

5    Q.   YES, MA'AM.

6    A.   OKAY.

7    Q.   AND WE ARE GOING TO LOOK AT JX_26.0457.

8              **MR. ARCHEY:**  YES, PLEASE.  WE NEED TO HAVE IT SEALED,

9    PLEASE.

10             **THE DEPUTY CLERK:**  WHAT?

11             **THE COURT:**  SEALED.

12             **MR. ARCHEY:**  SEALED IN THE COURTROOM.

13             **THE DEPUTY CLERK:**  OH, SEALED.  OKAY.  SORRY.

14             **MR. ARCHEY:**  THANK YOU.

15   **BY MR. ARCHEY:**

16   Q.   YOU LET ME KNOW WHEN YOU'RE READY, DOCTOR.

17   A.   OKAY.  JUST ONE MOMENT.  THANK YOU.

18             OKAY.  IF YOU WOULD LIKE TO PROCEED WITH YOUR

19   QUESTION, I CAN -- I DON'T WANT TO SLOW THE COURT DOWN.

20   Q.   OKAY.

21   A.   BUT I WILL LOOK AT THEM AGAIN TO SEE THE ANSWER TO YOUR

22   QUESTION.

23   Q.   YES, MA'AM.  THE PATIENT PRESENTED TO THE ATU AT 0147 WITH

24   AMBULATORY, PURSUANT -- SECONDARY TO EMS, SLURRED SPEECH, NO

25   FACIAL DROOP.  HE HAD RIGHT ARM WEAKNESS AND HIS GRIP WAS EQUAL

01:51  1    AND STRONG.  CORRECT?

2    **A.**   YES.

3    **Q.**   AND HE HAD REPORTED HAVING THESE SYMPTOMS FOR MORE THAN 12

4    HOURS.  CORRECT?

5    **A.**   CORRECT.

6    **Q.**   SO HE WAS WELL OUTSIDE ANY WINDOW BY THE TIME HE SHOWED UP

7    AT THE ATU?

8    **A.**   LET'S NOT TALK ABOUT A WINDOW.  THAT'S NOT STROKE CARE IN

9    2022.  IT WASN'T IN 2018.  SO STROKE CARE IS NOT JUST THE

10   WINDOW AND TPA.  THAT'S A MISREPRESENTATION OF WHAT'S HAPPENING

11   WHEN YOU'RE HAVING A STROKE.

12   **Q.**   YOU TALK ABOUT THE WINDOW IN YOUR REPORT.

13   **A.**   WELL, I CAN'T TALK ABOUT ALL HIS STROKE CARE, BUT I CAN IF

14   YOU WANT TO.

15   **Q.**   I UNDERSTAND THERE'S OTHER THINGS TO BE DONE.  I'M NOT

16   ARGUING WITH YOU ABOUT THAT.

17          YOU SAID THERE WAS A WINDOW AND YOU TALK ABOUT THE

18   WINDOW IN YOUR REPORT AS WELL?

19   **A.**   YEAH.  THERE'S ALSO PERMISSIVE HYPERTENSION --

20   **Q.**   UNDERSTOOD.

21   **A.**   -- THAT HE CAN BE -- A LOT OF THINGS CAN HAPPEN TO A

22   PERSON WHO'S IN THE MIDDLE OF HAVING A STROKE --

23   **Q.**   UNDERSTOOD.

24   **A.**   -- WAY BEYOND TPA.

25   **Q.**   UNDERSTOOD.  YOU TALKED ABOUT THE STROKE, THE WINDOWS --

01:52  1    AND SO DID THE COURT IN HER RULING.

2              SO THIS GENTLEMAN GETS TO THE ATU AT 0147.  HE LEAVES

3    AT 0245 OR -- I THINK IT'S FIVE?

4    **A.**    UH-HUH.

5    **Q.**    DO YOU SEE THAT?

6    **A.**    I DO.

7    **Q.**    THAT'S A QUICK RESPONSE, ISN'T IT?

8    **A.**    YEAH, THAT'S -- THAT'S A GOOD RESPONSE.  THIS THAT YOU'RE

9    SHOWING ME DOESN'T TELL ME ANYTHING ABOUT WHAT HAPPENED THE DAY

10   BEFORE.  SO WHEN YOU'RE TALKING ABOUT WHEN THIS PATIENT GOT TO

11   THE ATU AT 1:47 IN THE MORNING, HE WAS THEN GIVEN NARCAN A FEW

12   TIMES FOR HIS STROKE, AND THEN HE WAS -- HAD A -- THEN HE WENT

13   -- LEFT -- TIME LEFT:  2:48 A.M.

14   **Q.**    OKAY.

15   **A.**    THAT'S NOT THE COMPLETE PICTURE, BUT THAT'S WHAT HAPPENED.

16   **Q.**    WELL, WE DON'T HAVE ANY RECORDS OF WHAT WAS GOING ON

17   BEFORE THAT.  THAT'S THE RECORD WHEN HE SHOWS UP TO THE ATU

18   WITH THESE SYMPTOMS.

19   **A.**    WE DO HAVE MEDICAL RECORDS.

20   **Q.**    NOT OF THE DAY BEFORE, OR WHAT HAVE YOU.

21   **A.**    WELL --

22   **Q.**    LET ME SHOW YOU JX_26_0459.

23             THIS IS THE REFERRAL TO GO WITH THE PATIENT TO OUR

24   LADY OF THE LAKE FOR THIS ENCOUNTER.  RIGHT?

25   **A.**    AND THIS IS JUST EXACTLY PROOF OF WHAT I JUST SAID.  THE

01:53 1  PATIENT HAS A PREVIOUS STROKE WITH SYMPTOMS CONSISTENT:

2  DYSARTHRIA, APHASIA AND FOLLOWED -- NOW HE'S REPORTED.  SO HOW

3  DID -- IF THERE WERE NO RECORDS, HOW WOULD THAT -- HOW WOULD

4  THEY KNOW HE HAD A PREVIOUS STROKE WITH SYMPTOMS CONSISTENT OF

5  DYSARTHRIA, APHASIA THAT -- AND FOLLOWED BY NEURO.

6           THEN HE'S WORSE.  AND HE'S NON-COMPLIANT WITH HIS

7  MEDICATIONS.  AND HE'S HAD SYMPTOMS FOR THE PAST 12 HOURS, PER

8  REPORT.  AND THEN HE HAS A LEFT FACIAL DROOP.  HE CAN'T SPEAK

9  AND HE'S APHASIC.  AND HE'S SENT TO THE HOSPITAL.

10  **Q.**   AND THE RESPONSE ON THIS PRESENTATION WAS TIMELY.

11  CORRECT?

12  **A.**   A MAN WITH A PREVIOUS STROKE WAS SENT OUT FROM THE ATU

13  WITHIN TWO HOURS, I'M GLAD.  AND THAT'S CORRECT; THAT'S TIMELY.

14  **Q.**   ALL RIGHT.  LET'S GO TO PATIENT NO. 56 NOW, AND I WANT TO

15  TURN TO PAGE JX -- WHILE YOU'RE LOOKING AT YOUR NOTES --

16  JX_56_0055.

17           ARE YOU READY?

18  **A.**   YES, SIR.

19  **Q.**   ALL RIGHT.  THIS PATIENT REPORTS TO THE ATU.  HE PRESENTS

20  WITH LEFT-SIDED WEAKNESS, LEFT FACIAL DROOP, LEFT SIDE LOCKING

21  UP ON HIM, I BELIEVE IT SAYS.  IT GOES ON.  HE STATES THE ONSET

22  OF THESE SYMPTOMS WERE AT 1430, AT 2:30, TODAY.  SO HE'S RIGHT

23  AT BEING OUTSIDE THE WINDOW WHEN HE PRESENTS TO THE ATU. RIGHT?

24  **A.**   NOW THAT I KNOW YOU'RE FOCUSING ON THAT DATE AND THAT

25  TIME, LET ME JUST LOOK AT MY REPORT TO SEE WHAT HAPPENED.

01:55  1  **Q.**  GO RIGHT AHEAD, MA'AM.
2  **A.**  (WITNESS REVIEWING DOCUMENTS.)
3  **Q.**  YOU READY?  I'M SORRY.  GO AHEAD.  TAKE YOUR TIME.
4  **A.**  THE THING THAT TAKES TIME IS WHEN I'M PRESENTED WITH WHAT
5  HAPPENED IN THE ATU, IT DOESN'T REPRESENT TO ME WHAT HAPPENED
6  THE DAY BEFORE.  AND WHAT HAPPENED THE DAY BEFORE IN THESE
7  CASES IS VERY RELEVANT TO WHAT HAPPENS IN THE ATU.
8  **Q.**  AND, MA'AM, FOR THE RECORD, THESE ARE THE CHARTS THAT YOU
9  IDENTIFIED IN YOUR REPORT AS YOU ASSESS THE STROKE -- RESPONSE
10  TO STROKES BY LSP.  RIGHT?
11  **A.**  YES.  I'M PERFECTLY READY TO TALK ABOUT IT.
12  **Q.**  OKAY.  SO THIS GENTLEMAN REPORTS WITH THOSE SYMPTOMS, AND
13  WITHIN TWO HOURS HE'S OUT THE DOOR HEADED TO OUR LADY OF THE
14  LAKE HOSPITAL.  CORRECT?
15  **A.**  THAT WHAT YOU JUST SAID IS CORRECT.  BUT I'M PRETTY SURE
16  HE HAD PRESENTED WITH THE LOCKING UP COMPLAINT BEFORE THIS
17  DATE, THIS TIME, BECAUSE IT WAS AN INTERESTING WAY TO PUT IT
18  WHEN YOU'RE STARTING TO HAVE A STROKE; THAT YOUR LEG IS LOCKING
19  UP.
20  **Q.**  MA'AM, LET'S GO --
21  **A.**  I'M SORRY TO INTERRUPT YOU.  BUT THE PATIENT HAD A SICK
22  CALL ON JUNE 6TH.  THERE WAS NO PHYSICAL EXAM AND NO PROVIDER
23  ASSESSED THE PATIENT.  THE SCREENER WAS AN EMT.  AND THREE DAYS
24  LATER, BEING THE RECORD YOU'RE SHOWING ME HERE, HE HAD A
25  DEBILITATING STROKE.  SO UNLESS YOU PRESENT JUNE 6TH, I CANNOT

01:58 1  TELL YOU IF THE CARE ON JUNE THE 9TH WAS GOOD.

2  **Q.**   MA'AM, ON JUNE 9TH IT SAYS, "THE ONSET OF THESE SYMPTOMS

3  WERE AT 2:30 TODAY."  THAT'S WHAT THE RECORD STATES.  RIGHT?

4  **A.**   WELL, THAT'S NOT CORRECT.  HE HAD A SICK CALL ON JUNE THE

5  6TH.  THERE WAS NO EXAMINATION.  I HAPPEN NOT TO HAVE ON PAGE

6  0427 EXACTLY WHAT -- THE SICK CALL ON JUNE THE 6TH THEN.  BUT I

7  HAPPEN -- I REMEMBER IT WAS FOR LOCKING UP OF HIS LEG.  SO --

8  **Q.**   ALL RIGHT.  I WANT TO GO TO THE NEXT ONE, WHICH IS PATIENT

9  NO. 52.

10          I WANT TO BEGIN ON THE JANUARY 27, 2019 ENCOUNTER.

11  THIS IS JX_52_0117.  ACTUALLY, LET ME GO TO JX_52_0119.

12          ALL RIGHT.  HE PRESENTED WITH COMPLAINTS THAT BEGAN

13  AT 1:00 IN THE MORNING.  IT'S NOW 12:30 THE NEXT DAY.  CORRECT?

14  **A.**   HE WAS BROUGHT IN -- I'M JUST READING ALOUD.  I CAN READ

15  TO MYSELF.  IT SAYS, "FEELING LIKE SOMETHING WAS WRONG."  HE

16  WANTED TO BE CHECKED OUT.  IS THAT WHAT YOU SAID?

17  **Q.**   I SAID --

18  **A.**   YES.  OH, YOU'RE READING -- I'M SORRY -- FROM THE

19  "PHYSICIAN ASSISTANT AND TREATMENT:  58-YEAR-OLD BLACK, MALE

20  COMES IN TODAY COMPLAINING OF ONSET OF LEFT-SIDED WEAKNESS AT

21  1:00 A.M. IN THE MORNING."

22  **Q.**   YES, MA'AM.

23  **A.**   SO IT'S 11 AND A HALF HOURS BEFORE, YES, SIR.

24  **Q.**   OKAY.  AND WHEN HE GETS TO THE ATU, WITHIN 30 MINUTES THEY

25  GET HIM OUT ON THE ROAD HEADED TO THE EMERGENCY ROOM.

02:00  1  CORRECT?

2  **A.**   THAT'S CORRECT.  BUT THAT'S AN INCORRECT REPRESENTATION OF

3  HIS CARE ABOUT THIS STROKE.  AS A MATTER OF FACT, THEY

4  SPECIFICALLY NOTED ON THIS PATIENT WHEN THEY GOT TO THE

5  HOSPITAL THAT HE WAS OUTSIDE OF THE WINDOW.

6          AND HERE -- WE HAVE HERE THAT HE HAD -- I DON'T HAVE

7  A RECORD OF WHAT HAPPENED DURING THE NIGHT, BUT HE SAID HE

8  COULDN'T GET CARE.  WHETHER HE COULD OR COULDN'T GET CARE, I

9  PUT IT IN MY NOTE.  I DON'T KNOW.

10          SO HE ARRIVED AT 4:00 P.M. AND HE HAD A CATHETER

11  REMOVAL OF THE BLOOD CLOT.  SO THAT'S AN EXAMPLE OF A PERSON

12  WHO WAS OUTSIDE OF THE WINDOW AND WHO HAD SOME DELAY IN CARE,

13  HAD PREVIOUS COMPLAINTS AND GOT CATHETER REMOVAL OF THE BLOOD

14  CLOT.

15  **Q.**   MA'AM, HE GETS TO THE ATU IN 30 MINUTES, THEY GET HIM ON

16  THE ROAD, HEADED TO THE EMERGENCY ROOM.  RIGHT?

17  **A.**   WELL, HE ARRIVED IN THE ATU, ON THIS RECORD, AT 12:32 P.M.

18  THE TIME THEY LEFT IS 2:00 P.M., 1400.  WHERE DID YOU -- THAT'S

19  NOT 30 MINUTES.

20  **Q.**   DID I DO BAD MATH?  HOLD ON.  AN HOUR AND A HALF.  I'M

21  SORRY.  MY APOLOGIES.  BAD MATH.  THANK YOU.

22          SO IN AN HOUR AND A HALF HE'S ON THE ROAD HEADED OUT?

23  **A.**   MR. ARCHEY, MAY I SUPPLEMENT MY ANSWER?  SO I JUST WANT TO

24  POINT OUT THAT ONE OF THE REASONS THEY WEREN'T RUSHING, AS A

25  PHYSICIAN WHO READS CHARTS, IS IT SAYS HERE, WE'RE TAKING THE

02:01 1  PATIENTS TO UMCNO BY BASIC LIFE SUPPORT.  THEY RECOGNIZED HE

2  WAS HAVING A STROKE.  AND IT SAYS, "OUTSIDE OF THE WINDOW FOR

3  THROMBOLYTICS."  THIS IS A CLEAR MISUNDERSTANDING OF WHAT

4  HAPPENS TO THE -- SO THEY -- HE WAS OUTSIDE THE WINDOW, BUT

5  THAT'S NOT IT.  THIS IS A MISTAKE, BECAUSE THE LONGER THE BLOOD

6  CLOT STAYS IN POSITION -- THEY COULD HAVE REMOVED -- THE MORE

7  THE INJURY TO THE BRAIN CELLS.  AND THEY DID, IN FACT, USE A

8  CATHETER REMOVAL OF THE BLOOD CLOT.

9  **Q.**  ALL RIGHT.  ARE YOU DONE?

10  **A.**  YES, SIR.

11  **Q.**  ALL RIGHT.  NOW, WE'RE GOING TO TALK ABOUT PATIENT NO. 55,

12  WHICH IS THE ONE YOU HAVE ZEROED IN ON IN YOUR TESTIMONY.

13  I WANT TO BEGIN WITH APRIL 26, TWO THOUSAND -- WELL,

14  BEFORE I DO THAT, THIS GENTLEMAN HAS A HISTORY OF HAVING

15  STROKES.  CORRECT?

16  **A.**  ONE MOMENT WHILE I GET ORIENTED TO 55, PLEASE.  YES.

17  **Q.**  ALL RIGHT.  AND THESE ARE GENERALLY SPEAKING.  HE'S HAVING

18  SOME MINOR STROKES WHERE THERE'S NOT MUCH TREATMENT TO BE DONE

19  FOR THOSE, IS THERE?  IF YOU HAVE AN ISCHEMIC STROKE, A TIA.

20  **A.**  SIR, THESE WERE NOT TIA'S.  THESE SHOWED UP ON THE CAT

21  SCAN.  WHY DID YOU DO SOMETHING TO CHARACTERIZE IT AS A TIA?

22  HE WAS --

23  **Q.**  LET'S BEGIN --

24  **A.**  -- HAVING STROKES.  HE HAD MULTIPLE.

25  **Q.**  LET'S BEGIN WITH MY QUESTION.  OKAY.  A TIA -- WHAT

02:03 1  TREATMENT IS THERE FOR A TIA?  LET ME BEGIN THERE, PLEASE.

2  **A.**   WELL, THE FIRST THING YOU DO FOR A TIA IS YOU RECOGNIZE

3  IT'S A TRANSIENT ISCHEMIC EPISODE.

4        SECONDLY, YOU MAKE SURE IT'S TRANSIENT.  THEN --

5  FIRST OF ALL, IN ORDER TO MAKE SURE IT'S TRANSIENT, YOU MAKE

6  SURE -- I GUESS I MIGHT AS WELL HOLD MY LESSON -- MY ANSWER.

7  **Q.**   THANK YOU.

8        **THE COURT:**  DO YOU WANT HER TO FINISH?

9  **BY MR. ARCHEY:**

10  **Q.**   IF YOU NEED TO FINISH, PLEASE DO.

11        **THE COURT:**  YES.  SHE --

12        **MR. ARCHEY:**  I DIDN'T --

13        **THE COURT:**  SHE HELD BECAUSE YOU WERE --

14  **BY MR. ARCHEY:**

15  **Q.**   I'M SORRY.  PLEASE CONTINUE.

16  **A.**   OKAY.  ASK ME THE QUESTION AGAIN.  I WANT TO START FROM

17  THE BEGINNING.

18  **Q.**   I WILL WITHDRAW THE QUESTION.

19  **A.**   I WAS AFRAID YOU WEREN'T -- YOU WEREN'T LISTENING TO ME,

20  MR. ARCHEY.

21  **Q.**   WELL, I PROBABLY -- I PROBABLY WASN'T, DR. VASSALLO.  I

22  THINK YOU ARE CORRECT.

23        ALL RIGHT.  LET ME BEGIN -- AND LET'S GET SPECIFIC.

24  I WANT TO BEGIN WITH JX_55.0448.

25        ON THIS DAY THE GENTLEMAN COMES IN AND PRESENTS WITH

02:04  1  SYMPTOMS OF STROKE.  CORRECT?

2  **A.**  GO BACK UP SO I CAN SEE IF THIS IS THE -- YES.  SO THIS IS

3  AN AMBULANCE RUN REPORT YOU'RE SHOWING ME NOW.

4  **Q.**  YES, MA'AM.

5  **A.**  AND THE NATURE -- IT'S A LEFT-SIDED WEAKNESS.

6  **Q.**  LET'S GO TO --

7  **A.**  AND CAN YOU GO BACK DOWN NOW A LITTLE SO I CAN SEE WHAT IT

8  SAYS?

9  **Q.**  YES, MA'AM.

10  **A.**  OKAY.  SO THE PATIENT WAS SITTING ON THE BED.  HIS MOUTH

11  WAS FEELING NUMB.  HE HAD ALREADY HAD SEVERAL CVA'S.  IT'S

12  RIGHT HERE IN THIS HISTORY.  HE HAD THE SLURRED SPEECH, WHICH

13  WAS NORMAL FOR HIM.  IT SAYS "NORMAL" IN PARENTHESIS.  HE WAS

14  DROOLING, WHICH WAS NEW.  HIS FACE WAS SYMMETRICALLY EXPRESSIVE

15  EXPRESSION.

16         ONE MOMENT, PLEASE.

17         SO THEN HE HAD GRIP STRENGTH TO THE HANDS, SLIGHTLY

18  WEAKER ON THE LEFT SIDE.  THE LEFT LEG WAS MUCH WEAKER THAN THE

19  RIGHT, AND HE DOES HAVE A TREMOR IN THE LEFT HAND AND THE ARM.

20  SO HE WAS TAKEN TO THE ATU.

21  **Q.**  OKAY.

22  **A.**  TO ME THESE ARE SYMPTOMS OF A STROKE.

23  **Q.**  YES, MA'AM.  LET'S GO TO THE ATU RECORD, JX_55.0450.

24         HE GETS TO THE ATU AT 1530, 3:30, AND THEY HAVE HIM

25  LEAVING THE ATU, GOING TO OUR LADY OF LAKE AT 1610; 10 AFTER

02:06 1  4:00.  CORRECT?

2  **A.**  COULD YOU GO BACK TO THE -- I WOULD LIKE TO SEE WHEN THE

3  AMBULANCE WAS CALLED.

4  **Q.**  YES, MA'AM.

5        **MR. ARCHEY:**  BROOKE, GO BACK ONE PAGE.  THERE YOU GO.

6  **BY THE WITNESS:**

7  **A.**  SO THE AMBULANCE WAS ASSIGNED AT 1500; 3:00 P.M.

8        AND GO TO THE NEXT ONE, PLEASE.

9        AND HE LEAVES AT 4:10.  THAT'S GOOD.  I DON'T KNOW

10  RIGHT NOW, UNLESS I SPEND A FEW MOMENTS, WHAT HAPPENED FROM THE

11  PREVIOUS TWO DAYS TO THIS GENTLEMAN.

12  **Q.**  OKAY.

13  **A.**  BECAUSE MY OPENING SENTENCE ON PATIENT 55 -- MY

14  INTERPRETATION IN MY ATTACHMENT ON THIS PATIENT IS THAT

15  SOMETHING -- REMEMBER, THIS IS THE -- NOW I'M REMEMBERING; THAT

16  THIS IS THE PATIENT WHO HAD SYMPTOMS FOR A WHILE, WAS --

17  **Q.**  AND I WILL WALK THROUGH THEM WITH YOU.  BUT YOU CAN FINISH

18  YOUR THOUGHT.

19  **A.**  THANK YOU.

20  **Q.**  BUT WE'RE GOING TO WALK THROUGH THEM.  GO AHEAD.

21  **A.**  LET ME JUST FINISH, AND THEN YOU CAN WALK THROUGH.

22        SO THIS IS THE PATIENT WHO HAD HAD SYMPTOMS FOR A

23  WHILE AND HE WAS SENT TO WEST FELICIANA HOSPITAL FOR A CAT SCAN

24  AFTER SEVERAL VISITS THAT WERE CONSISTENT WITH A STROKE.

25  **Q.**  WE'RE GOING TO WALK THROUGH THEM ALL.

02:07  1  **A.**   AND THAT CAT SCAN WAS INADEQUATE.  AND SO THEN HE FINISHED
     2  -- THIS IS -- HE'S FINISHING HIS STROKE.  AND SO THIS IS WHAT
     3  WE'RE SHOWING.  WE TALKED ABOUT THIS THIS MORNING.
     4  **Q.**   ALL RIGHT.  NOW, LET'S BEGIN WITH JX_55.0070.
     5          THIS IS JANUARY 28, 2021.  WE'VE GOT A GENTLEMAN THAT
     6  -- HE'S GOT HIGH BLOOD PRESSURE AND THEY'RE FOLLOWING FOR HIS
     7  BLOOD PRESSURE.  RIGHT?
     8  **A.**   THE FIRST PART IS CORRECT.  AFTER TREATMENT WITH CLONIDINE
     9  THE PATIENT'S BLOOD PRESSURE WAS 206/132.  BY 4:00, 3:50 P.M.,
    10  THE BLOOD PRESSURE IS 152/104.  WITH THESE -- AND HE WENT BACK
    11  TO THE -- HE WAS GOING TO GO BACK TO THE CLINIC FOR A BLOOD
    12  PRESSURE CHECK.
    13  **Q.**   OKAY.  SO THAT'S GOOD.  RIGHT?
    14  **A.**   WHAT'S GOOD?
    15  **Q.**   THAT THEY GOT HIS BLOOD PRESSURED LOWERED AND THEY'RE
    16  GOING TO FOLLOW UP WITH BLOOD PRESSURE CHECKS?
    17  **A.**   YES.  I'M GLAD THEY WERE GOING TO FOLLOW THE BLOOD
    18  PRESSURE.
    19  **Q.**   ALL RIGHT.  NOW I'D LIKE FOR YOU TO LOOK AT JX_55.0069.
    20          THIS IS FEBRUARY 3, 2021.  THIS INDICATES HE WAS SEEN
    21  IN THE ATU TODAY, WAS NON-COMPLIANT WITH HIS BLOOD PRESSURE
    22  MEDICATIONS.
    23  **A.**   AND HIS BLOOD PRESSURE WAS 205/131.
    24  **Q.**   WHICH WOULD BE CONSISTENT WITH BEING NON-COMPLIANT WITH
    25  BLOOD PRESSURE MEDICATIONS.  CORRECT?

02:09 1   **A.**   NO.

2   **Q.**   NO?

3                LET'S GO TO JX_55.0068, WHICH IS THE ATU VISIT THAT

4   DAY.

5                ALL RIGHT.  HE GETS TO THE ATU.  THEY NOTE THAT HE

6   HAD NOT FILLED HIS BLOOD PRESSURE MEDS SINCE OCTOBER.  DO SEE

7   THAT?  IT'S ON THE RIGHT SIDE OF THE --

8   **A.**   I SEE THEY WROTE THAT, YES.

9   **Q.**   ALL RIGHT.  WELL, MA'AM, DON'T WE ACCEPT THAT AS FACIALLY

10  CORRECT SINCE IT'S IN THE RECORD?

11  **A.**   I DON'T KNOW REALLY KNOW WHAT "FACIALLY" MEANS.

12  **Q.**   IT MEANS ONLY ASSUME IT'S CORRECT UNTIL WE'RE SHOWN

13  SOMETHING ELSE.

14  **A.**   THAT SOUNDS LIKE A LEGAL CONCEPT, BECAUSE I -- BUT SURE.

15  IF THAT'S A LEGAL CONCEPT, THEN I'LL SHOW YOU SOMETHING ELSE.

16  **Q.**   ALL RIGHT.  DO YOU KNOW HOW THE PROVIDERS MAKE THE

17  DETERMINATION THAT HE HAD NOT FILLED HIS BLOOD PRESSURE

18  MEDICATION SINCE OCTOBER?

19  **A.**   I DO.

20  **Q.**   AND THEY CALLED THE PHARMACY TO PULL IT UP IN THE RECORDS.

21  RIGHT?

22  **A.**   THERE ARE A NUMBER OF WAYS THEY CAN DO THAT, AND SOMETIMES

23  THERE'S GREAT CONFUSION ABOUT THAT.  YOU AND I OBSERVED A

24  PATIENT IN THE CLINIC WHICH HAD INCREDIBLE CONFUSION AROUND

25  THAT.  BUT, YES, THEY HAVE SEVERAL WAYS TO FIND OUT IF THE

02:10 1    BLOOD PRESSURE MEDICATION HAS BEEN FILLED OR NOT.

2    **Q.**   OKAY.  AND THE ASSESSMENT FOR THIS PATIENT ON THIS DAY WAS

3    NON-COMPLIANCE, HYPERTENSION, HIGH BLOOD PRESSURE.  CORRECT?

4    **A.**   YES.  AND THEY DECIDED TO DISCHARGE THE PATIENT WITH THIS

5    -- THESE BLOOD PRESSURES.  YEP, THAT'S CORRECT, THAT'S WHAT

6    THEY DID.

7    **Q.**   ALL RIGHT.  LET'S GO TO JX_55_0063.

8         THIS IS THE NEXT DAY ON FEBRUARY 4, 2021.  AND THIS

9    TIME HE PRESENTS -- "HE'S SITTING UPRIGHT.  THERE WAS NO

10   SEIZURE-LIKE ACTIVITY.  HE JUST STARTED DROOLING AND SLUMPED TO

11   THE SIDE."  ALL RIGHT.  ARE YOU WITH ME?

12   **A.**   YES.

13   **Q.**   ALL RIGHT.  THE PATIENT SAID, "I'M OKAY."  RIGHT?

14   **A.**   HE SAID THAT.

15   **Q.**   OKAY.

16   **A.**   BUT PEOPLE WHO ARE HAVING STROKES SAY "I'M OKAY."

17   **Q.**   ALL RIGHT.  HIS VITAL SIGNS WERE STABLE?

18   **A.**   NO, THEY WEREN'T.

19   **Q.**   OKAY.

20   **A.**   HE HAD DROPPED HIS SYSTOLIC, THE TOP NUMBER, BY OVER 100

21   POINTS FROM THE TWO BLOOD PRESSURES YOU SHOWED ME PREVIOUSLY.

22   THAT IS NOT STABLE.  IT'S LIKE WHY DID THIS GUY GO -- NOBODY'S

23   BLOOD PRESSURE CORRECTS BY 100 POINTS UNLESS THERE'S A PROBLEM.

24   EITHER IT'S TOO LOW BECAUSE HE'S BEEN TOO AGGRESSIVELY

25   RESTARTED ON HIS MEDICATIONS OR THERE'S SOMETHING ELSE:  HE'S

02:12 1  SEPTIC OR SOMETHING ELSE, WHICH THIS PATIENT WAS NOT.

2  **Q.**   BUT THESE ARE NOT VITAL SIGNS THAT SAY "UNSTABLE, SEND

3  SOMEONE OUT."  RIGHT?  BLOOD PRESSURE 102/79.

4  **A.**   OKAY.  THE VITAL SIGN HERE DOES NOT SAY "I AM UNSTABLE."

5  BUT THE GUY IS NOW JUST THERE THE PREVIOUS DAY OR TWO.  YOU

6  SHOWED ME 200-SOMETHING AND NOW HE'S DROOLING AND SLUMPED TO

7  THE SIDE AND HE SAYS, "I'M OKAY."  IT'S IRRELEVANT WHAT HE

8  SAYS.

9  **Q.**   ALL RIGHT.  LET'S GO TO JX_55_00 --

10          **MR. ARCHEY:**  IS IT 54 OR 64, BROOKE?  55_0064.

11  **BY MR. ARCHEY:**

12  **Q.**   ALL RIGHT.  HE GOES TO THE ATU AND HE IS SEEN IN THE ATU.

13  CORRECT?

14  **A.**   WELL, THIS RECORD IS OF THE ATU, YES.

15  **Q.**   OKAY.  AND THERE'S NO CHANGES IN HIS NEURO STATUS?

16  **A.**   NOW, WAIT A MINUTE.  AT 7:30 IT SAYS "NO CHANGE IN NEURO

17  STATUS."  SO HE CAME IN AT 6:00.  HE WAS OBSERVED, GIVEN ALL

18  THE THINGS WE'VE BEEN TALKING ABOUT UNTIL 7:30, AND HIS NEURO

19  STATUS WAS WHAT?  HE HAD BEEN SLUMPED IN A CHAIR, SLUMPED OVER

20  AND FALLING TO THE SIDE AND THERE'S NO CHANGE.  IF THAT'S WHAT

21  YOU MEAN, HE WAS BAD AND HE WAS STILL BAD.

22  **Q.**   MA'AM, THEY DID DRAW HIS LABS, HAVE THOSE CHECKED OUT.

23  RIGHT?

24  **A.**   THEY -- WHAT DID YOU SAY?  THEY DREW LABS?

25  **Q.**   YES, MA'AM.

02:13 1   A.   I BELIEVE I REMEMBER THAT THEY DID -- I DON'T KNOW.  I SEE
      2   THAT HE HAD A -- CAN YOU SHOW ME WHERE THEY DREW HIS LABS?
      3   Q.   I THOUGHT YOU TALKED ABOUT IT DURING YOUR DIRECT.
      4   A.   IF THIS IS THE SAME PATIENT, YEAH.  BECAUSE THE NEXT
      5   EXHIBIT --
      6   Q.   OKAY.
      7   A.   -- DID SHOW THE CREATINE OF 2.8, THE BUN OF 70 AND THE
      8   ANION GAP OF 25.
      9   Q.   AND THEY ALSO DID AN EKG ON THE PATIENT?
     10   A.   I BELIEVE I REMEMBER THAT.  WELL, IT SAYS RIGHT HERE
     11   "EKG."  I THINK IT'S ORDERED.
     12   Q.   ALL RIGHT.  AND LET'S GO TO THE NEXT RECORD, WHICH IS
     13   JX_55.0061.
     14        ALL RIGHT.  THIS IS A SELF-DECLARED EMERGENCY WHERE
     15   HE SAYS HE'S HAD SOME INCREASED WEAKNESS TO HIS LEFT FOOT --
     16   LEG/FOOT SINCE YESTERDAY.  HE GOES TO THE ATU.  CORRECT?
     17   A.   UH-HUH.  IT ALSO SAYS HE HAD DIFFICULTY WALKING AND HE HAD
     18   TO USE A WHEELCHAIR.
     19   Q.   ALL RIGHT.  SO THEY SENT HIM TO THE ATU.  RIGHT?
     20   A.   CORRECT.
     21   Q.   ALL RIGHT.  AS WE LOOK AT THESE SELF-DECLARED EMERGENCIES,
     22   THERE'S A LOT OF THEM WHERE THEY DO SEND THEM TO THE ATU.
     23   RIGHT?
     24   A.   WHAT DO YOU MEAN?  THESE TWO THAT YOU JUST WENT OVER?
     25   Q.   NO, MA'AM.  LOTS OF THEM IN THE RECORDS.

1  **A.**   I THINK THEY DO SEND PATIENTS TO THE ATU WHEN THEY'RE

2  HAVING STROKES SOMETIMES AND SOMETIMES THEY DON'T.

3  **Q.**   ALL RIGHT.  LET'S LOOK AT JX_55.0057.

