1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF LOUISIANA

3

4  JOSEPH LEWIS JR., ET AL      *    CIVIL ACTION

5  VERSUS                      *    NO. 15-318-SDD

6  BURL CAIN, ET AL            *    JUNE 9, 2022

7  * * * * * * * * * * * * * *

8

9                          DAY 4
                        BENCH TRIAL
10        BEFORE THE HONORABLE SHELLY D. DICK
         UNITED STATES CHIEF DISTRICT JUDGE
11

12  APPEARANCES:

13  FOR THE PLAINTIFFS:      THE PROMISE OF JUSTICE INITIATIVE
                            BY:  MERCEDES MONTAGNES, ESQ.
14                               NISHI KUMAR, ESQ.
                                 REBECCA RAMASWAMY, ESQ.
15                               ELENA MALIK, ESQ.
                                 SAMANTHA BOSALAVAGE, ESQ.
16                          1024 ELYSIAN FIELDS AVENUE
                            NEW ORLEANS, LOUISIANA 70117
17
                            COHEN MILSTEIN SELLERS & TOLL,
18                          PLLC
                            BY:  JEFFREY B. DUBNER, ESQ.
19                               BRENDAN R. SCHNEIDERMAN, ESQ.
                            1100 NEW YORK AVE N.W., SUITE 500
20                          WASHINGTON, D.C. 20005

21                          SOUTHERN POVERTY LAW CENTER
                            BY:  BRUCE HAMILTON, ESQ.
22                               EMILY LUBIN, ESQ.
                            201 ST. CHARLES AVE., SUITE 2000
23                          NEW ORLEANS, LOUISIANA 70170

24

25

```
 1   FOR THE DEFENDANTS:        BUTLER SNOW, LLP
                                BY:   RANDAL J. ROBERT, ESQ.
 2                                    CONNELL L. ARCHEY, ESQ.
                                      ALLENA W. MCCAIN, ESQ.
 3                              445 NORTH BOULEVARD, SUITE 300
                                BATON ROUGE, LOUISIANA 70802
 4
                                SHOWS, CALI & WALSH, LLP
 5                              BY:   JEFFREY K. CODY, ESQ.
                                      CAROLINE M. TOMENY, ESQ.
 6                                    JOHN C. CONINE, JR., ESQ.
                                628 ST. LOUIS STREET
 7                              BATON ROUGE, LOUISIANA 70802

 8
     OFFICIAL COURT REPORTER:   SHANNON L. THOMPSON, CCR
 9                              UNITED STATES COURTHOUSE
                                777 FLORIDA STREET
10                              BATON ROUGE, LOUISIANA 70801
                                (225) 389-3567
11
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
12                 COMPUTER-AIDED TRANSCRIPTION SOFTWARE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              **INDEX**

2                                                        <u>PAGE</u>

3    **PLAINTIFFS' WITNESS:**

4    **MICHAEL PUISIS, D.O.**

5        VOIR DIRE BY MR. DUBNER                    7

6        VOIR DIRE BY MR. ARCHEY                    9

7        DIRECT EXAMINATION BY MR. DUBNER           16

8        CROSS-EXAMINATION BY MR. ARCHEY            144

9        REDIRECT EXAMINATION BY MR. DUBNER         239

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(JUNE 9, 2022)**

2          **(CALL TO THE ORDER OF COURT.)**

3      **THE COURT:**  BE SEATED.

4              GOOD MORNING, EVERYONE.

5              DO WE WANT TO GO OVER OUR TIME FIRST?

6      **MS. MONTAGNES:**  YES, JUDGE.

7              GOOD MORNING.

8      **THE COURT:**  GOOD MORNING.

9      **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME THE

10   PLAINTIFFS HAVE AGREED THAT YESTERDAY, WEDNESDAY, JUNE 8TH --

11   BOTH PARTIES HAVE AGREED THAT THE PLAINTIFFS USED THREE HOURS

12   AND THIRTY-FIVE MINUTES AND THAT THE DEFENDANTS USED TWO HOURS

13   AND TEN MINUTES.  THAT IS A GRAND TOTAL OF TIME FOR THE

14   PLAINTIFFS OF NINE HOURS AND FOURTEEN MINUTES AND FOR THE

15   DEFENDANTS OF FIVE HOURS AND FORTY-FIVE MINUTES.

16         **THE COURT:**  OKAY.  IS THERE ANYTHING ELSE THAT WE

17   NEED TO DO IN THE WAY OF HOUSEKEEPING?

18         **MR. ROBERT:**  YES, YOUR HONOR.

19         **THE COURT:**  WHAT IS THAT?  WELL, WE HAD OUR FIRST

20   COVID ISSUE TODAY.  JEFF CODY, WHO IS CO-COUNSEL WITH US, WAS

21   FEELING POORLY YESTERDAY, AND HE DID A RAPID TEST WHICH

22   INDICATED THAT HE WAS POSITIVE FOR COVID.  OBVIOUSLY HE'S NOT

23   GOING TO BE HERE TODAY.  IT SHOULD NOT AFFECT ANY OF OUR -- THE

24   REST OF THIS WEEK CERTAINLY, BUT WE'D LIKE FOR HIM TO HAVE THE

25   OPPORTUNITY TO VIEW IT ON ZOOM AS FAR AS, YOU KNOW, THE

09:08 1  TESTIMONY AND SO FORTH.  AND I JUST WANT TO LET THE COURT KNOW
2  THAT THAT DID ARISE.
3        **THE COURT:**  OKAY.  ALL RIGHT.  WE HAD A SIMILAR
4  SITUATION IN A TRIAL TWO WEEKS AGO.  OBVIOUSLY YOU'RE
5  ENCOURAGED TO WEAR MASKS IF YOU SO CHOOSE.  AND IF YOU ARE
6  FEELING SYMPTOMATIC -- OR ACTUALLY, I MEAN, IT MIGHT BE A GOOD
7  IDEA JUST TO PROPHYLACTICALLY START TESTING, PARTICULARLY IF
8  YOU WERE SITTING AT COUNSEL TABLE WITH MR. CODY, BUT I'M NOT
9  GOING TO TELL YOU WHAT TO DO.  Y'ALL DO YOUR OWN THING.
10        IN TERMS OF ZOOM, HE CAN PARTICIPATE -- NOT
11  PARTICIPATE, BUT HE CAN WATCH.
12        SUZIE, WHAT'S THE STATUS OF THAT?
13        **THE DEPUTY CLERK:**  EVERYTHING IS UP AND RUNNING.  THE
14  AUDIO IS ON RIGHT NOW.
15        **THE COURT:**  OKAY.
16        **THE DEPUTY CLERK:**  I HAVE TWO PEOPLE IN THE WAITING
17  ROOM, AND I WAS GOING TO ASK WHO THEY WERE.
18        **THE COURT:**  OKAY.  DO YOU KNOW WHO THEY ARE?
19        **THE DEPUTY CLERK:**  CLYDE CARTER AND SHELLY CODY.
20        I ASSUME THAT'S MR. CODY?
21        **MR. ROBERT:**  YEAH.
22        **THE COURT:**  ALL RIGHT.  AND THEN MR. CARTER IS --
23        **MS. MONTAGNES:**  MR. CARTER IS A PLAINTIFF, YOUR
24  HONOR.
25        **THE COURT:**  -- ONE OF THE PLAINTIFFS.  OKAY.  SO THEY

09:09 1  CAN BOTH BE ADMITTED.

2            AND THEN DO WE KNOW ABOUT THE AUDIO?

3      **THE DEPUTY CLERK:**  IT'S ON.

4      **THE COURT:**  AND IS ANYBODY LISTENING?

5      **THE DEPUTY CLERK:**  THERE ARE TWO PEOPLE ON THE AUDIO.

6      **THE COURT:**  DO YOU HAVE PHONE NUMBERS?

7      **THE DEPUTY CLERK:**  (404)617-1467.

8      **THE COURT:**  WHO IS THAT?  ANYBODY KNOW WHO THAT IS?

9      **MR. CONINE:**  CAN YOU SAY THE NUMBER AGAIN?

10     **MR. ARCHEY:**  SAY THE NUMBER AGAIN.  IT MIGHT BE AN

11  EXPERT, BUT I'M NOT SURE.

12     **THE DEPUTY CLERK:**  IT'S (404) --

13     **MS. MONTAGNES:**  NISHI KUMAR.

14     **THE DEPUTY CLERK:**  NISHI?

15     **MS. MONTAGNES:**  THAT'S NISHI KUMAR, YOUR HONOR.

16     **THE DEPUTY CLERK:**  OKAY.  AND THEN (978)337-6479.

17     **MR. DUBNER:**  THAT'S MY MOTHER.

18     **MS. MONTAGNES:**  YOUR HONOR, THAT'S MR. DUBNER'S

19  MOTHER.

20     **THE COURT:**  WELCOME, MS. DUBNER.  OKAY.  I ASSUME

21  SHE'S NOT A WITNESS?

22     **MS. MONTAGNES:**  NOT AT THIS TIME, YOUR HONOR.

23     **THE COURT:**  ALL RIGHT.  CALL YOUR NEXT WITNESS.

24     **MR. ROBERT:**  THANK YOU, YOUR HONOR.

25     **MR. DUBNER:**  JEFFREY DUBNER FOR THE PLAINTIFFS.

09:10 1          AT THIS TIME PLAINTIFFS CALL DR. MICHAEL PUISIS.

2                 **MICHAEL PUISIS, D.O.,**

3  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

4          **THE DEPUTY CLERK:**  AND IF YOU WOULD PLEASE STATE YOUR

5  NAME AND SPELL IT, FOR THE RECORD.

6          **THE WITNESS:**  MICHAEL PUISIS.  P-U-I-S-I-S.

7          **THE COURT:**  YOU MAY PROCEED.

8                    **VOIR DIRE**

9  **BY MR. DUBNER:**

10  **Q.**   GOOD MORNING, DR. PUISIS.

11          COULD YOU GIVE US A BRIEF OVERVIEW OF YOUR EXPERIENCE

12  WORKING FOR CORRECTIONAL HEALTH SYSTEMS?

13  **A.**   I STARTED IN 1985.  I WAS IN THE NATIONAL SERVICE CORPS,

14  AND I WORKED AT THE COOK COUNTY JAIL AS PAYBACK.  I'M BOARD

15  CERTIFIED IN INTERNAL MEDICINE.  I WORKED AT THE JAIL FOR NINE

16  YEARS, BECAME THE MEDICAL DIRECTOR, BEGAN CONSULTING WITH THE

17  JUSTICE DEPARTMENT IN THE EARLY '90'S AND WAS BASICALLY CALLED

18  -- THEY CALLED ME AND ASKED ME.

19          I'VE PARTICIPATED IN A NUMBER OF STUDIES AND CREATION

20  OF GUIDELINES, WORKED WITH THE CDC ON THE TUBERCULOSIS

21  GUIDELINES.  I HAVE WORKED WITH THE ADA TWICE ON THE ADA

22  GUIDELINES -- AND THAT'S THE AMERICAN DIABETIC ASSOCIATION --

23  PUBLISHED A TEXTBOOK ON CORRECTIONAL MEDICINE.  AND I WORK BOTH

24  IN THE PRIVATE SECTOR AND IN THE PUBLIC SECTOR, MANAGED BOTH

25  PRISONS AND JAILS.

09:12 1  **Q.**  IF YOU COULD, STATE WHAT PRISONS AND JAILS YOU HAVE

2  MANAGED.

3  **A.**  WELL, COOK COUNTY JAIL; I WAS BOTH THE MEDICAL DIRECTOR

4  AND THE CHIEF OPERATING OFFICER.  I WAS THE REGIONAL MEDICAL

5  DIRECTOR FOR THE STATE OF NEW MEXICO.  I WAS THE STATE MEDICAL

6  DIRECTOR IN ILLINOIS FOR A YEAR BEFORE I WENT BACK TO COUNTY.

7       AND LET ME SEE IF THERE'S ANOTHER ONE.  AS THE --

8  WHEN I WORKED FOR THE PRIVATE COMPANY, I MANAGED ALSO NEW

9  MEXICO AND PARTS OF ILLINOIS.

10  **Q.**  AND IN YOUR WORK AS A CONSULTANT, HAVE YOU BEEN RETAINED

11  BY CORRECTIONAL SYSTEMS?

12  **A.**  YES.

13  **Q.**  HAVE YOU TESTIFIED ON BEHALF OF CORRECTIONAL SYSTEMS?

14  **A.**  YOU KNOW, I DON'T REMEMBER ALL MY TESTIMONY; BUT, YEAH.

15  **Q.**  AND HAVE YOU BEEN BROUGHT IN TO CONSULT FOR CORRECTIONAL

16  SYSTEMS THAT HAVE BEEN FOUND TO BE UNCONSTITUTIONAL IN THEIR

17  CARE?

18  **A.**  YES.

19  **Q.**  AND HAVE YOU BEEN APPOINTED AS A MONITOR BY COURTS?

20  **A.**  YES.

21  **Q.**  HAVE YOU BEEN RETAINED BY COURTS TO SERVE AS THE

22  COURT-APPOINTED EXPERT?

23  **A.**  YES.

24  **Q.**  AND DOES THAT INCLUDE THE *BROWN V. PLATA* CASE?

25  **A.**  IT DOES, YES.

09:13 1   Q.   AND YOU SAID YOU AUTHORED A TEXTBOOK.  WHAT TEXTBOOK IS
2   THAT?
3   A.   IT'S A TEXTBOOK ON CORRECTIONAL MEDICINE.
4   Q.   IS THAT THE MAIN TEXTBOOK ON CORRECTIONAL MEDICINE USED IN
5   COURSES ON THE SUBJECT?
6   A.   YES.  I THINK IT'S THE ONLY ONE.
7   Q.   OKAY.
8        **MR. DUBNER:**  YOUR HONOR, PLAINTIFFS AT THIS TIME
9   TENDER DR. PUISIS AGAIN AS AN EXPERT IN INTERNAL MEDICINE AND
10  CORRECTIONAL MEDICINE.
11       **THE COURT:**  CROSS ON THE TENDER.
12       **MR. ARCHEY:**  JUST A VERY FEW, YOUR HONOR.
13                         **VOIR DIRE**
14  BY MR. ARCHEY:
15  Q.   DR. PUISIS, IN THIS CASE DID YOU GO TO THE SITE VISIT IN
16  APRIL OF THIS YEAR?
17  A.   I DID NOT.
18  Q.   IN FACT, LAST TIME YOU VISITED LSP WAS IN 2016.  CORRECT?
19  A.   THAT'S CORRECT.
20  Q.   YOU WERE INVOLVED IN THE LAWSUIT THAT WAS BROUGHT AGAINST
21  LSP FOR COVID BACK IN THE SUMMER OF 2020.  CORRECT?
22  A.   I WROTE A DECLARATION.
23  Q.   CORRECT.
24       AND YOU OPINED THAT LSP'S COVID PLAN WAS CONTRARY TO
25  THE CDC'S GUIDANCE AND, IN YOUR WORDS, MADE LITTLE SENSE FROM A

09:14 1   MEDICAL PERSPECTIVE.  CORRECT?

2   **A.**   YOU KNOW, IT WAS SEVERAL YEARS AGO, SO I'M JUST -- I'M NOT

3   AWARE OF IT.

4            **MR. ARCHEY:**  YOUR HONOR, I'D LIKE AT THIS TIME IF WE

5   CAN PULL UP DX_57.  I'M SORRY.  NOT 57.  I MIGHT HAVE THROWN MY

6   STAFF A CURVE BACK THERE, YOUR HONOR.

7            **THE COURT:**  DO YOU WANT TO PUT IT ON THE ELMO?

8            **MR. ARCHEY:**  I COULD.

9            **THE COURT:**  GO AHEAD.

10           **MR. DUBNER:**  HAS A COPY BEEN GIVEN TO THE EXPERT?

11           **MR. ARCHEY:**  NO.  I MEAN, I -- THESE -- I ACTUALLY

12   ONLY HAVE THESE TWO COPIES, SO HOWEVER YOU WANT TO HANDLE THIS.

13   WELL, IT'S A RECORD DOCUMENT FROM THE *GUMNS* CASE.

14           **THE COURT:**  IT'S ON HIS SCREEN.  HE'S GOT IT ON HIS

15   SCREEN.

16           **THE WITNESS:**  YEAH.  IT'S RIGHT THERE.

17           **MR. ARCHEY:**  AND IT'S IMPEACHMENT.

18   **BY MR. ARCHEY:**

19   **Q.**   ALL RIGHT, DOCTOR.  DO YOU RECOGNIZE THIS AS YOUR

20   DECLARATION?

21           AND WHAT I'LL DO FOR YOU -- LET ME GO TO THE LAST

22   PAGE.  THERE'S JUST AN S SLASH, BUT THAT'S THE WAY OF THE WORLD

23   NOWADAYS.  RIGHT?

24   **A.**   I'M SORRY?

25   **Q.**   THIS IS YOUR DECLARATION ON THAT CASE?

09:16 1   **A.**   YES, IT IS.

2   **Q.**   ALL RIGHT.  I WANT TO GO TO PAGE -- JUST A FEW COMMENTS ON

3   PAGE 3.

4           ONE OF YOUR OPINIONS WAS THAT "ONE COULDN'T DEVISE A

5   SYSTEM MORE CONTRARY TO CURRENT PUBLIC HEALTH RECOMMENDATIONS

6   AND THE PRESIDENT'S TASK FORCE RECOMMENDATIONS IN A PRISON LIKE

7   LSP."  CORRECT?

8   **A.**   WELL, LET ME READ IT.  LET ME -- IF YOU CAN MOVE DOWN,

9   LET ME READ WHAT I WROTE SO I CAN SEE WHAT YOU'RE SAYING.

10   **Q.**   LET ME KNOW WHEN YOU WANT ME TO MOVE UP OR WHAT HAVE YOU.

11   **A.**   NO, NO, JUST BE PATIENT, AND I'LL READ IT AND WE CAN TALK.

12           RIGHT.  I MEAN, I'M JUST TALKING ABOUT THE DORMITORY

13   SETTINGS AND THE RISK FOR TRANSMISSION OF COVID.  AND IT

14   ACTUALLY IS TRUE; IF YOU LIVE IN A DORMITORY, COVID SPREADS

15   VERY EASILY.

16           AND IN MY OWN EXPERIENCE, BOTH IN ILLINOIS -- I

17   MONITORED FRESNO COUNTY -- THE SAME THING HAPPENED WHERE PEOPLE

18   LIVING IN DORMITORIES HAD VERY RAPID SPREAD OF COVID.  AND SO

19   IT'S DIFFICULT TO CONTROL, AND THAT'S REALLY WHAT I'M SAYING

20   THERE.

21   **Q.**   GO TO PARAGRAPH 14 ON PAGE 5.

22           YOU SAID THAT THE -- IT WAS YOUR OPINION THAT THE

23   PLAN THAT LSP WAS IMPLEMENTING OF TRANSFERRING DETAINEES FROM

24   JAILS TO LSP FOR MEDICAL ISOLATION AND CLINICAL MANAGEMENT IS

25   NOT A GOOD IDEA FOR MULTIPLE REASONS, AND THEN YOU GO ON.

09:18 1    CORRECT?

2    **A.**    I SAID THAT, YES.

3    **Q.**    YOU FURTHER STATED THAT YOU THOUGHT THE DECISION MADE

4    LITTLE SENSE, FROM A MEDICAL PERSPECTIVE.  CORRECT?

5    **A.**    WELL, I MEAN, IF YOU CAN JUST --

6    **Q.**    THAT'S ON PARAGRAPH 14.

7    **A.**    OKAY.  LET ME JUST --

8    **Q.**    CERTAINLY.

9    **A.**    CAN YOU MOVE DOWN A LITTLE BIT SO I CAN READ THE

10   PARAGRAPH?  YEAH.  THIS IS JUST EXPLAINING THE GEOGRAPHIC

11   SITUATION AT LSP:  THAT THERE'S DORMITORY SETTINGS.  THEY HAVE

12   AN INFIRMARY THAT'S A DORMITORY SETTING AND IT'S POTENTIALLY AT

13   RISK; AND IF YOU HAVE COVID THEY NEED ISOLATION.

14   **Q.**    DO YOU KNOW WHAT THE COURT'S RULING WAS IN THAT CASE WHERE

15   YOU OFFERED THE DECLARATION?

16   **A.**    I BELIEVE THEY RULED AGAINST IT.

17   **Q.**    "AGAINST," MEANING THEY ALLOWED LSP --

18   **A.**    AGAINST THE PLAINTIFFS, CORRECT, YEAH.

19   **Q.**    ALL RIGHT.  LET ME SHOW YOU -- I WANT TO SHOW YOU A

20   STATEMENT OUT OF THE COURT'S RULING.  THIS IS THE COURT'S

21   RULING IN DOCKET NO. 20-CV-0231, DOCKET NO. 57.  THIS IS FROM

22   THE COURT'S RULING ON PAGE 14.

23            "THE COURT FINDS DR. PUISIS' CONCLUSIONS GENERAL,

24   SPECULATIVE, NOT BASED ON FIRSTHAND KNOWLEDGE OF THE CURRENT

25   CONDITIONS OR ACTIVITIES IN CAMP J AND, IN SOME INSTANCES,

09:19 1  REFUTED BY DEFENDANTS' EVIDENCE."

2         ARE YOU AWARE OF THIS COURT'S RULING AS TO YOUR

3  OPINIONS IN THE COVID CASE?

4  **A.**   I'M SURE I READ IT, BUT I DON'T RECALL IT OFF THE TOP OF

5  MY HEAD.

6  **Q.**   AND ALL THE DIRE THINGS THAT YOU WERE PREDICTING AT LSP,

7  THEY NEVER CAME TO PASS, DID THEY?

8  **A.**   WELL, I'M NOT SURE OF THE EXACT DATA THAT -- ON

9  INFECTIONS.

10         **MR. ARCHEY:**  YOUR HONOR, BOTH OF THESE DOCUMENTS ARE

11  FROM THAT OTHER CASE.  I'D LIKE TO OFFER THEM INTO EVIDENCE.  I

12  CAN REFER TO THEM BY THE DOCKET NUMBER OR THE IMPEACHMENT

13  NUMBER -- OR PACER NUMBER, BUT I'D LIKE TO OFFER THEM INTO

14  EVIDENCE AT THIS TIME.

15         **THE COURT:**  ANY OBJECTION?

16         **MR. DUBNER:**  THE COURT CAN TAKE JUDICIAL NOTICE OF

17  THEM.  NO OBJECTION.

18         **THE COURT:**  THE COURT CAN TAKE JUDICIAL NOTICE OF

19  THEM, BUT WITHOUT OBJECTION YOU CAN OFFER THEM.  GIVE THEM

20  EXHIBIT NUMBERS AND LOAD THEM INTO JERS.

21         **MR. ARCHEY:**  YOUR HONOR, THESE HAVE ALREADY BEEN

22  PREMARKED, ACTUALLY, AS DEFENDANTS DX_57, SO I'LL OFFER 57.

23         **THE COURT:**  OKAY.  SO THEY'RE JOINTLY OFFERED AS

24  DX_57.  THEY'RE ADMITTED.

25         **MR. ARCHEY:**  WELL, THAT'S NOT JOINT.

09:21 1          **THE COURT:** OH.

2          **MR. ARCHEY:** THAT'S A DX.

3          **THE COURT:** NO, I MEANT --

4          **MR. ARCHEY:** OKAY.

5          **THE COURT:** -- THEY'RE OFFERED IN GLOBO. THAT WAS A

6     POOR -- POOR LANGUAGE ON MY PART. DX_57 IN GLOBO, WHICH IS TWO

7     DOCUMENTS, ADMITTED.

8          **MR. ARCHEY:** MY APOLOGIES. THANK YOU, YOUR HONOR.

9     **BY MR. ARCHEY:**

10    **Q.** AND TO BE CLEAR, SINCE THAT GENERAL SPECULATIVE OPINION

11    WITHOUT FIRSTHAND KNOWLEDGE, YOU'VE NEVER BEEN BACK TO LSP.

12    CORRECT?

13    **A.** NO. I'VE READ RECORDS, THOUGH, AND DOCUMENTS.

14    **Q.** NOW, YOUR OPINIONS IN THIS CASE ARE LIMITED TO SPECIALTY

15    CARE. CORRECT?

16    **A.** SPECIALTY CARE, ORGANIZATION, PEER REVIEW, CREDENTIALING.

17    **Q.** THANK YOU. MY APOLOGIES.

18    **A.** I MEAN, THERE'S A NUMBER OF ITEMS, YEAH.

19    **Q.** YOU'RE 100 PERCENT CORRECT, OBVIOUSLY. SPECIALTY CARE,

20    PEER REVIEW, MEDICAL LEADERSHIP AND CREDENTIALING?

21    **A.** YEAH. AND WE ALL PARTICIPATED WITH RESPECT TO CLINICAL

22    CARE.

23    **Q.** WELL, THAT'S WHERE I GUESS I'M GOING TO HAVE A PROBLEM,

24    BECAUSE YOU SAY IN THE REPORT YOUR AREAS WERE THOSE. CORRECT?

25    **A.** CORRECT. BUT INTERNALLY, WHEN WE WROTE THE REPORT, WE

09:22 1 UNDERSTOOD THAT CLINICAL CARE WAS AN ASPECT OF ALL OF THE CARE.

2 **Q.** RIGHT. BUT YOU DIDN'T IDENTIFY -- YOU ARE NOT IDENTIFIED

3 AS SOMEONE TESTIFYING ON CLINICAL CARE. CORRECT?

4 **A.** THE REPORT -- WHAT THE REPORT IDENTIFIES IS WHAT I'M

5 RESPONSIBLE FOR.

6 **Q.** WHICH IS SPECIALTY CARE AND THEN THE MEDICAL LEADERSHIP,

7 CREDENTIALING --

8 **A.** CORRECT.

9 **Q.** -- PEER REVIEWS, MORTALITY REVIEWS?

10 **A.** CORRECT.

11 **MR. ARCHEY:** YOUR HONOR, WITH THAT, WE HAVE NO

12 OBJECTION TO DR. PUISIS BEING OFFERED AS AN EXPERT IN

13 CORRECTIONAL MEDICINE LIMITED TO THE AREAS THAT HE'S ADDRESSED

14 IN THE EXPERT REPORT.

15 **THE COURT:** WELL, THE TENDER IS CORRECTIONAL MEDICINE

16 AND INTERNAL MEDICINE. NO OBJECTION TO THE FIELD OF TENDER?

17 THAT'S A QUESTION.

18 **MR. ARCHEY:** I HAVE NO OBJECTION TO THE FIELD OF

19 TENDER, YOUR HONOR.

20 **THE COURT:** ALL RIGHT. YOU CAN MAKE YOUR OBJECTIONS

21 AS TO THE SCOPE OF THE TESTIMONY AS WE GO THROUGH. YOUR

22 OBJECTIONS ARE RESERVED.

23 DR. PUISIS WILL BE ACCEPTED BY THE COURT IN THE

24 FIELDS OF INTERNAL MEDICINE AND CORRECTIONAL MEDICINE AND WILL

25 BE PERMITTED TO GIVE OPINION TESTIMONY.

09:23 1    YOU MAY PROCEED, MR. DUBNER.

2                     **DIRECT EXAMINATION**

3    **BY MR. DUBNER:**

4    **Q.**   AND, DR. PUISIS, ONE FOLLOW-UP ON SOME OF THE QUESTIONS

5    YOU WERE JUST ASKED.

6              ARE YOU AWARE IF LSP CHANGED SOME OF ITS POLICIES

7    REGARDING ITS COVID PLAN AFTER YOU SUBMITTED YOUR DECLARATION

8    IN THAT CASE?

9    **A.**   I WAS NOT.

10   **Q.**   AND ARE YOU AWARE THAT THEY -- IF THEY HAD CHANGED SOME OF

11   THEIR POLICIES BEFORE THE COURT'S RULING AND AFTER YOUR REPORT?

12   **A.**   YOU KNOW, I'M NOT SURE OF THE SEQUENCE.  I DO KNOW THAT

13   THEY CREATED IN -- I THINK IT WAS CAMP J.  THEY ISOLATED PEOPLE

14   IN CAMP J, WHICH WAS A REASONABLE THING TO DO.

15   **Q.**   SO, NOW, LET'S TURN TO THIS CASE.

16             AS JUST DISCUSSED, WHAT WAS YOUR ASSIGNMENT IN THE

17   REMEDY PHASE OF THIS CASE?

18   **A.**   THE ASSIGNMENT WAS TO LOOK AT SEVERAL ASPECTS OF CARE,

19   ORGANIZATIONAL STRUCTURE, PEER REVIEW, CREDENTIALING, SPECIALTY

20   CARE, AND MORTALITY REVIEW.

21   **Q.**   AND WHAT DID YOU DO TO PREPARE YOUR OPINION?

22   **A.**   I READ DOCUMENTS, A NUMBER OF DOCUMENTS, AND RECORD

23   REVIEWS.

24   **Q.**   AND GENERALLY SPEAKING, WHAT DOCUMENTS DID YOU REVIEW?

25   **A.**   I REVIEWED DEPOSITIONS, DATA THAT WAS SUBMITTED BY LSP,

09:24 1    REPORTS AND AGAIN RECORD REVIEWS.

2    **Q.**    AND IN TERMS OF THE CHARTS YOU REVIEWED, HOW MANY

3    PATIENTS' MEDICAL CHARTS DID YOU REVIEW?

4    **A.**    SEVENTEEN, I BELIEVE.

5    **Q.**    NOW, YOU SPOKE A MOMENT AGO ABOUT SPECIALTY CARE AND

6    CLINICAL CARE.  DOES SPECIALTY CARE OVERLAP WITH CLINICAL AND

7    EMERGENCY AND INFIRMARY CARE?

8    **A.**    VERY MUCH SO.  I MEAN, THEY ARE CONNECTED.

9    **Q.**    AND IN WHAT WAY ARE THEY CONNECTED?

10    **A.**    WELL, AS AN EXAMPLE, IF THE -- THERE ARE RECOMMENDATIONS

11    FOR PREVENTATIVE SCREENING, AS AN EXAMPLE.  AND THE

12    PREVENTATIVE SCREENING RECOMMENDATIONS INCLUDE RECOMMENDATIONS

13    TO, FOR EXAMPLE, DO A COLONOSCOPY OR A SCREENING FOR COLON

14    CANCER; THEY INCLUDE RECOMMENDATIONS FOR SCREENINGS FOR LUNG

15    CANCER; THEY INCLUDE RECOMMENDATIONS FOR SCREENINGS FOR BREAST

16    CANCER, ET CETERA.  AND WHEN THOSE SPECIALTY REFERRALS DON'T

17    OCCUR, THEN BAD THINGS HAPPEN.

18         **THE COURT:**  I'M SORRY.  I MISSED THE LAST WORD.  WHEN

19    THEY DON'T OCCUR WHAT?

20         **THE WITNESS:**  WHEN THOSE SPECIALTY REFERRALS DON'T

21    OCCUR, BAD THINGS HAPPEN.

22         **THE COURT:**  OH, GOTCHA.  OKAY.

23    **BY THE WITNESS:**

24    **A.**    SO, FOR EXAMPLE, IF A WOMAN WAS NOT SCREENED FOR BREAST

25    CANCER, SHE WOULD -- MIGHT DEVELOP BREAST CANCER.  IF SOMEONE

09:25 1  ISN'T SCREENED FOR COLON CANCER, THEY MIGHT DEVELOP COLON

2  CANCER.  AND THOSE ARE PREVENTABLE ILLNESSES, AND THEY RELATE

3  TO SPECIALTY CARE.  AND SO THE SCREENING IS CLEARLY A PART OF

4  THAT.

5  **Q.**  AND IN TERMS OF THE ONGOING MANAGEMENT OF PATIENTS WHO ARE

6  SEEING SPECIALISTS, WHAT IS THE RELATIONSHIP BETWEEN CLINICAL

7  CARE AND SPECIALTY CARE IN THOSE CIRCUMSTANCES, GENERALLY

8  SPEAKING?

9  **A.**  WELL, LSP USES SPECIALISTS AT A VARIETY OF INSTITUTIONS,

10  BUT THE SPECIALISTS MAKE RECOMMENDATIONS.  AND IN ALL CASES THE

11  PRIMARY CARE PHYSICIAN -- AND THE PRIMARY CARE PHYSICIAN IS

12  ONE WHO IS PRINCIPALLY RESPONSIBLE FOR MANAGING THE CARE OF THE

13  PATIENT IN PRIMARY PRACTICE.  THOSE PHYSICIANS ARE RESPONSIBLE

14  FOR INTEGRATING THE CARE RECOMMENDED BY THE SPECIALIST INTO THE

15  CARE OF THE PATIENT SO THAT EVERYONE IS ON THE SAME PAGE.  AND

16  SO IT'S AN IMPORTANT FUNCTION OF HANDOFFS, A TRANSFER OF

17  INFORMATION, AND INTEGRATION OF CARE BETWEEN ONE PHYSICIAN AND

18  ANOTHER.

19  **Q.**  NOW, YOU DIDN'T DO A SITE VISIT AT THIS STAGE OF THIS

20  CASE.  WHY WAS THAT?

21  **A.**  WELL, WE WERE UNDER A TIGHT DEADLINE.  THE COURT HAD A

22  DEADLINE FOR WANTING TO COME TO A CONCLUSION, WHICH WAS

23  REASONABLE AND UNDERSTOOD, AND WE HAD 17 RECORDS TO REVIEW.

24  THERE WERE A NUMBER OF DOCUMENTS TO REVIEW.  AND ABOUT A WEEK

25  BEFORE THE VISIT, WE WERE TOLD THAT WE WOULD NOT BE ALLOWED TO

09:27 1  TALK TO ANYONE.  AND THE AREAS THAT I'M RESPONSIBLE FOR --

2  MORTALITY REVIEW, LEADERSHIP ISSUES, ORGANIZATIONAL STRUCTURE

3  -- INVOLVED TALKING TO PEOPLE.

4          IN THE LAST VISIT I DID, THAT'S WHAT I DID:  I SAT

5  DOWN, I TALKED TO THE LEADERSHIP.  AND THE FAILING ABILITY TO

6  DO THAT, I CAME TO A CONCLUSION THAT IT DIDN'T MAKE SENSE TO

7  MAKE THE VISIT IF I COULDN'T TALK TO PEOPLE.

8          AND INDEED WHEN THE GROUP WENT, THEY WERE RESTRICTED

9  IN TERMS OF TALKING TO PEOPLE, ATTENDING THE MORNING HUDDLE

10  THAT THEY DO, SO WE COULDN'T REALLY SEE WHAT WAS GOING TO GO

11  ON.  AND IF THAT WAS NOT GOING TO BE POSSIBLE, I THINK MY TIME

12  WAS BETTER SPENT -- BECAUSE WE WERE ON A DEADLINE -- TO REALLY

13  REVIEW RECORDS AND REVIEW REPORTS.

14  Q.   WERE THE ADMINISTRATIVE AREAS THAT YOU LOOKED AT AREAS

15  THAT YOU COULD SUFFICIENTLY EVALUATE THROUGH DOCUMENTS AND

16  DEPOSITIONS ALONE?

17  A.   YES, I THINK SO.  SURE.  I MEAN, THE DEPOSITIONS GAVE A

18  FAIR AMOUNT OF INFORMATION.  THE DATA THAT WAS SUBMITTED GAVE

19  INFORMATION, AND THE RECORD REVIEW CERTAINLY GAVE INFORMATION.

20  Q.   AND WERE THE ADMINISTRATIVE AREAS YOU WERE LOOKING AT

21  AREAS THAT WOULD HAVE BEEN AIDED BY A SITE VISIT WHERE YOU

22  COULDN'T TALK TO STAFF?

23  A.   I THINK NOT.  IN THE LAST VISIT I DID REVIEW A LOT OF THE

24  CLINICAL SPACE AND THAT -- IF I WAS RESPONSIBLE FOR THAT, I

25  WOULD HAVE GONE FOR SURE.  BUT OTHER MEMBERS OF THE TEAM, MY

09:29 1  COLLEAGUES, DID THAT REVIEW.  AND SO I THINK THE REVIEW I DID

2  WAS -- I HAD SUFFICIENT INFORMATION TO DO THAT.

3  **Q.**   AND THEN IN TERMS OF SPECIALTY CARE, WAS SPECIALTY CARE AN

4  AREA THAT YOU COULD SUFFICIENTLY EVALUATE THROUGH THE CHART

5  REVIEWS AND THE DOCUMENTS AND DEPOSITIONS YOU REVIEWED?

6  **A.**   YES.  AND ADDITIONALLY, I TALKED TO A HOSPITALIST FROM

7  UNIVERSITY MEDICAL CENTER NEW ORLEANS.  AND I CAN'T RECALL HER

8  NAME, BUT, YOU KNOW, SHE GAVE ME SOME INFORMATION.

9              **MR. ARCHEY:**  YOUR HONOR, OBJECTION.

10             **THE COURT:**  WHAT'S YOUR OBJECTION?

11             **MR. ARCHEY:**  OUTSIDE THE SCOPE OF HIS REPORT.  THERE

12  IS NO DISCUSSION OF THAT IN HIS REPORT.

13             **MR. DUBNER:**  THERE IS.  I DON'T HAVE A PAGE CITATION.

14  **BY MR. ARCHEY:**

15  **Q.**   BUT, DOCTOR --

16             **MR. ARCHEY:**  WELL, IF THERE IS, HELP ME OUT.

17             **MR. DUBNER:**  SHE'S SPECIFICALLY NAMED IN THE REPORT

18  AS SOMEBODY WHO THEY SPOKE WITH IN PREPARATION.

19             **THE COURT:**  OVERRULED.

20  **BY MR. DUBNER:**

21  **Q.**   AND I'M SORRY.  WERE YOU -- WERE YOU -- HAD YOU COMPLETED

22  YOUR ANSWER?

23  **A.**   I FORGOT THE QUESTION AGAIN NOW.  I'M SORRY.

24  **Q.**   OH, THAT'S ENTIRELY FINE.

25             AND SO FOR SPECIALTY CARE, DO YOU BELIEVE THAT THE --

09:30 1  I THINK I ASKED YOU THIS ALREADY, BUT JUST IN CASE I DIDN'T, DO

2  YOU BELIEVE THAT THE CHART REVIEWS AND DOCUMENTS AND

3  DEPOSITIONS YOU REVIEWED WERE ADEQUATE, TOGETHER WITH THE --

4  **A.**   YES.  I BELIEVE THE DOCUMENTS I REVIEWED WERE SUFFICIENT.

5  **Q.**   AND THEN IN TERMS OF THE EXPERT REPORT ITSELF, DID YOU

6  REVIEW THE PARTS OF THE REPORT THAT WERE OUTSIDE THE AREAS THAT

7  YOU DRAFTED YOURSELF?

8  **A.**   DID I REVIEW OUR EXPERT REPORT?

9  **Q.**   UH-HUH.

10  **A.**   YES.

11  **Q.**   AND DID ANYTHING THAT YOU OBSERVED, EITHER IN THE CHART

12  REVIEWS OR THE OTHER DOCUMENTS AND DEPOSITIONS YOU READ, GIVE

13  YOU ANY REASON TO THINK THAT THE CONCLUSIONS IN THE OTHER

14  SECTIONS OF THE REPORT WERE INCORRECT?

15  **A.**   NO.  IN FACT, I THOUGHT THERE WAS CONCORDANCE IN MULTIPLE

16  AREAS.

17  **Q.**   OKAY.  LET'S FOCUS IN ON SPECIALTY CARE.

18       WHEN YOU REVIEWED THE SPECIALTY CARE AT LSP FOR THE

19  LIABILITY TRIAL, YOU FOUND THAT IT PUT CLASS MEMBERS AT A

20  SUBSTANTIAL RISK OF SERIOUS HARM.  DID YOU FIND THAT AGAIN

21  TODAY?

22  **A.**   YES, I DID.

23  **Q.**   IN WHAT WAYS DOES THE SPECIALTY CARE AT LSP PUT PATIENTS

24  AT A SUBSTANTIAL RISK OF SERIOUS HARM?

25  **A.**   THERE'S TWO MAIN AREAS.  AND ONE IS THAT PEOPLE ARE NOT

09:31 1  REFERRED WHEN THEY SHOULD BE REFERRED; AND THAT INCLUDES PEOPLE
2  WHO ARE, FOR EXAMPLE, SEEN IN THE ATU AND THEY HAVE A CONDITION
3  AND THEY'RE NOT REFERRED FOR SOME REASON OR ANOTHER.  AND
4  ADDITIONALLY, PEOPLE WHO REQUIRE PREVENTATIVE SCREENING ARE
5  OFTEN NOT REFERRED, AND THAT CAN CAUSE PROBLEMS.  SO THAT'S ONE
6  GENERAL AREA.
7          AND THE SECOND ONE IS THE PROCESS OF SPECIALTY CARE,
8  IT IS NOT WELL-DESIGNED.  AND THE PHYSICIANS AT LSP ARE
9  DISENGAGED FROM MANAGEMENT OF THE PATIENTS ALONG WITH AND IN
10  COLLABORATION WITH THE SPECIALISTS; AND AS A RESULT,
11  RECOMMENDATIONS TO THE SPECIALISTS ARE SOMETIMES UNKNOWN,
12  UNATTENDED TO, AND CAN HAVE ADVERSE CONSEQUENCES.
13  **Q.**   AND COULD YOU GIVE US SOME EXAMPLES OF WHAT YOU SAW IN
14  EACH OF THOSE CATEGORIES OF HARM?
15  **A.**   WELL, SO IF WE START WITH SPECIALTY REFERRALS, THERE WERE
16  TWO CASES.  ONE WAS A GENTLEMAN WHO WAS NOT SCREENED FOR LUNG
17  CANCER.  HE WAS 55 AND A SMOKER, AND THE --
18          **MR. ARCHEY:**  YOUR HONOR, I NEED A PATIENT NUMBER SO
19  THAT I CAN TRACK WHERE HE IS IN THE REPORT AND HE'S NOT GOING
20  OUTSIDE HIS REPORT, PLEASE.
21          **THE COURT:**  AND THE OBJECTION?
22          **MR. ARCHEY:**  OBJECTION, THAT IT'S --
23          **THE COURT:**  CAN'T FOLLOW.
24          **MR. ARCHEY:**  IT COULD BE OUTSIDE THE REPORT.  I DON'T
25  KNOW.  SO IT'S OUTSIDE OF THE REPORT THEN UNTIL I KNOW.  THAT'S

09:33 1  MY OBJECTION.

2          **THE COURT:**  CAN YOU GIVE --

3          **MR. DUBNER:**  IT'S WITHIN THE REPORT.  PATIENT NO. 1.

4          **MR. ARCHEY:**  THAT'S WHAT I NEED.  THANK YOU, YOUR

5  HONOR.

6  **BY THE WITNESS:**

7  **A.**   SORRY.  SO THIS GENTLEMAN HAD -- WAS A SMOKER, 55.  AND

8  THE U.S. PREVENTATIVE HEALTH SERVICE TASK FORCE RECOMMENDS

9  PEOPLE OVER AGE 50 WHO ARE EVER SMOKERS SHOULD BE SCREENED WITH

10  A LOW-DOSE CT SCAN ANNUALLY, AND THAT DID NOT OCCUR.  HE WAS

11  IDENTIFIED WITH LATE STAGE LUNG CANCER THAT WAS METASTATIC BY

12  THE TIME OF DIAGNOSIS.  THAT WAS ONE CASE.

13          THERE WAS ANOTHER CASE OF AN INMATE WHO WAS ALSO OVER

14  50.  U.S. PREVENTATIVE HEALTH SERVICE TASK FORCE RECOMMENDS

15  SCREENING FOR COLON CANCER USING EITHER GUAIAC TESTING,

16  SENSITIVE GUAIAC TESTING, OR COLONOSCOPY OR SIGMOIDOSCOPY.

17  HE WAS NOT SCREENED.  HE WAS IDENTIFIED WITH A POSITIVE GUAIAC

18  STOOL, AND HE WAS FAILED TO BE REFERRED FOR A FOLLOW-UP TEST.

19  AND TWO YEARS LATER HE WAS RE-IDENTIFIED WITH LATE-STAGE

20  METASTATIC COLON CANCER.

21  **Q.**   AND SO -- SORRY.  WERE YOU --

22  **A.**   WELL, I WAS GOING TO SAY, SO THAT'S THE FIRST GROUP.

23          AND THEN THE SECOND GROUP, THERE WERE NUMEROUS CASES

24  THAT I REVIEWED WHERE THE INTEGRATION BETWEEN THE SPECIALIST

25  AND THE PRIMARY CARE PROVIDER WAS SUCH THAT INFORMATION DID NOT

09:35 1  APPEAR TO BE TRANSFERRED.  AND WITH RESPECT TO THAT, THE

2  PROCESS FOR SPECIALTY CARE AT LSP, AS I UNDERSTAND IT -- AND

3  EVEN DESCRIBED -- I THINK IT WAS DR. LAVESPERE IN HIS

4  DEPOSITION SAID THAT WHEN A PATIENT GOES FOR SPECIALTY CARE,

5  THE TRIP NURSES SEE THE PATIENT IN RETURN, ORDER MEDICATIONS,

6  AND BRING THE ORDERS TO A PHYSICIAN.  THE TRIP NURSE FORM IS

7  OFTEN INITIALED BY A PROVIDER.  HOWEVER, THE PHYSICIANS DO NOT

8  DOCUMENT IN THE MEDICAL RECORD REVIEW OF THE REPORT OR REVIEW

9  OF THE RECOMMENDATIONS.

10        LSP POLICY REQURIES THAT THE PHYSICIANS REVIEW THE

11  RECOMMENDATIONS OF THE CONSULTANT AND DOCUMENT IN THE MEDICAL

12  RECORD WHETHER THEY ARE GOING TO UNDERTAKE THE RECOMMENDATIONS

13  OR WHETHER THEY WILL NOT AND, IF THEY DO NOT, WHY THEY WON'T.

14  SO THAT'S AN LSP POLICY.

15        BUT, IN FACT, I DID NOT FIND THAT THAT OCCURS.  I

16  RARELY -- AND I CAN'T REMEMBER A RECORD WHERE I REVIEWED WHERE

17  THE PHYSICIAN AT LSP ACTUALLY DOCUMENTED IN THE RECORD THAT

18  THEY REVIEWED THE REPORT OF THE CONSULTANT.  AND THERE WERE

19  MANY INSTANCES WHERE RECOMMENDATIONS WERE JUST NOT ATTENDED TO.

20  SO THERE WERE THOSE TWO AREAS NOT BEING REFERRED.  AND I USED

21  TWO PREVENTABLE EXAMPLES, BUT THERE ARE OTHER EXAMPLES.  ONE --

22  I THINK, IF I CAN GET THE NUMBER, IT WAS THE PERSON -- AND I

23  THINK 10, PATIENT 10, WHO SHOULD HAVE BEEN REFERRED TO A --

24        **MR. ARCHEY:**  YOUR HONOR, I BELIEVE THIS TO BE OUTSIDE

25  THE REPORT.  I OBJECT.  PATIENT 10.

09:37  1                **MR. DUBNER:**  OUTSIDE THE REPORT?

2                **MR. ARCHEY:**  YES.

3                **MR. DUBNER:**  PATIENT 10 IS DISCUSSED IN THE REPORT AT

4       PAGE 61 TO 63.

5                **MR. ARCHEY:**  AND THAT'S NOT THE SPECIALTY CARE

6       SECTION, YOUR HONOR.

7                **THE COURT:**  OVERRULED.

8       **BY MR. DUBNER:**

9       **Q.**   SO YOU CAN CONTINUE.

10      **A.**   AND THAT PATIENT SHOULD HAVE BEEN REFERRED TO A

11      NEUROLOGIST.  SO THERE WERE JUST NUMEROUS CASES WHERE PEOPLE

12      SHOULD HAVE BEEN REFERRED, WERE NOT.

13               AND THERE WERE CASES -- ALMOST ALL THE PATIENTS IN

14      SPECIALTY CARE WHERE THE LSP PROVIDERS DID NOT DOCUMENT IN THE

15      RECORD THEIR REVIEW OF THE CONSULTANT REPORTS AND ATTENTION TO

16      THE RECOMMENDATIONS.

17      **Q.**   NOW, WHAT TIME PERIOD DID YOU REVIEW TO COME TO THESE

18      CONCLUSIONS?

19      **A.**   WE LOOKED AT RECORDS THAT INCLUDED A SPAN FROM 2019 TO

20      EARLY 2022, AND IT VARIED DEPENDING ON THE INDIVIDUAL.  SOME

21      INDIVIDUAL CHARTS WERE A LATER TIME PERIOD; SOME WERE A LITTLE

22      EARLIER.

23      **Q.**   AND WHY DID YOU GO BACK TO 2019?

24      **A.**   WELL, WE WANTED TO GET A SPAN OF TIME.  OBVIOUSLY IT

25      SPANNED COVID.  COVID WAS CLEARLY AN ISSUE, BECAUSE COVID

09:38 1 DISRUPTED THE MEDICAL CARE PROCESS IN THE COUNTRY.  AND EVERY
2 LOCALE HAD ISSUES WITH INCREASED HOSPITALIZATIONS, SO THERE
3 WERE SERVICE CUTS.  THERE WERE THINGS THAT WERE HAPPENING, AND
4 WE WANTED TO ENSURE THAT WE SAW A BEFORE-AND-AFTER AND
5 DURING -- AND JUST TO SEE IF THERE WERE ANY DIFFERENCES IN
6 CARE.
7 **Q.**   AND DOES THAT ALLOW YOU -- IF YOU HAD ONLY LOOKED AT,
8 LET'S SAY, 2020-2021, WOULD THERE HAVE BEEN A RISK THAT THAT
9 WOULD ONLY SHOW PERIODS WHEN THERE WERE COVID PROBLEMS OR
10 REBUILDING FROM COVID?
11 **A.**   THAT WOULD BE A RISK, YEAH.
12 **Q.**   ACROSS THE ENTIRE PERIOD FROM 2019 TO THE END OF THE
13 MEDICAL RECORDS, WAS SPECIALTY CARE SIGNIFICANTLY BETTER THAN
14 IT WAS IN YOUR REVIEW DURING THE LIABILITY TRIAL?
15 **A.**   NO, I DIDN'T BELIEVE IT WAS.
16 **Q.**   HAS LSP MADE MAJOR CHANGES TO ITS SPECIALTY CARE PROCESS
17 SINCE THE LIABILITY TRIAL?
18 **A.**   THEY MENTIONED SEVERAL ITEMS IN A -- I DON'T KNOW IF IT
19 WAS A DECLARATION, BUT IT WAS A DOCUMENT THAT WAS PROVIDED TO
20 ME.  THEY INCREASED THE NUMBER OF PEOPLE WHO WENT TO UNIVERSITY
21 MEDICAL CENTER NEW ORLEANS.  THEY SAID THAT THEY PUT A -- I
22 CALLED IT A BILLBOARD, BUT I THINK MR. ARCHEY CORRECTED ME IN
23 DEPOSITION THAT IT WAS A -- IT WAS SOME SIGNAGE THAT -- OF THE
24 SCHEDULED APPOINTMENTS OF PATIENTS.
25         SO, IN OTHER WORDS, YOU WOULD -- IN THE YARD YOU

09:40 1   WOULD SEE AN ELECTRONIC SIGNAGE THAT INDICATED WHO WAS

2   SCHEDULED FOR AN APPOINTMENT.

3        THEY ALSO SAID THAT THEY IMPROVED THE COMMUNICATION

4   BETWEEN HEADQUARTERS AND THE SITE, AND THAT RELATED TO THE

5   SCHEDULING EFFORT.  THEIR PROCESS IS THAT THE -- WHEN A LSP

6   PROVIDER REFERS FOR A SPECIALTY APPOINTMENT, THAT REFERRAL GOES

7   TO A NURSE WHO ENTERS IT INTO ECEPTIONIST, WHICH IS A DATABASE

8   PROGRAM THAT'S USED TO TRACK SPECIALTY APPOINTMENTS.  THAT

9   NURSE, WHO IS CALLED A TRIP NURSE, SENDS THE INFORMATION TO

10  HEADQUARTERS, AND HEADQUARTERS ARRANGES THE SCHEDULED

11  APPOINTMENT WITH UNIVERSITY MEDICAL CENTER OR WHEREVER.

12  **Q.**   AND IN TERMS OF THAT PROCESS -- THE PROCESS OF SCHEDULING

13  APPOINTMENTS, ENSURING THAT THEY OCCUR, ENSURING THAT FOLLOW-UP

14  OCCURS, HAS THAT CHANGED AT ALL SINCE THE LIABILITY TRIAL?

15  **A.**   NO.

16  **Q.**   AND DID YOU REVIEW DEPOSITIONS AND INTERROGATORIES THAT

17  SAID THAT?

18  **A.**   YES.  I THINK DR. LAVESPERE SAID THAT DIRECTLY.

19  **Q.**   AND LET'S PULL UP ECF NO. 717, THE AMENDED JOINT PRETRIAL

20  ORDER, AT PAGE 5.

21       **MR. DUBNER:**  IF YOU COULD BLOW UP 51B IN THE MIDDLE

22  OF THE PAGE.

23  **BY MR. DUBNER:**

24  **Q.**   COULD YOU READ THIS SENTENCE, DR. PUISIS?

25  **A.**   YES.

1  Q.   OUT LOUD.

2  A.   YES.  OH, YOU WANT ME TO READ IT?

3  Q.   YES.

4  A.   I'M SORRY.  "LSP'S POLICIES OR PRACTICES HAVE NOT CHANGED

5  REGARDING RECOMMENDING, AUTHORIZING, AND SCHEDULING SPECIALTY

6  HEALTH CARE SERVICES; GETTING PEOPLE TO APPOINTMENTS OR MAKING

7  SURE PATIENTS HAVE ALL NECESSARY TESTS, PAPERWORK, AND FASTING;

8  OR ENSURING THAT SPECIALISTS' RECOMMENDATIONS ARE IMPLEMENTED

9  OR THE DECISION NOT TO IMPLEMENT THEM IS DOCUMENTED."

10  Q.   THAT'S A STIPULATED FACT BETWEEN THE PARTIES.  IS THAT

11  CONSISTENT WITH WHAT YOU REVIEWED IN THE -- WHAT YOU READ IN

12  THE DEPOSITIONS AND INTERROGATORY RESPONSES?

13  A.   YES.

14  Q.   AND NOW -- AND IS IT ALSO CONSISTENT WITH WHAT YOU SAW IN

15  YOUR CHART REVIEW?

16  A.   YES.

17        MR. DUBNER:  YOU CAN TAKE THAT DOWN.  THANK YOU.

18  BY MR. DUBNER:

19  Q.   NOW LET'S GO BACK TO THOSE CHANGES THAT YOU DID SAY.

20        FIRST OFF, DID YOU SEE IN YOUR REVIEW OF PATIENTS'

21  CHARTS ANY MEANINGFUL IMPACT ON THE QUALITY OF CARE THAT SEEMED

22  TO BE RELATED TO THESE SUPPOSED CHANGES?

23  A.   NO.

24  Q.   AND LET'S FIRST TAKE DEFENDANTS' STATEMENT THAT THEY HAVE

25  IMPROVED COMMUNICATIONS WITH HEADQUARTERS STAFF.

09:43 1         DID THAT INVOLVE ANY POLICY CHANGES?

2    **A.**   NOT THAT I'M AWARE OF.

3    **Q.**   AND IF WE COULD PULL UP PX_44E AT PAGE 3.

4         AND LOOK DOWN AT THE BOTTOM OF THE PAGE,

5    INTERROGATORY NO. 20.  COULD YOU READ THE FIRST SENTENCE OF

6    THIS INTERROGATORY RESPONSE?

7    **A.**   "DEFENDANTS ARE NOT AWARE OF ANY CHANGES TO LSP'S POLICIES

8    OR PRACTICES REGARDING COMMUNICATION WITH THE DOC HEADQUARTERS

9    REGARDING SCHEDULING OF SPECIALTY APPOINTMENTS."

10   **Q.**   AND IS THAT CONSISTENT WITH WHAT YOU SAW REGARDING

11   COMMUNICATIONS WITH HEADQUARTERS STAFF?

12   **A.**   YES.

13        **MR. DUBNER:**  THANK YOU.  YOU CAN TAKE THAT DOWN.

14   **BY MR. DUBNER:**

15   **Q.**   AND THEN YOU SAID THAT THEY HAVE MORE APPOINTMENTS.  THEY

16   SAY THEY HAVE MORE APPOINTMENTS AT THE UNIVERSITY OF MEDICAL --

17   UNIVERSITY MEDICAL CENTER NEW ORLEANS.

18        DID YOU SEE EVIDENCE THAT THE OVERALL NUMBER OF

19   SPECIALTY APPOINTMENTS IS HIGHER TODAY THAN IT WAS DURING THE

20   LIABILITY PERIOD?

21   **A.**   WELL, IT MAY HAVE BEEN, BUT I HAVE TO ADMIT ECEPTIONIST IS

22   -- WAS NOT POSSIBLE FOR ME TO DETERMINE HOW MANY PEOPLE

23   ACTUALLY COMPLETED APPOINTMENTS.  WHAT WAS ENTERED INTO

24   ECEPTIONIST ARE THE REFERRALS.  IT'S A DATABASE.  AND I'M SURE

25   THE DATABASE IS A REASONABLE DATABASE, BUT THE WAY IT IS USED,

09:44 1  IT'S EXTREMELY DIFFICULT TO IDENTIFY HOW MANY PEOPLE ACTUALLY

2  WERE SENT AND COMPLETED APPOINTMENTS.

3          THERE'S A SECOND SET OF DATA:  THE CO-5 REPORTS.

4  THEY GIVE --

5          **MR. ARCHEY:**  YOUR HONOR, I WANT TO OBJECT.  THIS IS

6  OUTSIDE THE REPORT AS TO THE DISCUSSION OF THE CO-5 REPORTS.

7          **MR. DUBNER:**  I ACTUALLY THINK THAT'S CORRECT.  I

8  DON'T THINK HE DISCUSSED THE CO-5 REPORTS, SO.

9  **BY THE WITNESS:**

10  **A.**   OKAY.  SO I WON'T DISCUSS THAT.  BUT IT APPEARED THAT IN

11  LOOKING AT ECEPTIONIST -- AND I WAS GIVEN 17 FILES OF

12  SPREADSHEETS.  EACH I BELIEVE HAD A DIFFERENT PURPOSE.  SO ONE

13  OF THEM WAS USED TO TRACK COMMENTS BY THE TRIP NURSE, WHO WOULD

14  WRITE COMMENTS ON AN ONGOING BASIS AS TO WHERE THE -- WHAT THE

15  STATUS WAS ON AN APPOINTMENT.  THAT WAS NOT USEFUL WITH RESPECT

16  TO DETERMINING HOW MANY PEOPLE WENT.

17          BUT BASED ON MY ASSESSMENT, IT LOOKED LIKE THE NUMBER

18  OF APPOINTMENTS WAS ABOUT THE SAME.  AND I HAVE TO QUALIFY THAT

19  A LITTLE BIT.  THAT THE POPULATION OF LSP DECREASED DURING

20  COVID SO THAT THE END RESULT WAS PROBABLY ON A PER CAPITA

21  BASIS.  THE NUMBER OF APPOINTMENTS WAS PROBABLY HIGHER IN THE

22  2022 PERIOD THAN IT WAS IN 2019.  BUT IT WAS EXTREMELY

23  DIFFICULT TO TELL, AND I COULD NOT WITH ANY CERTAINTY VERIFY

24  THE EXACT NUMBERS.

25  **Q.**   AND LET'S ASSUME FOR THE MOMENT THAT DEFENDANTS COULD SHOW

09:46 1  THAT THE NUMBER OF SPECIALTY APPOINTMENTS HAS INCREASED.  IF

2  THEY ARE ABLE TO SHOW THAT, WOULD THAT CHANGE YOUR CONCLUSIONS?

3  **A.**  NO.  BECAUSE I WAS -- I'M CONCERNED ABOUT THE PROCESS OF

4  HOW IT HAPPENS, REMEMBER, WHETHER PEOPLE ARE REFERRED WHEN THEY

5  SHOULD BE REFERRED AND WHETHER PEOPLE ARE FOLLOWED UP

6  APPROPRIATELY.

7  **Q.**  WE'RE GOING TO TALK NOW ABOUT SOME OF THE MEDICAL CARE YOU

8  SAW ON THE CHARTS.

9       YOU SAID YOU REVIEWED 17 PATIENTS' CHARTS?

10  **A.**  I DID.

11  **Q.**  IN HOW MANY OF THEM DID YOU SEE MEDICAL CARE THAT PUT

12  PATIENTS AT A RISK OF SERIOUS HARM?

13  **A.**  THERE WERE -- I MEAN, THERE WERE FIVE MORTALITIES THAT I

14  THOUGHT WERE PREVENTABLE.  SO THAT'S I THINK A SERIOUS -- THOSE

15  PEOPLE HAD SERIOUS ISSUES.  ALMOST EVERY RECORD HAD PROBLEMS.

16  AND THEY -- I MEAN, I DON'T KNOW EXACTLY HOW MANY WERE SERIOUS,

17  BUT THERE WERE MANY, MANY SERIOUS ISSUES THAT PUT PATIENTS AT

18  RISK AND INVOLVING OFTEN PHYSICIAN COMMUNICATION ISSUES,

19  PHYSICIANS NOT DOCUMENTING HISTORIES, PHYSICIANS NOT EXAMINING

20  PEOPLE, FAILURE TO GET MEDICATION.  AND SO THERE WERE NUMEROUS

21  PROBLEMS THAT SHOWED THAT PEOPLE WERE AT RISK.

22  **Q.**  WHAT STANDARDS DID YOU APPLY TO DETERMINE WHAT WAS

23  MEDICALLY APPROPRIATE IN THE CHARTS YOU WERE REVIEWING?

24  **A.**  SO JUST AS A COMMENT, I USE UPTODATE.  UPTODATE IS A --

25  IT'S AN INTERNET WEB-BASED TEXTBOOK THAT IS UPDATED ON AN

09:47 1  ONGOING BASIS.  SO EVERY FEW MONTHS AN AUTHOR MAY UPDATE THE

2  TREATMENT OF DIABETES OR HEART FAILURE.  AND IT'S BY

3  SUBSCRIPTION.

4        I THINK LSP -- ACTUALLY A COUPLE OF PEOPLE USE IT.

5  IT'S KNOWN AS A STANDARD IN HOSPITALS AND HMOS THROUGHOUT THE

6  COUNTRY.  AND I USE THAT AS A SOURCE.  THE AMERICAN DIABETES

7  ASSOCIATION, AMERICAN THORACIC ASSOCIATION, AMERICAN CARDIOLOGY

8  ASSOCIATION PUT OUT CONSENSUS GUIDELINES.  AND MOST OF THOSE

9  CONSENSUS GUIDELINES ARE COVERED IN UPTODATE.  AND SO I USE THE

10  CONSENSUS GUIDELINES, BUT I ALSO USE UPTODATE.  I MEAN, THAT'S

11  WHAT I USE FOR A STANDARD.

12  **Q.**   AND WHAT DO YOU MEAN BY "CONSENSUS GUIDELINES"?

13  **A.**   WELL -- SO, FOR EXAMPLE, THE AMERICAN DIABETES ASSOCIATION

14  HAS A PANEL.  THEY CONVENE, THEY OBTAIN THE DATA ON -- THEY

15  LOOK AT STUDIES AND THEY CRAFT GUIDELINES THAT ARE DEVELOPED BY

16  CONSENSUS OF THE GROUP.  AND THE GROUP INCLUDES, YOU KNOW, A

17  VARIETY OF PEOPLE FROM DIFFERENT TRAININGS AND BACKGROUNDS.

18  **Q.**   AND ARE THESE CUTTING-EDGE GUIDELINES, OR ARE THESE SORT

19  OF THE STANDARD ACROSS THE COUNTRY?

20  **A.**   NO.  THESE ARE JUST GENERAL MEDICAL PRACTICE GUIDELINES.

21  THEY'RE NOT -- I MEAN, I THINK THAT WITH RESPECT TO THE

22  GUIDELINES THERE IS NO OPTIMAL CARE.

23        WHEN YOU HAVE DIABETES, THEY HAVE A GUIDELINE AND

24  THEY SAY, YOU KNOW, YOU SHOULD -- EVERYONE WITH DIABETES SHOULD

25  BE SCREENED FOR RETINOPATHY ONCE A YEAR.  AND THAT'S BASED ON

09:49 1   STUDIES.  IT'S NOT OPTIMAL THAT YOU DO IT.  IT'S WHAT IS

2   EXPECTED.  SO THAT'S THE WAY I WOULD LOOK AT THAT.

3   **Q.**  OKAY.  SO LET'S START WITH A PATIENT WHO DID SEE

4   SPECIALISTS AND LOOK AT HOW LSP COORDINATED THAT SPECIALTY

5   CARE.  WE'RE GOING TO START WITH PATIENT NO. 5.

6        CAN YOU BRIEFLY SUMMARIZE WHAT YOU SAW IN THIS

7   PATIENT'S RECORDS?

8   **A.**  SO PATIENT 5 HAD MULTIPLE MEDICAL CONDITIONS.  HE WAS

9   ADMITTED TO A HOSPITAL WITH CHEST PAIN, AND HE HAD A MYOCARDIAL

10   INFARCTION.  HE WAS TREATED WITH A STENT AND RETURNED TO THE

11   LSP FACILITY.

12        SEVERAL WEEKS LATER AT LSP HE DEVELOPED ONGOING CHEST

13   PAIN AND HAD TO BE READMITTED TO THE HOSPITAL WHERE IT WAS

14   FOUND THAT HIS STENT WAS NOT PROPERLY SEATED AND THEY HAD TO

15   REDO THE STENT.

16        DURING BOTH HOSPITALIZATIONS THEY RECOGNIZED THAT HE

17   HAD ONGOING AORTIC STENOSIS, AND THEY DID ECHOCARDIOGRAMS AT

18   BOTH -- DURING BOTH ADMISSIONS.  DURING BOTH ADMISSIONS THE

19   VALVE WAS NOT WELL VISUALIZED.

20        AND IN THE FIRST VISIT, IN THE FIRST HOSPITALIZATION,

21   THE PATIENT HAD AN EJECTION FRACTION OF HIS HEART OF 40 PERCENT

22   AND HE WAS DETERMINED TO HAVE MODERATE AORTIC STENOSIS.  AND I

23   JUST WANT TO TAKE A MINUTE TO JUST DESCRIBE AORTIC STENOSIS

24   BECAUSE IT'S PART OF THIS DISCUSSION.

25        THE AORTIC VALVE IS THE VALVE OF THE LEFT VENTRICLE.

09:51 1    IT'S THE MAIN PUMP OF THE HEART TO GET BLOOD OUT TO THE REST OF
2    THE BODY, AND THE AORTIC VALVE IS THE VALVE THAT -- IS THE
3    VALVE THAT -- BETWEEN THE AORTA AND THE HEART, AND THAT VALVE
4    CAN BE DISEASED.  IT CAN BE CALCIFIED.  IT CAN BE CONGENITALLY
5    ABNORMAL, A BICUSPID VALVE, AND THAT CAN LEAD TO PROBLEMS.
6            AN AORTIC STENOSIS IS A CONDITION WHERE THE VALVE IS
7    -- IT IS DAMAGED OR FIBROTIC AND THE BLOOD DOES NOT EXIT THE
8    HEART.  AND SO AORTIC STENOSIS IS MEASURED BY THE FLOW ACROSS
9    THE VALVE AND HOW MUCH GRADIENT THERE IS.  IN OTHER WORDS, THE
10   PRESSURE BETWEEN WHAT'S IN THE HEART AND WHAT'S ON THE OTHER
11   SIDE OF THE HEART, THOSE ARE THE TWO WAYS TO MEASURE IT.  AND
12   YOU DETERMINE THAT VALVE FUNCTION BY DOING AN ECHOCARDIOGRAM.
13   AND SO THE CONDITION CAN BE LABELED AS MILD, MODERATE, OR
14   SEVERE.
15           UNDER ALL CIRCUMSTANCES, ANYONE WITH SYMPTOMS -- AND
16   BECAUSE THE HEART IS PUMPING BLOOD THAT HAS OXYGEN, THE MAIN
17   SYMPTOMS ARE SHORTNESS OF BREATH, BECAUSE YOU'RE NOT GETTING
18   ENOUGH BLOOD AND YOU BECOME SHORT OF BREATH; OR DIZZINESS,
19   BECAUSE YOU'RE NOT GETTING ENOUGH BLOOD WITH OXYGEN TO THE
20   BRAIN; OR CHEST PAIN, BECAUSE YOU ARE NOT GETTING ENOUGH BLOOD
21   TO THE CORONARY ARTERIES.  AND SO THOSE ARE THREE KEY SYMPTOMS.
22           AND VALVE SURGERY IS INDICATED WHENEVER SOMEONE IS
23   SYMPTOMATIC OR WHEN THE MEASUREMENTS OF THE VALVE AREA OR THE
24   VALVE FLOW ACROSS THE VALVE IS DEFECTIVE.  AND SO IT'S A LITTLE
25   COMPLEX, BUT YOU HAVE TO UNDERSTAND THAT.

09:53 1        SO FOR THIS PERSON, HIS FIRST HOSPITALIZATION HE HAD

2  AN EJECTION FRACTION THAT WAS NOT THAT BAD.  IT WAS 40.  AND HE

3  WAS DETERMINED TO HAVE MODERATE AORTIC STENOSIS.

4        AT THE SECOND HOSPITALIZATION THEY COULD ALSO NOT

5  VISUALIZE THE VALVE, AND THE VALVE WAS FOUND TO BE SEVERE

6  AORTIC STENOSIS WITH AN EJECTION FRACTION OF 30 TO 35 PERCENT.

7  SO IT WAS WORSE.  AND THE SECOND HOSPITALIZATION THEY

8  RECOMMENDED THAT THE PATIENT GET A SPECIAL ECHOCARDIOGRAM.

9  **Q.**   AND WHY DON'T WE PAUSE HERE AND START LOOKING AT SOME OF

10  THESE RECORDS.

11  **A.**   SURE.

12  **Q.**   SO IF WE COULD BRING UP JX_5 AT 332.

13        THESE ARE ALL GOING TO BE SEALED.

14        **THE COURT:**  OKAY.  BETWEEN THE FIRST AND SECOND

15  HOSPITAL VISITS, FIRST IT'S MODERATE AORTIC STENOSIS.

16          AND THE SECOND WAS WHAT?

17        **THE WITNESS:**  SEVERE.

18        **THE COURT:**  OKAY.

19  **BY MR. DUBNER:**

20  **Q.**   SO THIS IS A RECORD FROM THAT FIRST HOSPITALIZATION WHERE

21  THEY -- I THINK YOU SAID THEY PLACED A STENT AND NOTED MODERATE

22  AORTIC STENOSIS AND SAID THAT HE NEEDED ANOTHER ECHOCARDIOGRAM.

23  WHAT DID THEY RECOMMEND FOR FOLLOW-UP?

24  **A.**   THEY RECOMMENDED HE GO BACK TO UNIVERSITY MEDICAL CENTER

25  FOR A FOLLOW-UP WITH THE CARDIOLOGIST.

09:54 1    Q.    AND THEN LET'S LOOK AT PAGE 331 OF JOINT EXHIBIT 5.

2                WHAT IS THIS DOCUMENT?

3          A.    SO THIS IS A TRIP RETURN NOTE.  AND THIS IS IMPORTANT.  SO

4          THESE ARE RNS OR LPNS WHO ARE THE TRIP NURSES.  AND WHEN A

5          PATIENT COMES BACK, WITHIN 24 HOURS OR SOMETIMES THE NEXT DAY,

6          THE TRIP NURSE TAKES THE REPORT OF THE HOSPITALIZATION AND

7          WRITES DOWN WHAT THE RECOMMENDATIONS ARE OF THE SPECIALIST OR

8          THE HOSPITAL.  AND THEY WRITE THEM AS YOU SEE THEM HERE, AND

9          THAT'S HOW -- THAT'S THE PROCESS THAT LSP USES.  THIS IS -- AND

10         THE TRIP NURSE, AS I BELIEVE, ARE REALLY IN CONTROL OF THE

11         MANAGEMENT OF SPECIALTY CARE.  I DON'T SEE EVIDENCE THAT THE

12         DOCTORS ACTUALLY ARE INVOLVED IN IT MUCH.  SO THE TRIP NURSES

13         DO IT.

14               AND THIS NURSE IS WRITING DOWN WHAT THE

15         RECOMMENDATIONS WERE FROM THE HOSPITAL, WHICH THE SECOND ONE

16         YOU'LL NOTE SAYS "F/U," FOLLOW UP, "WITH CARDIOLOGY AT UMCNO."

17         SO THE NURSE NOTES THAT THAT IS -- SHOULD HAPPEN.

18         Q.    AND THEN AT THE BOTTOM I SEE IT SAYS, "NOTED 9/28/20."  DO

19         YOU HAVE AN UNDERSTANDING OF WHO WOULD HAVE WRITTEN THAT?

20         A.    I THINK THAT THIS IS THE PROVIDER INITIALING THAT THEY

21         REVIEWED THE NOTE.

22         Q.    AND THAT WAS DATED 9/28/20.  HOW LONG AFTER THE PATIENT

23         GOT THESE RECOMMENDATIONS FROM THE CARDIOLOGIST IS THAT?

24         A.    CORRECT.  THAT'S EIGHT DAYS.

25               NOW, REMEMBER ONE ADDITIONAL PIECE HERE:  WHAT THE

09:56 1    TRIP -- ACCORDING TO DR. LAVESPERE, THE TRIP NURSES WILL WRITE

2    THE -- ANY PRESCRIPTION ORDERS AND THEN HAVE THE DOCTOR SIGN

3    THEM.

4              BUT FROM MY PERSPECTIVE, THE DOCTOR SHOULD REVIEW TO

5    SEE WHETHER THERE MIGHT BE ANY DRUG INTERACTIONS, WHETHER THE

6    PATIENT SHOULD GET THIS, SHOULD NOT GET IT; AND THERE SHOULD BE

7    SOME PHYSICIAN OR A NURSE PRACTITIONER OVERSIGHT OVER ORDERING

8    THOSE MEDICATIONS.  THERE SHOULDN'T JUST BE THE NURSE JUST

9    TRANSCRIBES AN ORDER AND GIVES IT.  IT SHOULD BE A THOUGHTFUL,

10   INTEGRATED, COLLABORATIVE PROCESS.

11   Q.   AND IS THERE EVIDENCE THAT THAT IS OCCURRING AT LSP?

12   A.   NO.

13   Q.   AND FOR THIS CASE IN PARTICULAR, FOR EXAMPLE, IS THERE

14   EVIDENCE THAT THE PROVIDER REVIEWED THAT HOSPITAL REPORT?

15   A.   WELL, THIS INITIAL -- NOT THE REPORT, NO.  THAT I DON'T

16   SEE EVIDENCE OF AT ALL.  I SEE -- I DON'T THINK I EVER SAW A

17   PHYSICIAN DOCUMENT THAT THEY REVIEWED THE REPORT.  THE

18   CARDIOLOGIST ONCE READ THAT HE WANTED THE REPORT, BUT THERE

19   WERE -- THERE MAY HAVE BEEN ONE OR TWO BUT NOT MANY.

20   Q.   AND IF WE GO BACK -- SO, AS YOU POINTED OUT, THIS SAYS

21   "FOLLOW UP WITH CARDIOLOGIST AT UMCNO."  IF WE GO TO PAGE 272,

22   DID THEY REFER HIM BACK FOR A FOLLOW-UP AT UMCNO?

23   A.   NO.  SO THEY HAVE AN ON-SITE CARDIOLOGIST, AND THEY WERE

24   REFERRED TO DR. COLON, WHO IS THE ON-SITE CARDIOLOGIST AT LSP.

25   Q.   OKAY.  NOW, YOU SAID THAT HE WENT BACK TO THE HOSPITAL.

09:58 1    SO LET'S LOOK AT THAT ON OCTOBER 2, 2020, AND I WILL BRING UP
      2    PAGE 238 AND THEN 239.
      3         BUT LET'S START HERE.  IF WE LOOK AT THE BOTTOM OF
      4    THE PAGE, WHAT DID THE -- WHAT WAS FOUND AT THE HOSPITAL ON
      5    THIS OCCASION?
      6    A.   SO AS I SAID IN BOTH CASES, THEY HAD DIFFICULTY
      7    VISUALIZING THE AORTIC VALVE.  AND IN ADDITION, THE
      8    ECHOCARDIOGRAM THAT THEY DID DO SHOWED SEVERE AORTIC STENOSIS.
      9    AND SO THEY FELT THAT THE PERSON NEEDED A DOBUTAMINE STRESS
     10    ECHO.  AND THIS GETS A LITTLE COMPLICATED.  I'LL TRY TO MAKE IT
     11    SIMPLE.  BUT YOU JUDGE THE AORTIC VALVE BY THE FLOW ACROSS THE
     12    VALVE IN THE VALVE AREA.  AND THERE WERE -- IT WAS NOT A
     13    TYPICAL FLOW ACROSS THE VALVE AREA.  IT WAS A LOW FLOW I THINK.
     14    SO THEY FELT THAT A DOBUTAMINE STRESS ECHO WAS NECESSARY.
     15         SO THIS WAS A SPECIALIZED ECHO THAT WAS NECESSARY TO
     16    MAKE THE EVALUATION, WHICH IS STANDARD OF CARE FOR WHEN YOU
     17    HAVE AN ISSUE THAT MAY INDICATE THAT THE PATIENT HAD A
     18    LOW-FLOW, LOW-GRADE AORTIC STENOSIS.  SO FOR THIS PATIENT THEY
     19    WERE JUST GIVING THE TYPICAL RECOMMENDATION THAT SHOULD HAVE
     20    HAPPENED.
     21    Q.   AND IF WE GO TO PAGE 239 OF THE RECORD AS WELL TO SEE A
     22    LITTLE MORE OF WHAT THEY SAID.  SO IF YOU COULD CONTINUE THAT
     23    PARAGRAPH AT THE TOP OF THE PAGE.
     24         AND SO WHAT WAS THE REMAINDER OF THE EXPLANATION OF
     25    WHY THEY DIDN'T DO A DOBUTAMINE STRESS ECHO AT THAT TIME, AND

1    THEN ALSO THEIR RECOMMENDATION?

2    **A.**    RIGHT.  SO THEY COULDN'T COMPLETE THE DOBUTAMINE STRESS

3    ECHO DURING THE HOSPITALIZATION AND THEY SAID HE SHOULD

4    FOLLOW-UP WITH A CARDIOLOGIST IN NEW ORLEANS AND DETERMINE IF

5    HE IS A CANDIDATE FOR A SURGICAL REPLACEMENT.

6            SO THE WHOLE ISSUE WAS THE ECHO THEY DID SHOWED

7    SEVERE AORTIC STENOSIS.  THAT WOULD INDICATE DOING SURGERY ON

8    THE VALVE.  AND THEY WANTED TO MAKE SURE THAT HE HAD THAT

9    EVALUATION.  SO HE NEEDED AN EVALUATION TO SEE IF HE WAS A

10   SURGICAL CANDIDATE.

11           **MR. DUBNER:**  AND IF YOU COULD JUST TAKE DOWN THE

12   HIGHLIGHT THERE.

13   **BY MR. DUBNER:**

14   **Q.**    AND SO IF WE LOOK DOWN TOWARDS THE BOTTOM IN THE

15   "CONCLUSIONS," WHAT WAS HIS EJECTION FRACTION AT THAT POINT IN

16   TIME?

17   **A.**    SO THE ECHO -- ON THE VERY BOTTOM OF THAT PAGE, 10/2/20,

18   SAYS THAT HIS EJECTION FRACTION IS 30 TO 35 PERCENT AND IT

19   SAYS, ON LINE 3, "SEVERE AORTIC VALVE STENOSIS."

20   **Q.**    AND THEN THE LAST THING TO LOOK AT IN THE RECORD, IF WE

21   COULD GO TO PAGE 237.

22           IN TERMS OF THE INSTRUCTIONS THAT THEY GAVE, FIRST,

23   WHAT FOLLOW-UP DID THEY RECOMMEND?

24   **A.**    WELL, THEY WANTED HIM TO SEE THE CARDIOLOGIST IN A WEEK.

25   **Q.**    AND WHAT DID THEY SAY TO DO IF HIS SYMPTOMS GOT WORSE?

10:01 1    **A.**   THEY SAID, "CALL US."  YEAH.  I MEAN -- SO THEY WANTED THE

2    PATIENT -- YOU KNOW, THEY WERE CONCERNED.  HE HAD BOTH ANOTHER

3    SECOND STENT AND HE HAD THIS AORTIC VALVE, SO IF YOU GET WORSE

4    SYMPTOMS, CALL THE DOCTOR AND FOLLOW UP IN FIVE TO SEVEN DAYS

5    WITH YOUR PRIMARY CARE DOCTOR.

6    **Q.**   SO TO GO THROUGH THOSE RECOMMENDATIONS, DID THEY FOLLOW UP

7    WITH THE CARDIOLOGIST IN NEW ORLEANS?

8    **A.**   NO.  THEY SENT HIM TO THE ON-SITE CARDIOLOGIST.

9    **Q.**   AND AS HIS SYMPTOMS GOT WORSE, DID THEY CALL THE

10   CARDIOLOGIST TO DISCUSS WITH THEM?

11   **A.**   WELL, YOU'LL SEE THROUGH THE ENTIRE YEAR AFTERWARDS HE HAD

12   RELATIVELY CONTINUAL SYMPTOMS.  I COUNTED 19 EPISODES OF

13   SHORTNESS OF BREATH AND SO ON, WHICH ARE CARDINAL SYMPTOMS OF

14   AORTIC STENOSIS.  AND THEY DIDN'T CONTACT A CARDIOLOGIST.

15   **Q.**   AND YOU NOTED ON THE PREVIOUS PAGE THAT THEY WANTED TO

16   DETERMINE IF HE WAS A CANDIDATE FOR A SURGICAL REPLACEMENT.

17   DID YOU SEE ANY FURTHER CONSIDERATION OF WHETHER THE PATIENT

18   WOULD HAVE BEEN A CANDIDATE FOR A SURGICAL REPLACEMENT IN THE

19   RECORDS?

20   **A.**   NO.

21   **Q.**   LET'S PAUSE HERE FOR A MOMENT.  I THINK YOU SAID EARLIER

22   DEFENDANTS HAVE A POLICY ABOUT WHAT THEY SHOULD DOCUMENT WHEN

23   THEY DON'T FOLLOW A SPECIALIST'S RECOMMENDATIONS.  IS THAT

24   RIGHT?

25   **A.**   YES.

10:03 1  **Q.**   AND LET'S PULL THAT UP.  IF WE COULD GET PLAINTIFFS'

2  EXHIBIT 190 AT 3.  AND THIS IS NOT SEALED.

3        COULD YOU READ PARAGRAPH 5 THERE?

4  **A.**   YEAH.  "ALL RECOMMENDATIONS BY NON-DEPARTMENTAL HEALTH

5  CARE PRACTITIONERS CONCERNING AN OFFENDER'S TREATMENT SHALL BE

6  REVIEWED BY THE OFFENDER'S PRIMARY CARE PROVIDER.  IF THE

7  DECISION IS MADE NOT TO CARRY OUT ANY OR ALL RECOMMENDATIONS,

8  JUSTIFICATION SHALL BE DOCUMENTED IN THE OFFENDER'S MEDICAL

9  RECORD.  DUTY STATUSES OR RECOMMENDATIONS FOR SPECIAL

10  ACCOMMODATIONS ARE NOT A PART OF THE TREATMENT PLAN AND THE

11  PRIMARY CARE PROVIDER IS BETTER SUITED TO MAKE THESE

12  DECISIONS."

13  **Q.**   NOW, IN THIS CASE WHAT WE WILL BE DISCUSSING DOESN'T

14  INVOLVE DUTY STATUSES OR RECOMMENDATIONS FOR SPECIAL

15  ACCOMMODATIONS?

16  **A.**   CORRECT.

17  **Q.**   SO THIS IS SQUARELY IN THOSE FIRST TWO SENTENCES?

18  **A.**   RIGHT.

19  **Q.**   AND DID DEFENDANTS -- THIS IS A DOC-WIDE POLICY.  IS THAT

20  RIGHT?

21  **A.**   YES.

22  **Q.**   AND IS THERE ALSO ANOTHER DOCUMENT REPEATING IT FOR LSP?

23  **A.**   I BELIEVE THERE IS, YES.

24  **Q.**   DID DEFENDANTS FOLLOW THIS POLICY?

25  **A.**   NO.

1  **Q.**   IN FACT, DID YOU SEE EVIDENCE THAT DEFENDANTS AREN'T EVEN

2  AWARE OF THIS POLICY?

3  **A.**   DR. LAVESPERE DIDN'T, I THINK, BELIEVE THAT THIS EXISTED.

4  HE DIDN'T KNOW IT EXISTED.

5  **Q.**   AND SO LET'S PULL UP JOINT EXHIBIT 70A AT 44.

6       AND FIRST OFF, DO YOU NEED WATER, DR. PUISIS?

7  **A.**   I HAVE WATER.

8  **Q.**   OH, YOU HAVE WATER?

9  **A.**   YEAH.  I HAVE A LITTLE, YEAH.  I'M SORRY.

10  **Q.**   AND SO IF YOU COULD READ STARTING AT LINE 15 THROUGH THE

11  END OF THE PAGE?

12  **A.**   SO THE QUESTION IS:  "IS THERE ANY POLICY OR PROCEDURE

13  GOVERNING HOW LSP PROVIDERS ARE SUPPOSED TO DECIDE WHETHER OR

14  NOT TO, FOR EXAMPLE, SEND SOMEONE FOR A FOLLOW-UP OR OTHERWISE

15  FOLLOW A SPECIALIST'S RECOMMENDATIONS?"

16       AND THE ANSWER WAS:  "THAT'S UP TO THE MEDICAL

17  DIRECTOR."

18       AND THE QUESTION:  "THE MEDICAL DIRECTOR AT THE

19  FACILITY?

20       "RIGHT.

21       "ARE THERE ANY SORT OF WRITTEN GUIDELINES OR POLICIES

22  THEY ARE SUPPOSED TO APPLY IN FOLLOWING THAT?"

23  **Q.**   AND THEN IF YOU COULD CONTINUE TO THE NEXT PAGE.

24  **A.**   "NO.  YOU KNOW, WHAT ARE YOU CAPABLE OF HANDLING AT YOUR

25  FACILITY, YOU KNOW, AND WE'RE VERY CAPABLE."

10:05 1  Q.   AND THEN IF WE GO TO PAGE 48 OF THE DEPOSITION, STARTING

2  AT LINE 4, IF YOU COULD READ THAT AND THE ANSWER.

3  A.   "IS THERE ANY POLICY OR PROCEDURE REQUIRING LSP PROVIDERS

4  TO PROVIDE A WRITTEN EXPLANATION WHEN THEY DON'T FOLLOW WHAT A

5  SPECIALIST'S RECOMMENDATIONS WAS, WHETHER IT'S ONE OF THOSE

6  CATEGORIES OR SOMETHING ELSE?

7         "THERE IS NO POLICY.  WHY WOULD THERE NEED TO BE?"

8  Q.   SO LET'S RETURN TO PATIENT 5.

9         AND NOW WE WILL BE BACK UNDER SEAL.

10         LET'S PULL UP PAGE NO. 252.

11         AND SO NOW HE'S SEEING DR. COLON, THE ON-SITE

12  CONTRACT CARDIOLOGIST.  WHAT DOES DR. COLON RECOMMEND?

13  A.   SO I BELIEVE THIS IS THE FIRST DR. COLON VISIT.  HE SAW

14  DR. COLON I THINK FIVE TIMES.  AND DR. COLON NOTES THAT HE

15  WANTS THE RECORDS.  AND HE NOTES THAT THE PATIENT HAD A HEART

16  ATTACK ON 9/20, THAT HE HAS AORTIC STENOSIS.  AND HE DOES A

17  PHYSICAL EXAM.  AND HE ASKS FOR -- IN THE PLAN HE SAYS, "RETURN

18  TO CLINIC IN THREE MONTHS AND GET AN ECHO."

19         AND HE ALSO -- THIS PATIENT ALSO HAD PERIPHERAL

20  VASCULAR DISEASE.  SO THE OTHER RECOMMENDATIONS, THEY WERE

21  RELATED TO HIM GETTING A STUDY OF HIS LOWER EXTREMITY

22  VASCULATURE.  AND HE ALSO ASKED FOR THE CATH REPORT FROM 9/20.

23         SO OBVIOUSLY HE DID NOT HAVE THE REPORT OF THE

24  PATIENT'S HOSPITALIZATION -- OF EITHER PATIENT HOSPITALIZATION.

25  AND THAT IS SOMETHING THAT I THINK REALLY I NEED TO CALL

10:07 1  ATTENTION TO, BECAUSE IT'S CRITICAL THAT THE PRIMARY CARE

2  PROVIDERS, INCLUDING ANY SPECIALISTS THAT ARE WORKING ON-SITE,

3  REVIEW THE REPORTS OF THE SPECIALTY CARE, BECAUSE OTHERWISE

4  THEY DON'T KNOW WHAT'S HAPPENING, AS CLEARLY AS DEMONSTRATED

5  HERE.  AND SO HE'S SAYING TO LSP THAT "I NEED TO SEE THE CATH

6  REPORT.  I NEED TO SEE THE RECORDS."  AND THAT'S WHAT HE'S

7  STATING.

8  **Q.**    AND THEN LET'S LOOK AT PAGE 248.

9          TWO DAYS LATER THE PATIENT WAS SEEN IN THE GENERAL

10  MEDICINE CLINIC.  WHAT PROBLEMS DO YOU SEE WITH THIS VISIT?

11  **A.**    SO IN THIS VISIT, IF YOU LOOK AT THE -- IN THE UPPER BOX

12  THERE'S A LINE SECOND FROM THE BOTTOM THAT SAYS "CHIEF

13  COMPLAINT," AND FOLLOWING THAT IT LISTS THE PATIENT'S PROBLEMS

14  THAT INCLUDE NON-STEMI, WHICH IS HEART ATTACK, GI BLEED,

15  HYPERTENSION, AORTIC STENOSIS.  SO THE PERSON WHO SCHEDULED

16  NOTED THAT THE PATIENT WAS TO BE SEEN FOR AORTIC STENOSIS

17  INCLUDING THAT.

18          WHAT YOU NOTE, THOUGH, IN THE RECORD -- IF YOU CAN

19  REMOVE THE -- YEAH.  THANK YOU -- IS THAT IT BASICALLY SAYS

20  THAT THE PATIENT SAW DR. COLON, BUT THERE'S NO HISTORY.  SO --

21  AND THIS IS TYPICAL OF LSP NOTES.  IF SOMEONE HAS AORTIC

22  STENOSIS, YOU MIGHT ASK THEM A FEW QUESTIONS ABOUT WHETHER THEY

23  HAVE ANY SYMPTOMS OF AORTIC STENOSIS, BECAUSE THAT'S A KEY

24  FACTOR IN DECIDING WHETHER SOMEONE DESERVES SURGERY OR NOT.

25  AND YOU DON'T SEE THAT.  IT BASICALLY SAYS HE HAS NO

10:09 1  COMPLAINTS.

2        IN THE "ASSESSMENT" IN THE LEFT LOWER CORNER, HE

3  INDICATES HYPERTENSION, NON-STEMI, WHICH IS A HEART ATTACK, GI

4  BLEED, LOW BACK PAIN, C-A-B.  I THINK THAT MEANS CORONARY

5  ARTERY DISEASE.  AND -- BUT AORTIC STENOSIS ISN'T MENTIONED.

6        SO THE OTHER THING IS THAT THIS PROVIDER -- THIS IS

7  THE FIRST VISIT AFTER TWO HOSPITALIZATIONS FOR A HEART ATTACK

8  AND THEN A RE-STENTING, AND THERE'S NO MENTION OF ANY OF THAT.

9  THE DOCTOR DOESN'T SAY "THE PATIENT WAS JUST ADMITTED FOR A

10  STEMI.  HE HAD THIS.  HE HAD TO HAVE A STEMI REDONE."  THEY DID

11  AN ECHO.  THE ECHO -- THERE WERE TWO VERSIONS OF THE ECHO.  THE

12  LATEST ECHO WAS SEVERE AORTIC STENOSIS AND THEY RECOMMENDED A

13  DOBUTAMINE STRESS ECHO.  THERE'S NOTHING THERE.

14        SO IT'S AS IF THE DOCTOR IS DISENGAGED FROM THE CARE

15  OF THE PATIENT, AND THAT'S A KEY FEATURE.  AND AS A RESULT, THE

16  PLAN -- NOW, REMEMBER I CALLED ATTENTION THAT THE MAIN FOCUS OF

17  THE PRIMARY CARE PROVIDER SHOULD BE TO INTEGRATE THE PLAN OF

18  THE SPECIALIST WITH THE THERAPEUTIC PLAN OF THE PATIENT AT THE

19  SITE.  AND YOU DON'T SEE THAT HAPPENING.  YOU DON'T SEE A

20  RECOMMENDATION THAT "WE NEED TO GET A DOBUTAMINE STRESS ECHO."

21        AND I REVIEWED DR. COLON'S NOTE AND I DIDN'T SEE

22  ANYTHING ABOUT IT, "MAYBE WE SHOULD TALK."  AND THERE'S NO --

23  SO IT'S NOT INTEGRATED INTO THE PLAN AND IT'S DISENGAGED AND

24  IT'S AS IF IT DOESN'T EXIST.

25  **Q.**  AND THEN LET'S MOVE FORWARD TO HIS NEXT CARDIOLOGY VISIT

10:11 1 ON JANUARY 30TH.  THIS IS PAGE 221 OF JOINT EXHIBIT 5.

2         SO HAD THE ECHOCARDIOGRAM BEEN DONE BY THIS POINT?

3 **A.**  NO.  SO THE CARDIOLOGIST BASICALLY RESCHEDULES THE ECHO,

4 AND HE SAID, "REFERRALS WERE SENT."  AND HE SAID, "NONE OF THE

5 TESTS WERE DONE."  AND HE HAD A NOTE "RECORDS" AND HE CHECKED

6 IT.  IT'S NOT CLEAR WHETHER HE REVIEWED THE RECORD, BUT IT DOES

7 NOT APPEAR THAT HE REVIEWED IT.  SO BASICALLY IT'S THE SAME:

8 HE'S NOT GETTING INFORMATION THAT HE NEEDS TO COME TO

9 CONCLUSIONS.

10 **Q.**  AND IF WE LOOK IN THE TOP LEFT, FIRST AT THAT NO. 4.

11 **A.**  RIGHT.

12 **Q.**  IT SAYS, "EF 40 TO 45."

13 **A.**  YEAH.  SO HERE HE'S WRITING THE EJECTION FRACTION FROM THE

14 FIRST HOSPITALIZATION.  SO HE CLEARLY HAS NOT REVIEWED THE

15 RECORD FROM THE SECOND HOSPITALIZATION, OR AT LEAST HE'S NOT

16 DOCUMENTING THAT THE ECHOCARDIOGRAM SHOWED 30 TO 35 PERCENT

17 EJECTION FRACTION AND SEVERE AORTIC STENOSIS.  AND SO IT JUST

18 SHOWS THAT THERE'S -- THAT THERE'S DISCOORDINATION AND THAT THE

19 FLOW OF INFORMATION IS DIFFICULT.

20         IN THE CONVERSATION THAT I HAD WITH THE HOSPITALIST

21 AT THE UNIVERSITY MEDICAL CENTER, SHE CONFIRMED THAT THE FLOW

22 OF INFORMATION IS AWFUL, AND SHE HAD SOME RECOMMENDATIONS THAT

23 I CAN TALK ABOUT LATER THAT I THINK WOULD BE VERY USEFUL TO LSP

24 TO IMPROVE THAT.

25         BUT YOU CAN SEE HERE WHAT IT'S RESULTING IN.  IT'S

10:13 1    RESULTING IN A -- YOU KNOW, THE CONSULTANT NOT KNOWING WHAT'S
2    GOING ON WITH THE PATIENT.
3    **Q.**    AND IF WE LOOK TO THE RIGHT OF THERE WE SEE WHAT LOOKS
4    LIKE "?LFLG" AND THEN AN ARROW TO --
5    **A.**    YEAH.
6    **Q.**    WHAT DOES THAT SUGGEST?
7    **A.**    THAT HE'S BASICALLY SAYING -- REMEMBER I SAID THAT THE
8    AORTIC STENOSIS IS MEASURED BY THE FLOW ACROSS THE VALVE AND
9    THE GRADIENT ACROSS THE VALVE.  AND THIS MEANS -- HE PUTS A
10   QUESTION MARK, LOW FLOW, LOW GRADIENT, "LFLG," AND HE PUTS AN
11   ARROW.  AND THAT ARROW IS TO DOBUTAMINE STRESS ECHO.  SO HE,
12   HIMSELF, IS THINKING, DOES THE PATIENT HAVE LOW FLOW, LOW
13   GRADE? 'CAUSE HE'S KIND OF SEEING THE REPORT -- MAYBE THE FIRST
14   REPORT AND HE'S THINKING THE PATIENT MIGHT NEED A DOBUTAMINE
15   STRESS ECHO.
16   **Q.**    AND IF HE HAD HAD THE SECOND REPORT, THAT WOULD HAVE
17   ANSWERED THE QUESTION FOR HIM?
18   **A.**    I THINK IT WOULD HAVE, YES, YES.
19   **Q.**    SO THEN THE PATIENT DOES GET THE ECHOCARDIOGRAM ON APRIL
20   21ST.  LET'S LOOK AT THAT, SO PAGE 113.
21            WHAT DOES THAT ECHOCARDIOGRAM SHOW?
22   **A.**    SO I JUST WANT TO PREFACE:  THIS ECHO WAS DONE AT ANGOLA
23   AND IT'S NOT A DOBUTAMINE STRESS ECHO.  IT'S A TRANSTHORACIC
24   ECHO.  SO IT'S A 2D ECHO AT LSP.  AND IT WAS DONE BY THE SAME
25   CARDIOLOGIST WHO SAW THE PATIENT.

10:14 1        AND AT THIS ONE HE NOTES AN EJECTION FRACTION OF 15

2   TO 20 PERCENT -- SO IT'S WORSE -- WITH MODERATE TO SEVERE

3   AORTIC STENOSIS WITH LOW FLOW, LOW GRADE.  AND THAT WOULD --

4   LOW FLOW, LOW GRADE WITH SEVERE AORTIC STENOSIS, IT'S

5   RECOMMENDED TO GET A DOBUTAMINE STRESS ECHO TO DIFFERENTIATE

6   WHETHER SURGERY IS INDICATED.

7   **Q.**   AND YOU JUST SAID "SEVERE."  I KNOW THIS SAYS "MODERATE TO

8   SEVERE."

9   **A.**   YOU KNOW, IT'S -- I THINK IT'S CLOSE ENOUGH.  IT'S HARD TO

10  TELL.  I MEAN, IT'S -- WHETHER HE LEANED MORE TOWARD "MODERATE

11  OR SEVERE," IT'S UNCLEAR.

12  **Q.**   BUT EITHER WAY, WHAT DOES THE EJECTION FRACTION OF 15 TO

13  20 PERCENT SUGGEST?

14  **A.**   THAT'S VERY LOW.  SO THAT'S A SEVERE RESTRICTION OF -- A

15  DIMINISHMENT OF CARDIAC FUNCTION.

16  **Q.**   AND WHAT DID THE PATIENT NEED AT THAT TIME?

17  **A.**   I MEAN, HE NEEDED A DOBUTAMINE STRESS ECHO AND HE NEEDED

18  AN EVALUATION BY A CARDIOTHORACIC SURGEON TO SEE WHETHER HE

19  NEEDED VALVE SURGERY.

20  **Q.**   SO, NOW, LET'S GO TO HIS NEXT CARDIOLOGY VISIT ON JUNE

21  19TH.  THIS IS PAGE 164.

22         DID DR. COLON AT THIS VISIT RECOGNIZE THAT NEW

23  FINDING?

24  **A.**   RIGHT.  SO THIS IS DR. COLON.  I THINK IT'S TWO MONTHS

25  AFTER THE ECHOCARDIOGRAM, AND HE WRITES THAT "THERE WAS NO

10:16 1  REPORT AVAILABLE."  IF YOU SEE THE CIRCLED AREA, IT SAYS, "NO

2  REPORTS AVAILABLE."  SO HE IS THE CARDIOLOGIST WHO PERFORMED

3  THE ECHO, BUT IT WAS TWO MONTHS AGO.  I MEAN, I DON'T KNOW IF

4  HE CAN MEMORIZE EVERY ECHOCARDIOGRAM HE DOES, BUT HE SAYS,

5  "THERE'S NO REPORT AVAILABLE."  SO HE ASKS -- I THINK HE --

6  YEAH.  HE DOESN'T ASK FOR THE REPORT, BUT HE HAS NO REPORT.  SO

7  HE TAKES NO ACTION.

8        HE ALSO REFERS ABOVE TO THE EJECTION FRACTION OF 40

9  TO 45 PERCENT.  SO HE'S STILL USING HIS LAST NOTE THAT HE HAS.

10  HE'S USING THE SAME EJECTION FRACTION BECAUSE HE DOESN'T HAVE

11  THE REPORT, EVEN THOUGH HE DID THE ECHO.  SO IT'S A PROBLEM.

12        AND THERE'S A LOT OF WAYS TO MAYBE INTERPRET THIS.

13  BUT AT A MINIMUM, HE DOES NOT HAVE THE INFORMATION HE NEEDS TO

14  MAKE A DECISION.  HE SHOULD HAVE THE REPORT.  AND ALL THE

15  PROVIDERS, INCLUDING THE PRIMARY CARE PROVIDER, SHOULD READ

16  THOSE REPORTS, AND THEY DON'T.

17  **Q.**  AND IS THAT A PROBLEM OF MEDICAL RECORDS MANAGEMENT, IN

18  YOUR MIND, AS PART OF THE PROBLEM?

19  **A.**  YEAH.  IT'S A PROCESS.  THEY HAVE -- THERE IS NO SPECIALTY

20  CARE POLICY.  THERE IS PART OF A REFERENCE TO WHAT THE

21  PHYSICIANS HAVE -- THEY HAVE TO REVIEW RECOMMENDATIONS, BUT

22  THAT'S NOT A PART OF A POLICY ON SPECIALTY CARE.  THERE IS NO

23  SPECIFIC POLICY ON SPECIALTY CARE, SO THEY DON'T HAVE A POLICY.

24  AND SO IT APPEARS THAT PRACTICE IS AD HOC.  AND THE TRIP NURSES

25  MANAGE SPECIALTY CARE.  AND THIS IS FIXABLE.  THIS IS NOT AN

10:18 1  UNFIXABLE THING.  YOU NEED TO STANDARDIZE THE PROCESS.  YOU
2  NEED TO GET -- DETERMINE EXACTLY WHAT YOU'RE GOING TO DO.  YOU
3  NEED TO GET THE REPORTS IN FRONT OF THE PRIMARY CARE PROVIDERS,
4  IN FRONT OF ANY CONSULTANTS, AND YOU NEED TO ENSURE THAT THE
5  RECOMMENDATIONS ARE ADDRESSED.
6  **Q.**  AND THEN LET'S LOOK AT ONE MORE CARDIOLOGY VISIT.  IF WE
7  COULD GO TO PAGE 158.
8  THIS IS AUGUST 21, 2021.  WHY WAS DR. COLON SEEING
9  THE PATIENT THIS DAY?
10  **A.**  SO I THINK IN THIS CASE HE WAS REFERRED BECAUSE HE NEEDED
11  CARDIOLOGY CLEARANCE FOR A PROCEDURE, FOR AN ENDOSCOPY AND --
12  BECAUSE HE HAD HAD A HEART ATTACK, BEFORE HE GOT AN ENDOSCOPY
13  THEY WANTED TO MAKE SURE THAT THE CARDIOLOGIST THOUGHT THAT HE
14  COULD BE SUBMITTED FOR A PROCEDURE.
15  **Q.**  UH-HUH.
16  **A.**  AND SO THAT'S WHY HE SAW HIM.  AND ON THIS NOTE YOU WILL
17  NOTE AGAIN THAT HE NOTES THAT THE EJECTION FRACTION IS 40 TO
18  45 PERCENT.  AND HE AGAIN SAYS THAT THE STUDIES ARE NOT
19  AVAILABLE, "N/A."  SO HE'S IN THE DARK AGAIN, AND IT JUST SHOWS
20  THE -- HOW THE PROCESS IS WORKING THERE.
21  **Q.**  AND LET'S TALK ABOUT WHAT WAS HAPPENING WITH PATIENT 5'S
22  PRIMARY CARE WHILE THIS WAS HAPPENING.
23  BETWEEN OCTOBER 7, 2020 AND OCTOBER 1, 2021, WHEN THE
24  PATIENT PASSED, DID PATIENT NO. 5 PRESENT TO LSP MEDICAL STAFF?
25  **A.**  MULTIPLE TIMES, YES.

**Q.** AND YOU REFERRED TO KEY SYMPTOMS OF AORTIC STENOSIS

EARLIER. WAS HE PRESENTING WITH THOSE SYMPTOMS?

**A.** YES. AND JUST TO ADD TO THAT, IF A PERSON IS SYMPTOMATIC

OF AORTIC STENOSIS, IF IT CAN BE VERIFIED BY A CARDIOLOGIST

THAT IT'S THE -- THE SYMPTOMS ARE ACTUALLY DUE TO THE AORTIC

STENOSIS, THEY SHOULD BE A CANDIDATE FOR SURGERY. SO IN

ADDITION TO THE MEASURMENT OF THE VALVE, SYMPTOMS ARE A KEY

INDICATION FOR REFERRAL FOR SURGERY. AND THIS PATIENT -- I

COUNTED 19 EPISODES WHERE HE COMPLAINED TO LSP -- EITHER MEDICS

OR PROVIDERS -- OF SHORTNESS OF BREATH.

ADDITIONALLY, HE HAD SEVERAL EPISODES WHERE HE HAD

LEG EDEMA OR SYMPTOMS THAT INDICATED HE MIGHT HAVE HEART

FAILURE, WHICH IS A LATE COMPLICATION OF AORTIC STENOSIS AND

WOULD BE AN INDICATION FOR SURGERY. AND THERE WAS ONE OR TWO

EPISODES WHERE HE HAD CHEST PAIN. SO ALL OF THOSE EPISODES

OCCURRED WITHOUT RECOGNITION THAT THEY MIGHT BE SYMPTOMS OF

AORTIC STENOSIS.

**Q.** AND YOU MENTIONED LEG EDEMA A MOMENT AGO. I DON'T THINK

YOU LISTED THAT BEFORE. JUST WHAT'S THE RELATIONSHIP BETWEEN

LEG EDEMA AND AORTIC STENOSIS?

**A.** SO LEG EDEMA CAN BE A RESULT OF MULTIPLE DIFFERENT

ETIOLOGIES. SO IT CAN BE CAUSED BY KIDNEY DAMAGE, IT CAN BE

CAUSED BY HEART FAILURE, IT CAN BE CAUSED BY PROBLEMS WITH YOUR

LIVER. AND WHEN YOU HAVE LEG EDEMA, THE PRIMARY AIM OF A

PRIMARY CARE PHYSICIAN SHOULD BE TO DETERMINE WHY THE PERSON

10:21 1    HAS THE LEG EDEMA.

2              AND IN MULTIPLE CASES I SAW IT APPEARED, BASED ON THE

3    RECORD REVIEW, THAT THE PATIENT'S LEG EDEMA WAS FROM HEART

4    FAILURE.  AND HEART FAILURE WITH AORTIC STENOSIS SHOULD PUSH A

5    PROVIDER TO REFER PROMPTLY FOR EVALUATION FOR VALVE

6    REPLACEMENT.

7    **Q.**   AND WHEN HE PRESENTED TO LSP WITH THESE SYMPTOMS, DID THEY

8    CONSULT DR. COLON OR LET HIM KNOW ABOUT THEM, AS FAR AS YOU

9    SAW?

10   **A.**   THEY NEITHER CONSULTED DR. COLON, THEY DIDN'T REFER TO A

11   DIFFERENT CARDIOLOGIST, AND THEY DIDN'T SOMETIMES EVEN

12   RECOGNIZE THAT IT MIGHT BE DUE TO HEART FAILURE.

13   **Q.**   AND WE SAW IN THE, I THINK, SECOND HOSPITAL NOTE IT SAID,

14   "CONTACT M.D. WITH WORSENING SYMPTOMS."  DID THAT HAPPEN?

15   **A.**   NO.

16   **Q.**   SO LET'S LOOK AT A FEW OF THESE ENCOUNTERS.  LET'S GO TO

17   PAGE 212 OF JOINT EXHIBIT 5.

18             THIS IS A FEBRUARY 10, 2021 GENERAL MEDICINE CLINIC.

19   WHAT CONCERNS DO YOU HAVE WITH THIS VISIT?

20   **A.**   SO ON THIS PATIENT, THE SECOND LINE AT THE VERY END, IT

21   SAYS, "BLE EDEMA," SO THAT'S BILATERAL LEG EDEMA, AND HE WAS

22   REQUESTING ENSURE.

23             ON THE EXAMINATION THEY NOTED TWO PLUS BILATERAL LEG

24   EDEMA, AND IT SAYS, "MUCH IMPROVED."  BUT HE STILL HAS TWO PLUS

25   LEG EDEMA.  AND SO THIS NOTE IS CHARACTERISTIC.  THERE'S VERY

1    LITTLE HISTORY.

2              IF SOMEONE HAS AORTIC STENOSIS AND THEY HAD STENTS,

3    YOU MIGHT ASK THEM, "INCIDENTALLY, DO YOU HAVE CHEST PAIN?   DO

4    YOU HAVE" -- ONE OF THE CARDINAL SYMPTOMS OF AORTIC STENOSIS --

5    "SHORTNESS OF BREATH, CHEST PAIN, OR DIZZINESS?"  AND YOU DON'T

6    SEE THAT.

7              AND IN THE "ASSESSMENT" YOU SEE "BILATERAL LEG

8    EDEMA."  WELL, THAT'S NOT A DIAGNOSIS.  IT'S A SYMPTOM.  SO THE

9    DOCTOR HASN'T -- OR THE PROVIDER, IF IT'S AN NP -- HASN'T GONE

10   THROUGH THE TYPICAL PROCESS OF EVALUATING DATA AND COMING TO A

11   CONCLUSION OR A DIAGNOSIS.

12             SO HE ALSO DOES NOT RECOGNIZE THAT THE PATIENT HAS

13   AORTIC STENOSIS.

14             SO THE ASSESSMENTS DO NOT INCLUDE AORTIC STENOSIS.

15   SO HE'S NOT FOLLOWING IT.  HE DOESN'T MENTION ANY OF THE

16   SPECIALTY VISITS.  THE PATIENT HAS -- YOU KNOW, THE PATIENT HAS

17   SEEN CARDIOLOGISTS.  HE HAD REPORTS.  NONE OF THAT IS

18   MENTIONED.  AND HE SAYS, "I'LL SEE YOU IN SIX MONTHS."

19   **Q.**   AND JUST TO PAUSE ON THAT, I THINK YOU SAID HE HADN'T --

20   HE DOESN'T MENTION ANY OF THE SPECIALISTS.  I DO SEE -- I THINK

21   IT SAYS "SAW DR. COLON"?

22   **A.**   OH, YES.  NO, HE DID MENTION HE SAW DR. COLON ON 1/30, AND

23   I THINK THAT WAS FOR THE CLEARANCE FOR THE EGD.  BUT HE'S NOT

24   RECOGNIZING THE PATIENT'S SERIOUS MEDICAL CONDITIONS.  THE

25   PATIENT IS NOT HAVING ACCESS TO A PROFESSIONAL FOR HIS SERIOUS

10:25  1   MEDICAL CONDITION BECAUSE THE PROCESS THAT IS ESTABLISHED IS A
       2   BARRIER TO THAT.
       3   **Q.**   AND JUST TO GET THE RECORD CLEAR, I THINK YOU SAID IT WAS
       4   THE TIME DR. COLON WAS CLEARING HIM FOR PROCEDURES, IF
       5   POSSIBLE, AS ONE OF THE EARLIER VISITS?
       6   **A.**   I'M SORRY.  CAN YOU REPEAT THAT?
       7   **Q.**   IS IT POSSIBLE THAT HE WAS REFERRING TO ONE OF THE EARLIER
       8   DR. COLON VISITS AND NOT THE SEIZURE?
       9   **A.**   IT MAY HAVE BEEN, YES, BUT YOU DON'T KNOW.  YOU DON'T KNOW
      10   WHAT HE'S -- WHAT HE'S THINKING.
      11   **Q.**   SO LET'S GO TO THE WEEK OF JUNE 6TH AND LOOK AT FIRST
      12   JOINT EXHIBIT ONE NINETY -- OR PAGE 193.
      13          SO THIS WEEK HE'S SEEN MULTIPLE TIMES IN THE ATU.  IF
      14   YOU CAN TELL US ABOUT THOSE VISITS.
      15   **A.**   SO THIS IS AN ATU VISIT, AN EMERGENCY VISIT, WHERE THE
      16   PATIENT WAS BROUGHT INTO THE ATU IN A WHEELCHAIR BECAUSE HIS
      17   LEGS WERE SWELLING.  HE SAYS, "I KEEP FLUID IN MY LEGS" AND
      18   HE'S SHORT OF BREATH WHEN HE BENDS OVER.  AND HE HAD, ACCORDING
      19   TO THE MEDIC, SOME STOMACH ISSUES AND GENERALIZED WEAKNESS.
      20   AND THE MEDIC WROTE THAT HE HAD PITTING EDEMA TO HIS LEGS AND
      21   HIS ABDOMEN WAS DISTENDED.
      22          SO HERE A PROVIDER -- IT'S UNCLEAR WHO THIS IS,
      23   WHETHER IT'S A DOCTOR OR A NURSE PRACTITIONER.  I BELIEVE IT'S
      24   A PROVIDER.  BASICALLY THIS IS WHAT I WOULD CONSIDER A VERY
      25   EPISODIC EVENT BECAUSE THE PROVIDER IS NOT PUTTING THE

10:26 1   PATIENT'S COMPLAINT INTO THE PERSPECTIVE OF WHAT THE PATIENT

2   HAS.

3         SO LEG SWELLING IN A PERSON -- IF I WENT TO THE

4   EMERGENCY ROOM WITH LEG SWELLING, THEY WOULD START FROM SCRATCH

5   BECAUSE I DON'T HAVE ANY CONDITIONS THAT MIGHT CAUSE LEG

6   SWELLING.  BUT IF I CAME TO -- FOR AN EMERGENCY EVALUATION AND

7   I HAD AORTIC STENOSIS AND I HAD A RECENT HEART ATTACK, YOU

8   WOULD WANT TO KNOW IF THE LEG SWELLING IS RELATED IN ANY WAY TO

9   THE AORTIC STENOSIS.  AND THAT JUST DOESN'T OCCUR.  SO IT'S

10   EPISODIC IN A SENSE THAT THE PROVIDER IS JUST CONSIDERING THE

11   LEG SWELLING INDEPENDENTLY AND, IN FACT, THE ASSESSMENT IS TO

12   TO GIVE TED HOSE AND LASIX.  IN OTHER WORDS, THEY'RE GOING TO

13   TREAT IT.

14         NOW, SHE DOES ORDER A CHEST X-RAY, WHICH IS GOOD.

15   SHE ORDERS A CHEST X-RAY, BECAUSE THAT CAN EVALUATE FOR HEART

16   FAILURE.  BUT THIS IS NOT GOOD, BECAUSE IT DOES NOT CONSIDER

17   THE PATIENT'S BASELINE CONDITIONS.

18   **Q.**  AND ABOUT THOSE CHEST X-RAYS -- I DON'T HAVE THE RECORDS

19   PREPARED, BUT ON THIS AND OTHER CHEST X-RAYS, WERE THERE

20   INDICATIONS OF HEART FAILURE?

21   **A.**  I'M SORRY.  I DIDN'T UNDERSTAND THE QUESTION.

22   **Q.**  WHEN THEY GOT THE CHEST X-RAYS, WERE THERE SUGGESTIONS OF

23   HEART FAILURE?

24   **A.**  I'M NOT SURE.

25   **Q.**  OKAY.  AND THEN LET'S LOOK AT THE NEXT ATU RECORD, PAGE

10:28 1    195.

2              COULD YOU TELL US AGAIN ABOUT THIS ATU VISIT AND

3    WHETHER IT HAS THE SAME SORTS OF CONCERNS?

4    **A.**   SO IT'S THE SAME CONCERNS.  THE MEDIC WRITES THAT "THE

5    PATIENT COMPLAINS OF SHORTNESS OF BREATH AND CHEST PAIN."  SO

6    THOSE ARE TWO SYMPTOMS OF AORTIC STENOSIS, AND HE SAYS THERE'S

7    SWELLING IN THE LEGS AND HE'S USING A WHEELCHAIR EVERY DAY.

8              THEN A PROVIDER, APPARENTLY, ON THE RIGHT LOWER

9    SECTION, WRITES -- AND IT'S A LITTLE BIT DIFFICULT TO READ, BUT

10   -- "HE HAS ABDOMINAL PAIN FOR THE LAST TWO WEEKS AND HE'S BEEN

11   HAVING SOME DIFFICULTIES GOING TO SLEEP."

12             NOW, THAT HISTORY IS JUST -- I WOULD CONSIDER IT

13   INADEQUATE BASED ON THE COMPLAINT OF THE PATIENT; THAT IF

14   SOMEONE COMES IN AND SAYS THEY'RE SHORT OF BREATH AND THEY HAVE

15   LEG SWELLING, YOU WOULD WANT TO TAKE A HISTORY THAT'S

16   CONSISTENT WITH TRYING TO EVALUATE WHETHER THEY HAVE HEART

17   FAILURE.  YOU MIGHT ASK THEM IF THEY -- HOW FAR CAN THEY WALK,

18   CAN THEY LIE FLAT, ET CETERA.  AND YOU DON'T SEE THAT.

19             AN EXAMINATION WAS DONE, AND THE DOCTOR REMARKABLY --

20   THE ASSESSMENT IS "ABDOMINAL PAIN AND CAN'T SLEEP," AND I THINK

21   IT SAYS "D/C," WITHOUT, "DISTRESS."  IT'S A LITTLE DIFFICULT TO

22   READ, BUT I THINK THE MAIN POINT IS THAT TREATMENT IS

23   SIMETHICONE.

24             AND IF YOU CAN GO BACK TO THE FULL CHART --

25   SIMETHICONE AND BENADRYL.  AND BENADRYL WAS GIVEN FOR SLEEP AND

10:30 1    SIMETHICONE FOR GAS, BUT THERE'S NO INDICATION THAT THEY

2    ADDRESSED THE MAIN COMPLAINT OF THE PATIENT, WHICH WAS HE'S

3    SHORT OF BREATH AND HIS LEGS ARE SWELLING, IN A PERSON WHO HAS

4    AORTIC STENOSIS.

5         SO THE PROVIDER DOES NOT RECOGNIZE HE HAS AORTIC

6    STENOSIS OR EVEN CORONARY ARTERY DISEASE AND DOESN'T ADDRESS

7    THE PATIENT'S SYMPTOMS.

8    Q.   AND LET'S LOOK AT ANOTHER ATU NOTE, NOW GOING FORWARD TO

9    SEPTEMBER 29, 2021.  SO I BELIEVE IT WAS PAGE 144.

10        I BELIEVE HE WAS SEEN THIS DAY.  THERE WAS CONCERNS

11   THAT HE HAD COVID, BUT WHAT WERE HIS COMPLAINTS AT THE TIME?

12   A.   THIS ONE YOU'RE GOING TO HAVE TO BLOW UP FOR ME A LITTLE

13   BIT.

14   Q.   SO IF YOU COULD BLOW UP THE "CHIEF COMPLAINT AND INITIAL

15   ASSESSMENT" SECTION.

16   A.   YEAH.

17   Q.   AND I'LL DRAW YOUR ATTENTION TO THE BOTTOM LEFT.

18   A.   YEAH.  I MEAN, SO HE CAME IN SAYING THAT HE HAD CHILLS AND

19   THEN HE SAID HE ALSO IS GETTING SHORT OF BREATH.  HE SAID HE

20   WANTED SOME TYLENOL 'CAUSE -- APPARENTLY 'CAUSE HE HAD CHILLS.

21   Q.   AND THEN IF WE LOOK DOWN AT THE BOTTOM LEFT OF THE

22   "PHYSICIAN ASSESSMENT AND TREATMENT," WHAT DO THE FIRST FEW

23   LINES SAY?

24   A.   WELL, IT SAYS HE HAS ACHES AND PAINS.  AND THE SECOND LINE

25   IS A LITTLE STRANGE.  IT SAYS, "BRINGS UP MANY COMPLAINTS HE

10:31 1  HAD PRIOR TO COVID."  I'M NOT SURE WHAT THAT MEANS.  IT SOUNDS

2  LIKE HE BELIEVES THE PATIENT IS ALWAYS COMPLAINING OR

3  SOMETHING.  IT'S HARD TO TELL.

4        HE DOES SAY LATER, "THE PATIENT HAS FEET SWELLING,"

5  AND HE SAID, "THEY DON'T PROVIDE ME A STOOL TO PROP THEM UP

6  ON."

7  Q.   AND SO THAT'S FEET SWELLING AND SHORTNESS OF BREATH AGAIN?

8  A.   RIGHT.

9  Q.   AND THEN IF WE LOOK DOWN TOWARDS THE NEXT TO THE LAST

10  STATEMENT WRITTEN THERE, WHAT DOES THAT SAY?

11  A.   "ALL OF THESE COMPLAINTS ARE HIS STANDARD DAILY COMPLAINTS

12  WHETHER HE HAS COVID-19 OR NOT."  THAT'S JUST I THINK AN

13  INAPPROPRIATE STATEMENT.  THEY SHOULD JUST DOCUMENT THE

14  STATEMENTS AND GO FROM THERE.

15  Q.   AND SO -- BUT LSP STAFF KNEW THAT FEET SWELLING AND

16  SHORTNESS OF BREATH WERE DAILY COMPLAINTS FOR THIS PATIENT.  IS

17  THAT RIGHT?

18  A.   THAT'S THE OTHER THING, YEAH.  AND THAT'S OF CONCERN,

19  BECAUSE THE FEET SWELLING COULD RELATE TO HEART FAILURE.  THE

20  SHORTNESS OF BREATH IS A PRIMARY SYMPTOM OF AORTIC STENOSIS.

21  AND IF HE INDEED HAD THOSE, HE SHOULD HAVE BEEN REFERRED FOR

22  SURGERY.

23  Q.   AND THEN IF WE JUST LOOK AT THE TOP RIGHT OF THE

24  "PHYSICIAN ASSESSMENT AND TREATMENT" SECTION, IT LOOKS LIKE IT

25  SAYS "SPOKE WITH C. PARK, FNP, NO TREATMENT INDICATED."

10:33 1  **A.**  RIGHT.  SO ALL OF THIS APPEARS TO BE I THINK WRITTEN BY A

2  NURSE.  IN FACT, I THINK THAT IS A RN'S SIGNATURE.  SO THIS IS

3  A NURSE WRITING THIS AND SAYS THAT SHE CALLED THE NP WHO SAYS

4  THAT HE'S GOING TO GET BACK OUT OF CAMP J.  APPARENTLY HE --

5  THEY THOUGHT HE HAD COVID, SO MAYBE THEY PUT HIM IN CAMP J.

6  BUT IT SAID "NO TREATMENT WAS INDICATED."

7  **Q.**  NOW, LET'S MOVE FORWARD TO OCTOBER 9TH.  SO WE WILL GO TO

8  PAGE 134.

9          SO FIRST ON THAT DAY HE WAS SEEN IN THE ATU AT

10  1:20 P.M.  WHAT WERE HIS COMPLAINTS?

11  **A.**  SO HE TOLD THE MEDIC THAT HE HAD SHORTNESS OF BREATH FOR

12  FOUR DAYS, AND HE DENIED HEADACHE, DIZZINESS, CHEST PAIN.  SO

13  HE DIDN'T HAVE CHEST PAIN OR DIZZINESS, BUT HE DID HAVE

14  SHORTNESS OF BREATH.  AND HE WAS SEEN BY A NURSE PRACTITIONER,

15  I BELIEVE, WHO -- I'M NOT SURE WHO IT IS.  THE NURSE

16  PRACTITIONER NOTED THAT HE HAD NUMEROUS COMPLAINTS:  HE CAN'T

17  SLEEP, HE WOKE UP, AND HE WAS SHORT OF BREATH.

18          AND I THINK THAT'S AN IMPORTANT COMMENT; BECAUSE IF

19  YOU'RE SHORT OF BREATH WHEN YOU LIE FLAT, IT'S A SIGN OF

20  POSSIBLE HEART FAILURE, AND SO THAT SHOULD HAVE BEEN EXPOUNDED

21  ON A LITTLE BIT MORE.

22          BUT SHE CONTINUES A PHYSICAL EXAM.  BUT THE

23  ASSESSMENT IS PEDAL EDEMA AND A HISTORY OF COPD.  THERE WAS NO

24  EVIDENCE THAT THE PATIENT HAD COPD THAT I COULD FIND.  AND HE

25  HAD, I BELIEVE, A PULMONARY FUNCTION TEST THAT SHOWED

10:34 1    RESTRICTIVE LUNG DISEASE, NOT OBSTRUCTIVE LUNG DISEASE.  SO HE

2    DIDN'T HAVE CHRONIC OBSTRUCTIVE PULMONARY DISEASE.  AND HE HAD

3    PEDAL EDEMA.

4          AND THIS IS ANOTHER CASE WHERE AGAIN THE PROVIDER IS

5    EPISODICALLY MANAGING THE PATIENT WITHOUT CONSIDERATION OF WHAT

6    THE PATIENT'S BASELINE PROBLEMS ARE.  THE PATIENT HAS AORTIC

7    STENOSIS AND CORONARY ARTERY DISEASE, AMONG OTHER THINGS.  AND

8    TO HAVE PEDAL EDEMA, THEY SHOULD EVALUATE WHETHER THE PATIENT

9    HAS HEART FAILURE.

10          AND ALL THAT IS DONE IS TO ORDER LASIX.  IN OTHER

11    WORDS, IF HIS FEET ARE SWELLING, JUST GIVE HIM A DIURETIC TO

12    REDUCE THE SWELLING.  YOU DON'T FIND OUT WHY HE'S -- HIS LEGS

13    ARE SWELLING.  AND SHE DID ORDER A CBC AND A CHEM 20.

14    **Q.**   NOW, LET'S LOOK AT PAGE 132.

15          SO THE PATIENT RETURNS TO THE ATU AT AROUND 6:00 THAT

16    AFTERNOON.  WHAT WAS THE EVALUATION THERE?

17    **A.**   SO THE MEDIC WRITES IN THE "CHIEF COMPLAINT" -- THIS IS A

18    MEDIC -- SAYS "MULTIPLE CHIEF COMPLAINTS OF COPD SIDE EFFECTS."

19          NOW, I DON'T FEEL A MEDIC -- IT'S APPROPRIATE FOR

20    THEM TO BE MAKING THAT KIND OF A COMMENT.  I THINK IT'S BEYOND

21    THEIR --

22    **Q.**   AND IS IT POSSIBLE THAT THAT IS A NURSE RATHER THAN A

23    MEDIC?

24    **A.**   IT COULD BE.  IT COULD BE.  OKAY.  SO IF IT'S A NURSE,

25    EVEN THAT, IT'S BETTER TO SAY WHAT THE COMPLAINTS ARE.  IS IT

1  SHORTNESS OF BREATH?  IT IS DYSPNEA ON EXERTION?  DO YOU GET

2  SHORT OF BREATH WHEN YOU LIE FLAT?  WHAT IS IT?  "MULTIPLE

3  CHIEF COMPLAINTS" DOESN'T TELL YOU MUCH.  BUT IN ANY CASE,

4  THAT'S WHY HE SHOWED UP.

5        SO ON THE -- IN THE EVALUATION, A -- AND I PRESUME

6  IT'S A NURSE PRACTITIONER AGAIN.  IT'S NOT -- IT'S INITIALED,

7  BUT I DON'T KNOW WHO THAT IS -- SAYS "A 67-YEAR-OLD MALE CAME

8  TO THE ATU WITH CHIEF COMPLAINT OF SHORTNESS OF BREATH FOR A

9  WEEK.  HE WAS SEEN IN ATU TODAY AND" SOMETHING "AND TREATED."

10  AND IT APPEARS TO SAY SOMETHING ABOUT HIV, BUT IT'S A -- IT'S

11  REALLY -- OH, HE SAYS A NEGATIVE -- SAYS -- IT APPEARS TO SAY

12  "NEGATIVE HIV, STATES" -- "NEGATIVE" SOMETHING "HIV" THAT I

13  CAN'T READ.  AND THEN IT EXAMINES THE PATIENT.

14        AND IN THE ASSESSMENT IS "ANXIETY RESOLVED."  NOW, I

15  CAN'T TELL FROM THE HISTORY OR FROM THE EXAMINATION HOW THE

16  PERSON CAME UP WITH A DIAGNOSIS OF ANXIETY AND THAT IT

17  RESOLVED.  I DON'T GET IT, SO I'M NOT SURE WHAT THAT MEANS.

18        AND IF YOU GO TO THE LEFT, THIS IS WRITTEN BY A --

19  IT'S UNCLEAR WHETHER IT'S A NURSE, WHETHER IT'S A MEDIC OR

20  WHETHER IT'S A PROVIDER, BUT IT'S IN THE "PHYSICIAN ASSESSMENT"

21  AREA ON THE LEFT SIDE.  AND IT LISTS MEDICATIONS THAT WERE

22  PRESCRIBED:  TYLENOL, HYDROXYZINE.  AND IT SAYS IN CAPITAL

23  LETTERS WITH EXCLAMATION POINTS:  "STOP SMOKING!  GET OUT OF

24  THE WHEELCHAIR -- GET OFF YOUR BUTT!"  THIS IS JUST

25  INAPPROPRIATE.  THIS IS NOT PROFESSIONAL.  IT'S NOT APPROPRIATE

10:38 1   COUNSELING, IF IT'S MEANT TO BE COUNSELING, AND IT'S DEMEANING

2   AND IT'S UNNECESSARY.

3   Q.   AND IF WE GO BACK TO THE RIGHT SIDE, WHAT WAS THE PLAN FOR

4   THE PATIENT?

5   A.   YEAH.  I THINK IT JUST SAYS -- I THINK IT MEANS "D/C"

6   WITHOUT" SOMETHING.

7   Q.   DISTRESS, POTENTIALLY?

8   A.   IT COULD BE.  BUT --

9   Q.   WE SAW EARLIER --

10   A.   -- AGAIN, BASICALLY THEY'RE JUST DISCHARGING HIM BACK TO

11   HIS HOUSING UNIT.

12   Q.   WE SAW IN AN EARLIER RECORD "D/C S" WITH A LINE OVER IT,

13   "DISTRESS."  DOES THAT MEAN WITHOUT?

14   A.   THE "S" WITH A LINE OVER IT MEANS WITHOUT.

15   Q.   SO DISCHARGED WITHOUT DISTRESS?

16   A.   RIGHT.

17   Q.   SO THAT WAS OCTOBER 9, 2021.

18          SO ON OCTOBER 9TH HE SEES MULTIPLE NURSES AND NURSE

19   PRACTITIONERS WHO SHOW NO RECOGNITION OF HIS AORTIC STENOSIS,

20   REFER TO A CONDITION HE DIDN'T HAVE, LEAVE HIS COMPLAINTS

21   UNDIAGNOSED AND TELL HIM TO GET OFF HIS BUTT.  WHAT HAPPENED TO

22   THE PATIENT ON OCTOBER 11, 2021?

23   A.   WELL, HE DIED.

24   Q.   AND WHAT DID HE DIE OF?

25   A.   HYPERTENSIVE CARDIOVASCULAR DISEASE AND AORTIC STENOSIS.

1  **Q.**   IF HE HAD BEEN EVALUATED FOR SURGERY, WHAT WOULD HIS

2  PROGNOSIS HAVE BEEN?

3  **A.**   I THINK PRETTY GOOD.

4  **Q.**   IS AORTIC STENOSIS A MANAGEABLE OR TREATABLE CONDITION?

5  **A.**   VALVE REPLACEMENT SIGNIFICANTLY IMPROVES MORTALITY, YES.

6  **Q.**   DID THIS PATIENT SOMETIMES REFUSE TREATMENT OR MISS

7  APPOINTMENTS?

8  **A.**   YOU KNOW, HE DID.  I SAW ONE RECORD FROM A CARDIOLOGIST --

9  AND I THINK IT WAS 2018 OR 2019 WHERE HE -- THE CARDIOLOGIST

10  WAS SEEING HIM, AND HE HAD MISSED AN APPOINTMENT TO CARDIOLOGY.

11  AND THERE WAS A DISCUSSION ABOUT IT, AND THE INMATE SAID THAT

12  HE REFUSED ONE TRIP BECAUSE HE HAD TO WEAR A BLACK BOX.

13          NOW, THIS IS A GENTLEMAN IN A WHEELCHAIR WHO, IT'S MY

14  ESTIMATE -- AND I'M NOT A SECURITY EXPERT AND I DON'T PRETEND

15  TO BE, BUT HE'S PROBABLY NOT A HIGH ESCAPE RISK.  HE -- AND

16  HE -- HE JUST SAID, "IF THEY WOULD GIVE ME A DIFFERENT KIND OF

17  ARM CUFFS, IT WOULD BE FINE."

18          IN FACT, I THINK DR. LAVESPERE ACTUALLY DID THAT AT A

19  LATER TIME, BUT THAT'S SOMETHING THAT SHOULD BE DONE ON A

20  REGULAR BASIS, SO HE REFUSED ONCE FOR THAT.

21          AND I THINK THERE WERE OTHER REFUSALS WHERE HE

22  COMPLAINED ABOUT HAVING TO SIT AND WAIT FOR A LONG TIME FOR

23  CLINICS.  THERE WERE ONE OR TWO REFUSALS WHERE HE SAID, YOU

24  KNOW, "MY FEET ARE -- IF I SIT, MY FEET ARE DOWN ON THE FLOOR

25  AND MY LEGS SWELL AND IT BOTHERS ME.  I CAN'T LIFT MY LEGS UP.

10:41
1  THERE'S NO CHAIR OR ANYTHING HERE.  I'M WAITING THREE HOURS,"

2  AND HE REFUSED.

3  Q.   SO IF WE LOOK, FOR EXAMPLE, AT PAGE 198 --

4  A.   SO YEAH.  THESE ARE THE ONES, YEAH.

5  Q.   SO, YEAH, IT APPEARS TO SAY -- I DON'T KNOW IF YOU WANT TO

6  READ IT OR IF YOU WANT -- WHY DON'T YOU GIVE WHAT YOUR

7  UNDERSTANDING IS.

8  A.   WELL, HE SAYS, "I'M HERE THREE HOURS.  YOUR DELAY CAUSES

9  ME SERIOUS PAIN, SUFFERING," SOMETHING "LEGS."

10  Q.   FLUID LEGS?

11  A.   "FLUID LEGS," YEAH.  NOW, SOMETHING "ALL DAY - NIGHT

12  RESCHEDULE EARLY."  I THINK HE'S JUST ASKING TO LIKE

13  "RESCHEDULE ME EARLY, SEE ME EARLY, 'CAUSE I CAN'T WAIT HERE

14  THREE HOURS."

15  Q.   AND IF WE TAKE DOWN THE HIGHLIGHT THERE, I SEE -- UNDER

16  THE SIGNATURE IT SAYS "RTC N/A."  WHAT DOES "RTC" MEAN?

17  A.   RETURN TO CLINIC.

18  Q.   UH-HUH.

19  A.   SO I THINK THAT MEANS NOT APPLICABLE OR SOMETHING.  I'M

20  NOT SURE WHAT THAT MEANS.

21  Q.   HE DID EVENTUALLY SEE THE CARDIOLOGIST AGAIN?

22  A.   YEAH.

23  Q.   AND THEN IF WE LOOK AT PAGE 200, HERE'S ANOTHER REFUSAL.

24  AND THIS APPEARS TO BE FOR THE GENERAL MEDICINE CLINIC.  AND

25  I'LL READ -- TELL ME IF YOU THINK THIS IS WHAT IT SAYS IN THAT

10:42 1  SECTION:  "ONGOING FLUID - LEG TREATMENT NOT WORKING.  THIS
2  CALLOUT CAUSING ME SERIOUS LEG/KNEE PAIN FOR TWO HOURS.  FLUID
3  BUILDUP, LEGS NOT ELEVATED."  DOES THAT APPEAR RIGHT TO YOU?
4  **A.**   YEAH, IT DOES.  AND AGAIN -- SO THIS IS IN MAY OF 2021.
5  IT'S ALSO INDICATIVE OF HE'S -- HIS LEGS ARE SWELLING.  I MEAN,
6  IT'S NOT JUST THAT THIS IS A REFUSAL.  IT'S JUST A
7  DEMONSTRATION OF THE ONGOING SYMPTOMS LIKELY OF HEART FAILURE
8  AND THE INATTENTION TO THAT.
9  **Q.**   AND IF WE LOOK AT WHAT THEY DID AFTER THIS REFUSAL, I SEE
10  CIRCLED TOWARDS THE BOTTOM LEFT "FU 3M"?
11  **A.**   FOLLOW-UP THREE MONTHS I THINK THAT MEANS.
12  **Q.**   AND THEN LET'S JUST LOOK AT ONE MORE.  PAGE 216.
13       HERE AGAIN, IF I'M READING IT RIGHT, "I CAN'T GET
14  LASIX THREE DAYS, SERIOUS PAIN, SWELLING LEGS, FEET, CAN'T
15  WALK.  PLEASE FILL KOP.  NEED LEGS ELEVATED."  DOES THAT APPEAR
16  RIGHT TO YOU?
17  **A.**   YEAH, SAME THING.  AND, I MEAN, JUST AS ANOTHER ASIDE,
18  THIS -- HE'S SAYING HE CAN'T GET LASIX.  SO LASIX IS A
19  DIURETIC.  IT WOULD REDUCE LEG SWELLING.  BUT IT'S USED TO
20  TREAT HEART FAILURE.  AND HE'S -- HE WAS MISSING LASIX.  SO IT
21  DOES SHOW THE PROBLEMS WITH THE MEDICATION.
22  **Q.**   AND HERE AGAIN THEY DID CHECK TO RESCHEDULE HIM.  CORRECT?
23  **A.**   THEY DID.
24  **Q.**   BUT THERE'S NO --
25  **A.**   WELL, THEY PUT A QUESTION MARK.  BUT THEY PUT "YES" OR

10:44 1  "NO" AND THEY CHECKED "YES."  SO I PRESUME THEY DID RESCHEDULE

2  HIM, YES.

3  **Q.**    BUT DID YOU SEE ANY EFFORT TO TRY TO REDUCE THE CONDITIONS

4  THAT WERE MAKING THE WAITS UNBEARABLE FOR HIM?

5  **A.**    WELL, AS TO THE CLINICAL RECORDS WE LOOKED AT, THERE WERE

6  -- THERE WAS NOT A SERIOUS EFFORT TO EVALUATE THE REASON FOR

7  HIS LEG SWELLING AND TO HELP ADDRESS IT.

8  **Q.**    WE'RE GOING TO TALK ABOUT MORTALITY REVIEWS IN GENERAL

9  LATER ON.  BUT WHILE ON THIS PATIENT, DID THE MORTALITY REVIEW

10  FOR THIS PATIENT ACKNOWLEDGE ANY OF THE ISSUES THAT YOU RAISED?

11  **A.**    NO.

12  **Q.**    DID IT ADDRESS, FOR EXAMPLE, THE FACT THAT LSP'S CONTRACT

13  CARDIOLOGIST APPARENTLY DIDN'T HAVE TEST RESULTS FOR SEVERAL

14  APPOINTMENTS IN A ROW?

15  **A.**    NO.

16  **Q.**    DID IT ADDRESS THAT SEVERAL PROVIDERS, MEDICS AND NURSES,

17  SAW THE PATIENT FOR SYMPTOMS OF AORTIC STENOSIS WITHOUT

18  CONNECTING THEM TO HIS CONDITION?

19  **A.**    NO.

20  **Q.**    DID IT ADDRESS THAT LSP'S STAFF MISTAKENLY THOUGHT HE HAD

21  COPD?

22  **A.**    NO.

23  **Q.**    LET'S TAKE A LOOK AT IT AND SEE WHAT SORT OF THINGS IT DID

24  ADDRESS.

25          IF WE COULD PULL UP PX_8A AT 1601.  I DON'T KNOW IF

10:45 1    IT'S POSSIBLE TO PULL 1601 AND 1602 AT THE SAME TIME.

2              SO IF YOU LOOK AT THE FIRST PARAGRAPH UNDER "MEDICAL

3    SUMMARY" -- THERE WE GO.  IF YOU LOOK AT THE FIRST PARAGRAPH

4    UNDER "MEDICAL SUMMARY," WHAT SORT OF DETAILS DO YOU SEE HERE?

5    **A.**    WELL, IT'S MAINLY -- AND IT APPEARS TO BE AN EFFORT TO, I

6    WOULD SAY, BLAME THE PATIENT FOR HIS PROBLEMS.

7              "THE OFFENDER CAME TO ANGOLA WITH INITIAL COMPLAINTS

8    OF SHOULDER, KNEE" -- "SO THAT HE" IN QUOTES "CANNOT WALK.  HE

9    ALSO CLAIMS HE CANNOT SEE SECONDARY TO LOSING HIS GLASSES."

10   AND THEN "HE MADE A SICK CALL FOR HIS" -- YOU KNOW, "HIS HANDS

11   GOING NUMB.  HE STATED, 'I CANNOT WALK AT ALL FROM PERMANENT

12   BACK INJURY.'  HE THREATENED LEGAL ACTION."

13             YOU KNOW, IT'S JUST -- IT'S JUST A TONE.  I MEAN, THE

14   WAY I READ IT -- OTHER PEOPLE MAY READ IT DIFFERENTLY.  IT'S

15   JUST A TONE OF, YOU KNOW, THIS IS A PERSON WHO COMPLAINS A LOT;

16   HE THREATENS US WITH LAWSUITS; HE CLAIMS HE CAN'T WALK WHEN HE

17   PRESUMABLY CAN, ET CETERA.

18   **Q.**    AND THESE ARE GOING BACK TO 2007.  AM I CORRECT THAT HE

19   PASSED AWAY IN 2021?

20   **A.**    RIGHT.  RIGHT.

21   **Q.**    AND THESE COMPLAINTS AREN'T RELATED -- OR AT LEAST MANY OF

22   THESE COMPLAINTS DON'T SEEM TO BE RELATED TO ANY OF THE

23   CONDITIONS THAT LED TO HIS DEATH.  CORRECT?

24   **A.**    NO.

25   **Q.**    AND THEN IF WE START LOOKING AT WHERE THEY WERE DISCUSSING

10:47 1  HIS DEATH, WHAT -- AND I GUESS GO TO PAGE 1602 AND 1603, NOW IF

2  YOU COULD.

3       BUT IF YOU COULD GENERALLY DESCRIBE WHAT ARE SOME

4  CONCERNS THAT YOU HAVE ABOUT THE WAY THEY DISCUSSED THE -- YOU

5  KNOW, THE ISSUES THAT DID IN THE LAST COUPLE YEARS OF HIS LIFE?

6  **A.**   WELL, THERE'S A LOT OF DISCUSSION HERE.  BUT IF I GO TO

7  603, THAT DOCUMENT WHERE IT WAS LATER IN THE COURSE, YOU JUST

8  DON'T SEE THAT -- THEY DOCUMENT THAT THE PATIENT HAD EDEMA.  SO

9  THEY DOCUMENT THE COMPLAINT, BUT THEY DON'T DOCUMENT THE ACTUAL

10  EVALUATION THAT OCCURRED AND THEY DON'T DOCUMENT THE ACTUAL

11  RELATIONSHIP TO THE PATIENT'S CONDITION.

12       SO THIS IS MORTALITY REVIEW.  AND MORTALITY REVIEW

13  SHOULD BE A CRITICAL ANALYSIS OF THE DEATH TO DETERMINE IF

14  THERE'S ANY OPPORTUNITIES FOR IMPROVEMENT.  AND YOU DON'T SEE

15  THAT HERE.

16       SO THEY'RE NOT CRITICALLY LOOKING AT THE PATIENT'S

17  CARE.  I MEAN, WE JUST -- WE SPENT PROBABLY AN HOUR GOING

18  THROUGH THE DETAILS OF WHAT WAS MISSED, BUT YOU DON'T SEE THAT

19  COMMENTED ON HERE.

20  **Q.**   OKAY.  SO WE CAN FINISH UP WITH PATIENT NO. 5.

21       LET'S TAKE A LOOK AT A PATIENT WHO WAS NEVER REFERRED

22  TO A SPECIALIST AT ALL.  I'D LIKE TO LOOK AT --

23       **THE COURT:**  OKAY.  ARE WE GOING TO A NEW PATIENT?

24       **MR. DUBNER:**  WE ARE GOING TO A NEW PATIENT.

25       **THE COURT:**  THEN LET'S TAKE A BREAK.  WE ARE GOING TO

10:49 1    TAKE A 15-MINUTE RECESS.

2                    **THE LAW CLERK:**  ALL RISE.

3                         THE COURT IS AT RECESS.

4                    **(WHEREUPON, THE COURT WAS IN RECESS.)**

5               **THE COURT:**  OKAY.  BE SEATED.

6                    YOUR WITNESS, MR. DUBNER.

7          **MR. DUBNER:**  APOLOGIES FOR THE DELAY, YOUR HONOR.

8          **THE COURT:**  GO AHEAD.

9    BY MR. DUBNER:

10   **Q.**   DR. PUISIS, BEFORE WE MOVE ON TO THE NEXT PATIENT, I JUST

11   WANTED TO RETURN -- YOU WERE ASKED SOME QUESTIONS ABOUT THE

12   *GUMNS* CASE EARLIER TODAY, THE COVID TRANSFER PLAN.

13   **A.**   UH-HUH.

14   **Q.**   HAVE YOU REVIEWED THAT DECLARATION RECENTLY?

15   **A.**   NO.  I MEAN, I HADN'T SEEN IT FOR MONTHS, I MEAN, MAYBE

16   SIX MONTHS OR EIGHT MONTHS.  I'M NOT SURE HOW LONG.  SO I DID

17   REVIEW THE ONE PARAGRAPH I WAS ASKED ABOUT.  I DID COMMENT IN

18   THE DECLARATION THAT I THOUGHT THERE WAS -- THERE WERE PROBLEMS

19   WITH HOUSING AT CAMP J, AND I JUST WANT TO CLARIFY THAT.

20            AND, YOU KNOW, THE MAIN ISSUE THERE WAS THE TRANSFER

21   OF INMATES BETWEEN FACILITIES, BECAUSE THE TRANSFER OF INMATES

22   WHO POTENTIALLY HAD COVID COULD INCREASE THE RATES OF

23   TRANSMISSION.  SO, YOU KNOW, I'M HAPPY TO DISCUSS THAT

24   DOCUMENT, BUT I WOULD NEED A LITTLE TIME TO JUST BE ABLE TO

25   REFRESH MY RECOLLECTION BEFORE I, YOU KNOW, MADE ANY OFFICIAL

11:07 1 COMMENT ON THAT.

2 **Q.** AND YOU WERE SHOWN PART OF PARAGRAPH 14 AND YOU ASKED TO

3 SEE THE FULL PARAGRAPH. WAS THAT THE FULL PARAGRAPH THAT YOU

4 WERE SHOWN?

5 **A.** NO. I MEAN, I JUST NEED TO SEE THE DOCUMENT. IF I'M

6 ASKED TO COMMENT ON SOMETHING, I'D LIKE TO SEE THE DOCUMENT.

7 SO, YEAH, IF YOU WANT TO DO IT IN THE FUTURE, I'M HAPPY TO DO

8 THAT.

9 **Q.** SO LET'S RETURN TO THE PATIENTS.

10 WE'RE GOING TO TALK ABOUT PATIENT NO. 7. CAN YOU

11 SUMMARIZE WHAT YOU SAW IN THIS PATIENT'S RECORDS?

12 **A.** LET ME JUST --

13 **Q.** AND ACTUALLY, WHY DON'T WE -- WE CAN START WITH DOCUMENTS.

14 IF YOU COULD PULL UP JX_7 AT 25.

15 THIS IS SEALED.

16 **A.** SO PATIENT 7 IS AN EXAMPLE OF THE FIRST CATEGORY OF ISSUES

17 THAT I MENTIONED EARLIER; AND THAT IS, PEOPLE WHO NEED

18 REFERRALS BUT DO NOT RECEIVE IT. AND IN THIS CASE IT INVOLVES

19 COLON CANCER SCREENING.

20 THE STANDARD OF CARE IS THAT EVERYONE OVER AGE 50 --

21 NOW IT'S AGE 45, BUT AT THE TIME OF 2019 IT WAS STILL AGE 50 --

22 SHOULD RECEIVE COLON CANCER SCREENING AT INTERVALS BASED ON

23 RISKS; AND THAT INCLUDES EITHER A COLONOSCOPY, A

24 PROCTOSIGMOIDOSCOPY OR HIGHLY SENSITIVE GUAIAC TESTING.

25 AND PATIENT 7 ACTUALLY HAD A GUAIAC TEST. I'M NOT

11:09 1    SURE WHAT KIND IT WAS.  BUT HE HAD A GUAIAC TEST, AND HE HAD

2    THREE POSITIVE GUAIAC TESTS.  AND I THINK THAT -- IN 2019, AND

3    THEY WERE NOT ACTED ON.  THERE WAS NO EVIDENCE THAT THERE WAS

4    ANY ACTION TAKEN.  SO THIS IS A PERSON WHO IS OVER 50, HAS

5    POSITIVE GUAIAC TESTING AND SHOULD, THEREFORE, BE EVALUATED AND

6    WAS NOT.

7    **Q.**    WHAT ARE THE KINDS OF ACTION THAT IS TYPICALLY TAKEN AFTER

8    A POSITIVE GUAIAC TEST FOR SOMEBODY IN THAT AGE RANGE?

9    **A.**    YOU WOULD GET A COLONOSCOPY.  AND SO HE DIDN'T.  AND ABOUT

10   TWO, TWO AND A HALF YEARS LATER HE DEVELOPED METASTATIC COLON

11   CANCER.

12   **Q.**    AND DID YOU FIND ANY PROVIDER NOTES IN THE RECORD

13   COMMENTING ON THE POSITIVE GUAIAC TESTS?

14   **A.**    I COULDN'T, NO.

15   **Q.**    DID YOU FIND ANY PROVIDER NOTES NOTING THE NEED FOR A

16   COLONOSCOPY?

17   **A.**    NO.

18   **Q.**    DID YOU FIND ANY PROVIDER NOTES NOTING ANY EVIDENCE THAT

19   THEY ENCOURAGED THE PATIENT TO GET A COLONOSCOPY?

20   **A.**    NO.

21   **Q.**    DID YOU FIND ANY PROVIDER NOTES AFTER THE -- DID YOU FIND

22   ANY PROVIDER NOTES NOTING ANY CONSIDERATION OF SENDING HIM TO

23   SEE A SPECIALIST?

24   **A.**    NO.

25   **Q.**    OVER THE NEXT TWO YEARS DID HE COMPLAIN OF SYMPTOMS THAT

11:10  1   TOGETHER WITH THE POSITIVE GUAIAC TEST WOULD SUGGEST COLON
       2   CANCER?
       3   **A.**   HE HAD ONGOING COMPLAINTS OF CONSTIPATION, WHICH CAN BE
       4   ASSOCIATED WITH COLON CANCER.
       5   **Q.**   AND SO LET'S JUST LOOK AT ONE EXAMPLE, THE LAST OF THOSE.
       6   ON PAGE 103 OF THE RECORD, WHAT DOES THIS NOTE SHOW?
       7   **A.**   SO THE MEDIC WRITES THAT "THIS IS A SELF-DECLARED
       8   EMERGENCY FOR CONSTIPATION," AND THE MEDIC WRITES BELOW IN THE
       9   "ASSESSMENT" THAT "THE PATIENT COMPLAINS OF CONSTIPATION FOR
      10   THREE DAYS.  HE SPEAKS IN CLEAR SENTENCES," WHICH IS AN
      11   UNRELATED FACT, AND "VOICES NO OTHER MEDICAL COMPLAINTS."
      12   **Q.**   AND WHAT WAS THE DISPOSITION OF THIS CASE?
      13   **A.**   SO THE MEDIC REFERS FOR A PHYSICIAN RECORD REVIEW AND GETS
      14   A VERBAL ORDER FROM A NURSE PRACTITIONER FOR COLACE FOR A MONTH
      15   -- THAT'S A STOOL SOFTENER -- AND FOR MAG CITRATE, WHICH IS A
      16   POTENT LAXATIVE.
      17   **Q.**   IS THERE ANY SORT OF EXAMINATION YOU WOULD WANT TO DO IF A
      18   PATIENT HAS HAD MULTIPLE POSITIVE GUAIAC TESTS PRESENTS WITH
      19   CONSTIPATION?
      20   **A.**   WELL, OBVIOUSLY THEY SHOULD BE REFERRED, NOT JUST
      21   EXAMINED, BUT THEY SHOULD -- THAT'S LIKE A BIG MISS.
      22   **Q.**   AND WHAT DO THE HEALTH CARE PRACTITIONER NOTES SAY?
      23   **A.**   IT JUST SAYS "SICK CALL PRN," WHICH MEANS HE CAN BE SEEN
      24   IF HE DEVELOPS ANOTHER PROBLEM.
      25   **Q.**   DOES "PRN" MEAN AS NEEDED?

1    **A.**    YEAH, AS NEEDED, RIGHT.

2    **Q.**    AND THEN IF WE GO TO PAGE 44 OF THE RECORD, WHAT HAPPENED

3    TWO DAYS AFTER THIS?

4    **A.**    SO TWO DAYS LATER -- THIS IS AN ATU NOTE WHERE HE'S

5    BROUGHT INTO THE ATU IN A WHEELCHAIR.  HE APPEARED TO BE WEAK

6    AND HE WASN'T ABLE TO HAVE BOWEL MOVEMENTS SINCE SATURDAY.  I'M

7    NOT SURE WHAT DATE THIS WAS, BUT LET'S ASSUME IT'S A FEW DAYS.

8    AND HE'S SEEN BY A -- APPARENTLY A -- YEAH, A NURSE

9    PRACTITIONER SAW HIM.  AND SHE WRITES THAT HE'S 67 AND HE HAS

10    CONSTIPATION, DECREASED APPETITE AND LOW BACK PAIN FOR A COUPLE

11    OF DAYS.  AND, YOU KNOW, SHE COULD HAVE DONE A STOOL GUAIAC

12    TEST, WHICH WOULD HAVE BEEN POSSIBLY APPROPRIATE BUT DIDN'T.

13    I'M NOT SAYING THAT THAT'S, YOU KNOW, A CRITICAL THING.  BUT

14    DIAGNOSES CONSTIPATION AND WRITES "COLONIC OBSTRUCTION" AND

15    SAYS THAT SHE DID AN X-RAY AND THERE WAS MARKEDLY DILATED

16    COLON, SO SHE SENT THE PATIENT TO A HOSPITAL.

17    **Q.**    AND THAT WAS APPROPRIATE AT THAT POINT?

18    **A.**    YEAH.  SURE, THAT WAS APPROPRIATE.

19    **Q.**    AND DID HE RECOVER IN THE HOSPITAL?

20    **A.**    WELL, HE WAS FOUND TO HAVE -- NO.  THIS GENTLEMAN HAD --

21    HE WAS FOUND TO HAVE COLON CANCER AND UNFORTUNATELY HE

22    DEVELOPED A PULMONARY EMBOLISM, WHICH IS ASSOCIATED WITH COLON

23    CANCERS AND OTHER CANCERS BECAUSE IT INCREASES COAGULABILITY,

24    AND HE DEVELOPED A P.E. AND DIED.  SO HE DIED AS A RESULT OF A

25    COMPLICATION OF HIS COLON CANCER THAT HAD BEEN UNDIAGNOSED.

11:14 1  **Q.**   AND TO STEP BACK, YOU'VE LOOKED AT A FEW DOZEN RECORDS

2   FROM LSP AT THIS POINT, INCLUDING SEVERAL CANCER PATIENTS?

3   **A.**   I LOOKED AT 17 RECORDS, YEAH.

4   **Q.**   INCLUDING THE FIRST TRIAL AS WELL?

5   **A.**   OH, THE FIRST TRIAL?  YES.  YES.

6   **Q.**   HAVE YOU EVER SEEN A PATIENT WHOSE CANCER WAS CAUGHT AT AN

7   EARLY STAGE?

8   **A.**   NO.

9   **Q.**   AND IF WE LOOK AT THE PATIENT'S MORTALITY REVIEW, PX_8A AT

10  1509 AND 1510, DOES THIS REFERENCE THE POSITIVE GUAIAC TESTS AT

11  ALL?

12  **A.**   MY RECOLLECTION IS NO, IT DID NOT.

13  **Q.**   AND DOES IT RECOGNIZE THE ABSENCE OF A COLONOSCOPY?

14  **A.**   NO.

15  **Q.**   DOES IT PROVIDE ANY INFORMATION FROM WHICH THEY COULD

16  DISCUSS WAYS TO IMPROVE CARE IN THE FUTURE?

17  **A.**   WELL, AGAIN, IT MISSES THE OPPORTUNITY TO IDENTIFY

18  OPPORTUNITIES FOR IMPROVEMENT.  SO IF THE GOAL IS TO IMPROVE,

19  YOU'VE LOST AN OPPORTUNITY THERE BECAUSE YOU -- YOU KNOW, THIS

20  IS AN EASILY -- CAN BE AN EASILY CORRECTABLE SITUATION.  YOU

21  KNOW, SOMEONE WITH A POSITIVE GUAIAC STOOL, HOW DID YOU MISS

22  THE COLON CANCER SCREENING AND WHAT DO YOU DO TO PREVENT THAT

23  FROM HAPPENING AGAIN?  AND IT JUST DIDN'T HAPPEN.

24  **Q.**   SO LET'S MOVE ON TO ANOTHER PATIENT WHO WAS NOT REFERRED

25  TIMELY FOR A SPECIALIST.

11:15  1          IF WE COULD GO TO PATIENT NO. 10.  LET'S GO TO

       2   JX_10_172.

       3          **MR. ARCHEY:**  YOUR HONOR, I'VE GOT TO OBJECT.  IN HIS

       4   SPECIALTY SECTION HE HAS FIVE CHARTS THAT HE ADDRESSES, AND I

       5   CAN GIVE YOU THE NUMBERS.  IT IS NOT NO. 10.  HE NEVER

       6   ADDRESSES THIS AS A SPECIALTY ISSUE AT ALL.  AND SO THIS IS

       7   OUTSIDE THE SCOPE OF HIS OPINION.  IT'S OUTSIDE OF WHAT WE

       8   PREPARED FOR.  I DIDN'T EVEN QUESTION HIM ON THIS.  SO I HAVE

       9   AN OBJECTION ON THIS, YOUR HONOR.

      10          **MR. DUBNER:**  AND THIS IS THE SAME PATIENT WE REFERRED

      11   TO EARLIER, BUT THESE OPINIONS WERE FULLY DISCLOSED IN THE

      12   EXPERT REPORT, AS IS THE FACT THAT DR. PUISIS WAS GOING TO

      13   TESTIFY ABOUT THEM.  THERE'S NO SURPRISE HERE.  WE TOLD THEM

      14   WITH THE EXCHANGE OF EXPERT REPORTS THAT THIS WAS ONE OF DR.

      15   PUISIS' PATIENTS.  MS. LAMARRE TOLD THEM AT HER DEPOSITION WHEN

      16   THEY PREPARED TO DEPOSE HER BEFORE DR. PUISIS THAT THESE

      17   WEREN'T HER PATIENTS.  DR. PUISIS WAS THE ONE PREPARED TO

      18   TESTIFY ABOUT THEM.  THEY THEN TOOK DR. PUISIS' DEPOSITION,

      19   KNOWING ALL THAT, DECIDED NOT TO ASK QUESTIONS.

      20          IN TERMS OF THE REPORT, IT IS DISCUSSED IN THE

      21   CLINICAL CARE SECTION.  AND HERE'S WHY, AS DR. PUISIS

      22   EXPLAINED, CLINICAL CARE, SPECIALTY CARE, AND EMERGENCY CARE

      23   ALL OVERLAP.  THIS COULD HAVE BEEN DUPLICATED THREE TIMES IN

      24   THE REPORT.  INSTEAD WE PUT IT ONCE THE FIRST TIME IT WAS

      25   RELEVANT.

1          BUT, YOU KNOW, THE IMPORTANT THING HERE IS

2     DEFENDANTS ALL ALONG WERE AWARE OF ALL OF THE RELEVANT FACTS:

3     THAT THESE WERE DR. PUISIS' PATIENTS, WHAT THE CONTENT OF THE

4     OPINION WAS, THE ENTIRE CONTENT OF THE OPINION, THAT HE WAS THE

5     ONE PREPARING TO TESTIFY ABOUT THEM.  THERE IS SIMPLY NO

6     SURPRISE OR PREJUDICE HERE.

7          **THE COURT:**  OKAY.  I'M GOING TO OVERRULE THE

8     OBJECTION.  I'M GOING TO GIVE YOU VERY LIMITED LATITUDE.  IF HE

9     WANTS TO TESTIFY TO THE OVERLAP BETWEEN CLINIC CARE AND

10    SPECIALTY CARE ON PATIENT 10, THAT'S FINE, LIMITED TO THE

11    OVERLAP.

12    **BY MR. DUBNER:**

13    **Q.**   AND SO IF -- TO LOOK AT A COUPLE OF RECORDS TO SET THE

14    STAGE FOR YOUR OPINIONS ON THIS PATIENT, LET'S START WITH JOINT

15    EXHIBIT 10 AT 172, WHICH IS SEALED.

16          COULD YOU GIVE US AN OVERVIEW OF WHAT YOU SEE IN THIS

17    RECORD AND THEN, OF COURSE, THIS PATIENT'S TREATMENT GOING

18    FORWARD?

19    **A.**   SO THIS IS AN ATU NOTE, AND HE'S BROUGHT TO THE ATU

20    BECAUSE HE'S CONFUSED AND HE COULDN'T -- IT'S A LITTLE

21    DIFFICULT TO READ.

22    **Q.**   COULD YOU BLOW UP THE CHIEF COMPLAINT?

23    **A.**   YEAH.  BLOW IT UP JUST A LITTLE.  THANK YOU.

24    **Q.**   AS WELL AS -- AND THE PORTION ABOVE IT AS WELL, IF YOU

25    COULD, THE BLOOD PRESSURE AND SO ON.

11:18 1   **A.**   YEAH.   SO THIS IS A PATIENT WHO HAS VERY HIGH BLOOD

2   PRESSURE, 193/103 -- AT LEAST THE SYSTOLIC IS VERY HIGH -- AND

3   HE COMPLAINS OF ALTERED MENTAL STATUS AND HE -- HE'S SAID TO

4   HAVE A STEADY GAIT.   SO HE HAS BASICALLY ALTERED MENTAL STATUS

5   AND A VERY HIGH BLOOD PRESSURE.

6   **Q.**   AND IS IT YOUR RECOLLECTION THAT HE PRESENTED WITH SIMILAR

7   SYMPTOMS ON NUMEROUS OCCASIONS?

8   **A.**   YES.

9   **Q.**   DO YOU HAVE A RECOLLECTION OF ABOUT HOW MANY?

10   **A.**   SO THERE WERE I THINK EIGHT EPISODES WHERE THE PATIENT HAD

11   SIMILAR AND SOMETIMES WORSE SYMPTOMS THAT INCLUDED INABILITY --

12   DYSARTHRIA, OR INABILITY TO SPEAK CLEARLY.   HE HAD ALTERED GAIT

13   AT TIMES.   HE WAS CONFUSED AT -- ON TWO EPISODES HE HAD

14   LEFT-SIDED SYMPTOMS.   AND THIS OCCURRED OVER MONTHS, A COUPLE

15   OF MONTHS, SEVERAL MONTHS.

16   AND WHEN THAT OCCURS, A PERSON LIKE THIS SHOULD BE

17   REFERRED TO A NEUROLOGIST.   THE SYMPTOMS RESOLVED.   SO THEY

18   WERE TRANSIENT AND THEY MIMICKED A TRANSIENT ISCHEMIC ATTACK,

19   AND THAT PERSON SHOULD BE REFERRED TO A NEUROLOGIST.   SO THE

20   SYMPTOMS RESOLVED, BUT YOU'RE NOT OUT OF THE -- YOU'RE NOT IN

21   THE CLEAR.   A REASONABLE PRACTITIONER WOULD REFER THAT PERSON

22   TO A NEUROLOGIST FOR SPECIALIZED TESTING, AND THEY USUALLY -- I

23   MEAN, THEY WOULD GET A CT OR AN MRI, ANGIOGRAPHIC STUDY AND/OR

24   A CT SCAN OR MRIS, AND THEY WOULD HAVE A GOOD NEUROLOGICAL

25   EXAM.   SO THAT WAS NOT DONE.   AND TRAGICALLY THE PROTOCOL, THE

11:20 1 ALTERED MENTAL STATUS PROTOCOL, IS REALLY I THINK A -- YOU WANT
2 --
3 **Q.** WE'VE HEARD ABOUT THAT FROM DR. VASSALLO.
4 **A.** OKAY. ALL RIGHT. SO I'M NOT GOING TO GO INTO THAT.
5 BUT THE MAIN THING IS THAT HE SHOULD HAVE BEEN
6 REFERRED, YEAH.
7 **Q.** AND IF WE LOOK AT THIS PATIENT'S MORTALITY REVIEW, JX_8A
8 AT 1179 TO 1180.
9 **A.** THIS IS 172?
10 **Q.** IT HASN'T BEEN BROUGHT UP YET.
11 **A.** OKAY.
12 **Q.** IS THERE ANY DISCUSSION OF THE EVENTS LEADING UP TO HIS
13 DEATH AT ALL?
14 **A.** NO. AND I WOULD MENTION -- I WANT TO MENTION, AT EACH OF
15 THOSE EPISODES HIS BLOOD PRESSURE WAS SIGNIFICANTLY ELEVATED,
16 AND IT WAS JUST NOT ADDRESSED. HE HAD AN ELEVATED BLOOD
17 PRESSURE THROUGH MOST OF THE RECORD REVIEW PERIOD THAT I LOOKED
18 AT. SO THERE WERE -- THEY SHOULD HAVE BEEN ATTUNED TO THE FACT
19 THAT HE HAD A RISK FACTOR FOR STROKE. HE SHOULD HAVE BEEN
20 REFERRED. HE HAD SYMPTOMS. HE PRESENTED WITH SYMPTOMS. HE
21 WAS NOT REFERRED, AND HE ULTIMATELY DIED OF A STROKE -- I MEAN,
22 AN INTRACEREBRAL BLEED.
23 **Q.** IF WE LOOK, FOR EXAMPLE, AT JX_10 AT 125, THIS IS A
24 DECEMBER 9, 2020 ATU NOTE, JUST TO -- WELL, WHAT BETWEEN THE
25 BLOOD PRESSURE AND THE CHIEF COMPLAINT ARE THE KEY CONCERNS

11:22 1    HERE?

2              IF YOU COULD BLOW THOSE UP.

3    **A.**   SO NOW HE HAS UNILATERAL SYMPTOMS:  LEFT HAND, LEFT ANKLE,

4    FOOT, LEFT WRIST, SO IT'S ALL LEFT-SIDED, WHICH IS VERY

5    SUGGESTIVE OF A CEREBROVASCULAR ISSUE.  AND AGAIN THE BLOOD

6    PRESSURE IS ELEVATED.

7              I WOULD -- I'D SAY TWO THINGS.  WHERE IS THE

8    EVALUATION?  YOU KNOW, THERE'S NO -- MEDICS ARE DEALING WITH A

9    GUY.  HE'S NOT EVALUATED BY A PROVIDER.  HE'S NOT EXAMINED.

10   THERE'S NO HISTORY.  THEY PRESUME THAT, YOU KNOW, THE PATIENT

11   HAS INTOXICATION, BUT IT'S NOT AN ISSUE, AND HE SHOULD BE

12   REFERRED.  HE'S NOT EXAMINED AT LSP, AND HE'S NOT REFERRED TO A

13   SPECIALIST FOR SPECIALIZED TESTING TO EVALUATE HIS COMPLAINT.

14   **Q.**   AND IF WE LOOK AT PAGE 122, A COUPLE WEEKS LATER, ON

15   JANUARY 6TH, IT APPEARS THAT HE TOLD A PHYSICAL THERAPIST THAT

16   HE THOUGHT HE HAD HAD A STROKE ON DECEMBER 9TH.  IS THAT

17   CORRECT?

18   **A.**   YES.

19   **Q.**   AND IS THERE ANY EVIDENCE THAT THAT INFORMATION MADE IT

20   FROM THE PHYSICAL THERAPIST TO ANY PROVIDERS OR OTHER MEDICAL

21   PERSONNEL AT LSP?

22   **A.**   NO.  AND I WOULD MENTION THAT HE HAS LEFT-SIDED SYMPTOMS.

23   HIS INTRACEREBRAL BLEED AND AUTOPSY WAS THE RIGHT SIDE.  SO

24   IT'S CONSISTENT WITH HE HAD A INTRACEREBRAL BLEED ON THE RIGHT

25   AND HIS SYMPTOMS WERE ON THE LEFT, WHICH IS CONSISTENT WITH

11:24 1    WHAT YOU WOULD EXPECT.

2    **Q.**   RIGHT.  DOES A BLEED ON THE RIGHT SIDE CAUSE SYMPTOMS ON

3    THE LEFT SIDE?

4    **A.**   EXACTLY, CORRECT.

5    **Q.**   AND THEN ONE FINAL NOTE, JANUARY 23RD, WHICH IS PAGE 113,

6    AND JUST ON THIS ONE, THIS IS TWO WEEKS AFTER HE HAD TOLD THE

7    PHYSICAL THERAPIST THAT HE HAD WHAT HE THOUGHT WAS A STROKE.

8    HOW DOES HE PRESENT THIS TIME?

9    **A.**   WELL, THE PRESSURE IS INITIALLY HYPOTENSIVE, AND THEN IT'S

10   VERY ELEVATED, WHICH IS A VERY CONCERNING SIGN.  BUT HE

11   PRESENTS TO THE ATU AGAIN WITH ALTERED MENTAL STATUS AND

12   SLURRED SPEECH.  THESE ARE SYMPTOMS THAT I THINK A CIVILIAN

13   WOULD BE ABLE TO RECOGNIZE AS SOMETHING CONSISTENT WITH A

14   STROKE.  I MEAN, IF MY PARENTS HAD SLURRED SPEECH, I WOULD BE

15   WORRIED AND TAKE THEM TO A HOSPITAL.

16   **Q.**   AND IS THERE ANY RECOGNITION OF THE PHYSICAL THERAPIST'S

17   NOTE HERE?

18   **A.**   NO.

19   **Q.**   AND IS THERE ANY RECOGNITION OF HIS PREVIOUS SYMPTOMS

20   HERE?

21   **A.**   NO.

22   **Q.**   AND IS THERE ANY CONSIDERATION DOCUMENTED OF A REFERRAL

23   HERE?

24   **A.**   NO.

25   **Q.**   IS THERE ANY PROVIDER EXAMINATION DOCUMENTED HERE?

11:25 1  **A.**   NO.

2  **Q.**   OKAY.  LET'S MOVE ON TO PATIENT NO. 48.

3       **MR. DUBNER:**  AND I'LL SAY UP FRONT, THERE IS ANOTHER

4  PATIENT.  THERE ARE THREE PATIENTS IN THIS SECTION MR. ARCHEY

5  IS TALKING ABOUT.  ALL OF THEM WERE DISCLOSED, AS I SAID.  I

6  WOULD -- YOU KNOW, I DON'T BELIEVE THERE'S A VALID OBJECTION

7  HERE, BUT I WOULD ASK FOR THE SAME TIGHT LEEWAY TO TALK ABOUT

8  THESE TWO PATIENTS AS WELL.

9       **THE COURT:**  OKAY.  I'M NOT GOING TO GIVE ADVISORY

10  OPINIONS.  IF YOU DRAW AN OBJECTION, I'LL RULE ON THE

11  OBJECTION.  ASK YOUR QUESTIONS.

12       **MR. DUBNER:**  FAIR ENOUGH.

13  **BY MR. DUBNER:**

14  **Q.**   IF WE COULD TURN TO PATIENT NO. 48.

15       **MR. ARCHEY:**  WELL, I OBJECT, YOUR HONOR.  IT IS NOT

16  IN THAT SPECIALTY SECTION.  HE DRAFTED A SPECIALTY SECTION AND

17  THAT'S ALL HE WAS IDENTIFIED FOR.  AND FIVE CHARTS WERE

18  IDENTIFIED IN THERE.

19       **THE COURT:**  OKAY.  YOU ARE --

20       **MR. ARCHEY:**  I'M SORRY.

21       **THE COURT:**  YOU ARE GIVING SPEAKING OBJECTIONS THAT I

22  SPECIFICALLY DIRECTED THE PARTIES NOT TO DO YESTERDAY.

23         WHAT PATIENT ARE WE TALKING ABOUT?

24       **MR. DUBNER:**  PATIENT NO. 48, WHO IS DISCUSSED AT

25  PAGES 63 TO 65 OF THE REPORT.

1       **THE COURT:**  THE COURT WILL PERMIT -- OVERRULES THE

2    OBJECTION, WILL PERMIT TESTIMONY REGARDING PATIENT 48 STRICTLY

3    LIMITED TO THE CROSSOVER BETWEEN SPECIALTY CARE AND CLINIC

4    CARE.

5    **BY MR. DUBNER:**

6    **Q.**   SO LET'S START WITH AN EKG ON MAY 21, 2021.

7            THIS IS GOING TO BE JX_48_38.

8            WHAT DID THIS EKG SHOW, IF WE LOOK AT THE -- WHAT DID

9    THIS EKG SHOW?

10   **A.**   I MEAN, IT'S NORMAL SINUS RHYTHM.  IT HAS LEFT ATRIAL

11   ENLARGEMENT.

12   **Q.**   AND SO IF AN EKG SHOWS LEFT ATRIAL ENLARGEMENT, IS THERE

13   ANY KIND OF REFERRAL OR CONSIDERATION THAT YOU WOULD WANT TO

14   MAKE?

15   **A.**   NOT NECESSARILY, NO.  YOU WOULD PUT IT IN THE CONTEXT OF

16   WHAT'S HAPPENING WITH THE PATIENT.

17   **Q.**   WAS THERE ANY RECORD OF HIM BEING EVALUATED AFTER THIS

18   EKG?

19   **A.**   NOT WITH RESPECT TO THE LEFT ATRIAL ENLARGEMENT.  I DON'T

20   THINK ANYBODY MENTIONED IT.

21   **Q.**   AND YOU WROTE IN YOUR CHART REVIEW THAT HE HAD A SERIES OF

22   ENCOUNTERS BEGINNING ON AUGUST 18, 2021.  SO LET'S JUST LOOK AT

23   THE FIRST ONE ON PAGE 117.

24           **MR. ARCHEY:**  YOUR HONOR, I OBJECT WITHOUT KNOWING

25   MORE.  SO I OBJECT, OUTSIDE THE SCOPE.

11:28  1    **THE COURT:** OBJECT TO OUTSIDE THE SCOPE?

2    **MR. ARCHEY:** (NODDED HEAD.)

3    **THE COURT:** MR. DUBNER?

4    **MR. DUBNER:** I'M NOT ENTIRELY SURE HOW TO RESPOND,

5 "OBJECT WITHOUT KNOWING MORE." IT'S DISCUSSED IN THE REVIEW.

6 OH, I SAID "CHART REVIEW." HE DISCUSSED IN THE REPORT. I

7 SHOULD HAVE SAID "REPORT" RATHER THAN "CHART REVIEW," IF THAT'S

8 --

9    **THE COURT:** OKAY. THE OBJECTION IS SUSTAINED.

10 REPHRASE YOUR QUESTION.

11 **BY MR. DUBNER:**

12 **Q.** YOU WROTE IN YOUR REPORT THAT HE HAD A SERIES OF

13 ENCOUNTERS BEGINNING ON AUGUST 18, 2021. IF WE GO TO PAGE 117,

14 IF YOU COULD TELL US ABOUT THE FIRST ONE.

15    **MR. ARCHEY:** YOUR HONOR, SAME OBJECTION.

16    **THE COURT:** OVERRULED.

17 **BY MR. DUBNER:**

18 **Q.** SO WHAT DID HE PRESENT WITH HERE?

19 **A.** HE HAD A PULSE OF 146, WHICH IS HIGH, AND HE'S SEEN BY A

20 MEDIC. HE WAS SITTING ON THE FLOOR OF THE CELL. SO APPARENTLY

21 HE EITHER HAD A SYNCOPE EPISODE OR HE SOMEHOW FOUND HIMSELF ON

22 THE FLOOR, AND A PULSE THAT HIGH WITH THAT PRESENTATION, THE

23 PATIENT SHOULD BE EVALUATED. SO HE WAS SENT TO THE ATU.

24 **Q.** AND DID YOU FIND ANY RECORD OF ANY EVALUATION IN THE ATU

25 IN THE MEDICAL RECORDS?

11:29 1  **A.**   I THINK FOR THIS ONE, NO.

2  **Q.**   IF WE GO TO PAGE 115, HE WAS SEEN THE NEXT WEEK IN THE

3  GENERAL MEDICINE CLINIC.  WHAT WAS -- WHAT WAS DONE AT THAT

4  VISIT?

5  **A.**   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

6  **Q.**   YES.  SO IF WE LOOK AT THE FOLLOWING WEEK IN THE GENERAL

7  MEDICINE CLINIC, WHAT WAS DONE AT THAT VISIT?

8  **A.**   SO A NURSE PRACTITIONER SAW THE PATIENT, AND HE WAS TO BE

9  SEEN BECAUSE OF AN EKG.  AND THE NURSE PRACTITIONER NOTED THAT

10  HIS HEART WAS RACING INTERMITTENTLY FOR A MONTH AND THAT HE HAD

11  A CVA, A STROKE, IN 2019, AND SHE DOCUMENTED THAT EKG WAS NOTED

12  WITH A PULSE OF 96.  AND THERE'S SOMETHING -- I CAN'T READ THE

13  LAST LINE OF WHAT SHE SAYS, BUT SHE WROTE DOWN SOME LAB RESULTS

14  AND THERE WAS A BRIEF EXAMINATION.  AND THE ASSESSMENT REALLY

15  HAD NOTHING IN IT EXCEPT THAT IT SAID "SUBJECTIVE CVA IN 2017

16  AND HEART RACING."  AND THAT'S NOT A DIAGNOSIS.  SO ADDITIONAL

17  TESTING SHOULD HAVE BEEN DONE.  AND IF THE NURSE PRACTITIONER

18  FELT THAT THIS WAS SOMETHING BEYOND WHAT SHE COULD DO, SHE

19  SHOULD HAVE REFERRED THE PATIENT, OBVIOUSLY.  BUT -- AND IT

20  SEEMS LIKE SHE SEEMED UNSURE OF WHAT TO DO.

21  **Q.**   AND IS THERE ANY ASSESSMENT OF THE PATIENT'S ELEVATED

22  PULSE OR TACHYCARDIA?

23  **A.**   NO.  I MEAN, THE NURSE PRACTITIONER DID ORDER THYROID

24  STUDIES, WHICH IS GOOD.  THAT IS APPROPRIATE AND THAT WAS A

25  GOOD THING TO DO.  BUT THAT WAS THE LIMIT OF WHERE THE NURSE

11:31 1  PRACTITIONER WAS.

2  **Q.**  WELL, IF WE LOOK AT WHAT SHE DID -- HE OR SHE, I'M NOT

3  SURE WHO THIS WAS -- WHAT THEY RECOMMENDED, I BELIEVE YOU SAID

4  THEY WERE -- THERE WERE LAB TESTS ORDERED.  THERE'S A ONE-MONTH

5  FOLLOW-UP, AND THERE IS A REFERRAL TO CARDIOLOGY.  IS THAT

6  CORRECT?

7  **A.**  WELL, YOU'VE LOST ME.

8  **Q.**  IF WE LOOK AT THE HIGHLIGHTED PART WHERE IT SAYS "RTC ONE

9  MONTH."

10  **A.**  RIGHT.

11  **Q.**  AND THEN YOU REFERENCE SOME LAB WORK.  AND THEN IF WE LOOK

12  AT THE LAST LINE OF THE PLAN, IT LOOKS LIKE IT SAYS --

13  **A.**  CARDIOLOGY, RIGHT.  IT WAS UNDER THE "REFUSE," SO I

14  COULDN'T SEE IT.  YEAH, CARDIOLOGY REFERRAL, RIGHT.

15  **Q.**  DOES IT SAY "REFUSED" OR "REFERRAL SENT"?

16  **A.**  IT'S UNCLEAR.  I MEAN, I THINK YOU COULD SAY IT'S

17  REFERRAL, BUT I DON'T KNOW.

18  **Q.**  HAVE YOU SEEN THAT INDICATION IN OTHER PLACES WHERE

19  REFERRALS WERE SENT?

20  **A.**  I DON'T THINK THIS PERSON WAS REFERRED.

21  **Q.**  THAT WAS GOING TO BE MY NEXT QUESTION.

22      DID YOU FIND ANY EVIDENCE THAT THIS PATIENT EVER DID

23  SEE A CARDIOLOGIST?

24  **A.**  NO.

25  **Q.**  DID YOU FIND ANY EVIDENCE THAT THERE WAS --

11:32 1    **A.**  I TAKE THAT BACK.  HE MAY HAVE SEEN A -- HE SAW A

2    CARDIOLOGIST IN THE HOSPITAL WHEN HE WAS HOSPITALIZED FOR CHEST

3    PAIN.

4    **Q.**  SO I'LL WALK THAT BACK THEN.  THANK YOU.

5         SO IN TERMS OF THESE REFERRALS, DID YOU SEE ANY

6    EVIDENCE THAT THE LAB TESTS THAT WERE REQUESTED OCCURRED?

7    **A.**  DID I SEE EVIDENCE THAT THE LAB TESTS WERE DONE?  I'M

8    SORRY.  I DIDN'T --

9    **Q.**  I'LL FOCUS JUST ON THE CARDIOLOGY.

10         DID YOU SEE ANY EVIDENCE THAT THE CARDIOLOGY REFERRAL

11   ACTUALLY OCCURRED?

12   **A.**  NO.

13   **Q.**  AND LET'S SKIP FORWARD.  THERE'S SOME MORE ON YOUR REPORT,

14   BUT WE'RE GOING TO SKIP TO THE HOSPITALIZATION.  IF WE GO TO

15   PAGE 94 WHEN HE WAS SUBSEQUENTLY HOSPITALIZED, WHAT DID THEY

16   FIND AT THE HOSPITAL?

17   **A.**  SO HE WAS ADMITTED TO THE HOSPITAL FOR CHEST PAIN, AND

18   THEY DID A CARDIAC CATH.  DURING THE CARDIAC CATH, HE

19   EXPERIENCED EPISODES OF SVT OR SUPRAVENTRICULAR TACHYCARDIA.

20   AND SO THEY RECOMMENDED THAT -- I MEAN, THEY KIND OF TREATED

21   IT, BUT HE WAS DISCHARGED AND THEY THOUGHT HE SHOULD BE

22   FOLLOWED UP WITH AN ELECTROPHYSIOLOGIST.

23         SVT GENERALLY IS A BENIGN RHYTHM, BUT IN CERTAIN

24   CIRCUMSTANCES IT CAN BE MORE SERIOUS, AND IT NEEDS TO BE

25   EVALUATED, ESPECIALLY WITH RESPECT TO SYMPTOMS.  SO IN SOME

11:34 1  CASES THE CARDIOLOGIST WILL DO AN ELECTRICAL EVALUATION OF THE
2  HEART RHYTHM TO SEE IF THERE'S A PROBLEM, AND THAT'S WHAT THEY
3  WERE RECOMMENDING HERE.
4  **Q.**   OKAY.  AND IF WE LOOK AT -- GIVE ME ONE MOMENT -- THE
5  THIRD PARAGRAPH HERE, IT SAYS, "HE WILL NEED TO FOLLOW UP WITH
6  INFIRMARY ELECTROPHYSIOLOGIST FOR SVT WITH FEATURES CONSISTENT
7  WITH THE AVNRT" AND "FURTHER FOLLOW UP."  DO YOU SEE WHERE IT
8  SAYS THAT?
9  **A.**   RIGHT.  AND BASICALLY THE AVNRT IS ONE OF THE ABERRANT
10  PATHWAYS THAT IS POTENTIALLY A PROBLEM.
11          **MR. ARCHEY:**  YOUR HONOR --
12  **BY MR. DUBNER:**
13  **Q.**   AND THEN IF WE LOOK --
14          **MR. ARCHEY:**  -- I STILL OBJECT.
15          **THE COURT:**  THE WORD "OBJECTION"?
16          **MR. ARCHEY:**  YES, YOUR HONOR.  THAT'S WHAT I WAS
17  TRYING TO DO.  OBJECT, OUTSIDE THE SCOPE.  THESE OPINIONS ARE
18  NOT STATED.
19          **MR. DUBNER:**  I BELIEVE THEY WERE.  LET ME PULL UP THE
20  REPORT.  I ONLY HAVE TWO MORE QUESTIONS.
21          **THE COURT:**  WELL, IT DOESN'T MATTER HOW MANY MORE
22  QUESTIONS YOU HAVE.
23          **MR. DUBNER:**  FAIR.
24          **THE COURT:**  IS THIS WITHIN THE SCOPE OF THE SPECIALTY
25  CARE REFERRALS, AND IS THIS PATIENT REFLECTED IN THE REPORT?

11:35 1     **MR. DUBNER:**  YES.

2           MY QUESTION JUST NOW WAS ABOUT A SPECIALTY CARE

3    REFERRAL.  "HE WILL NEED TO FOLLOW UP WITH INFIRMARY

4    ELECTROPHYSIOLOGIST FOR SVT."  AND THIS IS IN THE -- AND THEN

5    IN THE REPORT IT SAYS "THE SVT WAS NEVER SPECIFICALLY

6    ACKNOWLEDGED AS A PROBLEM WITH THE FACILITY, AND THERE WAS NO

7    EVIDENCE OF REFERRAL TO A CARDIOLOGIST."

8           **THE COURT:**  OVERRULED.

9    BY MR. DUBNER:

10   **Q.**   SO WE HAVE THIS REFERENCE TO A REFERRAL -- TO A STATEMENT

11   THAT HE NEEDS TO FOLLOW UP WITH AN INFIRMARY

12   ELECTROPHYSIOLOGIST.

13          CAN WE LOOK AT THE TRIP RETURN?  JX_48 AT 92.

14          WAS HE REFERRED TO THE ELECTROPHYSIOLOGIST?

15   **A.**   SO THIS IS A TRIP NURSE FORM, AND THERE'S NO INDICATION

16   THAT HE WAS REFERRED TO A CARDIOLOGIST.

17   **Q.**   AND DID YOU SEE ANY EVIDENCE THAT PROVIDERS RECOGNIZED

18   THAT RECOMMENDATION AT ANY POINT?

19   **A.**   NO.

20   **Q.**   AND AS YOU SAID BEFORE, HE DID SUBSEQUENTLY SEE A

21   CARDIOLOGIST.  WAS HE EVER REFERRED TO THE ELECTROPHYSIOLOGIST?

22   **A.**   NO.  WELL, HE DIDN'T SUBSEQUENTLY SEE HIM.  HE SAW HIM IN

23   THE HOSPITAL.

24   **Q.**   THANK YOU.

25   **A.**   RIGHT.

11:36 1  **Q.** IS IT POSSIBLE THAT HE MIGHT HAVE BEEN REFERRED TO DR.

2  COLON?

3  **A.** I'M NOT SURE IF DR. COLON IS AN ELECTROPHYSIOLOGIST. I

4  DON'T BELIEVE HE IS, BUT I'M NOT SURE, TO BE FAIR.

5  **MR. DUBNER:** IF I COULD HAVE THE COURT'S INDULGENCE

6  FOR ONE MOMENT?

7  **THE COURT:** OKAY.

8  **BY MR. DUBNER:**

9  **Q.** LET'S TALK ABOUT PATIENT 4.

10  CAN YOU -- LET'S START THIS WAY. WHEN THE RELEVANT

11  PERIOD STARTED, THIS PATIENT HAD INTERSTITIAL LUNG DISEASE. IS

12  THAT CORRECT?

13  **A.** YES.

14  **Q.** AND YOU WRITE IN YOUR REPORT THAT "HE WAS LOST TO

15  FOLLOW-UP." WHAT DID YOU MEAN BY THAT?

16  **A.** SO THIS WAS A MAN WHO HAD RENAL CELL CARCINOMA, AND HE WAS

17  IN THE HOSPITAL AND HAD A PARTIAL REMOVAL OF HIS KIDNEY.

18  DURING THAT HOSPITALIZATION -- AND I THINK IT WAS EITHER 2018

19  OR 2019 -- IT WAS -- THEY DID TESTING BECAUSE OF IDENTIFIED

20  PROBLEMS AND DETERMINED THAT HE HAD INTERSTITIAL LUNG DISEASE.

21  AN INTERSTITIAL LUNG DISEASE IS A DISEASE OF FIBROSIS OF THE

22  LUNG OF UNCERTAIN ETIOLOGY. SO THEY WEREN'T REALLY SURE WHAT

23  IT WAS. AND HE NEEDED TO FOLLOW UP WITH SPECIALISTS.

24  AND HE DID SEE A PULMONOLOGIST IN THE HOSPITAL, AND I THINK HE

25  MAY HAVE HAD ONE OR TWO OTHER APPOINTMENTS AND THEN COVID HIT.

11:39 1   AND FROM -- I THINK IT WAS -- IT MAY HAVE BEEN MAY OF 2019

2   UNTIL DECEMBER OF 2020 HE DIDN'T SEE ANYONE.

3         AND THE PROBLEM WITH THAT -- AND I UNDERSTAND COVID

4   AND I'M VERY SYMPATHETIC TO THE DIFFICULTIES.  IN THIS CASE

5   THEY HAVE TELEMEDICINE AND, IN FACT, IN SUBSEQUENT VISITS THEY

6   CONDUCTED TELEMEDICINE VISITS WITH THE PULMONOLOGIST.  AND

7   THERE WAS NO REASON WHY THEY COULDN'T HAVE CONDUCTED A

8   TELEMEDICINE VISIT WITH A PULMONOLOGIST.  BUT IT JUST DIDN'T

9   OCCUR.  AND THERE WAS SOME SNAFU WITH SCHEDULING OR SOMETHING

10   HAPPENED, BUT HE WASN'T SEEN FOR A YEAR AND A HALF.

11  **Q.**   SO WE'LL LOOK THROUGH SOME OF THAT.

12         AND YOU SAID THAT HIS LAST APPOINTMENT BEFORE HIS

13   LAST FOLLOW-UP WAS MAY 2019.  IS THAT RIGHT?

14  **A.**   I THINK THAT'S ACCURATE, BUT I'D HAVE TO GO BACK AND LOOK

15   AT THE --

16  **Q.**   AND IS THAT ABOUT NINE OR TEN MONTHS BEFORE COVID BECAME A

17   SIGNIFICANT PROBLEM IN THE UNITED STATES?

18  **A.**   RIGHT.  RIGHT, IT WAS, YEAH.

19  **Q.**   SO THE FIRST NINE, ROUGHLY, MONTHS OF THAT "LOST TO

20   FOLLOW-UP" WAS NOT DUE TO COVID?

21  **A.**   RIGHT.  RIGHT.  IT WAS NOT COVID RELATED.

22  **Q.**   LET'S LOOK AT THE CARE HE WAS RECEIVING WHILE LOST TO

23   FOLLOW-UP.

24         IF WE GO TO PAGE 370 OF JOINT EXHIBIT 4, AND IF WE

25   CAN PUT UP 370 AND 371.

11:40 1          SO THIS IS A CAT SCAN HE RECEIVED ON MARCH 2, 2020.

2       WHY DID HE RECEIVE THAT CAT SCAN?

3       **A.**   WELL -- SO REMEMBER HE WAS IN THE MIDST OF HAVING MISSED

4       THE PULMONARY APPOINTMENT, AND IN THAT INTERVAL HE WAS IN A

5       MOTOR VEHICLE ACCIDENT.  HE WAS IN A VEHICLE AND THERE WAS A

6       CRASH.  HE WAS TAKEN TO THE HOSPITAL, AND WHILE HOSPITALIZED HE

7       HAD A CT SCAN OF THE CHEST, AND THEY DETERMINED -- I MEAN, THEY

8       FOUND THE INTERSTITIAL LUNG DISEASE.  IT'S AS DESCRIBED HERE:

9       EXTENSIVE RETICULAR AIRWAY CHANGES, ET CETERA.  AND THEY

10      IDENTIFIED THAT HE HAD HAD A PRIOR CONSULTATION WITH A

11      PULMONOLOGIST, AND THEY RECOMMENDED THAT HE FOLLOW UP WITH A

12      PULMONOLOGIST, AND THEY GAVE A DATE.

13      **Q.**   UH-HUH.

14      **A.**   I THINK IT WAS 03/25, IS MY RECOLLECTION, BUT I'M NOT

15      ENTIRELY SURE.

16              SO THE HOSPITAL RECOGNIZED THAT THERE WAS AN ABORTED

17      SPECIALTY FOLLOW-UP.  THEY RE-ENTERED IT AND RE-RECOMMENDED IT.

18      **Q.**   AND THEN IF WE GO TO JX_437.

19              MARCH 20TH HE'S SEEN IN GENERAL MEDICINE ABOUT 18

20      DAYS AFTER THAT CT SCAN.  COULD YOU DISCUSS THE ISSUES THAT YOU

21      SEE WITH THIS NOTE?

22      **A.**   SO THIS IS -- IT'S TYPICAL TO MY OPINION ON SPECIALTY CARE

23      IN THAT PEOPLE AREN'T REFERRED; AND PEOPLE WHO ARE REFERRED,

24      THERE IS NO FOLLOW-UP AND NO RECOGNITION OF WHAT THE SPECIALIST

25      HAS DETERMINED.  AND THIS NOTE DISPLAYS THAT.

11:42 1          SO THIS IS A PERSON -- THIS IS 3/20.  SO THIS IS

2     AFTER THE HOSPITALIZATION, SO THE PERSON HAS MISSED HIS

3     PULMONARY APPOINTMENT FOR -- THIS IS ALMOST MAYBE EIGHT MONTHS

4     OR TEN MONTHS.  AND HE NEVERTHELESS WAS HOSPITALIZED BRIEFLY

5     FOR AN EVALUATION AFTER A MOTOR VEHICLE ACCIDENT, HAS AN

6     ABNORMAL CT SCAN AND GETS A RECOMMENDATION TO SEE THE

7     PULMONOLOGIST.

8          WHAT YOU DON'T SEE IN THE NOTE IS THERE'S NO REVIEW

9     OF THE HOSPITAL REPORT; THERE'S NO REVIEW OF THE CT SCAN;

10    THERE'S NO RECOGNITION THAT THE HOSPITAL HAS RECOGNIZED HE HAS

11    LOST TO FOLLOW-UP; AND THERE'S NO RECOGNITION THAT HE HAS

12    INTERSTITIAL LUNG DISEASE.

13          SO IT'S JUST A COMPLETE DISENGAGEMENT FROM THE

14    PATIENT'S PROBLEM.

15    **Q.**   FOR A --

16    **A.**   AND THEY CREATE A SIX-MONTH APPOINTMENT.  SO I'M NOT

17    SAYING A SIX-MONTH APPOINTMENT IS BAD, BUT IN THIS CASE THEY

18    JUST MISSED THE BOAT.  AND I THINK IT'S AS A RESULT OF THE

19    PROCESS OF HOW SPECIALTY CARE IS RUN:  THAT TRIP NURSES RUN IT,

20    DOCTORS ARE UNINVOLVED.

21    **Q.**   AND WHAT KIND OF TESTS WOULD YOU WANT TO DO TO ASSESS

22    SOMEBODY'S INTERSTITIAL LUNG DISEASE?

23    **A.**   WELL, IT'S A COMPLICATED DISEASE.  THEY DID NOT HAVE A

24    COMPLETE DIAGNOSIS, AND THEY RECOMMENDED ON MULTIPLE OCCASIONS

25    WHAT'S CALLED A VATS, OR VIDEO ASSISTED THORACIC SURGERY.

11:44 1 **Q.** AND LET ME REASK THE QUESTION BECAUSE --

2 **A.** OKAY.

3 **Q.** -- I MAY HAVE GONE DOWN THE WRONG ROAD.

4 IS OXYGEN TWO SATURATION SOMETHING THAT YOU MEASURE

5 TYPICALLY?

6 **A.** ABSOLUTELY. AND THAT'S ANOTHER THING THAT'S NOT HERE. I

7 MEAN, TYPICALLY IF SOMEBODY HAS INTERSTITIAL LUNG DISEASE, YOU

8 WOULD, ON A ROUTINE, MEASURE THEIR OXYGEN SATURATION. SO

9 THEY'RE NOT EVEN RECOGNIZING THAT IT'S AN IMPORTANT VITAL SIGN

10 THAT SHOULD BE OBTAINED.

11 **Q.** AND IF WE LOOK AT THE BOTTOM LEFT OF THE ASSESSMENT, IT

12 SAYS, "CILD STABLE"?

13 **A.** YES.

14 **Q.** IS IT POSSIBLE TO ASSESS THIS PATIENT'S CHRONIC

15 INTERSTITIAL LUNG DISEASE AS STABLE, GIVEN THE INFORMATION

16 THAT'S HERE?

17 **A.** WELL, HOW WOULD HE KNOW? I MEAN, HE -- THIS IS JUST -- SO

18 THERE'S NO HISTORY RELATED TO IT. IF YOU GO UP TO THE NOTE,

19 THERE'S REALLY NO HISTORY RELATED TO INTERSTITIAL LUNG DISEASE.

20 THEY LISTENED TO THE LUNGS AND THEY'RE CLEAR. THERE IS NO

21 OXYGEN SATURATION. THEY HAVE NO BASIS TO MAKE AN ASSESSMENT OF

22 STABLE INTERSTITIAL LUNG DISEASE IF YOU DON'T TAKE A HISTORY

23 OR, YOU KNOW, DON'T OBTAIN -- I MEAN, OXYGEN SATURATION IS LIKE

24 A FUNDAMENTAL THAT YOU WOULD CHECK. AND THEY DIDN'T LOOK AT

25 THE CT SCAN.

11:45 1      SO I DON'T THINK THERE'S A GOOD BASIS TO MAKE THAT

2   ASSESSMENT.

3   **Q.**   AND YOU REFERENCED A MARCH 25, 2020 PULMONOLOGY

4   APPOINTMENT.  DID THAT APPOINTMENT HAPPEN?

5   **A.**   NO.

6   **Q.**   NOW, IS IT POSSIBLE THAT THAT WAS -- HAD TO BE CANCELED

7   DUE TO COVID?

8   **A.**   WELL, LIKE I SAY, THERE'S TELEMEDICINE.  AND OBVIOUSLY

9   THIS IS 3/2020, IT'S RIGHT AT THE BEGINNING OF COVID.  SO, YOU

10  KNOW, I'M NOT SURE WHAT THE SITUATION WAS HERE, BUT THERE IS

11  TELEMEDICINE.

12  **Q.**   UH-HUH.

13  **A.**   AND I WOULD'VE USED IT.  AND, YOU KNOW, ADDITIONALLY, IF

14  THEY CAN'T DO THAT, YOU CAN ALWAYS GET ON THE PHONE AND CALL

15  THE PULMONOLOGIST.

16  **Q.**   DID YOU SEE ANY EVIDENCE THAT -- WHATEVER THE REASON THAT

17  IT DIDN'T HAPPEN -- THAT THEY RESCHEDULED THAT APPOINTMENT?

18  **A.**   HE DID GET A PULMONOLOGY VISIT IN DECEMBER:  12/12/20.

19  **Q.**   UH-HUH.

20  **A.**   SO, YOU KNOW, IF THAT'S THE DATE THEY RESCHEDULED IT, THAT

21  WOULD HAVE BEEN, WHAT, NINE MONTHS AWAY.

22  **Q.**   AND DID IT APPEAR THAT IT WAS RESCHEDULED AT THAT TIME, OR

23  WAS THAT SOME TIME LATER?

24  **A.**   IT'S NOT CLEAR WHETHER IT WAS RESCHEDULED OR WHETHER IT

25  WAS FROM A DIFFERENT REFERRAL.

11:46 1  **Q.**   AND THEN LET'S LOOK AT OCTOBER 27, 2020, IF WE GO TO PAGE
       2  240 OF JOINT EXHIBIT 4.
       3       HOW DID HE PRESENT ON OCTOBER 27TH?
       4  **A.**   SO THE PROVIDER WHO WROTE THE NOTE SAID THAT HE HAS
       5  OBVIOUS SHORTNESS OF BREATH AND DYSPNEA AND HE WAS WHEEZING.
       6  HE HAD A DRY HACKING COUGH FOR TWO OR THREE MONTHS, AND THEY
       7  WROTE THAT HE HAD TACHYCARDIA.
       8  **Q.**   AND IF YOU COULD TAKE DOWN THE -- AND THEN WHAT WAS HIS
       9  OXYGEN SATURATION?
      10  **A.**   WELL, IT SAID IT WAS 78 PERCENT ON ARRIVAL AND 84 PERCENT
      11  IN THE BOX ABOVE.  AND SO 78 PERCENT -- SO THIS IS
      12  10/27/20 DURING COVID, AND JUST LISTEN TO THE SYMPTOMS: HACKING
      13  COUGH, WHEEZING, SHORTNESS OF BREATH.  YES, HE HAS INTERSTITIAL
      14  LUNG DISEASE, BUT COVID IS UP THERE.  AND HE'S SENT FOR AN ATU
      15  EVALUATION FOR SHORTNESS OF BREATH AND DECREASED OXYGEN
      16  SATURATION.
      17  **Q.**   AND SO THEN IF WE LOOK AT THAT ATU EVALUATION, JOINT
      18  EXHIBIT 4 AT 342.
      19       WHAT DID THEY -- OR WHAT DID THEY ORDER FOR THE
      20  PATIENT AT THIS POINT?
      21  **A.**   SO THE NP TAKES A BRIEF HISTORY -- NOT MUCH MORE THAN WHAT
      22  WAS ALREADY ON THE OTHER SHEET -- ORDERS A BNP, WHICH IS A TEST
      23  TO SEE IF THERE IS HEART FAILURE, A CBC -- AND IF YOU CAN GO
      24  BACK TO THE REGULAR CHART.  THANK YOU -- ORDERS ANTIBIOTICS,
      25  BASICALLY ORAL DOXYCYCLINE, AND ADMITS HIM TO THE NURSING UNIT

11:49 1  WITH A DIAGNOSIS OF "RULE OUT COMMUNITY ACQUIRED PNEUMONIA,"

2  CAP, AND THAT HE HAS INTERSTITIAL LUNG DISEASE.

3  AND, I MEAN, THIS IS A LITTLE CAVALIER.  I MEAN, I

4  WOULD BE -- SOMEBODY WITH A 78 OXYGEN SATURATION IN THE TIME OF

5  COVID PROBABLY SHOULD BE HOSPITALIZED.

6  Q.   UH-HUH.

7  A.   AND I DON'T THINK THERE'S MANY PEOPLE WHO WOULD NOT HAVE

8  HOSPITALIZED HIM, GOTTEN A COVID TEST, PUT A MASK ON HIM.

9  I THINK AT ONE OF THESE -- SO THERE WERE FOUR

10  EPISODES LIKE THIS, AND I'M NOT SURE WHICH ONE IT WAS.  HE WAS

11  TESTED ONCE FOR COVID, BUT HE HAD FOUR SIMILAR EPISODES.  AND

12  THREE OF THE EPISODES HE WAS NOT TESTED; ONE OF THE EPISODES HE

13  WAS TESTED.

14  Q.   AND AT THIS ONE HE ALSO PRESENTED WITH SHORTNESS OF BREATH

15  AND COUGH TIMES TWO TO THREE MONTHS.  IS THAT RIGHT?

16  A.   RIGHT.

17  Q.   IS THAT RIGHT?

18  A.   RIGHT.

19  Q.   AND ARE THESE SYMPTOMS -- IN ADDITION TO COVID, ARE THEY

20  RELEVANT TO HIS INTERSTITIAL LUNG DISEASE?

21  A.   RIGHT.  RIGHT.  THAT'S PROBABLY INTERSTITIAL LUNG DISEASE.

22  Q.   AND IS THERE ANY EVIDENCE THAT THEY CONTACTED A

23  PULMONOLOGIST AT THIS POINT?

24  A.   NO.

25  Q.   NOW, YOU SAID BEFORE THAT HE DID FINALLY SEE THE

11:50 1 PULMONOLOGIST ON DECEMBER 2ND.  WHEN HE FINALLY STARTED SEEING

2 THE PULMONOLOGIST AGAIN, DID LSP CONSISTENTLY IMPLEMENT THE

3 PROVIDER'S RECOMMENDATIONS?

4 **A.**   NOT CONSISTENTLY, NO.

5        **MR. DUBNER:**  AND GIVE ME ONE MOMENT, YOUR HONOR.

6 **BY MR. DUBNER:**

7 **Q.**   SO LET'S LOOK AT SOME EXAMPLES OF THOSE.  IF WE GO TO PAGE

8 194 OF JOINT EXHIBIT 4.

9        SO WHEN HE SAW THE PULMONOLOGIST -- AND THIS IS SOME

10 TIME A LITTLE LATER -- I SEE A LINE THAT SAYS "CHECK AUTOIMMUNE

11 SEROLOGIES," AND THEN HAS A NUMBER OF ABBREVIATIONS.  COULD YOU

12 EXPLAIN WHAT THAT MEANS?

13 **A.**   THOSE ARE JUST BLOOD TESTS TO CHECK, TO EVALUATE WHETHER

14 THE SOURCE OF THE INTERSTITIAL FIBROSIS IS FROM AN AUTOIMMUNE

15 DISORDER.

16 **Q.**   AND DID YOU FIND ANY EVIDENCE THAT THOSE BLOOD TESTS WERE

17 EVER COMPLETED?

18 **A.**   NO, I COULDN'T FIND EVIDENCE THAT THEY WERE DONE.  THERE

19 WAS MENTION THAT THEY WERE ORDERED, BECAUSE IT SAID "WILL

20 FOLLOW."  BUT THERE IS NO EVIDENCE OF A TEST RESULT.

21        AND, MORE IMPORTANTLY, THERE'S NO EVIDENCE THAT ANY

22 OF THE PROVIDERS EVER ACKNOWLEDGED THAT THIS WAS EITHER

23 RECOMMENDED OR THAT THEY CHECKED TO SEE THAT THE TEST WAS DONE,

24 WHICH AGAIN SPEAKS TO THE FACT THAT THERE'S A DISENGAGEMENT OF

25 THE PROVIDERS AND THE SPECIALISTS.

11:52 1  **Q.** WHEN PATIENTS RETURN FROM SPECIALTY VISITS OUTSIDE OF LSP,

2  DO YOU SEE EVIDENCE THAT THEY CONSISTENTLY MEET WITH THE

3  PATIENTS AFTERWARDS?

4  **A.** THEY OFTEN SEE THE PATIENTS, BUT THERE'S NO EVIDENCE THAT

5  THEY REVIEW THE SPECIALIST'S CONSULTATION WITH THE PATIENT OR

6  EVIDENCE THAT THEY CONSISTENTLY UPDATE THE PLAN OF THE PATIENT.

7  SO, NO, THERE'S -- IT'S A DISENGAGEMENT. IT'S AS IF THE

8  SPECIALIST DOES THEIR THING AND THE PRIMARY CARE PROVIDERS DO

9  THEIR THING. BUT THE WHOLE PURPOSE OF USING A SPECIALIST IS TO

10  INTEGRATE THE SPECIALTY CARE INTO THE PRIMARY CARE OF THE

11  PATIENT.

12  **Q.** AND THEN IF WE LOOK AT PAGE 172, HERE ONE OF THE

13  SPECIALIST'S REFERRALS IS -- AND YOU WILL BE ABLE TO PRONOUNCE

14  IT BETTER THAN I WILL, SO THE LINE THAT STARTS WITH "START" AND

15  THEN A DRUG BEGINNING WITH "M."

16  **A.** MYCOPHENOLATE.

17  **Q.** AND WHAT IS MYCOPHENOLATE?

18  **A.** IT'S ALSO CALLED CELLCEPT, AND IT'S A DRUG USED FOR

19  AUTOIMMUNE CONDITIONS.

20  **Q.** AND THIS ENCOUNTER WAS ON JULY 7, 2021. IF WE LOOK AT

21  PAGE 25 OF JOINT EXHIBIT 4, WHEN DOES IT APPEAR THAT THE

22  CELLCEPT WAS STARTED?

23  **A.** IT LOOKS LIKE THE 23RD.

24  **Q.** SO MORE THAN TWO WEEKS LATER?

25  **A.** RIGHT.

11:53 1   **Q.**   SO WHILE HE WAS -- BOTH BEFORE AND AFTER HE WAS GETTING

2   THIS TREATMENT, HOW DID PROVIDERS REACT WHEN HIS INTERSTITIAL

3   LUNG DISEASE FLARED UP?

4   **A.**   SO HE HAD FOUR EPISODES WHERE HE HAD WHAT I WOULD CONSIDER

5   SERIOUS EXACERBATION OF HIS INTERSTITIAL LUNG DISEASE WITH

6   SYMPTOMS OF SHORTNESS OF BREATH AND LOW OXYGEN SATURATIONS.

7           AS I SAID, ON ONE OF THE OCCASIONS THEY DID TEST FOR

8   COVID, BUT BECAUSE OF THE NATURE OF THE SYMPTOMS, ON ALL OF

9   THOSE EVALUATIONS HE SHOULD HAVE BEEN TESTED FOR COVID.  HE

10   SHOULD HAVE BEEN MASKED, ISOLATED.  AND HE WAS SEEN IN ATUS, HE

11   WAS ADMITTED TO THE INFIRMARY ON MULTIPLE OCCASIONS, BUT ON NO

12   OCCASION DID THEY REFER TO A PULMONOLOGIST, ON NO OCCASION DID

13   THEY CALL A PULMONOLOGIST.  ON MOST OF THE OCCASIONS HE WOULD

14   HAVE BEEN A CANDIDATE TO ADMIT TO A HOSPITAL BECAUSE THE OXYGEN

15   SATURATION WAS LOW.

16           FOR COVID WE WERE USING 92 AS KIND OF A BASELINE FOR

17   ADMISSION TO A HOSPITAL OR TO SEE A PROVIDER, TO SEE A DOCTOR.

18   AND SO THIS GUY HAD LIKE 88, 78, AND THOSE KINDS OF OXYGEN

19   SATURATIONS, PARTICULARLY AT THE TIME OF COVID, SOMEBODY WITH

20   INTERSTITIAL NEPHRITIS -- I MEAN, SHOULD HAVE BEEN, YOU KNOW,

21   SENT TO A HOSPITAL.  AND -- BUT HE WAS SENT TO INFIRMARIES, AND

22   THERE WAS JUST NO INTEGRATION WITH HIS SPECIALTY CARE AT ALL.

23   **Q.**   SO LET'S LOOK AT A COUPLE OF THESE.  IF WE GO TO

24   JANUARY 19, 2021, WHICH IS -- I'M SORRY -- PAGE 295.

25           AND SO IF WE COULD BLOW UP THE CHIEF COMPLAINT.

11:55 1  WHAT HAPPENED ON THIS OCCASION?

2  **A.**   SO THIS ONE IS A LITTLE STRANGE AND -- BECAUSE OF THE

3  DATES.  BUT HE WENT TO THE ATU WITH A LOW OXYGEN SATURATION,

4  85 PERCENT, AND HE HAD SHORTNESS OF BREATH AND COUGH AND

5  WHEEZING ON EXPIRATION.  AND HE HAD BEEN ON TWO LITERS OF

6  OXYGEN.  AND HIS OXYGEN -- IT SAID, "PATIENT'S O2" -- THE LAST

7  LINE OF THAT -- THE SECOND TO LAST LINE SAYS, "PATIENT'S O2 RAN

8  OUT IN" -- IT LOOKS LIKE "EN ROUTE TO THE HOSPITAL AND CRACKLES

9  NOTED ON AUSCULTATION."

10        SO HE ACTUALLY SAW A PULMONOLOGIST.  THE

11  PULMONOLOGIST NOTE WAS DOCUMENTED 1/20, AND THIS IS DOCUMENTED

12  1/19.  SO IT APPEARED THAT HE WAS ON HIS WAY TO SEE THE

13  PULMONOLOGIST.  AND IT APPEARS THAT HE HAD COME BACK FROM THE

14  PULMONOLOGIST AND THIS HAD OCCURRED, BUT IT'S UNCLEAR.

15  BUT IN ANY CASE, HE HAS AN EXACERBATION OF HIS LUNG DISEASE.

16  **Q.**   AND IS THERE ANY MENTION OF HIS INTERSTITIAL LUNG DISEASE

17  ON THIS CHART?

18  **A.**   NO.  IT SAYS THAT HE HAS A HISTORY OF COPD, WHICH IS JUST

19  NOT ACCURATE.  I MEAN, HE HAS INTERSTITIAL LUNG DISEASE, WHICH

20  IS A DIFFERENT CONDITION.

21  **Q.**   AND, YEAH, JUST VERY BRIEFLY, WHAT'S THE DIFFERENCE

22  BETWEEN INTERSTITIAL LUNG DISEASE AND CHRONIC OBSTRUCTIVE

23  PULMONARY DISEASE?

24  **A.**   THEY'RE JUST DIFFERENT.  I MEAN, INTERSTITIAL LUNG DISEASE

25  IS KIND OF A FIBROTIC -- AND IN THIS CASE THEY WEREN'T SURE OF

11:57 1    THE ETIOLOGY OF IT.  BUT CHRONIC OBSTRUCTIVE LUNG DISEASE IS

2    EMPHYSEMA.  HE JUST DID NOT HAVE THAT.  AND SO IF HE HAD GONE

3    TO THE PULMONOLOGIST -- IT'S NOT MENTIONED HERE.  IF HE DIDN'T

4    GO TO THE PULMONOLOGIST BUT HE WAS ON ROUTE, THERE WAS NO

5    MENTION OF IT.  THERE WAS NO MENTION OF HIS INTERSTITIAL LUNG

6    DISEASE.

7         AND BY THE WAY, IF DURING THE TIME -- THIS IS IN

8    JANUARY OF 2021.  EVEN AT THAT TIME, GIVEN COVID, HE SHOULD

9    HAVE BEEN MASKED, ISOLATED, AND THEY SHOULD HAVE CALLED A

10    PULMONOLOGIST IF THEY REALIZED THAT HE HAD INTERSTITIAL LUNG

11    DISEASE.  BUT NONE OF THAT HAPPENED.

12    **Q.**    BUT AS YOU SAID, HE DID SEE THE PULMONOLOGIST THE NEXT

13    DAY?

14    **A.**    HE DID.  IT APPEARS THAT'S THE NEXT DAY.  I'M NOT SURE IF

15    THERE'S A PROBLEM WITH THE DATES, BUT IT'S NOT CLEAR.

16    **Q.**    BUT -- SO ASSUMING THE DATES ARE CORRECT, HE SEES THE

17    PULMONOLOGIST ON JANUARY 20TH, THE NEXT DAY.  IS THERE ANY

18    EVIDENCE THAT THE PULMONOLOGIST KNEW ABOUT HIS CONDITION IN

19    THAT ENCOUNTER THE PREVIOUS DAY?

20    **A.**    NO.

21    **Q.**    WHAT DOES THE PULMONOLOGIST DOCUMENT THE OXYGEN SATURATION

22    TO BE?

23    **A.**    I DON'T KNOW WHERE IT IS HERE, BUT I THINK IT WAS BETTER

24    WHATEVER IT WAS.  IT WAS VIRTUALLY NORMAL.

25    **Q.**    IT MAY BE THE NEXT PAGE THAT HAS THE OXYGEN SATURATION.

1  **A.**   YEAH.

2  **Q.**   NO.  SORRY.  PAGE -- NO, THAT WOULD BE THE NEXT PAGE.

3         SO YOU SAID THIS NOTE DOCUMENTS THAT IT'S VIRTUALLY

4  NORMAL OXYGEN SATURATION.  AND IF WE -- AND SOON AFTER THIS

5  PULMONOLOGIST APPOINTMENT, WHAT DOES THE PATIENT PRESENT WITH?

6         LET'S GO TO PAGE 292.

7  **A.**   JUST BY THE WAY, YOU CAN SEE THE PULMONOLOGIST IN THE TOP,

8  IT SAYS, "MEDICAL DECISION MAKING:  INTERSTITIAL LUNG DISEASE,

9  RESTRICTIVE LUNG DEFECT."  THERE'S NO COPD HERE.  SO WHERE THAT

10 CAME FROM, I'M NOT SURE.  BUT GO AHEAD WITH YOUR QUESTION.  I'M

11 SORRY.

12 **Q.**   SO, YEAH, IF WE GO TO PAGE 292.

13        SOON AFTER THIS PULMONOLOGIST APPOINTMENT, WHAT DOES

14 HE PRESENT WITH?

15 **A.**   SO THIS IS 1/21.  SO THIS IS APPARENTLY THE DAY AFTER, AND

16 HE'S AGAIN SEEN IN A -- IT APPEARS TO BE A SELF-DECLARED

17 EMERGENCY.  HIS OXYGEN SATURATION IS 80 PERCENT.

18 **Q.**   AND IT LOOKS LIKE HE'S COMPLAINING OF FEET SWOLLEN?

19 **A.**   FEET SWOLLEN, RIGHT.

20 **Q.**   AND IS THAT SIGNIFICANT IN INTERSTITIAL LUNG DISEASE?

21 **A.**   WELL, IN THIS CASE -- SO HE HAD PULMONARY HYPERTENSION AND

22 HE PROBABLY HAD RIGHT HEART FAILURE.  AND RIGHT HEART FAILURE

23 CAN LEAD TO EDEMA.  VERY SIMILAR TO LEFT HEART FAILURE.  SO

24 IT'S A -- IT COULD BE A SYMPTOM OF HEART FAILURE.

25 **Q.**   AND DOES THE -- WHAT'S THE DISPOSITION ON THIS

12:00 1  SELF-DECLARED EMERGENCY?

2  **A.**   "KEEP FOLLOW UP," WHATEVER THAT MEANS.  I'M NOT SURE WHAT

3  THAT MEANS.  BUT THE PATIENT HAS A -- NOW HE'S ON TWO LITERS OF

4  OXYGEN.  SO A OXYGEN SATURATION OF 80 PERCENT ON OXYGEN IS

5  DISTURBING, AND I THINK THEY SHOULD HAVE CONSIDERED SOMETHING.

6  **Q.**   AND, YEAH, I DON'T THINK I ASKED THIS BEFORE.  SOMETHING I

7  SHOULD HAVE ASKED.  IS THERE LIKE A REFERENCE RANGE FOR OXYGEN

8  SATURATION, OR JUST WHAT ARE THE SORT OF THRESHOLDS?

9  **A.**   WELL, LIKE I SAY, GENERALLY IN THE VICINITY OF 92 TO 94

10  YOU WOULD WORRY A LITTLE BIT.  AND PEOPLE WITH COPD -- PEOPLE

11  SOMETIMES SHOOT FOR AN OXYGEN SATURATION ABOVE 90, BUT IF YOU

12  ARE BELOW 90, IT'S OF CONCERN.  AND IN SOMEONE WITH A SERIOUS

13  DISEASE, YOU WOULD START TO CONSIDER WHETHER THEY NEED

14  HOSPITALIZATION.  AND IN SOME CASES IT MAY BE THAT HIS

15  INTERSTITIAL LUNG DISEASE IS JUST GOING TO MEAN HE'S GOING TO

16  HAVE LOW OXYGEN SATURATIONS.  BUT HE'S NOT HAD ENOUGH

17  EVALUATIONS TO MAKE DETERMINATIONS LIKE THAT.

18  **Q.**   AND IF WE LOOK AT THE HEALTH CARE PRACTITIONER NOTES, WHEN

19  WAS IT SIGNED?

20  **A.**   IT LOOKS LIKE 1/25.

21  **Q.**   SO FOUR DAYS --

22  **A.**   RIGHT.  AFTER AN EPISODE WHERE THE OXYGEN SATURATION IS

23  80.

24  **Q.**   AND THEN IS THERE ANY EVIDENCE THAT THIS WAS DISCUSSED

25  WITH A PULMONOLOGIST?

1  **A.**   NO.

2  **Q.**   AND THEN -- SO HE -- IF WE GO TO PAGE 279, HE DID HAVE A

3  GENERAL MEDICINE APPOINTMENT SCHEDULED FOR FEBRUARY 1ST.  DID

4  THAT APPOINTMENT OCCUR?

5  **A.**   NO.

6  **Q.**   AND WHAT WAS THE -- HOW LONG DID THEY WAIT TO RESCHEDULE

7  IT?

8  **A.**   A MONTH.

9  **Q.**   AND IN THAT TIME, AGAIN THEY DIDN'T DISCUSS THESE SYMPTOMS

10  WITH A PULMONOLOGIST.  IS THAT CORRECT?

11  **A.**   NO.

12  **Q.**   NOW, IF WE GO TO MARCH 2021, HE DID SEE A CARDIOLOGIST

13  THEN.  IS THAT CORRECT?

14  **A.**   HE DID SEE A CARDIOLOGIST, YEAH.  I THINK IT WAS 3/25, IF

15  I'M NOT MISTAKEN -- 3/23.

16  **Q.**   SO, YES, IF WE GO TO PAGE 272, HE HAD AN ECHOCARDIOGRAM.

17  WHAT DID THAT ECHOCARDIOGRAM SHOW?

18  **A.**   SO IF YOU LOOK TO THE AREA THAT'S CIRCLED IN THE REPORT,

19  IT'S BASICALLY -- IT SHOWS THAT HE HAS PULMONARY HYPERTENSION.

20  SO THE SYSTOLIC PRESSURE IS SEVERELY ELEVATED AT 83.  SO HE HAS

21  PULMONARY HYPERTENSION, AND THAT'S WHAT IT SHOWED.

22  **Q.**   AND SO THEN IF WE GO TO PAGE 273, A GENERAL MEDICINE

23  CLINIC FIVE DAYS LATER.  WAS THERE ANY RECOGNITION OF THE

24  ECHOCARDIOGRAM OR THE PULMONARY HYPERTENSION?

25  **A.**   YES.  SO THIS IS AN IMPORTANT DOCUMENT.  NO. 1, THE OXYGEN

12:04 1  SATURATION -- AGAIN ON ROOM AIR -- IS 84 PERCENT, WHICH IS

2  EXTREMELY LOW.  AND THE PROVIDER NOTES THAT THE PATIENT WENT TO

3  THE CARDIOLOGIST, BUT THERE'S NO REVIEW OF THE CARDIOLOGY NOTE,

4  WHICH WAS BASICALLY AN ECHOCARDIOGRAM.  SO THE REPORT IS NOT

5  REVIEWED OR NOT DOCUMENTED AS REVIEWED.  AND, YOU KNOW, THE

6  PROVIDER DOES DOCUMENT THAT THE PATIENT HAS INTERSTITIAL LUNG

7  DISEASE AND THAT THE PATIENT HAS A 20-POUND WEIGHT LOSS.

8  AND THERE WAS SOME CONCERN ABOUT WHETHER THE PATIENT

9  WAS ACTUALLY RECEIVING THE OXYGEN.  THERE SEEMS TO BE PROBLEMS

10  WITH THE OXYGEN.  THE NURSE CALLED FOR AN O2 TANK TO BE

11  DELIVERED, AND HE WAS ASSISTED BACK TO HIS DORM AND PLACED ON

12  AN OXYGEN CONCENTRATOR.  BUT THERE'S NO DISCUSSION OF THE

13  ECHOCARDIOGRAM, AND THERE'S NO DISCUSSION OF THE STATUS OF HIS

14  INTERSTITIAL LUNG DISEASE OR WHAT THE PLAN IS OF THE

15  PULMONOLOGIST.

16  YOU'LL NOTE IN ALMOST ALL OF THESE PROVIDER NOTES AT

17  LSP THAT THEY'RE NOT INTEGRATING THEIR PLAN WITH WHAT THE

18  PULMONOLOGIST IS RECOMMENDING.  SO THERE'S A DISCONNECT.

19  **Q.**   SO LET'S LOOK AT THE LAST GENERAL MEDICINE ENCOUNTER

20  BEFORE HIS DEATH, IF WE GO TO PAGE 165.

21  ON AUGUST 11, 2021 HE'S SEEN IN THE GENERAL MEDICINE

22  CLINIC.  COULD YOU TELL US WHAT CONCERNS YOU HAVE ABOUT THIS

23  VISIT?

24  **A.**   SO THE OXYGEN SATURATION IS 75 PERCENT.  THAT'S REALLY

25  LOW.  WITH O2 ON, THAT'S VERY LOW, AND I -- IN MY OPINION, I

12:05 1 WOULD SEND THAT PATIENT TO THE HOSPITAL.  HE DOES SAY -- THE

2 PROVIDER DOES SAY THAT -- IF YOU CAN EXPAND IT A LITTLE.  IN

3 THE FOURTH LINE, HE SAID THAT THE OXYGEN SATURATION IMPROVED TO

4 92 TO 93 PERCENT, AND HE SAYS HE FEELS GREAT SINCE BEING

5 DISCHARGED FROM THE WARD.

6          THE PROBLEM HERE IS THAT THERE'S WIDE VARIANCE IN THE

7 OXYGEN SATURATION, AND YOU WONDER WHETHER THE PATIENT WAS

8 ACTUALLY APPROPRIATELY USING THE OXYGEN, WHETHER THE -- WHETHER

9 IT IS -- WHETHER HE WAS USING NASAL PRONGS, WHETHER THEY FIT.

10 BUT THERE WAS NO CONSIDERATION OF THAT, AND -- BUT 75 PERCENT

11 IS A DISTURBING NUMBER.

12          **MR. DUBNER:**  AND I THINK WE'RE DONE WITH THIS

13 PATIENT, SO IF THE COURT THINKS THIS WOULD BE THE TIME FOR

14 LUNCH.

15          **THE COURT:**  YES, THIS IS A GOOD TIME.  THIS IS A GOOD

16 TIME TO BREAK FOR LUNCH.

17          WE WILL BE IN RECESS UNTIL 1:30.

18          **THE LAW CLERK:**  ALL RISE.

19          THE COURT IS AT RECESS.

20          **(WHEREUPON, THE COURT WAS IN RECESS.)**

21          **THE COURT:**  BE SEATED.

22          YOU MAY CONTINUE.

23 **BY MR. DUBNER:**

24 **Q.**   GOOD AFTERNOON, DR. PUISIS.

25 **A.**   GOOD AFTERNOON.

01:33 1    **Q.**   BEFORE WE WRAP UP ON SPECIALTY CARE, I JUST WANT TO

2    CORRECT A MISTAKE I MADE.  WHEN I SHOWED YOU -- WE TALKED ABOUT

3    SOME MORTALITY REVIEWS FOR PATIENTS BEFORE.  ONE OF THEM I

4    ACCIDENTALLY SHOWED YOU THE WRONG DOCUMENT.  I SHOWED YOU A

5    STANDARDIZED DEATH REPORT INSTEAD OF THE DEATH SUMMARY.

6    IF WE COULD PULL THAT UP, PLAINTIFFS' EXHIBIT 8A_1192 AND 1193.

7            IF YOU WILL RECALL, JUST BRIEFLY, THIS IS A PATIENT

8    WHO YOU TESTIFIED HAD SEVERAL APPARENT TRANSIENT ISCHEMIC

9    ATTACKS LEADING UP TO A STROKE AND HIS DEATH IN MARCH 2021.

10   TO REASK MY QUESTION NOW THAT I'M SHOWING YOU THE RIGHT

11   DOCUMENT, IS THERE ANY MENTION HERE OF THE PREVIOUS INCIDENTS

12   OF POTENTIAL TRANSIENT ISCHEMIC ATTACKS THAT WERE NOT

13   ADDRESSED, NOT RESULTING IN REFERRALS?

14   **A.**   NO.

15   **Q.**   YOU CAN TAKE THAT DOWN.  THANK YOU.

16           SO TO WRAP THINGS UP ON SPECIALTY CARE, YOU SPOKE

17   ABOUT FIVE OF THE PARTIES IN YOUR SAMPLE.  ARE THERE

18   SIGNIFICANT ERRORS IN ALL OF THE CHARTS THAT YOU LOOKED AT?

19   **A.**   YES.

20   **Q.**   WERE THERE ILLUSTRATIONS OF DEFICIENCIES THAT WOULD

21   POTENTIALLY EXPOSE PEOPLE TO SERIOUS RISK OF HARM?

22   **A.**   WELL, IN SOME CASES THEY RESULTED IN DEATH.

23   **Q.**   AND EVEN WHERE THEY DIDN'T RESULT IN DEATH, WERE THEY THE

24   KIND OF ERRORS THAT EITHER RESULTED IN NON-FATAL HARM OR COULD

25   HAVE RESULTED IN SERIOUS HARM?

01:35 1    A.    THEY WERE ALL SERIOUS, YES.

2    Q.    AND DID YOU FIND THAT TRUE THROUGHOUT THE RELEVANT PERIOD?

3    A.    I THINK THE PROCESS WAS THE SAME.  AND WHETHER IT WAS A

4    SERIOUS MISTAKE OR NOT A SERIOUS MISTAKE WAS, IN PART, RELATIVE

5    TO THE CONDITION OF THE PATIENT.

6    Q.    AND THIS WAS TRUE BEFORE COVID, DURING THE WORST OF COVID,

7    AND AFTER THE WORST OF COVID?

8    A.    YES.

9    Q.    IN THE COURT'S LIABILITY OPINION, THE COURT FOUND FAILURE

10    TO PROVIDE ACCESS TO MEDICALLY NECESSARY SPECIALTY CARE IN A

11    TIMELY MANNER, FAILED TO SCHEDULE AND TRACK APPOINTMENTS,

12    FAILURE TO COMPLY WITH TESTING AND DIAGNOSTIC REQUIREMENTS,

13    FAILURE TO EXECUTE APPROPRIATE FOLLOW-UP CARE ORDERED BY

14    SPECIAL CARE PROVIDERS, AND FAILURE TO COORDINATE CARE.  DID

15    YOU FIND THAT ALL OF THOSE PROBLEMS PERSIST TODAY?

16    A.    YES.

17    Q.    NOW, BEFORE WE GET TO WHAT STEPS YOU CONCLUDED ARE

18    NECESSARY TO ELIMINATE THAT SERIOUS RISK TO PATIENTS, I'D LIKE

19    TO TALK ABOUT THE ADMINISTRATIVE PRACTICES YOU LOOKED AT.  YOU

20    LOOKED AT HEALTH CARE ORGANIZATION, CREDENTIALING, PEER REVIEW,

21    AND MORTALITY REVIEW.  IS THAT CORRECT?

22    A.    CORRECT.

23    Q.    NOW, WHY DID YOU LOOK AT LSP'S ADMINISTRATIVE PRACTICES?

24    A.    WELL, THE WAY A SYSTEM IS DESIGNED IS IMPORTANT.  THERE IS

25    A SAYING THAT EVERY SYSTEM IS PERFECTLY DESIGNED TO GET THE

01:36 1  RESULTS IT GETS.  AND IF YOU USE THAT KIND OF AS A FRAMEWORK,

2  YOU CAN LOOK AT LSP AND THE SYSTEM GETS THE RESULTS IT DOES

3  BECAUSE IT'S POORLY DESIGNED, AND THAT'S A FUNCTION OF

4  ORGANIZATION AND LEADERSHIP.  AND THAT'S ONE OF THE PROBLEMS.

5  SO THEY ARE -- YOU KNOW, PART OF OUR RECOMMENDATIONS

6  WERE THAT, YOU KNOW, THEY HAVE POLICIES, THAT THEY INCREASE

7  STAFFING, ET CETERA.  BUT THEY ARE RELATED TO THE SYSTEM

8  DESIGN.  WHO WOULD DESIGN A SYSTEM WHERE OFFICERS GIVE

9  MEDICATION?  WHO WOULD DESIGN A SYSTEM WHERE, YOU KNOW, YOU

10  HAVE ONE PHYSICIAN WORKING IN A FACILITY AND UNABLE TO

11  SUPERVISE THE NURSE PRACTITIONERS?  SO ALL OF THOSE DESIGN

12  ISSUES ARE RELATED AND IT -- THE DESIGN INCLUDES HAVING A PLAN.

13  THERE IS NO GOOD PLAN.

14  WITH RESPECT TO HOW TO CORRECT IT, IF YOU ARE -- WITH

15  RESPECT TO REMEDIES, IF PEOPLE ARE INTERESTED IN THAT, AN

16  IMPLEMENTATION PLAN WOULD BE ONE AVENUE TO DO THAT.  AND THAT

17  PLAN SHOULD INCLUDE, AS WE SAY IN THE RECOMMENDATIONS,

18  STAFFING.  IT SHOULD INCLUDE ANALYSIS OF STAFFING.  IT SHOULD

19  INCLUDE A -- YOU KNOW, A CREDENTIALING PROCESS.  IT SHOULD

20  INCLUDE HAVING POLICIES THAT DETERMINE WHAT PROCEDURES ARE

21  DONE, AND IT SHOULD INCLUDE A WAY TO ENSURE THAT THE POLICIES

22  THAT ARE DEVELOPED ARE SUPPORTED WITH EQUIPMENT, SUPPLIES THAT

23  ARE NECESSARY TO CARRY OUT THOSE POLICIES.

24  SO THAT IS HOW A SYSTEM IS DESIGNED, AND THAT IS WHY

25  LOOKING AT THE ORGANIZATIONAL STRUCTURE IS IMPORTANT; BECAUSE

01:38 1   IT WILL DETERMINE HOW, YOU KNOW, THE PROCESSES WORK.

2 **Q.** IN YOUR EXPERIENCE, IS IT POSSIBLE TO FIX MEDICAL CARE AT

3 A FACILITY, WHETHER WE'RE TALKING ABOUT SPECIALTY CARE OR OTHER

4 ELEMENTS, WITHOUT ADDRESSING STRUCTURAL AND ADMINISTRATIVE

5 ISSUES?

6 **A.** I THINK NOT. YOU COULD HAVE A SYSTEM WITH GOOD

7 PHYSICIANS, AS AN EXAMPLE, AND STILL BE A POORLY FUNCTIONING

8 SYSTEM, BUT THE DESIGN IS CRITICAL.

9 **Q.** SO LET'S NOW START LOOKING AT THAT DESIGN. SO FIRST LET'S

10 TALK ABOUT THE ORGANIZATION OF THE HEALTH CARE AT LSP. WHAT,

11 BRIEFLY SPEAKING, DID YOU FIND WHEN YOU LOOKED AT HEALTH CARE

12 ORGANIZATION IN THE LIABILITY PHASE?

13 **A.** IT WAS -- AND YOU'RE TALKING ABOUT 2016?

14 **Q.** UH-HUH.

15 **A.** YEAH. IT WAS -- THE DEPUTY WARDEN WAS IN CHARGE OF

16 MEDICAL AND DR. LAVESPERE REPORTED TO HER. THERE WAS -- SHE

17 WAS THE HEALTH AUTHORITY, THE BEST I COULD TELL. THERE WAS NO

18 KNOWN BUDGET FOR MEDICAL. I THINK DR. LAVESPERE TESTIFIED THAT

19 HE DIDN'T KNOW WHAT THE BUDGET WAS AND THAT THE LEGISLATURE

20 GAVE HIM A BUDGET AND HE ACCEPTED IT.

21       AND SO THE PROGRAM IS DESIGNED -- WAS -- IT WAS AN AD

22 HOC -- IT APPEARED TO BE AN AD HOC PROGRAM IN THE MANAGEMENT OF

23 CUSTODY WITHOUT A MEDICAL PERSPECTIVE --

24 **Q.** AND --

25 **A.** -- WITHOUT KNOWING WHAT THE BUDGET WAS. AND SO THEY WOULD

01:40 1  USE OFFICERS TO PASS MEDS AND INMATES TO PROVIDE CARE IN THE

2  INFIRMARY.

3  **Q.**   AND WHAT, IF ANY, SIGNIFICANT CHANGES HAVE BEEN MADE SINCE

4  THEN?

5  **A.**   WELL, I MEAN, I THINK IT'S SIGNIFICANT THAT THEY APPOINTED

6  MR. JACOB JOHNSON TO BE AN ADMINISTRATOR.   THAT'S VERY GOOD AND

7  I APPLAUD THEM FOR THAT.   THE PROBLEM WITH THAT IS THAT HE

8  DOESN'T APPEAR TO BE IN CONTROL.

9           AND THE TABLE OF ORGANIZATION IS STRUCTURED SO THAT

10  IT SHOWS THAT ALMOST EVERY DEPARTMENT REPORTS TO DR. TOCE, SO

11  THE ORGANIZATIONAL STRUCTURE.   AND, IN FACT, IN TESTIMONY, I

12  THINK THE DEPOSITIONS, THEY SAID THAT DR. TOCE SUPERVISES

13  PHARMACY, HE SUPERVISES MENTAL HEALTH, HE SUPERVISES NURSING,

14  HE SUPERVISES THE LABORATORY, RADIOLOGY, PHARMACY, AND DR.

15  JOHNSON SUPERVISES HIM.   IT WASN'T REALLY CLEAR WHETHER DR.

16  JOHNSON WAS REALLY IN CONTROL OF THE ORGANIZATION.   SO THAT

17  NEEDS TO BE CLARIFIED.

18           THERE SHOULD BE A SINGLE LEADER WHO IS THE HEALTH

19  AUTHORITY WHO IS IN CHARGE OF MANAGING THE PROGRAM, AND THE

20  PROGRAM SHOULD BE MANAGED MEDICALLY.   SO -- AND I'M GUESSING

21  HERE, BUT APPROXIMATELY 20 PERCENT OF THE STAFF ACTUALLY REPORT

22  TO CUSTODY.   THE OFFICERS WHO PASS MEDICATIONS, AND THE MEDICS,

23  THE WHOLE MEDIC DEPARTMENT, THOSE ARE CUSTODY POSITIONS.   SO

24  YOU HAVE A SIGNIFICANT PORTION OF THE STAFF WHO HAVE CUSTODY

25  SUPERVISION, AND THAT'S INAPPROPRIATE.

01:42 1          SO THE DESIGN OF THE SYSTEM SHOULD BE SO THAT A

2     MEDICAL PERSON IS IN CHARGE OF THE ENTIRE MEDICAL PROGRAM AND

3     DESIGNS THE PROGRAM CONSISTENT WITH STANDARD MEDICAL

4     PROCEDURES.  AND THAT'S NOT OCCURRING.  IT DIDN'T OCCUR IN THE

5     LIABILITY PHASE AND IT DOESN'T OCCUR NOW.

6     **Q.**   AND SO YOU TALKED A LITTLE BIT ABOUT DR. TOCE AND HIS

7     RESPONSIBILITY AS MEDICAL DIRECTOR.  WHAT CONCERNS DO YOU HAVE

8     IN THE WAY THAT THE -- THE CURRENT ROLE OF THE MEDICAL DIRECTOR

9     AT LSP?

10    **A.**   WELL, THE SPAN OF CONTROL FOR HIM IS TOO LARGE.  SO HE --

11    AND HE ADMITS IT.  HE STATES THAT HE IS -- HE WOULD -- HE'S NOT

12    ABLE TO SUPERVISE THE NURSE PRACTITIONERS AS HE WOULD LIKE.  HE

13    DOESN'T HAVE ENOUGH TIME TO SUPERVISE THEM.  HE HAS TOO MANY

14    ADMINISTRATIVE RESPONSIBILITIES FOR HIM TO SUPERVISE LAB,

15    PHARMACY, MENTAL HEALTH, DENTAL, NURSING.  IT'S JUST NOT

16    POSSIBLE TO DO THAT AND BE A MEDICAL DIRECTOR.  AND IT'S NOT

17    CLEAR WHAT MR. JOHNSON'S ROLE IS.  AND ALSO, THERE'S A PARALLEL

18    ADMINISTRATIVE PROCESS.

19          SO DR. TOCE -- AND REMEMBER HE'S THE ONLY PHYSICIAN.

20    THEY'VE REDUCED THE NUMBER OF PHYSICIANS FROM FOUR TO ONE, AND

21    THEY'VE INCREASED THE NURSE PRACTITIONERS.

22          AND I THINK THAT'S -- IT'S GOOD TO HAVE NURSE

23    PRACTITIONERS.  I DON'T WANT TO SAY THAT THAT'S A BAD THING.

24    IT'S A GOOD THING, AND THEY'RE VERY HELPFUL.  BUT THEY NEED

25    MORE PHYSICIANS.  AND DR. TOCE IS UNABLE TO PROVIDE THAT ALONE

01:44 1 AND TO DO THE ADMINISTRATIVE RESPONSIBILITIES THAT HE IS
2 RESPONSIBLE FOR, AND THAT PROBABLY SHOWS IN THE OUTCOME.
3 AND SO THE DESIGN OF THE SYSTEM IS NOT WELL DONE.  IT
4 SHOULD BE DESIGNED SO THAT THERE ARE SUFFICIENT STAFF AND
5 THAT'S A DEFINITE DEFICIENCY.
6 **Q.**  AND WHY IS IT -- YOU SAID THAT THE -- YOU KNOW, THE
7 ADDITION OF ADDITIONAL NURSE PRACTITIONERS IS A GOOD THING BUT
8 THEY NEED MORE PHYSICIANS.  WHY IS IT THAT NURSE PRACTITIONERS
9 ON THEIR OWN WITH ONE PHYSICIAN AS MEDICAL DIRECTOR POSES
10 CONCERNS IN YOUR MIND?
11 **A.**  WELL, THE STATE LICENSING BOARD HAS RULES.  THEIR RULES
12 ARE THAT EVERY NURSE PRACTITIONER HAVE A COLLABORATIVE
13 AGREEMENT WITH A PHYSICIAN FOR SUPERVISION.  AND SO SUPERVISION
14 IS A KEY FUNCTION IN THE DESIGN OF THE STATE SYSTEM, AND IT
15 SHOULD BE AT LSP AS WELL.  SO THERE SHOULD BE A REASONABLE
16 RATIO, AND, YOU KNOW -- AND PHYSICIANS SHOULDN'T BE SUPERVISING
17 SEVEN NURSE PRACTITIONERS -- OR THEY COULD.  BUT WITH ALL THE
18 OTHER RESPONSIBILITIES, IT'S JUST NOT POSSIBLE TO SUPERVISE
19 THEM.
20 AND WHY IS THAT IMPORTANT?  BECAUSE I THINK
21 PHYSICIANS HAVE MORE TRAINING THAN A NURSE PRACTITIONER.  I
22 MEAN, IT'S AS SIMPLE AS THAT.  THEY HAVE MORE EXPERIENCE
23 GENERALLY AND BETTER TRAINING; AND THEREFORE, ON AVERAGE THE
24 CALIBER OF CARE IS SUPERIOR, AND THEY'RE ABLE TO SUPERVISE AND
25 THEY SHOULD.

01:45 1   **Q.**   AND WHAT DOES SUPERVISION -- WHAT SHOULD SUPERVISION LOOK

2   LIKE FOR A COLLABORATIVE PRACTICE AGREEMENT AND A PHYSICIAN WHO

3   IS SUPERVISING A NURSE PRACTITIONER?

4   **A.**   WELL, IT SHOULD INCLUDE COUNSELING, WHEN NECESSARY.  SO,

5   FOR EXAMPLE, THE -- ALL THE EXAMPLES THAT I GAVE TODAY, IF

6   THOSE WERE NURSE PRACTITIONERS SEEING THE PATIENTS, IF THERE'S

7   A MORNING HUDDLE, A PHYSICIAN COULD LOOK AT THAT AND SAY, YOU

8   KNOW, "WHY DIDN'T YOU ASK ABOUT THIS?  THE PATIENT ACTUALLY HAS

9   THIS DISEASE AND YOU SHOULD BE ASKING QUESTIONS, HISTORY

10   RELATED TO THAT PROBLEM, AND YOU DIDN'T DO IT.  YOU SHOULD TRY

11   TO DO IT.  HERE'S WHAT YOU SHOULD ASK FOR.  HERE'S WHERE YOU

12   CAN READ SOMETHING ABOUT IT.  HERE'S WHAT YOU CAN DO."

13   SO THERE SHOULD BE A BACK-AND-FORTH CONTACT AND EVALUATION.

14         PHYSICIANS CAN ALSO REVIEW CHARTS OF PEOPLE WHO GO

15   OFF SITE, LOOK AT THEM, IDENTIFY THE SAME KIND OF PROBLEMS THAT

16   I JUST SPOKE OF AND BRING IT UP WITH THE NURSE PRACTITIONERS

17   AND TALK TO THEM, AND THAT'S HOW IT WOULD WORK.

18   **Q.**   AND UNDERSTANDING THAT YOU WEREN'T ABLE TO VIEW THE

19   MORNING MEETINGS, BASED ON YOUR REVIEW OF THE CHARTS, DOES IT

20   APPEAR THAT WHATEVER HAPPENS IN THOSE MORNING MEETINGS HAS BEEN

21   ADEQUATE TO ENSURE THAT THAT KIND OF COMMUNICATION GOES ON?

22   **A.**   I MEAN, IT'S NOT POSSIBLE TO TELL ACTUALLY, BUT IT DOESN'T

23   APPEAR TO BE.  AND MORNING MEETINGS ARE A GREAT THING.  WE

24   DIDN'T GET A CHANCE TO LOOK AT WHAT THEY DO, BUT IT'S HARD TO

25   IMAGINE SOME OF THE THINGS HAPPENING.  IF THEY WERE HAVING

01:47  1  MEANINGFUL MORNING MEETINGS, IT'S HARD TO BELIEVE THAT THEY
2  WOULD ACTUALLY OCCUR AS THEY DID.
3  **Q.**   AND HOW DID THESE DEFICIENTS IN ORGANIZATION AND
4  LEADERSHIP THAT YOU'VE DISCUSSED AFFECT THE RISK TO PATIENTS?
5  **A.**   I'M SORRY.  CAN YOU SAY THAT AGAIN?
6  **Q.**   YES.  HOW DO THESE DEFICITS IN ORGANIZATION AND LEADERSHIP
7  THAT YOU'VE DISCUSSED AFFECT THE RISK TO PATIENTS?
8  **A.**   WELL, LIKE I SAID, EVERY SYSTEM IS PERFECTLY DESIGNED TO
9  GET THE RESULTS IT GETS.  SO IF THE SYSTEM IS DESIGNED POORLY,
10  THEN YOU'RE GOING TO GET A BAD RESULT.  AND IN THE CASE OF
11  MEDICAL CARE, IT CAN RESULT IN RISK TO PATIENTS, IT CAN RESULT
12  IN DEATH.  AND SO THERE ARE MISTAKES, AND THOSE MISTAKES ARE A
13  RESULT OF THE WAY THE SYSTEM HAS BEEN DESIGNED.
14  **Q.**   AND LET'S TALK ABOUT PEER REVIEW.  LET'S TALK ABOUT PEER
15  REVIEW WHILE WE'RE TALKING ABOUT SUPERVISION.
16  **A.**   SURE.
17  **Q.**   WHAT PROBLEMS HAVE YOU FOUND WITH LSP'S PEER REVIEW?
18  **A.**   THE PEER REVIEW CHANGED MINIMALLY SINCE THE LAST VISIT,
19  AND THE BIG CHANGE WAS THEY REVIEW MORE RECORDS.  SO THEY
20  REVIEW EITHER TEN CHARTS OR ONE PERCENT OF THE POPULATION,
21  WHICHEVER IS GREATER.  HOWEVER, THAT THE PEER REVIEW -- THE
22  LAST PEER REVIEW THAT WAS DONE, WHICH WAS I THINK A YEAR AGO,
23  USED THE OLD METHOD.  SO IT USED TEN RECORD REVIEWS.  SO WE
24  HAVE NOT SEEN A PEER REVIEW THAT INCLUDES THE NEW METHOD,
25  NO. 1; AND, TWO, WE HAVE -- THE PEER REVIEW DOCUMENTATION THAT

01:49 1 THEY GAVE US WAS JUST THE SCORING.  IT DID NOT INCLUDE THE DATA

2 THAT THEY USED TO DEVELOP THEIR SCORE.  SO WE COULD NOT

3 ACTUALLY EVALUATE THE CALIBER, THE QUALITY OF THE PEER REVIEW.

4 WE JUST SAW THEIR SCORES.

5 **Q.** AND SO LET'S FIRST LOOK -- SO IF WE COULD LOOK AT DX_18,

6 WHICH IS PAGE 1 FOR NOW.  SO IF YOU LOOK AT THIS, IN THE TOP

7 RIGHT, IS THIS THE MOST RECENT PEER REVIEW AT LSP?

8 **A.** YES.

9 **Q.** AND WHAT WAS THE DATE OF THIS?

10 **A.** OCTOBER 23, 2020.

11 **Q.** NOW, BEFORE WE GO INTO THIS, LET'S ALSO LOOK AT

12 PLAINTIFFS' EXHIBIT 19I AT PAGE 1.

13   AND SO IS THIS THE POLICY MAKING THAT CHANGE TO ONE

14 PERCENT OF THE RECORDS THAT YOU MENTIONED?  IT'S NOT ON THAT

15 PAGE, SO WE MAY HAVE TO --

16 **A.** YEAH, I DON'T SEE IT HERE.

17 **Q.** BUT IS THIS THE PEER REVIEW POLICY?

18 **A.** YES.  THIS IS THE PEER REVIEW POLICY, CORRECT.

19 **Q.** AND WHEN DID THIS GO INTO EFFECT?

20 **A.** JULY 12, 2020.

21 **Q.** SO THAT WAS BEFORE LSP'S MOST RECENT PEER REVIEW?

22 **A.** CORRECT.

23 **Q.** BUT THEY DIDN'T FOLLOW THE CHANGE IN THE NUMBER OF CHARTS

24 FOR THAT PEER REVIEW.  IS THAT CORRECT?

25 **A.** NO.

01:50 1    **Q.**   OKAY.  SO LET'S RETURN TO DEFENDANTS' EXHIBIT 18, AND WE

2    WILL START AT PAGE 3.

3          SO LOOKING THROUGH THIS REVIEW, IF YOU COULD TALK TO

4    US ABOUT WHAT SHORTCOMINGS YOU SEE.  AND, YOU KNOW, JUST LET

5    MS. LESNICK KNOW WHEN YOU WANT TO MOVE TO THE NEXT PAGE.

6    **A.**   I MEAN, SO IT'S A YES/NO QUESTION.  THE DATA IS NOT SHOWN,

7    SO YOU DON'T SEE THE RECORD THAT'S ACTUALLY REVIEWED, SO YOU

8    DON'T KNOW WHAT THEY'RE ACTUALLY REVIEWING.  AND IT'S A SERIES

9    OF YES/NO QUESTIONS.  IT'S THE SAME AS THE LAST VISIT.  SOME OF

10   THE QUESTIONS ARE NOT CLEAR.  "THE FACILITY PLAN IS BEING

11   FOLLOWED," I'M NOT SURE WHAT THAT MEANS.  DOES THAT MEAN THAT

12   THERE'S A GUIDELINE AND THEY'RE FOLLOWING IT?  I'M NOT SURE

13   WHAT "FACILITY PLAN" MEANS.

14         AND WHAT WAS REMARKABLE TO ME IN OUR OWN REVIEWS --

15   WE DID REVIEWS -- THEY SCORED LIKE 88 -- I THINK A CERTAIN

16   PERCENT -- I THINK IT WAS AROUND NINE OR TEN PERCENT WERE NOT

17   APPLICABLE, SO THE QUESTION WAS NOT APPLICABLE TO THE

18   PARTICULAR CHART THEY WERE LOOKING AT.

19         SO IF YOU EXCLUDE THE NON-APPLICABLES, LIKE

20   88 PERCENT OF THE ANSWERS WERE "YES."  SO CARE WAS LIKE

21   GENERALLY FOUND TO BE OUTSTANDING, AND IT'S JUST NOT WHAT WE

22   FOUND WHEN WE LOOKED AT RECORDS.  YOU COULD FIND DEFICIENCIES

23   IF YOU'RE LOOKING.

24         SO WITH RESPECT TO THE PURPOSE OF THE PEER REVIEW, IF

25   IT'S TO IMPROVE CARE, YOU WANT TO IDENTIFY THINGS THAT ARE

01:52  1   AREAS WHERE PEOPLE CAN IMPROVE.  AND WHEN YOU DON'T DO THAT,

2   YOU -- YOU KNOW, YOU'RE GIVING YOURSELF A GOOD SCORE.

3          THE PURPOSE OF THE TEST IS NOT TO SCORE WELL.  THE

4   PURPOSE OF THE TEST IS TO SEE HOW YOU'RE ACTUALLY DOING.  AND

5   IN THAT RESPECT, THIS TYPE OF REVIEW DOES NOT REALLY -- IS NOT

6   SATISFACTORY.

7   Q.   AND IF WE COULD PULL UP DEFENDANTS' EXHIBIT 18 AT PAGE 8.

8          WHILE WE'RE PULLING THAT UP, ASSUMING THAT LSP DOES

9   FOLLOW THE NEW POLICY IN THE FUTURE, WILL THAT SOLVE THE

10  PROBLEMS THAT YOU'RE TALKING ABOUT NOW?

11  A.   I'M SORRY.  CAN YOU REPEAT THAT?

12  Q.   YES.  ASSUMING THAT LSP DOES FOLLOW THE JULY 2020 POLICY

13  IN THE FUTURE AND EXPANDS THE NUMBER OF CHARTS THAT THEY ARE

14  REVIEWING, WILL THAT SOLVE THE PROBLEMS THAT YOU ARE DISCUSSING

15  NOW?

16  A.   I DON'T THINK IT WILL.  AND FURTHERMORE, ONE OF THE

17  CRITICISMS WE HAD IN THE PRIOR REPORT AND IN THIS REPORT IS

18  THAT INDIVIDUAL PROVIDERS ARE NOT EVALUATED.  NOW, THERE IS A

19  WAY TO DO THAT, BUT THEY DON'T SHOW HOW THEY ARE GOING TO DO

20  THAT.  AND IN SOME WAY THEY NEED TO ENSURE THAT EVERY

21  INDIVIDUAL PROVIDER HAS A PEER REVIEW, AND THAT'S NOT

22  DEMONSTRATED.

23  Q.   AND IF WE LOOK AT DX_18 AT PAGE 8, YOU SAID THAT THERE

24  WERE ONLY A COUPLE PLACES WHERE THEY FOUND THAT SOMETHING DID

25  NOT SATISFY THE CRITERIA OF THE PEER REVIEW.  I SEE DOWN HERE

01:54 1  AT THE BOTTOM THERE'S A "NO" CHECKED FOR -- OR CIRCLED -- FOR

2  "LAB TEST REPORTS ARE SIGNED, DATED AND REVIEWED TIMELY"?

3  **A.**  RIGHT.

4  **Q.**  IS THAT THE ONLY KIND OF -- IS THAT THE ONLY BOX THAT WAS

5  EVER CHECKED "NO" IN YOUR REVIEW?

6  **A.**  THAT'S THE MOST COMMON DEFICIENCY IDENTIFIED.  BUT AS WE

7  -- IN OUR DISCUSSION TODAY WHEN WE LOOKED AT RECORDS, YOU COULD

8  SEE THE RECORD -- AS I WENT THROUGH -- AND ON MULTIPLE

9  OCCASIONS PATIENTS DID NOT HAVE A HISTORY; THEY DID NOT HAVE A

10  PHYSICAL EXAM; THE RECORD REVIEW FROM THE CONSULTANT WAS NOT

11  REVIEWED; THE RECOMMENDATIONS OF THE CONSULTANT WERE NOT

12  CONSIDERED; SIGNIFICANT SYMPTOMS THAT WERE ATTRIBUTABLE TO THE

13  PATIENTS' SERIOUS MEDICAL CONDITIONS WERE NOT ADDRESSED.  AND

14  SO THOSE ARE THE KINDS OF THINGS THAT NEED TO BE REVIEWED AND

15  DISCUSSED SO THAT THEY ARE NOT REPEATED OVER AND OVER.

16  **Q.**  AND IS IT -- TO YOUR RECOLLECTION, WERE ANY OF THE OTHER

17  CRITERIA THAT THEY LOOKED AT IN THE PEER REVIEW EVER CHECKED

18  "NO" OTHER THAN THIS LAB REPORT ONE?

19  **A.**  IT MAY HAVE BEEN ONE OR TWO, BUT NOT MUCH, NO.  LIKE I

20  SAID, IT WAS A TEST OF PROVING THAT YOU'RE A HUNDRED PERCENT

21  COMPLIANT, AND THAT'S NOT THE PURPOSE OF THIS TEST.

22  **Q.**  RIGHT.

23  **A.**  RIGHT.

24  **Q.**  AND IS IT POSSIBLE -- YOU SAID MAYBE ONE OR TWO.  IS IT

25  POSSIBLE THAT IT WAS ZERO?

01:55 1  **A.**   IT MAY BE, YEAH.

2  **Q.**   OKAY.  AND HOW DID THE SHORTCOMINGS IN LSP'S EXTERNAL PEER

3  REVIEW AFFECT THE RISK OF SERIOUS HARM TO PATIENTS?

4  **A.**   WELL, IF YOU DON'T CORRECT IT, YOU KEEP PERFORMING IN THE

5  SAME MANNER; AND IF YOU KEEP PERFORMING IN THE SAME MANNER, YOU

6  GET THE SAME RISK AND THE SAME MORBIDITY AND MORTALITY.

7  **Q.**   AND ONE QUESTION BEFORE WE CLOSE ON EXTERNAL PEER REVIEW.

8  IF WE COULD GO BACK TO PAGE 1 OF THIS DOCUMENT, DX_18.

9        WHO WAS THE REVIEWER WHO REVIEWED LSP IN ITS MOST

10  RECENT PEER REVIEW?

11  **A.**   JONATHAN ROUNDTREE.

12  **Q.**   ARE YOU AWARE OF WHO JONATHAN ROUNDTREE'S EMPLOYER IS?

13  **A.**   I THINK HE WORKS -- HE WORKS FOR THE STATE OF LOUISIANA.

14  HE'S ONE OF THE DOCTORS, I THINK.

15  **Q.**   AND WAS HE PREVIOUSLY A MEDICAL DIRECTOR AT LSP?

16  **A.**   I THINK HE WAS, YES.

17  **Q.**   AND NOW LET'S TALK ABOUT INTERNAL PEER REVIEW.  HOW ARE

18  MEDICAL PERSONNEL FORMALLY EVALUATED AT LSP?

19  **A.**   WELL, ACCORDING TO DR. LAVESPERE IN HIS DEPOSITION, THERE

20  IS TWO WAYS TO REVIEW.  THERE'S AN INTERNAL REVIEW AND AN

21  EXTERNAL REVIEW.  THE EXTERNAL REVIEW WE JUST WENT OVER.

22  THE INTERNAL REVIEW IS A CIVIL SERVICE REVIEW THAT IS DONE ON

23  ALL EMPLOYEES, REGARDLESS OF POSITION.  BUT IT'S A CIVIL

24  SERVICE REVIEW.  IT'S NOT A CLINICAL REVIEW.  SO IT REALLY

25  SHOULDN'T BE USED AS A CLINICAL PEER REVIEW FOR PROVIDERS.

01:57 1   IT'S A CIVIL SERVICE REVIEW FOR GENERAL TOPICS RELATED TO
2   EMPLOYMENT.
3   **Q.**   IS THE CIVIL SERVICE REVIEW SPECIFIC TO MEDICAL PERSONNEL
4   IN ANY WAY?
5   **A.**   NO.  NO.
6   **Q.**   AND IS THERE ANY FORMAL METHOD AT LSP OF EVALUATING
7   INDIVIDUAL MEDICAL PERSONNEL'S CLINICAL PERFORMANCE?
8   **A.**   EXCEPT FOR THE EXTERNAL PEER REVIEW, NO.
9   **Q.**   AND DOES THE EXTERNAL PEER REVIEW REVIEW SPECIFIC
10   PROVIDERS?
11   **A.**   NO.
12   **Q.**   AND IN THE CIVIL SERVICE REVIEW, WHO EVALUATES EMTS?
13   **A.**   WELL, THE EMT SUPERVISOR, I THINK, DOES THE -- ALL THE
14   EMTS, AND I'M NOT SURE WHO DOES THE EMT SUPERVISOR'S REVIEW,
15   BUT IT'S NOT A -- I DON'T BELIEVE IT'S A MEDICAL PERSON.  I
16   THINK IT MIGHT BE THE -- ONE OF THE DEPUTY WARDENS, BUT I'M NOT
17   SURE ON THAT.
18   **Q.**   AND WHO EVALUATES THE CORRECTIONAL OFFICERS WHO ADMINISTER
19   MEDICATION?
20   **A.**   IT'S CORRECTIONAL OFFICERS, I THINK.
21   **Q.**   IS THAT A PROBLEM?
22   **A.**   IT'S A DEFINITE PROBLEM.
23   **Q.**   WHY IS THAT?
24   **A.**   WELL, I MEAN, READING A REPORT, THE ERRORS MADE IN
25   MEDICATION ADMINISTRATION NEED TO BE CORRECTED.  IF YOU DON'T

01:58 1  HAVE AN EVALUATION THAT EVALUATES THAT, YOU'RE NOT GOING TO

2  CORRECT IT.  YOU'RE PUTTING YOUR HEAD IN THE SAND, AND THERE

3  NEEDS TO BE A WAY TO EVALUATE PEOPLE CLINICALLY, AND IT'S JUST

4  NOT DONE.

5  **Q.**  AND HOW DO THE SHORTCOMINGS IN LSP'S INTERNAL PEER REVIEW

6  AFFECT THE RISK OF SERIOUS HARM TO PATIENTS?

7  **A.**  WELL, YOU'RE NOT PICKING UP ERRORS, SO YOU CONTINUE TO

8  MAKE THE SAME ERRORS YOU MAKE OVER AND OVER AND OVER.

9  **Q.**  AND LET'S TALK BRIEFLY ABOUT CREDENTIALING.

10  WHAT PROBLEMS DO YOU FIND WITH LSP'S CREDENTIALING AT

11  THE LIABILITY PHASE?

12  **A.**  THE PROBLEMS WERE THAT THEY -- THE ONLY REQUIREMENT TO

13  WORK IS A LICENSE, AND YOU HAVE TO PROVE YOU'RE ALIVE AND THAT

14  YOU HAVE A LICENSE.  AND PEOPLE WHO WORK IN MEDICINE --

15  PHYSICIANS SHOULD BE CREDENTIALED BASED ON WHAT THEY ARE

16  EXPECTED TO DO.

17  FOR EXAMPLE, IF I'M GOING TO DELIVER BABIES, MY

18  CREDENTIAL EVALUATION WOULD INCLUDE WHETHER I HAD TRAINING IN

19  OBSTETRICS, GYNECOLOGY RESIDENCY, WHETHER I COMPLETED A

20  RESIDENCY, WHETHER I HAD EXPERIENCE AND TRAINING.  AND IT WOULD

21  LOOK AT MY CHARACTER AND SEE IF I HAD ANY FELONIES, IF I HAD

22  LITIGATION, LAWSUITS, IF I MADE MISTAKES IN THE PAST, ET

23  CETERA.  BUT YOU HAVE TO SHOW THAT YOU'RE CAPABLE OF PERFORMING

24  THOSE SERVICES FOR WHICH YOU ARE GOING TO BE ASSIGNED.

25  AND HERE THE ONLY THING YOU HAVE TO SHOW IS A

02:00 1   LICENSE.  SO YOU COULD BE AN ANESTHESIOLOGIST AND NOT REALLY

2   KNOW ANYTHING ABOUT PRIMARY CARE AND -- BUT GET CREDENTIALED TO

3   PROVIDE PRIMARY CARE, AND I THINK THAT'S A PROBLEM.  AND I

4   THINK IT'S A FUNDAMENTAL PROBLEM.  AND SO THAT WAS EXISTING

5   BACK IN 2016 AND IT EXISTS TODAY.

6           AS DR. LAVESPERE SAID, THE ONLY REQUIREMENT -- HE

7   SAYS, WE HAVEN'T DONE ANYTHING IN CREDENTIALING AND IT'S THE

8   SAME AS IT WAS AND THERE'S NO CHANGE.  AND, IN FACT, HE SAID IN

9   HIS DEPOSITION THAT REALLY THE STATE BOARD CREDENTIALS OUR

10   PHYSICIANS, WHICH IS JUST -- I THINK IT'S AN ERRONEOUS

11   STATEMENT.  THE STATE BOARD SHOULDN'T CREDENTIAL YOUR

12   PHYSICIANS.  THEY GIVE THEM A LICENSE, BUT YOU'RE THE ONE

13   RESPONSIBLE FOR CREDENTIALING.

14   Q.   AND LET'S GO TO SOME OF THAT DEPOSITION TESTIMONY.

15           IF WE COULD SEE JOINT EXHIBIT 69A AT 213.

16           AND FIRST CAN YOU READ THE LINE STARTING AT -- THE

17   TWO SENTENCES ON LINES 8 THROUGH 10?

18   A.   OH.  "SO CREDENTIALING IS THE SAME.  THERE WASN'T ANYTHING

19   WRONG WITH OUR CREDENTIALING."

20   Q.   YOU SAID THAT HE TESTIFIED THAT THE MEDICAL BOARD

21   CREDENTIALS THE PROVIDERS.  COULD YOU READ THE NEXT SENTENCE?

22   A.   "ALL OUR CREDENTIALING, WHEN WE HAD PROVIDERS THAT HAD

23   INDIVIDUAL LICENSES, WE ALWAYS HAD TO GO THROUGH THE MEDICAL

24   BOARD TO CREDENTIAL THEM ANYWAY, AND WE HAD TO GO THROUGH THE

25   MONITORING BOARD."

02:02 1   **Q.**   AND SO THERE IS ONE OTHER SENTENCE THAT DR. LAVESPERE SAYS

2   HERE THAT I WANT TO DRAW YOUR ATTENTION TO.  STARTING AT LINE

3   5, HE SAYS, "SO THE BIGGEST CHANGE IS, I THINK, THE FILING AND

4   THE FILES ON EACH OF THE PROVIDERS HAVE BEEN UPDATED TO INCLUDE

5   ALL OF THEIR INFORMATION."

6         IS THAT WHAT YOU FOUND WHEN YOU REVIEWED THE

7   CREDENTIALING FILES?

8   **A.**   WELL, IT WAS IMPROVED.  THERE'S NO QUESTION IT WAS

9   IMPROVED, BUT THERE WERE STILL SOME FILING ERRORS.  THERE WERE,

10   I THINK, SEVERAL NURSES WHO HAD AN EXPIRED LICENSE.  I CHECKED

11   ONLINE.  THEY ACTUALLY HAD AN ACTIVE LICENSE, BUT IT WASN'T IN

12   THE FILE.  SO, YOU KNOW, THERE WERE THOSE MINOR THINGS.

13         THERE WERE, I THINK, EIGHT PHYSICIAN FILES IN THERE

14   AND MOSTLY BASICALLY JUST VERIFICATION OF LICENSE.  BUT THERE'S

15   ONLY ONE PHYSICIAN AT LSP, SO THESE OTHER PHYSICIANS WERE NO

16   LONGER WORKING THERE; THE FILES WERE STILL THERE.  AND, YOU

17   KNOW, IT WAS JUST DISORGANIZED.

18         THE OTHER THING IS THAT NONE OF THE SPECIALISTS HAVE

19   ANY INFORMATION IN THE CREDENTIALING FILE EVEN WHEN THEY WORK

20   FOR LSP, SO I THINK THAT'S A PROBLEM.

21   **Q.**   AND ARE YOU REFERRING TO THE ONSITE SPECIALISTS?

22   **A.**   THE ONSITE SPECIALISTS, CORRECT.

23   **Q.**   AND WHAT OTHER -- WHAT SORT OF INFORMATION WAS MISSING

24   FROM THE CREDENTIALING FILES THAT YOU WOULD EXPECT TO SEE AND

25   THAT YOU BELIEVE NEEDS TO BE THERE?

02:03 1  **A.**  WELL, YOU WOULD EXPECT TO SEE, FOR EXAMPLE, A NATIONAL

2  PRACTITIONER DATA BANK.  A NATIONAL PRACTITIONER DATA BANK IS A

3  FEDERAL AGENCY THAT TRACKS ANY LITIGATION THAT WAS AGAINST THE

4  PROVIDER, ANY CHANGE IN PRIVILEGES.

5  SO, FOR EXAMPLE, IF A HOSPITAL REDUCED PRIVILEGES OF

6  SOMEONE, THAT WOULD BE IN THE FILE, AND THAT NATIONAL

7  PRACTITIONER DATA BANK SHOULD BE REVIEWED BECAUSE IT GIVES

8  INFORMATION ABOUT ANY ISSUES WITH THE PROVIDER AND LOSS OF

9  PRIVILEGES.

10  THEY SHOULD DO PRIMARY VERIFICATION OF THEIR LICENSE,

11  OF THEIR TRAINING.  AND PRIMARY SOURCE VERIFICATION IS -- THEY

12  SHOULD SEEK, FOR EXAMPLE, THE DOCUMENT THAT VERIFIES THAT THEY

13  COMPLETED MEDICAL SCHOOL, THAT THEY COMPLETED A RESIDENCY; IF

14  THEY DID, THAT THEY COMPLETED -- HAVE BOARD CERTIFICATIONS.  SO

15  IT SHOULD INCLUDE THOSE DOCUMENTS.  THAT'S WHAT "PRIMARY

16  SOURCE" MEANS.  IT SHOULD INCLUDE A REVIEW OF WHETHER THEY HAVE

17  ANY FELONIES.  IT SHOULD INCLUDE AN ATTESTATION THAT THEY HAVE

18  NO PHYSICAL OR MENTAL DISABILITIES THAT MAY IMPAIR THEIR

19  ABILITY TO PRACTICE MEDICINE.  AND SO ALL OF THOSE THINGS

20  SHOULD BE LOOKED AT AND EVALUATED.

21  **Q.**  AND YOU REFERRED TO SOME OF THEIR ERRORS YOU SAW AS FILING

22  ERRORS.  ON THE WHOLE, ARE THE KINDS OF OMISSIONS YOU'VE SEEN,

23  INFORMATION YOU DON'T SEE -- IS THAT SORT OF A SUBSTANTIAL

24  CONCERN TO YOU?

25  **A.**  WELL, THE ONLY THING THEY HAVE IS THE LICENSE, SO THEY

02:05 1    HAVE VERIFICATION THAT SOMEONE HAS A LICENSE.  THAT'S ALL THEY

2    HAVE.  AND I JUST THINK AS A CREDENTIAL FILE THAT'S INADEQUATE;

3    THAT THEY SHOULD VERIFY THAT IF THEY'RE GOING TO DO PRIMARY

4    CARE MEDICINE, THAT THEY HAVE QUALIFICATION TO DO THAT.

5    **Q.**    AND IT SOUNDS LIKE THERE ARE TWO KINDS OF PROBLEMS:  THE

6    FILING PROBLEM AS WELL AS THE PROBLEM OF CREDENTIALING AT ALL

7    AND CREDENTIALING PEOPLE TO WORK IN THE PARTICULAR AREAS WITH

8    THE EXAMPLE YOU GAVE OF DELIVERING A BABY?

9    **A.**    THAT'S CORRECT.

10    **Q.**    AND DO YOU FIND THAT LATER PROBLEM, THE FIRST ONE YOU

11    TALKED ABOUT, TO BE A SERIOUS PROBLEM?

12    **A.**    THE LATER PART WAS, AGAIN?

13    **Q.**    YEAH, SORRY, A CONFUSING QUESTION.

14    THE ABSENCE OF A CREDENTIALING PROCESS WHERE THEY

15    CREDENTIAL SOMEBODY TO PERFORM THE KINDS OF SERVICES THEY ARE

16    PERFORMING, DO YOU FIND THAT TO BE A SIGNIFICANT PROBLEM?

17    **A.**    I THINK IT IS.  I MEAN, LOOK, RIGHT NOW THEY HAVE ONE

18    PHYSICIAN, AND SO YOU DON'T SEE WHAT THE EFFECTS MIGHT BE.  BUT

19    THEY SHOULD HAVE A PROCESS WHERE THEY VERIFY THAT PEOPLE WHO

20    ARE GOING TO WORK AT LSP HAVE PRIMARY CARE TRAINING.  AND I

21    WOULD CONSIDER THAT THEY HAVE SOME RESIDENCY TRAINING IN A

22    PRIMARY CARE FIELD.

23    **Q.**    AND HOW DOES THE LACK OF AN ADEQUATE CREDENTIALING PROCESS

24    INCREASE THE RISK TO PATIENTS?

25    **A.**    WELL, I MEAN, IT'S PROVEN THAT -- FOR EXAMPLE, IT'S PROVEN

02:06 1   THAT -- THERE WAS A CASE THAT I AM FAMILIAR WITH IN CALIFORNIA

2   WHERE BEFORE A STRICT CREDENTIALING PROCESS WAS PUT IN PLACE,

3   THE MORTALITY RATE WAS MUCH HIGHER.  SO AFTER THEY STARTED A

4   CREDENTIALING PROCESS THAT REQUIRED PRIMARY CARE TRAINING,

5   AFTER THEY DID THAT, THE MORTALITY RATE ACTUALLY DECREASED, AND

6   THAT WAS SIGNIFICANT.

7          TO ME IT WAS -- IT'S THE ONLY STUDY I'VE SEEN ON IT,

8   AND THAT'S IN A CORRECTIONAL SYSTEM.  SO IT WAS THE CALIFORNIA

9   SYSTEM.  BUT IT'S A STUNNING EXAMPLE OF THE EFFECT OF

10   CREDENTIALING ON MORTALITY IN A SYSTEM.

11   Q.   AND WHY DOES PROPER CREDENTIALING HAVE THAT EFFECT?

12   A.   LIKE I SAY, IF YOU TOOK AN OBSTETRICIAN OR AN

13   ANESTHESIOLOGIST AND ASKED THEM TO DO PRIMARY CARE, THEY'RE

14   GOING TO MAKE MISTAKES.  AND IF YOU ASK A PRIMARY CARE DOCTOR

15   TO DO SURGERY OR TO DELIVER BABIES, THEY'RE GOING TO MAKE

16   MISTAKES, AND THAT'S WHAT HAPPENS.

17   Q.   LET'S MOVE OVER TO MORTALITY REVIEW.

18          YOU EXPLAINED THIS IN YOUR TESTIMONY IN THE LIABILITY

19   TRIAL, BUT BRIEFLY, WHAT SHOULD A MORTALITY REVIEW ENTAIL?

20   A.   SO I THINK THE BIG PICTURE FOR MORTALITY REVIEW IS IT HAS

21   TO BE A CRITICAL REVIEW TO IDENTIFY DEFICIENCIES AND THEN, FROM

22   THOSE DEFICIENCIES, TO IDENTIFY OPPORTUNITIES TO IMPROVE THEM.

23   AND THAT'S REALLY THE BOTTOM LINE.

24          NOW, THERE'S A LOT OF WAYS YOU COULD STRUCTURE IT.

25   YOU HAVE TO DO A NARRATIVE.  YOU HAVE TO INCLUDE CERTAIN

02:08 1  INFORMATION.  YOU HAVE TO GET AN AUTOPSY REPORT.  THOSE DETAILS

2  ARE IMPORTANT.  BUT THE OVERRIDING FACTOR IS THAT YOU MUST DO A

3  CRITICAL REVIEW, AN HONEST REVIEW, TO IDENTIFY YOUR PROBLEMS.

4  BECAUSE IF YOU DON'T IDENTIFY YOUR PROBLEMS, YOU'LL NEVER FIX

5  THEM.

6  **Q.**   AND HOW DOES IT AFFECT MEDICAL CARE WHEN A SYSTEM DOESN'T

7  ENGAGE IN A MORTALITY REVIEW THAT INCLUDES A CRITICAL REVIEW TO

8  LOOK FOR PROBLEMS?

9  **A.**   YOU GENERALLY KEEP REPEATING THE MISTAKES OVER AND OVER

10  AND OVER.

11  **Q.**   AND DID YOU REVIEW LSP'S MORTALITY REVIEWS IN THE REMEDIAL

12  PHASE?

13  **A.**   YES.

14  **Q.**   AND DID THEY HAVE THE SAME PROBLEMS THAT YOU FOUND IN THE

15  LIABILITY PHASE?

16  **A.**   THERE'S VIRTUALLY NO CRITICAL ANALYSIS AT ALL.

17  **Q.**   WHAT PROBLEMS DID YOU SEE IN THE MORTALITY REVIEWS AT THIS

18  STAGE?

19  **A.**   WELL, NO. 1, THERE'S NO CRITICAL ANALYSIS, SO THERE'S NO

20  CRITICAL REVIEW; THERE'S NO IDENTIFICATION OF THE DEFICIENCIES.

21  AND TO A CERTAIN EXTENT, ON SEVERAL OF THE RECORDS -- I MEAN,

22  THE MORTALITY REVIEW REPORTS THAT I SAW, IT WAS ACTUALLY, YOU

23  KNOW, KIND OF JUDGMENTAL STATEMENTS ABOUT PATIENTS BEING

24  MANIPULATIVE OR COMPLAINERS OR, YOU KNOW, NON-COMPLIANT WITH

25  THIS, NON-COMPLIANT WITH THAT.

02:09  1        AND IT APPEARED TO ME THAT IT WAS THE OVERRIDING

2    CONCERN OF THE REVIEWER.  INSTEAD OF LOOKING INTERNALLY AT WHAT

3    DID WE DO, WHAT CAN WE DO BETTER, IT WAS LOOKING AT THE PATIENT

4    AS IF IT WAS THE PATIENT'S PROBLEM, AND THAT'S JUST A COMMENT.

5    IT'S NOT IN ALL OF THESE, BY ANY MEANS, BUT IT IS PRESENT.

6    **Q.**    AND EVEN WHEN YOU DIDN'T SEE THAT SORT OF

7    BLAMING-THE-PATIENT ATTITUDE, DID YOU SEE ANY EXAMINATION OF

8    AREAS FOR IMPROVEMENT OR POTENTIAL MISTAKES THAT WERE MADE?

9    **A.**    I DIDN'T SEE ANY, NO.

10   **Q.**    WOULD THESE MORTALITY REVIEWS ALLOW LSP TO IDENTIFY

11   PROBLEMS IN PATIENT CARE AND REDUCE THE RISK OF SERIOUS HARM TO

12   PATIENTS?

13   **A.**    SURE.  YES.

14   **Q.**    LET ME REPHRASE.

15        THE ONES THAT LSP IS DOING NOW?

16   **A.**    OH, I DON'T THINK THE ONES THEY DO NOW WOULD BE HELPFUL AT

17   ALL.  I DON'T THINK THEY ADD -- I DON'T THINK THEY ADD

18   ANYTHING, NO.

19   **Q.**    NOW, IN 2021 LSP STARTING HOLDING MORTALITY REVIEW

20   MEETINGS.  IS THAT CORRECT?

21   **A.**    THAT'S CORRECT.

22   **Q.**    DID YOU REVIEW THE MINUTES OF THOSE MEETINGS?

23   **A.**    I DID.

24   **Q.**    LET'S PULL SOME OF THOSE UP.

25        IF WE COULD GO TO PLAINTIFFS' EXHIBIT 9.  AND THIS IS

02:11 1  SEALED.

2            SO IS THIS AN EXAMPLE OF ONE OF THE SEPTEMBER --

3  EXCUSE ME -- THE MORTALITY REVIEW MEETING MINUTES FOR THE

4  SEPTEMBER 2021 DEATHS?

5  **A.**   YES.

6  **Q.**   AND WHAT CONCERNS DO YOU HAVE ABOUT WHAT THESE MINUTES

7  REFLECT?

8  **A.**   WELL, LIKE I SAY, IT'S KIND OF AN ANNOUNCEMENT LIKE "FOUND

9  DEAD IN BED" OR -- AND IT HAS MINIMAL BACKGROUND.  LIKE NO. 3,

10  "HYPERTENSION, HIGH BLOOD LIPIDS, PERIPHERAL VASCULAR DISEASE,

11  LUNG CANCER, CACHEXIA, DEATH, 9/20/21."  IT DOESN'T TELL YOU

12  ANYTHING.  IT JUST MAKES -- IT'S KIND OF AN ANNOUNCEMENT THAT

13  THEY DIED.  IT'S A STATEMENT.  BUT IT'S NOT A CRITICAL ANALYSIS

14  AT ALL.

15            I WOULD COMMENT.  LOOK AT NO. 1:  JUST TO PROLONG

16  NON-COMPLIANCE WITH DIET, EXERCISE.  I MEAN, I'M SURE THERE'S

17  MORE IN THIS PERSON'S CASE, WHOEVER THIS IS, BUT IT'S JUST THE

18  WAY THEY ARE.  THEY'RE VERY SHORT.  THEY HAVE VERY LITTLE

19  DETAIL.  THERE'S NO CRITICAL ANALYSIS.

20  **Q.**   AND AFTER YOUR EXPERT REPORT, DID YOU RECEIVE ADDITIONAL

21  MORTALITY REVIEW MEETING MINUTES FROM THE PAST FEW MONTHS?

22  **A.**   I DID, YES.

23  **Q.**   AND DID THEY LARGELY HAVE THE SAME SHORTCOMINGS?

24  **A.**   THEY'RE THE SAME, BASICALLY.

25  **Q.**   IF WE PULL UP DEFENDANTS' EXHIBIT 4A -- THIS IS -- WHICH

02:12 1  IS, AGAIN, SEALED.  THANK YOU -- AND GO TO PAGE 6.

2  **A.**   WELL, HOLD ON.  BEFORE YOU GO, I JUST WANT TO MAKE A

3  COMMENT.

4        SO ON THE FIRST PATIENT, THE SECOND BULLET IS

5  INTERESTING TO ME.  IT'S THE WARDEN WHO PROPOSES "THERAPY COULD

6  HAVE BEEN CHANGED TO INSULIN."  WHAT'S THE WARDEN TALKING ABOUT

7  WHETHER THE PATIENT SHOULD GET INSULIN?  THAT'S A MEDICAL

8  DECISION.  AND I DON'T KNOW THE CONTEXT, BECAUSE THE CONTEXT

9  ISN'T GIVEN, BUT IT -- I AM APPRECIATIVE OF THE WARDEN

10  PARTICIPATING IN MORTALITY REVIEW.  IT'S A GOOD THING.  IT'S A

11  VERY GOOD THING.  BUT THE DISCUSSION OF CHANGING INSULIN IS NOT

12  SOMETHING THAT IS UNDER THE PURVIEW OF THE WARDEN.

13  **Q.**   YES.  IF WE LOOK AT THESE MEETING MINUTES, IS THERE

14  SLIGHTLY MORE DISCUSSION OF POTENTIAL CHANGES THEY CAN MAKE

15  THAN THE ONE WE LOOKED AT JUST NOW FROM SEPTEMBER?

16  **A.**   YES, A LITTLE BIT MORE.  SO, I MEAN, BULLET 3 THEY TALKED

17  ABOUT -- I MEAN, AGAIN, IT'S THE WARDEN LEADING THE DISCUSSION.

18  I'M VERY HAPPY THE WARDEN IS INVOLVED, BUT IT DOES SHOW A LACK

19  OF CLINICAL LEADERSHIP WHEN THE WARDEN IS LEADING A DISCUSSION

20  ON DIETARY CHANGES THAT CAN BE MADE AND INSULIN CHANGES.  AND

21  IT -- YOU KNOW, IT'S JUST -- IT'S A CONCERN.  YOU DON'T KNOW

22  THE CONTEXT BECAUSE VERY LITTLE IS WRITTEN, BUT THERE IS A, YOU

23  KNOW, LITTLE BIT MORE THAN THERE WAS BEFORE.  THEY TALK ABOUT

24  DIETARY, WHICH IS GOOD.

25  **Q.**   AND IF YOU LOOK AT THE DATE OF THIS, IT'S DATED MARCH 15,

02:14 1   2022. IS THAT CORRECT?

2   **A.**   RIGHT.

3   **Q.**   IS IT YOUR UNDERSTANDING THAT THAT WAS WHILE DOCUMENT

4   DISCOVERY WAS STILL GOING ON IN THIS CASE?

5   **A.**   I THINK, YES. THAT WAS WHEN WE WERE RECEIVING DOCUMENTS,

6   RIGHT.

7   **Q.**   AND SO LET'S NOW MOVE FORWARD TO PAGE 5 OF DEFENDANTS'

8   EXHIBIT 4A. THIS IS THE APRIL 28, 2022 MEETING AFTER DOCUMENT

9   DISCOVERY HAD ENDED.

10        DO YOU SEE ANY DISCUSSION OF POTENTIAL CHANGES HERE?

11   **A.**   NO.

12   **Q.**   DO YOU SEE ANY EVIDENCE OF A CRITICAL REVIEW HERE?

13   **A.**   NO.

14   **Q.**   AND IF YOU LOOK AT THE ATTENDEES, IS IT THE SAME ATTENDEE

15   LIST AS THE PREVIOUS MEETINGS?

16   **A.**   I'D HAVE TO GO BACK AND LOOK AT THE LAST LIST.

17   **Q.**   THANK YOU.

18        SO, YEAH, IF WE LOOK AT THE ONE FROM MARCH 15TH, WE

19   SEE THE WARDEN, SEVERAL NURSE PRACTITIONERS, THE LONG-TERM CARE

20   HOSPITAL ADMINISTRATOR, THE EMT SUPERVISOR, AND DR. TOCE. IS

21   THAT RIGHT?

22   **A.**   YES.

23   **Q.**   AND THEN IF WE GO BACK TO PAGE 5.

24   **A.**   YEAH. IT'S A DIFFERENT GROUP WITH -- I MEAN, SOME OF THE

25   SAME PEOPLE ARE ON IT.

02:15 1    **Q.**    BUT A SMALLER GROUP.  IS THAT RIGHT?

2    **A.**    SMALLER, YEAH.

3    **Q.**    AND IT DOESN'T HAVE THE WARDEN?

4    **A.**    THAT'S CORRECT.

5    **Q.**    IT DOESN'T HAVE THE LONG-TERM CARE HOSPITAL ADMINISTRATOR?

6    **A.**    THAT'S CORRECT.

7    **Q.**    IT DOESN'T HAVE THE EMT SUPERVISOR?

8    **A.**    CORRECT.

9    **Q.**    AND THEN LET'S JUST LOOK AT THE LAST ONE THAT WAS PRODUCED

10   AT PAGE 6.  AND THEN HOW WOULD YOU CONSIDER THIS SUMMARY OF

11   THIS PATIENT'S CONDITIONS, DEATH AND TREATMENT?

12   **A.**    IT'S THE SAME WITHOUT ANALYSIS, WITHOUT SUGGESTIONS FOR

13   IMPROVEMENT.

14   **Q.**    AND IN YOUR EXPERIENCE, HOW DO THE SHORTCOMINGS IN -- IN

15   YOUR OPINION, HOW DO THE SHORTCOMINGS IN LSP'S MORTALITY REVIEW

16   PROCESS AFFECT THE RISK OF SERIOUS HARM TO PATIENTS?

17   **A.**    WELL, I REVIEWED 11 DEATHS; FIVE OF THEM I FOUND TO BE

18   POTENTIALLY PREVENTABLE OR PREVENTABLE.  AND THE DEFICIENCIES

19   THAT WERE IDENTIFIED ARE CORRECTABLE.  THEY'RE MODIFIABLE; YOU

20   KNOW, NOT DOING A COLONOSCOPY ON A PERSON WHO HAS A GUAIAC

21   POSITIVE STOOL, NOT DOING LUNG CANCER SCREENING ON A

22   55-YEAR-OLD SMOKER.

23          ONE OF THE DEATHS WAS A PERSON WITH BACK PAIN WHO,

24   YOU KNOW, THEY FAILED TO ACTUALLY EXAMINE THE PATIENT ON FIVE

25   CONSECUTIVE EVALUATIONS; A PERSON DIED.  I CAN GO THROUGH THEM.

02:17 1        I MEAN, THERE'S ONE GUY WHO HAD A STROKE, WHO HAD AN

2    INTRACEREBRAL BLEED AND HAD LIKE NINE EPISODES OF SYMPTOMS THAT

3    WERE INDICATIVE HE COULD HAVE BEEN HAVING A STROKE AND IT WAS

4    JUST IGNORED.  HE WAS NOT EVALUATED.  SO ALL OF THOSE ARE --

5    ALL OF THOSE -- IF YOU DID A CRITICAL ANALYSIS OF THAT, YOU'D

6    SAY "HOW CAN WE IMPROVE THAT?"  SO WHY IS IT THAT SOMEONE WHO

7    HAD A GUAIAC POSITIVE STOOL DID NOT GET A COLONOSCOPY?

8        YOU CAN LOOK AT YOUR PROCESS AND YOU CAN TRY TO

9    FIGURE OUT HOW TO MAKE IT BETTER SO THAT IT DOESN'T HAPPEN

10   AGAIN, AND THAT'S JUST NOT DONE.  SO THERE'S PLENTY OF

11   OPPORTUNITY HERE.  AND THOSE ARE JUST THE EGREGIOUS ONES WHERE

12   PEOPLE DIED, BUT THERE ARE ONES WHERE PEOPLE ARE HARMED,

13   THERE'S MORBIDITY, AND, YOU KNOW, THE SAME SITUATION HOLDS.

14       SO THERE'S PLENTY OF ROOM FOR IMPROVEMENT, BUT

15   THERE'S VERY LITTLE WILL OR DESIRE TO ACTUALLY ENGAGE THAT AND

16   TO TRY TO FIX IT.

17   Q.   AND SO TO JUST CONCLUDE ON THESE ADMINISTRATIVE PRACTICES,

18   IN THE LIABILITY OPINION THE COURT FOUND THAT LSP HAD FAILED TO

19   PROVIDE MEDICAL LEADERSHIP AND ORGANIZATION IN THE FOLLOWING

20   PARTICULARS:  LACK OF MEANINGFUL MORTALITY REVIEW; USE OF

21   CORRECTIONAL PERSONNEL TO MANAGE MEDICAL DECISIONS; LACK OF

22   PEER REVIEW; LACK OF MEDICAL STAFF INVOLVEMENT IN BUDGETING;

23   LACK OF MEDICAL SUPERVISION BY DR. LAVESPERE AT THE TIME, THE

24   MEDICAL DIRECTOR; AND FAILURE TO MAINTAIN PROPER CREDENTIALING

25   RECORDS.  DO YOU FIND THAT ALL OF THOSE FAILINGS CONTINUE

1 TODAY?

2 **A.** YES.

3 **Q.** AND DO YOU FIND THAT THEY CONTRIBUTE TO THE SUBSTANTIAL

4 RISK OF SERIOUS HARM TO PATIENTS?

5 **A.** YES.

6 **Q.** NOW, LET'S WRAP THINGS UP BY TALKING ABOUT REMEDIES AND

7 WHAT MIGHT BE DONE FROM HERE.

8 YOU'VE BEEN INVOLVED WITH FIXING THE MEDICAL SYSTEM

9 AT A NUMBER OF FACILITIES. IS THAT CORRECT?

10 **A.** YES.

11 **Q.** COULD YOU REMIND THE COURT OF THE ROLES YOU'VE PLAYED IN

12 FIXING CORRECTIONAL MEDICAL SYSTEMS FOUND TO PROVIDE

13 UNCONSTITUTIONAL CARE?

14 **A.** WELL, I'VE BEEN ON BOTH ENDS. SO I WAS ASKED BY

15 LEADERSHIP IN COOK COUNTY TO COME BACK WHEN THE COOK COUNTY

16 JAIL HAD A CONSENT DECREE. THEY WERE INVESTIGATED BY THE

17 DEPARTMENT OF JUSTICE. AND I WENT BACK IN 2009 AND HELPED THEM

18 TO GET OUT OF THAT. THEY DID -- IT TOOK SEVEN YEARS. THEY

19 ENDED THE CONSENT AGREEMENT, AND SO I HELPED THEM DO THAT.

20 I ALSO HAVE BEEN A MONITOR. I WORKED IN CALIFORNIA

21 AND BEEN IN MULTIPLE STATES WITH RESPECT TO ESTABLISHING

22 PROCESSES TO END CONSENT DECREES. SO I THINK I HAVE EXPERIENCE

23 IN THAT. YOU CAN LOOK AT THE C.V.

24 **Q.** AND SOME OF THOSE MONITORING EXPERIENCES, THAT WAS AT THE

25 REQUEST OF BOTH CORRECTIONAL SYSTEMS AND PLAINTIFFS?

02:20 1 **A.** I THINK THEY HAVE TO COME TO A MUTUAL AGREEMENT GENERALLY,
2 SO I THINK THEY BOTH WOULD AGREE THAT I COULD BE A MONITOR.
3 **Q.** SO LET'S TALK AT A GENERAL LEVEL.
4 IN YOUR EXPERIENCE, WHAT ARE THE ELEMENTS OF A
5 REMEDIAL PLAN? WHETHER WE'RE TALKING A CONSENT DECREE OR AN
6 INDIVIDUAL -- OR AN INJUNCTIVE ORDER OR ANYTHING ELSE, WHAT ARE
7 THE ELEMENTS OF A REMEDIAL PLAN THAT HELPS IMPROVE MEDICAL CARE
8 WITH THE LEAST BURDEN ON THE PRISON?
9 **A.** SO I THINK WHAT'S IMPORTANT IS THAT IF THERE'S A CONSENT
10 DECREE -- AND I DON'T KNOW THAT THERE WILL BE A CONSENT DECREE
11 IN THIS CASE, BUT IF THERE IS -- IF THERE'S NOT A CONSENT
12 DECREE, THERE WILL BE FINDINGS OF THE COURT IF THE COURT
13 DECIDES THAT THE STATE HAS TO DO SOMETHING.
14 NOW, UNDER THOSE CIRCUMSTANCES, THEN THERE SHOULD BE
15 AN IMPLEMENTATION PLAN CONSISTENT WITH EITHER THE CONSENT
16 DECREE OR THE FINDINGS OF THE COURT. AND THE LEAST BURDENSOME
17 IS A SITUATION WHERE THE DEFENDANTS DEVELOP THE IMPLEMENTATION
18 PLAN; SO THE COURT HAS FINDINGS OR THERE'S A CONSENT AGREEMENT
19 AND THE DEFENDANTS DEVELOP A WAY TO FIX IT. SO IT'S LEAST
20 BURDENSOME BECAUSE IT'S UNDER THEIR CONTROL.
21 NOW, THAT IS BEST DONE IN THE COLLABORATION WITH
22 WHOEVER IS MONITORING IT. SO THE DEFENDANTS AND PLAINTIFFS OR
23 THE COURT OR SOMEBODY WILL DECIDE, SOMEBODY WILL MONITOR THIS.
24 SO THE MONITOR SHOULD BE A PARTICIPANT IN HELPING THE
25 DEFENDANTS TO DEVELOP THAT, AND THE PARTIES CAN DECIDE WHETHER

02:22 1  -- WHAT ROLE PLAINTIFFS PLAY.  BUT REALLY IT SHOULD BE -- THE

2  DRIVER SHOULD BE THE DEFENDANTS.

3       AND SO AN IMPLEMENTATION PLAN IS REALLY A GOOD WAY TO

4  SAY, OKAY, WE HAVE FINDINGS.  YOU DEVELOP A PLAN TO SHOW ME HOW

5  YOU'RE GOING TO FIX FINDINGS; AND THAT SHOULD INCLUDE STAFFING,

6  WHATEVER STAFFING YOU NEED, WHATEVER SUPPORT SERVICES YOU NEED,

7  WHATEVER POLICIES AND PROCEDURES YOU NEED.

8       SO POLICIES, PROCEDURES, STAFFING AND SUPPORT SHOULD

9  BE IN THE IMPLEMENTATION PLAN AS PART OF HOW DEFENDANTS ARE

10  GOING TO SHOW THEY'RE GOING TO REMEDY IT.  AND THAT'S TO --

11  BECAUSE THEN YOU'RE GIVING -- THE DEFENDANTS ARE IN THE

12  DRIVER'S SEAT.  THEY CREATE THE PLAN.  THEY SHOW IT TO WHOEVER

13  IS MONITORING.  THE MONITOR AGREES OR DISAGREES.  IF THE

14  MONITOR DISAGREES, THE MONITOR CAN WRITE HIS DISAGREEMENTS IN A

15  FORMAL WAY, AND THEN THEY CAN GO TO THE COURT AND THEY CAN

16  DECIDE.

17       AND OBVIOUSLY BEFORE THE COURT HAS TO DECIDE, THE

18  PARTIES SHOULD GET TOGETHER AND FIGURE IT OUT, HOW CAN WE DO

19  THIS AND --

20       **MR. ARCHEY:**  YOUR HONOR, I'M HEARING A LOT OF --

21  OBJECTION.  THESE ARE LEGAL OPINIONS.  THIS IS NOT IN THE

22  REPORT AS WELL.

23       **THE COURT:**  OVERRULED.

24  **BY THE WITNESS:**

25  **A.**  AND IT'S REALLY -- SO IT'S DEFENDANTS WHO SHOULD -- IT'S

02:23 1    MINIMAL; THEY'RE IN CONTROL.  THEY HAVE TO WORK WITH A

2    MONITOR, AND THEY COME UP WITH SOLUTIONS AND THEY TRY TO FIX

3    IT.  AND IT SHOULD BE BASED ON WHAT THE FINDINGS ARE.  AND I

4    THINK THAT'S THE MINIMAL YOU CAN DO, BECAUSE YOU'RE REALLY

5    TURNING IT OVER BACK TO THE STATE TO SAY, "THIS IS WHAT WE

6    FOUND.  TELL US HOW YOU'RE GOING TO FIX IT, PUT IT IN A

7    DOCUMENT AND LET'S GO FROM THERE."

8    **Q.**   AND HOW IS IT -- IN YOUR EXPERIENCE, HOW IS IT -- WHAT

9    MAKES IT MOST EFFECTIVE TO DETERMINE WHETHER THE IMPLEMENTATION

10   PLAN ONCE PUT INTO EFFECT IS ACTUALLY BRINGING THE FACILITY

11   INTO COMPLIANCE WITH WHATEVER FINDINGS A COURT MADE?

12   **A.**   WELL -- SO IF YOU HAVE AN IMPLEMENTATION PLAN, IT SHOULD

13   HAVE DEADLINES TO IT.  IT SHOULD HAVE WHATEVER PLAN YOU'RE

14   GOING TO DO AND SO YOU CAN MEASURE IT AGAINST THE TIMELINES

15   THAT WERE SET.  AND YOU WOULD -- PRESUMABLY THE MONITOR WOULD

16   MEASURE THE COMPLIANCE BASED ON THEIR EVALUATION, WHICH IS

17   HOWEVER YOU DETERMINE -- HOWEVER OFTEN YOU DETERMINE THEY

18   SHOULD -- THE MONITOR SHOULD COME IN AND SEE.

19        SO IF IT'S EVERY SIX MONTHS OR EVERY YEAR, THE

20   MONITOR WOULD COME IN, EVALUATE AND SAY, "THIS IS HOW FAR

21   THEY'VE COME.  THIS IS HOW FAR THEY HAVE TO GO."  AND THAT'S

22   HOW YOU WOULD PROCEED.

23   **Q.**   AND IN YOUR REPORT YOU HAVE A NUMBER OF SPECIFIC

24   RECOMMENDATIONS.  ARE THOSE POTENTIAL ELEMENTS FOR AN

25   IMPLEMENTATION PLAN THAT DEFENDANTS AND THE MONITOR COULD COME

1  UP WITH?

2  **A.**   YEAH.  SO THOSE ARE RECOMMENDATIONS FROM ALL OF US, FROM

3  THE EXPERTS, AND THEY SHOULD BE CONSIDERED.  SO, FOR EXAMPLE,

4  IF YOU'RE GOING TO -- IF THE -- WHATEVER THE FINDINGS OF THE

5  COURT ARE OR WHATEVER CONSENT AGREEMENT IS AGREED TO, WHAT

6  STAFFING DO YOU NEED TO ACCOMPLISH WHAT THE FINDINGS ARE, AND

7  SHOW US HOW YOU'RE GOING TO DO THAT AND WHEN ARE YOU GOING TO

8  DO IT.  AND SO THAT SHOULD BE DONE FOR EACH ELEMENT.

9          AND I THINK THE ITEMS THAT WE GAVE ARE SPECIFIC.

10  THERE ARE THINGS THAT, BASED ON OUR EVALUATIONS, WE THINK

11  SHOULD BE DONE, AND I THINK THOSE ARE -- THEY'RE ALL REASONABLE

12  AND THEY SHOULD BE CONSIDERED.  BUT IF THEY'RE NOT DONE, YOU

13  KNOW, THE STATE HAS A RIGHT TO SAY HOW THEY'RE GOING TO FIX IT

14  AND, YOU KNOW, THE MONITOR CAN DECIDE AND GIVE DISAGREEMENTS IF

15  THEY DISAGREE.

16          BUT WE FEEL THAT OUR OPINIONS AND OUR RECOMMENDATIONS

17  ARE GOOD.  WE WOULD HOPE THAT THE STATE WOULD CONSIDER THOSE.

18  WE THINK THEY'RE GOOD.  WE HAVE A LOT OF EXPERIENCE AS A GROUP.

19  WE'RE VERY FAMILIAR WITH HOW THINGS WORK.  WE'VE BEEN THROUGH

20  THIS A NUMBER OF TIMES.  IF SOME OF OUR RECOMMENDATIONS AREN'T

21  TAKEN UP, I MEAN, WOULD I BE -- I MEAN, IT'S OKAY.  I MEAN, YOU

22  KNOW, IT'S NOT A PERSONAL THING.  IT'S NOT A -- ANYTHING ELSE,

23  BUT WE THINK THEY ARE GOOD RECOMMENDATIONS.  WE THINK ALL OF

24  THEM SHOULD BE CONSIDERED.  AND, I MEAN, IF I WERE WRITING A

25  PLAN, I WOULD CONSIDER ALL OF THEM AND ENGAGE MOST OF THEM.

02:27  1    BUT AGAIN, THAT'S A DETAIL THAT'S BEYOND WHAT OUR

2    RESPONSIBILITY IS.

3              **MR. DUBNER:**  THE COURT'S INDULGENCE FOR A MOMENT?

4              **THE COURT:**  OKAY.

5    **BY MR. DUBNER:**

6    **Q.**   AND BEFORE WE CLOSE, YOU WERE TALKING ABOUT -- WE TALKED A

7    LITTLE BIT ABOUT THE RECOMMENDATIONS IN YOUR REPORT, BUT IN

8    TERMS OF THE RECOMMENDATIONS, LET'S FOCUS ON SPECIALTY CARE IN

9    PARTICULAR.

10             WHAT, IN YOUR MIND, IS THE MOST EFFECTIVE AND LEAST

11   INTRUSIVE WAY TO REDUCE THE RISK OF HARM IN THE AREA OF

12   SPECIALTY CARE?

13   **A.**   SO THERE ARE FOUR OR FIVE ITEMS THAT I THINK REALLY NEED

14   TO BE DONE.  ONE IS THE PHYSICIANS HAVE TO BE ENGAGED IN THE

15   REVIEW OF RECOMMENDATIONS, THE REVIEW OF REPORTS, AND THEY HAVE

16   TO MEET WITH THE PATIENT AND DISCUSS WITH THE PATIENT THE

17   MODIFICATIONS TO THE THERAPEUTIC PLAN BASED ON THE

18   RECOMMENDATIONS OF THE CONSULTANT REPORT.  SO THAT'S REALLY THE

19   KEY THING.

20             AND THE SECOND KEY THING IS THAT PEOPLE HAVE TO BE

21   REFERRED WHEN IT'S INDICATED.  SO, FOR EXAMPLE, ALL THE

22   PREVENTATIVE SCREENING THAT'S NOT REFERRED, THERE HAS TO BE --

23   THE STATE HAS TO FIGURE OUT A WAY TO ADDRESS THAT.

24             YOU KNOW, AN EASY WAY TO ADDRESS IT IS JUST ACCEPT

25   THE A AND B RECOMMENDATIONS OF THE U.S. PREVENTATIVE SERVICE

02:29 1  TASK FORCE AND JUST MAKE THAT PART OF YOUR PROCEDURE.  BUT THEY

2  HAVE TO DO BOTH OF THOSE.  AND SO PRIMARY CARE PHYSICIANS HAVE

3  TO BE INVOLVED IN THE FOLLOW-UP OF SPECIALTY CARE.  THEY HAVE

4  TO REVIEW THE REPORTS; THEY HAVE TO REVIEW RECOMMENDATIONS;

5  THEY HAVE TO ACT ON RECOMMENDATIONS OR SAY WHY THEY DIDN'T;

6  THEY HAVE TO INVOLVE A DISCUSSION WITH THE PATIENT TO UPDATE

7  THE TREATMENT PLAN SO THAT THE PATIENT UNDERSTANDS WHAT'S GOING

8  TO HAPPEN TO THEM AFTER THE SPECIALTY REVIEW; AND PEOPLE HAVE

9  TO BE REFERRED, WHEN NECESSARY.  AND THOSE ARE REALLY THE MAIN

10  ITEMS THAT THEY WANT TO FOCUS ON.

11  **Q.**  THANK YOU, DOCTOR.

12      **MR. DUBNER:**  I HAVE A FEW EXHIBITS TO MOVE IN, SOME

13  HOUSEKEEPING, THAT I DID NOT THINK TO DO AS I WAS GOING

14  THROUGH, IF I CAN MOVE THOSE IN.

15          THE FIRST IS PLAINTIFFS' EXHIBIT 44E, WHICH IS A

16  RESPONSE TO -- ACTUALLY THE DEFENDANTS' THIRD RESPONSE TO

17  PLAINTIFFS' INTERROGATORIES.  IT'S ONLY RESPONSE TO NO. 20 THAT

18  WE'RE REMOVING IN.

19      **MR. ARCHEY:**  YOUR HONOR, I HAVE NO OBJECTION, BUT I

20  MOVE FOR THE WHOLE DOCUMENT TO BE PUT IN INSTEAD OF LIMITED.

21      **THE COURT:**  OKAY.  UNDER THE RULE OF COMPLETENESS,

22  44E COMES IN IN ITS ENTIRETY.

23      **MR. DUBNER:**  AND JUST TO BE HEARD FOR A MOMENT.  WE

24  DON'T BELIEVE THE OTHER ANSWERS ARE NECESSARY TO PUT THE

25  PORTION THAT WE'RE MOVING IN INTO CONTEXT.  WE DON'T THINK IN

02:30 1 FAIRNESS THEY NEED TO BE, BUT JUST TO PUT THAT ON THE RECORD.

2       **THE COURT:** I UNDERSTAND.

3       44E IS ADMITTED IN ITS ENTIRETY.

4       **MR. DUBNER:** OKAY. AND THEN PLAINTIFFS' EXHIBIT 190,

5 WHICH IS THE CONTINUITY OF CARE POLICY.

6       **MR. ARCHEY:** NO OBJECTION, YOUR HONOR.

7       **THE COURT:** ADMITTED.

8       **MR. DUBNER:** PLAINTIFFS' EXHIBIT 9 AND DEFENDANTS'

9 EXHIBIT 4, WHICH ARE THE MORTALITY REVIEW MEETING MINUTES, WE

10 WOULD ASK TO MOVE THOSE IN FOR CONTENT RATHER THAN FOR THE

11 TRUTH OF THE MATTER ASSERTED.

12       **THE COURT:** ANY OBJECTION TO THE MORTALITY REVIEWS?

13       **MR. ARCHEY:** I HAVE NO OBJECTION. I DON'T UNDERSTAND

14 THE DISTINCTION THAT'S BEING MADE. BUT I HAVE NO OBJECTION TO

15 THE DOCUMENTS BEING ADMITTED.

16       **THE COURT:** ALL RIGHT. THEY'RE ADMITTED.

17       **MR. DUBNER:** AND JUST FOR CLARITY, IS THAT WITH OR

18 WITHOUT THE CAVEAT?

19       **THE COURT:** BEG YOUR PARDON?

20       **MR. DUBNER:** JUST FOR CLARITY, IS THAT FOR THE TRUTH

21 OF THE MATTER ASSERTED OR JUST TO SHOW THE CONTENT?

22       **THE COURT:** THEY ARE COMING IN AS SUBSTANTIVE

23 EVIDENCE.

24       **MR. DUBNER:** DEFENDANTS' EXHIBIT 18, WHICH IS THE

25 PEER REVIEW DOCUMENT THAT WE SHOWED, WE WOULD AGAIN ASK FOR IT

02:31 1 TO BE FOR THE CONTENT RATHER THAN FOR THE TRUTH OF THE MATTER

2 ASSERTED. BUT I UNDERSTAND THAT'S NOT --

3     **THE COURT:** AND THAT IS EXHIBIT NUMBER? I'M SORRY.

4 I MISSED IT.

5     **MR. DUBNER:** SORRY. DEFENDANTS' EXHIBIT 18.

6     **THE COURT:** OBJECTION?

7     **MR. ARCHEY:** I HAVE NO OBJECTION; ALTHOUGH AGAIN I

8 DON'T UNDERSTAND THE DISTINCTION BEING --

9     **THE COURT:** ADMITTED.

10     WELL, I'M NOT GOING TO EXPLAIN IT TO YOU, BUT

11 THEY ARE ADMITTED FOR SUBSTANTIVE -- THEY ARE ADMITTED

12 SUBSTANTIVELY. THE COURT WILL CONSIDER THE STATEMENTS MADE

13 THEREIN IN CONNECTION WITH THE TESTIMONY IN THIS MATTER.

14     **MR. DUBNER:** AND THEN PLAINTIFFS' EXHIBIT 19I, WHICH

15 IS THE PEER REVIEW POLICY THAT WE WOULD MOVE IN.

16     **MR. ARCHEY:** NO OBJECTION, YOUR HONOR.

17     **MR. DUBNER:** AND HOLD ON. LET ME JUST DOUBLE-CHECK

18 THESE. IF I COULD HAVE THE COURT'S INDULGENCE FOR ONE MORE

19 MOMENT, AND THEN I'LL BE DONE?

20     **THE COURT:** TAKE A MINUTE.

21     **MR. DUBNER:** THANK YOU, YOUR HONOR. THAT'S ALL I

22 HAVE.

23     AND THANK YOU, DR. PUISIS.

24     **THE COURT:** OKAY. HOW MUCH DO YOU HAVE ON CROSS? A

25 FAIR AMOUNT, I'M ASSUMING?

02:32 1        **MR. ARCHEY:**  YOU'RE ASKING FOR AN ESTIMATION?  I

2  WOULD THINK AN HOUR AND A HALF TO MAYBE TWO HOURS.

3        **THE COURT:**  ALL RIGHT.  DO YOU WANT TO TAKE A BREAK

4  NOW OR IN THE MIDDLE OF YOUR CROSS?

5        **MR. ARCHEY:**  I CAN GET STARTED, AND THEN MAYBE IF I

6  COULD SUGGEST WHEN THERE'S A NICE BREAK AT THE COURT'S --

7        **THE COURT:**  THAT WOULD BE FINE.  I JUST DON'T WANT TO

8  INTERRUPT YOUR CROSS, BUT WE'RE GOING TO NEED A BREAK FOR

9  OBVIOUS REASONS; FOR THE COURT REPORTER, FOR NO -- THE TWO

10  COURT REPORTERS WHO ARE THE ONES THAT ARE DOING PHYSICAL

11  EXERTION HERE TODAY.

12        **MR. ARCHEY:**  I MEAN, YOUR HONOR, IF YOU WANT IT FOR

13  --

14        **THE COURT:**  NO.

15        **MR. ARCHEY:**  OKAY.  ALL RIGHT.

16        **THE COURT:**  LET'S GO AHEAD, UNLESS THERE'S -- LADIES,

17  YOU OKAY?

18        **THE COURT REPORTER:**  YES, MA'AM.

19        **THE COURT:**  ALL RIGHT.

20        **MR. ARCHEY:**  ALL RIGHT.  THANK YOU, YOUR HONOR.

21        ARE YOU READY TO PROCEED, YOUR HONOR?

22        **THE COURT:**  YOU MAY.

23                **CROSS-EXAMINATION**

24  BY MR. ARCHEY:

25  **Q.**  GOOD AFTERNOON, DR. PUISIS.

02:33 1  **A.**  GOOD AFTERNOON.

2  **Q.**  LET'S TALK A LITTLE BIT ABOUT THE HEALTH CARE ORGANIZATION

3  TO BEGIN WITH.

4       THE HIRING OF DR. JOHNSON AS A LONG-TERM HEALTH CARE

5  ADMINISTRATOR IS A VERY POSITIVE DEVELOPMENT FOR LSP.  ISN'T

6  THAT TRUE?

7  **A.**  I THINK IT'S A GOOD THING, YES.

8  **Q.**  DR. JOHNSON HAS THE TRAINING AND EDUCATION CONSISTENT

9  WITH SOMEONE FOR THAT POSITION.  RIGHT?

10  **A.**  HE DOES.

11  **Q.**  ASSISTANT WARDEN OLIVEAUX, SHE HAS THE POTENTIAL TO BE A

12  VERY POSITIVE ELEMENT AT LSP.  CORRECT?

13  **A.**  CAN YOU GIVE ME A LITTLE BACKGROUND TO THAT?

14  **Q.**  OKAY.  ARE YOU NOT FAMILIAR WITH DEPUTY WARDEN -- I'M

15  SORRY, NOT ASSISTANT -- DEPUTY WARDEN OLIVEAUX?

16  **A.**  IS SHE THE ONE THAT'S GOING TO BE THE DEPUTY DIRECTOR OVER

17  MEDICAL?

18  **Q.**  SHE IS THE DEPUTY WARDEN OVER MEDICAL, YES.

19  **A.**  OKAY.  YEAH.  I MEAN, IT'S THE SAME ISSUE:  THAT YOU'RE

20  PLACING A CUSTODY PERSON OVER THE MEDICAL PROGRAM.

21  **Q.**  DO YOU KNOW WHAT DEPUTY WARDEN OLIVEAUX'S BACKGROUND IS?

22  **A.**  I DO.  I KNOW SHE'S AN LPN, CORRECT.

23  **Q.**  AND DO YOU KNOW WHAT AREAS SHE IS ASSIGNED TO BE OVER?

24  **A.**  YOU JUST TOLD ME.  SHE'S THE DEPUTY WARDEN OF MEDICAL.

25  **A.**  RIGHT.  AND IT INCLUDES SOME OTHER THINGS SUCH AS THE ADA,

02:34 1   BUT IT'S ALL THOSE --

2   **A.**   RIGHT.

3   **Q.**   -- RELATED TYPE AREAS.

4   **A.**   RIGHT.

5   **Q.**   I DON'T UNDERSTAND.  I MEAN, YOU WANTED A MEDICAL PERSON

6   OVER THE PROGRAM.  ISN'T THAT WHAT YOU END UP WITH HERE WHEN WE

7   PUT DEPUTY WARDEN OLIVEAUX OVER THE PROGRAM?

8   **A.**   WELL, I THINK YOU'RE MISUNDERSTANDING ME.  THE PERSON IN

9   CHARGE SHOULD BE AUTHORIZED TO -- IS A CLINICAL PERSON WHO

10   OVERSEES THE MEDICAL PROGRAM AND DOESN'T HAVE OTHER LOYALTIES.

11   SO, FOR EXAMPLE, IS NOT A CUSTODY PERSON.

12        AND THE PROBLEM WITH THAT OBVIOUSLY IS, AS AN

13   EXAMPLE, YOU ADMINISTER MEDICATION AT TIMES WHEN THE -- YOU

14   KNOW, I THINK AT 6:00 A.M. AND 4:00 P.M.  SO ON ONE HAND IT'S

15   TEN HOURS FROM ONE DOSE TO ANOTHER DOSE AND ON ANOTHER HAND

16   IT'S 14 HOURS FROM THE SECOND DOSE TO THE FIRST DOSE.  AND IT'S

17   JUST NOT GOOD PRACTICE.  AND SO THE PERSON WHO DESIGNS THE

18   PROGRAM SHOULD BE A CLINICAL PERSON WHO IS IN CHARGE OF THE

19   MEDICAL PROGRAM.

20   **Q.**   AND DEPUTY WARDEN OLIVEAUX IS A NURSE WHO IS NOW OVER ALL

21   OF MEDICAL.  ISN'T THAT RIGHT?

22   **A.**   WELL, WE JUST DISAGREE ON THAT.  I MEAN, YOU'RE SAYING

23   THAT IT'S OKAY TO PUT A WARDEN IN CHARGE OF THE MEDICAL PROGRAM

24   AND I'M SAYING IT'S NOT.

25   **Q.**   ALL RIGHT.

02:36 1    **A.**   AND IT'S I THINK AS SIMPLE AS THAT.

2    **Q.**   BUT YOU WANT A MEDICAL PERSON OVER THE MEDICAL PROGRAM.

3    CAN WE AGREE THERE?

4    **A.**   I WANT SOMEONE OVER THE MEDICAL PROGRAM WHO CAN DESIGN THE

5    PROGRAM AS IT IS SUPPOSED TO BE DESIGNED.

6    **Q.**   OKAY.  AND DEPUTY WARDEN OLIVEAUX WITH HER MEDICAL

7    EXPERIENCE COULD VERY WELL BE THAT PERSON.  ISN'T THAT RIGHT?

8    **A.**   I MEAN, I THINK I'VE ANSWERED ALREADY.

9    **Q.**   DO YOU KNOW IF DEPUTY WARDEN OLIVEAUX HAS ANY

10   RESPONSIBILITIES AS TO SECURITY?

11   **A.**   SHE'S A DEPUTY WARDEN.

12   **Q.**   OVER MEDICAL?

13   **A.**   SHE'S A --

14   **Q.**   ARE YOU AWARE --

15   **A.**   SHE'S A DEPUTY WARDEN.

16   **Q.**   ALL RIGHT.  WELL, IS THAT THE SOLE BASIS FOR YOUR

17   CONTENTION THAT DEPUTY WARDEN OLIVEAUX WOULD NOT BE -- WOULD BE

18   INAPPROPRIATE BECAUSE OF SECURITY CONCERNS?

19   **A.**   I THINK IT'S ASKED AND ANSWERED.  BUT I'LL REPEAT IT

20   AGAIN:  THE PERSON IN CHARGE OF THE MEDICAL PROGRAM NEEDS TO BE

21   A CLINICAL PERSON WHO DESIGNS THE MEDICAL PROGRAM CLINICALLY,

22   AND IT SHOULDN'T BE A CUSTODY PERSON WHO HAS, YOU KNOW, OTHER

23   RESPONSIBILITIES.

24   **Q.**   IS IT THE TITLE THAT BOTHERS YOU?  IS THAT WHERE WE ARE?

25   **A.**   IT'S NOT THE TITLE.

1   **Q.**   BECAUSE SHE'S CALLED "WARDEN"?

2   **A.**   WELL, "WARDEN" MEANS SOMETHING.  DOESN'T "WARDEN" MEAN

3   SOMETHING?

4   **Q.**   SO IT'S THE TITLE THAT BOTHERS YOU?

5   **A.**   WELL, WHAT DOES "WARDEN" MEAN?  IT HAS A MEANING.

6   **Q.**   SO THAT'S WHAT'S BOTHERING YOU?

7   **A.**   IT HAS A MEANING, AND THE MEANING IS THAT THERE'S A CHAIN

8   OF COMMAND AND THAT THEY FIT IN THE ORGANIZATION IN A

9   STRUCTURE.  AND THEY ARE -- THEIR PRINCIPAL DEDICATION IS NOT

10   TO THE MEDICAL PROGRAM, IT'S TO -- THEY'RE A WARDEN.

11   **Q.**   WELL, TELL ME THIS:  WHOEVER THIS HYPOTHETICAL PERSON THAT

12   YOU HAVE THAT'S GOING TO BE RUNNING MEDICAL SOLELY FOR MEDICAL,

13   WHO DO THEY ANSWER TO?

14   **A.**   WELL, OBVIOUSLY LET'S SAY MR. JACOBS WAS THAT PERSON.

15   OKAY.  SO HE DOES REPORT TO THE WARDEN, BUT MR. JACOBS IS

16   RESPONSIBLE FOR DESIGNING THE MEDICAL PROGRAM.

17   **Q.**   OKAY.  AND IF THAT -- IF DEPUTY WARDEN OLIVEAUX HAS FULL

18   AUTHORITY TO DESIGN THE MEDICAL PROGRAM AS SHE SEES FIT, FROM A

19   MEDICAL PERSPECTIVE, THAT WOULD BE WHAT YOU WOULD WANT.

20   CORRECT?

21   **A.**   WELL, WE'RE GOING OVER AND OVER.  BUT LET ME PUT IT THIS

22   WAY:  WITH RESPECT TO INSULIN ADMINISTRATION AND WITH RESPECT

23   TO MEDICATION, IT'S CLEAR THAT YOU HAVE PROBLEMS.  YOU HAVE

24   PROBLEMS.  AND YOUR OFFICERS ARE ADMINISTERING MEDICATION AND

25   THEY'RE DOING IT WRONG AND PEOPLE ARE GETTING INSULIN AT WEIRD

02:38 1  HOURS WHEN THEY'RE NOT EATING.  AND IT'S NOT GOOD AND THAT

2  SHOULD BE SOLVED BY THE MEDICAL LEADERSHIP WHO SHOULD SAY, "YOU

3  CAN'T DO THIS AND, WARDEN, WE HAVE TO SIT DOWN AND FIGURE OUT

4  HOW CAN WE GIVE PEOPLE INSULIN AT A TIME TO WHEN THEY'RE GOING

5  TO EAT SO THAT THEY DON'T BECOME HYPOGLYCEMIC OR THEY DON'T

6  HAVE ADVERSE REACTIONS."  AND WHEN YOU HAVE A WARDEN IN CHARGE

7  OF THE MEDICAL PROGRAM, THAT KIND OF STUFF WILL CONTINUE,

8  'CAUSE IT'S HAPPENING NOW.

9  Q.    DO YOU KNOW HOW LONG DEPUTY WARDEN OLIVEAUX HAS BEEN IN

10  HER POSITION?

11  A.    I DON'T KNOW.

12  Q.    OKAY.  AND YOU REALLY HAVE NO BASIS FOR SAYING THAT THINGS

13  WILL NOT CHANGE UNDER HER GOING FORWARD?  SHE'S GOT THE

14  AUTHORITY TO COME IN AND MAKE THOSE CHANGES IN THIS MEDICAL

15  ARENA, DOES SHE NOT?

16  A.    WELL, YOU'VE HAD MEDICAL -- YOU'VE HAD WARDENS WHO HAVE

17  BEEN IN CHARGE OF THE MEDICAL PROGRAM IN THE PAST, AND THIS

18  PROGRAM -- THE PRACTICES THAT YOU HAVE ARE INHERITED FROM THAT

19  TYPE OF SYSTEM.  SO THE SYSTEM DESIGN THAT YOU'VE HAD IS BASED

20  ON A SYSTEM WHERE WARDENS HAVE BEEN IN CHARGE OF MEDICAL, AND

21  IT'S JUST WRONG.

22  Q.    LET ME MOVE ON THEN.

23  A.    OKAY.

24  Q.    THE OFFICERS ADMINISTERING PILL CALL, THAT HAPPENS IN

25  OTHER INSTITUTIONS, DOESN'T IT?

02:40 1   **A.**   I'M NOT SURE WHAT YOU'RE ASKING.

2   **Q.**   PILL PASS?

3   **A.**   YES.

4   **Q.**   YOU WERE CONCERNED.  YOU APPARENTLY ARE EXPRESSING

5   OPINIONS ABOUT PILL PASS, EVEN THOUGH IT'S NOT IN YOUR SECTION

6   OF YOUR REPORT.  BUT THAT HAPPENS IN OTHER INSTITUTIONS AS

7   WELL, DOESN'T IT?

8   **A.**   YOU MEAN IN LOUISIANA?

9   **Q.**   I'M TALKING ABOUT IN THE COUNTRY.

10  **A.**   I HAVE NEVER SEEN A STATE SYSTEM WHERE THE OFFICERS ARE

11  PRINCIPALLY RESPONSIBLE FOR ADMINISTERING MEDICATION.

12         I TALKED TO OUR NURSE CONSULTANT, WHO TOLD ME THAT IN

13  KANSAS AND IN ONE OTHER STATE THE OFFICERS PARTICIPATE IN KOP

14  MEDICATION, BUT IT'S UNDER A DIFFERENT TYPE OF ARRANGEMENT.

15         BUT I'VE NEVER SEEN AND HAVE NOT HEARD OF IN ANY

16  OTHER STATE IN THE COUNTRY WHERE OFFICERS ACTUALLY ADMINISTER

17  ALL MEDICATIONS, EXCEPT FOR THE INFIRMARY.

18  **Q.**   THE ACA ALLOWS FOR OFFICERS TO ADMINISTER MEDICATIONS --

19  TO HANDLE PILL PASS.  RIGHT?

20  **A.**   I'M NOT FAMILIAR WITH THAT, NO.

21  **Q.**   OKAY.  ALL RIGHT.  AS FAR AS THE STRUCTURE BELOW THAT, WE

22  HAVE DR. TOCE.  AND I HEAR YOU SAYING THAT THERE SHOULD BE MORE

23  THAN ONE PHYSICIAN BESIDES DR. TOCE; THERE'S TOO MUCH FOR HIM

24  TO DO.  IS THAT FAIR?

25  **A.**   I AGREE WITH THAT, YES.

02:41 1    **Q.**   ALL RIGHT.  DO YOU KNOW HOW MANY PHYSICIANS ARE AUTHORIZED

2    AND THAT LSP IS TRYING TO HIRE?

3    **A.**   I THINK YOU HAVE THREE.  IS THAT CORRECT?

4    **Q.**   THAT'S MY UNDERSTANDING, AS OF CURRENTLY.

5    **A.**   OKAY.

6    **Q.**   ALL RIGHT.  SO THERE ARE TWO OTHER POSITIONS THAT THEY'RE

7    TRYING TO FILL AS WE SPEAK.  ARE YOU FAMILIAR WITH THAT?

8    **A.**   I ACTUALLY DON'T HAVE INFORMATION ON THAT.

9    **Q.**   OKAY.  FAIR ENOUGH.

10        'CAUSE THESE OTHER TWO PHYSICIANS WOULD THEN PROVIDE

11    THAT RELIEF AND ALLOW THESE DUTIES TO BE SPREAD OUT TO BETTER

12    HANDLE THE VARIOUS ADMINISTRATIVE DUTIES, AND THE NURSE

13    PRACTITIONER.  THAT'S WHAT YOU WANT TO SEE.  RIGHT?

14    **A.**   YEAH.  I MEAN, ACTUALLY I THINK YOU SHOULD HAVE ONE MORE.

15    I THINK THAT THE INFIRMARY HAS A FAIR AMOUNT OF BEDS, AND YOU

16    HAVE VERY SICK PEOPLE IN THE INFIRMARY.  I THINK A SINGLE

17    PHYSICIAN ON THE INFIRMARY -- THE TWO UNITS, NU 1 AND NU 2; I

18    THINK THERE SHOULD BE ONE DOCTOR OVER THE ATU; I THINK THERE

19    SHOULD BE A DOCTOR OVER THE SIGNIFICANT -- THE MEDICAL DORMS,

20    ASH 1, ASH 2; AND I THINK THERE SHOULD BE A DOCTOR OVER THE

21    GENERAL POPULATION.

22    **Q.**   ALL RIGHT.  AND AS YOU ADD MORE REQUIREMENTS AND MORE

23    CREDENTIALS FOR EACH PHYSICIAN, YOU MAKE IT THAT MUCH HARDER TO

24    FILL EACH ONE OF THOSE POSITIONS, DO YOU NOT?

25    **A.**   I DON'T UNDERSTAND YOUR QUESTION.

02:42 1    **Q.**   WHEN YOU INCREASE THE REQUIREMENTS AND THE CREDENTIALS,
2    YOU HAVE REDUCED THE POOL OF POTENTIAL APPLICANTS TO BE FIT TO
3    FILL EACH ONE OF THOSE POSITIONS.   CORRECT?
4    **A.**   YOU WILL HAVE ISSUES WITH FILLING POSITIONS, BUT I THINK
5    THAT THERE ARE WAYS TO DO THAT.   IT'S BEEN WELL DEMONSTRATED
6    THAT TELEMEDICINE -- EVEN FOR PRIMARY CARE -- WORKS VERY WELL,
7    AND I DON'T SEE WHY YOU COULDN'T DO THAT AS PART OF IT.
8         I MEAN, I THINK YOU SHOULD BE ABLE TO RECRUIT.
9    OBVIOUSLY YOUR OWN PHYSICIANS RIGHT NOW SAY YOU CAN'T RECRUIT
10   BECAUSE YOU DON'T PAY ENOUGH.   THAT'S CORRECTABLE.   IF THAT'S
11   TRUE, YOU CAN RAISE THE SALARIES AND YOU CAN RECRUIT.
12        AND I THINK IN OTHER STATES WHERE THEY HAVE HAD
13   PROBLEMS, THEY RAISE THE SALARIES AND THEY WERE ABLE TO
14   RECRUIT.
15   **Q.**   ARE YOU AWARE OF THE CASE OUT OF ILLINOIS WHERE THEY COULD
16   NOT HIRE ALL THE PROVIDERS THAT THEY AGREED TO IN THEIR CONSENT
17   DECREE DESPITE INCREASE IN PAY AND ALL THESE OTHER INCENTIVES
18   THAT THEY UNDERTOOK?   IT'S A REPORTED CASE.   YOU UNDERSTAND?
19   YOU'RE IN AGREEMENT WITH THAT?
20   **A.**   WELL, THAT'S A LONG DISCUSSION.
21   **Q.**   ARE YOU FAMILIAR WITH THAT?
22   **A.**   I MEAN, IF YOU WANT TO TALK ABOUT ILLINOIS, WE CAN TALK
23   ABOUT ILLINOIS, BUT IT WOULD BE A LONG DISCUSSION.   AND I THINK
24   IT'S PROBABLY NOT WORTH IT 'CAUSE I THINK THERE WERE OTHER
25   REASONS WHY THEY CAN'T HIRE.

02:43 1  Q.   FAIR ENOUGH.

2  A.   YEAH.

3  Q.   ALL RIGHT.  LSP HAS HIRED ADDITIONAL NURSE PRACTITIONERS

4  WITHIN THE LAST YEAR, LET'S SAY.  CORRECT?

5  A.   THAT'S VERY GOOD.

6  Q.   AND THAT'S VERY GOOD.  RIGHT?

7  A.   IT'S VERY GOOD, YES.

8  Q.   AND THAT HAS THE POTENTIAL TO IMPROVE CARE AT LSP, DOESN'T

9  IT?

10  A.   I THINK THAT'S A GOOD THING.  SO -- BUT THE ONE THING I

11  WOULD SAY IS THAT THEY LACKED SUPERVISION.  SO I THINK IF YOU

12  HAD A STRUCTURE WHERE YOU HAD, LET'S SAY, FOUR PHYSICIANS IN

13  ADDITION TO DR. TOCE AND EACH OF THEM PAIRED WITH -- FOR

14  INSTANCE, THE DOCTOR WHO WORKED IN THE ATU HAD ONE OR TWO NURSE

15  PRACTITIONERS WHO WORKED IN THE ATU, THEY WOULD FORM MORNING

16  HUDDLES AND THEY COULD TALK ABOUT THE ISSUES IN THE ATU; AND

17  SIMILARLY WITH THE INFIRMARY; SIMILARLY WITH THE CAMPS; AND

18  SIMILARLY WITH THE MEDICAL DORMS, AND THAT WOULD BE A GOOD

19  THING.

20  Q.   THE NURSE PRACTITIONERS THAT LSP HAS HIRED, THEY HAVE

21  TRAINING IN FAMILY PRIMARY CARE MEDICINE.  RIGHT?

22  A.   YES.  NO, THOSE ARE -- I DON'T HAVE ANY OBJECTIONS TO

23  THAT.  AND I THINK, YOU KNOW, IT'S A GOOD THING.

24  Q.   OKAY.  NOW, YOU REFERENCED IT AND YOU TALKED ABOUT IT

25  SEVERAL TIMES.  LSP DOES HAVE A MORNING MEETING WITH ALL OF ITS

02:44 1  PROVIDERS AND DEPARTMENT HEADS.  CORRECT?

2  **A.**   I MEAN, WE DIDN'T SEE IT.  I DON'T KNOW WHAT IT IS.

3  LET ME JUST SAY THE HUDDLES ARE GOOD.  TO HAVE A HUDDLE IS A

4  VERY GOOD THING.

5  **Q.**   ALL RIGHT.

6  **A.**   I THINK THE DOCUMENT THAT WE WERE GIVEN ABOUT IT, I WOULD

7  --

8  **Q.**   I'M SORRY.

9  **A.**   I'LL WAIT TILL YOU'RE DONE.  NO, GO AHEAD.

10  **Q.**   PLEASE CONTINUE.  I'M SORRY.

11  **A.**   IF YOU WANT ME TO WAIT FOR A MINUTE, I CAN.

12  **Q.**   NO.  I'M SORRY.  PLEASE CONTINUE.

13  **A.**   OKAY.  I WOULD JUST SAY THAT I WOULD PROBABLY STRUCTURE IT

14  A LITTLE BIT DIFFERENTLY, BUT IT'S GOOD.  MORNING HUDDLES ARE

15  GOOD.  AND I THINK THAT IF YOU SEPARATED IT BY THE ACTIVITIES

16  -- SO, FOR INSTANCE, THE HIGH-RISK MEDICAL DORMS, THE

17  INFIRMARY, THE ATU -- THE HUDDLES WOULD BE FOCUSED ON THE

18  ACTIVITIES IN THOSE AREAS, WHICH ARE VERY DIFFERENT.  AND I

19  WOULD INCLUDE THE TRIP NURSES IN THE HUDDLE BECAUSE RIGHT NOW

20  THERE'S A TOTAL DISCONNECT BETWEEN WHAT THE TRIP NURSES ARE

21  DOING AND WHAT THE DOCTORS ARE DOING.  AND THE DOCTORS DON'T

22  SEEM TO HAVE REPORTS, AND THE TRIP NURSES COULD HELP THAT.

23  **Q.**   ALL RIGHT.  I WANT TO PULL UP EXHIBIT DX_53, PLEASE.  AND

24  THIS NEEDS TO BE SEALED.

25        **MR. DUBNER:**  AND, YOUR HONOR, OBJECTION TO THIS

02:46 1    DOCUMENT.

2              THE COURT:  YOU OBJECT TO DX_53?

3              MR. DUBNER:  YEAH, ON 403 PREJUDICE GROUNDS.  THIS IS

4    ALSO RULE 37 GROUNDS.  THIS IS A DOCUMENT THAT WAS NOT PROVIDED

5    UNTIL AFTER OUR EXPERT REPORTS.  THE EXPERT DIDN'T HAVE TIME TO

6    -- OR HAVE A CHANCE TO EVALUATE FOR THEIR EXPERT REPORT.

7              THE COURT:  WHAT IS IT, MR. ARCHEY?

8              MR. ARCHEY:  YOUR HONOR, IT'S THE CENSUS DOCUMENTS.

9                  YOU MIGHT TAKE IT DOWN, I GUESS, WHILE WE'RE

10    STILL SORTING IT.

11              THE COURT:  WELL, LET ME TAKE A LOOK AT IT.

12              MR. ARCHEY:  OKAY.  I'M SORRY.  I'M SORRY.

13              THE COURT:  I'LL RULE ON IT.

14              MR. ARCHEY:  I DIDN'T WANT TO GET IN --

15              THE COURT:  IT'S NOT A JURY TRIAL.

16              MR. ARCHEY:  I'M SORRY, YOUR HONOR.

17              THE COURT:  WHAT IS IT?

18              MR. ARCHEY:  IT'S CENSUS DOCUMENTS.

19              THE COURT:  MARCH 14, 2022, CENSUS DOCUMENTS?

20              MR. ARCHEY:  YES, YOUR HONOR.  THESE ARE THE

21    DOCUMENTS THAT ARE DISCUSSED AT THESE MORNING MEETINGS THAT HE

22    JUST BROUGHT UP AND THEY JUST TALKED ABOUT ON DIRECT AND THAT

23    I WANT TO EXPLORE WITH HIM.

24              THE COURT:  WHAT PREVENTED YOU FROM PRODUCING --

25    WERE SIMILAR DOCUMENTS THAT WERE PRIOR TO THE DISCOVERY CUT-OFF

02:47 1  PRODUCED?

2        **MR. ARCHEY:**  PRIOR TO THE DISCOVERY CUT-OFF?  NO,

3  MA'AM.  NO.  BECAUSE WE DIDN'T -- I'LL TELL YOU WHY.  PRIMARILY

4  WE DIDN'T KNOW ABOUT THEM.  SECONDLY, THESE WERE --

5        **THE COURT:**  OKAY.  GO AHEAD.

6        **MR. ARCHEY:**  THAT'S THE SIMPLE ANSWER.  OKAY.

7        **THE COURT:**  I BELIEVE THAT THAT'S PROBABLY THE

8  ANSWER.

9        **MR. ARCHEY:**  OKAY.

10        **THE COURT:**  GO AHEAD.

11        **MR. ARCHEY:**  AND THEN AT THE SITE VISITS THESE WERE

12  OBSERVED, AND THEN THEY WERE PRODUCED.

13        **THE COURT:**  THE PLAINTIFFS HAVE HAD UTTERLY NO CHANCE

14  TO LOOK AT THESE, AND YOU'RE GOING TO BRING THEM IN AT A TRIAL

15  ON THE MERITS OF THE REMEDY AND THEY'VE NEVER LAID THEIR EYES

16  ON THEM.  HOW IS THAT NOT A 403 PREJUDICE?

17        **MR. ARCHEY:**  I NEED TO RESPOND TO THAT BECAUSE THAT'S

18  NOT COMPLETELY ACCURATE.  THEY'VE HAD THEM SINCE APRIL 18TH.

19  THEY WERE PRODUCED AT THAT TIME.  YOU ASKED ME -- WHAT I WAS

20  ANSWERING --

21        **THE COURT:**  RIGHT.  OKAY.  SO THEY WERE PRODUCED

22  AFTER THE DISCOVERY CUT-OFF?

23        **MR. ARCHEY:**  YES, MA'AM.

24        **THE COURT:**  WHICH MEANS THAT THEY HAD NO CHANCE TO

25  LOOK INTO THEM, TEST THEM, TAKE DEPOSITIONS ON THEM, NOTHING.

02:48 1          **MR. ARCHEY:**  WELL, THAT'S --

2          **THE COURT:**  AND THEN YOU WANT PUT IT ON -- NO.  I'M
3     GOING TO SUSTAIN THE OBJECTION.  PUT IT ON THROUGH ONE OF YOUR
4     WITNESSES IF YOU CAN.  BUT, I MEAN, THE PREJUDICE IS JUST --
5     IT'S REMARKABLE, FRANKLY.

6          **MR. ARCHEY:**  YOUR HONOR, CAN I ARGUE, OR NO?

7          **THE COURT:**  FEEL FREE.

8          **MR. ARCHEY:**  ALL RIGHT.  I DON'T SEE IT THAT WAY,
9     YOUR HONOR.  THIS IS MORE ABOUT THE PROCESS.  IF I WERE ARGUING
10    WHAT THE MEDICAL NOTES HERE MEAN, THEN I WOULD TEND TO SAY
11    MAYBE YOU'RE CORRECT.  I WOULD SEE THE ARGUMENT THERE.  THAT IS
12    NOT WHAT THIS IS ABOUT.  THIS IS ABOUT THESE ARE OCCURRING.
13    THEY QUESTIONED WITNESSES ABOUT THESE IN THE DEPOSITIONS.  THEY
14    KNEW ABOUT THE MEETING.  THEY QUESTIONED OUR OWN -- THESE
15    ATTENDEES AT THESE MEETINGS, ASKED THEM, "WHAT GOES ON?  HOW
16    DOES IT GO?  HOW'S IT WORK?  WHAT HAPPENS?"  OKAY.

17         **THE COURT:**  SO WHAT YOU'RE TRYING TO ILLUSTRATE IS
18    NOT WHAT THE DISCUSSIONS WERE, BUT YOU'RE TRYING TO ILLUSTRATE
19    THAT THESE MORNING MEETINGS OCCUR?

20         **MR. ARCHEY:**  THE MORNING MEETINGS OCCUR AND THAT --
21    AND THAT THERE IS A DISCUSSION.  I'M NOT GOING TO GET INTO AND
22    WOULD NOT GET INTO WAS THIS AN APPROPRIATE --

23         **THE COURT:**  THEN YOU DON'T NEED THE DOCUMENT.  THE
24    MORNING MEETINGS OCCUR.

25                   IS THERE ANY DISPUTE THAT THESE MORNING MEETINGS

02:49 1  ARE HAPPENING?

2        **MR. DUBNER:** NO, YOUR HONOR.

3        **MR. ARCHEY:** BUT THE DOCUMENT IS --

4        **THE COURT:** SHOWS THE MORNING MEETINGS ARE HAPPENING.

5        **MR. ARCHEY:** AND THE SUBSTANCE OF WHAT ALL THEY'RE

6  TALKING ABOUT, I DO THINK IT'S IMPORTANT.

7        **THE COURT:** YOU JUST SAID YOU'RE NOT OFFERING IT FOR

8  THE SUBSTANCE, MR. ARCHEY.

9        **MR. ARCHEY:** I'M NOT.

10       **THE COURT:** PICK YOUR POISON.

11       **MR. ARCHEY:** I'M NOT. I'M NOT GOING TO GO THROUGH IT

12  AND MAKE THESE WHATEVER, BUT IT DOES SHOW THESE DISCUSSIONS.

13  THAT'S ALL I'M SAYING, YOUR HONOR.

14       **THE COURT:** OBJECTION SUSTAINED.

15       **MR. ARCHEY:** LET ME TRY THIS. AND, YOUR HONOR, I

16  DON'T MEAN --

17       **THE COURT:** GO AHEAD. GO AHEAD.

18       **MR. ARCHEY:** ALL RIGHT.

19  **BY MR. ARCHEY:**

20  **Q.** YOU WANT A MORNING MEETING WHERE THERE'S DISCUSSION ABOUT

21  PATIENT CARE AMONG THE PROVIDERS. THAT'S A GOOD THING. RIGHT?

22  **A.** IT IS.

23  **Q.** ALL RIGHT. AND WHERE THERE'S GIVE AND TAKE, WHERE ANOTHER

24  PROVIDER COULD RAISE SOMETHING AND SAY, "WELL, DID YOU THINK

25  ABOUT THIS ANTIBIOTIC OR THIS MEDICATION OR PROCEDURE?" THAT'S

02:50 1    WHAT YOU PREFER -- WANT TO SEE.  IS THAT RIGHT?

2    **A.**  WELL -- SO THE MORNING HUDDLE, IT IS TYPICALLY, YOU KNOW,

3    "WHAT HAPPENED LAST NIGHT?  WHAT'S GOING TO HAPPEN TOMORROW?"

4    YOU KNOW, "WHICH PATIENTS ARE GOING OFF SITE?  WHICH PATIENTS

5    WENT OFF SITE?  WHERE ARE THE REPORTS?  WHAT DO WE NEED DO FOR

6    THE FOLLOW-UP OF THOSE PATIENTS?" ET CETERA.

7         THE PROBLEM WITH THE DISCUSSION ON THE MORNING HUDDLE

8    IS I THINK WHAT WE SHOULD DO IS AGREE THAT MORNING HUDDLES ARE

9    A GOOD THING.  YOU DIDN'T WANT US TO ATTEND THE MORNING HUDDLE,

10    SO THERE WAS NO OPPORTUNITY TO ACTUALLY SEE IT.

11    **Q.**  UH-HUH.

12    **A.**  SO YOU WANT US TO GIVE YOU AN IMPRESSION OF WHAT IT WAS,

13    BUT YOU WOULDN'T LET US SEE IT, SO IT'S REALLY HARD TO DO THAT.

14    SO LET ME JUST SAY THAT --

15    **Q.**  DO YOU KNOW WHY?

16    **A.**  HANG ON.  LET ME FINISH.  BUT IT'S A GOOD THING.  AND I

17    THINK THAT IT'S GOOD YOU'RE DOING IT.  YOU SHOULD CONTINUE TO

18    DO IT, AND YOU SHOULD, I THINK, SEPARATE IT INTO THE FOCUS AND

19    TO THE FUNCTIONAL AREAS OF YOUR SYSTEM, AND IT'S GOOD.

20    **Q.**  OKAY.  ALL RIGHT.  YOU'VE TALKED ABOUT BUDGET.  HAVE YOU

21    EVER SEEN WHERE CARE WAS DENIED BECAUSE OF ANY BUDGET CONCERN?

22    **A.**  I MEAN, LET'S PUT IT THIS WAY.  YOU HAVE OFFICERS PASSING

23    MEDICATION, I'M SURE, BECAUSE OF BUDGET.  YOU -- WHETHER YOU

24    DON'T SEND PEOPLE OFF FOR CERTAIN APPOINTMENTS BECAUSE OF

25    BUDGET, I HAVE NO IDEA.  AND I THINK THAT'S SPECULATION AND IT

02:51 1   WOULDN'T BE FAIR.  BUT I WOULD THINK THAT IT COULD BE A
      2   POSSIBILITY.  YOU HAVE STAFFING ISSUES.  YOU USE INMATES FOR A
      3   FAIR AMOUNT OF WORK ON THE INFIRMARY.  AND THOSE ARE BUDGET
      4   ISSUES.  AND FURTHERMORE, YOUR STAFF DON'T KNOW WHAT THE BUDGET
      5   IS AND WE DON'T KNOW WHAT THE BUDGET IS, AND SO IT'S VERY HARD
      6   TO EVALUATE WHETHER SOMEBODY DIDN'T GET ANYTHING.
      7         WE SEE PEOPLE WHO DON'T GET MEDICATION.  IS THAT
      8   BECAUSE YOU CAN'T AFFORD TO PAY FOR IT, OR IS THAT BECAUSE YOU
      9   JUST DIDN'T GIVE IT, OR IS THAT BECAUSE OF SOME OTHER REASON?
     10   WE DON'T KNOW.
     11   **Q.**   ALL RIGHT.  YOUR SPECULATION ASIDE, HAVE YOU SEEN -- LET
     12   ME FINISH MY QUESTION.
     13         HAVE YOU SEEN ANY DOCUMENT THAT SAID "THIS PATIENT IS
     14   NOT GOING TO GET MEDICATION OR BE SENT OFF SITE BECAUSE OF A
     15   BUDGETARY CONCERN"?
     16   **A.**   WHY WOULD YOU WRITE A DOCUMENT LIKE THAT?
     17   **Q.**   HAVE YOU SEEN A --
     18   **A.**   I MEAN --
     19   **Q.**   HAVE YOU SEEN --
     20   **A.**   -- IT WOULD BE -- IT'S ALMOST RIDICULOUS TO ASK BECAUSE,
     21   YOU KNOW, YOU KNOW WHAT YOU'RE RESPONSIBLE FOR.
     22   **Q.**   PLEASE ANSWER THE QUESTION.
     23   **A.**   WELL, THAT'S --
     24   **Q.**   HAVE YOU SEEN --
     25   **A.**   I AM ANSWERING IT.  BUT DO YOU THINK THAT SOMEBODY FROM

02:53 1  LSP WOULD WRITE "WE'RE NOT GOING TO GIVE MEDICATION BECAUSE WE
      2  CAN'T AFFORD IT"?
      3  **Q.**   HAVE YOU SEEN ANY EVIDENCE OF THAT?
      4  **A.**   OBVIOUSLY NOT.
      5  **Q.**   ALL RIGHT.
      6  **A.**   BUT WHAT DIFFERENCE DOES IT MAKE?
      7  **Q.**   LSP GIVES OUT MEDICATIONS THAT ARE VERY PRICEY AND VERY
      8  COSTLY; HIV, CHEMOTHERAPY, ON AND ON.  ISN'T THAT TRUE?
      9  **A.**   YES, I'M SURE THEY DO.
     10  **Q.**   LSP GIVES TREATMENT TO THESE INMATES THAT'S VERY COSTLY
     11  AND EXPENSIVE, SUCH AS CHEMOTHERAPY AND RADIATION ON A
     12  GENTLEMAN THAT YOU -- ONE OF THE GENTLEMEN YOU LOOKED AT THAT
     13  TOOK PLACE OVER AN ENTIRE YEAR.  RIGHT?
     14  **A.**   SURE.  AND SOMETIMES THEY DON'T.  I MEAN, WE'VE -- AT OUR
     15  OWN -- IN MY TESTIMONY TODAY I TALKED ABOUT PEOPLE WHO DIDN'T
     16  GET THINGS THAT THEY SHOULD HAVE GOTTEN.
     17  **Q.**   WELL --
     18  **A.**   IS THAT BECAUSE YOU DIDN'T HAVE MONEY?
     19  **Q.**   WE'RE GOING TO TALK ABOUT EACH ONE OF THOSE.
     20  **A.**   OKAY.
     21  **Q.**   AND WHAT I'M ASKING YOU -- GOING BACK TO MY QUESTION, HAVE
     22  YOU EVER SEEN WHERE THE BUDGET WAS THE FACTOR THAT DENIED CARE?
     23  **A.**   SO I NEVER SAW A DOCUMENT WRITTEN BY LSP THAT SAID "WE'RE
     24  NOT GOING TO PROVIDE CARE BECAUSE WE DON'T HAVE THE BUDGET."
     25  **Q.**   ALL RIGHT.

02:54  1  **A.**   I DIDN'T SEE A DOCUMENT LIKE THAT.

2  **Q.**   LSP IS ACA ACCREDITED.  CORRECT?

3  **A.**   YES, I BELIEVE IT IS.

4      **MR. ARCHEY:**  BROOKE, CAN YOU PULL UP -- DO WE HAVE

5  THAT DOCUMENT?

6      I'LL MOVE ON, YOUR HONOR.

7      WE DON'T NEED IT, BROOKE.

8  **BY MR. ARCHEY:**

9  **Q.**   ALL RIGHT.  SPECIALTY CARE.  LET ME DO SOME DISCUSSION ON

10  THAT, AND THEN MAYBE WE'LL TAKE OUR AFTERNOON BREAK.

11      THERE ARE THREE WAYS, THREE MEANS BY WHICH LSP

12  PROVIDES SPECIALTY CARE.  THEY HAVE SOME SPECIALISTS COME

13  ON-SITE, SOME ARE THROUGH TELEMED, AND THEN LSP SENDS THE

14  PATIENTS OUT TO OTHER SPECIALISTS.  CORRECT?

15  **A.**   THAT'S CORRECT.

16  **Q.**   ALL RIGHT.  SO THREE DIFFERENT MEANS.  RIGHT?

17  **A.**   YES.

18  **Q.**   ALL RIGHT.  ON-SITE, DID YOU LOOK AT THE CLINICS WHERE THE

19  SPECIALISTS COME ON-SITE TO LSP?

20  **A.**   WHEN YOU SAY, "DID I LOOK AT IT," WHAT DO YOU MEAN?

21  **Q.**   WELL, FIRST OFF, DID YOU PHYSICALLY GO LOOK AT THEM?

22  **A.**   YOU MEAN DID I WATCH A CONSULTANT SEE A PATIENT?  I'M NOT

23  SURE I UNDERSTAND WHAT YOU MEAN.

24  **Q.**   SEE THE SPACE?  EITHER.

25  **A.**   I HAVE SEEN IT IN THE PAST, YEAH.

02:55 1   **Q.** ALL RIGHT.

2   **A.** I MEAN, IT'S A DECENT SPACE. AND THE RETCB [SIC], IT'S A

3   GOOD SPACE.

4   **Q.** ALL RIGHT. ARE YOU AWARE THAT THE NUMBER OF ON-SITE

5   CLINICS HAS INCREASED SINCE 2016?

6   **A.** WELL, LIKE I SAID BEFORE, ECEPTIONIST IS VERY HARD TO

7   TRACK, AND IT'S DIFFICULT TO DETERMINE EXACTLY HOW MANY

8   APPOINTMENTS WERE COMPLETED. HOWEVER, I --

9   **Q.** YOU MISUNDERSTOOD MY QUESTION.

10   **A.** OKAY.

11   **Q.** IF I MAY?

12   **A.** SURE.

13   **Q.** ALL RIGHT. AND WE WILL TALK ABOUT WHAT YOU -- THAT AND --

14   **A.** GO AHEAD.

15   **Q.** MY QUESTION IS: HAVE YOU SEEN WHETHER THE TYPE AND THE

16   NUMBER OF -- I MEAN, TYPE OF ON-SITE SPECIALISTS HAS INCREASED?

17   WE'VE GOT ENDOSCOPY, WE GOT GASTROENTEROLOGY, THOSE TYPES OF

18   THINGS. HAVE YOU SEEN -- DID YOU SEE WHERE THE ON-SITE

19   CLINICS, THE NUMBER BEING PROVIDED, INCREASED?

20   **A.** I'M NOT SURE ABOUT THE NUMBER. YOU DO HAVE -- YOU DO

21   OFFER A LARGER ARRAY OF SERVICES THAT HAD BEEN PROVIDED IN

22   2016.

23        WITH RESPECT TO THE NUMBER, I'M UNCERTAIN.

24   **Q.** ALL RIGHT. THAT FIRST PART IS REALLY WHERE I WAS TRYING

25   TO GO. THANK YOU.

02:56 1  **A.** OH, OKAY. SO THE --

2  **Q.** SO THE NUMBER OF SPECIALISTS -- NOT THE NUMBER OF

3  APPOINTMENTS, BUT THE NUMBER OF SPECIALTY OPTIONS?

4  **A.** YEAH. I MEAN, I THINK YOU HAVE UROLOGY NOW AND YOU HAVE

5  CARDIOLOGY. YOU DIDN'T HAVE THOSE BEFORE, YES. NO, THAT'S --

6  **Q.** OKAY. SO THERE ARE MORE SPECIALISTS --

7  **A.** THERE ARE MORE --

8  **Q.** -- SPECIALTY AREAS COMING ON-SITE?

9  **A.** YES. YES.

10  **Q.** CARDIOLOGY; YOU SAID UROLOGY, INFECTIOUS DISEASE, DIETARY,

11  AND I HEARD YOU SAY ONE MORE.

12  **A.** I DIDN'T SAY ONE MORE, BUT --

13  **Q.** OKAY. FAIR ENOUGH.

14  ALL RIGHT. TELEMED, THE SAME THING AS FAR AS: HAVE

15  THE NUMBER OF SPECIALTY AREAS THAT ENGAGE IN TELEMED

16  INCREASED?

17  **A.** YOU KNOW, I'M NOT SURE OF IT, BUT IF YOU SAY IT'S TRUE, I

18  DON'T DISPUTE IT.

19  **Q.** THERE ARE ACTUALLY SEVEN MORE AREAS IN TELEMED THAN THERE

20  WERE BACK IN 2016. ARE YOU GOOD WITH THAT?

21  **A.** GOOD.

22  **Q.** OKAY. THE NEUROLOGY, INFECTIOUS DISEASE, HEPATITIS, ENT,

23  HEMATOLOGY, ONCOLOGY, DERMATOLOGY, ENDOCRINOLOGY, AND GI.

24  **A.** I THINK THAT'S GOOD.

25  **Q.** GOOD. ALL RIGHT. OFF SITE -- AND IN ADDITION TO ALL

02:57 1    THAT, THERE IS AN ON-SITE IMAGING TRAILER.  CORRECT?

2    **A.**    I'M SORRY.  CAN YOU REPEAT THAT?

3    **Q.**    THERE IS AN ON-SITE IMAGING TRAILER AT LSP?

4    **A.**    YEAH.  YOU BRING A TRAILER IN AND THEY DO CT SCANS, I

5    THINK, AND ULTRASOUNDS, YEAH.

6    **Q.**    OKAY.  DO YOU KNOW IF WE BRING IT IN OR IF IT STAYS THERE?

7    **A.**    I'M NOT -- ACTUALLY, I'M NOT SURE.  I THINK YOU DO

8    ULTRASOUNDS ON-SITE.  AND YOU USED TO DO THEM IN THE R.E.

9    TREATMENT CENTER, AND WHETHER YOU BRING THEM IN OR HAVE A

10    TRUCK, IT'S -- TO ME IT'S THE SAME DIFFERENCE, SO.

11    **Q.**    ALL RIGHT.  NOW LET'S TALK ABOUT OFF SITE.

12    **A.**    OKAY.

13    **Q.**    WHEN THERE'S A REFERRAL, DR. TOCE APPROVES THE REQUEST FOR

14    A SPECIALIST.  IT BEGINS RIGHT THERE.  CORRECT?

15    **A.**    THAT'S THE WAY IT'S BEEN DESCRIBED TO ME.

16    **Q.**    OKAY.  FROM THERE THE REQUEST GOES TO THE LSP TRIP OFFICE?

17    **A.**    CORRECT.

18    **Q.**    AND FROM THE TRIP OFFICE IT GOES TO THE DOC HEADQUARTERS

19    TRIP OFFICE FOR SCHEDULING?

20    **A.**    CORRECT.

21    **Q.**    AND THE ONLY THING THAT DOC HEADQUARTERS WANTS TO ENSURE

22    IS THAT PREREQUISITES THAT ARE NECESSARY SUCH AS LABS, TESTING

23    ARE PRESENT.  CORRECT?

24    **A.**    THAT'S WHAT HAS BEEN SAID, RIGHT.

25    **Q.**    OKAY.  AND THEN THE APPOINTMENT IS MADE BASED ON THE

02:58 1  AVAILABILITY OF THE SPECIALIST AT UMC OR WHEREVER.  CORRECT?

2  **A.**   YEAH.  I MEAN, I'M NOT SURE HOW THEY MAKE APPOINTMENTS.

3  **Q.**   OKAY.

4  **A.**   SO I CAN'T SPEAK TO THAT.

5  **Q.**   AND YOU TOLD ME AT YOUR DEPOSITION THAT THIS IS A GOOD

6  PROCESS.  RIGHT?

7  **A.**   IT'S A GOOD PROCESS?

8  **Q.**   THAT'S WHAT YOU TOLD ME.

9  **A.**   WELL, OKAY.  SO IT DEPENDS ON HOW -- WHAT THE PERSPECTIVE

10 IS, AND I DON'T KNOW WHAT CONTEXT YOU WERE ASKING ME THE

11 QUESTION.  IT'S A GOOD PROCESS THAT DR. TOCE WOULD REVIEW IT.

12 BUT AS I SAID, THE PROCESS OF THE TRIP NURSE INVOLVEMENT IS A

13 PROBLEM.  IT'S A MAJOR PROBLEM, BECAUSE THE TRIP NURSE IS A

14 NURSE AND THE DOCTORS ARE DISENGAGED FROM THE MANAGEMENT OF THE

15 PATIENT AND DON'T REVIEW THE REPORTS AND THEY DON'T REVIEW THE

16 RECOMMENDATIONS.

17 **Q.**   ALL RIGHT.  I'M FOLLOWING YOUR CRITICISM, I UNDERSTAND IT.

18 **A.**   OKAY.

19 **Q.**   I'M TALKING ABOUT THE PROCESS OF GETTING THE SPECIALTY

20 CARE APPOINTMENTS SET UP; THAT PROCESS OF GOING THROUGH DR.

21 TOCE TO LSP, TO THE DOC, TO THE SPECIALISTS.

22 **A.**   YEAH.  I MEAN, THAT'S OKAY.

23 **Q.**   THAT'S --

24 **A.**   OKAY.  I DON'T HAVE ANY PROBLEM WITH THAT.

25 **Q.**   ALL RIGHT.  NOW, LET'S TALK ABOUT NUMBERS.

02:59 1          ALL RIGHT.  SO THIS IS PURE NUMBERS.  AND LSP HAS

2  INCREASED THE NUMBER OF SPECIALTY APPOINTMENTS.  CORRECT?

3  **A.**    I MEAN, LIKE I SAY, IT WAS HARD FOR ME TO DETERMINE THAT.

4  **Q.**    WELL, THAT'S WHAT YOU DID DETERMINE, THOUGH, WASN'T IT?

5  **A.**    WELL -- SO IN 2016 I THINK I WAS TALKING ABOUT REFERRALS

6  IN TWENTY -- IN THIS VISIT, I WAS TRYING TO LOOK AT COMPLETED

7  APPOINTMENTS, AND I COULDN'T FIND A MATCH-MATCH IN ECEPTIONIST.

8  I MEAN, I CHALLENGE ANYONE IN THIS ROOM TO LOOK AT THE

9  ECEPTIONIST DOCUMENTS AND TELL ME HOW MANY PEOPLE ACTUALLY

10  COMPLETED AN APPOINTMENT AT A SPECIALTY CLINIC.  IT'S JUST --

11  IT'S BEFUDDLING TO LOOK AT THAT DOCUMENT.  AND THAT'S NOT ANY

12  COMMENT ON ECEPTIONIST.  I BELIEVE IT'S PROBABLY A REASONABLE

13  DATABASE.  I JUST THINK THE WAY IT'S USED AND THE WAY IT'S

14  PORTRAYED AND THE DATA GIVEN TO US DOESN'T ALLOW FOR A CLEAR

15  INTERPRETATION OF THE DATA.

16  **Q.**    I WANT TO SHOW YOU YOUR 2016 EXPERT REPORT.  WE'RE ON PAGE

17  74 AT THIS TIME.

18  **A.**    UH-HUH.

19  **Q.**    ALL RIGHT.  THIS IS WHERE YOU HAVE NUMBERS.  DO YOU SEE

20  THAT?  AND THERE'S A WHOLE LITANY OF NUMBERS UP THERE, AND YOU

21  CONCLUDE WITH 4,937 APPOINTMENTS AT UMC OVER A 24-MONTH PERIOD,

22  AVERAGE 205 APPOINTMENTS PER MONTH.  SO --

23  **A.**    WELL, HANG ON A SECOND.

24          SO THE THIRD LINE, THE END OF THE THIRD LINE:  "THERE

25  IS NO INFORMATION ON THE TIMELINESS OF THE APPOINTMENTS OR

03:01 1  WHETHER, IN FACT, THE APPOINTMENT HAD OCCURRED."

2  **Q.**   LOOK AT YOUR PARAGRAPH WHERE YOU SAY THE "4,937

3  APPOINTMENTS AT UMC OVER A 24-MONTH PERIOD," AND THEN THEY

4  AVERAGE AND YOU SAY THOSE.  RIGHT?

5  **A.**   RIGHT.  SO, I MEAN, WHAT I'M -- SO THE DATA THAT I AM

6  GIVING IS -- IT DOESN'T INDICATE WHETHER THAT -- WHAT IS LISTED

7  IS A COMPLETED APPOINTMENT.  SO YOU HAVE A LIST IN ECEPTIONIST

8  -- IF YOU ACTUALLY BROUGHT UP A COPY OF THE DOCUMENT YOU SENT

9  TO ME, YOU COULD LOOK AT IT AND SAY, "HOW DO I FIGURE OUT HOW

10 MANY PEOPLE ACTUALLY COMPLETED AN APPOINTMENT AND WHERE THEY

11 COMPLETED IT?"

12       SO, NO. 1, I BELIEVE ALL THE APPOINTMENTS ARE MIXED

13 UP.  SO THE ON-SITE, THE OFF SITE, THE TELEMEDICINE, THEY'RE

14 ALL IN THERE.  YOU DON'T KNOW WHETHER THE APPOINTMENT WAS

15 ACTUALLY COMPLETED, AND IT'S JUST -- IT'S A CONFUSING DOCUMENT.

16 **Q.**   LET'S LOOK AT YOUR CURRENT REPORT NUMBERS NOW.  LET'S GO

17 TO PAGE 83.  AND DOWN AT THE BOTTOM THESE NUMBERS -- OOPS, PAGE

18 --

19       **MR. ARCHEY:**  YEAH.  KEEP GOING, BROOKE.  ONE MORE.

20 THERE YOU GO.  KEEP GOING DOWN.

21       OH, YOUR HONOR, THERE WERE DIFFERENT VERSIONS OF

22 THE REPORT.  WE JUST HAD A PAGE ISSUE.

23 **BY MR. ARCHEY:**

24 **Q.**   ALL RIGHT.  HERE WE GO.  THIS IS IT.

25       ALL RIGHT.  YOUR NUMBERS ARE BASICALLY DOUBLE WHAT

03:03 1    THEY WERE THE FIRST TIME.  RIGHT?

2    **A.**    LOOK, IT COULD BE.  BUT LIKE I SAY, I'M NOT SURE I'M

3    COMPARING APPLES TO APPLES.  HERE I'M TALKING ABOUT -- IT

4    APPEARS THAT THERE'S 10,150 REFERRALS IN 2019 AND THEN

5    REFERRALS IN 2020 AND REFERRALS IN 2021.  NOW, THOSE ARE

6    REFERRALS.  I'M NOT CLEAR IT'S COMPLETED APPOINTMENTS.

7    **Q.**    OKAY.

8    **A.**    BUT YOU COULD ASSUME THAT IT'S COMPLETED APPOINTMENTS --

9    **Q.**    OKAY.

10    **A.**    -- IF YOU WANT TO.

11    **Q.**    YOU GO FURTHER AND YOU SAY IN YOUR REPORT "THAT THESE

12    CHANGES ALL HAVE SOME POSITIVE EFFECT."  DO YOU SEE THAT?  YOU

13    HAVE THE WORD "WHILE."  WHILE THESE CHANGES ALL --

14    **A.**    YEAH.

15    **Q.**    SO THESE CHANGES HAVE POSITIVE EFFECTS.  RIGHT?

16    **A.**    SO IN 2019 THERE WERE 10,000.  IT DROPS IN 2020, THERE'S

17    COVID.  IT INCREASES TO 9,900 IN 2021, AND THAT'S AN INCREASE.

18    IT'S NOT THE SAME AS IT WAS IN 2019.  IT'S LESS.

19            BUT AS I SAID BEFORE, IF YOU LOOK AT IT ON A PER CAP

20    BASIS, YOU HAD A REDUCTION IN POPULATION, SO IT MAY INDEED BE

21    AN INCREASE.  BUT AGAIN, IT'S REFERRALS.  I DON'T KNOW IF THESE

22    PEOPLE ACTUALLY COMPLETED THE APPOINTMENT.

23            SO, YOU KNOW, YOU MAY ACTUALLY BE RIGHT.  AND I CAN

24    EVEN ALMOST ASSUME THAT, OKAY, LET'S AGREE TO SAY THAT YOU ARE

25    RIGHT, BUT YOUR DATA DOESN'T SHOW IT.

03:04  1        AND WHAT'S WRONG WITH YOU GETTING DATA TO SAY "WE HAD
       2  X APPOINTMENTS IN 2019 AND X APPOINTMENTS IN 2021" AND SHOW ME,
       3  BUT YOU DIDN'T DO THAT.
       4  **Q.**   YOUR FOOTNOTE EVEN STATES YOU DON'T KNOW HOW TO OPERATE
       5  ECEPTIONIST, AND THAT MAY BE THE ISSUE.  RIGHT?
       6  **A.**   WELL, WE WEREN'T ALLOWED TO TALK TO THEM THIS TIME.  AND
       7  EVEN LAST TIME WHEN WE TRIED TO TALK TO THEM -- I STARTED TO
       8  TALK TO THEM FOR AN HOUR, AND THEN I WAS TOLD I COULDN'T TALK
       9  TO THEM ANY LONGER.
      10  **Q.**   ALL RIGHT.
      11  **A.**   SO IT WAS -- IT'S HARD TO FIGURE OUT HOW THE THING WORKS
      12  IF YOU CAN'T TALK TO PEOPLE.
      13  **Q.**   ALL RIGHT.  LET'S GO TO RECORD DOC 691.
      14        THIS IS OUT OF THE JOINT PRETRIAL ORDER THAT WAS
      15  ORIGINALLY SUBMITTED WHERE PLAINTIFFS STIPULATED AS A
      16  STIPULATED FACT THAT THE NUMBER OF SPECIALTY APPOINTMENTS
      17  PROVIDED TO CLASS MEMBERS HAS INCREASED SINCE SEPTEMBER OF
      18  2016.
      19        **MR. DUBNER:**  OBJECTION TO FORM.  THIS IS THE
      20  WITHDRAWN DOCUMENT.  I GUESS IT'S A BEST EVIDENCE OBJECTION.
      21        **THE COURT:**  OKAY.  "IT WAS WITHDRAWN" AND THEN
      22  MUMBLE, MUMBLE, MUMBLE.
      23        **MR. DUBNER:**  SORRY.  OBJECTION.  THIS DOCUMENT WAS
      24  WITHDRAWN.  HE'S SHOWING A SUPERSEDED DOCUMENT.  THE CORRECT
      25  ONE IS I BELIEVE DOCKET NO. 717.

03:05 1          **THE COURT:**  IS THERE A STIPULATION IN THE RECORD THAT

2    SPECIALTY APPOINTMENTS PROVIDED TO CLASS MEMBERS INCREASED

3    SINCE SEPTEMBER 2016?

4          **MR. DUBNER:**  IT WAS STIPULATED TO AND THEN WITHDRAWN,

5    PER ORDER OF THE COURT, AT PLAINTIFFS' MOTION.

6          **MR. ARCHEY:**  THAT IS CORRECT.  AND I STILL WANT TO

7    SHOW THAT THEY AGREED TO THIS AND THEY PUT THIS IN.  IT WAS

8    BASED UPON WHAT THEY FOUND AND THEN THEY TRIED TO PULL IT BACK.

9    THEY DID PULL IT BACK.  THE COURT ALLOWED THEM.

10          SO IT'S STILL SIGNIFICANT TO ME THAT IT MADE IT

11    INTO THIS DOCUMENT AND THAT THIS WAS WHAT THEY AGREED TO, AT

12    LEAST FOR A PERIOD OF TIME.

13          **THE COURT:**  OKAY.  IF I RECALL -- AND THERE'S BEEN A

14    LOT OF WATER UNDER THE BRIDGE -- THEY SAID THAT THAT WAS AN

15    ERROR, AND I ALLOWED Y'ALL TO CORRECT THE PRETRIAL ORDER.  SO

16    IT'S IRRELEVANT TO SHOW THIS WITNESS THAT.  I MEAN, HE'S

17    TESTIFIED AD NAUSEAM THAT SPECIALTY -- ACCORDING TO THE

18    ECEPTIONIST, THERE WERE MORE SPECIALTY APPOINTMENTS.  WHAT HE

19    CAN'T TELL IS WHETHER THEY WERE ACTUALLY FULFILLED OR ACTUALLY

20    COMPLETED.

21          **MR. ARCHEY:**  VERY WELL, YOUR HONOR.

22          **THE COURT:**  DO YOU NEED ME TO -- I MEAN, WHAT ELSE

23    CAN I -- I DON'T KNOW WHAT ELSE YOU CAN PROVE THERE.

24          **MR. ARCHEY:**  OKAY.  VERY WELL, YOUR HONOR.

25          **THE COURT:**  SUSTAINED.

03:06 1    **BY MR. ARCHEY:**

2    **Q.**   DR. PUISIS, LSP NOW TRACKS REFUSALS.  CORRECT?

3    **A.**   I THINK -- I'M NOT SURE THEY'VE ALWAYS TRACKED THEM, BUT

4    YOU SAY THAT THAT IS A CHANGE IN YOUR PRACTICE, YES.

5    **Q.**   AND THAT'S AN IMPROVEMENT.  CORRECT?

6    **A.**   IF YOU WOULD ADD TO THAT A REASON WHY PEOPLE REFUSED AND

7    TRY TO GET AT THAT, I THINK IT WOULD BE A BIG IMPROVEMENT, YES.

8    **Q.**   LSP NOW COUNSELS INMATES ON REFUSALS.  CORRECT?

9    **A.**   WELL, I HAVEN'T SEEN IT IN THE RECORDS.  AND IN THE

10   MORTALITY REVIEWS, IT'S MORE OF A, YOU KNOW,

11   THE-PATIENT-REFUSED-EVERYTHING KIND OF ISSUE.  AND I THINK YOU

12   COULD DO A BETTER JOB AT GETTING REFUSALS AND TALKING TO PEOPLE

13   ABOUT WHY THEY REFUSE.

14          WHEN AN INMATE REFUSES BECAUSE THEY CAN'T -- THEY ARE

15   MADE TO WEAR A BLACK BOX OR BECAUSE THEY HAVE TO SIT FOR THREE

16   HOURS IN A CLINIC AND IF YOU TRY TO FIX THAT, THEN I WOULD SAY

17   YOUR REFUSAL PROCESS IS EFFECTIVE.  BUT JUST CATEGORIZING

18   REFUSALS AND SAYING YOU HAVE A THOUSAND REFUSALS, IT SEEMS LIKE

19   MORE OF A LEGAL STRATEGY THAN A -- THAN ONE THAT'S MEANT TO TRY

20   TO IMPROVE THE ACCESS TO CARE.

21   **Q.**   YOU DIDN'T SEE AS MANY MISSED APPOINTMENTS THIS TIME AS

22   YOU DID BEFORE.  ISN'T THAT TRUE?

23   **A.**   I'M NOT SURE I UNDER -- MISSED APPOINTMENTS FOR WHAT?

24   **Q.**   YOU DID NOT NOTE AS MANY MISSED APPOINTMENTS IN THE

25   RECORDS THIS TIME AS YOU DID BEFORE IN 2016.  CORRECT?

03:08 1  **A.**  WELL, I REALLY DON'T KNOW HOW TO ANSWER THAT.  I'M NOT

2  SURE HOW TO ANSWER THAT.  I DON'T THINK I HAVE DATA TO SAY THAT

3  ONE WAY OR ANOTHER.

4  **MR. ARCHEY:**  BROOKE, CAN YOU GO AHEAD AND PULL UP THE

5  DEPOSITION ON PAGE 258, PLEASE?  GO UP.  OH, THERE WE GO.  YES,

6  THERE IT IS.

7  **BY MR. ARCHEY:**

8  **Q.**  BEGINNING ON LINE 20, "WE DIDN'T SEE AS MANY MISSED

9  APPOINTMENTS."  DO YOU SEE THAT?  THAT WAS YOUR WORDS.

10  CORRECT?

11  **A.**  HANG ON A SECOND.  LET ME JUST READ THE CONTEXT.

12  YES.  NO, I DID SAY THAT.

13  **MR. ARCHEY:**  ALL RIGHT.  YOU CAN TAKE THAT DOWN,

14  BROOKE.  THANK YOU.

15  **BY MR. ARCHEY:**

16  **Q.**  WHEN A PATIENT RETURNS FROM A TRIP, AT THIS TIME THE

17  PATIENT WILL GO TO THE NURSING UNIT 1.  THAT'S A GOOD THING.

18  RIGHT?

19  **A.**  I MEAN, I DIDN'T SEE THAT IN THE RECORD.  I SEE THE TRIP

20  NURSE SIGNING THE DOCUMENT.  I THINK DR. LAVESPERE SAID IN A

21  DEPOSITION THAT THE PATIENT GOES TO NU 1, YES.

22  **Q.**  OKAY.  AND THAT'S A GOOD THING.  RIGHT?

23  **A.**  I THINK IT'S A GOOD THING TO SEE A NURSE IMMEDIATELY UPON

24  ARRIVAL TO ENSURE THAT IF ANY IMMEDIATE MEDICATIONS WERE

25  RECOMMENDED THAT THEY BE STARTED.  AND THAT WOULD COME ISSUED

03:10 1   FROM THE NURSE CALLING A DOCTOR AND JUST SAYING "THE CONSULTANT

2   SAID I SHOULD START X,Y,Z," AND THEY WOULD GET A PHONE ORDER.

3          **MR. ARCHEY:**  YOUR HONOR, THIS IS A GOOD STOPPING

4   POINT FOR ME, IF THAT'S THE COURT'S PLEASURE.

5          **THE COURT:**  YES, THAT'S GOOD.

6              WHY DON'T WE BE IN RECESS UNTIL 3:30.

7          **THE LAW CLERK:**  ALL RISE.

8              THE COURT IS AT RECESS.

9          **(WHEREUPON, THE COURT WAS IN RECESS.)**

10         **THE COURT:**  BE SEATED.

11             OKAY.  GO AHEAD, MR. ARCHEY.

12         **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

13  **BY MR. ARCHEY:**

14  **Q.**   DR. PUISIS, I'D LIKE TO TALK ABOUT PATIENT NO. 5 NOW, IF

15  WE MAY.

16  **A.**   THANK YOU.

17  **Q.**   OKAY.  AND IF THERE'S ANYTHING YOU NEED TO LOOK AT, LET ME

18  KNOW, BUT I'M GOING TO BEGIN WITH PAGE NO. JX_05_0502.

19             ALL RIGHT.  THIS IS AUGUST 20, 2019.  IT'S A NO-SHOW

20  FOR A CLINIC A CALLOUT.  WHAT IS THE CHIEF COMPLAINT UP AT THE

21  TOP OF THE DOCUMENT?

22  **A.**   IT SAYS, "FOLLOW UP AORTIC STENOSIS, HYPERTENSION,

23  OSTEOARTHRITIS, GERD, LABS, EKG."

24  **Q.**   OKAY.  SO LSP WAS FOLLOWING THIS PATIENT FOR AORTIC

25  STENOSIS AS FAR BACK AS AUGUST OF 2019.  IS THAT RIGHT?

03:32 1   **A.**   WELL, THIS IS A NO-SHOW, SO IT LOOKS LIKE THEY WERE

2   SUPPOSED TO BE FOLLOWING HIM.  BUT, YES, I THINK I CAN ANSWER

3   YOUR QUESTION.

4   **Q.**   LET'S GO TO JX_05_0500.

5           THE VERY NEXT DAY, AUGUST 21ST, THIS IS A TELEMED

6   VISIT; CARDIOLOGY TELEMED.  IS THAT RIGHT?

7   **A.**   YES.

8   **Q.**   OKAY.  AND IT SAYS, "SEE ATTACHED."  RIGHT?

9   **A.**   YES.

10   **Q.**   LET'S GO TO JX_05.490.

11           ALL RIGHT.  THIS IS THE CARDIOLOGIST NOTE FROM THAT

12   ENCOUNTER ON THAT SAME DATE, AUGUST 21, 2019.  IT'S REAL SMALL

13   UP AT THE TOP RIGHT.  DO YOU SEE THAT?

14   **A.**   CORRECT.

15   **Q.**   OKAY.  AND DIAGNOSIS NO. 1 WAS AORTIC STENOSIS, MODERATE.

16   RIGHT?

17   **A.**   CORRECT.

18   **Q.**   AND ONE OF THE RECOMMENDATIONS -- IT MAY NOT BE ON THE

19   PAGE I'M SHOWING YOU, BUT HE WOULD NEED AN ECHOCARDIOGRAM -- IS

20   ONE OF THE THINGS YOU WOULD EXPECT.  IS THAT RIGHT?

21   **A.**   WELL, I HAVE NO IDEA.  I MEAN, IF YOU SHOW ME THE REST OF

22   THE NOTE, I CAN SAY.  I MEAN, I DON'T KNOW WHEN HIS LAST ECHO

23   WAS.

24   **Q.**   OKAY.

25   **A.**   YEAH.

1   **Q.**   WELL, LET'S GO TO JX_05.0489 THEN.

2           OKAY.  THEY TRIED TO GET AN ECHO FOR HIM ON

3   SEPTEMBER 19TH OF 2019, AND HE REFUSED IT.  DO YOU SEE THAT?

4   **A.**   YEAH.

5   **Q.**   OKAY.  AND WHAT WAS LSP'S RESPONSE?

6   **A.**   RESUBMITTED.

7   **Q.**   OKAY.  SO RESCHEDULED IT FOR HIM.  RIGHT?

8   **A.**   CORRECT.

9   **Q.**   THAT'S A GOOD THING.  RIGHT?

10   **A.**   WELL, I'M NOT SURE.

11   **Q.**   IT'S A GOOD THING TO RESCHEDULE FOR THE PATIENT WHEN HE

12   REFUSED TO GO.  RIGHT?

13   **A.**   YES, OF COURSE.

14   **Q.**   ALL RIGHT.  AND LET'S GO TO JX_0482 -- JX_05_0482.

15   THERE WE GO.

16           THIS IS THE SECOND REFUSAL FOR THE ECHO ON OCTOBER

17   16, 2019.  RIGHT?

18   **A.**   CORRECT.

19   **Q.**   OKAY.  AND ENTERED IN ECEPTIONIST.  DO YOU KNOW WHAT

20   HAPPENED AFTER THIS REFUSAL?

21   **A.**   DO I KNOW WHAT HAPPENED AFTER THIS REFUSAL?

22   **Q.**   YES, SIR.  DID THEY RESCHEDULE?

23   **A.**   I'M NOT SURE.

24   **Q.**   OKAY.  LET'S GO JX_05.0485.

25           THIS IS THE REFUSAL FORM THAT WAS SECURED -- HAD

03:35 1  SIGNED BY THE PATIENT -- IT PURPORTS TO BE AT THIS TIME.  OKAY.

2  HE EXPRESSES SOME CONCERNS ABOUT HIS MEDICATIONS, ABOUT THAT'S

3  WHY HE COULDN'T GO.  IS THAT WHAT IT APPEARS TO BE THERE?

4  **A.**  WHAT'S THE QUESTION?

5  **Q.**  THE FORM SEEMS TO SUGGEST THAT HE IS CLAIMING THAT HIS

6  MEDICATIONS WERE THE REASON WHY HE COULDN'T GO.  RIGHT?

7  **A.**  YEAH.  I MEAN, HE SAYS HE CAN'T SLEEP; HIS BP IS WRONG;

8  HE'S GOT A SKIN INFECTION, YES.

9  **Q.**  AND BELOW THAT THERE'S AN ARROW THAT SAYS, "MEDICATIONS

10  HAVE BEEN FIXED.  WILL GIVE ONE LAST ATTEMPT."  AND DO YOU

11  RECOGNIZE THOSE INITIALS AS DR. LAVESPERE OR NO?

12  **A.**  NO, I DON'T, BUT --

13  **Q.**  OKAY.  FAIR ENOUGH.

14      AND IT SAYS, "RESCHEDULE" WITH A QUESTION MARK.  AND

15  WHAT IS CHECKED?

16  **A.**  I'M SORRY.  I DIDN'T HEAR THE QUESTION.

17  **Q.**  MY APOLOGIES.

18      THERE IS "RESCHEDULE" WITH A QUESTION MARK.  AND MY

19  QUESTION IS:  WHICH BLANK IS CHECKED?

20  **A.**  OH, THEY RESCHEDULED IT.

21  **Q.**  OKAY.  ALL RIGHT.  NOW, ON -- I WANT TO GO TO JX_05.0481.

22      HE IS SEEN IN CLINIC A, WHICH IS THE TERM FOR THE

23  GENERAL CLINIC AT THAT TIME.  CHIEF COMPLAINT INCLUDES WHAT?

24  **A.**  IN THE TYPED PORTION IT SAYS, "FOLLOW UP A.S.," AORTIC

25  STENOSIS, "HYPERTENSION, OSTEOARTHRITIS, GERD, LABS, EKG,

03:37 1  BOIL."

2  **Q.**   OKAY.  AND THE HANDWRITTEN PORTION ALSO INCLUDES AORTIC

3  STENOSIS.  CORRECT?

4  **A.**   THEY REPEAT IT, YES.

5  **Q.**   OKAY.  AND DOWN AT THE "PLAN" THERE'S AN ENTRY FOR AORTIC

6  STENOSIS AS WELL.  CORRECT?

7  **A.**   YEAH.  I'M NOT SURE WHAT THAT MEANS, BUT THEY DO DOCUMENT

8  AORTIC STENOSIS IN THE PLAN.

9  **Q.**   OKAY.  AND IN THE MEANTIME, LSP HAS BEEN TRYING TO GET AN

10  ECHO FOR THE PATIENT.  CORRECT?

11  **A.**   THEY'RE TRYING TO GET AN ECHO?  WELL, I -- ALL I CAN SAY

12  IS THE ASSESSMENT PLAN GIVES YOU NO INDICATION OF EXACTLY WHAT

13  THEY'RE GOING TO DO.

14         FOR EXAMPLE, NO. 4 SAYS, "CAD," CORONARY ARTERY

15  DISEASE, "PER CARDIOLOGY."  THIS IS TYPICAL OF -- THEY DON'T

16  REVIEW THE CARDIOLOGY NOTE.  THEY DON'T TELL YOU WHAT THE

17  CARDIOLOGIST SAID.  YOU DON'T KNOW WHAT THE CARDIOLOGIST SAID.

18  YOU DON'T KNOW WHAT THE RECOMMENDATIONS ARE.  THEY JUST SAY,

19  "DO WHAT THE CARDIOLOGIST SAID."

20         AND WITH AORTIC STENOSIS, IT'S JUST BASICALLY -- I

21  THINK IT SAYS "FOR SYMPTOMS," AND IT'S BASICALLY BLANK.  SO YOU

22  HAVE NO IDEA WHAT THE PLAN IS FOR THIS PATIENT.  NONE.

23  **Q.**   WHEN THERE'S A REFERENCE TO "PER CARDIOLOGY," THE PROVIDER

24  HAS THOSE RECORDS RIGHT THERE WITH HIM OR HER TO BE ABLE TO

25  TURN BACK TWO OR THREE PAGES TO SEE THE CARDIOLOGIST'S REPORT

03:38 1  RIGHT THERE.  CORRECT?

2  **A.**   WELL, BY YOUR OWN POLICY -- WHY DON'T THEY JUST WRITE IN

3  THE RECORD WHETHER THEY AGREE WITH THE RECOMMENDATIONS OR THEY

4  DON'T AGREE?  THAT'S YOUR POLICY.  AND THEY CAN SAY, "THE

5  CARDIOLOGIST WANTED TO GET AN ECHOCARDIOGRAM AND WE'VE

6  SCHEDULED THAT.  HE REFUSED TWICE.  WE'RE ATTEMPTING A THIRD

7  TIME."

8  **Q.**   OKAY.

9  **A.**   WHATEVER THEY HAVE TO WRITE.  BUT THE PLAN SHOULD BE VERY

10  CLEAR -- IT SHOULD BE -- TO THE NEXT READER.  AND WHAT YOU

11  SHOULD APPRECIATE IS THAT YOU HAVE -- I'M NOT SURE AT THIS TIME

12  HOW MANY PHYSICIANS -- NURSE PRACTITIONERS AND PHYSICIANS YOU

13  HAD, BUT LET'S ASSUME YOU HAD SEVEN NURSE PRACTITIONERS.  ANY

14  ONE OF THE SEVEN MIGHT SEE THE PATIENT.  SO ONE TO THE OTHER

15  COLLEAGUE HAS TO COMMUNICATE WHAT THE RECOMMENDATIONS ARE AND

16  WHAT THE PLAN IS, AND IT'S JUST NOT EVIDENT, SO IT'S NOT CLEAR.

17  **Q.**   THE CHARTS CONTAIN A COLOR-CODING SYSTEM, WHICH ALLOWS THE

18  PROVIDER TO LOOK AND SEE WHEN THE PREVIOUS SPECIALTY CARE

19  APPOINTMENT WAS VERY EASILY.  RIGHT?

20  **A.**   YEAH.  I'M UNFAMILIAR WITH THE COLOR CODE.

21  **Q.**   OKAY.  ALL RIGHT.  LET'S GO TO JX_05.0472.

22         THIS IS THE THIRD REFUSAL.  DO YOU SEE THIS?

23  **A.**   I DO.

24  **Q.**   FOR THE ECHO.  NOW, DELAYING GETTING THE ECHO IS BAD FOR

25  THIS PATIENT'S HEALTH.  CORRECT?

03:40 1    **A.**    IF HE SHOULD GET AN ECHO, HE SHOULD GET AN ECHO.

2    **Q.**    LSP EMPLOYS BASICALLY A THREE-STRIKES-AND-YOU'RE-OUT RULE.

3    YOU HAVE NO CRITICISMS OF GIVING A PATIENT THREE OPPORTUNITIES;

4    AND IF HE DOESN'T GO, IT'S ON HIM?

5    **A.**    WELL, I THINK YOU HAVE TO PUT IT IN THE CONTEXT OF WHAT'S

6    HAPPENING WITH THE PATIENT.  AND LIKE I SAY, WE'VE MADE

7    COMMENTS ABOUT THE REFUSAL PROCESS.  AND I DON'T THINK THE

8    PROVIDERS TAKE INTO CONSIDERATION THE PERSPECTIVE OF THE

9    PATIENT, WHICH THEY SHOULD.

10          SO YOU DO HAVE A PROCESS WHERE YOU -- IF SOMEBODY

11    REFUSES THREE, THAT'S IT.  BUT I THINK YOU SHOULD LOOK AT THE

12    WAY YOU DO REFUSALS AND MODIFY THAT.

13    **Q.**    LET'S LOOK AT YOUR DEPOSITION TESTIMONY.

14          I WANT TO TURN TO PAGE 161 UP AT THE TOP.  LINE

15    NO. 5, THE QUESTION IS:  DO YOU HAVE ANY CRITICISMS OF

16    BASICALLY A THREE-STRIKES RULE ON TRYING TO SCHEDULE AN

17    APPOINTMENT FOR AN INMATE?

18          YOUR ANSWER --

19          **MR. DUBNER:**  OBJECTION.  MISREADS THE DEPOSITION.

20          **MR. ARCHEY:**  YOUR HONOR, I WILL --

21          **MR. DUBNER:**  FOR THE RECORD, "BASICALLY A THREE TIMES

22    AND YOUR RULE ON TRYING TO SCHEDULE AN APPOINTMENT FOR AN

23    INMATE."

24          **MR. ARCHEY:**  I WILL TRY TO READ IT A HUNDRED PERCENT

25    ACCURATE.  I DON'T KNOW WHAT I DID WRONG, YOUR HONOR, SO.

1   **BY MR. ARCHEY:**

2   **Q.**   "QUESTION:  DO YOU HAVE ANY CRITICISMS OF BASICALLY A

3   THREE TIMES AND YOUR RULE ON TRYING TO SCHEDULE AN APPOINTMENT

4   FOR AN INMATE?

5          "ANSWER:  NO."

6          YOU GO ON AND SAY, "I MEAN, I DON'T THINK THERE'S A

7   HARD AND FAST RULE ON IT.  I DO THINK WE NEED TO CONSIDER WHAT

8   THE SITUATION WITH THE PATIENT IS."

9          SO THE THREE STRIKES RULE IN AND OF ITSELF IS FINE.

10   RIGHT?

11   **A.**   WELL, I THINK I JUST RESPONDED THE SAME WAY I DID IN THE

12   DEPOSITION; THAT YOU HAVE TO PUT IT INTO CONTEXT.

13   **Q.**   ALL RIGHT.  LET'S GO TO JX_05.0471.

14          WE HAVE A CARDIOLOGY TELEMED APPOINTMENT, WHICH AGAIN

15   HE REFUSED AGAINST MEDICAL ADVICE.  CORRECT?

16   **A.**   THAT'S WHAT SOMEONE WROTE.

17   **Q.**   OKAY.  AND THEN -- BUT LET ME JUST SAY, I MEAN, IT WOULD

18   BE NICE IF WHEN YOU SHOWED THIS YOU SHOWED THE SIGNED REFUSAL

19   BY THE INMATE WITH THE REFUSAL FORM AND WHY HE REFUSED.

20   **Q.**   LET'S GO TO JX_05.040.

21          HERE'S THE REFUSAL FORM.  IT DOESN'T HAVE A

22   SIGNATURE, BUT IT'S OTHERWISE FILLED OUT.  SO WHAT'S THE

23   RESPONSE TO HIS REFUSING TELEMED ONCE AGAIN?

24   **A.**   WHAT AM I LOOKING AT HERE?

25   **Q.**   YOU'RE LOOKING AT A REFUSAL FORM FOR THE TELEMED CARDIO

03:43 1  VISIT.

2  **A.**   OKAY.  IT SAYS, "PLEASE RESCHEDULE, TEMP SERIOUS KNEE

3  PAIN."

4  **Q.**   OKAY.  AND WHAT DOES LSP DO?  THEY RESCHEDULE.  RIGHT?

5  **A.**   YES.

6  **Q.**   OKAY.  NOW I WANT TO GO JX_05.0352.

7        WE HAVE YET ANOTHER CARDIOLOGY TELEMED APPOINTMENT,

8  WHICH AGAIN IS RESCHEDULED.  DO YOU SEE THIS?  THIS IS

9  JANUARY 7, 2020.  DO YOU SEE THAT?

10  **A.**   YES, I CAN READ IT.

11  **Q.**   OKAY.  THE PATIENT IS THE ONE REFUSING APPOINTMENTS TO GET

12  TO HIS -- THE ECHOS AND TO GET TO A CARDIOLOGIST.  RIGHT?

13  **A.**   WELL, NOT ON THIS ONE.  I MEAN, THIS LAST ONE IT WAS -- I

14  THINK IT SAID "OFFENDER IS BEING RELEASED" AND THEN

15  "RESCHEDULED," ACCORDING TO THE -- BY THE DOCTOR.

16  **Q.**   OKAY.

17  **A.**   SO THAT'S NOT THE PATIENT'S FAULT.  I MEAN --

18  **Q.**   LET'S GO TO JX_05_0350.

19        THIS IS A WEEK LATER, JANUARY 14, 2020.  AGAIN WE

20  HAVE ANOTHER CARDIOLOGY TELEMED CLINIC.  SECOND REFUSAL:  GOING

21  TO COURT IN THE MORNING, THE NEXT DAY.  RIGHT?

22  **A.**   SO IF HE'S GOING TO COURT, WHY DO YOU CONSIDER THAT A

23  REFUSAL?

24  **Q.**   BECAUSE HE DIDN'T GO TO THE APPOINTMENT WHEN HE WAS GOING

25  TO COURT THE NEXT DAY, NOT THE DAY OF THE APPOINTMENT.

03:44 1   **A.**   OH, I SEE.  YEAH.  I MEAN, I'D LIKE TO SEE THE CONNECTION

2   BETWEEN -- I MEAN, IF HE WAS GOING TO COURT THE SAME DAY, MAYBE

3   HE THOUGHT YOU WERE DOING THE APPOINTMENT ON THE DAY OF THE

4   COURT.  THAT'S WHAT IT LOOKS LIKE, BUT I DON'T KNOW.

5   **Q.**   LET'S GO TO --

6   **A.**   I DON'T KNOW.

7   **Q.**   LET'S GO TO JX_05.349.

8        THIS IS THE REFUSAL FOR THAT APPOINTMENT.  THIS MAKES

9   IT PRETTY CLEAR HIS COURT APPOINTMENT IS THE NEXT DAY.

10   CORRECT?

11   **A.**   OKAY.

12   **Q.**   AND DOWN AT THE BOTTOM WE GOT -- WE HAVE C. PARKS,

13   POSSIBLY.  WELL, WE HAVE SOMEONE AT THE BOTTOM.  THE NOTE

14   STATES, "EXPLAINS THAT THIS IS A SECOND REFUSAL.  ENCOURAGED TO

15   STAY.  CONTINUED TO REFUSE.  EMAILED HEADQUARTERS TO RESCHEDULE

16   ONE MORE TIME ONLY."  DO YOU SEE THAT?

17   **A.**   I DO.

18   **Q.**   IT'S A GOOD THING THAT THEY ARE ENCOURAGING HIM TO STAY TO

19   GET THE CARE THAT HE NEEDS.  RIGHT?

20   **A.**   WELL, I THINK -- YOU KNOW, I'VE SAID THIS A NUMBER OF

21   TIMES.  I THINK IT'S BEST TO TRY TO UNDERSTAND WHY THE PERSON

22   IS REFUSING AND SEE IF YOU CAN ACCOMMODATE IT.

23   **Q.**   AND THAT'S WHAT THEY ARE DOING, EXACTLY AS SHOWN ON THIS

24   DOCUMENT.

25   **A.**   WELL, GOOD.

03:45 1  **Q.**   OKAY.  ALL RIGHT.  I WANT TO SHOW YOU THE NEXT DOCUMENT,

2  WHICH IS JX_05_348.

3       AND AS WE LOOK AT THIS, I WANT TO BE VERY CLEAR:  I

4  DON'T WANT TO MISLEAD OR TRY -- TO MAKE SURE YOU AND I

5  UNDERSTAND, THIS IS FOR MINOR SURGERY, WHICH HE AGAIN REFUSES.

6  "AMA" IS AGAINST MEDICAL ADVICE.  RIGHT?

7  **A.**   IS THAT WHAT THAT SAYS?  "AMA"?

8  **Q.**   WELL, I WAS --

9  **A.**   I MEAN, I BELIEVE YOU, BUT --

10  **Q.**   WELL, LET'S GO TO JX_05.0347.

11       THIS IS THE REFUSAL FORM FOR THAT SAME ENCOUNTER.  HE

12  SAYS HE HAD A "SUDDEN MIGRAINE AND LOW BACK" -- I CAN'T MAKE

13  OUT THAT WORD -- "PAIN.  PLEASE RESCHEDULE."  CORRECT?

14  **A.**   AND CAN I ASK A QUESTION?  BECAUSE I THINK IT'S RELEVANT.

15  WHERE ARE ALL THESE APPOINTMENTS TO?

16  **Q.**   I'M READING THE DOCUMENTS WITH YOU.  THEY WERE CARDIOLOGY

17  TELEMED UNTIL THIS LAST ONE, WHICH IS NOT MINOR SURGERY.

18  **A.**   AND ARE SOME OF THEM GOING TO UMCNO?

19  **Q.**   ALL THESE PRIOR TO THIS ONE SAID CARDIOLOGY TELEMED.

20  **A.**   OKAY.  OKAY.

21  **Q.**   TELEMED.  RIGHT THERE ON CAMPUS.  RIGHT?

22  **A.**   ALL RIGHT.  I'M JUST ASKING.

23  **Q.**   ON THE PRISON GROUNDS.  RIGHT?  THERE'S NOT MUCH EXCUSE TO

24  NOT BE ABLE TO GET TO A TELEMED APPOINTMENT RIGHT THERE IN THE

25  TREATMENT CENTER, IS THERE?

03:47 1          **MR. DUBNER:**  OBJECTION.  ARGUMENTATIVE.

2          **THE COURT:**  OVERRULED.

3  BY MR. ARCHEY:

4  **Q.**    YOU WOULD EXPECT THE PATIENT TO GET TO THE CLINIC IF HE

5  WANTS CARE RIGHT THERE ON THE PRISON GROUNDS.  RIGHT?

6  **A.**    I MEAN, I DON'T HAVE ANY -- I'M NOT MAKING ANY COMPLAINT.

7  **Q.**    OKAY.  LET'S GO TO THE NEXT DOCUMENT, WHICH IS JX_05.0345.

8          IT'S MARCH 10, 2020.  IT'S AGAIN THE MINOR SURGERY,

9  SO I WANT TO KEEP THESE STRAIGHT FOR YOU.  IT SAYS "NO-SHOW."

10  RIGHT?

11  **A.**    THAT'S CORRECT.

12  **Q.**    THE NEXT DOCUMENT IS JX_05.0344.

13          THIS IS MARCH 23, 2020.  IT'S A GENERAL MEDICINE

14  CLINIC VISIT FOLLOW-UP AGAINST MEDICAL ADVICE.  RIGHT?

15  **A.**    YES.

16  **Q.**    LOOK AT THE CHIEF COMPLAINTS AND LIST THOSE OUT FOR ME,

17  PLEASE.

18  **A.**    I'M SORRY?

19  **Q.**    WHAT ARE THE CHIEF COMPLAINTS?

20  **A.**    IT SAYS IN THAT TOP LINE "LOW BACK PAIN, GERD, SHOULDER,

21  CAD, HYPERTENSION, AORTIC STENOSIS, CYST."

22  **Q.**    OKAY.  I WANT TO SHOW YOU THE REFUSAL FOR THIS DAY, WHICH

23  IS JX_05.0343.

24          ALL RIGHT.  THIS IS WHERE COVID COMES INTO PLAY.  HE

25  SAYS, "TOO MANY PEOPLE IN A SMALL PLACE.  I'M ELDERLY."  THAT'S

03:48 1  A COVID CONCERN.  IS THAT FAIR?

2  **A.**   JUST REPEAT THAT, PLEASE.

3  **Q.**   CERTAINLY.  I SAID -- WHAT I'M SUGGESTING TO YOU AND

4  SURMISING, THE REFUSAL SAYS, "TOO MANY PEOPLE IN SMALL PLACE.

5  I'M ELDERLY."  CONSIDERING THE DATE, THIS IS LIKELY A COVID

6  CONCERN.  IS THAT RIGHT?

7  **A.**   IT COULD BE.

8  **Q.**   ALL RIGHT.  LET'S GO TO SEPTEMBER 20, 2020, JX_05.0263.

9       THE GENTLEMAN HAD A HEART ATTACK AND WAS TAKEN TO THE

10  ATU.  CORRECT?

11  **A.**   HE HAD A HEART ATTACK.  LET ME JUST --

12  **Q.**   WELL, MAYBE I NEED TO USE A BETTER --

13  **A.**   YEAH.  I MEAN, I'M NOT SURE WHERE YOU -- SO YOU'RE --

14  YOU'VE GOT TO JUMP TO A CONCLUSION THERE.

15  **Q.**   GO AHEAD AND HELP ME OUT.  I'M NOT TRYING TO MISLEAD YOU.

16  **A.**   OKAY.  SO THERE IS A -- ON THE LEFT IT SAYS, "EKG, ST

17  DEPRESSION, V4 AND 5."  THAT COULD INDICATE ACUTE CORONARY

18  SYNDROME, NOT NECESSARILY A HEART ATTACK, BECAUSE IT SAYS

19  "DEPRESSION."  SO HE HAD A HEART ISSUE.

20  **Q.**   OKAY.

21  **A.**   LET'S PUT IT THAT WAY.

22  **Q.**   LET'S LOOK AT JX_05.0265.

23       AS A RESULT OF THIS ENCOUNTER, LSP SENDS HIM TO OUR

24  LADY OF THE LAKE HOSPITAL TO BE EVALUATED.  CORRECT?

25  **A.**   GOOD.

03:50 1    Q.   OKAY.  AND THIS IS ON -- IF I LOOK AT JX_05.0245, THIS IS

2    WHERE HE HAS THE STENT PUT IN THE FIRST TIME AT OUR THE LADY OF

3    THE LAKE HOSPITAL.  CORRECT?

4    A.   I THINK THAT'S CORRECT, YES.

5    Q.   OKAY.  LOOK AT JX_05.0433.

6         WHEN HE COMES BACK HE IS ADMITTED INTO NU 2.  DO YOU

7    SEE THAT?

8    A.   I DO.

9    Q.   OKAY.  NOW, THERE WAS SOME -- STRIKE THAT.

10         GO TO JX_05.0247.

11         HE HAS ANOTHER HEART -- I'LL CALL IT AN EVENT.  HE

12    HAS A HEART ISSUE THAT GOES TO THE -- PRESENTS TO THE ATU.

13    CORRECT?

14    A.   YES.

15    Q.   AND HE IS ONCE AGAIN SENT TO OUR LADY OF THE LAKE

16    HOSPITAL.  RIGHT?

17    A.   WELL, THIS IS AN AMBULANCE RUN REPORT.

18    Q.   I UNDERSTAND.

19         AND THEY SEND HIM TO OUR LADY OF THE LAKE HOSPITAL.

20    CORRECT?

21    A.   WELL, LET ME JUST READ IT.  I CAN FIGURE OUT WHERE THEY

22    SENT HIM, BUT I BELIEVE YOU IF YOU SAY THIS IS WHAT IT

23    REPRESENTS.

24    Q.   ALL RIGHT.  WELL, LET'S LOOK AT JX_05.0238.

25         THIS IS THE DISCHARGE NOTE, OR AT LEAST ONE PAGE OF

03:51 1  IT, WHEN HE CAME BACK FROM OUR LADY OF THE LAKE HOSPITAL THE
2  SECOND TIME.  RIGHT?
3  **A.**   THIS IS -- CORRECT.  THIS IS FROM THE SECOND
4  HOSPITALIZATION.
5  **Q.**   AND TO BE CLEAR, THE ISSUE WITH THE STENT, THAT IS NOTHING
6  ATTRIBUTABLE TO LSP?  THAT HAPPENED --
7  **A.**   I'M NOT SURE I UNDERSTAND THE QUESTION.
8  **Q.**   YEAH.  LET ME SEE IF I CAN ARTICULATE IT BETTER.
9       LSP PUT THE STENT IN.  THERE WAS AN ISSUE WITH THE
10  STENT.  THEY HAD TO REWORK THE STENT.  THAT IS NOTHING
11  ATTRIBUTABLE TO LSP AT ALL.  RIGHT?
12  **A.**   LSP DIDN'T PUT THE STENT IN.
13  **Q.**   SORRY.
14  **A.**   HE HAD THE STENT PUT IN AT THE HOSPITAL, AND THE STENT
15  DIDN'T -- IT WAS DEPLOYED IMPROPERLY, AND SO THEY HAD TO REDO
16  THE STENT.
17  **Q.**   AND IF THERE'S ANY ISSUE THERE, IT'S WITH OUR LADY OF THE
18  LAKE, NOT WITH LSP.  IS THAT RIGHT?
19  **A.**   OBVIOUSLY, YEAH.
20  **Q.**   OKAY.  THAT'S ALL I WAS TRYING TO --
21  **A.**   YEAH.
22  **Q.**   -- MAKE SURE WE WERE CLEAR ON.
23       ALL RIGHT.  HE GETS BACK FROM THAT VISIT.  HE COMES
24  BACK TO LSP ON OCTOBER 9, 2020.
25       LET'S GO BACK TO JX_05.0238 TO GET THAT DATE, PLEASE.

03:52 1          IT ACTUALLY HAS A CHECK ON IT RIGHT THERE.  DO YOU
2   SEE THAT?
3   **A.**   I'M SORRY.  I DON'T UNDERSTAND THE QUESTION.
4   **Q.**   I'M JUST TRYING TO MAKE SURE WE'VE GOT THE DATE, WHICH IS
5   OCTOBER 9, 2020.  THAT'S ALL I'M DOING.
6   **A.**   WAIT A MINUTE.  THE DATE OF THIS IS OCTOBER 7TH.
7   **Q.**   NO, SIR.  IF YOU GO DOWN TO THE DISCHARGE DATE, GO DOWN TO
8   --
9   **A.**   OH, THE DISCHARGE DATE.
10  **Q.**   YES, SIR.
11  **A.**   OKAY.
12  **Q.**   THAT'S WHERE I'M TRYING TO GO RIGHT THERE.  DO YOU SEE IT?
13  **A.**   HANG ON.  YOU'RE MOVING A LITTLE FAST THERE.  OKAY.  I SEE
14  WHAT YOU SAY.  OKAY.  HE WAS DISCHARGED ON 10/9.
15  **Q.**   VERY GOOD.  LET'S GO TO JX_05.256.
16          TWO DAYS AFTER HIS DISCHARGE, DR. LAVESPERE MAKES A
17  REFERRAL TO DR. COLON, WHO IS CARDIOLOGY.  CORRECT?
18  **A.**   LET ME JUST READ THIS.  I DO SEE IT.  THERE'S NO -- SO IT
19  DOESN'T MENTION ANY OF THE SIGNIFICANT INFORMATION WITH RESPECT
20  TO THE AORTIC STENOSIS.
21  **Q.**   LET'S BEGIN WITH DR. LAVESPERE MAKES A REFERRAL TO THE
22  CARDIOLOGIST, DR. COLON, TWO DAYS AFTER THE DISCHARGE.
23  CORRECT?
24  **A.**   THAT'S CORRECT.
25  **Q.**   ALL RIGHT.  AND HE STATES ON THIS NOTE THERE'S A "HISTORY

03:54 1   OF AORTIC STENOSIS."  CORRECT?

2   **A.**   THAT'S CORRECT.

3   **Q.**   ALL RIGHT.  AND THE SUGGESTION ABOUT WHETHER THERE ARE

4   RECORDS IN THE FILE OR NOT, DR. LAVESPERE REFERS TO AN "EPISODE

5   OF CARDIOGENIC SHOCK WHILE AT HOSPITAL."  DO YOU SEE THAT?

6   **A.**   I SEE THAT.

7   **Q.**   OKAY.  AND LET'S GO BACK TO JX_05.0239.

8   **A.**   WELL, HANG ON A SECOND.  IF THIS REQUEST -- SO THE

9   QUESTION IS, IS IF THIS IS A REFERRAL TO DR. COLON, WHY

10   WOULDN'T THE REFERRER, DR. LAVESPERE, WHO IS AN LSP DOCTOR,

11   WRITE THAT "THEY COULD NOT VISUALIZE THE AORTIC VALVE AND THEY

12   NEED TO DO A DOBUTAMINE STRESS ECHO," WHICH WAS A KEY THING.

13   AND HE HAS REQUESTED TO GO BACK TO THE UNIVERSITY MEDICAL

14   CENTER NEW ORLEANS TO GET THAT SPECIAL TEST.

15          NOW, HE DOESN'T DO THAT.  HE REFERS TO DR. COLON.

16   BUT HE DOESN'T GIVE THE INFORMATION BASED ON THE REPORT, WHICH

17   IS ONE OF THE CRITICISMS THAT I'VE MADE; THAT THE DOCTORS NEED

18   TO REVIEW THE REPORTS AND BE CLEAR ABOUT THE RECOMMENDATIONS SO

19   THAT THE TREATMENT PLAN CAN BE ACCURATELY MODIFIED.  AND THIS

20   IS JUST AN EXAMPLE OF WHY A HAND-OFF PROBLEM OF INFORMATION CAN

21   RESULT IN ERROR.  THIS IS A GOOD EXAMPLE OF IT.

22   **Q.**   ALL RIGHT.

23   **A.**   IT'S A PERFECT EXAMPLE OF IT.

24   **Q.**   DR. LAVESPERE REFERS TO THE EPISODE OF CARDIAC SHOCK WHILE

25   AT THE HOSPITAL.  CORRECT?

03:55 1    **A.**   YES.

2    **Q.**   NOW LET'S GO BACK TO JX_05.0239.

3         NOW, DOWN AT THE BOTTOM UNDER "IMPRESSION:  NO. 1,"

4    REFERS TO THE CARDIOGENIC SHOCK.  CORRECT?

5    **A.**   WAIT.  I'M LOST WHERE YOU'RE AT.

6    **Q.**   I'M AT THE BOTTOM PORTION OF THE PAGE WHERE IT SAYS

7    "IMPRESSION."

8    **A.**   OKAY.

9    **Q.**   AND NO. 1 INCLUDES IN THE DESCRIPTION "CARDIOGENIC SHOCK."

10   CORRECT?

11   **A.**   OKAY.  SO THIS IS THE --

12   **Q.**   THIS IS THE DISCHARGE RECORD FROM OUR LADY OF THE LAKE.

13   IF WE NEED TO GO BACK ONE MORE PAGE, I CAN SHOW IT TO YOU.

14   **A.**   SO IF YOU LOOK AT IT -- SO IT SAYS "LHC" -- KEEP ON THAT

15   PAGE.

16        GO BACK TO THE PAGE THAT YOU WERE JUST AT.

17        OKAY.  SO IT SAYS ON THIS -- WHERE THERE'S LINED

18   ITEMS, THE SECOND FROM THE BOTTOM, IT SAYS, LHC 10/2020.  IT

19   DOES SAY "CARDIOGENIC SHOCK."  BUT THIS IS A NOTE FROM 10/2020.

20   IT'S NOT THE DISCHARGE SUMMARY.

21        THE DISCHARGE SUMMARY YOU'LL SEE IS ON THE TOP OF THE

22   PAGE WHERE IT SAYS "DISCHARGE PLAN."  IT SAYS DISCHARGE BACK TO

23   ANGOLA.  FOLLOW-UP WITH OUTPATIENT CARDIOLOGY, NEW ORLEANS, FOR

24   CONSIDERATION FOR DOBUTAMINE STRESS TEST TO EVALUATE AORTIC

25   STENOSIS ONCE PRESSURES ARE MORE AMENABLE TO PROCEDURE.

03:57 1  **Q.**   DOCTOR, MY QUESTION --

2  **A.**   AND SO --

3  **Q.**   MY ISSUE --

4  **A.**   SO THE ISSUE IS, IS THAT DR. LAVESPERE'S REFERRAL SHOULD
5  HAVE INCLUDED THE DISCHARGE PLAN AND NOT A NOTE FROM THE
6  HOSPITAL FROM 10/20.

7  **Q.**   OKAY.  DR. LAVESPERE HAD THE ABILITY AND SAW THE NOTE THAT
8  WAS IN THE FILE FROM OUR LADY OF THE LAKE?

9  **A.**   I'M SORRY?

10  **Q.**   DR. LAVESPERE SAW THE NOTE THAT WAS IN THE FILE FROM OUR
11  OF THE LAKE HOSPITAL.  RIGHT?

12  **A.**   I DON'T KNOW WHAT HE SAW.

13  **Q.**   OKAY.  AND HE REFERS HIM TO A CARDIOLOGIST?  NOT THE UMC
14  CARDIOLOGIST, BUT A CARDIOLOGIST.  CORRECT?

15  **A.**   WHAT I'M SAYING IS THAT THE DISCHARGE PLAN FROM THE
16  HOSPITAL IS TO FOLLOW UP WITH CARDIOLOGY IN NEW ORLEANS FOR A
17  DOBUTAMINE STRESS ECHO TO EVALUATE THE AORTIC STENOSIS, AND
18  THAT WAS UNRECOGNIZED.  AND DR. LAVESPERE'S NOTE DOCUMENTS THE
19  LACK OF RECOGNITION OF THAT.

20  **Q.**   AND HE REFERRED HIM TO A CARDIOLOGIST TO FOLLOW THE CARE
21  FROM THERE.  CORRECT?

22  **A.**   HE REFERRED HIM TO DR. COLON ON-SITE, WHO DOES NOT HAVE
23  THE CAPACITY TO DO A DOBUTAMINE STRESS ECHO.

24  **Q.**   WHO IS A LICENSED BOARD CERTIFIED CARDIOLOGIST.  CORRECT?

25  **A.**   IF YOU SAY SO, YES.

03:58 1   **Q.**   DO YOU KNOW WHERE HE'S CREDENTIALED THROUGH?

     2   **A.**   NO, I DON'T.

     3   **Q.**   OKAY.  YOU EVER HEARD OF LALLIE KEMP HOSPITAL?

     4   **A.**   I HAVE HEARD OF LALLIE KEMP.

     5   **Q.**   OKAY.  AND HE'S CREDENTIALED THROUGH THERE AS A

     6   CARDIOLOGIST.  ARE YOU FAMILIAR WITH THAT?

     7   **A.**   THAT'S GOOD.  I HAVE NO DISPUTE ABOUT THAT.

     8   **Q.**   ALL RIGHT.  LET'S GO TO JX_05.0253.

     9        THIS IS A CARDIOLOGY CLINIC VISIT -- 0252.

   10        **MR. ARCHEY:**  I'M SORRY, BROOKE.  I MISSPOKE.

   11   **BY MR. ARCHEY:**

   12   **Q.**   ALL RIGHT.  THIS IS THE FIRST VISIT, AND HE REFERS TO THE

   13   AORTIC STENOSIS THAT HAS BEEN IDENTIFIED.  CORRECT?

   14   **A.**   DID YOU HAVE A QUESTION?

   15   **Q.**   YES, SIR.  THE CARDIOLOGIST RECOGNIZES THAT THERE'S A

   16   AORTIC STENOSIS ISSUE WITH THIS PATIENT.  CORRECT?

   17   **A.**   YES.

   18   **Q.**   OKAY.  AND DR. COLON SAID, "LET'S GET AN ECHO."  CORRECT?

   19   **A.**   THAT'S WHAT HE DOES.

   20   **Q.**   OKAY.

   21   **A.**   BUT AS I'VE SAID, THE PROBLEM WITH THIS NOTE -- AND YOU

   22   CAN SEE IT IN DR. LAVESPERE'S REFERRAL -- IS THAT HE WAS

   23   REFERRED WITHOUT INFORMATION ABOUT THE NEED FOR A DOBUTAMINE

   24   STRESS ECHO.

   25   **Q.**   YOU THINK DR. COLON DOESN'T HAVE THE CHART WITH HIM

04:00  1  AVAILABLE TO LOOK BACK AND SEE ALL THESE RECORDS FROM OUR LADY

2  OF THE LAKE AND ALL THESE OTHER NOTES THAT ARE AVAILABLE IN THE

3  CHART?

4  **A.**   WELL, HE ASKED FOR REPORTS, SO HE OBVIOUSLY DIDN'T HAVE

5  ALL OF IT.

6  **Q.**   YOU DON'T THINK ALL THESE RECORDS ARE RIGHT THERE IN THE

7  CHART JUST LIKE WE GOT THEM?

8  **A.**   HOW WOULD I KNOW THAT?

9  **Q.**   RIGHT.  YOU'RE SPECULATING, AREN'T YOU?

10  **A.**   WELL, I'M SPECULATING -- I'M LOOKING AT HIS NOTE, AND HIS

11  NOTE EITHER TELLS ME HE REVIEWED THE RECORD OR IT TELLS ME HE

12  DIDN'T REVIEW THE RECORD.

13  **Q.**   OKAY.

14  **A.**   AND BASED ON WHAT HE WROTE, IT DOESN'T LOOK LIKE HE

15  REVIEWED THE RECORD.

16  **Q.**   YOU CAN EASILY READ THAT AS HE DID A RECORDS REVIEW, CAN

17  YOU NOT?

18  **A.**   I'M SORRY.  I DIDN'T UNDERSTAND YOU.

19  **Q.**   YEAH.  I READ THAT AND I SAY IT READS TO ME LIKE HE DID A

20  RECORDS REVIEW.

21  **A.**   DOES IT SHOW THAT HE UNDERSTOOD THAT THEY WANTED A

22  DOBUTAMINE STRESS ECHO?  IS THAT WHAT YOU'RE SAYING?

23  **Q.**   NO, SIR.  I DON'T KNOW EITHER WAY.  I'M NOT GOING TO

24  SPECULATE.

25          WHAT I'M SAYING IS THESE WORDS CAN EASILY BE

04:00 1  INTERPRETED TO SAY HE DID A RECORDS REVIEW.

2  **A.**   WELL, WE WOULD DISAGREE ON THAT.

3  **Q.**   OKAY.  LET'S LOOK AT PAGE JX_05.0255.

4        THE REFERENCE FOR THE ECHO, LSP FOLLOWED UP AND SENT

5  OUT THE REFERENCE OR THE REFERRAL.  CORRECT?

6  **A.**   THEY SENT OUT A REFERRAL FOR A 2D ECHO, WHICH IS NOT A

7  DOBUTAMINE STRESS ECHO.

8  **Q.**   UNDERSTOOD.

9        AND THAT'S EXACTLY WHAT DR. COLON SAID GO DO.  RIGHT?

10 **A.**   DR. COLON I THINK DID NOT KNOW THAT THEY RECOMMENDED A

11 DOBUTAMINE STRESS ECHO.

12 **Q.**   ALL RIGHT.  LSP IS FOLLOWING THE GUIDANCE OF THE

13 CARDIOLOGIST, DR. COLON, AT THIS TIME.  RIGHT?

14 **A.**   THAT'S WHO YOU SENT HIM TO, YES.

15 **Q.**   OKAY.

16 **A.**   IT WAS NOT THE RECOMMENDATION OF THE HOSPITAL.

17 **Q.**   AN OUTSIDE LICENSED CARDIOLOGIST THAT IS NOT AN EMPLOYEE

18 OF LSP.  CORRECT?

19 **A.**   WELL, I MEAN, WHAT YOU'RE SAYING IS THAT DR. COLON IS NOT

20 PRIVY TO THE INFORMATION THAT WAS IN THE RECORD.  AND IF HE'S

21 NOT PRIVY TO THE INFORMATION IN THE RECORD, YOU COULD TAKE

22 DEBAKEY AND ASK DEBAKEY WHAT HE SHOULD DO, AND HE WOULD SAY,

23 "GET AN ECHOCARDIOGRAM."

24 **Q.**   YOU'RE SPECULATING, 'CAUSE YOU DON'T KNOW?

25 **A.**   WELL, NO, BUT YOU ARE, TOO.  AND SO THE -- I'M NOT

04:02 1 SPECULATING WITH RESPECT TO WHAT I READ IN THE RECORD.  THE

2 RECORD SPEAKS FOR ITSELF.

3 **Q.**   ALL RIGHT.

4 **A.**   HE DID NOT DOCUMENT UNDERSTANDING THAT THE RECOMMENDATION

5 WAS FOR A DOBUTAMINE STRESS ECHO.

6 **Q.**   LET'S GO TO JX_05.248.

7         THIS IS OCTOBER 19, 2020.  HE'S SEEN IN THE GENERAL

8 MEDICINE CLINIC AT LSP, AND THE CHIEF COMPLAINTS INCLUDED THE

9 AORTIC STENOSIS THAT YOU'RE CONCERNED ABOUT.  RIGHT?

10 **A.**   IT DOES.

11 **Q.**   AND THE PROVIDER ALSO NOTES THAT THE PATIENT HAD SEEN DR.

12 COLON.  RIGHT?

13 **A.**   IT DOES.

14 **Q.**   OKAY.  SO THAT MEANS THAT THE PROVIDER OBVIOUSLY FLIPPED

15 BACK IN THE CHART AND SAW, "HEY, THERE'S A NOTE FROM DR.

16 COLON."  RIGHT?

17 **A.**   WELL, IT -- YES.  BUT THE -- AS I SAID PREVIOUSLY, WHEN WE

18 -- WE LOOKED AT THE SAME RECORD, THERE'S NO REVIEW OF THE

19 HOSPITAL RECORD BY THE PHYSICIAN -- THIS PHYSICIAN EITHER.  AND

20 SO AS I SAID BEFORE, YOU HAVE A TRANSFER OF -- YOU HAVE A

21 HAND-OFF PROBLEM.  THE PATIENT WENT FROM THE HOSPITAL TO A

22 FACILITY.  AND THE INFORMATION AS RELAYED BY THE HOSPITAL WAS

23 NOT ACCURATELY TRANSMITTED TO THE CLINICIANS AT THE FACILITY.

24 AND YOU HAVE TO -- WHY THAT OCCURS?  I'M NOT ENTIRELY SURE.

25 THERE MIGHT BE MULTIPLE REASONS FOR IT, BUT IT DID NOT OCCUR.

04:03 1  SO THE DOCTOR DOESN'T KNOW.

2  **Q.**   THIS DOCTOR DID GO BACK AND LOOK AT THE HOSPITAL RECORD

3  BECAUSE HE NOTED THE NSTEMI -- RIGHT? -- ON THE LEFT UNDER

4  "ASSESSMENT."

5  **A.**   HE KNEW THAT THE PATIENT HAD A NON-STEMI.  BUT DID HE

6  REVIEW THE RECORD?

7  **Q.**   HOW ELSE WOULD HE KNOW THAT, DOCTOR, IF HE DIDN'T REVIEW

8  THE RECORD?

9  **A.**   WELL, HE DIDN'T REVIEW THE IMPORTANT PART OF THE RECORD,

10  WHICH WAS THE RECOMMENDATIONS.

11  **Q.**   DR. COLON IS HANDLING THAT NOW?  JUST LIKE HE SAID, "SAW

12  DR. COLON."  RIGHT?

13  **A.**   WELL, DR. COLON DIDN'T REVIEW IT EITHER.  HE DIDN'T --

14  **Q.**   OKAY.

15  **A.**   APPARENTLY HE DIDN'T REVIEW THE RECORD.

16  **Q.**   THE ERROR IS BY DR. COLON AT THAT POINT?

17  **A.**   I'M NOT SURE WHAT YOU'RE TRYING TO GET AT.

18  **Q.**   OKAY.

19  **A.**   I MEAN, IT JUST DOESN'T LINE UP.

20  **Q.**   LET'S GO -- I WANT TO SHOW YOU THE NEXT PAGE, WHICH IS

21  JX_05.0231.

22         THIS IS A NOTE.  IT'S RECOMMENDATIONS, AND IT SAYS,

23  "KEEP CARDIOLOGY FOLLOW-UP, IF THEY APPROVE, CAN PROCEED WITH

24  EGD, COLONOSCOPY."  SO HE NEEDED CARDIOLOGY APPROVAL TO GO GET

25  A COLONOSCOPY.  IS THAT RIGHT?

04:04 1   **A.**   I'M NOT SURE WHAT THIS IS.  WHAT IS THIS?

2   **Q.**   YOU KNOW, I'M NOT SURE I CAN TELL YOU COMPLETELY, TO BE

3   FRANK.

4           **MR. ARCHEY:**  GO TO THE PAGE BEFORE THIS, BROOKE, AND

5   LET'S SEE IF THAT SHOWS IT.

6   **BY MR. ARCHEY:**

7   **Q.**   WHAT I BELIEVE THIS TO BE, DOCTOR, IS THE LAST PAGE OF

8   PROBABLY A GASTRO REGIMEN.

9   **A.**   YES.  IS THIS A GASTROENTEROLOGY?

10   **Q.**   PROBABLY.

11   **A.**   OKAY.  SO THIS IS THE GASTROENTEROLOGIST BASICALLY SAYING

12   THAT HE WANTS A CARDIOLOGY FOLLOW-UP --

13   **Q.**   OKAY.

14   **A.**   -- FOR A CLEARANCE FOR THE EGD?  RIGHT?

15   **Q.**   RIGHT.  OKAY.  AND LSP IS NOTING THAT AND GETTING THAT

16   DONE.  RIGHT?

17   **A.**   THEY SENT HIM TO DR. COLON.

18   **Q.**   OKAY.  WHO IS A CARDIOLOGIST.  RIGHT?

19   **A.**   HE IS A CARDIOLOGIST, YES.

20   **Q.**   OKAY.  ALL RIGHT.  NOW, I WANT TO SHOW YOU JX_05.0216

21   WHERE HE REFUSED CARE, REFUSED 'CAUSE HE SAID HE COULDN'T GET

22   HIS LASIX -- SERIOUS PAIN, SWELLING LEGS, FEET, CAN'T WALK.

23   PLEASE FILL KOP.  SO HE REFUSED THE CARDIOLOGY VISIT YET AGAIN.

24   CORRECT?

25   **A.**   IS THIS FOR THE CARDIOLOGY VISIT?

04:05 1   **Q.**   THIS MIGHT BE FOR THE ECHO, I BELIEVE.  THIS MIGHT BE AN

2   ECHO.  YES, SIR.  THIS IS FOR HIM TO GET THE ECHO.

3   **A.**   I THINK ULTIMATELY HE DID GET THE ECHO.

4   **Q.**   RIGHT.

5   **A.**   YEAH.

6   **Q.**   AND IT SAYS "RESCHEDULE?  YES OR NO."  ONCE AGAIN, LSP

7   SAID, "YES, RESCHEDULE."  RIGHT?

8   **A.**   RIGHT.  AGAIN, THIS ONE IS NOT THAT IMPORTANT WITH RESPECT

9   TO THE AORTIC STENOSIS ISSUE.

10   **Q.**   OKAY.  NOW WE GO TO JX_05.0221.

11        THIS IS A VISIT WITH CARDIOLOGY ON JANUARY 30, 2021.

12   RIGHT?

13   **A.**   YES, 1/30/21.

14   **Q.**   AND THIS IS WITH DR. COLON.  RIGHT?

15   **A.**   THAT'S TRUE.

16   **Q.**   OKAY.  AND DR. COLON NOTES BOTH THE SEPTEMBER AND THE

17   OCTOBER INCIDENTS UNDER "NO. 1" ON THE LEFT UP AT THE TOP.  DO

18   YOU SEE THAT?

19   **A.**   YES.  I'M NOT SURE WHAT -- I THINK THAT'S WHEN HE HAD THE

20   STENT ON 9/20.

21   **Q.**   THOSE ARE THE TWO INSTANCES WHERE HE HAD THE STENT?

22   **A.**   CORRECT.

23   **Q.**   THE FIRST ONE AND THE SECOND ONE.  RIGHT?

24   **A.**   YEAH.  HE PUTS THE DATES WHEN HE HAD THE STENTS.

25   **Q.**   OKAY.  AND HE NOTES THE LOW FLOW, LOW GRADE CONCERNS THAT

04:07 1  YOU'VE EXPRESSED BEFORE.  RIGHT?

2  **A.**   WELL, IT'S A QUESTION MARK.  SO I'M NOT SURE WHAT THAT

3  REFERS TO, WHETHER HE DETERMINED THAT FROM HIS OWN EVALUATION.

4  **Q.**   DID HE --

5  **A.**   OR WHERE HE GOT THE INFORMATION.

6  **Q.**   DID HE ORDER THE -- HELP ME OUT WITH THE NAME OF THAT

7  SPECIAL ECHOGRAM.  I DON'T WANT TO MESS IT UP TOO BADLY.  DOB-

8  --

9  **A.**   DOBUTAMINE --

10  **Q.**   THANK YOU.

11  **A.**   -- STRESS ECHO.

12  **Q.**   THANK YOU.

13  **A.**   YEAH.

14  **Q.**   THAT'S WHAT I WAS TRYING TO GET TO.

15  **A.**   YEAH.

16  **Q.**   ALL RIGHT.  AND HE NOTES THE HEART E-FRACTION RATE OF 40

17  TO 45 PERCENT.  RIGHT?

18  **A.**   RIGHT.  AND AS I SAID, THAT'S RELATED TO THE FIRST

19  HOSPITALIZATION.

20  **Q.**   RIGHT.  SO IT'S DR. COLON WHO APPARENTLY IS MISSING THE

21  INFORMATION FROM THE SECOND VISIT THAT HE NOTES ON HIS OWN

22  RECORD.  RIGHT?

23  **A.**   WELL, I HAVE A DIFFERENT INTERPRETATION.  HE DOESN'T

24  REALLY DOCUMENT REVIEWING THAT SECOND HOSPITALIZATION RECORD.

25  HE DOESN'T SAY THAT THE CARDIOLOGIST COULDN'T VISUALIZE THE

04:08 1  AORTIC.

2       YOU WOULD THINK A CARDIOLOGIST WOULD SAY IF THERE WAS

3  A RECOMMENDATION:  "BECAUSE I CAN'T VISUALIZE THE AORTIC VALVE,

4  WE NEED TO DO A DOBUTAMINE STRESS ECHO."  HE WOULD SAY THAT.

5  **Q.**   YOU'RE SPECULATING?

6  **A.**   BUT HE DOESN'T.

7  **Q.**   YOU'RE SPECULATING.  CORRECT?

8  **A.**   NO.  I'M GIVING A SENSE THAT THIS IS WHAT A CARDIOLOGIST

9  WOULD NORMALLY DO.  IF YOU'RE TELLING ME THAT HE KNEW

10  EVERYTHING BUT HE DOESN'T DOCUMENT IT, I THINK THAT'S EVEN MORE

11  SPECULATIVE.

12  **Q.**   HE DOES DOCUMENT THE OCTOBER STENT INCIDENT THAT HAS --

13  THE RECORDS YOU'RE TALKING ABOUT.  RIGHT?

14  **A.**   WELL, THAT WAS THE DISCHARGE OF THE HOSPITALIZATION.  SO

15  HE KNOWS THAT HE WAS HOSPITALIZED THE SECOND TIME FOR A STENT.

16  BUT DID HE REVIEW THE RECORD?

17  **Q.**   HE SAYS "RECORDS CHECK," WHICH, AS OUR -- AS I UNDERSTAND

18  LSP'S LINGO, MEANS THEY DID GO CHECK THE RECORDS.

19  **A.**   I'M NOT SURE WHAT THAT MEANS.

20  **Q.**   OKAY.  DR. COLON SAYS, "OKAY, RESCHEDULE THE ECHO YET

21  AGAIN SINCE HE WON'T APPEAR."  RIGHT?

22  **A.**   RIGHT.  HE RESCHEDULES THE ECHO, CORRECT.

23  **Q.**   AL RIGHT.  LET'S GO TO JX_05.0211.

24       THIS PATIENT WAS A NO-SHOW FOR AN ADA APPOINTMENT.

25  OKAY.  WERE YOU AWARE OF THAT?

04:09 1  **A.**   I MEAN, I'M SEEING IT, YES.  HE WAS A NO-SHOW, CORRECT.

2  **Q.**   OKAY.  AND HE WAS OFFERED THE COVID-19 VACCINATION.

3  JX_05.0022.

4        DO YOU KNOW WHAT HE DECIDED TO DO AS TO COVID?

5  **A.**   HE REFUSED.

6  **Q.**   THAT WOULD BE AGAINST MEDICAL ADVICE?  YOU WOULD ADVISE

7  HIM IT WOULD BE A VERY GOOD IDEA TO TAKE THE COVID VACCINE?

8  **A.**   I ADVISE EVERYBODY TO GET A COVID VACCINE.

9  **Q.**   IT WOULD BE EVEN MORE IMPORTANT WITH SOMEONE WITH

10  COMORBIDITIES LIKE THIS PERSON.  RIGHT?

11  **A.**   IT WOULD, YES.

12  **Q.**   LET'S GO TO JX_05.0201.

13        WE'RE UP TO APRIL 10, 2021.  THIS IS CARDIOLOGY.

14  ONCE AGAIN, THE NOTE STATES THAT HE REFUSED TESTS AND NEEDS

15  CARDIO CLINIC FOR HIS COLONOSCOPY.  NO-SHOW.  RESCHEDULE YET

16  AGAIN.  RIGHT?

17  **A.**   THAT'S CORRECT.

18  **Q.**   ALL RIGHT.  LET'S GO TO JX_05.0113.

19        THE PATIENT FINALLY GETS THE ECHO THAT HAS BEEN

20  ORDERED BY DR. COLON FOR SOME MONTHS NOW.  RIGHT?

21  **A.**   THAT'S CORRECT.

22  **Q.**   AND THE CONCLUSIONS -- WE HAVE TWO.  HIS E-FRACTION RATE

23  NOW HAS DECREASED ALL THE WAY DOWN TO 15 TO 20 PERCENT.  RIGHT?

24  **A.**   CORRECT.

25  **Q.**   AN AVERAGE IS ABOUT 60.  THAT'S WHAT YOU WANT TO SEE.  IS

04:10 1 THAT RIGHT?

2 **A.**   THAT WOULD BE A GOOD NUMBER, YEAH.

3 **Q.**   AND 40 TO 60 IS A MODERATE IMPAIRMENT.  IS THAT THE RIGHT

4 WORD?

5 **A.**   FIFTY IS -- YOU KNOW, COULD BE OKAY.  I MEAN, IT DEPENDS.

6 IT'S -- YEAH.

7 **Q.**   OKAY.  GOOD ENOUGH.

8         AND THEN THE SECOND CONCLUSION IS "MODERATE TO SEVERE

9 AORTIC STENOSIS."  IS THAT COMBINED WITH LOW FLOW, LOW GRADE?

10 RIGHT?

11 **A.**   RIGHT.  CONSISTENT WITH.

12 **Q.**   CONSISTENT WITH.  FAIR ENOUGH.

13         ALL RIGHT.  THERE HAS BEEN A LITTLE BIT OF DISCUSSION

14 -- SO LET'S JUST TOUCH ON THIS REAL QUICK.  AND JX_05.0109.

15         THERE'S ALSO IMAGING FOR HIS LOWER EXTREMITIES AS

16 WELL.  RIGHT?

17 **A.**   CORRECT.

18 **Q.**   OKAY.  AND THAT AGAIN WOULD BE A GOOD STEP IN CARE THAT HE

19 -- THIS PATIENT NEEDED.  RIGHT?

20 **A.**   IT WAS ORDERED BY -- SOME TIME AGO FROM A VASCULAR

21 SURGEON.

22 **Q.**   OKAY.  AND ONCE THE PATIENT FINALLY DECIDED TO GO, HE GOT

23 IT.  RIGHT?

24 **A.**   HE DID.

25 **Q.**   OKAY.  LET'S GO TO JX_05.0023.

04:12 1           THE PATIENT DECLINED THE COVID-19 VACCINE FOR A
     2   SECOND TIME.  OKAY.  AND THESE COVID VACCINATION DOCUMENTS --
     3   THIS PATIENT ULTIMATELY DOES GET COVID.  RIGHT?
     4   **A.**   YEAH.  I THINK HE DID.
     5   **Q.**   OKAY.  LET'S GO TO JX_05.0200.
     6           THIS IS A REFUSAL ON MAY 16, 2021, WHERE HE REFUSED A
     7   WHOLE LITANY OF THINGS IN GENERAL MEDICINE.  AGAIN, GENERAL
     8   MEDICINE WOULD BE RIGHT THERE IN THE CLINIC AT LSP.  RIGHT?
     9   **A.**   GENERAL MEDICINE WOULD BE -- I'M SORRY.  I DIDN'T HEAR IT.
    10   **Q.**   IT WOULD BE LOCATED AT THE CLINIC AT LSP.  RIGHT?
    11   **A.**   CORRECT.
    12   **Q.**   OKAY.  SO HE WON'T EVEN GO TO AN APPOINTMENT ON THE CLINIC
    13   PRISON GROUNDS THERE AT LSP.  RIGHT?
    14   **A.**   YEAH.  I MEAN, I DON'T KNOW WHERE HE WAS HOUSED, BUT HE
    15   WOULD HAVE TO GO TO THE CLINIC, CORRECT.
    16   **Q.**   OKAY.  LET'S GO TO JX_05.0199.
    17           THIS IS A CARDIOLOGY APPOINTMENT.  AGAIN, INDICATES
    18   "AGAINST MEDICAL ADVICE."  CORRECT?
    19   **A.**   THAT'S WHAT IT SAYS, YES.
    20   **Q.**   OKAY.  AND THEN WE HAVE THE REFUSAL FORM SIGNED THAT SAME
    21   DAY.  JX_05.0198.
    22           **MR. ARCHEY:**  BROOKE, DID Y'ALL GO -- THERE WE GO.
    23   OKAY.
    24   **BY MR. ARCHEY:**
    25   **Q.**   ALL RIGHT.  HE COMPLAINS ABOUT DELAY.  RIGHT?

04:13 1  **A.**   HE DOES.

2  **Q.**   THAT HAPPENS IN THE REAL-WORLD EMERGENCY ROOMS, BUSY

3  DOCTORS' OFFICES, SPECIALISTS' OFFICES?  THIS HAPPENS EVERY DAY

4  IN MEDICINE, DOESN'T IT?

5  **A.**   YOU MEAN PEOPLE REFUSING BECAUSE THEY HAVE TO WAIT THREE

6  HOURS AND THEIR LEGS ARE SWELLING?

7  **Q.**   I'M TALKING ABOUT DELAY.

8  **A.**   DELAYS HAPPENS, CORRECT.

9  **Q.**   ALL RIGHT.  AND WHAT I MEAN BY THAT -- LET'S BE MORE

10  CLEAR.  THE DELAY LIKE WAITING IN THE OFFICE, WAITING FOR YOUR

11  APPOINTMENT, IT MAY BE RUNNING LATER THAN WHAT WAS EXPECTED;

12  THAT TYPE OF THING?

13  **A.**   THREE HOURS?

14  **Q.**   SURELY.

15  **A.**   IT WOULD BE A LITTLE UNUSUAL, BUT --

16  **Q.**   OKAY.  LET'S GO TO THE NEXT DOCUMENT, WHICH IS JX_05.0193.

17         ALL RIGHT.  HE COMES INTO THE ATU AND HE HAS SOME

18  COMPLAINTS:  FLUID ON HIS LEGS, SHORTNESS OF BREATH, ET CETERA.

19  SOME OTHER COMPLAINTS AS WELL.  I DON'T MEAN TO MINIMIZE THEM.

20  I'M JUST TRYING TO GET US TO OUR LOOKING AT THE DOCUMENT.

21         ALL RIGHT.  ONE OF THE RECOMMENDATIONS SPECIFICALLY

22  REFERS TO CARDIOLOGY.  RIGHT?

23  **A.**   YES.

24  **Q.**   OKAY.  AND THERE IS A CHEST X-RAY, WHICH IS GOOD.  RIGHT?

25  **A.**   YES.

04:15 1  **Q.** ALL RIGHT. AND THEY GET THE LABS DRAWN AND TAKEN AGAIN
2  FOR THIS PATIENT. CORRECT?
3  **A.** YES.
4  **Q.** ALL RIGHT. LET ME SHOW YOU JX_05.0192.
5         THIS SAME DAY HERE'S A REFERRAL TO CARDIOLOGY, AND IT
6  SAYS UNDERNEATH "URGENT." CORRECT?
7  **A.** YES.
8  **Q.** OKAY. LSP IS TRYING TO GET THIS GENTLEMAN CARE WHEN HE
9  WAS REFUSING TO ATTEND THE APPOINTMENTS, ISN'T IT?
10  **A.** WELL, I THINK THIS ONE -- OH, YOU JUST REMOVED IT.
11  **Q.** I DIDN'T MEAN TO.
12  **A.** THAT'S OKAY. I UNDERSTAND.
13  **Q.** THERE WE GO.
14  **A.** IT'S NOT BACK ON MY SCREEN YET.
15  **Q.** OH.
16  **A.** JUST GIVE IT A SECOND. OOPS.
17  **Q.** IT'S ON.
18  **A.** SO IT'S BACK HERE.
19         YEAH. SO THIS I THINK -- THE REASON WHY IT'S URGENT
20  IS NOT BECAUSE THEY ARE CONCERNED ABOUT THE AORTIC STENOSIS, I
21  DON'T THINK, BUT I THINK THIS IS THE CLEARANCE FOR EGD, I
22  THINK. BUT I'M NOT SURE ABOUT THAT. BUT, YOU KNOW, IN EITHER
23  CASE, YOU'RE CORRECT THAT THEY'RE TRYING TO GET HIM BACK TO THE
24  CARDIOLOGY CLINIC, SO I'M NOT DISPUTING THAT.
25  **Q.** AND WHEN YOU LOOK AT THE REFERRAL, THOUGH, ALL THE

04:16 1  COMMENTS TALK ABOUT AEMI, THE AORTIC STENOSIS.  HE CONTINUES

2  WITH SHORTNESS OF BREATH, PEDAL EDEMA; PREVIOUSLY REFUSED

3  FOLLOW-UP WITH YOU.  IS THAT "LABS" -- I'M SORRY -- "WILL BE

4  DONE," I BELIEVE, IF I'M INTERPRETING THAT RIGHT.  I MEAN, THIS

5  IS A CARDIOLOGY REFERRAL.  RIGHT?

6  **A.**   WELL, I MEAN, I THINK THAT LSP NOTES -- WHAT'S REMARKABLE

7  TO ME IS THE NUMBER OF TIMES THAT THEY DOCUMENT SYMPTOMS OF

8  AORTIC STENOSIS THAT SHOULD REQUIRE URGENT, YOU KNOW, VALVE

9  SURGERY, BUT IT'S UNRECOGNIZED.  AND -- WELL, IT IS.  I MEAN,

10  YOU'RE LOOKING AT ME QUIZZICALLY, BUT THERE'S NOTHING QUIZZICAL

11  ABOUT IT.  SYMPTOMATIC AORTIC STENOSIS SHOULD RESULT IN

12  SURGERY.  IT'S ONE INDICATION FOR SURGERY.  AND YOU LOOK AT THE

13  VALVE AREA, YOU LOOK AT THE GRADIENT, AND YOU LOOK AT SYMPTOMS.

14  IF A PERSON IS SYMPTOMATIC, IF THEY HAVE HEART FAILURE, SURGERY

15  SHOULD BE CONSIDERED.

16  **Q.**   AND, DOCTOR, TO GET SURGERY AND CONSIDER SURGERY, YOU'VE

17  GOT TO GET THE PATIENT TO SHOW UP AT APPOINTMENTS TO BE

18  EVALUATED, DON'T YOU?

19  **A.**   YOU SHOULD REFER THEM TO THE CARDIOTHORACIC SURGEON,

20  CORRECT.

21  **Q.**   OKAY.  AND THEY CAN'T EVEN GET HIM TO GO TO THE

22  CARDIOLOGIST TO GET HIS JOB DONE, TO GO FURTHER?

23  **A.**   RIGHT.  BUT YOU COULDN'T GET A DOBUTAMINE STRESS ECHO.

24  SO, I MEAN, YOU KNOW, IT'S -- YOU SHOULD LOOK AT WHAT LSP DID

25  AS WELL AS WHAT YOU'RE SAYING THE PATIENT DID.

04:18 1    Q.    ALL RIGHT.

2    A.    AND, YES, THE PATIENT REFUSED.  SURE, HE REFUSED.

3    Q.    ALL RIGHT.

4    A.    BUT DID YOU TAKE THE CARDIOLOGY RECOMMENDATION OF 10/20

5    AND ACT ON IT?  YOU NEVER DID.

6    Q.    WE ACTED BY GETTING HIM TO DR. COLON TO FOLLOW HIS CARE.

7    A.    YOU NEVER ACTED ON THE RECOMMENDATION FROM THE

8    CARDIOLOGIST AT UNIVERSITY MEDICAL CENTER NEW ORLEANS.

9    Q.    AND ONE CARDIOLOGIST MIGHT HAVE DISAGREED WITH THE OTHER

10   CARDIOLOGIST, BECAUSE DR. COLON EVEN REFERRED TO THE

11   SPECIALIZED ECHO.

12   A.    THERE'S NO EVIDENCE HE REVIEWED THE REPORT.

13   Q.    YOU'VE GOT IN EVIDENCE THAT HE SAID OCTOBER OF 2020,

14   WHICH IS --

15   A.    HE SAID HE WAS HOSPITALIZED IN OCTOBER OF 2020.  THAT

16   DOESN'T MEAN HE REVIEWED THE REPORT.

17   Q.    YEAH.  YOU'RE SPECULATING BECAUSE YOU DON'T KNOW, BECAUSE

18   HE DID SAY IT HAPPENED.

19   A.    OKAY.  I MEAN, YOU KNOW, WE'VE BEEN OVER THIS A BUNCH

20   ALREADY.

21   Q.    AND THEY DID MAKE AN URGENT CARDIOLOGY REFERRAL FOR THIS

22   PATIENT.  RIGHT?

23   A.    THIS ONE IS AN URGENT REFERRAL, CORRECT.

24   Q.    OKAY.  AND NOW WE GO TO JX_05.194.

25         THIS IS JUNE 15, 2001, GENERAL MEDICINE.  HE'S THERE

04:19 1   FOR NOT SLEEPING AND LEG PAIN.

2   **A.**   NOW -- I'M SORRY.  THE URGENT REFERRAL WAS WHAT DATE?

3   **Q.**   IT WAS JUNE 8, 2021.

4   **A.**   OKAY.  JUNE 8, 2021.

5   **Q.**   OKAY.  SO NOW WE'RE ON JUNE 15, 2021.  HE GOES TO GENERAL

6   MEDICINE FOR THESE COMPLAINTS.  THE PROVIDER NOTES THAT HE HAD

7   MISSED TWO CARDIOLOGY APPOINTMENTS.  CORRECT?

8   **A.**   RIGHT.

9   **Q.**   AND ADVISES HIM TO "KEEP YOUR CARDIOLOGIST APPOINTMENT"

10  AND EVEN GIVES THE DATE OF JUNE 19, 2021?

11  **A.**   CORRECT.  I SEE THAT.

12  **Q.**   OKAY.  LET'S GO TO THE NEXT RECORD, WHICH IS JX_5.0164.

13         THIS IS THE CARDIOLOGY APPOINTMENT ON THAT JUNE 19,

14  2021 DATE.  ALL RIGHT.  THIS IS WITH DR. COLON.  RIGHT?

15  **A.**   THAT'S CORRECT.

16  **Q.**   OKAY.  AGAIN DR. COLON NOTES BOTH THE SEPTEMBER AND THE

17  OCTOBER EVENTS IN HIS NOTES.  CORRECT?

18  **A.**   WELL, HE NOTES THE EJECTION FRACTION FROM SEPTEMBER, BUT

19  HE DOESN'T NOTE THE ECHOCARDIOGRAM FROM OCTOBER.  AND HE SAYS,

20  "NO REPORTS AVAILABLE."

21  **Q.**   HE ALSO DOESN'T EVEN NOTE ON THE ECHO THAT HE ORDERED AND

22  SIGNED FOR IT, DOES HE?

23  **A.**   I DON'T THINK HE GOT THAT, EITHER.

24  **Q.**   LET'S GO --

25  **A.**   HE DIDN'T GET HIS OWN REPORT.

04:20 1  **Q.**  WELL, LET'S GO JX_5.0113.

2        THIS IS THE REPORT BACK IN APRIL.  IT'S

3  ELECTRONICALLY SIGNED BY DR. RICHARD COLON, M.D., 04/24/21 AT

4  7:12 P.M.  RIGHT?

5  **A.**  I'M SORRY.  CAN YOU REPEAT THAT, PLEASE?

6  **Q.**  I'M JUST LOOKING AT THE BOTTOM OF THE FORM WHERE HE SAYS

7  HE ELECTRONICALLY SIGNED IT AND GAVE THE DATE AND THE TIME.

8  RIGHT?

9  **A.**  THAT'S TRUE, YES.

10  **Q.**  AND THEN NEXT TO IT ARE EVEN WHAT APPEAR TO BE HIS

11  INITIALS.  RIGHT?

12  **A.**  I'M NOT SURE THOSE ARE HIS INITIALS.  BUT IF YOU SAY SO,

13  I'LL BELIEVE IT.

14  **Q.**  ALL RIGHT.  SO WHEN A PHYSICIAN SIGNS OFF ON A REPORT,

15  THEY ARE CHARGED WITH KNOWLEDGE OF THAT REPORT, AREN'T THEY?

16  **A.**  SO IT'S TWO MONTHS LATER.  DID HE GET THE REPORT WHEN HE

17  SAW THE PATIENT?  DID HE REMEMBER IT?  DO YOU REMEMBER ALL THE

18  -- I MEAN, IF I GAVE YOU THESE NUMBERS, WOULD YOU REMEMBER IT

19  TWO MONTHS FROM NOW?

20  **Q.**  BUT THAT'S WHY WE SIGN OFF --

21  **A.**  AND --

22  **Q.**  -- AND THAT'S WHY THEY'RE IN THE RECORDS.

23  **A.**  WELL, THAT'S WHY YOU HAVE -- THAT'S WHY YOU HAVE RECORDS

24  AND THAT'S WHY YOU HAVE THEM IN THE CHART AND THAT'S WHY YOU

25  CAN REVIEW THEM.  I MEAN, IT'S THAT SIMPLE.

04:21 1    **Q.**   SO THE E-FRACTION RATE THAT DR. COLON NOTES ON THIS RECORD
    2    IS WRONG; IT'S NOT THE SAME AS THE E-FRACTION RATE NOTED ON THE
    3    ECHO THAT HE SIGNED FOR.  RIGHT?
    4    **A.**   WAIT.  YOU'RE SAYING HIS EJECTION FRACTION IS WRONG?  I
    5    DIDN'T UNDERSTAND IT.
    6    **Q.**   LET ME -- I SAID THAT ALL -- LET ME -- I GOT GARBLED.  LET
    7    ME TRY IT AGAIN.
    8    **A.**   OKAY.
    9    **Q.**   THE E-FRACTION RATE NOTED ON THE JUNE 19, 2021 NOTE IS 40
    10   TO 45 PERCENT.  RIGHT?
    11   **A.**   THAT'S ON THE SEPTEMBER ONE, YEAH.  THE EJECTION FRACTION
    12   IN SEPTEMBER WAS 40 TO 45 PERCENT, AND IN OCTOBER IT WAS, I
    13   THINK, 30 TO 35 PERCENT.
    14   **Q.**   RIGHT.  HE'S NOTING THE E-FRACTION RATE FROM SEPTEMBER OF
    15   2020.  CORRECT?
    16   **A.**   AND HE NOTED IT WHERE?
    17   **Q.**   ON THE JUNE 19, 2021 NOTE.
    18   **A.**   NOTE, YES.
    19   **Q.**   ALL RIGHT.
    20   **A.**   YEAH.
    21   **Q.**   HE DIDN'T EVEN NOTE THE E-FRACTION RATE OF 15 TO 20
    22   PERCENT ON THE ECHO HE ORDERED AND SIGNED FOR, DID HE?
    23   **A.**   THAT'S RIGHT, HE DIDN'T, YEAH.
    24   **Q.**   AND HE ALSO DIDN'T NOTE THE E-FRACTION RATE ON THE OCTOBER
    25   HOSPITAL VISIT, EITHER, DID HE?

04:23 1    **A.**   NO.  AND THE QUESTION IS WHY.  AND I SAY HE DIDN'T HAVE

2    THE REPORTS.

3    **Q.**   AND THE OTHER SPECULATION IS HE MADE AN ERROR?

4    **A.**   WELL, I MEAN, TYPICALLY IF YOU REVIEW A REPORT YOU SAY, "I

5    REVIEWED THE REPORT."  AND THERE WERE A COUPLE OF TIMES WHEN HE

6    SAID, "I DIDN'T GET THE REPORT," SO HE'S ASKING FOR REPORTS.

7    **Q.**   WE KNOW HE GOT THE REPORT.  HE SIGNED FOR IT BOTH

8    ELECTRONICALLY AND THERE ARE INITIALS BELOW THAT AS WELL.

9    RIGHT?

10    **A.**   WELL, WE JUST DISAGREE ON THAT.

11    **Q.**   ALL RIGHT.  LET'S GO TO JX_5.0191.

12         ALL RIGHT.  THIS IS A NOTE BY DR. LAVESPERE ASKING

13    THAT HE BE EVALUATED FOR LOWER -- "LE EDEMA."  WHAT IS "LE

14    EDEMA"?

15    **A.**   LOWER EXTREMITY, I THINK.

16    **Q.**   OKAY.  THAT'S LOWER EXTREMITY SWELLING.  RIGHT?

17    **A.**   CORRECT.

18    **Q.**   AND SO DR. LAVESPERE SAID, "LET'S GET HIM TO THE ATU AND

19    GET HIM CHECKED OUT."  RIGHT?

20    **A.**   OKAY.

21    **Q.**   THAT'S A GOOD THING.  RIGHT?

22    **A.**   YEAH.

23    **Q.**   OKAY.  ALL RIGHT.  LET'S LOOK NOW AT JX_5.0173.

24         ALL RIGHT.  THIS IS RESPIRATORY THERAPY -- A REQUEST

25    FOR RESPIRATORY THERAPY FOR A "PFT."  IS THAT "PLUS" OR

04:24 1  "PLEASE"?  WHAT IS THAT?

2  **A.**  I THINK IT SAYS "PLEASE."

3  **Q.**  OKAY.

4  **A.**  BUT YOU TELL ME.  I DON'T KNOW.

5  **Q.**  FAIR ENOUGH.

6          WHAT IS "PFT"?  LET'S GO THERE.

7  **A.**  PULMONARY FUNCTION TEST.

8  **Q.**  ALL RIGHT.  AND IF WE GO TO JX_5.0107.

9          WHAT IS THAT, DOCTOR?

10  **A.**  IT'S HIS PULMONARY FUNCTION TEST.

11  **Q.**  SO HE GOT THE TEST THAT WAS REQUESTED.  RIGHT?

12  **A.**  HE DID.  YOU'LL NOTE, BY THE WAY, THAT IT SAYS "SEVERE."

13  THERE'S ANOTHER THING ABOUT THIS IN PARTICULAR.  SO TO THE BEST

14  OF MY KNOWLEDGE -- YOU CAN CORRECT ME IF I'M WRONG -- BUT YOU

15  HAVE A TECHNICIAN WHO DOES THE PULMONARY FUNCTION TEST.  I

16  DON'T SEE THAT A PULMONOLOGIST ACTUALLY REVIEWS THE TRACING AND

17  DOES A DIAGNOSTIC INTERPRETATION.  AND I'M NOT SAYING THAT THE

18  TECHNICIAN CAN'T DO A REASONABLE INTERPRETATION, BUT YOU SHOULD

19  HAVE A PULMONOLOGIST DO THE INTERPRETATION.

20          IT DOES SAY THIS:  "SEVERE RESTRICTION," AND THAT'S

21  NOT OBSTRUCTION.  SO COPD, WHICH IS CHRONIC OBSTRUCTIVE

22  PULMONARY DISEASE, IS NOT A RESTRICTIVE CONDITION.

23  **Q.**  LET'S GO TO THE NEXT RECORD, WHICH IS JX_5.0159.

24          THIS IS AUGUST 3RD OF 2021, A FEW DAYS LATER.  HE IS

25  SEEN IN THE GENERAL MEDICINE CLINIC AT THIS TIME.  RIGHT?

04:25 1    **A.**   HE IS.

2    **Q.**   AND DOWN AT THE "PLAN" IT SAYS, "RESCHEDULE ALL CARDIOLOGY

3    TESTING WITH TRIPS, AGREED TO GO."  DO YOU SEE THAT?

4    **A.**   I DO.

5    **Q.**   SO THAT LOOKS LIKE THERE MIGHT HAVE BEEN SOME EDUCATING

6    AND SOME PERSUADING AND ENCOURAGING WITH THIS PATIENT.  IS THAT

7    WHAT YOU --

8    **A.**   DID YOU ASK A QUESTION?

9    **Q.**   YES, SIR.  IT LOOKS LIKE --

10   **A.**   OH, I THOUGHT YOU GAVE ME A --

11   **Q.**   IT LOOKS LIKE THE PROVIDER --

12   **A.**   YOU GAVE ME THE ANSWER AND YOU WANT ME --

13   **Q.**   THAT'S HOW IT WORKS ON CROSS-EXAMINATION, YES.

14   **A.**   THAT'S FINE, BUT IT SOUNDED LIKE AN ANSWER TO ME.

15   **Q.**   RIGHT.  LET'S GO TO THE NEXT RECORD, WHICH IS JX_5.0168.

16           HE'S SEEN IN THE GENERAL MEDICINE CLINIC AGAIN.  HE'S

17   GOT SHORTNESS OF BREATH.  HE WAS GIVEN -- HIS INHALER WAS

18   CHANGED TO SOME OTHER TYPE OF INHALER.  HIS O2 STAT WAS UP TO

19   100 PERCENT.  IT SAID, "AWAITING CARDIOLOGY TESTING" THAT WE

20   JUST REFERRED TO.  RIGHT?

21   **A.**   YES.

22   **Q.**   OKAY.  THE PLAN AT THE BOTTOM IS "KSA" -- IS KEEP

23   SCHEDULED APPOINTMENT -- "WITH CARDIOLOGY."  RIGHT?

24   **A.**   CORRECT.

25   **Q.**   OKAY.  LET'S GO TO JX_5.0158.

04:27 1        ALL RIGHT.  THIS IS ANOTHER APPOINTMENT WITH DR.
      2  COLON.  WE'RE ON AUGUST 21, 2021.
      3        ALL RIGHT.  DR. COLON AGAIN NOTES THE SEPTEMBER AND
      4  THE OCTOBER BOTH.  RIGHT?
      5  **A.**   HE NOTES THAT THE PATIENT WAS HOSPITALIZED.  HE DOESN'T
      6  SAY MUCH ABOUT IT.  HE CONTINUES TO SAY THAT THE EJECTION
      7  FRACTION IS 40 PERCENT.  HE SAYS, "STUDIES NOT AVAILABLE."  HE
      8  CONTINUES TO NOT APPRECIATE THE PRIOR RECOMMENDATION TO GET A
      9  DOBUTAMINE STRESS ECHO.
     10  **Q.**   AND THE THIRD THING UNDER THOSE, IT SAYS, MODIFIED -- OR
     11  "MODERATE" -- I'M SORRY -- "MODERATE AORTIC STENOSIS/BIC."
     12  WHAT IS THAT?  CAN YOU MAKE THAT OUT FOR ME?
     13  **A.**   I'M SORRY.  CAN YOU TELL ME WHERE YOU'RE READING?
     14  **Q.**   YES, SIR.  AT THE TOP WE HAVE THE SEPTEMBER AND THE
     15  OCTOBER DATE.  RIGHT BELOW THAT HE HAS MODIFIED -- OR "MODERATE
     16  AORTIC STENOSIS/" -- I DON'T KNOW IF THE -- IF YOU CAN MAKE
     17  THAT OUT OR NOT.
     18  **A.**   YEAH, I CAN'T MAKE THAT OUT.
     19  **Q.**   OKAY.  FAIR ENOUGH.
     20        ALL RIGHT.  LET'S ADDRESS THE DOCUMENT THAT YOU DON'T
     21  LIKE AND PLAINTIFFS DO NOT LIKE.  LET'S GO TO -- OH, BEFORE WE
     22  GO THERE, ON JX_05.0044 IS A COVID TEST.  HE'S NEGATIVE THERE.
     23  THERE'S ONE AFTER THAT WHERE HE IS POSITIVE.
     24        IS IT 144?  YEAH.  JX_5.0144.  OKAY.  SO IT STILL
     25  SAYS NEGATIVE, SO MAYBE I'M INCORRECT ON THAT.  IT SAYS, "NOT

04:29 1    DETECTED."

2                ALL RIGHT.  LET'S MOVE ON.  LET'S GO TO JX_05.0132.

3                ALL RIGHT.  THIS NOTE ON THE LEFT ABOUT "STOP

4    SMOKING," LET'S STOP RIGHT THERE FOR A MOMENT.  THAT IS GOOD

5    MEDICAL ADVICE FOR THIS GENTLEMAN.  WITH ALL OF HIS HEART

6    CONDITIONS AND ALL HIS OTHER CONDITIONS, HE SHOULD NOT BE

7    SMOKING.  RIGHT?

8    **A.**   WELL, NO ONE SHOULD SMOKE.  BUT THE WAY THIS IS WRITTEN,

9    IT'S CLEARLY A DEMEANING COMMENT, I BELIEVE.

10   **Q.**   ALL RIGHT.  FAIR ENOUGH.

11               MY QUESTION IS, SIMPLY:  THE ADVICE TO STOP SMOKING

12   IS OBVIOUSLY GOOD ADVICE?

13   **A.**   UNDER ANY CONDITION IT IS.

14   **Q.**   OKAY.  THE SECOND PIECE OF THIS ADVICE IS HE NEEDS TO GET

15   OUT OF HIS WHEELCHAIR; HE NEEDS TO GET UP AND MOVE.  THAT IS

16   GOOD MEDICAL ADVICE AS WELL.  CORRECT?

17   **A.**   WELL, DOES THIS PERSON KNOW WHAT IS WRONG WITH HIM?  SO HE

18   HAS AORTIC STENOSIS, CORONARY ARTERY DISEASE.  IF HE'S SAYING

19   THAT THE PATIENT HAS COPD AND HE SHOULD WALK MORE, YES, THAT

20   WOULD BE A GOOD RECOMMENDATION.

21               IF HE HAS AORTIC STENOSIS AND HE GETS SHORT OF BREATH

22   WHENEVER HE WALKS, IT MAY NOT BE GOOD ADVICE.  AND THE WAY IT'S

23   WRITTEN AND THE CONTEXT IS SUCH THAT THIS IS JUST -- I DON'T

24   SEE HOW YOU CAN SEE IT OTHER THAN UNPROFESSIONAL AND DEMEANING.

25   **Q.**   ALL RIGHT.  AND SOMETIMES YOU NEED TO SPEAK IN THE

04:30 1  PERSON'S LANGUAGE TO TRY TO GET THROUGH TO THEM WHEN YOU'VE

2  BEEN UNABLE TO FOR MONTHS AND MONTHS AND MONTHS.  RIGHT?

3  **A.**   WELL, YOU'RE WRONG.  THIS PERSON IS WRONG.  THEY DON'T

4  KNOW WHAT HE HAS.

5  **Q.**   OKAY.

6  **A.**   HE HAS A DIFFERENT DISEASE, AND HE'S GOING TO DIE FROM IT

7  IN A COUPLE OF DAYS, AND THEY DON'T UNDERSTAND THAT.  AND

8  THEY'RE YELLING AT HIM IN BIG CAPITAL LETTERS:  GET UP OFF YOUR

9  BUTT AND WALK.  AND THEY DON'T KNOW WHAT THEY'RE TALKING ABOUT.

10  **Q.**   NOBODY KNOWS THE GENTLEMAN IS GOING TO DIE IN TWO DAYS.

11  **A.**   THIS PERSON WHO WROTE THIS DOESN'T KNOW WHAT THEY'RE

12  TALKING ABOUT.

13  **Q.**   ALL RIGHT.  BUT THE ADVICE TO GET OUT OF THE WHEELCHAIR

14  WOULD BE GOOD ADVICE; MEDICAL ADVICE?

15  **A.**   IN THIS CONDITION IT MIGHT BE BAD ADVICE.

16  **Q.**   ALL RIGHT.  DR. COLON -- IF HE HAD IDENTIFIED WHAT WAS IN

17  THE CHART, THIS PATIENT COULD HAVE BEEN CARED FOR IN A

18  DIFFERENT MANNER?

19  **A.**   IF THE PATIENT HAD VALVE SURGERY, HE MIGHT BE LIVING

20  TODAY.

21  **Q.**   AND THE PATIENT MAY NOT HAVE EVEN QUALIFIED FOR VALVE

22  SURGERY BECAUSE HE HAD A LOT OF COMORBIDITIES ALONG WITH IT.

23  RIGHT?

24  **A.**   THAT WOULD BE UP TO THE SURGEON, YES.

25  **Q.**   OKAY.  AND ALL THIS IS THROUGH DR. COLON, WHO IS THE

04:31 1  SPECIALIST THAT WAS IN CHARGE OF THIS PATIENT'S CARE FOR THAT

2  WHOLE PERIOD OF TIME.  RIGHT?

3  **A.**   WELL, I DISAGREE.  I MEAN, I REALLY THINK IT'S A PROCESS

4  ISSUE WITH THE WAY IN WHICH YOUR SPECIALTY CARE IS PROCESSED.

5  IT'S A TRANSFER OF INFORMATION PROBLEM THAT'S CORRECTABLE, BUT

6  IT'S SERIOUS.

7  **Q.**   AND TO GET THERE, YOU HAVE TO ASSUME ALL THE -- ALL THOSE

8  ASSUMPTIONS YOU MADE AS YOU READ THESE RECORDS AS OPPOSED TO

9  THE SIMPLE FACT OF DR. COLON ERRED BY NOT LOOKING AT THE RIGHT

10  CHART?

11  **A.**   WELL, I CAN SEE ON ALMOST EVERY RECORD I READ THAT THERE

12  IS A -- FOR MANY RECORDS THERE IS A DISCHARGE SUMMARY WITH

13  RECOMMENDATIONS.  AND I DON'T SEE YOUR PHYSICIANS DOCUMENTING

14  REVIEW OF THOSE RECORDS OR CONDUCTING -- INSERTING THAT IN THE

15  IMPLEMENTATION -- IN THE PLAN OF CARE FOR THE PATIENT AND

16  DISCUSSING IT WITH THE PATIENT.  I JUST DON'T SEE THAT.

17  **Q.**   ISN'T IT PRETTY COMMON TO SEE LIKE WHERE WE SAW THE

18  DISCHARGE NOTE FOR GASTROLOGY OR DR. LAVESPERE SIGNING OFF ON

19  EVERYTHING THAT NEEDS TO BE DONE IN THEIR SCHEDULING?

20       LET ME SEE IF I CAN GET MY HANDS ON IT REAL QUICK.

21  DO YOU REMEMBER WHAT I'M REFERRING TO?  DO YOU REMEMBER WHAT

22  I'M --

23  **A.**   I'M NOT SURE I UNDERSTAND THE QUESTION.

24  **Q.**   DO YOU REMEMBER THE DOCUMENT WHERE THERE IS A DISCHARGE

25  SUMMARY -- WE LOOKED AT THE LAST PAGE -- HAD ALL THE

04:33 1    RECOMMENDATIONS AND LSP IS RESPONDING TO GET THEM ALL DONE?

2    **Q.**   DO I REMEMBER THE DOCUMENT WITH DR. LAVESPERE?  I'M SORRY.

3    I DON'T -- I DON'T RECALL IT.

4              **MR. ARCHEY:**  GIVE ME ONE -- YOUR HONOR, IF I MAY?

5              **THE COURT:**  MAY YOU WHAT, TAKE A MINUTE?

6              **MR. ARCHEY:**  JUST TAKE A SECOND.

7              **THE COURT:**  YES, YOU MAY.

8    **BY MR. ARCHEY:**

9    **Q.**   DOCTOR, I'M REFERRING YOU TO JX_5.0231.

10             THESE ARE THE RECOMMENDATIONS FROM THE -- RETURN FROM

11   THE GI CLINIC WHERE ALL THE RECOMMENDATIONS ARE BEING

12   ADDRESSED.  DO YOU SEE THIS?

13   **A.**   THIS IS FROM THE GI CLINIC, CORRECT.

14   **Q.**   UNDERSTOOD.  UNDERSTOOD.

15   **A.**   OKAY.

16   **Q.**   I'M ADDRESSING YOUR CONCERN WHERE THERE NEEDS TO BE

17   COORDINATION WITH THE RECOMMENDATIONS.  THIS IS AN EXAMPLE OF

18   IT.  RIGHT?

19   **A.**   SO SHOW ME A PROGRESS NOTE, A GENERAL MEDICINE CLINIC

20   WHERE THEY DOCUMENT THAT THEY REVIEWED THE -- I MEAN, THE G.I.

21   NOTE AND THAT THEY INCORPORATED THIS INTO THE PLAN.

22   **Q.**   WELL, I CAN'T WALK THROUGH ALL THE RECORDS YET AGAIN, BUT

23   THEY DID ALL THAT.  NOW, HOLD ON.  MY TURN.  AND DR. LAVESPERE

24   SIGNED OFF ON THIS.  DO YOU SEE DOWN AT THE BOTTOM?  RIGHT?

25   **A.**   HE DID SIGN OFF ON IT, AND I'M NOT SURE IT WAS ALL DONE.

04:34 1  **Q.**  ALL RIGHT.  LET'S MOVE ON.  I WANT TO GO TO PATIENT NO. 7.

2  PATIENT NO. 7 IS THE ONE THAT HAD THE POSITIVE -- YOU'RE USING

3  A DIFFERENT TERM.  I CALL IT HEMOCCULT OR BLOOD STOOL.  YOU'RE

4  USING A DIFFERENT TERM FOR THAT.

5  **A.**  IT'S A GUAIAC TEST.

6  **Q.**  A GUAIAC TEST.  THANK YOU.  I WAS GOING TO HAVE TROUBLE

7  GETTING THAT RIGHT.

8        SO IN MAY OF 2019 HE HAS THREE POSITIVE GUAIAC TESTS

9  WHICH SHOW BLOOD IN THE STOOL.  RIGHT?

10  **A.**  THAT'S CORRECT.

11  **Q.**  AND AS A RESULT OF THOSE TESTS, THE GENTLEMAN SHOULD -- OR

12  NEEDED A COLONOSCOPY.  RIGHT?

13  **A.**  HE DID.

14  **Q.**  DID YOU READ WHERE DR. TOCE SAID -- HE TOLD HIM THAT HE

15  REFUSED IT?

16  **A.**  I THINK I SAW THAT WHERE DR. TOCE IN HIS DEPOSITION SAID

17  THAT THE PATIENT REFUSED THE TEST.

18  **Q.**  OKAY.  AND DID YOU SEE RECORDS INDICATING THAT THE PATIENT

19  HAD REFUSED THIS TEST IN THE PAST?

20        **MR. DUBNER:**  OBJECTION, YOUR HONOR.  RELEVANCE AND

21  PREJUDICE.  RELEVANCE BECAUSE HE'S ASKING ABOUT RECORDS FROM

22  BEFORE 2019 WHEN THE PARTIES EXPRESSLY STIPULATED THAT THE

23  RELEVANT PERIOD BEGINS IN 2019 FOR THIS COURT'S CONSIDERATION.

24  PREJUDICE BECAUSE HE'S TALKING ABOUT RECORDS THAT DEFENDANTS

25  EXPLICITLY REFUSED TO GIVE US AND MOVED THIS COURT FOR A

04:36 1 PROTECTIVE ORDER TO NOT HAVE TO GIVE US.

2          **THE COURT:**  MR. ARCHEY, ADDRESS THE RELEVANCE.  IS IT

3 BEFORE 2019?

4          **MR. ARCHEY:**  IT'S IN LATE 2018.  HE REFUSED THE TEST

5 WHEN IT WAS OFFERED TO HIM, AND HE SAYS, "I DO NOT WANT THAT

6 TEST."

7          **THE COURT:**  GREAT.  DON'T REALLY CARE WHAT IT SAYS.

8 ADDRESS THE RELEVANCE.

9          **MR. ARCHEY:**  THE RELEVANCE IS HE HAD A HISTORY OF

10 REFUSING THE TEST, AND IT SUPPORTS WHAT --

11          **THE COURT:**  THEN SHOW IT WITH 2019 FORWARD.

12 OBJECTION SUSTAINED.

13 **BY MR. ARCHEY:**

14 **Q.**  ARE YOU AWARE OF ANY INFORMATION THAT THE PATIENT HAD

15 TURNED DOWN THE COLONOSCOPY IN THE PAST?

16 **A.**  EXCEPT FOR DR. TOCE'S DEPOSITION, I DON'T KNOW.

17 **Q.**  ALL RIGHT.  BECAUSE IF THE PATIENT TURNS DOWN THE

18 COLONOSCOPY, THEN WHAT WE'VE GOT IS STILL AN ERROR FOR NOT

19 HAVING A REFUSAL FORM?  THERE NEEDS TO BE A REFUSAL FORM.

20 RIGHT?

21 **A.**  THERE'S NO DOCUMENTATION IN THE RECORD THAT ANYONE EVER

22 DISCUSSED IT WITH HIM.

23 **Q.**  RIGHT.

24 **A.**  AND THERE'S NO DOCUMENTATION THAT ANYONE EVERY FOLLOWED UP

25 ON IT.  AND SO IT LOOKS TO ME -- IF YOU LOOK AT THE RECORD THAT

04:37 1  WE WERE GIVEN, IT LOOKS LIKE NOTHING WAS DONE.

2  **Q.**  THERE NEEDS TO BE A REFUSAL FORM WITH THE PATIENT.

3  CORRECT?

4  **A.**  IF THE PATIENT REFUSES A TEST, YES, THERE SHOULD BE A

5  REFUSAL FORM.

6  **MR. ARCHEY:**  YOUR HONOR, I'M HAVING TO JUGGLE TO TAKE

7  CARE OF THE CHARTS THAT WERE NOT IDENTIFIED OR WEREN'T PART

8  OF A -- LET ME ADDRESS THAT.

9  **BY MR. ARCHEY:**

10  **Q.**  IN YOUR EXPERT REPORT YOU HAVE A "SPECIALTY CARE SECTION"

11  BEGINNING ON PAGE 82 OF THE REPORT.  CORRECT?

12  **MR. ARCHEY:**  NOW GO AHEAD AND PULL THAT UP FOR US, IF

13  YOU CAN, BROOKE.

14  **BY THE WITNESS:**

15  **A.**  YES.

16  **Q.**  OKAY.  AND AS WE GO THROUGH THAT, YOU ADDRESS FIVE

17  PATIENTS UNDER "SPECIALTY CARE" AND FIVE PATIENTS ONLY.  YOU

18  ADDRESS PATIENT NO. 1.  LET'S GO DOWN AND LET'S GO THROUGH

19  THEM.  OKAY.  GO DOWN FURTHER.  AND YOU REALLY HAVEN'T TALKED

20  ABOUT PATIENT 1 IN CERTAINLY NO DETAIL HERE TODAY.  CORRECT?

21  **A.**  THAT'S CORRECT.

22  **Q.**  OKAY.  KEEP GOING.  YOU THEN IDENTIFY PATIENT NO. 2?

23  **A.**  THAT'S CORRECT.

24  **Q.**  OKAY.  KEEP GOING.  AND YOU AGAIN HAVE NOT TALKED ABOUT

25  PATIENT 2 HERE TODAY?

04:38 1  **A.**   I'M SORRY.  IS THAT A QUESTION?

2  **Q.**   IT IS.  HAVE YOU TALKED ABOUT PATIENT 2 HERE TODAY?

3  **A.**   I DON'T THINK WE DID.

4  **Q.**   OKAY.  KEEP GOING.  YOU THEN TALK ABOUT PATIENT NO. 4,

5  WHICH YOU HAVE TALKED ABOUT TODAY?

6  **A.**   CORRECT.

7  **Q.**   OKAY.  TALKED ABOUT PATIENT NO. 5, WHICH WE TALKED ABOUT

8  AND YOU AND I TALKED ABOUT.  AND YOU TALKED ABOUT PATIENT

9  NO. 7.  CORRECT?

10  **A.**   CORRECT.

11  **Q.**   AND THAT'S THE ENTIRETY OF THE PATIENTS YOU TALKED ABOUT

12  IN THE "SPECIALTY CARE" SECTION.  CORRECT?

13  **A.**   THAT'S ALL I USED AS EXAMPLES IN THERE, YES.

14  **Q.**   OKAY.  ALL RIGHT.  LET'S TALK ABOUT PATIENT NO. 10.  AND

15  THIS GENTLEMAN HAD A NUMBER OF TRANSIENT ISCHEMIC ATTACKS.

16  CORRECT?

17  **A.**   YES.  HE HAD WHAT APPEARED TO BE TRANSIENT ISCHEMIC

18  ATTACKS.

19  **Q.**   AND I'M GLAD YOU SAID IT THAT WAY.  YOU SAID, "WHAT

20  APPEARED TO BE."  RIGHT?

21  **A.**   CORRECT.

22  **Q.**   'CAUSE THERE ARE ALSO A NUMBER OF TIMES WHERE HE ADMITTED

23  TO SMOKING MOJO.  AND THAT'S WHAT WAS GOING ON.  RIGHT?

24  **A.**   I THINK HE ADMITTED TO SMOKING MOJO ONCE.

25  **Q.**   LET'S LOOK AT JX_10, I GUESS IT IS, .176, I HOPE.

04:40 1    **MR. ARCHEY:** YOUR HONOR, I APOLOGIZE. I'M NOT GOING

2 TO BE AS SMOOTH ON THIS. IT'S GOING TO BE CLUMSY.

3 **BY MR. ARCHEY:**

4 **Q.** DOWN AT THE BOTTOM, THE THIRD LINE FROM THE BOTTOM:

5 "PATIENT ADMITTED TO SMOKING," QUOTE, "A DIPSTICK." DO YOU

6 KNOW WHAT A DIPSTICK IS?

7 **A.** I JUST WANT TO MAKE A COMMENT. WE SPENT -- I LISTENED TO

8 THE TESTIMONY YESTERDAY, AND A LONG TIME WAS SPENT BY DR.

9 VASSALLO TALKING ABOUT THE --

10    **MR. ARCHEY:** YOUR HONOR, MAY I? I ASKED HIM A VERY

11 DIRECT QUESTION, AND HE WANTS TO PROVIDE -- HE CAN DO ALL THIS

12 ON HIS DIRECT OR REBUTTAL OR WHAT HAVE YOU. I'M ASKING HIM TO

13 ANSWER THE QUESTION I ASKED.

14    **THE COURT:** I WOULD ASK YOU TO ANSWER THE QUESTION

15 ASKED, DOCTOR.

16 **BY THE WITNESS:**

17 **A.** OKAY.

18 **Q.** ALL RIGHT.

19 **A.** CAN YOU REPEAT IT?

20 **Q.** YES, I CAN, DOCTOR.

21    DOCTOR, IF WE LOOK AT THE BOTTOM OF THIS FORM, THIS

22 DOCUMENT INDICATES THAT THE PLAINTIFF ADMITTED TO SMOKING A

23 DIPSTICK. MY QUESTION TO YOU IS: WHAT IS A DIPSTICK?

24 **A.** I ACTUALLY DON'T KNOW.

25 **Q.** OKAY. IS IT REASONABLE TO ASSUME THAT THAT'S AN ILLICIT

04:41 1    DRUG SUBSTANCE?  YOU EVER HEARD OF THAT?

2    **A.**    IF YOU TELL ME.

3    **Q.**    OKAY.  AND THE SIGNIFICANCE FOR THIS PATIENT IS THAT WOULD

4    CAUSE -- IF HE USED ILLICIT DRUGS, THAT COULD CAUSE ALTERED

5    MENTAL STATUS.  RIGHT?

6    **A.**    THERE'S A LOT OF THINGS THAT CAN CAUSE ALTERED MENTAL

7    STATUS.  I DON'T KNOW WHAT A DIPSTICK IS.

8    **Q.**    OKAY.

9    **A.**    I DON'T KNOW WHAT DRUG IT IS, BUT THERE'S A LOT OF THINGS

10   THAT CAUSE ALTERED MENTAL STATUS.

11   **Q.**    INCLUDING ILLICIT DRUG USE.  RIGHT?

12   **A.**    YES.

13   **Q.**    OKAY.  LET'S GO TO JX_10.0150.

14          **MR. ARCHEY:**  GO TO THE NEXT PAGE FOR ME THERE,

15   BROOKE, AND SEE IF THAT DOES IT.  OR THE PREVIOUS PAGE THEN.

16   OH, 149.  I'M SORRY.  I SEE MY NOTE NOW.  NOW IT'S 149.

17   **BY MR. ARCHEY:**

18   **Q.**    DOWN AT THE "CHIEF COMPLAINT" SECTION, THE LAST LINE:

19   "PATIENT STATES HE SMOKED A DIPSTICK EARLIER."  DO YOU SEE

20   THAT?

21   **A.**    I'M SORRY.  WHERE ARE YOU AT?

22   **Q.**    UNDER "CHIEF COMPLAINT" UNDER -- THE LAST LINE UNDER --

23   THERE'S FOUR LINES THERE.

24   **A.**    YEAH.  SO, YOU KNOW, I WANT TO MAKE -- AND I CAN MAKE THIS

25   SAME COMMENT ON ALMOST EVERY ONE OF THESE THAT YOU SHOW WITH

04:43 1  RELATION TO DIPSTICK, OR WHATEVER OTHER DRUG YOU'RE USING, IS

2  THAT THAT DOES NOT MEAN THAT YOU SHOULD NOT EVALUATE THE

3  COMPLAINT OF THE PATIENT.

4  **Q.**   OKAY.

5  **A.**   IF THE COMPLAINT OF THE PATIENT IS ALTERED MENTAL STATUS,

6  YOU ARE -- YOU MUST EVALUATE THE ETIOLOGY OF THE ALTERED MENTAL

7  STATUS.  SO IF YOU CONSIDER INTOXICATION, GO AHEAD AND CONSIDER

8  IT, BUT YOU MUST EVALUATE THE ETIOLOGY, AND THAT'S NOT DONE FOR

9  THIS PATIENT.  IN FACT, I DON'T THINK THIS PATIENT HAD A

10  PHYSICAL EXAM.

11  **Q.**   WELL, DOCTOR, THE -- YOU HAVE TO TAKE INTO ACCOUNT THE

12  DRUG USE AS PART OF THE REASON FOR THE ALTERED MENTAL STATUS,

13  DO YOU NOT?

14  **A.**   YOU MUST CONSIDER ALL POSSIBILITIES.  AND THE MEDICAL

15  POSSIBILITIES WERE NOT CONSIDERED EVER FOR THIS PATIENT.

16  **Q.**   OKAY.  LET'S KEEP GOING.  LET'S LOOK AT JX_10.114.

17          ALL RIGHT.  AGAIN IT REFERS TO SMOKED A DIPSTICK;

18  "PATIENT ADMITTED TO SMOKING A DIPSTICK" ON THE THIRD AND

19  FOURTH LINE.  DO YOU SEE THAT?

20  **A.**   AS I SAID, THAT DOES NOT RELIEVE THE RESPONSIBILITY OF

21  EVALUATING THE PATIENT FOR A POSSIBLE MEDICAL CONDITION.

22  **Q.**   BUT YOU ALSO HAVE TO TREAT WHAT YOU KNOW ABOUT THE

23  PATIENT, WHAT HE PRESENTS WITH.  RIGHT?

24  **A.**   YEAH.  BUT YOU CAN'T ASSUME THAT EVERYONE IS SMOKING A

25  DIPSTICK; AND THEREFORE, WE DON'T HAVE TO EVALUATE ANY ALTERED

04:45 1   MENTAL STATUS -- LEFT ARM WEAKNESS, ATAXIA, SLURRED SPEECH.

2   YOU HAVE TO BE JOKING.

3   **Q.**   DOCTOR, NOBODY'S ASSUMING ANYTHING.  HE'S ADMITTING TO

4   SMOKING --

5   **A.**   NO.  YOU'RE TELLING ME THAT THAT'S A REASON FOR NOT

6   EVALUATING THE MEDICAL CONDITION.

7   **Q.**   I'M NOT.  I'M TELLING YOU HE'S ADMITTING TO SMOKING A

8   DIPSTICK, AND WE'RE TREATING HIM FOR WHAT HE'S ADMITTING TO

9   DOING.  RIGHT?

10   **A.**   YEAH.  BUT THAT'S NOT THE SOLE -- HE HAS ALTERED MENTAL

11   STATUS.  WHAT'S THE EVALUATION FOR ALTERED MENTAL STATUS?  IT'S

12   NOT TO SAY IF HE SMOKED A DIPSTICK, WE JUST DISCHARGE HIM.

13   **Q.**   AND NOBODY --

14   **A.**   THAT'S WHY HE DIED.

15   **Q.**   NOBODY DID JUST DISCHARGE HIM.

16   **A.**   WELL, THEY NEVER EXAMINED HIM.

17   **Q.**   LET'S KEEP GOING.  LET'S GO TO JX_10.111.

18         ALL RIGHT.  THIS TIME HE HAS A BURN ON HIS INDEX

19   FINGER.  HE'S PASSING OUT WITH A WICK IN HAND.  DO YOU KNOW

20   WHAT A WICK IS USED FOR?

21   **A.**   NO.

22   **Q.**   OKAY.  YOU DON'T KNOW THAT TO BE USED FOR ILLICIT DRUG

23   USE, ONCE AGAIN?

24   **A.**   NO, I DON'T KNOW THAT.

25   **Q.**   OKAY.  AND THERE ARE OTHER INDICATIONS OF INTOXICATION IN

04:46 1  THE CHART THAT ARE NOT DIRECTLY ATTRIBUTABLE TO THE PATIENT

2  LIKE THESE ARE.  THESE ARE THE PATIENT ADMITTING IT OR BEING

3  FOUND WITH THE SUBSTANCE ON HIM.

4         **THE COURT:**  IS THERE A QUESTION THERE?

5         **MR. ARCHEY:**  YEAH.  YEAH.

6  **BY MR. ARCHEY:**

7  **Q.**  ARE YOU AWARE --

8         **THE COURT:**  WHERE IS IT?

9         **MR. ARCHEY:**  YES, YOUR HONOR, THAT'S FAIR.

10  **BY MR. ARCHEY:**

11  **Q.**  ARE YOU AWARE THAT THERE ARE SIX INSTANCES OF ADMITTED

12  DRUG USE WITH THIS PATIENT?

13  **A.**  I MEAN, IF YOU SAY SO.  SO LOOK AT THE BLOOD PRESSURE:

14  145/107.

15  **Q.**  OKAY.

16  **A.**  EVERY ONE OF THESE EPISODES, THE PATIENT'S BLOOD PRESSURE

17  WAS ELEVATED.  NEVER DID THEY CONSIDER IT.  NEVER.

18  **Q.**  AND WHAT DO YOU THINK SMOKING A DIPSTICK WOULD DO TO YOUR

19  BLOOD PRESSURE?

20  **A.**  NEVER DID THEY CONSIDER THE BLOOD PRESSURE IS ELEVATED.

21  **Q.**  ALL RIGHT.  WHAT DO YOU THINK THAT THE -- SMOKING A

22  DIPSTICK WOULD DO TO THE BLOOD PRESSURE?

23  **A.**  ARE YOU AN EXPERT IN TOXICOLOGY?  I MEAN, I DON'T KNOW.

24  **Q.**  I'M ASKING YOU, DOCTOR.

25  **A.**  I HAVE NO IDEA.

04:47 1   **Q.**   I DID NOT SUGGEST AN ANSWER.  I ASKED YOU A QUESTION.

2   **A.**   I'M UNFAMILIAR WITH DIPSTICKS, SO I'M NOT SURE WHAT THEY

3   DO.

4   **Q.**   ALL RIGHT.  LET'S TALK ABOUT HIS BLOOD PRESSURE.

5         HIS BLOOD PRESSURE GENERALLY RAN FAIRLY RIGHT AT THE

6   NORMAL CUT-OFF OF 140/90.  ISN'T THAT RIGHT?

7   **A.**   NOT FROM MY EXAMINATION.

8   **Q.**   OKAY.  LET'S GO TO PAGE 187; JX_10.187.

9         THIS NOTES 130/90 ON SEPTEMBER 19, 2019.  DO YOU SEE

10   THAT?

11   **A.**   I DO SEE THAT.

12   **Q.**   OKAY.  LET'S GO TO PAGE 187 -- I'M SORRY -- 180.  180.

13         THIS ONE NOTES 127/90.  THIS IS JANUARY 22ND OF 2020.

14   DO YOU SEE THAT?

15   **A.**   SO IT'S STILL A LITTLE BIT -- IT'S ON THE BORDERLINE

16   ELEVATED.

17   **Q.**   IT'S NOT ELEVATED, IS IT?

18   **A.**   WELL, 90 IS NOT -- YOU'D LIKE IT UNDER 140/90.

19   **Q.**   OKAY.  LET'S GO TO THE NEXT ONE, WHICH IS 176.

20         THIS TIME IT IS ELEVATED EVER SO SLIGHTLY, 146/94,

21   AND THEN IT DROPS DOWN TO 144/90.  RIGHT?

22   **A.**   OKAY.  SO THAT'S ELEVATED A LITTLE BIT.

23   **Q.**   RIGHT.  LET'S GO TO THE NEXT ONE, WHICH IS JX_10.169.

24         THIS TIME IT'S 147/97.  RIGHT?

25   **A.**   THAT'S CORRECT.

04:48 1    Q.   OKAY.  LET'S GO TO THE NEXT ONE, WHICH IS 163.

2               IT'S 131/86 AND 121/85.  BOTH OF THOSE ARE NORMAL.

3    RIGHT?

4    A.   THOSE ARE.

5    Q.   EXCUSE ME?

6    A.   THOSE ARE, YEAH.

7    Q.   OKAY.  LET'S GO TO THE NEXT ONE, WHICH IS PAGE 150.  IT'S

8    146 -- OH, HOLD ON.  DID I GIVE YOU THE RIGHT PAGE NUMBER?  OH,

9    153.  I'M SORRY.  THERE WE GO.  OKAY.  146/80, WHICH IS

10   SLIGHTLY ELEVATED.  RIGHT?

11   A.   THAT'S RIGHT.

12   Q.   LET'S GO TO PAGE 149.

13   A.   BUT HANG ON A SECOND.  SO YOU'RE GOING THROUGH THE RECORD

14   AND YOU CAN FIND INSTANCES WHERE THE BLOOD PRESSURE IS WITHIN

15   NORMAL.  BUT IF YOU GO THROUGH THE WHOLE RECORD, YOU'LL FIND

16   INSTANCES WHERE THE BLOOD PRESSURE IS NOT AND --

17   Q.   DOCTOR, I'M GOING THROUGH EVERY ONE I FOUND WITH YOU.

18   A.   YOU'RE GOING THROUGH EVERY ONE OF WHAT?

19   Q.   EVERY BLOOD PRESSURE THAT IS NOTED.

20   A.   OH, EVERY BLOOD PRESSURE YOU FOUND YOU'RE GOING THROUGH?

21   Q.   YES, SIR.

22   A.   OKAY.  SO LOOK AT THE SEQUENCE OF THE ONES WHERE HE

23   ACTUALLY PRESENTED WITH ALTERED MENTAL STATUS.  JUST GO THROUGH

24   THOSE SIX AND SEE WHAT YOU SEE.

25   Q.   LET'S KEEP GOING.  I'M SORRY.  MY ORGANIZATION --

04:50 1    **A.**   AND YOU'LL SEE SOMETHING THAT'S VERY INTERESTING.

2    **Q.**   MY ORGANIZATION --

3    **A.**   BECAUSE THEY'RE ALL REALLY, REALLY HIGH.

4    **Q.**   THERE'S BEEN NONE REALLY, REALLY HIGH.  SEVERE BLOOD

5    PRESSURE IS --

6    **A.**   GO LOOK AT THE SIX THAT WERE PART OF THE CHART REVIEW.

7    **Q.**   WHAT IS SEVERE BLOOD PRESSURE?

8    **A.**   WELL, IT'S CHANGED OVER TIME.  BUT 180 OVER -- I MEAN, IN

9    EMERGENCY SITUATIONS IS 180/120.

10    **Q.**   OKAY.

11    **A.**   BUT ANYTHING OVER 140/90.  AND IN A DIABETIC IT'S A LITTLE

12    LOWER.

13    **Q.**   OKAY.

14    **A.**   130/80 IS ABNORMAL.

15    **Q.**   ALL RIGHT.  DID YOU SEE ANY READING ANYWHERE IN THIS CHART

16    THAT WAS AS HIGH AS THAT SEVERE LEVEL?

17    **A.**   THAT'S NOT THE POINT.  THE POINT IS IT'S ELEVATED AND HE

18    HAD AN INTRACRANIAL BLEED, AND THE RISK FACTOR FOR INTRACRANIAL

19    BLEED IS BLOOD PRESSURE OUT OF CONTROL.  AND HE HAD BLOOD

20    PRESSURE OUT OF CONTROL DURING EVERY ONE OF THOSE EPISODES.

21         GO LOOK AT IT.  I MEAN, I'M HAPPY TO REVIEW THOSE AND

22    TALK TO YOU ABOUT IT.

23    **Q.**   ALL RIGHT.  I WANT TO STOP GOING THROUGH THESE.  I THINK

24    I'VE ESTABLISHED -- AND WE CAN DO IT IN BRIEFING LATER, AS

25    NECESSARY.

04:51 1        LET'S MOVE ON TO --

2        **MR. ARCHEY:** YOUR HONOR, ONCE AGAIN I WANT TO ASK THE

3 COURT'S INDULGENCE, BECAUSE THIS IS AGAIN PART OF WHAT I WASN'T

4 PREPARED TO TALK ABOUT TODAY.

5 **BY MR. ARCHEY:**

6 **Q.** ALL RIGHT. LET'S GO TO PATIENT 48. AGAIN, NOT IN YOUR

7 SPECIALTY SECTION. CORRECT?

8 **A.** I'M SORRY?

9 **Q.** IS PATIENT 48 IN YOUR SPECIALTY SECTION?

10 **A.** HE WASN'T AN EXAMPLE IN THE SPECIALTY SECTION, NO.

11 **Q.** OKAY. LET'S GO TO PAGE NO. JX_48.0038.

12        ALL RIGHT. THIS IS THAT EKG I THINK YOU REFERRED TO.

13 IT'S A NORMAL EKG, ISN'T IT?

14 **A.** IT IS LEFT ATRIAL ENLARGEMENT.

15 **Q.** OKAY. WHICH IS A TYPICAL FINDING. THE EKG IS READ AS

16 NORMAL. RIGHT?

17 **A.** NO, IT'S NOT TYPICAL AND IT'S NOT NORMAL, BUT IT IS WHAT

18 IT IS.

19 **Q.** OKAY.

20 **A.** IT'S LEFT ATRIAL ENLARGEMENT.

21 **Q.** LET'S GO TO JX_48.0117.

22        OKAY. MY NOTE -- THAT YOU SAID WAS ADDITIONAL

23 TESTING SHOULD HAVE BEEN DONE AND CARDIOLOGY SHOULD HAVE BEEN

24 REFERRED AT THIS TIME. IS THAT RIGHT?

25 **A.** RIGHT. BECAUSE HE LOOKED LIKE HE HAD A SYNCOPE EPISODE.

04:53 1    **Q.**   OKAY.  LET'S GO JX_48.0116.

2         HE ACTUALLY IS REFERRED OUT TO CARDIOLOGY.  RIGHT?

3    **A.**   YES.

4    **Q.**   EXACTLY WHAT YOU WANTED TO OCCUR.  RIGHT?

5    **A.**   YES.

6    **Q.**   AND IF WE GO TO JX_48.093, THAT'S WHERE HE GOES TO LANE

7   MEMORIAL HOSPITAL, AND THEN HE HAS THE HEART CATH HERE.  RIGHT?

8    **A.**   RIGHT.  I MEAN, THE REFERRAL TO CARDIOLOGY I DON'T THINK

9   EVER OCCURRED.  BUT HE --

10   **Q.**   HE HAD A --

11   **A.**   HE WAS HOSPITALIZED AND HE HAD A CARDIAC CATH.

12   **Q.**   DO YOU KNOW IF --

13   **A.**   SO HE MUST HAVE SEEN A CARDIOLOGIST DURING THE CARDIAC

14   CATH.

15   **Q.**   DO YOU KNOW IF THE EVENT OCCURRED BEFORE THE CARDIOLOGY

16   APPOINTMENT?

17   **A.**   WHAT EVENT?

18   **Q.**   THAT LEAD HIM TO LANE MEMORIAL HOSPITAL.

19   **A.**   SO IF YOU SHOW ME THE DATES, I CAN -- I CAN SPEAK TO THAT.

20   **Q.**   THIS IS WHERE -- I'M SORRY -- I'M HAMSTRUNG.  THIS IS ALL

21   I GOT FOR YOU.  IF THE RECORDS REFLECT --

22   **A.**   I'M NOT SURE OF THE QUESTION THEN.  CAN YOU REPEAT THE

23   QUESTION?

24   **Q.**   DO YOU KNOW WHETHER THE CARDIOLOGY APPOINTMENT WAS AFTER

25   THIS LANE MEMORIAL ENCOUNTER?

04:54 1  **A.**   HE DIDN'T HAVE A CARDIOLOGY APPOINTMENT.

2  **Q.**   HOW DO YOU KNOW THAT?

3  **A.**   WELL, I COULDN'T FIND IT IN THE RECORD.

4  **Q.**   ALL RIGHT.  LET'S GO TO PATIENT NO. 4.

5          WE'RE ON THE HOME STRETCH HERE.  GET US ALL OUT AT A

6  DECENT HOUR MAYBE.

7          LET'S BEGIN WITH JX_4.0241.

8          BEFORE THAT THIS PATIENT'S MEDICAL HISTORY INCLUDED A

9  SEIZURE DISORDER, HYPERTENSION, RENAL CANCER, AND SEVERE

10  INTESTINAL LUNG DISEASE.  RIGHT?

11  **A.**   INTESTINAL LUNG DISEASE?

12  **Q.**   INTERSTITIAL.  I'M SORRY.

13  **A.**   INTERSTITIAL, YES.

14  **Q.**   SORRY.

15  **A.**   INTERSTITIAL LUNG DISEASE, CORRECT.

16  **Q.**   THANK YOU.  MY APOLOGIES.

17  **A.**   THAT'S OKAY.

18  **Q.**   PLEASE CORRECT ME WHEN YOU NEED TO.

19  **A.**   I HAVEN'T HEARD OF INTESTINAL LUNG DISEASE.

20  **Q.**   THERE YOU GO.  MY BAD.

21  **A.**   SORRY.

22  **Q.**   ALL RIGHT.  MY MEDICAL KNOWLEDGE ONLY GOES SO FAR, DOCTOR.

23  **A.**   IT IS LATE.

24  **Q.**   IT IS LATE.

25  **A.**   YEAH.

04:55 1  **Q.**  ALL RIGHT.  ONE OF THE PROBLEMS HERE, HE WAS LOST TO CARE

2  AND THIS WAS A COVID INCIDENT.  RIGHT?

3  **A.**  YOU KNOW, I'M NOT SURE IF IT WAS A COVID INCIDENT, BUT

4  COVID WAS THERE, SO I -- YOU KNOW, I'M GIVING A LITTLE CREDIT

5  THERE.  IT COULD VERY WELL HAVE BEEN A COVID ISSUE.

6  **Q.**  RIGHT.  AND YOU ADMIT IN YOUR REPORT THAT IT WAS POSSIBLY

7  DUE TO COVID.  RIGHT?

8  **A.**  WELL, I MEAN, REMEMBER HE -- WHEN HE WAS SUPPOSED TO GO

9  WAS ABOUT FIVE MONTHS BEFORE COVID ACTUALLY STARTED, SO HE --

10  DID HE MISS THE APPOINTMENT?  IT DIDN'T OCCUR FOR FIVE MONTHS

11  AND THEN COVID CAME.  AND SO WE DON'T KNOW QUITE WHAT HAPPENED,

12  BUT IT LOOKED LIKE HE JUST MISSED IT.

13  **Q.**  ALL RIGHT.

14  **A.**  YOU KNOW, THERE WAS NEVER AN APPOINTMENT THAT THEY SAID,

15  "CANCEL THE APPOINTMENT BECAUSE OF COVID."  SO THERE WAS NO

16  DOCUMENTATION THAT THERE WAS EVER AN APPOINTMENT SCHEDULED.

17  **Q.**  LET'S GO TO JX_04.0190.

18      THIS IS THE UMC RECORD, WHICH INDICATES THAT HE WAS

19  LOST TO CARE DUE TO COVID -- DUE TO THE PANDEMIC.  GIVE ME ONE

20  SECOND.  I'LL DIRECT YOU MORE SPECIFICALLY.

21  **A.**  YEAH.  IT SAYS, "HE WAS LOST TO FOLLOW UP DURING THE

22  PANDEMIC, REEMERGED IN DECEMBER OF 2020."

23  **Q.**  ALL RIGHT.  VERY GOOD.

24      AND THERE WAS A PERIOD OF TIME DURING THE PANDEMIC

25  WHERE THERE WERE ZERO SPECIALTY OR ZERO CARE OTHER THAN COVID

04:56 1  AT THE HOSPITALS.  RIGHT?

2  **A.**   OH, ABSOLUTELY, YEAH.

3  **Q.**   OKAY.  LET'S MOVE ON FROM THIS PATIENT.  ALL RIGHT.  LET'S

4  WRAP UP.  I WANT TO TALK ABOUT SOME OF THE ADMINISTRATIVE TYPE

5  THINGS THAT I HAVEN'T ADDRESSED SO FAR.

6         AS TO PEER REVIEW, DOC HAS INCREASED THE NUMBER OF

7  CHARTS TO BE REVIEWED AS PART OF PEER REVIEW.  CORRECT?

8  **A.**   IN POLICY THEY HAVE, YES, BUT NOT IN PRACTICE.

9  **Q.**   WELL, YOU SAW THE ONE TIME WHERE THE POLICY WAS MAYBE

10  STILL NEWER.  BUT THE POLICY IS IT'S GOING TO BE -- TEN PERCENT

11  OF YOUR POPULATION IS GOING TO BE THE PEER REVIEWED.  RIGHT?

12  **A.**   WELL, YOU HAD THE POLICY.  FIVE MONTHS LATER YOU DID A

13  PEER REVIEW.  YOU DIDN'T USE THE NUMBER THAT YOU SAID YOU WOULD

14  USE IN THE POLICY AND YOU SAY IT'S GOING TO BE INCREASED IN THE

15  FUTURE.  AND WE'LL SEE.

16  **Q.**   ALL RIGHT.  AND SO THE POLICY OF TEN PERCENT OF YOUR

17  POPULATION, THAT WOULD BE AN IMPROVEMENT.  RIGHT?

18  **A.**   IT WOULD BE AN IMPROVEMENT TO REVIEW MORE RECORDS,

19  CORRECT.

20  **Q.**   BECAUSE THAT'S GOING TO LEAD TO -- IN THEORY, IT'S GOING

21  TO LEAD TO A BETTER PEER REVIEW.  RIGHT?

22  **A.**   IT WILL.

23  **Q.**   OKAY.  AND THE PEER REVIEW IS CONDUCTED BY A PHYSICIAN

24  FROM ANOTHER FACILITY.  CORRECT?

25  **A.**   FROM ANOTHER LSP FACILITY, CORRECT.

04:57 1  Q.   SURE.

2  A.   I MEAN, ANOTHER LOUISIANA PRISON FACILITY.

3  Q.   DOC?

4  A.   YEAH, DOC.

5  Q.   FAIR ENOUGH.

6         AND PEER REVIEW IS BETTER BECAUSE OF THESE CHANGES.

7  RIGHT?

8  A.   WELL, LIKE I SAY, I MEAN, MY COMMENTS ON PEER REVIEW

9  REMAIN.  I GAVE MY CRITICISMS OF IT, AND I STAND BY THOSE.

10  Q.   ALL RIGHT.  THERE IS THE PERFORMANCE EVALUATION SYSTEM

11  FOR, YOU CALL IT, CIVIL SERVANTS.  RIGHT?

12  A.   CORRECT.

13  Q.   ALL RIGHT.  THAT DOES ADDRESS YOUR JOB DUTIES AND YOUR

14  PERFORMANCE OF YOUR JOB DUTIES.  CORRECT?

15  A.   THERE'S NO CLINICAL REVIEW.

16  Q.   IT DOES ADDRESS YOUR JOB DUTIES AND YOUR PERFORMANCE OF

17  YOUR DUTIES.  RIGHT?

18  A.   THE INFORMATION THAT WAS PROVIDED TO ME DOES NOT SHOW

19  THAT, SO I DON'T SEE WHERE THEY REVIEWED, FOR EXAMPLE, DR. TOCE

20  OR ANY OF THE NURSE PRACTITIONERS.  THEY REVIEWED THEIR

21  CLINICAL WORK IN THE PERFORMANCE EVALUATION.

22  Q.   AND THE PERFORMANCE EVALUATION IS COMPLETED BY A SUPERIOR

23  SUPERVISOR OVER THE --

24  A.   CORRECT.

25  Q.   OKAY.  ALL RIGHT.  CREDENTIALING AT LSP IS BETTER.

04:59 1  CORRECT?

2  **A.**   WELL, LIKE DR. LAVESPERE SAID, THERE'S BEEN NO CHANGE IN

3  THE WAY YOU CREDENTIAL.  THERE WERE -- THE FILES WERE A LITTLE

4  BETTER ORGANIZED, BUT THAT I THINK WAS THE EXTENT OF IT.

5  **Q.**   SO IT'S A LITTLE BETTER IS WHAT YOU TOLD ME.  RIGHT?

6  **A.**   THE FILES WERE A LITTLE BETTER ORGANIZED, AND THAT WAS IT.

7  **Q.**   ARE YOU AWARE OF ANY SUITS AGAINST LSP FOR NEGLIGENT

8  CREDENTIALING?

9  **A.**   NO.

10  **Q.**   OKAY.  YOU GAVE SOME TESTIMONY ABOUT THE CREDENTIALING FOR

11  THE ON-SITE SPECIALISTS.  ARE YOU SUGGESTING THAT LSP HAS TO GO

12  -- HAVE A CREDENTIALING FILE FOR EACH ON-SITE SPECIALIST THAT

13  COMES TO LSP?

14  **A.**   I THINK IF THE SPECIALIST WORKS AT LSP, YOU SHOULD HAVE A

15  CREDENTIAL FILE ON THEM, YES.  YOU SHOULD VERIFY THEY HAVE A

16  LICENSE.  I MEAN, YOU'RE HIRING THEM.  SO THERE ARE -- EVEN IF

17  IT'S A CONTRACT EMPLOYEE, IT'S NO DIFFERENT IN THE WORLD.  IF

18  OUR LADY OF THE LAKE HOSPITAL HIRES A PHYSICIAN TO WORK ON A

19  CONTRACT BASIS, THEY WOULD CREDENTIAL THEM.  AND CREDENTIALING

20  IS DONE FOR ANY SPECIALIST THAT COMES ON.  I MEAN, I'VE DONE

21  THIS.  I MEAN, THIS IS SOMETHING THAT I'M USED TO, SO.

22  **Q.**   WHAT ABOUT AT UMC?  DOES LSP HAVE TO HAVE CREDENTIALING

23  FILES FOR UMC PHYSICIANS?

24  **A.**   NO.  BECAUSE THEY'RE GOING TO UMC.

25  **Q.**   OKAY.  SO --

05:00 1   **A.**   BUT IF A SPECIALIST WORKS HERE AT LSP -- SO IF YOU HAVE A

2   PODIATRIST, YOU SHOULD CREDENTIAL THE PODIATRIST.

3   **Q.**   IS THERE A DIFFERENCE BETWEEN WORKING THERE AND COMING IN

4   TO DO A CLINIC ON A CONTRACT BASIS ONCE A MONTH?

5   **A.**   YEAH.  I THINK YOU SHOULD CREDENTIAL THEM, YES.

6             **MR. ARCHEY:**  GIVE ME ONE SECOND, YOUR HONOR, IF I

7   MAY?  YOUR HONOR, THOSE ARE MY QUESTIONS.

8   **BY MR. ARCHEY:**

9   **Q.**   THANK YOU, DR. PUISIS.

10  **A.**   I APPRECIATE IT.  THANK YOU.

11            **THE COURT:**  HOW MUCH REDIRECT IS THERE, MR. DUBNER?

12            **MR. DUBNER:**  FIFTEEN, 20 MINUTES, I WOULD EXPECT.

13            **THE COURT:**  OKAY.  WE ARE GOING TO FINISH AT THE

14  CLOSE -- WE ARE GOING TO CONCLUDE COURT AT THE END OF YOUR

15  REDIRECT.

16            **MR. DUBNER:**  COULD I HAVE ONE MOMENT TO CONFER BEFORE

17  I START?

18            **THE COURT:**  YES.

19            **MR. DUBNER:**  THANK YOU, YOUR HONOR.

20                      **REDIRECT EXAMINATION**

21  **BY MR. DUBNER:**

22  **Q.**   DR. PUISIS, I'D LIKE TO START BY TALKING ABOUT PATIENT

23  NO. 5.

24            FIRST OFF, THERE WERE A BUNCH OF QUESTIONS ABOUT

25  REFUSALS BETWEEN AUGUST 2019 AND I BELIEVE SEPTEMBER 2020.  DO

05:03 1  YOU RECALL THAT FROM THE CROSS-EXAMINATION?

2  **A.**  YES.

3  **Q.**  IN YOUR TESTIMONY TODAY, DID YOU HAVE ANY CRITICISMS ABOUT

4  LSP'S RESPONSE FOR THE REFUSALS BEFORE SEPTEMBER 2020?

5  **A.**  NO.

6  **Q.**  SO FIRST LET'S TALK ABOUT -- THERE WAS DISCUSSION OF

7  WHETHER OR NOT THIS WAS A MEDICAL RECORDS ERROR OR AN ERROR ON

8  THE PART OF DR. COLON.  LET'S FIRST TALK ABOUT THE MEDICAL

9  RECORDS PART.

10  DO FILES GET ADDED TO THE MEDICAL RECORD -- THE PAPER

11  MEDICAL RECORD AT LSP THE MOMENT THEY'RE CREATED, TO YOUR

12  KNOWLEDGE?

13  **MR. ARCHEY:**  YOUR HONOR, I OBJECT.  I DON'T KNOW THAT

14  HE'S GOT -- IT'S NOT IN THE REPORT.  OUTSIDE THE SCOPE OF THE

15  REPORT.

16  **THE COURT:**  OVERRULED.

17  **BY THE WITNESS:**

18  **A.**  I'M SORRY.  CAN YOU REPEAT THE QUESTION?

19  **Q.**  DO FILES GET ADDED TO THE MEDICAL RECORD AND A PAPER

20  RECORD THE MOMENT THEY'RE CREATED?

21  **A.**  THE MOMENT THE REPORT IS CREATED?

22  **Q.**  LET ME REPHRASE.

23  IN A PAPER RECORD, A FILE THAT IS PRODUCED HAS TO BE

24  ADDED TO THE RECORD.  CORRECT?

25  **A.**  CORRECT.

05:04 1    **Q.**   AND DID YOU SEE EVIDENCE IN YOUR REVIEW OF THE MEDICAL

2    RECORDS THROUGHOUT THIS CASE, THROUGHOUT THE REMEDIAL PERIOD,

3    OF DOCUMENTS THAT LOOKED LIKE THEY SHOULD HAVE BEEN ADDED TO

4    THE RECORD AND WEREN'T?

5    **A.**   YES.  THERE WERE -- IT LOOKED LIKE THERE WERE MISSING

6    DOCUMENTS.

7    **Q.**   AND DID YOU SEE EVIDENCE OF RECORDS THAT LOOKED LIKE THEY

8    WERE ADDED WELL OUTSIDE OF CHRONOLOGICAL ORDER?

9    **A.**   THE CHART WAS NOT IN CHRONOLOGICAL ORDER, THAT'S CORRECT.

10    **Q.**   AND SO IT SOUNDS LIKE YOUR OPINION IS THE MOST LIKELY

11    EXPLANATION IS THAT DR. COLON DIDN'T HAVE THE MEDICAL RECORDS

12    THAT HE NEEDED TO ADEQUATELY TREAT THE PATIENT.  IS THAT

13    CORRECT?

14    **A.**   YES.  IN CONVERSATIONS WITH THE OTHER EXPERTS, WE ALL

15    EXPERIENCED AND HAD SIMILAR COMMENTS ABOUT THE CONDITION OF THE

16    MEDICAL RECORD.  SO IF WE'RE EXPERIENCING THAT, I'M SURE THE

17    PROVIDERS WHO WORK HERE EXPERIENCE THE SAME THING.

18    **Q.**   AND THERE WERE REPEATED REFERRALS TO THE FACT THAT DR.

19    COLON NOTED THAT HE HAD BEEN TO THE HOSPITAL, HAD A STENT IN

20    OCTOBER OF 2020.  COULD THAT INFORMATION HAVE BEEN AVAILABLE

21    PLACES OTHER THAN THE REPORT FROM THAT HOSPITALIZATION ITSELF?

22    **A.**   SURE, YEAH.

23    **Q.**   OKAY.  BUT LET'S ASSUME FOR THE MOMENT THAT DEFENDANTS ARE

24    RIGHT AND THAT THERE WAS NO MEDICAL RECORDS PROBLEM; THAT THIS

25    WAS PURELY A MISTAKE BY DR. COLON.  WHAT RESPONSIBILITIES DOES

05:06 1   A MEDICAL SYSTEM HAVE TO REVIEW THE CARE OF SOMEBODY WHO IT
      2   BRINGS ON-SITE FOR AN EXTENDED PERIOD OF TIME TO PROVIDE CARE
      3   TO ITS PATIENTS?
      4   **A.**   WELL, LIKE I SAID, THIS PATIENT HAD 19 EPISODES OF
      5   SYMPTOMATIC AORTIC STENOSIS, SYMPTOMATIC -- AND SYMPTOMATIC
      6   AORTIC STENOSIS IS AN INDICATION FOR SURGERY.  AND DESPITE
      7   REPEATED -- ALMOST A YEAR-LONG SPAN OF SYMPTOMATIC AORTIC
      8   STENOSIS, THE PRIMARY CARE DOCTORS FAILED TO RECOGNIZE IT AND
      9   REFER HIM FOR POSSIBLE SURGERY, WHICH SHOULD HAVE BEEN DONE.
     10   **Q.**   AND IN TERMS OF THE CARE PROVIDED BY THEIR CONTRACT
     11   CARDIOLOGIST WHO THEY'VE CONTRACTED WITH TO COME ON-SITE, WHAT
     12   RESPONSIBILITIES DOES A MEDICAL FACILITY -- THE DIRECTOR OF A
     13   MEDICAL FACILITY HAVE REGARDING THE QUALITY OF CARE THAT THAT
     14   PERSON PROVIDES?
     15   **A.**   WELL, THEY'RE RESPONSIBLE FOR IT.  THEY HIRED THEM.
     16   **Q.**   AND COUNSEL ASKED DO THEY HAVE TO REVIEW THE CARE -- ARE
     17   THEY RESPONSIBLE FOR THE CARE OF EVERY PROVIDER THEY SEND
     18   SOMEBODY OUT TO AT UMCNO.  IN THE CASE OF SPECIALISTS
     19   PRACTICING AT UMCNO, IS THE UMCNO FACILITY RESPONSIBLE FOR THE
     20   CARE THAT'S PROVIDED THERE?
     21   **A.**   YES.  UMC WOULD BE RESPONSIBLE FOR THE CARE AND THE
     22   CREDENTIALING, BY THE WAY.
     23   **Q.**   AND IS ANYBODY OTHER THAN LSP RESPONSIBLE FOR THE CARE AND
     24   CREDENTIALING OF THE SPECIALISTS WHO COME TO LSP?
     25   **A.**   IT'S LSP.

05:07 1    Q.    YOU REFERRED TO THE NEED FOR CREDENTIALING FILES OF

2    SPECIALISTS AT LSP.  DR. COLON HAS BEEN PRACTICING AT LSP FOR

3    QUITE SOME TIME.  IS THAT CORRECT?

4    A.    I BELIEVE SO, YES.

5    Q.    ARE YOU AWARE OF DR. COLON'S DISCIPLINARY HISTORY?

6    A.    YES.

7    Q.    ARE YOU AWARE THAT IN --

8          **MR. ARCHEY:**  YOUR HONOR, I WILL OBJECT.  IT'S OUTSIDE

9    THE SCOPE OF MY DIRECT WHEN HE STARTED TALKING ABOUT

10   DISCIPLINARY HISTORY OF DR. COLON.

11         **THE COURT:**  MR. DUBNER?

12         **MR. DUBNER:**  IT GOES TO THE OVERSIGHT OF THE

13   PRACTITIONER -- OF THE PROVIDERS PRACTICING AT LSP TO THE

14   FAILURES OF MORTALITY REVIEW AND LEADERSHIP AND MANAGEMENT OF

15   THE PEOPLE PRACTICING.

16         **THE COURT:**  WHICH ALL WERE PART OF THE CROSS.

17   OVERRULED.

18   **BY MR. DUBNER:**

19   Q.    LET'S PULL UP PLAINTIFFS' EXHIBIT 17A AT PAGE 1.

20         AND IS IT CORRECT THAT IN 2003 DR. COLON'S LICENSE

21   WAS SUSPENDED DUE TO SUBSTANCE AND ALCOHOL ABUSE?

22   A.    YES.

23   Q.    AND IF WE GO TO PAGE 20, IS IT CORRECT THAT THERE WAS A

24   SUPERSEDING CONSENT ORDER IN -- I'M NOT SURE OF THE YEAR OF

25   THIS -- IN MID-TWO THOUSAND -- DUE TO AN EVENT IN MID-2004

05:09  1    WHERE DR. COLON HAD A RELAPSE OF ALCOHOL ABUSE?

2    **A.**    YES.

3    **Q.**    AND IF WE GO TO PAGE 28, IS IT CORRECT THAT THERE WAS

4    ANOTHER RELAPSE AND FURTHER REPRIMAND AND DISCIPLINE IN 2012?

5    **A.**    YES.

6    **Q.**    AND IF WE GO TO PAGE 43, IS IT CORRECT THAT THE

7    RESTRICTIONS ON DR. COLON'S LICENSE WERE ONLY LIFTED IN FULL ON

8    OCTOBER 26TH OF 2020?

9    **A.**    THAT'S CORRECT.

10    **Q.**    AND IS THAT AFTER THE CARE THAT WE'VE STARTED TALKING

11    ABOUT HERE?  SORRY.  IS THAT IN THE MIDDLE OF THE CARE WE

12    STARTED TALKING ABOUT HERE?

13    **A.**    YES.

14    **Q.**    AND IF THERE WERE A CREDENTIALING FILE FOR SPECIALISTS AT

15    LSP, WOULD THIS SORT OF INFORMATION BE IN IT?

16    **A.**    IT SHOULD BE.

17    **Q.**    AND IF LSP WERE -- AND LET'S TALK ABOUT MORTALITY REVIEW.

18          AS WE DISCUSSED BEFORE, IN THE MORTALITY REVIEW, WAS

19    THERE ANY DISCUSSION WHATSOEVER OF ANY PROBLEMS IN THIS

20    PATIENT'S CARE?

21    **A.**    NO.

22    **Q.**    WAS THERE ANY DISCUSSION OF DR. COLON NOT RECOGNIZING THE

23    EJECTION FRACTION?

24    **A.**    NO.

25    **Q.**    WAS THERE ANY DISCUSSION OF FAILURES TO REFER EVENTS TO

05:10 1    DR. COLON?

2    **A.**    NO.

3    **Q.**    WHETHER IT'S A MEDICAL RECORDS ISSUE OR WHETHER IT'S THE

4    FAILURE OF DR. COLON, SHOULD THAT HAVE BEEN IN THE MORTALITY

5    REVIEW?

6    **A.**    YES.

7    **Q.**    LET'S TALK ABOUT PATIENT 7 FOR A MOMENT.

8            WHETHER OR NOT THERE WERE REFUSALS PRIOR TO THOSE

9    THREE POSITIVE GUAIAC TESTS, AFTER THOSE THREE POSITIVE GUAIAC

10   TESTS, DID -- WAS THERE ANY REFUSAL FORM IN THE RECORDS RELATED

11   TO A GUAIAC TEST OR A COLONOSCOPY?

12   **A.**    I COULDN'T FIND ANY.

13   **Q.**    WAS THERE ANY RECORD IN THE MEDICAL RECORDS SUGGESTING ANY

14   SORT OF FOLLOW-UP OF THOSE TESTS IN GENERAL MEDICINE OR ANY

15   OTHER CLINIC?

16   **A.**    NO.

17   **Q.**    WAS THERE ANY EVIDENCE IN THE RECORD OF ANY REFERRAL TO A

18   SPECIALIST?

19   **A.**    NO.

20   **Q.**    WAS THERE ANY RECORD OF ANY DISCUSSION OF ANYTHING RELATED

21   TO THOSE POSITIVE TESTS OR A COLONOSCOPY?

22   **A.**    NO.

23   **Q.**    AND THEN IF WE LOOK AT PATIENT 10, THIS WAS A PATIENT

24   WHO -- WELL, I'M GOING TO GO THROUGH A FEW RECORDS THAT -- YOU

25   SAID ON DIRECT THAT HE HAD EIGHT TRANSIENT ISCHEMIC ATTACKS OR

05:11 1 EIGHT THINGS THAT APPEARED TO BE TRANSIENT ISCHEMIC ATTACKS.

2 CORRECT?

3 **A.** CORRECT.

4 **Q.** AND THAT WAS NOT INCLUDING A COUPLE OF EVENTS LIKE THE

5 FINAL ENCOUNTER THAT LED TO HIM BEING HOSPITALIZED WITH A

6 STROKE. CORRECT?

7 **A.** CORRECT.

8 **Q.** AND MR. ARCHEY SHOWED YOU THREE INCIDENCES -- THREE

9 INCIDENTS WHERE THERE WAS EVIDENCE THAT THIS PATIENT SMOKED A

10 DIPSTICK. IS THAT CORRECT?

11 **A.** CORRECT.

12 **Q.** IF WE LOOK AT JX_10 AT 169 -- AND YEAH, WE'LL DO THIS

13 FIRST. SO YES, JX_10 AT 169.

14 IS THIS ONE OF THE TRANSIENT -- POTENTIAL TRANSIENT

15 ISCHEMIC ATTACKS?

16 **A.** YOU KNOW, I'M NOT SURE. IT SAYS -- THE ASSESSMENT IS

17 "RECENT AMS." SO IT LOOKS LIKE THIS IS A -- IT'S SUBSEQUENT TO

18 THE EVENT.

19 **Q.** YOU'RE CORRECT, A GENERAL MEDICINE ENCOUNTER DISCUSSING

20 IT.

21 IN THIS GENERAL MEDICINE CLINIC, IS THERE ANY

22 DISCUSSION OF ANY PRIOR OR ALTERED MENTAL STATUS EVENTS?

23 **A.** NO.

24 **Q.** AND IS THERE ANY EVALUATION OF BLOOD PRESSURE?

25 **A.** NO.

05:13 1    Q.   NOW, I BELIEVE COUNSEL SAID THERE WERE A FEW WHICH, LIKE

2    THIS, WERE SLIGHTLY ABOVE 140/90 BUT NO PARTICULARLY HIGH BLOOD

3    PRESSURE.  DO YOU RECALL THAT?

4    A.   NO.  I MEAN, I THINK THE EVENTS HE HAD, HE HAD FAIRLY

5    SIGNIFICANTLY ELEVATED BLOOD PRESSURE.  I MEAN, IT WASN'T AN

6    EMERGENCY BLOOD PRESSURE, BUT IT WAS SIGNIFICANTLY ELEVATED.

7         AND REMEMBER, THE PROBLEM IS HE DIED OF AN

8    INTRACEREBRAL HEMORRHAGE.  THE RISK FACTOR FOR THAT IS BLOOD

9    PRESSURE THAT'S OUT OF CONTROL, AND HE HAD PERSISTENTLY

10   UNCONTROLLED BLOOD PRESSURE, IF YOU LOOK AT IT OVER THE SPAN OF

11   TIME.

12   Q.   AND SO LET'S LOOK AT PAGE 176.  I BELIEVE THIS IS A RECORD

13   THAT MR. ARCHEY SHOWED YOU TO SHOW THAT HIS BLOOD PRESSURES

14   WERE IN THE VICINITIES OF 140/90?

15   A.   OH, THEY'RE A LITTLE BIT ELEVATED, YEAH.  BUT THEY'RE IN

16   THE VICINITY, YEAH.

17   Q.   AND THE DATE ON THAT IS FEBRUARY 20, 2020.  IS THAT

18   CORRECT?

19   A.   THAT'S TRUE.

20   Q.   COULD WE ALSO LOOK AT PAGE 172?  THIS IS ALSO FEBRUARY 20,

21   2020.  IS THAT CORRECT?

22   A.   YES.

23   Q.   AND COULD YOU READ THE BLOOD PRESSURES RECORDED?

24   A.   193/103 AND SO FORTH.  THEY'RE ALL VERY HIGH.

25   Q.   181/101, 188 --

1   **A.**   188/100.

2   **Q.**   THIS IS THE SAME DAY AS THE RECORD THAT MR. ARCHEY SHOWED

3   YOU?

4   **A.**   THAT'S CORRECT.

5   **Q.**   AND RATHER THAN GO THROUGH ALL OF THESE, WERE THERE

6   SEVERAL INCIDENTS OF ALTERED MENTAL STATUS, ELEVATED BLOOD

7   PRESSURE WHERE THERE WAS NO EVIDENCE THAT YOU FOUND IN THE

8   RECORD RELATED TO POTENTIAL DRUG USE?

9   **A.**   THAT'S TRUE.

10   **Q.**   AND WERE THERE ALSO, IN ADDITION TO THE ONE THAT WE

11   ALREADY SHOWED, OTHER GENERAL MEDICINE CLINICS WHERE THERE WAS

12   NO RECOGNITION OF THE FACT THAT HE WAS HAVING REPEATED ALTERED

13   MENTAL STATUS INCIDENCES -- INCIDENTS AND REPEATED HIGH BLOOD

14   PRESSURE?

15   **A.**   THAT'S TRUE.  AND WITH RESPECT TO THIS, I MEAN, THAT'S WHY

16   I ASKED MR. ARCHEY TO GO BACK AND LOOK AT THE SIX EPISODES,

17   BECAUSE THE BLOOD PRESSURE IS SIMILAR TO THIS OR MAYBE A LITTLE

18   BIT LOWER.

19   **Q.**   IT VARIES.  IT'S NOT ALWAYS THIS HIGH.

20   **A.**   YEAH.  NO, I UNDERSTAND.

21   **Q.**   IS THAT CORRECT?  OKAY.

22        AND ONE MORE MATTER -- SORRY TO RETURN TO PATIENT

23   NO. 5.  BUT THERE WAS TESTIMONY ABOUT WHETHER THERE ARE ANY

24   IMPEDIMENTS TO GETTING TO AN APPOINTMENT AT THE GENERAL

25   MEDICINE CLINIC OR TO ATTENDING AN APPOINTMENT AT THE GENERAL

05:15 1  MEDICINE CLINIC.  DO YOU RECALL THAT?

2  **A.**   YES.

3  **Q.**   LET'S PUT UP PLAINTIFFS' EXHIBIT 1D AT 2.

4         LOOKING AT THE PICTURE ON THE RIGHT, DO YOU RECOGNIZE

5  THAT AREA?

6  **A.**   YEAH.  THAT'S THE CLINIC AREA IN THE MAIN BUILDING, I

7  THINK.

8  **Q.**   AND THAT'S WHERE PATIENTS MAY HAVE TO -- THAT'S WHERE

9  PATIENTS TYPICALLY WAIT FOR THEIR APPOINTMENTS UNLESS THEY'RE

10  IN A HIGHER SECURITY STATE?

11  **A.**   ON THE BENCH, YEAH.

12  **Q.**   AND IS IT YOUR UNDERSTANDING, BASED ON YOUR REVIEW OF

13  RECORDS IN THIS CASE AND YOUR OBSERVATIONS AT THE FIRST SITE

14  VISIT AS WELL, THAT PATIENTS MAY BE WAITING THERE FOR HOURS FOR

15  THEIR APPOINTMENT?

16  **A.**   HE SAID HE WAITED THREE HOURS.

17  **Q.**   ALL RIGHT.  LET'S TALK ABOUT PATIENT NO. 4.

18         THE MARCH 25, 2020 APPOINTMENT THAT DIDN'T HAPPEN,

19  YOU ADMITTED THAT THAT MIGHT HAVE BEEN RELATED TO COVID.

20  CORRECT?  SORRY.  LET ME SITUATE THIS.

21  **A.**   NO, I THINK I REMEMBER.  YES, IT COULD HAVE BEEN PARTIALLY

22  RELATED TO COVID, CORRECT.

23  **Q.**   AND NO PULMONOLOGY APPOINTMENT HAPPENED AFTER THAT UNTIL

24  DECEMBER 2020.  IS THAT CORRECT?

25  **A.**   THAT'S CORRECT.

1   Q.   TO YOUR KNOWLEDGE, WAS THERE ANY RESTRICTION ON SEEING

2   PATIENTS WHEN APPOINTMENTS WERE NEEDED TO PREVENT DISEASE

3   PROGRESSION AT ALL AFTER, LET'S SAY, JUNE 2020?

4   A.   I DON'T THINK SO.  I MEAN, IT DEPENDS ON THE LOCALE.  BUT

5   IN GENERAL, JUST BASED ON, YOU KNOW, INFORMATION THAT I GOT

6   ANECDOTALLY, IT -- YOU COULD DO TELEMEDICINE.  EMERGENCIES WERE

7   BEING SEEN.  BUT GENERAL APPOINTMENTS -- THERE WAS A PERIOD

8   WHEN THEY WERE REALLY SHUT DOWN AND THEN IT OPENED UP.  AND I'M

9   NOT SURE -- I THINK IT REALLY DEPENDS ON THE LOCALE.

10  Q.   UH-UH.

11  A.   SO I PROBABLY DON'T HAVE ENOUGH INFORMATION TO ANSWER

12  THAT.

13  Q.   BETWEEN MARCH 2020 AND DECEMBER 2020 FOR THIS PATIENT, WAS

14  A PULMONOLOGY APPOINTMENT SOMETHING THAT HE NEEDED TO PREVENT

15  DISEASE PROGRESSION?

16  A.   THEY DIDN'T HAVE A DIAGNOSIS, SO I THINK IT WAS IMPORTANT

17  THAT HE BE FOLLOWED.  AND WHAT I DON'T UNDERSTAND IS WHY THEY

18  COULDN'T DO IT BY TELEMEDICINE, BECAUSE THEY HAD THAT ABILITY.

19  Q.   BUT SPECIFICALLY SPEAKING ABOUT THE RISK OF HIS DISEASE

20  PROGRESSING AND GETTING WORSE OR EVEN UNTREATABLE, IS THAT

21  SOMETHING THAT MIGHT HAVE BEEN AFFECTED BY THE NINE-MONTH WAIT?

22  A.   YES.  IT COULD HAVE BEEN, YES.

23  Q.   AND EVEN PUTTING ALL OF THIS ASIDE, MOST OF YOUR

24  CRITICISMS WERE AFTER HE STARTED SEEING THE PULMONOLOGIST

25  AGAIN.  IS THAT CORRECT?

05:18 1  **A.**   THAT IS CORRECT, YES.

2  **Q.**   AND THIS WAS A PATIENT WHO WAS IN YOUR SPECIALTY SECTION?

3  THIS ISN'T A PATIENT WHERE THERE WAS, YOU KNOW, ANY ISSUE IN

4  PREPARING TO RESPOND TO.  IS THAT CORRECT?

5  **A.**   I DIDN'T HEAR THE LAST PART OF THE QUESTION.

6  **Q.**   THIS IS A PATIENT WHO WAS IN YOUR SPECIALTY SECTION.

7  CORRECT?

8  **A.**   YES.

9  **Q.**   AND DEFENDANTS DIDN'T ON CROSS TODAY BRING UP ANY

10  DISAGREEMENTS WITH ANYTHING YOU WROTE AFTER HE STARTED SEEING

11  THE PULMONOLOGIST AGAIN.  IS THAT CORRECT?

12  **A.**   I DON'T THINK SO, NO.

13  **Q.**   NOW, TO COVER A COUPLE THINGS EARLIER.

14       FIRST YOU SAID SOMETHING THAT SOUNDED LIKE YOU SAID

15  YOU MIGHT HAVE BEEN UNFAMILIAR WITH THE COLOR-CODING SYSTEM IN

16  THE MEDICAL RECORDS AT LSP?

17  **A.**   YES.

18  **Q.**   IS THAT SOMETHING THAT YOU REVIEWED IN THE FIRST TRIAL?

19  **A.**   WE MAY HAVE.  I MEAN, I DON'T RECALL IT, BUT WE MAY HAVE.

20  **Q.**   AND DID YOU RE-REVIEW YOUR NOTES FROM WHAT YOU HAD WRITTEN

21  ABOUT THE -- IF YOU HAD WRITTEN ANYTHING ON THE COLOR-CODING

22  SYSTEM FROM THE FIRST TRIAL AT THIS TIME?

23  **A.**   YEAH, I DIDN'T LOOK AT IT.

24  **Q.**   YEAH.  AND LET'S GO BACK TO THE BEGINNING OF THE CROSS.

25       FIRST TALKING ABOUT THE ASSISTANT WARDEN OVER HEALTH

05:19 1  CARE, COUNSEL ASKED YOU ABOUT THE CURRENT ASSISTANT WARDEN OVER

2  HEALTH CARE, A LICENSED PRACTICAL NURSE, LPN, ASHLI OLIVEAUX.

3  ARE YOU AWARE WHO THE PREVIOUS ASSISTANT WARDEN OVER HEALTH

4  CARE WAS?

5  **A.**    IT WAS FALGOUT, THE -- HE WAS A NURSE.

6  **Q.**    TRACY FALGOUT?

7  **A.**    YES.

8  **Q.**    HE HAD BEEN THE ASSISTANT WARDEN OVER HEALTH CARE FOR

9  SEVERAL YEARS?

10  **A.**    RIGHT.

11  **Q.**    AND YOU SAID HE WAS A NURSE.  IS HE A REGISTERED NURSE?

12  IS THAT CORRECT?

13  **A.**    HE'S A REGISTERED NURSE I BELIEVE, YES.

14  **Q.**    AND WAS HAVING A REGISTERED NURSE AS ASSISTANT WARDEN OVER

15  HEALTH CARE -- DID THAT PREVENT THE PROBLEMS THAT YOU

16  DOCUMENTED IN YOUR REVIEW OF THIS CASE?

17  **A.**    NO.

18  **Q.**    AND THEN COUNSEL ALSO ASKED YOU ABOUT ACA STANDARDS THAT

19  THEY SAID ALLOWED CORRECTIONAL OFFICERS TO PASS MEDICATION.

20  DOES THE ACA HAVE DIFFERENT STANDARDS FOR SMALL FACILITIES AND

21  LARGE FACILITIES?

22  **A.**    I MEAN, I KNOW NCCHC DOES AND I'M SURE ACA DOES.  OFFICERS

23  PASS MEDS IN SOME VERY SMALL JAILS.  WHERE THEY DO -- WHERE

24  OFFICERS PASS MEDS, IT'S GENERALLY IN VERY SMALL JAILS -- AND

25  I'M TALKING ABOUT A 20-BED JAIL, A 30-BED JAIL IN A VERY RURAL

05:21 1    AREA -- BECAUSE THEY DON'T HAVE THE ABILITY TO HIRE STAFF TO DO

2    THAT, AND THAT'S UNDERSTANDABLE.  BUT IN A PRISON THAT'S A

3    LARGE PRISON, IT'S DIFFERENT.  AND I THINK BOTH NCCHC AND ACA

4    DISTINGUISH THAT AND MAKE A POINT THAT IN LARGER FACILITIES

5    IT'S NOT ACCEPTABLE.

6    **Q.**    AND THEN YOU ALSO SAID I BELIEVE TELEMEDICINE WORKS VERY

7    WELL.  WERE YOU TALKING AS A GENERAL MATTER THAT TELEMEDICINE

8    WORKS -- LET ME REPHRASE THAT.

9             I BELIEVE YOU TESTIFIED TELEMEDICINE WORKS VERY WELL.

10   WERE YOU TALKING SPECIFICALLY ABOUT AT LSP OR AS A GENERAL

11   MATTER, TELEMEDICINE IS SOMETHING THAT COULD WORK WELL?

12   **A.**    NO.  AS A GENERAL MATTER TELEMEDICINE IS A VEHICLE THAT

13   COULD BE USED.  AND I KNOW THAT WE DID HAVE CRITICISM OF THE

14   QUALITY OF THE CAMERAS, THE QUALITY OF THE AVAILABILITY OF

15   EQUIPMENT AND QUALITY.  AND SO THOSE ARE ISSUES THAT COULD BE

16   IMPROVED.  BUT TELEMEDICINE IS A VERY GOOD VEHICLE AND COULD BE

17   USED, AND THAT'S MORE OF A GENERAL STATEMENT THAN IT IS A

18   SPECIFIC ONE.

19   **Q.**    RIGHT.  THAT DOESN'T MEAN THAT THE TELEMEDICINE AS USED AT

20   LSP IS NECESSARILY APPROPRIATE OR ADEQUATE?

21   **A.**    CORRECT.

22   **Q.**    AND SIMILARLY, YOU TALKED ABOUT MORNING HUDDLES BEING

23   GOOD.  WERE YOU SAYING THAT MORNING HUDDLES ARE GOOD AS A

24   GENERAL MATTER OR THAT THE MORNING HUDDLE PRACTICE AT LSP IS

25   GOOD?

05:22 1   **A.**   I'M SAYING THE CONCEPT OF A MORNING HUDDLE IS A GOOD IDEA.

2   AND BECAUSE WE DIDN'T -- AS I SAID IN TESTIMONY, WE DID NOT --

3   WE WERE NOT ABLE TO SEE WHAT THE HUDDLES LOOKED LIKE, SO I

4   CAN'T COMMENT ON WHAT THEY DO HERE.

5   **Q.**   AND ARE YOU AWARE THAT THE MORNING MEETINGS EXISTED

6   THROUGHOUT THE LIABILITY PERIOD THAT YOU REVIEWED AS WELL?

7   **A.**   I ACTUALLY DIDN'T.

8   **Q.**   OKAY.  AND THEN THERE WERE ALSO QUESTIONS ABOUT THE AREAS

9   WHERE SPECIALTY CARE IS PROVIDED AT LSP, AND THERE WAS

10   REFERENCE TO THE PROCEDURES BUILDING, I BELIEVE SOMETIMES

11   CALLED THE NEW BUILDING.  DID YOU LOOK AT THAT BUILDING IN

12   2016?

13   **A.**   YES, I DID.

14   **Q.**   AND DID YOU IN YOUR LIABILITY REPORT SAY THAT IT WAS

15   ADEQUATE?

16   **A.**   YOU KNOW, I CAN'T REMEMBER WHETHER I DID OR DIDN'T, BUT I

17   -- MY RECOLLECTION IS THAT IT WAS A NEW BUILDING.  THEY WERE

18   ABLE TO DO ECHOS; THEY WERE ABLE TO DO COLONOSCOPIES, EGDS.

19   SOME OF THE ROOMS WERE VERY NICE.  I MEAN --

20   **Q.**   IF YOUR TESTIMONY WAS THAT IT WAS ADEQUATE IN 2016, WOULD

21   YOU HAVE NEEDED TO REVIEW IT AGAIN TO DETERMINE WHETHER IT WAS

22   ADEQUATE TODAY?

23   **A.**   I DON'T THINK SO.  I MEAN, I THOUGHT IT WAS PRETTY DECENT.

24   I MEAN, YOU KNOW, THEY COULD DO PULMONARY FUNCTION TESTS.  I

25   SAW IT.  IT WAS A NICE SETUP.

05:23 1  **Q.**  AND SIMILARLY FOR THE ULTRASOUND TRAILER, IS THAT

2  SOMETHING THAT YOU RECALL REVIEWING IN 2016?

3  **A.**  YEAH.  I CAN'T REMEMBER OFF -- I PROBABLY DID, BECAUSE I

4  WENT -- I REMEMBER GOING TO THE MAIN CENTER AND SEEING WHAT

5  THEY HAD THERE.

6  **Q.**  DO YOU RECALL HAVING ANY CRITICISMS OF THE ULTRASOUND

7  TRAILER IN 2016?

8  **A.**  I DON'T, NO.

9  **Q.**  AND YOU DIDN'T MAKE ANY CRITICISMS OF EITHER THE

10  PROCEDURES BUILDING OR THE ULTRASOUND TRAILER TODAY OR IN YOUR

11  EXPERT REPORT NOW?

12  **A.**  NO.

13  **Q.**  AND YOU MENTIONED -- YOU USED AS AN EXAMPLE, TALKING ABOUT

14  MEDICATION ADMINISTRATION, MEDS BEING PASSED AT -- I THINK YOU

15  SAID 6:00 A.M. AND 4:00 P.M., SOMETHING ALONG THOSE LINES?

16  **A.**  CORRECT.

17  **Q.**  YOU WEREN'T REVIEWING MEDICATION ADMINISTRATION IN THIS

18  CASE.  CORRECT?

19  **A.**  NO.

20  **Q.**  AND IF ONE OF THE EXPERTS WHO WAS TESTIFIED THAT IT WAS AT

21  8:00 A.M AND 2:00 P.M., WOULD YOU ACCEPT THAT?

22  **A.**  YEAH.  I THINK IT WAS AT TWO -- IT WAS AT MULTIPLE

23  DIFFERENT TIMES.  SO I THINK IT WAS AT 6:00 A.M. AND 4:00 P.M.

24  SOMETIMES AND OTHER PLACES IT WAS 8:00 A.M.  SO IT WAS LIKE ALL

25  OVER THE PLACE, AND THAT'S MY RECOLLECTION OF READING MY

1  COLLEAGUE'S REPORT.  AND I'M SURE THAT MY COLLEAGUE CAN TESTIFY

2  TO THAT SUBSEQUENTLY TO THIS.

3  **Q.**   AND THERE WAS SOME TESTIMONY ABOUT THE REFUSAL TRACKING

4  AND REFUSAL FORMS, AND I BELIEVE YOU DESCRIBED IT AS MORE OF A

5  LEGAL STRATEGY AND WERE CHALLENGED ON THAT.  DID YOU REVIEW ANY

6  TESTIMONY THAT SUGGESTS THAT DEFENDANTS SEE IT AS, AT LEAST IN

7  PART, A LEGAL STRATEGY?

8  **A.**   I'M NOT SURE I REMEMBER THAT.

9          **MR. DUBNER:**  LET'S BRING UP -- I BELIEVE IT IS JX_71

10  AT 192 OR THE LAVASPERE 30(B)(6) DEPOSITION, IF YOU COULD.  THE

11  30(B)(6).  I BELIEVE THIS IS THE INDIVIDUAL.  OR MAYBE I HAVE

12  THOSE REVERSED.

13          ONE MOMENT, YOUR HONOR, IF I MAY?

14          **THE COURT:**  TAKE YOUR TIME.

15  **BY MR. DUBNER:**

16  **Q.**   I'LL COME BACK TO THIS IN A MOMENT.

17          IN THE MEANTIME, THERE WAS SOME DISCUSSION OF THE --

18  THAT WILL ALSO REQUIRE -- WELL, SKIP THE DOCUMENT FOR THE

19  MOMENT.

20          YOU WERE ASKED ABOUT SPECIALTY -- HERE WE GO.  SORRY

21  TO MOVE AND THEN COME BACK.  SO -- AND IF WE COULD GO TO

22  PAGE 192.  I'M SORRY.  THIS IS JX_70.  IF WE CAN DO JX_69A AT

23  192.

24          **MS. MONTAGNES:**  I'M SORRY.  ONE SECOND.

25          **MR. DUBNER:**  AT 192.

05:27 1      **MS. MONTAGNES:**  SORRY.

2           **MR. DUBNER:**  OH, NO WORRIES.  I'M SURE I MISSPOKE

3      BEFORE.  THANK YOU.  THANK YOU, MS. LESNICK.

4      BY MR. DUBNER:

5      **Q.**   AND SO FOCUSING AT WHERE IT -- STARTING AT LINES 3 TO 8 --

6      AND I'LL REPRESENT TO YOU THAT THE REFERENCE TO THIS FORM IS TO

7      THE REFUSAL FORM.  AND SO THE QUESTION IS ASKED OF DR.

8      LAVESPERE:  "THE PURPOSE OF THIS FORM IS TO RELEASE THE

9      DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS FROM LIABILITY.  IS

10     THAT CORRECT?"

11          THE ANSWER IS "YES."

12          DR. PUISIS, DOES THAT REFRESH YOUR RECOLLECTION AS TO

13     --

14     **A.**   YEAH.

15     **Q.**   -- WHETHER YOU READ TESTIMONY TO THAT EFFECT?

16     **A.**   YES.  SO IT JUST CONFIRMS WHAT I SPOKE IN TESTIMONY.

17     **Q.**   AND THEN IF WE COULD -- PAGE 74.  THERE WAS SOME

18     DISCUSSIONS OF YOUR COMPARISON OF YOUR EXPERT REPORTS

19     DISCUSSION OF THE ECEPTIONIST DATA BETWEEN THE PREVIOUS TRIAL

20     AND THIS ONE IN -- ON PAGE 74 OF THE LIABILITY TRIAL, PX_6,

21     PLAINTIFFS' EXPERT -- MEDICAL EXPERT REPORT.  HERE, IF I DRAW

22     YOUR ATTENTION TO THE THIRD LINE, YOU WERE REFERRING TO

23     SPECIALTY APPOINTMENTS.  IS THAT CORRECT?

24     **A.**   YES.

25     **Q.**   AND IF WE THEN GO TO REMEDY TRIAL PX_1 -- THIS DOES NOT

05:30 1   NEED TO BE SEALED -- PAGE 83, PLEASE.

2                   **MR. DUBNER:**  I COULD ALSO --

3                   **THE COURT:**  CAN YOU PUT IT ON THE ELMO?

4                   **MR. DUBNER:**  YES.

5                   **THE COURT:**  LET'S TRY TO MOVE THINGS ALONG.

6                   **MR. DUBNER:**  SORRY.  YES.  SORRY THAT THAT DIDN'T

7   OCCUR TO ME SOONER.

8   **BY MR. DUBNER:**

9   **Q.**    AND SO IF I DRAW YOUR ATTENTION TO THE BEGINNING OF THE

10  SECOND PARAGRAPH HERE, HERE YOU WERE REFERRING TO THE NUMBER OF

11  REFERRALS IN YOUR --

12  **A.**    THAT'S CORRECT.

13  **Q.**    AND IS THAT THE SAME THING AS SPECIALTY APPOINTMENTS?

14  **A.**    WELL, THAT'S WHAT I WAS SAYING; THAT WITH ECEPTIONIST YOU

15  CAN'T TELL WHAT THEY'RE PRESENTING.  IS IT COMPLETED

16  APPOINTMENTS?  IS IT REFERRALS?  AND SO IT MAY BE COMPARING

17  APPLES TO ORANGES, AND IT'S JUST NOT CLEAR.

18  **Q.**    AND IF WE GO TO PAGE 7 OF YOUR REPORT, THIS IS WHERE YOU

19  LISTED THE DOCUMENTS THAT YOU REVIEWED.  THERE IS SOMETHING

20  LISTED HERE LABELED AS C-05-001 REPORTS.  DO YOU RECALL

21  REVIEWING THOSE?

22  **A.**    YEAH.  THEY ARE THE KIND OF DATA THAT THE -- LSP MAINTAINS

23  ON HOW MANY PEOPLE, YOU KNOW, HAD CERTAIN EVENTS OCCUR.

24  **Q.**    AND YOU DIDN'T DISCUSS THAT IN THE EXPERT REPORT.  IS THAT

25  CORRECT?

05:33 1    **A.**   I THINK I DID, BUT I'M NOT SURE.

2    **Q.**   YOU MAY NOT HAVE FOR THIS POINT, SO WE'RE NOT GOING TO

3    TALK ABOUT THE SUBSTANCE OF YOUR ANALYSIS OF THOSE DOCUMENTS.

4    JUST FOR THESE PURPOSES MY ONLY QUESTION IS:  DID YOUR REVIEW

5    OF THOSE DOCUMENTS, THAT DATA, CONFLICT WITH YOUR CONCLUSION

6    FROM THE ECEPTIONIST DATA THAT THAT DATA DOESN'T SHOW A

7    CONSISTENT OR SUBSTANTIAL INCREASE IN SPECIALTY APPOINTMENTS?

8    **A.**   I MEAN, THIS DATA, THE CO-5, LOOKED LIKE IT WAS PRETTY

9    MUCH THE SAME.  NOW, AS I SAID, YOU KNOW, THERE IS A -- THE

10   POPULATION DROPS, SO THE RATE MIGHT HAVE BEEN INCREASED.  BUT

11   IT LOOKED LIKE IT WAS THE SAME NUMBER.  I MEAN, IT WENT DOWN

12   DURING COVID, WENT UP A LITTLE BIT HIGHER THAN 2019, THEN IT

13   DROPPED AGAIN TO WHAT IT HAD BEEN BEFORE IN 2019.

14   **Q.**   AND THERE WAS SOME TESTIMONY ABOUT BUDGETARY RESTRICTIONS

15   AND WHETHER THOSE AFFECT WHAT HAPPENS AT LSP?

16   **A.**   YES.

17   **Q.**   AND THERE WAS I BELIEVE QUESTIONS ABOUT WHETHER YOU WERE

18   SPECULATING THAT THEY WEREN'T PAYING DOCTORS ENOUGH.  DO YOU

19   RECALL READING TESTIMONY SAYING THAT THEY WEREN'T PAYING

20   DOCTORS ENOUGH?

21   **A.**   I THINK DR. LAVESPERE SAID THAT.  I THINK THERE'S ONE OR

22   TWO OTHERS THAT MADE COMMENTS ABOUT THE SALARY ISSUES WITH

23   RESPECT TO PROVIDERS.

24   **Q.**   AND IF WE COULD PULL UP JX_70A AT PAGE 29.

25            AND COULD YOU READ FROM LINES 3 THROUGH LINES 14?

05:34 1    A.    "WHAT IS THE PERMITTED RATE PAY FOR MDS?

2              "ANSWER:  WELL, IT DEPENDS.  I'VE BEEN STARTING MY

3    KNEW DOCS OUT THERE AT 215.  WE'VE HAD A COUPLE OF BITES ON

4    PEOPLE WANTING TO COME, BUT THE MONEY IS JUST NOT RIGHT.  THE

5    DEFENDANT, AS A WHOLE, IS GOING TO HAVE TO UP THE SALARY TO GET

6    PHYSICIANS IN THERE.  I MEAN, SOME OF MY PHYSICIANS THAT HAVE

7    BEEN THERE FOR A GOOD WHILE ARE MAKING MID-200'S, BUT, YOU

8    KNOW, WE NEED TO START THEM AT THAT.  WE NEED TO BE COMPETITIVE

9    WITH THE PRIVATE SECTOR, AND RIGHT NOW WE'RE NOT IN ANY

10   CATEGORY OF MEDICAL, YOU KNOW."

11   Q.    THANK YOU, DR. PUISIS.  THANK YOU FOR YOUR TIME.  I HAVE

12   NO FURTHER QUESTIONS.

13   A.    THANK YOU.

14             MR. DUBNER:  AND ONE HOUSEKEEPING MATTER, JUST

15   EXHIBITS TO MOVE IN.  APOLOGIES FOR NOT DOING IT

16   CONTEMPORANEOUSLY.  PLAINTIFFS' EXHIBIT 17A, WHICH WERE THE

17   DISCIPLINARY RECORDS FOR DR. COLON.

18             THE COURT:  IS THERE AN OBJECTION TO THOSE?

19             MR. ARCHEY:  NO OBJECTION, YOUR HONOR.

20             THE COURT:  ADMITTED.

21             OKAY.  WE ARE GOING TO BREAK FOR THE DAY.  WE

22   WILL RECONVENE AT 9:00 A.M.

23             JUST FOR PURPOSES OF YOU ALL KNOWING WHAT TO

24   EXPECT, WE WILL BREAK TOMORROW AT A TIME THAT SEEMS -- THAT

25   SEEMS TO FIT WITH THE PRESENTATION OF TESTIMONY, SOMETIME

05:36  1   BETWEEN 11:30 AND 12:00, NO LATER THAN 12:00.

2              MONDAY MORNING THE COURT HAS ANOTHER OBLIGATION,

3   SO WE WILL COMMENCE -- WE CAN EITHER START AT 12:00 OR AT 1:00.

4   IF Y'ALL THINK IT'S REALLY IMPORTANT TO GET AN HOUR ON THE

5   RECORD, WE CAN GO OVER THE LUNCH HOUR, JUST ASSUMING THAT

6   EVERYBODY WILL EAT BEFORE THAT.  BUT IF YOU ARE OKAY WITH

7   STARTING AT 1:00 -- IF YOU THINK THAT HOUR IS -- I MEAN, WHERE

8   ARE -- HOW FAR ALONG ARE WE, I GUESS IS THE REAL QUESTION?

9              **MS. MONTAGNES:**  YOUR HONOR, IN TERMS OF TIME USED, WE

10  HAVEN'T USED -- YOU KNOW, WE HAVEN'T USED THAT MUCH TIME.  I

11  MEAN, FROM OUR PERSPECTIVE, I THINK GETTING GOING ON MONDAY

12  WOULD BE BETTER FOR US.  WE WOULD RATHER START AT NOON.  BUT IF

13  IT'S INCONVENIENT TO FOLKS, WE WILL WORK AROUND THAT.

14             **THE COURT:**  Y'ALL WANT TO START AT NOON ON MONDAY OR

15  AT 1:00 ON MONDAY?

16             **MR. ROBERT:**  NOON IS FINE, YOUR HONOR.

17             **THE COURT:**  ALL RIGHT.  WE WILL START AT NOON ON

18  MONDAY.  WE WILL BREAK TOMORROW NO LATER THAN 12:00, BUT WE

19  WILL TRY TO BREAK AT SOME LOGICAL POINT.  SO WE WILL STAND IN

20  RECESS UNTIL TOMORROW MORNING AT 9:00.

21             **THE LAW CLERK:**  ALL RISE.

22             THE COURT IS AT RECESS.

23       **(WHEREUPON, THIS MATTER WAS RECESSED UNTIL 06/10/2022 AT**

24                       **9:00 A.M.)**

25                         * * *

05:37 1                    <u>**CERTIFICATE**</u>

2        I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

3    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

4    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

5    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

6    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                              *Shannon Thompson*

9                         SHANNON THOMPSON, CCR

10                        OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25