1                    UNITED STATES DISTRICT COURT

2                    MIDDLE DISTRICT OF LOUISIANA

3

4    JOSEPH LEWIS JR., ET AL      *    CIVIL ACTION

5    VERSUS                       *    NO. 15-318-SDD

6    BURL CAIN, ET AL             *    JUNE 10, 2022

7    * * * * * * * * * * * * * * *

8

9                              DAY 5
                             BENCH TRIAL
10             BEFORE THE HONORABLE SHELLY D. DICK
               UNITED STATES CHIEF DISTRICT JUDGE
11

12   APPEARANCES:

13   FOR THE PLAINTIFFS:         THE PROMISE OF JUSTICE INITIATIVE
                                 BY:  MERCEDES MONTAGNES, ESQ.
14                                    NISHI KUMAR, ESQ.
                                      REBECCA RAMASWAMY, ESQ.
15                                    ELENA MALIK, ESQ.
                                      SAMANTHA BOSALAVAGE, ESQ.
16                               1024 ELYSIAN FIELDS AVENUE
                                 NEW ORLEANS, LOUISIANA 70117
17
                                 COHEN MILSTEIN SELLERS & TOLL,
18                               PLLC
                                 BY:  JEFFREY B. DUBNER, ESQ.
19                                    BRENDAN R. SCHNEIDERMAN, ESQ.
                                 1100 NEW YORK AVE N.W., SUITE 500
20                               WASHINGTON, D.C. 20005

21                               SOUTHERN POVERTY LAW CENTER
                                 BY:  BRUCE HAMILTON, ESQ.
22                                    EMILY LUBIN, ESQ.
                                 201 ST. CHARLES AVE., SUITE 2000
23                               NEW ORLEANS, LOUISIANA 70170

24

25

```
 1   FOR THE DEFENDANTS:          BUTLER SNOW, LLP
                                  BY:  RANDAL J. ROBERT, ESQ.
 2                                     CONNELL L. ARCHEY, ESQ.
                                       ALLENA W. MCCAIN, ESQ.
 3                                445 NORTH BOULEVARD, SUITE 300
                                  BATON ROUGE, LOUISIANA 70802
 4
                                  SHOWS, CALI & WALSH, LLP
 5                                BY:  JEFFREY K. CODY, ESQ.
                                       CAROLINE M. TOMENY, ESQ.
 6                                     JOHN C. CONINE, JR., ESQ.
                                  628 ST. LOUIS STREET
 7                                BATON ROUGE, LOUISIANA 70802

 8
     OFFICIAL COURT REPORTER:     SHANNON L. THOMPSON, CCR
 9                                UNITED STATES COURTHOUSE
                                  777 FLORIDA STREET
10                                BATON ROUGE, LOUISIANA 70801
                                  (225) 389-3567
11
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
12               COMPUTER-AIDED TRANSCRIPTION SOFTWARE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              **INDEX**

2                                                              <u>PAGE</u>

3    **PLAINTIFFS' WITNESSES:**

4    **HELEN POPE, M.D.**

5       DIRECT EXAMINATION BY MS. KUMAR                        15

6       CROSS-EXAMINATION BY MR. ROBERT                        22

7       REDIRECT EXAMINATION BY MS. KUMAR                      32

8    **ANGELA GOEHRING, RN, MSA, CCHP**

9       VOIR DIRE BY MS. MONTAGNES                             34

10      VOIR DIRE BY MR. ARCHEY                                53

11      DIRECT EXAMINATION BY MS. MONTAGNES                    58

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **(JUNE 10, 2022)**

2                 **(CALL TO THE ORDER OF COURT)**

3         **THE COURT:**  OKAY.  GOOD MORNING.

4              BE SEATED.

5              OKAY.  WHERE ARE WE ON TIME?

6         **MS. MONTAGNES:**  GOOD MORNING, JUDGE.

7              YESTERDAY, JUNE 9TH, THE PLAINTIFFS USED FOUR

8    HOURS AND -- EXCUSE ME -- TWO MINUTES, FOR A TOTAL OF 13 HOURS

9    AND 16 MINUTES AND THE DEFENDANTS USED TWO HOURS AND 17

10   MINUTES, FOR A TOTAL OF EIGHT HOURS AND TWO MINUTES.

11         **THE COURT:**  OKAY.  ALL RIGHT.  CALL YOUR NEXT

12   WITNESS.

13         **MS. KUMAR:**  GOOD MORNING, YOUR HONOR.

14              NISHI KUMAR FOR THE PLAINTIFFS.

15              WE CALL DR. HELEN POPE TO THE STAND.

16                    **HELEN POPE, M.D.,**

17   **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

18         **THE COURT:**  GO AHEAD.

19                    **DIRECT EXAMINATION**

20   **BY MS. KUMAR:**

21   **Q.**   GOOD MORNING, DR. POPE.

22              CAN YOU PLEASE STATE YOUR FULL NAME FOR THE COURT.

23   **A.**   GOOD MORNING.

24              IS THAT TOO CLOSE?

25              HELEN POPE.  P-O-P-E, AND H-E-L-E-N.

09:05 1    Q.    DR. POPE, WHAT DO YOU DO FOR A LIVING?

2    A.    I'M AN ACADEMIC HOSPITALIST AT UNIVERSITY MEDICAL CENTER.

3    Q.    AND WHAT IS UNIVERSITY MEDICAL CENTER?

4    A.    UMC IS A LARGE ACADEMIC MEDICAL CENTER IN NEW ORLEANS.  IT

5    BELONGS TO -- WELL, TWO MEDICAL SCHOOLS.  I WORK FOR TULANE

6    UNIVERSITY THAT HAS A RESIDENCY PROGRAM, AN ATTACHED MEDICAL

7    SCHOOL; AND WE CARE FOR A LOT OF THE INDIGENT, UNDERSERVED,

8    UNINSURED OR UNDERINSURED PATIENTS IN LOUISIANA.

9    Q.    WHERE DID YOU GO TO MEDICAL SCHOOL?

10    A.    UNIVERSITY OF IOWA.

11    Q.    AND DID YOU DO A RESIDENCY AFTERWARDS?

12    A.    YES.  IN 2016 I STARTED MY INTERNAL MEDICINE RESIDENCY AT

13    TULANE.

14    Q.    DO YOU HAVE ANY BOARD CERTIFICATIONS?

15    A.    I'M BOARD CERTIFIED IN INTERNAL MEDICINE.

16    Q.    AND WHAT IS YOUR SPECIALTY?

17    A.    INTERNAL MEDICINE.

18    Q.    WHAT DOES BEING A HOSPITALIST MEAN?

19    A.    AS A HOSPITALIST I ADMIT PATIENTS FROM THE EMERGENCY ROOM

20    TO THE IN-PATIENT WARDS, AND THEN I CARE FOR THEM DURING THE

21    ENTIRETY OF THEIR HOSPITAL STAY.

22    Q.    HOW LONG HAVE YOU WORKED AT UMC?

23    A.    I STARTED THERE IN MY RESIDENCY IN 2016.

24    Q.    AND HOW OFTEN ARE YOU AT UMC?

25    A.    AS A HOSPITALIST I WORK EVERY DAY FROM LIKE SEVEN -- TO

09:06  1   28-DAY BLOCKS, AND I DO 35 WEEKS A YEAR.

2   **Q.**   YOU MENTIONED UNDERSERVED AND UNDERINSURED.  WHAT SPECIFIC

3   POPULATIONS DO YOU TREAT AT UMC?

4   **A.**   SURE.  SO WE ARE KIND OF THE PUBLIC SAFETY-NET HOSPITAL

5   FOR LOUISIANA, SO WE TAKE CARE OF A LOT OF MEDICAID/MEDICARE

6   PATIENTS, UNDOCUMENTED PATIENTS, PATIENTS THAT ARE UNABLE TO

7   ACCESS INSURANCE, AND THEN, OF COURSE, OUR INCARCERATED

8   POPULATION AS WELL.

9   **Q.**   HOW MANY YEARS HAVE YOU BEEN TREATING INCARCERATED

10   PATIENTS AT UMC?

11   **A.**   SINCE I STARTED IN 2016.

12   **Q.**   DO YOU KNOW WHAT PRISONS OR JAILS YOUR INCARCERATED

13   PATIENTS ARE COMING FROM?

14   **A.**   SURE.  I CARE FOR PATIENTS FROM EVERY FACILITY IN

15   LOUISIANA, SO LOUISIANA STATE PENITENTIARY, ELAYN HUNT,

16   JEFFERSON PARISH, ORLEANS PARISH PRISON.

17   **Q.**   HOW DO YOU KNOW WHAT FACILITY YOUR PATIENTS ARE COMING

18   FROM?

19   **A.**   I ASK PATIENTS, WHEN AN INCARCERATED PATIENT COMES THROUGH

20   THE E.R., WHAT FACILITY THEY'RE COMING FROM.  THE GUARD IN THE

21   ROOM WILL KNOW, AND THEN IT'S ALSO LISTED IN THEIR CHART.  THE

22   ADDRESS OF THE PATIENT WILL BE THE ADDRESS OF THE FACILITY.

23   **Q.**   AND DO YOU KNOW THE ADDRESS FOR ANGOLA?

24   **A.**   UH-HUH.  IT'S TUNICA TRACE, SO IF -- I KNOW IF I SEE THAT,

25   THAT THAT WILL BE A PATIENT FROM LSP.

09:07 1   **Q.**   ABOUT HOW MANY INCARCERATED PATIENTS FROM ANGOLA HAVE YOU

2   TREATED SINCE 2019?

3   **A.**   I WOULD ESTIMATE -- I HAVE ONE TO TWO PATIENTS FROM LSP

4   EVERY MONTH, SO I WANT TO SAY, LOW END, 30 TO 40.

5   **Q.**   WHAT'S IT LIKE TREATING AN INCARCERATED PATIENT?

6   **A.**   TAKING CARE OF AN INCARCERATED PATIENT COMES WITH A FEW

7   DIFFICULTIES THAT YOU WOULDN'T SEE FROM A PATIENT COMING FROM

8   THE COMMUNITY.

9           FIRST, AN INCARCERATED PATIENT OFTEN WON'T HAVE THE

10   SAME KIND OF WORKUP OR LIKE DIAGNOSIS PROCESS THAT'S HAPPENED

11   BEFORE THEY'VE COME TO THE HOSPITAL.  OFTENTIMES IT'S MORE

12   DIFFICULT TO REVIEW THE MEDICAL RECORDS OF A PATIENT WHO IS

13   COMING FROM A FACILITY.  THEY'LL PRESENT LATER IN THE COURSE OF

14   THEIR ILLNESS, WHICH MAKES IT A LITTLE BIT MORE DIFFICULT TO

15   ASCERTAIN AN APPROPRIATE TREATMENT REGIMEN FOR THAT PATIENT.

16           AND THEN WHEN YOU ARE DISCHARGING A PATIENT FROM THE

17   HOSPITAL WHO IS FROM A FACILITY, IT'S OFTEN MORE DIFFICULT TO

18   ASCERTAIN FOLLOW-UP FOR THESE PATIENTS AND HAVE SOME

19   CONFIRMATION THAT THEY'LL BE ABLE TO GO TO APPOINTMENTS AFTER

20   THEY'VE LEFT THE HOSPITAL.

21   **Q.**   WHAT IS THE DEMEANOR OF YOUR PATIENTS FROM ANGOLA?

22   **A.**   WITHOUT A DOUBT, MY PATIENTS FROM ANGOLA ARE POLITE,

23   COURTEOUS, GRATEFUL FOR THEIR MEDICAL CARE.

24   **Q.**   DO YOU REMEMBER THE NAMES OF ANY SPECIFIC PATIENTS FROM

25   ANGOLA THAT YOU'VE TREATED?

09:09 1    **A.**   I DON'T HAVE A GREAT MEMORY FOR NAMES, SO I DON'T REMEMBER

2    ANY OF THE NAMES OF MY PATIENTS.  HOWEVER, I HAVE A VERY GOOD

3    RECALL OF CLINICAL DETAILS ABOUT PATIENTS THAT I'VE TREATED IN

4    THE PAST.

5    **Q.**   DR. POPE, CAN YOU DESCRIBE THE MAIN TYPES OF MEDICAL

6    CONDITIONS YOUR PATIENTS FROM ANGOLA ARE PRESENTING WITH WHEN

7    THEY COME TO UMC?

8    **A.**   SO MY INCARCERATED PATIENTS I'D SAY KIND OF FALL INTO TWO

9    MAIN GROUPS.  THE FIRST GROUP WOULD BE PATIENTS WHO HAVE AN

10   UNDER-TREATED UNDERLYING MEDICAL ILLNESS THAT HAS PROGRESSED TO

11   A LATE STAGE.  FOR EXAMPLE, HYPERTENSION OR DIABETES THAT HAS

12   GONE UNTREATED OR UNDER-TREATED AND THEN HAS PROGRESSED TO AN

13   ISCHEMIC STROKE, FOR EXAMPLE.

14          AND THEN THE OTHER BIG GROUP OF PATIENTS WOULD BE

15   PATIENTS WHO HAVE AN UNDIAGNOSED MEDICAL ILLNESS AND THEY'RE

16   PRESENTING WITH THE FIRST SIGNS OF THAT.  SO A PATIENT COMING

17   IN WITH MONTHS OF ABDOMINAL PAIN AND IT IS THEN DIAGNOSED WITH

18   A STAGE IV GALLBLADDER CANCER, FOR EXAMPLE.

19   **Q.**   WHAT STEPS DO YOU FOLLOW WHEN YOU'RE EVALUATING A PATIENT

20   FROM ANGOLA?

21   **A.**   WHEN I'M SEEING AN INCARCERATED PATIENT -- AT FIRST IT'S

22   NOT UNLIKE TAKING CARE OF SOMEONE FROM THE COMMUNITY.  SO I'M

23   COLLECTING MY HISTORY AND PHYSICAL FROM THAT PATIENT, AND THEN

24   OFTENTIMES I HAVE TO CALL THE WARDEN AT THEIR FACILITY TO GAIN

25   PERMISSION TO CONTACT THEIR MEDICAL DECISION-MAKERS OR FAMILY.

09:10 1    I ALSO CALL THE MEDICAL DIRECTOR OF THEIR FACILITY TO DETERMINE

2    IF THERE HAS BEEN ANY WORKUP PRIOR FOR THEIR ILLNESS, HOW LONG

3    HAVE THEY BEEN REPORTING THESE SYMPTOMS.  I'D SAY THAT'S WHERE

4    I'D START.

5    **Q.**   DO YOU TAKE A PATIENT HISTORY?

6    **A.**   YES, ALWAYS.

7    **Q.**   AND WHAT DOES THAT CONSIST OF?

8    **A.**   THE HISTORY HAS SEVERAL DIFFERENT PARTS.  SO THE FIRST IS

9    A HISTORY OF PRESENT ILLNESS.  THAT'S A DESCRIPTION OF HOW IS

10   THE PATIENT PRESENTING, SO WHAT SYMPTOMS DO THEY HAVE -- EXCUSE

11   ME -- WHAT ARE, YOU KNOW, TREATMENTS THAT THEY'VE TRIED,

12   ALLEVIATING FACTORS, FOLLOWED BY A REVIEW OF SYSTEMS, WHICH IS

13   A LAUNDRY LIST OF KIND OF ANY SYMPTOM A PATIENT MIGHT BE

14   EXPERIENCING:  COUGH, FEVER, TROUBLE SWALLOWING, STOMACH ACHE,

15   ET CETERA.

16           AFTER THE REVIEW OF SYSTEMS IS A PAST MEDICAL

17   HISTORY, A MEDICATIONS LIST, A PAST SURGICAL HISTORY, A SOCIAL

18   HISTORY, WHICH IS SUBSTANCE USE, SEXUAL HISTORY, EMPLOYMENT

19   HISTORY, ANY KIND OF EXPOSURES, A FAMILY HISTORY.  AND THAT'S

20   EVERYTHING THAT GOES INTO MY HISTORY BEFORE MY PHYSICAL EXAM.

21           **MS. KUMAR:**  YOUR HONOR, PERMISSION TO APPROACH THE

22   BENCH -- OR TO APPROACH THE WITNESS STAND WITH A BOTTLE OF

23   WATER?

24           **THE COURT:**  GRANTED.

25   **BY MS. KUMAR:**

09:12 1  **Q.**   DO YOU HAVE ONE?

2  **A.**   I DON'T HAVE ONE.  THANK YOU.  I THOUGHT I COULD MAKE IT

3  WITHOUT, BUT THANK YOU.

4  **Q.**   DR. POPE, DO YOU LIST A CHIEF COMPLAINT WHEN YOU ARE

5  TAKING A PATIENT HISTORY?

6  **A.**   YES.  A CHIEF COMPLAINT KIND OF GOES BEFORE THAT HISTORY

7  OF PRESENT ILLNESS.  IT'S A SUBJECTIVE COMPLAINT WRITTEN IN THE

8  PATIENT'S WORDS.

9        USUALLY WHEN I WALK INTO THE ROOM AND I SAY, "WHAT

10  BROUGHT YOU TO THE HOSPITAL?  WHAT BROUGHT YOU TO THE E.R.,"

11  WHATEVER THEY SAY IS MY CHIEF COMPLAINT.  SO IF A PATIENT SAYS,

12  "I AM HERE WITH A COUGH AND A FEVER," THAT IS DIRECTLY MY CHIEF

13  COMPLAINT IN QUOTES:  "I HAVE A COUGH AND A FEVER."

14  **Q.**   WOULD YOU EVER -- WOULD IT EVER BE APPROPRIATE TO WRITE

15  "DRUG SEEKING," AS CHIEF COMPLAINT?

16  **A.**   NOT UNLESS THE PATIENT SAID, "I AM HERE SEEKING DRUGS."

17  **Q.**   HAVE YOU EVER WRITTEN "DRUG SEEKING" AS THE CHIEF

18  COMPLAINT?

19  **A.**   NO.

20  **Q.**   SINCE 2019, WHAT ARE THE PROBLEM AREAS YOU'VE OBSERVED IN

21  TERMS OF ANGOLA PATIENTS?

22  **A.**   SURE.  SO A COUPLE OF THINGS HAVE BEEN RECURRING ISSUES IN

23  CARING FOR AN INCARCERATED PATIENT FROM ANGOLA.

24        THE FIRST WOULD BE LACK OF TRANSPARENCY WITH THE

25  MEDICAL TEAM AT THE FACILITY AND THEN THE IN-PATIENT MEDICAL

09:13 1    TEAM.  WE'RE NOT ABLE TO REVIEW THOSE RECORDS.  SO WHEN THE

2    PATIENT DOES COME WITH SOME RECORDS, THEY'RE OFTEN HANDWRITTEN

3    AND DIFFICULT TO DECIPHER.  ALONG WITH THAT LACK OF

4    TRANSPARENCY IS IT CAN BE DIFFICULT TO COMMUNICATE WITH THE

5    MEDICAL STAFF AT THE PRISON.

6         AFTER THE PATIENT LEAVES THE HOSPITAL, I HAVE NO

7    ASSURANCE THAT APPOINTMENTS WILL BE TAKING PLACE.  I'M NOT

8    ALLOWED TO SCHEDULED APPOINTMENTS FOR INCARCERATED PATIENTS

9    LIKE I AM FOR SOMEONE FROM THE COMMUNITY.

10         BEFORE I DISCHARGE SOMEONE FROM THE COMMUNITY, FOR

11   EXAMPLE, I LIKE TO HAVE THEIR APPOINTMENTS COMPLETELY MADE, AND

12   THAT WAY I CAN ASSURE THAT AFTER THEY LEAVE, THEY'LL BE SEEING

13   AN ONCOLOGIST OR A CARDIOLOGIST.  I'M NOT ABLE TO DO THAT FOR

14   INCARCERATED PATIENTS.  I HAVE NO IDEA IF THEY'RE HAVING THOSE

15   FOLLOW-UPS THAT THEY NEED.

16         OTHER BIG ISSUES WOULD BE -- I GUESS THE BIGGEST ONE

17   IS A PATIENT PRESENTING LATER IN THE COURSE OF AN ILLNESS THAN

18   I WOULD EXPECT SOMEONE FROM THE COMMUNITY.  I'LL HAVE A PATIENT

19   PRESENTING WITH MONTHS OF ABDOMINAL PAIN, HASN'T HAD THE SAME

20   KIND OF WORKUP THAT I WOULD EXPECT SOMEONE COMING FROM THE

21   COMMUNITY, AND THEN WE'RE STARTING FROM BEHIND OFTENTIMES WITH

22   THESE PATIENTS.

23   Q.   WOULD YOU DESCRIBE THESE AS COMMONALITIES?

24   A.   YEAH.  I'D SAY THAT THOSE ARE RUNNING ISSUES.

25   Q.   HAVE THESE COMMONALITIES CHANGED IN ANY WAY FROM WHAT YOU

09:14 1   OBSERVED PRIOR TO 2018?

2   **A.**   NOT IN MY EXPERIENCE, NO.

3   **Q.**   DR. POPE, YOU MENTIONED THAT PATIENTS YOU'VE SEEN FROM

4   ANGOLA ARE MORE LIKELY TO PRESENT WITH AN ADVANCED STAGE OF

5   DISEASE.  WHY IS THAT A PROBLEM?

6   **A.**   SO WHEN SOMEONE COMES IN WITH AN ADVANCED STAGE OF

7   DISEASE, IT IS OFTEN DIFFICULT TO CURE THAT PATIENT.  MANY

8   TIMES THE TREATMENT OPTIONS WILL BE PALLIATIVE, SO SYMPTOM

9   BASED.

10        FOR EXAMPLE, IF SOMEONE IS PRESENTING WITH A

11   COMPLICATION OF END-STAGE HYPERTENSION OR BLOOD PRESSURE WITH A

12   LARGE STROKE, IF SOMEONE HAS A LARGE ENOUGH STROKE AND ENOUGH

13   TIME HAS GONE BY AND THAT STROKE WASN'T CAUGHT, THERE OFTEN

14   ISN'T GOING TO BE A CURATIVE MEASURE FOR THAT.  THERE CAN

15   CERTAINLY BE SYMPTOM-BASED TREATMENTS, PHYSICAL THERAPY,

16   MEDICATIONS THAT CAN PREVENT THAT FROM OCCURRING AGAIN.  BUT

17   ONCE WE'VE GOTTEN TO THE END STAGES OF MANY OF THESE DISEASE

18   PROCESSES, THERE IS NOT A REVERSAL.

19   **Q.**   CAN YOU GENERALIZE ABOUT THE SEVERITY OF THESE SYMPTOMS

20   THAT YOUR PATIENTS FROM ANGOLA WITH ADVANCED DISEASE ARE

21   PRESENTING WITH?

22   **A.**   SURE.  MANY TIMES THESE PATIENTS WILL HAVE MORE ADVANCED

23   SYMPTOMS THAN PATIENTS FROM THE COMMUNITY.  AND IN ADDITION TO

24   HAVING ADVANCED SYMPTOMS, THEY'LL HAVE LONGER-STANDING

25   SYMPTOMS.  SO INSTEAD OF -- EXCUSE ME -- INSTEAD OF HAVING

09:16 1  SYMPTOMS FOR SEVERAL DAYS OR SEVERAL WEEKS, THESE PATIENTS WILL

2  PRESENT WITH SYMPTOMS FOR SEVERAL MONTHS THAT HAVE BEEN

3  PROGRESSIVE.

4  **Q.**   WHAT TYPES OF SYMPTOMS DO THE PATIENTS FROM ANGOLA WHO

5  FALL INTO THIS CATEGORY HAVE?

6  **A.**   THE BIGGEST COMPLAINT OR THE BIGGEST SYMPTOM THAT I SEE

7  PATIENTS ARE HAVING IS PAIN.  THEY'LL HAVE FREQUENTLY

8  PROGRESSIVE SEVERE PAIN COMPLAINTS OVER LONG PERIODS OF TIME.

9  **Q.**   WHAT ABOUT THE SEVERITY OF THESE SYMPTOMS STANDS OUT TO

10  YOU?

11  **A.**   IT'S UNUSUAL TO HAVE A PATIENT PRESENTING WITH THIS

12  LONG-STANDING -- THESE LONG-STANDING SYMPTOMS.  LIKE I SAID,

13  SOMEONE FROM THE COMMUNITY, IF THEY HAVE SEVERE PAIN FOR THAT

14  LONG, THEY'RE OFTEN SEEKING HELP BEFORE IT GETS TO THIS POINT:

15  SEEING A COMMUNITY PHYSICIAN, GOING TO A URGENT CARE, OR COMING

16  TO THE EMERGENCY ROOM SOONER.  AND WE'RE ABLE TO KIND OF

17  DIAGNOSE THINGS MORE EASILY OR CATCH THINGS IN AN EARLIER STAGE

18  THAN SOMEONE WHO IS PRESENTING LATER IN THE COURSE OF AN

19  ILLNESS.

20  **Q.**   DO YOU HAVE ANY KNOWLEDGE AS TO WHY THESE SYMPTOMS ARE SO

21  SEVERE?

22  **A.**   IT'S MY IMPRESSION THAT SOMEONE WHO IS INCARCERATED DOES

23  PRESENT WITH THESE SYMPTOMS OR DOES, YOU KNOW, INFORM SOMEONE

24  AT THE PRISON OF THESE SYMPTOMS, BUT OFTEN, IN MY EXPERIENCE,

25  INCARCERATED PERSONS ARE NOT BELIEVED OR COULD BE ACCUSED OF --

09:17  1               **MR. ROBERT:**  JUDGE, I JUST WANT TO OBJECT TO

2       SPECULATION.

3               **THE COURT:**  OKAY.  SHE'S TESTIFYING TO HER

4       IMPRESSIONS.  I'LL ALLOW IT.  OVERRULED.

5       **BY MS. KUMAR:**

6       **Q.**   YOU CAN CONTINUE.

7       **A.**   I'M SORRY.  COULD YOU SAY THE QUESTION AGAIN?

8       **Q.**   SURE.  DO YOU HAVE ANY KNOWLEDGE AS TO WHY THESE PATIENTS'

9       SYMPTOMS ARE SO SEVERE?

10      **A.**   AGAIN, IN MY IMPRESSION, INCARCERATED PERSONS CAN PRESENT

11      LATER IN THE COURSE OF THEIR ILLNESS BECAUSE THEY'RE OFTEN NOT

12      BELIEVED, ESPECIALLY WITH A PAIN COMPLAINT; CAN BE ACCUSED OF

13      MALINGERING OR SECONDARY GAIN WITH THESE COMPLAINTS.

14      **Q.**   HOW DOES THIS LATE PRESENTATION IMPACT YOUR ABILITY TO

15      PROVIDE TREATMENT FOR THESE PATIENTS?

16      **A.**   WHEN A PATIENT PRESENTS LATE IN THE COURSE OF AN ILLNESS

17      -- EVEN IF IT'S SOMETHING LIKE LONG-STANDING DIABETES, FOR

18      EXAMPLE -- IF THEY'RE PRESENTING WITH END-STAGE COMPLICATIONS

19      FROM THAT ILLNESS, OFTENTIMES THERE ARE NOT GOING TO BE

20      CURATIVE TREATMENT OPTIONS FOR THEM.

21               AT THE LATE STAGE OF DIABETES, FOR EXAMPLE, SOMEONE

22      WILL HAVE LIKE (INAUDIBLE) BLOOD VESSELS.  SO BASICALLY THEIR

23      BLOOD VESSELS HAVE BEEN COMPLETELY RAVAGED BY HAVING

24      LONG-STANDING HYPERGLYCEMIA OR HIGH BLOOD SUGAR.  THESE

25      PATIENTS -- WHEN THIS HAS PROGRESSED LONG ENOUGH -- WILL HAVE

09:18  1   PERIPHERAL ARTERIAL DISEASE.  AND ONCE THE LEG IS NOT PERFUSED,

2   HAS NOT RECEIVED BLOOD, THAT TISSUE DIES.  THERE IS NOT A WAY

3   TO PERFUSE THE LEG AGAIN, AND MANY TIMES THIS CAN LEAD TO AN

4   AMPUTATION.

5        SO EVEN SOMETHING LIKE DIABETES WHEN UNTREATED OR

6   UNDER-TREATED CAN LEAD TO THESE END-STAGE COMPLICATIONS THAT

7   ARE NOT TREATABLE.

8   **Q.**   YOU MENTIONED PATIENTS WHO HAD MONTHS OF ABDOMINAL PAIN.

9   DO YOU HAVE ANY SPECIFIC EXAMPLES PERTAINING TO THAT SYMPTOM?

10  **A.**   SURE.  I HAVE A FEW.

11       ONE MEMORABLE PATIENT THAT I ADMITTED FROM LSP, I

12  WANT TO SAY A YEAR AGO, CAME IN WITH SEVERAL MONTHS OF

13  PROGRESSIVE WORSENING ABDOMINAL PAIN.  BY THE TIME HE GOT TO

14  THE HOSPITAL, HE HAD ADVANCED STAGES OF PANCREATITIS, SO

15  INFLAMMATION OF THE PANCREAS.  WHEN THIS PROGRESSES AND HAS

16  GONE UNTREATED, IT CAN LEAD TO COMPLICATIONS LIKE PSEUDOCYST IN

17  THE PANCREAS, WHICH ARE COLLECTIONS OF FLUID; IT CAN ALSO CAUSE

18  NECROSIS OR DEATH OF THE PANCREATIC TISSUE, AND THEN EVENTUALLY

19  SEPSIS AND THEN DEATH, IF THIS IS NOT CAUGHT.

20       BY THE TIME HE CAME TO THE HOSPITAL, HE HAD BOTH

21  PSEUDOCYST AND PANCREATIC NECROSIS AND REQUIRED SEVERAL DRAINS

22  AND SURGERIES.

23  **Q.**   DO YOU HAVE ANY OTHER EXAMPLES OF PATIENTS PRESENTING LATE

24  IN THEIR ILLNESS?

25  **A.**   SURE.  THERE WAS ANOTHER PATIENT WHO PRESENTED WITH

09:20 1  SEVERAL MONTHS OF ABDOMINAL PAIN AND JAUNDICE, YELLOWING OF THE

2  SKIN.  BY THE TIME HE GOT TO THE HOSPITAL, HE WAS DIAGNOSED

3  WITH STAGE IV, SO UNCURABLE METASTATIC CHOLANGIOCARCINOMA,

4  WHICH IS CANCER OF THE GALLBLADDER.

5  **Q.**  AND WHAT HAPPENED WITH THAT PATIENT?

