```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF LOUISIANA


JOSEPH LEWIS JR., ET AL            : CIVIL ACTION

VERSUS                             : NO. 15-318-SDD

BURL CAIN, ET AL                   : HON. SHELLY D. DICK

                                   : JUNE 15, 2022

===============================================================
                    MORNING SESSION DAY 8
                        BENCH TRIAL
===============================================================


                   A P P E A R A N C E S

FOR THE PLAINTIFFS:

   THE PROMISE OF JUSTICE INITIATIVE
   BY:  MERCEDES MONTAGNES, ESQ.
        NISHI KUMAR, ESQ.
        REBECCA RAMASWAMY, ESQ.
        ELENA MALIK, ESQ.
        SAMANTHA BOSALAVAGE, ESQ.
   1024 ELYSIAN FIELDS AVENUE
   NEW ORLEANS, LOUISIANA 70117


   COHEN MILSTEIN SELLERS & TOLL, PLLC
   BY:  JEFFREY B. DUBNER, ESQ.
        BRENDAN R. SCHNEIDERMAN, ESQ.
   1100 NEW YORK AVE. N.W., SUITE 500
   WASHINGTON, D.C. 20005


   SOUTHERN POVERTY LAW CENTER
   BY:  BRUCE HAMILTON, ESQ.
        EMILY LUBIN, ESQ.
   201 ST. CHARLES AVE., SUITE 200
   NEW ORLEANS, LOUISIANA  70170
```

1   FOR THE DEFENDANTS:

2

3       BUTLER SNOW, LLP
        BY:   RANDAL J. ROBERT, ESQ.
              CONNELL L. ARCHEY, ESQ.
4             ALLENA W. MCCAIN, ESQ.
        445 NORTH BOULEVARD, SUITE 300
5       BATON ROUGE, LOUISIANA  70802

6       SHOWS, CALI & WALSH, LLP
        BY:   JEFFREY K. CODY, ESQ.
7             CAROLINE M. TOMENY, ESQ.
              JOHN C. CONINE, JR., ESQ.
8       628 ST. LOUIS STREET
        BATON ROUGE, LOUISIANA  70802

9

10

11

12

13

14

15

16

17

18

19

20              REPORTED BY: GINA DELATTE-RICHARD,CCR

21              _____
                UNITED STATES COURTHOUSE
                       777 FLORIDA STREET
22              BATON ROUGE, LOUISIANA 70801
                       (225) 389-3564
23

24      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                COMPUTER-AIDED TRANSCRIPTION SOFTWARE
25

*I N D E X*

DEFENDANT'S WITNESSES:

  DR. DAVID MATHIS

            CROSS-EXAMINATION BY JEFFERY DUBNER.................6

            REDIRECT EXAMINATION BY CONNELL ARCHEY...........113

1       JUNE 15, 2022

2       **(CALL TO THE ORDER OF COURT)**

3       **THE COURT:**  GOOD MORNING.  BE SEATED.

4       YOU MAY BE SEATED, SIR.

5       MS. MONTAGNES, YOU'RE GOING TO TAKE DR. MATHIS ON

6   CROSS.  YOU MAY BEGIN -- YOU WANT TO TALK ABOUT TIME FIRST?

7       **MS. MONTAGNES:**  YEAH, I'M NOT TAKING DR. MATHIS.

8       **THE COURT:**  OH, OKAY.  I THOUGHT MAYBE Y'ALL HAD

9   CHANGED STRATEGIES.  I THOUGHT MR. DUBNER WAS QUE'D UP.

10      **MS. MONTAGNES:**  YESTERDAY, JUNE 14TH, 2022,

11  PLAINTIFFS USED 57 MINUTES, FOR A TOTAL OF 18 HOURS AND 50

12  MINUTES, AND DEFENDANTS USED FOUR HOURS AND 37 MINUTES FOR A

13  TOTAL OF 14 HOURS AND 31 MINUTES.

14      **THE COURT:**  THANK YOU.  Y'ALL ARE IN AGREEMENT?

15      **MS. MCCAIN:**  YES, YOUR HONOR.

16      **MR. ARCHEY:**  JUDGE, I'D LIKE TO MAKE ONE PROFFER

17  OF -- I MENTIONED IT YESTERDAY.  IT'S MARKED AS DX-56.  I'D

18  LIKE TO PROFFER THAT I GUESS AS DEFENSE PROFFER 1.

19      **THE COURT:**  OKAY.

20      **MR. DUBNER:**  COULD I PUT PLAINTIFFS' OBJECTION ON

21  THE RECORD?

22      **THE COURT:**  YOU MAY.

23      **MR. DUBNER:**  IN ADDITION TO THE REASONS THAT WE

24  ALREADY STATED EARLIER WHICH WERE, AGAIN, RULE 403, BOTH

25  RELEVANCE AND SURPRISE, PREJUDICE; RELEVANCE BECAUSE THE

1   PARTIES STIPULATED THAT THE RELEVANT PERIOD FOR THIS COURT'S

2   CONSIDERATION BEGINS IN 2019 AND THESE PURPORTED DOCUMENTS ARE

3   FROM BEFORE 2019; PREJUDICE BECAUSE DEFENDANTS REFUSED TO

4   PRODUCE THESE DOCUMENTS OR THE FULL RECORD TO PLAINTIFFS.

5   THEY REFUSED TO PRODUCE ANYTHING BEFORE 2019, MADE A MOTION

6   FOR PROTECTIVE ORDER TO THAT EXTENT.  PLAINTIFFS DON'T HAVE

7   ANY DOCUMENTS AROUND THESE TO PUT THEM INTO CONTEXT OR

8   ANYTHING OF THE SORT.

9           THE LAST PIECE, AND THIS DIDN'T COME UP BEFORE, IT'S

10  JUST THE MANNER OF HOW THIS WAS PRODUCED TO PLAINTIFFS.  THIS

11  WAS NOT ON THE DEFENDANT'S EXHIBIT LIST.  THE FIRST TIME THESE

12  DOCUMENTS WERE EVER GIVEN TO THE PLAINTIFFS, EVEN THOUGH THEY

13  ARE FIVE/SIX YEARS OLD, WAS THE THURSDAY BEFORE TRIAL; TWO

14  BUSINESS DAYS BEFORE TRIAL BEGAN AND FIVE DAYS AFTER THE

15  CUTOFF THAT THIS COURT GAVE DEFENDANTS FOR THE DOCUMENTS THAT

16  WERE SPECIFIED IN THEIR MOTION IN LIMINE TO ADD ADDITIONAL

17  EVIDENCE.  THESE DOCUMENTS WERE NOT DISCLOSED IN THAT MOTION

18  EITHER.

19          IN ADDITION, DEFENDANTS DIDN'T EVEN TELL PLAINTIFFS

20  THEY WERE PRODUCING THESE ARTICLES.  THEY JUST ADDED THEM TO

21  THE LIST -- TO THE PDF FILES THAT THEY GAVE TO THE COURT TO

22  HAVE THE FILES -- THE COPIES OF THE RECORD.  DEFENDANTS SAID

23  NOTHING TO PLAINTIFFS ABOUT THESE UNTIL USING THEM DURING THE

24  CROSS OF DR. PUISIS.  SO THAT WOULD BE THE BASIS FOR

25  PLAINTIFFS' OBJECTION.

1      **THE COURT:**  IT'S NOTED FOR THE RECORD.

2      YOU MAY BEGIN YOUR CROSS-EXAMINATION.

3      **THE CLERK:**  THIS D-56, IS IT LARRY WALKER

4  SUPPLEMENTAL RECORDS?

5      **MR. ARCHEY:**  YES, MA'AM.

6      **THE CLERK:**  OKAY.  JUST MAKING SURE.

7  **CROSS-EXAMINATION**

8  **BY MR. DUBNER:**

9      **Q**    GOOD MORNING, DR. MATHIS.

10     **A**    GOOD MORNING.

11     **Q**    I'D LIKE TO START BY UNDERSTANDING THE WAY YOU WROTE

12  UP THE CHARTS THAT YOU REVIEWED IN YOUR REPORT.

13         NOW, THE MAJORITY OF CHARTS YOU LOOKED AT WERE

14  PATIENTS WHO DIED; IS THAT CORRECT?

15     **A**    YES.

16     **Q**    AND FOR THOSE PATIENTS, YOUR EXPERT REPORT GENERALLY

17  HAS AN LSP DEATH REVIEW SECTION; IS THAT RIGHT?

18     **A**    YES.

19     **Q**    AND THAT SECTION HAS SUBSECTIONS, NOT ALWAYS ALL

20  FOUR OF THESE, BUT OFTEN A NARRATIVE SECTION, A MEDICAL

21  SUMMARY SECTION AND SOMETIMES AN AUTOPSY OR TOXICOLOGY REPORT

22  SECTION; IS THAT RIGHT?

23     **A**    YES.

24     **Q**    AND THOSE SECTIONS ARE TAKEN ESSENTIALLY

25  WORD-FOR-WORD FROM LSP'S MORTALITY REVIEW OF THOSE PATIENTS;

| | |
|---|---|
| 1 | IS THAT CORRECT? |
| 2 | **A**   YES. |
| 3 | **Q**   JUST TO SEE WHAT YOU MEAN THERE BY ESSENTIALLY WORD |
| 4 | FOR WORD, IF WE COULD PULL UP REPORT DX-35C AT 106. |
| 5 | **MR. DUBNER:**  I'M NOT SURE IF THE -- |
| 6 | **(TECHNICAL DIFFICULTIES WITH THE EXHIBIT CAMERA)** |
| 7 | **MR. DUBNER:**  FOR THE TIME BEING I COULD USE THE |
| 8 | ELMO, BUT I WOULD ONLY BE ABLE TO DO A FEW QUESTIONS THAT WAY. |
| 9 | WOULD IT BE POSSIBLE TO TEST IT ON DEFENDANT'S SIDE |
| 10 | TO SEE IF THE PROBLEM IS ON OUR CONNECTION OR SOMETHING ELSE? |
| 11 | IN THE MEANTIME, I CAN MOVE ON TO ANOTHER SECTION |
| 12 | THAT I CAN DO WITH THE ELMO AND THEN RETURN TO THIS. |
| 13 | **THE COURT:**  HAVE WE DETERMINED WHAT THE ISSUE IS? |
| 14 | NO?  DO WE KNOW IF IT'S THEIR CONNECTION OR -- |
| 15 | **UNIDENTIFIED SPEAKER:**  I BELIEVE WE DO, YOUR HONOR. |
| 16 | BECAUSE BOTH SIDES OF CONNECTED AND IT WON'T WORK WITH EITHER |
| 17 | SIDE.  I BELIEVE IT MAY BE WITH THE TECHNOLOGY OF THE COURT. |
| 18 | **THE COURT:**  CAN YOU CARRY ON MOMENTARILY WITH YOUR |
| 19 | ELMO? |
| 20 | **MR. DUBNER:**  YES.  I CAN SWITCH TO ANOTHER SECTION |
| 21 | AND WE'LL WORK WITH THE ELMO. |
| 22 | **THE COURT:**  WE'LL GET I.T. UP HERE TO SEE WHAT THE |
| 23 | PROBLEM IS. |
| 24 | BY MR. DUBNER: |
| 25 | **Q**   SO, DR. MATHIS, LET'S TALK ABOUT THE PATIENT SAMPLE |

1   THAT YOU REVIEWED.  NOW YOU THINK THE SAMPLE IS INAPPROPRIATE

2   BECAUSE IT ONLY LOOKED AT SICK PATIENTS, CORRECT?

3       **A**    YES.

4       **Q**    AND YOU DON'T HAVE ANY EXPERTISE IN STATISTICS,

5   RIGHT?

6       **A**    THAT'S ALREADY BEEN ESTABLISHED.

7       **Q**    YOU CAN'T POINT TO ANY LITERATURE OR WRITTEN

8   GUIDANCE THAT SUPPORTS YOUR VIEW?

9       **A**    NO.  IT'S ONLY ON MY TRAINING AND EXPERIENCE WHEN I

10  LOOK AT A POPULATION.

11      **Q**    YOU BELIEVE THAT MOST ACCREDITATION BODIES REVIEW

12  CHARTS AT RANDOM WHEN THEY'RE REVIEWING MEDICAL CARE, CORRECT?

13      **A**    NO, I DON'T BELIEVE THAT'S TRUE.

14      **Q**    DID YOU PREVIOUSLY ASSERT THAT YOU BELIEVED THAT WAS

15  TRUE?

16      **A**    YOU'LL HAVE TO TELL ME WHETHER THAT'S IN THE

17  DEPOSITION.

18      **Q**    IF WE LOOK AT YOUR -- AND IF WE LOOK AT -- THIS IS

19  PAGE 148 OF YOUR DEPOSITION TRANSCRIPT FROM THIS APRIL

20  STARTING AT LINE 19.

21          I ASKED YOU, "DO MOST ACCREDITATION BODIES REVIEW

22  CHARTS AT RANDOM WHEN THEY ARE REVIEWING MEDICAL CARE?"

23          ANSWER, "I BELIEVE THEY DO."

24          DO YOU RECALL GIVING THAT TESTIMONY?

25      **A**    NOT SPECIFICALLY, BUT IT'S OBVIOUSLY THERE.

1      **Q**     AND YOU'VE NEVER BEEN AN ACA OR NCCHC AUDITOR,

2   CORRECT?

3      **A**     CORRECT.

4      **Q**     IF DR. DAVID THOMAS, A MEMBER OF THE BOARD OF

5   GOVERNORS OF THE AMERICAN CORRECTIONAL ASSOCIATION, TESTIFIED

6   FOR DEFENDANTS IN THIS CASE THAT WHAT PLAINTIFFS' EXPERTS DO

7   IS WHAT MOST ACCREDITATION BODIES AND EXPERTS DO, YOU WOULDN'T

8   HAVE A BASIS TO DISPUTE THAT, WOULD YOU?

9      **A**     I DON'T KNOW WHAT CONTEXT HE WAS STAYING THAT.  I'VE

10  NEVER READ THAT TESTIMONY.

11     **Q**     IN TERMS OF THE STATEMENT THAT WHAT PLAINTIFF

12  EXPERTS DO IS WHAT MOST ACCREDITATION BODIES AND EXPERTS DO,

13  DO YOU HAVE ANY BASIS FOR DISPUTING THAT STATEMENT?

14     **A**     NO.  I'M SURE THAT'S HIS OPINION.  I CAN'T REFUTE

15  THAT.

16     **Q**     AND IF DR. JACLYN MOORE WHO WORKED AS AN ACA AND

17  NCCHC AUDITOR TESTIFIED FOR DEFENDANTS IN THIS CASE THAT SHE

18  DOES A SELECTIVE REVIEW OF CHARTS, PULLING CHARTS OF PEOPLE

19  WHO HAVE GONE TO THE EMERGENCY ROOM OR HAD CHRONIC CARE, YOU

20  WOULDN'T HAVE ANY BASIS TO DISPUTE THAT EITHER?

21     **A**     CORRECT.

22     **Q**     IN FACT, OTHER THAN ONE CLASS ACTION AT A JAIL IN

23  TENNESSEE, YOU DON'T HAVE ANY EXPERIENCE LOOKING AT THE

24  OVERALL CARE IN A PRISON RATHER THAN IN A SPECIFIC INSTANCE,

25  CORRECT?

1       **A**     RATHER THAN AS BEING MEDICAL DIRECTOR, THAT'S

2   CORRECT.

3       **Q**     ASIDE FROM BEING MEDICAL DIRECTOR AT THE PRISON IN

4   MARYLAND?

5       **A**     THAT'S CORRECT.

6       **Q**     AND YOU DIDN'T MAKE YOUR OWN SAMPLE IN THIS CASE,

7   CORRECT?

8       **A**     THAT'S CORRECT.

9       **Q**     LET'S PUT ALL THAT ASIDE FOR A MOMENT.  YOUR CONCERN

10  IS THAT THE SAMPLE ONLY LOOKED AT SICK PATIENTS, RIGHT?

11      **A**     YES.

12      **Q**     AND YOU SAID YESTERDAY PEOPLE IN PRISON AGE FASTER

13  THAN PEOPLE NOT IN PRISON, CORRECT?

14      **A**     YES.

15      **Q**     PEOPLE IN PRISON ARE MORE LIKELY TO DEVELOP SERIOUS

16  MEDICAL NEEDS SOONER THAN PEOPLE ON THE OUTSIDE, CORRECT?

17      **A**     YES.

18      **Q**     PEOPLE IN PRISON ARE LIKELY TO COLLECT MORE

19  CO-MORBIDITIES THAN PEOPLE NOT IN PRISON, CORRECT?

20      **A**     YES.

21      **Q**     IN YOUR REPORT YOU SAY THAT LSP HAD A POPULATION OF

22  4,850 WHICH INCLUDED 3,783 PEOPLE WITH LIFE SENTENCES?

23      **A**     YES.

24      **Q**     THAT'S MORE THAN THREE-QUARTERS OF THE POPULATION

25  WHO HAVE LIFE SENTENCES?

1      **A**    YES.

2      **Q**    AND YOUR UNDERSTANDING IS THAT PEOPLE WITH LIFE

3  SENTENCES IN LOUISIANA ARE LESS LIKELY TO GET OUT EARLY THAN

4  PEOPLE IN OTHER STATES DUE TO LOUISIANA'S LIFE WITHOUT PAROLE

5  SYSTEM; IS THAT RIGHT?

6      **A**    YES.

7      **Q**    SO MORE THAN THREE-QUARTERS OF THE POPULATION AT LSP

8  ARE LIKELY TO SPEND THE ENTIRE REST OF THEIR LIVES IN PRISON?

9      **A**    YES.

10     **Q**    AND JUST BECAUSE OF THE WAY THE HUMAN CONDITION

11 WORKS, EVERY ONE OF THOSE PEOPLE WILL EITHER DEVELOP SERIOUS

12 MEDICAL NEEDS OR DIE IN AN EMERGENCY; IS THAT CORRECT?

13     **A**    THEY MIGHT DIE IN A NONEMERGENCY, SO THAT'S -- THOSE

14 ARE A COUPLE OF WAYS THAT THEY -- THINGS THAT WILL HAPPEN TO

15 THEM.

16     **Q**    BUT FOR THE VAST MAJORITY OF THEM, THEY WILL EITHER

17 DIE -- THEY WILL EITHER DEVELOP SERIOUS MEDICAL NEEDS IF THEY

18 DON'T DIE BEFORE THAT IN AN EMERGENCY SITUATION?

19     **A**    I'M CONFUSED BY YOUR QUESTION.

20     **Q**    I'LL PUT IT THIS WAY; THAT AT LEAST THREE-QUARTERS

21 OF THE POPULATION, THAT THREE-QUARTERS WILL HAVE SERIOUS

22 MEDICAL NEEDS OR EMERGENT MEDICAL NEEDS AT SOME POINT DURING

23 THEIR TIME IN PRISON; IS THAT CORRECT?

24     **A**    NOT NECESSARILY.  THE ISSUE I HAVE IS THE EMERGENT

25 MEDICAL NEEDS BECAUSE, YOU KNOW, IT CAN BE PICKED UP AND CARED

1  FOR IN A REASONABLE FASHION WITHOUT HAVING IT BE AN EMERGENCY.

2      **Q**    AND THAT WOULD BE THE CATEGORY OF PEOPLE WITH

3  SERIOUS MEDICAL NEEDS?

4      **A**    NOT NECESSARILY.  IT'S -- IT'S JUST PICKING UP

5  ROUTINE MEDICAL NEEDS.  IT'S JUST -- IT'S THE FORM OF THE

6  QUESTION.

7      **Q**    OKAY.

8          **MR. DUBNER:**  WE STILL DON'T HAVE THE -- THAT'S FINE.

9  **BY MR. DUBNER:**

10     **Q**    LET'S TALK ABOUT SOME POINTS OF AGREEMENT ON THE

11  CHARTS YOU REVIEWED.  THERE ARE SOME PATIENTS WHERE YOU FOUND

12  STATE STANDARD OF CARE VIOLATIONS, RIGHT?

13     **A**    YES.

14     **Q**    AS TO PATIENT TWO, YOUR REPORT STATES THAT LSP

15  VIOLATED THE STANDARD OF CARE BY NOT OBTAINING THYROID

16  FUNCTION TESTS WHILE FOLLOWING A PATIENT WITH A DIAGNOSIS OF

17  HYPOTHYROIDISM?

18     **A**    I'M NOT SURE IT'S PATIENT TWO, BUT THERE WAS ONE

19  PATIENT THAT THEY WERE FOLLOWING FOR HYPOTHYROIDISM THAT THEY

20  DIDN'T DO A TSH ON, YES.

21     **Q**    AS TO PATIENT FIVE, YOUR REPORT NOTES DEFICIENCIES

22  IN DR. COLON'S TREATMENT OF A PATIENT'S AORTIC STENOSIS AND

23  PARTICULARLY HIS FAILURE TO NOTE PRIOR MEDICAL RECORDS SHOWING

24  A LOW EJECTION FRACTION?

25     **A**    THEY WERE CURRENT MEDICAL RECORDS.  HE'S THE ONE

1   THAT DID THE ECHO, AND HE'S THE ONE THAT SIGNED OFF ON THE

2   ECHO, SO I DON'T THINK THEY'RE PAST RECORDS.

3       **Q**    FAIR POINT.  RECENT MEDICAL RECORDS SHOWING A LOW

4   EJECTION FRACTION.

5       **A**    I AGREE.

6       **Q**    AS TO PATIENT SEVEN, YOUR REPORT STATES THAT LSP

7   VIOLATED THE STANDARD OF CARE BECAUSE THE PATIENT DIDN'T GET A

8   COLONOSCOPY AFTER THREE POSITIVE FECAL OCCULT BLOOD TESTS, BUT

9   THERE WAS NO DOCUMENTATION OF ANY REFUSAL OF A COLONOSCOPY?

10      **A**    THE VIOLATION WAS IN THE FAILURE TO OBTAIN A

11  REFUSAL.

12      **Q**    AS TO PATIENT 35, YOUR REPORT STATES THAT IT WAS

13  BELOW THE STANDARD OF CARE TO ADMIT HIM TO THE INFIRMARY WITH

14  ALTERED MENTAL STATUS AND A TEMPERATURE OF 103.2, CORRECT?

15      **A**    YES.

16      **Q**    AS TO PATIENT 20, YOUR REPORT STATES THAT IT WAS

17  BELOW THE STANDARD OF CARE NOT TO HAVE PATIENT 20 EXAMINED BY

18  A NURSE PRACTITIONER WHEN HE PRESENTED TO THE ATU WITH

19  ABDOMINAL PAIN AND JAUNDICE, CORRECT?

20      **A**    YES.

21      **Q**    AS TO PATIENT 47, YOUR REPORT STATES THAT LSP

22  VIOLATED THE STANDARD OF CARE BY ASSESSING THE PATIENT'S

23  HEMATURIA AS STABLE WITHOUT PERFORMING A URINALYSIS, CORRECT?

24      **A**    YES.

25      **Q**    AS TO PATIENT 32, YOUR REPORT STATES THAT EMT'S

1   REPEATEDLY PRACTICED BEYOND THEIR SCOPE OF PRACTICE WHEN HE

2   COMPLAINED OF CARDIAC SYMPTOMS AND THEY DIDN'T BRING IT TO THE

3   ATTENTION OF A PROVIDER, CORRECT?

4       **A**    SYMPTOMS THAT WERE COMPATIBLE WITH CARDIAC DISEASE,

5   YES.

6       **Q**    AND ALSO AS TO PATIENT 32, THAT HE DIDN'T RECEIVE AN

7   EKG THAT WAS ORDERED, DESPITE HIS CHEST PAIN, CORRECT?

8       **A**    YES.

9       **Q**    AS TO PATIENT 11, YOUR REPORT STATES THAT CAPTAIN

10  CASHIO VIOLATED THE STANDARD OF CARE BY NOT RECORDING VITAL

11  SIGNS AND NOT REFERRING PATIENT 11 TO THE ATU FOR EXAMINATION

12  BY AN NP WITH SYMPTOMS OF BLOODY STOOLS AND URINE, CORRECT?

13      **A**    YES.

14      **Q**    AS TO PATIENT 28, YOUR REPORT STATES THAT LSP

15  VIOLATED THE STANDARD OF CARE BY NOT PUTTING THE PATIENT ON

16  INSULIN DUE TO HIS ELEVATED HEMOGLOBIN A1-C AND THE FAILURE OF

17  ORAL DIABETIC MEDICATIONS, CORRECT?

18      **A**    YES.

19      **Q**    THIS ONE ISN'T IN THE CHART REVIEWS IN YOUR REPORT,

20  BUT IN YOUR DEPOSITION YOU ACKNOWLEDGED THAT LSP VIOLATED THE

21  STANDARD OF CARE AS TO PATIENT 48 WHEN EMT'S PRACTICED BEYOND

22  THE SCOPE OF THEIR LICENSE BY NOT REFERRING HIM TO THE ATU

23  DESPITE ELEVATED HEART RATES ON MULTIPLE OCCASIONS AND WHEN NO

24  PROVIDER EXAMINED HIM OR ORDERED AN EKG WHEN HE DID COME TO

25  THE ATU, CORRECT?

1   **A**   TO CLEAR THIS UP, THIS IS THE FELLOW WITH THE SPT?

2   **Q**   THAT'S CORRECT.

3   **A**   YES.

4   **Q**   YOU SAY IN YOUR REPORT THAT YOU DOCUMENTED FEWER

5   THAN FIVE VIOLATIONS OF THE STANDARD OF CARE; IS THAT CORRECT?

6   **A**   MR. ARCHEY AND I WENT THROUGH THAT.  I THINK THERE

7   WERE SIX.

8   **Q**   I JUST READ TO YOU FROM TEN PATIENTS; IS THAT

9   CORRECT?

10   **A**   I DON'T KNOW.

11   **Q**   I'LL COUNT THEM.  NUMBER 2, NUMBER 5, NUMBER 7,

12   NUMBER 35, NUMBER 20, NUMBER 47, NUMBER 32, NUMBER 11, NUMBER

13   28 AND NUMBER 48; IS THAT TEN?

14   **A**   I'M SURE YOU'RE CORRECT.  I FOLLOWED YOUR FINGERS.

15   **Q**   WHEN YOU WERE DISCUSSING YOUR ULTIMATE OPINIONS

16   YESTERDAY, YOU COMPARED THE CARE AT LSP TO OTHER CORRECTIONAL

17   FACILITIES YOU'RE FAMILIAR WITH, CORRECT?

18   **A**   OTHER -- I BELIEVE IT'S OTHER CORRECTIONAL

19   FACILITIES AT WHICH I'VE BEEN CONSULTED OR OTHERWISE FAMILIAR

20   WITH, SO THERE ARE TWO SIGNIFICANT CATEGORIES.

21   **Q**   AND BY "AT WHICH YOU'VE CONSULTED" YOU'RE REFERRING

22   TO PRISONS WHERE YOU SERVED AS AN EXPERT IN INDIVIDUAL

23   STANDARD OF CARE CASES?

24   **A**   WELL, THEY'RE UNCOMMONLY STANDARD OF CARE CASES

25   ALMOST ALL OF THEM.  95 PERCENT OF WHAT I WORK WITH ARE CIVIL

1    RIGHTS CASES.

2        **Q**    SO THAT'S PRISONS WHERE YOU'VE BEEN AN EXPERT IN

3    CIVIL RIGHTS CASES; IS THAT CORRECT?

4        **A**    YES.

5        **Q**    OTHER THAN THIS CASE, THE ONLY TIME YOU'VE BEEN

6    RESPONSIBLE AS AN EXPERT FOR LOOKING AT THE OVERALL CARE IN A

7    PRISON OR JAIL WAS IN THE TENNESSEE JAIL CASE, CORRECT?

8        **A**    YES.

