1                 UNITED STATES DISTRICT COURT

2                 MIDDLE DISTRICT OF LOUISIANA

3

4   JOSEPH LEWIS, ET AL     : CIVIL ACTION

5   VERSUS                  : NO. 15-318-SDD-RLB

6   BURL CAIN, ET AL        : JUNE 13, 2022

7   ========================================================
                            DAY 6
8                         BENCH TRIAL
              BEFORE THE HONORABLE SHELLY D. DICK
9              UNITED STATES CHIEF DISTRICT JUDGE

10

                    A P P E A R A N C E S

11

12  FOR THE PLAINTIFFS:

13       PROMISE OF JUSTICE INITIATIVE
         BY: MERCEDES HARDY MONTAGNES, ESQUIRE
14       BY: SAMANTHA NICOLE BOSALAVAGE, ESQUIRE
         BY: NISHI LAL KUMAR, ESQUIRE
15       1024 ELYSIAN FIELDS
         NEW ORLEANS, LOUISIANA 70118
16
         COHEN MILSTEIN SELLERS & TOLL PLLC
17       BY: JEFFREY DUBNER, ESQUIRE
         BY: BRENDAN R. SCHNEIDERMAN, ESQUIRE
18       1100 NEW YORK AVENUE NW
         SUITE 500
19       WASHINGTON, D.C. 20005

20       SOUTHERN POVERTY LAW CENTER
         BY: BRUCE WARFIELD HAMILTON, ESQUIRE
21       BY: EMILY BLYTHE LUBIN, ESQUIRE
         201 ST. CHARLES AVENUE
22       SUITE 2000
         NEW ORLEANS, LOUISIANA 70170
23
    FOR THE DEFENSE:
24
         BUTLER SNOW
25       BY: CONNELL LEE ARCHEY, ESQUIRE
         BY: RANDAL J. ROBERT, ESQUIRE

445 NORTH BOULEVARD
SUITE 300
BATON ROUGE, LOUISIANA 70802

SHOWS, CALI, BERTHELOT & WALSH, L.L.P.
BY: JOHN CLIFTON CONINE, JR., ESQUIRE
BY: JEFFREY K. CODY, ESQUIRE
628 ST. LOUIS STREET
BATON ROUGE, LOUISIANA 70802

REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
UNITED STATES COURTHOUSE
777 FLORIDA STREET
BATON ROUGE, LOUISIANA 70801
NATALIE_BREAUX@LAMD.USCOURTS.GOV
(225) 389-3565

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
COMPUTER-AIDED TRANSCRIPTION SOFTWARE

1            I N D E X

2   PLAINTIFFS' WITNESS:

3    ANGELA GOEHRING (CONTINUED)                    PAGE

4        DIRECT EXAMINATION BY MS. MONTAGNES ..........5

5        CROSS-EXAMINATION BY MR. ARCHEY .............69

6        REDIRECT EXAMINATION BY MS. MONTAGNES ......123

7   PLAINTIFFS' WITNESS:

8    DANIEL BRADY, M.D.

9        DIRECT EXAMINATION BY MR. HAMILTON .........130

10        CROSS-EXAMINATION BY MR. ROBERT ............145

11        REDIRECT EXAMINATION BY MR. HAMILTON .......153

12   PLAINTIFFS' WITNESS:

13    MARCIA GLASS, M.D.

14        DIRECT EXAMINATION BY MS. KUMAR ............157

15        CROSS-EXAMINATION BY MR. ROBERT ............172

16        REDIRECT EXAMINATION BY MS. KUMAR ..........184

17   PLAINTIFFS' WITNESS:

18    CHARLES T. BUTLER

19        DIRECT EXAMINATION BY MS. BOSALAVAGE .......185

20        CROSS-EXAMINATION BY MR. CONINE ............201

21        REDIRECT EXAMINATION BY MS. BOSALAVAGE .....213

22   PLAINTIFFS REST ................................215

23

24

25

1          **(JUNE 13, 2022)**

2       **(CALL TO THE ORDER OF COURT.)**

3              **PROCEEDINGS**

4          **THE COURT:**  GOOD AFTERNOON, EVERYONE.  BE

5  SEATED.

6              OKAY.  HOUSEKEEPING.  WHERE ARE WE ON

7  TIME?

8          **MS. MONTAGNES:**  HI, YOUR HONOR.  MERCEDES

9  MONTAGNES ON BEHALF OF THE PLAINTIFFS.

10              YESTERDAY -- OR FRIDAY THE PLAINTIFFS

11  AND THE DEFENDANTS HAVE AGREED THAT THE PLAINTIFFS

12  USED TWO HOURS OF TIME, FOR A TOTAL OF 15 HOURS AND

13  16 MINUTES; AND THE DEFENDANTS USED 18 MINUTES OF

14  TIME, FOR A TOTAL OF EIGHT HOURS AND 20 MINUTES.

15          **THE COURT:**  TO DATE YOU'RE ONLY 15 HOURS IN

16  AND EIGHT HOURS IN?  WE'VE BEEN ON THE RECORD LONGER

17  THAN THAT, FOLKS.  YOU'RE TELLING ME THAT WE'VE ONLY

18  BEEN ON THE RECORD 20-SOMETHING HOURS?

19          **MS. MONTAGNES:**  YES, YOUR HONOR.  THAT'S THE

20  TIME THAT WE HAVE.

21          **THE COURT:**  OKAY.  CALL YOUR NEXT WITNESS.

22          **MS. MONTAGNES:**  WE'RE GOING TO CONTINUE THE

23  EXAMINATION OF MS. ANGELA GOEHRING.

24          **THE COURT:**  AND WE HAVE A NEW COURT -- WELL,

25  WE HAVE A FILL-IN COURT REPORTER.  YOU'LL NEED TO

1  SPELL THE WITNESS'S NAME FOR HER, PLEASE.

2            YOU HAVE IT?  OKAY.  THANKS.

3            OKAY, MA'AM.  YOU'RE STILL UNDER OATH.

4            GO AHEAD, MS. MONTAGNES.

5        **MS. MONTAGNES:**  THANK YOU.

6        **DIRECT EXAMINATION (CONTINUED)**

7  BY MS. MONTAGNES:

8     **Q**    MS. GOEHRING, I WANT TO JUST TAKE US BACK TO

9  WHERE WE WERE IN YOUR LAST EXAM WHEN WE WERE

10 DISCUSSING POLICIES AND PROCEDURES.  YOU MENTIONED IN

11 YOUR TESTIMONY, JUST TO SUMMARIZE FOR EXPEDIENCY,

12 THAT THERE WAS A LACK OF COMPREHENSIVE POLICIES AND

13 PROCEDURES AT LSP.

14            WHEN YOU WERE ON YOUR SITE VISIT, DID YOU

15 SEE ANY EVIDENCE OF THE LACK OF THOSE POLICIES AND

16 PROCEDURES?

17     **A**    YES.

18     **Q**    CAN YOU DESCRIBE WHAT EVIDENCE?

19     **A**    YES.  THE FIRST STRIKING THING WAS IN THE

20 POLICY AND PROCEDURAL MANUAL IT STATES THAT THE

21 ELECTRONIC MEDICAL ADMINISTRATION RECORDS, OR EMARs,

22 WILL BE FILED IN THE HEALTH RECORD.  AND THOSE WERE

23 NOT.  THEY WERE PRODUCED IN A SEPARATE FILE.

24            SO WHILE WE WERE OBSERVING THE SICK CALL

25 PROCESS, WE ASKED MR. BORDELON, ONE OF THE NURSE

1   PRACTITIONERS, IF HE COULD PULL UP THE ELECTRONIC

2   MEDICATION ADMINISTRATION RECORD SO WE COULD SEE THE

3   COMPLIANCE OF THE PATIENT'S MEDICINE.

4        FIRST OF ALL, HE WAS UNABLE TO IDENTIFY THE

5   ICON, WHERE TO FIND THE ICON ON THE COMPUTER.  AND

6   THE EMT HELPED HIM, SHOWED HIM THE ICON.  AND THEN

7   ONCE HE TRIED TO OPEN THAT, HE DIDN'T KNOW WHAT HIS

8   LOG-IN WAS, SO WAS UNSUCCESSFUL BRINGING THAT UP.

9   ULTIMATELY THE DIRECTOR OF NURSING THEN TOOK US TO

10  HIS OFFICE.  AND AFTER A BIT OF STRUGGLING,

11  MANEUVERING THROUGH THAT, THEY WERE ABLE THEN TO PULL

12  UP THE ELECTRONIC MEDICAL RECORD.

13       BUT WHY THAT IS SIGNIFICANT IS THAT THAT'S

14  DEMONSTRATIVE THAT IT'S NOT SOMETHING THAT THEY DO

15  WITH EVERY PATIENT, WHICH REVIEW OF COMPLIANCE WITH

16  MEDICATIONS IS A KEY COMPONENT OF EVERY ENCOUNTER.

17     Q   DID YOU SEE ANY OTHER EVIDENCE?

18     A   YES.  WE WANTED REALLY TO WATCH THE

19  MEDICATION ADMINISTRATION PROCESS IN THE ASH 1 AND

20  ASH 2, THE ASSISTED LIVING UNITS.  AND WE WERE GIVEN

21  MULTIPLE DIFFERENT TIMES OF START.

22       AND SO I RECALL THE FIRST ONE WAS SUPPOSED

23  TO BE IN THE AFTERNOON, AND SO WE ARRIVED AT THE

24  POINT OF TIME -- I DON'T REMEMBER IF IT WAS TWO OR

25  THREE O'CLOCK NOW.  BUT WHEN WE GOT THERE, THEY SAID,

1   "OH, NO, IT DOESN'T HAPPEN UNTIL 8:00 P.M."

2          AND SO THEN WE:  "SO THEN WE'LL DO IT

3   TOMORROW.  WHAT TIME WILL IT HAPPEN IN THE MORNING?"

4   AS I RECALL, THEY TOLD US 8:00 A.M.

5          SO WHEN WE ARRIVED AT 8:00 A.M., WE WERE

6   TOLD "NO, IT ALREADY HAPPENED.  IT HAPPENED EARLIER

7   AT SIX O'CLOCK."

8          AND THE VARIETY OF THOSE TIMES TO TELL US

9   WHEN THE PILL TIMES OCCURRED WAS COMING FROM

10  DR. JOHNSON, THE ADMINISTRATOR, EVEN THE DIRECTOR OF

11  NURSING.  AND SO THAT WAS, I THINK FOR ME -- I WAS

12  TAKING THAT THEY DIDN'T EVEN KNOW WHEN THEIR

13  MEDICATION ADMINISTRATION LINES WOULD OCCUR.

14         AND THEN A THIRD I THINK IMPORTANT EXAMPLE

15  IS WE ASKED WHERE THE AEDs WERE LOCATED, AND WE WERE

16  TOLD THAT THEY WERE IN A SUPERVISOR'S OFFICE, WHICH

17  IS RIGHT OUTSIDE THE DOORS OF ASH 1 AND 2 AND -- AND

18  SO WE WENT IN THERE, AND THE OFFICERS KIND OF LOOKED

19  AT EACH OTHER.  AND AFTER A FEW MINUTES THEY WENT

20  INTO A CLOSET.  AND AFTER SOME SEARCHING, THEY

21  PRODUCED WHAT THEY BELIEVED WAS AN AED, WHICH WAS, IN

22  FACT, A FIRST AID KIT.  AND SO WE EXPLAINED "NO, WHAT

23  WE'RE LOOKING FOR" -- AND SO THEN THEY WENT FURTHER

24  ON BACK IN THE BUILDING.  AND AFTER SOME TIME THEY

25  FINALLY PRODUCED IT.

**1**      THAT'S SIGNIFICANT, BECAUSE THE AED REALLY

**2** SHOULD BE TAKEN TO EVERY EMERGENCY OCCURRENCE UNDER A

**3** FOUR-MINUTE MARK, BECAUSE IT'S SOMETHING THAT YOU

**4** NEED.  WHEN A PATIENT IS NOT BREATHING, THERE IS NO

**5** HEART BEAT, YOU NEED TO GET THAT GOING IMMEDIATELY.

**6** AND THE STRUGGLE WITH FINDING THAT WAS CONCERNING.

**7**      Q    CAN YOU JUST LET US KNOW:  WHAT IS AN AED?

**8** WHAT DOES THAT STAND FOR?

**9**      A    IT'S AN AUTOMATIC EXTERNAL DEFIBRILLATOR,

**10** WHICH RESTARTS -- IT MEASURES IS THIS A RHYTHM ISSUE,

**11** ELECTRICAL ISSUE WITH THE HEART, WHY THE HEART'S NOT

**12** BEATING.  IF SO, YOU CAN SHOCK THAT PATIENT AND PUT

**13** THEM BACK INTO RHYTHM.

**14**      Q    AND NOW LET'S TURN TO QUALITY IMPROVEMENT

**15** AND QUALITY ASSURANCE, WHICH WE WERE TALKING ABOUT

**16** WHEN WE TOOK A BREAK ON FRIDAY.  ONE THING I

**17** NEGLECTED TO ASK YOU WAS:  WHAT ARE YOU HOPING TO GET

**18** FROM THESE TESTS, THESE STUDIES THAT YOU ARE -- THAT

**19** YOU WERE DISCUSSING?

**20**      A    WELL, FIRST OF ALL, THEY SHOULD TELL THE

**21** STORY, BUT THEY'RE REALLY -- YOU CAN DIVIDE THE

**22** QUALITY ASSURANCE STUDIES KIND OF INTO TWO BROADER

**23** CATEGORIES.  ONE IS PROCESS AND ONE IS OUTCOME.

**24**      AND THE PROCESS STUDIES REALLY ARE

**25** PROMULGATED ON YOUR POLICY AND PROCEDURES, SO YOU

1  MEASURE EACH STEP OF THE PROCEDURE:  SO DID WE MEET

2  THE TIME FRAME?  YOU KNOW, WAS THE FORM COMPLETED?

3  WAS THE FORM SUBMITTED TO THE RIGHT PERSON AT THE

4  RIGHT PLACE AT THE RIGHT TIME?  YOU MEASURE THOSE

5  KINDS OF THINGS SO THAT IT EITHER REASSURES YOU THAT,

6  YOU KNOW, STAFF EACH AND EVERY DAY ARE DOING IT THE

7  RIGHT WAY, OR IT POINTS TO THERE IS AN OPPORTUNITY

8  HERE FOR IMPROVEMENT AND WE MAY HAVE AN ISSUE.

9         ON THE PROCESS SIDE, THAT REALLY LOOKS MORE

10  AT THE PATIENT OUTCOME.  AND THOSE ARE USUALLY

11  DESIGNED BY A PHYSICIAN.  SOMETIMES YOU CAN HAVE

12  OUTCOME STUDIES THAT ARE NURSE DESIGN.  AN EXAMPLE OF

13  A PHYSICIAN DESIGN, ONE WOULD BE IF YOU'RE GOING TO

14  STUDY YOUR -- THE CARE BEING GIVEN TO THE DIABETIC

15  POPULATION, AND YOU MIGHT LOOK AT DIABETIC A1Cs,

16  WHICH IS AN INDICATOR OF THE CONTROL OF THE DIABETES

17  OVER TIME.  YOU CAN LOOK AT THOSE A1Cs, AND OFTEN

18  THAT WILL SHOW YOU WHETHER OR NOT YOUR -- YOU KNOW,

19  IF THEY'RE IN GOOD CONTROL OR NOT.

20         HYPERTENSION IS ANOTHER ONE.  YOU CAN LOOK

21  AT BLOOD PRESSURES OVER TIME.  OBVIOUSLY, LIKE

22  PATIENTS IN THE COMMUNITY, SOMETIMES PATIENTS WON'T

23  ALWAYS MAKE THE BEST CHOICE WITH DIET AND EXERCISE.

24  BUT IT IS A GOOD INDICATOR TO REALLY TAKE A LOOK AT

25  THAT.

1      AN EXAMPLE OF A NURSE NEEDING ONE WOULD BE

2  BEDSORES OR DECUBITUS ULCERS IN THE INFIRMARY

3  SETTING.  YOU KNOW, YOU REALLY SHOULD STRIVE FOR THAT

4  TO BE ZERO, BECAUSE THAT'S AN INDICATOR THAT YOU'RE

5  GIVING GOOD NURSING CARE, GOOD TURNING AND GOOD SKIN

6  CARE AND AVOIDING PRESSURE POINTS AND THOSE KINDS OF

7  THINGS.

8      Q   ALL RIGHT.  NOW LET'S TALK A BIT ABOUT YOUR

9  RECOMMENDATIONS AS THEY RELATE TO THE QUALITY

10  IMPROVEMENT AND QUALITY ASSURANCE.

11      MS. MONTAGNES:  CAN WE PULL UP PLAINTIFFS'

12  EXHIBIT A1 AT PAGE 135?  ALL RIGHT.  THIS IS NOT

13  SEALED.  AND CAN WE PULL IT UP ALONGSIDE 136, IF

14  THAT'S POSSIBLE?

15  BY MS. MONTAGNES:

16      Q   AND SO ARE THESE THE RECOMMENDATIONS THAT

17  YOU WROTE?

18      A   YES.

19      Q   WHAT, IF ANYTHING, WOULD YOU WANT TO

20  HIGHLIGHT TO THE COURT WITH REGARDS TO THESE

21  RECOMMENDATIONS?

22      A   SO I THINK IN ANY HEALTH SERVICE DELIVERY

23  PROGRAM IT'S IMPORTANT THAT YOU IDENTIFY WHO'S

24  ACCOUNTABLE, YOU KNOW, WHO'S IN CHARGE OF IT, WHO'S

25  RESPONSIBLE AND WHO'S THEN HELD ACCOUNTABLE.  SO THE

1   ADMINISTRATOR OF THE ENTIRE PROGRAM SHOULD BE

2   ACCOUNTABLE TO UNDERSTAND THE QUALITY IMPROVEMENT

3   PROGRAM; THAT THEY MAY NOT DO THE BOOTS-ON-THE-GROUND

4   STEP-BY-STEP WORK, BUT THEY WOULD DELEGATE THAT.

5          LIKE IN THE CASE AT ANGOLA, THERE IS A NURSE

6   THAT'S ASSIGNED AS THAT COORDINATOR, AND THAT'S

7   ACCEPTABLE.  BUT THE ADMINISTRATOR SHOULD BE VERSED

8   IN WHAT A GOOD PROGRAM LOOKS LIKE AND ASKING "DO WE

9   HAVE A GOOD PROGRAM?" AND CERTAINLY USING THE RESULTS

10  OF THAT, THOSE STUDIES, TO HELP GUIDE IMPROVEMENT IN

11  THE PROGRAM AND RECTIFYING SUBSTANDARD SCORES THAT

12  ARE FOUND.

13         AND I ALSO BELIEVE THAT THE COORDINATOR

14  NEEDS TO BE SOMEONE WITH EXPERIENCE.  YOU CAN'T JUST

15  ASSIGN A NURSE TO BE THE QA DIRECTOR IF HE OR SHE HAS

16  NOT HAD EXPERIENCE WITH DESIGN DEVELOPMENT AND HOW

17  YOU REALLY INTERPRET THE DATA AND USE THAT TO DRIVE

18  YOUR PROGRAM.

19         THE COMMITTEE REALLY SHOULD HAVE A BROAD

20  REPRESENTATION ACROSS ALL LINES.  AND THAT INCLUDES

21  MEDICINE, NURSING, DENTAL, BEHAVIORAL HEALTH, CUSTODY

22  STAFF AND CERTAINLY MEDICAL DIRECTOR OBVIOUSLY,

23  DIRECTOR OF NURSING.  SO THAT COMMITTEE SHOULD HAVE A

24  BROAD REPRESENTATION FOR EVERY QUARTER.  I MEAN, THEY

25  DON'T MEET THAT OFTEN.  IT'S ONCE A QUARTER, SO YOU

1   WOULD EXPECT THAT THERE IS A TIME WHEN THERE IS

2   REPRESENTATION.

3          AND THEN THE LINE STAFF NEED TO BE INVOLVED

4   IN THE PROGRAM.  IF IT -- IF YOUR QUALITY PROGRAM HAS

5   NO MEANING TO YOUR LINE STAFF OR THEY'RE BLIND TO IT,

6   IT DOESN'T HELP THEM UNDERSTAND WHAT THEY DO DAY IN

7   AND DAY OUT, HOW THAT IMPACTS THE QUALITY.  SO THAT

8   NEEDS TO BE ROPED BACK INTO THE LINE STAFF NURSE.

9          I THINK IT'S EFFECTIVE -- AND I SEE THIS

10  MANY PLACES -- WHERE LINE STAFF NURSES ACTUALLY

11  COMPLETE THE DATA COLLECTION.  AND THEN IF YOU WATCH

12  THAT OVER TIME, THEY BEGIN TO POLICE EACH OTHER.  I

13  THINK I WRITE A SPECIFIC WAY AND THAT IT'S CLEAR, BUT

14  OFTEN I'LL SLIDE IT TO A COLLEAGUE AND SAY, "AM I

15  CLEAR?"  AND THEY MAY READ IT AND "NO, I'M NOT

16  UNDERSTANDING IT."  AND I'M SURE MAYBE YOU DO THAT AS

17  WELL.  BUT THE POINT IS THAT LINE STAFF APPRECIATE

18  IT, THEY UNDERSTAND THE AREAS THAT WE NEED TO BE

19  REALLY WATCHING TO MAKE SURE THAT WE GET IT DONE.

20         AND THEN THE LAST RECOMMENDATION ACTUALLY

21  CAME FROM DR. PUISIS.  AND I CERTAINLY SUPPORT THIS.

22  AND THAT IS TO INITIATE A JOINT QUALITY IMPROVEMENT

23  WITH THE HOSPITAL TO REALLY LOOK AT THE ROOT CAUSES

24  FOR THE MEDICAL HAND-OFFS.  AND WE CERTAINLY HEARD

25  DEPOSITION FROM ONE OF THE HOSPITALISTS ABOUT THE

1   CHALLENGES WITH GETTING GOOD INFORMATION THAT THE

2   PATIENT RECEIVED AND THEN THE HAND-OFF IN THE OTHER

3   DIRECTION.  AND THAT'S WHAT THIS SPEAKS TO.

4        Q    ALL RIGHT.  LET'S TURN AND TALK A BIT ABOUT

5   SOME OF THE PATIENTS WHOSE CHARTS YOU REVIEWED.

6   LET'S START WITH PATIENT 20.  WHAT CAN YOU TELL ME

7   ABOUT PATIENT 20?

8        A    SO PATIENT 20 WAS A 52-YEAR-OLD PATIENT THAT

9   HAD HEPATITIS C WITH TREATMENT, HEPATITIS B; HE HAD

10  HIGH BLOOD PRESSURE AND HE HAD GERD, WHICH IS A

11  GASTRIC REFLUX CONDITION.  AND HE BECAME -- HE BEGAN

12  COMPLAINING OF LOWER ABDOMINAL PAIN SOME TIME IN

13  FEBRUARY OF 2021.  AND THEN IN ABOUT MAY 2021, ONE OF

14  NURSE --

15       Q    I'M GOING TO STOP YOU JUST FOR A SECOND.

16           MS. MONTAGNES:  LET'S PULL UP JX_20.124.

17  AND THIS IS SEALED, SUZIE.  I'M SORRY.

18  BY MS. MONTAGNES:

19       Q    GO ON.

20       A    SO -- AND THEN IN MAY, A NURSE PRACTITIONER

21  REVIEWED THE CHART, BECAUSE HE WAS COMPLAINING OF

22  GENERALIZED WEAKNESS.  AND YOU CAN SEE ON THIS HEALTH

23  CARE REQUEST FORM THE EMT -- I BELIEVE IT WAS AN EMT

24  OR CERTAINLY AN OFFICER, NO. 605 -- REFERRED THE

25  PATIENT TO THE EMD -- I MEAN TO THE M.D.  PARDON ME.

1  AND YOU'LL SEE THAT THE DISPOSITION WAS THAT NURSE

2  PRACTITIONER CYNTHIA PARK JUST SAID, "FOLLOW UP AS

3  NEEDED," AND THERE IS NO INDICATION THAT THE PATIENT

4  WAS SEEN OR EXAMINED.

5      Q    THIS WAS ON MAY 14, 2021?

6      A    THAT'S CORRECT.

7      Q    THE PATIENT WAS EXPERIENCING, IT APPEARS,

8  RAPID WEIGHT LOSS AS WELL?

9      A    YES.  DIAGNOSED WITH HEPATITIS C,

10  EXPERIENCING REFLUX -- OR I'M SORRY -- RAPID WEIGHT

11  LOSS AND WEAKNESS.

12          AND THE OTHER THING THAT STICKS OUT ABOUT

13  THIS IS THAT THE WEIGHT WASN'T TAKEN.  AND I THINK WE

14  SPOKE -- I SPOKE ON FRIDAY ABOUT, YOU KNOW, WEIGHT IS

15  PART OF YOUR COMPLETE VITAL SIGNS AND SHOULD BE

16  TAKEN.

17      Q    ALL RIGHT.  LET'S PULL UP JX_20.123.

18      A    SO THEN ON MAY 18TH HE AGAIN -- HE PUT IN AN

19  EMERGENCY REQUEST THIS TIME SAYING THAT HE WAS HAVING

20  ABDOMINAL PAIN AND IT FELT LIKE THAT SOMETHING WAS

21  STICKING HIM -- AND I BELIEVE HE MEANT INTERNALLY --

22  AND COMPLAINING OF HAVING A GREASY STOOL.  HE TOLD

23  THEM THAT HE HAD BEEN DIAGNOSED WITH HEPATITIS C AND

24  THAT HE WAS NOT RECEIVING HIS MEDICATION.  AND HE

25  ACTUALLY ASKED IF HE CAN BE REFERRED FOR A

1  RE-EVALUATION OF HIS ABDOMEN.

2          AND YOU'LL SEE ON THIS AS WELL, IF YOU ZOOM

3  BACK OUT, THAT THE DISPOSITION WAS TO THE PHYSICIAN.

4  AND IT APPEARS THAT THE HEALTH CARE PRACTITIONER DID

5  NOT SEE THE PATIENT.  "VSS" MEANS VITAL SIGNS ARE

6  STABLE.  AND "SC PRN" MEANS SICK CALL AS NEEDED.

7      Q    AND THEN AT SOME POINT HE DID RECEIVE AN

8  ULTRASOUND.  IS THAT RIGHT?

9      A    YES, HE DID.  HE DID GET HIS ABDOMINAL

10  ULTRASOUND THE END OF MAY.  AND THE IMPRESSION ON IT

11  WAS THAT IT WAS UNREMARKABLE.  SO THEN THE BEGINNING

12  OF AUGUST HE PUT IN YET ANOTHER HEALTH CARE REQUEST

13  AND --

14      Q    IF YOU COULD PAUSE.  IF WE COULD PULL UP

15  JX_116 -- JX_20.116.

16      A    YEAH.  SO THIS IS HIS REQUEST, AND IT SAYS

17  "ABDOMINAL PAIN."  AND THEN THE ASSESSMENT IS THEY

18  "STATED THAT HE HAD AN ULTRASOUND FOR HEP C, NOT FOR

19  HIS STOMACH PAIN.  HE STATES HE HAD BEEN HAVING

20  REALLY BAD PAINS LATELY THAT WERE UNBEARABLE."  AND

21  IT LOOKS LIKE THE SERGEANT NOTED THAT HE DID SHOW

22  SOME SIGNS OF DISCOMFORT AND THAT HE WALKED BENT AT

23  THE TORSO BUT HAD NO OTHER COMPLAINTS.

24          AND YOU'LL SEE THAT THE DISPOSITION OF THIS

25  SICK CALL ENCOUNTER WAS TO SEND THEM TO THE

1    PHYSICIAN, THE M.D.  BUT IF YOU LOOK TO THE RIGHT ON

2    THE HEALTH CARE PRACTITIONER NOTES, AGAIN, NURSE

3    PRACTITIONER PARKS WROTE "FOLLOW UP AS NEEDED."  AND

4    THERE IS NO INDICATION THAT THE PATIENT WAS EXAMINED

5    OR ANY TREATMENT PROVIDED.

6          AND I DO WANT TO POINT OUT HE WAS CHARGED

7    SIX DOLLARS FOR THAT, WHICH THERE IS A PATTERN THERE

8    OF CHARGING THE PATIENT.  WHICH I HAVE NO ISSUE WITH

9    THE COPAY, BUT THEY SHOULD RECEIVE A SERVICE.

10    **Q**    LET'S GO AHEAD AND PULL UP JX_20.112.

11    **A**    SO THIS IS AUGUST 31ST THEN, AGAIN 2021.  HE

12    PUT IN A DIAGNOSIS THAT SAID PUT IN -- I MEAN SICK

13    CALL SLIP -- THAT SAID THAT HIS EYES ARE YELLOW AND

14    THAT HIS LIVER WAS HURTING REALLY BAD AND THAT HE

15    COULDN'T LAY ON HIS LEFT SIDE.

16    **Q**    WHAT WAS THE OUTCOME OF THIS SICK CALL?

17    **A**    IT LOOKS, AGAIN, LIKE NO WEIGHT WAS TAKEN

18    AND "AMBULATES WITHOUT DIFFICULTY"; "PATIENT IS IN NO

19    ACUTE DISTRESS"; "THIS IS A CHRONIC CONDITION"; "ALL

20    REMAINING PHYSICAL EXAM IS UNREMARKABLE."  AND THE

21    DISPOSITION BY, AGAIN, THE SAME -- I DON'T KNOW IF IT

22    WAS THE EMT OR A SECURITY PERSON, NO. 605 -- REFERRED

23    TO THE M.D.

24          AND ON THIS ONE YOU'LL SEE THAT, UNDER THE

25    HEALTH CARE PRACTITIONER NOTES OR THE NURSE

1    PRACTITIONER/PHYSICIAN SECTION, IT SAYS THAT THE

2    PATIENT WAS SENT TO UMCNO, AND IT WAS SIGNED ON

3    9/28/21.

4       Q    HOW LONG AFTER THIS WAS SUBMITTED WAS IT

5    SIGNED?

6       A    YEAH.  SO HE -- IT WAS DOCUMENTED THAT THIS

7    WAS ON 8/31/21 BY THE HEALTH CARE PERSONNEL THAT DID

8    THE SCREENING.  AND SO IT WAS ABOUT 30 DAYS LATER

9    THAT IT WAS NOTED BY THE -- I CAN'T READ THAT, WHO

10   THE PERSON WAS, SO I DON'T KNOW WHO NOTED IT ON THE

11   PRACTITIONER SIDE.  IT'S NOT LEGIBLE TO ME.

12      Q    ALL RIGHT.  SO THEN WHAT HAPPENED -- OR CAN

13   WE PULL UP JX_20.115?

14      A    SO NOW WE'RE AT 9/21 -- SEPTEMBER 21, 2021.

15   AND HE PUTS YET ANOTHER SICK CALL REQUEST IN SAYING

16   THAT HE HAD GOTTEN WORSE OR THAT HE'D DEVELOPED

17   JAUNDICE.  HE SAID, "MY EYES ARE COMPLETELY YELLOW.

18   I CAN'T EAT.  I DON'T HAVE THE STRENGTH TO STAND IN

19   THE SHOWER SO I SHOWER WITH A CHAIR" AND "MY WEIGHT

20   HAS NEVER BEEN THIS LOW."

21      Q    DID THEY TAKE HIS WEIGHT ON THAT DAY?

22      A    NO.

23      Q    AND THEN WHAT HAPPENED?

24      A    SO HE WAS AGAIN REFERRED TO THE M.D.  AND

25   THE NOTE FOR THE HCP SAYS "SEEN IN THE ATU ON

1    9/21/21" AND "WAS SENT TO THE EMERGENCY DEPARTMENT."

2        Q    ALL RIGHT.  AND LET'S PULL UP JX_20.91.  SO

3    WHAT HAPPENED NEXT?

4        A    SO THIS IS A TRIP RETURN, AND IT IS DATED

5    9/22.  AND YOU CAN SEE THAT THERE IS A NUMBER OF

6    MEDICATIONS, FOLLOW-UP APPOINTMENTS THAT ARE NEEDED.

7    A NUMBER OF MEDICATIONS WERE RECOMMENDED.

8            AND WHAT'S STRIKING ABOUT THIS IS THAT

9    YOU'LL SEE DOWN ON THE -- IN THE RIGHT LOWER-HAND

10   CORNER AND THE LEFT-HAND CORNER "NOTED" ON "11-2-21,"

11   WHICH WAS ABOUT SIX WEEKS AFTER HE HAD RETURNED.

12       Q    AND SO IS IT YOUR UNDERSTANDING THAT NONE OF

13   THIS FOLLOW-UP HAPPENED FOR SIX WEEKS AFTER HE

14   RETURNED?

15       A    THAT'S CORRECT.  AND ONCE WE RECEIVED THE

16   ELECTRONIC MEDICATION ADMINISTRATION RECORDS AND

17   LATER ON IN SEPARATE FILES, I WENT BACK TO MAKE SURE

18   THAT THEY WEREN'T THERE.  AND THERE WERE NO

19   MEDICATIONS EVEN ON THE ELECTRONIC MARs, WHICH

20   MATCHES THE NURSES NOT NOTING IT UNTIL 11/2.  SO THEY

21   DIDN'T ACKNOWLEDGE IT UNTIL NOVEMBER 2ND.

22       Q    AND IT NOTES HERE THAT HE WAS TO BE

23   TRANSFERRED TO THE NURSING UNIT.  TO YOUR KNOWLEDGE,

24   ON 9/22 WAS HE TRANSFERRED TO THE NURSING UNIT?

25       A    I COULDN'T REALLY TELL FROM THE RECORD THAT

1   HE ENDED UP IN THE NURSING UNIT.  IT'S CLEAR FROM THE

2   RECORD THAT HE DID END UP IN THE INFIRMARY ON OCTOBER

3   31ST IN THE NURSING UNIT 1 WITH THE DIAGNOSIS OF

4   PANCREATIC CANCER.

5       Q    THERE IS NO RECORDS OF THAT BEFORE OCTOBER

6   31ST?

7       A    NOT THAT WE FOUND, NO.

8       Q    ALL RIGHT.  NOW LET'S TURN -- LET'S TURN

9   TO -- WELL, WHAT HAPPENED NEXT?

10      A    SO HE'S ADMITTED ON OCTOBER 31ST TO THE

11  NURSING NU 1.  AND WHEN I LOOKED AT THE NURSING

12  ADMISSION --

13      Q    COULD WE PAUSE FOR A SECOND?  DID HE GO

14  AHEAD AND RECEIVE A BIOPSY?

15      A    YES.  AND THAT'S HOW THE PANCREATIC CANCER,

16  THE DIAGNOSIS, I'M ASSUMING, WAS CONFIRMED.

17      Q    AND SO THEN HE WAS ADMITTED TO THE HOSPITAL.

18           CAN WE BRING UP JX_20.193.

19      A    SO THIS IS THE NURSING ADMISSION ASSESSMENT

20  FORM THAT THE NURSES USE WHEN THEY'RE ADMITTING

21  SOMEONE TO THE INFIRMARY.  AND WHAT'S PECULIAR ABOUT

22  THIS FORM IS THAT THEY PUT THAT HE IS INDEPENDENT

23  WITH HIS ADLS.  BUT ON THE RIGHT-HAND SIDE THEY WRITE

24  THAT HE NEEDS ASSISTANCE WITH MOBILITY, HYGIENE AND

25  DRESSING.  AND THE "FALL RISK?"  IS LEFT BLANK.  THEY

1   DIDN'T COMPLETE THAT.  AND I ALSO FOUND HE WAS

2   ACTUALLY RETURNED WITH A BILIARY DRAIN, AND THERE WAS

3   NO MENTION OF A BILIARY DRAIN ON THAT ASSESSMENT,

4   WHICH SEEMS TO BE IMPORTANT.

5       Q    WHAT IS A BILIARY DRAIN?

6       A    IT'S A DRAIN THAT WAS SURGICALLY PUT IN THAT

7   COMES OUT THROUGH THE SKIN THAT DRAINS FLUID THAT

8   SHOULD BE -- YOU SHOULD MONITOR THAT FOR DRAINAGE.

9       Q    SO ON HIS -- WHEN HE ENTERED THE NURSING

10  UNIT, THEY DIDN'T NOTE THAT?

11      A    THAT'S CORRECT.  THAT'S CORRECT.  SO --

12      Q    LET'S GO AHEAD AND PULL UP JX_20.203 AND

13  204.

14      A    SO THIS, AGAIN, IS ONE OF THEIR FLOW SHEETS.

15  THERE IS NO PLACE TO PUT A DATE ON EACH ONE OF THESE

16  SHEETS.  THERE IS ON THE INITIAL ONE, YOU SEE AT THE

17  TOP.  SO THIS IS 11/1/21 AT PAGE 1 OF THIS DOCUMENT.

18  BUT YOU'LL SEE PAGE 2 THERE IS NO PLACE TO DATE IT,

19  WHICH IS CONCERNING, BECAUSE IN A PAPER RECORD SYSTEM

20  THE CHART COULD BE DROPPED AND THESE COULD BE

21  SEPARATED AND YOU WOULDN'T HAVE A WAY TO PUT THEM

22  BACK IN CHRONOLOGICAL ORDER.

23          SO I DID RUN ON SOME ASSUMPTION IF THEY

24  FOLLOWED, THEN THE PDF FILE THAT WE RECEIVED, THAT

25  THAT IT TRULY WAS THAT SECOND PAGE BELONGED TO THE

1   FIRST PAGE.  BUT I HAD TO MAKE THAT ASSUMPTION.

2          BUT WHAT'S MARKED ABOUT THIS IS THAT THEY

3   DOCUMENT AT SIX O'CLOCK BEGINNING AT 1800 THAT HE IS

4   IN HIS WHEELCHAIR.  IF YOU LOOK AT WHERE HIS ACTIVITY

5   IS WHEN IT SAYS "UP TO CHAIR" -- THE ONE ABOVE THAT,

6   PLEASE.  IT SAYS -- "1" IS WITH ASSIST, AND THEN

7   BELOW, "WC" MEANS WHEELCHAIR.  SO AT 1800 AND 2000,

8   2200 AND 0200 IT LISTS IN THE WHEELCHAIR.

9          SO THEN IF YOU GO BELOW THAT AND YOU --

10  WHERE THEY SHOW WHETHER THE PATIENT IS AWAKE OR

11  SLEEPING -- LET ME FIND IT HERE.

12     Q    COULD IT BE ABOVE IT?

13     A    YES.  ONE MOMENT.  LET ME FIND THAT.  YES.

14  SO CLOSED -- THE EYES ARE CLOSED.  AND RIGHT ABOVE

15  THAT IT'S "ALERT," "CONFUSED," "ORIENTED,"

16  "UNRESPONSIVE" OR "SLEEPING."  YOU'LL SEE THAT HE WAS

17  ALERT AND ORIENTED AT 1800, 2000.  BUT AT 2200 HE WAS

18  SLEEPING, 2400 HE WAS SLEEPING, AND AT TWO IN THE

19  MORNING HE WAS SLEEPING.  AND THEY DOCUMENTED THAT HE

20  WAS STILL IN HIS WHEELCHAIR.

21     Q    WHY IS THAT SIGNIFICANT?

22     A    THE PATIENT SHOULD BE PUT TO BED.  HE ALSO,

23  I BELIEVE -- AS I RECALL, THAT WAS THE MORNING THAT

24  HE WAS TAKEN BACK TO THE HOSPITAL.  SO I DON'T KNOW

25  WHY THEY DIDN'T PUT HIM TO BED.  BUT IT CLEARLY SAYS

1   HE WAS IN HIS WHEELCHAIR.

2       Q    ALL RIGHT.  AND LET'S PULL UP JX_20.89.

3   SORRY.  ONE MORE QUESTION.

4           DID YOU NOTE WHETHER OR NOT THEY DOCUMENTED

5   FEEDING HIM ANY MEALS DURING THIS TIME?

6       A    NO.  AND THAT WAS ANOTHER NOTE THAT I MADE.

7   THERE WAS NO MEALS DOCUMENTED FOR THAT DAY THAT WERE

8   GIVEN THAT DAY AT ALL.  AND I DON'T KNOW IF THAT'S

9   JUST AN ERROR THAT THEY FAILED TO CHART IT OR HE

10  WASN'T FED.  BUT FROM THE DOCUMENTATION, THERE WERE

11  NO MEALS.

12      Q    LET'S LOOK AT JX_20.89.

13      A    OKAY.  AND THIS IS ON 11/2, THE TRIP RETURN

14  FROM HIS CHOLANGIOGRAM.

15      Q    IS THAT THE DAY THAT THEY NOTED THE OTHER

16  TRIP RETURN DOCUMENT?

17      A    I DON'T KNOW THAT I'M FOLLOWING WHAT YOU'RE

18  ASKING ME.  I'M SORRY.

19      Q    IT'S OKAY.  WE CAN MOVE ON.

20          WHAT HAPPENED TO THIS PATIENT?

21      A    BEFORE -- IT WAS NOTED ON 11/5 HE CAME IN ON

22  11/2, BECAUSE IT WAS NOTED ON 11/5.

23      Q    WHAT ENDED UP HAPPENING WITH THIS PATIENT?

24      A    ON 11/16, JUST A FEW WEEKS LATER, THERE WAS

25  AN AMBULANCE RUN TO CAMP C BEAR 2 UNIT WHERE HE WAS

1  FOUND UNRESPONSIVE.  THEY NARCAN'D HIM, TRIED TO

2  INTUBATE HIM, BUT HE STILL HAD A GAG REFLUX.  SO THEY

3  TOOK HIM TO THE ATU, AND HE ULTIMATELY WAS INTUBATED.

4  AND THEN HE WAS TAKEN TO OUR LADY OF THE LAKE

5  HOSPITAL AND ADMITTED.  AND ON THE 25TH OF NOVEMBER

6  THE PRISON WAS NOTIFIED THAT HE HAD PASSED AWAY.  AND

7  THE CAUSE OF DEATH WAS PANCREATIC CANCER.

8      Q    I WANT TO PULL UP JUST A FEW OTHER DOCUMENTS

9  HAVING TO DO WITH THIS CASE.  LET'S GO AHEAD AND PULL

10 UP JX_20.21.  WHAT ARE WE LOOKING AT?

11     A    THIS IS A LABORATORY REQUEST THAT WAS

12 WRITTEN WITH THE DATE TO BE DONE ON JULY 19, 2021.

13 THE DOCTOR IS ORDERING LFTs, OR A LIVER FUNCTIONING

14 TEST, SO IT'S A LABORATORY STUDY FOR -- TO TEST HIS

15 LIVER.  AND AT THE BOTTOM OF IT, IT SAYS HE WAS NO

16 SHOW 9/22/21 AND NO SHOW 9/24/21, WHICH INDICATES

17 THAT HE DID NOT RECEIVE THE LAB -- THEY DIDN'T DRAW

18 THE LAB IN JULY LIKE ORDERED AND THAT HE WAS A TWO

19 TIMES NO SHOW.

20         BUT THE OTHER PIECE OF THIS THAT WAS

21 DISTURBING IS THAT THERE WAS A MEMO IN THE --

22     Q    LET'S HOLD FOR ONE SECOND ON THAT.  SO DO WE

23 KNOW WHERE THIS PATIENT WAS ON 9/22?

24     A    YES.  HE WAS IN THE HOSPITAL.  AND THEN HE

25 RETURNED ON 9/24.

1    Q    LET'S GO AHEAD AND PULL UP JX_20.20.

2    A    YEAH, THIS IS A "NO SHOW FOR LABORATORY

3  CALLOUT."  I'M ASSUMING THIS IS A LAB TECH, BUT IT'S

4  NOT SIGNED AND IT JUST SAYS "THE ATTACHED PATIENT HAS

5  BEEN PLACED ON LAB CALL OUT 2 OR MORE TIMES AND WAS A

6  NO SHOW.  THE INMATE WILL NOT BE PUT BACK ON CALL

7  FROM THIS ORDER.  IF THE DOCTOR WANTS LABS DONE HE

8  WILL HAVE TO CREATE ANOTHER ORDER."

9         THERE SHOULD BE NO PERSON ALLOWED TO CANCEL

10 A PHYSICIAN'S ORDER WITHOUT A PHYSICIAN ORDERING TO

11 DISCONTINUE THEIR ORDER.

12    Q    AND IN THIS PARTICULAR CASE THE PATIENT WAS

13 A NO-SHOW BECAUSE HE WAS IN THE HOSPITAL?

14    A    CORRECT.  AND I LOOKED AND THERE WAS NO

15 PHYSICIAN ORDER TO DISCONTINUE THE ORDERED LAB.

16    Q    ALL RIGHT.  LET'S GO BACK TO THAT TRIP

17 RETURN, JX_20.91.  THIS IS THE TRIP RETURN FROM 9/22

18 THAT WAS NOTED ALMOST SIX WEEKS LATER?

19    A    CORRECT.

20    Q    YOU MENTIONED THAT THERE WERE SEVERAL

21 MEDICATIONS THAT WERE NOT NOTED UNTIL 11/2.

22    A    CORRECT.

23    Q    SO LET'S GO AHEAD AND PULL UP JX_68.2878.

24 SORRY.  THERE WE GO.  WHAT IS THIS?

25    A    THAT'S THE ELECTRONIC MEDICATION

1    ADMINISTRATION RECORD.

2        Q    FOR THIS -- PATIENT 1?

3        A    FOR SEPTEMBER 2021 FOR THIS PATIENT.

4        Q    HE RETURNED ON SEPTEMBER 22ND.  IS THAT

5    RIGHT?

6        A    YES.

7        Q    ARE THOSE MEDICATIONS NOTED IN HIS RECORD?

8        A    NO.

9        Q    LET'S GO TO 2879.  WHAT IS THIS?

10       A    THIS IS THE OCTOBER 2021 ELECTRONIC MEDICAL

11   RECORD -- ADMINISTRATION RECORD FOR THIS PATIENT.

12       Q    WAS MEDICATIONS NOTED IN HIS RECORD?

13       A    NO.

14       Q    LET'S GO AHEAD AND TURN TO 2880.  WHAT IS

15   THIS?

16       A    THIS IS THE NOVEMBER 2021 MEDICATION

17   ADMINISTRATION RECORD.

18       Q    AND DO YOU SEE THOSE MEDICATIONS NOTED?

19       A    YES; BEGINNING ON 11/2, WHICH IS THE DATE

20   THEY WERE NOTED.

21       Q    AND CAN WE GO TO 2881?  AND IS THIS THE

22   REMAINDER OF THOSE MEDICATIONS?

23       A    YES, MA'AM.  IT'S A CONTINUATION OF THE LIST

24   ON THE TRIP RETURN.

25       Q    OKAY.  SO THOSE MEDICATIONS WERE NOT ORDERED

1 | FOR SIX WEEKS AFTER HE RETURNED?

2 |   **A**   THEY WERE ORDERED, BUT THEY WERE NOT NOTED

3 | AND PLACED ON THE MEDICATION ADMINISTRATION RECORD

4 | AND GIVEN TO THE PATIENT.

5 |   **Q**   LET'S TURN NOW TO PATIENT 22.  CAN YOU TELL

6 | ME ABOUT --

7 |       **MR. ARCHEY:**  YOUR HONOR, I'VE BEEN WAITING

8 | FOR A BREAK.  THEY TELL ME THAT THE ZOOM AUDIO IS

9 | MUTED AND THEY CANNOT HEAR.  I DIDN'T WANT TO

10 | INTERRUPT WHILE SHE WAS IN THE MIDDLE OF THIS.

11 |       **THE COURT:**  THANK YOU.  ONE MINUTE.  SHE'LL

12 | LOOK.

13 |       **(OFF THE RECORD.)**

14 |       **THE COURT:**  GO AHEAD.

15 | **BY MS. MONTAGNES:**

16 |   **Q**   ALL RIGHT, MS. GOEHRING.  LET'S TALK A

17 | LITTLE BIT ABOUT PATIENT 22.  CAN YOU TELL ME ABOUT

18 | HIM?

19 |   **A**   YES.  HE WAS A 60-YEAR-OLD WHITE MALE.  I'M

20 | NOT SURE WHEN HE ARRIVED AT LSP.  BUT HE HAD A

21 | SIGNIFICANT PAST MEDICAL HISTORY IN THAT IN THE 1990s

22 | HE'D HAD A TRAUMATIC BRAIN INJURY WITH LEFT -- WHICH

23 | LEFT HIM WITH PERMANENT LEFT-SIDED WEAKNESS.  HE ALSO

24 | HAD CORONARY ARTERY DISEASE, HYPERTENSION, A SEIZURE

25 | DISORDER, AND HE ALSO HAD AN ENLARGED PROSTATE WHICH

1   WAS ULTIMATELY OPERATED ON.

2          IN MARCH OF 2019 HE EXPERIENCED A WEIGHT

3   LOSS OF ABOUT 30 POUNDS AND BEGAN COMPLAINING OF

4   CHRONIC DIARRHEA IN JUNE.  ALSO, HE WAS HAVING

5   URINARY TRACT INFECTIONS AND BEGAN TO HAVE EPISODES

6   OF FALLING.  SO ON -- IN JULY OF 2019 THEY DID A

7   COLONOSCOPY, AND HE WAS FOUND TO HAVE A MASS -- A

8   CECAL MASS.  AND THEN HE UNDERWENT A LARGE BOWEL

9   RESECTION IN NOVEMBER OF 2019.

10          SO IN MAY OF -- MAY 31ST OF 2020 HE ACTUALLY

11   WAS ASSAULTED BY HIS CELL MATE PRETTY SERIOUSLY.  HE

12   REPORTED BEING KICKED IN THE FACE TWICE AND

13   REMEMBERING HIS HEAD HITTING THE WALL EACH TIME.  SO

14   HE WAS TRANSFERRED TO THE ATU, AND THEY FOUND THAT HE

15   HAD A NASAL FRACTURE, ZYGOMATIC ARCH FRACTURE, WHICH

16   IS A FRACTURE OF THE EYE, AND A LACERATION TO THE

17   SCALP ON THE BACK OF HIS HEAD.

18          HE ULTIMATELY WAS TAKEN TO THE HOSPITAL AND

19   FOUND TO HAVE AN ACUTE SUBARACHNOID HEMORRHAGE.  HE

20   HAD AN EPIDURAL HEMATOMA -- WHICH MEANS BLEEDING IN

21   THE BRAIN BASICALLY -- AND A SUSPECTED SUBDURAL

22   HEMATOMA, A LEFT BASAL OR SKULL FRACTURE, BILATERAL

23   NASAL BONE FRACTURES AND A RIGHT ZYGOMATIC FRACTURE.

24   HE ALSO WAS FOUND TO BE BLEEDING FROM HIS EARS WHICH

25   WERE -- WHICH REQUIRED AN ENT DOCTOR TO DRAIN THE

1  LEFT EAR, A BLOOD CLOT OUT OF THAT LEFT EAR.  AND

2  THEY RECOMMENDED AUDIOGRAMS FOR BILATERAL HEARING

3  LOSS.  AND UNFORTUNATELY THOSE WERE NEVER DONE UPON

4  HIS RETURN.

5      Q    I'M GOING TO ASK YOU TO PAUSE THERE.

6          **MS. MONTAGNES:**  LET'S PULL UP JOINT EXHIBIT

7  22 AT 674.  AND THIS IS SEALED.  IT'S NOT PUBLISHING

8  FOR SOME REASON.

9  **BY MS. MONTAGNES:**

10     Q    SO WHAT ARE WE LOOKING AT RIGHT NOW?

11     A    SO THIS IS AN AFTER VISIT SUMMARY FROM WHEN

12 HE WAS DISCHARGED FROM THE HOSPITAL.

13     Q    OKAY.  AND IF WE FOLLOW THIS DOWN, THEY'RE

14 MAKING RECOMMENDATIONS.  THERE IS SOME MEDICATIONS.

15     A    MEDICATIONS THAT THEY RECOMMEND, YES.

16     Q    KEEP GOING.  KEEP GOING.  AND THEY'RE MAKING

17 RECOMMENDATIONS ABOUT HIS MOBILITY AND VARIOUS

18 FUNCTIONS.

19     A    AND ALL THE DIAGNOSES, YES.

20     Q    AND THEN WE GO DOWN THERE IS A DIET

21 RECOMMENDATION.  CAN YOU TELL ME WHAT THAT IS?

22     A    SO IF YOU LOOK DOWN BELOW, THERE WAS A

23 SWALLOWING EVALUATION DONE RIGHT BELOW THAT.  AND THE

24 REASON THAT THAT WAS DONE, HE HAD LEFT-SIDED

25 WEAKNESS.  AND THIS PATIENT WAS EDENTULOUS; IN OTHER

1   WORDS, HE HAD NO TEETH.  AND SO THE SPEECH

2   PATHOLOGIST -- THEY DID A SWALLOWING STUDY AND THEY

3   RECOMMENDED A MECHANICAL SOFT DIET, WHICH MEANS IT'S

4   GROUND -- VERY CHOPPED AND GROUND, AND THAT THIN

5   LIQUIDS BE USED AND TO FEED HIM UPRIGHT, BECAUSE HE

6   WAS UNABLE TO UTILIZE UTENSILS WITH HIS LEFT UPPER

7   EXTREMITY.

8         BASICALLY WHAT THIS IS SAYING IS THIS

9   PATIENT WOULD BE AT RISK FOR CHOKING SO YOU NEED TO

10  TAKE CAUTION TO FEED HIM UPRIGHT AND WITH A SPECIAL

11  DIET.

12      Q   OKAY.  SO THEN WHAT HAPPENS NEXT?

13      A   HE WAS DISCHARGED AND ADMITTED TO THE NU 1

14  INFIRMARY.  THAT DIET -- SPECIAL DIET WAS NOT

15  ORDERED.  AND THERE WAS NO -- I FOUND NO NURSING

16  ADMISSION ASSESSMENT FOR THAT ADMISSION TO THE

17  INFIRMARY.  THERE WAS NO PLAN OF CARE FOUND.

18        THEY DID DOCUMENT ON A FLOW SHEET, THOUGH,

19  ON THE DAY THAT HE WAS TAKEN BACK AND ADMITTED AT

20  3:10 IN THE AFTERNOON, AROUND 7:00 P.M. THAT NIGHT ON

21  THE FLOW SHEET THEY INDICATED THAT -- THEY NOTED -- I

22  MEAN, THEY ACKNOWLEDGED THAT HE SUFFERED A SKULL

23  FRACTURE, WAS IN A C-COLLAR.  AND HE WAS TOLD TO CALL

24  THE NURSE FOR ASSISTANCE.  BUT THEY NOTED THAT HIS

25  BED RAILS WERE LEFT DOWN.

1          MS. MONTAGNES:  CAN WE BRING UP JX_22.981?

2   THIS IS ALSO SEALED.  EVERYTHING WILL BE SEALED FOR

3   THE NEXT ROUND.

4   BY MS. MONTAGNES:

5      Q   IS THIS THAT NOTE THAT YOU WERE TALKING

6   ABOUT?

7      A   YES.  YEAH, THEY -- WHERE THEY NOTE THAT

8   HE'S GOT A C-COLLAR AND INSTRUCTED TO CALL FOR

9   ASSISTANCE AND TO FEED AND TO DRINK.

10     Q   WAS THERE ANYTHING ELSE NOTABLE ABOUT THIS

11  NOTE?

12     A   WELL, AT EIGHT O'CLOCK IT SAYS HE'S LYING IN

13  BED, STATING HE NEEDS HELP AND HE CAN'T GET UP.  AND

14  IT SAYS THAT HE, QUOTE, MESSED IN HIS PANTS, WHICH I

15  FIND AN UNPROFESSIONAL TERM TO USE -- BE USED BY A

16  LICENSED NURSE.

17         THE APPROPRIATE TERMINOLOGY IS THAT THEY'RE

18  INCONTINENT OF STOOL OR BOWEL.  "MESSED IN HIS PANTS"

19  IS STRIKING TO ME.

20     Q   ALL RIGHT.  SO THEN WHAT HAPPENED NEXT WITH

21  THIS PATIENT?

22     A   ON 6/3 AT 9:28 THERE WAS A PHYSICIAN ORDER

23  TO MOVE HIM TO A LOCKED ROOM.  AND THERE WERE NO

24  VITAL SIGNS I FOUND FOR THE ENTIRE TIME, JUNE 3RD; NO

25  VITAL SIGNS.  THEY DID DOCUMENT AT 1700 ON THE FLOW

1  SHEET THAT HE HAD NO PROBLEMS WITH HIS ELIMINATION,

2  WHICH MEANS HIS ABILITY TO GO TO THE BATHROOM.  BUT

3  THE NURSING NARRATIVE NOTE SAID THAT HE HAD URINATED

4  IN HIS DIAPER; IN OTHER WORDS, HE WAS INCONTINENT OF

5  URINE AS WELL.  AND I ALSO DIDN'T FIND ANY VITAL

6  SIGNS FOR JUNE 3RD, EITHER.

7      Q    SO WHAT HAPPENED THE NEXT DAY?

8      A    SO ON JUNE 4TH AROUND 5:07 P.M. IN THE

9  EVENING HE WAS FOUND ON THE FLOOR, SITTING ON THE

10  FLOOR.  AND HE TOLD THEM THAT HE WAS STANDING UP TO

11  HIS WHEELCHAIR WHEN HE SLID DOWN TO THE FLOOR.  AND

12  HIS BLOOD PRESSURE WAS NOTED TO BE 169 OVER 108 WITH

13  A PULSE OF 106, WHICH IS ELEVATED.  THEY DID CALL THE

14  PHYSICIAN.  NO NEW ORDERS WERE GIVEN, BUT IT WAS

15  NOTED THAT THE BED RAILS REMAINED DOWN.

16      Q    IF WE COULD PULL UP JX_22.970 -- WELL, I

17  THINK WE CAN ACTUALLY -- LET'S GO TO THE NEXT ONE,

18  JX_22.891.

19          SO THAT'S -- SO THAT'S FALL NO. 1.  WOULD

20  YOU CALL THAT FALL NO. 1?

21      A    YES.

22      Q    SO THEN WHAT HAPPENS A FEW DAYS LATER?

23      A    SO ON 6/8 THE PHYSICIAN SEES HIM -- I

24  BELIEVE THIS IS DR. LAVESPERE.  AND HE NOTED THAT HE

25  WAS STILL COMPLAINING OF RIGHT ANKLE PAIN, NOT

1  WANTING TO WALK, NOT WANTING TO PUT PRESSURE ON HIS

2  ANKLE.  AND HE DID NOTE THAT HE HAD GONE TO THE

3  HOSPITAL THAT WEEKEND SECONDARY TO NOT BEING ABLE TO

4  URINATE.  HE NOTED THE RIGHT ANKLE HAD EDEMA AND WAS

5  LIGHT YELLOW/PURPLE ECCHYMOSIS FROM HIS ANKLE TO HIS

6  FOREFRONT -- FOREFOOT.  HE ORDERED THE X-RAY, BUT HE

7  ALSO UNDERLINED -- PUT AN ASTERISK AND UNDERLINED *NOT*

8  *MOTIVATED*.

9      **Q**   CAN WE TURN NOW TO JX_22.623.

10     **A**   SO THEY DID GET THE X-RAY THAT DAY AS

11 ORDERED AT 10:28.  AND HE WAS FOUND TO HAVE A

12 FRACTURE OF THE LOWER BONE IN THAT LEG.  AND THEY

13 QUESTIONED THE TIBIA.  SO BOTH THE FIBULA AND THE

14 TIBIA, BOTH LOWERS BONES, WERE INVOLVED IN THAT.  AND

15 THAT THEY COULDN'T EXCLUDE A NONDISPLACED FRACTURE.

16         SO THEN ON 6/9 THEY ORDERED -- DR. LAVESPERE

17 ORDERED AN ORTHO CONSULT AND A SPLINT TO HIS RIGHT

18 ANKLE AND NONWEIGHT-BEARING TO THE RIGHT LOWER

19 EXTREMITY TILL HE WAS SEEN BY ORTHO.  AT NOON THE

20 NURSES DOCUMENTED THAT THERE WAS NO RIGHT ANKLE

21 SPLINT AVAILABLE AND CENTRAL SUPPLY WOULD HAVE TO

22 ORDER ONE.

23         ALSO OF NOTE ON THAT DATE ON 6/9, THERE WAS

24 AN 8:00 P.M. TELEPHONE ORDER BY A DR. MOODY FOR -- TO

25 PLACE DUODERM TO HIS SACRUM, WHICH MEANS HE'S ALREADY

1  HAVING PROBABLY SOME SKIN -- BEGINNING OF SKIN

2  BREAKDOWN.  THERE WASN'T ANY DOCUMENTATION OF WHAT

3  THAT WOUND LOOKED LIKE, BUT USUALLY THAT DUODERM IS

4  ORDERED FOR THAT REASON.

5          ON 6/10 THEY DID A NARRATIVE -- NURSE DID A

6  NARRATIVE NOTE THAT THERE WAS A RED AREA ON HIS

7  SACRUM.  AND ON THAT DAY AT 12:30 DR. LAFLEUR WENT

8  AHEAD AND PUT A POSTERIOR PLASTER SPLINT TO THE RIGHT

9  LOWER EXTREMITY.  AND THEN ON 6/11 --

10     Q    WAIT.  CAN WE BACK UP FOR A SECOND?  WAS

11  THERE AN ORTHO CONSULT WRITTEN ON THAT DAY; 6/10?

12     A    NO.  ACTUALLY IT WAS DONE ON 6/11.  MR.

13  LAVESPERE WROTE ON 6/8 THAT HE WANTED HIM TO SEE

14  ORTHO BUT DIDN'T ACTUALLY WRITE THE CONSULT.  I'M

15  SORRY.  HE DID IT ON 6/9.  ON 6/9 HE WROTE TO SEND

16  HIM OUT TO ORTHO.  BUT HE MUST NOT HAVE WRITTEN THE

17  ACTUAL CONSULTATION SHEET BECAUSE THAT WAS THEN DONE

18  ON 6/11.

19     Q    AND WHEN WE WERE TALKING ABOUT 24-HOUR CHART

20  CHECKS, THAT WAS ONE OF THE THINGS THAT WE TALKED

21  ABOUT QUALITY IMPROVEMENT AND QUALITY ASSURANCE.  IS

22  THIS THE KIND OF --

23     A    YES, MA'AM.  THE NURSES SHOULD HAVE CAUGHT

24  THAT.  IF THEY'RE TRULY DOING A 24-HOUR CHART CHECK,

25  EVERY PLACE THAT THE DOCTOR IS ORDERING SOMETHING,

1  THEY NEED TO MAKE SURE, GO FOLLOW THROUGH:  DID IT

2  HAPPEN?  YOU KNOW, YOU CROSS THE Ts AND DOT THE Is.

3  THAT'S THE PURPOSE OF THE 24-HOUR CHART CHECK.

4      **Q**    LET'S PULL UP JX_22.954.  THIS IS FROM 6/12.

5  CAN YOU TELL ME WHAT HAPPENED THIS DAY?

6      **A**    SO HE CAME BACK FROM HIS ORTHOPEDIC

7  CONSULTATION, AND HE RETURNED AT ABOUT 2200 TO THE

8  NURSING UNIT 1 IN A WHEELCHAIR.  AND THEY NOTED AT

9  2355 THAT THE PATIENT WAS NOTED ON THE FLOOR BEFORE

10 THE ORDERLY WAS ABLE TO GET HIM INTO THE BED.  AND HE

11 NOTED HE HAD TRIED TO GET IN THE BED HIMSELF AND FELL

12 SITTING ON THE FLOOR.  AND THEN AT TEN MINUTES AFTER

13 MIDNIGHT, AGAIN HE WAS FOUND ON THE FLOOR.  HE'D

14 MOVED HIMSELF OFF THE BED AND SLID TO THE FLOOR.

15 THEY CHANGED HIS DIAPER AND PUT HIM BACK TO BED.  AND

16 THEN APPROXIMATELY 15 MINUTES LATER, AT 25 MINUTES

17 AFTER MIDNIGHT, THEY FOUND HIM AGAIN ON THE FLOOR,

18 AND THIS TIME HE WAS KICKING THE DOOR WITH HIS FEET.

19      SO THEY MOVED THE MATTRESS TO THE DOOR -- I

20 MEAN, THEY MOVED THE MATTRESS TO THE FLOOR.  THE

21 PATIENT HAD TO BE PUT IN A LOCKED ROOM WITH THE DOOR

22 SHUT DUE TO HIM KICKING THE DOOR OPEN, WHICH WAS

23 CONCERNING AND IT RED-FLAGS ME.  BECAUSE ALTHOUGH HE

24 WAS ONLY 62 YEARS OLD, WE -- YOU KNOW, PATIENTS TEND

25 TO BE A BIT MORE ELDERLY FOR A STATED AGE AND HE --

1 ANYONE THAT HAS A FRESH BREAK IN THE LOWER LEG, THAT

2 HAD TO HAVE BEEN PAINFUL.  BUT HE WAS KICKING, SO I

3 WOULD HAVE QUESTIONED IF HE WAS CONFUSED OR WHAT

4 MIGHT HAVE BEEN GOING ON.  AND IT WAS CONFUSING TO ME

5 AND SURPRISING TO ME THAT THE PHYSICIAN WAS NOT

6 NOTIFIED TO REPORT THAT.

7         AND I GUESS I WOULD SAY RATHER THAN PLACE

8 YOUR PATIENT IN A LOCKED ROOM, THAT'S THE KIND OF

9 PATIENT YOU WANT TO BRING FORWARD AND MOVE HIM CLOSER

10 TO YOU.  AND IF IT'S SOMEONE THAT IS CONFUSED AND

11 YOU'RE HAVING TROUBLE KEEPING THEM IN BED, YOU MAY

12 NEED TO POST SOMEBODY WITH THEM TO MAKE SURE THAT

13 THEY DON'T FALL OUT AND FURTHER INJURE THEMSELVES.

14    Q   LET'S TURN TO 6/19 TO JX_22.788.

15    A   OKAY.  SO ON 6/18 HE DID HAVE THE SURGERY TO

16 SURGICALLY REPAIR HIS FRACTURE.

17    Q   SO JUST TO PUT A FINE POINT ON THAT, THE

18 BREAK THAT HE INCURRED IN THE -- PRESUMABLY IN THE

19 FIRST FALL -- WAS SURGICALLY FIXED?

20    A   IT HAD TO BE OPEN -- THEY CALL IT OPEN

21 REDUCTION, SO THEY ACTUALLY HAD TO OPEN IT UP TO FIX

22 THE BREAK, YES.  SO HE WAS RETURNED.

23         AND ON 6/19 THE DOCTOR ORDERED A BEDSIDE

24 COMMODE, WHICH, AGAIN, IS -- IT'S PECULIAR TO ME THAT

25 I WOULD NEED A DOCTOR'S ORDER TO PUT A BEDSIDE

1  COMMODE ON A PATIENT COMING BACK FROM SURGERY THAT

2  IS -- LEFT-SIDED WEAKNESS, THAT'S A NURSING FUNCTION.

3  I DON'T NEED AN ORDER FROM A PHYSICIAN TO DO THAT.

4  BUT THE DOCTOR DID, THANKFULLY, ORDER A BEDSIDE

5  COMMODE.

6       BUT AS YOU CAN SEE HERE AT THE VERY BOTTOM,

7  IT SAYS ON 6/19 THEY GAVE HIM THE COMMODE BUT THERE

8  WAS NO BOTTOM BUCKET.  SO THE BUCKET DIDN'T GET

9  DELIVERED UNTIL 6/22, SO THREE DAYS LATER.  SO, IN

10  ESSENCE, IT'S A -- I DON'T KNOW IF YOU'RE FAMILIAR

11  WITH THE COMMODE, BUT IT'S LIKE A TOILET SEAT AND THE

12  BUCKET IS WHAT CATCHES IT.  SO HE JUST HAD A TOILET

13  SEAT, AND IT WOULD HAVE FALLEN TO THE FLOOR IF HE'D

14  USED IT.

15       Q   LET'S TURN TO JX_22.935.

16       A   SO THIS IS ON 6/19.  AGAIN HE WAS FOUND ON

17  THE FLOOR NEAR HIS BED IN HIS ROOM.  HE SAID HE WAS

18  ATTEMPTING TO GET UP TO THE WHEELCHAIR TO TOILET,

19  WHICH MAKES SENSE, BECAUSE THE BEDSIDE COMMODE WAS

20  NOT USEFUL AT THAT POINT, AND HE'D SLIPPED.  AND THEY

21  DID AT THAT POINT NOTE THAT THERE WAS WATER ON THE

22  FLOOR FROM HIS PITCHER, ALONG WITH URINE FROM HIS

23  LEAKING BAG, BECAUSE HE HAD A CATHETER.

24       Q   AND IT'S YOUR UNDERSTANDING AT THIS POINT

25  HE'S STILL IN A LOCKED ROOM?

**1**    **A**    YES.  SO THAT WAS AT 5:15.  AND THEN THE

**2** NEXT DAY AT 8:45 --

**3**    **Q**    LET'S PULL UP JX_22.770.

**4**    **A**    THE NEXT DAY AT 8:45 IN THE MORNING HE

**5** DECLARED HIMSELF A MEDICAL EMERGENCY.  AND I THINK

**6** HIS NOTE IS PRETTY TELLING.  HE SAYS HIS HEAD HURTS,

**7** BACK HURTS.  SOME OF THIS IS DIFFICULT TO MAKE OUT.

**8** BUT HE'S SAYING "BACK HURTS" AND SOMETHING "4 TIMES"

**9** AND THEN "NEED HELP NOW" WITH AN EXCLAMATION.

**10**          AND I DON'T KNOW WHO PUT "NO APPARENT

**11** INJURIES NOTED, PRN ULTRAM GIVEN."  I DON'T KNOW IF

**12** THAT'S A NURSE, I DON'T KNOW IF IT WAS A PROVIDER.

**13** IT LOOKS TO ME LIKE "ULTRAM GIVEN" WAS WRITTEN BY

**14** SOMEONE ELSE.  AND I BELIEVE THAT TO BE CINDY PARK'S

**15** SIGNATURE THERE, THE NURSE PRACTITIONER.

**16**          WHAT'S ALSO BOTHERSOME ABOUT THIS IS IF YOU

**17** LOOK AT THE MEDICATION ADMINISTRATION, THEY HAD

**18** ORDERED -- THE DOCTOR HAD ORDERED THE ULTRAM FOR HIM

**19** EVERY SIX HOURS, AND HE WAS ONLY DOSED AT EIGHT IN

**20** THE MORNING AND THEN NOT AGAIN UNTIL 12 HOURS LATER

**21** AT 8:00 P.M.

**22**    **Q**    WHY IS IT NOTEWORTHY THAT THEY SAY "NO

**23** APPARENT INJURIES NOTED"?

**24**    **A**    BECAUSE THIS IS A MAN THAT CAME TO THEM WITH

**25** FRACTURES IN HIS HEAD, FRACTURES OF HIS FACE AND HIS

1  NOSE, LEFT-SIDED WEAKNESS, HE HAD A FRACTURED LEG.  I

2  MEAN, HE WAS PRETTY BEAT UP.

3      Q    ALL RIGHT.  LET'S PULL UP JX_22.931.  WHAT

4  HAPPENED AT NINE -- JUST, YOU KNOW, 20 MINUTES AFTER

5  HE DECLARED HIMSELF AN EMERGENCY?

6      A    SO AT 9:05 A.M. THEY AGAIN FOUND HIM ON THE

7  FLOOR.  "NO APPARENT INJURIES NOTED."  ONCE AGAIN,

8  IT'S -- THIS PATIENT JUST KEEPS FALLING.  AND, YOU

9  KNOW, THERE ARE SAFETY PARAMETERS YOU REALLY NEED TO

10 PUT AROUND PATIENTS THAT ARE SUBJECT TO FALL.  AND HE

11 WAS NOTED TO BE FOUND BY AN ORDERLY ON THE FLOOR.

12     Q    WHAT HAPPENS NEXT WITH THIS PATIENT?

13     A    SO ON 7/1 THE PHYSICIAN SAW HIM AND NOTED

14 THAT HE WAS NOT EATING ANYTHING AND WAS REFUSING HIS

15 ENSURE AND THAT HE WAS CONFUSED AND LETHARGIC.  AND

16 HIS DIAGNOSIS WAS FAILURE TO THRIVE.  AND AT THAT

17 POINT HE SENT HIM TO THE EMERGENCY DEPARTMENT.

18     Q    LET'S PULL UP JX_22.729.

19     A    SO THE PATIENT WAS SEEN AT OUR LADY OF THE

20 LAKE.  AND HE TOLD THE PHYSICIAN THERE THAT HE

21 ACTUALLY HAD EATEN PANCAKES THAT MORNING BUT THAT IT

22 WAS DIFFICULT FOR HIM TO EAT BECAUSE HIS LEFT HAND

23 JUST DOESN'T FUNCTION BECAUSE OF THE HEAD INJURY AND

24 THAT HE CAN'T OPEN PACKETS OF SYRUP WITH ONE HAND.

25          THAT'S SIGNIFICANT, BECAUSE IF YOU TIE THAT

1   BACK TO THE -- TO THE SPEECH PATHOLOGIST WHO TALKED

2   ABOUT WHAT HE NEEDED TO HAVE A MECHANICAL SOFT DIET

3   AND TO FEED HIM UPRIGHT, THIS IS A PATIENT WHO NEEDS

4   ASSISTANCE WITH WHAT WE CALL -- NURSING CALLS SETTING

5   UP THEIR MEAL TRAY:  MAKING SURE IT'S TINY BITES; YOU

6   MAY NEED TO HELP FEED THEM TO MAKE SURE THAT THEY

7   DON'T CHOKE; AND MONITOR THAT FEEDING PROCESS AND

8   MONITOR AS THEY'RE TAKING WATER.  AND IT APPEARS FROM

9   HIS REPORT TO THE ED PHYSICIAN THAT, YOU KNOW, HE WAS

10  LEFT TO KIND OF CUT UP HIS OWN PANCAKES OR WHATEVER.

11          IT'S ALSO NOTABLE THAT HE DIDN'T HAVE ANY

12  SUPPORT TO HIS LOWER EXTREMITY THAT HAD BEEN

13  SURGICALLY REPAIRED.  AND HE TOLD THE DOCTOR THEY

14  KEPT STEALING HIS ACE WRAPS AND HIS WHEELCHAIR.  WE

15  DON'T KNOW THAT, BUT THAT'S CERTAINLY -- YOU KNOW,

16  THAT HE DIDN'T HAVE ANYTHING TO SUPPORT THAT LEG WAS

17  CONCERNING.  HE ALSO WAS FOUND TO HAVE A SIGNIFICANT

18  URINARY TRACT INFECTION AT THAT TIME.  BUT I THINK IF

19  YOU LOOK AT THE BOTTOM --

20      Q   WE'LL TURN TO JX_22.713.

21      A   THE PHYSICIAN THERE MADE A NOTE THAT THE

22  CONFUSION WAS LIKELY DUE TO POLYPHARMACY VERSUS

23  URINARY TRACT INFECTION.  SO --

24      Q   WHAT DOES THAT MEAN?

25      A   IT MEANS THAT HE COULD BE HAVING SIDE

1  EFFECTS FROM MULTIPLE -- A LOT OF MEDICATIONS CAUSING

2  THE CONFUSION AND THAT -- I THINK WHAT HE'S

3  INDICATING TO THE ANGOLA DOCS IS:  TAKE A LOOK AT

4  THIS AND, YOU KNOW, REASSESS HIS WHOLE LIST OF

5  MEDICATION THAT HE'S ON.

6          AND THEY ALSO RECOMMENDED THAT THEY CHANGE

7  UP HIS ANTIBIOTIC, WHICH DID HAPPEN.  AND HE WAS SENT

8  BACK TO ANGOLA AND PLACED ON KEFLEX THEN ON 7/2.

9      Q    LET'S PULL UP JX_22.918.

10     A    SO ON AUGUST 6TH THE NURSES NARRATIVELY

11 NOTED THAT HE COMPLAINED THAT AN ORDERLY HAD PUNCHED

12 HIM IN THE HEAD AND THAT THEY NOTIFIED SECURITY, AND

13 THEN THE NURSE NOTIFIED THE WARDEN AND THE WARDEN WAS

14 AWARE.  SHE ALSO NOTIFIED HER SUPERVISOR.  AND THAT

15 WAS ON 8/6, SO ...

16     Q    LET'S GO AHEAD AND PULL UP JX.918.

17 JX_22.918.  MY APOLOGIES.

18     A    SO AT -- ON 8/22 AT FIVE IN THE MORNING, AT

19 THE VERY BOTTOM YOU'LL SEE THAT HE WAS FOUND ON THE

20 FLOOR AGAIN WITH A SMALL AMOUNT OF BLOOD NOTED ON HIS

21 NOSE, AND HE COMPLAINED OF HIS NOSE HURTING.  SO THEY

22 NOTIFIED NURSE PRACTITIONER PARKS A COUPLE HOURS

23 LATER, AND SHE ORDERED A FACIAL FILM.  AND IT WAS

24 NOTED THAT HE HAD NASAL BONE FRACTURES.  AND THEY --

25 THE RADIOLOGIST SAID CROSS-SECTIONAL IMAGING CAN BE

1   OBTAINED IF IT'S CLINICALLY WARRANTED.  SO WHAT

2   THAT'S BASICALLY SAYING IS THAT HE HAD BROKEN SOME

3   BONES IN HIS NOSE ON THAT FALL.

4       Q    LET'S TURN TO JX_20.917 -- JX_22.917.  MY

5   APOLOGIES.

6       A    SO THIS IS THREE DAYS LATER ON THE 25TH.

7   THE PATIENT HAD AN UNWITNESSED FALL TIMES TWO, IS

8   WHAT THE NURSE DOCUMENTED; THAT THE NURSE

9   PRACTITIONER WAS THERE AND EXAMINED THE PATIENT.

10      Q    ALL RIGHT.  SO I THINK WE'RE AT NINE FALLS

11  NOW.  IS THAT RIGHT?

12      A    I BELIEVE SO.

13      Q    OKAY.  SO WE'VE GONE THROUGH IN SOME DETAIL

14  THROUGH THESE RECORDS.  I'M GOING TO JUST FAST -- TRY

15  TO FAST-FORWARD US.  CAN YOU SORT OF DESCRIBE WHAT

16  HAPPENS WITH THIS PATIENT OVER THE NEXT FEW MONTHS?

17      A    RIGHT.  SO I THINK WHAT'S SIGNIFICANT NEXT

18  IS THAT ON JANUARY 6, 2021 AT 9:25 A.M. AN AMBULANCE

19  WAS CALLED.  HE WAS FOUND IN THE NURSING UNIT 2

20  PULSELESS AND WITHOUT BREATHING.  THEY STARTED CPR.

21  AND WHEN I SAY "THEY," A UNIT ORDERLY -- I MEAN ONE

22  OF THE INMATE ORDERLIES IS THE ONE THAT STARTED THE

23  CPR AND CONTINUED THE CPR.

24           IT'S ALSO NOTABLE -- NOTED THAT THERE WAS NO

25  MENTION OF ANY AED APPLIED TO THE PATIENT.  AND THEY

1  FINALLY INTUBATED HIM.  DR. LAFLEUR THEN SHOWED UP

2  AND WAS IN ATTENDANCE AND CALLED AN ACLS CODE.  BUT

3  HE ULTIMATELY EXPIRED.  THE CAUSE OF DEATH WAS

4  CARDIOPULMONARY ARREST SECONDARY TO AIRWAY

5  OBSTRUCTION.  BECAUSE WHEN THEY WENT TO START THE

6  CPR, THEY FOUND A PIECE OF SAUSAGE IN HIS AIRWAY THAT

7  WAS -- HAD BLOCKED THE AIRWAY.

8       Q    AND HE WAS IN A LOCKED ROOM AT THAT TIME?

9       A    YES, MA'AM.

10      Q    AND HE HAD NO TEETH?

11      A    NO TEETH, WITH AN ORDER FOR A MECHANICAL

12  DIET AND TO BE FED UPRIGHT, YES.

13      Q    AND HE HAD LEFT-SIDED WEAKNESS?

14      A    YEAH.

15      Q    AND HE HAD CONFUSION?

16      A    YES, MA'AM.

17      Q    AND HE HAD FALLEN MULTIPLE TIMES?

18      A    YES, MA'AM.

19      Q    OKAY.  NOW LET'S TALK ABOUT PATIENT 50.

20      A    PATIENT 50 IS A 32-YEAR-OLD BLACK MAN THAT

21  HAS BEEN AT ANGOLA SINCE THE AGE OF 17.  AND DURING

22  HIS ARREST HE SUFFERED A GUNSHOT WOUND THAT

23  TRANSECTED HIS SPINAL CORD AT THE LEVEL T12 WHICH

24  LEFT HIM A PARAPLEGIC IN A WHEELCHAIR.  HE ALSO HAS A

25  NEUROGENIC BLADDER, WHICH MEANS THAT HE MUST

1   SELF-CATHETERIZE TO EMPTY HIS BLADDER.

2          I DIDN'T GET THE ENTIRE RECORD.  I GOT 19 --

3   FROM '19, '20, '21.  AND IN EARLY 2019 HE WAS SEEN ON

4   MULTIPLE SPECIALTY CONSULTATIONS OFF-SITE AT THE

5   HOSPITAL.  ONE OF THEM WAS FOR ORTHOPEDICS.  AND THEY

6   ORDERED THAT HE SHOULD BE LOOKED AT FOR HAVING MOLDS

7   MADE TO WHAT WE CALL OFFLOAD, WHICH MEANS IT'S TO

8   DECREASE THE PRESSURE ON THAT SACRAL AREA, BECAUSE HE

9   HAD A DECUBITUS ULCER ON HIS SACRUM, WHICH IS AT THE

10  BOTTOM OF YOUR SPINE ACROSS THE -- EITHER SIDE OF THE

11  BUTTOCKS.  AND DURING THAT SUMMER OF 2009 HE BEGAN TO

12  --

13      Q    2019?

14      A    I'M SORRY.  2019.  THANK YOU -- HE BEGAN TO

15  REFUSE THE NURSES BEING ABLE TO PACK HIS WOUND.  AND

16  THEN HE STARTED REFUSING THE ANTIBIOTICS.  AT FIRST

17  HE SAID HE WOULDN'T REFUSE THE OFF-SITE TRIPS, BUT

18  THEN HE DID START REFUSING THE OFF-SITE TRIPS.

19          AND IN JULY OF 2019 IT WAS NOTED BY THE

20  DOCTOR THAT THEY WOULD GET THE WARDEN INVOLVED AND

21  TAKE HIS CASE TO THE ETHICS COMMITTEE.  BUT WE WERE

22  UNABLE TO FIND ANYTHING IN THE CHART WHAT THE OUTCOME

23  OF THAT ETHICS COMMITTEE MEETING -- YOU KNOW, WHAT

24  THE RESULTS WERE OF THAT.  SO --

25      Q    LET'S PULL UP JX_50.68.

1      **A**    SO IN JULY 23RD HE REFUSED HIS OFF-SITE

2   WOUND CARE AND SIGNED A REFUSAL.  AND WHAT'S STRIKING

3   IS THAT HE SIGNED IT AND HE REFUSED IT, BUT HE WROTE

4   "MENTAL HEALTH PROBLEMS" DOWN ON HIS -- THE REASON

5   THAT HE WAS REFUSING.

6      **Q**    WHY IS THAT NOTABLE?

7      **A**    IT'S SIGNIFICANT.  THE PATIENT IS TELLING

8   HIM "I'M REFUSING BECAUSE I HAVE MENTAL HEALTH

9   PROBLEMS."  AND IF YOU LOOK ABOVE WHERE HE SIGNED IT,

10  HE SAYS "MENTAL HEALTH PROBLEMS."  AGAIN, TWICE HE

11  WRITES "MENTAL HEALTH PROBLEMS."

12         THERE WAS NOTHING IN THE CHART -- AND HE WAS

13  BEING SEEN BY BEHAVIORAL HEALTH OR PSYCHIATRY AT THAT

14  POINT, SO HE ACTUALLY WAS PUT BACK INTO THE INFIRMARY

15  AND ACTUALLY WAS DISCHARGED THEN ON 8/7/19.

16     **Q**    IF WE COULD PULL UP JX_50.584.

17     **A**    FIRST THEY WROTE TO RECLASS HIM TO NURSING

18  UNIT 2, AND THEN THEY QUICKLY CHANGED THAT ORDER AND

19  SAID "WE'RE JUST GOING TO DISCHARGE HIM TO HOUSING."

20         BUT THE PHYSICIAN DISCHARGE SUMMARY AND THE

21  SIGNATURE IS NOT LEGIBLE TO ME.  BUT HE WROTE

22  "DESPITE VERBAL ABUSE, BELLIGERENCE AND CAUSTIC

23  PERSONALITY," THIS PATIENT'S "WOUNDS ARE HEALTHY

24  ENOUGH FOR OUT-PATIENT DRESSING CHANGES."

25     **Q**    WHY IS THAT NOTABLE TO YOU?

1    **A**    I THINK THAT'S SO UNPROFESSIONAL.  AND WHAT

2   KEYED ME IN WAS HE WAS TELLING US IN JULY OF MENTAL

3   HEALTH PROBLEMS, SO I'M THINKING, IS THIS BECAUSE

4   HE'S MENTALLY ILL?  AGAIN, THERE IS -- THE RECORD'S

5   VOID OF ANY DISCUSSION ABOUT ASSESSING OR MULTI-

6   DISCIPLINARY TEAM MEETING.

7         WHEN YOU HAVE A DIFFICULT PATIENT, WHICH

8   IT'S OBVIOUS THIS PATIENT WOULD BE DIFFICULT TO

9   MANAGE BECAUSE HE KEPT REFUSING, WHAT YOU WOULD

10  EXPECT TO SEE IS WHAT WE CALL MULTI-DISCIPLINARY TEAM

11  MEETINGS WHERE THE PHYSICIAN THAT'S CARING FOR HIM IS

12  INVOLVED, THE NURSING STAFF ARE INVOLVED.  YOU BRING

13  IN BEHAVIORAL HEALTH, YOU MAY INVOLVE SECURITY.  WE

14  SIT DOWN AND WE LOOK AT THIS PATIENT.

15        AND THEN YOU NEED TO INVOLVE THE PATIENT AND

16  TRY TO FIND OUT WHAT WILL MOTIVATE THIS PATIENT TO

17  ALLOW -- YOU KNOW, TO GET THEM TO REALLY SAY "YES, I

18  WILL GO AHEAD AND TAKE CARE OF MYSELF."  BECAUSE HE'S

19  HAD OSTEOMYELITIS, WHICH IS INFECTION IN HIS BONE,

20  HE'S GOT THIS HUGE WOUND.  YOU JUST DON'T SEE IT --

21  THAT PROACTIVE KIND OF STEPS BEING TAKEN.

22    **Q**    MS. GOEHRING, I'M JUST GOING TO POINT YOU

23  DOWN TO THE BOTTOM RIGHT-HAND CORNER.  IS THAT THE

24  INITIALS "PMT"?

25    **A**    APPEARS TO BE SO, YES.

1    Q    AT THE TOP OF THIS PAGE, IF WE COULD ZOOM

2   BACK OUT, WHO IS THE PHYSICIAN IDENTIFIED AS?

3    A    TOCE.

4    Q    THANK YOU.

5         ALL RIGHT.  SO WHAT HAPPENS NEXT WITH THIS

6   PATIENT?

7    A    SO THEN IN AUGUST 21ST OF 2019 THERE IS

8   ANOTHER PHYSICIAN NOTE THAT SAYS THAT ON APRIL 30,

9   2019 THE OFFEN- --

10    Q    LET'S PAUSE FOR A SECOND.  LET'S BRING THAT

11   UP.  JX_50.44.

12    A    SO THIS IS DATED AUGUST 21, 2019.  I BELIEVE

13   THIS IS DR. LAVESPERE SAYING ON APRIL 30, 2019 THE

14   OFFENDER REFUSED A MANDATORY TB TEST; THE OFFENDER

15   WAS COUNSELED BUT CONTINUED TO REFUSE; THE OFFENDER

16   THEN WAS WRITTEN UP FOR A RULE NO. 5 CHARGE OF

17   AGGRAVATED DISOBEDIENCE.  ON MAY 2, 2019 HE WAS FOUND

18   GUILTY, AND THEY ADMINISTERED THE TB TEST PER POLICY

19   ON 8/21/19.

20    Q    WHY DOES THIS STAND OUT TO YOU?

21    A    YOU SHOULDN'T EVER FORCE THAT ON A PATIENT.

22   THEY HAVE A RIGHT TO REFUSE.  AND THERE IS WAYS TO

23   MITIGATE AN ANNUAL TB SKIN TEST BEYOND FORCING A TB

24   SKIN TEST.  AND TO CHARGE THEM WITH -- I'VE NEVER

25   SEEN THAT IN MY CAREER.

**1**          ON THAT SAME DATE THE DOCTOR DID NOTE THAT

**2**    THE PATIENT ASKED TO SEE DR. GAMBLE.

**3**        **Q**    LET'S PULL UP JX_50.58.

**4**        **A**    WHICH IS THE PSYCHIATRIST.  HE WOULD LIKE TO

**5**    SEE DR. GAMBLE.  AND THEY DID GO AHEAD AND ORDER A

**6**    CONSULT FOR THEIR PSYCHIATRIST TO SEE HIM.

**7**          SO DR. GAMBLE THEN SAW HIM ON 8/28/19 AND

**8**    DOCUMENTED THAT THE PATIENT TOLD HIM THAT HE WAS

**9**    HAVING OLFACTORY AND AUDITORY DISTURBANCES, OR

**10**   PSYCHOSIS; HE WAS SMELLING THINGS AND HEARING THINGS

**11**   THAT WEREN'T THERE.  AND WHAT'S REALLY MARKED ABOUT

**12**   THAT IS THAT HE HAD FILED SOME COMPLAINTS -- WHAT WE

**13**   CALL PREA COMPLAINT FROM THE PRISON RAPE ELIMINATION

**14**   ACT -- SAYING THAT OFFICERS WERE INAPPROPRIATELY

**15**   TOUCHING HIM.  AND HE TALKED ABOUT SMELLS AND THINGS,

**16**   WHICH REALLY FITS INTO WHAT DR. GAMBLE, YOU KNOW,

**17**   WROTE AND DIAGNOSED.

**18**          HE ALSO WROTE THAT HE BELIEVES -- THE

**19**   PATIENT SAID THAT HE TOLD DR. GAMBLE THAT PEOPLE CAN

**20**   MONITOR HIM BY ASSESSING HIS EYES.  AND HE WROTE THAT

**21**   HE BELIEVED HE HAD THESE SYMPTOMS FOR MANY YEARS BUT

**22**   HAD NOT REPORTED THEM.  SO HE DIAGNOSED HIM AS AN

**23**   UNSPECIFIED SCHIZOPHRENIC, ORDERED LAB WORK AND A CT

**24**   OF HIS HEAD WITH CONTRAST.

**25**          HE WAS SEEN BY SOME BEHAVIORAL HEALTH

1   PROFESSIONALS DURING THAT TIME FOR INDI- -- ON

2   INDIVIDUAL PROGRESS NOTES.  BUT YOU DON'T REALLY SEE

3   ANY NOTE THAT TIES IT BACK TO DR. GAMBLE'S DIAGNOSIS

4   OF SCHIZOPHRENIA IN HIS AUDITORY AND OLFACTORY

5   PSYCHOSIS.  ALSO OF NOTE WAS ON APRIL -- ON AUGUST

6   29TH HE -- THE FAMILY CALLED ANGOLA AND REPORTED THAT

7   HE HAD TOLD HIS FATHER THAT HE WANTED TO KILL

8   HIMSELF.

9          SO DR. GAMBLE AGAIN SAW HIM ON SEPTEMBER

10  25TH.  AND IN THAT NOTE THAT HE -- HE NOTED THAT HE

11  FELT HIS CAPACITY TO FULLY CONSENT WAS IMPAIRED BY

12  HIS PSYCHOSES AND HIS PARANOIAS AND ORDERED MORE LAB

13  AND GOT HIM TO START TAKING HIS MEDICATIONS.

14         SO IF YOU FAST-FORWARD THEN INTO MARCH OF

15  2020, AGAIN HE'S BACK IN THE -- HE'S BACK IN THE

16  INFIRMARY WITH A STAGE IV DECUBITUS ULCER.  THERE IS

17  REALLY NOT MUCH CHANGE.  STILL TREATING THE -- STILL

18  DOING THE PACKING THE WOUND, STILL ON IV ANTIBIOTICS.

19  AND HE WAS PLACED IN A LOCKED ROOM.  HE'S PLACED --

20  AT ONE POINT HE'S PUT IN ISOLATION BECAUSE HE HAD A

21  FEVER, AND SO THEY PUT HIM IN AN ISOLATION ROOM.

22  AGAIN, HE REMAINED IN A LOCKED ROOM.  HE CONTINUED IN

23  A LOCKED ROOM, AND THEN HE PULLED HIS OWN PIC LINE

24  OUT IN MARCH OF 2021.  AND DR. GAMBLE AT THAT POINT

25  ARRANGED FOR HIM TO BE MOVED OUT TO AN OPEN WARD OUT

1  OF THE LOCKED ROOM.

2          SO HE PIQUED MY INTEREST BECAUSE HE WAS A

3  YOUNG MAN WITH A -- HAS HAD THIS DECUBITUS ULCER

4  SINCE 2019 WITH BASICALLY NOT A LOT OF CHANGE,

5  UNDIAGNOSED MENTAL ILLNESS DURING THIS TIME.  AND SO

6  I CHOSE HIM TO INTERVIEW BECAUSE I WAS INTERESTED TO

7  SEE WHAT HE WOULD TELL ME WHY HE REFUSED ALL OF THAT

8  CARE.

9          AND I RECALL THE DAY THAT I APPROACHED HIM,

10  THEY POINTED HIM OUT IN THE BED TO ME.  AND HE HAS

11  THIS MOVEMENT THAT -- IT'S LIKE PILL ROLLING WITH

12  YOUR FINGERS AND YOUR HANDS.  AND SO I ASKED HIM "CAN

13  YOU DESCRIBE WHAT'S GOING ON WITH YOUR HANDS?"

14          AND HE SAID, "IT STARTED AFTER THEY STARTED

15  GIVING ME HALDOL."  SO THAT'S A -- CAN BE A SIDE

16  EFFECT OF PSYCHOTROPIC MEDICATIONS THAT YOU WATCH

17  FOR.

18          I WILL SAY THAT I DID NOT HAVE THE

19  OPPORTUNITY TO LOOK AT HIS CURRENT CHART, THE 2022,

20  WHILE WE WERE AT ANGOLA ON TOUR IN APRIL OF 2022, SO

21  I CAN'T OPINE AS TO WHAT HAD BEEN DONE WITH THE

22  MEDICATIONS AT THAT POINT.  BUT I ASKED HIM ABOUT THE

23  REFUSALS DURING THE SUMMER, AND HE SAID, "YES, I DID

24  REFUSE."  AND HE DESCRIBED FOR ME THE LENGTH OF THE

25  TRIP TO NEW ORLEANS.

1          AND I TOLD HIM, "I'M NOT FROM HERE.  YOU

2  NEED TO EXPLAIN IT TO ME."

3          AND HE SAID, "ON A GOOD DAY, WITHOUT

4  TRAFFIC, TO GET TO NEW ORLEANS IT CAN BE TWO AND A

5  HALF TO THREE HOURS."  AND HE SAID, "THEY PUT ME IN A

6  WHEELCHAIR, THEY PUT ME IN THE VAN."  AND HE SAID, "I

7  WAS BLACK BOXED."  AND HE EXPLAINED THAT'S A STEEL

8  BOX THAT GOES OVER THEIR HANDS.  AND HE SAID, "I'M

9  NOT ABLE TO SHIFT MY WEIGHT AND IT BECOMES QUITE

10  PAINFUL."  HE SAID, "IF WE HIT TRAFFIC, IT CAN BE A

11  TOTAL OF SEVEN AND A HALF TO EIGHT HOURS."  AND HE

12  SAID, "I JUST COULDN'T TOLERATE THE LENGTH OF TIME IN

13  THE CHAIR AND THE PAIN."  HE SAID, "IF THEY HAD PUT

14  ME ON A GURNEY AND TAKEN ME IN THE AMBULANCE, I WOULD

15  HAVE GONE."

16          AND HE WAS IN THE BED KIND OF TRYING TO

17  REPOSITION HIMSELF.  I ASKED HIM IF THAT WAS HIS

18  WHEELCHAIR SITTING BESIDE THE BED, BECAUSE I NOTED IT

19  WAS IN VERY POOR SHAPE WITH NO KIND OF CUSHION IN IT.

20  AND I SAID, "DO YOU NOT HAVE ANY CUSHION"?

21          HE SAID, "YEAH, I USE IT TO TRY TO GET THE

22  PRESSURE OFF OF MY BOTTOM END," AND HE SHOWED ME.

23  AND IT'S A VERY THIN, THIN CUSHION THAT HE WAS

24  ROLLING UP.

25          AND I SAID, "WELL, DO YOU RECALL THAT THEY

1  RECOMMENDED THIS OFFLOADING, THESE MOLDS?"

2           AND HE SAID, "YES, BUT THEY HAD NOT BEEN

3  PROVIDED."

4           BESIDE ON HIS BEDSIDE TABLE WERE TWO

5  CATHETERS --

6      **Q**   LET'S STOP FOR A MOMENT.  CAN WE PULL UP

7  PX_1-C AT PAGE 320?

8      **A**   AND THEY ARE THIS -- THIS CATHETER THAT YOU

9  SEE.  THIS IS A PICTURE OF THE CLEAN CATHETERS AND

10  SUPPLIES.  HE HAD TWO OF THESE AT THE BEDSIDE THAT

11  WERE OPEN, AND THEY'RE MEANT FOR SINGLE USE.  AND I

12  ASKED HIM, I SAID -- HE SAID THAT HE ONLY GETS A

13  COUPLE OF THOSE AND HE HAS TO USE THEM WEEK AFTER

14  WEEK.

15           I SAID, "HOW ARE YOU DISINFECTING THEM?"

16  AND HE SAID THAT HE HAS TO ASK AN INMATE ORDERLY TO

17  TAKE THEM TO THE SINK AND RINSE THEM WITH WATER.

18           NOW, THERE ARE REUSABLE CATHETERS THAT CAN

19  BE PROVIDED TO A PATIENT.  THESE ARE NOT MEANT FOR

20  THAT, BUT YOU CAN.  AND YOU HAVE TO PROVIDE THE

21  DISINFECTANT SOLUTION AND A PLACE TO AIR DRY.  BUT

22  THAT'S NOT OCCURRING.

23           AND HE ALSO SHARED WITH ME THAT HE WAS

24  CURRENTLY BEING TREATED WITH ANTIBIOTICS FOR A

25  URINARY TRACT INFECTION, WHICH IS NOT A SURPRISE.

1            IN ONE OF THE PRIOR HOSPITALIZATIONS THE

2    PHYSICIAN HAD NOTED THAT HE WAS HAVING OVERSPILL OF

3    URINE BECAUSE HE WASN'T CATH'ING ENOUGH; THERE WAS

4    TOO LONG OF A PERIOD BETWEEN.  AND HE JUST TOLD ME,

5    HE SAID THAT HE ASKED NURSE PRACTITIONER PARKS FOR

6    MORE CATHETERS BECAUSE HE BELIEVES THAT THAT'S PART

7    OF WHAT'S CAUSING THE INFECTION.  AND SHE TOLD HIM

8    THAT THEY WEREN'T BUDGETED TO USE CLEAN CATHETERS

9    EACH TIME AND THAT THEY HAD TO BE REUSED.

10       Q    ALL RIGHT.  SO, MS. GOEHRING, YOU REVIEWED

11   RECORDS FOR -- APPROXIMATELY HOW MANY PATIENTS DID

12   YOU REVIEW RECORDS FOR?

13       A    I'M GOING TO SAY 25 TO 30.  SOME OF THOSE

14   WERE VERY POINTED REVIEWS.  THE PHYSICIANS HAD

15   REVIEWED THEM AHEAD OF ME AND ASKED ME TO LOOK AT

16   SPECIFIC AREAS LIKE INFIRMARY OR MEDICATION

17   ADMINISTRATION, THE MARs, AND TRY TO MATCH UP WERE

18   THEY WERE RECEIVING THEIR MEDS.  BUT PROBABLY 25 TO

19   30 IN TOTAL.

20       Q    AND YOU REVIEWED RECORDS FROM 2019 AND 2020

21   AND 2021?

22       A    YES.

23       Q    AND IN YOUR REVIEW OF THOSE RECORDS, WAS THE

24   CARE YOU SAW AT A SIMILAR LEVEL THROUGHOUT THAT

25   PERIOD?

**1**      **A**    THE NURSING CARE IS CONSISTENT THROUGHOUT

**2**  THOSE THREE YEARS, YES.

**3**      **Q**    AND CONSISTENTLY --

**4**      **A**    -- NOT ADEQUATE.

**5**      **Q**    LET'S TALK A LITTLE BIT ABOUT SICK CALL.

**6**  WE'RE GOING TO BE VERY BRIEF HERE BECAUSE WE'VE

**7**  ALREADY COVERED A LOT OF THIS.

**8**          WE'VE BEEN TALKING ABOUT THE PROCEDURE FOR

**9**  SICK CALL.  IT'S BEEN SUGGESTED THAT -- ACTUALLY,

**10**  LET'S PULL UP JX_20.124.

**11**          IT'S BEEN SUGGESTED THAT THE USE OF NURSE

**12**  PRACTITIONERS IS ABOVE THE STANDARD OF CARE.  AND I

**13**  WAS HOPING THAT YOU COULD SORT OF WALK US THROUGH A

**14**  SICK CALL PROCEDURE AND WHAT YOUR OPINION IS WITH

**15**  RESPECT TO THAT.

**16**      **A**    OKAY.  SO THE FIRST THING IS IT'S A SICK

**17**  CALL PROCEDURE.  IT'S -- THIS IS NOT A ONE-TIME

**18**  ENCOUNTER WITH THE PATIENT, SO THERE ARE STEPS IN THE

**19**  PROCEDURE.

**20**          THE FIRST THING IS THE PATIENT WRITES THE

**21**  REQUEST.  AND I THINK I'VE ALREADY MENTIONED THERE IS

**22**  NOWHERE FOR THE PATIENT TO WRITE THE DATE THAT THEY

**23**  ARE REQUESTING IT, SO THAT'S THE FIRST THING.  THE

**24**  SECOND STEP IS THAT THAT SHOULD GO STRAIGHT INTO A

**25**  LOCK BOX OR BE HANDED DIRECTLY TO A HEALTH CARE

1   PROFESSIONAL; A NURSE, AND THAT SECURITY SHOULD NOT

2   BE INVOLVED WITH THAT.  YOU NEED TO KEEP THAT

3   SEPARATE.

4          SO THEN THE NURSE GOES TO THE LOCK BOX,

5   RETRIEVES IT, DATE AND TIME STAMPS IT.  AND THAT

6   STARTS YOUR CLOCK.  AND WITHIN 24 HOURS, THAT NEED --

7   THE REQUESTS NEED TO BE TRIAGED.  AND IT REALLY

8   SHOULD BE DONE FACE TO FACE.  ALTHOUGH ACA DOES

9   REQUIRE IT TO BE DONE JUST WITH A CHART REVIEW, IT IS

10  A BETTER PROCEDURE TO BE FACE TO FACE.

11         SO THE TRIAGING IS USUALLY DONE BY AN RN OR

12  AN LPN.  AND IF A NURSE PRACTITIONER IS GOING TO DO

13  THE TRIAGING PIECE, THAT IS ABOVE THE STANDARD OF

14  CARE.  SO THE TRIAGING IS LOOK -- FIRST IS LOOKING --

15  FIRST THING YOU DO IS LOOK THROUGH IT TO MAKE SURE NO

16  ONE HAS WRITTEN DOWN *I THINK I'M GOING TO KILL MYSELF*

17  OR *I FEEL LIKE KILLING MYSELF* OR *I'M HAVING CHEST*

18  *PAIN* OR *MY SHORTNESS OF BREATH IS REALLY BAD.*  THOSE

19  ARE RED FLAG.  YOU PULL THEM FROM THE -- UP TO THE

20  FRONT OF THE LINE.  THOSE ARE THE FIRST PATIENTS THAT

21  YOU HAVE GOT TO GET IN AND INTERVIEW.

22         MOST SYSTEMS LET NURSES GO AHEAD AND DO THAT

23  INITIAL FIRST ASSESSMENT:  TO GET THE VITAL SIGNS.

24  SOMETIMES THEY HAVE NURSING PROTOCOLS AND THAT CAN

25  TAKE CARE OF MINOR THINGS LIKE BLISTERS AND BOILS OR

1   ATHLETE'S FOOT, AND THEY DON'T NEED TO GO TO THE

2   PROVIDER OR THE PHYSICIAN OR MID-LEVEL PRACTITIONER,

3   WHICH WOULD BE NURSE PRACTITIONER OR PHYSICIAN'S

4   ASSISTANT.

5           IF IT IS SOMETHING THEY CAN'T MANAGE, THEN

6   IT GOES TO THE NEXT LEVEL, AND THAT'S WHERE IT ENDS.

7   AND THAT'S THE ENCOUNTER, AND THAT'S AN ENCOUNTER

8   WITH THE PHYSICIAN OR A NURSE PRACTITIONER.  AND AT

9   ANGOLA WHAT'S HAPPENED IS IT'S ALL ONE.  THERE IS NOT

10  A SEPARATE TRIAGING.  IT'S YOU SIGN UP AND YOU'RE

11  SEEN THE NEXT DAY.  THERE WAS NO WAY TO TRULY MONITOR

12  THAT BECAUSE THERE IS NOT LIKE A LOG THAT SHOWS ALL

13  OF THEM THAT WROTE IT AND THEN THE 24-HOUR TRIAGING

14  AND THEN FROM THEN 24 TO 48 HOURS THAT THEY GET SEEN

15  BASED ON THE TRIAGING AND THE ACUITY OF THE PATIENT.

16      Q   BUT TO BE CLEAR, EVERY SICK CALL PROCEDURE

17  ENDS WITH AN ENCOUNTER WITH A PROVIDER?

18      A   YES, IT SHOULD.  ABSOLUTELY.

19      Q   SO IT IS NOT ABOVE --

20      A   UNLESS YOU'RE RUNNING A SYSTEM WHERE THE

21  NURSES HAVE NURSING PROTOCOLS THAT ARE WRITTEN AND

22  SIGNED OFF BY THE MEDICAL DIRECTOR THAT STEPS THEM

23  THROUGH A CLINICAL PATHWAY THAT SAYS "FOR A BLISTER,

24  YOU CAN GIVE THEM TRIPLE ANTIBIOTIC OINTMENT" OR "FOR

25  A COUGH WITH NO FEVER YOU CAN GIVEN THEM A THROAT

1   LOZENGE" OR "FOR A RUNNY NOSE YOU CAN GIVE THEM, YOU

2   KNOW, SOME CTM," SO OVER-THE-COUNTER MEDICATIONS THAT

3   YOU AND I WOULD JUST NATURALLY GO TO THE PHARMACY OR

4   GO TO OUR MEDICINE CABINET AND SELF-MEDICATE WITH THE

5   OVER-THE-COUNTER MEDICINE.  NURSES CERTAINLY CAN DO

6   THAT, AND OFTEN MINOR COMPLAINTS CAN BE TAKEN CARE OF

7   THAT WAY AND THEY DON'T NEED TO GO TO THE PHYSICIAN

8   UNLESS MULTIPLE COMPLAINTS FOR THE SAME SYMPTOM.

9          AND YOU'LL SEE IN MOST SYSTEMS THEY'LL SAY

10  LIKE, IF IT'S THE THIRD COMPLAINT IN A 30-DAY PERIOD,

11  AUTOMATIC THEY HAVE TO BE PUT IN FRONT OF A DOCTOR OR

12  A NURSE PRACTITIONER.

13     Q   SO IT IS NOT ABOVE THE STANDARD OF CARE THAT

14  THESE -- THAT THE FINAL ENCOUNTER IS HAPPENING WITH

15  THE NURSE PRACTITIONER?

16     A   NO.  IT'S ABOVE THE STANDARD OF CARE FOR THE

17  TRIAGE.  IF THEY'RE TRIAGING, THEN IT WOULD BE ABOVE

18  STANDARD OF CARE, YES.

19     Q   AND I WANT TO LOOK AT THIS -- THIS IS JUST

20  AN EXAMPLE.  THIS IS JX_20.124.  OR THIS IS AN

21  EMERGENCY SICK CALL.  LET ME CALL UP A DIFFERENT ONE.

22  ONE SECOND.  LET'S TRY JX_20.123.  LET'S TRY

23  JX_20.116.  OKAY.  THIS IS A SICK CALL.

24     A   SO THIS PATIENT COMPLAINED OF ABDOMINAL

25  PAIN.  AND --

1    **Q**    MY APOLOGIES.  LET'S GO AHEAD AND PULL UP

2    PATIENT 4240.

3    **A**    OKAY.  SO THE PATIENT SAYS, "MY HEART IS

4    STILL HURTING.  I JUST CAME AND SEEN YOU ON THE

5    18TH."  I DON'T KNOW WHEN THIS WAS WRITTEN BECAUSE

6    THEY CAN'T DATE -- THEY DON'T HAVE A PLACE TO DATE

7    IT.

8         SO THIS LOOKS LIKE THE PROVIDER WENT AHEAD

9    AND COMPLETED THE -- IT'S 1/25/22 AT 7:32 IN THE

10   MORNING.  THERE WAS VITALS TAKEN, EXCEPT NO WEIGHT

11   AND NO TEMPERATURE WAS TAKEN.  AND IT SAYS SOMETHING

12   "COMPLAINTS, VERY DISCON" -- I DON'T KNOW.  AND

13   "HEART" -- THANK YOU.  "HEART HURTING, ARM WEAKNESS,

14   LEG NUMBNESS, VERY ANXIOUS" AND STATES THAT THE

15   MOTRIN HELPS WHEN HE TAKES IT.

16   **Q**    AND, MS. GOEHRING, WHAT I MOSTLY WANT TO

17   TALK ABOUT IS WHAT SECTION IS COMPLETED BY WHO.  SO

18   THAT TOP SECTION, WHAT IS YOUR UNDERSTANDING OF WHO

19   FILLS OUT THE "OFFENDER TO COMPLETE THIS SECTION

20   ONLY"?

21   **A**    THE "OFFENDER TO COMPLETE THIS SECTION ONLY"

22   SHOULD BE THE OFFENDER.  AND THEN THE HEALTH CARE

23   PERSONNEL SCREENING IN MOST SYSTEMS SHOULD BE A

24   NURSE.  AND THEN --

25   **Q**    WHAT IS YOUR UNDERSTANDING OF WHAT HAPPENS

1   AT LSP?

2       **A**   IT'S ALL MESHED TOGETHER.  SO NOW WITH THE

3   NEW PROCESS, THE NURSE PRACTITIONER DOES ALL OF THAT.

4   SO IT'S -- THERE IS NO TRIAGING.  THERE IS NO INITIAL

5   ASSESSMENT WITH THE TRIAGE.

6       **Q**   HOW DO YOU KNOW THAT THE NURSE PRACTITIONER

7   FILLS OUT THIS SECTION?

8       **A**   WE OBSERVED IT WHILE WE WERE THERE.

9       **Q**   DURING THE SITE VISIT?

10      **A**   YES.

11      **Q**   DID YOU REVIEW ANY DOCUMENTS THAT CONFIRMED

12  THAT AS WELL?

13      **A**   YES.

14      **Q**   DEPOSITION TESTIMONY?

15      **A**   YES.  YES.  ABSOLUTELY.  I MEAN, THEY

16  DESCRIBED THAT'S THEIR NEW PROCESS, IS IT GOES

17  STRAIGHT -- THEY ARE PICKED UP, PUT ON A LIST THROUGH

18  A SECURITY SUPERVISOR A NUMBER OF WAYS, A LIST IS

19  GENERATED, AND THEN THE NURSE PRACTITIONERS SEE THEM.

20      **Q**   AND FILLS THIS SECTION OUT DURING THE

21  ENCOUNTER?

22      **A**   YES.

23      **Q**   THANK YOU.  ALL RIGHT.  LET'S TALK A BIT

24  MORE GENERALLY ABOUT INFIRMARY CARE.  THE COURT

25  CONCLUDED IN ITS OPINION THAT IN-PATIENT INFIRMARY

1   CARE AT LSP IS CONSTITUTIONALLY DEFICIENT,

2   SPECIFICALLY NOTING THAT THERE IS SIGNIFICANTLY

3   INADEQUATE STAFFING THAT RESULTS IN INAPPROPRIATE USE

4   OF INMATE ORDERLIES.  DO YOU FIND THAT THE CARE

5   REMAINS SO?

6       A    ABSOLUTELY.

7       Q    AND WHAT IS YOUR APPRECIATION OF WHAT HAS

8   CHANGED AT LSP WITH REGARD TO INFIRMARY CARE SINCE

9   THE ORIGINAL OPINION?

10      A    WELL, UNDER DEPOSITION I READ THAT THEY HAVE

11  A RATIO NOW OF TEN TO ONE; TEN PATIENTS TO ONE NURSE.

12  AND THEN I BELIEVE IT WAS 25 PATIENTS -- OR 15

13  PATIENTS TO ONE NURSE, WHICH I'M NOT SURE HOW YOU DO

14  THAT BECAUSE -- LET ME EXPLAIN.

15           THE INFIRMARY HAS ABOUT 25 BEDS, SO THERE IS

16  25 PATIENTS, WE'LL SAY.  ONE PATIENT MIGHT BE THERE

17  FOR PREPARATION FOR LIKE A COLONOSCOPY THE NEXT DAY,

18  WHICH MEANS YOU GIVE THEM SOME GOLYTELY TO CLEAN OUT

19  THEIR SYSTEM AND YOU MAKE SURE THEY DON'T EAT OR

20  DRINK AFTER MIDNIGHT.  THEY'RE ABLE TO AMBULATE, THEY

21  GET UP TO GO TO THE BATHROOM, THEY'RE KIND OF -- YOU

22  KNOW, YOU'RE JUST MAKING SURE TO REMIND THEM "DON'T

23  EAT OR DRINK SO THAT YOU DON'T BLOW THE APPOINTMENT

24  FOR THE COLONOSCOPY."

25           YOU COMPARE THAT TO SOMEBODY THAT'S A

1   QUADRIPLEGIC THAT IS GOT A CATHETER IN, THEY'RE

2   INCONTINENT OF STOOL, THEY NEED TO BE FED, THEY

3   NEED -- THEY'RE DEPENDENT ON NURSING TO EVEN, YOU

4   KNOW, TAKE WATER IN.  AND YOU NEED TO BE DOCUMENTING

5   INTAKE, OUTPUT.  SKIN CARE IS INCREDIBLY IMPORTANT.

6   REPOSITIONING IS INCREDIBLY IMPORTANT IN THOSE

7   PATIENTS TO MAKE SURE THAT YOU'RE -- YOU KNOW, THE

8   PRESSURE POINTS.  YOU AVOID -- YOU WANT TO AVOID THE

9   SKIN BREAKDOWN AT ALL COSTS.  THAT TAKES A LOT MORE

10  NURSING TIME THAN THE PERSON THAT'S -- THE PATIENT

11  THAT'S AMBULATORY.

12          SO MOST INFIRMARY SYSTEMS HAVE AN -- WHAT WE

13  CALL AN ACUITY SYSTEM.  AND THERE IS A VARIETY OF

14  WAYS TO DO IT.  THEY EVEN USE THIS IN THE HOSPITAL

15  SETTING.  AND IT'S A WAY TO COMMUNICATE TO

16  ADMINISTRATION WHAT THE EBB AND FLOW OF WHAT THE

17  NEEDS ARE IN THE INFIRMARY.  IT'S NOT JUST CUT AND

18  DRY TEN TO ONE OR 15 TO ONE, BECAUSE THE ACUITY OF

19  THOSE PATIENTS VARIES GREATLY.

20     Q    AND WOULD YOU CALL THAT STANDARD PRACTICE TO

21  HAVE AN ACUITY MEASURE?

22     A    ABSOLUTELY.

23     Q    WERE YOU MADE AWARE OF OTHER CHANGES THAT

24  HAD BEEN MADE?

25     A    THERE WAS AN ADDITION THAT THEY -- THAT WAS

1  BOARDED UP WHILE WE WERE THERE AND NOT IN USE.  AND

2  IT'S MY UNDERSTANDING THAT FROM -- I FORGET WHO TOLD

3  US THAT, BUT THAT THERE WAS NOT A NURSING STATION;

4  THAT THEY -- I DON'T KNOW IF THEY -- IT WASN'T IN THE

5  DESIGN OR WHAT HAPPENED.  BUT THEY COULDN'T USE IT

6  BECAUSE THERE IS NO NURSING STATION THERE.

7      Q    AND WERE YOU AWARE OF ANY OTHER CHANGES TO

8  THE INFIRMARY?

9      A    THE LIGHT -- THEY PUT IN THIS LIGHT SYSTEM

10 BECAUSE THEY DON'T HAVE A CALL SYSTEM.  AND IT'S A

11 SMALL IMPROVEMENT, BUT IT'S STILL WORRISOME BECAUSE

12 IT'S JUST A LIGHT SWITCH AND A RED LIGHT COMES ON.

13      IF YOU'RE IN THE NURSING STATION, WHICH IS

14 WHERE THE NURSES WERE WHEN I WAS THERE, I SAW TWO

15 SEPARATE NURSES COME OUT OF THAT NURSING UNIT.  AND I

16 WAS IN THERE OVER TWO HOURS.  ONE OF THEM WAS BECAUSE

17 WE TESTED THE LIGHT TO SEE HOW LONG IT WOULD TAKE HE

18 OR SHE TO RESPOND TO THE LIGHT.  THE OTHER ONE WAS

19 HELPING AN INMATE WITH SOME WOUND CARE.

20      SO THE LIGHT REQUIRES YOU TO CONSTANTLY

21 WATCHING THOSE RED LIGHTS.  IT'S NOT LIKE AT THE

22 HOSPITAL WHERE YOU'RE -- THERE IS AUDIO, TOO.  IF YOU

23 DON'T SEE THE LIGHT, A BELL IS RINGING AND YOU CAN

24 HEAR IT AND YOU NEED TO -- YOU KNOW THAT YOU'VE GOT

25 SOMEBODY CALLING.  SO IT REALLY WOULD REQUIRE SOMEONE

1  CONSTANTLY WATCHING THOSE.  AND I THINK IT'S JUST --

2  IT'S BETTER THAN WHAT THEY -- HAD BEEN NOTHING, BUT

3  IT CERTAINLY IS NOT A TOTAL MITIGATION.

4      Q    SO WHAT WAS INVOLVED IN YOUR EVALUATION OF

5  THE INFIRMARY CARE AT LSP?

6      A    I STARTED WITH THE CHART REVIEW -- I'M

7  SORRY.  LET ME BACK UP.

8          I STARTED WITH REVIEW OF ALL THE POLICIES,

9  WHICH IS WHERE I ALWAYS START.  AND THEN I REVIEWED

10 THE CHARTS, THE HEALTH FILES THAT WERE PROVIDED TO

11 US, AND THEN I DID OBSERVATION WHEN WE WENT THERE.

12     Q    AND WHAT CONCLUSIONS DID YOU REACH?

13     A    MY CONCLUSION IS THAT THE INMATES ARE

14 PROVIDING THE CARE IN THE INFIRMARY.  I SAW IT.

15 THEY -- EVEN BEHIND PRIVACY SCREENS -- WHICH I

16 APPRECIATE THE ORDERLIES TRYING TO KEEP THEIR PATIENT

17 PRIVATE WHILE THEY'RE CHANGING DIAPERS AND

18 CONDUCTING, YOU KNOW, SKIN CARE AND WHAT -- WOUND

19 DRESSINGS.  I DON'T KNOW WHAT ALL THEY MIGHT BE DOING

20 BEHIND THERE, BUT IT WAS DISCONCERTING THAT THERE WAS

21 NO SUPERVISION.  BECAUSE WE REVIEWED RECORDS WHERE

22 THEY -- THERE HAD BEEN, YOU KNOW, AN ASSAULT INJURY.

23 I TALKED TO AN INMATE WHO SHOWED ME -- HE SAID THAT

24 HE HAD -- ONE OF THE ORDERLIES HAD TRIED TO CHOKE

25 HIM, AND YOU STILL COULD SEE WHERE THE THUMB NAILS

1  HAD -- IT WAS A HEALING WOUND RIGHT HERE.

2        AND HE WANTED TO INTRODUCE ME TO THE INMATE

3  ORDERLY HE CREDITS FOR SAVING HIS LIFE.  AND HE SAID,

4  "HE SAW HIM CHOKING ME AND HE CAUGHT -- WENT AND GOT

5  SECURITY."  AND I'M THINKING, WHY WOULD THEY NEED TO

6  RUN TO GET SECURITY?  AND THEN IT DAWNED ON ME.  I

7  TURNED AND THERE IS A CABINET -- A VERY TALL CABINET

8  THAT THEY PUT PATIENTS' BELONGINGS IN, AND THERE WAS

9  NO LINE OF SIGHT BETWEEN THE NURSING STATION AND HIS

10  BED.  YOU COULDN'T SEE HIM BECAUSE THE CABINET

11  BLOCKED THE VIEW.

12        SO I THINK IT'S JUST -- IT'S RIPE FOR THAT.

13  PATIENTS IN THE INFIRMARY ARE THEIR MOST VULNERABLE.

14  AND THAT'S WHY OUR NATIONAL STANDARDS SAY THAT, YOU

15  KNOW, THEY DON'T -- YOU DON'T USE INMATES TO DO

16  DIRECT CARE IN INFIRMARY SETTING.  THEY CERTAINLY CAN

17  HELP WITH CLEANING BATHROOMS, MOPPING THE FLOOR.

18  THEY CAN EVEN FILL ICE PITCHERS, THOSE KINDS OF

19  THINGS THAT YOU MIGHT THINK OF IN A HOSPITAL SETTING

20  A VOLUNTEER MIGHT DO.  BUT THEY SHOULD NOT BE DOING

21  ANY DIRECT CARE.

22        MY CONCERN IS THERE IS A LOT -- 25 BEDS IS A

23  LOT OF PATIENTS, AND ESPECIALLY IN NURSING UNIT 2

24  WHERE THEY'RE MORE OF A LONG-TERM CARE; A LOT OF

25  TURNING AND REPOSITIONING AND SKIN CARE.  IT'S

1  JUST -- THE STAFFING THERE, YOU KNOW, IT WOULD NEED

2  TO BE LOOKED AT AGAIN UNLESS THEY'RE GOING TO

3  CONTINUE WITH THE INMATE ORDERLY CARE, WHICH I THINK

4  IS -- WOULD REALLY NOT BE GOOD.

5     Q    LET'S JUST -- LET'S TALK A BIT MORE ABOUT

6  THE CARE WITHIN THE FACILITY.  SO HOW LONG DID YOU

7  SPEND IN EACH UNIT AND WHAT DID YOU OBSERVE?

8     A    YEAH.  I WAS -- I MEAN, I DIDN'T USE A STOP

9  CLOCK.  BUT I -- IN NU 2 I WAS THERE A LONG TIME

10  BECAUSE I TALKED TO A LOT OF THE INMATES, THE

11  PATIENTS.  AND AS YOU CAN IMAGINE, ONCE YOU START

12  TALKING TO THEM, EVERYONE WANTS TO TALK TO YOU AND

13  TELL YOU THEIR STORY.  SO WE WERE IN THERE QUITE A

14  WHILE.  AND I WANTED TO TALK TO SOME IN THE LOCKED

15  ROOMS, WHICH I DID.  BECAUSE I OBSERVED INMATES EVEN

16  CHANGING OUT OXYGEN TANKS ON SOMEBODY THAT'S OXYGEN

17  DEPENDENT.  AND I SPENT A LOT OF TIME IN KIND OF

18  VERIFYING SOME OF WHAT I HAD SEEN IN THE CHART.

19          AND IN ORDER TO DOCUMENT EVERY TWO HOURS,

20  EVEN EVERY FOUR HOURS ON THAT MANY PATIENTS AND

21  YOU'RE DOCUMENTING A PHYSICAL EXAM, YOU WOULD EXPECT

22  YOU'D SEE SOME VITALS BEING TAKEN, LISTENING OF HEART

23  TONES AND LUNG TONES, LISTENING TO THE BELLY.  THOSE

24  PATIENTS THAT ARE IN THE BEDS, WHICH THERE WERE

25  SEVERAL OF THEM, YOU NEED TO BE TURNING AND

1    REPOSITIONING THEM AND EVALUATING THOSE PRESSURE

2    POINTS.  AND IT'S JUST NOT HAPPENING.

3        Q    AND ABOUT HOW MANY INFIRMARIES DO YOU THINK

4    YOU'VE SEEN IN JAIL AND PRISON SETTINGS OVER YOUR

5    CAREER?

6        A    OH, GOODNESS.  25 YEARS.  PROBABLY AT LEAST

7    OVER A HUNDRED.

8        Q    AND GENERALLY WHEN YOU SHOW UP TO REVIEW AN

9    INFIRMARY OR, YOU KNOW, OBSERVE AN INFIRMARY, WHAT

10   WOULD YOU SAY IS THE TENOR OF THE STAFF?

11       A    WHAT DO YOU MEAN "THE TENOR OF THE STAFF"?

12   I'M NOT --

13       Q    HOW IS NURSING CARE DELIVERED WHEN YOU'RE

14   THERE OBSERVING CARE?

15       A    WELL, USUALLY THEY'RE ON THEIR BEST

16   BEHAVIOR.  I -- LIKE I SAID ON FRIDAY, I LEAD A TEAM

17   OF REGISTERED NURSES THAT GO IN AND PROVIDE TECHNICAL

18   ASSISTANCE AND DO TRAINING AND WHATNOT.

19            WHAT WE DO KNOW IS THAT YOU CAN SPEND A

20   COUPLE OF DAYS AND THEY WILL HOLD IT TOGETHER WHEN

21   THEY'RE TRYING TO BE ON THEIR BEST BEHAVIOR.  BUT

22   ONCE WE STAY THERE ABOUT A WEEK OR CERTAINLY BY THE

23   SECOND WEEK, THINGS KINDS OF START BUBBLING UP AND

24   YOU REALLY SEE WHAT'S TRULY HAPPENING AND, YOU KNOW,

25   FIND THINGS, SO ...

1    Q   ALL RIGHT.  LET'S TURN NOW TO TALK ABOUT

2  SOME OF YOUR RECOMMENDATIONS WITH RESPECT TO

3  INFIRMARY CARE.  IF WE COULD PULL UP JX_1-A AT 129.

4    A   SURE.  SO NO. 1 IS THAT THE --

5    Q   THIS IS WITH REGARDS TO MEDICATION

6  ADMINISTRATION.  I JUST WANT TO GO THROUGH THESE.

7    A   I'M SORRY.  OKAY.  YEAH.  SO MEDICATION

8  REALLY NEEDS TO BE DONE BY LICENSED NURSING STAFF.

9  IT JUST SHOULD BE.  AND I THINK THAT THEY NEED TO DO

10  AN ANALYSIS AND LOOK AT THAT.  SOMETIMES THERE ARE

11  SMALL PLACES LIKE COUNTY JAILS THAT MAYBE HAVE TEN OR

12  15 PEOPLE THERE AND AN OFFICER WILL GIVE THE

13  MEDICATION, BUT IT'S REALLY NOT THEM GIVING THE

14  MEDICATION.  IT'S MORE OF -- IT'S IN A BLISTER PACK.

15  IT'S LIKE THEM -- THE PATIENT TAKING THEIR OWN.

16  THEY'RE THE CONDUIT TO GET THE MEDICATION FROM THE

17  LOCKER TO THE PATIENT.  THE PATIENT ITSELF PUNCHES

18  IT, THEY DOCUMENT *I GOT IT, I RECEIVED IT* AND GO

19  BACK.  THEY'RE NOT DOING LONG PILL LINES

20  ADMINISTERING TO SEVERAL HUNDRED PATIENTS.

21        THE OTHER THING IS THEY'RE NOT -- NOT

22  TRAINED TO ANSWER QUESTIONS ABOUT NEW MEDICATIONS.

23  ONE OF THE COMMON THINGS IN A PILL LINE THAT YOU'LL

24  ENCOUNTER IS THAT MANUFACTURERS CHANGE THOSE PILLS OR

25  THE PHARMACY WILL BUY THEIR MEDICATIONS -- SAME

1   MEDICATION -- FROM A DIFFERENT VENDOR AND IT WILL

2   LOOK DIFFERENT.  ONE WEEK IT MIGHT BE A PINK PILL AND

3   THE NEXT DAY -- TIME IT COMES IT'S A YELLOW.  AND

4   THEY'LL OFTEN ASK WHAT THAT IS, YOU KNOW.  AND

5   THEY'RE NOT TRAINED -- THEY'RE NOT TRAINED WITH THAT.

6         SO THE OTHER THING IS OFTENTIMES PATIENTS

7   WILL COME TO THE PILL ADMINISTRATION AND SAY "HEY,

8   YOU KNOW, I'VE GOT THIS HAPPENING."  I'VE MYSELF

9   WORKED PILL LINE WHERE I'LL, SAY, YOU KNOW, WRITE A

10  SICK CALL OR, YOU KNOW, THEY TELL ME, YOU KNOW, "I'M

11  HAVING THIS SHARP PAIN IN MY BELLY AND IT STARTED

12  AFTER I ATE TODAY AND IT'S JUST GOTTEN WORSE AND

13  WORSE."

14        THEN I'LL SEND THEM TO THE CLINIC:  "YOU

15  NEED TO BE SEEN."  AND YOU CAN'T ASK A CORRECTIONAL

16  OFFICER, YOU KNOW, TO BE PUT IN THAT POSITION TO BE

17  RESPONSIBLE FOR THAT KIND OF THING.

18     Q    ALL RIGHT.  LET'S TURN NOW -- I THINK TO

19  JUST GET A GENERAL OVERVIEW OF THOSE, LET'S TURN NOW

20  TO PX_1-A.130 AND 131.

21     A    SO OUR RECOMMENDATIONS ARE THAT THE INMATE

22  ORDERLY SHOULD NOT BE USED IN THOSE NURSING UNITS.

23  AND THAT INFIRMARY -- THOSE INFIRMARIES -- THERE IS

24  TWO OF THEM AT ANGOLA -- DESERVES A PHYSICIAN TO

25  OVERSEE THEM.  WE'RE TALKING 50 BEDS OF SICK PEOPLE.

1  AND THAT REALLY REQUIRES A PHYSICIAN TO BE IN THE

2  LEAD.  AND IT'S GREAT TO USE NURSE PRACTITIONERS.

3  THAT'S FINE IF YOU WANT TO USE THEM AS AN ADJUNCT.

4  BUT REALLY THOSE ARE YOUR SICKEST, HIGHEST RISK

5  PATIENTS THAT ARE IN THOSE INFIRMARY.  AND SO I

6  THINK, YOU KNOW, THEY'RE GOING TO HAVE TO DO THAT,

7  KIND OF TAKE A STEP BACK.

8          I THINK ABSOLUTELY THEY NEED TO HAVE AN

9  ACUITY SYSTEM SO THAT WHEN THEY SPEAK TO THE

10 ADMINISTRATOR HE UNDERSTANDS KIND OF WHAT THE

11 WORKLOAD LOOKS LIKE.  AND I DIDN'T SEE ANY EVIDENCE

12 OF THAT THAT WAS OCCURRING.

13         THEY NEED TO BE WITHIN SIGHT AND SOUND.  I

14 MEAN, THEY'VE TRIED TO DO -- TO IMPROVE IT WITH THE

15 RED LIGHT, BUT I DON'T THINK IT'S WHERE IT CERTAINLY

16 NEEDS TO BE.

17         VULNERABLE PATIENTS SHOULD NOT BE PLACED IN

18 THOSE LOCKED ROOMS.  AND I THINK THERE REALLY NEEDS

19 TO BE A CHANGE-UP IN THE CULTURE.  WHEN SOMEONE GETS

20 DIFFICULT, THEY'RE CONFUSED, DON'T LOCK THEM UP.

21 THOSE AREN'T THE PATIENTS YOU PUSH AWAY.  THOSE ARE

22 THE PATIENTS YOU PULL FORWARD TO YOU, CLOSER TO YOU.

23         ASSISTED LIVING.  WE WENT THERE AND SPENT

24 QUITE A BIT OF TIME IN ASH 1 AND ASH 2 UNITS.  THEY

25 REALLY NEED TO HAVE A NURSE IN THERE.  I BELIEVE IT

1   WAS ON FRIDAY I SHOWED WHERE THE INMATES WERE TRYING

2   TO TAKE CARE OF EACH OTHER, WERE GIVING THE LIQUID

3   GLUCOSE.  IT'S THOSE KINDS OF THINGS THAT REALLY CAN

4   BE VERY DANGEROUS, AND THEY NEED TO HAVE A NURSE IN

5   THOSE UNITS.

6         AND A PHYSICIAN NEEDS TO BE MAKING ROUNDS IN

7   THOSE UNITS, BECAUSE THERE ARE SOME INFIRMED

8   PATIENTS, EVEN THOSE IN ASSISTED LIVING FACILITIES.

9   YOU KNOW, IT'S -- THERE IS LIMITED BED SPACE THERE IN

10  THOSE INFIRMARIES.  SO THEY NEED TO KEEP THEIR EYE ON

11  IT.

12        AND, YOU KNOW, THEY CAN CONTINUE TO USE

13  ORDERLIES.  AND I THINK THEY DO PLAY -- INMATE

14  ORDERLIES PLAY A VALUABLE ROLE WITH PUSHING

15  WHEELCHAIRS, YOU KNOW, FILLING WATER PITCHERS.  THERE

16  IS A LOT OF THINGS THAT CAN BE DONE WITH INMATE

17  ORDERLIES, BUT I THINK THE LINE REALLY NEEDS TO BE

18  DRAWN IN THE DIRECT PATIENT CARE.

19     Q   THANK YOU VERY MUCH, MS. GOEHRING.

20         THE COURT:  CROSS.

21                   CROSS-EXAMINATION

22  BY MR. ARCHEY:

23     Q   GOOD AFTERNOON, MS. GOEHRING.  GOOD TO SEE

24  YOU AGAIN.

25     A   IT'S GOOD TO SEE YOU, MR. ARCHEY.

1      Q    CONNELL ARCHEY HERE.

2           MS. GOEHRING, THE NURSE PRACTITIONERS DOING

3   SICK CALL IS ABOVE THE STANDARD OF CARE.  CORRECT?

4      A    IF THEY'RE DOING IT ON THE TRIAGE PORTION OF

5   THE PROCESS, YES.

6      Q    BECAUSE LSP -- FROM THE TIME THAT THE INMATE

7   TURNS IN HIS SICK CALL, THE VERY NEXT DAY DURING THE

8   WEEKDAY, THAT PATIENT SEES THE NURSE PRACTITIONER.

9   CORRECT?

10     A    THAT'S WHAT IS REPORTED TO US.  BUT YOU

11  CANNOT CONFIRM THAT BECAUSE THERE IS NO LOGGING

12  SYSTEM.

13     Q    ALL RIGHT.  NOW, ARE YOU AWARE THAT THOSE

14  SICK CALL SLIPS GO TO THE ATU WHERE THEY'RE THEN

15  PROCESSED AND A LIST IS DRAFTED UP AND -- FOR THE

16  CALL-OUTS?

17     A    THROUGH SECURITY, YES.

18     Q    ALL RIGHT.  AND WHEN THEY GO TO THE ATU, ARE

19  YOU AWARE THERE IS AN RN THERE THAT'S ACTUALLY

20  LOOKING AT THOSE SICK CALL SLIPS AND TRIAGING THEM?

21     A    WE DIDN'T SEE THAT HAPPENING.

22     Q    WOULD THAT SATISFY WHAT YOU WANT AS FAR AS

23  THE TRIAGE SO --

24     A    NO.

25     Q    LET'S ASSUME FOR ME -- LET'S MAKE SURE WE'RE

1    CLEAR, AND THEN I'LL LET YOU TELL ME WHY -- THAT THE

2    SICK CALL SLIPS ARE TURNED IN; THEY GO TO THE ATU; AN

3    RN THERE PROCESSES THEM; AND THEN AFTER THAT, THE

4    NEXT MORNING THEY'RE SEEN BY THE NURSE PRACTITIONER?

5        A    BACK UP.

6        Q    GO AHEAD.

7        A    IT NEEDS TO BE A -- NOT AN RN BUT AT LEAST

8    AN LPN WHO RETRIEVES THOSE REQUESTS OUT OF THE BOX.

9    FIRST THE FORM NEEDS TO BE EDITED IN ORDER TO BE ABLE

10   TO MONITOR THIS PROGRAM.  THE INMATE HAS TO BE ABLE

11   TO PUT THE DATE THAT THEY WROTE IT.  THEN WHEN THAT

12   NURSE -- WHETHER IT'S AN RN OR LPN -- OPENS THAT

13   LOCK BOX, IT NEEDS TO BE DATE AND TIME STAMPED.  THAT

14   STARTS THE 24-HOUR CLOCK.

15        WITHIN THE NEXT 24 HOURS, AN RN SHOULD

16   TRIAGE THEM, WHICH MEANS THEY GO SEE THAT PATIENT,

17   GET A SET OF VITAL SIGNS WITH THE HEALTH CARE RECORD,

18   BECAUSE I NEED TO KNOW WHAT THE HISTORY IS.  YOU

19   CAN'T ADEQUATELY DO A TRIAGE BY JUST LOOKING AT A

20   PIECE OF PAPER.  BECAUSE YOU DON'T HAVE THE PATIENT

21   --

22        Q    THERE IS PAPER TRIAGE.  THAT IS A THING.

23   RIGHT?

24        A    IT IS WITH ACA, BUT IT'S NOT -- NCCHC

25   DOESN'T ALLOW IT.  THEY REQUIRE A FACE-TO-FACE, AND

1  THERE IS A REASON WHY.

2      Q    OKAY.

3      A    YOU'RE DEPENDING ON AN INMATE TO WRITE TO

4  YOU WHAT'S SERIOUS AND WHAT'S NOT.  AND THEY'RE NOT

5  PHYSICIANS.

6      Q    ALL RIGHT.  PAUSE FOR ME.

7           SO THE ACA ALLOWS PAPER TRIAGE.  CORRECT?

8      A    YES.

9      Q    ALL RIGHT.  AND SO LSP WHEN THEY GO TO THE

10 ATU, IF YOU ACCEPT WITH ME THAT AN RN DOES THAT PAPER

11 TRIAGE, THAT'S STEP ONE AS -- ACCORDING TO THE ACA

12 THEN.  RIGHT?

13     A    YES.

14     Q    AND THEN THE NEXT DAY, REGARDLESS, THEY'RE

15 SEEN BY THE NURSE PRACTITIONER?

16     A    EXCEPT NOT ON THE WEEKEND, SO ...

17     Q    EXCEPT NOT ON THE WEEKEND.  WE'LL TALK

18 WEEKDAY FIRST.  OKAY?

19          SO THEY'VE MADE THAT 24-HOUR AND THEY GOT

20 THERE BETTER THAN HAVING TO GO THROUGH AN RN, HAVEN'T

21 THEY?

22     A    THERE IS NO EVIDENCE IN THE RECORD THAT'S

23 HAPPENING, THOUGH.  YOU WOULD NEED TO SEE THE DATE

24 AND THE TIME THE RN -- THE ACTION OF THE RN.  AND

25 THERE IS NO DOCUMENTATION ANYWHERE THAT'S OCCURRING.

1   I BELIEVE YOU, SIR, THAT YOU SEE IT, BUT IT'S NOT

2   DOCUMENTED.

3        Q    NOW, IN THE SYSTEMS YOU'RE FAMILIAR WITH,

4   WHEN THAT RN DOES THE TRIAGE, A LOT OF TIMES IT ENDS

5   RIGHT THERE, DOESN'T IT?

6        A    IF THEY ARE OPERATING ON NURSING PROTOCOLS

7   THAT ARE DEVELOPED AND SIGNED AND APPROVED BY THE

8   MEDICAL DIRECTOR, YES.

9        Q    SO THERE AREN'T -- IN THOSE INSTANCES OR

10   THOSE SYSTEMS YOU'RE AWARE OF, THE RN CONDUCTS THE

11   SICK CALL AND IT CAN STOP RIGHT THERE.  RIGHT?

12        A    WITH MINOR ISSUES LIKE A BOIL OR A RASH OR

13   ATHLETE'S FOOT, YES.

14        Q    IN LSP EVERY SICK CALL ENDS UP IN FRONT OF A

15   NURSE PRACTITIONER.  RIGHT?

16        A    YES.

17        Q    AND WHEN THE NURSE PRACTITIONER SEES THE

18   PATIENT, THEY HAVE THE MEDICAL RECORD WITH THEM.

19   CORRECT?

20        A    UH-HUH.

21        Q    YES?

22        A    YES.

23        Q    AND THE NURSE PRACTITIONER HAS A SICK CALL

24   FORM WITH THEM.  CORRECT?

25        A    CORRECT.

**1**     **Q**    THE SICK CALL TAKES PLACE IN A PRIVATE ROOM

**2**  NOW.  CORRECT?

**3**     **A**    CORRECT.

**4**     **Q**    WHAT DOES ARMOR CHARGE ITS PATIENTS FOR ITS

**5**  SICK CALLS?

**6**     **A**    WHAT DOES WHAT?

**7**     **Q**    LET ME TRY THAT QUESTION AGAIN.

**8**         WHAT DOES ARMOR CHARGE IN THE WAY OF COPAYS

**9**  FOR A SICK CALL?

**10**    **A**    ARMOR DOESN'T HAVE -- WE DON'T CHARGE COPAY.

**11**  THE INDIVIDUAL CLIENT, WHETHER IT'S A DOC OR A

**12**  SHERIFF, THEY'RE THE ONES THAT DECIDE WHAT THEY'RE

**13**  GOING TO CHARGE ON THEIR COPAY.  THAT'S NOT A

**14**  DECISION ARMOR MAKES.

**15**    **Q**    IN THE CONTRACTS THAT ARMOR ADMINISTERS,

**16**  WHAT COPAYS ARE THERE USUALLY?

**17**    **A**    IT'S TYPICALLY THREE DOLLARS.

**18**    **Q**    DO YOU SEE FIVE, SIX DOLLARS?

**19**    **A**    I DON'T RECALL.  I DON'T REALLY PAY TOO MUCH

**20**  ATTENTION TO THE AMOUNT.  BUT IT'S USUALLY -- MOSTLY

**21**  IT'S THREE DOLLARS, IS THE MOST COMMON.

**22**    **Q**    THAT'S ACTUALLY WHAT LSP IS CHARGING AS

**23**  WELL.  CORRECT?

**24**    **A**    I SAW SIX DOLLARS WAS USUALLY WHAT IT IS.

**25**    **Q**    IT'S THREE DOLLARS FOR ROUTINE, SIX DOLLARS

1  FOR EMERGENCY.  ISN'T THAT RIGHT?

2      **A**   I SAW MOSTLY SIX DOLLARS, AND THEY WEREN'T

3  ALL EMERGENCIES.  SOME OF THEM WERE SIX PLUS THREE,

4  FOR A TOTAL OF NINE.

5      **Q**   DID YOU SEE THREE DOLLARS FOR ROUTINE SICK

6  CALLS?

7      **A**   I'D HAVE TO GO BACK, MR. ARCHEY, AND READ.

8  THIS WASN'T SOMETHING I CALIBRATED AND MADE A LIST

9  OF.

10     **Q**   ALL RIGHT.  SO LET'S MOVE OFF THAT.

11          YOU DID FIND THAT THE FACILITY WAS CLEAN

12  WHEN YOU WENT ON THE SITE VISIT.  CORRECT?

13     **A**   FOR THE MOST PART.  THERE WERE SOME AREAS

14  THERE WAS CONCERN.  YOU AND I TALKED ABOUT THAT UNDER

15  DEPOSITION.

16     **Q**   WE DID.  AND YOU FOUND THAT THE FACILITY --

17          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.

18  CLINICAL SPACE WAS NOT A PORTION OF THE EXPERT REPORT

19  COVERED BY MS. GOEHRING, AND IT GOES BEYOND THE SCOPE

20  OF HER DIRECT.

21          **THE COURT:**  I THINK HE WAS ASK -- WERE YOU

22  ASKING TO CONFINE THE CLINICAL SPACE OR THE NURSING

23  UNIT?  I MEAN, I DIDN'T HEAR HIM REFERENCE A SPACE.

24  HE JUST SAID THE SPACES WERE CLEAN, AND I THOUGHT HE

25  WAS TALKING ABOUT THE NURSING UNIT.

**1**          MAYBE YOU COULD JUST CLARIFY YOUR

**2** QUESTION.

**3**          **MR. ARCHEY:** YOUR HONOR -- ALL RIGHT.  WELL,

**4** TWO RESPONSES.  ONE, I WILL CLARIFY.  TWO IS SHE IS

**5** LISTED UNDER CLINICAL SPACE -- CLINICAL CARE.  I'M

**6** SORRY.  IS THAT WHAT SHE'S TRYING TO TELL ME?  SHE'S

**7** LISTED AS CLINICAL CARE IS WHAT I WAS LISTING.

**8**          **THE COURT:** YOUR QUESTION WAS ABOUT WHAT

**9** SPACE?  THE OBJECTION IS OVERRULED.  AND YOUR

**10** QUESTION WAS ABOUT WHAT SPACE?

**11**          JUST MAKE SURE THAT -- I MEAN, I'D LIKE

**12** TO KNOW WHAT YOU'RE TALKING ABOUT.

**13**          **MR. ARCHEY:** RIGHT.

**14** BY MR. ARCHEY:

**15**     **Q**   YOU SAW THE EXAM ROOMS IN THE GENERAL

**16** MEDICINE BUILDING?

**17**     **A**   YES.

**18**     **Q**   THEY WERE CLEAN.  CORRECT?

**19**     **A**   EXCEPT FOR THE HALLWAY BEHIND.  WE'VE

**20** DISCUSSED THERE IS FOOD MIXED IN WITH CHARTS AND

**21** DIRTY MOP BUCKET IN THE CORNER, YES.  WITH THE

**22** EXCEPTION OF THAT, I DON'T KNOW WHAT YOU CALL THAT

**23** SPACE.  IT'S LIKE THE ENTRY -- THE BACK ENTRYWAY INTO

**24** THOSE ROOMS, YES.

**25**     **Q**   YEAH.  THAT'S WHERE YOU EXIT THE BACK

1    OUTSIDE THE EXAM ROOMS?

2        A    CORRECT.

3        Q    THAT'S WHERE THE MEDICAL CHARTS ARE THAT ARE

4    BEING HELD COMING IN FROM MEDICAL RECORDS ROOM?

5        A    UH-HUH.

6        Q    THAT VERY SMALL HALLWAY.  CORRECT?

7        A    CORRECT.

8        Q    OTHER THAN THAT ONE SPACE, YOU FOUND THE

9    SPACE IN THE GENERAL MEDICINE AREA TO BE CLEAN.

10   CORRECT?

11       A    YES.

12       Q    YOU FOUND THE INFIRMARIES TO BE CLEAN.

13   CORRECT?

14       A    YES.

15       Q    THE MEDICAL DORMS, YOU OBSERVED THAT VIDEO

16   MONITORS WERE INSTALLED.  CORRECT?

17       A    CORRECT.

18       Q    AND THAT IS TO ASSIST THE PATIENTS IN MAKING

19   THEIR CALL-OUTS FOR SPECIALTY CARE, GENERAL CLINIC,

20   WHAT HAVE YOU.  CORRECT?

21       A    YES, SIR.

22       Q    THAT'S A GOOD THING.  RIGHT?

23       A    CORRECT.

24       Q    AIR CONDITIONER HAS BEEN INSTALLED IN THOSE

25   MEDICAL DORMS, ASH 1 THROUGH 4.  CORRECT?

1    **A**    THEY WEREN'T WORKING.  THEY WERE LEAKING AND

2  THEY WERE OFF THE DAY WE WERE THERE.  AND WE WERE

3  TOLD THAT THEY WEREN'T WORKING.  AND SO I DON'T -- IF

4  THEY'RE WORKING NOW, GREAT.  WHEN WE WERE THERE THEY

5  WERE NOT.

6    **Q**    AIR CONDITIONING IN THOSE MEDICAL DORMS

7  WOULD BE A SUBSTANTIAL IMPROVEMENT.  ISN'T THAT

8  RIGHT?

9    **A**    YES, IT WOULD BE, WHEN THEY WORK.

10    **Q**    THE HIRING OF DR. JOHNSON IS AN IMPROVEMENT.

11  CORRECT?

12    **A**    I THINK IT'S GOOD THAT A WARDEN IS NO LONGER

13  OVER THAT.  I THINK THAT YOU'D HAVE TO REALLY MONITOR

14  IN TERMS OF DR. JOHNSON'S EFFECTIVENESS.

15        I AM CONCERNED THAT THE POLICY AND PROCEDURE

16  MANUAL IS SUBSTANDARD, AS IS THE QUALITY IMPROVEMENT

17  PROGRAM.  AND HE'S BEEN THERE WELL OVER A YEAR, SO I

18  WOULD HAVE EXPECTED HIM PROBABLY TO START IN SOME OF

19  THOSE FOUNDATIONAL AREAS.  SO I THINK THAT, YOU KNOW,

20  TIME WILL TELL ON THE EFFECTIVENESS.  BUT IT IS GOOD

21  THE WARDEN IS NO LONGER OVER IT.

22    **Q**    ON SICK CALL -- WE TALKED ABOUT THE WEEKDAY.

23  LET'S TALK ABOUT THE WEEKEND.  YOU ARE FAMILIAR OF

24  PRISON SYSTEMS -- LET ME START OVER.

25        YOU'RE AWARE OF PRISON SYSTEMS WHERE THE

1  SICK CALL SYSTEM OPERATES DIFFERENT ON THE WEEKEND.

2  CORRECT?

3      A    THE -- OKAY.  THE SICK CALL IS NOT ONE

4  ENCOUNTER, SO LET'S BE CLEAR.  TRIAGE HAPPENS -- SICK

5  CALL REQUEST MUST HAPPEN SEVEN DAYS A WEEK.  AND IN

6  ORDER FOR TRIAGE TO BE DONE WITHIN 24 HOURS, TRIAGE

7  HAS TO HAPPEN SEVEN DAYS A WEEK.

8          THE PHYSICIAN ENCOUNTER PIECE -- OR IN THE

9  CASE OF ANGOLA, THE NURSE PRACTITIONER ENCOUNTER

10  PIECE -- NEEDS TO BE WITHIN 24 TO 48 HOURS AFTER THE

11  TRIAGE.

12          THE CAVEAT IS:  BASED ON THE TRIAGE, IF A

13  NURSE SAYS "THIS IS MORE EMERGENT," THERE IS A

14  CHOICE.  EITHER THE PHYSICIAN COMES IN, THEY CAN DEAL

15  WITH IT BY PHONE ORDERS OR THEY COME IN, OR YOU SEND

16  THEM TO THE EMERGENCY DEPARTMENT.  SO THERE IS A

17  MECHANISM THROUGH WEEKEND HOURS TO TAKE CARE OF

18  CLINICAL ISSUES THAT NEED TO BE ADDRESSED.

19      Q    ALL RIGHT.  SO THERE ARE SYSTEMS WHERE

20  THE -- ON WEEKENDS THERE IS NO OPPORTUNITY TO SEE THE

21  PROVIDER OTHER THAN GOING THROUGH SOMETHING LIKE AN

22  ATU.  CORRECT?

23      A    ASK ME THAT AGAIN, PLEASE.

24      Q    YEAH, LET ME TRY IT AGAIN.  ON THE -- THERE

25  ARE SYSTEMS WHERE ON THE WEEKEND TO GET TO A PROVIDER

1  YOU HAVE TO GO TO SOMETHING LIKE THE ATU THAT EXISTS

2  AT LSP?

3      A    I'VE NOT SEEN A SYSTEM THAT HAD AN ATU

4  THAT'S LIKE TRYING TO OPERATE LIKE AN EMERGENCY ROOM.

5  I WILL TELL YOU THAT IN SYSTEMS THAT HAVE

6  INSIGNIFICANT SIZE INFIRMARIES, THERE -- USUALLY THE

7  PROVIDER COMES IN, EVEN IF IT'S JUST TWO TO FOUR

8  HOURS, TO SEE THOSE LEVEL -- REMEMBER I TALKED ABOUT

9  THE ACUITY LEVELING SYSTEM.  THAT ALSO DICTATES THE

10 PATIENTS THAT SHOULD BE SEEN EVERY DAY BY A PROVIDER.

11 AND THEY USUALLY COME IN AT LEAST TWO HOURS, FOUR

12 HOURS TO THOSE INFIRMARY BEDS.  AND AT THAT POINT THE

13 NURSES CAN PRESENT ANY HIGHER ACUITY SICK CALL

14 THEY'RE WORRIED ABOUT.

15     Q    ALL RIGHT.  SO SICK CALL OPERATES DIFFERENT

16 ON THE WEEKENDS AT THE SYSTEMS YOU'RE AWARE OF.

17 RIGHT?

18     A    IT'S MODIFIED, YES.

19     Q    ALL RIGHT.  WHEN YOU OBSERVED THE CLINICAL

20 CARE, THAT DOOR TO THE HALLWAY WHERE THE OTHER

21 PATIENTS ARE WAITING, THAT DOOR WAS CLOSED DURING THE

22 EXAMINATION.  CORRECT?

23     A    ARE WE IN THE GENERAL CLINIC AREA YOU'RE

24 TALKING ABOUT NOW?

25     Q    YES, MA'AM.

**1**      **A**    I DIDN'T GO IN WHEN THE PATIENTS WERE IN --

**2**  BEING SEEN.  I TRIED NOT TO DO THAT, FOR PRIVACY

**3**  REASONS.

**4**      **Q**    YEAH, BUT I'M --

**5**      **A**    IF YOU SAY IT IS, I BELIEVE IT IS.

**6**      **Q**    YEAH.  WELL, I ASKED YOU -- AND I'M TALKING

**7**  ABOUT THE DOOR GOING TO THE HALLWAY.  IT WAS CLOSED.

**8**  RIGHT?

**9**      **A**    CORRECT.

**10**      **Q**    PROVIDE PRIVACY FOR THE PROVIDER AND HIS

**11**  PATIENT.  CORRECT?

**12**      **A**    CORRECT.

**13**      **Q**    ALL RIGHT.  FROM THE DEPOSITIONS YOU READ,

**14**  ARE YOU AWARE OF A MEETING THAT OCCURS EVERY MORNING

**15**  DURING THE WEEKDAY?

**16**      **A**    YES.

**17**      **Q**    AND WHAT'S YOUR UNDERSTANDING OF THAT

**18**  MEETING?

**19**      **A**    IT MEANS THEY HAVE A MEETING EVERY MORNING

**20**  TO DISCUSS -- I REALLY DON'T KNOW WHAT ALL.  I'VE

**21**  HEARD AND I READ THROUGH DEPOSITION THAT THEY TALK

**22**  ABOUT PATIENTS THAT ARE GOING OFF SITE OR MAYBE

**23**  RETURNING OFF SITE.  BUT WE WEREN'T ALLOWED TO

**24**  OBSERVE IT, SO THAT'S ABOUT THE LIMIT OF I -- THAT I

**25**  COULD TALK ABOUT THAT MEETING.

1      Q    I'M ASKING WHAT YOU FOUND OUT FROM THE

2    DEPOSITIONS YOU READ.

3      A    YEAH.  THAT THEY --

4      Q    THEY TALK ABOUT PATIENTS?

5      A    YEAH.

6      Q    AMONG THE PROVIDERS?

7      A    UH-HUH.

8      Q    AND THE DEPARTMENT HEADS.  RIGHT?

9      A    YES.

10     Q    IS THAT AN APPROPRIATE AND HELPFUL PROCESS?

11          MS. MONTAGNES:  OBJECTION, YOUR HONOR.  I

12   BELIEVE WE'VE BEEN DOWN THIS ROAD.  THEY WERE

13   EXPLICITLY FORBIDDEN FROM ATTENDING THIS MEETING.

14   HE'S ASKING FOR HER TO DRAW AN OPINION ON A MEETING

15   SHE WAS EXPLICITLY NOT ALLOWED TO VIEW.

16          THE COURT:  THE QUESTION WAS IS IT A HELPFUL

17   PROCESS.  I MEAN, I GUESS YOU CAN ASK IN --

18   OVERRULED.

19     A    IT CAN BE -- IT CAN BE HELPFUL IF IT'S DONE

20   APPROPRIATELY, YES.

21     Q    OKAY.  DID YOU SEE ANY DISCUSSION WHERE --

22   WITHIN LSP ABOUT CARE BEING AFFECTED BY COST?

23     A    NO, OTHER THAN THE PATIENTS -- THE PATIENT'S

24   STATEMENT, BUT NO.

25     Q    IN SYSTEMS YOU'RE FAMILIAR WITH, PROVIDERS

1  WEREN'T EVEN ALLOWED TO KNOW THE BUDGET.  CORRECT?

2      **A**   I'M SORRY?

3      **Q**   IN SYSTEMS YOU'RE FAMILIAR WITH, PROVIDERS

4  ARE NOT EVEN ALLOWED TO KNOW THE BUDGET.  CORRECT?

5      **A**   THAT'S CORRECT.

6      **Q**   THAT'S TO KEEP THE BUDGETING FROM LIMITING

7  THE CARE THAT YOU NEED TO PROVIDE.  RIGHT?

8      **A**   YES, SIR.  YES, SIR.

9      **Q**   ALL RIGHT.  LET'S TALK ABOUT INFIRMARY CARE

10 FOR A MOMENT.  LSP USES -- HAS TWO NURSING UNITS.  IT

11 HAS NU 1, WHICH IS MORE OF AN ACUTE CARE FACILITY,

12 AND IT HAS NU 2, WHICH IS MORE OF A LONG-TERM CARE

13 FACILITY.  IS THAT RIGHT?

14     **A**   CORRECT.

15     **Q**   THAT'S A GOOD THING THAT THEY HAVE THE STAGE

16 LEVELS OF NURSING UNITS.  IS THAT RIGHT?

17     **A**   IT CAN BE, YES.

18     **Q**   AND, IN FACT, IT'S GOOD THAT LSP HAS

19 HOSPITAL BEDS FOR THE PATIENTS IN EACH OF THOSE UNITS

20 AS OPPOSED TO JUST THE REGULAR PRISON BEDS.  RIGHT?

21     **A**   I'VE NEVER BEEN IN A TRUE INFIRMARY THAT

22 DIDN'T HAVE HOSPITAL BEDS.  SO YES, IT'S A GOOD

23 THING.

24     **Q**   IT'S POSITIVE THEY HAVE HOSPITAL BEDS.

25 RIGHT?

1      A    YES.

2      Q    AND TO YOUR KNOWLEDGE, HAS THE NURSING --

3   NURSE STAFF RATIO IN THE NURSING UNITS IMPROVED

4   BETWEEN NOW AND BACK IN 2016?

5      A    YES.  I RECALL IN READING THE DEPOSITION

6   THAT THEY HAD CHANGED IT TO THE TEN-TO-ONE, 15-TO-ONE

7   RATIO.

8      Q    AND YOU MADE NO DETERMINATION OF WHAT AN

9   APPROPRIATE NURSE -- NURSE STAFFING RATIO SHOULD BE

10  IN EITHER OF THOSE UNITS.  CORRECT?

11     A    NO.  THAT WASN'T MY CHARGE TO GO IN AND

12  STAFF THAT.  BUT AGAIN, AN ACUITY SYSTEM WILL NEED TO

13  BE IMPLEMENTED TO REALLY GET GOOD DATA TO MAKE THOSE

14  DECISIONS.

15     Q    AND YOU DIDN'T DO THAT?

16     A    NO.

17     Q    THE RED LIGHT THAT WAS INSTALLED ABOVE THE

18  LOCKED DOORS, THAT'S AN IMPROVEMENT.  CORRECT?

19     A    YES.

20     Q    AND THAT -- STRIKE THAT.

21          NCCHC SAYS THAT YOU HAVE TO HAVE -- PATIENTS

22  NEED TO BE WITHIN SIGHT OR SOUND OF THE NURSES.

23  CORRECT?

24     A    CORRECT.

25     Q    NCCHC STANDARDS ALLOW FOR THE USE OF THE

1  INMATE ORDERLIES IN THESE MEDICAL DORMS, THE ASH

2  UNITS.  CORRECT?

3      A    BUT NOT WITH DIRECT CARE.

4      Q    BUT THEY DO ALLOW THE USE OF THE INMATE

5  ORDERLIES IN THE --

6      A    FOR PUSHING WHEELCHAIRS AND THINGS LIKE

7  THAT, YES.

8      Q    THE INMATE ORDERLIES CAN HELP WITH

9  ACTIVITIES OF DAILY LIVING.  CORRECT?

10     A    CORRECT.

11     Q    THE NEW MEDICAL SPACE OR THE NEW SPACE IN

12  THE NURSING UNIT, OKAY, THAT WASN'T OPERATIONAL YET,

13  WAS IT?

14     A    THAT'S CORRECT.

15     Q    IT'S BEEN BUILT AND THERE WERE BEDS IN

16  THERE, BUT THEY WEREN'T READY -- OR THEY DON'T HAVE

17  PATIENTS IN THERE YET.  CORRECT?

18     A    CORRECT.

19     Q    DO YOU KNOW WHAT THE PLAN IS ABOUT THE

20  NURSING STATION IF THAT SPACE BECOMES OPERATIONAL?

21     A    I DO NOT.

22     Q    DID YOU HEAR ANYTHING ABOUT REBUILDING THE

23  NURSING STATION IN THE MIDDLE OF THOSE TWO AREAS SO

24  THAT THEY COULD HAVE DIRECT SIGHT BETWEEN BOTH?

25     A    I DID NOT.

1       Q    YOU WOULD WANT SOMETHING LIKE THAT BEFORE

2   YOU OPEN THAT NEW SPACE UP WHERE YOU GET DIRECT

3   SIGHT.  RIGHT?

4       A    YOU WOULD NEED A NURSING STATION, YES.

5       Q    LET'S TALK ABOUT YOUR POLICIES AND

6   PROCEDURES FOR A MOMENT.  POLICY IS AN OVER-ARCHING

7   DOCUMENT THAT DOESN'T GENERALLY CHANGE.  IT SETS THE

8   POLICY.  RIGHT?

9       A    I AGREE WITH THAT, YES.

10      Q    PROCEDURES ARE WHERE YOU GET INTO DETAILS OF

11  WHAT NEEDS TO BE DONE PURSUANT TO POLICY.  THAT'S

12  WHAT YOU'VE BEEN TELLING US?

13      A    CORRECT.

14      Q    DOC AND LSP, THEY HAVE POLICIES THAT COVER

15  THE AREAS THAT SHOULD BE COVERED.  RIGHT?

16      A    SOME OF THE AREAS.

17      Q    YOU DIDN'T IDENTIFY ANY AREAS THAT WERE

18  MISSING, DID YOU?

19      A    I DON'T BELIEVE I SAW A HUNGER STRIKE

20  POLICY, JUST OFF THE TOP OF MY HEAD.

21      Q    DID YOU LIST THOSE IN YOUR REPORT?

22      A    I'D HAVE TO GO BACK, SIR.

23      Q    THEY'RE NOT IN THERE, ARE THEY?

24      A    THE HUNGER STRIKE?

25      Q    YOUR CRITICISMS THAT THERE ARE AREAS OR -- I

1   GUESS CRITICISMS THAT THERE ARE AREAS THAT ARE NOT

2   COVERED BY POLICY, THAT'S NOWHERE IN YOUR REPORT, IS

3   IT?

4        A    I'D HAVE TO GO BACK.  BUT I DON'T -- I'M

5   JUST GIVING YOU AN EXAMPLE OF A FULL COMPLEMENT.  I

6   THINK I ALREADY SPOKE ABOUT THAT THEY NEED TO COVER

7   EVERY ASPECT OF THE HEALTH CARE SERVICE DELIVERY.

8        Q    MY QUESTION TO YOU IS REAL SIMPLE.  DID YOU

9   IDENTIFY POLICIES THAT WERE MISSING ANYWHERE IN THE

10  EXPERT REPORT?

11       A    YEAH, THAT WASN'T MY CHARGE IS TO COME UP

12  WITH A LAUNDRY LIST OF WHAT YOU NEED TO CREATE.  IT

13  WAS JUST TO REVIEW AND OPINE ON THE POLICIES

14  PRESENTED TO ME, SO ...

15       Q    SO NO.  RIGHT?

16       A    NO, CORRECT.

17       Q    ALL RIGHT.  NOW, AS TO PROCEDURES, YOU

18  EXPECT THOSE TO BE VERY, VERY SPECIFIC, ACCORDING TO

19  YOU.  RIGHT?

20       A    THEY SHOULD BE, YES.

21       Q    INCLUDING DOWN TO WHERE THE DOOR IS LOCATED.

22  RIGHT?

23       A    WELL, THAT'S NOT NECESSARILY SO, BUT --

24       Q    THAT'S WHAT YOU SAID ON FRIDAY.

25       A    IT'S AN ANALOGY OF:  IF YOU FILL THIS FORM

1  OUT, HOW DO I GET IT TO THE PHARMACY?  IS THAT BY

2  COMPUTER?  DO I PUT IT IN A BOX SOMEWHERE?  YES, SO

3  IT NEEDS TO BE DOWN TO THAT DETAIL.

4      Q    OKAY.  AND THESE TYPE OF VERY, VERY SPECIFIC

5  POLICIES WILL HAVE TO BE CONTINUALLY UPDATED FOR ANY

6  VARIATION IN PROCEDURES THAT TAKE PLACE.  RIGHT?

7      A    ABSOLUTELY.  THAT'S HOW YOU COMMUNICATE WITH

8  YOUR STAFF THE EXPECTATIONS.

9      Q    IT TAKES A LOT OF RESOURCES TO KEEP THAT UP.

10  RIGHT?

11      A    NOT NECESSARILY.  USUALLY SYSTEMS HAVE ONE

12  POLICY MANAGER, AND IT'S A STANDING AGENDA ITEM ON

13  YOUR STAFF MEETINGS THAT YOU HAVE, AND THAT'S WHEN

14  YOU UPDATE STAFF.  SO IT'S REALLY NOT A

15  LABOR-INTENSIVE ACTIVITY.

16      Q    I'D LIKE TO SHOW YOU -- GO TO YOUR EXPERT

17  REPORT NOW.  THIS IS PX_1-A, PAGE 134.  IF WE GO

18  TO -- GO DOWN, PLEASE.

19          MA'AM, YOU CONSIDER THE NCCHC STANDARDS TO

20  BE THE MINIMUM STANDARDS FOR THE POLICIES AT LSP.

21  CORRECT?

22      A    THEY ARE ONE PUBLISHED SET OF MINIMAL

23  STANDARDS, YES.

24      Q    MA'AM, YOU CALL THEM THE MINIMUM STANDARDS.

25  RIGHT?

1      **A**    THEY ARE MINIMAL, YES.

2      **Q**    SO IF THEY DO NOT COMPLY -- IF LSP DOES NOT

3  COMPLY WITH THE NCCHC, ACCORDING TO YOU, LSP IS

4  SUBSTANDARD?

5      **A**    I THINK THERE IS AREAS THAT WOULD BE

6  SUBSTANDARD, YES.

7      **Q**    SO THE MINIMUM STANDARDS, ACCORDING TO YOU.

8  CORRECT?

9      **A**    YES.  BECAUSE ACA'S STANDARDS ARE NOT AS

10 BROAD WHEN IT COMES TO HEALTH CARE BECAUSE THEY

11 MEASURE EVERYTHING INCLUDING SECURITY.  NCCHC'S ARE

12 MUCH BROADER BECAUSE THEY ONLY LOOK AT THE HEALTH

13 SERVICES DELIVERY PROGRAM.

14     **Q**    SO ACCORDING TO YOU, THE NCCHC STANDARDS

15 MUST BE COMPLIED WITH IN ORDER TO MEET THE STANDARD

16 OF CARE?

17     **A**    CORRECT.

18       **MR. ARCHEY:**  ALL RIGHT.  YOU CAN TAKE THAT

19 DOWN.

20 **BY MR. ARCHEY:**

21     **Q**    LET'S GO TO QUALITY IMPROVEMENT.  THE QI/QA

22 PERSON AT LSP IS RN JENNIFER STICKELLS.  CORRECT?

23     **A**    YES.

24     **Q**    SHE'S AN ACCEPTABLE PERSON, WHICH YOU TOLD

25 ME.  RIGHT?

1    **A**    SHE'S AN RN, YES.

2    **Q**    SHE'S WELL-INTENTIONED.  CORRECT?

3    **A**    WELL-INTENTIONED, YES.

4    **Q**    THERE IS A COMMITTEE MEETING FOR THE QA/QI.

5    CORRECT?

6    **A**    CORRECT.

7    **Q**    AND YOU INDICATED DR. TOCE IS NOT PRESENT

8    DURING THAT?

9    **A**    NOT EVERY TIME.

10   **Q**    LET'S LOOK AT PX_34D, PAGES 11 THROUGH 13,

11   PLEASE.

12          MA'AM, ARE YOU FAMILIAR WITH THIS, WHAT

13   WE'RE LOOKING AT HERE?

14   **A**    THIS IS TRAINING VERIFICATION, IT LOOKS

15   LIKE, FOR THE CQI MEETING FOR JULY, AUGUST AND

16   SEPTEMBER.  SO THIRD QUARTER OF 2021.

17   **Q**    DR. TOCE IS INDICATED AS BEING PRESENT.

18   CORRECT?

19   **A**    YES.

20   **Q**    AND IF WE LOOK THROUGH THERE, MR. HAWKINS,

21   DO YOU KNOW WHO HE IS?

22   **A**    YES.

23   **Q**    HE'S THE DIRECTOR OF NURSING.  RIGHT?

24   **A**    CORRECT.

25   **Q**    MS. LEMOINE IS THE ASSISTANT DIRECTOR OF

1    NURSING?

2        **A**    YES.

3        **Q**    DR. JOHNSON, JACOB JOHNSON --

4        **A**    YES.

5        **Q**    -- DO YOU KNOW WHO THAT IS?

6        **A**    UH-HUH.

7        **Q**    WHO IS THAT?

8        **A**    YES.

9        **Q**    THAT'S THE LONG-TERM ADMINISTRATOR.

10   CORRECT?

11       **A**    YES.

12       **Q**    WE'VE GOT SOME OF THE KEY PLAYERS HERE,

13   DON'T WE?

14       **A**    YES.

15       **Q**    LET'S GO TO PAGE 12, PLEASE.  ALL RIGHT.

16   LET'S GO THROUGH THIS LIST OF ATTENDEES AT THIS TIME.

17          MS. STICKELLS.  MS. LEMOINE, YOU KNOW WHO

18   THAT IS.  RIGHT?

19       **A**    CORRECT.

20       **Q**    DR. TOCE IS STILL THERE.  CORRECT?

21       **A**    YES.

22       **Q**    DR. JOHNSON IS STILL THERE.  CORRECT?

23       **A**    YES.

24       **Q**    MR. HAWKINS -- IS A LITTLE BIT FURTHER DOWN

25   -- HE'S STILL THERE.  CORRECT?

1    A    CORRECT.

2    Q    DO YOU KNOW WHO MR. WILL RICHIE IS?

3    A    I DON'T.

4    Q    DO YOU KNOW HE'S ACTUALLY OVER THE NURSING

5    UNITS?

6    A    I DID NOT KNOW THAT.

7    Q    AND LET'S GO TO THE NEXT PAGE, PLEASE.  THIS

8    IS ANOTHER COMMITTEE MEETING SIGN-IN.  LET'S GO

9    THROUGH SOME OF THE ATTENDEES ON THIS ONE.

10        YOU SEE MS. LEMOINE AGAIN IS THE ASSISTANT

11   DIRECTOR OF NURSING.  CORRECT?

12   A    YES.

13   Q    YOU SEE DR. TOCE ONCE AGAIN.  CORRECT?

14   A    YES.

15   Q    DR. JACOB JOHNSON.  CORRECT?

16   A    YES.

17   Q    MARY CARROLL, DO YOU KNOW WHO SHE IS?

18   A    MARY CARROLL.

19   Q    SOMETIMES GOES -- YOU SEE ANNETTE CARROLL.

20   MAYBE I'LL HELP YOU OUT THERE.

21   A    YEAH, I DON'T KNOW WHAT HER ROLE IS.

22   Q    YOU UNDERSTAND SHE'S OVER THE GENERAL

23   MEDICINE CLINIC?

24   A    OKAY.

25   Q    WE'VE GOT MR. BILL HAWKINS, THE DIRECTOR OF

1  NURSING.  CORRECT?

2      A    CORRECT.

3      Q    AND THEN MR. WILL RICHIE AGAIN.  THAT'S GOOD

4  ATTENDANCE AT THESE COMMITTEE QA/QI, ISN'T IT?

5      A    IT IS A FAIRLY GOOD ATTENDANCE.  YOU'RE

6  STILL MISSING SOME KEY COMPONENTS, LIKE YOUR LAB

7  DIRECTOR SHOULD BE INVOLVED THERE AND WHOEVER IS OVER

8  RADIOLOGY, AND THEN USUALLY SECURITY IS ALSO INVOLVED

9  IN THE QA.

10     Q    MA'AM, I DIDN'T GO THROUGH ALL THE NAMES,

11 PROBABLY BECAUSE I DON'T KNOW EXACTLY WHO ALL THEY

12 ARE.  BUT DO YOU KNOW IF THOSE ARE THE OTHER NAMES

13 REFLECTED?

14     A    NO.  OKAY.

15     Q    OKAY.

16         **MR. ARCHEY:**  YOU CAN TAKE THAT DOWN.

17 **BY MR. ARCHEY:**

18     Q    ALL RIGHT.  RN STICKELLS, SHE'S DEVELOPED

19 POWERPOINTS FOR DISCUSSION OF THE QA/QI ISSUES.

20 CORRECT?

21     A    CORRECT.

22     Q    AND LSP HAS BEEN STUDYING 11 DIFFERENT

23 THINGS FOR ITS QA/QI PROCESS.  CORRECT?

24     A    FOR THREE YEARS, YES.

25     Q    THE STUDY OF THE 24-HOUR CHART CHECKS

1  ACTUALLY ROSE THE 24-HOUR CHART CHECK PROCESS FROM

2  ABOUT 80 PERCENT UP TO A HUNDRED PERCENT.  RIGHT?

3      A    YES.

4      Q    THAT'S A GOOD THING.  RIGHT?

5      A    I CAN'T TELL BECAUSE THERE IS NO DATA

6  COLLECTION TOOLS TO KNOW WHAT CRITERIA WAS USED TO

7  MARK THAT IT WAS COMPLIANT.

8      Q    SO YOU'RE CRITICAL THAT THESE STUDIES ARE

9  NOT CAPTURING SUFFICIENT DATA.  RIGHT?

10     A    CORRECT.

11     Q    SO YOU WANT SOMETHING LIKE -- LET'S SAY THE

12 STUDY OF THE LABS.  YOU WANT TO TRACK THE REQUEST,

13 THE DATE AND TIME OF THE REQUEST, THE NAME OF THE

14 PROVIDER, THE NAME OF THE PATIENT, DATE OF

15 COMPLETION, FILING IN THE CHART.  AND THERE MAY EVEN

16 BE SOME OTHER THINGS I'M FORGETTING.

17     A    DATE IT WAS DRAWN, DATE IT WAS SENT TO THE

18 LAB, DATE IT WAS RETURNED FROM THE LAB AND THE DATE

19 THAT THE PROVIDER SAW IT, YES, AND THE DATE THAT THE

20 PATIENT WAS BROUGHT AND TOLD ABOUT THEIR LAB RESULTS.

21     Q    SO YOU WANT ALL OF THAT ON EVERY LAB AND

22 DIAGNOSTIC TEST FOR WHATEVER THE STUDY PERIOD IS.

23 CORRECT?

24     A    YOU DON'T NEED TO LOOK AT EVERY ONE IN A CQI

25 STUDY.  YOU CAN TAKE A RANDOM SAMPLING THAT WILL GIVE

1   YOU -- WILL ADEQUATELY MEASURE.  I WOULDN'T EXPECT

2   YOU TO LOOK AT EVERY LAB SPECIMEN, SIR, BUT YOU WOULD

3   DO A RANDOM SAMPLING AS PART OF THE METHODOLOGY --

4   STUDY METHODOLOGY.

5       Q    24-HOUR CHART CHECKS THAT YOU JUST REFERRED

6   TO, YOU WANT TO SEE EVERY ENTRY, YOU WANT TO SEE THAT

7   THE NURSE TOOK VITALS WHEN THEY WERE SUPPOSED TO,

8   DOCTOR'S ORDERS WERE FOLLOWED?

9       A    WE DON'T KNOW BECAUSE THE STUDY IS NOT

10  CLEARLY DEFINED AND METHODOLOGY IS NOT STATED.

11  TYPICALLY WHEN YOU'RE LOOKING AT 24-HOUR CHART

12  CHECKS, YOU'RE FOCUSING ON PHYSICIAN ORDERS.  SO YOU

13  WOULD EXPECT TO SEE, NO. 1, WERE MEDICATIONS ORDERED;

14  YES OR NO.  IF IT'S YES, THE NEXT STEP IS WERE THEY

15  SUBMITTED TO THE PHARMACY, WHATEVER YOUR POLICY SAYS

16  IS THE MECHANISM TO GET IT THERE.  THEN THE NEXT

17  QUESTION WOULD BE WAS IT PLACED ON THE MAR; YES OR

18  NO.  DID THE PATIENT RECEIVE THE MEDICATION WITH

19  WHATEVER YOUR STANDARD IS, WHETHER IT'S A 24-HOUR

20  PERIOD, EIGHT-HOUR PERIOD.  WHATEVER YOUR POLICY FOR

21  YOUR PROGRAM REQUIRES, YOU LOOK AT EACH STEP OF THAT.

22  RADIOLOGY, WAS IT SENT INTO -- WHEREVER YOU SEND THE

23  ORDER, YOU KNOW, WAS IT DONE AT THE TIME FRAME THE

24  PHYSICIAN ORDERED IT.

25          SO YOU'RE LOOKING AT THOSE SPECIFIC DETAILS

1   TO MEASURE THE EFFECTIVENESS OF IT.  THAT'S WHAT YOU

2   HAVE TO LOOK AT FOR A 24-HOUR CHART CHECK.  ALL I CAN

3   ASCERTAIN FROM WHAT'S PRESENTED IS THAT THEY'RE

4   LOOKING FOR THE LINE DRAWN THAT THE NURSE LOOKED AT

5   IT.  BUT YOU DON'T REALLY KNOW WHAT THE NURSE IS

6   LOOKING AT.

7          AND FINALLY YOU NEED TO BE ABLE TO EDUCATE

8   YOUR LINE STAFF WHAT THE EXPECTATION IS WHEN THEY'RE

9   DOING THOSE 24-HOUR CHART CHECKS.  AND THAT'S THE

10  MISSING PIECE.

11     Q    THIS IS AN INCREDIBLY LABOR-INTENSIVE

12  PROCESS YOU'RE DESCRIBING, ISN'T IT?

13     A    NO, IT'S NOT.  YOU DO A RANDOM SAMPLING, AND

14  SO HOW YOU MANAGE IT IS THE CQI COORDINATOR SAYS

15  "WE'RE GOING TO STUDY 24-HOUR CHART CHECKS NEXT MONTH

16  AND HERE'S THE DATA COLLECTION TOOL."  AND YOU GET

17  THAT OUT TO YOUR NURSING SUPERVISORS AND YOU ASK THEM

18  EACH TO DO TWO OR THREE IN A 30-DAY PERIOD.  AND YOU

19  INVOLVE YOUR LINE STAFF, BECAUSE IT'S IMPORTANT --

20  LET THEM DO THE DATA COLLECTION, BECAUSE IT'S

21  IMPORTANT THAT THEY NEED TO UNDERSTAND THEIR -- HOW

22  THEIR ACTION IMPACTS THE QUALITY AND IMPACTS THE

23  MEASUREMENT OF THE EFFECTIVENESS OF THE PROGRAM.

24          SO IT'S A TEAM EFFORT AND IT MAKES IT NOT

25  LABOR-INTENSIVE FOR ANY ONE PERSON.

1    Q    DID YOU IMPLEMENT THIS TYPE OF QA/QI PROGRAM

2  AT THE VARIOUS PLACES THAT YOU'VE BEEN AFFILIATED

3  WITH?

4    A    EVERY PLACE.  AND EVEN PLACES THAT I'M NOT

5  IN THAT I REVIEW HAVE THIS KIND OF QUALITY PROGRAM.

6    Q    DOES ARMOR HAVE A DETAILED QA/QI PROGRAM AS

7  YOU'VE DESCRIBED?

8    A    ABSOLUTELY WE DO.

9    Q    WHEN YOU WERE AT CENTURION, DID CENTURION

10  HAVE A DETAILED QA/QI PROGRAM AS YOU DESCRIBED?

11    A    ABSOLUTELY.

12    Q    YOU'RE STILL CURRENTLY EMPLOYED BY ARMOR.

13  CORRECT?

14    A    CORRECT; PART-TIME.

15    Q    YOU WERE EMPLOYED BY -- YOU'RE IN THEIR

16  LEGAL DEPARTMENT NOW.  CORRECT?

17    A    CORRECT.

18    Q    YOU WERE EMPLOYED BY ARMOR FROM 2004 TO 2015

19  AND THEN ONCE AGAIN FROM 2019 TO CURRENT.  IS THAT

20  RIGHT?

21    A    THAT'S CORRECT.

22    Q    FROM 2004 TO 2015 YOU WERE THE SENIOR VICE

23  PRESIDENT IN CLINICAL OPERATIONS FOR ARMOR.  CORRECT?

24    A    CORRECT.

25    Q    YOUR DUTIES INCLUDED OPERATIONAL ACTIVITIES

1  OF 25 CONTRACTS.  RIGHT?

2      A    CORRECT.

3      Q    YOU DIRECTED A TEAM TO ENSURE ALL CONTRACTED

4  HEALTH CARE SERVICE AND PROGRAMS WERE IN COMPLIANCE

5  WITH CONTRACT AND ACCREDITING BODIES.  CORRECT?

6      A    CORRECT.

7      Q    YOUR DUTIES AT ARMOR INCLUDED TRAINING AND

8  MONITORING.  CORRECT?

9      A    CORRECT.

10     Q    YOUR RESPONSIBILITIES INCLUDED OPERATIONAL

11 AUDITS.  CORRECT?

12     A    CORRECT.

13     Q    WITH YOU DIRECTING THE PROGRAM INCLUDING

14 COMPLIANCE, TRAINING AND MONITORING QUALITY

15 IMPROVEMENT, THE SYSTEMS SHOULD BE IN PLACE TO

16 PROVIDE EXCELLENT MEDICAL CARE.  CORRECT?

17     A    CORRECT.

18     Q    HAS ARMOR EVER BEEN SUED FOR PROVIDING

19 INADEQUATE MEDICAL CARE UNDER THE EIGHTH AMENDMENT?

20     A    I -- I DON'T KNOW.  I JUST JOINED THE LEGAL

21 DEPARTMENT, SO I DON'T KNOW WHAT THE ALLEGATIONS ARE.

22 I CAN TELL YOU THAT THERE ARE LAWSUITS BROUGHT BY

23 INMATES.  IT'S A LITIGIOUS BUSINESS THAT WE'RE IN.

24 AND I DO KNOW THAT OFTEN THEY'RE NOT REPRESENTED,

25 THEY'RE NOT -- IT'S NOT A PERFECT COMPANY.  THERE IS

1  NO PERFECT COMPANY ANYWHERE, SO I'M SURE THERE HAVE

2  BEEN LAWSUITS.

3      Q    I'M TALKING ABOUT A CLASS ACTION LAWSUIT

4  ALLEGING CRUEL AND UNUSUAL PUNISHMENT UNDER THE

5  EIGHTH AMENDMENT.

6      A    NOT THAT I'M AWARE OF, BUT I'M NOT PART OF

7  THE LEGAL.

8      Q    YOU TOLD ME AT THE DEPOSITION "ABSOLUTELY

9  NOT" WHEN ASKED THE QUESTION.

10     A    I DON'T BELIEVE SO.

11     Q    ALL RIGHT.  I WANT TO TALK ABOUT THE 2004 TO

12  2015 TIME FRAME.  DID ARMOR PROVIDE MEDICAL CARE FOR

13  THE VIRGINIA DEPARTMENT OF CORRECTIONS DURING THAT

14  PERIOD OF TIME?

15     A    YES.

16     Q    INCLUDING A WOMAN'S FACILITY CALLED FLUVANNA

17  CORRECTIONAL FACILITY?

18     A    THEY HAD THAT FOR A WHILE, YES.  AND AFTER I

19  LEFT ARMOR, I BELIEVE THAT IT WENT BACK TO

20  SELF-OPERATION.

21     Q    ALL RIGHT.  I'D LIKE TO SHOW YOU A COMPLAINT

22  FOR DECLARATORY AND INJUNCTIVE RELIEF FILED BY

23  MS. CYNTHIA B. SCOTT AGAINST A NUMBER OF ENTITIES,

24  INCLUDING ARMOR CORRECTIONAL HEALTH CARE SERVICES,

25  INC.

1          MR. ARCHEY:  GO TO PAGE 1 FOR HER, PLEASE,

2    BROOKE.  AND THEN GO DOWN TO PAGE 2 NOW.

3    BY MR. ARCHEY:

4      Q    MA'AM, DO YOU SEE "ARMOR CORRECTIONAL HEALTH

5    SERVICES, INC." THERE?

6      A    YES.

7          MR. ARCHEY:  NOW GO TO PARAGRAPH 1 ON PAGE

8    3, PLEASE, BROOKE.

9    BY MR. ARCHEY:

10     Q    MA'AM, THIS IS A SUIT SEEKING DECLARATORY

11   AND INJUNCTIVE RELIEF TO ADDRESS AND REMEDY THE

12   FAILURE OF FCCW -- THAT'S THAT FLUVANNA CORRECTIONAL

13   FACILITY FOR WOMEN -- ON A SYSTEMATIC PERVASIVE AND

14   ONGOING BASIS TO PROVIDE ITS RESIDENTS WITH MEDICAL

15   CARE SUFFICIENT, EITHER IN NATURE OR IN EXTENT, TO

16   SATISFY THE MINIMUM STANDARDS REQUIRED BY THE EIGHTH

17   AMENDMENT TO THE UNITED STATES CONSTITUTION.

18     A    OKAY.

19     Q    WERE YOU NOT AWARE THAT THERE WAS A CLASS

20   ACTION SUIT FILED AGAINST ARMOR FOR EIGHTH AMENDMENT

21   VIOLATIONS?

22     A    NO, I WASN'T INVOLVED WITH THAT.

23     Q    OKAY.  LET'S GO TO PARAGRAPH 14 ON PAGE 6.

24   ARMOR HAD THIS CONTRACT FROM 2011 FORWARD.  CORRECT?

25     A    YES.

1    Q    AND THAT'S DURING YOUR TIME FRAME.  RIGHT?

2    A    I WAS THERE UNTIL 2015, YES.

3    Q    YOU WERE THERE FROM 2011 TO 2015.  CORRECT?

4    A    YES.

5    Q    LET'S GO TO PAGE 9, PARAGRAPH 23, PLEASE.

6  WELL, PARAGRAPH 21 FIRST OFF.  LET'S GO UP THERE.

7         THERE WAS A FIVE-DOLLAR COPAY FOR EACH SICK

8  CALL VISIT IN THIS SYSTEM?

9    A    OKAY.

10    Q    ARE YOU AWARE OF THAT?

11    A    I DON'T RECALL IT.  I MEAN, IT'S A LONG TIME

12  AGO.  THREE DOLLARS, FIVE DOLLARS, YES, I'M NOT GOING

13  TO ARGUE THAT.  IT COULD HAVE BEEN FIVE.

14    Q    LET'S GO TO PARAGRAPH 23 NOW.

15         THE ALLEGATIONS WERE THAT APART FROM ROUTINE

16  SICK CALL PROCESS, PRISONERS MAY SUBMIT A REQUEST FOR

17  CARE ON AN EMERGENCY BASIS; HOWEVER, FCCW UPON

18  INFORMATION AND BELIEF VIRTUALLY NEVER HONORS

19  PRISONERS' REQUESTS FOR EMERGENCY MEDICAL CARE,

20  REGARDLESS OF THE TRUE CIRCUMSTANCES OF THE

21  PRISONERS' ACTUAL NEEDS.

22         WERE YOU AWARE THAT THOSE WERE THE

23  ALLEGATIONS UNDER THE SYSTEM THAT YOU WERE MONITORING

24  AND IMPLEMENTING?

25    A    NO, I WAS NOT.

**1**     **Q**    LOOK AT PARAGRAPH 24.  IT TALKS ABOUT SICK

**2**  CALL TAKING PLACE BETWEEN 3:00 AND 4:00 A.M. IN THE

**3**  MORNING.  DO YOU SEE THAT?

**4**     **A**    YES.

**5**     **Q**    WERE YOU AWARE THAT THAT WAS GOING ON?

**6**     **A**    WE DID KNOW THAT THE PILL LINE WAS

**7**  UNCOVERED, AND WE HAD COMPLAINED TO THE CLIENT THAT

**8**  IT NEEDED TO BE MITIGATED, YES.

**9**        **MS. MONTAGNES:**  YOUR HONOR, I'D LIKE TO

**10**  RAISE AN OBJECTION.  SHE SAID SHE DOESN'T KNOW.  IF

**11**  WE'RE GOING TO GO THROUGH EVERY PAGE, SHE'S ALREADY

**12**  INDICATED SHE WASN'T AWARE OF THE LAWSUIT.

**13**        **THE COURT:**  SHE DOESN'T KNOW ABOUT THE CASE.

**14**  IT SEEMS LIKE IT'S ARGUMENT.  YOU WANT TO RESPOND TO

**15**  THE OBJECTION?  I MEAN, IT'S ARGUMENT, BUT I'M NOT

**16**  SURE IT'S CROSS-EXAMINATION.

**17**        **MR. ARCHEY:**  THERE ARE A FEW MORE OF THESE

**18**  ALLEGATIONS I WANT TO SHOW, YOUR HONOR, AND THEN I'LL

**19**  MOVE ON.  THIS WILL CULMINATE, AND I WILL SHOW -- I

**20**  HAVEN'T IMPEACHED HER ABOUT -- SHE'S RUNNING THE

**21**  SYSTEM OF THE QUALITY ASSURANCE/QUALITY

**22**  IMPLEMENTATION, SAYS EVERYTHING IS GOING TO BE GREAT,

**23**  AND HERE WE ARE.

**24**        **THE COURT:**  I DON'T UNDERSTAND.  RESPOND TO

**25**  THE OBJECTION.  YOU'RE GOING OVER A CASE THAT THE

1  LADY SAID THAT SHE DOESN'T KNOW ANYTHING ABOUT, SO

2  THAT'S THE OBJECTION.  I MEAN, IF THIS IS -- IF THIS

3  IS A LAWSUIT AND IT'S PART OF THE PUBLIC RECORD, THE

4  COURT CAN TAKE NOTICE OF IT AND YOU CAN ARGUE IT.

5  BUT I FAIL TO SEE HOW IT'S GERMANE CROSS-EXAMINATION.

6          **MR. ARCHEY:**  I'LL ASK ONE MORE QUESTION AND

7  MOVE ON, IF I MAY, YOUR HONOR.

8          **THE COURT:**  YOU MAY ASK ONE MORE QUESTION.

9  THE OBJECTION IS OVERRULED FOR THIS NARROW QUESTION,

10 WHATEVER IT IS.

11 **BY MR. ARCHEY:**

12    **Q**   MA'AM, ARE YOU AWARE THAT THIS LAWSUIT

13 CONTINUES TODAY AND THAT THIS FACILITY IS

14 UNDER-MONITORING?

15    **A**   NO.

16    **Q**   MA'AM, ARE YOU AWARE OF ANY OTHER LAWSUITS

17 AGAINST ARMOR ALLEGING NEGLIGENT AND SUBSTANDARD

18 HEALTH CARE?

19    **A**   I STARTED WITH THE LEGAL DEPARTMENT ON

20 JUNE -- ACTUALLY JUNE 1ST STARTED THE TRANSITION AND

21 THEN I GOT CALLED HERE, SO I HAVEN'T EVEN GOTTEN MY

22 FEET WET IN THE LEGAL DEPARTMENT TO BE ABLE TO

23 RESPOND TO THAT.

24    **Q**   YOU WEREN'T AWARE OF THESE IN YOUR POSITION

25 AS THE OPERATIONS MANAGER DEALING WITH ALL THESE

1  ISSUES?

2     **A**   I WAS A SENIOR VICE PRESIDENT AND THEN, WHEN

3  I CAME BACK THE SECOND TIME, THE CHIEF NURSING

4  OFFICER.  AND NO.  WE HAVE A LEGAL DIVISION THAT

5  HANDLES THAT AND A RISK MANAGEMENT DIVISION.

6     **Q**   ALL RIGHT.  I WANT TO ASK YOU ABOUT -- ARE

7  YOU AWARE OF A SUIT IN NEW YORK AGAINST ARMOR?

8     **A**   I AM AWARE THEY'VE HAD LITIGATION OUT OF NEW

9  YORK, YES.

10    **Q**   ALL RIGHT.  AND ARMOR HAD A CONTRACT TO

11  PROVIDE HEALTH SERVICES TO INMATES AT NASSAU COUNTY

12  CORRECTIONAL CENTER FROM 2011 UNTIL YOU LEFT ARMOR IN

13  2015.  CORRECT?

14    **A**   YES.  THEY WERE STILL THERE WHEN I LEFT.

15    **Q**   AND YOU -- ARE YOU AWARE THAT THE NEW YORK

16  ATTORNEY GENERAL FILED SUIT AGAINST ARMOR FOR

17  EGREGIOUS LAPSES IN MEDICAL CARE?

18    **A**   YES, I WAS -- I DON'T KNOW THE SPECIFICS.  I

19  DO KNOW AFTER I LEFT THAT THEY HAD LOST THE CONTRACT,

20  BUT I DON'T KNOW THE SPECIFICS OF IT.

21       **MR. ARCHEY:**  BROOKE, IF WE CAN BRING THIS

22  DOCUMENT UP AND BEGIN BY GOING TO PAGE 3.

23       **MS. MONTANGES:**  OBJECTION, YOUR HONOR.  I

24  BELIEVE SHE JUST INDICATED SHE WAS NOT AWARE OF THE

25  SPECIFICS OF THE LAWSUIT.

**1**          THE COURT:  MR. ARCHEY, WHY ARE WE GOING

**2** HERE?

**3**          MR. ARCHEY:  SHE SAID SHE WAS AWARE OF

**4** THE -- THIS LAWSUIT -- OR LITIGATION, I GUESS I

**5** SHOULD SAY, IN NEW YORK.  SHE DID SAY SHE WAS AWARE

**6** OF THAT.

**7**          AND WHY AM I DOING THIS?  TO SHOW -- I

**8** MEAN, I THINK I'M IMPEACHING THE WITNESS, YOUR HONOR.

**9** SHE SAID, "IF I HAVE ALL THESE SYSTEMS IN PLACE, THAT

**10** THINGS ARE GOING TO BE GREAT."  SHE SAYS THOSE

**11** SYSTEMS WERE IN PLACE, AND THERE IS A LITANY OF

**12** LAWSUITS HERE.  AND THESE ARE NOT INDIVIDUAL

**13** LAWSUITS.  THESE ARE SUITS ALLEGING THE CARE IS BAD

**14** THROUGH THE SYSTEM, SO I THINK IT'S HIGHLY RELEVANT.

**15**          MS. MONTAGNES:  I BELIEVE THE -- YOUR HONOR,

**16** IF I MAY.  ALLEGATIONS.  THESE ARE JUST MERELY

**17** ALLEGATIONS THAT WE'RE TALKING ABOUT HERE.  AND SHE'S

**18** INDICATED SHE DOESN'T KNOW THE SPECIFICS.

**19**          THE COURT:  SUSTAINED.

**20** BY MR. ARCHEY:

**21**    Q    MA'AM, ARE YOU AWARE OF CURRENT LITIGATION

**22** AGAINST ARMOR OUT OF FLORIDA?

**23**    A    UNLESS YOU CAN BE SPECIFIC, NO, I'M GOING TO

**24** SAY NO, I DON'T -- ARE THERE LAWSUITS OUT OF FLORIDA?

**25** I'M GOING TO ASSUME -- THERE IS A LOT OF BOOKS OF

1   BUSINESS IN FLORIDA, SO I'M ASSUMING THAT THERE WOULD

2   BE SOME.  BUT AGAIN, I'M NOT -- IT'S NOT IN A

3   DIVISION THAT I HAVE BEEN IN UNTIL MY NEWLY -- MY NEW

4   POSITION, AND I HAVEN'T EVEN GOTTEN STARTED.

5       Q    MA'AM, DO YOU RECALL TESTIFYING AS A

6   CORPORATE WITNESS ON BEHALF OF ARMOR IN LITIGATION

7   AGAINST ARMOR?

8       A    BACK IN THE EARLY 2000s I WAS -- WHATEVER

9   THE TITLE IS WHERE YOU'RE THE REPRESENTATIVE.  THERE

10  WAS A SUIT ABOUT -- AN ALLEGATION ABOUT HIV

11  MEDICATIONS.  AND I OPINED ON THE POLICY, YEAH.

12      Q    DO YOU REMEMBER TESTIFYING AS A CORPORATE

13  WITNESS ON BEHALF OF ARMOR IN A SUIT IN FLORIDA IN

14  2020?

15      A    YES.  YES.

16      Q    WHAT DO YOU RECALL ABOUT WHAT THAT

17  LITIGATION WAS ABOUT?

18          MS. MONTAGNES:  THIS ISN'T -- THIS IS NOT --

19  THIS IS JUST SNIPPETS --

20          THE COURT:  ADDRESS THE COURT, NOT EACH

21  OTHER.  IF YOU HAVE SOMETHING TO SAY, MAKE AN

22  OBJECTION.  VERY CLEAR.

23          MS. MONTAGNES:  I APOLOGIZE.  I WAS JUST

24  TRYING TO DO LOGISTICS.  I JUST HAVE HALF A

25  DEPOSITION HERE.  I DON'T HAVE THE FRONT PIECE, AND

1  SO I WAS JUST ASKING MR. ARCHEY FOR A COPY OF THE

2  DEPOSITION.

3          **THE COURT:**  FINE.  ADDRESS THE COURT, NOT

4  EACH OTHER:  *OBJECTION.  I DON'T KNOW WHAT HE'S*

5  *TALKING ABOUT.  I NEED THE DEPOSITION.*

6              YOU WANT TO GIVE HER THE DEPOSITION

7  NOW?

8          **MR. ARCHEY:**  I DID, YOUR HONOR.  BUT WHAT I

9  HAVE IS THE PORTION WHERE MS. GOEHRING TESTIFIED OUT

10 OF THIS.  AND IF SHE'S ASKING FOR THE ENTIRE

11 DEPOSITION, I DO NOT HAVE THAT WITH ME.  BUT I HAVE

12 THE PORTION OF MS. GOEHRING'S TESTIMONY, THE ENTIRETY

13 OF THAT.  THAT'S WHAT I HAVE.

14         **MS. MONTAGNES:**  YOUR HONOR, THIS IS --

15 OBJECTION.  THIS ISN'T SUFFICIENT FOR ME TO

16 IDENTIFY -- YOU KNOW, THE WITNESS ISN'T SWORN IN

17 THIS.  IT'S A DIRECT EXAM.  THE ATTORNEYS AREN'T

18 IDENTIFIED.  THERE IS NO WAY FOR ME TO -- IT DOESN'T

19 HAVE THE FRONT PIECE OF THIS DEPOSITION TRANSCRIPT ON

20 IT.

21         **THE COURT:**  THERE IS NO WAY FOR HER TO

22 IDENTIFY THAT YOU'RE IMPEACHING HER WITH MS.

23 GOEHRING'S PRIOR TESTIMONY.

24         **MR. ARCHEY:**  MAY I, YOUR HONOR?  IT SAYS

25 "ANGELA GOEHRING, WHO IS CALLED AS A WITNESS, AND

1  HAVING FIRST BEEN SWORN, WAS EXAMINED AND TESTIFIED

2  AS FOLLOWS."  I'VE GOT THE SUIT NUMBER AT THE TOP,

3  THE PATIENT NUMBER, THE I.D. THE WHOLE BIT.

4          THE COURT:  OBJECTION IS OVERRULED.

5          MS. MONTANGES:  YOUR HONOR, IF I MAY, MAY I

6  PLEASE JUST HAVE THE NAME OF THE CASE, WHICH I DON'T

7  HAVE IN FRONT OF ME, BASED ON THIS?

8          THE COURT:  EXCUSE ME.  HE HAS WHAT?

9          MS. MONTANGES:  I DON'T HAVE THE NAME OF THE

10 CASE.

11         MR. ARCHEY:  IT IS -- THE SUIT NO. IS

12 19-CV-00596.  THE CASE NAME IS *PATRICK HANNAH VS.*

13 *ARMOR CORRECTIONAL HEALTH CARE SERVICES, INC. AND*

14 *OTHERS.*

15         THE COURT:  *HANNAH VS. ARMOR CORRECTIONAL.*

16 PROCEED.

17         MR. ARCHEY:  I'D LIKE TO GO TO PAGE 128,

18 PARAGRAPH 776, PLEASE.

19 BY MR. ARCHEY:

20    Q   MA'AM, THE SUIT YOU TESTIFIED AS A CORPORATE

21 WITNESS, WERE YOU ALLEGE -- WERE YOU AWARE THAT THERE

22 WERE ALLEGATIONS THAT ARMOR WAS PROVIDING -- WAS

23 DELIBERATELY INDIFFERENT IN PROVIDING CARE?

24    A   I'M NOT DOUBTING IT BECAUSE I SEE IT HERE,

25 BUT I DON'T RECALL THIS.  I MEAN, I'D HAVE TO SEE THE

1    DEPOSITION AND REVIEW IT TO RECALL REALLY WHAT THIS

2    IS EVEN ABOUT.

3        Q    I'D LIKE NOW TO GO TO PARAGRAPH 308.  THE

4    PLAINTIFF ALLEGED THAT THE SHERIFF WAS LIABLE FOR

5    BREACHING ITS DUTY TO REASONABLY VET AND INVESTIGATE

6    ARMOR PRIOR TO ENTERING INTO THE ORIGINAL CONTRACT

7    BY, AMONG OTHER THINGS, NOT ADEQUATELY CONSIDERING

8    ARMOR'S LONGSTANDING HISTORY OF MEDICAL NEGLIGENCE,

9    FRAUD AND DELIBERATE INDIFFERENCE.

10           WERE YOU AWARE OF THOSE ALLEGATIONS AGAINST

11   ARMOR?

12       A    I'M NOT GOING TO QUESTION THAT THEY WERE

13   ALLEGED.  BUT AGAIN, I'M NOT PART OF THE LEGAL

14   DEPARTMENT AND I -- I DON'T DOUBT THAT THIS IS IN

15   HERE.  SO I'M NOT SURE WHAT YOU'RE -- I JUST DON'T --

16   I'M NOT PART OF THE LEGAL DEPARTMENT AND I DON'T

17   RECALL THE SPECIFICS ON IT.

18       Q    YOU WERE CERTAINLY A SENIOR MANAGEMENT

19   PERSON WITH ARMOR THROUGHOUT THAT PERIOD OF TIME.

20   CORRECT?

21       A    THROUGHOUT TWO -- NO.  I DIDN'T JOIN THEM --

22   THIS WAS FILED IN APRIL OF '19, IT LOOKS LIKE, AND I

23   DIDN'T GO BACK THERE UNTIL JULY 6TH OF 2019.

24       Q    OKAY.  ALL RIGHT.  LET'S TALK ABOUT THE --

25   YOUR SECTION ON UNPROFESSIONAL AND PUNITIVE

1  ATTITUDES.

2           THE MALINGERING POLICY THAT LSP PREVIOUSLY

3  HAD HAS BEEN REVOKED.  CORRECT?

4      A    I'M SORRY, MR. ARCHEY, I WAS UNABLE TO HEAR

5  YOU.

6      Q    I'M SORRY.  THE MALINGERING POLICY THAT LSP

7  PREVIOUSLY HAD IN PLACE HAS BEEN REVOKED.  CORRECT?

8           MS. MONTAGNES:  OBJECTION, YOUR HONOR.

9  BEYOND THE SCOPE OF HER DIRECT.  SHE DIDN'T TESTIFY

10 AS TO THIS SECTION OF THE EXPERT REPORT.

11          THE COURT:  YOUR QUESTION WAS, MR. ARCHEY?

12          MR. ARCHEY:  IT WAS ABOUT THE MALINGERING

13 POLICY BEING REVOKED, YOUR HONOR.  SHE DEFINITELY

14 TESTIFIED --

15          THE COURT:  YEAH, RESPOND TO THE OBJECTION.

16          MR. ARCHEY:  SHE DEFINITELY TESTIFIED TO

17 UNPROFESSIONAL AND PUNITIVE ATTITUDES, AND I THINK

18 THIS GOES TO THAT.

19          THE COURT:  OVERRULED.

20 BY MR. ARCHEY:

21     Q    ARE YOU AWARE THAT THE MALINGERING POLICY

22 THAT LSP PREVIOUSLY HAD IN PLACE PRIOR TO 2016 HAS

23 BEEN REVOKED?

24     A    YES, SIR.

25     Q    WERE YOU THERE, DID YOU OBSERVE THE

1   ENCOUNTER BETWEEN NURSE PRACTITIONER DEDEAUX AND THE

2   PATIENT WHERE HE FIST-BUMPS HIM ABOUT HE'S ON PAROLE

3   AND GETTING OUT AND THAT TYPE OF THING?  WERE YOU

4   THERE FOR THAT ENCOUNTER?

5       **A**   I DON'T RECALL THE FIST BUMP.

6       **Q**   TRACKING REFUSALS AND NONCOMPLIANCE, THAT'S

7   IMPORTANT.  CORRECT?

8       **A**   YES.

9       **MR. ARCHEY:**  BROOKE, PULL UP JX_13.01015.

10  PLEASE.

11  **BY MR. ARCHEY:**

12      **Q**   GIVE YOU A SECOND TO LOOK THROUGH THIS

13  EMAIL, MA'AM.  ARE YOU FAMILIAR WITH THIS?

14      **A**   NO.

15      **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS

16  IS NOT A PATIENT REVIEWED BY ANGELA GOEHRING.

17      **THE COURT:**  THIS IS NOT A PAGE NUMBER WHAT?

18      **MS. MONTAGNES:**  I APOLOGIZE.  THIS IS NOT A

19  PATIENT REVIEWED BY MS. GOEHRING.  I BELIEVE MR.

20  ARCHEY OBJECTED EVERY TIME WE TRIED TO -- THIS IS A

21  PATIENT EXPLICITLY LISTED BY ANOTHER PROVIDER.

22      **THE COURT:**  SO WHY ARE YOU ASKING HER ABOUT

23  IT, MR. ARCHEY?

24      **MR. ARCHEY:**  BECAUSE IT GOES TO THIS SECTION

25  WHERE THEY'RE TALKING ABOUT THIS, QUOTE,

1   UNPROFESSIONAL AND PUNITIVE ATTITUDES.  THAT'S WHAT

2   IT'S FOR, YOUR HONOR.

3        **THE COURT:**  OVERRULED.

4   **BY MR. ARCHEY:**

5        Q    MS. GOEHRING, IF YOU LOOK RIGHT WHERE IT

6   SAYS "EXTERNAL EMAIL: EVALUATE" -- RIGHT THERE IN THE

7   MIDDLE OF THE DOCUMENT.  DO YOU SEE WHERE I AM?

8        A    YES.

9        Q    REFERENCES THAT THE PATIENT HAD SEEN AN

10  OUTSIDE PROVIDER AND THAT THE PROVIDER "PLACED THE

11  OFFENDER AS PRN, WHICH SURPRISED MYSELF AND DR.

12  LAVESPERE."  AND IT GOES ON.  AND IT'S BASICALLY

13  QUESTIONING THE DOCTOR, SAYING "IS THAT RIGHT?  CAN

14  YOU CHECK WITH HIM AND VERIFY?"  RIGHT?

15       A    YES.

16       Q    ALL RIGHT.  AND IT TURNS OUT THAT THE DOCTOR

17  RESPONDS "NO, WE WOULD LIKE A FOLLOW-UP IN SIX

18  MONTHS. " RIGHT?

19       A    YES.

20       Q    THAT'S A VERY GOOD THING TO BE DOING.

21  RIGHT?

22       A    YES.

23       **MR. ARCHEY:**  I'D NOW LIKE TO CALL UP

24  JX_01.0581.

25       **MR. CONINE:**  THIS NEEDS TO BE SEALED,

1  MS. EDWARDS.

2         **MR. ARCHEY:**  YES.  THANK YOU, JOHN.

3  **BY MR. ARCHEY:**

4      **Q**   DO YOU SEE THIS DOCUMENT THERE, MA'AM?

5      **A**   YES.

6      **Q**   ALL RIGHT.  IT SAYS "OFFENDER DID NOT MAKE

7  IT TO" -- THAT'S MARY BIRD PERKINS IN GONZALES, ARE

8  THOSE INITIALS -- "XRT," AND IT CONTINUES.  "IT TOOK

9  TOO LONG AT THE INFUSION CLINIC AT UMCO."  ARE YOU

10 WITH ME SO FAR?

11     **A**   YES.

12     **Q**   IT SAYS "CALL AND SPOKE WITH MICHAEL AT MARY

13 BIRD PERKINS GONZALES AND THEY ARE GOING TO FAX NEW

14 SCHEDULED DATES."

15        THAT'S A GOOD THING TO FOLLOW UP ONCE WE HAD

16 ONE CLINIC TAKING TOO LONG TO GET TO THE OTHERS.

17 RIGHT?

18     **A**   YES.

19     **MR. ARCHEY:**  ALL RIGHT.  I'D LIKE AT THIS

20 TIME TO CALL UP JX_30.001.

21 **BY MR. ARCHEY:**

22     **Q**   ALL RIGHT.  YOU WERE REFERENCING AN ETHICS

23 BOARD WITH A TUMOR WITH ANOTHER PATIENT.  WERE YOU

24 AWARE THAT THIS PATIENT ACTUALLY -- THERE WERE

25 PROCEEDINGS TO HAVE HIM COMMITTED SO THEY COULD GET

1  CARE TO THIS INDIVIDUAL?

2          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS

3  IS A DIFFERENT PATIENT.

4      **A**   YEAH, I DON'T RECALL THIS PATIENT NAME.

5          **THE COURT:**  MR. ARCHEY, DO YOU WANT TO

6  RESPOND?

7          **MR. ARCHEY:**  YOUR HONOR, I DIDN'T MEAN TO

8  INSINUATE IT WAS THE SAME PATIENT.  I'M NOT.  SHE

9  TALKED ABOUT A TUMOR ETHICS BOARD, AND I'M SHOWING

10  THIS OTHER ONE.  SO TO BE CLEAR, THESE ARE TWO

11  DIFFERENT PATIENTS.

12          **THE COURT:**  OKAY.  OVERRULED.

13  BY MR. ARCHEY:

14      **Q**   MA'AM, WERE YOU AWARE THAT LSP WENT THROUGH

15  THE PROCESS AND HAD THIS PATIENT COMMITTED IN ORDER

16  TO GET HIM CARE?

17      **A**   NO.

18          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS

19  DOESN'T APPEAR IN ANY SECTION THAT MS. GOEHRING HAS

20  IDENTIFIED FOR, AND THIS IS NOT A PATIENT THAT SHE

21  REVIEWED.

22          **THE COURT:**  OVERRULED.

23  BY MR. ARCHEY:

24      **Q**   MA'AM, WERE YOU AWARE OF THAT?

25      **A**   NO.

1      Q    IT'S A GOOD THING.  RIGHT?

2      A    I'M NOT EVEN SURE WHAT THIS SAYS.  IF YOU

3   COULD SCROLL IT SO I CAN EVEN SEE WHAT IT SAYS.

4      Q    MOST CERTAINLY, MA'AM.

5      A    YES, THAT'S GOOD.  THANK YOU.

6           **MR. ARCHEY:**  OKAY, BROOKE, YOU CAN TAKE THAT

7   DOWN.

8   **BY MR. ARCHEY:**

9      Q    MA'AM, IT'S IMPORTANT TO KNOW ABOUT A

10  PATIENT'S ILLICIT DRUG USE WHEN TREATING THE PATIENT.

11  CORRECT?

12     A    SOMETIMES YOU KNOW, SOMETIMES YOU DON'T.

13     Q    BUT IT'S IMPORTANT TO KNOW ABOUT IT WHEN YOU

14  CAN WHEN TREATING THE PATIENT.  CORRECT?

15     A    YES, IT'S GOOD INFORMATION TO HAVE.

16     Q    THERE IS A PROBLEM WITH ILLICIT DRUG USE AT

17  LSP.  RIGHT?

18     A    APPEARS TO BE, YES.

19     Q    YOU, IN FACT, SMELLED SYNTHETIC MARIJUANA

20  DURING THE SITE VISIT AT SOME POINT.  CORRECT?

21     A    YES.

22     Q    DO YOU KNOW WHY YOUR EXPERT REPORT NEVER

23  MENTIONS ILLICIT DRUG USE EVEN ONCE?

24     A    IT'S IRRELEVANT TO US.  IT'S JUST LIKE IN

25  THE COMMUNITY; IF A PATIENT TELLS YOU THEY'RE USING

1  ILLICIT DRUGS, THAT'S GREAT.  BUT YOU APPROACH THEM

2  AND YOU ASSESS AND DOCUMENT WHAT YOU'RE SEEING

3  WITHOUT -- WHETHER YOU KNOW IT OR NOT.  AND OFTEN YOU

4  DON'T KNOW.

5      Q    MA'AM, ARE YOU AWARE THAT PATIENTS HAVE DIED

6  OF OVERDOSES?

7      A    I'M SURE THERE HAVE BEEN.

8      Q    EVEN IN THE CHARTS THAT YOU SELECTED, ARE

9  YOU AWARE OF THAT?

10     A    I DON'T RECALL THAT I SAW ANY OF THE ONES I

11  REVIEWED AS CAUSE OF DEATH WAS OVERDOSE, NO.

12     Q    IF THERE IS AN OVERDOSE IN THE CHARTS THAT

13  Y'ALL REVIEWED AS A GROUP, THAT WOULD MAKE THAT VERY

14  RELEVANT, WOULDN'T IT?

15         MS. MONTAGNES:  OBJECTION, YOUR HONOR.  THIS

16  CALLS FOR AN OPINION BEYOND THE SCOPE OF HER REPORT

17  AND BEYOND THE SCOPE OF THE CHARTS THAT SHE REVIEWED.

18  SHE IS BEING HELD ACCOUNTABLE FOR CHARTS REVIEWED BY

19  OTHER PEOPLE.  EXPLICITLY THIS COURT HAS SAID OVER

20  AND OVER AGAIN THEY CAN ONLY TALK ABOUT THINGS THAT

21  OCCURRED IN THEIR SECTION.

22         THE COURT:  DO YOU WANT TO RESPOND?

23         MR. ARCHEY:  YOUR HONOR, THE "ILLICIT DRUG

24  USE" QUESTION PERVADES THROUGHOUT THE REPORT.  THAT'S

25  THE PROBLEM, IS THAT NONE OF THEM TALKED ABOUT IT.

1    AND SO THIS IS MY IMPEACHMENT OF HER ON THAT ISSUE --

2    OR CROSS-EXAMINATION OF HER ON THAT ISSUE.

3             THE COURT:  OVERRULED.

4    BY MR. ARCHEY:

5        Q    MA'AM, ARE YOU AWARE THAT THERE ARE PATIENTS

6    WITHIN THE 60 THAT YOU SELECTED THAT OVERDOSED?

7        A    I AM NOT AWARE OF A DEATH BY OVERDOSE.

8        Q    DID YOU NOT HEAR DR. VASSALLO SAY THERE WAS

9    A DEATH BY OVERDOSE?

10       A    I WASN'T HERE WHEN SHE TESTIFIED.  I WAS

11   TRAVELING THAT DAY.

12       Q    FAIR ENOUGH.  OKAY.

13            MR. ARCHEY:  YOUR HONOR, I WOULD SUGGEST

14   THIS IS A NICE PLACE FOR A BREAK, OR I CAN KEEP

15   GOING, OF COURSE, AT THE COURT'S PLEASURE.

16            THE COURT:  NO, LET'S TAKE A 15-MINUTE

17   RECESS.

18            (WHEREUPON, A RECESS WAS TAKEN.)

19            THE COURT:  BE SEATED.  YOU MAY PROCEED.

20            MR. ARCHEY:  THANK YOU, YOUR HONOR.

21   BY MR. ARCHEY:

22       Q    MS. GOEHRING, LET'S TURN TO THE CHARTS NOW,

23   IF WE MAY.  I WANT TO BEGIN WITH PATIENT NO. 20.  ARE

24   YOU READY OR I NEED TO GIVE YOU A SECOND?

25       A    YES.

1      Q    OKAY.  PATIENT NO. 20, HE SUFFERED FROM

2   HEPATITIS C, HEPATITIS B, HYPERTENSION, GASTRO REFLUX

3   DISEASE AND LIVER CANCER.  CORRECT?

4      A    CORRECT.

5      Q    ALL RIGHT.  I WANT TO LOOK AT NOW

6   JX_20.0091.  THIS IS THAT TRIP RETURN THAT YOU SPOKE

7   ABOUT.  RIGHT?

8      A    CORRECT.

9      Q    ALL RIGHT.  BETWEEN -- YOU SAY HE WAS --

10  CAME BACK ON SEPTEMBER 22, 2021.  CORRECT?

11     A    THAT'S WHAT IT SAYS THERE, YES.

12     Q    ALL THESE ORDERS WERE NOT FILLED UNTIL

13  NOVEMBER 2, 2021.  RIGHT?

14     A    CORRECT.  THE MEDICATION ORDERS WEREN'T, NO.

15     Q    LET'S LOOK AT THE EMARs AS WELL.  LET'S GO

16  TO JX_68.2878, AND LET'S LOOK THROUGH THE NEXT COUPLE

17  OF PAGES.  THESE DOCUMENTS ARE ALSO SHOWING THAT

18  THOSE MEDICATIONS WERE NOT FILLED UNTIL NOVEMBER 2,

19  AND THEN YOU SEE THEM COME ON.  IS THAT RIGHT?

20     A    CORRECT.

21     Q    ALL RIGHT.  DO YOU KNOW WHERE HE WAS BETWEEN

22  SEPTEMBER 22 AND NOVEMBER 2?

23     A    NO, I DO NOT.

24          MR. ARCHEY:  BROOKE, CAN YOU PULL UP

25  JX_20.0103.

1  BY MR. ARCHEY:

2      Q    MA'AM, ISN'T IT TRUE HE WAS AT THE HOSPITAL

3  THAT WHOLE TIME AND HE WAS DISCHARGED ON OCTOBER 31,

4  2021?

5      A    YES.  CORRECT.

6      Q    SO THAT EXPLAINS WHY THOSE ORDERS WERE NOT

7  FILLED UNTIL AFTER HE GOT BACK FROM THE HOSPITAL.

8  RIGHT?

9      A    CORRECT.

10     Q    YOU JUST MISREAD THE CHART?

11     A    WELL, BUT THERE IS A RETURN -- TRIP RETURN

12  DATED 9/22.  AND THIS SAYS THAT HE WAS ADMITTED ON

13  9/21, WHICH WOULD MEAN THAT HE WAS DISCHARGED, SO

14  IT'S CONFLICTING.

15     Q    YOU DID NOT SEE THIS HOSPITAL RECORD

16  INDICATING THAT HE WAS ACTUALLY IN THE HOSPITAL FOR

17  THAT WHOLE PERIOD OF TIME THAT YOU TOLD THE COURT YOU

18  DIDN'T KNOW WHERE HE WAS AND THOSE ORDERS WERE NOT

19  FILLED.  RIGHT?

20     A    CORRECT.

21     Q    YOU WERE WRONG?

22     A    YES.

23     Q    LET'S GO TO PATIENT NO. 22 NOW.  I'D LIKE TO

24  GO TO PAGE NUMBER -- WELL, BEFORE I DO THAT, THIS IS

25  THE GENTLEMAN THAT EVENTUALLY CHOKES ON A PIECE OF

1  SAUSAGE IN A ROOM.  RIGHT?  IS THAT RIGHT?

2      A    CORRECT.

3      Q    MAKE SURE WE UNDERSTOOD.

4          MR. ARCHEY:  I'D LIKE TO GO TO DOCUMENT NO.

5  JX_22.0674.  I'M SORRY.  THAT'S WRONG.  0683.

6  BY MR. ARCHEY:

7      Q    ALL RIGHT, MA'AM.  THERE IS A -- THEY

8  PERFORMED A SWALLOW STUDY WHEN HE WAS IN THE

9  HOSPITAL.  CORRECT?

10     A    CORRECT.

11         MR. ARCHEY:  AND NOW GO FORWARD TO --

12 BROOKE, GO FORWARD TO THE NEXT PAGE, PLEASE.  GO BACK

13 ONE, PLEASE.  GO TO --

14 BY MR. ARCHEY:

15     Q    ALL RIGHT, MA'AM.  THIS IS MORE OF THE

16 SWALLOW STUDY.  IT SAYS "TRIAL FEEDING

17 CONSISTENCIES."  DO YOU SEE THAT?

18     A    YES.

19     Q    AND GO TO THE NEXT PAGE.  YOU REALIZE HE WAS

20 RETURNED TO HIS NORMAL DIET AT THE END OF THIS VISIT?

21     A    I DIDN'T SEE A DIET ORDER.  I JUST SAW THE

22 RECOMMENDATION FOR THE MECHANICAL SOFT DIET.

23     Q    RIGHT.  AND DID YOU SEE WHERE HE WAS

24 RETURNED TO HIS NORMAL DIET?

25     A    AT THE HOSPITAL OR AT THE PRISON?

1    Q    AT THE HOSPITAL.

2    A    NO.

3         MR. ARCHEY:  LET'S GO TO 674.  LET'S TRY

4    THAT.  I'M SORRY, YOUR HONOR.  THIS IS ALL ON THE FLY

5    A LITTLE BIT.  MY APOLOGIES, YOUR HONOR.

6    BY MR. ARCHEY:

7    Q    ALL RIGHT.  MA'AM, IF YOU LOOK DOWN AT THE

8    DIET INSTRUCTIONS, DO YOU SEE THAT?

9    A    RETURN TO THE ADULT HOME DIET TYPE?

10   Q    YES, MA'AM.

11   A    IT SAYS "RETURN TO PREVIOUS DIET."

12   Q    YES, MA'AM.  SO HE WAS ALLOWED TO RETURN TO

13   HIS PREVIOUS DIET FROM BEFORE THE HOSPITAL.  RIGHT?

14   A    WHICH WAS?

15   Q    WHICH WAS NO RESTRICTIONS.

16   A    I'D HAVE TO SEE WHAT THE "NO RESTRICTIONS"

17   WAS.

18   Q    OKAY.  SO -- BUT IT WASN'T THE MECHANICAL

19   DIET THAT YOU REFERENCED.  THIS SUPERSEDED THAT.

20   RIGHT?

21   A    WOULD YOU ASK ME THAT AGAIN, PLEASE?

22   Q    YES, MA'AM.  THIS SUPERSEDED THAT MECHANICAL

23   DIET THAT YOU WERE REFERRING TO EARLIER?

24   A    THIS IS DATED 6/2, AND THAT IS THE DISCHARGE

25   THAT THE SUMMARY SAID THE MECHANICAL DIET WAS

1   RECOMMENDED, YES.

2       Q    THIS HERE ON THE DISCHARGE SAYS "RETURN TO

3   PREVIOUS DIET."  IT SUPERSEDES THE MECHANICAL DIET.

4   RIGHT?

5       A    SO THERE IS A CONFLICT WITH THE DISCHARGE

6   SUMMARY, YES.

7       Q    FROM THE HOSPITAL RECORDS?

8       A    YES.

9       Q    LET'S GO TO PATIENT 50 NOW.  ARE YOU READY?

10      A    YES.

11      Q    THIS WAS A DIFFICULT PATIENT, IN YOUR OWN

12  WORDS.  RIGHT?

13      A    CHALLENGING PATIENT, YES.

14      Q    OKAY, CHALLENGING.  HE HAD MANY REFUSALS

15  INCLUDING REFUSALS FOR HIS WOUND CARE.  CORRECT?

16      A    CORRECT.

17      Q    AND HE WAS A MENTAL HEALTH PATIENT.  RIGHT?

18      A    CORRECT.

19      Q    AND, IN FACT, HE WAS A MENTAL HEALTH PATIENT

20  EVEN BEFORE HE ASKED TO SEE DR. GAMBLE, WASN'T HE?

21      A    I DON'T HAVE THAT RECORD BECAUSE I WAS ONLY

22  PROVIDED THE RECORDS FROM 2019 FORWARD.  SO ANYTHING

23  PRIOR TO THAT I DIDN'T HAVE.

24      Q    WELL, YOU REFERENCED AN AUGUST OF 2019

25  ENCOUNTER WHERE HE ASKED TO SEE DR. GAMBLE.  RIGHT?

1      **A**    THAT'S CORRECT.

2      **Q**    LET'S GO TO PX_50 -- JX_50.0196.  MA'AM,

3   THIS IS JUNE OF 2019.  HE'S BEEN SEEN BY MENTAL

4   HEALTH AT THAT TIME.  ISN'T THAT RIGHT?

5      **A**    IF YOU COULD MAKE THAT A LITTLE BIT LARGER.

6      **Q**    SURELY, MA'AM.

7      **A**    THANK YOU.  YES, THIS IS THE CLINICIAN NOTE

8   SURROUNDING HIS ACCUSATION.

9      **Q**    AND HE HAD ALREADY BEEN DIAGNOSED AS A

10   SCHIZOPHRENIC PRIOR TO THIS DAY.  ISN'T THAT RIGHT?

11      **A**    I'M NOT SEEING THE DIAGNOSIS OF

12   SCHIZOPHRENIA ON THIS DOCUMENT.

13      **Q**    OKAY.  MA'AM, THOSE ARE MY QUESTIONS.

14          **MR. ARCHEY:**  THANK YOU, YOUR HONOR.

15          **THE COURT:**  ANY REDIRECT?

16          **MS. MONTAGNES:**  BRIEFLY, YOUR HONOR.

17          IF WE COULD -- HI, MS. GOEHRING.  COULD

18   WE PULL UP JX_22.682, PLEASE.

19                **REDIRECT EXAMINATION**

20   BY MS. MONTAGNES:

21      **Q**    MS. GOEHRING, I'M GOING TO TURN YOUR

22   ATTENTION TO THE BOTTOM RIGHT HERE.  AND IT APPEARS

23   THIS RECORD WAS PRINTED ON 6/2.  IS THAT RIGHT?

24      **A**    YES, AT 12:31 P.M.

25      **Q**    THAT WAS THE SAME DAY AS HE WAS DISCHARGED.

1   IS THAT RIGHT?

2        **A**    THAT'S CORRECT.

3        **Q**    OKAY.  AND IT SAYS RIGHT HERE "ACUTE SPEECH

4   THERAPY BEDSIDE SWALLOW EVALUATION."  IS THAT RIGHT?

5        **A**    CORRECT.

6        **Q**    AND IF WE COULD GO TO JX_22.683.  IS THAT

7   THE CONTINUATION OF THAT RECORD?

8        **A**    COULD YOU FLIP IT BACK, PLEASE?  I'M SORRY.

9        **Q**    GO BACK.

10       **A**    YES.

11       **Q**    NOW GO TO THE NEXT PAGE.  IS THAT THE --

12  PLEASE TAKE YOUR WATER.

13       **A**    YES, THAT'S PAGE -- THE FIRST PAGE WAS 17.

14  THIS IS PAGE 18 OF 19, YES.

15       **Q**    SO ON 6/2, WHAT WAS THE -- THE DAY THAT MR.

16  ARCHEY -- THAT COUNSEL SHOWED YOU EARLIER, WHAT WAS

17  THE RECOMMENDATION OF THE SPEECH PATHOLOGIST?

18       **A**    COULD YOU ASK ME THAT AGAIN, PLEASE?

19       **Q**    WHAT WAS THE RECOMMENDATION ON 6/2, THE DAY

20  OF HIS DISCHARGE, WITH RESPECT TO HIS DIET?

21       **A**    THAT -- MECHANICAL SOFT.

22       **Q**    COULD WE TURN TO JX_50.196.  AND THIS WAS

23  THE MENTAL HEALTH STATUS THAT COUNSEL SHOWED YOU

24  EARLIER.  IS THAT RIGHT?

25       **A**    YES.

**1**      Q    AND IF WE COULD JUST LOOK AT -- ON THE FIRST

**2**  LINE THERE IS THE WORD "PREA."

**3**      A    IF YOU COULD --

**4**      Q    WHAT IS YOUR UNDERSTANDING OF WHAT THIS NOTE

**5**  IS?

**6**      A    COULD YOU PLEASE MAKE THAT JUST A LITTLE BIT

**7**  BIGGER?  THANK YOU.

**8**      Q    SURE.

**9**      A    BECAUSE HE HAD MADE AN ALLEGATION AGAINST

**10** STAFF ABOUT INAPPROPRIATENESS.

**11**     Q    SO IS THIS -- YOUR UNDERSTANDING IS THAT

**12** THIS IS A -- THIS IS AN INVESTIGATION INTO HIS

**13** ALLEGATION?

**14**     A    THAT'S CORRECT.

**15**     Q    THANK YOU.  LET'S TURN TO JX_68.2879.  SO

**16** THIS IS REGARDS TO PATIENT NO. 20.  THESE ARE HIS

**17** MEDICATION ADMINISTRATION RECORDS.  MR. ARCHEY IS

**18** SUGGESTING THAT HE WAS IN THE HOSPITAL FOR ALL OF

**19** OCTOBER.  WHAT, IF ANYTHING, IS DOCUMENTED ON HERE

**20** THAT CONTRADICTS THAT?

**21**     A    THAT THE PATIENT WAS THERE AND RECEIVED HIS

**22** KEEP-ON-PERSON MEDICATIONS.

**23**     Q    AND IF WE COULD TURN TO JX_20.91.  WHAT, IF

**24** ANYTHING ON THIS DOCUMENT SUGGESTS THAT THE PATIENT

**25** WAS RETURNED TO --

1      A    IT SAYS THAT HE WAS RETURNED ON 9/22 AND

2  ADMITTED TO THE NURSING UNIT.

3      Q    WHAT'S HIS LOCATION LISTED AS?

4      A    IT IS C BEAR 2.

5      Q    LET'S PULL UP PLAINTIFF'S EXHIBIT 34D.  ALL

6  RIGHT.  COUNSEL SHOWED YOU A NUMBER OF MEETINGS,

7  QA/QI MEETINGS.  THIS IS A MEETING -- IT LOOKS LIKE

8  IT'S DATED 7/9/21.  IS THAT WHAT YOU'RE APPRECIATING

9  AS WELL, MS. GOEHRING?

10     A    YES.

11     Q    HOW MANY PEOPLE ATTENDED THAT MEETING?

12     A    JUST FIVE.

13     Q    IS DR. TOCE THERE?

14     A    NO.

15     Q    IS MR. JOHNSON THERE?

16     A    NO.

17     Q    IS MR. CASHIO THERE?

18     A    NO.

19     Q    ARE MANY OF THE LEADERS WHO WERE AT THE

20  LATER MEETINGS THERE?

21     A    NO.

22     Q    LET'S GO TO 34D AT 8.  HOW MANY PEOPLE

23  ATTENDED THIS MEETING?

24     A    THREE.

25     Q    IS DR. TOCE THERE?

1      A      NO.

2      Q      IS MR. JOHNSON THERE?

3      A      NO.

4      Q      ARE MANY OF THE OTHER PEOPLE AT THE OTHER

5 MEETINGS THERE?

6      A      CORRECT.  NO.

7      Q      OKAY.  LET'S GO TO 34D-7.  HOW MANY PEOPLE

8 ATTENDED THIS MEETING?

9      A      FOUR.

10      Q      LET'S GO TO 34D-6.  HOW MANY PEOPLE ATTENDED

11 THIS MEETING?

12      A      THREE.

13      Q      LET'S GO TO 34D-5.  HOW MANY PEOPLE ATTENDED

14 THIS MEETING?

15      A      AGAIN, THREE.

16      Q      IS DR. TOCE THERE?

17      A      NO.

18      Q      IS THERE A SINGLE DOCTOR THERE?

19      A      NO.

20      Q      IS THERE A SINGLE PROVIDER THERE?

21      A      NO.

22      Q      LET'S GO TO 34D-3.  SORRY.  YEAH.  IS

23 DR. TOCE THERE?

24      A      NO.

25      Q      IS THERE A SINGLE PROVIDER THERE?

1      **A**    NO.

2      **Q**    IN YOUR EXPERIENCE, EVERY SICK CALL

3   ENCOUNTER ENDS WITH A PROVIDER.  IS THAT RIGHT?

4      **A**    THAT'S THE END STEP, CORRECT.

5      **Q**    OKAY.  SO JUST TO PUT A FINE POINT ON THIS,

6   THE FACT THAT THE SICK CALL AT LSP IS ENDING WITH A

7   NURSE PRACTITIONER, IS THAT ABOVE OR -- IS THAT ABOVE

8   THE STANDARD OF CARE?

9      **A**    NO, IT'S NOT ABOVE.  IT MUST BE A PROVIDER

10  FOR THE END SETS AT THE END.

11     **Q**    DID YOU SEE ANY EVIDENCE IN THE DOCUMENTS OF

12  RNs TRIAGING SICK CALLS?

13     **A**    NO.

14     **Q**    DID YOU SEE ANY EVIDENCE IN THE CHARTS OF

15  RNs BRINGING A PATIENT WHO NEEDED TO BE SEEN SOONER

16  FORWARD?

17     **A**    NO.

18     **Q**    IN YOUR EXPERIENCE, IS THE LEADERSHIP OF AN

19  INSTITUTION FAMILIAR WITH ITS BUDGET?

20     **A**    YES.

21     **Q**    ARE YOU AWARE OF ANY -- ARE YOU AWARE OF ANY

22  REFERENCES TO ILLICIT DRUGS WITHIN THE ATTACHMENT C,

23  THE CHART REVIEWS THAT THE EXPERTS PERFORMED?

24     **A**    YES.

25     **Q**    WHAT STANDARD DID YOU USE TO EVALUATE LSP'S

1   HEALTH CARE?

2       **A**   IT'S A COMBINATION OF THINGS.  ACA, NCCHC,

3   GENERAL ACCEPTED PRACTICE WITHIN A CORRECTIONAL

4   ENVIRONMENT.

5           SO THE REASON THAT YOU LOOK AT THE STANDARDS

6   IS THAT IT'S -- THEIR MISSION IS TO KEEP PATIENTS

7   SAFE AND TO REDUCE RISK.  AND THEY CERTAINLY DON'T

8   COVER EVERY ASPECT OF A HEALTH SERVICES OPERATIONAL

9   PROGRAM, BUT THEY DO A LOT, AND SO IT'S JUST -- IT'S

10  A HELPFUL GUIDE TO USE IN LOOKING AT THE VARIOUS

11  PIECES.

12          AT THE END OF THE DAY, YOU KNOW, THE MINIMAL

13  STANDARD IS ABOUT PATIENT SAFETY AND IT'S ABOUT

14  REDUCING RISK.

15      **Q**   THANK YOU, MS. GOEHRING.

16          **THE COURT:**  OKAY.  DOES THAT CONCLUDE THIS

17  WITNESS?

18          **MS. MONTAGNES:**  WE'D LIKE TO RESERVE THE

19  RIGHT TO RECALL HER.

20          **THE COURT:**  YOU MAY STEP DOWN.  THANK YOU.

21              NEXT WITNESS.

22          **MR. HAMILTON:**  YOUR HONOR, BRUCE HAMILTON

23  FOR THE PLAINTIFFS.  WE WOULD CALL DR. DANIEL BRADY.

24  HE'S BEEN SEQUESTERED, SO WE'RE JUST PULLING HIM IN.

25

1      **THE COURT:**  COUNSEL, MAKE YOUR APPEARANCE,

2   PLEASE.

3      **MR. HAMILTON:**  BRUCE HAMILTON FOR THE

4   PLAINTIFFS, YOUR HONOR.

5      **THE COURT:**  SIR, IF YOU'LL COME RIGHT UP

6   HERE, PLEASE.

7      **(WHEREUPON, DANIEL BRADY, M.D., BEING DULY**

8   **SWORN, TESTIFIED AS FOLLOWS.)**

9                 **DIRECT EXAMINATION**

10  BY MR. HAMILTON:

11     **Q**   GOOD AFTERNOON, DR. BRADY.

12     **A**   GOOD AFTERNOON.

13     **Q**   PLEASE STATE YOUR FULL NAME FOR THE RECORD.

14     **A**   DANIEL BRADY.

15     **Q**   AND WHAT IS YOUR OCCUPATION?

16     **A**   I WORK AS A HOSPITALIST AT UNIVERSITY

17  MEDICAL CENTER IN TULANE.

18     **Q**   I'D LIKE TO TALK WITH YOU BRIEFLY ABOUT YOUR

19  PROFESSIONAL AND EDUCATIONAL BACKGROUND.  WHERE DID

20  YOU GO TO MEDICAL SCHOOL?

21     **A**   I WENT TO MEDICAL SCHOOL AT STATE UNIVERSITY

22  OF NEW YORK IN BROOKLYN, NEW YORK.

23     **Q**   FOLLOWING MEDICAL SCHOOL, WHAT TRAINING DID

24  YOU RECEIVE?

25     **A**   I WENT TO RESIDENCY AT TULANE.

1    Q    DO YOU HAVE ANY BOARD CERTIFICATIONS?

2    A    IN INTERNAL MEDICINE, YES.

3    Q    AND THAT IS YOUR SPECIALIST -- SPECIALTY?

4    A    YES, IT IS.

5    Q    WHAT IS A HOSPITALIST?

6    A    SO A HOSPITALIST IS BASICALLY AN INTERNAL

7    MEDICINE DOCTOR THAT WORKS IN THE HOSPITAL WITH

8    HOSPITALIZED PATIENTS, NOT IN THE CLINIC.

9    Q    IN ADDITION TO BEING A DOCTOR AT UMC, DO YOU

10   HOLD ANY OTHER EMPLOYMENT POSITIONS?

11   A    I'M A CLINICAL INSTRUCTOR FOR TULANE MEDICAL

12   SCHOOL, BUT THAT SORT OF GOES WITH THE JOB.

13   Q    HOW MANY YEARS HAVE YOU BEEN PRACTICING

14   MEDICINE AT UMC?

15   A    AS A RESIDENT I WAS THERE FROM 2017 TO 2020,

16   AND THEN STARTING IN AUGUST OF 2020 I STARTED WORKING

17   AS AN ATTENDING PHYSICIAN THERE.

18        THE REPORTER:  I'M SORRY, SIR.  COULD YOU

19   SPEAK RIGHT INTO THE MIC?

20        THE WITNESS:  YES.  SORRY.

21   BY THE WITNESS:

22   A    FROM 2017 TO 2020 I WAS A RESIDENT WORKING

23   AT UMC, AND THEN STARTING IN AUGUST OF 2020 I STARTED

24   WORKING AS AN ATTENDING.

25   Q    AND WHAT TYPES OF POPULATIONS DO YOU SERVE

1  AT UMC?

2     **A**   SO LIKE I SAID, I TAKE CARE OF PATIENTS WHEN

3  THEY COME INTO AND ARE ADMITTED TO THE HOSPITAL.  IN

4  GENERAL WE'RE KNOWN AS A SAFETY-NET HOSPITAL IN NEW

5  ORLEANS, SO WE HAVE A LOT OF UNDER-INSURED, UNINSURED

6  PATIENTS, ALSO INCARCERATED PATIENTS THAT COME FROM

7  ALL OVER THE STATE.

8     **Q**   SPEAKING OF WORKING WITH AND TREATING

9  INCARCERATED PATIENTS, WHAT PRISONS ARE THE

10  INCARCERATED PEOPLE YOU TREAT COMING FROM?

11     **A**   AS FAR AS I KNOW, THEY COME FROM ALL OVER

12  THE STATE.  ANGOLA IS OBVIOUSLY ONE OF THE PLACES.

13  WE HAVE A LOT OF PATIENTS THAT COME FROM THERE.  HUNT

14  IS ANOTHER ONE I CAN THINK OF, ANOTHER PATIENT THIS

15  PAST WEEK FROM RAYBURN, SO SORT OF ALL OVER.

16     **Q**   DO YOU TREAT A LOT OF PATIENTS FROM ANGOLA?

17     **A**   YES, I WOULD SAY SO.

18     **Q**   HOW OFTEN?

19     **A**   I MEAN, ON A REGULAR BASIS I USUALLY HAVE A

20  PATIENT LIST OF AROUND 16.  OF THOSE, TYPICALLY THERE

21  ARE A FEW PATIENTS THAT ARE INCARCERATED.  NOT ALWAYS

22  FROM ANGOLA BUT I WOULD SAY OFTEN.

23     **Q**   AND HOW DO YOU KNOW THAT THEY ARE PATIENTS

24  FROM ANGOLA?

25     **A**   WELL, FIRST OF ALL, USUALLY THEY'RE ABLE TO

1   TELL US WHERE THEY STAY AND WHERE THEY'RE COMING

2   FROM.  BUT WHEN WE ADMIT THEM TO THE ER, YOU KNOW,

3   THEY COME WITH PAPERWORK AND USUALLY ARE TOLD, YOU

4   KNOW, "THIS PATIENT IS COMING FROM THIS FACILITY."

5        Q    HOW MANY PATIENTS FROM ANGOLA WOULD YOU

6   ESTIMATE YOU'VE TREATED SINCE JANUARY OF 2019?

7        A    I WOULD HAVE A HARD TIME PUTTING A NUMBER ON

8   THAT.

9        Q    WOULD YOU SAY MORE THAN 50?

10       A    YEAH, I WOULD SAY MORE THAN 50.

11       Q    DO THE PATIENTS YOU TREAT FROM ANGOLA HAVE

12   PARTICULAR HEALTH ISSUES THAT YOU'VE NOTICED?

13       A    I WOULD SAY THAT, YOU KNOW, THEY HAVE

14   SIMILAR HEALTH ISSUES TO THE GENERAL POPULATION.  I

15   WOULD SAY ONE OF THE THINGS I HAVE NOTICED IS THAT

16   OFTENTIMES THEY WILL COME IN AT SORT OF LATE STAGES

17   OF DISEASE OR WHEN THINGS HAVE PROGRESSED A LITTLE

18   BIT FARTHER THAN, YOU KNOW, SOMEONE COMING IN JUST

19   THROUGH THE ER.

20       Q    OKAY.  I'D LIKE TO TALK TO YOU ABOUT YOUR

21   PERSONAL EXPERIENCES AND OBSERVATIONS TREATING

22   PATIENTS FROM ANGOLA.  AND I WANT TO TRY TO CABIN

23   YOUR ANSWERS TO JUST SINCE JANUARY OF 2019.

24       A    OKAY.

25       Q    WHAT HAVE YOU OBSERVED WITH RESPECT TO THOSE

1   PARTICULAR PATIENTS?

2     **A**   I -- LIKE I SORT OF JUST MENTIONED, I'VE

3   OBSERVED THAT OFTENTIMES THEY'LL COME IN AT LATE

4   STAGES OF THEIR DISEASE, SOMETIMES WITH DELAYED

5   DIAGNOSES.

6     **Q**   LATE STAGES OF A DISEASE AND -- I'M SORRY?

7   LATE STAGES --

8     **A**   WITH -- AND DELAYED DIAGNOSES, YES.  SORT OF

9   THEY GO HAND IN HAND, I WOULD SAY, BUT --

10    **Q**   COULD YOU EXPLAIN WHAT YOU MEAN BY THAT?

11    **A**   YEAH.  SO, YOU KNOW, OBVIOUSLY WE WANT TO

12  CATCH THINGS EARLY ON SO THAT WE CAN TREAT THEM

13  BETTER.  BUT WHEN SOMEONE COMES IN WITH, SAY, A

14  CANCER OR AN INFECTION THAT'S PROGRESSED TO THE POINT

15  THAT IT HAS SPREAD, YOU KNOW, OTHER PLACES THAT WE

16  HAVEN'T WANTED IT TO GO, IT MAKES IT HARDER TO TREAT.

17  AND I HAVE NOTICED THAT AMONGST INCARCERATED

18  PATIENTS.

19    **Q**   HAVE YOU -- SO YOU MENTIONED TREATING

20  PATIENTS FROM ANGOLA WHO HAD DELAYS IN DIAGNOSIS.  DO

21  YOU HAVE ANY PARTICULAR EXAMPLES?

22    **A**   ONE THAT HAS ALWAYS REALLY STUCK OUT TO ME

23  IS A PATIENT I TOOK CARE OF SOMETIME IN THE FALL OF

24  LAST YEAR -- FALL INTO WINTER.  I DON'T REMEMBER THE

25  MONTH.  BUT IT WAS A GENTLEMAN THAT HAD COME IN WITH

1  COMPLICATIONS FROM STAGE IV LUNG CANCER THAT HAD

2  SPREAD ALL OVER HIS BODY.

3          AND WHEN I WENT BACK AND LOOKED AT THE

4  CHART, HE HAD HAD A CHEST X-RAY AND A CT SCAN ABOUT

5  NINE MONTHS PRIOR THAT SHOWED A LARGE LUNG MASS THAT

6  HE DIDN'T END UP SEEING AN ONCOLOGIST FOR OR GETTING

7  A BIOPSY FOR UNTIL ABOUT SIX MONTHS AFTER THAT TIME,

8  EVEN THOUGH IT WAS SORT OF VERY OBVIOUS THAT THIS

9  COULD HAVE BEEN A LUNG CANCER.  AND BY THE TIME THAT

10  I WAS TAKING CARE OF HIM IN THE HOSPITAL, HE -- THE

11  CANCER HAD SPREAD EVERYWHERE, AND THE ONLY THING WE

12  COULD REALLY OFFER HIM WAS HOSPICE AND COMFORT CARE.

13  HE WASN'T A CANDIDATE FOR CHEMO OR RADIATION OR ANY

14  SORT OF THERAPY BECAUSE IT HAD BEEN, YOU KNOW, SO FAR

15  GONE.

16      Q    AND SO DID YOU OFFER HIM HOSPICE CARE?

17      A    YES, WE DID.

18      Q    AND WHAT ULTIMATELY HAPPENED WITH THAT

19  PATIENT?

20      A    THAT PATIENT UNFORTUNATELY ENDED UP PASSING

21  AWAY IN THE HOSPITAL.  I WAS TRYING TO COORDINATE

22  WITH THE MEDICAL DIRECTOR OVER AT ANGOLA TO TRY TO

23  SEE IF WE COULD MAYBE GET HIM BACK TO THEIR HOSPICE

24  UNIT OR SOMEWHERE CLOSER TO HIS DAUGHTER OR SOMEWHERE

25  SO HIS DAUGHTER COULD VISIT, SO -- BUT HE PASSED IN

1   THE HOSPITAL.

2       **Q**   DO YOU REMEMBER THAT PATIENT'S NAME?

3       **A**   I DO NOT RECALL HIS NAME, NO.

4       **Q**   WHAT IMPACT DOES DELAYED DIAGNOSIS HAVE ON

5   MEDICAL CARE?

6       **A**   I GUESS, YOU KNOW, THAT WAS A PRETTY GOOD

7   EXAMPLE OF, YOU KNOW, THE FACT THAT IF WE CATCH

8   THINGS SOMETIMES TOO LATE, THERE MIGHT NOT BE A CURE,

9   SO THAT'S I THINK THE BIGGEST CONCERN.

10      **Q**   DO YOU HAVE ANY OTHER EXAMPLES OF THAT WITH

11  RESPECT TO PATIENTS FROM ANGOLA?

12      **A**   THAT WAS THE EXAMPLE THAT STUCK OUT IN MY

13  MIND THE MOST, JUST BECAUSE IT WAS SUCH AN

14  UNFORTUNATE SITUATION.

15          I REMEMBER A PATIENT WHO DIDN'T HAVE

16  MALIGNANCY BUT HAD ENDOCARDITIS, WHICH IS AN

17  INFECTION OF THE HEART VALVE, WHO CAME IN WITH, YOU

18  KNOW, AN INFECTION THAT SPREAD INTO HIS LUNGS.  HE

19  HAD ABSCESSES ALL OVER HIS ARMS, HIS LIMBS.  AND IT

20  WAS VERY DIFFICULT TO GET HIS BLOOD CULTURES TO CLEAR

21  FROM THE INFECTION, BECAUSE IT HAD SPREAD TO SO MANY

22  PLACES AND THERE WERE SO MANY POCKETS OF INFECTION

23  THAT ANTIBIOTICS THEMSELVES COULD NOT TREAT.

24          SO I'M NOT SURE WHAT ENDED UP HAPPENING TO

25  HIM.  I TOOK CARE OF HIM FOR ABOUT A WEEK AND THEN

1    WENT OFF SERVICE.

2        Q    AND HOW LONG AGO WAS THAT?

3        A    I WANT TO SAY THAT WAS THE BEGINNING OF THIS

4    YEAR, MAYBE JANUARY OR FEBRUARY.

5        Q    AND HOW DO YOU REMEMBER THAT PATIENT WAS

6    FROM ANGOLA?

7        A    IT WAS ONE OF THE WORST CASES OF

8    ENDOCARDITIS THAT I HAD SEEN.  I JUST REMEMBER THE

9    PATIENT HIMSELF, AND I HAD REMEMBERED BECAUSE I WAS

10   THERE WHEN HE WAS ADMITTED FROM THE ER.

11       Q    WHEN YOU TREAT PATIENTS WHO HAVE A PRIMARY

12   CARE PROVIDER, DO YOU COORDINATE WITH THAT PROVIDER?

13       A    AS MUCH AS WE CAN.  IT'S OBVIOUSLY NICE TO

14   DO THAT.  THE EASIEST IS WHEN THEY SEE THEIR PRIMARY

15   CARE DOCTOR AT UNIVERSITY, BECAUSE I COULD JUST, YOU

16   KNOW, SEE THE RECORDS.  I KNOW A LOT OF THEM THAT I

17   CAN REACH OUT TO.

18            BUT IF THEY'RE COMING FROM, YOU KNOW, THE

19   COMMUNITY, I CAN ALSO SORT OF REACH OUT TO THEM AND

20   SOMETIMES HAVE ACCESS TO THE RECORDS OF THOSE PRIMARY

21   CARE PROVIDERS.

22       Q    AND WHEN YOU RECOMMEND FOLLOW-UP TO YOUR

23   PATIENTS, DO YOU KNOW IF -- TO YOUR PATIENTS

24   FROM ANGOLA -- DO YOU KNOW IF THEY'RE GETTING IT?

25       A    SO THE WAY THAT IT WORKS IS WHEN WE

1  DISCHARGE PATIENTS AT ANGOLA, WE PUT IN -- THERE IS A

2  LITTLE SECTION WE CAN WRITE IN THE DISCHARGE

3  INSTRUCTIONS TO SAY "I WANT THIS PATIENT TO FOLLOW UP

4  WITH, SAY, CARDIOLOGY IN THIS TIME FRAME."  BUT WE'RE

5  NOT ABLE TO ACTUALLY SCHEDULE THOSE APPOINTMENTS AT

6  DISCHARGE.

7      Q    SO WHAT ISSUES WITH FOLLOW-UP DO YOU NOTICE

8  WITH ANGOLA PATIENTS?

9      A    SO I TYPICALLY LIKE TO HAVE FOLLOW-UP

10  SCHEDULED FOR PATIENTS WHEN I SEND THEM HOME FROM THE

11  HOSPITAL SO I KNOW -- YOU KNOW, THEY KNOW THAT

12  THIS -- I KNOW THAT THEY'RE GOING TO SEE THIS PERSON

13  IN THIS TIME FRAME.  IT CAN BE SORT OF DIFFICULT TO

14  SCHEDULE AT UNIVERSITY JUST BECAUSE IT'S SUCH A BUSY

15  PLACE.  SO AT LEAST KNOWING THAT THEY HAVE A FOLLOW-

16  UP APPOINTMENT WITH SOMEONE IS SORT OF REASSURING

17  WHEN I SEND SOMEONE HOME.

18          SO WITH ANGOLA PATIENTS I DON'T HAVE THAT

19  ABILITY TO SCHEDULE THOSE APPOINTMENTS, SO I CAN'T

20  FOR SURE SAY THEY'RE GOING TO SEE THIS PERSON.

21      Q    ARE YOU ABLE TO COORDINATE CARE FOR PATIENTS

22  FROM ANGOLA WITH HEALTH CARE PROVIDERS AT THE PRISON?

23      A    YEAH.  I'VE BEEN IN COMMUNICATION WITH THE

24  MEDICAL DIRECTOR THERE FOR CERTAIN PATIENTS, SORT OF

25  FIGURING OUT *CAN YOU GIVE THIS MEDICINE WHEN I SEND*

1    *THIS PATIENT BACK?* OR THINGS LIKE THAT, LIKE WHAT

2    THEY CAN OFFER THERE.

3        **Q**    DO PROVIDERS AT ANGOLA CONTACT YOU WHEN THE

4    PATIENTS -- YOUR PATIENTS DEVELOP CONCERNING

5    SYMPTOMS?

6        **A**    I CAN'T RECALL A TIME THAT I WAS CONTACTED

7    SPECIFICALLY.

8        **Q**    WHAT IMPACT DOES A LACK OF FOLLOW-UP HAVE ON

9    MEDICAL CARE?

10       **A**    SO OBVIOUSLY OUR GOAL IS TO KEEP PATIENTS

11   OUT OF THE HOSPITAL.  SO THE WAY WE DO THAT IS, YOU

12   KNOW, HAVING GOOD PRIMARY CARE, GOOD OUT-PATIENT

13   FOLLOW-UP FOR PATIENTS, SO -- TO TAKE CARE OF THEIR

14   MEDICAL PROBLEMS SO THAT THEY DON'T END UP, YOU KNOW,

15   NEEDING TO BE HOSPITALIZED AND TAKEN CARE OF BY ME IN

16   THE HOSPITAL.

17           SO NOT HAVING THAT SET UP, OBVIOUSLY PEOPLE

18   WILL PRESENT AT LATE STAGES OF DISEASE WITH MORE

19   COMPLICATIONS, AND IT MAKES IT HARDER TO TREAT THEM.

20       **Q**    AND IS LACK OF FOLLOW-UP CARE A PROBLEM WITH

21   PATIENTS FROM ANGOLA?

22       **A**    I THINK SO, YES.  I'VE NOTICED FOR THAT --

23   FOR EXAMPLE, FOR THAT PATIENT THAT I TOLD YOU ABOUT

24   EARLIER, HE NEVER SAW AN ONCOLOGIST UNTIL SIX MONTHS

25   AFTER THAT LUNG MASS WAS FOUND AND DIDN'T GET A

1  BIOPSY UNTIL SIX MONTHS AFTER.  SO TYPICALLY IF WE

2  WOULD SEE THAT, WE WOULD GET SOMEONE IN PRETTY

3  QUICKLY.

4       Q    WOULD YOU SAY LACK OF FOLLOW-UP IS A COMMON

5  PROBLEM WITH PATIENTS FROM ANGOLA?

6       A    I THINK SO, YES.

7       Q    WHEN YOU SEE PATIENTS FROM ANGOLA, DO YOU

8  HAVE ACCESS TO THEIR MEDICAL RECORDS FROM THE PRISON?

9       A    FROM THE PRISON, NO.  THEY DO COME OVER, I

10 WOULD SAY, WITH USUALLY A COUPLE PAPERS THAT HAVE A

11 LIST OF MEDICINES THAT THEY TAKE.  MAYBE A LITTLE BIT

12 OF A BLUR, BUT WHY THEY WERE BEING SENT OVER.  BUT

13 ALL THEIR MEDICAL RECORDS, NO, I DO NOT HAVE ACCESS

14 TO THAT.

15      Q    WHY DON'T YOU HAVE ACCESS TO THE MEDICAL

16 RECORDS?

17      A    I'M NOT SURE.  YOU KNOW, UNFORTUNATELY IT'S

18 SORT OF HARD TO GET RECORDS FROM OTHER PLACES OUTSIDE

19 OF OUR SYSTEM.

20      Q    DO THE MEDICAL RECORDS THEY DO -- THE

21 PATIENTS FROM ANGOLA DO BRING, DO THOSE HAVE THE

22 NECESSARY DOCUMENTS YOU NEED TO TREAT THEM?

23      A    IT'S OBVIOUSLY HELPFUL HAVING THEIR

24 MEDICINES, THEIR MEDICATION LIST.  BUT IT WOULD BE

25 HELPFUL TO, YOU KNOW, SEE WHAT WAS GOING ON NOT JUST

1   TODAY WHEN THEY WERE SENT TO THE ER BUT, YOU KNOW,

2   WHAT'S BEEN GOING ON WITH THEIR OTHER MEDICAL

3   CONDITIONS FOR THE LAST SEVERAL MONTHS TO YEARS.

4       Q    WHY DO YOU NEED THAT INFORMATION?

5       A    IT HELPS US AS PHYSICIANS JUST KNOWING, YOU

6   KNOW, WHY WERE THEY ON THESE MEDICINES, WHY WERE THEY

7   STARTED, WHY MAYBE THEY AREN'T ON SOME, SO THAT WE

8   CAN TREAT THEM, YOU KNOW, AS BEST AS WE CAN.

9       Q    ARE YOU ABLE TO COMMUNICATE WITH PROVIDERS

10  AT ANGOLA?

11      A    YES.

12      Q    HOW DO YOU COMMUNICATE WITH THEM?

13      A    I TYPICALLY JUST CALL IF I HAVE A QUESTION.

14      Q    WHO HAVE YOU SPOKEN TO THERE?

15      A    I KNOW I HAD SPOKEN TO DR. LAVESPERE BEFORE.

16  I'M BLANKING ON THE NAME OF THE CURRENT MEDICAL

17  DIRECTOR, BUT I HAVE SPOKEN TO HIM OVER THE PHONE AS

18  WELL.

19      Q    YOU MENTIONED THAT PATIENTS FROM ANGOLA HAVE

20  RECORDS OF THE MEDICATIONS THAT THEY'RE RECEIVING.

21      A    UH-HUH.

22      Q    DO THE RECORDS YOU RECEIVE SHOW WHEN AND

23  WHERE THEY'RE GETTING THEIR MEDICATIONS?

24      A    I WOULD SAY, YOU KNOW, IT HAS A LIST AND HOW

25  FREQUENTLY THEY'RE TAKING THEM, HOW THEY'RE

1   PRESCRIBED.  SO I CAN SEE THAT.

2       **Q**   ARE THE MEDICATIONS THAT YOUR PATIENTS FROM

3   ANGOLA RECEIVE -- ARE THE MEDICATIONS -- I'M SORRY --

4   THAT YOUR PATIENTS FROM ANGOLA RECEIVE, ARE THOSE

5   APPROPRIATE?

6       **A**   SOME OF THE TIME.  I HAVE NOTICED SOME

7   TRENDS WITH SOME OF THE MEDS THAT -- MEDICATIONS THAT

8   PEOPLE COME ON -- COME IN WITH.  ONE IN PARTICULAR

9   EXAMPLE, THERE WAS -- I NOTICE THAT A LOT OF PATIENTS

10  ARE PLACED ON A MEDICINE CALLED KEPPRA OR

11  LEVETIRACETAM, WHICH IS USED AS A SEIZURE MEDICINE

12  AND DOESN'T REALLY HAVE AN INDICATION FOR OTHER

13  MEDICAL CONDITIONS.

14          AND I'VE SEEN A LOT OF PEOPLE WITHOUT

15  SEIZURES THAT ARE ON THAT MEDICINE AND HAVE ALWAYS

16  BEEN A LITTLE BIT CONFUSED ABOUT THAT, IN PARTICULAR

17  BECAUSE THE MAIN SIDE EFFECT OF THAT MEDICINE IS --

18  SORT OF CAN EXACERBATE UNDERLYING PSYCHIATRIC

19  CONDITIONS.  AND OBVIOUSLY THAT'S PRETTY PREVALENT IN

20  THE INCARCERATED POPULATION, SO I'VE ALWAYS -- I'VE

21  NOTICED THAT FOR THAT REASON.  SO THAT'S ONE THING

22  I'VE BEEN CONFUSED ABOUT IN TERMS OF THE MEDICATIONS.

23      **Q**   HAVE YOU ASKED PROVIDERS AT ANGOLA WHY

24  KEPPRA IS SO WIDELY PRESCRIBED?

25      **A**   I CAN'T RECALL A TIME THAT I SPECIFICALLY

1  ASKED.  I KNOW THAT I HAD ASKED A RESIDENT TO CALL

2  ONCE AND ASKED, YOU KNOW, WHY ARE THEY ON THIS.  AND

3  THEY WEREN'T ABLE TO GIVE ME AN ANSWER, BUT I DIDN'T

4  CALL MYSELF, SO ...

5      Q    DO YOU KNOW WHETHER YOUR PATIENTS FROM

6  ANGOLA GET MEDICATIONS THAT YOU PRESCRIBE?

7      A    SO WE USUALLY WILL DO WHAT'S CALLED A

8  MEDICATION RECONCILIATION WHEN WE DISCHARGE SOMEONE.

9  SO WE'LL SAY, YOU KNOW, WE'D LIKE THEM TO BE ON THESE

10  MEDICINES.  SO AS FAR AS I KNOW WHEN I SEND THEM BACK

11  TO ANGOLA, THAT THEY SHOULD BE RECEIVING THOSE

12  MEDICINES.  BUT OBVIOUSLY IF -- AS WE JUST DISCUSSED,

13  I DON'T HAVE RECORDS, SO ...

14      Q    IN YOUR EXPERIENCE, ARE THE PATIENTS YOU SEE

15  FROM ANGOLA ANY LESS INTERESTED IN GETTING BETTER

16  THAN OTHER PATIENTS?

17      A    NO, I WOULDN'T SAY THAT.

18      Q    IN YOUR EXPERIENCE, DO THEY EXAGGERATE THEIR

19  SYMPTOMS?

20      A    NO, I WOULDN'T SAY THAT.

21      Q    DO THEY SEEK CARE THAT THEY DON'T NEED?

22      A    I DON'T THINK SO, NO.

23      Q    HAVE YOU EVER HAD A PATIENT FROM ANGOLA

24  REFUSE CARE?

25      A    I MEAN, WE HAVE PATIENTS ALL THE TIME THAT

1 WILL OCCASIONALLY, SAY, REFUSE MEDICATIONS, BUT I

2 WOULDN'T SAY REFUSE CARE ALTOGETHER.  NOT THAT I CAN

3 REMEMBER.

4     Q    DOCTOR, BASED ON YOUR EXPERIENCES, WHAT

5 CONCLUSIONS HAVE YOU FORMED ABOUT THE MEDICAL CARE AT

6 ANGOLA?

7     A    I GUESS ONE OF THE MAIN CONCERNS I HAVE IS

8 REALLY THE FOLLOW-UP SITUATION, SO I AM CONCERNED

9 THAT THEY'RE NOT FOLLOWING UP WITH SUBSPECIALISTS IN

10 A TIMELY FASHION.  ALSO CONCERNED THAT SOMETIMES

11 THEY'RE PRESENTING QUITE SICK AND QUITE DELAYED WHEN

12 WE'D PROBABLY LIKE TO SEE THEM IN THE HOSPITAL A

13 LITTLE BIT EARLIER.  AND THEN SORT OF ALSO WHEN IT

14 COMES TO THE MEDICATIONS, I'M SOMETIMES CONFUSED

15 ABOUT THEIR MEDICATION LIST AND WHY THEY'RE ON THE

16 THINGS THAT THEY'RE ON.

17     Q    WHAT RECOMMENDATIONS WOULD YOU MAKE TO

18 IMPROVE THE MEDICAL CARE AT ANGOLA?

19     A    I THINK, AT LEAST FOR US TO TREAT THEM

20 BETTER IN THE HOSPITAL, IT WOULD BE NICE -- YOU KNOW,

21 IT WOULD BE NICE TO HAVE ACCESS TO THE RECORDS.  IT

22 WOULD BE NICE TO SCHEDULE THEN FOLLOW-UP

23 APPOINTMENTS.

24          IN TERMS OF THE ACTUAL MEDICAL CARE THERE,

25 IT MAY BE JUST HAVING NEW PROVIDERS OR DIFFERENT

1   PROVIDERS, A BIGGER VARIETY TAKING CARE OF THEM

2   THERE, JUST BECAUSE I AM A LITTLE BIT CONCERNED ABOUT

3   SOME OF THE MEDICINES THAT THEY GET PUT ON AND WHY.

4        Q    DOCTOR, WHY ARE YOU TESTIFYING HERE TODAY?

5        A    I'M TESTIFYING JUST BECAUSE I AM CONCERNED

6   ABOUT, YOU KNOW, THE CARE THAT OUR INCARCERATED

7   PATIENTS RECEIVE.  I TAKE CARE OF A LOT OF THEM ON A

8   REGULAR BASIS, AND IT'S OBVIOUSLY HARD TO WATCH WHEN

9   THEY'RE MAYBE NOT RECEIVING THE MOST IDEAL MEDICAL

10  CARE.

11       Q    THANK YOU, DOCTOR.  THAT'S ALL MY QUESTIONS.

12            **THE COURT:**  CROSS.

13            **MR. ROBERT:**  YES.

14                     **CROSS-EXAMINATION**

15  BY MR. ROBERT:

16       Q    GOOD AFTERNOON, DR. BRADY.

17       A    GOOD AFTERNOON.

18       Q    GOOD TO SEE AGAIN.

19       A    GOOD TO SEE YOU.

20       Q    I JUST WANT TO FOLLOW UP ON A FEW THINGS

21  WITH YOU.  FIRST OF ALL, YOU HAVE A WORKING

22  RELATIONSHIP WITH MS. KUMAR.  CORRECT?

23       A    A WORKING RELATIONSHIP?

24       Q    YEAH.

25       A    CAN YOU CLARIFY?

1    Q   Y'ALL HAVE WORKED TOGETHER ON THIS

2 COMPASSIONATE RELEASE PROJECT.  CORRECT?

3    A   YEAH, I WAS ASKED, YOU KNOW, SEVERAL MONTHS

4 AGO JUST TO GIVE TESTIMONY ABOUT AN EXAMPLE OF A

5 ISSUE WITH A COMPASSIONATE RELEASE CASE.  ASIDE FROM

6 THAT, I HAVEN'T WORKED WITH MS. KUMAR.

7    Q   THAT'S HOW YOU CAME TO BE INVOLVED IN THIS

8 CASE; YOU WERE CONTACTED BY MS. KUMAR?

9    A   CORRECT.

10    Q   AND WHEN WE MET, THAT WAS MARCH OF THIS

11 YEAR.  RIGHT?

12    A   YEAH.

13    Q   AND WHEN WE MET IN MARCH, I ASKED YOU, I

14 SAID, "CAN YOU GIVE ME THE NAMES OF ANY OF THE

15 PATIENTS THAT YOU TREATED AT ANGOLA IN THE LAST TWO

16 YEARS"?

17    A   UH-HUH.

18    Q   AND YOU COULDN'T GIVE ME THE NAME OF A

19 SINGLE PATIENT, COULD YOU?

20    A   NO, I DON'T BELIEVE SO.

21    Q   OKAY.  AND I ASKED YOU IF YOU COULD GIVE ME

22 THE DATES OF ANY OF THE PATIENTS THAT YOU'VE SEEN

23 FROM ANGOLA, YOU KNOW, YOU SAID YOU APPROXIMATE ABOUT

24 50 PATIENTS THAT YOU'VE SEEN.  I ASKED YOU ABOUT

25 DATES AND YOU COULDN'T GIVE ME THAT.  CORRECT?  YOU

1   COULDN'T GIVE ME ANY INFORMATION ON THAT.  RIGHT?

2       A    YEAH, I COULDN'T GIVE YOU EXACT DATES, NO.

3       Q    AND YOU INDICATED TO ME THAT YOU HAD SEEN

4   PATIENTS BOTH BEFORE AND AFTER 2019 THAT CAME FROM

5   ANGOLA.  CORRECT?

6       A    CORRECT.

7       Q    AND I ASKED YOU IF YOU COULD PROVIDE ME ANY

8   SPECIFICS ABOUT THE TREATMENT THAT YOU PROVIDED TO

9   PATIENTS AT ANGOLA, AND YOU TOLD ME -- INITIALLY YOU

10  SAID YOU DIDN'T KNOW ANY SPECIFICS.  CORRECT?

11      A    CAN YOU REPEAT THAT?

12      Q    I ASKED YOU IF YOU COULD PROVIDE ME THE

13  SPECIFICS OF ANY TREATMENT THAT YOU GAVE TO PATIENTS

14  AT ANGOLA, AND INITIALLY YOU TOLD ME YOU COULDN'T

15  GIVE ME ANY SPECIFICS.  IS THAT CORRECT?

16      A    SPECIFICS IN TERMS OF A PARTICULAR PATIENT

17  OR -- I DON'T RECALL HOW I ANSWERED THAT.  I'M A

18  LITTLE BIT CONFUSED BY THE QUESTION.

19      Q    LET'S PULL UP -- THIS MAY REFRESH YOUR

20  RECOLLECTION -- PAGE 17 AT LINES 46.

21           DO YOU SEE AT LINE 4 MY QUESTION WAS:  "SO

22  YOU CAN'T GIVE ME ANY KIND OF SPECIFIC TREATMENT THAT

23  YOU'VE GIVEN ANYBODY.  RIGHT?

24           "NOW RIGHT NOW I CAN'T RECALL."

25      A    YEAH, I SEE THAT.

1    Q    IS THAT THE TESTIMONY THAT YOU GAVE ME?

2    A    YES.

3    Q    OKAY.  AND I ASKED YOU THEN, I SAID, "SINCE

4  WE CAN'T TALK ABOUT SPECIFICS, WHAT ARE YOUR GENERAL

5  OBSERVATIONS AND WHAT ARE THE PROBLEMS THAT YOU SAW

6  AT ANGOLA?"  AND YOU IDENTIFIED TWO THINGS WHEN I

7  TALKED TO YOU.  ONE WAS FOLLOW-UP?

8    A    UH-HUH.

9    Q    AND THE OTHER ONE WAS DELAYED DIAGNOSIS?

10   A    UH-HUH.

11   Q    AND WE TALKED ABOUT -- YOU TALKED ABOUT THAT

12  WITH --

13   A    YES.

14   Q    -- MR. HAMILTON TODAY.  CORRECT?

15   A    YES.

16   Q    BUT YOU DIDN'T GIVE ME ANY OTHER INFORMATION

17  ABOUT ANYTHING ELSE THAT WAS A PROBLEM OTHER THAN, IN

18  YOUR OPINION, WAS FOLLOW-UP AND DELAYED DIAGNOSIS.

19  ISN'T THAT CORRECT?

20   A    YES.  AT THE TIME I HAD NOT SAID ANYTHING

21  ELSE.

22   Q    AND WHEN I ASKED YOU ABOUT THOSE GENERAL

23  OBSERVATIONS, WHETHER THOSE WERE SPECIFIC TO ANGOLA

24  OR PUBLIC IN GENERAL OR WHAT HAVE YOU, YOU SAID IT

25  WAS THAT THAT OBSERVATION RELATED TO INCARCERATED

1   PATIENTS.  DO YOU REMEMBER THAT?

2        A    YEAH.

3        Q    AND I ASKED YOU, I SAID, "SO YOU'RE NOT

4   LIMITING YOUR TESTIMONY ABOUT THIS PARTICULAR ISSUE

5   TO -- SPECIFICALLY TO PEOPLE AT ANGOLA?"

6             AND YOU SAID, "NO."  CORRECT?

7        A    YEAH.  I THINK SIMILAR ISSUES ARE PRESENT

8   IN -- WITH ALL OF OUR INCARCERATED PATIENTS, YES.

9        Q    AND THEN WHEN WE TALKED FURTHER, YOU DID

10  RECALL THE ONE PATIENT --

11       A    UH-HUH.

12       Q    -- WITH THE MASS IN HIS LUNG?

13       A    UH-HUH.

14       Q    THAT YOU SAID YOU HAD SEEN A FEW MONTHS

15  EARLIER --

16       A    UH-HUH.

17       Q    -- AND THAT YOU THOUGHT HE WAS -- HAD AN

18  ISSUE WITH DELAYED DIAGNOSIS?

19       A    CORRECT.

20       Q    OKAY.  AND I ASKED YOU WHETHER YOU COULD

21  CONFIRM THAT THAT PATIENT CAME FROM ANGOLA, AND YOU

22  TOLD ME YOU COULD NOT WITHOUT THE CHART.  CORRECT?

23       A    YEAH.  I WOULD SAY THAT -- I THINK I DID SAY

24  I COULDN'T, YOU KNOW, A HUNDRED PERCENT CONFIRM THAT

25  HE WAS FROM THERE.

1          I DO RECALL, THOUGH, AT THAT TIME SPEAKING

2     TO THE MEDICAL DIRECTOR, SO I THINK THAT'S WHY I'M

3     QUITE CONFIDENT HE WAS AT ANGOLA.

4          **Q**    AND I ASKED YOU TO GIVE ME THE NAME, AND YOU

5     COULDN'T GIVE ME THE NAME.  CORRECT?

6          **A**    YEAH, I DON'T RECALL HIS NAME STILL.

7          **Q**    WELL, HAVE YOU GONE BACK AND LOOKED AT THE

8     CHART ON THAT PATIENT SINCE WE LAST TALKED?

9          **A**    NO, I HAVEN'T.  AND TYPICALLY I DON'T -- I'M

10    NOT SUPPOSED TO DO THAT UNLESS I'M TAKING CARE OF

11    THEM IN THE HOSPITALS.

12         **Q**    SO THERE IS NOTHING THAT HAS REFRESHED YOUR

13    MEMORY REGARDING THAT PATIENT SINCE THE TIME WE HAD

14    YOUR DEPOSITION.  CORRECT?

15         **A**    YEAH.  BUT I HAVEN'T GONE BACK IN HIS CHART,

16    NO, YEAH.

17         **Q**    AND AGAIN I ASKED YOU IN YOUR DEPOSITION "DO

18    YOU HAVE ANY OTHER OBSERVATIONS BEYOND FOLLOW-UP AND

19    DELAYS IN DIAGNOSIS?"

20         AND YOU TOLD ME "NO."  DO YOU RECALL THAT?

21         **A**    I DON'T RECALL, BUT I'M SURE THAT'S TRUE.

22         **Q**    I MEAN, BECAUSE WE CAN BRING UP YOUR

23    DEPOSITION.

24         **A**    YEAH, YEAH, YEAH.

25         **Q**    BUT YOU'RE NOT GOING TO DISAGREE WITH ME ON

1  THAT.  RIGHT?

2      A    NO, I DO NOT DISAGREE WITH YOU.

3      Q    OKAY.  AND SO NOW WE TALKED ABOUT FOLLOW-UP

4  AND ISSUES WITH FOLLOW-UP.  AND THE ONLY SPECIFICS OF

5  ANYTHING TO DO WITH FOLLOW-UP OR WITH ANYTHING IS ONE

6  PATIENT THAT WE TALKED ABOUT, THE LUNG CANCER

7  PATIENT.  CORRECT?

8      A    YEAH.  THAT WAS AN EXAMPLE THAT I HAD GIVEN,

9  YES.

10     Q    AND YOU COULDN'T GIVE ME ANY MORE EXAMPLES

11 OTHER THAN THAT ONE.  CORRECT?

12     A    YES.  SO I COULDN'T GIVE YOU ANY SPECIFIC

13 EXAMPLES, NO.

14     Q    AND I ASKED YOU SPECIFICALLY IN YOUR

15 DEPOSITION TO TRY TO REMEMBER ANY EXAMPLES YOU CAN

16 GIVE ME; I WANT TO KNOW ABOUT?

17          MR. HAMILTON:  YOUR HONOR, ASKED AND

18 ANSWERED.  HE'S ARGUING WITH THE WITNESS AT THIS

19 POINT.

20          THE COURT:  OVERRULED.

21     Q    IS THAT CORRECT?  DID I SPECIFICALLY ASK YOU

22 THAT?

23     A    I BELIEVE YOU DID, YEAH.

24     Q    NOW, YOU TALKED HERE TODAY -- DESPITE THAT,

25 YOU TALKED ABOUT MEDICATIONS AND APPROPRIATENESS OF

1  MEDICATIONS.  CORRECT?

2      **A**   DID WE SPEAK ABOUT THAT --

3      **Q**   TODAY HERE.

4      **A**   TODAY WE DID TALK ABOUT THAT, YEAH.

5      **Q**   YOU CAN'T GIVE ME THE SPECIFICS OTHER THAN

6  YOU THINK KEPPRA IS PRESCRIBED MORE OFTEN THAN IT

7  SHOULD BE?

8      **A**   YES.  THAT'S JUST ONE SPECIFIC EXAMPLE THAT

9  I CAN THINK OF.

10     **Q**   YOU SAID SOMETHING ABOUT THAT THEY OUGHT TO

11  GET NEW PROVIDERS?  DID YOU KNOW THAT THERE ARE AT

12  LEAST FOUR NEW PROVIDERS AT --

13     **A**   NOPE, I DIDN'T -- I DID NOT KNOW THAT.

14     **Q**   -- ANGOLA?

15     **A**   NO, I DID NOT KNOW.

16     **Q**   AND YOU TALKED WITH MR. HAMILTON ABOUT YOUR

17  COMMUNICATIONS WITH DR. LAVESPERE.  AND WHEN I TOOK

18  YOUR DEPOSITION I ASKED YOU ABOUT THAT, AND YOU SAID

19  THAT HE WAS HELPFUL AND RESPONSIVE TO YOUR CALLS.  DO

20  YOU RECALL THAT?

21     **A**   YEAH, HE DOES -- YEAH, HE TYPICALLY WILL BE

22  RESPONSIVE TO OUR CALLS, YES.

23     **Q**   AND YOU DIDN'T RECALL THE NAME OF THE

24  MEDICAL -- THE MEDICAL DIRECTOR AT ANGOLA, BUT HIS

25  NAME IS DR. TOCE.  DO YOU REMEMBER THAT NAME?

1    **A**   YEAH, THAT DOES SOUND FAMILIAR, NOW THAT YOU

2    SAY IT, YEAH.

3    **Q**   I ASKED YOU ABOUT HIM, AND YOU SAID THAT HE

4    WAS HELPFUL AND RESPONSIVE TO YOUR CALLS.  CORRECT?

5    **A**   CORRECT.

6    **Q**   AND AS FAR AS MEDICAL RECORDS ARE CONCERNED,

7    YOU'D LIKE TO SEE ELECTRONIC MEDICAL RECORDS?

8    **A**   CORRECT.

9    **Q**   THAT'S ASSUMING THAT IS CONNECTED WITH UMC,

10   BECAUSE YOU INDICATED HERE TODAY THAT SOMETIMES YOU

11   HAVE TROUBLE GETTING RECORDS FROM OTHER PROVIDERS.

12   CORRECT?

13   **A**   UH-HUH.

14   **Q**   SO THAT'S NOT ANYTHING SPECIFIC TO ANGOLA.

15   CORRECT?

16   **A**   YEAH, I THINK IT'S -- IN GENERAL IT'S A

17   PROBLEM, YEAH.

18   **Q**   OKAY.

19        **MR. ROBERT:**  THAT'S ALL I HAVE, YOUR HONOR.

20        **THE COURT:**  OKAY.  REDIRECT.

21        **MR. HAMILTON:**  BRIEFLY, YOUR HONOR.

22            **REDIRECT EXAMINATION**

23   BY MR. HAMILTON:

24   **Q**   DOCTOR, WE'VE TALKED A LITTLE BIT ABOUT A

25   PATIENT THAT YOU RECALL WHO HAD A MASS IN HIS LUNG

1  FROM ANGOLA.  AFTER GIVING YOUR DEPOSITION, DID YOU

2  RECALL ADDITIONAL DETAILS ABOUT THIS PATIENT?

3      A    YES.  I MEAN, I RECALL, YOU KNOW -- ACTUALLY

4  I THINK, YOU KNOW, MOST OF WHAT WE TALKED ABOUT TODAY

5  IS WHAT I REMEMBER ABOUT HIS CASE, YEAH.

6      Q    DID YOU THINK ABOUT THAT CASE A LITTLE AFTER

7  THE DEPOSITION?

8      A    YEAH, OF COURSE.  BECAUSE WE HAD TALKED, YOU

9  KNOW, BROUGHT IT BACK UP.

10     Q    AND WHAT MADE IT MEMORABLE TO YOU?

11     A    I MEAN, I THINK, YOU KNOW, AS DOCTORS WE

12 OFTEN REMEMBER CASES WHERE THE MEDICAL SYSTEM HAS

13 FAILED THEM.  AND THAT OBVIOUSLY HAPPENED WITH HIM,

14 SO THAT ALWAYS STICKS OUT IN MY MIND; THAT, YOU KNOW,

15 IF WE COULD HAVE CAUGHT THIS EARLIER, YOU KNOW, YOU

16 REMEMBER PATIENTS LIKE THAT.  SO THAT'S, YOU KNOW,

17 WHY I REMEMBER HIM SO WELL.

18     Q    AND DID YOU RECALL AFTER THE DEPOSITION

19 ARRANGING HOSPICE CARE FOR HIM?

20     A    YEAH.  I WAS IN COMMUNICATION, YOU KNOW, ON

21 A DAILY BASIS FOR ALMOST A WEEK WITH THE MEDICAL

22 DIRECTOR THERE TO FIGURE OUT, YOU KNOW, HOW WE CAN

23 GET THIS PATIENT INTO HOSPICE AND HIS DAUGHTER TO SEE

24 HIM.  SO I THINK THAT'S WHY I RECALL THAT.  I'M

25 PRETTY CONFIDENT HE WAS AT ANGOLA.

1      Q    DID YOU WITHHOLD ANY INFORMATION FROM

2   MR. ROBERT AT YOUR DEPOSITION?

3      A    I DON'T -- NO, I DON'T THINK SO.

4      Q    DID MR. ROBERT ASK YOU ABOUT MEDICATION

5   DELIVERY AT ANGOLA?

6      A    NOT THAT I RECALL.

7      Q    YOU TESTIFIED A LITTLE BIT ABOUT THE

8   PROBLEMS THAT YOU'VE SEEN WITH INCARCERATED PATIENTS.

9   AND I BELIEVE YOU TESTIFIED THAT SOME OF THE PROBLEMS

10  YOU'VE NOTICED WITH PATIENTS FROM ANGOLA ARE ALSO

11  TRUE WITH PATIENTS FROM OTHER PRISONS?

12     A    UH-HUH.  YEAH.

13     Q    IN YOUR MIND, DOES THAT MAKE THE PROBLEM --

14  DOES THAT CHANGE THE PROBLEM WITH -- AT ANGOLA?

15     A    NO.  I DON'T THINK SO, NO.

16     Q    THANK YOU.

17     A    YEAH.  THANK YOU.

18          THE COURT:  THANK YOU.  THANK YOU,

19  DR. BRADY.  YOU MAY STEP DOWN.

20               IS DR. BRADY RELEASED FROM HIS SUBPOENA

21  OR DO YOU NEED HIM FOR RECALL?

22          MS. MONTAGNES:  HE'S RELEASED, YOUR HONOR.

23          THE COURT:  OKAY.  THANK YOU, SIR.

24               NEXT WITNESS.

25          MS. KUMAR:  WE JUST NEED TO GET HER, YOUR

1  HONOR.  SHE'S BEING SEQUESTERED.

2           **THE COURT:**  COULDN'T HEAR THAT.

3           **MR. HAMILTON:**  THE OTHER WITNESS IS BEING

4  SEQUESTERED AS WELL, YOUR HONOR.

5           **MS. MONTAGNES:**  THE NEXT WITNESS IS IN THE

6  HALLWAY.  WE'RE JUST GETTING HER BECAUSE SHE WAS

7  BEING SEQUESTERED.

8           **THE COURTROOM DEPUTY:**  WHAT'S HER NAME?

9           **MS. MONTAGNES:**  DR. MARCIA GLASS.

10          AND, YOUR HONOR, IF IT'S HELPFUL, I CAN

11  PREVIEW FOR YOU THAT WE'LL HAVE DR. GLASS AND THEN

12  WE'LL HAVE MR. BUTLER, WHO'S JOINING US FROM LSP

13  TODAY, AND THEN THE PLAINTIFFS WILL REST.

14          **THE COURT:**  GREAT NEWS.  THANK YOU.

15          **MS. MONTAGNES:**  AND I WILL MENTION THAT WE

16  DIDN'T ANTICIPATE RESTING.  WE'VE GONE A LITTLE

17  QUICKER TODAY THAN WE ANTICIPATED.  BUT I TAKE IT THE

18  DEFENDANTS WILL BE READY TOMORROW MORNING, IF THAT'S

19  OKAY WITH YOUR HONOR.

20          **MR. ROBERT:**  WE'LL BE READY.

21          **THE COURT:**  THEY'RE GOING TO HAVE TO BE

22  READY TOMORROW, BECAUSE THAT'S THE WAY WE'RE GOING TO

23  ROLL.

24          WHO WILL BE TAKING THE EXAMINATION OF

25  DR. GLASS?  YOU MAY STEP RIGHT UP HERE, MA'AM.

1        **MS. MONTAGNES:** MS. KUMAR WILL BE TAKING THE

2   EXAMINATION, YOUR HONOR.

3        **THE COURT:** DR. GLASS, RIGHT HERE.  AND

4   SHE'S GOING TO SWEAR YOU IN.

5        **(WHEREUPON, MARCIA GLASS, M.D., BEING DULY**

6   **SWORN, TESTIFIED AS FOLLOWS.)**

7        **THE COURTROOM DEPUTY:** WOULD YOU PLEASE

8   STATE YOUR NAME AND SPELL IT FOR THE RECORD, PLEASE.

9        **THE WITNESS:** MARCIA GLASS.  M-A-R-C-I-A

10  GLASS, G-L-A-S-S.

11       **THE COURT:** GO AHEAD, MS. KUMAR.

12       **MS. KUMAR:** NISHI KUMAR FOR THE PLAINTIFFS.

13                  **DIRECT EXAMINATION**

14  BY MS. KUMAR:

15       **Q**   GOOD AFTERNOON, DR. GLASS.

16       **A**   GOOD AFTERNOON.

17       **Q**   CAN YOU TELL THE COURT WHAT YOU DO FOR A

18  LIVING?

19       **A**   I'M A PHYSICIAN AND I WORK AT UMC HOSPITAL

20  AND THE VA OF NEW ORLEANS.

21       **Q**   WHERE DID YOU GO TO MEDICAL SCHOOL?

22       **A**   GEORGETOWN MEDICAL SCHOOL.

23       **Q**   AND WHEN DID YOU START PRACTICING?

24       **A**   IN 2003.

25       **Q**   SO HOW MANY YEARS AGO WAS THAT?

1      **A**    NINETEEN.

2      **Q**    WHAT TRAINING OR RESIDENCY DID YOU DO

3   FOLLOWING MEDICAL SCHOOL?

4      **A**    I DID AN INTERN YEAR AND RESIDENCY IN

5   INTERNAL MEDICINE AT BOTH TULANE AND UNIVERSITY OF

6   CALIFORNIA SAN FRANCISCO.

7      **Q**    WHAT YEAR WAS THAT?

8      **A**    BETWEEN 2003 AND 2006.

9      **Q**    DO YOU HAVE ANY BOARD CERTIFICATIONS?

10     **A**    YES.  I AM BOARD CERTIFIED IN INTERNAL

11  MEDICINE WITH A FOCUS IN HOSPITAL MEDICINE AND

12  PALLIATIVE CARE AND IN ADDICTION MEDICINE.

13     **Q**    WHAT IS YOUR SPECIALTY?

14     **A**    MY PRIMARY SPECIALTY IS INTERNAL MEDICINE,

15  BUT I HAVE SUBSPECIALIZATION IN PALLIATIVE CARE AND

16  ADDICTION MEDICINE.

17     **Q**    HOW MANY YEARS HAVE YOU WORKED AT UMC?

18     **A**    FIVE YEARS.

19     **Q**    DO YOU TREAT INCARCERATED PATIENTS AT UMC?

20     **A**    YES.

21     **Q**    DO YOU KNOW WHAT FACILITY YOUR INCARCERATED

22  PATIENTS ARE COMING FROM?

23     **A**    YES.  THEY'RE GENERALLY FROM ANGOLA AND

24  HUNT.

25     **Q**    AND HOW DO YOU KNOW WHAT FACILITY THEY'RE

1   COMING FROM?

2       **A**    IT'S USUALLY LISTED IN THE ER NOTES.  AND IF

3   IT ISN'T, THEN WE ASK THE PATIENT MOST OF THE TIME,

4   YEAH.

5       **Q**    ABOUT HOW MANY INCARCERATED PATIENTS FROM

6   ANGOLA HAVE YOU TREATED BETWEEN 2019 AND PRESENT?

7       **A**    APPROXIMATELY 50.

8       **Q**    HOW OFTEN ARE YOU ON SERVICE AT UMC?

9       **A**    APPROXIMATELY ONE WEEK PER MONTH.

10      **Q**    WHAT DOES IT MEAN TO BE ON SERVICE?

11      **A**    ABOUT HALF MY JOB IS ADMINISTRATIVE AND HALF

12  MY JOB IS CLINICAL.  WHEN I'M ON MY ADMINISTRATIVE

13  TIME I'M GENERALLY WORKING FROM AN OFFICE.  WHEN I'M

14  ON MY CLINICAL TIME I'M PHYSICALLY IN THE HOSPITAL.

15      **Q**    WHAT IS IT LIKE TREATING AN INCARCERATED

16  PATIENT?

17      **A**    IT'S DIFFERENT THAN TREATING OUR OTHER

18  PATIENTS BECAUSE THEY'RE IN SHACKLES IN A LOCKDOWN

19  UNIT.  IT'S GENERALLY VERY HARD TO COMMUNICATE WITH

20  ANY FAMILY MEMBERS.  AND SINCE THERE ISN'T AN

21  ELECTRONIC RECORD, WE DON'T USUALLY HAVE RECORDS

22  ABOUT WHAT IS GOING ON WITH THESE PATIENTS.

23          IT'S ALSO VERY HARD TO GET FOLLOW-UP

24  APPOINTMENTS FOR THESE PATIENTS, AND THERE IS NO --

25  THERE IS NO WAY TO TELL WHAT THE FORMULARY IS IN THE

1  PRISONS, SO A LOT OF TIMES WE CAN'T DISCHARGE THEM ON

2  THE MEDICINES WE NORMAL DO.

3      Q    WHAT IS THE DEMEANOR OF YOUR PATIENTS FROM

4  ANGOLA?

5      A    OVERALL VERY RESPECTFUL.  THERE IS A

6  PRETTY -- THERE IS A PRETTY BIG POWER DIFFERENTIAL.

7  THEY TEND TO AGREE WITH ANYTHING WE SUGGEST.  A LOT

8  OF THEM ARE PRETTY SCARED.

9      Q    DO YOU REMEMBER THE NAMES OF ANY SPECIFIC

10 PATIENTS FROM ANGOLA THAT YOU'VE TREATED?

11     A    NO, NOT SPECIFICALLY.

12     Q    WHAT DO YOU REMEMBER ABOUT YOUR PATIENTS?

13     A    I REMEMBER THEIR CHIEF COMPLAINTS, WHICH IS

14 THE ISSUE THAT BROUGHT THEM INTO THE HOSPITAL, AND

15 THEIR STORIES.  AND SOMETIMES I REMEMBER THE TESTS WE

16 RAN ON THEM AND WHAT OUR DIFFERENTIAL DIAGNOSIS AND

17 TREATMENT PLAN WAS.

18     Q    CAN YOU DESCRIBE THE DIFFERENT KINDS OF

19 CONDITIONS YOUR PATIENTS FROM ANGOLA ARE PRESENTING

20 WITH WHEN THEY COME TO UMC?

21     A    YEAH.  OUR PATIENTS COME IN PRETTY SICK

22 BECAUSE IT'S -- YOU HAVE TO BE QUITE SICK TO GET

23 ADMITTED AS AN IN-PATIENT TO UMC.  AND A LOT OF TIMES

24 THEY HAVE COMPLICATIONS FROM HIGH BLOOD PRESSURE,

25 LIKE STROKES, UNCONTROLLED DIABETES.  SOMETIMES IT'S

1   A LATE PRESENTATION OF CANCER OR DISEASES LIKE

2   DEMENTIA; THAT SORT OF THING.

3        Q    WHAT STEPS DO YOU TAKE WHEN YOU'RE

4   EVALUATING A PATIENT FROM ANGOLA?

5        A    FIRST WE INTERVIEW THEM AND FIGURE OUT WHAT

6   BROUGHT THEM TO THE HOSPITAL, ASSUMING THAT THEY'RE

7   ABLE TO TELL US THAT.  SOMETIMES THEY'RE TOO SICK TO.

8   AND THEN WE TRY TO CONTACT THE FACILITY THEY CAME

9   FROM AND GET AS MUCH INFORMATION WE CAN, BECAUSE,

10  LIKE I MENTIONED, THERE IS NO ELECTRONIC MEDICAL

11  RECORD, SO WE CAN'T REALLY READ ANY NOTES.

12       Q    DO YOU TAKE THE PATIENT'S HISTORY?

13       A    YES.

14       Q    WHAT DOES TAKING THE PATIENT'S HISTORY

15  CONSIST OF?

16       A    THAT INVOLVES ASKING A PATIENT WHAT BROUGHT

17  HIM OR HER TO THE HOSPITAL AND THEN GOING THROUGH A

18  DETAILED REVIEW OF ALL THE SYMPTOMS THEY'VE BEEN

19  EXPERIENCING, HOW LONG THEY'VE BEEN GOING ON, WHETHER

20  THEY'VE SOUGHT MEDICAL TREATMENT IN THE PAST, WHETHER

21  THEY'VE TRIED ANY TREATMENTS, WHETHER THOSE

22  TREATMENTS HELPED, WHAT THEIR MEDICAL HISTORY IS AS

23  FAR AS THEY KNOW, WHAT MEDICATIONS THEY'RE TAKING,

24  ALLERGIES, FAMILY HISTORY OF ILLNESS, AND SOCIAL

25  HISTORY AS FAR AS THINGS THAT COULD BE CONTRIBUTING

1  TO THE ILLNESS.

2      **Q**    YOU MENTIONED A CHIEF COMPLAINT EARLIER.

3  WOULD IT EVER BE APPROPRIATE TO WRITE "DRUG SEEKING"

4  AS A CHIEF COMPLAINT?

5      **A**    NO.

6      **Q**    ARE THE PATIENTS YOU SEE FROM ANGOLA LESS

7  INTERESTED IN GETTING TREATMENT THAN YOUR

8  NON-INCARCERATED PATIENTS?

9      **A**    NO.  OVERALL I ACTUALLY FOUND THEM TO BE

10 MORE INTERESTED IN THEIR HEALTH AND TRYING TO

11 UNDERSTAND WHAT'S GOING ON WITH THEM MEDICALLY.

12     **Q**    GENERALLY ARE THERE ANY PATTERNS YOU'VE

13 OBSERVED WITH ANGOLA PATIENTS?

14     **A**    A LOT OF TIMES THEY'RE COMING IN VERY LATE

15 IN THEIR ILLNESS.  SO IF IT'S CANCER, THEY'RE COMING

16 IN WITH STAGE IV CANCER AND NOT STAGE I CANCER.

17 DEMENTIA, THEY COULD BE LIKE VERY DEBILITATED AND

18 SICK BY THE TIME WE SEE THEM.  SOMETIMES THERE HAS

19 BEEN DELAYS IN THEIR FOLLOW-UP CARE, AND OVERALL

20 THEY'VE BEEN ON MEDICATIONS THAT AREN'T NECESSARILY

21 STANDARD OF CARE.

22     **Q**    HAVE THOSE PATTERNS CHANGED IN ANY WAY FROM

23 WHAT YOU OBSERVED PRIOR TO 2019?

24     **A**    NOT SIGNIFICANTLY.

25     **Q**    DR. GLASS, YOU MENTIONED LATE PRESENTATION

1 OF PATIENTS.  WHY IS ADVANCED ILLNESS ON PRESENTATION

2 TO THE HOSPITAL A PROBLEM?

3    A    IT DEPENDS ON THE ILLNESS.  BUT IF YOU DELAY

4 TREATMENT, FOR SOME ILLNESSES IT CAN MEAN DEATH

5 BECAUSE IT COULD MEAN THAT SOMETHING WAS CURABLE IF

6 YOU CAUGHT IT EARLY.  LIKE STAGE I CANCER, A LOT OF

7 TIMES IT'S CURABLE, OR NO WAY TO TREAT IT AND NO WAY

8 TO EVEN SLOW DOWN THE ILLNESS IF YOU CATCH IT AT

9 STAGE IV.

10       OTHER TIMES IT COULD BE SOMETHING LIKE

11 HYPERTENSION WHERE IF YOU DON'T CONTROL SOMEONE'S

12 BLOOD PRESSURE THEY'RE GOING TO HAVE COMPLICATIONS

13 FROM IT LIKE A STROKE, LOSS OF VISION, OR KIDNEY

14 ISSUES.  SOMETHING LIKE DIABETES, IF YOU DON'T TREAT

15 IT, YOU COULD HAVE ALL KINDS OF ORGAN INVOLVEMENT.

16 HIV, IF YOU DON'T TREAT IT -- WHEREAS IT'S A VERY

17 TREATABLE ILLNESS WITH LOTS OF MEDICINES THAT WE CAN

18 EASILY ACCESS; IF YOU DON'T TREAT HIV, YOU COULD HAVE

19 SERIOUS COMPLICATIONS LIKE BRAIN INFECTIONS THAT WE

20 CANNOT CURE.

21    Q    WHAT SYMPTOMS DO YOUR PATIENTS FROM ANGOLA

22 HAVE WHEN THEY COME TO YOU WITH THESE TYPES OF

23 ADVANCED ILLNESSES?

24    A    HEADACHE, SHORTNESS OF BREATH, CHEST PAIN,

25 NEUROLOGIC DEFICITS, DIZZINESS.  SOMETIMES THEY COULD

1  HAVE AN ALTERED MENTAL STATUS.  THOSE ARE PRETTY

2  COMMON CHIEF COMPLAINTS.

3     **Q**   CAN YOU GENERALIZE ABOUT THE SEVERITY OF THE

4  SYMPTOMS THAT YOUR PATIENTS FROM ANGOLA ARE

5  PRESENTING WITH?

6     **A**   OVERALL MORE SEVERE THAN WHAT WE SEE IN THE

7  COMMUNITY SETTING.

8     **Q**   WHY DO YOU THINK THEIR SYMPTOMS ARE SO

9  SEVERE?

10    **A**   I THINK IT'S MULTI-FACTORIAL.  MY IMPRESSION

11  THAT IT IS, THAT IT'S QUITE HARD TO SEEK HOSPITAL

12  TREATMENT IN THE FIRST PLACE.  YOU HAVE TO CALL OUT

13  WITH A SICK CALL, YOU HAVE TO GET EVALUATED.  IT'S

14  NOT ALWAYS EASY TO GET EVALUATED BY A PHYSICIAN.

15  THERE CAN BE PENALTIES IF PEOPLE DON'T FEEL THAT YOUR

16  CHIEF COMPLAINT IS AN ACTUAL COMPLAINT, SO PEOPLE

17  HOLD BACK FROM DESCRIBING THEIR MEDICAL ISSUES.

18        BY THE TIME THEY EVEN MAKE IT TO THE

19  HOSPITAL, IT CAN -- OFTENTIMES THESE THINGS HAVE BEEN

20  GOING ON FOR SEVERAL MONTHS, IF NOT YEARS.  SO I

21  THINK THAT'S PART OF IT.

22        I THINK SOMETIMES THEY WERE SUPPOSED TO GET

23  FOLLOW-UP CARE AND THEY DIDN'T.  SO BY THE TIME WE

24  SEE THEM, THEIR ILLNESS HAS PROGRESSED; WHEREAS IT

25  COULD HAVE BEEN TREATABLE, IT IS NO LONGER.  I ALSO

1 JUST HAVE CONCERNS ABOUT THE NUTRITION AND ABILITY TO

2 EXERCISE. AND I THINK THOSE THINGS CONTRIBUTE TO

3 THEIR ILLNESSES AS WELL.

4    **Q**   DR. GLASS, YOU MENTIONED FOLLOW-UP CARE.

5 WHY IS NOT BEING ABLE TO GUARANTEE FOLLOW-UP CARE A

6 PROBLEM?

7    **A**   SO FOR SOMETHING LIKE CANCER, IF YOU -- WE

8 NORMALLY DON'T DO CHEMOTHERAPY IN THE HOSPITAL. MOST

9 OF THE TIME WE START AT OUT-PATIENT AND A FOLLOW-UP

10 APPOINTMENT. SO IF WE REFERRED YOU TO A FOLLOW-UP

11 CARE, IT MEANS THAT YOU NEED TO GO TO OUR CLINIC TO

12 START YOUR CANCER TREATMENT. IF YOU DON'T -- IF

13 YOU'RE NOT BROUGHT TO OUR CLINIC, YOU DON'T COME TO

14 OUR CLINIC, YOU WON'T GET YOUR CHEMOTHERAPY, AND YOUR

15 CANCER IS ALMOST CERTAINLY GOING TO PROGRESS. AND

16 THAT'S TRUE WITH LOTS OF OTHER ILLNESSES, TOO.

17    **Q**   DO YOU KNOW IF YOUR ORDERS FOR FOLLOW-UP

18 CARE ARE COMMUNICATED TO ANGOLA STAFF?

19    **A**   DID YOU SAY DO I KNOW IF?

20    **Q**   YEAH.

21    **A**   THERE IS NO REAL WAY TO VERIFY THAT. WE PUT

22 IT IN OUR DISCHARGE ORDERS, BUT WE HAVE NO WAY OF

23 TELLING WHETHER THAT'S GOING TO HAPPEN OR NOT.

24    **Q**   DO YOU EVER NOTICE THAT YOUR PATIENTS FROM

25 ANGOLA ARE NOT RECEIVING THE FOLLOW-UP CARE THAT YOU

1  PRESCRIBED?

2      **A**    SINCE I'M AN IN-PATIENT DOCTOR, I DON'T HAVE

3  A CLINIC, I DON'T HAVE A WAY TO CHECK WHETHER

4  PATIENTS I DISCHARGE GET THEIR FOLLOW-UP

5  APPOINTMENTS.  BUT I DO SEE PATIENTS WHO WERE

6  REFERRED FOR FOLLOW-UP APPOINTMENTS BY OTHER DOCTORS

7  THAT DID NOT GET THOSE APPOINTMENTS.

8      **Q**    HOW DOES THIS IMPACT YOUR ABILITY TO PROVIDE

9  EFFECTIVE TREATMENT?

10     **A**    BECAUSE BY THE TIME I'VE SEEN THEM, THERE

11 HAS BEEN A DELAY IN CARE.  AND THAT CAUSES ALL THE

12 SEQUELA WE WERE TALKING ABOUT I MENTIONED EARLIER.

13     **Q**    HOW DOES LACK OF FOLLOW-UP CARE IMPACT

14 PATIENT PROGNOSIS?

15     **A**    SO IF YOU TAKE THE EXAMPLE OF CANCER, YOU

16 COULD GO FROM SOMETHING COMPLETELY TREATABLE WHERE

17 YOU CAN CURE IT AND THIS PERSON IS GOING TO GO AND

18 LIVE 40 MORE YEARS, TO STAGE IV CANCER WHEN THEY

19 MIGHT ONLY HAVE ONE YEAR.

20     **Q**    DR. GLASS, YOU MENTIONED TREATING PATIENTS

21 FROM ANGOLA WITH UNCONTROLLED DISEASES AND YOU

22 DESCRIBED A COUPLE OF THOSE.  WHY IS THAT A PROBLEM?

23     **A**    FOR EXAMPLE, WITH DIABETES, IF YOU DON'T

24 CONTROL IT, YOUR SUGARS ARE VERY HIGH AND YOUR ORGANS

25 START TO SHUT DOWN, SO YOU BECOME BLIND, YOUR KIDNEYS

1  SHUT DOWN; YOU COULD HAVE SERIOUS INFECTIONS OF YOUR

2  LIMBS THAT END UP WITH AMPUTATION.

3       WITH HYPERTENSION, IF YOU DON'T CONTROL

4  SOMEONE'S BLOOD PRESSURE, VERY OFTEN IT'S GOING TO

5  LEAD TO STROKE WITH DEFICITS THAT CAN'T BE CORRECTED.

6  AND THEN WITH HIV, YOU CAN TAKE AN ILLNESS THAT'S

7  TOTALLY TREATABLE AND CONTROLLABLE AND MAKE IT

8  SOMETHING COMPLETELY DEBILITATING THAT CAN EVEN KILL

9  THE PATIENT.

10     Q   IS THIS MORE COMMON FOR ANGOLA PATIENTS THAN

11 PATIENTS WHO ARE NOT INCARCERATED?

12     A   YES.

13     Q   DR. GLASS, WHAT WOULD YOU DO -- OR WHAT DO

14 YOU DO IF A PATIENT PRESENTS WITH EXTREMELY HIGH

15 BLOOD PRESSURE?

16     A   I ATTEMPT TO LOWER THE BLOOD PRESSURE AND I

17 WATCH TO SEE WHETHER IT'S COMING DOWN ADEQUATELY.

18     Q   IS THERE ANYTHING YOU DO DIFFERENTLY IF A

19 PATIENT APPEARS TO BE NONCOMPLIANT WITH THEIR

20 MEDICATION?

21     A   FIRST I'M GOING TO TALK TO THE PATIENT AND

22 FIGURE OUT WHAT HAPPENED.  BECAUSE WE SAY

23 "NONCOMPLIANT," BUT THAT COULD BE FOR LOTS OF

24 DIFFERENT REASONS.  SOMETIMES MY PATIENTS ARE

25 NONCOMPLIANT BECAUSE THEY COULDN'T AFFORD THE

1  MEDICINE.  IF THAT'S THE ISSUE, THEN I'M GOING TO TRY

2  TO FIGURE OUT A WAY TO EITHER GET THEM HEALTH

3  INSURANCE OR GET THEM CHEAPER MEDICINES.  IF THEY'RE

4  INCARCERATED, I'M GOING TO TALK TO THEM ABOUT WHETHER

5  THEY'RE EVEN TO BE ADMINISTERED THE MEDICINE, BECAUSE

6  SOMETIMES WHAT COMES UP IS THAT NOBODY GAVE THEM THE

7  MEDICINE THAT THEY WERE SUPPOSED TO BE PRESCRIBED

8  WHEN THEY LEFT THE HOSPITAL.  AND THEN I'M GOING TO

9  TRY A MEDICINE AND SEE IF IT WORKS BEFORE I DECIDE

10 THAT THAT'S THE MEDICINE THEY SHOULD STAY ON.

11     Q    AND BY "SEE IF IT WORKS," WHAT DOES THAT

12 ENTAIL?

13     A    PRIMARILY TO SEE IF THEIR BLOOD PRESSURE

14 COMES DOWN.  BUT IF THEY HAVE SIGNS OF ORGAN DAMAGE,

15 I'M GOING TO SEE IF THOSE ORGANS START LOOKING

16 BETTER.  SO IF THEIR KIDNEYS WERE INJURED BECAUSE

17 THEIR BLOOD PRESSURE WAS HIGH, I'M GOING TO SEE IF

18 THEIR KIDNEYS START GETTING BETTER.  SAME THING FOR

19 THEIR HEART, SAME THINGS FOR THEIR VISION OR THEIR

20 BRAIN.  BECAUSE PEOPLE CAN COME IN VERY CONFUSED WITH

21 HIGH BLOOD PRESSURE, AND IF THEY'RE GETTING MORE

22 CLEARER, IT'S A SIGN THAT THEY'RE NOT HAVING ANY

23 ORGAN EFFECTS FROM THE HIGH BLOOD PRESSURE.

24     Q    DR. GLASS, YOU ALSO MENTIONED THE FORMULARY

25 AT ANGOLA.  WHAT PROBLEMS HAVE YOU HAD WITH

1    PRESCRIBING MEDICATIONS TO ANGOLA PATIENTS?

2        **A**    OFTENTIMES WE DON'T REALLY KNOW WHAT THEY'RE

3    GOING TO USE OVER THERE BECAUSE THE FORMULARY ISN'T

4    PUBLIC.  SO WE SUGGEST MEDICINES, BUT WE HAVE NO WAY

5    OF VERIFYING, EXCEPT TO TRY TO DO IT OVER A PHONE

6    CALL, WHETHER THOSE MEDICINES ARE ACTUALLY GOING TO

7    BE GIVEN TO THE PATIENT.  AND A LOT OF TIMES WE'LL

8    SEND SOMEBODY OUT ON A LIST OF MEDICINES, AND WHEN

9    THEY COME BACK THEY'RE MISSING A LOT OF THEM.  THAT

10   COULD HAPPEN WITH INSULIN, THAT COULD HAPPEN WITH

11   BLOOD PRESSURE MEDICINES.

12          I RUN INTO IT A LOT WITH PAIN MANAGEMENT,

13   BECAUSE IN MY SUBSPECIALTY I'M TRYING TO SEND

14   SOMEBODY OUT WITH ADEQUATE PAIN CONTROL BECAUSE THEY

15   MIGHT HAVE CANCER-RELATED PAIN, AND MOST EVERYTHING

16   IS NOT ON THE FORMULARY IN THE DOC.

17       **Q**    HAVE YOU EVER HAD A PATIENT ASK YOU FOR A

18   SPECIFIC TYPE OF MEDICATION?

19       **A**    NO.

20       **Q**    HAVE YOU OBSERVED ANY DRUG-SEEKING BEHAVIORS

21   FROM YOUR PATIENTS FROM ANGOLA?

22       **A**    NO.

23       **Q**    DR. GLASS, HAVE YOU EVER PRESCRIBED PHYSICAL

24   THERAPY FOR PATIENTS FROM ANGOLA?

25       **A**    YES.

**1**      Q     WERE THOSE PATIENTS ABLE TO OBTAIN IT?

**2**      A     I HAD A PATIENT RECENTLY WHO NEEDED PHYSICAL

**3**   THERAPY AFTER SEVERAL STROKES.  AND WHAT HE ACTUALLY

**4**   NEEDED WAS INTENSE REHABILITATION.  THAT'S THE

**5**   STANDARD OF CARE.  SO TWO TO THREE HOURS A DAY.  AND

**6**   WE COULD NOT SEND HIM TO A REHAB FACILITY BECAUSE HE

**7**   WAS INCARCERATED AND WE WERE TOLD THAT THEY WOULD DO

**8**   SOME PHYSICAL THERAPY AT ANGOLA.

**9**         BUT THERE WAS SIGNIFICANT CONCERNS FROM OUR

**10**  NEUROLOGY TEAM AND THE PHYSICAL THERAPY TEAM ABOUT

**11**  HIM RECEIVING THE CARE THAT HE NEEDED.

**12**     Q     HOW DOES THAT IMPACT YOUR ABILITY TO PROVIDE

**13**  EFFECTIVE CARE?

**14**     A     IF YOU DON'T GET EARLY PHYSICAL THERAPY

**15**  AFTER A STROKE, IT REALLY AFFECTS YOUR PROGNOSIS, AND

**16**  YOU'RE MUCH MORE LIKELY TO BE STUCK WITH A PERMANENT

**17**  DISABILITY FOREVER.

**18**     Q     DR. GLASS, WHY ARE YOU TESTIFYING HERE

**19**  TODAY?

**20**     A     I CONSIDER MYSELF AN ADVOCATE FOR ALL OF MY

**21**  PATIENTS, AND I WANT TO GUARANTEE THEY CAN GET THE --

**22**  EVERY SINGLE PATIENT I CARE FOR GETS THE BEST

**23**  POSSIBLE MEDICAL TREATMENT.  AND OVER THE PAST COUPLE

**24**  OF YEARS I'VE HAD PRETTY GRAVE CONCERNS ABOUT THE

**25**  STANDARD OF CARE THAT'S BEING PROVIDED IN OUR DOC,

1  INCLUDING ANGOLA.

2         TALKING TO COLLEAGUES FROM OTHER STATES, THE

3  EXAMPLES I BRING UP ARE VERY DIFFERENT THAN THE

4  STANDARD OF CARE THAT'S PROVIDED IN OTHER STATES,

5  ESPECIALLY ON THE WEST COAST.  AND IT'S MADE ME WANT

6  TO TRY TO DO SOMETHING TO CHANGE WHAT'S HAPPENING FOR

7  THESE PATIENTS.

8     Q   WHAT RECOMMENDATIONS DO YOU HAVE TO HELP

9  IMPROVE CARE AT ANGOLA?

10    A   I THINK THERE IS A LOT OF THINGS THAT NEED

11 TO BE CHANGED.  ONE THING IS THEY SHOULD HAVE AN

12 ELECTRONIC MEDICAL RECORD THAT DOCTORS LIKE ME AT UMC

13 AND OUR LADY OF THE LAKE, WHICH ARE FOR ALL

14 HOSPITALS, SHOULD BE ABLE TO ACCESS EASILY SO WE HAVE

15 SOME WAY OF KNOWING WHAT'S BEEN GOING ON WITH THESE

16 PATIENTS.

17        THEY NEED TO COMPLETELY REVAMP THEIR HIRING

18 PROCESS.  THEY SHOULD NOT BE RELIANT ON DOCTORS WHO

19 HAVE HAD THEIR LICENSES SUSPENDED, WHICH IS THE

20 MAJORITY OF PHYSICIANS IN THE DOC RIGHT NOW.  THEY

21 NEED TO MORE EFFECTIVELY PROVIDE FOLLOW-UP CARE.

22 THEY NEED TO HAVE A WAY TO VERIFY THAT A PATIENT THAT

23 WE'VE RECOMMENDED FOLLOW-UP CARE IS GOING TO GET

24 FOLLOW-UP CARE.  AND THEY NEED TO COMPLETELY IMPROVE

25 THEIR FORMULARY AND BRING IT UP TO STANDARD OF CARE.

1      Q    THANK YOU.

2           THE COURT:  MR. ROBERT, CROSS?

3           MR. ROBERT:  YES, YOUR HONOR.

4                   CROSS-EXAMINATION

5  BY MR. ROBERT:

6      Q    GOOD AFTERNOON, DR. GLASS.

7      A    HI.

8      Q    NICE TO SEE YOU AGAIN.

9           MS. KUMAR DID YOUR QUESTIONING.  LIKE THE

10 OTHER TWO DOCTORS THAT WE'VE SEEN, YOU WORK WITH HER

11 ON THE COMPASSIONATE RELEASE PROJECT.  CORRECT?

12     A    YES, I WAS PART OF THAT COMPASSIONATE

13 RELEASE PROJECT.

14     Q    YOU PROVIDED INPUT INTO THE REPORT THAT WAS

15 ISSUED ABOUT COMPASSIONATE RELEASE; THAT MS. KUMAR

16 WAS ON THAT COMMITTEE AS WELL.  CORRECT?

17     A    YES.  I WAS PERIPHERALLY INVOLVED.

18     Q    AND YOU'RE A PALLIATIVE CARE DOCTOR.

19 CORRECT?

20     A    YES.

21     Q    AND WHAT DOES THAT MEAN TO BE A PALLIATIVE

22 CARE DOCTOR?

23     A    IT MEANS MY SPECIALTY IS TREATING PATIENTS

24 AT THE END OF THEIR LIFE AND, IN PARTICULAR,

25 SPECIALIZATION IN PAIN MANAGEMENT.

1    Q    AND YOU'RE -- I THINK YOU INDICATED YOU'RE

2 IN-PATIENT, IS THE WORK THAT YOU DO.  CORRECT?

3    A    YES.

4    Q    SO YOU'RE NOT IN THE CLINIC WHERE PATIENTS

5 ARE SEEN AT CLINIC AT UMC.  CORRECT?

6    A    AT UMC THAT'S CORRECT, YEAH.

7    Q    AND YOU INDICATED TO ME I THINK PREVIOUSLY

8 THAT YOU WORK AT UMC IN THE IN-PATIENT A TOTAL OF 11

9 WEEKS A YEAR.  CORRECT?

10    A    YES.

11    Q    AND THAT WOULD BE TRUE FOR 2019; YOU WORKED

12 11 WEEKS IN IN-PATIENT IN 2019.  CORRECT?

13    A    YES.

14    Q    AND THAT WOULD BE TRUE FOR 2020; 11 WEEKS.

15 CORRECT?

16    A    YES.

17    Q    SAME FOR 2021.  CORRECT?

18    A    YES.

19    Q    AND THAT'S WHAT YOU'RE DOING RIGHT NOW.

20 CORRECT?

21    A    YEAH -- IT'S A NEW ACADEMIC YEAR STARTING,

22 SO I HAVE A DIFFERENT SCHEDULE.  IT JUST STARTED.

23    Q    JUST STARTING?

24    A    UH-HUH.

25    Q    ALL RIGHT.  AND AGAIN I ASKED YOU IN YOUR

1  DEPOSITION IF YOU COULD PROVIDE ME WITH THE NAMES OF

2  ANY OF THE PATIENTS THAT YOU'VE SEEN WHO ACTUALLY

3  CAME FROM ANGOLA, AND YOU TOLD ME YOU COULD NOT.  DO

4  YOU RECALL THAT?

5      **A**   I DO RECALL THAT.

6      **Q**   AND I ASKED YOU IF YOU COULD GIVE ME THE

7  SPECIFICS OF ANY PARTICULAR PATIENT, AND YOU

8  INDICATED YOU COULD NOT.  CORRECT?

9      **A**   YES.  ALTHOUGH WE DID DISCUSS ONE EXAMPLE.

10     **Q**   I THINK WE DID DISCUSS GENERALLY EXAMPLES OF

11  TREATMENT, BUT WE'LL GET TO THAT.

12         **MR. ROBERT:**  I WITHDRAW THAT QUESTION.  THAT

13  WAS A TERRIBLE QUESTION, YOUR HONOR.  MY APOLOGIES.

14  **BY MR. ROBERT:**

15     **Q**   AND YOUR GENERAL OBSERVATIONS WERE NOT

16  GETTING THE STANDARD OF CARE IN SOME CASES.  CORRECT?

17     **A**   YEAH.

18     **Q**   DELAYED DIAGNOSIS IN SOME CASES.  CORRECT?

19     **A**   YES.

20     **Q**   FOLLOW-UP.  RIGHT?

21     **A**   YES.

22     **Q**   AND THEN MEDICATIONS.  CORRECT?

23     **A**   YES.

24     **Q**   SO YOU DID TELL ME GENERALLY ALL FOUR OF

25  THOSE THINGS WHEN WE TOOK YOUR DEPOSITION.  IS THAT

1  RIGHT?

2      **A**   YES.

3      **Q**   AND AGAIN I ASKED YOU IF YOU COULD GIVE ME

4  THE NAME OF ANY OF THE PATIENTS, AND YOU SAID YOU

5  COULD NOT?

6      **A**   YES.

7      **Q**   AND I ASKED YOU ABOUT "CAN YOU IDENTIFY ANY

8  KINDS OF SPECIFIC -- ANYTHING ABOUT PEOPLE WHO DIDN'T

9  GET PROPER TREATMENT, CAN YOU GIVE ME SOME EXAMPLES?"

10 AND YOU WERE ABLE TO GIVE ME I THINK TWO.

11         LET'S TALK ABOUT THE FIRST ONE.  OKAY?

12     **A**   CORRECT.

13     **Q**   THE FIRST ONE, YOU SAID YOU RECALLED A

14 PATIENT WITH WEIGHT LOSS THAT YOU DIDN'T THINK GOT

15 PROPER TREATMENT.  CORRECT?

16     **A**   YES.

17     **Q**   OKAY.  AND I ASKED YOU "DO YOU KNOW IF THE

18 ISSUE WITH THAT PATIENT HAPPENED BEFORE OR AFTER

19 JANUARY '19?"  DO YOU REMEMBER THAT?

20     **A**   YES.

21     **Q**   AND YOU INDICATED TO ME THAT YOU DIDN'T KNOW

22 WHETHER THAT HAPPENED BEFORE OR AFTER JANUARY 2019.

23 CORRECT?

24     **A**   I'M GETTING CONFUSED, BECAUSE THERE WERE --

25 THERE WAS ONE CASE THAT WAS AFTER 2019 AND I THINK

1  MAYBE ONE THAT WAS BEFORE.

2      Q    WELL, I'LL PULL IT UP SO WE CAN MAKE SURE

3  WE'RE CLEAR.

4      A    YEAH.

5          MR. ROBERT:  LET'S GO TO DR. GLASS'S

6  DEPOSITION AT PAGE 30, LINES 13 TO 15.

7  BY MR. ROBERT:

8      Q    AND IF YOU WANT ME TO GO UP A LITTLE BIT --

9  YOU CAN SEE AT THE VERY TOP OF THE SCREEN AT LINE 4

10 YOU'RE TALKING ABOUT -- WE'RE TALKING ABOUT THE

11 WEIGHT LOSS SITUATION.  ALL RIGHT?  SO THAT'S WHAT WE

12 WERE JUST TALKING ABOUT.  CORRECT?

13     A    OKAY.  COULD YOU GO UP A LITTLE BIT?  A

14 LITTLE BIT MORE.

15          YEAH, I THINK THAT WAS THE ONE THAT I DIDN'T

16 REMEMBER WHETHER IT WAS BEFORE OR AFTER, YEAH.

17     Q    OKAY.  SO YOU ACKNOWLEDGE THAT --

18     A    I STILL DON'T REMEMBER.

19     Q    AND YOU STILL DON'T REMEMBER WHETHER THAT

20 WAS BEFORE OR AFTER JANUARY?

21     A    NO.

22     Q    AND THEN I ASKED YOU IF YOU RECALLED ANY

23 OTHER EXAMPLES OF PATIENTS WHO DIDN'T GET PROPER

24 TREATMENT?

25     A    YES.

1    **Q**   AND YOU INDICATED TO ME THAT THERE WAS A

2  PATIENT WITH MEMORY LOSS THAT YOU DIDN'T THINK GOT

3  PROPER TREATMENT.  DO YOU REMEMBER THAT?

4    **A**   YEAH.  I THINK THAT WAS ON THE SAME CASE.

5    **Q**   WELL, I HAVE THEM AS TWO THINGS.  THE WEIGHT

6  LOSS AND THE MEMORY LOSS WERE THE SAME PATIENT?

7    **A**   SO THERE IS TWO PEOPLE.  THERE IS ONE THAT

8  HAD MEMORY LOSS AND HE HAD ADVANCED DEMENTIA, AND I

9  WASN'T SURE IF THAT WAS BEFORE OR AFTER 2019.  AND

10 THERE WAS ONE WHO HAD WEIGHT LOSS AND SHORTNESS OF

11 BREATH AND CHEST PAIN, AND I WAS PRETTY SURE THAT WAS

12 AFTER 2019.

13   **Q**   WE'LL GET TO THE ONE WITH SHORTNESS OF

14 BREATH.  YOU DID TELL ME THAT AT THE VERY -- AT THE

15 VERY END?

16   **A**   YEAH.

17   **Q**   I'M JUST GOING THROUGH --

18   **A**   OKAY.

19   **Q**   -- THE ONES THAT YOU GAVE ME.

20   **A**   SO THE MEMORY LOSS PERSON, I DON'T KNOW IF

21 IT WAS BEFORE OR AFTER 2019.

22   **Q**   YOU CAN'T TELL ME TODAY WHETHER YOU KNOW IT

23 WAS BEFORE OR AFTER 2019?

24   **A**   NO, I CANNOT.

25   **Q**   AND YOU ACKNOWLEDGE THAT YOU TOLD ME IN YOUR

1   DEPOSITION YOU DIDN'T -- NEVER MIND.

2       **A**    YEAH.  AGREE.

3       **Q**    AND THEN I ASKED YOU ABOUT ANY OTHER

4   SPECIFIC -- ANY SPECIFIC EXAMPLES ON FOLLOW-UP, AND

5   YOU DIDN'T GIVE ME ANY EXAMPLES ON THAT.  CORRECT?

6       **A**    CORRECT.  YEAH.

7       **Q**    OKAY.  AND I ASKED ABOUT MEDICATIONS.  AND

8   AGAIN WE TALKED ABOUT SCHEDULE I MEDICATIONS AND THAT

9   PRESENTS A PROBLEM.  CORRECT?

10      **A**    WHAT DO YOU MEAN IT PRESENTS A --

11      **Q**    IT PRESENTS A PROBLEM FOR THE PRISON TO

12  CONTROL NARCOTIC MEDICATIONS.  CORRECT?

13      **A**    RIGHT.  BUT IT'S NOT JUST SCHEDULE I

14  MEDICINES I WAS TALKING ABOUT.

15      **Q**    BUT YOU RECOGNIZE -- BECAUSE YOU DO A LOT OF

16  PAIN MANAGEMENT, YOU RECOGNIZE THAT THAT BECOMES AN

17  ISSUE AS FAR AS THE FORMULARY AND THE ABILITY TO

18  PROVIDE NARCOTICS.  CORRECT?

19      **A**    WITH THAT SPECIFIC SCHEDULE I, YES.

20      **Q**    AND I ASKED YOU IF YOU RECALLED HOW MANY

21  TIMES THIS MEDICATION ISSUE THAT YOU RECALL WAS A

22  PROBLEM OR AN ISSUE FOR YOUR PATIENTS, AND YOU TOLD

23  ME YOU DIDN'T KNOW HOW MANY TIMES THAT THAT WAS A

24  PROBLEM.  CORRECT?

25      **A**    YEAH, I CAN'T GIVE YOU AN EXACT NUMBER.

1     Q    AND I ASKED YOU IF YOU CAN TELL ME WHETHER A

2  PARTICULAR SITUATION HAPPENED BEFORE OR AFTER JANUARY

3  OF 2019, AND YOU TOLD ME YOU COULD NOT.  CORRECT?

4     A    CORRECT.

5     Q    NOW, LET'S TALK ABOUT THE ONE PATIENT THAT

6  YOU SAID THAT SINCE 2019 HAD CHEST PAIN AND SHORTNESS

7  OF BREATH AND WAS DIAGNOSED WITH LUNG CANCER.

8     A    YES.

9     Q    YOU TOLD ME ABOUT THAT PATIENT.

10     A    YES.

11     Q    CORRECT?

12          AND YOU DIDN'T KNOW THE NAME OF THAT

13  PATIENT.  CORRECT?

14     A    I DON'T KNOW HIS NAME.

15     Q    AND THAT WAS THE ONLY PATIENT -- SPECIFIC

16  PATIENT AFTER 2019 INCIDENCE OF DELAYED DIAGNOSIS

17  THAT YOU RECALL.  CORRECT?

18     A    YES.

19     Q    AND YOU TALKED ABOUT MEDICAL RECORDS.  AND I

20  THINK YOU SAID THAT ONCE ANGOLA GETS ELECTRONIC

21  MEDICAL RECORDS, THAT WILL SOLVE YOUR MEDICAL RECORDS

22  PROBLEM.  CORRECT?

23     A    YES.  MEDICAL RECORD THAT OTHER -- THAT THE

24  HOSPITALS CAN ACCESS.

25     Q    OKAY.  AND I ASKED YOU ABOUT ANY OTHER

1  SPECIFICS ABOUT ANYBODY ELSE THAT YOU COULD RECALL

2  THAT, YOU KNOW, WAS A DELAYED DIAGNOSIS OR A FAILURE

3  TO FOLLOW UP OR WHAT HAVE YOU, AND YOU DIDN'T RECALL

4  ANYTHING ELSE OTHER THAN WHAT WE TALKED ABOUT AND

5  THAT WE'VE GONE OVER TODAY.  CORRECT?

6      A   YES.

7      Q   SO THIS PERSON WITH PHYSICAL THERAPY, THAT'S

8  SOMETHING THAT WE DIDN'T TALK ABOUT.  CORRECT?

9      A   YES.

10     Q   AND YOU DIDN'T RECALL THAT WHEN I TOOK YOUR

11 DEPOSITION.  CORRECT?

12     A   IT HAPPENED SINCE THE DEPOSITION.

13     Q   OKAY.

14     A   YEAH.

15     Q   DO YOU KNOW WHO THAT PATIENT IS?

16     A   ACTUALLY, I DON'T.

17     Q   AND YOUR CONCERN WAS THAT YOU COULDN'T SEND

18 AN INCARCERATED PATIENT TO A INTENSIVE REHAB

19 FACILITY.

20     A   YES.

21     Q   CORRECT?

22     A   YES.

23     Q   DO YOU UNDERSTAND THE REASONING BEHIND THAT?

24     A   I UNDERSTAND THE REASONING, BUT THERE SHOULD

25 BE A BACK-UP OPTION AT THE PRISON TO PROVIDE THE

1  STANDARD OF CARE.

2      **Q**   IS THE PRISON PROVIDING PHYSICAL THERAPY?

3      **A**   THEY'RE NOT DOING INTENSIVE REHAB.

4      **Q**   OKAY.  DO YOU KNOW WHAT PHYSICAL THERAPY

5  THEY'RE PROVIDING?

6      **A**   I DON'T KNOW EXACTLY WHAT IT ENTAILS.  BUT

7  FROM WHAT I'VE HEARD, IT IS NOT CONSISTENT WITH AN

8  IN-PATIENT INTENSIVE REHAB PROGRAM.

9      **Q**   AND WHERE DID YOU HEAR THAT?

10     **A**   FROM OTHER PROVIDERS AT UMC.

11     **Q**   AND YOU TALKED ABOUT ALL OF THESE PROVIDERS

12 AT ANGOLA WHO HAVE SUSPENDED LICENSES.

13     **A**   YES.

14     **Q**   IS THAT A CONCERN FOR YOU THAT --

15     **A**   YES.

16     **Q**   OKAY.  DO YOU KNOW HOW MANY PROVIDERS -- AS

17 WE SIT HERE TODAY, HOW MANY PROVIDERS AT ANGOLA HAVE

18 BLEMISHED RECORDS OR HAVE ANY TYPE OF BLEMISH ON

19 THEIR RECORD?

20     **A**   IN THE DOC, THE LAST NEWS ARTICLE I SAW WAS

21 OVER 70 PERCENT.

22     **Q**   I'M NOT ASKING ABOUT DOC.  I'M ASKING ABOUT

23 ANGOLA.

24     **A**   THAT I KNOW OF, THERE ARE MULTIPLE, YES.

25     **Q**   OKAY.  WHO ARE THEY?

1    **A**    IS LAVESPERE STILL --

2    **Q**    NO.

3    **A**    BUT ISN'T HE IN CHARGE OF THE DOC, SO HE'S

4    OVER ANGOLA?

5    **Q**    IS HE A PROVIDER AT ANGOLA?  DO YOU KNOW?

6    **A**    BUT HE'S SUPERVISING THE DOCTORS.

7    **Q**    SO WHO ELSE?

8    **A**    WHEN MY RESIDENT WAS WORKING THERE RIGHT

9    BEFORE COVID, THERE WAS A DOCTOR WHO HAD BEEN

10   SUSPENDED FOR SELLING FAKE GROWTH HORMONE --

11   **Q**    DO YOU KNOW --

12   **A**    -- AT ANGOLA.  I DON'T KNOW IF SHE'S STILL

13   THERE.

14   **Q**    IS SHE STILL THERE?

15   **A**    I'M NOT SURE IF SHE'S STILL THERE.

16   **Q**    IF SHE'S NOT STILL THERE, DOES THAT

17   ALLEVIATE SOME OF YOUR CONCERNS?

18   **A**    NO.

19   **Q**    DO YOU KNOW HOW LONG AGO DR. LAVESPERE HAD A

20   BLEMISH ON HIS LICENSE?  DO YOU KNOW HOW LONG AGO

21   THAT WAS?

22   **A**    IT'S WITHIN THE LAST 20 YEARS.

23   **Q**    WITHIN THE LAST 20 YEARS, OKAY.

24   **A**    YES.

25   **Q**    SO ANYBODY WITH A BLEMISH WITHIN THE LAST 20

1   YEARS YOU THINK SHOULD NOT BE PROVIDING CARE AT

2   ANGOLA?

3        A    I WOULD CONSIDER DISTRIBUTING

4   METHAMPHETAMINES TO BE MORE THAN A BLEMISH ON ONE'S

5   RECORD.

6        Q    WELL, APPARENTLY THE LICENSING BOARD DOESN'T

7   VIEW IT THAT WAY, DO THEY?  HE'S BEEN HAVING A

8   LICENSE FOR A VERY LONG TIME, HASN'T HE?

9        A    BUT A LOT OF THE PEOPLE WORKING THERE HAVE

10  RESTRICTED LICENSES WHERE THEY'RE ONLY ALLOWED TO

11  PRESCRIBE AND WORK IN THE PRISON.  THEY'RE NOT

12  ALLOWED TO SEE PATIENTS IN THE COMMUNITY.

13       Q    AGAIN YOU'RE SAYING A LOT OF PEOPLE THERE.

14  WHO ARE THE PEOPLE THERE THAT HAVE THAT?  DO YOU KNOW

15  OR ARE YOU SPECULATING?

16       A    I'M GOING OFF THE STATISTICS I'VE SEEN ABOUT

17  70 TO 80 PERCENT OF THE DOCTORS WORKING IN DOC.

18       Q    THAT'S NOT --

19       A    IN OUR STATE.

20       Q    WE'RE NOT HERE ABOUT THE DOC.  WE'RE HERE

21  ABOUT ANGOLA.  I MEAN, THIS IS A SIMPLE QUESTION.  DO

22  YOU KNOW HOW MANY OF THEM HAVE THOSE KINDS OF

23  RESTRICTIONS THAT ARE CURRENTLY WORKING THERE?

24       A    I DON'T KNOW THE EXACT NUMBER.

25       Q    THANK YOU.

1          **THE COURT:**  NOTHING FURTHER?

2                REDIRECT?

3          **MS. KUMAR:**  JUST BRIEFLY, YOUR HONOR.

4                    **REDIRECT EXAMINATION**

5    BY MS. KUMAR:

6       **Q**    DR. GLASS, THE EXAMPLES YOU GAVE TODAY WHEN

7    I WAS ASKING YOU QUESTIONS, THOSE WERE ALL FROM 2019

8    OR AFTER, WEREN'T THEY?

9       **A**    YES.

10      **Q**    AND, DR. GLASS, WHEN YOU WORKED ON THE

11   COMPASSIONATE RELEASE PROJECT THAT COUNSEL REFERRED

12   TO, DID YOU ALSO WORK WITH DOC PROVIDERS ON THAT

13   PROJECT?

14      **A**    YES.

15         **MS. KUMAR:**  NO FURTHER QUESTIONS.

16         **THE COURT:**  OKAY.  YOU MAY STEP DOWN.

17               IS DR. GLASS RELEASED FROM HER

18   SUBPOENA?

19         **MS. KUMAR:**  YES, YOUR HONOR, SHE IS.

20         **THE COURT:**  THANK YOU, MA'AM.  YOU'RE

21   RELEASED FROM YOUR SUBPOENA.

22               OKAY.  NEXT WITNESS.

23

24

25

**1**          MS. BOSALAVAGE:  GOOD AFTERNOON, YOUR HONOR.

**2**   SAMANTHA BOSALAVAGE ON BEHALF OF THE PLAINTIFFS.

**3**              WE CALL CHARLES BUTLER.

**4**          THE COURT:  I DIDN'T HEAR YOUR NAME, MA'AM.

**5**          MS. BOSALAVAGE:  THIS MIGHT BE BETTER.

**6**   SAMANTHA BOSALAVAGE ON BEHALF OF THE PLAINTIFFS.

**7**          THE COURT:  AND YOUR WITNESS THAT YOU'RE

**8**   CALLING IS?

**9**          MS. BOSALAVAGE:  CHARLES BUTLER.

**10**         THE COURT:  THANK YOU.

**11**         MS. BOSALAVAGE:  YOUR HONOR, I'D LIKE TO

**12**  REQUEST THAT MR. BUTLER'S RIGHT HAND BE UNSHACKLED SO

**13**  HE CAN GESTURE AND TAKE A DRINK OF WATER.

**14**         THE COURT:  SO ORDERED.

**15**         MS. BOSALAVAGE:  MAY I APPROACH THE WITNESS

**16**  THEN TO BRING A BOTTLE OF WATER?

**17**         THE COURT:  YOU MAY.

**18**         **(WHEREUPON, CHARLES BUTLER, BEING DULY**

**19**  **SWORN, TESTIFIED AS FOLLOWS.)**

**20**                    **DIRECT EXAMINATION**

**21**  BY MS. BOSALAVAGE:

**22**     Q   GOOD AFTERNOON, MR. BUTLER.

**23**     A   GOOD AFTERNOON.

**24**     Q   PLEASE STATE YOUR FULL NAME FOR THE RECORD.

**25**     A   MY NAME IS CHARLES TERRY BUTLER.

CHARLES BUTLER                          **186**

1    Q    HOW OLD ARE YOU, MR. BUTLER?

2    A    I AM 72 YEARS.

3    Q    WHERE ARE YOU FROM?

4    A    I'M FROM TENSAS PARISH; NEWELLTON,

5   LOUISIANA.

6    Q    WHERE DO YOU CURRENTLY LIVE?

7    A    CURRENTLY I AM LIVING AT THE LOUISIANA STATE

8   PENITENTIARY AT ANGOLA.

9    Q    HOW LONG HAVE YOU BEEN IMPRISONED AT LSP?

10   A    I'VE BEEN AT LSP SINCE 1997.

11   Q    DO YOU HAVE ANY MEDICAL TRAINING?

12   A    I HAVE FOUR MEDICAL COMPLAINTS, THE FIRST

13  ONE BEING --

14   Q    I'M SORRY.  I THINK YOU MISHEARD MY

15  QUESTION.  DO YOU HAVE ANY MEDICAL TRAINING?

16   A    YES, I DO HAVE MEDICAL TRAINING.

17   Q    WHAT KIND OF MEDICAL TRAINING?

18   A    I AM A LICENSED, REGISTERED RADIOLOGIC

19  TECHNOLOGIST.

20   Q    WHAT TIME PERIOD DID YOU PRACTICE AS A X-RAY

21  TECHNICIAN?

22   A    PARDON ME?  I DIDN'T HEAR YOU.

23   Q    WHAT TIME PERIOD DID YOU PRACTICE AS AN

24  X-RAY TECHNICIAN?

25   A    I WAS LICENSED -- I WAS REGISTERED AND

1   LICENSED IN 1972 UNTIL 1995.

2       Q    ARE YOU A TRUSTEE AT LSP?

3       A    YES, I AM.

4       Q    WHAT KIND OF TRUSTEE?

5       A    I AM A CLASS "A" TRUSTEE.

6       Q    WHAT DOES THAT MEAN?

7       A    THAT MEANS THAT I PERFORM AND HAVE

8   PRIVILEGES OF THE HIGHEST CALIBER.  THAT MEANS THAT I

9   AM A TRUSTEE WHOSE INTEGRITY IS UNQUESTIONABLE.

10      Q    WHAT KIND OF PRIVILEGES DO YOU HAVE?

11      A    I DIDN'T HEAR YOU AGAIN.

12      Q    WHAT KIND OF PRIVILEGES DO YOU HAVE?

13      A    I HAVE PRIVILEGES WHERE I AM ALLOWED TO

14  TRAVERSE THE STATE AND WORK IN A TRUSTEE CAPACITY

15  WITH MINIMAL SECURITY.

16      Q    HOW DID YOU BECOME A CLASS "A" TRUSTEE?

17      A    I BECAME A CLASS "A" TRUSTEE THROUGH

18  EARNESTNESS, HONESTY, AND INTEGRITY.

19      Q    PRIOR TO BECOMING A CLASS "A" TRUSTEE, WERE

20  YOU OTHER TYPES OF TRUSTEES?

21      A    YES.  I WENT THROUGH THE PRIOR STAGES FROM A

22  CLASS "C" TRUSTEE, A CLASS "B" TRUSTEE, AND NOW A

23  TRUST "A."

24      Q    WHAT IS YOUR JOB AT THE PRISON CURRENTLY?

25      A    PRESENTLY I AM A GED TUTOR, WHICH I HAVE

1  BEEN PERFORMING SINCE 2003.

2      Q    MR. BUTLER, WHY ARE YOU HERE TESTIFYING

3  TODAY?

4      A    I AM HERE TESTIFYING TODAY TO BE ABLE TO

5  CORRECT A WRONG THAT IS BEING PERPETRATED UPON THE

6  PRISONERS AT LSP.

7      Q    DID YOU TESTIFY IN THIS CASE PREVIOUSLY?

8      A    YES, I HAVE.

9      Q    WHY DID YOU AGREE TO TESTIFY AGAIN?

10     A    I AGREED TO TESTIFY ONCE AGAIN BECAUSE FROM

11  MY OBSERVATIONS AND PERSONAL EXPERIENCES, THE

12  ADEQUACY OF THE MEDICAL TREATMENT OF THE PRISONERS

13  HAS NOT BEEN CORRECTED.

14     Q    THANK YOU.  I'D LIKE TO TALK ABOUT YOUR

15  SPECIFIC EXPERIENCES WITH OBTAINING MEDICAL CARE AT

16  LSP, BEARING IN MIND THAT WE'RE THINKING ABOUT

17  JANUARY 2019 UNTIL THE PRESENT.

18          DURING THAT TIME PERIOD, WHAT MEDICAL

19  PROBLEMS DID YOU HAVE AT LSP?

20     A    I HAVE HAD PROBLEMS WITH MY VISION; I HAVE

21  HAD PROBLEMS WITH CHEST PAINS; I HAVE HAD PROBLEMS

22  WITH SHORTNESS OF BREATH; I HAVE PROBLEMS WITH LOWER

23  GI TRACT AND BOWEL PROBLEMS; AND I ALSO HAVE HAD

24  CANCERS.

25     Q    HAVE YOU HAD ANY OTHER ISSUES DURING THAT

1  TIME PERIOD?

2      **A**   NO.  JUST MINOR COMPLAINTS.

3      **Q**   LET'S TAKE THESE ONE AT A TIME.  YOU

4  MENTIONED ISSUES WITH YOUR BOWEL.  CAN YOU DESCRIBE

5  WHAT SYMPTOMS YOU'VE BEEN EXPERIENCING?

6      **A**   THE BOWEL PROBLEMS I HAVE ARE IN THE

7  CATEGORY OF DIARRHEA, OCCASIONAL CONSTIPATION.  AND

8  MAINLY AND MOST OF ALL I'VE BEEN HAVING BLOODY

9  DISCHARGES.

10      **Q**   APPROXIMATELY WHEN DID YOU START

11  EXPERIENCING THESE SYMPTOMS?

12      **A**   I STARTED EXPERIENCING THESE EXPERIENCES IN

13  2019.

14      **Q**   HAVE YOU BEEN SEEN BY A HEALTH CARE PROVIDER

15  AT LSP FOR THESE SYMPTOMS?

16      **A**   YES, I HAVE.

17      **Q**   WHO DID YOU SEE?

18      **A**   I SAW MS. CINDY PARKER, I BELIEVE HER NAME

19  WAS.

20      **Q**   AND WHAT HAPPENED IN THAT ENCOUNTER?

21      **A**   AT THAT ENCOUNTER I HAD COMPLAINED OF THE

22  BLOODY DISCHARGES AND THE LOOSE BOWELS, THE LOOSE

23  STOOL, AND THE CONSTIPATION, AND I WAS PRESCRIBED A

24  SUPPOSITORY.

25      **Q**   HOW DID SHE DIAGNOSE YOU?

1    **A**   JUST FROM SPEAKING WITH ME.  SHE DID NO

2   CURSORY OBSERVATION OR PHYSICAL EXAMINATIONS.

3    **Q**   DID THE SUPPOSITORIES ALLEVIATE YOUR

4   SYMPTOMS?

5    **A**   NO, THEY DID NOT.

6    **Q**   HAVE YOU GOTTEN A COLONOSCOPY SINCE THE

7   ONSET OF THESE SYMPTOMS?

8    **A**   SINCE THE ONSET OF THESE SYMPTOMS?  NO, I

9   HAVE NOT.

10    **Q**   HAVE YOU EVER GOTTEN A COLONOSCOPY?

11    **A**   YES, I HAVE.

12    **Q**   HAVE YOU BEEN SEEN BY A SPECIALIST FOR THIS

13   ISSUE?

14    **A**   YES, I HAVE BEEN SEEN BY A

15   GASTROENTEROLOGIST.  AND HIS TREATMENT FOR ME WAS TO

16   INCREASE MY FIBER INTAKE.

17    **Q**   DO YOU HAVE ANY OTHER APPOINTMENTS SCHEDULED

18   FOR THIS ISSUE?

19    **A**   I DIDN'T UNDERSTAND YOU AGAIN.

20    **Q**   DO YOU HAVE ANY OTHER APPOINTMENTS SCHEDULED

21   FOR THIS ISSUE?

22    **A**   YES, I HAVE BEEN SCHEDULED FOR THAT

23   PARTICULAR ISSUE, BUT I HAVE YET TO HAVE THE TEST

24   PERFORMED.

25    **Q**   HAVE YOU PUT IN AN EMERGENCY SICK CALL FOR

1  THIS ISSUE?

2      A    NO, I HAVE NOT PUT IN AN EMERGENCY SICK

3  CALL, BECAUSE AT LSP AN EMERGENCY WOULD BE

4  UNCONSCIOUSNESS, A HEMORRHAGING OF BLOOD OF THAT

5  NATURE.  REGULAR AMBULATORY COMPLAINTS ARE NOT

6  CONSIDERED EMERGENCY.  AND HAD I TRIED TO MAKE AN

7  EMERGENCY ON THAT, I WOULD HAVE BEEN DISCIPLINED.

8      Q    WHAT WOULD YOU LIKE TO SEE LSP DO ABOUT THIS

9  ISSUE?

10      A    I WOULD LIKE TO SEE LSP INFORM THE PRISONERS

11  OF THEIR MEDICAL CONDITIONS, OF THEIR MEDICAL

12  COMPLAINTS, AND JUST CARE ABOUT THE PRISONERS'

13  CONDITIONS.  THE AVERAGE PRISONER IS ELDERLY, BUT NO

14  ONE EXPLAINS THEIR COMPLAINTS.  THEY DO NOT KEEP THEM

15  APPRISED OF TEST RESULTS.

16      Q    MR. BUTLER, DO YOU ALSO EXPERIENCE ISSUES

17  WITH FAINTING?

18      A    YES, I DO.  I'VE HAD EPISODES OF SYNCOPE AND

19  ABOUT MAYBE FIVE OR FOUR WITHIN THE PAST FEW YEARS.

20  AND I HAVE NOT EVER BEEN ABLE TO GET A DIAGNOSIS OR A

21  PROGNOSIS.

22      Q    DO ANY OF THOSE TIMES STAND OUT TO YOU IN

23  PARTICULAR?

24      A    THERE IS ONE PARTICULAR INCIDENT WHEN I

25  PASSED OUT, AND IT WAS IN THE FALL OF 2021.  I PASSED

1    OUT ONE AFTERNOON, AND I WAS TREATED, BROUGHT TO THE

2    TU UNIT; AND THERE I WAS GIVEN INTRAVENOUS FLUIDS AND

3    I WAS DIAGNOSED AS BEING DEHYDRATED.  WELL, NO MORE

4    THAN SIX HOURS LATER AT WORK THAT MORNING, I PASSED

5    OUT AGAIN.  AND ONCE AGAIN I WAS BROUGHT TO THE TU

6    UNIT WHERE I WAS DIAGNOSED AS BEING DEHYDRATED.

7           AND THAT ONE STANDS OUT BECAUSE DURING THE

8    SIX-HOUR PERIOD BETWEEN THE EPISODES, I HADN'T DONE

9    ANYTHING TO -- ANYTHING TO, YOU KNOW, LOSE ANY FLUIDS

10   OR --

11     Q    HAVE YOU BEEN BROUGHT TO THE ATU EACH TIME

12   YOU'VE PASSED OUT?

13     A    YES, I HAVE.

14     Q    HAVE YOU BEEN SEEN BY OTHER DOCTORS BESIDES

15   THE DOCTORS AT THE ATU AFTER YOU PASSED OUT?

16     A    NOT FOR THAT PARTICULAR COMPLAINT, NO.

17     Q    WHY DO YOU THINK IT'S NOT DEHYDRATION?

18     A    I DON'T BELIEVE IT'S DEHYDRATION BECAUSE I

19   AM -- MY INTAKE OF FLUIDS ARE VERY HIGH AND ADEQUATE

20   I BELIEVE, AND I DON'T DO HEAVY PERSPIRING OR

21   ANYTHING, AND I JUST DON'T FEEL IT.  IT'S SOMETHING

22   OTHER THAN JUST SIMPLE DEHYDRATION.

23     Q    BUT YOU'VE RECEIVED NO OTHER DIAGNOSIS FOR

24   FAINTING?

25     A    NO, I HAVE NOT.

**1**    **Q**   NOW I'D LIKE TO TALK ABOUT YOUR CHEST PAIN

**2**   AND YOUR SHORTNESS OF BREATH.  CAN YOU DESCRIBE THOSE

**3**   SYMPTOMS?

**4**    **A**   THE CHEST PAIN, IT'S A STABBING PAIN THAT'S

**5**   LOCATED IN MY LEFT CHEST WALL, AND IT IS A CONSTANT

**6**   PAIN.  AND SOMETIMES IT'S TO THE POINT WHERE I TRY TO

**7**   SHIFT POSITIONS AND I CANNOT BECAUSE THE PAIN GETS

**8**   INTENSE.

**9**        THE SHORTNESS OF BREATH COMES EVEN WHEN I'M

**10**  SITTING.  I DON'T NECESSARILY HAVE TO BE EXERTING

**11**  PHYSICALLY, BUT THE PAIN REMAINS THE SAME.  I MIGHT

**12**  BE WALKING A NUMBER OF FEET AND I GET THE SHORTNESS

**13**  OF BREATH.  THE CHEST PAINS ARE CONSTANT.

**14**   **Q**   APPROXIMATELY WHEN DID YOU START

**15**  EXPERIENCING THESE SYMPTOMS?

**16**   **A**   THESE CHEST PAINS CAME 2020.

**17**   **Q**   HAVE YOU BEEN SEEN ABOUT THIS ISSUE?

**18**   **A**   YES, I HAVE.  I'VE HAD A CARDIAC WORK-UP

**19**  ORDERED.  AND THEY ARE STILL IN THE PROCESS OF DOING

**20**  THIS WORK-UP, BUT IT'S BEEN SOME TIME NOW.

**21**   **Q**   DO YOU RECALL APPROXIMATELY WHEN YOU HAD THE

**22**  MOST RECENT TEST DONE ON THIS?

**23**   **A**   ON THIS CARDIAC WORK-UP, THE MOST RECENT WAS

**24**  IN MARCH OF THIS YEAR.  A STRESS TEST WAS DONE AROUND

**25**  THE TIME OF THE DEPOSITION.

**1**    **Q**    HAVE YOU EVER SIGNED A REFUSAL?

**2**    **A**    YES, I HAVE.

**3**    **Q**    WHEN WAS THE MOST RECENT TIME YOU SIGNED A

**4**  REFUSAL?

**5**    **A**    THE MOST RECENT REFUSAL I SIGNED WAS IN

**6**  MARCH OF THIS YEAR.

**7**    **Q**    CAN YOU DESCRIBE WHAT HAPPENED?

**8**    **A**    ON THIS PARTICULAR OCCASION -- IN FACT, IT

**9**  WAS THE DAY I WAS TO GIVE THE DEPOSITION -- I WAS

**10**  ALSO SCHEDULED FOR A MEDICAL APPOINTMENT.  GOING TO

**11**  THE TU TO INFORM THEM THAT I WOULD BE A BIT LATE FOR

**12**  THE APPOINTMENT, I WAS TOLD AT TU THAT I MUST SIGN A

**13**  MEDICAL REFUSAL; HOWEVER, I WAS NOT REFUSING

**14**  TREATMENT.  I WAS JUST BEING COURTEOUS TO LET THEM

**15**  KNOW THAT I WOULD BE LATE.

**16**        WELL, I WAS THREATENED WITH A DISCIPLINARY

**17**  LOCKUP SHOULD I NOT SIGN A REFUSAL.  SO OBVIOUSLY I

**18**  HAD TO SIGN THE REFUSAL, WHICH I DID.  AND I

**19**  EXPLAINED ON THE REFUSAL THAT I WAS NOT REFUSING

**20**  TREATMENT.  I WAS JUST BEING A BIT TARDY.

**21**        WELL, WHEN I DID MEET WITH THE ATTORNEYS FOR

**22**  THE DEPOSITION, I INFORMED THE ATTORNEYS OF THE

**23**  INCIDENT, AND I WAS VERBALLY ACCOSTED BY THE

**24**  DEFENDANT'S ATTORNEY WHERE HE WAS SAYING IT WAS MY

**25**  FAULT, WHICH IT WAS NOT.  AND THAT PARTICULAR REFUSAL

1   WAS NOT REFUSING MEDICAL TREATMENT.

2      Q    ARE THERE OTHER INSTANCES WHERE YOU SIGNED A

3   REFUSAL BUT YOU WEREN'T REFUSING TREATMENT?

4      A    THERE WAS ANOTHER INCIDENT WHERE I REFUSED

5   TRANSPORTATION.  IN FACT, IT WAS FOLLOWING ONE OF THE

6   SYNCOPE EPISODES.  AND I WAS ASKED TO LET -- TO BE

7   TRANSPORTED BY AMBULANCE TO THE TU.  HOWEVER, I FELT

8   THAT I COULD AMBULATE AND WALK OVER, AND SO I REFUSED

9   THE TRANSPORTATION.  BECAUSE AS SOON AS I GOT TO THE

10  TU UNIT, I WAS GIVEN, ONCE AGAIN, INTRAVENOUS FLUIDS,

11  SO I RECEIVED THE TREATMENT.

12     Q    WAS THERE EVER A TIME YOU SIGNED A REFUSAL

13  RELATED TO COVID-19?

14     A    THERE WAS ONE OTHER TIME RIGHT AT THE TIME

15  OF THE PANDEMIC CRISIS.  AND THIS WAS WHEN THE

16  REGIMEN AT ANGOLA WAS THAT ANYONE THAT LEFT THE

17  PRISON AND RETURNED HAD TO BE PLACED UNDER

18  QUARANTINE.

19          WELL, DURING THIS TIME THE PRISON WAS

20  OVERCROWDED AND THEY DID NOT HAVE THE SPACE, SO THEY

21  SUGGESTED THAT I NOT GO TO GET TO THE APPOINTMENT

22  BECAUSE I WOULDN'T HAVE SPACE WHEN I CAME BACK.  THAT

23  WAS THE ONLY OTHER TIME.

24     Q    SO THE LSP PERSONNEL ASKED YOU TO SIGN THE

25  REFUSAL.  RIGHT?

1    **A**   THEY ASKED ME TO SIGN THE PAPERWORK, AND

2  THEY EVEN SUGGESTED WHAT WAS WRITTEN ON THE FORM.

3    **Q**   NOW I'D LIKE TO TALK ABOUT YOUR VISION

4  ISSUES.  CAN YOU PLEASE DESCRIBE THOSE SYMPTOMS?

5    **A**   IT'S -- FOR MANY YEARS NOW I'VE BEEN TOLD BY

6  MY OPHTHALMOLOGIST THAT THERE IS A POSSIBILITY I HAD

7  CATARACTS.  NO ONE HAS SPECIFICALLY DONE AN

8  EXAMINATION ON ME FOR THESE CATARACTS, BUT I HAVE

9  COMPLAINED CONSTANTLY OF BLURRED VISION -- BLURRED

10  VISION, DRY EYES, AND A WEAKNESS IN MY FOCUSING.

11    **Q**   HAVE YOU BEEN PRESCRIBED ANYTHING FOR YOUR

12  BLURRY VISION?

13    **A**   I WAS GIVEN ARTIFICIAL TEARS.  AND USUALLY

14  EVERY SIX TO EIGHT MONTHS I'M GIVEN A NEW

15  PRESCRIPTION FOR EYE GLASSES.

16    **Q**   HAVE THE ARTIFICIAL TEARS HELPED WITH YOUR

17  BLURRED VISION?

18    **A**   NO, THEY HAVE NOT.  IN FACT, THEY HAVE

19  AGGRAVATED THE DRYNESS.

20    **Q**   NOW I'D LIKE TO TALK ABOUT SICK CALL.  HOW

21  DOES A ROUTINE SICK CALL WORK?

22    **A**   THE SICK CALL SYSTEM IN PLACE NOW REQUIRES

23  AN OFFENDER TO FILL OUT THE SICK FORM, PLACE IT IN

24  THE DROPBOX.  AND IF IT'S PLACED IN THIS BOX BEFORE

25  12:00 P.M., THE OFFENDER WILL BE SEEN AT SICK CALL

1   THE FOLLOWING DAY.

2       **Q**    HAS THE SICK CALL PROCESS ALWAYS WORKED THAT

3   WAY?

4       **A**    I'M SORRY?

5       **Q**    HAS THE SICK CALL PROCESS ALWAYS WORKED THAT

6   WAY?

7       **A**    NO.  IT -- PREVIOUSLY THE PROCESS WAS THE

8   OFFENDER HAD TO AWAKEN AT 4:00 A.M. IN THE MORNING

9   AND WAIT UNTIL THE EMTs WOULD COME AROUND.  AND THEY

10  WOULD TAKE THIS SAME FORM AND GIVE IT TO THE EMT, AND

11  THE EMT WOULD TAKE HIS VITALS AND THEY WOULD FILL OUT

12  THE FORM AND BRING IT -- AND BRING IT TO THE

13  PHYSICIAN.

14      **Q**    HAVE YOU MADE A SICK CALL SINCE THE NEW

15  PROCESS WAS IMPLEMENTED?

16      **A**    YES, I HAVE.

17      **Q**    HAVE YOU EXPERIENCED ANY PROBLEMS MAKING

18  SICK CALL?

19      **A**    ONE PROBLEM WOULD BE IS THAT THE SICK CALL

20  IS NOT OPEN ON THE WEEKENDS.  THE PROBLEMS I

21  EXPERIENCED WAS WHERE MY COMPLAINTS OF THE HEADACHES,

22  THE BLURRED VISION, SHORTNESS OF BREATH AND CHEST

23  PAINS REQUIRED VITALS TO BE TAKEN.  SO IF I DROPPED

24  THE SICK CALL FORM IN THE BOX, I WON'T BE SEEN UNTIL

25  MONDAY, WHICH IS 48 HOURS LATER.  SO THAT'S

1   INADEQUATE, BECAUSE I'M CAUGHT BETWEEN THE PLACE

2   WHERE I WILL NOT BE AN EMERGENCY PER SE BUT SOMETHING

3   THAT NEEDS TO BE CHECKED ON STRAIGHT AWAY.  AND THIS

4   IS ONE OF THE FAILINGS OF THAT NEW SYSTEM.

5       Q    HAVE YOU OBSERVED ANY OTHER PROBLEMS WITH

6   THE NEW SYSTEM?

7       A    THE NEW SYSTEM IS GEARED TO APPEAR THAT

8   YOU'RE RECEIVING TREATMENT, BUT YOU'RE NOT ACTUALLY

9   RECEIVING TREATMENT.  YOU'RE STILL GOING THROUGH THE

10  SAME PROCESS.  AND THE TREATMENT ONLY COMES THREE TO

11  FOUR WEEKS DOWN THE ROAD.  YOUR VITALS ARE TAKEN TWO

12  TO THREE DAYS AFTER YOU FILL THE FORM IN.

13      Q    WHAT IS A COPAY?

14      A    THE COPAY IS THE COST ASSESSED TO THE

15  OFFENDER.  AND IT IS SET AT A RATE THAT IS THREE

16  DOLLARS PER SICK CALL VISIT, TWO DOLLARS PER

17  PRESCRIPTION.

18      Q    CAN YOU DESCRIBE HOW HAVING A COPAY HAS

19  IMPACTED YOUR ABILITY TO ACCESS CARE?

20      A    THE SICK CALL COPAY TENDS TO CREATE A

21  PERPETUAL DEBT, BECAUSE THE AVERAGE PAY AT ANGOLA IS

22  FOUR CENT.  WITH THE SICK CALL BEING AT NO LESS THAN

23  FIVE DOLLARS, IT'S VERY HARD BECAUSE THE PRISON ONLY

24  PROVIDES YOU WITH PARTIAL HYGIENE.  YOU HAVE TO BUY

25  YOUR DEODORANTS, YOUR TOILETRIES AND ALL, AND

1  THAT'S -- YOUR SICK CALL, YOU END UP PAYING MORE OR

2  CREATING A DEBT THAT YOU REALLY CAN'T PAY AND THE

3  BILL CONTINUES TO GROW.  AND THE SICK CALL IS MANY

4  TIMES MUCH HIGHER THAN OVER-THE-COUNTER MEDICATIONS

5  YOU CAN GET THROUGH THE CANTEEN SYSTEM.

6      Q    MR. BUTLER, WE'VE TALKED ABOUT YOUR

7  INDIVIDUAL ISSUES SEEKING MEDICAL CARE AT LSP.  HOW

8  WOULD YOU DESCRIBE YOUR OVERALL EXPERIENCE ACCESSING

9  CARE?

10     A    THE EXPERIENCE HAS BEEN I HAVE TO REALLY

11 FIGHT TO GET SEEN FOR MY MEDICAL AILMENTS.  IN FACT,

12 THE GI TRACT COMPLAINT THAT I HAVE AND NOT RECEIVED

13 TREATMENT FOR, THE CONDITION HAS PROGRESSED WHERE THE

14 BLOODY DISCHARGE WAS FLUID AT FIRST, BUT ON MY LAST

15 SICK CALL, WHICH WAS LAST WEEK, I'M PASSING BLOOD

16 CLOTS.

17         BUT NO ONE CAN TELL ME WHEN I WILL HAVE THE

18 TEST PERFORMED OR ARE THEY ABLE TO GIVE ME A

19 DIAGNOSIS OR A PROGNOSIS.

20     Q    ON A SCALE FROM ONE TO TEN, WITH ONE BEING

21 THE WORST AND TEN BEING THE BEST, HOW WOULD YOU RATE

22 THE MEDICAL CARE AT LSP?

23     A    THE MEDICAL CARE AT LSP IS A ONE.

24     Q    WHY DO YOU GIVE IT THAT RATING?

25     A    I WILL GIVE IT THAT RATING BECAUSE OF MY OWN

1  PERSONAL EXPERIENCES.  THE COMPASSION, THE CARE AND,

2  IN MANY CASES, THE COMPETENCY IS NOT THERE.  THE

3  MEDICAL STAFF AT LSP PREFERS NOT TO KEEP YOU INFORMED

4  OF YOUR CONDITIONS.  SOME OF THE LIMITATIONS ON SICK

5  CALL IS THAT I AM RESTRICTED TO HAVING ONLY ONE

6  MEDICAL COMPLAINT ADDRESSED PER CLINIC VISIT, AND

7  THAT IS NO GOOD.  IT'S INADEQUATE.

8      **Q**    ASIDE FROM THE CHANGES WE DISCUSSED WITH

9  SICK CALL, HAVE YOU SEEN ANY OTHER CHANGES WITH

10  RESPECT TO THE MEDICAL CARE AT LSP SINCE YOU LAST

11  TESTIFIED?

12     **A**    NO, I HAVE NOT.

13     **Q**    WHAT WOULD YOU LIKE TO CHANGE?

14     **A**    I WOULD LIKE TO CHANGE THE SYSTEM OF THE

15  SICK CALL.  I WOULD LIKE TO CHANGE THE WAIT INVOLVED.

16  I REALIZE THAT EVEN OUT ON THE STREET THERE IS A

17  WAIT, BUT YOU ARE GIVEN SOMETHING TO HOLD ON TO.  AT

18  LSP YOU'RE GIVEN NOTHING.

19          AND THEN WITH THE LIMITATIONS, IF I'M AT THE

20  CLINIC AND I'M BEING SEEN, IF I HAVE A NOSE BLEED,

21  WHY SHOULDN'T I BE ASKING ABOUT A HEADACHE THAT I'M

22  ALSO HAVING AT THIS PARTICULAR TIME?  THE MEDICAL

23  STAFF COULD BE OVERWORKED; HOWEVER, SEEING ME FOR

24  MORE THAN THAT ONE COMPLAINT WOULD ALLEVIATE SOME OF

25  THAT PROBLEM.

1    **Q**    THANK YOU, MR. BUTLER.

2    **A**    YES.

3          **THE COURT:**  MR. CONINE?

4          **MR. CONINE:**  JOHN CONINE ON BEHALF OF THE

5    DEFENDANTS.

6                    **CROSS-EXAMINATION**

7    **BY MR. CONINE:**

8    **Q**    GOOD AFTERNOON, MR. BUTLER.

9    **A**    GOOD AFTERNOON.

10   **Q**    LET'S START WITH YOUR CHEST ISSUES YOU JUST

11   DISCUSSED.  SINCE 2019 YOU'VE HAD FOUR CHEST X-RAYS.

12   IS THAT CORRECT?

13   **A**    I REALLY CAN'T ANSWER ON ANY OF THAT BASIS.

14   IT'S POSSIBLE I'VE HAD FOUR, YES.

15   **Q**    IF YOUR MEDICAL RECORDS STATED THAT YOU'VE

16   HAD FOUR X-RAYS -- CHEST X-RAYS SINCE 2019, WOULD YOU

17   HAVE ANY REASON TO DISPUTE THAT?

18   **A**    NO, I WOULD NOT.

19   **Q**    LET'S TALK ABOUT SOME OTHER TESTS YOU'VE HAD

20   ON YOUR CHEST.  SINCE 2019 YOU'VE ALSO HAD THREE CT

21   SCANS ON YOUR CHEST.  ISN'T THAT RIGHT?

22   **A**    IF MY CHART SAYS SO, YES, IT'S CORRECT.

23   **Q**    ALL RIGHT.  AND THEN LET'S TALK ABOUT SOME

24   ADDITIONAL TESTS THAT YOU'VE HAD DONE ON YOUR HEART.

25   YOU HAD A CAROTID ARTERY DUPLEX REPORT ON JULY 14,

1  2021.  ISN'T THAT RIGHT?

2      **A**   I'M NOT SURE OF THE DATE.

3      **Q**   DID YOU HAVE THAT REPORT DONE?

4      **A**   WELL, YOU SEE, I HAVEN'T BEEN GIVEN ANY

5  RESULTS OF ANY TESTS THAT I'VE HAD.

6      **Q**   YES, SIR, I UNDERSTAND THAT.  BUT DID YOU

7  HAVE THAT CAROTID ARTERY REPORT DONE IN JULY OF 2021?

8      **A**   I'M NOT SURE.  I'M NOT SURE WHAT TEST YOU'RE

9  SPEAKING OF.

10     **Q**   YES, SIR.  AND I'LL HELP YOU REFRESH YOUR

11 RECOLLECTION.

12         **MR. CONINE:**  BROOKE -- THIS IS SEALED,

13 MS. EDWARDS -- CAN WE BRING UP WHAT IS MARKED AS

14 DX_34-VVV?  THIS IS ON PAGE 98.  CAN YOU MAKE IT A

15 LITTLE BIGGER FOR MR. BUTLER TO SEE?

16 **BY MR. CONINE:**

17     **Q**   MR. BUTLER, DO YOU SEE AT THE TOP IT SAYS

18 "CAROTID ARTERY DUPLEX REPORT"?  DO YOU SEE THAT?

19     **A**   YES, I DO.  YES.

20     **Q**   AND THAT IS YOUR NAME:  BUTLER CHARLES.

21 CORRECT?

22     **A**   THE LAST NAME IS MISSPELLED.  IT SHOULD BE

23 B-U-T-L-E-R.

24     **Q**   YES, SIR.  IS THAT YOUR DATE OF BIRTH RIGHT

25 ACROSS FROM THAT:  7/4/1951?

1      **A**   YES, IT IS.

2      **Q**   AND DO YOU RECALL RECEIVING THIS REPORT?  OR

3  RECEIVING THIS TEST?  I'M SORRY.

4      **A**   I HAVE NOT RECEIVED ANY REPORTS.

5      **Q**   OKAY.  DID YOU HAVE THIS TEST DONE ON YOU IS

6  WHAT I'M ASKING.

7      **A**   I'VE HAD THIS TEST DONE, BUT I HAVE NOT

8  RECEIVED ANY REPORTS.

9      **Q**   OKAY.  AND IN THE CIRCLED SECTION THERE IT

10  SAYS "NORMAL BILATERAL CAROTID ARTERY DUPLEX

11  EXAMINATION."  DO YOU SEE THAT?

12      **A**   YES.

13          **MR. CONINE:**  BROOKE, YOU CAN TAKE THAT DOWN.

14  BY MR. CONINE:

15      **Q**   AND YOU'VE ALSO HAD A ECHOCARDIOGRAM.  ISN'T

16  THAT RIGHT?

17      **A**   YES.

18      **Q**   AND THAT WAS DONE AT UNIVERSITY MEDICAL

19  CENTER.  IS THAT CORRECT?

20      **A**   YES.

21      **Q**   AND YOU'VE ALSO HAD A STRESS TEST DONE.  I

22  BELIEVE YOU MENTIONED THAT TO YOUR -- WHEN YOUR

23  COUNSEL WAS ASKING YOU QUESTIONS.  IS THAT RIGHT?

24      **A**   YES.

25      **Q**   AND WHERE WAS THAT DONE?

1     **A**    THAT WAS DONE AT THE FRANKLINTON HOSPITAL.

2     **Q**    THANK YOU.  AND LET'S TALK ABOUT THIS LAST

3   TEST.  YOU ALSO HAD A 48-HOUR HEART MONITOR.  ISN'T

4   THAT RIGHT?

5     **A**    YES.

6     **Q**    AND WHEN WAS THAT?

7     **A**    THAT WAS IN MARCH OF THIS YEAR.

8     **Q**    SORRY.  ONE SECOND.  I'M JUST GOING TO GET

9   SOME WATER.  THANK YOU, MR. BUTLER.

10          AND YOU'VE ALSO BEEN SEEN IN THE CARDIOLOGY

11  CLINIC AT LSP.  ISN'T THAT RIGHT?

12    **A**    I'M NOT SURE.

13          **MR. CONINE:**  OKAY.  MS. RAGUSA, CAN WE BRING

14  UP 179, PLEASE?

15  **BY MR. CONINE:**

16    **Q**    AND, MR. BUTLER, I'M SHOWING YOU THIS RECORD

17  RIGHT HERE.  AND IS THAT YOUR NAME AT THE TOP:

18  CHARLES BUTLER?

19    **A**    YES, IT IS.

20    **Q**    AND DO YOU SEE THE DATE THERE:  1/22 OF '22?

21    **A**    YES.

22    **Q**    AND IT SAYS "CARDIOLOGY CLINIC" RIGHT THERE

23  TO THE SIDE.  IS THAT RIGHT?

24    **A**    YES, IT DOES.

25    **Q**    OKAY.  THANK YOU.

1          MR. CONINE:  YOU CAN TAKE IT DOWN, BROOKE.

2   BY MR. CONINE:

3     Q    ALL RIGHT.  LET'S MOVE ON TO YOUR NEXT

4   ISSUE.  THIS IS YOUR LOSS OF CONSCIOUSNESS.  DO YOU

5   UNDERSTAND WHAT SYNCOPE MEANS?

6     A    YES.

7     Q    AND YOU FAINTED IN MARCH OF 2021.  IS THAT

8   RIGHT?

9     A    THAT'S CORRECT.

10     Q    AND YOU WERE TAKEN BY AMBULANCE TO THE ATU?

11     A    THAT'S CORRECT.

12     Q    AND YOU WERE ADMINISTERED FLUIDS THROUGH IV?

13     A    YES.

14     Q    AND THIS ALSO HAPPENED IN JUNE OF 2021.  IS

15   THAT RIGHT?

16     A    YES, THAT'S CORRECT.

17     Q    YOU THINK -- DOES JUNE 16TH SOUND ABOUT

18   RIGHT?

19     A    A SPECIFIC DATE I AM NOT AT LIBERTY TO SAY

20   RIGHT NOW.

21     Q    IS THAT BECAUSE YOU DON'T RECALL WHAT DATE

22   IT WAS?

23     A    I RECALL, BUT I DON'T RECALL THE SPECIFIC

24   DATE.

25     Q    OKAY.  AND AT THAT TIME WERE YOU TAKEN BY

1   AMBULANCE TO THE ATU?

2       A    POSSIBLY I MIGHT HAVE BEEN.

3       Q    WERE YOU GIVEN FLUIDS AT THAT TIME?

4       A    YES.

5       Q    AND YOU'VE ALSO REFUSED TRIPS TO THE ATU FOR

6   PAIN -- FOR FAINTING.  ISN'T THAT RIGHT?

7       A    I REFUSED TRANSPORTATION BY AMBULANCE.  I

8   HAVE GONE -- EACH TIME I HAD THE EPISODES OF SYNCOPE,

9   I HAVE GONE TO THE TU UNIT FOR TREATMENT FOR

10  REHYDRATION.

11      Q    SO YOU DON'T RECALL REFUSING A TRIP TO THE

12  ATU ON JUNE 15TH OF 2021?

13      A    REFUSING THE TRIP?

14      Q    YES, SIR.

15      A    I HAVE REFUSED THE TRANSPORTATION, BUT I DID

16  NOT REFUSE MEDICAL TREATMENT.

17      Q    OKAY.  AND -- LET'S SEE.  AND YOU'VE ALSO

18  HAD A CT SCAN OF YOUR BRAIN AND HEAD.  ISN'T THAT

19  RIGHT?

20      A    YES, I HAVE HAD A CT SCAN.

21      Q    OKAY.  DO YOU RECALL WHEN THAT WAS?

22      A    THAT WAS IN '19.

23      Q    2019?

24      A    2019, YES.

25           **MR. CONINE:**  I'M SORRY, BROOKE.  CAN WE

1  BRING UP 199; PAGE 199?

2  **BY MR. CONINE:**

3     **Q**   AND, MR. BUTLER, I'LL DRAW YOUR ATTENTION --

4  IT SAYS "CT HEAD/BRAIN W-O."  DO YOU SEE THAT?

5     **A**   YES.

6     **Q**   AND DO YOU SEE THE SERVICE DATE NEXT TO THAT

7  SAYS OCTOBER 19, 2021?

8     **A**   YES.

9     **Q**   AND THEN BELOW THAT IT SAYS "REASON:

10 SYNCOPE, HISTORY OF LUNG AND PROSTATE CANCER."  DO

11 YOU ALSO SEE THAT?

12    **A**   YES, I SEE THAT.

13    **Q**   THANK YOU.

14       **MR. CONINE:**  BROOKE, YOU CAN TAKE THAT DOWN.

15 **BY MR. CONINE:**

16    **Q**   AND, MR. BUTLER, YOU HAVE BEEN SEEN IN THE

17 GENERAL MEDICINE CLINIC RELATED TO FAINTING.  ISN'T

18 THAT RIGHT?

19    **A**   RELATED TO FAINTING?

20    **Q**   YES, SIR.  OR SYNCOPE.

21    **A**   NO, I'M NOT SURE ON THAT ONE.

22       **MR. CONINE:**  BROOKE, CAN YOU BRING UP PAGE

23 230, PLEASE.

24 **BY MR. CONINE:**

25    **Q**   MR. BUTLER, YOU DON'T RECALL BEING SEEN IN

1   THE GENERAL MEDICINE CLINIC ON JULY 2, 2021?

2       **A**   NO, I DO NOT.

3       **Q**   DO YOU SEE THE DATE AT THE TOP RIGHT CORNER,

4   IT SAYS JUNE -- I'M SORRY -- JULY 2, 2021?  DO YOU

5   SEE THAT?

6       **A**   YES, I DO.

7       **Q**   AND DO YOU SEE OVER HERE ON THE LEFT-HAND

8   SIDE THE CHIEF COMPLAINT "S-C PASSING OUT"?  DO YOU

9   SEE THAT?

10      **A**   YES.  I WAS CHECKING FOR MY SIGNATURE.

11      **Q**   THIS IS JUST A PHYSICIAN NOTE.

12      **A**   SO THIS IS NOTHING THAT WAS CREATED BY ME

13  SIGNING?

14      **Q**   NO, SIR.

15      **A**   OKAY.  SO I REALLY CAN'T SAY FOR SURE.  BUT

16  BECAUSE OF THE DATE BEING JULY 2ND, I WOULD MOST

17  EARNESTLY RECALL THIS BECAUSE IT'S TWO DAYS BEFORE MY

18  BIRTHDAY.  AND I -- NO, I DO NOT RECALL THIS.

19      **Q**   ARE YOU SAYING YOU DISPUTE THIS RECORD?

20      **A**   NO.  I'M SAYING I DO NOT RECALL THIS.

21      **Q**   I GOT YOU.  ALL RIGHT.

22          AND YOU WERE ALSO SEEN IN THE GENERAL

23  MEDICINE CLINIC FOR FAINTING ON SEPTEMBER 16, 2021.

24  ISN'T THAT RIGHT?

25      **A**   THAT'S CORRECT.

1    Q    AND YOU STATED IN YOUR DEPOSITION THAT YOU

2  HADN'T BEEN SEEN BY ANY PROVIDER.  ISN'T THAT RIGHT?

3  I BELIEVE YOU TESTIFIED TO THAT EARLIER, TOO.  I MAY

4  BE MISTAKEN ON THAT, BUT --

5    A    WAS THE DEPOSITION SPECIFIC AS TO WHAT

6  COMPLAINT?

7    Q    I'M SORRY?

8    A    BECAUSE -- WAS THE DEPOSITION SPECIFIC AS TO

9  WHICH COMPLAINT, WHAT CONDITION?

10    Q    FOR THE PASSING OUT, THE FAINTING.

11         DIDN'T YOU TESTIFY EARLIER THAT YOU HAD NOT

12  SEEN A PROVIDER FOR PASSING OUT?

13    A    THAT'S CORRECT.

14    Q    OKAY.  ALL RIGHT.  LET'S MOVE ON TO YOUR

15  BOWEL ISSUES.  YOU WERE SEEN IN GENERAL MEDICINE

16  CLINIC FOR YOUR BOWEL ISSUES.  ISN'T THAT RIGHT?

17    A    THAT'S CORRECT.

18    Q    AND YOU WERE SEEN IN GENERAL MEDICINE -- IN

19  THE GENERAL MEDICINE CLINIC ON APRIL 14, 2020 --

20  2021.  ISN'T THAT RIGHT?  2020 -- 2021.

21    A    THAT'S CORRECT.

22    Q    YIKES.  SORRY.  AND AGAIN FOR BLOOD IN YOUR

23  STOOL ON AUGUST 25, 2021.  ISN'T THAT RIGHT?

24    A    THAT'S -- YES, THAT'S CORRECT.

25    Q    AND HOW ABOUT DECEMBER OF 2021?  WERE YOU

1   ALSO SEEN IN THE GENERAL MEDICINE CLINIC THEN?

2       **A**   YES.  THAT'S WHEN I WAS PRESCRIBED THE

3   SUPPOSITORIES.

4       **Q**   AND YOU HAVE HAD A COLONOSCOPY.  ISN'T THAT

5   RIGHT?  A COLONOSCOPY?  YOU'VE HAD A COLONOSCOPY?

6       **A**   I HAVE HAD COLONOSCOPIES.

7       **Q**   I JUST WANTED TO CONFIRM.  YOU HAVE HAD

8   THOSE.  CORRECT?

9       **A**   IS THERE ANY PARTICULAR COMPLAINT YOU'RE

10  ASKING ABOUT?

11      **Q**   NO, SIR.  I'M JUST TRYING TO CONFIRM WHETHER

12  YOU'VE HAD A COLONOSCOPY OR NOT.

13      **A**   YEAH, I HAD A COLONOSCOPY IN 2003 BEFORE I

14  HAD SURGERY FOR A COLONECTOMY (SIC) IN 2005.

15      **Q**   OKAY.

16      **A**   I'VE ALSO HAD A COLONOSCOPY IN 2018.  BUT

17  SINCE THE ONSET OF THIS NEWEST COMPLAINT, I HAVE HAD

18  NO COLONOSCOPIES.

19      **Q**   YOU DIDN'T HAVE A COLONOSCOPY IN JULY OF

20  2019?

21      **A**   NO, I DID NOT.

22          **MR. CONINE:**  BROOKE, CAN WE PLEASE BRING UP

23  PAGE 454 OF DX_34-VVV.  454.

24  BY MR. CONINE:

25      **Q**   MR. BUTLER, I'M SHOWING YOU THIS RECORD.  DO

1  YOU SEE IT SAYS "PROCEDURE: COLONOSCOPY"?  DO YOU SEE

2  THAT, MR. BUTLER?

3       A    YES, I DO.

4            **MR. CONINE:**  BROOKE, CAN YOU ZOOM OUT,

5  PLEASE?  CAN YOU SCROLL DOWN?  GO BACK UP.  DOWN AT

6  THE BOTTOM, PLEASE.

7  **BY MR. CONINE:**

8       Q    MR. BUTLER, DOWN AT THE BOTTOM, IS THAT YOUR

9  NAME?  IT SAYS "BUTLER, CHARLES" AND YOUR DOC NUMBER?

10      A    YES, IT IS.

11      Q    AND THE DATE AT THE BOTTOM IS JULY 11, '19.

12 ISN'T THAT RIGHT?

13      A    YES, IT IS.

14           **MR. CONINE:**  BROOKE, CAN YOU ALSO GO TO PAGE

15 462 AND ZOOM IN, PLEASE, AT THE TOP?

16 **BY MR. CONINE:**

17      Q    MR. BUTLER, DO YOU SEE WHERE IT SAYS

18 "PROCEDURE" AND IT'S CIRCLED?  IT SAYS "COLON."  DO

19 YOU SEE THAT?

20      A    YES, I DO.

21      Q    AND THEN RIGHT BELOW THAT IT SAYS "PRE-OP

22 DX" CIRCLED, AND IT'S A "PH COLON" IS CIRCLED AND

23 "POLYPS" IS CIRCLED.  ISN'T THAT RIGHT?

24      A    THAT'S CORRECT.

25      Q    AND BELOW THAT IT SAYS "POST-OP DX."  AND

1   "HEMORRHOIDS RECOGNIZED" IS CIRCLED AND

2   "DIVERTICULOSIS" IS ALSO CIRCLED.  DO YOU SEE THAT?

3        A    WAIT.  I DON'T SEE "HEMORRHOIDS."

4        Q    RIGHT THERE IN THE HIGHLIGHTED PORTION, DO

5   YOU SEE THAT "HEMORRHOIDS" IS CIRCLED?

6        A    YES, I SEE IT.

7        Q    THANK YOU, MR. BUTLER.

8             **MR. CONINE:**  BROOKE, YOU CAN TAKE THAT DOWN.

9   **BY MR. CONINE:**

10       Q    AND YOU HAVE BEEN PRESCRIBED SUPPOSITORIES

11  FOR HEMORRHOIDS.  ISN'T THAT RIGHT?

12       A    YES, I HAVE.

13       Q    ALL RIGHT, MR. BUTLER.  LET'S TALK ABOUT

14  YOUR VISION ISSUES.

15            AND YOU SAID THAT YOU'RE SEEN EVERY SIX

16  MONTHS.  ISN'T THAT RIGHT?

17       A    EVERY SIX TO EIGHT MONTHS, YES.

18       Q    AND THAT'S BY A EYE DOCTOR?

19       A    THAT'S BY A OPHTHALMOLOGIST, YES.

20       Q    THAT'S NOT AN ANGOLA DOCTOR?  HE COMES TO

21  THE PRISON?

22       A    HE COMES TO THE PRISON.

23       Q    OKAY.  AND HE GIVES -- HE'S GIVEN YOU

24  ARTIFICIAL TEARS.  ISN'T THAT RIGHT?

25       A    YES.

1     Q    AND HE'S ALSO UPDATED YOUR PRESCRIPTIONS.

2  ISN'T THAT CORRECT?

3     A    THAT'S CORRECT.

4     Q    OKAY.  AND I GUESS TO CLOSE, MR. BUTLER,

5  YOU'VE ALSO SEEN AN ONCOLOGIST SINCE 2019.  ISN'T

6  THAT RIGHT?

7     A    I AM NOT SURE.  WE -- WE ARE SEEN BY

8  DIFFERENT DOCTORS, BUT I'M NOT SURE WHETHER HE WAS AN

9  ONCOLOGIST OR OPHTHALMOLOGIST OR WHICH.

10    Q    A CANCER DOCTOR?  HAVE YOU BEEN SEEN BY A

11 CANCER DOCTOR?

12    A    AN ONCOLOGIST?

13    Q    YES, SIR.  I'M SORRY.

14    A    YES, I HAVE.

15    Q    THANK YOU.

16         MR. CONINE:  I HAVE NO FURTHER QUESTIONS,

17 YOUR HONOR.

18         THE COURT:  IS THERE ANY REDIRECT?

19         MS. BOSALAVAGE:  A FEW QUESTIONS, YOUR

20 HONOR.

21              REDIRECT EXAMINATION

22 BY MS. BOSALAVAGE:

23    Q    MR. BUTLER, HAVE YOU EVER SEEN THE CAROTID

24 ARTERY DUPLEX REPORT BEFORE?

25    A    NO, I HAVE NOT.

1    **Q**    HAD ANYONE DISCUSSED THE RESULTS OF IT WITH

2    YOU?

3    **A**    NO, THEY HAVE NOT.

4    **Q**    DID YOU KNOW THAT YOU HAD NORMAL RESULTS

5    BEFORE TODAY?

6    **A**    NO.

7    **Q**    WHEN YOU WERE SEEN IN CLINIC ON JANUARY 22,

8    2022 -- COUNSEL SHOWED YOU THAT RECORD -- DID YOU

9    KNOW THAT IT WAS FOR A CARDIO CLINIC?

10   **A**    NO, I DID NOT.

11   **Q**    WHY DO YOU THINK YOU DIDN'T RECALL BEING

12   SEEN IN GENERAL MEDICINE CLINIC FOR SYNCOPE?

13   **A**    BECAUSE WE ARE SCHEDULED FOR THE DIFFERENT

14   CLINICS, BUT NO ONE EXPLAINS TO US WHAT THE CLINIC IS

15   FOR, WHICH SPECIFIC COMPLAINT WE'RE BEING SEEN FOR.

16   AND BECAUSE MULTIPLE COMPLAINTS ARE SEEN ABOUT AS TO

17   WHICH COMPLAINT WILL BE ADDRESSED, WE NEVER KNOW

18   BECAUSE WE'RE NOT GIVEN RESULTS OF THE CLINICS OR THE

19   TESTS OF THE EXAMINATIONS.

20   **Q**    DID ANYONE DISCUSS THE RESULTS OF YOUR

21   COLONOSCOPY WITH YOU?

22   **A**    NO, THEY HAVE NOT.

23         IN FACT, IT WAS AMAZING TO ME THAT I HAD

24   BEEN DIAGNOSED WITH DIVERTICULOSIS AND NO ONE TOLD

25   ME.

1      Q    AND YOU'VE HAD MULTIPLE CANCERS BEFORE.
2  RIGHT?

3      A    YES, I HAVE.

4      Q    WHEN WERE THE STRESS TESTS DONE THAT
5  COUNSELOR REFERRED TO?

6      A    MARCH THIS YEAR.

7      Q    AND WHEN WAS THE DEPOSITION IN THIS CASE?

8      A    YES, IT WAS POST-DEPOSITION.

9      Q    WHAT ABOUT THAT ECHOCARDIOGRAM?

10     A    THE CARDIOGRAM -- THE ECHOCARDIOGRAM WAS
11 POST-DEPOSITION.

12     Q    AND HAVE YOU BEEN GIVEN A DIAGNOSIS FOR YOUR
13 CHEST PAIN?

14     A    NO, I HAVE NOT.

15     Q    BEFORE TODAY HAD YOU EVER SEEN ANY OF THE
16 MEDICAL RECORDS COUNSEL PUT UP ON THE SCREEN BEFORE
17 YOU?

18     A    NO, I HAVE NOT.

19         MS. BOSALAVAGE:  NO FURTHER QUESTIONS.

20         THE COURT:  THANK YOU, MR. BUTLER.  YOU MAY
21 STEP DOWN.

22             IS THERE ANYTHING FURTHER?

23         MS. MONTAGNES:  NO, YOUR HONOR.

24             THE PLAINTIFFS REST.

25         **(WHEREUPON, THE PLAINTIFFS REST).**

1    **THE COURT:**  ALL RIGHT.  WELL, THIS IS

2  OBVIOUSLY A VERY GOOD TIME TO BREAK FOR THE DAY.  WE

3  WILL RECONVENE WITH THE DEFENDANTS' CASE IN CHIEF AT

4  9:00 A.M.  SEE YOU ALL IN THE MORNING.

5    (**WHEREUPON, THE PROCEEDINGS WERE ADJOURNED**

6  **UNTIL JUNE 14, 2022 AT 9:00 A.M.**)

C E R T I F I C A T E

I CERTIFY THAT THE FOREGOING IS A CORRECT
TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE
ABOVE-ENTITLED NUMBERED MATTER.

S:/NATALIE W. BREAUX

NATALIE W. BREAUX, RPR, CRR

OFFICIAL COURT REPORTER