| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | MIDDLE DISTRICT OF LOUISIANA |
| 3 | |
| 4 | JOSEPH LEWIS, ET AL    : CIVIL ACTION |
| 5 | VERSUS                 : NO. 15-318-SDD-RLB |
| 6 | BURL CAIN, ET AL       : JUNE 15, 2022 |
| 7 | ======================================================= |

```
                        DAY 8
 8              BENCH TRIAL (AFTERNOON)
          BEFORE THE HONORABLE SHELLY D. DICK
 9         UNITED STATES CHIEF DISTRICT JUDGE

10
                A P P E A R A N C E S
11

12  FOR THE PLAINTIFFS:

13      PROMISE OF JUSTICE INITIATIVE
        BY: MERCEDES HARDY MONTAGNES, ESQUIRE
14      BY: SAMANTHA NICOLE BOSALAVAGE, ESQUIRE
        BY: NISHI LAL KUMAR, ESQUIRE
15      1024 ELYSIAN FIELDS
        NEW ORLEANS, LOUISIANA 70118
16
        COHEN MILSTEIN SELLERS & TOLL PLLC
17      BY: JEFFREY DUBNER, ESQUIRE
        BY: BRENDAN R. SCHNEIDERMAN, ESQUIRE
18      1100 NEW YORK AVENUE NW
        SUITE 500
19      WASHINGTON, D.C. 20005

20      SOUTHERN POVERTY LAW CENTER
        BY: BRUCE WARFIELD HAMILTON, ESQUIRE
21      BY: EMILY BLYTHE LUBIN, ESQUIRE
        201 ST. CHARLES AVENUE
22      SUITE 2000
        NEW ORLEANS, LOUISIANA 70170
23
    FOR THE DEFENSE:
24
        BUTLER SNOW
25      BY: CONNELL LEE ARCHEY, ESQUIRE
        BY: RANDAL J. ROBERT, ESQUIRE
```

1      445 NORTH BOULEVARD
       SUITE 300
2      BATON ROUGE, LOUISIANA 70802

3      SHOWS, CALI, BERTHELOT & WALSH, L.L.P.
       BY: JOHN CLIFTON CONINE, JR., ESQUIRE
4      BY: JEFFREY K. CODY, ESQUIRE
       628 ST. LOUIS STREET
5      BATON ROUGE, LOUISIANA 70802

6

7

8

9

10

11

12

13

14

15

16

17

18

19
               REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
20                 UNITED STATES COURTHOUSE
                       777 FLORIDA STREET
21              BATON ROUGE, LOUISIANA 70801
               NATALIE_BREAUX@LAMD.USCOURTS.GOV
22                    (225) 389-3565

23   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
            COMPUTER-AIDED TRANSCRIPTION SOFTWARE
24

25

1                    I N D E X

2   DEFENSE WITNESS:

3   DR. MICHAEL MCMUNN                          PAGE

4       VOIR DIRE EXAMINATION BY MR. ARCHEY ..........4

5       CROSS-EXAMINATION BY MS. MONTAGNES ..........14

6       DIRECT EXAMINATION BY MR. ARCHEY ............17

7       CROSS-EXAMINATION BY MS. MONTAGNES ..........78

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (JUNE 15, 2022 AFTERNOON)

2                 PROCEEDINGS

3         THE COURT:  GOOD AFTERNOON.  BE SEATED.

4              CALL YOUR NEXT WITNESS.

5         MR. ARCHEY:  THANK YOU, YOUR HONOR.  YOUR

6  HONOR, WE CALL DR. MICHAEL MCMUNN TO THE STAND,

7  PLEASE.

8         (WHEREUPON, DR. MICHAEL MCMUNN, BEING DULY

9  SWORN, TESTIFIED AS FOLLOWS.)

10        THE COURTROOM DEPUTY:  IF YOU WOULD, PLEASE,

11  SIR, STATE YOUR NAME AND SPELL IT FOR THE RECORD.

12        THE DEFENDANT:  SURE.  DR. MICHAEL MCMUNN.

13  M-I-C-H-A-E-L M-C-M-U-N-N.

14             VOIR DIRE EXAMINATION

15  BY MR. ARCHEY:

16    Q    DR. MCMUNN, GOOD TO SEE YOU THIS AFTERNOON.

17         WHAT IS YOUR PROFESSIONAL EDUCATION

18  BACKGROUND, SIR?

19    A    I HAVE FIVE DEGREES, FOUR IN NURSING.  I

20  HAVE AN ASSOCIATE'S FROM EMMANUEL COLLEGE IN

21  RELIGION; I HAVE AN ASSOCIATE'S FROM ATHENS TECHNICAL

22  COLLEGE IN ATHENS, GEORGIA; I HAVE A BACHELOR'S FROM

23  BRENAU UNIVERSITY IN GAINESVILLE, GEORGIA; I HAVE A

24  MASTER'S DEGREE IN NURSING FROM MEDICAL COLLEGE OF

25  GEORGIA, SATELLITE IN ATHENS; AND THEN I HAVE A

1  DOCTORATE IN NURSING PRACTICE FROM THE UNIVERSITY OF

2  NORTH GEORGIA IN DAHLONEGA.

3      Q    ALL RIGHT.  AND WHAT CERTIFICATIONS DO YOU

4  HOLD?

5      A    SPECIFICALLY RELATED TO CORRECTIONAL HEALTH

6  CARE, I HAVE THE CCHP, CERTIFICATION OF CORRECTIONAL

7  HEALTHCARE PROFESSIONAL CERTIFICATION.  IN I BELIEVE

8  2013 IN NASHVILLE I WAS IN THE FIRST CLASS TO BE

9  CERTIFIED IN MENTAL HEALTH BY THE NCCHC.  SO I HAVE A

10  CCHP-MH.

11         THEN I APPLIED THROUGH THE ARDUOUS PROCESS

12  TO BE A CCHP ADVANCED, WHICH IS THE HIGHEST

13  CERTIFICATION FROM THE NCCHC.  MY INTENT WAS TO DO

14  THAT AT ONE OF THE CONFERENCES, AND IT WAS HELD --

15  BECAUSE OF COVID IT WASN'T HELD.  SO THEY ENDED UP

16  DOING THOSE REMOTELY, AND I WAS THE FIRST PERSON TO

17  GET THE CCHP-A THROUGH REMOTE TESTING.

18      Q    OKAY.  AND WHAT IS THE CCHP-A AND WHAT DOES

19  IT TAKE TO GET IT?

20      A    THE CCHP-A IS ONLY OFFERED TO FOLKS WITH

21  CERTIFICATION FOR SEVERAL YEARS.  IT REQUIRES A

22  THREE-RING BINDER OF YOUR BACKGROUND, OF REFERENCES

23  AND C.V., LOTS OF OTHER MATERIALS.  IT'S SUBMITTED TO

24  THE NCCHC.  THEY MAKE A DETERMINATION IF YOU CAN SET

25  FOR TESTING OR NOT.

1          IF YOU ARE APPROVED FOR TESTING, THEN YOU

2   ARE GIVEN AN ESSAY TEST OVER THAT PERIOD, AND THEN

3   THEY MAKE A DETERMINATION IF YOU RECEIVE THAT

4   CERTIFICATION OR NOT.  CURRENTLY IT'S -- CURRENTLY

5   THERE'S PROBABLY 50 OR 60 IN THE UNITED STATES.

6      Q    50 OR 60 PERSONS WHO HAVE THIS HIGHEST

7   CERTIFICATION YOU'RE DESCRIBING:  CCHP-A?

8      A    YES, IN THE UNITED STATES.

9      Q    ALL RIGHT, DOCTOR.  WHAT ABOUT -- ARE YOU A

10  NURSE PRACTITIONER?

11     A    YES, SIR.  I'VE BEEN A NURSE PRACTITIONER

12  SINCE 2000.  LICENSED IN GEORGIA.

13     Q    DO YOU HOLD ANY CERTIFICATIONS AS A NURSE

14  PRACTITIONER?

15     A    WELL, I'M BOARD CERTIFIED AS A NURSE

16  PRACTITIONER THROUGH THE ANCC.

17     Q    IS YOUR BOARD CERTIFICATION IN ANY

18  PARTICULAR AREA, OR DOES IT WORK THAT WAY?

19     A    MY DEGREE AND CERTIFICATION WERE AS FAMILY

20  NURSE PRACTITIONERS.

21     Q    ALL RIGHT.  LET'S TALK ABOUT YOUR EXPERIENCE

22  IN THE MEDICAL FIELD.  CAN YOU DESCRIBE THAT FOR US,

23  PLEASE?

24     A    IT'S PRETTY VARIED AND IT GOES PRETTY FAR

25  BACK.  BUT ORIGINALLY AS A NURSE I DID FIVE YEARS OF

1   IN-PATIENT PULMONARY AT ATHENS REGIONAL MEDICAL

2   CENTER, WHICH IS NOW PIEDMONT ATHENS.  I ALSO DID

3   AGENCY CONTRACT WORK IN EMERGENCY ROOMS AND ICUs

4   AFTER THAT.  I ALSO TAUGHT FOR THREE YEARS AT THE

5   MEDICAL COLLEGE OF GEORGIA -- BACHELOR'S DEGREE

6   NURSES -- FOR THREE YEARS.  I DID THE ROTATIONS FOR

7   INITIAL CLINICAL FOR MENTAL HEALTH AND FOR

8   LEADERSHIP.  I WORKED FOR A NEW COMPANY AT THE TIME

9   AFTER THAT CALLED MINUTECLINIC®, WHICH IS A

10  CONVENIENCE CARE CLINIC.  THEY'RE -- THEY WERE

11  EVENTUALLY BOUGHT OUT BY CVS AND THEY'RE NATIONWIDE

12  NOW.

13          AFTER THAT I WAS HIRED BY A COMPANY CALLED

14  THE LITTLE CLINIC, WHICH IS THE SAME CONCEPT,

15  CONVENIENCE CARE CLINICS, INSIDE OF KROGER FRANCHISE

16  STORES.  IN THAT ENTIRE TIME BACK FROM 2001 GOING

17  BACK TO CORRECTIONAL, I WORKED FOR A COMPANY CALLED

18  THE BRIDGE INSTITUTE, WHICH WAS A PRIVATE COMPANY, IN

19  ATHENS, GEORGIA, THAT ESTABLISHED A PRIVATE FACILITY

20  FOR THE DEPARTMENT OF INTERNAL JUSTICE IN GEORGIA.

21  DID THAT FOR ABOUT A YEAR.  I STARTED WORKING IN

22  JAILS AND PRISONS IN 2000.  I WORK FOR A COMPANY --

23  OR 2002.  I'M SORRY -- SOUTHERN HEALTH PARTNERS; I'VE

24  BEEN WITH THEM ALMOST 20 YEARS NOW.

25          AND FROM 2002 TO 2020, I DID AGENCY WORK

1   FILLING IN FOR PRISONS ALL OVER THE STATE OF GEORGIA,

2   ABOUT 25 DIFFERENT FACILITIES.  LET'S SEE WHAT ELSE I

3   MIGHT BE MISSING.  I ALSO -- I ALSO WAS HIRED TO

4   PROVIDE PRIMARY CARE TO THE CITY OF MONROE, AN

5   EMPLOYER-BASED CLINIC -- I DID THAT FOR ABOUT THREE

6   YEARS -- TO PROVIDE THE PRIMARY CARE TO THE EMPLOYEES

7   OF THAT FACILITY.

8        SO DURING THAT WHOLE TIME I CONTINUED TO DO

9   JAILS AND PRISONS THE WHOLE TIME.  I'VE DONE AS FEW

10  AS TWO JAILS AND AS MANY AS PROBABLY 12.  RIGHT NOW I

11  HAVE EIGHT.

12     Q    ALL RIGHT.  AND YOU'RE CURRENTLY EMPLOYED BY

13  SOUTHERN HEALTH PARTNERS.  IS THAT RIGHT?

14     A    I CONTRACT WITH THEM.

15     Q    CONTRACT?

16     A    BUT YES.

17     Q    WHAT DO YOU DO WITH SOUTHERN HEALTH PARTNERS

18  THROUGH YOUR CONTRACT?

19     A    IN THE -- FOR SEVEN JAILS AND ONE PRISON

20  WORK CAMP, I DO THE PRIMARY CARE AND THE MENTAL

21  HEALTH AT THOSE CAMPS, IN COLLABORATION WITH THE

22  PHYSICIAN.

23     Q    LET'S PULL UP EXHIBIT 35 -- DX, DEFENDANT'S

24  EXHIBIT, 35-B, PLEASE.

25        MR. ARCHEY:  WELL, YOUR HONOR, IF YOU'LL

1  JUST, I GUESS, TURN ON THE ELMO, I'LL BE FINE.  I CAN

2  KEEP GOING.

3         **THE COURT:**  THANK YOU.  I'M GOING TO TALK TO

4  THE HEAD OF I.T.

5         **MR. ARCHEY:**  GOT THE ELMO OR DO I NEED TO DO

6  SOMETHING?  THERE IT GOES.  OKAY.

7  **BY MR. ARCHEY:**

8     **Q**    ALL RIGHT.  WE'LL GO KIND A LITTLE BIT OLDER

9  SCHOOL HERE, DR. MCMUNN.

10    **A**    THAT'S FINE.

11    **Q**    I'M SHOWING YOU PAGE 2 OF YOUR EXPERT

12  REPORT.  YOU'VE GOT DIRECT CLINICAL EXPERIENCE

13  LOCATIONS LISTED THERE.

14        WHAT ARE YOU -- WHAT IS THIS CONVEYING IN

15  YOUR REPORT?

16    **A**    THAT -- THOSE ARE ALL OF THE STATE OF

17  GEORGIA DOC FACILITIES THAT I WAS -- THAT I PROVIDED

18  SERVICES AT.

19    **Q**    ALL RIGHT.  NOW LET ME SHOW YOU PAGE 3 OF

20  YOUR REPORT.  AND WHAT ARE WE LOOKING THERE AT ON

21  PAGE 3 OF YOUR REPORT?

22    **A**    THE FIRST 24 ARE THE DIFFERENT COUNTY JAILS

23  AND THE CITIES THAT I PROVIDED SERVICES FOR SOUTHERN

24  HEALTH PARTNERS AND -- INCLUDING THE ONES I'M AT NOW.

25  AND THEN THE ONE AT THE BOTTOM IS THE PRIVATE COMPANY

1  THAT I WORK WITH IN ATHENS, GEORGIA.

2      Q    OKAY.  SO IS THAT -- AM I UNDERSTANDING THAT

3  BETWEEN THE TWO THIS IS 50 FACILITIES IN GEORGIA THAT

4  YOU PROVIDED THE CLINICAL CARE TO?

5      A    YEAH.  YEAH.  AT LEAST THAT MANY, YEAH.

6      Q    OKAY.  AT THE BOTTOM OF PAGE 3 THERE IS A

7  DISCUSSION OF THE BRIDGE INSTITUTE.  WHAT IS THAT,

8  PLEASE, DOCTOR?

9      A    WELL, THE BRIDGE -- BELOW THAT IS WHAT I WAS

10 DOING WITH THE PRISON SYSTEM.  BUT THE BRIDGE

11 INSTITUTE WAS A PRIVATE COMPANY THAT BOUGHT A

12 BANKRUPT -- A BUILDING HOSPITAL OUT OF BANKRUPTCY AND

13 DEVELOPED A PRIVATE DJJ FACILITY FOR MEDICAL AND

14 MENTAL HEALTH, MORE ACUTE FOLKS FROM THE DJJ SYSTEM.

15         AND PART OF THE REASON THAT THEY WERE

16 REQUIRED TO DO THAT WAS DUE TO A MEMORANDUM OF

17 AGREEMENT WITH THE FEDERAL GOVERNMENT.

18     Q    I'M GOING TO GIVE YOU THE TOP OF PAGE 4 SO

19 WE JUST GET THE REST OF IT.  THE BOTTOM OF 3 AND TOP

20 OF 4 IS THE ENTIRETY OF THAT SECTION WE'RE DISCUSSING

21 THERE.

22         ALL RIGHT.  SO YOU REFERENCE THE DOJ UNDER

23 THIS SETTLEMENT AGREEMENT?  IS THAT WHAT IT WAS?

24     A    WELL, THE DJJ HAD A SETTLEMENT AGREEMENT --

25 THEY HAD A MEMORANDUM OF AGREEMENT WITH THE FEDERAL

1    GOVERNMENT.  AND THE PRIVATE COMPANY CONTRACTED WITH

2    ME TO BE THE CLINIC DIRECTOR AND ALSO THE NURSE

3    PRACTITIONER TO SEE THE INMATES.

4           AND ONE OF MY INITIAL TASKS WAS TO TAKE THE

5    DJJ POLICIES AND PROCEDURES AND THE MEMORANDUM OF

6    AGREEMENT AND CREATE SITE-SPECIFIC POLICIES AND

7    PROCEDURES THAT COMPLIED WITH BOTH.

8       Q    AND YOU DID THAT IN CONNECTION WITH THE

9    BRIDGE INSTITUTE, AS REFLECTED HERE IN YOUR EXPERT

10   REPORT?

11      A    YES.

12      Q    PAGE 3 AND 4?

13      A    YES.

14      Q    ALL RIGHT.  ARE YOU STILL ACTIVE WITH NCCHC?

15      A    YES.

16      Q    HOW SO?

17      A    I TYPICALLY MODERATE AT THEIR CONFERENCES.

18   THE MOST RECENT CONFERENCE IN APRIL I ATTENDED AND I

19   MODERATED SEVERAL SESSIONS FOR THEM.  I STAY

20   NETWORKED WITH THEM BECAUSE, YOU KNOW, OBVIOUSLY

21   THEY'RE ONE OF THE PREMIER SOURCES FOR CORRECTIONAL

22   HEALTH-CARE STANDARDS AND THE BEST PRACTICES IN

23   CORRECTIONAL HEALTH CARE.

24      Q    ALL RIGHT.  WHAT IS YOUR EXPERIENCE SERVING

25   AS AN EXPERT WITNESS?

**1**    **A**   I THINK CURRENTLY I'VE DONE ABOUT 125 CASES

**2**  THAT I'VE BEEN RETAINED ON; TWO, INCLUDING THIS ONE,

**3**  CLASS ACTION LAWSUITS.  I'VE DONE ABOUT -- 60 PERCENT

**4**  OF THOSE HAVE BEEN PLAINTIFF RETENTIONS, ABOUT 40

**5**  PERCENT DEFENSE RETENTIONS.  I'VE DONE A LITTLE OVER

**6**  20 DEPOSITIONS.  I HAVE DONE A PANEL HEARING IN

**7**  MAINE, BUT I HAVE NOT YET -- THIS IS MY FIRST TIME IN

**8**  TRIAL.

**9**    **Q**   OKAY.  VERY GOOD.  I'M LOOKING ON PAGE 6 OF

**10**  YOUR EXPERT REPORT WHERE YOU TALK ABOUT SOME

**11**  ADDITIONAL RELEVANT EXPERIENCE AND SKILLS.  I THINK

**12**  WE'VE GONE THROUGH MANY OF THESE, BUT I WANT TO GO

**13**  DOWN TO NO. 7.

**14**        YOU REFERENCE "EXPERIENCE FORMULATING

**15**  POLICIES, PRACTICES, AND CLINIC DESIGN TO CONFORM

**16**  WITH JOINT COMMISSION (JCAHO) WITH MULTIPLE

**17**  COMPANIES."

**18**        WHAT IS THAT ABOUT, DOCTOR?

**19**    **A**   YES.  WHAT HAPPENED IS MINUTECLINIC® AND

**20**  LITTLE CLINIC WERE INITIALLY FUNDED BY A VENTURE

**21**  CAPITALIST.  AND PART OF THE REQUIREMENTS TO BE ABLE

**22**  TO SELL TO CVS AND KROGER WAS JOINT COMMISSION

**23**  ACCREDITATION.  AND BOTH COMPANIES I WAS TASKED WITH

**24**  HELPING TO MAKE THAT OCCUR THROUGH, YOU KNOW,

**25**  FORMULATION POLICIES, PROCEDURES, COMPLIANCE WITH

1    JOINT COMMISSION AMBULATORY STANDARDS.

2        Q    OKAY.  NO. 10 ON PAGE 6 DOWN AT THE BOTTOM,

3    YOU SAY YOU HAVE "EXTENSIVE EXPERIENCE ADVOCATING AND

4    ASSURING THAT WARDENS, JAIL ADMINISTRATORS, AND

5    SHERIFFS AVOID UNDUE INFLUENCE UPON MEDICAL

6    ACTIVITIES."

7             WHAT ARE YOU REFERENCING THERE FOR US?

8        A    TYPICALLY WHAT I WOULD DO, WHETHER I WAS IN

9    A PRISON OR IN A JAIL SETTING, IS OFTENTIMES,

10   ESPECIALLY IN THE JAIL SETTINGS, I MAY BE THE ONLY

11   PERSON ON SITE IN TERMS OF MEDICAL AUTHORITY.  AND SO

12   IF THERE IS CONFUSION OR IF THERE IS THE POTENTIAL

13   FOR CONFLICT, I'M GENERALLY THE PERSON THAT MEDIATES

14   THAT CONFLICT AND GOES TO THEM AND EXPLAIN THE

15   EVIDENCE BASE WHY -- OF WHY SOMETHING NEEDS TO OCCUR

16   A CERTAIN WAY TO MAKE SURE THAT THERE IS NO UNDUE

17   INFLUENCE UPON MEDICAL.

18       Q    ALL RIGHT.  AND CURRENTLY HOW DO YOU SPEND

19   THE BULK OF YOUR TIME WHEN YOU'RE AT THE JAILS AND

20   PRISONS THROUGH SOUTHERN HEALTH CARE PARTNERS?

21       A    WELL, I MEAN, LATELY I'VE BEEN DOING A LOT

22   MORE EXPERT WITNESS WORK THAN I TYPICALLY DO.  THIS

23   CASE HAS BEEN VERY -- A VERY LARGE CASE.  BUT I

24   TYPICALLY ROUND ON THOSE SITES -- I ROUNDED ON THOSE

25   SITES THIS WEEK BEFORE I CAME HERE AND SIGNED CHARTS

1  AND SEE WHO NEEDS TO BE SEEN; MENTAL HEALTH AND

2  PRIMARY CARE.

3      Q    AND THAT WAS PROBABLY A CLUMSY WAY OF ME

4  ASKING.  YOU'RE STILL VERY ACTIVELY PROVIDING DIRECT

5  CARE TO PATIENTS IN PRISONS.  IS THAT CORRECT?

6      A    WELL, I HAVE SEVEN JAILS AND ONE WORK CAMP

7  PRISON, BUT YES, I'M IN ACTIVE PRACTICE.  AND THEY

8  PROBABLY LIKE ME TO DO ABOUT TWICE AS MANY JAILS AS I

9  DO, BUT I'M TRYING TO KEEP MYSELF FROM WORKING TOO

10 HARD.

11     Q    DO YOU HAVE EXPERIENCE IN DOING STANDARD OF

12 CARE EVALUATIONS?

13     A    YEAH.  I DO THAT AS AN EXPERT WITNESS, YOU

14 KNOW, A LOT.

15     Q    IS THAT THE PART OF THE PROCESS YOU

16 UNDERTOOK IN THIS CASE?

17     A    YES.  YES, SIR.

18         MR. ARCHEY:  YOUR HONOR, AT THIS TIME WE

19 TENDER DR. MCMUNN AS AN EXPERT IN CORRECTIONAL

20 MEDICINE.

21         THE COURT:  CROSS ON THE TENDER?

22         MS. MONTAGNES:  VERY BRIEFLY, YOUR HONOR.

23          MERCEDES MONTAGNES ON BEHALF OF THE

24 PLAINTIFFS.

25                    CROSS-EXAMINATION

1  BY MS. MONTAGNES:

2      **Q**    GOOD AFTERNOON, MR. MCMUNN.  HOW ARE YOU?

3      **A**    GOOD AFTERNOON.

4      **Q**    I JUST WANT TO ASK YOU A FEW QUESTIONS.  YOU

5  ARE NOT GOING TO BE OFFERING ANY TESTIMONY REGARDING

6  LEADERSHIP AND ORGANIZATION.  IS THAT RIGHT?

7      **A**    I READ A RULING RELATED TO THAT.  BUT I

8  BELIEVE I'M NOT GOING TO BE, YES.

9      **Q**    YOU'RE NOT GOING TO BE OFFERING ANY

10  TESTIMONY WITH REGARDS TO PEER REVIEW?

11     **A**    I DON'T RECALL THE RULING, BUT I DON'T THINK

12  SO.

13     **Q**    AND YOU'RE NOT GOING TO BE OFFERING ANY

14  TESTIMONY WITH REGARDS TO MORTALITY REVIEWS?

15     **A**    CORRECT.

16     **Q**    AND YOU'RE NOT GOING TO BE OFFERING ANY

17  TESTIMONY WITH REGARDS TO MEDICAL DEPARTMENT

18  MANAGEMENT?

19         **MR. ARCHEY:**  YOUR HONOR, I GUESS I NEED TO

20  OBJECT.  OBJECTION.

21         **THE COURT:**  I'M LISTENING.

22         **MR. ARCHEY:**  IT'S -- TRACKING THE RULING, I

23  THINK WE MIGHT HAVE A DISAGREEMENT OF THE SCOPE OF

24  THE COURT'S RULING.  CERTAINLY GOING TO ABIDE EVERY

25  LETTER OF THE COURT'S RULING.  BUT THE THINGS THAT

1   ARE NOT FORECLOSED BY THE COURT'S RULING WE DO INTEND

2   TO COVER WITH THE WITNESS.  WHETHER HE --

3        **THE COURT:**  WELL, THAT'S GREAT.  LET HIM

4   ANSWER THE QUESTION.  IS HE GOING TO GIVE OPINION

5   TESTIMONY ON MEDICAL DEPARTMENT MANAGEMENT?  SHE

6   ASKED HIM THAT.  I DON'T -- YOUR OBJECTION IS

7   OVERRULED.

8        **Q**   SIR, ARE YOU GOING TO BE OFFERING ANY

9   OPINIONS ON THAT?

10       **A**   I'LL OFFER WHATEVER THE RULING ALLOWS ME TO

11  OFFER ON ANY MATTER.

12       **Q**   AND YOU WORKED AT BRIDGE -- THE BRIDGE

13  CENTER FOR ABOUT A YEAR.  IS THAT RIGHT?

14       **A**   YES.

15       **Q**   AND WITH -- SPECIFICALLY WITH RESPECT TO

16  YOUR OPINIONS ON COVID, YOU'RE GOING TO BE TESTIFYING

17  AS TO YOUR OWN EXPERIENCE IN GEORGIA.  IS THAT RIGHT?

18       **A**   YES.  THROUGHOUT THE PANDEMIC I WAS

19  PROVIDING CARE, YES.

20       **Q**   AND SPECIFICALLY WITH REGARD TO THE NURSING

21  SHORTAGE, YOU'RE GOING TO BE TESTIFYING AS TO YOUR

22  OWN EXPERIENCE IN GEORGIA.  IS THAT RIGHT?

23       **A**   WELL, I'VE REVIEWED CASES THAT THAT WAS A

24  FACTOR.  BUT YES, IN GENERAL.

25            **MS. MONTAGNES:**  YOUR HONOR, AT THIS TIME,

1  SUBJECT TO THE LIMITATIONS OF THE ORDER, WE HAVE NO

2  PROBLEM WITH HIS TENDER.  WE DO BELIEVE THAT THE

3  ORDER WAS PRETTY CLEAR WITH REGARDS TO ANY LEADERSHIP

4  AND ORGANIZATION.  THE COURT IDENTIFIED THOSE AS PEER

5  REVIEW, MORTALITY REVIEW, MEDICAL DEPARTMENT

6  MANAGEMENT.  THERE WAS ONE OTHER TOPIC, QUALITY

7  IMPROVEMENT AND QUALITY ASSURANCE, WHICH THE COURT

8  SPECIFICALLY SAID HE COULD TESTIFY WITH RESPECT TO,

9  SO WE HAVE NO PROBLEM ABOUT THAT, AND LIMITING HIS

10  TESTIMONY ONTO HIS OWN PERSONAL EXPERIENCE WITH

11  REGARDS TO COVID-19 AND NURSING SHORTAGES.

12         THE COURT:  OKAY.  WELL, A LOT OF

13  INFORMATION THERE.  YOU CAN RESERVE YOUR OBJECTIONS

14  TO HIS TESTIMONY WITH RESPECT TO THE MOTION IN

15  LIMINE.

16         BASED ON YOUR STIPULATION, THE COURT

17  WILL ACCEPT DR. MCMUNN IN CORRECTIONAL MEDICINE AS

18  TENDERED.

19         MR. ARCHEY:  THANK YOU, YOUR HONOR.

20              DIRECT EXAMINATION

21  BY MR. ARCHEY:

22     Q    ALL RIGHT, DR. MCMUNN.  LET'S TALK ABOUT

23  YOUR WORK IN THIS CASE AND WHAT YOU DID TO BE ABLE TO

24  DO YOUR WORK.

25         DO YOU RECALL WHEN YOU WERE FIRST RETAINED

1   IN THIS CASE, OR FIRST BEGAN WORK?

2       **A**    FEBRUARY OF THIS YEAR.

3       **Q**    OKAY.  AND CAN YOU TELL THE COURT SOME OF

4   THE STEPS THAT YOU UNDERTOOK TO DO THIS WORK?

5       **A**    WOW.  IT WAS A LOT.  YOU KNOW, I REVIEWED --

6   IN TOTAL I REVIEWED PROBABLY CLOSE TO 200 DOCUMENTS,

7   22 PATIENT CHARTS.  I CAME TO LSP AND DID A SITE

8   VISIT.  I WENT TO THE DOC.  AND, YOU KNOW, I'VE GONE

9   BACK A SECOND TIME AND REVIEWED THE CHARTS -- SOME OF

10  THE CHARTS AGAIN.  AND I'VE DONE A DEPOSITION IN THIS

11  MATTER.  AND, OF COURSE, WE'RE HERE FOR TRIAL.

12          **MR. ARCHEY:**  OKAY.  ARE WE WORKING ON --

13  WHICH ONES?

14          **THE COURTROOM DEPUTY:**  YEAH, WE'RE GOOD.

