```
 1                UNITED STATES DISTRICT COURT

 2                MIDDLE DISTRICT OF LOUISIANA

 3

 4   JOSEPH LEWIS, ET AL    : CIVIL ACTION

 5   VERSUS                 : NO. 15-318-SDD-RLB

 6   BURL CAIN, ET AL       : JUNE 17, 2022

 7   ========================================================
                           DAY 10
 8                       BENCH TRIAL
             BEFORE THE HONORABLE SHELLY D. DICK
 9           UNITED STATES CHIEF DISTRICT JUDGE

10

                     A P P E A R A N C E S
11

12   FOR THE PLAINTIFFS:

13       PROMISE OF JUSTICE INITIATIVE
         BY: MERCEDES HARDY MONTAGNES, ESQUIRE
14       BY: SAMANTHA NICOLE BOSALAVAGE, ESQUIRE
         BY: NISHI LAL KUMAR, ESQUIRE
15       1024 ELYSIAN FIELDS
         NEW ORLEANS, LOUISIANA 70118
16
         COHEN MILSTEIN SELLERS & TOLL PLLC
17       BY: JEFFREY DUBNER, ESQUIRE
         BY: BRENDAN R. SCHNEIDERMAN, ESQUIRE
18       1100 NEW YORK AVENUE NW
         SUITE 500
19       WASHINGTON, D.C. 20005

20       SOUTHERN POVERTY LAW CENTER
         BY: BRUCE WARFIELD HAMILTON, ESQUIRE
21       BY: EMILY BLYTHE LUBIN, ESQUIRE
         201 ST. CHARLES AVENUE
22       SUITE 2000
         NEW ORLEANS, LOUISIANA 70170
23
     FOR THE DEFENSE:
24
         BUTLER SNOW
25       BY: CONNELL LEE ARCHEY, ESQUIRE
         BY: RANDAL J. ROBERT, ESQUIRE
```

1    445 NORTH BOULEVARD
     SUITE 300
2    BATON ROUGE, LOUISIANA 70802

3    SHOWS, CALI, BERTHELOT & WALSH, L.L.P.
     BY: JOHN CLIFTON CONINE, JR., ESQUIRE
4    BY: JEFFREY K. CODY, ESQUIRE
     628 ST. LOUIS STREET
5    BATON ROUGE, LOUISIANA 70802

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20           REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
                 UNITED STATES COURTHOUSE
21                  777 FLORIDA STREET
               BATON ROUGE, LOUISIANA 70801
22          NATALIE_BREAUX@LAMD.USCOURTS.GOV
                    (225) 389-3565
23

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
24          COMPUTER-AIDED TRANSCRIPTION SOFTWARE

25

1                    I N D E X

2  DEFENSE WITNESS:

3   JENNIFER STICKELLS                        PAGE

4       DIRECT EXAMINATION BY MR. CONINE ..............9

5       CROSS-EXAMINATION BY MS. BOSALAVAGE ..........32

6       REDIRECT EXAMINATION MR. CONINE ..............50

7  DEFENSE WITNESS:

8  ASHLI OLIVEAUX

9       DIRECT EXAMINATION BY MR. CODY ...............52

10       CROSS-EXAMINATION BY MS. RAMASWAMY ...........80

11       REDIRECT EXAMINATION MR. CODY ................85

12  DEFENSE WITNESS:

13   SHARITA SPEARS

14       DIRECT EXAMINATION BY MR. CONINE .............87

15       CROSS-EXAMINATION BY MS. RAMASWAMY ..........107

16       REDIRECT EXAMINATION MR. CONINE .............116

17  DEFENSE WITNESS:

18   JACOB CHARLES JOHNSON, ED.D.

19       DIRECT EXAMINATION BY MR. ROBERT ............120

20       CROSS-EXAMINATION BY MR. DUBNER .............179

21       REDIRECT EXAMINATION MR. ROBERT .............225

22        DEFENSE RESTS .............................235

23

24  PLAINTIFFS' REBUTTAL WITNESS:

25   ANGELA GOEHRING

1    DIRECT EXAMINATION BY MS. MONTAGNES  ........238

2    CROSS-EXAMINATION BY MR. ARCHEY .............240

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **(JUNE 17, 2022)**

2                **(CALL TO THE ORDER OF COURT.)**

3                        **PROCEEDINGS**

4           **THE COURT:**  GOOD MORNING.  I APOLOGIZE FOR

5   THE LATE START.  IT'S JUST ALWAYS SOMETHING AROUND

6   HERE.

7                   OKAY.  NEXT WITNESS.

8                   DO Y'ALL WANT TO TALK ABOUT THE TIME?

9   I THINK WE'RE PROBABLY A-OKAY.

10          **MR. DUBNER:**  WE ARE.  WE CAN UPDATE JUST FOR

11  THE RECORD.  YESTERDAY -- ON THURSDAY DEFENDANTS USED

12  THREE HOURS AND NINE MINUTES, FOR A TOTAL OF 19 HOURS

13  AND 21 MINUTES.  PLAINTIFFS USED 58 MINUTES, FOR A

14  TOTAL OF 23 HOURS AND 31 MINUTES.

15          **THE COURT:**  Y'ALL ARE PRETTY -- Y'ALL ARE

16  NECK AND NECK.  OKAY.

17          **MR. DUBNER:**  AND THEN, YOUR HONOR, IF -- ONE

18  HOUSEKEEPING MATTER.  NOW THAT THE DEFENDANTS HAVE

19  INDICATED THAT THEY'RE GOING TO BE RESTING AFTER THE

20  CURRENT SET OF WITNESSES, WE'RE READY TO TALK ABOUT

21  REBUTTAL, IF THE COURT WOULD LIKE TO HEAR IT.  I

22  THINK THERE IS ONE ISSUE BETWEEN THE PARTIES AT THE

23  MOMENT.  AND WE CAN TALK ABOUT IT NOW OR LATER IN THE

24  DAY.

25          **THE COURT:**  WHAT IS THE ISSUE?  BECAUSE

1 MAYBE THE SOONER THAT WE GET IT RESOLVED, THE SOONER

2 THAT Y'ALL KNOW WHAT THE RESOLUTION IS.

3      **MR. DUBNER:**  ABSOLUTELY.  SO IT'S ABOUT THE

4 TESTIMONY OF COLONEL DARREN CASHIO, ONE OF THE

5 WITNESSES THE DEFENDANTS MAY CALL.  THIS WAS ONE OF

6 THE WITNESSES WHO THE COURT ORDERED A 30-MINUTE

7 DEPOSITION ABOUT THE SELF-DECLARED EMERGENCY MEMO.

8      WE WOULD LIKE TO INTRODUCE THAT

9 DEPOSITION OR CALL MR. CASHIO IN REBUTTAL TO RESPOND

10 TO SOME OF DEFENDANTS' ASSERTIONS ABOUT THE

11 SELF-DECLARED EMERGENCY POLICY.  WE'RE HAPPY TO JUST

12 DO IT BY THOSE DESIGNATIONS.  AND IT SEEMS THE

13 DEFENDANTS HAVE AN OBJECTION.

14      **THE COURT:**  WHAT'S THE DEFENDANTS' OBJECTION

15 TO THE DEPOSITION OF MR. CASHIO, OR OFFICER CASHIO?

16      **MR. ARCHEY:**  YOUR HONOR, HE'S NOT ON THE

17 PLAINTIFFS' LIST AT ALL.  HE WAS ON OUR MAY CALL

18 LIST.  AND WE'VE NOT CALLED HIM AND THAT'S OKAY, AND

19 THAT'S WHERE WE ARE.  SO WE DON'T --

20      **THE COURT:**  YOU'RE NOT SURPRISED.  HE WAS ON

21 YOUR MAIN CALL LIST.

22      **MR. ARCHEY:**  CORRECT.  WE DON'T KNOW -- AS

23 FAR AS HIS AVAILABILITY, I DON'T EVEN KNOW.  THIS

24 CAME TO US AT 8:30 LAST NIGHT, SO WE DON'T EVEN KNOW

25 IF HE'S AVAILABLE, AROUND, WHAT HAVE YOU.  I MEAN --

1  SO WE'VE GOT -- THERE IS THE OPTION THAT THEY'VE

2  GIVEN US OF USING HIS DEPOSITION OR CALLING HIM LIVE.

3  AND SO INITIALLY I DON'T THINK THIS IS REBUTTAL

4  EVIDENCE.  THEY SHOULD HAVE LISTED HIM IF THEY WANTED

5  HIM.  THAT'S NO. 1.

6           THE COURT:  WELL, THEY SAY IT'S REBUTTAL.

7  THEY SAY IT'S REBUTTAL OF THE SELF-DECLARED EMERGENCY

8  TESTIMONY.

9           MR. ROBERT:  IS IT LIMITED TO THAT SECOND

10  DEPOSITION?

11           MR. ARCHEY:  ARE WE LIMITING IT TO THE

12  SECOND DEPOSITION?

13           THE COURT:  THE 30-MINUTE DEPOSITION THAT

14  THE COURT --

15           MR. ARCHEY:  WE CAN AGREE TO THAT -- LIMITED

16  TO THAT, JUDGE.  THAT WILL WORK.

17           THE COURT:  SO THEN ON REBUTTAL YOU CAN

18  OFFER THE DEPOSITION OF OFFICER -- I GUESS IT'S

19  OFFICER CASHIO.

20           MR. DUBNER:  GREAT.  THANK YOU, YOUR HONOR.

21               AND THEN JUST A PREVIEW --

22           MR. ARCHEY:  YEAH, THE WHOLE DEPOSITION.

23           THE COURT:  THAT'S FINE.  I CAN READ 20

24  PAGES, MAYBE.

25           MR. DUBNER:  AND THEN JUST TO GIVE A PREVIEW

1    OF WHAT WE HAVE IN MIND, WE INTEND TO CALL

2    MS. GOEHRING BACK FOR PROBABLY ABOUT TEN MINUTES.  WE

3    WOULD BE HAPPY TO HAVE HER JUST TESTIFY OVER ZOOM TO

4    SAVE THE EXPENSE OF FLYING HER OUT FROM KANSAS.

5              OTHER THAN THAT, BARRING ANY SURPRISES

6    TODAY, WE'LL CERTAINLY NOT NEED THE FOUR HOURS THAT

7    WE HAD ANTICIPATED ORIGINALLY.  WE WOULD APPRECIATE

8    THE OPPORTUNITY FOR A BRIEF CLOSING ARGUMENT, IF THE

9    COURT IS AMENABLE TO IT.

10             **THE COURT:**  OKAY.  WELL, WE WON'T GET TO

11   THAT PROBABLY UNTIL TUESDAY.  SO HOPEFULLY MAYBE

12   YOU'LL REST TODAY.  IF NOT, THERE WILL BE A LITTLE

13   BIT OF CARRYOVER, AND THEN YOU'LL HAVE YOUR REBUTTAL

14   ON TUESDAY.  AND THEN I'LL CERTAINLY ENTERTAIN SOME

15   CLOSING ARGUMENTS AND I'LL GIVE Y'ALL A BRIEFING

16   SCHEDULE.

17             **MR. ARCHEY:**  SO DID I JUST UNDERSTAND IT'S

18   JUST MS. GOEHRING AND THE DEPOSITION?

19             **MR. DUBNER:**  BARRING ANY SURPRISES TODAY,

20   YES.

21             **MR. ARCHEY:**  THANK YOU.  YOUR HONOR, THANK

22   YOU.

23             **THE COURT:**  CALL YOUR NEXT WITNESS, PLEASE.

24

25

1          **MR. CONINE:**  GOOD MORNING, JUDGE.  JOHN

2   CONINE ON BEHALF OF THE DEFENDANTS.  WE CALL

3   MS. JENNIFER STICKELLS TO THE STAND.

4          **(WHEREUPON, JENNIFER STICKELLS, BEING DULY**

5   **SWORN, TESTIFIED AS FOLLOWS.)**

6          **THE COURT:**  OFF THE RECORD.

7          **(OFF THE RECORD.)**

8          **THE COURT:**  GOOD MORNING, MA'AM.  OKAY.

9          **THE COURTROOM DEPUTY:**  WOULD YOU STATE YOUR

10  NAME AND SPELL IT FOR THE RECORD, PLEASE.

11         **THE WITNESS:**  JENNIFER STICKELLS.

12  J-E-N-N-I-F-E-R S-T-I-C-K-E-L-L-S.

13                    **DIRECT EXAMINATION**

14  BY MR. CONINE:

15     **Q**   MS. STICKELLS, HOW ARE YOU CURRENTLY

16  EMPLOYED?

17     **A**   I AM A REGISTERED NURSE AT LOUISIANA STATE

18  PENITENTIARY.

19     **Q**   ARE YOU A PROGRAM COORDINATOR AT LSP?

20     **A**   YES.

21     **Q**   OKAY.  HOW LONG HAVE YOU HELD THAT POSITION?

22     **A**   APPROXIMATELY THREE YEARS.

23     **Q**   ARE YOU A REGISTERED NURSE?

24     **A**   YES.

25     **Q**   CAN YOU PLEASE GIVE THE COURT A BRIEF

1 BACKGROUND OF YOUR EDUCATION AS IT RELATES TO

2 NURSING?

3    **A**   I'VE BEEN A RN FOR A TOTAL OF 14 YEARS. I

4 INITIALLY STARTED OFF AS A REGISTERED NURSE AT A

5 HOSPITAL. AND THEN I WENT TO THE DEPARTMENT OF

6 CORRECTIONS AND I WORKED AT RAYMOND LABORDE FOR ABOUT

7 EIGHT YEARS, AND THEN I WENT WORK AT A NURSING HOME

8 FOR ABOUT A YEAR AND A HALF, AND THEN I ENDED UP BACK

9 AT -- IN THE STATE AT LSP.

10    **Q**   AND YOUR EDUCATION BACKGROUND, COULD YOU

11 PLEASE GIVE THE COURT A BRIEF OVERVIEW OF THAT?

12    **A**   FOUR YEARS OF NURSING AT LOUISIANA STATE

13 UNIVERSITY AT ALEXANDRIA.

14    **Q**   VERY GOOD. OKAY. IN YOUR CURRENT POSITION

15 DO YOU SUPERVISE ANY DEPARTMENTS?

16    **A**   YES. I'M OVER QUALITY ASSURANCE, ADA, STAFF

17 EDUCATION, HEALTH CARE ORDERLY TRAINING, AND RECENTLY

18 A CPR INSTRUCTOR.

19    **Q**   OKAY. AND DO YOU PROVIDE DIRECT PATIENT

20 CARE AT LSP?

21    **A**   AT TIMES I DO, WHEN THEY ASK ME TO WORK THE

22 UNITS, THE HOSPITAL WARD.

23       **THE COURT:** MA'AM, WILL YOU ADJUST -- PULL

24 THE MIC A LITTLE BIT TOWARD YOU? YOU'RE SOFT-SPOKEN

25 AND I'M HAVING A HARD TIME HEARING YOU, AND I THINK

1    THE COURT REPORTER IS, TOO.

2          **THE WITNESS:**  SORRY.  THAT'S GOOD?

3          **THE COURT:**  YEAH.

4    **Q**    OKAY, MS. STICKELLS.  WHEN I SAY "QA/QI," DO

5    YOU UNDERSTAND THAT TO MEAN QUALITY ASSURANCE/QUALITY

6    IMPROVEMENT?

7    **A**    CORRECT.

8    **Q**    I BELIEVE THAT WILL SAVE US A LITTLE TIME

9    HERE.  SO WHAT DOES THE QA/QI PROCESS INVOLVE?

10   **A**    QA/QI IS WHENEVER WE FIND AN ISSUE THAT

11   NEEDS TO BE RESOLVED AND WE GO THROUGH -- WE CAN DO

12   STUDIES, JUST ANYTHING -- ANY PROCESS THAT NEEDS

13   IMPROVEMENT.

14   **Q**    OKAY.  DO YOU MONITOR HEALTH CARE SERVICES

15   THROUGH QA/QI?

16   **A**    YES.

17   **Q**    GENERALLY CAN YOU EXPLAIN TO THE COURT HOW

18   THE QA/QI PROCESS WORKS?

19   **A**    SO THE PROCESS IS THERE IS A PROBLEM, WE

20   FIND A PROBLEM, AND THEN WE USE A CERTAIN METHOD TO

21   ORGANIZE IT TO SEE IF THERE IS ANY IMPROVEMENTS THAT

22   ARE NEEDED IN THE PROCESS.  AND THE STUDIES ARE

23   MONITORED FOR EFFECTIVENESS AND PRESENTED AT THE

24   QUARTERLY MEETINGS.

25   **Q**    ARE YOU FAMILIAR WITH LSP'S DIRECTIVE

1  RELATED TO QA/QI?

2     **A**   YES.

3         **MR. CONINE:**  BROOKE, CAN YOU PLEASE BRING UP

4  DX DASH -- DX_8-N, PLEASE?

5  **BY MR. CONINE:**

6     **Q**   MS. STICKELLS, DO YOU RECOGNIZE THIS

7  DOCUMENT?

8     **A**   YES.

9     **Q**   WHAT IS IT?

10    **A**   THIS IS THE -- I'M SORRY -- DIRECTIVE FOR

11 PEER REVIEW, INTERNAL REVIEW OF QUALITY INSURANCE.

12    **Q**   SO THIS IS THE DIRECTIVE FOR QA/QI?

13    **A**   YES.

14        **MR. CONINE:**  AT THIS TIME I'D LIKE TO OFFER

15 THIS DOCUMENT INTO EVIDENCE, YOUR HONOR.

16        **THE COURT:**  IS THERE ANY OBJECTION?  WHAT'S

17 THE EXHIBIT NUMBER AGAIN?  DX --

18        **MR. CONINE:**  DX_8-N.

19        **THE COURT:**  DASH N.  ANY OBJECTION?

20        **MS. BOSALAVAGE:**  NO OBJECTION.

21        **THE COURT:**  ADMITTED.

22 **BY MR. CONINE:**

23    **Q**   MS. STICKELLS, IN YOUR MIND, WHAT IS THE

24 PURPOSE OF QA/QI?

25    **A**   TO MONITOR OUR SERVICES THAT WE PROVIDE TO

1  MAKE SURE THERE IS CONSISTENCY AND ADEQUATE CARE IS

2  PROVIDED TO THE OFFENDER POPULATION.

3      Q    I'M GOING TO SHOW YOU ANOTHER DOCUMENT,

4  DX_49.1.

5          MR. CONINE:  BROOKE, CAN YOU PLEASE BRING

6  THAT UP?  THAT'S GOOD RIGHT THERE.

7  BY MR. CONINE:

8      Q    DO YOU RECOGNIZE THIS DOCUMENT, MS.

9  STICKELLS?

10     A    YES.

11     Q    PLEASE EXPLAIN TO THE COURT WHAT THIS IS.

12     A    THIS IS A TRAINING VERIFICATION ROSTER THAT

13 IS USED FOR OUR QUARTERLY MEETINGS.

14     Q    OKAY.  AND WHEN WAS THIS MEETING HELD?

15     A    APRIL 22, 2022.

16     Q    DID YOU ATTEND THIS MEETING?

17     A    YES.

18         MR. CONINE:  YOUR HONOR, I WOULD LIKE TO

19 ADMIT THIS DOCUMENT INTO EVIDENCE, JUST THIS FIRST

20 PAGE.  WE'RE GOING TO RUN THROUGH SOME OTHER

21 DOCUMENTS IN -- OR DOCUMENTS IN THIS PAGE OR GROUP OF

22 PDF.  BUT I WOULD LIKE TO ADMIT THIS INTO EVIDENCE AT

23 THIS TIME.

24         THE COURT:  SO JUST THIS ONE PAGE?

25         MR. CONINE:  YES, AT THE MOMENT.

1          **THE COURT:**  DX_49, ANY OBJECTION?

2          **MS. BOSALAVAGE:**  YOUR HONOR, PLAINTIFFS

3    WOULD JUST LIKE TO PRESERVE THEIR OBJECTION AS TO THE

4    DISCLOSURE OF THIS AFTER THE DISCOVERY CUT-OFF, JUST

5    FOR THE RECORD.

6          **THE COURT:**  SO NOTED.

7               ADMITTED.

8          **MR. CONINE:**  THANK YOU.

9    BY MR. CONINE:

10     Q    MS. STICKELLS, IS THERE A MEETING HELD IN

11   CONJUNCTION WITH THIS ROSTER?

12     A    YES.

13     Q    HOW OFTEN DO YOU MEET?

14     A    UNDER NORMAL CIRCUMSTANCES, QUARTERLY.

15     Q    IS THAT REQUIRED BY THE DIRECTIVE WE

16   DISCUSSED EARLIER?

17     A    YES.

18     Q    AND DO YOU TYPICALLY HAVE YOUR MEETINGS

19   AFTER THE CLOSE OF THE QUARTER?

20     A    CORRECT.

21     Q    SO THAT WOULD BE THE FOLLOWING MONTH AFTER

22   THE CLOSE OF THE QUARTER?

23     A    YES.

24     Q    WHO ATTENDED THIS MEETING?

25     A    MYSELF.  MS. KATIE IS ON THERE.  SHE'S OUR

1    MENTAL HEALTH DIRECTOR.  TONIA FAUST IS OUR HOSPICE

2    COORDINATOR.  WILL RICHIE IS OUR NURSING UNIT

3    MANAGER.  LISA LEMOINE IS OUR ADON.  JACOB JOHNSON IS

4    OUR HEALTH CARE ADMINISTRATOR.  LARS IS OUR PROGRAM

5    MANAGER -- I'M SORRY -- NURSE MANAGER.  CODY DELANEY

6    IS -- WELL, BYRON DELANEY ON HERE, HE'S MY

7    SUPERVISOR.  HE'S A REGISTERED NURSE.  SHAWANDA DIXON

8    IS THE CAPTAIN OF SECURITY IN THE TREATMENT CENTER.

9    PAUL TOCE IS OUR MEDICAL DIRECTOR.  AND, OF COURSE,

10   ASHLI OLIVEAUX, WHO IS OUR WARDEN, AND BILL HAWKINS,

11   WHO IS OUR DIRECTOR OF NURSES.

12       Q    ALL RIGHT.  ARE MEETING -- ARE MINUTES KEPT

13   OF THESE MEETINGS?

14       A    YES.

15            MR. CONINE:  BROOKE, CAN YOU SCROLL DOWN ONE

16   PAGE, PLEASE?

17   BY MR. CONINE:

18       Q    DO YOU RECOGNIZE THIS DOCUMENT?

19       A    YES.

20       Q    PLEASE IDENTIFY IT FOR THE COURT.

21       A    THIS IS THE 2022 FIRST QUARTER QUALITY

22   IMPROVEMENT MEETING FOR JANUARY, FEBRUARY, MARCH.

23       Q    ALL RIGHT.  AND CAN YOU BRIEFLY EXPLAIN TO

24   THE COURT HOW THE MEETINGS ARE CONDUCTED?

25       A    OKAY.  SO I'LL SUBMIT AN EMAIL TO ALL THE

1  DEPARTMENT HEADS AND ANYONE WHO USUALLY ATTENDS, AND

2  WE'LL USUALLY MEET IN THE WARDEN'S OFFICE AT THE

3  TABLE WHERE THEY HOLD THE MORNING MEETINGS.  AND THEN

4  WE GO THROUGH EACH STUDY AND DISCUSS IT AND SEE IF WE

5  CAN COME TO ANY CONCLUSIONS OF ANY DEFICIENCIES, ANY

6  PROCESSES THAT NEED IMPROVEMENT.  IT'S ALL DETERMINED

7  RIGHT THERE.

8      Q    ALL RIGHT.  AND DO YOU SEE WHERE IT SAYS

9  "OLD BUSINESS: NONE?"  DO YOU SEE THAT?

10     A    YES.

11     Q    WHAT DOES THAT MEAN?

12     A    IT ACTUALLY -- IT'S NOT THAT WE DON'T TALK

13 ABOUT OLD BUSINESS.  IT'S JUST SOMETHING -- IT

14 PROBABLY NEEDS TO BE REVISED AND CHANGED TO MAYBE

15 "DISCUSSED AT THIS MEETING," OR JUST "REFER TO THE

16 PREVIOUS MEETING" IS PROBABLY WHAT IT SHOULD SAY.

17     Q    SO DO YOU DISCUSS PREVIOUS STUDIES?

18     A    YES, WE HAVE.

19     Q    AND THIS PARTICULAR MEETING HERE, WHAT

20 STUDIES WERE DISCUSSED?

21     A    WE DISCUSSED REQUESTS FOR ACCOMMODATIONS,

22 THE INFECTION CONTROL, SUICIDE FOLLOW-UP, EMERGENCY

23 DOCUMENTATION STUDY; DATE, TIME AND SIGNATURE STUDY

24 ON THE PHYSICIAN'S ORDERS, AND 24-HOUR CHART CHECKS,

25 AND WE DISCUSSED THE WORKLOAD INDICATORS.

1      Q    OKAY.  AND JUST GENERALLY, WHAT IS A QA/QI

2   STUDY?

3      A    IT'S A STUDY THAT A PROBLEM IS PRESENTED,

4   AND SO THE -- I USE AN ORGANIZED METHODOLOGY TO SEE

5   IF THERE IS ANY IMPROVEMENT NEEDED FOR A PROCESS OF

6   THE PROBLEM THAT'S BEEN GIVEN.

7      Q    OKAY.  AND HOW ARE THESE STUDIES SELECTED?

8      A    THEY CAN BE BROUGHT ABOUT BY JUST ABOUT

9   ANYONE.  I KNOW RECENTLY THE LAST STUDY -- ONE OF OUR

10  LAST STUDIES WAS BROUGHT TO ME BY THE PHARMACIST.

11  BUT USUALLY IT'S, YOU KNOW, THE DON, ADON, DR. JACOB.

12  ANYBODY CAN SAY "HEY, I THINK WE NEED A QI STUDY ON

13  THIS.  WE'VE COME ACROSS A ISSUE."

14     Q    WHAT WAS THAT STUDY THAT YOU JUST MENTIONED?

15     A    THE -- THE ONE BROUGHT BY THE PHARMACIST?

16     Q    YES, MA'AM.

17     A    THAT'S THE CAMP D MARs NO-SHOW DOCUMENTATION

18  STUDY.

19     Q    SO THAT WILL BE IMPLEMENTED ON THE NEXT --

20     A    THE NEXT, YES.

21     Q    ALL RIGHT.  SO YOU MENTIONED EARLIER ABOUT

22  RESULTS BEING MEASURED.  HOW ARE RESULTS MEASURED?

23     A    A LOT OF TIMES I'LL LEAVE LIKE THE PREVIOUS

24  QUARTER'S RESULTS ON THE STUDY OR ON THE WORKLOAD

25  INDICATOR SO THAT YOU CAN OBVIOUSLY SEE WHAT IT WAS

1    THE PREVIOUS QUARTER.  AND USUALLY UNDER THE ACT --

2    BECAUSE THE ACRONYM IS FOCUS PDCA.  USUALLY UNDER ACT

3    IT WILL HAVE LIKE THE PERCENTAGE THIS QUARTER IS 98

4    PERCENT AS COMPARED TO LAST QUARTER, 97 PERCENT; TO

5    THAT EFFECT.

6        Q    SO YOU DO CHECK RESULTS AGAINST PREVIOUS

7    MEASURE RESULTS?

8        A    ABSOLUTELY.

9        Q    AND IS RESEARCH CONDUCTED?

10       A    YES.

11       Q    DO YOU MAKE RECOMMENDATIONS FOR IMPROVEMENT

12   ACTIONS BASED OFF THOSE STUDIES?

13       A    YES.

14       Q    AND I BELIEVE YOU MIGHT HAVE JUST TOUCHED ON

15   THIS.  THE FOCUS PDCA METHOD, WHAT DOES THAT MEAN TO

16   YOU?

17       A    THAT'S AN ACRONYM USED.  IT'S LIKE AN

18   ANALYTIC TOOL, AND IT JUST ORGANIZES THE PROCESS THAT

19   WE USE IN THE STUDY.

20       Q    VERY GOOD.  WHAT IS THE GOAL OF THESE

21   MEETINGS?

22       A    TO DISCOVER IF THERE IS ANY DEFICIENCIES

23   WHERE WE NEED TO IMPROVE ACCORDING TO THE PROBLEM

24   THAT'S FOUND.

25       Q    OKAY.  AND WHAT, IF ANYTHING, HAPPENS TO THE

1 | INFORMATION AFTER THE MEETING IS OVER?

2 |    **A**   I USUALLY -- EVERYTHING IS SCANNED, SO I

3 | EMAIL IT TO THE DIRECTOR OF NURSES.  AND IN HIS

4 | ABSENCE I HAVE EMAILED IT TO ASHLI OLIVEAUX, OUR

5 | WARDEN.  AND I HAVE EMAILED IT TO STACYE RODRIGUEZ AT

6 | HEADQUARTERS.

7 |    **Q**   ALL RIGHT.  SINCE YOU TOOK OVER THE QA/QI

8 | PROGRAM, WHAT STUDIES HAVE YOU ADDED, IF ANY?

9 |    **A**   I HAVE ADDED THE WORKLOAD INDICATORS AND --

10 |    **Q**   CAN YOU PLEASE ELABORATE ON WHAT THOSE SHOW?

11 |    **A**   WELL, THE WORKLOAD INDICATORS, IT LETS -- IT

12 | CAN BE USED AS A REFERENCE TOOL.  AND IT'S REALLY

13 | GOOD TO LOOK AT IF -- IT LET'S US KNOW WHAT EVERYBODY

14 | IN THE MEDICAL DEPARTMENT IS DOING AND -- I MEAN,

15 | LIKE YOU CAN SEE THE NUMBER OF LABS THAT ARE BEING

16 | PERFORMED; YOU CAN SEE HOW MANY SICK CALLS WERE MADE.

17 |    YOU KNOW, IF WE SEE A RISE OR A DECREASE IN

18 | ANY OF THESE NUMBERS, IT CAN ALERT US TO AN ISSUE

19 | SOMEWHERE THAT, NO, WE DIDN'T CATCH BEFORE.

20 |    **Q**   AND YOU MENTIONED A NEW STUDY OF CAMP B MARs

21 | NO-SHOW DOCUMENTATION.  IS THAT RIGHT?

22 |    **A**   YES.

23 |    **Q**   ARE THERE OTHERS?

24 |    **A**   YES.  WE'RE CURRENTLY WORKING ON

25 | SELF-DECLARED EMERGENCIES AND UTILIZATION OF

1  INDIVIDUAL TREATMENT ORDERS.

2      **Q**   CAN YOU PLEASE EXPLAIN THAT TO THE COURT?

3      **A**   SO THE SELF-DECLARED EMERGENCIES, THAT

4  USUALLY OCCUR DURING HOURS WHERE THERE IS NO NURSE

5  PRACTITIONER ON SITE, WHICH IS USUALLY MONDAY THROUGH

6  THURSDAY BETWEEN 5P AND 5A.  IF THE EMS TEAM HAS TO

7  GO OUTSIDE OF THE INDIVIDUAL TREATMENT ORDER, IT'S

8  JUST TO MAKE SURE THAT THEY NOTIFY THE NURSE

9  PRACTITIONER FOR ANY FURTHER INSTRUCTIONS.  AND IT

10 ALSO HELPS US, LIKE A CHECK-OFF, YOU KNOW, IF ALL THE

11 PERTINENT INFORMATION IS BEING PUT ON THE FORM.

12     **Q**   OKAY.  LET'S TALK ABOUT ORDERLY TRAINING

13 NOW.  THAT IS ALSO ONE OF YOUR DUTIES.  CORRECT?

14     **A**   YES.

15     **Q**   ALL RIGHT.  WHAT IS YOUR ROLE AS IT RELATES

16 TO THE HEALTH CARE ORDERLIES?

17     **A**   I DO THE TRAINING, I CONDUCT THE CLASSES,

18 TRADITIONALLY LECTURE THAT I JUST INCORPORATED A DVD,

19 LIKE A -- IT SHOWS EACH SKILL.

20         **MS. BOSALAVAGE:**  OBJECTION.

21         **THE COURT:**  WHAT'S YOUR OBJECTION?

22         **MS. BOSALAVAGE:**  YOUR HONOR, I BELIEVE NURSE

23 STICKELLS IS TESTIFYING TO WHAT WE HEARD DR. MATHIS

24 TESTIFY ABOUT.  AND FOLLOWING DR. MATHIS' TESTIMONY

25 ON THIS, WE CONSULTED WITH DEFENDANT AND THEY SAID

1  THEY WERE NOT GOING TO BE BRINGING UP THE DVD AND SO

2  REFUSED TO PRODUCE IT TO US.

3          MR. CONINE:  TO BE FAIR, I DID NOT ASK HER

4  ABOUT THAT, BUT WE CAN NOT MENTION THAT IF THAT IS

5  THE COURT'S RULING.

6          THE COURT:  THE QUESTION DIDN'T CALL FOR THE

7  DVD.  DID Y'ALL AGREE THAT YOU WEREN'T GOING TO GO

8  INTO THE DVD?

9          MR. ARCHEY:  I DON'T KNOW THAT WE HAD THAT

10 KIND OF AGREEMENT.

11          MR. ROBERT:  WE DIDN'T PRODUCE IT TO THEM.

12 I KNOW THAT.

13          THE COURT:  OKAY.  THEN THE OBJECTION WILL

14 BE SUSTAINED.  AND SO HE DIDN'T CALL FOR INFORMATION

15 ABOUT THE DVD AND WE'RE NOT GOING TO HEAR TESTIMONY

16 ABOUT THE DVD.

17 BY MR. CONINE:

18    Q    THANK YOU, MS. STICKELLS.  LET'S SEE.  ARE

19 YOU FAMILIAR WITH LSP'S DIRECTIVE RELATED TO HEALTH

20 CARE ORDERLIES?

21    A    YES.

22          MR. CONINE:  BROOKE, CAN YOU PLEASE BRING UP

23 DX_8-MMM?

24 BY MR. CONINE:

25    Q    IT'S ON YOUR SCREEN THERE.  DO YOU RECOGNIZE

1   THIS DOCUMENT?

2        **A**    YES.

3        **Q**    WHAT IS IT?

4        **A**    THIS IS THE DIRECTIVE FOR USE OF OFFENDERS

5   IN HEALTH CARE.

6        **Q**    DOES THIS DIRECTIVE ALLOW FOR OFFENDERS TO

7   PROVIDE DIRECT PATIENT CARE?

8        **A**    IT CLEARLY STATES IT DOES NOT.

9             **MR. CONINE:**  WE'D LIKE TO OFFER THIS

10  DOCUMENT INTO EVIDENCE, YOUR HONOR.

11            **MS. BOSALAVAGE:**  NO OBJECTION.

12            **THE COURT:**  ADMITTED.  WHAT'S THE EXHIBIT

13  NUMBER?

14            **MR. CONINE:**  THIS IS DX_8-MMM.

15            **THE COURT:**  OKAY.  IT'S ADMITTED.

16  BY MR. CONINE:

17       **Q**    ALL RIGHT.  LET'S TALK ABOUT THE TRAINING

18  PROGRAM.  CAN YOU PLEASE DESCRIBE THE CURRENT

19  TRAINING PROGRAM TO THE COURT, WITHOUT GETTING INTO

20  THE DVD?

21       **A**    CERTAINLY.  SO TYPICALLY I ARRANGE FOR THEM

22  TO MEET ME IN THE TREATMENT CENTER CHAPEL.  WE GO IN

23  THERE AND I HAVE -- I DON'T KNOW EXACTLY WHAT IT'S

24  CALLED, BUT IT'S ON THE SCREEN.  IT'S FROM A LAPTOP

25  AND IT'S PROJECTED ON A SCREEN AND IT'S A POWERPOINT.

1   AND I ALSO GIVE THEM A HAND-OUT OF THE POWERPOINT.

2           AND SO WE GO THROUGH EACH THING.  IT TAKES

3   ABOUT FIVE DAYS; A FIVE-DAY COURSE.  AND ONE DAY IT'S

4   THREE DAY -- I'M SORRY -- FOUR DAYS OF LECTURE AND

5   ONE DAY OF HANDS ON.  AND THEY LEARN -- WE GO THROUGH

6   THE WHOLE POWERPOINT, WHATEVER IS ON THE POWERPOINT,

7   SUCH AS -- WANT ME TO EXPLAIN WHAT'S ON THERE?

8      Q   SURE.

9      A   OKAY.  SO WE DO LIKE THE ROLES OF THE

10  HEALTH CARE ORDERLY.  I TEACH THEM ABOUT ETHICS.

11  THEY NEED TO DISTINGUISH BETWEEN ABUSE AND NEGLECT

12  AND HOW TO REPORT IT, IF ANY OBSERVED; COMMUNICATING

13  WITH PATIENTS, TRANSFERS, BODY MECHANICS,

14  REPOSITIONING.  I USED TO BE A WOUND CARE NURSE, SO

15  I'M A BIG STICKLER ON WOUND CARE PREVENTION, WHICH IS

16  LIKE FLOATING HEELS, TURNING, REPOSITIONING, ADLs.

17           MR. CONINE:  BROOKE, CAN YOU PLEASE BRING UP

18  DX_47.

19  BY MR. CONINE:

20     Q   IS THIS THE POWERPOINT YOU JUST DESCRIBED?

21     A   YES.

22     Q   SO THIS IS WHAT YOU AND THE CANDIDATES GO

23  OVER IN THE LECTURE SETTING.  CORRECT?

24     A   CORRECT.

25     Q   ALL RIGHT.  AND THERE IS ALSO A HANDS-ON --

1    I MEAN -- YES, IT'S A HANDS-ON SETTING?

2        A    YES.

3        Q    AND WHERE IS THAT DONE?

4        A    IN NURSING UNIT 2.

5        Q    OKAY.  AND --

6        A    THOSE ARE MORE NURSING ON PATIENTS SO THEY

7    CAN GET A BETTER IDEA -- YOU KNOW, IT'S A BETTER

8    SETTING.

9        Q    ALL RIGHT.  VERY GOOD.  SO THIS -- DOES THIS

10   POWERPOINT COVER ABUSE AND NEGLECT?

11       A    YES.

12       Q    AND BODY MECHANICS?

13       A    YES.

14           MR. CONINE:  I WOULD -- AT THIS TIME I WOULD

15   LIKE TO OFFER, FILE, AND INTRODUCE THIS DOCUMENT

16   MARKED AS DX_47 INTO EVIDENCE.

17           THE COURT:  ANY OBJECTION TO DX_47?

18           MS. BOSALAVAGE:  AGAIN, WE JUST WANT TO NOTE

19   OUR OBJECTION ABOUT IT BEING PRODUCED PAST THE

20   DISCOVERY CUT-OFF.

21           THE COURT:  NOTED.

22               DX_47 IS ADMITTED.

23   BY MR. CONINE:

24       Q    MS. STICKELLS, ARE YOU CERTIFIED TO TEACH

25   BLS CLASSES?

1      **A**    YES.

2      **Q**    AND IN THE FUTURE WILL YOU TEACH THOSE TO

3   HEALTH CARE ORDERLIES?

4           **MS. BOSALAVAGE:**  OBJECTION.

5           **THE COURT:**  WHAT'S THE OBJECTION?

6           **MS. BOSALAVAGE:**  YOUR HONOR, SHE HAS

7   NOT INDICATED -- DID NOT TESTIFY TO THIS IN HER

8   DEPOSITION.  THIS IS THE FIRST TIME WE'RE HEARING OF

9   THIS.

10          **THE COURT:**  IS SHE ONE OF THE ONES THAT I

11  LET YOU TAKE AN ADDITIONAL DEPOSITION OF?

12          **MS. BOSALAVAGE:**  NO.

13          **THE COURT:**  I MEAN, I CAN'T HELP IT IF YOU

14  DIDN'T ASK HER IN HER DEPOSITION.

15          **MS. BOSALAVAGE:**  WE DID ASK HER WHETHER IT

16  ENTAILED ANY HEALTH CARE ORDERLY TRAINING, AND THIS

17  WAS NOT A PART OF IT.  WE ASKED IF THERE WERE ANY

18  PLANS TO CHANGE IT.  SHE DID NOT INDICATE THERE WAS

19  GOING TO BE ANY PLAN TO INCREASE THE TRAINING WITH

20  THIS NEW ASPECT.

21          **THE COURT:**  ALL RIGHT.  MR. CONINE, WHY ARE

22  THEY NOT PREJUDICIALLY SURPRISED?

23          **MR. CONINE:**  THIS IS THE CURRENT CONDITION,

24  YOUR HONOR.  SHE JUST RECENTLY HAD THE --

25          **THE COURT:**  I GET IT, IT'S THE CURRENT

1   CONDITION.  BUT I MEAN, THERE ARE RULES OF FAIR PLAY,

2   AND THEY DIDN'T KNOW ABOUT IT.

3          **MR. CONINE:**  RIGHT.  OKAY.  I WAS JUST

4   ASKING HER ABOUT, YOU KNOW, FUTURE PLANS AND WHAT SHE

5   PLANS TO DO IN THE FUTURE, AND THAT WAS JUST ALL THE

6   QUESTION I HAD.

7          **THE COURT:**  PERHAPS YOU CAN PROFFER IT.

8          **MR. CONINE:**  OKAY.  THANK YOU.  WE WILL DO

9   THAT, YOUR HONOR.

10         **THE COURT:**  SO THIS IS PART OF A PROFFER

11  RIGHT HERE?

12         **MR. CONINE:**  NO.

13         **THE COURT:**  NO?  OKAY.  GO AHEAD.

14         **MR. CONINE:**  YES.  OKAY, WE'LL PROFFER IT --

15  WE WILL PROFFER IT NOW.  THERE'S A PARROT ON MY

16  SHOULDER.

17         **THE COURT:**  OKAY.  THERE IS AN ANGEL ON YOUR

18  SHOULDER, SO THAT YOU'RE MAKING A PROFFER NOW OR ARE

19  YOU GOING TO MAKE A PROFFER IN A LITTLE WHILE?

20         **MR. CONINE:**  NOW.  RIGHT NOW.

21         **(WHEREUPON, DEFENSE COUNSEL PRESENTED A**

22  **PROFFER THAT WAS TRANSCRIBED AND PLACED IN A SEPARATE**

23  **TRANSCRIPT.)**

24         **MR. CONINE:**  BROOKE, CAN WE PULL THAT

25  DOCUMENT BACK UP, DX_47, AND GO TO PAGE 33?

1    BY MR. CONINE:

2        Q    SO, MS. STICKELLS, DID YOU UPDATE THIS

3    LECTURE POWERPOINT RECENTLY?

4        A    YES.

5        Q    WHEN WAS THAT?

6        A    PROBABLY IN EITHER MARCH OR MAY.

7        Q    ALL RIGHT.  CAN YOU BRIEFLY EXPLAIN TO THE

8    COURT WHAT YOU ADDED?

9        A    I ADDED THIS WHEELCHAIR SAFETY TIP RIGHT

10   HERE, BECAUSE I HAVE EXPERIENCED AN ORDERLY PLACE AN

11   OFFENDER IN A WHEELCHAIR AND IT WAS NOT BEING LOCKED,

12   WHICH COULD POSSIBLY LEAD TO FURTHER INJURY.  SO I

13   THINK IT'S VERY IMPORTANT TO STRESS WHEELCHAIR

14   SAFETY.  AND I TELL THEM ALL THE TIME:  "IF THERE IS

15   ANYTHING YOU HAVEN'T LEARNED, IT'S LOCK THE

16   WHEELCHAIR."  OKAY?  THAT'S THE ONE THING YOU LEARN,

17   PLEASE.  AND SO IT'S JUST SOMETHING I LIKE TO FOCUS

18   ON.

19       Q    OKAY.

20           MR. CONINE:  BROOKE, CAN WE GO TO DX_47.27,

21   PLEASE?

22   BY MR. CONINE:

23       Q    ARE YOU FAMILIAR WITH THIS DOCUMENT, MS.

24   STICKELLS?

25       A    YES.

1      Q    WHAT IS THIS?

2      A    THIS IS THE CHECK-OFF LIST FOR WHENEVER

3   WE'RE DOING HANDS ON.  AND IT LET'S ME KNOW IF

4   THEY'RE DOING PROPER BODY MECHANICS, BED TO PIVOT

5   TRANSFER.  IN THEIR PATIENT POSITION THEY GO THROUGH

6   THESE THINGS, AND IF THEY DO IT CORRECTLY THEY GET A

7   CHECK AND THEN I SIGN OFF ON IT.

8      Q    THAT IS YOUR SIGNATURE AT THE BOTTOM?

9      A    YES.

10     Q    LET'S SEE.  ARE ORDERLIES REQUIRED TO SIGN

11  CONFIDENTIALITY FORMS?

12     A    YES.

13        MR. CONINE:  BROOKE, CAN YOU GO TO PAGE 66

14  OF THIS DOCUMENT?

15  BY MR. CONINE:

16     Q    IS THAT WHAT WE'RE LOOKING AT HERE?

17     A    THAT'S CORRECT.

18        MR. CONINE:  ALL RIGHT.  IF I HAVE NOT

19  ALREADY DONE SO, I WOULD LIKE TO OFFER DX_47 INTO

20  EVIDENCE.

21        MS. BOSALAVAGE:  HE ALREADY DID.

22        MR. CONINE:  ALL RIGHT.  GREAT.

23        THE COURT:  47 IS ALREADY IN EVIDENCE.

24  BY MR. CONINE:

25     Q    MS. STICKELLS, HOW OFTEN DO YOU TEACH HEALTH

1   CARE ORDERLY TRAINING CLASSES?

2       **A**   WELL, USUALLY IT'S BROUGHT TO MY ATTENTION

3   BY DR. JACOB.  HE HAS A LIST AND THEN HE'LL EMAIL IT

4   TO ME, AND I'LL GET IT SCREENED BY SECURITY.  WE HAVE

5   TO GO THROUGH A SECURITY SCREENING.  AND SOMETIMES --

6   I MEAN, IT'S WHENEVER -- IT'S AS NEEDED.

7           BUT I HAVE MENTIONED TO DR. JACOB IN THE

8   PAST THAT IT NEEDS TO BE DONE AT LEAST QUARTERLY.

9       **Q**   OKAY.  AND WHY ARE THESE NAMES VETTED?

10      **A**   I'M SORRY?

11      **Q**   WHY ARE THE NAMES SCREENED?

12      **A**   WELL, WE NEED TO KNOW IF THEY HAVE ANY

13  DISCIPLINARY ACTION, YOU KNOW, IF THEY HAVE A HISTORY

14  OF ANY TYPE OF, YOU KNOW, SOMETHING -- THEY HAVE TO

15  MEET THAT CRITERIA IN ORDER TO BE A HEALTH CARE

16  ORDERLY.  YOU DON'T WANT SOMEONE IN THERE THAT'S

17  HAVING MULTIPLE DISCIPLINARY ACTIONS FOR THEFT OR

18  STRONG-ARMING SOMEBODY OR SOMETHING LIKE THAT.  WE

19  LIKE TO KEEP THE PATIENTS SAFE.

20      **Q**   ALL RIGHT.  WHO SUPERVISES THE HEALTH CARE

21  ORDERLIES ON THE UNITS?

22      **A**   THE NURSES AND SECURITY.

23      **Q**   ALL RIGHT.  AND AS THE TRAINING COORDINATOR,

24  ARE YOU AVAILABLE FOR QUESTIONS OR ISSUES?

25      **A**   ABSOLUTELY.

1      Q    OKAY.  AS THE HEALTH CARE ORDERLY TRAINING

2  COORDINATOR, HOW WOULD YOU HANDLE A COMPLAINT ABOUT

3  AN ORDERLY?

4      A    A COMPLAINT ABOUT AN ORDERLY?

5      Q    YES, MA'AM.

6      A    IF SOMEONE WAS TO COME TO ME AND HAD A

7  COMPLAINT ABOUT AN ORDERLY, I WOULD GO TO THE CAPTAIN

8  OF SECURITY AND POSSIBLY DR. JACOB.

9      Q    OKAY.  AND DO YOU FEEL THAT ORDERLIES ARE

10  SUFFICIENTLY TRAINED?

11      A    ABSOLUTELY.

12      Q    AND HOW DO YOU KNOW THAT THEY'RE FOLLOWING

13  THEIR TRAINING?

14      A    I'M SORRY?

15      Q    HOW DO YOU KNOW THAT THEY ARE FOLLOWING

16  THEIR TRAINING?

17      A    WELL, THE NURSES WILL LET ME KNOW, FOR ONE,

18  IF THEY'RE NOT.  AND I ALSO GO AND I CHECK ON THEM

19  MYSELF.  I'LL MAKE ROUNDS.

20      Q    OKAY.  LET'S MOVE OFF THAT TOPIC AND TALK

21  ABOUT SOME OF YOUR DIRECT PATIENT CARE.

22          YOU WERE A REGISTERED NURSE AT ANGOLA DURING

23  COVID.  RIGHT?

24      A    CORRECT.

25      Q    WHAT WAS YOUR ROLE AT LSP DURING COVID?

1      **A**    I WAS INSTRUCTED TO GO AND PERFORM DUTIES AT

2    CAMP J COVID UNIT AND -- WHERE WE TOOK -- WE HOUSED

3    OFFENDERS FROM ALL OVER THE STATE, ALL PARISHES.  AND

4    WE GAVE THEM THEIR MEDICATIONS, ANY TREATMENTS

5    NEEDED.  WE TOOK CARE OF THEM THERE.  12-HOUR SHIFTS.

6      **Q**    AND SO WERE YOU ALLOWED TO COME BACK TO THE

7    TREATMENT UNIT?

8      **A**    ABSOLUTELY NOT.

9      **Q**    SO YOU WERE ISOLATED AT CAMP J?

10     **A**    CORRECT.

11     **Q**    MS. STICKELLS, HAVE YOU EVER HAD A

12   RESTRICTION ON YOUR LICENSE?

13     **A**    NO.

14        **MR. CONINE:**  THAT'S ALL THE QUESTIONS I

15   HAVE.

16           I DO WANT TO OFFER, FILE AND -- OR

17   OFFER AND INTRODUCE DX_49, THE ENTIRE DOCUMENT.  I

18   BELIEVE I ONLY OFFERED DX_49.1.  BUT I'D ALSO LIKE TO

19   DO 2 THROUGH 29 AS WELL.

20        **THE COURT:**  IS THERE ANY OBJECTION TO DX_49?

21        **MS. BOSALAVAGE:**  SAME OBJECTION, YOUR HONOR.

22   JUST PRESERVING THE RECORD.

23        **THE COURT:**  NOTED.

24           ADMITTED.

25           DO YOU HAVE CROSS?

1          MS. BOSALAVAGE:  YES, YOUR HONOR.

2              SAMANTHA BOSALAVAGE FOR THE PLAINTIFFS.

3                  CROSS-EXAMINATION

4   BY MS. BOSALAVAGE:

5      Q    GOOD MORNING, MS. STICKELLS.

6      A    GOOD MORNING.

7      Q    THE MAJORITY OF YOUR CAREER AS A NURSE HAS

8   BEEN IN CORRECTIONS.  CORRECT?

9      A    CORRECT.

10     Q    AND YOU'VE NEVER RECEIVED FORMAL TRAINING ON

11  RUNNING A QUALITY IMPROVEMENT AND QUALITY ASSESSMENT

12  PROGRAM.  RIGHT?

13     A    WHAT DO YOU MEAN AS FORMAL?

14     Q    YOU'VE ONLY RECEIVED ON-THE-JOB TRAINING?

15  NO FORMAL TRAINING IN IT.  CORRECT?

16     A    CORRECT.

17     Q    WHEN YOU TOOK OVER THE QA/QI PROGRAM IN

18  2019, YOU NOTICED THERE WERE THINGS THAT NEEDED

19  IMPROVEMENT.  RIGHT?

20     A    YES.

21     Q    AT YOUR DEPOSITION WHEN PRESENTED WITH THIS

22  COURT'S FINDING THAT THE LSP QA/QI PROGRAM WAS

23  LACKING, YOU AGREED.  RIGHT?

24     A    THAT'S RIGHT.

25     Q    AND IN THE THREE YEARS THAT YOU'VE TAKEN

1  OVER THE QI/QA PROGRAM, THERE HAVE ONLY BEEN TWO NEW

2  STUDIES ADDED SO FAR.  RIGHT?

3      A    TWO NEW STUDIES AND THE WORKLOAD INDICATORS.

4      Q    THE 24-HOUR CHART CHECKS IS ONE OF THEM.

5  CORRECT?

6      A    24-HOUR CHART CHECKS, YES.

7      Q    WORKLOAD INDICATORS?

8      A    WORKLOAD INDICATORS.

9      Q    WHAT'S THE THIRD?

10     A    WELL, WE HAVE THE OTHER TWO --

11     Q    THOSE HAD NOT YET -- HAVE NOT PRODUCED ANY

12 REPORTS.  CORRECT?

13     A    CORRECT.

14     Q    SO FAR THERE HAVE JUST BEEN TWO NEW STUDIES

15 ADDED IN THE THREE YEARS.  CORRECT?

16     A    THAT'S RIGHT.

17     Q    LET'S PULL UP ONE OF THOSE STUDIES, STARTING

18 WITH THE MOST RECENT 24-HOUR CHART CHECK FROM THE

19 MATERIALS DISCLOSED WITHIN THE DISCOVERY PERIOD OF

20 THIS CASE, WHICH IS PX_34-A AT 11.

21          THIS IS THE 2021 FOURTH QUARTER QI 24-HOUR

22 CHART CHECK REPORT.  CORRECT?

23     A    CORRECT.

24     Q    AND IF WE CAN GO TO THE NEXT PAGE, WE SEE

25 THE SECOND AND FINAL PAGE OF THIS REPORT.  CORRECT?

1      **A**    YES.

2      **Q**    AND THE OUTCOME OF THE STUDY FOR THIS

3  QUARTER WAS COMPLIANCE AVERAGED 91 PERCENT FOR THIS

4  QUARTER.  CORRECT?

5      **A**    YES.

6      **Q**    AND THAT FINDING IS BASED ON AVERAGING OUT

7  EACH MONTH IN THIS QUARTER AS REPRESENTED IN THIS BAR

8  GRAPH.  CORRECT?

9      **A**    YES.

10      **Q**    LET'S PULL UP ONE OF THESE NURSING CHART

11  CHECKS.  I'M PULLING UP WHAT HAS BEEN PREVIOUSLY

12  MARKED AS JX_22 AT 872.

13          **MS. BOSALAVAGE:**  AND THIS IS SEALED.

14  **BY MS. BOSALAVAGE:**

15      **Q**    IS THIS AN EXAMPLE OF THE CHART CHECK FOR

16  THIS STUDY?

17      **A**    THAT'S RIGHT.

18      **Q**    AND HERE WE CAN SEE THE LINES ARE INDICATING

19  THE 24 -- CHART CHECK WAS COMPLETE AND SIGNED BY THE

20  NURSE.  RIGHT?

21      **A**    YES.

22      **Q**    SO THIS CHART WOULD BE IN COMPLIANCE.

23  CORRECT?

24      **A**    YES.

25      **Q**    WE'RE CHECKING TO MAKE SURE THEY DATE IT AND

1  SIGN IT?

2      A    THAT'S RIGHT.  WELL -- YES.

3      Q    THANK YOU.  IF WE CAN GO BACK TO PX_34-A AT

4  24.

5          MS. BOSALAVAGE:  THIS IS NOT SEALED.

6  BY MS. BOSALAVAGE:

7      Q    THIS IS THE FIRST WORKLOAD INDICATOR REPORT.

8  RIGHT?

9      A    YES.

10     Q    AND AT THE BOTTOM WE SEE A LIST OF WHAT DATA

11 YOU ARE COLLECTING.  RIGHT?

12     A    YES, I AM.

13     Q    AND THE STUDY IS TO COLLECT THAT DATA AND

14 DISSEMINATE IT.  RIGHT?

15     A    I'M SORRY.  WHAT WAS THAT?

16     Q    THE STUDY'S PURPOSE IS TO COLLECT THAT DATA

17 AND DISSEMINATE IT AT THE QUARTERLY MEETINGS.

18 CORRECT?

19     A    THAT'S RIGHT.

20     Q    IT'S NOT AN OUTCOMES-BASED STUDY?

21     A    NO.

22     Q    IT ISN'T ADDRESSING A PROBLEM PER SE?

23     A    IT DOESN'T ADDRESS A PARTICULAR PROBLEM.

24 BUT IF YOU LOOK AT THE NUMBERS, LIKE I SAID BEFORE,

25 IF THEY RISE OR DECREASE, THEN IT CAN ALERT US TO ANY

1    PROBLEMS -- FUTURE PROBLEMS.

2        **Q**    SO IT'S MORE OF A REFERENCE TOOL.  RIGHT?

3        **A**    THAT'S RIGHT.

4        **Q**    KIND OF LIKE THE C-05 REPORTS.  RIGHT?

5        **A**    KIND OF.

6        **Q**    THERE ARE NO SPECIFIC GOALPOSTS LIKE WE HAVE

7    WITH THE 24-HOUR CHART CHECK WHERE COMPLIANCE IS

8    MEASURED.  RIGHT?

9        **A**    NO.

10       **Q**    SO IN THAT WAY THE WORKLOAD INDICATOR STUDY

11   IS SIMILAR TO THE HIN DEATH STUDY WHICH LIST THE

12   NUMBER OF DEATHS EACH MONTH.  RIGHT?

13       **A**    YES.

14       **Q**    LET'S TURN TO ONE OF THE OLDER STUDIES

15   THAT'S BEEN GOING ON SINCE THE LIABILITY PHASE; THE

16   ADA STUDY THAT WAS IN PLACE WHEN YOU JOINED LSP.

17   RIGHT?

18       **A**    THAT'S RIGHT.

19       **Q**    IN THAT STUDY YOU TRACK THE AMOUNT OF TIME

20   IT TAKES TO PROCESS REQUESTS FOR ACCOMMODATIONS.

21   RIGHT?

22       **A**    CORRECT.

23       **Q**    AND THOSE REQUESTS ARE MADE THROUGH THE

24   REQUEST FOR ACCOMMODATION FORM?

25       **A**    YES.

1    **Q**   LET'S PULL UP THE ADA STUDY FOR THE THIRD

2    QUARTER OF 2021, DX_19 AT PAGE 213.  DX_19 OR

3    PX_34-B.  CAN WE GO TO PAGE 246, PLEASE?

4         SO THIS IS THE ADA STUDY FOR THE 2021 THIRD

5    QUARTER.  CORRECT?

6    **A**   YES.

7    **Q**   AND IF WE GO TO THE NEXT PAGE, WE CAN SEE

8    THE FINAL PAGE OF THE REPORT ON PAGE 247.

9         SO THERE WAS NO AVAILABLE DATA DURING THIS

10   QUARTER.  CORRECT?

11   **A**   CORRECT.

12   **Q**   AND IF WE GO TO THE FOURTH QUARTER 2021 AT

13   PX_34-A PAGE 3, THIS IS THE FOURTH QUARTER OF 2021.

14   CORRECT?  THE ADA STUDY.

15   **A**   YES.

16   **Q**   AND IF WE TURN TO THE NEXT PAGE, WE'LL SEE

17   THE FINAL PAGE OF THE REPORT.  AND HERE AGAIN THERE

18   WAS NO AVAILABLE DATA.  RIGHT?

19   **A**   CORRECT.

20   **Q**   AND FINALLY LET'S PULL UP THE MOST RECENT

21   REPORT, THE 2022 FIRST QUARTER, WHICH IS AT DX_49,

22   PAGE 4.

23         AND HERE WE HAVE THE FOURTH -- SORRY -- THE

24   FIRST QUARTER OF 2022, THE FIRST PAGE OF THE REPORT,

25   AND THE NEXT PAGE IS THE FINAL PAGE OF THE ADA STUDY.

1 AND AGAIN, THERE IS NO AVAILABLE DATA. RIGHT?

2 A CORRECT.

3 Q SO IN THE MOST -- IN THESE MOST RECENT THREE

4 QUARTERS, THERE HAVE BEEN NO AVAILABLE DATA FOR THE

5 ADA STUDY. CORRECT?

6 A CORRECT.

7 Q BECAUSE NO REQUESTS WERE MADE?

8 A NO. BECAUSE NONE WERE SUBMITTED TO ME.

9 Q WHERE DO YOU GET THAT DATA FROM?

10 A I -- WELL, RIGHT NOW IT'S MS. OLIVEAUX, WHO

11 TOOK OVER TRACY FALGOUT'S PLACE. I WOULD GO TO TRACY

12 FALGOUT AND SAY "PLEASE SUBMIT ANY REQUEST FOR

13 ACCOMMODATIONS FOR THE LAST QUARTER." IF HE DOESN'T

14 SUBMIT THEM TO ME AND I DON'T GET THEM, THEN I ASSUME

15 THERE WERE NONE.

16 Q SO FOR THE LAST THREE QUARTERS YOU HAVEN'T

17 BEEN GIVEN ANY REQUESTS FOR ACCOMMODATION?

18 A NO.

19 Q I'D LIKE TO TALK ABOUT THE HEALTH CARE

20 ORDERLY TRAINING. AT YOUR DEPOSITION WHEN PRESENTED

21 WITH THIS COURT'S FINDING THAT LSP'S USE OF HEALTH

22 CARE ORDERLIES WENT BEYOND THE SCOPE OF WHAT WAS

23 MEDICALLY ACCEPTED, YOU DISAGREED. RIGHT?

24 A CORRECT.

25 Q AT THAT TIME YOU DIDN'T SEE ANY REASON TO

1    REVAMP THE TRAINING.  RIGHT?

2        A    NOT THE POWERPOINT.

3        Q    AT YOUR DEPOSITION YOU DIDN'T SEE A NEED TO

4    REVAMP THE TRAINING -- CORRECT? -- ON MARCH 10TH?

5        A    WE WERE REFERRING TO THE POWERPOINT AT THAT

6    TIME, WERE WE?  THERE IS ALWAYS ROOM FOR IMPROVEMENT.

7            MS. BOSALAVAGE:  IF WE COULD PULL UP MS.

8    STICKELLS' DEPOSITION AT PAGE 25.

9    BY MS. BOSALAVAGE:

10       Q    COULD YOU PLEASE READ LINE 16 THROUGH 22 OUT

11   LOUD.  ARE YOU ABLE TO FIND IT?  LINE 16 THROUGH 22.

12   I CAN READ IT FOR YOU.

13           "SO AS FAR AS YOU KNOW, ANGOLA WAS FOLLOWING

14   ITS TRAINING POLICIES WITH RESPECT TO ORDERLIES?

15           "YES.  I MEAN, I FOUND IT -- IT IS VERY

16   LENGTHY.  IT'S VERY DETAIL SPECIFIC AND IT WAS

17   ACTUALLY VERY GOOD.  I DIDN'T THINK OF ANY REASON TO

18   REVAMP IT."

19       A    YES.  SO IN MY MIND I WAS THINKING OF THE

20   POWERPOINT.

21       Q    AND YOU DISAGREED WITH THIS COURT'S FINDING

22   THAT HEALTH CARE ORDERLIES WERE SUPERVISED BY

23   SECURITY STAFF WHO LACKED MEDICAL TRAINING.  RIGHT?

24       A    I'M SORRY.  WHAT WAS THAT?

25       Q    YOU DISAGREED WITH THIS COURT'S FINDING THAT

1  HEALTH CARE ORDERLIES WERE SUPERVISED BY SECURITY

2  STAFF WHO LACKED MEDICAL TRAINING.  RIGHT?

3     **A**   THEY'RE SUPERVISED BY NURSES, AND SECURITY

4  IS ALSO.

5     **Q**   BUT YOU DO BELIEVE THEY ARE SUPERVISED BY

6  BOTH NURSES AND SECURITY.  RIGHT?

7     **A**   YES.

8     **Q**   BUT NOT BY ONE PARTICULAR NURSE?

9     **A**   NO.

10    **Q**   AND YOU AREN'T THEIR SUPERVISOR?

11    **A**   I'M WHAT?

12    **Q**   YOU'RE NOT THEIR SUPERVISOR.  CORRECT?

13    **A**   NO.

14    **Q**   YOU JUST TRAIN THEM INITIALLY?

15    **A**   YES.

16    **Q**   AND YOU'RE NOT AWARE OF ANY PATIENT WHO IS

17 SUBJECT TO NEGLECT OR ABUSE BY AN ORDERLY.  RIGHT?

18    **A**   NOT TO MY KNOWLEDGE.

19    **Q**   AND YOU DON'T SELECT THE HEALTH CARE

20 ORDERLIES?  AS YOU DISCUSSED, YOU'RE GIVEN A LIST BY

21 DR. JACOB?

22    **A**   THAT'S RIGHT.

23    **Q**   AND YOU'RE NOT SURE HOW THAT LIST IS

24 SELECTED IN THE FIRST PLACE.  RIGHT?

25    **A**   I THINK THAT OFFENDER MURRAY, HE'S LIKE OUR

1  LEADER FOR HOSPICE AND HEALTH CARE ORDERLIES AND HE

2  LIVES IN THE MEDICAL DORMS WITH THESE GUYS.  AND THEY

3  LET HIM KNOW "HEY, HOW CAN I BECOME A HEALTH CARE

4  ORDERLY?"  AND THEN HE BRINGS IT TO DR. JACOB'S

5  ATTENTION BECAUSE HE'S DR. JACOB'S ORDERLY, SO -- AND

6  THEN FROM THERE I GET THE LIST.  AND I DO HAVE SOME

7  THAT COME TO ME INTERESTED IN BEING A HEALTH CARE

8  ORDERLY.

9      Q    YOU TESTIFIED ON DIRECT THAT THE LECTURE YOU

10  GIVE WAS FOUR DAYS.  RIGHT?

11     A    I'M SORRY?

12     Q    YOU TESTIFIED ON DIRECT EXAMINATION THAT THE

13  LECTURE YOU GIVE FOR THE HEALTH CARE ORDERLY TRAINING

14  WAS FOUR DAYS.  RIGHT?

15     A    IT'S FOUR, YEAH.  IT CAN VARY.

16     Q    AT YOUR DEPOSITION YOU TESTIFIED THAT IT WAS

17  TWO TO THREE DAYS.  RIGHT?

18     A    RIGHT.

19     Q    AND WE DISCUSSED YOU USE A POWERPOINT SLIDE.

20  CORRECT?

21     A    YES.

22     Q    AND AT THE TIME OF YOUR DEPOSITION, THE

23  TRAINING MATERIALS HAD NOT CHANGED SINCE YOU TOOK

24  OVER?

25     A    THAT'S RIGHT.

**1**    **Q**   BUT SINCE THEN THE POWERPOINT SLIDE SHOW HAS

**2**  BEEN UPDATED A BIT.  RIGHT?

**3**    **A**   YES.

**4**        **MS. BOSALAVAGE:**  ALEXANDRA, CAN YOU PLEASE

**5**  PULL UP A SIDE-BY-SIDE OF DX_32, WHICH IS THE

**6**  PREVIOUS POWERPOINT ENTERED INTO EVIDENCE DURING THE

**7**  LIABILITY PHASE AS JX_15 AND THE POWERPOINT

**8**  DEFENDANTS DISCLOSED TO PLAINTIFFS ON MAY 25, 2022

**9**  MARKED AS DX_47.

**10**  **BY MS. BOSALAVAGE:**

**11**    **Q**   SO HERE, IS THIS ACCURATE THAT THE ONE ON

**12**  OUR LEFT IS THE NEW ONE THAT YOU'VE MADE SINCE THE

**13**  DEPOSITION AND THE ONE ON THE RIGHT IS THE OLD

**14**  VERSION?

**15**    **A**   YEAH, THE ONE ON THE RIGHT IS THE NEW ONE.

**16**  I JUST THOUGHT IT WOULD BE EASIER FOR THEM TO READ BY

**17**  PUTTING SIX SLIDES ON A PAGE.

**18**    **Q**   THE ONE WITH THE IMAGES IS THE NEW ONE OR

**19**  THE OLD ONE?

**20**    **A**   THE NEW ONE.

**21**    **Q**   THE NEW ONE.  OKAY.

**22**        **THE COURT:**  SO THE SUBSTANCE IS THE SAME.

**23**  YOU JUST CHANGED THE WAY IT LOOKS?

**24**        **THE WITNESS:**  YES.

**25**        **THE COURT:**  GO AHEAD.

1    BY MS. BOSALAVAGE:

2        Q    YOU DID ADD TWO NEW SIDES, THOUGH.  RIGHT?

3        A    NO.

4        Q    CAN WE TURN TO PAGE 24?  SORRY.  AND DO A

5    SIDE-BY-SIDE OF THE SAME PAGE.

6            SO HERE WE SEE ON THE BOTTOM LEFT-HAND

7    CORNER THERE IS A NEW SLIDE THAT WASN'T IN THE OLD

8    TRAINING.  CORRECT?

9        A    WHICH ONE ARE YOU REFERRING TO?

10       Q    THE BOTTOM LEFT-HAND SIDE OF THE NEW ONE

11   THAT YOU CREATED.  DID YOU NOT ADD THAT NEW SLIDE?

12       A    I DIDN'T ADD THAT.  THAT'S ON THE

13   POWERPOINT.

14       Q    OKAY.  SO TO BE CLEAR, YOU DIDN'T ADD ANY

15   NEW CONTENT -- POWERPOINT CONTENT?

16       A    NO NEW CONTENT.  I JUST CHANGED ITS

17   APPEARANCE FOR EASIER READING.

18       Q    THIS POWERPOINT COVERS TOPICS SUCH AS

19   ACTIVITIES OF DAILY LIVING.  RIGHT?

20       A    YES.

21       Q    AND ABUSE AND NEGLECT?

22       A    YES.

23       Q    THE HEALTH CARE ORDERLIES RECENTLY GOT A

24   RAISE.  RIGHT?

25       A    TO MY KNOWLEDGE.

1    **Q**   BUT IN ORDER FOR THE ORDERLIES TO GET THAT

2    RAISE, THEY HAD TO BE CERTIFIED.  RIGHT?

3        **A**   CORRECT.

4        **Q**   SO WHEN THE RAISE WENT INTO EFFECT, YOU WERE

5    ASKED TO HOLD SOME MORE ADDITIONAL TRAININGS TO

6    ENSURE ALL OF THE ORDERLIES WERE PROPERLY CERTIFIED.

7    RIGHT?

8        **A**   YES.

9        **Q**   BECAUSE YOU HAD SOME ORDERLIES WORKING

10   PREVIOUSLY THAT DIDN'T HAVE PROOF OF THEIR

11   CERTIFICATION.  RIGHT?

12       **A**   CORRECT.

13       **Q**   SO AS WE'VE DISCUSSED, YOU'RE IN CHARGE OF

14   THE QA/QI PROGRAM.  RIGHT?

15       **A**   I'M SORRY?

16       **Q**   AS WE'VE DISCUSSED, YOU'RE IN CHARGE OF THE

17   QA/QI PROGRAM?  YOU'RE THE COORDINATOR.  RIGHT?

18       **A**   YES.

19       **Q**   AND YOU ALSO ARE IN CHARGE OF THE HEALTH

20   CARE ORDERLY PROGRAM?

21       **A**   THAT'S RIGHT.

22       **Q**   BUT YOU DON'T REVIEW MEDICAL OCCURRENCE

23   REPORTS AS PART OF YOUR DUTIES.  RIGHT?

24       **A**   I DO NOT.

25       **Q**   BUT IF THERE IS SOMETHING THE ORDERLIES

1   REPEATEDLY DO THAT CAUSES A MEDICAL OCCURRENCE

2   REPORT, YOU WOULD KNOW ABOUT IT.  RIGHT?

3        A    I WOULD HOPE SO.

4        Q    IN YOUR DEPOSITION YOU TESTIFIED THAT YOU

5   DON'T HAVE A LOT OF PROBLEMS WITH FALLS ON THE

6   NURSING UNITS.  RIGHT?

7        A    DID I SAY THAT?

8        Q    YEAH.  WOULD YOU LIKE ME TO PULL IT UP?

9        A    I BELIEVE YOU.

10       Q    BUT THAT WASN'T TRUE, WAS IT?  WOULD IT --

11       A    I DON'T HAVE ANYTHING -- LIKE A LOT OF

12   FALLS, WHAT ARE YOU SAYING?

13       Q    WOULD IT SURPRISE YOU TO LEARN THAT THERE

14   WERE AT LEAST 87 DOCUMENTED FALLS IN THE MEDICAL

15   OCCURRENCE REPORTS BETWEEN MARCH 2020 AND DECEMBER

16   2021?

17       A    YEAH.

18       Q    IN FACT, THERE ARE MULTIPLE MEDICAL

19   OCCURRENCE REPORTS THAT SPECIFICALLY RECOMMEND TO

20   INSTRUCT ORDERLIES TO ASSIST PATIENTS IN NU 2 WHO ARE

21   FALLING BECAUSE OF HOW MANY FALLS THAT WERE BEING

22   DOCUMENTED.  ISN'T THAT RIGHT?

23       A    I DON'T HAVE ANYTHING TO DO WITH MEDICAL

24   OCCURRENCE REPORTS.  I HAVE NOT SEEN THOSE.

25       Q    CAN WE PULL UP PX_28-A.

**1**          **MR. CONINE:**  JUDGE, I OBJECT TO THE

**2** RELEVANCE.  AND SHE JUST TESTIFIED THAT SHE DOESN'T

**3** KNOW ANYTHING ABOUT THE MEDICAL OCCURRENCE REPORTS.

**4**          **MS. BOSALAVAGE:**  YOUR HONOR, SHE WAS SHOWN

**5** THIS AT THE DEPOSITION, SO SHE HAS SEEN THIS BEFORE,

**6** AND IT WAS DISCUSSED AT THE DEPOSITION.  I CAN MOVE

**7** ON IF YOU'D LIKE.

**8**          **THE COURT:**  WHAT'S THE RELEVANCE OF IT IS

**9** THE QUESTION.

**10**          **MS. BOSALAVAGE:**  THE MEDICAL OCCURRENCE

**11** REPORT SPECIFICALLY SAYS THE ORDERLIES SHOULD BE

**12** INSTRUCTED TO DO THIS, AND SHE TRAINS THE ORDERLIES.

**13** SO IT IS RELEVANT THAT SHE HAD NOT BEEN COMMUNICATED

**14** THAT AND DOES NOT KNOW ABOUT THAT.

**15**          **THE COURT:**  SAY AGAIN.  THE

**16** MEDICAL OCCURRENCE --

**17**          **MS. BOSALAVAGE:**  THE MEDICAL OCCURRENCE

**18** REPORTS DOCUMENT MANY FALLS, AND THEN IN A SUMMARY IN

**19** THEM IT SAYS THE ORDERLIES SHOULD BE INSTRUCTED TO

**20** ASSIST PATIENTS BECAUSE OF THESE FALLS.  AND NURSE

**21** STICKELLS RUNS THE ORDERLY TRAINING PROGRAM.  AND IT

**22** IS RELEVANT THAT SHE WAS NOT COMMUNICATED THAT OR

**23** MADE AWARE OF THAT AND SHE DIDN'T KNOW IT.

**24**          **THE COURT:**  SHE DIDN'T KNOW ABOUT THE FALLS?

**25** SHE DIDN'T KNOW WHAT?

1        MS. BOSALAVAGE:  SHE DIDN'T KNOW THAT

2   SPECIFICALLY THE ORDERLIES -- THERE WAS A

3   RECOMMENDATION THAT THE ORDERLIES SHOULD BE PROPERLY

4   TRAINED ON HOW TO ASSIST TO ENSURE THAT THESE FALLS

5   DID NOT CONTINUE.

6        THE COURT:  IT'S ALREADY IN EVIDENCE.  I'M

7   GOING TO SUSTAIN THE OBJECTION.  YOU CAN ARGUE THAT.

8   YOU'VE ALREADY IT GOT IN EVIDENCE.

9   BY MS. BOSALAVAGE:

10     Q    IF YOU HAVE A CALL-OUT FOR A PATIENT TO COME

11  SEE YOU IN CLINIC, IT ALL REVOLVES AROUND SECURITY.

12  RIGHT?

13        MR. CONINE:  JUDGE, I WOULD OBJECT AGAIN.

14  THIS IS OUTSIDE THE SCOPE OF OUR DIRECT.

15        THE COURT:  SHE'S GOT HER ON CROSS.  I MEAN,

16  I'M GOING TO GIVE HER SOME LATITUDE.

17        BUT WHERE ARE YOU HEADED?

18        MS. BOSALAVAGE:  SHE DISCUSSED HOW THE

19  HEALTH CARE ORDERLIES ARE SUPERVISED BY SECURITY AND

20  MEDICAL.  AND IT'S RELEVANT.

21        THE COURT:  I'LL ALLOW IT.  OVERRULED.

22  BY MS. BOSALAVAGE:

23     Q    I'LL ASK IT.  IF YOU HAVE A CALL-OUT FOR A

24  PATIENT TO COME SEE YOU IN CLINIC, IT ALL REVOLVES

25  AROUND SECURITY.  RIGHT?

**1**      **A**    WELL, MOSTLY IT'S PRISONS WHERE EVERYTHING

**2**  HAS TO BE SECURE.

**3**      **Q**    SO ONE OF THE CHALLENGES IN PROVIDING CARE

**4**  IN A CORRECTIONAL SETTING IS THE SECURITY.  RIGHT?

**5**      **A**    YES, IT CAN BE CHALLENGING.

**6**      **Q**    YOU MENTIONED THAT YOU'RE ALSO IN CHARGE OF

**7**  SOME STAFF EDUCATION.  RIGHT?

**8**      **A**    CORRECT.

**9**      **Q**    YOU DON'T GIVE ANY ADA SPECIFIC TRAINING,

**10**  THOUGH.  CORRECT?

**11**      **A**    ADA SPECIFIC TRAINING?

**12**      **Q**    UH-HUH.

**13**      **A**    NO.

**14**      **Q**    THE STAFF EDUCATION YOU CONDUCT IS FOR THE

**15**  NURSES TO HAVE AN ADEQUATE NUMBER OF CREDITS.  RIGHT?

**16**      **A**    THAT'S RIGHT.

**17**      **Q**    AND THAT NURSE EDUCATION PROGRAM WAS IN

**18**  PLACE BEFORE YOU STARTED IT?

**19**      **A**    YES.

**20**      **Q**    BEFORE YOUR DEPOSITION IN THIS CASE YOU WERE

**21**  NOT FAMILIAR WITH THIS COURT'S OPINION FROM MARCH

**22**  2021.  RIGHT?

**23**      **A**    RIGHT.

**24**      **Q**    YOU HADN'T READ IT?

**25**      **A**    NO.

**1**    Q    NO ONE AT ANGOLA DISCUSSED IT WITH YOU?

**2**    A    PRIOR TO THIS IS WHAT YOU'RE SAYING?

**3**    Q    UH-HUH.

**4**    A    NO.

**5**    Q    ONE OF YOUR OTHER DUTIES YOU DISCUSSED IS

**6**  RUNNING THE ADA CLINIC.  CORRECT?

**7**    A    ADA, YES.

**8**    Q    IN THE ADA CLINIC YOU ONLY SEE PEOPLE WITH

**9**  HEARING IMPAIRMENTS.  CORRECT?

**10**   A    THAT'S CORRECT.

**11**   Q    YOU SCHEDULE APPOINTMENTS WITH THOSE

**12**  PATIENTS ANNUALLY?

**13**   A    YES.

**14**   Q    AND THAT'S IMPORTANT BECAUSE SOME OF THE

**15**  GUYS WHO WERE HEARING IMPAIRED, THEY FORGET OR THEY

**16**  DON'T KNOW HOW TO CONTACT YOU.  RIGHT?

**17**   A    RIGHT.

**18**   Q    BUT YOU DON'T HAVE A CLINIC FOR PEOPLE WITH

**19**  OTHER DISABILITIES.  RIGHT?

**20**   A    NO.

**21**       MS. BOSALAVAGE:  NO OTHER QUESTIONS, YOUR

**22**  HONOR.

**23**       THE COURT:  ANY REDIRECT?

**24**       MR. CONINE:  JUST VERY BRIEFLY, YOUR HONOR.

**25**       BROOKE, CAN YOU PLEASE BRING UP

1   DX_47.33.

2           MS. EDWARDS, CAN YOU SWITCH IT OVER?

3   THANK YOU.

4           AND THIS IS NOT SEALED.

5                **REDIRECT EXAMINATION**

6   BY MR. CONINE:

7       **Q**   MS. STICKELLS, IS THIS POWERPOINT I'M

8   SHOWING YOU -- THIS WAS UPDATED.  CORRECT?

9       **A**   THE WHEELCHAIR SAFETY TIP?

10      **Q**   YES.

11      **A**   YES.

12      **Q**   THIS WAS NEWLY ADDED --

13      **A**   YES.

14      **Q**   -- TO THE TRAINING.  IS THAT RIGHT?

15      **A**   THAT'S RIGHT.  THAT'S A -- THAT'S SOMETHING

16  I PRINTED OFF.

17      **Q**   OKAY.

18          **MR. CONINE:**  AND, BROOKE, CAN YOU SCROLL

19  DOWN?

20  BY MR. CONINE:

21      **Q**   IS THIS ALSO PART OF THE NEW POWERPOINT?

22      **A**   YES.

23          **MR. CONINE:**  AND, BROOKE, CAN YOU SCROLL

24  DOWN AGAIN?

25  BY MR. CONINE:

1      Q    AND THE BODY MECHANICS, IS THAT ALSO PART OF

2    THE NEW POWERPOINT FOR ORDERLY TRAINING?

3      A    YES.

4           MR. CONINE:  NO FURTHER QUESTIONS, YOUR

5    HONOR.

6           THE COURT:  YOU MAY STEP DOWN.

7           MR. CONINE:  SHE'S RELEASED.

8           THE COURT:  YOU'RE RELEASED FROM YOUR

9    SUBPOENA.

10               NEXT WITNESS.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(WHEREUPON, ASHLI OLIVEAUX, BEING DULY**

2    **SWORN, TESTIFIED AS FOLLOWS.)**

3          **THE COURT:**  Y'ALL HAVE NOT TOLD US WHO

4    YOU'RE CALLING.  DO YOU WANT TO GIVE US A NAME?

5          **MR. CODY:**  GOOD MORNING, YOUR HONOR.  JEFF

6    CODY FOR DEFENDANTS.  WE CALL ASHLI OLIVEAUX TO THE

7    STAND.

8          **THE COURT:**  MS. OLIVEAUX, YOU'VE BEEN SWORN.

9          GO AHEAD, SUZIE.

10         **THE COURTROOM DEPUTY:**  WOULD YOU STATE YOUR

11   NAME AND SPELL IT FOR THE RECORD, PLEASE.

12         **THE WITNESS:**  ASHLI, A-S-H-L-I, OLIVEAUX,

13   O-L-I-V-E-A-U-X.

14                   **DIRECT EXAMINATION**

15   BY MR. CODY:

16     **Q**    ALL RIGHT.  THANK YOU, MS. OLIVEAUX.  COULD

17   YOU PLEASE TELL THE COURT WHERE YOU'RE EMPLOYED

18   TODAY?

19     **A**    I'M EMPLOYED AT LOUISIANA STATE PENITENTIARY

20   FOR THE DEPARTMENT OF CORRECTIONS.

21     **Q**    WHAT'S YOUR POSITION?

22     **A**    DEPUTY WARDEN 5, THE TITLE IS.  I'M THE

23   QUALITY ASSURANCE MANAGEMENT WARDEN; DEPUTY WARDEN.

24     **Q**    AND WHEN DID YOU BECOME THE DEPUTY WARDEN

25   OVER QUALITY ASSURANCE AND MANAGEMENT?

1     **A**    I STEPPED INTO MY ROLE AROUND MARCH 21ST OF

2  THIS YEAR.

3     **Q**    ALL RIGHT.  AND FOR THE RECORD, HAS THAT

4  TITLE CHANGED SINCE YOU FIRST WERE HIRED AT LSP?

5     **A**    YES.

6     **Q**    WHAT WAS YOUR PRIOR TITLE?

7     **A**    DEPUTY WARDEN OF PROGRAMS.

8     **Q**    OKAY.  AND LET'S TALK ABOUT YOUR PRIOR WORK

9  HISTORY.  WHAT DID YOU -- FIRST OFF, LET'S TALK ABOUT

10 YOUR EDUCATION.  SORRY.

11         WHAT'S YOUR DEGREE IN?

12    **A**    I'M AN LPN.

13    **Q**    WHEN DID YOU OBTAIN YOUR LPN DEGREE?

14    **A**    2001.

15    **Q**    ALL RIGHT.  AND ANY OTHER DEGREES OR

16 CERTIFICATIONS OR ANYTHING?

17    **A**    I'VE DONE SOME ADA TRAINING, BUT I'M NOT

18 CERTIFIED YET.

19    **Q**    AND LET'S TALK ABOUT YOUR PRIOR WORK HISTORY

20 BEFORE ANGOLA.  WHERE DID YOU FIRST WORK AS AN LPN?

21    **A**    LANE REGIONAL MEDICAL CENTER, FOR ABOUT A

22 YEAR.

23    **Q**    AND WHERE AFTER THAT?

24    **A**    AFTER THAT I WENT TO ANGOLA IN 2002.  I

25 WORKED THERE UNTIL ABOUT 2012.  I TRANSFERRED TO THE

1  DEPARTMENT OF CORRECTIONS HEADQUARTERS IN THE MEDICAL

2  AREA, MEDICAL DEPARTMENT.  AND THEN IN FEBRUARY OF

3  2021 I APPLIED FOR AN ASSISTANT WARDEN'S 3 HEALTH

4  CARE POSITION WARDEN AT ELAYN HUNT CORRECTIONAL

5  CENTER, AND I ACCEPTED THAT JOB.  AND I WORKED THERE

6  UNTIL JULY 2021 WHEN A POSITION CLOSER TO HOME CAME

7  AVAILABLE AT DCI.

8          AND AGAIN, THAT WAS INVOLVED HEALTH CARE,

9  THE BUSINESS OFFICE AND SOME OTHER ASPECTS AS A

10  DEPUTY WARDEN 3.  AND THEN THE POSTING FOR THE DEPUTY

11  WARDEN 5 POSITION AT ANGOLA WAS MADE AVAILABLE, AND I

12  APPLIED FOR IT.  AND THAT'S WHERE I'M CURRENTLY AT.

13      Q    OKAY.  AND IN YOUR CURRENT POSITION AT

14  ANGOLA, WHAT ARE YOUR AREAS OF RESPONSIBILITY?

15      A    SO I HAVE THE ADA COORDINATOR, MEDICAL,

16  MENTAL HEALTH, EMS AND FIRE, LEGAL PROGRAMS, ACA,

17  TRAINING ACADEMY.

18      Q    OKAY.  AND HAS THIS LIST OF RESPONSIBILITIES

19  CHANGED SINCE YOUR DEPOSITION WAS TAKEN IN THIS

20  MATTER?

21      A    YES.  WHEN I TOOK MY DEPOSITION I HAD THE

22  RELIGIOUS PROGRAM UNDER ME.  AND I WAS NOT -- I DID

23  NOT HAVE ACA OR TRAINING ACADEMY.

24      Q    AND JUST FOR THE RECORD, DO YOU RECALL WHEN

25  YOUR DEPOSITION WAS TAKEN IN THIS MATTER?

1      **A**     I STARTED ON MARCH 21ST.  IT WAS A WEEK AND

2    ONE DAY AFTER, SO WOULD THAT HAVE BEEN ON MARCH 29TH?

3      **Q**     THANK YOU.  IS THERE A NUMBER ASSIGNED TO

4    YOUR WARDEN POSITION?

5      **A**     DEPUTY WARDEN 5.

6      **Q**     OKAY.  AND YOUR POSITION AS DEPUTY WARDEN 5,

7    IS THAT THE SAME AS THE ASSISTANT WARDEN OVER MEDICAL

8    POSITION AT ANGOLA, OR IS THAT SOMETHING DIFFERENT?

9      **A**     WELL, THERE IS NO LONGER AN ASSISTANT WARDEN

10   OVER MEDICAL POSITION AT ANGOLA.  I BELIEVE BEFORE I

11   GOT THERE -- AND I'M THINKING AROUND 2020 -- THAT WAS

12   CHANGED INTO THE LONG-TERM HEALTH CARE ADMINISTRATOR.

13   AND DR. JACOB JOHNSON HOLDS THAT POSITION.

14     **Q**     OKAY.  AND DR. JOHNSON, DOES HE REPORT TO

15   YOU?

16     **A**     YES, DIRECTLY TO ME.

17     **Q**     AND IS THAT BECAUSE YOU'RE OVER MEDICAL AND

18   MENTAL HEALTH?

19     **A**     YES.

20     **Q**     WHAT IS YOUR ROLE IN OVERSEEING DR. JOHNSON?

21   WHAT DOES THAT ENTAIL?

22     **A**     SO DR. JOHNSON -- MY ROLE IS TO MAKE SURE

23   THAT DR. JOHNSON HAS WHAT HE NEEDS FOR OUR MEDICAL

24   DEPARTMENT TO RUN.  WE MEET REGULARLY.  WE TALK.  WE

25   DISCUSS IDEAS.  IF THERE IS A PROBLEM WITH MAYBE

1   GETTING OFFENDERS TIMELY TO THE TREATMENT CENTER, WE

2   WORK IT OUT WITH THE OTHER AREAS OF THE FACILITY.

3          I'M THERE TO ASSIST HIM IN ANY NEEDS TO MAKE

4   SURE WE PROVIDE EFFICIENT HEALTH CARE FOR OUR

5   OFFENDER POPULATION.

6      Q    AND AS THE DEPUTY WARDEN, WHO DO YOU REPORT

7   TO AT ANGOLA?

8      A    THE WARDEN, TIM HOOPER.

9      Q    AND DO YOU HAVE PEOPLE -- YOU MENTIONED

10  DR. JACOB JOHNSON.  ARE THERE OTHER DEPARTMENT HEADS

11  THAT ARE UNDER YOU AT ANGOLA?

12     A    YES, I DO.  FOR THE ACA DEPARTMENT IT'S

13  MS. LIBBY.  FOR OUR TRAINING ACADEMY DEPARTMENT, THE

14  LIEUTENANT COLONEL'S POSITION IS VACANT, BUT THERE IS

15  A MAJOR THAT REPORTS TO ME IN ABSENCE OF THE

16  LIEUTENANT COLONEL.  FOR LEGAL PROGRAMS IT'S MISS

17  NYESHA DAVIS.  MEDICAL, EMS AND FIRE, I DON'T -- FOR

18  THE FIRE DEPARTMENT, MR. DARREN REPORTS TO DR. TOCE.

19  DR. TOCE REPORTS TO JACOB, SO THAT'S HOW I'M OVER

20  THAT, BECAUSE JACOB REPORTS TO ME.

21     Q    AND WHEN YOU REFERRED TO MR. DARREN, IS THAT

22  DARREN CASHIO?

23     A    YES.

24     Q    THANK YOU.  AND YOUR DUTIES RESPECTED TO THE

25  DEPARTMENT HEADS, WHAT ARE YOU DOING WITH REGARD TO

1  OVERSEEING THESE DEPARTMENT HEADS SPECIFICALLY?

2      A    THE ONES SPECIFICALLY UNDER ME?

3      Q    IN THOSE CATEGORIES.

4      A    OR ALL THE CATEGORIES?

5      Q    WELL, IN THOSE AREAS OF RESPONSIBILITY YOU

6  MENTIONED, GENERALLY WHAT IS YOUR CHARGE AS THE

7  DEPUTY WARDEN OVERSEEING THEM?

8      A    I JUST MAKE SURE THAT WE ARE MEETING ALL OF

9  OUR GUIDELINES.  I MAKE SURE THAT ALL OF OUR

10 PROTOCOL -- I MEAN POLICIES -- ARE BEING FOLLOWED,

11 PROCEDURES ARE BEING FOLLOWED.  I'M THERE TO ASSIST

12 THEM TO MAKE SURE THAT THEY'RE ABLE TO PERFORM THEIR

13 JOB DUTIES TO THE FULLEST.

14     Q    ARE YOU A RESOURCE FOR THESE DEPARTMENT

15 HEADS?

16     A    YES.  THEY CAN COME TO ME WITH ANYTHING, AND

17 WE'RE GOING TO FIGURE OUT THE SOLUTION TO THE

18 PROBLEM.

19     Q    AND YOU'VE BEEN IN THIS ROLE SINCE -- WAS IT

20 ABOUT CLOSE TO THREE MONTHS NOW?

21     A    YES.

22     Q    ABOUT -- CAN YOU DESCRIBE ABOUT HOW MUCH

23 TIME IS TAKEN UP BY THESE VARIOUS DEPARTMENTS; HOW

24 MUCH OF YOUR TIME IS TAKEN UP?

25     A    SO THE -- ABOUT 50 PERCENT OF MY TIME -- AND

1   AGAIN, THIS IS JUST ESTIMATED VALUES.  50 PERCENT OF

2   MY TIME -- THE MAJORITY OF MY TIME IS WITH THE

3   MEDICAL, MENTAL HEALTH, EMS AND FIRE.  THE REMAINING

4   PERCENTAGE OF MY TIME WOULD VARY WITH THE OTHER

5   DEPARTMENTS THAT I'M OVER.

6       Q    OKAY.  AND CAN YOU EXPLAIN TO THE COURT THE

7   TRANSITION PERIOD THAT YOU'VE GONE THROUGH AND COMING

8   ON TO ANGOLA AND BEING TASKED WITH THIS POSITION AS

9   DEPUTY WARDEN?  WHAT'S THE TRANSITION BEEN LIKE?

10      A    SO THE TRANSITION FOR ME, I'VE BEEN -- I'VE

11  MADE ROUNDS, I'VE SPOKEN TO ALL MY DEPARTMENT HEADS.

12  WE'VE DISCUSSED ANY ISSUES THAT THEY'VE HAD.  I'VE

13  HAD SOME TRAINING FOR THE ADA COORDINATOR ROLE,

14  BECAUSE THAT WAS A TRANSITION ROLE FOR ME.  I'VE HAD

15  TO SPEAK WITH DEPUTY WARDEN FALGOUT ABOUT THINGS THAT

16  HE DID IN THAT ROLE AND WHAT'S EXPECTED OF ME IN THAT

17  ROLE.  MS. SHARITA HAS HELPED ME WITH THAT.  I'VE

18  JUST WALKED AROUND AND SPOKEN TO THEM.  I'VE READ

19  SOME OF THE POLICY -- I'VE READ THE POLICIES FOR THE

20  AREAS AND THINGS LIKE THAT.

21      Q    OKAY.  AND YOU MENTIONED ALREADY BEFORE

22  ABOUT DR. JACOB JOHNSON.  BUT I WANT TO ASK YOU:

23  WHAT'S YOUR WORK RELATIONSHIP LIKE WITH DR. JOHNSON?

24      A    WE HAVE A VERY OPEN LINE OF COMMUNICATION.

25  I SEE DR. JOHNSON ON A DAILY BASIS.  WE TALK DAILY.

1  SOME KIND OF COMMUNICATION WE DO IS DAILY.

2      Q    OKAY.  WHAT DO YOU THINK ABOUT THE JOB THAT

3  DR. JOHNSON IS DOING AT ANGOLA?

4      A    I THINK HE'S DOING A GREAT JOB.  HE BRINGS A

5  LOT OF IDEAS TO THE TABLE.  HE'S OPEN-MINDED.  HE'S

6  ALWAYS WILLING TO TRY TO SOLVE THE SOLUTION THE BEST

7  WAY WE CAN, ANY KIND OF PROBLEMS WE HAVE.  OR IF IT'S

8  NOT A PROBLEM, JUST GOING ABOUT AND TALKING TO THE

9  OFFENDERS AND STAFF TO SEE HOW WE CAN MAKE THINGS

10  BETTER.

11      Q    OKAY.  AND DO YOU FEEL THAT DR. JOHNSON'S

12  QUALIFIED FOR THE ROLE THAT'S ASSIGNED TO HIM AT

13  ANGOLA?

14      A    YES.

15      Q    HAS HE COME TO YOU WITH ANYTHING THAT HE

16  NEEDS SINCE YOU STARTED AT ANGOLA?

17      A    NO NEEDS.  LIKE HE HASN'T NEEDED ANYTHING

18  FROM ME.  WELL, I GUESS THIS COULD BE A NEED.

19  THERE -- WE HAD TROUBLE FROM ONE OF THE CAMPS GETTING

20  THE OFFENDERS TO THEIR CLINIC VISITS, SO WE WORKED

21  TOGETHER, GOT ON THE PHONE WITH THE WARDEN OF THAT

22  CAMP.  AND THE OFFENDERS WERE THERE WITHIN FIVE

23  MINUTES.

24      Q    OKAY.  AND DR. TOCE.  DO YOU HAVE MUCH

25  INTERACTION WITH DR. TOCE?

1    **A**   I DON'T SPEAK TO DR. TOCE DAILY, BUT AT

2  LEAST THREE TO FOUR TIMES A WEEK I, YOU KNOW, TALK TO

3  HIM.  WE INTERACT.  HE CAN CONTACT ME IN ANY WAY.

4        BUT DR. JOHNSON IS HIS DIRECT SUPERVISOR, SO

5  THEY HAVE MORE OF A DAILY RAPPORT.  BUT THERE IS AN

6  OPEN LINE OF COMMUNICATION.

7    **Q**   OKAY.  DO YOU KEEP TABS ON DR. TOCE THROUGH

8  DR. JOHNSON?

9    **A**   YES.

10   **Q**   WHAT DO YOU THINK ABOUT THE JOB THAT DR.

11 TOCE IS DOING AT ANGOLA?

12   **A**   I THINK HE'S DOING GOOD.

13   **Q**   ARE YOU FAMILIAR WITH THE NURSE

14 PRACTITIONERS AT ANGOLA?

15   **A**   YES.

16   **Q**   WHAT DO YOU THINK ABOUT THE JOB THAT THE

17 NURSE PRACTITIONERS ARE DOING AT ANGOLA?

18   **A**   I THINK WE HAVE AWESOME NURSE PRACTITIONERS.

19 I ACTUALLY ENJOY HOW THEY BOUNCE IDEAS OFF OF EACH

20 OTHER, HOW THEY HAVE -- ONE PATIENT MIGHT BE YOUR

21 PATIENT, JEFF, AND THEN YOU'RE TALKING ABOUT YOUR

22 PATIENT WITH THE OTHER DOCTOR.  A NURSE PRACTITIONER

23 MAY CHIME IN AND SAY "HEY, HAVE YOU TRIED THIS

24 TREATMENT?"  I LOVE HOW THEY COMMUNICATE.

25   **Q**   AND SINCE YOU'VE BEEN AT ANGOLA, HAVE YOU

1   HAD OCCASION TO WITNESS THE NEW SICK CALL PROCEDURE?

2       A    THE SICK CALL PROCEDURE THROUGH THE

3   TELEHEALTH WITH NURSE PRACTITIONER BORDELON?

4       Q    CORRECT.

5       A    YES.  I HAVE SAT IN THERE ON BOTH SIDES.

6   I'VE SAT IN THERE ON THE SIDE OF NURSE PRACTITIONER

7   BORDELON, AND THEN I ALSO WENT TO THE MAIN PRISON

8   CLINIC AREA WHERE THE EMT IS AND WATCHED THEM DO IT

9   ON THEIR END AS WELL.

10      Q    WHAT DO YOU THINK ABOUT THAT PROCESS?

11          MS. RAMASWAMY:  OBJECTION, YOUR HONOR.  MS.

12  OLIVEAUX IS NOT A MEDICAL EXPERT.

13          MR. CODY:  YOUR HONOR, SHE OVERSEES MEDICAL

14  AS PART OF HER JOB.  SHE'S AN LPN BY TRAINING.  THIS

15  IS AN AREA OF HER RESPONSIBILITY.

16          THE COURT:  BUT YOU'RE ASKING HER FOR

17  OPINION TESTIMONY.

18          MR. CODY:  WELL, OKAY.  I'M SORRY, YOUR

19  HONOR.  I'LL WITHDRAW THE QUESTION.

20          THE COURT:  REPHRASE.

21  BY MR. CODY:

22      Q    AND WHAT ABOUT -- ARE YOU FAMILIAR WITH THE

23  RNs AND THE LPNs AT LSP?

24      A    YES.  I MAKE IT A POINT -- DAY SHIFT, NIGHT

25  SHIFT, WHATEVER SHIFT YOU'RE WORKING ON -- TO GO AND

1  SEE THEM AT LEAST THREE TO FOUR TIMES A WEEK AND

2  SPEAK TO THEM AND SEE WHAT -- ANYTHING THAT THEY NEED

3  HELP WITH.

4      **Q**   SO ARE YOU A RESOURCE ALSO FOR THE RNs AND

5  THE LPNs?

6      **A**   YES.  THEY CAN CALL ME AT ANY TIME.

7      **Q**   WHAT ABOUT EMS AT LSP?  ARE YOU A RESOURCE

8  FOR THEM AS WELL?

9      **A**   YES.  I VISIT THEM REGULARLY AS WELL.

10     **Q**   AND WHAT DO YOU THINK ABOUT THE JOB THAT THE

11 EMS ARE DOING AT LSP?

12         **MS. RAMASWAMY:**  OBJECTION, YOUR HONOR.  SAME

13 THING.  SHE'S NOT QUALIFIED AS A MEDICAL EXPERT IN

14 THIS CASE.

15         **MR. CODY:**  I'LL WITHDRAW THE QUESTION, YOUR

16 HONOR.  I'LL REPHRASE.

17 **BY MR. CODY:**

18     **Q**   DO YOU FEEL LIKE THERE IS AN ADEQUATE NUMBER

19 OF EMS AT LSP TO PERFORM THEIR JOB DUTIES?

20     **A**   I THINK THEY'RE PERFORMING THEIR JOB DUTIES

21 WELL AND I THINK THE NUMBER WE HAVE IS SUFFICIENT.

22 BUT WITH ANY HEALTH CARE ANYWHERE IN THE -- ANYWHERE

23 IN THE HOSPITAL SETTING OR ANY SETTING, IT'S -- YOU

24 COULD USE MORE.

25     **Q**   OKAY.

1     **A**    WE HAVE VACANCIES IN THE DEPARTMENT.

2     **Q**    RIGHT.  AND YOU'RE ACTIVELY TRYING TO FILL

3  VACANCIES?

4     **A**    WE ARE.

5     **Q**    WHAT ABOUT VACANCIES WITH NURSING?

6     **A**    YES, SIR, WE'RE ACTIVELY TRYING TO FILL

7  VACANCIES.

8     **Q**    SINCE BEGINNING YOUR JOB AT LSP, HAVE YOU

9  HAD ANY INVOLVEMENT WITH SELF-DECLARED EMERGENCIES?

10    **A**    YES.  THAT WAS A TASK THAT WAS GIVEN TO US.

11    **Q**    ARE THERE ANY ISSUES THAT LSP IS TRYING TO

12  ADDRESS WITH SELF-DECLARED EMERGENCIES?

13    **A**    YES.  THE ISSUE IS THAT WE'RE -- THE EMS

14  STAFF WORKING OUTSIDE OF THE ITOs, THE INDIVIDUAL

15  TREATMENT ORDERS, ARE OUTSIDE THEIR SCOPE OF

16  PRACTICE, SO WE CAME UP WITH A MEMO ABOUT THAT AND

17  TRAINING THEM ON THINGS OF THAT NATURE.

18    **Q**    SO THIS MEMO THAT YOU MENTIONED --

19    **A**    UH-HUH.

20       **MR. CODY:**  MS. RAGUSA, CAN YOU PULL UP

21  EXHIBIT DX_50, PLEASE, ON THE SCREEN?

22  **BY MR. CODY:**

23    **Q**    WARDEN OLIVEAUX, DO YOU SEE THE MEMO THERE

24  ON YOUR SCREEN?

25    **A**    YES.

1      Q    IS THAT THE MEMO YOU WERE REFERRING TO A

2   MOMENT AGO?

3      A    YES.

4      Q    AND DO YOU SEE A DATE ON THE MEMO?

5      A    MAY 12, 2022.

6           **MR. CODY:**  AND, MS. RAGUSA, IF YOU COULD

7   SCROLL DOWN JUST -- THERE YOU GO.

8   **BY MR. CODY:**

9      Q    DO YOU SEE A SIGNATURE AT THE BOTTOM OF THE

10  MEMO?

11     A    TIM HOOPER, WARDEN.

12     Q    IS THAT TIM HOOPER'S -- WARDEN HOOPER'S

13  SIGNATURE?  DO YOU KNOW?

14     A    YES.

15     Q    WERE YOU INVOLVED IN THE DEVELOPMENT OF THIS

16  MEMO?

17     A    YES.

18     Q    CAN YOU EXPLAIN YOUR INVOLVEMENT?

19     A    MY INVOLVEMENT, IT WAS BROUGHT TO OUR -- TO

20  MY ATTENTION FROM OUR EXPERT THAT THERE MAY HAVE BEEN

21  SOME ISSUES WITH EMS STAFF WORKING OUTSIDE THE SCOPE

22  OF THEIR PRACTICE.

23          SO WITH THAT BEING SAID, TO MAKE SURE WE'RE

24  UTILIZING OUR ITOS, OUR INDIVIDUAL TREATMENT ORDERS,

25  WE ESTABLISHED A WAY FOR OUR EMS STAFF THAT'S ON SITE

1  AT THE CAMPS TO HAVE CONTINUOUS CONTACT WITH THE

2  PROVIDER VIA THROUGH A TELEHEALTH VISIT OR A PHONE

3  CALL.  THAT WAY IF THEY NEED TO GO OUTSIDE OF THE

4  INDIVIDUALIZED TREATMENT ORDERS, THEY HAVE A WAY TO

5  CONTACT AND COMMUNICATE TO GET FURTHER INSTRUCTIONS

6  ON HOW TO PROVIDE CARE FOR THE PATIENT IF THE

7  INDIVIDUAL TREATMENT ORDER CANNOT PROVIDE THE NEEDED

8  CARE.

9        MR. CODY:  AND AT THIS TIME, YOUR HONOR, I

10  WOULD OFFER, FILE, AND INTRODUCE DX_50 INTO EVIDENCE.

11        MS. RAMASWAMY:  YOUR HONOR, WE JUST WANT TO

12  PRESERVE OUR OBJECTION THAT THIS WAS PREVIOUSLY

13  OUTSIDE THE DISCOVERY PERIOD.

14        THE COURT:  NOTED.

15             ADMITTED.

16        MR. CODY:  THANK YOU.

17  BY MR. CODY:

18    Q    YOU MENTIONED EARLIER THE ITOs.  ARE YOU

19  FAMILIAR WITH THE ITOs USED AT LSP?

20    A    YES.

21    Q    WHAT DOES "ITO" STAND FOR?

22    A    INDIVIDUALIZED TREATMENT ORDER.

23    Q    AND WHAT, IF YOU KNOW, IS THE PURPOSE OF AN

24  ITO?

25    A    THE ITO IS -- EACH OFFENDER WILL HAVE THEIR

1  NAME ON IT AND THE PHYSICIAN SIGNS IT.  AND IT'S USED

2  FOR A HEALTH CARE PROFESSIONAL -- NURSE, EMS STAFF --

3  TO FOLLOW THESE ORDERS THAT ARE INDIVIDUALIZED TO THE

4  OFFENDER AND TRY TO TREAT THEM BEFORE CONTACTING THE

5  PHYSICIAN.  IF YOU CANNOT HELP THEM WITHIN THE

6  ORDERS, THEN YOU CONTACT THE HEALTH CARE PROVIDER.

7      Q    OKAY.  AND LET ME JUST STOP YOU RIGHT THERE

8  A MOMENT.

9          **MR. CODY:**  MS. RAGUSA, IF YOU COULD PULL UP

10  DX_10-CCC, PLEASE.  ALL RIGHT.

11  **BY MR. CODY:**

12      Q    AND THERE ON THE SCREEN IN FRONT OF YOU,

13  WARDEN OLIVEAUX, DOES THAT APPEAR TO BE WHAT YOU WERE

14  JUST REFERRING TO?

15      A    YES.

16          **MR. CODY:**  AND, MS. RAGUSA, YOU COULD SCROLL

17  DOWN.

18  **BY MR. CODY:**

19      Q    ARE YOU FAMILIAR WITH THIS DOCUMENT, WARDEN

20  OLIVEAUX?

21      A    THERE IS MULTIPLE PAGES TO THIS DOCUMENT.

22      Q    AND IT LOOKS LIKE NINE PAGES?

23      A    YES.

24      Q    THESE ARE THE ITOs THAT ARE REFERRED TO IN

25  THE MEMO YOU MENTIONED EARLIER?

1      **A**    YES.

2      **Q**    AND I THINK YOU SAID THIS, BUT JUST IN CASE,

3   THESE ARE CURRENTLY IN USE AT LSP?

4      **A**    YES.

5          **MR. CODY:**  YOUR HONOR, I WOULD OFFER, FILE,

6   AND INTRODUCE DX_10-CCC INTO EVIDENCE.

7          **MS. RAMASWAMY:**  NO OBJECTION.

8          **THE COURT:**  ADMITTED.

9   **BY MR. CODY:**

10     **Q**    ALL RIGHT.  SO, WARDEN OLIVEAUX, THE MEMO

11  THAT WE WENT OVER --

12         **MR. CODY:**  AND YOU CAN TAKE THAT OFF THE

13  SCREEN, MS. RAGUSA.

14  **BY MR. CODY:**

15     **Q**    WARDEN OLIVEAUX, THE MEMO THAT YOU DISCUSSED

16  EARLIER, DO YOU UNDERSTAND THAT THAT'S GOING TO HAVE

17  AN IMPACT ON PREVENTING EMTs FROM PRACTICING MEDICINE

18  AT LSP?

19     **A**    YES.

20     **Q**    AND HOW LONG HAS THIS MEMO BEEN IN EFFECT?

21     **A**    THE MEMO WAS WRITTEN ON MAY 12TH.  BUT WE

22  HAD TO GET OUR -- THE PHONES AND THE SUPPLIES THAT WE

23  NEEDED, SO WE ACTUALLY STARTED IT ON JUNE 1ST.

24     **Q**    SO WE'RE JUST -- TODAY IS THE 17TH OF JUNE,

25  SO --

1      **A**    WE'RE ABOUT HALFWAY THROUGH OUR MONTH-LONG

2  QA STUDY TO SEE THE EFFECTIVENESS OF IT.

3      **Q**    WHAT IS THAT?

4      **A**    IT'S A STUDY THAT WE DECIDED TO DO TO SEE

5  HOW MANY TIMES THE -- JUST TO KIND OF TRACK AS FAR AS

6  HOW MANY TIMES A PROVIDER HAD TO BE CALLED BECAUSE AN

7  EMT HAD TO GO OUTSIDE OF THE INDIVIDUALIZED TREATMENT

8  ORDER TO TREAT THE OFFENDER'S NEEDS AND THAT ALL THE

9  DOCUMENTATION ON THE SICK CALL WAS COMPLETED AND

10  THINGS LIKE THAT.

11          SO WE DID A 30-DAY STUDY ON THIS AND IF WE

12  NEEDED TO MAKE IMPROVEMENTS OR CHANGES.

13      **Q**    IS THAT TO MAKE SURE THE ITOs ARE BEING

14  FOLLOWED?

15      **A**    YES.

16      **Q**    ALL RIGHT.  DO YOU EVER ATTEND THE MORNING

17  MEETINGS AT LSP?

18      **A**    YES, I TRY TO, TWO TO THREE TIMES A WEEK.

19      **Q**    WHAT KIND OF THINGS HAPPEN AT THE MORNING

20  MEETINGS?

21      **A**    SO AT THE MORNING MEETINGS IT'S LIKE A

22  ROUNDABOUT TABLE DISCUSSION.  IT'S WHERE THE

23  PROVIDERS WILL GO OVER THE PATIENT LOADS THAT THEY

24  HAVE.  THERE MAY BE A UNIQUE CASE OR A CASE THAT

25  THEY'RE HAVING TROUBLE WRAPPING THEIR HEADS AROUND,

1   AND THEY'LL ALL DISCUSS THAT OFFENDER'S CARE AND

2   THEY'LL COME UP WITH LIKE A PLAN OF ACTION TO CARE

3   FOR THEM OR PROVIDE FOR THEM.  THEY DISCUSS ANYTHING

4   THAT MAY HAVE HAPPENED THE NIGHT BEFORE WHILE ON

5   CALL, ANYTHING THAT HAS OCCURRED THE DAY BEFORE OR

6   THAT WILL BE OCCURRING THAT DAY; THINGS OF THAT

7   NATURE.

8       Q    DO YOU ALSO BECOME AWARE OF ISSUES IN THE

9   MEDICAL DEPARTMENT AT THE MORNING MEETINGS?

10      A    YES, I DO.  THAT'S HOW I FIND OUT IF OUR

11  OFFENDERS ARE GETTING THERE TO THEIR APPOINTMENTS ON

12  TIME.  WHEN I SAY "ON TIME," YOU KNOW, LIKE IF THE

13  OUTCAMPS ARE BRINGING THEM TO -- IF THE OUTCAMPS ARE

14  BRINGING THEM TO THE TREATMENT CENTER FOR THEIR

15  VISITS ON TIME SO I CAN ASSIST WITH THEM.

16          SO IF THERE'S A PROBLEM, THEN THAT'S WHERE I

17  NEED TO STEP IN AND I NEED TO CONTACT THE WARDEN OF

18  THAT AREA AND SAY "HEY, WHY AREN'T THESE OFFENDERS

19  GETTING HERE ON TIME?  WHY ARE THEY CONSTANTLY LATE?"

20  SO I CAN HELP GET THAT THERE.

21          IF IT COULD BE A PROBLEM WITH -- IT COULD BE

22  ANYTHING.  I MEAN, ANY KIND OF PROBLEM THAT THEY

23  HAVE.  IF IT'S -- I'M TRYING TO THINK OF SOMETHING.

24  MOSTLY IT'S THE REFUSALS, LIKE MAKING SURE THAT THE

25  PATIENTS COME TO THE CLINICS FOR THEIR REFUSALS.

1    THAT WILL COME UP IN THE MEETINGS, SO THEN I HAVE TO

2    CONTACT THE OUTCAMP WARDEN AND REMIND THEM THAT IF

3    THE OFFENDER IS GOING TO REFUSE, THEY NEED TO COME IN

4    FOR EDUCATIONAL WHY THEY'RE REFUSING AND THE -- WHAT

5    COULD HAPPEN IF THEY REFUSE.  BUT THAT'S USUALLY WHAT

6    IT IS.

7         OR IF THE PROVIDERS NEED HELP WITH MOVING AN

8    OFFENDER FROM ONE HOUSING AREA TO ANOTHER, THEN I GET

9    WITH THEM WITH THE CLASSIFICATIONS AND MAKE SURE THE

10   MOVE OCCURS.  THERE IS A RESOURCE.

11   Q    AND NOW I'M GOING TO SWITCH GEARS A BIT.

12   LET'S TALK MORE ABOUT YOUR FUNCTION AS ADA

13   COORDINATOR AT ANGOLA.

14        PRIOR TO APPLYING FOR YOUR CURRENT POSITION,

15   HAD YOU RECEIVED ANY TRAINING IN THE ADA?

16   A    I BELIEVE THERE WAS SOME TRAINING YEARS AGO

17   WHENEVER I STARTED WITH THE DEPARTMENT.  BUT I'M A

18   NURSE BY TRADE, SO I WAS FAMILIAR WITH DISABILITIES.

19   Q    SO IN YOUR PRIOR WORK AS AN LPN YOU HAD

20   OCCASION TO WORK AROUND PATIENTS WITH DISABILITIES?

21   A    UH-HUH.

22   Q    OKAY.  WERE YOU OPEN TO HAVING ADDITIONAL

23   TRAINING IN THE ADA WHEN YOU STARTED?

24   A    YES.

25   Q    ALL RIGHT.  WERE YOU WILLING TO HAVE MORE

1  ADA TRAINING THAN YOUR PREDECESSOR, WARDEN TRACY

2  FALGOUT?

3      **A**   YES.

4      **Q**   ALL RIGHT.  AND SINCE YOUR DEPOSITION IN

5  MARCH, HAVE YOU RECEIVED ANY TRAINING IN THE ADA?

6      **A**   I'VE HAD 35 HOURS OF ADA TRAINING.

7      **Q**   AND CAN YOU PLEASE DESCRIBE WHAT THAT ADA

8  TRAINING ENTAILS?

9      **A**   SO IT WAS THE BASICS TO AN ADA COORDINATOR.

10  IT TALKED ABOUT PHYSICAL BARRIERS.  THERE WAS -- ONE

11  OF THE TOPICS WAS ABOUT DEAF OFFENDERS AND HOW YOU

12  COMMUNICATE WITH THEM FROM THE CORRECTIONAL

13  STANDPOINT.  IT TALKED ABOUT A LOT OF PHYSICAL

14  BARRIERS.  IT TALKED ABOUT TITLE II, SOME TITLE I.

15          IT WAS A SYMPOSIUM THAT I ATTENDED, SO IT

16  WAS DONE ZOOM.  AND IT WAS -- SOME OF THE PRESENTERS,

17  THEY WERE FROM ALL OVER THE DIFFERENT STATES, ALL

18  OVER THE UNITED STATES, AND PEOPLE PARTICIPATED FROM

19  EVERYWHERE.  IT WAS A WEEK-LONG COURSE.

20      **Q**   AND -- I'M SORRY -- IF YOU SAID THE DATES, I

21  DON'T RECALL.  BUT DO YOU KNOW WHEN THE -- THE DATE

22  RANGE OF WHEN THIS TRAINING OCCURRED?

23      **A**   THE FIRST FULL WEEK OF MAY:  MAY 5TH, MAY

24  9TH I BELIEVE.

25      **Q**   THE 5TH THROUGH THE 9TH, OR --

1      A    UH-HUH.  IT WAS A WEEK.

2      Q    AS FAR AS YOU KNOW, IS THIS MORE TRAINING

3  THAN WHAT WARDEN TRACY FALGOUT PREVIOUSLY RECEIVED?

4      A    AS FAR AS I KNOW, YES.  I DON'T KNOW HOW

5  MANY HOURS HE RECEIVED.

6      Q    OKAY.  AND DO YOU RECALL WHETHER ANY

7  PARTICULAR AGENCY WAS INVOLVED WITH PUTTING ON THIS

8  TRAINING?

9      A    IT WAS CALLED THE ADA SYMPOSIUM, AND I

10 BELIEVE SOME OF THE SPEAKERS THAT PRESENTED THEIR

11 THINGS CAME FROM CORNELL UNIVERSITY.  I REMEMBER

12 GOING BACK AND LOOKING.

13     Q    AND DID YOU RECEIVE ANY MATERIALS AS PART OF

14 THIS TRAINING?

15     A    SO THE MATERIALS, YOU WERE ALLOWED TO

16 DOWNLOAD THEIR SLIDE SHOWS AND THEIR PRESENTATIONS,

17 SO I DOWNLOADED THEM TO MY DESKTOP.

18     Q    AND THE SLIDE SHOWS, I MEAN, ARE THOSE

19 THINGS THAT YOU WILL -- YOU TEND --

20     A    YEAH, THEY'RE REFERENCE POINTS.  YOU CAN GO

21 BACK TO THEM.  ESPECIALLY FOR THE PHYSICAL BARRIERS,

22 IT TELLS YOU HOW THE DOOR SHOULD OPEN IF YOU HAVE A

23 WHEELCHAIR.  IT TELLS YOU ABOUT KNEE HEIGHT FOR YOUR

24 WATER FOUNTAINS, HOW YOU SHOULD -- THE SLOPES FOR THE

25 RAMPS AND DIFFERENT THINGS LIKE THAT.  IT'S A

1  REFERENCE TOOL.

2      Q    DID ANYONE ASK YOU TO TAKE THIS ADA

3  TRAINING?

4      A    MS. SHARITA SPEARS BROUGHT IT TO MY

5  ATTENTION WHENEVER -- SHE'S OUR NEW ADA

6  COORDINATOR -- OR NEW TO ME -- ADA COORDINATOR FOR

7  THE DEPARTMENT.  AND SHE WAS PUTTING TOGETHER THE

8  TRAINING, SO SHE SENT THE INFORMATION TO ME WHEN I

9  WAS ABOUT A WEEK INTO THE JOB.  AND THAT'S HOW I

10 FOUND OUT ABOUT IT.

11     Q    AND AT THE TIME OF YOUR DEPOSITION IN MARCH,

12 WERE YOU YET FAMILIAR WITH MS. SPEARS?

13     A    NO.

14     Q    DO YOU KNOW -- I GUESS WITH RESPECT TO WHEN

15 YOUR DEPOSITION WAS, DO YOU KNOW WHEN YOU FIRST

16 BECAME AWARE OF MS. SPEARS?

17     A    I WANT TO SAY THAT AFTERNOON I RECEIVED THE

18 EMAIL ON THE ADA SYMPOSIUM.

19     Q    ALL RIGHT.  HOW OFTEN DO YOU TALK TO MS.

20 SPEARS?

21     A    AT LEAST ONCE A WEEK.

22     Q    WHAT SORTS OF THINGS DO THE TWO OF YOU

23 DISCUSS?

24     A    IF I HAVE A QUESTION AS FAR AS LIKE AN

25 ACCOMMODATION, I'LL CALL HER AND GET FEEDBACK FROM

1  HER.  SOMETIMES IT'S JUST TO DISCUSS THE TRAINING,

2  THE TRANSCRIPT THAT I HAD ABOUT ADDITIONAL TRAINING

3  THAT I NEED.

4       ALSO, SHE'S -- WE'VE TALKED ABOUT THE

5  QUARTERLY TRAININGS THAT SHE'S GOING TO BE DOING AND

6  JUST DIFFERENT -- WE'VE TALKED ABOUT THE DATABASE,

7  THE ADA DATABASE; THINGS LIKE THAT.  SHE'S MY

8  REFERENCE.

9       Q    AND DO YOU KNOW IF MS. SPEARS IS A LAWYER?

10      A    YES.  SHE TOLD ME THAT A FEW WEEKS AGO.

11      Q    AND YOU KIND OF WENT INTO THIS, BUT HAS SHE

12  DISCUSSED HER PLANS FOR ADA WITH REGARD TO DOC?

13      A    SHE HAS A PLAN FOR ADA LIKE AS FAR AS LIKE A

14  SELF -- LIKE FOR US TO SELF-EVALUATE OURSELF AND THEN

15  GO INTO LIKE A TRANSITION PLAN FROM THERE.  SHE WANTS

16  TO MAKE ROUNDS WITH EACH FACILITY AND -- WHICH SHE

17  AND I DID MAKE A ROUND ABOUT A WEEK AGO -- AND COME

18  UP WITH A PLAN FOR EACH FACILITY, LIKE A CHECKLIST OF

19  THINGS.  SHE WANTS TO DO QUARTERLY TRAININGS.  SHE

20  HAS BINDERS THAT SHE'S PUTTING TOGETHER FOR HER ADA

21  COORDINATORS.

22      Q    WHEN YOU SAY "QUARTERLY TRAININGS," IS THAT

23  WITH REGARD TO ADA COORDINATORS?

24      A    JUST THE COORDINATORS OF THE STATE.  IT WILL

25  BE HER, BECAUSE SHE'S THE DEPARTMENT HEAD -- THE

1 HEADQUARTERS ONE.  AND THEN IT WILL BE EACH

2 FACILITY'S ADA COORDINATOR WILL COME IN AND DO THE

3 QUARTERLY TRAININGS MEETINGS; THINGS LIKE THAT.

4     **Q**   AND YOU ALLUDED TO THIS EARLIER.  BUT YOU

5 STILL HAVE MORE TRAINING -- ADA TRAINING TO TAKE?

6     **A**   UH-HUH.  I NEED FIVE MORE HOURS OF TRAINING

7 BEFORE I CAN TAKE -- WHAT I'M TOLD BY MS. SHARITA,

8 I'LL TAKE A TEST AND THEN THEY'LL SEND ME A

9 CERTIFICATION.  AND THIS IS THROUGH THE SYMPOSIUM --

10 THE ADA SYMPOSIUM THAT I PREVIOUSLY TOOK THE 35 HOURS

11 OF CLASSES WITH.

12     **Q**   DO YOU INTEND TO COMPLETE THESE ADDITIONAL

13 FIVE HOURS?

14     **A**   YES.  YES.

15     **Q**   DO YOU HAVE ANY TIME FRAME FOR DOING SO?

16     **A**   I HAVEN'T SET MYSELF A TIME FRAME, BUT I

17 WOULD LOVE TO HAVE IT DONE BEFORE THE END OF AUGUST.

18     **Q**   OKAY.  NOW LET'S TALK ABOUT THE ADA

19 DATABASE.  SINCE YOUR DEPOSITION, HAVE YOU BECOME

20 ACQUAINTED WITH THE ADA DATABASE AT LSP?

21     **A**   YES.

22     **Q**   CAN YOU PLEASE DESCRIBE WHAT THAT IS.

23     **A**   SO THE ADA DATABASE IS A TRACKING DATABASE

24 WHERE YOU GET THE REQUEST FOR ACCOMMODATION -- IT'S

25 THREE DIFFERENT FORMS -- AND YOU INPUT THE REQUEST

1  FOR ACCOMMODATION.  AND THEN THE NEXT AREA IS THE

2  TRACKING FORM WHERE YOU WOULD SHOW HOW YOU

3  ACCOMMODATED THEM.

4           SO IF AN OFFENDER TOLD ME THAT THEY WERE

5  HARD OF HEARING, THEY NEEDED -- THEY REQUEST THE TTY

6  PHONE, THEN MY ACCOMMODATION TO THEM WOULD BE I WOULD

7  TYPE THEM A LETTER -- BUT THEN I HAVE TO PUT IT IN

8  THE DATABASE AS WELL -- THAT A T -- "YOU USE MAY THE

9  TTY PHONE THAT'S LOCATED IN YOUR AREA."

10    Q    AND THIS DATABASE, CAN IT BE ARRANGED

11 CHRONOLOGICALLY?  DO YOU KNOW?

12    A    LIKE IN DATE ORDER?  I BELIEVE IT'S ARRANGED

13 THROUGH THE YEAR, LIKE THEY CAN DO IT BY FISCAL YEAR

14 OR CALENDAR YEAR, IF I'M NOT MISTAKEN.  OR DO YOU

15 MEAN IN ALPHABETICAL ORDER?

16    Q    I MEAN -- YOUR ANSWER IS FINE.

17           CAN YOU SEE ALL OF THE REQUESTS FOR

18 ACCOMMODATIONS SUBMITTED BY AN INDIVIDUAL OFFENDER?

19    A    YOU CAN TYPE THE INDIVIDUAL OFFENDER'S NAME

20 IN AND SEARCH IT, AND IT POPS UP.

21    Q    AND WHO ACTUALLY INPUTS THE INFORMATION INTO

22 THE DATABASE?

23    A    MS. DIANTHA ROGER, MY ASSISTANT, HELPS ME

24 WITH INPUTTING INTO THE DATABASE.

25    Q    HAVE YOU HAD OCCASION TO DO IT YOURSELF AS

1   WELL?

2       A    YES.

3       Q    DO YOU KNOW IF ANYBODY AT HEADQUARTERS

4   ACCESSES THIS SAME DATABASE?

5       A    MS. SHARITA SPEARS HAS ACCESS TO IT.

6       Q    DO YOU KNOW WHY MS. SPEARS ACCESSES THE

7   DATABASE?

8       A    SHE'S THE ADA COORDINATOR FOR OUR

9   DEPARTMENT, SO SHE HAS ACCESS TO THE DATABASE.  I

10  THINK SHE HAS ACCESS FOR ALL THE FACILITIES, FOR HER

11  REVIEW AND STUFF.

12      Q    AND HER REVIEW, DO YOU KNOW WHY SHE'S

13  REVIEWING THEM?

14      A    I WOULD ASSUME THAT'S PART OF HER JOB.  I

15  KNOW THAT SHE DOES THE SECOND-LEVEL ARPs FOR ADA

16  THINGS.  SO SHE USES THE DATABASE TO PULL INFORMATION

17  FROM.

18      Q    DOES SHE EVER CALL YOU WITH QUESTIONS

19  REGARDING WHAT'S IN THAT DATABASE?

20      A    YES.

21      Q    AND WHAT KIND OF QUESTIONS DOES SHE HAVE?

22      A    SHE'LL ASK ME -- I'M GOING TO USE THE ARP

23  FOR EXAMPLE, BECAUSE THAT WOULD BE WHEN SHE WOULD

24  CALL.  SHE'LL ASK ME WHAT DID WE DO TO ACCOMMODATE

25  THIS OFFENDER.  AND SHE'LL SAY, "THE DATABASE SAYS

1  THIS.  DID Y'ALL DO THIS?"

2          AND I'LL TELL HER "YES."  I'LL GO PULL MY

3  HANDWRITTEN NOTES TO LET HER KNOW EXACTLY IF THAT'S

4  WHAT IT IS:  "YES, THE DATABASE MATCHES IT AND THAT'S

5  WHAT WE DID."

6     Q    SINCE YOU STARTED AT LSP, HAVE YOU BEEN

7  INVOLVED IN HANDLING ANY REQUESTS FOR ACCOMMODATION

8  YET?

9     A    SINCE MARCH I THINK I'VE HAD APPROXIMATELY

10  SEVEN.

11    Q    ALL RIGHT.  AND WITHOUT NAMING ANY OF THE

12  OFFENDERS INVOLVED, WHAT SORTS OF ISSUES HAVE YOU HAD

13  TO ADDRESS IN THOSE REQUESTS FOR ACCOMMODATION?

14    A    TTY PHONES FOR OUR HARD-OF-HEARING

15  OFFENDERS, WHEELCHAIRS, OXYGEN, AND HOUSING LOCATION

16  CHANGE, MEANING THE ASSISTANT LIVING DORM.

17    Q    HAVE YOU DENIED ANY REQUESTS FOR

18  ACCOMMODATION?

19    A    NO, SIR.

20    Q    LET'S TALK A LITTLE BIT ABOUT PHYSICAL

21  BARRIERS.  SO ARE YOU AWARE OF ISSUES WITH PHYSICAL

22  BARRIERS AT LSP?

23    A    I KNOW THAT WARDEN FALGOUT IS WORKING WITH

24  THEIR -- THERE IS A MASS REPORT AND DOJ REPORT.  AND

25  THEY'RE WORKING ON PHYSICAL BARRIERS WITH THAT.

1    **Q**   HAVE YOU HAD MUCH INVOLVEMENT, THOUGH, WITH

2   PHYSICAL BARRIERS?

3    **A**   NO, SIR.

4    **Q**   AS YOU'RE COMING ON TO THIS ROLE, IS MISTER

5   -- IS WARDEN FALGOUT -- IS HE STILL FOCUSING ON

6   PHYSICAL BARRIERS?

7    **A**   YES.

8    **Q**   IS THAT GOING TO CONTINUE FOR A WHILE?  DO

9   YOU KNOW?

10   **A**   I'M GOING TO SAY YES.

11   **Q**   AT SOME POINT DO YOU PLAN TO BECOME MORE

12   INVOLVED WITH THE PHYSICAL BARRIER ISSUES?

13   **A**   YES.

14       **MR. CODY:**  YOUR HONOR, THOSE ARE MY

15   QUESTIONS.  THANK YOU.

16       **THE COURT:**  CROSS?

17       **MS. RAMASWAMY:**  COULD WE HAVE ONE MOMENT TO

18   CONFER, YOUR HONOR?

19       **THE COURT:**  WHY DON'T WE TAKE A 15-MINUTE

20   RECESS.

21       **(WHEREUPON, A RECESS WAS TAKEN.)**

22       **THE COURT:**  BE SEATED.

23          CROSS, PLEASE.

24       **MS. RAMASWAMY:**  GOOD MORNING, YOUR HONOR.

25   REBECCA RAMASWAMY FOR THE PLAINTIFFS.

1                    CROSS-EXAMINATION

2    BY MS. RAMASWAMY:

3        Q    GOOD MORNING, MS. OLIVEAUX.

4        A    GOOD MORNING.

5        Q    GOOD TO SEE YOU AGAIN.

6        A    YOU, TOO.

7        Q    YOU INTERVIEWED FOR YOUR CURRENT POSITION?

8        A    YES, MA'AM.

9        Q    AND THAT INTERVIEW WAS AROUND LATE FEBRUARY

10   OF THIS YEAR?

11       A    YES.

12       Q    THE ADA COORDINATOR ROLE WAS NOT DISCUSSED

13   IN YOUR INTERVIEW?

14       A    NO.

15       Q    YOU WERE NOT ASKED ANY QUESTIONS ABOUT THE

16   ADA?

17       A    NO.

18       Q    YOU DIDN'T FIND OUT FOR SURE THE ADA

19   COORDINATOR WAS PART OF YOUR DUTIES UNTIL YOUR FIRST

20   DAY ON THE JOB?

21       A    YES.

22       Q    AND YOU HAD NO FAMILIARITY WITH THE

23   REQUIREMENTS OF THE ADA?

24       A    I DON'T UNDERSTAND WHAT YOU'RE ASKING ME.

25       Q    SO WHEN YOU FIRST TOOK THE JOB --

1      THE COURT:  I'M SORRY.  I DIDN'T HEAR THAT

2    ANSWER.  WHAT WAS THE ANSWER?

3      THE WITNESS:  I JUST TOLD HER I DIDN'T

4    UNDERSTAND WHAT SHE WAS ASKING ME.

5      THE COURT:  OKAY.

6    BY MS. RAMASWAMY:

7      Q    WHEN YOU FIRST TOOK THE JOB, YOU DIDN'T HAVE

8    ANY FAMILIARITY WITH THE REQUIREMENTS OF THE ADA?

9      A    THE COORDINATOR OR THE ADA?

10     Q    SO YOU TESTIFIED IN YOUR DEPOSITION THAT YOU

11   HAD NO FAMILIARITY WITH THE REQUIREMENTS OF THE ADA

12   WHEN YOU TOOK THE JOB.  DOES THAT SOUND RIGHT?

13     A    YES.

14     Q    BUT YOU KNEW WHEN YOU APPLIED FOR THIS

15   POSITION THAT THERE WAS AN ONGOING LAWSUIT AGAINST

16   LSP.  RIGHT?

17     A    YES.

18     Q    YOU DIDN'T ASK ANY QUESTIONS ABOUT THE

19   LAWSUIT WHEN YOU INTERVIEWED FOR THE POSITION?

20     A    NO.

21     Q    THE LAWSUIT WASN'T MENTIONED AT ALL DURING

22   YOUR APPLICATION PROCESS?

23     A    NO.

24     Q    YOU DIDN'T HAVE ANY CONCERNS ABOUT THE

25   LAWSUIT WHEN YOU DECIDED TO TAKE THE JOB?

1      **A**    NO.

2      **Q**    AND AT THE TIME OF YOUR FIRST DEPOSITION IN

3   THIS CASE, YOU HADN'T READ THE LIABILITY RULING FROM

4   MARCH OF 2021?

5      **A**    NO.

6      **Q**    AND YOU WERE NOT FAMILIAR WITH ANY OF THE

7   SPECIFIC ADA CLAIMS IN THE LAWSUIT?

8      **A**    NO.

9      **Q**    YOU WERE NOT FAMILIAR WITH THE JUDGE'S

10   FINDINGS WITH RESPECT TO THE ADA?

11      **A**    NO.

12      **Q**    YOU WERE NOT AWARE OF ANY PROBLEMS WITH THE

13   USE OF ORDERLIES WITH RESPECT TO ADA COMPLIANCE AT

14   LSP?

15      **A**    PRIOR TO MY DEPOSITION, THE FIRST ONE, NO.

16      **Q**    YOU WERE NOT AWARE OF ANY PROBLEMS WITH

17   STAFF TRAINING WITH RESPECT TO ADA COMPLIANCE AT LSP?

18      **A**    NO.

19      **Q**    YOU WERE NOT AWARE OF ANY PROBLEMS WITH THE

20   ADA TRACKING SYSTEM?

21      **A**    NO.

22      **Q**    YOU WERE NOT AWARE OF ANY PROBLEMS WITH THE

23   POSITION OF ADA COORDINATOR?

24      **A**    NO.

25      **Q**    AND AS OF THAT MARCH DEPOSITION, YOU

1  TESTIFIED THAT YOU PLANNED TO TAKE WHATEVER TRAINING

2  WARDEN FALGOUT HAD DONE?  YEAH?

3      A    YES.

4      Q    AND SINCE YOUR MARCH 29TH DEPOSITION, YOU'VE

5  RECEIVED SOME ADDITIONAL TRAINING RELATED TO THE ADA?

6      A    YES.

7      Q    THAT'S THE ADA SYMPOSIUM TRAINING?

8      A    YES.

9      Q    ONE OF THE CLASSES THAT WAS PART OF THE

10  SYMPOSIUM HAD TO DO WITH CORRECTIONS?

11     A    YES.  ONE OF THE CLASSES THAT I TOOK HAD TO

12  DO WITH CORRECTIONS, YES.

13     Q    YOU DON'T REMEMBER ANY OTHER CLASSES IN THE

14  SYMPOSIUM THAT HAD SPECIFICALLY TO DO WITH

15  CORRECTIONS?

16     A    NO, MA'AM.

17     Q    THE MAJORITY OF THE TOPICS COVERED IN THE

18  SYMPOSIUM HAD TO DO WITH PHYSICAL BARRIERS?

19     A    THE ONES THAT I TOOK, YES.

20     Q    AND THERE WAS NOTHING IN THE SYMPOSIUM ABOUT

21  DISCIPLINARY ACCOMMODATIONS?

22     A    NOT THAT I TOOK OR SEEN.

23     Q    NO ONE ELSE FROM LSP PARTICIPATED IN THAT

24  TRAINING?

25     A    NO.

1      **Q**    OTHER THAN THE SYMPOSIUM, YOU HAVEN'T

2    PARTICIPATED IN ANY OTHER TRAININGS RELATED TO YOUR

3    POSITION AS ADA COORDINATOR?

4      **A**    I HAVE NOT.

5      **Q**    THERE ARE NO OTHER ADA-RELATED TRAININGS

6    THAT YOU CURRENTLY PLAN TO PARTICIPATE IN OTHER THAN

7    THE REMAINDER OF YOUR SYMPOSIUM TRAINING?

8      **A**    NOT AT THIS TIME.

9      **Q**    NOTHING ABOUT THE SYMPOSIUM TRAINING CHANGED

10   YOUR PRACTICES OR YOUR APPROACH AS ADA COORDINATOR AT

11   LSP?

12     **A**    I WOULDN'T AGREE WITH THAT.  I COULD TELL

13   YOU THAT IT OPENED MY EYES UP MORE, ESPECIALLY THE

14   PHYSICAL BARRIERS PART.  IT INTRODUCED ME TO --

15   LIKE NOW EVEN WHENEVER I GO -- LIKE WHEN I WALKED

16   INTO THIS COURTROOM, I WAS LOOKING AT THE KNEE HEIGHT

17   THAT THE -- YOU KNOW, LOOK AT THINGS DIFFERENTLY.  SO

18   IT OPENED UP MY EYES.  IT TAUGHT ME THINGS THAT I

19   DIDN'T KNOW BEFORE.

20          LIKE THE OFFENDER ONE WAS ABOUT

21   COMMUNICATION; TAP THEM ON THEIR SHOULDER WHENEVER

22   YOU GO TO TALK TO THEM.  MAKE THEM LOOK AT YOU SO

23   THEY COULD SEE YOU, BECAUSE THEY CAN'T HEAR YOU;

24   THINGS LIKE THAT.  SO I WOULDN'T SAY THAT I DIDN'T

25   LEARN ANYTHING FROM IT.

ASHLI OLIVEAUX                                          85

1        Q    I THINK THAT'S A LITTLE DIFFERENT FROM WHAT

2   I'M ASKING.

3             SO I'M ASKING WHETHER THE SYMPOSIUM TRAINING

4   CHANGED YOUR PRACTICES OR YOUR APPROACH AS ADA

5   COORDINATOR AT LSP.

6        A    ME PERSONALLY, NO, BECAUSE I'M HANDS ON.  I

7   WAS HANDS ON BEFORE THE SYMPOSIUM.  I MADE ROUNDS TO

8   THE AREAS WHERE THEY WERE AT.  I SPEAK TO THE

9   OFFENDERS.  I TALK TO THEM.  I STILL DO THAT EVEN

10  AFTER THE SYMPOSIUM.

11       Q    SO YOUR ANSWER IS "NO"?

12       A    IN SERVICE?

13       Q    YOUR ANSWER IS "NO"?

14       A    YEAH.

15       MS. RAMASWAMY:  THAT'S ALL I HAVE, YOUR

16  HONOR.

17       THE COURT:  REDIRECT?

18       MR. CODY:  JUST BRIEFLY, YOUR HONOR.

19                   REDIRECT EXAMINATION

20  BY MR. CODY:

21       Q    WARDEN OLIVEAUX, COUNSEL ASKED YOU A MOMENT

22  AGO -- OR YOU SAID YOU SPEAK TO OFFENDERS.  CAN YOU

23  ELABORATE ON THAT?

24       A    YES.  I TRY TO GO DOWN AT LEAST ONCE A WEEK

25  TO A DIFFERENT HOUSING AREA AND TALK WITH THE

1  OFFENDERS TO SEE HOW THINGS ARE GOING IN GENERAL.  I

2  WANT TO BE INVOLVED.  OUR ASSISTANT LIVING AREA IS

3  THE ASH UNIT.  I GO THERE PROBABLY MORE THAN ANY

4  OTHER AREA.  I WANT THEM TO BE ABLE TO COME TO ME --

5  LIKE IF THE TTY PHONE'S DOWN, I DON'T WANT IT TO BE

6  LIKE A LONG PAPER PROCESS.  I WANT THEM TO BE ABLE TO

7  GET A MESSAGE TO ME AND WE HAVE AN OPEN LINE OF

8  COMMUNICATIONS.  SO THAT'S WHY I MAKE MY PRESENCE

9  KNOWN:  TO SEE WHAT'S GOING ON, TO SEE HOW I CAN HELP

10  THEM.

11      Q    DO YOU EVER SPEAK TO OFFENDERS WHO SUBMIT A

12  REQUEST FOR ACCOMMODATION TO YOU?

13      A    YES.  IF THEY SUBMIT SOMETHING TO ME AND

14  IT'S CONFUSING FOR ME TO UNDERSTAND, THEN I GO DOWN

15  THERE AND SIT WITH THEM AND TALK TO THEM AND TRY TO

16  FIGURE OUT HOW I CAN HELP THEM OR WHAT THEY'RE ASKING

17  ME HELP FOR.

18      Q    AND COUNSEL ASKED YOU ABOUT TRAINING.  AND I

19  KNOW YOU SAID YOU DIDN'T DO MUCH CORRECTIONS-SPECIFIC

20  TRAINING.  IF THERE ARE ANY COURSES OUT THERE THAT DO

21  OFFER CORRECTIONS-SPECIFIC ADA TRAINING, WOULD YOU

22  SEEK THOSE OUT?

23      A    YES.  I'M WILLING TO TAKE THEM.

24          MR. CODY:  THAT'S ALL I HAVE, YOUR HONOR.

25          THE COURT:  YOU MAY STEP DOWN.

1          NEXT WITNESS.

2              **MR. CONINE:**  JOHN CONINE FOR THE DEFENDANTS.

3              WE CALL SHARITA SPEARS TO THE STAND.

4          **(WHEREUPON, SHARITA SPEARS, BEING DULY**

5   **SWORN, TESTIFIED AS FOLLOWS.)**

6              **THE COURTROOM DEPUTY:**  IF YOU WOULD, PLEASE

7   STATE YOUR NAME AND SPELL IT FOR THE RECORD.

8              **THE WITNESS:**  SHARITA SPEARS.

9   S-H-A-R-I-T-A, LAST NAME SPEARS, S-P-E-A-R-S.

10                  **DIRECT EXAMINATION**

11  BY MR. CONINE:

12      **Q**    THANK YOU, MS. SPEARS.

13          HOW ARE YOU CURRENTLY EMPLOYED?

14      **A**    WITH THE LOUISIANA DEPARTMENT OF PUBLIC

15  SAFETY AND CORRECTIONS.

16      **Q**    AND WHAT IS YOUR TITLE?

17      **A**    DEPUTY ASSISTANT SECRETARY.

18      **Q**    HOW LONG HAVE YOU HELD THAT POSITION?

19      **A**    SINCE DECEMBER 20TH OF LAST YEAR; 2021.

20      **Q**    OKAY.  IN THAT ROLE DO YOU SUPERVISE ANY

21  DEPARTMENTS?

22      **A**    YES.  I'M OVER THE ADA DEPARTMENT AND THE

23  PRE-CLASS DEPARTMENT.

24              **THE COURT:**  THE WHAT DEPARTMENT?

25              **THE WITNESS:**  PRE-CLASSIFICATION DEPARTMENT.

1          **THE COURT:** OKAY.

2    **BY MR. CONINE:**

3      **Q**   HOW LONG HAVE YOU BEEN THE ADA COORDINATOR?

4      **A**   I GOT IN THE POSITION IN DECEMBER, BUT I

5    STEPPED INTO THE ROLE IN JANUARY OF THIS YEAR.

6      **Q**   JANUARY OF 2022?

7      **A**   YES.

8      **Q**   DO YOU KNOW WHO WAS PERFORMING THOSE

9    RESPONSIBILITIES BEFORE YOU?

10     **A**   MS. MELISSA STAUB AND THERESA DAVIS.

11     **Q**   THANK YOU.  ARE YOU AN ATTORNEY, MS. SPEARS?

12     **A**   YES.

13     **Q**   WHEN DID YOU BECOME ATTORNEY -- AN ATTORNEY?

14     **A**   DECEMBER OF 2020.

15     **Q**   OKAY.  AS THE ADA COORDINATOR, WHAT ARE YOUR

16   DUTIES?

17     **A**   RIGHT NOW I OVERSEE THE ADA COORDINATORS AT

18   THE LOCAL LEVEL, SO ALL OF OUR DOC FACILITIES.  I

19   REVIEW INSTITUTIONAL POLICIES; I REVIEW INSTITUTIONAL

20   DIRECTIVES; I ASSIST WITH TRAINING; I CREATE

21   TRAININGS AND ANSWER SECOND-LEVEL ARPs FOR THE

22   OFFENDERS AND ANY GRIEVANCES AT THE SECOND LEVEL FOR

23   EMPLOYEES.

24     **Q**   IS THAT THROUGH THE ADA DATABASE?

25     **A**   YES.

1      Q   ALL RIGHT.  VERY GOOD.

2           WHAT PERCENTAGE OF YOUR DUTIES ARE DEVOTED

3   TO ADA?

4      A   I WOULD SAY ABOUT 85 TO 90 PERCENT OF MY

5   DUTIES ARE ADA RELATED.

6      Q   AND THE REMAINDER ARE RELATED TO PRE-CLASS?

7      A   YES.

8      Q   IS THERE A SUBORDINATE THAT HANDLES

9   PRE-CLASS MATTERS?

10     A   YES; MS. DANA BELL.  SHE'S THE PROGRAM

11   MANAGER OVER THE PRE-CLASS DEPARTMENT.  AND I

12   BASICALLY JUST GIVE HER GUIDANCE AS NEEDED.

13     Q   LET'S TURN AND DISCUSS YOUR DUTIES AS ADA

14   COORDINATOR IN TURN, STARTING WITH THE POLICIES.

15           CAN YOU PLEASE EXPLAIN TO THE COURT THAT

16   ASPECT OF YOUR JOB?

17     A   SO BASICALLY I GO THROUGH THE DEPARTMENT OF

18   REGULATIONS AND INSTITUTIONAL POLICIES.  I REVIEW THE

19   DEPARTMENT OF REGULATIONS AS THEY RELATE TO ADA

20   COMPLIANCE.  I GO THROUGH AND MAKE ANY NECESSARY

21   CHANGES OR REVISIONS WITH THE POLICY DEPARTMENT ONCE

22   WE'VE IDENTIFIED THAT THERE IS A CHANGE IN THE LAW OR

23   ANYTHING NEEDS TO BE UPDATED WITHIN THOSE POLICIES.

24     Q   OKAY.  AND DO THESE POLICIES ALSO INCLUDE

25   OR -- ALSO INCLUDE VISITORS AND EMPLOYEES?

1      A    YES.

2      Q    AND AFTER YOU REVIEW THE POLICIES, WHAT WILL

3  YOU DO?

4      A    SO ONCE WE REVIEW THE POLICIES -- OR ONCE I

5  REVIEW THE POLICIES AND I NOTICE THAT THERE IS

6  SOMETHING THAT NEEDS TO BE UPDATED OR WE NEED TO

7  EXPOUND ON IT A LITTLE MORE, I WILL SUBMIT THOSE

8  REVISIONS TO THE POLICY REVIEW DEPARTMENT.  AND THEN

9  WE'LL GO FORTH WITH MAKING THOSE REVISIONS, IF

10 NECESSARY, AND HAVE IT DISSEMINATED TO ALL OF THE DOC

11 FACILITIES SO THEY CAN UPDATE INSTITUTIONAL POLICIES.

12     Q    SO WHEN YOU'RE REVIEWING THE POLICIES,

13 THAT'S WHAT YOU'RE LOOKING FOR:  ANY POTENTIAL

14 UPDATES?

15     A    YES.

16     Q    YOU MENTIONED TRAINING BEING PART OF YOUR

17 DUTIES.  WHAT IS YOUR ROLE RELATED TO ADA TRAINING?

18     A    SO RIGHT NOW I WORK WITH THE TRAINING

19 DEPARTMENT FOR THE DEPARTMENT OF CORRECTIONS, AND I

20 CREATE ADA TRAININGS, ALONG WITH THE TRAINING

21 DEPARTMENT.  AND I HAVE PRESENTED ADA TRAININGS TO

22 THE EXECUTIVE STAFF AT THE LEADERSHIP ACADEMY THAT WE

23 RECENTLY HAD.  I'M ALSO WORKING WITH THEM TO CREATE

24 SOME NEW TRAININGS THAT ARE FORTHCOMING AND TO MODIFY

25 MAYBE SOME COSMETIC CHANGES TO SOME CURRENT POLICIES

1  THAT WE HAVE.

2      Q    OKAY.  AND DO YOU HELP CREATE TRAINING

3  MATERIALS SPECIFICALLY?

4      A    YES.

5      Q    WOULD THAT BE THE POWERPOINTS?

6      A    YES.

7      Q    AND THESE POWERPOINTS ARE USED AT LEADERSHIP

8  ACADEMY?

9      A    YES, THEY WERE.

10      Q    OKAY.  LET'S TALK ABOUT THAT LEADERSHIP

11  ACADEMY TRAINING.

12          MR. CONINE:  BROOKE, CAN YOU BRING -- PLEASE

13  BRING UP DX_52, PLEASE?

14  BY MR. CONINE:

15      Q    CAN YOU SEE THAT DOCUMENT, MS. SPEARS?

16      A    YES, I CAN.

17      Q    DO YOU RECOGNIZE THIS POWERPOINT?

18      A    YES.  THIS WAS THE POWERPOINT THAT I CREATED

19  FOR THE LEADERSHIP ACADEMY.

20      Q    IS THAT YOUR NAME TO THE RIGHT?

21      A    YES, IT IS.

22      Q    SO THIS IS USED AT THE LEADERSHIP TRAINING

23  ACADEMY.  CORRECT?

24      A    YES.

25      Q    WHO ATTENDS THE LEADERSHIP ACADEMY?

1      **A**    SO THE LEADERSHIP ACADEMY IS ATTENDED BY ALL

2   OF THE EXECUTIVE TEAM, THE DEPUTY WARDENS, WARDENS OF

3   THE FACILITIES, ADA -- SOME OF THE ADA COORDINATORS

4   ATTEND THE LEADERSHIP ACADEMY, AND ANY EMPLOYEE IN A

5   LEADERSHIP ROLE WITHIN THE DEPARTMENT.

6      **Q**    DOES THAT INCLUDE LSP'S ADA COORDINATOR?

7      **A**    YES.

8      **Q**    DID YOU GIVE THIS SPECIFIC PRESENTATION?

9      **A**    YES, I DID.

10         **MR. CONINE:**  AND, BROOKE, CAN WE SCROLL DOWN

11   TO DX -- PAGE -- 55 OF THIS EXHIBIT, PLEASE?  ONE

12   MORE.  ONE MORE.  I'M SORRY.  35.  MY APOLOGIES.

13  **BY MR. CONINE:**

14     **Q**    DO YOU ALSO RECOGNIZE THIS DOCUMENT?

15     **A**    YES, I DO.

16     **Q**    DID YOU HELP PREPARE THIS DOCUMENT?

17     **A**    YES.  I WORKED ALONG WITH MS. DIANA MCCOOL

18   IN THE TRAINING TO CREATE THIS PORTION OF THE

19   PRESENTATION PRESENTED ON THE -- AT THE LEADERSHIP

20   ACADEMY.

21     **Q**    JUST BRIEFLY, CAN YOU EXPLAIN TO THE COURT

22   WHAT WAS COVERED IN THE LEADERSHIP ACADEMY TRAINING?

23     **A**    SO THE LEADERSHIP ACADEMY TRAINING COVERED

24   REASONABLE ACCOMMODATIONS, IT COVERED OUR GRIEVANCE

25   PROCESS.  WE OUTLINE TITLE I, WE OUTLINE SOME

1  INFORMATION IN TITLE II AS IT RELATES TO

2  ACCESSIBILITY, PHYSICAL BARRIERS.  WE TALKED ABOUT

3  WORKING WITH OFFENDERS THAT HAVE HEARING IMPAIRMENTS.

4  WE TALKED ABOUT -- A LOT OF STUFF -- GRIEVANCE

5  PROCESS, REASONABLE ACCOMMODATIONS.

6          WE TALKED ABOUT SOME UPCOMING THINGS THAT

7  HAVE, YOU KNOW, BEEN COMING MORE PREVALENT IN THE

8  CORRECTIONAL SYSTEMS SUCH AS SERVICE ANIMALS AND HOW

9  THEY SHOULD HANDLE THAT.  WE TALKED ABOUT THAT THEY

10 SHOULDN'T HAVE ANY TYPE OF -- USE DISCRIMINATORY

11 LANGUAGE AS IT RELATES TO EMPLOYEES OR OFFENDERS AND

12 HOW TO ASSESS IF THE PERSON QUALIFIES AS A QUALIFIED

13 PERSON UNDER ADA.

14     **Q**   OKAY.  HOW LONG WAS THIS TRAINING?

15     **A**   IT WAS A LITTLE OVER AN HOUR.  PROBABLY

16 ABOUT AN HOUR AND 15, 20 MINUTES.

17         **MR. CONINE:**  I WOULD LIKE TO ADMIT THIS

18 DOCUMENT INTO EVIDENCE AS DX_52.

19         **THE COURT:**  ANY OBJECTION TO DX_52?

20         **MS. RAMASWAMY:**  YES, YOUR HONOR.  WE WANT TO

21 PRESERVE OUR OBJECTION THAT THIS WAS PRODUCED OUTSIDE

22 THE DISCOVERY PERIOD.

23         **THE COURT:**  NOTED.

24             IT'S ADMITTED.

25 BY MR. CONINE:

1       Q    MS. SPEARS, HAD THIS TRAINING BEEN OFFERED

2    BEFORE?

3       A    NO.  THIS WAS A NEWLY IMPLEMENTED TRAINING.

4       Q    WHEN DID THIS SPECIFIC TRAINING TAKE PLACE?

5       A    WE DID A TRAINING IN APRIL AND A TRAINING IN

6    MAY.  SO I THINK APRIL THE 28TH AND MAYBE MAY 12TH.

7       Q    IS THIS SEPARATE FROM THE IN-SERVICE

8    TRAINING?

9       A    YES, IT IS.

10      Q    LET'S TALK ABOUT IN-SERVICE TRAINING FOR

11   ADA.  WHAT CAN YOU TELL ME ABOUT THAT?

12      A    SO THE IN-SERVICE TRAINING IS OFFERED AT THE

13   INSTITUTIONAL LEVELS FOR ALL CORRECTIONAL STAFF

14   ANNUALLY.  AND RIGHT NOW THE TRAININGS THAT THEY'RE

15   GIVING IS BASICALLY GEARED TOWARD DEAF AND

16   HARD-OF-HEARING OFFENDERS AND HOW TO EFFECTIVELY

17   COMMUNICATE WITH THOSE OFFENDERS TO ENSURE THAT WE'RE

18   MEETING THEIR NEEDS.

19      Q    OKAY.  SO YOU SAID THIS WOULD BE -- THIS IS

20   OFFERED ANNUALLY?

21      A    YES.

22      Q    AND WILL THIS TRAINING BE UPDATED?

23      A    THE EFFECTIVE COMMUNICATION WITH HEARING AND

24   -- HARD-OF-HEARING AND DEAF OFFENDERS?

25      Q    YES.

1      **A**    YES, IT WILL BE UPDATED.

2      **Q**    AND WHAT UPDATES WILL BE MADE?

3      **A**    TO THE BASIC PRESENTATION THAT WE HAVE RIGHT

4   NOW, THERE IS NOT ANYTHING THAT WE NEED TO UPDATE SO

5   FAR AS CONTENT.  BUT WE DO WANT TO EXPOUND ON SOME

6   THINGS BASED ON THE QUESTIONS.  SO WE JUST WANT TO

7   KIND OF ADD A LITTLE BIT MORE INFORMATION TO IT TO

8   BETTER HELP THE SECURITY STAFF KNOW HOW TO DEAL WITH

9   THESE OFFENDERS.

10     **Q**    SO ARE YOU ADDING MORE INFORMATION OUTSIDE

11  OF DEAF AND HARD OF HEARING?

12     **A**    YES.  RIGHT NOW THAT CONTENT HAS NOT BEEN

13  DECIDED UPON.  BUT WE ARE GOING TO ADD MORE

14  INFORMATION DEALING WITH BLIND OFFENDERS OR VISUALLY

15  IMPAIRED OFFENDERS AND HOW TO DEAL WITH THOSE.  AND

16  WE'RE GOING TO DO SOME MORE STUFF ABOUT EMERGENCY

17  PREPAREDNESS.

18     **Q**    LET'S TALK ABOUT THE TRAINING YOU HAVE

19  RECEIVED.  SINCE YOUR DEPOSITION HAVE YOU RECEIVED

20  TRAINING RELATED TO ADA?

21     **A**    YES, I HAVE.

22     **Q**    WHEN DID THAT TAKE PLACE?

23     **A**    I DON'T REALLY REMEMBER WHAT MONTH MY

24  DEPOSITION WAS IN.  BUT I DID TAKE SOME TRAINING LAST

25  MONTH.  I ATTENDED THE ADA NATIONAL SYMPOSIUM.  IT

1   WAS THE WEEK OF MAY 9TH THROUGH THE 13TH.

2       Q    OKAY.  AND CAN YOU DESCRIBE WHAT KIND OF

3   TRAINING YOU RECEIVED?

4       A    IT WAS A LOT OF INFORMATION WITHIN THAT

5   WEEK.  WE RECEIVED TRAINING ON REASONABLE

6   ACCOMMODATIONS, THE 2010 STANDARDS, ADA STANDARDS.  I

7   ALSO ATTENDED THE IBC, THE INTERNATIONAL BUILDING

8   CODE.  I GOT TRAINING ON EMERGENCY PREPAREDNESS,

9   TRAINING DEALING WITH COVID AND THE PANDEMIC AS IT

10  RELATES TO PERSONS WITH DISABILITIES, BASIC ROLE OF

11  THE ADA COORDINATOR, THE HISTORY OF ADA.

12      Q    AND HOW MANY HOURS DID YOU COMPLETE?

13      A    I COMPLETED A TOTAL OF 50 HOURS.

14      Q    DID YOU RECEIVE ANY MATERIALS IN CONJUNCTION

15  WITH THIS TRAINING?

16      A    I DID.  THEY SENT POWERPOINTS OF EVERY

17  PRESENTATION THAT WAS OFFERED THROUGHOUT THAT WEEK,

18  EVEN THE ONES THAT WE WERE UNABLE TO ATTEND DUE TO

19  CONFLICTS WITH ATTENDANCE AND THE OTHER ONE.  SO I

20  PRINTED ALL OF THAT INFORMATION OUT AND I ALSO

21  DISSEMINATED IT TO THE OTHER ADA COORDINATORS WITH

22  THE DEPARTMENT.

23      Q    DID YOU TAKE A TEST FOLLOWING THE TRAINING

24  COURSE?

25      A    I DID.

1    Q    DID YOU PASS THAT TEST?

2    A    YES.

3    Q    ARE YOU NOW CERTIFIED?

4    A    YES, I AM.

5    Q    IS THIS GOING TO BE REQUIRED FOR ALL ADA

6  COORDINATORS?

7    A    YES.

8    Q    WHEN WILL IT BE MANDATORY?

9    A    WE SENT AN EMAIL OUT AT THE BEGINNING OF

10 APRIL NOTIFYING ALL THE ADA COORDINATORS THAT WE

11 CURRENTLY HAVE THAT THIS WILL BE A MANDATORY

12 REQUIREMENT AND THEY HAVE TO HAVE IT COMPLETED BY MAY

13 OF NEXT YEAR; 2023.

14   Q    ARE YOU AWARE WHETHER LSP'S ADA COORDINATOR

15 RECEIVED THIS TRAINING?

16   A    YES.  MS. OLIVEAUX ACTUALLY ATTENDED THE ADA

17 SYMPOSIUM AT THE SAME TIME AS ME.  AND I THINK, BASED

18 ON THE TRANSCRIPT THAT SHE SENT ME, SHE HAS ABOUT

19 MAYBE FIVE HOURS LEFT BEFORE COMPLETION.

20   Q    OKAY.  MS. SPEARS, WHAT IS THE NAME OF THE

21 CERTIFICATION?

22   A    IT IS THE ADA CERTIFICATION PROGRAM.  IT'S

23 OFFERED THROUGH THE UNIVERSITY OF MISSOURI.

24   Q    LET'S TALK ABOUT THE TRANSITION PLAN YOU

25 MENTIONED EARLIER.  CAN YOU PLEASE TELL THE COURT

SHARITA SPEARS                                    **98**

1  ABOUT THAT?

2      **A**    SO THE TRANSITION PLAN IS SOMETHING THAT

3  WE'RE DOING TO ENSURE THAT WE IDENTIFY ANY POTENTIAL

4  BARRIERS WITHIN OUR FACILITIES AND CREATE A PLAN TO

5  RECTIFY THEM OVER A PERIOD OF TIME.

6      **Q**    AND HAVE YOU SOUGHT THE HELP OF A COMPANY

7  FOR THIS?

8      **A**    YES.  WE HAD A ROUND-TABLE MEETING WITH A

9  GROUP CALLED ACCESSIOLOGY (SIC).  AND THEY GAVE US

10 SOME INFORMATION AS TO WHAT WE WOULD NEED TO MOVE

11 FORWARD WITH A SELF-EVALUATION PLAN.

12         SO AS OF RIGHT NOW I'M JUST GATHERING SOME

13 INFORMATION SO WE CAN PRESENT IT BACK TO THEM TO

14 DETERMINE HOW WE'LL MOVE FORWARD.

15     **Q**    AND WHAT DOES ACCESSIOLOGY DO?

16     **A**    ACCESSIOLOGY IS A GROUP THAT COMES IN TO

17 COMPANIES, AND THEY GO IN AND THEY EVALUATE PROGRAM

18 SERVICES AND POLICIES AND THE FACILITIES TO ENSURE

19 THAT WE'RE IN COMPLIANCE WITH ADA.  AND THEY GIVE US

20 FEEDBACK AS TO WHAT BARRIERS THEY IDENTIFY OR WHAT

21 DEFICIENCIES THAT WE MAY HAVE.

22     **Q**    SO ACCESSIOLOGY WOULD DO THIS AT ANGOLA?

23     **A**    YES.

24     **Q**    AS WELL AS THE DEPARTMENT OF CORRECTIONS

25 AS --

1    **A**   YES.

2    **Q**   -- THE HEADQUARTERS?

3    **A**   IF THEY ARE HIRED, YES.

4    **Q**   WILL THEY LOOK AT PHYSICAL ACCESSIBILITY

5    ISSUES?

6    **A**   YES.

7    **Q**   AND HOW ABOUT --

8        **MS. RAMASWAMY:** OBJECTION, YOUR HONOR. THIS

9    CALLS FOR SPECULATION. SHE JUST SAID THEY HAVE NOT

10   YET BEEN HIRED.

11       **MR. CONINE:** JUDGE, SHE'S TELLING

12   WHAT THEY'RE -- SHE'S HAD DISCUSSIONS WITH THEM. SHE

13   SAID THAT. AND SHE'S TELLING US WHAT THEY HAVE

14   DISCUSSED AND WHAT THEY WILL DO.

15       **THE COURT:** OKAY. SO WHAT IS YOUR QUESTION,

16   THOUGH?

17       **MR. CONINE:** MY QUESTION WAS: WILL THEY

18   LOOK AT PHYSICAL ACCESSIBILITY ISSUES?

19       **THE COURT:** SO -- OKAY. OVERRULED.

20   BY MR. CONINE:

21   **Q**   DO YOU NEED ME TO REPEAT THE QUESTION?

22   **A**   NO. SO IN THE ROUND-TABLE CONVERSATION,

23   THEY DID STATE THAT THEY WOULD LOOK AT ALL THE

24   POLICIES, PROCEDURES AND FACILITIES. SO THROUGHOUT

25   THAT ASSESSMENT PROCESS, THEY WILL LOOK AT THE

1  PHYSICAL ASPECTS OF THE INSTITUTIONS AS WELL AS THE

2  POLICIES AND PROCEDURES AND PROGRAMS.

3       Q    AND PROGRAMS?  IS THAT WHAT YOU SAID?

4       A    YES.

5       Q    AND WHERE ARE YOU IN THIS PROCESS?

6       A    RIGHT NOW I'M GATHERING -- GATHERING

7  INFORMATION FOR THE COMPANY TO DETERMINE WHAT THE

8  PRICE RANGE WOULD BE TO SEE IF IT'S -- HOW WE HAVE TO

9  GO ABOUT OBTAINING THEM IF WE DECIDE TO GO WITH THAT

10 COMPANY.

11      Q    OKAY.  ARE YOU AWARE WHETHER THEY HAVE

12 ASSISTED OTHER STATE AGENCIES?

13      A    YES.  I RECEIVED A PACKET THAT ACCESSIOLOGY

14 DID -- A TRANSITION PLAN THAT ACCESSIOLOGY DID FOR

15 LSU FROM OUR STATE COORDINATOR AT THE GOVERNOR'S

16 OFFICE.  SHE SENT ME THAT, AND I HAD THE OPPORTUNITY

17 TO REVIEW THE WORK THAT THEY DID FOR THEM.

18      Q    OKAY.  LET'S MOVE ON.

19           YOU MENTIONED THE ADA DATABASE FOR THE

20 DEPARTMENT.  CAN YOU JUST PLEASE DESCRIBE THE

21 DATABASE FOR THE COURT?

22      A    SO THE ADA DATABASE IS THE DATABASE THAT I

23 CHECK WEEKLY, PROBABLY ABOUT TWO TO THREE TIMES A

24 WEEK.  THE DATABASE CONSIST OF ALL OF THE REQUESTS

25 FOR ACCOMMODATIONS FOR OFFENDERS, EMPLOYEES, AND

1  OTHERS, SO VISITORS OR CONTRACT WORKERS.

2           AND ONCE I GO INTO THE DATABASE, ON THE

3  LEFT-HAND SIDE THERE IS A -- I GUESS A LEDGER.  SO

4  SAY -- AND IT HAS THE EMPLOYEE TAB, IT HAS AN

5  OFFENDER TAB, IT HAS A MAIN TAB.  SO I CAN LOOK AT --

6  VIEW BOTH AREAS.  AND IT HAS A STATISTICAL TAB.

7           SO IN GOING INTO THE OFFENDER DATABASE, WHEN

8  I TYPICALLY GO IN I GO AND I LOOK AT THE

9  CHRONOLOGICAL TAB.  SO IN LOOKING AT THE

10 CHRONOLOGICAL TAB, I CAN BASICALLY CLICK ON THE YEAR

11 THAT I WANT TO REVIEW; I CAN GO AND I CAN CLICK ON

12 THE INSTITUTION THAT I WANT TO LOOK AT; AND I CAN

13 CLICK ON THE MONTH WITHIN, AND IT'S GOING TO POP UP

14 THE OFFENDERS WITHIN THAT TAB.

15          I CAN ALSO GO IN AND I CAN SEARCH BY THE

16 OFFENDER'S DOC NUMBER AND I CAN PULL UP HIS

17 INFORMATION AND THE AR -- THE REQUEST THAT HE'S PUT

18 IN OVER A PERIOD OF TIME.  I CAN ALSO SEARCH BY THE

19 OFFENDER'S NAME, AND IT WILL PULL THE FIELDS UP WHERE

20 HIS NAME APPEARS.

21          I CAN ALSO GO IN AND I CAN SEARCH BY THE

22 ACCOMMODATIONS THAT HAVE BEEN GRANTED TO THE

23 OFFENDERS.  SO I CAN LOOK AND I CAN CLICK ON THE TAB.

24 AND IF THE OFFENDER RECEIVED A CANE OR A WHEELCHAIR

25 OR A HEARING AID, I CAN CLICK ON IT BY THE TYPE OF

1   AUXILIARY AID THAT WAS PROVIDED TO THE OFFENDER.  I

2   CAN GO IN, I CAN LOOK AT IT BY THE NUMBER OF

3   OFFENDERS THAT WERE APPROVED AT A CERTAIN FACILITY,

4   DISAPPROVED AT A CERTAIN FACILITY, IF IT WAS

5   MODIFIED, AND THE DATE THAT IT WAS DONE.

6        Q    SO DOES THE DATABASE INCLUDE REQUESTS FROM

7   LSP?

8        A    YES.

9        Q    THEN YOU MENTIONED THAT YOU'RE ABLE TO SORT

10  BY THE OUTCOME.  IS THAT RIGHT?

11       A    YES.

12       Q    DO YOU INVESTIGATE CERTAIN ADA REQUESTS?

13       A    YES, I DO.

14       Q    CAN YOU PLEASE DESCRIBE THAT PROCESS TO THE

15  COURT?

16       A    SO WHEN I GO INTO THE DATABASE, IF I NOTICE

17  THAT AN OFFENDER WAS POSSIBLY -- OR AN EMPLOYEE --

18  WAS POSSIBLY DENIED FOR AN ACCOMMODATION REQUEST,

19  I'LL GO AND I'LL READ THE COMMENTS TO SEE WHAT THE

20  ADA COORDINATOR PUT IN AS TO THE REASON, AND I LOOK

21  AT THE REQUEST OF WHAT THEY WERE REQUESTING AND WHAT

22  REASONS.

23            I'LL THEN GO TO THE INQUIRY FORM TO KIND OF

24  SEE -- THE INQUIRY FORM BASICALLY TELLS US IF THEY

25  MEET THE DEFINITION OF A QUALIFIED PERSON UNDER ADA.

1  SO I'LL GO IN AND I'LL LOOK AT THE FORM, AND I'LL GO

2  THROUGH THE -- YOU KNOW, THE CHECKLIST AND SEE WHAT

3  ALL THEY PUT IN THE FORM.

4        AND ONCE I GO THROUGH AND I DO THAT, I'LL

5  CONTACT THE ADA COORDINATOR AT THE INSTITUTION -- IF

6  IT'S SOMETHING THAT I THINK NEEDS TO BE LOOKED AT A

7  LITTLE MORE CLOSELY, I'LL CONTACT THE ADA

8  COORDINATOR, GET WITH THE ADA COORDINATOR, GET SOME

9  MORE INSIGHT, GET THEM TO SEND ME SOME INFORMATION,

10  ANSWER A FEW QUESTIONS.  AND THEN ONCE I GET THAT

11  INFORMATION, IF I DEEM IT NECESSARY FOR ME TO GO TO

12  THE LOCATION, I'LL GO TO THE LOCATION AND I'LL DO A

13  SITE VISIT.

14        IF NOT, IF I FEEL LIKE I CAN MAKE -- IF I

15  FEEL COMFORTABLE WITH THEIR RECOMMENDATION, AT THAT

16  POINT I'LL GO WITH THEIR RECOMMENDATION.  IF THE

17  OFFENDER THEN FILES AN ARP -- I HAVE MY ACCOMPANYING

18  DOCUMENTATION WHERE I DID MY INITIAL INVESTIGATION --

19  I'LL LOOK AT WHAT THE OFFENDER'S CLAIMING IN HIS ARP

20  AND THEN I MAY HAVE TO DO A FOLLOW-UP INVESTIGATION.

21     Q   OKAY.  I BELIEVE YOU SAID YOU ACCESS THE

22  DATABASE TWICE A WEEK?

23     A   YES.

24     Q   DO YOU ALWAYS CHECK TO SEE THE MOST RECENT

25  REQUEST?

1      **A**    YES.  I LOOK AT EVERY REQUEST FOR THAT

2   MONTH.

3      **Q**    THAT WAS KIND OF A BAD QUESTION.

4          DO YOU REVIEW ALL NEW ENTRIES?

5      **A**    I DO.

6      **Q**    AND LET'S BACK UP TO THE INVESTIGATION.

7   HAVE YOU EVER HAD OCCASION WHERE YOU HAVE GONE OUT TO

8   ANGOLA?

9      **A**    YES.  I WENT TO ANGOLA ON THE 6TH.

10     **Q**    I'M SORRY?

11     **A**    ON THE 6TH OF THIS MONTH I WENT TO ANGOLA.

12     **Q**    AND WHAT WAS THAT -- WHAT DID THAT INVOLVE?

13     **A**    I HAD SOME ARPs FROM SOME OFFENDERS.  AND I

14   WENT AND JUST DID A WALK-THROUGH TO LOOK AND SEE THE

15   INVESTIGATION, REVIEW THAT ALL OF THE ACCOMMODATIONS

16   HAD BEEN MET.  SO I DIDN'T, YOU KNOW, HAVE ANYTHING

17   ELSE.  I DID WALK THROUGH AND SPEAK WITH A FEW

18   OFFENDERS WHILE I WAS THERE.  BUT OTHER THAN THAT,

19   EVERYTHING LOOKED FINE.

20     **Q**    OKAY.  AND JUST I GUESS BACK TO THE

21   DATABASE.  CAN YOU SORT BY OFFENDER?

22     **A**    I CAN.

23     **Q**    AND CAN YOU ALSO SORT IN CHRONOLOGICAL

24   ORDER?

25     **A**    YES.

1      **Q**    BY DATE?

2      **A**    YES.  BY DATE RECEIVED, UH-HUH.

3      **Q**    I BELIEVE YOU TOUCHED ON THIS A BIT.  WHAT

4    IS YOUR ROLE RELATED TO THE ADA ARPs?

5      **A**    I AM THE SECOND-LEVEL, I GUESS, RESPONDENT.

6      **Q**    CAN YOU PLEASE DESCRIBE THAT PROCESS TO THE

7    JUDGE?

8      **A**    SO THROUGH THE ARP PROCESS THERE ARE TWO

9    LEVELS PRIOR TO THE OFFENDER BEING ABLE TO BRING A

10   SUIT.  SO THERE IS THE FIRST LEVEL THAT'S ANSWERED BY

11   THE ADA COORDINATOR AT THE FACILITY.  THEY HAVE A

12   CERTAIN AMOUNT OF TIME TO ANSWER THE REQUEST FOR

13   ACCOMMODATION.

14        AND THEN IF THE OFFENDER IS NOT PLEASED WITH

15   THE ACCOMMODATION THAT THEY'RE GIVEN OR IF THEY'RE

16   DENIED, THEY CAN APPEAL AND SEND IT TO THE SECOND

17   LEVEL, AND IT COMES TO ME.  AND BY DELEGATION, I

18   ANSWER ON THE BEHALF OF THE SECRETARY AT THE SECOND

19   LEVEL.

20     **Q**    OKAY.  AND THIS IS AN APPEALS PROCESS FOR

21   THE ADA REQUESTS.  RIGHT?

22     **A**    WELL, FOR THE ARP PROCESS.  BUT ADA IS

23   INCLUDED UNDER THAT UMBRELLA, YES.

24     **Q**    LET'S TALK ABOUT -- A BIT ABOUT YOUR

25   DEPARTMENT.  AS THE ADA COORDINATOR DO YOU HAVE

1  CLERICAL SUPPORT?

2      **A**    I DON'T HAVE ANYONE IN THAT POSITION

3  CURRENTLY.  WE ARE CURRENTLY WORKING ON GETTING SOME

4  STAFF HIRED.  BUT I HAVE A CLERICAL ADMINISTRATIVE

5  ASSISTANT THAT'S UNDER THE PRE-CLASS UMBRELLA, AND

6  SHE HELPS WITH MANAGING THE DAY-TO-DAY OPERATIONS OF

7  ADA AS WELL.

8      **Q**    OKAY.  AND DO YOU HAVE ACCESS TO I.T.?

9      **A**    I DO.

10     **Q**    DO YOU HAVE ACCESS TO DOC LEGAL?

11     **A**    YES, I DO.

12     **Q**    AND DO YOU HAVE ACCESS TO THE SECRETARY'S

13 OFFICE?

14     **A**    YES.

15     **Q**    DO YOU FEEL THAT YOU HAVE THE RESOURCES

16 NECESSARY TO DO YOUR JOB?

17     **A**    YES, I DO.

18     **Q**    LET'S TALK ABOUT -- I BELIEVE YOU DISCUSSED

19 SOME PLAN FOR THE FUTURE.  DO YOU HAVE ANY PRIORITIES

20 FOR THE DEPARTMENT?

21     **A**    BASICALLY, AS I STATED, WE'RE WORKING ON A

22 TRANSITION PLAN RIGHT NOW, GETTING THAT COMPLETE, AND

23 ALSO ADDITIONAL TRAININGS FOR THE ADA COORDINATORS AT

24 THE FACILITY LEVELS.

25     **Q**    OKAY.

1          **MR. CONINE:**  JUDGE, THAT'S ALL THE QUESTIONS

2   I HAVE FOR DIRECT.

3          **THE COURT:**  CROSS?

4          **MS. RAMASWAMY:**  IF WE COULD TAKE JUST ONE

5   MOMENT, YOUR HONOR, PLEASE.

6                    **CROSS-EXAMINATION**

7   BY MS. RAMASWAMY:

8      **Q**    HELLO, MS. SPEARS.

9      **A**    HEY.  HOW ARE YOU?

10     **Q**    GOOD TO SEE YOU AGAIN.

11     **A**    GOOD TO SEE YOU AS WELL.

12     **Q**    SO YOU'RE A LAWYER?

13     **A**    YES.

14     **Q**    AND YOU PRACTICED FAMILY LAW, PERSONAL

15   INJURY, AND ESTATE PLANNING?

16     **A**    YES.

17     **Q**    YOU DON'T HAVE ANY PARTICULAR EXPERIENCE

18   WITH DISABILITY LAW?

19     **A**    NO.

20     **Q**    YOU REVIEWED LSP'S ADA POLICIES?

21     **A**    DIRECTIVES?

22     **Q**    YES.

23     **A**    YES.

24     **Q**    AND YOU THOUGHT LSP'S ADA DIRECTIVES WERE

25   CLEAR AND CONCISE?

1      **A**    YES.

2      **Q**    YOU DIDN'T SEE ANYTHING IN LSP'S ADA

3  DIRECTIVES THAT YOU WOULD CHANGE?

4      **A**    NO, NOT AS THEY CURRENTLY READ.

5      **Q**    YOU DIDN'T SEE ANYTHING IN ANY OF THE DOC

6  FACILITY'S ADA POLICIES THAT YOU THINK NEEDS TO BE

7  CHANGED, EXCEPT MAYBE REWORDING?

8      **A**    CORRECT.

9      **Q**    CAN WE PULL UP DEFENDANTS' EXHIBIT 52,

10  PLEASE?

11         NOW, MS. SPEARS, YOU TESTIFIED THAT THIS

12  DOCUMENT IS A POWERPOINT THAT WAS USED AS PART OF THE

13  LEADERSHIP ACADEMY TRAINING?

14      **A**    YES.

15      **Q**    YOU CREATED THIS DOCUMENT?

16      **A**    YES.

17      **Q**    AND IT WAS ALSO CREATED BY DIANA MCCOOL?

18      **A**    WELL, MS. MCCOOL -- IT WAS -- THERE ARE TWO

19  SEPARATE POWERPOINTS.  SO MS. MCCOOL CREATED PART OF

20  IT AND I CREATED PART OF IT, YES.

21      **Q**    AND THE TWO OF YOU CONSULTED ON THE CONTENT

22  OF THE POWERPOINT?

23      **A**    YES.

24      **Q**    BUT YOU DON'T KNOW WHETHER MS. MCCOOL HAS

25  ANY EXPERTISE IN THE ADA?

1    **A**   NO, I CAN'T ATTEST TO THAT.

2    **Q**   NOW, I WANT TO CLARIFY SOMETHING FROM YOUR

3    TESTIMONY TODAY.  YOU SAID THAT LSP'S ADA

4    COORDINATOR, ASHLI OLIVEAUX, ATTENDED THE LEADERSHIP

5    ACADEMY TRAINING?

6    **A**   YES, SHE DID ATTEND LEADERSHIP ACADEMY.

7    **Q**   AND THAT INCLUDES THIS POWERPOINT?

8    **A**   FOR THE ONE THAT ASHLI ATTENDED?  I DON'T

9    KNOW WHICH DAY SHE ATTENDED, BUT I KNOW SHE DID

10   ATTEND LEADERSHIP ACADEMY.

11   **Q**   SO IT WOULDN'T NECESSARILY SURPRISE YOU TO

12   HEAR THAT MS. OLIVEAUX TESTIFIED LAST WEEK THAT SHE'D

13   NEVER SEEN THIS POWERPOINT?

14   **A**   OH, OKAY.  I DON'T KNOW WHICH ACADEMY SHE

15   ATTENDED, BUT WE ATTENDED THE LEADERSHIP ACADEMY

16   TOGETHER.

17   **Q**   WHEN YOU SAY "LEADERSHIP ACADEMY," IS THAT

18   THE SAME AS THE ADA SYMPOSIUM?

19   **A**   NO, IT'S NOT.

20   **Q**   OKAY.  SO WOULD IT SURPRISE YOU TO HEAR THAT

21   MS. OLIVEAUX TESTIFIED LAST WEEK THAT THE ONLY

22   TRAINING SHE'S DONE SINCE MARCH WITH RESPECT TO THE

23   ADA IS THE ADA SYMPOSIUM?

24   **A**   YEAH, THAT WOULD SURPRISE ME.  I THOUGHT SHE

25   HAD DID SOME ADDITIONAL TRAININGS OUTSIDE OF THE ADA

1  SYMPOSIUM.

2      Q    BUT STILL RELATED TO THE ADA?

3      A    THAT'S RELATED TO ADA, YEAH.

4      Q    SO SHE MIGHT BE MISTAKEN ABOUT THAT?

5      A    I CAN'T SAY IF SHE'S MISTAKEN OR NOT.

6      Q    LET'S GO TO PAGE 5 OF THIS DOCUMENT.  AND

7  THE TITLE OF THIS SLIDE IS "BENEFITS OF AN ADA

8  COORDINATOR."  AND THE FIRST BULLET SAYS "TAKES THE

9  LEAD."  MEANING THE ADA COORDINATOR TAKES THE LEAD?

10     A    YES.

11     Q    AND THEN IT SAYS "CREATES A POINT PERSON."

12  SO DOES THAT MEAN THE ADA COORDINATOR SHOULD CREATE A

13  POINT PERSON?

14     A    ME AS THE ADA PERSON FOR THE DEPARTMENT, I

15  CREATE A POINT PERSON.  SO THAT WOULD BE -- IF WE'RE

16  DISCUSSING LSP, MS. OLIVEAUX AT LSP IS THE POINT

17  PERSON FOR THAT FACILITY.

18     Q    SO YOU'RE SAYING THAT THIS SLIDE IS MOSTLY

19  DIRECTED TO YOU IN YOUR POSITION?

20     A    SO IT'S DIRECTED TO ME IN MY POSITION, AND

21  THEN SOME OF THE OTHER POINTS ARE DIRECTED TOWARDS

22  WHAT THE ADA COORDINATORS AT THE FACILITIES NEED TO

23  KNOW AS WELL.

24     Q    SO NOTHING ABOUT THIS SLIDE IS MEANT TO

25  SUGGEST THAT SOMEONE LIKE ASHLI OLIVEAUX SHOULD

1    APPOINT A POINT PERSON OTHER THAN HERSELF AT LSP?

2        A    CORRECT.

3        Q    LET'S GO TO PAGE 8.  AND THIS SLIDE IS

4    TITLED "REQUESTS FOR ACCOMMODATION."  AND THE FIRST

5    BULLET SAYS "ADA COORDINATOR REQUIRES THE 'REQUEST

6    FOR ACCOMMODATION' FORM BE COMPLETED."  RIGHT?

7        A    CORRECT.

8        Q    SO THIS IS SAYING THAT IN ORDER TO MAKE AN

9    ACCOMMODATION REQUEST, A PERSON HAS TO FILL OUT A

10   REQUEST FOR ACCOMMODATION FORM?

11       A    THE PERSON THEMSELVES DOESN'T NECESSARILY

12   HAVE TO FILL IT OUT.  SO IF THEY MAKE A VERBAL

13   REQUEST FOR ACCOMMODATION, THEN THE ADA COORDINATOR

14   WILL REDUCE IT TO PUT IT IN THE FORM.  AND THAT'S

15   WHEN MS. OLIVEAUX PUTS IT IN THE ADA DATABASE.

16       Q    BUT THIS SLIDE DOESN'T SAY ANYTHING ABOUT

17   THAT?

18       A    THE NEXT SLIDE DOES.

19       Q    LET'S LOOK AT THE NEXT SLIDE.  OKAY.  I WANT

20   TO ASK YOU ABOUT THIS THIRD COLUMN ALL THE WAY ON THE

21   RIGHT.  IT SAYS "OFFENDERS" AT THE TOP.  AND RIGHT

22   UNDER "OFFENDERS" IT SAYS "IN WRITING - ARP."  RIGHT?

23       A    CORRECT.

24       Q    SO THIS IS INDICATING THAT OFFENDERS SHOULD

25   USE THE ARP PROCESS TO MAKE A REQUEST FOR

1  ACCOMMODATION?

2      **A**    UH-HUH.

3             **THE COURT:**  YOU HAVE TO SAY "YES."

4      **A**    I'M SORRY.  YES.

5      **Q**    AND THAT'S THE ONLY WAY LISTED HERE FOR THE

6  IN-WRITING REQUEST FOR OFFENDERS?

7      **A**    THAT'S THE ONLY ONE LISTED HERE, YES.

8      **Q**    AND THE ARP PROCESS IS A GRIEVANCE PROCESS.

9  RIGHT?

10     **A**    CORRECT.

11     **Q**    CAN WE PULL UP PLAINTIFFS' EXHIBIT 21-CCCC?

12            DO YOU RECOGNIZE THIS DOCUMENT?

13     **A**    YES.

14     **Q**    WHAT IS THIS?

15     **A**    THE LOUISIANA STATE PENITENTIARY DIRECTIVE

16  FOR THE ADMINISTRATIVE REMEDY PROCEDURE, OR ARP

17  PROCEDURE.

18     **Q**    SO THIS IS THE LSP DIRECTIVE REGARDING THE

19  ADMINISTRATIVE REMEDY PROCEDURE?

20     **A**    YES.

21     **Q**    CAN WE GO TO PAGE 12?

22            NOW, I WANT TO DRAW YOUR ATTENTION TO NO. 3,

23  "REJECTED REQUESTS," LETTER A.  IT SAYS "IF A REQUEST

24  IS REJECTED, IT MUST BE FOR ONE OF THE FOLLOWING

25  REASONS:"

1        AND THEN IF WE CAN GO TO THE NEXT PAGE, PAGE

2   13, AND I WANT YOU TO LOOK AT NO. 4.  AND NO. 4 SAYS

3   "THE COMPLAINT CONCERNS AN ACTION NOT YET TAKEN OR A

4   DECISION WHICH HAS NOT YET BEEN MADE."  RIGHT?

5        A    THAT'S WHAT IT SAYS, YES.

6        Q    SO THAT MEANS A PERSON CAN'T FILE AN ARP

7   UNLESS SOME DECISION HAS ALREADY BEEN MADE?

8        A    SO THERE ARE SOME EXCEPTIONS WHEN IT COMES

9   TO THE ADA.  SO IF THE OFFENDER HAS NOT MADE A VERBAL

10  REQUEST TO A PERSON, HE CAN INITIATE AN ADA REQUEST

11  IN AN ARP AND IT WON'T BE REJECTED.

12       Q    DOES IT SAY THAT IN THIS POLICY?

13       A    NO, IT DOES NOT.

14       Q    I WANT TO LOOK AT NO. 6 NOW.  NO. 6 SAYS

15  "THE REQUEST WAS NOT WRITTEN BY THE OFFENDER AND A

16  WAIVER WAS NOT APPROVED."  AND THEN IT SAYS "THE ONLY

17  EXCEPTION IS IF THE OFFENDER HAS ALLEGED SEXUAL

18  ABUSE."

19       SO THIS IS SAYING THAT THE PERSON NEEDS A

20  WAIVER BEFORE THEY CAN HAVE SOMEONE ELSE WRITE THE

21  ARP FOR THEM?

22       A    YES.

23       Q    AND DOES IT INCLUDE ANY EXCEPTION FOR ADA

24  REQUESTS?

25       A    NO, IT DOES NOT.

1      Q    OKAY.  THEN I WANT TO LOOK AT NO. 7.  IT

2   SAYS "THE OFFENDER HAS REQUESTED A REMEDY FOR MORE

3   THAN ONE INCIDENT (A MULTIPLE COMPLAINT) UNLESS THE

4   REQUEST IS A REPORT OF AN ALLEGATION OF SEXUAL

5   ABUSE."  RIGHT?

6           MR. CONINE:  JUDGE, I'LL OBJECT.  THIS IS

7   NOT -- I DON'T EVEN KNOW IF THAT'S LISTED IN THE PART

8   RELATED TO ADA.

9           THE COURT:  IS THAT RELATED TO THE ADA?

10          MS. RAMASWAMY:  THAT'S WHAT I'M ASKING HER,

11  YOUR HONOR.

12          THE COURT:  WELL, ASK THE QUESTION.

13              OBJECTION OVERRULED.

14  BY MS. RAMASWAMY:

15     Q    AND JUST TO CLARIFY, YOU DID SAY EARLIER

16  THAT THE IN-WRITING PROCESS FOR AN OFFENDER TO MAKE

17  AN ADA REQUEST IS THE ARP PROCESS?

18     A    YES.

19     Q    SO NO. 7 IS SAYING YOU CAN'T FILE MORE THAN

20  ONE ARP AT A TIME.  RIGHT?

21     A    CORRECT.

22     Q    AND IT DOESN'T INCLUDE AN EXCEPTION FOR THE

23  ADA?

24     A    NO, IT DOES NOT.

25     Q    I ALSO WANT TO ASK YOU -- YOU SAID IN YOUR

1   TESTIMONY EARLIER THAT YOU HANDLE THE SECOND LEVEL OF

2   THE ARP PROCESS?

3       A    YES.

4       Q    IS THAT JUST THE ADA REQUEST OR YOU

5   HANDLE -- YOU HANDLE SECOND LEVEL FOR ALL THE ARPs?

6       A    JUST ADA.

7           MS. RAMASWAMY:  YOUR HONOR, AT THIS TIME I'D

8   LIKE TO MOVE TO ADMIT PLAINTIFFS' EXHIBIT 21-CCCC.

9           THE COURT:  THAT'S THE POLICY ON --

10          MS. RAMASWAMY:  ADMINISTRATIVE REMEDY

11  PROCEDURES.

12          THE COURT:  ON THE ARPs?

13          MR. CONINE:  THAT'S WHAT WE'RE LOOKING AT

14  HERE?

15          MS. RAMASWAMY:  YES.

16          MR. CONINE:  NO OBJECTION, YOUR HONOR.

17          THE COURT:  ADMITTED.

18  BY MS. RAMASWAMY:

19      Q    MS. SPEARS, YOU DIDN'T KNOW ABOUT THE ADA

20  CLAIMS IN THIS LAWSUIT WHEN YOU FIRST TOOK THE JOB OF

21  DOC'S HEADQUARTERS ADA COORDINATOR.  RIGHT?

22      A    CORRECT.

23      Q    YOU FOUND OUT A WEEK OR SO AFTER YOU TOOK

24  THE JOB?

25      A    AROUND ABOUT, YES.

1    Q    AND AT THE TIME OF YOUR DEPOSITION, YOU SAID

2  THAT YOU WERE PLANNING TO WORK WITH AN OUTSIDE

3  COMPANY ON AN ADA TRANSITION PLAN?

4    A    YES.

5    Q    YOU SAID THAT TODAY, TOO?

6    A    YES.

7    Q    THAT'S ACCESSOLOGY -- OR ACCESSIOLOGY?

8    A    YES.

9    Q    AND IT WAS NOT YOUR UNDERSTANDING THAT THE

10 COURT'S FINDINGS IN THIS CASE RELATED TO THE ADA

11 WOULD BE PART OF YOUR DISCUSSIONS WITH ACCESSOLOGY?

12   A    CORRECT.

13        MS. RAMASWAMY:  NOTHING FURTHER, YOUR HONOR.

14        THE COURT:  MR. CONINE?

15        MR. CONINE:  YES, JUDGE, JUST BRIEFLY.

16               REDIRECT EXAMINATION

17 BY MR. CONINE:

18   Q    MS. SPEARS, IS THE ARP PROCESS THE ONLY WAY

19 AN OFFENDER CAN REQUEST AN ACCOMMODATION?

20   A    NO.

21   Q    CAN YOU PLEASE ELABORATE?

22   A    THE OFFENDERS CAN REQUEST AN ACCOMMODATION

23 VERBALLY.

24   Q    ALL RIGHT.

25   A    AND IF THEY REQUEST THE ACCOMMODATION

1  VERBALLY, THEN THE ADA COORDINATOR OR EVEN THE WARDEN

2  OR SECURITY PERSONNEL IN THEIR UNIT CAN GRANT THEM

3  THE ACCOMMODATION AND GET THEM WHAT THEY NEED.

4      **Q**   OKAY.

5          **MR. CONINE:**  THAT'S ALL I HAVE, YOUR HONOR.

6          **THE COURT:**  OKAY.  I HAVE ONE.

7              WITH RESPECT TO THIS ACCESSOLOGY, HAS

8  THERE BEEN A REQUEST FOR PROPOSAL PREPARED?

9          **THE WITNESS:**  HAS THERE BEEN A REQUEST FOR A

10 PROPOSAL?  YES, MA'AM.

11         **THE COURT:**  YOU DO HAVE A REQUEST FOR A

12 PROPOSAL?

13         **THE WITNESS:**  NO, I DON'T AT THIS TIME.  I'M

14 WORKING ON GATHERING INFORMATION THAT THEY NEED TO

15 CREATE A PROPOSAL.

16         **THE COURT:**  SO THE SCOPE OF THE WORK THAT

17 YOU WOULD BE ASKING ACCESSOLOGY TO DO IS NOT -- HAS

18 NOT REALLY BEEN DEFINED YET?

19         **THE WITNESS:**  NO, MA'AM.

20         **THE COURT:**  THAT'S ALL I HAVE.

21             DO YOU ALL WANT TO ASK ANY QUESTIONS

22 FOLLOWING THAT?

23         **MS. RAMASWAMY:**  NO, YOUR HONOR.

24         **THE COURT:**  OKAY.  YOU MAY STEP DOWN.  THANK

25 YOU, MA'AM.

1          **THE WITNESS:**  THANK YOU.

2          **THE COURT:**  Y'ALL HAVE ONE MORE WITNESS?

3          **MR. ROBERT:**  WE DO, YOUR HONOR.  AND TO BE

4    FULL DISCLOSURE -- WE MOVED AT BREAK-NECK SPEED -- I

5    HAD HIM COMING AT ONE O'CLOCK TODAY.

6          **THE COURT:**  CARDINAL SIN, OKAY.  WE'RE GOING

7    TO BRING UNTIL 1:00 P.M.

8          **MR. ROBERT:**  CAN I -- BEFORE WE LEAVE, COULD

9    WE -- I MEAN, WE'RE VERY CONFIDENT NOW THAT WE'RE

10   GOING TO BE DONE TODAY.

11          AND I ALSO WANTED TO NOTE THAT, YOU

12   KNOW, COUNSEL TALKED ABOUT REBUTTAL AND HAVING A

13   TEN-MINUTE REBUTTAL.  WE HAVE REACHED OUT TO THEM AND

14   OFFERED TO TRY TO SEEK SOME KIND OF STIPULATION

15   REGARDING THAT, IF WE CAN REACH SOME KIND OF

16   AGREEMENT SO WE DON'T HAVE TO COME BACK AND DEAL WITH

17   THAT, YOU KNOW, IF IT'S THE COURT'S PLEASURE, BUT

18   THAT -- YOU KNOW, WE'VE REACHED OUT AND OFFERED TO DO

19   THAT.

20          **THE COURT:**  OKAY.  WELL --

21          **MR. DUBNER:**  WE HADN'T HAD A CHANCE YET TO

22   RESPOND ON THAT.  I DON'T THINK IT'S REALLY AMENABLE

23   TO STIPULATION.  BUT MS. GOEHRING WILL BE AVAILABLE

24   THIS AFTERNOON IF WE'RE GOING THAT FAST.  WE CHECKED

25   TO MAKE SURE, GIVEN HOW FAST WE WERE GOING.

1        THE COURT:  I THOUGHT, IF MEMORY SERVED, YOU

2   HAD TWO REBUTTAL WITNESSES.  JUST MS. GOEHRING?

3        MR. DUBNER:  THE OTHER IS DARREN CASHIO,

4   WHOSE DEPOSITION IS HIS TESTIMONY.

5        THE COURT:  IT'S GOING TO BE A DEPOSITION

6   THAT I'M GOING TO READ.  WELL, WHY DON'T WE -- IF

7   Y'ALL WANT TO TALK ABOUT -- YOU HAVE UNTIL ONE

8   O'CLOCK TO FIGURE THAT OUT.  IF WE CAN TAKE MS.

9   GOEHRING TODAY, FINE.  IF WE CAN'T AND YOU CAN'T

10  REACH A STIPULATION, THEN WE'LL SEE YOU ALL ON

11  TUESDAY.  BUT FOR NOW WE'RE GOING TO BE ON BREAK

12  UNTIL ONE O'CLOCK.

13       MR. ROBERT:  THANK YOU, YOUR HONOR.

14       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

15       THE COURT:  BE SEATED.

16            OKAY.  NEXT WITNESS, PLEASE.

17       MR. ROBERT:  YES, YOUR HONOR.  WE CALL

18  DR. JACOB JOHNSON.

19       THE COURT:  DR. JOHNSON, IF YOU'LL STAND

20  RIGHT HERE, THE COURTROOM DEPUTY IS GOING TO SWEAR

21  YOU IN.

22

23

24

25

1        (WHEREUPON, JACOB CHARLES JOHNSON, ED.D.,

2   BEING DULY SWORN, TESTIFIED AS FOLLOWS.)

3        THE COURTROOM DEPUTY:  IF YOU WOULD, PLEASE,

4   SIR, STATE YOUR NAME AND SPELL IT FOR THE RECORD.

5        THE WITNESS:  JACOB JOHNSON.  J-A-C-O-B

6   JOHNSON, J-O-H-N-S-O-N.

7        THE COURT:  GO AHEAD, SIR.

8                  DIRECT EXAMINATION

9   BY MR. ROBERT:

10       Q    GOOD AFTERNOON, DR. JOHNSON.  CAN YOU GIVE

11  US YOUR FULL NAME, PLEASE.

12       A    DR. JACOB CHARLES JOHNSON.

13       Q    AND COULD YOU PROVIDE US WITH YOUR

14  EDUCATIONAL BACKGROUND.

15       A    EDUCATIONAL BACKGROUND:  MY COLLEGIATE

16  CAREER STARTED AT SOUTHERN UNIVERSITY WHERE I

17  OBTAINED A BACHELOR'S IN BUSINESS MANAGEMENT, MINOR

18  IN MARKETING.  CONTINUED MY --

19       Q    WHAT YEAR WAS THAT?

20       A    THAT WAS IN 2000.

21       Q    OKAY.

22       A    AND IN 2004 I WENT BACK TO SOUTHERN

23  UNIVERSITY, OBTAINED A MASTER'S DEGREE IN PUBLIC

24  ADMINISTRATION, HEALTH CARE CONCENTRATION.  AND THAT

25  WAS IN 2006.  IN 2017 I STARTED AT LOUISIANA STATE

1   UNIVERSITY WHERE I OBTAINED A SECOND MASTER'S IN

2   NON-PROFIT ADMINISTRATION AND A DOCTORATE IN

3   LEADERSHIP STUDIES.

4        **Q**    OKAY.  AND CAN YOU PROVIDE US WITH -- JUST

5   BASICALLY RUN THROUGH YOUR EMPLOYMENT HISTORY.

6        **A**    EMPLOYMENT HISTORY:  AFTER GRADUATING

7   UNDERGRAD, I STARTED A INTERNSHIP AT CHARITY

8   HOSPITAL, EARL K. LONG, IN BATON ROUGE.  ALSO HAD THE

9   OPPORTUNITY TO WORK FOR LOUISIANA EASTERN HOSPITAL,

10  MENTAL HEALTH HOSPITAL, IN JACKSON, LOUISIANA.  THEN

11  FROM THERE I WORKED FOR A COMMUNITY HEALTH CENTER IN

12  BATON ROUGE.  AND AFTER THAT I WENT TO WORK FOR THE

13  SECRETARY OF STATE'S OFFICE IN NEW ORLEANS AS THE

14  DEPUTY REGISTRAR.

15           AFTER THAT I WENT TO SOUTHEAST COMMUNITY

16  HEALTH CENTER IN ST. HELENA PARISH WHERE WE HAD FOUR

17  COMPREHENSIVE SITES -- SCHOOL-BASED SITES AND

18  ADDICTIVE DISORDERS.  AFTER THAT I WENT TO THE

19  DEPARTMENT OF HEALTH, WORKED WITH THE A21 PANDEMIC

20  AND PROGRAM MANAGER COMMUNITY OUTREACH.  AFTER THAT I

21  WENT TO HEAL, HEALTH EDUCATION AUTHORITY, IN NEW

22  ORLEANS.

23           AND AFTER HEAL I WENT BACK TO THE DEPARTMENT

24  OF HEALTH.  I WORKED AS THE DEPUTY INCIDENT

25  COMMANDER -- DEPUTY INCIDENT COMMANDER FOR THE

1  DEPARTMENT'S RESPONSE FOR ALL HAZARDOUS EMERGENCIES

2  THROUGHOUT THE STATE. AND CURRENTLY I'M AT

3  DEPARTMENT OF CORRECTIONS WORKING AS THE LONG-TERM

4  CARE HOSPITAL ADMINISTRATOR.

5      Q    AND YOU SAID "CURRENTLY." WHEN DID YOU

6  BECOME -- I KNOW LONG-TERM HEALTH CARE ADMINISTRATOR,

7  IT'S A LONG TITLE. IS IT BASICALLY A HEALTH CARE

8  ADMINISTRATOR? IS THAT WHAT YOU'RE DOING?

9      A    IT IS.

10     Q    SO IT'S OKAY IF I REFER TO IT AS HEALTH CARE

11 ADMINISTRATOR?

12     A    YES.

13     Q    WHEN DID YOU BECOME EMPLOYED BY THE

14 DEPARTMENT OF CORRECTIONS IN THAT CAPACITY?

15     A    OCTOBER 20, 2020.

16     Q    AND WHERE ARE YOU -- IS IT WITH THE

17 DEPARTMENT HEADQUARTERS OR IS IT SOME FACILITY

18 LOCATION? WHERE ARE YOU HOUSED?

19     A    EXCUSE ME. AT LOUISIANA STATE PENITENTIARY.

20     Q    ALL RIGHT. AND WHAT ARE YOUR DUTIES AND

21 RESPONSIBILITIES IN YOUR ROLE AS HEALTH CARE

22 ADMINISTRATOR?

23     A    THE DUTIES ARE VAST. THE JOB DESCRIPTION

24 COVERS GOVERNANCE THROUGHOUT THE TREATMENT CENTER OR

25 HOSPITAL, MANAGING OVER 14 DEPARTMENTS, A LITTLE OVER

1  300 EMPLOYEES.

2         BUT THE OVER-ARCHING MISSION IS TO

3  ACCOMPLISH THE ORGANIZATION'S MISSION -- EXCUSE ME --

4  AND, IN DOING SO, PROVIDE FOR THE CARE AND TREATMENT

5  OF THE PEOPLE BEHIND BARS.  AND IN DOING SO, IT

6  ENCOMPASSES PRETTY MUCH EVERYTHING:  ENFORCEMENT OF

7  POLICIES AND PROCEDURES, MEETINGS, COMMUNICATION,

8  INTERNAL, EXTERNAL.

9      Q    HOW DID YOU COME TO GET THE JOB AT LSP?

10     A    I APPLIED FOR IT.

11     Q    AND DID YOU INTERVIEW?

12     A    I DID.

13     Q    AND YOU -- WERE YOU OFFERED THE POSITION?

14     A    I WAS.

15     Q    AND WHY DID YOU ACCEPT THE POSITION?

16     A    I THOUGHT IT WAS A GOOD OPPORTUNITY TO WORK

17 WITH A -- A -- ANOTHER VULNERABLE POPULATION.  HAVING

18 WORKED WITH VULNERABLE POPULATIONS IN THE PAST, THIS

19 IS ONE POPULATION THAT I HADN'T HAD AN OPPORTUNITY TO

20 WORK WITH, AND I THOUGHT IT WAS A GOOD OPPORTUNITY.

21     Q    WHAT WERE YOU CHARGED WITH DOING AS THE

22 HEALTH CARE ADMINISTRATOR AT LSP?

23     A    AS I SAID, ENFORCEMENT OF THE ORGANIZATION'S

24 POLICIES, TO MORE OR LESS EFFECTUATE THE CARE AND

25 TREATMENT FOR THE OFFENDERS.

1      Q    AND WHAT'S BEEN YOUR PRIMARY FOCUS SINCE

2  TAKING OVER AS THE HEALTH CARE ADMINISTRATOR?

3      A    PRIMARY IS THE DELIVERY OF HEALTH CARE TO

4  THE PEOPLE BEHIND BARS.

5      Q    HAVE YOU IMPLEMENTED CHANGES SINCE YOU'VE

6  BEEN IN YOUR CAPACITY?

7      A    I HAVE.

8      Q    CAN YOU GENERALLY DESCRIBE SOME OF THE

9  CHANGES THAT HAVE BEEN IMPLEMENTED SINCE YOU'VE BEEN

10  THERE?

11     A    I GUESS CHANGING IN STAFF, CHANGING IN I

12  GUESS THE ORGANIZATIONAL CULTURE; MORE

13  ACCOUNTABILITY, MORE PATIENT SATISFACTION IN DEALING

14  WITH THE OFFENDER POPULATION, ENSURING THAT THE

15  OFFENDERS' NEEDS ARE MET TO THE BEST OF EACH

16  DEPARTMENT DEPENDING ON THE ANCILLARY SERVICES THAT

17  THEY MAY REQUIRE.

18     Q    IS SICK CALL ONE OF THE AREAS WHERE CHANGES

19  HAVE BEEN MADE UNDER YOUR WATCH?

20     A    YES.

21     Q    LET'S TALK ABOUT THAT.  INITIALLY LET'S GO

22  AHEAD AND PULL UP DX_8-AAA.

23          DO YOU RECOGNIZE THIS DOCUMENT, DR. JOHNSON?

24     A    YES.

25     Q    WHAT IS IT?

**1**      **A**    IT IS THE PENITENTIARY DIRECTIVE FOR HEALTH

**2**   CARE SERVICES ACCESS TO SICK CALL AND CLINICAL

**3**   SERVICES.

**4**      **Q**    AND WHAT'S THE PURPOSE OF THIS DIRECTIVE?

**5**      **A**    WELL, THE PURPOSE OF THIS DIRECTIVE IS TO

**6**   ENSURE THAT OFFENDERS HAVE ACCESS TO CARE IN A TIMELY

**7**   MANNER.

**8**      **Q**    IT'S DATED MARCH 3, 2022.  IS THAT THE MOST

**9**   RECENT AND THE MOST CURRENT VERSION OF THE POLICY, TO

**10**  YOUR KNOWLEDGE?

**11**     **A**    TO MY KNOWLEDGE, IT IS.

**12**     **Q**    IS LSP IN COMPLIANCE WITH THAT -- TO YOUR

**13**  KNOWLEDGE, IS LSP IN COMPLIANCE WITH THIS DIRECTIVE?

**14**     **A**    YES.

**15**        **MR. ROBERT:**  YOUR HONOR, I'D LIKE TO OFFER,

**16**  FILE, AND INTRODUCE DX_8-AAA.

**17**        **MR. DUBNER:**  NO OBJECTION.

**18**        **THE COURT:**  ADMITTED.

**19**  BY MR. ROBERT:

**20**     **Q**    HOW IS SICK CALL CURRENTLY BEING OPERATED AT

**21**  LSP?  JUST WALK ME THROUGH IT, IF YOU DON'T MIND.

**22**     **A**    SICK CALL IS INITIATED BY THE OFFENDER BY

**23**  COMPLETING A -- WHAT WE CALL A SICK CALL FORM.  AND

**24**  THAT FORM IS DEPOSITED INTO A SICK CALL BOX IN THE

**25**  OFFENDER'S HOUSING AREA, AND THOSE FORMS ARE TURNED

1   IN BY TWELVE NOON ON MONDAY THROUGH THURSDAY.  THE

2   OFFENDERS WILL BE SEEN THE FOLLOWING DAY.  HOLIDAYS

3   AND WEEKENDS THE OFFENDER WILL BE SEEN THE NEXT

4   FOLLOWING DAY FROM THAT, SO EITHER WITHIN 24 OR

5   WITHIN 48 OR 72 HOURS.

6       Q    OKAY.  SO THEY DEPOSIT THE SICK CALL FORM

7   INTO THE BOX BY NOON.  IS THAT CORRECT?

8       A    YES.

9       Q    WHAT HAPPENS TO THEM FROM THERE ONCE THEY'RE

10  IN THAT BOX?

11      A    THE FORMS ARE TRANSPORTED TO THE -- WHAT WE

12  CALL THE ATU, OR ASSESSMENT AND TREATMENT UNIT.  AND

13  THEY'RE DEPOSITED IN THAT BOX.  AND THE ATU STAFF,

14  EITHER THE NURSE OR THE NURSE PRACTITIONER, IN THAT

15  AREA WILL TRIAGE THOSE FORMS.  SIMULTANEOUSLY THERE

16  IS AN EMAIL SENT FROM THEIR HOUSING AREA TO A WORK

17  GROUP, AND THE OFFENDER'S FILES ARE PULLED.  A

18  CALL -- A CALL-OUT IS PUBLISHED FOR THAT NEXT DAY FOR

19  THE OFFENDERS.

20          AND THE OFFENDERS ARE SEEN WITH THEIR CHART,

21  AND THE PROVIDER -- CURRENTLY A PROVIDER PROVIDES

22  THAT FACE-TO-FACE CONTACT WITH THE OFFENDER THROUGH

23  VIDEOCONFERENCE.

24      Q    LET'S BACK UP A SECOND.  YOU SAID IT'S

25  DELIVERED FROM THE BOXES AT THE VARIOUS LOCATIONS

1  THROUGHOUT THE PRISON TO THE BOX OUTSIDE THE ATU.  IS

2  THAT CORRECT?

3      **A**    BOX INSIDE THE ATU.

4      **Q**    INSIDE THE ATU.

5      **A**    YES.

6      **Q**    I'M SORRY.

7          HOW LONG AFTER THOSE SICK CALLS AFTER --

8  AFTER NOON, HOW LONG -- YOU KNOW, WHAT KIND OF TIME

9  PERIOD IS IT BEFORE THEY'RE COLLECTED AND DELIVERED

10 TO THE ATU?

11     **A**    IF THEY'RE DEPOSITED IN THEIR HOUSING

12 LOCATION BY 12:00, 1:00, 1:30, THEY'LL REACH THE ATU.

13     **Q**    AND ONCE THEY'RE -- I THINK YOU TESTIFIED,

14 BUT I WANT TO EXPLORE THIS A LITTLE BIT.  ONCE

15 THEY'RE DEPOSITED INTO THE BOX AT THE ATU, WHAT

16 HAPPENS TO THEM AFTER THAT?  WHAT'S THE NEXT STEP?

17     **A**    THE NURSE OR THE NURSE PRACTITIONER, STAFF

18 IN THE ATU, WILL TRIAGE THOSE FORMS.

19     **Q**    SO IT'S EITHER THE NURSE OR THE NURSE

20 PRACTITIONER ASSIGNED TO THE ATU ON ANY GIVEN

21 AFTERNOON WHEN THE FORMS COME IN, THEY'RE THE ONES

22 WHO WOULD DO THAT TRIAGE THAT YOU'RE TALKING ABOUT?

23     **A**    YES.

24     **Q**    AND WHAT EXACTLY DO THEY DO WHEN THEY DO

25 THAT TRIAGE?

1    A    THEY WILL SEPARATE THOSE -- FIRST OF ALL,

2  THEY'LL DO A ROUGH SCAN TO ENSURE THAT THERE IS NO

3  EMERGENT NEED OF THOSE OFFENDERS ON THOSE SICK CALL

4  FORMS.  BUT OTHER THAN THAT, THEY'LL ROUTE THEM TO

5  OTHER DEPARTMENTS.  WE MAY HAVE SOME THAT REQUIRE

6  COVID VACCINATIONS OR DENTAL CARE.  AND THOSE THAT

7  NEED DIRECT MEDICAL ATTENTION, THEY WILL BE TRIAGED

8  FOR THEIR VARIOUS AREAS, DISBURSED TO THE AREAS.  THE

9  CALL-OUT WILL BE COMPLETED, FILES WILL BE PULLED, THE

10 MEDICAL CHARTS WILL BE PULLED, THE NEXT DAY WE'LL

11 START.

12   Q    SO THE MEDICAL CHARTS, ONCE THEY'RE TRIAGED,

13 IT GOES TO MEDICAL RECORDS AND THEY PULL THE MEDICAL

14 CHARTS?  IS THAT THE NEXT STEP?

15   A    THE NEXT -- AFTER THAT -- THE MEDICAL

16 RECORDS ARE ALREADY BEING PULLED FROM THE EMAIL

17 NOTIFICATION.  AND ONE OF THE CHECK POINTS WE HAVE

18 THERE IS TO RECONCILE THE BOX WITH THE EMAIL TO

19 ENSURE THAT NO OFFENDERS ARE MISSED.

20   Q    OKAY.  AND THE MEDICAL RECORDS, ONCE THEY'RE

21 PULLED, WHERE DO THEY GO?

22   A    THEY GO TO THE PRACTITIONER'S OFFICE FOR THE

23 COMMENCEMENT OF SICK CALL.

24   Q    AND SICK CALL IS CONDUCTED IN WHAT MANNER?

25 IS IT FACE TO FACE, TELEMED?  HOW DOES IT WORK?

1    **A**    99 PERCENT OF THE TIME IT IS DONE VIA

2    TELEMED.  IF WE SHOULD HAVE A I.T. ISSUE, THAT SICK

3    CALL WILL BE DONE IN PERSON.

4    **Q**    AND WHAT ARE THE HOURS -- YOU KNOW, WE -- I

5    THINK YOU TESTIFIED IT'S PUT IN THERE BY NOON --

6    LET'S SAY IT'S A MONDAY -- PUT IN THERE BY NOON ON

7    MONDAY, AND THE PATIENT IS SEEN BY THE PROVIDER THE

8    FOLLOWING DAY.  CORRECT?

9    **A**    YES.

10   **Q**    WITH THE EXCEPTION OF WEEKENDS, WHICH I

11   THINK YOU'VE CLARIFIED AS WELL.

12        WHAT IS THE TIME PERIOD IN WHICH SICK CALL

13   IS CONDUCTED THAT FOLLOWING DAY?

14   **A**    SICK CALL BEGINS AT 5:00 A.M., AND IT MAY --

15   DEPENDING ON THE VOLUME, IT MAY END ANYWHERE FROM

16   11:00 TO 12:00, SOMETIMES 1:00.

17   **Q**    AND HOW DOES IT WORK AS FAR AS IS IT DIVIDED

18   -- SICK CALL BROKEN UP BY CAMP, OR HOW IS IT BROKEN

19   OUT FOR THE NURSE PRACTITIONER TO CONDUCT IT?

20   **A**    YES.  EACH HOUSING AREA HAS A TELEMEDICINE

21   CODE THAT THE NURSE PRACTITIONER WILL ADMINISTER THE

22   SICK CALL, OR THEY ACCESS THE CARE AT THAT POINT.

23   **Q**    SO THE NURSE PRACTITIONER IS LOCATED IN

24   TELEMEDICINE AREA AT THE TREATMENT CENTER.  CORRECT?

25   **A**    AT THE NEW CLINIC BUILDING ADJACENT TO THE

1  TREATMENT CENTER, YES.

2  **Q**  AND THEY HAVE MEDICAL RECORDS WITH THEM.

3  CORRECT?

4  **A**  CORRECT.

5  **Q**  NOW, WHERE ARE THE PRISONERS LOCATED WHEN

6  THEY ATTEND SICK CALL?

7  **A**  THE PATIENTS ARE AT THEIR HOUSING AREA.

8  **Q**  AND WHERE IN THEIR HOUSING AREA?

9  **A**  AT A -- IT'S A MODULAR BUILDING, WHAT WE

10  CALL ONE OF THE CLINICS AT THAT AREA.

11  **Q**  IS THAT SOMETHING NEW -- THE MODULAR

12  BUILDING, IS THAT SOMETHING NEW SINCE YOU'VE BEEN

13  THERE?

14  **A**  IT IS.

15  **Q**  TELL ME ABOUT THAT MODULAR BUILDING.  WHAT

16  DOES IT LOOK LIKE?  HOW IS IT EQUIPPED, WHAT HAVE

17  YOU?

18  **A**  IT'S A BUILDING THAT'S -- IN EVERY HOUSING

19  AREA THERE IS A MEDICAL AREA.  AND ADJACENT TO THAT

20  MEDICAL AREA WE HAVE THESE MODULAR BUILDINGS FOR

21  TELEMED PURPOSES.  AND THE TELEMED BUILDING HAS A

22  WAITING AREA AND, DEPENDING ON THE BUILDING, HAS EXAM

23  ROOMS.  THE OUTER CAMPS HAVE -- CAMPS D AND C HAVE

24  TWO EXAM ROOMS AND A WAITING AREA; CAMP F HAS MORE,

25  AS WELL AS MAIN PRISON.

**1**      Q    AND THESE MODULAR BUILDINGS AT THE VARIOUS

**2** SITES, ARE THEY AIR CONDITIONED?

**3**      A    THEY ARE.

**4**      Q    DO THEY PROVIDE A PRIVATE ENCOUNTER FOR THE

**5** PATIENT?

**6**      A    YES.

**7**      Q    NOW, YOU INDICATED THAT TELEMEDICINE

**8** EQUIPMENT IS USED TO DO THIS.  WERE YOU INVOLVED IN

**9** SETTING THIS UP, THE USE OF TELEMEDICINE, GETTING THE

**10** EQUIPMENT AND SO FORTH?

**11**      A    YES.

**12**      Q    TELL ME ABOUT THAT.

**13**      A    WELL, IT WAS CONVERSATIONS WITH SOME OF

**14** DOC'S PARTNERS, LOUISIANA STATE HEALTH CENTER --

**15** HEALTH, AND THEY HAD VARIOUS TELEMED STATIONS THAT

**16** THEY WAS WILLING TO ALLOW OTHERS TO USE.  WE

**17** REQUESTED TELEMED STATIONS FOR ALL OF OUR HOUSING

**18** AREAS, AND WE BEGAN MEETING WITH I.T. AND ALL OF THE

**19** PROVIDERS AND INTERNAL WORK GROUPS TO FACILITATE A

**20** MORE EFFECTIVE WAY TO DELIVER CARE TO THE OFFENDER

**21** POPULATION.

**22**      Q    NOW, WHAT IS THE EMT'S INVOLVEMENT, IF ANY,

**23** IN THE SICK CALL EXPERIENCE?

**24**      A    THEY ARE INVOLVED ON THE OPPOSITE END OF THE

**25** PRACTITIONER IN THE CARE AND DELIVERY SIDE.

1    Q    AND WHY IS THAT?

2    A    WELL, ON THESE TELEMED UNITS THERE ARE A

3    VARIETY OF EQUIPMENT FOR THE PRACTITIONER TO BE ABLE

4    TO PROVIDE A EXAMINATION OF THE OFFENDER.  AND THEY

5    ALSO TAKE ALL VITAL SIGNS AND COMMUNICATE THAT AND

6    WORK WITH THE HOUSING AREA TO ENSURE THAT ALL

7    OFFENDERS ARE AT THE HOUSING LOCATION.

8    Q    HOW IS SICK CALL DIFFERENT NOW -- BEFORE I

9    ASK YOU THAT, IS THERE ANY OTHER CHANGES OR ANYTHING

10   OTHER THAN WHAT WE JUST COVERED THAT YOU'VE BEEN

11   INVOLVED IN WITH RESPECT TO SICK CALL THAT THE

12   JUDGE -- YOU WANT THE JUDGE TO HEAR ABOUT?

13   A    THERE HAS BEEN A LOT OF CHANGES.  MY MIND

14   KIND OF ESCAPES ME NOW.  BUT SICK CALL, NEW HIRES --

15   Q    NO.  JUST SICK -- LET'S STICK --

16   A    JUST IN SICK CALL?

17   Q    -- WITH SICK CALL BEFORE WE MOVE ON.

18   A    THE BIGGEST DIFFERENCE I WOULD SAY IS

19   INSTEAD OF HAVING AN EMT, YOU WOULD HAVE A NURSE

20   PRACTITIONER PROVIDING THE CARE.  THERE IS NO

21   CELL-SIDE DELIVERY OF CARE.  IT'S A PRIVATE ENCOUNTER

22   AND ONE THAT IS VERY EXPEDIENT FOR THE REQUEST FROM

23   THAT OFFENDER.

24   Q    AND THE MEDICAL RECORDS BEING AVAILABLE TO

25   THE PROVIDER, IS THAT SOMETHING NEW THAT YOU CHANGED?

1      **A**    YES.

2      **Q**    IS THAT HELPFUL?

3      **A**    VERY MUCH HELPFUL.

4      **Q**    LET ME ASK YOU, BEFORE WE MOVE ON:  HOW IS

5   THE SICK CALL PERSON -- THE NEW CHANGES, HOW ARE THEY

6   WORKING?

7      **A**    OVERALL THEY'RE WORKING WELL, OUTSIDE

8   LOOKING IN.  BUT IF YOU LOOK AT THE DATA, WHAT WE

9   REFER TO AS OUR C-05 REPORT, WE SHOW A REDUCTION IN

10  WHAT WE CALL SELF-DECLARED EMERGENCIES.  WE HAVE --

11         **MR. DUBNER:**  OBJECTION, YOUR HONOR.  HE'S

12  TESTIFYING ABOUT C-05 REPORTS FROM 2022.  DEFENDANTS

13  STOPPED PRODUCING THEM IN 2021, DESPITE OUR REQUESTS

14  FOR THEM.

15         **THE COURT:**  MR. ROBERT?

16         **MR. ROBERT:**  HE DOESN'T HAVE TO TESTIFY

17  ABOUT THAT, YOUR HONOR, IF YOU DON'T WANT HIM TO.

18  HE'S -- I THINK HE WAS GENERALLY TALKING ABOUT WHAT

19  THE C-05 REPORTS PROVIDE, AND THAT GOES BEYOND 2022.

20  THAT GOES -- HE'S BEEN THERE SINCE 2020.

21         **THE COURT:**  I'M GOING TO ALLOW THE WITNESS

22  TO TESTIFY TO WHATEVER METRICS THAT HE HAS LOOKED AT

23  THAT HE THINKS ARE SIGNIFICANT IN TERMS OF THE CARE

24  THAT'S BEING DELIVERED AT ANGOLA.

25         **MR. ROBERT:**  THANK YOU, YOUR HONOR.

1   BY MR. ROBERT:

2       **Q**   I ASKED YOU IF YOU DID ANYTHING TO TRACK THE

3   SICK CALL PROCESS, AND YOU WERE TALKING ABOUT IT.  I

4   THINK THAT'S WHERE WE WERE.

5       **A**   OVERALL THE SICK CALL IS PROVIDING MORE

6   MEANINGFUL ENCOUNTERS WITH THE OFFENDER POPULATION.

7   I THINK I WAS SAYING THE DATA FROM THE C-05 REPORTS

8   INDICATE THAT WE HAVE FEWER EMERGENT CALLS, WHICH

9   TELLS ME THAT WE'RE PROVIDING CARE ON THE FRONT END

10  VERSUS LETTING AN ILLNESS EXACERBATE ITSELF.

11          ASIDE FROM THAT, JUST FROM THE OFFENDERS --

12  HAVING CONVERSATIONS WITH THE OFFENDERS, THEY

13  APPRECIATE THE CHANGE AND THE MORE EXPEDITED ACCESS.

14      **Q**   LET ME ALSO PULL UP 5 -- DX_51-B FOR ME,

15  PLEASE.

16          DOCTOR, DO YOU RECOGNIZE THIS DOCUMENT?

17      **MR. ROBERT:**  NEEDS TO BE SEALED.  SORRY.

18  BY THE WITNESS:

19      **A**   YES.

20  BY MR. ROBERT:

21      **Q**   DO YOU RECOGNIZE IT?

22      **A**   THAT IS THE SICK CALL REQUESTS FROM THE

23  HOUSING AREA.

24      **Q**   AND IS THIS SOMETHING THAT YOU HAVE

25  IMPLEMENTED SINCE YOU'VE BEEN AT LSP?

**1**      **A**   YES, AS A PART OF THE WORK GROUP.

**2**      **Q**   WHAT WAS THE PURPOSE OF IMPLEMENTING THIS OR

**3**  PUTTING IN THIS DOCUMENTATION?

**4**      **A**   WELL, WE WANTED TO TRACK EACH HOUSING AREA

**5**  FOR THE REQUESTS THAT THE OFFENDERS HAVE MADE FOR

**6**  CARE, BUT WE ALSO WANTED TO RECONCILE THAT WITH THE

**7**  SICK CALL THAT ARE BEING DEPOSITED IN THE SICK CALL

**8**  BOX IN THE ATU.

**9**          AND THIS GENERALLY GIVES A GOOD IDEA OF EACH

**10**  HOUSING AREA AND THE AMOUNT OF SICK CALLS THAT ARE

**11**  COMING FROM THAT AREA EVERY DAY, WEEK AND THE MONTH.

**12**      **Q**   IS THIS SOMETHING THAT YOU REVIEW REGULARLY

**13**  IN ORDER TO TRACK WHAT'S GOING ON WITH SICK CALL?

**14**      **A**   YES; DAILY.

**15**      **Q**   LET'S SCROLL THROUGH -- BECAUSE THERE IS A

**16**  NUMBER OF PAGES HERE, LET'S JUST SCROLL THROUGH A FEW

**17**  OF THEM.

**18**          DO YOU RECOGNIZE ALL THIS INFORMATION HERE?

**19**      **A**   YES.  THAT'S THE EACH HOUSING AREA REQUEST

**20**  FOR SICK CALL ON THE SPECIFIED DATE.

**21**      **Q**   ALL RIGHT.

**22**          **MR. ROBERT:**  YOUR HONOR, I'D LIKE TO OFFER,

**23**  FILE, AND INTRODUCE DX_51-B.

**24**          **MR. DUBNER:**  WE PRESERVE OUR OBJECTION TO

**25**  THE LATE DISCLOSURE.  BUT OTHERWISE NO OBJECTION.

**1**          THE COURT:  IT'S 1,145 PAGES LONG.  HOW MUCH

**2**  OF THAT HAVE THE PLAINTIFFS SEEN?

**3**          MR. ROBERT:  ALL OF IT, YOUR HONOR.

**4**          THE COURT:  WHEN DID THEY GET IT?

**5**          MR. ROBERT:  I THINK THEY -- THESE ARE DATED

**6**  BACK IN 2021.  I DON'T THINK THERE IS ANYTHING THAT'S

**7**  BEEN ADDED TO THAT.

**8**          MR. DUBNER:  WE RECEIVED IT AFTER THE CLOSE

**9**  OF DISCOVERY.  I DON'T REMEMBER EXACTLY WHEN.  BUT AS

**10**  I SAID, WE PRESERVE OUR OBJECTION BUT OTHERWISE ARE

**11**  NOT MAKING ANY OTHER OBJECTIONS.

**12**          THE COURT:  OKAY.  ADMITTED.

**13**          MR. ROBERT:  YOU CAN TAKE IT DOWN.  LET'S GO

**14**  AHEAD AND BRING UP 51-B -- DX_51-B.

**15**          THE COURTROOM DEPUTY:  I THOUGHT THAT WAS B.

**16**  51-B.

**17**          MR. ROBERT:  OKAY.  BRING UP A.  I HAD A

**18**  TYPO IN MY OUTLINE.  I'M SORRY.

**19**  BY MR. ROBERT:

**20**     Q   DOCTOR, DO YOU RECOGNIZE THIS DOCUMENT?

**21**     A   YES.

**22**     Q   WHAT IS IT?

**23**     A   IT'S A EXCEL SPREADSHEET SICK CALL BY

**24**  HOUSING LOCATION.

**25**     Q   AND IS THIS SOMETHING THAT YOU IMPLEMENTED?

1      **A**    YES.  THIS IS PART OF THE WORK GROUP, YES.

2      **Q**    WHAT IS THE PURPOSE OF THIS DOCUMENT?

3      **A**    IT'S TO -- IT'S A AT-A-GLANCE OR SNAPSHOT OF

4  EACH HOUSING AREA SICK CALL ON A DAILY BASIS.  AND IT

5  GIVES YOU ALSO THE TOTAL FOR THE MONTH AS WELL.

6      **Q**    OKAY.  AND WHAT'S THE PURPOSE OF THIS

7  DOCUMENT?

8      **A**    WELL, IT GIVES A SNAPSHOT OF THE SICK CALL

9  ON THAT DAY.  IT SHOWS TRENDS.  IT SHOWS, YOU KNOW,

10  MAYBE AFTER A WEEKEND IF YOU NEED TO SEARCH ANOTHER

11  PRACTITIONER IN THE SICK CALL AREA TO ENSURE TIMELY

12  CARE.  SO IT SERVES A VARIETY OF PURPOSES.

13      **Q**    IS THIS SOMETHING THAT YOU REVIEW ON A

14  REGULAR BASIS?

15      **A**    YES.

16      **Q**    DO YOU FIND IT HELPFUL IN TRACKING SICK CALL

17  AND MAKING SURE YOU'RE ADEQUATELY PROVIDING CARE?

18      **A**    YES.

19      **MR. ROBERT:**  YOUR HONOR, I'D LIKE TO GO

20  AHEAD AND OFFER, FILE, AND INTRODUCE DX_51-A.

21      **THE COURT:**  ANY OBJECTION?

22      **MR. DUBNER:**  WE PRESERVE OUR OBJECTION TO

23  THE LATE PRODUCTION, BUT OTHERWISE NO.

24      **THE COURT:**  ADMITTED.

25      **MR. ROBERT:**  YOU CAN TAKE IT DOWN.

1   BY MR. ROBERT:

2       Q    DOCTOR, YOU'RE ALSO TRACKING REFUSALS,

3   AREN'T YOU?

4       A    YES.

5       Q    TELL ME ABOUT THAT.  IS THAT SOMETHING YOU

6   IMPLEMENTED?

7       A    REFUSALS WERE I GUESS SOMEWHAT TRACKED, BUT

8   WE'VE JUST WANTED TO HIGHLIGHT MORE OF THE REFUSALS

9   AND NO-SHOWS FROM THE DIFFERENT HOUSING AREAS.  SO

10  YES.

11      Q    AND IS THAT SOMETHING THAT YOU REGULARLY

12  LOOK AT?

13      A    YES.

14      Q    LET'S MOVE ON TO TALK ABOUT THE ATU.  ARE

15  THERE ANY CHANGES THAT HAVE BEEN MADE IN THE ATU?

16      A    YES.  THE ATU IS NOW STAFFED BY A NURSE

17  PRACTITIONER DAILY AND A CHARGE NURSE, ALONG WITH THE

18  EMT OR PARAMEDIC.

19      Q    LET'S START WITH -- PULL UP DX_8-YY.

20           DO YOU RECOGNIZE THIS DOCUMENT?

21      A    YES.  THAT'S THE PENITENTIARY DIRECTIVE FOR

22  HEALTH CARE SERVICES TRIAGE AND TREATMENT IN THE

23  ASSESSMENT AND TREATMENT UNIT.

24      Q    IS THIS THE MOST CURRENT VERSION OF THIS

25  PARTICULAR DIRECTIVE?

1    **A**    YES.

2    **Q**    TO YOUR KNOWLEDGE, IS LSP IN COMPLIANCE WITH

3    THIS DIRECTIVE?

4    **A**    YES.

5         **MR. ROBERT:**  YOUR HONOR, I'D LIKE TO OFFER,

6    FILE, AND INTRODUCE DX_8-YY.

7         **MR. DUBNER:**  IT'S ALREADY IN EVIDENCE.  NO

8    OBJECTION, YOUR HONOR.

9         **THE COURT:**  OKAY.  IF IT'S ALREADY IN

10   EVIDENCE, THEN I DON'T NEED TO ADMIT IT.

11        **MR. ROBERT:**  I'M SORRY.

12   BY MR. ROBERT:

13   **Q**    OKAY.  LET'S GO BACK TO WHAT WE WERE TALKING

14   ABOUT WITH THE ATU.  HOW IS IT STAFFED?

15   **A**    THE ATU IS STAFFED WITH A NURSE

16   PRACTITIONER, A NURSE, AND AN EMT OR A PARAMEDIC.

17   **Q**    AND LET'S TALK FIRST ABOUT THE NURSE

18   PRACTITIONER.  WHAT IS THE STAFFING FOR A NURSE

19   PRACTITIONER ON WEEKDAYS?  WHAT IS THE STAFFING

20   REQUIREMENTS THERE?

21   **A**    ONE NURSE PRACTITIONER.

22   **Q**    ON SITE, BASICALLY IN THE ATU OR VERY NEAR

23   THE ATU, DURING THE WEEKDAYS WHAT -- WHAT'S THE DEAL

24   WITH THAT?  WHAT HOURS ARE THEY ON SITE AVAILABLE IN

25   THE ATU?

1    **A**    THERE IS A -- MONDAY THROUGH FRIDAY --

2    EXCUSE ME.   MONDAY THROUGH THURSDAY DURING BUSINESS

3    HOURS; AFTERHOURS THERE IS A NURSE PRACTITIONER ON

4    CALL; AND WEEKENDS 24 HOURS A DAY.

5      **Q**    SO FRIDAY WOULD INCLUDE WEEKENDS THEY WOULD

6    BE 24 HOURS A DAY?

7      **A**    YES.   FRIDAY, SATURDAY AND SUNDAY.

8          **THE COURT:**   SO FRIDAY, SATURDAY AND SUNDAY

9    IS 24-HOUR CALL?

10         **THE WITNESS:**   YES.   NURSE PRACTITIONERS ON

11   STAFF 24 HOURS DAILY.

12   **BY MR. ROBERT:**

13     **Q**    IS IT CALL, OR ARE THEY ACTUALLY ON AT THE

14   ATU?

15     **A**    NO, THEY'RE STAFFED.   THEY'RE ON THE

16   PREMISES.

17         **THE COURT:**   SO MONDAY THROUGH THURSDAY

18   THEY'RE ON THE PREMISES EIGHT TO FIVE.   WELL, YOU

19   SAID BUSINESS HOURS, SO I'M ASSUMING THAT.   AND THEN

20   FRIDAY AND SATURDAY AND SUNDAY THERE IS A NURSE

21   PRACTITIONER IN THE ATU 24 HOURS A DAY?

22         **THE WITNESS:**   YES.   WE HAVE TWO.   MISS --

23   EXCUSE ME.   PRACTITIONER PARKS AND PRACTITIONER

24   WALLACE ON THE ATU, 12-HOUR SHIFTS.

25         **THE COURT:**   ALL RIGHT.

1  BY MR. ROBERT:

2      Q    AND SO WE'VE COVERED THE NURSE PRACTITIONERS

3  THEN.  THERE IS A NURSE IN THERE AS WELL.  CORRECT?

4      A    CORRECT.

5      Q    AND WHAT'S THE NURSE STAFFING FOR THE ATU?

6  HOW MANY AND WHAT HOURS?

7      A    SAME HOURS.  WELL, THE NURSE IS THERE 24

8  HOURS A DAY, AND SO -- AND SO AS -- AS WELL AS THE

9  EMT OR PARAMEDIC.

10     Q    AND YOU HAVE ONE EMT OR PARAMEDIC IN THERE

11  24/7 AS WELL?

12     A    CORRECT.

13     Q    AND WHAT'S THE ROLE OF THE EMT OR PARAMEDIC?

14     A    TO ASSIST THE NURSE OR NURSE PRACTITIONER,

15  ALSO MAN THE TELEPHONES AND/OR WHAT WE CALL MEDICAL

16  FLOOR, WHICH IS THE INCOMING CALLS TO THE ASSESSMENT

17  AND TREATMENT UNIT.

18     Q    WHAT'S THE BREAKDOWN AS FAR AS RN VERSUS

19  NURSE PRACTITIONER, OR WHAT -- WHAT DO YOU DO WITH

20  STAFFING THERE?  DO YOU HAVE AN RN IN THERE ALL THE

21  TIME, OR HOW DOES THAT WORK?

22     A    WE'RE SPEAKING OF THE ATU?

23     Q    THE ATU, YES, SIR.

24     A    YES.  YES.

25     Q    NOW, HAVE YOU DONE ANYTHING TO ANALYZE THE

1  ADEQUACY OF THE STAFFING IN THE ATU SINCE YOU CAME

2  ON?

3     **A**    YES.  REVIEWING THE STAFF MATRIX FOR ALL

4  NURSING AREAS.

5     **Q**    AND ARE YOU SATISFIED THAT THE CURRENT

6  STAFFING THERE IS MEETING PATIENT NEEDS?

7     **A**    YES.

8     **Q**    ARE YOU TRACKING -- AND YOU SAID YOU ARE.

9  YOU'RE TRACKING THE NURSE SCHEDULES, TRACKING TO

10 SEE -- YOU KNOW, MAKE SURE THAT YOU'VE GOT ADEQUATE

11 COVERAGE.  CORRECT?

12    **A**    YES.

13    **Q**    LET'S GO AHEAD AND PULL UP JX_67-A, WHICH IS

14 A JOINT EXHIBIT.

15       DO YOU RECOGNIZE THIS DOCUMENT?

16    **A**    YES.  THAT'S THE STAFFING MATRIX FOR THE

17 NURSING AREAS.

18    **Q**    AND TELL ME ABOUT -- WHAT IS IT?

19    **A**    I SHOULD SAY MAYBE ABOUT 90, 95 PERCENT OF

20 THE NURSING AREAS.

21       WHAT ABOUT IT?

22    **Q**    YEAH.  WHAT'S ITS SIGNIFICANCE?

23    **A**    IT JUST SHOWS YOU PRETTY MUCH ALL OF THE

24 NURSING AREAS, THEIR START TIME, END TIME, WHEN SHIFT

25 CHANGE HAPPENS, ALSO PROVIDES FOR REDUNDANCY ON

1  CALL-INS FOR ON-CALL NURSING STAFF AND -- OR FOR

2  COLLABORATION WITH NURSING STAFF AS WELL.

3         MR. ROBERT:  WHY DON'T YOU SCROLL TO THE

4  NEXT PAGE, BROOKE.

5  BY MR. ROBERT:

6     Q   NOW, YOU SEE THERE IS A SECTION THERE FOR

7  ATU.  IS THAT THE STAFFING SCHEDULE FOR THE ATU?

8     A   YES.

9     Q   NOW, I SEE ON THERE, THERE IS AN LPN LISTED

10 ON THERE.  CORRECT?

11    A   YES.

12    Q   WHAT IS THE REASON FOR THAT?

13    A   ATU?

14    Q   YES.

15    A   IT'S NOT PRIMARILY AN RN.  SOMETIMES AN LPN

16 DOES WORK THAT AREA.

17    Q   SO YOU DO HAVE BOTH FROM TIME TO TIME

18 DEPENDING ON AVAILABILITY?

19    A   ALL AREAS, YES.

20        MR. ROBERT:  YOUR HONOR, I'D LIKE TO -- IT'S

21 ALREADY IN.  YOU CAN TAKE IT DOWN.

22 BY MR. ROBERT:

23    Q   HOW OFTEN DO YOU VISIT THE ATU?

24    A   DAILY OR -- WITH THE EXCEPTIONS OF EXTERNAL

25 MEETINGS, BUT DAILY.

1      **Q**    WHAT ARE YOUR OBSERVATIONS?

2      **A**    OBSERVATIONS ARE CHECKING TO SEE IF IT'S

3    OPERATIONAL, TALKING TO STAFF, TALKING TO OFFENDERS,

4    MAKING SURE THERE IS NO EQUIPMENT NEEDS OR ANY

5    CONCERNS THAT MAY ARISE FROM STAFF OR OFFENDERS IN

6    THAT AREA.

7      **Q**    DO YOU HAVE ANY PLANS FOR ADDITIONAL

8    IMPROVEMENTS IN THAT AREA?

9      **A**    THERE ARE RESOURCE PLANS FOR MORE EQUIPMENT.

10   WE'RE LOOKING AT SOME MONITORS -- AS OF NOW, SOME

11   UPDATED MONITORS.  WE WANT TO DO MORE CLEANER

12   CABINETRY IN THAT AREA, BUT -- BUT YES, THERE IS

13   ALWAYS OPPORTUNITY TO UPGRADE EQUIPMENT.

14     **Q**    LET ME ASK YOU SOMETHING.  YOU KNOW, IN

15   TALKING ABOUT NURSING AND THESE NURSING SCHEDULES, DO

16   YOU HAVE NURSING VACANCIES THAT ARE AVAILABLE?

17     **A**    YES.

18     **Q**    ARE YOU TRYING TO FILL THOSE VACANCIES?

19     **A**    YES.

20     **Q**    WHAT ARE Y'ALL DOING TO TRY TO FILL THOSE

21   VACANCIES?

22     **A**    WE WORK WITH THE DEPARTMENT'S CHIEF NURSING

23   OFFICER, THE DEPARTMENT OF CORRECTIONS IN GENERAL.

24   WE WORK WITH THE COMMUNITY AND TECHNICAL COLLEGES, AS

25   WELL AS THE FOUR-YEAR INSTITUTIONS.

1    **Q**   HAS ANYTHING BEEN DONE TO INCREASE OR

2   IMPROVE SALARIES FOR --

3    **A**   I'M SORRY.  WE ALSO UTILIZE SOCIAL MEDIA

4   WHENEVER WE CAN AS WELL.

5    **Q**   HAS ANYTHING BEEN DONE TO TRY TO BUMP UP OR

6   IMPROVE SALARIES TO TRY TO ATTRACT ADDITIONAL

7   APPLICANTS?

8    **A**   YES.  WELL, ACTUALLY WE'VE BEEN FORTUNATE TO

9   HAVE A FEW INCENTIVE INCREASES FOR BOTH RETENTION AND

10   ALSO NEW HIRES, RAISING THE RATE OF PAY FOR THOSE

11   EMPLOYEES COMING IN.

12    **Q**   OKAY.  AND HAVE THOSE INCREASES BEARED ANY

13   FRUIT YET?

14    **A**   THEY HAVE.  YOU KNOW, THE PRIVATE INDUSTRY

15   IS VERY COMPETITIVE NOW, SO I THINK THE DEPARTMENT

16   HAS BEEN ON TRACK TO TRY TO MEET SOME OF THAT

17   EXTERNAL DEMAND.

18          BUT YES, THERE HAS BEEN NEW HIRES AS A

19   RESULT OF THE RETENTION AND THE ENTRY PAY OF NURSING

20   STAFF COMING IN.

21    **Q**   LET'S SHIFT GEARS AND MOVE ON TO INFIRMARY

22   CARE AT LSP.

23          DOES LSP PROVIDE INFIRMARY CARE?

24    **A**   YES.

25    **Q**   LET'S GO ON AND PULL UP DX_8-BB.

1        WHAT IS THIS DOCUMENT?

2     **A**   THAT IS THE PENITENTIARY DIRECTIVE HEALTH

3   CARE SERVICES NURSING UNIT AND THE INFIRMARY CARE.

4     **Q**   IT'S DATED APRIL 29, 2021.  IS THIS THE MOST

5   CURRENT DIRECTIVE ON THIS ISSUE?

6     **A**   YES.

7        **MR. ROBERT:**  YOUR HONOR, I'D LIKE TO GO

8   AHEAD AND OFFER, FILE, AND INTRODUCE DX_8-BB INTO

9   EVIDENCE.

10       **MR. DUBNER:**  NO OBJECTION.

11       **THE COURT:**  ADMITTED.

12  BY MR. ROBERT:

13    **Q**   ARE THE NURSING UNITS SOMETHING THAT YOU'VE

14  REVIEWED AND ANALYZED SINCE YOU'VE COME TO WORK AS

15  THE HEALTH CARE ADMINISTRATOR AT LSP?

16    **A**   YES.

17    **Q**   OKAY.  TELL ME ABOUT WHAT YOU'VE DONE IN

18  THAT REGARD.

19    **A**   CHECKING FOR, YOU KNOW, RESOURCE NEEDS,

20  STAFFING NEEDS, OFFENDER CARE NEEDS; MAKING SURE THE

21  UNITS ARE LIVABLE AND OPERATIONAL FOR PATIENT CARE.

22    **Q**   TELL ME ABOUT HOW THE -- LET'S START WITH

23  NURSING UNIT NO. 1.  TELL ME ABOUT -- HOW IS NURSING

24  UNIT NO. 1 STAFFED?

25    **A**   NURSING UNIT 1 IS OUR ACUTE NURSING UNIT,

1  AND WE STAFF IT, BASED ON THE CENSUS, ONE NURSE TO

2  EVERY TEN OFFENDERS.

3      Q    IS THERE A PARTICULAR PROVIDER ASSIGNED TO

4  NURSING UNIT NO. 1?

5      A    NOT REALLY.  WE HAVE PROVIDERS WHO MAKE

6  ROUNDS IN THAT UNIT MORNING, NOON, AND EVENING.

7      Q    YOU SAID THAT IT WAS ONE NURSE TO EVERY -- A

8  RATIO OF ONE NURSE TO EVERY TEN PATIENTS.  IS THAT

9  SOMETHING NEW THAT'S BEEN IMPLEMENTED?

10     A    YES.

11     Q    HOW DID THAT COME ABOUT?

12     A    FROM THE NURSING STAFF HAVING TO -- BASED ON

13 THE NURSING NEEDS AND THE OFFENDER NEEDS, NURSING

14 UNIT 1 IS MORE OF ACUTE CARE AREA, AND SUFFICIENT

15 STAFF WILL ALLOW FOR APPROPRIATE CARE.  SO WE WANTED

16 TO RAISE THE RATIO TO PATIENTS IN THAT AREA, SO WE

17 DID INCREASE THE RATIO.

18     Q    HOW DID YOU COME TO DECIDING ON A RATIO OF

19 TEN PATIENTS TO EVERY ONE NURSE?

20     A    WE JUST LOOKED AT WHAT SOME OF THE NURSING

21 HOMES DO, LOOKING AT SOME -- CONVERSATIONS WITH

22 DEPARTMENT OF HEALTH AND CAME TO THAT WITH ME ON

23 POINT THERE.

24     Q    YOU TRACK THE NURSING SCHEDULES AND THE

25 NURSING ASSIGNMENTS FOR NURSING UNIT NO. 1?

1     **A**    IT'S A PART OF THE STAFFING MATRIX, YES.

2     **Q**    SO WE LOOKED AT JX_67 WITH ALL OF THE

3   SCHEDULES.  THE NURSING UNITS ARE LAID OUT ON THAT

4   SCHEDULE AS WELL?

5     **A**    YES.

6     **Q**    AND THAT'S SOMETHING YOU REVIEW REGULARLY?

7     **A**    YES.

8     **Q**    TO MAKE SURE THERE IS APPROPRIATE COVERAGE?

9     **A**    YES.

10    **Q**    AND HOW DO YOU KNOW WHAT THE CENSUS IS FOR A

11  PARTICULAR -- FOR NU 1?  IS THAT SOMETHING THAT YOU

12  MONITOR?

13    **A**    YES.  THE CENSUS IS COVERED IN THE MORNING

14  MEETINGS.  WE USUALLY MEET AT ABOUT 7:30 EVERY

15  MORNING AND -- WELL, MONDAY THROUGH FRIDAY.

16         AND YES, THE CENSUS ON NURSING UNIT 1 AND 2

17  IS PRETTY CAPTURED IN THAT CENSUS, SO WE HAVE A GOOD

18  IDEA EACH DAY OF THE PATIENTS ON EACH UNIT AND THEIR

19  LEVEL OF CARE.

20    **Q**    OKAY.  ARE YOU SATISFIED THAT THE CURRENT

21  STAFFING LEVELS IN NU 1 ARE MEETING PATIENTS' NEEDS?

22    **A**    YES.

23    **Q**    LET ME ASK YOU ABOUT ANOTHER CHANGE THAT

24  TOOK PLACE IN NU 1, YOU KNOW, IS THESE -- CALL SYSTEM

25  FOR THE LOCKED ROOMS IN THE NURSING UNITS.  IS THAT

1  SOMETHING THAT YOU IMPLEMENTED?

2      **A**   IT'S A PART OF THE WORK GROUP.

3      **Q**   AND YOU SAY "IT'S PART OF THE WORK GROUP."

4  WHO IS IN THE WORK GROUP?

5      **A**   OUR NURSING -- DIRECTOR OF NURSING, ADON,

6  MEDICAL DIRECTOR, TREATMENT CENTER SECURITY.  SO WE

7  TRY TO HAVE A COLLABORATIVE GROUP TO MEET AND DISCUSS

8  DIFFERENT CHANGES.

9      **Q**   HOW DID YOU GO ABOUT GETTING THOSE CALL

10 LIGHTS INSTALLED?

11     **A**   WHAT DO YOU MEAN, HOW DO YOU GO ABOUT THEM?

12     **Q**   WHAT -- WERE YOU THE ONE WHO TOOK CARE OF

13 CONTRACTING AND GETTING THAT SET UP, OR HOW -- OR WAS

14 THAT SOMETHING YOU DELEGATED?

15     **A**   YEAH, WE DELEGATED THAT TO MAINTENANCE

16 DEPARTMENT TO GIVE A VISION OF WHAT WE WANTED AND

17 GIVE EXAMPLES.  AND THEY ACTUALLY ORDERED THE

18 MATERIALS AND INSTALLED THE SYSTEM.

19     **Q**   IS THAT WORKING WELL?

20     **A**   IT IS.

21         **THE COURT:**  DOCTOR, WHAT WAS THE NURSING

22 UNIT RATIO STAFFING BEFORE YOU WENT TO TEN TO ONE IN

23 NURSING UNIT 1?  YOU SAID YOU IMPROVED IT TO TEN TO

24 ONE.  WHAT WAS IT BEFORE?

25         **THE WITNESS:**  THEY USUALLY STAFFED IT WITH

1   TWO NURSES.  SO THE STAFFING COULD HAVE BEEN 15 TO

2   ONE, 15 OR -- YEAH, 15 TO ONE.  THE NURSING UNIT 1

3   HAS 20 BEDS -- OPEN BEDS AND TEN LOCKED ROOMS, SO...

4          **THE COURT:**  OKAY.  THANK YOU.

5   **BY MR. ROBERT:**

6      **Q**   HOW OFTEN DO YOU VISIT THE NURSING UNIT NO.

7   1?

8      **A**   I TRY TO VISIT IT DAILY.  IF NOT DAILY,

9   EVERY OTHER DAY.

10     **Q**   AND WHY DO YOU DO THAT?

11     **A**   CHECK FOR OPERATIONS, CHECK FOR PATIENT

12  CARE, TALK TO THE OFFENDERS IN THAT AREA, TALK TO THE

13  NURSING STAFF, TALK TO THE SECURITY, SPEAK WITH OUR

14  HEALTH CARE ORDERLIES.  JUST OVERALL MONITORING.

15     **Q**   YOU SAID YOU TALK TO THE PATIENTS?

16     **A**   YES.

17     **Q**   AND DO THEY EXPRESS CONCERNS?

18     **A**   SOMETIMES.

19     **Q**   AND WHAT DO YOU DO WHEN THEY EXPRESS

20  CONCERNS?

21     **A**   USUALLY I WOULD TRY TO -- NORMALLY I

22  WOULD -- DEPENDING ON THE CONCERN, I WOULD

23  COMMUNICATE THAT TO THE VARIOUS DEPARTMENT THAT THEIR

24  CONCERN MAY BE ADDRESSING; OR IF IT'S DIRECTLY

25  RELATED TO THE AREA IN WHICH THEY RESIDE, I SPEAK

1  WITH NURSING STAFF.

2      Q    BEFORE WE GET AWAY FROM THIS, WE TALKED MORE

3  IN DEPTH ABOUT NURSING UNIT NO. 1.  TELL ME ABOUT

4  NURSING UNIT NO. 2.

5      A    WHAT ABOUT IT?

6      Q    WHAT IS IT?

7      A    NURSING UNIT NO. 2 IS A AREA WHERE WE HAVE

8  MORE -- A SKILLED NURSING AREA, LONG-TERM CARE

9  PATIENTS THERE.  WE HAVE 24 BEDS OPEN AND NINE LOCKED

10 ROOMS.  IT IS STAFFED WITH TWO NURSES, AND THE RATIO

11 THERE IS 15 TO ONE.

12     Q    WHY IS THE RATIO IN NU 2 15 TO ONE AS

13 OPPOSED TO THE TEN TO ONE IN NU 1?

14     A    WELL, THESE ARE -- THIS IS LIKE A SKILLED

15 NURSING AREA.  PATIENTS ON THAT AREA DON'T REQUIRE A

16 LOT OF -- SOME OF THEM DO REQUIRE A LOT OF ADL HELP,

17 DAILY LIVING HELP.  BUT THESE ARE FOLKS THAT CAN --

18 MAJORITY OF THEM CAN OTHERWISE FUNCTION PRETTY WELL,

19 BUT THEY DO NEED ASSISTANCE WITH THEIR DAILY LIVING.

20     Q    DO YOU HAVE ANY FUTURE PLANS FOR THE NURSING

21 UNITS?

22     A    OF COURSE WE ALWAYS LOOK AT EQUIPMENT THAT

23 WE CAN ADD OVER THERE.  BUT THERE IS -- THE ONLY

24 THING THAT COMES TO MIND RIGHT NOW IS THE ADDITION TO

25 THAT NURSING UNIT, THAT NURSING UNIT 2.  BUT IT'S NOT

1  OPERATIONAL AS OF RIGHT NOW.

2      **Q**   TELL ME ABOUT THAT.  FIRST OF ALL, WHY IS IT

3  NOT OPERATIONAL; AND SECOND OF ALL, IS THERE -- DO

4  YOU HAVE ANY PLANS FOR IT?

5      **A**   IT IS NOT IN OPERATION DUE TO THE NURSING

6  SHORTAGES.  BUT ONCE WE HAVE MORE NURSING, WE WILL

7  MAKE SURE THAT IS OPERATIONAL.

8          LOGISTICALLY THERE NEEDS TO BE SOME POLICY

9  EXPECTATIONS MET THERE TO ENSURE THAT THERE IS A

10  NURSE STATION THAT CAN HAVE SIGHT AND SOUND TO THAT

11  AREA.  BUT IT AFFORDS THE NURSING UNIT TO EXPAND 15

12  ADDITIONAL BEDS FOR THE OFFENDERS.

13      **Q**   AND WHAT IS -- YOU MAY HAVE SAID THIS, BUT

14  WHAT IS THE REASON THAT IT'S NOT OPERATIONAL RIGHT

15  NOW?  I MEAN, WHAT IS CAUSING THE DELAY?

16      **A**   NURSING -- NURSING STAFFING.

17      **Q**   LET'S MOVE ON.  LET'S TALK ABOUT THE MEDICAL

18  DORMS.  PULL UP, PLEASE, EX -- DX_8-YYY.

19          DO YOU RECOGNIZE THIS DOCUMENT?

20      **A**   YES.  THAT IS THE PENITENTIARY DIRECTIVE OF

21  HEALTH CARE SERVICES ASSISTED LIVING DORMS.

22      **Q**   IT'S DATED JULY 21, 2021.  IS THAT THE MOST

23  CURRENT VERSION, TO YOUR KNOWLEDGE?

24      **A**   YES.

25          **MR. ROBERT:**  YOUR HONOR, I'D LIKE TO GO

1  AHEAD AND OFFER, FILE, AND INTRODUCE DX_8-YYY.

2        **MR. DUBNER:**  NO OBJECTION.

3        **THE COURT:**  ADMITTED.

4  BY MR. ROBERT:

5    **Q**   WHAT'S THE PURPOSE OF THE MEDICAL DORMS?

6    **A**   MEDICAL DORMS ARE AN OPPORTUNITY FOR THE

7  OFFENDERS TO TRY TO LIVE INDEPENDENT FROM THE

8  TREATMENT AREA OR NURSING UNIT 2 AREA.  AND IT GIVES

9  THEM A SENSE OF NORMALCY OUTSIDE OF A CONFINED AREA

10 IN THE TREATMENT CENTER HOSPITAL.

11   **Q**   AND WHERE ARE THE MEDICAL DORMS LOCATED?

12   **A**   THEY'RE LOCATED IN WHAT WE CALL THE EAST

13 YARD.  EAST YARD.

14   **Q**   DO THEY HAVE A DESIGNATED NAME FOR THOSE?

15   **A**   YES.  ASH -- ASH UNIT 1 AND 2.

16   **Q**   SO ASH 1 AND 2, THAT'S THE PRIMARY HOUSING

17 LOCATION FOR THE PEOPLE WHO NEED MEDICAL ASSISTANCE?

18   **A**   YES.

19   **Q**   AND -- OR ASSISTANCE WITH DAILY LIVING.  IS

20 THAT MORE ACCURATE?

21   **A**   YES.

22   **Q**   WHAT -- HOW IS THAT STAFFED?  HOW IS -- IS

23 ASH 1 AND 2 STAFFED?

24   **A**   WE HAVE WHAT WE CALL HEALTH CARE ORDERLIES

25 IN THAT -- THOSE UNITS OUT THERE.

1    **Q**   AND WHAT DO THEY DO?

2    **A**   ASSIST THE PATIENTS WITH THEIR DAILY LIVING:

3    EATING, SHOWERING, OUTSIDE TIME, TRANS- -- EXCUSE

4    ME -- TRANSFERRING FROM THEIR BEDS; THINGS LIKE THAT

5    THAT THEY MAY NEED HELP WITH.

6    **Q**   HOW MANY DO YOU HAVE IN ASH 1 AND ASH 2 ON

7    ANY GIVEN DAY?

8    **A**   THE CAPACITY -- I BELIEVE THAT DORM IS 64,

9    SO WE MAY HAVE ANYWHERE FROM 50 ON UP.  BUT WE DO

10   HAVE A COUPLE OF VACANCIES RIGHT NOW.

11   **Q**   HOW MANY HEALTH CARE ORDERLIES DO YOU HAVE

12   ASSIGNED TO EACH ONE OF THOSE?

13   **A**   WE WOULD HAVE MAYBE -- ANYWHERE FROM MAYBE

14   SIX TO POSSIBLY EIGHT IN THOSE DORMS.

15   **Q**   AND YOU MENTIONED ASH 1 AND 2.  WHAT'S ASH 3

16   AND 4 USED FOR?

17   **A**   ASH 3 AND 4 ARE HANDICAP ACCESSIBLE OR MORE

18   ADA DORMS.  THEY DON'T REQUIRE THE LEVEL OF CARE THAT

19   YOU WOULD FIND IN ASH 1 AND 2.

20   **Q**   SO THE FOLKS IN 3 AND 4 ARE NOT IN AS MUCH

21   NEED OF ASSISTANCE WITH DAILY LIVING.  IS THAT

22   CORRECT?

23   **A**   NO.  THEY MAY BE FOLKS WHO ARE WHEELCHAIR

24   BOUND OR SOMETHING LIKE THAT, CAN OTHERWISE FUNCTION

25   WITHOUT ADL HELP.

1    Q    ARE THERE ANY HEALTH CARE ORDERLIES ASSIGNED

2   TO ASH 3 AND 4?

3    A    YEAH, THERE ARE A FEW THERE AS WELL.

4    Q    ABOUT HOW MANY PER UNIT?

5    A    ASH 3 AND 4, MAYBE -- MAYBE THREE OR FOUR,

6   FIVE OR SIX.  I'M NOT -- REALLY NOT SURE ON THAT ONE.

7    Q    YOU'RE NOT SURE ON THAT ONE?

8         LET ME ASK ABOUT SOME CHANGES THAT HAVE

9   TAKEN PLACE SINCE YOU'VE BEEN AT LSP WITH REGARD TO

10  THE MEDICAL DORMS.  THEY'RE NOW AIR CONDITIONED.  IS

11  THAT CORRECT?

12   A    YES.

13   Q    WHEN DID THAT GO INTO EFFECT?

14   A    THAT WAS PRETTY RECENT.  I CAN'T GIVE A

15  DATE.  I DON'T HAVE A DATE ON THAT.

16   Q    IN THE LAST THREE OR FOUR MONTHS?

17   A    YES.  YES.  PRETTY RECENT.

18   Q    AND THE AIR CONDITIONING IS IN BOTH ASH 1,

19  ASH 2, ASH 3, AND ASH 4?

20   A    ALL FOUR, YEAH.

21   Q    ALL FOUR OF THEM?

22   A    UH-HUH.

23   Q    OKAY.  AND HAS ANYTHING BEEN DONE TO ASSIST

24  FOLKS WHO LIVE IN THOSE DORMS TO -- WITH REGARD TO

25  BEING INFORMED OF CALL-OUTS AND THINGS LIKE THAT?

1    **A**    YES.  THERE IS A ON-CALL -- OR A MONITOR IN

2    THOSE AREAS THAT PUBLISH THE CALL-OUT FOR VARIOUS

3    MEDICAL NEEDS THAT THE PATIENT MAY HAVE AT THE

4    TREATMENT CENTER.

5    **Q**    AND IS THAT -- THAT'S SOMETHING THAT YOU

6    PUT -- IMPLEMENTED?

7    **A**    THE MONITORS, YES, AND THEIR FUNCTIONALITY,

8    YES.

9    **Q**    DO YOU FIND THAT -- OR HAVE PATIENTS

10   INDICATED THAT THAT'S HELPFUL TO THEM IN MAKING SURE

11   THEY'RE AWARE AND ON TOP OF THEIR CALL-OUTS?

12   **A**    YES.

13   **Q**    HOW OFTEN DO YOU VISIT THE MEDICAL DORMS?

14   **A**    THE MEDICAL DORMS ARE MONTHLY OR EVERY MONTH

15   AND A HALF WE -- MYSELF, MEDICAL DIRECTOR, EITHER THE

16   DON, ADON, WE WOULD GO OUT AND DO PRETTY MUCH A BED

17   CHECK.  AND BASICALLY WE WANT TO MAKE SURE THAT --

18   JUST CHECK THE STATUS OF THE OFFENDERS AND MAKING

19   SURE THAT NO OTHER OFFENDERS HAVE BEEN RELOCATED TO

20   THOSE AREAS AS WELL.

21   **Q**    ALL RIGHT.  LET'S MOVE ON TO CLINICAL CARE,

22   GENERAL MEDICINE.

23        I ASSUME LSP PROVIDES THAT TYPE OF CARE.

24   CORRECT?

25   **A**    YES.

1     Q    LET'S PULL UP DX_8-AAA.

2          IS THIS -- WE'VE LOOKED AT THIS.  WE'VE

3    ALREADY INTRODUCED IT.  DOES THIS POLICY -- IN

4    ADDITION TO SICK CARE, DOES IT ALSO RELATE TO

5    CLINICAL SERVICES?

6     A    YES.

7     Q    AND THIS IS THE MOST CURRENT POLICY ON THAT?

8     A    YES.

9     Q    LET'S GO TO DX_8-Y.

10         WHAT IS THIS DOCUMENT?

11    A    PENITENTIARY DIRECTIVE FOR PERIODIC HEALTH

12   EXAMINATIONS.

13    Q    IS THIS SOMETHING THAT IS DONE AS PART OF

14   THE CLINICAL CARE?

15    A    YES.

16    Q    IS THIS THE MOST CURRENT VERSION OF THAT

17   POLICY?

18    A    IT APPEARS TO BE.

19         MR. ROBERT:  WE'D LIKE TO OFFER, FILE, AND

20   INTRODUCE DX_8-Y INTO EVIDENCE, YOUR HONOR.

21         MR. DUBNER:  NO OBJECTION.

22         THE COURT:  ADMITTED.

23   BY MR. ROBERT:

24    Q    TELL US ABOUT THE GENERAL MEDICINE CLINIC AT

25   LSP.

1      A    GENERAL MEDICINE CLINIC OPERATES WITHIN

2  SEVEN CLINIC ROOMS.  ADJACENT TO IT WE HAVE A NURSE

3  STATION.  WE HAVE THREE PROVIDERS, THREE TO FOUR

4  PROVIDERS.  THREE NURSE PRACTITIONERS AND/OR THE

5  MEDICAL DIRECTOR WILL PROVIDE DAILY GENERAL MEDICINE

6  CLINICS.

7      Q    SO ON ANY GIVEN DAY -- AND IT OPERATES, I

8  ASSUME, WEEKDAYS, MONDAY THROUGH FRIDAY?

9      A    WEEKENDS AS WELL.

10     Q    THE CLINIC OPERATES ON WEEKENDS AS WELL?

11     A    UH-HUH.  SOME SPECIALTY CLINICS.

12     Q    OKAY.  BASICALLY GENERAL MEDICINE, DOES IT

13  OPERATE ON THE WEEKENDS?

14     A    IT HAS BEFORE.  BUT GENERALLY IT'S MONDAY

15  THROUGH FRIDAY.

16     Q    AND I THINK YOU INDICATED YOU -- THREE TO

17  FOUR PROVIDERS ON ANY GIVEN DAY?

18     A    YES.

19     Q    AND FOUR TO SIX NURSES ON ANY GIVEN DAY.  IS

20  THAT CORRECT?

21     A    YES.

22     Q    IS THAT SOMETHING THAT YOU TRACK, THAT YOU

23  PAY ATTENTION TO?

24     A    AS A PART OF THE STAFF MATRIX FOR NURSING

25  BUT ALSO THE PROVIDER SCHEDULE AS WELL.

1    Q    DO YOU FEEL LIKE GENERAL MEDICINE IS -- AS

2  IT CURRENTLY STANDS, IS IT ADEQUATELY STAFFED?

3    A    REPEAT THAT.

4    Q    GENERAL MEDICINE AS IT CURRENTLY STANDS

5  IS -- DO YOU FEEL THAT IT IS ADEQUATELY STAFFED?

6    A    YES.

7    Q    AND DO YOU TRACK THE BACKLOG OF CASES IN

8  GENERAL MEDICINE OR CLINICAL CARE?

9    A    YES.

10   Q    LET'S PULL UP DX_48-A.

11        TELL ME:  WHAT IS THIS DOCUMENT?

12   A    THAT'S OUR CUMULATIVE DEPARTMENT TRACK --

13  BACKLOG TRACKER BREAKDOWN.

14   Q    AND WHAT DOES IT TRACK?

15   A    IT TRACKS EVERYTHING IN THE TREATMENT

16  CENTER, EVERYTHING THAT RELATES TO HEALTH CARE

17  DELIVERY.

18   Q    IF YOU LOOK KIND OF IN THE MIDDLE OF THAT

19  DOCUMENT, IT HAS "GENERAL MEDICINE."  IS THAT SHOWING

20  THE BACKLOG AS IT EXISTED IN GENERAL MEDICINE?

21   A    YES, AT THAT PARTICULAR TIME.

22   Q    OKAY.  AND WHEN I SAY "BACKLOG," WHAT AM I

23  TALKING ABOUT?  WHAT -- LET THE COURT KNOW WHAT YOU

24  MEAN BY "BACKLOG."

25   A    BACKLOG IS DEFINED AS PATIENTS WHO WERE

1  SCHEDULED TO RETURN AND DID NOT MEET THAT RETURN

2  DATE.

3      Q    AND GENERAL MEDICINE, IS THAT WHAT IT IS?

4      A    YES.

5      Q    WELL, LET ME ASK YOU THIS.  THE GENERAL

6  MEDICINE START -- IF YOU LOOK IN FEBRUARY OF 2021,

7  IT'S A PRETTY BIG NUMBER, A SUBSTANTIAL NUMBER.

8  CORRECT?

9      A    YES.

10     Q    AND WHY IS THAT?

11     A    FEBRUARY YOU HAD PANDEMIC AND WE HAD SOME

12  PROVIDER CHALLENGES WITH REMOVAL OR RELEASING

13  PROVIDERS, SO WE HAD A SHORTAGE IN HEALTH CARE

14  PROVIDER STAFF.

15     Q    DID YOU FEEL --

16     A    AND THE PANDEMIC.

17     Q    DO YOU FEEL LIKE THE NUMBERS IN THE EARLY

18  PART OF 2021, IS THAT WHAT YOU'RE LOOKING FOR OR WAS

19  IT TOO HIGH?

20     A    TOO HIGH, NO DOUBT.

21     Q    DID YOU DO ANYTHING TO MAKE -- TO ENSURE

22  THAT THOSE NUMBERS CAME DOWN?

23     A    YES.  AS WE WORKED WITH THE DEPARTMENT

24  MEDICAL TEAM -- DEPARTMENT OF CORRECTIONS MEDICAL

25  TEAM TO WORK WITH OTHER DOC FACILITIES TO HAVE OTHER

1   PROVIDERS COME IN TO WORK GENERAL MEDICINE CLINIC, WE

2   PAID CURRENT PROVIDERS -- PAID COMPENSATION AND WE

3   WORKED AFTER HOURS AND WEEKENDS.

4       Q    AND I SEE BY JULY OF 2021 WE'VE KNOCKED THAT

5   DOWN TO WHAT?  IT LOOKS LIKE 268 IN THAT MONTH.

6   CORRECT?

7       A    YES.

8       Q    LET'S FLIP, BECAUSE I THINK IT GOES FURTHER.

9   AND THIS -- AND THEN WE MOVE FORWARD WITH THE GENERAL

10  MEDICINE.

11          HAVE YOU KEPT -- DID YOU BRING THOSE NUMBERS

12  DOWN?  HAVE YOU BEEN ABLE TO HAVE SUCCESS IN KEEPING

13  THOSE NUMBERS AT A REASONABLE LEVEL?

14      A    YES.

15      Q    AND YOU'VE HAD -- I SEE YOU'VE HAD SOME

16  INCREASES THERE AS WELL IN THE END OF 2021.  WHAT DID

17  YOU DO TO ADDRESS THAT?

18      A    SAME THING.  WORKED WITH THE DEPARTMENT OF

19  CORRECTIONS MEDICAL TEAM TO HAVE OTHER PHYSICIANS

20  FROM OTHER INSTITUTIONS COME IN AND PAY OUR

21  PROVIDERS, ALONG WITH WORKING EXTENDED HOURS AND

22  WEEKENDS.

23      Q    HAS THAT NUMBER COME DOWN SINCE DECEMBER OF

24  2021?

25      A    YES.

1   **Q**   WHAT KIND OF NUMBERS ARE YOU LOOKING AT MORE

2   RECENTLY AS FAR AS BACKLOG IN GENERAL MEDICINE?

3   **A**   MORE RECENTLY WE MAY HAVE MAYBE UNDER -- AT

4   OR AROUND 200, 150.

5   **Q**   IS THAT A REASONABLE NUMBER, IN YOUR VIEW?

6   **A**   YEAH.  EACH PROVIDER PRETTY MUCH SEES 20

7   PATIENTS A DAY, SO THAT NUMBER IS NOT ANYTHING I

8   WOULD WORRY ABOUT.

9   **Q**   AND THIS SCHEDULE HERE, IS THIS SOMETHING

10  THAT YOU CREATED OR HAD CREATED?

11  **A**   YES.

12  **Q**   AND WHY DID YOU DO THAT?

13  **A**   JUST TO TRACK THE TRENDS AND TO SEE WHERE

14  PROBLEMS MAY ARISE THROUGHOUT THE TREATMENT CENTER AS

15  WE OPERATIONALIZE THE MISSION.

16  **Q**   IS THAT SOMETHING THAT YOU REVIEW REGULARLY?

17  **A**   YES.

18  **Q**   DO YOU FIND IT'S A HELPFUL TOOL?

19  **A**   YES.

20      **MR. ROBERT:**  YOUR HONOR, I'D LIKE TO OFFER,

21  FILE, AND INTRODUCE DX_48-A.

22      **MR. DUBNER:**  OBJECT TO THE LATE PRODUCTION.

23  I'M NOT SURE WE EVER GOT PAGES 2 AND 3 OF THIS

24  DOCUMENT.  IF I COULD RESERVE THE RIGHT TO RAISE THAT

25  OBJECTION IF WE NEVER DID RECEIVE THOSE.  BUT WE HAVE

1   NO OBJECTION TO THE FIRST PAGE OTHER THAN THE LATE

2   PRODUCTION.

3         **THE COURT:**  IT'S ADMITTED, SUBJECT TO THE

4   OBJECTION.

5   **BY MR. ROBERT:**

6       **Q**   ARE YOU OKAY, DOC?  DO YOU NEED SOME WATER?

7       **A**   THIS CHAIR IS TIGHT.

8         **THE COURT:**  THE CHAIR IS WHAT?

9         **THE WITNESS:**  THIS CHAIR IS TIGHT.  THIS

10  CHAIR IS FOR SMALL PEOPLE.

11  **BY MR. ROBERT:**

12      **Q**   ARE YOU GOOD?

13      **A**   I'M HERE.

14      **Q**   DO YOU VISIT THE GENERAL MEDICINE CLINIC

15  REGULARLY?

16      **A**   YES.

17      **Q**   HOW OFTEN?

18      **A**   PRETTY MUCH DAILY.

19      **Q**   DO YOU FEEL LIKE IT'S STAFFED PROPERLY?

20      **A**   YES.

21      **Q**   WHAT IMPRESSIONS DO YOU HAVE OR VIEWS DO YOU

22  HAVE ABOUT GENERAL MEDICINE AS FAR AS THE WAY IT'S

23  OPERATED AND ITS CONDITION AND SO FORTH?

24      **A**   GENERAL IMPRESSION IS HAVING A OPEN WAITING

25  AREA, EXAM ROOMS THAT ARE UNCLUTTERED, AND

1   PROVIDER-TO-NURSE RATIO IN KIND FOR THAT OFFENDER

2   ENCOUNTER.

3      Q    WHEN YOU SAY "UNCLUTTERED," WHAT DO YOU MEAN

4   BY THAT?  ARE THE ROOMS JUST SMALL OR IS THERE

5   CLUTTER IN THE ROOMS?

6      A    THE ROOMS ARE, I WOULD SAY, THE STANDARD

7   SIZE, BUT THEY ARE -- THERE WAS REPORTS OF HAVING

8   ITEMS IN PATIENT AREAS THAT SHOULD NOT BE THERE.  SO

9   THE ITEMS THAT YOU NOW FOUND -- FIND IN A PATIENT

10  AREA ARE CONDUCIVE TO PROVIDING CARE.  SO YOU HAVE AN

11  EXAM ROOM WITH A EXAM BED, DESK, CHAIR FOR THE

12  PATIENT, FOR THE PROVIDER, AND OTHER ANCILLARY ITEMS

13  THAT THE PROVIDER MAY NEED.

14     Q    WHEN YOU GOT THOSE REPORTS ABOUT THINGS

15  BEING THERE THAT, YOU KNOW, SHOULDN'T BE IN THERE,

16  DID YOU DO ANYTHING TO ADDRESS IT?

17     A    YES.

18     Q    WHAT DID YOU DO?

19     A    WE MADE SOME CHANGES ON REQUIREMENTS THAT

20  SHOULD BE IN THOSE AREAS.  IN OUR MINOR SURGERY ROOM

21  WE RELOCATED ALL NURSING STAFF OUT OF THAT AREA TO

22  ANOTHER AREA ADJACENT TO ALL THE EXAM ROOMS.  SO WE

23  WANTED TO JUST MAKE SURE ALL THE PATIENT CARE AREAS

24  ARE CONDUCIVE FOR PATIENT CARE WHENEVER PATIENT CARE

25  IS SCHEDULED.

1    Q    AND IS THAT SOMETHING THAT YOU'VE

2   IMPLEMENTED AND YOU HAVE ENSURED IS HAPPENING TODAY?

3    A    YES.

4    Q    ALL RIGHT.  LET'S MOVE ON TO SPECIALTY CARE.

5   DOES LSP PROVIDE SPECIALTY CARE TO PATIENTS?

6    A    YES.

7    Q    AND THERE IS TWO TYPES -- CORRECT? -- OF

8   SPECIALTY CARE AS FAR AS ON-SITE, OFF-SITE?  IS

9   THAT -- ARE YOU FAMILIAR WITH THAT?

10    A    YES.

11    Q    TELL ME ABOUT THE ON-SITE SPECIALTY CARE.

12    A    ON-SITE, WE PROVIDE A VARIETY OF PATIENT

13   CARE.  WE HAVE -- THE DEPARTMENT HAS CONTRACTS WITH A

14   VARIETY OF PROVIDERS, SPECIALISTS TO COME IN AND

15   PROVIDE THE CARE.  CARE THAT CAN BE PROVIDED

16   IN-HOUSE, WE HAVE THAT AS A PART OF OUR EXTERNAL

17   SPECIALTY CARE.

18    Q    LET'S PULL UP DX-GG, PLEASE.

19         DO YOU RECOGNIZE THIS, DOCTOR?

20    A    YES.  PENITENTIARY DIRECTIVES SPECIALTY

21   HEALTH CARE SERVICES.

22    Q    IS THAT THE CURRENT POLICY WITH RESPECT TO

23   SPECIALTY HEALTH CARE SERVICES?

24    A    IT APPEARS TO BE.

25    Q    LET'S SCROLL DOWN TO A-1.  THERE IS A WHOLE

1   LISTING THERE OF SPECIALTIES THAT ARE ON-SITE --

2   PROVIDED ON-SITE.  IS THAT CORRECT?

3       A    YES.

4       Q    IS LSP PROVIDING ALL OF THESE SPECIALTY

5   CARES THAT ARE LISTED HERE?

6       A    YES.

7       Q    AND THOSE ARE ALL PROVIDED ON-SITE.

8   CORRECT?

9       A    YES.

10      Q    MAKE SURE -- I KNEW THERE WAS SOME MORE.

11  THERE IS A FEW MORE AT THE BOTTOM.  ARE THOSE AS

12  WELL?

13      A    YES.

14      Q    AND HOW ARE THOSE PROVIDED?  ARE THEY IN

15  PERSON?  ARE THEY TELEMED?  HOW DO THEY WORK?

16      A    IN PERSON, BUT SOME OF IT CAN BE TELEMED.

17  BUT MAJORITY IS IN PERSON.

18      Q    AND HOW -- WHO PROVIDES THOSE SERVICES?

19      A    WHAT DO YOU MEAN?

20      Q    ARE THEY LSP STAFF PROVIDERS OR ARE THEY

21  OUTSIDE FOLKS WHO COME IN?  HOW DOES THAT WORK?

22      A    OUTSIDE PROVIDERS.  THE DEPARTMENT OF

23  CORRECTIONS HAS CONTRACTUAL AGREEMENTS WITH EXTERNAL

24  SPECIALISTS.

25      Q    AND HOW OFTEN DO THESE EXTERNAL SPECIALISTS

1  COME TO LSP?

2      A    DAILY, DEPENDING ON THE SPECIALIST.  BUT

3  THERE IS A SCHEDULE FOR -- DEPENDENT UPON THE --

4  THEIR CONTRACTUAL AGREEMENT AND THE DAILY SCHEDULE,

5  SO IT DEPENDS.  YOU MAY HAVE THREE OR FOUR

6  SPECIALISTS IN WITHIN A GIVEN WEEK.

7      Q    SO YOU'RE NOT TELLING ME THAT EVERY SINGLE

8  ONE OF THESE ARE DONE DAILY, BUT YOU'VE GOT --

9      A    NO.

10     Q    -- YOU'VE GOT CLINICS GOING EVERY DAY.

11 CORRECT?

12     A    MOST GENERAL MED AS WELL AS SPECIALTY, YES.

13     Q    AND YOU'VE GOT CONTRACTS FOR ALL THESE

14 DIFFERENT AREAS.  CORRECT?

15     A    THE DEPARTMENT DOES, YES.

16     Q    AND THE OUTSIDE PROVIDERS WHO ARE EITHER

17 COMING IN OR DOING TELEMED, THEY ARE HAVING REGULARLY

18 SCHEDULED APPOINTMENTS FOR THESE FOLKS.  CORRECT?

19     A    YES.

20     Q    AND ARE YOU TRACKING THAT TO MAKE SURE THAT

21 YOU DON'T HAVE ANY SIGNIFICANT BACKLOG AND SO FORTH

22 IN ON-SITE SPECIALTY DEPARTMENTS?

23     A    YES.

24     Q    HOW ARE YOU DOING THAT?

25     A    THROUGH THE PREVIOUS DOCUMENT:  CUMULATIVE

1   BACKLOG TRACKING.

2       **Q**   BECAUSE WE LOOKED AT A NUMBER OF DIFFERENT

3   CATEGORIES ON THAT.  AND SPECIALTY CARE IS

4   SOMETHING -- ONE OF THE ITEMS THAT YOU'RE TRACKING.

5   RIGHT?

6       **A**   YES.

7       **Q**   AND WHAT, IF ANYTHING, DO YOU DO IF YOU SEE

8   IT OR HAVE ANY CONCERN ABOUT ANY BACKLOG, ANY ISSUES

9   REGARDING PROVIDING THOSE SERVICES?

10      **A**   WELL, WE WOULD MEET WITH THE DEPARTMENT HEAD

11  AND SEE WHAT THE INCREASE -- WHAT'S DRIVING THE DATA

12  TO INCREASE.  SO WE MAY DETERMINE TO DO AN ADDITIONAL

13  CLINIC, OR WHATEVER IS NEEDED, TO IDENTIFY THE RISE

14  IN WHATEVER AREA THAT IS ON THAT TRACKER.

15      **Q**   SINCE THINGS GOT CRANKED UP AGAIN FOR THESE

16  SPECIALTY CLINICS IN -- AFTER COVID, HAVE YOU HAD ANY

17  PROBLEMS WITH -- LIKE YOU JUST TALKED ABOUT -- HAD

18  ANY PROBLEMS WITH BACKLOGS OR ISSUES ABOUT PEOPLE

19  BEING SEEN?

20      **A**   WHAT DO YOU MEAN?

21      **Q**   YOU KNOW, I MEAN, THERE WAS A TIME DURING

22  COVID THAT NOT ALL THESE WERE ABLE TO BE OPERATED

23  ON-SITE.  SINCE YOU'VE BEEN BACK -- I MEAN, SINCE

24  WE'RE BACK RUNNING FULL STEAM, HAVE YOU HAD ANY

25  PROBLEMS WITH BACKLOGS OR ISSUES WITH PEOPLE NOT

1  GETTING SEEN OR DELAYED IN BEING SEEN?

2      **A**    NO.  BUT GENERALLY SPEAKING, YOU KNOW, THERE

3  ARE OUTSIDE ISSUES THAT ARE BEYOND OUR CONTROL, SO --

4  BUT I DON'T WANT TO GLOBALLY SAY YES, BUT THERE ARE

5  CAVEATS; WHEREAS THERE ARE ISSUES BEYOND LSP OR EVEN

6  THE DEPARTMENT.

7      **Q**    WHAT ISSUES?

8      **A**    SUCH AS SPECIALTY CARE.  YOU KNOW, YOU MAY

9  HAVE A EXTERNAL PROVIDER WHO MAY NOT HAVE

10  AVAILABILITY FOR AN OFFENDER, SO -- BUT THAT IS TRUE

11  WHETHER WE'RE DEALING WITH CORRECTIONAL CARE OR CARE

12  IN SOCIETY.

13      **Q**    DOES THAT PRIMARILY OCCUR WITH RESPECT TO

14  ON-SITE OR OFF-SITE?

15      **A**    MORE SO OFF-SITE.

16      **Q**    WELL, LET'S TALK ABOUT OFF-SITE THEN.

17          WHAT DRIVES OFF-SITE SPECIALTY CARE?  WHAT

18  CAUSES A PERSON -- WE'VE LISTED -- WE'VE SEEN A

19  LAUNDRY LIST OF SPECIALTIES THAT ARE ACTUALLY

20  PROVIDED ON-SITE.  WHAT DRIVES PROVIDING OFF-SITE

21  SPECIALTY CARE?

22      **A**    CARE THAT IS MORE BETTER SUITED FOR EXTERNAL

23  PURPOSES.  IT COULD BE MORE COST-EFFECTIVE, IT COULD

24  BE MORE AVAILABILITY, OR YOU CAN HAVE MORE QUANTITY,

25  MORE PATIENTS SEEN OR A MORE MEANINGFUL VISIT.  SO IT

1   JUST DEPENDS.  A COUPLE OF VARIABLES THERE.

2        Q    WHAT ABOUT EMERGENCIES?  IS THAT SOMETHING

3   THAT COULD REQUIRE OFF-SITE; SOMEBODY IS HAVING A

4   HEART ATTACK OR A STROKE?

5        A    YES.

6        Q    AND THAT'S SOMETHING THAT -- AND I DON'T

7   KNOW THAT THAT'S SPECIALTY CARE.  BUT --

8        A    NO.

9        Q    -- IN THOSE CIRCUMSTANCES WOULD YOU SEND

10  SOMEBODY OFF-SITE?

11       A    YES.

12       Q    AND WHERE DO YOU GENERALLY SEND EMERGENCIES

13  WHEN YOU'RE SENDING THEM OFF-SITE?

14       A    EMERGENCIES -- IT VARIES DEPENDING ON THE

15  EMERGENCY.  BUT WE HAVE -- THE CLOSEST HOSPITAL IS

16  THE HOSPITAL IN ST. FRANCISVILLE -- WHICH WILL

17  PROBABLY BE MORE OF OUR CARDIAC PATIENTS -- ST.

18  FRANCISVILLE OR LANE IN ZACHARY.  OTHERWISE OUR LADY

19  OF THE LAKE OR THE UNIVERSITY HOSPITAL IN NEW

20  ORLEANS.

21       Q    AND ARE YOU SATISFIED WITH THE WAY ON-SITE

22  SPECIALTY CARE IS WORKING?

23       A    ON-SITE?

24       Q    YES.

25       A    YES.

**1**   Q   ARE YOU SATISFIED CURRENTLY WITH THE WAY

**2**   OFF-SITE SPECIALTY CARE IS WORKING?

**3**   A   YES.  BUT, YOU KNOW, I JUST WANT TO CAVEAT

**4**   HERE.

**5**   Q   YEAH, THAT'S ALL RIGHT.

**6**   A   YOU KNOW, EVERYTHING CAN ALWAYS BE BETTER,

**7**   YOU KNOW, SO YES.  BUT OVERALL, YES.

**8**   Q   WHAT HAVE YOU DONE TO IMPART NEW LEADERSHIP

**9**   AT LSP?

**10**   A   WHAT HAVE I DONE TO IMPART NEW LEADERSHIP.

**11**   MORE COMMUNICATION, MORE I GUESS FOCUSING, HAVING THE

**12**   DEPARTMENT HEADS AND THE STAFF FOCUS ON THE MISSION,

**13**   YOU KNOW, ON THE CARE AND TREATMENT SIDE.  WE'RE

**14**   THERE TO PROVIDE CARE AND TREATMENT; AND HOW CAN WE

**15**   DELIVER CARE AND TREATMENT WITHIN A CORRECTIONAL

**16**   SETTING WITHIN THE -- SOME OF THE LIMITATIONS THAT

**17**   YOU MAY HAVE AND DO SO TO MEET THE MISSION STANDARD

**18**   OR MEET THAT CARE THAT IS PROVIDED IN SOCIETY.

**19**        SO YOU JUST HAVE TO HAVE A CULTURE CHANGE TO

**20**   DISCUSS THE IMPORTANCE OF CARE AND TREATMENT WHILE WE

**21**   DO WHAT WE DO AND BE MORE PATIENT FOCUSED.

**22**   Q   WE HEARD SOME TALK ABOUT THE MORNING

**23**   MEETINGS.  IS THAT SOMETHING THAT YOU'RE INVOLVED

**24**   WITH?

**25**   A   YES.

1    Q    TELL ME ABOUT YOUR INVOLVEMENT.

2    A    MORNING MEETINGS ARE AN OPPORTUNITY FOR ALL

3 THE CLINICAL AREAS TO SIT DOWN AND DISCUSS ALL

4 PATIENTS FROM THE PREVIOUS NIGHT OF ATU CALL FOR THAT

5 PROVIDER BUT ALSO THE NURSING UNIT 1 AND NURSING UNIT

6 2.  BUT WE ALSO INCORPORATE MORE COLLABORATIVE OR

7 CONTINUITY THERE BY HAVING THE LAB FOLKS IN THAT

8 MEETING, HAVING SOME OF THE NURSING SUPERVISORS AND

9 THE MENTAL HEALTH FOLKS IN THAT MEETING AS WELL AS

10 SOME IMMUNIZATION BECAUSE WE'RE DEALING WITH COVID.

11    Q    AND YOU DO THAT EVERY DAY?

12    A    THAT'S DAILY, MONDAY THROUGH FRIDAY.

13    Q    OKAY.  AND THERE HAS ALSO BEEN SOME

14 DISCUSSION ABOUT NEGATIVE ATTITUDES BY PROVIDERS AND

15 NURSING STAFF AND SO FORTH TOWARD PATIENTS.  AND I

16 WANT TO ASK YOU ABOUT THAT.  YOU DON'T HAVE -- REALLY

17 HAVE ANY BACKGROUND IN CORRECTIONS, DO YOU?

18    A    NO.

19    Q    YOU'VE TAKEN THIS JOB AT LSP AS YOUR FIRST

20 JOB AS PART OF CORRECTIONS.  RIGHT?

21    A    YES.

22    Q    DO YOU HAVE ANY NEGATIVE ATTITUDES OR

23 FEELINGS TOWARDS INMATES AS PATIENTS?

24    A    DO I?

25    Q    YES.

1    **A**    NO.

2    **Q**    WOULD YOU TOLERATE -- OR DO YOU TOLERATE ANY

3  OF YOUR STAFF MISTREATING OR SHOWING BAD ATTITUDES

4  TOWARDS THEIR PATIENTS?

5    **A**    NO.  THE GENERAL GOAL IS NOT TO TOLERATE IT.

6  ONE OF THE POLICIES IS -- THAT THE DEPARTMENT HAS

7  IS -- EXCUSE ME.  ONE OF THE POLICIES THAT THE

8  DEPARTMENT HAS IS NONTOLERANCE FOR PROFESSIONAL

9  WORKPLACE.  AND THAT'S ONE OF MY GO-TO POLICIES.

10        BUT GENERALLY SPEAKING, IF AN OFFENDER

11  VOICES CONCERNS, TRY TO INVESTIGATE THAT TO SEE

12  EXACTLY WHAT'S GOING ON.  BUT NO, GENERALLY WE

13  DON'T -- TRY TO GIVE THE BENEFIT OF THE DOUBT ON BOTH

14  ENDS OF THE COINS TO THE EMPLOYEE AS WELL AS THE

15  OFFENDER.

16        BUT THE ULTIMATE GOAL IS TO HAVE THAT

17  EMPLOYEE UNDERSTAND THAT WE'RE THERE FOR PATIENT

18  CARE, AND ANYTHING OUTSIDE OF PATIENT CARE SHOULD NOT

19  BE TOLERATED.

20    **Q**    IF YOU SEE ANYTHING THAT YOU FEEL IS

21  INAPPROPRIATE, DO YOU ADDRESS IT?

22    **A**    I DO.

23    **Q**    HAVE YOU HAD TO ADDRESS SOME ISSUES OR --

24  SOME ISSUES WITH REGARD TO FOLKS WHO DIDN'T WANT TO

25  FOLLOW THE CULTURE THAT YOU'RE TRYING TO SET AT LSP?

1       A    WE HAVE.

2       Q    AND WHAT'S HAPPENED WITH RESPECT TO THOSE

3   FOLKS?

4       A    SOME ARE JUST NOT THERE ANYMORE.  SO WE HAVE

5   SOME PROVIDERS, NURSING STAFF AND MENTAL HEALTH STAFF

6   THAT -- AND SOME EMS THAT ARE NOT THERE ANYMORE.

7       Q    NOW, WE TALKED SOME ABOUT STAFFING ISSUES

8   AND THE ONGOING EFFORTS WITH NURSES TO ADDRESS TRYING

9   TO FILL VACANCIES.  CORRECT?

10      A    YES.

11      Q    DO YOU HAVE VACANCIES FOR PROVIDERS AS WELL?

12      A    HEALTH CARE PROVIDERS?

13      Q    YES.

14      A    YES.

15      Q    AND ARE YOU MAKING -- TAKING AN ACTIVE ROLE,

16  ACTIVE EFFORTS TO TRY TO FILL THOSE VACANCIES?

17      A    YES.

18      Q    WHAT ARE Y'ALL DOING IN THAT REGARD?

19      A    SAME THING.  WORKING WITH THE DEPARTMENT OF

20  CORRECTIONS, ENSURING THAT THE -- I GUESS THE

21  INSURANCE PAY IS ONE THAT'S AMENABLE, ALSO WORKING

22  WITH THE DEPARTMENT'S HEALTH CARE TEAM AND THE

23  MEDICAL SCHOOLS AROUND THE STATE.

24      Q    THE EMERGENCY -- SELF-DECLARED EMERGENCY, IS

25  THAT SOMETHING THAT'S COME TO YOUR ATTENTION THAT

1    NEEDED SOME -- SOME REMEDYING?

2        **A**    YES.

3        **Q**    AND WHAT, IF ANYTHING, HAS BEEN DONE IN THAT

4    REGARD?

5        **A**    RECENTLY WE'VE LOOKED AT THE SELF-DECLARED

6    EMERGENCIES AND -- THAT EMT OR A PARAMEDIC GOING TO

7    THE HOUSING AREA -- AND IMPLEMENTED A MANDATE THAT

8    THE EMS FOLKS FOLLOW WHAT WE CALL THE INDIVIDUAL

9    TREATMENT ORDERS, OR ITOs.  AND ANYTHING OUTSIDE OF

10   THOSE ITOs MUST BE COMMUNICATED TO THAT PROVIDER FOR

11   VERBAL AUTHORIZATION OR BROUGHT TO THE ATU FOR HIGH-

12   LEVEL CARE.

13       **Q**    ARE YOU GOING TO DO ANYTHING TO TRACK THIS

14   NEW POLICY TO SEE IF IT'S WORKING, TO SEE IF IT'S

15   GOING TO IMPROVE CARE?

16       **A**    WELL, IT'S A CURRENT POLICY, JUST A

17   REVISED -- OR A REVISION IN THE PROCEDURE.  AND YES,

18   WE ARE TRACKING.  IT'S ONLY BEEN IN -- WE STARTED THE

19   INITIATION ON JUNE 1ST, SO WE HAVE ABOUT 14 DAYS OF

20   DATA.  BUT IT'S GOING PRETTY WELL.

21       **Q**    AND THAT'S SOMETHING THAT YOU INTEND TO

22   MONITOR GOING FORWARD?

23       **A**    YES.

24       **Q**    ARE YOU INVOLVED IN THE QA/QI PROCESS?

25       **A**    YES.

1    Q    WHAT INVOLVEMENT DO YOU HAVE?

2    A    TO ATTEND THE MEETINGS BUT ALSO ENSURE THAT

3 WE HAVE OTHER -- ALL CLINICAL AND ALL COMPONENTS OF

4 THE HEALTH CARE DELIVERY IN THE TREATMENT CENTER.

5         SO INVOLVEMENT IS ATTENDING THE MEETINGS,

6 ENSURING THAT WE HAVE A MEANINGFUL MEETING WITH SOME

7 GOOD DATA POINTS AND GOOD TRENDS AND GOOD

8 INFORMATION, AND TRY TO, I GUESS, ENSURE THAT WE ARE

9 CRITICAL IN OURSELVES TO HAVE A GOOD IMPROVEMENT OF

10 WHATEVER AREA WE LOOK AT.

11    Q    HAS QA/QI BEEN AN AREA THAT'S KIND OF

12 CHALLENGING SINCE YOU'VE BEEN AT LSP?

13    A    YES.

14    Q    AND WHY IS THAT?

15    A    IT'S PROGRESSIVELY GOTTEN BETTER.  IT'S JUST

16 WE WANT TO LOOK AT, YOU KNOW, WHAT THE MISSION IS AND

17 WHAT THE POLICY PARAMETERS ARE FOR WHATEVER AREA.

18 AND THOSE THAT ARE NOT MEETING THE POLICY

19 EXPECTATIONS, WE WANT TO INCORPORATE THAT INTO QA/QI

20 SO WE CAN MAKE SOME NECESSARY IMPROVEMENTS THERE.

21    Q    AND NURSE STICKELLS IS IN CHARGE OF

22 BASICALLY THE QA/QI PROGRAM?  IS SHE OVERSEEING IT?

23    A    SHE'S THE LEAD.

24    Q    AND WHAT ABOUT MORBIDITY AND MORTALITY

25 REVIEWS?  ARE YOU INVOLVED IN THAT IN ANY WAY?

1    A    YES.

2    Q    WHAT IS YOUR INVOLVEMENT WITH RESPECT TO

3 THAT?

4    A    I ATTEND THE MEETINGS.  WE HAVE AN IDEA OF,

5 YOU KNOW, THE -- WELL, I DO KNOW ABOUT THE DEATHS

6 THAT ARE HAPPENING THAT PRECEDING MONTH.  BUT ATTEND

7 THE MEETINGS.

8    Q    HAVE YOU BEEN SATISFIED WITH THE ANALYSIS

9 THAT TAKES PLACE IN THOSE MORBIDITY/MORTALITY

10 REVIEWS?

11    A    THAT'S A WORK IN PROCESS AS WELL.  AND WE,

12 YOU KNOW, WANT TO MAKE SURE WE HAVE A MEANINGFUL

13 MEETING THERE, TOO, SO WE WANT TO BE AS CRITICAL AS

14 WE CAN BE ON OURSELVES TO SEE HOW WE CAN IMPROVE AS

15 WELL.

16    Q    IS THAT SOMETHING THAT YOU'D LIKE TO SEE

17 HAPPEN; A LITTLE BIT MORE SELF-EVALUATION?

18    A    YES.

19    Q    IS THAT SOMETHING THAT YOU'RE -- INTEND TO

20 IMPLEMENT IN YOUR POSITION?

21    A    YES.

22    Q    THANK YOU, DR. JOHNSON.  THAT'S ALL THE

23 QUESTIONS I HAVE FOR NOW.

24    A    THANK YOU.

25         THE COURT:  CROSS-EXAMINATION.

1      **THE WITNESS:** CAN I USE THE RESTROOM?

2      **THE COURT:** I BEG YOUR PARDON?

3      **THE WITNESS:** I NEED TO USE THE RESTROOM.

4      **THE COURT:** YOU NEED A BREAK?

5      **THE WITNESS:** YES.

6      **THE COURT:** LET'S TAKE A 15-MINUTE RECESS.

7      **(WHEREUPON, A RECESS WAS TAKEN.)**

8      **THE COURT:** BE SEATED.

9           DR. JOHNSON, YOU GET TO SIT IN THE
10 CLOWN CHAIR.

11     **THE WITNESS:** OKAY.  THANK YOU.

12     **THE COURT:** GO AHEAD.  IT'S NOT SAYING
13 YOU'RE A CLOWN.  I'M SAYING THE CHAIR IS A CLOWN
14 CHAIR.

15     **THE WITNESS:** I DIDN'T TAKE IT THAT WAY.

16     **THE COURT:** I MEAN, IT REALLY IS A CLOWN
17 CHAIR.  APPARENTLY WE NEED TO GET IT LOOKED AT AND
18 SEE IF WE CAN GET SOMETHING THAT DOESN'T SQUEAK AND
19 THAT MAYBE HAS MORE ROOM IN IT.

20          OKAY.  GO AHEAD.

21     **THE WITNESS:** THANK YOU.

22     **MR. DUBNER:** IF YOU NEED TO STRETCH, WE'VE
23 HAD WITNESSES STAND UP AND WORK THEIR LEGS, SO NO
24 PROBLEM.

25     **THE WITNESS:** OKAY.  THANK YOU.

1              CROSS-EXAMINATION

2    BY MR. DUBNER:

3       Q    GOOD AFTERNOON, DR. JOHNSON.  JUST FOR THE

4    RECORD, I CALLED YOU DR. JOHNSON.  YOU'RE NOT A

5    MEDICAL DOCTOR.  CORRECT?

6       A    CORRECT.

7       Q    YOU DON'T HAVE ANY DEGREE OR TRAINING IN

8    PROVIDING DIRECT PATIENT CARE?

9       A    CORRECT.

10      Q    YOU SAID ON DIRECT THAT YOU WORKED AS CHIEF

11   EXECUTIVE OFFICER OF ST. HELENA COMMUNITY HEALTH

12   CENTER.  IS THAT RIGHT?

13      A    YES, SIR.

14      Q    IN THAT JOB YOU SERVED AS THE ADMINISTRATOR

15   OF A FACILITY THAT WAS PROVIDING DIRECT PATIENT CARE.

16   CORRECT?

17      A    YES.

18      Q    AND THAT'S THE ONLY JOB YOU HAD PRIOR TO

19   COMING TO LSP WHERE YOU SERVED AS THE ADMINISTRATOR

20   OF A FACILITY PROVIDING DIRECT PATIENT CARE.  RIGHT?

21      A    YES.

22      Q    YOU WORKED AT ST. HELENA FOR ABOUT 13

23   MONTHS?

24      A    YES.

25      Q    THAT WAS IN 2008 AND 2009?

1      A    YES.

2      Q    ST. HELENA PROVIDED PRIMARY CARE.  CORRECT?

3      A    YES.

4      Q    IT DIDN'T HAVE AN INFIRMARY?

5      A    IT DID NOT.

6      Q    AND IT DIDN'T HAVE AN EMERGENCY ROOM?

7      A    IT DID NOT.

8      Q    FOR EMERGENCY SERVICES IT SENT PEOPLE TO A

9  NEARBY HOSPITAL?

10     A    YES.

11     Q    AND IT WASN'T A RESIDENTIAL FACILITY OF ANY

12 SORT?

13     A    NO.

14     Q    ONE OF THE BIGGEST CHALLENGES YOU FACE AT

15 LSP IS CHANGING THE ORGANIZATIONAL CULTURE.  CORRECT?

16     A    YES.

17     Q    THAT'S BECAUSE, LIKE ANY ORGANIZATION, IT

18 HAS AN ENTRENCHED CULTURE?

19     A    YES.

20          THE REPORTER:  IT HAS A WHAT?

21          MR. DUBNER:  ENTRENCHED CULTURE.  SORRY.

22 I'LL TRY TO SLOW DOWN.

23 BY MR. DUBNER:

24     Q    YOU'RE TRYING TO BRING THE ORGANIZATION

25 TOWARD THINKING ABOUT PATIENT CARE AND COMPASSIONATE

1  TREATMENT?

2       A    YES.

3       Q    AND YOU'RE TRYING TO CHANGE THE CULTURE TO

4  MAKE IT MORE PATIENT ORIENTED?

5       A    YES.

6       Q    WHEN YOU STARTED YOU BELIEVED THAT THE

7  NURSING DEPARTMENT NEEDED MORE LEADERSHIP.  RIGHT?

8       A    WHAT DO YOU MEAN?

9       Q    DID YOU BELIEVE WHEN YOU STARTED THAT THE

10 NURSING DEPARTMENT NEEDED MORE LEADERSHIP?

11      A    I DON'T UNDERSTAND THE -- WHAT DO YOU MEAN

12 BY "MORE LEADERSHIP"?

13      Q    I TOOK YOUR DEPOSITION IN THIS CASE.  IS

14 THAT RIGHT?

15      A    YES.

16      Q    DO YOU RECALL TELLING ME DURING YOUR

17 DEPOSITION THAT YOU BELIEVED THE NURSING DEPARTMENT

18 WAS ONE THAT NEEDED MORE LEADERSHIP WHEN YOU STARTED?

19      A    I DON'T RECALL IT, BUT I JUST WANTED AN

20 UNDERSTANDING OF EXACTLY THE MEANING BEHIND "MORE

21 LEADERSHIP."

22      Q    WELL, WHAT WOULD YOU MEAN BY THE CONCEPT OF

23 MORE LEADERSHIP?

24      A    WHAT DO I MEAN BY IT?

25      Q    YEAH.  HOW WOULD YOU DEFINE THE CONCEPT OF A

1  DEPARTMENT HAVING MORE LEADERSHIP?

2      **A**   MORE -- I GUESS HAVING -- BEING MORE

3  PROACTIVE, MORE IN TUNE WITH THE STAFF AND/OR THAT

4  PARTICULAR DEPARTMENT OR PROGRAM NEEDS.

5      **Q**   AND YOU'VE TRIED TO WORK WITH STAFF AS PART

6  OF YOUR EFFORTS TO CHANGE THE CULTURE TO REDUCE THE

7  ASSUMPTION THAT PATIENTS ARE LYING TO THEM.  IS THAT

8  RIGHT?

9      **A**   I WORK WITH STAFF IN GENERAL.

10      **Q**   IS THAT ONE THING THAT YOU HAVE WORKED WITH

11  STAFF TO TRY TO DO, IS TO REDUCE THE ASSUMPTION THAT

12  PATIENTS ARE LYING TO THEM?

13      **A**   YOU KNOW, WHEN WORKING WITH STAFF AND/OR

14  PATIENTS, THE GOAL IS TO QUANTIFY THE ISSUE.  I WON'T

15  MAKE ASSUMPTIONS ABOUT AN ALLEGATION OF SOMEONE

16  MENTIONING.  I JUST -- I WON'T TAKE THAT AS FACT.  I

17  WILL TRY TO INVESTIGATE IT MORE.

18      **Q**   SO HAVE YOU NOT HAD TO WORK WITH ANY STAFF

19  ON -- TO REDUCE THE ASSUMPTION THAT PATIENTS ARE

20  LYING TO THEM?

21      **A**   I WORK WITH STAFF DAILY TO ENSURE THAT WE

22  ARE PROVIDING PATIENT CARE.

23      **Q**   AND SPECIFICALLY ON -- HAVE YOU HAD TO WORK

24  WITH ANY STAFF TO REDUCE AN ASSUMPTION THAT THEY HAD

25  THAT PATIENTS WERE LYING TO THEM?

1      **A**    I WORK WITH STAFF TO ENSURE WHATEVER

2   UNDERLYING ISSUE THERE WAS.  WE DID NOT CLOUD THAT

3   UNDERLYING ISSUE WITH THE OVER-ARCHING DELIVERY OF

4   PATIENT CARE.  THAT CAN BE ANYTHING.  IT CAN BE

5   LYING, IT CAN BE PERSONAL FEELINGS OR WHAT HAVE YOU.

6      **Q**    AND SO ONE OF THE THINGS THAT YOU'VE HAD TO

7   WORK ON STAFF TO REDUCE IS THE ASSUMPTION THAT

8   PATIENTS ARE LYING TO THEM.  IS THAT CORRECT?

9      **A**    AS I SAID, THE GOAL IS TO WORK WITH ALL

10   STAFF TO ENSURE THAT, YOU KNOW, WE'RE PROVIDING

11   PATIENT CARE AND REMOVING ANY UNDERLYING FACTORS

12   THERE.

13      **Q**    LET'S TAKE A LOOK AT THAT DEPOSITION THAT WE

14   DID TOGETHER.  IF WE COULD PULL UP PAGE 192 AND 193.

15           AND SO IF WE LOOK STARTING AT LINE 19 OF

16   PAGE 192, I ASKED YOU:  "HAVE YOU HAD TO WORK ON THAT

17   ASSUMPTION WITH ANY STAFF AT LSP TO TRY TO REDUCE

18   THAT ASSUMPTION, THAT PARTICULAR ASSUMPTION?"

19           YOU ASKED ME:  "WHAT IS THE PARTICULAR

20   ASSUMPTION AGAIN?"

21           I SAID:  "THAT PATIENTS ARE LYING TO HEALTH

22   CARE STAFF."

23           YOU ANSWERED:  "YES, I WOULD SAY YES."

24           DID I READ THAT CORRECTLY?

25      **A**    YOU DID.

**1**      Q    AND IT ISN'T APPROPRIATE TO THREATEN AN

**2**  OFFENDER WITH DISCIPLINE FOR FAILING TO SIGN A

**3**  REFUSAL FORM.  CORRECT?

**4**      A    YES.

**5**      Q    WOULD THREATENING PATIENTS IF THEY FAILED TO

**6**  SIGN A REFUSAL FORM BE THE KIND OF BAD ATTITUDE YOU

**7**  SPOKE ABOUT BEFORE THAT YOU WOULD WANT TO ADDRESS?

**8**      A    YEAH.  NOT ONLY BAD ATTITUDE BUT OUTSIDE OF

**9**  POLICY AS WELL.

**10**     Q    IT'S OUTSIDE OF POLICY TO --

**11**     A    YES, SIR.

**12**     Q    -- THREATEN SOMEBODY FOR THREATENING --

**13**          THE REPORTER:  I'M SORRY.

**14**          MR. DUBNER:  SORRY.

**15**          THE REPORTER:  IT'S OUTSIDE OF POLICY TO --

**16**  BY MR. DUBNER:

**17**     Q    -- TO THREATEN SOMEBODY FOR REFUSING TO SIGN

**18**  A REFUSAL FORM?

**19**     A    YOU'RE ASKING ME?  YES.

**20**     Q    COULD WE BRING UP DEFENDANTS' EXHIBIT 46 AT

**21**  172.

**22**          DOCTOR, ARE YOU ABLE ON YOUR SCREEN TO READ

**23**  WHAT'S STATED ON THE SIGN OUT LOUD?

**24**     A    YES.  YOU WANT ME TO READ THAT?

**25**     Q    YES, IF YOU COULD.

1      A     "YOU MUST SIGN A MEDICAL REFUSAL AT CLINIC

2  BEFORE LEAVING OR YOU WILL FACE DISCIPLINARY ACTION."

3      Q     DR. JOHNSON, IS THIS A SIGN THAT IS AFFIXED

4  TO THE TREATMENT CENTER?

5      A     I DON'T KNOW WHERE THE SIGN IS.

6      Q     HAVE YOU SEEN THIS SIGN BEFORE?

7      A     I'M SURE I HAVE.  IF YOU CAN OPEN UP THAT

8  PICTURE, I CAN -- OH.  I CAN'T.  I DON'T KNOW WHERE

9  IT IS.

10     Q     WE DO HAVE A SECOND PICTURE.  I'LL REPRESENT

11 THIS IS A PICTURE THAT DEFENDANTS' EXPERT DR. MCMUNN

12 TOOK; DEFENDANTS' EXHIBIT 46-172.

13         **MR. DUBNER:**  AND WHILE WE HAVE IT UP, WE

14 WILL MOVE JUST THIS PAGE OF DEFENDANTS' EXHIBIT 46

15 INTO EVIDENCE.  PLAINTIFFS WILL MOVE PAGE 172 OF

16 DEFENDANTS' EXHIBIT 46 INTO EVIDENCE.

17             OH, I STAND CORRECTED.  MR. ROBERT IS

18 ABSOLUTELY RIGHT.  DEFENDANTS' EXHIBIT 46 IS IN

19 EVIDENCE ALREADY.

20 **BY MR. DUBNER:**

21     Q     SO YOU COULDN'T RECOGNIZE FROM THAT PICTURE.

22 IF WE COULD PULL UP PLAINTIFFS' EXHIBIT 1-D AT 47.

23         DOES THIS HELP YOU IDENTIFY IT AS BEING

24 SOMETHING THAT'S ATTACHED TO THE TREATMENT CENTER?

25     A     YES.

1    **Q**   THAT'S AN AREA THAT MANY PATIENTS PASS AS

2  THEY ENTER THE TREATMENT CENTER?

3    **A**   YES.   THAT IS AN AREA OFFENDERS -- ONE OF

4  THE AREAS THE OFFENDERS GO THROUGH FROM MAIN PRISON,

5  YES, SIR.

6    **Q**   NOW, YOU USE TO REPORT DIRECTLY TO WARDEN

7  HOOPER.   RIGHT?

8    **A**   YES.

9    **Q**   BUT YOU NO LONGER REPORT DIRECTLY TO WARDEN

10  HOOPER.   CORRECT?

11    **A**   INDIRECTLY, YES, SIR.

12    **Q**   YOU NOW REPORT TO CORRECTIONAL DEPUTY WARDEN

13  ASHLI OLIVEAUX?

14    **A**   YES.

15    **Q**   AND SHE'S IN THE SECURITY CHAIN OF COMMAND?

16    **A**   YES.

17    **Q**   HER BACKGROUND IS AS AN LPN.   CORRECT?

18    **A**   YES.

19    **Q**   AND HER PREDECESSOR, TRACY FALGOUT, HE WAS

20  AN RN.   IS THAT CORRECT?

21    **A**   YES.

22    **Q**   YOUR JOB INVOLVES TRYING TO FILL VACANT

23  POSITIONS ACROSS ALL MEDICAL DEPARTMENTS AT LSP.

24  CORRECT?

25    **A**   YES.

**1**     Q    BUT YOU DON'T KNOW STAFFING LEVELS FOR EMTs,

**2** DO YOU?

**3**     A    OFF THE TOP OF MY HEAD I DON'T, BUT THEY ARE

**4** SIGNIFICANTLY UNDERSTAFFED AT THIS TIME.

**5**     Q    AND AT YOUR DEPOSITION YOU ALSO DIDN'T KNOW

**6** THE EMT STAFFING LEVELS?

**7**     A    I WOULD TAKE YOUR WORD FOR IT, YES.

**8**     Q    YOU DON'T KNOW HOW MANY UNFILLED EMT

**9** POSITIONS LSP HAS?

**10**    A    UNFILLED?  I CAN'T GIVE YOU A QUANTITATIVE

**11** NUMBER.  BUT AS I SAID, IT'S A -- IT'S A SIGNIFICANT

**12** NUMBER UNFILLED.

**13**    Q    AND LSP PAYS EMTs LESS THAN OTHER EMPLOYERS

**14** IN THE PRIVATE OR PUBLIC SECTOR?

**15**    A    YES.

**16**    Q    AND YOU BELIEVE THAT THAT'S AN IMPEDIMENT TO

**17** FILLING EMT VACANCIES WITH QUALITY CANDIDATES?

**18**    A    YES.

**19**    Q    LSP, AS OF YOUR DEPOSITION, ALSO HAD 12 TO

**20** 14 UNFILLED NURSING POSITIONS.  CORRECT?

**21**    A    YES.

**22**    Q    OUT OF ABOUT 45 OR 47 POSITIONS TOTAL?

**23**    A    YES.  I THINK IT MIGHT HAVE BEEN A LITTLE

**24** BIT MORE.

**25**    Q    A LITTLE BIT MORE VACANCIES OR A LITTLE BIT

1  MORE TOTAL --

2      **A**    VACANCIES.

3      **Q**    AND LSP DIDN'T HAVE A LAB DIRECTOR AT ALL

4  FOR ABOUT A YEAR?

5      **A**    YES.

6      **Q**    AND IT CURRENTLY, OR AT THE TIME OF YOUR

7  DEPOSITION AT LEAST, HAD THREE UNFILLED POSITIONS OUT

8  OF SIX OR SEVEN POSITIONS?

9      **A**    IN THE LAB?

10     **Q**    YES.

11     **A**    YES.

12     **Q**    YOU WERE INVOLVED IN HIRING DR. TOCE.

13  RIGHT?

14     **A**    YES.

15     **Q**    HE WAS THE ONLY APPLICANT CONSIDERED FOR THE

16  POSITION?

17     **A**    HE WAS THE ONLY APPLICANT, YES.

18     **Q**    AND HE CAME TO LSP FROM WITHIN THE DOC.

19  RIGHT?

20     **A**    YES.

21     **Q**    HE WAS MEDICAL DIRECTOR AT DIXON

22  CORRECTIONAL?

23     **A**    YES.

24     **Q**    AND BEFORE THAT HE PRACTICED AT LSP FOR

25  ABOUT A DECADE?

1    **A**    YES.

2    **Q**    THAT WAS ROUGHLY 2011 TO 2020?

3    **A**    I'M UNSURE ABOUT THE TIME.  BUT I DO KNOW

4    THAT HE PRACTICED AT LSP BEFORE THEN.

5    **Q**    AND THAT INCLUDED THE TIME FROM 2015 TO

6    2016.  IS THAT CORRECT?

7    **A**    I CAN'T VERIFY THAT.  BUT HE DID PRACTICE

8    BEFORE.

9    **Q**    DID HE PRACTICE THERE WHEN DR. LAVESPERE WAS

10   MEDICAL DIRECTOR?

11   **A**    YES.

12   **Q**    AND, IN FACT, ALL OF THE MEDICAL LEADERSHIP

13   WHO HAVE BEEN HIRED WHILE YOU'VE BEEN AT LSP CAME

14   FROM WITHIN DOC.  CORRECT?  ASIDE FROM YOURSELF?

15   **A**    WHAT'S THAT?

16   **Q**    ALL OF THE MEDICAL LEADERSHIP, ASIDE FROM

17   YOURSELF, WHO HAVE BEEN HIRED WHILE YOU'VE BEEN AT

18   LSP CAME FROM WITHIN DOC?

19   **A**    NO.

20   **Q**    AND WHO CAME FROM OUTSIDE OF DOC?

21   **A**    ALL OF OUR NURSE PRACTITIONERS.

22   **Q**    IN TERMS OF THE LEADERSHIP -- PUTTING ASIDE

23   THE PROVIDERS -- FOR EXAMPLE, YOUR MEDICAL -- WE

24   DISCUSSED YOUR MEDICAL DIRECTOR, YOUR DIRECTOR OF

25   NURSING CAME FROM WITHIN LSP.  CORRECT?

1     **A**    YES.

2     **Q**    AND CORRECTIONAL DEPUTY WARDEN ASHLI

3  OLIVEAUX CAME FROM DC HEADQUARTERS AND WORKED AT LSP

4  BEFORE THAT?

5     **A**    YES, SIR.

6     **Q**    AND YOU TALKED ABOUT PROVIDERS HAVING LEFT

7  DURING YOUR TIME AT LSP.  WHEN YOU STARTED, THERE

8  WERE MORE PHYSICIANS THAN THERE ARE NOW.  RIGHT?

9     **A**    THAT'S CORRECT.

10     **Q**    AROUND THE TIME YOU STARTED, DR. LAFLEUR WAS

11  THERE, DR. BUNCH, DR. CROOK.  IS THAT ALL CORRECT?

12     **A**    WHEN I WAS THERE STARTING IN OCTOBER 20TH,

13  WE HAD DR. LAVESPERE, DR. LAFLEUR, AND -- I'M TRYING

14  TO THINK WHO ELSE.  AND TWO NURSE PRACTITIONERS I

15  BELIEVE.

16     **Q**    AND WERE DR. BUNCH AND DR. CROOK EITHER

17  THERE WHEN YOU STARTED OR THERE SHORTLY BEFORE YOU

18  STARTED?

19     **A**    I COULDN'T -- I DON'T RECALL AT MY START

20  DATE THAT DR. BUNCH OR DR. CROOK.

21     **Q**    AND DR. LAFLEUR, FOR EXAMPLE, HE WASN'T LET

22  GO.  CORRECT?

23     **A**    WHAT DO YOU MEAN?

24     **Q**    WAS HE PROMOTED TO ANOTHER POSITION WITHIN

25  DOC?

1     **A**    HE WAS.  HE TRANSFERRED TO ANOTHER FACILITY.

2     **Q**    HE TRANSFERRED TO ANOTHER FACILITY AND IS

3  NOW MEDICAL DIRECTOR OF DIXON CORRECTIONAL?

4     **A**    YES.

5     **Q**    AND I KNOW YOU SAID YOU WEREN'T SURE WHEN

6  THEY WERE AT LSP, BUT ARE YOU FAMILIAR WITH DR. BUNCH

7  AND DR. CROOK?

8     **A**    ACTUALLY, I'M NOT.

9     **Q**    ARE YOU FAMILIAR WITH THE MEDICAL DIRECTORS

10 AT OTHER DOC FACILITIES?

11    **A**    YES.

12    **Q**    SO ARE YOU FAMILIAR WITH DAVID WADE

13 CORRECTIONAL, FOR EXAMPLE?

14    **A**    YES.

15    **Q**    AND THE MEDICAL DIRECTORS THERE IN RECENT

16 YEARS HAVE BEEN DR. BUNCH AND DR. CROOK.  IS THAT

17 CORRECT?

18    **A**    OKAY.  I DIDN'T KNOW -- I HAVE MET THEM

19 BEFORE, SO -- AT ONE OF THE MEDICAL MEETINGS BUT

20 DIDN'T CORRELATE THE NAME WITH THE FACILITY.

21    **Q**    RIGHT.  AND DIDN'T --

22    **A**    SO THANK YOU FOR THAT.

23    **Q**    -- REALIZE THEY HAD BEEN AT LSP?

24       **MR. DUBNER:**  SORRY TO TALK OVER THE WITNESS.

25       **THE REPORTER:**  I DIDN'T GET EITHER.

1       MR. DUBNER:  I'M SURE.

2  BY MR. DUBNER:

3       Q    WHAT WERE YOU SAYING?

4       A    I HAVE MET -- IF -- DR. BUNCH, IF THAT'S ONE

5  OF THE FEMALE DOCTORS, I HAVE MET HER AT ONE OF THE

6  DOC MEDICAL MEETINGS BUT WAS UNAWARE OF HER TENURE AT

7  LSP.

8       Q    OKAY.  LET'S TALK ABOUT MORTALITY REVIEW

9  MEETINGS.  AT YOUR DEPOSITION YOU COULDN'T RECALL

10 MORTALITY REVIEW MEETINGS EVER TALKING ABOUT ANY

11 PROBLEMS IN THE CARE PROVIDED BY ANY MEDICAL STAFF AT

12 LSP.  CORRECT?

13      A    YES.

14      Q    AND QUALITY ASSURANCE AND QUALITY

15 IMPROVEMENT MEETINGS.  YOU ALSO COULDN'T NAME ANY

16 SPECIFIC CHANGES TO CARE AT LSP OR LSP PRACTICES OR

17 POLICIES THAT HAD RESULTED FROM QA/QI MEETINGS.

18 CORRECT?

19      A    I COULDN'T RECALL, BUT THEY ARE -- I MEAN, I

20 CAN'T NAME ONE PARTICULAR ONE AT THIS TIME.

21      Q    YOU CAN'T NAME ONE AT THIS TIME?

22      A    WELL, WE HAVE -- THE ONE I JUST NAMED ABOUT

23 THE SELF-DECLARED EMERGENCIES, WE JUST INCORPORATED

24 THAT.  BUT THERE HAVE BEEN A NUMBER OF CHANGES ACROSS

25 THE BOARD.

1    **Q**    ANY CHANGES THAT DID COME FROM QA/QI, THOSE

2    WOULD BE IN WRITTEN QA/QI REPORTS.  CORRECT?

3    **A**    THEY SHOULD BE, YES.

4    **Q**    IF THERE HAVE BEEN IMPROVEMENTS, THEY WOULD

5    BE SHOWN THERE?

6    **A**    YES.

7    **Q**    AND THE SELF-DECLARED EMERGENCIES IS

8    SOMETHING THAT HAS BEGUN BEING STUDIED, BUT THERE ARE

9    NO CHANGES THAT HAVE BEEN MADE AS A RESULT OF THAT

10   STUDY YET.  CORRECT?

11   **A**    NO.  IT'S BOTH BEING STUDIED AND CHANGES

12   HAVE BEEN MADE AS EFFECTIVE JUNE 1ST.

13   **Q**    RIGHT.  PRIOR TO THE QA/QI STUDY.  CORRECT?

14   **A**    WE COMMENCED THE QA/QI STUDY IN -- IN --

15   SIMULTANEOUSLY WITH THE CHANGE, SO WE CAN TRACK THE

16   POLICY CHANGE -- EXCUSE ME -- THE PROCEDURAL CHANGES

17   WITH THE DATA SET SO WE CAN MAKE SURE WE ARE ON TRACK

18   THERE.  BUT BOTH ARE BEING DONE AT THE SAME TIME.

19   **Q**    RIGHT.  IT WAS CHANGED AND A STUDY WAS ADDED

20   AT THE SAME TIME.  IT'S NOT SOMETHING THAT RESULTED

21   FROM THE QA/QI MEETINGS.  CORRECT?

22   **A**    YES, SIR.

23   **Q**    THANK YOU.  AND IF WE COULD JUST BRING UP

24   PLAINTIFFS' EXHIBIT 34-B AT 244.

25        DO YOU RECOGNIZE THIS AS BEING MINUTES FROM

1  THE 2021 THIRD QUARTER QUALITY IMPROVEMENT MEETING?

2       **A**   YES.

3            **MR. DUBNER:**  AT THIS TIME PLAINTIFFS WILL

4  MOVE PLAINTIFFS' EXHIBIT 34-B INTO EVIDENCE.  IT'S

5  THE PREVIOUS MEETING MINUTES.  ONLY THE MOST RECENT

6  ONE HAD BEEN PREVIOUSLY ENTERED.

7            **MR. ROBERT:**  NO OBJECTION.

8            **THE COURT:**  ADMITTED.

9  **BY MR. DUBNER:**

10      **Q**   AND AT YOUR DEPOSITION YOU TESTIFIED THAT

11  YOU COULDN'T SAY HOW LSP DETERMINES WHAT TOPICS

12  SHOULD BE STUDIED IN THE QA/QI MEETINGS?

13      **A**   YES.

14      **Q**   YOU TALKED A LITTLE BIT ABOUT DATA AND THE

15  BACKLOG BEFORE.  YOU DON'T KEEP ANY STATISTICS ON HOW

16  LONG PEOPLE IN THE BACKLOG HAVE BEEN WAITING, DO YOU?

17      **A**   ANY STATISTICS ON WHAT?

18      **Q**   HOW LONG PEOPLE IN THE BACKLOG HAVE BEEN

19  WAITING.  CORRECT?

20      **A**   YEAH.  THE BACKLOG TRACKER -- NO, WE DON'T

21  REALLY KEEP STATS ON THAT.  YES.

22      **Q**   AND YOU'RE NOT AWARE HOW THE BACKLOG IS

23  DEFINED IN THE REPORTS THAT TRACK BACKLOG; THE C-05

24  REPORTS.  CORRECT?

25      **A**   WHAT'S THAT?

1    **Q**   YOU'RE NOT AWARE -- OR AT YOUR DEPOSITION

2  YOU WEREN'T AWARE OF HOW BACKLOG IS EVEN DEFINED IN

3  THE REPORTS THAT TRACK BACKLOG; THE C-05 REPORTS.

4  CORRECT?

5    **A**   SO I'M UNAWARE OF HOW THAT DEFINITION

6  HAPPENS.  AND JUST TO BACKTRACK, ON THE C0 -- EXCUSE

7  ME -- THE STATISTICS ON THEIR -- YOU ASKED ABOUT WAIT

8  TIME?

9    **Q**   UH-HUH.

10   **A**   SO WE DON'T TRACK THAT, BUT WE TRACK THE

11 PATIENT ITSELF.  SO I THINK ONE IS KIND OF AND THE

12 SAME.  IF THE PATIENT HASN'T MET THEIR APPOINTMENT

13 TIMELY, WE WANT TO TRACK THAT PATIENT GETTING TO THAT

14 APPOINTMENT VERSUS THE STATS ON LAST TIME THEY WERE

15 SEEN.

16   **Q**   THAT WOULD BE TRACKING PEOPLE WHO ARE

17 NO-SHOWS OR REFUSED OR LEFT AGAINST MEDICAL ADVICE?

18   **A**   THAT IS ONE AREA.  BUT ALSO IF -- WE HAVE ON

19 THE BACKLOG TRACKER HOW MANY PATIENTS ARE WHAT I CALL

20 IN THE QUEUE, HOW MANY ARE WAITING.

21   **Q**   RIGHT.  AND WHY DON'T WE PULL THAT BACK UP,

22 DEFENDANTS' EXHIBIT 48-A.  WHY DON'T WE DO PAGE 2.

23       THIS TRACKER ONLY SHOWS THE NUMBER OF

24 PATIENTS WHO ARE IN THE BACKLOG, NOT HOW LONG THEY'VE

25 BEEN WAITING.  CORRECT?

1    **A**    THAT'S CORRECT, SIR.

2    **Q**    THERE IS NO OTHER DATA SOURCE THAT SHOWS HOW

3    LONG THE PATIENTS HAD BEEN WAITING.  CORRECT?

4    **A**    THERE IS OTHER DATA SOURCE FOR THAT, BUT

5    THAT'S NOT WHAT THIS REPORT SHOWS.

6         **MR. DUBNER:**  IF WE COULD PULL UP PAGE 210 OF

7    DR. JOHNSON'S DEPOSITION.

8    **BY MR. DUBNER:**

9    **Q**    AND I'LL READ TO YOU STARTING AT LINE 1.

10        "QUESTION:  DO YOU KEEP ANY STATISTICS OF

11   HOW LONG PEOPLE IN THE BACKLOG HAVE BEEN WAITING?

12        "ANSWER:  NO."

13        WAS THAT TESTIMONY ACCURATE WHEN YOU GAVE

14   IT?

15   **A**    YES.  SO I DON'T KEEP THE STATS.  IN THE

16   ECEPTIONIST SYSTEM, ALL OF THAT INFORMATION IS THERE.

17   I THINK IT'S JUST MORE IMPORTANT TO TRACK THE PATIENT

18   VERSUS HOW LONG THEY'VE BEEN WAITING TO GET THAT

19   PATIENT SEEN A LITTLE BIT MORE TIMELY.

20        BUT I DON'T TRACK IT.  I TRACK THE PATIENTS.

21   AND THE ECEPTIONIST SYSTEM TRACK THE TIME IN WHICH

22   THEY HAVEN'T BEEN SEEN.

23   **Q**    RIGHT.  YOU CAN LOOK IN ECEPTIONIST OR THE

24   MEDICAL RECORDS TO DETERMINE HOW LONG A SPECIFIC

25   PATIENT HAS BEEN WAITING.  BUT NOBODY TRACKS

1   STATISTICS ON THAT MORE GENERALLY.  CORRECT?

2       A   THE -- I DON'T.  BUT THE ECEPTIONIST SYSTEM

3   TRACKS ALL OF THAT.

4       Q   ARE YOU AWARE OF ANYBODY IN THE TRIPS OFFICE

5   OR THE QUALITY ASSURANCE AND QUALITY IMPROVEMENT

6   DEPARTMENT OR ELSEWHERE WHO ACTUALLY DOES LOOK TO

7   TRACK STATISTICS ON HOW LONG PEOPLE HAVE BEEN WAITING

8   IN THE BACKLOG?

9       A   THE NURSE MANAGER FOR CLINIC, NURSE CARROLL,

10  WOULD HAVE THAT PARTICULAR RESPONSIBILITY WITH THE

11  CLINIC AND TRIP OFFICE, TRACKING ALL PATIENT CARE AS

12  FAR AS WAIT TIMES, YES, SIR.

13      Q   AND IF MS. CARROLL DIDN'T TESTIFY THAT SHE

14  ACTUALLY LOOKED AT THAT STATISTIC, WOULD YOU HAVE ANY

15  BASIS FOR BELIEVING THAT'S SOMETHING THAT SHE DID?

16      A   REPEAT THAT.

17      Q   I'LL REPHRASE THE QUESTION.

18          YOU DON'T HAVE ANY BASIS FOR BELIEVING THAT

19  MS. CARROLL HAS ACTUALLY DONE THAT.  YOU ONLY KNOW

20  THAT SHE HAS THE CAPABILITY TO DO THAT.  CORRECT?

21      A   OH, THEY DO THAT.  THAT'S WHAT TRIP OFFICE

22  AND THE CLINIC STAFF DOES.

23      Q   AGAIN, I'M NOT REFERRING TO WITH AN

24  INDIVIDUAL PATIENT.  I'M REFERRING TO ON A BROADER

25  STATISTICAL BASIS.

1      **A**   YES, THEY DO TRACK THAT.

2      **Q**   AND YOU DON'T DO ANYTHING TO TRACK HOW

3  SPECIALIST RECOMMENDATIONS ARE IMPLEMENTED AT LSP, DO

4  YOU?

5      **A**   HOW SPECIALIST RECOMMENDATIONS ARE

6  IMPLEMENTED?  WHAT DO YOU MEAN BY THAT?

7      **Q**   YOU DON'T DO ANYTHING TO TRACK HOW AND

8  WHETHER PROVIDERS ARE IMPLEMENTING SPECIALIST

9  RECOMMENDATIONS?

10      **A**   NO, SIR.

11      **Q**   YOU ALSO SPOKE ABOUT REDUCING THE GENERAL

12  MEDICINE CLINIC AT THE END OF TWENTY -- OR IN THE

13  BEGINNING OF 2022 BY BRINGING IN PART-TIME DOCTORS.

14  CORRECT?

15      **A**   YES.

16      **Q**   AND THAT INCLUDED DR. LAVESPERE SEEING

17  PATIENTS?

18      **A**   YES.

19      **Q**   AND THAT INCLUDED DR. MOODY SEEING PATIENTS.

20  CORRECT?

21      **A**   YES.

22      **Q**   DR. MOODY HAD ALSO WORKED AT LSP PREVIOUSLY.

23  CORRECT?

24      **A**   YES.

25      **Q**   HE HAD WORKED WHEN DR. LAVESPERE WAS MEDICAL

1   DIRECTOR?

2       **A**   YES.

3       **Q**   AND THOSE WERE THE ONLY PROVIDERS WHO WERE

4   PROVIDING PART-TIME PRIMARY CARE IN EARLY 2022.

5   CORRECT?

6       **A**   EARLY 2022.  AND DR. TOCE AS WELL.

7       **Q**   AND DR. TOCE AS WELL?

8       **A**   YES, SIR.

9       **Q**   THANK YOU.

10          YOU TALKED ABOUT VARIOUS CHANGES THAT HAVE

11  BEEN MADE SINCE 2019 DURING YOUR DIRECT.  LET'S START

12  WITH SICK CALL.  YOU'RE NOT INVOLVED -- I'LL WITHDRAW

13  THAT.

14          YOU'RE FAMILIAR WITH THE POLICY THAT GOVERNS

15  SICK CALL.  CORRECT?  THE POLICY --

16      **A**   YES.

17      **Q**   -- THAT YOU -- THAT WE SHOWED?

18          CAN WE BRING UP DEFENDANTS' EXHIBIT 8-AAA AT

19  2?

20          THIS IS THE POLICY THAT YOU DISCUSSED ON

21  DIRECT.  CORRECT?

22      **A**   YES.

23      **Q**   AND YOU SAID THAT THERE IS A TRIAGE STEP

24  THAT NURSES OR NURSE PRACTITIONERS CONDUCT IN THE

25  ATU.  IS THAT DESCRIBED IN THIS POLICY?

1      **A**    NO.

2      **Q**    AND MR. BORDELON, THE NURSE PRACTITIONER,

3    HE'S MORE INVOLVED IN THE DAY-TO-DAY SICK CALL

4    PROCESS THAN YOU ARE.  WOULD YOU AGREE WITH THAT?

5      **A**    YES.

6      **Q**    IF MR. BORDELON TESTIFIED THAT HE DIDN'T

7    REMEMBER ANYBODY EVER BEING SEEN MORE QUICKLY DUE TO

8    TRIAGE, YOU WOULDN'T HAVE ANY BASIS TO DISPUTE THAT,

9    WOULD YOU?

10          **MR. ROBERT:**  YOUR HONOR, I'M GOING TO OBJECT

11   TO HIM CHARACTERIZING WHAT MR. BORDELON'S TESTIMONY

12   WAS.

13          **MR. DUBNER:**  I BELIEVE IT'S AN ACCURATE

14   REFLECTION.  THE TESTIMONY WILL SHOW WHAT IT SHOWS.

15   IF I MISSTATED HIS TESTIMONY, THE ANSWER WILL HAVE

16   LITTLE WEIGHT.

17          **THE COURT:**  OVERRULED.

18   BY MR. DUBNER:

19      **Q**    WANT ME TO REPEAT THE --

20      **A**    CAN YOU REPEAT THAT?  YES.

21      **Q**    IF MR. BORDELON TESTIFIED THAT HE DIDN'T

22   REMEMBER ANYBODY BEING SEEN MORE QUICKLY DUE TO

23   TRIAGE, YOU WOULDN'T HAVE ANY BASIS TO DISPUTE THAT,

24   WOULD YOU?

25      **A**    NO.

1      Q    AND THE NURSING UNIT RATIOS, THOSE CHANGED

2   IN EARLY 2021.  IS THAT CORRECT?

3      A    YES.

4      Q    SO IF THE MEDICAL RECORDS THAT HAVE BEEN

5   REVIEWED IN THIS CASE SHOW ANY ISSUES IN THE NURSING

6   UNIT AFTER THAT TIME, THAT WOULD BE WHILE THE NEW

7   STAFFING RATIOS ARE IN PLACE.  CORRECT?

8      A    YES.

9      Q    YOU ALSO TESTIFIED ABOUT SOME CHANGES THAT

10  HAPPENED IN YOUR TENURE, SUCH AS THE VIDEO MONITORS

11  THAT WERE ADDED TO THE ASH UNITS.  CORRECT?

12     A    YES.

13     Q    IN FACT, THOSE MONITORS HAVE BEEN THERE

14  SINCE 2019 BEFORE YOU STARTED, HAVEN'T THEY?

15     A    YES.

16     Q    AND YOU REFERRED TO IMPROVEMENTS IN THE EXAM

17  ROOMS THAT YOU IMPLEMENTED.  THOSE HAVE ALSO BEEN IN

18  PLACE SINCE BEFORE YOU ARRIVED.  CORRECT?

19     A    YES.

20     Q    AND COULD WE PULL UP DEFENDANTS' EXHIBIT

21  8-Y?

22          THIS IS A HEALTH CARE SERVICES POLICY THAT

23  YOU LOOKED AT ON DIRECT.  CORRECT?

24     A    YES.

25     Q    AND THIS HASN'T CHANGED SINCE OCTOBER 2017.

1  CORRECT?

2      **A**    YES.

3      **Q**    THIS ALSO SAYS AT A.1.:  "BEGINNING AT AGE

4  50 OFFENDERS WHO ARE NOT BEING FOLLOWED ROUTINELY

5  WILL BE REFERRED FOR AN ANNUAL PHYSICAL ASSESSMENT."

6  IS THAT CORRECT?

7      **A**    YES.

8      **Q**    IF THOSE PHYSICAL ASSESSMENTS ARE OCCURRING,

9  THEY SHOULD BE IN THE MEDICAL RECORDS.  CORRECT?

10      **A**    YES.

11      **Q**    AND THEN YOU TALKED ABOUT THE ATU STAFFING.

12  LET'S PULL UP DX_8-YY AT PAGES 1 AND 2.

13          THIS IS THE ENTIRE TRIAGE AND TREATMENT IN

14  THE ASSESSMENT AND TREATMENT UNIT POLICY.  CORRECT?

15      **A**    YES.

16      **Q**    AND THIS DOESN'T SAY ANYTHING ABOUT NURSE

17  PRACTITIONERS OR NURSES STAFFING THE ATU.  CORRECT?

18      **A**    NO.

19      **Q**    AND THAT -- BUT THE NURSES AND NURSE

20  PRACTITIONERS STAFFING THE ATU, THAT'S ALSO NOT A NEW

21  CHANGE IN YOUR TENURE.  THAT WAS ALREADY IN PLACE

22  WHEN YOU STARTED?

23      **A**    WHAT'S THAT?

24      **Q**    THE NURSE PRACTITIONER AND NURSE STAFFING IN

25  THE ATU.

1      **A**   NO.  IT WAS PREVIOUSLY STAFFED BY EMS.

2      **Q**   YOUR TESTIMONY IS THAT THAT STARTED SINCE

3  YOU'VE GOTTEN TO LSP?

4      **A**   WHAT'S THAT?

5      **Q**   THE NURSE PRACTITIONER AND NURSE STAFFING IN

6  THE ATU.

7      **A**   WELL, THE NURSES ALWAYS BEEN STAFFED THERE.

8  I'M NOT FOLLOWING THE QUESTION.

9      **Q**   SURE.  LET'S BRING UP PLAINTIFFS' EXHIBIT

10  44-F AT PAGE 13.

11      THIS IS A RESPONSE SENT BY DEFENDANTS IN

12  RESPONSE TO OUR INTERROGATORIES.  IF WE LOOK AT THE

13  FIRST BULLET POINT, THAT SAYS THAT THE ATU IS STAFFED

14  BY EITHER A PHYSICIAN OR NURSE PRACTITIONER WHO IS

15  ASSISTED BY A NURSE AND AN EMT BASIC AND PUTS THE

16  DATE OF THAT CHANGE IN 2018.  IS THAT CORRECT?

17      **A**   ACCORDING TO THIS DOCUMENT, YES.

18      **Q**   AND SO ARE YOU SAYING THAT THE RESPONSE

19  DEFENDANTS MADE IN DISCOVERY WAS INCORRECT OR ARE YOU

20  SAYING THAT THE CHANGE ACTUALLY BEGAN BEFORE YOU

21  STARTED?

22      **A**   SO WHEN YOU SAY "EMT," I THINK YOU'RE -- IF

23  YOU WOULD REPHRASE YOUR QUESTION OR REPEAT YOUR

24  QUESTION.  I UNDERSTOOD YOUR QUESTION TO BE IS

25  PARAMEDICS OR EMS STAFFING THE ATU.  STAFFING STARTS

1  WITH THE NURSE PRACTITIONER, THEN NURSE AND THEN EMT

2  OR PARAMEDIC.

3      Q    AND THE NURSE PRACTITIONER STAFFING, THAT

4  BEGAN BEFORE YOU STARTED.  CORRECT?

5      A    THE NURSE PRACTITIONERS -- YES.  YEAH, IT

6  WAS ALWAYS THAT.

7          MR. DUBNER:  YOU CAN TAKE THAT DOWN.

8  BY MR. DUBNER:

9      Q    AND IF -- YOU TESTIFIED ON DIRECT THAT NURSE

10 PRACTITIONERS WERE IN THE ATU 24 HOURS A DAY ON THE

11 WEEKEND.  IS THAT CORRECT?

12     A    YES.

13     Q    IF THE MEDICAL RECORDS SHOW NURSE

14 PRACTITIONERS MAKING TELEPHONE ORDERS AND NOT SEEING

15 PATIENTS ON THE WEEKEND, WOULD THAT CONCERN YOU?

16     A    IT WOULD.

17     Q    IF NURSE PRACTITIONER PARK TESTIFIED THAT

18 THE NPUs WERE -- THAT NPs WERE NOT IN THE ATU 24

19 HOURS A DAY ON THE WEEKEND, WOULD THAT CONCERN YOU?

20     A    IF THEY WEREN'T IN THE ATU?

21     Q    CORRECT.

22     A    SO, YOU KNOW, BECAUSE THEY'RE NOT IN THE

23 ATU, THEY CAN PROBABLY BE IN ONE OF THE ADJACENT

24 AREAS:  THE NURSING UNITS OR CLINIC AREA OR MEDICAL

25 RECORDS, SO -- BUT ON THE WEEKENDS THEY ARE STAFFING

1  THE ATU.

2      Q    OKAY.  AND THEN IN TERMS OF THE NURSE

3  STAFFING, I JUST WANT TO CLARIFY FROM WHAT YOU SAID

4  ON DIRECT.  IT'S NOT YOUR TESTIMONY THAT RNs ARE

5  ALWAYS STAFFING THE ATU.  CORRECT?

6      A    THAT IS CORRECT.

7      Q    IN FACT, LPNs STAFF THE ATU MOST NIGHTS OF

8  THE WEEK?

9      A    I WOULDN'T SAY MOST NIGHTS.  WE DO HAVE AN

10  8P -- 8 -- LPN ON THE ROTATION ON THE STAFFING

11  MATRIX, SO IT'S BY SHIFT.  SO HER SHIFT WOULD

12  PROBABLY STAFF IT, BUT OTHER SHIFTS WOULD HAVE RNs.

13      Q    AND LET'S PULL UP DEFENDANTS' EXHIBIT 30 AT

14  PAGE 86.

15          IS THIS THE NURSING SCHEDULE FOR DECEMBER

16  13, 2021 THROUGH JANUARY 9, 2022?

17      A    YES.

18      Q    AND I'LL REPRESENT TO YOU THIS IS THE MOST

19  RECENT NURSING SCHEDULE WE RECEIVED.  THIS SHOWS

20  MS. RICUARD -- WHO IS AN LPN.  CORRECT?

21      A    YES.

22      Q    THIS SHOWS HER WORKING FOUR NIGHTS A WEEK

23  THE FIRST WEEK IN THE MONTH.  CORRECT?

24      A    YES.

25      Q    AND IT SHOWS HER WORKING THREE OR FOUR

Case 3:15-cv-00318-SDD-RLB   Document 757   11/05/22   Page 206 of 244
JACOB CHARLES JOHNSON, ED.D.

206

1  NIGHTS A WEEK IN THE SECOND MONTH?  SORRY.  THREE OR

2  FOUR NIGHTS IN THE SECOND WEEK?

3      **A**   YES.

4      **Q**   AND IT SHOWS HER WORKING FIVE NIGHTS IN THE

5  WEEK AFTER THAT?

6      **A**   YES.

7      **Q**   AND IT SHOWS HER WORKING FIVE NIGHTS IN THE

8  WEEK AFTER THAT?

9      **A**   YES.

10      **Q**   AND IF WE GO BACK TO PAGE 79, THIS ALSO

11  SHOWS MS. RICUARD, AN LPN, WORKING IN THE ATU MOST

12  NIGHTS OF THE WEEK?

13      **A**   YES.

14      **Q**   AND THERE IS NO RN ALSO STAFFED TO THE ATU

15  WHEN SHE'S THERE.  CORRECT?

16      **A**   NO.

17      **Q**   AND ON WEEK NIGHTS WHEN SHE'S STAFFING IT,

18  THERE IS NO NURSE PRACTITIONER PRESENT, EITHER?

19      **A**   THERE IS A NURSE PRACTITIONER ON CALL, NOT

20  PRESENT.

21      **Q**   THANK YOU.  AND THEN IF WE GO BACK TO PAGE

22  73.

23          HERE, AGAIN, WE SEE MS. RICUARD WORKING FOUR

24  TO FIVE NIGHTS A WEEK IN THE ATU.  CORRECT?

25      **A**   YES.

1    **Q**   AND ARE YOU AWARE -- IF WE WERE TO GO BACK

2    THROUGH THE ENTIRETY OF THESE RECORDS, WOULD IT SHOW

3    SOMETHING SIMILAR?

4    **A**   I WOULD SAY SO.

5    **Q**   THANK YOU.

6          DR. JOHNSON, YOU TESTIFIED ON DIRECT ABOUT

7    YOUR JOB AT THE HEALTH EDUCATION AUTHORITY OF

8    LOUISIANA.  IS THAT CORRECT?

9    **A**   YES.

10   **Q**   HEAL'S MISSION -- AND SORRY.  THE ACRONYM

11   FOR THAT IS HEAL.  CORRECT?

12   **A**   HEAL, YES, SIR.

13   **Q**   AND HEAL'S MISSION WAS TO FINANCE MEDICAL

14   CONSTRUCTION PROJECTS?

15   **A**   YES.

16   **Q**   YOU RAN THE HEALTH EDUCATION AUTHORITY OF

17   LOUISIANA FOR ALMOST A DECADE.  RIGHT?

18   **A**   YES.

19   **Q**   AND WHILE YOU RAN HEAL, IT WAS AUDITED BY

20   THE LOUISIANA LEGISLATIVE AUDITOR.  CORRECT?

21   **A**   IT WAS.

22   **Q**   THE AUDIT FOUND UNDER YOUR MANAGEMENT HEAL

23   EXECUTED CONTRACTS THAT CIRCUMVENTED STATE PURCHASING

24   OVERSIGHT CONTROLS AND VIOLATED STATE PURCHASING

25   REGULATIONS?

1      **A**    ACCORDING TO THE AUDIT.

2      **Q**    AND IT FOUND NONCOMPLIANCE WITH ETHICS

3   TRAINING REQUIREMENTS?

4      **A**    ACCORDING TO THE AUDIT.

5      **Q**    IT ALSO FOUND NONCOMPLIANCE WITH REPORTING

6   REQUIREMENTS?

7      **A**    YES.

8      **Q**    AND IT FOUND COMPLIANCE ISSUES REGARDING

9   TRAVEL REIMBURSEMENTS?

10     **A**    YES.

11     **Q**    THE AUDIT EVEN FOUND THAT UNDER YOUR

12  LEADERSHIP HEAL HADN'T FUNDED A SINGLE CONSTRUCTION

13  PROJECT.  IS THAT CORRECT?

14     **A**    ACCORDING TO THE AUDIT.

15     **Q**    AND YOUR BOARD, THE BOARD OF HEAL,

16  RECOGNIZED THAT THESE WERE LEGITIMATE CONCERNS.

17  CORRECT?

18     **A**    DISAGREE.

19     **Q**    IF WE COULD PULL UP WHAT I'M MARKING AS

20  PLAINTIFFS' EXHIBIT 78 AT -- THANK YOU -- AT PAGE 21.

21  AND LET'S JUST ACTUALLY GO BACK TO PAGE 1 FIRST.

22          DOES THIS APPEAR TO BE THE AUDIT

23  PERFORMED -- THE FINAL AUDIT REPORT ISSUED BY THE

24  LOUISIANA LEGISLATIVE AUDITOR?

25     **A**    YES.

**1**     Q    AND IF WE GO TO PAGE 21, THE BOARD OF HEAL

**2** ISSUED A RESPONSE TO THE AUDIT.  CORRECT?

**3**     A    THE CHAIRMAN DID.

**4**     Q    AND IF -- COULD YOU READ THE FIRST SENTENCE

**5** OF THE SECOND PARAGRAPH?

**6**     A    "HEAL RECOGNIZES THE LEGITIMATE CONCERNS

**7** EXPRESSED BY THE LLA WITH REGARD TO THE ITEMS IN THE

**8** REPORT."

**9**     Q    THANK YOU, DR. JOHNSON.

**10**        MR. DUBNER:  WE WOULD MOVE PLAINTIFFS'

**11** EXHIBIT 78 INTO EVIDENCE.

**12**        MR. ROBERT:  I OBJECT, YOUR HONOR, TO BOTH

**13** --

**14**        THE COURT:  WITHOUT OBJECTION?

**15**        MR. ROBERT:  WITH OBJECTION.

**16**        THE COURT:  GO AHEAD.

**17**        MR. ROBERT:  TO BOTH RELEVANCE AND THE FACT

**18** THAT THIS IS -- THIS REPORT IS HEARSAY.

**19**        THE COURT:  WELL, IT'S PROBABLY A PARTY

**20** ADMISSION, BUT LET'S TALK ABOUT RELEVANCE.

**21**        MR. DUBNER:  I ACTUALLY DON'T THINK IT IS A

**22** PARTY ADMISSION, YOUR HONOR, BUT I WOULD SAY THAT IT

**23** IS A PUBLIC RECORD.

**24**        THE COURT:  WELL, IT'S THE LEGISLATIVE

**25** AUDITOR.

**1**      **MR. DUBNER:**  YEAH.  IT'S A PUBLIC RECORD

**2**  THAT IS REPORTING ON THE SCOPE -- SOMETHING WITHIN

**3**  THE SCOPE OF THE AUDITOR'S DUTIES AND WE WOULD THINK

**4**  OTHERWISE MEETS THE REQUIREMENTS OF -- I THINK IT'S

**5**  803(6).  IN TERMS OF RELEVANCE -- SORRY.  THE

**6**  REQUIREMENTS OF 803(6) IS I BELIEVE THE NUMBER.

**7**            IN TERMS OF RELEVANCE, DEFENDANTS HAVE

**8**  PUT DR. JOHNSON'S MANAGEMENT EXPERIENCE INTO ISSUE AS

**9**  PART OF THEIR CASE, AND THIS IS JUST SHOWING EVIDENCE

**10**  REGARDING THAT MANAGEMENT EXPERIENCE.

**11**      **THE COURT:**  OBJECTION IS OVERRULED.

**12**            WHAT'S YOUR EXHIBIT NUMBER?  75?

**13**      **MR. DUBNER:**  78.

**14**      **THE COURT:**  78 IS ADMITTED.

**15**  BY MR. DUBNER:

**16**      **Q**   AND ON DIRECT, DR. JOHNSON, YOU DIDN'T

**17**  DISCUSS BUDGET AT ALL.  YOU DON'T MAKE AN ANNUAL

**18**  BUDGET REQUEST, DO YOU?

**19**      **A**   NO.

**20**      **Q**   WHEN DEPARTMENT HEADS SEND YOU A BUDGET

**21**  REQUEST, DO YOU SEND THAT TO THE LSP BUSINESS OFFICE?

**22**      **A**   IT GOES TO THE LSP BUSINESS OFFICE BY WAY OF

**23**  OUR -- WHAT WE CALL THE 156B PROGRAM SYSTEM.

**24**      **Q**   MOVING OFF OF BUDGET, EVERY MONTH THE HEADS

**25**  OF EACH OF THE DEPARTMENTS YOU SUPERVISE SEND YOU A

1   MONTHLY MANAGEMENT REPORT.  CORRECT?

2       A    YES.

3       Q    YOU USE THESE REPORTS TO MONITOR THE

4   PERFORMANCE AND POLICY COMPLIANCE OF EACH DEPARTMENT?

5       A    IT'S A REPORT TO GIVE A VARIETY OF

6   INFORMATION.

7       Q    DID YOU TESTIFY DURING YOUR DEPOSITION THAT

8   YOU USE THESE REPORTS TO MONITOR THE PERFORMANCE AND

9   POLICY COMPLIANCE WITH EACH DEPARTMENT?

10      A    YES.

11      Q    THE PURPOSE OF THESE WRITTEN REPORTS IS SO

12  YOU CAN LEARN IF THERE ARE ISSUES OR CONCERNS AND HOW

13  THOSE ISSUES OR CONCERNS ARE BEING ADDRESSED.

14  CORRECT?

15      A    YES.

16      Q    AND THEY'RE WRITTEN TO ENSURE THAT YOU HAVE

17  GOOD DOCUMENTATION OF WHAT IS AND ISN'T HAPPENING AND

18  ENSURE THAT YOU CAN TIMELY ADDRESS ISSUES OR

19  CONCERNS.  CORRECT?

20      A    YES.

21      Q    YOU WANT THOSE REPORTS WRITTEN BECAUSE IF

22  IT'S UNWRITTEN IT'S UNSEEN.  CORRECT?

23      A    A REPORT IS ONE WAY TO ASCERTAIN INFORMATION

24  FROM DEPARTMENT HEADS.  WE OFTEN HAVE MEETINGS,

25  EMAILS, PHONE CONVERSATIONS, IN PERSON, SO -- IT'S

1  JUST ONE METHOD.

2      Q    BUT ONE CONCERN YOU MAY HAVE IS THAT IF

3  SOMETHING ISN'T WRITTEN, IT DOESN'T GET SEEN.

4  CORRECT?

5      A    THAT'S NOT MY CONCERN.  THAT COULD BE A

6  CONCERN.

7          MR. DUBNER:  LET'S PULL UP PAGES 130 AND 131

8  OF DR. JOHNSON'S DEPOSITION.

9  BY MR. DUBNER:

10     Q    STARTING AT LINE 24 I ASKED YOU:  "AND

11 WHAT'S THE PURPOSE OF THAT SORT OF WRITTEN

12 COMPILATION?"

13         AND YOU RESPONDED:  "WELL, THE WRITTEN

14 COMPILATION IS TO ENSURE THAT -- I WANT TO KNOW IF

15 THERE ARE ISSUES OR CONCERNS, BECAUSE IF YOU DON'T

16 WRITE THEM DOWN, IN MY OPINION, THEY'RE NOT --

17 BECAUSE IF IT'S UNWRITTEN, IT'S UNSEEN."

18         DID I READ THAT CORRECTLY?

19     A    YOU DID.

20     Q    YOU COMPILE THOSE REPORTS AND SEND THEM TO

21 WARDEN HOOPER AND TO EVERY DEPARTMENT HEAD?

22     A    YES.

23     Q    AND YOU TALK ABOUT THEM AT STAFF MEETINGS?

24     A    YES.

25     Q    AND THE MONTHLY REPORT IS SUPPOSED TO BE

1    INDICATIVE OF THAT MONTH TO PROVIDE A SITUATIONAL

2    AWARENESS OF THE CURRENT STATE AFFAIRS -- CURRENT

3    STATE OF AFFAIRS AND NOT KEEP THE SAME REPORT WITHOUT

4    ANY CHANGES.  CORRECT?

5        **A**    THAT'S THE GOAL.

6        **Q**    YOU WOULD HOPE THAT DEPARTMENT HEADS FILLING

7    OUT THE REPORTS CHANGE THE CONTENT FROM MONTH TO

8    MONTH.  CORRECT?

9        **A**    YES.

10       **Q**    THE REPORTS HAVE BOXES FOR PEOPLE TO FILL

11   OUT LABELED THINGS LIKE "UNIT PRIORITIES"; "MAJOR

12   PROBLEMS"; "OFFENDER MORAL."  CORRECT?

13       **A**    YES.

14       **Q**    AND YOUR DEPARTMENT HEADS SHOULDN'T TURN

15   THEM ALL IN WITH ALL OF THE BOXES BLANK EXCEPT FOR

16   ONE BOX.  CORRECT?

17       **A**    YES.

18       **Q**    YOU SAID BEFORE THAT YOU USE THIS REPORT TO

19   MONITOR THE PERFORMANCE AND POLICY COMPLIANCE WITH

20   EACH DEPARTMENT.  YOU CAN'T DO THAT WHEN YOU GET

21   BLANK REPORTS.  RIGHT?

22       **A**    YES.

23       **Q**    AND BLANK REPORTS INDICATE A LACK OF

24   OVERSIGHT AND A LACK OF LEADERSHIP?

25       **A**    A LACK OF WHAT?

1     **Q**    A LACK OF OVERSIGHT AND A LACK OF

2   LEADERSHIP.

3     **A**    REPEAT THE QUESTION, PLEASE.

4     **Q**    SURE.  BLANK REPORTS INDICATE A LACK OF

5   OVERSIGHT AND A LACK OF LEADERSHIP?

6     **A**    IT COULD.

7     **Q**    I'LL RETURN TO THAT IN A MOMENT.

8          BLANK REPORTS, WOULD YOU SAY, ARE A

9   PERFORMANCE ISSUE?

10    **A**    WHAT DO YOU MEAN "PERFORMANCE ISSUE"?

11    **Q**    WOULD YOU DESCRIBE BLANK REPORTS AS A

12  PERFORMANCE ISSUE, IN YOUR MIND?

13    **A**    IT COULD BE.

14    **Q**    LET'S BRING UP PLAINTIFFS' EXHIBIT 29-B,

15  PAGES 451 AND 452.

16         AT YOUR DEPOSITION I SHOWED YOU THIS

17  DECEMBER 2021 REPORT FROM DR. TOCE.  YOU SAID THAT IF

18  IT'S BLANK IT'S A PROBLEM FOR YOU.  CORRECT?

19    **A**    YES.

20    **Q**    YOU SAID HE SHOULD HAVE COMPLETED THIS AND

21  PROVIDED THE NECESSARY INFORMATION IN THOSE AREAS?

22    **A**    YES.

23         **MR. DUBNER:**  AND IF WE CAN PULL UP PAGE 157

24  OF DR. JOHNSON'S DEPOSITION.  AND -- 157 AND 158.

25  BY MR. DUBNER:

1    Q    I ASKED YOU:  "AND SO HOW DOES IT AFFECT

2    YOUR ABILITY" -- LET ME STEP BACK TO LINE 9 ON PAGE

3    157.

4         I ASKED YOU:  "YOU SAID YOU USED THIS REPORT

5    TO MONITOR THE PERFORMANCE AND POLICY COMPLIANCE AND

6    SO ON WITH EACH DEPARTMENT.  DO I HAVE THAT RIGHT?"

7         YOU ANSWERED:  "YES."

8         I ASKED YOU:  "AND SO HOW DOES IT AFFECT

9    YOUR ABILITY TO DO THAT WHEN YOU GET REPORTS THAT ARE

10   BLANK?"

11        YOU ANSWERED:  "YOU CAN'T DO THAT BECAUSE IF

12   I WERE -- AND I HAVEN'T SEEN THIS PARTICULAR ONE,

13   BUT -- OR IT SLIPPED PAST ME AS I TRY TO LOOK AT

14   EVERYTHING.  BUT ME SEEING A REPORT LIKE THIS, YOU

15   KNOW, IT TELLS ME THAT THERE IS A LACK OF OVERSIGHT

16   AND A LACK OF LEADERSHIP THAT -- TO SUBMIT A REPORT

17   TO MY OFFICE, WHICH GOES TO THE WARDEN'S OFFICE,

18   TELLS ME THAT THERE IS A LACK OF LEADERSHIP THERE."

19        DID I READ THAT CORRECTLY?

20   A    YES.

21   Q    AND DURING YOUR DEPOSITION YOU DIDN'T KNOW

22   IF ALL OF DR. TOCE'S PAST REPORTS HAD THE SAME

23   PROBLEM, DID YOU?

24   A    YES.

25   Q    DO YOU NOW KNOW WHETHER ALL OF HIS PAST

1   REPORTS HAVE THE SAME PROBLEM?

2       **A**   I DON'T.

3       **Q**   SO AFTER SEEING THIS ISSUE AT YOUR

4   DEPOSITION, YOU DIDN'T LOOK TO SEE IF IT WAS A

5   RECURRING PROBLEM?

6       **A**   SO DID I LOOK TO SEE IF IT WAS A RECURRING

7   PROBLEM?

8       **Q**   YES.

9       **A**   WELL, YOU KNOW, GOING BACK TO THAT REPORT, I

10  DO RECALL THAT REPORT.  AND DR. TOCE ASSUMED THAT

11  LEADERSHIP ROLE.  AND FROM MY UNDERSTANDING FROM HIM

12  IS THAT HE WAS UNAWARE OF THAT RESPONSIBILITY IN

13  FORMULATING THAT REPORT, BUT -- SO YEAH, IT'S

14  ACTUALLY SOMETHING THAT WE'RE WORKING ON.

15      **Q**   OKAY.  SO ALL OF THE REPORTS THAT HAVE BEEN

16  SUBMITTED TO YOU BY DR. TOCE SINCE THAT -- SINCE YOU

17  STARTED HAVE BEEN IN SIMILAR -- HAVE BEEN SIMILARLY

18  BLANK?

19      **A**   NO.  NO.  NO.  HIS REPORTS ARE FILLED OUT.

20      **Q**   SINCE WHAT TIME?

21      **A**   OH.  THE MOST RECENT ONE.  WE JUST HAD OUR

22  MONTHLY REPORT, SO LAST MONTH.

23      **Q**   AND LET'S LOOK BACK -- IF WE PULL UP THAT

24  OCTOBER 2021 -- I'M SORRY.  WE LOOKED AT DECEMBER

25  2021.  LET'S ALSO JUST USE THE OCTOBER 2021,

1   PLAINTIFFS' EXHIBIT 29-B, 306 THROUGH 309.  SORRY.

2   STARTING AT 306 AND 307.  COULD WE GET PAGE 306 AND

3   307?

4           SO THIS IS DR. TOCE'S OCTOBER 2021 REPORT.

5   CORRECT?

6       A   UH-HUH.  YES.

7       Q   AND THEN IF WE GO TO PAGE 308 AND 309.

8           SO IF YOU LOOK AT THE LAST BOX, "AREA

9   SPECIFIC REPORTING," SOMEBODY WAS FILLING THAT OUT;

10  EITHER DR. TOCE OR SOMEBODY ON HIS BEHALF.  IS THAT

11  CORRECT?

12      A   YES.

13      Q   AND SOMEBODY WAS SUBMITTING THIS REPORT TO

14  YOU?

15      A   YES.

16      Q   DO YOU KNOW WHO WAS SUBMITTING THIS REPORT

17  TO YOU?

18      A   I DON'T.

19          BUT TO ADD ONTO THIS -- I'M GLAD YOU BROUGHT

20  THIS UP, BECAUSE THIS IS ONE THAT I DID INVESTIGATE.

21  THERE WAS SOME COMMUNICATION SENT OUT AND -- TO EACH

22  DEPARTMENT HEAD ABOUT THE WAY TO FILL OUT THIS

23  REPORT.

24          BUT THAT WAS CAPTURED IN ONE OF THE MONTHLY

25  MEETINGS TO THE DEPARTMENT HEADS, SO -- FROM MY

**1** UNDERSTANDING, THE DEPARTMENT HEADS WAS UNAWARE THAT

**2** THEY NEED TO PUT THIS INFORMATION IN SOME OF THOSE

**3** OTHER BLANKS AS THEY USED TO DO BEFORE.  BECAUSE IF

**4** YOU LOOK AT SOME OF THE PREVIOUS REPORTS AND --

**5** INDICATIVE TO THE TIME WHEN THAT COMMUNICATION CAME

**6** OUT, SO THERE WAS, I GUESS, MISCOMMUNICATIONS THERE.

**7**     Q    YOU'RE SAYING THAT IT WAS BETTER AT AN

**8** EARLIER TIME?

**9**     A    IT WAS.

**10**     Q    AND DO YOU HAVE A TIME FRAME FOR WHEN YOU

**11** THINK IT WAS BETTER?

**12**     A    I CAN'T DETERMINE WHEN THAT EMAIL CAME OUT,

**13** BUT I WOULD SAY -- I DON'T.  I DON'T.

**14**     Q    YOUR TESTIMONY IS AT SOME POINT PEOPLE

**15** STOPPED FILLING OUT THE REPORT?

**16**     A    NO.  THEY TOOK AN EMAIL AND THEY FILLED OUT

**17** -- THEY DIDN'T FILL OUT THE FORM COMPLETELY, I GUESS,

**18** BECAUSE IT'S -- BASED ON THAT CORRESPONDENCE, WHICH

**19** THEY SHOULDN'T HAVE DONE, SO -- EVERYONE IS

**20** SUBMITTING THE REPORT AND THE REPORT IS COMPLETE.

**21**     Q    AND SO AT THIS TIME IF WE LOOK AT THAT

**22** OCTOBER 2021 PARAGRAPH -- LET'S FOCUS IN ON THIS

**23** PARAGRAPH.  THIS IS THE SORT OF INFORMATION THAT, AS

**24** YOU SAID, YOU WANT TO BE CHANGED FROM MONTH TO MONTH.

**25** CORRECT?

1     **A**    YES.

2     **Q**    SOMEBODY WAS FILLING THIS OUT FOR DR. TOCE.

3   CORRECT?

4     **A**    YES.

5     **Q**    YOU DON'T KNOW.  IT MAY HAVE BEEN DR. TOCE

6   HIMSELF.  CORRECT?

7     **A**    UNSURE.

8     **Q**    AND THIS IS THE OCTOBER 2021.  LET'S PUT 309

9   UP NEXT TO, FOR EXAMPLE, PAGE 259.

10          COULD YOU READ THE PARAGRAPH -- LET'S START

11   WITH THE OCTOBER 1 ON THE RIGHT, THE FULL PARAGRAPH.

12     **A**    IT'S THE SAME PARAGRAPH.

13     **Q**    IT'S THE SAME PARAGRAPH.  THANK YOU.

14          AND IF WE LOOKED AT, FOR EXAMPLE -- COMPARE

15   PAGE 309 TO PAGE 9, THE JUNE 2021 REPORT.

16     **A**    SAME PARAGRAPH.

17     **Q**    SAME PARAGRAPH.

18          AND, IN FACT, HE'S BEEN SENDING YOU THAT

19   SAME PARAGRAPH THE ENTIRE TIME YOU'VE BEEN AT LSP.

20   CORRECT?

21     **A**    AS I SAID, HE PROBABLY HAS.  BUT THIS HAS

22   SINCE BEEN CORRECTED.

23     **Q**    BUT YOU DON'T HAVE ANY -- STRIKE THAT.

24          IF WE LOOK AT -- IF WE KEEP 309 UP AND BRING

25   UP PLAINTIFFS' EXHIBIT 29-A AT 617.

1              THIS IS A MONTHLY REPORT FROM BEFORE THE

2    CHANGE THAT YOU SAID HAPPENED.  RIGHT?  BEFORE THE

3    CHANGE IN THE REPORTING STRUCTURE.  CORRECT?

4         A    YES.

5         Q    AND IS THAT THE EXACT SAME PARAGRAPH?

6         A    YES.

7         Q    AND, IN FACT, THAT'S A PARAGRAPH THAT'S BEEN

8    COPY AND PASTED BY MEDICAL DIRECTOR AFTER MEDICAL

9    DIRECTOR FOR OVER A DECADE, ISN'T IT?

10        A    IT HAS.

11        Q    AND IF WE LOOK BACK AT JOINT EXHIBIT 2-A

12   FROM THE LIABILITY TRIAL AT PAGE 222, THERE IS THAT

13   SAME PARAGRAPH IN AN OCTOBER 2011 MONTHLY MANAGEMENT

14   REPORT.  CORRECT?

15        A    YES.

16        Q    AND THE LAST SENTENCE, IF I READ THAT

17   CORRECTLY, THAT SAYS "THE DOCTORS' MEETINGS ARE HELD

18   EVERY DAY AT 7:30 A.M. IN WHICH THEY DISCUSS THE

19   DAILY CLINIC, SCHEDULES, AND MEDICAL TREATMENT PLANS

20   FOR OFFENDERS."  CORRECT?

21        A    YES.

22        Q    THAT'S THE MORNING MEETING THAT YOU TALKED

23   ABOUT EARLIER?

24        A    YES.

25        Q    THAT MORNING MEETING HAS BEEN HAPPENING

1  SINCE 2011 AT LEAST.  CORRECT?

2      **A**   YES.

3      **Q**   AND SO DO YOU RECALL WHICH OTHER DEPARTMENTS

4  HAVE BEEN -- UNTIL THE RECENT CHANGE THAT YOU STATE

5  HAPPENED, DO YOU KNOW WHICH OTHER DEPARTMENT HEADS

6  WERE SENDING YOU BLANK OR COPY/PASTED REPORTS?

7      **A**   AS I SAID, THERE WERE A FEW DEPARTMENTS.

8  AND BASED ON THAT COMMUNICATION THAT CAME OUT, A

9  VARIETY OF DEPARTMENTS HAD STARTED SUBMITTING FORMS

10 WITH THIS MISSING INFORMATION ON IT.  BUT SINCE THEN

11 THEY'VE CORRECTED THAT.

12     **Q**   WHAT WAS THE COMMUNICATION THAT LED PEOPLE

13 TO THINK YOU WANTED BLANK REPORTS?

14     **A**   IT'S -- IT DIDN'T COME FROM ME.  THE

15 INSTITUTIONAL GATHERS ALL OF THIS INFORMATION AND

16 COMBINES IT AND SENDS IT UP TO THE DEPARTMENT OF

17 CORRECTIONS.  SO THERE IS A BRIEF MOMENT I WAS OUT

18 AND THAT COMMUNICATION CAME ACROSS, SO...

19     **Q**   AND THAT COMMUNICATION CAME ACROSS SOME TIME

20 PRIOR TO JUNE 2021, IT WOULD SEEM, WHEN WE SAW

21 DR. TOCE'S -- A BLANK REPORT FROM DR. TOCE?

22     **A**   I CAN'T SAY WHEN.  BUT AGAIN, DR. TOCE IS

23 DIFFERENT BECAUSE I DON'T KNOW IF HE KNEW TO FILL OUT

24 THAT FORM.  BUT OTHER DEPARTMENTS, THEY JUST --

25 BEFORE THAT THEY DID, AND THEY STARTED SUBMITTING THE

1   FORMS DIFFERENTLY AFTER THAT CORRESPONDENCE.

2       Q    LET'S LOOK, FOR EXAMPLE, AT ONE OF THOSE

3   OTHER DEPARTMENTS.  LET'S SAY THE NURSING UNITS.  IF

4   WE COULD PULL UP PX_29-B FROM FIVE-O -- STARTING AT

5   506 AND 507.

6            THIS IS A BLANK REPORT SUBMITTED BY THE

7   NURSING UNITS IN DECEMBER 2021.  CORRECT?

8       A    YES.

9       Q    WILL RICHIE, THE NURSE PRACTITIONER, IS THE

10  PERSON WHO SUBMITTED THIS OR WAS RESPONSIBLE FOR

11  SUBMITTING IT?

12      A    WHAT'S THAT?

13      Q    WILL RICHIE, THE NURSE PRACTITIONER --

14      A    HE'S AN RN.

15      Q    SORRY.  MY MISTAKE.  BUT HE'S RESPONSIBLE

16  FOR SENDING YOU THESE?

17      A    YES.

18      Q    AND IF WE LOOK AT PAGES 395 AND 396, HE DID

19  THE SAME THING IN NOVEMBER?

20      A    YEAH.  AND, YOU KNOW, THE NURSING REPORTS,

21  SOMETIMES THEY COLLAPSE THOSE.  SO IF YOU PULL UP THE

22  REGULAR NURSING REPORT, SOME OF THAT INFORMATION IS

23  REDUNDANT, SO SOME OF THAT INFORMATION MAY BE IN

24  THERE TO CAPTURE ALL THE NURSING AREAS.

25      Q    SURE.  LET'S LOOK AT PAGE 509, FOR EXAMPLE.

1   THIS IS THE AREA SPECIFIC REPORTING FOR THE NURSING

2   UNIT.  CORRECT?  THIS IS THE INFORMATION THAT WAS

3   SUBMITTED?

4        A    YES, LOOKS LIKE IT.

5        Q    AND IF WE COMPARE THIS, FOR EXAMPLE, TO PAGE

6   398, THESE ARE ESSENTIALLY THE SAME INFORMATION; JUST

7   THE NUMBERS ARE DIFFERENT?

8        A    THE NUMBERS?

9        Q    THE NUMBERS OF PATIENTS, THE NUMBERS OF

10  NURSES.

11       A    THE NUMBERS ARE DIFFERENT.  THE INFORMATION

12  IS DIFFERENT.

13       Q    BUT IT'S JUST REPLACING NUMBERS IN

14  ESSENTIALLY THE SAME SENTENCES?

15       A    THE NUMBERS SHOW THE DIFFERENCE.

16       Q    AND SO CAN YOU -- SO I THINK I ASKED YOU

17  THIS BEFORE, BUT I MAY NOT HAVE.  CAN YOU TELL THE

18  COURT WHICH OTHER DEPARTMENTS WERE SENDING YOU BLANK

19  REPORTS DURING THAT PERIOD OF TIME?

20       A    WELL, ALL DEPARTMENTS SENT THIS REPORT.

21       Q    BUT WHICH ONES WERE SENDING IT TO YOU BLANK?

22       A    ALL DEPARTMENTS SEND THE REPORTS.  I DON'T

23  KNOW WHICH ONES YOU'RE SPEAKING OF.

24       Q    SOME OF THEM WERE -- SOME OF THEM APPARENTLY

25  DID NOT INTERPRET THIS COMMUNICATION YOU DESCRIBED AS

1  MEANING THEY SHOULD SEND BLANK REPORTS.  RIGHT?  SOME

2  CONTINUED TO SEND YOU REPORTS THAT WERE FILLED OUT.

3  RIGHT?

4      A    CORRECT.

5      Q    DO YOU KNOW WHICH DEPARTMENTS WERE NOT?

6      A    I DON'T.

7      Q    IF WE LOOK AT PAGES 526 AND 527, FOR

8  EXAMPLE, RESPIRATORY CARE WAS SENDING YOU BLANK

9  REPORTS.  CORRECT?

10     A    YES.

11     Q    IF WE LOOK AT PAGES -- PAGES 496 AND 497,

12 THE LABORATORY WAS SENDING YOU BLANK REPORTS?

13     A    WE DIDN'T HAVE A LAB DIRECTOR.

14     Q    IF WE LOOK AT PAGES 461 AND 462, "CENTRAL

15 SUPPLY" ALSO BLANK?

16     A    YES.

17     Q    IF WE LOOK AT 481 AND 482, "HEALTH

18 INFORMATION MANAGEMENT" -- THAT'S THE MEDICAL RECORDS

19 DEPARTMENT -- ALSO BLANK?

20     A    IT APPEARS TO BE.

21     Q    AND IF WE LOOK AT PAGES 516 AND 517, EVEN

22 YOUR QUALITY IMPROVEMENT AND ADA DEPARTMENTS WERE

23 SENDING BLANK REPORTS.  CORRECT?

24     A    IT APPEARS TO BE.

25     Q    AND IF WE LOOK AT PAGES 241 AND 242, THIS

1   WAS GOING ON FOR MONTHS.  CORRECT?

2       A    THESE REPORTS?

3       Q    THE BLANK REPORTS.

4       A    YEAH.  AS I SAID, YOU KNOW, THESE REPORTS --

5   SOME OF THESE AREAS ARE COLLAPSED IN THE DON'S

6   REPORT, SO THE AREAS THAT QA/QI, NURSING -- CENTRAL

7   SUPPLY FALLS UNDER NURSING.  NURSING UNIT FALLS UNDER

8   NURSING.  SO I WOULD REALLY HAVE TO LOOK AT THE DON

9   REPORT OR ADON REPORT.

10      Q    AS YOU SAID BEFORE, YOU USED THESE REPORTS

11  TO MONITOR THE PERFORMANCE AND POLICY COMPLIANCE WITH

12  EACH DEPARTMENT.  CORRECT?

13      A    YES.

14      Q    AND YOU DIDN'T NOTICE THE BLANK REPORTS FOR

15  MONTHS UNTIL THEY WERE POINTED OUT AT YOUR

16  DEPOSITION.  CORRECT?

17      A    THOSE REPORTS WERE.  AS I SAID, THEY -- SOME

18  OF THOSE REPORTS ARE COLLAPSED IN OTHER REPORTS AS

19  WELL, SIR.

20      Q    THANK YOU, DR. JOHNSON.  NO FURTHER

21  QUESTIONS.

22      A    YOU'RE WELCOME.  THANK YOU.

23          THE COURT:  REDIRECT?

24          MR. ROBERT:  BRIEFLY, YOUR HONOR.

25                  REDIRECT EXAMINATION

1  BY MR. ROBERT:

2      Q    DR. JOHNSON, YOU WERE ASKED ABOUT ISSUES

3  WITH NURSING DEPARTMENT LEADERSHIP SINCE YOU BECAME

4  HEALTH CARE ADMINISTRATOR.  DO YOU REMEMBER THAT?

5      A    YES.

6      Q    HAVE CHANGES BEEN MADE IN THAT PARTICULAR

7  AREA SINCE YOU'VE BEEN THERE?

8      A    YES.  WE HAVE A NEW DON, NEW NURSING STAFF.

9      Q    OKAY.  SO REGARDLESS OF WHETHER YOU SAW

10 PROBLEMS WITH LEADERSHIP WHEN YOU GOT THERE, IT'S NOT

11 THE SAME LEADERSHIP.  CORRECT?

12     A    CORRECT.

13     Q    AND ARE YOU SATISFIED WITH THE LEADERSHIP IN

14 THE NURSING DEPARTMENT THAT YOU HAVE NOW?

15     A    I AM.

16     Q    ARE THEY DOING A GOOD JOB?

17     A    THEY ARE.

18     Q    ARE THEY TREATING PATIENTS IMPROPERLY?

19     A    NO.

20     Q    ARE THEY -- AND I'M TALKING ABOUT FROM

21 ATTITUDE, FROM BELIEVING THEY'RE LYING.  HAVE YOU

22 SEEN ANY OF THAT WITH RESPECT TO THE NEW PEOPLE THAT

23 YOU'VE GOT?

24     A    NO.

25     Q    YOU WERE ASKED ABOUT THE ASSUMPTION THAT

1   PEOPLE LIE AND SOMEHOW THERE IS THE IMPLICATION THAT

2   PEOPLE WHO HAVE WORKED IN CORRECTIONS BELIEVE THAT

3   ALL PRISONERS LIE.  IS THAT SOMETHING THAT YOU AGREE

4   WITH?

5       A    I DON'T.

6       Q    AND YOU'VE GOT A BUNCH OF NEW -- YOU TALKED

7   ABOUT PROVIDERS.  THEY MAY NOT BE THE VERY TOP

8   LEADERSHIP, BUT ALL OF THESE SEVEN NURSE

9   PRACTITIONERS NOW THAT YOU HAVE, MOST OF THEM HAD NO

10  INVOLVEMENT WHATSOEVER WITH CORRECTIONS BEFORE THEY

11  GOT HERE.  CORRECT?

12      A    YES.  ALL BUT ONE.

13      Q    ALL BUT ONE.  NURSE PARK.  RIGHT?

14      A    RIGHT.

15      Q    AND THESE ARE THE PEOPLE -- THE PRIMARY

16  PEOPLE THAT ARE SEEING AND TREATING THESE PATIENTS,

17  AREN'T THEY?

18      A    YES.  THAT'S OUR LEADERSHIP.

19      Q    DO YOU HAVE ANY PROBLEMS WITH ANY OF THESE

20  NEW NURSE PRACTITIONERS AS FAR AS THEY'RE TREATING

21  PEOPLE DISRESPECTFULLY OR IMPROPER?

22      A    NO.

23      Q    COUNSEL SHOWED YOU A SIGN THAT -- YOU HAD TO

24  GET HIM TO BLOW IT UP TO FIGURE OUT WHERE IT IS.  IS

25  THAT CORRECT?

1    **A**    YES.

2    **Q**    AS YOU SIT HERE TODAY -- YOU'VE BEEN THERE

3    SINCE OCTOBER OF 2020 -- ARE YOU AWARE OF ANY INMATE

4    WHO'S BEEN DISCIPLINED FOR FAILURE TO SIGN A REFUSAL?

5    **A**    NO.

6    **Q**    YOU TALK TO INMATES EVERY DAY, DON'T YOU?

7    **A**    EVERY DAY.

8    **Q**    HAVE YOU EVER HAD A SINGLE INMATE COME TO

9    YOU AND SAY "I GOT DISCIPLINED FOR FAILURE TO SIGN A

10   REFUSAL"?

11   **A**    NO.

12   **Q**    SINCE YOU -- COUNSEL POINTED OUT THIS SIGN

13   TO YOU.  ARE YOU WILLING TO TAKE THAT DOWN?

14   **A**    YEAH, IF NEED BE.

15   **Q**    OKAY.  DOES THAT PRESENT A PROBLEM FOR YOU

16   TO TAKE DOWN THE SIGN?

17   **A**    NO.  BUT THAT SIGN IS INDICATIVE OF AN

18   OPPORTUNITY TO EDUCATE THE OFFENDER ABOUT MAKING THAT

19   HEALTH CARE CONTACT WITH THE SPECIALIST OR THE

20   PRIMARY CARE.  SO WITHOUT -- WE DON'T WANT ANY

21   PATIENT TO LEAVE A FOLLOW-UP OR A SCHEDULED

22   APPOINTMENT WITHOUT HAVING SOME TYPE OF INTERVENTION

23   WITH NURSING STAFF OR THE HEALTH CARE PROVIDER.

24        SO WE TRY TO COUNSEL THEM ON THE IMPORTANCE

25   OF TAKING THEIR MEDICATION ADMINISTRATION AND/OR

1   SEEING THE PROVIDER TIMELY.

2       Q    COUNSEL ASKED YOU ABOUT ANY EFFORTS TO TRACK

3   OR COORDINATE SPECIALTY RECOMMENDATIONS FROM OUTSIDE

4   SPECIALTY CARE.  DO YOU REMEMBER THOSE QUESTIONS?

5       A    YES.

6       Q    LET ME ASK YOU SOMETHING.  ARE PEOPLE WHO

7   COME BACK FROM TRIP RETURNS -- OR AT LEAST PEOPLE WHO

8   COME BACK FROM THE HOSPITAL -- ARE THEY GOING

9   DIRECTLY TO THEIR HOUSING UNITS?

10      A    NO.

11      Q    WHERE ARE THEY GOING?

12      A    PRIMARILY NURSING UNIT 1.

13      Q    AND IS THAT SOMETHING THAT YOU IMPLEMENTED?

14      A    YES.

15      Q    WHY DID YOU DO THAT?

16      A    GENERALLY IF THEY'RE COMING FROM AN

17  OUT-PATIENT OR IN-PATIENT HOSPITAL STAY, IT'S BEST

18  THAT THEY COME TO THE NURSING UNIT TO ENSURE THAT

19  THEY ARE -- THE EXAMINATION HAPPENS TO ENSURE THAT

20  THEY ARE STABLE ENOUGH TO GO TO THEIR HOUSING AREA.

21      Q    YOU WERE ASKED ABOUT THE MONITORS IN THE

22  MEDICAL DORMS.  YOU SAID THAT THE MONITORS HAVE BEEN

23  THERE.  CORRECT?

24      A    YES.

25      Q    WERE THE MONITORS ACTUALLY BEING OPERATED

1   BEFORE YOU GOT THERE?

2       **A**   NO.  THEY WEREN'T FUNCTIONAL, YES.

3       **Q**   SO ARE YOU THE ONE WHO GOT THEM FUNCTIONAL

4   AND MADE THEM ACTUALLY USEFUL?

5       **A**   THROUGH I.T.

6       **Q**   COUNSEL ASKED YOU ABOUT THE ATU ON WEEKENDS

7   AND NURSE PARK TESTIFYING THAT SHE WASN'T IN THERE

8   24/7 WHEN SHE'S GOT A 12-HOUR SHIFT -- DURING THE

9   ENTIRETY OF HER 12-HOUR SHIFT.  DO YOU RECALL HIM

10  ASKING YOU ABOUT THAT?

11      **A**   YES.

12      **Q**   WHAT OTHER RESPONSIBILITY DOES NURSE

13  PRACTITIONER PARKER HAVE -- PRIMARY RESPONSIBILITY --

14  AT THE TREATMENT CENTER?

15      **A**   NURSING UNIT 2 ROUNDS.

16      **Q**   SO I MEAN, DOES THAT -- DOES IT MAKE SENSE

17  THAT -- SHE'S WORKING ON THE WEEKENDS -- THAT SHE

18  WOULD GO AND CHECK NURSING UNIT 2, SEE HOW THINGS ARE

19  GOING, SEE IF SHE CAN BE HELPFUL THERE?

20      **A**   YES.

21      **Q**   YOU'D RATHER HAVE HER DO THAT WHEN THERE IS

22  NOBODY IN THE ATU THAN SIT AROUND IN THE ATU AND EAT

23  A SANDWICH, WOULDN'T YOU?

24      **A**   CORRECT.

25      **Q**   I WANT TO PULL UP DX_30.86.  COUNSEL SHOWED

1   YOU WHERE A NURSE PRACTITIONER WAS WORKING

2   EVENINGS -- LPN.  I'M SORRY.  NOT NURSE

3   PRACTITIONER -- AN LPN WAS WORKING SOME NIGHTS IN THE

4   ATU.  CORRECT?

5        A    YES.

6        Q    IF WE LOOK AT THIS, WE SEE AN LPN WORKING

7   5:00 P.M. SHIFT ON THURSDAY, FRIDAY, SATURDAY AND

8   SUNDAY.  CORRECT?

9        A    YES.

10       Q    SO LET ME ASK YOU SOMETHING.  ON FRIDAY

11  NIGHT IS THERE A NURSE PRACTITIONER THAT'S THERE ON

12  SITE THAT'S EITHER IN THE ATU OR IN THE NURSING UNIT

13  THAT'S THERE TO SEE PATIENTS DIRECTLY AND TO PROVIDE

14  THEM WITH ADEQUATE CARE?

15       A    YES.

16       Q    ON SATURDAY NIGHT IS IT THE SAME

17  CIRCUMSTANCE?

18       A    YES.

19       Q    ON SUNDAY NIGHT IS IT THE SAME CIRCUMSTANCE?

20       A    YES.

21       Q    SO THE ONLY NIGHT, BASED ON THIS SCHEDULE,

22  THAT AN LPN WOULD HAVE BEEN IN THERE WOULD HAVE BEEN

23  THURSDAY NIGHT.  CORRECT?

24       A    YES.

25       Q    AND ON THAT THURSDAY NIGHT SHE HAD THE

1   PROVIDER AVAILABLE TO CONSULT AND TO HAVE HIM COME IN

2   IF IT WAS NECESSARY.  CORRECT?

3       A    YES.

4       Q    PULL UP DX_30.73.

5            TAKE A LOOK AT THE ATU STAFFING THERE.  IS

6   THAT BASICALLY THE SAME TYPE OF STAFFING THAT WE

7   TALKED ABOUT ON THE LAST PAGE?

8       A    YES.

9       Q    AND PRIMARILY THAT LPN IS WORKING ON THE

10  WEEKEND.  RIGHT?

11      A    YES.

12      Q    AND SHE'S THERE WITH A NURSE PRACTITIONER.

13  CORRECT?

14      A    YES.

15      Q    TALKED ABOUT THE MONTHLY MEETINGS, AND

16  COUNSEL SPENT A LONG TIME ON THOSE BLANK FORMS.

17           IS THAT SOMETHING THAT YOU'VE ADDRESSED

18  SINCE BECOMING AWARE OF IT?

19      A    YES.

20      Q    AND THAT'S FOR THE WARDEN'S MONTHLY MEETING,

21  ISN'T IT?

22      A    YES.

23      Q    AND YOU TRACK AND YOU -- YOU'RE ON TOP OF

24  THINGS BASED ON OTHER REPORTS AND OTHER THINGS

25  GOING -- THAT'S AVAILABLE TO YOU, AREN'T YOU?

1      A    YES.

2      Q    BUT ONCE YOU SAW THAT, YOU FIXED IT, DIDN'T

3  YOU?

4      A    YES.

5      Q    IS THAT BASICALLY YOUR MANAGEMENT STYLE,

6  YOUR BELIEF, WHEN THINGS COME TO YOUR ATTENTION THAT

7  ARE NOT THE WAY YOU WANT THEM?

8      A    YES.

9      Q    AND LSP, IT'S NOT PERFECT.  THEY'RE NOT

10  PROVIDING PERFECT HEALTH CARE, ARE THEY?

11      A    NO.  NO ONE IS.

12      Q    SO THERE IS THINGS THAT NEED TO BE IMPROVED

13  AND CAN BE IMPROVED FROM TIME TO TIME.  CORRECT?

14      A    YES.

15          **MR. DUBNER:**  OBJECTION.  COUNSEL IS JUST

16  TESTIFYING AT THIS POINT.

17          **THE COURT:**  YES, YOU ARE.  SUSTAINED.

18              I WAS WONDERING WHEN THAT WAS COMING.

19          **MR. ROBERT:**  I'LL GET OFF MY SOAPBOX, YOUR

20  HONOR.  MY APOLOGIES.

21  **BY MR. ROBERT:**

22      Q    THANK YOU, DR. JOHNSON.  IT'S BEEN A

23  PLEASURE.

24      A    THANK YOU.

25          **THE COURT:**  YOU MAY STEP --

1        MR. ROBERT:  OH.  I DID HAVE ONE MORE THING

2   I WANTED TO ASK HIM ABOUT.

3        THE COURT:  GO AHEAD.

4        MR. ROBERT:   MY APOLOGIES, YOUR HONOR.

5   BY MR. ROBERT:

6     Q    THIS AUDITOR'S REPORT, DO YOU AGREE WITH

7   THIS AUDITOR'S REPORT?

8     A    I DID NOT.

9     Q    DID YOU AGREE WITH HOW YOU WERE TREATED WHEN

10  YOU WORKED AT HEAL?

11    A    I DIDN'T.

12    Q    DID YOU HAVE ANYTHING ELSE YOU WANT TO ADD

13  TO THAT?

14    A    A BAD SITUATION, TURNED OUT POSITIVE.

15  EARNED A DOCTORATE DEGREE, ANOTHER MASTER'S DEGREE

16  FROM LOUISIANA STATE UNIVERSITY.  AND ALTHOUGH IT'S A

17  BOARD UNDER THE DEPARTMENT OF HEALTH, JUST

18  TRANSITIONED TO THE DEPARTMENT OF HEALTH THEREAFTER.

19    Q    THANK YOU.

20    A    YOU'RE WELCOME.

21        MR. ROBERT:  THANK YOU, YOUR HONOR.

22        THE COURT:  YOU MAY STEP DOWN.

23             ANY OTHER WITNESSES?

24

25

1          **MR. ROBERT:**  NO, YOUR HONOR, WE DON'T HAVE

2    ANY WITNESSES.  WE'VE GOT A DOCUMENT I THINK WE NEED

3    TO DEAL WITH.  BUT OTHERWISE I THINK WE'RE READY TO

4    REST.

5          **THE COURT:**  OKAY.  WHAT'S THE DOCUMENT?

6          **MR. ARCHEY:**  YOUR HONOR, WE HAD OFFERED THIS

7    PREVIOUSLY.  THEY WANTED TO VERIFY AND LOOK AT IT,

8    AND THEY'VE DONE THAT.  IT'S BEEN MARKED AS DX_59.

9    I'VE GOT THE PAPER HERE.  I CAN HAVE IT SCANNED AND

10   GET IT FORWARDED, WOULD PROBABLY BE THE PREFERENCE.

11   RIGHT?

12         **THE COURTROOM DEPUTY:**  JUST UPLOAD IT TO

13   JERS.

14         **THE COURT:**  UPLOAD IT TO JERS.

15              IS THERE AN OBJECTION TO DX_59?

16         **MR. DUBNER:**  NO.  WE WERE ABLE TO GET IT

17   CLEARED UP.

18         **THE COURT:**  ALL RIGHT.  UPLOAD IT TO JERS.

19              DX_59 IS ADMITTED.

20              IS THERE ANYTHING FURTHER?

21         **MR. ARCHEY:**  YOUR HONOR, DEFENSE RESTS AT

22   THIS TIME?

23              **(WHEREUPON, THE DEFENSE RESTS.)**

24         **THE COURT:**  IS THERE ANYTHING IN REBUTTAL?

25         **MR. DUBNER:**  WELL, FIRST OFF, JUST TO MOVE

1   TWO EXHIBITS THAT I NEGLECTED TO MOVE IN DURING THE

2   CROSS THERE:  PLAINTIFFS' EXHIBIT 29-B, WHICH IS

3   THOSE MONTHLY MANAGEMENT REPORTS, AND DEFENDANTS'

4   EXHIBIT 30, WHICH IS THE NURSING SCHEDULE.

5           MR. ROBERT:  I THINK EXHIBIT 30 IS IN.

6           MR. DUBNER:  THERE ARE A COUPLE OF DIFFERENT

7   VERSIONS.  I DON'T KNOW WHICH VERSION IS IN.

8           MR. ROBERT:  I DON'T HAVE ANY OBJECTION TO

9   EITHER ONE.

10           THE COURTROOM DEPUTY:  I'M ONLY PUTTING ONE

11   VERSION.  RIGHT?  D_30?

12           MR. DUBNER:  YEAH, DX_30.  I BELIEVE WHAT

13   COUNSEL WAS SAYING WAS JUST THAT THERE ARE A COUPLE

14   OF DIFFERENT DOCUMENT NUMBERS THAT HAVE SIMILAR

15   SCHEDULES, BUT THERE IS ONLY ONE DOCUMENT WE'VE GIVEN

16   YOU AS DEFENSE EXHIBIT 30.

17           THE COURT:  DX_30 AND 29 -- I THINK THOSE

18   ARE THE TWO EXHIBIT NUMBERS -- ARE ADMITTED.

19           THE COURTROOM DEPUTY:  29-B?

20           MR. DUBNER:  YES.  THANK YOU.

21               AND THEN IN TERMS OF REBUTTAL, WE'VE

22   ALREADY MOVED IN THE -- I DON'T BELIEVE WE HAVE MOVED

23   IN THE REPORT OF -- NO.  SO THE REPORT OF MR. CASHIO

24   IS PLAINTIFFS' EXHIBIT 79.

25           THE COURT:  IT'S THE DEPOSITION, NOT THE

1  REPORT.  RIGHT?

2        **MR. DUBNER:**  YOU ARE ENTIRELY CORRECT.  THE

3  DEPOSITION OF MR. CASHIO.

4        **THE COURT:**  AND THAT'S EXHIBIT 79?

5        **MR. DUBNER:**  YEP.

6        **THE COURT:**  THAT WILL BE ADMITTED AS

7  SUBSTANTIVE EVIDENCE WITHOUT OBJECTION OF THE

8  DEFENDANT.

9        **MR. DUBNER:**  AND THEN WE'RE PREPARED TO TAKE

10  THE TESTIMONY OF MS. GOEHRING BY ZOOM, IF THE COURT

11  IS READY.

12        **THE COURT:**  NO, WE'RE READY.  DO WE NEED A

13  BREAK TO GET THE ZOOM LINK UP?

14        **MS. MONTAGNES:**  WE PROBABLY NEED A LITTLE

15  BREAK TO GET HER ON AND JUST MAKE SURE THE TECHNOLOGY

16  IS WORKING, YOUR HONOR.

17        **THE COURT:**  OKAY.  15 MINUTES.

18        **(WHEREUPON, A RECESS WAS TAKEN.)**

19        **THE COURT:**  ARE WE READY WITH MS. GOEHRING?

20        **MS. MONTAGNES:**  WE ARE, YOUR HONOR.

21        MERCEDES MONTAGNES ON BEHALF OF THE

22  PLAINTIFFS.

23        **THE COURT:**  OKAY.  YOUR NEXT WITNESS IS?

24        **MS. MONTAGNES:**  MS. ANGELA GOEHRING.

25        **THE COURT:**  ALL RIGHT.  PROCEED.

1        (WHEREUPON, ANGELA GOEHRING, BEING

2  PREVIOUSLY SWORN, TESTIFIED VIA ZOOM VIDEOCONFERENCE

3  AS FOLLOWS.)

4                  DIRECT EXAMINATION

5  BY MS. MONTAGNES:

6     Q    GOOD AFTERNOON, MS. GOEHRING.  WELCOME BACK.

7     A    THANK YOU.  GOOD AFTERNOON.

8     Q    I WANT TO JUST ASK YOU SOME BRIEF QUESTIONS

9  THIS AFTERNOON.

10        DURING THE COVID PANDEMIC WERE YOU MANAGING

11  HEALTH CARE DELIVERY SERVICES?

12     A    YES.

13     Q    DID YOU ENCOUNTER ANY TROUBLE ACCESSING

14  SERVICES FOR INCARCERATED PEOPLE DURING THAT TIME?

15     A    THERE WERE DELAYS IN OFF-SITE -- GETTING

16  PATIENTS OFF-SITE AND SOMEWHAT ON-SITE -- FOR ON-SITE

17  SPECIALTY SERVICES AS WELL.

18     Q    AND WHAT, IF ANY, STEPS DID YOU TAKE TO

19  MITIGATE THE IMPACT OF THE COVID PANDEMIC ON YOUR

20  PATIENTS?

21     A    FOR THE ON-SITE SPECIALISTS WE HAD ZONES:

22  GREEN ZONE, YELLOW ZONE, RED ZONE.  RED ZONE WERE

23  PATIENTS THAT WERE SYMPTOMATIC; PATIENTS IN YELLOW

24  ZONES WERE POSITIVE, ASYMPTOMATIC; AND THEN GREEN

25  ZONE WAS A CLEAN AREA IN EACH INSTITUTION.

1          AND SO ON-SITE SPECIALISTS CAME ON AND SAW

2   PATIENTS IN BOTH GREEN AND YELLOW ZONE BUT NOT RED

3   ZONE.  ONCE THE PATIENTS OUT OF THE HOT RED ZONE AREA

4   WERE ROTATED BACK INTO EITHER A YELLOW OR GREEN, THEY

5   WERE SEEN AT THAT POINT.

6          FOR OFF-SITE WE MONITORED THOSE PATIENTS,

7   AND THEY WERE PUT IN FRONT OF A PHYSICIAN AT LEAST

8   ONCE EVERY 30 DAYS OR MORE OFTEN DEPENDING ON WHAT

9   THE DOCTOR ORDERED.  AND THE REASON THAT THEY WOULD

10  RE-EXAMINE THEM AND DOCUMENT A NOTE WAS TO MAKE SURE

11  THAT THE PATIENT WASN'T GETTING WORSE OR

12  DETERIORATING PENDING GETTING THEM OFF -- OUT --

13  OFF-SITE FOR EITHER SPECIALTY CONSULTATIONS OR

14  DIAGNOSTICS.

15      Q    AND IN YOUR CHART REVIEW DID YOU SEE ANY

16  EVIDENCE OF THESE MITIGATION EFFORTS OR ANYTHING

17  SIMILAR DOCUMENTED AT LSP?

18      A    NO, WE DID NOT.

19      Q    AND WAS THE LEVEL OF CARE YOU SAW SIMILAR

20  THROUGHOUT THE TIME PERIOD YOU REVIEWED RECORDS?

21      A    I WOULD SAY IT WAS CONSISTENT THROUGHOUT THE

22  TIME PERIOD OF THE RECORDS THAT WE REVIEWED.

23      Q    SO YOU DIDN'T SEE A CHANGE IN THE CARE IN

24  EARLY 2020?

25      A    NO.

**1**          **MS. MONTAGNES:**  THAT'S ALL MY QUESTIONS,

**2** YOUR HONOR.

**3**          **THE COURT:**  CROSS?

**4**          **MR. ARCHEY:**  YES, YOUR HONOR, VERY, VERY

**5** BRIEFLY.

**6**                    **CROSS-EXAMINATION**

**7** BY MR. ARCHEY:

**8**     **Q**    I'M NOT SURE WHICH WAY TO LOOK.  MS.

**9** GOEHRING, CAN YOU HEAR ME OKAY?

**10**    **A**    I CAN HEAR YOU, SIR.

**11**    **Q**    ALL RIGHT.  MA'AM, YOU WEREN'T IN LOUISIANA

**12** DURING COVID, WERE YOU?

**13**    **A**    NO.

**14**    **Q**    YOU HAVE NO EXPERIENCE AS TO LSP AND ITS

**15** CAMP J PROGRAM THAT IT PUT IN PLACE.  CORRECT?

**16**    **A**    OTHER THAN WHAT HAS BEEN REPORTED THROUGH

**17** DEPOSITION AND TRIAL TESTIMONY.

**18**    **Q**    RIGHT.  YOU WEREN'T INVOLVED IN THE

**19** INJUNCTION PROCEEDING THAT -- INVOLVING LSP'S CAMP J

**20** PLAN THAT IT IMPLEMENTED.  CORRECT?

**21**    **A**    CORRECT.

**22**          **MR. ARCHEY:**  YOUR HONOR, I HAVE NO FURTHER

**23** QUESTIONS.

**24**          **THE COURT:**  OKAY.

**25**              IS THERE ANY REDIRECT ON THE REBUTTAL?

1          **MS. MONTAGNES:**  NO, YOUR HONOR.

2          **THE COURT:**  YOU'RE FREE TO GO, MA'AM.  THANK

3   YOU.

4          **THE WITNESS:**  THANK YOU.

5          **THE COURT:**  OKAY.  DOES THAT CONCLUDE ALL OF

6   THE EVIDENCE IN THE CASE?

7          **MR. DUBNER:**  I THINK IT DOES, YOUR HONOR.

8          **THE COURT:**  OKAY.  THE CASE IS CONSIDERED

9   SUBMITTED.

10          I WANT TO TELL Y'ALL THAT YOU DID A

11   REALLY GOOD JOB -- BOTH SIDES DID A REALLY GOOD JOB,

12   AND THE COURT REALLY APPRECIATES ALL OF Y'ALL

13   ALLOWING THE YOUNGER LAWYERS TO HAVE A CRACK AT SOME

14   OF THE WITNESSES.  Y'ALL DID A VERY GOOD JOB.  AND I

15   HOPE YOU LEARNED A LOT IN THE -- I'M SPEAKING TO THE

16   YOUNG LAWYERS.  I HOPE YOU LEARNED SOME THINGS IN THE

17   TRIAL AND MOSTLY FROM THE OTHER LAWYERS THAT YOU

18   OBSERVED AND NOT FROM ME.

19          LET'S TALK BRIEFLY.  I WILL ALLOW YOU

20   ALL TO DO SOME POST-TRIAL BRIEFING.  BUT I CAN TELL

21   YOU THAT I'M NOT GOING TO ORDER BRIEFING UNTIL AFTER

22   WE GET A TRANSCRIPT.  SO JUST FOR SAKE OF DISCUSSION

23   PURPOSES, DO YOU WANT TO TALK ABOUT WHAT KIND OF

24   BRIEFING -- WHAT KIND OF BRIEFING YOU'RE INTERESTED

25   IN GETTING?

1          NOW, I WANT PROPOSED FINDINGS OF FACT

2   AND CONCLUSIONS OF LAW.  GIVEN THE FACT THAT YOU

3   WOULD PROBABLY PUT -- THAT YOU'RE GOING TO PUT

4   CONCLUSIONS OF LAW, I'M NOT SURE THAT I NEED YOU TO

5   CONNECT THE DOTS IN A POST-TRIAL BRIEF.  BUT IF YOU

6   FEEL LIKE THAT YOU -- THAT YOU JUST HAVE THIS BURNING

7   DESIRE TO DO THAT, YOU CAN.  AND I'M ALSO NOT

8   PREEMPTING Y'ALL FROM CLOSING ARGUMENTS; ALTHOUGH DO

9   YOU NEED THEM?  DO YOU WANT THEM?

10          MR. DUBNER:  YES, YOUR HONOR, I THINK WE

11  WOULD SUGGEST THAT IT WOULD BE HELPFUL.  WE'RE HAPPY

12  TO ON TUESDAY AT THE TIME WE WERE ORIGINALLY GOING TO

13  DO TRIAL, OR IF THE COURT WOULD LIKE A DIFFERENT TIME

14  AFTER THE FINDINGS OF FACTS, WHENEVER IS CONVENIENT

15  FOR THE COURT.

16          THE COURT:  NO, WE'RE NOT GOING TO COME BACK

17  ON -- I MEAN, I -- NO, WE'RE NOT GOING TO COME BACK

18  ON TUESDAY TO HEAR ARGUMENTS.  IF Y'ALL WANT TO DO

19  FIVE OR TEN MINUTES RIGHT NOW, YOU CAN DO IT RIGHT

20  NOW.  BUT WE'RE NOT COMING BACK ON TUESDAY FOR

21  ARGUMENTS.

22          MR. DUBNER:  I DON'T THINK WE AT LEAST ARE

23  PREPARED.  I DON'T KNOW ABOUT DEFENDANTS.  IF THE

24  COURT HAS QUESTIONS THAT IT THINKS WOULD BE HELPFUL

25  FOR ATTORNEYS TO ANSWER, HAPPY TO DO THAT.  BUT WE

1    DON'T HAVE ANYTHING PREPARED.

2            THE COURT:  OBVIOUSLY WHAT I'M INTERESTED

3    IN -- AND I'LL GIVE YOU KIND OF A -- I DON'T KNOW IF

4    IT'S A METAPHOR OR -- IT'S REALLY NOT A METAPHOR.

5    IT'S MORE OF A PARALLEL EXAMPLE.

6            OVER COVID WHAT HAPPENED TO US IS THAT

7    WE WOULD HAVE DEFENDANTS WHO WOULD COME IN AND PLEAD

8    GUILTY TO CRIMES, AND YOU COULDN'T SET THEIR

9    SENTENCING FOR HEARING -- WELL, AT LEAST I DIDN'T SET

10   THEIR SENTENCING BECAUSE I FELT LIKE IF I WAS GOING

11   TO SENTENCE SOMEBODY, THAT I WANTED TO LOOK THEM IN

12   THE FACE.  SO WE DIDN'T DO -- I DIDN'T DO SENTENCINGS

13   ON ZOOM.

14           YOU KNOW WHAT?  WE CAN -- THIS IS OFF

15   THE RECORD.

16           **(WHEREUPON, AN OFF-THE-RECORD DISCUSSION WAS**

17   **HELD.)**

18           **THE COURT:**  WELL DONE, EVERYBODY.  I HOPE

19   YOU HAVE A WONDERFUL, LONG WEEKEND.

20             **(WHEREUPON, THE BENCH TRIAL WAS CONCLUDED.)**

21

22

23

24

25

1          C E R T I F I C A T E

2          I CERTIFY THAT THE FOREGOING IS A CORRECT

3   TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE

4   ABOVE-ENTITLED NUMBERED MATTER.

5   S:/NATALIE W. BREAUX

6   NATALIE W. BREAUX, RPR, CRR

7   OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25