UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOSEPH LEWIS, JR. et al., on behalf of themselves and all others similarly situated | * * * | CIVIL ACTION NO. 3:15-cv-00318 |
| VERSUS | * * | JUDGE SHELLY D. DICK |
| BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, et al. | * * * | MAGISTRATE JUDGE RICHARD L. BOURGEOIS |

**DEFENDANTS' PROPOSED**
**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800
Randal J. Robert (#13800)
Connell L. Archey (#29992)
Keith J. Fernandez (#33124)
Allena W. McCain (#38830)
*Special Assistant Attorneys General*
Email: randy.robert@butlersnow.com
 connell.archey@butlersnow.com
 keith.fernandez@butlersnow.com
 allena.mccain@butlersnow.com

**SHOWS, CALI & WALSH, L.L.P.**
Jeffrey K. Cody, La. Bar No. 28536
Caroline M. Tomeny, La. Bar No. 34120
John C. Conine, Jr., La. Bar No. 36834
*Special Assistant Attorneys General*
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
Email: jeffreyc@scwllp.com
 caroline@scwllp.com
 coninej@scwllp.com

Counsel for Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

I.   PROCEDURAL HISTORY .............................................................................................. 1

II.  FACTUAL BACKGROUND AND CHANGES IN PERSONNEL ................... 2

III. ANY CONSTITUTIONAL SICK CALL VIOLATIONS HAVE BEEN
     REMEDIED .......................................................................................................... 3

     A.   Issues Identified in the Liability Ruling Have Been Remedied .................... 3

     B.   Chart Reviews Show that Sick Call Exceeds the Constitutional Minimum .. 5

     C.   Sick Call Meets or Exceeds the Minimum Standard of Care ........................ 8

IV.  CLINICAL CARE ..................................................................................................... 8

     A.   Issues Identified in the Liability Ruling Have Been Remedied .................... 8

     B.   Chart Reviews Show that Clinical Care Meets or Exceeds the
          Constitutional Minimum .............................................................................. 10

     C.   Medication Management Meets Minimum Standards ................................ 16

     D.   Allegations of Punitive and Unprofessional Attitudes Are Without Merit .. 17

     E.   Clinical Care at LSP Does Not Violate any Constitutional Standards. ....... 19

V.   SPECIALITY CARE ................................................................................................ 20

     A.   Issues Identified in the Liability Ruling Have Been Remedied .................. 20

     B.   UMCNO Was Unable to Provide Care for LSP Due to COVID and
          Hurricanes During the Relevant Period of Time ......................................... 22

     C.   Chart Reviews Show that Specialty Care Meets or Exceeds the
          Constitutional Minimum .............................................................................. 24

     D.   Specialty Care at LSP Does Not Violate any Constitutional Standards ...... 30

VI.  INFIRMARY/IN-PATIENT CARE .................................................................... 30

     A.   There Have Been Significant Improvements in Infirmary/In-Patient Care . 30

     B.   LSP's Inmate Orderly Program is Improved and Meets the Standard of
          Care ............................................................................................................. 31

i

C.    The Medical Dorms At LSP Do Not Violate any Constitutional Standards 35

VII.    EMERGENCY CARE/ATU ................................................................ 36

A.    Issues Identified in the Liability Ruling Have Been Remedied .................. 36

B.    The Reviews by Dr. Mathis and Dr. McMunn are More Credible and are Entitled to More Weight than the Review by Dr. Vassallo ........................ 37

C.    Dr. Vassallo's Chart Reviews Show Either No Error or Merely a Difference in Medical Opinion. ................................................................ 39

D.    Issues with Responding to Strokes Have Been Resolved. ........................... 45

E.    Medical Care Requires Consideration of Illicit Drug Use ........................... 48

VIII.    SELF DECLARED EMERGENCIES ................................................ 49

IX.    MEDICAL LEADERSHIP AND ORGANIZATION ........................ 51

X.    PLAINTIFFS' EXPERTS APPLIED AN INCORRECT STANDARD OF CARE ................................................................................................. 52

XI.    ADA/RA .............................................................................................. 54

XII.    CONCLUSIONS OF LAW ................................................................ 64

A.    Plaintiffs Have Not Proven an Ongoing Eighth Amendment Violation. ...... 64

B.    Plaintiffs Have Not Proven Ongoing ADA/RA Violations ........................ 69

C.    Remedy Considerations under the Prison Litigation Reform Act. .............. 72

XIII.    CONCLUSION ................................................................................... 73

CERTIFICATE OF SERVICE ....................................................................... 75

65885423.v2

# TABLE OF AUTHORITIES

**Cases**

*Ball v. LeBlanc*, 881 F.3d 346 (5th Cir. 2018) ................................................................. 65

*Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997) ........................................ 64

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................................. 73

*Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005) ............................. 72

*Berry v. Brady*, 192 F.3d 504 (5th Cir. 1999) ................................................................. 73

*Brauner v. Coody*, 793 F.3d 493 (5th Cir. 2015) .............................................................. 65

*Brewster v. Dretke*, 587 F.3d 764 (5th Cir. 2009) ............................................................ 64

*Carlucci v. Chapa*, 884 F.3d 534 (5th Cir. 2018) ............................................................. 65

*Criollo v. Milton*, 414 F.App'x. 719 (5th Cir. 2011).......................................................... 66

*Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021)................................................................... 68

*Dockery v. Hall,* 443 F.Supp.3d 726 (S.D. Miss. 2019), aff'd 7 F.4th 375 (5th Cir.
 2021)............................................................................................... 11, 16, 17, 68

*Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752 (5th Cir. 2001) .............................. 64, 66

*Estelle v. Gamble*, 429 U.S. 97 (1976).................................................................... 64, 66

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................................. 66, 67

*Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006) ....................................................... 65, 66

*Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 746 (N.D. Tex. 2010), *aff'd,*
 472 F. App'x 287 (5th Cir. 2012) .......................................................................... 69, 70

*Grogan v. Kumar*, 873 F.3d 273 (5th Cir. 2017)............................................................... 64

*Gumns v. Edwards*, No. CV 20-231-SDD-RLB, 2020 WL 2510248 (M.D. La. May 15,
 2020).................................................................................................... 38, 52

*Hale v. King*, 642 F.3d 492 (5th Cir. 2011).................................................................... 69

*Helling v. McKinney*, 506 U.S. 25 (1993) ...................................................................... 65

*Hudson v. McMillian*, 503 U.S. 1 (1992) ...................................................................... 65

*Johnson v. Treen*, 759 F.2d 1236 (5th Cir. 1985) ................................................. 2, 51, 64, 73

*Lewis v. Casey*, 518 U.S. 343 (1996) .......................................................................... 73

*Norton v. Dimazana*, 122 F.3d 286 (5th Cir. 1997) ........................................................... 65

*People of New York v. Armor Correctional Health Medical Services of New York, Inc.,
 P.C., et al.*, Supreme Court of the State of New York, County of New York,
 7/11/2016................................................................................................. 5

*Rogers v. Boatright*, 709 F.3d 403 (5th Cir. 2013) ........................................................... 66

*Sama v. Hannigan*, 669 F.3d 585 (5th Cir. 2012) ............................................................. 66

*Scott v. Clarke*, No. 12-cv-0036 (W. D. Va.) ................................................................. 50

*Shadrick v. Hopkins Cnty.*, 805 F.3d 724 (6th Cir. 2015) ................................................... 64

*Tasby v. Cain*, No. 16-277, 2017 WL 4295441 (M.D. La. Sept. 12, 2017) ............................... 73

*Tennessee v. Lane*, 541 U.S. 509 (2004) ...................................................................... 69

*Tompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987) .............................................................. 66

*United States v. Hinds County, et al.*, No. 3:16-CV-489-CWR-RHWR, 2022 WL
 1112223 (S.D. Miss. Apr. 13, 2022) ....................................................................... 52

*Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021) ........................................................... 67

*Williams v. Hampton*, 797 F.3d 276 (5th Cir. 2015) ......................................................... 66

*Wilson v. Seiter*, 501 U.S. 294 (1991) .................................................................... 64, 65

**Rules and Statutes**

18 U.S.C. § 3626 ............................................................................................ 73

28 C.F.R. § 35.130 ......................................................................................... 71

28 C.F.R. § 35.150 .................................................................................. 69, 70

42 U.S.C. § 12132 .......................................................................................... 69

65885423.v2

NOW INTO COURT, through undersigned counsel, come Defendants, who respectfully submit the following proposed findings of fact and conclusions of law:

## I.     PROCEDURAL HISTORY

1.     This is a certified class action brought by inmates in the custody of the Louisiana Department of Public Safety and Corrections ("DOC"). Plaintiffs brought two class claims: (1) a claim for violation of the Eighth Amendment on behalf of all inmates who are now or will in the future be housed at the Louisiana State Penitentiary at Angola ("LSP" or "Angola"), and (2) a claim for violation of the Americans with Disabilities Act and Rehabilitation Act (collectively, "ADA/RA") on behalf of all inmates with disabilities who are now or will in the future be housed at LSP. These claims are brought against the DOC and eight personnel in their official capacities.

2.     The liability phase of the trial was held in October of 2018. On March 31, 2021, the Court found that LSP's medical care was below the minimum standard allowed by the Eighth Amendment in six areas: (1) sick call, (2) emergency care/Assessment and Triage Unit ("ATU"), (3) clinical care, (4) specialty care, (5) infirmary/in-patient care, and (6) medical leadership and organizational structure.[1] The Court further found violations of the ADA/RA.[2] The March 31, 2021 Ruling shall be referred to hereafter as the "Liability Ruling."

3.     Trial on the remedy phase was held over ten days from June 6, 2022 through June 17, 2022. Defendants submit these proposed findings of fact and conclusions of law consistent with the evidence adduced during trial of the remedy phase.

---

[1] The Court found that the following did not violate the Eighth Amendment: (1) chronic care, (2) laboratory services, (3) pain medication management, (4) LSP's system of co-pays, (5) LSP's malingering policy, (6) LSP's do not resuscitate policy, and (7) LSP staffing levels. Further, Defendants contend that areas not identified by the Court (medication administration, for instance) are also irrelevant.
[2] See generally, Liability Ruling, R. Doc. 594.

## II.    FACTUAL BACKGROUND AND CHANGES IN PERSONNEL

4.     LSP is a maximum security prison within DOC. As of September of 2016, there were approximately 6,400 inmates at LSP.[3] As of late 2021, there were approximately 4,900 inmates at LSP.[4] Approximately half of the people incarcerated at LSP are over the age of 50, and approximately 3,783 people incarcerated at LSP are serving life sentences.[5]

5.     In August 2020, Defendants hired Dr. Jacob Johnson, Ed. D, MSNPA, MPA, CLED, as a Long Term Care Health Administrator.[6] The Long Term Care Health Administrator reports to the Deputy Warden over Medical.[7] Beginning on March 21, 2022, Ashli Oliveaux, LPN, who has a medical background and has worked for DOC since 2002, became the Deputy Warden over Medical.[8]

6.     Dr. Toce is now the Medical Director at LSP.[9] LSP also has seven nurse practitioners providing primary care. Health care providers are no longer assigned to specific housing units. Instead, one nurse practitioner is assigned to sick call, as described below; two are assigned to the ATU on weekends; and the others rotate between the ATU and General Medicine Clinics.[10] As of the date of the Joint Pretrial Order, LSP employed 23 RNs and 21 LPNs.[11]

7.     Dr. Randy Lavespere is now the DOC statewide Medical Director.[12] Dr. Lavespere works at LSP at least one to two days a week; he estimates that he spends 30% of his time at LSP.[13]

---

[3] Liability Ruling, R. Doc. 594, ¶ 1.
[4] DX14.0655.
[5] Joint Pretrial Order, ¶¶ I.1 and I.2 [R. Doc. 691].
[6] Joint Pretrial Order, ¶ II.8 [R. Doc. 691].
[7] Joint Pretrial Order, ¶ II.8 [R. Doc. 691].
[8] Joint Pretrial Order, ¶ II.9 [R. Doc. 691].
[9] Joint Pretrial Order, ¶ II.4 [R. Doc. 691].
[10] Joint Pretrial Order, ¶¶ II.5 through II.7 [R. Doc. 691].
[11] Joint Pretrial Order, ¶ III.12 [R. Doc. 691].
[12] Joint Pretrial Order, ¶ II.3 [R. Doc. 691].
[13] JX70-a.0012–0013.

8.      As of January 4, 2022, Deputy Assistant Secretary Sharita Spears became the ADA Director for DOC.[14]

9.      As of March 21, 2022, Deputy Warden Ashli Oliveaux, LPN, became the LSP ADA Coordinator.[15]

## III.   ANY CONSTITUTIONAL SICK CALL VIOLATIONS HAVE BEEN REMEDIED

10.     Sick call is an important part of clinical care because sick call provides access to medical care.[16] This Court previously noted that "[s]ick call is the main process by which patients access the medical system at Angola."[17]

### A.   Issues Identified in the Liability Ruling Have Been Remedied

11.     The Liability Ruling found that:

> At LSP, emergency medical technicians ("EMTs") and paramedics are front line staff for screening and treatment of patients with routine (sick call) and urgent health care needs. EMTs conduct sick calls in inmate housing units without the patient's medical record, adequate medical equipment, or supplies. Pursuant to both LSP Policy and applicable Standards of Care, physicians are required to clinically supervise EMTs; yet, this does not meaningfully or consistently occur at LSP.[18]

12.     As of October 31, 2021, LSP changed the sick call process at LSP.[19] Nurse Practitioner ("NP") Park recommended that a NP be assigned to sick call so that it would be quicker and more efficient.[20] LSP implemented this important change. NP Bordelon now has primary responsibility for sick call.[21] LSP secured telemedicine ("telemed") equipment from LSU and acquired portable buildings (small trailers referred to as Cogens) for patients to be seen at their

---

[14] Joint Pretrial Order, ¶ III.10 [R. Doc. 691].
[15] Joint Pretrial Order, ¶ III.11 [R. Doc. 691].
[16] Tr. Day 2, 6.7.22, p. 200.
[17] Liability Ruling, R. Doc. 594, ¶ 84.
[18] Liability Ruling, R. Doc. 594, ¶ 29.
[19] Tr. Day 7, 6.14.22, p. 90; DX8-aaa.
[20] Tr. Day 7, 6.14.22, pp. 79 & 90-91.
[21] Tr. Day 7, 6.14.22, p. 90.

location.[22] NP Bordelon calls the new process of sick call for sick call "night and day" compared to the old sick call procedure.[23] Even plaintiffs' expert, NP LaMarre, admits, "for sick call, access has improved."[24]

13. Since November 1, 2021, inmates submit routine sick call slips before noon Sunday through Thursday.[25] The slips are taken to the Assessment and Treatment Unit ("ATU") where a nurse or a NP performs a paper triage[26] of the slips; any inmate's sick call slip that reflects an urgent condition can be seen immediately.[27] The remainder are seen the next morning on Monday through Friday by a NP via telemed.[28] The NP has the sick call slip and the patient's medical record with him or her.[29] The NP also has access through the computer to the patient's list of medications, lab reports, duty status, and upcoming appointments.[30] The inmate is in a private room during the sick call visit.[31] An EMT is with the inmate to take vital signs and facilitate the sick call visit.[32] This visit takes place in a confidential, medical setting.[33]

14. If the NP determines during the telemed visit that he or she needs to see the patient in person, the NP has the patient brought to the ATU. On average, NP Bordelon sends about three patients a day to the ATU, where he can see them in person to complete the sick call encounter.[34]

---

[22] Tr. Day 7, 6.14.22, pp. 91-92.
[23] Tr. Day 7, 6.14.22, p. 104.
[24] Tr. Day 2, 6.7.22, p. 200.
[25] Tr. Day 7, 6.14.22, p. 96.
[26] Tr. Day 10, 6.17.22, pp. 126–128; Tr. Day 7, 6.14.22, pp. 107-108. The ACA provides for paper triage, meaning that the nurse triages the sick call slips without a face-to-face encounter. Tr. Day 6, 6.13.22, p. 72.
[27] Tr. Day 7, 6.14.22, p. 108.
[28] Tr. Day 7, 6.17.22, pp. 92–93, 96.
[29] Tr. Day 6, 6.13.22, p. 73; Tr. Day 7, 6.14.22, pp. 93 & 95-96.
[30] Tr. Day 7, 6.14.22, p. 94.
[31] Tr. Day 7, 6.14.22, p. 100; Tr. Day 6, 6.13.22, p. 74; Tr. Day 10, 6.17.22, pp. 131–132.
[32] Tr. Day 7, 6.7.22, pp. 99, 196; Tr. Day 10, 6.17.22, p. 131-132.
[33] Tr. Day 7, 6.14.22, p. 100.
[34] Tr. Day 7, 6.14.22, p. 103; Tr. Day 2, 6.7.22, p. 202.

15.     LSP modifies its sick call process on weekends, just like other prisons throughout the country.[35] When a sick call slip is submitted after noon on Thursday and before Sunday at noon, the sick call slips are still triaged, but the encounter with the NP occurs on Monday. This process is clearly within the standard of care for conducting sick call.[36]

16.     Every inmate who submits a routine sick call request is now seen by a NP.[37] Most prisons use nurses to conduct sick call.[38] Plaintiffs' expert acknowledges that having a NP conduct sick call is above the standard of care.[39]

17.     The effectiveness of the new sick call process has resulted in a decrease in the number of self-declared emergencies.[40] Further, the sick call NP has identified more serious illnesses during the routine sick call process.[41]

**B.      Chart Reviews Show that Sick Call Exceeds the Constitutional Minimum**

18.     Plaintiffs' expert, NP LaMarre, provided opinions regarding sick call. Of the eight cases cited in the expert report, three were self-declared emergencies, not routine sick call addressed in this section.[42] The remainder show no problem with LSP's revised sick call process.

