## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, et al.,

Defendants.

CIVIL ACTION NO. 3:15-cv-318

JUDGE SDD

MAGISTRATE RLB

## PLAINTIFFS' PROPOSED REMEDIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

BACKGROUND ..................................................................................................1

I. REMEDY HEARING WITNESSES.............................................................1

    A.    Plaintiffs' Medical Experts ................................................1

    B.    Defendants' Expert Witnesses.............................................3

    C.    Plaintiffs' Fact Witnesses....................................................7

    D.    Defendants' Fact Witnesses ................................................8

FINDINGS OF FACT........................................................................................8

II. CLASS MEMBERS ARE STILL AT A SUBSTANTIAL RISK OF SERIOUS HARM ...................................................................................8

    A.    Clinical Care.........................................................................9

    B.    Specialty Care ....................................................................13

    C.    Infirmary Care....................................................................16

    D.    Emergency Care.................................................................19

III. DEFENDANTS' CURRENT POLICIES AND PRACTICES CONTRIBUTE TO THE SUBSTANTIAL RISK OF SERIOUS HARM......................................................26

    A.    Clinical Care.......................................................................27

    B.    Specialty Care ....................................................................32

    C.    Infirmary Care....................................................................34

    D.    Emergency Care.................................................................36

    E.    Organizational and Structural Deficiencies ...................41

IV. DEFENDANTS ARE STILL NOT IN COMPLIANCE WITH THE ADA.............51

A.     Plaintiffs' ADA Experts ...........................................................52

B.     Architectural Barriers ..............................................................54

C.     Methods of Administration.......................................................55

CONCLUSIONS OF LAW...............................................................................62

V.     Eighth Amendment..................................................................62

VI.    Americans with Disabilities Act/Rehabilitation Act ....................65

REMEDY.......................................................................................................66

VII.   Injunctive Relief Is Necessary and Appropriate Under the PLRA ........66

VIII.  Remedies Necessary to Correct Eighth Amendment Violation............68

IX.    Remedies Necessary to Correct ADA/RA Violations.............................74

## BACKGROUND

1.    From June 6 to June 17, 2022, the Court held a remedial hearing to determine the scope of the remedy needed to correct the constitutional and statutory violations identified in the Court's March 31, 2021 Opinion.[1] The evidence at the remedial hearing showed that Plaintiffs with serious medical needs are still at a substantial risk of serious harm and a remedial order is necessary and appropriate.

## I.    REMEDY HEARING WITNESSES

### A.  Plaintiffs' Medical Experts[2]

2.    **Madeleine LaMarre** is a nurse practitioner with over 30 years of experience in corrections, including serving as the Nursing Director and Clinical Services Manager in the Georgia Department of Corrections and 15 years of experience monitoring correctional facilities. Ms. LaMarre also consults with the Department of Homeland Security and previously consulted with the Centers for Disease Control and Prevention. She was an associate editor of the textbook Clinical Practice in Correctional Medicine, Second Edition. She was accepted by the Court as an expert in correctional health.[3]

3.    **Dr. Susi Vassallo** is a board-certified physician in emergency medicine and medical toxicology. Dr. Vassallo treats patients from correctional facilities at Bellevue Hospital in New York City. In that capacity, she treats patients from correctional facilities. She also consults with the Department of Homeland Security Division of Civil Rights and Civil Liberties regarding medical care in Immigration and Customs Enforcement Detention Centers. Dr. Vassallo was accepted by the Court as an expert in emergency medicine, toxicology, and correctional medicine.[4]

4.    **Dr. Mike Puisis**, a board-certified doctor in internal medicine, has more than 30 years of experience in correctional settings. He was Assistant Medical Director, Medical Director, and Chief

---

[1] Rec. Doc. 594 (the "Liability Opinion").
[2] Plaintiffs' ADA experts are discussed *infra* ¶¶ 135-136, 139.
[3] PX 1-a at 5; Rec. Doc. 748, LaMarre Testimony at 86:6-9, 87:3-14, 90:24-91:2.
[4] PX 1-a at 6; Rec. Doc. 749, Vassallo Testimony at 11:5-7; 14:8-12.

1

Operating Officer for the Cook County Jail; Regional Medical Director with Correctional Medical Services for New Mexico, and Medical Director of correctional facilities with Addus Health Care. He has been retained by the United States Department of Justice, the District Court for the Northern District of California, and numerous state or local jurisdictions, as well as serving as a court-appointed expert or monitor in numerous cases. He is the author of the leading textbook on correctional medicine and has helped revise or establish standards of care for the American Diabetes Association, the National Commission on Correctional Health Care, and the American Public Health Association. Dr. Puisis was accepted by the Court as an expert in internal medicine and correctional medicine.[5]

5.      **Angela Goehring**, a registered nurse, has over 25 years of experience in correctional health care, including as Chief Nursing Officer for a private correctional health care company. She served on the American Correctional Association's Commission for Accreditation and has worked with court-appointed monitors and as an expert and consultant. Ms. Goehring was accepted as an expert "in the field of correctional medicine with an emphasis on nursing care and administration."[6]

6.      To prepare their principal report, the medical experts reviewed a sample of 60 patients who had passed away or required hospitalization after January 1, 2019, which the parties stipulated was the start of the "relevant and appropriate time period for the Court to assess whether the constitutional deficiencies listed in the [Liability Opinion] have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[7] Ms. LaMarre, Dr. Vassallo, and Ms. Goehring performed a site visit of LSP on April 6, 7, and 8, 2022.[8] And the experts reviewed a variety of policies, minutes, reports, and other documents from LSP and DOC.[9]

---

[5] PX 1-a at 5; Rec. Doc. 750, Puisis Testimony at 7:10-15; 9:1-6; 15:23-25.
[6] PX 1-a at 6; Rec. Doc. 751, Goehring Testimony at 35:13-16; 58:9-12.
[7] PX 1-a at 4; *see generally* PX 1-c (full chart review for all 60 patients), JX 77-a (stipulation).
[8] PX 1-a at 3.
[9] *Id.* at 7-8.

7.      Plaintiffs' experts produced a 136-page principal report, which was accompanied by a 443-page appendix of detailed chart reviews.[10] In addition, Ms. LaMarre and Ms. Goehring produced a supplemental report evaluating belatedly produced electronic medication administration records.[11]

8.      Overall, Plaintiffs' experts found that "[p]atients at LSP with serious medical needs continue to face a substantial risk of serious harm, including preventable hospitalizations and deaths."[12] Furthermore, "the vast majority of medical records from the remedy period contained multiple examples – typically pervasive – of often grossly substandard medical care."[13] The experts' key findings and conclusions regarding the details of this substandard care and the factors contributing to the risk of harm are incorporated into the Findings of Fact below and discussed therein.

9.      Plaintiffs' experts are credible, just as this Court found in the Liability Opinion.[14] As Plaintiffs extensively documented in their liability-stage proposed findings,[15] none of Defendants' criticisms of Plaintiffs' experts' methodology, expertise, credibility, or impartiality holds water. Moreover, the Court's independent review of the experts' analyses and the underlying records will confirm that the examples Plaintiffs' experts presented at trial are representative and their conclusions well-founded.[16]

### B.  Defendants' Expert Witnesses

10.     **Dr. David Mathis** is a physician in family medicine who works as a medical consultant for the Office of Legal Affairs for California Correctional Health Care Services.[17] He previously worked at a California prison and was the medical director at a prison in Maryland.[18] He has not worked as an ACA or NCCHC auditor; aside from his own prison in Maryland, he has never evaluated the overall

---

[10] *See id.*; PX 1-c.
[11] *See* PX 5-a; PX 5-b (amended chart reviews incorporating eMARs).
[12] PX 1-a at 8.
[13] *Id.*
[14] Rec. Doc. 594 at ¶ 24.
[15] *See* Rec. Doc. 558-2 at 7-38.
[16] *See* JX 1-JX 60.
[17] Rec. Doc. 752, Mathis Testimony at 139:22-140:23.
[18] *Id.* at 141:14-22; 143:17-23; 145:23-146:11.

medical care at a prison, and has evaluated just one jail.[19]

11.      There is substantial reason to question the reliability, thoroughness, and independence of Dr. Mathis's chart reviews and conclusions. Approximately 50 pages of his expert report—nearly half of his entire chart review section—were copied directly from LSP's mortality reviews.[20]  Much of the actual independent analysis in Dr. Mathis's report was as cursory and conclusory as "I reviewed the entire chart of [the patient] and found the LSP death review to be substantially accurate[,]" and "[i]t is my opinion that there are no Standard of Care violations by LSP in their care for [the patient]."[21] Moreover, while Dr. Mathis claimed in his report that he found "fewer than five" standard of care violations, at trial he acknowledged that in fact he found violations in 10 records, more than a fourth of the records he reviewed,[22] and espoused several additional standards that LSP was violating.[23] Although he opined in his report and deposition that Plaintiffs' experts' methodology was unreliable and that accreditation bodies review records randomly, he admitted at trial that that was incorrect.[24]

12.      Dr. Mathis's credibility is further undermined by his false statement at his deposition that he had never had an opinion excluded in whole or in part by a court, coupled with his omission from his list of testifying history of a case where his opinion had been partially excluded.[25]

13.      In any event, Dr. Mathis's opinions are of limited utility for the ultimate questions before the Court, because he declined to opine on several key questions regarding the overall quality of medical

---

[19] Rec. Doc. 753, Mathis Testimony at 9:1-3; 9:22-10:5.

[20] *Id.* at 29:24-30:4; 24:15-30:4 (comparing Dr. Mathis's expert report to LSP mortality reviews); *see* DX 35-c at 94-211.

[21] DX 35-c at 110 (Patient #36); *see, e.g.*, Rec. Doc. 753, Mathis Testimony at 28:20-29:23; DX 35-c at 129-32 (Patient #14); 132-34 (Patient #17); 173-74 (Patient #16).

[22] *Compare* DX 35-c at 212 *with* Rec. Doc. 753, Mathis Testimony at 12:10-15:14.

[23] *See, e.g.*, Rec. Doc. 753, Mathis Testimony at 30:7-31:14 (nurses in an infirmary should note the time they take vital signs, which did not occur at LSP); *id.* at 31:17-32:15 (trained personnel should use an AED for a pulseless person not breathing, which did not happen for Patient #25); *id.* at 34:6-9, 42:11-44:11 (patient who is incontinent and cannot get out of bed due to back pain should be presented to provider, which did not happen for Patient #6); *id.* at 47:17-51:5 (patient with acute hepatic failure should go to emergency room, which did not happen for Patient #33).

[24] *See id.* at 8:11-9:21; *see also* DX 35-c at 206-07; Rec. Doc. 698-1 at 11.

[25] Rec. Doc. 753, Mathis Testimony at 109:14-111:13.

care at LSP. He did not opine on whether physicians treat complaints episodically and routinely fail to adequately obtain information regarding a patient's medical history upon evaluation, perform a meaningful physical examination, read and monitor testing, or monitor and manage medications.[26] He did not opine on whether people were correctly and timely sent out for emergency care as an overall matter.[27] And although he acknowledged that LSP's protocol for responding to emergency sick call requests was "problematic" and involved EMTs practicing beyond their training and licensing, and that this led to patients not receiving evaluations that they needed, he declined to opine on the adequacy of Defendants' purported replacement for that process or how it was affecting health care.[28]

14.     **Michael McMunn** is a nurse practitioner who works for Southern Health Partners as a contractor in seven jails and one prison work camp.[29] He has never previously evaluated a prison of this scope, nor has he worked as an auditor for the ACA or NCCHC.[30] Prior to trial, the Court precluded Mr. McMunn from "giv[ing] opinion testimony regarding Medical Leadership or Organizational Structure" or the effect or impact of nursing shortages "on LSP particularly."[31] The Court stated that "[t]he lack of data and recorded observations is problematic in terms of testing his opinions for reliability" and that "[t]his lack of empirical data is troublesome."[32] The Court also noted that "McMunn's opinions are in many instances dogmatic expressions of opinion premised on unverifiable observations."[33]

15.     For his work on this case, Mr. McMunn reviewed 22 charts.[34] He claims to have observed over 50 patient encounters and conducted 63 interviews, but took no notes of any of those encounters.[35]

---

[26] *Id.* at 65:4-23.
[27] *Id.* at 59:11-17.
[28] *Id.* at 61:23-63:15.
[29] Rec. Doc. 756, McMunn Testimony at 6:9-11; 8:12-22.
[30] *Id.* at 79:9-14; 80:14-20.
[31] Rec. Doc. 720 at 10.
[32] *Id.* at 5.
[33] *Id.* at 6.
[34] *Id.* at 22:25-23:2.
[35] *Id.* at 85:23-86:3; 88:12-14.

16.     The unreliability and unhelpfulness of Mr. McMunn's opinion was apparent in his testimony. For example, Mr. McMunn claimed in his report that LSP was compliant with 95 percent of NCCHC regulations, but reached that calculation in his head without any paperwork or audit.[36] Most significantly, "the standard [he] used was basically did they do nothing in the face of people having serious medical needs."[37] "Did they do nothing" is not the standard for deliberate indifference under the Eighth Amendment,[38] and therefore his opinions applying that standard are of little if any utility.

17.     **Dr. John Morrison**, a general surgeon, was the DOC medical director from April 2018 to April 2020 and a named defendant in this case at the liability trial.[39] He is currently the Section Chief of General Surgery for the LSU part of UMC New Orleans.[40] He performs procedures on patients from LSP both at LSP and at UMC.[41] Dr. Morrison was accepted by the Court as an expert in "general surgery with an emphasis in surgical administration."[42]

18.     Dr. Morrison testified that he had not seen any changes to the delivery of medical care at LSP since he resumed treating LSP patients after the COVID-19 pandemic receded.[43] His testimony is of limited utility for evaluating the adequacy of the medical care provided to Class members. He did not perform chart reviews, and aside from a snapshot of DOC backlog numbers and notes from a single meeting of the surgery committee, reviewed no documents.[44] His testimony was largely his personal experience treating patients during the COVID-19 pandemic and national disasters, but he did not recall operating on any incarcerated patients during that time.[45]

---

[36] Rec. Doc. 756, McMunn Testimony at 85:4-22.
[37] *Id.* at 92:4-7.
[38] *See infra* Part V.
[39] Rec. Doc. 754, Morrison Testimony at 5:18-21; 10:6-9; Rec. Doc. 696-1 at 3.
[40] Rec. Doc. 754, Morrison Testimony at 7:4-6.
[41] *Id.* at 9:16-10:5.
[42] *Id.* at 14:3-5.
[43] *Id.* at 39:4-21.
[44] *Id.* at 30:17-31:9; 32:7-33:5.
[45] *See generally id.* at 18:16-20:16; 32:7-33:5; 36:4-13.

## C. Plaintiffs' Fact Witnesses

19. **Class Members:** The Class members offered consistent testimony. Three Class members, Dennis Mischler, Jean Paul Creppel, and Charles Butler credibly testified about problems they experience at LSP,[46] including difficulty receiving necessary medical supplies;[47] disbelief and disregard from providers;[48] and physical barriers obstructing or endangering Class members who use wheelchairs.[49]

20. The parties stipulated to the substance of five additional Class members' testimony and designated testimony from two inmate health care orderlies on Defendants' witness list.[50] These Class members described issues they faced with health care and accessibility for people with disabilities.[51]

21. **University Medical Doctors:** Dr. Helen Pope, Dr. Daniel Brady, and Dr. Marcia Glass credibly testified regarding their experiences treating LSP patients at University Medical Center. Among other things, they each testified about patients arrived with late-stage undiagnosed disease despite extended periods of symptoms;[52] difficulties obtaining follow-up appointments for patients from LSP or ensuring follow-up care occurs;[53] and an inability to view LSP patients' full medical records.[54]

---

[46] *See* Rec. Doc. 747, Mischler Testimony at 41:24-60:1; Rec. Doc. 749, Creppel Testimony at 227:6-244:20; Rec. Doc. 755, Butler Testimony at 185:22-201:2.

[47] *See* Rec. Doc. 747, Mischler Testimony at 49:18-50:13; Rec. Doc. 749, Creppel Testimony at 236:2-17.

[48] *See, e.g.,* Rec. Doc. 749, Creppel Testimony at 230:3-5; 230:13-232:18; Rec. Doc. 755, Butler Testimony at 191:8-15; 214:11-25.

[49] *See* Rec. Doc. 747, Mischler Testimony at 52:3-55:25.

[50] JX 75-a; JX 76-a; JX 77-c.

[51] *See, e.g.,* JX 77-c at 3 (Class member Derrick Martin has suffered at least 11 infections because his catheter was not cleaned correctly); *id.* at 8 (LSP has attempted to take away Class member John Price's wheelchair); *id.* at 2 (Class member Robert Lucas was prevented from talking about his degenerative disc disease with a doctor at an annual check-up and directed instead to submit a sick call); *id.* at 10 (Class member Michael Videau did not receive a wheelchair from LSP for months); *id.* at 4 (Class member Jerome Mellion stopped getting his blood pressure medication without explanation).

[52] *See, e.g.,* Rec. Doc. 751, Pope Testimony at 8:8-18; 11:16-22 ("[T]he biggest [issue] is a patient presenting later in the course of an illness than I would expect someone from the community."); *id.* at 12:3-17:5 (providing additional details); Rec. Doc. 755, Brady Testimony at 134:19-137:10 (describing patients who received delayed diagnoses); Rec. Doc. 755, Glass Testimony at 162:12-164:21 (comparing patients from LSP population with others in the community).

[53] *See, e.g.,* Rec. Doc. 751, Pope Testimony at 11:6-15 ("After the patient leaves the hospital, I have no assurance that appointments will be taking place."); Rec. Doc. 755, Glass Testimony at 165:21-166:7 ("We put [orders for follow up care] in our discharge orders, but we have no way of telling whether that's going to happen or not . . . [I] see patients who were referred for follow-up appointments by other doctors that did not get those appointments."); 166:8-19 (describing the impact on patient prognosis); Rec. Doc. 755, Brady Testimony at 137:22-140:6 ("Q: Would you say lack of follow-up is a common problem with patients from Angola? A: I think so, yes.").

[54] *See, e.g.,* Rec. Doc. 755, Glass Testimony at 171:11-16 ("[T]hey should have an electronic medical record that doctors

### D. Defendants' Fact Witnesses

22.     Defendants offered testimony from several DOC employees. To the extent their testimony was intended to reflect what actually occurs in practice in all or most instances, it frequently lacked foundation or was contradicted by other evidence.

23.     Notably, Defendants did not call two significant witnesses: LSP Medical Director Dr. Paul Toce and DOC Medical Director Randy Lavespere. Both doctors provided deficient care during the Liability Period, and have since been promoted to positions with even more responsibility for the medical care at LSP.[55] Indeed, Dr. Toce was the only physician on LSP's staff at the time of the remedy hearing. He was similarly absent during Plaintiffs' experts' site visit, during which no physicians were providing primary care or supervising nurse practitioners.[56] Their absence from trial left unrebutted much of Plaintiffs' experts' evaluation of deficiencies in the leadership and administrative oversight of LSP's medical system, inadequate supervision of nurse practitioners and medical staff, and problematic attitudes toward patients. Indeed, their deposition designations often confirmed those findings.[57]

## FINDINGS OF FACT

## II.     CLASS MEMBERS ARE STILL AT A SUBSTANTIAL RISK OF SERIOUS HARM

24.     In determining what remedy is appropriate given current conditions at LSP, the critical question is whether class members are still at a substantial risk of serious harm when they develop serious medical needs. Unfortunately, the evidence shows that that they are.

---

like me … should be able to access easily so we have some way of knowing what's been going on with these patients."); Rec. Doc. 751, Pope Testimony at 10:24-11:5; 21:4-22:2 (describing how patients are not able to give full medical histories); Rec. Doc. 755, Brady Testimony at 140:7-141:8.

[55] *See* Rec. Doc. 594 at ¶¶ 95; 129; JX 70-a, R. Lavespere Depo. Tr. at 11:19-20; 12:1; 14:1-12; JX 71-a, P. Toce Depo. Tr. at 24:10-14; 31:10-23.

[56] PX 1-a at 20.

[57] *See, e.g.*, JX 71-a, P. Toce Depo. Tr. at 46:1-14; 47:10-15 (testifying that he should be more involved with the nurse practitioners); 60:17-62:4 (testifying about LSP patients making frivolous complaints); JX 70-a, R. Lavespere Depo. Tr. at 44:15-45:1 (testifying that there is no policy regarding the decision to follow specialist recommendations or schedule follow up appointments); 14:13-19 (testifying that he medically supervises approximately 20 people).

25.     In the Liability Opinion, the Court found access to care "constitutionally inadequate in the following ways: clinical care, specialty care, infirmary care, and emergency care."[58] The medical records of the patient sample overwhelmingly prove that those areas remain inadequate today. As Plaintiffs' experts credibly testified, the care in each area places patients at a substantial risk of serious harm.[59]

26.     Although the discussion below is separated out by type of medical care, these categories overlap and patients often had issues in multiple areas.[60] Thus, while the case studies below are presented in the context of a specific type of care, many are relevant to more than one type of care.

### A.  Clinical Care

27.     Nurse practitioner Madeleine LaMarre and nurse Angela Goehring principally testified about clinical care at the remedial hearing.

28.     The evidence showed that clinical care at LSP continues to put Class members at a substantial risk of "serious harm and preventable harm, including hospitalizations and deaths as a result of lack of timely and appropriate medical care."[61] This stems from problems in provider encounters, medication administration and management, and sick call.

29.     As during the liability period, Class members are frequently denied timely access to a medical provider, adequate medical evaluations, and timely diagnosis of treatment for serious medical needs.[62] Providers in clinical encounters routinely fail to perform a meaningful physical exam, flag and react to unstable vital signs, read and monitor testing, adequately obtain information regarding a patient's medical history upon evaluation, or identify the underlying state of a patient's disease.[63] Instead, most

---

[58] Rec. Doc. 594 at ¶ 28.
[59] *See* Rec. Doc. 748, LaMarre Testimony at 96:6-10; Rec. Doc. 749, Vassallo Testimony at 17:21-25; 90:16-23; Rec. Doc. 750, Puisis Testimony at 21:18-22; 108:9-16; Rec. Doc. 751, Goehring Testimony at 65:21-66:2; 67:1-6.
[60] *See, e.g.*, Rec. Doc. 750, Puisis Testimony at 17:5-18:18; PX 1-a at 4.
[61] Rec. Doc. 748, LaMarre Testimony at 96:6-10.
[62] *See id.* at 153:21-154:11; 155:5:19; PX 1-a at 48-49, 58-65.
[63] *See* Rec. Doc. 748, LaMarre Testimony at 153:18-154:17; PX 1-a at 48-71.

records showed patients at best being treated haphazardly for episodic complaints.[64] And due in part to an unchanged and inadequate system of medication administration (discussed *infra* ¶¶ 118-120), providers do not appropriately monitor and manage medication or educate patients regarding medication.[65] Additionally, while Defendants changed their sick call system shortly before trial (discussed *infra* ¶¶ 75-83), the evidence shows that the sick call process persists as a barrier to care.

