UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOSEPH LEWIS, JR. et al., on behalf of themselves and all others similarly situated | * * * | CIVIL ACTION NO. 3:15-cv-00318 |
| VERSUS | * * | JUDGE SHELLY D. DICK |
| BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, et al. | * * * * | MAGISTRATE JUDGE RICHARD L. BOURGEOIS |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED
POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Respectfully Submitted:

**JEFF LANDRY,
ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800
Randal J. Robert (#13800)
Connell L. Archey (#29992)
Keith J. Fernandez (#33124)
Allena W. McCain (#38830)
*Special Assistant Attorneys General*
Email: randy.robert@butlersnow.com
        connell.archey@butlersnow.com
        keith.fernandez@butlersnow.com
        allena.mccain@butlersnow.com

**SHOWS, CALI & WALSH, L.L.P.**
Jeffrey K. Cody, La. Bar No. 28536
Caroline M. Tomeny, La. Bar No. 34120
John C. Conine, Jr., La. Bar No. 36834
*Special Assistant Attorneys General*
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
Email: jeffreyc@scwllp.com
        caroline@scwllp.com
        coninej@scwllp.com

Counsel for Defendants

67140178.v2

## **TABLE OF CONTENTS**

I.    PLAINTIFFS' ATTACKS ON DEFENDANTS' EXPERTS SHOULD BE
      REJECTED ....................................................................................................1

II.   UMC DOCTORS ............................................................................................3

III.  ANY CONSTITUTIONAL SICK CALL VIOLATIONS HAVE BEEN
      REMEDIED ....................................................................................................5

IV.   CLINICAL CARE ..........................................................................................6

V.    SPECIALITY CARE .......................................................................................9

VI.   INFIRMARY/IN-PATIENT CARE ...............................................................14

VII.  EMERGENCY CARE/ATU ...........................................................................15

VIII. ADA/RA CLAIMS .......................................................................................20

NOW INTO COURT, through undersigned counsel, come Defendants, who respectfully submit the following response to Plaintiffs' proposed findings of fact and conclusions of law:

Initially it is noted that Plaintiffs admit that LSP has made material improvements in the process for non-emergency sick call requests, ATU staffing, the cleanliness and hygiene of clinical spaces[1], and the hiring of Dr. Johnson.[2] Plaintiffs also cannot dispute other improvements, such as the hiring of six nurse practitioners who are directly involved in all aspects of medical care. Additionally, plaintiffs have produced zero evidence of the so-called punitive attitudes that they contended existed at the time of the first trial.

## I.    PLAINTIFFS' ATTACKS ON DEFENDANTS' EXPERTS SHOULD BE REJECTED

1.      Defendants retained qualified and experienced experts who rendered reasonable and supported opinions in this case. Defendants' experts reviewed the charts selected by the Plaintiffs' experts and rendered detailed expert reports to support their opinions. Plaintiffs' attacks are without basis and should be rejected.

2.      Dr. Mathis has a lengthy career in correctional medicine. To the contrary, Plaintiffs' primary expert, Dr. Vassallo, has no experience in correctional medicine. The experience in correctional medicine is critical and necessary for a credible review of the records in this case.

3.      Dr. Mathis created a report that is over 3,000 pages long. He undertook the daunting task and personally reviewed each chart selected by Plaintiffs' experts and set forth the basis for his opinions. Plaintiffs criticize the fact that Dr. Mathis set forth the findings from LSP's mortality reviews in his report. Dr. Mathis wanted to set forth LSP's findings as part of his opinion. He

---

[1] Plaintiffs' FFCL pp. 27-28
[2] Plaintiffs' FFCL p. 42

then set forth his opinion on the record. In some instances, Dr. Mathis' opinion was that he did not find a breach of the standard of care. Plaintiffs attack Dr. Mathis for merely stating that there was no breach of the standard of care. Plaintiffs' criticisms are invalid. The Court should also recall that Dr. Mathis and Plaintiffs' experts rendered reports simultaneously. Thus, Dr. Mathis was unaware of specific criticisms Defendants' experts may have had.  Dr. Mathis could not be expected to address every encounter and every decision made by every provider without knowing what needed to be addressed. His already incredibly lengthy report would have been completely unwieldly.

4.      Further, Dr. Mathis provided a reasonable and credible record review. When there was an issue, Dr. Mathis noted it. Dr. Mathis in fact noted five instances where he found an act below the standard of care. The other five instances that Plaintiffs attempt to include as concessions by Dr. Mathis are five instances where EMTs acted beyond their scope in response to self-declared emergencies. Dr. Mathis told Defendants that LSP's SDE policy EMTs needed to be changed, and it was. The fact that Dr. Mathis noted issues when he saw them buttresses Dr. Mathis' credibility.

5.      Plaintiffs cite to one instance in another case where Dr. Mathis' opinion was limited in part pertaining to medical toxicology and Fentanyl. That ruling has no bearing on this case.

6.      Plaintiffs attempt to argue that Dr. Mathis did not render opinions on certain issues is without merit. The best example is where Plaintiffs argue that Dr. Mathis rendered no opinion about whether LSP is timely determining whether to transfer inmates to a higher level of care. Again, Dr. Mathis rendered his report without the benefit of knowing the focus of Plaintiffs' experts, based upon his review of the charts in detail. Dr. Mathis testified that he thought that LSP

sent out inmates in an appropriate and timely fashion.[3] Dr. Mathis' review and opinions validate his experience and work in this case.

7.    Plaintiffs have no real basis to attack Dr. McMunn. Dr. McMunn is practicing in correctional medicine and has unimpeachable credentials. Dr. McMunn's opinions are supported and set forth both in his report and in his testimony.

8.    The attacks upon Dr. Morrison are inexplicable. Dr. Morrison testified as to the impact of COVID upon LSP. There is no basis to attack him.

9.    Plaintiffs' experts are litigation-savvy professional experts. NP LaMarre now does nothing but litigation.  In their zeal to criticize LSP, both NP LaMarre and Nurse Goehring made egregious and inexplicable errors. Dr. Puisis was not fully engaged in the second phase of the trial and is the only expert that did not even take the time to visit LSP in advance of rendering his report. Dr. Vassallo has no experience in correctional medicine and applied an over-exacting standard. Further, as Dr. Mathis credibly rebutted Dr. Vassallo's criticisms, she developed new criticisms not previously expressed in the first phase or in her report.