4          THIS IS WHEN HE GETS TO THE ATU, AND HE SEES A

5  PROVIDER WHEN HE'S IN THE ATU.  CORRECT?

6  **A.**   WAS THIS THE FOLLOWING DAY?  CAN YOU GO BACK ONE, PLEASE?

7  **Q.**   IT'S THE SAME DAY, YOUR -- DR. VASSALLO.  I'M SORRY.  IT'S

8  THE SAME DAY AS --

9  **A.**   YOU UPGRADED ME.  YOU UPGRADED ME, MR. ARCHEY.

10  **Q.**   HE GOES TO THE --

11  **A.**   SO THE PREVIOUS DAY -- I WOULD JUST LIKE TO SAY THAT I

12  DON'T THINK WE -- HE SAW A PROVIDER.  CAN YOU SHOW ME THAT

13  RECORD?  IS THIS IT?

14  **Q.**   I ASKED ABOUT THIS DAY.  I ASKED ABOUT ON 5/7.

15  **A.**   RIGHT.  BUT THE PREVIOUS DAY HE DIDN'T SEE A PROVIDER.

16  **Q.**   WELL, I DIDN'T ASK YOU THAT.

17  **A.**   IT'S IMPORTANT.

18  **Q.**   I UNDERSTAND, MA'AM.  5/7, LET'S TALK ABOUT THIS ONE.

19  **A.**   OKAY.

20  **Q.**   HE SEES A PROVIDER.  RIGHT?

21  **A.**   YES.

22  **Q.**   OKAY.  AND THE PROVIDER ASSESSES HIM AND THE PROVIDER

23  DECIDES TO GO GET A CT SCAN.  RIGHT?

24  **A.**   YEAH.  WE TALKED ABOUT THAT THIS MORNING, YES, SIR.

25  **Q.**   THE RESULTS OF THE CT SCAN WERE "NO ACUTE INTRACRANIAL

02:16 1 ABNORMALITY."  CORRECT?

2 **A.**    WELL, THAT WAS PART OF THE RESULT.  WE TALKED CLEARLY

3 ABOUT THE FACT THAT THE RADIOLOGIST SAID, "IF YOU'RE WORRIED

4 ABOUT A STROKE, TAKE IT FURTHER."

5 **Q.**    OKAY.

6 **A.**    THEY WERE WORRIED ABOUT A STROKE.

7 **Q.**    DID THE RADIOLOGIST SUGGEST THAT THE PROVIDER DO ANY OTHER

8 KIND OF CT SCAN?  YOU WERE TALKING ABOUT THE CT SCAN WITH THE

9 --

10 **A.**    WHAT I'M -- EXCUSE ME FOR -- SO THEY COULD DO A DIFFERENT

11 -- THEY COULD DO A MRI.  BUT I SAID THIS MORNING YOU DON'T HAVE

12 TO DO A MRI TO DIAGNOSE A STROKE.  AND SO A PROVIDER SHOULD

13 KNOW IN THIS SETTING WHERE YOU DON'T HAVE AN EMERGENCY ROOM --

14 WE'VE ALREADY SAID HOW TO DIAGNOSE A -- OR IF YOU DON'T KNOW,

15 YOU CALL YOUR SPECIALIST OR YOU SEND HIM TO THE HOSPITAL.

16 **Q.**    DOCTOR --

17 **A.**    SO THE THING IS --

18 **Q.**    -- MY QUESTION IS, IS DID THE RADIOLOGIST SUGGEST THE

19 PROVIDER GET A DIFFERENT TYPE OF CT SCAN THAT YOU REFERRED TO?

20 **A.**    HE SUGGESTED YOU DO SOMETHING BETTER:  AN MRI.

21 **Q.**    DID HE SUGGEST DO A DIFFERENT TYPE OF CT SCAN THAT YOU

22 WERE JUST TALKING ABOUT EARLIER?

23 **A.**    NO.

24 **Q.**    OKAY.  WHEN HE GOES TO WEST FELICIANA HOSPITAL, DID THEY

25 DO ANYTHING AS A RESULT OF THESE STROKE-LIKE SYMPTOMS?

1    **A.**   WELL, HE WENT FOR A CAT SCAN.

2    **Q.**   AND DID ANY OF THE PROVIDERS THERE DO ANYTHING?

3    **A.**   THERE WERE NO PROVIDERS WHO SAW HIM THERE.

4    **Q.**   ALL RIGHT.

5    **A.**   HE WENT FOR A CAT SCAN AND HE CAME HOME.

6    **Q.**   ALL RIGHT.  SO AFTER THAT ENCOUNTER WE GO FROM

7    FEBRUARY 5TH UP TO MARCH 17TH.  CORRECT?

8    **A.**   DID YOU WANT TO SHOW ME THAT, OR ARE YOU SHOWING IT?

9    **Q.**   YES, MA'AM.

10   **A.**   OH, YOU ARE SHOWING IT TO ME.

11   **Q.**   I'LL SHOW IT TO YOU, YES, MA'AM.

12   **A.**   THERE IT IS.

13   **Q.**   IT'S JX_55.0053.

14   **A.**   YEAH.  THE NEXT RECORD THAT YOU ARE JUST SHOWING ME IS

15   ANOTHER SELF-DECLARED EMERGENCY, AND IT IS ON MARCH 17TH AT

16   10:00 IN THE MORNING.

17   **Q.**   ALL RIGHT.  SO WE GO FROM FEBRUARY 5TH TO MARCH 17TH WITH

18   NO COMPLAINTS IN THE INTERIM PERIOD THAT WE'RE AWARE OF.

19   CORRECT?

20   **A.**   THOSE ARE TWO VERY DIFFERENT THINGS.

21   **Q.**   ALL RIGHT.  THIS IS THE NEXT RECORD IN THE CHART.

22   CORRECT?

23   **A.**   ARE YOU TELLING ME THAT'S TRUE?

24   **Q.**   I BELIEVE THAT TO BE TRUE, MA'AM.

25   **A.**   OKAY.  WELL, LET ME SEE IF IT'S IN MY REPORT TO BE TRUE.

02:18 1   YES.  ACCORDING TO MY REPORT, YES, THAT'S TRUTHFUL.

2   **Q.**   ALL RIGHT.  AND AS WE LOOK AT THIS SELF-DECLARED

3   EMERGENCY, HE IS ONCE AGAIN SENT TO THE ATU.  CORRECT?

4   **A.**   HE WAS SENT TO THE ATU.  AND LOOKING AT MY REPORTS, I ALSO

5   SEE THAT ON MARCH 12TH, WHICH IS FIVE DAYS BEFORE THIS -- NO.

6   EXCUSE ME.  I WITHDRAW THAT.  YES, HE WAS SENT TO THE ATU.

7   **Q.**   OKAY.  AND LET'S LOOK AT THAT RECORD.  IT'S JX_55.0054.

8           THE PROVIDER NOTED "NO SIGNS OR SYMPTOMS OF A NEW

9   CVA."  CORRECT?

10  **A.**   IT SAYS THAT HERE.  I DON'T KNOW HOW HE COULD NOT NOTICE

11  THAT THE GUY CAN'T WALK.  THE GUY SAYS, "I CAN'T WALK SINCE

12  YESTERDAY."  IF SOME PROVIDER DECIDES THAT'S NOT A SYMPTOM OF A

13  STROKE, THAT'S THE PROVIDER'S PROBLEM.

14  **Q.**   AND THEN THE NEXT TIME HE PRESENTS IS WHEN THEY GET HIM

15  OUT OF THE ATU ON APRIL 26TH WITHIN 30 MINUTES.  RIGHT?

16  **A.**   THIS IS EXACTLY WHAT I'VE SAID.  CAN YOU GO TO THAT REPORT

17  THAT YOU'RE SHOWING ME -- I MEAN, THAT YOU JUST REFERRED TO?

18  THIS IS EXACTLY IT.  YOU HAVE A 229/151, SOMEBODY WHO CAN'T

19  WALK.  THE PUSHER SAYS, "HE NORMALLY WALKS."  AND THEY SAY HE

20  DOESN'T HAVE A STROKE.  THEY SEND HIM BACK.  THEY DISCHARGE

21  HIM.  AND NOW "RETURN TO QUARTERS."  AND NOW YOU'RE TELLING ME

22  ANOTHER DATE.  AND YOU TELL ME THAT HE WENT -- RIGHT AWAY HE

23  WENT OUT.  IS THAT WHAT YOU JUST SAID?

24  **Q.**   YES, MA'AM.

25  **A.**   OKAY.

02:19 1   Q.   BECAUSE HE GOES ANOTHER SIX WEEKS.  AND THEN WHEN HE
     2   PRESENTS AGAIN, THEY SEND HIM OUT BECAUSE HE PRESENTS WITH
     3   STROKE SYMPTOMS.
     4   A.   SO THIS RIGHT HERE, THE RECORD YOU JUST SHOWED ME FROM
     5   MARCH 17TH -- AND WHAT RECORD ARE YOU REFERRING TO ABOUT THE
     6   SIX WEEKS AND JUST SENT OUT?
     7   Q.   APRIL 26TH.
     8   A.   AND MY QUESTION IS:  WHY DIDN'T THEY SEND HIM OUT ON
     9   MARCH 17TH WHEN HE WAS -- CLEARLY COULDN'T WALK?  HE WAS HAVING
    10   A STROKE ON MARCH 17TH.  WHY DIDN'T THEY SEND HIM OUT THEN?
    11   Q.   BECAUSE, ACCORDING TO THE PROVIDER, HE SAID, "NO SIGNS OR
    12   SYMPTOMS OF A NEW CVA."
    13   A.   WELL, THAT SHOWS THE PROVIDER EITHER DID NOT EXAMINE THE
    14   PATIENT OR DOESN'T KNOW ANYTHING ABOUT HOW TO RECOGNIZE A
    15   STROKE.  THAT'S ABSURD.
    16   Q.   ALL RIGHT.  I'M GOING TO MOVE ON.
    17           THE COURT:  ARE YOU MOVING TO ANOTHER PATIENT?
    18           MR. ARCHEY:  I BELIEVE SO, YOUR HONOR.
    19           THE COURT:  OKAY.  I'M SORRY TO DO THIS, BUT THE
    20   COURT NEEDS TO TAKE A LITTLE BREAK.  I DON'T MEAN TO INTERRUPT
    21   YOUR CROSS.  WE WILL BE IN ABOUT A 20-MINUTE RECESS.
    22           THE LAW CLERK:  ALL RISE.
    23               THE COURT IS NOW IN RECESS.
    24           (WHEREUPON, THE COURT WAS IN RECESS.)
    25           THE COURT:  ALL RIGHT.  LET'S CARRY ON.  SORRY ABOUT

02:49  1  THE DISRUPTION.  GO AHEAD.

2  **BY MR. ARCHEY:**

3  **Q.**  DR. VASSALLO, I WANT TO TALK ABOUT PATIENT NO. 38 NOW,

4  PLEASE.

5  **A.**  GO AHEAD.

6  **Q.**  OKAY.  THIS PATIENT HAD A MEDICAL HISTORY THAT INCLUDED

7  MECHANICAL HEART VALVE, COPD, DIABETES, HYPERLIPIDEMIA, GERD --

8  GASTRO REFLUX DISEASE, IF I HAVE THAT RIGHT?

9  **A.**  YES.

10  **Q.**  HEPATITIS C, MAJOR DEPRESSIVE ORDER, AND PANIC DISORDER.

11  CORRECT?

12  **A.**  I CERTAINLY REMEMBER THE FIRST FOUR OF THOSE.  BUT IF YOU

13  SAY THAT'S WHAT HE HAD -- THE ADDITIONAL GERD, I DIDN'T REALLY

14  REMEMBER HE HAD GERD.

15  **Q.**  OKAY.  WE'RE TALKING ABOUT BEGINNING ON MARCH 4, 2019, HE

16  WAS ADMITTED TO THE NURSING UNIT FOR THE LOVENOX BRIDGE THAT

17  YOU SPOKE ABOUT.  RIGHT?

18  **A.**  YES, SIR.

19  **Q.**  OKAY.  AND THAT WAS SO HE COULD GET A CATARACT SURGERY.

20  RIGHT?

21  **A.**  I REMEMBER IT WAS DENTAL SURGERY.

22  **Q.**  OKAY.

23  **A.**  AS A MATTER OF FACT, I'M SURE IT WAS DENTAL SURGERY.

24  **Q.**  ALL RIGHT.  OKAY.  STILL A GOOD THING THAT HE'S ABLE TO

25  GET CARE SUCH AS DENTAL SURGERY THAT HE MAY NEED.  CORRECT?

1   **A.**   YEAH.  CATARACTS DON'T CAUSE BLEEDING, SO YOU WOULDN'T
2   STOP COUMADIN OR LOVENOX FOR THAT.
3   **Q.**   ALL RIGHT.  FAIR ENOUGH.
4         HE PRESENTS WITH A FEVER WHEN HE GETS TO THE ATU.
5   CORRECT?
6   **A.**   YES.  WELL, HE PRESENTS WITH FEVER, DID YOU SAY?
7   **Q.**   YES, MA'AM.
8   **A.**   THE FIRST TIME HE HAD FEVER WAS IN THE NURSING UNIT.
9   **Q.**   THAT'S WHAT I -- OKAY.  I MISSPOKE.  YES, MA'AM, THAT'S
10  WHAT I WAS TRYING TO SAY.
11  **A.**   OKAY.
12  **Q.**   YES, WE'RE IN AGREEMENT.
13        AT THAT TIME DR. BUNCH IS CALLED.  RIGHT?
14  **A.**   A DOCTOR WAS CALLED BY THE PERSON ABOUT THE FEVER, YES.
15  **Q.**   AND MEDICATION WAS GIVEN?
16  **A.**   WHAT MEDICATION WAS GIVEN?  TYLENOL WAS GIVEN.
17  **Q.**   AND HIS FEVER RESOLVED.  CORRECT?
18  **A.**   TYLENOL ALWAYS -- IT'S AN ANTIPYRETIC; IT LOWERS FEVER NO
19  MATTER WHAT THE CAUSE.
20  **Q.**   OKAY.
21  **A.**   SO TYLENOL WAS GIVEN AND THE TEMPERATURE WENT DOWN.  THE
22  TYLENOL WORKED.
23  **Q.**   RIGHT.  AND THAT'S ALL I'M ASKING YOU.  HE WAS GIVEN
24  MEDICATION FOR HIS FEVER AND IT WENT DOWN.  RIGHT?
25  **A.**   WELL, THAT'S NOT WHAT YOU ASKED ME, BUT THAT IS WHAT I

02:51 1   ANSWERED, YES, SIR.

2   **Q.**   VERY WELL.  THANK YOU.

3           THE REMAINDER OF HIS STAY HE NEVER HAD ANOTHER FEVER,

4   DID HE?

5   **A.**   WELL, THE LONG -- AS LONG AS YOU'RE GIVEN TYLENOL, YOU'RE

6   NEVER GOING TO SEE ANOTHER FEVER.

7   **Q.**   OKAY.  AND THE DOCTOR -- OR HE WAS BEING TREATED FOR

8   FLU-LIKE SYMPTOMS.  RIGHT?

9   **A.**   WITH AMANTADINE.

10  **Q.**   FLU-LIKE SYMPTOMS.  RIGHT?

11  **A.**   THAT'S WHAT HE WAS BEING TREATED FOR.

12  **Q.**   CORRECT.

13          I'D LIKE TO SHOW YOU JX_003 -- JX_38.0037.

14          THIS IS THE AUTOPSY REPORT?

15  **A.**   YES.

16  **Q.**   THE BOTTOM OF THE -- WHERE IT SAYS THE "OPINION," THE

17  FIRST PARAGRAPH, IT SAYS, "THE DECEDENT WAS A 58-YEAR-OLD MALE

18  PRISON INMATE WITH A HISTORY OF MECHANICAL HEART VALVE,

19  HYPERTENSION, CHRONIC OBSTRUCTIVE PULMONARY DISEASE AND

20  FLU-LIKE SYMPTOMS FOR TWO DAYS."  CORRECT?

21  **A.**   THAT'S WHAT IT SAYS.

22  **Q.**   LET'S TALK ABOUT PATIENT NO. 36 NOW.

23  **A.**   YES, SIR.

24  **Q.**   OKAY.  THIS PATIENT'S UNDERLYING CONDITIONS INCLUDED

25  PNEUMONIA, SHORTNESS OF BREATH, PULMONARY CAVITARY LESION,

02:52 1  CYSTIC BULLOUS -- DISEASE OF THE LUNGS -- COPD, RESPIRATORY
      2  FAILURE WITH HYPOXIA.  CORRECT?
      3  **A.**    TWO SECONDS.  I'M GOING TO RETURN TO PAGE 36.
      4  **Q.**    YES, MA'AM.  MY APOLOGIES.  GO AHEAD.
      5  **A.**    I MEAN PATIENT 36.  GO AHEAD, SIR.  SORRY.
      6  **Q.**    I'D LIKE FOR US TO GO TO JX_36.0137 AT THIS TIME.
      7          THIS IS A HOSPITAL DISCHARGE AS OF JANUARY 6TH OF
      8  2019.  HE'D BEEN IN INTENSIVE CARE IN THE HOSPITAL.  ISN'T THAT
      9  RIGHT?
     10  **A.**    THIS RECORD DOES NOT SHOW THAT.  IT SAYS THAT THEY HAD A
     11  CONSULTANT AS INTENSIVE CARE.
     12  **Q.**    OKAY.
     13  **A.**    SO I CAN LOOK NOW AT MY REPORT, TAKE A MINUTE TO SEE IF HE
     14  DID GO TO INTENSIVE CARE.  BUT THIS GENTLEMAN, NO. 36, DID HAVE
     15  A CARDIAC ARREST DUE TO EXACERBATION OF COPD.  SO YES, HE DID
     16  GO TO THE INTENSIVE CARE.
     17  **Q.**    OKAY.  LET'S LOOK AT THE BOTTOM.  WE'LL START AT THE VERY
     18  BOTTOM OF PAGE 137 AND WE WILL GO OVER TO 138.  IT READS --
     19          **MR. ARCHEY:**  THANK YOU.  THAT'S PERFECT, BROOKE.
     20          THE GLARE HAS GOT ME, JUDGE.
     21  **BY MR. ARCHEY:**
     22  **Q.**    STATES HE HAD A GRADUAL WORSENING OF SOB ON EXERTION TIMES
     23  TWO TO THREE YEARS, WHICH WAS PARTIALLY RELIEVED BY LUNG
     24  WASHING TIMES THREE YEARS AGO FOR BULLOUS DISEASE.  STATES OVER
     25  THE PAST SEVERAL DAYS HIS BREATHING HAS DRAMATICALLY WORSENED

02:54  1   AND HE IS NOW SHORT OF BREATH WITH REST.  HE IS NOT ON HOME O2
       2   AT THE PRISON.  REPORTS A CHRONIC COUGH PRODUCTIVE OF WHITE
       3   SPUTUM, NO BLOODY SPUTUM.  DENIES FEVER, CHILLS, CHEST PAIN,
       4   ABDOMEN PAIN, NAUSEA, VOMITING, DIZZINESS, DIARRHEA AND LEG
       5   SWELLING.  CORRECT?
       6   A.    YOU'RE READING FROM A DISCHARGE SUMMARY.
       7   Q.    YES, MA'AM.
       8   A.    AND SO THAT -- WHAT YOU'RE REPRESENTING HERE IS THAT --
       9   FIRST OF ALL, HE COULD NOT TALK WHEN HE ARRIVED BECAUSE HE WAS
      10   IN CARDIAC ARREST AND INTUBATED, IN RESPIRATORY FAILURE.  SO
      11   THIS IS IRRELEVANT.  THIS IS IRRELEVANT TO WHAT HAPPENED AND
      12   THEN WHY IT HAPPENED, EXCEPT TO THE EXTENT THAT WHEN YOU HAVE
      13   WORSENING COPD FOR EITHER TWO DAYS -- LIKE I'VE TESTIFIED THIS
      14   MORNING, YOU ASK SOMEBODY IF THEY'VE EVER BEEN HOSPITALIZED,
      15   IF THEY'VE EVER BEEN INTUBATED.  AND NOW IF YOU HAVE THE
      16   KNOWLEDGE WHEN THEY COME IN THAT SOMEONE'S BEING -- GRADUALLY
      17   WORSENING, SHORTNESS OF BREATH, FOR TWO TO THREE YEARS,
      18   REQUIRED LUNG WASHING, WHICH IS BRONCHIAL LAVAGE, THREE YEARS
      19   AGO FOR BULLOUS DISEASE, THIS IS A SICK PATIENT WITH A SERIOUS
      20   UNDERLYING DISEASE.  BUT ALL OF THIS REPORTING IS HAPPENING
      21   SOMEWHERE DURING HIS HOSPITALIZATION, NOT ON ARRIVAL.
      22   Q.    YES, MA'AM, I UNDERSTAND.  AND I'M JUST TRYING TO
      23   ESTABLISH WHAT THE RECORD SHOWS IS HIS CONDITION AND, IN
      24   EFFECT, HIS BASELINE AT THE BEGINNING OF 2019.  RIGHT?
      25   A.    WELL, THE PATIENT HAD COPD WITH SHORTNESS OF BREATH AT

02:56 1   BASELINE FOR SIX YEARS.  THIS WAS WRITTEN -- SO IF YOU'RE

2   SAYING THAT'S TWO THOUSAND -- THIS IS -- 2019 MINUS SIX IS

3   2013.

4          SO THE POINT IS THAT THIS IS A PERSON WITH SEVERE

5   PULMONARY DISEASE, JUST AS YOU'VE JUST LAID OUT, FOR SIX YEARS,

6   AND NOW HE'S PRESENTING WITH A RESPIRATORY RATE OF 32,

7   INABILITY TO BREATHE AND SUCKING AIR.  LIKE I SAID THIS

8   MORNING -- AND YOU KNOW THIS -- THIS IS A CRITICALLY ILL

9   PATIENT.

10  Q.   AND IF YOU GO FURTHER DOWN ON PAGE 138, IT REFERENCES

11  THAT -- REPORTS SUPPOSED TO USE 3L IN PRISON BUT NON-COMPLIANT?

12  3L'S, IS THAT THREE LITERS OF OXYGEN?

13  A.   3L MEANS THREE LITERS.

14  Q.   FOR OXYGEN.  RIGHT?

15  A.   OF OXYGEN, RIGHT.

16  Q.   OKAY.  SO HE WAS SUPPOSED TO BE USING THE OXYGEN IN PRISON

17  BUT WAS NON-COMPLIANT IS WHAT THE OUTSIDE HOSPITAL REPORTED?

18  A.   IT'S IRRELEVANT.  IF YOU'RE COMPLIANT WITH OXYGEN OR NOT,

19  YOU DON'T WORSEN YOUR DISEASE BY EITHER BEING ON OXYGEN OR NOT

20  BEING ON OXYGEN.

21          SO THE COPD PATIENTS, SOMETIMES THEY USE THEIR

22  OXYGEN, SOMETIMES THEY SAY THEY DON'T.  IF THEY'RE WALKING

23  AROUND AND GOING SHOPPING, THEY MAY USE OXYGEN.

24  Q.   OKAY.

25  A.   BUT JUST BECAUSE OXYGEN IS PRESCRIBED IS NOT GOING TO

02:57 1   CHANGE HOW HIS LUNG DISEASE PROGRESSES, AND IT'S NOT GOING TO

2   MAKE HIM WHEEZE IF HE'S NOT USING OXYGEN.

3   **Q.**   MA'AM, I'M JUST ASKING A VERY SPECIFIC QUESTION AND YOU'RE

4   TALKING ABOUT THINGS I'M NOT EVEN ASKING ABOUT.

5         I JUST ASKED YOU ABOUT HIM BEING ON OXYGEN,

6   THREE LITERS.  RIGHT?

7   **A.**   ARE YOU ASKING ME IF YOU JUST ASKED ME IF THE MAN IS ON

8   OXYGEN?  THE ANSWER IS YES.

9   **Q.**   THANK YOU.

10        NOW, LET'S GO TO PAGE JX_36.0134.

11        THIS IS JANUARY 23RD:  "RECENT ADMIT TO NU 1 FOR

12   ACUTE EXACERBATION OF COPD."  I DON'T KNOW IF I CAN MAKE OUT

13   THOSE NEXT TWO WORDS.  I THINK IT'S TWO MEDICATIONS AS WELL AS

14   ALBUTEROL AND DOING WELL.  HIS BLOOD PRESSURE WAS IMPROVED WITH

15   CURRENT MEDICATIONS.  CORRECT?

16   **A.**   THIS IS JANUARY 23RD IN 2019, CORRECT.

17   **Q.**   YES, MA'AM.  ALL RIGHT.

18   **A.**   AND HE'S IN NURSING UNIT 1 FOR -- HE'S BEING ADMITTED.

19   HE RECENTLY HAD ADMISSION TO NURSING UNIT 1 FOR ACUTE

20   EXACERBATION OF COPD.  HE'S ON SYMBI AND ALBUTEROL.  THERE'S

21   THAT DUONEB I TALKED TO YOU -- AND HE'S DOING WELL, AND HE SAYS

22   HIS BREATHING IS BETTER THAN BEFORE.  I'M NOT QUITE SURE WHEN

23   THIS NOTE IS VERSES WHEN HE WENT TO THE INTENSIVE CARE UNIT.

24   SO ANYTHING IS BETTER THAN THAT, SO I DON'T KNOW.

25   **Q.**   LET'S GO TO THE NEXT NOTE, WHICH IS FEBRUARY 13, 2019.

02:59 1 THIS IS JX_36.0127.

2       HE GOES TO CLINIC A FOR FOLLOW UP FOR HIS

3 HYPERTENSION.  CORRECT?

4 **A.**  YES.

5 **Q.**  OKAY.  AND HE ADMITTED TO AN INCREASED SALT INTAKE AND

6 THEY RECOMMENDED DIET AND EXERCISE.  CORRECT?

7 **A.**  WHAT YOU SAID IS "HE ADMITTED."  BUT I THINK YOU MEANT THE

8 PLAN WAS TO DECREASE THE SALT INTAKE -- IS THAT WHAT YOU'RE

9 SAYING? -- AND TO EXERCISE.

10 **Q.**  WELL, THAT'S TRUE.  BUT I'M LOOKING AT THE TOP AS WELL,

11 THE SECOND LINE DOWN.

12 **A.**  OKAY.

13 **Q.**  IT SAYS, "ADMITS TO INCREASED SALT INTAKE, RECOMMENDED

14 DIET AND EXERCISE."  CORRECT?

15 **A.**  YES.

16 **Q.**  ALL RIGHT.  AND HE REPORTED -- DOES THAT SAY NO POSITIVE

17 -- OR INCREASED -- NO INCREASED PROBLEMS WITH BREATHING,

18 RECENTLY USING A C-PAP.  RIGHT?

19 **A.**  YES, THAT'S WHAT IT SAYS.

20 **Q.**  ALL RIGHT.  AND THE GENTLEMAN WAS OBESE.  CORRECT?

21 **A.**  YES.

22 **Q.**  OKAY.  AND THEY HAVE MEDICATIONS LISTED ON THE SIDE.

23 RIGHT?

24 **A.**  THIS IS THE MEDICATIONS FOR BLOOD PRESSURE,

25 NORVASC/LISINOPRIL, AND THE BETA BLOCKER, COREG, YES.

03:00 1   **Q.**   OKAY. VERY GOOD. NOW I WANT TO GO TO THE NEXT TREATMENT

2   IN THE CLINIC, WHICH IS JX_36.0126.

3         THIS IS APRIL 17, 2019. ALL RIGHT. NOW HE ADMITS TO

4   BLOOD PRESSURE RECHECKED, ADMITS TO NON-COMPLIANCE ON MEDS.

5   **A.**   YEAH, I NOTICED THAT. THAT WAS SO AMAZING TO ME. HIS

6   BLOOD PRESSURE IS 140/83. THAT'S GOOD.

7   **Q.**   OKAY.

8   **A.**   SO HE'S COMPLIANT. IT DIDN'T DO THAT ON HIS OWN.

9   **Q.**   OKAY. DO YOU KNOW WHY THE RECORD SAYS HE'S NON-COMPLIANT

10   WITH HIS MEDS?

11   **A.**   NO.

12   **Q.**   OKAY. HE'S STILL BEING FOLLOWED, THOUGH, BY LSP IN ITS

13   CLINICS. RIGHT?

14   **A.**   YEAH. THIS IS ALL ABOUT THE BLOOD PRESSURE, YES.

15   **Q.**   ALL RIGHT. NOW WE COME TO MAY 2, 2019. THIS IS

16   JX_36.0106.

17         I WANT TO ASK SOME VERY SPECIFIC QUESTIONS, IF I MAY.

18   YOU'VE HAD A CHANCE TO TALK ABOUT IT. I'D LIKE TO ASK SPECIFIC

19   QUESTIONS. HE WAS APPROPRIATELY TREATED WITH NEBULIZERS AND

20   MONITORED. CORRECT?

21   **A.**   WITH NEBULIZERS AND WHAT?

22   **Q.**   AND HE WAS MONITORED?

23   **A.**   YES.

24   **Q.**   OKAY. LSP SECURED THE LABS FOR THIS GENTLEMAN. CORRECT?

25   **A.**   DID YOU SAY THEY SECURED THEM?

03:02 1    **Q.**   YES, MA'AM.  THEY ORDERED LABS AND HAD LABS DRAWN?

2    **A.**   OH, I UNDERSTAND.  THE WORD "LABS," YES, SIR.

3    **Q.**   THERE WE GO.  I'M SORRY.  BAD LANGUAGE.

4             LSP ORDERED A CHEST X-RAY WHICH HAD STABLE FINDINGS.

5    CORRECT?

6    **A.**   I DON'T SEE THE INTERPRETATION OF THE CHEST X-RAY.

7    **Q.**   ALL RIGHT.  AS HE DETERIORATED, DR. CROOK ENDS UP COMING

8    -- GIVES A VERBAL ORDER AND THEN ENDS UP COMING INTO THE ATU.

9    CORRECT?

10   **A.**   WELL, HE WAS DETERIORATING, THAT'S CORRECT.  AND THEN AT

11   SOME POINT SOMEBODY CAME IN, NOTICED HE WAS DETERIORATING, SENT

12   TO NURSE UNIT NO. 1.  IT'S NOT TIMED, SO I REALLY DON'T KNOW

13   WHEN THIS NOTE WAS WRITTEN OR WHEN HE CAME IN.

14   **Q.**   OKAY.  YOU DO HAVE "DR. CROOK."  YOU TOLD ME THAT THAT WAS

15   HIS SIGNATURE ON THE BOTTOM OF THAT PAGE?

16   **A.**   I BELIEVE IT IS.  I THINK HIS NAME IS D. CROOK.

17   **Q.**   OKAY.  YOU UNDERSTAND -- OR DO YOU KNOW WHAT DR. CROOK'S

18   CREDENTIALS ARE?

19   **A.**   I DON'T KNOW HIS CREDENTIALS.

20   **Q.**   OKAY.  ARE YOU AWARE THAT DR. CROOK IS A FELLOW IN

21   EMERGENCY MEDICINE?

22   **A.**   HE'S A WHAT?

23   **Q.**   A FELLOW IN EMERGENCY MEDICINE.

24   **A.**   THERE'S NO SUCH THING.  THAT HAS NO MEANING TO ME, A

25   FELLOW.

03:03 1    Q.    THAT DOESN'T MEAN ANYTHING TO YOU?

2    A.    NO, SIR.

3    Q.    OKAY.

4    A.    THERE'S NO SUCH THING AS A FELLOW IN EMERGENCY MEDICINE.

5    YOU COULD BE A RESIDENT.  YOU COULD BE A FELLOW OF THE AMERICAN

6    COLLEGE OF A MEDICAL -- OF EMERGENCY MEDICINE, WHICH I AM.  YOU

7    CAN BE -- BUT THEN YOU HAVE TO BE A BOARD CERTIFIED EMERGENCY

8    MEDICINE PHYSICIAN.

9    Q.    OKAY.  ARE YOU AWARE DR. CROOK IS BOARD CERTIFIED IN

10   EMERGENCY MEDICINE?

11   A.    I THINK, NOW THAT YOU REMIND ME.  I REMEMBER MORE ABOUT

12   HIS FELONY CONVICTION, AND THAT WAS RATHER STRIKING TO ME.  AND

13   I DO REMEMBER THAT I WAS LIKE, WOW, THIS GUY IS TRAINED IN

14   EMERGENCY MEDICINE.  I WAS SHOCKED.  YOU'RE RIGHT.

15   Q.    OKAY.  BECAUSE ONE OF THE RECOMMENDATIONS IS YOU WANT A --

16   A PROVIDER WHO HAS EXPERTISE IN EMERGENCY CARE.  CORRECT?

17   A.    YOU'RE RIGHT, I WANT SOMEBODY WITH EXPERTISE IN EMERGENCY

18   CARE.

19   Q.    ALL RIGHT.  AND THIS DR. CROOK HAS EXPERTISE IN EMERGENCY

20   CARE, ADMITTED THE PATIENT INTO NU 1.  CORRECT?

21   A.    HE DID.

22   Q.    AND THEN AFTER THE PATIENT IS IN NU 1, WITHIN A SHORT

23   PERIOD OF TIME HE COMES BACK AND HE GOES TO OUR LADY OF THE

24   LAKE HOSPITAL.  RIGHT?

25   A.    SHORTLY AFTER HE WAS PUT IN THE NURSING UNIT, HE HAD A

03:04  1  CARDIAC ARREST AND WENT TO THE HOSPITAL, THAT'S CORRECT.