6  **A.**  HE PASSED AWAY IN THE HOSPITAL.

7  **Q.**  DR. POPE, YOU ALSO MENTIONED A CATEGORY OF PATIENTS WITH

8  UNDIAGNOSED OR UNCONTROLLED MEDICAL ISSUES.  WHY IS THAT A

9  PROBLEM?

10  **A.**  SURE.  SO WHEN I'M TALKING ABOUT UNDIAGNOSED OR

11  UNDER-TREATED MEDICAL ISSUES, I'M TALKING ABOUT UNDERLYING

12  MEDICAL PROBLEMS LIKE HYPERTENSION, DIABETES.  THESE KINDS OF

13  ISSUES WHEN GONE UNTREATED FOR LONG PERIODS OF TIME HAVE

14  END-STAGE COMPLICATIONS.  MOST NOTABLY WOULD BE ISCHEMIC HEART

15  DISEASE LEADING TO HEART FAILURE, ISCHEMIC STROKES LEADING TO

16  PARALYSIS, AND THEN, YOU KNOW, THE EXAMPLES THAT I GAVE WITH

17  DIABETES AND VASCULAR DISEASE.

18  **Q.**  HOW DO PATIENTS HAVING UNDIAGNOSED OR UNCONTROLLED MEDICAL

19  ISSUES AFFECT YOUR ABILITY TO PROVIDE TREATMENT?

20  **A.**  WHEN A DISEASE HAS PROGRESSED TO A POINT WHERE IT IS

21  CONSIDERED END-STAGE, TREATMENT IS OFTEN NOT THE COURSE OF

22  ACTION, IT'S MORE PALLIATIVE, SO KIND OF A SYMPTOM-GUIDED

23  COURSE.

24      WHEN WE TALK ABOUT TREATING, MANY TIMES PEOPLE ARE

25  REFERRING TO CURING SOMETHING.  WHEN SOMEONE HAS AN END-STAGE

09:21 1   COMPLICATION FROM A DISEASE THAT IT'S END-STAGE, SO IT'S NOT

2   SOMETHING THAT'S GOING TO BE CURABLE, IT'S SOMETHING THAT WE

3   WOULD -- WE WOULD BE ABLE TO TREAT SYMPTOMS OF.  BUT MANY TIMES

4   WHEN DAMAGE IS DONE IN THE BODY, IRREVERSIBLE DAMAGE, IT IS

5   JUST THAT:  IT'S IRREVERSIBLE.

6   **Q.**   WHAT WOULD YOU DO IF A PATIENT WITH SEVERELY HIGH BLOOD

7   PRESSURE APPEARED TO BE NON-COMPLIANT WITH THEIR MEDICATION?

8   **A.**   SURE.  WHEN SOMEONE COMES IN WITH A VERY, VERY HIGH BLOOD

9   PRESSURE AND I'M SUSPECTING THAT MAYBE THEY'RE NOT TAKING THEIR

10   MEDICATIONS AS PRESCRIBED, THE FIRST THING I DO IS ASK THEM:

11   WHAT MEDICATIONS ARE THEY SUPPOSED TO BE TAKING.  DO THEY HAVE

12   AN UNDERSTANDING OF WHAT THESE MEDICATIONS ARE FOR.

13        SOMETIMES WHEN YOU'RE TALKING TO A PATIENT, THEY'LL

14   REVEAL THEIR MOTHER WAS ON A MEDICATION AND IT CAUSED SOME SIDE

15   EFFECT AND THAT THEY'RE VERY CONCERNED ABOUT THAT HAPPENING,

16   OR THEY WERE TOLD BY SOMEONE THAT A MEDICATION WAS DANGEROUS.

17   SO ASKING THEM DO THEY HAVE THESE KINDS OF CONCEPTIONS ABOUT

18   THEIR MEDICATIONS.  DO THEY KNOW WHY THEY'RE TAKING THEM.  ARE

19   THEY ABLE TO -- IF THIS IS SOMEONE COMING FROM THE COMMUNITY,

20   ARE THEY ABLE TO AFFORD THAT MEDICATION.  DO THEY HAVE ACCESS

21   ISSUES GETTING TO A PHARMACY.

22        AND AFTER I'VE ASSESSED ALL OF THESE THINGS, I MAKE A

23   PLAN WITH THE PATIENT.  IF IT'S A MEDICATION THAT THEY'RE

24   HESITANT TO TAKE FOR SOME REASON.  IS THERE ANOTHER MEDICATION

25   THAT THEY WILL BE WILLING TO CONSIDER AFTER WE'VE REVIEWED THE

09:23 1  SIDE EFFECTS.

2  **Q.**   WOULD YOU OBSERVE THAT PATIENT AFTER THEY TAKE THEIR

3  MEDICATION?

4  **A.**   WHEN SOMEONE PRESENTS WITH VERY, VERY HIGH BLOOD PRESSURE,

5  WHICH IS CALLED HYPERTENSIVE URGENCY OR HYPERTENSIVE EMERGENCY,

6  THEY DO NEED TO BE OBSERVED IN THAT ACUTE PERIOD WHILE YOU'RE

7  LOWERING THEIR BLOOD PRESSURE.  THERE ARE GUIDELINES FOR THE

8  PERCENTAGE OF THE BLOOD PRESSURE LOWERING THAT NEEDS TO HAPPEN

9  WITHIN A CERTAIN TIME PERIOD.  AND IT CAN OFTEN BE DANGEROUS TO

10  RESTART SOMEONE'S MEDICATION ACUTELY WHEN THEY ARE IN THAT

11  URGENCY OR EMERGENCY PHASE AND CAN CAUSE MORE DAMAGE.  SO THEY

12  DO NEED TO BE OBSERVED.

13  **Q.**   DR. POPE, YOU ALSO MENTIONED CONCERNS AROUND DISCHARGE FOR

14  ANGOLA PATIENTS.  WHAT CONCERNS DO YOU HAVE WHEN YOUR PATIENTS

15  FROM ANGOLA LEAVE UMC AND GO BACK TO THE PRISON?

16  **A.**   SO THERE'S A FEW THINGS.  FIRST, WHEN I'M DISCHARGING AN

17  INCARCERATED PERSON, I'M NOT ALLOWED TO MAKE FOLLOW-UP

18  APPOINTMENTS FOR THEM.

19          WHEN I'M DISCHARGING SOMEONE FROM THE COMMUNITY, I'M

20  ALLOWED TO CALL THE CLINIC.  I CAN GET THEM CARDIOLOGY,

21  UROLOGY, ONCOLOGY, WHATEVER THEY NEED, SPECIALIST CARE WHEN

22  THEY LEAVE.  FOR AN INCARCERATED PERSON, WE ARE INSTRUCTED TO

23  PLACE THE APPOINTMENTS NEEDED IN THE DISCHARGE SUMMARY, BUT I

24  HAVE NO IDEA IF THOSE APPOINTMENTS ARE ACTUALLY MADE.

25          ANOTHER PROBLEM IS THE MEDICATION LIST THAT I

09:24 1   DISCHARGE A PATIENT WITH, I HAVE NO ASSURANCE THAT THOSE ARE

2   THE MEDICATIONS THAT ARE GOING TO BE DELIVERED TO THE PATIENT

3   ONCE THEY LEAVE THE HOSPITAL.  I'D SAY THOSE ARE THE BIG

4   DISCHARGE CONCERNS.

5   **Q.**   WHY IS THAT A PROBLEM FOR THESE PATIENTS?

6   **A.**   SO WHEN SOMEONE LEAVES THE HOSPITAL, IN A VERY, VERY RARE

7   INSTANCE WILL THEY NOT NEED ANY FOLLOW-UP WHEN THEY LEAVE.

8           WHEN SOMEONE IS HOSPITALIZED, IT'S OFTEN FOR AN ACUTE

9   WORSENING OF SOMETHING THAT HAD ALREADY EXISTED OR A NEW

10   DIAGNOSIS.  SO THEY WILL NEED CONTINUED TREATMENT WHEN THEY

11   LEAVE THE HOSPITAL WITH A SPECIALIST.  IF I'M NOT ABLE TO MAKE

12   THOSE APPOINTMENTS, I'M NOT SURE IF THAT PATIENT IS RECEIVING

13   THAT CARE.

14   **Q.**   DO YOU KNOW IF YOUR ORDERS OR PRESCRIPTIONS FOR FOLLOW-UP

15   CARE ARE COMMUNICATED TO ANGOLA STAFF?

16   **A.**   NO.

17   **Q.**   HAVE YOU DONE ANYTHING TO ENSURE THAT THOSE ARE

18   COMMUNICATED?

19   **A.**   SURE.  IF A PATIENT IS DISCHARGED FROM THE HOSPITAL, I TRY

20   TO CALL THE MEDICAL DIRECTOR OR THE PRISON STAFF TO COMMUNICATE

21   OUR RECOMMENDATIONS, OFFER TO FAX OVER THE DISCHARGE SUMMARY.

22           I KNOW WE ALSO HAVE A SOCIAL WORKER ON OUR CONTROLLED

23   ACCESS UNIT WHO FAXES THAT SUMMARY AS WELL.

24   **Q.**   HAVE YOU EVER COME TO LEARN THAT YOUR PATIENTS FROM ANGOLA

25   ARE NOT RECEIVING THE FOLLOW-UP CARE THAT YOU PRESCRIBE?

09:25 1    **A.**   YES.   OFTENTIMES THESE PATIENTS WILL RE-PRESENT TO THE

2    HOSPITAL FOR, YOU KNOW, ANOTHER ACUTE WORSENING OF THE SAME

3    CONDITION THAT WAS PROVIDED CARE FOR PREVIOUSLY.

4           ONE MEMORABLE PATIENT HAS CHRONIC LOWER EXTREMITY

5    WOUNDS RELATED TO A RARE UNDERLYING RHEUMATOLOGIC DISEASE.

6    HE'S PRESENTED TO THE HOSPITAL SEVERAL TIMES.   IN THE INTERIM,

7    HE HAS NOT RECEIVED ANY OF THE CARE THAT WAS PRESCRIBED,

8    INCLUDING RHEUMATOLOGY FOLLOW-UP.

9    **Q.**   IS IT COMMON FOR YOU TO DISCOVER THAT YOUR PATIENTS FROM

10   ANGOLA ARE NOT RECEIVING THE FOLLOW-UP CARE YOU PRESCRIBE?

11   **A.**   YES.

12   **Q.**   HOW DOES THE LACK OF FOLLOW-UP CARE IMPACT YOUR ABILITY TO

13   PROVIDE EFFECTIVE MEDICAL TREATMENT?

14   **A.**   SO WHEN SOMEONE IS DISCHARGED FROM THE HOSPITAL WITH A

15   CONDITION, THEY NEED ONGOING MAINTENANCE OR, IN SOME CASES,

16   ONGOING WORKUP OF THAT CONDITION.   THE IN-PATIENT SIDE OF

17   MEDICAL CARE IS FOR ACUTE MEDICAL CONDITIONS; ESPECIALLY DURING

18   THE CORONAVIRUS PANDEMIC WE'VE HAD TO BE VERY CAREFUL ABOUT HOW

19   WE USE OUR MEDICAL SPACE.   SO IF SOMEONE IS IN THE HOSPITAL

20   WITH A CONDITION THAT COULD BE TREATED OR WORKED UP AS AN

21   OUT-PATIENT, WE OFTEN DISCHARGE THEM SO THAT THEY CAN DO THAT

22   OUTSIDE OF THE HOSPITAL, AND THEN WE CAN USE OUR IN-PATIENT

23   RESOURCES MORE WISELY.   BUT IF SOMEONE ISN'T GETTING THAT CARE

24   OUTSIDE OF THE HOSPITAL, IT BECOMES MUCH MORE DIFFICULT TO

25   DISCHARGE THEM.

09:26 1   **Q.**   HAS A PATIENT FROM ANGOLA EVER ASKED YOU FOR A SPECIFIC
2   MEDICATION?
3   **A.**   NOT THAT I REMEMBER, NO.
4   **Q.**   DR. POPE, YOU MENTIONED THE LIMITED INFORMATION YOU HAVE
5   FOR ANGOLA PATIENTS WHEN THEY'RE ADMITTED.  WHAT INFORMATION
6   ARE YOU PROVIDED WHEN ADMITTING AN ANGOLA PATIENT?
7   **A.**   SOMETIMES NOT ALWAYS THE PATIENT WILL COME WITH A STACK OF
8   COPY PAPERS, SO HANDWRITTEN NOTES FROM THE MEDICAL PROVIDERS AT
9   LSP.
10   **Q.**   ARE YOU ABLE TO ACCESS ANGOLA PATIENTS' FULL MEDICAL
11   RECORDS?
12   **A.**   NO.
13   **Q.**   WHY NOT?
14   **A.**   I DON'T KNOW IF THEY DON'T HAVE AN EMR.  THE RECORDS THAT
15   I GET FROM LSP ARE HANDWRITTEN.  IT'S NOT SOMETHING THAT WE
16   HAVE ACCESS TO.
17   **Q.**   HAVE YOU EVER TRIED TO GET MORE INFORMATION FROM ANGOLA?
18   **A.**   YES.
19   **Q.**   HOW DOES THE LACK OF ACCESS TO MEDICAL RECORDS IMPACT
20   YOUR ABILITY TO PROVIDE EFFECTIVE TREATMENT?
21   **A.**   WHEN SOMEONE PRESENTS TO THE HOSPITAL, SOMETIMES THEY ARE
22   NOT IN A MENTAL STATE WHERE THEY CAN GIVE ME A FULL HISTORY.
23   IF SOMEONE IS CONFUSED OR IF THEY'RE NOT CONFUSED, IF THEY HAVE
24   A BASELINE OF DEMENTIA OR COGNITIVE DELAY, IT'S VERY DIFFICULT
25   TO TAKE A HISTORY FROM THESE PATIENTS.  IT WOULD BE VERY

09:28 1 HELPFUL IF I HAD RECORDS OF THAT PATIENT'S CARE PRIOR TO COMING

2 TO THE HOSPITAL.

3 **Q.**   DR. POPE, WHY ARE YOU TESTIFYING HERE TODAY?

4 **A.**   I THINK IT'S VERY IMPORTANT AS A PHYSICIAN TO BE AN

5 ADVOCATE FOR MY PATIENTS.  I HAVE BEEN VERY BLESSED IN MY LIFE

6 TO BE IN THIS POSITION OF POWER, AND I THINK WITH THIS POWER

7 COMES A RESPONSIBILITY TO HELP PEOPLE THAT HAVE BEEN

8 DISENFRANCHISED AND ARE NOT GIVEN THAT VOICE.

9 **Q.**   WHAT WOULD YOU RECOMMEND TO IMPROVE THE CARE FOR YOUR

10 ANGOLA PATIENTS?

11 **A.**   I'D SAY, FIRST AND FOREMOST, THE PHYSICIANS IN THE PRISON,

12 IN MY IMPRESSION, NEED TO BELIEVE A PATIENT WHEN THEY HAVE A

13 PAIN COMPLAINT AND NOT ASSUMING SECONDARY GAIN OR MALINGERING

14 AS THE DIAGNOSIS.  I'D SAY SECOND, THERE NEEDS TO BE MORE

15 TRANSPARENCY BETWEEN IN-PATIENT PHYSICIANS AND PHYSICIANS IN

16 FACILITIES.  THERE NEEDS TO BE SOME KIND OF WAY TO DETERMINE

17 THAT FOLLOW-UP CARE CAN BE ESTABLISHED FOR THESE PARTIES WHEN

18 THEY LEAVE THE HOSPITAL.  THAT WOULD JUST BE WHERE I WOULD

19 START.

20 **Q.**   I HAVE NO FURTHER QUESTIONS.

21          **THE COURT:**  CROSS?

22          **MR. ROBERT:**  BRIEFLY, YOUR HONOR.

23                    **CROSS-EXAMINATION**

24 BY MR. ROBERT:

25 **Q.**   GOOD MORNING, DR. POPE.

09:29 1    **A.**   GOOD MORNING.

2    **Q.**   GOOD TO SEE YOU AGAIN.

3    **A.**   AND YOU AS WELL.

4    **Q.**   JUST A FEW FOLLOW-UP QUESTIONS.

5    **A.**   SURE.

6    **Q.**   YOU'VE GOT A WORKING RELATIONSHIP WITH MS. KUMAR.

7    CORRECT?

8    **A.**   I'M NOT SURE WHAT YOU MEAN BY "WORKING RELATIONSHIP."

9    **Q.**   YOU'VE HAD COMMUNICATIONS WITH HER AND DEALT WITH HER ON

10   PROJECTS THAT SHE'S INVOLVED WITH INVOLVING INCARCERATED

11   PATIENTS.  CORRECT?

12   **A.**   THAT'S CORRECT.

13   **Q.**   YOU'VE WORKED WITH HER ON ISSUES REGARDING COMPASSIONATE

14   RELEASE AND MEDICAL PAROLE.  CORRECT?

15   **A.**   THAT'S CORRECT.

16   **Q.**   AND AT HER REQUEST, YOU'VE TESTIFIED BEFORE THE

17   LEGISLATURE ABOUT THAT.  CORRECT?

18   **A.**   THAT'S RIGHT.

19   **Q.**   OKAY.  I TOOK YOUR DEPOSITION A COUPLE MONTHS AGO.  DO YOU

20   RECALL THAT?

21   **A.**   UH-HUH.

22   **Q.**   AND WHEN I TOOK YOUR DEPOSITION, I ASKED YOU ABOUT

23   DISCUSSIONS THAT YOU HAD WITH MS. KUMAR.  DO YOU REMEMBER THAT?

24   **A.**   I DO.

25   **Q.**   AND YOU TOLD ME THAT MS. KUMAR -- YOU HAD HAD A PHONE CALL

09:30 1   WITH HER ABOUT A WEEK BEFORE YOUR DEPOSITION.  DO YOU RECALL

2   THAT?

3   **A.**   YES.

4   **Q.**   AND YOU TOLD ME THAT DURING THAT PHONE CALL YOU WERE TOLD

5   THAT I MAY BE ASKING YOU QUESTIONS ABOUT SPECIFIC PATIENTS THAT

6   YOU TREATED THAT YOU FOUND ISSUES WITH.  DO YOU RECALL THAT?

7   **A.**   YES.

8   **Q.**   OKAY.  AND I ASKED YOU IF YOU HAD GONE BACK AND DONE

9   ANYTHING AFTER BEING TOLD THAT PRIOR TO THE DEPOSITION TO LOOK

10  AT ANY FILES OR TO DO ANY INQUIRY AS TO SPECIFIC ANGOLA

11  PARTIES.  DO YOU RECALL ME ASKING YOU THAT?

12  **A.**   ASKING ME DID I GO BACK AND LOOK AT CHARTS OF PATIENTS?

13  **Q.**   RIGHT.  YES.

14  **A.**   I RECALL YOU ASKING ME THAT.

15  **Q.**   AND WHAT WAS YOUR RESPONSE?

16  **A.**   I BELIEVE MY RESPONSE WAS "NO."

17  **Q.**   OKAY.  AND YOU ALSO INDICATED THAT DURING YOUR DISCUSSIONS

18  WITH MS. KUMAR THAT SHE TOLD YOU I MIGHT ASK ABOUT THE NAMES OF

19  ANY PATIENTS THAT YOU RECALL THAT YOU HAD ISSUES WITH THAT CAME

20  FROM ANGOLA.  DO YOU REMEMBER THAT?

21  **A.**   YES.

22  **Q.**   AND WHEN I TOOK YOUR DEPOSITION, I ASKED YOU COULD YOU

23  GIVE ME THE NAMES OF ANY OF THOSE PATIENTS -- ANY PATIENTS THAT

24  YOU HAD ISSUES WITH AT ANGOLA, AND YOU TOLD ME YOU COULDN'T

25  GIVE ME ANY NAMES.  CORRECT?

09:32 1    A.   THAT'S RIGHT.

2    Q.   OKAY.  AND YOU SAID HERE TODAY YOU IDENTIFIED -- PRIMARILY

3    YOU IDENTIFIED PATIENTS THAT COME FROM ANGOLA BECAUSE THEY TELL

4    YOU THEY COME FROM ANGOLA.  RIGHT?

5    A.   IT'S ALSO LISTED IN THEIR CHART, AND THE GUARD IN THE ROOM

6    WILL KNOW WHAT FACILITY THEY'RE COMING FROM.

7    Q.   YOU DIDN'T MENTION TO ME WHEN I TOOK YOUR DEPOSITION THAT

8    IT WAS LISTED IN THE CHART, DID YOU?

9    A.   I'M NOT SURE.  I'M SORRY.

10   Q.   OKAY.  YOU'VE TESTIFIED TODAY THAT YOU'VE SEEN

11   APPROXIMATELY 30 TO 40 PATIENTS FROM ANGOLA SINCE JANUARY OF

12   2019.  CORRECT?

13   A.   SINCE 2016 --

14   Q.   OKAY.

15   A.   -- WHEN I STARTED MY RESIDENCY AT UNIVERSITY.

16   Q.   SO SINCE 2016 YOU CAN RECALL SEEING APPROXIMATELY 20 TO --

17   I MEAN -- EXCUSE ME -- 30 TO 40 PATIENTS FROM ANGOLA.  CORRECT?

18   A.   I'D SAY THAT'S A LOW ESTIMATE; BUT YES.

19   Q.   OKAY.  AND HOW MANY PATIENTS DO YOU SEE IN ANY GIVEN

20   MONTH?

21   A.   SURE.  SO IF I'M ON SERVICE FOR 14 DAYS A MONTH, I TAKE

22   CARE OF 16 PATIENTS A DAY.  SO WHATEVER THAT WORKS OUT TO BE.

23   Q.   OKAY.  SO 16 A DAY.  AND YOU CAN RECALL IN THE LAST SIX

24   YEARS SEEING 30 TO 40 THAT CAME FROM ANGOLA.  CORRECT?

25   A.   THAT'S RIGHT.

09:33 1   Q.   OKAY.  WHEN I TOOK YOUR DEPOSITION -- AND SIMILAR TO

2   TODAY, YOU'VE ADDED A FEW THINGS THAT WE'RE GOING TO TALK

3   ABOUT.  BUT WHEN I ASKED YOU ABOUT WHAT YOUR GENERAL

4   OBSERVATIONS WERE ABOUT PATIENTS -- INCARCERATED PATIENTS, YOU

5   SAID THAT GENERALLY YOU FOUND THEM TO BE IN ADVANCED STAGE OF

6   DISEASE, IF YOU HAD, YOU KNOW, ANY ISSUE, AND ALSO YOU FOUND

7   UNDIAGNOSED CONDITIONS.  DO YOU REMEMBER US TALKING ABOUT THAT?

8   A.   YES.

9   Q.   OKAY.  AND THOSE WERE YOUR TWO CHIEF COMPLAINTS.  CORRECT?

10   A.   I DON'T KNOW THAT I WOULD USE THOSE AS CHIEF COMPLAINTS.

11   I WOULD SAY THAT THOSE ARE THE TWO PRIMARY GROUPS OF PATIENTS

12   THAT I WOULD CARE FOR.

13   Q.   OKAY.  AND YOU SAID THAT -- WHEN WE TALKED YOU SAID THAT

14   YOU SEE THAT IN ALL INCARCERATED PATIENTS, NOT JUST FROM THOSE

15   THAT COME FROM LSP.  CORRECT?

16   A.   YES.

17   Q.   OKAY.  SO WHEN YOU TALK ABOUT ALL THESE ISSUES ABOUT

18   FOLLOW-UPS AND ALL THESE KINDS OF THINGS, YOU SEE THAT WITH ALL

19   INCARCERATED PATIENTS, NOT JUST ANGOLA?

20   A.   UNFORTUNATELY, YES.  MOST OF MY INCARCERATED PATIENTS ARE

21   COMING FROM LSP.

22   Q.   WELL, YOU'VE TOLD ME YOU HAVE ONLY SEEN 30 TO 40 IN THE

23   LAST SIX YEARS?

24   A.   THAT'S QUITE A FEW PATIENTS; BUT YES, I WOULD SAY 30 TO 40

25   ON A LOW END.

09:35 1    **Q.**   OKAY.  SO THAT'S LESS THAN ONE A MONTH.  RIGHT?

2    **A.**   I THINK IT'S ABOUT ONE OR TWO A MONTH.

3    **Q.**   AND WHEN I ASKED YOU -- BECAUSE YOU KNEW I WAS GOING TO

4    ASK YOU ABOUT SPECIFIC INSTANCES THAT YOU HAD AN ISSUE WITH --

5    YOU TOLD ME ABOUT TWO INSTANCES.  DO YOU REMEMBER THAT?

6    **A.**   OKAY.

7    **Q.**   ALL RIGHT.  THE FIRST ONE, YOU SAID A PATIENT FROM -- YOU

8    RECALLED FROM ANGOLA THAT HAD INFLAMMATION OF THE PANCREAS -- I

9    WROTE THAT.  IT WAS MORE SPECIFIC THAN THAT.  YOU'VE TALKED

10   ABOUT THAT TODAY.  CORRECT?

11   **A.**   YES, PANCREATITIS.

12   **Q.**   YES.  AND THAT PARTICULAR PATIENT, WHEN I ASKED YOU ABOUT

13   IT, YOU DIDN'T KNOW THE PATIENT'S NAME.  CORRECT?

14   **A.**   THAT'S RIGHT.

15   **Q.**   AND YOU DIDN'T KNOW THE DOCTOR WHO TREATED THE PATIENT.

16   CORRECT?

17   **A.**   I DON'T KNOW THAT YOU ASKED ME THAT.  I DON'T RECALL THAT

18   QUESTION.  I'M SORRY.

19   **Q.**   WELL, WE CAN PULL IT UP IF WE NEED TO.  LET'S DO THAT.

20   **A.**   OKAY.

21   **Q.**   LET'S GO TO PAGE 32, LINES 3 TO 5.

22            DO YOU SEE THAT ON THE SCREEN?

23   **A.**   I DO.

24   **Q.**   DOES THAT REFRESH YOUR RECOLLECTION?

25   **A.**   YES.

09:36 1   **Q.**   AND WHAT DID YOU TELL ME?

2   **A.**   IT'S SAYS, "I DON'T KNOW."

3   **Q.**   OKAY.  SO YOU DIDN'T KNOW THE NAME OF THE DOCTOR.

4   CORRECT?

5   **A.**   IT APPEARS SO.

6   **Q.**   AND YOU CAN TAKE IT DOWN.

7          AND YOU DIDN'T KNOW IF THE DOCTOR THAT TREATED THAT

8   PATIENT IS STILL AT ANGOLA OR NOT.  CORRECT?

9   **A.**   NO.  IF I DIDN'T KNOW THE DOCTOR, THEN I WOULDN'T KNOW IF

10   THEY'RE STILL AT ANGOLA.

11   **Q.**   OKAY.  THE SECOND THING THAT YOU TOLD ME WHEN WE TALKED

12   WAS ABOUT THE PATIENT WITH HEP C, AND YOU TALKED ABOUT THAT

13   TODAY.  CORRECT?

14   **A.**   I DON'T THINK I TALKED ABOUT THE PATIENT WITH HEPATITIS C

15   TODAY.

16   **Q.**   SO THAT WAS ONE THAT YOU RECALLED.  AND AGAIN I ASKED YOU

17   THE NAME OF THE PATIENT.  DO YOU RECALL THAT?

18   **A.**   I DO.

19   **Q.**   AND WHAT WAS YOUR ANSWER?

20   **A.**   I DON'T KNOW.

21   **Q.**   OKAY.  AND AGAIN I ASKED IF YOU KNEW THE DOCTOR WHO

22   TREATED THE PATIENT, AND YOU TOLD ME YOU DIDN'T KNOW.  IS THAT

23   CORRECT?

24   **A.**   YES.

25   **Q.**   OKAY.  AND YOU DON'T KNOW IF THAT DOCTOR -- SINCE YOU

09:37 1   DIDN'T KNOW THE DOCTOR, YOU DON'T KNOW IF THAT DOCTOR IS STILL

2   AT ANGOLA OR NOT.  CORRECT?

3   **A.**   RIGHT.

4   **Q.**   AND YOU DON'T RECALL WHETHER THAT PARTICULAR PATIENT

5   OCCURRED -- SINCE YOU'VE BEEN SEEING HIM SINCE 2016, YOU DON'T

6   KNOW WHETHER THAT PATIENT OCCURRED BEFORE OR AFTER JANUARY OF

7   2019, DO YOU?

8   **A.**   WHAT DO YOU MEAN BY "PATIENT OCCURRED"?

9   **Q.**   THAT ENCOUNTER -- I'M SORRY -- OCCURRED BEFORE OR AFTER

10   2019?  WITH THE HEP C PATIENT.