9        **Q**    YOU WORKED AT THE CALIFORNIA MEDICAL FACILITY FROM

10   2010 TO 2020?

11       **A**    CORRECT.

12       **Q**    AND BEFORE THAT YOU WORKED AT THE EASTERN

13   CORRECTIONAL INSTITUTION IN MARYLAND FOR THREE YEARS?

14       **A**    IT WAS FOUR AND A HALF YEARS.

15       **Q**    AND BEFORE THAT YOU WORKED AT THE CALIFORNIA STATE

16   PRISON SACRAMENTO FOR A YEAR?

17       **A**    I WAS WORKING REGISTRY IN CALIFORNIA AND IT WAS, YOU

18   KNOW -- MY CV ONLY SHOWS YEARS.  I'M NOT SHOWING NUMBERS AND

19   MONTHS.  SO I WAS AT SEVERAL PRISONS IN CALIFORNIA DURING THAT

20   PERIOD.

21       **Q**    IT WAS APPROXIMATELY A YEAR; IS THAT CORRECT?

22       **A**    APPROXIMATELY.

23       **Q**    AND BEFORE THAT YOU TREATED PATIENTS AT A ROADCAMP

24   IN VIRGINIA FROM 1981 TO 1991?

25       **A**    CORRECT.

1    **Q**   AND THOSE ARE THE ONLY CORRECTIONAL FACILITIES YOU

2    HAD IN YOUR REPORT, YOUR CV, YOUR DEPOSITION OR YOUR DIRECT

3    TESTIMONY AS HAVING WORKED IN OR EVALUATED THE CARE AT AN

4    ORGANIZATIONAL LEVEL, CORRECT?

5    **A**   CORRECT.

6    **Q**   LET'S TALK ABOUT CALIFORNIA FOR A MOMENT.  THE

7    CALIFORNIA SYSTEM WAS IN RECEIVERSHIP THE ENTIRE TIME YOU

8    PRACTICED AT THE CALIFORNIA MEDICAL FACILITY, CORRECT?

9    **A**   CORRECT.

10   **Q**   WHEN YOU WENT TO WORK AT CALIFORNIA MEDICAL

11   FACILITY, THE RECEIVER HAD ALREADY IMPOSED SEVERAL

12   REQUIREMENTS ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS

13   STAFFING, CORRECT?

14   **A**   YES.  THAT'S TO A LARGE DEGREE WHY I WENT.

15   **Q**   INDEED YOU WERE HIRED -- YOU WERE BOARD CERTIFIED,

16   CORRECT?

17   **A**   I WAS BOARD CERTIFIED AND THEY HAD GREAT SALARY AND

18   BENEFITS.

19   **Q**   THEY HAD RECENTLY DOUBLED THEIR PHYSICIAN SALARY; IS

20   THAT CORRECT?

21   **A**   I'M NOT SURE ABOUT DOUBLING, BUT IT WAS -- TO WORK

22   IN CALIFORNIA HAS BEEN A REAL PRIVILEGE AND HELPED ME BE ABLE

23   TO RETIRE.

24   **Q**   AND ALL OF THAT TIME WAS DURING THE RECEIVERSHIP?

25   **A**   CORRECT.

1    **Q**    AMONG THE THINGS THAT WERE PUT IN PLACE IN THE FEW

2    YEARS BEFORE YOU WERE HIRED, IN ADDITION TO THAT INCREASED

3    SALARY THERE WERE PHYSICIAN COMPETENCY ASSESSMENTS, CORRECT?

4    **A**    I'M NOT SURE ABOUT THAT.

5    **Q**    OF THE PHYSICIANS WHO WERE THERE PREVIOUSLY?

6    **A**    I DON'T KNOW.

7    **Q**    ARE YOU AWARE THAT THERE WAS AN EFFORT TO REPLACE

8    PROBLEM PHYSICIANS?

9    **A**    I DON'T -- I MEAN -- WHAT I CAN GIVE YOU IS THAT THE

10   PHYSICIANS THAT HAD BEEN THERE FOR A LONG TIME WERE NOT BOARD

11   CERTIFIED, BUT THEY HAD BEEN THERE FOR 15, 20 YEARS AND HAD A

12   LOT OF EXPERIENCE.

13   **Q**    AND ARE YOU AWARE THAT PART ONE OF THE STEPS THAT

14   THE RECEIVER TOOK WAS TO REQUIRE ALL OF THOSE PHYSICIANS WHO

15   WERE ALREADY THERE AND NOT BOARD CERTIFIED TO BE REVIEWED BY A

16   UNIVERSITY OF SAN DIEGO ASSESSMENT GROUP?

17   **A**    I THINK I DO REMEMBER SOMETHING LIKE THAT.

18   **Q**    AND THE RECEIVERSHIP ALSO ENHANCED PEER REVIEW

19   REQUIREMENTS, CORRECT?

20   **A**    I'M NOT CERTAIN ABOUT THAT.

21   **Q**    ARE YOU AWARE THAT THE STEPS THAT THE RECEIVER TOOK,

22   WHATEVER THE SPECIFICS OF THEM, REDUCED MORTALITY

23   SIGNIFICANTLY IN CALIFORNIA?

24        **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO OBJECT.  THIS

25   IS BEYOND THE SCOPE AND THIS IS SIMILAR -- OBJECT.

1   **THE COURT:**  BEYOND THE SCOPE.

2   **MR. DUBNER:**  HE TESTIFIED ABOUT HIS EXPERIENCE IN

3   CALIFORNIA.  I'M ELICITING FACTS ABOUT THE EXPERIENCE OF THE

4   CALIFORNIA PRISONS DURING THE TIME HE WAS PRACTICING THERE.

5   **THE COURT:**  VERY LIMITED LATITUDE.  IT'S STRAYING A

6   LITTLE FAR.

7   **MR. DUBNER:**  OKAY.

8   **BY MR. DUBNER:**

9   **Q**   ARE YOU AWARE THAT RESEARCH WAS CONDUCTED INTO

10  MORTALITY RATES IN THE CALIFORNIA CORRECTIONAL SYSTEM BEFORE

11  AND AFTER THE RECEIVERSHIP CHANGED PROVIDER REQUIREMENTS?

12  **A**   I'M NOT AWARE OF IT SPECIFICALLY, BUT I'M CERTAIN

13  THAT THEY DID THAT.

14  **Q**   AND ARE YOU SIMILARLY -- DO YOU BELIEVE THAT -- AND

15  ARE YOU AWARE THAT THE RESEARCH CONDUCTED THAT THE MORTALITY

16  RATES DECLINED AS A RESULT OF THE STEPS THAT WERE TAKEN?

17  **A**   NO.

18  **Q**   I'M GOING TO SHOW YOU AN ARTICLE THAT I'M MARKING

19  FOR IDENTIFICATION AS PLAINTIFFS' EXHIBIT 67.

20  **MR. ARCHEY:**  COULD I HAVE A COPY, PLEASE?

21  **MR. DUBNER:**  YES.  AND A COPY FOR THE COURT.

22  **BY MR. DUBNER:**

23  **Q**   DR. MATHIS, THIS IS AN ARTICLE TITLED:  *A CASE FOR*

24  *REVISITING PEER REVIEW:  IMPLICATIONS FOR PROFESSIONAL*

25  *SELF-REGULATION AND QUALITY IMPROVEMENT.*

| | |
|---|---|
| 1 | COULD YOU READ THE RESULT SECTION? |
| 2 | **A**   I'M TRYING TO GET AN IDEA WHO IT IS FIRST. |
| 3 | **Q**   YES.  YOU SEE IT'S WRITTEN BY TERRY HILL, PETER |
| 4 | MARTELLI AND JULIE KUO? |
| 5 | **A**   WOULD YOU TAKE THE STICKY OFF? |
| 6 | **Q**   ABSOLUTELY. |
| 7 | **A**   I DON'T KNOW ANYTHING ABOUT THESE PEOPLE. |
| 8 | **Q**   AND COULD YOU READ THE RESULT SECTION? |
| 9 | **MR. ARCHEY:**  YOUR HONOR, I OBJECT.  I MEAN -- I |
| 10 | OBJECT. |
| 11 | **THE COURT:**  WELL, WHAT'S THE GROUNDS FOR YOUR |
| 12 | OBJECTION?  I'M SUPPOSED TO GUESS? |
| 13 | **MR. ARCHEY:**  NO.  YES, YOUR HONOR. |
| 14 | **THE COURT:**  YOU DON'T NEED TO ARGUE.  JUST TELL ME. |
| 15 | IS IT RELEVANCE?  WHAT IS IT? |
| 16 | **MR. ARCHEY:**  RELEVANCE, WE'VE NOT SEEN IT, HE'S NOT |
| 17 | EVEN BEEN ASKED ANYTHING ABOUT IT YET OTHER THAN HE WANTS HIM |
| 18 | TO START READING IT, SO I OBJECT ON ALL OF THOSE GROUNDS, YOUR |
| 19 | HONOR. |
| 20 | **THE COURT:**  OKAY.  WELL, HE HASN'T BEEN ASKED A |
| 21 | SUBSTANTIVE QUESTION SO LET'S HOLD YOUR OBJECTION. |
| 22 | DO YOU WANT HIM TO READ IT OUT LOUD OR DO YOU WANT |
| 23 | HIM TO JUST READ IT -- |
| 24 | **MR. DUBNER:**  I WAS GOING TO ASK HIM TO READ IT OUT |
| 25 | LOUD. |

1      **THE WITNESS:**  THE RESULTS?

2   **BY MR. DUBNER:**

3      **Q**    THE RESULT SECTION.

4      **A**    "CHANGE POINT ANALYSIS" -- I DON'T KNOW WHAT THAT

5   MEANS.  I'M NOT A STATISTICIAN -- "REVEALS WITH 98 PERCENT

6   CONFIDENCE" -- THAT'S PRETTY GOOD -- "THAT A SIGNIFICANT

7   IMPROVEMENT IN AGE-ADJUSTED NATURAL MORTALITY OCCURRED IN

8   2007, DECREASING FROM 138.7 PER 100,000 IN THE 1998 TO 2006

9   PERIOD TO 106.4 IN THE 2007 TO 2009 PERIOD.  THE IMPROVEMENT

10  IN MORTALITY OCCURRED AFTER IMPLEMENTATION OF ACCOUNTABILITY

11  PROCESSES PRIOR TO IMPLEMENTATION OF QUALITY IMPROVEMENT

12  INTERVENTIONS.  ARCHIVAL EVIDENCE SUPPORTS THE POSITIVE IMPACT

13  OF PHYSICIAN COMPETENCY ASSESSMENTS, ROBUST PEER REVIEW AND

14  REPLACEMENT OF PROBLEM PHYSICIANS."

15     **Q**    MY QUESTION TO YOU, DR. MATHIS, IS BASED ON YOUR

16  EXPERIENCE IN CALIFORNIA AND WHAT YOU TESTIFIED ABOUT

17  YESTERDAY ABOUT YOUR EXPERIENCE, WOULD YOU AGREE THAT THE

18  STAFFING REQUIREMENTS THAT LED TO YOUR HIRING, AMONG OTHERS,

19  LIKELY IMPROVED CARE?

20     **MR. ARCHEY:**  YOUR HONOR, I RENEW MY OBJECTION.

21  WE'RE GOING REALLY FAR DOWN -- THE RELEVANCE AND OUTSIDE THE

22  SCOPE.  IT'S STILL CALIFORNIA.  YOU HAD SAID A LITTLE

23  LATITUDE.  THIS IS MORE THAN A LITTLE LATITUDE.

24     **THE COURT:**  THIS IS THE LAST QUESTION ON THIS --

25     **MR. DUBNER:**  THIS IS THE LAST QUESTION, YES.

1          **THE COURT:**  -- SUBJECT, MR. DUBNER.

2          **THE WITNESS:**  WOULD YOU REPEAT THE QUESTION, PLEASE?

3    BY MR. DUBNER:

4      **Q**    YES.  BASED ON YOUR EXPERIENCE IN THE CALIFORNIA

5    SYSTEM, WOULD YOU AGREE THAT THE STAFFING REQUIREMENTS THAT,

6    AMONG OTHER THINGS, LED TO YOUR HIRING LIKELY REDUCED

7    MORTALITY AT THOSE PRISONS?

8      **A**    I CAN'T AGREE WITH THAT.  THIS IS THEIR ASSUMPTION.

9    WHAT YOU HAD ME READ WERE THE RESULTS AND A LOT OF IT WAS

10   THEIR OPINION, AND I DON'T KNOW WHO THE HILL GROUP IS.  I

11   THINK IT'S A STRETCH FOR ME TO COME TO THAT CONCLUSION WITH

12   WHAT YOU SHOWED ME BRIEFLY.

13     **Q**    AND BASED ON YOUR EXPERIENCE, YOU DON'T HAVE AN

14   OPINION ONE WAY OR THE OTHER?

15     **A**    I DON'T HAVE ANY EXPERIENCE TO BE ABLE TO TELL YOU

16   THAT ONE WAY OR THE OTHER.

17         **MR. DUBNER:**  IT APPEARS THAT TRIAL PAD IS BACK UP SO

18   WE CAN SWITCH OFF THE ELMO.

19         **THE COURT:**  I APOLOGIZE FOR THE TECHNOLOGICAL

20   PROBLEMS.

21   BY MR. DUBNER:

22     **Q**    SO IF WE COULD, I'M GOING TO RETURN TO WHERE WE

23   WERE, WHICH WAS DISCUSSING THE NATURE OF YOUR WRITE-UPS IN

24   YOUR REPORT.  I BELIEVE YOU WERE GOING TO START AT PAGE 106 OF

25   YOUR REPORT.

1          AT THE BOTTOM BEGINS YOUR WRITEUP FOR PATIENT NUMBER

2    36, CORRECT?

3        **A**    YES.

4        **Q**    AND WE SEE THERE THE LSP DEATH REVIEW, CORRECT?

5        **A**    CORRECT.

6        **Q**    AND IF WE GO TO THE NEXT PAGE WE SEE SECTIONS

7    LABELED:  *NARRATIVE, MEDICAL CONDITIONS AND MEDICAL SUMMARY,*

8    CORRECT?

9        **A**    YES.

10       **Q**    AND THEN IF WE GO TO THE NEXT PAGE AND THE PAGE

11   AFTER THAT, THE MEDICAL SUMMARY SECTION CONTINUES FOR TWO

12   PAGES, CORRECT?

13       **A**    YES.

14       **Q**    AND THEN THERE'S A SENTENCE -- A HEADLINE, *AUTOPSY*

15   *REPORT*?

16       **A**    YES.

17       **Q**    AND THEN ON THE FOLLOWING PAGE -- YOU CAN GO TO PAGE

18   110 -- THERE IS A ONE SENTENCE SECTION TITLED:  *MATHIS CHART*

19   *REVIEW OF PATIENT 36*.  AND A ONE SENTENCE SECTION TITLED:

20   *MATHIS OPINION REGARDING PATIENT 36*, CORRECT?

21       **A**    YES.

22       **Q**    LET'S GO BACK TO PAGE 106 OF THE REPORT AND PUT IT

23   NEXT TO PLAINTIFFS' EXHIBIT 8A AT 140, AND THIS NEEDS TO BE

24   SEALED.

25          SO LET'S SEE WHAT YOU MEAN BY ESSENTIALLY WORD FOR

1   WORD.  GIVE US ONE MOMENT TO GET PAGE 140 UP.

2       **A**   PARDON ME, I DON'T THINK I EVER SAID ESSENTIALLY

3   WORD FOR WORD.  I SAID ESSENTIALLY THE SAME.  LET'S GO BACK

4   AND LOOK AT WHAT I WROTE.

5       **Q**   IN YOUR DEPOSITION YOU SAID ESSENTIALLY THE SAME,

6   CORRECT?

7       **A**   OH, THAT COULD BE THAT I SAID IT IN THE DEPOSITION.

8       **Q**   IS IT POSSIBLE YOU SAID ESSENTIALLY WORD FOR WORD

9   EARLIER TODAY?

10      **A**   I'D HAVE TO LOOK AT THE REPORT.

11      **Q**   I'LL JUST ASK THE QUESTION NOW TO CHECK.  DO YOU

12  BELIEVE THAT YOUR WRITEUP IS ESSENTIALLY WORD FOR WORD THE

13  SAME?

14      **A**   NO.

15      **Q**   OKAY.  SO LET'S TAKE A LOOK HERE.  YOU RECOGNIZE

16  THAT THE RIGHT-HAND SIDE IS THE LSP DEATH REPORT FOR PATIENT

17  NUMBER 36, CORRECT?

18      **A**   YES.

19      **Q**   SO IF WE LOOK AT THE BOTTOM OF PAGE 106 OF YOUR

20  REPORT, THE LEFT-HAND SIDE, FIRST YOU HAVE MEDICAL DIAGNOSIS,

21  CHRONIC OBSTRUCTIVE PULMONARY EXACERBATION, CORRECT?

22      **A**   THAT'S EXACTLY THE SAME.

23      **Q**   THAT'S EXACTLY THE SAME.  SO NOW LET'S GO TO THE

24  NEXT PAGE OF YOUR EXPERT REPORT, PAGE 107 OF DX_35_C.  COULD

25  YOU READ THE FIRST TWO SENTENCES OF YOUR NARRATIVE SECTION?

1    **A**    IT'S EXACTLY THE SAME.  I'LL STIPULATE THAT.

2    **Q**    IT'S EXACTLY THE SAME AS THE NARRATIVE SECTION IN

3    THE DEATH REPORT?

4    **A**    CORRECT.

5    **Q**    AND JUST TO CLARIFY, YOU REPLACED THE NAME OF THE

6    PATIENT THAT -- HIS DOC NUMBER WITH PATIENT NUMBER 36?

7    **A**    YES.

8    **Q**    BUT OTHER THAN THAT IT'S EXACTLY THE SAME?

9    **A**    YES.  THESE TWO SENTENCES ARE EXACTLY THE SAME OTHER

10   THAN THAT.

11   **Q**    AND THEN IF WE WERE TO LOOK AT THE NEXT SENTENCE,

12   THAT IS ALSO EXACTLY THE SAME AS THE NARRATIVE SUMMARY, THE

13   FOLLOWING SENTENCE IN THE NARRATIVE SUMMARY?

14   **A**    CORRECT.

15   **Q**    AGAIN, WITH THE CHANGE OF THE NAME OF THE OFFENDER'S

16   BROTHER AND HIS PHONE NUMBER?

17   **A**    CORRECT.

18   **Q**    OKAY.  LET'S NOW TURN TO PAGE 141 OF EXHIBIT 8A,

19   PLAINTIFFS' EXHIBIT 8A.  THIS IS THE MEDICAL SUMMARY REPORT

20   PART OF THE MORTALITY REVIEW?

21   **A**    CORRECT.

22   **Q**    AND IF WE LOOK AT THE NEXT LINE OF YOUR REPORT,

23   MEDICAL CONDITIONS LISTED THERE.  COULD YOU READ THOSE?

24   **A**    HYPERTENSION, CHRONIC OBSTRUCTIVE PULMONARY DISEASE,

25   PRE-DIABETES AND CYSTIC BULLOUS EMPHYSEMA.

1      **Q**    AND THOSE ARE THE EXACT SAME WORDS LISTED IN THE

2    EXACT SAME ORDER AS THE MEDICAL CONDITIONS IN THE MORTALITY

3    REPORT?

4      **A**    EXACTLY.

5      **Q**    AND THEN LET'S READ THE NEXT TWO SENTENCES IN THE

6    MEDICAL SUMMARY SECTION OF YOUR REPORT.

7      **A**    "MEDICAL PATIENT #36 WAS A 65-YEAR-OLD BLACK MALE

8    WHO ARRIVED AT LSP IN NOVEMBER 1994."

9      **Q**    AND COULD YOU READ THE FIRST SENTENCE OF THE MEDICAL

10   SUMMARY SECTION ON THE RIGHT-HAND SIDE, EXCEPT REPLACING THE

11   PATIENT'S NAME WITH PATIENT NUMBER 36?

12     **A**    "CLINTON FOREST WAS A 65-YEAR-OLD BLACK MALE WHO

13   ARRIVED AT LSP IN NOVEMBER 1994."

14     **Q**    AND THEN COULD YOU READ THE NEXT SENTENCE IN YOUR

15   MEDICAL SUMMARY?

16     **A**    "HE HAD A PAST MEDICAL HISTORY SIGNIFICANT FOR

17   HYPERTENSION, CHRONIC OBSTRUCTIVE PULMONARY DISEASE,

18   PRE-DIABETES AND CYSTIC BULLOUS EMPHYSEMA."

19     **Q**    CAN YOU READ THE NEXT SENTENCE IN THE MORTALITY

20   REVIEW?

21     **A**    "HE HAD A PAST MEDICAL HISTORY SIGNIFICANT FOR

22   HYPERTENSION, CHRONIC OBSTRUCTIVE PULMONARY DISEASE,

23   PRE-DIABETES AND CYSTIC BULLOUS EMPHYSEMA."

24     **Q**    THOSE ARE EXACTLY THE SAME EXCEPT FOR THE

25   SUBSTITUTION OF THE PATIENT'S NAME?

1       **A**    CORRECT.

2       **Q**    THEN COULD YOU READ THE NEXT TWO SENTENCES OF YOUR

3    REPORT?

4       **A**    "OVER THE LAST THREE YEARS (3) HE WAS FOLLOWED

5    REGULARLY BY THE PULMONARY TELEMEDICINE PHYSICIAN, DR. WELCH.

6    A PULMONARY FUNCTION TEST WAS DONE ON 4/12/16, SHOWED AN FEV1

7    OF 33 PERCENT AND AN FEV1/FVC OF 46 PERCENT."

8       **Q**    AND COULD YOU READ THE NEXT TWO SENTENCES OF THE

9    MORTALITY REVIEW?  IT BEGINS WITH "OVER THE LAST THREE YEARS."

10      **A**    THANK YOU.  "OVER THE LAST THREE YEARS HE WAS

11   FOLLOWED REGULARLY BY THE PULMONARY TELEMEDICINE PHYSICIAN

12   DR. WELCH.  A PULMONARY FUNCTION TEST DONE 4/12/16 SHOWED AN

13   FEV1 OF 33 PERCENT AND AN FEV1/FVC OF 46 PERCENT."

14      **Q**    THOSE ARE EXACTLY THE SAME EXCEPT THAT YOU ADDED AN

15   ARABIC NUMERAL THREE AFTER THE WRITTEN WORD --

16      **A**    EXACTLY.  AND AS I'VE SAID BEFORE, IT'S THE SAME

17   EXCEPT FOR SOME PUNCTUATIONS AND, AS YOU NOTED, I PUT A

18   NUMERAL THREE INSIDE BRACKETS -- PARENTHESIS, YOU KNOW, IT'S

19   ESSENTIALLY THE SAME.

20      **Q**    AND IF WE WERE TO CONTINUE THROUGH THE ENTIRETY OF

21   YOUR WRITEUP OF THE MEDICAL SUMMARY OF THIS PATIENT FOR THE

22   NEXT TWO AND A HALF PAGES OF YOUR REPORT, WE WOULD SEE THE

23   SAME THING, THEY ARE SENTENCE FOR SENTENCE, LINE FOR LINE THE

24   SAME AS MORTALITY REVIEW?

25      **A**    I WOULD REPLY THAT THEY'RE ESSENTIALLY THE SAME WITH

1    MINOR VARIATIONS TO MAKE THEM MORE READABLE.

2        **Q**    AND THE SUBSTANCE IS EXACTLY THE SAME?

3        **A**    THE SUBSTANCE IS THE SAME.

4        **Q**    THE SENTENCES ARE EXACTLY THE SAME?

5        **A**    ESSENTIALLY THE SAME.

6        **Q**    THE CONTENT IS EXACTLY -- THE SUBSTANTIVE CONTENT IS

7    EXACTLY THE SAME?

8        **A**    YES.

9        **Q**    THERE IS NO ANALYSIS OF YOUR OWN IN THESE MEDICAL

10   SUMMARY SECTIONS OF YOUR REPORT?

11       **A**    NOT IN THIS SECTION, NO.

12       **Q**    OKAY.  SO IF WE TURN TO PAGE 108, THE NEXT PAGE OF

13   YOUR REPORT, AGAIN THIS IS WHAT WE'RE TALKING ABOUT, THIS

14   ENTIRE PAGE IS ALL TAKEN WORD FOR WORD WITH THOSE TYPE OF

15   CHANGES FROM LSP'S MORTALITY REVIEW?

16       **A**    CORRECT.

17       **Q**    IF WE GO TO PAGE 109 OF YOUR EXPERT REPORT, THE SAME

18   THING IS TRUE HERE?

19       **A**    I'M CERTAIN IT IS.  I'VE ALREADY REPLIED TO THAT.

20       **Q**    THEN IF WE GO TO PAGE 110, HERE THESE TOP TWO

21   SENTENCES, THOSE ARE YOUR WORK, CORRECT?

22       **A**    THE PORTION WHERE I REVIEWED THE ENTIRE CHART OF

23   PATIENT 36 AND FOUND THE LSP DEATH REVIEW TO BE SUBSTANTIALLY

24   ACCURATE.

25       **Q**    THAT IS WHAT YOU WROTE ABOUT THIS PATIENT?

1     **A**    YES.

2     **Q**    AND THOSE TWO SENTENCES ARE THE ONLY PLACES IN YOUR

3  REPORT WHERE YOU PROVIDE ANY DISCUSSION OF PATIENT NUMBER 36

4  THAT ISN'T REPRODUCED ESSENTIALLY VERBATIM FROM THE LSP

5  MEDICAL SUMMARY?

6     **A**    THAT'S CORRECT.  OTHER THAN THE ATTACHMENTS AND THE

7  FOOTNOTES, AS YOU KNOW MY REPORT'S OVER 3,000 PAGES LONG, SO

8  EVERYTHING THAT I WRITE IN THE REPORT HAS BEEN BACKED UP.

9     **Q**    AND IF WE LOOK AT THIS PAGE ARE THERE ANY FOOTNOTES

10  FOR PATIENT NUMBER 36?

11     **A**    NO, NOT ON THIS PAGE.

12     **Q**    IF WE GO TO THE PREVIOUS PAGE ARE THERE ANY

13  FOOTNOTES FOR PATIENT 36?

14     **A**    NO.

15     **Q**    IF WE GO TO THE PREVIOUS PAGE ARE THERE ANY

16  FOOTNOTES FOR PATIENT 36?

17     **A**    NO.

18     **Q**    IF WE GO TO THE PREVIOUS PAGE ARE THERE ANY

19  FOOTNOTES FOR PATIENT 36?

20     **A**    NO.

21     **Q**    AND IF WE GO TO THE PREVIOUS PAGE ARE THERE ANY

22  FOOTNOTES FOR PATIENT 36?

23     **A**    NO, UNFORTUNATELY.

24     **Q**    AND JUST IN TERMS OF YOUR REPORT AS A WHOLE, WOULD

25  YOU ESTIMATE THAT ABOUT 50 PAGES WORTH OF TEXT ARE COPIED IN

1    THIS STYLE FROM LSP'S MORTALITY REVIEWS?

2        **A**    I WILL AGREE WITH YOU IF YOU'VE CHECKED THAT.

3        **Q**    APPROXIMATELY 50?

4        **A**    I WILL AGREE THAT YOU'RE SUBSTANTIALLY ACCURATE.

5            **MR. DUBNER:**  WE CAN TAKE THOSE DOWN.

6    **BY MR. DUBNER:**

7        **Q**    LET'S TALK ABOUT SOME -- A FEW MEDICAL STANDARDS

8    THAT WE DISCUSSED AT YOUR DEPOSITION.  NURSES IN AN INFIRMARY

9    ARE REQUIRED TO NOTE THE TIME THAT THEY TAKE VITAL SIGNS,

10   CORRECT?

11       **A**    YES.