15          **MR. ARCHEY:**  OH, WE'RE GOOD?  OKAY.  I'M

16  SORRY.  WELL, LET'S DO -- LET'S GO MORE HIGH-TECH

17  THEN.

18  **BY MR. ARCHEY:**

19      **Q**    DR. MCMUNN, I'M SHOWING YOU WHAT'S BEGINNING

20  ON PAGE 9 OF YOUR EXPERT REPORT.  YOU LISTED DOWN AT

21  THE BOTTOM INFORMATION RELIED UPON.  AND IF WE KEEP

22  GOING INTO -- JUST SCROLL THROUGH PAGES 10, 11, 12

23  AND ON TO 13, YOU LISTED 111 DIFFERENT SPECIFIC ITEMS

24  THAT YOU REVIEWED.

25          DID YOU PERSONALLY REVIEW ALL THOSE ITEMS?

**1**    **A**   YES.  AND THERE ARE SOME OF THEM -- SOME OF

**2**   THEM HAVE MULTIPLE SUBS -- MULTIPLE DOCUMENTS UNDER

**3**   EACH HEADING.  BUT YES, THOSE ITEMS AT THAT POINT IN

**4**   THAT REPORT.

**5**    **Q**   AND THESE INCLUDE DISCOVERY RESPONSES,

**6**   POLICIES AND PROCEDURES, DEPOSITIONS AND CHART

**7**   REVIEWS, AT LEAST IN BROAD SCOPE.  IS THAT RIGHT?

**8**    **A**   YES.

**9**    **Q**   THE -- LET ME GO BACK TO PAGE 7 OF YOUR

**10**  REPORT.  YOU ALSO HAD A SITE VISIT AT LSP.  IS THAT

**11**  RIGHT?

**12**   **A**   YES.

**13**   **Q**   AND WHAT ALL DID YOU DO ON YOUR SITE VISIT,

**14**  PLEASE?

**15**   **A**   I WENT EARLY ON SITE TWO DAYS TO THE MORNING

**16**  MEETINGS, BECAUSE I FELT LIKE THEY WERE VERY

**17**  IMPORTANT.  AND I ALSO VISITED THE DOC.  IN GENERAL

**18**  THAT WAS MY ITINERARY.  BUT I HAD GUIDED TOURS OF THE

**19**  FACILITY, MET ALL OF THE NURSE PRACTITIONERS -- OTHER

**20**  THAN MS. PARK, WHO WAS NOT -- SHE WASN'T WORKING AT

**21**  THAT TIME -- ALL THE LEADERSHIP; SPOKE WITH THE

**22**  WARDEN ON TWO DIFFERENT OCCASIONS; TOURED ALL THE

**23**  FACILITIES, INCLUDING ON THE SECOND DAY,

**24**  UNSUPERVISED, I WAS PERMITTED TO GO AND VISIT WHERE I

**25**  WANTED TO GO VISIT AND WHAT I WANTED TO SEE.

1    **Q**   DID YOU FIND THAT IMPORTANT?

2    **A**   YES, I DID.

3    **Q**   WHY?

4    **A**   WELL, YOU KNOW, I WANTED TO MAKE SURE THAT,

5  YOU KNOW, I WASN'T GETTING EVERYTHING KIND OF

6  SPOON-FED TO ME.  I WANTED TO KIND OF SEE HOW THINGS

7  MIGHT BE IF THEY DIDN'T KNOW I WAS GETTING READY TO

8  WALK THROUGH THE DOOR.

9    **Q**   WHEN YOU SAY UNESCORTED, I MEAN, YOU MEAN

10  LITERALLY BY YOURSELF, DR. MCMUNN, GOING WHERE DR.

11  MCMUNN WANTED TO SEE -- GO AFTER YOU HAD BEEN

12  INTRODUCED TO THE FACILITIES THE DAY BEFORE.  IS THAT

13  WHAT WE'RE TALKING ABOUT?

14    **A**   YES.  AND I'M -- AND I MUST SAY THAT, YOU

15  KNOW, I'VE BEEN IN A LOT OF CORRECTIONAL FACILITIES.

16  AND THE MOVEMENT AROUND AND ABOUT WITHIN THE COMPOUND

17  AT LSP IS ALMOST UNPRECEDENTED FROM WHAT I'VE SEEN.

18  IT'S VERY -- THERE IS LOTS OF PEOPLE GOING LOTS OF

19  DIFFERENT DIRECTIONS.

20    **Q**   ALL RIGHT.  AND LET'S TALK ABOUT -- OF

21  COURSE, YOU PREPARED AN EXPERT REPORT AFTER DOING ALL

22  THIS WORK THAT WE HAVE HERE IN THE COURT.

23         WHAT DID YOU DO AFTER THE PREPARATION OF

24  YOUR EXPERT REPORT?  WHAT DID YOU DO THEREAFTER,

25  CONTINUE TO DO?

1    **A**    WELL, THERE WAS, YOU KNOW, ADDITIONAL

2  DISCOVERY THAT CAME IN.  THERE WERE DEPOSITIONS.

3  THERE WAS, YOU KNOW, LOTS OF DIFFERENT ITEMS THAT

4  CAME IN.  AFTER THE REPORT COMPLETED, I WAS STILL

5  PROBABLY REVIEWING DOCUMENTS AT ALMOST THE SAME PACE

6  THAT I WAS BEFORE THE REPORT.  SO ALL THE WAY UP

7  UNTIL MY DEPOSITION JUST ABOUT I WAS PROCESSING

8  DISCOVERY.

9         I FELT LIKE IT WAS AS PROBABLY THE -- WELL,

10 I GUESS I AM THE LATEST ARRIVING OF THE EXPERT

11 WITNESSES.  I FELT IT WAS VERY IMPORTANT THAT I

12 EXPOSE MYSELF TO JUST ABOUT EVERYTHING THAT I COULD

13 IN THE CASE TO MAKE SURE THAT I WAS UP TO DATE AS

14 PEOPLE THAT HAVE BEEN LOOKING AT THIS STUFF FOR TWO,

15 THREE, FOUR, FIVE YEARS.

16   **Q**    AND YOU REVIEWED THE PLAINTIFFS' EXPERT

17 REPORTS IN THIS CASE?

18   **A**    YES.  BOTH VERSIONS, YES.

19   **Q**    THE ONES BACK IN THE 2018 TRIAL AND THE

20 CURRENT ONES.  IS THAT WHAT WE'RE TALKING ABOUT?

21   **A**    YES.

22   **Q**    HOW MUCH COORDINATION WAS THERE BETWEEN YOU

23 AND DR. MATHIS?

24   **A**    SOME.  YOU KNOW, AN EXPERT WITNESS HAS THEIR

25 OWN OPINIONS.  AND WE DID SPEND SOME TIME TOGETHER

1   AND WE TALKED ABOUT ELEMENTS OF THE CASE AND WE HAD

2   SOME COMMUNICATION.  BUT, YOU KNOW, WE DIDN'T

3   REALLY -- YOU KNOW, WE REALLY DIDN'T COORDINATE OUR

4   OPINIONS AS SUCH.  HE HAD HIS AND HE WENT HIS OWN

5   DIRECTION, AND I HAD MINE.

6         AND AS YOU CAN SEE FROM OUR REPORTS, THEY

7   HAVE MUCH DIFFERENT FOCUS AND FLAVOR.

8     Q   ON THE CHART REVIEWS, HOW MUCH TIME -- HOW

9   MANY HOURS DO YOU THINK -- LET ME ASK IT THIS WAY.

10        UP TO THE DATE OF THE PREPARATION OF YOUR

11  REPORT, DO YOU KNOW HOW MANY HOURS YOU SPENT WORKING

12  ON THE CASE?

13    A   ALMOST 300.

14    Q   AND OF THOSE 300 HOURS, HOW MANY OF THOSE DO

15  YOU THINK WERE IN ACTUAL CHART REVIEWS?  BALLPARK.

16    A   THAT WAS OVER 10,000 PAGES.  I MEAN, THESE

17  ARE -- THESE ARE SOME INMATES THAT HAVE BEEN THERE

18  FOR A VERY LONG TIME.  SOME OF THEM ARE HAVING LOTS

19  OF PROCEDURES, LOTS OF CONSULTS.  PROBABLY AT LEAST A

20  HUNDRED HOURS.

21    Q   OKAY.  AND AS TO THE CHART REVIEWS, DID YOU

22  DO THOSE INDEPENDENT OF DR. MATHIS?

23    A   YES.  THERE WAS NO -- IT WAS NOT -- WE

24  HAD -- EACH HAD OUR OWN CHARTS THAT WE REVIEWED.

25    Q   HOW MANY CHARTS DID YOU INDEPENDENTLY

1   REVIEW?

2       **A**    TWENTY-TWO.

3       **Q**    ALL RIGHT.  I WANT TO WALK THROUGH SOME OF

4   THE GENERAL PARTS OF YOUR REPORT.  WE'RE GOING TO DO

5   THIS RATHER QUICKLY AND THEN WE'RE GOING TO GET TO

6   YOUR CHART REVIEWS.  LET'S GO TO YOUR REPORT ON PAGE

7   13 FIRST, PLEASE.

8            ALL RIGHT.  I WANT TO LOOK AT THE "CLINICAL

9   CARE" SECTION THERE.  I WANT TO GO NO. 1 BEFORE

10  THAT -- BELOW THAT.  IT SAYS "EMTs NO LONGER CONDUCT

11  SICK CALL."

12           NOW, THE WAY -- HOW DID YOU STRUCTURE YOUR

13  REPORT?  WHERE IS THAT COMMENT COMING FROM?

14      **A**    I BASICALLY DID IT IN THIS -- IN A SIMILAR

15  ORDER TO THE ORIGINAL RULING IN THE ORIGINAL MATTER

16  TO TRY TO KEEP IT IN THE SAME FORMATTING TO LOOK AT

17  WHAT THE COURT IDENTIFIED AS AREAS OF CONCERN.

18      **Q**    ALL RIGHT.  AND AS TO THIS SPECIFIC AREA OF

19  CONCERN, EMTs NO LONGER CONDUCT SICK CALL -- OR EMTs

20  CONDUCTING SICK CALL -- WHAT DID YOU FIND?

21      **A**    I WAS VERY EXCITED TO SEE NURSE

22  PRACTITIONERS CONDUCTING SICK CALL, BECAUSE THAT'S

23  CERTAINLY ABOVE THE STANDARD OF CARE.

24      **Q**    WHY DO YOU SAY THAT'S ABOVE THE STANDARD OF

25  CARE?

1    **A**    TYPICALLY IN MOST CORRECTIONAL FACILITIES

2   WITHIN THE UNITED STATES, LPNs DO THEM, IN SOME

3   PLACES RNs DO THEM.  I PROBABLY COULD COUNT ON ONE

4   HAND THE NUMBER OF FACILITIES I'M AWARE OF THAT USE

5   NURSE PRACTITIONERS TO CONDUCT SICK CALL.

6    **Q**    ALL RIGHT.  LET'S GO TO -- NOW TO PAGE 15.

7   THE STATEMENT THERE IS THE "CLINIC SPACE LACKS

8   HYGIENE."

9        WHAT DID YOU FIND IN YOUR INSPECTION THERE?

10    **A**    I MEAN, LSP IS AN OLDER FACILITY.  AND I'VE

11   WORKED IN SEVERAL FACILITIES THAT WERE EVEN OLDER IN

12   GEORGIA.  BUT, YOU KNOW, THE CONDITION OF IT AT THE

13   SITE VISIT WAS THE HYGIENE WAS NOT AN ISSUE.

14    **Q**    LET'S LOOK ON PAGE 16 NOW.  YOU'VE GOT A

15   COMMENT ABOUT SPECIALTY CARE.  AND WE MIGHT NEED TO

16   GET IN THE CHART REVIEWS.  BUT UNDER YOUR

17   "CHALLENGES-DELAYS IN TREATMENT," WHAT DID YOU FIND

18   AS TO WHETHER THERE WERE DELAYS IN TREATMENT, FROM

19   YOUR CHART REVIEWS?

20    **A**    IN THE 22 CHART REVIEWS THAT I REVIEWED --

21   OF COURSE, THIS IS DONE WITHIN THE SCOPE OF A COVID

22   PANDEMIC -- I DID NOT FIND ANY SYSTEMIC ISSUES OF

23   DELAY.  INDIVIDUALLY WHEN YOU'VE GOT FIVE OR SIX

24   THOUSAND INMATES, YOU'RE GOING TO HAVE A CLERICAL

25   ISSUE OR A TRANSPORT ISSUE OR OTHER ISSUES.  BUT I

1 DID NOT SEE A SYSTEMIC PATTERN OF DELAY.

2    **Q**   LET'S GO TO PAGE 17 NOW AND "FAILURE TO

3 FOLLOW SPECIALIST RECOMMENDATIONS."

4        WITH THE SAME CAVEAT THAT WE'RE GOING TO GET

5 TO THE CHARTS IN A SECOND, WHAT DID YOU FIND AS TO

6 WHETHER THERE WAS ANY PROBLEM WITH FAILURE TO FOLLOW

7 SPECIALIST RECOMMENDATIONS?

8    **A**   THIS DOVETAILS INTO SOMETHING ELSE.  BUT

9 ESSENTIALLY THEY USE A WRITTEN SYSTEM NOW, OR THEY

10 WERE USING A WRITTEN SYSTEM IN MY CHART REVIEWS,

11 WHERE THE RECOMMENDATIONS COME BACK AND THEN THEY

12 WOULD SIGN BACK OFF ON THEM AND DIVVY THOSE OUT TO

13 WHAT NEEDS TO HAPPEN NEXT.  AND I THINK THAT'S, AS WE

14 MAY DISCUSS LATER, WHERE AN EMR MAY HAVE VALUE IN

15 FOLLOWING UP ON SOMETHING LIKE THAT.

16    **Q**   AND YOU -- ARE YOU SPECIFICALLY REFERRING TO

17 THE TRIP RETURNS THERE?  IS THAT WHAT YOU'RE

18 REFERRING TO?

19    **A**   YES.  TRIP RETURNS USUALLY FROM SPECIALIST

20 RECOMMENDATIONS, YES.

21    **Q**   OKAY.  LET'S GO TO THE NEXT ITEM.  YOU SAY

22 "FAILURE TO COORDINATE CARE BETWEEN PROVIDERS AND

23 SPECIALISTS."

24        WHAT WERE YOUR FINDINGS THERE BASED ON YOUR

25 CHART REVIEWS, RECOGNIZING WE'LL GET TO THOSE

1  SPECIFICS IN A MINUTE?

2      **A**   YES.  AGAIN, I DID NOT SEE ANY SYSTEMIC

3  ISSUE.  A LOT OF THE CHARTS THAT I HAD HAD ONCOLOGY

4  ISSUES.  AND I WAS PARTICULARLY IMPRESSED WITH SOME

5  OF THE COORDINATION WITH PAIN CONTROL AND ALSO WITH

6  LOCAL UNIVERSITIES THAT WERE PROVIDING SOME OF THE

7  GUIDANCE IN TERMS OF PROVIDING CARE.

8      **Q**   RADIATION, CHEMOTHERAPY; THAT TYPE OF THING?

9      **A**   IN THAT PARTICULAR AREA I NOTED.

10     **Q**   ALL RIGHT.  LET'S CONTINUE ON, STILL ON PAGE

11  17.  YOU HAVE AN "INFIRMARY/IN-PATIENT CARE" SECTION

12  HERE.  "INMATES UNABLE TO CONTACT OR NOTIFY THE

13  NURSE."  WHAT DID YOU FIND AS TO THAT FINDING?

14     **A**   AGAIN, I WAS NOT INVOLVED AND I DID NOT DO A

15  SITE VISIT INITIALLY TO SEE THE MECHANISMS THEY USED

16  BEFORE.  BUT THEY HAVE INSTALLED A LIGHTING SYSTEM

17  WHERE WHEN ACTIVATED A RED LIGHT COMES ON OUTSIDE OF

18  THE -- OUT OF THE BUNK OR CELL AREA SO THAT THE NURSE

19  CAN COME AND CHECK ON THE PERSON.  AND I PERSONALLY

20  TESTED ALL OF THOSE AND INSTALLATION ON ALL OF THOSE.

21     **Q**   IN FACT, WHEN YOU TESTED THE FIRST ONE, WHAT

22  HAPPENED?

23     **A**   GOSH, I DON'T RECALL.

24     **Q**   FAIR ENOUGH.  LET'S LOOK AT --

25     **A**   OH.  I DO RECALL.  WE WERE ACTUALLY ON A

1   SIDE AWAY FROM THE NURSE'S STATION, AND, YOU KNOW,

2   WITHIN, YOU KNOW, A MINUTE OR SO A NURSE CAME WHEN I

3   TURNED IT ON.  SHE DIDN'T REALIZE THERE WASN'T

4   ANYBODY IN THE ROOM.

5       Q    SHE CAME AROUND AND WANTED TO KNOW WHAT'S

6   THE EMERGENCY OR WAS SHE NEEDED.  RIGHT?

7       A    YEAH.

8       Q    THE -- IS UNDER THE STANDARDS HAVING AN

9   INMATE ABLE -- OR PATIENT, I'M SORRY -- ABLE TO

10  NOTIFY YOU BY SIGHT OR SOUND, IS THAT ACCEPTABLE?

11      A    YES.

12      Q    ALL RIGHT.  LET'S GO TO NOW PAGE 20.  WE'RE

13  GOING TO INMATE ORDERLY.  YOU'VE GOT ANOTHER SECTION

14  ON THIS AS WELL.  LET'S TALK ABOUT IT NOW.

15          TELL ME:  WHAT ARE YOUR OPINIONS AS TO THE

16  INMATE ORDERLY UTILIZATION PROGRAM AT LSP?

17      A    WELL, I REVIEWED IT FROM TWO STANDPOINTS --

18  WELL, FROM THREE STANDPOINTS, ACTUALLY.  I DID VISIT

19  THE SITE AND SEE THE CARE DELIVERED.  I WENT DIRECTLY

20  TO THE PERSON WHO COORDINATES THE INMATE ORDERLY

21  TRAINING AND MATERIALS AND REVIEWED WHAT THEY HAD.

22          I ALSO WENT BACK SPECIFICALLY, EVEN THOUGH

23  I'M FAMILIAR WITH THE NCCHC STANDARDS, AND I LOOKED

24  AT THE LANGUAGE AND THE RULINGS AND THE STANDARDS,

25  POSITIONS THAT THEY HAVE REGARDING INMATE ORDERLY

1  FUNCTION.  AND I LOOKED AT IT FROM ALL THREE

2  STANDPOINTS.

3      Q    WHAT DID YOU CONCLUDE WHEN YOU LOOKED AT IT

4  FROM THE THREE STANDPOINTS?

5      A    MY CONCLUSION WAS THAT IT DID MEET THE

6  STANDARD OF CARE BUT IT WOULD NOT MEET NCCHC

7  STANDARDS.

8      Q    WHY DO YOU SAY THAT?  I MEAN, I UNDERSTAND

9  THEY'RE NOT MEETING NCCHC STANDARDS.  BUT WHY DO YOU

10 SAY IT STILL MEETS THE STANDARD OF CARE?

11     A    WELL, THE STANDARD OF -- WELL, THAT GETS

12 INTO ANOTHER MATTER.  BUT THE NCCHC CURRENTLY, YOU

13 KNOW, ACCREDITS ABOUT EIGHT PERCENT OF THE FACILITIES

14 IN THE UNITED STATES, AND THEY PROVIDE US WITH THE

15 IDEALS FOR OPTIMAL CARE IN CORRECTIONAL FACILITIES.

16 BUT GENERALLY THAT'S GOING TO BE IN SOME MATTERS IN

17 EXCESS OF THE STANDARD OF CARE.  AND THEY

18 SPECIFICALLY CITE WITHIN THE STANDARDS THAT THEY DO

19 NOT WANT ORDERLIES IN AN INFIRMARY AREA.

20     Q    OKAY.  AND WHAT WAS YOUR UNDERSTANDING OR

21 WHAT DID YOU OBSERVE OR CONCLUDE THAT THE ORDERLIES

22 ARE DOING IN THE INFIRMARY AREA?

23     A    WELL, I'VE SEEN TESTIMONY THAT THEY HAVE --

24 THAT THEY ARE PERFORMING FUNCTIONS IN EXCESS OF

25 WHAT JUST PROVIDING ADLs WOULD BE.  I PERSONALLY

1  DIDN'T OBSERVE THAT.  IT WAS ALL SECONDARY FROM OTHER

2  FOLKS.  YOU KNOW, I WAS ADVISED THAT THEY WERE DOING

3  PHYSICAL THERAPY IN SOME PARTS OF THE FACILITY, THEY

4  WERE DOING DIFFERENT THINGS IN THE INFIRMARY.  BUT I

5  PERSONALLY DID NOT OBSERVE THAT ACTIVITY.

6     Q    OKAY.  SO WHAT DID YOU OBSERVE?  LET'S START

7  THERE.

8     A    WHEN I VISITED THE SITE, I SAW THEM

9  ASSISTING WITH ADLs, WHICH IS APPROPRIATE, WHICH

10 WOULD BE WITHIN THE STANDARD OF CARE.

11    Q    WHAT ARE ADLs?

12    A    ACTIVITIES OF DAILY LIVING, YOU KNOW, ARE

13 GOING TO BE, YOU KNOW, ASSISTING FEEDING, BATHING,

14 ANYTHING, YOU KNOW, THAT WOULD BE UNSKILLED IS --

15 "UNSKILLED" IS A TYPICAL WORD THAT'S USED.

16    Q    OKAY.  ALL RIGHT.  LET'S GO TO YOUR OPINION

17 ON SICK CALL ON PAGE 20.  THERE WAS A COMMENT ABOUT

18 "SICK CALL DONE WITHOUT CHARTS."

19       WHAT IS THE PROCESS CURRENTLY?

20    A    THE PROCESS CURRENTLY IS WHERE THE NURSE

21 PRACTITIONER HAS THE PHYSICAL CHART AND THE PERSON ON

22 TELEMEDICINE IN FRONT OF IT.

23    Q    ALL RIGHT.  LET'S GO TO PAGE 21.  THERE WAS

24 A CONCERN ABOUT "NO TRANSPORT ORDERS."

25       WHAT DID YOU FIND ABOUT THE USE OF NO

1  TRANSPORT ORDERS AT LSP?

2      **A**    NO TRANSPORT ORDERS ARE TYPICALLY, YOU KNOW,

3  WHEN THEY'RE -- AGAIN, THEY'RE ORDERED NOT TO GO OUT.

4  I DID NOT SEE A SYSTEMIC ISSUE AT ALL WITH TRANSPORT

5  ORDERS, BECAUSE TRANSPORT TO AN OUTSIDE ENTITY IS

6  BASED ON THE DISCRETION OF THE PROVIDER.  AND IF THEY

7  CHOOSE NOT TO TRANSPORT, THEN THAT'S APPROPRIATE AND

8  WITHIN THE STANDARD OF CARE.

9      **Q**    ALL RIGHT.  NOW I'M ON PAGE 22.  YOU TALK --

10  THERE IS A COMMENT ABOUT "HEALTHCARE DECISIONS MADE

11  BY SECURITY PERSONNEL."  WHAT WAS YOUR FINDING ABOUT

12  THAT CONCERN?

13     **A**    WELL, I MEAN, THAT KIND OF -- THAT KIND OF

14  DOVETAILS INTO LEADERSHIP, IF I'M PERMITTED TO SPEAK

15  ON THAT.

16     **Q**    I DON'T -- STAY AWAY FROM LEADERSHIP BECAUSE

17  THE JUDGE HAS RULED YOU'RE NOT GOING TO TALK ABOUT

18  LEADERSHIP.  BUT CAN YOU TALK ABOUT THIS WITHOUT

19  GOING INTO LEADERSHIP?  IF THE ANSWER IS "NO," I'LL

20  MOVE ON.

21     **A**    I CAN IN GENERAL TERMS.  YOU KNOW, TYPICALLY

22  WHAT YOU DO WHEN YOU TRY TO MAINTAIN THE AUTONOMY OF

23  THE HEALTH-CARE PROVIDERS IS YOU TRY TO PROVIDE

24  LAYERS IN BETWEEN SO THAT THEY'RE ANSWERING MORE

25  DIRECTLY TO PEOPLE AFFILIATED WITH HEALTH CARE AND

1  NOT --

2        **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS

3  SQUARELY GOES INTO EXACTLY WHAT YOUR ORDER SAID HE

4  COULDN'T TESTIFY TO, WHICH IS HEALTH-CARE LEADERSHIP

5  AND THE STRUCTURE OF THE ORGANIZATION.

6        **THE COURT:**  WELL, CAN YOU REPHRASE YOUR

7  QUESTION?  I MEAN, I THINK THAT IS WHERE HE'S GOING,

8  BUT THAT'S NOT WHAT YOU CALLED FOR.

9        **MR. ARCHEY:**  I'LL TRY, YOUR HONOR.

10       **THE COURT:**  TRY ANOTHER QUESTION MAYBE.

11       **MR. ARCHEY:**  YES, YOUR HONOR.

12  BY MR. ARCHEY:

13    **Q**   WE'RE TALKING ABOUT THE HEALTH-CARE

14  DECISIONS MADE BY SECURITY PERSONNEL.  YOU SAID

15  THAT'S BEEN RESOLVED.  CAN YOU EXPLAIN TO US HOW

16  THAT'S BEEN RESOLVED?  AND IF IT GOES OFF INTO

17  MEDICAL LEADERSHIP, THEN WE'LL JUST STOP.  OKAY?

18    **A**   I'LL KEEP IT VERY GENERAL.

19    **Q**   GO AHEAD.