19.     As to Patient #39, NP LaMarre initially opined that on 12/21/21, the EMT blocked access to the physician.[43] NP LaMarre had to correct this opinion when it was shown that a NP,

---

[35] Tr. Day 6, 6.13.22, p. 80.
[36] Nurse Goerhing was a high level administer for Armor Correctional Health Services, Inc. ("Armor"). Armor's contract to provide services for the Nassau County Correctional Center provided that a clinician would see a patient within 72 hours of pick-up of the patient's sick call slip, even during weekdays.  See ¶ 70 of the Verified Petition in the matter captioned, *People of New York v. Armor Correctional Health Medical Services of New York, Inc., P.C., et al.*, Supreme Court of the State of New York, County of New York, 7/11/2016, available at https://clearinghouse.net/doc/82569.
[37] Tr. Day 6, 6.13.22, p. 73.
[38] Tr. Day 2, 6.7.22, p. 191.
[39] Tr. Day 2, 6.7.22, pp. 191-192. Dr. McMunn testified that NPs conducting sick call is "certainly above the standard of care." Tr. Day 8 (afternoon), 6.15.22, pp. 23-24. Dr. Mathis opined that LSP's current sick call process "exceeds the standard of care." Tr. Day 7, 6.14.22, p. 192.
[40] Tr. Day 10, 6.17.22, p. 133.
[41] Tr. Day 7,  6.14.22, p. 104.
[42] The self-declared emergency encounters were as to Patient #42, #49 and #48.
[43] PX01-a.0052.

not an EMT, saw this patient.[44] Patient #39 made two requests on the sick call slip.[45] First, he requested a reorder of his Glucerna prescription. NP Bordelon told him that he did not qualify for Glucerna, and this was confirmed by Dr. Toce at a later encounter.[46] Patient #39 further requested an eye exam. NP Bordelon requested an eye exam for the patient.[47] All of this occurred with a patient that was admittedly a difficult patient with many refusals.[48] This encounter shows a working, effective sick call system.

20.     NP LaMarre is also critical of a sick call encounter with Patient #56 on 11/3/21. Patient #56 submitted a sick call request complaining of head, neck, shoulder and hip pain.[49] NP Bordelon sent the patient to the ATU where he was administered a Toradol shot and prescribed medications.[50] NP LaMarre then opines that there was no follow-up appointment recommended.[51] Her opinion is wrong. Patient #56 had an orthopedic follow up on 11/15/21, less than two weeks later.[52] When that appointment was rescheduled, Patient #56 saw an orthopedist on 11/29/21.[53]

21.     NP LaMarre criticized the sick call encounter with Patient #54 on 11/6/21.[54] She implied that the patient was not seen for two days during which he was having chest pain. In reality, Patient #54 was sent to the ATU and then to Lane Hospital for three days.[55] NP LaMarre withdrew her complaints as to Patient #54 as without merit.[56]

---

[44] Day 2, 6.7.22, p. 211.
[45] JX39.1254.
[46] JX39.1249.
[47] JX39.1254; Tr. Day 2, 6.7.22, p. 212.
[48] Tr. Day 2, 6.7.22, pp. 212-213.
[49] JX56.0575.
[50] JX56.0575.
[51] PX01-a-0052.
[52] JX56.0574.
[53] JX56.0572.
[54] JX56.0572.
[55] Day 2, 6.7.22, p. 216.
[56] Tr. Day 2, 6.7.22, p. 217.

22.     NP LaMarre next addressed a sick call encounter with Patient #49 on 1/24/22 where Patient #49 requested a shot in his knee.[57] NP Bordelon prescribed Celebrex for the patient and set up an orthopedics appointment him. NP LaMarre criticizes NP Bordelon for failing to address the patient's high blood pressure. However, the patient was seen a mere four days later in clinic where his high blood pressure was addressed.[58] NP Bordelon either set up the appointment for the patient during the encounter or noted the appointment was already set.

23.     NP LaMarre criticizes a sick call encounter with Patient #63 that she observed during the site visit. Patient #63 complained of a foot problem. NP Bordelon looked through the medical chart as he addressed the patient's concerns. NP Bordelon explained that the patient had previously signed a refusal to see the podiatrist.[59] NP Bordelon then observed Patient #63's foot through telemed with the EMT palpating the foot. NP Bordelon scheduled an appointment with the podiatrist for Patient #63.[60] NP Bordelon then noted the patient's high blood pressure, although the patient had not requested an evaluation for high blood pressure on the sick call form. NP Bordelon scheduled Patient #63 to come to the clinic two times a week for the next three weeks to monitor and address his high blood pressure.[61]

24.     Finally, NP LaMarre criticizes a sick call encounter with Patient #64 that she observed during the site visit. Patient #64 presented with an eye complaint. NP Bordelon addressed the eye complaint through telemed.[62] NP Bordelon also noted the patient's high blood pressure; he inquired as to why the patient was not taking his blood pressure medications.[63] NP Bordelon

---

[57] JX49.0288.
[58] JX49.0287.
[59] Tr. Day 2, 6.7.22, pp. 220-221.
[60] Tr. Day 2, 6.7.22, p. 221.
[61] Tr. Day 2, 6.7.22, p. 222.
[62] Tr. Day 2, 6.7.22, p. 222.
[63] Tr. Day 2, 6.7.22, pp. 222-223.

ultimately sent the patient to the ATU for further follow up. NP LaMarre was not present for the follow up encounter in the ATU.[64]

## C.     Sick Call Meets or Exceeds the Minimum Standard of Care

25.     LSP's sick call process provides patients prompt access to a NP provider. Every sick call encounter results in the patient's complaints being timely addressed by a provider and additional follow up care thereafter. Any constitutional deficiency found by the Court previously in connection with sick call has been remedied.

## IV.     CLINICAL CARE

## A.     Issues Identified in the Liability Ruling Have Been Remedied

26.     In the Liability Ruling, the Court found the following as to clinical care:

> In *Gates v. Cook*, the Fifth Circuit recognized that a combination of conditions may "have a mutually enforcing effect" that violates the Eighth Amendment. This combination of conditions regarding clinical care is amply demonstrated by the evidence supporting the Court's findings of fact, generally, that: (1) exam rooms lack privacy and standard medical equipment; (2) there are often no medical records available to the providers making cell side visits; (3) hygiene and spacing issues abound; and (4) physicians/providers treat complaints episodically rather than the underlying state of diseases. Several specific practices or failings by LSP are identical or similar to matters that have been held to violate the Constitution. These include: (1) the failure to provide adequate facilities and equipment for necessary medical care; (2) the failure to ensure that medical records are available to providers treating the inmate, which permeates numerous aspects of health care delivery; and (3) the use of unqualified or untrained staff or inmate orderlies who provide medical care outside the scope of their qualifications.[65]

The evidence at the remedy trial establishes that none of these conditions still exist at LSP.

---

[64] See generally, PX01-a.055; Tr. Day 2, 6.7.22, p. 223.
[65] Liability Ruling, R. Doc. 594, p. 85-86 (footnotes and citations omitted.).

27.     As addressed above, sick call now takes place in a private room.[66] Similarly, providers see patients in general medical clinic in a private setting with the door closed.[67]

28.     The exam rooms are now appropriately supplied and have paper on the examination table.[68] The exam rooms are also now clean and free of clutter.[69]

29.     Providers have medical records with them during clinical encounters.[70]

30.     Hygiene and spacing issues have been remedied since 2016. Hygiene is shown by the photographs of the medical facilities.[71] Spacing has been remedied by a reduced census in the nursing units and by converting the medical dorms from double bunks to single bunks.[72]

31.     The Court's finding that physicians/providers treat complaints episodically rather than the underlying state of diseases requires a more extensive discussion, see *infra* pages 10–19, the result of which shows that the issue has been remedied.

32.     During the later part of 2021, LSP hired additional NPs, bringing the total number of NPs at LSP to seven. These seven NPs, along with Dr. Toce, comprise LSP's medical provider team.  Dr. McMunn opines that the increased reliance on nurse practitioners has several positive effects. He explained that studies have shown that primary care outcomes can be as good or better than physicians in some settings. In his experience, Dr. McMunn observes that NPs tend to interact more effectively with patients and are more thorough in counseling and educating patients.[73] Plaintiffs' experts agree that the addition of NPs is a "positive development" for LSP.[74]

---

[66] Tr. Day 7, 6.14.22, p. 100; Tr. Day 6, 6.13.22, p. 74; Tr. Day 10, 6.17.22, p. 131.
[67] Tr. Day 6, 6.13.22, p. 81.
[68] Tr. Day 2, 6.7.22, p. 198; Tr. Day 7, 6.14.22, p. 100; DX46.0013; DX46.0152; DX46.0188.
[69] Tr. Day 2, 6.7.22, p. 197; Tr. Day 6, 6.13.11, p. 76; DX46.0013; DX46.0152; DX46.0188.
[70] Tr. Day 7, 6.14.22, p. 18. Additionally, the NP has medical records with him or her during sick call encounters, as addressed above.
[71] See generally, DX46.
[72] DX46.056, 060, 062, 170 & 171.
[73] Tr. Day 8 (afternoon), 6.15.22, pp. 74-75.
[74] PX1-a.0016.

33.     Considering that LSP's census has decreased from approximately 6,400 previously to slightly under 5,000 at present, LSP's medical team is robust.[75]

34.     LSP providers meet every morning on Monday through Friday to discuss patient care. The providers discuss patients that came into the ATU overnight, patients in NU1, patients in NU2, and patients who are at outside hospitals. Everyone agrees that the morning meetings where patient care is discussed among providers are good.[76]

**B.     Chart Reviews Show that Clinical Care Meets or Exceeds the Constitutional Minimum.**

35.     Defendants retained two correctional medical experts, David M. Mathis, MD, CCHP-P, FAAFP and Michael McMunn, DNP, CCHP-MH, CCHP-A. Both have extensive experience working in correctional medicine. Dr. Mathis and Dr. McMunn[77] conducted a site visit at LSP, interviewed key LSP employees, and reviewed the 60 charts selected by Plaintiffs.[78] Dr. Mathis and Dr. McMunn concluded that the clinical care provided by LSP meets or exceeds the standard of care for a correctional institution.

36.     NP LaMarre and Nurse Goehring were the only two experts who addressed clinical care for the Plaintiffs.[79] As Nurse Goehring is a nurse, opinions as to medical care are outside the scope of her expertise; she provided no opinions on care provided by LSP providers.[80]

---

[75] In 2016, Plaintiffs' experts opined that a provider could reasonably provide care to 600 to 800 inmates depending upon medical acuity, Plaintiffs' Expert Report, Liability Phase, p. 17. While Defendants do not concede that 600 to 800 is the most a provider can provide care for, LSP meets the Plaintiffs' suggested ratio at this time. Even under Plaintiffs' recommendations, LSP's eight providers can reasonably provide care to 4,800 to 5,600 inmates, easily providing care for the current census at LSP.

[76] Tr. Day 4, 6.9.22, p. 114 ("Morning meetings are a great thing."); Tr. Day 4, 6.9.22, p. 159 ("I think what we should do is agree that morning huddles are a good thing.").

[77] Dr. McMunn is a nurse practitioner who holds a PhD.

[78] Defendants object to Plaintiffs' methodology of selecting 60 charts from deaths and the most seriously ill at LSP as designed to paint LSP in a negative light. Plaintiffs' methodology does not appropriately reflect the preponderance of health care being provided at LSP.  Tr. Day 7, 6.14.22, pp. 245-246.

[79] PX01-a.04.

[80] Tr. Day 5, 6.10.22, p. 56.

37.     Plaintiffs' criticisms of the providers are largely based upon the fact that that LSP has paper medical charts[81] and LSP's providers hand write medical notes. Hand-writing leads to a more succinct note than an electronic record would generate, fueling the complaint that providers are not thorough enough in their evaluations.

38.     Plaintiffs further complain much about medication administration at LSP. Defendants contend that Plaintiffs' complaints regarding medication administration are not an appropriate issue before this Court because it was not addressed in the Liability Ruling. Such complaints do not arise to a constitutional level in any event.[82]

39.     NP LaMarre and Nurse Goehring each testified about three charts at trial. None of these six charts show constitutionally deficient or substandard health care.

40.     NP LaMarre testified that Patient #16 had severely uncontrolled high blood pressure which was not treated when he visited the clinic.[83] Review of the chart shows a different story. On 8/15/19, UMCNO recommended that the patient follow up for his high blood pressure.[84] The trip return paperwork noted the recommendation and scheduled an appointment for his high blood pressure.[85] On 9/17/19, before the date of that appointment, Patient #16 went back to UMCNO for nerve conduction studies where his high blood pressure was again noted. The trip

---

[81] DOC has diligently been converting to electronic medical records, although COVID slowed the implementation process. At the time of the Remedy Trial, seven of the nine DOC facilities had electronic medical records, and LSP was in the process of upgrading its infrastructure to be able to support electronic medical records.

[82] See *Dockery v. Hall,* 443 F.Supp.3d 726, 740 (S.D. Miss. 2019), aff'd 7 F.4th 375 (5th Cir. 2021). There, the plaintiffs, utilizing NP LaMarre, the same expert as Plaintiffs are using in this case, argued that the medication administration and the MARs were deficient, very similar to what is argued here. The Court held, "To the extent the missed doses or untimely administration of medications evidenced on the MARs reflect human error or poor record keeping, they do not amount to constitutional violations." This is evidence that Plaintiffs' experts are judging LSP by an invalid standard.

[83] Day 2, 6/7/22, p. 100.

[84] JX16.0138.

[85] JX16.0136.

return again noted the recommendation that he follow up for high blood pressure; a Category I appointment (the quickest available) was scheduled.[86] The trip return also states:

> Offender told MD at UMCNO that he misses meds in his cell because he is out of his cell during med pass – offender is KOP and not in a cell and is not taking meds as prescribed. Discontinuing KOP[87]

Patient #16 refused to be admitted to the nursing unit at that time.[88] On 10/18/19, he was seen in Clinic to follow up for hypertension, dysthymia and drug-seeking behavior. The note indicates that, "Pt told the ER doctor he was missing pill call but Pt was KOP." His high blood pressure was noted, along with the comment that he did not take his medication that day. The assessment included a question about the patient's compliance with medications.[89]

41.     On 11/4/19, Patient #16 was in the clinic for a blood pressure check. The nurse indicated that she educated the patient on the need to take medications consistently. He was instructed that if his blood pressure remained high, he could suffer a stroke.[90] LSP also placed the patient on a low sodium diet.[91] On 11/20/19 and 12/19/19, he was seen to follow up for his high blood pressure.[92]

42.     Patient #16 was also using illicit drugs. On 6/30/20 and 02/21/21, he admitted using Mojo.[93] When the patient died on 3/13/21, he was found with a "wick"' in his sock with a blackened burn hole.[94]

---

[86] JX16.0102.
[87] JX16.0102. "KOP," or "keep on person," indicates that the patient keeps his medication with him and self-administers the medication.
[88] JX16.0102. NP LaMarre agreed that putting the patient in the nursing unit was the right thing to do, although he refused. Tr. Day 2, 6.7.22, p. 233.
[89] JX16.0101.
[90] JX16.0097. NP LaMarre agreed that this education note was very good. Tr. Day 2, 6.7.22, p. 234-35.
[91] JX16.0086. NP LaMarre agreed that placing the patient on a low sodium diet was a good thing. Tr. Day 2, 6.7.22, p. 235.
[92] JX16.0085 & 0084.
[93] JX16.0059 & 0043. NP LaMarre was unaware that Patient #16 used illicit drugs. Tr. Day 2, 6.7.22, p. 238.
[94] JX16.0041.

43.     LSP identified and attempted to treat Patient #16. Unfortunately, he was a non-compliant patient who also used illicit drugs. LSP's care of Patient #16 complied with the standard of care.[95]

44.     NP LaMarre also testified as to Patient #13, a patient she described as "very medically complex" with diagnoses of HIV, chronic kidney disease, cirrhosis, and a prior heart attack.[96] LaMarre admitted that her initial opinions regarding Patient #13's care were mistaken and inaccurate. The patient indeed did have a urology consult, contrary to her initial opinion.[97] The patient was also treated for pneumonia, contrary to her initial opinion.[98]

45.     The remainder of NP LaMarre's criticisms regarding Patient #13 relate to medications. She criticizes LSP for giving Patient #13 antibiotics to which he was resistant.[99] Dr. Mathis explained that even though the patient demonstrated resistance to antibiotics, there was still a possibility that the antibiotics could work, and if you give an antibiotic long enough, it can still be helpful.[100]

46.     Finally, NP LaMarre opines on Patient #42. She initially criticized of a series of encounters in early 2022. On 1/14/22, the patient made a self-declared emergency ("SDE"), and he was referred to sick call as needed.[101] On 1/18/22, the patient saw a NP through sick call and was prescribed medications for his left-sided pain.[102] On 1/25/22, he made another SDE and was again referred to sick call as necessary.[103] On 1/27/22, he was seen in the physician's clinic. The provider addressed all of his complaints, ordered labs and a chest x-ray, and scheduled a follow up

---

[95] DX35-c.0180.
[96] Tr. Day 2, 6.7.22, p. 110-111.
[97] Tr. Day 2, 6.7.22, pp. 109-110.
[98] Tr. Day 2, 6.7.22, p. 110.
[99] Tr. Day 2, 6.7.22, p.113.
[100] Tr. Day 8 (morning), 6.15.22, p. 108.
[101] JX42.0042.  The new SDE policy took effect beginning on 6/2/22.
[102] JX42.0041.
[103] JX42.0039.

appointment.[104] On 2/3/22, Patient #42 presented to the ATU with altered mental status. NP Park ordered that he remain in the ATU until she got there to see him. NP Park evaluated the patient and ultimately referred him to psychiatry.[105] The patient had three encounters with providers over two weeks.

47.    NP LaMarre criticizes a second set of encounters with Patient #42. On 4/3/20, the patient made a SDE for spitting blood, after he had smoked some Mojo.[106]  The next day, on 4/4/20, he made a second SDE for spitting up blood. The patient was referred to a general medicine clinic follow up.[107] On 4/6/20, he made a SDE with complaints of coughing up blood. He was sent to the ATU.[108] In the ATU, the patient was evaluated and then sent to OLOL for a CT scan and treatment.[109] Upon return from OLOL, the patient was admitted into NU1.[110] There is nothing deliberately indifferent about care to this patient.