30. The following examples illustrate the deficiencies in LSP's clinical care:

31. **Patient #13** was a 61-year-old man with a number of health problems, including HIV and chronic kidney disease.[66] LSP providers and health care staff made numerous errors that harmed the patient and put him at risk of serious, and ultimately fatal, consequences.[67] Among other mistakes, LSP staff treated an infection with an antibiotic they knew it was resistant to; repeatedly allowed his HIV medication to lapse or failed to administer it to him even though he was in the infirmary; provided specialists with incorrect information regarding the patient's medication dosage; and changed specialists' prescriptions without explanation, reverting them to medication that had been ineffective.[68]

32. His treatment in the final week of his life was particularly egregious. First, although specialists repeatedly advised LSP not to give him Toradol or other NSAIDs because they "will worsen his kidney function," and even though the cover of his medical record explicitly said in bold letters "NO TORADOL IS TO BE GIVEN," an LSP provider again prescribed him Toradol.[69] Several hours after receiving the Toradol, the patient made a self-declared emergency request saying that he had been unable to urinate since the shot, a sign of exacerbated kidney issues.[70] LSP providers diagnosed him

---

[64] *See* Rec. Doc. 748, LaMarre Testimony at 154:7-11; PX 1-a at 10; *see, e.g.,* PX 1-a at 65 (describing **Patient #48**); *id.* at 66 (describing **Patient #13**); *id.* at 90 (describing **Patient #4**).

[65] *See* Rec. Doc. 748, LaMarre Testimony at 154:12-17; PX 1-a at 71-79.

[66] Rec. Doc. 748, LaMarre Testimony at 110:23-111:2; PX 1-a at 66-67; JX 13.

[67] *See generally* Rec. Doc. 748, LaMarre Testimony at 110:23-117:17, 123:14-132:18; PX 1-a at 66-67.

[68] Rec. Doc. 748, LaMarre Testimony at 112:11-116:12, 123:14-127:13; JX 13 at 58, 158, 755, 883, 919, 1080-82, 1152; JX 68 at 2222, 2252, 2321.

[69] Rec. Doc. 748, LaMarre Testimony at 127:14-132:17; JX 13 at 1, 402, 404, 405, 1074, 1035, 1085.

[70] Rec. Doc. 748, LaMarre Testimony at 129:23-130:4; JX 13 at 405.

with a urinary tract infection and again treated him with an antibiotic that the infection was resistant to, then discharged him to his dorm with extremely elevated blood pressure, with a clinical follow-up scheduled for a week later.[71] Within a week, the patient died of sepsis, which Ms. LaMarre credibly concluded "may very well have come from an improperly treated urinary tract infection."[72]

33.     **Patient #20** was a 52-year-old man who was diagnosed with hepatitis C in early 2021.[73] He made four sick calls between February and August 2021 complaining of symptoms escalating from lower abdominal pain to yellow eyes and inability to lie on his left side, as well as not receiving his hepatitis C medication.[74] The EMTs who received the sick call requests invariably referred him for "M.D. review" without treatment; the providers did not see the patient and simply indicated that he should continue making sick call as needed, often not reviewing the sick call request for several days or more.[75] His August 31, 2021 request, in which he noted his recent hepatitis C diagnosis, his jaundice, and his liver pain was not reviewed by any provider until September 29, 2021—by which time he had already been sent to the hospital after a medic responded to a fifth sick call request and finally recognized the jaundice.[76] Even Defendants' expert Dr. Mathis agreed that the failure to see the patient after the August 31 request was below the standard of care.[77] He passed away two months later.[78]

34.     **Patient #42** is a 25-year-old man with a history of asthma and cavitary pneumonia who repeatedly made sick call requests for serious or red-flag symptoms such as spitting up blood, without evaluation by a provider.[79] Even after Defendants began conducting sick call via telemedicine with a

[71] Rec. Doc. 748, LaMarre Testimony at 130:5-131:4; 131:14-132:9; JX 13 at 404-05.
[72] Rec. Doc. 748, LaMarre Testimony at 132:10-17.
[73] *See generally* Rec. Doc. 755, Goehring Testimony at 13:8-26:4; PX 1-c at 286-88; JX 20 at 5, 123.
[74] Rec. Doc. 755, Goehring Testimony at 13:8-17:11; JX 20 at 112, 116, 123-24.
[75] Rec. Doc. 755, Goehring Testimony at 13:8-17:11; JX 20 at 112, 116, 123-24.
[76] Rec. Doc. 755, Goehring Testimony at 16:10-18:11; JX 30 at 91, 112, 114-15.
[77] Rec. Doc. 753, Mathis Testimony at 13:16-20; DX 35-c at 178.
[78] PX-c at 288, 295; JX 20 at 52-56.
[79] Rec. Doc. 748, LaMarre Testimony at 132:24-137:4; 139:13-144:24; PX 1-a at 53, 55-56, 58-59; JX 42 at 38-39, 41-42, 74-76.

nurse practitioner, he was denied timely access to care, an adequate examination, and timely diagnosis. For example, on January 14, 2022, he made an emergency sick call request complaining of chest pain for two days; the EMT provided no treatment and merely referred the request to a provider, who simply wrote "S/C PRN [sick call as needed]" four days later without seeing the patient.[80] Five days later, he made another sick call request and was seen via telemedicine by Nurse Practitioner Bordelon, who did not take an adequate history, physically examine the patient, recognize the previous cavitary pneumonia and the risk of reoccurrence, or attempt to diagnose the source of the patient's pain.[81]

35.     **Patient # 16** was a 43-year-old man with a history of hypertension.[82] For two years prior to his death by cardiac arrest in 2021, "medical providers essentially did nothing" in response to a series of episodes of very high blood pressure.[83] In multiple encounters, providers failed to treat his blood pressure, document a diagnosis or treatment plan, or determine whether the patient was receiving and taking his medication and, if not, why not; at times, they did not even take his vital signs.[84] In the nine months before his fatal heart attack, LSP providers did not see him at all for his blood pressure.[85]

36.     In addition to these examples, the experts' report is replete with documented numerous similar problems in other patients' records, including records with encounters from 2022.[86] Even Defendants'

[80] Rec. Doc. 748, LaMarre Testimony at 139:13-140:9; JX 42 at 42.
[81] Rec. Doc. 748, LaMarre Testimony at 140:17-142:18; JX 42 at 41.
[82] *See generally* Rec. Doc. 748, LaMarre Testimony at 100:1-108:6; PX 1-a at 67-69; JX 16.
[83] Rec. Doc. 748, LaMarre Testimony at 100:1-25; 105:22-106:20; *see also* PX 1-a at 67-69.
[84] Rec. Doc. 748, LaMarre Testimony at 101:1-105:2; 105:22-106:20; PX 1-a at 67-69; *see, e.g.*, JX 16 at 58-59, 64, 101.
[85] Rec. Doc. 748, LaMarre Testimony at 107:23-108:6.
[86] *See, e.g.*, PX 1-a at 68-69 (**Patient #15**, whose condition of COPD was left off the "problem list" in his medical records and therefore was not addressed in the "woefully inadequate" medical evaluations in his clinical visits; even after a test showed severe obstruction, Dr. Toce did not document a follow-up plan or see the patient before his death from COPD); *id.* at 120 (**Patient #29**, who was given NSAIDs despite hypertension and kidney damage and whose hypertension was not treated); *id.* at 121 (**Patient #30**, who made sick call requests or ATU visits five times in a month without being examined by a provider, delaying the diagnosis of metastatic colon cancer); *id.* at 121-22 (**Patient #17**, who was incorrectly diagnosed with venous insufficiency instead of deep vein thrombosis); *id.* at 123-24 (**Patient #18**, who did not receive physical examination, monitoring, or a history in clinical encounters); *id.* at 124 (**Patient #19**, who submitted multiple health services requests related to a degenerative joint disease without a timely and appropriate evaluation); *id.* at 53-54, 65 (identifying problems in health care encounters in January 2022 in **Patients #42, #49, #48, & #47**); PX 1-c at 87 (noting inadequate assessments for **Patient #46** in January and February 2022); *id.* at 91, 349 (noting problems in records for **Patient #47** in January 2022); *id.* at 99-100 (same for **Patient #48**); *id.* at 106-107 (same for **Patient #49**); *id.* at 193

expert Dr. Mathis acknowledged, explicitly or implicitly, several critical standard of care violations in LSP's clinical care.[87] In their totality, these examples and Plaintiffs' other evidence proved that the risk posed to patients who need clinical care is widespread and substantial.

### B. Specialty Care

37.     Dr. Mike Puisis principally testified about specialty care at the remedial hearing.

38.     The evidence showed that specialty care at LSP continues to put patients at a substantial risk of serious harm. This happens in two main ways. First, patients are not referred to specialists or for preventative screening when they should be referred. Second, specialists' recommendations are often ignored, because the process of specialty care is not well-designed and physicians at LSP are disengaged from management of their patients rather than collaborating with the specialists.[88] These failings place patients at a substantial risk of having serious conditions go undiagnosed or become more severe, resulting in permanent damage, significant pain, or even preventable death.

39.     The following examples illustrate the deficiencies in LSP's specialty care:

40.     **Patient #5** was a 66-year-old man with aortic stenosis.[89] When he was hospitalized twice in September 2020 for a heart attack and re-stenting, the cardiologist found severe aortic stenosis; recommended that a dobutamine stress echocardiogram ("DSE") and follow up with the hospital cardi-

---

(noting problems in the MARs between December 2021 to March 2022 for **Patient #39**); *id.* at 194 (noting problems in the February 2022 MARs for **Patient #40**); *id.* at 215 (noting inadequate assessment in January 2022 for **Patient #41**); *id.* at 219-220 (identifying multiple issues in the records from January 2022 for **Patient #42**); Rec. Doc. 748, LaMarre Testimony at 155:22-160:5 (describing inadequate sick call from January 2022 for **Patient #49**); JX 49 at 288.

[87] *See* Rec. Doc. 753, Mathis Testimony at 12:10-15:3 (**Patient #2**, who was not given thyroid function tests for hypothyroidism; **Patient #47**, whose hematuria was assessed to be stable without urinalysis; **Patient #32**, who did not receive an EKG ordered to diagnose chest pain; **Patient #28**, who was not put on insulin despite elevated hemoglobin A1-C and the failure of oral diabetic medications); *see also id.* at 48:17-51:4 (**Patient #33**, who had autoimmune hepatitis and developed signs of acute hepatic failure but was discharged to quarters instead of being sent to the hospital).

[88] *See* Rec. Doc. 750, Puisis Testimony at 21:23-22:12.

[89] *Id.* at 33:6-34:25.

ologist to consider valve replacement surgery; and urged LSP to contact them if his symptoms worsened.[90] LSP did not follow the cardiologist's recommendations. Instead, Defendants sent the patient to an onsite cardiologist who either was not given critical records or ignored them.[91] Defendants' expert Dr. Mathis opined that the failure to note the recent medical records was deficient.[92]

41.     In clinical visits, LSP providers rarely took a history of aortic stenosis.[93] In the last year of his life, he presented to LSP medical staff numerous times with symptoms of aortic stenosis and heart failure.[94] The LSP providers didn't consult either the contract cardiologist or the hospital cardiologist, nor did they appear to recognize that the symptoms might be due to heart failure.[95] While they treated some symptoms episodically, they rarely if ever sought to identify and treat the source of those symptoms. Instead, in the last week of his life, LSP medical staff wrote off these symptoms as "his standard daily complaints."[96] When he presented to multiple nurses and nurse practitioners on October 9, 2021, they misdiagnosed him with COPD (rather than restrictive lung disease, which he did have), again treated him symptomatically, and wrote on his medical chart, in all caps, "STOP SMOKING! GET OUT OF THE WHEELCHAIR—GET OFF YOUR BUTT."[97] Two days later, he died of hypertensive cardiovascular disease and aortic stenosis.[98] Had he been evaluated for and received valve surgery, Dr. Puisis credibly concluded, "he might be living today."[99]

42.     **Patient #7** was a 65-year-old man who had three positive fetal occult blood tests in 2019, along with a history of constipation.[100] This called for a prompt colonoscopy to rule out colon cancer,

[90] *Id.* at 35:1-40:5; JX 5 at 237-39, 272, 331-32.
[91] Rec. Doc. 750, Puisis Testimony at 37:20-24; 43:11-50:20; JX 5 at 113, 158, 164, 221, 248, 252, 272.
[92] Rec. Doc. 753, Mathis Testimony at 12:21-13:5.
[93] Rec. Doc. 750, Puisis Testimony at 50:21-62:25; *e.g.*, JX 5 at 132, 134, 144, 193, 212.
[94] Rec. Doc. 750, Puisis Testimony at 50:21-62:25; *e.g.*, JX 5 at 132, 134, 144, 193, 212.
[95] Rec. Doc. 750, Puisis Testimony at 50:21-62:25; *e.g.*, JX 5 at 132, 134, 144, 193, 212.
[96] Rec. Doc. 750, Puisis Testimony at 57:8-59:6; JX 5 at 144.
[97] Rec. Doc. 750, Puisis Testimony at 59:7-62:16; JX 5 at 132, 134.
[98] Rec. Doc. 750, Puisis Testimony at 62:17-25.
[99] *Id.* at 217:19-20; *see also id.* at 63:1-5.
[100] *Id.* at 70:16-73:25; PX 1-a at 97-98; JX 7 at 44, 103.

but there is no indication that this was considered by LSP medical staff or discussed with the patient; indeed, there was no evidence of any medical personnel even acknowledging the positive tests.[101] By the time he was finally sent to the hospital in July 2021, he had metastatic colon cancer, which resulted in a fatal pulmonary embolism.[102] Dr. Puisis credibly concluded that this death was preventable.[103]

43.    **Patient #10** was a 60-year-old man with hypertension and high blood lipids, risk factors for stroke.[104] He had eight episodes of elevated blood pressure, inability to speak clearly, altered gait, and/or left-sided symptoms, symptoms consistent with transient ischemic attacks, which can portend stroke and indicate higher-level diagnostic testing.[105] LSP neither addressed his uncontrolled hypertension nor referred him to a neurologist.[106] Even after he told a physical therapist he thought he had a stroke a month earlier, LSP medical personnel did not evaluate him, refer him to a neurologist, or even recognize the concern.[107] Instead, LSP treated the fact that the patient admitted to using drugs on some occasions as a reason not to evaluate or treat medically concerning symptoms, both at times when the patient may have been using drugs and times when there is no evidence of drug use at all.[108] He ultimately suffered a fatal stroke, which Dr. Puisis credibly concluded was possibly preventable.[109]

44.    **Patient #4** was a 63-year-old man, who had pulmonary hypertension and interstitial lung disease, both of which require pulmonology follow-up.[110] Beginning in May 2019, however, he was "lost to follow up"; he did not see a pulmonologist until December 2020, more than a year and a half later.[111] While some of this delay may be attributable to the impact of COVID-19 on the medical system,

---

[101] Rec. Doc. 750, Puisis Testimony at 71:12-24; 245:8-22; PX 1-a at 97-98.
[102] Rec. Doc. 750, Puisis Testimony at 73:4-25; PX 1-a at 98; JX 7 at 44.
[103] PX 1-a at 98.
[104] Rec. Doc. 750, Puisis Testimony at 76:13-81:1; PX 1-a at 61-63; JX 10 at 113, 122, 125, 172.
[105] Rec. Doc. 750, Puisis Testimony at 77:1-15; 245:23-248:20; PX 1-a at 62-63.
[106] Rec. Doc. 750, Puisis Testimony at 77:16-78:6; PX 1-a at 63.
[107] Rec. Doc. 750, Puisis Testimony at 79:14-81:1; JX 10 at 112, 113.
[108] Rec. Doc. 750, Puisis Testimony at 79:10-13; 225:24-227:16.
[109] PX 1-a at 63.
[110] Rec. Doc. 750, Puisis Testimony at 89:16-106:11; PX 1-a at 89-92; JX 4.
[111] Rec. Doc. 750, Puisis Testimony at 89:14-90:21; PX 1-a at 90.

roughly half of the delay occurred before the pandemic began. Both during that delay and after it, he repeatedly presented with oxygen saturation levels that called for hospitalization, yet LSP providers did not consult a pulmonologist or hospitalize the patient.[112] When he eventually did see a pulmonologist, LSP did not provide the patient with tests the pulmonologist ordered, delayed filling prescriptions for weeks, and failed to "integrate the specialty care into the primary care of the patient."[113] Throughout 2021, until his death from respiratory failure in October 2021, LSP repeatedly failed to consult a pulmonologist or hospitalize the patient though he was repeatedly presenting with "disturbing" oxygen saturation levels, severely elevated pulmonary hypertension, and weight loss.[114]

45.    In addition to the examples discussed at trial, the experts' report documented numerous similar problems in other patients' records.[115] In their totality, these examples and Plaintiffs' other evidence proved that the risk posed to patients who need specialty care is widespread and substantial.

### C. Infirmary Care

46.    Nurse Angela Goehring principally testified about infirmary care.

47.    The evidence shows that infirmary care at LSP continues to place the most vulnerable patients at LSP at a substantial risk of serious harm. As discussed further below (see *infra* Part III.C), this is caused by inadequate nursing care, the inappropriate use of inmate orderlies to provide medical care, and the lack of supervision and medical involvement by providers.[116]

---

[112] Rec. Doc. 750, Puisis Testimony at 95:1-24; 99:1-106:11; PX 1-a at 90-92; JX 4 at 165, 194, 240, 272-73, 279, 292, 295, 342.

[113] Rec. Doc. 750, Puisis Testimony at 97:9-98:25; PX 1-a at 90-92; JX 4 at 25, 172, 194.

[114] Rec. Doc. 750, Puisis Testimony at 102:15-106:11; PX 1-a at 90-92; JX 4 at 165, 272-73, 279, 292.

[115] *See, e.g.*, Rec. Doc. 750, Puisis Testimony at 23:7-12, PX 1-a at 84-89 (**Patient # 1**, who was not screened for lung cancer despite having an 81-pound weight loss with a history of smoking; after his diagnosis of lung cancer, LSP providers failed to monitor his condition or update his treatment plan based on consultant recommendations); *id.* at 82:6-88:23; PX 1-a at 63-65 (**Patient #48**, who had delayed or uncompleted referrals to cardiology, electrophysiology, and gastroenterology, as well as for a colonoscopy); PX 1-a at 68-69 (**Patient #15**, who was not referred to a pulmonologist for management of COPD); *id.* at 89 (**Patient #2**, who was delayed from seeing an endocrinologist for over a year after a thyroid ultrasound showed bilateral cysts, LSP providers were unaware of a 40-pound weight loss, hoarseness, and dysphagia during the year-long delay, and the patient was ultimately hospitalized requiring major head and neck surgery to remove a metastatic squamous cell carcinoma).

[116] *See generally* Rec. Doc. 755, Goehring Testimony at 58:23-65:25; PX 1-a at 100-07.

48. The following examples illustrate the deficiencies in LSP's infirmary care:

49. **Patient #22** was a 60-year-old man with left-sided weakness due to a traumatic brain injury, among other medical needs.[117] In May 2020, he was assaulted by a cellmate, suffering head injuries and leg injuries that affected his mobility and eating abilities; among other needs, (1) his ankle was surgically repaired and (2) a hospital speech pathologist recommended a mechanical soft diet and that he be fed upright, both because he had no teeth and because he was unable to use utensils with his left hand.[118] Upon discharge from the hospital, LSP placed him in Nursing Unit 1, where staff made no nursing admission assessment or plan of care and failed to place him on the recommended diet.[119] Over the next two and a half months, he suffered at least nine falls; a number of issues contributed to these falls, including nurses' or orderlies' repeated failures to put up the patient's bed rails, confusion that an outside doctor believed stemmed from polypharmacy,[120] and Defendants' failure to properly support his surgically repaired, non-weight-bearing right ankle.[121] Rather than move the patient to a location where he could be observed more closely and measures could be taken to reduce the risk of falls, Defendants isolated him in a locked room and took away his bed, forcing him to sleep on a mattress on the floor.[122] A doctor ordered a bedside commode so that the patient would not have to travel to the bathroom, but Defendants did not provide him a bucket to catch the waste for three days.[123] Nursing staff provided pain medication only half as often as prescribed.[124]

50. Defendants' failure to provide the patient with the mechanical soft diet and feeding assistance that the speech pathologist recommended ultimately led to the patient's death. Although the patient

---

[117] *See generally* Rec. Doc. 755, Goehring Testimony at 26:16-42:18; PX 1-a at 11, 103; PX 1-c at 258-286; JX 22.
[118] Rec. Doc. 755, Goehring Testimony at 27:10-29:11; JX 22 at 674.
[119] Rec. Doc. 755, Goehring Testimony at 29:13-17.
[120] *Id.* at 39:21-40:5. Polypharmacy is the excessive prescription of multiple medications for the same condition.
[121] *Id.* at 29:18-41:12; JX 22 at 623, 713, 729, 770 788, 891, 917, 918, 931, 935 954, 981.
[122] Rec. Doc. 755, Goehring Testimony at 34:4-35:13; JX 22 at 954.
[123] Rec. Doc. 755, Goehring Testimony at 35:23-36:23.
[124] *Id.* at 37:3-21; JX 22 at 770.

could not use his left arm, had been prescribed a mechanical soft diet, and needed assistance with activities like cutting his food, he had to feed himself regular meals in a locked room in the infirmary.[125] On January 6, 2021, the patient choked on a piece of sausage while attempting to feed himself in his locked room; the airway obstruction led to cardiopulmonary arrest.[126] Astonishingly, infirmary staff did not attempt CPR, leaving that to inmate orderlies, and staff did not use an AED.[127]

51.     **Patient #50** is a 35-year-old man who is paraplegic and requires a catheter to empty his bladder.[128] In 2019, a hospital orthopedist recommended that he receive molds to offload pressure on his sacral area, because he had a decubitus ulcer on his sacrum.[129] Beginning in June 2019, he began refusing wound care and off-site specialty care; there is no record of any provider, nurse, or other infirmary staff attempting to determine the reason for his refusals.[130] Although he stated in one refusal that he was refusing due to "mental health problems" and later requested to see a psychiatrist, medical staff did not communicate his medical issues to social workers who saw him on rounds, so the social workers were not aware that he was refusing care, expressing mental health concerns, or requesting to see a psychiatrist.[131] Instead of having multi-disciplinary team meetings with behavioral health staff to attempt to resolve the issue, Dr. Toce described the patient as "belligeren[t]" and discharged him from the infirmary.[132] Ultimately, he was diagnosed with schizophrenia, but the psychiatrist's findings were not incorporated into his treatment plan or the social workers' visits.[133] During the experts' site visit, he explained to Ms. Goehring that he refused off-site visits because he had to ride in a wheelchair with his hands in black box restraints for up to eight hours, and that he wouldn't refuse if they put him on

[125] Rec. Doc. 755, Goehring Testimony at 38:18-39:10; 41:13-42:14.
[126] Rec. Doc. 755, Goehring Testimony at 41:13-42:14; JX 22 at 900-01.
[127] *Id.*; JX 22 at 547.
[128] *See generally* Rec. Doc. 755, Goehring Testimony at 42:19-52:9; PX 1-a at 102, 104-06; JX 50.
[129] Rec. Doc. 755, Goehring Testimony at 43:3-11.
[130] Rec. Doc. 755, Goehring Testimony at 43:14-46:3; PX 1-a at 104-05.
[131] Rec. Doc. 755, Goehring Testimony at 44:1-11; PX 1-c at 311-13; JX 50 at 68.
[132] Rec. Doc. 755, Goehring Testimony at 43:14-46:3; JX 50 at 68, 584.
[133] Rec. Doc. 755, Goehring Testimony at 47:3-48:5; JX 50 at 58.

a gurney and took him in an ambulance.[134] There is no evidence that Defendants ever offered to transport him in an appropriate vehicle or even investigated his reasons for refusal. And rather than an appropriate wheelchair or cushioning for his sacral decubitus, Defendants gave him an uncushioned wheelchair, and he had to roll up a thin cushion to provide his own pressure relief.[135]

52. Perhaps most disturbingly, the patient was forced to reuse single-use catheters for weeks.[136] Even if the catheters had been reusable, they were not disinfected and dried as reusable catheters need to be; instead, their only cleaning was when he asked an inmate orderly to rinse them with water.[137] Unsurprisingly, this resulted in urinary tract infections, which a hospital physician recognized was due to insufficient catheterization.[138] When the patient asked Nurse Practitioner Park for more catheters because he thought that was contributing to the infections, she told him they weren't budgeted to use clean catheters and they had to be reused.[139] Ms. Goehring credibly concluded that "[r]euse of single use medical supplies is dangerous and does not meet minimal standards of care."[140]

53. In addition to these examples discussed, the experts' report documented numerous similar problems in other patients' records.[141] In their totality, these examples and Plaintiffs' other evidence proved that the risk posed to patients who need infirmary care is widespread and substantial.