## II.    UMC DOCTORS

10.    Plaintiffs UMC witnesses added nothing meaningful to the trial testimony.  All three witnesses worked closely with Plaintiffs' counsel on previous occasions to advocate for prison reform in various areas.[4]  All three witnesses also gave extremely vague and general testimony that was not tied to any names, dates, or records.

11.    Dr. Pope's testimony was not based upon the review of any medical charts and she could not recall the names of anyone she treated.[5]  She saw a very limited number of patients over

---

[3] Tr. Day 8, 6.15.22, p. 58.
[4] Tr. Day 5, 6.10.22, pp. 22-23; Tr. Day 6, 6.13.22, pp. 145-146, 172.
[5] Tr. Day 5, 6.10.22, pp. 24.

a six year period.[6]  The conditions that she witnessed regarding patients were not specific to LSP but were instead general to all incarcerated patients.[7]  She could not identify any of the LSP providers who treated the patients she saw and did not know if any of those providers were still employed at LSP.[8]

12.     Dr. Brady's testimony was similar and cumulative.  He could not provide the names or dates of any patients he treated.[9]  He could not provide any specifics about any patient he treated.[10]  He agreed that his testimony was based on his generalized opinions of all incarcerated patients, not just those housed at LSP.[11]  He acknowledged that the current medical director at LSP has been helpful and responsive to his calls.[12]  Finally, Dr. Brady acknowledged that problems getting complete medical records is not specific to LSP, but also occurs with other medical providers.[13]

13.     Finally, Dr. Glass proved to be a blind advocate in support of plaintiffs' case despite providing no relevant testimony.  Dr. Glass is a palliative care provider who spends very little time actually treating LSP patients.[14]  She could not provide the names of any LSP patients that she treated, did not review any medical records in advance of testifying and did not recall specifics of LSP patients that she treated.[15]  She could not even recall if the patients that she only generally referred to were seen before or after January 2019.[16]  Finally, she was critical about LSP providers

---

[6] Tr. Day 5, 6.10.22, pp. 25.
[7] Tr. Day 5, 6.10.22, pp. 25.
[8] Tr. Day 5, 6.10.22, pp. 27-28.
[9] Tr. Day 6, 6.13.22, p. 146-147.
[10] Tr. Day 6, 6.13.22, p. 147.
[11] Tr. Day 6, 6.13.22, p. 149.
[12] Tr. Day 6, 6.13.22, p. 153.
[13] Tr. Day 6, 6.13.22, p.153.
[14] Tr. Day 6, 6.13.22, p.173.
[15] Tr. Day 6, 6.13.22, p.175.
[16] Tr. Day 6, 6.13.22, p.175, 179.

having licensure issues but could not identify a single LSP provider currently on staff who had a restricted license.[17]

## III.    ANY CONSTITUTIONAL SICK CALL VIOLATIONS HAVE BEEN REMEDIED

14.    Sick call is an important part of clinical care because sick call provides access to medical care.[18] This Court previously noted that "[s]ick call is the main process by which patients access the medical system at Angola."[19]

15.    LSP's sick call system allows an inmate to see a nurse provider the day after submitting a sick call slip. In most systems, a sick call request results in a visit to a nurse; at LSP a sick call request results in a visit with a Nurse Practitioner ("NP"). The effectiveness of the new sick call process has resulted in a decrease in the number of self-declared emergencies.[20] Importantly, the sick call NP has identified more serious illnesses during the routine sick call process.[21]

16.    Plaintiffs' expert acknowledged that a NP conducting sick call is above the standard of care.[22] It is incredible that Plaintiffs still attempt to challenge LSP's sick call process.

17.    Defendants' FFCL addressed the specific charts that NP LaMarre claimed supported her opinions that sick call is somehow still deficient. Defendants provided a detailed analysis of patient numbers 39, 56, 54, 49, 63 and 64.[23] Amazingly, Plaintiffs did not analyze these patients, except for some in passing in footnotes. Plaintiffs did not refute the analysis of the charts

---

[17] Tr. Day 6, 6.13.22, p.180-182.
[18] Tr. Day 2, 6.7.22, p. 200.
[19] Liability Ruling, R. Doc. 594, ¶ 84.
[20] Tr. Day 10, 6.17.22, p. 133.
[21] Tr. Day 7,  6.14.22, p. 104.
[22] Tr. Day 2, 6.7.22, pp. 191-192. Dr. McMunn testified that NPs conducting sick call is "certainly above the standard of care." Tr. Day 8 (afternoon), 6.15.22, pp. 23-24. Dr. Mathis opined that LSP's current sick call process "exceeds the standard of care." Tr. Day 7, 6.14.22, p. 192.
[23] Defendants FFCL, R. Doc. 770, pp. 5-8.

identified by NP LaMarre.  This analysis confirmed that sick call indeed greatly exceeds any constitutional standards subject to review by this Court.

## IV.    CLINICAL CARE

18.    As with sick call, [24] clinical encounters now take place in a private setting with the door closed.[25] The exam rooms are now appropriately supplied and have paper on the examination table.[26] The exam rooms are also now clean and free of clutter.[27] Providers have medical records with them during clinical encounters.[28]

19.    The record shows that providers no longer treat complaints episodically. The model of using nurse practitioners has had a positive effect on patient care. Dr. McMunn explained that studies have shown that primary care outcomes can be as good or better than physicians in some settings. In his experience, Dr. McMunn observes that NPs tend to interact more effectively with patients and are more thorough in counseling and educating patients.[29] Plaintiffs' experts agree that the addition of NPs is a "positive development" for LSP.[30]

20.    LSP providers meet every morning on Monday through Friday to discuss patient care. The providers discuss patients that came into the ATU overnight, patients in NU1, patients in NU2, and patients who are at outside hospitals. Everyone agrees that the morning meetings where patient care is discussed among providers are good.[31]

---

[24] Tr. Day 7, 6.14.22, p. 100; Tr. Day 6, 6.13.22, p. 74; Tr. Day 10, 6.17.22, p. 131.
[25] Tr. Day 6, 6.13.22, p. 81.
[26] Tr. Day 2, 6.7.22, p. 198; Tr. Day 7, 6.14.22, p. 100; DX46.0013; DX46.0152; DX46.0188.
[27] Tr. Day 2, 6.7.22, p. 197; Tr. Day 6, 6.13.11, p. 76; DX46.0013; DX46.0152; DX46.0188.
[28] Tr. Day 7, 6.14.22, p. 18. Additionally, the NP has medical records with him or her during sick call encounters, as addressed above.
[29] Tr. Day 8 (afternoon), 6.15.22, pp. 74-75.
[30] PX1-a.0016.
[31] Tr. Day 4, 6.9.22, p. 114 ("Morning meetings are a great thing."); Tr. Day 4, 6.9.22, p. 159 ("I think what we should do is agree that morning huddles are a good thing.").