2  Q.   OKAY.  LET'S MOVE ON.  ALL RIGHT.  I WANT TO TALK ABOUT

3  PATIENT 35.

4        AND I THINK I CAN DO THIS IN A KIND OF GENERIC

5  FORMAT, IF WE MAY.  AND IF YOU NEED TO DO MORE, THEN YOU

6  CERTAINLY ARE GOING TO BE ALLOWED TO.

7        BUT YOUR CRITICISM HERE IS THAT DR. BUNCH DECIDED TO

8  SEND THIS PATIENT TO THE NU TO BE OBSERVED AS OPPOSED TO

9  SENDING THE PATIENT OUT RIGHT AWAY. RIGHT?

10  A.   I'M SURE THAT IT'S NOT AN ENTIRE CRITICISM.  THAT'S

11  PROBABLY ONE.  PATIENT 35 WAS MISSED MENINGITIS.

12  Q.   RIGHT.  AND HE GOES -- THE PATIENT IS SENT TO THE NURSING

13  UNIT WITH ALTERED MENTAL STATUS AND A FEVER AS OPPOSED TO BEING

14  SENT OUT RIGHT AWAY.  CORRECT?  I'M NOT TRYING TO DISAGREE WITH

15  YOU.  I THINK I'M TRYING TO RECAPITULATE WHAT YOU'RE SAYING.

16  A.   I KNOW.  BUT I HAVE TO WATCH OUT HOW YOU ENCAPSULATE WHAT

17  I'M SAYING, SO JUST ONE MOMENT.

18        I'M JUST MAKING SURE THAT YOU DID SAY PATIENT NO. 35.

19  RIGHT?

20  Q.   YES, MA'AM.

21  A.   OKAY.  YEAH.  SO JUST REVIEWING SO I CAN CATCH UP WITH

22  YOU, AT 5:16 HE WAS BROUGHT TO THE ATU WITH A FEVER OF 103 AND

23  CONFUSED.  AND YOU COULD SHOW ME THE RECORD AND I'D BE MORE

24  ACCURATE.  AND HE WAS CONFUSED WITH 103 FEVER.  AND THIS IS THE

25  MAN WHO GOT CATHETERIZED FOR THAT SYMPTOM.  HE WAS CONFUSED AND

1  WENT TO THE NURSING UNIT FOR 23 HOURS OF OBSERVATION.

2  **Q.**   RIGHT, MA'AM.  THAT'S EXACTLY WHAT I SAID.  I'M JUST

3  TRYING TO GET US THERE SO WE CAN GET TO THE QUESTION AND MOVE

4  ON.

5  **A.**   YES.

6  **Q.**   OKAY.

7  **A.**   THAT'S WHAT YOU SAID.

8  **Q.**   ALL RIGHT.

9  **A.**   BUT I NEED TO LOOK AT THE RECORD, TOO.  I MEAN, I'M DONE

10  WITH MY ANSWER.

11  **Q.**   YOU'RE DONE?

12  **A.**   YES.

13  **Q.**   DR. BUNCH'S DECISION TO SEND THIS PATIENT TO THE NU WAS

14  ONE YOU THINK WAS A POOR DECISION.  CORRECT?

15  **A.**   HIS DECISION TO SEND THE PATIENT TO THE NURSING UNIT WITH

16  --

17  **Q.**   YES, MA'AM.

18  **A.**   -- FEVER AND CONFUSION WAS A POOR DECISION, YES.

19  **Q.**   ALL RIGHT.  DID YOU READ WHAT DR. MATHIS HAS TO SAY ABOUT

20  THAT?

21  **A.**   I DON'T REMEMBER.  HE HAS A LONG REPORT.

22  **Q.**   OKAY.  LET'S GO TO PATIENT NO. 29 NOW.

23  **A.**   OKAY.  YES.

24  **Q.**   ALL RIGHT.  I'D LIKE TO -- LET'S BEGIN WITH JX_29.038.

25          OKAY.  THE GENTLEMAN CAME INTO THE -- OR MADE A

03:07  1  SELF-DECLARED EMERGENCY FOR STOMACH AND BACK PAIN ON THE

2  MORNING OF MARCH 27TH.  CORRECT?

3  **A.**  CORRECT.

4  **Q.**  OKAY.  DO YOU KNOW WHERE HE WENT AFTER THAT?

5  **A.**  I THOUGHT HE -- IT SAYS "M.D."  SO THE RECORD JUST SAYS

6  "M.D." AND THEN THE FOLLOWING RECORD A FEW DAYS LATER SAYS

7  "SICK CALL AS NEEDED."  I THOUGHT HE WENT BACK TO WHEREVER.

8  BUT WHERE DID HE GO?

9  **Q.**  LET'S PULL UP JX_29.082.

10  HE WENT ON SUICIDE WATCH BACK IN HIS QUARTERS.

11  **A.**  I DO REMEMBER, NOW THAT YOU SHOW ME THIS.

12  **Q.**  ALL RIGHT.  NOW LET'S GO LOOK AT JX_29.037.

13  AT THE TOP THERE YOU HAD A DIFFERENT INTERPRETATION

14  OF WHAT -- THAN WHAT THE LSP PERSONNEL HAVE ON THIS.  "PER

15  SECURITY, PATIENT BURNING AROMA IN CELL."

16  **A.**  THERE IS NO "C" IN THE WORD "BURNING."  THERE'S NO "C"

17  HERE.  IT'S HE'S "BOUNCING AROUND IN THE CELL."  A-R-O-U-N-D.

18  **Q.**  ALL RIGHT.  IF SECURITY TELLS THE MEDICAL THAT HE WAS

19  SMOKING SOMETHING IN THE CELL, THAT WOULD PUT THIS IN AN

20  ENTIRELY DIFFERENT LIGHT AS YOU ANALYZE WHAT'S GOING ON HERE.

21  CORRECT?

22  **A.**  HE HAD COTININE, WHICH IS A NICOTINE METABOLITE IN HIS

23  BLOOD ON THE AUTOPSY, AND SO HE WAS SMOKING CIGARETTES AT SOME

24  POINT.

25  **Q.**  AND HE PRESENTS WITH A FEVER OF 108.2.  CORRECT?

03:09 1  **A.**   CORRECT.

2  **Q.**   AND THERE ARE ILLICIT DRUGS THAT WILL CAUSE YOUR FEVER TO

3  SPIKE LIKE THAT.  CORRECT?

4  **A.**   HE HAD NO EVIDENCE OF SUCH DRUG.

5  **Q.**   OKAY.  I'M GOING TO TALK ABOUT THE TESTING IN A MOMENT.

6  LET'S DO IT NOW.  LET'S GO TO JX_29.026, PLEASE.

7  ALL RIGHT.  THIS IS YOUR TOXICOLOGY SCREEN THAT

8  YOU'RE REFERRING TO THAT SHOWS THE ITEMS THAT YOU TALKED ABOUT.

9  RIGHT?

10  **A.**   THIS IS THE TOXICOLOGY, YES.

11  **Q.**   OKAY.  AND WHEN YOU HAVE A TOXICOLOGY SCREEN, YOU GET WHAT

12  YOU TEST FOR.  RIGHT?

13  **A.**   THAT'S ONLY PARTIALLY TRUE.

14  **Q.**   OKAY.  LET'S GO TO PAGE JX --

15  **A.**   BUT LET ME -- JUST TO TELL YOU -- EXCUSE ME FOR SPEAKING

16  UP.  BUT ON THIS KIND OF A TOXICOLOGY SCREEN, LIKE I SAID THIS

17  MORNING, IT DEPENDS ON HOW THE SCREEN IS DONE.  AND SO THAT IS

18  THE -- IT'S IMPORTANT HOW -- WHICH SCREEN IS USED AND WHAT IT'S

19  GOING TO PICK UP.  THAT'S ALL I WANT TO SAY.

20  **Q.**   AND THAT'S ALL I WAS SAYING.  SO WE'RE IN AGREEMENT.

21  LET'S GO TO PAGE JX_29.028.

22  DOWN AT THE BOTTOM, THE NEXT TO THE LAST PARAGRAPH,

23  THERE'S A SENTENCE THAT SAYS "NOTE, NOT ALL ANALYTES IN EACH

24  SPECIFIED COMPOUND CLASS ARE INCLUDED."  DO YOU SEE THAT?

25  **A.**   THAT'S ALWAYS TRUE FOR TOXICOLOGY.

03:10 1   **Q.**   OKAY.  WE TALKED ABOUT SYNTHETIC MARIJUANA.  THERE ARE

2   MANY CHEMICALS THAT MAKE UP -- THAT CAN MAKE UP SYNTHETIC

3   MARIJUANA.  CORRECT?

4   **A.**   SYNTHETIC MARIJUANA CAN BE ANY OF -- BECAUSE IT'S

5   HOMEMADE, YES.

6   **Q.**   IT CAN BE OVER 30 DIFFERENT COMPOUNDS OR CHEMICALS THAT

7   CAN BE USED FOR SYNTHETIC MARIJUANA.  RIGHT?

8   **A.**   YES.

9   **Q.**   AND SYNTHETIC MARIJUANA CAN PRODUCE MANY SYMPTOMS ON THE

10   BODY THAT RANGE -- OF A WIDE RANGE OF SYMPTOMS.  CORRECT?

11   **A.**   YES.  I'VE SEEN HUNDREDS AND HUNDREDS AND HUNDREDS OF

12   CASES OF SYNTHETIC MARIJUANA.

13   **Q.**   AND EVERYTHING FROM INCREASED TEMPERATURE TO STROKE-LIKE

14   SYMPTOMS TO ALTERED MENTAL STATUS TO HEART ATTACK.  IT CAN

15   AFFECT THE BODY IN ALL THOSE WAYS.  ISN'T THAT RIGHT?

16   **A.**   NO.  THE REASON IT'S NOT RIGHT IS BECAUSE IT ALMOST NEVER

17   DOES THAT.  YOU CAN SEE 400 CASES OF SYNTHETIC MARIJUANA AND

18   YOU NEVER SEE HEAT STROKE.  AND IN SOME OF THE REPORTS THAT

19   YOU'RE ALLUDING TO, THEY DID NOT CONFIRM SYNTHETIC MARIJUANA.

20   THESE ARE CASE REPORTS WHERE THERE WAS NO SYNTHETIC MARIJUANA

21   LOOKED AT.  SO THESE CASE REPORTS, LIKE EVERY CASE REPORT, THEY

22   DID NOT CONFIRM THE PRESENCE OF SYNTHETIC MARIJUANA.  I READ

23   THE CASE REPORTS AGAIN THIS MORNING --

24   **Q.**   MA'AM, MA'AM --

25   **A.**   -- AND THE CHAPTER.

03:12 1  **Q.**  -- PLEASE, MA'AM, I'M NOT ASKING ABOUT LSP.  I'M ASKING
2  ABOUT JUST IN GENERAL.
3  **A.**  AND THAT'S WHAT I'M ANSWERING.  I'M ANSWERING YOU --
4  **Q.**  BUT YOU ANSWERED AS TO LSP, AND I'M TALKING --
5  **A.**  I DIDN'T SAY LSP.  I'M TALKING ABOUT SYNTHETIC MARIJUANA,
6  RIGHT.
7  **Q.**  BUT THEN YOU STARTED TALKING ABOUT THE CASE REPORTS IN
8  THIS CASE.  I'M ASKING YOU ABOUT THE EFFECTS THAT SYNTHETIC
9  MARIJUANA CAN HAVE.
10  **A.**  OKAY.  LET ME BE CLEAR.
11  **Q.**  PLEASE.
12  **A.**  HAVING SEEN HUNDREDS AND HUNDREDS OF CASES OF SYNTHETIC
13  MARIJUANA, THEY DO NOT PRESENT WITH HEAT STROKE.  THEY DO NOT
14  PRESENT WITH STROKE-LIKE SYMPTOMS.
15  NOW YOU'RE TELLING ME -- WHEN YOU SAY, YES, THAT'S
16  REPORTED, WHAT I'M TELLING YOU IS THAT IT'S REPORTED IN CASE
17  REPORTS WHERE THEY DID NOT LOOK FOR SYNTHETIC MARIJUANA.  THOSE
18  CASE REPORTS DO NOT CONSIST OF THE CONFIRMATION, SO THAT'S NOT
19  A VALID CASE REPORT.  AND SO IF YOU HAVE -- IF SOMETHING
20  HAPPENS ONE IN 500 TIMES, THAT CAN HAPPEN.  BUT IF YOU SEE THAT
21  ONE IN 500 YOU SEE STROKE-LIKE SYMPTOMS, YOU BETTER TREAT IT
22  LIKE A STROKE UNTIL YOU CONFIRM SYNTHETIC CANNABINOIDS, WHICH
23  IS GOING TO TAKE A LOT OF TIME.
24  **Q.**  ALL RIGHT.  THE PATIENTS DO DIE FROM ILLICIT DRUG USE.
25  CORRECT?

03:13 1   **A.**   OBVIOUSLY WE HAVE AN OPIATE CRISIS IN THIS COUNTRY AND

2   THAT'S ILLICIT. THEY DON'T DIE FROM THIS DRUG PRACTICALLY

3   EVER, IF EVER. I'VE NEVER SEEN A PATIENT DIE OF SYNTHETIC

4   CANNABINOIDS.

5   **Q.**   ALL RIGHT. GOING BACK TO PATIENT 29. ONE OF YOUR

6   COMPLAINTS IS HE NEEDS TO BE COOLED. CORRECT?

7   **A.**   ABSOLUTELY.

8   **Q.**   ALL RIGHT. DO YOU KNOW WHAT STEPS WERE TAKEN TO COOL THE

9   PATIENT?

10   **A.**   WELL, THE REPORT HAS NOTHING ABOUT COOLING IN IT.

11   **Q.**   OKAY. LET'S TURN TO PATIENT NO. 51, PLEASE.

12   **A.**   GO AHEAD.

13       **MR. ARCHEY:** YES, GIVE ME ONE SECOND, YOUR HONOR,

14   WHILE I FIND WHERE I NEED TO GO, PLEASE.

15       **THE COURT:** OKAY.

16       **MR. ARCHEY:** ALL RIGHT. PULL UP, PLEASE, MS. RAGUSA,

17   JX_51_0131 -- 0131 -- PLEASE.

18       **THE COURT:** SO THIS IS PATIENT 51?

19       **MR. ARCHEY:** YES, YOUR HONOR.

20       **THE COURT:** OKAY.

21   **BY MR. ARCHEY:**

22   **Q.**   AND WHILE I STRUGGLE TO GET MY ACT TOGETHER, DO YOU SEE

23   WHERE ICE WAS USED ON SOME OF THE PATIENTS?

24   **A.**   I DID NOT REVIEW A CASE WHERE ICE WAS USED.

25   **Q.**   OKAY. THAT'S WHY I WANT TO SHOW YOU THIS RECORD AS SOON

03:16 1    AS I --

2              **MR. ARCHEY:**  GO TO THE NEXT PAGE, MS. RAGUSA.  GO THE

3    OTHER WAY.  I'M SORRY.  KEEP GOING.

4              ALL RIGHT.  LET'S LEAVE THIS WHILE I GO GET MY ACT

5    TOGETHER IN A SECOND, JUDGE, AND I'LL COME BACK TO THAT.  I

6    APOLOGIZE.  IT WAS TOO MUCH PAPER FLOODING.

7    BY MR. ARCHEY:

8    **Q.**   ALL RIGHT.  LET'S TALK ABOUT PATIENT NO. 25 NOW, PLEASE.

9              ALL RIGHT.  THIS IS A GENTLEMAN WHO HAD ONE EPISODE

10   ON SYNCOPE.  SYNCOPE IS FAINTING, IN LAYMAN'S TERM.  IS THAT

11   FAIR?

12   **A.**   YES.

13   **Q.**   OKAY.  SO IF WE GO TO JX_25.33.

14             ALL RIGHT.  THIS IS WHERE HE PRESENTED.  HE SAID HE

15   STUCK UP -- HE STOOD UP -- I'M SORRY -- TOOK A FEW STEPS AND HE

16   FELT DIZZY.  HE REFUSED TRANSPORT FROM THIS ENCOUNTER.

17   CORRECT?

18   **A.**   YES.

19   **Q.**   AND THERE WAS A TELEPHONE CONFERENCE WITH A NURSE

20   PROVIDER.  CORRECT?

21   **A.**   YES.

22   **Q.**   OKAY.  AND HIS VITAL SIGNS WERE STABLE.  RIGHT?

23   **A.**   THEY WERE FINE.

24   **Q.**   ALL RIGHT.  THE NEXT TIME HE THEN PRESENTS TO THE ATU --

25   I'M SORRY -- CLINIC ON OCTOBER 27, 2020, ABOUT TWO WEEKS LATER

03:18 1 ON JX_25.032.

2          ALL RIGHT.  DO YOU KNOW HOW HE -- THIS APPOINTMENT

3 WAS SET UP?

4 **A.**   WELL, SOMEBODY SET IT UP FOR HIM.

5 **Q.**   AS A RESULT OF THE SELF-DECLARED EMERGENCY --

6 **A.**   THAT'S CORRECT.

7 **Q.**   -- WHERE HE REFUSED TO BE TRANSPORTED.  RIGHT?

8 **A.**   YES, SIR.

9 **Q.**   SO THAT'S GOOD.  RIGHT?

10 **A.**   IT IS GOOD.

11 **Q.**   OKAY.  AND THE PROVIDER CHECKS HIM OUT HERE AND GOES OVER,

12 NOTES THAT HE HAS THE ONE SINGLE EPISODE.  CORRECT?

13 **A.**   CORRECT.

14 **Q.**   ALL RIGHT.  HE HAS AN EKG AND LABS WITH NO PROBLEMS SINCE.

15 RIGHT?

16 **A.**   WELL, HE HAD A NORMAL EKG.  THAT REFERS TO ONE MONTH AGO.

17 **Q.**   OKAY.  AND --

18 **A.**   AND HE DID NOT HAVE -- I DON'T KNOW THAT HE HAD AN EKG.

19 BUT HE DID HAVE A NORMAL SINUS RHYTHM A MONTH AGO WHEN THE --

20 THE PARAMEDICS DO THAT.

21 **Q.**   OKAY.  HIS CBG WAS NORMAL AS WELL, HAD NO PROBLEMS SINCE.

22 RIGHT?

23 **A.**   RIGHT.  AND JUST -- JUST TO SAY, SYNCOPE TIMES ONE IS JUST

24 AS IMPORTANT AS SYNCOPE NO. 2.  ON NO. 2 HE DIED.  SO SYNCOPE

25 TIMES ONE SHOULD NO WAY REASSURE THE PROVIDER.  FAINTING IS

03:19 1  FAINTING AND IT'S IMPORTANT.

2  **Q.**   OKAY.  HE THEN GOES WITH NO OTHER COMPLAINTS UNTIL

3  JANUARY 22, 2021.  CORRECT?

4  **A.**   I DON'T KNOW ABOUT THE "NO OTHER COMPLAINTS."  BUT ANYWAY,

5  HE GOES FURTHER AND THEN HE DROPS DEAD.

6  **Q.**   OKAY.  AND HE WAS TAKEN TO THE ATU AT THAT POINT.  RIGHT?

7  **A.**   YOU COULD -- PLEASE SHOW ME.  I FORGET.  WELL, YOU MEAN

8  WHEN HE DROPPED DEAD HE WAS.  WHEN HE HAD A CARDIAC ARREST?

9  YES.  I THINK THEY MANAGED HIM.

10  **Q.**   THANK YOU.

11       YOU MADE A COMMENT ABOUT APPLYING NARCAN.  YOU HAD NO

12  PROBLEM WITH THAT?

13  **A.**   SAY THAT AGAIN.  I MISSED IT.

14  **Q.**   TO MAKE SURE I'M CORRECT, ON YOUR DIRECT YOU SAID GIVING

15  THIS GENTLEMAN NARCAN ONCE HE WAS FOUND UNRESPONSIVE WAS

16  ACCEPTABLE.  CORRECT?

17  **A.**   WHAT I SAID IS THAT YOU CAN ONLY DO A COUPLE OF THINGS

18  RIGHT.  YOU GIVE A GUY NARCAN.  IF YOU WANT TO GIVE NARCAN TO

19  EVERY PATIENT, EVEN THOUGH HE HAS NO OPIATE TOXIDROME, THAT'S

20  OKAY WITH ME, UNLESS IT INTERFERES WITH THE PROPER APPLICATION

21  OF AED, MOVING THE PATIENT, MAKING PHONE CALLS OR SOMETHING

22  ELSE.  BECAUSE IF YOU DON'T HAVE AN OPIATE TOXIDROME -- AND

23  FAINTING IS NOT PART OF THE OPIATE TOXIDROME IN TERMS OF WHAT

24  HAPPENED HERE.  HE WAS IN FULL ACL, YES.  SO IF THEY WANT TO

25  GIVE NARCAN, GIVE NARCAN ALL DAY LONG.  THEY GAVE NARCAN.  I'M

03:20 1   NOT CRITICIZING THAT.

2         WHAT I'M CRITICIZING IN THIS CASE IS WHAT I'VE

3   ALREADY CRITICIZED.

4   **Q.**   RIGHT.  AND IS IT ACCEPTABLE TO GIVE MORE THAN ONE DOSE OF

5   NARCAN?

6   **A.**   IT'S ALWAYS ACCEPTABLE TO GIVE MORE THAN ONE DOSE OF

7   NARCAN, UNLESS -- THERE'S CERTAIN SITUATIONS WHERE IT'S NOT

8   ACCEPTABLE, IS IF YOU PUT SOMEBODY INTO WITHDRAWAL.  THESE

9   SITUATIONS DO NOT PERTAIN TO LSP.

10   **Q.**   WHEN YOU GIVE SOMEONE NARCAN AND IF THERE'S NO RESPONSE,

11   TWO TO THREE MINUTES LATER YOU CAN GIVE THEM ANOTHER DOSE OF

12   NARCAN.  CORRECT?

13   **A.**   WHY WOULD YOU DO THAT?

14   **Q.**   I'M ASKING YOU --

15   **A.**   OKAY.

16   **Q.**   -- IF THAT'S THE MEDICAL GUIDANCE.

17   **A.**   THAT'S NOT THE MEDICAL PRACTICE.  IF YOU GIVE

18   TWO MILLIGRAMS OF NARCAN -- IT'S A COMPETITIVE ANTAGONIST,

19   MEANING THAT IF YOU HAVE A BIG BUCKET OF OPIATE, THEN YOU NEED

20   TO GIVE A BIG BUCKET OF NARCAN.  IF YOU HAVE MOJO IT DOESN'T

21   WORK, SYNTHETIC CANNABINOIDS AND FENTANYL.  YOU DON'T HAVE TO

22   GIVE MORE.

23   **Q.**   OKAY.

24   **A.**   SO IT'S A COMPETITIVE -- IT'S COMPETING.  IF YOU GIVE A

25   TINY LITTLE BIT OF OPIATE, YOU CAN USE A LOWER DOSE OF

03:21 1  NALOXONE.

2  **Q.**   OKAY.  FENTANYL IS A STRONGER OPIOID.  IT'S A PART OF THE

3  CRISIS THAT EXIST NOWADAYS.  CORRECT?

4  **A.**   FENTANYL IS STRONG AND IT ABSOLUTELY DOES NOT REQUIRE MORE

5  NARCAN.  I SAID THAT IN MY DEPOSITION.  IT'S IN EVERY PAPER.

6  AND IF YOU DON'T KNOW -- IF A PERSON DOESN'T KNOW THAT, THEY

7  JUST DON'T UNDERSTAND FENTANYL.

8  **Q.**   MA'AM, ARE YOU FAMILIAR WITH THE CDC GUIDANCE FOR USE OF

9  NARCAN?

10  **A.**   NO.  I'D LIKE TO KNOW WHO WROTE IT IF YOU'RE GOING TO TELL

11  ME THAT THEY SAID THAT THAT WAS THE CASE.

12  **Q.**   LET ME SHOW YOU THE DOCUMENT.  AND THEN THIS IS ON --

13  OKAY.  IF YOU GO DOWN RIGHT THERE.  "MORE THAN ONE DOSE OF

14  NALOXONE" -- WHICH IS NARCAN.  IS THAT RIGHT?

15  **A.**   YES.

16  **Q.**   -- "MAY BE REQUIRED WHEN STRONGER OPIOIDS LIKE FENTANYL

17  ARE INVOLVED."  CORRECT?

18  **A.**   YES, SIR.  LET'S SEE.  REFERENCE 3, THAT'S ABSOLUTELY

19  FALSE AND INCORRECT.

20  **Q.**   OKAY.  REFERENCE 3, "OPIOID OVERDOSE PREVENTION TOOLKIT."

21  **A.**   OKAY.  SO THIS IS SAMHSA.  THEY DON'T KNOW.  THEY DON'T

22  KNOW.  THIS IS -- THIS IS NOT IN THE TEXTBOOKS.  THEY CAN SAY

23  ANYTHING THEY WANT.  SAMHSA IS NOT -- THE OPIOID OVERDOSE

24  PREVENTION TOOLKIT IS NOT THE REFERENCE TO GO TO.

25              THE REFERENCE TO GO TO IS THE STUDIES AND HOW MUCH

03:23 1  NALOXONE IS NEEDED AND HOW IT BINDS AND HOW IT REVERSES.

2  **Q.** LET'S LOOK -- LET'S LOOK AT THE TOOLKIT THEN.

3  **A.** YOU JUST SHOWED ME AN IMPORTANT RECORD. WHEN YOU GIVE

4  NASAL NALOXONE, YOU MAY NEED MORE BECAUSE OF THE ABSORPTION AND

5  THE SLOWER ABSORPTION. IF I INJECT IT INTRAVENOUSLY -- OR

6  THERE ARE DIFFERENT WAYS TO GIVE IT, SO SHOW ME THE RECORD.

7  **Q.** MA'AM, WE'RE TALKING ABOUT NASALLY ADMINISTERED NARCAN.

8  **A.** NO, YOU NEVER SAID NASALLY ADMINISTERED.

9  **Q.** OKAY.

10  **A.** YOU CAN GIVE IT -- THEY CAN GIVE IT IV, IM. I DON'T KNOW.

11  IT DOESN'T SAY. IT JUST SAYS "NARCAN GIVEN."

12  **Q.** OKAY. HOW DO YOU THINK THEY'RE GIVING NARCAN OUT IN THE

13  PRISON CAMPS WHEN THESE GUYS ARE BEING ADMITTED TO --

14  **A.** I DON'T KNOW. THEY COULD GIVE IT RECTALLY. THEY COULD

15  SHOOT THEM UP WITH IT, GIVE THEM A NEEDLE. THEY COULD GIVE IT

16  IV IF IT'S ACLS. I DON'T KNOW.

17  **Q.** OKAY. SO THE NASAL --

18  **A.** THEY COULD GIVE IT UNDER THE TONGUE, TOO, JUST SO YOU

19  KNOW.

20  **Q.** NASAL NARCAN CAN BE REPEATED EVERY TWO TO THREE MINUTES.

21  CORRECT?

22  **A.** YOU CAN GIVE AS MUCH NARCAN AS YOU WANT. I AM NOT AGAINST

23  NARCAN. GIVE AS MUCH AS YOU WANT.

24  **Q.** AND, IN FACT, MORE THAN ONE DOSE OF NARCAN MAY BE NEEDED

25  TO REVIVE SOMEONE WHO IS OVERDOSING, PARTICULARLY WITH THE

03:24  1   STRONGER OPIOIDS SUCH AS FENTANYL?

2   **A.**   THAT'S INCORRECT.  FENTANYL DOES NOT REQUIRE MORE NARCAN

3   TO GET A -- TO CLEAR THE MENTAL STATUS.

4   **Q.**   SO THE SAMHSA TOOLKIT IS INCORRECT?

5   **A.**   YES, SIR.  AND I'LL MAKE SURE AND ADDRESS IT WHEN I GET

6   OFF THE STAND.

7   **Q.**   YOU'LL BE WHAT?

8   **A.**   I'LL ADDRESS IT WITH SAMHSA.  I'LL TELL SAMHSA THAT'S JUST

9   WRONG.  THEY SHOULD KNOW THAT'S WRONG.  AND IF THEY DON'T KNOW

10   IT, THE NEW YORK CITY POISON CONTROL IN WHICH I WORK, WE ARE

11   THERE TO INFORM THEM.

12   **Q.**   DO YOU RECOGNIZE THE MAYO CLINIC AS A RESPECTED SOURCE?

13   **A.**   THE WHAT?

14   **Q.**   THE MAYO CLINIC.  DO YOU RECOGNIZE THEM AS --

15   **A.**   SOMETIMES.  IT DEPENDS ON WHICH DOCTOR IS WORKING THERE,

16   DOESN'T IT?

17   **Q.**   OKAY.  LET'S LOOK AT THEIR GUIDANCE FOR USE OF NARCAN.  GO

18   DOWN TO THE BOTTOM.  IT SAYS "YOU MAY GIVE ADDITIONAL DOSES TO

19   THE PATIENT EVERY TWO TO THREE MINUTES UNTIL THE PATIENT

20   RESPONDS OR EMERGENCY MEDICAL ASSISTANCE BECOMES AVAILABLE."

21          **MR. DUBNER:**  AND CAN I ASK FOR A COPY OF THIS?

22          **MR. ARCHEY:**  OH, I'M SORRY.  YES.  MY APOLOGIES.

23   **BY THE WITNESS:**

24   **A.**   AND WHAT'S THE POINT?

25   **Q.**   THE POINT IS:  HERE'S ANOTHER AUTHORITY SAYING YOU CAN

03:25 1  GIVE MORE THAN ONE DOSE OF NARCAN.  CORRECT?

2  **A.**   I HAVE SAID I DON'T -- EVERY TIME I DISCUSSED NARCAN THIS

3  MORNING I SAID YOU CAN GIVE AS MUCH AS YOU WANT.  THIS DOESN'T

4  MEAN MAY.  DO WHATEVER YOU WANT TO DO.  BUT THAT DOESN'T MEAN

5  IT'S NECESSARY TO REVERSE THAT, NO.

6  **Q.**   OKAY.  I'M GOING TO SHOW YOU ONE MORE SOURCE AND THEN

7  WE'LL MOVE ON, WHICH IS:  YOU'RE IN NEW YORK STATE.  RIGHT?

8  THAT'S WHERE YOU ARE?

9  **A.**   WELL, I PRACTICE MEDICINE IN NEW YORK.

10  **Q.**   THAT'S RIGHT.

11  **A.**   MANHATTAN, YES.

12  **Q.**   YES, MA'AM.

13       AND MASSACHUSETTS, A NEIGHBORING STATE, THEY HAVE

14  GUIDANCE THAT SAYS "IF NO RESPONSE, KEEP GIVING DOSES EVERY

15  THREE MINUTES, CHANGING NOSTRILS EACH TIME."  YES?

16  **A.**   THAT'S WHAT IT SAYS.  WHAT'S THAT -- I MEAN, YES, THAT'S

17  WHAT IT SAYS, CHANGE NOSTRILS EACH TIME, IN CASE ONE NOSTRIL IS

18  NOT WORKING.  ONE -- SO THIS IS FOR A LAYPERSON.  KEEP GIVING

19  IT, DO SOMETHING.  AND I AM -- THEY CAN GIVE AS MUCH AS THEY

20  WANT, AND LSP AND ALL OF THESE PEOPLE ARE SAYING CALL 911 AND

21  KEEP GIVING THEM NALOXONE.  SPRAY IT IN THEIR NOSTRILS.  IT'S

22  FINE.

23  **Q.**   OUT OF THE 60 CHARTS THAT YOU AND YOUR TEAM SELECTED, DO

24  YOU KNOW HOW MANY HAVE DOCUMENTED USE OF ILLICIT DRUGS?

25  **A.**   NO.  YOU KNOW WHY?  BECAUSE IT DOESN'T MATTER.  ALL IT

03:26 1 DOES IS IMPAIRS THE PROVIDER'S JUDGMENT AND CLINICAL REASONING.

2        SO LET'S SAY THAT EVERY ONE OF THEM USED IT.  IT

3 COULD BE 60 OUT OF 60, AND THAT DOES NOT EXPLAIN THE SERIOUS

4 HARMS AND THE SERIOUS NEEDS OF THESE PATIENTS.  THAT'S WHY --

5 SO LET'S JUST SAY 60; 60 OF THEM USED IT.  LET'S JUST SAY THAT.

6 **Q.**    HOW ABOUT I GIVE YOU THE REAL NUMBER, WHICH IS 20 OUT OF

7 60 HAVE DOCUMENTED PROOF OF ILLICIT DRUG USE.  THERE ARE

8 OTHERS.  THAT NUMBER WOULD INCREASE IF I INCLUDED ONES THAT THE

9 -- THAT WERE SUSPECTED OR BELIEVED.  I'M TALKING ABOUT

10 DOCUMENTED ILLICIT DRUG USE IN 20 OF THE 60 CHARTS.

11 **A.**    YOU SAID THEY ARE SUSPECTED OR WHAT?

12 **Q.**    NO, MA'AM.  I SAID IF I INCLUDED SUSPECTED, THAT NUMBER

13 WOULD GO UP.

14 **A.**    OKAY.  AND HOW WAS IT DOCUMENTED?

15 **Q.**    THE PATIENT ADMITTED IT OR WE GOT A POSITIVE DRUG TEST.

16 **A.**    OKAY.  I'VE EXPLAINED AT GREAT LENGTH -- FIRST OF ALL, I

17 BELIEVE THAT 20 PATIENTS USED ILLICIT -- I WOULD BELIEVE THAT

18 60 OF THEM USED IT.

19 **Q.**    OKAY.

20 **A.**    BUT I'M ALSO SAYING THAT POSITIVE DRUG SCREENS, AS THEY'RE

21 DONE WITH THAT LITTLE TOX CUP ARE -- THERE ARE FALSE POSITIVES,

22 THERE ARE INCORRECT POSITIVES.  AND POSITIVE IS WHAT I WORRY

23 ABOUT, BECAUSE IT MISLEADS THE PROVIDER.

24 **Q.**    THERE ARE PATIENTS WHO HAVE DIED OVER DRUG USE AT LSP,

25 INCLUDING WITHIN THIS SUBSET.  RIGHT?

03:28 1  **A.**   I DON'T REMEMBER THAT A PATIENT HERE OVERDOSED AND DIED

2  OF THE -- OF AN ILLICIT DRUG.  MAYBE I'M NOT AWARE OF ONE OF

3  THE 60 PATIENTS THAT HAD AN OPIATE OVERDOSE AND DIED.

4  **Q.**   PATIENT NO. 31, YOU AGREED WITH ME THAT WAS AN OVERDOSE.

5  **A.**   PATIENT NO. 31?

6  **Q.**   YES, MA'AM.

7  **A.**   THIS IS THE PATIENT WHO HAD MYOCARDIAL INFARCTION.

8  **Q.**   THEY --

9  **A.**   AND THEN I'M GOING TO GO DOWN.  IF YOU SAY I AGREED WITH

10  YOU, THEN I MUST HAVE LOOKED AT THIS FURTHER.

11  **Q.**   IT SAID "ACCORDING TO THE AUTOPSY, HE HAD MULTIPLE DRUG

12  INTOXICATIONS," AND YOU ACCEPTED THAT HE HAD A DRUG OVERDOSE?

13  **A.**   THERE WAS -- I REMEMBER THAT.  I PROBABLY TOLD YOU THAT

14  BECAUSE IF THE AUTOPSY -- THE AUTOPSY DID NOT SHOW THAT THERE

15  WERE -- CAN YOU SHOW ME THE AUTOPSY?

16  **Q.**   MA'AM, DID YOU TELL ME THAT AT YOUR DEPOSITION?