11   **A.**   DO YOU MEAN LIKE -- ARE YOU ASKING WHEN DID I MEET THE

12   PATIENT?

13   **Q.**   WHEN DID YOU TREAT THE PATIENT?

14   **A.**   OH, IT WAS AFTER 2019.

15   **Q.**   OKAY.

16   **A.**   BECAUSE I WAS FACULTY BY THEN.

17   **Q.**   OKAY.  GOOD.  AND WHEN I ASKED YOU AFTER WE TALKED ABOUT

18   THOSE TWO INSTANCES IF YOU RECALLED ANY OTHER INSTANCES OF

19   ISSUES WITH TREATMENT WITH PATIENTS FROM ANGOLA, YOU SAID "NO."

20   CORRECT?

21   **A.**   YES.

22   **Q.**   ALL RIGHT.  SO YOU DIDN'T DISCUSS WITH ME ANYTHING ABOUT

23   PATIENTS WITH STROKES THAT WERE UNDIAGNOSED OR HAD ANY ISSUES

24   WITH REGARD TO WHO YOU TREATED.  CORRECT?

25   **A.**   I DON'T BELIEVE THAT CAME UP DURING OUR DISCUSSION.

09:38  1    Q.   BUT I ASKED YOU ABOUT ANYTHING.   YOU KNOW, AT THAT POINT I

2    DIDN'T HAVE ANY NAMES.   I JUST ASKED YOU:   ANYTHING THAT YOU

3    CAN THINK OF THAT WAS A PROBLEM WITH TREATMENT, PLEASE TELL ME

4    ABOUT IT, AND YOU SAID -- AFTER THOSE TWO SPECIFIC INSTANCES

5    YOU SAID, "THAT'S ALL I CAN RECALL."   CORRECT?

6    A.   THAT'S ALL I COULD RECALL AT THE TIME.

7    Q.   OKAY.   SO WHAT DID YOU DO TO RECALL MORE AT THIS POINT?

8    DID YOU DO ANYTHING ELSE?   OR NOW YOU'RE REMEMBERING SOMETHING

9    YOU DIDN'T REMEMBER IN MARCH?

10   A.   SURE.   SO BETWEEN MARCH AND NOW, OUR DISCUSSION MADE ME

11   THINK A LOT ABOUT MY CARE OF INCARCERATED PATIENTS AND THE

12   NUMBER OF ISSUES THAT HAVE COME UP IN MY YEARS OF CARING FOR

13   PATIENTS FROM ANGOLA, WHICH DID CAUSE ME TO REMEMBER QUITE A

14   BIT MORE OF THESE ISSUES.

15   Q.   SO WHEN I TOOK YOUR DEPOSITION A COUPLE MONTHS AGO THOUGH,

16   YOU COULDN'T RECALL, BUT NOW YOU'RE RECALLING MORE.   IS THAT

17   RIGHT?

18   A.   CORRECT.

19   Q.   BECAUSE YOU TALKED A GOOD BIT ABOUT FOLLOW-UP, PEOPLE LOST

20   TO FOLLOW-UP.   YOU DIDN'T GIVE ME ANY SPECIFIC INSTANCES OF

21   ANYBODY LOST TO FOLLOW-UP OF THE 30 OR 40 PATIENTS THAT YOU'VE

22   TREATED.   CORRECT?

23   A.   I DON'T BELIEVE SO.

24   Q.   BUT YOU'RE TALKING ABOUT THAT TODAY.   RIGHT?

25   A.   THAT'S RIGHT.

09:40 1   Q.   AND YOU TALKED ABOUT RECORD ISSUES TODAY.  AND I ASKED YOU

2   ABOUT ANY COMPLAINTS, AND YOU DIDN'T TELL ME ANYTHING ABOUT

3   RECORD ISSUES.  CORRECT?

4   A.   I DON'T BELIEVE SO.

5   Q.   AND ONCE ANGOLA GETS ONLINE WITH MEDICAL RECORDS, IS THAT

6   GOING TO SOLVE YOUR PROBLEMS WITH THAT, WITH AVAILABILITY OF

7   RECORDS ONCE THEY GET ELECTRONIC RECORDS?

8   A.   OH, IF THE EMAR IS SHARED WITH OTHER FACILITIES, THEN YES,

9   I THINK THAT WOULD BE HELPFUL.

10   Q.   OKAY.  ALSO YOU TALKED ABOUT A PATIENT WITH CANCER OF THE

11   GALLBLADDER.  IS THAT ANOTHER RECENT MEMORY THAT YOU HAD THAT

12   YOU DIDN'T HAVE WHEN WE TALKED DURING YOUR DEPOSITION?

13   A.   I'M TRYING TO REMEMBER, BECAUSE HE DIED FAIRLY RECENTLY.

14   I THINK HE PASSED AWAY PRIOR TO US TALKING IN MARCH, BUT IT

15   SOUNDS LIKE I DIDN'T REMEMBER HIS CASE WHEN WE SPOKE.

16   Q.   RIGHT.  AND YOU TALKED ABOUT HAVING TO FOLLOW UP WITH

17   PEOPLE AT LSP WHEN YOU HAVE QUESTIONS.  AND WE TALKED SOME

18   ABOUT THAT.  AND WE TALKED ABOUT -- YOU SAID YOU HAD REACHED

19   OUT TO THE NURSES, THE TRIP NURSES, AND THE FOLKS THERE AT LSP

20   ABOUT QUESTIONS OR ISSUES.  CORRECT?

21   A.   THAT'S RIGHT.

22   Q.   AND YOU TOLD ME THEY'VE BEEN HELPFUL AND RESPONSIVE.

23   CORRECT?

24   A.   THEY ANSWER THE PHONE AND ARE OCCASIONALLY ABLE TO ANSWER

25   QUESTIONS THAT I HAVE ABOUT PATIENT CARE.

09:42 1  **Q.**   OKAY.  AND YOU HAVE HAD AT LEAST ONE ENCOUNTER WITH DR.

2  TOCE, THE MEDICAL DIRECTOR -- CURRENT MEDICAL DIRECTOR AT LSP.

3  CORRECT?

4  **A.**   YES, I'VE CALLED HIM ONCE.

5  **Q.**   AND YOU FOUND THAT HE WAS RESPONSIVE TO YOUR CALL.

6  CORRECT?

7  **A.**   YES.  HE ANSWERED THE PHONE AND WAS RESPONSIVE.

8  **Q.**   AND HE WAS HELPFUL TO YOU.  CORRECT?

9  **A.**   HE WAS HELPFUL.

10  **Q.**   OKAY.  THANK YOU FOR YOUR TIME, DR. POPE.

11  **A.**   OKAY.  THANK YOU.

12           **THE COURT:**  REDIRECT.

13           **MS. KUMAR:**  THE COURT'S INDULGENCE?

14                    **REDIRECT EXAMINATION**

15  BY MS. KUMAR:

16  **Q.**   DR. POPE, JUST A COUPLE QUESTIONS.  SO YOU SAID WHEN I WAS

17  ASKING YOU QUESTIONS ON DIRECT THAT YOU TREAT ABOUT 30 TO 40

18  PATIENTS SINCE 2019.  ON CROSS-EXAMINATION COUNSEL ASKED YOU IF

19  THAT WAS SINCE 2016.  CAN YOU JUST CLARIFY FOR US?

20  **A.**   I APOLOGIZE.  I -- MY ESTIMATE OF 30 TO 40 PATIENTS WOULD

21  BE SINCE 2019, SINCE JOINING THE FACULTY AT TULANE.  I

22  APOLOGIZE.  I THINK I MISSPOKE.

23  **Q.**   YOU ALSO MENTIONED A RHEUMATOLOGY PATIENT HAD BEEN LOST TO

24  FOLLOW-UP.  HAS THAT ENCOUNTER -- OR HAVE YOU HAD ENCOUNTERS

25  WITH THAT PATIENT SINCE YOUR DEPOSITION IN MARCH?

09:44 1   **A.**   YES.  HE RE-REPRESENTED TO THE HOSPITAL WITH THE SAME

2   ISSUE, THE CHRONIC LOWER EXTREMITY WOUNDS, SINCE MY DEPOSITION

3   IN MARCH.

4   **Q.**   AND DID YOU NOTICE THAT HE HADN'T RECEIVED HIS FOLLOW-UP

5   APPOINTMENTS?

6   **A.**   CORRECT.

7   **Q.**   AND IN YOUR DEPOSITION IN MARCH YOU DID DISCUSS TRYING TO

8   FOLLOW UP WITH DR. LAVASPERE TO GET APPOINTMENTS WITH PATIENTS.

9   RIGHT?

10   **A.**   YES.  BEFORE MY ONE PHONE CALL WITH DR. TOCE, DR.

11   LAVESPERE WOULD BE THE PHYSICIAN I WOULD COMMUNICATE WITH AT

12   LSP.

13   **Q.**   AND DID YOU FIND THOSE COMMUNICATIONS HELPFUL?

14   **A.**   I DID NOT FIND COMMUNICATING WITH DR. LAVESPERE TO BE

15   PRODUCTIVE OR HELPFUL.

16   **Q.**   THANK YOU.  I HAVE NO FURTHER QUESTIONS.

17           **THE COURT:**  ALL RIGHT.  YOU MAY STEP DOWN.

18           **THE WITNESS:**  THANK YOU.

19           **THE COURT:**  NEXT WITNESS.

20               IS SHE RELEASED?

21           **MS. KUMAR:**  YES.

22           **THE COURT:**  YOU ARE RELEASED FROM YOUR SUBPOENA.

23   THANK YOU, DOCTOR.

24           **MS. MONTAGNES:**  GOOD MORNING, YOUR HONOR.

25               I'M DOING THE NEXT WITNESS.  I ACTUALLY HAVE TO

09:45 1  GO TO THE BATHROOM.  I'M WONDERING IF IT WOULD BE OKAY TO DO

2  THAT NOW?  I'M SORRY.

3          **THE COURT:**  OKAY.  IT'S SUFFICIENT JUST TO SAY THAT

4  WE NEED A BREAK, SO...

5          **MS. MONTAGNES:**  SORRY.

6          **THE COURT:**  IT GOES IN THE CATEGORY OF TMI.

7          **MS. MONTAGNES:**  I APOLOGIZE.

8          **THE COURT:**  A 15-MINUTE RECESS.

9          **MS. MONTAGNES:**  THANK YOU.

10          **THE LAW CLERK:**  ALL RISE.

11              THE COURT IS AT RECESS.

12          **(WHEREUPON, THE COURT WAS IN RECESS.)**

13          **THE COURT:**  BE SEATED.

14              NEXT WITNESS.

15          **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME I CALL

16  ANGELA GOEHRING TO THE STAND.

17              **ANGELA GOEHRING, RN, MSA, CCHP,**

18  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

19          **THE DEPUTY CLERK:**  AND IF YOU WOULD. PLEASE STATE

20  YOUR NAME AND SPELL IT FOR THE RECORD.

21          **THE WITNESS:**  IT'S ANGELA GOEHRING.  G-O-E-H-R-I-N-G.

22                  **VOIR DIRE**

23  **BY MS. MONTAGNES:**

24  **Q.**  GOOD MORNING, MS. GOEHRING.

25  **A.**  GOOD MORNING.

10:06  1  **Q.**  I JUST WANT TO ASK YOU, AS A STARTING QUESTION:  DID YOU

2  TESTIFY IN THE LIABILITY TRIAL IN THIS MATTER?

3  **A.**  NO.

4  **Q.**  WHEN WERE YOU RETAINED BY PLAINTIFFS?

5  **A.**  I BELIEVE IT WAS IN FEBRUARY OF THIS YEAR.

6  **Q.**  OKAY.  SO LET'S WALK BACK.  LET'S STEP IT BACK NOW, AND

7  CAN I ASK YOU:  WHAT IS YOUR CURRENT POSITION?

8  **A.**  I'M CURRENTLY EMPLOYED BY ARMOR CORRECTIONAL, AND I AM THE

9  CLINICAL LIAISON TO THE LEGAL DEPARTMENT.

10  **Q.**  OKAY.  AND WHAT IS ARMOR CORRECTIONAL?

11  **A.**  IT'S A PRIVATE CORRECTIONAL HEALTH CARE COMPANY THAT DOES

12  HEALTH CARE IN BOTH JAILS AND PRISONS.

13  **Q.**  ALL RIGHT.  SO LET'S TURN THE CLOCK BACK, AND COULD YOU

14  START BY TELLING ME WHAT IS YOUR EDUCATIONAL BACKGROUND?

15  **A.**  SO I HAVE A BACHELOR OF NURSING, AND I OBTAINED THAT IN

16  1987 AND BECAME A REGISTERED NURSE.

17         **MR. ARCHEY:**  YOUR HONOR, CAN WE GET HER TO MOVE THE

18  MIC A TOUCH CLOSER?  SHE'S A LITTLE LIGHT.  THAT'S ALL.

19         **THE COURT:**  YES.  YOU'RE SOFT-SPOKEN.  THAT WOULD BE

20  HELPFUL.  THANK YOU.  GO AHEAD.

21         **THE WITNESS:**  IS THAT BETTER?

22         **THE COURT:**  YES.

23  **BY THE WITNESS:**

24  **A.**  SO I GOT MY DEGREE IN NURSING IN 1987 AND BECAME A

25  REGISTERED NURSE.  I WENT TO WORK AT A HOSPITAL IN TOPEKA,

10:07 1   KANSAS, ON THE ORTHOPEDIC FLOOR.  AND I ALSO WORKED ON THE MED

2   SURG UNITS.  THEN I WANTED TO GO BACK TO SCHOOL TO GET MY

3   MASTER'S, AND I GOT THE MASTER'S IN HEALTH SERVICES

4   ADMINISTRATION IN 1995.

5        SO I WORKED FOR AN OPHTHALMOLOGY OFFICE, AND I WAS A

6   SCRUB NURSE AND WORKED BOTH IN THE OFFICE AND THEN WAS A FIRST

7   ASSISTANT IN SURGERY IN OPHTHALMOLOGY.

8        AFTER THAT I WANTED TO WORK WITH THE MEDICAL DOCTORS,

9   BECAUSE THEY ARE TYPICALLY A LITTLE NICER THAN THE SURGEONS,

10   AND SO I SWITCHED GEARS AND WENT TO WORK FOR TWO INFECTIOUS

11   DISEASE DOCTORS THAT WERE PARTNERS.  DURING THAT TIME THE FIRST

12   GULF WAR BROKE OUT, AND ONE OF THE PARTNERS WAS -- THEY HAD TO

13   GO SET UP THE NAVAL HOSPITAL.  SO I WORKED WITH THE INFECTIOUS

14   DISEASE DOC THAT WAS LEFT BEHIND.  AND I WAS HIS NURSE LIAISON,

15   SO I WOULD ROUND AT THE HOSPITAL AHEAD OF HIM AND COLLECT THE

16   CONSULTANTS THAT WE GOT FOR SPECIALTY SERVICES, AND I WOULD GO

17   TAKE THE PATIENT HISTORY; I WOULD GO TO THE LAB AND OBTAIN ANY

18   LAB, GATHER THE INFORMATION.  AND THEN I WOULD ROUND WITH THEM,

19   AND THEN WE WOULD GO TO THE OFFICE.  AND AT THE END OF THE DAY,

20   I WOULD ALSO ROUND BEHIND HIM AT THE HOSPITAL.

21   **Q.**   LET ME JUST STOP YOU.

22   **A.**   UH-HUH.

23   **Q.**   SO AT WHAT -- HOW DID YOU GET INVOLVED IN CORRECTIONAL

24   MEDICINE?

25   **A.**   SO I -- AFTER I LEFT THE INFECTIOUS DISEASE POSITION, I

10:08  1    WENT TO THE STATE OF KANSAS, AND I WAS A TUBERCULOSIS NURSE

2    CONSULTANT, AND THAT WAS A --

3    **Q.**    STOP.  AND WHAT IS THAT?

4    **A.**    SO THAT WAS DURING THE TIME THAT TUBERCULOSIS WAS SPIKING

5    IN THE UNITED STATES, AND SO THE CENTERS FOR DISEASE CONTROL

6    PROVIDED STATES WITH ADDITIONAL MONEY TO TRAIN.  AND I WAS SENT

7    TO CDC TO TRAIN.  AND I ALSO TRAINED WITH MIKE GIESEMANN AT THE

8    NATIONAL JEWISH CENTER IN DENVER.

9    **Q.**    AND I'M JUST GOING TO ASK YOU TO SLOW DOWN JUST A LITTLE

10   BIT IN SUPPORT OF THE COURT REPORTERS.

11   **A.**    SORRY.

12   **Q.**    THAT'S OKAY.

13   **A.**    SO I TRAINED WITH MIKE GIESEMANN AT THE NATIONAL JEWISH

14   CENTER IN DENVER, COLORADO.  AND SO THEN I SPENT A SIGNIFICANT

15   AMOUNT OF TIME FLYING AROUND RURAL KANSAS TRAINING PHYSICIANS

16   ON TUBERCULOSIS CONTROL AND TREATMENT, AND THEN THE OTHER PART

17   OF MY TIME WAS SPENT AT THE STATE HEALTH DEPARTMENT MANAGING

18   TUBERCULOSIS.  AND IT WAS THERE THAT I MET A PULMONOLOGIST THAT

19   WAS WORKING IN CORRECTIONS, BECAUSE PART OF MY ROLE WAS TO GO

20   INTO THE PRISONS AND WORK WITH THEM ON SETTING UP TUBERCULOSIS.

21           HE ASKED ME TO LUNCH ONE DAY -- I LIKE TO SAY THAT HE

22   TRICKED ME, BECAUSE HE SAID HE WANTED ME TO GO TO WORK FOR THE

23   UNIVERSITY OF KANSAS MEDICAL CENTER AND HELP THEM WITH

24   MONITORING THE CONTRACT WITH THE DEPARTMENT OF CORRECTIONS AS A

25   THIRD-PARTY LIAISON, BECAUSE IT WAS PRIVATIZED.

10:10 1          AFTER I ACCEPTED THE POSITION, I LEARNED THAT MY

2    OFFICE WAS NOT AT THE UNIVERSITY OF KANSAS MEDICAL CENTER; THAT

3    ACTUALLY IT WAS IN THE CENTRAL OFFICE AT THE KANSAS DEPARTMENT

4    OF CORRECTIONS IN TOPEKA, KANSAS.  AND I WAS THE CONTRACT

5    MONITOR FOR A NUMBER OF YEARS MONITORING THE HEALTH CARE THAT

6    WAS PROVIDED IN THAT CORRECTIONAL SYSTEM IN THE STATE OF

7    KANSAS.

8    **Q.**   AND WHAT DID THAT INVOLVE MONITORING THAT --

9    **A.**   EVERYTHING FROM STAFFING, POLICY AND PROCEDURE

10   DEVELOPMENT.  AND WE ALSO WOULD LOOK AT THE PRIVATE VENDOR IF

11   THEY WANTED TO CHANGE A POLICY.  I ALSO WENT OUT AND AUDITED

12   EVERY FACILITY; OPERATIONAL AUDITING.

13   **Q.**   CAN YOU DESCRIBE THE PROCESS OF OPERATIONAL AUDITING?

14   **A.**   SURE.  WE USED THE CONTINUOUS QUALITY IMPROVEMENT, THEIR

15   PROGRAM AND THEIR DATA COLLECTION TOOLS, AND JUST VERIFIED THE

16   DATA THAT THEY WERE PROVIDING WAS ACTUALLY ACCURATE AND

17   VERIFIED THAT.  AND THEN WE HAD OUR OWN TOOLS THAT WE WOULD USE

18   TO GATHER DATA TO MEASURE, BECAUSE THAT REPORT THEN WAS A

19   CULMINATION AND REPORTED BACK TO THE LEGISLATURE BODY ABOUT THE

20   -- WHETHER THE CARE WAS GOOD OR NOT GOOD.

21          SO THERE WAS A TEAM:  THAT WAS MYSELF, THERE WAS

22   ANOTHER RN, AND THERE WAS A PHYSICIAN.  AND SO WE WOULD GO OUT

23   AT LEAST TWICE A YEAR TO ALL OF THE -- I BELIEVE, AS I RECALL,

24   THERE WERE TEN CORRECTIONAL FACILITIES THAT WE WOULD AUDIT.

25   **Q.**   AND WHAT YEAR WAS THAT?

10:11 1   **A.**   OH, MY GOSH.  I DON'T KNOW.  I DON'T REMEMBER.  I'D HAVE

2   TO LOOK AT MY CV.  I'VE BEEN DOING THIS A LONG TIME.

3   **Q.**   APPROXIMATELY.

4   **A.**   IT WOULD HAVE BEEN IN THE LATE '90S.

5           SO I DID THAT.  AND WE HAD ONE FACILITY -- LANSING

6   CORRECTIONAL FACILITY IN LANSING, KANSAS, THAT WAS THE OLDEST

7   FACILITY AND THEY -- IT WAS JUST A TROUBLED SYSTEM, AND THEY

8   HAD TROUBLE.  AND SO THE PRIVATE HEALTH CARE COMPANY APPROACHED

9   ME AND ASKED ME IF I WOULD CONSIDER WORKING FOR THEM AS THE

10   ADMINISTRATOR THERE TO HELP TURN THINGS AROUND.  AND I WAS

11   FRUSTRATED BECAUSE I KNEW THERE WAS A BETTER WAY.  AND SO I

12   ACCEPTED THAT POSITION, AND I WORKED AT LANSING FOR SEVERAL

13   YEARS AS THE ADMINISTRATOR THERE.

14           THE CONTRACT WENT OUT FOR BID, AND THE COMPANY THAT I

15   WAS EMPLOYED WITH LOST THAT PRISON -- THAT PRISON CONTRACT.  IT

16   WENT TO A NEW VENDOR.  AND THE COMPANY I WAS WITH ASKED ME TO

17   REMAIN EMPLOYED WITH THEM, AND I WAS SENT TO A JAIL IN TOPEKA,

18   KANSAS, AS THE ADMINISTRATOR.

19           WHEN I GOT THERE THEY WERE FACING THEIR INITIAL

20   NATIONAL COMMISSION ON CORRECTIONAL FACILITY CARE SURVEY IN 90

21   DAYS.  AND I WALKED IN AND ASKED THE HSA WHERE SHE WAS AT, YOU

22   KNOW, WITH PREPARING, AND SHE DIDN'T EVEN KNOW WHAT I WAS

23   TALKING ABOUT.  I ASKED HER IF SHE HAD A STANDARD BOOK.  SHE

24   DID NOT.

25   **Q.**   I'M GOING TO JUST STOP YOU.  WHAT DOES "HSA" STAND FOR?

10:12 1   **A.**   HEALTH SERVICE ADMINISTRATOR.

2   **Q.**   OKAY.

3   **A.**   SO I ROLLED MY SLEEVES UP AND WE BEGAN TRAINING.  AND I

4   DID -- FIRST I DID AN AUDIT OF THE PROGRAM TO SEE WHERE WE WERE

5   AT AND WHAT NEEDED TO BE IMPROVED.  AND THE SURVEY WAS THE

6   FIRST WEEK IN JANUARY OF THAT YEAR.  I HAD 90 DAYS TO GET IT

7   DONE.  AND WE SUCCESSFULLY PASSED THAT INITIAL NCCHA

8   ACCREDITATION WITHOUT ANY FLAWS THAT WERE FOUND.  AND IT WAS

9   100 PERCENT ACCREDITATION, AND AT THAT POINT I WAS ABOARD.

10   AND SO THE COMPANY ASKED ME TO START DOING BUSINESS

11   DEVELOPMENT WITH THEM.  SO I WOULD TRAVEL ACROSS THE COUNTRY

12   WITH THE BUSINESS DEVELOPMENT AND LOOK AT BUSINESS

13   OPPORTUNITIES, AND I DEVELOPED THE STAFFING MATRIXES FOR THE

14   BID, LIKE THE NUMBER OF DOCTORS AND NURSES, DENTISTS, MENTAL

15   HEALTH PROFESSIONALS THAT WOULD BE REQUIRED FOR ANY BOOK OF

16   BUSINESS, WHETHER IT'S A DIRECT DEPARTMENT OF CORRECTIONS

17   SYSTEM OR WHETHER IT WAS A JAIL.  AND I ALSO WOULD LOOK AT THE

18   POLICIES AND PROCEDURES AND DEVELOP A RESPONSE TO REQUEST FOR

19   PROPOSAL.

20   I GOT A CALL THEN BY AN INDIVIDUAL WORKING THAT WAS

21   LEAVING THE COMPANY.  AND THERE WAS A PHYSICIAN IN MIAMI,

22   FLORIDA, WHO WANTED TO PUT A CORRECTIONAL COMPANY TOGETHER.  HE

23   WAS -- HE OWNED MULTIPLE PRIMARY CARE FACILITIES IN THE SOUTH

24   FLORIDA AREA.  AND THE SHERIFF AT THE BROWARD COUNTY JAIL IN

25   FORT LAUDERDALE WAS REALLY FRUSTRATED BECAUSE HE FELT LIKE HE

10:14 1   WASN'T GETTING GOOD CARE FROM PRIVATE HEALTH CARE COMPANIES.

2                  AND SO IN THE SUMMER OF 2004 WE PUT TOGETHER ARMOR

3   CORRECTIONAL.  I WAS PART OF THAT TEAM.  AND WE BID THE BROWARD

4   COUNTY CONTRACT, AND WE WON THAT AND STARTED THAT DECEMBER 1ST

5   OF 2004.

6   **Q.**   AND ABOUT HOW MANY BEDS WAS THAT FACILITY?

7   **A.**   AT THAT POINT THEY HAD 6,500 INMATES.  AND THERE WERE FIVE

8   JAIL FACILITIES AND FOUR SATELLITE BOOKING FACILITIES ACROSS

9   THE COUNTY.  IT'S A LARGE COUNTY.

10                 AND SO THINGS STARTED TO FALL LIKE DOMINOES.  WITHIN

11  ABOUT 60 DAYS PALM BEACH COUNTY IN PALM BEACH, FLORIDA, CALLED

12  AND ASKED IF WE WOULD COME AND LOOK AT THEIRS.  AND WITHOUT

13  EVEN A COMPETITIVE BID, WE WERE AWARDED THAT AND TOOK THAT OVER

14  IN AN EMERGENCY BASIS.  AND SO PART OF MY ROLE -- AT THAT POINT

15  I WAS THE SENIOR VICE PRESIDENT OF CLINICAL OPERATIONS.

16                 SO THE NURSING EDUCATION DEPARTMENT REPORTED TO ME.

17  AND I WOULD -- WE WOULD GO IN -- AND THE FIRST STEP ALWAYS IN

18  ASSESSING A SYSTEM IS TO REALLY DO WHAT I CALL A SOUP TO NUTS

19  ANALYSIS OF IT.  YOU LOOK AT EVERYTHING.  YOU LOOK AT SICK

20  CALL; YOU LOOK AT CHRONIC CARE; YOU LOOK AT THEIR CQI PROGRAM;

21  YOU LOOK AT STAFFING; YOU LOOK AT EVERYTHING.  AND THAT THEN

22  BECOMES YOUR ROADMAP OF WHAT YOU NEED TO CORRECT.  THAT'S KIND

23  OF YOUR WORK PLAN.

24                 AND I LED A GROUP OF REGISTERED NURSES THAT -- WE

25  WOULD GO IN AND WORK SIDE BY SIDE WITH THE STAFF, WHETHER IT

10:15 1    WAS INTAKE OR WHETHER IT WAS AN INFIRMARY CARE, AND REALLY

2    TEACH THEM AND WORK WITH THEM UNTIL -- I LIKE TO SAY WE'RE

3    STAYING UNTIL WE'RE IN THE WAY AND YOU WILL ASK US TO LEAVE,

4    BECAUSE YOU'VE GOT IT, THINGS ARE WORKING THE WAY IT SHOULD.

5    SO I WAS WITH THAT COMPANY UNTIL 2015.

6            AND ABOUT 2013 DR. ARMAS DECIDED THAT HE WAS LOOKING

7    AT SELLING THE COMPANY, AND HE CHANGED THE LEADERSHIP.  AND I

8    QUICKLY SAW THAT THEY WERE TAKING THEIR EYE OFF PATIENT CARE

9    AND REALLY FOCUSING ON DOLLARS, SO I GOT THE OPPORTUNITY TO BE

10   THE CHIEF NURSING OFFICER FOR CENTURION, WHICH IS ANOTHER

11   PRIVATE CONTRACT.  THEY PRIMARILY DID PRISONS.  AND THEY HAD

12   NOT PUT THEIR TOE IN THE WATER YET OF JAILS.  I WAS BROUGHT ON

13   BECAUSE I HAD JAIL EXPERIENCE.  I ALSO HAD PRISON EXPERIENCE,

14   BUT MORE JAIL.  AND I WAS WITH THEM FOR FOUR YEARS -- AND WE

15   HAD CONTRACTS THROUGHOUT THE COUNTRY, PRISON CONTRACTS

16   THROUGHOUT THE COUNTRY -- AS THEIR CHIEF NURSING OFFICER.  AND

17   REALLY THE TITLE CHANGED, BUT WHAT I DID WAS VERY, VERY

18   SIMILAR.

19           AND THEN IN 2019 I GOT A CALL FROM DR. ARMAS, BECAUSE

20   HE HAD TAKEN HIS COMPANY BACK.  THE PEOPLE THAT PURCHASED IT --

21   HE SELF-FUNDED IT, AND THEY DIDN'T COME TO THE TABLE WITH THEIR

22   PAYMENT.  AND HE CHANGED THE LEADERSHIP, ASKED ME TO COME BACK,

23   AND I TOLD HIM I WOULD COME BACK ON TWO -- ON SEVERAL

24   CONDITIONS:  THAT I -- THAT THE NURSING EDUCATION DEPARTMENT

25   AND THE CLINICAL OPERATIONS REPORTED TO ME, BUT I ALSO DEMANDED

10:17 1  THAT THE REGIONAL VICE PRESIDENT.  SO THE BUSINESS END OF THE

2  COMPANY REPORTED TO ME AS WELL.

3              **THE COURT:**  OKAY.  SLOW DOWN A LITTLE BIT.  JUST TAKE

4  A BREATH.

5              **THE WITNESS:**  I'M SORRY.  I TALK FAST NORMALLY.  I'LL

6  SLOW DOWN, YOUR HONOR.

7              **THE COURT:**  THE LAST SENTENCE, YEAH.