12       **Q**    LET'S LOOK, FOR EXAMPLE, AT PATIENT NUMBER 12'S

13   MEDICAL RECORDS.  IF WE COULD SEE JX_12_454.  THIS IS STILL

14   SEALED.

15           THESE ARE VITAL SIGNS TAKEN IN THE INFIRMARY,

16   CORRECT?

17       **A**    YES.

18       **Q**    THERE ARE NO TIMES RECORDED, CORRECT?

19       **A**    YES.

20       **Q**    AND IF WE GO TO PAGE 540 OF JOINT EXHIBIT 12 THESE

21   ARE ALSO TIMES RECORDED -- THESE ARE ALSO VITAL SIGNS TAKEN BY

22   A NURSE IN THE INFIRMARY?

23       **A**    I'M NOT CERTAIN IT'S THE INFIRMARY.  IT DOESN'T SAY

24   THAT.

25       **Q**    AT THE TOP IT SAYS IT IS A NURSING UNIT 1/2 VITAL

1    SIGNS FLOW SHEET?

2        **A**    WELL, AS WE KNOW, NURSING UNIT 1 VITAL SIGNS ARE TO

3    BE TAKEN EVERY SHIFT.  NURSING UNIT 2 VITAL SIGNS ARE NOT --

4    ARE TAKEN EVERY WEEK.  AND AS YOU CAN SEE HERE, WE'VE GOT THE

5    VITAL SIGNS THAT ARE SEPARATED SOMETIMES BY SEVEN.  HERE'S ONE

6    THAT'S 14 DAYS, SO IT'S NURSING UNIT 2.

7        **Q**    AND IF WE GO TO PAGE 541 OF JOINT EXHIBIT 12, THESE

8    VITAL SIGNS, IF WE LOOK AT IT, ARE DAY-BY-DAY, CORRECT?

9        **A**    ESSENTIALLY.  SO THESE WOULD BE FOR NURSING UNIT 1.

10       **Q**    AND HERE AGAIN THERE IS NO TIME RECORDED?

11       **A**    CORRECT.

12       **Q**    IN FACT, THERE'S NOWHERE ON THIS SHEET TO RECORD THE

13   TIME, CORRECT?

14       **A**    CORRECT.

15           **MR. DUBNER:**  WE CAN TAKE THOSE DOWN.

16   **BY MR. DUBNER:**

17       **Q**    LET'S TALK ABOUT ANOTHER STANDARD.  IF A PATIENT HAS

18   NO PULSE AND ISN'T BREATHING AND THE PRISON HAS AN AED ON SITE

19   AND PERSONNEL TRAINED TO USE IT, THE STANDARD OF CARE IS THAT

20   THEY SHOULD USE THE AED, CORRECT?

21       **A**    YES.

22       **Q**    IF WE COULD PULL UP PATIENT 25'S MEDICAL RECORD,

23   D -- JX_25_31.

24           PATIENT NUMBER 25 COLLAPSED IN THE KITCHEN AND DIED

25   OF CARDIOPULMONARY ARREST; IS THAT CORRECT?

1       **A**    I SEE THAT HE COLLAPSED IN THE KITCHEN, BUT I DON'T

2   SEE THE LINE THAT DEMONSTRATES THAT HE DIED.

3       **Q**    I WILL REPRESENT TO YOU THAT'S NOT ON THIS PAGE, BUT

4   YOU RECALL THIS IS A PATIENT WHO HAD SYNCOPE AND THEN A FEW

5   MONTHS LATER DIED OF CARDIOPULMONARY ARREST, IS THAT PATIENT

6   FAMILIAR TO YOU?

7       **A**    I BELIEVE THAT'S THE PATIENT WHO HAD SYNCOPE -- YES,

8   I REMEMBER HIM.

9       **Q**    YES.  AND SO IF WE LOOK AT THE FIRST LINE IN THE

10  NARRATIVE SUMMARY SECTION TOWARDS THE BOTTOM --

11      **A**    YES.

12      **Q**    -- IT SAYS, "PTA". THAT IS SHORT FOR PRIOR TO

13  ARRIVAL, CORRECT?

14      **A**    OR PRIOR TO ADMISSION, SOMETHING LIKE THAT.  BUT

15  WHAT YOU'RE LOOKING FOR I WILL AGREE THERE'S NO AED ATTACHED.

16      **Q**    THANK YOU.  LET'S TALK ABOUT ANOTHER STANDARD.  IF A

17  PATIENT --

18      **A**    CAN WE LOOK AT THAT FOR A SECOND THOUGH?

19      **Q**    I DIDN'T HAVE ANY FURTHER QUESTIONS ON THAT.

20      **A**    UH-HUH.

21          **MR. ARCHEY:**  YOUR HONOR, IF HE HAS MORE TO PROVIDE

22  TO HIS ANSWER I THINK HE SHOULD BE ALLOWED.

23          **THE COURT:**  WELL, I MEAN HE ASKED HIM A QUESTION, HE

24  ANSWERED IT.  YOU CAN ASK HIM ON REDIRECT.

25  **BY MR. DUBNER:**

1    **Q**    LET'S TALK ABOUT ANOTHER STANDARD.  IF A PATIENT IS

2    INCONTINENT AND CAN'T GET OUT OF BED DUE TO BACK PAIN, THEY

3    SHOULD BE PRESENTED TO A PROVIDER, CORRECT?

4    **A**    NOT NECESSARILY.

5    **Q**    IN YOUR DEPOSITION DID YOU TELL ME THAT IF A PATIENT

6    IS INCONTINENT AND CAN'T GET OUT OF BED DUE TO BACK PAIN THEY

7    SHOULD BE PRESENTED TO A PROVIDER?

8    **A**    I'LL HAVE TO KNOW THE CONTEXT OF THAT.

9    **Q**    LET'S PULL UP THE DEPOSITION AT PAGES 117 THROUGH

10   118.

11            IF YOU LOOK STARTING AT LINE 24 ON PAGE 117, I ASKED

12   YOU, "IF A PATIENT HAS BEEN COMPLAINING ABOUT BACK PAIN FOR A

13   WEEK AND HASN'T BEEN ABLE TO GET OUT OF BED FOR THREE DAYS AND

14   BECOMES INCONTINENT, WHAT EXAMINATION SHOULD THE PROVIDER DO

15   UNDER THE STANDARD OF CARE?"

16            YOU ANSWERED, "WELL, I GUESS IF THEY'RE IN BED IT'S

17   PRETTY HARD TO BE -- TO HAVE THEM SEEN.  YOU NEED TO BE MORE

18   CLEAR ABOUT THAT.  IF THEY'RE IN BED -- IF THEY CAN'T GET OUT

19   OF BED, THEN THEY CAN'T SEE THE PROVIDER UNLESS THEY'RE TAKING

20   THERE BY A PORTER OR TAKEN TO THE ATU BY AMBULANCE.  I NEED A

21   DIFFERENT HYPOTHETICAL."

22            QUESTION, "YEAH.  NO.  THAT IS A GOOD CLARIFICATION.

23   SHOULD THEY BE TAKEN TO SEE A PROVIDER WITH THOSE SYSTEMS?"

24            ANSWER, "THEY SHOULD BE PRESENTED TO A PROVIDER IF

25   THEY'RE INCONTINENT AND THEY CAN'T GET OUT OF BED.  THEY NEED

1    TO BE PRESENTED TO A PROVIDER ONE WAY OR THE OTHER, WHETHER

2    IT'S BY A SELF-DECLARED EMERGENCY WITH AN EMT PROVIDING THAT

3    INFORMATION TO A HIGHER LEVEL PROVIDER OR SOMEHOW GETTING THAT

4    PATIENT SEEN."  DOES THAT PROVIDE THE CONTEXT THAT YOU NEED?

5        **A**    YES.

6        **Q**    AND SO IF A PATIENT IS INCONTINENT AND CAN'T GET OUT

7    OF BED DUE TO BACK PAIN, THEY SHOULD BE PRESENTED TO A

8    PROVIDER, CORRECT?

9        **A**    YES.

10       **Q**    THAT'S BECAUSE INCONTINENCE COULD BE A RED FLAG OF

11   CAUDA EQUINA SYNDROME OR SPINAL CORD COMPRESSION?

12       **A**    THAT'S POSSIBLE.

13       **Q**    AND IT TAKES OBSERVATION AND PUTTING TWO AND TWO

14   TOGETHER AS A PROVIDER TO EVALUATE THE RED FLAG SYMPTOM?

15       **A**    YES, BUT WE HAVEN'T ESTABLISHED THAT THIS PATIENT

16   HAD ANY RED FLAG SYMPTOMS.  YOU'RE GIVING ME -- THE FELLOW IS

17   IN BED AND HE'S INCONTINENT.  THAT DOESN'T MEAN HE'S GOT RED

18   FLAG SYMPTOMS.

19       **Q**    DID YOU NOT JUST SAY A MOMENT AGO INCONTINENCE COULD

20   BE A RED FLAG OF CAUDA EQUINA SYNDROME OR SPINAL CORD

21   COMPRESSION?

22       **A**    COULD, BUT THAT'S NOT MEDICALLY CERTAIN.  SOME GUYS

23   LAY IN BED AND ARE INCONTINENT.

24       **Q**    AND IF THIS PATIENT, AS WE ALREADY SAID, ALSO HAS

25   BEEN COMPLAINING ABOUT BACK PAIN FOR A WEEK AND HASN'T BEEN

1   ABLE TO GET OUT OF BED FOR THREE DAYS AND THEN BECOMES

2   INCONTINENT, IN THAT CASE WOULD IT BE A RED FLAG FOR --

3   **A**    THIS IS JUST A HYPOTHETICAL.

4   **Q**    WE CAN LOOK AT THE PATIENT.  LET'S PULL UP PATIENT

5   6'S MEDICAL RECORDS AT -- LET'S BEGIN A LITTLE BIT BEFORE THIS

6   INCIDENT.  PAGE 61.

7        DO YOU RECALL THIS PATIENT, DR. MATHIS?

8   **A**    NO.  I'D HAVE TO LOOK AT MY -- MY CHART.

9   **Q**    WOULD YOU LIKE TO TAKE A MOMENT AND LOOK AT YOUR

10  CHART?

11       **THE WITNESS:**  MAY I?

12       **THE COURT:**  YOU MAY.

13       **THE WITNESS:**  PATIENT 61, CORRECT?

14  **BY MR. DUBNER:**

15  **Q**    NO PATIENT NUMBER 6.

16  **A**    I'M SORRY.  I THINK I HAVE MORE INFORMATION TO BE

17  ABLE TO ANSWER YOUR QUESTIONS NOW.

18  **Q**    WONDERFUL.  SO LET'S START AT PAGE 61 OF JOINT

19  EXHIBIT 6.

20       ON APRIL 25TH, 2021, HE'S FOUND LYING IN BED AND

21  INFORMS THE MEDIC THAT HE CAN'T MOVE BECAUSE HIS BACK HAS BEEN

22  LOCKED UP SINCE FRIDAY AND THE PATIENT IS TAKEN TO THE ATU IN

23  A WHEELCHAIR; IS THAT CORRECT?

24  **A**    YES.

25  **Q**    THEN IF WE LOOK AT PAGE 60 OF JOINT EXHIBIT 6, AT

1    THE ATU NO PROVIDER EXAMINES HIM, CORRECT?

2       **A**    WOULD YOU MAKE THAT A LITTLE BIGGER, PLEASE?  I

3    CAN'T -- IT'S HARD FOR ME TO READ.

4       **Q**    SURE.  LET'S ZOOM IN ON THE SECTION BELOW MED'S

5    SIGNATURE.  AND IF YOU COULD GET THE FULL SECTION THERE.

6       **A**    IF I COULD WHAT?

7       **Q**    I'M SORRY.  I'M TALKING WITH MS. -- OKAY.

8          SO AT THE ATU NO PROVIDER EXAMINES HIM, CORRECT?

9       **A**    I DON'T SEE ANY EVIDENCE OF THAT ON THIS PAGE.

10      **Q**    HE JUST GETS A SHOT OF A MUSCLE RELAXANT AND SOME

11   ANTI-INFLAMMATORIES, TORADOL AND NORFLEX?

12      **A**    YES.

13      **Q**    AND THAT'S PER A -- IT APPEARS TO SAY "V-O."  WOULD

14   THAT BE VERBAL ORDER OR TELEPHONE ORDER?

15      **A**    I CAN'T MAKE THAT OUT.  IT DOES APPEAR TO BE BY

16   MR. WALLIS, THOUGH, A NURSE PRACTITIONER.  WHETHER IT'S A

17   VERBAL ORDER OR TELEPHONE ORDER I CAN'T MAKE IT OUT.

18      **Q**    OKAY.  AND THIS IS AT 12:47 PM; IS THAT CORRECT?

19      **A**    YES.

20      **Q**    UNDER DEFENDANT'S STAFFING PLAN THERE SHOULD BE A

21   PROVIDER IN THE ATU AT THAT TIME, CORRECT?

22      **A**    YES.

23      **Q**    IF WE THEN GO TO PAGE 59, TWO DAYS LATER,

24   APRIL 27TH, 2021, HE MAKES A SELF-DECLARED EMERGENCY.  HE SAYS

25   HIS BODY HAS BEEN LOCKING UP SINCE WEDNESDAY AND HE CAN'T USE

1  THE RESTROOM BECAUSE HE CAN'T SIT ON THE TOILET; IS THAT

2  CORRECT?

3      **A**    THAT'S WHAT IT SAYS, YES.

4      **Q**    THE PATIENT SAYS HE WAS TREATED ON SUNDAY, BUT

5  DOESN'T THINK IT HELPS, CORRECT?

6      **A**    YES.

7      **Q**    AND THE PATIENT REQUESTS TO GO ON THE NURSING UNIT,

8  CORRECT?

9      **A**    YES.

10      **Q**    THE EMT JUST WRITES "MD REVIEW," CORRECT?

11      **A**    YES.

12      **Q**    AND THE PROVIDER, IT'S HARD TO SEE, BUT IF YOU COULD

13  ZOOM IN TO WHERE -- TO THE RIGHT OF THAT CIRCLE UNDER HEALTH

14  CARE PRACTITIONER NOTES.

15      **A**    WOULD YOU HIGHLIGHT THAT FOR ME, PLEASE?

16      **Q**    NEXT TO THAT CIRCLE, THE TOP MOST THING OF THAT

17  SECTION, DOES IT APPEAR TO SAY, "SC PRN"?

18      **A**    I'M SORRY.  I CAN'T SEE WHAT YOU'RE LOOKING AT.

19      **Q**    THAT'S ALL RIGHT.  ARE THERE ANY DISCERNIBLE NOTES

20  IN THE HEALTH CARE PRACTITIONER REVIEW THERE?

21      **A**    I THINK THAT THE ONLY DOCUMENTATION FROM A HEALTH

22  CARE PRACTITIONER IS LIKELY THE BLUE PEN WHERE IT'S SIGNED

23  OFF.  THERE'S AN LPN -- IT LOOKS LIKE AN LPN MS. HUGHES ON

24  4/29/21, 08:15.  I CAN'T TELL WHO ELSE SCRIBBLED ON THAT ABOVE

25  OR COUNTER-SIGNED IT.

1     **Q**    AND YOU CAN'T SEE ANY DOCUMENTATION OF REVIEW OR

2 ASSESSMENT BY A HEALTH CARE PRACTITIONER?

3     **A**    WELL, I THINK THAT THE SIGNOFF IN BLUE IS THE REVIEW

4 BY A HEALTH CARE PRACTITIONER.

5     **Q**    AND THERE'S NO STATEMENT OF THE HEALTH CARE

6 PRACTITIONER'S ASSESSMENT OR OTHER --

7     **A**    OTHER THAN HIS SIGNATURE.

8     **Q**    OKAY.  AND THE DATE ON THAT IS APRIL 29TH, 2021; TWO

9 DAYS AFTER THE SICK CALL REQUEST --

10     **A**    CORRECT.

11     **Q**    -- AFTER THE SELF-DECLARED EMERGENCY?

12     **A**    CORRECT.

13     **Q**    THEN LET'S GO TO PAGE 56.  THREE DAYS LATER AROUND

14 1:00 A.M. ON APRIL 30TH, HE SAYS HE CAN'T SIT UP AND HIS

15 ENTIRE SPINE HURTS; IS THAT CORRECT?

16     **A**    YES.

17     **Q**    AND SO THEN IF WE GO TO PAGE 58, HE'S TAKEN TO THE

18 ATU BY WHEELCHAIR AGAIN, CORRECT?

19     **A**    IT DOESN'T SAY HE'S TAKEN TO IT.  IT SAYS, "PATIENT

20 INTO ATU."  SO IT LOOKS LIKE HE WHEELED HIMSELF AND HE CAME

21 SECONDARY TO LAFLEUR'S ORDERS.  I THINK IT'S AN ASSUMPTION

22 THAT HE WAS TAKEN THERE.

23     **Q**    IF WE GO BACK TO PAGE 56.  IF WE LOOK AT THE LAST

24 LINE OF THE NARRATIVE/SUMMARY, IT SAYS, "PATIENT LEFT" AND

25 THEN THERE'S A MARKING, IT LOOKS LIKE A "C" WITH A LINE OVER

1  IT.  THAT MEANS WITH?

2      **A**    YES.

3      **Q**    "PATIENT LEFT WITH SECURITY;" IS THAT CORRECT?

4      **A**    YES.

5      **Q**    OKAY.  SO LET'S JUST RETURN TO PAGE 58.  IF WE COULD

6  RETURN TO PAGE 58.  THANK YOU.

7          SO HE'S COMPLAINING OF PAIN AND DECREASED MOBILITY

8  TO HIS BACK AND LEFT KNEE?

9      **A**    IT LOOKS TO ME LIKE HE'S COMPLAINING OF BACK PAIN

10  AND PAIN FROM A RASH.

11      **Q**    AND THEN IF YOU LOOK AT THE LAST TWO LINES OF THE

12  CHIEF COMPLAINT, PATIENT COMPLAINS OF PAIN AND DECREASED

13  MOBILITY TO BACK AND LEFT KNEE -- TO LOWER BACK AND LEFT KNEE?

14      **A**    YES.

15      **Q**    AND HERE AGAIN NO PROVIDER EXAMINES HIM?

16      **A**    CORRECT.

17      **Q**    AND HERE AGAIN A PROVIDER JUST GIVES A TELEPHONE

18  ORDER FOR THE MUSCLE RELAXANT AND THE ANTI-INFLAMMATORIES?

19      **A**    CORRECT.

20      **Q**    AND IF WE LOOK AT PAGE 57, LATER THAT MORNING HE

21  SAYS THAT HE'S STILL IN PAIN, CORRECT?

22      **A**    IT SAYS, "COVID SHOT HAS GIVEN PROBLEMS."

23      **Q**    IF WE LOOK AT THE THIRD LINE OF THE

24  ASSESSMENT/COMMENT, TELL ME IF YOU THINK I'M READING THIS

25  RIGHT, "PATIENT STATES WAS AT TREATMENT CENTER LAST NIGHT,

1  GIVEN SHOTS AND STILL IN PAIN"?

2      **A**    YES, I BELIEVE THAT'S WHAT IT SAYS.

3      **Q**    AND BELOW THAT -- A LITTLE BIT DIFFICULT TO READ --

4  COULD YOU BLOW THAT BACK UP, PLEASE?  THANKS.

5          PATIENT HAS -- I'M NOT SURE ABOUT THIS WORD -- IT

6  MIGHT BE "PATIENT HAS STOPPED OR DIFF WALKING AND THE

7  WHEELCHAIR DUE TO BACK PAIN," CORRECT?

8      **A**    EXCEPT FOR THAT WORD THAT WE CAN'T READ.  THE REST

9  OF IT LOOKS CORRECT.

10     **Q**    SO IF WE GO TO PAGE 55.  SO THEY BRING HIM BACK TO

11  THE ATU AND HE IS SEEN BY A PROVIDER ON THIS INSTANCE, RIGHT?

12     **A**    YES.

13     **Q**    AND THE PROVIDER, IF WE ZOOM IN ON THE PHYSICIAN

14  ASSESSMENT NOTES, THE PROVIDER ONLY ASSESSES HIS LEFT KNEE

15  PAIN, CORRECT?

16     **A**    WELL, HE'S LOOKING AT THE HEALED SCABS BILATERAL

17  LOWER EXTREMITY AND WITHOUT SIGNS OR SYMPTOMS OF INFECTION.

18  SO HE'S -- IT LOOKS TO ME LIKE HE'S TRYING TO CORRELATE THIS

19  RASH WITH WHAT'S GOING ON IN HIS LOW BACK.  THEN HE TREATED

20  HIM WITH CELEBREX WHICH IS A NONSTEROIDAL ANTI-INFLAMMATORY

21  DRUG, AS WELL AS TO KEEP THE APPOINTMENT WITH ORTHOPAEDICS AND

22  WHATEVER THAT IS.

23     **Q**    AND CELEBREX YOU SAID IS A NONSTEROIDAL

24  ANTI-INFLAMMATORY DRUG.  THE TORADOL THAT THEY WERE GIVING HIM

25  ALSO A NONSTEROIDAL ANTI-INFLAMMATORY DRUG?

1     **A**    CORRECT.

2     **Q**    AND THERE'S NO DOCUMENTATION OF ANY ASSESSMENT OF

3    HIS BACK HERE, IS THERE?

4     **A**    CORRECT.

5     **Q**    THERE'S NO DOCUMENTATION OF A PHYSICAL EXAMINATION

6    OF HIS BACK, CORRECT?

7     **A**    CORRECT.  YOU KNOW I CAN'T SAY -- I'M SORRY.  ALERT

8    AND ORIENTED TIMES THREE.  I'M NOT CERTAIN WHAT THAT NEXT LINE

9    SAYS.  MAYBE IT SAYS SOMETHING THAT'S PERTINENT.  THAT'S

10   UNCERTAIN.  IT SAYS HIS LUNGS ARE CLEAR AND I GUESS NUMEROUS

11   HEALED SCABS BILATERAL LOWER EXTREMITIES.

12    **Q**    NOTHING THAT YOU RECOGNIZE TO SIGNIFY A PHYSICAL

13   EXAMINATION OF THE PATIENT'S BACK PAIN -- OF THE PATIENT'S

14   BACK?

15    **A**    NOTHING THAT I CAN RECOGNIZE, CORRECT.

16    **Q**    AND THEN IF WE GO TO PAGE 35.  SO HERE WE ARE THREE

17   DAYS LATER, MAY 3RD, 2021 AT 10:24 A.M.  HE SAYS MY BACK

18   LOCKED UP ON ME AND I CAN'T MOVE.  SAYS HE HASN'T BEEN ABLE TO

19   GET OUT OF THE BED THE PAST THREE DAYS AND SAYS WHEN HE

20   ATTEMPTS TO MOVE IT'S LIKE FIRE SHOOTING DOWN HIS LEGS TO HIS

21   TOES AND SAYS HE CAN'T ROLL OVER; IS THAT ALL CORRECT?

22    **A**    YES.  THAT'S A PORTION OF WHAT IT SAYS.

23    **Q**    AND NURSE PRACTITIONER BORDELON ORDERS NO TRANSPORT

24   AND ANOTHER SHOT OF MUSCLE RELAXANT AND ANTI-INFLAMMATORIES,

25   CORRECT?

1     **A**     AT THE PATIENT'S REQUEST, CORRECT.

2     **Q**     DOES THE PATIENT REQUEST NO TRANSPORT?

3     **A**     THE PATIENT REQUESTED AN INJECTION.  HE DIDN'T

4  REQUEST NO TRANSPORT.  ALL HE WAS ASKING FOR WAS THE

5  INJECTION.

6     **Q**     IS THERE ANYWHERE THAT IT STATES THAT ALL THE

7  PATIENT WAS ASKING FOR WAS THE INJECTION?  DID THE PATIENT --

8  THERE'S NOTHING THERE THAT SAYS THE PATIENT DIDN'T WANT TO SEE

9  A DOCTOR?

10     **A**     NO, IT DOESN'T SAY THAT.

11     **Q**     IF WE GO TO PAGE 37.  THAT EVENING AT 5:11 P.M. THE

12  PATIENT IS FOUND LAYING ON A MATTRESS ON THE FLOOR WITH URINE

13  ON HIM COMPLAINING OF BACK PAIN.  THE PATIENT YELLED WHEN THE

14  MEDICS TRIED TO ROLL HIM AND HELP HIM UP; IS THAT CORRECT?

15     **A**     I DON'T KNOW.  YOU'RE TAKING IT OUT OF CONTEXT AND

16  IT'S HARD TO READ.  WHERE ARE YOU?  ABDOMINAL --

17     **Q**     IF WE START AT THE FIRST LINE OF THE NARRATIVE

18  SUMMARY.  "PATIENT WAS LAYING ON A MATTRESS ON THE FLOOR WITH

19  URINE ON HIM COMPLAINING OF BACK PAIN," CORRECT?

20     **A**     CORRECT.

21     **Q**     THEN IT SAYS, "PATIENT HAS BEEN TREATED BY

22  AMBULANCES AND IN THE ATU FOR BACK PAIN RECENTLY," CORRECT?

23     **A**     YES.

24     **Q**     IT SAYS, "PATIENT'S DORM DOES NOT HAVE WHEELCHAIR

25  ACCESS TO THE SHOWER/RESTROOM AREA SO HE HAS BEEN LAYING ON A

1   MATTRESS NEARBY SINCE BEING MOVED THERE," CORRECT?

2       **A**   YES.

3       **Q**   THEN IT SAYS, "NO NEW TRAUMA NOTED, NO NEW

4   COMPLAINTS, PATIENT'S RASH IS STILL HEALING," CORRECT?

5       **A**   YES.

6       **Q**   "PATIENT YELLED WHEN WE TRIED TO ROLL HIM AND HELP

7   HIM UP," CORRECT?

8       **A**   YES.

9       **Q**   AND HERE, AGAIN, NURSE PRACTITIONER BORDELON ORDERED

10  NO TRANSPORT AND ANOTHER SHOT OF -- I'M SORRY, I TAKE THAT

11  BACK.  THERE'S, AGAIN, ONLY A TELEPHONE ORDER HERE, CORRECT?

12      **A**   LET'S READ THROUGH THIS BEFORE I CAN AGREE.

13      **Q**   SURE.

14      **A**   BECAUSE A DOCTOR I/T, I'M NOT SURE WHAT THAT MEANS.

15      **Q**   COULD THAT BE DR. YI?

16      **A**   DOCTOR WHO?

17      **Q**   YI?

18      **A**   COULD BE?

19      **Q**   AND IT SAID, "WAS PHONED AND ADVISED A TORADOL

20  INJECTION AND A MEDROL DOSE PACK RX"?

21      **A**   CORRECT.

22      **Q**   IT THEN SAYS, "SECURITY WAS ALSO SPOKEN TO ABOUT HIS

23  LOCATION," CORRECT?

24      **A**   YES.

25      **Q**   "PATIENT WAS GIVEN THE INJECTION IN RIGHT GLUTE AND

1   REMINDED THAT IT MIGHT TAKE A FEW MINUTES FOR IT TO WORK.

2   PATIENT LEFT IN CUSTODY," CORRECT?

3       **A**    YES.

4       **Q**    NO PROVIDER SEES HIM HERE, CORRECT?

5       **A**    CORRECT.

6       **Q**    AND HE IS LEFT IN CUSTODY?

7       **A**    YES.

8       **Q**    AND HE'S COMPLAINING HERE OF BACK PAIN WHICH HAS NOW

9   LASTED FOR OVER A WEEK.  SAYS HE CAN'T -- HAS SAID HE CAN'T

10  GET OUT OF BED FOR THREE DAYS AND IS INCONTINENT, CORRECT?

11      **A**    YES.