20    **A**   THE CHANGES MADE WITHIN THE ORGANIZATION ARE

21  SUCH THAT IT'S REDUCING TO ELIMINATING THAT

22  POSSIBILITY.  AND IT IS WITHIN THE STANDARD OF CARE.

23    **Q**   LET'S GO TO EMERGENCY CARE.  THIS IS ON PAGE

24  22.  YOU'VE GOT THE "EMERGENCY" AND "ATU."  IT SAYS

25  "FAILURE TO DO ER REFERRALS."  AND YOU SAY THAT'S

1  RESOLVED.  WHY IS THAT?  ON PAGE 22 THERE IN THE

2  MIDDLE OF THE PAGE.

3      A    YES.  I DID NOT NOTE ANY SYSTEMIC ISSUE

4  ABOUT ER REFERRALS.  IF THEY NEEDED TO GO, YOU KNOW,

5  THEY WENT.  AND SOME OF THE SPECIFIC CASES I

6  REVIEWED, THEY WERE TRANSPORTED RELATIVELY RAPIDLY.

7      Q    AND YOU'VE GOT LANGUAGE IN HERE ABOUT

8  "CERTAINLY, OBJECTIVE EXAMINATIONS BY LICENSED

9  PROVIDERS CAN ARRIVE AT A CONCLUSION THAT NO OUTSIDE

10  REFERRAL TO THE ER IS NECESSARY."

11        WHAT ARE YOU TRYING TO CONVEY THERE IN THAT

12  SENTENCE?

13     A    IT'S SIMILAR RATIONALE TO NO TRANSPORT.  YOU

14  KNOW, IF THE PROVIDER DETERMINES THAT THERE IS NOT A

15  RISK THAT SUBSTANTIALLY REQUIRES AN OUTSIDE ENTITY TO

16  EVALUATE THE PERSON, THEN THEY CAN MAKE A DECISION

17  THAT THAT DOESN'T NEED TO BE DONE.

18     Q    SO THESE ARE PROFESSIONAL MEDICAL JUDGMENTS

19  BEING MADE BY THE PROVIDERS ON THE SCENE?

20     A    YES.

21     Q    LET'S GO TO THE NEXT ITEM, WHICH IS "EMTs

22  MANAGE THE ATU."  YOU SAY "RESOLVED."  WHAT'S -- WHY

23  DO YOU SAY THAT'S RESOLVED?

24     A    THE CURRENT STAFFING IS SUCH THAT THE NURSES

25  MANAGE THE ATU WITH NURSE PRACTITIONER AND PHYSICIAN

1  AVAILABILITY.

2      Q    BELOW THAT YOU TALK ABOUT THE STROKE

3  PROTOCOLS.  YOU SAY IT'S RESOLVED.  WHAT'S THE BASIS

4  FOR THAT OPINION?

5      A    WELL, THEY'VE REDONE IN TERMS OF THE

6  DOCUMENTS, BUT THE -- AGAIN, IT GETS BACK TO THE

7  PROVIDERS' EXAMINATIONS THAT I NOTE IN THE REPORT.

8  ONE OF THE CONCERNS THAT I'VE HAD IN THIS FACILITY

9  AND OTHER FACILITIES LIKE THIS, TOO, IS, YOU KNOW,

10 THE EFFECT OF SOME OF THE CONTRABAND THAT'S WITHIN

11 THERE.

12          SO THERE IS SOME SORTING OUT SOMETIMES THAT

13 YOU HAVE TO DO TO MAKE SURE YOU DELIVER THE PROPER

14 CARE SO THAT YOU CAN DETERMINE IF IT'S A STROKE OR

15 IT'S A OVERDOSE OR IF IT'S RECREATIONAL DRUG USE, OR

16 WHATEVER IT IS.

17     Q    OKAY.  AND THAT'S A REFERENCE TO THE ALTERED

18 MENTAL STATUS PRESENTATION BY A PATIENT?

19     A    YES.  THAT'S ONE OF THE PRESENTATIONS OF

20 STROKE.

21     Q    IS THAT A PROBLEM YOU SEE IN JAILS AND

22 PRISONS THAT YOU PRACTICE IN?

23     A    IT'S VERY COMMON.  I MEAN, SOME STUDIES HAVE

24 SHOWN UP TO 25 PERCENT OF THE POPULATION REGULARLY

25 USES CONTRABAND.

**1**       Q    ALL RIGHT.  AND THAT SORT OF LEADS TO THE

**2**   NEXT POINT YOU HAVE THAT'S ON PAGE 23:  "TREATMENT

**3**   FOR DRUG ABUSE AND OVERDOSE."  YOU SAY "RESOLVED."

**4**   AND WHAT IS THE BASIS FOR THAT OPINION?

**5**       A    THEY DON'T HAVE SOMETHING AS DEFINITIVE AS

**6**   NARCAN FOR ALL DIFFERENT TYPES OF CONTRABAND.  NARCAN

**7**   WORKS SPECIFICALLY FOR OPIATES, HEROIN, FENTANYL,

**8**   OXYCODONE; THINGS LIKE THAT.  BUT THEY HAD AN

**9**   EXCELLENT SUPPLY OF THAT AVAILABLE IN THE ATU.  SOME

**10**  CONTRABAND DOES NOT HAVE A ANECDOTE AS SUCH LIKE

**11**  METHAMPHETAMINE AND SUCH.

**12**      Q    ALL RIGHT.  NOW I'D LIKE TO GO TO PAGE 25 AT

**13**  THIS POINT, ITEM NO. 4.  THIS IS THE "QUALITY

**14**  IMPROVEMENT ACTIVITY."  ALL RIGHT.  AND YOU SAY IT'S

**15**  RESOLVED.  WHY DO YOU SAY THAT?

**16**      A    THE QUALITY IMPROVEMENT ACTIVITY THAT I

**17**  REVIEWED ON SITE WITH THE PERSON WHO COORDINATES WITH

**18**  THAT IS WHERE YOU BASICALLY -- YOU IDENTIFY ISSUES

**19**  THAT CAN PROVIDE IMPROVEMENT WITHIN THE FACILITY AND

**20**  THEN YOU PLAN AND YOU CARRY OUT A STUDY AND THEN YOU

**21**  TAKE THAT STUDY BACK TO THE POWERS THAT BE AND YOU

**22**  ATTEMPT TO IMPROVE THE QUALITY.  THAT'S WHY IT'S

**23**  QUALITY IMPROVEMENT.

**24**           YOU KNOW, THEY'RE LOOKING NOW AT SEVERAL

**25**  DIFFERENT THINGS, INCLUDING REFUSALS IN LABORATORY

1  SERVICES.  BUT ESSENTIALLY YOU ROTATE THROUGH ALL THE

2  DIFFERENT THINGS TO TRY TO MAKE THE DELIVERY OF CARE

3  BETTER WITHIN THE FACILITY.

4      Q    AND WHO IS IT THAT IS RUNNING THE QUALITY

5  IMPROVEMENT PROGRAM AT LSP?

6      A    I BELIEVE IT'S NURSE STICKELLS.

7      Q    DID YOU HAVE CONVERSATIONS WITH NURSE

8  STICKELLS?

9      A    I HAD TWO CONVERSATIONS WITH HER AND

10  REVIEWED HER MATERIALS.

11      Q    AND AFTER THAT PROCESS, WHAT IS YOUR OPINION

12  AS TO THE QUALITY IMPROVEMENT ACTIVITY AT LSP?

13      A    I BELIEVE THAT IT MEETS THE STANDARD OF

14  CARE.

15      Q    ALL RIGHT.  CREDENTIALING.  THIS IS ON PAGE

16  25 OF YOUR REPORT.  WHAT WERE YOUR FINDINGS AS TO

17  CREDENTIALING?

18          MS. MONTAGNES:  OBJECTION, YOUR HONOR.  THIS

19  WAS SPECIFICALLY EXCLUDED BY THE COURT.  I'M LOOKING

20  AT RECORD DOC 20 -- 720.  I APOLOGIZE.

21          THE COURT:  I LOOKED AT IT.  I DON'T

22  REMEMBER --

23          MR. ARCHEY:  IF IT IS, YOUR HONOR, I'LL MOVE

24  ON.  BUT I DIDN'T -- I EITHER DIDN'T KNOW IT OR

25  DIDN'T RECALL.  ONE OF THE TWO.

1        MS. MONTAGNES:  ON PAGE 7 AT THE TOP.

2        THE COURT:  SUSTAINED.

3        MR. ARCHEY:  VERY WELL.

4  BY MR. ARCHEY:

5     Q    ALL RIGHT.  DR. MCMUNN, WE ARE FINALLY TO

6  THE POINT WHERE WE WANT TO TALK ABOUT YOUR CHARTS OR

7  YOUR CHART REVIEWS.  FIRST I WANT TO TALK ABOUT THE

8  PROCESS.  LET'S GO TO PAGE 27 OF YOUR REPORT.

9        MR. ARCHEY:  AND, YOUR HONOR, AT THIS TIME

10 I'D LIKE TO OFFER THE REPORT, 35-B, INTO EVIDENCE, IF

11 I MAY.

12        THE COURT:  ANY OBJECTION?

13        MS. MONTAGNES:  NO OBJECTION, YOUR HONOR.

14        THE COURT:  35-B IS ADMITTED.

15        MR. ARCHEY:  THANK YOU, YOUR HONOR.

16 BY MR. ARCHEY:

17    Q    ALL RIGHT.  EXPLAIN HOW YOU PERFORMED YOUR

18 CHART REVIEW AND WHAT YOUR PROCESS WAS AND WHAT

19 PRODUCT YOU GENERATED.

20    A    YOU KNOW, AS I MENTIONED EARLIER, I WAS -- I

21 WAS THE LAST ONE OF THE DANCE, AND SO, YOU KNOW, A

22 LOT OF THE MATERIAL I DID NOT HAVE AND DID NOT HAVE A

23 LONG TIME TO LOOK AT IT.  AND I FELT IT WAS VERY

24 COMPELLING TO LOOK AT ALL THE ELEMENTS THAT I COULD

25 WITHIN THE CHART.

1        SO I USED THE FORMATTING WHERE BASICALLY I

2   LOOKED AT ALL THE MEDICATIONS THAT WERE DELIVERED,

3   ALL THE RELATIVE DIAGNOSTICS I COULD FIND, ANYTHING

4   IN TERMS OF FINDINGS I COULD GATHER, ANYTHING THAT I

5   SAW THAT WAS UNUSUAL.  AND THEN IF I FELT LIKE THERE

6   WAS ANY -- ANYTHING THAT COULD BE HELPFUL MAYBE IN

7   TERMS OF SUGGESTING TO FOLKS AT LSP OR IF I FELT LIKE

8   THE STANDARD OF CARE WAS MET, I WOULD MAKE COMMENTARY

9   ON MY FORM.

10       NOW, I THINK IT WAS WELL-NOTED WITHIN THE

11  DEPOSITION THAT -- UNFORTUNATELY WITH THIS KIND OF

12  FORMATTING, SOME OF MY LONG FORM GOT CUT OFF, AND SO

13  THE REPORT AND MY ACTUAL NOTES THERE CAN BE VARIATION

14  BETWEEN THE TWO.  AND SOMETIMES EVEN A COLUMN IS

15  MISSING, BUT -- AND THAT'S MOSTLY FORMATTING.  BUT I

16  DID AN EXHAUSTIVE REVIEW ON ALL OF THE CHARTS.

17       AND THEN SECONDARILY, YOU KNOW, WITH THE

18  TESTIMONY THAT OCCURRED, I WANTED TO GO BACK AND LOOK

19  AT THE CHARTS AGAIN.  I WANTED TO CONFIRM WHAT I --

20  MAKE SURE I DIDN'T MISS ANYTHING.  AND SO I WENT BACK

21  TO SOME OF THESE CHARTS A SECOND TIME.  I WENT

22  THROUGH THEM COMPLETELY.

23     Q   ALL RIGHT.  AND THEN LET'S GO TO PAGE 58, I

24  THINK MAYBE.  YES.

25       IS THIS THE LONG FORM YOU WERE TALKING ABOUT

1  THAT WE HAVE ON THE SCREEN THERE?

2     A    YES.

3         MR. ARCHEY:  ALL RIGHT.  LET'S TAKE THAT

4  DOWN FOR THE MOMENT BECAUSE IT'S GOT A NAME ON IT.

5  OKAY.

6  BY MR. ARCHEY:

7     Q    ALL RIGHT.  LET'S TALK ABOUT -- I WANT TO

8  BEGIN WITH THE SPECIFIC CHART, WHICH IS PATIENT NO.

9  1.  HE'S ON PAGE 28 OF YOUR EXPERT REPORT, WITH SOME

10 OF THE INFORMATION MISSING.

11    A    GOSH, I -- THIS LONG FORM DOESN'T HAVE THE

12 NUMBERS ON IT.

13    Q    IF YOU GO TO --

14        MR. ARCHEY:  YOUR HONOR, I THINK WHAT I'D

15 LIKE TO DO IS I HAVE A -- ONE OF OUR DOCUMENTS THAT

16 SHOWS THE NAMES THAT I CAN HAND HIM.  THAT WAY HE CAN

17 CORRELATE AND GET THE NAMES TO CORRELATE WITH HIS

18 FORM, BECAUSE HE'S GOT TWO:  ONE WITH NUMBERS, ONE

19 WITH NAMES.  IF I MAY?

20        THE COURT:  ANY OBJECTION?

21        MS. MONTAGNES:  NO OBJECTION.  I WOULD JUST

22 LIKE TO SEE IT BEFORE THEY HAND IT TO HIM.

23 BY THE WITNESS:

24    A    COUNSEL, THERE IS -- IT'S GOT A HANDWRITTEN

25 NUMBER ON IT, SO I DO HAVE NO. 1, IF YOU WANT TO GET

1 STARTED, AND THEN SOMEBODY ELSE CAN HER GET THE

2 DOCUMENT.

3 **BY MR. ARCHEY:**

4    **Q**   LET'S DO THAT THEN, BECAUSE I'VE GOT A LOT

5 OF PAPER OVER HERE AND I DON'T WANT TO SPEND THE

6 COURT'S TIME DOING THAT.

7      AS TO PATIENT NO. 1, THIS PATIENT DEVELOPED

8 CANCER.  IS THAT RIGHT?

9    **A**   YES.

10    **Q**   AND WHAT WAS YOUR OPINION AS TO WHETHER THE

11 CANCER WAS DIAGNOSED AND FOUND TIMELY?

12    **A**   YOU KNOW, THERE WAS -- THE TIME FROM THE

13 ABNORMAL CHEST X-RAY TO THE BIOPSY WAS TIMELY.  THERE

14 WAS THE USE OF 35 DIFFERENT MEDICATIONS AND ADVANCED

15 CHEMOTHERAPY, MULTIPLE CAT SCANS, MRIs.

16    **Q**   I'M GOING TO READ SOME LANGUAGE FROM

17 PLAINTIFFS' EXPERT REPORT.  FROM THE PLAINTIFFS'

18 REPORT IT STATES THAT, QUOTE, INTENSIVE FOLLOW-UP FOR

19 RADIATION THERAPY -- I'M SORRY -- RADIATION THERAPY,

20 CHEMO, DIAGNOSTIC TESTING, AND ONCOLOGY FOLLOW-UPS,

21 CLOSE QUOTES; THAT HE RECEIVED ALL THAT.  DO YOU

22 AGREE WITH THAT?

23      **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS

24 IS BEYOND THE SCOPE OF HIS REPORT, AND HE'S, YOU

25 KNOW, RESPONDING TO OUR EXPERTS.

1          THE COURT:  CAN YOU RESPOND?

2          MR. ARCHEY:  YES, YOUR HONOR.  HE TALKS

3  ABOUT ALL THE CARE THAT WAS PROVIDED.  HE'S GOT IT

4  ALL LISTED HERE.  HE TALKS ABOUT THE RADIATION, HE

5  TALKS ABOUT CHEMOTHERAPY, HE TALKS ABOUT THE

6  EXCEPTIONAL CARE, HE TALKS ABOUT -- HE'S GOT THEM

7  LISTED.  REFERENCES CHEMOTHERAPY TREATMENTS AND --

8          THE COURT:  WHY DO YOU CONTEND IT'S BEYOND

9  THE SCOPE?

10          MS. MONTAGNES:  BECAUSE HE'S READING FROM --

11  HE'S HAVING HIS WITNESS RESPOND TO OUR EXPERT REPORT,

12  WHICH HE DOESN'T DO IN HIS REPORT.

13          THE COURT:  IS IT IN HIS REPORT, MR. ARCHEY?

14          MR. ARCHEY:  WELL, AS YOU RECALL, YOUR

15  HONOR, THESE TWO REPORTS WERE EXCHANGED

16  SIMULTANEOUSLY, SO OF COURSE THE LANGUAGE FROM

17  PLAINTIFFS' REPORTS ARE NOT GOING TO BE IN HIS

18  REPORT.  THE -- MY POINT IS THE COMMENT OUT OF

19  PLAINTIFFS' REPORT, THAT SUBSTANCE IS REFLECTED IN

20  HERE, YES.

21          THE COURT:  OKAY.  I'M GOING TO OVERRULE THE

22  OBJECTION.

23  BY MR. ARCHEY:

24      Q   ALL RIGHT, DR. MCMUNN.  LET ME MAKE SURE

25  WE'RE ON THE SAME PAGE HERE.

1          DID YOU FIND THAT PATIENT NO. 1 RECEIVED,

2    QUOTE, INTENSIVE FOLLOW-UP FOR RADIATION THERAPY,

3    CHEMO, DIAGNOSTIC TESTING, AND ONCOLOGY FOLLOW-UPS?

4       **A**    YES.

5       **Q**    AND THE TREATMENT FOR THESE -- RADIATION AND

6    CHEMOTHERAPY INVOLVES A COMPLEX INTERACTION BETWEEN

7    THE TWO.  CORRECT?

8       **A**    YES.

9       **Q**    AND WHAT DID YOU FIND IN THE WAY OF THE

10   COORDINATION AND THE LSP'S ABILITY TO GET THIS

11   PATIENT ALL THIS TREATMENT THAT HE NEEDED?

12      **A**    I BELIEVE THAT IT WAS TIMELY AND IT WAS

13   WITHIN THE STANDARD OF CARE.

14      **Q**    AND DEALING WITH THE SIDE EFFECTS AND

15   MANAGING HEALTH CARE THROUGH RADIATION AND

16   CHEMOTHERAPY, THAT CAN BE COMPLICATED.  CORRECT?

17      **A**    YES.

18      **Q**    AND THERE WERE TIMES WHEN HE'S MAKING

19   MULTIPLE FOLLOW-UPS AND TRIPS TO SPECIALISTS PER

20   WEEK, DAILY SOMETIMES.  RIGHT?

21      **A**    YES.

22          **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS

23   ISN'T NOTED IN HIS CHART REVIEW.

24          **MR. ARCHEY:**  YOUR HONOR, HE'S LISTED OUT HIS

25   CHART REVIEW.  DID HE LIST EVERY PIECE OF PAPER?  NO.

1   BUT HE LIST THAT 35 MEDICATIONS, EXCEPTIONAL CARE; IT

2   WAS TIMELY; THERE WERE DIAGNOSTIC FOLLOW-UPS.  IT'S

3   ALL HERE.

4            THE COURT:  OVERRULED.

5            MR. ARCHEY:  THANK YOU, YOUR HONOR.

6   BY MR. ARCHEY:

7       Q    ALL RIGHT.  I WANT TO PULL UP ONE DOCUMENT.

8   IT'S JX_01.0 -- SEALED.  LET'S SEE.  IT'S JX_01.0581.

9            ALL RIGHT, DOCTOR.  DO YOU RECOGNIZE THIS AS

10  ONE OF THE TRIP RETURNS THAT WE WERE -- WE REFERENCED

11  A LITTLE BIT EARLIER?

12      A    YES.

13      Q    AND LOOK AT THAT TOP -- I GUESS BULLET WOULD

14  BE THE LANGUAGE FOR IT.  IT SAYS "OFFENDER DID NOT

15  MAKE IT TO MBPG" -- MARY BIRD PERKINS GONZALES --

16  "XRT," AND THEN IT GOES ON.  "IT TOOK TOO LONG AT

17  INFUSION CLINIC AT UMC."

18           SO WHAT DID THE LSP PERSONNEL DO AT THAT

19  TIME?

20      A    LOOKS LIKE THEY RESCHEDULED IT FOR TWO DAYS

21  LATER.

22      Q    SO THEY MADE THE CALL DOWN TO THE SPECIALIST

23  TO COORDINATE AFTER THIS PROBLEM AROSE BETWEEN THE

24  SPECIALISTS?

25      A    YES.  THEY NOTED IT ON THE 24TH, AND IT WAS

1  RESCHEDULED FOR THE 25TH.

2     **Q**   IS THAT AN EXAMPLE OF VERY GOOD COORDINATION

3  BETWEEN LSP AND THE SPECIALIST?

4     **A**   YES.

5     **Q**   ALL RIGHT.  AT THIS TIME I'D LIKE TO GO TO

6  PATIENT NO. 10, WHICH IS ON PAGE 30 OF YOUR REPORT.

7  I THINK IT'S LIKE TWO CHARTS OVER IN YOUR LONG FORM

8  MAYBE.

9     **A**   YEAH, I DON'T HAVE THE NUMBER ON HERE, BUT I

10  SEEM TO RECALL, YES.

11     **Q**   ARE YOU GOOD?  ALL RIGHT.  LET'S BEGIN BY --

12  I WANT TO SHOW YOU JX_10.0176.  ALL RIGHT.  AND IF WE

13  LOOK TOWARD THE BOTTOM, THERE IS A REFERENCE TO

14  "PATIENT ADMITTED TO SMOKING A DIPSTICK."

15        ARE YOU FAMILIAR WITH WHAT A DIPSTICK IS?

16     **A**   YES.  IT'S IN SEVERAL -- SEVERAL OF THE

17  DOCUMENTS I REVIEWED.  IT'S A CONTRABAND DRUG.

18     **Q**   AND WHEN YOU HAVE A PATIENT PRESENTS WHO IS

19  ADMITTED SMOKING TO -- OR SMOKING A CONTRABAND AND

20  HE'S GOT ALTERED MENTAL STATUS, WHAT IS THE

21  APPROPRIATE TREATMENT AT THAT TIME?

22     **A**   WELL, YOU KNOW, UNFORTUNATELY, YOU KNOW,

23  CONTRABAND WITHIN A CORRECTIONAL SYSTEM IS NOT ALWAYS

24  DRUGSTORE GRADE.  AND SO SOMETIMES EVEN WHEN THEY

25  ADMIT TO SMOKING A DIPSTICK, YOU HAVE TO CONSIDER

1  OTHER POSSIBILITIES SUCH AS BEING LACED WITH

2  FENTANYL, HEROIN, MORPHINE, METHADONE,

3  METHAMPHETAMINE.

4       SO ONCE YOU HAVE AN ADMITTED CONTRABAND USE,

5  EVERYTHING IS ON THE TABLE, SO YOU HAVE TO CONSIDER A

6  VERY WIDE DIFFERENTIAL OF POSSIBILITIES THAT CAN

7  OCCUR IN THAT PERSON.

8     Q   OKAY.  LET'S GO TO JX_10.0172.

9       ALL RIGHT.  THE -- AS TO THE ALTERED MENTAL

10 STATUS, WHEN YOU HAVE A PATIENT THAT ADMITS TO

11 ALTERED -- OR TO ILLICIT DRUG USE, WHAT WOULD YOU DO

12 AS TO ALTERED MENTAL STATUS AT THAT TIME?

13    A   WELL, IF YOU HAVE AN ADMISSION, OBVIOUSLY

14 YOU WANT TO WORK FROM WHAT THEY'VE ADMITTED TO IF

15 THEY'RE BEING -- IF YOU'RE GETTING A GOOD HISTORY.

16 BUT ALTERED MENTAL STATUS HAS A WIDE DIFFERENTIAL,

17 INCLUDING INFECTION, METABOLIC ISSUES.  BLOOD GLUCOSE

18 CAN ALTER MENTATION.  LONG-TERM DEMENTIA CAN ALTER

19 MENTATION.  ISSUES WITH MENTAL HEALTH MEDICATIONS,

20 UNDERDOSING, OVERDOSING CAN ALL ALTER MENTATION.

21 BLOOD PRESSURE TOO HIGH OR TOO LOW CAN ALTER

22 MENTATION, INCLUDING ALL THE NEUROLOGIC DISORDERS,

23 CHRONIC AND ACUTE.

24    Q   IS IT APPROPRIATE -- I'M SORRY.  GO AHEAD.

25 DID I CUT YOU OFF?

1  **A**   NO.

2  **Q**   IS IT APPROPRIATE TO FOLLOW A PATIENT IN A

3 FACILITY UNTIL THEIR ALTERED MENTAL STATUS RESOLVES

4 BACK TO BASELINE?

5  **A**   YES.

6  **Q**   IF THAT'S TOO BIG A QUESTION, BREAK IT DOWN

7 FOR ME, PLEASE.

8  **A**   WELL, YOU KNOW, ALTERED -- WHEN YOU'RE

9 LOOKING AT THAT BIG, LONG LIST, SOME OF THOSE THINGS

10 DON'T RESOLVE.  YOU KNOW, SOME OF THOSE THINGS ARE

11 CHRONIC.  AND, YOU KNOW, THEIR ALTERED MENTAL STATUS

12 CAN BE LONG-TERM, NOT ACUTE.

13  **Q**   NOW LET'S GO TO JX_10.0163.

14     AT THE TOP HERE WE'VE GOT ANOTHER POSSIBLE

15 INTOXICATION PER SECURITY.  AS WE GO THROUGH PATIENT

16 NO. 10, WHAT DID YOU NOTE AS TO ILLICIT DRUG USE

17 THROUGH THIS CHART?

18  **A**   LOOKING AT THE EXHIBIT OR MY --

19  **Q**   JUST GENERALLY WHAT DID YOU NOTE?

20  **A**   OH.  YEAH, THERE WAS SEVERAL INSTANCES OF

21 INTOXICATION AND DRUG USE AND ADMISSION OF CONTRABAND

22 USE.

23  **Q**   AND LET'S GO TO JX_10.0149.

24     **MR. ARCHEY:**  AT THE -- BROOKE, CAN YOU BLOW

25 THIS UP A LITTLE BIT FOR US?

1  BY MR. ARCHEY:

2      Q    AT THE BOTTOM OF THE CHIEF COMPLAINT, THE

3  LAST SENTENCE, "PATIENT STATES HE SMOKED DIPSTICK

4  EARLIER PTA."  DO YOU SEE THAT?

5      A    YES.

6      Q    IS IT APPROPRIATE TO TAKE ILLICIT DRUG USE

7  INTO EFFECT OR INTO ACCOUNT WHILE TREATING SOMEONE?

8      A    IN MY OPINION, IT'S NEGLIGENT NOT TO IN A

9  CORRECTIONAL SETTING.  YOU HAVE TO ALWAYS CONSIDER

10  THAT OPTION.

11      Q    WHY?

12      A    BECAUSE OF THE PREVALENCE, IT'S SO HIGH.

13      Q    ALL RIGHT.  I WANT TO GO NOW TO JX_10.0137.

14  AT THE TOP WE'VE GOT ANOTHER POSSIBLE INTOXICATION ON

15  OCTOBER 18, 2020.  DO YOU SEE THAT?

16      A    YES.

17      Q    NOW I WANT TO GO TO JX_10.0129.  ALL RIGHT.

18  HERE WE'VE GOT "LEFT-SIDED WEAKNESS TIMES 3 HOURS."

19  DO YOU SEE THAT?

20      A    YES.

21      Q    SO WHAT IS YOUR -- WHAT'S YOUR RESPONSE TO

22  THIS PRESENTATION?

23      A    YOU KNOW, OF COURSE I DIDN'T DO THE

24  EXAMINATION.  I CAN ONLY GO BY WHAT'S ON HERE.  BUT

25  AS WE TALKED ABOUT ALTERED MENTAL STATUS AND

1  NEUROLOGIC CHANGES, SOME OF THE THINGS IN THE

2  DIFFERENTIAL ARE LISTED OUT WITH HIS MEDICATIONS,

3  INCLUDING ELAVIL, SEVERAL ANTI-DEPRESSANTS -- I MEAN

4  SEVERAL ANTI-HYPERTENSIVES.  THERE IS LOTS OF

5  DIFFERENT MEDICATIONS THERE THAT CAN CAUSE LOTS OF

6  DIFFERENT THINGS.  "LEFT-SIDED WEAKNESS" IS -- COULD

7  BE A SIGN OF SOMETHING SERIOUS AS WELL.

8     Q    SOMETHING SERIOUS, ARE WE TALKING -- NOW

9  WE'RE GETTING INTO THE STROKE CONSIDERATIONS?

10    A    IT COULD BE.

11    Q    AND YOU MENTIONED ELAVIL.  WHAT WAS THE

12  SIGNIFICANCE OF MENTIONING ELAVIL?

13    A    I NOTED ON SEVERAL CHARTS THAT I, IN

14  PARTICULAR, REVIEWED THE USE OF ELAVIL, WHICH IS

15  DISCONTINUED BY THE FDA.  AND IN CORRECTIONAL

16  FACILITIES, IN MY EXPERIENCE, IT'S BEEN DIVERTED AND

17  SNORTED AND MISUSED, USED AS A SLEEPING PILL.  EVEN

18  THOUGH, AGAIN, IT WAS DISCONTINUED BY THE FDA, IT'S

19  STILL USED BY SOME MENTAL HEALTH PROFESSIONALS.

20    Q    NOW, MAKE SURE I'M UNDERSTANDING.  YOU'RE

21  SAYING THAT A PRESCRIPTION MEDICATION PILL IS SNORTED

22  AND ABUSED IN THAT MANNER?

23    A    ACTUALLY, ELAVIL IS PROBABLY NOT ON THE

24  FIRST TIER OF DIVERTED MEDICATIONS IN A CORRECTIONAL

25  FACILITY.  TYPICALLY, IN MY EXPERIENCE, SEROQUEL,

1    WELLBUTRIN, AND NEURONTIN --

2            **MS. MONTAGNES:**  OBJECTION, YOUR HONOR.  THIS

3    IS BEYOND THE SCOPE OF HIS REPORT.  HE'S NOW

4    TESTIFYING AS AN EXPERT IN DRUG USE INSIDE OF

5    PRISONS.

6            **THE COURT:**  HE'S TESTIFYING TO WHAT HIS

7    EXPERIENCE IS WITH SEROQUEL, WELLBUTRIN AND WHAT THE

8    OTHER ONE WAS, SO --

9            **MS. MONTAGNES:**  NONE OF WHICH THIS --

10   APOLOGY.

11           **THE COURT:**  OVERRULED.

12       **Q**   GO AHEAD, DOCTOR.

13       **A**   THOSE THREE ARE TYPICALLY DIVERTED MORE THAN

14   I SEE ELAVIL DIVERTED AND MISUSED.

15           BUT ELAVIL, EVEN WHEN IT'S TAKEN JUST

16   REGULARLY IN PILL FORM, HAS SIGNIFICANT EFFECTS UPON

17   THE NEUROLOGIC SYSTEM AND SPECIFICALLY ON HEART

18   RHYTHMS AND IN CARDIAC.  THAT'S ONE OF THE REASONS

19   THE FDA DISCONTINUED IT.

20       **Q**   ALL RIGHT.  LET'S MOVE ON TO JX_10.0122.

21   ALL RIGHT.  THIS IS A PHYSICAL THERAPY NOTE.  AND IF

22   YOU LOOK DOWN TOWARD THE BOTTOM OF THE PAGE, THE

23   THERAPIST NOTES "NO SIGNS OF LEFT-SIDED WEAKNESS IN

24   THERAPY TODAY."  DO YOU SEE THAT?

25       **A**   I DO.

1    **Q**   SO CONSIDERING THE PREVIOUS NOTE AND THIS

2    NOTE, WHAT ARE WE -- WHAT IS YOUR CONCLUSION AS TO

3    STROKE OR NO STROKE AS TO THIS GENTLEMAN?

4    **A**   WELL, IF HE HAD A TIA OR WHATEVER NEUROLOGIC

5    ACTIVITY, IT WAS NOT RESIDUAL, ACCORDING TO THIS

6    PHYSICAL THERAPIST REPORT.

7    **Q**   SO IF HE HAD THE TIA, HE RECOVERED FROM IT,

8    IF IT WAS A TIA.  IS THAT WHAT YOU'RE --

9    **A**   YEAH.  TIA IS NOT -- MAY NOT CAUSE PERMANENT

10   INJURY.

11   **Q**   WHAT IS A TIA?

12   **A**   I GUESS IN -- TO BREAK IT DOWN INTO LIKE A

13   LAYMAN'S TERM, IT'S KIND OF LIKE A TREMOR BEFORE AN

14   EARTHQUAKE.  IT'S A SMALL EVENT THAT DOES NOT CAUSE

15   LASTING EFFECT.

16   **Q**   LET'S GO NOW TO JX_10.0114.

17       IF WE GO DOWN TO THE BOTTOM, THIRD LINE

18   DOWN, "PATIENT ADMITS TO SMOKING A DIPSTICK" AGAIN.

19   DO YOU SEE THAT?

20   **A**   YES.

21   **Q**   AND IF YOU'RE TREATING A PATIENT, HE COMES

22   IN, HE'S GOT THESE RECORDS AND THE CHART, AS YOU LOOK

23   THROUGH THEM, DOES THAT ADD WEIGHT TO YOUR

24   DIFFERENTIAL DIAGNOSIS OF WHETHER YOU NEED TO

25   CONSIDER DRUG -- ILLICIT DRUG ABUSE?

**1**     **A**   YEAH.  EACH ONE STEP-WISE WOULD PUSH IT UP

**2** THE LIST OF THE DIFFERENTIAL.  THE MORE YOU HAVE, THE

**3** MORE YOU WOULD CONSIDER THAT AS YOUR OPTION.

**4**     **Q**   LET'S GO NOW TO JX_10.0120.

**5**         ALL RIGHT.  AT THIS TIME HE PRESENTS WITH A

**6** BURN ON LEFT INDEX FINGER.  DO YOU SEE THAT?

**7**     **A**   YES.

**8**     **Q**   NOW LET'S GO TO JX_10.0111.

**9**         THIS DOCUMENT STATES THAT "PASSING OUT WITH

**10** WICK IN HAND."  DO YOU KNOW WHAT A WICK IS?

**11**     **A**   TYPICALLY THAT'S WHAT THEY -- YOU KNOW,

**12** THAT THEY'RE DISCUSSING CONTRABAND.

**13**     **Q**   AND --

**14**     **A**   NOW, THEY USE DIFFERENT -- FROM SYSTEM TO

**15** SYSTEM YOU'LL SEE DIFFERENT TERMINOLOGY.

**16**     **Q**   IF WE LOOK DOWN AT THE BOTTOM RIGHT WHERE

**17** THE PROVIDER'S NOTE IS, THE PROVIDER NOTES HE HAD A

**18** "SECOND DEGREE BURN TO LEFT INDEX FINGER AND THUMB

**19** FROM SMOKING A WICK.  BLISTER" RINSED I GUESS --

**20** WHATEVER THE WORD IS THERE -- AND PROVIDED WOUND CARE

**21** FOR THIS PATIENT.  IS THAT RIGHT?

**22**     **A**   YEAH.  LOOKS LIKE "BLISTER REMOVED."

**23**     **Q**   "REMOVED."  OKAY.

**24**     **A**   YEAH.

**25**     **Q**   ALL RIGHT.  OKAY.  LET'S GO NOW TO

1  JX_10.0106.  AMBULANCE RUN.  AND PATIENT SAYS "I HAD

2  A STROKE."  LET'S GO THROUGH THIS DOCUMENT.

3          FIRST OFF, WHAT ARE -- HOW ARE HIS VITAL

4  SIGNS INITIALLY ON THE AMBULANCE RUN?

5      A    ELEVATED BLOOD PRESSURE, NORMAL PULSE,

6  NORMAL RESPIRATIONS, SLIGHTLY ELEVATED TEMP, NORMAL

7  OXYGEN SATURATION.

8      Q    AND THE AMBULANCE TAKES HIM TO THE ATU.

9  CORRECT?

10     A    YES.

11     Q    LET'S GO TO JX_10.0106.  I'M SORRY.  I WAS

12 ONE PAGE AHEAD.  HE'S SEEN IN THE ATU AT 0643.  GO

13 DOWN TO THE BOTTOM, PLEASE.  DOWN A LITTLE BIT MORE,

14 PLEASE.  THERE IT IS.  "TIME LEFT:  0731."  AND HE

15 WAS SENT TO OUR LADY OF THE LAKE HOSPITAL.  IS THAT A

16 QUICK RESPONSE IN ATU?

17     A    WHAT'S THAT TOP TIME?  IS THAT 6:51?

18     Q    TOP TIME IS -- GO BACK UP, PLEASE -- IT IS

19 6:43.