48.    Nurse Goehring next opined regarding Patient #20. On 5/14/21, this patient made a SDE for weakness related to his diagnosis of hepatitis C.[111] On 5/26/21, he had an unremarkable ultrasound of his abdomen.[112] He was instructed to follow up as necessary. On 8/3/21, he complained of abdominal pain, and the ultrasound was reviewed.[113] He was again told to follow up as necessary. On 8/31/21, Patient #20 submitted a routine sick call slip stating that his eyes were yellow and that his left side hurt.[114] Under the then-existing sick call policy, he was not seen

---

[104] JX42.0038.
[105] JX42.0048.
[106] JX42.0076.  NP Lamarre ignores the fact that the patient was experiencing an adverse reaction to illicit substances.
[107] JX42.0075.
[108] JX42.0074.
[109] JX42.0071.
[110] JX42.0055.
[111] JX20.0124.
[112] JX20.0045.
[113] JX20.0116.
[114] JX20.0112.

by a provider. Three weeks later, on 9/21/21, Patient #20 submitted a sick call slip and was referred to the ATU.[115] In the ATU, the patient was seen and referred to UMCNO.[116]

49.     Nurse Goehring incorrectly claims that Patient #20 returned from UMCNO on 9/22/21 and that LSP did not follow recommendations or fill medications until 11/2/21.[117] She reinforces her incorrect opinion by reference to eMARs which show that Patient #20 did not receive the medications recommended by the hospital until 11/2/21.[118] The "rest of the story" is that Patient #20 was actually in the hospital at UMCNO between 9/22/21 and 10/31/21.[119] The patient being in the hospital explains why the orders were not filled at LSP prior to 11/2/221. NP LaMarre admits that she did not see the hospital record and that she is wrong.[120]

50.     Nurse Goehring next criticizes the care provided to Patient #22. This patient had a swallow study performed during a hospitalization, which showed that his swallowing was mildly impaired.[121] The discharge paperwork noted: "Diet-Adult Home Diet Type: Return to previous diet."[122] Seven months later, on 1/6/21, Patient #22 choked on a piece of sausage and died.[123] Significantly, the autopsy found that his digestive tract contained "partially digested food consisting of approximately 10 fragments of partially masticated hot dog/sausage (measuring up to 6.5 cm in length by up to 2.5 cm in diameter)."[124] As Dr. McMunn testified, there was no breach of the standard of care; the patient just choked.[125]

---

[115] JX20.0115.
[116] JX20.0114.
[117] Tr. Day 6, 6/13/21, p. 18; JX20.0091.
[118] Tr. Day 6, 6.13.22, pp. 18 & 118; JX68.2078-2080.
[119] JX20.0103.
[120] Tr. Day 6, 6/13/21, p. 119.
[121] JX22.0684.
[122] JX22.0686 & 0687.
[123] JX22.0547.
[124] JX22.0536.
[125] Tr. Day 8 (afternoon), 6.15.22, p. 66.

51.     Finally, Nurse Goehring discusses Patient #50. She admits that Patient #50 was a challenging patient with many refusals, including refusals for wound care.[126] In fact, there were so many refusals that LSP considered getting the warden involved to take his case to the ethics committee and potentially have the patient committed to force care on him.[127] Patient #50 was a mental health patient with a diagnosis of schizophrenia.[128] Dr. Mathis concluded that not only was there no breach of the standard of care, but LSP actually exceeded the standard of care.[129]

## C.     **Medication Management Meets Minimum Standards**

52.     The Liability Ruling did not explicitly find that medication management was substandard. Nevertheless, much of Plaintiffs' case focused on medication management.

53.     Plaintiffs' experts made serious errors in attempting to find medication management errors. For instance, NP LaMarre alleges that there was "falsification" of eMARs for Patient #13.[130] The eMARs were completed showing medications administered to the patient. The only "error" was that the patient was still listed as being in his usual housing area after he had been transferred to the nursing unit.[131] NP LaMarre had to admit that there was no "falsification" of a record as to Patient #13.[132] This was a simple matter that was readily apparent by a reasonable view of the records.

---

[126] Tr. Day 6, 6/13/22, p. 122.
[127] Tr. Day 6, 6/13/22, p. 43.
[128] JX50.0181.
[129] DX35-b.073.
[130] Tr. Day 2, 6.7.22, pp. 244-245.
[131] Tr. Day 2, 6.7.22, p. 244.
[132] Tr. Day 2, 6.7.22, p. 245.  The question was, "This is not a falsified record, is it?"  Her answer was, "Not that I know of."

54.     As discussed in Paragraph 60 above, Nurse Goehring claims that LSP failed to administer medications to Patient #20 for three weeks after he returned from the hospital.[133] After being shown other records, Nurse Goehring admitted that she was "wrong."[134]

55.     NP LaMarre also applied an incorrect standard for judging errors in medication management records.  NP LaMarre testified as an expert witness in the *Dockery v. Hall* case arising out of Mississippi.[135] In considering NP LaMarre's testimony, the court in *Dockery* held:

> to the extent that the missed doses and untimely administration of medications evidenced on the MARs reflect human error or poor recordkeeping they do not amount to constitutional violations.[136]

Even after the Court in *Dockery* rejected NP LaMarre's opinion as to medication management, she did not change the manner in which she assessed medication management.[137]

56.     This case is similar to *Dockery*. To the extent that the eMARs reflect human error or poor recordkeeping, these potential errors do not amount to constitutional violations, particularly when the Court did not explicitly find that medication management was constitutionality deficient in the Liability Ruling.

**D.      Allegations of Punitive and Unprofessional Attitudes Are Without Merit**

57.     Plaintiffs' allegations of punitive and unprofessional attitudes are another issue not addressed in the Liability Ruling. Nevertheless, the evidence refutes Plaintiffs' allegations that healthcare employees at LSP exhibit punitive and unprofessional attitudes.

58.     As noted in the Liability Ruling, LSP was no longer enforcing a malingering policy, even as of 2016. LSP has since revoked the malingering policy altogether.[138] NP LaMarre testified

---

[133] Tr. Day 6, 6.13.22, pp. 18 & 118; JX68.2078-2080.
[134] Tr. Day 6, 6/13/21, p. 119.
[135] *Dockery v. Hall*, 443 F.Supp.3d 726 (S.D. Miss. 2019)
[136] *Dockery*, 443 F.Supp.3d at 740.
[137] Tr. Day 2, 6.7.22, p. 246.  (Q: "Since this court rejected your testimony, have you changed your standard of review any?" A: "No.")
[138] Tr. Day 6, 6.13.22, p. 110.

on direct examination that the medical records were "replete with documentation that inmates are malingerers."[139] The medical charts refute her testimony. There is only one record which notes malingering, and that note was made by the contract psychiatrist who is not an LSP employee.[140]

59.     Many records and encounters bely plaintiffs' contentions. For instance, Patient #16 was a patient who was noncompliant with his blood pressure medications. On 11/4/19, LSP prepared a record which educated the patient as to the dangers of his high blood pressure and failure to take his medications.[141] NP LaMarre admits that there was nothing "punitive" about that record.[142]

60.     In addition, Patient #13 returned from a visit to the cardiologist with the recommendation to return as needed. The Trip Office nurse sent an email to the specialist which stated that the specialist:

> placed the offender as PRN which surprised myself and Dr. Lavespere. I know he noted for the PCP to titrate his meds and monitor him but we just want to make sure that Dr. Helmcke does NOT want to see offender again. Do you mind checking with him?[143]

The specialist replied that he wanted to see Patient #13 in six months. NP LaMarre and Nurse Goehring admitted that this was good proactive care by LSP for the patient.[144]

61.     Patient #1 was undergoing a complicated regimen of radiation and chemotherapy. On 11/23/20, Patient #1's infusion treatment at UMCNO took too long and the patient was unable

---

[139] Tr. Day 2, 6.7.22, p. 186.
[140] Tr. Day 2, 6.7.22, p. 247; JX14.0092.
[141] JX16.0097.
[142] Tr. Day 2, 6.7.22, p. 234-35.
[143] JX13.1015.
[144] Tr. Day 2, 6.7.22, pp. 248-249; Tr. Day 6, 6.13.22, p. 112. This record prevented Patient #13 from being "lost to care."

to make it to Mary Bird Perkins for his radiation treatment. LSP nurses called and arranged for a new appointment for radiation.[145] This is good professional care by LSP.[146]

62. Patient #30 was diagnosed with cancer but refused to undergo the radiation and chemotherapy that the doctors' recommended. LSP had Patient #30 legally committed to get him the care he needed.[147]

63. During the site visit, Dr. Vassallo observed an excellent encounter between NP Jeremy Dedeaux and a patient with diabetes who was noncompliant with his medications. NP Dedeaux educated the patient about why he needed to take his medications. NP Dedeaux spent a lot of time with the patient explaining to him the seriousness of his condition. NP Dedeaux explained to the patient some of the consequences of noncompliance and connected with the patient in a very understandable way. Dr. Vassallo concluded that NP Dedeaux was "very compassionate" with the patient.[148]

64. At least one inmate complemented the healthcare received at LSP, although Plaintiffs' experts did not report the positive statements in the expert report.[149]

65. Finally, Dr. Vassallo testified that that she believed that the LSP providers "are fundamentally good in their wish to do the right thing."[150]

**E.** **Clinical Care at LSP Does Not Violate any Constitutional Standards.**

66. With the new sick call process in place and the addition of the new medical providers, as confirmed by credible chart reviews by Dr. Mathis and Dr. McMunn, there is no material evidence that clinical care is constitutionally deficient.

---

[145] JX01.0581.
[146] Tr. Day 6, 6.13.22, pp. 1.13
[147] JX30.0001.
[148] Tr. Day 3, 6.8.22, pp. 94-95.
[149] Tr. Day 2, 6.7.22, p. 248.
[150] Tr. Day 3, 6.8.22, p. 96.

# V. SPECIALITY CARE

## A. Issues Identified in the Liability Ruling Have Been Remedied

67.    In the Liability Ruling the Court found that:

> inmates at LSP experience unnecessary and harmful delays in the
> assessment for and receiving of specialty medical care; harmful
> failure to follow specialty care recommendation; and failure to
> coordinate care. Referrals of patients for specialty care is untimely.
> There are systematic and recurring failures by LSP providers to
> follow-up on specialty care recommendations. There are repeated
> breakdowns in communication between the specialty care providers
> and the LSP medical providers. In sum, the timeliness of referrals to
> specialists, and the coordination of care between specialists and LSP
> physicians, is seriously flawed and constitutionally inadequate.[151]

68.    There is no material evidence that referrals are untimely, that recommendations for
specialty care are overlooked or that recommendations by specialists are not being followed. In
short, LSP's system of providing specialty care is working.

69.    LSP provides specialty care to patients through three means: (i) on-site specialty
clinics where specialists come to LSP, (ii) telemedicine visits with specialists, and (iii) off-site
trips to specialists.[152]

70.    From 2016 to today, LSP has increased the number of on-site specialty clinics to
include cardiology, urology, infectious disease, and dietary.[153]

71.    From 2016 to today, LSP has increased the number of specialists available via
telemedicine to include seven additional specialties: neurology, infectious disease, hepatitis, ENT,
hematology and oncology, dermatology, endocrinology, and GI.[154]

72.    The process of arranging trips and follow up from specialty care using Eceptionist
has not changed. Plaintiffs' specialty care expert testified that he has no problem with the manner

---

[151] R. Doc. 594, ¶ 42.
[152] DX35-c.0031.
[153] Tr. Day 4, 6.9.22, pp. 163-164.
[154] Tr. Day 4, 6.9.22, p. 164.

in which specialty care appointments are scheduled.[155] Further, the Eceptionist system along with relationships developed over time[156] has created a mature, smoothly operating system. DOC headquarters never denies a request for specialty care.[157]

73.    LSP had more specialty appointments in 2021 than in 2015 and 2016.[158] The number of specialty appointments at UMCNO increased from approximately 2,600 in 2016 to approximately 3,500 in 2021.[159] The increase in specialty care is confirmed by Plaintiffs' own expert. Plaintiffs' expert report in 2016 found an average of 5,923 specialty appointments per year in 2014 and 2015, of which 2,469 were with UMCNO.[160] Plaintiffs' experts now found that there were 10,150 referrals in 2019 and 9,905 referrals in 2021 (excluding 2020 as impacted by COVID).[161] With the decrease in census at LSP, more specialty care is being provided to a smaller number of patients.

74.    There is no delay in setting up specialty care for patients at LSP.[162]

75.    Dr. Morrison testified that he treats LSP patients in the same manner as patients from the civilian population and that what he sees with LSP patients is similar to what he sees with non-incarcerated patients.[163]

76.    LSP has installed monitors in the Ash dorms to alert inmates to appointments.[164] Previously, inmates had to review a paper print out to determine if he had an appointment. The video monitors provide easy access for inmates to stay aware of their medical appointments.

---

[155] Tr. Day 4, 6.9.22, p. 166.
[156] Tr. Day 9, 6.16.22, pp. 104-105.
[157] Tr., Day 9, 6.16.22, p. 102.
[158] Tr. Day 9, 6.16.22, pp. 64 & 154.
[159] Tr. Day 9, 6.16.22, p. 110.
[160] Plaintiffs' Liability Trial Expert Report, p. 74 (stating that there were 11,846 specialty appointments from 2014-2015, 4937 of which were at UMCNO).
[161] PX01-a.0083.
[162] Day 9, 6.16.22, p. 101.
[163] Tr. Day 9, 6.16.22, p. 22.
[164] Tr. Day 7, 6.14.22, pp. 191-192; Tr. Day 10, 6.17.22, pp. 155-156.

77.     LSP does not have as many missed appointments with specialists as it did in 2016.[165]

## B.     UMCNO Was Unable to Provide Care for LSP Due to COVID and Hurricanes During the Relevant Period of Time

78.     University Medical Center in New Orleans ("UMCNO") is the largest provider of off-site hospital and specialty services for LSP patients.[166]

79.     At the beginning of COVID in March 2020, New Orleans had the highest incidence of COVID per capita in the world.[167] On March 21, 2020, the Louisiana Department of Health ("LDH") issued a Notice #2020-COVID19-ALL-07 that directed that "any and all medical and surgical procedures <u>SHALL BE postponed until further notice</u>," subject to certain exceptions.[168] Thereafter, LDH loosened its restrictions, although restrictions remained in place through 5/21/21.[169] Even as LDH loosened its restrictions, UMCNO was not able to offer surgeries to the fullest extent authorized by LDH due to limited resources.[170] Initially, UMCNO was overwhelmed with patients and had limited protective equipment for UMCNO personnel.[171] Thereafter, UMCNO lost personnel; some had to take care of family, and some just quit.[172] The shortage of personnel at UMCNO continued through trial.[173]

80.     As things slowly improved and UMCNO had more supplies, UMCNO opened its operating rooms primarily for urgent cases. Because UMCNO could not meet the demand, a committee was formed to decide which surgeries would go forward and which ones would be

---

[165] Tr. Day 4, 6.9.22, pp. 172-173.
[166] Tr. Day. 9, 6.16.22, p. 110.
[167] Tr. Day 9, 6.16.22, pp. 18-19.
[168] DX35-a.034.
[169] DX35-a.033–045.
[170] Tr. Day 9, 6.16.22, pp. 18-19.
[171] Tr. Day 9, 6.16.22, pp. 18-19.
[172] Tr. Day 9, 6.16.22, pp. 18-19.
[173] Tr. Day 9, 6.16.22, pp. 21-22.

delayed.[174] Physicians from different specialties presented cases to the committee to determine the priority of cases. In Dr. Morrison's words:

> if there was a case that I had that was cancer and – but it needed to be done more urgently than somebody else's cancer, you know, patient, which is horrible to say, we would say, well, this one needs to be done and maybe we will try again, you know, next month.[175]

LSP patients were included in the case presentations to the committee.[176]

81.     In 2020, Hurricane Laura hit southwest Louisiana. Patients from southwest Louisiana were evacuated to UMCNO.[177] UMCNO had to shift staff from the surgical department to different areas of the hospital to address the influx of inpatients.[178] Then, in 2021, Hurricane Ida hit the LaPlace area which caused additional staffing problems for UMCNO.[179] Indeed, UMCNO was shut down for a week with loss of power after Hurricane Ida.[180]

82.     As of trial, UMCNO's staffing problems persisted. Due to staffing shortages, UMCNO is routinely able to run only 11 to 13 of its 19 operating rooms.[181]

83.     UMCNO's care for inmates at LSP was impacted because UMCNO providers were unable to see patients face to face and hold clinics.[182]

84.     In late 2021, UMCNO opened an outpatient surgery center. UMCNO began reserving entire days at the surgery center for patients from LSP and other DOC facilities. Since then, UMCNO has increased the frequency of these surgical clinics from one Friday to two Fridays per month. This allows UMCNO to perform more surgeries more quickly to provide care to its

---

[174] Tr. Day 9, 6.16.22, p. 26-28.
[175] Tr. Day 9, 6.16.22, p. 28.
[176] Tr. Day 9, 6.16.22, p. 28.
[177] Tr. Day 9, 6.16.22, p. 19.
[178] Tr. Day 9, 6.16.22, p. 19.
[179] Tr. Day 9, 6.16.22, pp. 19-20.
[180] Tr. Day 9, 6.16.22, p. 20.
[181] Tr. Day 9, 6.16.22, p. 21.
[182] Tr. Day 9, 6.16.22, p. 22.

incarcerated patients, while conserving DOC resources by consolidating transport and security for the surgical patients.[183]

85.     Despite these unforeseen obstacles, LSP has remained diligent in its efforts to provide necessary surgical and specialty services to LSP patients.

## C.     Chart Reviews Show that Specialty Care Meets or Exceeds the Constitutional Minimum

86.     Dr. Mathis and Dr. McMunn reviewed a total of 60 medical charts selected by the Plaintiffs' experts and found no issues with specialty care. After reviewing 38 charts, Dr. Mathis was impressed with specialty care and found that LSP did a good job.[184] Dr. McMunn testified that in the 22 charts that he reviewed, he did not find any systemic pattern of delay.[185]

87.     Dr. Puisis was the only expert identified by the Plaintiffs to discuss specialty care.[186] Dr. Puisis addressed only five charts in the section addressing specialty care.[187] Those charts do not establish any problem with specialty care.