### D. Emergency Care

54. Dr. Susi Vassallo principally testified about emergency care.

---

[134] Rec. Doc. 755, Goehring Testimony at 49:22-50:15.
[135] *Id.* at 50:16-24.
[136] *Id.* at 51:6-22; PX 1-c at 320; PX 1-a at 106.
[137] *Id.*
[138] Rec. Doc. 755, Goehring Testimony at 51:23-52:9.
[139] *Id.*
[140] PX 1-a at 106; *see also* Rec. Doc. 755, Goehring Testimony at 51:23-52:9.
[141] *See, e.g., infra* ¶ 58 (**Patient #38**, who had a mechanical heart valve and was taken off antibiotics, died of pneumonia when infirmary staff and Dr. Toce failed to recognize an infection or respond when the patient was found in shock); *supra* ¶¶ 31-32 (**Patient #13** was subjected to substantial gaps in HIV medication and administration of an incorrect antibiotic in the infirmary); Rec. Doc. 755, Goehring Testimony at 19:19-22:11, JX 20 at 89, 193, 203 (**Patient #20** had a biliary drain installed at the hospital; infirmary staff did not monitor the drain, left him sleeping overnight in his wheelchair, and failed to document meals); PX 1-a at 105 (**Patient #4**, who had incidents of oxygen desaturation and elevated blood pressure while in the infirmary without a provider being notified).

55.     The evidence showed that specialty care at LSP continues to put patients at a substantial risk of serious harm. This happens in three main ways. First, Defendants' practices frequently subject patients with emergent medical needs to dangerous delays in transferring them to an appropriate level of care such as a hospital emergency room, even in the presence of red-flag symptoms. Second, EMTs continue to evaluate self-declared emergencies, making decisions regarding symptoms and treatment that are beyond their training and capabilities. Third, treatment in the ATU is often provided by registered nurses or even licensed practical nurses; at best, it is provided by nurse practitioners without specialized training in emergency medicine and without supervision by anyone with such training.[142]

56.     These failings result in emergencies going unrecognized or inadequately treated, exposing patients to a substantial risk of permanent damage, significant pain, or even preventable death.

57.     The following examples illustrate the deficiencies in LSP's emergency care:

58.     **Patient #38** was a 58-year-old-man who had diabetes and an artificial heart valve.[143] He was admitted to Nursing Unit 1 to taper off an anticoagulant in preparation for a dental procedure.[144] Uncoagulated patients with an artificial heart valve are at significant risk for serious infection.[145] In the nursing unit, he developed wheezing, a fever, and an elevated respiratory rate, suggesting a potentially life-threatening infection.[146] Instead of treating this as a potentially emergent situation or ruling out bacterial infection, LSP medical staff placed the patient in a locked room and prescribed Tylenol and an antiviral.[147] The patient's symptoms rapidly declined over the next three days; among other things,

[142] *See* Rec. Doc. 749, Vassallo Testimony at 17:21-19:2.
[143] *See generally id.* at 21:23-31:24; PX 1-a at 115-16; JX 38.
[144] Rec. Doc. 749, Vassallo Testimony at 22:2-23:14; PX 1-a at 115.
[145] Rec. Doc. 749, Vassallo Testimony at 23:1-12.
[146] *Id.* at 23:13-24:15; JX 38 at 94.
[147] Rec. Doc. 749, Vassallo Testimony at 24:14-25:7; PX 1-a at 115.

he developed bloody sputum, which is concerning in an anticoagulated patient, and his oxygen saturation rates declined to abnormal levels.[148] On his third day in the nursing unit, lab results showed signs of sepsis, kidney failure, and bacterial infection.[149] LSP medical staff ignored or failed to appreciate the patient's emergent condition, which required hospitalization.[150] On his fourth day, he went into shock, which was reported to Dr. Toce, yet he was kept in the locked room, was not examined, and was given no treatment other than oxygen and withholding blood pressure medication.[151] An hour later, he suffered a fatal cardiorespiratory arrest secondary to pneumonia.[152] Dr. Vassallo credibly described this as "an egregious example of delayed care" that "caused this patient's death."[153]

59. **Patient #35** was a 59-year-old man who presented to the ATU with a 103.2° temperature and confusion.[154] This was an emergent situation, suggestive of a brain infection or a severe urinary tract infection.[155] Instead of transferring the patient to a level of care where he could receive appropriate evaluation, such as a spinal tap, ATU staff transferred him to the nursing unit for observation.[156] Despite presenting on a Saturday afternoon, when Defendants' practices call for a nurse practitioner to be in the ATU (see *infra* ¶¶ 98-101), no provider saw the patient and no provider reviewed the emergency medical report until the following Monday.[157] Even Defendants' expert Dr. Mathis admitted that it was below the standard of care to admit the patient to the infirmary.[158] Defendants waited nearly 24 hours to send the patient to the hospital, at which point he was diagnosed with meningitis.[159]

---

[148] Rec. Doc. 749, Vassallo Testimony at 25:8-26:16; PX 1-a at 115; JX 38 at 71, 86, 90.
[149] Rec. Doc. 749, Vassallo Testimony at 26:21-28:13; PX 1-a at 115; JX 38 at 22-23.
[150] Rec. Doc. 749, Vassallo Testimony at 28:16-24.
[151] Rec. Doc. 749, Vassallo Testimony at 29:2-30:15; PX 1-a at 115; JX 38 at 82.
[152] Rec. Doc. 749, Vassallo Testimony at 30:16-31:19; PX 1-a at 115; JX 38 at 82.
[153] PX 1-a at 116; *see also* Rec. Doc. 749, Vassallo Testimony at 30:23-31:12.
[154] *See generally id.* at 32:22-35:25; PX 1-a at 118; JX 35 at 121.
[155] Rec. Doc. 749, Vassallo Testimony at 35:6-16.
[156] *Id.* at 33:24-25; JX 35 at 121.
[157] Rec. Doc. 749, Vassallo Testimony at 33:14-34:13.
[158] Rec. Doc. 753, Mathis Testimony at 13:12-15.
[159] Rec. Doc. 749, Vassallo Testimony at 35:1-25; JX 35 at 111.

60.      **Patient #36** was a 65-year-old man with a history of chronic obstructive pulmonary disease, which had previously required hospitalization.[160] He presented to the ATU gasping, with significantly elevated respiratory rate and blood pressure, and complaining of shortness of breath for two days.[161] Although the ATU staff initially treated him appropriately by providing a nebulizer and monitoring the patient, they failed to provide adequate emergency care or transfer to an appropriate level care as his condition worsened over the next hours.[162] Despite being in the ATU at a time when Defendants' practices call for a provider to be present, he did not see a provider for over two hours.[163] By the time he did see a provider, he was unstable and in respiratory distress, with a sinking oxygen saturation rate.[164] The provider prescribed a beta blocker, which is a bronchoconstrictor—"exactly the opposite" of what the patient needed, as Dr. Vassallo credibly testified.[165] Then, rather than transferring him to the hospital for respiratory distress, the provider sent him to the nursing unit—where he suffered a fatal heart attack within 30 minutes.[166] Dr. Vassallo credibly concluded that LSP's treatment deprived the patient of "potential lifesaving treatment when there still may have been time to save his life."[167]

61.      **Patient #29**, a 28-year-old man in a segregation unit, made a self-declared emergency request for stomach and back pain.[168] He was seen only by an EMT, who performed no physical examination and provided no treatment, merely marking the form for "M.D." review.[169] Roughly eight hours later, he was found undergoing agonal respirations with a 108.2° temperature and a very weak pulse—that is, suffering from heatstroke and "about to die or . . . in critical" condition.[170] Even though the critical

[160] *See generally* Rec. Doc. 749, Vassallo Testimony at 36:1-41:21; PX 1-a at 116; JX 36 at 106-07.
[161] Rec. Doc. 749, Vassallo Testimony at 36:1-21; PX 1-a at 116; JX 36 at 106.
[162] Rec. Doc. 749, Vassallo Testimony at 36:22-41:21; PX 1-a at 116; JX 36 at 106.
[163] Rec. Doc. 749, Vassallo Testimony at 36:22-41:21; PX 1-a at 116; JX 36 at 106-07.
[164] Rec. Doc. 749, Vassallo Testimony at 38:5-13; PX 1-a at 116; JX 36 at 106.
[165] Rec. Doc. 749, Vassallo Testimony at 39:19-40:13; JX 36 at 106.
[166] Rec. Doc. 749, Vassallo Testimony at 40:13-41:21; PX 1-a at 116; JX 36 at 106-07.
[167] PX 1-a at 116; *see also* Rec. Doc. 749, Vassallo Testimony at 40:15-41:21; JX 36 at 107.
[168] *See generally* Rec. Doc. 749, Vassallo Testimony at 41:23-47:18; PX 1-a at 120; JX 29 at 39.
[169] Rec. Doc. 749, Vassallo Testimony at 42:11-43:3; PX 1-a at 120; JX 29 at 39.
[170] Rec. Doc. 749, Vassallo Testimony at 43:5-44:5; PX 1-a at 120; JX 29 at 37.

treatment for heatstroke is cooling, no matter the etiology of the heatstroke, LSP staff never applied any cooling to the patient, which Dr. Vassallo credibly described as "inexplicable" from a medical perspective.[171] Instead, they treated the patient with the opiate reversal drug Narcan—even though opiates do not cause fever and there was "no sign of opiates"—and catheterized the patient to obtain a urine sample, which Dr. Vassallo credibly testified had "zero point" and took away from efforts that were needed to treat the patient.[172] The patient died in the ATU.[173] Seven days later, a provider finally reviewed the self-declared emergency request, merely writing "sick call PRN [as needed]."[174]

62.     **Patient #25**, a 52-year-old man with aortic stenosis and a recent syncopal episode, went into cardiac arrest in the kitchen, falling and hitting his head.[175] Security personnel present failed to use the automatic external defibrillator ("AED"), a failing so egregious that an EMT noted it on the ambulance run report.[176] By the time EMTs arrived, applied the AED, and began CPR, between six and 10 minutes had passed without defibrillation—even though LSP policy and ACA standards both require that all staff are trained to use the AED and are expected to respond to such emergencies within four minutes.[177] Dr. Vassallo credibly concluded that this patient's death was preventable if not for this error and a provider's errors during a clinical visit after the first syncopal episode.[178]

63.     **Patient #55**, a 54-year-old man with a history of stroke, "just started drooling and slumped to the side" a day after resuming his blood pressure medication, and was recorded as having slightly

---

[171] Rec. Doc. 749, Vassallo Testimony at 45:1-5.
[172] *Id.* at 44:20-46:25; PX 1-a at 120; JX 29 at 34, 37.
[173] Rec. Doc. 749, Vassallo Testimony at 46:24-25; PX 1-a at 120.
[174] Rec. Doc. 749, Vassallo Testimony at 47:2-16; JX 29 at 38-39.
[175] Rec. Doc. 749, Vassallo Testimony at 47:20-50:20; PX 1-a at 120-21; JX 25 at 31-34.
[176] Rec. Doc. 749, Vassallo Testimony at 50:21-52:8 ("It's very unusual to write when something was not done that should have been done, so somebody was a little mad about it."); PX 1-a at 120; JX 25 at 31.
[177] Rec. Doc. 749, Vassallo Testimony at 50:21-51:20; 113:9-16; Rec. Doc. 753, Mathis Testimony at 60:1-61:17; DX 11 at 29; PX 21-y at 2.
[178] Rec. Doc. 749, Vassallo Testimony at 48:24-50:14, 52:10-53:6; PX 1-a at 120-21.

increased left-side weakness and a drop of roughly 100 points in blood pressure in a day.[179] This combination of signs and symptoms indicated that he might be having or about to have a stroke.[180] Although he should have been sent to the hospital to rule out a stroke, he was not even examined by a provider; instead, he was kept in the ATU for approximately four hours with only telephone orders from Dr. Lavespere, and then discharged to his quarters despite having no change in his neurological status.[181] He was not sent to the hospital until the following morning, roughly 17 hours after he first presented, by which time he had developed focal seizures and was unable to walk.[182] Rather than referring the patient to a facility that could perform a standard stroke workup, Dr. Lavespere sent him to West Feliciana Hospital for a non-contrast CAT scan, which is below the standard of care because it cannot exclude an ischemic stroke.[183] Although the radiologist advised LSP providers that the CAT scan could not rule out intracranial pathology and that an MRI should be considered if there were "further clinical concern or persistent symptoms," there is no indication that the patient was evaluated or the radiologist's notes were reviewed by LSP providers, and a follow-up appointment in the general medicine clinic was cancelled due to office closure and never rescheduled.[184]

64.     When the patient presented in the ATU a month later with complaints of being unable to walk since the day before and urinating on himself, Nurse Practitioner Bordelon incorrectly recorded him as having no "signs and symptoms of a new stroke" despite the new symptoms.[185] Instead of referring the patient for an MRI as recommended by the radiologist, Mr. Bordelon gave a telephone order and

[179] Rec. Doc. 749, Vassallo Testimony at 57:6-58:25; PX 1-a at 113; JX 55 at 63; PX 1-c at 337.
[180] Rec. Doc. 749, Vassallo Testimony at 58:24-25.
[181] Id. at 59:1-60:11; PX 1-a at 113; JX 55 at 64.
[182] Rec. Doc. 749, Vassallo Testimony at 60:16-61:21; PX 1-a at 113; JX 55 at 57, 61.
[183] Rec. Doc. 749, Vassallo Testimony at 62:2-21; PX 1-a at 113; JX 55 at 60.
[184] Rec. Doc. 749, Vassallo Testimony at 63:15-64:15; 67:8-68:15; PX 1-a at 113; JX 55 at 56, 59.
[185] Rec. Doc. 749, Vassallo Testimony at 64:16-67:7; PX 1-a at 113; JX 55 at 54.

sent the patient back to his quarters with instructions to keep his scheduled appointment.[186] The following month, he was finally sent to Our Lady of the Lake, by which time he was left "with a devastating inability to speak properly" and "dysphasia, difficulty swallowing."[187]

65.     **Patient #6** was a 50-year-old man who passed away on May 3, 2021.[188] For the last two weeks of his life, he made no fewer than seven separate requests for medical attention for escalating back pain, without a provider ever examining his back.[189] By his last request, he was incontinent and unable to get out of bed, which Defendants' expert Dr. Mathis acknowledged could be red-flag for cord compression, which should be presented to a doctor.[190] Instead, for the fifth time in two weeks, providers ordered no transport to the ATU and declined to see him.[191] As Plaintiffs' experts' report summed it up, "the patient should have been transported to a hospital or had immediate higher-level imaging studies . . . Instead, the patient was managed by medics and treated indifferently by providers."[192] In agonizing pain, unable to move his lower half, and unable to get medical attention, the patient resumed self-injurious cutting that he had abandoned years earlier, contributing to a fatal liver abscess.[193] Plaintiffs' experts credibly found that "[t]he infection could have been recognized earlier with higher-level diagnostic testing and his death may have been prevented with earlier treatment."[194] Even knowing that "something terrible happened" to this patient, Dr. Toce described these symptoms as "entirely consistent with the manipulative behavior that we see so frequently."[195]

66.     In addition to these examples, the experts' report documented numerous similar problems in

[186] Rec. Doc. 749, Vassallo Testimony at 64:16-67:7; PX 1-a at 113; JX 55 at 54.
[187] Rec. Doc. 749, Vassallo Testimony at 68:19-70:5; PX 1-a at 113-14; JX 55 at 450.
[188] *See generally* PX 1-a at 60-61; Rec. Doc. 753, Mathis Testimony at 35:4-47:16; JX 6.
[189] PX 1-a at 60-61; Rec. Doc. 753, Mathis Testimony at 35:18-44:18; JX 6 at 35-37, 54-59, 61.
[190] Rec. Doc. 753, Mathis Testimony at 34:6-12
[191] PX 1-a at 60-61; Rec. Doc. 753, Mathis Testimony at 35:18-44:18; JX 6 at 35-37, 54-59, 61.
[192] PX 1-a at 61.
[193] PX 1-a at 60-61; Rec. Doc. 753, Mathis Testimony at 45:6-47:16.
[194] PX 1-a at 61.
[195] PX 1-a at 61; JX 71-b at 23:7-9.

other patients' records.[196] Even Defendants' expert Dr. Mathis acknowledged several critical violations of the standard of care in LSP's emergency practice.[197] In their totality, these examples and Plaintiffs' evidence proved that the risk posed to patients needing emergency care is widespread and substantial.

## III. DEFENDANTS' CURRENT POLICIES AND PRACTICES CONTRIBUTE TO THE SUBSTANTIAL RISK OF SERIOUS HARM

67.     Just as the medical records show that patient care and outcomes are similar to the liability period, a review of Defendants' current policies and practices makes clear that Defendants have not made sufficient changes to protect Class members from a substantial risk of serious harm. As in the liability trial, the remedy evidence proves "organizational and structural deficiencies in the LSP health care system . . . underpin and contribute to Eighth Amendment violations,"[198] as well as specific deficiencies in policies and practices related to clinical, specialty, infirmary, and emergency care.

68.     The evidence at trial showed that many policies and practices that the Court had found contributed to the risk of harm to Class members now persist substantially unchanged. Defendants stipulated or conceded to many of these facts, as noted below. Defendants have made material changes in a few areas, most notably to the process for non-emergency sick call requests, ATU staffing, and

---

[196] *See, e.g.*, Rec. Doc. 748, LaMarre Testimony at 105:6-21, JX 16 at 56 (**Patient #16** died of cardiac arrest after staff failed to apply an AED); *id.* at 132:24-136:24, JX 42 at 75-76 (**Patient #42** made repeated self-declared emergencies stating red-flag symptoms without seeing a provider); Rec. Doc. 755, Goehring Testimony at 41:13-42:14, JX 22 at 900-01 (**Patient #22**, same); PX 1-a at 112-13 (**Patient #26**, who was given Narcan and a urine toxicology while experiencing an acute stroke, and was held for 12 hours before Defendants sent him to the hospital); *id.* at 114 (**Patient #52**, who was sent out by basic life support during a stroke, delaying his care; who was given no transport orders even after his stroke; and who was given just a single troponin test and no EKG when he presented with chest pain, leading to a cardiac arrest); *id.* at 117 (**Patient #58**, whose hypotension was missed by a provider, then given antibiotics for suspected Covid, and who was not sent to the hospital or treated when he was anemic and lab results suggested diabetic ketoacidosis); *id.* at 117 (**Patient #59**, whose transfer to the hospital for vascular disease with right lower abdominal pain was delayed eight hours); *id.* at 118 (**Patient #53**, who was given a no transport order and inappropriately treated despite chest pain and diabetes); *id.* at 121-23 (**Patient #17**, who had numerous serious delays in emergency care when presenting with significant cardiovascular or stroke symptoms).

[197] *See* Rec. Doc. 753, Mathis Testimony at 12:10-15:3 (**Patient #35**, who was admitted to the infirmary despite altered mental status and a temperature of 103.2°; **Patient #32**, whose symptoms compatible with cardiac disease were not reported to a provider by EMTs; **Patient #11**, whose vital signs were not taken and who was not referred by Captain Cashio to a provider when he reported bloody stools and urine; **Patient #48**, who was not referred to the ATU by EMTs despite elevated heart rates and who did not receive an EKG when he did come to the ATU).

[198] Rec. Doc. 594 at ¶ 120; *see also id.* at ¶ 28.

the cleanliness and hygiene of clinical spaces. However, as discussed below and as the patient sample shows, these changes did not come close to eliminating the substantial risk of serious harm to Class members. Additionally, in some significant areas, including physician staffing, medical care provided by orderlies, and medication administration, practices have gotten worse since the liability trial.

### A. Clinical Care

69.     **Clinical Exam Spaces**: Defendants appear to have improved the cleanliness and hygiene of clinical spaces, as well as the availability of appropriate medical equipment in those spaces.[199] Plaintiffs' experts acknowledged "improvements in clinical space," which they described as "good news."[200] Although they identified some reasons for concern that the changes may be temporary,[201] and some minor issues of missing medical equipment,[202] Plaintiffs do not dispute that Defendants have made improvements in this area and do not assert that any current deficits in the cleanliness or hygiene of clinical spaces contribute materially to the significant risk of serious harm to Class members.

70.     **Clinical Care Provided by Medical Providers**: As to the actual clinical care provided in those examination rooms, however, there have been no significant changes.[203] Defendants did not identify any material changes to their policies for providing routine clinical care or the practices of providers conducting routine clinical appointments, nor were any apparent from the medical records. As proven at the liability trial and as demonstrated above, these practices expose Class members to a substantial risk of serious harm when they have serious medical needs that require clinical care.[204]

71.     As during the liability period, clinical care is "focused on episodic complaints rather than the

---

[199] *See* PX 1-a at 37; PX 44-c at 04, Response to ROG 1.
[200] Rec. Doc. 748, LaMarre Testimony at 146:16-22; *see also* PX 1-a at 36-37.
[201] *See, e.g.*, Rec. Doc. 748, LaMarre Testimony at 146:23-147:15.
[202] *See id.* at 147:18-19; PX 1-a at 37.
[203] *See, e.g.,* Rec. Doc. 748, LaMarre Testimony at 166:21-167:25.
[204] *See* Rec. Doc. 594 at 9-12; PX 1-a at 10, 48-49, 58-71; *see supra* Part II.A.

underlying state of disease."[205] Providers routinely fail to perform adequate medical evaluations, take appropriate histories, flag unstable vital signs, timely diagnose and treat patients, monitor and evaluate patients' adherence to medication regimens, or address obstacles to medication adherence.[206] Tellingly, neither of Defendants' experts reached a conclusion about whether physicians at LSP routinely failed to do these things;[207] although their interpretations of certain medical records differed from Plaintiffs', they left Plaintiffs' overall conclusions on these subjects unrebutted. The lack of change is unsurprising given medical leadership's disagreement with this Court's liability findings regarding clinical care[208] and the persistence of the assumption that patients frequently lie to medical staff.[209]

72.     Furthermore, "[n]urse practitioners are providing almost all clinical care with no evidence of supervision or collaboration with a physician."[210] While Plaintiffs do not dispute that appropriately trained and supervised nurse practitioners can provide primary care pursuant to collaborative practice agreements, they credibly found that physician understaffing makes the medical director, Dr. Toce, unable "to meet all his supervisory duties, especially with respect to the quality of clinical care."[211] Dr. Toce himself conceded that he was not "involved enough with" the nurse practitioners.[212]

---

[205] Rec. Doc. 594 at ¶ 33; *see* PX 1-a at 10; Rec. Doc. 748, LaMarre Testimony at 153:16-154:17.

[206] PX 1-a at 49; *see generally id.* at 60-71; *supra* Part II.A; Rec. Doc. 748, LaMarre Testimony at 153:21-154:17; *see, e.g., id.* at 157:14-160:2 (describing inadequate medical evaluation of **Patient #49** in sick call from January 2022, JX 49 at 288); *id.* at 160:6-162:2 (describing inadequate medical evaluation in sick call observed during site visit for **Patients #63 & 64**).