21.     NP LaMarre and Nurse Goehring were the only two experts who addressed clinical care for the Plaintiffs.[32] As Nurse Goehring is a nurse, opinions as to medical care are outside the scope of her expertise; she provided no opinions on care provided by LSP providers.[33]

22.     Plaintiffs' clinical care section of their FFCL addresses only four patients, #13, #20, #42, and #16. None of these four charts show constitutionally deficient or substandard health care.

23.     Patient #13 was a "very medically complex" patient with diagnoses of HIV, chronic kidney disease, cirrhosis, and a prior heart attack.[34] NP LaMarre was mistaken and inaccurate when she initially opined that the patient did not receive a urology consult.[35] Similarly, NP LaMarre's initial opinion that the patient was not treated for pneumonia was shown to be incorrect.[36] Plaintiffs offered no explanation for NP LaMarre's errors. Plaintiffs continued to complain that LSP gave Patient #13 antibiotics to which he was resistant. Dr. Mathis explained that even though the patient demonstrated resistance to antibiotics, there was still a possibility that the antibiotics could work, and if you give an antibiotic long enough, it can still be helpful.[37] In a newly developed opinion, not stated in the expert report, NP LaMarre contended at trial that the patient should not have been administered Toradol. This opinion, not disclosed in the expert report and provided only after her other opinions were refuted, is nothing more than after-the-fact second guessing of a qualified medical provider's decision making.  This is not a medical malpractice case – it is an Eighth Amendment case.

---

[32] PX01-a.04.
[33] Tr. Day 5, 6.10.22, p. 56.
[34] Tr. Day 2, 6.7.22, pp. 110-111.
[35] Tr. Day 2, 6.7.22, pp. 109-110.
[36] Tr. Day 2, 6.7.22, p.110.
[37] Tr. Day 8 (morning, 6.15.22, p. 108.

24.    Plaintiffs complain about care provided to Patient #20. This patient's Hepatitis C condition was being followed and tracked.[38] Plaintiffs complain of one encounter on 8/31/21. Under the previous sick call policy, the patient was not seen by a provider.[39] He was treated and referred to the hospital three weeks later. Dr. Mathis opined that the three-week delay between 8/31/21 and 9/21/21 was a breach of the standard of care. Again, this demonstrates Dr. Mathis' independence and impartiality. The three-week delay has been addressed by the change in the sick call policy which would have resulted in the patient seeing a provider at that time. There is nothing to indicate that the current policies and/or practices are substandard.

25.    Plaintiffs ignored the gross error made by Nurse Goehring when she incorrectly claimed that Patient #20 returned from UMCNO on 9/22/21 and that LSP did not follow recommendations or fill medications until 11/2/21.[40] Of course, the reality was that Patient #20 was actually in the hospital at UMCNO between 9/22/21 and 10/31/21.[41] Nurse Goehring admitted that she did not see the hospital record and that she was wrong.[42]

26.    Plaintiffs complain as to encounters with Patient #42, which primarily occurred under the old self-declared emergency ("SDE") policy.  Regardless, the patient had three encounters with providers over two weeks.[43] On the last encounter on 2/3/22, Patient #42 presented to the ATU with altered mental status. NP Park evaluated the patient and ultimately referred him

---

[38] On 5/14/21, Patient #20 made a SDE for weakness related to his diagnosis of hepatitis C. JX20.0124.  On 5/26/21, he had an unremarkable ultrasound of his abdomen. JX20.0045.  He was instructed to follow up as necessary. On 8/3/21, he complained of abdominal pain, and the ultrasound was reviewed. JX20.0116. On 9/21/21, Patient #20 submitted a sick call slip and was referred to the ATU. JX20.0115. In the ATU, the patient was seen and referred to UMCNO. JX20.0114.

[39] This was before implementation of the new sick call policy manned by NPs on a daily basis.

[40] Tr. Day 6, 6.13.21, p. 18; JX 20.0091. She called the delay "striking" and referenced the eMAR as proof the patient did not get the medications until 11/2/21. Tr. Day 6, 6.13.21, pp. 18 & 118; JX68.2078-2080.

[41] JX20.0103.

[42] Tr. Day 6, 6.13.21, p. 119.

[43] JX42.0038-0042.

to psychiatry.[44] There is nothing deliberately indifferent about this care, particularly when the revised SDE policy is considered.[45]

27.     Plaintiffs continue to maintain that "medical providers essentially did nothing" in response to Patient #16's high blood pressure. The record shows that this criticism is simply incorrect. The patient's high blood pressure was noted repeatedly.[46] Further, the patient was not taking his medication, and he was instructed that if his blood pressure remained high, he could suffer a stroke.[47] Patient #16 refused to be admitted to the nursing unit.[48] LSP also placed the patient on a low sodium diet.[49] Further, Plaintiffs' expert completely ignored the inmate's extensive illicit drug use.[50] LSP identified and attempted to treat Patient #16. Unfortunately, he was a non-compliant patient who also used illicit drugs. LSP's care of Patient #16 did not fall below any constitutional standards.[51]

28.     With the new sick call process in place and the addition of the new medical providers, as confirmed by credible chart reviews by Dr. Mathis and Dr. McMunn, there is no material evidence that clinical care is constitutionally deficient.