17  **A.**   I DON'T KNOW.  DID I?

18  **Q.**   YES.

19        **MR. ARCHEY:**  LET'S TURN TO THE DEPOSITION, IF WE CAN,

20  MS. RAGUSA.  LET'S GO TO PAGE -- ARE THESE CONDENSED OR NOT?

21  **BY MR. ARCHEY:**

22  **Q.**   LET'S GO TO PAGE 122.

23  **A.**   IN EVERY PATIENT THAT YOU'RE ASKING ME ABOUT IN MY

24  DEPOSITION I REVIEWED, AND WHEN I -- THE MEDICAL EXAMINER -- I

25  WOULD HAVE -- IF THIS PATIENT HAD HIGH LEVELS OF SOME DRUGS

03:29 1    THAT HE OVERDOSED ON, THEN I WOULD KNOW IT.

2    Q.    AND I QUESTIONED YOU ON PAGE 122, ABOUT LINE 6.  IT SAID,

3    "ACCORDING TO THE AUTOPSY, IT SAYS, 'MULTIPLE DRUG

4    INTOXICATIONS.'"

5         LET ME START THERE.  YOU SAID, JUST LIKE YOU DID

6    TODAY, "CAN YOU SHOW ME THE TOXICOLOGY?"  WE DID THAT.  YOU GO

7    OVER TO THE RIGHT ON PAGE 124.  YOU ACCEPTED THE MEDICAL

8    EXAMINER ON THIS.

9         DO YOU SEE THAT?

10   A.    THERE WERE TWO THINGS.  THE CAUSE OF DEATH:  MULTIPLE

11   DRUG INTOXICATIONS AND ATHEROSCLEROTIC AND HYPERTENSIVE

12   CARDIOVASCULAR DISEASE.  I SAID, "I SEE THAT."

13   Q.    ALL RIGHT.  DO YOU KNOW -- ON THE DEATH CHARTS THAT YOU

14   SELECTED FROM, DO YOU HOW MANY OVERDOSES THE AUTOPSIES AND THE

15   MEDICAL CORONER SHOWED SINCE 2019?

16   A.    THE QUESTION WAS IF -- WHAT WAS THE QUESTION?  I'M SORRY.

17   Q.    SORRY.  I'LL TRY IT AGAIN.  IT WAS GARBLED.

18        HOW MANY OVERDOSES THERE WERE SINCE 2019, ACCORDING

19   TO THE AUTOPSIES, OUTSIDE PATHOLOGISTS?

20   A.    THE OVERDOSES THAT OBVIOUSLY RESULTED IN --

21        MR. DUBNER:  OBJECTION.  HE'S ASKING WELL BEYOND THE

22   PATIENTS SHE REVIEWED.

23        THE COURT:  WELL, I AM ASSUMING THAT -- YES, HE'S

24   CORRECT.  YOU WILL NEED TO REPHRASE YOUR QUESTION.  YOU ASKED A

25   BROAD -- BASICALLY ALL AUTOPSIES.  I THINK WHAT YOU INTENDED TO

03:31 1  ASK WAS WITHIN HER SAMPLE SET.  I WILL LET YOU REPHRASE IT.

2  **MR. ARCHEY:**  LET ME MAKE SURE MY QUESTION IS CLEAR.

3  **THE COURT:**  YES.

4  **MR. ARCHEY:**  IT IS BROADER THAN I THINK THE COURT'S

5  UNDERSTANDING.

6  **BY MR. ARCHEY:**

7  **Q.**   AND SO MAYBE -- YOU LOOKED THROUGH DEATH CHARTS TO SELECT

8  THE CHARTS YOU WANTED TO REVIEW.  OF THOSE -- WHICH RECORDS ARE

9  PRODUCED AND A PART OF THIS SUIT -- DO YOU KNOW HOW MANY OF

10  THOSE CHARTS SHOWED OVERDOSES WHERE THE OUTSIDE PATHOLOGIST,

11  THE CORONER, FOUND DRUG OVERDOSES?

12  **A.**   OF THE 60 CHARTS THAT WE REVIEWED?

13  **Q.**   NO, MA'AM.

14  **A.**   I DON'T UNDERSTAND.

15  **Q.**   YOU ASKED FOR EVERY DEATH FROM 2019 FORWARD.  YOU GOT IT

16  AND I WANT -- I'M ASKING YOU:  DO YOU KNOW HOW MANY OF THOSE

17  SHOWED OVERDOSES?

18  **A.**   WELL, I DIDN'T REVIEW ALL OF THE CHARTS.

19  **Q.**   YEAH.  THERE'S 16 OVERDOSES.  ACCORDING TO THE

20  PATHOLOGIST, THE AUTOPSY REPORTS, THERE HAVE BEEN 16 OVERDOSES

21  SINCE JANUARY 1 OF 2019.

22  **MR. DUBNER:**  OBJECTION.  COUNSEL IS TESTIFYING AT

23  THIS POINT.

24  **THE COURT:**  ARE YOU ASKING HER IF SHE KNOWS THEM?

25  ASK HER THE QUESTION.  BUT HE'S RIGHT, YOU ARE GIVING -- YOU

03:32 1   ARE GIVING THE TESTIMONY.  WHAT'S THE QUESTION?

2          **MR. ARCHEY:**  THE QUESTION IS -- I WANT TO -- I HAVE

3   DOCUMENTS HERE WHICH ARE A SUBSET OF -- WHAT'S MY EXHIBIT

4   NUMBER, PLEASE?

5          ONE SECOND, YOUR HONOR.  YOUR HONOR, THESE

6   DOCUMENTS HAVE ALREADY BEEN ADMITTED.  THIS IS THE SUBSET OF

7   THEM SHOWING WHAT I'M SAYING.

8          **THE COURT:**  WHAT'S YOUR EXHIBIT NUMBER?  THAT'S THE

9   POINT.

10         **MR. ARCHEY:**  THE EXHIBIT NUMBER IS --

11         **MR. CONINE:**  DX_2.

12         **MR. ARCHEY:**  -- DX_2, YOUR HONOR.

13         **THE COURT:**  SO THE QUESTION IS, IS DX_2 ALL OF THE

14  DEATH CHARTS.  CORRECT?

15         **MR. ARCHEY:**  YES, MA'AM.

16         **THE COURT:**  OF THOSE -- OF ALL THOSE DEATH CHARTS, DO

17  YOU KNOW AND WOULD YOU AGREE WITH HIM THAT THERE ARE --

18         **MR. ARCHEY:**  SIXTEEN.

19         **THE COURT:**  -- SIXTEEN OVERDOSE DEATHS?

20         **MR. ARCHEY:**  YES, MA'AM.

21  **BY THE WITNESS:**

22  **A.**   I WANT TO SAY -- I'M GOING TO ANSWER YOUR QUESTION, BUT I

23  JUST WANT TO EXPLAIN MY ANSWER.  WHEN A MEDICAL EXAMINER FINDS

24  OUT THE HISTORY, LIKE TWO TO THREE DAYS OF SHORTNESS OF BREATH,

25  THE PATIENT CLEARLY DIDN'T TELL HIM THAT.  THEY GOT THAT FROM

03:33 1 THE CHART.  SO IF SOMEBODY IN THE CHART SAYS "THIS PATIENT USED

2 DRUGS," IT'S -- THAT'S THE MEDICAL EXAMINER.  HE IS GOING TO

3 SAY "THE PATIENT USED DRUGS" AND THIS -- UNLESS HE HAS A

4 TOXICOLOGY THAT SHOWS ELEVATED OPIATES OR WHATEVER IT IS.

5 THERE ARE A LOT OF WAYS YOU CAN KILL YOURSELF WITH DRUGS.

6 THAT'S MY SPECIALTY.  DOES NOT EQUAL -- JUST BECAUSE LSP GAVE

7 HIM A HISTORY, MEDICAL EXAMINERS NEED A HISTORY FROM THE

8 PHYSICIAN AND FROM THE -- SO IF THEY GIVE A HISTORY THAT SAYS

9 HE USED MULTIPLE DRUGS, HE MAY CONCLUDE THAT.  BUT HE HAS TO

10 HAVE -- THE MEDICAL EXAMINER HAS TO HAVE THE EVIDENCE OF THE

11 TOXICOLOGY THAT SUPPORTS THAT CONCLUSION.

12 **Q.**   EVERY ONE OF THESE HAS THE TOXICOLOGY SUPPORTING THIS

13 CONCLUSION, ALL 16?

14 **A.**   I DON'T KNOW.

15       **MR. DUBNER:**  AGAIN, YOUR HONOR, WITHOUT HIM GIVING

16 HER THE DOCUMENTS TO LOOK AT --

17       **MR. ARCHEY:**  I WOULD LIKE TO OFFER THESE INTO

18 EVIDENCE, YOUR HONOR.  THEY ARE ALREADY IN EVIDENCE, SO IT'S

19 JUST A SUBSET TO ALLOW US TO --

20       **THE COURT:**  MARK THEM.

21       YOU'RE GOING TO HAVE AN OBJECTION TO THEM?  THEY

22 ARE ALREADY IN EVIDENCE.

23       **MR. DUBNER:**  I MEAN, WE'LL HAVE TO SEE THE PAGE

24 NUMBERS.  BUT IF HE WANTS TO MARK EACH INDIVIDUAL PAGE NUMBER,

25 THAT'S FINE.

03:34 1    THE COURT:  WHAT'S YOUR EXHIBIT NUMBER?

2    MR. CONINE:  D_2, YOUR HONOR.

3    THE COURT:  THIS IS GOING TO BE A NEW EXHIBIT.

4    MR. ARCHEY:  I UNDERSTAND, YOUR HONOR.

5    THE COURT:  SO YOUR NEXT NUMBER IS PX --

6    MS. MCCAIN:  37.

7    THE COURT:  37?

8    MR. ARCHEY:  NO, YOUR HONOR, IT'S NOT 37.

9    THE DEPUTY CLERK:  47.

10    MR. ARCHEY:  ONE SECOND, YOUR HONOR.

11    MR. DUBNER:  AND IS THERE A COPY OF THE NEW EXHIBIT

12   FOR PLAINTIFFS TO REVIEW?

13    MR. CONINE:  59.

14    MR. DUBNER:  THANK YOU.

15    THE COURT:  ALL RIGHT.  PX_59 HAS BEEN OFFERED.  THE

16   PLAINTIFFS ARE GOING TO REVIEW IT, AND THEN THE COURT WILL --

17    THE DEPUTY CLERK:  "D."

18    THE COURT:  OH, "D."  THAT'S RIGHT, "D."  I'M SORRY.

19   LONG DAY.  OKAY.  DX_59 HAS BEEN OFFERED.  THE COURT WILL

20   RESERVE ADMISSION UNTIL AFTER PLAINTIFFS' COUNSEL IS ABLE TO

21   LOOK AT IT.

22    MR. ARCHEY:  THANK YOU, YOUR HONOR.

23   BY MR. ARCHEY:

24   Q.   ALL RIGHT.  LET'S NOW GO TO PATIENT NO. 54.

25   A.   YES.

03:35 1    **Q.**   ALL RIGHT.  WHEN HE GETS INTO THE ATU WITH CHEST PAIN, LSP
2    DOES A TROPONIN TEST.  CORRECT?

3    **A.**   TROPONIN, YES.

4    **Q.**   TROPONIN.  THANK YOU.  DR. MATHIS HAS CORRECTED ME AS
5    WELL.

6         AND WHAT IS A TROPONIN TEST?  WHAT'S IT TEST FOR?

7    **A.**   TROPONIN IS A TEST THAT LOOKS FOR BASICALLY DEATH OF A
8    CARDIAC CELL.

9    **Q.**   OKAY.

10   **A.**   AND THAT ENZYME LEAKS OUT INTO THE BLOOD AND YOU MEASURE
11   IT.

12   **Q.**   OKAY.  SO THAT'S A TEST TO -- THAT YOU DO FOR HEART ATTACK
13   CONCERNS.  IS THAT FAIR?

14   **A.**   IT'S ONE OF SEVERAL, YES.

15   **Q.**   SURE.  AND ONE OF THE THINGS YOU CAN DO ARE SERIAL
16   TROPONINS.  CORRECT?

17   **A.**   IF THE FIRST ONE IS NEGATIVE LIKE IT WAS IN THIS CASE,
18   YES, IT IS.

19   **Q.**   OKAY.  AND IT WAS NEGATIVE IN THIS CASE.  RIGHT?

20   **A.**   THE EKG SHOWED A HEART ATTACK AS CLEAR AS DAY.

21   **Q.**   ALL RIGHT.  THE TROPONIN WAS NEGATIVE.  RIGHT?

22   **A.**   IRRELEVANT.  WHEN THE EKG SHOWS -- WE DON'T WAIT FOR
23   TROPONINS.  WHEN THE EKG SHOWS A HEART ATTACK, WE DON'T SAY
24   "WHAT'S THE TROPONIN?  LET'S HANG AROUND FOR A WHILE."  WE TAKE
25   THE PATIENT TO THE CATH LAB AND WE START TO TREAT FOR A HEART

03:36 1  ATTACK.  THE EKG HERE SHOWS A HEART ATTACK.

2  **Q.**   I'M GOING TO TALK ABOUT THAT NEXT.  PLEASE ANSWER MY

3  QUESTION.  THE TROPONIN WAS NEGATIVE.  CORRECT?

4  **A.**   I SAID THAT.

5  **Q.**   OKAY.  NOW, LET'S TALK ABOUT THE EKG.  ALL RIGHT.  SO NOW

6  I WANT TO SHOW YOU JX_54.0406.

7       ALL RIGHT.  SO THIS IS THE EKG THAT YOU CONTEND

8  SHOWED A HEART ATTACK?

9  **A.**   THAT'S RIGHT.

10  **Q.**   ALL RIGHT.

11  **A.**   GIVEN THE CIRCUMSTANCES OF THE CHEST PAIN, EKG'S HAVE

12  MEANING AND CONTEXT OF THE HISTORY.

13       **MR. ARCHEY:**  I WANT YOU TO GO UP TO -- TAKE IT WHERE

14  WE CAN SEE THE TOP OF THIS, PLEASE.  THERE YOU GO.

15  **BY MR. ARCHEY:**

16  **Q.**   IT SAYS "PROBABLE INFERIOR MYOCARDIAL INFARCTION" AND

17  "ABNORMAL EKG."  CORRECT?

18  **A.**   IT SAYS THAT.  YOU KNOW, YOU CAN'T RELY ON THESE.  WHEN IT

19  SAYS "ACUTE STEMI," I LOOK AT IT AS NOT ACUTE STEMI.  THESE

20  READINGS -- THIS HAPPENS TO SAY THAT, AND IT DOES SHOW THAT.

21  HOWEVER, ONE CAN NEVER RELY ON THIS.  SO I'M NOT RELYING ON

22  THAT.  THERE WAS NO SUCH READING ON THE PREVIOUS EKG, AND THE

23  HOSPITAL CONFIRMED THAT THE EKG HAD SHOWN A STEMI IN THEIR

24  NOTES.

25  **Q.**   LET'S GO TO DOCUMENT NO. JX_54.0414.

03:37  1              **THE COURT:**  MR. ARCHEY?

2              **MR. ARCHEY:**  YES, MA'AM.

3              **THE COURT:**  CAN I JUST INTERPOSE A QUESTION?  THE

4     NOTE "POSSIBLE LEFT ATRIAL," DOES THE EKG MACHINE ACTUALLY

5     GENERATE THAT NOTE, OR IS SOMEBODY READING THAT?  IS SOMEBODY

6     INTERPRETING THAT?

7              **THE WITNESS:**  THIS IS MACHINE GENERATED, YOUR HONOR.

8              **THE COURT:**  OKAY.  I JUST WANTED TO KNOW.  THAT'S

9     WHAT I THOUGHT.

10              **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

11              **THE COURT:**  BUT I DIDN'T WANT TO ASSUME IT.  ALL

12    RIGHT.  GO AHEAD.

13    **BY MR. ARCHEY:**

14    **Q.**   ALL RIGHT.  VERY GOOD.  NOW I WANT TO SHOW YOU THIS NEXT

15    EKG.  DO YOU SEE THIS ONE?

16    **A.**   YES.

17    **Q.**   SAME FINDINGS?

18    **A.**   ABSOLUTELY NOT.

19    **Q.**   OKAY.  SAME FINDING AT THE TOP THAT THE MACHINE KICKED

20    OUT, JUST LIKE THE JUDGE SAID.

21    **A.**   I JUST POINTED OUT THAT I NEVER RELY ON THE READING.

22    **Q.**   THEN WHEN THE -- WELL, LET'S DO THIS.  LET'S GO TO --

23    THERE IS A SECOND EKG TAKEN LATER IN THE EVENING OF MAY 2ND.

24    THIS IS JX_54_0408.  OKAY.  IT READS -- THIS ONE READS

25    DIFFERENT FROM THE OTHER ONE, DOESN'T IT?

03:39 1   **A.** WHEN YOU SAY "READS," WHAT DO YOU MEAN "READ"? I'M

2   READING IT DIFFERENTLY? I'M READING IT DIFFERENTLY. BUT

3   WHETHER -- THE READ IS IRRELEVANT.

4   **Q.** OKAY. AND THIS IS THE -- BY THIS TIME, THIS IS WHEN A

5   POSITIVE TROPONIN TEST ARRIVES. CORRECT?

6   **A.** I DON'T KNOW. BUT THERE WAS A POSITIVE TROPONIN. THIS

7   EKG IS DIFFERENT FROM THE FIRST TWO THAT SHOWED INFARCTION.

8   **Q.** AND THAT'S WHEN HE'S SENT OUT. CORRECT?

9   **A.** HE'S SENT OUT WITH A POSITIVE TROPONIN INSTEAD OF WHEN THE

10   EKG CLEARLY SHOWED AN ACUTE MYOCARDIAL INFARCTION, WHICH WAS

11   CONFIRMED AT THE HOSPITAL AND WHICH ANY BEGINNER EKG READER CAN

12   READ.

13   **Q.** ALL RIGHT. LET'S GO TO -- I WANT TO TALK ABOUT SOME OF

14   YOUR RECOMMENDATIONS. WE'RE GETTING CLOSE.

15       YOU MADE A NUMBER OF RECOMMENDATIONS. YOU SAID THOSE

16   WERE TO, QUOTE, MAXIMIZE, CLOSE QUOTE, HEALTH CARE AT LSP.

17   CORRECT?

18   **A.** AND BY THAT, I SAID I WANTED TO IMPROVE THE -- WE ARE

19   HERE TO TRY TO IMPROVE THE HEALTH CARE. IT'S NOT SUPPOSED TO

20   BE THE BEST POSSIBLE HEALTH CARE IN THE WORLD AT LSP. IT'S

21   SUPPOSED TO BE IMPROVED. MAXIMIZED AS IN IMPROVED, NOT MAKE IT

22   MAXIMAL. JUST IMPROVE IT.

23   **Q.** BUT YOU USED THE WORD "MAXIMIZED." CORRECT?

24   **A.** AND I JUST EXPLAINED HOW I MEANT IT. I AIM TO IMPROVE IT.

25   IF I MAXIMIZE IT, I'M IMPROVING IT.

03:40 1  **Q.**   ALL RIGHT.

2  **A.**   IT DOESN'T HAVE TO BE THE BEST CARE IN THE WORLD.  I DON'T

3  EXPECT IT AND IT WON'T BE.

4  **Q.**   OKAY.  AND WE'VE GOT A NUMBER OF RECOMMENDATIONS THAT GO

5  BEYOND THE STANDARDS FOR CORRECTIONAL CARE.  ISN'T THAT RIGHT?

6  **A.**   MAY I TURN TO MY RECOMMENDATIONS?  I JUST NEED TO KNOW THE

7  PAGE THAT YOU'RE ON, IF YOU'RE ON A PAGE.  OTHERWISE I'LL JUST

8  FIND IT.

9  **Q.**   107, I BELIEVE IT IS, MA'AM.

10  **A.**   OF OUR EXPERT REPORT?  OKAY.  THANK YOU.  THANK YOU.

11        **THE COURT:**  SO THE QUESTION --

12  **BY MR. ARCHEY:**

13  **Q.**   NO, IT'S NOT THAT PAGE.  IT'S 126.

14  **A.**   THANK YOU.

15  **Q.**   THAT'S WHAT I THOUGHT.  I GOT IT.

16        **THE COURT:**  SO THE QUESTION IS:  WHICH OF THESE

17  RECOMMENDATIONS EXCEED THE CORRECTIONAL STANDARD OF CARE?  IS

18  THAT ESSENTIALLY THE QUESTION?

19        **MR. ARCHEY:**  THAT'S ESSENTIALLY THE QUESTION.

20  **BY THE WITNESS:**

21  **A.**   THERE IS NO SUCH THING AS A CORRECTIONAL STANDARD OF CARE.

22  THERE IS A STANDARD OF CARE.  THERE IS NO CORRECTIONAL STANDARD

23  OF CARE.  WHAT IS THAT?

24  **Q.**   SO YOU APPLY -- THE STANDARD OF CARE FOR BELLEVUE APPLIES

25  AT LSP AS WELL?

03:41 1   **A.**   ABSOLUTELY NOT.  I'M TELLING YOU THERE'S NO CORRECTIONAL

2   STANDARD OF CARE.

3   **Q.**   OKAY.  HOW ABOUT --

4   **A.**   THIS HAS NOTHING TO DO WITH BELLEVUE'S STANDARD OF CARE.

5   **Q.**   ALL RIGHT.  HOW ABOUT THE STANDARD OF CARE THAT SHOULD BE

6   APPLIED AT LSP?  IS THAT THE SAME STANDARD OF CARE THAT IS

7   APPLIED AT BELLEVUE?

8   **A.**   I'M TALKING ABOUT AT LSP THERE SHOULD BE A -- THERE SHOULD

9   BE A RECOGNITION OF SERIOUS MEDICAL NEEDS, AND THAT COULD BE

10   BASED ON THIS RISK.  IT DOESN'T HAVE TO HAPPEN TO EVERY

11   PATIENT, THAT THEY DIE OF SOMETHING WHEN THERE'S A RISK, AND

12   THERE HAS TO BE A SUBSTANTIAL RISK OF SERIOUS HARM.  SO I DON'T

13   KNOW WHY YOU'RE BRINGING BELLEVUE INTO THIS.

14        WE KNOW BELLEVUE IS A BIG CITY HOSPITAL.  WE KNOW

15   THAT LSP -- THIS IS WHY WE'RE HERE.  THERE MIGHT BE A --

16   THERE'S A MORAL STANDARD, THERE'S A LEGAL STANDARD.  BUT THERE

17   IS NO CORRECTIONAL STANDARD OF CARE.

18   **Q.**   OKAY.  WELL, I'M TRYING TO EXPLORE THE STANDARD OF CARE

19   THAT YOU'RE JUDGING YOUR LSP BY.  IT'S THE SAME STANDARD THAT

20   YOU COMPORT WITH AT BELLEVUE.  CORRECT?

21   **A.**   ABSOLUTELY NOT.

22   **Q.**   ABSOLUTELY NOT.

23        OKAY.  SO WHAT IS IT?  THERE'S NOT A CORRECTIONAL

24   STANDARD OF CARE.  IT'S NOT BELLEVUE.  WHAT IS IT?

25   **A.**   WELL, I THINK THAT'S WHY WE HAVE THE JUDGE HERE IN A

03:42 1    FEDERAL COURT.  I THINK IT -- THERE'S A CONSTITUTIONAL

2    STANDARD, THERE IS A MORAL, THERE IS A DECENT THING.  AND

3    THERE'S THE -- AND THE APPLICATION OF -- SO THE STANDARD OF

4    CARE FOR SOMEBODY COULD BE A MINIMAL STANDARD OF CARE THAT

5    MEETS CONSTITUTIONAL STANDARDS.  THERE IS A LEGAL QUESTION

6    YOU'RE ASKING ME.  AND TO THE BEST OF MY ABILITY, I'M ANSWERING

7    AS A PHYSICIAN.  IT'S GOT NOTHING TO DO WITH BELLEVUE OR BIG

8    CITY EMERGENCY MEDICINE.  IT'S GOT EVERYTHING TO DO WITH

9    MEETING THE SERIOUS MEDICAL NEEDS OF THESE PATIENTS.

10   **Q.**   BUT, MA'AM, YOU SAID NUMEROUS TIMES THAT IT'S A BREACH OF

11   STANDARD OF CARE, THIS IS BAD MEDICINE; THINGS LIKE THAT.

12   **A.**   WAIT, WAIT, WAIT.  I NEVER SAID ANY OF THE WORDS YOU JUST

13   SAID.  I NEVER SAID THE WORD "BAD MEDICINE."

14   **Q.**   OKAY.

15   **A.**   WHAT --

16   **Q.**   YOU SAID THERE WERE BREACHES OF THE STANDARD OF CARE.  YOU

17   SAID --

18   **A.**   I NEVER SAID THOSE WORDS, IN DEPOSITION AND NOT TODAY.  I

19   NEVER SAID BREACHES OF THE STANDARD OF CARE.

20   **Q.**   ARE THERE BREACHES OF THE STANDARD OF CARE?

21   **A.**   THAT'S NOT A QUESTION THAT I CAN ANSWER.  THAT IS SO

22   BROAD.  THE ANSWER IS THAT I OBSERVED POOR CARE, DECENT CARE

23   THAT DID NOT MEET THE SERIOUS MEDICAL NEEDS OF THE PATIENTS.

24   AND THAT'S WHAT I OBSERVED.

25   **Q.**   WAS IT BELOW THE STANDARD OF CARE?

03:44 1    **A.**   SO IF YOU HAVE -- I DO BELIEVE THAT IF A PATIENT IS HAVING

2    A STROKE IN FRONT OF YOU, THE STANDARD OF CARE -- AND YOU

3    CANNOT ADMINISTER ANY TREATMENT FOR A STROKE THAT IS CURRENTLY

4    -- "CURRENTLY" BEING THE LAST TEN YEARS, TEN YEARS, AND WAS IN

5    PLACE FOR TEN YEARS -- YOU SHOULD SEND THE PATIENT TO A

6    HOSPITAL.  TO THE EXTENT THAT THAT'S THE STANDARD OF CARE

7    STANDARD, I BELIEVE THAT THE PATIENT SHOULD RECEIVE TREATMENT,

8    AND THAT MAY BE JUST SIMPLY SENDING THE PATIENT TO THE

9    HOSPITAL.

10    **Q.**   MA'AM, THERE ARE DRUGS THAT WILL CAUSE HYPER -- THE

11    ELEVATED TEMPERATURE.  CORRECT?

12    **A.**   IN AND OF THEMSELVES?

13    **Q.**   ILLICIT DRUGS?

14    **A.**   LIKE AN OVERDOSE?

15    **Q.**   THERE ARE ILLICIT DRUGS IN WHICH YOU CAN OVERDOSE THAT

16    CAUSE YOU TO HAVE ELEVATED TEMPERATURE.  CORRECT?

17    **A.**   COCAINE IS A GREAT EXAMPLE.  IT'S ALL THE MOTOR MOVEMENT:

18    YOU'RE MOVING, YOU'RE RUNNING, WHATEVER.  IF YOU CREATE MOTOR

19    MOVEMENT OR YOU ALREADY HAVE BENADRYL OR SOMETHING LIKE THAT,

20    THAT'S IMPAIRING YOUR ABILITY TO -- OR SOMETHING THAT'S

21    IMPAIRING THE ABILITY OF THE HEART.  AS YOU KNOW, I CAN TALK

22    ABOUT THIS FOREVER.  SO THE ANSWER IS THAT THERE ARE SOME

23    ILLICIT DRUGS IN THE OVERDOSE SETTING THAT CAN CAUSE HEAT

24    STROKE, YES.

25    **Q.**   OKAY.  AMPHETAMINES AS WELL?

03:45 1    **A.**   YES.

2    **Q.**   OKAY.  AND WHEN WE TALK ABOUT METHAMPHETAMINES, DOES THAT

3    INCLUDE AMPHETAMINES?

4    **A.**   YES.

5    **Q.**   MA'AM, I WANT TO TALK ABOUT YOUR SITE VISIT FOR JUST A

6    SECOND.  YOU HAVE NO CRITICISMS OF THE CARE YOU OBSERVED IN THE

7    ATU DURING YOUR SITE VISIT.  CORRECT?

8    **A.**   WHERE DID YOU GET THAT?

9    **Q.**   I GOT IT DIRECTLY FROM YOUR DEPOSITION.  BUT I'M JUST

10   ASKING YOU THE QUESTION.

11   **A.**   THAT'S CORRECT.

12   **Q.**   OKAY.  AND, IN FACT, YOU OBSERVED A REALLY GOOD ENCOUNTER

13   BETWEEN NURSE PRACTITIONER JEREMY DEDEAUX AND A PATIENT WHO WAS

14   HAVING PROBLEMS WITH HIS DIABETES.  CORRECT?

15   **A.**   LET'S PUT IT THIS WAY:  I OBSERVED -- WHEN YOU AND I STOOD

16   IN THE DOORWAY TOGETHER WE OBSERVED NURSE PRACTITIONER JEREMY

17   AND THE PATIENT.  AND WHAT WE REALLY OBSERVED WAS A SHOCKING

18   CONFUSION.  THE PATIENT SAID HE'S TAKING THE OTHER FIVE

19   MEDICATIONS AND JEREMY SHOWED THEM TO THE PATIENT.

20           HE SAID, "I'M NOT GETTING THOSE TWO."

21           SO JEREMY SAID, "WHAT DO YOU MEAN?"

22           HE SAID, "I DON'T GET THOSE TWO.  I'M TAKING THE

23   OTHER FIVE."

24           THE COMPUTER WAS IN FRONT OF THE PATIENT, JEREMY --

25   NURSE PRACTITIONER JEREMY.  AND HE GOES, "WHAT'S HAPPENING

03:46 1  HERE?"  COMPLETE CONFUSION RIGHT IN FRONT OF YOU AND ME.

2        THE PATIENT DIDN'T HAVE CERTAIN MEDICATIONS.  HE WAS

3  GETTING MEDICATIONS HE WASN'T SUPPOSED TO GET AND JEREMY WENT

4  NUTS.  IT'S LIKE, I'M GOING OUT THERE.  THIS IS NOT GOING TO

5  HAPPEN ANYMORE.

6        SO, I MEAN, THAT -- WAS THE PATIENT NICE?  YES.  WAS

7  JEREMY NICE?  YES.  BUT IT WAS -- THE CARE WAS CONFUSED AND A

8  MESS WITH REGARD TO THE PATIENT'S MEDICATIONS.

9  **Q.**   JEREMY EDUCATED THE PATIENT ABOUT WHY HE NEEDED TO TAKE

10 HIS MEDICATIONS.  CORRECT?

11 **A.**   HE DID.

12 **Q.**   JEREMY SPENT A LOT OF TIME WITH THE PATIENT EXPLAINING TO

13 HIM THE SERIOUSNESS OF HIS CONDITION.  CORRECT?

14 **A.**   YES, HE DID.

15 **Q.**   AND JEREMY EXPLAINED TO HIM EVEN SOME OF THE CONSEQUENCES

16 AND HAD A VERY COLLOQUIAL EXCHANGE WITH HIM?

17 **A.**   THAT'S A VERY NICE WAY TO PUT IT.

18 **Q.**   IT WAS.  THE PATIENT TOLD JEREMY THAT HE WAS UP FOR PAROLE

19 IN THE NEXT SIX MONTHS, I BELIEVE IT WAS?

20 **A.**   THAT'S RIGHT.

21 **Q.**   OKAY.  AND WHAT DID JEREMY THEN TELL HIM?

22 **A.**   JEREMY TOLD HIM "IF HE WANTS TO USE THE THING BETWEEN HIS

23 LEGS, HE BETTER TAKE CARE OF HIS DIABETES."

24 **Q.**   JEREMY WAS BEING VERY COMPASSIONATE WITH THIS PATIENT,

25 WASN'T HE?

03:47 1 **A.** HE WAS.

2 **Q.** THE MORNING MEETING WHERE THE PROVIDERS TALK THROUGH

3 PATIENT CARE, THAT'S A GOOD THING, ISN'T IT?

4 **A.** YES.

5 **MR. DUBNER:** OBJECTION. OUR EXPERTS WEREN'T ALLOWED

6 TO REVIEW THE MORNING MEETINGS.

7 **THE COURT:** I DID NOT HEAR ANYTHING BUT THE WORD

8 "OBJECTION." OBJECTION WHAT?

9 **MR. DUBNER:** SORRY. OBJECTION. THIS IS SOMETHING

10 OUR EXPERTS WERE PRECLUDED FROM REVIEWING. THEY WEREN'T

11 ALLOWED TO ATTEND THE MORNING MEETINGS. SO THE OBJECTION IS

12 403, UNFAIR PREJUDICE.

13 **THE COURT:** WERE THEY ALLOWED TO REVIEW THE -- WHAT

14 WAS YOUR QUESTION?

15 **MR. ARCHEY:** THAT THE MORNING MEETINGS WHERE THE

16 PROVIDERS TALK THROUGH PATIENT CARE IS A GOOD THING.

17 **THE COURT:** SUSTAINED.

18 BY MR. ARCHEY:

19 **Q.** DR. VASSALLO, YOU READ DEPOSITIONS THAT DISCUSSED THE

20 MORNING MEETING?

21 **A.** I DID.

22 **Q.** AND THE DEPOSITIONS THAT YOU READ DISCUSSED IN THE MORNING

23 MEETING, THAT WOULD BE A GOOD THING. RIGHT?

24 **A.** I DON'T UNDERSTAND THE QUESTION.

25 **Q.** RIGHT. THE DESCRIPTIONS OF THE MORNING MEETING THAT IS

03:48 1  SHOWN IN THE DEPOSITIONS, IT'S A GOOD THING THAT THERE'S A

2  MORNING MEETING GOING ON?

3  **A.**   I SPECIFICALLY REMEMBER THAT DR. TOCE SAID HE MISSED THE

4  LAST FEW, WHICH WAS SHOCKING.  AND SO THERE'S NOT -- EVERYTHING

5  ABOUT THE MEET -- I THINK MORNING MEETINGS DISCUSSING PATIENTS

6  ARE GOOD.  WHAT HAPPENS IN THE MEETING, I DON'T KNOW.  WHO'S

7  ATTENDING, I DON'T KNOW.  AND I CERTAINLY DIDN'T SEE THE

8  MORNING MEETING, ALTHOUGH WE VERY MUCH WOULD HAVE LIKED TO.

9  **Q.**   RIGHT.