8  **BY THE WITNESS:**

9  **A.**   SO THE REGIONAL VICE PRESIDENT, WHICH IS THE BUSINESS ARM

10  OF THE COMPANY, REPORTED TO ME ALSO.

11  **Q.**   AND WHY WAS THAT IMPORTANT?

12  **A.**   IT'S IMPORTANT BECAUSE YOU DON'T WANT DOLLARS TO DRIVE THE

13  PROGRAM AND YOU DON'T -- IF IT'S SEPARATE, THEN THE PEOPLE WITH

14  THE BUDGET OFTEN MAKE DECISIONS THAT ARE NOT CLINICALLY

15  APPROPRIATE.  AND THEN YOU ALSO CAN SEE WHEN THE CLINICAL

16  PEOPLE ANALYZE THINGS, THEY TEND TO NOT WANT TO BE FORTHCOMING

17  BECAUSE THEY KNOW IT WILL UPSET THE BUSINESS SIDE OF IT.  THEY

18  NEED TO KNOW THAT WE'RE ALL ON THE SAME TEAM.

19              AND IF YOU TAKE CARE OF YOUR PATIENTS CORRECTLY, THE

20  DOLLARS TAKE CARE OF THEMSELVES, BECAUSE IT'S ABOUT EARLY

21  INTERVENTION AND PREVENTING THEM FROM GETTING SO SICK THAT THEY

22  END UP IN THE HOSPITAL, YOU KNOW, WITH -- WHICH CAUSES LARGER

23  BILLS.  AND SO I -- THEY ALL REPORTED TO ME.

24              AND SO -- BUT I'M GETTING OLDER IN MY CAREER AND THAT

25  POSITION WAS VERY DEMANDING.  I ACTUALLY WAS SLEEPING WITH MY

10:18 1   PHONE AT THE BEDSIDE BECAUSE IT'S A SMALL COMPANY, AND IF

2   ANYTHING HAPPENS, YOU KNOW, THEY REPORTED UP.  AND SO I

3   APPROACHED THEM -- AND I WAS ACTUALLY GOING TO JUST RESIGN AND

4   NOT DO THAT ANYMORE.  BECAUSE ALSO IN MY CAREER IN 2014, I WAS

5   APPROACHED TO JOIN A CONTRACT MONITORING TEAM IN MIAMI-DADE

6   COUNTY IN MIAMI, FLORIDA, AND THEY WERE UNDER CONSENT DECREE

7   AND SETTLEMENT AGREEMENT.  AND I JOINED A TEAM THERE, AND WE

8   CONTRACT MONITORED THAT.  AND I DID THAT FOR ABOUT FOUR YEARS

9   WITH A GROUP OF PHYSICIANS, PSYCHIATRISTS, MENTAL HEALTH

10  PROFESSIONALS, FIRE SAFETY.  THEIR CONSENT DECREE AND

11  SETTLEMENT AGREEMENT WAS VERY BROAD.  THERE WERE A LOT OF

12  ISSUES IN THE SYSTEM, BUT WE WATCHED THEM REALLY GROW AND MAKE

13  POSITIVE CHANGE.  AND SO IT WAS REALLY -- WE DIDN'T NEED THAT

14  MANY OF US MONITORING THEN.

15        SO, I MEAN, TO BE A GOOD MONITOR, YOUR JOB IS TO WORK

16  YOURSELF OUT OF A JOB.  AND I RAISED MY HAND FIRST AND SAID,

17  "I'LL GO FIRST."  THERE WAS LEFT ANOTHER RN BECAUSE I WAS

18  WORKING FULL-TIME, AND THAT WAS KIND OF A SIDE PROJECT FOR ME.

19  SO I QUIT MONITORING BASED ON THE PROGRESS THAT THEY WERE

20  MAKING.  IT'S STILL UNDER MONITORING, BUT THEY'RE DOING QUITE

21  WELL AND HAVE MADE, YOU KNOW, LEAPS AND BOUNDS IN IMPROVEMENT.

22        SO I TALKED TO MY COMPANY ABOUT TWO MONTHS AGO AND

23  TOLD THEM THAT MY INTENT WAS TO JUST STEP DOWN OUT OF MY

24  POSITION.  AND I TOLD THEM, YOU KNOW, I JUST -- BECAUSE I ALSO

25  TAKE CASES ON FOR PRIVATE ATTORNEYS, AND THAT WAS STARTING TO

10:20 1    BLOSSOM.  AND THEY'RE LIKE, "NO, WE'RE NOT GOING TO LET YOU

2    GO."  AND I DON'T SAY THAT TO TOOT MY OWN HORN, BUT I SAID, "I

3    THINK THERE IS A PLACE FOR ME."  AND SO I AM NOW WORKING IN THE

4    LEGAL DEPARTMENT, AND I CONTINUE TO REVIEW CASES, ALL M&M'S,

5    MORBIDITY AND MORTALITY, THE TIMELINE; I REVIEW THE REPORT THAT

6    THE FACILITY LEVEL LEADERSHIP IS WRITING TO MAKE SURE THAT

7    THEY'RE NOT MISSING SOMETHING.

8            AND DURING THOSE -- FOR THOSE MEETINGS I PARTICIPATE.

9    AND THEN I REVIEW ANY CASES FOR LITIGATION AND PREPARE THAT,

10   BECAUSE THAT ALWAYS GOES TO OUTSIDE COUNSEL.  SO I DID THE

11   TIMELINE, THE CHRONOLOGY TIMELINE.  AND IF THERE IS ANY MISS

12   LIKE ON A POLICY OR A PROCEDURE, I WILL NOTE THAT AND PACKAGE

13   THAT UP SO THAT IT GOES TO THE OUTSIDE COUNSEL.  OR IF THERE'S

14   NOT AND WE FOLLOWED POLICY AND I THINK IT LOOKS GOOD, WHICH

15   OFTEN IS THE CASE, THAT GOES OUT AS WELL, AND IT JUST REDUCES

16   THE LEGAL FEES.

17   **Q.**   I WANT TO TALK A LITTLE BIT MORE ABOUT YOUR MONITORING

18   ROLE IN MIAMI.

19   **A.**   UH-HUH.

20   **Q.**   SO CAN YOU DESCRIBE THE SIZE OF THAT FACILITY AND WHAT THE

21   ISSUES THAT YOU MONITORED THERE WERE?  AND AGAIN, JUST TRY TO

22   TALK AS SLOWLY AS POSSIBLE FOR THE COURT REPORTER.

23   **A.**   SO AT THAT TIME I BELIEVE THEY HAD AROUND 6,000.  THEIR

24   POPULATION WAS DOWN A LITTLE BIT.  I THINK IT WAS AROUND 6,000,

25   BUT THEY HAD BEEN AS HIGH AS 7,500.  THERE ARE FOUR JAILS

10:21 1  THROUGHOUT THAT COUNTY, AND WE MONITORED -- LET'S SEE.  WE

2  MONITORED THEIR INTAKE PROCESS, WE MONITORED THE WITHDRAWAL AND

3  CARE OF DETOX PROCESS.  THEY HAD MULTIPLE INFIRMARIES, SO WE

4  MONITORED THE INFIRMARY CARE; WE MONITORED THE CHRONIC CARE,

5  EMERGENCY RESPONSE, OFFICER TRAINING, OFFICER RESPONSE,

6  KNOWLEDGE OF LIKE WHERE THEIR CUTDOWN TOOLS WERE, WHERE ARE THE

7  AEDS.  THAT NEEDS TO WORK LIKE CLOCKWORK SO THAT WHEN YOU HAVE

8  AN EMERGENCY EVERYBODY KNOWS.

9      IT'S LIKE IN A HOSPITAL, A CODE BLUE.  THEY NEED TO

10  BE ABLE TO QUICKLY RESPOND AND EVERYBODY KNOWS THEIR ROLE.  AND

11  THEN THERE WAS A BEHAVIORAL HEALTH COMPONENT TO IT, MENTAL

12  HEALTH SERVICES.  SO THE PSYCHOLOGIST MONITORED THAT.  BUT

13  MEDICATION MANAGEMENT, PHARMACY, DISCHARGE PLANNING, RELEASE.

14  WE LOOKED AT THE -- YOU KNOW, THE PACKAGING OF MEDICATION FOR

15  THE PATIENT.  SETTING THEM UP OUT IN THE COMMUNITY WITH

16  FOLLOW-UP CARE IS IMPORTANT AS WELL.  SO WE LOOKED AT ALL OF

17  THAT.

18  CQI WAS A HUGE PIECE OF IT.

19      AND WHEN WE FIRST STARTED THERE, THEIR POLICIES AND

20  PROCEDURES NEEDED A LOT OF WORK.  THEY LACKED SPECIFICITY AND

21  GUIDANCE TO STAFF.  THEIR TRAINING OF WHAT WE CALL NEW HIRE

22  ON-BOARDING LACKED BECAUSE IT'S PART OF JACKSON HEALTH SYSTEMS.

23  AND SO THEY THOUGHT, WE'LL JUST SEND THE HOSPITAL NURSES OVER

24  TO THE JAIL, AND IF YOU'VE BURNED OUT AT THE HOSPITAL, YOU GOT

25  IN TROUBLE.  BECAUSE IT WAS UNION, IT WAS HARD TO JUST

10:23 1   TERMINATE THEM; THEY WOULD SEND THEM TO THE JAIL KIND OF AS

2   PUNISHMENT.  SO THEY WERE GETTING LIKE THE NURSES THAT COULDN'T

3   REALLY -- WEREN'T VERY GOOD AT THE HOSPITAL OVER THERE.  AND

4   THEY JUST THOUGHT, OH, WELL, IT'S LIKE HOSPITAL NURSING.  IT'S

5   NOT.  IT'S VERY DIFFICULT.  AND SO WE SPENT A LOT OF TIME

6   REALLY IN BUILDING A GOOD TRAINING PROGRAM.

7           THE BEAUTY OF IT WAS THAT THE CEO WAS DETERMINED TO

8   TURN IT AROUND.  AND I MET WITH HIM AND WE TALKED ABOUT THE

9   STAFFING.  YOU KNOW, I TOLD HIM, I SAID, "WOULD YOU LIKE ME TO

10  SEND A JAIL NURSE TO YOUR ICU AND BE YOUR NURSE?" AND HE'S

11  LIKE, "I GET IT."  SO THEY STOPPED SENDING THE BAD NURSES.  YOU

12  ACTUALLY -- THERE WAS AN APPLICATION PROCESS.  SO WE WOULD DO

13  SOME PRE-TESTING.  IF YOU APPLY, YOU HAVE TO SHOW THAT YOU'RE

14  COMPETENT, TRAIN THEM, AND THEN TESTING AFTER THAT, AND THEN

15  MENTORING, YOU KNOW, SO THAT WHEN YOU CUT THEM LOOSE TO

16  ACTUALLY WORK ON THEIR SPECIFIC POST, THAT THEY'RE PREPARED.

17          THE OTHER THING THAT WE DID IS THAT -- IT'S IMPORTANT

18  THAT YOU TRAIN YOUR DIRECTORS OF NURSING, YOUR NURSING

19  SUPERVISORS, YOUR CHARGE NURSES.

20          OFTEN WHAT YOU'LL SEE IN SYSTEMS EVERYWHERE ACROSS

21  THE UNITED STATES IS WE'VE GOT A VACANCY FOR A CHARGE NURSE;

22  AND IF YOU'RE AN RN, YOU CAN DO IT.  I'M JUST GOING TO ASSIGN

23  YOU THERE AND YOU KNOW WHAT TO DO, AND IT'S NOT TRUE.  IT'S A

24  DIFFERENT POST, AND THEY NEED TO BE TRAINED AND MENTORED.  AND

25  SO WE SPENT A LOT OF TIME DEVELOPING THOSE PROGRAMS.

10:24  1    **Q.**   CAN YOU TALK TO ME JUST A LITTLE BIT ABOUT WHAT YOU WOULD

2    DO OVER THE YEARS WHEN YOU TOOK ON A NEW CONTRACT WITH A JAIL

3    OR A PRISON?

4    **A.**   YEAH.  I STARTED EARLY.  I ALWAYS WANTED TO BE ON THE

5    GROUND FLOOR OF LOOKING AT THE REQUEST FOR PROPOSAL, BECAUSE I

6    WANTED TO SEE -- DO AN ASSESSMENT AS BEST YOU CAN OF WHERE

7    THEY'RE AT NOW SO YOU KNOW WHAT YOU'RE GETTING INTO.  USUALLY

8    WHEN JAILS AND PRISON SYSTEMS CHANGE VENDORS, IT'S 'CAUSE

9    THEY'RE UNHAPPY, AND USUALLY THEY ARE UNHAPPY BECAUSE THINGS

10    ARE NOT RUNNING WELL.  AND IT'S IMPORTANT TO KNOW WHAT YOU'RE

11    GETTING INTO, BECAUSE IT'S IMPORTANT TO KNOW WHAT RESOURCES

12    YOU'RE GOING TO NEED TO GO IN AND TURN THAT SYSTEM AROUND.

13        AND SO THEN I WOULD ASSIST WITH WRITING WITH THE

14    REQUEST FOR PROPOSAL.  AND ONCE YOU'RE AWARDED, WE WOULD GO IN

15    AND REALLY DO A SOLID ASSESSMENT OF WHERE WE WERE AT AND THEN

16    LOOK AT THE STAFFING AND HIRE THE NURSES.  AND WE ALWAYS

17    TRAINED BEFORE WE ACTUALLY WERE AWARDED.

18        SO ABOUT 30 DAYS PRIOR TO TAKING IT OVER, WE WOULD

19    START TRAINING ON EVENINGS, NIGHTS, AND WEEKENDS, AND SOME DAYS

20    FOR THE NIGHT SHIFT MULTIPLE TIMES BECAUSE WE REQUIRED THEM TO

21    COME IN AND BE COMPLETELY TRAINED.  LIKE IF YOU'RE A NEW

22    EMPLOYEE, THE BASIS OF THAT WAS ALWAYS OUR POLICIES AND

23    PROCEDURES.  AND WHEN THEY GOT DONE WITH THAT TRAINING, THEY

24    KNEW WHAT THE POLICIES AND PROCEDURES ARE.  WE'D ROLE-PLAY.  WE

25    SAT IN A CLASSROOM WHERE IT'S SAFE TO ASK QUESTIONS.  SO A

10:25  1  NURSE WOULD PLAY A NURSE, AND THE NEXT PERSON WOULD BE THE
       2  PATIENT AND REALLY, YOU KNOW, GO THROUGH THE EXERCISE OF HOW
       3  WOULD YOU HANDLE THIS.  AND THE NURSES REALLY APPRECIATE THAT.
       4  WE DID IT FOR BEHAVIORAL HEALTH, TOO, BECAUSE THEY FELT VERY
       5  PREPARED THEN.
       6          AND THEN ONCE WE WERE -- ONCE WE STARTED THE
       7  CONTRACT, I HAD A TEAM THAT I LED OF NURSES.  AND WE WORK SIDE
       8  BY SIDE.   SO IN OTHER WORDS, IF I'M IN THE -- TEACHING THE
       9  INTAKE SUITE, I ACTUALLY WOULD WORK INTAKE WITH THE NURSE, ALL
      10  SHIFTS, AND SIT SIDE BY SIDE.  AND THAT'S WHEN THE QUESTIONS
      11  COME UP WHEN YOU START DOING THINGS.  AND SO THAT'S PART OF
      12  WHAT I WOULD DO.
      13          THEN FOLLOWING IT, IF YOU IDENTIFY THERE ARE SPECIFIC
      14  CHALLENGES IN THEIR STAFFING ISSUES -- LIKE DURING COVID MY
      15  COMPANY, LIKE EVERYWHERE IN THE UNITED STATES, STAFFING WAS A
      16  PROBLEM DURING COVID.  AND I ACTUALLY LAST SUMMER WAS IN
      17  JACKSONVILLE, FLORIDA, FOR ABOUT THREE MONTHS, AND I WORKED THE
      18  NIGHT SHIFT AT THE BACK DOOR DOING THE INTAKE SCREENING COVID
      19  SWABBING, BECAUSE WE WERE SHORT-STAFFED.  AND I TOOK A TEAM IN
      20  -- AND I DON'T EVER ASK MY TEAM TO DO ANYTHING I WON'T DO.  SO
      21  I LITERALLY RELOCATED FOR ABOUT 90 DAYS UNTIL WE WERE ABLE TO
      22  GET THE STAFFING BACK UP.  DID SOME ADDITIONAL TRAINING, AND
      23  THEY WERE READY TO THEN MARCH ON THEIR OWN.
      24  **Q.**   AND WHEN YOU SAY YOU GO IN ON THE GROUND, YOU GO INTO THE
      25  FACILITY AND ARE WORKING IN THE FACILITY DURING, YOU KNOW, DAYS

10:27 1   AND NIGHTS?

2   **A.**   YEAH.  I'VE NEVER HAD AN OFFICE IN THE CORPORATE OFFICE.

3   I'VE NEVER OFFICED.  I'VE ALWAYS -- I'M EITHER IN THE FACILITY.

4   I'VE -- I MEAN, I WAS FLYING OVER A HUNDRED THOUSAND AIR MILES

5   A YEAR.  I'M EITHER IN THE FACILITY OR, IF I'M NEEDING TO DO

6   ADMINISTRATIVE WORK, I'M IN MY -- I OFFICE FROM HOME.

7             I'VE LIVED IN SOUTH FLORIDA FOR TEN YEARS, STARTED

8   HAVING GRANDCHILDREN.  THEY DIDN'T KNOW ME WHEN I WENT BACK.

9   AND SO I TOLD THE COMPANY "I'M GOING BACK TO KANSAS, AND I CAN

10  WORK WITH YOU OR NOT, BUT MY GRANDCHILDREN ARE IMPORTANT."  AND

11  SO THAT'S THE WAY I'VE LONG DONE IT.

12  **Q.**   ALL RIGHT.  AND COULD YOU JUST TELL US BRIEFLY ABOUT THE

13  LOCATIONS OF SOME OF THESE CONTRACTS; WHERE HAVE YOU WORKED?

14  **A.**   SURE.  SO PRISON SYSTEMS, THE VERMONT DEPARTMENT OF

15  CORRECTIONS, JAIL IN -- JAILS IN MAINE, THE NEW MEXICO

16  DEPARTMENT OF CORRECTIONS SYSTEM, ARIZONA DEPARTMENT OF

17  CORRECTIONS, TEXAS JAILS, KANSAS DEPARTMENT OF CORRECTIONS,

18  GEORGIA, JAILS IN GEORGIA, THE FLORIDA DEPARTMENT OF

19  CORRECTIONS, AND MANY JAILS IN FLORIDA, BECAUSE THAT'S OUR

20  CORPORATE OFFICE HOME BASE, MISSISSIPPI DEPARTMENT OF

21  CORRECTIONS.  AND SO THAT'S BOTH WITH ARMOR AND CENTURION.  I'M

22  SURE I'M MISSING SOME.  COLORADO AS WELL.

23  **Q.**   IS IT FAIR TO SAY YOU'VE WORKED ALL AROUND THE COUNTRY IN

24  JAILS AND PRISONS?

25  **A.**   YES.

10:28  1   **Q.**   AND FOR THE MAJORITY OF THE TIME YOU'VE WORKED FOR
       2   PRIVATE PRISON COMPANIES.  IS THAT RIGHT?
       3   **A.**   THAT'S CORRECT.
       4   **Q.**   AND SO FAIR TO -- WELL, TELL ME ABOUT -- YOU KNOW, IS YOUR
       5   AIM TO PROVIDE CADILLAC CARE IN THESE PROGRAMS?
       6   **A.**   NO.  NO, IT'S NOT CADILLAC CARE.  THERE'S A LIMITED NUMBER
       7   OF RESOURCES.  IT'S TAX DOLLARS THAT FUND THESE PROGRAMS, AND
       8   YOU COULD NEVER LOSE SIGHT OF THAT.  AND SO THE WHOLE ROLE IS
       9   TO BE AS EFFICIENT AND EFFECTIVE AS YOU CAN WITHOUT SACRIFICING
      10   PATIENT OUTCOMES.  AND AN EXAMPLE I'LL GIVE YOU OF THAT IS
      11   MEDICATIONS.  YOU KNOW, THERE'S ALWAYS THE SHINY NEW PENNY IN
      12   MEDICATIONS, BUT THAT DOESN'T MEAN THE OLD TRIED-AND-TRUE
      13   GENERIC THAT COST MUCH LESS WOULD JUST DO THE SAME AMOUNT.  YOU
      14   KNOW, I MEAN, YOU WOULD GET THE SAME OUTCOME WITH USING THOSE.
      15   AND SO, YOU KNOW, THEY DO A GOOD JOB WITH THE FORMULARY
      16   MANAGEMENT.
      17        AND THE OTHER THING IS THAT IT'S THE EARLY
      18   INTERVENTION THAT WE PUSH, BECAUSE IF YOU DON'T CONTROL THAT
      19   DISEASE, YOU GET THAT PATIENT -- WITH NURSES I SAY, "YOU'VE GOT
      20   TO GET THE PATIENT IN FRONT OF THE PROVIDER EARLIER."  THE
      21   EARLIER THAT WE DO THAT AND THE MORE EFFECTIVE THAT THAT PLAN
      22   OF CARE IS, WE CAN FIX MOST OF THIS STUFF BEHIND THE WALL AND
      23   AVOID TAKING THEM -- NOT HAVING TO GO TO THE HOSPITAL, WHICH IS
      24   NOT ONLY COSTLY FOR THE PATIENT, BUT IT COST IN SECURITY
      25   DETAIL.  SO IT'S A HUGE IMPACT OF THE STATE, AND USUALLY THAT'S

10:30  1   OVERTIME.  SO IT'S A FOCUS ON DOING EARLY, BEING EFFECTIVE, AND

2   BEING AS LEAN AND EFFICIENT AS YOU CAN.

3   Q.   ALL RIGHT.  NOW, I JUST WANTED TO CLARIFY SOMETHING.  YOU

4   MENTIONED THAT YOU RAISED YOUR HAND TO LEAVE THE MONITORING

5   JOB, AND I THINK IT JUST GOT LOST IN THE SHUFFLE.

6           SO YOU HAD BEEN MONITORING FOR FOUR YEARS AND THEN

7   THE FACILITY WAS IMPROVING, AND THEN WHAT HAPPENED?  I JUST

8   WANT TO WALK US -- SO WE DON'T WALK OVER THAT.

9   A.   SO THERE WAS A NUMBER OF US -- AND I WANT TO SAY AT THAT

10   POINT THERE WERE LIKE SIX MONITORS ON THE TEAMS AND THERE WERE

11   TWO REGISTERED NURSES.  AND BECAUSE WE HAD DONE SUCH A GOOD JOB

12   WITH THE POLICIES AND PROCEDURES IN THEIR QUALITY IMPROVEMENT,

13   THEY WERE SELF-MONITORING.  THEY WERE -- LIKE IT'S SUPPOSED TO

14   HAPPEN.  THEY WERE COMING TO US SAYING, "LOOK, WE'RE DEFICIENT

15   IN THIS AREA.  WE'RE GOING TO DO A CORRECTIVE ACTION."  AND

16   IT'S REALLY REWARDING, BECAUSE THAT'S WHAT YOU WANT TO SEE.

17           SO ONCE THEY SELF-MONITORED, THEY BECAME THE -- THEY

18   STARTED TO MEET US AT THE DOOR:  "THESE ARE OUR WEAKNESSES."

19   THEY HAD IT.  THEY GOT IT.  AND SO THEY DIDN'T NEED AS MUCH OF

20   INTENSIVE MONITORING AND OVERSIGHT, BECAUSE EVERY TIME WE WOULD

21   GO VERIFY THE REPORTS, WE COULD VERIFY, AND SO IT WAS REALLY A

22   WASTE AND YOU DON'T WANT TO CHARGE MORE THAN YOU NEED TO.  AND

23   SO WE REALLY NEEDED TO REDUCE THE TEAM.  AND I VOLUNTEERED,

24   BECAUSE I WAS EMPLOYED FULL-TIME AND THE OTHER RN THAT WAS

25   WORKING ON THE CASE WAS NOT.  SHE WAS RETIRED.  AND I -- NOT

10:31 1    THAT I WANTED OUT, BUT IT MADE SENSE FOR ME.

2    **Q.**    ALL RIGHT.

3              **MS. MONTAGNES:**  AT THIS TIME, YOUR HONOR, I WOULD

4    LIKE TO TENDER THIS WITNESS AS AN EXPERT IN CORRECTIONAL

5    MEDICINE.

6              **THE COURT:**  IN CORRECTIONAL MEDICINE.

7                   OKAY.  THE TENDER IS IN CORRECTIONAL MEDICINE.

8    ANY CROSS?

9              **MR. ARCHEY:**  YES, YOUR HONOR.

10                          **VOIR DIRE**

11   **BY MR. ARCHEY:**

12   **Q.**    GOOD MORNING, MS. GOEHRING.

13              CONNELL ARCHEY.  GOOD TO SEE YOU AGAIN, MA'AM.

14   **A.**    NICE TO SEE YOU, SIR.

15   **Q.**    I'M GOING TO SORT OF REITERATE SOMETHING THE JUDGE SAID,

16   SLOW DOWN, MAYBE --

17   **A.**    OKAY.

18   **Q.**    -- DEEP BREATHS.  OKAY?

19   **A.**    IT'S MY FIRST TIME.  I'M NERVOUS.

20   **Q.**    YES, MA'AM.  I UNDERSTAND.

21              THIS IS YOUR FIRST TIME TO TESTIFY IN COURT LIKE

22   THIS.  RIGHT?

23   **A.**    YES.

24   **Q.**    YOU'RE CURRENTLY WORKING IN THE CORRECTIONAL HEALTH

25   SERVICES.  CORRECT?

10:32  1   **A.**   YES, SIR.

2   **Q.**   AND ARMOR CORRECTIONAL HEALTH SERVICES IS A VENDOR FOR

3   STATE SYSTEMS.  RIGHT?

4   **A.**   CORRECT.  THEY CURRENTLY DO NOT HAVE A PRISON CONTRACT.

5   THEY DID HAVE IT IN VIRGINIA DEPARTMENT OF CORRECTIONS UNTIL

6   DECEMBER OF 2021.

7   **Q.**   OKAY.  AND BY "VENDOR," THE STATE OR COUNTY, THE

8   GOVERNMENT ENTITY, WILL CONTRACT WITH ARMOR TO PROVIDE THE

9   HEALTH SERVICES FOR THE PRISON OR THE JAIL.  IS THAT WHAT WE'RE

10   TALKING ABOUT?

11   **A.**   THAT'S CORRECT.

12   **Q.**   ALL RIGHT.  AND IF -- I AM LOOKING AT YOUR CV.  IF I'M

13   UNDERSTANDING THIS CORRECT, THE LAST TIME YOU WORKED DIRECTLY

14   FOR D.O.C. OR A STATE ENTITY OF ANY KIND WAS IN THE 1990'S IN

15   KANSAS?

16   **A.**   THAT'S CORRECT.

17   **Q.**   AND YOU HAVE MORE EXPERIENCE WITH JAILS OVER PRISONS.

18   RIGHT?

19   **A.**   I WOULDN'T SAY THAT IS TRUE.

20   **Q.**   WELL, I THINK THAT'S WHAT YOU SAID, WASN'T IT?

21   **A.**   I WORKED FOR FOUR YEARS AT CENTURION.  AND IT WAS THE

22   MAJORITY -- WE HAD ONE JAIL -- TWO JAILS, AND THE REST OF THEM

23   WERE STATE DEPARTMENT OF CORRECTIONS SYSTEMS.

24   **Q.**   ALL RIGHT.  I JUST WROTE DOWN -- WHEN YOU SAID "MORE JAIL

25   EXPERIENCE," I WROTE IT DOWN.

10:33 1    **A.**    OKAY.  WELL, I MISSPOKE.

2    **Q.**    ALL RIGHT.

3    **A.**    I WOULD SAY IT'S 50/50.

4    **Q.**    ALL RIGHT.  BECAUSE THERE'S A DIFFERENCE BETWEEN JAILS AND

5    PRISONS IN --

6    **A.**    THERE ARE SOME NUANCES, DIFFERENCES, YES, BUT THERE ARE

7    MANY SIMILARITIES AS WELL.

8    **Q.**    RIGHT.  BUT THERE'S A LOT OF DIFFERENCES BECAUSE A JAIL

9    TENDS TO HAVE A TURNOVER OF ITS POPULATION.  RIGHT?

10    **A.**    RIGHT.  UH-HUH.

11    **Q.**    YOU HAVE TO BE MORE CONCERNED ABOUT THE INTAKE IN THE JAIL

12    PROCESS AND THE THINGS LIKE WITHDRAWAL FROM DRUGS OR ALCOHOL;

13    AND SUICIDES ARE A REAL PROBLEM AT THE INITIAL STAGE OF A JAIL

14    INTAKE?

15    **A.**    CORRECT.  CORRECT.