12      **Q**    THEN IF WE GO TO PAGE 36, 7:30:43 P.M. ON MAY 3RD,

13  2021, THIS IS TWO AND A HALF HOURS LATER.  HE'S FOUND

14  UNRESPONSIVE, CORRECT?

15      **A**    YES.

16      **Q**    IF WE GO TO PAGE 54.  HE'S PRONOUNCED DEAD SHORTLY

17  THEREAFTER?

18      **A**    YES.

19      **Q**    NOW IN YOUR REPORT WHAT'S YOUR OPINION REGARDING THE

20  CAUSE OF THIS PATIENT'S DEATH?

21      **A**    I'LL HAVE TO LOOK AT MY REPORT.

22          **THE COURT:**  CAN YOU GIVE IT TO HIM OR DO YOU HAVE

23  IT, SIR?

24  **BY MR. DUBNER:**

25      **Q**    DO YOU HAVE IT?

1    **A**    OH, I'VE GOT IT.  I JUST WANT TO MAKE SURE --

2    **Q**    YES, PLEASE.  DO YOU RECALL AFTER SEEING ALL OF THAT

3 WHAT YOUR OPINION ON THE CAUSE OF THIS PATIENT'S DEATH WAS?

4    **A**    THIS IS -- THIS IS PATIENT 6 -- 6, RIGHT?

5    **Q**    CORRECT.

6    **A**    THE CAUSE OF DEATH WAS A COMPLICATION OF A LIVER

7 ABSCESS WITH AORTIC PSEUDOANEURYSM, VERTEBRAL OSTEOMYELITIS

8 AND DISCITIS.

9    **Q**    AND IN YOUR VIEW LSP BORE NO RESPONSIBILITY FOR THIS

10 PATIENT'S DEATH BECAUSE HE WAS CLANDESTINELY CUTTING HIMSELF;

11 IS THAT CORRECT?

12    **A**    YES.  THAT'S BECAUSE IT OBFUSCATED THE POSSIBILITIES

13 OF HIM HAVING THE ABSCESS.

14    **Q**    THE CUTS WERE MAINLY ON HIS ABDOMEN, PELVIS AND

15 UPPER LEGS, CORRECT?

16    **A**    YES, PLACES THAT COULDN'T BE SEEN.

17    **Q**    THE MEDICAL RECORDS WE JUST DISCUSSED SHOWED HIM

18 ASKING FOR MEDICAL ATTENTION TO HIS LOWER BACK AND LEGS,

19 CORRECT?

20    **A**    YES.

21    **Q**    THE MEDICAL RECORDS SHOW HIM ASKING TO BE MOVED TO

22 THE NURSING UNIT, CORRECT?

23    **A**    YES.

24    **Q**    HE WAS ASKING FOR PROVIDERS TO EXAMINE THE VERY

25 AREAS YOU SAY HE WAS HIDING, WASN'T HE?

1    **A**    WELL, HE WAS ASKING TO EXAMINE HIS BACK.  I MEAN THE

2   CUTS WERE ALL OVER HIM.  THEY WERE ENUMERABLE.

3    **Q**    AND, IN FACT, IF WE LOOK AT PAGE 55 OF THE MEDICAL

4   RECORD, NURSE PRACTITIONER BORDELON DOCUMENTED NUMEROUS HEALED

5   SCABS, BILATERAL LOWER EXTREMITIES?

6    **A**    YES.

7    **Q**    AND THE MEDICAL RECORDS REPORT THAT THE LAST KNOWN

8   EPISODE OF CUTTING BEHAVIOR, SELF-INJURY, FOR THIS PATIENT WAS

9   IN 1997, CORRECT?

10    **A**    YES.

11    **Q**    CUTTING BEHAVIOR CAN BE TRIGGERED BY STRESS OR PAIN,

12   CORRECT?

13    **A**    IT'S HARD TO SAY, BUT THAT'S ONE OF THE REASONS.

14    **Q**    FOR THE LAST TWO WEEKS OF THIS MAN'S LIFE HE

15   COULDN'T MOVE, HE COULDN'T SIT UP, HE COULDN'T GET OUT OF BED.

16   HE ASKED FOR MEDICAL ATTENTION ON NO FEWER THAN SEVEN SEPARATE

17   OCCASIONS WITHOUT A PROVIDER EVALUATING HIS BACK.  HE WAS IN

18   AGONY AND COULDN'T MOVE THE LOWER HALF OF HIS BODY BUT COULD

19   MOVE HIS ARMS.  THAT'S THE KIND OF PAIN AND STRESS THAT COULD

20   CAUSE A RECURRENCE OF CUTTING BEHAVIOR, ISN'T IT?

21    **A**    THAT'S AN ASSUMPTION.

22    **Q**    NOT AN ASSUMPTION YOU'RE WILLING TO MAKE?

23    **A**    NOT CONSIDERING THE AUTOPSY REPORT.  THE AUTOPSY

24   REPORT'S DEMONSTRATING THAT THESE CUTS ARE OF VARIOUS AGES.

25    **Q**    THE AUTOPSY REPORT DEMONSTRATES THAT THEY'RE HEALING

1  WITH RED ESCHARS, CORRECT?

2      **A**    "APPROXIMATELY 30 WOUNDS CONSIDERATE CONSISTING OF

3  RED/PURPLE ABRASIONS AND ULCERATIONS, MANY OF WHICH ARE

4  HEALING RANGING IN GREATEST DIMENSIONS FROM 0.1 TO 0.8

5  CENTIMETERS, BY LESS THAN 0.1 CENTIMETERS IN DEPTH.  THEY'RE

6  SCATTERED IN THE BILATERAL BUTTOCKS.  LOWER EXTREMITIES HAVE

7  APPROXIMATELY 80 WOUNDS CONSISTING OF RED/PURPLE ULCERATIONS

8  AND ABRASIONS, MANY OF WHICH ARE HEALING WITH DARK RED ESCHARS

9  RANGING FROM 0.1 TO 2.8 CENTIMETERS BY 0.1 CENTIMETERS IN

10 DEPTH ON THE RIGHT UPPER LEG, RIGHT LOWER LEG AND DORSAL RIGHT

11 FOOT.  APPROXIMATELY 60 WOUNDS CONSISTING OF RED/PURPLE

12 ULCERATIONS AND ABRASIONS, MANY OF WHICH ARE HEALING WITH DARK

13 RED ESCHARS RANGING IN GREATEST DIMENSION FROM 0.1 TO

14 CENTIMETERS BUT LESS THAN 0.1 CENTIMETERS IN DEPTH.  THEY'RE

15 SCATTERED ON THE LEFT UPPER LEG, LEFT LOWER LEG AND DORSAL

16 FOOT."

17     **Q**    THANK YOU, DOCTOR.  LET'S TALK ABOUT ANOTHER

18 STANDARD.  A PATIENT WITH ACUTE HEPATIC FAILURE REQUIRES

19 HOSPITALIZATION OR HOSPICE AND CAN'T BE TREATED IN A PRISON

20 INFIRMARY OR ATU, CORRECT?

21     **A**    WELL, THEY TREAT HOSPICE PATIENTS IN THE INFIRMARY.

22     **Q**    IF THE PATIENT IS TO BE TREATED RATHER THAN GIVEN

23 HOSPICE CARE THE PATIENT REQUIRES HOSPITALIZATION, CORRECT?

24     **A**    IDEALLY.

25     **Q**    AND CAN'T BE TREATED IN A PRISON INFIRMARY OR ATU,

1    CORRECT?

2       **A**    IDEALLY.

3       **Q**    BY IDEALLY DO YOU MEAN THAT'S CORRECT?

4       **A**    WE NEED TO LOOK AT THE PATIENT A BIT MORE.  I JUST

5    CAN'T TAKE THAT OUT OF CONTEXT.

6       **Q**    OKAY.  LET'S LOOK AT YOUR DEPOSITION.

7            IF WE COULD GO TO PAGE 142.  IF WE START AT LINE 17

8    I ASKED YOU, "UNDER THE STANDARD OF CARE, WHAT TREATMENT IS

9    RECOMMENDED FOR ACUTE-ON-CHRONIC HEPATIC FAILURE IN A PATIENT

10   WITH AUTOIMMUNE HEPATITIS?"

11           YOU ANSWERED, "ACUTE HEPATIC FAILURE REQUIRES

12   HOSPITALIZATION OR HOSPICE.  THIS PERSON IS DYING AND THEY --

13   ACUTE HEPATIC FAILURE CAN NOT BE MANAGED IN AN INFIRMARY AT A

14   PRISON OR ATU.  THEY NEED TO GO TO AN EMERGENCY ROOM --"  DID

15   I READ THAT -- IS THAT --

16      **A**    CAN WE READ THROUGH THE REST OF IT?

17      **Q**    SURE.  LET'S GO TO THE NEXT PAGE.

18           "THEY NEED TO GO TO AN EMERGENCY ROOM FOR IMMEDIATE

19   EVALUATION AND DETERMINATION OF WHETHER OR NOT THEY CAN BE

20   TREATED REASONABLY OR SENT BACK FOR THE HOSPICE CARE.  CHRONIC

21   LIVER FAILURE IS BAD ENOUGH, BUT TO HAVE ACUTE LIVER FAILURE

22   ON TOP OF THAT IS USUALLY A DEATH SENTENCE."

23           DID I READ THAT CORRECTLY?

24      **A**    YES.

25      **Q**    AND IS THAT YOUR OPINION?

1    **A**    YES.

2         **Q**    A PATIENT WITH AUTOIMMUNE HEPATITIS WHO DEVELOPS

3    FOUR-PLUS LOWER EXTREMITY EDEMA, THREE WEEKS OF YELLOWING TO

4    BOTH EYES, SWELLING TO THE ABDOMEN AND PAIN AT THE BOTTOM OF

5    THE ABDOMEN MAY BE IN ACUTE HEPATIC FAILURE, CORRECT?

6         **A**    YES.

7         **Q**    LET'S LOOK AT PATIENT 33'S MEDICAL RECORDS.  IF WE

8    COULD GO TO PAGE 81.

9              THIS PATIENT HAD -- IF WE LOOK AT CAUSE OF DEATH

10   THIS PATIENT HAD AUTOIMMUNE HEPATITIS, CORRECT?

11        **A**    THAT'S THE AUTOPSY RESULT, YES.

12        **Q**    IF WE GO TO PAGE 113 AND LET'S HIGHLIGHT THE CHIEF

13   COMPLAINT AND INITIAL ASSESSMENT.

14             I BELIEVE IT SAYS, "LOWER EXTREMITY EDEMA, PLUS

15   FOUR, TIMES THREE WEEKS, YELLOWING TO BOTH EYES, SWELLING TO

16   ABDOMEN --"

17        **A**    COULD YOU ENLARGE THAT FOR ME, PLEASE?

18        **Q**    "-- SWELLING TO ABDOMEN AND PAIN AT THE BOTTOM OF

19   ABDOMEN," IS THAT CORRECT?

20        **A**    I THINK YOU -- I THINK THERE MAY BE SOME PUNCTUATION

21   IN THERE THAT WOULD CHANGE THE MEANING.

22        **Q**    AND WHAT WOULD THAT BE?

23        **A**    WELL, IT LOOKS TO ME LIKE A LOWER EXTREMITY EDEMA

24   PLUS FOUR.  IT LOOKS LIKE THERE'S A PERIOD.  FOR THREE WEEKS

25   HAD YELLOWING TO BOTH EYES, SO IT MAY BE THAT THE JAUNDICE IS

1   THREE WEEKS DURATION.  BUT THE EDEMA IS DOCUMENTED

2   OBJECTIVELY.  THE HISTORY IS THAT THERE WAS A THREE-WEEK

3   HISTORY OF JAUNDICE.

4       **Q**    SO FOUR PLUS LOWER EXTREMITY EDEMA, THREE WEEKS OF

5   JAUNDICE, SWELLING TO THE ABDOMEN AND PAIN AT THE BOTTOM OF

6   THE ABDOMEN, CORRECT?

7       **A**    YES.

8       **Q**    AND IF YOU COULD TAKE DOWN THE -- THANK YOU.

9            THIS PATIENT WAS SEEN IN THE ATU, CORRECT?

10      **A**    CORRECT.

11      **Q**    THE PROVIDER AT THE ATU DIDN'T SEND HIM TO THE

12  HOSPITAL, CORRECT?

13      **A**    MAY WE ENLARGE THAT?

14      **Q**    IF WE ENLARGE THE BOTTOM PART FROM APPOINTMENT ON

15  DOWN JUST THE BOTTOM RIGHT SIDE.

16      **A**    PLEASE.

17      **Q**    ALL THE WAY TO THE BOTTOM, PLEASE.

18           SO HERE WE HAVE A PLAN, "CONTINUE CURRENT MEDICINE.

19  IBUPROFEN 400 GRAMS --" I'M NOT GOING TO TRY TO READ THE --

20  YOU CAN READ THAT BETTER THAN I CAN, I'M SURE.  WHAT WAS THE

21  PLAN THERE?

22      **A**    THE PLAN IS TO COME BACK TO CLINIC A IN ONE TO TWO

23  WEEKS.

24      **Q**    AND IF WE LOOK AT THE BOTTOM DESTINATION IT SAYS,

25  "RTQ," THAT MEANS RETURN TO QUARTERS, CORRECT?

1    **A**    YES.

2    **Q**    THE PATIENT WAS NOT SENT TO THE HOSPITAL?

3    **A**    PARDON ME?

4    **Q**    THE PATIENT WAS NOT SENT TO THE HOSPITAL, CORRECT?

5    **A**    CORRECT.

6    **Q**    AND LET'S TALK ABOUT ANOTHER STANDARD.  IF A PATIENT

7    PRESENTS TO THE ATU IN THE MIDDLE OF DIABETIC KETOACIDOSIS

8    WITH SEVERE ANEMIA, HE SHOULD BE HYDRATED, MAYBE GIVEN INSULIN

9    AND SENT TO THE EMERGENCY ROOM, CORRECT?

10   **A**    THAT'S REALLY OUT OF CONTEXT -- I DON'T -- YOU NEED

11   TO SHOW ME THE PATIENT AND THE PAST HISTORY.

12   **Q**    LET'S GO TO PAGE 106 OF THE DEPOSITION.

13          STARTING AT THE BEGINNING.  I ASKED YOU, "SO JUST AS

14   AN EXAMPLE, LET'S SAY A PATIENT PRESENTS IN THE MIDDLE OF

15   DIABETIC KETOACIDOSIS WITH SEVERE ANEMIA.  ARE PREVIOUS

16   REFUSALS RELEVANT TO THE QUESTION OF WHAT CARE SHOULD BE

17   PROVIDED?"

18          YOU ANSWERED, "NO."

19          I ASKED, "AND WHAT STANDARD OF CARE SHOULD BE

20   PROVIDED UNDER THE STANDARD OF CARE?"  SORRY.  I ASKED, "AND

21   WHAT CARE SHOULD BE PROVIDED UNDER THE STANDARD OF CARE?"

22          YOU SAID, "WITH DIABETIC KETOACIDOSIS?"

23          I SAID, "YES."

24          YOU ASKED, "AT AN ATU OR AT AN EMERGENCY ROOM?

25   WHERE ARE YOU TALKING ABOUT?"

1    I SAID, "AT THE ATU."

2    YOU SAID, "AT THE ATU YOU HYDRATE THEM, YOU MAY GIVE

3    THEM INSULIN AND YOU GET THEM OUT."

4    I ASKED, "WHAT DO YOU MEAN BY GET THEM OUT?"

5    YOU SAID, "TO SEND THEM TO THE EMERGENCY ROOM.  YOU

6    CAN'T FOLLOW THEM CLOSELY THERE.  YOU DON'T HAVE A LABORATORY.

7    YOU DON'T HAVE -- YOU MAY NOT EVEN HAVE PUMPS.  YOU DON'T HAVE

8    THE NURSING THAT CAN OBSERVE THEM TWENTY-FOUR HOURS A DAY.

9    YOU DON'T HAVE MONITORS IN THE INFIRMARY.  I MEAN IT'S NOT A

10   PLACE TO BE -- IT'S AN ATU.  IT'S NOT AN EMERGENCY ROOM."

11   IS THAT CORRECT?

12   **A**   FOR THIS EXAMPLE, YES.

13   **Q**   AND YOU STAND BY THAT TESTIMONY?

14   **A**   YES.

15   **Q**   LET'S LOOK AT A PAGE FROM PATIENT 58'S MEDICAL

16   RECORDS.  IF WE COULD GO TO PAGE 1.  IF WE COULD ZOOM IN ON

17   THE TOP FEW LAB RESULTS THERE.

18   THESE LAB RESULTS SHOW ELEVATED GLUCOSE, ELEVATED

19   B-U-N, BLOOD UREA NITROGEN, AND ELEVATED CREATININE; IS THAT

20   CORRECT?

21   **A**   YES.

22   **Q**   THOSE ARE ALL SIGNS OF KETOACIDOSIS?

23   **A**   NO.

24   **Q**   YOUR TESTIMONY IS THAT ELEVATED GLUCOSE, ELEVATED

25   BLOOD UREA NITROGEN AND ELEVATED CREATININE ARE NOT --

1   **A**   THEY MAY BE COMPATIBLE, BUT THEY'RE NOT NECESSARILY

2   SIGNS.  WE SEE 385'S ALL THE TIME.  I DON'T KNOW IF THE GUY'S

3   GOT CHRONIC RENAL FAILURE OR WHAT.  YOU NEED TO GIVE ME THE

4   CONTEXT FOR THIS.

5   **Q**   IF I WERE TO REPRESENT TO YOU THAT THESE ARE

6   SIGNIFICANTLY ELEVATED COMPARED TO HIS NORMAL LEVELS WOULD

7   THAT CHANGE YOUR ANSWER?

8   **A**   WELL, WHAT'S HIS LACTATE?

9   **Q**   I BELIEVE THAT WOULD BE SHOWN ON THE NEXT PAGE.

10  LET'S GO TO PAGE 2.  AND UNFORTUNATELY THIS IS SIDEWAYS.  I

11  DON'T KNOW IF IT'S POSSIBLE FOR US TO TURN THIS.  WE MAY HAVE

12  TO CRANE OUR NECKS A LITTLE BIT HERE, DOCTOR.  WONDERFUL.

13  THANK YOU.

14  **A**   IT'S NOT GOING TO BE ON THIS PAGE.

15  **Q**   IT'S NOT.  OKAY.  BUT THESE LAB RESULTS DO SHOW RED

16  BLOOD CELLS, LOW HEMOGLOBIN AND LOW HEMATOCRIT, CORRECT?

17  **A**   YES.

18  **Q**   THOSE ARE ALL SIGNS OF ANEMIA?

19  **A**   YES.

20  **Q**   LET'S JUST LOOK TO SEE IF THE LACTATE IS ON THE

21  PREVIOUS PAGE.  LET'S GO TO PAGE 1.  DID THEY TAKE A LACTATE

22  FOR THIS PATIENT?

23  **A**   NO.

24  **Q**   SO WE DON'T HAVE THE LACTATE THAT YOU WOULD LIKE TO

25  SEE.  WE DO HAVE ELEVATED GLUCOSE, ELEVATED BLOOD UREA

1  NITROGEN, ELEVATED CREATININE AND DECREASED RED BLOOD CELLS,

2  HEMOGLOBIN AND HEMATOCRIT.  ASSUMING THAT THOSE ARE ALL

3  DEVIATIONS FROM HIS USUAL RESULTS, IS THAT CONCERNING FOR

4  DIABETIC KETOACIDOSIS FOR ANEMIA?

5      **A**    IT DOESN'T MAKE THE DIAGNOSIS.

6      **Q**    IS THAT A POSSIBILITY FOR WHAT IS GOING ON WITH THIS

7  PATIENT?

8      **A**    IT'S A POSSIBILITY.

9      **Q**    IS THAT A DIFFERENTIAL DIAGNOSIS THAT NEEDS TO BE

10  MADE?

11      **A**    IT SHOULD BE CONSIDERED, I AGREE.

12      **Q**    IF WE GO TO PAGE 563.  THIS IS THE ATU NOTE FROM

13  THAT TIME.

14          IF WE LOOK AT THE DESIGNATION IN THE BOTTOM RIGHT,

15  WHERE DO THEY SEND HIM?

16      **A**    EXCUSE ME, I'D LIKE TO READ THE NOTE A LITTLE BIT.

17      **Q**    PLEASE.

18      **A**    OKAY.  WE CAN TALK ABOUT THIS PATIENT NOW.

19      **Q**    THEY SENT HIM TO THE NURSING UNIT, CORRECT?

20      **A**    WE WERE TALKING ABOUT DIABETIC KETOACIDOSIS.  THIS

21  IS A PRESUMPTIVE COVID PATIENT.

22      **Q**    IF THE LAB RESULTS ARE THE SAME DAY AND THEY DIDN'T

23  CONSIDER DIABETIC KETOACIDOSIS WOULD THAT BE CONCERNING TO

24  YOU?

25      **A**    NO.  THIS IS A DIABETIC WHO'S GOT A BLOOD SUGAR OF

1   385.  THERE'S NO EVIDENCE OF DIABETIC KETOACIDOSIS THAT'S

2   SUPPORTED.  THEY THINK HE'S GOT COVID AND THEY TREAT HIM WITH

3   ANTIBIOTICS AND, YOU KNOW, IT'S A RESPIRATORY COMPLAINT.  I'M

4   HAPPY TO SEE IF YOU'VE GOT DOCUMENTATION THAT SUPPORTS

5   DIABETIC KETOACIDOSIS.

6       Q    WE CAN MOVE ON FROM THIS ONE.  I'LL JUST END WITH

7   THE QUESTION AGAIN:  THIS PATIENT WAS SENT TO NURSING UNIT 1,

8   NOT THE HOSPITAL?

9       A    WITH A BLOOD SUGAR OF 120.

10      Q    WE'LL DISCUSS THE OTHER RECORDS IN CLOSING.  I DON'T

11  HAVE THE OTHER SLIP TO SHOW YOU.

12          OKAY.  SO LET'S MOVE ON FROM THIS ONE.

13          LET'S TALK ABOUT EMERGENCY CARE.  IF IN DOUBT SEND

14  HIM OUT IS A MOTTO IN CORRECTIONS, RIGHT?

15      A    YES.

16      Q    AND THAT MEANS IF YOU DON'T KNOW EXACTLY WHAT'S

17  GOING ON WITH A PATIENT OR IF YOU DON'T THINK YOU CAN TAKE

18  CARE OF THEM, THEN YOU SEND THEM TO THE EMERGENCY ROOM,

19  CORRECT?

20      A    YES.

21      Q    IN YOUR RECORD REVIEWS AND OBSERVATIONS, YOU DIDN'T

22  SEE A SINGLE INSTANCE OF DEFENDANTS TAKING PEOPLE DIRECTLY

23  FROM THEIR HOUSING UNIT TO AN OUTSIDE HOSPITAL, DID YOU?

24      A    NO.

25      Q    THEY ALWAYS WENT TO THE ATU FIRST?

1    **A**    YES.

2    **Q**    AND YOU DIDN'T EVEN SEE AN EXAMPLE OF AN RN SENDING

3    SOMEONE DIRECTLY FROM THE ATU TO THE HOSPITAL, DID YOU?

4    **A**    NO.

5    **Q**    RN'S SHOULD BE ABLE TO SEND PEOPLE OUT IF THERE'S AN

6    EMERGENCY, CORRECT?

7    **A**    NO.

8    **Q**    DO YOU RECALL TELLING ME AT YOUR DEPOSITION THAT

9    THEY SHOULD?

10    **A**    IN SOME CIRCUMSTANCES.  IT DEPENDS UPON THE HOUSING

11    UNITS.  I DON'T BELIEVE THAT'S APPROPRIATE AT LSP AND I DON'T

12    AGREE WITH YOUR EXPERTS ON IT.  MANY FACILITIES BRING THE

13    PATIENTS TO THE ATU OR THEIR TREATMENT AGENT AREA TO BE

14    STABILIZED BEFORE THEY'RE SENT OUT.  LSP IS IN THE MIDDLE OF

15    NOWHERE.  IT'S NOT IN A CITY SOMEPLACE WHERE THE LOCAL

16    EMERGENCY ROOM IS JUST DOWN THE STREET.

17    **Q**    LET ME STATE MY QUESTION AGAIN.  RN'S SHOULD BE ABLE

18    TO SEND PEOPLE FROM THE ATU TO THE EMERGENCY ROOM IF THERE'S

19    AN EMERGENCY, CORRECT?

20    **A**    FROM THE ATU TO THE EMERGENCY ROOM, I BELIEVE SO.

21    **Q**    YES.  THAT'S PRETTY MUCH THE SAME WAY THAT IT IS

22    THROUGHOUT THE UNITED STATES; RN'S ARE LICENSED TO DETERMINE

23    THAT SOMEONE NEEDS TO BE SENT TO THE EMERGENCY ROOM?

24    **A**    IT'S JUST REALLY OUT OF CONTEXT.  IN THE ATU YOU'VE

25    GOT NURSE PRACTITIONERS AND SO I DON'T -- I DON'T SEE THE

1   LIKELIHOOD OF THAT HAPPENING.

2       **Q**   YOU'RE AWARE, SIR, THAT THERE ARE NURSE

3   PRACTITIONERS IN THE ATU FROM 7:30 A.M. TO 4 P.M. ON WEEKDAYS,

4   CORRECT?

5       **A**   CORRECT.

6       **Q**   AND NOT AFTER THAT TIME UNLESS THEY CHOOSE TO COME

7   IN, CORRECT?

8       **A**   CORRECT.

9       **Q**   AND ON THE WEEKEND -- YOU'VE BEEN LISTENING TO THE

10  TESTIMONY FOR THE LAST WEEK OR TWO -- THE WEEKEND NURSE

11  PRACTITIONERS MAY BE ELSEWHERE IN THE TREATMENT CENTER AND MAY

12  OR MAY NOT COME TO THE ATU, CORRECT?

13      **A**   I'LL AGREE TO ELSEWHERE IN THE TREATMENT CENTER, BUT

14  IF YOU'VE GOT SOMEBODY THAT NEEDS TO GO OUT, THE NURSE

15  PRACTITIONER IS GOING TO MAKE THAT DECISION.  YOU'VE GOT NURSE

16  PRACTITIONERS TO MAKE THAT DECISION AND IT'S GOING TO TAKE A

17  WHILE FOR THEM TO LOAD THEM UP IN THE AMBULANCE.  AN RN IS

18  JUST NOT GOING TO GO SEND HIM OUT AND THEN HAVE THE NURSE

19  PRACTITIONER SHOW UP FIVE MINUTES LATER AND SAY WHY DID YOU

20  SEND HIM OUT?

21      **Q**   SO IT'S YOUR TESTIMONY TODAY THAT RN'S SHOULD NOT

22  HAVE THE ABILITY TO --

23      **A**   NO.  I THINK THEY SHOULD, PARTICULARLY IF YOU DON'T

24  HAVE A NURSE PRACTITIONER THERE.

25      **Q**   THANK YOU.  AND YOU DON'T HAVE AN OPINION OVERALL

1  ABOUT WHETHER PEOPLE ARE CORRECTLY AND TIMELY SENT OUT TO THE

2  EMERGENCY ROOM FROM LSP, CORRECT?

3      **A**    OVERALL?

4      **Q**    YES.

5      **A**    I THINK THEY'RE SENT OUT IN AN APPROPRIATE AND

6  TIMELY FASHION.

7      **Q**    AT YOUR DEPOSITION YOU TOLD ME YOU DON'T HAVE AN

8  OPINION ABOUT THAT, CORRECT?

9      **A**    LET'S LOOK AT THE CONTEXT.