20     A    YES, THAT'S TIMELY AND APPROPRIATE.

21     Q    ALL RIGHT.  I WANT TO GO TO ANOTHER PATIENT.

22 AT THIS TIME LET'S GO TO PATIENT 51.

23          DOCTOR, I DON'T KNOW WHERE THAT'S GOING TO

24 BE IN YOUR CHARTS.

25          **MR. ARCHEY:**  YOUR HONOR, MY --

1  BY THE WITNESS:

2       A    ARE YOU STILL --

3  BY MR. ARCHEY:

4       Q    LET ME JUST SHOW YOU A DOCUMENT.  I THINK WE

5  CAN DO IT THIS WAY.  IF YOU CAN PULL UP JX_51.0157.

6  ALL RIGHT.

7            THIS IS AUGUST 29, 2019; THIS GENTLEMEN

8  PRESENTS TO THE ATU.  HE IS HAVING -- WHERE IS HIS

9  TEMPERATURE, DOCTOR?  DO YOU SEE HIS TEMPERATURE

10 READINGS?

11      A    ONE TEMP THERE AND THEN THERE'S --

12      Q    103.3.  HE'S GOT AN ELEVATED TEMPERATURE.

13 IS THAT RIGHT?

14      A    YEAH.  AND THERE IS NOT A DECIMAL IN THERE,

15 BUT THAT APPEARS TO BE CORRECT.

16      Q    IF WE GO DOWN TO THE BOTTOM ON THE LEFT

17 SIDE, HE'S GOT A DRUG SCREEN, WHICH AT LEAST

18 INITIALLY IS POSITIVE FOR OPIOIDS.  DO YOU SEE THAT?

19      A    YES.

20      Q    LOOK TO THE RIGHT IN THE THIRD LINE DOWN

21 UNDER THE PROVIDER.  DOES THAT SAY "ICE PACK

22 APPLIED"?

23      A    YES.

24      Q    WOULD THAT BE APPROPRIATE FOR SOMEONE WHEN

25 THEY HAVE AN ELEVATED TEMPERATURE?

1      **A**   ALONG WITH THE NEXT ORDER AS WELL, YES.

2           **THE REPORTER:**  I'M SORRY, SIR?

3      **A**   IT WOULD BE APPROPRIATE, AND THEN THE NEXT

4  ORDER WOULD BE APPROPRIATE AS WELL.

5      **Q**   WHAT IS THE NEXT ORDER?

6      **A**   TYLENOL.

7      **Q**   LET'S GO TO THE NEXT PAGE, PLEASE.  OR I'M

8  SORRY.  IT'S JX_51.0131.  OKAY.  THIS IS A REFERRAL

9  FOR THAT SAME VISIT TO OUR LADY OF THE LAKE EMERGENCY

10  ROOM.  GO DOWN.  A LITTLE BIT MORE, PLEASE.  ALL

11  RIGHT.  RIGHT THERE.

12           OKAY.  THE INFORMATION THAT'S BEING PROVIDED

13  TO THE ER, WE'VE GOT "PROVISIONAL DIAGNOSIS" AT THE

14  BOTTOM IS WHAT, DOCTOR?

15      **A**   I'M SORRY.  I DIDN'T HEAR YOU.

16      **Q**   I'M LOOKING AT "PROVISIONAL DIAGNOSIS" AT

17  THE BOTTOM.  "HEAT STROKE"?

18      **A**   "HEAT STROKE VERSUS CENTRAL NERVOUS SYSTEM

19  PATHOLOGY."

20      **Q**   IS THIS AN APPROPRIATE DOCUMENT TO PROVIDE

21  TO THE ER TO GIVE THEM INFORMATION SO THEY CAN SORT

22  IT OUT?

23      **A**   YES.

24      **Q**   AS TO THIS ENCOUNTER, DO YOU SEE ANY ISSUES?

25  IS THIS AN APPROPRIATE ENCOUNTER THAT MET THE

1   STANDARD OF CARE?

2       **A**   YES.  I MEAN, THE ONLY THING I SEE MISSING

3   UP ABOVE IS THE DATE OF BIRTH.  BUT, YOU KNOW, THAT'S

4   CLERICAL.

5       **Q**   ALL RIGHT.  NOW LET'S GO TO PATIENT NO. 55.

6   ARE YOU THERE?

7       **A**   I AM.

8       **Q**   LET'S GO NOW AND START AT JX_55.0070.  GO

9   DOWN, PLEASE.  I'M SORRY.  0071.  THERE IT IS.  OKAY.

10  THANK YOU.

11          ALL RIGHT.  DOCTOR, WHAT DO YOU -- WHAT IS

12  THIS?  WHAT ARE WE LOOKING AT?

13      **A**   IT LOOKS LIKE PHYSICIAN'S CLINIC FORM.

14      **Q**   FOR -- WHAT WAS THE REASON FOR THE VISIT?

15      **A**   LOOKS LIKE WE'VE GOT SOME ELEVATED -- IT'S

16  NEUROLOGIC, BUT WE'VE GOT ELEVATED TEMP -- I MEAN

17  ELEVATED BLOOD PRESSURE.

18      **Q**   AND THIS NEURO VISIT IS AN OUTSIDE

19  SPECIALIST THAT COMES TO LSP?

20      **A**   YES.  I THINK THAT'S WHY IT'S GOT THE COLOR

21  CODING ON THE SIDES.

22      **Q**   ALL RIGHT.  AND WHAT ARE SOME OF THE

23  CONCERNS FROM ELEVATED BLOOD PRESSURE?

24      **A**   IN GENERAL?

25      **Q**   YES, SIR.

1     **A**    YOU KNOW, ELEVATED BLOOD PRESSURE CAN CAUSE

2   TEMPORARY AND PERMANENT DAMAGE TO THE NEUROLOGIC

3   SYSTEM AND THE RENAL SYSTEM; IT INCREASES THE RISK

4   FOR CARDIAC EVENTS, NEUROLOGIC EVENTS.  YOU KNOW,

5   IT'S -- BLOOD PRESSURE GOES EVERYWHERE AND AFFECTS

6   THE WHOLE BODY.

7     **Q**    AND DID YOU NOTE, AS YOU LOOKED THROUGH THIS

8   CHART, WHETHER THIS PATIENT WAS COMPLIANT WITH HIS

9   BLOOD PRESSURE MEDICATIONS OR NOT?

10    **A**    THIS IS ONE OF THOSE THAT I FELT COMPELLED

11  TO LOOK AT TWICE.  AND WHEN I DID, I -- YOU KNOW, IT

12  DIDN'T REALLY CHANGE ANYTHING.  BUT I NOTED THAT HE

13  WAS COMPLIANT AT ONE POINT, AND THEN AT SOME POINT IN

14  2019 HIS COMPLIANCE WANED AND HIS BLOOD PRESSURES

15  INCREASED.  AND THEN AFTER SOME OF THE EVENTS AND HE

16  HAD A FEEDING TUBE INSTALLED WHERE HIS MEDICATION

17  CAME IN ALL THE TIME, HIS BLOOD PRESSURE STABILIZED

18  AGAIN BECAUSE, AGAIN, HE WAS COMPLIANT WITH THE

19  MEDICATION AND THEY WERE NORMALIZED.

20    **Q**    NOW LET'S GO TO JX_55.0070.

21         ALL RIGHT, DOCTOR.  WE'VE GOT A -- IT

22  SAYS -- LOOKS LIKE IT'S A BLOOD PRESSURE CHECK.  AND

23  HIS BLOOD PRESSURE IS -- WHEN YOU SEE 206 OVER 132,

24  WHAT IS THAT TO YOU?

25    **A**    THAT'S A -- THAT'S AN EMERGENT BLOOD

1  PRESSURE THAT REQUIRES TREATMENT.

2      Q    IF WE GO BELOW THAT, LOOKS LIKE THEY GAVE

3  HIM -- WHAT IS THE MEDICATION IT LOOKS LIKE THEY GAVE

4  HIM?

5      A    CLONIDINE.  IT'S A SHORT-ACTING HYPERTENSION

6  MEDICATION.

7      Q    WHAT IS HIS BLOOD PRESSURE AFTER THAT?

8      A    152 OVER 104.

9      Q    STILL ELEVATED?

10     A    YES, BUT NOT EMERGENT.

11     Q    SO IS THAT A GOOD PROCESS THAT HAPPENED

12  RIGHT THERE?

13     A    THAT WOULD BE APPROPRIATE AND WITHIN THE

14  STANDARD OF CARE.

15     Q    LET'S GO NOW TO JX_55.0069.

16         ALL RIGHT.  ONCE AGAIN, WHAT IS THE BLOOD

17  PRESSURE NOTED ON THIS DOCUMENT, PLEASE?

18     A    IT'S VERY HIGH AGAIN.

19     Q    AND IS THERE A EXPLANATION ON WHY HIS BLOOD

20  PRESSURE IS THAT HIGH?

21     A    WELL, THE ONLY NOTE IS THAT HE'S

22  NONCOMPLIANT WITH HIS BLOOD PRESSURE MEDICATION,

23  WHICH WOULD BE CONSISTENT WITH THAT NUMBER.

24     Q    AND THEN WAS THERE AN INDICATION OF WHAT

25  THEY DID WITH THE PATIENT AT THAT TIME?

1    **A**    THERE IS A PLAN AND EDUCATION TO TAKE HIS

2  MEDICATIONS AS PRESCRIBED.

3    **Q**    AND THEN "SEEN IN ATU TODAY" AS WELL?

4    **A**    YES.

5    **Q**    LET'S GO TO JX_55.0068.

6       ALL RIGHT.  THIS IS ONE OF THE ATU NOTES.

7  IF WE LOOK DOWN ON THE LEFT, WHAT ARE THE MEDICATIONS

8  THAT ARE LISTED THERE THAT THEY APPEAR TO HAVE

9  ADMINISTERED TO THE PATIENT?

10    **A**    WELL, THE CLONIDINE WAS HELD, BUT THE

11 AMLODIPINE, HIGH-DOSE LOSARTAN, HYDRALAZINE AND THE

12 SPIRONOLACTONE, WHICH IS A DIURETIC.

13    **Q**    WHAT DO THOSE MEDICATIONS -- WHAT ARE THEY

14 TRYING TO DO?

15    **A**    THEY'RE FOR LONG-TERM BLOOD PRESSURE

16 CONTROL.

17    **Q**    AND IF WE LOOK TO THE RIGHT WHERE WE HAVE

18 THE PROVIDER'S NOTE DOWN AT THE BOTTOM, IT SAYS

19 "PATIENT HAS NOT FILLED BLOOD PRESSURE MEDS SINCE

20 OCTOBER."  AND WE'RE IN WHAT?  FEBRUARY HERE?

21    **A**    YES.

22    **Q**    IS THAT CONSISTENT WITH SOMEONE WHOSE BLOOD

23 PRESSURE WOULD BE IN THE SEVERE RANGE?

24    **A**    YES.  I MEAN, YOU KNOW, OF COURSE BLOOD

25 PRESSURE WITH DIFFERENT FOLKS IS RELATIVE AND

1  SOMEBODY CANNOT TAKE THEIR BLOOD PRESSURE PILL AND

2  NOT BE THAT HIGH.  BUT THESE ARE VERY -- IT'S A VERY

3  HIGH AND POTENT COMBINATION OF MEDICATIONS.  AND IF

4  YOU DON'T TAKE IT, IT'S TYPICALLY GOING TO RAISE VERY

5  HIGH, LIKE HE DID -- LIKE THE NUMBERS HE DID HAVE.

6      Q    AND UNDER THE ASSESSMENT, IT NOTED "MEDICAL

7  NONCOMPLIANCE" WITH "HYPERTENSION."  CORRECT?

8      A    YES, THAT'S ACCURATE.

9      Q    LET'S GO NOW TO JX_55.0063.

10         THIS IS AN AMBULANCE RUN.  DOCTOR, IT SAYS

11 THERE WAS NO -- AMONG OTHER THINGS, IT SAYS "NO

12 SEIZURE LIKE ACTIVITY.  HE JUST STARTED DROOLING AND

13 SLUMPED TO ONE SIDE."  DO YOU SEE THAT OR WANT ME TO

14 BLOW IT UP A LITTLE BIT MORE FOR YOU?

15     A    YES, DOWN AT THE BOTTOM?

16     Q    YES, SIR.  THERE WE GO.  AND HE SAYS "I'M

17 OKAY"; "VITAL SIGNS WERE STABLE."  DO YOU SEE THAT?

18     A    YES.

19     Q    AND THIS PATIENT FROM HERE GOES TO THE ATU.

20 LET ME SHOW YOU THE -- WOULD IT BE APPROPRIATE TO

21 SEND THIS PATIENT TO THE ATU?

22     A    YES.

23     Q    LET'S GO TO JX_55.0064.

24         ALL RIGHT.  THIS IS THE ATU NOTE.

25         MR. ARCHEY:  NOW, BLOW THAT UP A LITTLE BIT

1  MORE FOR US, PLEASE, BROOKE.  THERE YOU GO.

2  **BY MR. ARCHEY:**

3      **Q**    DOCTOR, GIVE YOU A SECOND TO WORK YOUR WAY

4  THROUGH THAT.  IF YOU CAN GO DOWN A LITTLE BIT,

5  PLEASE.

6          DOCTOR, HOW ARE HIS VITAL SIGNS AT THIS

7  TIME?

8      **A**    THIS LOOKS MORE LIKE THE BLOOD PRESSURES

9  WHEN HE'S TAKING HIS MEDICATIONS.

10     **Q**    GO FURTHER DOWN.  THERE IS A NOTE AT 1930.

11 IT SAYS "NO DELTA" -- THAT WOULD BE CHANGE -- "IN

12 NEURO STATUS."  DO YOU SEE THAT?

13     **A**    YEAH.  THE "DELTA" IS A CHANGE; "NO CHANGE

14 IN NEURO STATUS."

15     **Q**    "OK TO DISCHARGE."  WHAT'S YOUR

16 INTERPRETATION OF WHAT THAT NOTE MEANS AT THAT TIME?

17     **A**    WELL, THAT HE DID NOT HAVE A CHANGE FROM HIS

18 NEUROLOGIC BASELINE NOW.  THIS PARTICULAR PATIENT HAD

19 A HISTORY OF STROKES FOR MANY YEARS, SO HE MAY HAVE

20 HAD A CERTAIN BASELINE.  BUT THEY DID NOT SEE A

21 CHANGE IN THAT STATUS.

22     **Q**    LET'S LOOK AT A COUPLE OF THE OTHER THINGS

23 THEY DID FOR HIM THAT DAY, IS ON JX_55.0065.  AN EKG

24 WAS RUN.  WOULD THAT BE APPROPRIATE?

25     **A**    WELL, YES.

1    Q   OKAY.  ALL RIGHT.  NOW, LET'S NOW GO TO

2   JX_55.0061.  ALL RIGHT.  SO THE NEXT DAY HE HAS

3   ANOTHER EPISODE WHERE HE SAYS HE HAD INCREASED

4   WEAKNESS TO LEFT FOOT -- LEFT LEG/FOOT SINCE

5   YESTERDAY AND MAKES A SELF-DECLARED EMERGENCY.  HE

6   ACTUALLY CAME IN THE AMBULANCE VIA WHEELCHAIR.

7        ALL RIGHT.  DOCTOR, IS IT APPROPRIATE FOR

8   HIM TO BE SEEN AT THE ATU AT THAT TIME?

9    A   YES.

10    Q   AND IT SAYS ON THE RIGHT "SEEN IN ATU BY

11   NURSE PRACTITIONER BORDELON."  DO YOU SEE THAT?

12    A   YES.

13    Q   NOW LET'S GO TO THE ACTUAL ATU VISIT, WHICH

14   IS JX_55.0057.

15        ALL RIGHT.  THE INCREASED LEFT-SIDE WEAKNESS

16   IS NOTED AS -- BY THE PROVIDER.  AND IF WE GO DOWN TO

17   THE VERY BOTTOM -- KEEP GOING.  WHAT DOES THE

18   PROVIDER DO AT THAT TIME?

19    A   FORWARDS HIM FOR DIAGNOSTICS.

20    Q   TO GO GET A CT SCAN AT WEST FELICIANA?

21    A   YES.  I THINK HE WROTE THAT ORDER.

22    Q   OKAY.  SO IS THAT -- AND HE NOTES IN HIS

23   NOTE THAT HE HAD A HISTORY OF A CVA WITH LEFT-SIDED

24   WEAKNESS.  HE'S TRACKING WHAT'S GOING ON WITH HIM.

25   RIGHT?

1    **A**    YES.  HE'S READ THE CHART OR HE'S FAMILIAR

2  WITH IT.

3    **Q**    AND HE EVEN NOTES HE WAS SEEN YESTERDAY WITH

4  HIS ELEVATED BLOOD PRESSURE.  RIGHT?

5    **A**    YES.

6    **Q**    WHAT'S HIS BLOOD PRESSURES TODAY WHEN HE

7  PRESENTS?

8    **A**    THEY'RE A LITTLE HIGHER BUT -- THEY'RE

9  ELEVATED BUT NOT EMERGENT.

10    **Q**    LET'S GO NOW TO JX_55.0060.

11         THIS IS A CT SCAN THAT THE PROVIDER OBTAINED

12  FROM WEST FELICIANA HOSPITAL.  WHAT WAS THE

13  IMPRESSION ON THE CT SCAN?

14    **A**    THE CT SCAN SHOWED NO ACUTE INTRACRANIAL

15  ABNORMALITY.  IT DID SHOW ATROPHY AND CHRONIC SMALL

16  VESSEL DISEASE, WHICH IS COMMON IN OLD STROKES OR

17  DEMENTIA.

18    **Q**    NOW, AFTER THIS, THE NEXT RECORD IS

19  JX_55.0053.  IT'S DATED MARCH 17, 2021.  WE'RE ABOUT

20  SIX WEEKS LATER.

21         WHAT IS THE SIGNIFICANCE TO YOU THAT THERE

22  ARE NO INDICATIONS OF PROBLEMS FOR ABOUT SIX WEEKS

23  AFTER THAT VISIT?

24    **A**    WELL, I MEAN, IT WAS NOT AN ACUTE ISSUE.  IF

25  IT WAS AN ACUTE ISSUE, IT WOULD HAVE COMPOUNDED IT.

1  HE EITHER REQUIRED FURTHER TREATMENT OR HE'D BE

2  DECEASED.

3      Q    YOU WERE TALKING ABOUT THE TIAs EARLIER.  IS

4  THAT A TIA THAT SEEMS TO HAVE RESOLVED ITSELF?

5      A    WELL, THAT'S A LIKELY POSSIBILITY, YES.

6      Q    ON MARCH 17, ONCE AGAIN HE HAS -- HE

7  COMPLAINS OF HIS RIGHT -- IT DOESN'T EVEN SAY AFTER

8  IT -- GIVING OUT ON HIM.  HE'S WHEELED INTO THE ATU

9  IN HIS WHEELCHAIR.  AND HE'S SEEN IN THE ATU.

10  CORRECT?

11      A    YES.

12      Q    AND THEY NOTE MEDICAL NON -- "PATIENT

13  NONCOMPLIANT WITH BLOOD PRESSURE" MEDICARE "ON THE

14  LEFT SIDE" -- "MEDICINE ON THE LEFT SIDE."  RIGHT?

15      A    YES.

16      Q    OKAY.  LET'S GO TO THE ACTUAL ATU NOTE,

17  WHICH IS JX_55.0054.

18          IF WE LOOK AT THE PROVIDER'S NOTE ON THE

19  RIGHT SIDE, YOU WOULD WANT THIS INDIVIDUAL TO BE SEEN

20  BY A PROVIDER WITH THESE TYPES OF COMPLAINTS?

21      A    YES.

22      Q    AND THAT HAPPENED.  RIGHT?

23      A    YES.

24      Q    PROVIDER NOTED THE ELEVATED BLOOD PRESSURE

25  SECONDARY TO NONCOMPLIANT.  WHAT DO YOU NOTE ABOUT

1   WHETHER THERE WERE ANY INDICATIONS OF A NEW STROKE?

2       A    NO SIGNS AND SYMPTOMS NOTED.

3       Q    ALL RIGHT, DOCTOR.  AND --

4       A    AND IT'S INTERESTING THAT THEY -- THAT IT

5   SAYS "NEW CVA."  SO THERE WAS A BASELINE OF SOME SORT

6   OF NEUROLOGIC DEFICIT IN THIS PERSON, BECAUSE THEY'RE

7   FAMILIAR I GUESS WITH HIS BASELINE AND THEY DON'T SEE

8   NEW SYMPTOMS.

9       Q    ALL RIGHT.  NOW, DOCTOR, HE -- GO TO

10  JX_55.0049.  THIS PATIENT GOES AND SEES CARDIOLOGY --

11  LET'S SEE.  I'M SORRY -- A WEEK LATER?

12      A    YEAH, IN BETWEEN.  YEAH.

13      Q    AND UMC.  CORRECT?

14      A    CORRECT.

15      Q    IS THAT SIGNIFICANT TO YOU?

16      A    YES.

17      Q    WHY IS THAT?

18      A    WELL, THAT MEANS HE WENT OUT.  AND A

19  SPECIALIST EXTERNAL TO LSP EVALUATED HIM, DID NOT SEE

20  ANYTHING PROBLEMATIC AT THAT PARTICULAR VISIT.

21      Q    NOW LET'S GO TO JX_55.0450.  LET ME START

22  WITH THE AMBULANCE RUN, WHICH IS JX_55.0449.

23           ALL RIGHT.  THE PATIENT HAS AN EPISODE HERE

24  WHERE HE'S FOUND HIS SPEECH WAS SLURRED, HE WAS

25  UNABLE TO MOVE ALL HIS EXTREMITIES.  AND HE WAS TAKEN

1  TO THE ATU AND THEN TRANSFERRED TO LADY OF THE LAKE

2  WITH A STROKE.  IS THAT YOUR UNDERSTANDING?

3      A   YES.

4      Q   AND IS THAT APPROPRIATE?

5      A   YES.  AND IT LOOKS TO BE TIMELY AS WELL.

6      Q   LET'S GO TO JX_55.0450.  TOP RIGHT CORNER OF

7  THE FORM, TIME SEEN, YOU SEE "15:30."  GO TO THE

8  BOTTOM LEFT CORNER.  LOOKS LIKE HE'S LEAVING TO GO TO

9  OUR LADY OF THE LAKE AT 1610, 40 MINUTES LATER.  IS

10 THAT TIMELY?

11     A   YES.

12     Q   DO YOU SEE ANY VIOLATION OF THE STANDARD OF

13 CARE THERE IN THAT CHART?

14     A   NOT IN THESE DOCUMENTS AT ALL.

15     Q   LET ME GO BACK TO THE CT SCAN.  THERE WAS

16 SOME CRITICISM BY DR. VASSALLO -- JX_55.0060 -- THAT

17 THIS SHOULD HAVE BEEN A DIFFERENT TYPE OF CT SCAN.

18 ALL RIGHT?  DO YOU HAVE ANY OPINIONS ON THAT?

19     A   I -- I'D SAY AS A NON-NEUROLOGIST THAT I

20 PROBABLY SHOULDN'T HAVE AN OPINION ONE WAY OR THE

21 OTHER, OTHER THAN HE ORDERED WHAT HE FELT LIKE WAS

22 HELPFUL.

23     Q   OKAY.  LET'S MOVE ON.  LET'S GO TO PATIENT

24 NO. 22 NOW.  LET ME KNOW WHEN YOU'RE READY, DOCTOR.

25     A   I'VE GOT IT.

1      **Q**    ALL RIGHT.  LET'S GO TO JX_22.0683.

2            ALL RIGHT, DOCTOR.  WE NEED TO TALK ABOUT

3    THE SWALLOW STUDY AND THE DIET RECOMMENDATIONS.  I

4    WANT TO DIRECT YOU TO JX_22.0684.  ALL RIGHT.  THERE

5    IN THE MIDDLE THERE IS THE ACTUAL STUDY, AND IT'S GOT

6    FUNCTIONAL LEVELS AND THEY'VE GOT AN X IN THE MIDDLE

7    THERE.  CAN YOU INTERPRET THAT FOR US, PLEASE?

8      **A**    YEAH.  WHEN YOU DO A FUNCTIONAL LEVEL WITH

9    THESE STUDIES, THERE IS DIFFERENT LEVELS OF

10   IMPAIRMENT.  BUT USUALLY MILD IMPAIRMENT WOULD BE,

11   YOU KNOW, ALMOST A HUNDRED PERCENT OF FUNCTION;

12   SOMEWHERE BETWEEN 75 AND A HUNDRED PERCENT OF

13   FUNCTION.  GREATER THAN 75 PERCENT IS WHAT THEY HAVE

14   IN THIS FORM.

15     **Q**    WHAT DOES THAT MEAN TO YOU AS GREATER THAN

16   75 PERCENT?

17     **A**    IT MEANS HE HAD, YOU KNOW, MINOR IMPAIRMENT.

18     **Q**    LET'S NOW GO TO JX_22.0686, THE SAME

19   DOCUMENT.  DOWN AT THE VERY BOTTOM OF THE PAGE WE

20   HAVE "DISCHARGE DIET."  AND GOING OVER TO THE NEXT

21   PAGE, IT SAYS -- UNDER "DIET" -- "ADULT HOME

22   DIET: RETURN TO PREVIOUS DIET."  DO YOU SEE THAT?

23     **A**    YES.  IN FACT, I THINK HE WAS UPGRADED TO

24   DOUBLE PORTIONS SHORTLY AFTER THIS.

25     **Q**    LET'S GO TO JX_22.0626.

1           ALL RIGHT.  THIS IS A FORM YOU'RE TALKING

2    ABOUT WHERE THEY'RE --

3       A    YES.

4       Q    DOCTOR, WE KNOW THAT IN JANUARY OF THE NEXT

5    YEAR HE CHOKES WHILE IN THE ATU ON A PIECE OF

6    SAUSAGE.  DO YOU HAVE AN OPINION ON WHETHER THERE WAS

7    ANY VIOLATION OF THE STANDARD OF CARE AS A RESULT OF

8    THAT INCIDENT?

9       A    WELL, HE ACTUALLY CHOKED ON SAUSAGE AFTER HE

10   HAD ALREADY EATEN SOME.  BUT THAT WAS HIS CAUSE OF

11   DEATH, WAS CHOKING.  AND THAT I DON'T BELIEVE THAT

12   THAT'S A VIOLATION OF THE STANDARD OF CARE FOR THE

13   CARE DELIVERED AT LSP.

14      Q    WHY DO YOU -- WHAT IS YOUR BASIS FOR YOUR

15   OPINION THAT HE HAD ALREADY EATEN MULTIPLE SAUSAGES

16   BEFORE HE CHOKED?

17      A    THE MEDICAL EXAMINER FOUND SAUSAGES IN HIS

18   STOMACH, HIS STOMACH CONTENTS, SO...

19      Q    AND HOW MANY MONTHS WAS THIS?  SEVEN MONTHS

20   AFTER THE DIET STUDIES WHEN THIS INCIDENT OCCURRED?

21      A    YES.

22      Q    ALL RIGHT.  NOW, THE OTHER THAT COUNSEL HAS

23   RAISED WITH PATIENT NO. 2 IS HE HAD SOME FALLS.  ALL

24   RIGHT.  DID YOU ASSESS THIS PATIENT'S FALL HISTORY

25   AND HIS -- WHAT WAS GOING ON WITH HIM?

1     **A**    THIS IS ONE OF THEM THAT I WENT BACK AND

2    LOOKED AT TWICE.  I FELT LIKE I SHOULD.  AND IT

3    DIDN'T -- AGAIN, IT DID NOT CHANGE MY OPINION; YOU

4    KNOW, THAT THE SAME STANDARD OF CARE YOU'D HAVE IN

5    THE COMMUNITY WITH SOMEONE WHO FALLS FREQUENTLY IS

6    THE SAME THAT YOU WOULD HAVE HERE.

7           YOU CAN EITHER, YOU KNOW, GET HIM A MATTRESS

8    ON THE FLOOR IN A SECURE LOCATION; YOU COULD TIE THEM

9    TO A BED SO THEY WOULDN'T BE OUT AND ABOUT.  BUT

10   ESSENTIALLY ANYTHING YOU DO YOU'RE GOING TO HAVE A

11   FALL RISK UNLESS YOU SECURE THE PERSON IN A WAY THAT

12   THEY CANNOT FALL.

13    **Q**    YOU MENTIONED -- IS IT APPROPRIATE TO GIVE

14   HIM A MATTRESS ON THE FLOOR IN A LOCKED ROOM?

15    **A**    YES.

16    **Q**    AND WHY ARE YOU DOING THAT?