88.     Patient #1 developed metastatic lung cancer and "underwent intensive follow up for radiation therapy, chemotherapy, diagnostic testing, and oncology follow ups" including a "complex arrangement for radiation therapy and chemotherapy."[188] The chart shows that LSP managed the complex arrangement between radiation therapy and chemotherapy. On 11/23/20, the patient did not make it to Mary Bird Perkins for radiation because the infusion at UMCNO took too long. LSP called and spoke with Mary Bird Perkins to arrange for rescheduling.[189] LSP provided extensive and appropriate specialty care to Patient #1.

---

[183] Tr. Day 9, 6.16.22, p. 23.
[184] Tr. Day 7, 6.14.22, p. 240.  Dr. Mathis referenced Patient #13 who received an "amazing" amount of specialty care. No expert for either party was critical of the care provided to Patient #12.
[185] Tr. Day 8 (afternoon), 6.15.22, p. 24.
[186] PX01-a.0004.
[187] PX01-a.0082-0099.
[188] PX01-a.0084 and 0085.
[189] JX01.0581.

89. Patient #2 was 78 years old with a history of hypothyroidism, hypertension and chronic kidney disease (CKD). In February of 2020, a doctor ordered a thyroid ultrasound which showed bilateral cysts. On 3/3/20, an LSP provider noted the findings on the ultrasound and referred the patient to a specialist.[190] The specialty appointment did not occur because of COVID.[191]

90. In Plaintiffs' expert report, Dr. Puisis states that on 4/13/21 an endocrinologist documented that Patient #2 reported a weight loss of 40 pounds over the last six months; the patient's weight at this appointment was 140 pounds.[192] The actual records show that the endocrinologist was incorrect. On 9/30/20, approximately seven months prior to the 4/13/21 note by the endocrinologist, LSP recorded Patient #2's weight as 144 pounds.[193] Then, on 11/25/20, approximately five months prior to the 4/13/21 note, LSP recoded Patient #2's weight as 150 pounds.[194] Thus, there was no 40 pound weight loss over the six months prior to 4/13/21. Dr. Puisis did not testify regarding Patient #2 at trial, and there is nothing to indicate that specialty care provided to Patient #2 was substandard.

91. Patient #4's medical history included seizure disorder, hypertension, renal cancer, and severe interstitial lung disease. UMCNO's records confirm that he "was lost to follow up during the pandemic and re-emerged in December 2020."[195] This is simply a case that was impacted by COVID, like many others in the state.

92. Patient #5 was the subject of much testimony. His medical history included coronary artery disease, hypertension, gastrointestinal bleeding, and aortic stenosis. The chart

---

[190] JX02.0063.
[191] PX1-a.0089.
[192] PX01-a.0089; JX02.0052.
[193] JX02.0097.
[194] JX02.0071.
[195] JX04.00190.

shows that LSP constantly secured specialty care for Patient #5, notwithstanding his persistent refusals. To the extent that an error was made in this chart, the error was attributable to an outside, board certified cardiologist, not LSP.

93.     Patient #5 constantly missed important appointments and diagnostic tests, to wit:

| Bates | Date | Comment |
|---|---|---|
| JX05.0502 | 08/20/19 | No show for Clinic A, follow up for aortic stenosis |
| JX05.0489 | 09/19/19 | Refused an echo |
| JX05.0482 & 0485 | 10/16/19 | Refused an echo |
| JX05.0472 & 0479 | 11/07/19 | Refused an echo |
| JX05.0471 & 0470 | 11/26/19 | AMA[196], cardiology telemed |
| JX05.0352 | 01/07/20 | Rescheduled cardiology telemed |
| JX05.0350 & 0349 | 01/14/20 | Refused cardiology telemed |
| JX05.0348 & 0347 | 02/11/20 | AMA, minor surgery (for an hernia) |
| JX05.0345 | 03/10/20 | No show, minor surgery |
| JX05.0344 & 0343 | 03/23/20 | AMA, General Medicine clinic, follow up for multiple complaints including aortic stenosis |
| JX05.0217 & 0216 | 01/26/21 | Refused diagnostic testing |
| JX05.0211 | 02/23/21 | No show for ADA appointment |
| JX05.0022 | 02/24/21 | Declined the COVID vaccine |
| JX05.0201 | 04/10/21 | No show for cardiology |
| JX05.0023 | 04/30/21 | Declined the COVID vaccine |
| JX05.0200 | 05/16/21 | Refused General Medicine clinic follow up |
| JX05.0199 & 0198 | 05/22/21 | AMA, cardiology |

94.     On 9/25/20, Patient #5 had a stent placed while at OLOL.[197] His heart ejection rate was found to be 40-45% at that time.[198] On 10/2/20, he was taken to OLOL and the stent was redone.[199] The replacement of the stent was not attributable to any care provided by LSP.[200] The echo from the second OLOL visit revealed a heart ejection rate of 30-35%.[201] On 10/9/20, he was

---

[196] AMA, or "Against Medical Advice," is a refusal in which the patient may suffer significant consequences for refusing care.
[197] JX05.0245.
[198] JX05.0238.  A normal heart ejection rate is approximately 60%.
[199] JX05.0238.
[200] Day 4, 6.9.22, p. 188.
[201] JX05.0239.

discharged from OLOL.[202] Recommendations included a dobutamine stress echo and follow up with a cardiologist.[203] Two days later, on 10/11/20, Dr. Lavespere referred Patient #5 to Dr. Colon, LSP's outside cardiologist who is board certified and credentialed through Lallie Kemp Hospital.[204] On 10/17/20, Dr. Colon saw Patient #5; he ordered a regular echo, not a dobutamine stress echo as recommended by OLOL.[205] On 1/30/21, Dr. Colon saw Patient #5 again; Dr. Colon noted both the September and the October events on his note.[206] On 4/21/21, the echo ordered by Dr. Colon showed a heart ejection rate of 15-20%.[207] Dr. Colon electronically and physically signed the report from the echo showing the reduced ejection rate of 15-20%. On 6/9/21, Dr. Colon saw the patient and noted the prior heart ejection rate of 40-45%.[208] Inexplicably, he failed to note the heart ejection rate on the echo that he ordered and signed for both electronically and physically. On 8/21/21, Dr. Colon saw the patient and again noted a heart ejection rate of 40-45%.[209] On 10/11/21, the patient had a heart attack and died.[210]

95.     The chart for Patient #5 does not show any problem with specialty care. The chart may show a difference in opinions between two cardiologists.

96.     Dr. Puisis finally addresses Patient #7. Patient #7 had tests which revealed blood in his stool.[211] These results call for a colonoscopy. According to Dr. Toce, the patient declined the colonoscopy.[212] The patient had previously declined a colonoscopy.[213] LSP did not secure a

---

[202] JX05.0238.
[203] JX05.0238 & 0239.
[204] JX05.0256; Tr. Day 4, 6.9.22, p. 189.
[205] JX05.0252.
[206] JX05.0221.
[207] JX05.0113.
[208] JX05.0164.
[209] JX05.0158.
[210] JX05.0130.
[211] JX07.0030, 0026 & 0025.
[212] JX71-a.0142.
[213] Tr. Day 4, 6.9.22, p. 220.

written refusal. Dr. Mathis agrees that failure to document the refusal was a violation of the standard of care.[214] The patient thereafter died of colon cancer. While this case is unfortunate, it is not an indication of a systematic problem with specialty care at LSP.

97.     Likely recognizing the lack of any significant problem with specialty care in the charts identified in his expert report, Dr. Puisis addressed two additional charts not in the specialty care section of Plaintiffs' expert report. Neither of these cases are persuasive.

98.     Patient #48 was diagnosed with supraventricular tachycardia ("SVT"), a condition which is usually self-limiting or benign.[215] On 5/21/21, he had an EKG which was normal.[216] On 8/24/21, he complained of his heart racing; the provider referred him to cardiology.[217] On 9/17/21, the patient complained of shortness of breath and chest pain.[218] He was sent to Lane Regional Medical Center.[219] Lane performed a heart catheterization that showed normal coronary arteries; however, the patient had three episodes of SVT during the procedure.[220] He was placed on appropriate medications.[221] On 1/1/22, he was again referred to a cardiologist.[222] Dr. Mathis concludes that there was no breach of the standard of care for a self-limiting or benign condition of SVT.[223]

99.     Patient #10 experienced a number of episodes of altered mental status. He was not discussed in Dr. Puisis' section on specialty care. There are a total of six instances where illicit drugs are noted or suspected. He admitted to smoking Mojo, a synthetic marijuana, three times.[224]

---

[214] DX35-c.0189.
[215] DX35-c.0194. Dr. Puisis agreed that SVT is generally benign.  Tr. Day 4, 6.9.22, p. 86.
[216] DX35-c.0194.
[217] JX48.0116.
[218] JX48.0111.
[219] JX48.0110.
[220] DX35-c.0194–195; JX48.0094.
[221] DX35-c.0195.
[222] JX48.0049.
[223] DX35-c.0194–0196.
[224] JX10.0176 (2/20/20); JX10.0149 (8/4/20) and JX10.0114 (1/23/21).

One time, he was found with physical evidence of illicit drug use.[225] Two other times, he was reported as possibly intoxicated.[226] Dr. Puisis testified that he thought the patient admitted to smoking mojo once.[227] This testimony shows either obvious bias or lack of knowledge since he did not include this chart in his specialty care section.[228]

100.     Dr. Puisis asserts that Patient #10 had high blood pressure that was not addressed. That assertion is incorrect. On 8/25/19, Patient #10's blood pressure was noted as elevated, and blood pressure medications were prescribed.[229] His hypertension was noted as controlled as of 1/22/20.[230] The evidence shows that Patient #10's blood pressure was generally controlled except when he presented with altered mental status:

| Date | Blood pressure | Citation and Comment |
|---|---|---|
| 09/19/19 | 130/90 | JX10.0187 |
| 01/22/20 | 127/90 | JX10.0180 |
| 02/20/20 | 146/94 144/90 | JX10.0176 (ambulance run - smoking a dipstick) |
| 02/20/20 | 193/103 181/101 188/100 | JX10.0172 (ATU – smoking a dipstick) |
| 03/23/20 | 131/86 | JX10.0163 |
| 06/12/20 | 131/86 121/85 | JX10.0163 (possible intoxication) |
| 06/12/20 | 85/53 122/80 | JX10.0164 (ATU – possible intoxication) |
| 07/14/20 | 105/69 107/68 | JX10.0154 |
| 07/23/20 | 146/80 111/70 148/95 | JX10.0153 |
| 08/04/20 | 124/72 | JX10.0149 |

---

[225] JX10.0120 & JX10.0111 (He made sick call for burn of his left index finger from smoking a wick and "passing out with wick in hand."

[226] JX10.0163 (6/12/20); JX10.0137 (10/28/20).

[227] Tr. Day 4, 6.9.22, p. 223.

[228] This testimony is consistent with the fact that the Plaintiffs' Expert Report never mentions illicit drug use by any patient, even once.

[229] JX10.0221.  Blood pressure medication consisting of Inderal (Propranolol) and Cozaar (Losartan) continued through March of 2021.  JX68.02763.

[230] JX10.0180.

| 08/25/20 | 128/?? | JX10.0147 |
|---|---|---|
| 09/04/20 | 146/99<br>145/98 | JX10.0144 |
| 10/02/20 | 148/104 | JX10.0141 |
| 10/18/20 | 146/74 | JX10.0137 (ambulance run – possible intoxication) |
| 10/18/20 | 102/68<br>104/76 | JX10.136 (ATU – possible intoxication) |
| 12/09/20 | 155/101<br>162/107<br>158/98 | JX10.0129 (SDE)<br>JX10.0125 (ATU)<br>JX10.0125 (ATU) |
| 01/23/21 | 98/62<br>100/56 | JX10.0114 (ambulance run - smoking a dipstick) |
| 01/23/21 | 71/49<br>83/54<br>178/96 | JX10.0113 (ATU – after smoking a dipstick) |
| 01/25/21 | 137/79 | JX10.0120 (burn on index finger) |
| 03/13/21 | 144/100 | JX10.0105 (ambulance run) |
| 03/13/21 | 187/113 | JX10.106 (ATU – sent to OLOL) |

On 03/13/21, Patient #10 suffered a stroke. He presented to the ATU at 06:43 and left for OLOL at 07:31.[231] This was a timely response.[232] LSP's care of this patient met the standard of care.[233]

**D.**     **Specialty Care at LSP Does Not Violate any Constitutional Standards**

101.     The evidence shows that LSP provides timely and appropriate specialty care and that the recommendations of the specialists are being followed. Consistent with the records, Dr. Mathis and Dr. McMunn note no problems with specialty care. Plaintiffs have not proven any constitutional or systematic deficiencies in the delivery of specialty care to patients at LSP.

## VI.     INFIRMARY/IN-PATIENT CARE

**A.**     **There Have Been Significant Improvements in Infirmary/In-Patient Care**

102.     LSP has improved care in the infirmary/in-patient care areas in multiple ways since 2016.

---

[231] JX10.0106.
[232] Tr. Day 3, 6.8.22, p. 134 (Dr. Vassallo agrees that a response to stroke symptoms within two hours was timely.)
[233] DX35-b.099.

103.     LSP has improved the ratio of nurses to patients in Nursing Units NU1 and NU2. In NU1 (acute care), there is 1 RN for every 10 patients; in NU2 (long-term care), there is 1 RN for every 15 patients.[234] Further, the census in each unit has decreased.

104.     LSP has built a new area with additional beds in NU2. The new area is not operational at this time due to a shortage of nurses.[235]

105.     LSP addressed the issue of patients being in locked rooms by installing a red call light outside the door of the locked rooms.[236] The switch for the patient to activate the red call light is located immediately next to the bed.[237] Paralyzed patients are positioned such that their functioning side is adjacent to the switch for the call light.[238] NP Park, who works in the nursing units, has responded to the call light, and she has seen other nurses respond to the red call light.[239]

106.     NU1 and NU2 are clean and well-maintained.[240]

107.     NP Park rounds on patients in NU1 on Friday and Saturday mornings.[241] She rounds on the patients in NU2 every other Saturday morning.[242]

**B.**     **LSP's Inmate Orderly Program is Improved and Meets the Standard of Care**

108.     LSP continues to use inmate orderlies in the nursing units. There are three to four inmate orderlies on every shift.[243] The orderlies assist patients with activities of daily living[244] such as handing out trays of food, feeding patients that cannot feed themselves, cleaning patients who are incontinent of bladder and bowel, turning patients every two hours to prevent skin

---

[234] Tr. Day 7, 6.14.22, p. 22; Tr. Day 10, 6.17.22, p. 147, 150-151.
[235] Tr. Day 10, 6.17.22, pp. 151-152.
[236] Tr. Day 7, 6.14.22, pp. 21-25; Tr., Day 8, (afternoon), 6.15.22, p. 26;  DX46.173 & 175.
[237] DX46.130.
[238] Tr. Day 7, 6.14.22, p. 24.
[239] Tr. Day 7, 6.14.22, p. 25.
[240] DX35-c-0034–0044.
[241] Tr. Day 7, 6.14.22, pp. 10-11.
[242] Tr. Day 7, 6.14.22, p. 11.
[243] Tr. Day 7, 6.14.22, p. 23.
[244] Tr. Day 7, 6.14.22, pp. 26-28, 110 & 187;  Tr. Day 8 (afternoon), 6.15.22, p. 29 (excluding the inmate orderly working in the physical therapy department.).

breakdown, and bathing patients.[245] The inmate orderlies allow the nurses to do other tasks that are related to nursing care, such as administering medications, performing wound care, performing assessments, including skin care, and taking care of the patients in other ways.[246] Inmate orderlies do not perform wound care, dispense medications, or administer insulin.[247] An inmate confirmed that orderlies do only activities of daily living and not perform medical tasks.[248]

109. Dr. Mathis included a photograph in his expert report showing an inmate orderly assisting a nurse in performing her task.[249] Dr. Mathis testifies, and the photograph supports, that the nurse was performing wound care. The inmate orderly was wearing gloves and a gown and was appropriately trained. The nurse handed the soiled dressings to the inmate orderly to dispose of. The inmate orderly assisted the nurse in positioning the patient as well.[250]

110. Inmate orderlies are supervised by both security staff and the nurses, and the nurses also monitor the orderlies and guide and direct them as-needed.[251]

111. LSP has increased the training for the inmate orderly program. Nurse Jennifer Stickells is in charge of training inmate orderlies.[252] Candidates for the inmate orderly job are screened for disciplinary issues and vetted for eligibility.[253] The training takes place over five days, four of which consist of lectures with handouts.[254] The lectures cover ethics, neglect, abuse, transfer of patients, body mechanics, and communication with patients.[255] The training concludes

---

[245] Tr. Day 7, 6.14.22, pp. 26-27 & 187.
[246] Tr. Day 7, 6.14.22, p. 28.
[247] Tr. Day 7, 6.14.22, p. 29-30 & 110.
[248] PX64-o, p. 20.
[249] DX35-c, p. 50.
[250] Tr. Day 7, 6.14.22, pp. 188-190.
[251] Tr. Day 7, 6.14.22, p. 29; Tr. Day 10, 6.17.22, p. 29.
[252] Tr. Day 10, 6.17.22, p. 20.
[253] Tr. Day 10, 6.17.22, p. 29.
[254] DX47.
[255] Tr. Day 10, 6.17.22 p. 23.

with one day of hands-on training.[256] NP Park observed the hands on training recently. She

described how RN Stickells brought a group into the nursing unit and worked with them all day.[257]

There is a check off list as the orderlies complete the hands-on training.[258] At the end of the

training, the inmate orderly is required to sign a confidentiality form.[259]

112.    When NP Park works as a nurse in the nursing units, she monitors the inmate

orderlies and believes that they do their job very well. In fact, she testified that "[i]f it was my

family on the streets or even myself and they were my orderlies, I'd be very happy."[260] RN Stickells

makes rounds to ensure that the inmate orderlies are following their training.[261]

113.    The parties jointly submitted portions of the depositions of two inmate orderlies:

Bruce Hines and Donald Murray. Hines had been an inmate orderly for three years and one month.