[207] *See* Rec. Doc. 753, Mathis Testimony at 65:1-23. In fact, Defendants' expert noted that he had concerns about weight loss monitoring in clinical encounters, flagging it as an area that LSP could improve upon. Rec. Doc. 756, McMunn Testimony at 107:14-17; PX 61-b at 16.

[208] *See, e.g.,* JX 71-a, P. Toce Depo. Tr. at 12:14-20 (testifying that this Court's finding regarding clinical care was wrong because "anybody that needs to be seen is seen, and anybody that has appropriate signs of illness is evaluated, and that's enough."); JX 70-a, R. Lavespere Depo. Tr. at 62:3-10; 62:19-23, 63:8-19 (testifying that there has been no change in the privacy in clinical visits because there was adequate privacy during the liability period).

[209] *See* JX 71-b, P. Toce Depo Tr. at 23:7-9 ("[T]his is entirely consistent with the manipulative behavior that we see so frequently."); JX 71-a P. Toce Depo Tr. at 62:2-4 ("They're not sick, and they keep complaining, keep complaining."). Rec. Doc. 752, Bordelon Testimony at 135:15-25 (testifying that patients "absolutely" lie "the majority of days," in order to get out of work and out of drug seeking behavior); Rec. Doc. 748, LaMarre Testimony at 164:19-165:22 (describing Patient #65's comment that he didn't "want to keep coming here because you're going to say that I'm malingering, but I'm not malingering"); *see also id.* at 85:9-24; 186:11-187:9 (describing the negative effects of the pervasive attitude that patients are lying).

[210] PX 1-a at 15.

[211] *Id.*

[212] JX 71-a, P. Toce Depo Tr. at 46:3-5.

73.    Indeed, LSP is not complying with the collaborative practice agreements required under Louisiana law. For example, LSP's collaborative practice agreements require collaborating physicians to review at least 10% of the charts of each nurse practitioner they supervise, and require the nurse practitioner to note each consultation with their collaborating physician.[213] But Nurse Practitioner Bordelon acknowledged that Dr. Lavespere, his collaborating physician, doesn't review his charts and that he doesn't note consultations; indeed, he seemed to be unaware of the requirements altogether.[214]

74.    This near-total reliance on mid-level providers to provide clinical care, with little to no supervision from physicians, represents a decline from the level of care being provided at the time of the liability trial and contributes to the deficits in the adequacy of clinical care and the corresponding risk to patients demonstrated *supra* Part II.A.

75.    **Routine Sick Call:** Defendants have changed the process for routine sick call since the liability trial. Beginning approximately November 1, 2021, Class members who submit a sick call request form that is received by noon Sunday–Thursday are seen by a nurse practitioner (primarily Mr. Bordelon) via telemedicine the following day.[215] The written policy was propounded on March 3, 2022.[216]

76.    Plaintiffs applaud Defendants' acknowledgment that the sick call system was deficient.[217] However, the evidence showed that the new sick call system implemented in late 2021, still does not "provide a sick call system that ensures access to care and effectively handles emergencies, which results in the endangerment to the health of inmates by denying or delaying access to health care."[218]

77.    Plaintiffs' experts credibly found, based on the patients in the sample and the encounters they

[213] PX 66 at 4; *see* Rec. Doc. 752, Bordelon Testimony at 119:20-120:9.
[214] *See id.* at 117:17-18; 118:12-13; 118:23-120:9.
[215] PX 44-c at 09, Response to ROG No. 12; Rec. Doc. 717 at 4-5.
[216] PX 21-ssss, LSP Directive 13.061 (Mar. 3, 2022).
[217] PX 74-a, J. LeBlanc Depo. Tr. at 53:1-15 (testifying that the sick call system stood out to him as a major issue more than anything else after reviewing the opinion from the liability phase); PX 78, T. Hooper Depo. Tr. at 72:16-19 (testifying that delays were a problem with the previous sick call system).
[218] Rec. Doc. 594 at 87; *see* Rec. Doc 748, LaMarre Testimony at 166:7-20; *supra* Part II.A. (describing **Patients #20** & **#42**); *supra* n. 86 (describing **Patients #30** & **#19**).

viewed during their site visit, that "the new policy is inadequate as applied" and fails to "ensure patients are provided unimpeded access" to a medical provider licensed to diagnose and treat serious medical conditions or to adequate medical evaluations and timely diagnoses.[219] The new sick call practices are undermined by several shortcomings.[220]

78.     First, triage in the new sick call process is delayed. Under the new system, patient complaints are not reviewed until the next business day, contrary to standards requiring a daily triage.[221] Defendants claim that the nurses receiving the sick call forms triage them the day they are received,[222] but this triage is not described in the updated sick call policy and does not appear in any medical records, suggesting that no such triage actually takes place.[223] In any event, patients are not prioritized.

79.     Second, Defendants conduct inadequate physical examinations in sick call visits. This is evidenced by the lack of information documented in the sick call forms, the lack of immediate follow up for red-flag vital signs, and other shortcomings, as well as Plaintiffs' experts' credible observations during their site visit.[224] This appears to be the product both of the same inadequate clinical evaluations that plague routine clinical visits, as well as the inadequacy of Defendants' telemedicine equipment.[225]

---

[219] PX 1-a at 49, 52.

[220] PX 1-a at 49-58, *see also* Rec. Doc. 748, LaMarre Testimony at 144:1-10; 155:5-162:2, 164:19-166:20; Rec. Doc. 751, Goehring Testimony at 66:4-10; 78:7-79:23; 80:25-85:4; Rec. Doc. 755, Goehring Testimony at 5:24-6:16.

[221] Rec. Doc 748, LaMarre Testimony at 156:17-157:2. Moreover, the sick call form does not include a place for patients to note when they are submitting a request, so there is no documentation to confirm the timing of the sick call procedure actually occurs as the policy suggests. PX 70-a, R. Lavespere Depo. Tr. at 128:8-14; 129:5-19; Rec. Doc 748, LaMarre Testimony at 134:21-135:2; 157:3-7; Rec. Doc. 751, Goehring Testimony at 81:13-19, 83:17-19; Rec. Doc. 755, Goehring Testimony at 53:20-23.

[222] Rec. Doc. 752, Bordelon Testimony at 107:10-108:8.

[223] DX 8-aaa; *see* Rec. Doc. 757, Johnson Testimony at 199:18-200:1 (admitting that the updated policy does not describe the nurse or nurse practitioners conducting a triage step); Rec. Doc. 752, Bordelon Testimony at 123:2-125:6 (testifying that there is no documentation of the "triage" on the sick call form, nor is it mentioned in the LSP directive for sick call or Defendants' interrogatory response describing the new sick call procedure); JX 71-d; Rec. Doc. 752, Bordelon Testimony at 108:9-11 (admitting that he has never found some patients that had an emergent issue when conducting the "triage" of the forms the day before); Rec. Doc 748, LaMarre Testimony at 202:16-203:12.

[224] *See, e.g.*, Rec. Doc 748, LaMarre Testimony at 141:4-142:18; 144:1-10; 157:13-22; 159:14-160:2; 160:6-162:2; 167:4-25; Rec. Doc. 755, Goehring Testimony at 5:24-6:16; 58:6-10; PX 1-a at 52-55 (reporting observed and reviewed sick calls).

[225] PX 1-a at 10; Rec. Doc 748, LaMarre Testimony at 158:15-23; 201:1-16.

Even Defendants and Dr. Mathis admitted that equipment was not always available or properly functional.[226] As a result, "nurse practitioners are unable to independently perform adequate examinations of the heart, lungs, and abdomen during telemedicine sick call visits."[227] Instead "[t]he encounters appeared to be driven and controlled by the EMT who was with the patient."[228] Even if this could be an appropriate role for EMTs, they do not receive training before assisting in telemedicine sick call.[229]

80.     Third, security staff are inappropriately involved in the routine sick call process. The new sick call protocol uses security supervisors to collect requests and create a list of all patients requesting treatment.[230] As Ms. Goehring testified, security should not be collecting the forms because they contain confidential health information.[231] Moreover, if a patient feels uncomfortable with a security officer seeing a particular health issue, they would not even be allowed to turn in their sick call form themselves, reinforcing the dangerous entanglement security has with medical.[232]

81.     Fourth, while the availability of the paper medical record to the provider conducting the examination is an improvement on the record-less sick call encounters EMTs were conducting during the liability trial, it is concerning that the primary provider conducting sick call, Robert Bordelon, did not know how to access medication administration records during Plaintiffs' experts' site visit.[233] Mr. Bordelon's lack of familiarity with accessing this key medical record indicates that the sick call encounter does not include a review of medications, a key component of an adequate assessment.[234]

82.     These deficits, when viewed in light of the demonstrated harm to patients who need medical

---

[226] Rec. Doc. 752, Bordelon Testimony at 101:20-102:6; JX 69-a, R. Lavespere Depo. Tr. at 128:15-21; Rec. Doc. 753, Mathis Testimony at 75:13-16.
[227] PX 1-a at 57; *see also id.* at 51-52.
[228] *Id.* at 52.
[229] JX 69-a, R. Lavespere Depo. Tr. at 225:7-18.
[230] PX 21-ssss, at 2, LSP Directive 13.061 (Mar. 3, 2022).
[231] Rec. Doc. 751, Goehring Testimony at 82:1-6; 82:16-83:5; *see also* PX 1-a at 33-34.
[232] *See* PX 1-d at 9 (sick call log book with note stating "offenders are not allowed to turn in sick call forms! Must be turned in by security"); Rec. Doc. 751, Goehring Testimony at 82:17-83:5. *See also infra* ¶¶ 115-117.
[233] Rec. Doc. 752, Bordelon Testimony at 128:25-129:9
[234] Rec. Doc. 755, Goehring Testimony at 5:24-6:16.

attention through sick call, substantiate Plaintiffs' experts' conclusion that "[e]very effort should be made to conduct the sick call encounters in person, unless extenuating circumstances" prevent it.[235]

83.    Additionally, Defendants stipulated that the "co-pay system for sick call and self-declared emergencies has not changed."[236] While they may not be unconstitutional on their own, they continue to be "one factor that contributes to a delivery system that is . . . woefully inadequate";[237] multiple patients reported that the copay led them to decline to seek care at all through sick call.[238] The co-pays are particularly problematic given the frequency with which sick call and SDE requests do not result in any treatment or provider examination; many who use the sick call process have to submit multiple health requests before getting care, which leads to excessive fees.[239]

## B.  Specialty Care

84.    The policies and practices that the Court previously found led to "inmates at LSP experi-enc[ing] unnecessary and harmful delays in the assessment for and receiving of specialty medical care; harmful failure to follow specialty care recommendation; and failure to coordinate care" persist.[240] As during the liability period, "people are not referred when they should be referred" and "physicians at LSP are disengaged from management of the patients . . . and as a result, recommendations [from] the specialists are sometimes unknown, unattended to, and can have adverse consequences."[241]

85.    Defendants concede that LSP's policies and practices pertaining to specialty care are almost entirely unchanged.[242] In particular, there have been no changes to policies or practices for ensuring

---

[235] PX 1-a at 51-52.

[236] Rec. Doc 717 at 5.

[237] Rec. Doc. 594 at ¶ 96; *see also* PX 1-a at 32; Rec. Doc 748, LaMarre Testimony at 184:22-185:8.

[238] PX 1-a at 32; *see also* Rec. Doc. 755, Butler Testimony at 198:13-199:5 (describing how the sick call copays create a "perpetual debt" due to the high cost compared to the rate of pay).

[239] Rec. Doc 748, LaMarre Testimony at 185:1-8; Rec. Doc. 755, Goehring Testimony at 15:24-16:9; *see, e.g.,* PX 1-a at 32; *supra* ¶¶ 33-34 (describing **Patients #20** & **#42**).

[240] Rec. Doc. 594 at ¶ 42; Rec. Doc. 750, Puisis Testimony at 108:9-16.

[241] *Id.* at 21:23-22:1; 22:8-12.

[242] JX 69-a, R. Lavespere Depo. Tr. at 111:17-113:1; 122:23-123:8; *see also* Rec. Doc. 717 at 5 (stipulating that "LSP's polices or practices have not changed regarding recommending, authorizing, and scheduling specialty health care services; getting

that specialist recommendations are followed, and even Defendants' medical leadership is unaware of their own policy for documenting decisions not to follow those recommendations.[243] If someone is seen by a specialist, LSP policy requires the primary provider to reviews the specialist's recommendations and document whether they will follow the recommendations, and if not, why they reject them.[244] As Plaintiffs' experts showed, this does not occur.[245] Dr. Johnson admitted that LSP does not track this information,[246] Dr. Lavespere testified that he would not advocate for such a policy,[247] and Dr. Toce denied that it would improve care to track specialist recommendations to completion.[248]

86.     Similarly, while Defendants claimed—without offering specific details—that they had "improved communication" regarding specialty referrals, they conceded that the process for recommending, authorizing, scheduling, and completing specialty appointments is unchanged.[249]

87.     Testimony from outside physicians supports Dr. Puisis's conclusions. Dr. Glass observed troubling patterns she sees in patients from Angola, including patients "coming in very late in their illness[,]" "delays in their follow-up care," and prescription of "medications that aren't necessarily the standard of care."[250] She cannot verify whether follow-up care is communicated to Angola staff, and she has seen "patients who were referred for follow-up appointments by other doctors that did not get those appointments."[251] These delays can result in a treatable condition becoming terminal.[252] Dr.

people to appointments or making sure patients have all necessary tests, paperwork, and fasting; or ensuring that specialists' recommendations are implemented or the decision not to implement them is documented."); Rec. Doc. 750, Puisis Testimony at 28:10-16 (opining that the stipulation is consistent with Dr. Puisis' review of the depositions, interrogatory responses, and chart reviews).

[243] JX 70-a, R. Lavespere Depo. Tr. at 44:15-45:1; 48:4-10; PX 21-t at 3, LSP Directive 13.001 (requiring documentation). *See also* JX 70-a, R. Lavespere Depo. Tr. at 43:24-44:1 ("There are certain things that we don't follow the recommendation of specialists on . . . ."); JX 69-a, R. Lavespere Depo. Tr. at 111:17-112:12; 122:21-123:20; 212:11-15.

[244] Rec. Doc. 750, Puisis Testimony at 24:10-14; PX 21-t at 3, LSP Directive 13.001 (requiring documentation).

[245] Rec. Doc. 750, Puisis Testimony at 24:15-19.

[246] Rec. Doc. 757, Johnson Testimony at 198:2-10.

[247] JX 70-a, R. Lavespere Depo. Tr. at 48:12-15; 48:20-49:13.

[248] JX 71-b, P. Toce. Depo. Tr. at 54:25-55:21.

[249] Rec. Doc. 717 at 5; Rec. Doc. 750, Puisis Testimony at 28:10-16.

[250] Rec. Doc. 755, Glass Testimony at 158:17-18, 162:12-24.

[251] *Id.* at 165:17-166:7.

[252] *Id.* at 166:15-19.

Brady echoed these observations, credibly testifying that follow-up care is a problem with patients from Angola, and "oftentimes they will come in at sort of late stages of disease or when things have progressed a little bit farther than . . . someone coming in just through the ER."[253]

88.     Defendants identified two other changes to the specialty care process. First, Defendants have installed monitors in the assisted living dorms to display specialty care appointments, instead of paper notices.[254] Second, they now use new documents to track the total number of patient refusals, and require patients in some circumstances to travel to the Treatment Center to refuse care.[255] However, Dr. Puisis credibly observed that these changes did not result in any meaningful impact on the quality of specialty care.[256] The continuing risk of serious harm confirms this conclusion.[257]

### C.     Infirmary Care

89.     **Medical Care in the Infirmary:** The medical care in Nursing Units 1 & 2 remains deficient, resulting in the harm shown above.[258] Defendants claim the infirmary has a higher ratio of nurses to patients, but DOC's 30(b)(6) designee admitted those numbers were aspirational.[259] Regardless of the number of nurses, the medical staff continue not to appropriately monitor and treat patients.[260] Ms. Goehring testified that when she observed the infirmary during the site visit, nurses never performed

---

[253] Rec. Doc. 755, Brady Testimony at 131:13-17; 139:20-22; 144:7-13; 133:16-19; *see, e.g., id.* at 134:22-135:15 (describing stage 4 lung cancer patient who did not see an oncologist or get a biopsy for six months after an x-ray and CT scan showed a large lung mass, limiting his treatment options to hospice and comfort care); *id.* at 136:15-137:4 (describing patient he treated in early 2022 whose endocarditis infection had spread to his lungs and had abscesses all over his limbs that antibiotics could not treat); *see also supra* Part II.B & n. 115 (describing **Patients #1, 2, 4, 5, 7, 10, 15,** & **48**).

[254] PX 44-c at 03, Response to ROG No. 1; *see also* PX 1-a at 83, Rec. Doc. 750, Puisis Testimony at 26:16-27:5.

[255] PX 44-c at 03, Response to ROG No. 1; JX 69-a, R. Lavespere Depo Tr. at 170:3-10, 179:22-180:4; PX 41, PX 42-b, PX 42-c; *see also* PX 1-a at 83.

[256] Rec. Doc. 750, Puisis Testimony at 28:19-23; *see also* PX 1-a at 83 ("While these changes all have some positive effect, the significant findings of the Court remain present[,]" as "[n]o changes have been made to the internal scheduling, follow up or medical record deficiencies that we have identified.").

[257] *See supra* Part II.B.

[258] Rec. Doc. 755, Goehring Testimony at 58:24-59:6; PX 1-a at 100-07; *supra* Part II.C.

[259] PX 44-c at 04, Response to ROG No. 1; JX 69-a, R. Lavespere Depo. Tr. at 141:12-25. Moreover, Ms. Goehring testified that setting nurse to patient ratios was insufficient without an acuity measurement. Rec. Doc. 755, Goehring Testimony at 59:10-60:22.

[260] PX 1-a at 100-06; *supra* Part II.C.

rounds to assess or care for the patients.[261] The lack of regular rounding is especially concerning, as some patients remain outside of sight or sound of nurses when they are in the nursing stations.[262]

90.     **Use of Inmate Orderlies in the Infirmary:** Despite the Liability Opinion's finding that Defendants used inmate orderlies "as nursing assistants which is beyond the scope of the medically accepted use of orderlies,"[263] Defendants asserted that "[o]rderlies are utilized the same today as they were at the close of liability discovery."[264] Dr. Mathis confirmed that inmate orderlies in the LSP infirmary are performing duties that would be handled by nursing assistants if they were present.[265]

91.     In fact, Defendants' use of inmate orderlies to provide medical care has become more problematic than during the liability period: orderlies are unmistakably providing direct patient care in the infirmary and outside it. Among other medical tasks, patients and orderlies routinely perform wound care, handle patient lab reports, and take x-rays.[266] The evidence supports Ms. Goehring's conclusion "that the inmates are providing the care in the infirmary."[267] Even when a patient had a heart attack in Nursing Unit 2, the records show an orderly providing CPR, rather than staff.[268]

92.     Defendants have not changed their orderly training practices,[269] despite the Court's finding

[261] Rec. Doc. 755, Goehring Testimony at 64:5-65:2; *see also* Rec. Doc. 755, Goehring Testimony at 61:13-19 (describing that in the hours she was observing the infirmary only two nurses left the nursing station); PX 1-a at 104.

[262] PX 1-a at 100. Though Defendants installed call lights above the locked rooms in January 2022, there is no audio connected to the light, so it requires nurses to constantly look out from their nursing station to observe whether a light has come on. PX 44-c at 04, Response to ROG No. 2; PX 44-f at 14; Rec. Doc. 755, Goehring Testimony at 61:9-62:3. Moreover, Class member Derrick Martin could not reach the call button to activate the call light. JX 77-c at 3.

[263] Rec. Doc. 594 at ¶ 75.

[264] PX 44-d at 04, Response to ROG No. 16.

[265] Rec. Doc. 753, Mathis Testimony at 68:4-69:13.

[266] PX 1-a at 11-12, 101-04; PX 1-d at 19; Rec. Doc. 751, Goehring Testimony at 75:7-76:7; Rec. Doc. 755, Goehring Testimony at 58:24-59:6; 62:13-63:21; Rec. Doc 748, LaMarre Testimony at 176:17-177:1; *see also* Rec. Doc. 594 at 90.

[267] Rec. Doc. 755, Goehring Testimony at 62:13-14.

[268] *See* JX 22 at 547; *see supra* ¶¶ 49-50 (describing **Patient #22**).

[269] PX 44-d at 04, Response to ROG No. 15; JX 72-a.; T. Falgout Depo. Tr. at 24:9-12; *see* Rec. Doc. 757, Stickells Testimony at 41:22-42:24; 43:14-17 (explaining that the updates to the training powerpoint after she was deposed in March were stylistic and not substantive, as no new content was added). As this Court found in the liability phase, orderly training continues to take place on an "as needed" basis. Rec. Doc. 594 at 99; Rec. Doc. 757, Stickells Testimony at 29:5-6.

that "LSP failed to follow its own training policies with respect to inmate orderlies.[270] Orderlies continue to operate with little supervision, resulting in abuse of patients and risk to vulnerable patients.[271] And although they provide medical care, they continue to be supervised in part by security.[272]

93.     The testimony of Defendants' health care orderly witnesses highlights the deficiencies with LSP's orderly program. Bruce Hines testified that, even though he has worked as a health care orderly for the past three years, he completed his first healthcare orderly training class at LSP "three or four" days before he was deposed.[273] He testified that the health care orderlies "are the ones that are going to be more hands-on than the nurses[,]" and "it seems like I'm doing their job as well."[274] He testified that nurses often do not follow up with patients that he flags for them as having an issue, such as blood in their stool.[275] Defendants' other health care orderly witness, Donald Murray, similarly noted that the orderlies "fill the gaps in" for the nurses and are very important because "by it being a shortage of nurses, they couldn't do all that work that needs to be done."[276]

### D. Emergency Care

94.     **Assessment and Treatment Unit—Practices and Quality of Care:** LSP continues to fail to provide timely and appropriate emergency care at the Assessment and Treatment Unit ("ATU") or transfer patients to an outside hospital when necessary.[277] As the patient examples discussed above demonstrate, the deficits in LSP's emergency practices continue to place Class members at substantial

---

[270] Rec. Doc. 594 at ¶ 78, *see also id.* at 51-55 (finding that "the orderly program creates an unnecessary risk of harm to disabled and vulnerable inmates.").

[271] PX 1-a at 101-06; *see, e.g.*, Rec. Doc. 755, Goehring Testimony at 40:10-15 (describing a nurses narrative note recording that **Patient #22** complained that an orderly had punched him in the head); JX 22 at 918; Rec. Doc. 755, Goehring Testimony at 62:13-63:21 (recounting observing orderlies providing care behind screens without supervision and interviewing a patient that had scars on his neck from when an orderly had choked him).

[272] Rec. Doc. 757, Stickells Testimony at 29:20-22.

[273] JX 75-a, B. Hines Depo. Tr. at 6:10-11; 7:24-9:12; 34:25-35:4. Jennifer Stickells admitted that she had orderlies working that did not have proof of their certification. Rec. Doc. 757, Stickells Testimony at 44:9-12.

[274] JX 75-a, B. Hines Depo. Tr. at 10:9-11:2; 18:2-10.

[275] *Id.* at 33:14-34:11.

[276] JX 76-a, D. Murray Depo. Tr. at 5:18-21; 17:14-22; 23:23-25.