## V.     SPECIALITY CARE

29.     There is no material evidence that referrals are untimely, that recommendations for specialty care are overlooked or that recommendations by specialists are not being followed. These

---

[44] JX42.0048.
[45] NP LaMarre had previously criticized a second set of encounters with Patient #42 in April of 2020. The patient was spitting blood after he smoked Mojo. He was seen in the ATU, sent to OLOL for a CT scan and treatment, and upon return from OLOL, admitted into NU1. Plaintiffs apparently now concede that there is nothing deliberately indifferent about care to this patient, as there is no argument as to these visits.
[46] JX16.0136; JX16.0101-0102; JX16.0083-0086.
[47] JX16.0097. NP LaMarre agreed that this education note was very good. Tr. Day 2, 6.7.22, p. 234-35.
[48] JX16.0102. NP LaMarre agreed that putting the patient in the nursing unit was the right thing to do, although he refused. Tr. Day 2, 6.7.22, p. 233.
[49] JX16.0086. NP LaMarre agreed that placing the patient on a low sodium diet was a good thing. Tr. Day 2, 6.7.22, p. 235.
[50] JX16.0059, 0043 & 0041.
[51] DX35-c.0180.

were all issues that the Court noted in its prior ruling. In short, LSP's system of providing specialty care is working.

30.    From 2016 to today, LSP has increased the number of on-site specialty clinics to include cardiology, urology, infectious disease, and dietary and the number of specialists available via telemedicine to include seven additional specialties: neurology, infectious disease, hepatitis, ENT, hematology and oncology, dermatology, endocrinology, and GI.[52]

31.    The process of arranging trips and follow up from specialty care using Eceptionist has not changed, and Plaintiffs' specialty care expert testified that he has no problem with the manner in which specialty care appointments are scheduled.[53]

32.    LSP had more specialty appointments in 2021 than in 2015 and 2016.[54] Plaintiffs offered no evidence otherwise. Plaintiffs offered no credible evidence of delay in setting up specialty care for patients at LSP, other than delay caused by COVID.[55]

33.    LSP does not have as many missed appointments with specialists as it did in 2016, likely due in part to the installation of monitors in the Ash dorms to alert inmate to appointments.[56]

34.    After reviewing 38 charts, Dr. Mathis was impressed with specialty care and found that LSP did a good job.[57] Dr. McMunn testified that in the 22 charts that he reviewed, he did not find any systemic pattern of delay.[58]

---

[52] Tr. Day 4, 6.9.22, pp. 163-164.
[53] Tr. Day 4, 6.9.22, p. 166.
[54] Tr. Day 9,  6.16.22, pp. 64 & 154.
[55] Day 9, 6.16.22, p. 101.
[56] Tr. Day 4, 6.9.22, pp. 172-173; Tr. Day 7, 6.14.22, pp. 191-192; Tr. Day 10, 6.17.22, pp. 155-156..
[57] Tr. Day 7, 6.14.22, p. 240.  Dr. Mathis referenced Patient #13 who received an "amazing" amount of specialty care. No expert for either party was critical of the care provided to Patient #12.
[58] Tr. Day 8 (afternoon), 6.15.22, p. 24.

35.     Dr. Puisis was the only expert identified by the Plaintiffs to discuss specialty care.[59]

Plaintiffs' FFCL addressed only four charts in connection with specialty care, #5, #7, #10 and #4.

Those charts do not establish any problem with specialty care.

36.     As expected, Plaintiffs' FFCL focuses on Patient #5. However, Defendants showed

that Patient #5 was seen regularly seen by providers, including cardiologists, except when he

would refuse[60], and that his condition was diagnosed. To the extent that an error was made in this

chart, the error was attributable to an outside, board-certified cardiologist, not LSP. Plaintiffs

attempt to make much of this chart because this is the *only* example that Plaintiffs have identified

to support their contention that LSP does not follow the recommendations of specialists. LSP in

fact followed the recommendations and referred the patient to a board-certified cardiologist. LSP

cannot be faulted for following the medical decisions of the board-certified cardiologist. The chart

may show a difference in opinions between two cardiologists. Alternatively, the chart may be read

to show an error by the outside, board-certified cardiologist. The chart for Patient #5 does not show

---

[59] PX01-a.0004.

[60] Patient #5 constantly missed important appointments and diagnostic tests, to wit:

| Bates | Date | Comment |
|---|---|---|
| JX05.0502 | 08/20/19 | No show for Clinic A, follow up for aortic stenosis |
| JX05.0489 | 09/19/19 | Refused an echo |
| JX05.0482 & 0485 | 10/16/19 | Refused an echo |
| JX05.0472 & 0479 | 11/07/19 | Refused an echo |
| JX05.0471 & 0470 | 11/26/19 | AMA[60], cardiology telemed |
| JX05.0352 | 01/07/20 | Rescheduled cardiology telemed |
| JX05.0350 & 0349 | 01/14/20 | Refused cardiology telemed |
| JX05.0348 & 0347 | 02/11/20 | AMA, minor surgery (for an hernia) |
| JX05.0345 | 03/10/20 | No show, minor surgery |
| JX05.0344 & 0343 | 03/23/20 | AMA, General Medicine clinic, follow up for multiple complaints including aortic stenosis |
| JX05.0217 & 0216 | 01/26/21 | Refused diagnostic testing |
| JX05.0211 | 02/23/21 | No show for ADA appointment |
| JX05.0022 | 02/24/21 | Declined the COVID vaccine |
| JX05.0201 | 04/10/21 | No show for cardiology |
| JX05.0023 | 04/30/21 | Declined the COVID vaccine |
| JX05.0200 | 05/16/21 | Refused General Medicine clinic follow up |
| JX05.0199 & 0198 | 05/22/21 | AMA, cardiology |

any problem with specialty care provided by LSP. Again, Patient #5 is at best a potential malpractice issue (relating to an outside provider); it is not an Eighth Amendment issue.

37.     Plaintiffs FFCL also focuses on Patient #7. The patient had tests which revealed blood in his stool.[61] These results called for a colonoscopy. Contrary to Plaintiffs' statement that there was no indication that the results were considered or discussed with the patient, Dr. Toce testified that the patient declined the colonoscopy.[62] The patient had previously declined a colonoscopy.[63] The issue is that LSP did not secure a written refusal. Dr. Mathis agrees that failure to document the refusal was improper.[64] The patient thereafter died of colon cancer. While this case is unfortunate, it is not an indication of a systemic problem with specialty care at LSP.