10        **MR. ARCHEY:**  AND, YOUR HONOR, I NEED TO ADDRESS THAT.

11  AND I THINK I DID EARLIER WITH THE COURT ABOUT THE MORNING

12  MEETING AND WHAT WENT ON DURING THE SITE VISIT, IF I MAY, OR

13  CAN I --

14        **THE COURT:**  NO, YOU MAY NOT.  WE'RE NOT -- THIS ISN'T

15  ARGUMENT.

16        GO AHEAD.  THIS IS QUESTIONS, ANSWERS,

17  OBJECTIONS.  NEXT QUESTION.

18  **BY MR. ARCHEY:**

19  **Q.**   LSP HAS ADDED ADDITIONAL NURSE PRACTITIONERS TOWARD THE

20  END OF 2021 AND INTO 2022.  CORRECT?

21  **A.**   YES.

22  **Q.**   AND THE USE OF THE NURSE PRACTITIONERS ON SICK CALL IS

23  GOING TO IMPROVE CARE AT LSP.  CORRECT?

24  **A.**   THE USE OF A NURSE PRACTITIONER ON SICK CALL HAS IMPROVED

25  --

03:49 1          **MR. DUBNER:** OBJECTION. DR. VASSALLO IS TESTIFYING
    2  ABOUT EMERGENCY CARE, NOT ROUTINE SICK CALL.
    3          **THE COURT:** THE OBJECTION IS TO RELEVANCE, I GUESS.
    4  I DON'T KNOW. IT'S AN OBJECTION. WHAT?
    5          **MR. ARCHEY:** I'VE GOT HER ON CROSS-EXAMINATION. SHE
    6  TOLD ME THIS AT HER DEPOSITION.
    7          **THE COURT:** SHE DIDN'T TESTIFY TO SICK CALL. I DON'T
    8  CARE WHAT SHE TESTIFIED TO IN HER DEPOSITION. BEYOND THE SCOPE
    9  OF DIRECT. SUSTAINED.
   10          **MR. ARCHEY:** YOUR HONOR, IF I MAY?
   11          **THE COURT:** YOU MAY.
   12          **MR. ARCHEY:** I HAVE BEEN INSTRUCTED THAT I SHOULD
   13  OFFER EXHIBIT DX_50, WHICH IS THE SELF-DECLARED EMERGENCY MEMO.
   14  I NEED TO OFFER THAT INTO EVIDENCE.
   15          **THE COURT:** THAT'S THE MAY 2022 MEMO? OKAY.
   16          **MR. ARCHEY:** IT IS, YOUR HONOR.
   17          **THE COURT:** ANY OBJECTION?
   18          **MR. DUBNER:** PLAINTIFFS PRESERVE THEIR OBJECTION ON
   19  THE LATE DISCLOSURE AND ON *BROWN V. PLATA*. BUT WE UNDERSTAND
   20  IT'S BEEN OVERRULED.
   21          **THE COURT:** YES. ADMITTED.
   22  **BY MR. ARCHEY:**
   23  **Q.** DR. VASSALLO, IT WAS A PLEASURE, AS ALWAYS. THOSE ARE MY
   24  QUESTIONS.
   25  **A.** I LOVE TALKING TO YOU, MR. ARCHEY.

03:51 1    **Q.**   THANK YOU FOR SAYING THAT.

2            **THE COURT:**  I WISH I COULD SAY IT WAS SUCH A PLEASURE

3    LISTENING TO ALL THIS.

4                    GO AHEAD.

5                    I LEARNED A LOT.  IT'S NOT SAYING THAT WASN'T

6    PLEASURABLE, BUT -- REDIRECT.

7            **THE WITNESS:**  OH, I THOUGHT I WAS DONE.

8                    **REDIRECT EXAMINATION**

9    **BY MR. DUBNER:**

10   **Q.**   I'LL TRY TO KEEP IT, IF NOT PLEASURABLE, AT LEAST BRIEF.

11           **THE COURT:**  GO AHEAD, MR. DUBNER.

12   **BY MR. DUBNER:**

13   **Q.**   I'M GOING TO BE GOING BASICALLY BACK TO THE BEGINNING OF

14   THE CROSS-EXAMINATION, SO SORRY TO TAKE YOU BACK A FEW HOURS.

15                   BUT TO BEGIN, COUNSEL ASKED YOU -- SAID IT DOESN'T

16   TRY TO BE AN EMERGENCY ROOM, SPEAKING OF THE ATU.  DO YOU

17   RECALL THAT?

18   **A.**   I DO.

19   **Q.**   DID YOU SEE EXAMPLES OF THE DEFENDANTS DESCRIBING THE ATU

20   AS AN EMERGENCY ROOM WHEN YOU REVIEWED DEPOSITIONS?

21   **A.**   I DID.

22   **Q.**   SO, FOR EXAMPLE, IF WE COULD PULL UP JOINT EXHIBIT 70_A AT

23   PAGE 75.

24           **MR. DUBNER:**  AND THIS IS NOT SEALED.

25   **BY MR. DUBNER:**

03:52 1    Q.   SO, FOR EXAMPLE, THIS IS A -- I'LL REPRESENT TO YOU THAT
     2    THIS IS THE DEPOSITION OF DR. LAVESPERE, THE STATEWIDE MEDICAL
     3    DIRECTOR.  CAN YOU READ, STARTING AT LINE 15, THE SENTENCE
     4    BEGINNING -- OR THE TWO SENTENCES BEGINNING "I SAW"?
     5    A.   "I SAW A LOT OF DEFICIENCIES IN THAT DEPARTMENT.  THAT'S
     6    WHY WE HAVE RNS RUNNING THE EMERGENCY ROOM NOW."
     7    Q.   AND THEN, FOR EXAMPLE, IF WE GO TO PAGE 85.
     8         MR. DUBNER:  AND IF YOU COULD ZOOM THAT OUT.  THANK
     9    YOU.
    10    BY MR. DUBNER:
    11    Q.   AND IF YOU COULD READ THE FIRST TWO LINES THERE.  SORRY.
    12    LINE 7 AND THE FIRST HALF OF LINE 8.
    13    A.   "THE FIRST ONE.  I THOUGHT THAT WE NEEDED RNS IN THE
    14    EMERGENCY ROOM."
    15    Q.   THANK YOU.
    16         AND THEN LET'S GO TO PAGE 108 OF THE REPORT, WHICH IS
    17    PLAINTIFFS' EXHIBIT 1A.
    18         THESE ARE THE STANDARDS THAT COUNSEL ASKED YOU ABOUT,
    19    AND I'M GOING TO FOCUS YOUR ATTENTION ON THE ONE -- THE MAIN
    20    ONE THAT WAS DISCUSSED:  "EMERGENCY ON-CALL PHYSICIAN, DENTAL,
    21    AND MENTAL HEALTH SERVICE WHEN THE EMERGENCY HEALTH CARE
    22    FACILITY IS NOT NEARBY."
    23         WHILE IT'S NOT A FULL EMERGENCY ROOM, DOES LSP HAVE
    24    AN EMERGENCY HEALTH CARE FACILITY?
    25    A.   WELL, THE ATU IS WHERE THEY TAKE THEIR EMERGENCIES.

03:53  1    IS THAT WHAT YOU'RE ASKING ME?

2    **Q.**    YES.

3            AND WOULD SAY THAT THAT IS NEARBY?

4    **A.**    OH, YES.

5    **Q.**    AND YOU SAID -- TESTIFIED ON BOTH DIRECT AND CROSS THAT

6    THE PROVIDER WHO IS ON CALL COMING IN WITHIN 15 MINUTES, THAT'S

7    ACCEPTABLE.  DID YOU SEE THAT HAPPENING ROUTINELY IN THE CHARTS

8    YOU REVIEWED?

9    **A.**    NO.

10            **MR. DUBNER:**  IF WE COULD BRING UP DEFENDANTS' EXHIBIT

11    50.

12    **BY MR. DUBNER:**

13    **Q.**    SO TWO QUESTIONS ABOUT THIS.

14            FIRST, COUNSEL REPRESENTED THAT THE EMTS WOULD NOW BE

15    USING FACETIME FOR SOME OR ALL -- I DON'T KNOW -- CALLS TO

16    PROVIDERS.  FROM YOUR PERSPECTIVE, IS THAT DIFFERENT --

17    SUBSTANTIALLY DIFFERENT FROM A PHONE CALL TO A PROVIDER?

18    **A.**    IT COULD BE IF THE FACETIME IS NOT FACE TO FACE BUT IT'S

19    LIKE FACE TO LEG OR SOMETHING LIKE THAT, LIKE IF THE LEG IS THE

20    PROBLEM AND THEY WANT TO SHOW THE LEG OR A RASH.  BUT OTHER

21    THAN THAT, IT'S ESSENTIALLY -- AND IF THEY START TALKING TO THE

22    PATIENT AT GREAT LENGTH AND TAKING A PROPER HISTORY, IT MAY BE

23    BETTER.  IT'S FACETIME.

24    **Q.**    UH-HUH.

25    **A.**    AND SO A PHONE CALL MIGHT ALSO DO THAT.

03:54 1  **Q.**   A PROPER HISTORY, FOR EXAMPLE, COULD BE TAKEN BY A PHONE
2  CALL WITHOUT FACETIME?
3  **A.**   OH, YES.  YES, RIGHT.
4  **Q.**   AND IN A TELEMEDICINE APPOINTMENT, THAT'S ALSO DONE OVER
5  SORT OF A VIDEO SCREEN.  RIGHT?
6  **A.**   YES.
7  **Q.**   FOR TELEMEDICINE, IS THERE USUALLY EQUIPMENT THAT IS
8  AVAILABLE SO THAT THE PROVIDER CAN EXAMINE THE PATIENT IN
9  VARIOUS WAYS?
10  **A.**   YES.
11  **Q.**   IS THAT THE CASE IN FACETIME?
12  **A.**   IS THAT --
13  **Q.**   IS THAT THE CASE WITH FACETIME ON A CELL PHONE?
14  **A.**   NO.
15  **Q.**   AND THEN IF WE COULD PULL UP DX_15 FROM THE LIABILITY
16  TRIAL.
17          YOU WERE ASKED ABOUT THE LOUISIANA LAW AND HOW IT
18  APPLIES TO EMTS AND EMTS OPERATING UNDER PROTOCOLS.
19          **MR. ARCHEY:**  YOUR HONOR, I OBJECT.
20          **THE COURT:**  WHAT'S YOUR OBJECTION?
21          **MR. ARCHEY:**  THE APPLICABILITY -- RELEVANCE WOULD BE
22  THE OBJECTION.
23          **THE COURT:**  ON CROSS YOU SPECIFICALLY ASKED HER ABOUT
24  LOUISIANA LAW AND WHAT IT PERMITTED EMT'S SCOPE TO BE.
25  OVERRULED.

03:55 1          **MR. ARCHEY:**  THIS IS 2015, IS MY OBJECTION, THOUGH.
      2   IT'S WHAT HE'S SHOWING.
      3          **MR. DUBNER:**  I'M NOT AWARE OF A -- I'M NOT AWARE OF A
      4   CHANGE, CERTAINLY TO THE PIECE THAT WE'RE GOING TO BE TALKING
      5   ABOUT.  I WAS USING THE VERSION THAT WAS IN THE PREVIOUS TRIAL
      6   BECAUSE --
      7          **THE COURT:**  I'LL ALLOW IT.  IF IT'S -- IF IT'S NOT
      8   THE CURRENT STANDARD, I'M SURE THAT MISTER -- THE CURRENT STATE
      9   OF THE LAW, I'M SURE MR. ARCHEY CAN POINT THAT OUT WITH HIS
     10   EXPERT.  OVERRULED.
     11   **BY MR. DUBNER:**
     12   **Q.**   AND SO THE SCOPE OF PRACTICE MATRIX THAT ALLOWS -- THAT
     13   ALLOWS EMTS TO PROVIDE PURSUANT -- TO PRACTICE PURSUANT TO
     14   PROTOCOLS THAT ARE MADE BY THE SUPERVISING PHYSICIAN.  IS THAT
     15   CORRECT?  MORE OR LESS.  I MAY NOT HAVE --
     16   **A.**   MORE OR LESS, YES.
     17   **Q.**   COULD YOU READ -- THERE'S A SENTENCE I'VE HIGHLIGHTED.
     18   COULD YOU READ THAT SENTENCE?
     19   **A.**   YES.  "EMPLOYERS AND/OR AGENCIES, SPECIFIC MEDICAL
     20   DIRECTORS MAY LIMIT BUT NOT EXPAND THE SCOPE OF PRACTICE."
     21   **Q.**   AND HOW, IF AT ALL, DOES THAT APPLY TO PROTOCOLS LIKE THE
     22   INDIVIDUAL TREATMENT ORDERS?
     23   **A.**   THE INDIVIDUAL TREATMENT ORDERS, THE MOST IMPORTANT ONES,
     24   REQUIRE A DIAGNOSIS; AND THAT IS, A DIAGNOSIS IS ABOVE AND
     25   BEYOND THE SCOPE OF PRACTICE OF EMERGENCY EMTS OR PARAMEDICS.

203

03:57  1            **MR. DUBNER:**  WE CAN TAKE THAT DOWN.

2    **BY MR. DUBNER:**

3    **Q.**   I AM NOW GOING TO MOVE TO STROKES IN SOME OF THE PATIENTS

4    THAT WERE DISCUSSED ON CROSS.

5            FIRST OFF, THE FOUR-AND-A-HALF-HOUR WINDOW THAT WE'VE

6    -- OH.  AND ACTUALLY -- I'M SORRY -- THERE'S ONE MORE THING I

7    HAVE ON DEFENDANTS' EXHIBIT 50, IF WE COULD GO BACK.

8            **MR. DUBNER:**  THANK YOU, RACHEL.

9    **BY MR. DUBNER:**

10   **Q.**   I THINK YOU WERE DIRECTED, IF I REMEMBER RIGHT -- I'M NOT

11   CERTAIN -- TO NO. 3:  "ANY TREATMENT THAT WILL BE PROVIDED TO

12   THE OFFENDER POPULATION OUTSIDE OF THE INDIVIDUAL TREATMENT

13   ORDERS WILL REQUIRE THE EMT HEALTH CARE PROFESSIONAL TO CONTACT

14   THE ON-CALL HEALTH CARE PRACTITIONER."

15           DOES THIS SAY ANYTHING ABOUT WHAT THE EMT SHOULD OR

16   NEEDS TO DO WHEN THEY DON'T PROVIDE ANY TREATMENT?

17   **A.**   NO.

18   **Q.**   AND WHEN THEY DESIGNATE A CHART FOR M.D. REVIEW AND IT --

19   THE CHART IS SENT OFF TO A PROVIDER TO REVIEW, IS THAT

20   COMMONLY WHEN YOU SEE THAT "M.D." OR "M.D. REVIEW" ACCOMPANIED

21   BY TREATMENT IN YOUR REVIEW OF THE CHARTS?

22   **A.**   NO.

23           **MR. DUBNER:**  OKAY.  NOW YOU CAN TAKE IT DOWN.  THANK

24   YOU.

25   **BY MR. DUBNER:**

1    **Q.**   SO NOW TO MOVE TO STROKES.

2             THE FOUR-AND-A-HALF-HOUR WINDOW IS THE MOST IMPORTANT

3    PART OF STROKE CARE, TYPICALLY WITHIN THAT FOUR-AND-A-HALF-HOUR

4    WINDOW?

5    **A.**   IT MAY OR MAY NOT BE.

6    **Q.**   SO LET ME REPHRASE.

7             THE FOUR-AND-A-HALF WINDOW, IS THE CARE IN THAT TIME

8    TYPICALLY PARTICULARLY IMPORTANT?

9    **A.**   IT'S IMPORTANT TO THE ADMINISTRATION OF TPA THE -- THE

10   LYTIC.

11   **Q.**   AND DOES THE PROMPTNESS OF CARE STOP BEING IMPORTANT AFTER

12   THAT WINDOW?

13   **A.**   DOES THE WHAT?

14   **Q.**   DOES THE PROMPTNESS OF THE CARE, THE TIMELINESS OF CARE,

15   DOES IT STOP BEING IMPORTANT AFTER THAT?

16   **A.**   IT'S SO IMPORTANT AFTER THAT, BECAUSE EVERY BIT OF TIME

17   WHERE THAT CLOT SITS IN THAT BLOOD VESSEL, THAT PART OF THE

18   BRAIN THAT THAT BLOOD VESSEL FEEDS IS NOT GETTING OXYGEN, SO

19   IT'S CRITICAL.

20   **Q.**   AND ARE THERE TREATMENTS THAT CAN BE PROVIDED AFTER THE

21   WINDOW THAT -- WHETHER OR NOT THEY'RE AS EFFECTIVE AS TPA --

22   WOULD STILL HAVE A POTENTIALLY SIGNIFICANT EFFECT ON THE

23   DEFICITS THAT A PATIENT MIGHT BE LEFT WITH OR THE RISK THAT

24   THEY'D FACE?

25   **A.**   I MEAN, CATHETER -- IN THE LAST -- 2012, TWO THOUSAND --

03:59 1  ABOUT THE LAST TEN YEARS OR SO, CATHETER REMOVAL -- CALLED

2  EMBOLECTOMY WHERE YOU MOVE THE -- NOT CATHETER -- CATHETER

3  REMOVAL OF A BLOOD CLOT HAS REVOLUTIONIZED STROKE CARE.

4  **Q.**   AND WHEN YOU SAY "REVOLUTIONIZED," DO YOU MEAN THAT IS

5  SOMETHING THAT IS CUTTING EDGE AND JUST AVAILABLE IN THE LAST,

6  YOU KNOW, FEW MONTHS?  OR IS THAT SOMETHING THAT'S BEEN THE

7  CASE FOR A WHILE?

8  **A.**   AT LEAST TEN YEARS.

9  **Q.**   NOW IF WE COULD LOOK AT PATIENT 56, STARTING AT PAGE 53 OF

10  JOINT EXHIBIT 56.

11       SO JUST BRIEFLY ON THIS.  THIS WAS A SELF-DECLARED

12  EMERGENCY THAT YOU WERE -- I THINK YOU WERE ASKED ABOUT AND

13  WERE SHOWN.  I BELIEVE THIS WAS THREE DAYS BEFORE THE PATIENT'S

14  STROKE.  WHAT, FIRST OFF, IS THE DISPOSITION THAT THE EMT GAVE?

15  **A.**   M.D.  IT LOOKS LIKE M.D.  I THINK IT'S M.D.

16  **Q.**   AND THEN LOOKING AT THE RIGHT-HAND SIDE WHEN THE M.D.

17  REVIEWED IT, DO YOU SEE ANY DISCUSSION OF THE REQUEST THERE?

18  **A.**   I JUST SEE A BLUE SIGNATURE AND ANOTHER SIGNATURE.

19  **Q.**   AND DO YOU RECOGNIZE THE SIGNATURE WITH THE SLASH OVER IT

20  AS DR. LAVESPERE'S SIGNATURE?

21  **A.**   I DON'T.  THAT'S ONLY BECAUSE I DON'T KNOW HIS SIGNATURE

22  WELL ENOUGH.

23  **Q.**   THAT'S FINE.

24       AND DO YOU SEE A DATE THERE ANYWHERE WHERE -- WHEN

25  THE M.D. REVIEWED IT?

04:01 1    **A.**    NO.

2    **Q.**    OKAY.  AND NOW LET'S MOVE ON TO THE DAY OF HIS STROKE

3    ITSELF, SO LET'S GO TO PAGE 55.

4          AND REALLY JUST LOOKING AT THE TIMING HERE.  SO HE'S

5    SEEN IN THE ATU AT 5:58 P.M.  IS THAT RIGHT?

6    **A.**    IT'S 1802, SO THAT WOULD BE --

7    **Q.**    OH.  AND IF WE LOOK AT THE TOP RIGHT WHEN HE ARRIVES AT

8    THE --

9    **A.**    OH, YES.  EXCUSE ME.  THAT'S CORRECT.

10    **Q.**    OKAY.  AND THEN COULD WE LOOK AT PAGE 52.

11          IF YOU LOOK AT THE TOP LEFT, AT WHAT TIME DID THE

12    PATIENT ARRIVE AT THE HOSPITAL?

13    **A.**    9:00 P.M.

14    **Q.**    AND SO FROM ALREADY -- I'VE ALREADY FORGOTTEN THE -- DO

15    YOU RECALL WHAT THE TIME WAS ON THE PREVIOUS PAGE?  BECAUSE

16    I'VE ALREADY FORGOTTEN.

17    **A.**    IT WAS 1758.

18    **Q.**    5:58.

19    **A.**    SO IT'S TWO MINUTES BEFORE 6:00 P.M.  SO FROM 6:00 P.M. TO

20    2100, WHICH IS -- THREE HOURS HAD ELAPSED.

21    **Q.**    OKAY.  SO IT TOOK HIM ABOUT THREE HOURS TO GET TO OUR LADY

22    OF THE LAKE FROM ANGOLA.  ANGOLA IS ABOUT AN HOUR AWAY FROM OUR

23    LADY OF THE LAKE.  IS THAT CORRECT?

24    **A.**    YES.  OF COURSE, IF YOU'RE REALLY GOING LIGHTS AND SIREN,

25    YOU MIGHT GET THERE A LITTLE FASTER.  BUT WHEN I DRIVE THAT'S

04:02 1  WHAT IT IS.

2  **Q.**   AND, YOU KNOW, AS YOU WERE SAYING ABOUT THE TIMELINESS

3  BEING IMPORTANT IN STROKE CARE, IS TWO EXTRA HOURS IMPORTANT IN

4  STROKE CARE?

5  **A.**   YES.  EVERY -- EVERY -- ALL THE TIME -- TIME EQUALS BRAIN

6  CELLS; AND WORKING BRAIN CELLS YOU'RE LOSING WHEN YOU DON'T GET

7  OXYGEN TO THAT PART OF THE BRAIN.  THAT'S AN EMERGENCY.

8  **Q.**   AND LET'S ALSO LOOK AT PATIENT NO. 26 BRIEFLY, AT PAGE

9  457.

10       SO THIS IS A PATIENT THAT -- IF WE LOOK AT THE TOP

11  RIGHT -- ARRIVED IN THE ATU AT 1:47 AND WAS SENT OUT AT 2:45.

12  IS THAT CORRECT?

13  **A.**   YES.

14  **Q.**   AND I'LL REPRESENT THERE'S NO AMBULANCE RUN REPORT IN THIS

15  CHART, SO I UNFORTUNATELY CAN'T ASK YOU ABOUT HOW LONG IT TOOK

16  TO GET TO THE HOSPITAL.  BUT DURING THAT HOUR BEFORE THEY SENT

17  THE PATIENT OUT -- IF WE ZOOM IN ON THE LEFT-HAND SIDE UNDER

18  "PHYSICIAN ASSESSMENT AND TREATMENT" -- WE HAVE A VERBAL ORDER

19  HERE FROM DR. MACMURDO.  IS THAT CORRECT?

20  **A.**   THAT'S CORRECT.

21  **Q.**   AND CAN YOU SAY WHAT THAT VERBAL ORDER WAS FOR?

22  **A.**   IT APPEARS THAT THERE WAS AN ORDER GIVEN FOR NARCAN TWO

23  MILLIGRAMS AT 1:55 A.M. AND THEN 20 MINUTES LATER, AT 1:55 AND

24  THEN 1:59 -- EXCUSE ME -- FOUR MINUTES LATER, GIVE TWO MORE

25  MILLIGRAMS OF NARCAN INTRAVENOUSLY, WHICH IS IMPORTANT BECAUSE

04:03 1    IT WORKS IMMEDIATELY WHEN IT'S INTRAVENOUS.

2    **Q.**    OKAY.

3    **A.**    AND THE URINE DRUG SCREEN, WHICH WAS SAID IS NEGATIVE.

4    **Q.**    YES.  THANK YOU.

5          AND THEN IF WE LOOK AT THE RIGHT SIDE AS WELL, JUST

6    -- DOES IT -- THE URINE TOXICOLOGY AND NARCAN ARE REFERENCED

7    THERE AS WELL, I GATHER?

8    **A.**    THE URINE TOXICOLOGY IS NEGATIVE.

9    **Q.**    UH-HUH.

10   **A.**    AND THE NARCAN -- LET'S SEE.  APHASIA, DYSARTHRIA AND NO

11   -- I DON'T SEE -- OH, YEAH, RIGHT BELOW IT:  NARCAN TIMES TWO.

12   **Q.**    AND DURING THIS HOUR IS THERE ANY EVIDENCE OF TREATMENT

13   THE PATIENT WAS RECEIVING?

14   **A.**    NO.

15   **Q.**    SORRY.  LET ME REPHRASE THAT.

16          ASIDE FROM --

17   **A.**    CAN WE --

18   **Q.**    I DON'T WANT TO DISCOUNT THE NARCAN.

19   **A.**    YEAH.  OKAY.

20   **Q.**    ASIDE FROM NARCAN, IS THERE ANY --

21   **A.**    CAN WE MAKE IT SMALL AGAIN?

22          **THE COURT REPORTER:**  WAIT.  CAN YOU PLEASE SLOW DOWN?

23          **MR. DUBNER:**  YES.  SORRY ABOUT THAT.

24   **BY THE WITNESS:**

25   **A.**    OKAY.  CAN YOU ASK THE QUESTION?

04:04 1   **Q.**   MY QUESTION -- I WAS IGNORING THE NARCAN.  DIDN'T MEAN TO

2   DISCOUNT THAT.

3         ASIDE FROM NARCAN, IS THERE ANY EVIDENCE OF TREATMENT

4   GIVEN TO THE PATIENT?

5   **A.**   NO.

6   **Q.**   OKAY.  THERE IS ONE OTHER THING.  I JUST DON'T KNOW WHAT

7   IT IS:  THE "20G, R. HAND," JUST TO MAKE SURE.

8   **A.**   20-GAUGE IV.

9   **Q.**   OKAY.  THAT'S JUST THE SIZE OF THE IV THAT THEY --

10  **A.**   THAT'S RIGHT.

11  **Q.**   THANK YOU.

12        AND NOW LET'S TALK ABOUT PATIENT 55, THE PATIENT YOU

13  DISCUSSED ON YOUR DIRECT AND WAS DISCUSSED A BIT FOR A LITTLE

14  WHILE ON CROSS.

15        FIRST OFF, COUNSEL ASKED YOU ABOUT THE RESPONSE TIME

16  ON APRIL 26TH, THE DAY THAT HE DID FINALLY GET DIAGNOSED WITH

17  THE STROKE THAT LEFT HIM UNABLE TO EAT OR SPEAK.  WHAT WAS YOUR

18  CRITICISM ABOUT THE RESPONSE TIME ON THAT DATE?

19  **A.**   I DON'T HAVE THAT NOW.  IT'S PROBABLY GOING TO COME UP.  I

20  WANT TO LOOK -- I DON'T THINK THERE WAS A -- BUT LET'S GET THE

21  --

22  **Q.**   YEAH, WE CAN PULL THAT UP.  I BELIEVE THAT WILL BE JX_55

23  AT PAGE 450.

24        SO THIS IS THE APRIL 26TH ATU NOTE.

25  **A.**   I DO REMEMBER.  AND SO HE CAME INTO THE ATU AT 1530 AND HE

04:05 1    LEFT AT 1610.  AND MY POINT WAS THAT THAT WAS FINE.  IT WAS THE
       2    PREVIOUS DAYS WHERE THE STROKE -- BECAUSE THIS IS A STROKE PLUS
       3    DAYS.
       4    **Q.**   TO -- SORRY IF YOU WERE NOT FINISHED.
       5    **A.**   GO AHEAD.
       6    **Q.**   TO SUMMARIZE -- CORRECT ME IF THIS IS WRONG -- YOUR
       7    TESTIMONY WAS THAT ESSENTIALLY ON FEBRUARY 4TH WHEN HE SHOWED
       8    UP WITH SYMPTOMS HE SHOULD HAVE BEEN TREATED THEN.  AND THEN
       9    FEBRUARY 5TH HE WAS SENT OUT.  HE WAS SENT OUT FOR THE WRONG
      10    KIND OF CAT SCAN, AND THERE WAS NO FOLLOW-UP FROM THAT.  AND
      11    THEN MARCH 17TH IT WAS OVERLOOKED.  IS THAT CORRECT?
      12         I'M NOT TRYING TO TESTIFY.  I JUST WANT TO SUMMARIZE
      13    SO WE DON'T HAVE TO GO THROUGH IT AGAIN.
      14    **A.**   WELL, HE WAS SENT OUT FOR A CAT SCAN IS -- AND IF YOU
      15    THINK SOMEBODY'S HAVING A STROKE AND YOU WANT TO GET -- FIND
      16    OUT, A PLAIN CAT SCAN -- UNLESS IT'S A HEMORRHAGIC, WHICH IS --
      17    IT SHOWS UP AS WHITE; BLOOD SHOWS UP -- IT'S NOT ADEQUATE.  SO
      18    THAT WAS MY CRITICISM.
      19    **Q.**   OKAY.  BUT THEY DID SOMETHING FOR THE PATIENT ON THAT DAY,
      20    WE'LL SAY?
      21    **A.**   YES.  THEY GOT A CAT SCAN.
      22    **Q.**   SO ESSENTIALLY YOUR CRITICISM, IF I UNDERSTAND IT
      23    CORRECTLY, IS THEY GOT IT WRONG ON FEBRUARY 4TH, SEMI-RIGHT ON
      24    FEBRUARY 5TH, WRONG ON MARCH 17TH, RIGHT ON APRIL 26TH?  IS
      25    THAT RIGHT?

04:07 1   A.    THAT'S EXACTLY RIGHT.

2   Q.    IF THEY GET IT WRONG -- IF THEY GET IT RIGHT TWO OUT OF

3   FOUR TIMES -- WELL, ROUND UP THE FEBRUARY 5TH.  IF THEY GET IT

4   RIGHT TWO OUT OF FOUR TIMES, WHAT DOES THAT MEAN FOR THE REST

5   OF THE PATIENTS?

6   A.    WAIT.  FOR THE REST OF THE PATIENTS OR THIS PATIENT?

7   Q.    FOR THAT PATIENT AND THE REST OF THE PATIENTS.

8   A.    I MEAN, YOU JUST CANNOT -- IT MEANS THAT YOU'RE MISSING A

9   LOT; MAYBE YOU'RE MISSING 50 PERCENT, AS YOU'VE POSED THE

10  QUESTION.  THIS IS A CANNOT MISS DIAGNOSIS, BECAUSE THIS

11  RESULTS IN TERRIBLE DISABILITY.  SO YOU CANNOT -- SO IF YOU --

12  WHEN WE HAVE STROKE AS PART OF A DIFFERENTIAL DIAGNOSIS, WE

13  HAVE TO BE VERY LIBERAL WITH WORKING UP AND PROVING IT'S NOT A

14  STROKE.  IT HAS TO BE PROVEN.

15  Q.    THE FACT THAT THEY SOMETIMES GET IT RIGHT, DOES THAT, IN

16  YOUR VIEW, ELIMINATE THE SUBSTANTIAL RISK OF SERIOUS HARM TO

17  PATIENTS AS AN OVERALL THAT MATTERS?

18  A.    NO.  YOU KNOW, THAT'S WHAT I TRIED TO SAY.  SOMETIMES YOU

19  GET IT RIGHT.  YOU'RE DRIVING DRUNK NINE TIMES AND NOTHING

20  HAPPENED TO YOU.  YOU GOT IT RIGHT.  BUT THE TENTH TIME YOU

21  KILL SOMEBODY.  THAT DOESN'T MAKE DRIVING DRUNK SAFE.

22  Q.    AND A COUPLE OTHER THINGS ON THIS PATIENT.  FIRST, IF WE

23  COULD GO TO PAGE 68.

24        THIS IS THE ONE -- IF YOU WILL RECALL, THIS HAS THE

25  NOTE "PATIENT HAS NOT FILLED BLOOD PRESSURE MEDICATION SINCE

04:08 1   OCTOBER."  ON CROSS YOU WERE ASKED COULD THE PROVIDER CALL THE
      2   PHARMACY AND ASK WHAT THE MEDICATION ADMINISTRATION RECORD
      3   SHOWS.  DO YOU RECALL THAT?
      4   **A.**   YES.
      5   **Q.**   LET'S PULL UP JOINT EXHIBIT 68 AT 1612.
      6        IF THE PROVIDER DID LOOK AT THE MEDICATION
      7   ADMINISTRATION RECORDS, DO YOU KNOW WHAT THEY WOULD SHOW?
      8   **A.**   THEY WOULD SHOW THAT HE'S GOT HIS MEDICINE.  IT SAYS "KEEP
      9   ON PERSON" THE WHOLE TIME.
     10   **Q.**   AND THAT -- AND IF WE LOOK -- IF WE SCROLL FORWARD, THAT'S
     11   11/2020.  COULD WE SCROLL FORWARD I THINK TWO PAGES.
     12        WHILE WE'RE DOING THAT, "KEEP ON PERSON," IF IT'S
     13   SHOWN LIKE THAT FOR A MONTH, DOES THAT SUGGEST THAT HE FILLED
     14   THE MEDICATION THAT MONTH?
     15   **A.**   YES.
     16   **Q.**   AND SO IF WE THEN LOOK AT YET THE NEXT PAGE I BELIEVE.
     17        SO HERE WE HAVE AGAIN DECEMBER 2020.  AND HERE AGAIN
     18   IT SHOWS "KEEP ON PERSON" THE WHOLE MONTH?
     19   **A.**   CORRECT.
     20   **Q.**   SO IF WE GO BACK TO PAGE -- JOINT EXHIBIT 55 AT PAGE 68 --
     21   SORRY -- JOINT EXHIBIT 55 AT PAGE 68.
     22        SO IF THE PROVIDER HAD CALLED THE PHARMACY, WHAT THE
     23   MEDICATION ADMINISTRATION RECORDS WOULD HAVE SHOWN IS NOT THAT
     24   THE PATIENT HAD FILLED BLOOD PRESSURE MEDICATIONS -- SORRY --
     25   IS NOT THAT THE PATIENT HAD NOT FILLED HIS --

1  **A.**   YEAH.  IT WOULD HAVE SUGGESTED THAT THE PATIENT WAS

2  FILLING HIS MEDICATION.

3  **Q.**   RIGHT.  BUT YOU'RE NOT ASSUMING THAT THE PATIENT WAS

4  FILLING THE MEDICATION.  CORRECT?

5  **A.**   NO.  IT'S JUST THE PHARMACY RECORD SUGGESTS THAT HE HAD

6  THE MEDICATION AND IT WAS BEING FILLED.

7  **Q.**   AND ONE MORE QUESTION ON -- AND ALSO ON THAT, COUNSEL I

8  BELIEVE -- OR YOU SAID IN RESPONSE TO COUNSEL'S QUESTION THAT,

9  YOU KNOW, THERE ARE LOTS OF WAYS THAT THEY COULD CHECK THE

10 MEDICATION ADMINISTRATION.  DID YOU SEE EVIDENCE THAT PROVIDERS

11 WERE CHECKING THE MEDICATION ADMINISTRATION IN LOTS OF WAYS?

12 **A.**   I SAW ONE INTERACTION, WHICH I ALLUDED TO WITH JEREMY --

13 **Q.**   UH-HUH.