16    **Q.**    IS THAT ALL ACCURATE?

17    **A.**    CORRECT.

18    **Q.**    OKAY.  AND THEN AS A RULE, THEY DON'T STAY THERE AS LONG

19    AND THEY GET OUT THE DOOR; AND THEN YOU'VE GOT ALL THE ISSUES

20    WITH GETTING THEM OUT.  RIGHT?

21    **A.**    CORRECT.

22    **Q.**    OKAY.  PRISONS TEND TO BE LONG-TERM, WHICH PRESENT A WHOLE

23    DIFFERENT SET OF ISSUES AS FAR AS LONG-TERM CARE WENT ON.  IS

24    THAT FAIR?

25    **A.**    UH-HUH.

10:34 1    Q.   OKAY.  AND YOU'VE NEVER BEEN RETAINED TO GIVE OPINIONS IN

2    A SYSTEM-WIDE MEDICAL CASE BEFORE.  CORRECT?

3    A.   OTHER THAN THE MIAMI-DADE COUNTY JAIL SYSTEM.

4    Q.   TELL ME ABOUT THAT, PLEASE, BECAUSE I THOUGHT --

5    A.   IT'S --

6    Q.   -- THAT I ASKED YOU AND YOU TOLD ME YOU HAD NEVER BEEN

7    RETAINED TO GIVE OPINIONS IN A SYSTEM-WIDE MEDICAL CASE.  SO

8    MAKE SURE I'M CORRECT.

9    A.   WELL, THAT --

10    Q.   I UNDERSTAND WHAT YOU'RE TALKING ABOUT.  GO AHEAD.

11    A.   CONTRACT MONITORING, YES.  I CONTRACT MONITORED MIAMI-DADE

12    COUNTY JAIL SYSTEM, YES.

13    Q.   ALL RIGHT.  BUT AS FAR AS WHAT YOU ARE DOING TODAY, THIS

14    IS THE FIRST TIME THAT YOU'VE BEEN RETAINED FOR --

15    A.   CORRECT.  FOR A DEPARTMENT OF CORRECTIONS, YES, SIR.

16    Q.   ALL RIGHT.  OPINIONS AS TO MEDICAL CARE ARE OUTSIDE THE

17    SCOPE OF YOUR EXPERTISE AS A NURSE.  RIGHT?

18    A.   CORRECT.

19    Q.   YOU'RE NOT PROVIDING ANY OPINIONS ON CARE PROVIDED BY

20    PHYSICIANS OR NURSE PRACTITIONERS.  CORRECT?

21    A.   NOT IN TERMS OF DIAGNOSES OR TREATMENT PLAN, NO.

22    Q.   ALL RIGHT.

23         MR. ARCHEY:  YOUR HONOR, WE OBJECT TO THE TENDER AS

24    STATED.  I THINK A MORE NARROW TENDER COULD BE ACCEPTABLE.  BUT

25    IN CORRECTIONAL MEDICINE, I WOULD CONTEND THAT'S TOO BROAD.

10:35 1   SHE DOESN'T HAVE THE EXPERTISE IN THE ACTUAL MEDICAL PART.

2   PART OF ISSUE, IF WE CALL IT ADMINISTRATION OR NURSING OR ANY

3   OF THOSE ISSUES, THAT WOULD PROBABLY -- OR THOSE TYPES OF

4   MATTERS, THAT WOULD PROBABLY BE ACCEPTABLE.  BUT I THINK THE

5   TENDER ITSELF IS TOO BROAD, SO WE OBJECT TO THE TENDER AS

6   STATED.

7          **THE COURT:**  OKAY.  LET ME SEE IF I CAN PUT A POINT ON

8   THIS.  SO YOU WOULD STIPULATE THAT SHE IS QUALIFIED BY

9   EXPERIENCE, KNOWLEDGE, SKILL TO GIVE OPINION TESTIMONY IN

10  MEDICAL ADMINISTRATION?

11         **MR. ARCHEY:**  I WOULD, YOUR HONOR.

12         **THE COURT:**  IN A CORRECTIONAL SETTING?

13         **MR. ARCHEY:**  I WOULD, YOUR HONOR.

14         **THE COURT:**  BUT YOU WOULD CHALLENGE THE TENDER AS IT

15  MIGHT RELATE TO OPINION TESTIMONY AS TO SPECIFIC CARE AND

16  TREATMENT OF INMATES AT LSP?

17         **MR. ARCHEY:**  THAT'S CORRECT.  AND I MEAN, THE TENDER,

18  AS I HEARD IT, WAS MEDICAL --

19         **THE COURT:**  CORRECTIONAL MEDICINE.

20         **MR. ARCHEY:**  CORRECT.  YES, YOUR HONOR.  SO THAT'S

21  CORRECT.  YOU STATED IT, CAPTURED IT.

22         **THE COURT:**  I MEAN, I SCANNED -- I DON'T RECALL THAT

23  THIS WAS SUBJECT TO A MOTION IN LIMINE.  AM I CORRECT?  SO I

24  REMEMBER TAKING A LOOK AT THIS JUST TO KNOW WHERE WE WERE, AND

25  MY APPRECIATION IS THAT SHE'S PROBABLY GOING TO TESTIFY TO

10:36 1    ADMINISTRATIVE KIND OF OVERSIGHT MATTERS.

2         IS THAT CORRECT, MS. MONTAGNES?

3         **MS. MONTAGNES:**  JUST TRYING TO STAY WITH A

4    MICROPHONE, YOUR HONOR.  SHE'S GOING TO TESTIFY AS TO THE

5    NURSING CARE AND AS TO THE ADMINISTRATIVE MATTERS.

6         **THE COURT:**  DO YOU HAVE A PROBLEM WITH THAT, MR.

7    ARCHEY?

8         **MR. ARCHEY:**  I DO NOT, YOUR HONOR.

9         **THE COURT:**  OKAY.  THE COURT WILL ACCEPT MS. GOEHRING

10   AND WILL PERMIT HER TO GIVE OPINION TESTIMONY IN THE FIELD OF

11   CORRECTIONAL MEDICINE WITH AN EMPHASIS ON NURSING CARE AND

12   ADMINISTRATION.

13                        **DIRECT EXAMINATION**

14   BY MS. MONTAGNES:

15   **Q.**   AND, MS. GOEHRING, I JUST WANT TO TAKE US BACK.  WHEN YOU

16   SAID THAT YOU HAD MORE JAIL EXPERIENCE THAN PRISON, WAS THAT

17   PRIOR TO GOING AND WORKING AT CENTURION?

18   **A.**   CORRECT.

19   **Q.**   AND THEN AFTER THAT YOU HAD MUCH MORE EXPERIENCE?

20   **A.**   IT FLIPPED.  THEN IT WAS ALL PRISON AND VERY LITTLE JAIL,

21   YES.

22   **Q.**   OKAY.  SO LET'S TURN NOW TO THE INVESTIGATION AT LSP.

23   WHAT WERE YOU TASKED WITH INVESTIGATING AT LSP?

24   **A.**   I WAS PART OF THE TEAM.  AND WE DIVIDED THE AREAS THAT WE

25   WERE LOOKING AT.  I LOOKED AT NURSING CARE IN GENERAL BUT

10:37  1  SPECIFICALLY IN THE INFIRMARY SETTINGS.  AND WE ALSO LOOKED AT

2  THE ASSISTED CARE, ASSISTED LIVING UNITS, AND HOW THEY WOULD

3  ACCESS CARE THERE.  I LOOKED -- ALSO OBSERVED THE MEDICATION

4  ADMINISTRATION PROCESS; I REVIEWED THE POLICIES AND PROCEDURES

5  IN DEPTH AND ALSO LOOKED AT THEIR QUALITY IMPROVEMENT PROGRAM

6  IN DEPTH.

7  **Q.**  AND DID YOU ALSO REVIEW THEIR CLINICAL CARE ALONG WITH

8  MADELEINE LAMARRE?

9  **A.**  YES, YES.

10  **Q.**  OKAY.  AND DID YOU PRODUCE A REPORT IN THIS MATTER?

11  **A.**  YES.

12  **Q.**  AND CAN YOU DESCRIBE THE PROCESS OF PRODUCING THAT REPORT?

13  **A.**  YES.  SO WE EACH HAD OUR INDIVIDUAL AREAS THAT WE WERE THE

14  LEAD WRITER ON.  AND MINE WERE THE AREAS THAT I JUST SPOKE OF.

15  AND THEN THE TWO PHYSICIANS, DR. VASSALLO AND DR. PUISIS, HAD

16  THEIR PIECE, AND THEY DIVIDED UP THE MEDICINE PIECE.  AND THEN

17  NURSE PRACTITIONER LAMARRE ALSO HAD PIECES THAT SHE WROTE, AND

18  WE TOOK THE LEAD.

19        AND THEN MS. LAMARRE WAS KIND OF -- I CALL HER THE

20  PIVOT POINT, BECAUSE WE HAD -- WE WERE WORRIED ABOUT VERSION

21  CONTROL.  SO WHEN WE WOULD WRITE OUR PIECE, THEN IT WOULD GO TO

22  HER AND SHE'D PUT IN THE DOCUMENT AT-LARGE.  AND THEN IT WOULD

23  RECIRCULATE TO THE OTHER ON -- THE OTHERS ON THE TEAM TO MAKE

24  ANY CORRECTIONS OR ADDITIONS THAT THEY FELT LIKE YOU MIGHT HAVE

25  MISSED OR SOMETHING THEY OBSERVED THAT YOU DIDN'T.

10:39 1   **Q.**   AND SO DID YOU HAVE AN OPPORTUNITY TO REVIEW THE ENTIRE

2   REPORT?

3   **A.**   ABSOLUTELY.

4   **Q.**   AND DO YOU FEEL COMFORTABLE WITH THE OPINIONS EXPRESSED IN

5   THE REPORT?

6   **A.**   YES, MA'AM.

7   **Q.**   ALL RIGHT.  LET'S TALK ABOUT CHART REVIEWS.

8           ABOUT HOW MANY RECORDS DID YOU REVIEW?

9   **A.**   GOSH, I DON'T HAVE THAT COUNT IN FRONT OF ME.  BUT THE

10   PROCESS WAS THAT DOCTOR -- DR. SUSI AND DR. MIKE WOULD REVIEW

11   THE RECORD AND THEY WOULD SEND IT TO ME AND ASK ME "WOULD YOU

12   PLEASE LOOK AT THE MEDICATION ADMINISTRATION, HELP ME DECIPHER

13   WHAT THE MARS MEAN AND LOOK AT THE INFIRMARY CARE" -- IF THERE

14   WAS OTHER NURSING CARE, THAT THEY WOULD SEND THAT TO ME, AND I

15   WOULD REVIEW THAT IN A NARROWER SCOPE.

16           BECAUSE OF THE TIME CRUNCH, WE FELT LIKE WE WERE

17   GETTING BEHIND.  AND SO I VOLUNTEERED TO BE ON THE FRONT END OF

18   THREE OR FOUR, MAYBE FIVE OF THE CASES WHERE I WENT IN AND

19   ACTUALLY DID THE CHRONOLOGY, WHICH IS REALLY HELPFUL BECAUSE

20   THE RECORDS ARE VOLUMINOUS.  AND MANY OF THEM WERE OVER A

21   THOUSAND PAGES AND THEY ARE NOT IN CHRONOLOGICAL ORDER, VERY

22   MIXED, AND SO IT TOOK A LOT OF TIME TO GO IN AND DEVELOP THAT

23   CHRONOLOGICAL REPORT.  SO THAT THEN I WOULD VOLLEY IT BACK TO

24   THE DOCTOR AND THE NURSE PRACTITIONER FOR THEM TO LOOK AT THE

25   MEDICAL CARE, YOU KNOW, THE DIAGNOSING, WHAT MEDICATIONS WERE

10:40 1  ORDERED, DIAGNOSTICS, AND ALL THAT KIND OF STUFF.

2  **Q.**   WHAT ELSE DID YOU REVIEW IN -- FOR PREPARATION FOR YOUR

3  REPORT?

4  **A.**   POLICIES.  THAT'S THE OTHER THING I LOOKED AT IN RECORD

5  REVIEW:  WERE THEY FOLLOWING THE POLICIES AS IT'S STATED.

6  THAT'S REALLY THE FOUNDATION OF THE PROGRAM.  SO I ALSO LOOKED

7  AT DEPOSITIONS.  OFF THE TOP OF MY HEAD, THAT'S LIKE WHAT I CAN

8  THINK OF RIGHT NOW.

9  **Q.**   ANY CQI?

10  **A.**   OH, YES.  ALL OF THE CQI MINUTES, YES.  ALL OF THE CQI

11  MINUTES THAT WERE PRODUCED.

12       AND THEN THE MEDICATION ADMINISTRATION RECORDS

13  WEREN'T IN THE PATIENT HEALTH FILES.  THERE WERE SOME.  THEY

14  WERE MORE THE HANDWRITTEN ONES.  OR THEY HAVE A PROCESS AT LSP:

15  THE OFFICERS WILL PRINT ON THE MEDICATION LIST AND THE PATIENT

16  INITIALS THAT THEY TAKE IT.  SO THOSE WERE EPISODICALLY IN

17  THERE.

18       AND SO THEN LATER A FILE WAS PRODUCED OF THE

19  ELECTRONIC MEDICAL RECORDS.  AND SO WE WENT BACK AND DID A

20  CROSS-BLOCK OF THE ELECTRONIC MEDICAL RECORD WITH THE REPORT --

21  OUR REPORT.  AND THEN THERE WAS A SUPPLEMENTAL ADDITION OR A

22  SUPPLEMENT TO THE REPORT THAT WAS PRODUCED.

23  **Q.**   AND WHO PARTICIPATED IN THE WRITING OF THAT SUPPLEMENTAL

24  REPORT?

25  **A.**   I DID.

10:41 1   **Q.**   OKAY.

2   **A.**   MS. LAMARRE AND I DID IT.

3   **Q.**   OKAY.  AND YOU INDICATED THAT YOU REVIEWED MEDICAL

4   RECORDS.  WHAT WAS THE PROCESS OF SELECTING THOSE MEDICAL

5   RECORDS?

6   **A.**   I WAS REALLY MORE OR LESS ASSIGNED MY RECORDS BY THE

7   PHYSICIAN TEAM.  BUT IT WAS PATIENTS THAT HAD BEEN HOSPITALIZED

8   AND IT WAS PATIENTS THAT HAD DIED, PRIMARILY.

9   **Q.**   AND WOULD YOU CALL THAT JUDGMENT SAMPLING?  IS THAT A TERM

10   YOU'RE FAMILIAR WITH AT ALL?

11   **A.**   SAMPLING, YES.

12   **Q.**   OKAY.  IS THAT PROCESS YOU'VE SEEN USED AT OTHER PLACES?

13   **A.**   YES.

14   **Q.**   CAN YOU DESCRIBE SOME OF THOSE PLACES?

15   **A.**   YES.  SO I'LL USE THE NATIONAL COMMISSION, BECAUSE I'VE

16   BEEN ON THE RECEIVING END OF MANY AUDITS OR STATE AUDITS.

17   LIKE IN FLORIDA WE HAVE SPECIFIC STATE AUDITS THAT

18   HAPPEN.  AND THEY WILL COME IN AND THEY WANT TO SEE YOUR LIST

19   OF YOUR DEATHS, BECAUSE THEY'RE GOING TO LOOK AT THOSE FILES.

20   THEY WANT TO SEE YOUR OFF-SITE -- WHAT I CALL AN OFF-SITE LOG,

21   WHICH ARE PATIENTS THAT ARE SENT TO THE COMMUNITY FOR CARE;

22   I.E., AT THE HOSPITAL OR SPECIALISTS.  AND THEY CHOOSE CHARTS

23   FROM THAT.  THEY WILL ALSO ASK FOR LIKE A SICK CALL LIST,

24   CHRONIC CARE LIST.  AND THEY WILL CHOOSE OFF OF CHRONIC CARE,

25   BECAUSE THOSE ARE THE PATIENTS USING SERVICES.

10:43 1          AND THE REASON THAT THEY DO THAT IS IF YOU JUST GO

2    INTO A PRISON AND YOU DO JUST A RANDOM CHART SAMPLE, YOU VERY

3    WELL COULD GET A CHART OF A VERY HEALTHY PATIENT THAT'S NOT

4    ACCESS CARE.  SO IT DOESN'T REALLY GIVE YOU MUCH INFORMATION.

5    **Q.**   ABOUT HOW MANY PATIENT ENCOUNTERS DO YOU THINK YOU

6    REVIEWED IN YOUR REVIEWING OF THE RECORDS?

7    **A.**   OH, MY GOSH.  THOUSANDS.  THOUSANDS OF ENCOUNTERS.

8    **Q.**   AND NOW LET'S TALK A BIT ABOUT THE SITE VISIT.

9          CAN YOU DESCRIBE THE SITE VISIT TO ME?

10   **A.**   YES.  WE HAD AREAS THAT WE WANTED TO REVIEW BASED ON JUDGE

11   DICK'S -- IS IT AN ORDER?

12   **Q.**   YES.

13   **A.**   IS THAT THE CORRECT TERM?

14   **Q.**   YES.

15   **A.**   HER ORDER.  WE WANTED TO REVIEW ALL THE AREAS THAT WERE

16   MENTIONED IN THAT REPORT, AND SO IT WAS DIVIDED.

17          FOR EXAMPLE, AT THE ATU IT MADE SENSE THAT -- DR.

18   VASSALLO IS AN EMERGENCY PHYSICIAN, WOULD BE THE ONE TO MONITOR

19   THAT.

20          DR. PUISIS STAYED BACK BECAUSE THERE WERE SO MANY

21   RECORDS THAT NEEDED TO BE REVIEWED, AND IT MADE SENSE AS A

22   PHYSICIAN HE DO THAT.

23          AND THEN MS. LAMARRE BEING A NURSE PRACTITIONER, THEN

24   SHE WAS REVIEWING THINGS LIKE THE SICK CALL PROCESS.

25          I ALSO REVIEWED THAT BECAUSE I WAS INTERESTED ON THE

10:44 1   OTHER SIDE OF IT, WHICH WOULD BE LIKE THE EMT, OR IN SOME
     2    PLACES THEY USED NURSES ON THAT END BECAUSE IT'S A TELEMEDICINE
     3    ENCOUNTER.  SHE WAS REALLY LOOKING MORE AT DID THEY DIAGNOSE --
     4    YOU KNOW, WAS THE DIAGNOSIS WHAT IT SHOULD BE, WAS THE PLAN OF
     5    CARE ADEQUATE.
     6         I'M OBSERVING THE EMT OR THE NURSES IN TERMS OF THEIR
     7    PROCESS.  SO, YOU KNOW, HOW WERE THEY -- YOU KNOW, IF THEY
     8    ORDERED LIKE AN X-RAY, YOU KNOW, WHAT WERE THEY DOING IN TERMS
     9    OF PROCESS TO MAKE SURE THAT THE PATIENT'S X-RAY GOT DONE.  SO
    10    I WAS LOOKING AT IT THROUGH A DIFFERENT LENS.
    11         INFIRMARY CARE, I REALLY WANTED TO FOCUS ON THAT,
    12    BECAUSE I'D REVIEWED A LOT OF INFIRMARY CHARTS AND I WANTED TO
    13    OBSERVE THAT.  BECAUSE WHAT -- WHEN YOU'RE OBSERVING, YOU WANT
    14    TO MAKE SURE THAT THE PRACTICES MATCHES WHAT THE POLICY AND
    15    PROCEDURAL DOCUMENTS TELL YOU.
    16         IN OTHER WORDS, I ALWAYS START WITH THE POLICY
    17    MANUAL, BECAUSE THE PROCEDURAL PIECE OF THAT DOCUMENT SHOULD
    18    TELL ME HOW I'M GOING -- HOW I DO MY JOB; WHETHER I'M AN
    19    INFIRMARY NURSE, WHAT IS THE EXPECTATION.  HOW OFTEN SHOULD I
    20    BE TAKING VITAL SIGNS.  HOW OFTEN AM I REQUIRED TO ASSESS THE
    21    PATIENT.
    22         IF I AM WORKING WITH THE PROVIDERS -- AND WHEN I SAY
    23    "PROVIDERS," I MEAN EITHER A DOCTOR OR A NURSE PRACTITIONER --
    24    AND THEY ORDER A MEDICATION, THEN HOW DO I -- TO NOTE THAT
    25    MEDICATION ORDER, HOW DO I DO THAT, WHAT FORM DO I FILL OUT TO

10:46 1  GET IT TO THE PHARMACY, OR DO I HAVE TO GO INTO THE COMPUTER

2  SYSTEM AND TYPE THAT IN, OR DO THE PHYSICIANS DO THAT AND THEN

3  I JUST HAVE TO PUT IT ON A MAR.  SO THERE'S ALL THOSE PIECES

4  THAT THE -- WHAT I CALL THE -- IT'S IN THE WEEDS, BUT IT'S A

5  VERY IMPORTANT STEP BY STEP THAT YOU CAN KIND OF SEE HOW THAT

6  OPERATES.

7  **Q.**  AND WHY IS THAT IMPORTANT?

8  **A.**  IT'S IMPORTANT BECAUSE THAT IS REALLY IN ANY HEALTH

9  SERVICE SYSTEM THAT WE'RE DOING IT BASED -- WE'RE ALL DOING IT

10  THE SAME WAY EVERY DAY EACH TIME, THE SAME WAY.  AND THAT'S HOW

11  YOU HAVE AN EFFECTIVE SYSTEM.  IT REDUCES ERRORS AND IT REDUCES

12  THE RISK OF HARM TO THE PATIENT.

13  **Q.**  OKAY.  AND WERE YOU ABLE TALK TO PATIENTS ON YOUR SITE

14  VISIT?

15  **A.**  YES.

16  **Q.**  OKAY.  ABOUT HOW MANY PATIENTS?  DO YOU KNOW?

17  **A.**  OH, GOSH.  I TALKED TO A LOT OF PATIENTS.  I LIKE TO TALK

18  TO PATIENTS.  THEY ARE OUR CUSTOMERS.  IT'S IMPORTANT WHAT THEY

19  THINK AND WHAT THEIR EXPERIENCE IS, SO I ENJOY PATIENT

20  ENGAGEMENT.

21  **Q.**  OKAY.  SO BASED ON YOUR REVIEW OF THE RECORD, THE HEALTH

22  RECORDS, BASED ON YOUR REVIEW OF THE DOCUMENTS, THE

23  DEPOSITIONS, YOUR SITE VISIT, WERE YOU ABLE TO FORM AN OPINION

24  AS TO THE ADEQUACY OF THE HEALTH CARE AT LSP?

25  **A.**  YES.

10:47 1   **Q.**   AND WHAT DID YOU FIND?

2   **A.**   I WAS VERY DISAPPOINTED.  VERY DISAPPOINTING.

3   **Q.**   CAN YOU TALK ABOUT SOMETHING THAT STOOD OUT TO YOU?

4   **A.**   YEAH.  I'D SEEN IN THE RECORDS WHERE YOU CAN SEE A PATTERN

5   OF PATIENTS WRITING THEIR SICK CALL REQUESTS.  AND YOU'LL SEE

6   IT, IT'S THE SAME THING KIND OF OVER AND OVER.  AND YOU WOULD

7   SEE A PATTERN WHERE THEY WOULDN'T GET TO A PHYSICIAN; EITHER

8   THERE WAS A DELAY AND MAYBE THE PHYSICIAN WOULD NOTE IT LATER,

9   YOU KNOW, OR A DECISION WAS MADE THAT THEY DIDN'T NEED TO SEE A

10   PHYSICIAN.  SO THERE WAS THAT.

11          AND THEN IN THE INFIRMARY, I -- WHEN I REVIEWED THE

12   RECORD, THE FLOWSHEETS ARE KIND OF PREPRINTED, SO IT'S A LOT OF

13   JUST CHECKING THE BOX THAT ROUNDS ARE MADE AND THINGS THAT ARE

14   -- YOU KNOW, THINGS ARE DONE.  SO I WAS REALLY INTERESTED IN

15   OBSERVING THAT.

16          AND MY OBSERVATION OF THE INFIRMARY NURSING CARE, I

17   WAS TAKEN ABACK.  I SPENT QUITE A BIT OF TIME IN NU 1 MORE SO

18   AND NU 2.  AND I -- THE WHOLE TIME I WAS THERE, I SAW ONE NURSE

19   AT A PATIENT.  THAT'S INCORRECT.  I SAW TWO NURSES AND ONE --

20   THE SECOND NURSE WAS BECAUSE WE ASKED THE PATIENT TO TURN THEIR

21   LIGHT ON TO SEE HOW LONG IT WOULD TAKE THE NURSE TO RESPOND.

22   SO I SAW TWO NURSES ACTUALLY THE WHOLE TIME I WAS THERE.  THE

23   MAJORITY OF IT WAS -- WHAT I SAW WAS THE INMATE ORDERLIES DOING

24   THE CARE.

25   **Q.**   OKAY.  SO LET'S TALK A BIT ABOUT POLICIES AND PROCEDURES.

10:49 1          IN HER OPINION, JUDGE DICK FOUND THAT LSP LACKED THE

2   INFRASTRUCTURE NECESSARY TO PROVIDE CONSTITUTIONALLY ADEQUATE

3   CARE, AND SHE CITES THE INADEQUATE HEALTH CARE POLICIES AND

4   PROCEDURES AS ONE OF THE CONTRIBUTING FACTORS TO THAT.  DO YOU

5   BELIEVE THAT THAT PERSISTS?

6   **A.**   CORRECT.  YES, I DO.

7   **Q.**   OKAY.  AND WHAT IS YOUR UNDERSTANDING AS TO HOW THE HEALTH

8   CARE POLICIES HAVE CHANGED SINCE THE LAST REPORT?

9   **A.**   SO VERY LITTLE.  AND I BELIEVE IT WAS DR. LAVESPERE'S

10   DEPOSITION; HE SAID, "OTHER THAN THE SICK CALL CHANGE, VERY

11   LITTLE HAD CHANGED IN THE POLICIES AND PROCEDURES."

12   **Q.**   OKAY.  HOW DID YOU CONDUCT YOUR INVESTIGATION INTO THE

13   POLICIES AND PROCEDURES AT LSP?

14   **A.**   I STARTED WITH READING ALL OF THEM.  AND THE LENS WITH

15   WHICH I LOOKED AT THEM IS DO THEY CONTAIN ENOUGH SPECIFICITY IN

16   THE PROCEDURAL PIECE OF THAT TO GUIDE HEALTH STAFF TO KNOW HOW

17   THINGS SHOULD BE DONE, TO HOW -- WHAT'S EXPECTED OF ME GIVEN

18   THE SITUATION.

19   **Q.**   AND, YOU KNOW, YOU SPOKE IN THE TENDER A LITTLE BIT ABOUT

20   YOUR EXPERIENCE.  BUT WOULD YOU SAY YOU'VE LOOKED AT MANY

21   POLICIES AND PROCEDURES MANUAL BEFORE?

22   **A.**   I MEAN, I'VE BEEN DOING CORRECTIONAL-SPECIFIC STUFF FOR 25

23   YEARS, AND I ALWAYS START WITH POLICIES AND PROCEDURES.  WHEN I

24   TRAIN NURSES WE START WITH POLICY AND PROCEDURE MANUALS.  ANY

25   NEW BOOK OF BUSINESS, WE LOOK AT THE POLICY AND PROCEDURE

10:50 1    MANUAL.  ANY TIME I GO INTO ANY SYSTEM OR ANY JAIL, THE FIRST

2    THING I ASK FOR IS A POLICY AND PROCEDURE MANUAL.  IT'S THE

3    FOUNDATION OF YOUR HEALTH SERVICES PROGRAM.

4    **Q.**   AND CAN YOU DESCRIBE THE PROCESS THAT YOU GENERALLY USE

5    FOR DEVELOPING A NEW POLICY AND PROCEDURE MANUAL WHEN YOU GO

6    INTO A NEW JAIL AND PRISON?

7    **A.**   SURE.  SO TYPICALLY THE POLICY PIECE OF THAT, IT DOESN'T

8    CHANGE A LOT.  AND I'LL USE THE DEPARTMENT OF CORRECTIONS, FOR

9    EXAMPLE.  USUALLY THE POLICY IS ESTABLISHED THROUGH A CENTRAL

10   OFFICE.  AND I DON'T KNOW WHAT THEY CALL IT IN LOUISIANA.  BUT

11   THERE'S A HEADQUARTERS OFFICE.  AND USUALLY THEY ESTABLISH WHAT

12   THE POLICY IS AND THEN EACH INDIVIDUAL PRISON, BECAUSE THERE'S

13   UNIQUENESS IN EVERY PRISON, WOULD HAVE -- THE PROCEDURAL MAY

14   LOOK VERY DIFFERENT.  AND IN A VERY SIMPLISTIC DESCRIPTION, YOU

15   KNOW, THE DOOR THAT I, YOU KNOW, NEED TO KNOCK ON TO GET IN THE

16   PHARMACY AT ONE PRISON MAY BE IN A DIFFERENT BUILDING THAN IT

17   IS IN THIS.  AND SO THAT NEEDS TO BE INCLUDED IN THERE.

18        YOU KNOW, THE COMMUNICATION FORM THAT I FILL OUT ONE

19   PLACE, YOU KNOW, MAY BE DIFFERENT THAN ANOTHER.  SO YOU LOOK AT

20   THE -- YOU KNOW, FOR THE SPECIFICS OF THAT.

21   **Q.**   AND, YOU KNOW, YOU MENTIONED WHERE A DOOR IS.  THAT LEVEL

22   OF SPECIFICITY, IS THAT NECESSARY FOR THESE POLICIES?

23   **A.**   ABSOLUTELY.  AND I USE THAT ANALOGY, I DON'T KNOW THAT YOU

24   WOULD LABEL A DOOR.  BUT LET ME TRY TO CLARIFY.  KEEP-ON-PERSON

25   MEDICATION, I'LL TALK ABOUT THAT POLICY.  IT SAYS IN THE

10:52 1    POLICY, AS I RECALL, THAT THE --

2    **Q.**    DO YOU WANT ME TO PULL IT UP FOR YOU?