10      **Q**    LET'S LOOK AT PAGE -- LET'S LOOK AT PAGE 184 AND 185

11  OF THE DEPOSITION.

12      SO LET'S START AT 184, LINE 6.

13      I ASKED YOU, "IN THIS SECTION, YOU DON'T EXPRESS AN

14  OPINION HERE ABOUT WHETHER LSP STAFF ARE CORRECTLY DETERMINING

15  WHETHER TO TRANSFER INMATES TO A HIGHER LEVEL OF CARE,

16  CORRECT?"  AND I'LL REPRESENT THAT "IN THIS SECTION" WAS

17  REFERRING TO THE SECTION OF YOUR CONCLUSIONS TOWARDS THE END

18  OF YOUR REPORT ABOUT EMERGENCY CARE.

19      YOU ANSWERED, "CORRECT.  THAT'S IN THE CHART

20  REVIEWS."

21      I SAID, "AND YOU DON'T EXPRESS AN OPINION HERE ABOUT

22  WHETHER LSP IS TIMELY DETERMINING WHETHER TO TRANSFER INMATES

23  TO A HIGHER LEVEL OF CARE?"

24      YOU ANSWERED, "CHART REVIEWS."

25      I SAID, "SO WHEN YOU SAY 'CHART REVIEWS' ARE YOU

1    SAYING THAT BASED ON YOUR CHART REVIEWS YOU HAVE FORMED THE

2    CONCLUSION AND THE OPINION THAT LSP STAFF ARE CORRECTLY

3    DETERMINING WHETHER TO TRANSFER INMATES TO A HIGHER LEVEL OF

4    CARE?"

5            YOU ANSWERED, "IT DEPENDS ON THE INDIVIDUAL CHART

6    REVIEW.  I DID NOT SET UP A CRITERIA THAT SAID THAT A PATIENT

7    HAD TO BE SEEN WITHIN FOUR MINUTES OF AN EMERGENCY.  I'M NOT

8    DOING AN ACCREDITATION REVIEW.  I'M DOING A STANDARD OF CARE

9    REVIEW.  SO IF WE GO INTO THE CHART REVIEWS WE CAN TALK ABOUT

10   THE STANDARD OF CARE AND MY CONCLUSIONS."

11           THEN I ASKED YOU, "SO YOU HAVE AN OPINION ABOUT IN

12   SPECIFIC CHARTS THAT PEOPLE WERE CORRECTLY AND TIMELY SENT

13   OUT, BUT YOU DON'T HAVE AN OPINION ABOUT OVERALL WHETHER

14   THAT'S HAPPENING?"

15           YOU ANSWERED, "THAT'S CORRECT."

16           DID I READ THAT CORRECTLY?

17     **A**    YOU DID.

18     **Q**    YOU ALSO STATED THAT THAT SORT OF SYSTEMATIC REVIEW

19   SHOULD BE LOOKED AT IN THE QUALITY IMPROVEMENT PROGRAM,

20   CORRECT?

21     **A**    YES.

22     **Q**    BUT YOU DIDN'T REVIEW THE QUALITY IMPROVEMENT

23   PROGRAM TO SEE IF IT WAS UNDERTAKING THAT SORT OF SYSTEMATIC

24   REVIEW, DID YOU?

25     **A**    NO.

1    **Q**    LET'S TALK ABOUT THAT FOUR MINUTE STANDARD.  YOU'RE

2    CRITICAL OF PLAINTIFFS' EXPERTS FOR SAYING THAT THERE SHOULD

3    BE A FOUR MINUTE RESPONSE TIME TO EMERGENCIES, CORRECT?

4        **A**    YES.

5        **Q**    IT'S YOUR VIEW THAT IT'S UNREALISTIC TO EXPECT

6    HEALTH CARE STAFF IN A PRISON TO RESPOND TO EMERGENCIES WITHIN

7    A FOUR MINUTE RESPONSE TIME?

8        **A**    IN SOME OF THE LOCATIONS AT LSP THEY'RE REMOTE AND

9    YOU CAN'T HAVE HEALTH CARE PERSONNEL ARRIVE WITHIN FOUR

10   MINUTES.

11       **Q**    LET'S PULL UP DEFENSE EXHIBIT 11.11 AT PAGES 1 AND

12   -- FIRST JUST PAGE 1.

13           YOU'RE FAMILIAR WITH THE AMERICAN CORRECTIONAL

14   ASSOCIATION STANDARDS, CORRECT?

15       **A**    YES.

16       **Q**    DOES THIS APPEAR TO BE PART OF THE AMERICAN

17   CORRECTIONAL STANDARDS FOR ADULT CORRECTIONAL INSTITUTIONS?

18       **A**    I'M NOT SURE WHAT YEAR IT IS.

19       **Q**    LET'S GO TO PAGE 29 OF DEFENSE EXHIBIT 11.

20           IF WE LOOK AT THE SECOND EMERGENCY RESPONSE LISTED

21   HERE 5-6B-4389, COULD YOU READ THE FIRST SENTENCE?

22       **A**    I'M SORRY.  I WAS STILL TRYING TO FIGURE OUT WHEN

23   THESE STANDARDS WERE FROM -- WHAT THEY WERE FROM.

24       **Q**    IT SAYS THAT THIS IS THE FIFTH EDITION.  WE'LL PUT A

25   PEN IN WHEN THESE ARE FROM.  I DON'T HAVE THE DATE ON ME.

1   LET'S STIPULATE THAT THIS WAS CURRENT AS THE FIFTH EDITION AND

2   THEN WE CAN FIND OUT WHEN THAT WAS LATER.

3      **A**   ALL RIGHT.

4      **Q**   SO GIVEN THAT, PLEASE READ THE FIRST SENTENCE OF THE

5   SECOND EMERGENCY RESPONSE PARAGRAPH ON THE PAGE.

6      **A**   "MANDATORY," MEANING IT'S ONE OF THE STANDARDS THEY

7   BELIEVE EVERYONE SHOULD COMPLY WITH.  "DESIGNATED CORRECTIONAL

8   AND ALL HEALTH CARE STAFF ARE TRAINED TO RESPOND TO HEALTH

9   RELATED SITUATIONS WITHIN A FOUR MINUTE RESPONSE TIME."

10     **Q**   OKAY.  AND THEN LET'S ALSO PULL UP PLAINTIFF'S

11  EXHIBIT 21-Y.  THIS IS LSP'S EMERGENCY CARE POLICY, CORRECT?

12     **A**   YES.

13     **Q**   LET'S GO TO PAGE 2.  COULD YOU READ THE FIRST

14  SENTENCE ON THAT PAGE?

15     **A**   "ALL EMPLOYEES OF THE LSP SHALL BE TRAINED TO

16  RESPOND TO HEALTH RELATED SITUATIONS WITHIN A FOUR MINUTE

17  RESPONSE TIME."

18     **Q**   AND I DON'T BELIEVE EITHER OF THESE ARE IN EVIDENCE

19  SO I'LL MOVE DX-11 AND PX_21_Y INTO EVIDENCE.

20         **MR. ARCHEY:**  NO OBJECTION.

21         **THE COURT:**  ADMITTED.

22  **BY MR. DUBNER:**

23     **Q**   REGARDING SELF-DECLARED EMERGENCIES, YOU AGREE THAT

24  THE PRACTICE AT THE TIME YOU ISSUED YOUR REPORT WAS

25  PROBLEMATIC, CORRECT?

1          **A**    YES.

2          **Q**    THAT'S BECAUSE EMT'S WERE PRACTICING BEYOND THEIR

3     TRAINING AND LICENSING WHEN THEY TRIAGED PATIENTS WITHOUT

4     CONSULTING AN EMT OR OTHER PROVIDER?

5          **A**    YES.

6          **Q**    EMT'S SHOULDN'T BE DECIDING WHETHER SOMETHING IS

7     REALLY AN EMERGENCY, CORRECT?

8          **A**    THAT QUESTION IS HARD TO ANSWER.  I DON'T THINK I

9     CAN ANSWER THAT QUESTION.

10         **Q**    DID YOU STATE AT YOUR DEPOSITION THAT EMT'S SHOULD

11    NOT BE MAKING A DETERMINATION ABOUT WHETHER SOMETHING IS

12    REALLY AN EMERGENCY?

13         **A**    IF YOU SAY SO THAT'S TRUE.  I WAS THINKING IN THE

14    CONTEXT OF THE SELF-DECLARED EMERGENCIES AND HOW THE -- THEY

15    WERE PRACTICING OUTSIDE OF THEIR SCOPE.

16         **Q**    LET'S PULL UP PAGE 75.  YOU KNOW AT LEAST FOUR CASES

17    WHERE THE SELF-DECLARED EMERGENCY PROCESS LED TO PATIENTS NOT

18    RECEIVING EVALUATIONS THAT THEY NEEDED, CORRECT?

19         **A**    I'M NOT SURE HOW MANY CIRCUMSTANCES, BUT I BELIEVE

20    THAT THAT WAS OCCURRING.

21         **Q**    AT THE TIME OF YOUR REPORT, YOU UNDERSTOOD THE

22    DEFENDANT'S PLAN TO CHANGE THEIR SELF-DECLARED EMERGENCY

23    PROCESS, CORRECT?

24         **A**    AT THE TIME OF THE REPORT I WAS HOPING THEY WOULD

25    CHANGE IT.

1    **Q**    AT THE TIME OF YOUR REPORT, YOU HAD DISCUSSED

2    WITH -- YOU HAD DISCUSSED THIS OPINION WITH -- WITH RETAINING

3    COUNSEL DR. JACOB JOHNSON -- LET ME REPHRASE THAT.

4            AT THE TIME OF YOUR REPORT, YOU WERE AWARE THAT LPN

5    WAS CURRENTLY PRODUCING A POLICY THAT WOULD INSTITUTE THE

6    CHANGE YOU SUGGESTED?

7    **A**    LSP YOU MEAN?

8            **THE COURT:**  YOU SAID LPN.

9    **BY MR. DUBNER:**

10   **Q**    YES.  I SAID LPN.  LSP, CORRECT.

11   **A**    YES.  WE WERE WORKING ON IT AFTER MY REPORT AND IT

12   HAS SINCE CHANGED SIGNIFICANTLY.

13   **Q**    AND IN YOUR REPORT YOU DIDN'T OPINE ON THE SPECIFICS

14   OF THE PROCESS THEY PLANNED TO INTRODUCE, CORRECT?

15   **A**    CORRECT.

16   **Q**    IN YOUR TESTIMONY YESTERDAY YOU DIDN'T TESTIFY ABOUT

17   ANY CHART REVIEWS SHOWING HOW THE NEW MEMO WAS AFFECTING CARE,

18   CORRECT?

19   **A**    I DON'T THINK I WAS ALLOWED TO.

20   **Q**    UNDER BOTH THE NEW SYSTEM AND THE SYSTEM IN PLACE,

21   THROUGHOUT DISCOVERY, A PROVIDER DECIDES WHETHER OR NOT THE

22   PATIENT SHOULD BE TRANSPORTED TO THE ATU -- LET ME REPHRASE

23   THAT.

24           UNDER BOTH THE NEW SYSTEM AND THE SYSTEM IN PLACE,

25   THROUGHOUT DISCOVERY, A PROVIDER CAN DECIDE NOT TO TRANSPORT A

1   PATIENT TO THE ATU BASED ON THE EMT'S REPORT?

2   **A**   I BELIEVE THERE'S NO -- NO -- WELL, THE TRANSPORT IS

3   DETERMINED WHETHER OR NOT THE PATIENT FALLS UNDER ONE OF THE

4   ITO'S, AND THEN THE NURSE PRACTITIONER IS CONTACTED TO BE ABLE

5   TO MAKE A DETERMINATION WHETHER OR NOT SOMETHING IS AN

6   EMERGENCY AND WHETHER OR NOT THAT PATIENT NEEDS TO BE SEEN IN

7   THE ATU, BECAUSE THEY'RE NOT ALL EMERGENCIES.

8   **Q**   SO THE PROVIDER STILL DECIDES WHETHER OR NOT THE

9   PATIENT SHOULD BE TRANSPORTED TO THE ATU BASED ON WHAT IS

10  REPORTED BY THE EMT?

11  **A**   YES.

12  **Q**   AND YOU STATED YESTERDAY THAT YOU HAVE CONCERNS WITH

13  THE ITO'S?

14  **A**   SOME OF THE ITO'S NEED TO BE REWORKED AT

15  HEADQUARTER'S LEVEL.

16  **Q**   LET'S TALK ABOUT CLINICAL CARE.

17      YOU WOULD AGREE THAT A PHYSICIAN IN A CLINICAL

18  APPOINTMENT SHOULD CONDUCT A DIRECTED PHYSICAL EXAMINATION,

19  READ AND MONITOR THE MOST RECENT TEST RESULTS AND MONITOR AND

20  MANAGE MEDICATIONS, CORRECT?

21  **A**   YES.

22  **Q**   IF WE COULD PULL UP YOUR REPORT AT PAGES, I BELIEVE,

23  212 AND 213.  SORRY, THOSE ARE THE PAGE NUMBERS AT THE BOTTOM

24  OF THE -- IT WILL -- I'M SORRY.  THAT'S CORRECT.  212 AND 213.

25  SORRY FOR THE CONFUSION.

1          THIS IS THE OPINION YOU STATE IN YOUR REPORT ABOUT

2    THE MEDICAL CARE PROVIDED IN LSP'S CLINICS?

3        **A**    CORRECT.

4        **Q**    NOWHERE IN YOUR REPORT DO YOU DISCUSS WHETHER

5    PHYSICIANS ROUTINELY FAIL TO ADEQUATELY OBTAIN INFORMATION

6    REGARDING A PATIENT'S MEDICAL HISTORY UPON EVALUATION,

7    CORRECT?

8        **A**    CORRECT.

9        **Q**    NOWHERE IN YOUR REPORT DO YOU DISCUSS WHETHER

10   PHYSICIANS ROUTINELY FAILED TO PERFORM A MEANINGFUL PHYSICAL

11   EXAM, CORRECT?

12       **A**    CORRECT.

13       **Q**    NOWHERE IN YOUR REPORT DO YOU DISCUSS WHETHER

14   PHYSICIANS ROUTINELY FAILED TO READ AND MONITOR TESTING,

15   CORRECT?

16       **A**    CORRECT.

17       **Q**    NOWHERE IN YOUR REPORT DO YOU DISCUSS WHETHER

18   PHYSICIANS ROUTINELY FAILED TO MONITOR AND MANAGE MEDICATIONS

19   INCLUDING EDUCATING PATIENTS REGARDING MEDICATIONS, CORRECT?

20       **A**    CORRECT.

21       **Q**    AND NOWHERE IN YOUR REPORT DO YOU DISCUSS WHETHER

22   PHYSICIANS TREAT COMPLAINTS EPISODICALLY, CORRECT?

23       **A**    CORRECT.

24       **Q**    WE CAN TAKE THAT DOWN.

25          LET'S TALK ABOUT REFUSALS BRIEFLY.  IDEALLY A

1   REFUSAL FORM SHOULD SAY WHAT VISIT THE PATIENT IS REFUSING AND

2   EXPLAIN WHY THE CARE IS IMPORTANT, CORRECT?

3       **A**   YES.

4       **Q**   BUT AS YOU SAID IN YOUR DEPOSITION, THAT'S JUST THE

5   IDEAL WORLD.  IN YOUR VIEW THE MINIMAL STANDARD IS THAT THE

6   REFUSAL SHOULD SAY THAT THEY REFUSED AND WHAT THE CARE IS,

7   CORRECT?

8       **A**   YES.

9       **Q**   IS IT APPROPRIATE TO THREATEN A PATIENT WITH

10   DISCIPLINE IF THEY REFUSE TO SIGN A REFUSAL FORM?

11       **A**   I DIDN'T UNDERSTAND THE FIRST PART OF YOUR QUESTION.

12       **Q**   SURE.  IT WOULD NOT BE APPROPRIATE TO THREATEN A

13   PATIENT WITH DISCIPLINE IF THEY REFUSED TO SIGN A REFUSAL

14   FORM, CORRECT?

15       **A**   CORRECT.

16       **Q**   LET'S TALK ABOUT THE INFIRMARY.

17       **THE COURT:**  MR. DUBNER, IF YOU'RE IN A LOGICAL PLACE

18   YOU WANT TO TAKE A 15-MINUTE BREAK?

19       **MR. DUBNER:**  SURE.

20       **THE COURT:**  WE'RE GOING TO TAKE A 15-MINUTE BREAK.

21   WHEN WE COME BACK I'D LIKE TO HEAR FROM THE DEFENDANTS IN

22   TERMS OF HOW MUCH MORE TESTIMONY YOU ANTICIPATE.  I NEED TO

23   TRY TO MOVE SOME THINGS NEXT WEEK IF NECESSARY.

24                         (RECESS)

25       **THE COURT:**  ANY IDEA ABOUT PREDICTION ON WHAT WE

1  HAVE REMAINING.

2        **MR. ROBERT:**  JUDGE, I'M THINKING WE'RE PROBABLY --

3  AFTER TODAY, WE'RE PROBABLY GOING TO HAVE ABOUT, BETWEEN CROSS

4  EXAM AND SO FORTH, ABOUT THREE MORE DAYS OF TESTIMONY.

5        **THE COURT:**  OKAY.  ALL RIGHT.  WELL, WE'LL GO INTO

6  MONDAY PROBABLY THEN.  I'M SORRY ABOUT THAT.  OH, MONDAY IS A

7  HOLIDAY.  TUESDAY.  WE'LL HAVE TO GO INTO TUESDAY.  I MAY NOT

8  BE ABLE -- I MAY NOT -- WELL, MY COURTROOM DEPUTY AND I WILL

9  TALK AT THE BREAK AND FIGURE OUT WHAT WE'RE GOING TO DO.

10       **MR. ROBERT:**  THANK YOU, JUDGE.

11       **THE COURT:**  WHERE'S MR. DUBNER?

12       **MS. MONTAGNES:**  YOUR HONOR, I BELIEVE HE'S IN THE

13  WASH ROOM, I APOLOGIZE.

14       **THE COURT:**  OKAY.

15       **MS. MONTAGNES:**  WE PLAN TO GET HIM.

16       **THE COURT:**  GO AHEAD, MR. DUBNER.

17  **BY MR. DUBNER:**

18    **Q**   DR. MATHIS, IF WE COULD RETURN TO PATIENT 58 FOR A

19  MOMENT, THAT WAS WHERE WE HAD THE CONVERSATION ABOUT THE

20  DIABETIC KETOACIDOSIS VERSUS COVID.

21       WHEN WE WERE DISCUSSING THE PATIENT YOU SAID THAT

22  LSP THOUGHT HE HAD COVID SO THEY PRESCRIBED ANTIBIOTICS; IS

23  THAT CORRECT?

24    **A**   THEY COVERED HIM WITH ANTIBIOTICS AND THEY DID

25  PRESCRIBE THEM, YES.

1  **Q**   IS IT YOUR BELIEF THAT ANTIBIOTICS ARE A TREATMENT

2  FOR COVID?

3  **A**   NO.

4  **Q**   LET'S TALK ABOUT THE INFIRMARY.  ON AN INFIRMARY

5  CERTIFIED NURSING ASSISTANTS TYPICALLY CHANGE BEDS, CORRECT?

6  LET ME REPHRASE THAT.  PUTTING LSP ASIDE, ON A

7  TYPICAL INFIRMARY CERTIFIED NURSING ASSISTANTS TYPICALLY

8  CHANGE BEDS, CORRECT?

9  **A**   THEY'RE NOT THE SOLE PEOPLE THAT CHANGE BEDS.  IT'S

10 ONE OF THEIR DUTIES GENERALLY IF THERE ARE CERTIFIED NURSING

11 ASSISTANTS.  IT'S UNCOMMON TO SEE CNA'S.  LPN'S ARE USUALLY

12 THE LOWEST NURSING DEGREE THAT I'M AWARE OF.

13 **Q**   SO ARE YOU TESTIFYING CHANGING BEDS IS NOT A ROLE

14 THAT CERTIFIED NURSING ASSISTANTS TYPICALLY PLAY ON

15 INFIRMARIES?

16 **A**   IT'S ONE OF THEIR DUTIES IF THEY'RE ASSIGNED TO THE

17 INFIRMARY IF THERE'S SOMEONE -- IF THERE'S A CNA.

18 **Q**   AND ANOTHER ONE OF THOSE DUTIES WOULD BE HELPING TO

19 ROLL PATIENTS?

20 **A**   YES.

21 **Q**   ANOTHER ONE OF THOSE DUTIES WOULD BE FEEDING

22 PATIENTS?

23 **A**   YES.

24 **Q**   AND ANOTHER ONE OF THOSE DUTIES WOULD BE CLEANING UP

25 INCONTINENCE?

1    **A**    YES.

2    **Q**    AT LSP'S INFIRMARY INMATE ORDERLIES TYPICALLY CHANGE

3    BEDS, CORRECT?

4    **A**    YES.

5    **Q**    INMATE ORDERLIES TYPICALLY CHANGE PATIENTS, CORRECT?

6    **A**    COMMONLY.

7    **Q**    INMATE ORDERLIES TYPICALLY ROLL PATIENTS, CORRECT?

8    **A**    COMMONLY.

9    **Q**    INMATE ORDERLIES TYPICALLY FEED PATIENTS?

10   **A**    COMMONLY.

11   **Q**    AND INMATE ORDERLIES TYPICALLY CLEAN UP

12   INCONTINENCE?

13   **A**    YES.

14   **Q**    YOU STATED ON DIRECT THAT THE ORDERLIES ARE

15   SUPERVISED BY NURSES.  IN YOUR VISIT TO LSP, YOU ONLY

16   WITNESSED ONE INTERACTION BETWEEN A NURSE AND AN ORDERLY,

17   CORRECT?

18   **A**    YES.

19   **Q**    ASIDE FROM THAT ONE OBSERVATION, YOUR BELIEF THAT

20   NURSES SUPERVISE ORDERLIES IS BASED ON YOUR REVIEW OF THE

21   ORDERLY TRAINING AND THE FACT THAT A CHARGE NURSE IS PRESENT

22   IN THE NURSING UNIT, CORRECT?

23   **A**    THIS IS DIFFICULT TO ANSWER, BECAUSE A SUPERVISOR

24   CAN BE STANDING THERE WATCHING OR JUST DIRECT SOMEONE TO DO

25   SOMETHING.  IF AN INMATE NEEDS TO BE BATHED, THEN A NURSING

1  SUPERVISOR OR AN RN CAN SAY, *GO BATHE THIS GUY* AND THEN THE

2  ORDERLIES TAKE IT UP.  SO YOU NEED TO -- WE NEED TO BE MORE

3  CLEAR ABOUT THIS.

4      **Q**   BUT TO GO BACK TO MY QUESTION, THE BASIS FOR YOUR

5  BELIEF THAT NURSES SUPERVISE ORDERLIES IN ADDITION TO YOUR ONE

6  OBSERVATION IS YOUR REVIEW OF THE ORDERLY TRAINING AND THE

7  FACT THAT A CHARGE NURSE IS PRESENT IN THE NURSING UNIT,

8  CORRECT?

9      **A**   IN THE WAY THAT THINGS WORK IN AN INFIRMARY WE'VE

10 GOT A NURSE WHO'S RUNNING THE SHOW.

11     **Q**   SO YOUR ASSUMPTION IS ABOUT HOW INFIRMARIES

12 TYPICALLY WORK.

13     **A**   YES.

14     **Q**   DID I HEAR YOU SAY YESTERDAY THAT YOU WORKED WITH

15 MS. STICKELLS TO IMPROVE THE ORDERLY TRAINING POWERPOINT?

16     **A**   I THINK THAT TESTIMONY WAS EXCLUDED.

17     **Q**   THAT MAY HAVE BEEN.  I WITHDRAW THE QUESTION.

18     YOU BELIEVE THAT IT CAN BE APPROPRIATE FOR ORDERLIES

19 TO PROVIDE DIRECT PATIENT CARE AS LONG AS THEY'RE BEING

20 DIRECTLY SUPERVISED BY AN LPN OR RN, CORRECT?

21     **A**   I WOULD PREFER IT WAS THE RN, BUT THE ANSWER TO THAT

22 IS YES.

23     **Q**   YOU BELIEVE IT'S APPROPRIATE FOR AN ORDERLY TO

24 PROVIDE PHYSICAL THERAPY AS LONG AS HE'S SUPERVISED BY A

25 PHYSICAL THERAPIST?

1     **A**    IN THIS CIRCUMSTANCE IT'S EXTENUATING BECAUSE HE

2  HAS -- HE'S A CERTIFIED PHYSICAL THERAPY ASSISTANT.  IT'S NOT

3  JUST SOME GUY OUT OF THE YARD.

4     **Q**    YOU BELIEVE IT'S APPROPRIATE FOR ORDERLIES TO HELP

5  POSITION PATIENTS DURING WOUND CARE, CORRECT?

6     **A**    YES.

7     **Q**    YOU SAID THAT THE INMATE ORDERLY ROLE AT LSP

8  COMPLIES WITH THE ACA STANDARDS, CORRECT?

9     **A**    YES, I BELIEVE SO.

10    **Q**    DO THE ACA STANDARDS ALLOW ORDERLIES TO PROVIDE

11 DIRECT PATIENT CARE?

12    **A**    I BELIEVE SO.

13    **Q**    IF WE COULD PULL UP DX-11 AT 31.  HALFWAY DOWN THE

14 PAGE DO YOU SEE THE LINE, "OFFENDERS ARE NOT TO BE USED FOR

15 THE FOLLOWING DUTIES"?

16    **A**    YES.

17    **Q**    COULD YOU READ THE NEXT LINE?

18    **A**    "PERFORMING DIRECT PATIENT CARE SERVICES."

19    **Q**    DOES DOC POLICY ALLOW ORDERLIES TO PROVIDE DIRECT

20 PATIENT CARE?

21    **A**    I DON'T BELIEVE SO.

22    **Q**    DOC POLICY EXPLICITLY PROHIBITS ORDERLIES FROM

23 PROVIDING DIRECT PATIENT CARE, CORRECT?

24    **A**    I BELIEVE SO.

25    **Q**    AND LET'S JUST PULL UP PLAINTIFFS' EXHIBIT 19-H.  IF

1   WE COULD GO TO PAGE 2.  THE SECTION TOWARDS THE BOTTOM THAT'S

2   LABELED 2.

3           IS THIS THE PROHIBITION THAT YOU'RE TALKING ABOUT?

4       **A**   THIS IS EXACTLY WHAT YOU'VE SUGGESTED.  "OFFENDERS

5   SHALL NOT BE USED FOR THE FOLLOWING DUTIES:  PERFORMING DIRECT

6   PATIENT CARE SERVICES."

7       **Q**   AND WE'LL MOVE PLAINTIFFS' EXHIBIT 19-H INTO

8   EVIDENCE.

9           **MR. ARCHEY:**  NO OBJECTION, YOUR HONOR.

10          **THE COURT:**  ADMITTED.

11  **BY MR. DUBNER:**

12      **Q**   YOUR UNDERSTANDING OF THE NCCHC STANDARDS IS THAT

13  THEY COMPLETELY REJECT USING INMATE ORDERLIES; IS THAT

14  CORRECT?

15      **A**   NO.

16      **Q**   IS THAT WHAT YOU WROTE IN YOUR REPORT?

17      **A**   I BELIEVE SO.