17    **A**    TO REDUCE AND PREVENT THAT FALL RISK.  YOU

18   KNOW, HE HAD A BRAIN BLEED FROM AN ALTERCATION.  AND,

19   YOU KNOW, THERE IS A SIGNIFICANT RISK OF HIM HAVING,

20   YOU KNOW, ANOTHER INJURY FROM FALLS.  THAT'S NOT

21   ULTIMATELY WHY HE DIED.  HE DIED OF ACCIDENTAL DEATH;

22   CHOKING.  BUT IT'S SIGNIFICANT THAT HE COULD DIE FROM

23   A FALL.

24    **Q**    ALL RIGHT.  I'D LIKE TO NOW MOVE ON TO

25   PATIENT NO. 40.  AND THIS PATIENT --

1     MR. ARCHEY:  BROOKE, I'M NOT GOING TO PULL

2  UP ANY DOCUMENTS.

3  BY MR. ARCHEY:

4     Q    HE HAD AN ISSUE WITH HIS PSA LEVELS?  GIVE

5  YOU A SECOND TO GET TO YOUR CHART.

6     A    AS SOON AS IT POPS UP, I CAN SEE WHAT THE

7  NAME IS.

8     Q    THERE YOU GO.  SORRY ABOUT THAT, DOCTOR.

9  THERE YOU GO.

10     A    ALL RIGHT.  I'VE GOT IT NOW.

11     Q    ALL RIGHT, DOCTOR.  I WANT TO ADDRESS HIS

12  PSA LEVELS.  DO YOU KNOW WHAT THIS PATIENT'S PSA

13  LEVELS OR HOW HE WAS TREATED FOR ELEVATED -- FIRST

14  OFF, WHAT IS A PSA LEVEL?

15     A    A PSA LEVEL -- IT STANDS FOR PROSTATE

16  SPECIFIC ANTIGEN, WHICH IT IS A SPECIFIC ANTIGEN, BUT

17  IT IS A NONSPECIFIC TEST FOR THE PROSTATE.  THE

18  PROSTATE CAN BE AGGRAVATED BY MANY DIFFERENT THINGS,

19  INCLUDING CANCER, BPH, PROSTATITIS, INFECTION,

20  MECHANICAL TRAUMA, SURGERY.  THERE IS A LOT OF THINGS

21  THAT CAN RAISE A PSA BESIDES JUST DANGEROUS ONES.

22     Q    AND THE PSA ADDRESSES -- OR, IN PART, IS

23  LOOKING FOR PROSTATE CANCER.  IS THAT PART OF THE

24  ISSUE WITH IT?

25     A    IT'S USED AS A -- IT'S CERTAINLY.  BUT

1   CONTROVERSIAL THE PSA AGAIN JUST TELLS YOU THAT THE

2   PROSTATE IS UPSET ABOUT SOMETHING.  IT DOESN'T REALLY

3   TELL YOU WHAT IT'S UPSET ABOUT.

4       Q    AND DID LSP OBTAIN PSA SCREENING TESTS FOR

5   THIS PATIENT?

6       A    YES.

7       Q    AND WHAT WAS THE RECOMMENDATION FOR THIS

8   PATIENT BECAUSE OF THE PSA SCREENING TEST?

9       A    THAT THEY WANT HIM TO FOLLOW UP WITH

10  UROLOGY.

11      Q    AND DID -- WELL -- AND WAS HIS PSA ELEVATED

12  ON THOSE SCREENS?

13      A    YES.

14      Q    AND DID HE AGREE TO FOLLOW UP WITH UROLOGY?

15      A    HE REFUSED.

16      Q    AND LSP ALSO WANTED -- OR OFFERED OR TRIED

17  TO GET HIM AN MRI OF HIS PROSTATE AS WELL?

18      A    YES.  TYPICALLY --

19      Q    DID HE AGREE TO THAT?  GO AHEAD.

20      A    YES.  THAT WAS FIRST.  WELL, THAT WAS

21  ACTUALLY LATER.  BUT MRIs ARE USUALLY MORE SPECIFIC

22  FOR SOFT TISSUE, LIKE A PROSTATE, WHICH IS NOT BONE.

23      Q    AND DID HE ALLOW THE MRI TO OCCUR?

24      A    NO.  HE REFUSED THE MRI.

25      Q    SO LSP IS TRYING TO GET HIM THE CARE, BUT

1   HE'S REFUSING.  IS THAT WHERE WE ARE?

2       **A**   YES, WITH THE PROSTATE.

3       **Q**   DOCTOR, I'VE GONE THROUGH A HANDFUL OF YOUR

4   CHARTS.  I'M NOT GOING TO GO THROUGH THE REMAINDER.

5   DID YOU FIND THE CARE REFLECTED IN THE CHARTS WAS

6   APPROPRIATE AND WITHIN THE STANDARD OF CARE?

7       **A**   YES.  I FOUND -- YOU KNOW, I OBVIOUSLY FOUND

8   CLERICAL ERRORS, CHART FLOW ERRORS, YOU KNOW, MINOR

9   OMISSIONS, SOME MINOR DELAYS.  BUT SYSTEMICALLY I

10  FOUND THAT THE CARE THERE WAS WITHIN THE STANDARD OF

11  CARE.

12      **Q**   ALL RIGHT.  WHAT DID YOU FIND ABOUT

13  ACCREDITATION?  WAS LSP ACCREDITED?

14      **A**   THEY HAVE ACA ACCREDITATION CURRENTLY.

15      **Q**   AND WHAT DOES THAT CONVEY TO YOU?  WHAT DOES

16  THAT TELL YOU?

17      **A**   THE MAIN TWO BODIES THAT ARE ACCREDITED

18  WITHIN THE UNITED STATES IN CORRECTIONAL FACILITIES

19  ARE THE ACA AND THE NCCHC.  WITHIN MY REPORT LATER I

20  TALK ABOUT THE NUMBERS OF TOTAL IN THE UNITED STATES:

21  ABOUT 900 ACA AND ABOUT 500 NCCHC.  SO THEY HAVE AN

22  ACCREDITATION THAT WOULD BE UNCOMMON.

23          **MR. ARCHEY:**  BROOKE, LET'S PULL UP -- THE

24  REPORT BACK UP, 35-B.  I'M ON PAGE 50 NOW, PLEASE.

25  BY MR. ARCHEY:

1    Q    ALL RIGHT.  YOU REFERRED TO SOME NUMBERS.  I

2  DIDN'T WANT YOU TO HAVE TO HAVE MEMORIZE THESE OFF

3  THE TOP OF YOUR HEAD.  BUT WHAT PERCENTAGE OF

4  FACILITIES WITHIN THE UNITED STATES ARE ACA

5  ACCREDITED?

6    A    PER THE TOTAL NUMBER, AROUND 15 PERCENT ARE

7  ACA ACCREDITED.

8    Q    LSP IS ONE OF THAT 15 PERCENT.  IS THAT

9  RIGHT?

10   A    YES.

11   Q    NCCHC, HOW MANY -- WHAT'S THE PERCENTAGE OF

12 THOSE FACILITIES THAT ARE ACCREDITED IN THE UNITED

13 STATES?

14   A    WELL, THE INTERESTING THING ABOUT THAT IS

15 IT'S NOT PUBLISHED.  THE TOTAL NUMBER OF FACILITIES

16 THE NCCHC ACCREDITS, IT'S NOT A PUBLISHED NUMBER.

17 AND IN MY NETWORKING WITH THE NCCHC -- I WENT TO THE

18 CONFERENCE IN ATLANTA IN APRIL, WHICH HAPPENED TO BE

19 AROUND THE TIME OF MY REPORTING.  AND I WENT TO THE

20 VICE PRESIDENT OF ACCREDITATION DIRECTLY AND I ASKED

21 HER HOW MANY FACILITIES ARE ACCREDITED SO THAT I

22 COULD KNOW WITHIN THE UNITED STATES.

23   Q    AND IS THAT WHERE YOU GOT THAT INFORMATION,

24 IS DIRECTLY FROM AN NCCHC HIGH-RANKING OFFICIAL?

25   A    YES.  THE VICE PRESIDENT OF ACCREDITATION

1   FOR NCCHC, THE PERSON WHO COORDINATES IT.

2       **Q**   ALL RIGHT.  LET'S TALK ABOUT THE EFFECTS OF

3   COVID-19, AS YOU UNDERSTAND THEM.

4       DID YOU EXPERIENCE THE EFFECTS OF COVID-19

5   THROUGHOUT THE PANDEMIC?

6       **A**   YES.

7       **Q**   AND WHAT WERE THEY?

8       **A**   WELL, IN GEORGIA, YOU KNOW, IT WAS

9   SIGNIFICANT.  AND THERE WAS ACTUALLY A PERIOD IN THE

10  WORST OF THE OUTBREAK FOR 30 DAYS THAT I COULD NOT GO

11  IN ANY FACILITY, ANY OF MY EIGHT FACILITIES.  WE

12  COORDINATED AND DEVELOPED QUICKLY TELEMEDICINE SO

13  THAT I COULD COMMUNICATE WITHIN THE FACILITY.  WE GOT

14  CAMERAS OUT, WHICH SOME OF THESE SMALLER JAILS DID

15  NOT HAVE THE AUDIO-VISUAL EQUIPMENT THAT WAS REQUIRED

16  TO DO A TELEMEDICINE VISIT.  BUT WE GOT IT OUT THERE

17  AND WE HAD TO ADJUST TO THAT.

18      THE OTHER IMPACT THAT I HAD WAS THAT SOME OF

19  THE ROUTINE REFERRALS THAT I WOULD MAKE TO THE

20  EMERGENCY ROOM OF THE HOSPITAL WERE DENIED.  EITHER

21  THEY WEREN'T TAKING PATIENTS OR THEY WOULDN'T ACCEPT

22  PATIENTS FROM OUR FACILITY.  THANKFULLY WE DID NOT

23  HAVE ANY EMERGENT EVENTS WITHIN MY FACILITIES WHERE

24  IT CAUSED A DIRECT DEATH, BUT IT CERTAINLY COULD

25  HAVE.

**1**       THERE WERE PROBLEMS WITH REFERRALS; THERE

**2**  WERE PROBLEMS WITH SPECIALIST REFERRALS; THERE WAS

**3**  PROBLEMS WITH ACCESS.  YOU KNOW, OBVIOUSLY

**4**  CONSTITUTIONALLY A SHERIFF OR A WARDEN AT A FACILITY

**5**  CAN LOCK IT DOWN AT ANY TIME AND NOT EVEN PERMIT

**6**  MEDICAL PERSONNEL TO ENTER.  BECAUSE I'M NOT THERE ON

**7**  SITE, I VISIT THESE FACILITIES, SO THAT CAUSED

**8**  SIGNIFICANT PROBLEMS IF THEY WOULD HAVE DONE THAT,

**9**  BECAUSE OBVIOUSLY I'M GOING BETWEEN FACILITIES, TOO,

**10**  SO I WOULD BE A VECTOR FOR INFECTION.

**11**    Q   NOW I'D LIKE TO MOVE TO PAGE 52 OF YOUR

**12**  REPORT.  YOU'VE GOT -- YOU ADDRESS NURSING STAFFING.

**13**  LET'S WALK THROUGH THAT OPINION.  WHAT'S THE FIRST

**14**  LINE THERE?  YOU'VE GOT "RNs PER 1000 STATE

**15**  RESIDENTS" AS OF 2020.

**16**    A   YEAH, IT'S JUST THE RATIO OF RNs PER

**17**  STATE -- PER THE STATE RESIDENTS.  IT'S JUST A ROUGH

**18**  NUMBER TO SHOW THAT ACCORDING TO SOME -- AND RELATIVE

**19**  TO OTHER LOCAL STATES IT'S SLIGHTLY LOWER IN

**20**  LOUISIANA.

**21**    Q   WHAT'S THE EFFECT OF A LOWER RN RATIO ON

**22**  LOUISIANA?

**23**    A   WELL, IN GENERAL -- AND WE TALKED ABOUT

**24**  COVID.  AND GOING BACK TO THAT A LITTLE BIT, COVID

**25**  PUSHED MANY RNs AND LPNs INTO ACUTE CARE SETTINGS AND

1  SOME INTO TRAVEL NURSING TO MORE AFFECTED PARTS OF

2  THE UNITED STATES IN THAT POOL FROM CORRECTIONS.  SO

3  IT AGGRAVATED AN ALREADY CHRONIC AND ACUTE PROBLEM.

4        ACCORDING TO THE AMERICAN NURSES

5  ASSOCIATION, NURSING SHORTAGES ARE GOING TO GET EVEN

6  WORSE.  AND THEY WERE WORSE WITHIN MY FACILITIES AND

7  MY -- YOU KNOW, MY EXPERIENCE.  AND IT'S ALSO A

8  SIGNIFICANT FACTOR, YOU KNOW, IN THE FACILITIES HERE.

9     Q    ALL RIGHT.  LET'S GO TO PAGE 53 NOW.

10        YOU TALK ABOUT THE NURSE PRACTITIONERS.  I

11  WANT TO FOCUS ON THE BOTTOM WHERE YOU SAY "THE VALUE

12  OF A NURSE PRACTITIONER FOCUSED HEALTHCARE MODEL."

13        BEFORE I ASK MY QUESTION, DO YOU KNOW HOW

14  MANY NURSE PRACTITIONERS LSP NOW HAS ON SITE?

15     A    LAST NUMBER WAS SEVEN THAT I'M AWARE OF,

16  UNLESS THEY'VE HIRED OR SOME HAVE RESIGNED.

17     Q    AND WHAT IS THE EFFECT OF AN INCREASED -- AN

18  INCREASED RELIANCE ON NURSE PRACTITIONERS?

19     A    WELL, YOU KNOW, IT HAS SEVERAL POS- -- IT

20  HAS SEVERAL POSITIVE ANGLES.  AND I MENTIONED SOME OF

21  THEM HERE.  YOU KNOW, SOME OF THE STUDIES, INCLUDING

22  THIS ONE, HAVE SHOWN THAT YOUR PRIMARY CARE OUTCOMES

23  CAN BE AS GOOD OR BETTER THAN PHYSICIANS IN SOME

24  SETTINGS.

25        YOU KNOW, OBVIOUSLY NURSE PRACTITIONERS ARE

1   NURSES, SO THAT'S ALSO GOING TO LEND ITS FACT TO

2   WITHIN THE CORRECTIONAL HEALTH-CARE SYSTEM AS THE

3   NEXT BIGGEST GROUP OF PROVIDERS WITHIN THAT SYSTEM IS

4   GOING TO BE YOUR LPNs AND RNs, OF WHICH NURSE

5   PRACTITIONERS WERE NURSES BEFORE THEY BECAME NURSE

6   PRACTITIONERS.

7        SO IN MY EXPERIENCE, THEY TEND TO INTERACT

8   MORE EFFECTIVELY AND WRITE ORDERS THAT ARE ACCEPTED

9   AS PEERS MORE OFTEN.  THE EDUCATION, THEY TYPICALLY

10  TAKE A LITTLE BIT LONGER, IN MY EXPERIENCE, WITH

11  EDUCATION TO PROVIDE THE INMATES WITH WHAT THEY NEED

12  TO HOPEFULLY HELP WITH COMPLIANCE.

13       YOU KNOW, OBVIOUSLY I'M A NURSE

14  PRACTITIONER; I HAVE A DOCTORATE IN NURSING PRACTICE

15  AS WELL, SO I'M A VERY LARGE ADVOCATE OF NURSE

16  PRACTITIONERS IN CORRECTIONS.  I THINK THEY'RE

17  EFFECTIVE AND I'D LIKE TO SEE A WHOLE BUNCH MORE.

18    Q   GOOD.  ALL RIGHT.  CLOSE TO WRAPPING UP.

19  LET ME ASK YOU ABOUT -- YOU'VE GOT A SECTION ON PAGE

20  54:  "OPPORTUNITIES TO IMPROVE THE QUALITY OF CARE."

21       WHAT OPPORTUNITIES TO IMPROVE THE QUALITY OF

22  CARE DO YOU BELIEVE EXIST AT LSP?

23    A   THE BIGGEST ONE IS THE ONE THAT I'VE LISTED.

24  YOU KNOW, GOING WAY BACK INTO MY EXPERIENCE WHEN

25  CONVENIENCE CARE WAS COMING AROUND WITH MINUTECLINIC®

1  AND LITTLE CLINIC, IF YOU'RE GOING TO MOVE PEOPLE IN

2  AND OUT EFFICIENTLY AND WITH THE LEAST AMOUNT OF

3  ERRORS IN A QUICK VISIT WITHIN A CONVENIENCE STORE OR

4  A GROCERY STORE, IT REQUIRES AN ELECTRONIC MEDICAL

5  RECORD TO GUIDE YOU AND MAKE SURE THAT EVERYTHING IS

6  COVERED THAT NEEDS TO BE COVERED.

7          WHEN YOU HAVE -- AND AS YOU CAN SEE FROM THE

8  GRAPHIC IN THAT PICTURE, WHEN YOU HAVE THOUSANDS AND

9  THOUSANDS OF CHARTS AND THOUSANDS OF PAGES OF WRITTEN

10 CHARTS, YOU KNOW, YOU'RE GOING TO HAVE CLERICAL

11 ERRORS, YOU'RE GOING TO HAVE FOLLOW-UP ERRORS, YOU'RE

12 GOING TO HAVE THOSE THINGS.  THERE IS SO MUCH THAT AN

13 EMR WOULD DO FOR THIS FACILITY.  I HAVE NEVER SEEN A

14 FACILITY THAT WOULD BENEFIT SO MUCH FROM AN EMR AS

15 THIS FACILITY.

16    Q    YOU SAY YOU'RE GOING TO HAVE THESE ERRORS.

17 DID YOU SEE ANYTHING IN WHAT ALL YOU REVIEWED AS TO

18 WHETHER IT WAS A VIOLATION OF STANDARD OF CARE AT

19 LSP, EVEN WITH ITS PAPER RECORDS?

20    A    YES.  AS I STATED, THERE IS NO SYSTEMIC

21 ISSUE.  NOW, THERE IS GOING TO BE INDIVIDUAL ISSUES

22 LIKE THAT.  BUT, YOU KNOW, THE EMR TOUCHES FOLLOW-UP,

23 IT TOUCHES MEDICATION, IT TOUCHES SPECIALTY

24 REFERRALS.  IT -- YOU KNOW, ONE THING THAT HASN'T

25 BEEN MENTIONED, WHICH IS EXCEPTIONAL, IS AN EMR

1    ALLOWS FOR BETTER CQI DATA PULL, BECAUSE YOU'RE NOT

2    HAVING TO GO GET A HUNDRED CHARTS.  YOU CAN GO TO THE

3    EMR AND SAY "WE WANT TO PULL THIS INFORMATION UP,"

4    AND THEN IT JUST SNAPS IT RIGHT OUT OF THE RECORDS.

5    SO IMMEDIATELY YOU FIX CQI -- AT LEAST CQI DATA

6    PULLING.

7        Q    NOW, DOCTOR, LSP HIRED THESE NURSE

8    PRACTITIONERS IN THE LATTER PART OF 2021 AND EVEN

9    INTO EARLY 2022.  WHAT IS YOUR VIEW OF LSP GOING

10   FORWARD WITH THIS NURSE PRACTITIONER FOCUSED

11   HEALTHCARE MODEL THEY'RE USING?

12       A    I HAVE A -- YOU KNOW, I THINK THAT EVEN THE

13   FOLKS ON THE GROUND WOULD AGREE MAYBE THAT THEY NEED

14   SOME MORE HELP, MAYBE ANOTHER DOCTOR OR TWO.  BUT

15   THE -- YOU KNOW, IT'S LIKE WITH A LOT OF STAFFING

16   PROBLEMS.

17            BUT AS FAR AS THE NURSE PRACTITIONERS, YOU

18   KNOW, THAT MODEL, ESPECIALLY A SICK CALL RUN BY NURSE

19   PRACTITIONERS, THAT'S GOING TO -- THAT'S GOING TO

20   HAVE A COMPOUNDING EFFECT TO WHERE YOU HAVE LESS OF

21   THESE CLINICAL ISSUES ARISE BECAUSE THEY'RE CAUGHT

22   BEFORE THEY BECOME CLINICAL ISSUES, BECAUSE THEY'RE

23   CAUGHT AT SICK CALL BY SOMEBODY WITH QUALIFICATIONS

24   ABOVE WHAT A TYPICAL SICK CALL PERSON IS GOING TO

25   HAVE.

1      **Q**   DR. MCMUNN, THOSE ARE MY QUESTIONS.  THANK

2  YOU.

3          **THE COURT:**  OKAY.  LET'S TAKE A SHORT BREAK

4  BEFORE CROSS-EXAMINATION.  WE'LL TAKE A 15-MINUTE

5  RECESS.  THAT WILL PUT US BACK IN ABOUT -- RIGHT

6  ABOUT 25 TILL.

7          **(WHEREUPON, A RECESS WAS TAKEN.)**

8          **THE COURT:**  BE SEATED.

9              OKAY.  CROSS-EXAMINATION.

10             COUNSEL, WE ARE GOING TO HAVE TO BREAK

11  AT FIVE TODAY.  SOMETHING ELSE HAS COME UP, SO SORRY

12  ABOUT THAT.

13             GO AHEAD.

14         **MS. MONTAGNES:**  YOUR HONOR, I JUST WANT TO

15  NOTE THAT I DO HAVE A LITTLE BIT OF A COUGH.  I'VE

16  TESTED THREE TIMES NEGATIVE THIS WEEK FROM COVID, BUT

17  I JUST -- SOMETIMES I WILL BE COUGHING, SO I DIDN'T

18  WANT TO CREATE ANY FEAR.

19         **THE COURT:**  THANK YOU FOR THE FULL

20  DISCLOSURE.  I APPRECIATE IT.

21                  **CROSS-EXAMINATION**

22  BY MS. MONTAGNES:

23     **Q**   GOOD AFTERNOON, MR. MCMUNN.

24     **A**   GOOD AFTERNOON.

25     **Q**   SO YOU'VE ONLY WORKED IN PRISONS AND JAILS

1  IN GEORGIA.  RIGHT?

2      A    YES.

3      Q    AND YOU GENERALLY TRAVEL BETWEEN SMALLER

4  JAIL FACILITIES?

5      A    CURRENTLY, YES.

6      Q    AND THIS IS THE FIRST TIME THAT YOU FORMED

7  AN OPINION IN A CLASS ACTION LAWSUIT?

8      A    YES.

9      Q    AND YOU'VE NEVER EVALUATED A WHOLE SYSTEM

10 BEFORE THIS?

11     A    SOMETIMES WITHIN THE INDIVIDUAL CASES THAT I

12 DID I WAS TASKED WITH LOOKING AT OVERALL PROCEDURES

13 AND POLICIES, BUT NOT IN A CLASS ACTION.  NOT

14 ANYTHING OF THIS SCOPE.

15     Q    AND YOU'VE NEVER BEEN APPOINTED BY A COURT

16 TO MONITOR A FACILITY?

17     A    NO, I HAVE NOT.

18     Q    AND WHEN YOU WERE WORKING WITH THE BRIDGE

19 INSTITUTE, THE FEDERAL GOVERNMENT CREATED A MOU THAT

20 YOU WORKED WITH?

21     A    YES.

22     Q    AND THOSE -- AND THE STANDARDS THEY

23 ESTABLISHED WERE GOOD?

24     A    I'M SORRY.  COULD YOU REPEAT THAT?

25     Q    THE STANDARDS THAT THEY ESTABLISHED WERE

1  GOOD?

2      **A**   WELL, I PULLED FROM THE STANDARDS THAT THE

3  DJJ ALREADY HAD.  AND IN GENERAL THE MEMORANDUM

4  REQUIRED A HIGHER LEVEL OF CARE THAN THEY HAD BEEN

5  PROVIDING, SO I HAD TO CREATE POLICIES AND PROCEDURES

6  TO COME UP TO THAT LEVEL.

7      **Q**   AND THE MOU INCLUDED STANDARDS ON STAFFING?

8      **A**   YES.

9      **Q**   AND CLINICAL GUIDELINES?

10      **A**   YES.

11      **Q**   AND STRUCTURE?

12      **A**   YES.  AND THEN I HAD TO HIRE STAFF ACCORDING

13  TO THOSE GUIDELINES.

14      **Q**   AND YOU HAVE NEVER BEEN AN AUDITOR FOR THE

15  ACA?

16      **A**   NO.

17      **Q**   AND YOU'VE NEVER CONTRACTED WITH NCCHC?

18      **A**   WELL, THEY'VE CONTACTED ME ABOUT POSSIBLY

19  WORKING WITH THEM IN NCCHC RESOURCES, BUT I HAVE NOT

20  ACCEPTED ANY WORK THROUGH THEM YET, NO.

21      **Q**   OKAY.  AND THE ACA IS NOT PRIMARILY FOCUSED

22  ON MEDICAL CARE?

23      **A**   WELL, THEY'RE MORE GLOBAL.

24      **Q**   AND THE NCCHC IS?

25      **A**   THE NCCHC HAS MORE OF A CORRECTIONAL HEALTH-

1  CARE FOCUS.

2      Q    WHEN YOU WERE TESTIFYING, WE SPOKE ABOUT THE

3  NUMBER OF FACILITIES THAT ARE ACCREDITED BY THE ACA.

4  DO YOU REMEMBER THAT EARLIER IN YOUR TESTIMONY?

5      A    YES.  IN MY REPORT I LIST A NUMBER OF ACA

6  AND THE NUMBER OF NCCHC.

7      Q    AND YOU SAID THERE WERE APPROXIMATELY 900

8  OUT OF 6,000 CORRECTIONAL FACILITIES THAT ARE ACA

9  ACCREDITED?

10     A    APPROXIMATELY, YES.

11     Q    AND THAT -- AND YOU BASED THAT OUT OF -- 900

12 OUT OF ABOUT 6,096 FACILITIES, THAT INCLUDED JUVENILE

13 DETENTION FACILITIES?

14     A    INCLUDED ALL CORRECTIONAL FACILITIES.

15     Q    AND IT INCLUDED LOCAL JAILS AND PARISH

16 JAILS?

17     A    YES.

18     Q    IT EVEN INCLUDED COMMUNITY-BASED FACILITIES

19 LIKE HALFWAY HOUSES?

20     A    I DON'T RECALL THE -- WHERE THE DATA -- BUT

21 I BELIEVE IT INCLUDED ALL CORRECTIONAL FACILITIES OF

22 ALL TYPES, INCLUDING TRIBAL WITHIN THE UNITED STATES.

23     Q    BUT THE PERCENTAGE IS SIGNIFICANTLY HIGHER

24 WHEN YOU LOOK AT ADULT CORRECTIONAL INSTITUTIONS,

25 ISN'T IT?

1      A    WELL, IF YOU ELIMINATE OTHER TYPES, IT WOULD

2   CHANGE THE NUMBERS, BUT IT WOULD STILL BE LOW.

3      Q    ALL RIGHT.  ARE YOU FAMILIAR WITH HOW MANY

4   ADULT CONFINEMENT INSTITUTIONS THERE ARE IN THE

5   UNITED STATES?

6      A    I DON'T KNOW THE EXACT NUMBER.

7      Q    ARE YOU FAMILIAR WITH THE BUREAU OF JUSTICE

8   STATISTICS?

9      A    SOME OF THEIR STATISTICS I AM.

10      Q    I'M SHOWING WHAT I'M GOING TO MARK AS

11   PLAINTIFFS' EXHIBIT 71.

12          **MS. MONTAGNES:**  YOUR HONOR, PERMISSION TO

13   APPROACH THE WITNESS?

14          **THE COURT:**  PERMITTED.

15   BY MS. MONTAGNES:

16      Q    ALL RIGHT.  CAN YOU TELL ME WHAT THE NAME OF

17   THIS IS.

18      A    THE TITLE?

19      Q    YES.

20      A    IT SAYS "CENSUS OF STATE AND FEDERAL ADULT

21   CORRECTIONAL FACILITIES, 2019."

22      Q    OKAY.  ALONG THE SIDE DOES IT SAY "BUREAU OF

23   JUSTICE STATISTICS"?

24      A    YES, ON TOP IT DOES.

25      Q    COULD WE TURN TO PAGE 2.  UP TOP UNDER "KEY

1  FINDINGS" WHAT DOES IT SAY?

2      **A**   DO YOU WANT ME TO READ THE FIRST BULLET

3  POINT?

4      **Q**   YES, PLEASE.

5      **A**   "AT MIDYEAR 2019, THERE WERE 1,079 PUBLIC

6  CONFINEMENT FACILITIES OPERATED BY EITHER STATE OR

7  FEDERAL AUTHORITIES AND 82 PRIVATE CONFINEMENT

8  FACILITIES."

9      **Q**   SO THERE IS APPROXIMATELY 161 ADULT

10  CONFINEMENT INSTITUTIONS IN THE UNITED STATES?

11      **A**   I'M SORRY.  WHAT WAS THE QUESTION?

12      **Q**   SO IF YOU ADD UP THE NUMBER OF PUBLIC

13  CONFINEMENT FACILITIES AND PRIVATE CONFINEMENT

14  FACILITIES, THAT GETS US AT ABOUT A HUNDRED -- 1,161

15  FACILITIES?

16      **A**   STATE AND FEDERAL FACILITIES, YES.

17      **Q**   ADULT FACILITIES?

18      **A**   YES, ADULT.

19      **Q**   AND DO YOU KNOW WHAT PERCENTAGE OF THOSE

20  INSTITUTIONS ARE ACCREDITED BY THE ACA?

21      **A**   WITHOUT RUNNING NUMBERS, I DO NOT KNOW.

22      **Q**   OKAY.  I'M GOING TO BRING UP WHAT I'M GOING

23  TO MARK AS PLAINTIFFS' EXHIBIT 72.

24          AND YOU TESTIFIED EARLIER THAT THE ACA

25  NUMBERS ARE ACTUALLY PUBLISHED AND PUBLICLY

1   AVAILABLE.  IS THAT RIGHT?

2      **A**    THE ACCREDITATION NUMBERS?

3      **Q**    YES.

4      **A**    YES.

5      **Q**    OKAY.  THIS IS THEIR WEBSITE?  DOES THIS

6   APPEAR TO BE THEIR WEBSITE?

7      **A**    YEAH, I'M --

8      **Q**    AND IF WE CAN GO TO PAGE 2, THIS IS A SEARCH

9   FUNCTION WHERE YOU CAN SEARCH.  AND AS YOU CAN SEE UP

10  TOP, WE SEARCHED "ADULT CORRECTIONAL INSTITUTIONS."

11  AND IF YOU LOOK OVER ON THE RIGHT-HAND SIDE, YOU'LL

12  SEE THAT 578 FACILITIES CAME UP AS ACCREDITED?

13     **A**    THAT'S WHAT IT SAYS, YES.