He began as an inmate orderly with the recommendation of NP Park who knew him from his time

at Elayne Hunt, where he worked as an inmate orderly prior to  his transfer to LSP.[262] He described

attending the week long training with classroom and hands on training led by RN Stickells exactly

as testified to by RN Stickells.[263] At the conclusion of the training, Hines had certificates for the

Offender Healthcare Orderly Training Program, CPR, and Basic Life Support.[264] Hines, who had

prior experience working as an inmate orderly, found that training useful and informative.[265]

114.    Hines, who works in NU1, described his typical day as follows:

> Well, when I start making my rounds, first thing I do when I come
> in, I make my rounds and some of them be asleep, some be awoke.
> I make me a pot of coffee and I drink me a pot of coffee. I sit down

---

[256] Tr. Day 10, 6.17.22, p. 23-24.
[257] Tr. Day 7, 6.14.22, p. 27.
[258] Tr. Day 10, 6.17.22, p. 28; DX47.
[259] Day 10, 6.17.22, p. 28; JX75-b.0006.
[260] Tr. Day 7, 6.14.22, p. 28.
[261] Tr. Day 10, 6.17.22, p. 30.
[262] JX75-a, pp. 7 & 35.
[263] JX75-a, pp. 8-10 & 25-26 (He also testified that he took a test at the end of the training.).
[264] JX75-b.
[265] JX75-a, pp. 40-41.

and wait on breakfast to come. Once breakfast come, I feed them. Once I feed them and get that part out of the way, then I make sure the ones that can't shower themselves or bathe themselves, I start my day off with that first. Once I do that duty, then I go to cleaning up and making beds, and then I clean up the wardroom. And then I go and see what it is that the nurses need, any kind of assistance done as well.[266]

Later, Hines makes rounds every 30 minutes to see if any patient is wet. He is "most definitely" trying to help the patients because "they are one of us. They are one of me. So I'm going to make sure they are taken care of" and "make them comfortable all kinds of ways."[267] He sits and talks to the patients to make them laugh, especially the ones with strokes.[268] He treats the patients with respect and courtesy.[269] He was clear that nurses change dressings and take vital signs.[270]

115.    Hines enjoys his job as an inmate orderly because he enjoys helping the patients.[271] In his own words, he "make[s] a difference."[272] Orderlies who do not do their job like Hines get replaced.[273]

116.    Murray has been an inmate orderly at LSP for 21 years.[274] Murray lives in Ash 2 and helps out on the nursing wards.[275] He also assists in the training of healthcare orderlies.[276] He described how the inmates are vetted and selected to be orderlies.[277] He also described the training conducted by RN Stickells similar to what she described.[278] He described how orderlies clean patients, clean the ward, and keep the patients company.[279] Like Hines, he treats the patients with

---

[266] JX75-a, p. 11.
[267] JX75-a, p. 15.
[268] JX75-a, p. 15.
[269] JX75-a, p. 20.
[270] JX75-a, pp. 18-19.
[271] JX75-a, p. 19.
[272] JX75-a, p. 29.
[273] JX75-a, p. 356.
[274] JX76-a, p. 5.
[275] JX76-a, pp. 5-6.
[276] JX76-a, p. 6.
[277] JX76-a, p. 9.
[278] JX76-a, p. 7.
[279] JX76-a, pp. 7-8.

respect.[280] Murray has a number of certificates going back for years in his file.[281] If Murray sees an orderly who is not doing a good job, he speaks to security or the nurses and ensures that the issue is properly addressed.[282]

117.     An inmate, Jean Paul Creppel, confirmed that the inmate orderlies do a good job. Creppel, who is a paraplegic, testified that inmate orderlies helped him with activities of daily living such as eating and drinking, and he had no issues with how the orderlies did their job of taking care of him. In fact, he testified that the inmate orderlies had "kind hearts and did a good job."[283]

118.     Dr. McMunn opined that the inmate orderly program met the standard of care, even though it would not comply with NCCHC standards.[284] Dr. Mathis noted that California utilizes inmate orderlies in a similar manner as LSP.[285] Dr. Mathis testified that the inmate orderlies were integral to care in the nursing units and in the Ash medical dorms because the orderlies helped patients with activities of daily living that the patients cannot do by themselves.[286] Dr. Mathis concluded that the inmate orderly program is a good program that he would like to see continue.[287]

C.     **The Medical Dorms at LSP Do Not Violate any Constitutional Standards**

119.     LSP has four medical dorms, now Ash 1 through Ash 4. The medical dorms provide the opportunity for patients to try to live independently, away from the nursing units, to give the patients a sense of normalcy.[288] Patients in Ash 1 and Ash 2 generally need assistance with the

---

[280] JX76-a, p. 11.
[281] JX76-b.
[282] JX76-a, p. 10.
[283] Tr. Day 3, 6.8.22, p. 245.
[284] Tr. Day 8 (afternoon), 6.15.22, p. 28; DX 35-c-0216.
[285] DX35-c-0216.
[286] Tr. Day 7, 6.14.22, p. 187.
[287] Tr. Day 7, 6.14.22, p. 250.
[288] Tr. Day 10, 6.17.22, p. 153.

activities of daily living.[289] Ash 3 and Ash 4 are handicap accessible and are primarily for ADA patients, such as those with wheelchairs.[290] The conditions in the medical dorms have improved substantially since 2016.

120. Ash 1 and Ash 2 previously contained double bunk beds; all medical dorms are now single bunk beds.[291] The medical dorms are clean.

121. In a substantial and consequential change, all medical dorms are now air-conditioned.[292]

## VII. EMERGENCY CARE/ATU

### A. Issues Identified in the Liability Ruling Have Been Remedied

122. LSP has addressed the staffing concerns in the ATU. Previously, EMTs were the primary provider of care in the ATU. Currently, the ATU is staffed 24/7 by a nurse and an EMT.[293] Further, a NP is onsite from 7:30 am until 4:00 pm Monday through Friday, and 24 hours a day from Friday night through Monday morning.[294] The only time a NP is not present in the ATU is on weekday evenings. However, a NP is on call and stationed on the prison grounds to address any ATU patients in the evenings Monday through Thursday.[295]

123. The improved staffing in the ATU has resulted in markedly improved care in the ATU. Indeed, Dr. Vassallo had no criticisms of the care she observed in the ATU during her three-day site visit.[296]

---

[289] Tr. Day 10, 6.17.22, p. 153.
[290] Tr. Day 10, 6.17.22, p. 154.
[291] Tr. Day 7, 6.14.22, p. 191.
[292] Tr. Day 10, 6.17.22, p. 155.
[293] Tr. Day 7, 6.14.22, p. 11-12; Tr. Day 10, 6.17.22, p. 139-141.
[294] Tr. Day 7, 6.14.22, pp. 12-23; Tr. Day 10, 6.17.22, pp. 139-140. Nurse Park explained that she could also be in the nursing unit or doing paperwork, both of which are seconds away from the ATU. Tr. Day 7, 6.14.22, p. 12.
[295] Tr. Day 7, 6.14.22, p. 13; Tr. Day 10, 6.17.22, p. 139-140.
[296] Tr. Day 3, 6.8.14, p. 193.

**B.** **The Reviews by Dr. Mathis and Dr. McMunn are More Credible and are Entitled to More Weight than the Review by Dr. Vassallo**

124. Dr. Mathis and Dr. McMunn both visited the ATU during the site visit and reviewed the same 60 charts selected by the Plaintiffs. They found that the care in the ATU met the standard of care.

125. Important to the finding that the ATU met the standard of care is the acknowledgement of what the ATU is – it is an assessment and triage unit, not an emergency room.[297] The ATU is not attached to a hospital as is an emergency room. ATU staff cannot wheel sick patients to the operating room or admit patients directly to the hospital. Unlike an emergency room, the ATU does not have a doctor or several doctors present 24-hours daily. The ATU does not have RNs, med techs, and laboratory facilities constantly available. The ATU does not have CT scans immediately available. The ATU does not have specialty doctors who can come treat patients as they could in an emergency room[298]

126. Correctional medicine is a field of practice different from emergency medicine. Comparisons with emergency room physicians who treat patients on the street (in non-correctional settings) are not appropriate or proper comparisons.[299] Opinions by experts who have never practiced in corrections set a standard of care that inherently exceeds the scope of practice in corrections.[300] A provider experienced in correctional medicine knows to take into account and is cognizant of things like security, inmate behavior, patients who live in widespread dormitory situations, transportation to and from referral hospitals, limitation of a prison formulary, pill call lines, limitations of delivering long-term care, and more.[301] Dr. Mathis succinctly testified that

---

[297] DX35-c-.0076.
[298] DX35-c-0076-0077; Tr. Day 7, 6.14.22, p. 197.
[299] DX35-c-0213.
[300] DX35-c-0213. While Dr. Mathis acknowledges that Dr. Vassallo is highly qualified emergency room physician, she inappropriately compares the ATU to an emergency room. Tr. Day 7, 6.14.22, p. 197.
[301] DX35-c-0213; Tr. Day 7, 6.14.22, pp. 247-248.

"once you walk-in that gate, everything changes."[302] Judging the ATU by the same standards as an emergency room is improper.

127. Dr. Vassallo was designated as Plaintiffs' expert witness on emergency care. However, Dr. Vassallo has never worked in corrections. In conducting the chart reviews, Dr. Vassallo applied a standard that is consistent with her practice in a Level I trauma center in New York City, not a standard applicable to primary care providers at LSP.

128. This situation is similar to the one before the Court in the *Gumns v. Edwards*[303] matter where these same plaintiffs filed for an injunction against LSP regarding LSP's COVID policies, specifically addressing the use of Camp J as an isolation facility. Dr. Vassallo testified in that case that the medical care being provided at Camp J fell short of the "community standard." She testified that Camp J's staff failed to properly manage Otto Barrera's oxygen saturation and recognize indicators that he needed hospitalization five days before he was transferred to OLOL. She further testified generally as to certain protocols at Camp J she considered to be "medically unreasonable." The Court nevertheless ruled that LSP was not deliberately indifferent and denied the injunction notwithstanding Dr. Vassallo's objections.[304]

129. Just as in *Gumns*, Dr. Vassallo has opined in this case that patients should have been transported to the hospital sooner and that LSP's protocols and actions are medically unreasonable. Respectfully, Dr. Vassallo's opinions are based upon her experience in a Level I trauma center in New York City, and she fails to consider the standard of care for a primary provider in a prison. Accordingly, her opinions are entitled to less weight.

---

[302] Tr. Day 7, 6.14.22, p. 246.
[303] *Gumns v. Edwards*, No. 20-231 (M. D. La) (Judge Dick presiding).
[304] *Gumns*, R. Doc. 57, pp. 22-23.

## C. Dr. Vassallo's Chart Reviews Show Either No Error or Merely a Difference in Medical Opinion.

130. Detailed chart reviews show no evidence of deliberate indifference.

131. Patient #54 presented to the ATU with chest pain on 5/1/21 at 6:20 p.m..[305] An EKG was ordered, and according to Dr. Vassallo, the EKG showed an inferior myocardial infarction. According to Dr. Vassallo, the patient needed to go to the hospital at that time.[306] Instead, LSP sent Patient #54 to NU1 for monitoring until 1:23 am, seven hours later, when he was sent to OLOL ER.[307]

132. Dr. Vassallo ignored substantial critical parts of the record of Patient #54, making her opinion unreliable and incorrect. On 6/22/20, Patient #54 was discharged from Lane Regional Medical Center with a diagnosis of angina.[308] Dr. Mathis explained that angina is pain in the heart or chest.[309] On 9/5/20, Patient #54 saw a cardiologist and reported that he was still having chest tightness, shortness of breath, and angina.[310] On 12/5/20, he saw a cardiologist again and noted that he was having chest pain a few times a week, which was relieved by nitroglycerin.[311] On 12/20/20, Patient #54 had chest pain for two hours, even though he had taken three nitroglycerin tablets.[312] Dr. Mathis testified that the patient had chronic, stable angina at this point.[313] On 1/16/21, Patient #54 saw a cardiologist again. He felt better with no new complaints at that time.[314]

---

[305] JX54.0666.
[306] Tr. Day 3, 6.8.22, p. 74.
[307] Tr. Day 3, 6.8.22, pp. 75-76.
[308] JX54.0796.
[309] Tr. Day 7, 6.14.22, p. 209.
[310] JX54.0739.
[311] JX54.0726; Tr. Day 7, 6.14.22, p. 210-211.
[312] JX54.0716.
[313] Tr. Day 7, 6.17.22, p. 212.
[314] JX54.0715.

133.    On 4/2/21, Patient #54 presented to the ATU with chest pain that was not relieved by nitroglycerin.[315] The NP ordered serial troponin tests. Dr. Mathis explained the reason for ordering serial troponin tests[316] as follows:

> When you've got somebody who has chronic angina, recurrent angina, you want to know if there's actually been any damage to the heart. Troponins are very sensitive to test to determine whether or not there's been any damage to the heart which require more evaluation and treatment.  Serial troponins are done because that can happen over a period of time and it might be done every two to four hours because troponins respond pretty rapidly and gives you a little better idea about what's going on and what may be necessary for intervention.[317]

On 4/2/21, LSP also obtained multiple EKG strips as well.[318] The EKG strips suggested an inferior myocardial infarction, which Dr. Mathis suggests was probably old.[319]

134.    Ten days later, on 4/12/21, Patient #54 saw the cardiologist with chest pain.[320] On 4/24/21, the patient was seen by the cardiologist with chest pain.[321] This patient was being routinely seen by a cardiologist, and this was his second visit to the cardiologist in as many weeks following his visit to the ATU.

135.    In light of the background of ongoing established angina and chest pain, an ambulance was called for Patient #54 on the evening of 5/1/21 for chest pain.[322] He was taken to the ATU.  In the ATU, the provider ordered an EKG, a GI cocktail, and a troponin test.[323] Dr. Mathis testified that the EKG showed waves consistent with myocardial infarction, but that the

---

[315] JX54.0704.
[316] Plaintiffs' Expert Report acknowledges that serial troponin test should be used.  See, PX01-a.108 (Patients with heart problems "require" serial troponin tests.); PX01-a.128 (Patients who present with chest pain and other conditions "should receive serial troponins.").
[317] Tr. Day 7, 6.14.22, pp. 213-214.
[318] JX54.0413–0415.
[319] Tr. Day 7, 6.14.22, p. 214.
[320] JX54.0701.
[321] JX54.0697.
[322] JX54.0666.
[323] JX54.0407.

age was "indeterminant."[324] The troponin test came back negative.[325] Moreover, Patient #54's chest pain improved after the GI cocktail was administered.[326] Based on this information, the provider admitted Patient #54 to NU1 for observation.[327] An EKG at approximately 1:00 showed more prominent findings with a suspected inferior myocardial infarction.[328] Further, the troponin test then came back higher which showed a "little something happening."[329] Based on these results, Dr. Mathis opines that the appropriate response was to send the patient to the ER,[330] which is exactly what happened.[331] Dr. Mathis explained that the decision not to send Patient #54 out prior to that time was an appropriate one

> based on the consultation with the cardiologist for recurrent angina and without evidence of new damage to the heart, the primary care correctional people kept him there until the serial troponins showed a bump.[332]

136. Dr. Mathis' opinion regarding Patient #54 is confirmed by looking at what occurred when the patient arrived at Lane ER that evening. Lane did another EKG which did not show much change from the EKG performed at LSP; they did a heart catheterization which did not find anything; and they returned him to LSP.[333] The medical chart review supports Dr. Mathis' opinion that the LSP care was proper.

---

[324] Tr. Day 7, 6.14.22, pp. 216-217.
[325] JX54.0119; Tr. Day 7, 6.14.22, p. 217.
[326] JX54.0407.
[327] JX54.0407.
[328] Tr. Day 7, 6.14.22, p. 217; JX54.0408.
[329] Tr. Day 7, 6.14.22, p. 217; JX54.0120.
[330] Tr. Day 7, 6.14.22, pp. 217-218.
[331] Tr. Day 7, Tr. 6.14.22, p. 218; JX54.0661.
[332] Tr. Day 7, 6.14.22, p. 218.
[333] Tr. Day 7, 6.14.22, p. 218.

137.    Patient #38 was admitted to the nursing unit to undergo Lovenox bridging[334] to prepare for cataract surgery.[335] After admission to the nursing unit, Patient #38 developed a fever. He was given Tylenol which reduced his fever.[336] The treating provider, Dr. Bunch, believed that the patient had influenza type A. She moved him to an isolation room, gave him Tylenol for any temperature elevation and Amantadine, a medication for type A influenza.[337] His temperature thereafter was essentially normal.[338] A few days later, the patient had a productive cough with blood-tinged sputum.[339] Dr. Mathis explained that the finding of blood-tinged sputum with coughing associated with COPD was not a danger signal.[340] Further, LSP performed labs.[341] Dr. Mathis explained that the labs were nonsignificant.[342]

138.    Dr. Vassallo opined that the patient should have been diagnosed with pneumonia. Dr. Mathis explained that the lab findings and the wheezing noted in the lungs were more consistent with influenza.[343] Indeed, the outside pathologist found that the patient had flu like symptoms for two days prior to his death.[344] Dr. Mathis' opinion is better supported. Regardless, at most, this chart shows a difference of medical opinion.

139.    Patient #36 is another patient where reasonable medical providers disagree.

---

[334] Lovenox bridging is a process by which a patient on Coumadin is transitioned to Lovenox, a shorter acting anti-coagulant drug, so that the patient can undergo surgery. Tr. Day 3, 6.8.22, p. 22.
[335] Dr. Vassallo testified that the surgery was dental and that cataract surgery would not require Lovenox bridging. Tr. Day 3, 6.8.22, p. 152. She was "sure" it was dental surgery because cataracts do not cause bleeding so you would not need to stop the Coumadin. Tr. Day 3, 6.8.22, p. 152-153. She was wrong. JX38.0054.
[336] Tr. Day 7, 6.14.22, p. 153.
[337] JX38.0071; Tr. Day 7, 6.14.22, p. 224.
[338] JX38.0097.
[339] JX38.0086.
[340] Tr. Day 7, 6.14.22, p. 225.
[341] JX38.0025.
[342] Tr. Day 7, 6.14.22, p. 225.
[343] Tr. Day 7, 6.14.22, pp. 225-226.
[344] JX38.0037.