[277] PX 1-a at 107-24; Rec. Doc. 749, Vassallo Testimony at 17:21-18:22; 90:7-19; *see also* Rec. Doc. 594 at ¶ 100 ("[T]he trial evidence demonstrates that LSP often fails to refer patients to an outside ER when necessary.").

risk of serious harm when they develop an emergency medical need.

95. As Dr. Mathis testified, "if in doubt send him out" is a motto in corrections—meaning, "if you don't know exactly what's going on with a patient or if you don't think you can take care of them, then you send them to the emergency room."[278] Defendants do not adhere to this motto. Defendants failed to transfer patients to an outside facility in the face of symptoms that raised the possibility of critical and often life-threatening conditions.[279] Notably, Defendants' experts did not express an opinion about whether patients were correctly and timely sent out as an overall matter.[280]

96. Even though the Court previously found that Defendants' general practice of "hold[ing] patients in the ATU for observation for several hours instead of transport[ing] them off-site immediately, where appropriate" had "inexorably led to preventable deaths and avoidable exacerbation of conditions,"[281] Defendants admit that they have not changed policies related to referrals to outside hospitals.[282] If anything, they are in the process of exacerbating that problem: EMT Director Darren Cashio testified that Defendants are removing the (never-used) option in their emergency policy of "scoop and runs" because they worry that a patient might be malingering.[283] Even registered nurses are not allowed to send a patient to an emergency room when there is no provider available in the ATU, despite Dr. Mathis's testimony that they should be able to do so.[284]

97. As to the care provided in the ATU itself, Dr. Vassallo's testimony and the examples in Plaintiffs' experts' report powerfully demonstrated that the nurses and nurse practitioners practicing in the

---

[278] Rec. Doc. 753, Mathis Testimony at 55:13-20; *see also* DX 35-c at 213.
[279] *See supra* Part II.D. (describing **Patients #38, #35, #36, #55,** & **#54**); *supra* n. 196 (describing **Patients #26, #52, #58, #59, #53,** & **#17**).
[280] Rec. Doc. 753, Mathis Testimony at 59:11-15.
[281] Rec. Doc. 594 at 90.
[282] JX 70-a, R. Lavespere Depo. Tr. 108:7-24; 114:25-115:2; JX 69-a, R. Lavespere Depo. Tr. 49:15-50:1; 100:13-23.
[283] Rec. Doc 748, LaMarre Testimony at 186:23-187:9.
[284] Rec. Doc. 753, Mathis Testimony at 56:17-20, 57:21-24.

ATU frequently missed critical signs and symptoms, misdiagnosed or ignored serious medical conditions, and even provided treatment that was directly contraindicated for the patient's condition.[285] While Dr. Mathis criticized Dr. Vassallo for purportedly holding the ATU to the standards of an emergency room (which it is not),[286] Dr. Vassallo made clear that she was doing no such thing.[287] Rather, her analysis appropriately evaluated whether Defendants' practice in the ATU impeded Class members from obtaining appropriate emergency medical care and increased the risk that they would suffer serious harm. Her conclusion that it did is tragically well-supported.

98.     **Assessment and Treatment Unit—Staffing**: Defendants have changed ATU staffing since the liability trial. Previously, most care in the ATU was provided by EMTs; a physician was on call, but rarely came in.[288] Defendants have acknowledged this led to deficiencies in care.[289] Now, a nurse is assigned to the ATU at all times, and a nurse practitioner is assigned to the ATU some of the time.[290]

99.     Defendants testified inconsistently regarding when nurse practitioners are actually expected to be present in the ATU, and when they were merely "on call" in the same way providers were previously. Although Dr. Lavespere claimed in his deposition that nurse practitioners were "physically in the ATU" on their shifts,[291] and Defendants made the same claim in their opening,[292] Nurse Practitioner Park admitted that that is not the case.[293] Troublingly, medical records show that even when a nurse practitioner is supposed to be staffed to the ATU, they frequently give telephone orders and do

---

[285] *See generally supra* Part II.D.
[286] *See* Rec. Doc. 752, Mathis Testimony at 197:9-13.
[287] *See, e.g.,* Rec. Doc. 749, Vassallo Testimony at 92:22-24; 97:15-17; 116:25-117:7.
[288] *See* Rec. Doc. 594 at ¶ 102.
[289] JX 70-a, R. Lavespere Depo. Tr. at 75:13-17.
[290] Rec. Doc. 717 at 4.
[291] *See* JX 70-a at 90:3-18 (claiming that a nurse practitioner is "physically in the ATU" on weekdays from 7:30 am to 4:00 pm and on Friday, Saturday, and Sunday nights).
[292] Rec. Doc. 747, Defendants' Opening at 29:11-13 ("During the daytime there is always a nurse practitioner in there. During the weekend, there is a nurse practitioner there day and night.").
[293] *See, e.g.,* Rec. Doc. 752, Park Testimony at 73:5-8 (Q: "You said when you're on duty at the ATU you don't physically sit in the ATU, right? A: No, I don't. Not all the time."); *id.* at 12:16-17 ("I could be in the nursing units evaluating patients or assessing patients.").

not examine the patient, strongly suggesting that they simply are not present when Defendants claim they should be.[294] Even Dr. Johnson acknowledged it would be concerning if the medical records show nurse practitioners making telephone orders and not seeing patients on the weekend.[295] Perhaps relatedly, Defendants refused to allow Plaintiffs' experts to observe after-hours care in the ATU.[296]

100.    As a result, "many patients are seen in the ATU without any health care provider assessing the patient."[297] This means "care in the ATU is frequently provided by nurses treating and diagnosing patients, with the health care provider basing any recommendations on the nurse's diagnosis on the telephone."[298] In other words, nurses now play the role EMTs played during the liability period. Dr. Vassallo acknowledged this is an improvement[299]—but it is still far from adequate. RNs have more extensive training than EMTs, but they are not trained, qualified, or licensed to diagnose.[300] And several nights a week, the ATU is staffed by a lone LPN, not an RN.[301] The danger this creates is clear in the medical records, which include numerous critical errors.[302] Dr. Vassallo credibly concluded that "the care that's provided to patients often is just completely wrong."[303]

101.    Moreover, even when nurse a practitioner is physically present in the ATU, the nurse practitioners are not all emergency-trained or supervised by someone with emergency training.[304]

---

[294] *See supra* Part II.D. (describing **Patients #35**, JX 35 at 121; **#36**, JX 36 at 106; & **#55**, JX 55 at 54); *see also* PX 1-a at 110 ("Chart review demonstrates that verbal or telephone orders are standard in the ATU.").

[295] Rec. Doc. 757, Johnson Testimony at 204:13-16; *see also* Rec. Doc. 749, Vassallo Testimony at 78:14-79:3 (describing why having a provider on call, but not seeing the patient, is insufficient).

[296] *Id.* at 16:2-14; PX 1-a at 110.

[297] *Id.*

[298] *Id.*

[299] Rec. Doc. 749, Vassallo Testimony at 79:4-7.

[300] *Id.* at 20:16-17; 79:7-14.

[301] Rec. Doc. 757, Johnson Testimony at 205:7-207:4; Rec. Doc. 752, Park Testimony at 74:9-75:6; JX 67-a; JX 67-b; *see also* Rec. Doc. 749, Vassallo Testimony at 79:9-10 ("LPNs are much less trained than a registered nurse.").

[302] *See supra* Part II. D.

[303] Rec. Doc. 749, Vassallo Testimony at 18:14-15.

[304] *See id.* at 79:15-80:19; PX 1-a at 110-111 ("Even when nurse practitioners are staffing the ATU, there is rarely if ever a physician involved in care in the ATU. Nurse practitioners who work in emergency room settings often complete a fellowship in emergency medicine, but there is no evidence in the credentialing files that any of the LSP nurse practitioners have received such training. As a result, even the full staffing of the ATU lacks the training and experience necessary to ensure that emergency medicine reaches the standard of care.").

102.  **Self-Declared Emergencies:** EMTs still respond to Self-Declared Emergencies ("SDEs"),[305] resulting in patients receiving no medical evaluation, diagnosis, or treatment from a health care provider.[306] EMTs serve as a "door to medical care" and do not have medical records when they go to see a patient making an emergency sick call.[307] Even Dr. Mathis opined that the use of EMTs was unacceptable, as they were practicing medicine without a license.[308]

103.  As during the liability trial, EMTs determine how to respond to a self-declared emergency by consulting symptom-based treatment protocols (previously compiled in the "EMT Manual"; now called "individual treatment orders" ("ITOs"), even though they are not specific to an individual patient).[309] Dr. Vassallo credibly opined that the ITOs require EMTs to make diagnoses, which is outside their scope of practice.[310] Dr. Mathis agreed that "some of the ITOs need to be reworked."[311]

104.  Shortly before trial, Defendants issued a memo purporting to change SDE practices, supposedly in response to Dr. Mathis's concerns.[312] However, EMT Director Darren Cashio testified that the memo was merely "trying to streamline" the SDE process and "doesn't change, really, the process" except to allow EMTs to call a provider via FaceTime, rather than phone.[313] Mr. Cashio testified that the new policy did not limit EMTs' practice.[314] After reviewing the new policy, Dr. Vassallo credibly found that it made "really no difference" and would not change the quality of care.[315]

---

[305] The parties stipulated that SDEs "are still handled cell-side by EMTs. The EMTs may follow 'Individual Treatment Orders,' transport the patient to the ATU, or contact an on-call provider for telephone orders, depending on the circumstances." Rec. Doc. 717 at 5.
[306] PX 1-a at 9; *see, e.g., supra* Part II.D. (describing **Patients #29** & **#6**); *supra* n. 196 (describing **Patient #41**).
[307] Rec. Doc. 749, Vassallo Testimony at 84:14-19; 86:1-8.
[308] Rec. Doc. 752, Mathis Testimony at 194:11-17; DX 35-c at 223; *see also* Rec. Doc. 749, Vassallo Testimony at 18:7-8 ("[T]hat person has to take a symptom and make a decision about the symptom, and that is unacceptable.").
[309] Rec. Doc. 749, Vassallo Testimony at 84:23-85:4; 87:1-19.
[310] *Id.* at 87:20-88:21.
[311] Rec. Doc. 753, Mathis Testimony at 64:12-15.
[312] *See* DX 50.
[313] PX 79, D. Cashio Depo Tr. at 8:13-9:9; 10:4-11:2; 12:7-14:21. Note the memo is dated May 12, 2022, but Mr. Cashio testified that the new polices in the memo were implemented on June 2, 2022. *Id.* at 9:18-24.
[314] *Id.* at 15:21-23.
[315] Rec. Doc. 749, Vassallo at 86:9-11; 87:1-6; 88:14-89:21.

105.    **Emergency Response**: Finally, Defendants' staff do not respond appropriately to medical emergencies such as heart attacks. ACA standards and LSP policy require all staff to be "trained to respond to health-related situations within a four-minute response time" and provide first aid until medical personnel (i.e., EMTs) arrive.[316] Yet the records show numerous instances where staff failed to respond within the four-minute window.[317] Similarly, although staff are trained to use automatic external defibrillators ("AEDs"), they failed to do so in at least three cases, contributing to potentially preventable deaths.[318] Indeed, during Plaintiffs' expert's site visit, staff were not even sure where to find the AEDs—a failing that a 2021 audit acknowledged as well.[319]

### E.  Organizational and Structural Deficiencies

106.    As they did in the liability trial, Plaintiffs' experts credibly identified several aspects of LSP's leadership and administrative processes that contribute to the pervasive, persistent medical problems discussed above. Although each area was discussed in the Liability Opinion, Defendants made few relevant changes—and none providing any reason to believe that the "overwhelming deficiencies in the medical leadership and administration of health care at LSP"[320] have been eliminated.

107.    **Leadership & Organization:** Ongoing deficiencies in LSP's medical leadership and organizational structure prevent changes that would mitigate the substantial risks faced by Class members.[321] Although the addition of a Long-Term Care Hospital Administrator is positive, medical supervision and medical involvement in management decisions remain lacking.[322] Notably, Dr. Lavespere, whom

---

[316] *See* DX 11 at 29; PX 21-y at 2.
[317] *See supra* ¶ 62 (describing **Patient #25**); PX 1-c at 231 (describing **Patient #3**); *id.* at 237(describing **Patient #5**); *id.* at 244 (describing **Patient #19**); *id.* at 258 (describing **Patient #22**); *id.* at 288 (describing **Patient #20**); *id.* at 306 (describing **Patient #21**); PX 1-c at 307, 366 (**describing Patient #28**); PX 1-a at 111.
[318] *See supra* ¶ 62 (describing **Patient #25**); *supra* n. 196 (describing **Patients #16** & **#22**); *see also* Rec. Doc. 749, Vassallo Testimony at 113:9-14:16.
[319] PX 1-a at 111; *see also* Rec. Doc. 755, Goehring Testimony at 7:14-8:13.
[320] Rec. Doc. 594 at ¶ 28.
[321] *See* PX 1-a at 12, 14-16, 43-48.
[322] PX 1-a at 14-16; Rec. Doc. 750, Puisis Testimony at 115:6-13.

the Court found to have "directly contributed to constitutionally infirm health care at LSP" as LSP's medical director,[323] was promoted to statewide Medical Director, while Dr. Toce—one of the physicians providing deficient clinical care during the liability period and the only physician at LSP in the Relevant Period—was promoted to medical director of LSP.[324] The two men were the only people DOC considered for either position.[325] Tellingly, neither Dr. Lavespere nor Dr. Toce testified at trial.

108.    Dr. Toce admits that he is too busy to adequately supervise his staff, an opinion that Plaintiffs' experts shared after reviewing the current system.[326] The only testifying health care provider at LSP who worked during both the liability and remedy periods could not think of any changes Dr. Toce made, and testified that the culture has not changed at all since Dr. Toce started as medical director.[327]

109.    The only member of medical leadership who does not come from within DOC is Jacob Johnson, the Long Term Care Hospital Administrator.[328] While Plaintiffs take no issue with Dr. Johnson's qualifications, there is no reason to believe his hiring is a panacea that can be expected to fix all of LSP's problems. His only prior experience as an administrator in a facility providing direct patient care was a 13-month stint in 2008 at an outpatient clinic that did not provide infirmary or emergency care.[329] In another job, the Louisiana legislative auditor found mismanagement under his leadership.[330]

110.    Regarding his tenure at LSP, Dr. Johnson acknowledged difficulties changing the entrenched culture to be more patient centered.[331] Troublingly, while he purports to use documents known as

[323] Rec. Doc. 594 at ¶ 129.
[324] PX 44-c at 8, Response to ROG No. 10; PX 1-a at 15.
[325] JX 74-a, J. LeBlanc Depo. Tr. at 12:16-14:4; Rec. Doc. 757, Johnson Testimony at 188:12-17.
[326] JX 71-a, P. Toce Depo. Tr. at 46:1-12; *see* PX 1-a at 15 ("Dr. Toce is the only full-time physician at the facility with two physician vacancies . . . . In our opinion, due to physician understaffing, Dr. Toce is not able to meet all his supervisory duties, especially with respect to the quality of clinical care. Nurse practitioners are providing almost all clinical care with no evidence of supervision or collaboration with a physician."); Rec. Doc. 750, Puisis Testimony at 112:6-113:25.
[327] Rec. Doc. 752, Park Testimony at 66:8-22.
[328] Rec. Doc. 757, Johnson Testimony at 189:12-190:5.
[329] *Id.* at 179:10-180:7.
[330] *Id.* at 207:16-209:8; PX 78.
[331] Rec. Doc. 757, Johnson Testimony at 180:14-181:5.

"monthly management reports" to monitor performance and policy compliance, he was not aware until his deposition that Dr. Toce and various other medical department heads were submitting blank reports and/or copying-and-pasting the same information month after month for more than a decade.[332] There is also some reason to be concerned about Dr. Johnson's commitment to long-lasting change when outside the Court's scrutiny, given a patient's report that Dr. Johnson came into the physical therapy office the week before Plaintiffs' experts' site visit and instructed staff that they needed to clear the charts off the exam table, but could put them back after the experts leave.[333]

111.    Finally, defendants repeatedly emphasized that as of March 2022, the Deputy Warden over Quality Assurance and Management (whose duties include, inter alia, overseeing Dr. Johnson) is Ashli Oliveaux, who has "medical experience" as an LPN.[334] However, she has less medical experience than her predecessor, Tracy Falgout, an RN.[335] While Plaintiffs do not impugn Ms. Oliveaux's intentions, Defendants presented no evidence that her oversight has had or can be expected to have any meaningful impact on quality of medical care. Additionally, Ms. Oliveaux is in the custody chain of command, meaning that Dr. Johnson now reports to custody instead of directly to the warden.[336]

112.    **Medical Records:** As in the liability period, Defendants fail "to provide constitutionally adequate clinical care in . . . lack of adequate medical records management[.]"[337] Aside from tracking refusals differently, Defendants stipulated that "[m]edical recordkeeping has not changed."[338] Plain-

---

[332] *Id.* at 210:24-215:24; 216:23-225:19; *see, e.g.,* 222:2-20 (blank reports from the nursing units); 224:7:10 (respiratory care); 224:11-13 (laboratory); 224:14-16 (central supply); 224:17-20 (health information management); 224:21-24 (quality improvement and ADA); *compare, e.g.,* PX 29-a at 617 *with* Liability Trial JX 2-a at 222; *see generally* PX 29-a; PX 29-b.
[333] Rec. Doc 748, LaMarre Testimony at 147:5-15.
[334] Rec. Doc. 747, Defendants' Opening Statement at 27:1-3; Rec. Doc. 690 at ¶ 21; Rec. Doc. 717 at 4; Rec. Doc. 757, Oliveaux Testimony at 52:21-53:2.
[335] *Id.* at 53:11-12; Rec. Doc. 757, Johnson Testimony 186:19-21.
[336] *See* Rec. Doc. 750, Puisis Testimony at 145:18-149:21.
[337] Rec. Doc. 594 at 122.
[338] Rec. Doc. 717 at 5.

tiffs' experts credibly testified that the records continue to be "grossly disorganized, out of chrono-

logical order, and incomplete."[339] All four UMC doctors who testified, including former DOC Medical

Director Dr. Morrison, stated they do not receive full medical records when they treat LSP patients.[340]

Even Dr. Mathis opined that "anything [would] be an improvement" over the current records.[341]

113.     Among other issues, Plaintiffs' experts identified failures to "date, time and legibly sign medi-

cal record entries," "update problem lists," and "accurately document on the MAR and to file MARs

in the record."[342] Many records had no problems list at all, or were not updated or complete.[343] For

example, **Patient #15**'s problem list omitted COPD, from which he would ultimately die; as a result,

LSP providers did not address COPD in clinical visits and did not refer him to a pulmonologist.[344]

114.     Defendants claimed at the class certification hearing and again at the liability trial that they

were on the verge of implementing electronic medical records ("EMR") in 2018, and then 2019,[345] but

they had not done so by the remedial hearing.[346] Even once the connectivity issues LSP has blamed to

date are addressed,[347] implementation of an EMR system will take several months.[348] Dr. Toce testified

the changeover would "create a huge backlog" and reduce the number of patients seen in clinic.[349]

115.     **Security's Role in Health Care:** As in the liability period, LSP has a system "where health

care decisions are largely made by security rather than qualified health care providers."[350] Security

---

[339] PX 1-a at 13; *see also* Rec. Doc 748, LaMarre Testimony at 149:19-150:2.

[340] *See* Rec Doc. 754, Morrison Testimony at 43:2-8; Rec. Doc. 751, Pope Testimony at 10:24-11:5; 21:4-22:2; Rec. Doc. 755, Brady Testimony at 140:7-141:8; Rec. Doc. 755, Glass Testimony at 161:5-11; 171:10-16.

[341] Rec. Doc. 752, Mathis Testimony at 207:14-15; *see also id.* at 252:15-253:14 (explaining why an electronic medical record system would improve care); Rec. Doc. 756, McMunn Testimony at 131:20-24.

[342] PX 1-a at 40; *see also* Rec Doc 748, LaMarre Testimony at 98:19-25; 150:18-21; 152:8-153:15.

[343] PX 1-a at 39.

[344] *Id.* at 68-69.

[345] Rec. Doc. 374, Lavespere Testimony at 37:6-7; Rec. Doc. 374, Rodriguez/Falgout Testimony at 61:23-62:3; Rec. Doc. 549, Rodriguez/Falgout Testimony at 188:24-189:13.

[346] Rec. Doc. 754, Rodriguez Testimony at 76:4-13; JX 69-a, R. Lavespere Depo Tr. at 208:22.

[347] PX 44-c at 04, Response to ROG No. 1; PX 44-e at 03, Response to ROG No. 18.

[348] Rec. Doc. 753, Mathis Testimony at 81:20-83:11 (describing, based on experience implementing electronic medical records in California, it taking several months to train and get up to speed once the hardware is installed).

[349] JX 71-a, P. Toce Depo Tr. at 53:7-16.

[350] Rec. Doc. 594 at ¶ 99.

continues to be intermingled with medical care in many places, including the delivery of medications, the chain of command for EMTs and orderlies,[351] and self-declared emergencies.

116. Beyond medication administration and self-declared emergencies, security and discipline continue to play an inappropriate role in medical care. Although Dr. Lavespere, Dr. Johnson, and Dr. Mathis all acknowledged that it would be inappropriate to discipline a patient for refusing medical care or declining to sign a refusal form,[352] Patient #50 was charged and found guilty of aggravated disobedience for refusing a TB test—resulting in forced testing against his will, signed off by Dr. Lavespere.[353] Ms. Goehring credibly testified that she had never seen a charge like that in her career.[354]

117. This problem persists to date. As recently as March 2022, Class member Charles Butler credibly testified, he "was threatened with a disciplinary lockup should [he] not sign a refusal" for a medical appointment scheduled the day of his deposition in this case.[355] Indeed, security and discipline are so enmeshed in medical care that a sign over the entrance to the treatment center says "YOU MUST SIGN A MEDICAL REFUSAL AT CLINIC BEFORE LEAVING OR YOU WILL FACE DISCIPLINARY ACTION."[356] Dr. Toce also takes instruction from security on whether patients should be transported with black box restraints,[357] which both Class members and Plaintiffs' experts credibly testified create a barrier to accessing offsite care and is in violation of the ADA.[358]

---

[351] *See* Rec. Doc. 749, Vassallo Testimony at 85:12-21 (EMTs); JX 78, T. Hooper Depo. Tr. at 172:10-17 (orderlies); Rec. Doc. 757, Stickells Testimony at 29:20-22 (same); Rec. Doc. 752, Park Testimony at 22:25-23:5, 29:3-4 (same).

[352] JX 69-a, R. Lavespere Depo Tr. at 192:9-25; Rec. Doc. 757, Johnson Testimony at 184:1-9; Rec. Doc. 753, Mathis Testimony at 66:12-15.

[353] JX 50 at 44; *see* Rec. Doc. 755, Goehring Testimony at 46:10-25.

[354] *Id.*

[355] Rec. Doc. 755, Butler Testimony at 194:16-195:1.

[356] DX 46 at 172; PX 1-d at 47; Rec. Doc. 757, Johnson Testimony at 184:20-186:5.

[357] JX 71-a, P. Toce Depo. Tr. at 134:4-5. As observed by the Court during the Remedy hearing, security do not follow instructions to use flex cuffs instead of the black box to transport class members. Rec. Doc. 747, Mischler Testimony at 58:19-60:1; Rec. Doc. 747, at 157:1-158:19; Rec. Doc. 726.