38.     Patient #10 experienced a number of episodes of altered mental status. He was not discussed in Dr. Puisis' section on specialty care. There are a total of six instances where illicit drugs are noted or suspected.[65] Dr. Puisis testified that the patient admitted to smoking Mojo once.[66] Dr. Puisis asserts that Patient #10 had high blood pressure that was not addressed. That assertion is incorrect. On 8/25/19, Patient #10's blood pressure was noted as elevated, and blood pressure medications were prescribed.[67] His hypertension was noted as controlled as of 1/22/20.[68] The chart on page 29 of Defendants' FFCL cited ten difference instances between September of 2019 and August of 2020 where Patient #10's blood pressure was generally controlled except when he presented with altered mental status. On 03/13/21, Patient #10 suffered a stroke.[69] Dr. Pusis'

---

[61] JX07.0030, 0026 & 0025.
[62] JX71-a.0142.
[63] Tr. Day 4, 6.9.22, p. 220.
[64] DX35-c.0189.
[65] JX10.0176; JX10.0149; JX10.0114; JX10.0120; JX10.0111; JX 10.0163; JX10.0137.
[66] Tr. Day 4, 6.9.22, p. 223. This testimony shows either obvious bias or lack of knowledge since he did not include this chart in his specialty care section.
[67] JX10.0221.
[68] JX10.0180.
[69] Patient #10 presented to the ATU at 06:43 and left for OLOL at 07:31. This was a timely response.

opinion, not set forth in the expert report, is after-the-fact hindsight. LSP responded to the patient and met the standard of care.

39.     Patient #4's medical history included seizure disorder, hypertension, renal cancer, and severe interstitial lung disease. UMCNO's records confirm that he "was lost to follow up during the pandemic and re-emerged in December 2020."  His is simply a case that was impacted by COVID, like many others around the world.

40.     The remainder of the patients initially complained of by Plaintiffs were relegated to a footnote.  Patient #1 developed metastatic lung cancer and "underwent intensive follow up for radiation therapy, chemotherapy, diagnostic testing, and oncology follow ups" including a "complex arrangement for radiation therapy and chemotherapy." Patient #48 was diagnosed with supraventricular tachycardia, a condition which is usually self-limiting or benign. He was thereafter seen by cardiologists at Lane Memorial Hospital. Patient #2's referral for a thyroid ultrasound did not occur because of COVID. Patients #15 and #2 were lost to care due to COVID. Patient #2 did not have a weight loss as alleged by the Plaintiffs.[70]

41.     Plaintiffs have showed no problem with coordination of specialists as contended before. The lack of evidence of coordination or following recommendations of specialists is why Plaintiffs try so hard to make Patient #5 an issue – and even that unsuccessful attempt is limited to a single patient. Plaintiffs' evidence simply does show any Constitutional deficiency in specialty care.

---

[70] See page 25 of Defendants' FFCL.

## VI.    INFIRMARY/IN-PATIENT CARE

42.    LSP has improved the ratio of nurses to patients in Nursing Units NU1 and NU2. LSP addressed the issue of patients being in locked rooms by installing a red call light outside the door of the locked rooms.[71] NU1 and NU2 are clean and well-maintained.[72]

43.    Dr. McMunn opined that the inmate orderly program met the standard of care.[73] Dr. Mathis testified that the inmate orderlies were integral to care in the nursing units and in the Ash medical dorms because the orderlies helped patients with activities of daily living that the patients cannot do by themselves.[74] Dr. Mathis concluded that the inmate orderly program is a good program that he would like to see continue.[75]

44.    Ash 1 and Ash 2 previously contained double bunk beds; now all medical dorms are now single bunk beds.[76] The medical dorms are clean. In a substantial and consequential change, all medical dorms are now air-conditioned.[77]

45.    Plaintiffs' FFCL cite two charts, neither of which show deficient infirmary or in-patient care.

46.    Patient #22 had a swallow study performed during a hospitalization, which showed that his swallowing was mildly impaired.[78] The discharge paperwork noted: "Diet-Adult Home Diet Type: Return to previous diet."[79] Seven months later, on 1/6/21, Patient #22 choked on a piece of sausage and died.[80] Significantly, the autopsy found that his digestive tract contained

---

[71] Tr. Day 7, 6.14.22, pp. 21-25; Tr., Day 8, (afternoon), 6.15.22, p. 26;  DX46.173 & 175.
[72] DX35-c-0034–0044.
[73] Tr. Day 8 (afternoon), 6.15.22, p. 28; DX 35-c-0216.
[74] Tr. Day 7, 6.14.22, p. 187.
[75] Tr. Day 7, 6.14.22, p. 250.
[76] Tr. Day 7, 6.14.22, p. 191.
[77] Tr. Day 10, 6.17.22, p. 155.
[78] JX22.0684.
[79] JX22.0686 & 0687.
[80] JX22.0547.

"partially digested food consisting of approximately 10 fragments of partially masticated hot dog/sausage (measuring up to 6.5 cm in length by up to 2.5 cm in diameter)."[81] As Dr. McMunn testified, there was no breach of the standard of care; the patient just choked.[82]

47.    Patient #50 was a challenging patient with many refusals, including refusals for wound care.[83] In fact, there were so many refusals that LSP considered getting the warden involved to take his case to the ethics committee and potentially have the patient committed to force care on him.[84] Patient #50 was a mental health patient with a diagnosis of schizophrenia.[85] Dr. Mathis concluded that not only was there no breach of the standard of care, but LSP actually exceeded the standard of care.[86]

## VII.    EMERGENCY CARE/ATU

48.    LSP has addressed the staffing concerns in the ATU.  Previously, EMTs were the primary provider of care in the ATU.  Currently, the ATU is staffed 24/7 by a nurse and an EMT. Further, a NP is onsite from 7:30 am until 4:00 pm Monday through Friday, and 24 hours a day from Friday night through Monday morning.   The only time a NP is not present in the ATU is on weekday evenings.  However, a NP is on call and stationed on the prison grounds to address any ATU patients in the evenings Monday through Thursday. [87] Plaintiffs acknowledge "material" changes to ATU staffing.[88]

---

[81] JX22.0536.
[82] Tr. Day 8 (afternoon), 6.15.22, p. 66.
[83] Tr. Day 6, 6/13/22, p. 122.
[84] Tr. Day 6, 6/13/22, p. 43.
[85] JX50.0181.
[86] DX35-b.073.
[87] See Defendants' FFCL, p. 36.
[88] Plaintiffs' FFCL, p. 26.