14 **A.**   -- WHEN MR. ARCHEY AND I WERE OBSERVING THIS INTERACTION

15 WHERE THE -- JEREMY CHECKED THE COMPUTER AND FOUND THAT THE --

16 AND THE PATIENT SAID, "NO.  I'M TAKING THESE FIVE, NOT THOSE

17 TWO."  AND THEY RECONCILED THEIR MEDICATION -- CALLED

18 MEDICATION RECONCILIATION AND THAT WAS CONFUSED AND INCORRECT.

19 SO YOU CAN LOOK AT THE -- AT THE COMPUTER TO SEE WHAT'S

20 SUPPOSED TO BE HAPPENING AND THEN YOU TALK ABOUT IT WITH THE

21 PATIENT, AND THE PATIENT CLEARLY LAID OUT THAT THIS WAS NOT

22 WHAT WAS HAPPENING FOR HIM.

23 **Q.**   AND SO IT HAPPENED DURING YOUR SITE VISIT WHEN YOU AND MR.

24 ARCHEY WERE IN THE ROOM OBSERVING?

25 **A.**   YEAH.  WE WERE AT THE DOORWAY.

04:11 1    **Q.**   AND DID YOU SEE IT HAPPENING ROUTINELY IN THE CHARTS THAT

2    YOU REVIEWED?

3    **A.**   NO.

4    **Q.**   AND THEN THE LAST QUESTION ON HERE.  COUNSEL SAID NOTHING

5    HAPPENED IN BETWEEN FEBRUARY 5TH AND MARCH 17TH.  FEBRUARY 5TH

6    BEING WHEN THIS PATIENT GOT THE CT SCAN AND MARCH 17TH BEING

7    THE NEXT ENCOUNTER YOU DISCUSSED.  DID HE GET A FOLLOW-UP WITH

8    ANY PROVIDER DURING THAT TIME?

9    **A.**   MY MEMORY IS NO.  BUT HE -- AND HE CERTAINLY DIDN'T HAVE A

10   SPECIALTY REFERRAL -- OR HE CERTAINLY DID NOT HAVE A SPECIALIST

11   TELEMEDICINE VISIT FOR THE STROKES THAT WERE PRESENT ON THE CAT

12   SCAN OR FOR HIS SYMPTOMS.

13   **Q.**   LET'S TALK ABOUT PATIENT NO. 29.

14          WHY DON'T WE PULL UP 2982 FIRST -- JOINT EXHIBIT 29

15   AT PAGE 82.

16          AND SO YOU WERE SHOWN THIS.  THIS IS THE PATIENT WHO

17   MADE A SELF-DECLARED EMERGENCY IN THE MORNING AND THEN HAD A

18   HEAT STROKE IN THE AFTERNOON?

19   **A.**   YES.

20   **Q.**   THE PATIENT WAS ON SUICIDE WATCH.  IS THERE -- ARE THERE

21   RESTRICTIONS ON WHAT PATIENTS CAN POSSESS DURING SUICIDE WATCH?

22   **A.**   WELL, I WOULD THINK THEY SHOULDN'T BE JUST IN THERE

23   SMOKING, BECAUSE THEY COULD BURN THEMSELVES UP.

24   **Q.**   AND THEN -- LET'S GO THEN TO 29 AT 26; JOINT EXHIBIT 29 AT

25   26.  I'M SORRY.  LET ME GIVE YOU THE CORRECT PAGE NUMBER.

04:13 1  LET'S SEE.  PAGE 37.

2           THERE WAS SOME DISCUSSION OF WHETHER THE TOP SECTION

3  SAYS "PER SECURITY, PATIENT BOUNCING AROUND IN THE CELL," OR

4  "PER SECURITY, PATIENT BURNING AROMA IN CELL."

5           I'D ACTUALLY LIKE TO DRAW YOUR ATTENTION NOT TO THAT

6  -- WELL, WE CAN -- WHAT IS IT THAT MAKES YOU THINK THAT IT SAYS

7  "BOUNCING AROUND" AND NOT "BURNING AROMA"?

8  A.   THE "C" IN THAT -- FIRST OF ALL, HE WAS BOUNCING AROUND.

9  THAT'S DESCRIBED IN THE MEDICAL RECORDS.  AND SO THAT -- AND

10  THERE'S A "C" HERE AND THE WORD "AROMA," A-R-O-M-A.  AND HE WAS

11  BOUNCING AROUND.

12  Q.   I'M SORRY.  ARE YOU SAYING THERE IS OR THERE ISN'T THE

13  WORD "AROMA"?

14  A.   THE WORD IS "AROUND," A-R-O-U-N-D, "IN CELL" -- BOUNCING

15  AROUND.  THE GUY WAS BOUNCING AROUND IN HIS CELL.

16  Q.   AND WHAT'S --

17  A.   THAT'S MY UNDERSTANDING OF IT.

18  Q.   YEP.  AND THEN LET'S JUST POINT DOWN.  YOU SAID THAT THAT

19  WAS SHOWN.  IF WE COULD GO TO THE "ASSESSMENT/COMMENT."

20           THE FIRST LINE SAYS "PATIENT FOUND HALFWAY UNDER BED

21  LAYING SUPINE ON FLOOR WITH AGONAL RESPIRATIONS."  WHAT ARE

22  AGONAL RESPIRATIONS?

23  A.   THEY ARE THE KIND OF BREATHING THAT YOU DO AS YOU'RE

24  DYING, HAVING A CARDIAC ARREST.  IT'S LAST-DITCH EFFORTS THAT

25  THE BODY DOES UPON -- AS YOU OBSERVE SOMEBODY DIE.

04:15 1 Q. AND DOES THAT LOOK -- IS BOUNCING AROUND A WAY THAT YOU
2 COULD DESCRIBE THAT?
3 A. I'M NOT SURE WHAT YOU'RE ASKING. WHAT I'M SAYING IS THAT
4 THE PATIENT WAS FOUND UNDER HIS BED LAYING SUPINE. AND THERE
5 WERE OTHER RECORDS AND HE WAS AT 108. BUT THERE WAS -- THERE
6 WERE MORE RECORDS THAN JUST THIS.
7 Q. UH-HUH.
8 A. AND THE AMBULANCE WAS CALLED FOR 108.2 AND, YOU KNOW --
9 YEAH, GO AHEAD. I MIGHT HAVE LOST TRACK.
10 Q. WE CAN MOVE ON FROM THAT.
11 YOU WERE REFERRING TO CASE REPORTS ABOUT USING NARCAN
12 FOR SYNTHETIC CANNABINOIDS. COULD YOU EXPLAIN -- YOU'RE
13 LOOKING AT ME LIKE I'M SAYING THAT WRONG.
14 A. WHAT I WAS DESCRIBING WAS -- WHEN MR. ARCHEY ASKED ME WHAT
15 ARE THE -- ABOUT SYMPTOMS THAT YOU COULD POSSIBLY HAVE WITH
16 SYNTHETIC CANNABINOIDS.
17 Q. UH-HUH.
18 A. I DESCRIBED, YOU KNOW, 20 YEARS -- A LITTLE LESS THAN 20
19 YEARS WHEN SYNTHETIC CANNABINOIDS FIRST CAME OUT IN GERMANY
20 ABOUT 2000 OR SO, 2006. AND SO I'M DESCRIBING HUNDREDS OF MY
21 EXPERIENCES.
22 I WENT TO THE LITERATURE AND LOOKED AT THE
23 LITERATURE. WHEN YOU LOOK AT THE CASE REPORTS OF INDIVIDUALS
24 WHO PRESENTED WITH STROKE OR ALL THE THINGS THAT MR. ARCHEY
25 SAID, THEY DID NOT CONFIRM THAT THE TOXICOLOGY SHOWED A

04:16 1    SYNTHETIC CANNABINOID.

2              SO YOU CAN'T SAY YOU HAVE A CASE OF CANNABINOID

3    OVERDOSE WRITTEN IN THE LITERATURE UNLESS YOU CONFIRM AND PROVE

4    THAT CANNABINOIDS WAS PRESENT IN THE PATIENT'S SYSTEM.  YOU

5    CAN'T DO A CASE REPORT -- YOU CAN ALWAYS DO IT.  IT WAS

6    OBVIOUSLY IN THE LITERATURE.  BUT THAT'S A TERRIBLE CASE

7    REPORT.

8              ANY TIME YOU'RE REPORTING -- LIKE I JUST FOUND AN

9    ABSTRACT ACCEPTED TO SAN FRANCISCO AND NATIONAL  YESTERDAY.  WE

10   DID A QUETIAPINE OVERDOSE.  QUETIAPINE WAS IN THE BLOODSTREAM.

11   IT WAS MEASURED AND IN THE BLOODSTREAM.  YOU CAN'T JUST SAY THE

12   GUY TOOK QUETIAPINE AND THIS IS WHAT HAPPENED.  YOU HAVE TO

13   SHOW THE PRESENCE OF THE SUBSTANCE IN THE BLOODSTREAM.

14   Q.   BUT -- SO -- AND JUST TO CLARIFY, BECAUSE THERE WAS SOME

15   CONFUSION WHEN YOU SAID "CASE REPORTS," WHETHER YOU MEANT CHART

16   REVIEWS AT LSP OR CASE REPORTS IN THE MEDICAL LITERATURE.  SO

17   YOU WERE TALKING ABOUT THE ABSENCE OF CREDIBLE CASE REPORTS IN

18   THE MEDICAL LITERATURE AND NOT CHART REVIEWS AT LSP?

19   A.   THAT'S RIGHT.

20   Q.   AND SO THIS PATIENT WAS GIVEN NARCAN.  IS THAT INDICATED

21   FOR SYNTHETIC CANNABINOIDS?

22   A.   NO.  I MEAN, NARCAN, NALOXONE, IS A PURE -- IT'S AN OPIOID

23   ANTAGONIST.  NOW, NALOXONE HAS A LONG HISTORY IN THIS COUNTRY

24   AND PEOPLE HAVE PUT CASE REPORTS WHERE SOMEBODY -- THERE'S ONE

25   RESPONSE TO NALOXONE:  IT'S CLEARING OF THE MENTAL STATE.

04:18 1    THAT'S THE RESPONSE WE'RE LOOKING FOR.

2              IF SOMEBODY WAKES UP AND SAYS, "HEY, MAN, GIVE ME MY
3    METHADONE," THAT'S A GUY WHO JUST RESPONDED WHO WAS UNDER THE
4    INFLUENCE OF METHADONE OR HEROIN.  "HEY, YOU KNOW, DON'T" --
5    "I'M ALLERGIC TO NARCAN.  DON'T GIVE ME THAT," BECAUSE IT PUTS
6    HIM INTO WITHDRAWAL FOR METHADONE, FOR EXAMPLE.

7              NOW, THERE ARE A LOT OF CASE REPORTS OF SOMEBODY WHO
8    WAS GIVEN NARCAN AND TURNED OVER AT THAT MOMENT OR TWITCHED HIS
9    ARM OR WHATEVER HAPPENED TO HIM, AND THAT'S NOT A RESPONSE.
10   THERE'S ONE RESPONSE.  IT'S A -- IT COULD BE AN INCREASE IN
11   THE RESPIRATORY RATE, BECAUSE OPIATES DECREASE THE RESPIRATORY
12   RATE.  THEY DECREASE THE TEMPERATURE.  THAT'S WHY PEOPLE DIE.
13   AND IT DECREASES THE MENTAL STATUS INTO A COMATOSE STATE.
14   PEOPLE DIE BECAUSE THE RESPIRATORY RATE DECREASES FROM 14 TO
15   SIX TO ZERO.  SO THAT'S AN OPIATE TOXIDROME, AND THERE IS ONE
16   RESPONSE:  CLEARING OF THE MENTAL STATE.

17   Q.   SO BESIDES SOME SCATTERED CASE REPORTS, IS THERE ANY
18   RECOMMENDATION OR INDICATION OF NARCAN FOR THE USE OF
19   SYNTHETIC CANN -- FOR SYNTHETIC CANNABINOID OVERDOSES?

20   A.   NO.  I MEAN, IT'S NOT -- IN THIS SETTING IT'S NOT
21   DANGEROUS EXCEPT AS IT MIGHT SPEND TIME OR -- BUT IT MIGHT
22   SPEND TIME.

23   Q.   RIGHT.  AND I WANTED TO GO TO THAT NEXT.  HAS YOUR
24   CRITICISM BEEN THAT THEY GIVE NARCAN TOO MANY TIMES?

25   A.   I'VE NEVER SAID THAT.

04:19 1   **Q.**   HAS YOUR CRITICISM BEEN THAT THEY GIVE IT WHEN IT

2   INTERFERED IN WAYS OR AT TIMES WHEN IT INTERFERES WITH CARE?

3   **A.**   MY CRITICISM IS THAT THERE -- IT CAN DELAY CARE.  WHEN

4   YOU'RE GIVING NARCAN AND YOU'RE -- AND IT MAY -- AND YOU'RE

5   WAITING FOR A RESPONSE, THE CLEARING OF THE MENTAL STATUS,

6   WHICH WILL NOT -- THE REASON THESE PEOPLE OR SOME PEOPLE ARE --

7   THEY'RE NOT GOING TO RESPOND TO NALOXONE BECAUSE IT DOESN'T

8   WORK FOR MOJO.  SO THE CRITICISM I -- YOU CAN GIVE -- THESE

9   INDIVIDUALS CAN GET AS MUCH NARCAN AS YOU WANT TO GIVE THEM.

10        THE PROBLEM IS THAT IF IT'S IMPAIRING THE PHYSICIAN

11   OR THE NURSE PRACTITIONER'S JUDGMENT AND MEDICAL

12   DECISION-MAKING AND DIFFERENTIAL DIAGNOSES THINKING THAT THIS

13   IS THE PROBLEM, I'M GOING TO GIVE NARCAN FOUR OR FIVE DOSES  OR

14   TWO OR THREE OR WHATEVER IT IS, WAITING FOR A RESPONSE, THAT'S

15   THE PROBLEM.  THE ADMINISTRATION -- I DON'T CARE IF THEY

16   ADMINISTER IT IN THIS SETTING, EXCEPT TO THE EXTENT THAT IT

17   INTERFERES WITH THE CARE OF THE PATIENT.

18   **Q.**   AND THEN YOU WERE ASKED ABOUT PATIENTS WHO HAD OVERDOSED

19   IN THE SAMPLE.  AND AS COUNSEL POINTED OUT, THERE WAS -- YOU

20   DID SAMPLE PATIENTS WHO HAD OVERDOSES.  IS THAT CORRECT?  AS

21   COUNSEL SAID, WAS PATIENT NO. 31 A PATIENT WHO ULTIMATELY

22   PASSED AWAY OF AN OVERDOSE?

23   **A.**   THAT'S RIGHT.

24   **Q.**   AND IF WE GO TO -- WELL, SO FIRST OFF, YOUR SAMPLE THEN

25   DIDN'T EXCLUDE PATIENTS WITH OVERDOSES?

04:21 1   **A.**   NO.

2   **Q.**   AND LET'S PULL UP PAGE 376 OF JOINT EXHIBIT 1C. THIS IS A

3   PATIENT WHO WAS ONLY IN THE CHART REVIEWS, BUT IT WAS A PATIENT

4   BROUGHT UP BY DEFENDANTS.

5             **MR. ARCHEY:**  WHAT PAGE?

6             **MR. DUBNER:**  OH, I'M SORRY. PAGE 37 -- I BELIEVE

7   IT'S PAGE 376 OF JOINT EXHIBIT 1C OF THE CHART REVIEW

8   ATTACHMENT. I BELIEVE IT'S 1C. BUT LET ME --

9             **MS. MONTAGNES:**  NO, NO. IT'S PLAINTIFFS' EXHIBIT.

10            **MR. DUBNER:**  SORRY. SORRY. THAT'S CORRECT. IT'S

11   PLAINTIFFS' EXHIBIT 1C. THANK YOU.

12                AND I'LL DOUBLE-CHECK THE PAGE.

13            **MR. ARCHEY:**  YOUR HONOR, I NEVER ASKED ABOUT PATIENT

14   NO. 1. THIS IS NOT --

15            **MR. DUBNER:**  PATIENT 31.

16            **MR. ARCHEY:**  OH, I'M SORRY. MY APOLOGIES.

17            **MR. DUBNER:**  YEAH. THE PAGE NUMBER WE'RE LOOKING FOR

18   IS PAGE 387, PATIENT NO. 31.

19            **MR. ARCHEY:**  MY APOLOGIES.

20   **BY MR. DUBNER:**

21   **Q.**   AND JUST TO REFRESH YOUR RECOLLECTION ON THIS PATIENT, DID

22   YOU HAVE CRITICISMS OF THE TREATMENT OF THE PATIENT'S OVERDOSE?

23   **A.**   I DON'T -- I DON'T SEE ANY CRITICISMS.

24   **Q.**   AND IF YOU LOOK AT THE FIRST PARAGRAPH YOU HAVE, IT

25   APPEARS THE CRITICISM IS ABOUT NO PROVIDER THERE AND NO ONE WHO

04:22 1   COULD INTERPRET THE EKG AT AN INCIDENT TWO YEARS EARLIER?

2   **A.**   YES.

3   **Q.**   BUT THIS WAS NOT A PATIENT WHO YOU FOUND ANY OR -- SCRATCH

4   THAT.   STRIKE THAT.

5          AND WHEN YOU SAW PATIENTS WHO YOU DIDN'T FIND SERIOUS

6   PROBLEMS, YOU DIDN'T CLAIM THERE WERE SERIOUS PROBLEMS.

7   CORRECT?

8   **A.**   THAT IS CORRECT.

9   **Q.**   AND YOU ACKNOWLEDGED AT YOUR DEPOSITION THAT THERE WERE A

10   FEW PATIENTS WHO YOU DIDN'T FIND SERIOUS PROBLEMS.   IS THAT

11   RIGHT?

12   **A.**   THAT'S CORRECT.

13   **Q.**   BUT IN MOST OF THE 27 PATIENTS YOU REVIEWED, DID YOU FIND

14   SERIOUS PROBLEMS?

15   **A.**   YES.

16   **Q.**   BRIEFLY ON PATIENT NO. 54, TROPONIN -- IN DIAGNOSING A

17   HEART ATTACK, WHAT ARE THE ROLES OF AN EKG AND THE TROPONIN?

18   **A.**   SOMEBODY COMES IN, THEY GET AN EKG IF THEY SAY CHEST PAIN

19   WITHIN TEN MINUTES OR WHATEVER.   THEY GET AN EKG RIGHT AWAY.

20   IT'S A PICTURE OF THE HEART AND WHAT'S HAPPENING AND WHAT PART

21   HAS NO OXYGEN REACHING IT.   AND THAT PATIENT HAD THAT IN THE

22   AMBULANCE, HE HAD ST-ELEVATIONS, INFERIOR.   AND I SHOWED THE

23   COURT.   AND THEN HE HAD IT SUBSEQUENTLY ON THE SECOND EKG.

24   THEN THEY SHOWED ME A THIRD ONE.   THEY SAID THIS IS THE SAME.

25          I HAD ALREADY POINTED OUT THAT I DON'T RELY -- NOBODY

04:24 1  RELIES ON THE READING ON THE TOP BECAUSE THEY -- IT'S

2  WELL-DESCRIBED AND WE ALL UNDERSTAND THAT WHATEVER IS READ ON

3  TOP IS NOT -- IS A MACHINE.  IT'S NOT A -- NOT AN

4  INTERPRETATION THAT I RELY ON.

5      SO THE FIRST AMBULANCE RUN, I SAW IT WAS A HEART

6  ATTACK.  THE SECOND ONE SHOWED THE HEART ATTACK.  HE WENT TO

7  THE HOSPITAL, HE HAD A STENT.  HE HAD A HEART ATTACK.  AND SO

8  THEN THAT'S WHAT -- AND THEN SO TROPONIN -- IF THE EKG IS

9  TOTALLY NORMAL -- WHICH MANY TIMES PATIENTS SAID, "I DON'T KNOW

10  WHY YOU'RE ADMITTING ME FOR THIS CHEST PAIN BECAUSE MY EKG WAS

11  NORMAL."  THE WHOLE POINT IS THAT IT'S NOT ONLY THE EKG, THERE

12  COULD BE A -- WHAT WE CALL NON-ST-ELEVATIONS.  THESE ARE THE

13  DIFFERENT SQUIGGLES ON THE EKG.

14      SO YOU COULD JUST LEAK TROPONIN OUT OR KILL CELLS

15  ENOUGH SO THAT THE EKG IS NOT SHOWING THAT.  IT MAY SHOW IT WAY

16  LATER DOWN THE ROAD.  YOU MAY SAY THIS PERSON MUST HAVE HAD A

17  HEART ATTACK AT SOME TIME.

18      SO THERE ARE TWO PIECES OF INFORMATION.  THAT EKG IS

19  RESPONDED TO, BUT THE TROPONIN MAY HAVE LAGGED OR IT MAY -- IT

20  COULD BE A NON-ST-ELEVATION M.I. IS WHAT IT'S CALLED.

21  **Q.**   YOU USED THE WORD "LAGGED."  IN THE CONTEXT OF

22  DIAGNOSTICS, WHAT IS A LAGGING INDICATOR?

23  **A.**   WELL, I'M -- WHAT I'M TRYING TO SAY IS WHEN YOU -- IF YOU

24  RIGHT THIS SECOND START HAVING A HEART ATTACK, YOUR TROPONIN IS

25  TOTALLY NORMAL AND THEN YOU DRAW IT.  THEN YOU GET ANOTHER ONE

04:25 1 TO SEE IF THE CELLS ARE NOW LEAKING OUT OR HAVE LOST ENOUGH
2 OXYGEN SO THAT THEY'RE DYING AND RELEASING TROPONIN.
3      THIS PARTICULAR PATIENT WENT FROM ZERO TO 0.1 OR
4 WHATEVER IT WAS, TEN TIMES AS LARGE; .1 FROM ZERO ESSENTIALLY.
5 SO THAT'S TEN TIMES THE INCREASE.  AND AT THAT POINT HE WAS
6 TAKEN TO THE HOSPITAL.
7 **Q.**  AND SO THE TROPONIN WON'T NECESSARILY SHOW THE SYMPTOMS OF
8 A HEART ATTACK AS EARLY AS THE EKG.  IS THAT CORRECT?
9 **A.**  THEY CAN BOTH SHOW IT.  IT'S TWO DIFFERENT KINDS OF HEART
10 ATTACKS.
11 **Q.**  UH-HUH.
12 **A.**  THEY'RE BOTH INSUFFICIENT OXYGEN DELIVERY TO THE MUSCLE OF
13 THE HEART.
14 **Q.**  IF YOU HAVE AN EKG SHOWING A POSSIBLE HEART ATTACK AND A
15 TROPONIN LEVEL OF ZERO, DOES THAT MEAN THAT YOU'RE NOT HAVING A
16 HEART ATTACK?
17 **A.**  THE EKG TRUMPS THE TROPONIN.
18 **Q.**  AND JUST ABOUT YOUR POINT THAT PEOPLE DON'T -- YOU KNOW,
19 PROVIDERS DON'T RELY ON THE MACHINE READING AT THE TOP, WHILE
20 THEY DON'T RELY ON THAT, IF YOU SEE AN EKG THAT SAYS THAT,
21 YOU'LL WANT TO TAKE A CLOSE LOOK AT WHAT THE EKG ACTUALLY SAYS,
22 WOULDN'T YOU?
23 **A.**  AND YOU HAVE TO -- YOU HAVE TO HAVE A LITTLE -- A LITTLE
24 BACKBONE, BECAUSE IF IT SAYS ACUTE ST-ELEVATION M.I. AND -- OR
25 INFERIOR WALL MYOCARDIAL INFARCTION, YOU BETTER KNOW WHAT

04:26 1    YOU'RE TALKING ABOUT BECAUSE IF SOMEBODY -- IF HE'S HAVING IT
      2    AND YOU DIDN'T READ THAT THING AND HE WAS HAVING IT AND YOU
      3    DIDN'T CALL IT AS A HEART ATTACK, THAT'S A VERY BAD MISTAKE FOR
      4    ME TO MAKE.  SO I LOOK ESPECIALLY HARD WHEN I SEE THAT READ.
      5    AND, I MEAN, THIS IS AN OBVIOUS ONE, SO IT'S REALLY NOT HARD.
      6    **Q.**    AND THEN YOU SAID THE STANDARD OF CARE THAT YOU'RE -- OR
      7    THE STANDARD WITHIN WHICH YOU ARE REVIEWING THE CHARTS IS NOT
      8    WHAT YOU APPLY AT BELLEVUE.  WHAT STANDARD DID YOU APPLY WHEN
      9    YOU REVIEWED THE CHARTS IN THIS CASE?
      10   **A.**    WELL, I -- THE STANDARD THAT I USE FOR IS IT'S NOT -- I
      11   WOULDN'T REALLY CALL IT A -- I WANT THEM TO MEET THE SERIOUS
      12   MEDICAL NEEDS OF THE PATIENTS.  RIGHT?  AND SO THAT'S THE
      13   STANDARD.  SO IF A SERIOUS MEDICAL NEED WAS CHEST PAIN AND A
      14   HEART ATTACK, I WANT THAT TO BE MET.  IT COULD BE A NATIONAL
      15   STANDARD.  IF YOU HAVE AN EKG THAT SHOWS A HEART ATTACK, THE
      16   PATIENT SHOULD BE IN THE HOSPITAL AND GET TREATED.  THOSE ARE
      17   NATIONAL STANDARDS.
      18          I COULD USE -- THERE ARE A NUMBER OF NATIONAL
      19   RECOMMENDATIONS REGARDING HEART ATTACKS.  THERE ARE NATIONAL
      20   RECOMMENDATIONS REGARDING SYNCOPE, WHICH IS FAINTING, WHICH I
      21   ALLUDED TO; THE AMERICAN COLLEGE OF CARDIOLOGY AND THE AMERICAN
      22   HEART ASSOCIATION STANDARDS.  SO THERE A LOT OF STANDARDS.  BUT
      23   THEY'RE NOT LIKE -- DOES THAT ANSWER YOUR QUESTION?
      24   **Q.**    YEAH.  AND A FOLLOW-UP MAY HELP OR HURT AS WELL.  I DON'T
      25   KNOW AT THIS POINT.

04:28 1          IN DETERMINING WHETHER THERE WAS A SERIOUS -- IN

2     DETERMINING WHETHER CARE PUT SOMEBODY AT A SERIOUS RISK OF --

3     SUBSTANTIAL RISK OF SERIOUS HARM, ARE YOU APPLYING THOSE

4     NATIONAL CLINICAL STANDARDS?

5     **A.**    PART OF IT, YES.  SURE.  I MEAN, NATIONAL CLINICAL

6     STANDARDS SHOULD BE APPLIED TO SERIOUS MEDICAL CONDITIONS.  AND

7     THEN THERE'S ALSO THE FACT THAT YOU'RE A PRACTITIONER.  THERE'S

8     A HISTORY, THERE'S A PHYSICAL, THERE ARE STANDARDS AND THERE'S

9     PRACTICE AND THERE'S KEEPING THE PATIENT SAFE.

10    **Q.**    AND THOSE CLINICAL STANDARDS OF WHAT TO DO OR WHETHER OR

11    NOT AN EKG, FOR EXAMPLE, THAT SHOWS A HEART ATTACK REQUIRES

12    TREATMENT, THOSE ARE THE SAME EVERYWHERE?  IS THAT CORRECT?

13    **A.**    THAT'S RIGHT.

14    **Q.**    OKAY.  I HAVE NO FURTHER QUESTIONS.

15          **MR. DUBNER:**  ONE HOUSEKEEPING MATTER.  IN THE DIRECT

16    WE REFERRED TO PLAINTIFFS' EXHIBIT 22_A, WHICH IS THE

17    INDIVIDUAL TREATMENT ORDERS, AND I WANTED TO MOVE THOSE INTO

18    EVIDENCE.

19          **MR. ARCHEY:**  NO OBJECTION, YOUR HONOR.

20          **THE COURT:**  P_22A IS ADMITTED.

21          **MR. DUBNER:**  THANK YOU FOR YOUR TIME, DR. VASSALLO.

22          **THE WITNESS:**  THANK YOU.

23          **THE COURT:**  THANK YOU, DOCTOR.

24          **THE WITNESS:**  THANK YOU, YOUR HONOR.

25          **MS. MONTAGNES:**  JUDGE, WE HAVE SOMEONE HERE FROM

04:29 1  ANGOLA.  WE WOULD LIKE TO DO HIM TODAY IF WE CAN.  WE WILL TRY

2  TO KEEP IT AS BRIEF AS POSSIBLE, OF COURSE.

3           **THE COURT:**  LET'S DO IT.

4           **MS. MONTAGNES:**  THANK YOU, JUDGE.

5           **THE COURT:**  HE'S DOWNSTAIRS.  RIGHT?  THEY'LL CALL UP

6  FOR HIM.

7           YOU HAVE HIM?  THANK YOU.

8           SO THE NAME OF YOUR NEXT WITNESS IS?

9           **MS. MALIK:**  YOUR HONOR, ELENA MALIK ON BEHALF OF

10  PLAINTIFFS.

11           AND THE NEXT WITNESS'S NAME IS JEAN PAUL

12  CREPPEL.

13           **THE COURT:**  JEAN?

14           **MS. MALIK:**  J-E-A-N, P-A-U-L.  AND THEN THE LAST NAME

15  IS CREPPEL.  C-R-E-P-P-E-L.

16           **THE DEPUTY CLERK:**  SO 22_A IS A FORM HCP50 INDIVIDUAL

17  TREATMENT ORDER?  THAT'S WHAT IT IS?

18           **MS. MALIK:**  YES.

19           **MR. CONINE:**  YES.

20           **THE DEPUTY CLERK:**  OKAY.

21           **MS. MONTAGNES:**  AND, JUDGE, FOR THE RECORD, WE DO

22  WANT TO RESERVE THE RIGHT TO RECALL DR. VASSALLO.

23           **THE COURT:**  NOTED.

24           OKAY.  I DIDN'T KNOW WE HAD A WHEELCHAIR.  WE

25  ARE GOING TO BRING A MICROPHONE.

                        JEAN PAUL CREPPEL,

**HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

        **THE COURT:**  MS. MALIK.

                        **DIRECT EXAMINATION**

**BY MS. MALIK:**

**Q.**   HI, MR. CREPPEL.  PLEASE STATE YOUR FULL NAME, FOR THE

RECORD.

**A.**   JEAN PAUL RENE CREPPEL.

**Q.**   HOW OLD ARE YOU?

**A.**   FORTY-FOUR.

**Q.**   WHERE ARE YOU FROM?

**A.**   I WAS BORN IN MARRERO, LOUISIANA.

**Q.**   AND WHERE DO YOU LIVE NOW?

**A.**   I LIVE IN ANGOLA IN THE MAIN PRISON.

**Q.**   HOW LONG HAVE YOU BEEN IN PRISON AT ANGOLA?

**A.**   ABOUT SIX YEARS.

**Q.**   WHERE DO YOU LIVE IN THE PRISON?

**A.**   HEALTH CARE DORM ASH 1.

**Q.**   HOW LONG HAVE YOU LIVED IN ASH 1?

**A.**   ABOUT A YEAR AND A HALF.

**Q.**   AND WHERE WERE YOU BEFORE THAT?

**A.**   CYPRESS 2.

**Q.**   MR. CREPPEL, I SEE YOU ARE IN A WHEELCHAIR.  WHY ARE YOU

USING A WHEELCHAIR?

**A.**   I CAN'T WALK.

04:33 1  **Q.**  AND WHY IS THAT?

2  **A.**  I WAS PARALYZED DUE TO A NECK INJURY WITH MY SPINE.

3  **Q.**  APPROXIMATELY WHEN DID YOU EXPERIENCE THAT INJURY?

4  **A.**  THAT WAS AROUND MAY OF 2019.

5  **Q.**  HAVE YOU BEEN IN A WHEELCHAIR SINCE MAY OF 2019?

6  **A.**  WELL, I WAS BEDRIDDEN FOR ABOUT THREE TO FOUR MONTHS AFTER

7  THE INJURY.

8  **Q.**  BEFORE WE TURN BACK TO YOUR DISABILITY, I'D LIKE TO ASK

9  YOU SOME QUESTIONS ABOUT YOUR EXPERIENCE WITH MEDICAL CARE AT

10  ANGOLA.  ON A SCALE OF ONE TO TEN, HOW WOULD YOU RATE THE

11  MEDICAL CARE AT ANGOLA SINCE JANUARY 1ST OF 2019?

12  **A.**  I'D SAY A THREE.

13  **Q.**  WHY IS THAT?