3    **A.**    THAT WOULD BE HELPFUL.

4    **Q.**    OKAY.  CAN WE PULL UP PX_21_YY.

5    **A.**    OKAY.  COULD WE GO TO THE NEXT PAGE, PLEASE.

6    **Q.**    WELL, BEFORE WE GET STARTED --

7    **A.**    OKAY.

8    **Q.**    -- CAN I -- THIS POLICY -- CAN YOU TELL ME WHEN THIS

9    POLICY WAS PROPOUNDED?

10   **A.**    IT'S LABELED AS APRIL 28, 2017.  AND SO I BELIEVE THAT

11   THAT -- IF IT HAD BEEN REVIEWED OR REVISED, YOU SHOULD SEE A

12   REVISION OR A REVIEW DATE LISTED.

13   **Q.**    OKAY.  COULD WE GO TO THE NEXT PAGE.

14   **A.**    SO UNDER PROCEDURAL -- LET'S SEE.

15          "OFFENDER RESPONSIBILITY," FOR EXAMPLE --

16          **MR. ARCHEY:**  YOUR HONOR, MY COMPUTER MONITOR IS NOT

17   ON.  IS THERE AN ISSUE?  DO I NEED TO HIT THE BUTTON, OR DO WE

18   KNOW?

19          **THE DEPUTY CLERK:**  IS THE POWER TURNED OFF?

20          **THE COURT:**  THE OTHER ONE IS ON, AND THAT'S THE SAME

21   CORD.  SO IT EITHER IS YOUR --

22          **THE DEPUTY CLERK:**  DID YOUR IPAD BUMP THE --

23          **MR. ARCHEY:**  I'M SORRY, YOUR HONOR.  OH, THANK YOU.

24   WE FIXED IT.  MY APOLOGIES.

25          **THE COURT:**  YOUR MONITOR WAS OFF?

10:53 1          **MR. ARCHEY:**  IT WAS.

2          **THE COURT:**  ALL RIGHT.  CARRY ON.  USER ERROR.

3    **BY THE WITNESS:**

4    **A.**   SO UNDER "OFFENDER RESPONSIBILITY, C. NO. 1," IT SAYS,

5    APPROVED KOP PRESCRIPTION MEDICATION WILL BE RECEIVED AND

6    SIGNED FOR BY THE OFFENDER FOR SELF-ADMINISTRATION OR USE.  MY

7    QUESTION TO THAT IS:  WHAT DOES HE SIGN ON?  DO THEY SIGN ON AN

8    MAR?  IS THERE A FORM THAT THEY SIGN?  AND IF IT'S A FORM, IT

9    SHOULD LABEL WHICH FORM IT IS.  SO THAT WOULD BE A QUESTION

10   THAT I HAVE ON THAT ONE.

11   **Q.**   AND IN YOUR REVIEW OF THE RECORDS, DID YOU SEE A

12   CONSISTENT FORM BEING USED FOR THIS PROCESS?

13   **A.**   NO.  AND ACTUALLY WHAT I OBSERVED, BECAUSE WE SPENT TIME

14   AT THE MEDICATION -- THE MED ROOM WITH THE LINE WHERE THE

15   OFFENDERS GO TO GET THEIR MEDICINE, AND SO WE SPOKE WITH A LOT

16   OF OFFENDERS IN LINE WAITING.  AND WE SAW THIS BOX THAT SAID

17   "KOP," AND WE SAW THEM GOING UP THERE AND PUTTING PAPER IN

18   THERE.  WE ASKED THEM WHAT IT WAS, AND THEY'RE LIKE, "I'M

19   ASKING FOR A REFILL ON MY KOP."

20          AND SO WE SAID, "WELL, IS THERE A SPECIFIC FORM?"

21          AND THEY WERE LIKE, "NO.  YOU JUST WRITE IT ON ANY

22   PIECE OF PAPER AND PUT IT IN THE BOX."

23   **Q.**   AND WHAT ARE THEY SUPPOSED TO PUT IN THE BOX?

24   **A.**   THAT THEY NEED THEIR REFILL.  BUT THIS SAYS THAT THEY

25   WOULD -- I THINK IF YOU GO DOWN HERE TO NO. 4, "IT IS THE

10:54  1    OFFENDER'S RESPONSIBILITY TO NOTIFY PILL CALL PERSONNEL AT HIS

      2    HOUSING UNIT WHEN HE ONLY HAS A FIVE-DAY SUPPLY REMAINING SO

      3    THAT A REFILL MAY BE REQUESTED, IF PRESCRIBED.  AND THE

      4    OFFENDER IS TO PRESENT THE PROPERLY LABELED MEDICATION CARD TO

      5    THE PILL CALL PERSONNEL FOR REORDERING."  I OBSERVED THEM

      6    WRITING IT ON A PIECE OF PAPER.

      7            SO MY QUESTION TO STEP NO. 4 IS:  WHAT DOES THE

      8    PERSONNEL WHO ACCEPTS THAT CARD DO?  IT SHOULD SAY THERE'S A

      9    LABEL THAT YOU PEEL OFF AND YOU PLACE IT ON A SPECIFIC FORM AND

     10    IT'S FAXED TO THE PHARMACY.

     11            THERE'S JUST SO MANY STEPS THAT ARE MISSING IN THIS

     12    THAT IF I WERE ASKED TO GO TO WORK AT LSP TOMORROW, I COULDN'T

     13    USE THIS AS AN ADEQUATE GUIDE TO STEP ME THROUGH WHAT MY POST

     14    RESPONSIBILITIES ARE.

     15    Q.   OKAY.  IN YOUR REVIEW -- IN YOUR SITE VISIT, DID YOU HEAR

     16    ANY -- OR IN YOUR REVIEW, DID YOU ENCOUNTER ANY CONCERNS

     17    REGARDING ABILITIES TO GET REFILL KOP MEDICATION?

     18    A.   YES.  ACTUALLY, ONE OFFENDER, WE SAID, "DO YOU DO KOP?"

     19            HE SAID, "NO.  I GOT OUT OF THAT BECAUSE I HAD

     20    TROUBLE GETTING MY REFILLS, AND THEY ALWAYS SAID IT'S MY

     21    FAULT."  AND HE GOES, "I COME TO LINE BECAUSE IT'S LESS HASSLE,

     22    JUST TO COME AND STAND IN THE LINE."  AND THEN I RECALL THERE

     23    WAS A REFUSAL FORM THAT I SAW.

     24    Q.   AND LET ME JUST PAUSE FOR A SECOND.

     25            CAN WE BRING UP JX_5, PAGE 216.

10:56 1   **A.**   SO THIS WAS A CHART THAT DR. PUISIS SENT TO ME TO LOOK AT

2   FOR MEDICATIONS.  AND THIS PATIENT SAYS, "I CAN'T GET LASIX FOR

3   THREE DAYS.  I'M HAVING SERIOUS PAIN AND SWELLING IN MY LEGS

4   AND FEET, AND I CAN'T WALK."

5            **MS. MONTAGNES:**  OH, APOLOGIZE.  THIS IS SEALED.

6            **THE DEPUTY CLERK:**  OH, OKAY.

7            **MS. MONTAGNES:**  THAT WAS MY ERROR.  I APOLOGIZE.

8   **BY THE WITNESS:**

9   **A.**   HE SAID HE CAN'T GET HIS LASIX FOR THREE DAYS; HE WAS

10   HAVING SERIOUS PAIN, SWELLING AND -- IN HIS FEET, AND HE CAN'T

11   WALK; "PLEASE FILL THE KOP"; I NEED SOMETHING.  I CAN'T MAKE

12   OUT THAT LAST BIT.

13   **Q.**   ALL RIGHT.  AND SO YOU -- SO AT LEAST TWO INSTANCES WHERE

14   KOP MEDICATION WAS NOT DELIVERED TIMELY.

15            **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

16   TO MOVE WHAT HAS PREVIOUSLY BEEN MARKED AS PLAINTIFFS'

17   EXHIBIT 21_ YY.

18   **BY THE WITNESS:**

19   **A.**   IF I COULD ADD TO THAT, TOO.  SUCCESSFUL KEEP-ON-PERSON --

20   **Q.**   LET ME JUST -- MS. GOEHRING, WE NEED TO PAUSE FOR A

21   SECOND.

22   **A.**   SORRY.

23            **THE COURT:**  ANY OBJECTION TO P_21?

24            **MR. ARCHEY:**  THAT'S THE KOP POLICY YOU'RE LOOKING AT?

25            **MS. MONTAGNES:**  YES.

10:57 1        **MR. ARCHEY:**  NO OBJECTION, YOUR HONOR.

2        **THE COURT:**  OKAY.  KOP POLICY P_21_YY IS ADMITTED.

3             NOW YOU MAY RESPOND OR --

4    BY MS. MONTAGNES:

5    **Q.**   YOU MAY ADD YOUR THOUGHTS NOW, MS. GOEHRING.

6    **A.**   A KOP -- AN EFFICIENT KOP AND IN AN EFFECTIVE KOP PROGRAM

7    SHOULD BE AN ACTIVE PROGRAM AND NOT PASSIVE.  THIS REQUIRES THE

8    INMATE TO SAY, "I HAVE FIVE DAYS LEFT.  I NEED MY MEDICATION

9    ORDERED."  THIS SHOULD BE IN THE OPPOSITE.  SO THERE SHOULD BE

10   NURSING STAFF THAT ARE RESPONSIBLE FOR THE RE-ORDERING OF

11   MEDICATIONS, AND THEN THEY SEND OUT A NOTIFICATION TO THE

12   OFFENDER:  "YOU NEED TO COME TO THIS PILL LINE AT THIS TIME

13   BECAUSE WE WILL HAVE YOUR MEDICATIONS AVAILABLE TO YOU."  THEN

14   IF THEY DON'T SHOW UP, THAT PATIENT THEN SHOULD BE BROUGHT IN

15   FOR MEDICATION COMPLIANCE COUNSELING.  THIS PUTS THE

16   RESPONSIBILITY TOTALLY ON THE OFFENDER.

17             AND I DIDN'T SEE ANY EVIDENCE IN ANY OF THE RECORDS

18   THAT I REVIEWED THAT PATIENTS WERE BROUGHT IN FOR MEDICATION

19   COUNSELING BECAUSE THEY WERE FAILING TO SHOW UP TO GET THEIR

20   KOP.  IN OTHER WORDS, IT'S VERY PASSIVE AND NOT ACTIVE.

21   **Q.**   ALL RIGHT.  AND WHEN YOU'RE LOOKING AT POLICIES, WHAT

22   STANDARDS ARE YOU USING TO EVALUATE THE POLICIES?

23   **A.**   I USE A MULTITUDE OF STANDARDS.  I ALWAYS USE BOTH ACA AND

24   THE NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE STANDARDS.

25   AND DEPENDING ON WHAT STATE YOU'RE IN, AS I'VE ALLUDED TO

10:58 1  EARLIER, LIKE IN FLORIDA, THERE ARE TWO OTHER ACCREDITING

2  BODIES THAT YOU MUST ABIDE BY.  AND SO THAT WOULD BE FOUR

3  DIFFERENT SETS OF ACCREDITATION STANDARDS THAT I USE AS A

4  BASELINE.

5  **Q.**   AND DO YOU USE YOUR OWN EXPERIENCE AS WELL?

6  **A.**   ABSOLUTELY.

7  **Q.**   ALL RIGHT.  SO WE'VE TALKED ABOUT THE FACT THAT SOME OF

8  LSP'S POLICIES ARE NOT SPECIFIC.  DID YOU FIND ANY OTHER

9  PROBLEMS WITHIN THE POLICIES?

10  **A.**   WELL, I SAW THAT THE PRACTICE DIDN'T MATCH -- THE PRACTICE

11  DIDN'T MATCH WHAT THE POLICY AND PROCEDURE SAID.

12  **Q.**   ALL RIGHT.  CAN WE CALL UP PX_21_KKK.  AND THIS IS NOT

13  SEALED.

14        IS THIS ONE OF THE POLICIES THAT YOU REVIEWED WHERE

15  THE PRACTICE DIDN'T MATCH?

16  **A.**   YES.  UNDER PROCEDURE A(1), IT SAYS THAT "OFFENDERS SHALL

17  NOT BE" --

18  **Q.**   I'M GOING TO -- MS. GOEHRING, I'M JUST GOING TO BACK --

19  WHAT IS THIS A POLICY FOR?

20  **A.**   IT IS "USE OF OFFENDERS IN HEALTH CARE."

21  **Q.**   OKAY.  AND WHEN WAS THIS POLICY DEVELOPED?

22  **A.**   AUGUST 3, 2021.

23  **Q.**   OKAY.  AND CAN YOU READ TO ME FROM 1(A).  JUST TELL --

24  JUST READ THE WHOLE THING.

25  **A.**   THE PROCEDURE IN "A" IS "PROHIBITED OFFENDER HEALTH CARE

10:59 1   DUTIES.

2          "OFFENDERS SHALL NOT BE USED FOR THE FOLLOWING

3   DUTIES:

4          "NO. 1, TO PERFORM DIRECT PATIENT CARE."

5   **Q.**  AND DID YOU COME TO UNDERSTAND THAT THAT WAS NOT

6   HAPPENING?

7   **A.**  I CAME TO UNDERSTAND THAT DIRECT PATIENT CARE WAS

8   HAPPENING, ABSOLUTELY.

9   **Q.**  CAN YOU DESCRIBE SOME INSTANCES THAT YOU OBSERVED?

10   **A.**  YEAH.  I OBSERVED CHANGING OF ADULT DIAPERS; I OBSERVED

11   SKIN CARE BEING DONE; I OBSERVED SOME WOUND CARE BEING DONE BY

12   AN ORDERLY.  LET ME THINK A MINUTE.  PHYSICAL THERAPY.

13   **Q.**  CAN WE PAUSE THERE FOR A SECOND?

14          CAN WE BRING UP WHAT IS PREVIOUSLY -- IS THIS SEALED?

15   LET'S SEAL IT JUST FOR THE SAKE OF EXPEDIENCY.  THIS IS

16   PX_1D_19.

17          **THE COURT:**  OKAY.  THE COURT WILL PERMIT IT TO BE

18   SEALED SINCE IT CONTAINS IMAGES OF WHAT APPEARS TO BE PATIENTS.

19          **MS. MONTAGNES:**  YES.

20   **BY MS. MONTAGNES:**

21   **Q.**  AND WHAT -- CAN YOU DESCRIBE THIS PHOTOGRAPH ON THE LEFT?

22   **A.**  IT'S AN OFFENDER PROVIDING PHYSICAL THERAPY TO ANOTHER

23   INMATE.

24   **Q.**  AND HOW DO YOU KNOW THAT THAT'S AN OFFENDER?

25   **A.**  WELL, NO. 1, BY THEIR CLOTHING.  AND THEN WHEN I

11:00 1    INTERVIEWED A PATIENT THAT WAS IN NURSING UNIT 1, HE TOLD ME

2    THAT HE WAS TAKEN TO THE -- THIS IS THE NEW BUILDING -- AND

3    THAT HE WAS TAKEN TO THE NEW BUILDING FOR PHYSICAL THERAPY AND

4    THAT IT -- THE PHYSICAL THERAPY WAS DONE BY ANOTHER INMATE.

5    **Q.**   OKAY.  ALL RIGHT.  AND DID YOU OBSERVE OTHER INSTANCES OF

6    DIRECT PATIENT CARE?

7    **A.**   YES.

8    **Q.**   CAN WE CALL UP WHAT HAS PREVIOUSLY BEEN MARKED AS

9    PLAINTIFFS' EXHIBIT 1_D_7.  THIS HAS ACTUALLY BEEN ADMITTED

10   INTO EVIDENCE -- 27.  I APOLOGIZE.  PLAINTIFFS' 1_D_27.  AND

11   CAN WE BLOW UP THE PICTURE ON THE RIGHT.

12          AND CAN YOU TELL ME WHAT THIS IS?

13   **A.**   IT'S GLUCOSE GEL.  AND THIS PICTURE WAS TAKEN IN THE

14   ASSISTED LIVING UNIT.  THERE WAS AN OFFENDER IN THAT UNIT THAT

15   WAS CARING FOR ANOTHER PATIENT IN A BED THAT WAS -- APPEARED TO

16   BE SLEEPING.  AND THEY SHARED WITH US THAT HE HAS -- COMMONLY

17   HAS EPISODES THAT HIS BLOOD SUGAR GETS LOW.  AND SO THEY CAN

18   TELL.  THEY'VE BEEN AROUND HIM ENOUGH -- EVEN IT HAPPENS

19   SOMETIMES WHEN HE'S SLEEPING.  AND SO THAT THEY WILL GO GET THE

20   GLUCOSE GEL AND GIVE THAT TO HIM TO TRY TO GET HIS BLOOD SUGAR

21   ELEVATED SO THAT HE'S NOT SYMPTOMATIC.

22          AND SO I SAID, "WHERE ARE YOU KEEPING THIS?"  AND

23   THIS IS A PICTURE OF A LOCKER, AND YOU CAN SEE THAT'S CLEANING

24   FLUID THAT THEY USE TO CLEAN SITTING BESIDE AND -- AMONG SOME

25   OTHER THINGS.

11:02  1                    AND THEN I SAID, "WELL, HOW DO YOU GET THIS?"

       2            AND HE SAID, "THEY GO TO THE ATU AND JUST TELL THE

       3    NURSES THEY NEED MORE OF IT TO TAKE CARE OF THIS PATIENT."

       4    **Q.**   AND SO WHAT IS GLUCOSE GEL?

       5    **A.**   IT'S GLUCOSE THAT YOU GIVE.  AND IT WOULD BE LIKE TAKING

       6    SUGAR WATER OR WHATEVER.  IT'S IN A GEL, THOUGH, BECAUSE IT'S

       7    USED SO THAT YOU DON'T CHOKE AS EASY ON IT, AND IT'S USED WHEN

       8    A PATIENT IS HAVING HYPOGLYCEMIA OR LOW BLOOD SUGAR.

       9            THE CHALLENGE, THOUGH, IS THAT THE -- YOU KNOW, OTHER

      10    INMATES DON'T HAVE AN ACCU-CHECK TO REALLY KNOW WHAT THE BLOOD

      11    SUGAR IS.  AND IF HE'S HAVING EPISODES OF HYPOGLYCEMIA, THAT

      12    NEEDS TO BE LOOKED AT, SOMEONE NEEDS TO BE ASSESSING THE

      13    PATIENT AND EVALUATING THAT PATIENT.  AND SO THAT IN AND OF

      14    ITSELF IS CONCERNING THAT THEY ARE JUST TREATING THESE

      15    SYMPTOMS.

      16    **Q.**   AND COULD THE SYMPTOMS OF HYPOGLYCEMIA BE SOMETHING ELSE

      17    OTHER THAN HYPOGLYCEMIA?

      18    **A.**   ABSOLUTELY.

      19    **Q.**   OKAY.

      20    **A.**   BECAUSE THEY JUST DESCRIBE THAT HE KIND OF STARTS

      21    TWITCHING AND -- EVEN IN HIS SLEEP, AND THAT CAN BE -- WELL,

      22    THAT COULD BE A VARIETY OF THINGS.

      23    **Q.**   AND THEN IF WE COULD TURN TO PLAINTIFFS' EXHIBIT 21_SSS,

      24    PAGE 4 -- WELL, SORRY.  GO TO PAGE 1, PLEASE.

      25            **MS. MONTAGNES:**  YOUR HONOR, I APOLOGIZE.  I'M TRYING

11:03  1    TO DO THIS CONTEMPORANEOUSLY.  I'D LIKE TO MOVE PLAINTIFFS'

2    EXHIBIT 21_KKK, WHICH IS THE ORDERLY POLICY, INTO EVIDENCE.

3             **THE COURT:**  ANY OBJECTION?

4             **MR. ARCHEY:**  NO, YOUR HONOR.

5             **THE COURT:**  ADMITTED.

6    **BY MS. MONTAGNES:**

7    **Q.**   ALL RIGHT.  AND WHAT IS THIS POLICY, MS. GOEHRING?

8    **A.**   THIS IS THE POLICY ACCESS TO SICK CALL AND CLINICAL

9    SERVICES.

10    **Q.**   AND WHEN WAS THE POLICY PROPOUNDED?

11    **A.**   WELL, IT LOOKS LIKE MARCH 3, 2022.

12    **Q.**   OKAY.  AND WE'RE GOING TO JUST TURN NOW TO PAGE 4.  WE'RE

13    JUST GOING TO LOOK AT THIS WITH RESPECT TO THE NURSING UNIT.

14             **MS. MONTAGNES:**  IS THIS -- SO CAN WE GO TO PAGE -- TO

15    7, TO ITEM 7.  NO, NO.  AT THE BOTTOM.  SORRY.

16    **BY MS. MONTAGNES:**

17    **Q.**   CAN YOU TELL ME WHAT THIS DESCRIBES?

18    **A.**   SO IT SAYS THAT PATIENTS THAT ARE ASSIGNED TO THE NURSING

19    UNITS MAY INITIATE REQUESTS FOR EMERGENCY HEALTH SERVICES AS

20    FOLLOWS:

21             THEY WOULD REPORT TO STAFF ON THE NURSING UNIT 2 THAT

22    THEY NEED TO DECLARE -- IF THEY WANT TO DECLARE AN EMERGENCY,

23    AND THEN THE STAFF MEMBER REPORTS THE DECLARATION OF EMERGENCY

24    TO THE SHIFT LIEUTENANT AND NURSING STAFF ON UNIT 2 --

25    PREFERABLY THE SHIFT OR THE HOUSE UNIT SUPERVISOR.  AND THEN AN

11:05  1    ASSESSMENT OF THE DECLARATION OF EMERGENCY BY THE NURSING

2    SUPERVISOR, OR OTHER RN AS DESIGNATED, WILL BE COMPLETED WITHIN

3    A THREE-HOUR TIME LIMIT AS IN ANY OTHER HOUSING SITUATION.

4    **Q.**    AND TO YOUR KNOWLEDGE, DOES THIS HAPPEN?

5    **A.**    YEAH.  I -- YES, YES.

6    **Q.**    I MEAN, SHOULD THIS BE HAPPENING?

7    **A.**    NO.

8    **Q.**    WHY NOT?

9    **A.**    IF YOU'RE IN AN INFIRMARY SETTING, YOU SHOULD BE UNDER AN

10   ACTIVE PLAN OF CARE BY A PHYSICIAN, AND YOU SHOULD BE BEING

11   ROUNDED ON BY NURSES.  AND I EQUATE THIS TO A PATIENT BEING IN

12   THE HOSPITAL.  YOU DON'T HAVE TO CALL YOUR PRIMARY CARE

13   PHYSICIAN AND SAY YOU NEED SOMETHING.  THE ATTENDING OR THE

14   HOSPITALIST -- YOU WOULD TELL YOUR NURSE AND THEY WOULD WORK

15   WITH THE ATTENDING OR THE HOSPITALIST TO TAKE CARE OF YOU.

16   **Q.**    OKAY.  AND DID YOU EXPERIENCE ANY OTHER EXAMPLES OF

17   POLICIES WHERE YOU FELT LIKE THE PRACTICE ON THE GROUND DIDN'T

18   MATCH THE WRITTEN POLICY?

19   **A.**    THERE WERE -- YEAH, THERE WERE SEVERAL.  JUST OFF THE TOP

20   OF MY HEAD, I'M HAVING TROUBLE THINKING OF ANYTHING RIGHT NOW.

21   SICK CALL WAS ONE THAT I THINK IS NOT -- FIRST OF ALL, THE

22   POLICY IS NOT CRISP; AND SECOND OF ALL, WHAT I SAW ON THE

23   GROUND WASN'T HOW IT WAS WRITTEN.

24   **Q.**    AND WHAT ABOUT THE POLICIES REGARDING MEDICATION

25   ADMINISTRATION RECORDS?

11:06  1   **A.**   ABSOLUTELY.  THERE WERE NO MARS IN THOSE HEALTH RECORDS.

2   **Q.**   SO LET'S BACK UP.  WHAT DID THE POLICY SAY WITH REGARD TO

3   --

4   **A.**   THEY SAID THAT THEY'RE PLACE IN THE HEALTH RECORD.

5   **Q.**   AND IS IT YOUR UNDERSTANDING THAT THAT'S HAPPENING?

6   **A.**   NO, IT'S NOT.  AND THEN IN ONE OF THE DOCUMENTS THAT WE

7   REVIEWED -- AND I DON'T KNOW YOUR LEGAL TERM FOR IT, I

8   APOLOGIZE.  IT'S AN ATTESTATION OR AN -- IS IT AN AFFIDAVIT?

9   **Q.**   UH-HUH.

10   **A.**   THE HEAD OF THE MEDICAL RECORDS -- I THINK IT'S THE

11   H-I-M-S IS THE ALPHABET SUIT BEHIND HER NAME -- SAID THOSE ARE

12   NOT INCLUDED IN THE HEALTH RECORD; ALTHOUGH THE POLICY SAYS

13   THEY ARE.

14   **Q.**   OKAY.  SO WE'VE TALKED ABOUT THE POLICIES NOT BEING

15   SPECIFIC ENOUGH AND WE'VE TALKED ABOUT POLICY -- THE PRACTICE

16   DEVIATING FROM THE POLICY.  DID YOU FIND ANY OTHER PROBLEMS

17   WITH THE WAY THE POLICIES WERE DONE?

18   **A.**   I DON'T KNOW SPECIFICALLY.  I MEAN, IN GENERAL, YES, I HAD

19   ISSUES WITH A LARGE PORTION OF THEM.

20   **Q.**   WERE ANY OF THE POLICIES PERHAPS NOT -- DIDN'T MEET THE

21   MINIMUM STANDARDS ON THEIR FACE?

22   **A.**   OH, YES, YES.  AND SO IF WE --

23   **Q.**   IF WE COULD BACK UP AND GO TO PAGE 1 OF THIS DOCUMENT.

24   **A.**   YEAH.

25   **Q.**   SO WE PREVIOUSLY IDENTIFIED THIS AS BEING THE SICK CALL

11:07 1   POLICY.  IS THAT RIGHT?  THIS IS PX_21_SSSS.

2   **A.**   YES.  ACCESS TO SICK CALL AND CLINICAL SERVICES.

3   **Q.**   AND IF WE COULD GO TO THE NEXT PAGE.

4   **A.**   RIGHT.  SO THE PROBLEM WITH THIS POLICY -- LET ME STEP

5   BACK.  POLICIES AND PROCEDURES SHOULD BE WRITTEN SPECIFICALLY

6   SO THAT YOU CAN MEASURE THINGS, IT'S MEASURABLE.  AND STANDARDS

7   REQUIRE THINGS TO BE TIMELY.  AND SO YOU HAVE TO BE ABLE TO

8   MEASURE THINGS TO COLLECT DATA THAT TELLS YOU SOMETHING SO THAT

9   YOU CAN SHOW THAT YOUR SERVICES ARE TIMELY, WHETHER THAT'S 24

10   HOURS, FIVE DAYS, SEVEN DAYS.  IF YOU DON'T HAVE THAT

11   SPECIFICITY IN THE POLICY, THEN HOW ARE YOU GOING TO MEASURE

12   IT.

13          SO THE FIRST ISSUE I HAVE WITH THIS IS THAT THE

14   OFFENDERS ARE GIVEN AN OPPORTUNITY TO SIGN UP FOR SICK CALL IN

15   THEIR HOUSING AREA BY COMPLETING A REQUEST FOR MEDICAL

16   TREATMENT FORM.  IF YOU LOOK AT THE MEDICAL TREATMENT FORM,

17   THERE IS NO PLACE FOR THE PATIENT TO DATE IT.  AND THE PATIENT

18   SHOULD DATE WHEN THEY WROTE IT, OKAY, RIGHT?  SO THAT FORM

19   NEEDS TO BE CHANGED SO THE PATIENT CAN DATE IT.

20          WHAT WE SAW IN PRACTICE IS THAT SOMETIMES THE EMT

21   WOULD FILL OUT THE COMPLAINT AND NOT THE PATIENT.  SO THE

22   PATIENT SHOULD, UNLESS THEY'RE ILLITERATE AND, YOU KNOW, THEY

23   COULD ASK FOR HELP.  BUT IT SHOULDN'T BE FROM AN OFFICER TO DO

24   THAT.  IT SHOULD BE FROM A HEALTH PROFESSIONAL TO DO THAT.  SO

25   THAT --

11:09  1           AND THEN THE SECOND THING IS THOSE -- THAT THEY HAVE

2  SECURITY SUPERVISORS COLLECTING THOSE, WHICH SHOULD NOT BE

3  HAPPENING.  THE PATIENT SHOULD BE PUTTING THE SLIP DIRECTLY IN

4  A BOX, BECAUSE THERE IS -- THAT'S HEALTH INFORMATION THAT THE

5  OFFICER CAN SEE.  AND THE STANDARD REQUIRES THAT THEY NOT

6  PARTICIPATE IN THAT.  AND THERE IS A REASON WHY.

7           I'VE BEEN DOING THIS A LONG TIME.  AND I'VE TAKEN

8  OVER MANY, MANY PROGRAMS.  AND IT'S VERY COMMON TO PULL DRAWERS

9  OPEN AND FIND STACKS OF SICK CALL SLIPS THAT NOBODY HAS ACTED

10  ON.  SO IT NEEDS TO BE PLACED IN THE BOX.  THEN WHEN THE NURSE

11  OPENS THE BOX -- UNLOCKS THE BOX, THEY NEED TO BE DATE AND TIME

12  STAMPED OF WHEN THEY RECEIVED IT, BECAUSE THAT'S WHEN YOUR

13  CLOCK STARTS.  AND YOU HAVE 24 HOURS THEN TO DO THE TRIAGE.

14  AND IF YOU DON'T HAVE A DATE/TIME STAMP, YOU DON'T HAVE A CLOCK

15  THAT'S STARTED.

16           SO THEY COLLECT THEM AND THEN -- BUT THE OTHER THING

17  I SAW WAS IN THE ATU -- RIGHT OUTSIDE THE ATU THERE WAS A BOOK

18  THERE AND THERE WAS A STICKY NOTE ON IT.

19  **Q.**  LET ME PAUSE YOU AND PULL UP THAT IMAGE.