18      **Q**   YOU WROTE IN YOUR REPORT THAT NCCHC COMPLETELY

19  REJECTS USING ORDERLIES?

20      **A**   WELL, YOU NEED TO READ THE ENTIRE REPORT.  I THINK

21  WHAT STARTED OUT FROM WHAT IT SUGGESTED IN LIKE 2004 AND THEN

22  I BELIEVE THAT I WROTE THAT IT DOES UNDERSTAND THAT INMATE

23  ORDERLIES ARE BEING USED, AND THEN THE CIRCUMSTANCES IN WHICH

24  THEY'RE BEING USED, THAT NEEDS TO BE -- THEY NEED TO HAVE

25  PROPER TRAINING.  SO LET'S GO TO MY REPORT.

1    **Q**    SURE.  LET'S PULL UP PAGES 218 AND 219 OF YOUR

2  REPORT.  AT THE BOTTOM OF THE LEFT-HAND PAGE, PAGE 218 OF

3  DX_35_C, YOU WROTE, "THE COURT ADDRESSED INMATE ORDERLIES AT

4  THE TRIAL.  MY UNDERSTANDING AND DISCUSSION WITH RETAINING

5  COUNSEL ARE THAT THE COURT COMPLETELY REJECTED USING INMATE

6  ORDERLIES.  THIS DETERMINATION IS CONSISTENT WITH THE 2009

7  NCCHC GUIDELINES FOR THE MANAGEMENT OF AN ADEQUATE DELIVERY

8  SYSTEM."

9         DID I READ THAT CORRECTLY?

10    **A**    YOU DID.  AND THEN AS I ALLUDED TO, THE NEXT PAGE

11  GOING ON TO SAY THAT, "NEVERTHELESS, EVEN THE NCCHC APPEARS TO

12  RECOGNIZE THAT INMATE WORKERS ARE USED IN CORRECTIONAL

13  FACILITIES.  INMATE WORKERS, IF USED, ARE TRAINED IN

14  APPROPRIATE METHODS FOR HANDLING AND DISPOSING OF BIOHAZARDOUS

15  MATERIALS AND SPILLS."  THEY'RE USED FOR PALLIATIVE CARE.  I

16  MEAN I CAN GO ON IF YOU WANT.  I'M SURE YOU WANT TO TALK ABOUT

17  IT SPECIFICALLY.

18    **Q**    YES.  YOU SAY THAT THE NCCHC ALLOWS THE USE OF

19  INMATE WORKERS FOR CLEANING UP IN MEDICAL AREAS, ON-SITE

20  PALLIATIVE CARE, AND AGAIN CLEANING THE HEALTH SERVICES UNIT

21  OR HANDLING BIOHAZARDOUS WASTE; IS THAT CORRECT?

22    **A**    AND PC-06, THE NEXT BULLET.

23    **Q**    AND THAT'S, FOR EXAMPLE, PROVIDED THERE'S SUFFICIENT

24  SUPERVISION, INMATES MAY BE USED TO CLEAN THE HEALTH SERVICES

25  UNIT OR HANDLE BIOHAZARDOUS WASTE?

1      **A**    YES.

2      **Q**    WERE YOU AWARE THAT THE NCCHC DOES ALLOW THE USE OF

3   INMATE ORDERLIES TO PROVIDE ASSISTANCE WITH ACTIVITIES OF

4   DAILY LIVING IN ASSISTED LIVING DORMITORIES?

5      **A**    I DIDN'T INCLUDE THAT IN MY REPORT.

6      **Q**    SO YOUR BELIEF THAT THEY PROHIBIT -- STRIKE THAT.

7         AND ONE MORE QUESTION ABOUT THE NURSING UNITS.  YOU

8   ACKNOWLEDGE THAT IT'S DIFFICULT TO SEE ALL OF NURSING UNIT 2

9   FROM THE NURSING STATION, CORRECT?

10     **A**    IT'S A BIG NURSING UNIT AND UNLESS YOU STAND UP TO

11  THE WINDOW AND DIRECTLY LOOK.  YOU'RE NOT GOING TO BE ABLE TO

12  SEE IT FROM THE FRONT OF YOUR DESK.

13     **Q**    AND THEN ON THE MEDICAL DORMITORIES, OTHER THAN THE

14  ORDERLIES ASSISTING AT ADL'S THERE'S NO MEDICAL CARE PROVIDED

15  IN THE MEDICAL DORMITORIES, CORRECT?  ASH 1 THROUGH 4.

16     **A**    I BELIEVE THAT THE NURSE PRACTITIONERS ROTATE

17  THROUGH THERE WHEN THEY DECIDE AT THE MORNING MEETING WHERE

18  THEY'RE GOING TO WORK.  I THINK THEY ROTATE AND DO ROUNDS

19  THERE, BUT I'M NOT CERTAIN ABOUT ANY OTHER POLICY ABOUT THEM

20  SEEING PATIENTS THERE.

21     **Q**    AND THEN DID YOU SEE ANY RECORD EVIDENCE OF NURSE

22  PRACTITIONERS DOING ROUNDS IN ANY OF THE MEDICAL DORMITORIES?

23     **A**    I DIDN'T SEE ANY DOCUMENTATION OTHER THAN THE FACT

24  THAT THE -- THE MORNING MEETING HAD THE INFORMATION ABOUT

25  THOSE PATIENTS THAT WERE DISTRIBUTED AMONG ALL OF THE NURSE

1    PRACTITIONERS, MEDICAL DIRECTOR AND ALL THE OTHER PEOPLE THAT
2    ATTENDED THAT IMPORTANT MEETING.

3        **Q**    AND THERE'S BEEN NO DEPOSITION OR TRIAL TESTIMONY
4    SUGGESTING THAT NURSE PRACTITIONERS EVER GO TO THE ASSISTED
5    LIVING DORMITORIES?

6        **A**    I THINK YOU'RE RIGHT ABOUT THAT.

7        **Q**    YOUR BELIEF THAT NURSE PRACTITIONERS GO TO THE
8    ASSISTED LIVING DORMITORIES IS SOLELY BASED ON YOUR
9    EXTRAPOLATION FROM A DOCUMENT LISTING PATIENTS IN THE ASSISTED
10   LIVING DORMITORIES AT THE MORNING MEETING?

11       **A**    YES.

12       **Q**    LET'S TALK ABOUT MORTALITY REVIEWS -- ACTUALLY,
13   BEFORE THAT, LET'S JUST TALK ABOUT SICK CALL FOR A MOMENT.
14   YOU ACKNOWLEDGE THAT OTOSCOPES, STETHOSCOPES AND
15   SPHYGMOMANOMETERS ARE NOT ALWAYS AVAILABLE FOR SICK CALL?

16       **A**    YES.

17       **Q**    THAT'S THE FIRST TIME IN MY LIFE I EVER PRONOUNCED
18   THAT WORD CORRECTLY.

19           WHEN YOU SAID YESTERDAY THAT AT SOME OTHER
20   FACILITIES LPN'S CONDUCT SICK CALL, YOU WEREN'T SUGGESTING
21   THAT THE FINAL ENCOUNTER FOR PATIENTS AT OTHER FACILITIES IS
22   CONDUCTED BY LPN'S, WERE YOU?

23       **A**    OH, I SEE IT ALL THE TIME.  THAT'S PART OF THE
24   REASON I HAVE SO MANY CASES THAT I'VE WORKED ON; IS THE LPN'S
25   ARE HANDLING SICK CALL AND DON'T KNOW WHAT THEY'RE DOING.

1    **Q**    SO WHEN YOU SAID YESTERDAY THAT AT SOME OTHER

2    FACILITIES LPN'S CONDUCT SICK CALL YOU WERE DESCRIBING A

3    PRACTICE THAT RESULTS IN PROBLEMS?

4    **A**    YEAH, AND IT'S PREVALENT THROUGHOUT THE UNITED

5    STATES.

6    **Q**    AND LET'S USE CALIFORNIA AS AN EXAMPLE WHERE YOU'VE

7    PRACTICED.  IF A PERSON PUTS IN A SICK CALL REQUEST THAT

8    REQUIRES SOMETHING MORE THAN OVER-THE-COUNTER TREATMENT, THEY

9    SEE A PROVIDER, CORRECT?

10   **A**    THAT'S NOT TOTALLY TRUE.  THE SICK CALL REQUESTS ARE

11   FOR MULTIPLE REASONS.  IT MAY BE THAT THEY DIDN'T GET THEIR

12   MEDICATIONS.  THEY WANT TO SEE THE DENTIST.  THEY WANT TO SEE

13   THE PODIATRIST.  THERE ARE LOTS OF DIFFERENT REASONS THAT ARE

14   CARED FOR WHEN THE NURSE TRIAGES THOSE AND SHE TRIAGES THEM.

15   SHE SENDS THEM IN ONE DIRECTION OR ANOTHER DIRECTION AND SOME

16   OF THOSE NEED TO BE SEEN BY THE MEDICAL PROVIDER WHO CAN

17   DIAGNOSE AND TREAT.

18   **Q**    RIGHT.  YOU SAID PODIATRIST.  THAT'S A MEDICAL

19   PROVIDER FOR EXAMPLE?

20   **A**    UH-HUH.

21   **Q**    DENTIST IS A MEDICAL PROVIDER; DENTAL MEDICINE

22   PROVIDER?

23   **A**    YES.

24   **Q**    ASIDE FROM MEDICATION REFILLS OR A BLISTER OR

25   SOMETHING THAT CAN RECEIVE OVER-THE-COUNTER TREATMENT, ALL

1  SICK CALL REQUESTS IN CALIFORNIA END IN A PROVIDER SEEING THE
2  PATIENT, CORRECT?

3  **A**    WELL, THE RN'S CAN HANDLE CERTAIN THINGS WITHIN
4  THEIR SCOPE OF PRACTICE.  THE INMATE MAY SAY THAT THEY WANT TO
5  HAVE THEIR DRESSING CHANGED OR THEIR CALLUSES TRIMMED OR THEIR
6  TOENAILS TRIMMED.  THERE ARE LOTS OF REASONS THAT THE RN CAN
7  HANDLE THAT.

8  **Q**    THE STANDARD OF CARE IS IF IT IS NOT SOMETHING THAT
9  A NURSE CAN TREAT PURSUANT TO A NURSING PROTOCOL OR ITS SCOPE
10 OR LICENSE, THE PATIENT SEES A PROVIDER WHEN THEY MAKE SICK
11 CALL REQUESTS, CORRECT?

12 **A**    CORRECT.

13 **Q**    LET'S TALK ABOUT MORTALITY REVIEWS.  LSP MORTALITY
14 REVIEWS ARE A SHORT NARRATIVE SUMMARY OF THE CIRCUMSTANCES
15 SURROUNDING THE DEATH, CORRECT?

16 **A**    NOT ALWAYS SHORT, BUT THEY'RE A NARRATIVE SUMMARY.
17 I THINK EXPLICATORY IS WHAT I WROTE IN MY REPORT.

18 **Q**    YOU BELIEVE THAT MORTALITY REVIEWS SHOULD INCLUDE A
19 CRITICAL REVIEW OF THE CARE THAT PROCEEDED THE DEATH, CORRECT?

20 **A**    YES.

21 **Q**    YOU DIDN'T SEE ANY MORTALITY REVIEWS AT LSP THAT
22 INCLUDED A CRITICAL REVIEW OF THE CARE THAT PROCEEDED THE
23 DEATH, CORRECT?

24 **A**    WOULD YOU REPEAT THAT?

25 **Q**    ABSOLUTELY.  YOU DIDN'T SEE ANY MORTALITY REVIEWS AT

1   LSP THAT INCLUDED A CRITICAL REVIEW OF THE CARE THAT PROCEEDED

2   THE DEATH, CORRECT?

3       **A**    I DON'T BELIEVE THEY WERE PARTICULARLY CRITICAL.

4       **Q**    THE MORTALITY REVIEWS THAT YOU REVIEWED DIDN'T ASK

5   WHETHER ANY PROBLEMS THAT AROSE IN THE COURSE OF A PATIENT'S

6   CARE COULD BE CORRECTED?

7       **A**    NONE OF THAT WAS DOCUMENTED.  WHETHER IT OCCURRED OR

8   NOT AT THE MORTALITY CONFERENCE I'M UNCERTAIN.

9       **Q**    FOCUSING FIRST ON THE WRITTEN MORTALITY REVIEWS,

10  NONE OF THOSE ASKED WHETHER ANY PROBLEMS THAT AROSE IN THE

11  COURSE OF A PATIENT'S CARE COULD BE CORRECTED, CORRECT?

12      **A**    YES.

13      **Q**    AND NONE OF THOSE WRITTEN REVIEWS -- LET ME REPHRASE

14  THAT.  IN AT LEAST SOME OF THE CASES WHERE YOU FOUND STANDARD

15  OF CARE VIOLATIONS, YOU DIDN'T THINK THE MORTALITY REVIEWS

16  WERE ADEQUATE, CORRECT?

17      **A**    CORRECT.

18      **Q**    FOR EXAMPLE, PATIENT NUMBER 32, THAT'S THE PATIENT

19  WHERE YOU FOUND A STANDARD OF CARE VIOLATION WHEN THE EMT'S

20  DIDN'T CONSULT A PROVIDER ABOUT HIS CHEST PAIN AND WHEN AN EKG

21  THAT WAS ORDERED NEVER HAPPENED, YOU DON'T BELIEVE THAT

22  MORTALITY REVIEW WAS ADEQUATE?

23      **A**    CORRECT.

24      **Q**    NONE OF THE STANDARD OF CARE VIOLATIONS THAT YOU

25  IDENTIFIED IN YOUR CHART REVIEWS WERE NOTED IN THE

1  CORRESPONDING MORTALITY REVIEWS, CORRECT?

2      **A**   CORRECT.

3      **Q**   THEN TALKING ABOUT THOSE MORTALITY REVIEW MEETINGS,

4  YOU DIDN'T SEE ANY CRITICAL REVIEW IN THE MINUTES FROM THE

5  MORTALITY REVIEW MEETINGS EITHER, DID YOU?

6      **A**   CORRECT.

7      **Q**   YOU TESTIFIED YESTERDAY THAT ONE OF THE THINGS THAT

8  IMPRESSED YOU ABOUT LSP LEADERSHIP WAS THAT WARDEN HOOPER

9  ATTENDS THE MORTALITY REVIEW MEETINGS, CORRECT?

10     **A**   YES.

11     **Q**   IF WE COULD PULL UP PLAINTIFFS' EXHIBIT 9 STARTING

12  AT PAGE 1.

13         THESE ARE THE MORTALITY REVIEW MEETING MINUTES FROM

14  OCTOBER 2021.  THE ATTENDEES AREN'T LISTED HERE, CORRECT?

15     **A**   I'M SORRY, I WAS READING IT.  WHAT DID YOU SAY?

16     **Q**   THE QUESTION IS, THE ATTENDEES AREN'T LISTED HERE,

17  CORRECT?

18     **A**   CORRECT.

19     **Q**   SO YOU DON'T KNOW WHETHER WARDEN HOOPER ATTENDED

20  THIS MEETING, CORRECT?

21     **A**   CORRECT.

22     **Q**   LET'S GO TO PAGE 3.  THE NOVEMBER 30TH, 2021

23  MEETING.  IS WARDEN HOOPER LISTED AS AN ATTENDEE?

24     **A**   NO.

25     **Q**   LET'S GO TO PAGE 5.  THE -- THIS MAY BE THE SAME ONE

| | |
|---|---|
| 1 | DUPLICATED.  DID I SAY NOVEMBER ON PAGE 3?  WELL, FOR THIS |
| 2 | MEETING DR. TOCE IS NOT LISTED AS AN ATTENDEE, CORRECT? |
| 3 | **A**    IT SAYS PAUL TOCE UP THERE. |
| 4 | **Q**    I'M SORRY, I SAID DR. TOCE.  I MEANT WARDEN HOOPER. |
| 5 | **A**    CORRECT. |
| 6 | **Q**    IF WE GO TO PAGE 7, THE FEBRUARY 2ND MEETING, 2022, |
| 7 | WARDEN HOOPER IS NOT LISTED? |
| 8 | **A**    CORRECT. |
| 9 | **Q**    AND THEN LET'S GO TO DEFENDANT'S EXHIBIT 4-A.  PAGE |
| 10 | 1 IS FINE. |
| 11 | THIS MEETING, MARCH 15TH, 2022, WARDEN HOOPER DID |
| 12 | ATTEND, CORRECT? |
| 13 | **A**    YES. |
| 14 | **Q**    THAT OCCURRED IN THE MIDDLE OF YOUR SITE VISIT, |
| 15 | CORRECT?  YOUR SITE VISIT WAS MARCH 14TH TO MARCH 16TH. |
| 16 | **A**    I WASN'T THERE ON THE 15TH IF YOU REMEMBER MY |
| 17 | TESTIMONY.  I WAS AT HEADQUARTERS THAT DAY. |
| 18 | **Q**    YOU WERE AT LSP ON MARCH 14TH AND MARCH 16TH? |
| 19 | **A**    AND LAST MONDAY. |
| 20 | **Q**    FOR YOUR SITE VISIT THAT OCCURRED MARCH 14TH AND |
| 21 | MARCH 16TH? |
| 22 | **A**    YES. |
| 23 | **Q**    AND MARCH 15TH WAS A PORTION OF YOUR SITE VISIT THAT |
| 24 | OCCURRED AT DOC HEADQUARTERS? |
| 25 | **A**    YES. |

1     **Q**    SO THAT MEETING WARDEN HOOPER ATTENDED, CORRECT?

2     **A**    THE MARCH 15TH MEETING, YES.

3     **Q**    YES, THE MARCH 15TH MORTALITY REVIEW.  AND THEN IF

4 WE GO TO PAGE 5.  THE APRIL 28TH, 2022 MEETING, WARDEN HOOPER

5 WAS NOT IN ATTENDANCE?

6     **A**    CORRECT.

7     **Q**    AND PAGE 6.  THE MAY 26TH, 2022 MEETING, WARDEN

8 HOOPER IS NOT IN ATTENDANCE?

9     **A**    CORRECT.

10     **Q**    SO AS FAR AS THE RECORDS SHOW, THE ONLY TIME HE'S

11 EVER ATTENDED THE MORTALITY REVIEW MEETING WAS THE MEETING

12 THAT OCCURRED DURING THE TIME PERIOD OF YOUR SITE VISIT?

13     **A**    CORRECT.

14     **Q**    ELECTRONIC MEDICAL RECORDS, THOSE WOULD IMPROVE CARE

15 AT LSP, CORRECT?

16     **A**    I BELIEVE SO.

17     **Q**    AND THERE'S MORE TO GETTING ELECTRONIC MEDICAL

18 RECORDS READY THAN JUST INSTALLING THE HARDWARE, CORRECT?

19     **A**    YES.

20     **Q**    YOU SAID YESTERDAY THAT YOU PERSONALLY SPENT 1,000

21 HOURS WORKING TO IMPLEMENT THE ELECTRONIC MEDICAL RECORDS WHEN

22 THEY WERE INTRODUCED IN CALIFORNIA?

23     **A**    I MAY NOT HAVE BEEN CLEAR.  MY 1,000 HOURS WAS AS A

24 MEDICAL CONSULTANT TO HELP PROGRAM THE SOFTWARE SO IT WOULD

25 WORK IN THE PRISON SETTING.  THE IMPLEMENTATION IS HARDWARE

1  AND SOFTWARE AND THEN TRAINING AND ONGOING TRAINING AND THAT

2  SORT OF THING.

3      Q    RIGHT.  AFTER THE HARDWARE IS INSTALLED, TRAINING ON

4  THE ELECTRONIC MEDICAL RECORDS TAKES SEVERAL MONTHS, CORRECT?

5      A    YES.

6      Q    AND IMPLEMENTATION TAKES SEVERAL MORE MONTHS AFTER

7  THAT?

8      A    WELL, IMPLEMENTATION OCCURS -- WELL, THEY OCCUR

9  SIMULTANEOUSLY.  SO IT'S GOING TO TAKE SEVERAL MONTHS TO GET

10 UP TO SPEED ONCE THIS THING IS STARTED FOR LOTS OF DIFFERENT

11 REASONS, DEPENDING UPON HOW THEY PUT IN OR IF THEY PUT IN PAST

12 INFORMATION OR THEY START FROM SCRATCH, WHICH IS WHAT I

13 RECOMMEND.

14     Q    RIGHT.  THE FACILITY NEEDS TO DECIDE WHAT TO DO WITH

15 THE EXISTING MEDICAL RECORDS, CORRECT?

16     A    YES.

17     Q    AND THOSE ARE DETERMINATIONS THAT NEED TO BE MADE AT

18 THE HEADQUARTERS LEVEL?

19     A    YEAH -- WELL, IT'S GOING TO TAKE PLACE -- I MEAN

20 IT'S GOING TO BE A COLLABORATION ABOUT HOW IT'S HANDLED.

21     Q    AND DID YOU SEE ANY EVIDENCE THAT THOSE

22 DETERMINATIONS HAVE BEEN MADE YET?

23     A    I DIDN'T INVESTIGATE THE SIX OUT OF EIGHT SITES THAT

24 ARE ALREADY UP ON THE MEDICAL RECORD AND HOW THEY HANDLED IT.

25 I NEGLECTED TO ASK STACYE RODRIGUEZ AND RANDY LAVESPERE THOSE

1    QUESTIONS WHEN WE SPENT TIME AT HEADQUARTERS.

2        **Q**    YOU READ -- YOU READ DR. LAVESPERE'S DEPOSITIONS,

3    CORRECT?

4        **A**    YES.

5        **Q**    AND DO YOU RECALL HIM TESTIFYING THAT THEY HAVEN'T

6    MADE THAT DECISION YET FOR LSP?

7        **A**    NO.

8        **Q**    BUT YOU HAVE NO REASON TO BELIEVE THAT THEY HADN'T

9    MADE THAT DECISION FOR LSP?

10       **A**    NO.  IT'S SPECULATION ABOUT WHAT'S GOING ON WITH

11   THAT.

12       **Q**    LET'S TALK ABOUT SOME PATIENTS WHO YOU DISCUSSED ON

13   DIRECT EXAMINATION.  FIRST, PATIENT NUMBER 54.  THAT'S THE

14   PATIENT WHO HAD CHEST PAIN AND TWO ABNORMAL EKG'S AROUND 6:30

15   P.M. AND WASN'T SENT TO THE HOSPITAL UNTIL AROUND 1 A.M.; IS

16   THAT CORRECT?

17       **A**    I'D HAVE TO SEE THE CHART.  I DON'T HAVE A MEMORY

18   FOR THAT.

19       **Q**    SURE.  LET'S GO TO, FOR EXAMPLE, JOINT EXHIBIT 54 AT

20   407.

21           DOES THIS -- TAKE A MOMENT TO LOOK AT THIS CHART AND

22   LET ME KNOW IF THAT REFRESHES YOUR RECOLLECTION ABOUT THIS

23   PATIENT.

24       **A**    YES.  I'M PREPARED TO TAKE QUESTIONS ON THIS PAGE.

25       **Q**    SO JUST AGAIN, THAT'S THE PATIENT WHO HAD CHEST PAIN

1   AND TWO ABNORMAL EKG'S AROUND 6:30 P.M. AND WASN'T SENT TO THE

2   HOSPITAL TO AROUND 1 A.M., CORRECT?

3      **A**    THAT'S NOT EVIDENT ON THIS PAGE.

4      **Q**    SO YOU DON'T RECALL THIS PATIENT WHO YOU TESTIFIED

5   ABOUT YESTERDAY AND WHAT -- WHEN ULTIMATELY THEY SENT HIM TO

6   THE HOSPITAL FOR EXAMPLE?

7      **A**    EXACTLY.  PLEASE SHOW ME THE PAGES THAT YOU'RE

8   REFERRING TO.  THIS IS THE EMERGENCY MEDICAL REPORT AND WHAT

9   HAPPENED.  YOU ASKED ABOUT EKG'S.  I DON'T SEE THE EKG'S.  IT

10   JUST SHOWS THAT ONE WAS DONE.

11      **Q**    LET ME REPHRASE IT THIS WAY THEN.  THIS IS THE

12   PATIENT WHO HAD CHEST PAIN AND YOU RECALL AN EKG WAS DONE, A

13   TROPONIN WAS DONE AND HE WAS THEN SENT TO THE NURSING UNIT,

14   CORRECT?

15      **A**    YES.

16      **Q**    AND YOU TESTIFIED ON DIRECT THAT THE DECISION NOT TO

17   SEND HIM OUT UNTIL THE POSITIVE TROPONIN AT 1 A.M. WAS A

18   PRIMARY CARE DECISION BASED ON CONSULTATION WITH THE

19   CARDIOLOGIST FOR RECURRENT ANGINA, CORRECT?

20      **A**    CHRONIC STABLE ANGINA I BELIEVE IS WHAT I SAID.

21      **Q**    LET'S ACTUALLY GO TO PAGE 695.  AND HERE'S THE SAME

22   ATU NOTE WITH A NOTE FROM, I BELIEVE THAT'S NURSE PRACTITIONER

23   MIKE WALLIS ADDED, CORRECT?  WELL, WITH A NOTE FROM A PROVIDER

24   ADDED?

25      **A**    COULD YOU MAKE IT A LITTLE BIGGER PLEASE?

1      **Q**   SURE.  WHY DON'T WE BLOWUP THE BOTTOM RIGHT-HAND
2  PART.

3      **A**   YES.

4      **Q**   THERE'S NO DOCUMENTATION OF A CONSULTATION WITH A
5  CARDIOLOGIST, IS THERE?

6      **A**   NO, BUT THAT'S OUT OF CONTEXT.

7      **Q**   AND IF WE GO TO PAGE 194.  THESE ARE THE NURSING
8  UNITS FROM ONCE HE WAS SENT TO THE NURSING UNIT -- I'M SORRY.
9  THE NURSING NOTES FROM ONCE HE WAS SENT TO THE NURSING UNIT,
10 CORRECT?

11     **A**   YES.

12     **Q**   AND THERE'S NO DOCUMENTATION OF A CONSULTATION WITH
13 THE CARDIOLOGIST, CORRECT?

14     **A**   NO.

15     **Q**   AND IF WE GO TO PAGE SIX -- BEFORE WE LEAVE THAT,
16 THERE ARE -- WELL -- LET'S GO TO PAGE 693.  THESE ARE THE
17 PHYSICIAN'S ORDERS FOR WHEN HE WAS ADMITTED TO THE NURSING
18 UNIT, CORRECT?

19     **A**   YES.

20     **Q**   HERE AGAIN THERE'S NO DOCUMENTATION THAT STAFF AT
21 LSP CONTACTED A CARDIOLOGIST?

22     **A**   CORRECT.

23     **Q**   AND YOU SAID YESTERDAY THAT AT THE HOSPITAL THEY
24 CHECKED HIS HEART AND DIDN'T FIND ANYTHING, CORRECT?

25     **A**   THEY CATH'D HIM AND IT CAME UP NEGATIVE.

1    **Q**    IF WE GO TO PAGE 682.  THIS IS HIS NEXT FOLLOW-UP IN

2    THE GENERAL MEDICINE CLINIC.  COULD WE ZOOM IN ON THE TOP

3    THREE LINES ON THE RIGHT SIDE OF THE HANDWRITTEN.

4          DR. MATHIS, I BELIEVE THAT SAYS, "PATIENT WAS SEEN

5    AFTER LANE HOSPITAL ADMISSION FOR HI/CAD.  HAD TWO NEW STINTS

6    PLACED."  DID I READ THAT CORRECTLY?

7    **A**    WELL, IT'S MI, SLASH --

8    **Q**    -- SORRY, MI, YES.

9    **A**    WHEN I REVIEWED THE MEDICAL RECORD WITH RETAINING

10   COUNSEL FROM LANE I DIDN'T SEE THAT THERE WERE STINTS PLACED.

11   THEY DID THE CATH AND IT CAME UP NEGATIVE.

12   **Q**    JUST TO CHECK, DID YOU SAY YOU REVIEWED WITH

13   RETAINING COUNSEL FROM LANE HOSPITAL?  YOU REVIEWED WITH

14   DEFENSE COUNSEL REVIEWING THE LANE HOSPITAL REPORT, IS THAT

15   WHAT YOU MEANT TO SAY?

16   **A**    I'M GETTING CONFUSED.  HE'S RETAINING COUNSEL.