14     **Q**    SO THAT'S CLOSER TO 50 PERCENT THAN 15

15  PERCENT?

16     **A**    MY FIGURES INCLUDED ALL CORRECTIONAL

17  FACILITIES IN THE UNITED STATES, NOT JUST ADULT.

18     **Q**    RIGHT.  AND WHAT WE'RE LOOKING AT IS HOW

19  MANY ADULT CORRECTIONAL INSTITUTIONS ARE ACA

20  ACCREDITED.  AND IT LOOKS LIKE IT'S CLOSER TO 50

21  PERCENT THAN 15 PERCENT.  IS THAT RIGHT?

22     **A**    IT COULD BE, YES, OF ADULT CORRECTIONAL.

23     **Q**    AND ACTUALLY, IF WE LOOK AT FACILITIES THAT

24  ARE OVER 2500 BEDS, VIRTUALLY EVERY ONE OF THEM IS

25  ACCREDITED BY THE ACA OR THE NCCHC.  ISN'T THAT

1  RIGHT?

2      **A**   I DON'T HAVE THAT DATA.  I HAVEN'T REVIEWED

3  IT.

4      **Q**   OKAY.  IN YOUR REPORT YOU FORM AN OPINION

5  THAT LSP IS COMPLIANT WITH 95 PERCENT OF THE NCCHC

6  REGULATIONS, DON'T YOU?

7      **A**   YES, I MAKE THAT STATEMENT.

8      **Q**   BUT YOU HAVE NOT CONDUCTED AN AUDIT TO

9  DETERMINE WHETHER OR NOT THAT'S TRUE?

10     **A**   NO FORMAL AUDIT WAS DONE, NO.

11     **Q**   AND YOU DON'T HAVE ANY PAPERWORK OR

12  DOCUMENTATION TO SUPPORT THAT CALCULATION?

13     **A**   I DID NOT COMPLETE PAPERWORK TO DO THAT

14  FORMULATION.

15     **Q**   THAT WAS DONE IN YOUR HEAD?

16     **A**   YES.  I'M FAMILIAR WITH THE STANDARDS AS ONE

17  WITH ADVANCED CERTIFICATION, AND I'VE REVIEWED MANY

18  CASES WHERE AUDITS WERE DONE, AND I REVIEWED THOSE

19  AUDITS.

20     **Q**   AND THE CALCULATION OF 95 PERCENT WAS DONE

21  IN YOUR HEAD?

22     **A**   YES.

23     **Q**   YOU DIDN'T TAKE ANY NOTES ON YOUR SITE VISIT

24  AT LSP?

25     **A**   NO.  I TOOK PICTURES, BUT I DID NOT WRITE

1  ANYTHING DOWN, YES.

2      **Q**   YOU RELIED ON YOUR MEMORY?

3      **A**   YES.

4      **Q**   AND YOUR TIME AT THE PRISON WAS MOSTLY

5  CONFINED TO TWO DAYS?

6      **A**   YES.

7      **Q**   AND IN THOSE TWO DAYS YOU MET WITH THE NURSE

8  PRACTITIONERS TO DISCUSS THEIR BACKGROUNDS?

9      **A**   YES.

10     **Q**   YOU MET WITH DR. TOCE?

11     **A**   YES.

12     **Q**   YOU HAD TWO 45-MINUTE MEETINGS WITH WARDEN

13 HOOPER?

14     **A**   YES.

15     **Q**   YOU MET WITH NURSES AND NURSING LEADERSHIP?

16     **A**   YES.

17     **Q**   YOU ESTIMATE THAT YOU SPOKE TO ABOUT 40

18 NURSES?

19     **A**   YES.

20     **Q**   AND YOU SPOKE WITH FIVE PEOPLE WHO CONDUCT

21 TRANSPORT AT THE ATU?

22     **A**   I'M SORRY.  I DIDN'T HEAR THAT.

23     **Q**   AND YOU SPOKE WITH APPROXIMATELY FIVE PEOPLE

24 WHO CONDUCT TRANSPORT AT THE ATU?

25     **A**   I BELIEVE SO.

1    Q    AND IN ADDITION TO THOSE APPROXIMATELY 63

2    INTERVIEWS, YOU OBSERVED TWO 45-MINUTE MORNING

3    MEETINGS?

4        A    YES.

5        Q    AND YOU TOURED THE PRISON AND THE OUTCAMPS?

6        A    YES.

7        Q    AND YOU VIEWED 10 TO 15 CLINIC ROOMS?

8        A    WHAT WAS THE QUESTION?

9        Q    YOU VIEWED 10 TO 15 CLINICAL SPACES?

10       A    YES.

11       Q    AND YOU SPENT 45 MINUTES TO AN HOUR IN EACH

12   OF THE TWO NURSING UNITS?

13       A    YES.

14       Q    AND YOU SPENT ABOUT TWO AND A HALF HOURS IN

15   THE ATU?

16       A    OVER TWO DAYS, YES.

17       Q    AND YOU REVIEWED PATIENT RECORDS FOR

18   APPROXIMATELY AN HOUR AND A HALF?

19       A    I DON'T KNOW IF IT WAS THAT LONG, BUT I DID

20   REVIEW ADDITIONAL PATIENT RECORDS.

21       Q    AND YOU DID AN ON-SITE REVIEW OF THE QA/QI

22   MINUTES?

23       A    YES.

24       Q    AND YOU VIEWED APPROXIMATELY 50 MEDICAL

25   ENCOUNTERS?

1    **A**    I GUESS YOU NEED TO CLARIFY "MEDICAL

2   ENCOUNTERS."

3    **Q**    IN YOUR DEPOSITION DID YOU TESTIFY THAT YOU

4   VIEWED APPROXIMATELY 50 MEDICAL ENCOUNTERS?

5    **A**    WELL, I GUESS THAT WOULD INCLUDE EVERYTHING

6   THAT OCCURRED, WOULD BE PHYSICAL THERAPY, DRUG

7   ADMINISTRATION, SICK CALL, ANYTHING THAT OCCURRED

8   THAT WOULD BE A NORMAL CLINICAL ACTIVITY IN A PRISON.

9    **Q**    AND YOU VIEWED ABOUT FIVE -- FIVE OF THOSE

10   WERE SICK CALLS?

11    **A**    YES.

12    **Q**    SO YOU DID 50 PATIENT ENCOUNTERS, 63

13   INTERVIEWS, AND YOU TOOK NO NOTES?

14    **A**    YES.

15    **Q**    AND YOU DON'T REMEMBER THE NAMES OF THE

16   NURSES YOU MET WITH?

17    **A**    WELL, I HAD THE ORGANIZATIONAL CHART.  I

18   REMEMBER SOME OF THEM.

19    **Q**    AND YOU DON'T REMEMBER THE NAMES OF THE

20   GUIDES YOU HAD?

21    **A**    SOME OF THEM WERE SECURITY, AND I DID NOT

22   WRITE DOWN THEIR NAMES.

23    **Q**    AND YOU DON'T RECALL THE NAMES OF THE CAMPS

24   YOU VISITED?

25    **A**    I DIDN'T -- I BELIEVE IN MY DEPOSITION I

1  MENTIONED THE CAMPS I VISITED.  SOME OF THEM.

2      Q    SOME OF THEM?

3      A    YEAH.

4      Q    AND YOU COULDN'T REMEMBER THE NAMES OF THE

5  NURSING LEADERS YOU SPOKE WITH?

6      A    I MEAN, I HAVE THE ORGANIZATIONAL CHART.  I

7  KNOW THEIR NAMES.

8      Q    YOU COULDN'T RECALL THE NAMES OF THE PATIENT

9  RECORDS YOU REVIEWED?

10      A    I MAY NOT AT THE DEPOSITION, NO.

11      Q    AND YOU MENTIONED IN YOUR REPORT AND IN THE

12  DEPOSITION THAT THERE WAS A LOCAL HOSPITAL CLOSURE.

13  BUT YOU DON'T KNOW WHICH HOSPITAL THAT WAS?

14      A    NO.  THAT WAS JUST ADVISED -- I WAS ADVISED

15  OF THAT.  I WAS NOT AWARE PERSONALLY.

16      Q    AND YOU DON'T KNOW WHEN THAT HOSPITAL

17  CLOSURE HAPPENED?

18      A    NO.

19      Q    AND YOU DIDN'T REMEMBER -- YOU DIDN'T

20  REMEMBER THE NAMES OF THE EXAMPLES YOU IDENTIFIED AS

21  IN THE QA/QI ASSESSMENT?

22      A    NO, NOT THE SPECIFIC ONES.  I LOOKED AT THE

23  PROCESS THAT THEY WERE USING.

24      Q    AND WHEN YOU REVIEW A SYSTEM, YOU'RE LOOKING

25  FOR EXTENSIVE PROBLEMS?

1       **A**    WELL, I MEAN, I THINK WE ESTABLISHED THAT I

2   HAVE NOT REVIEWED A SYSTEM BEFORE.

3       **Q**    WHEN YOU REVIEWED THIS SYSTEM, YOU WERE

4   LOOKING FOR EXTENSIVE PROBLEMS?

5       **A**    YES.  I WAS LOOKING FOR SYSTEMATIC ISSUES.

6       **Q**    YOU BASED YOUR STANDARD OF CARE FOR

7   CORRECTIONAL SETTINGS ENTIRELY ON YOUR EXPERIENCE IN

8   CORRECTIONAL SETTINGS AND YOUR EDUCATION?

9       **A**    NO.

10      **Q**    IN YOUR DEPOSITION DID YOU TELL ME THAT YOU

11  BASED YOUR STANDARD OF CARE FOR CORRECTIONAL SETTINGS

12  ENTIRELY ON YOUR EXPERIENCE IN CORRECTIONAL SETTINGS

13  AND YOUR EDUCATION?

14      **A**    MY REPORT REFLECTS THAT I ALSO DID AN

15  EXTENSIVE REVIEW AT THIS FACILITY AND A SITE VISIT.

16      **Q**    I'M ASKING YOU; WHEN YOU EVALUATED YOUR

17  STANDARD, HOW DID YOU -- HOW YOU FORMULATED YOUR

18  STANDARD OF HOW YOU EVALUATED WHETHER OR NOT THE CARE

19  WAS MET, STANDARD OF CARE, YOU TESTIFIED UNDER OATH

20  IN YOUR DEPOSITION THAT IT WAS ENTIRELY ON YOUR

21  EXPERIENCE IN CORRECTIONAL SETTINGS AND YOUR

22  EDUCATION?

23      **A**    WELL, THAT WOULD BE AN ERROR IF IT WAS

24  ENTIRELY ON THAT AND I DIDN'T BASE IT ON THESE

25  RECORDS AND THE DISCOVERY THAT I REVIEWED.  IT WOULD

1   BE ON ALL OF THAT.

2       **Q**   I THINK WE'RE TALKING PAST EACH OTHER, SO

3   I'M GOING TO TRY AGAIN.

4           THE STANDARD OF CARE THAT YOU REVIEWED THE

5   FACILITY USING -- MEANING WHAT THE STANDARD IS, HOW

6   YOU EVALUATED THE FACILITY -- WAS BASED ON YOUR

7   EXPERIENCE AND YOUR EDUCATION ONLY?

8       **A**   NOT ONLY.

9       **Q**   WHAT ELSE?

10      **A**   IT WOULD BE BASED ON NATIONAL STANDARDS; IT

11  WOULD BE BASED ON THE DISCOVERY THAT I REVIEWED; IT

12  WOULD BE BASED ON THE 22 CHARTS THAT DOCUMENTED CARE

13  AND THEN MY SECONDARY REVIEW OF THOSE CHARTS.  IT

14  WOULD BE BASED ON ALL OF THOSE THINGS.

15      **Q**   WHEN YOU CONDUCTED YOUR REVIEW, YOU WERE

16  LOOKING FOR DELIBERATE INDIFFERENCE?

17      **A**   WELL, YOU LOOK FOR ANY SYSTEMATIC ERROR.

18  BUT DELIBERATE INDIFFERENCE IS ONE STANDARD FOR DUE

19  CARE THAT'S DELIVERED IN CORRECTIONAL SETTINGS.

20      **Q**   AND YOU WEREN'T LOOKING FOR NEGLIGENCE,

21  BECAUSE NEGLIGENCE IS A DIFFERENT THING?

22      **A**   WELL, THOSE ARE LEGAL TERMS.  BUT THEY ARE

23  DIFFERENT, YES.

24      **Q**   AND "INDIFFERENCE" IMPLIES THAT YOU'VE BEEN

25  ADVISED THAT THERE IS A PROBLEM AND YOU DO NOTHING?

1    **A**    AGAIN, I MEAN, THESE ARE LEGAL DEFINITIONS.

2  BUT YES, YOU'RE AWARE OF A SERIOUS MEDICAL NEED AND

3  SYSTEMATICALLY YOU IGNORE THAT NEED.

4    **Q**    THE STANDARD YOU USED WAS BASICALLY DID THEY

5  DO NOTHING IN THE FACE OF PEOPLE HAVING SERIOUS

6  MEDICAL NEEDS?

7    **A**    YES.

8    **Q**    AND IN YOUR OPINION, THEY MET THE STANDARD

9  IF THEY DID SOMETHING IN THE AREAS OF THE RULING THAT

10  THEY WERE ADVISED WERE DEFICIENT?

11    **A**    I DIDN'T HEAR PART OF THAT.  THERE WAS A

12  LITTLE RUSTLING.

13    **Q**    AND IN YOUR OPINION, THEY MET THE STANDARD

14  IF THEY DID SOMETHING IN THE AREAS OF THE RULING THAT

15  THEY WERE ADVISED WERE DEFICIENT?

16    **A**    IT TAKES MORE THAN JUST DOING SOMETHING.

17  YOU HAVE TO MEET THE STANDARD OF CARE.  AND THE

18  STANDARD OF CARE WAS MET.

19    **Q**    AND IN YOUR OPINION, THEY WOULD NEED TO DO

20  NOTHING IN THE FACE OF DEFICIENCIES TO BE CONSIDERED

21  INDIFFERENT?

22    **A**    AGAIN, I DIDN'T CAPTURE THE --

23    **Q**    IN YOUR OPINION, THEY WOULD NEED TO DO

24  NOTHING IN THE FACE OF DEFICIENCIES TO BE CONSIDERED

25  INDIFFERENT?

1      **A**    WELL, IT COULD BE THAT THEY'RE ALREADY

2   COMPLIANT.  AND IF THEY DO NOTHING, THEN THEY'RE

3   STILL COMPLIANT.  BUT IF THERE WAS A DEFICIT --

4   CONFIRMED DEFICIT AND THEY IGNORED IT, THEN THEY

5   WOULD BE INDIFFERENT TO THAT, YES.

6      **Q**    THAT'S WHAT THEY WOULD NEED TO DO TO SHOW

7   INDIFFERENCE?

8      **A**    IF THERE WAS A DEFICIT IN THE STANDARD OF

9   CARE AND THEY DID NOTHING, THEN IT WOULD BE

10  INDIFFERENCE, YES.  AND -- I MEAN, THAT'S A LEGAL

11  TERM.  THAT'S WHAT JUDGES AND JURIES DECIDE, BUT YES.

12     **Q**    YOU BASE YOUR OPINION, AT LEAST IN PART, ON

13  THE 23 PATIENT CHARTS YOU REVIEWED FROM PLAINTIFFS'

14  SAMPLE?

15     **A**    TWENTY-TWO.  BUT YES.

16     **Q**    AND YOU COULD HAVE ASKED FOR ADDITIONAL

17  RECORDS AND YOU DIDN'T?

18     **A**    I DID NOT -- I BELIEVE I DID ASK FOR SOME

19  ADDITIONAL THINGS, INCLUDING WHEN I DID MY SITE VISIT

20  I ASKED SPECIFICALLY TO LOOK AT THREE ADDITIONAL

21  RECORDS.

22     **Q**    RIGHT.  SO IF YOU WANTED MORE RECORDS TO

23  FORM YOUR OPINION, YOU COULD HAVE DONE THAT?

24     **A**    I WASN'T RESTRICTED.

25     **Q**    YOU TESTIFIED EARLIER THAT USING A NURSE

1   PRACTITIONER IS ABOVE THE STANDARD OF CARE BECAUSE IN

2   A LOT OF FACILITIES THAT YOU GO TO LPNs CONDUCT SICK

3   CALL.  DO LPNs CONDUCT THE FINAL ENCOUNTER IN SICK

4   CALL?

5      A    WHAT'S THE DIFFERENCE BETWEEN A FINAL

6   ENCOUNTER AND A SICK CALL ENCOUNTER?

7      Q    IN THESE FACILITIES ARE PATIENTS ABLE TO SEE

8   A PROVIDER BASED ON THEIR SICK CALL REQUESTS?

9      A    AT LSP?

10     Q    AT THE FACILITIES YOU REFERENCED.

11     A    WELL, IF THE -- IF THE ISSUE IS ADDRESSED BY

12  THE LPN OR RN AT THE INITIAL SICK CALL, THERE IS NO

13  NEED FOR A REFERRAL; THEN THE REQUEST ENDS THERE.

14     Q    BUT IF THE REQUEST CALLED FOR A PROVIDER TO

15  SEE THEM, THEN THE PROVIDER -- EVENTUALLY THE SICK

16  CALL ENDS WITH AN ENCOUNTER WITH A PROVIDER?

17     A    YES.  IF IT'S ABOVE THE LICENSE AND SCOPE OF

18  THE PERSON DOING THE SICK CALL, THEY REFER IT ON

19  GENERALLY TO ME.

20     Q    LET'S PULL UP WHAT WE'RE GOING TO MARK AS

21  PLAINTIFFS' EXHIBIT 73.  SO YOU MAKE A FINDING IN

22  YOUR REPORT ABOUT A NURSING SHORTAGE IN LOUISIANA.

23  IS THAT RIGHT?

24     A    NO.  I LISTED STATISTICS FOR LOUISIANA AND

25  SURROUNDING STATES ABOUT PERCENTAGES OF RNs PER

1  POPULATION.

2      Q    AND IN YOUR TESTIMONY YOU SAID LOUISIANA HAS

3  LESS RNs THAN OTHER STATES.  IS THAT RIGHT?

4      A    JUST BASED ON THE ONE -- WHAT I LOOKED AT,

5  YES.

6      Q    AND YOU DIDN'T CITE A SOURCE IN YOUR REPORT?

7      A    I DID NOT.

8      Q    AFTER YOUR DEPOSITION YOUR COUNSEL SENT

9  ALONG THIS ARTICLE AS THE SOURCE OF THAT INFORMATION.

10  IS THAT RIGHT?

11      A    I'M NOT AWARE OF THEIR ACTIVITY.

12      Q    IS THIS NOT THE SOURCE FOR YOUR INFORMATION?

13      A    I DON'T KNOW.  I CAN'T SEE THE CITATION.

14  ALL I CAN SEE IS A TITLE.

15      Q    DO YOU HAVE ANY REASON TO BELIEVE THIS IS

16  NOT THE SOURCE THAT WAS SENT ALONG BY YOUR COUNSEL?

17      A    I USED A GRAPHIC, AND SO I DON'T -- I'M NOT

18  FAMILIAR WITH THIS.

19      Q    WELL, IT WAS A WEBSITE, SO THIS IS THE --

20  THIS IS WHAT COMES UP WHEN WE POINT TO THE THING THAT

21  YOUR COUNSEL SENT US AS THE SOURCE OF INFORMATION.

22  AND IF YOU LOOK -- WE CAN GO TO THE NEXT PAGE.  AND

23  WE'LL MARK -- THESE ARE SCREENSHOTS, SO I'M GOING TO

24  MARK THIS AS 74; PLAINTIFFS' EXHIBIT 74.

25          IF YOU LOOK AT LOUISIANA, YOU'RE GOING TO

1   SEE THAT THE NUMBER IS ELEVEN SIXTY-TWO.  AND THAT'S

2   THE NUMBER YOU HAVE IN YOUR REPORT.  RIGHT?

3       A    YES.  NOW, I DIDN'T PULL IT FROM A LIST LIKE

4   THIS, I DON'T THINK.  I THOUGHT I DID IT FROM A

5   GRAPHIC, BUT I DON'T RECALL.

6       Q    OKAY.  AND YOU LIST MISSISSIPPI AS HAVING

7   13.9?

8       A    IS THAT OVER HERE, TOO?

9       Q    AND ALABAMA IS TWELVE-EIGHT.

10          SO THESE NUMBERS ARE PULLED FROM THIS LIST.

11  IS THAT RIGHT?

12      A    I CAN'T SEE THE WHOLE LIST.  I DON'T SEE

13  MISSISSIPPI OR ALABAMA ON THERE.

14      Q    I BELIEVE THE BOTTOM HALF OF THE LIST IS CUT

15  OFF ON THIS SCREENSHOT.

16          ON THIS LIST LOUISIANA IS LISTED AS ELEVEN-

17  SIX-TWO.  AND THAT'S -- THIS IS THE SAME NUMBER THAT

18  YOU USED IN YOUR REPORT.  IS THAT RIGHT?

19      A    YES.

20      Q    AND VIRGINIA HAS TEN-FIFTY-TWO, WHICH IS

21  LESS.  RIGHT?

22      A    10.52 IS WHAT IT SAYS.

23          MR. ARCHEY:  YOUR HONOR, I OBJECT.  THIS --

24  RELEVANCE.

25          THE COURT:  OVERRULED.

**1**     **Q**    TEXAS HAS 9.62 ON THIS LIST.  IS THAT RIGHT?

**2** UP THERE AT THE TOP.

**3**     **A**    YES.

**4**     **Q**    AND GEORGIA, WHERE YOU PRACTICE, HAS 10.23.

**5** IS THAT RIGHT?

**6**     **A**    YES.

**7**     **Q**    SO ACTUALLY LOUISIANA IS ABOUT THE MIDDLE

**8** WHEN IT COMES TO STATES.  RIGHT?

**9**          **MR. ARCHEY:**  YOUR HONOR, I HAVE TO OBJECT.

**10** SHE SHOWED HIM A PARTIAL DOCUMENT.  HE SAYS HE

**11** DOESN'T RECOGNIZE IT.  IT'S CUT OFF.

**12**          **THE COURTROOM DEPUTY:**  DO YOU WANT TO USE

**13** THE ELMO?

**14**          **MR. ARCHEY:**  I OBJECT.

**15**          **MS. MONTAGNES:**  I CAN TRY USING THE ELMO,

**16** YOUR HONOR.  BUT THIS WAS FROM THEM.  THIS IS

**17** LITERALLY -- I CAN MAKE A REPRESENTATION --

**18**          **THE COURT:**  I UNDERSTAND THAT IT'S FROM

**19** THEM.  BUT YOU'RE ASKING HIM TO SAY THAT LOUISIANA IS

**20** IN THE MIDDLE OF STATES, AND YOU'VE ONLY GOT ABOUT 20

**21** STATES HERE.

**22**          **MS. MONTAGNES:**  ALL RIGHT.  WE'LL TRY TO

**23** PULL UP THE WEBSITE.

**24**          **THE COURT:**  SO THE OBJECTION IS GRANTED, OR

**25** SUSTAINED.

1   BY MS. MONTAGNES:

2       Q    ALL RIGHT.  SO THIS IS THE FULL LIST OF ALL

3   THE STATES.  CAN YOU SCROLL ALL THE WAY DOWN TO THE

4   BOTTOM.  AND THEN YOU SEE MISSISSIPPI IS 13.88.  AND

5   THAT'S THE SAME NUMBER THAT'S IN YOUR REPORT.  IS

6   THAT RIGHT?

7       A    YES.

8       Q    OKAY.  SO DOES THIS APPEAR TO BE THE SOURCE

9   OF THAT GRAPHIC?

10      A    YEAH.  I THINK I PULLED IT FROM A GRAPHIC

11  INSTEAD OF A LIST.  BUT IT LOOKS LIKE LOUISIANA IS

12  ABOUT A THIRD OF THE WAY DOWN.

13      Q    WELL, LET'S TRY THAT AGAIN.  SCROLL UP

14  AGAIN.  SCROLL UP AGAIN.  THERE YOU GO.  LOUISIANA IS

15  AT 11.62?

16      A    YEAH.  I DIDN'T SEE WHAT NUMBER THAT IS IN

17  TERMS OF RANK.  I DIDN'T COUNT DOWN.

18      Q    WE CAN GO ALL THE WAY UP BACK UP TO THE TOP.

19  AND THERE IS SOUTH CAROLINA WITH SEVEN-EIGHT-NINE?

20      A    IF YOU COULD SCROLL DOWN.

21      Q    SURE.

22      A    IT'S NO. 20.

23      Q    YEAH.  AND HOW MANY --

24      A    SO THERE'S 20 -- THERE IS 19 ABOVE IT AND

25  THERE IS 30 THAT HAVE MORE.

1    **Q**   OKAY.  AND YOU -- IN YOUR REPORT YOU CITE

2   THIS DATA AS BEING FROM 2020.  IF WE COULD SCROLL TO

3   THE TOP OF THIS DOCUMENT.

4         IF YOU LOOK AT TOTAL NURSES, WHAT YEAR WAS

5   THAT DATA PULLED FROM?

6    **A**   YEAH, THERE WAS SOMETHING UP ABOVE THAT SAID

7   2019, BUT THIS -- THAT'S THE TOTAL NURSES FROM -- I

8   THINK THE CENSUS DATA WAS FROM 2020.  THAT'S HOW THEY

9   DID THE RATIO.  IF YOU'LL PULL BACK.  WELL, THEY DID

10  IT FROM 2019, BUT IT WAS -- THERE WERE TWO DIFFERENT

11  TIMES.

12         **MS. MONTAGNES:**  ALL RIGHT.  WE CAN TAKE THAT

13  DOWN.

14  **BY MS. MONTAGNES:**

15   **Q**   SO YOU DID CHART REVIEWS FOR THIS CASE?  MR.

16  MCMUNN, YOU DID CHART REVIEWS FOR THIS CASE?

17   **A**   YES.  22.

18   **Q**   AND THEY WERE INCLUDED IN YOUR REPORT?

19   **A**   YES.

20   **Q**   AND WHEN THE CHART REVIEWS WERE MIGRATED TO

21  THE REPORT, SOME INFORMATION GOT CUT OFF?

22   **A**   YES.

23   **Q**   AND ONE OF THE COLUMNS THAT WAS CUT OFF IS

24  LABELED "OPPORTUNITIES FOR IMPROVEMENT/CAUSATION

25  NOTES"?

1   **A**   YES.  IT WAS NOT INCLUDED IN THE REPORT.

2   **Q**   AND I'M GOING TO ASK FOR -- TO PULL UP

3   PX_61-B.1.

4        **MS. MONTAGNES:**  YOUR HONOR, THIS IS EXACTLY

5   IDENTICAL TO DEFENSE EXHIBIT 35, THE ATTACHMENT TO

6   THAT DOCUMENT.  IT'S JUST BATES STAMPED FOR

7   CONVENIENCE.  THIS DOCUMENT IS SEALED.

8   BY MS. MONTAGNES:

9    **Q**   AND IF WE COULD JUST SCROLL THROUGH THIS

10  DOCUMENT, DOES THIS APPEAR TO BE THE LONG FORM

11  VERSION OF YOUR CHART REVIEWS?

12   **A**   YEAH.  THERE WERE TWO:  DECEASED AND

13  CURRENT.  BUT I DON'T KNOW WHICH ONE THAT IS.

14   **Q**   IF WE COULD GO TO PAGE -- PX_61-B TO PAGE

15  45.

16        DOES IT APPEAR THAT IT JUST CONTINUES

17  THROUGH ALL THE PATIENTS; BOTH DOCUMENTS ARE SIDE --

18  ONE AFTER ANOTHER?

19   **A**   YES, IT LOOKS LIKE THEY'VE BEEN COMBINED

20  HERE.

21        **MS. MONTAGNES:**  YOUR HONOR, WE'D LIKE TO

22  MOVE TO ADMIT PLAINTIFFS' EXHIBIT 61-B.

23        **THE COURT:**  IS THERE ANY OBJECTION?

24        **MR. ARCHEY:**  IT'S ALREADY IN EVIDENCE, BUT I

25  HAVE NO OBJECTION.

1   **THE COURT:**  61-B IS ADMITTED.

2   **MS. MONTAGNES:**  AND SO LET'S TURN TO PATIENT

3   18; DX_35-B, PAGE 27.

4   BY MS. MONTAGNES:

5   **Q**   THIS IS YOUR CHART REVIEW OF PATIENT 18?

6   **A**   SEE, THE -- YEAH, I THINK WE ESTABLISHED IN

7   MY INITIAL THAT I DON'T HAVE THE NUMBERS ON HERE,

8   SO...

9   **Q**   SORRY.  THIS -- BUT IF YOU LOOK ON YOUR

10  SCREEN, THIS IS YOUR CHART REVIEW FOR PATIENT 18?

11  **A**   OKAY.

12  **Q**   AND YOU NOTE UP TOP THAT THE FAMILY DIDN'T

13  CLAIM THE BODY?

14  **A**   YES.

15  **Q**   AND YOU NOTE THAT THIS PATIENT WAS

16  TRANSPORTED TO THE ER ON 4/23/20 AND ON 4/28/20?

17  **A**   YES.

18  **Q**   AND YOU FOUND THAT THE RESPONSE TO

19  COVID-LIKE SYMPTOMS WAS RAPID AND APPROPRIATE?

20  **A**   YES.

21  **Q**   AND YOU BASED THAT OPINION ON THE FACT THAT

22  HE WAS TAKEN TO THE ER ON 4/23 AND 4/28?

23  **A**   HE HAD TWO REFERRALS BY AMBULANCE, YES.

24  **Q**   SO LET'S PULL UP JX_18.154.  AND THIS IS THE

25  AMBULANCE RUN REPORT FROM 4/23, THAT FIRST AMBULANCE

1  TRIP?  IF YOU LOOK IN THE TOP LEFT CORNER, IT SAYS

2  "4/23/20"?