140.    Patient #36's baseline condition as of 1/11/19 included COPD with shortness of breath and gradual worsening of shortness of breath on exertion over the prior 2-3 years.[345] In early 2019, the patient was being followed regularly.[346]

141.    On 5/2/19 at 8:20, Patient #36 ambulated into the ATU with shortness of breath.[347] Dr. Crook ordered medications and antibiotics for acute exacerbation of COPD. He further ordered labs, a chest xray, and monitoring of oxygen saturation levels.[348] After the work up, at 11:30, Dr. Bunch sent Patient #36 to the nursing unit. Dr. Mathis explained that one of the advantages of the nursing unit is that you have a place to hold somebody for monitoring when you do not think that they need to be admitted to a higher level of care. You can write orders and follow up with the patient.[349] Thirty minutes later, the patient deteriorated; he was transported back to the ATU, and then to OLOL ER.[350]

142.    Dr. Vassallo is of the opinion that it was a mistake to send Patient #36 to the nursing unit; Dr. Mathis disagrees. A disagreement in medical opinion does not support Plaintiffs' claims of deliberate indifference.

143.    Patient #29 was found on 3/27/20 with a temperature of 108.2 degrees. The SDE form stated that there was a burning aroma in his cell.[351] At 13:55, security found a very weak pulse and started CPR.[352] By the time that EMTs arrived at 14:00, the patient had no respirations, no heartbeat, unreactive pupils, a Glasgow Coma Scale of 1-1-1 (the lowest possible score on this

---

[345] JX36.0137–0138.
[346] JX36.0134 (1/23/19); JX36.0127 (2/13/19); JX36.0126 (4/17/19).
[347] JX36.0106.
[348] Tr. Day 7, 6.14.22, pp. 233-234.
[349] Tr. Day 7, 6.14.22, p. 235.
[350] JX36.0107–0108.
[351] JX29.0037.  Dr. Vassallo contends that the SDE states that the patient was "bouncing around his cell."  Tr. Day 3, 6.8.22, p. 43.
[352] JX29.0037.

scale), and oxygen saturation at 77 percent.[353] According to Dr. Mathis, Patient #29 was essentially a dead man at that time.[354]

144.     Dr. Vassallo was critical of not using ice to cool patients in response to heat stroke. However, LSP does indeed use ice when appropriate. Patient #51 presented to the ATU on 8/29/19 with a temperature of 103.3.[355] LSP applied an ice pack to treat the patient.[356] For Patient #29, there was nothing that could be done.

145.     Patient #25 stood up, felt dizzy, sat down, and fainted on 10/2/20.[357] EMTs found that his vital signs were good and that he had no other complaints such as chest pain or shortness of breath.[358] He refused transport, and an appropriate refusal form was signed.[359] On 10/27/19, he was seen in the general medicine clinic to follow up on his single episode of syncope (fainting).[360] The provider noted that the EKG and CBG (capillary blood glucose) were taken previously and that he had no problems since the episode. His vital signs were normal. The provider concluded that no further work up was necessary.[361] On 1/22/20, Patient #25 had a heart attack and died.[362]

146.     Dr. Vassallo opines that the patient should have been worked up after the single episode of syncope. Dr. Mathis, however, opined credibly that "the great majority of episodes of fainting especially in a 52-year old, otherwise asymptomatic man, are benign, most likely vasovagal syncope."[363] The patient did not have other symptoms, such as angina, which would

[353] Tr. Day 7, 6.14.22, p. 227.
[354] Tr. Day 7, 6.14.22, p. 227.
[355] JX51.0157.
[356] JX51.0157
[357] JX25.0033.
[358] Tr. Day 7, 6.14.22, p. 219.
[359] JX25.0034.
[360] JX25.0032.
[361] JX25.0032.
[362] JX25.0029–0031.
[363] DX35-c.0174.

have called for further work up.[364] Dr. Mathis' opinion is supported by "Up-to-Date," a medical source that all experts agree is valid and respected.[365]

147.    Overall, the above chart reviews do not demonstrate any systematic failure or deliberate indifference with regard to LSP emergency care or ATU.

**D.    Issues with Responding to Strokes Have Been Resolved.**

148.    The Liability Ruling criticized LSP's response to patients who were having strokes.[366] Plaintiffs' expert report alleged that transport from LSP to a higher level of care for stroke is consistently delayed, just as it was during the liability period. The report goes further to state that there is a relatively short window – typically up to 4.5 hours – in which lytics can be effectively administered to prevent the development of permanent and significant deficits.[367] The criticisms in the report are limited to the 4.5 hour window in responding to strokes. A simple review of the charts refutes the suggestion that LSP delays in responding to strokes – to the contrary, the evidence shows that LSP responds appropriately to symptoms of stroke.

149.    Plaintiffs' expert report stated that Patients # 26, 56, and 52 were "outside the window" when they arrived from LSP to the emergency room. These representations are misleading and lack candor to the Court.

150.    Patient #26 presented to the ATU with stroke symptoms which had already existed for more than 12 hours.[368] He arrived at the ATU at 01:47 and left for the emergency room at 02:45; Dr. Vassallo agreed that the time that it took LSP response to send him to the emergency

---

[364] Tr. Day 7, 6.14.22, p. 222.
[365] Tr. Day 4, 6.9.22, pp. 31-32.
[366] See, Liability Ruling, R. Doc. 594, ¶ 110, for example.
[367] PX01a.0112.
[368] JX26.0457.

room was a "good response" which she agreed was "timely."[369] Patient #26 was outside the window before he even arrived at the ATU.

151.    Patient #52 presented to that ATU at 12:32 with left-sided weakness that began at 1:00 am, almost twelve hours before.[370] He was sent to UMCNO at 14:00. Once again, the patient was outside the 4.5 hour window before he arrived at the ATU, and he was sent to an emergency room timely after arriving at the ATU.

152.    Patient #56 arrived at the ATU at 17:58 reporting that left-sided weakness and facial droop started at 14:30.[371] He was sent to OLOL ER at 19:48. Here, the patient was on the verge of being outside the window when he arrived at the ATU. He was sent to the emergency room thereafter.

153.    On 4/26/21, Patient #55 presented to the ATU with stroke symptoms at 15:30. He was sent to OLOL ER at 16:10.[372] This response was prompt.

154.    There are other cases not cited by Dr. Vassallo where LSP sent the patient to the outside emergency room timely. Patient #27 presented to the ATU at 07:58 after being found with right-sided facial droop and left-sided weakness. He was sent to OLOL ER at 08:47.[373] Patient #10 presented to the ATU at 06:43 with left-sided weakness and left facial droop. He was sent to OLOL at 07:31.[374]

155.    LSP sent all of these patients to an outside hospital in a timely manner.

156.    Patient #55 requires a more thorough discussion. He had a history of strokes and transient ischemic attacks ("TIAs"). He had very high blood pressure and was non-compliant with

[369] Tr. Day 3, 6.8.22, p. 133.
[370] JX52.0119.
[371] JX56.0055.
[372] JX55.0450.
[373] JX27.0049.
[374] JX10.0106.

his medications.[375] On 1/28/21, he was seen by a neurologist.[376] On 2/4/21, Patient #55 had an incident and was taken to the ATU. The provider in the ATU noted no change in his neuro status.[377] On 2/5/21, he was seen in the ATU with complaints of increased weakness in his left foot.[378] The provider sent Patient #55 to West Feliciana Hospital for a CT scan. The CT scan found "no acute intracranial abnormality."[379] The next complaint was over one month later, on 3/17/21. The fact that Patient #55 had no complaints for the weeks between 2/5/21 and 3/17/21 indicates that the event on 2/5/21 was likely a TIA that resolved itself.[380] Dr. McMunn explained that a "TIA …may not cause permanent injury…It's a small event that does not cause lasting effect."[381]

157.     On 3/17/21, Patient #55's blood pressure was elevated secondary to noncompliance with medications.[382] He had no new signs or symptoms of a stroke.  According to Dr. McMunn, Patient #55 was at his baseline.[383] Two days later, on 3/24/21, the patient was sent to a cardiologist at UMCNO.[384] On 4/26/21, Patient #55 presented to the ATU with stroke symptoms and within 40 minutes was sent promptly to OLOL ER.[385]

158.     To summarize, for the several months prior to his stroke on 4/26/21, Patient #55 had high blood pressure due to medication noncompliance, he had a number of TIAs after which he returned to his neurological baseline, and he was seen by both a neurologist and a cardiologist. Dr. McMunn found no violation of the standard of care.[386]

---

[375] JX55.0069.  On 2/3/21, a provider in the ATU noted that he had not filled his blood pressure medicine since October.  JX55.0068.
[376] JX55.0071.
[377] JX55.0064.
[378] JX55.0057.
[379] JX55.0060.
[380] Tr. Day 8 (afternoon), 6.15.22, p. 61-62.
[381] Tr. Day 8 (afternoon), 6.15.22, p. 49.
[382] JX55.0054.
[383] Tr. Day 8 (afternoon), 6.15.22, p. 63.
[384] JX55.0049.
[385] JX55.0450.
[386] Tr. Day 8 (afternoon), 6.15.22, p. 64; DX35-b.099.

159.    There is not a single case presented at the Remedy Trial where LSP failed to provide timely response to stroke symptoms.

## E.    Medical Care Requires Consideration of Illicit Drug Use

160.    Unfortunately, it is a fact that there is extensive illicit drug use in prisons, including at LSP. Patients present to the ATU regularly with symptoms of altered mental status and other symptoms of illicit drug use. Twenty of the sixty charts selected by the Plaintiffs' experts had confirmed use of illicit drug use, to wit:

| Pt. No. | Date | Exhibit No. | Comments |
|---|---|---|---|
| 10 | 02/20/2020 | JX10.00176 JX10.00149 | Patient admitted to smoking a dipstick twice. |
| 11 | 06/27/2021 | JX11.00069 - 0079 | Positive toxicology screen |
| 12 | 08/10/2021 | DX2-1465 | Positive toxicology screen |
| 14 | 12/19/2019 | JX14.0059 - 0051 | Multiple indications of intoxication |
| 16 | 03/17/2021 | JX16.00041 | Patient had a "wick" with a blackhead burn. |
| 17 | 08/07/2020 | JX17.0119, 0122 DX2-0901 | Altered mental status after smoking "something" |
| 21 | 12/17/2019 | JX21.0029 - 0030 | Positive toxicology screen |
| 24 | 3/24/2020 | JX24.00068 | "I got loaded" |
| 26 | 12/24/2019 | JX26.00280 | Good response with Narcan. |
| 27 | 12/02/2019 | DX2-0485 | Positive toxicology screen |
| 29 | 04/17/2020 | DX2-0610, DX2-0608, JX29-0037 | Decedent was "observed on camera smoking an unknown substance" |
| 31 | 07/05/2021 | JX31.00392 & 00398 - 00399 | Multiple drug intoxication and positive toxicology screen |
| 32 | 08/17/2020 | JX32.0037 - 0038 | Positive toxicology screen |
| 33 | 06/30/2020 | JX33.00087 | Positive toxicology screen |
| 35 | 08/26/2019 | JX35.00075 | Positive toxicology screen |
| 42 | 02/03/2021 | JX42.00082 | I was just tripping…he denies intox, but this is the most probable explanation for his presentation. |
| 43 | 01/17/2020 | JX43.00188 | "I took Elavil and a hit of Mojo." |
| 47 | 10/21/2021 | JX47.00084 | He has used Meth in 1 week. |
| 51 | 08/29/2019 | JX51.0157 - 0156 | Drug screen positive for opiates. |
| 52 | 03/23/2021 | JX52.0389, 0361 & 0359 | Patient states smoked a dipstick, twice. "I am quitting getting high." |

161.    At least one of the twenty, Patient #31, died of an overdose. In addition, there were at a minimum fifteen deaths at LSP attributable to illicit drug use from 2019 through the beginning of 2022.[387]

162.    With the wealth of illicit drug use at LSP, LSP providers necessarily must consider the possibility of illicit drug use when presented with symptoms consistent with illicit drug use.[388] Failure to consider illicit drug use would be poor practice of medicine.

163.    Amazingly, Plaintiffs' experts never once mention illicit drug use in their expert report.

164.    In 2016, LSP would perform lavage or stomach pumping on patients. LSP no longer performs lavage. This is an improvement in the response to suspected illicit drug use.[389]

## VIII.   SELF DECLARED EMERGENCIES

165.    Inmates at LSP can declare themselves to be an emergency and receive care at any time. During his review of the medical charts, Dr. Mathis, Defendants' expert, noted a weakness in the self-declared emergency ("SDE") process. Through early 2022, EMTs responded to SDEs and made assessments, sometimes without the involvement of a provider, in effect practicing medicine without a license.[390] Deputy Warden Oliveaux testified that the issue was that the EMTs were working outside of the individual treatment orders and outside their scope of practice.[391] In Dr. Mathis' words, this practice could not continue.[392]

166.    In response to Dr. Mathis' recommendation, Deputy Warden Oliveaux developed a new policy for responding to SDEs.[393] Now, EMTs respond and operate solely pursuant to

---

[387] DX59.
[388] Tr. Day 6, 6.13.22, p. 115.
[389] Tr. Day 3, 6.8.22, p. 81.
[390] Tr. Day 7, 6.14.22, p. 194.
[391] Tr. Day 10, 6.17.22, p. 63.
[392] Tr. Day 7, 6.14.22., p. 194.
[393] Tr. Day 10, 6.17.22, p. 64-65.

Individual Treatment Orders ("ITO") that are pre-approved by medical providers.[394] The EMT is required to attach the signed ITO that he or she is following in responding to an SDE. Should a situation not be covered by an ITO, the EMT must call a NP (usually through a video call) or take the inmate to the ATU for further assessment. All of this is set forth in a new memorandum from Warden Tim Hooper.[395]

167. LSP responds to all SDEs. However, there is some indication that some facilities do not always honor emergency requests. Nurse Goehring, Plaintiffs' nurse expert witness, was a high-level administrator with Armor Correctional Healthcare. Armor contracted to provide health care services to prisons and jails. Nurse Goehring is and was responsible for monitoring and training at Armor. Armor was a defendant in a class action lawsuit alleging that the healthcare did not meet the minimum standards of the Eighth Amendment. The Complaint alleged that Armor, as the provider for the correctional facility, "virtually never honors prisoners' requests for emergency medical care, regardless of the true circumstances or the prisoners' actual needs."[396] Unlike Armor in the lawsuit, LSP always responds to SDEs.

168. Since this policy was recently enacted, LSP began a quality control and improvement program to assess its effectiveness.[397] Defendants should be complimented for acknowledging a weakness and improving care as suggested by their expert.

169. Considering that the case is to be decided on current conditions, the evidence is that LSP has remedied a weakness as to SDE. There is nothing deliberately indifferent about LSP's SDE policy at this time.

---

[394] Tr. Day 10, 6.17.22, p. 64-65.
[395] DX50.
[396] *Scott v. Clarke*, No. 12-cv-0036 (W. D. Va.), Complaint ¶ 23.
[397] Tr. Day 10, 6.17.22, p. 68.

## IX. MEDICAL LEADERSHIP AND ORGANIZATION

170. In August of 2020, LSP hired Dr. Jacob Johnson as a long term healthcare administrator. Dr. Johnson has the training and experience necessary for that position.[398] Plaintiffs' expert agreed that the hiring of Dr. Johnson was a very positive development for LSP.[399] The hiring of Dr. Johnson has significantly improved the medical leadership and organization.

171. LSP recently appointed Ashli Oliveaux as a Deputy Warden; her duties include overseeing medical operations.[400] Deputy Warden Oliveaux is an LPN who has previously worked at the clinic at LSP.[401] Dr. Johnson reports directly to Deputy Warden Oliveaux.[402] Her role is to ensure that Dr. Johnson gets whatever he needs for the LSP medical department to operate and provide healthcare to the inmates.[403] She and Dr. Johnson speak daily.[404] Deputy Warden Oliveaux answers directly to Warden Timothy Hooper.[405] Given her medical background, the addition of Deputy Warden Oliveaux to LSP leadership has improved operations and provides a protective barrier between security and medical staff at LSP.

172. Dr. Toce is now the medical director at LSP. He oversees a team of seven NPs to provide care.

173. The improvement in the medical leadership is exemplified in many respects. One, Dr. Johnson maintains a weekly back log tracker.[406] This tracker allows him to identify any issues with care and to respond immediately. Two, Dr. Johnson and Dr. Toce conduct morning meetings Monday through Friday. The meetings are attended by Dr. Johnson, Dr. Toce (except on Fridays),

---

[398] Tr. Day 4, 6.9.22, p. 145.
[399] Tr. Day 4, 6.9.22, p. 145.
[400] Tr. Day 10, 6.17.22, p. 55.
[401] Tr. Day 10, 6.17.22, pp. 53-54.
[402] Tr. Day 10, 6.17.22, p. 55.
[403] Tr. Day 10, 6.17.11, p. 55-56.
[404] Tr. Day 10, 6.17.22, p. 58.
[405] Tr. Day 10, 6.17.11, p. 56.
[406] DX48-a; Tr. Day 10, 6.17.22, p. 159.

the NPs on duty, and the heads of the various departments such as nursing, EMT, lab, etc. The group sits around a large conference table and discusses the status of every patient in NU1 and NU2, patients seen in the ATU that night, and patients who are in an outside hospital.[407] This interactive collaborative process ensures that good care is being provided to the patients. The medical leadership is clearly reflected by how clean and orderly the LSP facilities are currently.

174.    In late 2021, LSP began conducting mortality reviews. A committee meets and reviews every death at LSP. DOC HQ also conducts its own separate mortality review.

175.    LSP's quality assurance/quality improvement ("QA/QI") program is now being directed by RN Jennifer Stickells. RN Stickells collects data and prepares reports that are reviewed by the QA/QI team.[408]

## X.    PLAINTIFFS' EXPERTS APPLIED AN INCORRECT STANDARD OF CARE

176.    Plaintiffs' experts are clear that they are judging heath care at LSP by applying the purported industry standards set forth in the National Commission on Correctional Heath Care ("NCCHC") and the community standard of care. However, as this Court previously noted in a related case, "[i]t is well settled that lack of adherence to industry best practice standards is not in and of itself deliberate indifference." *Gumns v. Edwards*, No. CV 20-231-SDD-RLB, 2020 WL 2510248, at *13 (M.D. La. May 15, 2020). This Court further noted that:

> the "community standard" of care is not the legal standard applicable to an Eighth Amendment claim. Rather, the Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency."