[358] Rec. Doc. 755, Goehring Testimony at 49:22-50:15; Rec. Doc. 750, Puisis Testimony at 63:8-20; Rec. Doc. 747, Mischler Testimony at 58:19-60:1; Rec. Doc. 749, Creppel Testimony at 243:20-244:20; JX 77-c at 05 (describing Mr. Mellion refusing for follow-up visits to UMCNO due to the pain to his neck and back as a result of hours of transportation in the Black Box); *see also* JX 71-a, P. Toce Depo. Tr. at 133:16-18 ("[Patients] tell m[e] I am not going on this appointment, even if I die, if you make me wear a black box.").

118. **Medication Administration:** Medication administration has gotten worse since the liability period, with even more unreliable and disorganized medication administration records and even more inconsistent and dangerous medication administration practices.[359] The unreliability of the medical administration records contributes to providers' failures to monitor and evaluate patients' adherence to medication regimens and address obstacles to adherence.[360]

119. Defendants acknowledge that they have made no changes to medication management (other than to reduce the frequency of administration),[361] continuing to allow "correctional officers [to] supervise the delivery of medications by other correctional officers."[362] This results in inadequate delivery of critical medications such as insulin, incomplete and inaccurate medical administration records, and ongoing failure by medical providers to monitor and manage medications.[363]

120. Ms. LaMarre credibly conclude that the "medication management system is completely broken, from ordering the meds, to getting them to the pharmacy, to timely dispensing the meds, to administering the meds, to documenting the meds in the medication administration record."[364] She

---

[359] PX 1-a at 10-11; 38-40; 72-79; PX 2; *see, e.g.*, Rec. Doc. 748, LaMarre Testimony at 179:6-180:21 (testifying about the unreliability of the MARs in **Patient #14**, and how it this error was not isolated to this patient); *see also* Rec. Doc. 755 Goehring Testimony at 6:18-7:13 (describing how Dr. Johnson and the Director of Nursing continued to give Plaintiffs' medical experts the wrong information about the timing of pill call, indicating that they did not even know when pill call took place); Rec. Doc. 749, Creppel Testimony at 241:21-242:24 (describing gaps in receiving necessary medication, and issues with the correctional officers administering the medications).

[360] Rec. Doc. 748, LaMarre Testimony at 98:19-25; *see, e.g.*, Rec. Doc. 749, Vassallo Testimony at 54:4-15 (describing how **Patient #55**'s MARs did not include the information for the provider treating him in the emergency room to know the accurate information regarding his blood pressure medication).

[361] PX 1-a at 73; *see* Rec. Doc. 748, LaMarre Testimony at 175:18-178:8 (describing how the reduced frequency results in therapeutically inappropriate time between doses, especially for insulin administration); *id.* at 178:4-8; 178:19-21 (describing the reduction in frequency of pill call as illustrative of the fact that "medication administration has been turned completely over to custody. It is a security operation with no oversight by the medical team.").

[362] Rec. Doc. 594 at ¶ 99; *see also* PX 1-a 72; JX 78, T. Hooper Depo. Tr. at 62:1-4; JX 69-a, R. Lavespere Depo. Tr. at 124:1-4; 20-23; *see also* Rec. Doc. 748, LaMarre Testimony at 174:16-175:17 (describing how the training for correctional officers at LSP is inadequate and how their use in pill call contravenes national standards based on the prison's size).

[363] PX 1-a at 10-11; 38-40; 72-79; *see* Rec. Doc. 594 at ¶ 33; *see, e.g.*, Rec. Doc. 747 Mischler Testimony at 49:4-50:23; 68:1-9 (describing the process for receiving his sliding-scale insulin twice a day from correctional officers and how LSP, as often as once a week, including the day prior to his testimony, does not have the test tabs for him to test his levels preventing him from knowing how much insulin to give himself); Rec. Doc. 748, LaMarre Testimony at 151:1-152:7 (testifying on how LSP does not record how much insulin patients receive twice-daily in their medical records).

[364] *Id.* at 97:4-8; *see also id.* at 115:14-19.

concluded from her observations during the site visit that the correctional officers are not following the basic rules of adequate medication administration, such as confirming the identity of the patient and confirming they are dispensing the correct medication.[365] These deficiencies in LSP's medical administration practices risk patients getting the wrong medication.[366]

121.     **Credentialing:** As the Court found in the liability phase, LSP continues to "fail[] to maintain provider credentialing documentation[.]"[367] Defendants acknowledge that no changes to credentialing of medical staff have been made,[368] which is unsurprising given Dr. Lavespere's insistence that "[t]here wasn't anything wrong with our credentialing."[369] Although there was some improvement in the content of some credentialing files, Dr. Puisis credibly testified that the credentialing process itself remains inadequate, with LSP continuing to fail to ensure that providers are credentialed based on type of work they are expected to perform.[370] As a result, LSP staff continue to practice without appropriate training.[371] Moreover, LSP maintains no credentialing file, and appears to perform no credentialing whatsoever, for the various onsite specialists that it hires to practice at LSP.[372]

122.     Patient #5 illustrates the risks caused by Defendants' credentialing practices. A contract cardiologist who has worked at the prison for years repeatedly failed to note troubling lab results, contributing to the patient's preventable death from aortic stenosis.[373] According to Defendants, blame for this should fall on the cardiologist.[374] But as Dr. Puisis explained, LSP is responsible for the quality

---

[365] *Id.* at 172:22-25; 173:8-24. Troublingly, she observed officers pouring Keppra into unlabeled cups and setting it on the counter for many patients, a practice that is not compliant with the standard of care. *Id.* at 173:25-174:8; *see* PX 1-d at 32 (picture of stacked Keppra in pill call room).
[366] Rec. Doc. 748, LaMarre Testimony at 174:12-15; *see, e.g., supra* ¶¶ 31-32 (describing **Patient #13**).
[367] Rec. Doc. 594 at ¶ 131.
[368] JX 69-a, R. Lavespere Depo. Tr. at 88:4-11; 213:8; *see also* PX 1-a at 13.
[369] JX 69-a, R. Lavespere Depo. Tr. at 213:9-10; *see also* Rec. Doc. 752, Park Testimony at 78:4-6 (testifying that she did not think LSP lacked adequate credentialing or peer review processes at the time of the liability trial).
[370] Rec. Doc. 750, Puisis Testimony at 122:10-123:13; 124:8-127:16.
[371] PX 1-a at 19-21.
[372] *See* Rec. Doc. 750, Puisis Testimony at 124:18-22.
[373] See *supra* ¶¶ 40-41 (describing **Patient #5**).
[374] Rec. Doc. 750, at 197:16; 217:16-18; 218:9-10; *but see* Rec. Doc. 750, Puisis Testimony at 49:12-50:5; 243:19-244:16 (explaining that issues with medical records and handoff to specialists likely contributed to the errors).

of care of the specialists it contracts to practice on-site at LSP.[375] LSP maintains no credentialing file for the cardiologist, and it took no steps to review the quality of his work—even though his license was restricted for recurrent substance and alcohol abuse when he began treating Patient #5.[376]

123.     **Peer Review**: As during the liability period, there is "a lack of peer review in the medical department at LSP."[377] As of the remedy trial, LSP's peer review practices had not changed.[378] Peer reviews fail to evaluate individual providers' clinical work,[379] consider an insufficient sample of records, and do not address whether patients who need specialty care are actually referred.[380] These shortcomings lead to the same errors occurring repeatedly, contributing to the risk of serious harm to patients.[381]

124.     While DOC changed its department-wide peer review policy in 2020 to increase the number of records reviewed, LSP failed to follow suit when it conducted peer review later that year.[382] Defendants did not attempt to explain this divergence from DOC's policies, nor did either of their experts dispute Dr. Puisis's conclusion that LSP's practices were inadequate.[383]

125.     **Quality Improvement**: LSP still lacks an effective quality improvement program, as measured by both national standards and LSP's own internal directives.[384] Furthermore, LSP's health services leadership staff lack understanding of the quality improvement program and required compliance, rendering it performative and unproductive.[385] As Ms. Goehring testified, LSP could, and should,

---

[375] Rec. Doc. 750, Puisis Testimony at 242:10-25.
[376] *See* Rec. Doc. 750, Puisis Testimony at 243:19-244:16; PX 17-a at 1, 20, 28, 43; *see, e.g.*, Rec. Doc. 750, Puisis Testimony at 49:12-50:5.
[377] Rec. Doc. 594 at ¶ 125.
[378] JX 78, T. Hooper Depo. Tr. at 105:6-10.
[379] Rec. Doc. 750, Puisis Testimony at 118:16-22; 121:6-11.
[380] PX 1-a at 21-25. In 2020, a total of 9 records were reviewed using the same methodology as in 2016. *Id.* at 23.
[381] Rec. Doc. 750, Puisis Testimony at 120:2-6; 122:5-8.
[382] *See id.* at 115:14-116:25; *compare* PX 19-i at 5 (as of July 12, 2020, requiring review of either ten charts or 1% of the prison's population) *with* PX 1-a at 22-24 (reviewing nine charts in October 2020).
[383] In fact, Defendants did not proffer any expert testimony on peer reviews as Dr. Mathis did not opine on this category, and the Court excluded Mr. McMunn's opinion in this area. *See* Rec. Doc. 720, at 7-8.
[384] PX 1-a at 40-43; DX 8-n, LSP Dir. No. 13.014; JX 69-a, R. Lavespere Depo. Tr. at 198:17-21; 201:16-19; 202:4-8; Rec. Doc. 751, Goehring Testimony at 90:21-91:3; 96:1-5.
[385] PX 1-a at 43-48; Rec. Doc. 757, Stickells Testimony at 32:10-16; *see, e.g.*, Rec. Doc. 751, Goehring Testimony at 98:12-101:23 (describing flaws in the Hospice Pain Management Study, as well as the reported information from the study); JX

have used this Court's Liability Opinion as a foundation to start new studies to collect data and implement corrective action plans; however, the coordinator of the Quality Improvement program, Ms. Stickells, had never even seen the opinion at the time of her deposition and no one at LSP discussed it with her.[386] Similarly, Dr. Toce believes that the quality improvement program has been adequate for years, even though this Court found that LSP "lacks a quality improvement ('QI') program."[387]

126.    LSP has continued to demonstrate a fundamental lack of understanding of the purpose and importance of QA/QI. Since the liability period, it has added just two new studies, both of which merely collect quantitative data points rather than assessing the quality or adequacy of care.[388] As Plaintiffs' experts explained, "[s]imply counting events does not measure the effectiveness of the services delivered nor measure outcomes of healthcare."[389] Aside from these two new studies, the program has merely continued studies that existed in the liability phase, such as the ADA study, which tracks the amount of time it takes to process requests for accommodations.[390] Troublingly, there were no reports on this study during the most recent three quarters during the Relevant Period because the ADA coordinator failed to transmit even a single accommodation form.[391]

127.    **Mortality Review**: Although the Court previously found "a lack of meaningful mortality review,"[392] Defendants' mortality review process is effectively the same as it was in 2016.[393]

128.    As Dr. Puisis summed it up, the purpose of mortality review is "to be a critical review to identify deficiencies and then, from those deficiencies, to identify opportunities to improve them."[394]

---

71-a, P. Toce Depo. Tr. at 132:8-16 (describing an informal process for monitoring compliance for the date and time study, where compliance continuously "falls off" and has to be "straightened out" over and over again).
[386] Rec. Doc. 751, Goehring Testimony at 96:6-16; Rec. Doc. 757, Stickells Testimony at 48:20-49:4.
[387] JX 71-a, P. Toce Depo. Tr. at 12:6-8; Rec. Doc. 594 at ¶ 127.
[388] *See* Rec. Doc. 751, Goehring Testimony at 93:8-18; 102:4-105:10; Rec. Doc. 757, Stickells Testimony at 35:7-36:5.
[389] PX 1-a at 41.
[390] Rec. Doc. 757, Stickells Testimony at 36:14-22.
[391] *Id.* at 37:1-38:18; PX 34-b at 246-47; PX 34-a at 03-04; DX 49 at 4-5.
[392] Rec. Doc. 594 at ¶ 121.
[393] PX 1-a at 14, 25-26; Rec. Doc. 750, Puisis Testimony at 127:18-130:24; 134:17-135:5.
[394] *Id.* at 127:20-22.

But in LSP's mortality reviews, "[t]here's no critical analysis, so there's no critical review; there's no identification of the deficiencies."[395] Not a single mortality review seeks to identify places where medical care could have been improved—even where clear, critical, and even fatal errors occurred.[396]

129.     Even Dr. Mathis acknowledged that the mortality reviews did not note the standard of care violations he identified in his chart reviews, include a critical review of care, or ask whether any problems in the patient's care could be corrected, and that at least some of the reviews were inadequate.[397]

130.     This inadequate review prevents LSP from identifying opportunities to improve care and prevent deaths.[398] Dr. Lavespere admitted LSP has not taken corrective action or changed provision of care as a result of mortality review.[399] As Dr. Puisis credibly concluded, "there's plenty of room for improvement, but there's very little will or desire to actually engage that and to try to fix it."[400]

131.     **Policies & Directives**: Defendants' policies and directives continue to have multiple shortcomings,[401] and the DOC acknowledged that, with a few specific exceptions, changes to DOC's policies and LSP's directives have not impacted the overall delivery of medical care.[402] The primary change reported was the implementation of a new program, PowerDMS, to access and review polices, but there have been no significant changes to the process of reviewing policies, or the content of the policies themselves.[403] Generally, the health care directives "lack operational detail sufficient to guide staff's practice."[404] Some policies are not specific enough, leading to broken and inadequate systems,

---

[395] *Id.* at 128:19-21; *see generally* PX 1-a at 25-31.
[396] *See, e.g.,* Rec. Doc. 750, Puisis Testimony at 66:8-68:19; 74:9-23; 78:7-22; 107:1-14 (describing mortality reviews for Patients **#5** & **8**); Rec. Doc. 749, Vassallo Testimony at 31:20-24 (**Patient #38**); PX 1-a at 27-30 (**Patients #1** & **#5**).
[397] Rec. Doc. 753, Mathis Testimony at 78:9-79:6.
[398] *See* PX 1-a at 25-31; Rec. Doc. 750, Puisis Testimony at 133:14-134:16.
[399] JX 69-a, R. Lavespere Depo. Tr. at 204:16-18; JX 70-a, R. Lavespere Depo. Tr. at 171:14-17.
[400] Rec. Doc. 750, Puisis Testimony at 134:14-16.
[401] PX 1-a at 31-36 (identifying deficiencies in LSP Directives 13.002, 13.032, 13.042, 13.061, 13.064, 13.076, 13.068).
[402] *See generally* PX 1-a at 31-36; JX 69-a, R. Lavespere Depo. Tr. at 42:15-44:9; 49:15-52:10; 57:9-58:6; 59:13-17; 59:24-60:2; 64:9-65:1; 75:12-18.
[403] PX 44-c at 05, Response to ROG No. 3; JX 70-a, R. Lavespere Depo. Tr. at 187:6-8; 188:4-7; 188:9-13; 204:2-14.
[404] PX 1-a at 31.

while others do not even meet minimum standards on their face, or are not applied in practice.[405]

132.    **Staffing:** Across LSP, staffing shortages throughout the Relevant Period—including multiple physician vacancies, chronic nursing and EMT shortages, and an approximately year-long lab closure—exacerbate existing dysfunctions within LSP's health care system and create additional, system-wide barriers to meaningful change.[406] Several defendants testified about staffing shortages' adverse impact on health care at LSP.[407] The shortages are so significant that an inmate orderly provides physical therapy, which even Mr. McMunn acknowledged is inappropriate.[408]

## IV.    DEFENDANTS ARE STILL NOT IN COMPLIANCE WITH THE ADA

133.    The numerous ADA violations identified by this Court in the liability phase of the litigation continue, and remedial measures are needed to address those violations. Defendants admitted during the remedy phase that "there have been no changes to the practices, procedures, or policies related to ADA accommodations" since the liability findings.[409]

134.    Defendants have treated the ADA violations identified by this Court—and the requirements of the ADA generally—as afterthoughts. Instead of hiring a dedicated ADA Coordinator with the skills, knowledge, and resources to address LSP's ADA violations, Defendants simply tacked the ADA onto the long list of responsibilities assigned to Deputy Warden of Quality Assurance Management

---

[405] *See, e.g.*, Rec. Doc. 751 Goehring Testimony at 69:4-15; 70:4-72:4 (describing the missing information in the KOP policy, PX 21-yy, leading to patients missing their medication); *id.* at 74:7-77:22 (describing offenders providing direct patient care in contravention of the policy regarding the use of offenders in health care, PX 21-kkk); *id.* at 78:18-79:23 (describing the deficiencies with the sick call policy, PX 21-ssss, applicable for the nursing units); *id.* at 79:24-80:13 (describing how the policy related to the medication administration records is not implemented based on her observations of the medical records, as well as an affidavit from LSP's employee Kelley Hawkins, Rec. Doc. 668-1, at 3).

[406] PX 1-a at 16-18; 110-11.

[407] JX 71-a, P. Toce Depo. Tr. at 15:3-9 (lab); 24:4-7 (nurses and doctors); 69:15-18 (medical records); 85:22-86:10 (nursing units); JX 69-a, R. Lavespere Depo. Tr. at 143:13-18 (fewer nurses at LSP); 147:22-148:5 (nurses "are wearing many hats right now"); 213:21-25 ("nowhere close" to fully staffed at the EMT level"); Rec. Doc. 757, Johnson Testimony at 187:1-188:10 (testifying that EMTs are "significantly understaffed," more than a dozen unfilled nursing positions, no lab director for about a year, and at least three unfilled positions in the lab); Rec. Doc. 752 Park Testimony at 57:7-10 (nursing shortages); *Id.* at 58:1-12 (testifying that her direct supervisor, Dr. Toce, is pulled in a lot of different directions, and LSP hiring another physician would help with that problem).

[408] PX 1-a at 12; Rec. Doc. 756, McMunn Testimony at 132:5-10.

[409] PX 44-c at 4, Response to ROG No. 2.

Ashli Oliveaux[410] and sent her to one generic, largely irrelevant training. Instead of working to meet the requirements of their own ADA policies, Defendants revised the policies so that the requirements—including those related to ADA Coordinator qualifications, an ADA advisory committee, and annual staff training—no longer exist. Even the relatively straightforward ADA violations related to physical barriers have not been fixed, with Plaintiffs' architectural expert finding over 150 violations during his remedy-phase survey, including many of the same identified in his liability report nearly six years earlier. Strikingly, many of these violations, such as the lack of proper grab bars in accessible bathrooms, would take Defendants only 10 to 15 minutes to remedy.[411]

### A. Plaintiffs' ADA Experts

135.    Plaintiffs submitted testimony and expert reports related to LSP's ADA violations from two experts, Mark Mazz and Dr. Dora Schriro. Defendants submitted no expert testimony or expert reports related to the ADA.

136.    **Mark Mazz** is an expert in architectural compliance with the ADA. For over 40 years, he has worked with private and public entities to identify and remedy architectural barriers to those with disabilities, including for the Architect of the Capitol, federal agencies, Montgomery County, Maryland, the Department of Justice's Housing and Civil Enforcement and Disability Rights sections, and the Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity. Mr. Mazz has served as a member of the ACA for over a decade. The Court accepted Mr. Mazz as an expert under the ADA in the field of architectural barriers.[412]

137.    Mr. Mazz conducted a site visit of LSP on April 6, 2022.[413] During that visit, he toured those parts of LSP that were identified by Defendants as accessible spaces, which included the spaces Mr.

---

[410] Rec. Doc. 757, Oliveaux Testimony at 52:21-23.
[411] Rec. Doc. 748, Mazz Testimony at 61:14-15.
[412] PX 4 at 5–9; Rec. Doc. 748, Mazz Testimony at 47:24-48:1.
[413] PX 4 at 2.

Mazz surveyed in 2016 that are still deemed necessary for access, plus any spaces that had been deemed substitute spaces for the spaces surveyed in 2016.[414] This included Ash dorms 1-4, segregation cellblock 28, Nursing Units 1 and 2, and the Visitor's Center, and the walkways leading to and from these areas.[415] In surveying these spaces, Mr. Mazz used the same methodology he employed during his liability phase visit, wherein he would measure various aspects of the accessible areas of LSP to ensure "programmatic access" in these areas.[416] Programmatic access is the requirement that new construction, altered spaces, and unaltered areas, to the extent they are necessary to a space's "programs," must be accessible.[417]

138.     At the remedy hearing, Mr. Mazz testified credibly about the violations and the feasibility of remedying them, stating that remedying the violations he found would not "impose any undue financial and administrative burden on LSP."[418] He applied the same "industry-standard methodology" that he used in the liability trial.[419] And, as in the liability stage, where Defendants' ADA expert "'substantiate[d] the items recorded' in the Mazz report 'as being violations of the 1991 and 2010 ADA Standards for Accessible Design,'"[420] Mr. Mazz's findings in the remedy stage went entirely unrebutted.

139.     **Dr. Dora Schriro** is a corrections expert who has served as Director of the Missouri and Arizona correctional systems; Commissioner of the St. Louis and New York City jail systems; warden of the St. Louis city jail; Assistant Commissioner for Program Services in New York City. She also served as Commissioner of the Connecticut Department of Emergency Services and Public Protection and as Connecticut's Homeland Security Advisor. She was the first Director of the ICE Office of

---

[414] Rec. Doc. 748, Mazz Testimony at 46:17-24.
[415] Id. at 49:9-51:6.
[416] Id. at 48:11-21.
[417] Id. at 48:22-49:3.
[418] Id. at 62:3-18.
[419] Rec. Doc. 594 at 97-98.
[420] Id. at 8 (quoting Liability Trial PX 18 at 2).

Detention Policy and Planning. In each of these positions, Dr. Schriro was responsible for implementing and ensuring compliance with state and federal law, including the ADA and RA. The Court accepted her as an expert in the field of corrections administration.[421]

140.    Dr. Schriro conducted a site visit of LSP over a period of three days on April 6, 7, and 8, 2022.[422] During that visit, she toured the facility and interviewed approximately 40 Class members, including an estimated 30 members of the ADA Subclass and about ten healthcare orderlies.[423] At the remedy hearing, Dr. Schriro testified credibly about the inadequacies of LSP's ADA administration, finding that the ADA problems the Court identified at LSP persist, including problems with the ADA coordinator; the ADA advisory committee; staff training; orderly assistance; accommodation requests; the ADA tracking system; and disciplinary accommodations.[424]

### B. Architectural Barriers

141.    The vast majority of the violations Mr. Mazz found in 2016 persist.[425] His report credibly connects each barrier to a specific provision of the ADA that that barrier violates.[426] Defendants do not dispute the existence of any of these barriers or that each one violates the ADA standards.

142.    At trial, Mr. Mazz testified about some of the more striking violations that existed in much the same way as they did in 2016. This included abrupt changes in the level of walkways which prevent Subclass members in wheelchairs from being able to go outside independently;[427] cell windows that Subclass members with motor function disabilities struggle to open or close, which can be especially dangerous for Subclass members with disabilities that affect thermoregulation;[428] doors oriented such

---

[421] PX 3 at 1-2; Rec. Doc. 747, Schriro Testimony at 114:3-17.
[422] PX 3 at 4.
[423] Rec. Doc. 747, Schriro Testimony at 131:3-4; 131:17-21; 133:5-10.
[424] *Id.* at 133:25-135:16.
[425] *See generally* PX 4 at 1-2.
[426] Rec. Doc. 748, Mazz Testimony at 53:6-8; *see also* PX 4 at 11-27.
[427] Rec. Doc. 748, Mazz Testimony at 55:10-56:15.
[428] *Id.* at 56:19-58:5.

that Subclass members in wheelchairs cannot open them independently;[429] and inaccessible drinking fountains.[430] Mr. Mazz credibly testified that LSP had done little to nothing to ameliorate these violations since Mr. Mazz first identified them, with only "19 to 20 percent" of the violations identified in 2016 addressed.[431] Here again, Defendants put forward no evidence to dispute this finding.