49.     The improved staffing in the ATU has resulted in markedly improved care in the ATU. Indeed, Dr. Vassallo had no criticisms of the care she observed in the ATU during her three-day site visit.[89]

50.     Dr. Vassallo was designated as Plaintiffs' expert witness on emergency care. However, Dr. Vassallo has never worked in corrections. In conducting the chart reviews, Dr. Vassallo applied a standard that is consistent with her practice in a Level I trauma center in New York City, not a standard applicable to primary care providers at LSP.

51.     Detailed chart reviews show no evidence of deliberate indifference. At most, the detailed review shows a legitimate difference of medical opinion, hindsight second guessing, morphed or newly developed opinions, or isolated errors that were not systematic.[90]

52.     Patient #38 was admitted to the nursing unit to undergo Lovenox bridging to prepare for cataract surgery.[91] Dr. Vassallo was "sure" that the procedure was dental surgery, not cataract surgery, because in her opinion the patient would not need to stop Coumadin for cataract surgery.[92] She was incorrect as the patient was having cataract surgery and was undergoing Lovenox bridging.

53.     After admission to the nursing unit for Lovenox bridging, Patient #38 developed a fever. Dr. Bunch treated the patient for influenza type A.[93] Dr. Mathis opined that the working diagnosis was reasonable because his temperature was essentially normal after being given Tylenol, the finding of blood-tinged sputum with coughing associated with COPD was not a danger signal, and his labs were nonsignificant.[94] Dr. Vassallo opined that the patient should have

---

[89] Tr. Day 3, 6.8.14, p. 193.
[90] As the Court considers the few errors found in the detailed record review, the Court should also recall that this review was of records deliberately selected by Plaintiffs' experts and was not random.
[91] JX38.0054.
[92] Tr. Day 3, 6.8.22, p. 152-153.
[93] JX38.0071; Tr. Day 7, 6.14.22, p. 224.
[94] Tr. Day 7, 6.14.22, pp. 224-226.

been diagnosed with pneumonia. Dr. Mathis explained that the lab findings and the wheezing noted in the lungs were more consistent with influenza.[95] Indeed, the outside pathologist found that the patient had flu like symptoms for two days prior to his death.[96] Dr. Mathis' opinion is better supported. Regardless, at most, this chart shows a difference of medical opinion.

54.    Patient #35 is one where the attending medical provider (who is no longer a provider at LSP) made a decision to observe the patient in the nursing unit. In hindsight, the decision may not have been the best course.  However, this does not demonstrate and systematic failure in emergency care by LSP.  The patient was seen by a doctor (not an EMT) and the doctor treated the patient.   The result was unfortunate, but this does not demonstrate deliberate indifference in any shape or form.

55.    Patient #36 suffered from COPD with shortness of breath and gradual worsening of shortness of breath on exertion over the prior 2-3 years and was being regularly followed.[97] On 5/2/19 at 8:20, Patient #36 ambulated into the ATU with shortness of breath.[98]  Dr. Crook ordered medications and antibiotics for acute exacerbation of COPD. He further ordered labs, a chest xray, and monitoring of oxygen saturation levels.[99]  After the work up, at 11:30, Dr. Bunch sent Patient #36 to the nursing unit. Dr. Mathis opined that monitoring the patient in the nursing unit was appropriate.[100] Thirty minutes later, the patient deteriorated; he was transported back to the ATU, and then to OLOL emergency unit. Dr. Vassallo is of the opinion that it was a mistake to send Patient #36 to the nursing unit; Dr. Mathis disagrees. A disagreement in medical opinion does not support Plaintiffs' claims of deliberate indifference. Dr. Vassallo's statement that beta blocker was

---

[95] Tr. Day 7, 6.14.22, pp. 225-226.
[96] JX38.0037.
[97] JX36.0126-0138.
[98] JX36.0106.
[99] Tr. Day 7, 6.14.22, pp. 233-234.
[100] Tr. Day 7, 6.14.22, p. 235.

"exactly the opposite" of what the patient needed is one of those evolving opinions. She did not give that opinion in the expert report. Indeed, she stated in the expert report that the beta blocker was to treat the high blood pressure, with no further comment or criticism.[101]

56.     Patient #29 was found on 3/27/20 with a temperature of 108.2 degrees with no respirations, no heartbeat, unreactive pupils and oxygen saturation of 77 percent by the time that EMTs arrived at his cell. Dr. Mathis opined that Patient #29 was essentially a dead man at that time.[102] Dr. Vassallo was critical of not using ice to cool patients in response to heat stroke. However, LSP does indeed use ice when appropriate.[103] For Patient #29, there was nothing that could be done.

57.     Patient #25 stood up, felt dizzy, sat down, and fainted on 10/2/20.[104] Dr. Vassallo opines that the patient should have been worked up after the single episode of syncope. Dr. Mathis, however, opined with the support of the "Up-to-Date" medical source that "the great majority of episodes of fainting especially in a 52-year-old, otherwise asymptomatic man, are benign, most likely vasovagal syncope."[105] The patient did not have other symptoms, such as angina, which would have called for further work up.[106]

---

[101] PX01-a.116
[102] Tr. Day 7, 6.14.22, p. 227.
[103] Patient #51 presented to the ATU on 8/29/19 with a temperature of 103.3. LSP applied an ice pack to treat the patient. JX51.0157.
[104] JX25.0033. EMTs found that his vital signs were good and that he had no other complaints such as chest pain or shortness of breath. Tr. Day 7, 6.14.22, p. 219. He refused transport, and an appropriate refusal form was signed. JX25.0034. On 10/27/19, he was seen in the general medicine clinic to follow up on his single episode of syncope (fainting). JX32.0036. The provider noted that the EKG and CBG (capillary blood glucose) were taken previously and that he had no problems since the episode. His vital signs were normal. The provider concluded that no further work up was necessary. Jx25.0032. On 1/22/20, Patient #25 had a heart attack and died. JX25.0029-0031.
[105] DX35-c.0174.
[106] Tr. Day 7, 6.14.22, p. 222.