14  **A.**  THERE ARE A HANDFUL OF GENUINE PEOPLE THAT ACTUALLY TAKE

15  THEIR PROFESSION EMPHATICALLY, SHOULD I SAY, BUT THEY ARE VERY

16  FEW AND FAR BETWEEN.

17  **Q.**  LET'S GET MORE SPECIFIC.  I WANT TO MAKE VERY CLEAR THAT

18  WE'RE ONLY TALKING ABOUT THE TIME PERIOD BETWEEN JANUARY 1,

19  2019 AND TODAY.  DURING THIS TIME FRAME, PLEASE LIST THE

20  MEDICAL ISSUES YOU HAVE EXPERIENCED.

21  **A.**  I HAD A PERSISTENT RASH, AND THEN I WAS -- RECEIVED THIS

22  INJURY AND THERE WERE SOME INCONTINENCE ISSUES I WAS FIGHTING

23  DUE TO THE INJURY.

24  **Q.**  OKAY.  AND WHEN YOU SAY "INCONTINENCE," DO YOU MEAN BOWEL

25  INCONTINENCE?

04:34 1  **A.**   YES.  BOWEL AND URINE.

2  **Q.**   OKAY.  THANK YOU, MR. CREPPEL.

3        LET'S GET INTO SOME OF YOUR -- BEGINNING WITH YOUR

4  NECK INJURY.  WHERE WERE YOU LIVING AT THE TIME?

5  **A.**   SPRUCE 2.

6  **Q.**   WHAT HAPPENED FIRST?

7  **A.**   I JUST WOKE UP WITH SOME DISCOMFORT IN MY NECK, LIKE A

8  CRICK.  I FELT LIKE MAYBE I JUST SLEPT ON IT WRONG.  I DIDN'T

9  THINK MUCH OF IT.  IT WASN'T AN EXTREME PAIN.  I WENT THROUGH

10  MY DAY.  AND AFTER ABOUT THREE DAYS OF NOT BEING ABLE TO SLEEP,

11  IT BECAME -- IT BECAME A BIT OF MORE OF A PROBLEM.

12  **Q.**   WHAT DID YOU DO TO SEEK TREATMENT?

13  **A.**   I WAS LOOKING FORWARD TO A SATURDAY WEEKEND WITH MY

14  CHILDREN, SO I TRIED TO POSTPONE IT TILL AFTER THAT.  BUT

15  IMMEDIATELY AFTER THAT WEEKEND, I PUT IN AN EMERGENCY SICK

16  CALL.

17  **Q.**   AND WHAT HAPPENED WHEN YOU PLACED THE EMERGENCY SICK CALL?

18  **A.**   I WENT TO THE ATU AND I WAS MET BY AN EMT THAT GAVE ME

19  SOME IBUPROFEN AND TOLD ME I'D BE SCHEDULED FOR A DOCTOR'S

20  APPOINTMENT.

21  **Q.**   APPROXIMATELY HOW LONG AFTER YOU SAW THE EMT DID YOU HAVE

22  THE APPOINTMENT WITH THE DOCTOR?

23  **A.**   IT NEVER HAPPENED.  THE FOLLOWING DAY I HAD A -- THE

24  BEGINNING OF MY SEMESTER AT A BIBLE COLLEGE AND I WAS TRYING TO

25  SIT THROUGH THE FIRST LECTURE AND THE PAIN WAS TOO MUCH.  I

04:36 1   COULDN'T EVEN FOCUS ON THE LECTURE, SO I MADE ANOTHER EMERGENCY

2   CALL.

3   **Q.**   AND THEN WHAT HAPPENED?

4   **A.**   ANOTHER EMT TOLD ME THAT I WAS ON A FUTURE SCHEDULE AND

5   THAT THERE WAS NOTHING THAT THEY COULD DO FOR ME.

6   **Q.**   WHAT HAPPENED AFTER THAT?

7   **A.**   I WENT BACK TO MY DORM AND I WAS FEELING TINGLING IN MY

8   FINGERS AND MY TOES, AND I WENT AND LAID DOWN. I TOOK A NAP.

9   A COUPLE OF HOURS LATER WHEN I WOKE UP, I -- WHEN I WAS

10   CLIMBING DOWN FROM THE BUNK -- I WAS IN THE TOP BUNK -- MY LEGS

11   WERE NUMB AND I WAS STUMBLING TRYING TO GET DOWN. I ALMOST

12   FELL.

13   **Q.**   WHAT DID YOU DO?

14   **A.**   I WENT TO SECURITY AND TOLD THEM THAT I WOULD NEED AN

15   AMBULANCE, THAT SOMETHING WAS WRONG.

16   **Q.**   AND APPROXIMATELY HOW LONG AFTER YOU WENT TO SECURITY DID

17   THE AMBULANCE ARRIVE?

18   **A.**   ABOUT AN HOUR OR TWO.

19   **Q.**   AND WHERE DID THE AMBULANCE TAKE YOU?

20   **A.**   NOWHERE. THE EMTS DID AN EVALUATION. THEY HAD ME STAND

21   UP AND WAS ASKING ME TO DO DIFFERENT THINGS WITH MY FEET AND

22   QUESTIONING ME. AND THE WOMAN THAT WAS DOING THE EXAMINATION,

23   SHE WAS KIND OF BEING ROUGH WITH ME, AND I ASKED HER NOT TO

24   DISRESPECT ME, THAT I WAS IN A LOT PAIN. AND AT THAT POINT SHE

25   LOOKED AT HER PARTNER AND SAID THAT "I THINK I'VE SEEN ENOUGH.

04:37 1   HE SEEMS FINE TO ME."  AND THEY LEFT.

2   **Q.**    DO YOU RECALL HER NAME?

3   **A.**    IT WAS CAPTAIN CASHIO.

4   **Q.**    WHAT HAPPENED AFTER THAT?

5   **A.**    I HAD SOME FRIENDS HELP ME TO THE PHONE AND I CALLED MY

6   EX-WIFE AND MY MOTHER, HAD THEM CALL THE PRISON TO DEMAND SOME

7   MEDICAL ATTENTION, FIND OUT WHY I WAS DENIED MEDICAL ATTENTION.

8   **Q.**    AND THEN WHAT?

9   **A.**    I TRIED TO USE THE RESTROOM.  MY BLADDER WAS FULL AND I

10   WASN'T ABLE TO, SO I HAD SOME FRIENDS HELP ME TO MY BUNK.  I

11   COULDN'T CLIMB INTO MY BUNK, SO I HAD THEM REMOVE THE MATTRESS

12   FROM MY BUNK AND I LAID DOWN ON THE FLOOR.  THERE WAS A COUNT,

13   AND SECURITY RANK HAD COME IN TO COUNT.  THEY KNEW THE

14   SITUATION WITH THE MEDICAL AND THEY WERE SYMPATHETIC, BUT THEY

15   DIDN'T DO ANYTHING.  THEY EVEN STEPPED OVER ME, COUNTED AND

16   DIDN'T ASK ME WHY I WAS DOWN.  JUST COUNTED AND LEFT.

17   **Q.**    AND THEN WHAT HAPPENS?

18   **A.**    I TRIED TO USE THE RESTROOM AGAIN.  STILL NOTHING.  I

19   THINK I TRIED A COUPLE OF TIMES AND LAID BACK DOWN, AND I THINK

20   I CALLED MY MOM AGAIN TO SEE IF SHE HEARD ANYTHING.  SHE TOLD

21   ME THAT THEY HAD TOLD HER THAT I HAD RECEIVED MEDICAL ATTENTION

22   AND THAT I WAS EITHER LYING OR WAS MISINFORMED.

23         THE NEXT TIME I WENT TO USE THE BATHROOM, I TRIED TO

24   STAND UP AND URINE.  I COULDN'T, SO I TRIED TO SIT DOWN ON THE

25   TOILET TO URINE AND STILL COULDN'T.  BUT WHEN I STOOD UP TO

04:39 1    PULL UP MY PANTS, I WINDED UP FALLING.  AND FROM THE FALL I

2    SCREAMED AND SOME INMATES CAME TO HELP ME AND I TOLD THEM I

3    NEEDED AN AMBULANCE.

4    **Q.**    DID THE AMBULANCE COME?

5    **A.**    YES.  THE SAME EMTS SHOWED UP, AND I COULD TELL RIGHT AWAY

6    THAT SHE THOUGHT I WAS FAKING OR CONTINUING WITH THE CHARADE

7    FROM EARLIER.  THEY PUT ME ON A STRETCHER, AND I TOLD HER THAT

8    MY NECK WAS HURTING, AND SHE DIDN'T USE ANY KIND OF NECK

9    RESTRAINT OR USE ANY TECHNIQUE FOR A NECK INJURY.

10         AS I'M GOING OUT THE DOOR, I ASKED FOR ANOTHER INMATE

11    TO GET ME A -- MY PILLOW.  THEY TOLD HIM THAT I COULDN'T HAVE

12    IT.  AND THEY BROUGHT ME TO -- DOWN THE -- DOWN THE WALK.  WE

13    WAS THE LAST DORM, SO WE HAD TO GO ALL THE WAY BACK TO THE EAST

14    GATE.  AND THERE WAS A SERGEANT ON DUTY THERE, A SERGEANT

15    COLLINS.  I ASKED HER TO PLEASE TELL THEM TO RESTRAIN MY NECK,

16    THAT I WAS IN A LOT OF PAIN.  AND AT THAT POINT WE WAS AT THE

17    AMBULANCE.  SO UNDER HER SUPERVISION THEY DID PUT THE NECK

18    RESTRAINT ON.

19    **Q.**    WHERE DID THE AMBULANCE TAKE YOU?

20    **A.**    TO THE EMERGENCY ROOM, THE ATU.

21    **Q.**    AND WHAT HAPPENED THERE?

22    **A.**    I WAS EXAMINED BY ANOTHER WOMAN, A NURSE PRACTITIONER, AND

23    SHE ADOPTED THE SIMILAR ATTITUDE, THOUGHT I WAS FAKING.  THEY

24    PUT ME IN ONE OF THE BEDS AND SHE ASKED ME TO PULL MYSELF OVER

25    SO THAT SHE CAN PERFORM SOME KIND OF EXAMINATION.  WHEN I

04:41 1  GRABBED THE RAIL OF THE BED TO TRY TO PULL MYSELF -- AND I WAS
      2  ABLE TO PULL THE TOP PART OF MY BODY, BUT FROM THE HIP DOWN I
      3  WASN'T ABLE TO MOVE IT TO THE RAIL.  SO I TOLD HER I COULDN'T.
      4  AND SO AT THAT POINT SHE SHOVED ME FROM MY SHOULDER FACE-FIRST
      5  INTO THE RAIL AND SHOVED HER FINGER INTO MY ANUS.  AND WHEN SHE
      6  WAS FINISHED, I ASKED HER IF -- I SAID, "IS THIS HOW YOU TREAT
      7  ALL YOUR PATIENTS?"
      8        AND SHE SAID, "ONLY THE ONES I KNOW THAT ARE LYING."
      9  Q.  DO YOU RECALL HER NAME?
     10  A.  YEAH.  IT WAS CINDY PARK.
     11  Q.  HAD YOU MET CINDY PARK BEFORE?
     12  A.  I CAN'T RECALL.  I DON'T THINK SO.
     13  Q.  AFTER THIS INCIDENT AT THE ATU, WHAT HAPPENED?
     14  A.  AT THAT POINT I WAS TELLING HER THAT I NEEDED TO URINE,
     15  THAT MY BLADDER WAS FULL.  SHE DID AN EXAMINATION PRESSING ON
     16  MY STOMACH.  SHE SAID THAT IT WAS NOT DISTENDED, AND I ASSURED
     17  HER THAT IT WAS FULL.  AND SO THE -- SHE INSTRUCTED WHOEVER
     18  WAS HELPING HER TO PERFORM A CATH AND THEY DID.  AND AT THAT
     19  POINT I RELEASED PROBABLY ABOUT 2,000 MILLILITERS OF URINE.
     20  THEY HAD TWO DIFFERENT CONTAINERS THEY FILLED UP.  AND I ASSUME
     21  FROM THAT SHE WAS CONVINCED AND ORDERED AN EMERGENCY TRANSPORT
     22  TO A HOSPITAL.
     23  Q.  AND THEN WHICH HOSPITAL WERE YOU TAKEN TO?
     24  A.  THE UMC IN NEW ORLEANS.
     25  Q.  AND HOW LONG DID IT TAKE YOU TO GET TO UMC FROM THE ATU?

04:43 1    **A.**   IT WAS PROBABLY ABOUT NINE HOURS.

2    **Q.**   WHY IS THAT?

3    **A.**   WE LEFT PROBABLY AROUND 10:00, 10:30, 11:00 THAT NIGHT.

4    AND SHORTLY AFTER LEAVING THE ANGOLA PREMISES -- THEY WERE

5    DRIVING REALLY FAST, AND AT SOME POINT THEY HIT A DEER AND THEY

6    PULLED OVER, HAD TO WAIT FOR THE POLICE TO MAKE A REPORT.  AND

7    THEY CALLED TO CHECK IN TO THE PRISON.  THE PRISON TOLD THEM TO

8    RETURN THE VEHICLE AND CHANGE VEHICLES.  SO BY THE TIME I GOT

9    TO THE HOSPITAL, I REMEMBER SEEING THE SUNRISE.

10    **Q.**   APPROXIMATELY HOW LONG DID YOU SPEND AT UMC?

11    **A.**   AS I RECALL, I WAS -- ABOUT THREE WEEKS.

12    **Q.**   DID YOU HAVE SURGERIES?

13    **A.**   YES.  I HAD TWO SURGERIES.

14    **Q.**   WHEN YOU CAME BACK TO LSP FROM UMC, WHERE DID YOU GO?

15    **A.**   TO NURSING UNIT 1.

16    **Q.**   AND APPROXIMATELY HOW LONG DID YOU SPEND THERE?

17    **A.**   I'D SAY ABOUT THREE MONTHS.

18    **Q.**   AND THEN WHERE DID YOU GO AFTER THAT?

19    **A.**   RIGHT ACROSS THE HALL, NURSING UNIT 2.

20    **Q.**   AND APPROXIMATELY HOW LONG DID YOU SPEND THERE?

21    **A.**   I THINK ABOUT THE SAME AMOUNT OF TIME.

22    **Q.**   YOU ALSO MENTIONED A RECURRING RASH.  CAN YOU PLEASE

23    DESCRIBE THE SYMPTOMS OF YOUR RASH?

24    **A.**   YEAH.  IT WAS JUST LITTLE SPOTS, REAL ITCHY.  THE MORE I

25    ITCHED, IT WOULD GET IRRITATED AND SPREAD.  IT HAD GOTTEN TO

04:45 1   ABOUT 60 PERCENT OF MY BODY.  IT STARTED ON MY LEGS AND THEN IT

2   WAS ON MY ARMS AND STOMACH.  HOT WATER WOULD MAKE IT BLISTER.

3   SO SHOWERING -- I'D HAVE TO TAKE COOL SHOWERS SO THAT IT

4   WOULDN'T BLISTER UP.

5   **Q.**   WHAT HAVE YOU DONE TO SEEK TREATMENT FOR YOUR RASH?

6   **A.**   I PUT IN A COUPLE SICK CALLS.

7   **Q.**   AND WHO SAW YOU ABOUT YOUR RASH?

8   **A.**   AT FIRST IT WAS AN EMT.  I DON'T KNOW IF SHE GAVE ME THE

9   HYDROCORTISONE OR SCHEDULED ME FOR A DOCTOR.  BUT AFTERWARDS I

10  DID SEE A DOCTOR, DR. MACMURDO.

11  **Q.**   DO YOU STILL HAVE THE RASH?

12  **A.**   YES.  IT'S STILL PERSISTENT.

13  **Q.**   WHAT TREATMENT WOULD YOU HAVE LIKED TO HAVE RECEIVED FOR

14  YOUR RASH?

15  **A.**   I THINK A DERMATOLOGIST PROBABLY WOULD HAVE BEEN A -- THE

16  RIGHT CHOICE.

17  **Q.**   OKAY.  YOU ALSO MENTIONED HAVING BOWEL INCONTINENCE

18  FOLLOWING YOUR NECK INJURY.  CAN YOU PLEASE DESCRIBE THE

19  SYMPTOMS OF THAT FOR ME?

20  **A.**   YES.  AT FIRST IT WOULD JUST BE ALL THE TIME.  I WOULD

21  HAVE TO WEAR A DIAPER.

22          WHILE I WAS IN THE HOSPITAL AT UMC, THE NURSES WOULD

23  HAVE TO CLEAN ME UP.

24          HERE AT ANGOLA, THEY PUT ME ON VARIOUS MEDICINES AND

25  IT BECAME TO WHERE IT WOULD BE -- I CAN GO THREE OR FOUR DAYS

04:46 1    WITHOUT HAVING A BOWEL MOVEMENT.

2    **Q.**    DID YOU EVER SEEK TREATMENT FOR YOUR INCONTINENCE?

3    **A.**    YES.  THEY HAD ME ON MEDICATION.  AND AT ONE POINT THEY

4    HAD ME ON SIX DIFFERENT LAXATIVES, SO THEY STARTED GIVING ME

5    SUPPOSITORIES.  AND THAT WAS A STIMULANT AND THAT USUALLY WOULD

6    FIX THE PROBLEM.

7    **Q.**    HAVE YOU EVER HAD ANY ISSUES GETTING YOUR SUPPOSITORIES?

8    **A.**    WHILE I WAS ON THE WARD?  NO.  BUT WHEN THEY LET ME GO

9    DOWN THE WALK TO A MEDICAL DORM, THAT WAS THE ONE PRESCRIPTION

10   THAT I DIDN'T RECEIVE.

11   **Q.**    DID YOU ASK FOR THE SUPPOSITORIES AGAIN?

12   **A.**    YES.  YES.  AFTER ABOUT THREE DAYS IT STARTED BECOMING A

13   BIT OF A PROBLEM.  I HAD TALKED TO THE PILL CALL LADY.  I'VE

14   TALKED TO SOME NURSES.  AND FINALLY I WAS ABLE TO GET MY WAY

15   BACK TO THE WARD AND ASKED THE NURSES THAT KNEW ME TO GIVE ME

16   SOME SUPPOSITORIES, AND THEY DID.  THEY ORDERED THEM -- OR THEY

17   SAID THEY DID, BUT I NEVER RECEIVED THEM DOWN THE WALK.

18   **Q.**    MR. CREPPEL, SINCE 2019 HAVE YOU EVER REFUSED TO GO ON A

19   TRIP TO AN OUTSIDE HOSPITAL?

20   **A.**    I THINK I RECALL ONCE OR TWICE.

21   **Q.**    DO YOU RECALL WHY YOU REFUSED?

22   **A.**    ONE I BELIEVE WAS RELATED TO THE RASH.  IT WAS -- THE RASH

23   HAD CLEARED UP FOR A TIME.  THEY HAD FINALLY GIVEN ME A STEROID

24   SHOT AND IT CLEARED IT UP.  AND I HAD BEEN SITTING IN THE

25   BULLPEN WAITING FOR A -- TO SEE A DOCTOR FOR ABOUT THREE HOURS,

SO I ASKED THEM WHEN THE DOCTOR WAS GOING TO BE THERE AND THEY

SAID THAT, YOU KNOW, JUST SIT TIGHT.  AND I SAID THAT I WANTED

TO REFUSE.

**Q.**   ANYTHING ELSE?

**A.**   THERE WAS ANOTHER ONE I KNOW THAT WHILE I WAS ON THE WARD.

THEY HAD TAKEN THE CATHETER OUT AND THEY WERE DOING WHAT THEY

CALLED A BLADDER TRAINING, AND I WAS LEARNING TO URINATE IN THE

URINAL INSTEAD OF THE BLADDER.  AND IT HAD BEEN RECENT SINCE

I'D DONE IT, SO I STILL HADN'T MASTERED IT.  I WAS -- I HAD A

LOT OF CONTROL ISSUES WHERE I WOULD ACTUALLY HAVE TO FALL

ASLEEP WITH THE URINAL IN POSITION, AND I TOLD THE EMTS THAT I

NEEDED AT LEAST A CONDOM CATHETER TO TRAVEL TO THE CALLOUT, AND

THEY ASKED MS. CINDY PARK.  SHE REFUSED.  AND I TOLD THEM THAT

I COULDN'T GO 'CAUSE I WOULD BE PEEING ON MYSELF THE WHOLE

TIME.

**Q.**   AND WAS --

**A.**   'CAUSE I WOULD BE IN RESTRAINTS AND TRYING TO HOLD A

URINAL.

**Q.**   WAS THAT A TRIP TO UMC?

**A.**   YES.

**Q.**   YOU SAID YOU HAD BEEN IN ASH 1 FOR ABOUT A YEAR AND A

HALF.  CAN YOU PLEASE DESCRIBE THE CONDITIONS IN ASH 1?

**A.**   WELL, YOU HAVE A LOT OF OLD, IRRITABLE SICK MEN.  YOU HAVE

PEOPLE WITH CONDITIONS LIKE MINE, SOME WORSE, SOME LESS.  IT'S

NOT VERY SANITARY.  THE ORDERLIES TRY TO KEEP UP WITH IT.  BUT

04:50 1    YOU GOT SO MUCH -- YOU HAVE A LOT OF URINE AND DEFECATION.

2    USUALLY IN THE SHOWER AREA.  THE WHEELCHAIR ACCESS IS LIMITED.

3              WHEN I WAS IN CYPRESS 2 THEY HAD MORE TIME TO PREPARE

4    IT FOR A MEDICAL DORM.  BUT RIGHT BEFORE THEY MOVED US TO ASH

5    1, THEY DID LIKE A -- KIND OF A QUICK UPGRADE OF THE DORM AND

6    IT WAS LIKE A -- KIND OF A REAL FAST FIX AND THEY OVERLOOKED A

7    LOT OF THINGS, AND THEY KIND OF SHORTCHANGED A LOT OF THINGS,

8    SO --

9    Q.   YOU MENTIONED THAT WHEELCHAIR ACCESS IS LIMITED.  WHAT DO

10   YOU MEAN BY THAT?

11   A.   WELL, FOR INSTANCE, GOING TO THE SHOWER, YOU HAVE LIKE A

12   FIVE-FOOT DOORWAY AND THEY CUT A RAMP INTO WHAT USED TO BE A

13   CURB THAT WOULD SEPARATE THE HALLWAY FROM THE BATHROOM.  THEY

14   CUT ABOUT A TWO-AND-A-HALF-FOOT, THREE-FOOT SWATH RAMP.  SO IF

15   YOU DON'T HIT IT JUST RIGHT -- THERE'S DIFFERENT WIDTH

16   WHEELCHAIRS.  MINE IS SLIMMER THAN SOME.  BUT IF YOU DON'T HIT

17   IT THE RIGHT ANGLE, YOU COULD HIT THE SHARP CURB AND IT COULD

18   TIP YOU OVER.

19   Q.   DO YOU FACE ANY OTHER ACCESS LIMITATIONS AS A RESULT OF

20   BEING IN A WHEELCHAIR?

21   A.   YES.  THERE'S TWO SHOWERS IN THE BATHROOM THAT ARE

22   WHEELCHAIR ACCESSIBLE; ONE OF THEM ONLY HAS HOT WATER.  THAT'S

23   ONE.  THE AREA WHERE WHEELCHAIRS HAVE ACCESS TO RECREATION, THE

24   YARD IS LIMITED TO THE BACK LEDGE.  AND FOR A LONG TIME WE

25   DIDN'T HAVE A RAMP OR HANDRAILS.

04:52 1    RECENTLY THEY LAID THE CONCRETE FOR THE RAMP, AND SO
2    WE WAS ABLE TO GO UP AND DOWN.  BUT THE HANDRAILS WAS A COUPLE
3    OF MONTHS IN WAITING.  SO THEY HAD A COUPLE OF GUYS FALL OFF
4    THE LEDGE AND OFF THE RAMP AND OFF THE -- LIKE A
5    BASKETBALL-COURT-SIZE DECK THAT THEY POURED.
6    **Q.**    DO YOU RECALL THE NAMES OF ANY OF THOSE INDIVIDUALS?
7    **A.**    THE ONE THAT FELL OFF THE DECK WAS DENNIS MISCHLER.
8    **Q.**    HAVE THEY MADE ANY CHANGES TO THE FACILITIES IN ASH 1
9    RECENTLY?
10   **A.**    AS FAR AS LIKE CONSTRUCTION?
11   **Q.**    IN TERMS OF -- YES, CONSTRUCTION ACCESSIBILITY.
12   **A.**    YEAH.  LIKE I SAID, THE RAMP WAS POURED A FEW MONTHS BACK,
13   BUT THEY DIDN'T HAVE HANDRAILS.  SO ALL OF A SUDDEN IT WAS LIKE
14   A QUICK -- QUICK UPGRADE THEY DID AROUND THE PRISON, A LOT OF
15   CONSTRUCTION, A LOT OF MAINTENANCE GOING ON, AND IT -- THEY PUT
16   UP HANDRAILS AND CUT DOWN SOME OTHER HANDRAILS.  AND IT WAS
17   LIKE THREE DAYS LATER THERE WAS A TOUR.  I THINK IT WAS THE
18   PROMISE OF JUSTICE HAD COME THROUGH.
19   **Q.**    DO YOU FACE ANY OTHER ISSUES GETTING AROUND THE PRISON
20   OUTSIDE OF THE ASH 1 COMPLEX?
21   **A.**    YES.  THERE'S LONG DISTANCES BETWEEN CALLOUTS; LIKE, SAY,
22   THE CHAPEL OR THE VISITING SHED OR LIBRARY, ALL THESE PLACES
23   THAT ARE WELL OVER 300 YARDS TO GET TO.  SO YOU USUALLY HAVE A
24   PUSHER, UNLESS YOU'RE PHYSICALLY ABLE TO PUSH YOURSELF.
25         THERE'S AN ELEVATOR IN THE EDUCATION BUILDING FOR

04:53 1   CALLOUTS.  LIKE, IF THEY WANT TO GO TO A REHABILITATION

2   PROGRAM, THEY USED TO HOLD THEM IN THE EDUCATION BUILDING.  AND

3   THERE'S ONE ELEVATOR AND IT'S USUALLY -- EVERY OTHER WEEK OR SO

4   IT'S BROKE DOWN.

5   **Q.**   WHAT HAS BEEN YOUR EXPERIENCE WITH THE SICK CALL SYSTEM AT

6   ANGOLA SINCE JANUARY 1, 2019?

7   **A.**   WELL, I TRY TO AVOID IT.  THE ONE -- THE ONE THAT I DEALT

8   WITH WAS YOU HAD TO BE UP AT 4:30 IN THE MORNING TO CATCH THE

9   EMTS.  SOMETIMES THEY WOULD COME INTO THE DORM AND YELL "SICK

10   CALL" AND THEN LEAVE.

11         AND IN THE SUMMERTIME YOU HAD FANS, LIKE YOU MIGHT

12   HAVE SIX, EIGHT FANS GOING.  AND SO A LOT OF TIMES YOU WOULDN'T

13   HEAR, SO YOU'D ACTUALLY HAVE TO BE UP AND AT THE FRONT.

14         AND THEN AT OTHER TIMES THEY WOULDN'T EVEN COME INTO

15   THE DORM.  THEY WOULD HOLLER FROM THE UNIT, WHICH IS JUST FOUR

16   DORMS TO A UNIT.  SO THEY'D BE LIKE IN THE MIDDLE OF A UNIT AND

17   THEY'LL JUST YELL IT ONE TIME AND KEEP MOVING TO THE NEXT UNIT.

18   **Q.**   HAVE YOU PLACED SICK CALL SINCE NOVEMBER 1ST OF 2021?

19   **A.**   NO, I HAVEN'T.

20   **Q.**   WHY NOT?

21   **A.**   MAINLY FOR THAT REASON.  IT WAS -- IT WAS VERY HARD TO

22   CATCH THE EMTS, AND THEN UNLESS IT WAS SOMETHING REALLY SEVERE,

23   YOU KNOW, I'D PREFER JUST TO AVOID THEM.

24   **Q.**   DID ANYONE WHO WORKS AT LSP EXPLAIN A NEW SICK CALL

25   PROCEDURE TO YOU?

**A.** NO. I DIDN'T EVEN KNOW THERE WAS ONE UNTIL I'D SEEN A BOX.

**Q.** DO YOU TAKE ANY MEDICATIONS?

**A.** YES.

**Q.** MORE THAN ONE?

**A.** YES.

**Q.** MORE THAN FIVE?

**A.** YES, UNFORTUNATELY.

**Q.** HOW DO YOU GET THESE MEDICATIONS?

**A.** IN THE MEDICAL DORMS THEY HAVE PILL CALL THAT COMES TO THE DORMS. THEY HAVE KOP, KEEP ON PERSON, THE ONES THAT ARE I GUESS OVER-THE-COUNTER SAFE; THEY'LL LET YOU KEEP CARDS OF MEDICATIONS. AND THE ONES THAT AREN'T, THEY'LL DISTRIBUTE PERSONALLY TO THE INMATE.

**Q.** HAVE YOU NOTICED ANY RECENT CHANGES TO PILL CALL?

**A.** YES. THE OFFICERS THAT DISTRIBUTE THE MORNING MEDICATION HAVE STARTED COMING AT 4:30 IN THE MORNING INSTEAD OF 8:00 IN THE MORNING.

**Q.** IS THIS BETTER?

**A.** NO, NOT AT ALL.

**Q.** HAVE YOU EVER ENCOUNTERED ANY PROBLEMS GETTING THE MEDICATIONS THAT YOU NEED?

**A.** YES. THERE WAS -- YOU KNOW, THE SUPPOSITORY SITUATION, IT TOOK A WHILE TO GET THAT STRAIGHT. BUT ALSO THERE'S UNUSUAL TIME -- THEY'LL HAVE LIKE A DISCONTINUE DATE ON A MEDICATION.

04:56 1  A LOT OF TIMES THE PATIENT WON'T KNOW UNTIL YOU GO TO GET YOUR

2  MEDICATION AND THE OFFICER TELLS YOU "THIS HAS BEEN

3  DISCONTINUED."  WELL, IF IT'S SOMETHING THAT I NEED, LIKE THIS

4  DITROPAN FOR BLADDER SPASMS, IF I DIDN'T GET THE MEDICATION, IT

5  COULD CAUSE ME TO URINE ON MYSELF.  AND IF THEY DIDN'T HAVE AND

6  IT WAS DISCONTINUED, THEY'D TELL ME I'D HAVE TO GO SEE A DOCTOR

7  TO GET IT, AND THAT WOULD MEAN I'D HAVE TO GO GET A SICK CALL.

8  AND THEN IT COULD TAKE A WEEK OR TWO BEFORE I GET SCHEDULED TO

9  SEE A DOCTOR.  SO IN THE MEANTIME I'M STUCK URINATING ON

10  MYSELF.

11  Q.   YOU MENTIONED THAT CORRECTIONAL OFFICERS ADMINISTER

12  MEDICATION.  DO YOU HAVE ANY CONCERNS ABOUT CORRECTIONAL

13  OFFICERS ADMINISTERING MEDICATION?

14  A.   YEAH.  I MEAN, IT'S -- I THINK THERE'S SOME OBVIOUS

15  ISSUES.  IF THEY DON'T -- ARE NOT FAMILIAR WITH YOUR MEDICATION

16  AND THEY'RE GIVING IT TO YOU -- IF YOU'RE NOT FAMILIAR WITH

17  WHAT THEY'RE GIVING YOU, YOU COULD TAKE IT AND THERE COULD BE A

18  MISTAKE IN WHAT THEY GIVE YOU.  AND IF THERE'S A PROBLEM WITH

19  YOUR MEDICATION, THEY CAN'T ANSWER THE QUESTIONS.  THEY DON'T

20  REALLY KNOW MUCH ABOUT IT.

21       I'VE HAD TO REORDER MEDICINE BEFORE AND THEY'LL --

22  WHATEVER IS ON THE COMPUTER, THEY'LL KNOW WHAT TO ORDER.  BUT

23  LIKE IF THERE'S A CHANGE IN NAME OR A DESCRIPTION, THEY REALLY

24  CAN'T HELP YOU.

25  Q.   MR. CREPPEL, WHY ARE YOU TESTIFYING TODAY?

04:58  1  **A.**   WELL, HONESTLY, IT'S BEEN A LONG THREE YEARS.  I'VE

2  ENDURED A LOT OF PAIN AND IRRITATION IN THE LAST THREE YEARS,

3  AND I REALLY WOULD NOT WISH THAT ON MY WORST ENEMY.  AND I

4  THINK THAT A CHANGE NEEDS TO BE DONE HERE AND IT'S REALLY

5  RIDICULOUS, AND I HOPE THAT MY TESTIMONY WILL HELP THAT.  I

6  MEAN, I'M NOT GOING TO GET ANYTHING OUT OF IT, AND I HOPE

7  SOMEBODY IN THE FUTURE WILL; THAT THEY WON'T HAVE TO GO THROUGH

8  WHAT I WENT THROUGH.

9  **Q.**   WHAT WOULD YOU LIKE TO SEE CHANGED TO THE HEALTH CARE AT

10  LSP?

11  **A.**   I WOULD SAY THE TRAINING.  BUT I THINK THAT THE TRAINING

12  WOULD ONLY MAKE THE ALREADY BITTER EMPLOYEES MORE BITTER.  I

13  THINK THAT WE NEED TO HAVE A CHANGE IN THE POOL OF PEOPLE THAT

14  THEY'RE BRINGING IN.  IT'S NOT THE -- IT'S NOT THE CHOICE

15  PROFESSION THAT THESE PEOPLE ARE COMING IN.  IT'S NOT BECAUSE

16  OF A GENUINE DESIRE TO HELP PEOPLE, TO HEAL PEOPLE.  IT'S

17  BECAUSE IT'S THEIR FRIEND, THEIR COUSIN THAT'S GETTING THEM THE

18  JOB THAT'S WORKING FOR THE STATE.  SO I THINK THAT DOC NEEDS TO

19  RELEASE THE MONOPOLY ON REHIRING NEW HIRES.

20  **Q.**   DID YOU HAVE ANY HESITATIONS ABOUT COMING HERE TO TESTIFY

21  TODAY?

22  **A.**   YES.  YES.  I HAD SOME CONCERNS ABOUT, YOU KNOW, TRAVELING

23  HERE.  AND THERE WAS ALWAYS THE FEAR OF THE BLACK BOX.

24  **Q.**   WHY DO YOU HAVE CONCERNS ABOUT BEING TRANSPORTED WITH A

25  BLACK BOX?

05:00 1   **A.**   IT'S VERY PAINFUL, ESPECIALLY IN A WHEELCHAIR.  THE

2   POSITION OF THE BOX -- REGULAR HANDCUFFS YOU HAVE LIKE FOUR

3   LINKS WHERE YOU CAN ACTUALLY MOVE YOUR ARMS OUT.  BUT WITH THE

4   BLACK BOX, IT KEEPS YOU CONSTRICTED WITHIN LIKE FOUR INCHES OF

5   YOUR WRISTS.  AND TO KEEP YOUR ELBOWS OUT, IT'S ALMOST

6   IMPOSSIBLE.  SO IT'S GOING TO DIG INTO YOUR ARM AND YOU WILL

7   HAVE TO JUST CHANGE POSITION, LET IT DIG IN FOR A WHILE ON ONE

8   SIDE AND THEN CHANGE POSITIONS, DIG IN FOR A LITTLE WHILE ON

9   THE OTHER SIDE.  THERE'S NO WAY OF AVOIDING PAIN.

10   **Q.**   HAVE YOU BEEN TRANSPORTED WITH A BLACK BOX BEFORE?