20           CAN WE PULL UP WHAT'S PREVIOUSLY BEEN ADMITTED INTO

21  EVIDENCE AS PX_1_D_9.  AND CAN WE BLOW UP THE PICTURE ON THE

22  RIGHT.

23           IS THAT THE BOOK YOU'RE REFERRING TO?

24  **A.**  YEAH, YEAH.  SO THERE'S A STICKY NOTE ON IT.  AND I --

25  IT'S INITIALED, BUT I DON'T KNOW WHOSE INITIALS THAT IS.  IT

11:10 1   SAYS "OFFENDERS ARE NOT ALLOWED TO TURN IN SICK CALL FORMS!

2   MUST BE TURNED IN BY SECURITY."

3   **Q.**   AND WHY IS THAT CONCERNING?

4   **A.**   IT REINFORCES THAT SECURITY HAS THEIR HAND IN THE SICK

5   CALL PROCESS, AND THAT'S DANGEROUS.

6   **Q.**   SO YOU WERE SAYING THE PROCESS.  SO THAT -- SO IN AN

7   EFFECTIVE SICK CALL PROCESS, THE NURSE STAMPS THE TIME WHEN

8   THEY OPEN IT UP.  WHAT HAPPENS NEXT?

9   **A.**   SO THEN YOU HAVE 24 HOURS TO DO THE TRIAGE.  AND THEN

10   NATIONAL COMMISSION REQUIRES THAT THAT TRIAGE BE FACE TO FACE.

11   ACA DOES NOT REQUIRE FACE TO FACE.  THEY DO REQUIRE THAT YOU

12   REVIEW THE HEALTH RECORD AND PERFORM THE TRIAGE.  SO THEN FROM

13   THAT POINT YOU HAVE 24 TO 48 HOURS BEYOND THE TRIAGE TO

14   COMPLETE THE SICK CALL ENCOUNTER, WHICH CAN BE DONE BY

15   REGISTERED NURSES.

16         AT LSP IT IS AT A HIGHER LEVEL.  THEY USE NURSE

17   PRACTITIONERS.  THE PROBLEM IS YOU CAN'T TRACK THAT AT LSP

18   BECAUSE THE CLOCK NEVER STARTS.  THE CLOCK AT LSP STARTS WHEN

19   THE NURSE PRACTITIONER SEES THAT PATIENT.

20   **Q.**   AND TYPICALLY IN A HEALTH CARE SYSTEM WOULD THERE BE SOME

21   SORT OF LOG OR A WAY TO DOCUMENT THIS TO FOLLOW THAT TIMING

22   THROUGH?

23   **A.**   ABSOLUTELY.  SO YOU CAN EITHER DO AN ELECTRONIC REPORT --

24   IF YOU HAVE AN ELECTRONIC HEALTH RECORD SYSTEM THAT WILL DATE

25   AND TIME STAMP IT AND THEN YOU CAN RUN THOSE REPORTS.

11:12   1              BUT I'VE WORKED IN MANY SYSTEMS WHERE THEY DON'T HAVE

2    ELECTRONIC HEALTH RECORDS.  AND SO THERE NEEDS TO BE EITHER AN

3    EXCEL SPREADSHEET OR AN ELECTRONIC LOG, OR A LOT OF TIMES IT'S

4    A HANDWRITTEN LOG.  AND IT'S VERY -- I LIKE TO USE THE WORD

5    "CRISP."  PUT THE PATIENT'S NAME AND THEIR NUMBER, THE DATE

6    THAT THEY -- THEY PUT -- EXCUSE ME -- THAT THEY WROTE THAT THEY

7    -- THAT THEY WROTE THE SICK CALL.  AND I DON'T HOLD AS MUCH

8    CREDENCE TO THAT, BECAUSE SOMETIMES THEY'RE UNSURE OF THE

9    ACTUAL DATE.  BUT WHAT THE IMPORTANT DATE AND TIME IS THAT IT

10    WAS RECEIVED, AND THEN YOU SEE THE DATE AND TIME OF WHEN IT WAS

11    TRIAGED; THE DATE AND TIME THAT THE PATIENT WAS SEEN FOR THE

12    ENCOUNTER; AND IF THEY'RE REFERRED TO THE PHYSICIAN, THEN THE

13    DATE AND TIME THAT THE PHYSICIAN OR THE MID-LEVEL PROVIDER SAW

14    THE PATIENT.

15              THEN PART OF SUPERVISION OF THE PROGRAM IS THAT

16    YOU MONITOR THAT LOG.  AND IF YOU DO THAT SUCCINCTLY AND

17    CORRECTLY, IT JUMPS OUT AT YOU -- PEOPLE THAT YOU'VE MISSED.

18    BECAUSE YOU'RE GOING TO MISS PATIENTS BECAUSE THEY'RE WITH

19    THEIR ATTORNEY, OR PERHAPS THEY CHOSE TO -- IF THERE'S A FAMILY

20    VISIT DAY, MAYBE THEY GO SEE THEIR FAMILY.  IT HAPPENS.  AND SO

21    YOU WANT TO BE SURE THAT YOU RE-APPOINT THAT PATIENT AND SEE

22    THEM AND MAKE SURE THAT YOU GET THEIR NEED MET.

23    Q.   AND THAT SORT OF LOG PROCESS, IS THAT USED IN OTHER

24    SYSTEMS, MAYBE SPECIAL -- ARE THERE OTHER EXAMPLES OF SYSTEMS

25    WITHIN THE CORRECTIONAL HEALTH CARE THAT THAT KIND OF LOG

11:13  1    SYSTEM IS THE BEST PRACTICE OR IS THE COMMON PRACTICE?  EXCUSE

2    ME.

3    **A.**   YES.  SO MANY, MANY ASPECTS OF A HEALTH SERVICES PROGRAM

4    SHOULD BE MONITORED THAT WAY.

5          ANOTHER EXAMPLE I'LL GIVE YOU IS LAB.  THE PHYSICIAN

6    WRITES THE ORDER FOR LAB.  AND USUALLY IT'LL SAY IT'S STAT OR

7    WITHIN A CERTAIN TIME FRAME, THAT NEEDS TO GO ON A LOG WITH THE

8    DATE OF THE ORDER, THE DATE THAT THE LAB IS TO BE DRAWN, THE

9    DATE THAT IT WAS SENT TO THE LAB, THE DATE THAT THE RESULTS

10    WERE RECEIVED BACK AT THE PRISON, AND THEN THE DATE THAT THE

11    PROVIDER NOTED -- AND NOTED IT AND NOTED IT ON THE PLAN OF

12    CARE.  AND IF YOU HAVE THOSE SUCCINCT LOGS, THEN YOU CAN WATCH

13    THAT, BECAUSE THINGS HAPPEN, ESPECIALLY IN A PAPER SYSTEM.

14    MAYBE, YOU KNOW, A RESULT CAME BACK BUT IT LAID ON A TABLE AND

15    SOMEBODY DIDN'T PICK IT UP.  AND SO YOU HAVE SOMEONE MONITORING

16    THAT TO SAY "WHAT HAPPENED TO THIS RESULT?  WE NEED TO FIND

17    IT."

18    **Q.**   ALL RIGHT.  LET'S TALK A BIT ABOUT -- OH, SORRY.  ONE

19    SECOND.

20          **MS. MONTAGNES:**  ALL RIGHT.  AT THIS TIME, YOUR HONOR,

21    I'D LIKE TO MOVE TO ADMIT PX_21_SSSS, WHICH IS THE SICK CALL

22    POLICY OF MARCH 3, 2022.

23          **MR. ARCHEY:**  NO OBJECTION, YOUR HONOR.

24          **THE COURT:**  ADMITTED.

25          **THE DEPUTY CLERK:**  SSSS?

11:14  1              **MS. MONTAGNES:**  FOUR S'S.

2              **THE LAW CLERK:**  OKAY.

3    **BY MS. MONTAGNES:**

4    **Q.**  ALL RIGHT.  LET'S MOVE TO PLAINTIFFS' EXHIBIT 1A,

5    PAGE 134, 135.

6              DO YOU RECOGNIZE WHAT THIS IS?

7    **A.**  YES.  IT'S FROM THE REPORT.

8    **Q.**  SO LET'S WALK THROUGH YOUR RECOMMENDATIONS WITH RESPECT TO

9    POLICIES AND PROCEDURES.  I BELIEVE THERE'S FOUR.

10             CAN YOU TELL ME -- TALK TO ME ABOUT THE FIRST POLICY,

11   THE FIRST RECOMMENDATION.

12   **A.**  SO "THE POLICIES AND PROCEDURES NEED TO REFLECT MINIMAL

13   STANDARDS AS PUBLISHED BY THE NATIONAL COMMISSION ON

14   CORRECTIONAL HEALTH CARE."

15             THE REASON THAT I AND THE TEAM RECOMMENDS THAT IS

16   BECAUSE THE AMERICAN CORRECTIONAL ASSOCIATION'S ACCREDITING

17   SYSTEM LOOKS AT THE ENTIRE JAIL SYSTEM.  THEY LOOK AT WATER

18   TEMPERATURES AND LAUNDRY; THEY LOOK AT THE KITCHEN; THEY LOOK

19   AT FIRE SAFETY ISSUES.  SO THEIR OVERVIEW AND THEIR REVIEW OF

20   THE MEDICAL CARE IS MUCH LESS SPECIFIC AND IN DETAIL THAN THE

21   NATIONAL COMMISSION.  THE NATIONAL COMMISSION ONLY LOOKS AT THE

22   MEDICAL CARE, THE HEALTH CARE SYSTEM AND PROGRAM.

23             SO IF YOU ONLY LOOK AT ACA AND YOU USE THAT AS YOUR

24   GUIDE, YOU'RE GOING TO LACK SPECIFICITY IN YOUR POLICIES AND

25   PROCEDURES AND REALLY YOU'RE AT RISK FOR MORE ERROR.  YOU'RE AT

11:16   1   RISK, YOU KNOW, FOR YOUR SYSTEMS NOT BEING AS TIGHT AS THEY

2   SHOULD BE.

3   **Q.**   OKAY.  MOVE TO THE NEXT RECOMMENDATION.

4   **A.**   SO "THE POLICIES NEED TO BE SITE SPECIFIC WITH THE

5   PROCEDURAL SECTION GUIDING STAFF ON SPECIFIC TASKS."

6           AS I SAID EARLIER, THEY NEED TO BE SPECIFIC ENOUGH TO

7   GUIDE THE STAFF IN EXPECTATIONS WITH PATIENT ENCOUNTERS SUCH AS

8   NURSING SICK CALL, PROVIDER SICK CALL, INFIRMARY ADMISSIONS,

9   MEDICATION ADMINISTRATION, AND ALL OTHER SERVICE DELIVERY

10  AREAS.

11          I'LL GIVE YOU AN EXAMPLE.  IT SHOULD CLEARLY SPELL

12  OUT, WHEN YOU SEE THE PATIENT FOR THE SICK CALL ENCOUNTER, THAT

13  YOU TAKE A COMPLETE SET OF VITAL SIGNS, AND IT SHOULD

14  SPECIFICALLY SAY BLOOD PRESSURE, PULSE, RESPIRATIONS,

15  TEMPERATURE, PULSE OXIMETRY, AND WEIGHT.

16          AND ONE OF THE CRITICISMS THAT I HAD IS THAT WEIGHTS

17  ARE NOT TAKEN AT EVERY ENCOUNTER AT LSP, AND THAT -- THAT'S A

18  MINIMAL STANDARD.  AND MY ARGUMENT WITH THAT IS WHEN I GO TO

19  THE DOCTOR'S OFFICE, I HAVE TO STEP ON THAT SCALE.  IT'S NOT A

20  PLEASANT EXPERIENCE TO HEAR THEM SAY WHAT MY WEIGHT IS, BUT

21  IT'S AN IMPORTANT VITAL SIGN.

22          AND WE REVIEWED CASES WHERE THERE WAS WEIGHT LOSS.

23  AND THE PATIENT WOULD RAISE THEIR HAND AND SAY, "I'VE HAD A

24  SIGNIFICANT WEIGHT LOSS."  AND I THINK THAT THAT -- THAT'S

25  CONCERNING THAT THE STAFF ARE NOT INCLUDING WEIGHT.  THAT'S

11:17 1   JUST AN EXAMPLE.

2   **Q.**   ALL RIGHT.  LET'S TURN TO THE THIRD RECOMMENDATION.

3   **A.**   SO "THE PRACTICE OF STAFF SHOULD FOLLOW THE POLICIES AND

4   PROCEDURES, AND THAT SHOULD BE MONITORED WITH THE CQI,

5   CONTINUOUS QUALITY IMPROVEMENT, DATA COLLECTION TOOLS THAT HAVE

6   THE POLICIES AND PROCEDURES AS THEIR FOUNDATION."

7        SO IN ORDER TO HAVE AN EFFECTIVE QUALITY IMPROVEMENT

8   PROGRAM, YOU HAVE TO HAVE A SOLID AND A COMPLETE SET OF

9   POLICIES AND PROCEDURES.  THAT'S YOUR FOUNDATION.  THEN YOUR

10  QUALITY IMPROVEMENT -- WHEN YOU DECIDE WHAT YOU'RE GOING TO

11  MEASURE, YOU SIMPLY GO TO THE SPECIFIC POLICY AND YOU'RE

12  LOOKING FOR PIECES OF DATA THAT YOU SHOULD BE COLLECTING THAT

13  WILL TELL YOU THE STORY OF WHAT'S HAPPENING.

14        THE DATA COLLECTED IN A CQI PROGRAM SHOULD TELL YOU

15  SOMETHING.  IT ISN'T JUST A MATTER OF HASH MARKS.  THE TOTAL

16  NUMBER OF LAB TESTS DONE TELLS ME NOTHING.  I WANT TO KNOW THE

17  TOTAL NUMBER THAT WERE ORDERED:  WERE THEY TIMELY -- THE

18  SPECIMEN TIMELY DRAWN?  WAS IT TIMELY SENT TO THE LAB?  AND WAS

19  THE SPECIMEN ACCEPTED TO THE LAB?  OR DID YOU HAVE A PROBLEM

20  BECAUSE A SPECIMEN IS NOT ADEQUATE WHEN IT GETS TO THE LAB?

21  AND THEN DID YOU RECEIVE IT IN A TIMELY MANNER?  AND THEN WAS

22  IT PLACED IN FRONT OF YOUR PROVIDER IN A TIMELY MANNER?

23        SO WITHOUT THE SPECIFICITY OF THAT AND CREATING A

24  QUALITY IMPROVEMENT DATA COLLECTION TOOL, YOU'RE REALLY NOT

25  MEASURING THE OUTCOME.

11:19  1   **Q.**   ALL RIGHT.  AND WHAT'S THE FOURTH RECOMMENDATION?

2   **A.**   THAT "STAFF SHOULD HAVE ACCESS TO POLICIES AND PROCEDURES

3   AT ALL TIMES AND THEY NEED BE TESTED FOR COMPETENCY."

4           I ALWAYS SAY THAT I WANT TO SEE THE POLICY AND

5   PROCEDURE MANUAL ON A DESK, IF IT'S IN A PAPER FORMAT, IF IT'S

6   IN AN ELECTRONIC, WHICH IS ACCEPTABLE.  EVERY STAFF MEMBER

7   SHOULD HAVE READY ACCESS TO A POLICY AND PROCEDURE MANUAL.  AND

8   THAT'S IMPORTANT, BECAUSE IT'S VERY DIFFICULT FOR STAFF TO

9   MEMORIZE IN TOTALITY THE ENTIRE POLICY AND PROCEDURE MANUAL.

10  IN A VERY SIMPLISTIC WAY, THE MOST EFFECTIVE POLICY AND

11  PROCEDURE MANUALS WILL BE FOUR INCHES, FIVE INCHES, SOMETIMES

12  SIX INCHES TALL.  AND WHEN I PRINTED OFF THE LSP -- ACTUALLY, I

13  BROUGHT THEM WITH ME, AND IT'S ABOUT AN INCH.  IT WAS LIGHT

14  ENOUGH TO GO IN MY SUITCASE.  SO THEY -- YOU CAN'T MEMORIZE.

15  IN A GOOD POLICY AND PROCEDURE MANUAL, YOU CAN'T MEMORIZE IT

16  ALL.

17          SO AN EXAMPLE:  IF SOMEONE DECLARES A HUNGER STRIKE

18  ON THE NIGHT SHIFT, IT'S NOT SOMETHING THAT A NURSE TYPICALLY

19  DEALS WITH AT NIGHT:  OH, I'VE BEEN NOTIFIED OF A HUNGER

20  STRIKE.  I NEED TO BE ABLE TO OPEN MY POLICY MANUAL AND SAY,

21  "WHAT ARE THE STEPS THAT I SHOULD BE TAKING?  WHO DO I HAVE TO

22  NOTIFY?  WHAT, YOU KNOW, AND HOW DO I NOTIFY?  DOES IT GO TO

23  BEHAVIORAL HEALTH?  AM I SUPPOSED TO LET THE MEDICAL DIRECTOR

24  KNOW?  AM I SUPPOSED TO TELL THEM TONIGHT OR CAN IT WAIT TILL

25  MORNING ROUNDS?"  ALL OF THOSE SPECIFIC THINGS THAT YOU'RE NOT

11:20 1  GOING TO REMEMBER IF IT'S SOMETHING THAT POPS UP THAT IT'S NOT

2  SOMETHING THAT YOU DO EVERY DAY LIKE A SICK CALL PROGRAM.

3  **Q.**    AND IF LSP WAS TO DO THESE FOUR THINGS, WOULD THAT BE FOR

4  THE CADILLAC SYSTEM, IN YOUR VIEW, OR FOR -- YOU KNOW, WHAT

5  KIND OF SYSTEM WOULD FOLLOWING THESE RECOMMENDATIONS LEAD TO?

6  **A.**    ABSOLUTELY NOT CADILLAC.  IT'S THE MINIMUM GUIDANCE THAT

7  YOUR STAFF DESERVE AND THAT YOUR PATIENTS DESERVE, BECAUSE THAT

8  WILL THEN PRODUCE AN EFFECTIVE HEALTH SERVICES PROGRAM FOR YOU.

9              **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME I COULD

10  START A NEW SECTION.  I REALIZE THAT IT'S A LITTLE EARLY, BUT I

11  DO THINK THE NEXT SECTION WILL BE QUITE LENGTHY.  I'M SORT OF

12  OPEN TO THE COURT'S SUGGESTION ABOUT WHAT TO DO.

13              **THE COURT:**  WELL, I MEAN, LET'S PUT A FEW MINUTES ON

14  THE RECORD.

15              **MS. MONTAGNES:**  OKAY.  SURE.

16              **THE COURT:**  GO AHEAD AND GET STARTED.

17  **BY MS. MONTAGNES:**

18  **Q.**    ALL RIGHT, MS. GOEHRING.  LET'S TALK A LITTLE BIT ABOUT

19  THE QUALITY IMPROVEMENT PROGRAM AT LSP.

20  **A.**    OKAY.

21  **Q.**    SO IN THE COURT'S ORDER, THE COURT FOUND THAT LSP FAILED

22  TO ENGAGE IN A MEANINGFUL QUALITY IMPROVEMENT PROGRAM, AN

23  ANALYSIS; THE COURT FOUND THAT LSP DOES NOT LOOK FOR PROBLEMS

24  AND THUS FINDS NONE, WHICH RESULTS IN NO PROCESS FOR CONTINUAL

25  IMPROVEMENT, AND THAT THE REPEATED FAILURE OF MEANINGFUL OR

11:22   1   SYSTEMATIC REVIEW OF THE MEDICAL CARE AT LSP IS EVIDENCE OF

2   DISREGARD.  DID YOU FIND THAT THAT REMAINS TRUE TODAY?

3   **A.**   YES.

4   **Q.**   OKAY.  WHAT, IF ANYTHING -- LET'S BRING UP PLAINTIFFS'

5   EXHIBIT 44_CO_4.

6           I BELIEVE THIS HAS ALREADY BEEN ADMITTED INTO

7   EVIDENCE.

8           **MR. DUBNER:**  I DON'T THINK THE FULL VERSION OF THIS

9   ONE HAS BEEN.

10   **BY MS. MONTAGNES:**

11   **Q.**   OKAY.  SO IF WE COULD HIGHLIGHT THE BULLET POINTS, SORT OF

12   THE THREE UP FROM THE BOTTOM -- FOUR UP FROM THE BOTTOM AT THIS

13   TOP BULLET POINT AT THE TOP OF PAGE 1.  RIGHT THERE.  THAT'S

14   PERFECT.

15           ARE YOU AWARE OF THE CHANGES THAT HAVE HAPPENED TO

16   THE QA/QI PROGRAM AT LSP SINCE THE LAST TRIAL?

17   **A.**   NO.

18   **Q.**   NO?

19   **A.**   I DON'T SEE THAT IT'S -- THAT IT'S IMPROVED MUCH.

20   **Q.**   OKAY.  BUT THE DEFENDANTS HAVE INDICATED THAT DR. TOCE

21   ATTENDS THE QA/QI MEETINGS, WHICH ARE CONDUCTED QUARTERLY.  DID

22   YOU FIND THAT IN YOUR REVIEW?

23   **A.**   NOT -- HE DOESN'T -- NO.  HE IS NOT AT EVERY MEETING, NO.

24   **Q.**   OKAY.  AND ARE THE MEETINGS CONDUCTED QUARTERLY, IN YOUR

25   REVIEW?

11:23 1   **A.**   THEY ARE NOT.  THEY GOT BEHIND.  AND SO THEY DID MULTIPLE

2   QUARTERS LIKE AT ONE TIME.

3   **Q.**   OKAY.  AND IT SAYS THAT LSP'S QA/QI HAS BEGUN LOOKING MORE

4   DEEP -- FOR MORE DETAILED INFORMATION AND MORE STATISTICAL DATA

5   AS PART OF ITS EVALUATION.  THERE ARE -- SPECIFIC FOCUS AND

6   FINDING.  DID YOU FIND THAT TO BE TRUE IN YOUR REVIEW OF LSP'S

7   QA/QI PROGRAM?

8   **A.**   NOT ALL ALL.

9   **Q.**   OKAY.  WE CAN TAKE THIS DOWN.

10          HOW DID YOU CONDUCT YOUR REVIEW OF THE QA/QI PROGRAM

11   AT LSP?

12   **A.**   WELL, FIRST LOOKED AT THE POLICY, AND THEN I LOOKED AT

13   THEIR MINUTES AND THEIR -- THE STUDIES THAT WERE PROVIDED,

14   ALONG WITH THE MINUTES AND THE STUDIES THAT THEY'RE PROVIDING.

15   **Q.**   DID YOU REVIEW ANY DEPOSITION TRANSCRIPTS?

16   **A.**   YES, I DID REVIEW THE DEPOSITION.  AND I APOLOGIZE.  I

17   DON'T REMEMBER THE NURSE'S NAME, BUT THERE'S A NURSE THAT'S

18   ASSIGNED AS THE QI COORDINATOR OR DIRECTOR.  I'M NOT SURE WHAT

19   HER TITLE IS.  BUT YES, I DID REVIEW HER DEPOSITION.

20   **Q.**   AND WHAT STANDARD DID YOU USE WHEN YOU WERE EVALUATING THE

21   QA/QI PROGRAM AT LSP?

22   **A.**   BOTH ACA AND NCCHC.

23   **Q.**   OKAY.  HOW MANY PRISON AND JAIL QUALITY -- QA/QI PROGRAMS

24   WOULD YOU SAY YOU'VE REVIEWED OVER YOUR CAREER?

25   **A.**   OH, I DON'T KNOW.  I MEAN, IT COULD EVEN BE WELL OVER A

11:24 1  HUNDRED.

2  **Q.**   OKAY.  AND IN EVERY ADEQUATE SYSTEM THAT YOU REVIEWED, WAS

3  THERE A QA/QI PROGRAM?

4  **A.**   YES.

5  **Q.**   OKAY.  AND CAN YOU TALK ABOUT WHAT ROLE THAT PLAYS IN AN

6  ADEQUATE SYSTEM?

7  **A.**   SO QUALITY ASSURANCE IS VITAL.  AND IT MEASURES BOTH

8  PROCESS -- ADEQUATE -- A PROGRAM WELL-DESIGNED MEASURES BOTH

9  PROCESS AND PATIENT OUTCOMES AND IT BECOMES YOUR ROADMAP, IF

10  IT'S DONE CORRECTLY, TO MEASURE WHERE YOUR WEAKNESSES ARE OR

11  OPPORTUNITIES FOR IMPROVEMENT.  AND IT NEEDS TO HAVE MEANINGFUL

12  DATA COLLECTED THAT TELLS THE STORY, NOT SIMPLY JUST, YOU KNOW,

13  COUNTING THINGS.

14       SO -- AND THEN ONCE YOU SEE THAT, YOU DEVELOP A

15  CORRECTIVE ACTION PLAN THAT BECOMES YOUR ROADMAP OF HOW YOU'RE

16  GOING TO FIX THINGS.  AND THAT CORRECTIVE ACTION PLAN NEEDS TO

17  BE SUCCINCTLY WRITTEN, AND IT DOES A DRILL-DOWN ON WHAT'S THE

18  ROOT CAUSE OF THE PROBLEM; SO WHAT'S REALLY CAUSING THIS?

19       FOR EXAMPLE, AT LSP THERE ARE A LOT OF REFUSALS.  AND

20  I THINK EVEN IN DR. LAVESPERE'S DEPOSITION HE TALKED ABOUT THE

21  REFUSALS AND THAT HIS BELIEF WAS THAT SECURITY WAS RESPONSIBLE

22  FOR A SIGNIFICANT PIECE OF THOSE REFUSALS.  AN EFFECTIVE QA

23  MEASUREMENT OF THAT IS GOING TO DRILL DOWN -- BECAUSE YOU'RE

24  GOING TO FIND OUT WHY DID THE PATIENT REFUSE.  IS IT BECAUSE

25  THEY WEREN'T, YOU KNOW --

11:26 1   **Q.**   SO LET'S BACK UP.

2   **A.**   OKAY.

3   **Q.**   SO HOW WOULD YOU DESIGN THAT, AN INVESTIGATION OF THAT?

4   **A.**   SO YOU WOULD START COLLECTING REFUSALS, COUNTING THE

5   REFUSALS, AND THEN YOU WOULD DO A SAMPLING OF THOSE PATIENTS

6   AND ASK WHY THEY REFUSED.  SOMETIMES THEY'LL PUT IT ON THE

7   REFUSAL SHEET; OFTEN THEY DON'T.  IF YOU HAVE AN EFFECTIVE

8   POLICY AND PROCEDURAL MANUAL, YOUR STAFF WILL BE COACHING THEM

9   TO PUT THE REASON DOWN ON THE REFUSAL.  BUT IF IT'S NOT THERE,

10   THEN YOU NEED TO GO BACK AND ASK WHY IS IT THAT YOU'RE

11   REFUSING?  AND THEN YOU WOULD BEGIN TO CATEGORIZE THAT:  WAS IT

12   A WAIT TIME?  WAS IT I WASN'T NOTIFIED?  WAS IT SECURITY SAID

13   NOPE, NOBODY -- THERE'S NOBODY TO ESCORT YOU, OR WHATEVER IT

14   IS, AND THEN YOU WOULD CATEGORIZE THOSE INTO CATEGORIES.  THAT

15   THEN -- THAT POINTS YOU TO THE TRUE PROBLEM AND WHERE YOU NEED

16   TO TAKE CORRECTIVE ACTION.

17       AT THAT POINT YOU MAY NEED TO INVOLVE SECURITY

18   ADMINISTRATION.  IF IT'S LIKE A WAIT TIME --  OR, FOR EXAMPLE,

19   AT LSP THEY DID PUT THE MONITORS IN THE HOUSING UNITS TO LET

20   THEM KNOW WHEN THEY HAD APPOINTMENTS.  SO THAT WOULD BE AN

21   EXAMPLE OF A MITIGATION FOR SOMETHING WHEN PATIENTS ARE SAYING

22   "WE DON'T KNOW THAT WE HAVE AN APPOINTMENT."

23       SO YOU IDENTIFY WHAT THE ROOT CAUSE IS, AND THEN YOU

24   IDENTIFY WHAT THE INTERVENTION SHOULD BE TO CORRECT IT, AND

25   THEN YOU ASSIGN A PERSON RESPONSIBLE.  AND THERE ALSO NEEDS TO

11:27  1    BE A TIME DEVELOPED THAT "THAT'S OUR GOAL TO COMPLETE THIS."