17   **Q**    YES.  IT SOUNDED TO ME LIKE YOU SAID YOU REVIEWED IT

18   WITH COUNSEL FROM LANE HOSPITAL.  I WAS CHECKING THAT.

19   **A**    RETAINING COUNSEL.  AND I REVIEWED THE LANE MEDICAL

20   RECORDS AND I BELIEVE THOSE RECORDS SAID THAT HE WAS CATH'D

21   AND THAT THEY DIDN'T PUT IN NEW STINTS.  HE HAD STINTS

22   PREVIOUSLY AND THEY DOCUMENT THEY WERE OPEN -- I BELIEVE THIS

23   IS THE SAME GUY THAT HAD PREVIOUS BYPASS SURGERY, AND THEY

24   WERE OPEN, SO I DON'T BELIEVE THERE WAS ANY ACTUAL

25   INTERVENTION -- EVALUATION, NOT INTERVENTION.

1    **Q**    SO THE DOCTOR SEEING THE PATIENT IN THE GENERAL

2    MEDICINE CLINIC WAS MISTAKEN?

3    **A**    I BELIEVE SO.

4    **Q**    LET'S GO TO PATIENT NUMBER 25.  WE TALKED ABOUT THIS

5    PATIENT EARLIER BRIEFLY.  THIS WAS A PATIENT WHO HAD A

6    SYNCOPAL EPISODE AND THEN DIED OF PULMONARY ARREST A FEW

7    MONTHS LATER; IS THAT CORRECT?

8    **A**    YOU'LL HAVE TO SHOW ME.

9    **Q**    SURE.  IF YOU WANT TO JUST GO TO -- PAGE 172 OF YOUR

10   REPORT ON THE PDF.  FEEL FREE TO REVIEW THAT AND THEN TELL ME

11   WHEN YOU'RE READY.

12   **A**    YES.  I KNOW WHO WE'RE TALKING ABOUT NOW.

13   **Q**    AND THEN IF WE GO TO PAGE 174, YOU SHOWED THE COURT

14   AN ARTICLE FROM UPTODATE THAT SAID CARE MUST BE TAKEN IN

15   ATTRIBUTING SYNCOPE TO AORTIC STENOSIS; IS THAT RIGHT?

16   **A**    CORRECT.

17   **Q**    THAT WAS AN ARTICLE ABOUT CLINICAL MANIFESTATIONS OF

18   AORTIC STENOSIS?

19   **A**    YES.

20   **Q**    BUT YOU DIDN'T SHOW THE COURT THE ACTUAL UPTODATE

21   ARTICLE ABOUT EVALUATING PATIENTS WITH SYNCOPE, DID YOU?

22   **A**    THIS WAS ABOUT SYNCOPE.

23   **Q**    THIS WAS --

24   **A**    IT WAS ABOUT AORTIC STENOSIS, BUT WHEN WE -- BECAUSE

25   THAT WAS HIS CAUSE OF DEATH, WAS AORTIC STENOSIS.  SO I WAS

1  TRYING TO GET TO WHY -- IF SYNCOPE, AS DEMONSTRATED, WAS

2  NON-EXERTIONAL, JUST STANDING UP, WAS CONSISTENT WITH AORTIC

3  STENOSIS.  AND CONSEQUENTLY THE ADMONITION ABOUT MY LAST

4  BULLET POINT IS WHAT I BROUGHT UP.

5      **Q**    RIGHT.  THAT ARTICLE SAYS, "CARE MUST BE TAKEN IN

6  ATTRIBUTING THESE SYMPTOMS TO A-S, SINCE MOST PATIENTS WITH

7  THESE SYMPTOMS DO NOT HAVE A-S," CORRECT?

8      **A**    YES.

9      **Q**    DOES THAT SENTENCE SAY ANYTHING ABOUT MAKING A

10  DIFFERENTIAL DIAGNOSIS FOR WHAT THE PATIENT HAS?

11      **A**    NO.

12      **Q**    LET'S LOOK AT WHAT I'M MARKING FOR IDENTIFICATION AS

13  PLAINTIFFS' EXHIBIT 68.

14          **MR. DUBNER:**  YES, YOU CAN PUT THAT UP ON THE SCREEN.

15          IF WE CAN SWITCH TO THE ELMO.  THANK YOU.

16  **BY MR. DUBNER:**

17      **Q**    DO YOU RECOGNIZE THIS AS BEING WHAT LOOKS LIKE A

18  PRINTOUT FROM UPTODATE?

19      **A**    YES.

20      **Q**    THE TITLE OF THE ARTICLE IS *SYNCOPE IN ADULTS,*

21  *CLINICAL MANIFESTATIONS AND INITIAL DIAGNOSTIC EVALUATION*,

22  CORRECT?

23      **A**    YES.

24      **Q**    I'M GOING TO GO TO PAGE 17.  IT STATES, "THE INITIAL

25  EVALUATION OF PATIENTS WITH TRANSIENT LOSS OF CONSCIOUSNESS

1  AND SUSPECTED SYNCOPE SHOULD FOCUS ON DIFFERENTIATION OF TRUE

2  SYNCOPE FROM OTHER EVENTS, RISK STRATIFICATION AND ASSESSMENT

3  OF POTENTIAL CAUSES," CORRECT?

4      **A**   YES.

5      **Q**   IT SAYS, "THE EVALUATION SHOULD GENERALLY INCLUDE A

6  COMPREHENSIVE HISTORY, INCLUDING INFORMATION ABOUT EVENTS,

7  PRE-EXISTING CONDITIONS, MEDICATIONS AND FAMILY HISTORY,

8  WITNESS OBSERVATIONS, IF AVAILABLE, A PHYSICAL EXAMINATION,

9  WHICH MAY INCLUDE CAREFUL CAROTID SINUS MASSAGE IN OLDER

10  PATIENTS AND REVIEW OF ECG'S.  DOCUMENTATION OF MEDICATIONS

11  THAT THE PATIENT IS TAKING IS AN IMPORTANT ELEMENT OF THE

12  INITIAL EVALUATION.  A TRANSTHORACIC ECHOCARDIOGRAM IS USEFUL

13  TO EVALUATE FOR STRUCTURAL HEART DISEASE IF THIS IS

14  SUSPECTED."

15        DID I READ THAT CORRECTLY?

16      **A**   YOU DID.

17      **Q**   AND IF WE GO TO PAGE 18 UNDER *DIFFERENTIAL*

18  *DIAGNOSIS*.  IT SAYS, "DISTINGUISHING SYNCOPE FROM OTHER

19  CONDITIONS WITH OR WITHOUT TLOC, TOTAL LOSS OF CONSCIOUSNESS,

20  REQUIRES CAREFUL DIAGNOSTIC ASSESSMENT."

21        DID I READ THAT CORRECT?

22      **A**   YES.

23      **Q**   THEN IF WE LOOK AT THE PARAGRAPH THAT SAYS

24  *ADDITIONAL TESTING*.  IT SAYS, "ADDITIONAL DIAGNOSTIC

25  EVALUATION IS INDIVIDUALIZED BASED ON THE SUSPECTED ETIOLOGY

1   OF SYNCOPE."  AND THEN AT THE END OF THE PARAGRAPH, "MANY

2   PATIENTS HAVE MULTIPLE COMORBIDITIES THAT CAN CONTRIBUTE TO

3   TOTAL LOSS OF CONSCIOUSNESS AND THUS MULTIPLE PLAUSIBLE CAUSES

4   OF SYNCOPE MAY REQUIRE CAREFUL ASSESSMENT."  AND THEN IT

5   REFERENCES TWO ADDITIONAL ARTICLES, INCLUDING ONE TITLED

6   *SYNCOPE IN ADULTS: RISK ASSESSMENT AND ADDITIONAL DIAGNOSTIC*

7   *EVALUATION*; IS THAT CORRECT?

8       **A**   YES.

9             **MR. ARCHEY:**  THIS IS 68.

10             **MR. DUBNER:**  PLAINTIFFS' EXHIBIT 68, YES.

11             AND WE'LL MOVE PLAINTIFFS' EXHIBIT 68 INTO EVIDENCE.

12             **THE COURT:**  MR. ARCHEY?

13             **MR. ARCHEY:**  NO OBJECTION, YOUR HONOR.

14             **THE COURT:**  ADMITTED.

15   **BY MR. DUBNER:**

16       **Q**   AND THEN IF WE CAN PULL UP JOINT EXHIBIT 25 AT 32.

17             DOCTOR, JOINT EXHIBIT 25 AT 32, THIS IS THE ENTIRETY

18   OF THE EVALUATION OF THE SYNCOPAL EPISODE; IS THAT CORRECT?

19       **A**   WELL, IT'S WHAT HE WROTE.  I DON'T KNOW IF IT'S THE

20   ENTIRETY OF THE EVALUATION.  WE HAVE TESTIMONY OF WHAT THEY DO

21   WHEN THEY SEE SOMEBODY.

22       **Q**   THERE'S NOTHING ELSE DOCUMENTED IN THE MEDICAL

23   RECORD, CORRECT?

24       **A**   THAT'S CORRECT.

25       **Q**   AND THEN IF WE PULL UP PATIENT NUMBER 38.  LET'S

1   START AT PAGE 23.  I'M SORRY, IS IT 38 OR 28?  IT'S 38.

2            YES, AT PAGE 23.

3            THIS IS THE PATIENT WHO WENT INTO THE NURSING UNIT

4   FOR LOVENOX BRIDGING AND DIED OF PNEUMONIA; DO YOU RECALL THAT

5   PATIENT?

6       **A**   I DIDN'T CATCH THE FIRST PART OF YOUR QUESTION.

7       **Q**   MY APOLOGIES.  THIS IS THE PATIENT WHO WENT INTO THE

8   NURSING UNIT FOR LOVENOX BRIDGING AND THEN DIED OF PNEUMONIA,

9   CORRECT?

10      **A**   YES.

11      **Q**   IN YOUR DIRECT TESTIMONY YOU DISCUSSED THIS PAGE OF

12  LAB RESULTS, PAGE 23, AND WHY YOU THOUGHT THEY WERE

13  NONSIGNIFICANT, CORRECT?

14      **A**   YES.

15      **Q**   IF WE COULD GO BACK TO PAGE 22.

16           IN YOUR DIRECT TESTIMONY YOU DIDN'T SAY A SINGLE

17  THING ABOUT THESE LAB RESULTS, DID YOU?

18      **A**   NO.

19      **Q**   AND THEN IF WE GO TO PAGE 82.

20           IF WE LOOK DOWN AT THE MARCH 7TH, 2019 NOTE

21  AT 6:20 A.M., IN YOUR DIRECT TESTIMONY YOU DIDN'T SAY A SINGLE

22  THING ABOUT DR. TOCE'S ACTIONS WHEN HE WAS TOLD THAT THE

23  PATIENT HAD A BLOOD PRESSURE OF 65/40 WITH AN OXYGEN

24  SATURATION OF 79 PERCENT, DID YOU?

25      **A**   CORRECT.

1     **Q**    AND LET'S TALK ABOUT PATIENT NUMBER 36.  IF WE COULD

2  GO TO PAGE 106.

3          THIS IS THE PATIENT WITH COPD WHO PRESENTED TO THE

4  ATU AT 8:20 IN THE MORNING, WAS SENT TO THE NURSING UNIT

5  AROUND 11:30 A.M. AND WENT INTO CARDIAC ARREST BY NOON.  DO

6  YOU RECALL THAT?

7     **A**    NO.

8     **Q**    LET ME REPHRASE.  THIS IS A PATIENT WITH COPD WHO

9  PRESENTED TO THE ATU AT 8:20 IN THE MORNING AND WAS SENT TO

10  THE NURSING UNIT AROUND 11:30 A.M.?

11     **A**    YES, IT APPEARS THAT WAY.

12     **Q**    AND IF WE GO TO PAGE 107, THIS PATIENT PRESENTED

13  BACK TO THE ATU PULSELESS AND APNEIC AT NOON, CORRECT?

14     **A**    YES.

15     **Q**    SO LET'S RETURN TO PAGE 106.

16          NOW IN YOUR TESTIMONY YESTERDAY YOU READ HIS VITAL

17  SIGNS AT 8:20 A.M. AND SAID HIS VITAL SIGNS HAD IMPROVED

18  BY 9:25 A.M., CORRECT?

19     **A**    YES.

20     **Q**    COULD WE HIGHLIGHT THE LAST TWO LINES OF THE CHIEF

21  COMPLAINT SECTION?

22          IN YOUR TESTIMONY YESTERDAY YOU DIDN'T DISCUSS HIS

23  VITAL SIGNS AT 11:30 WHEN HE WAS SENT TO THE NURSING UNIT, DID

24  YOU?

25     **A**    NO.

1       **Q**    AT 11:30 HIS BLOOD PRESSURE WAS 228/112; HIGHER THAN

2    IT WAS AT 8:20 A.M.?

3       **A**    YES.

4       **Q**    AND ALTHOUGH THE OXYGEN SATURATION --

5       **A**    WELL, NO.  THE SYSTOLIC IS HIGHER.  THE DIASTOLIC IS

6    A LITTLE LOWER.

7       **Q**    THE SYSTOLIC BLOOD PRESSURE IS HIGHER, CORRECT?

8       **A**    YES.

9       **Q**    IT'S QUITE ELEVATED?

10      **A**    WELL, IT'S STILL ELEVATED, BUT THE RESPIRATORY RATE

11   IS DIMINISHED.

12      **Q**    THE RESPIRATORY RATE HAS DIMINISHED BUT IS STILL

13   ELEVATED, CORRECT?

14      **A**    YES.

15      **Q**    ALTHOUGH THE OXYGEN SATURATION RATE ISN'T LISTED FOR

16   11:30, AT 10:40 IT WAS 88 PERCENT, DOWN 10 PERCENT

17   FROM 9:25 A.M., CORRECT?

18      **A**    IT'S NOT CLEAR WHETHER HE WAS ON OXYGEN AT 9:25.

19   BUT I WILL TESTIFY THAT AT 9:25 THERE WAS AN O2 STAT OF

20   98 PERCENT AND NOW IT'S, AT LEAST AT 10:40, IT WAS 88 PERCENT.

21      **Q**    AND THE 10:40 AND 11:30 VITAL SIGNS, THOSE ARE THE

22   LATEST VITAL SIGNS WHEN THE PATIENT WAS SENT FROM THE ATU TO

23   THE NURSING UNIT?

24      **A**    YES.

25      **Q**    LET'S TALK ABOUT PATIENT 29.  THIS IS THE PATIENT

1   WHO HAD A 108.2 DEGREE FEVER; DO YOU RECALL THAT PATIENT?

2        **A**    OH, YES.

3        **Q**    IF A PATIENT HAS A TEMPERATURE OF 108 OR HIGHER, THE

4   STANDARD OF CARE CALLS FOR THEM TO BE COOLED, RIGHT?

5        **A**    UNLESS THEY'RE DEAD.

6        **Q**    AND ASSUMING THEY'RE ALIVE, THE STANDARD OF CARE

7   CALLING FOR THEM TO BE COOLED, THAT DOESN'T CHANGE IF THE

8   PATIENT IS SUSPECTED TO HAVE USED CONTROLLED SUBSTANCES,

9   CORRECT?

10       **A**    NO.

11       **Q**    IF WE CAN PULL UP JX_29-37.

12            YOU SAID YESTERDAY THAT HE WAS DEAD WHEN THE MEDICS

13  ARRIVED?  HE WAS ALREADY PULSELESS, CORRECT?

14       **A**    PULSELESS, APNEIC, FIXED PUPILS, A GLASGOW COMA

15  SCALE OF THREE, WHICH IS AS LOW AS YOU CAN GET.

16       **Q**    IF WE LOOK AT THE THIRD LINE OF THE ASSESSMENT

17  COMMENT SECTION FROM THIS SICK CALL FORM -- EMERGENCY SICK

18  CALL FORM AT THE END OF THAT LINE -- SORRY, AT THE BEGINNING

19  OF THE NEXT LINE, THE FIRST OR THE NEXT LINE -- IT SAYS --

20       **A**    MAKE IT A LITTLE BIGGER FOR ME, PLEASE.

21       **Q**    IF WE COULD BLOW THAT UP.

22            IT SAYS, "PATIENT UNRESPONSIVE.  STERNUM RUB DONE,

23  NO RESPONSE.  CHECKED FOR A PULSE, VERY WEAK."  DID I READ

24  THAT CORRECTLY?

25       **A**    YES.

1    **Q**    ALSO, ON THE LINE ABOVE THAT, IT SAYS HE WAS HAVING

2    AGONAL RESPIRATIONS, CORRECT?  THIS IS NOT IN THE HIGHLIGHTED.

3    IT'S JUST ABOVE THE HIGHLIGHTED ON THE LEFT --

4    **A**    YES.

5    **Q**    -- HAND SIDE.  AND AGONAL RESPIRATIONS HAPPEN BEFORE

6    YOU DIE, NOT AFTER, CORRECT?

7    **A**    YES.  BUT I THINK THAT'S WHAT THEY USED IN THE

8    GLASGOW COMA SCALE.  SO HE'S GOT AGONAL RESPIRATIONS.  THAT'S

9    WHY HE'S AS LOW AS HE CAN GO ON THE GCS.

10   **Q**    THEN IF WE GO TO PAGE 34.  THIS IS THE ATU NOTE FROM

11   WHEN THEY TRIED TO RESUSCITATE HIM, CORRECT?

12   **A**    YES, I BELIEVE SO.

13   **Q**    IT SAYS ON THE RIGHT-HAND SIDE, "NO URINE ON URINARY

14   CATHETERIZATION," IS THAT CORRECT?

15   **A**    YOU'LL HAVE TO MAKE IT BIGGER.  I CAN'T READ THAT.

16   **Q**    SURE.  IF WE COULD ZOOM IN ON THE RIGHT-HAND SIDE OF

17   THE BLUE NOTES.  IN THE MIDDLE IT SAYS, "NO URINE ON URINARY

18   CATHETERIZATION"?

19   **A**    YES.

20   **Q**    AND THEN JUST BELOW THE BLUE NOTES IT SAYS AGAIN IN

21   BLACK, "UNABLE TO GET URINE FROM CATH; NOTHING CAME OUT," IS

22   THAT CORRECT?

23   **A**    YES.

24   **Q**    SO YOUR UNDERSTANDING IS THAT THEY CATHETERIZED A

25   DEAD MAN TO GET A URINE SAMPLE FOR TOXICOLOGY?

1      **A**    YES.

2      **Q**    YOU WORK IN THE OFFICE OF LEGAL AFFAIRS AT THE

3  CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES, CORRECT?

4      **A**    I STILL HAVE THAT RESPONSIBILITY, BUT I HAVEN'T HAD

5  ANY TIME SINCE MIDDLE OF JANUARY DUE TO THIS MATTER.

6      **Q**    AS PART OF THAT JOB, YOU PREPARE RESPONSES TO

7  LAWSUITS AND COMPLAINTS AND HABEAS CORPUS PETITIONS FILED BY

8  PATIENTS?

9      **A**    YES.

10     **Q**    AND YOU'RE PLAYING A SIMILAR ROLE IN THIS CASE,

11 CORRECT?

12     **A**    YES.

13     **Q**    YOU'VE SAT AT COUNSEL'S TABLE FOR MOST OF THE TRIAL,

14 CORRECT?

15     **A**    YES.

16     **Q**    YOU'VE ADVISED DEFENSE COUNSEL ON WHAT QUESTIONS

17 THEY SHOULD ASK?

18     **A**    YES.

19     **Q**    IN THE MIDDLE OF DEFENDANT'S EXAMINATIONS OF

20 PLAINTIFFS' EXPERTS, DEFENSE COUNSEL LEFT THE PODIUM TO COME

21 TALK TO YOU WHILE WITNESSES ARE ANSWERING, CORRECT?

22     **A**    YES.

23     **Q**    YOU SAID YESTERDAY THAT IN THE MIDDLE OF YOUR SITE

24 VISIT WHEN YOU WENT TO HEADQUARTERS YOU SPENT QUITE A BIT OF

25 TIME WITH DR. LAVESPERE, STACYE RODRIGUEZ, MELANIE BENEDICT

1    AND JONATHAN VINING TALKING ABOUT THE COURT DECISION AND HOW

2    WE WERE GOING TO PRESENT THIS MATTER TO THE COURT, CORRECT?

3         **A**    YES.

4         **Q**    AND JONATHAN VINING, JUST FOR THE RECORD, IS THE

5    DOC'S GENERAL COUNSEL; IS THAT CORRECT?

6         **A**    YES, HE'S IN PRESENCE.

7         **Q**    AND YOU SAID THIS CASE HAS BEEN A FULL-TIME JOB FOR

8    YOU SINCE JANUARY?

9         **A**    YES.

10        **Q**    IN THAT FULL-TIME JOB YOUR PRIMARY BILLING RATE IS

11   $675 AN HOUR?

12        **A**    YES.

13        **Q**    JUST FOCUSING BACK ON YOUR JOBS IN CALIFORNIA AND

14   MARYLAND, THOSE PRISONS GOT SUED BY PATIENTS, RIGHT?

15        **A**    I DIDN'T CATCH THE FIRST PART.

16        **Q**    YES.  FOCUSING BACK ON YOUR JOBS IN CALIFORNIA AND

17   MARYLAND, THOSE PRISONS GOT SUED BY PATIENTS FROM TIME TO

18   TIME, RIGHT?

19        **A**    EVERY PRISON GETS SUED BY INMATES.

20        **Q**    RIGHT.  YOU, YOURSELF, HAVE BEEN NAMED AS A

21   DEFENDANT IN A NUMBER OF SUITS?

22        **A**    YES.

23        **Q**    FOR EXAMPLE, MULTIPLE CASES ALLEGING THAT YOU

24   PERSONALLY DENIED INCARCERATED PATIENTS APPROPRIATE PAIN

25   MEDICATION AND SURVIVED A SUMMARY JUDGMENT, CORRECT?

1    **A**    I DON'T THINK THERE'S MULTIPLE CASES.   THERE WAS A

2    CASE IN CALIFORNIA THAT WE ELECTED TO SETTLE FOR $20,000 JUST

3    TO GET IT OVER WITH.   IT SURVIVED SUMMARY JUDGMENT, BUT THAT'S

4    WHAT HAPPENS WITH PRO SE´ CASES, YOU KNOW THAT.

5    **Q**    THAT'S THE *WILLIAMS V. DASCO* CASE; IS THAT CORRECT?

6    **A**    YES.

7    **Q**    AND IN THAT CASE -- IN THAT CASE THE PLAINTIFF DID

8    HAVE COUNSEL, CORRECT, JUST FOR THE RECORD?   IF YOU DON'T

9    REMEMBER IT'S NOT IMPORTANT.

10    **A**    I DON'T KNOW THAT.   I'M SURE HE HAD COUNSEL.   I MEAN

11    I THINK HE PICKED UP COUNSEL AFTER IT HAD SURVIVED SUMMARY

12    JUDGMENT.

13    **Q**    YOU SAID THAT'S THE -- DO YOU ALSO RECALL A CASE

14    FROM MARYLAND CALLED *BRADFORD V. MATHIS*?

15    **A**    RADFORD?

16    **Q**    BRADFORD.

17    **A**    NO.

18    **Q**    ANOTHER CASE WHERE YOU WERE ACCUSED OF DENYING A

19    PATIENT APPROPRIATE PAIN MEDICATION THAT SURVIVED SUMMARY

20    JUDGMENT.

21    **A**    I DON'T RECALL THAT CASE.   ACTUALLY -- THERE WAS --

22    I WAS IN A DEPOSITION THE OTHER DAY AND THEY WERE BRINGING UP

23    CASES THAT CAME UP AFTER I WAS NO LONGER IN MARYLAND.   MAYBE

24    THIS IS ONE OF THOSE.

25    **MR. DUBNER:**   AND IF WE COULD BRING UP, IF YOU HAVE

1  IT, *BRADFORD V. MATHIS*?  NOPE.  WE'LL USE THE ELMO.  WE'LL

2  MARK THIS AS PLAINTIFFS' EXHIBIT 69.

3        AND A COPY FOR THE COURT.  THANK YOU.

4  **BY MR. DUBNER:**

5   **Q**   JUST TO REFRESH YOUR RECOLLECTION, DOCTOR, I'M

6  SHOWING YOU A JUDICIAL OPINION FROM A CASE CALLED *BRADFORD V.*

7  *MATHIS* IN THE DISTRICT OF MARYLAND.  IF WE LOOK AT THE

8  PARAGRAPH LABELED ASTERISKS 1, IT SAYS, "STEVEN KARL EDWARD

9  BRADFORD SUED DR. DAVID MATHIS AND PETER STANFORD, THE

10  DEFENDANTS, UNDER 42 USC 1983 FOR DENIAL OF MEDICAL CARE."

11        **MR. ARCHEY:**  I'M GOING TO OBJECT AT THIS TIME, YOUR

12  HONOR, AS TO RELEVANCE.

13        **MR. DUBNER:**  I'LL ASK A QUESTION THAT'LL CIRCUMVENT

14  ALL OF THIS.  I'M JUST ESTABLISHING -- SORRY.

15        **THE COURT:**  RESPOND TO THE RELEVANCE.

16        **MR. DUBNER:**  TO ANSWER THE OBJECTION, THE RELEVANCE

17  IS IT GOES TO -- IT'S RESPONDING TO DEFENDANT'S USE OF SIMILAR

18  RECORDS AGAINST MS. GOEHRING LAST WEEK.

19        **MR. ARCHEY:**  YOUR HONOR, THIS IS DEALING WITH PAIN

20  MEDICATION.  YOU FOUND WAS EXACTLY LIKE HE'S DOING, IT WAS

21  APPROPRIATE.

22        **THE COURT:**  OVERRULED.

23  **BY MR. DUBNER:**

24   **Q**   DOES THIS REFRESH YOUR RECOLLECTION, DOCTOR?

25   **A**   I HAVE NO KNOWLEDGE OF THIS CASE.  THANK YOU FOR

1 | BRINGING IT UP.

2 |     **Q**    FAIR ENOUGH.  I WILL JUST SHOW YOU THE NEXT

3 | SENTENCE, "FOR THE FOLLOWING REASONS THE DEFENDANT'S MOTION

4 | FOR SUMMARY JUDGMENT WILL BE DENIED AND BRADFORD'S MOTION FOR

5 | APPOINTMENT OF COUNSEL BE GRANTED."  THIS WAS A PRO SE´

6 | PLAINTIFF.  I WILL REPRESENT TO YOU THAT THE ALLEGATION HERE

7 | WAS THAT YOU AND ANOTHER DOCTOR HAD DENIED PAIN MEDICATION.

8 | DO YOU HAVE ANY REASON TO DISPUTE THAT?

9 |     **A**    YEAH.  STANFORD IS A PHYSICIAN ASSISTANT OR WAS A

10 | PHYSICIAN ASSISTANT.  I DON'T THINK I EVER SAW THIS GUY.  I

11 | WAS JUST THE MEDICAL DIRECTOR AND THE CASE WAS BROUGHT AFTER I

12 | LEFT.

13 |     **Q**    IF WE LOOK AT THE --

14 |     **MR. ARCHEY:**  I'M GOING TO RENEW MY OBJECTION, YOUR

15 | HONOR.  I THINK WE'VE GONE TOO FAR DOWN THE --

16 |     **THE COURT:**  WHAT IS THE RELEVANCE NOW, MR. DUBNER?

17 |     **MR. DUBNER:**  I'M JUST NOW TRYING TO ESTAB- -- I CAN

18 | WITHDRAW IT.  I'LL WITHDRAW THE QUESTION.