3     A   YES.

4     Q   AND THIS IS FOR THE PATIENT -- PATIENT 18?

5     A   I DON'T HAVE THE NUMBER, BUT IT LOOKS LIKE

6  THAT'S CORRECT.

7     Q   IN FACT, HE WASN'T TAKEN TO THE ER, WAS HE?

8     A   NO.  THIS IS THE FORM THEY USE TO TRANSPORT

9  TO ATU.

10    Q   LET'S TALK ABOUT PATIENT 1.  AND LET'S GO TO

11  DX_35-B, PAGE 28.

12        IN YOUR REVIEW OF PATIENT 1, YOU NOTE THAT

13  HE HAD EXCEPTIONAL CARE?

14    A   YES.

15    Q   SO LET'S GO -- LET'S LOOK AT SOME OF THAT

16  CARE.  LET'S PULL UP JX_1.606.  JX_1.606.  THERE WE

17  GO.

18        THIS IS A PHYSICIAN'S CLINIC VISIT FOR THIS

19  PATIENT?

20    A   YES, THAT LOOKS LIKE THE FORM FOR THAT.

21    Q   HIS WEIGHT IS NOTED AS BEING 306 POUNDS.  IS

22  THAT RIGHT?

23    A   ON THIS FORM, THAT'S WHAT IT SAYS.

24    Q   LET'S GO TO JX_1.607.

25        THIS IS A SELF-DECLARED EMERGENCY FOR THAT

1   PATIENT?

2       **A**    OKAY.  I DON'T SEE A DATE.

3       **Q**    IS IT 4/7/20?

4       **A**    DOWN BELOW, YES.

5       **Q**    AND THERE IS NO WEIGHT TAKEN IN THIS

6   ENCOUNTER?

7       **A**    I DON'T SEE ONE AND I DON'T SEE A PLACE FOR

8   IT ON A SELF-DECLARED EMERGENCY FORM.

9       **Q**    SO LET'S TURN TO JX_1.608.  AND THIS IS AN

10  ENCOUNTER ON 4/13/20.  AND THIS IS ANOTHER EMERGENCY

11  SICK CALL.  AND THERE IS NO WEIGHT TAKEN ON THIS

12  ENCOUNTER, EITHER?

13      **A**    I DON'T SEE ONE, NO.

14      **Q**    OKAY.  LET'S GO TO JX_1.609.

15          THIS IS A CLINICAL VISIT FOR THIS PATIENT.

16  IS THAT RIGHT?

17      **A**    LOOKS LIKE A PHYSICIAN'S CLINIC VISIT, YES.

18      **Q**    AND THAT'S ON 6/4/20?

19      **A**    YES.

20      **Q**    THERE IS NO WEIGHT TAKEN?

21      **A**    THEY WROTE "O2 SAT," BUT THERE IS NO WEIGHT

22  LISTED THERE.

23      **Q**    LET'S GO TO JX_1.610.

24          AND THIS IS ANOTHER SELF-DECLARED EMERGENCY

25  FOR THIS PATIENT?  YES?

1     A    YES.  THAT'S THE FORM, YES.

2     Q    AND IT OCCURRED ON 7/17/20?

3     A    YES.

4     Q    AND THERE IS NO WEIGHT TAKEN FOR THIS

5  PATIENT?

6     A    NOT ON THIS FORM, NO.

7     Q    OKAY.  LET'S GO TO JX_1.611.

8          AND THIS IS ANOTHER SICK CALL EMERGENCY FOR

9  THIS PATIENT?

10    A    YES.  "DIFFICULTY URINATING."

11    Q    AND "SPITTING UP BLOOD."  RIGHT?

12    A    AT THE TOP IT SAYS "DIFFICULTY URINATING."

13    Q    AND THEN IT SAYS "SPITTING UP BLOOD"?

14    A    YES, UNDER "ASSESSMENT."

15    Q    AND THERE IS NO WEIGHT TAKEN?

16    A    NOT ON THIS FORM.

17    Q    AND THIS WAS 8/10/20?

18    A    YES.

19    Q    NOW LET'S GO TO JX_1.612.

20         AND THIS IS A PHYSICIAN CLINIC ENCOUNTER?

21    A    YES.

22    Q    AND THERE IS NO -- AND IS THIS FROM 8/25/20?

23    A    I'M SORRY?

24    Q    THIS IS FROM 8/25/20?

25    A    YES.

1    Q    AND THERE IS NO WEIGHT TAKEN?

2    A    NO WEIGHT LISTED, YES.

3    Q    AND UNDER "PLAN" THEY SAY "RECOMMENDED

4  WEIGHT LOSS"?

5    A    THAT APPEARS -- THAT APPEARS TO BE WHAT THAT

6  LOOKS LIKE.

7    Q    AND THE ASSESSMENT IS MORBID OBESITY AND

8  EDEMA?

9    A    PERIPHERAL EDEMA, IT LOOKS LIKE, EVEN THOUGH

10 IT'S KIND OF CUT OFF.

11   Q    NOW LET'S GO TO JX_1.613.

12        AND THIS IS ANOTHER SELF-DECLARED EMERGENCY

13 FOR THIS PATIENT?

14   A    YES.

15   Q    AND THIS IS FROM 9/23/20?

16   A    YES.

17   Q    AND HE AGAIN COMPLAINS ABOUT SPITTING UP

18 BLOOD?

19   A    YES.

20   Q    AND THERE IS NO WEIGHT TAKEN?

21   A    NO, NOT ON THIS FORM.

22   Q    AND THEN WE GO TO JX_1.615.  AND THIS IS

23 ANOTHER PHYSICIAN'S ENCOUNTER?

24   A    YES.

25   Q    AND THIS IS ON 9/28/20?

1    A    YES.

2    Q    AND IF YOU LOOK UNDER "CHIEF COMPLAINTS," IT

3  SAYS "FOLLOW-UP ATU COUGHING" UP "BLOOD"?

4    A    YES.

5    Q    AND THERE IS NO WEIGHT TAKEN?

6    A    CORRECT.

7    Q    AND IF YOU LOOK AT JX.616 ON 10/1/20, THERE

8  IS A REFERRAL RELATIVE TO A PROVISIONAL DIAGNOSIS OF

9  A CHEST MASS.  IS THAT RIGHT?

10   A    IT SAYS "RECENTLY."  I DON'T KNOW -- IT

11 LOOKS LIKE --

12   Q    DOWN AT THE BOTTOM, "PROVISIONAL DIAGNOSIS"

13 IS "CHEST MASS"?

14   A    OKAY.  YEAH, UP TOP IT SAYS "CHEST PAIN WITH

15 SHORTNESS OF BREATH."

16   Q    SO LET'S GO TO JX_1.688.

17        AND UNDER -- THIS IS A REPORT FROM AN

18 OUTSIDE HOSPITAL THAT HE WAS SENT TO.  IS THAT RIGHT?

19 IS THAT WHAT IT APPEARS TO BE?

20   A    IT LOOKS LIKE PAGE 2 OF 3, BUT IT LOOKS LIKE

21 IT'S PART OF A REPORT, YES.

22   Q    AND DO THEY DOCUMENT TAKING HIS WEIGHT?

23   A    HIS WEIGHT IS LISTED, YES.

24   Q    WHAT'S IT LISTED AS?

25   A    IT SAYS 102.1 KILOGRAMS.  225 POUNDS.

1   **Q**   SO THAT REPRESENTS AN 81-POUND WEIGHT LOSS

2   FROM HIS LAST WEIGHT ON 2/28/20?

3       **A**   YEAH.  IT WENT AWAY, BUT -- YEAH, I DIDN'T

4   -- I DIDN'T WRITE DOWN THE DATES BETWEEN WHICH --

5   WHERE THE WEIGHT LOSS OCCURRED.

6       **Q**   IF I REPRESENTED TO YOU THAT THE LAST WEIGHT

7   THAT WE HAD WAS FROM 2/28/20 AT 306, WOULD YOU HAVE

8   ANY REASON TO DISPUTE THAT?

9       **A**   FROM 2/20?

10      **Q**   2/28/20.  HERE WE GO.

11      **A**   SO OVER EIGHT MONTHS.

12      **Q**   81-POUND WEIGHT LOSS.

13      **A**   YES.

14      **Q**   AND, IN FACT, YOU NOTE IN YOUR CHARTS THAT

15  YOU HAVE A CONCERN ABOUT WEIGHT LOSS MONITORING; THAT

16  THAT'S AN AREA THAT LSP COULD IMPROVE IN?

17      **A**   YES.

18      **Q**   AND LET'S GO BACK TO DX_35-B.28.

19          YOU NOTE THAT HE WAS -- COMPLAINED OF

20  SPITTING UP BLOOD ON 9/23/20.  RIGHT?

21      **A**   WHERE IS THIS FROM?  OH, ON THE LONG FORM.

22  YES.

23      **Q**   BUT ACTUALLY THE FIRST COMPLAINT WAS

24  8/10/20.  RIGHT?

25      **A**   IT MAY BE THAT, YOU KNOW -- I DON'T LIST

1  EVERY DATA POINT, SO IT COULD HAVE BEEN.

2     Q    BUT YOU DO NOTE THAT HE HAD VICKS VAPOR RUB,

3  THAT HE HAD ASPIRIN, THAT HE HAD TYLENOL, THAT HE HAD

4  MOTRIN?

5     A    EVERYTHING -- YOU KNOW, TYPICALLY THE MEDS

6  ARE ALL LISTED IN ONE PLACE, YES.  I USUALLY LIST AS

7  MANY AS I CAN FIND.

8     Q    LET'S PULL UP PX_61-B.16.  SO FOR THIS

9  PATIENT -- THIS IS PATIENT 2 -- YOU NOTE THAT HIS

10 ENDOCRINE REFERRAL WAS MADE ON 3/3/20?

11    A    IS THIS THE ONE ON THE SCREEN RIGHT NOW?

12    Q    YES.

13    A    OKAY.  I CAN JUST LOOK AT THAT.  WHAT WAS

14 THE QUESTION ABOUT ENDOCRINE?

15    Q    YOU WROTE ON 3/3/20 THAT AN ENDOCRINE

16 REFERRAL WAS MADE?

17    A    YES.

18    Q    AND OVER AT THE SIDE YOU NOTE THAT THERE IS

19 "UNCLEAR DOCUMENTATION OF ENDOCRINE REFERRAL"?

20    A    YES.

21    Q    AND THAT'S BECAUSE THERE IS NO DOCUMENTATION

22 FROM 3/3/20 UNTIL 4/13/21 OF THAT ENDOCRINE REFERRAL.

23 CORRECT?

24    A    YES.  IF I COULDN'T FIND IT, I MIGHT HAVE

25 PUT A NOTE THAT I COULDN'T SEE IT.  AND THERE WAS

DR. MICHAEL MCMUNN                                    **109**

1  ACTUALLY SEVERAL OF THESE CHARTS THAT, YOU KNOW, SOME

2  OF THE MATERIALS CAME BACK TO ME AFTERWARDS THAT WERE

3  ACTUALLY IN OTHER CHARTS.

4      **Q**   THE CHARTS WERE MIXED UP?

5      **A**   THE DOCUMENTS FOR THE DIFFERENT INMATES WERE

6  IN DIFFERENT CHARTS.

7      **Q**   AND ACTUALLY THIS PATIENT SAW THE

8  ENDOCRINOLOGIST ON 4/13/21.  IS THAT RIGHT?

9      **A**   I DON'T RECALL, BUT -- I MEAN, I DON'T HAVE

10  THE CHART.  UNLESS I PUT IT IN MY NOTE.

11      **Q**   DO YOU WANT ME TO PULL IT UP FOR YOU?

12      **A**   YES, PLEASE, IF YOU --

13      **Q**   JX.252.  THIS IS THE NOTE FROM THAT

14  ENCOUNTER.  RIGHT?

15      **A**   YES, THIS IS AN ENDOCRINE REFERRAL.

16      **Q**   AND THEN HE WENT BACK INTO THE HOSPITAL ON

17  4/27, AND HE NEVER LEFT, AND HE DIED.  ISN'T THAT

18  RIGHT?

19      **A**   I DON'T HAVE THE LONG FORM UP AGAIN.

20      **Q**   LET'S GO TO JX.240.

21      **A**   YES.

22      **Q**   SO ON 4/27/21 HE WENT BACK TO THE HOSPITAL

23  AND HE DIED THERE?

24      **A**   YEAH, I DON'T HAVE THE DATES.  I DON'T HAVE

25  IT PULLED UP HERE, UNLESS YOU WANT ME TO PULL IT UP

1  HERE.  I DON'T KNOW WHEN HE DIED.  THAT'S WHEN HE

2  WENT, BUT I DON'T KNOW WHEN HE DIED.  IT LOOKS LIKE

3  DOWN BELOW THERE IS A NOTIFICATION THAT IT OCCURRED

4  ON 7/3/21.

5     Q   RIGHT.  ALL RIGHT.  LET'S TURN TO PATIENT 8.

6  AND YOU NOTE THAT GIVEN HIS DOCUMENTED HISTORY OF

7  CONTRABAND USE AND INCARCERATION IN MULTIPLE PRISON

8  SYSTEMS, IT IS ENTIRELY LIKELY THAT THIS PATIENT

9  ACCESSED SOME SORT OF CONTRABAND THAT CAUSED HIS

10 FIRST EPISODE.  BUT THE TOXICOLOGY REPORT WAS

11 NEGATIVE?

12    A   HIS DEATH TOXICOLOGY REPORT?

13    Q   THE TOXICOLOGY REPORT FOR THE POSSIBLE

14 INTOXICATION ON 12/6/20.  SORRY.  HIS DEATH -- SORRY.

15 I APOLOGIZE.  YOU'RE RIGHT; HIS DEATH TOXICOLOGY

16 REPORT WAS NEGATIVE.

17    A   YEAH.  I MEAN, I DON'T HAVE IT -- THE

18 TOXICOLOGY PULLED UP.  BUT IF IT'S -- THERE IS NO

19 CONTRABAND ON THERE, THEN THERE WASN'T ANY AT THE

20 TIME OF HIS DEATH.

21    Q   AND YOU BASED YOUR CONCLUSION THAT THIS WAS

22 CAUSED BY CONTRABAND BASED ON THE FACT THAT HE HAD

23 MOVED INSTITUTIONS?

24    A   IT WOULD BE BASED ON MORE THAN THAT.  I'D

25 HAVE TO LOOK BACK AT THE CHART.  BUT THERE WAS

1   PROBABLY DOCUMENTATION OF CONTRABAND USE.

2       **Q**   LET'S GO BACK AND LOOK AT THAT.

3       **A**   THIS IS 8?

4       **Q**   YES.

5       **A**   I DON'T HAVE NUMBERS ON HERE.  IF YOU COULD

6   PULL UP SOME OF THE CHART OR SOMETHING THAT HAS A

7   NAME ON IT.  OKAY, I'VE GOT IT.  I'VE GOT IT IN FRONT

8   OF ME.

9       **Q**   YOU BASED YOUR OPINION THAT HE DIED FROM

10  CONTRABAND ON THE FACT THAT HE HAD MOVED IN MULTIPLE

11  PRISONS?

12      **A**   NO.  HE PRESENTED WITH POSSIBLE INTOXICATION

13  ON 12/6/20.  THE FINAL COLUMN IN HERE -- AND I GUESS

14  I PROBABLY SHOULD HAVE ADDRESSED THIS UP FRONT -- IS

15  THAT A LOT OF TIMES IN THE LAST COLUMN I'LL MAKE

16  NOTES OR MAKE RECOMMENDATIONS THAT I'M GOING TO

17  PRESENT TO COUNSEL OR THE OFFICIALS AT THE PRISON TO

18  IMPROVE THE CARE.

19          BUT IN MY EXPERIENCE, INMATES THAT HAVE BEEN

20  INCARCERATED IN MULTIPLE SYSTEMS FOR MULTIPLE YEARS

21  USUALLY ARE MORE PROFICIENT AT THE MOVAL AND THE

22  TRANSPORT AND USE OF CONTRABAND.

23      **Q**   AND YOU ALSO NOTE IN YOUR REPORT THAT

24  BECAUSE IT WAS AROUND CHRISTMASTIME, THAT THERE IS AN

25  INFLUX OF CONTRABAND AROUND CHRISTMASTIME.  IS THAT

1  RIGHT?

2     **A**   IT'S NOT NECESSARILY AN INFLUX AROUND

3  CHRISTMAS.  THERE IS INCREASED USE AROUND CHRISTMAS.

4        DURING COVID SOME OF THE STANDARD CONTRABAND

5  METHODS WERE REDUCED.  BUT, YOU KNOW, CONTRABAND IS

6  OFTEN BROUGHT IN VIA GANGS AND/OR OFFICERS, SO IT

7  DOESN'T NECESSARILY RELY ON VISITATION.

8     **Q**   YOU WERE AWARE THAT AT THE TIME OF HIS DEATH

9  THERE WERE NO FAMILY VISITS THAT CHRISTMAS?

10    **A**   YES.  THAT'S NOT THE ONLY SOURCE OF

11 CONTRABAND IN CORRECTIONAL INSTITUTIONS.

12    **Q**   CERTAINLY BEFORE HIS DEATH THIS PATIENT WAS

13 PLACED ON THE NURSING UNIT AND HE WAS DISCHARGED ON

14 12/30/20.  IS THAT RIGHT?

15    **A**   YEAH, I DON'T HAVE A DISCHARGE DATE IN MY

16 NOTES.

17    **Q**   LET'S PULL UP JX_8 AT 140.  THIS IS A

18 DISCHARGE SUMMARY FOR THIS PATIENT ON 12/30/20?

19    **A**   YES.

20    **Q**   AND WHAT ARE THE DIAGNOSES FROM THIS?

21    **A**   IT LOOKS LIKE A-FIB, HYPERTENSION, HLD.

22    **Q**   AND WHAT WAS THE FOLLOW-UP APPOINTMENT?

23    **A**   "FOLLOW-UP TWO WEEKS CLINIC" -- I CAN'T

24 TELL -- "CARDIOLOGY ALREADY SCHEDULED" OR "AS

25 SCHEDULED."

1     Q    AND THAT FOLLOW-UP NEVER HAPPENED?

2     A    I DON'T HAVE RECORD THAT IT DID, AT LEAST IN

3   MY NOTES HERE.

4     Q    AND HE WAS FOUND PULSELESS ABOUT FIVE WEEKS

5   LATER?

6     A    YEAH.  I HAVE DOWN "EKG WAS ASYSTOLE ON

7   2/3/21" IN MY NOTES.

8     Q    2/3/21 IS THE DAY HE DIED?

9     A    YEAH.

10     Q    LET'S TALK ABOUT PATIENT 10.

11     A    IF YOU COULD FLASH SOMETHING UP WITH THE

12   NAME.

13     Q    WITH THE NAME.

14     A    NO, I THINK I KNOW THAT ONE.

15     Q    OKAY.  YOU NOTE IN YOUR -- LET'S GO BACK TO

16   THE CHART REVIEW.  YOU NOTE IN YOUR CHART REVIEW THAT

17   THIS PATIENT LIKELY USED DRUGS IN JANUARY.  HE

18   ADMITTED TO SMOKING CONTRABAND SUBSTANCES?

19     A    YEAH, LET ME PULL IT UP DOWN HERE, THEN I

20   CAN MAKE SURE.  HE'S UNDER CURRENT OR NOT?  HE'S

21   DECEASED?  I KNOW THAT'S ON THE FRONT.

22     Q    IT SHOULD BE ABOUT PAGE --

23     A    I'VE GOT IT.  THANK YOU.

24     Q    YOU NOTE THAT HE LIKELY USED DRUGS IN

25   JANUARY; HE ADMITTED TO USING DRUGS IN JANUARY OF

1  '21.  IS THAT RIGHT?

2      A    IF I RECALL, HE ADMITTED MANY TIMES TO USING

3  DRUGS.

4      Q    YEAH.  AND YOU ALSO NOTE THAT HE MAY HAVE

5  HAD A TRANSIENT ISCHEMIC ATTACK ON 12/9/20.  IS THAT

6  RIGHT?

7      A    IT HAS A QUESTION MARK, YES.

8      Q    YEAH.  IT SAID HE MIGHT HAVE HAD A TRANSIENT

9  ISCHEMIC ATTACK.  CORRECT?

10     A    YEAH.  I MEAN, I PULLED THAT PROBABLY

11 DIRECTLY FROM THE DOCUMENTS, YES.  BECAUSE I DIDN'T

12 EXAMINE HIM.

13     Q    PATIENT 10 HAD HYPERTENSION?

14     A    HE HAD -- I'M SORRY.  WHAT WAS YOUR

15 QUESTION?

16     Q    PATIENT 10 HAD HYPERTENSION?

17     A    YEAH, HE'S GOT HYPERTENSIONN.  MEDICATION I

18 DON'T HAVE -- FOR SOME REASON I DON'T HAVE THAT

19 LISTED.

20     Q    WELL, THEN LET'S LOOK AT A DOCUMENT.

21 JX_10.78.  IT SAYS "KNOWN PAST MEDICAL HISTORY OF

22 HYPERTENSION"?

23     A    YES, THAT'S WHAT IT SAYS.

24     Q    AND THAT HYPERTENSION WAS UNCONTROLLED?

25     A    IT DOESN'T SAY THAT ON THIS DOCUMENT.

1     Q     LET'S LOOK AT JX_10.221.  WHAT'S HIS BLOOD

2   PRESSURE THAT DAY?

3     A     160 OVER 102.

4     Q     IS THAT CONTROLLED HYPERTENSION?

5     A     NO.  THEY LIST IT AS HYPERTENSION UNDER

6   "ASSESSMENT," ITEM 1.

7     Q     AND THEY ALSO LIST HLD.  THAT'S

8   HYPERLIPIDEMIA?

9     A     YEAH, THAT'S ONE ABBREVIATION.

10    Q     SO HE ALSO HAD HIGH, UNCONTROLLED BLOOD

11  LIPIDS?

12    A     IT DOESN'T SAY ANYTHING ABOUT UNCONTROLLED.

13  IT JUST SAYS THAT HE HAS HLD.

14    Q     AND THIS PATIENT WAS TAKING CRESTOR?  AND WE

15  CAN GO --

16    A     YES.

17    Q     -- TO DX_35-B.

18    A     YES, HE WAS TAKING CRESTOR.

19    Q     AND HYPERTENSION AND HYPERLIPIDEMIA ARE

20  MODIFIABLE RISKS FOR CARDIOVASCULAR DISEASE?

21    A     YES.

22    Q     CRESTOR IS SOMETHING YOU TAKE FOR CARDIAC

23  ISSUES?

24    A     NO.  YOU TAKE IT FOR HYPERLIPIDEMIA, FOR

25  CHOLESTEROL ISSUES.

1    **Q**    FOR CHOLESTEROL.  AND CHOLESTEROL IS RELATED

2    TO THE HEART?

3    **A**    IT'S A RISK FACTOR.  IT'S NOT RELATED.

4    **Q**    SO WHEN YOU SAY THERE IS NO RECORD OF

5    CARDIAC ISSUES IN YOUR CHART REVIEW, YOU DON'T

6    CONSIDER HYPERTENSION, HYPERLIPIDEMIA AND BEING

7    PRESCRIBED CRESTOR A HISTORY?

8    **A**    THOSE ARE -- AS WE JUST DISCUSSED, THEY'RE

9    RISK FACTORS FOR THAT CONDITION.

10    **Q**    AND YOU DON'T LIST THE HYPERTENSION ON YOUR

11    REVIEW?

12    **A**    YEAH.  I MUST NOT HAVE FOUND IT, BECAUSE IT

13    WAS WITHIN A REPORT INSTEAD OF LISTED.  BUT, YOU

14    KNOW, WE LOOKED AT DOCUMENTS AND IT'S IN THERE, SO I

15    DON'T HAVE IT.

16    **Q**    SO LET'S GO BACK TO 10 -- JX_10.221.

17         THIS IS ANOTHER DOCUMENT WHERE THEY LIST --

18    THEN THEY ALSO LIST TACHYCARDIA.  RIGHT?

19    **A**    YEAH.  TACHYCARDIA IS NOT REALLY CONSIDERED

20    A CHRONIC CONDITION.  IT'S USUALLY RELATED TO

21    TEMPORARY PULSE.

22    **Q**    BUT IT'S RELATED TO YOUR HEART?

23    **A**    IT'S AN ELEVATED PULSE RATE, WHICH IS

24    USUALLY OVER A HUNDRED.  BUT IT'S SHOWN ABOVE THAT

25    HE'S ONLY 93.

1    Q    SO LET'S LOOK AT SOME OF THE DOCUMENTS WE

2  LOOKED AT EARLIER.  SO LET'S GO TO JX_10.111.

3        THIS IS AN INSTANCE WHERE COUNSEL SHOWED YOU

4  WHERE IT SHOWS THAT HE HAD A WICK IN HIS HAND.  IS

5  THAT RIGHT?

6    A    YEAH.  UNDER "COMPLAINT, HISTORY AND

7  ASSESSMENT," IT SAYS "PASSED OUT WITH WICK IN HAND."

8    Q    YEAH.  AND THAT WAS ON 1/25/21?

9    A    YES, THAT'S THE DATE LISTED.

10    Q    AND COUNSEL ALSO SHOWED YOU JX_10.114.  AND

11  THAT'S FROM THAT SAME DAY.  RIGHT?

12    A    IS THAT 1/23 OR 1/20?  IS THAT MAYBE NOT THE

13  SAME DAY?

14    Q    IS THIS THE -- SO THIS IS THE AMBULANCE RUN.

15  WE CAN GO BACK TO THE OTHER ONE.  SORRY.

16    A    LOOKS LIKE 1/25/21.

17    Q    IT DOES.  ALL RIGHT.  LET'S MOVE ON.

18        LET'S LOOK AT JX_10.153.  THIS IS AN

19  EMERGENCY MEDICAL REPORT FOR THIS PATIENT?

20    A    YES.

21    Q    AND THIS IS FROM 7/23/20?

22    A    YES.

23    Q    AND THE PATIENT HAD STAGGERING GAIT?

24    A    LOOKS LIKE THEY SAW HIM FOR ALTERED MENTAL

25  STATUS AND HE HAD STAGGERING GAIT, YES.

1    Q    AND SLURRED SPEECH?

2    A    YES.

3    Q    AND A BP OF 148 OVER 95?

4    A    THAT WAS AFTER HE HAD BEEN THERE FOR AN HOUR

5  AND A HALF, YES.

6    Q    AND THEN LET'S PULL UP JX_10 -- AND THERE IS

7  NO -- THE PATIENT DOESN'T ADMIT TO TAKING DRUGS ON

8  THIS OCCASION?

9    A    HE SAID "DENIES PAIN OR ILLICIT SUBSTANCE

10 USE."

11   Q    AND WE'VE SEEN EXAMPLES WHERE THIS PATIENT

12 ADMITTED WHEN HE USED DRUGS.  RIGHT?

13   A    YES.

14   Q    OKAY.  SO LET'S GO AND PULL UP JX_10.136.

15        AND THIS IS ANOTHER AMBULANCE RUN FOR THIS

16 PATIENT -- OR EMERGENCY MEDICAL REPORT FOR THIS

17 PATIENT?

18   A    YES.

19   Q    AND THIS WAS ON 10/18/20?

20   A    YES.

21   Q    AND THE PATIENT HAD A STAGGERING GAIT -- OR

22 SLURRED SPEECH?

23   A    "ALTERED MENTAL STATUS"; "DILATED";

24 "SLUGGISH"; "SLURRED SPEECH."

25   Q    THEY DID A DRUG SCREEN AND IT WAS NEGATIVE?

1    **A**    I DON'T SEE THAT.  OKAY.  URINE DRUG SCREEN

2   WAS NEGATIVE.

3    **Q**    AND IF WE PULL UP JX_10.137, THIS IS FOR

4   THAT SAME DAY.  AND IT MENTIONS THAT THE PATIENT IS

5   SHAKING?

6    **A**    YEAH.  HE WAS FOUND BY TWO OFFICERS IN THE

7   SHOWER SHAKING, YES.

8    **Q**    AND THE PATIENT DOESN'T ADMIT TO DRUG USE ON

9   THIS OCCASION?

10   **A**    I DON'T SEE AN ADMISSION ON THIS DOCUMENT,

11   ON AN AMBULANCE RUN REPORT, NO.

12   **Q**    SO IT'S POSSIBLE THIS PATIENT HAD MULTIPLE

13   TRANSIENT ISCHEMIC ATTACKS?

14   **A**    IT'S NOT LIKELY, BUT IT'S POSSIBLE, YES.

15   **Q**    WHY IS IT NOT LIKELY?

16   **A**    WELL, I THINK WE MAY HAVE ESTABLISHED

17   PREVIOUSLY THAT A LOT OF THE SYNTHETIC DRUGS THAT

18   THEY'RE USING ARE NOT GOING TO SHOW ON A URINE DRUG

19   SCREEN, SO THAT YOU DON'T NECESSARILY KNOW THAT

20   THAT'S -- JUST BECAUSE YOU HAVE A NEGATIVE URINE DRUG

21   SCREEN, IT'S LIMITED IN SCOPE, AND THEY CAN CERTAINLY

22   USE A DRUG THAT'S NOT ON THERE.  SO WHEN YOU HAVE A

23   URINE DRUG SCREEN, YOU HAVEN'T A HUNDRED PERCENT

24   RULED OUT THE USE OF A SYNTHETIC DRUG.

25   **Q**    SO WHEN YOU HAVE AN ALTERED MENTAL STATUS

1  AND A NEGATIVE TOX SCREEN AND THE PATIENT DENIES

2  USING DRUGS, YOU'RE WILLING TO SPECULATE THAT THAT

3  WAS DRUG USE?

4      A   THERE IS NO SPECULATION WHEN THEY ADMIT DRUG

5  USE IN THE CHART.

6      Q   WELL, I JUST SHOWED YOU SEVERAL OCCASIONS

7  WHERE HE DIDN'T.

8      A   YES, WHERE HE EITHER SAID HE DIDN'T OR THEY

9  DIDN'T ASK.  BUT HE HAS ADMITTED HE'S USED CONTRABAND

10 MANY TIMES.

11     Q   SO BECAUSE THIS PATIENT HAS USED DRUGS,

12 YOU'RE NOT WILLING TO ENTERTAIN THE OPTION THAT HE

13 WAS HAVING TRANSIENT ISCHEMIC ATTACKS?

14     A   NO.  I SAID THAT'S -- YOU'VE GOT TO

15 ENTERTAIN ALL DIFFERENTIALS.  BUT BECAUSE HE -- BUT

16 BECAUSE HE HAS THE HISTORY THAT HE HAS ADMITTED

17 CHRONIC DRUG USE OVER MANY DIFFERENT OCCASIONS, THEN

18 THAT'S GOING TO BE ONE OF YOUR PRIMARY CONSIDERATIONS

19 WHEN HE PRESENTS WITH ALTERED MENTAL STATUS.  THAT'S

20 JUST A GOOD CLINICIAN.

21     Q   YOU SAY -- I MEAN, YOU SAY MULTIPLE -- YOU

22 KNOW, CHRONIC.  WHAT DOES "CHRONIC" MEAN?

23     A   MULTIPLE TIMES, LOTS OF USE.  IF I'M NOT

24 MISTAKEN, HE MAY BE EVEN THE ONE THAT SAID HE WANTED

25 TO STOP.  ONE OF THEM DID, SAID, "YOU KNOW, I'M USING

1  -- I'M GETTING HIGH TOO MUCH.  I NEED TO STOP."