---

[407] Tr. Day 10, 6.17.22, pp. 68-69.
[408] Plaintiffs' proposed hyper aggressive QA/QI program, while possibly helpful or advisable, goes "beyond the minimum standards required by the Constitution." *United States v. Hinds County, et al.*, No. 3:16-CV-489-CWR-RHWR, 2022 WL 1112223, at *55 (S.D. Miss. Apr. 13, 2022) (The Court struck elements of a consent decree addressed to QA/QI requirements similar to those proposed by Plaintiffs herein).

*Id.*, fn. 81 at *10. This finding is logical and correct as only 8% of facilities in the country are NCCHC accredited.[409]

177.    Further, Plaintiffs' Expert "Recommendations" far exceed the minimum standards allowed by the PRLA. Dr. Vassallo testified that the recommendations are not necessarily required; there were "just my idea to maximize the quality of health care delivery."[410] Dr. Puisis similarly testified that their recommendations should be considered but it would be "okay" if their recommendations were not followed.[411] Nurse Goehring testified that LSP's policies and procedures need to reflect the minimum standards as published by the NCCHC,[412] even though the law clearly states that failure to adhere to industry best practices is not deliberate indifference.

178.    Further, Plaintiffs' experts seem to have endeavored to prove their case, rather than impartially reviewing health care. Plaintiffs' experts made a number of inexplicable errors, as set forth above.

179.    On the other hand, Dr. Mathis and Dr. McMunn reviewed the care based upon their experience in providing health care in a correctional facility. Both noted issues where issues were present. Indeed, Dr. Mathis' recommendation on SDE led LSP to implement a new and improved policy on SDE.

180.    Plaintiffs' experts' disagreements with or critical assessments of care currently being provided are inappropriate and fail to establish that health care is below the Constitutional minimum standard. The evidence refuted the prior finding that LSP was deliberately indifferent or that care is currently so unconscionable as to fall below society's minimum standards of decency.

---

[409] Tr. Day 8 (afternoon) 6.15.22, p. 71; DX35-b, p. 50.
[410] Tr. Day 3, 6.8.22, p. 98.
[411] Tr. Day 4, 6.9.22, p. 139.
[412] Tr. Day 5, 6.10.22, p. 86.

# XI.    ADA/RA

181.    In the Liability Ruling, the Court determined that Plaintiffs had failed to prove a violation of the ADA/RA as to the following: (1) the existence of an inmate orderly program; (2) informing inmates of their ADA rights and procedures; (3) availability of auxiliary aids and assistive devices; (4) work assignments and duty statuses; (5) dietary accommodations; (6) disability accessible transportation; (7) pill call, sick call, and head count procedures; and (8) hobby craft policies.

182.    Since September 30, 2016, LSP has made great strides in remedying architectural barriers to program access at LSP and continues to remedy its facilities in order to provide program access to disabled inmates.[413]

183.    LSP has removed or remedied all architectural barriers identified by the U.S. Department of Justice ("DOJ") in Attachment A to the November 14, 2017 Settlement Agreement, with the exception of architectural barriers identified in connection with the Rodeo Arena and the cell block expansions.[414]

184.    Of the one-hundred and ninety (190) architectural barriers identified in the Liability Ruling as impediments to independent access to programs, services, and activities at LSP, Plaintiffs' expert, Mark J. Mazz, found that one hundred and forty-one (141) have either been remedied or are no longer relevant for program access under current conditions.[415] The forty-nine (49) items that had not been remedied as of Mazz's April 6, 2022, site visit and are still relevant for program access are as follows:

---

[413] Tr. Day 10, 6.17.22, p. 78.
[414] JX 72-a, p. 71.
[415] Tr. Day 2, 6.7.22, p. 65-66. Mazz testified that items identified in his 2016 report that are not listed in his 2022 report have either been remediated or are no longer relevant for program access. Therefore, they are no longer considered architectural barriers to access.

| Area Reviewed: | Item Number: September 29, 2016, Report of Mark Mazz (Liability Trial – PX7, p. 18-39) | Item Number: April 18, 2022, Report of Mark Mazz (Remedy Trial – PX4, p. 11-27) |
|---|---|---|
| General | 3 – 4 | 3 – 4 |
| Pill Call Window near Ash Dormitory | 17 | 6 |
| Ramp near Ash Dormitory | 21 | 8 |
| (Ash 2 Dormitory) | 29, 32 | 34, 35 |
| Ash 2 Dormitory – bathroom | 36 | 44 |
| Camp F, Trustee Camp | 103 | 80 |
| Camp F, Dorm 1 | 78 | 90 |
| Camp F, Dorm 1 – bathroom | 87, 93 | 92, 93 |
| Camp F, Dorm 1 – shower | 99 | 95 |
| Protection Tier (Cell Block 28) – shower | 106-109 | 114 -117 |
| Nursing Unit 2 | 128-131 | 120[416]-123 |
| Nursing Unit 2 – bathroom | 134, 136-142, 144-146 | 126-135 |
| Nursing Unit 2 – shower area | 148-150 | 138-141 |
| Nursing Unit 1 | 162 | 155 |
| Nursing Unit 1 – bathroom | 166, 168-170, 173-178 | 157-166 |
| Nursing Unit 1 – shower area | 180-182 | 168-170 |
| Visiting Area | 185 | 172 |

185.    LSP converted Ash 1, 3, and 4 into handicapped accessible dormitories for disabled inmates, in place of the Cypress 2 and Hickory 4 dormitories.[417] This was beneficial because it allows disabled inmates to be housed in a centralized area within the prison.[418] The Ash dorms are fully handicapped accessible and centrally located near the treatment center, pill call, the cafeteria,

---

[416] Items 120 and 155 are security doors to Nursing Unit 2 and Nursing Unit 1, through which access is controlled by correctional officers. Tr. Day 2, 6/7/22, p. 76. Mazz acknowledged that there is no independent access through these doors. *Id.* Therefore, to the extent that the security doors do not comply with the technical requirements of the ADA/RA, there is no evidence that these doors impede program access for disabled inmates – the doors must be opened by correctional officers, regardless of ability.

[417] JX 72-a, pp. 19–20.

[418] JX 73-a, pp. 99–100.

the law library, and the education building.[419] These dorms are also closest to the hub of the main prison, which includes the education building.[420] These dorms also provide the easiest means of access to two of LSP's chapels.[421]

186.    Plaintiffs did not present any evidence that inmates housed in Ash 1, 3, and 4 are not afforded access to the same programs, services, and activities as inmates housed in non-accessible housing units.

187.    Plaintiffs presented the testimony of three class members currently housed in the Ash Dorms: Robert Lucas (via stipulation), Dennis Mischler, and Jean Paul Creppel.  Mr. Lucas is housed in Ash 3 and reported no accessibility issues in the Ash Dorms.[422] Mr. Mischler is housed in Ash 1. He uses a wheelchair but is able to walk short distances.[423] He is able to access the toilets and showers in Ash 1.[424] He is able to access the recreation yard with assistance.[425]  Mr. Creppel is housed in Ash 1 and also uses a wheelchair. He testified that he able to perform his activities of daily living without assistance.[426] He also testified that he is able to navigate the dorm in his wheelchair. He testified that orderlies are present to assist him and do, in fact, assist him with tasks such as making his bed.[427]

188.    The evidence presented at trial shows that inmates housed in Ash 1, 3, and 4 are afforded access to the same programs, services, and activities as other inmates.[428]  Therefore, further structural changes to Ash 1, 3, and 4 are not required.

---

[419] JX 73-a, pp. 99–100.
[420] JX 73-a, p. 100.
[421] JX73-a, p. 101.
[422] JX77-c, p. 2.
[423] Tr. Day 1, 6.6.22, p. 60.
[424] Tr. Day 1, 6/6/22, p. 62.
[425] Tr. Day 1, 6/6/22, p. 62.
[426] Tr. Day 3, 6.8.22, p. 250.
[427] Tr. Day 3, 6.8.22, p. 250.
[428] JX 72-a, p. 20.

189.     Only disabled inmates who utilize wheelchairs and require assistance are housed in the Ash dorms.[429] There are disabled inmates at LSP who are fully independent and live in general population in handicap accessible dorms.[430]

190.     To the extent any architectural barriers remain in the nursing units, LSP continues to use inmate orderlies to achieve access to programs, services, and activities. The Court noted in the Liability Ruling that "it is a generally acceptable and lawful practice to implement a health care orderly assistance program to provide disability access."[431] Though the Court previously found that LSP's program was ineffective "largely due to understaffing and the abuse/neglect/misconduct of the orderlies,"[432] there was little evidence of orderly abuse, neglect, or misconduct presented at the Remedy Trial. Nurse Practitioner Cindy Park testified that after an orderly choked a patient on Nursing Unit 2, the orderly was disciplined and removed.[433] This incident is the only evidence of orderly abuse presented at trial, and it was promptly addressed by LSP.[434]

191.     The inmate orderly program is sufficient to overcome any structural barriers to access. Indeed, Plaintiffs did not present any evidence to show that inmates in the nursing units are deprived of access to programs, services and activities. Thus, further structural changes to the nursing units at LSP is not warranted because LSP has achieved program access through alternative methods of compliance.

---

[429] JX73-a, p. 117.
[430] JX73-a, p. 117–118.
[431] R. Doc. 594, pp. 98-99.
[432] R. Doc. 594, p. 99.
[433] Tr. Day 7, 6/14/22, p. 30; *see also* Tr. Day 6, 6/13/22, pp. 62-63 (Testimony of Angela Goehring regarding the incident).
[434] Even Plaintiffs' ostensible ADA expert, Dr. Dora Schriro, testified that she had not observed any abuse, neglect, or misconduct by inmate orderlies. *See* Tr. Day 2, 6.7.22, pp. 24-25.

192.    In the Liability Ruling, the Court found that "LSP has systematically failed to provide access and accommodations to disabled inmates by failing to follow both Title II's implementing regulations and its own policies and procedures relating to ADA compliance."[435] This finding is no longer applicable in light of current conditions at LSP.

193.    Plaintiffs presented the testimony of Dr. Dora Schriro, an expert in corrections administration, who offered opinions as to whether ADA violations were still in effect at LSP and whether remedies were required.  Dr. Schriro, however, has never received any ADA training nor has she ever administered ADA training to others.  She has never directly overseen ADA compliance in any of her prior corrections work.  Though she opined upon the efficacy of the orderly care at LSP, Dr. Schriro's notes reflect her discussions with only two health care orderlies.[436]  As she is not a medical doctor, Dr. Schriro can offer no reliable testimony as to whether health care orderlies are performing tasks at LSP that constitutes medical care. Therefore, her opinions in this matter concerning ADA compliance should be given little to no weight.

194.    Deputy Warden Oliveaux was recently appointed as the ADA Coordinator at LSP.[437] The Court found in the Liability Ruling that LSP's ADA Coordinators had formerly not been sufficiently trained or educated to carry out their obligations under the ADA.[438] At the time of the Remedy Trial, however, Deputy Warden Oliveaux had already received 35 hours of ADA training and intends to complete the remaining 5 hours of ADA training to become a certified ADA Coordinator.[439] She is also willing to pursue further corrections-specific ADA training if available.[440]

---

[435] R. Doc. 594, p. 56.
[436] Tr. Day 2, 6.7.22, p. 26.
[437] Tr. Day 10, 6.17.22, p. 54.
[438] R. Doc. 594, p. 106.
[439] Tr. Day 10, 6.17.22, p. 71, 75.
[440] Tr. Day 10, 6.17.22, p. 86.

195.    In addition to serving as ADA Coordinator, Deputy Warden Oliveaux has other responsibilities assigned to her, about 50% of which are devoted to medical, mental health, fire and EMS.[441] Since starting in her position in March through trial in June of 2022, Deputy Warden Oliveaux had received and handled approximately seven requests for accommodation.[442] This frequency of requests (two requests per month) is consistent with the total of 84 requests for accommodation that were received by LSP for 2019 through 2021.[443] This workload does not necessitate a fulltime ADA Coordinator at LSP. Indeed, Dr. Schriro was unable to explain how such a low frequency of requests for accommodation would justify a fulltime ADA Coordinator.[444] Meanwhile, Deputy Warden Tracy Falgout maintains responsibility over LSP's remediation of physical barriers, further reducing Deputy Warden Oliveaux's ADA responsibilities.[445]

196.    In January of 2022, Deputy Assistant Secretary Sharita Spears, J.D. was appointed ADA Coordinator for the DOC.[446] Ms. Spears supervises the ADA coordinators at all of the DOC facilities; she reviews institutional policies and directives related to ADA;[447] maintains the ADA database; creates and coordinates ADA training; and answers second-level ARPs related to ADA.[448]

197.    Ms. Spears has overhauled the ADA training program for staff at headquarters and at local facilities, including LSP.[449] Ms. Spears creates and presents ADA training programs, including at the Leadership Academy in the spring of 2022, attended by Deputy Warden Oliveaux

---

[441] Tr. Day 10, 6.17.22, pp. 57-58.
[442] Tr. Day 10, 6.17.22, p. 78.
[443] DX44, pp. 1-93.
[444] Tr. Day 2, 6.7.22, pp. 8-10.  Dr. Schriro even conceded that she had previously hired and supervised a director who oversaw both ADA compliance and HR matters.  *See* Tr. Day 2, 6.7.22, pp. 6–7.
[445] Tr. Day 10, 6.17.22, pp. 78-79.
[446] Tr. Day 10, 6.17.22, pp. 87-88.
[447] As part of her review, Ms. Spears also considers any changes to the law and proposes revisions accordingly. *See* Tr. Day 10, 6.17.22, pp. 89–90.
[448] Tr. Day 10, 6.17.22, pp. 88-91 & 105.
[449] Tr. Day 10, 6.17.22, pp. 90-91.

and other members of the DOC executive team.[450] This newly implemented training, which is separate from annual in-service training, lasted over an hour.[451]

198.     The annual in-service training offered to all correctional staff at DOC facilities will be enhanced and updated to include additional ADA topics.[452]  Additionally, security staff at LSP are trained to recognize mental and physical disabilities.[453]

199.     Prior to the Remedy Trial, Ms. Spears completed fifty (50) hours of training through the ADA national symposium on topics including reasonable accommodations; the 2010 standards; ADA standards; international building codes; emergency preparedness; training dealing with COVID as it relates to persons with disabilities; basic role of the ADA coordinator; and the history of ADA.[454] Ms. Spears received training materials for every presentation at the symposium, which she disseminated to the other ADA coordinators within DOC.[455] After the symposium, Ms. Spears passed an exam and is now a certified ADA Coordinator.[456]

200.     All ADA Coordinators within DOC, including LSP, must complete mandatory ADA training to become certified ADA Coordinators.[457]

201.     Ms. Spears has engaged the services of Accessology – an independent ADA consulting firm – to create a transition plan that will comprehensively analyze and evaluate DOC's

---

[450] Tr. Day 10, 6.17.22, p. 91–93.  The topics presented included reasonable accommodations; DOC's grievance process; Title 1; Title 2 (as it relates to accessibility and physical barriers); working with offenders that have hearing impairments; and how to assess if an individual is a qualified person under ADA *See* DX52 for the PowerPoint presentation.

[451] Tr. Day 10, 6.17.22, pp. 92-93.

[452] Tr. Day 10, 6.17.22, pp. 94-95; DX43. Previously, the annual in-service training consisted primarily of communication with deaf and hearing-impaired inmates. *see also* JX 12, Liability Phase.

[453] JX72-a, pp. 46-47.

[454] Tr. Day 10, 6.17.22, pp. 95-96. Deputy Warden Oliveaux also attended the symposium and as of the Remedy Trial, she has five additional hours to complete by May of 2023. *Id.,* p. 97.

[455] Tr. Day 10, 6.17.22, p. 96.

[456] Tr. Day 10, 6.17.22, pp. 96-97.

[457] Tr. Day 10, 6.17.22, p. 97.  As noted by Deputy Warden Oliveaux, she had completed 35 hours of ADA training but still needed five more hours before Ms. Spears said she could take the test in order to receive her certification.  Tr. Day 10, 6.17.22, p. 75.

and LSP's practices, polices, and procedures, as well as programmatic and physical access issues.[458] As of the Remedy Trial, Ms. Spears is gathering the information needed to create a Request for Proposals.[459]

202.    As part of her duties, Ms. Spears maintains and evaluates the ADA database. Every DOC facility, including LSP, enters information regarding each ADA request for accommodation, including the name of the requestor, the date of the request, the type of accommodation requested, and the decision (accepted, modified, or denied).[460] Contrary to Dr. Schriro's criticism that the current database was not "user-friendly" and that it lacked the ability to "sort data and analyze data",[461] Ms. Spears testified that she can navigate the database with user-friendly search functions, allowing her to search by DOC number, inmate name, institution, accommodations that have been granted, the type of accommodations issued, and the outcome.[462] Ms. Spears typically arranges the requests in chronological order, by date received, ensuring that no request will be overlooked.[463]

203.    Dr. Schriro's criticisms of the database are unreliable.  Dr. Schriro admitted that she had never actually seen the ADA database and thus has no basis to refute Ms. Spears' assertion that she has no trouble accessing the ADA database or reviewing individual requests for accommodation.[464] . Additionally, Dr. Schriro offered no demonstrable support for her theory that not all of the requests for accommodation had been logged into the database.[465]   As Dr. Schriro

---

[458] Tr. Day 10, 6.17.22, p. 98.
[459] Tr. Day 10, 6.17.22, p. 98.
[460] Tr. Day 10, 6.17.22, pp. 100-102.
[461] Tr. Day 1, 6.6.22, p. 148.
[462] Tr. Day 10, 6.17.22, pp. 100-103.
[463] Tr. Day 10, 6.17.22, p. 101.
[464] Tr. Day 2, 6.7.22, pp. 13-14.
[465] Tr. Day 2, 6.7.22, pp. 18-21; *see also* p. 39 (Dr. Schriro admitted that she could not say whether or not the ADA database contained requests that were not made through formal channels).

noted, there is no current DOC audit finding under-reporting of requests for accommodation at LSP.[466]

204. Ms. Spears reviews the database two to three times a week, reviewing all new entries since the last review.[467] Ms. Spears follows up with the DOC facility denying any request for accommodations to investigate as necessary.[468] Ms. Spears examines the comments of the requests to ascertain the reason for the request and its specifics. Ms. Spears then determines whether the requester meets the definition of a qualified person under the ADA. Following her review of the request and documentation, Ms. Spears contacts the ADA coordinator to gather more information or make a site visit, as necessary.[469]

205. Ms. Spears is also the second-level reviewer on ADA Administrative Remedy Process (ARP) requests, which is also the appeals process for requests for accommodations.[470] Like her investigations into accommodation responses, Ms. Spears performs site visits to facilities.[471]

206. Ms. Spears has ample support staff to accomplish her duties as ADA coordinator. Ms. Spears has a clerical ADA assistant, as well as access to IT, the legal department at DOC, and the Secretary.[472] Indeed, Ms. Spears has all the resources she needs to do her job as ADA Coordinator.[473]

---

[466] Tr. Day 2, 6.7.22, p. 21. In this Court's Liability Ruling, it was specifically noted that a 2014 DOC audit had determined "the ADA database was 'not being used for offender request[s].'" R. Doc. 594, ¶186.
[467] Tr. Day 10, 6.17.22, p. 100. Even Dr. Schriro agreed that it is helpful to have a person at headquarters review requests for accommodation to ensure that the needs of disabled inmates are being met. *See* Tr. Day 2, 6.7.22, p. 12. Dr. Schriro also agreed that Ms. Spears' review of the database twice per week is sufficient for the number of requests for accommodations received by LSP. *Id.,* p. 14.
[468] Tr. Day 10, 6.17.22, pp. 102-103.
[469] Tr. Day 10, 6.17.22, p. 102-103.
[470] Tr. Day 10, 6.17.22, p. 105.
[471] Tr. Day 10, 6.17.22, p. 103.
[472] Tr. Day 10, 6.17.22, p. 106.
[473] Tr. Day 10, 6.17.22, p. 106.