### C. Methods of Administration

**143.** **Policy Revisions**: The main LSP Directive regarding ADA administration is Directive 01.016, Access to Programs and Services for Disabled Offenders.[432] In the liability phase of the litigation, the Court found that Defendants were failing to meet the requirements of LSP Directive 01.016 in several ways, including their failure to have a sufficiently qualified ADA Coordinator, an ADA Committee, or adequate staff training.[433]

**144.** Instead of addressing these deficiencies, Defendants have weakened their policies. In 2018, they amended Directive 01.016 to eliminate any mention of an ADA Advisory Committee, any reference to training, and the qualification requirements for the ADA Coordinator.[434] Dr. Schriro credibly testified that, by including these requirements in earlier versions of their policies, Defendants had "set good expectations," and the removal of these requirements is "a significant step backwards."[435]

**145.** **LSP ADA Coordinator:** Although LSP appointed a new ADA Coordinator in March 2022, the problems related to the role have not been remedied. In the Liability Opinion, the Court found that every individual who held the position of LSP's ADA Coordinator during the relevant time period "lacked sufficient education, training, and qualifications to carry out the obligations with which the

---

[429] *Id.* at 58:6-59:15.
[430] *Id.* at 60:2-61:11.
[431] *Id.* at 61:23-62:2; *see also id.* at 58:3-5; 59:14-15; 61:3-11.
[432] *See* PX 21-d at 1.
[433] *See* Rec. Doc. 594 at 56, 59.
[434] PX 21-d. The only language related to ADA Coordinator qualifications in the updated version reads "For the purpose of this directive, an appropriately trained and qualified individual is one who has been designated by the Warden to coordinate efforts to comply with and carry out responsibilities defined by the ADA." *Id.* at 1.
[435] Rec. Doc. 747, Schriro Testimony at 125:15-18.

ADA Coordinator is charged."[436] The Court also found that Tracy Falgout, who held the role at the time of the liability trial, was "juggling far too many competing responsibilities to adequately fulfill his obligations as ADA Coordinator" and that "LSP failed to provide adequate training and resources to any of its ADA Coordinators, and none of the ADA Coordinators during the relevant time period possessed the knowledge or experience necessary to oversee and ensure ADA compliance."[437]

146.    Like her predecessors, Ms. Oliveaux has been tasked with managing ADA administration on top of a multitude of other responsibilities, without support staff or appropriate training. In addition to her role as ADA Coordinator, Ms. Oliveaux oversees LSP's medical care, mental health care, emergency medical services, fire, legal program, and training academy.[438] At least four different department heads report directly to her.[439] She testified that her medical, mental health, EMS, and fire duties take up 50% of her time, while her other duties take up the remaining 50%.[440]

147.    Despite the Court's findings of numerous failings in LSP's ADA compliance following the liability trial, LSP seems not to have considered the ADA—or the need to remedy the violations—in the hiring of Ms. Oliveaux. Ms. Oliveaux interviewed for the deputy warden position "around late February" of 2022,[441] well into the discovery period for the remedial phase of this litigation and nearly a year after this Court issued its liability ruling. Nevertheless, there was no discussion of the ADA Coordinator role during Ms. Oliveaux's LSP interview.[442] In fact, she was not even certain that ADA Coordinator was one of the roles associated with the position she was applying for until she started the job.[443] Prior to her deposition in this case, Ms. Oliveaux was not aware of any of the specific ADA

---

[436] Rec. Doc. 594 at 56.
[437] *Id.* at 58.
[438] Rec. Doc. 757, Oliveaux Testimony at 54:13-17; *see also id.* at 57:5-13 (describing responsibilities).
[439] *Id.* at 56:9-20.
[440] *Id.* at 58:1-5.
[441] *Id.* at 80:7-11.
[442] *Id.* at 80:12-17.
[443] *Id.* at 80:18-21.

problems identified in the litigation, including the use of orderlies, staff training, the tracking system, or even the position of ADA Coordinator for which she had been hired.[444]

148.    Ms. Oliveaux's training related to ADA compliance and administration is also inadequate. She had no knowledge of ADA requirements when Defendants hired her into the position.[445] At the time of her deposition, Ms. Oliveaux "planned to take whatever training Warden Falgout had done"[446]—training this Court had found to be inadequate.[447] By the time she testified at the remedy hearing, Ms. Oliveaux had received an additional training related to the ADA, the "ADA Symposium training."[448] But even this additional training was ineffective in helping Ms. Oliveaux understand how to bring LSP into compliance with the ADA. She testified that only one of the classes she took as part of the symposium had anything to do with corrections,[449] and it was specifically about "deaf offenders and how you communicate with them"[450]—a subject no longer at issue in this litigation. Most of the classes were about physical barriers,[451] which Ms. Oliveaux testified she does not have "much involvement" with at LSP.[452] Ultimately, Ms. Oliveaux testified that her participation in the symposium training had not changed her practices or approach as ADA Coordinator at LSP.[453]

149.    **DOC ADA Coordinator**: The other ADA-related staffing change Defendants have made is the hiring of Sharita Spears as the statewide ADA Coordinator for the Department of Corrections and Public Safety ("DOC"), a role she started in January 2022.[454] As with Ms. Oliveaux, there is little

---

[444] *Id.* at 82:12-24.
[445] *Id.* at 81:10-13.
[446] *Id.* at 82:25-83:3.
[447] Rec. Doc. 594 at 58 ("The Court also finds that LSP failed to provide adequate training and resources to any of its ADA Coordinators.").
[448] Rec. Doc. 757, Oliveaux Testimony at 83:4-8.
[449] *Id.* at 83:9-16.
[450] *Id.* at 71:10-13.
[451] *Id.* at 83:17-19.
[452] *Id.* at 79:1-3.
[453] *Id.* at 85:3-14.
[454] Rec. Doc. 757, Spears Testimony at 88:3-7.

evidence that the DOC's placement of Ms. Spears in this role will adequately improve ADA compliance at LSP. Defendants emphasized at the remedy hearing that Ms. Spears is an attorney,[455] but she is a family law attorney with no experience in disability law or with the ADA specifically.[456]

150.    Ms. Spears appears not to be well-informed about the ADA's requirements or LSP's policies regarding ADA requests for accommodation. For example, Ms. Spears created a leadership training PowerPoint that indicated that offenders need to use the administrative remedy procedure ("ARP") to make requests for accommodation in writing and does not list any other method for making a written request.[457] At the remedy hearing, she similarly testified that "the in-writing process for an offender to make an ADA request is the ARP process."[458] But, as LSP's policies acknowledge, "[t]he ADA does not require that a request for accommodation be provided in any particular manner."[459] A person incarcerated at LSP may use the ARP process to make an accommodation request, but any other means of request, including writing a request on a blank piece of paper, suffices as well.[460]

151.    Indicating in a training document that the ARP process is the only means of submitting a written ADA accommodation request is a significant error because the ARP process is subject to a multitude of rules that are wholly inappropriate to impose upon the accommodation request process.[461] Moreover, under LSP policy, an ARP request is to be rejected if "[t]he complaint concerns an

---

[455] *Id.* at 88:11-14; Rec. Doc. 757, Oliveaux Testimony at 74:9-10.
[456] Rec. Doc. 757, Spears Testimony at 107:14-19.
[457] *Id.* at 111:24-112:10; DX 52 at 9.
[458] Rec. Doc. 757, Spears Testimony at 114:15-18.
[459] JX 73-c at 4.
[460] *See, e.g.*, Rec. Doc. 594 at 61 ("[A]n inmate can request an accommodation verbally, through a sick call form, or even 'on a blank piece of paper.' 'Any means of communication' satisfies the initiation of a request for accommodation . . . Inmates whose accommodations requests are denied are allowed to appeal through the ARP process.") (internal citations omitted); JX 73-c at 4 ("The ADA does not require that a request for accommodation be provided in any particular manner; therefore, LSP is charged with having knowledge, or deemed with having knowledge, of the request, regardless of the form of the request.").
[461] For example, an ARP will be rejected if "[t]he complaint concerns an action not yet taken or a decision which has not yet been made" or if the "request was not written by the offender" or if the "offender has requested a remedy for more than one incident"—none of these restrictions are permissible for requests under the ADA. PX 21-cccc at 12-13.

action not yet taken or a decision [that] has not yet been made."[462] Because an ADA request necessarily comes before the prison decides how to resolve it, an ADA request cannot start the ARP process. Based on her testimony, as well as the misleading language in the training she created, Ms. Spears appears not to fully understand how ADA requests and the ARP process interact either on paper or in practice—and provides advice that will likely lead to the inappropriate rejection of ADA requests.[463]

152.    Additionally, despite the fact that the Court found multiple ADA violations at LSP and Defendants' failure to change the policies the Court previously found deficient,[464] Ms. Spears does not believe any changes are needed in LSP's or DOC's ADA policies.[465]

153.    **Training Practices**: In the liability phase, the Court found that "LSP staff are inadequately trained to assist with disabled inmates."[466] Because there have been no meaningful changes to staff ADA training, this violation continues.[467] Defendants even removed from LSP Directive 01.016 the requirement that all employees receive "comprehensive annual training . . . relevant to access to programs, and activities available to individuals with disabilities."[468] Ms. Oliveaux testified that no staff participated in the symposium training she received,[469] and Ms. Spears testified that the annual in-service training for all staff is "basically geared toward . . . how to effectively communicate with [deaf and hard-of-hearing] offenders[.]"[470]

154.    **Orderly Assistance**: In the liability phase, the Court found LSP's healthcare orderly program

---

[462] *Id.* at 13.

[463] Because this training document was not created until after discovery, Plaintiffs had no opportunity to obtain discovery into how ARP requests were being processed in practice after Ms. Spears provided her erroneous training.

[464] Rec. Doc. 717 at 6 (VII.1.a).

[465] Rec. Doc. 757, Spears Testimony at 108:2-8.

[466] Rec. Doc. 594 at 59.

[467] PX 44-d at 3, Response to ROG 15 ("[T]he training materials [and] practices related to ADA accommodations have not changed.").

[468] *Compare* JX 73-b (2012 version) at 8 *with* JX 73-c (2020 version).

[469] Rec. Doc. 757, Oliveaux Testimony at 83:23-25.

[470] Rec. Doc. 757, Spears Testimony at 94:12-18. The only content changes Ms. Spears mentioned involved blind and visually impaired class members and emergency preparedness, and even those were vague and speculative. *Id.* at 95:10-17 (discussing plans to "add more" and "do more stuff").

"ineffective in achieving accessibility . . . largely due to understaffing and the abuse/neglect/miscon-duct of the orderlies" and that "more oversight of the orderlies in this program is glaringly neces-sary[.]"[471] Nonetheless, "[o]rderlies are used the same today as they were at the close of liability dis-covery."[472] Defendants provided no evidence at the remedy hearing that they have taken measures to reduce instances of abuse and neglect in the orderly program or that they have changed orderly super-vision. Indeed, even though Plaintiffs' evidence showed multiple examples of orderly abuse,[473] Ms. Stickells, who oversees healthcare orderly training, was unaware of any such incidents.[474]

**155.** **Disciplinary and Security Accommodations**: In the liability phase, this Court found that "LSP fails to take disability into account in its disciplinary decisions."[475] During the remedy phase, the DOC stated that there have been no changes to LSP's practices, policies, or procedures related to discipline with respect to the ADA.[476] To the contrary, Defendants' 30(b)(6) witness, former LSP ADA Coordinator Tracy Falgout, maintained that there is no situation in which a person's disability would become relevant in disciplinary decisions because "[a] rule violation is a rule violation."[477]

156.    LSP has no mechanism for proactively ensuring that disabled Class members are not disci-plined inappropriately in violation of the ADA; instead, Class members have the burden of appealing disciplinary decisions they believe are inappropriate.[478] Mr. Falgout also testified, in his individual ca-pacity, that he does not think that there should be any disciplinary measures that security is not per-mitted to impose on individuals with disabilities.[479] Current LSP ADA Coordinator Oliveaux testified

---

[471] Rec. Doc. 594 at 99.
[472] PX 44-d at 4, Response to ROG No. 16.
[473] *See, e.g.*, PX 1-a at 102 (**Patient #18**, who was punched in the head by an orderly); *id.* at 103 (**Patient #69**, who was choked by an orderly; **Patient #22**, who was punched in the head by an orderly).
[474] Rec. Doc. 757, Stickells Testimony at 40:16-18.
[475] Rec. Doc. 594 at 73.
[476] JX 72-a, T. Falgout Depo Tr. at 43:22-25.
[477] *Id.* at 46:6-12.
[478] *See id.* at 51:4-14; 20-25.
[479] JX 73-a at 111:25-112:5.

that she has received no training related to ADA accommodations in disciplinary proceedings.[480]

157.     Similarly, Defendants' process for accommodating Subclass members who use wheelchairs in transport—including transport for medical appointments—is wholly inadequate. The evidence showed several examples of patients deterred from getting off-site medical care due to security's insistence that they be chained to their wheelchair and transported in black box restraints, rather than transported in an appropriate fashion.[481] Indeed, even at trial, after the Court ordered Defendants to transport testifying Subclass members without the black box restraint, LSP personnel placed Subclass member Dennis Mischler in restraints for hours leading up to his testimony.[482] He arrived in obvious pain, and the Court was able to observe the discomfort and potential exacerbation of physical issues that extended transportation with black box restraints can cause.

158.     Defendants' subordination of disabled inmates' physical needs to security preferences is so strong that a sign on the Trip Office in the Treatment Center says in bold capital letters "WE DO NOT MODIFY RESTRAINTS IN THIS OFFICE. THANK YOU FOR NOT ASKING!!!"[483]— even though the ADA and LSP policy require that persons with disabilities be able to make accommodation requests to any employee.[484]

**159.     Tracking and Processing of Accommodation Requests**: In the liability phase, the Court found that "in practice, there appears to be no [ADA] tracking system, and the database is severely

---

[480] Rec. Doc. 757, Oliveaux Testimony at 83:20-22.

[481] *See* Rec. Doc. 749, Creppel Testimony at 243:20-244:20 (describing that it is "very painful, especially in a wheelchair" to be transported in a black box); JX 77-c at 5 (describing Mr. Mellion refusing follow-up visits to UMCNO due to the pain to his neck and back as a result of hours of transportation in the Black Box).

[482] Rec. Doc. 747, Mischler Testimony at 58:19-60:1; *see also* Rec. Doc. 747, at 157:1-158:19; Rec. Doc. 726 (ordering transport in side restraints rather than a black box).

[483] PX 1-d at 6.

[484] Rec. Doc. 748, Schriro Testimony at 39:6-8 (explaining that the ADA requests for accommodation through any means possible); PX 3 at 18 ("Staff should be trained to identify disabilities (both visible and not visible), to assist disabled inmates in requesting accommodations, to identify the need for accommodations or modifications of accommodations, to recognize and implement necessary accommodations in disciplinary proceedings, to comply with duty status restrictions, and to understand the prison's legal obligations and its corresponding written policies under the ADA.").

inadequate to effectively track disabled inmates' ADA needs."[485] During the remedy phase, Defendants admitted that there have been no changes to Defendants' ADA tracking database.[486]

160.     The evidence showed that this unchanged system of processing and tracking of ADA requests remains inadequate. The ADA Coordinator's files and LSP's QA/QI program show conflicting numbers of accommodation requests for nearly every quarter.[487] Ms. Stickells, the QA/QI coordinator, attributes the discrepancy to the ADA Coordinator's failure to report requests to her.[488]

161.     Additionally, it is likely that LSP's tracking system is undercounting accommodation requests. Consider, for example, Subclass member Robert Lucas's stipulated testimony that, although he has been confined to a wheelchair for more than a decade, he was moved from an accessible dormitory to Hickory 4, which is not wheelchair-accessible.[489] Dr. Schriro noted during her testimony that the number of accommodation requests recorded in LSP's tracking system per month "really seems to be an exceptionally low number" given her knowledge of LSP and her experience with other facilities.[490] When asked during the remedy hearing whether "problems persist with respect to ADA accommodation requests," Dr. Schriro answered that "[t]hey do."[491]

## CONCLUSIONS OF LAW

### V.     Eighth Amendment

Incarcerated people "must rely on prison authorities to treat [their] medical needs"; "if the

---

485 Rec. Doc. 594 at 64.
486 PX 44-c at 6, Response to ROG No. 5.
487 *Compare* PX 34-b *and* PX 34-a (QA/QI reports) *with* PX 36 (ADA accommodation requests).
488 Rec. Doc. 757, Stickells Testimony at 38:3-18.
489 *See* JX 77-c at 1. Citing records they did not produce in discovery and never admitted into evidence, Defendants say Mr. Lucas is *now* in the assisted living dorm Ash 3. JX 77-c at 2 (citing DX 34-ooo at 179). They do not acknowledge that the same records show them housing him in Hickory 4 as recently as February 2022. DX 34-ooo at 192.
490 Rec. Doc. 748, Schriro Testimony at 44:20-24; *see also id.* at 135:2-6 (opining that "problems persist with respect to ADA accommodation requests").
491 *Id.* at 135:2-6.

authorities fail to do so, those needs will not be met."[492] Therefore, "[t]he Eighth Amendment's pro-hibition against cruel and unusual punishment requires prison officials to provide 'humane conditions of confinement,' ensuring that 'inmates receive adequate . . . medical care.'"[493] If a state cannot meet this obligation, "courts have a responsibility to remedy the resulting Eighth Amendment violation."[494]

The deliberate indifference test has an objective and a subjective component. The objective test requires a showing that the incarcerated persons have "serious medical needs" and either have been harmed or "incarcerated under conditions posing a substantial risk of serious harm."[495] The sub-jective test requires proof that prison officials know of and disregard "an excessive risk to [incarcerated persons'] health or safety"; they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference."[496]

Systemic deficiencies in a prison's health-care system can cumulatively provide the basis for a finding of subjective indifference.[497] "Efforts to correct systemic deficiencies that 'simply do not go far enough,' when weighed against the risk of harm, . . . constitute deliberate indifference."[498] Simply "demonstrating that [prison officials] eventually took some form of 'corrective action' in response to a risk of harm" is not enough if it leaves a known substantial risk of serious harm in place.[499]

In the Liability Opinion, the Court found Defendants to be violating the Eighth Amendment because "Defendants' manner and means of health-care delivery creat[ed] a substantial risk of serious

---

[492] *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[493] *Palmer v. Johnson*, 193 F.3d 346, 351-52 (5th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

[494] *Brown v. Plata*, 563 U.S. 493, 511 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687 n. 9 (1978)); *see also id.* ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.").

[495] *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1189 (M.D. Ala. 2017) (quoting *Farmer*, 511 U.S. at 834).

[496] *Farmer*, 511 U.S. at 837; *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 1994).

[497] *See Gates*, 376 F.3d at 333 (5th Cir. 2004) ("Conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .") (internal quotation marks omitted).

[498] Rec. Doc. 594 at 83 (quoting *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002)).

[499] *Id.* (quoting *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998)).

harm to Plaintiffs" that Defendants had been deliberately indifferent by failing to address them.[500]

Although Defendants have made some improvements to the delivery of health care since the liability trial in 2018, those improvements do not eliminate the need for injunctive relief or terminate the Eighth Amendment violation. Based on the facts presented at the remedial hearings, as outlined above, the previously identified systemic deficiencies are current and ongoing, placing Class members at a substantial risk of serious harm and satisfying the objective requirement of deliberate indifference.

To the extent Plaintiffs must prove subjective deliberate indifference at this stage,[501] they have amply done so. The evidence compellingly shows that Defendants' practices continue to place Class members at a substantial risk of serious harm when they develop serious medical needs. Defendants' knowledge of the harm presented by LSP's medical care is beyond peradventure given the Court's Liability Opinion, the years of discovery and expert reports, and the evidence presented at the remedy hearing. It can also be inferred from the extended period of systemic deficiencies.[502] And while Defendants have taken some steps that could be building blocks toward an adequate system, they have not been remotely adequate to relieve Class members from the substantial risk of serious harm; they do not come close to "going far enough." Indeed, Defendants have not even begun to address critical findings from the Liability Opinion, making no changes at all to their episodic treatment of complaints, their failure to execute appropriate follow-up care ordered by specialty care providers or coordinate

---

[500] *Id.* at 85.

[501] Plaintiffs do not need to show subjective deliberate indifference. Once a plaintiff has won on the merits, injunctive relief is appropriate unless defendants show "(1) there is no reasonable expectation that the alleged violation will recur *and* (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 413-14 (5th Cir. 1999) (emphasis added); *accord Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (case moot only "[w]hen both conditions are satisfied"). Because Defendants have not completely and irrevocably eradicated the effects of the alleged violation, their present intent does not matter at this stage. However, because Plaintiffs have proved current subjective deliberate indifference, the Court need not decide this question.

[502] *See* Rec. Doc. 594 at 84 ("The 'long duration' of unconstitutional conditions can also demonstrate correctional officials' knowledge of the deficiencies that cause a substantial risk of harm." (quoting *Alberti v. Sheriff of Harris Cty.*, 937 F.2d 984, 998 (5th Cir. 1991))); *see also Farmer*, 511 U.S. at 842-43 (a trier of fact may infer actual knowledge from risks that are "longstanding, pervasive, well documented, or expressly noted by prison officials in the past" if "the circumstances suggest that the [prison officials] . . . had been exposed to information concerning the risk").

primary care with specialty care, or their use of orderlies, among other areas of concern.[503]

Nearly a decade of evidence in this case demonstrates that longstanding and well-documented unconstitutional conditions have persisted at LSP, yet the prison has insisted at all times that their practices are appropriate. If the Court needed to find that Defendants' subjective deliberate indifference persists, this record would amply supply it.

## VI. Americans with Disabilities Act/Rehabilitation Act

In the Liability Opinion, the Court concluded that Defendants "fail[] to comply with the ADA and RA in providing disabled inmates access to programs and services due to physical and architectural barriers."[504] Defendants have not remediated most of the barriers and offered no excuse for this non-compliance. Accordingly, the architectural aspects of the ADA/RA violations continue.

The Court also found that "methods of administration at LSP violate the ADA and RA by failing to provide adequate access and accommodations to [LSP's] disabled inmates due to neglect and/or failure to follow both Title II's implementing regulations and failure to follow some of LSP's own ADA Directives."[505] Defendants have conceded that their practices and policies are unchanged from the liability period in most respects, including the tracking of accommodation requests.[506] Likewise, LSP's leadership, staffing, and employee training is largely unchanged, despite placing a new person in the position of ADA Coordinator shortly before trial.[507] As during the liability period, LSP's ADA Coordinator is not "sufficiently trained and educated to effectively carry out their obligations under the ADA," and her role is "window dressing" and "secondary to other roles at LSP."[508]

Just as the liability trial, these deficits contribute to LSP's system-wide failure to comply with

---

[503] *See* Rec. Doc. 594 at 122-24.
[504] *Id.* at 123.
[505] Rec. Doc. 594 at 105 (citing *Holmes v. Godinez*, 311 F.R.D. 177, 219, 226 (N.D. Ill. 2015)).
[506] *See supra* Part IV.C.
[507] *See supra* ¶¶ 145-148, 153.
[508] Rec. Doc. 594 at 106; *see supra* ¶¶ 145-148.

the ADA, including in appropriately processing and tracking accommodation requests and in discipline of Subclass members with disabilities.[509] Accordingly, the evidence at the remedy stage proves that LSP continues to violate the ADA and RA.