58.    Plaintiffs' complaints regarding LSP's response to strokes have largely dissipated as the evidence showed that LSP properly transported patients to emergency rooms within the "window" to respond.

59.    Patient #55 had a history of strokes and transient ischemic attacks ("TIAs"). He had very high blood pressure and was non-compliant with his medications.[107] He was being followed by an outside neurologist.[108] On 2/5/21, he was seen in the ATU with complaints of increased weakness in his left foot and was sent to West Feliciana Hospital for a CT scan which found "no acute intracranial abnormality."[109] The next complaint was over one month later, on 3/17/21 which means that the 2/5/21 event was likely a TIA that resolved itself.[110] Dr. McMunn explained that a "TIA …may not cause permanent injury…It's a small event that does not cause lasting effect."[111] On 3/24/21, Patient #55 was sent to a cardiologist at UMCNO.[112] On 4/26/21, Patient #55 presented to the ATU with stroke symptoms and within 40 minutes was sent promptly to OLOL ER.[113]  Dr. McMunn found no violation of the standard of care.[114] Patient #55 had high blood pressure due to medication noncompliance, he had a number of TIAs after which he returned to his neurological baseline, and he was seen by both a neurologist and a cardiologist.

60.    This situation is similar to the one before the Court in the *Gumns v. Edwards*[115] matter where these same plaintiffs filed for an injunction against LSP regarding LSP's COVID policies, specifically addressing the use of Camp J as an isolation facility. Dr. Vassallo testified in

---

[107] JX55.0069.  On 2/3/21, a provider in the ATU noted that he had not filled his blood pressure medicine since October.  JX55.0068.
[108] JX55.0071.
[109] JX55.0060.
[110] Tr. Day 8 (afternoon), 6.15.22, p. 61-62.
[111] Tr. Day 8 (afternoon), 6.15.22, p. 49.
[112] JX55.0049.
[113] JX55.0450.
[114] Tr. Day 8 (afternoon), 6.15.22, p. 64; DX35-b.099.
[115] *Gumns v. Edwards*, No. 20-231 (M. D. La) (Judge Dick presiding).

that case that the medical care being provided at Camp J fell short of the "community standard." She testified that Camp J's staff failed to properly manage Otto Barrera's oxygen saturation and recognize indicators that he needed hospitalization five days before he was transferred to OLOL. She further testified generally as to certain protocols at Camp J she considered to be "medically unreasonable." The Court nevertheless ruled that LSP was not deliberately indifferent and denied the injunction notwithstanding Dr. Vassallo's objections.[116]

61.     Just as in *Gumns*, Dr. Vassallo's opinions are based upon her experience in a Level I trauma center in New York City, and she fails to consider the standard of care for a primary provider in a prison.  Accordingly, her opinions are entitled to less weight.

## VIII.   ADA/RA CLAIMS

62.     Architectural Barriers. Plaintiffs are incorrect that "the vast majority of the violations Mr. Mazz found in 2016 persist."[117] Of the 190 items identified by Mr. Mazz in 2016, only forty-nine (49) had not been remedied at the time of Mr. Mazz's April 6, 2022, site visit and are still relevant for program access.

63.     While Mr. Mazz identified purported violations of the ADA Accessibility Standards in the substituted areas of LSP,[118] Plaintiffs presented no evidence that such purported violations deprive disabled inmates access to programs, services, or activities.[119] The relevant consideration is "the accessibility of the program and not technical compliance with ADAAG in an existing facility."[120]

---

[116] *Gumns*, R. Doc. 57, pp. 22-23.
[117] Rec. Doc. 771 at paragraph 141.
[118] Those areas are Ash 1, 3, and 4 (Remedy Trial, PX4, Items 11-76) in place of Cypress and Hickory dorms, Visiting Area men's and women's restrooms (Remedy Trial, PX4, Items 176-191), and Nursing Unit 1, Cell #4 (Remedy Trial, PX4, Items 143-153) in place of Nursing Unit 2, Cell #7.
[119] *See* Rec. Doc. 770, paragraphs 186-191.
[120] *Id.* at 295.

64.    <u>LSP ADA Coordinator.</u> Plaintiffs failed to show that LSP's current ADA Coordinator (Deputy Warden Ashli Oliveaux) is not qualified to fulfill the obligations of that position. Dr. Schriro, Plaintiffs' expert in corrections administration, possessed no relevant background or knowledge to opine that Warden Oliveaux does not meet the specific requirements and/or qualifications for an ADA Coordinator. Dr. Schriro has never served in that role and does not cite any recognized standard for education, training, or experience necessary to handle the position of ADA Coordinator. Warden Oliveaux testified at trial that she had already completed 35 hours of a 40-hour course on ADA.[121] Dr. Schriro has no foundation for suggesting that the course work or number of hours is insufficient. Dr. Schriro also did not point to any specific failings of Warden Oliveaux in performing the role of ADA Coordinator.