11   **A.**   YES.

12   **Q.**   TO WHERE?

13   **A.**   I WENT TO UMC ABOUT FIVE WEEKS AGO, SIX WEEKS AGO.

14   **Q.**   AND WHY WERE YOU TRANSPORTED TO UMC WITH A BLACK BOX?

15   **A.**   PREVIOUSLY I WAS IN A FLEX CUFF ORDER.  BUT FOR SOME

16   REASON, THEY DIDN'T HAVE THAT ORDER AND THEY TOLD ME I DIDN'T

17   HAVE A CHOICE.

18   **Q.**   DOES BEING TRANSPORTED WITH A BLACK BOX DISCOURAGE YOU

19   FROM GOING ON A MEDICAL TRIP?

20   **A.**   ABSOLUTELY.

21            **MS. MALIK:**  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

22            **THE COURT:**  CROSS.

23                         **CROSS-EXAMINATION**

24   BY MS. MCCAIN:

25   **Q.**   GOOD AFTERNOON.

05:01 1        MY NAME IS ALLENA MCCAIN ON BEHALF OF THE DEFENDANTS.
     2        MR. CREPPEL, I'M GOING TO TALK TO YOU ABOUT A FEW
     3 THINGS THAT YOU DON'T CRITICIZE OR YOU DIDN'T CRITICIZE IN YOUR
     4 DEPOSITION ABOUT THE CARE AT ANGOLA.
     5        YOU SAID THAT THE INMATE ORDERLIES DID EVERYTHING
     6 THAT YOU NEEDED FOR YOU.  CORRECT?
     7 **A.**   YES.
     8 **Q.**   THEY HELPED YOU WITH EATING AND DRINKING WHEN YOU WERE
     9 UNABLE TO USE YOUR ARMS?
    10 **A.**   YES, MA'AM.
    11 **Q.**   OKAY.  YOU DIDN'T HAVE ANY ISSUES WITH THE WAY THAT THEY
    12 DID THEIR JOB?
    13 **A.**   I MEAN, THE PART OF TAKING CARE OF ME LIKE THAT, NO.
    14 **Q.**   THEY HELPED YOU WITH YOUR ACTIVITIES OF DAILY LIVING.  IS
    15 THAT RIGHT?
    16 **A.**   YES.
    17 **Q.**   OKAY.  YOU EVEN SAID THAT THE INMATE ORDERLIES HAD KIND
    18 HEARTS AND DID A GOOD JOB.  IS THAT RIGHT?
    19 **A.**   YES, I'VE SAID THAT.
    20 **Q.**   WHEN YOU WERE HOUSED IN THE NURSING UNITS, YOU WERE IN
    21 NURSING UNIT 1 FIRST.  IS THAT RIGHT?
    22 **A.**   YES, MA'AM.
    23 **Q.**   AND I BELIEVE YOU TESTIFIED PREVIOUSLY THAT DR. LAVESPERE
    24 WAS IN CHARGE OF NURSING UNIT 1?
    25 **A.**   YES.

05:02  1    **Q.**   AND THEN YOU WERE TRANSPORTED TO NURSING UNIT 2 WHERE

2    NURSE PARK WAS IN CHARGE.  RIGHT?

3    **A.**   THAT'S RIGHT.

4    **Q.**   AND NURSE PARK IS THE ONE THAT YOU CLAIM DID A RECTAL

5    EXAMINATION ON YOU WHEN YOU HAD YOUR NECK INJURY?

6    **A.**   THAT'S RIGHT.

7    **Q.**   WHEN YOU WERE IN NURSING UNIT 2 YOU ASKED NURSE PARK TO

8    DISCHARGE YOU TO A MEDICAL DORM.  DO YOU REMEMBER THAT?

9    **A.**   YES.

10    **Q.**   OKAY.  AND NURSE PARK WANTED YOU TO STAY IN NURSING UNIT

11    2.  RIGHT?

12    **A.**   THAT'S RIGHT.

13    **Q.**   YOU GET MORE MEDICAL CARE IN NURSING UNIT 2.  RIGHT?

14    **A.**   YES.  AS FAR AS THINGS THAT I WASN'T GETTING IN NURSING

15    UNIT 1, I WAS ABLE TO GET IN NURSING UNIT 2, YES.

16    **Q.**   AND YOU GET MORE IN NURSING UNIT 2 THAN YOU DO ON THE

17    MEDICAL DORM.  RIGHT?

18    **A.**   YES.

19    **Q.**   OKAY.  AND NURSE PARK WANTED YOU TO STAY ON NURSING UNIT 2

20    FOR A LITTLE LONGER WHILE YOU REGAINED SOME OF YOUR MOBILITY.

21    IS THAT RIGHT?

22    **A.**   I THINK HER WORDS WAS THAT I WILL NEVER LEAVE.

23    **Q.**   BUT SHE WANTED YOU TO STAY LONGER.  RIGHT?

24    **A.**   YES.

25    **Q.**   AND YOU WANTED TO DISCHARGE TO A MEDICAL DORM?

05:03 1    **A.**    YES.

2    **Q.**    OKAY.  WHEN YOU MOVED TO THE MEDICAL DORM, YOU CONTINUED

3    TO GET PHYSICAL THERAPY WEEKLY.  RIGHT?

4    **A.**    YES.

5    **Q.**    ARE YOU STILL RECEIVING PHYSICAL THERAPY TODAY?

6    **A.**    NO.  I WAS RECENTLY TAKEN OFF.

7    **Q.**    OKAY.  BUT FOR SEVERAL MONTHS AND EVEN POSSIBLY FOR A FEW

8    YEARS YOU WERE GETTING PHYSICAL THERAPY.  CORRECT?

9    **A.**    THAT'S RIGHT.

10    **Q.**    AND YOU IMPROVED AND YOU REGAINED A BUNCH OF YOUR

11    STRENGTH.  RIGHT?

12    **A.**    YES, MA'AM.

13    **Q.**    OKAY.  AND YOU CAN WALK SOME.  RIGHT?

14    **A.**    YES, MA'AM.

15    **Q.**    SOMETIMES WITH A WALKER, SOMETIMES INDEPENDENTLY FOR SHORT

16    DISTANCES?

17    **A.**    NOT INDEPENDENTLY.  I CAN STAND UP, HOLD ONTO SOMETHING

18    AND GET BEHIND MY CHAIR.

19    **Q.**    OKAY.  AND THAT'S IMPROVED A LOT SINCE YOU WERE FIRST

20    ADMITTED TO NURSING UNIT 1.  RIGHT?

21    **A.**    YES.

22    **Q.**    OKAY.  AT YOUR DEPOSITION YOU TOLD MR. ROBERT THAT YOU

23    DIDN'T HAVE ANY ISSUES ACCESSING THE WHEELCHAIR BATHROOM.  IS

24    THAT RIGHT?

25    **A.**    I DON'T RECALL SAYING THAT.

05:04 1   **Q.**   DO YOU REMEMBER GIVING THAT DEPOSITION?

2   **A.**   YES.

3   **Q.**   AND YOU REMEMBER MR. ROBERT WAS THERE AND HE ASKED YOU

4   SOME QUESTIONS?

5   **A.**   YES.

6   **Q.**   OKAY.

7         **MS. MCCAIN:**  MS. RAGUSA, CAN WE PULL UP THE

8   DEPOSITION AT PAGE 35, LINES 4 THROUGH 7?

9   **BY MS. MCCAIN:**

10  **Q.**   DO YOU REMEMBER MR. ROBERT ASKING YOU IF THE WHEELCHAIR

11  ACCESSIBLE BATHROOM WAS WORKING FOR YOU?

12  **A.**   YES.

13  **Q.**   AND YOU TOLD HIM YES?

14  **A.**   OKAY.  I CAN SEE IT WRITTEN THERE.

15        **MS. MCCAIN:**  DOES HE HAVE ACCESS TO VIEW THE WITNESS

16  COMPUTER?  DOES IT FLIP?

17        **THE COURT:**  WE ARE GOING TO TURN IT AROUND.

18  **BY THE WITNESS:**

19  **A.**   THAT'S GOOD.

20  **Q.**   OKAY.

21  **A.**   THANK YOU.

22        **THE COURT:**  CAN YOU SEE IT?

23        **THE WITNESS:**  YES.

24        **THE COURT:**  ALL RIGHT.  GO AHEAD.  SHE'S JUST TELLING

25  ME THAT THE ZOOM CAMERA IS NOT CONNECTED BECAUSE OF THE

05:05 1   EVIDENCE, SO...
2            **MS. MCCAIN:** OKAY. WE CAN TAKE IT DOWN.
3            **THE COURT:** NO. YOU DON'T NEED TO TAKE IT DOWN. WE
4    ARE JUST -- I'M JUST LETTING Y'ALL KNOW THAT THE CLASS MEMBER
5    WHO IS AT LSP IS NOT GOING TO BE ABLE TO BE ON ZOOM WHILE YOU
6    ARE SHOWING DOCUMENTS ON THE CAMERA.
7                SO ARE YOU OKAY WITH THAT, MS. MONTAGNES?
8            **MS. MONTAGNES:** NO OBJECTION, YOUR HONOR.
9            **THE COURT:** ALL RIGHT. SO YOU MAY SHOW YOUR
10   EVIDENCE.
11   **BY MS. MCCAIN:**
12   **Q.** MR. CREPPEL, IN THE MEDICAL DORM YOU'RE CURRENTLY ABLE TO
13   DO MOST OF YOUR ACTIVITIES OF DAILY LIVING. RIGHT?
14   **A.** YOU MEAN AS IN LIKE PRIOR TO BEING --
15   **Q.** NOW THAT YOU'RE IN A MEDICAL DORM, YOU'RE ABLE TO BATHE
16   YOURSELF AND TAKE A SHOWER. RIGHT?
17   **A.** YES.
18   **Q.** OKAY. AND YOU CAN NAVIGATE THE DORM IN YOUR WHEELCHAIR OR
19   WITH A WALKER?
20   **A.** YES.
21   **Q.** OKAY. AND WHEN YOU HAVE AN ISSUE THAT YOU NEED HELP WITH,
22   THERE ARE ORDERLIES THERE TO HELP YOU. RIGHT?
23   **A.** YES.
24   **Q.** AND THEY'LL HELP YOU WITH THINGS LIKE MAKING YOUR BED?
25   **A.** YES.

05:06 1    Q.   OKAY.  I WANT TO TALK ABOUT THE RASH YOU TALKED ABOUT A

2    LITTLE BIT WITH MS. MALIK.  YOU FIRST HAD THAT RASH, FROM WHAT

3    I CAN TELL, IN ABOUT MARCH OF 2019.  DOES THAT SOUND RIGHT?

4    A.   YES.  IT WAS EARLY 2019.

5    Q.   AND YOU SAID THAT YOU HAD A SELF-DECLARED EMERGENCY FOR

6    THAT RASH?

7    A.   I DON'T REMEMBER IF IT WAS AN EMERGENCY OR A SICK CALL;

8    BUT, YES, I DID SEEK MEDICAL ATTENTION.

9    Q.   ALL RIGHT.  AND DO YOU REMEMBER BEING TAKEN TO THE ATU FOR

10   THAT?

11   A.   YES.

12   Q.   OKAY.  AND THEY GAVE YOU TWO OR THREE DIFFERENT

13   MEDICATIONS, INCLUDING A SHOT.  RIGHT?

14   A.   YES.  OVER A PERIOD OF TIME, NOT AT ONE VISIT.

15   Q.   OKAY.  AND YOU WERE SCHEDULED FOR A FOLLOW-UP ABOUT A WEEK

16   LATER, AND THAT WAS WHEN YOU REFUSED CARE BECAUSE THE RASH HAD

17   CLEARED UP.  RIGHT?

18   A.   YES.

19   Q.   OKAY.  YOU HAD ANOTHER ROUTINE SICK CALL ONE WEEK LATER

20   FOR THE SAME RASH.  RIGHT?

21   A.   I'M NOT SURE ABOUT THE TIME FRAME, BUT I KNOW I DID GO

22   BACK BECAUSE IT DID COME BACK.

23   Q.   OKAY.  WOULD YOU DISAGREE WITH ME IF I TOLD YOU IT WAS

24   LESS THAN TWO WEEKS AFTER YOU REFUSED THE CLINIC APPOINTMENT

25   FOR THE RASH?

05:07 1    A.    I WOULDN'T KNOW.  I DON'T REALLY REMEMBER.

2    Q.    OKAY.  AND WHEN YOU HAD THAT FOLLOW-UP SICK CALL, YOU WERE

3    SCHEDULED FOR A CLINIC APPOINTMENT?  DO YOU REMEMBER BEING

4    SCHEDULED FOR A CLINIC APPOINTMENT AFTER THAT SECOND ENCOUNTER

5    WITH THE RASH?

6    A.    I DON'T REMEMBER.  BUT THAT'S USUALLY HOW IT WORKS.

7    Q.    DO YOU REMEMBER BEING GIVEN ALLERGY MEDICATIONS FOR THAT

8    RASH?

9    A.    YES.

10    Q.    OKAY.  AND THEN THINGS CLEARED UP AGAIN.  RIGHT?

11    A.    NO.  IT WAS THE -- WHEN HE GAVE ME THE ALLERGY MEDICATION,

12    HE GAVE ME SOME BENADRYL AND ANOTHER CREAM.  NO, IT DID NOT

13    CLEAR UP.

14    Q.    OKAY.  SO FROM APRIL 22, 2019 UNTIL MAY 12, 2020, I DIDN'T

15    SEE ANYTHING IN YOUR MEDICAL RECORDS THAT INDICATED ANY

16    COMPLAINTS ABOUT A RASH.  DO YOU HAVE ANY REASON TO DISAGREE

17    WITH THAT?

18    A.    AT WHATEVER POINT HE GAVE ME THE STEROID SHOT, THAT'S WHEN

19    THE RASH STOPPED.  I DON'T KNOW WHAT DATE THAT WAS.

20    Q.    OKAY.  AND TO BE CLEAR, YOU SAID THAT YOU HAVEN'T DONE ANY

21    SICK CALLS SINCE NOVEMBER OF 2021.  BUT YOU DID DO SICK CALLS

22    IN 2020 FOR YOUR RASH.  RIGHT?  THAT WOULD HAVE BEEN WHILE YOU

23    WERE ON THE NURSING UNIT.

24    A.    YES.

25    Q.    OKAY.  AND YOU DID GET TREATMENT FOR THAT.  RIGHT?

1  **A.**   YES.

2  **Q.**   AND YOU HAD A FOLLOW-UP APPOINTMENT WITH THE GENERAL

3  MEDICINE CLINIC?

4  **A.**   I DON'T REMEMBER.  I WAS ON THE WARD.  THEY USUALLY --

5  IT'S RIGHT THERE.

6  **Q.**   BUT YOU WERE SEEN MULTIPLE TIMES IN 2020 FOR YOUR RASH,

7  TOO.  CORRECT?

8  **A.**   I REALLY DON'T REMEMBER.  I MEAN, WE'RE SAYING -- YOU'RE

9  TALKING ABOUT AFTER MY WHOLE WORLD WAS TURNED UPSIDE DOWN.  I

10  MEAN, I'M BEDRIDDEN.

11  **Q.**   OKAY.  ALL RIGHT.  I'M GOING TO SHOW YOU A RECORD FROM

12  WHEN YOU WERE ADMITTED TO UMC IN NEW ORLEANS WHEN YOU HAD

13  YOUR --

14          **MS. MCCAIN:**  THIS NEEDS TO BE SEALED.

15  **BY MS. MCCAIN:**

16  **Q.**   -- WHEN YOU HAD YOUR NECK PAIN.  WHEN YOU FIRST GOT TO UMC

17  IN NEW ORLEANS -- I KNOW YOU TESTIFIED THAT IT TOOK YOU A

18  LITTLE BIT TO GET THERE.  RIGHT?

19  **A.**   UH-HUH.

20  **Q.**   AND WHEN YOU GOT TO THE HOSPITAL, THE DOCTORS ASKED WHAT

21  WAS GOING ON WITH YOU AND YOU WERE ABLE TO TELL THEM.  RIGHT?

22  **A.**   YES.

23  **Q.**   DO YOU REMEMBER WHAT YOU TOLD THEM?

24  **A.**   DO I REMEMBER WHAT I TOLD THE DOCTORS THE NIGHT THAT I GOT

25  THERE IN THE EMERGENCY?

05:10 1  Q.   RIGHT.

2  A.   NO.

3  Q.   OKAY.

4          **MS. MCCAIN:**  MS. RAGUSA, IF WE CAN GO TO PAGE 254.

5  THIS IS DEFENSE EXHIBIT 34_III.

6  **BY MS. MCCAIN:**

7  Q.   CAN YOU SEE THIS?

8  A.   YES.

9  Q.   OKAY.  DO YOU SEE THAT THIS SAYS IN THAT PARAGRAPH LABELED

10  "HPI," IT SAYS, "PATIENT, WHO HAS BEEN COMPLAINING OF NECK PAIN

11  OVER THE LAST SEVERAL WEEKS, PATIENT WAS WORKING WITH A FELLOW

12  INMATE WHO WAS A PREVIOUS CHIROPRACTOR AND HAD MANIPULATED

13  PATIENT FOUR DAYS AGO."  DO YOU REMEMBER TELLING THE UMC

14  DOCTORS THAT YOU HAD SEEN A CHIROPRACTOR?

15  A.   NOT AT THAT TIME; BUT, YES, I DO REMEMBER HAVING A

16  CONVERSATION WITH THEM.

17  Q.   YOU TOLD SOME DOCTORS AT UMC NEW ORLEANS THAT YOU HAD SEEN

18  AN INMATE CHIROPRACTOR?

19  A.   YES.

20  Q.   AND THAT CHIROPRACTOR WASN'T AT THE TREATMENT CENTER.

21  CORRECT?

22  A.   NO.

23  Q.   THAT WAS SOMEBODY AT THE GENERAL CAMP?

24  A.   YES.

25  Q.   OKAY.  SO YOU HAD BEEN MANIPULATED FOUR DAYS PREVIOUSLY

05:11 1    AND YOUR PAIN REMAINED THE SAME, AND THEN YOU UNDERWENT A

2    SECOND MANIPULATION AND YOU FELT YOUR NECK CRACK.  IS THAT WHAT

3    YOU TOLD DOCTORS AT UMC NEW ORLEANS?

4    **A.**    I MEAN, IF THAT'S WHAT HE WROTE.  I MEAN, I WOULDN'T -- I

5    WOULDN'T CALL THE MAN A LIAR.  I'M ASSUMING THAT'S WHAT I SAID.

6    **Q.**    IS THAT WHAT HAPPENED?

7    **A.**    YES.

8    **Q.**    OKAY.  ALL RIGHT.  I'M GOING TO ASK YOU A LITTLE BIT ABOUT

9    BEFORE YOU GOT TO UMC NEW ORLEANS.  YOU HAD A SELF-DECLARED

10   EMERGENCY WHEN YOU SAID THAT YOU WOKE UP WITH A CRICK IN YOUR

11   NECK.  RIGHT?

12   **A.**    YES.

13   **Q.**    OKAY.  AND YOU SAID YOU WERE SEEN BY AN EMT AND THEY GAVE

14   YOU TYLENOL?

15   **A.**    IBUPROFEN.

16   **Q.**    OKAY.  IBUPROFEN.  I'M SORRY.  THOSE ARE DIFFERENT.

17         AND THEN THEY WERE GOING TO SCHEDULE YOU FOR AN

18   APPOINTMENT WITH YOUR NECK PAIN.  RIGHT?

19   **A.**    YES.

20   **Q.**    YOU DIDN'T TELL THEM THAT YOU HAD HAD A CHIROPRACTOR

21   ADJUST YOUR NECK, DID YOU?

22   **A.**    NO.

23   **Q.**    OKAY.  AND THEN YOU HAD A SECOND SELF-DECLARED EMERGENCY

24   EITHER LATER THAT DAY OR THE NEXT DAY AND YOU TOLD THEM YOU

25   DIDN'T WANT OVER-THE-COUNTER MEDICATIONS.  RIGHT?

05:12 1   **A.**   NO.

2   **Q.**   NO, THAT'S NOT RIGHT OR NO, YOU DID NOT TELL THEM THAT?

3   **A.**   NO, I DID NOT TELL THEM THAT.

4   **Q.**   OKAY.  BUT YOU DID SEE ANOTHER PROVIDER THE SECOND DAY.

5   RIGHT?

6   **A.**   YES.

7   **Q.**   OKAY.  AND YOU DIDN'T TELL THEM THAT YOU HAD AN INMATE

8   CHIROPRACTOR MANIPULATE YOUR NECK.  RIGHT?

9   **A.**   NO.

10   **Q.**   OKAY.

11   **A.**   BECAUSE THERE WAS NO CHANGE IN MY CONDITION.

12   **Q.**   AT WHAT POINT DID YOU GO FOR YOUR SECOND MANIPULATION FROM

13   THAT INMATE CHIROPRACTOR?  WAS IT BEFORE OR AFTER YOUR

14   SELF-DECLARED EMERGENCY?

15   **A.**   AS I SAID BEFORE, I'M NOT SURE.

16   **Q.**   OKAY.  SO YOU HAD HAD TWO SELF-DECLARED EMERGENCIES WHERE

17   YOU DIDN'T TELL THE EMTS OR THE PROVIDERS EXACTLY WHAT WAS

18   WRONG WITH YOUR NECK.  RIGHT?

19   **A.**   NO.  I TOLD THEM WHAT WAS WRONG WITH MY NECK.

20   **Q.**   OKAY.

21       **MS. MCCAIN:**  MS. RAGUSA, LET'S GO BACK TO PAGE 254 OF

22   THE MEDICAL RECORDS.

23   **BY MS. MCCAIN:**

24   **Q.**   ALL RIGHT.  IN THIS PARAGRAPH THAT WE WERE LOOKING AT A

25   MINUTE AGO, IT SAYS THAT AFTER THE SECOND MANIPULATION -- I'M

05:13 1    ON THE FOURTH LINE OF THIS LONG PARAGRAPH -- YOU UNDERWENT A

2    SECOND MANIPULATION AND FELT YOUR NECK CRACK.  YOU WERE THEN

3    UNABLE TO MOVE YOUR LEGS OR FELT THE URGE TO URINATE.  WAS IT

4    AFTER THAT SECOND MANIPULATION THAT YOU WERE UNABLE TO URINATE?

5    **A.**    THAT'S OBVIOUSLY INCORRECT, BECAUSE I WENT TO SCHOOL THE

6    NEXT DAY AND WALKED FROM SCHOOL TO THE HOSPITAL AND THEN BACK

7    TO MY DORM.

8    **Q.**    OKAY.  IT WAS AFTER THE SECOND MANIPULATION THAT YOU

9    STARTED HAVING WEAKNESS IN YOUR LEGS.  RIGHT?

10   **A.**    THERE WAS TINGLING IN MY FINGERS BEFORE THAT.

11   **Q.**    OKAY.  DID YOU TELL THE -- ANYONE AT LSP THAT YOU HAD

12   TINGLING IN YOUR FINGERS?

13   **A.**    YES.

14   **Q.**    DID YOU TELL PEOPLE AT LSP THAT YOU HAD HAD SOMEONE CRACK

15   YOUR NECK?

16   **A.**    NO.

17   **Q.**    OKAY.  YOU TESTIFIED EARLIER THAT THAT EVENING YOU HAD AN

18   AMBULANCE COME TO THE CAMP AND YOU TOLD THEM THAT YOUR PAIN WAS

19   GETTING WORSE WHEN YOU WENT TO SCHOOL?

20   **A.**    UH-HUH.

21   **Q.**    YOU ALSO TESTIFIED THAT THEY ASKED YOU TO DO A FEW THINGS

22   AND YOU SAID THEY GOT ROUGH WITH YOU.  IS THAT RIGHT?

23   **A.**    THAT'S RIGHT.

24   **Q.**    DO YOU REMEMBER BEING ASKED TO STAND UP?

25   **A.**    YES.

05:14 1    **Q.**   WERE YOU ABLE TO STAND UP?

2    **A.**   YES.

3    **Q.**   OKAY.  DO YOU KNOW WHETHER OR NOT CAPTAIN CASHIO CALLED A

4    NURSE PRACTITIONER?

5    **A.**   I'M SURE THAT SHE WOULD HAVE TO.  THEY WORKED TOGETHER IN

6    THE ATU.

7    **Q.**   AND IT WAS A FEW HOURS AFTER THAT AMBULANCE RUN WHERE YOU

8    FELL IN THE BATHROOM.  RIGHT?

9    **A.**   YES.

10   **Q.**   AND YOU DIDN'T TELL CAPTAIN CASHIO AT EITHER OF THOSE

11   AMBULANCE RUNS THAT YOU HAD HAD THE INMATE MANIPULATE YOUR NECK

12   AND YOU FELT A CRACK.  RIGHT?

13   **A.**   NO.

14   **Q.**   OKAY.  AND WHEN YOU FINALLY DID GET TO UMC NEW ORLEANS,

15   THAT'S WHEN YOU STARTED TELLING DOCTORS WHAT ACTUALLY HAPPENED.

16   RIGHT?

17   **A.**   WELL, THEY ASKED ME IF THERE WAS A BLUNT TRAUMA.  I THINK

18   THEY WERE INSINUATING THAT IT WAS SECURITY.  I TOLD THEM THAT

19   "NO, THE ONLY THING I COULD THINK OF IS THAT I DID HAVE AN

20   INMATE MASSAGE MY NECK AND ADJUST MY NECK."

21   **Q.**   OKAY.  YOU TESTIFIED ON DIRECT EXAMINATION THAT YOU ASKED

22   FOR A CONDOM CATHETER IN ORDER TO BE TRANSPORTED SO THAT YOU

23   WOULDN'T URINATE ON YOURSELF.  RIGHT?

24   **A.**   UH-HUH.

25   **Q.**   YOU WERE GIVEN A CONDOM CATHETER FOR A TRANSPORT ON

05:15 1  JANUARY 27, 2021.  RIGHT?

2  **A.**    UH-HUH.

3  **Q.**    SO WHEN YOU ASKED FOR IT, THEY GAVE YOU WHAT YOU NEEDED?

4  **A.**    NO.

5  **Q.**    NO?

6  **A.**    THAT'S NOT THE SAME DATES.

7  **Q.**    OKAY.  SO AT SOME TIME AFTER YOU REFUSED THAT TRIP, YOU

8  ASKED FOR THE CONDOM CATHETER.  AT THE NEXT TRIP THEY GAVE YOU

9  A CONDOM CATHETER?

10  **A.**    YES.

11  **Q.**    OKAY.

12  **A.**    AT THE TIME THAT YOU'RE TALKING ABOUT, I DIDN'T EVEN KNOW

13  WHAT A CONDOM CATHETER WAS.  I WAS JUST TAKEN OFF A REGULAR CUT

14  CATHETER.

15  **Q.**    BUT AFTER YOU BROUGHT UP THE ISSUE ABOUT URINARY

16  INCONTINENCE ON A LONG TRIP TO LSP PERSONNEL, THEY DID ADDRESS

17  YOUR CONCERNS FOR THE NEXT TRIP?

18  **A.**    YES.  ABOUT FOUR MONTHS LATER, YES.

19  **Q.**    OKAY.  ONE MOMENT.

20          MR. CREPPEL, WHEN YOU'RE IN PHYSICAL THERAPY, YOU GO

21  ABOUT ONCE A WEEK.  RIGHT?

22  **A.**    YES.

23  **Q.**    AND WHEN YOU DON'T HAVE A PHYSICAL THERAPY APPOINTMENT,

24  YOU'RE ENCOURAGED TO GET THE EXERCISE IN ON YOUR OWN TIME.

25  RIGHT?

05:17 1  **A.**   YES.

2  **Q.**   AND YOU CAN GO OUT TO THE YARD AND TRY TO, YOU KNOW, DO

3  THE SAME THINGS THAT YOU WOULD NORMALLY DO IN PHYSICAL THERAPY?

4  **A.**   YES.

5  **Q.**   AND YOU TRY TO DO THAT AS MUCH AS POSSIBLE BECAUSE IT

6  HELPS YOU IMPROVE YOUR STRENGTH?

7  **A.**   THAT'S RIGHT.

8          **MS. MCCAIN:**  I HAVE NOTHING FURTHER, YOUR HONOR.

9          **THE COURT:**  ANY REDIRECT?

10         **MS. MONTAGNES:**  THE COURT'S INDULGENCE FOR ONE

11  MOMENT, YOUR HONOR?

12         **THE COURT:**  OKAY.

13         **MS. MALIK:**  THANK YOU.

14                   **REDIRECT EXAMINATION**

15  **BY MS. MALIK:**

16  **Q.**   I HAVE ONLY A COUPLE OF QUESTIONS FOR YOU, MR. CREPPEL.

17          FIRST, WHY DID YOU WANT TO BE DISCHARGED FROM NURSING

18  UNIT 2?

19  **A.**   IT'S A VERY DEPRESSING PLACE.  IT'S FOR PERMANENT -- MORE

20  PERMANENT PATIENTS, USUALLY GUYS THAT ARE DYING FROM CRITICAL

21  CRIPPLING DISEASES LIKE CANCER OR -- WHAT'S THE OTHER ONE?

22  ALZHEIMER'S OR SOMETHING LIKE THAT.  IT'S REALLY SAD.  AND YOU

23  DON'T HAVE ANY YARD TIME, SO YOU JUST HANG AROUND IN THE BED

24  ALL DAY OR WATCH TV ALL DAY.

25  **Q.**   AND WHY DIDN'T YOU TELL LSP ABOUT THE INMATE MANIPULATING

05:18  1    YOUR NECK?

2    **A.**    WHY DID I?

3    **Q.**    WHY DID YOU NOT?

4    **A.**    BECAUSE IT WOULD'VE GOTTEN HIM IN TROUBLE.

5    **Q.**    AND WHAT ARE YOUR IMPRESSIONS OF ORDERLY CARE AT LSP?

6    **A.**    AS SHE SAID EARLIER, I THINK THEY HAVE GOOD HEARTS.  IT

7    TAKES A SPECIAL KIND OF PERSON TO DO WHAT THEY DO.  BUT THEY

8    ARE DEFINITELY UNTRAINED.

9           THE ONES THAT DO HAVE SOME TRAINING ARE FEW AND FAR

10   BETWEEN AND THEY ARE THE ONES THAT HAVE BEEN THERE THE LONGEST.

11          THE ONES -- THE NEW ONES THAT COME IN, THEY'LL GET

12   LIKE A HANDS-ON TRAINING FROM THE ONES THAT HAVE BEEN TRAINED.

13   EVENTUALLY AFTER SOME GET FIRED OR GET LOCKED UP OR QUIT,

14   YOU'RE STILL STUCK WITH A VERY SMALL POOL THAT ARE TRAINED.

15   **Q.**    YOU MENTIONED ORDERLIES BEING UNTRAINED.  CAN YOU -- DO

16   YOU HAVE ANY EXAMPLES THAT COME TO MIND WITH THAT?

17   **A.**    THERE ARE --

18          **MS. MCCAIN:**  OBJECTION.  I THINK THAT'S GOING TO BE A

19   SPECULATIVE ANSWER.

20          **MS. MALIK:**  IT'S JUST TESTIFYING TO HIS OBSERVATIONS.

21          **MS. MCCAIN:**  HE'S NOT AN ORDERLY.

22          **THE COURT:**  OVERRULED.

23   BY MS. MCCAIN:

24   **Q.**    YOU CAN CONTINUE, MR. CREPPEL.

25   **A.**    YES.  WHEN THEY -- WHEN I WAS IN THE WARD, THE ONES THAT

05:19 1　ARE MORE IN CONTACT WITH NURSING, THEY'LL HAVE CERTAIN

2　PROCEDURES THAT THEY DO FOR CERTAIN THINGS.  LIKE I HAD TO ROLL

3　FROM SIDE TO SIDE BECAUSE OF FEAR OF BEDSORES AND THEY HAD A

4　CERTAIN PROCEDURE THEY WOULD DO.  WELL, DIFFERENT SHIFTS WOULD

5　HAVE DIFFERENT WAYS OF DOING THAT.

6　　　　　WHEN YOU GET DOWN THE WALK, THE ORDERLIES IN THE

7　MEDICAL DORM HAVE NO SET TECHNIQUES AT ALL.  THEY JUST DO

8　WHATEVER THEY FEEL LIKE AT THE MOMENT THAT'S THE BEST THING TO

9　DO.

10　　　　　IF SOMEBODY FALLS, ONE MIGHT RUSH IN AND TRY TO PICK

11　THEM UP, BUT ANOTHER ONE WILL HAVE ANOTHER GUY HELP THEM TO DO

12　IT THE PROPER WAY.  SO IT'S JUST LIKE IT'S INCONSISTENT.

13　**Q.**　HAVE YOU SEEN YOUR MEDICAL RECORDS BEFORE TODAY?

14　**A.**　NO.

15　　　　　**MS. MALIK:**  NO FURTHER QUESTIONS.  THANK YOU.

16　　　　　**THE COURT:**  OKAY.  THAT CONCLUDES THE TESTIMONY FOR

17　TODAY.  WE WILL RECONVENE TOMORROW MORNING AT 9:00.

18　　　　　**THE LAW CLERK:**  ALL RISE.

19　　　　　COURT IS NOW IN RECESS.

20　**(WHEREUPON, THIS MATTER WAS RECESSED UNTIL 06/09/2022 AT 9:00**

21　**A.M.)**

22　　　　　　　　　* * *

23　　　　　　　　**CERTIFICATE**

24　　　I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

25　UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

05:20 1    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

2    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5                    *Shannon Thompson*

6                    SHANNON THOMPSON, CCR

7                    OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25