2    AND THEN "WHEN ARE WE GOING TO REMEASURE IT?"  BECAUSE YOU

3    CAN'T JUST ASSUME YOU FIX IT.  YOU'VE GOT TO REMEASURE IT.

4    MAYBE YOU REMEASURE IT, YOU SEE YOU'VE IMPROVED; MAYBE YOU

5    DIDN'T IMPROVE; MAYBE YOU'VE GOTTEN WORSE.  AND SO IT'S REALLY

6    A CONTINUOUS CYCLE.

7          YOU CONTINUE THAT UNTIL YOU HAVE REACHED YOUR

8    ESTABLISHED THRESHOLD.  AND THAT'S REALLY UP TO THE PROGRAM,

9    WHETHER YOU WANT IT 90 PERCENT, 95 PERCENT.  CERTAINLY IN

10    LIFE-AND-DEATH-KIND OF THINGS YOU WANT IT TO BE 100 PERCENT.

11          ONCE YOU HAVE SEEN THAT THRESHOLD HIT 95 PERCENT OVER

12    TIME -- AND THERE'S NOT ANY MAGICAL NUMBER, BUT YOU'VE MEASURED

13    IT -- IN FOUR QUARTERS, SIX QUARTERS, THEN PUT THAT ASIDE AND

14    IT'S TIME TO STUDY SOMETHING ELSE BECAUSE STAFF GOT IT, IT'S NO

15    LONGER A PROBLEM.  BUT YOU SHOULD SEE A CALENDAR, IF YOU WILL,

16    THAT MEASURES DIFFERENT PROGRAMS OR DIFFERENT HEALTH SERVICE

17    DELIVERY PIECES.  EVERY MONTH THERE SHOULD BE A NEW STUDY GOING

18    ON.

19          AND IT REALLY CAN BECOME VOLUMINOUS IN A PROGRAM THAT

20    IS VERY BROKEN, BECAUSE IF EVERYTHING YOU MEASURE REQUIRES A

21    CORRECTIVE ACTION PLAN AND THEN ONGOING MONITORING, IT CAN

22    BECOME QUITE A LARGE UNDERTAKING.  BUT IT WILL DRIVE.  IT WILL

23    DRIVE, YOU KNOW, FIXING THINGS AND REALLY MAKING SURE THAT YOUR

24    PROGRAM IS OPERATING BASED ON WHAT YOU SAY YOU ARE GOING TO DO

25    IN YOUR POLICIES AND PROCEDURES.

11:28 1   Q.   OKAY.  AND BASED ON YOUR REVIEW OF THE MINUTES, THE -- AND

2   AS WELL AS THE DEPOSITION OF MS. STICKLES, DID YOU COME TO A

3   CONCLUSION AS TO WHETHER OR NOT LSP'S QA/QI PROGRAM WAS

4   ADEQUATE?

5   A.   NO, IT'S ABSOLUTELY NOT ADEQUATE.  I WANT TO TALK ABOUT A

6   COUPLE OF THINGS.  ONCE JUDGE DICK AUTHORED HER ORDER, I WOULD

7   HAVE NOT WALKED BACK TO LSP.  I WOULD HAVE RUN BACK TO LSP, AND

8   THAT WOULD HAVE BECOME THE FOUNDATION FROM WHICH I START

9   DEVELOPING MY DATA COLLECTION AND START MEASURING AND START

10  DOING CORRECTIVE ACTION PLANS.  AND I WAS TAKEN UNDER WHEN I

11  READ DEPOSITIONS BY THE DIRECTOR OF NURSING AND THE NURSES

12  ASSIGNED TO CQI.  SHE'D NEVER EVEN SEEN THE REPORT.

13       SO THE FIRST STEP IN FIXING THINGS IS ACKNOWLEDGING

14  THAT YOU HAVE A PROBLEM AND BEING WILLING TO MEASURE AND BE

15  WILLING TO LOOK AT IT WITH AN OPEN MIND AND SAY, "HOW ARE WE

16  GOING TO IMPROVE?"  SO THAT'S A FIRST STEP.

17       THE NEXT IS YOU NEED TO MEASURE YOUR ENTIRE HEALTH

18  SERVICES PROGRAM OVER TIME.  AND WHAT I SEE IN THE LSP'S QA

19  PROGRAM IS THAT THEY HAVE MEASURED THE SAME SIX OR SEVEN -- SIX

20  OR SEVEN THINGS.  IT HASN'T CHANGED SINCE 2019.  THEY ARE

21  LOOKING AT THE SAME THINGS OVER AND OVER AND OVER, AND THEY

22  HAVE NOT MEASURED CRITICAL PIECES OF THE DELIVERY SYSTEM.

23  Q.   ALL RIGHT.  SO LET'S TURN TO AN EXAMPLE OF THAT.

24       IF WE COULD PULL UP WHAT HAS BEEN MARKED AS

25  PLAINTIFFS' EXHIBIT 34-A.

11:30 1    **A.**   YEAH.

2    **Q.**   IF YOU COULD START AT PAGE 1.  SO WHAT IS THIS THAT WE'RE

3    LOOKING AT?

4    **A.**   THIS IS THE MINUTES FROM THE QI MEETING THAT WAS FOR 2021

5    FOURTH QUARTER.

6    **Q.**   OKAY.  AND LET'S JUST START BY LOOKING -- SO THERE ARE A

7    NUMBER OF STUDIES THAT ARE LISTED HERE.  I BELIEVE ON THIS PAGE

8    THERE ARE FIVE.

9          COULD WE GO TO THE NEXT PAGE.

10   **A.**   BEFORE WE LEAVE THAT, I'D JUST LIKE TO POINT OUT SOMETHING

11   MINOR:  THAT IT DOESN'T TELL ME WHAT DATE THE COMMITTEE MEETING

12   HAPPENED.  SO THIS IS LOOKING AT THE FOURTH QUARTER, BUT I

13   DON'T REALLY KNOW WHEN THIS HAPPENED.  IT SHOULD BE DATE --

14   THERE SHOULD BE A DATE ON IT.

15   **Q.**   OKAY.

16   **A.**   AND THE OTHER THING THAT STRIKES ME HERE:  "IS THERE OLD

17   BUSINESS?"  THERE'S "NONE."  IN A QI PROGRAM YOU DON'T EVER NOT

18   HAVE OLD BUSINESS, 'CAUSE WITH YOUR OLD BUSINESS WAS THE

19   STUDIES THAT YOU LOOKED AT FROM THE PRIOR MEETING.

20   **Q.**   OKAY.

21   **A.**   UNLESS YOU HAVE A PERFECT PROGRAM.  AND I'VE YET TO SEE

22   ONE.  THERE'S ALWAYS SOMETHING OLD THAT WE TALK ABOUT.

23   **Q.**   AND SO THERE ARE FIVE STUDIES LISTED ON THIS PAGE.

24          CAN WE GO TO THE NEXT PAGE.

25          AND THERE ARE AN ADDITIONAL SIX ON THIS PAGE.  IS

11:31 1    THAT RIGHT?

2    **A.**    CORRECT.

3    **Q.**    SO THEY ARE STUDYING ABOUT 11 THINGS AT THIS TIME?

4    **A.**    CORRECT.

5    **Q.**    OKAY.  AND DO YOU KNOW ABOUT HOW LONG THIS MEETING LASTS?

6    **A.**    FROM WHAT I'VE READ, THEY COMBINE IT WITH THE INFECTION

7    CONTROL MEETING; AND IT'S ABOUT AN HOUR.

8    **Q.**    AND IT HAPPENS FOUR TIMES A YEAR?

9    **A.**    CORRECT.

10    **Q.**    OKAY.  LET'S TURN NOW TO PAGE 19.

11            ALL RIGHT.  SO WHAT ARE WE LOOKING AT NOW?

12    **A.**    SO THIS IS A HOSPICE PAIN MANAGEMENT STUDY.  AND THEY USE

13    A FOCUS PROCESS, WHICH IS:  "F" IS FIND THE PROBLEM; "O" IS

14    ORGANIZE THE TEAM; THE "C" MEANS TO CLARIFY THE PROBLEM; THE

15    "U" IS TO UNDERSTAND THE PROBLEM; AND THE "S" IS TO SELECT AN

16    INTERVENTION; AND THEN THE PLAN IS TO PLAN WHAT YOU'RE GOING TO

17    DO:  DO IT, CHECKING THAT.

18            SO WHAT'S STRIKING ABOUT THIS IS THAT WHEN YOU LOOK

19    AT -- THEY SAY THAT THEIR FOCUS IS TO FIND A PROBLEM AND THEY

20    DESCRIBE PAIN.  AND THEY TALK ABOUT ACCURATE DOCUMENTATION IS

21    IMPORTANT, BUT THEY DON'T STATE THAT THERE REALLY IS A PROBLEM.

22    IT'S JUST REALLY MORE OF A DEFINITION OF WHY A PAIN MANAGEMENT

23    PROGRAM IS IMPORTANT.

24            WHEN YOU LOOK AT THE "O," WHICH IS TO ORGANIZE A

25    TEAM, I WOULD EXPECT TO SEE EITHER NAMES OR TITLES OF POSITIONS

11:33 1    OF THE TEAM THAT'S GOING TO ATTACK THE PROBLEM.

2              WHEN YOU LOOK AT THE "C" TO CLARIFY THE PROBLEM, IT

3    JUST BASICALLY SAYS AT PRESENT THE PAIN DOCUMENTATION IS DONE

4    BY THE NURSING FLOWSHEET.  IT'S INCLUSIVE OF A NARRATIVE

5    DESCRIPTION OF PAIN, METHOD OF TREATING THE PAIN AND THE

6    OUTCOME OF THE METHOD USED.  ALSO INCLUDED IN THE NURSING

7    FLOWSHEET IS A PAIN SCALE ZERO TO TEN; ZERO BEING NO PAIN AND

8    TEN MOST SEVERE.  AGAIN, IT'S JUST A DEFINITION.  IT DOESN'T DO

9    A DRILL-DOWN AND TELL ME, YOU KNOW, WHAT IS PROBLEM.  WHAT IS

10   THE PROBLEM?  WHAT IS THE STATE'S PROBLEM?  ARE WE -- ARE WE

11   NOT MAKING ROUNDS ON THE PATIENTS IN PAIN?  ARE WE NOT

12   MEDICATING THEM WHEN THEY SAY THEY HAVE PAIN?  WE NEED TO HAVE

13   A PROBLEM TO STUDY.

14             SO IF YOU LOOK AT THE "U," WHICH IS REALLY TO

15   UNDERSTAND THE PROBLEM, THE DRILL-DOWN, IT SAYS, "CURRENT

16   DOCUMENTATION DOES NOT REFLECT AN INCREASE IN PATIENT'S PAIN OR

17   A NEED FOR THE INCREASE OR CHANGE IN THE PAIN MEDICATION.

18   HOWEVER, THROUGHOUT THE CARE OF THE PATIENT, PHYSICIAN ORDERS

19   FOR INCREASE IN PAIN" -- "IN MEDICATION DOSAGE OR CHANGES IN

20   PAIN MANAGEMENT ARE GIVEN."

21             SO I'M STILL NOT COMPLETELY CLEAR WHAT WE'RE STUDYING

22   HERE, AND THAT THAT SELECT AN INTERVENTION IS WE'RE GOING

23   TO THE -- DOCUMENTATION WILL BE DOCUMENTED ACCURATELY, WHICH

24   I'M ASSUMING MEANS THAT, YOU KNOW, YOU'RE GOING TO -- IF HE

25   SAYS IT'S A SIX, YOU'RE GOING TO WRITE A SIX DOWN.

11:34 1          BUT IF YOU'LL GO -- I THINK WHAT'S MOST STRIKING IS

2  IF YOU WILL LOOK AT THE ACTUAL -- THE PAGE THAT SHOWS THE DATA.

3  **Q.**   OKAY.  CAN WE TURN TO THE NEXT PAGE, PAGE 20.

4  **A.**   SO THIS --

5  **Q.**   AND LET'S --

6  **A.**   THIS SAYS THE MEDICATION THAT IS ORDERED IS ULTRAM 50

7  MILLIGRAMS PRN, WHICH MEANS "AS NEEDED FOR PAIN."  IT'S AN

8  INCOMPLETE ORDER.  I NEED TO KNOW IS IT ORDERED EVERY FOUR

9  HOURS, SIX HOURS, EIGHT HOURS?  WHAT IS THE ORDER?  SO THAT'S

10  MY FIRST PROBLEM WITH IT.

11          AND SO THE DATE THAT WAS INITIATED SHOULD BE THE DATE

12  THAT THE PHYSICIAN ORDERED IT AND IT'S IN CURRENT PLAY.  AND SO

13  PAIN SCALE -- AND SO THEN THEY LIST THE DATE THAT THEY ASK THE

14  PATIENT WHAT THEIR PAIN RATING WAS.  SO I'M ASSUMING ON 11/22

15  THE PATIENT SAID THAT HIS PAIN WAS A SEVEN AND THAT AFTER HE

16  WAS MEDICATED IT WAS A THREE.

17          THE PROBLEM I HAVE WITH THIS IS IF THE ULTRAM ORDER

18  IS FOR EVERY SIX HOURS OR EVERY EIGHT HOURS, THEN I NEED TO BE

19  ACTIVE, NOT PASSIVE.  I SHOULD EXPECT TO SEE THREE ENTRIES IF

20  IT'S AN EVERY EIGHT-HOUR ORDER ON 11/22:  THREE ENTRIES FOR

21  11/23, THREE ENTRIES FOR 11/24.  BECAUSE A PATIENT MAY SAY

22  ZERO, BUT IT'S UP TO THE NURSE TO ASSESS IT AND BE ACTIVE.

23          THIS REALLY LEADS YOU TO BELIEVE THAT THE NURSE

24  DIDN'T EVEN ASK ON FROM THE 23RD TO THE 29TH.  IT'S CERTAINLY

25  NOT THERE.  AND THEN YOU NEED TO KNOW, YOU KNOW, WERE THEY

11:36 1    MEDICATED OR NOT?  AND THAT'S NOT CLEAR IN THIS.

2              SO I THINK THAT IT'S -- THE WHOLE STUDY PLAN IS NOT

3    DONE CORRECTLY.  I CERTAINLY THINK FROM THE DEPOSITION THAT THE

4    NURSE THAT IS ASSIGNED TO THIS IS VERY WELL-INTENDED.  I JUST

5    THINK THAT SHE LACKS THE EXPERIENCE OR PERHAPS THE SKILLS TO

6    UNDERSTAND HOW TO EFFECTIVELY DEVELOP THE PROGRAM.

7    **Q.**   OKAY.  CAN WE TURN THEN TO THE NEXT PAGE.

8              THIS BOX HERE, IS IT NOTIFICATION FOR THIS PATIENT

9    WHETHER OR NOT THEY RECEIVED -- CAN WE HIGHLIGHT THIS BOX?  I

10   DON'T WANT TO SAY THE PATIENT'S NAME OUT LOUD.

11   **A.**   SO THE -- CORRECT.  SO THE NORCO WAS ORDERED -- FIVE

12   MILLIGRAMS OF NORCO WAS ORDERED EVERY SIX HOURS AS NEEDED.  SO

13   WHAT YOU WOULD EXPECT TO SEE THEN IS FOUR TIMES EVERY SIX HOURS

14   A PATIENT -- THAT YOU WOULD APPROACH YOUR PATIENT AND ASSESS

15   THEIR PAIN AND ASK THEM "GIVE ME A ZERO TO A TEN.  IF IT'S

16   ZERO, GREAT.  IF IT'S TEN, OKAY, WE'RE GOING TO MEDICATE YOU."

17   AND THIS SAYS, "THE PATIENT HAS NOT ASKED FOR THE MEDICATION."

18             AND THIS IS A HOSPICE PAIN MANAGEMENT PROGRAM, WHICH

19   IS EVEN MORE CONCERNING TO ME, BECAUSE HOSPICE PATIENTS OFTEN

20   -- SPECIFICALLY AT THE END OF LIFE -- AREN'T CAPABLE REALLY OF

21   SAYING.  YOU KNOW, YOU HAVE TO REALLY WATCH THEM TO KNOW

22   THEY'RE IN PAIN AND TO MEDICATE THEM.  AND THIS STUDY IS --

23   IT'S CONCERNING.

24   **Q.**   OKAY.  LET'S TURN -- AND I'M MISSING THE PAGES HERE -- TO

25   THE STUDY ON 24-HOUR CHART CHECKS.

11:37   1          CAN WE SCROLL DOWN ON THIS DOCUMENT.  WE'RE GOING TO
       2   GO TO PAGE 11.
       3          ALL RIGHT.  LET'S TALK A LITTLE BIT ABOUT THIS STUDY.
       4          CAN YOU TELL ME WHAT A 24-HOUR CHART CHECK IS?
       5   **A.**   A 24-HOUR CHART CHECK IS WHEN A SPECIFIC NURSING POST ON A
       6   SPECIFIC SHIFT IS ASSIGNED TO DO -- REVIEW THE CHARTS FOR THE
       7   PRIOR 24 HOURS TO ENSURE THAT ALL OF THE PHYSICIAN OR NURSE
       8   PRACTITIONER ORDERS HAVE BEEN NOTED AND EXECUTED.
       9   **Q.**   OKAY.  SO TALK TO ME ABOUT THE DESIGN OF THIS STUDY.
      10   **A.**   SO THIS -- AGAIN, IT TELLS YOU THE FOCUS IS THAT THE
      11   24-HOUR CHART CHECKS IS A NURSING PROCEDURE.  AGAIN, THE STUDY
      12   WILL INCLUDE 20 RANDOM CHARTS, BUT IT DOESN'T TELL ME WHO THE
      13   TEAM IS.
      14          AND BACK TO "F," I DON'T REALLY KNOW WHAT THE PROBLEM
      15   IS.  ARE THEY NOT BEING DONE?  ARE THEY -- THEY'RE DOING THEM
      16   BUT THEY'RE NOT LOOKING AT THE SPECIFIC COMPONENTS OF IT AND
      17   JUST CHECKING IT?  WAS IT DONE WITHOUT THE FOLLOW-THROUGH OF
      18   EACH SPECIFIC ASPECT?  I DON'T KNOW.  IT'S NOT CLEAR TO ME.
      19          AND WHEN YOU GO DOWN TO CLARIFY THE PROBLEM IT SAYS,
      20   "CURRENTLY WEEKLY NURSING ASSESSMENTS ARE PERFORMED ON ASSIGNED
      21   BEDS.  AND THIS ASSIGNMENT FORM INCLUDES A MEMO TO THE STAFF
      22   INFORMING STAFF TO COMPLETE THE CHARTS CHECKS.  IT IS THE DUTY
      23   OF THE NIGHT SHIFT TO COMPLETE THE 24-HOUR CHART CHECKS WITHOUT
      24   FAIL.  THIS INCLUDES SIGNATURES ENSURING THE TASK IS COMPLETE."
      25          I'M GOING TO HAVE TO GUESS THAT MAYBE THE NIGHT SHIFT

11:39 1   ISN'T DOING IT, BUT I'M CONFUSED BY THE "WEEKLY NURSING

2   ASSESSMENTS ARE PERFORMED ON ASSIGNED BEDS."  IT'S JUST

3   UNCLEAR, AND IT REALLY NEEDS TO BE VERY SUCCINCTLY STATED WHAT

4   THE PROBLEM IS.

5   **Q.**   AND WHAT IS YOUR UNDERSTANDING OF WHAT THEY'RE MEASURING

6   HERE IN TERMS OF WHAT ARE THEY LOOKING AT TO ASSESS WHETHER OR

7   NOT THE 24-HOUR CHART CHECKS ARE HAPPENING?

8   **A.**   WELL, IT'S REALLY DIFFICULT TO TELL, BECAUSE I THINK THAT

9   WHEN I SAW THIS, WHEN I DID THE RECORD REVIEW, THEY TAKE THE

10   RED PEN AND THEY DRAW A LINE, WHICH IS AN ACCEPTABLE NURSING

11   FUNCTION IN MANY HEALTH CARE DELIVERY SYSTEMS, WHETHER IT'S

12   CORRECTIONS OR NOT.  YOU DRAW A LINE AND YOU PUT THE "24-HOUR"

13   AND THEN YOU INITIAL IT.  BUT IF YOU'RE GOING TO DESIGN THIS

14   STUDY, IT REQUIRES MANY MORE COMPONENTS ON THE DATA COLLECTION

15   TOOL.

16        SO, FOR EXAMPLE, MEDICATION ORDER:  DID YOU NOTE IT?

17   WAS IT NOTED?  YES.  WAS THE MEDICATION ENTERED ONTO THE

18   PATIENT'S MAR?  YES.

19        LET ME BACK UP.  WAS THE ORDER NOTED WITH WHATEVER

20   YOUR POLICY SAYS, WHETHER THAT'S SIX HOURS, EIGHT HOURS?  IF

21   IT'S A STAT ORDER, WAS IT WITHIN -- NORMALLY IT WOULD BE TWO

22   HOURS.  SO THERE NEEDS TO BE A TIME.  WAS IT TIMELY ORDERED?

23   THEN WAS IT PLACED ON THE MAR?  WAS THE MEDICATION -- HOWEVER

24   -- WHATEVER YOUR PROCESS IS TO ORDER FROM THE PHARMACY -- AND I

25   CAN'T DESCRIBE THAT FOR LSP BECAUSE THAT POLICY IS NOT CLEAR.

11:40  1   DO I ELECTRONICALLY SEND THAT?  DO I FAX IT?  DOES SOMEBODY
       2   COME PICK THEM UP?  I DON'T KNOW.  BUT WHATEVER THE PROCEDURE
       3   IS, IT SHOULD MEASURE THAT COMPONENT.  AND REALLY YOU SHOULD
       4   LOOK AT:  DID THE PATIENT RECEIVE THE FIRST DOSE WITHIN A
       5   CERTAIN TIME?
       6              ON LAB, YOU NOTED THAT THE LAB WAS ORDERED.  WAS IT
       7   PLACED ON THE LAB LOG?  IF THERE'S A LOG -- IT COULD BE
       8   ELECTRONIC.  WAS IT WITHIN THE TIME FRAME ORDERED BY THE
       9   PHYSICIAN?  IF THERE'S A REQUISITION THAT NEEDS TO BE
      10   COMPLETED, WAS THE REQUISITION COMPLETED?  I MEAN, YOU HAVE TO
      11   -- EACH STEP NEEDS TO BE MEASURED SO THAT YOU KNOW IT'S
      12   EFFECTIVELY BEING DONE.
      13              X-RAY IS ANOTHER ONE.  THEY ORDER -- THEY WANT A
      14   CHEST X-RAY.  WAS IT TIMELY NOTED?  DID I FILL OUT THE
      15   REQUISITION?  I DON'T KNOW HOW THAT HAPPENS, WHETHER IT'S A
      16   FORM THEY FILL OUT, WHETHER THEY -- I'M NOT SURE.  BUT YOUR
      17   PROCEDURAL DOCUMENT WOULD GUIDE YOU THEN ON WHAT THAT DATA
      18   COLLECTION TOOL WOULD LOOK LIKE, AND THAT'S THE DATA THAT YOU
      19   COLLECT THAT REALLY THEN TELLS YOU THE STORY OF YOUR SYSTEM AND
      20   WHETHER OR NOT THERE'S A PROBLEM OR NOT.
      21   Q.   OKAY.  AND COULD WE GO TO THE NEXT PAGE, PAGE 12 OF
      22   PX_34-A.
      23              AND IS THIS THE -- THIS IS THE DATA COLLECTION TOOL
      24   THAT WAS AVAILABLE?
      25   A.   YES.

11:42 1   **Q.**   AND WHAT DOES THIS TELL YOU?

2   **A.**   IT SAYS OCTOBER COMPLIANCE IS AT 80 PERCENT; NOVEMBER IS

3   AT 94 PERCENT, WHILE DECEMBER IS 100 PERCENT WITH AN OVERALL

4   AVERAGE OF 91 PERCENT.  COMPLIANCE GOAL WAS MET FOR THE SECOND

5   QUARTER.

6            SO WHAT THIS DOESN'T TELL ME IS WHEN -- THE

7   80 PERCENT AND THE 94 PERCENT, WAS IT THAT THEY DIDN'T DRAW THE

8   LINE?  WAS IT THAT THEY DIDN'T GET THE LAB ORDERED?  OR THEY

9   DIDN'T GET THE X-RAY THAT WAS ORDERED DONE?  YOU REALLY CAN'T

10   -- THIS DOESN'T TELL YOU WHAT TRULY THE PROBLEM IS.

11   **Q.**   SO IS IT YOUR IMPRESSION THAT THEY'RE MERELY JUST LOOKING

12   ABOUT WHETHER OR NOT THERE'S A RED LINE?

13   **A.**   I CAN'T TELL FROM THIS.

14   **Q.**   OKAY.

15   **A.**   YOU CAN'T DETERMINE.

16   **Q.**   OKAY.  WE CAN PUT THIS DOWN.

17            **MS. MONTAGNES:**  AT THIS TIME I'D LIKE TO MOVE TO

18   ADMIT PLAINTIFFS' EXHIBIT 34.

19            **THE COURT:**  34 OR 34-A?

20            **MS. MONTAGNES:**  SORRY.  34-A.

21            **MR. ARCHEY:**  NO OBJECTION, YOUR HONOR.

22            **THE COURT:**  ADMITTED.

23   **BY MS. MONTAGNES:**

24   **Q.**   WHAT, IF ANYTHING, DID YOU OBSERVE ABOUT THE LENGTH OF

25   STUDIES AND HOW -- AND WHETHER -- LENGTH OF STUDIES WITHIN THE

11:43  1   QA/QI STUDY MINUTES?

2   **A.**   THE STUDIES HAVE BEEN THE SAME.  I WAS PROVIDED 2019, 2020

3   AND '21 TO LOOK AT.  IT WASN'T SUBMITTED PRIOR TO THAT.  BUT

4   THEY HAVEN'T CHANGED SINCE 2019.  IT'S THE SAME STUDIES EVERY

5   QUARTER FOR THREE YEARS.

6   **Q.**   OKAY.  AND DID YOU FIND STUDIES RELATED TO WHETHER OR NOT

7   THERE WERE PHYSICAL EXAMINATIONS OF PATIENTS?

8   **A.**   NO.

9   **Q.**   DID YOU FIND STUDIES RELATED TO SICK CALL AND THE LATE

10   DELIVERY OF SICK -- LATE EVALUATION OF SICK CALL FORMS?

11   **A.**   NO.

12   **Q.**   DID YOU FIND STUDIES RELATED TO THE MEDICATION

13   ADMINISTRATION RECORDS AND FAILURES OF PHYSICIANS TO MANAGE THE

14   MEDICATION ADMINISTRATION?

15   **A.**   NO.

16   **Q.**   DID YOU FIND STUDIES RELATED TO SPECIALIST APPOINTMENTS

17   AND WHETHER OR NOT THEY WERE MADE TIMELY?

18   **A.**   NO.

19   **Q.**   DID YOU SEE ANY STUDIES RELATED TO ANYTHING THAT HAS BEEN

20   IDENTIFIED BY THIS COURT AS BEING UNCONSTITUTIONAL?

21   **A.**   NO.

22   **Q.**   ALL RIGHT.  LET'S TURN NOW TO PX_1 AT 135.

23           ALL RIGHT.  THESE ARE YOUR RECOMMENDATIONS AS IT

24   RELATES TO THE CQI PROGRAM.  LET'S START WITH NO. 1:  "THE

25   ADMINISTRATOR OF THE PRISON HEALTH SERVICE PROGRAM SHOULD BE

11:44 1   WELL-VERSED IN COMPONENTS OF AN EFFECTIVE QUALITY IMPROVEMENT

2   PROGRAM AND ASSIST IN DEFINING THE METRICS UTILIZED TO MEASURE

3   THE ADHERENCE TO POLICY, PROCEDURE, AND MEASURE PATIENT

4   OUTCOMES AS A RESULT OF COMPLIANT PRACTICE."

5           SO WHEN YOU SAY "THE ADMINISTRATOR OF THE PRISON

6   HEALTH SERVICE," ARE YOU REFERRING TO JACOB JOHNSON IN THIS

7   CASE?

8   **A.**   YES.  DR. JOHNSON DOES NEED TO BE WELL-VERSED IN IT.  MORE

9   IMPORTANTLY, WHOEVER IS PLACED IN AS ACCOUNTABLE FOR THE QA/QI

10  PROGRAM AT LSP NEEDS TO BE WELL-VERSED.

11  **Q.**   OKAY.

12          **THE COURT:**  COUNSEL, IT SEEMS LIKE THIS MIGHT BE A

13  REASONABLE BREAKING POINT BEFORE WE GET INTO THE FULL

14  RECOMMENDATIONS ON THE QUALITY CONTROL.

15          WOULD YOU AGREE WITH THAT?  DOES THAT MAKE SENSE

16  TO YOU?

17          **MS. MONTAGNES:**  ABSOLUTELY, JUDGE.

18          **THE COURT:**  OKAY.  THEN WE WILL STAND IN ADJOURNMENT

19  UNTIL MONDAY AT NOON.

20          HAVE A GOOD WEEKEND.

21          **THE LAW CLERK:**  ALL RISE.

22          THE COURT IS AT RECESS.

23  **(WHEREUPON, THE PROCEEDINGS WERE RECESSED UNTIL JUNE 13, 2022**

24                  **AT 12:00 P.M.)**

25                      * * *

11:45 1

## CERTIFICATE

2          I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

3    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

4    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

5    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

6    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                    *Shannon Thompson*

9                    SHANNON THOMPSON, CCR

10                   OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25