19 |     **THE COURT:**  LET'S GO TO THE NEXT LINE OF

20 | QUESTIONING.

21 | **BY MR. DUBNER:**

22 |     **Q**    MY NEXT QUESTION WAS SIMPLY, YOU WOULDN'T SAY THAT

23 | THE SUITS AGAINST YOU CULL YOUR TESTIMONY IN THIS CASE, YOUR

24 | ABILITY TO GIVE OPINIONS OR YOUR RELIABILITY INTO QUESTION,

25 | WOULD YOU?

1      **A**     PLEASE REPEAT THAT QUESTION.

2      **Q**     YES.  YOU WOULDN'T SAY THAT THE EXISTENCE OF SUITS

3   AGAINST YOU, EVEN ONES THAT HAVE SURVIVED SUMMARY JUDGMENT,

4   CULLS YOUR TESTIMONY OR THE RELIABILITY OF YOUR OPINIONS INTO

5   QUESTION, WOULD YOU?

6      **A**     I DON'T THINK SO.

7      **Q**     AND JUST FOR THE RECORD, THE CITATION FOR THAT CASE

8   IS 2010 WL4809128.  IT IS CIVIL ACTION NUMBER WDQ-100847 FROM

9   THE DISTRICT OF MARYLAND.

10          AND, DOCTOR, LET'S TALK ABOUT SPECIALTY CARE.  WHEN

11  A PATIENT RETURNS FROM A TRIP, PROVIDERS SHOULD SEE THEM NO

12  LATER THAN THE NEXT DAY, CORRECT?

13     **A**     YES.

14     **Q**     IF A PROVIDER DETERMINES NOT TO IMPLEMENT A

15  SPECIALIST'S RECOMMENDATION THE PROVIDER SHOULD SAY WHY,

16  CORRECT?

17     **A**     YES.

18     **Q**     IF A SPECIALIST RECOMMENDS BLOOD TESTS, THOSE TESTS

19  SHOULD OCCUR?

20     **A**     YES.

21     **Q**     AND THE RESULTS OF THOSE BLOOD TESTS SHOULD BE IN

22  THE MEDICAL RECORD?

23     **A**     YES.

24     **Q**     REGISTERED NURSES DON'T HAVE A LICENSE TO CHANGE

25  ORDERS RECOMMENDED BY SPECIALISTS, CORRECT?

1    **A**    YES.

2    **Q**    YOU SAID YESTERDAY THAT AN IMPORTANT THING ABOUT LSP

3    COMPARED TO OTHER FACILITIES THAT YOU'VE SEEN IS THAT THEY

4    PRIMARILY PUT PATIENTS WHO RETURN FROM TRIPS IN THE INFIRMARY

5    RATHER THAN SENDING THEM BACK TO THEIR HOUSING UNIT; IS THAT

6    CORRECT?

7    **A**    YES.

8    **Q**    LET'S PULL UP JOINT EXHIBIT 13 AT 411.  AND THIS IS

9    SEALED.

10           THIS IS A TRIP RETURN, DOCTOR, IS THAT CORRECT, FOR

11   PATIENT NUMBER 13?

12   **A**    YES.

13   **Q**    AND "DISCHARGED TO CAMP" IS CHECKED, CORRECT?

14   **A**    YES.

15   **Q**    "TO NURSING UNIT" IS NOT CHECKED?

16   **A**    RIGHT.

17   **Q**    IF WE GO TO PAGE 434.  HERE, AGAIN, ANOTHER TRIP

18   RETURN WITH DISCHARGE TO CAMP RATHER THAN NURSING UNIT?

19   **A**    RIGHT.

20   **Q**    LET'S GO TO PAGE 464.  DISCHARGED TO CAMP, NOT

21   ADMITTED TO NURSING UNIT?

22   **A**    I THINK MY TESTIMONY WAS ABOUT HOSPITAL RETURNS.

23   THESE ARE ABOUT PROCEDURES THAT DON'T REQUIRE NEW

24   INTERVENTIONS.  THERE'S A LITTLE DIFFERENCE.  THIS GUY HAD A

25   PULMONARY FUNCTION TEST.  THE PREVIOUS FELLOW HAD A CYSTOSCOPY

1  AND I DON'T REMEMBER WHAT THE FIRST ONE WAS ALREADY.  BUT FOR

2  THE HOSPITALIZATIONS THEY'RE PUT IN NURSING UNIT 1.

3  **Q**   SO IF YOUR TESTIMONY YESTERDAY WAS THAT FOR ALL TRIP

4  RETURNS LSP PRIMARILY PUTS PATIENTS IN THE INFIRMARY RATHER

5  THAN SENDING THEM BACK TO THE HOUSING UNIT YOU WOULD WANT TO

6  CORRECT THAT TESTIMONY?

7  **A**   IF I SAID ALL TRIP RETURNS THEN I WOULD CORRECT THAT

8  TESTIMONY.

9  **Q**   JUST HOSPITALIZATIONS?

10  **A**   YES.

11  **Q**   AND IT'S ONLY -- IT'S NOT ALL HOSPITALIZATIONS; IT'S

12  ONLY PRIMARILY?

13  **A**   YES.

14  **Q**   OKAY.  LET'S CONTINUE WITH PATIENT NUMBER 13.  WHO I

15  BELIEVE IN YOUR REPORT YOU SAID BEST DEMONSTRATES THE

16  CAPABILITY OF LSP TO MANAGE SPECIALTY CONSULTATIONS; IS THAT

17  RIGHT?

18  **A**   YES.

19  **Q**   LET'S LOOK AT A FEW EPISODES IN THIS PATIENT'S CARE.

20  IF WE COULD GO TO JOINT EXHIBIT -- SORRY, JOINT EXHIBIT 13 AT

21  1036 AND 1035.  THIS IS A NOTE FROM A NEPHROLOGY SPECIALIST,

22  CORRECT?

23  **A**   YES.

24  **Q**   AND -- I MIGHT HAVE GIVEN YOU THE WRONG PAGE.  GIVE

25  ME ONE MOMENT, PLEASE.

```
 1              NOPE.  I GAVE YOU THE RIGHT PAGE.  I'M JUST NOT

 2    READING IT CORRECTLY.

 3              MR. ARCHEY:  YOUR HONOR, I OBJECT THEN BECAUSE I SEE

 4    THIS IS DATED IN 2018.

 5              THE COURT:  COUNSEL?

 6              MR. DUBNER:  IT WAS PRODUCED AS PART OF THE MEDICAL

 7    RECORDS AND IS A NOTE THAT EXISTED IN THE MEDICAL RECORDS AT

 8    THE TIME OF 2019, BUT --

 9              THE COURT:  SUSTAINED.

10    BY MR. DUBNER:

11        Q    I'LL JUST POINT YOU IN THE PLAN RIGHT ABOVE THE

12    UNDERLINED --

13              MR. ARCHEY:  YOUR HONOR?

14              MR. DUBNER:  OH, SUSTAINED.  YOU SAID SUSTAINED.

15    I'M SO SORRY.

16              THE COURT:  OKAY.

17    BY MR. DUBNER:

18        Q    ABSOLUTELY.  SO LET'S GO TO PAGE 1085 AND 1086.

19              HERE IS ANOTHER ENCOUNTER WITH A PROVIDER DATED

20    FEBRUARY 12TH, 2019, CORRECT?  IF YOU'LL LOOK AT THE TOP RIGHT

21    OF EACH PAGE IT SAYS THE ENCOUNTER DATE.

22        A    YES.

23        Q    IF YOU'LL LOOK AT THE MIDDLE OF THE SECOND PAGE HERE

24    AGAIN IT'S THE NEPHROLOGIST?

25        A    YES.
```

1    **Q**    AND COULD YOU READ THE BOLDED SENTENCE AT THE BOTTOM

2    OF THE PLAN ON THE LEFT-HAND SIDE?

3    **A**    "AVOID NONSTEROIDALS, PATIENT RECEIVED TORADOL WHEN

4    VISITING THE ORTHOPAEDIC DOCTOR OR ER FOR BACK PAIN.  THIS

5    WILL WORSEN HIS KIDNEY FUNCTION."

6    **Q**    THE NEPHROLOGIST PUT THIS IN BOLD?

7    **A**    HE DID.

8    **Q**    THAT WAS FEBRUARY 12TH, 2019.  LET'S GO TO PAGE

9    1074.  THIS IS A PRESCRIPTION MARCH 27TH, 2019.  THIS IS A

10   PRESCRIPTION FOR TORADOL, CORRECT?

11   **A**    YES.

12   **Q**    PRESCRIBED BY AN LSP PROVIDER, CORRECT?

13   **A**    CORRECT.

14   **Q**    AND IF WE GO TO PAGE 402.  HERE IS AN ATU NOTE FROM

15   THE FOLLOWING YEAR.  AGAIN, THE THING THAT IS CIRCLED, YOU SEE

16   IT SAYS, "TORADOL 60 MILLIGRAMS"?

17   **A**    CORRECT.

18   **Q**    THIS IS MARCH 13TH, 2020.  IF WE GO TO PAGE 404.

19   ACTUALLY, LET'S GO BACK FOR A MOMENT TO 402.  THAT WAS

20   APPROXIMATELY 5:43 IN THE MORNING, CORRECT?

21   **A**    YES.

22   **Q**    LET'S GO TO THE NEXT PAGE.  LET'S GO TO PAGE 404.

23   THANK YOU.  AT 5:58 IN THE AFTERNOON THE PATIENT WAS BACK IN

24   THE ATU COMPLAINING OF URINARY ISSUES, CORRECT?

25   **A**    YES.

1    **Q**    AND IF WE GO TO PAGE 135.  WITHIN THREE DAYS THE

2    PATIENT WAS ANEMIC AND HIS CREATININE, EGFR AND GLUCOSE LEVELS

3    WERE ALL ABNORMAL, CORRECT?

4    **A**    YES.

5    **Q**    WHICH IS SUGGESTIVE POTENTIALLY OF KIDNEY FAILURE,

6    CORRECT?

7    **A**    YES.

8    **Q**    LET'S GO TO PAGE 883.  THIS IS A PATIENT WHO WENT TO

9    THE HOSPITAL AND HAD HIS INSULIN CHANGED FROM 70/30 INSULIN TO

10   LONG-ACTING INSULIN, CORRECT?  IF YOU'LL LOOK DOWN TOWARDS THE

11   BOTTOM DM2.

12   **A**    I THINK YOU TALKED ABOUT CHANGE.  I'M NOT SURE I SEE

13   A CHANGE.  HE'S GETTING 40 UNITS AND 20 UNITS OF 70/30.

14   **Q**    IF YOU'LL LOOK AT THE THIRD BULLET POINT, "DISCUSS

15   WITH UMC AND PATIENT PHARMACEUTICAL CONVERSION.  IT IS ONE TO

16   ONE, SO STARTED HIM ON TEN UNITS BID OF LONG-ACTING."

17   **A**    I SEE.  DO YOU KNOW WHAT KIND THAT IS?

18   **Q**    OF LONG-ACTING INSULIN IS YOUR QUESTION?

19   **A**    YES.

20   **Q**    I BELIEVE WE'LL SEE WHEN WE GO TO PAGE 919.

21   **A**    ALL RIGHT.

22   **Q**    THE SECOND PRESCRIPTION THERE IS FOR LEVEMIR; IS

23   THAT LONG-ACTING INSULIN?

24   **A**    YES.

25   **Q**    AND THEN IF WE GO TO PAGE 1152.  IF WE LOOK IN THE

1  MIDDLE OF THE PAGE IN THE 9/18/19 NOTES THERE'S A VERBAL ORDER

2  FROM DR. LAVESPERE THAT SAYS, "HOLD MEDICATIONS FOR NOW.  MD

3  TO REVIEW MEDICATIONS," CORRECT?

4      **A**   YES.

5      **Q**   AND THEN IF WE LOOK AT THE -- SORRY, IF YOU COULD

6  RETURN TO THAT PAGE.

7          IF WE LOOK AT THE NEXT SET OF HANDWRITING, NUMBER

8  TWO, IT SAYS 70/30.  THAT IS CHANGING THE PATIENT BACK TO THE

9  70/30 INSULIN, CORRECT?

10      **A**   YES.

11      **Q**   AND THAT'S SIGNED BY DR. TOCE?

12      **A**   YES.

13      **Q**   AND IF WE GO TO PAGE 158.  THIS IS ALSO THE SAME

14  PATIENT WHOSE LAB RESULTS ON JANUARY 14TH, 2020 SAID HE HAD AN

15  INFECTION THAT WAS RESISTENT TO TRIMETHOPRIM/SULFA, THE BOTTOM

16  READING THERE; IS THAT CORRECT?

17      **A**   YES.

18      **Q**   TRIMETHOPRIM/SULFA, BACTRIM IS THAT KIND OF

19  MEDICATION, CORRECT?

20      **A**   YES.

21      **Q**   IF WE GO TO PAGE 2321.  I'M SORRY, LET ME REPHRASE

22  THAT.  IF WE COULD GO TO JOINT EXHIBIT 68 AT 2321.

23      **A**   CAN WE GO BACK TO THAT ONE FOR A SECOND, PLEASE?

24      **Q**   SURE.  MS. LEZNIC (SIC) COULD WE GO BACK TO, I

25  BELIEVE IT'S JOINT EXHIBIT 13 AT 158.

1        **A**    NOW I UNDERSTAND MORE ABOUT IT.

2        **Q**    OKAY.  IT STILL SAYS THAT THE INFECTION IS RESISTENT

3   TO TRIMETHOPRIM/SULFA, CORRECT?

4        **A**    AND MORE IMPORTANTLY IT SAYS IT'S RESISTENT TO ALL

5   OF THE ORAL ANTIBIOTICS.  SO THE DECISION THAT WAS MADE HERE

6   WAS TO TRY AN ORAL ANTIBIOTIC.  RESISTENCE DOESN'T MEAN IT

7   WON'T WORK.  IT JUST HAS TO DO WITH THE SIZE OF THE -- THE

8   CHANGE ON THE PETRI DISH WHERE YOU PUT THE DISK ON.  AND IF

9   YOU GIVE IT LONG ENOUGH WHERE IT COULD STILL BE HELPFUL.  IT

10  DEPENDS ON WHAT THE CLINICAL SITUATION IS, BUT OF COURSE YOU

11  KNOW THAT.

12       **Q**    THEN IF WE GO TO JOINT EXHIBIT 68 AT 2321.  THEY DO

13  GIVE HIM A COURSE OF BACTRIM, CORRECT?  THE THIRD MEDICATION.

14       **A**    YES.  YES.

15       **Q**    AND YOU ALSO LIST PATIENT NUMBER 33 AS A GOOD

16  EXAMPLE OF SPECIALTY CARE, CORRECT?

17       **A**    I'M NOT CERTAIN.

18       **Q**    IF WE GO TO PAGE 215 OF YOUR EXPERT REPORT.  THE

19  BOTTOM OF THE PAGE YOU SAID, "PATIENT NUMBER 33 ALSO

20  DEMONSTRATED THE CAPABILITY OF LSP TO PROVIDE AND MANAGE

21  SPECIALTY CONSULTATIONS," CORRECT?

22       **A**    YES.

23       **Q**    AND THEN LET'S PULL UP JOINT EXHIBIT 33 AT 113.

24  WE'VE ALREADY DISCUSSED THIS SO I'M NOT GOING TO DWELL ON IT

25  AGAIN.

1            BUT THIS IS THE PATIENT THAT HAD AUTOIMMUNE

2   HEPATITIS, FOUR PLUS LOWER EXTREMITY EDEMA, THREE WEEKS OF

3   JAUNDICE, YELLOWING OF BOTH EYES, SWELLING TO THE ABDOMEN AND

4   PAIN AT THE BOTTOM OF THE ABDOMEN AND HE WAS RETURNED TO

5   QUARTERS, CORRECT?

6       **A**    YES.

7       **Q**    AND THERE IS NO EVIDENCE THAT THEY CONTACTED A

8   SPECIALIST, CORRECT?

9       **A**    THAT'S CORRECT.

10           **MR. DUBNER:**  THE COURT'S INDULGENCE FOR A MOMENT?

11           **THE COURT:**  GO AHEAD.

12  **BY MR. DUBNER:**

13      **Q**    ONE MORE LINE OF QUESTIONS, DOCTOR.

14           YOU TOLD ME IN YOUR DEPOSITION THAT YOU'VE NEVER HAD

15  AN OPINION EXCLUDED BY A COURT IN WHOLE OR IN PART, CORRECT?

16      **A**    YES.

17      **Q**    WAS THAT CORRECT WHEN YOU SAID IT?

18      **A**    I THINK IT WAS CORRECT AT THE TIME.

19      **Q**    YOU'RE CURRENTLY AN EXPERT IN A CASE IN ILLINOIS

20  CALLED *JOHNSON V. DART*, CORRECT?

21      **A**    YES.  THAT OCCURRED -- I WAS *DAUBERTED* ON AN OPINION

22  ABOUT FENTANYL IN THAT CASE, AS YOU ALREADY KNOW.  BUT THAT

23  OCCURRED AFTER THE REPORT I BELIEVE OR IT WAS INFORMED AFTER

24  THE REPORT.

25      **Q**    IS IT POSSIBLE THAT THE OPINION CAME OUT IN 2020?

1       **A**    IT'S POSSIBLE.  IT JUST DEPENDS ON WHEN THE ATTORNEY

2   CONTACTED ME.  THE ATTORNEY HAD A CONTRACTUAL OBLIGATION TO

3   CONTACT ME WHEN IT WAS GOING ON AND IT NEVER OCCURRED.  SO I

4   JUST FOUND OUT ABOUT IT AND TALKED WITH HER.

5       **Q**    THAT'S BECAUSE YOU WERE PREPARING FOR TRIAL IN THAT

6   CASE I ASSUME?

7       **A**    NO.  IT WAS BECAUSE I THINK SHE HAD TIME TO TALK TO

8   ME.

9       **Q**    BUT THAT CASE IS PREPARING FOR TRIAL, CORRECT?

10      **A**    YES.

11      **Q**    AND YOU'RE DESIGNATED AS A WITNESS IN THAT TRIAL?

12      **A**    YES.

13      **Q**    AND, SPECIFICALLY, THE COURT IN THAT CASE FOUND THAT

14  YOU WEREN'T QUALIFIED TO OPINE ON METHADONE TOXICITY, CORRECT?

15      **A**    YES.

16      **Q**    THE COURT FOUND THAT YOUR OPINION THAT THE PATIENT

17  CONTAINED CONTRABAND METHADONE WAS UNRELIABLE, CORRECT?

18      **A**    YES.

19      **Q**    AND THE COURT FOUND THAT YOU WEREN'T QUALIFIED TO

20  TESTIFY ABOUT THE SECURITY ISSUES FACING CORRECTIONAL OFFICERS

21  OR NURSES IN EMERGENCY SITUATIONS, CORRECT?

22      **A**    YES.

23      **Q**    AND IF WE COULD PULL UP DEFENDANT'S EXHIBIT 35.5 AND

24  35 -- SORRY.  DEFENDANT'S EXHIBIT 35 AT PAGES 5 AND 6.

25           THIS IS THE TESTIFYING HISTORY THAT YOU DISCLOSED.

1   YOU DIDN'T DISCLOSE THIS CASE AT ALL, DID YOU?

2        **A**    IF I DIDN'T IT WAS BECAUSE IT WAS BEFORE THE FOUR

3   YEARS BY RULE 26.

4        **Q**    AND IF -- I'M GOING TO MARK FOR IDENTIFICATION

5   PLAINTIFFS' EXHIBIT 70.  I'M MARKING FOR IDENTIFICATION AS

6   PLAINTIFFS' EXHIBIT 70 THE DEPOSITION OF DR. DAVID MATHIS IN

7   THE *JOHNSON V. DART* CASE.  IF WE COULD ZOOM IN ON THE TOP LEFT

8   PANEL.  THAT DEPOSITION WAS GIVEN DECEMBER 6TH, 2019; IS THAT

9   CORRECT?

10       **A**    I THINK YOU'RE RIGHT.

11       **Q**    SO THE CASE IN WHICH YOU WERE EXCLUDED WAS OMITTED

12   FROM YOUR LIST OF TESTIFYING HISTORY?

13       **A**    YOU'RE CORRECT.

14            **MR. DUBNER:**  NO FURTHER QUESTIONS FOR DR. MATHIS.

15            PLAINTIFFS WOULD MOVE INTO EVIDENCE PLAINTIFFS'

16   EXHIBIT 70, WHICH IS THIS DEPOSITION TRANSCRIPT, AND

17   PLAINTIFFS' EXHIBIT 67 WHICH IS THE CALIFORNIA ARTICLE.

18            **MR. ARCHEY:**  I OBJECT TO BOTH, YOUR HONOR.

19            **THE COURT:**  I THOUGHT YOU ALREADY OFFERED 67 --

20            **MR. DUBNER:**  I MARKED IT.  I DID NOT --

21            **THE COURT:**  SIXTY-SEVEN.  OKAY.

22            YOU OBJECT TO BOTH, AND THE GROUNDS ARE?

23            **MR. ARCHEY:**  RELEVANCE.  AND AS I UNDERSTAND THE WAY

24   IT WENT PREVIOUSLY, I WAS ALLOWED TO ASK ABOUT, TO A CERTAIN

25   EXTENT, TO ASK ABOUT THE PRIOR MATTERS, BUT I WASN'T ALLOWED

1   TO USE THE DOCUMENTS.

2          **MR. DUBNER:**  THAT'S ALL RIGHT.  WE CAN WITHDRAW.  WE

3   DON'T NEED TO MOVE 70 INTO EVIDENCE.  HE ACKNOWLEDGED THE DATE

4   SO WE CAN WITHDRAW --

5          **THE COURT:**  WHICH IS THE DEPOSITION IN THE PRIOR

6   CASE.  SO 70 IS OFF.  SO IT'S THE ARTICLE WHICH IS 67 AND IT'S

7   AN ARTICLE ON WHAT?

8          **MR. DUBNER:**  THAT IS ON THE PHYSICIAN REQUIREMENTS

9   IN THE CALIFORNIA CORRECTION SYSTEM.

10         **THE COURT:**  WHAT'S YOUR OBJECTION TO THAT?

11         **MR. ARCHEY:**  STILL RELEVANCE, YOUR HONOR.  THIS IS

12  SOMETHING GOING BACK, I DON'T KNOW, IN ANOTHER SYSTEM

13  UNRELATED.  WE DON'T KNOW ANYTHING ABOUT THAT VERSUS THIS.

14  IT'S RELEVANCE, YOUR HONOR.  THEY'VE GOT NO EXPERT TESTIMONY

15  REGARDING --

16         **THE COURT:**  WHAT IS THE RELEVANCE?

17         **MR. DUBNER:**  DR. MATHIS HAS REPEATEDLY SAID THAT HIS

18  OPINION IS BASED ON COMPARISONS BETWEEN LSP AND FACILITIES

19  THAT HE HAS WORKED AT.  THIS IS EVIDENCE ABOUT ONE OF THE

20  FACILITIES THAT HE'S WORKED AT.  IN TERMS OF HAVING EXPERT

21  TESTIMONY, DR. PUISIS DID REFERENCE THIS STUDY IN HIS DIRECT

22  WITHOUT OBJECTION.

23         **THE COURT:**  OVERRULED.  67 IS ADMITTED.

24  **BY MR. DUBNER:**

25      **Q**    THANK YOU FOR YOUR TIME, DR. MATHIS.

1      **THE COURT:**  I'M HAPPY TO LET YOU GO FORWARD.

2      **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO BE QUICK.  I

3  THINK THIS WILL WORK I BELIEVE.

4      **THE COURT:**  OKAY.  GO FORWARD WITH REDIRECT.

5  **REDIRECT EXAMINATION**

6  **BY MR. ARCHEY:**

7      **Q**    DR. MATHIS, I'M JUST GOING TO COVER, I'VE GOT, IT

8  LOOKS LIKE SIX POINTS I THINK.  THE FIRST ONE IS YOU WERE

9  ASKED ABOUT PREPARING YOUR OWN SAMPLE OR SELECTING YOUR OWN

10  SAMPLE.  WHY DID YOU NOT DO THAT?

11     **A**    THIS WAS AN OVERWHELMING PROJECT AND TO GO BEYOND

12  THE NUMBERS WAS JUST -- IT WAS IMPOSSIBLE TO GET THE REPORT

13  DONE AND PREPARE FOR THE DEPOSITION IN TIME.

14     **Q**    YOU BARELY WERE ABLE TO COMPLY EVEN WITH THE CHARTS

15  THAT THEY SELECTED --

16     **A**    YEAH.  WE WORKED HUNDREDS OF HOURS ON THIS.

17     **Q**    ALL RIGHT.  YOU WERE ASKED ABOUT YOUR REPORT AND HOW

18  YOU DREW IT UP.  YOU INCLUDED THE LSP MEDICAL SUMMARIES IN

19  YOUR OPINION.  WHY?

20     **A**    BECAUSE THAT WAS THE BEST WAY TO SUMMARIZE WHAT WAS

21  GOING ON.  I THOUGHT IT WAS SUPERFLUOUS TO GO AHEAD AND DO THE

22  SAME THING MYSELF AND WRITE IT UP ABOVE.

23     **Q**    DID YOU REVIEW THE CHARTS IN DETAIL TO VALIDATE THE

24  ACCURACY OF THE SUMMARY THAT YOU WERE PULLING OVER WHEN YOU

25  DID SO?

1    **A**    YES.

2    **Q**    DID YOU FIND THAT THEY WERE ACCURATE?

3    **A**    SUBSTANTIALLY.

4    **Q**    OKAY.  ALL RIGHT.  YOU WERE ASKED ABOUT THE

5    VIOLATIONS YOU FOUND AND COUNSEL COUNTED OFF LIKE TEN ON HIS

6    FINGERS.  ISN'T IT TRUE THAT SIX OF THOSE WERE ALL

7    SELF-DECLARED EMERGENCIES?

8    **A**    I'M NOT CERTAIN.

9    **Q**    AND THE SELF-DECLARED EMERGENCIES WE'VE ADDRESSED

10   WITH YOUR GUY?

11   **A**    YES.  WE'VE ADDRESSED THE SELF-DECLARED EMERGENCIES

12   AND THERE HAVE BEEN SIGNIFICANT CHANGES MADE CONTEMPORANEOUS

13   WITH THE PROCEEDINGS.

14   **Q**    AND EVEN WITH YOUR FINDINGS -- STRIKE THAT.

15   WHEN YOU LOOKED AT THESE RECORDS, DID YOU GIVE THEM

16   A HARD LOOK AND SEE WHETHER YOU SAW ERRORS OR NOT?

17   **A**    YES.

18   **Q**    AND AFTER DOING THAT, AND WITH A FEW ISSUES YOU

19   FOUND, WHAT WAS YOUR OPINION AS TO CLINICAL CARE AT LSP?

20   **A**    I THOUGHT CLINICAL CARE AT LSP COMPLIED WITH THE

21   STANDARD OF CARE AND WAS REASONABLE AND APPROPRIATE.

22   **MR. ARCHEY:**  YOUR HONOR, I'M GOING TO STOP RIGHT

23   THERE.  THOSE ARE MY QUESTIONS.

24   **THE COURT:**  THANK YOU.  ALL RIGHT.  YOU MAY STEP

25   DOWN, SIR.  WE WILL BE IN RECESS UNTIL 1:30.  I APOLOGIZE I

1   SHOULD CALL YOU DOCTOR NOT SIR.  IT'S A FORCE OF HABIT.  YOU

2   MAY STEP DOWN, DOCTOR.

3                            **(RECESS)**

4                  C E R T I F I C A T E

5        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6   FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

7   NUMBERED MATTER.

8   **S/GINA DELATTE-RICHARD**

9   GINA DELATTE-RICHARD, CCR

10  OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25