2      Q    SO IF I REPRESENTED TO YOU IT WAS THREE

3  TIMES IN THE RECORD, THAT WOULD BE CHRONIC TO YOU?

4      A    I DON'T -- I HAD MORE THAN THAT.  I HAVE

5  THAT HE'S PRESENTED WITH INTOXICATION MULTIPLE TIMES

6  AND THAT HE ADMITTED SMOKING CONTRABAND SUBSTANCE AS

7  WELL ON 8/5/20.

8      Q    WE'LL MOVE ON.

9           LET'S GO TO PATIENT 49.  YOU CONCLUDE THAT

10 THIS PATIENT USED UN- -- YOU SPECULATE THAT THIS

11 PATIENT USED UNKNOWN CONTRABAND SUBSTANCES WITH

12 ADVERSE EFFECT ON HIS HEALTH?

13     A    YEAH.  I DON'T HAVE A NAME BECAUSE I DON'T

14 HAVE THE NUMBERS.

15     Q    IF YOU LOOK, THIS IS YOUR CHART REVIEW FROM

16 THE REPORT.

17     A    OKAY.

18     Q    AND YOU DOCUMENT ONE INSTANCE OF POSSIBLE

19 INTOXICATION?

20     A    YEAH.  I DON'T KNOW IF SOME OF IT GOT CUT

21 OFF.  I NEED TO LOOK AT IT OVER HERE TO BE CERTAIN.

22     Q    IN YOUR REPORT YOU DOCUMENT ONE INSTANCE OF

23 POSSIBLE INTOXICATION?

24     A    YEAH.  I THINK THAT WE'VE ESTABLISHED THAT

25 THAT'S BEEN CUT OFF AND IN -- WITH DIFFERENT --

1    WITH -- FROM THIS LONG FORM.

2        Q    BUT, IN FACT, THIS PATIENT DIED OF

3    PNEUMONIA?

4        A    YOU DON'T WANT ME TO CHECK AND SEE THE FIRST

5    QUESTION ABOUT INTOXICATION IS CORRECT?

6        Q    MY QUESTION WAS REGARDING YOUR REPORT, SIR.

7    BUT, IN FACT, THIS PATIENT DIED OF PNEUMONIA?

8        A    I DON'T KNOW THAT.  I'LL HAVE TO LOOK AT

9    THIS FOR A SECOND.  BUT I DON'T SEE A --

10       Q    LET'S PULL UP JX_49 AT 345.  SORRY.  THIS

11   PATIENT HAD PNEUMONIA.  HE DIDN'T DIE OF PNEUMONIA.

12       A    YEAH, THAT WHAT IT SAYS.  IT SAYS IT'S

13   RESOLVING.

14       Q    LET'S TALK ABOUT PATIENT 56.  YOU NOTE THAT

15   THIS PATIENT -- THIS IS DX_35-B AT 42.  YOU NOTE THAT

16   THIS PATIENT HAD AN EXCEPTIONAL NUMBER OF DIAGNOSTIC

17   TESTS?

18       A    YES.  THE CHART REFLECTS AN EXCEPTIONAL

19   NUMBER OF DIAGNOSTICS AND REFERRALS.

20       Q    LET'S GO TO YOUR LONGER FORM ON THIS ONE,

21   PX_61-B AT 35.  AND IN YOUR SUGGESTIONS FOR

22   IMPROVEMENT, YOU NOTE THAT ALL X-RAYS SHOULD BE

23   RECHECKED BY A RADIOLOGIST TO ENSURE THAT NO

24   UNDIAGNOSED FRACTURES EXIST.

25       A    YES.  THAT'S THE SAME STANDARD THEY USE IN

1   THE COMMUNITY IN EMERGENCY ROOMS.

2       Q    AND YOU SAID THIS BECAUSE IN THIS CASE A

3   FRACTURE WAS MISSED?

4       A    IF I RECALL, THERE WAS A MISSED FRACTURE IN

5   THIS CASE.  IT WAS CAUGHT LATER.

6       Q    AND YOU DIDN'T NOTE THAT IN YOUR CHART

7   REVIEW?

8       A    I SEEM TO RECALL THAT.  THAT'S WHY I NOTED

9   IT IN MY CHART REVIEW.

10      Q    I'M LOOKING AT YOUR REPORT, SIR, FOR THIS

11  PATIENT, AND I DON'T SEE ANY REFERENCE TO THE MISSED

12  FRACTURE.

13      A    WELL, I WOULD HAVE LISTED WHAT WAS IN THE

14  REPORT.  SO IF -- LIKE IF WE'RE LOOKING AT -- FOR

15  EXAMPLE, ON 1/10/22, IF THIS REPORT SAID "X-RAY LEFT

16  SHOULDER WITHIN NORMAL LIMITS," THEN I'M JUST GOING

17  TO REPORT WHAT'S THERE.  IF THEY LATER FIND A

18  FRACTURE, THAT'S A DIFFERENT FINDING IN A DIFFERENT

19  REPORT.  THE REPORT STILL STANDS AS IT'S LISTED.

20      Q    AND UNDER STANDARD OF CARE YOU DIDN'T NOTE

21  THAT THEY HAD MISSED A FRACTURE?

22      A    I DID NOT NOTE THAT IN THAT COLUMN ON THE

23  RIGHT SIDE, THAT'S CORRECT.

24      Q    LET'S TALK ABOUT PATIENT 44.  THIS IS

25  DX_35-B.43.  YOU NOTE THAT "GIVEN THIS PATIENT'S

1    YOUNGER AGE AND LACK OF CO-MORBIDITIES, AN UNUSUAL

2    EVENT, CONTRABAND OR OTHERWISE CAUSED RESPIRATORY

3    FAILURE."  BUT YOU DON'T NOTE ANY CONTRABAND USE IN

4    YOUR REPORT?

5        A   HE WAS SENT OUT FOR ALTERED MENTAL STATUS,

6    SEIZURE, OVERDOSE WITH COMPLICATIONS.

7        Q   LET'S LOOK AT THAT ENCOUNTER.  JX_44.59.

8    THIS PATIENT WAS ADMINISTERED NARCAN AND THAT DID NOT

9    REVIVE HIM?

10       A   THAT'S WHAT IT SAYS, YES.

11       Q   OKAY.  LET'S GO TO PATIENT 41.  YOU NOTE

12   THAT THIS -- THIS IS DX_35-B.49.  YOU NOTE THAT THIS

13   PATIENT HAD 30 REFUSALS UNDER STANDARD OF CARE?

14       A   YES.

15       Q   YOU DOCUMENT EVERY SINGLE ONE OF THEM.  IF

16   WE GO TO PX_61-B.53 THROUGH 56 -- WE CAN JUST SCROLL

17   THROUGH.  KEEP GOING.  THAT'S THE END.

18           BUT YOU DON'T NOTE THAT MANY OF THESE

19   REFUSALS TOOK PLACE WHEN HE WAS HAVING DAILY

20   RADIATION THERAPY?

21       A   I DON'T NOTE THE NATURE OF THE REFUSAL.

22   ONLY THAT HE REFUSED TO BE -- HE REFUSED CARE.

23       Q   AND BECAUSE HE WAS HAVING DAILY RADIATION,

24   HE COULD HAVE BEEN TAKEN ON A TRIP AND IT COULD HAVE

25   BEEN DOCUMENTED AS A REFUSAL.  RIGHT?

1    **A**    USUALLY WRITTEN MEDICATION REFUSALS REQUIRE

2   A PRESENCE SO THEY CAN SIGN OFF ON THE WRITTEN

3   REFUSAL.

4    **Q**    BUT YOU DON'T KNOW THAT?

5    **A**    I DON'T -- I DON'T HAVE ANY INFORMATION

6   WRITTEN HERE ABOUT IF HE WAS GONE OR SOMEWHERE ELSE

7   OR --

8    **Q**    AND HE COULD HAVE BEEN WEAK FROM THE

9   RADIATION?

10    **A**    WELL, THAT'S A SECONDARY FACTOR.  A REFUSAL

11   IS A REFUSAL, WHETHER HE'S WEAK OR WHAT OTHER FACTOR.

12   REFUSAL IS JUST A REFUSAL.

13    **Q**    AND HE COULD HAVE HAD AN UPSET STOMACH FROM

14   THE RADIATION THERAPY?

15    **A**    HE CERTAINLY COULD HAVE.

16    **Q**    ACTUALLY HE TOLD US, SO LET'S LOOK AT

17   JX_41.50.  LET'S BLOW THAT UP.

18        WHAT DOES HE SAY?  HE SAYS "I'M HAVING HARSH

19   SIDE EFFECTS DUE TO OTHER MEDICAL TREATMENTS OF

20   CANCER AND THE TIME OF THE HEALING PROCESS THEY NEED.

21   ONCE I HAVE MY CLEARANCE OF CANCER SURGERY AND I HAVE

22   CONTROL OF MY URINE AND BOWELS ARE FUNCTIONING

23   PROPERLY AND NOT IN PAIN THEN I WILL TAKE THE BLOOD

24   THINNER."

25    **A**    YES, THAT'S WHAT HE STATED.

1      Q    AND YOU DON'T NOTE ANY OF THAT IN YOUR CHART

2   REVIEW?

3      A    I DO NOT LIST THAT IN MY CHART REVIEW, NO.

4      Q    LET'S GO TO JX_41.222.  LET'S BLOW UP THE

5   PART THAT SAID "STATED."

6           AND THIS IS ALSO A REFUSAL FOR HIS

7   MEDICATION.  HE SAYS "I DID NOT GO TODAY.  I TAKE IT

8   WHEN I GO TO TREATMENT."  RIGHT?  SO THIS WAS

9   MEDICATION THAT HE WAS TAKING WITH HIS -- WITH HIS --

10     A    HE CHOSE -- HE WANTS TO TAKE IT WITH HIS

11  TREATMENT, ACCORDING TO THAT STATEMENT.  HE DOESN'T

12  WANT TO TAKE IT WHEN THEY WANT IT.  HE WANTS TO TAKE

13  IT WITH HIS TREATMENT.

14     Q    IS IT POSSIBLE THAT THAT -- IT WAS

15  PRESCRIBED TO BE TAKEN WITH HIS TREATMENT?

16     A    I'D HAVE TO LOOK AT THE MARs AND SUCH.  BUT

17  THAT'S -- YOU KNOW, WHEN THEY MAKE A WRITTEN REFUSAL

18  LIKE THIS, SOMETIMES THEY DON'T PUT ANY NARRATIVE,

19  SOMETIMES THEY DO.  AND THE PLAN OF CARE REMAINS THE

20  SAME, THE ORDERS REMAIN THE SAME; BUT THEN THEY

21  DECIDE NOT TO TAKE IT AND THEY CAN WRITE WHATEVER

22  THEY'D LIKE FOR THE REASON THAT THEY REFUSED THE

23  ORDER OF CARE.

24     Q    BUT THESE ARE NOT THE REFUSALS OF A MAN WHO

25  DIDN'T WANT HIS CARE?

1    **A**    A REFUSAL MEANS YOU ARE NOT ACCEPTING THE

2    CARE THAT HAS BEEN ORDERED, BY DEFINITION.

3    **Q**    LET'S MOVE ON.  LET'S TALK ABOUT PATIENT 55.

4    ACTUALLY, SORRY.  LET'S STOP.  LET'S TALK ABOUT

5    PATIENT 22.  LET'S GO TO PX_61-B, PAGE 10.

6         SO THIS IS PATIENT 22.  THIS IS THE NAME OF

7    PATIENT 22, I'LL REPRESENT TO YOU.

8    **A**    MY APOLOGIES.  I'M HAVING A CRAMP IN MY LEG.

9    IT'S NOT TOO BAD.

10        **THE COURT:**  IF YOU NEED TO STAND UP, YOU

11   CAN.

12        **THE WITNESS:**  I THINK I CAN MASSAGE IT OUT.

13   WELL, I MIGHT NEED TO, BECAUSE IT'S GETTING WORSE.

14        **THE COURT:**  GIVE HIM JUST A SECOND.

15   **BY MS. MONTAGNES:**

16    **Q**    SO THIS IS PX-B.10.  THIS IS THE -- THIS IS

17   PATIENT 22?

18    **A**    YES.  YES.

19    **Q**    AND IN YOUR CHART REVIEW YOU SAY "DID NOT

20   FIND A SUGGESTED OR ORDERED ALTERNATIVE DIET.  IF

21   AWARE, PLEASE CITE PAGE NUMBERS."

22    **A**    YES.

23    **Q**    ALL RIGHT.  LET'S GO TO JX_22.850.  AND

24   LET'S LOOK -- THIS IS THIS PATIENT AS WELL?

25    **A**    YES.  THIS IS THE -- YES.  THIS IS THE STUDY

1   WITH THE MINOR IMPAIRMENT, YES.

2        Q    THE SPEECH THERAPIST MADE A DIET

3   RECOMMENDATION?

4        A    YES.  UNDER "RECOMMENDATIONS" IS A -- YES.

5        Q    ALL RIGHT.  LET'S MOVE -- LET'S TALK

6   ABOUT -- AND THAT WAS FOR A "MECHANICAL SOFT

7   (CHOPPED) AND THIN LIQUIDS DUE TO EDENTULOUS NATURE

8   AND INABILITY TO UTILIZE UTENSILS" DUE TO LEFT UPPER

9   EXTREMITY -- "UTENSILS WITH LEFT UPPER EXTREMITY."

10  IS THAT RIGHT?

11       A    WELL, THERE IS ANOTHER PAGE TO THIS REPORT.

12  BUT THAT'S WHAT HE WROTE HERE, YES.

13       Q    OKAY.  LET'S TALK ABOUT PATIENT 55.  ALL

14  RIGHT.  LET'S PULL UP JX_55.69.

15            FIRST OF ALL, DO YOU RECOGNIZE WHO THIS

16  PATIENT IS?  DO YOU RECOGNIZE THIS PATIENT?

17       A    YES.  I'VE GOT IT, YES.

18       Q    LET'S PULL UP JX_55.69.  AND BASED ON THIS

19  ENCOUNTER, THE CLINIC REPORTS THAT HE'S NONCOMPLIANT

20  WITH HIS BLOOD PRESSURE MEDS.  IS THAT RIGHT?

21       A    YES.

22       Q    LET'S PULL UP JX_68, PAGE 1618.

23            WHAT ARE WE LOOKING AT NOW?

24       A    IT APPEARS TO BE A MEDICATION ADMINISTRATION

25  RECORD THAT SHOWS "KEPT ON PERSON."

1    Q    FOR THIS PATIENT?  FOR THE SAME -- FOR

2  PATIENT 55?

3    A    YES.

4    Q    AND FOR THE SAME TIME PERIOD?  THIS IS

5  FEBRUARY 2021?

6    A    YES.

7    Q    AND IT SHOWS THAT HE WAS GIVEN HIS LIPITOR

8  KEEP ON PERSON, HIS COZAAR KEEP ON PERSON?

9    A    YEAH.  "KEPT ON PERSON" MEANS HE'S

10  SELF-ADMINISTERED, YES.

11    Q    AND THEN IF WE GO TO JX_68.1619, HE WAS

12  GIVEN ADDITIONAL MEDICATIONS KEEP ON PERSON?

13    A    YES.  AND IT APPEARS MEDICATION NO. 3 WAS

14  WHERE HE HAD TO COME TO GET THE MEDICATION.

15    Q    OKAY.  LET'S PULL UP JX_55.53.  SORRY.  ONE

16  SECOND.  LET'S GO BACK TO JX_55.68.

17        ON THIS FORM DOWN HERE UNDER "PHYSICIAN

18  ASSESSMENT AND TREATMENT," IT SAYS THE PATIENT HAD

19  NOT FILLED BLOOD PRESSURE MEDICINES SINCE OCTOBER.

20  IS THAT RIGHT?

21    A    THAT'S WHAT IT SAYS, YES.

22    Q    BUT THE EMAR WE JUST LOOKED AT SHOWED HE HAD

23  HIS KEEP-ON-PERSON MEDICATION.  RIGHT?

24    A    IT DOESN'T VERIFY THAT.  IT JUST IS A RECORD

25  THAT SAYS IT WAS KEPT-ON-PERSON MEDICATION.

1    Q    IT WAS DOCUMENTED AS BEING GIVEN TO HIM THE

2  SAME TIME PERIOD?

3    A    THAT'S WHAT THAT MEDICATION RECORD SHOWS.

4  BUT SOMETIMES WHEN THERE IS "KEPT ON PERSON,"

5  SOMETIMES THEY USE A DIFFERENT FORM.  BUT YES.

6    Q    LET'S GO TO JX_55.53.

7         SO WHEN YOU -- WHEN COUNSEL QUESTIONED YOU

8  ABOUT THIS DOCUMENT, YOU SAID HE HADN'T HAD ANY

9  PROBLEMS FOR SIX WEEKS.  BUT THE COMPLAINT SAYS HE'S

10  "BEEN FALLING A LOT LATELY AND HAVING URINE

11  INCONTINENCE," IF YOU LOOK AT THE MIDDLE.

12    A    YES, THAT'S WHAT IT SAYS.

13    Q    LET'S GO TO JX_55.54.

14         AND THIS IS AN EMERGENCY MEDICAL REPORT FOR

15  THIS -- FOR PATIENT 55?

16    A    YES.

17    Q    AND THIS IS FOR 3/17/21?

18    A    YES.

19    Q    AND THE PATIENT SAYS "I CAN'T WALK SINCE

20  YESTERDAY"?

21    A    YES.

22    Q    AND HIS PUSHER, WHO PUSHES HIS WHEELCHAIR,

23  SAYS "HE'S BEEN URINATING ON HIMSELF"?

24    A    YES, THAT'S WHAT IT SAYS.

25    Q    AND THE PROVIDER DOCUMENTS NO NEW SIGNS AND

1   SYMPTOMS OF -- "NO SIGNS AND SYMPTOMS OF A NEW CVA"?

2       A   WELL, ONE IS HISTORY AND ONE IS EXAMINATION.

3   THEY'RE DIFFERENT.

4       Q   THE PROVIDER DOESN'T THINK THAT NOT BEING

5   ABLE TO WALK AND URINATING ON YOURSELF ARE SYMPTOMS

6   OF A CVA?

7       A   YEAH.  THAT'S REPORTED HISTORY.  BELOW WOULD

8   BE HIS EXAMINATION.  IT'S ASSESSMENT AND TREATMENT.

9           MS. MONTAGNES:  WE CAN TAKE THAT DOWN.

10  BY MS. MONTAGNES:

11      Q   A MEDICAL CHART --

12          MS. MONTAGNES:  THE COURT'S INDULGENCE FOR

13  ONE MOMENT?

14          THE COURT:  TAKE YOUR TIME.

15  BY MS. MONTAGNES:

16      Q   A MEDICAL CHART SHOULD ALWAYS BE AS COMPLETE

17  AS POSSIBLE.  RIGHT?

18      A   YES, IDEALLY IT SHOULD BE AS COMPLETE AS

19  POSSIBLE.

20      Q   AND YOU NOTE IN YOUR REPORT THAT "IN ALL MY

21  CASE REVIEWS IN 28 STATES, I'VE NEVER SEEN A FACILITY

22  THAT WOULD BENEFIT FROM ELECTRONIC MEDICAL RECORDS AS

23  MUCH AS LSP WOULD"?

24      A   THAT'S CORRECT.

25      Q   AND THE DESIGN OF THE INFIRMARY IS NOT AS

1  GOOD AS A CENTRALIZED POD?

2      **A**   I THINK THAT RELATES TO THE AGE OF THE

3  FACILITY.  I DON'T THINK THAT THEY PURPOSELY DESIGNED

4  IT INAPPROPRIATELY.  BUT YES.

5      **Q**   AND YOU DON'T THINK ORDERLIES SHOULD DO

6  SKILLED LABOR LIKE PHYSICAL THERAPY?

7      **A**   I'M SORRY.  I DON'T THINK THAT --

8      **Q**   INMATE ORDERLIES SHOULD DO SKILLED LABOR

9  LIKE PHYSICAL THERAPY?

10     **A**   NO.  THEY SHOULD DO UNSKILLED ACTIVITIES.

11     **Q**   AND YOU FOUND -- YOU FOUND ISSUES AND YOU

12  DISCUSSED THEM WITH DR. MATHIS.  RIGHT?

13     **A**   I'M SORRY?

14     **Q**   YOU FOUND ISSUES AT LSP AND YOU DISCUSSED

15  THOSE ISSUES WITH DR. MATHIS?

16     **A**   I MEAN, I -- SOMETIMES I DISCUSS WHAT -- MY

17  FINDINGS WITH COUNSEL, SOMETIMES I DISCUSSED THEM

18  WITH DOC OFFICIALS, SOMETIMES I DISCUSSED THEM WITH

19  ADMINISTRATORS.  YOU KNOW, I WANT THE FACILITY TO DO

20  WELL.  IF I HAD A RECOMMENDATION, I MADE IT.

21     **Q**   AND AT YOUR DEPOSITION YOU TOLD ME ABOUT A

22  CONVERSATION WITH DR. MATHIS ABOUT SOME PROBLEMS THAT

23  YOU FOUND?

24     **A**   WE TALKED ABOUT SELF-DECLARED EMERGENCIES.

25  THAT WAS ONE OF THE BIGGEST THINGS THAT WE TALKED

1   ABOUT.

2        **Q**   AND THE CHRONIC CARE GUIDELINES?

3        **A**   YEAH, I MEAN, THAT WASN'T THE FOCUS.  I

4   MEAN, THAT WASN'T ONE OF THE AREAS THAT I WAS TASKED

5   WITH PROVIDING OPINIONS ON.

6            BUT WE TALKED ABOUT SOME OF THE CHRONIC CARE

7   GUIDELINES AND HOW THEY COULD BE EVEN BETTER.

8        **Q**   AND YOU SAW OPPORTUNITIES FOR IMPROVEMENT IN

9   OTHER AREAS AS WELL?

10       **A**   YES.  SOME OF THOSE ARE LISTED ON MY CHART

11  REVIEWS THAT WE TALKED ABOUT AS WE WENT THROUGH

12  THOSE.

13           **MS. MONTAGNES:**  OKAY.  NO FURTHER QUESTIONS.

14           **THE COURT:**  OKAY.

15           DO YOU HAVE ANY REDIRECT?

16           **MR. ARCHEY:**  I DO NOT, YOUR HONOR.  I DON'T

17  SEE A NEED FOR REDIRECT.

18           **THE COURT:**  THANK YOU.

19           ALL RIGHT.  YOU MAY STEP DOWN.

20           DO YOU WANT TO RESERVE DR. MCMUNN?

21  HE'S OBVIOUSLY IN YOUR POWER, BUT --

22           **MR. ARCHEY:**  THAT'S CORRECT, YOUR HONOR.

23

24

25

**1**      THE COURT:  YOU MAY STEP DOWN.

**2**           AS YOU KNOW, THE COURT HAS A HEARING IN

**3**  THE MORNING AT NINE.  I DON'T ANTICIPATE THAT IT'S

**4**  GOING TO TAKE LONG, BUT I WOULD NOT PLAN ON BEFORE

**5**  10:30.  SO IF YOU WANT TO COME AT 10:30 -- YOU'LL

**6**  NEED TO BUS YOUR TABLES BECAUSE THERE IS NO TELLING

**7**  WHO IS GOING TO BE HERE.  SO BUS YOUR TABLES.  IF YOU

**8**  WANT TO TRY TO STORE THINGS SOMEWHERE, YOU CAN.  YOU

**9**  CAN USE THIS TABLE OVER HERE.  NOBODY IS GOING TO GET

**10**  TO YOUR THINGS.  AND WE'LL CONVENE AS SOON AFTER

**11**  10:30'ISH AS WE CAN.  RECONVENE.

**12**      MS. MONTAGNES:  AND, YOUR HONOR, I NEGLECTED

**13**  TO MOVE IN PLAINTIFFS' EXHIBITS 71, 72 AND 73.

**14**      MR. ARCHEY:  YOUR HONOR, I OBJECT TO ALL OF

**15**  THOSE.  I DON'T EVEN KNOW WHAT THEY ARE AT THIS

**16**  POINT.  I THINK THOSE WERE THOSE DOCUMENTS HE SAID HE

**17**  DIDN'T RECOGNIZE AND DIDN'T KNOW AND THEY WERE

**18**  WEBSITES.

**19**      THE COURT:  ONE WAS THE WEBSITE THAT YOU

**20**  POINTED TO -- THIS IS 72 -- THE WEBSITE THAT WAS

**21**  POINTED TO BY THE DEFENDANTS AS THE FOUNDATION FOR

**22**  HIS STATEMENTS IN HIS REPORT AS TO THE PERCENTAGE OF

**23**  CORRECTIONAL FACILITIES THAT ARE ACCREDITED.  THE

**24**  COURT WILL --

**25**      MR. ARCHEY:  IS THAT 72, 73 AND 74?

**1**          **THE COURT:**  THAT'S 72.

**2**          **MR. ARCHEY:**  AND I THINK SHE DID THEM BY

**3**  PAGE.  RIGHT?

**4**          **MS. MONTAGNES:**  SO THE ACA WEBSITE IS 72.

**5**          **THE COURT:**  THE COURT IS GOING TO ADMIT THAT

**6**  OVER OBJECTION.  THE OBJECTION IS OVERRULED.

**7**          **MS. MONTAGNES:**  71 IS THE BJS --

**8**          **MR. ARCHEY:**  YOUR HONOR, WE NEVER -- THE ACA

**9**  DID NOT COME FROM US AT ALL.  I UNDERSTAND THE

**10**  COURT'S RULING.  BUT TO THE EXTENT THAT THAT WAS PART

**11**  OF THE COURT'S -- YOU KNOW, IF THAT AFFECTS THE

**12**  COURT.

**13**          **THE COURT:**  WELL -- OKAY.  WHETHER --

**14**  COUNSEL REPRESENTED THAT THE DEFENDANTS POINTED TO

**15**  THIS ACA WEBSITE AS THE FOUNDATION FOR HIS OPINIONS.

**16**          **MS. MONTAGNES:**  I THINK THERE IS CONFUSION,

**17**  YOUR HONOR, AND I CAN WALK US THROUGH IT.

**18**          **THE COURT:**  CLEAR IT UP.

**19**          **MS. MONTAGNES:**  SO PX_71 AND 72 RELATED TO

**20**  THE CALCULATION OF FACILITIES THAT WERE ACCREDITED.

**21**  THAT WAS JUST DOCUMENTS -- BJS STATISTICS AND ACA,

**22**  THAT CAME FROM US.

**23**          **THE COURT:**  THOSE COME IN AS IMPEACHMENT OF

**24**  HIS REPORT, SO 71 AND 72 ARE ADMITTED.  YOUR

**25**  OBJECTION IS OVERRULED.

1     **MS. MONTAGNES:**  AND PLAINTIFFS' EXHIBIT 73

2  AND 74, WHICH WERE THE SCREENSHOTTED PAGES OF THE

3  WEBSITE THAT WAS SENT TO US BY DEFENDANTS AS THE

4  BASIS FOR HIS REPORT.

5     **THE COURT:**  THOSE ARE THE NURSING SHORTAGES?

6     **MS. MONTAGNES:**  YES.

7     **THE COURT:**  DID YOU ALL SEND THAT

8  INFORMATION -- I MEAN, ARE WE IN AGREEMENT THAT THAT

9  INFORMATION WAS TRANSMITTED AS THE BASIS FOR HIS

10 REPORT?

11    **MR. ARCHEY:**  WE ARE IN AGREEMENT ON THAT,

12 YOUR HONOR.

13    **THE COURT:**  OKAY.  THE COURT'S APOLOGIES FOR

14 GETTING THAT BACKWARDS.  OKAY.  ALL THREE -- 73 AND

15 74, WHICH ARE REALLY THE SAME DOCUMENT, BUT 74 IS

16 MORE COMPLETE.

17    **MR. ARCHEY:**  CAN WE GET A COMPLETE COPY OF

18 IT, THOUGH?  A GOOD COPY OF IT?

19    **THE COURT:**  74 IS THE COMPLETE COPY.  AM I

20 CORRECT?

21    **MR. ARCHEY:**  IT'S STILL CUT OFF.

22    **MS. MONTAGNES:**  IT'S NOT, YOUR HONOR.  THESE

23 ARE SCREENSHOTS BECAUSE WE WERE TRYING TO CAPTURE THE

24 WEBSITE.  I'LL WORK TO TRY AND GET A SUBSTITUTED

25 EXHIBIT AND PROVIDE THAT FOR EVERYONE TOMORROW.

1          **THE COURT:**  WE'LL HAVE A SUBSTITUTE EXHIBIT

2    FOR 74 THAT WILL BE A COMPLETE COPY.

3               BUT YOUR OBJECTION IS OVERRULED AND THE

4    EXHIBITS ARE ADMITTED.

5          **MS. MONTAGNES:**  THANK YOU, YOUR HONOR.

6          **THE COURT:**  OKAY.  SO WE ALL KNOW WHAT WE'RE

7    DOING.  WE'LL SEE YOU ALL THEN IN THE MORNING.

8          **THE COURTROOM DEPUTY:**  73 ALSO?

9          **THE COURT:**  YES, 73 ALSO.

10              OKAY.  SEE Y'ALL IN THE MORNING.

11         **(WHEREUPON, THE TRIAL WAS ADJOURNED UNTIL**

12   **JUNE 16, 2022 AT 10:30 A.M.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I CERTIFY THAT THE FOREGOING IS A CORRECT

3   TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE

4   ABOVE-ENTITLED NUMBERED MATTER.

5   S:/NATALIE W. BREAUX

6   NATALIE W. BREAUX, RPR, CRR

7   OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25