207. In the Liability Ruling, the Court found that LSP fails to provide reasonable accommodations to inmates with disabilities in connection with disciplinary action.[474] This finding is no longer applicable in light of current conditions at LSP.

208. There is no evidence that disabled inmates who are subject to disciplinary action are deprived of reasonable accommodations.[475] As Tracy Falgout testified, the level of accommodation provided to a disabled inmate does not change as a result of a disciplinary writeup.[476]

209. At trial, Plaintiffs presented one example of discipline of a disabled inmate, Derrick Martin.[477] Mr. Martin, who is in a wheelchair, was disciplined and held in a locked room on the nursing unit.[478] However, arrangements were made to ensure that Mr. Martin had access to a call light and a call bell, to alert the nurses.[479] Mr. Martin also had the ability to call out loud to the nurses if necessary.[480] There is no evidence that Mr. Martin's limitations were not accommodated while subject to discipline. Thus, Plaintiffs failed to prove that LSP does not provide reasonable accommodations to disabled inmates in the disciplinary process.

210. Additionally, security staff is trained to contact the ADA Coordinator when an inmate is subject to discipline for a behavior that may implicate his disability.[481] The Disciplinary Board has the authority to the defer to the ADA Coordinator and/or Medical to verify whether the inmate's disability played a role in the infraction.[482] The ADA Coordinator participates in the

---

[474] R. Doc. 594, p. 73.
[475] JX72-a, p. 44.
[476] *Id.*
[477] *See* JX-c, p. 3.
[478] *Id.* Mr. Martin was disciplined for being verbally abusive to Nurse Practitioner Cindy Park. *See* Tr. Day 7, 6/7/22, p. 36.
[479] Tr. Day 7, 6/7/22, p. 37. Nurse Practitioner Cindy Park testified that she responded to Mr. Martin's call bell while he was in the locked room.
[480] *Id.*
[481] JX72-a, p. 47-48.
[482] *Id.;* see, e.g., p. 48-49.

disciplinary appeal process as requested.[483] During the relevant time period, there is no evidence of any ARPs filed by disable inmates alleging that they were inappropriately disciplined.[484]

## XII.    CONCLUSIONS OF LAW

### A.    Plaintiffs Have Not Proven an Ongoing Eighth Amendment Violation.

211.    Plaintiffs have failed to establish that LSP is engaging in continuing and systemic violations of the Eighth Amendment while providing medical care to the patients at LSP.  "Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs."  *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  "Deliberate indifference is an 'extremely high' standard to meet."  *Id*. at 770; see also *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  "Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his [, her or its] action.'"  *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)).

212.    To establish an Eighth Amendment violation for deliberate medical indifference, a prisoner-plaintiff must prove that appropriate medical care has been denied and that the denial constitutes "deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017); *Brewster*, 587 F. 3d at 769; *Johnson v. Treen*, 759 F.2d 1236, 1237 (5th Cir. 1985).  To meet his burden, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs."  *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)

---

[483] *Id.,* p. 52.
[484] *Id.*

(quoting *Johnson*, 759 F.2d at 1238). "Deliberate indifference is not established when 'medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials[.]'" *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quoting *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)).

213.    The Supreme Court has established a two-prong analysis that is used to analyze Eighth Amendment claims based upon conditions of confinement. *See Wilson v. Seiter*, 501 U.S. 294 (1991). To establish a violation of the Eighth Amendment, a plaintiff must prove that there was an "objective exposure to a substantial risk of serious harm"; and "that prison officials acted or failed to act with deliberate indifference to that risk." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (citing *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006)).

214.    To establish an objectively unreasonable risk of harm, the court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose **anyone unwillingly** to such a risk." *Helling v. McKinney*, 506 U.S. 25, 36 (1993). Further, the Fifth Circuit has confirmed that the Eighth Amendment does not protect against any and all risk of harm; rather it protects against "extreme" conditions that present an "unreasonable risk" of harm. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Helling*, 509 U.S. at 35; *Ball v. LeBlanc*, 881 F.3d 346, 356 (5th Cir. 2018) (Higginson, J., concurring in part and dissenting in part).

215.    Plaintiffs have not presented any evidence, nor do the medical records reflect, that LSP has engaged in deliberate indifference toward prisoners' serious medical needs. At most, the evidence at trial indicated that the patients at LSP are consistently noncompliant with recommendations of LSP medical providers and that LSP providers' care is subject to a difference in medical opinion when judged in hindsight by non-correctional medical professionals.

216.    Dr. Morrison's testimony shows that LSP patients present with similar clinical conditions as patients in the civilian population; LSP patients are treated in the same way as other patients and are subject to the same general delays in treatment as any other patients.[485]   The common medical conditions commonly addressed by LSP providers are much like the complaints that would be addressed and monitored at any other medical clinic, i.e., hypertension and chronic lung disease.

217.    Courts have consistently held that inadvertent failure to provide adequate medical care, unsuccessful treatment, misdiagnosis, or negligence are insufficient to satisfy the subjective prong of the deliberate indifference standard.  *See, e.g., Sama v. Hannigan,* 669 F.3d 585, 590 (5th Cir. 2012); *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013); *Criollo v. Milton*, 414 F.App'x. 719, 720 (5th Cir. 2011); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Domino*, 239 F.3d at 756.  Rather, "it is only deliberate indifference – 'an unnecessary and wanton infliction of pain' … [or acts] 'repugnant to the conscience of mankind,' that constitutes conduct proscribed by the Eighth Amendment."  *Tompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

218.    A prison official cannot be found liable under the Eighth Amendment for denying an inmate human conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.  *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015). To show subjective deliberate indifference, a plaintiff must show that the official is aware of facts from which a reasonable inference could be drawn that a substantial risk of harm exists **and actually draw that inference**.  *Id*.  Plaintiffs must show that defendants possessed a culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

---

[485] Tr. Day 9, 6.16.22, p. 22.

219.     Plaintiffs' expert Dr. Vasallo testified that LSP complies with the Eighth Amendment by acknowledging that the providers at LSP "are fundamentally good in their wish to do the right thing."[486]   This testimony plainly shows that even the Plaintiffs' expert does not believe that LSP providers are engaged in subjective deliberate indifference to patients' serious medical needs.

220.     There was no evidence presented at trial that LSP medical providers were subjectively aware of a substantial risk of harm and deliberately disregarded those risks with respect to a single patient.   There was likewise no evidence that the LSP providers systematically disregard the risks of harm to its patients.   The contrary was proven – LSP providers assess and address the complaints and conditions of the patients and provide the necessary care to address the risks associated with each patient's conditions and complaints.

221.     The Supreme Court has also held that current conditions are necessary to establish whether injunctive relief should be granted in prison cases like the one brought by the Plaintiffs, saying:

> [If a prisoner] seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, the subjective factor, deliberate indifference, should be determined in light of the prison authorities' **current attitudes and conduct**, their attitudes and conduct at the time the suit is brought and **persisting thereafter**. An inmate seeking an injunction on the ground that there is a contemporary violation of a nature likely to continue, must adequately plead such a violation[.]

*Farmer v. Brennan*, 511 U.S. 825, 845–46 (1994) (internal quotations and citations omitted) (emphasis added).

222.     The Fifth Circuit affirmed the principle that current conditions must be considered at the time of an injunction issuing.  *Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021).  *Valentine*

---

[486] Tr. Day 3, 6.8.22, pp. 94-95.

involved claims of deliberate indifference under the Eighth Amendment against a prison in Texas. After an 18-day bench trial, the district court found that the Defendants violated the Eight Amendment and issued a lengthy opinion granting an injunction. The Fifth Circuit reversed, concluding that given steps taken by the0 defendants,0 *including post-trial* reports of Defendants to the district court, plaintiffs failed to prove entitlement to injunctive relief. In so holding, the Court stated:

> When there is a possible constitutional violation that is likely to continue over time as in a prison injunction case, we consider the **evidence from the time suit is filed to the judgment**. Deliberate indifference is determined based on prison officials' current attitudes and conduct. The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate **the continuance of that disregard during the remainder of the litigation and into the future.**

*Id.* at 282 (emphasis added) (internal quotations and citations omitted).

223.	The Fifth Circuit reiterated its stance on current conditions in the case of *Dockery v. Hall*, 443 F.Supp.3d 726 (S.D. Miss. 2019), *aff'd sub nom. Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021). There, the district court specifically considered current conditions at the prison at the time of trial and post-trial. The district court ordered briefing and considered evidence of current conditions after the trial, prior to ruling. *Id.* at 377. In affirming the district court ruling, the Fifth Circuit considered current conditions and found them to be constitutional, noting that the conditions had "changed dramatically" since the beginning of the case. *Dockery v. Cain*, 7 F. 4th at 377. The Fifth Circuit affirmed the district court in all respects. *Id.*

224.	If the current conditions at LSP, even those developing after the remedy trial, establish that there are no ongoing Constitutional violations, then the Court must refrain from issuing an injunction regarding the conditions at LSP.

**B.** **Plaintiffs Have Not Proven Ongoing ADA/RA Violations**

225.     Plaintiffs failed to establish a violation of the ADA. The Americans with Disabilities Act states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[487] Claims against public entities for discrimination under the ADA and RA require that the plaintiff prove that: (1) plaintiffs have qualifying disabilities; (2) plaintiffs are being excluded from participation in or "being denied the benefits of services, programs, or activities for which the public entity is responsible, or [are] otherwise discriminated against by the public entity;" and (3) the discrimination is by reason of their disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). Plaintiffs have failed to meet their burden of proof.

226.     The ADA requires public entities to make reasonable modifications in order to ensure that disabled persons can access the services, programs, and activities provided by the public entity. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).

227.     "The accessibility requirements for existing facilities are less stringent and more flexible than for new facilities." *Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 746, 752 (N.D. Tex. 2010), *aff'd,* 472 F. App'x 287 (5th Cir. 2012).  A public entity is not required to make all of its existing facilities accessible to persons with disabilities, nor is it required to take any action that would result in an undue burden on the public entity. 28 C.F.R. § 35.150(a). Rather, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, <u>when viewed in its entirety</u>, is readily accessible to and usable by individuals with disabilities." *Id.* [emphasis added].  This is known as the program access requirement.

---

[487] 42 U.S.C. § 12132.

228. A public entity may comply with the program access requirement "through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities." *Id*.

229. Mazz visited Ash 1, 3, and 4 during his April 6, 2022, site visit.[488] In reviewing Ash 1, 3, and 4, Mazz applied the program access standard because he determined that certain areas of the facilities had not been altered since March 15, 2012.[489] A public entity like LSP may comply with the program access standard for existing facilities through alternative methods of compliance. 28 C.F.R. § 35.150. While Mazz noted purported architectural barriers in Ash 1, 3, and 4,[490] he did not consider whether LSP employs any alternative methods of compliance to achieve program access in those dorms.[491]

230. Mr. Mazz's singular focus on the physical aspects of limited areas of LSP's facility improperly conflates the 1991 facility standards with the program accessibility requirement and does not establish that LSP fails provide program access to inmates with disabilities. *Greer*, 472 F. App'x at 293. In *Greer v. Richardson Indep. Sch. Dist.*, the plaintiff, who used a wheelchair, claimed that she was discriminated against because she was unable to access the Berkner High School stadium bleachers and had to watch a football game from an accessible paved area next to the bleachers. *Id.* at 288–289. The Fifth Circuit affirmed the district court's finding that the plaintiff failed to establish a prima facie case of discrimination under the program access standard.

---

[488] Tr. Day 2, 6/7/22, p. 49.
[489] Tr. Day 2, 6/7/22, p. 71-72; *see also* p. 63.
[490] PX4.0012–0017.
[491] Tr. Day 2, 6.7.22, pp. 66, 70-71.

*Id*. at 298. The Court stated that the proper focus of the review is, instead, "the accessibility of the program and not technical compliance with ADAAG in an existing facility." *Id*. at 295.

231.    Here, LSP has complied with the progress access requirement. LSP has made its programs, services, and activities readily accessible and useable by inmates with disabilities through alternative methods of compliance. Specifically, Plaintiffs did not present any evidence that inmates housed in Ash 1, 3, and 4 are not afforded access to the same programs, services, and activities as inmates housed in non-accessible housing units. Therefore, further structural changes to Ash 1, 3, and 4 are not warranted.

232.    Additionally, to the extent any architectural barriers remain in the nursing units, LSP continues to use inmate orderlies to achieve access to programs, services, and activities. Plaintiffs did not present any evidence to show that inmates in the nursing units are deprived of access to programs, services and activities. Thus, further structural changes to the nursing units at LSP is not warranted.

233.    Since LSP has made its programs, services, and activities readily accessible and useable by inmates with disabilities, Plaintiffs failed to prove that disabled inmates are unjustly segregated in violation of the ADA.

234.    "A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3), in part.  Plaintiffs failed to meet their burden of proving that LSP discriminates against disabled inmates through its methods of administration.

235.    LSP's ADA Coordinator is sufficiently trained and equipped to perform the duties of ADA Coordinator at LSP. Requests for Accommodations and disability-related grievances are appropriately evaluated and addressed. The ADA Tracking Database maintained by DOC is sufficient to meaningfully track disabilities and accommodation requests.

236.    LSP's staff is adequately trained to assist inmates with disabilities and to identify ADA issues.

237.    "[B]oth the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005). In the Liability Ruling, the Court found that Plaintiffs failed to meet their burden of proof on all aspects of their claim of failure to accommodate, except as to disciplinary procedures.[492]  At the Remedy Trial, however, Plaintiffs failed to meet their burden of proving that LSP fails to accommodate disabled inmates in disciplinary actions.

**C.    Remedy Considerations under the Prison Litigation Reform Act.**

238.    As the Court weighs the evidence and considers what, if any, remedy is necessary at this time, the considerations of the Prison Litigation Reform Act ("PLRA") must be taken into account.  The PLRA and jurisprudence instructs that the case is not about the best practices or even preferred practices – the case is about whether Defendants are above the Constitutionally required minimum standards.  If the Court finds that Defendants are above the Constitutionally required minimum standard, then there is nothing more for this Court to do, even if the Court is convinced that a better practice is available.

---

[492] Liability Ruling, R. Doc. 594, p. 109-115.

239.    To the extent that the Court finds that any practice is below the Constitutionally required minimum standard, then the PLRA directs that the Court can order only the least restrictive measures necessary to meet the minimum standards. "The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626.

240.    Courts routinely advise against judicial intervention in the day-to-day operation of correctional facilities. States are given broad discretion to make the difficult judgments concerning institutional operations of their prisons. *Lewis v. Casey*, 518 U.S. 343 (1996). "Prison administrators … should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520 (1979). "[P]rison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order." *Tasby v. Cain*, No. 16-277, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted,* 2017 WL 4322413 (M.D. La. Sept. 28, 2017) (citing *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999)).

## XIII.   CONCLUSION

241.    During 2020, LSP was forced to respond to COVID, just as all other medical institutions, correctional or otherwise. As COVID waned toward the end of 2021, multiple events coalesced to improve health care at LSP. Dr. Johnson (hired in August of 2020) was able to focus on overall health care, including things such as mortality reviews and QA/QI programs. Additional NPs were hired in the second half of 2021. The addition of the NPs allowed LSP to implement its current sick call process. The NPs cemented the care provided in the ATU which is now manned 24/7 by an RN. COVID also slowed the process of fully implementing the ADA improvements

which is ongoing in good faith. Considering current conditions, as the Court must, LSP has clearly addressed all concerns raised by the Court previously.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: /s/ *Randal J. Robert*
      Randal J. Robert (#13800)
      Connell L. Archey (#29992)
      Keith J. Fernandez (#33124)
      Allena W. McCain (#38830)
      *Special Assistant Attorneys General*
      Email: randy.robert@butlersnow.com
             connell.archey@butlersnow.com
             keith.fernandez@butlersnow.com
             allena.mccain@butlersnow.com

**SHOWS, CALI & WALSH, L.L.P.**
Jeffrey K. Cody, La. Bar Roll No. 28536
Caroline T. Bond, La. Bar Roll No. 34120
John C. Conine, Jr., La. Bar Roll No. 36834
*Special Assistant Attorneys General*
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
Email: jeffreyc@scwllp.com
       caroline@scwllp.com
       coninej@scwllp.com

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of December, 2022, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Randal J. Robert*
Randal J. Robert