<h1 style="text-align:center">REMEDY</h1>

**VII.    Injunctive Relief Is Necessary and Appropriate Under the PLRA**

Under the Prison Litigation Reform Act ("PLRA"), prospective relief must be "narrowly drawn," extend "no further than necessary to correction the violation of the Federal right" of Class members, and be "the least intrusive means necessary to correct the violation of the Federal right."[510] In conducting this tripartite inquiry, the Court shall "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."[511]

Evidence from the liability and remedial phases overwhelmingly demonstrates that LSP continues to violate Plaintiffs' constitutional and statutory rights. Because Defendants have subjected Class members to ongoing statutory and constitutional violations for years, and have been unable to eliminate those violations without court-ordered relief, injunctive relief is necessary to protect Class and Subclass members from further harm. Moreover, the few changes made by Defendants since the liability phase do not obviate the need for a judicial remedy, as "[c]hanges made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended."[512] Defendants' limited changes do not satisfy their "heavy burden" of showing that they "have completely and irrevocably eradicated the effects of the alleged violations."[513]

---

[509] *See* Rec. Doc. 594 at 106-22; *see supra* ¶¶ 155-161.

[510] 18 U.S.C. § 3626(a)(1)(A).

[511] *Id.*

[512] *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974); *see also Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010) ("[S]ubsequent events, such as improvements in the allegedly infirm conditions of confinement, while potentially relevant, are not determinative of whether injunctive relief is no longer warranted") (internal quotation marks omitted).

[513] *Thomas*, 614 F.3d at 1322 (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1542 (11th Cir. 1993)).

As illustrated in Plaintiffs' factual findings, the evidence overwhelmingly shows that the totality of Defendants' policies and practices continue to subject Class members with serious medical needs to a substantial risk of serious harm. These inadequacies touch nearly every aspect of health care delivery, beginning with deep-rooted deficiencies in leadership, administration, staffing, and record-keeping, and manifesting as grossly substandard and delayed clinical care, specialty care, emergency care, and infirmary care. Superficial and subpar mortality review, quality improvement, and peer review systems fail to identify these systemic deficiencies or enable necessary corrective actions. As a direct consequence of the substantial risks entrenched in LSP's health care system, Class members suffer from needless suffering and preventable death. And Plaintiffs' experts, informed by decades of experience not only managing and working in functioning correctional systems but turning around unconstitutional systems, convincingly explained why the risk of harm cannot be ameliorated without addressing the procedural and administrative failures that produce those substantive medical failures.[514]

The factual evidence shows that a comprehensive remedial plan approved and monitored by Court-appointed monitors is necessary to correct the ongoing constitutional violations in the provision of medical care at LSP. Plaintiffs have shown through extensive testimonial and documentary evidence that these proposed remedial measures are narrowly drawn to correct the violations, which continue to place patients with serious medical needs at substantial risk of serious harm for the reasons discussed above. They also extend no further than necessary to correcting the violations found by the Court, as credibly testified to by Plaintiffs' experts and other witnesses, and are the least intrusive means necessary to correct the proven violations. Moreover, given the complex and ongoing nature of the necessary relief, monitors who can oversee Defendants' compliance and report to the Court are

---

[514] Rec. Doc. 750, Puisis Testimony at 108:24-111:2; 115:6-138:5; Rec. Doc. 751, Goehring Testimony at 65:8-12; 67:22-68:3; 88:3-90:8; 90:18-95:25.

essential to ensure that the violations end as swiftly and durably as possible.[515]

Aside from disputing the existing of ongoing violations and risk of harm, Defendants provided no evidence regarding the scope of relief, and proposed no alternative remedial measures.

The following sections connect the provisions of Plaintiffs' attached Proposed Remedial Order to specific evidence in the record. They are not intended to be a comprehensive summary of the Proposed Remedial Order or the trial evidence. Although the Court may make a global PLRA finding and need not make "particularized findings" for each individual provision,[516] each section and provision below extends no further than necessary to correcting the violations found by the Court, is narrowly drawn, and is the least intrusive means necessary to correct the pervasive violations.

## VIII. Remedies Necessary to Correct Eighth Amendment Violation

**Clinical Care:** To provide constitutionally adequate clinical care, LSP providers must timely diagnose, treat, and monitor patients with serious medical needs, including patients with red-flag symptoms; perform adequate medical histories and physical examinations; and appropriately monitor patients and their medication usage, among other elements of an appropriate clinical encounter.[517] To ensure that diseases are timely diagnosed, LSP should offer annual physical examinations to all Class members over the age of 50 and appropriate preventive screenings.[518] LSP should revise their policies regarding diagnostic services to ensure tests are performed when ordered, and urgent tests performed promptly, and the results reviewed by a provider and communicated to the patient.[519] If patients are refusing care, medical staff should ask why the patient is refusing, in addition to counseling about the

---

[515] *See, e.g.*, Rec. Doc. 751, Goehring Testimony at 52:6-21 (describing ability of monitoring and policy changes to help facility begin to monitor and correct its own problems); Rec. Doc. 750, Puisis Testimony at 136:14-138:22.
[516] *Gates*, 376 F.3d at 336 n. 8 (5th Cir. 2004) ("Section 3262(a)(1), which applies to prospective relief … does not [require particularized written findings].").
[517] PX 1-a at 36-37, 51-52, 60, 79-80, 126-127; *see also* Rec. Doc. 748, LaMarre Testimony at 104:14-105:2; 166:4-25.
[518] PX 1-a at 27, 42, 84, 127; Rec. Doc. 750, Puisis Testimony at 17:5-18:18; 21:23-22:6; 23:7-20; 140:20-141:10.
[519] PX 1-a at 30, 34, 39, 95; Rec. Doc. 750, Puisis Testimony at 140:6-141:10; 178:9-179:16; 213:14-19.

risks of refusing appointments and/or treatment and obtaining a refusal form.[520]

**Specialty Care:** To provide constitutionally adequate specialty care, LSP must ensure that patients are timely referred and sent to specialists; specialists have access to patients' medical records; providers see patients soon after specialist appointments; LSP implements specialists' recommendations or documents their reasons for not doing so and their alternate treatment plans; and providers communicate with specialists when a patient's condition worsens.[521] Defendants should track referrals from order to completion, and evaluate obstacles to completed appointments, including issues with Class members being transported to and from appointments in black box restraints.[522]

**Infirmary Care:** To provide constitutionally adequate infirmary care, LSP must provide infirmary-level care and assisted living care that meets the health needs of patients.[523] This will require a physician in charge of clinical care with nurse practitioner and nursing coverage assigned based on a workload analysis of acuity levels; clinical criteria for admission and procedures for changing medication orders on admission and discharge; nursing care plans for each patient; and regular rounds by RNs and documentation of all assessments and interventions.[524] Infirmary patients need to be within sight and sound of a licensed health care provider at all times and able to notify nurses through visual and audible means.[525] The use of inmate health care orderlies to deliver healthcare and assist with activities of daily living should be immediately discontinued in nursing units, and orderlies in assisted living dormitories should not deliver healthcare.[526] Medical care should be delivered in the assisted

---

[520] PX 1-a at 81-82, 105; Rec. Doc. 755, Goehring Testimony at 93:19-95:6; Rec. Doc. 748, LaMarre Testimony at 116:15-117:12.

[521] PX 1-a at 17, 28-30, 38, 40, 82-100, 131; Rec. Doc. 750, Puisis Testimony at 17:5-18:18; 21:23-22:12; 23:23-24:23; 108:9-16; 140:6-141:11; Rec. Doc. 748, LaMarre Testimony at 125:10-127:13; 189:22-190:2.

[522] PX 1-a at 98-100, 131-32; Rec. Doc. 750, Puisis Testimony at 30:10-16; 163:6-8; *see also* Rec. Doc. 749, Creppel Testimony at 243:20-244:20.

[523] PX 1-a at 100-07, 130; Rec. Doc. 755, Goehring Testimony at 10:1-7; 58:23-62:3.

[524] PX 1-a at 17, 104-07, 130; PX 5-a at 2-3; Rec. Doc. 755, Goehring Testimony at 59:15-60:21; 67:21-69:18; Rec. Doc 750, LaMarre Testimony at 114:1-11.

[525] PX 1-a at 37-38, 100-01, 130; Rec. Doc. 755, Goehring Testimony at 61:7-62:3; 68:13-19.

[526] PX 1-a at 17, 101-106, 130; Rec. Doc. 755, Goehring Testimony at 62:8-64:4; 67:18-68:12; Rec. Doc. 748, LaMarre

living dormitories, with an RN assigned to provide care to patients there, and an RN should visit those dormitories regularly to provide supervision, instruction, and assistance to the orderlies.[527]

**Emergency Care:** To provide constitutionally adequate emergency care, a provider must be physical present at all times and every patient presenting to the ATU must be examined by a provider.[528] As soon as possible, a provider credentialed to work in an emergency setting should be hired to practice in the ATU and supervise other providers and nurses who practice in the ATU.[529] Standards should be instituted for situations where patients must be transferred to a hospital in a number of circumstances that are currently left up to a nurse or nurse practitioner's discretion, and patients should not be transferred from the ATU to the Nursing Units without provider evaluation.[530] Urine toxicology should not be used in emergent situations.[531] The roles of all EMS Personnel must conform to their scope of practice; for self-declared emergencies, they should transport patients to a clinical exam room for evaluation by a medical provider licensed to diagnose and treat the patient with the complete medical record.[532] "No transport" orders should be eliminated and standing orders should not be used without an evaluation of the patient by a health care provider.[533] Staff should be regularly trained and drilled in use of automatic external defibrillators, which should be available in all prison areas.[534]

**Sick Call:** To provide constitutionally adequate access to health care, patients must be able to submit health care requests that are triaged daily, without having to disclose confidential information

Testimony at 176:17-177:8.

[527] PX 1-a at 73-74, 129-30; Rec. Doc. 755, Goehring Testimony at 68:23-69:18; Rec. Doc. 748, LaMarre Testimony at 176:17-177:8.

[528] PX 1-a at 17, 108, 110, 127; Rec. Doc. 749, Vassallo Testimony at 91:10-13; 115:2-11.

[529] PX 1-a at 9, 17, 127; Rec. Doc. 749, Vassallo Testimony at 91:10-93:25.

[530] PX 1-a at 17, 108-10, 128; Rec. Doc. 749, Vassallo Testimony at 92:25-93:25; 101:1-103:17; 108:13-109:11; 115:12-17.

[531] PX 1-a at 38, 109; Rec. Doc. 749, Vassallo Testimony at 105:11-108:10.

[532] PX 1-a at 50, 129; Rec. Doc. 749, Vassallo Testimony at 109:13-111:17; 115:25-116:6.

[533] PX 1-a at 114, 118, 129; Rec. Doc. 749, Vassallo Testimony at 109:13-112:15.

[534] PX 1-a at 38, 111, 129; Rec. Doc. 749, Vassallo Testimony at 112:16-114:23; Rec. Doc. 748, LaMarre Testimony at 105:5-21; 148:3-149:10.

to correctional officers.[535] Patients should be evaluated in a clinical setting with the medical record present and a complete set of vital signs and weight should be conducted at each encounter.[536] The sick call policy should include clinical criteria for whether the provider should schedule a follow up and how the provider should determine an appropriate follow up interval.[537] All health request forms should be logged and tracked, including the date and time they were written by the offender, received by health staff, and the clinical encounter, to allow determinations of timeliness of access.[538] On Nursing Units 1 and 2, daily rounds and provider involvement should take the place of the sick call process.[539] LSP should eliminate excessive copayments, including copays when the patient does not see a medical provider licensed to diagnose and treat their medical condition.[540]

**Medication Management:** To provide constitutionally adequate access to medication, LSP must ensure that all patients timely receive ordered medications.[541] This will require medication administration by medical personnel, not custody, and contemporaneous, adequate medication administration records.[542] LSP needs to provide medication administration a minimum of three times daily at appropriate intervals, including medications that are ordered at hour of sleep or taken with meals.[543] Patients should have access to information regarding their medications.[544] Given that LSP has an on-

---

[535] PX 1-a at 42, 48-51, 126; Rec. Doc. 748, LaMarre Testimony at 156:3-16; 202:23-203:4; 257:11-258:9; Rec. Doc. 755, Goehring Testimony at 79:3-11.

[536] PX 1-a at 36-37, 50-55, 58, 126; Rec. Doc. 748, LaMarre Testimony at 104:14-105:2; 166:7-20; Rec. Doc. 755, Goehring Testimony at 53:11-55:18; *see also* Rec. Doc. 756, McMunn Testimony at 107:14-17.

[537] PX 1-a at 57-58, 126; Rec. Doc. 755, LaMarre Testimony at 160:6-161:21; Rec. Doc. 755, Goehring Testimony at 79:3-18.

[538] PX 1-a at 33, 50, 126; Rec. Doc. 748, LaMarre Testimony at 134:21-135:3; 156:3-16; Rec. Doc. 755, Goehring Testimony at 53:16-55:18.

[539] PX 1-a at 50-51, 126; Rec. Doc. 748, LaMarre Testimony at 262:19-263:2.

[540] PX 1-a at 32, 126; Rec. Doc. 748, LaMarre Testimony at 184:22-185:8; Rec. Doc. 755, Goehring Testimony at 16:6-9.

[541] PX 1-a at 71-79, 129; Rec. Doc. 748, LaMarre Testimony at 168:16-169:7; 171:11-175:17.

[542] PX 1-a at 17, 31-32, 72-74, 129-30, 134; PX 5-a at 3; Rec. Doc. 748, LaMarre Testimony at 172:22-175:17; Rec. Doc. 755, Goehring Testimony at 66:5-67:17.

[543] PX 1-a at 73-75, 129; Rec. Doc. 748, LaMarre Testimony at 175:18-178:8.

[544] PX 1-a at 79, 129; Rec. Doc. 748, LaMarre Testimony at 169:23-170:23; Rec. Doc. 755, Goehring Testimony at 66:21-67:17.

site pharmacy, prescriptions should be filled within 24 hours.[545]

**Medical Organization and Structure:** As discussed above, Plaintiffs' experts convincingly opined that the substantive Eighth Amendment violation cannot be eliminated without incorporating administrative and operational requirements into the remedy. Moreover, including such requirements makes the Court's intervention less intrusive, by providing internal processes and structures that will allow Defendants to identify and correct problems themselves, reducing the burden and duration of monitoring. Accordingly, each of the measures in this section satisfies the PLRA's requirements.

**Policies and Procedures:** Changes to LSP's and DOC's written policies will be necessary to implement the required changes. These policies and directives should provide sufficient operational detail to provide guidance to staff; staff should be trained on the policies; and staff compliance should be tested and monitored in the quality improvement program.[546]

**Leadership and Staffing:** LSP must conduct a data-driven staffing analysis to determine the numbers and types of staff needed to provide adequate medical care to patients with serious medical needs, then hire appropriately qualified providers with unrestricted licenses and other staff.[547] Health care leadership in coordination with headquarters should propose a budget annually, based on the medical needs for the program, and prioritize funding to ensure the best use of available funds for patients with serious medical needs if the legislature does not provide sufficient funding.[548]

**Training:** Training should be provided as necessary to ensure staff are aware of and complying with policies and procedures as they are needed; retraining and regular updates should be provided,

---

[545] PX 5-a at 2; Rec. Doc. 748, LaMarre Testimony at 97:4-8; 171:14-172:8.

[546] PX 1-a at 15, 31-36, 132, 134-35; Rec. Doc. 750, Puisis Testimony at 108:23-110:8; 137:3-16; Rec. Doc. 748, LaMarre Testimony at 188:24-189:12.

[547] PX 1-a at 15-18, 132, 134; Rec. Doc. 750, Puisis Testimony at 109:14-115:13; 137:3-16; 243:20-244:16; Rec. Doc. 755, Goehring Testimony at 66:22-67:4; 68:21-69:11.

[548] PX 1-a at 15-18, 132; Rec. Doc. 750, Puisis Testimony at 110:9-111:2; Rec. Doc. 755, Goehring Testimony at 128:18-20.

as should remedial training on substantive medical topics and procedures as necessary.[549]

**Security and Medical: Staff:** Neither medical staff nor health care orderlies should report through the security chain of command.[550] Security personnel should play no role in the provision of medical care, and any security procedures that impede access to or delivery of care should be assessed to determine how they can be altered or mitigated to eliminate the impediment.[551]

**Credentialing:** Providers should be hired based on having credentials, residency, and training that are appropriate for the care they will be providing.[552] Nurse practitioners' collaborative agreements must be followed, documented, and considered in annual reviews.[553]

**Mortality Review:** LSP must ensure adequate mortality reviews that incorporate sufficient details to determine the appropriateness of the clinical care, to identify any areas of further study, and to determine whether any changes to policies, procedures, or practices are warranted.[554] Any deficiencies in care should be communicated to the quality improvement committee to address.[555] Until LSP is providing constitutional care, an independent outside reviewer should perform mortality reviews.[556]

**QA/QI:** LSP must revise their QA/QI Program to ensure that it is adequate to evaluate, monitor, and improve healthcare delivery at the facility.[557] Both the Long Term Care Hospital Administrator and the QA/QI coordinator should understand how to run an effective quality improvement

[549] PX 1-a at 31-36, 132.
[550] PX 1-a at 17, 31, 101-04, 126; Rec. Doc. 750, Puisis Testimony at 110:21-112:5.
[551] PX 1-a at 33-34, 50, 103, 126, 129, 132; Rec. Doc. 750, Puisis Testimony at 131:6-21; Rec. Doc. 755, Goehring Testimony at 53:20-54:3; Rec. Doc. 748, LaMarre Testimony at 178:19-179:3.
[552] PX 1-a at 18-21, 132-33; Rec. Doc. 750, Puisis Testimony at 109:14-110:8; 122:9-127:16.
[553] PX 1-a at 20-21, 132; Rec. Doc. 750, Puisis Testimony at 113:6-115:13; *see also* Title 46, Professional and Occupational Standards Part XLVII, at page 85, *available at* https://www.doa.la.gov/media/gybngco4/46v47.pdf.
[554] PX 1-a at 30-31, 133; Rec. Doc. 750, Puisis Testimony at 127:17-134:16.
[555] PX 1-a at 30-31, 133, Rec. Doc. 750, Puisis Testimony at 127:18-128:18.
[556] PX 1-a at 31, 133.
[557] PX 1-a at 41-45, 135-36; Rec. Doc. 755, Goehring Testimony at 10:11-13:3; 94:5-97:5.

program.[558] The QA/QI program should produce corrective action plans and monitor their implementation.[559] LSP should conduct meetings monthly and include representatives from all care areas as well as include line staff in their quality assurance activities.[560] A joint quality improvement project with UMCNO should be established to reduce issues in specialty care.[561]

**Medical Records:** LSP must implement an appropriate electronic health record system.[562] Medical records should include the appropriate documents and be available to any medical professional treating the patient.[563] The medical records policy should include a physician order sheet to record all medical provider orders in a single location, including medications.[564]

**Peer and Performance Review:** LSP must conduct biannual peer review that reviews enough records of patients with serious medical conditions to evaluate each provider.[565] Every member of LSP's medical staff should also undergo an annual written evaluation that measures performance of each of the provider's job duties and documents any recommendations.[566] The Medical Director should ensure that appropriate action is taken in response to unsatisfactory performance reviews.[567]

**Data Collection:** In order to evaluate the constitutionality of care and ensure that these measures are implemented and effective, the Monitors should have the ability to require collection of data that is reasonably related to health care outcomes and the delivery of medical care.[568]

## IX. Remedies Necessary to Correct ADA/RA Violations

---

[558] PX 1-a at 41-46, 135; Rec. Doc. 755, Goehring Testimony at 10:22-11:18; 78:12-21.
[559] PX 1-a at 41-46, 135; Rec. Doc. 755, Goehring Testimony at 10:22-11:12.
[560] PX 1-a at 45-48, 135-136; Rec. Doc. 755, Goehring Testimony at 11:19-12:19.
[561] PX 1-a at 99, 136; Rec. Doc. 755, Goehring Testimony at 12:20-13:3.
[562] PX 1-a at 38-39, 135; Rec. Doc. 748, LaMarre Testimony at 190:3-11; Rec. Doc. 755, Goehring Testimony at 153:6-17.
[563] PX 1-a at 38, 99, 135; Rec. Doc. 748, LaMarre Testimony at 109:5-110:18; 152:1-153:17.
[564] PX 1-a at 38, 135; Rec. Doc. 748, LaMarre Testimony at 149:13-150:21.
[565] PX 1-a at 24, 133-34; Rec. Doc. 750, Puisis Testimony at 115:18-118:16.
[566] PX 1-a at 24, 133-34; Rec. Doc. 750, Puisis Testimony at 120:17-122:8.
[567] PX 1-a at 25; Rec. Doc. 750, Puisis Testimony at 117:24-118:6; 118:23-120:16.
[568] PX 1-a at 41, 47, 135; Rec. Doc. 750, Puisis Testimony at 29:15-30:2; 136:4-140:2; Rec. Doc. 755, Goehring Testimony at 84:8-14; Rec. Doc. 748, LaMarre Testimony at 91:15-93:16.

**Physical Barriers:** The architectural barriers documented in Mr. Mazz's report[569] must be brought into compliance with the ADA. It is undisputed that (1) remedying these barriers would not "fundamentally alter the nature of the service program[s] or activit[ies]" at LSP or require LSP to provide new services or programs; (2) none of these barriers are logistically necessary; and (3) remedying these violations would not "impose any undue financial and administrative burden on LSP."[570]

**Methods of ADA Administration:** LSP's ADA Coordinator should be a full-time, dedicated position filled by someone with expertise in the ADA.[571] The ADA Advisory Committee previously required by Directive 01.016 should be convened.[572] Directive 01.016's previous requirement of comprehensive, annual staff ADA training should similarly be reinstated and followed.[573] Defendants should reassess the number of healthcare orderlies needed to assist disabled class members, increase supervision of the orderlies to prevent abuse, and rescreen orderlies.[574] Defendants should process accommodation requests separate from the ARP process, and maintain an appropriate tracking system. Disability status should be considered throughout the disciplinary process and it should be emphasized that simply imposing penalties without such consideration is impermissible.[575]

## CONCLUSION

Based on the evidence presented at the remedy hearing, the Court should find that the Eighth Amendment and ADA/RA violations persist and enter an order granting injunctive relief to the Class and Subclass.

/s/ *Mercedes Montagnes*
Mercedes Montagnes, La. Bar No. 33287

---

[569] PX 4 at 11-27.
[570] Rec. Doc. 748, Mazz Testimony at 62:3-18.
[571] Rec. Doc. 747, Schriro Testimony at 141:22-142:21; 149:22-151:2.
[572] *Id.* at 142:22-143:12; 150:12-23.
[573] *Id.* at 143:13-144:18; 151:3-22.
[574] *Id.* at 144:19-146:20; 151:23-152:12.
[575] *Id.* at 149:1-21; 153:15-154:7.

Nishi Kumar, La. Bar No. 37415
Samantha Bosalavage, La. Bar No. 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Jeffrey B. Dubner (*pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 771-1773
Email: jeffrey.dubner@gmail.com

Bruce Hamilton, La Bar No. 33170
Emily Lubin, La. Bar No. 38823
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Telephone: (504) 352-4398
Facsimile: (504) 486-8947
Email: bruce.hamilton@splcenter.org

Daniel A. Small (*pro hac vice*)
Brendan Schneiderman (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 09, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/Samantha Bosalavage
Samantha Bosalavage, Bar No. 39808