65.    <u>DOC ADA Coordinator.</u> Despite Plaintiffs' unsupported contention, Ms. Spears's role as ADA Coordinator at DOC has improved ADA administration, not only at LSP, but also at other DOC facilities. Not having any evidence to devalue Ms. Spears's qualifications, Plaintiffs attempt to diminish her law degree while ignoring the extensive ADA training she has received since taking over as coordinator.[122] Conceding that ADA training has vastly improved, Plaintiffs fail to find issues with overhauled the ADA training program for staff at headquarters. Similarly, LSP's ADA Coordinator, must complete mandatory ADA training to become a certified ADA Coordinator.[123]

66.    Plaintiffs attempt to relitigate settled issues when discussing the method for making a Request for Accommodation. After the Liability Trial, the Court found that "Plaintiffs failed to carry their burden of demonstrating that LSP systemically fails to inform patients of their ADA

---

[121] Tr. Day 10, 6.17.22, p. 71.
[122] Tr. Day 10, 6.17.22, pp. 95-96.
[123] Tr. Day 10, 6.17.22, p. 97.

rights and procedures."[124] Regardless, Ms. Spears confirmed in her testimony that Requests for Accommodation can also be made verbally.[125]

67.    Thus, Plaintiffs' criticisms of ADA administration lack merit and are invalid.

68.    <u>Orderly Assistance</u>. Contrary to Plaintiffs' assertion, Nurse Stickells has taken steps to reduce instances of abuse and neglect in the orderly program with reinforcement through constant training.[126] Further, Nurse Stickells has expanded orderly training to include patients with disabilities.[127]

69.    Plaintiffs contend that the evidence at the Remedy Trial showed "multiple" examples of orderly abuse, but this is a gross exaggeration. In fact, of the three incidents of alleged orderly abuse cited by Plaintiffs, only one instance has been verified, Patient #69. Patient #18 was deceased at the time of the alleged incident of orderly abuse,[128] and the incident involving Patient #22 is an unsubstantiated, unproven report of alleged abuse.[129] While Plaintiffs are attempting to frame orderly abuse as a rampant issue at LSP, they could only identify, at most, two alleged instances over a period of three years.

70.    <u>Disciplinary and Security Accommodations.</u> The evidence does not support Plaintiffs' argument that disabled inmates are not accommodated in disciplinary proceedings.[130] Plaintiffs' argument that Defendants subordinate "disabled inmates' physical needs to security

---

[124] R. Doc. 713, p. 60 and 101.
[125] Tr. Day 10, 6.17.22, p. 111; 113; 116-117
[126] Tr. Day 10, 6.17.22 p. 23.
[127] Tr. Day 10, 6.17.22 p. 27; DX_47 at pg. 33
[128] According to Plaintiffs' expert report, Patient #18 "was housed in a locked infirmary room and reported an orderly punched him in his head" on August 6, 2020. *See* PX1-a, p. 102. However, Patient #18 died on May 6, 2020. *See* DX 2 at 653 (confirming that Patient 18 died May 6, 2020, not on January 6, 2021, as stated in Plaintiffs' expert report).
[129] It appears as though Plaintiffs have incorrectly identified Patient #22 as Patient #18 in both their Proposed Remedial Findings of Fact and Conclusions of Law (Rec. Doc. 771, footnote 473, citing PX 1-a at 102) and their Expert Report (PX 1-a at 102; See, e.g., JX 18.112; JX 18 at 121-133; DX 2 at 653 (confirming that Patient 18 died May 6, 2020, of COVID-19 respiratory failure, not on January 6, 2021)).  As a result of this inability to properly identify the inmates, Plaintiffs erroneously attempt to use both patients as examples of orderly abuse when there is, in fact, only one alleged incident of abuse (Patient #22).
[130] *See* Rec. Doc. 770, paragraphs 208-210.

preferences" is a red herring.[131] Transport restraint modification orders are routinely issued to accommodate disabled inmates.[132] However, restraint orders are issued and modified by the Medical Department,[133] not the LSP Trips Office.[134]

71.    Tracking and Processing of Accommodation Requests. Despite Plaintiffs' unsupported assertion, there is no evidence the ADA tracking database is undercounting accommodation requests. Plaintiffs' expert, Dr. Schriro, noted that there is no current DOC audit finding of under-reported requests for accommodation at LSP.[135] In fact, Ms. Spears reviews the database two to three times a week, reviewing all new entries since the last review.[136]

72.    As previously noted by this Court, "Plaintiffs bear the burden of proving the need for equitable relief by demonstrating that the unlawful and unconstitutional conditions found following the liability trial *persist and are likely to persist into the future*."[137] Thus, Plaintiffs may not merely rely upon the prior finding that unconstitutional conditions occurred in the liability phase of trial combined with an admission that certain of Defendants' policies and/or practices remain unchanged. Plaintiffs have failed to show that unconstitutional conditions persist as to the ADA and RA.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

---

[131] Rec. Doc. 771, paragraph 158.
[132] *See e.g,* DX34-TTT, p. 7 (side restraints ordered for 1 year, issued less than a week after Mr. Mellion indicated that he refused an outside trip due to the black box – *see Id.,* p. 190); JX1, p. 6-10 (side restraints and lower extremity flex cuffs for six months); JX12, p. 129 (flex cuffs ordered for six months); JX22, p. 399 (flex cuffs with side restraints for six months); JX34, p. 78 (flex cuffs on all extremities for one month); JX55, p. 103 (flex cuffs, side restraints, permanently);
[133] JX71-a, 30(b)(6) Deposition of Paul Toce, MD, p. 134-136 (as the LSP Medical Director, Dr. Toce has the final say on the type of restraint ordered – p. 135).
[134] Tr. Day 9, 6/16/22, p. 154, lines 5-10.
[135] Tr. Day 2, 6.7.22, p. 21.
[136] Tr. Day 10, 6.17.22, p. 100.
[137] R. Doc. 713, p. 3. (Emphasis added.)

23

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: /s/ *Randal J. Robert*
       Randal J. Robert (#13800)
       Connell L. Archey (#29992)
       Keith J. Fernandez (#33124)
       Allena W. McCain (#38830)
       *Special Assistant Attorneys General*
       Email:  randy.robert@butlersnow.com
             connell.archey@butlersnow.com
             keith.fernandez@butlersnow.com
             allena.mccain@butlersnow.com

       **SHOWS, CALI & WALSH, L.L.P.**
       Jeffrey K. Cody, La. Bar Roll No. 28536
       Caroline M. Tomeny, La. Bar Roll No. 34120
       John C. Conine, Jr., La. Bar Roll No. 36834
       *Special Assistant Attorneys General*
       628 St. Louis Street (70802)
       P.O. Drawer 4425
       Baton Rouge, Louisiana 70821
       Telephone: (225) 346-1461
       Facsimile: (225) 346-1467
       Email: jeffreyc@scwllp.com
             caroline@scwllp.com
             coninej@scwllp.com

       Counsel for Defendants

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of January, 2023, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

_____ /s/ *Randal J. Robert* _____
Randal J. Robert