# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., ET AL.                                    CIVIL DOCKET

VERSUS                                                       15-318-SDD-RLB

BURL CAIN, ET AL.


## OPINION

## I.    INTRODUCTION

In 1989, the United States Department of Justice opened an investigation into the conditions of confinement at the Louisiana State Penitentiary ("LSP") at Angola ("Angola"). The Justice Department found that multiple conditions at Angola deprived inmates of their constitutional rights, among them the failure to provide adequate medical and psychiatric care.[1]

In 1992, a class action lawsuit was filed, alleging that the healthcare at Angola was so deficient that it violated the United States Constitution's Eighth Amendment prohibition against cruel and unusual punishment. The United States Department of Justice intervened in the lawsuit and joined in the allegations against Angola.

In 2009, the Louisiana Department of Corrections engaged Wexford, a third-party consultant, to assess the medical care at Angola and report its findings to the Department. Wexford found multiple medical care deficiencies, which Angola disputes. Whether Wexford's findings were substantiated was not an issue in this case, but LSP and the

---

[1] Liability Trial PX 239.

Department of Corrections were aware as early as 2009 that Wexford had identified persistent health care deficiencies at Angola.

All this to say that the healthcare of inmates at Angola has been the subject of consternation and criticism *since 1989*. In 2015, this Class Action suit was filed.  After years of discovery,[2] 21 days of trial,[3] and two site visits to Angola by the Court, the Plaintiffs proved that, rather than receiving medical "care," the inmates are instead subjected to cruel and unusual punishment by medical mistreatment. The human cost of these 26 YEARS is unspeakable.

In the following pages, the Court will make detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola. The finding is that the "care" is not care at all, but abhorrent cruel and unusual punishment that violates the United States Constitution.  These are but a few examples:

- After a 3-month delay in getting a CT scan that was ordered when a chest x-ray revealed a suspected malignancy, the CT confirmed the suspicious lesion, and the patient was referred to a pulmonologist. Yet the patient did not see a pulmonologist for another 4 months. After finally seeing the pulmonologist, twice the pulmonologist ordered a biopsy which the patient never received. The pulmonologist charted his frustration:

   "the biopsy didn't occur, what gives?"

   * * *

   "strongly suggest immediate IR [interventional radiology], FNA [fine needle aspiration] of left upper lobe nodule."[4]

---

[2] Both pretrial liability and remedy phase.
[3] 11 days on liability dates October 9-25, 2018, and 10 days on remedy June 6-17, 2022.
[4] Rec. Doc. 544, Puisis Testimony at 162:19-163:3.

Yet a biopsy was never completed. More than a year after the initial suspicious x-ray findings, the patient was hospitalized for a partial lung removal due to cancer, after which the patient was ordered to begin chemotherapy. Commencement of chemotherapy was also inexplicably delayed. The patient died.[5]

- A 50-year-old inmate made seven requests for medical attention for escalating back pain that went unanswered. The man became incontinent and bed ridden. When medics finally evaluated him, he was found lying on the floor. He was finally seen by a doctor but died within hours. His autopsy revealed a large liver abscess and resulting spinal cord compression.[6]

- An inmate underwent a colectomy due to untreated Chron's disease. Angola failed to refer him to gastroenterologist, failed to provide indicated immunosuppressive therapy, and failed perform to adequate physical examinations.  The patient died.[7]

- An inmate complained of chest pain for more than 16 months. When he was finally referred to a thoracic surgeon, a biopsy of a pulmonary nodule was ordered. When finally performed, the biopsy revealed adenocarcinoma of the lung. The patient died a week later.[8]

- An inmate complained for nearly three years of symptoms consistent with laryngeal cancer, yet he saw an Angola physician only a few times. After 33 months of constant complaints, he was diagnosed with laryngeal cancer from which he subsequently died.[9]

- A 65-year-old man with a history of diabetes, severe coronary artery disease and heart failure presented seven times in a single month with fevers as high as 103.6 degrees, altered mental state, and complaints of chest tightness. At one point, while exhibiting an altered mental state and a fever of 103.6 degrees, he was confined to a "locked room" in the infirmary with the "hatch up," after which he was not seen by physician for three days. Two days after being discharged from the

---

[5] Patient #7.
[6] Patient #6.
[7] Patient #11.
[8] Patient #17.
[9] Plaintiff Joseph Lewis.

infirmary, he was found vomiting in his cell. Angola doctors ordered EMTs not to transport the sick man to the hospital. He died in his cell the next day.[10]

- An inmate made an emergency sick call for severe flank pain. An x-ray and physical exam yielded no diagnosis. The pain progressed to the point that the man could not get out of bed, yet Angola's medical director refused EMT requests to transfer him to a hospital. Three days later he was found unresponsive in his cell. He died the following day.[11]

- An inmate with a tracheotomy presented with a progressively worsening cold and made repeated emergency sick calls. The inmate was seen in Angola's Acute Treatment Unit ("ATU") multiple times but each time he was simply returned to his dormitory where he finally died.[12]

- An inmate experienced two years of abdominal pain and weight loss that was unheeded and untreated leading to hospitalization and a diagnosis of advanced stage colon cancer, resulting in a preventable death.[13]

- An inmate suffered repeated and extensive delays in getting a colonoscopy that was ordered which resulted in emergency treatment, two hospital stays, and five surgical interventions - all avoidable.[14]

- The failure to administer ordered Statin drugs to an inmate resulted in a heart attack and stroke requiring the inmate's repeated avoidable hospitalizations.[15]

## II.    BACKGROUND[16]

Before the Court is a class action case alleging unconstitutional medical care provided at Louisiana State Penitentiary ("LSP") as well as violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") at the prison. The Court

---

[10] Patient #39.
[11] Patient #34.
[12] Rec. Doc. 547, Prince Testimony at 101:14-102:5.
[13] Patient #5.
[14] Patient #11.
[15] Patient #13.
[16] The Court adopts by reference, and in full, its prior Opinion following the bench trial on liability. Rec. Doc. 594.  All previous findings of fact and legal conclusions set forth therein are incorporated by reference in this Opinion.

bifurcated the case into separate liability and remedial phases. Following a trial on liability,[17] the Court found that LSP violated the Eighth Amendment and found violations of the ADA and RA in the following ways:

1. Failing to provide constitutionally adequate **clinical care** in the following particulars:
   a. privacy in examinations;
   b. lack of routine medical equipment in exam rooms;
   c. lack of adequate medical records management;
   d. lack of clinical hygiene and spacing;
   e. episodic treatment of complaints;

2. Failing to provide constitutionally adequate medical care w/ qualified providers at **sick call**;

3. Failing to provide constitutionally adequate access to medically necessary **specialty care**:
   a. in a timely manner;
   b. failure to schedule and track specialty appointments;
   c. failure to comply with testing and diagnostic requirements;
   d. failure to execute appropriate follow-up care ordered by specialty care providers;
   e. and failure to coordinate care;

4. Failing to provide constitutionally adequate **emergency** care in the evaluation and assessment of emergencies by qualified providers and failing to timely treat and/or transport to hospital for emergent care;

5. Failing to provide constitutionally adequate, qualified staff in **infirmary/inpatient care**;

6. Failing to provide constitutionally adequate **medical leadership and organization** in the following particulars:
   a. lack of meaningful mortality review;
   b. use of correctional personnel to manage medical decisions;

---

[17] The liability trial took place from October 9, 2018 through October 25, 2018.

    c.  lack of peer review;

    d.  lack of medical staff involvement in budgeting;

    e.  lack of medical supervision by Dr. Lavespere; and

    f.  failure to maintain proper credentialing records;

7.  Failing to comply with the **ADA and RA** in providing disabled inmates access to programs and services due to physical and architectural barriers;

8.  Failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications have not been made to provide access; failure to provide proper oversight of health care orderlies;

9.  Failing to comply with LSP's ADA Directives in maintaining a qualified ADA Coordinator and advisory committee to handle ADA issues;

10. Failing to make efforts to integrate disabled inmates within the spirit of the ADA implementing regulations; [18]

11. Failing to adequately train medical staff regarding ADA compliance;

12. Failing to appropriately evaluate and address ADA accommodation requests and disability-related grievances;

13. Failing to identify and track disabilities and accommodation requests in a meaningful way;

14. Failing to accommodate disabled inmates in applying discipline;

15. Maintaining blanket exclusionary policies for disabled inmates regarding access to various services, activities, and programs in violation of the ADA.[19]

It should be noted that, after the trial on the liability phase had concluded,[20] but before the Court issued its Ruling, the Court telegraphed to the parties that:

> The Court has taken under advisement the parties claims and defenses and is preparing to issue a Ruling on the merits. The Court will find that the medical care at Angola State Penitentiary is unconstitutional in some respects and is prepared to Order injunctive relief addressing conditions which the Court finds unconstitutional. The Court considers it to be in the

---

[18] Plaintiffs state that they "raise no claims of unjust segregation under the ADA;" therefore, the Court will consider this claim abandoned and it will not be addressed herein.  Rec. Doc. 775, p. 26 (citation omitted).
[19] Rec. Doc. 594, pp. 122-124.
[20] Trial concluded on October 25, 2018.

best interests of the litigants to attempt to reach an amicable resolution on some or all of the claims.[21]

The record reflects that the parties engaged in settlement negotiations with the assistance of the Magistrate Judge.[22] When resolution appeared futile, in March 2021, the Court issued its 124-page Opinion finding the Constitutional and statutory violations noted above. The Court set the matter for a remedy trial.  The Parties stipulated and agreed that "for the remedy phase of trial, January 1, 2019 begins the relevant and appropriate time period ("Relevant Period") for the Court to assess whether the constitutional deficiencies listed in the Court's March 31, 2021 opinion have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[23] The remedy trial was scheduled for June 2022, permitting LSP 15 months to address and rectify the constitutional and statutory violations identified above.

The Court held a two-week remedy phase trial in this matter and admitted evidence of current conditions[24] to allow LSP to demonstrate, through proof, steps taken to address and/or cure these constitutional and statutory violations.[25]   While LSP made some changes during the pendency of this litigation, LSP steadfastly defends its healthcare system and denies that it was constitutionally deficient at any time.

As the Court held previously in this case,

[T]he Fifth Circuit instructs that in a "prison injunction case.... The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction,

---

[21] Rec. Doc. 578.
[22] Rec. Doc. 579.
[23] Rec. Doc. 636-3.
[24] Up to the date of the remedy trial discovery cut-off date.
[25] *See* Rec. Docs. 733, 744.

**the inmate must demonstrate the continuance** of that disregard during the remainder of the litigation and into the future."[26]

While the burden of proof remains with Plaintiffs to establish entitlement to injunctive relief, in circumstances like these, if Plaintiffs offer evidence that nothing has changed since the liability phase, the burden shifts to the Defendants to demonstrate that the constitutional deficiencies have been remedied. Because deliberate indifference may be shown by a risk of harm that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,"[27] a "defendant's past conduct" is a relevant factor to consider in determining "that there is a reasonable likelihood of further violations in the future."[28] Hence, the evidence underpinning the Court's liability conclusions remain relevant for purposes of crafting injunctive relief, unless LSP can demonstrate that current conditions ameliorate the "likelihood of future transgressions."[29]

Following the remedy phase trial, the Court permitted the Parties to submit Post Trial Findings of Fact and Conclusions of Law and a Reply.[30]  Additionally, the Court encouraged the Parties to find common ground and settle or stipulate on any issues possible, and the Court provided the Parties significant time to reach an agreement themselves, which proved fruitless.  The Court has considered the Parties' arguments, the record and trial evidence, and the applicable law in reaching the conclusion that injunctive relief is required in this case. The Court's credibility findings, findings of fact,

---

[26] Rec. Doc. 713, pp. 2-3 (quoting *Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1993))(emphasis added)).
[27] *Farmer*, 511 U.S. at 842.
[28] *CAE Integrated, L.L.C. v. Moov Technologies, Incorp.*, 44 F. 4th 257, 263 (5th Cir. 2022)(citation omitted).
[29] *Valentine*, 993 F.3d at 280.
[30] Rec. Docs. 770, 771, 774, 775.

and conclusions of law are set forth below pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**III.    GLOSSARY**

| | |
|---|---|
| ACA | American Correctional Association |
| ATU | Acute Treatment Unit |
| DOC | Department of Corrections |
| eMARs | Electronic Medical Administration Records |
| EMT | Emergency Medical Technician |
| ITO | Individual Treatment Order |
| LPN | Licensed Practical Nurse |
| LSP | Louisiana State Penitentiary |
| NCCHC | National Commission on Correctional Health Care |
| NP | Nurse Practitioner |
| NU | Nursing Unit |
| OLOL | Our Lady of the Lake Hospital |
| PLRA | Prison Litigation Reform Act |
| RN | Registered Nurse |
| SDE | Self-declared Emergency |
| UMC or UMCNO | University Medical Center (at New Orleans) |

## IV.    FINDINGS OF FACT

The following findings of fact are supported by the evidence in the record.  Where a particular fact was controverted, the Court weighed the evidence and evaluated the credibility of the testifying witnesses to make a finding.

### EIGHTH AMENDMENT VIOLATIONS

### A.  Expert Witnesses - Credibility[31]

1.    Plaintiffs' expert Madeleine LaMarre ("LaMarre") is a nurse practitioner with over 30 years of experience in corrections, including serving as the Nursing Director and Clinical Services Manager in the Georgia Department of Corrections and 15 years of experience monitoring correctional facilities. The Court accepted LaMarre as an expert in correctional health and found her testimony credible.[32]

2.    Plaintiffs' expert Dr. Susi Vassallo ("Dr. Vassallo") is a board-certified physician in emergency medicine and medical toxicology. Dr. Vassallo was accepted by the Court as an expert in emergency medicine, toxicology, and correctional medicine, and the Court found her testimony credible.[33]

3.    Plaintiffs' expert Dr. Mike Puisis ("Dr. Puisis") is a board-certified physician in internal medicine with over 30 years of experience in correctional settings. Dr. Puisis was

---

[31] The credibility of fact witnesses is discussed specifically when referenced.

[32] PX 1-a, p.5; Rec. Doc. 748, LaMarre Testimony at 86:6-9, 87:3-14, 90:24-91:2.  LaMarre currently consults with the Department of Homeland Security and previously consulted with the Centers for Disease Control and Prevention. She served as an associate editor of the textbook Clinical Practice in Correctional Medicine, Second Edition. *See id.*

[33] Dr. Vassallo treats patients from correctional facilities, including the New York penal institution Rykers Island, at Bellevue Hospital in New York City. She also consults with the Department of Homeland Security, Division of Civil Rights and Civil Liberties regarding medical care in Immigration and Customs Enforcement Detention Centers. PX 1-a, p. 6; Rec. Doc. 749, Vassallo Testimony at 11:5-7; 14:8-12.

accepted by the Court as an expert in internal medicine and correctional medicine, and the Court found his testimony credible.[34]

4.      Plaintiffs' expert Angela Goehring ("Goehring") is a registered nurse with over 25 years of experience in correctional health care, including serving as Chief Nursing Officer for a private correctional health care company. Goehring was accepted by the Court as an expert "in the field of correctional medicine with an emphasis on nursing care and administration," and the Court found her testimony credible.[35]

5.      Plaintiffs' experts reviewed a sample of 60 inmate patients who died or required hospitalization after January 1, 2019, the start of the "relevant and appropriate time period for the Court to assess whether the constitutional deficiencies listed in the [Liability Opinion] have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[36] LaMarre, Dr. Vassallo, and Goehring visited LSP on April 6, 7, and 8, 2022.[37] Plaintiffs' experts reviewed numerous policies, minutes, reports, and other documents from LSP and DOC in preparation for formulating their opinions and preparing their joint expert report.[38]

---

[34] He was Assistant Medical Director, Medical Director, and Chief Operating Officer for the Cook County Jail, served as Regional Medical Director with Correctional Medical Services for New Mexico, and served as Medical Director of correctional facilities with Addus Health Care. He has been retained by the United States Department of Justice, the District Court for the Northern District of California, and numerous state/local jurisdictions, and he has served as a court-appointed expert or monitor in several cases. He is the author of the leading textbook on correctional medicine and has helped revise or establish standards of care for the American Diabetes Association, the National Commission on Correctional Health Care, and the American Public Health Association. PX 1-a at 5; Rec. Doc. 750, Puisis Testimony at 7:10-15; 9:1-6; 15:23-25.

[35] She served on the American Correctional Association's Commission for Accreditation, has worked with court-appointed monitors, and has served as an expert and consultant. PX 1-a, p. 6; Rec. Doc. 751, Goehring Testimony at 35:13-16; 58:9-12.

[36] PX 1-a, p. 4; see generally PX 1-c (full chart review for all 60 patients), JX 77-a (stipulation).

[37] PX 1-a, p. 3.

[38] *Id.* at 7-8.

6.      Plaintiffs' experts submitted a 136-page joint report, including a 443-page appendix of detailed chart reviews.[39]  A supplemental report was submitted jointly by LaMarre and Goehring after they evaluated LSP's electronic medical administration records ("eMAR").[40]

7.      Generally, Plaintiffs' experts opined that "[p]atients at LSP with serious medical needs continue to face a substantial risk of serious harm, including preventable hospitalizations and deaths."[41] Furthermore, "the vast majority of medical records from the remedy period contained multiple examples–typically pervasive–of often grossly substandard medical care."[42]

8.      Defendants' expert Dr. David Mathis ("Dr. Mathis") is a physician board-certified in family medicine who serves as a medical consultant for the Office of Legal Affairs for California Correctional Health Care Services.[43]  The Court accepted Dr. Mathis as an expert in the field of correctional medicine.[44] Nevertheless, while the Court does not discount Dr. Mathis' opinions in full, the Court finds that, in several instances, Dr. Mathis' medical opinions were entitled to less weight than those offered by Plaintiffs' experts. Outside of the Maryland prison, Dr. Mathis has never been tasked with evaluating the overall delivery of medical care at a prison; he has evaluated one jail.[45] In his expert report, almost half of Dr. Mathis' chart review section (approximately 50 pages) is a verbatim copy of LSP's mortality reviews with no independent analysis or comment by

---

[39] *See id.*; PX 1-c.
[40] *See* PX 5-a; PX 5-b (amended chart reviews incorporating eMARs).
[41] PX 1-a, p. 8.
[42] *Id.*
[43] Rec. Doc. 752, Mathis Testimony at 139:22-140:23. Dr. Mathis is also a Certified Correctional Health Professional.  Dr. Mathis previously worked at a California prison and served as the medical director at a Maryland prison. *Id.* at 141:14-22; 143:17-144:4, 145:23-146:11.
[44] *Id.* at 154:11-12.
[45] Rec. Doc. 753, Mathis Testimony at 9:1-3; 9:22-10:5.

Dr. Mathis.[46]  Although Dr. Mathis opined in his report that he found less than five standard of care violations by LSP, at trial he testified that he found ten instances of care that fell below the standard of care.[47]  During the course of his testimony, he acknowledged additional standard of care deficiencies.[48]  Further, although Dr. Mathis criticized Plaintiffs' experts' sampling methodology in both his report and deposition, stating that accreditation bodies review records randomly, when presented with contradictory testimony from members of such bodies at trial, he admitted he could not refute that testimony.[49]  Notably, Dr. Mathis did not opine on several critical issues before the Court regarding the systemwide delivery of medical care at LSP, including: (a) whether providers treat complaints episodically;[50] (b) whether providers routinely fail to obtain adequate medical histories upon evaluation;[51] (c) whether  providers routinely perform physician examinations;[52] (d) whether providers read and monitor testing,[53] (e) whether providers monitor or manage medications;[54] (f) whether patients are timely and correctly sent out for emergency care;[55] or (g) whether LSP's "new" method of responding

---

[46] *Id*. at 29:24-30:4; 24:15-30:4 (comparing Dr. Mathis' expert report to LSP mortality reviews); *see* DX 35-c at 94-211.

[47] *Compare* DX 35-c at 212 *with* Rec. Doc. 753, Mathis Testimony at 12:10-15:14.

[48] *See, e.g*., Rec. Doc. 753, Mathis Testimony at 30:7-31:14 (nurses in an infirmary should note the time they take vital signs, which did not occur at LSP); *id*. at 31:17-32:15 (trained personnel should use an AED for a pulseless person not breathing, which did not happen for Patient #25); *id*. at 34:6-9, 42:11-44:11 (patient who is incontinent and cannot get out of bed due to back pain should be presented to provider, which did not happen for Patient #6); *id.* at 47:17-51:5 (patient with acute hepatic failure should go to emergency room, which did not happen for Patient #33).

[49] *See id*. at 8:11-9:21; *see also* DX 35-c at 206-07; Rec. Doc. 698-1 at 11.

[50] Rec. Doc. 753, Mathis Testimony at 65:21-23.

[51] *Id*. at 65:4-8.

[52] *Id*. at 65:9-12.

[53] *Id*. at 65:13-16.

[54] *Id*. at 65:17-20.

[55] *Id*. at 59:11-17.

to emergency sick call was adequate.[56]   The Court found Dr. Mathis' opinions ill-supported and unpersuasive.

9.      Defendants' expert Michael McMunn ("McMunn") is a nurse practitioner with a Ph.D. in Nursing, and he is a Certified Correctional Healthcare Professional.[57] McMunn currently works for Southern Health Partners as a contractor in seven jails and one prison work camp.[58] The Court accepted McMunn as an expert in the field of correctional medicine.[59] For the remedy phase of this case, McMunn conducted a two-day site visit to LSP during which he reviewed 22 charts, conducted 63 interviews, observed 50 "medical encounters" involving inmate patients – five of which were sick calls.  McMunn took no notes during this site visit, admitted he performed no calculations to support his conclusion that LSP is complaint with 95% of the National Commission on Correctional Health Care ("NCCHC") regulations, and admitted he relied solely on his memory in reaching his conclusions.[60]  For more detailed reasons set forth *infra*, the Court finds that McMunn's testimony and conclusions are entitled to little weight.

10.     Defendants' expert Dr. John Morrison ("Dr. Morrison") is a general surgeon who previously served as the DOC Medical Director from April 2018 until April 2020.[61]  He currently serves as the Section Chief of General Surgery for Louisiana State University's section of University Medical Center New Orleans ("UMCNO" or "UMC").[62]  In this role, Dr. Morrison performs procedures on LSP inmate patients at LSP and UMC.[63]  The Court

---

[56] *Id.* at 61:23-63:15.
[57] Rec. Doc. 756, McMunn Testimony at 4:25-5:2; 5:6-7.
[58] *Id.* at 6:9-12; 8:12-22.
[59] *Id.* at 17:16-18.
[60] *Id.* at 22:25-23:2; 85:23-86:3; 88:12-14.
[61] Rec. Doc. 754, Morrison Testimony at 5:18-21; 10:6-9.
[62] *Id.* at 7:4-6.
[63] *Id.* at 9:16-10:5.

accepted Dr. Morrison as an expert in the field of general surgery with an emphasis in surgical administration.[64] The Court found Dr. Morrison's testimony credible but largely irrelevant to the majority of the constitutional violations at issue during the remedy trial.

### B. Clinical Care

11.    Based on the testimony and a review of evidence discussed below, the Court finds that the delivery of clinical care at LSP remains constitutionally deficient.  Because sick call is a part of clinical care, some records discussed below will include references to sick call encounters.

The Court previously found clinical care constitutionally inadequate in the following ways: (a) privacy in examinations; (b) lack of routine medical equipment in exam rooms; (c) lack of adequate medical records management; (d) lack of clinical hygiene and spacing; and (e) episodic treatment of complaints.  Considering the evidence presented at trial, the Court finds that LSP has properly remedied (a) privacy in examinations;[65] (b) lack of routine medical equipment in exam rooms;[66] and (d) lack of clinical hygiene and spacing.[67]  Plaintiffs concede these improvements.[68]  However, the lack of adequate medical records management and the episodic treatment of complaints persist in LSP's delivery of clinical care.  Clean rooms and the availability of medical equipment do not solve the constitutionally substandard care.

---

[64] *Id.* at 14:3-5.
[65] Rec. Doc. 752 at 100:10-18; Rec. Doc. 755 at 74:1-3, 81:6-12; Rec. Doc. 757 at 131:4-6.
[66] Rec. Doc. 748 at 198:2-13; Rec. Doc. 752 at 100:15-18; DX46.0013; DX46.0152; DX46.0188.
[67] Rec. Doc. 748 at 196:22-197:8; Rec. Doc. 755 at 76:15-24; DX46.0013; DX46.0152; DX46.0188;
[68] Rec. Doc. 771, p. 27 (citing PX 1-a, p. 37; PX 44-c, p. 4, Response to ROG 1; Rec. Doc. 748, LaMarre Testimony at 146:16-22; *see also* PX 1-a at 36-37).

Laudably, LSP hired additional nurse practitioners and utilizes them in clinical care.[69]   However, this fact alone does not establish that clinical care at LSP is now constitutionally adequate.

The Court rejects Defendants' contention that medication administration is not an issue before the Court "because it was not addressed in the Liability Ruling."[70] This contention is demonstrably false as the Court explicitly held that LSP's failure to monitor and manage medications contributed to constitutionally inadequate clinical care.[71]

<u>Patient # 13</u>

Patient #13, 61 years old, had numerous health problems, including HIV and chronic kidney disease.[72]  This patient's record documents multiple medical errors, the most egregious being the administration of Toradol for an infection known to be resistant to this medication. LSP providers repeatedly failed to administer his HIV medication, provided erroneous information to specialists regarding his medication dosage, and disregarded the prescriptions ordered by specialists, reverting instead to prior, ineffective medications.[73]

Specialists repeatedly instructed that Patient #13 was not to be given Toradol or other NSAIDs because they worsened his kidney function.  The cover of his medical record indicated in bold letters "NO TORADOL IS TO BE GIVEN."[74]  Yet, during the last week of Patient #13's life, he was given Toradol by a LSP provider.[75]  Hours later, Patient

---

[69] Rec. Doc. 756, McMunn Testimony, at 74; *see also* PX1-a, p. 16.
[70] Rec. Doc. 770, p. 16.
[71] Rec. Doc. 594, p. 10.  The Court specifically discussed the failure of medication administration with respect to Patient #13, *id*. at 11, Patient #6, *id*. at 17, Patient #53, *id*. at 19, and Patient #18, *id*. at 24.
[72] Rec. Doc. 748, LaMarre Testimony at 110:23-111:2; PX 1-a, pp. 66-67; JX 13.
[73] Rec. Doc. 748, LaMarre Testimony at 112:11-116:12, 123:14-127:13; JX 13, pp. 58, 158, 755, 883, 919, 1080-82, 1152; JX 68, pp. 2222, 2252, 2321.
[74] Rec. Doc. 748, LaMarre Testimony at 127:14-132:17; JX 13, pp. 1, 402, 404, 405, 1074, 1035, 1085.
[75] *Id.*

#13 made a self-declared emergency ("SDE") request, advising that he was unable to urinate since receiving the shot of Toradol.[76] In response, LSP providers treated him for a urinary tract infection with an ineffective medication, discharged him to his room, and set up a follow-up for the next week.[77]  Patient #13 never made the follow-up as he died within the week due to sepsis, which "may very well have come from an improperly treated urinary tract infection."[78]

Defendants' attempt to invalidate LaMarre's "initial opinions" about Patient #13 for her purported admission that they were "mistaken and inaccurate," falls flat.[79] Defendants inflate the impact of these errors and claim that "Plaintiffs offered no explanation for NP LaMarre's errors,"[80] which is demonstrably false. LaMarre acknowledged that she had erroneously concluded that this patient had not had a urology consult and had not been treated for pneumonia.[81]  However, LaMarre explained the reason for her errors:

> What I'd like to report is that in preparing for trial, I realized that there were two medical record volumes for this patient, but I had only reviewed one medical record volume because they were produced at different times.
>
> In reviewing the second volume -- or both volumes, I realized that each -- that both volumes were basically for the same chronological period. Both volumes contained documents from the same time period, except that one volume contained some documents that were not in the other volume. There were some duplicate documents. They were not in chronological order; and therefore, there are some -- while my overall opinions remained the same, there are a few factual statements made in my report that I would like to correct. So I'd just like to mention that before I testify about this case.[82]

LaMarre further testified that the two volumes of medical records for Patient #13 was

---

[76] *Id.* at 129:23-130:4; JX 13, p. 405.
[77] *Id.* at 130:5-131:4; 131:14-132:9; JX 13, pp. 404-05.
[78] *Id.* at 132:10-17.
[79] Rec. Doc. 770, p. 18.
[80] Rec. Doc. 774, p. 9.
[81] Rec. Doc. 748, LaMarre Testimony, at 109-110.
[82] *Id.* at 109:7-21.

an illustration of the systematic issues involving the medical records. When you have two separate medical volumes that are covering the -- you know, that are not chronological and complete, then the providers don't know what's happening with the patient, either. So their ability to be up to date and current and know the latest -- have a copy of the latest documents and consults and hospital reports is impaired by the lack of a complete and chronological record, and it leads to errors in treatment.[83]

These benign errors, caused by LSP's egregious medical records management, do not render LaMarre's otherwise supported conclusions about Patient #13's care invalid.[84] The Court finds that LSP's medical records remain in shambles. They are disorganized and incoherent. Medical records are the most important repository of healthcare information and a critical source of historical complaints and treatment. The utter and complete disarray of the medical records is emblematic of indifference.

Defendants rely on Dr. Mathis' opinion that using an antibiotic "long enough" could "still work" even where an infection has been historically resistant.[85]  That LSP's hired expert advocates for the prolonged use medication known to be ineffective, in the hopes that it might work, is deliberately indifferent to the patient's medical needs. In any event, Defendants failed to rebut Plaintiffs' evidence regarding Patient #13's HIV medication lapses, providing specialists with incorrect information, or disregarding specialists' prescription orders without explanation.

The treatment of Patient #13 is unrebutted evidence of LSP's failure to follow specialists' orders, callous indifference to medication efficacy, indifference to treatment

---

[83] *Id.* at 110:10-18.
[84] Defendants' suggestion that LaMarre's criticism of giving Patient #13 Toradol is a "newly developed opinion" raised somehow as a last resort and "provided only after her other opinions were refuted," is completely without merit. Rec. Doc. 774, p. 9. It is undisputed that the cover of Patient #13's chart contained, in bold letters, "NO TORADOL IS TO BE GIVEN."
[85] Rec. Doc. 753, Mathis Testimony, at 108:4-11.

plans and protocols, and incoherent, disorganized, untrustworthy medical records, all of which contribute to abysmal, unconstitutional medical care.

Patient #20

Patient #20 was 52 years old and had suffered from hepatitis C since 2021.[86]  He made four sick calls between February and August 2021 complaining of a wide range of symptoms, from lower abdominal pain to yellow eyes and an inability to lie on his left side; he also complained he was not receiving his hepatitis C medication.[87] The EMT referrals of the patient for "M.D. review" were disregarded.[88] Defendants admit that Patient #20 was not seen by a provider until he was referred to the hospital three weeks later.[89] Defendants' expert Dr. Mathis agreed that the three week failure to see Patient #20 between August 31, 2021 and September 21, 2021 fell below the standard of care.[90] Clinical care was non-existent for this Patient. The neglect and apathy shown rise to the level of callous disregard.

Patient #42

Patient #42 is 25 years old with a history of asthma and cavitary pneumonia who was also under mental health treatment.[91]  This patient made numerous sick call requests for several symptoms, including spitting up blood, with no subsequent physical evaluation

---

[86] JX 20, pp. 5, 123.
[87] Rec. Doc. 755, Goehring Testimony at 13:8-17:11; JX 20, pp. 112, 116, 123-24.
[88] *Id.*
[89] Rec. Doc. 774, p. 10.
[90] Rec. Doc. 753, Mathis Testimony at 13:16-20. Goehring admitted that she was incorrect about the breadth of the alleged delay in treatment for Patient #20.  She acknowledged that she did not see the hospital record demonstrating that Patient #20 was in the hospital from September 22, 2021 until October 31, 2021, and LSP could not have responded to this patient's needs or refill medications during that time. *See* Rec. Doc. 755, Goehring Testimony at 118:21-119:22. Nevertheless, even Dr. Mathis still found that delays in treating this patient attributable to LSP were below the standard of care.
[91] Rec. Doc. 748, LaMarre Testimony at 133:1-2.

by a provider.[92]   On April 3, 2020, the patient reported a SDE after spitting up blood. LaMarre testified that spitting up blood is a "red flag symptom" of potentially serious medical issues, and this should have prompted a physician examination "right away."[93] Although the patient was "seen" on April 4, 2020, because of the utter disarray of LSP's medical records, the record for this patient is indecipherable.

> A physician doesn't document any action or acknowledgement of the [April 3rd SDE] form until April 6th.  And it appears that the initial response of the physical was sick call, as needed, or medical provider."
>
> That may be – we actually don't know who that is.  We don't know if it's a physician.  We don't know if it's a nurse practitioner.  Because one of the medical record issues is that the providers do not legibly date, time, sign, and you don't know their credentials.  So you don't know who is seeing the patient.  But at any rate, they – the plan is clinical follow-up in eight weeks.[94]

After a third SDE on April 6, 2020, the patient was sent to the ATU and ultimately to the hospital where he was diagnosed with cavitary pneumonia.[95]

Defendants' new sick call policy, whereby sick call was conducted via telemedicine by a nurse practitioner, did not improve the quality of care for this patient.   After implementation of the new sick call policy, on January 14, 2022, Patient #42 made a SDE complaining that he was suffering chest pain for two days; the EMT provided no treatment and referred the request to a provider, who noted only "S/C PRN [sick call as needed]" four days later without ever seeing the patient.[96]

---

[92] *Id.* at 132:24-137:4, 139:13-144:24; PX 1-a, pp. 53, 55-56, 58-59; JX 42, pp. 38-39, 41-42, 74-76.

[93] *Id.* at 134-135.  Defendants criticize LaMarre's evaluation of Patient #42's treatment, claiming that, for the April 2020 incident, the patient was experiencing an adverse reaction to the use of "Mojo."  Rec. Doc. 770, p. 19, n. 106.  However, this is irrelevant to the question of whether this patient was adequately assessed and treated for the reported symptoms.

[94] *Id.* at 135:11-21.

[95] *Id.* at 136:8-14.

[96] *Id.* at 139:13-140:9; JX 42 at 42. Again, the state of LSP's medical records made it difficult to discern who provided the patient with care: "so initially when I reviewed this I thought that the patient was seen by an EMT because there's no legible signature.  But I came to appreciate that a nurse practitioner saw this patient on the 19th."  *Id.* at 140:24-141:2.

Five days later, he made another sick call request and was seen via telemedicine by Nurse Practitioner Ronald Bordelon ("Bordelon"), who failed to take an adequate history, failed to physically examine the patient, and failed to chart or acknowledge awareness of the patient's previous cavitary pneumonia and the risk of reoccurrence.[97]

Defendants note that this patient had three encounters with providers over a two-week period. However, a mere encounter with a health care provider is not evidence of medical care or treatment, and frequency does not establish constitutionally adequate care. Defendants did not address why no physical examination of this patient was performed, why he was not seen by a doctor after three days of spitting up blood, or why a medical provider did not review his sick call form for seven days although he was ill enough to be sent to OLOL in the meantime.[98]

Patient #42's care, particularly subsequent to LSP's purportedly improved sick call procedure, is disturbing. It suggests a level of apathy and indifference impervious to changes.

<u>Other Patients, Generally</u>

Dr. Puisis documented numerous additional patient charts that revealed systemic, recurring problems with clinical care.[99] Dr. Mathis also acknowledged the following

---

[97] *Id.* at 140:17-142:18; JX 42, p. 41. ("Now in telemedicine the patient is not with the nurse practitioner, so I'm not sure exactly how that got documented. But it's an inadequate history for heart pain: 'When did it start? What is the heart pain like? Do you have any associated symptoms? Do you have cough? Do you have palpitations?' there does not appear – even though the medical record should be with the nurse practitioner, it doesn't appear that the nurse practitioner looked back and saw what had happened with the patient to know that in the past he's had cavitary pneumonia … the nurse practitioner doesn't make a diagnosis. What is this patient – he just says he got intermittent pain when laying down. Not a particularly relevant medical evaluation.").

[98] *See* PX 1-a, p. 59.

[99] *See* PX 1-a, pp. 68-69 (Patient #15, whose condition of COPD was left off the "problem list" in his medical records and therefore was not addressed in the "woefully inadequate" medical evaluations in his clinical visits; even after a test showed severe obstruction, Dr. Toce did not document a follow-up plan or see the patient before his death from COPD); *id.* at 120 (Patient #29, who was given NSAIDs despite hypertension

standard of care violations in LSP's clinical care: Patient #2 was not given thyroid function tests for hypothyroidism; Patient #47 had hematuria that was assessed as stable without urinalysis; Patient #32 did not receive an EKG ordered to diagnose chest pain; Patient #28 was not put on insulin despite elevated hemoglobin A1-C and the failure of oral diabetic medications;[100] and Patient #33 had autoimmune hepatitis and developed signs of acute hepatic failure but was discharged to quarters instead of being sent to the hospital.[101]

Medication Administration/Security Oversight

Medication administration, a critical part of clinical care, is abysmal at LSP, and like the general medical records, the medication administration records remain unreliable and disorganized.[102] The state of these records directly contributes to the failure of health

---

and kidney damage and whose hypertension was not treated); *id.* at 121 (Patient #30, who made sick call requests or ATU visits five times in a month without being examined by a provider, delaying the diagnosis of metastatic colon cancer); *id.* at 121-23 (Patient #17, who was incorrectly diagnosed with venous insufficiency instead of deep vein thrombosis); *id.* at 123-24 (Patient #18, who did not receive physical examination, monitoring, or a history in clinical encounters); *id.* at 124 (Patient #19, who submitted multiple health services requests related to a degenerative joint disease without a timely and appropriate evaluation); *id.* at 53-54, 65 (identifying problems in health care encounters in January 2022 in Patients #42, #49, #48, & #47); PX 1-c at 87 (noting inadequate assessments for Patient #46 in January and February 2022); *id.* at 91, 349 (noting problems in records for Patient #47 in January 2022); *id.* at 99-100 (same for Patient #48); *id.* at 106-107 (same for Patient #49); *id.* at 193 (noting problems in the MARs between December 2021 to March 2022 for Patient #39); *id.* at 194 (noting problems in the February 2022 MARs for Patient #40); *id.* at 215 (noting inadequate assessment in January 2022 for Patient #41); *id.* at 219-220 (identifying multiple issues in the records from January 2022 for Patient #42); Rec. Doc. 748, LaMarre Testimony at 155:22-160:5 (describing inadequate sick call from January 2022 for Patient #49); JX 49, p. 288.

[100] Rec. Doc. 753, Mathis Testimony at 12:10-15:3.

[101] *Id.* at 48:17-51:4

[102] PX 1-a, pp. 10-11; 38-40; 72-79; PX 2; *see, e.g.*, Rec. Doc. 748, LaMarre Testimony at 179:6-180:21 (testifying about the unreliability of the MARs in Patient #14, and how it this error was not isolated to this patient); *see also* Rec. Doc. 755 Goehring Testimony at 6:18-7:13 (describing how Dr. Johnson and the Director of Nursing continued to give Plaintiffs' medical experts the wrong information about the timing of pill call, indicating that they did not even know when pill call took place); Rec. Doc. 749, Creppel Testimony at 241:21-242:24 (describing gaps in receiving necessary medication, and issues with the correctional officers administering the medications).

care providers to adequately monitor and evaluate patients' medical regimens.[103]

Defendants admit no changes have been made to medication management, other than the reduction in the frequency of administration,[104] and they continue to improperly allow "correctional officers [to] supervise the delivery of medications by other correctional officers," as criticized by the Court in the Liability Ruling.[105]

The change in the time of medication dispensation is particularly dangerous for insulin-dependent patients, who are not receiving sufficient or timely insulin medication or testing strips to determine the amount of insulin they need.[106]

LaMarre credibly opined that the "medication management system is completely broken, from ordering the meds, to getting them to the pharmacy, to timely dispensing the meds, to administering the meds, to documenting the meds in the medication administration record."[107]

Considering the evidence submitted at trial relating to clinical care at LSP, the Court finds that the delivery of clinical care remains constitutionally inadequate. While the physical space and equipment in the treatment rooms has improved, the quality of clinic

---

[103] Rec. Doc. 748, LaMarre Testimony at 98:19-25; *see, e.g.*, Rec. Doc. 749, Vassallo Testimony at 54:4-15 (describing how Patient #55's MARs did not include the information for the provider treating him in the emergency room to know the accurate information regarding his blood pressure medication).

[104] PX 1-a at 73; *see* Rec. Doc. 748, LaMarre Testimony at 175:18-178:8 (describing how the reduced frequency results in therapeutically inappropriate time between doses, especially for insulin administration); *id.* at 178:4-8; 178:19-21 (describing the reduction in frequency of pill call as illustrative of the fact that "medication administration has been turned completely over to custody. It is a security operation with no oversight by the medical team.").

[105] Rec. Doc. 594, ¶ 99; *see also* PX 1-a, p. 72; JX 78, T. Hooper Depo. at 62:1-4; JX 69-a, R. Lavespere Depo. at 124:1-4, 20-23; *see also* Rec. Doc. 748, LaMarre Testimony at 174:16-175:17 (describing how the training for correctional officers at LSP is inadequate and how their use in pill call contravenes national standards based on the prison's size).

[106] PX 1-a at 10-11; 38-40; 72-79; *see* Rec. Doc. 594 at ¶ 33; *see, e.g.*, Rec. Doc. 747 Mischler Testimony at 49:4-50:23; 68:1-9 (describing the process for receiving his sliding-scale insulin twice a day from correctional officers and how LSP, as often as once a week, including the day prior to his testimony, does not have the test tabs for him to test his levels preventing him from knowing how much insulin to give himself); Rec. Doc. 748, LaMarre Testimony at 151:1-152:7 (testifying on how LSP does not record how much insulin patients receive twice-daily in their medical records).

[107] Rec. Doc. 748, LaMarre Testimony at 97:4-8, 115:14-19.

care provided is unchanged.  The evidence demonstrates that patients continue to be treated episodically, and medical records management and medication administration are still seriously flawed. The medical records remain a significant impairment to delivering minimally adequate clinical care.

### C. Sick Call

12.    Sick call is an integral part of clinical care. Sick call is the principal means through which a clinical healthcare encounter is triggered. The Court previously made the specific finding that LSP's sick call policy was constitutionally inadequate because it failed to provide patients with medical care by qualified providers. While the Court is encouraged by some changes made to sick call, LSP's sick call process remains a constitutionally inadequate component of clinical care.

It is undisputed that LSP made changes to its sick call policy and procedures between the liability trial[108] and the remedy trial.[109]  Pursuant to LSP's new sick call policy, effective approximately November 1, 2021, inmates who submit a sick call request received by noon Sunday through Thursday are seen by a nurse practitioner via telemedicine on the following day.[110] NP Bordelon is responsible for sick call at LSP.[111] LSP secured telemedicine equipment and acquired portable buildings so patients could be seen via telemed by nurse practitioners from their dorms or cell blocks.[112]

Bordelon described the new sick call process as follows: inmates submit routine sick call slips before noon Sunday through Thursday, and the slips are taken to the ATU

---

[108] The Liability Trial began on October 9, 2018.
[109] The Remedy Trial began on June 6, 2022.
[110] Rec. Doc. 752, Bordelon Testimony at 90; DX8-aaa; PX 44-c, p. 9, Response to ROG No. 12; Rec. Doc. 717, pp. 4-5; PX 21-ssss, LSP Directive 13.061 (Mar. 3, 2022).
[111] Rec. Doc. 752, Bordelon Testimony at 90.
[112] *Id.* at 91-92.

where a nurse or a NP performs a paper triage of the slips;[113] any sick call slip stating an urgent condition can be seen immediately.[114] The remainder are seen the next morning on Monday through Friday by a NP via telemed.[115] The NP has in their possession the sick call slip and the patient's medical record.[116] The NP also has electronic access to the patient's list of medications, lab reports, duty status, and upcoming appointments.[117] The patient is in a private room during the sick call visit,[118] and an EMT is with the patient to take vital signs and facilitate the sick call visit.[119]

While the Court is encouraged by the improvements made to the sick call process, Plaintiffs presented evidence which demonstrates that these improvements have not transformed the level of care.[120]

NCCHC standards require daily sick call triage.[121] LSP's sick call policy has complaints reviewed the next day; further, sick call requests are only reviewed five days of the week at LSP.[122] Additionally, the sick call request form provides no place for the patient to time and date their request; there is likewise no place to time and date when the request was received. Thus, there is no documentation of policy compliance, i.e., that triage actually occurs within the timeline set forth in the policy.[123]

---

[113] *Id.* at 107-108.  The ACA provides for paper triage, meaning that the nurse triages the sick call slips without a face-to-face encounter.  Rec. Doc. 755, Goehring Testimony at 72:7-13.
[114] Rec. Doc. 752, Bordelon Testimony at 108.
[115] *Id.* at 92–93, 96.
[116] *Id.* at 93, 95-96.
[117] *Id.* at 94:10-14.
[118] *Id.* at 100; *see also* Rec. Doc. 755, Goehring Testimony at 74:1-3; Rec. Doc. 757, Johnson Testimony at 131–132.
[119] Rec. Doc. 752, Bordelon Testimony at 99:13-19, 196:5-16; *see also* Rec. Doc. 757, Johnson Testimony at 131–132.
[120] PX 1-a, pp. 49-58.
[121] Rec. Doc 748, LaMarre Testimony at 156:17-157:2.
[122] *Id.*
[123] PX 1-a, p. 50; Rec. Doc 748, LaMarre Testimony at 156:17-157:2.

While LSP's sick call policy defines triage as "[t]he review or screening of offender health concerns by health care personnel to determine the priority of need and the appropriate level of intervention[,]" the triage process is not explained and triage is not noted in patient charts.[124] Additionally, patient charts are replete with examples of sick calls where vitals were not taken, physical examinations were not performed, documentation of symptoms/medical history did not occur, and patients were charged a co-pay despite receiving no examination, diagnosis, or treatment.[125]

The lack of physical examinations during sick call encounters is highly problematic. The encounters appear to be "driven and controlled by the EMT who was with the patient [rather] than by the Nurse Practitioner who should be guiding the encounter as the provider."[126] The telemedicine equipment contributes to the lack of an adequate physical exam since the camera used to assess the patients has a poor resolution quality. Defendants and Dr. Mathis acknowledged that this equipment was not always available or properly functional.[127] Additionally, performing a physical examination is beyond the skill training of an EMT. The NP should be directing the hands-on examination. As implemented, LSP's telemedicine sick call policy amounts to a band-aid on a gaping wound.

---

[124] DX 8-aaa; *see* Rec. Doc. 757, Johnson Testimony at 199:18-200:1 (admitting that the updated policy does not describe the nurse or nurse practitioners conducting a triage step); Rec. Doc. 752, Bordelon Testimony at 123:2-125:6 (testifying that there is no documentation of the "triage" on the sick call form, nor is it mentioned in the LSP directive for sick call or Defendants' interrogatory response describing the new sick call procedure); JX 71-d; Rec. Doc. 752, Bordelon Testimony at 108:9-11 (admitting that he has never found some patients that had an emergent issue when conducting the "triage" of the forms the day before); Rec. Doc 748, LaMarre Testimony at 202:16-203:1.

[125] *See* PX 1-a, pp. 52-55.

[126] *Id.* at 52.

[127] Rec. Doc. 752, Bordelon Testimony at 101:20-102:6; JX 69-a, Lavespere Depo. at 128:15-21; Rec. Doc. 753, Mathis Testimony at 75:13-16. This problem is exacerbated by the fact that EMTs do not receive training before assisting in telemedicine sick calls. JX 69-a, Lavespere Depo. at 225:7-18.

The Court agrees that:

> The use of telemedicine is a helpful adjunct option when the patient is unable to be transported, such as after clinic hours when the provider is not physically on-site, and during times such as severe weather, etc. The use of telemedicine as the only mechanism to conduct patient sick call encounters is not optimal. Given the limited optics, poor resolution, and placing the responsibility of the physical exam on an EMT is not the same as an in person patient-physician/nurse practitioner encounter. Many physical findings such as heart tones, lung sounds, abdominal examination, and close examination of many skin issues can be easily lost when done via camera. Every effort should be made to conduct the sick call encounters in person, unless extenuating circumstances place a burden on the patient to travel to the clinic location.[128]

The access to a patient's medical record during sick call is certainly an improvement; however, the evidence demonstrates that the medical records are not necessarily being reviewed during sick call, rendering this ostensible improvement meaningless.  Plaintiffs' experts observed a sick call encounter with Patient #42 where NP Bordelon did not attempt to access eMARs.  Bordelon testified that, although he reviewed the patient's medical list–which does not show whether the patient received the medications–he was unable to access the medical record via eMARs because he did not know his login.[129]

Evidence that sick call is still essentially performed by EMTs even though there is a NP on the other end of the screen went unrefuted. Patient #42, discussed previously, is one example of the persistent incompetence of the sick call process at Angola. As a matter of their discipline, EMT's are not qualified to medically manage sick call. To alleviate this scope of practice dilemma, LSP added a layer of medical oversight by a

---

[128] PX 1-a, pp. 51-52.
[129] Rec. Doc. 752, Bordelon Testimony at 128:9-129:9.  Plaintiffs claim that Bordelon does not know how to "access medical administration records" is not exactly supported by this testimony. Nevertheless, Bordelon's testimony demonstrates that there is no point to having access if providers are not using eMARs during sick call visits, whether it is because they forget their logins or for any other reason.

nurse practitioner, but the qualitative nature of the medical care is unchanged, and it is exacerbated by the physician's avoidance of clinical care.

Sick call is the most important component to the delivery of health care because it is the access point to meaningful and early diagnosis and treatment; it should minimize the risk of (or worsening of) an acute disease process becoming chronic and the attendant human and economic impacts of a worsening illness or disease. An ounce of prevention is worth a pound of cure.

### C. Specialty Care

13.    While there has been some improvement in this area, the Court finds that specialty care at LSP continues to be constitutionally inadequate in the following ways: (a) timeliness; (b) failure to schedule and track specialty appointments; (c) failure to comply with testing and diagnostic requirements; (d) failure to execute appropriate follow-up care; and (e) failure to coordinate care. The Eceptionist program utilized to schedule specialty appointments may be robust, but its use has not resolved failures in timely scheduling and tracking adherence to specialty provider orders and follow-up.

LSP provides specialty care in three ways: (a) on-site specialty clinics where specialists come to LSP, (b) telemedicine visits with specialists, and (c) off-site visits to specialists.[130]  Specialty care appointments (trips and follow-up) are scheduled and tracked by DOC headquarters using the Eceptionist program.[131]

Since 2016, LSP has added the following on-site specialty clinics: cardiology, urology, infectious disease, and dietary.[132]  Since 2016, LSP has expanded the number

---

[130] DX 35-c, p. 31.
[131] Rec. Doc. 754, Benedict Testimony at 104-105.
[132] Rec. Doc. 750, Lavespere Testimony at 164:2-10.

and scope of specialists available via telemedicine to include: neurology, infectious disease, hepatitis, ENT (ear, nose and throat), hematology and oncology, dermatology, endocrinology, and gastrointerology.[133]

By 2021, the number of specialty referrals and appointments had substantially increased since 2015/2016.[134] The amount of missed specialty appointments since 2016 has also decreased.[135] Further, since the liability trial, LSP has installed monitors in the Ash dorms to notify inmates of their appointments, replacing the previous method of inmates reviewing paper print outs to determine if they had appointments.[136]

These changes provide a framework for constitutionally adequate health care, but the evidence demonstrates that these changes have not resolved the constitutional deficiencies in the delivery of specialty care. Dr. Lavespere testified that LSP's policies and practices regarding specialty care are essentially unchanged.[137] Further, the policies in place are not necessarily followed. LSP Directive 13.001 provides: "All recommendations by non-departmental health care practitioners concerning an offender's treatment shall be reviewed by the offender's primary care provider. If the decision is made not to carry out any or all recommendations, justification **shall be** documented in the offender's medical record."[138] However, Dr. Lavespere's testimony

---

[133] *Id.* at 164:19-24.
[134] Rec. Doc. 754, Benedict Testimony at 64:9-20, 110:2-3, 154:2-4; PX 1-a, p. 83.
[135] Rec. Doc. 750, Lavespere Testimony at 173:8-12.
[136] PX1-a, p. 83.
[137] JX 69-a, Lavespere Depo. at 111:17-113:1, 122:23-123:8; *see also* Rec. Doc. 717, p. 5 (stipulating that "LSP's polices or practices have not changed regarding recommending, authorizing, and scheduling specialty health care services; getting people to appointments or making sure patients have all necessary tests, paperwork, and fasting; or ensuring that specialists' recommendations are implemented or the decision not to implement them is documented."); Rec. Doc. 750, Puisis Testimony at 28:10-16 (opining that the stipulation is consistent with Dr. Puisis' review of the depositions, interrogatory responses, and chart reviews).
[138] PX 21-t, p. 3 (emphasis added).

reveals that LSP's medical leadership is either unaware of or knowingly disregards this policy requiring documentation of such decisions.[139] Dr. Johnson admitted LSP does not track this information,[140] and Dr. Toce, LSP's current medical director, denied that it would improve care to track specialist recommendations to completion.[141]

A review of patient charts shows that specialty care remains constitutionally deficient.  And while Dr. Mathis ultimately concluded that the specialty care LSP provides meets the standard of care, even he acknowledged instances where LSP medical personnel ignored specialist's warnings, changed prescriptions without explanation, and failed to contact specialists when patients' conditions deteriorated.[142]   The following patients exemplify the persisting problems in LSP's delivery of specialty care.

<u>Patient #7</u>

Patient #7, 65 years old, had three positive fecal occult blood tests in 2019 and a history of constipation.[143]   Dr. Puisis concluded that this called for an immediate colonoscopy, but the patient's chart contains no indication that any provider considered or noted the need for a colonoscopy or that colonoscopy was discussed with the patient.[144] He was not sent to the hospital until July 2021, when it was discovered he had

---

[139]  JX 70-a, Lavespere Depo. at 44:15-45:1, 48:4-10; PX 21-t, p. 3, LSP Directive 13.001 (requiring documentation). *See also* JX 70-a, Lavespere Depo. at 43:24-44:1 ("There are certain things that we don't follow the recommendation of specialists on . . . ."); JX 69-a, Lavespere Depo. at 111:17-112:12, 122:21-123:20, 212:11-15.

[140] Rec. Doc. 757, Johnson Testimony at 198:2-10.

[141] JX 71-b, P. Toce Depo. at 54:24-55:21.

[142] Rec. Doc. 753, Mathis Testimony at 12:21-13:11 (discussing Patients #5 & 7), 103:14-18, 104:19-109:9 (discussing Patients #13 & 33).

[143] Rec. Doc. 750, Puisis Testimony at 70:16-73:25; PX 1-a, pp. 97-98; JX 7, pp. 44, 103.

[144] Rec. Doc. 750, Puisis Testimony at 71:12-24, 245:8-22; PX 1-a, pp. 97-98.

metastatic colon cancer, resulting in a fatal pulmonary embolism.[145] Dr. Puisis credibly concluded that Patient #7's death was preventable.[146]

By deposition, Dr. Toce testified that Patient #7 refused the colonoscopy.[147] Defendants admit they failed to obtain a written refusal by this patient, which Dr. Mathis agreed was below the standard of care.[148] Defendants could not refute the fact that this patient's medical record was devoid of any references to the three bloody stool tests or the need for a colonoscopy.[149] The Court finds Dr. Toce's testimony of this patient's undocumented colonoscopy refusal incredible in light of the medical records.

<u>Patient #10</u>

Patient #10 is a perfect example of LSP's failure to timely recognize his need to be referred to a neurologist. Patient #10 was sixty years old and suffering from hypertension and high blood lipids, placing him at risk for a stroke.[150] His medical records reveal that he had eight episodes of elevated blood pressure, inability to speak clearly, altered gait, and/or left-sided symptoms, and symptoms consistent with transient ischemic attacks, which can indicate stroke and require higher-level diagnostic testing.[151] His records also show that he was sporadically treated for high blood pressure but that he also presented on several occasions as possibly intoxicated or having used illicit drugs.[152] On numerous occasions, it appears that this patient's high blood pressure was blamed on illicit drug use and dismissed, without treatment. While Defendants contend Patient #10's blood

---

[145] *Id.* at 73:4-25; PX 1-a, p. 98; JX 7, p. 44.
[146] PX 1-a, p. 98.
[147] JX71-a, p. 142:8-14.
[148] DX 35-c, p. 189.
[149] JX 71-a at 142:8-14.
[150] Rec. Doc. 750, Puisis Testimony at 76:13-81:1; PX 1-a, pp. 61-63; JX 10, pp. 113, 122, 125, 172.
[151] Rec. Doc. 750, Puisis Testimony at 77:1-15, 245:23-248:20; PX 1-a, pp. 62-63.
[152] JX 10, pp. 187, 180, 176, 172, 163, 164, 154, 153, 149, 147, 144, 141, 137, 136, 129, 125, 114, 113, 120, 105, 106.

pressure "was generally controlled except when he presented with altered mental status,"[153] the records show multiple occasions of high blood pressure without any notation of an altered mental state.[154]

On another occasion, Patient #10 advised a physical therapist that he believed he had a stroke, but he was not evaluated by LSP providers or referred to a neurologist, and there is no documentation that any provider addressed this at all.[155] Patient #10 ultimately suffered a fatal stroke.[156] It is indeterminate whether the fatal stroke was due to lack of care or drug use, but the vagueness of this patient's cause of death does not change the fact that Defendants were indifferent to Patient #10's diagnosis and treatment.

<u>Patient #4</u>

Patient #4 was 63 years old and suffering from seizure disorder, renal cancer, pulmonary hypertension and interstitial lung disease, all conditions warranting pulmonology follow-up.[157] Defendants point to UMCNO records which note that, as of May 2019, this patient was "lost to follow-up" due to the COVID-19 pandemic.[158] He did not see a pulmonologist until December 2020.[159] While delays caused by the pandemic were unavoidable and not caused by LSP, about half of the delay of this patient's care occurred before the pandemic began. Further, before and after the pandemic delay, this patient presented on several occasions with oxygen levels which required hospitalization;

---

[153] Rec. Doc. 770, p. 34.

[154] *Id.* at pp. 34-35 (noting blood pressures above 140/90 with no evidence of drug use on 7/23/20, 9/4/20, 10/2/20, 12/9/20); *see also* JX 10, pp. 153, 144, 141, 129, 125 (same); *see generally* Rec. Doc. 750, Puisis Testimony, at 245:23-248:20 (responding to Defendants' analysis). As stated previously, an inmate-patient's illicit substance use is not a justification not to provide medical treatment that meets the standard of care; Defendants have not submitted any authority to the contrary.

[155] Rec. Doc. 750, Puisis Testimony at 79:14-81:1; JX 10, pp. 112, 113.

[156] PX 1-a, p. 63.

[157] Rec. Doc. 750, Puisis Testimony at 89:16-106:11; PX 1-a, pp. 89-92; JX 4.

[158] JX 04, p. 190.

[159] Rec. Doc. 750, Puisis Testimony at 89:14-90:21; PX 1-a, p. 90.

however, a pulmonologist was not consulted and the patient was not hospitalized.[160] When this patient finally did see a pulmonologist, LSP failed to provide the patient with tests the pulmonologist ordered, delayed filling prescriptions for weeks, and failed to "integrate the specialty care into the primary care of the patient."[161]

The initial failure to timely refer this patient to a specialist was exacerbated by LSP's failure to follow the specialist's orders, which failures persisted from early 2021 until his death from respiratory failure in October 2021.[162]  Patient #4 suffered an egregious lack of care that cannot be justified by a "pandemic defense."  It is evidence of deliberate indifference wholly unexplained or justified by the pandemic.

Patient #48

Patient #48, 51 years old, suffers from supraventricular tachycardia ("SVT"), other cardiac issues, and significant gastrointestinal problems.[163]  Defendants submitted evidence of sporadic treatment this patient received for his cardiac problems;[164] however, Dr. Puisis credibly opined about this patient's significant symptoms that were largely ignored.[165]

For example, this patient was noted as having seizure disorder, schizophrenia, and major depression, but his records show that he was on no medication, and no explanation was provided as to why he was not being treated for these conditions. There was also no provider evaluation.[166]  At one point, this patient was referred to a physician for an

---

[160] Rec. Doc. 750, Puisis Testimony at 95:1-24; 99:1-106:11; PX 1-a, pp. 90-92; JX 4, pp. 165, 194, 240, 272-73, 279, 292, 295, 342.
[161] Rec. Doc. 750, Puisis Testimony at 97:9-98:25; PX 1-a, pp. 90-92; JX 4, pp. 25, 172, 194.
[162] Rec. Doc. 750, Puisis Testimony at 102:15-106:11; PX 1-a, pp. 90-92; JX 4, pp. 165, 272-73, 279, 292.
[163] PX 1-a, pp. 63-65.
[164] JX 48, pp. 116, 111, 110; DX 35-c, pp. 194–195; JX 48, p. 94; DX 35-c, p. 195; JX 48, p. 49.
[165] PX 1-a, pp. 63-65.
[166] *Id.* at 63.

elevated blood pressure, but this appointment never occurred, without explanation.[167]  On August 18, 2021, an EMT sent this patient to the ATU for evaluation; no ATU evaluation ever occurred.[168]  On September 15, 2021, this patient was seen in the ATU by an EMT after he had been vomiting for three days and had not had a bowel movement in a month. These symptoms should have prompted an immediate examination by a provider.  After evaluation in the ATU, the patient was sent to the hospital emergency department.[169]

After his hospital visit, this patient was prescribed beta blockers; however, there is no record that he was consistently given this medication.   Further, this patient was referred for a cardiology work-up, but there was no cardiology referral in Eceptionist.[170] This is one of many instances that Defendants were deliberately indifferent to the need for specialty care follow-up.

Dr. Puisus ultimately credibly opined that:

[Patient #48] had persistent tachycardia diagnosed at the hospital as supraventricular tachycardia (SVT) needing cardiology evaluation. The SVT was never specifically acknowledged as a problem at the facility and there was no evidence of referral to a cardiologist. The patient also had severe constipation causing a rare disease of the colon, likely due to inattention to the patient's chronic constipation. Referral for colonoscopy was made but was significantly delayed. The results of the colonoscopy are unknown.

The episodic nature of this patient's care resulted in the patient failing to have his serious ongoing conditions (SVT, constipation, and colitis) properly or timely evaluated causing potential risk of harm to the patient and delayed diagnosis and treatment. This patient had abnormal vital signs (blood pressure or tachycardia) on seven occasions over a year which were not acknowledged by a medic or a provider and not addressed.[171]

---

[167] *Id.*
[168] *Id.*
[169] *Id.* at 64.
[170] *Id.*
[171] *Id.* at 65.

<u>Patient #1</u>[172]

Patient #1 was 55 years old with a history of smoking, hypertension, peripheral vascular disease, and high blood lipids.[173] He developed metastatic lung cancer, discovered on October 28, 2020, and "underwent intensive follow up for radiation therapy, chemotherapy, diagnostic testing, and oncology follow ups."[174]  Between February 2020 and October 2020, this patient had an unintentional weight loss of 81 pounds that went undocumented and unaddressed by LSP medical personnel.[175]  Due to this patient's age, smoking history, severe unexplained weight loss, and other symptoms like spitting up blood, he should have been more closely monitored and his cancer discovered earlier.[176]

Eceptionist proved worthless in tracking this patient's oncology appointments.  For example, it did not list all of the patient's consultation or offsite appointments; it failed to include almost all radiation and chemotherapy appointments; and it included oncology appointments but failed to document whether they occurred.  Verification that all appointments were scheduled and actually occurred could not be gleaned from Eceptionist.[177]

Further problematic, "providers at LSP [were] disengaged from monitoring th[is] patient's progress based on recommendations and findings of consultants and reports of diagnostic testing."[178]  For example, Patient #1's "complex arrangement for radiation therapy and chemotherapy" was not monitored by a LSP doctor or mid-level provider.

---

[172] The Court offers a summary of the problems in providing this patient with appropriate specialty care for his metastatic lung cancer.  A full recitation of the problems Dr. Puisis identified for this patient's treatment is found at PX 1-a, pp. 84-89.
[173] *Id.* at 84.
[174] *Id.*
[175] *Id.*
[176] *Id.*
[177] *Id.* at 84-85.
[178] *Id.* at 85.

Trip nurses managed all follow-up and clinical scheduling.  After this patient's hospital discharge with a cancer diagnosis on November 6, 2020, he was not scheduled for a provider appointment until January 8, 2021, and he developed complications during this delay.[179]

This patient's white blood cell count was life-threateningly low, and he was prescribed a medication to raise his white blood cell count.  However, the medication records fail to document if or when the patient received the medication. Furthermore, there is no evidence that the patient was seen or followed by a health care provider while being treated for the seriously low white blood cell condition."[180]   There is no record that providers were monitoring the patient's complications or that he was receiving this necessary white count medication.[181]

Further, Patient #1's medical records are devoid of evaluations for headaches and infection, and the oncologist's recommendation for a CT of the head, chest, abdomen, and pelvis was not performed in accordance with the specialist's orders.[182]

> The provider did not document that the patient had a recent oncology visit and update the therapeutic plan. The assessment was tension headache despite the known brain metastases. The provider did not check when the CT scan would be done. The provider did not evaluate the facial edema more thoroughly for SVC syndrome. The provider did not document awareness of the oncology plan which called for an earlier evaluation if problems occurred. The CT scan should have been promptly performed. A 3-month follow up was ordered and ibuprofen prescribed for the tension headache.[183]

---

[179] *Id*.
[180] *Id*.
[181] *Id*.
[182] *Id*. at 86.
[183] *Id*.

On June 21, 2021, this patient arrived for chemotherapy without recent lab testing that had been ordered but not performed; thus, this chemotherapy appointment had to be cancelled and rescheduled.[184]    Countless problems like this continued to occur throughout this patient's cancer treatment.[185]

<u>Pandemic/Natural Disasters/UMCNO Providers</u>

LSP refers its sickest inmates to UMCNO.  Defendants justify a record replete with treatment and referral delays, citing the COVID-19 pandemic and natural disasters which befell the State.[186] While the delays attributed to these events are understandable and not the fault of LSP, the record establishes that the problems identified with specialty care were evident from 2019 through March 2020, and they persisted after the pandemic and natural disaster issues subsided.[187] This is confirmed by the credible testimony of the UMCNO providers.

The improved communication LSP boasts between its medical staff and specialty providers was undermined by the testimony of the UMC doctors who testified in this case. Dr. Helen Pope, Dr. Daniel Brady, and Dr. Marcia Glass credibly testified about their experiences treating LSP patients at UMC. They each testified that patients from LSP often arrived with late-stage, undiagnosed diseases despite extended periods of symptoms;[188] they explained the difficulties obtaining follow-up appointments for patients

---

[184] *Id*.
[185] *Id*. *a*t 86-89.
[186] *See* Rec. Doc. 754, Morrison Testimony at 18-22, 26-28; DX 35-a, pp. 33–45.
[187] Rec. Doc. 750, Puisis Testimony at 25:23-26:15; Rec. Doc. 748, LaMarre Testimony at 93:4-7.
[188] *See* Rec. Doc. 751, Pope Testimony at 8:8-18, 11:16-22 ("[T]he biggest [issue] is a patient presenting later in the course of an illness than I would expect someone from the community."); *id*. at 12:3-17:5 (providing additional details); Rec. Doc. 755, Brady Testimony at 134:19-137:10 (describing patients who received delayed diagnoses); Rec. Doc. 755, Glass Testimony at 162:12-164:21 (comparing patients from LSP population with others in the community).

from LSP or ensuring that follow-up care occurs;[189] and they expressed lack of access to LSP patients' full medical records.[190]  The testimony of the UMC providers is unrebutted, and the Court finds the UMC physicians' testimony particularly persuasive and credible because they are neutral intermediaries.

### D. Emergency Care

14.    The Court previously held that LSP failed to provide constitutionally adequate emergency care in the evaluation and assessment of emergencies by qualified providers and failed to timely treat and/or transport patients to the hospital for emergency care. Although LSP has improved staffing in the ATU, the constitutional deficiencies identified by the Court persist.

Regarding SDEs, until early 2022, EMTs responded to all SDEs and made assessments, at times without input from a provider, which both Deputy Warden LPN Ashli Oliveaux ("Oliveaux") and Defendants' expert Dr. Mathis identified as practicing medicine without a license.[191] LSP contends it has remedied the SDE process and utilizes a new policy for responding to SDEs developed by Oliveaux.[192]  Under this policy, EMTs respond to SDEs solely pursuant to Individual Treatment Orders ("ITO") that are pre-

---

[189] *See* Rec. Doc. 751, Pope Testimony at 11:6-15 ("After the patient leaves the hospital, I have no assurance that appointments will be taking place."); Rec. Doc. 755, Glass Testimony at 165:21-166:7 ("We put [orders for follow up care] in our discharge orders, but we have no way of telling whether that's going to happen or not . . . [I] see patients who were referred for follow-up appointments by other doctors that did not get those appointments."), 166:8-19 (describing the impact on patient prognosis); Rec. Doc. 755, Brady Testimony at 137:22-140:6 ("Q: Is lack of follow-up is a common problem with patients from Angola? A: I think so, yes.").

[190] *See* Rec. Doc. 755, Glass Testimony at 171:11-16 ("[T]hey should have an electronic medical record that doctors like me … should be able to access easily so we have some way of knowing what's been going on with these patients."); Rec. Doc. 751, Pope Testimony at 10:24-11:5, 21:4-22:2 (describing how patients are not able to give full medical histories); Rec. Doc. 755, Brady Testimony at 140:7-141:8.

[191] Rec. Doc. 757, Oliveaux Testimony at 63:11-16; Rec. Doc. 752, Mathis Testimony at 194:11-17.

[192] Rec. Doc. 757, Oliveaux Testimony at 64-65.

approved by medical providers.[193]  If a SDE is not covered by an ITO, the EMT must call a NP or take the patient to the ATU for further assessment.[194]

Plaintiffs point out that LSP's EMT Director, Darren Cashio ("Cashio") testified that this "new" policy is simply "trying to streamline" the SDE process and "doesn't change, really, the process," except EMTs may now contact a provider via FaceTime rather than by phone.[195]

Dr. Vassallo was critical of this purportedly new policy, concluding that it made "really no difference" to the quality of emergency care.[196]  As to ITOs, Dr. Vassallo pointed out that they are not specific to an individual patient,[197] and they still require EMTs to make diagnoses, which is outside their scope of practice.[198]  Dr. Mathis agreed that "some of the ITOs need to be reworked."[199]

Defendants are correct that the ATU is not an emergency room ("ER"); however, the ATU must be sufficiently staffed with providers capable of properly assessing emergent situations for which transport to an ER may be warranted, and emergency transport should not be delayed.

LSP has improved staffing in the ATU by having a RN and an EMT present twenty-four hours a day, seven days a week.[200]  A NP is now present in the ATU from 7:30 am until 4:00 pm Monday through Friday and 24 hours a day from Friday night through

---

[193] *Id.*
[194] DX 50.
[195] PX 79, Cashio Depo at 8:13-9:9, 10:4-11:2, 12:7-14:21.
[196] Rec. Doc. 749, Vassallo at 86:9-11, 87:1-6, 88:14-89:21.
[197] *Id.* at 84:23-85:4, 87:1-19.
[198] *Id.* at 87:20-88:21.
[199] Rec. Doc. 753, Mathis Testimony at 64:12-15.
[200] Rec. Doc. 752, Park Testimony at 11-12; Rec. Doc. 757, Johnson Testimony at 139-141.

Monday morning.[201] A NP is on call and stationed on the prison grounds to address any ATU patients in the evenings Monday through Thursday.[202]

The Parties' experts performed chart reviews of the same 60 patients in evaluating emergency care at LSP.[203]   Defendants urge the Court to credit the opinions of their medical experts, Dr. Mathis and McMunn, over Plaintiffs' expert, Dr. Susi Vassallo, in considering whether the deficiencies in emergency care have been remedied.[204] Defendants claim that, because Dr. Vassallo has never worked in a correctional setting, she applied the inapplicable "community standard of care," consistent with her own Level I Trauma practice, rather than the lesser standard of care applicable to correctional settings; thus, her opinions are flawed.[205] The Court disagrees.

First, this Court has already found Dr. Vassallo's opinion highly credible in the liability portion of this case.[206] Second, the Fifth Circuit and a number of courts within the Fifth Circuit have accepted Dr. Vassallo's expertise in medical care in prison systems.[207] Finally, there is no evidence in the current record that Dr. Vassallo applied "community standards of care" when performing chart reviews for the remedy phase trial.[208] The Court

---

[201] Rec. Doc. 752, Park Testimony at 12-23; Rec. Doc. 757, Johnson Testimony at 139-140. Park explained that she could also be in the nursing unit or doing paperwork, both of which are seconds away from the ATU.  Rec. Dc. 752, Park Testimony at 12.

[202] Rec. Doc. 752, Park Testimony at 13; Rec. Doc. 757, Johnson Testimony at 139-140.

[203] Rec. Doc. 770, pp. 29, 38, 42.

[204] *Id.*

[205] *Id.*

[206] Rec. Doc. 594, p. 7.

[207] *See Yates v. Collier*, 868 F.3d 354, 363-64 (5th Cir. 2017)("Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony. *See Ball*, 792 F.3d at 593–94; *Gates*, 376 F.3d at 339–40)); *see also Cole v. Collier*, 2017 WL 3049540, \*9 (S.D. Tex. 2017); *Cole v. Livingston*, 2016 WL 3258345, \*3 (S.D. Tex. 2016); *McCollum v. Livingston*, 2017 WL 608665, \*22 (S.D. Tex. 2017).

[208] Defendants' reliance on *Gumns v. Edwards*, No. 20-231, 2020 WL 2510248 at \* 11 (M.D. La. May 15, 2020) is inapplicable here. In *Gumns*, a case challenging LSP's emergency response to the COVID-19 pandemic, the Court noted that Dr. Vassallo's testimony that certain care was "medically unreasonable," was not evidence of deliberate indifference.  Defendants point to no similar testimony in the present case.

finds that Dr. Vassallo credibly concluded that the emergency care provided by LSP remains constitutionally deficient as a review of the patient charts discussed below demonstrates.

Patient #38

Patient #38 was 58 years old and suffered from diabetes, hypertension, COPD, and had an artificial heart valve.[209] In preparation for cataract removal,[210] he was admitted to the nursing unit to transition from his regular anticoagulant to a shorter-acting anticoagulant drug to address the increased risk of blood clots due to his artificial heart valve.[211]  Uncoagulated patients with an artificial heart valve are at significant risk for serious infection.[212]

While in the nursing unit, this patient developed wheezing, a fever, and an elevated respiratory rate, suggesting a potentially life-threatening infection.[213]  LSP medical staff responded by placing this patient in a locked isolation room and prescribed him Tylenol and an anti-viral drug.[214] This patient's symptoms quickly worsened over the next three days when he developed bloody sputum, which is cause for concern in an anticoagulated patient, and his oxygen saturation rates declined to abnormal levels.[215]

On his third day in the nursing unit, this patient's lab results indicated signs of sepsis, kidney failure, and bacterial infection.[216] Recounting the evidence in the medical

---

[209] PX 1-a, pp. 115-16; JX 38.

[210] JX 38, p. 54. Dr. Vassallo erroneously stated that this patient was preparing for a dental procedure rather than cataract surgery.  Rec. Doc. 749, Vassallo Testimony at 152. This error has no impact on the deliberate indifference displayed by LSP to this patient's need for emergency care.

[211] Rec. Doc. 749, Vassallo Testimony at 23.

[212] *Id.*

[213] *Id.* at 23-24; JX 38, p. 94.

[214] *Id.* at 24-25; PX 1-a, p. 115.

[215] *Id.* at 25:8-26:16; PX 1-a, p. 115; JX 38, pp. 71, 86, 90.

[216] *Id.* at 26:21-28:13; PX 1-a, p. 115; JX 38, pp. 22-23.

records, Dr. Vassallo testified that, at 6:20 am, "the patient's blood pressure was 65/40 mm Hg and the oxygen saturation was 79%. This was reported to Dr. Toce, but there is no record of Dr. Toce conducting any assessment or providing any care. The patient's blood pressure and oxygen saturation were both extremely low, indicating that the patient was in shock and should have been sent to a hospital. Instead, he received no care."[217]

At 7:20 am, the patient was found on the floor of his isolation room; CPR was started, and he was transferred to the ATU where resuscitation efforts continued.  An ambulance was called at 8 am.  As the patient continued to struggle in the ambulance, the destination was diverted from Our Lady of the Lake Hospital ("OLOL") in Baton Rouge, Louisiana to the West Feliciana Hospital just minutes from Angola.[218]  Patient #38 was later pronounced dead at the hospital after he suffered a fatal cardiorespiratory arrest secondary to pneumonia.[219]

Shockingly, Dr. Mathis concluded that the care provided to this patient met the constitutional standard of care.[220]  Dr. Mathis testified that the patient's bloody sputum was "not a danger signal" in a patient with COPD,[221] and he found the patient's labs to be "nonsignificant."[222]  Further, based on the patient's white blood cell count, Dr. Mathis found it reasonable for the LSP provider to treat the patient for the flu rather than pneumonia.[223]  Defendants maintain this patient's chart shows a simple difference in medical opinions rather than deliberate indifference.  The Court finds Dr. Mathis' opinions uncredible.

---

[217] PX 1-a, p. 115.
[218] *Id.*
[219] Rec. Doc. 749, Vassallo Testimony at 30:16-31:19; JX 38, p. 82.
[220] Rec. Doc. 752, Mathis Testimony at 227:6-8.
[221] *Id.* at 225:5-8.
[222] *Id.* at 225:15-16.
[223] *Id.* at 225:23-226:2, 226:16-22.

The failure to order an x-ray or the failure to prescribe antibiotics could possibly be argued to reflect what Dr. Mathis calls a difference of medical opinion as to the appropriate diagnostics, care, or treatment. But the failure to have a health care provider examine this patient to substantiate a proper course of action is not mere neglect, it is callous disregard.[224] Dr. Vassallo credibly concluded that "[t]his was an egregious example of delayed care, and this lack of care caused this patient's death."[225]

The Court is dumbfounded to understand how treating these symptoms as flu can be justified without so much as a physical examination.  No health care provider saw this seriously ill patient in the days preceding his death.  The failure to see and examine this patient constitutes deliberate indifference at best and more aptly, callous disregard.

<u>Patient #35</u>

Patient #35 was 56 years old and presented to the ATU with a temperature of 103.2 degrees and confusion.[226]  Dr. Vassallo opined that this was an emergent situation indicating a brain infection or severe urinary tract infection.[227]  Instead of treating this situation like an emergency, ATU staff transferred this patient to the nursing unit for observation.[228]  Although this patient presented to the ATU on a Saturday when a NP was available, nothing was done for this patient until the following Monday.[229]

Dr. Mathis agreed that this patient should have been transferred to the infirmary, and LSP's treatment for this patient was below the standard of care.[230]  When the patient

---

[224] PX 1-a, p. 116.
[225] *Id.*
[226] *Id.* at 118; JX 35, p. 121.
[227] Rec. Doc. 749, Vassallo Testimony at 35:6-16.
[228] *Id.* at 33:24-25; JX 35, p. 121.
[229] *Id.* at 33:14-34:13.
[230] Rec. Doc. 753, Mathis Testimony at 13:12-15.

finally got to a hospital, he was diagnosed with meningitis.[231]   Without citation to any evidence, LSP claims the medical provider that handled this situation with Patient #35 is no longer with LSP.  Contrary to its own expert, LSP further claims this incident does not constitute deliberate indifference. The Court disagrees.

Patient #35 was a "high-risk patient with an aortic valve replacement, a high fever, and an altered mental state."[232]   The delay in treating this patient with emergent care demonstrates deliberate indifference.

<u>Patient #36</u>

Patient #36 was 65 years old with a history of chronic obstructive pulmonary disease ("COPD"), which had previously required hospitalization.[233]  He presented to the ATU gasping, with a significantly elevated respiratory rate and blood pressure, and complaining of shortness of breath for two days.[234]  ATU staff appropriately treated him with a nebulizer and monitoring; however, his conditioned worsened over the next two hours.[235]  The patient did not see a provider in the ATU for over two hours; by the time he was seen, he was unstable and in respiratory distress with poor oxygen levels.[236]  He was prescribed a Beta blocker, which increased his respiratory distress.[237]  Instead of sending this patient to the hospital, he was sent to the nursing unit where he died from a heart attack within 30 minutes.[238]

---

[231] Rec. Doc. 749, Vassallo Testimony at 35:1-25; JX 35 at 111.
[232] PX 1-a, p. 118.
[233] Rec. Doc. 749, Vassallo Testimony at 36:1-41:21; PX 1-a, p. 116; JX 36, pp. 106-07.
[234] *Id.* at 36:1-21; PX 1-a, p. 116; JX 36, p. 106.
[235] *Id.* at 36:22-41:21; PX 1-a, p. 116; JX 36, p. 106.
[236] *Id.*
[237] Rec. Doc. 749, Vassallo Testimony at 39:19-40:13; JX 36, p. 106.
[238] *Id.* at 40:13-41:21; PX 1-a, p. 116; JX 36, pp. 106-07.

Again, Defendants chalk this incident up to a difference in medical opinions.[239] Dr. Mathis testified that it was advantageous to send this patient to the nursing unit because it is "a place to hold somebody where you don't think they really need to be admitted but they need to be at a higher level of care as possible rather than in their housing unit."[240] Given the speed with which this patient expired, Dr. Vassullo's opinion that this patient should have received emergency care after the nebulizer treatment failed is more credible than that of Dr. Mathis.

The Court finds that Patient #38's treatment was below the constitutional standard of care. The patient was treated in the ATU.  The patient worsened despite the treatment. He was not monitored in the ATU as his condition deteriorated and then, in this deteriorating state, with a history of ineffective treatment, he was stepped down to the nursing unit where he died within (30) minutes.   The care of this patient constitutes deliberate indifference to his history of failed treatment and a worsening condition.

<u>Patient #29</u>

Patient #29 was 28 years old and housed in a segregation unit.[241]  The records for this patient showed that he made repeated sick calls but was never given a physical exam or assessed by a provider.[242]  On March 27, 2020, he made a SDE request complaining of stomach and back pain.[243]  The patient was evaluated by an EMT at 6:40 am and charged $6.00 with no indication of any treatment.[244]  That afternoon, approximately eight hours later, the patient was found collapsed on the floor, foaming at the mouth, with a

---

[239] Rec. Doc. 770, p. 42.
[240] Rec. Doc. 752, Puisis Testimony at 235:9-13.
[241] Rec. Doc. 749, Vassallo Testimony at 41:23-47:18; PX 1-a, p. 120; JX 29, p. 39.
[242] PX 1-a, p. 120.
[243] *Id.*
[244] *Id.*

temperature of 108.2 degrees.[245]    Dr. Vassallo testified this was "obviously a heat stroke."[246] No attempt was made to cool the patient with ice.  Instead, he was catheterized in an apparent attempt at urine toxicology in the ATU. He died in the ATU at 2:34pm.[247]

Defendants do not address the eight hours between the patient's self-declared emergency and his demise. They do not explain why this patient was given no physical exam and did not see a provider.  Rather, Defendants ostensibly suggest illicit drug use, arguing that the patient's SDE form contains a note, pictured below, that there was a "burning aroma in his cell."[248]  Dr. Vassallo interprets this note as saying "bouncing around in cell."[249]

Per security pt buncing aroma in cell

Neither the observing security officer nor the nurse who made the note testified to this matter.  In any event, treatment of this patient should not have been dismissed based on an assumption of drug use.

Relying on Dr. Mathis' opinion, Defendants maintain that, by the time EMTs arrived in the patient's cell, he "was essentially a dead man at that time."[250]  Thus, there was no reason to administer ice to this patient because "there was nothing that could be done."[251] The Court disagrees.  The failure to administer ice in an attempt to save a 28-year-old's life is the least of the failures.  The fact that the persistent complaints of a 28-year-old went unanswered constitutes deliberate indifference.  Moreover, the cavalier response

---

[245] *Id.*
[246] Rec. Doc. 749, Vassallo Testimony at 43:10.
[247] PX 1-a, p. 120.
[248] JX 29, p. 37.
[249] Rec. Doc. 749, Vassallo Testimony at 43:8.
[250] Rec. Doc. 770, p. 44; Rec. Doc. 752, Mathis Testimony at 227-228.
[251] Rec. Doc. 770, p. 49.

that this patient "was a dead man" is evidence of apathy and further evidence of an attitude of general indifference. Sadly, Patient #29 is yet another example of LSP medical staff dismissing a SDE.

Patient #25

Patient #25 was 52 years old suffering with aortic stenosis who, after a fainting episode, went into cardiac arrest, causing him to fall and hit his head.[252]  Security staff failed to use the automatic external defibrillator ("AED"), which the EMT noted on the ambulance run report.[253] When the EMTs arrived, they applied the AED and began CPR; however, six to ten minutes had passed without defibrillation, and this patient died.[254] Although Dr. Mathis declined to agree that a minimum four minute response was required to meet the standard of care,[255] he was presented with both LSP policy and American Correctional Association ("ACA") standards, ***mandating*** a four-minute response to such an event.[256] The ACA standards state: "(MANDATORY) All health care staff in the facility are trained in the implementation of the facility's emergency plans. Health care staff are included in facility's emergency drills, as applicable."[257]  Likewise, LSP Directive 13.007 requires that "All employees of Louisiana State Penitentiary shall be trained to respond to health-related situations within a four-minute response time."[258]

Dr. Vassallo credibly concluded that this patient's death was preventable had AED been applied within four minutes, as required by LSP and the ACA. Defendants offered

---

[252] Rec. Doc. 749, Vassallo Testimony at 47:20-50:20; PX 1-a, pp. 120-21; JX 25, pp. 31-34.
[253] Rec. Doc. 749, Vassallo Testimony at 50:21-52:8 ("It's very unusual to write when something was not done that should have been done, so somebody was a little mad about it."); PX 1-a, p. 120; JX 25, p. 31.
[254] Rec. Doc. 749, Vassallo Testimony at 50:21-51:20, 113:9-16.
[255] Rec. Doc. 753, Mathis Testimony at 60:1-61:17.
[256] *See* DX 11, p. 29; PX 21-y, p. 2.  LSP contends the ACA standards are the relevant national standards as opposed to the more rigorous NCCHC standards advocated by Plaintiffs.
[257] *Id.*
[258] PX 21-y, p. 2.

no response to the failure to administer the AED within four minutes. The emergency response to Patient #25 was below the standard of care and evidence of deliberate indifference.  LSP's cavalier dismissal of a four-minute response time mandated by its own policy underscores a pervasive ethic of indifference and callous disregard.

<u>Patient #55</u>

Patient #55 is 54 years old and suffers from a history of strokes who, on February 3, 2021, presented to the ATU with hypertension.  The assessment was noncompliance with medications.[259]   On February 4, 2021, an ambulance was called to this patient's housing unit because he "just started drooling and slumped to the side."[260]  Dr. Vassallo testified that these symptoms are indicative of stroke.[261]  Although he should have been taken to a hospital, he was not even examined by a provider; rather, he was kept in the ATU for four hours with only telephone orders from Dr. Lavespere.  He was discharged to his room although his status was unchanged.[262]  The patient was sent to West Feliciana Hospital the next morning for a CT scan, some 17 hours after symptom onset, by which time he was unable to walk and was having focal seizures.[263]  Dr. Vassallo explained that sending this patient to West Feliciana Hospital for a CT scan was below the standard of care because this test cannot exclude an ischemic stroke.[264] The hospital radiologist advised LSP that this patient needed an MRI, but he was never referred for one, and there is no record that any follow-up of this patient ever took place.[265]

---

[259] PX 1-a, p. 113.
[260] *Id.*; JX 55, p. 63.
[261] Rec. Doc. 749, Vassallo Testimony at 58:24-25.
[262] *Id.* at 59:1-60:11; PX 1-a, p. 113; JX 55, p. 64.
[263] *Id.* at 60:16-61:21; PX 1-a, p. 113; JX 55, pp. 57, 61.
[264] *Id.* at 62:2-21; PX 1-a, p. 113; JX 55, p. 60.
[265] *Id.* at 63:15-64:15; 67:8-68:15; PX 1-a, p. 113; JX 55, pp. 56, 59.

On March 17, 2021, this patient presented with an inability to walk and urinary incontinence.[266] Despite these symptoms, NP Bordelon erroneously noted that there were no "signs and symptoms of a new stroke."[267]  Rather than refer this patient for an MRI, Bordelon issued a telephone order and sent him back to his quarters with instructions for a follow-up appointment.[268]

On April 26, 2021, an ambulance was called for this patient after he presented with slurred speech and a numb mouth.[269]  The patient was taken to the ATU and, based on suspicion of a stroke, he was sent to OLOL about an hour later.[270]  At the hospital, it was determined that this patient was a level one stroke alert, and his MRI showed an acute stroke; the patient was ultimately left "with a devastating inability to speak properly" and "dysphasia, difficulty swallowing."[271]

McMunn determined that the response treatment for this patient's symptoms met the standard of care.[272]  However, there is no explanation by Defendants why the radiologist's recommendation for an MRI was not followed.  Defendants claim that the CT scan performed at West Feliciana Hospital indicated "no acute intracranial abnormality,"[273] but they ignore that LSP was told that a CT was diagnostically useless for an ischemic stroke.  McMunn admitted he was not qualified to opine on this issue:

> Q      Let me go back to the CT scan. There was some criticism by Dr. Vassallo -- JX_55.0060 -- that this should have been a different type of CT scan.  All right? Do you have any opinions on that?

---

[266] PX 1-a, p. 113; JX 55, p. 54.
[267] Rec. Doc. 749, Vassallo Testimony at 64:16-67:7; PX 1-a, p. 113; JX 55, p. 54.
[268] *Id.* at 64:16-67:7; PX 1-a, p. 113; JX 55, p. 54.
[269] JX 55, p. 450.
[270] PX 1-a, p. 113.
[271] Rec. Doc. 749, Vassallo Testimony at 68:19-70:5; PX 1-a, pp. 113-14; JX 55, p. 450.
[272] Rec. Doc. 756, McMunn Testimony at 64; DX 35-b, p. 99.
[273] JX 55, p. 60.

A        I -- I'd say as a non-neurologist that I probably shouldn't have an opinion one way or the other, other than he ordered what he felt like was helpful.[274]

Dr. Vassallo's opinion regarding Patient #55 was not credibly rebutted.  Moreover, it is not as simple as whether Patient #55 was timely transported to the hospital on April 26, 2021; rather, the question is whether LSP appropriately responded to multiple presentations of stroke symptoms by this patient.  Bordelon's note of "no new signs or symptoms of a stroke," when this patient presented with an inability to walk and urinary incontinence, was egregious.  Dr. Vassallo credibly concluded that "the provider either did not examine the patient or doesn't know anything about how to recognize a stroke. That's absurd."[275]  The emergency response to this patient was below the constitutional standard of care and evidence of deliberate indifference.

<u>Patient #6</u>

Patient #6 was 50 years old at the time of his death on May 3, 2021.[276]  In the last two weeks of his life, he made at least seven separate requests for medical attention for escalating back pain, yet no provider ever examined his back.[277] By his last request, he was incontinent and unable to get out of bed, which Dr. Mathis acknowledged could be a red-flag for cord compression, requiring evaluation by a doctor.[278]  On five occasions during his last two weeks, providers ordered no transport to the ATU and declined to see him.[279]  Plaintiffs' experts credibly concluded that Patient #6 "should have been

---

[274] Rec. Doc. 756, McMunn Testimony at 64:15-22.
[275] Rec. Doc. 749, Vassallo Testimony at 151:13-15.
[276] PX 1-a, pp. 60-61; Rec. Doc. 753, Mathis Testimony at 35:4-47:16; JX 6.
[277] PX 1-a, pp. 60-61; Rec. Doc. 753, Mathis Testimony at 35:18-44:18; JX 6, pp. 35-37, 54-59, 61.
[278] Rec. Doc. 753, Mathis Testimony at 34:6-12.
[279] PX 1-a, pp. 60-61; Rec. Doc. 753, Mathis Testimony at 35:18-44:18; JX 6, pp. 35-37, 54-59, 61.

transported to a hospital or had immediate higher-level imaging studies . . . Instead, the patient was managed by medics and treated indifferently by providers."[280]

On May 3, 2021, at 5:11 pm, medics evaluated the patient as he was unable to get up and had urinated on himself.[281]  The patient did not have wheelchair access to a shower, so he was lying on a mattress near the shower; when medics moved him, he yelled out in pain.[282]  At this point, a doctor was called in to see the patient, and he prescribed a pain injection and steroids.[283]  At 7:43 pm, the patient was found unresponsive and moved to the ATU, where he was pronounced dead at 8:25 pm.[284]

The patient's autopsy showed that his cause of death was a large liver abscess with bloodstream spread of the infection to the spinal cord which resulted in cord compression.[285]  Dr. Mathis concluded that LSP was not at fault for this patient's death because he had recently resumed self-cutting.[286]

Plaintiffs' experts concluded that:

Care of this patient was incompetent and indifferent to his serious medical needs. The patient had escalating symptoms all of which should have included provider evaluation and imaging. Symptoms progressed to red-flag symptoms by 4/27/21 or 4/30/21 and the patient should have been transported to a hospital or had immediate higher-level imaging studies as these studies were unavailable onsite … The infection could have been recognized earlier with higher-level diagnostic testing and his death may have been prevented with earlier treatment.[287]

Dr. Toce's caustic response to this patient's care highlights the underlying indifference to all patients' medical needs at LSP.  He testified in a deposition that: "you

---

[280] PX 1-a, p. 61.
[281] *Id.*
[282] *Id.*
[283] *Id.*
[284] *Id.*
[285] *Id.*
[286] Rec. Doc. 753, Mathis Testimony at 45:9-13.
[287] PX 1-a, p. 61 (quoting JX 71-b, Paul Toce Dep. at 23).

know, this is entirely consistent with manipulative behavior that we see so frequently."[288] Later, he added, "but with this ongoing picture and him unable to really get to the bathroom, I'm concerned that it's a bit more serious. Might need to take lab or x-rays or something on him."[289]

The care and treatment provided to Patient #6 was woefully deficient, and Dr. Toce's testimony demonstrates a callous disregard of medical symptoms. The predisposition to attribute serious medical conditions to malingering or manipulation is unacceptable, and the Court finds that the lack of emergency care provided to this patient fell far below the constitutional standard of care.

### E. Infirmary/Inpatient Care

15.    The Court previously held that infirmary and inpatient care at LSP was below the constitutional standard of care because LSP failed to provide adequate, qualified staff in infirmary/inpatient care.[290] The evidence at the remedy trial established that an appropriate number of qualified, adequate staff remains lacking in the infirmary, and inmate orderlies are still utilized to provide care beyond the scope of the medically accepted use of orderlies.

LSP claims to have increased the ratio of nurses to patients in the nursing units with one registered nurse for every ten patients in acute care (NU1) and one registered nurse for every 15 patients in long-term care (NU2);[291] Dr. Lavespere testified in March 2022 that this ratio "depends on the census" and "there's a very strong effort" to achieve

---

[288] *Id.*
[289] *Id.*
[290] Rec. Doc. 594, p. 120.
[291] Rec. Doc. 752, Park Testimony at 22:16-21; Rec. Doc. 757, Johnson Testimony at 147, 150-51.

these ratios."[292]  Dr. Toce testified of these staffing ratios, "Look, that's a goal okay.  That change is how we would really like to run the units, and most of the time, we can put that together. It does happen like that. It is still a bit of a struggle, because people call-in last-minute sick, and people get sick, and I think we still have an issue with understaffing."[293] While the Court commends efforts to improve staffing levels, the evidence discussed below shows that constitutional inadequacies in infirmary care persist.

LSP presented evidence that it addressed the issue of patients being in locked rooms by installing a red call light outside the door of these rooms with an activation switch located at the patient's bedside.[294] Paralyzed patients are still inexplicably placed in locked rooms, but now appear to be positioned within reach of the call light switch.[295] Evidence shows that the nursing units are clean and not in disarray.[296]  NP Cynthia Park ("Park") testified that she rounds in NU1 on Friday and Saturday mornings, and she rounds in NU2 every other Saturday morning.[297]

Despite the call lights installed outside of locked rooms, evidence shows that patients continue to be outside of sight or sound of nurses due to the positioning of nurses and black coverings over windows.[298]  In NU2, lockers placed in the open bay area block the line of sight between patients and the nursing station, and patients in the open bay

---

[292] JX 69-a, Lavespere Depo. at 141:12-25.
[293] JX 71-a, Toce Depo at 86:5-12.
[294] Rec. Doc. 752, Park Testimony at 21-25; Rec. Doc. 756, McMunn Testimony at 26; DX 46, pp. 173, 175; DX 46, p. 130.
[295] Rec. Doc. 752, Park Testimony at 24.
[296] DX 35-c, pp. 34–44.
[297] Rec. Doc. 752, Park Testimony at 10-11.
[298] PX 1-a, p. 100: "The nursing station in Nursing Unit 1 has black coverings over the windows prohibiting nursing staff from visualizing the patients without standing up. Although there are call light mounted above the locked cells, patients in open bay area cannot be seen by the staff when they are sitting, nor do they have a call light to summon the nurse."  Additionally, "[i]nmates reported that a few days before the team toured the facility on April 6-8, 2022, the paper was removed, and it was placed back up after the tour of the facility concluded."  *Id.* Plaintiffs' experts detailed specific examples of this problem.  *Id.* at 101.

area have no way to summon a nurse.  Patients in this area reported they must get the attention of an orderly and ask for a nurse.[299]

During the three days Plaintiffs' experts toured LSP, multiple team members observed NU1 and NU2 on multiple occasions, and they reported that they never observed a nurse rounding patients even though infirmary nurses document that rounds are done every two hours, whether the patient is sleeping or awake.[300] Multiple inmates reported to Plaintiffs' expert team that nurses remained seated in the nurses' station and relied on inmate orderlies to provide care.[301]

No "head-to-toe" physical assessment of a patient by nursing staff, as required by LSP policies, was observed during this tour. Nurses were primarily observed sitting in the nurses' station or administering medications.[302]  Infirmary forms are inadequate as they fail to provide a space for date and time, and vital sign flowsheets do not allow for documentation of the time vitals were taken.[303]  "Pre-printed nursing care plans are not specific to correctional health care space and include interventions more in line with community nursing, *e.g.*, contact the home health nurse."[304]

Additionally, the LSP infirmary fails to provide adequate equipment and supplies for effective patient care.  Plaintiffs' experts observed several instances where patients were not timely provided crutches, walkers, or bedside commodes until after patient injury had occurred.[305]  A particularly cruel and egregious example of this problem involves

---

[299] *Id.*
[300] PX 1-a, p. 104.
[301] *Id.*
[302] *Id.* at 106.
[303] *Id.* at 107.
[304] *Id.*
[305] *Id.*

Patient #50, a 35-year-old paraplegic who requires a catheter to empty his bladder.[306]  He was forced to reuse single-use catheters for weeks at a time, leading to repeated urinary tract infections.[307]  This patient reported to Goehring that he sought more catheters from Nurse Parks, but she advised him they were not budgeted to use clean catheters each time so he must re-use.[308]  Goehring credibly concluded that "[r]euse of single use medical supplies is dangerous and does not meet minimal standards of care."[309]

Inmate Orderlies

While LSP maintains its inmate orderly program is improved, evidence demonstrates that "[o]rderlies are utilized the same today as they were at the close of liability discovery."[310] Currently, LSP utilizes three to four inmate orderlies on every shift in the infirmary.[311]  LSP claims these orderlies assist patients with activities of daily living like handing out food trays, feeding patients who cannot feed themselves, cleaning incontinent patients, turning patients to prevent skin breakdown, and bathing patients.[312]  NP Parks testified that inmate orderlies do not perform wound care, dispense medications, or administer insulin.[313]

Nurse Jennifer Stickells ("Stickells") is responsible for training inmate orderlies.[314] She testified that inmate orderlies are supervised by both security staff and nurses; Park testified that nurses monitor orderlies and guide and direct them as necessary.[315]

---

[306] Rec. Doc. 755, Goehring Testimony at 42:19-52:9; PX 1-a, pp. 102, 104-06; JX 50.
[307] Rec. Doc. 755, Goehring Testimony at 51:6-22; PX 1-c, p. 320; PX 1-a, p.106.
[308] Rec. Doc. 755, Goehring Testimony at 52:4-9.
[309] PX 1-a, p. 106.
[310] PX 44-d at 04, Response to ROG No. 16.
[311] Rec. Doc. 752, Park Testimony at 23:2.
[312] Rec. Doc. 752, Park Testimony at 26-28, 110, 187; Rec. Doc. 756, McMunn Testimony at 29:12-14.
[313] Rec. Doc. 752, Park Testimony at 29-30, 110.
[314] Rec. Doc. 757, Stickells Testimony at 20.
[315] *Id.* at 29:20-22; Rec. Doc. 752, Park Testimony at 29.

Candidates for the inmate orderly job are screened for disciplinary issues and vetted for eligibility.[316]  The training of inmate orderlies has increased since 2019, and Stickells testified that this training takes place over five days, and the orderlies are given lectures on ethics, neglect, abuse, transfer of patients, body mechanics, and communication with patients.[317]  The final day of training involves hands-on training where Stickells brings orderlies into the nursing unit and works with them throughout the day.[318]  Stickells makes rounds to ensures that the orderlies are following the training.[319]

At first glance, this training procedure appears robust; however, Defendants' own witnesses testified that LSP's training practices have not changed since the liability phase and acknowledged that this training had not occurred for at least three years, until right before trial.[320]  The following evidence reflects the inadequacy of orderly training.

Trial evidence demonstrates that inmate orderlies continue to perform tasks outside the scope of their appropriate use.  Defendants' own inmate orderly witnesses testified to this. Bruce Hines testified that, although he has worked as a health care orderly for the past three years, he completed his first training class at LSP "three or four" days before he was deposed on March 30, 2022, mere weeks before the discovery cutoff.[321] He testified that the orderlies "are the ones that are going to be more hands-on than the nurses[,]" and "it seems like I'm doing their job as well."[322] He also testified that nurses often fail to follow up with patients he has flagged as having an issue, like a bloody

---

[316] Rec. Doc. 752, Park Testimony at 29.
[317] *Id.* at 23; DX, p. 47.
[318] *Id.* at 23-24, 27.
[319] *Id.* at 27.
[320] JX 72-a, Falgout Depo. at 24:9-12; Rec. Doc. 757, Stickells Testimony at 41:22-42:24, 43:14-17.
[321] JX 75-a, Hines Depo. at 6:10-11, 7:24-9:12, 34:25-35:4. Jennifer Stickells admitted that she had orderlies working that did not have proof of their certification. Rec. Doc. 757, Stickells Testimony at 44:9-12.
[322] JX 75-a, Hines Depo. at 10:9-11:2, 18:2-10.

stool.[323]  Similarly, Donald Murray testified that the orderlies "fill the gaps in" for the nurses and are very important because "by it being a shortage of nurses, they couldn't do all that work that needs to be done."[324]

Further, Plaintiffs' experts observed inmate orderlies in the infirmary provide direct patient care, including routinely performing wound care, handling patient lab reports, and taking x-rays.[325]  Orderlies were also observed emptying catheters, clearing catheter supplies, and changing oxygen tanks.[326]  Patient #50 and Patient #67 reported that inmate orderlies sometimes performed wound care: Patient #50 stated that he prefers the orderlies do it because he believes they do it better than nurses.[327] As the Court held previously, inmate orderlies can assist with activities of daily living, but the evidence shows far more being handled by orderlies than appropriate under either NCCHC or ACA standards.  In many instances, the orderlies are performing tasks that should only be performed by medical staff.[328]

The most egregious example of both substandard infirmary care and inmate orderlies providing direct medical care to patients is Patient #22. Patient # 22 was 60 years old and suffered with left-sided weakness due to a traumatic brain injury.[329]  After being assaulted by a cellmate in May 2020, this patient suffered head and leg injuries that affected his ability to walk and eat; his ankle was surgically repaired, and a hospital

---

[323] *Id.* at 33:14-34:11.
[324] JX 76-a, Murray Depo. at 5:18-21, 17:14-22, 23:23-25.
[325] PX 1-a, pp. 11-12, 101-04; PX 1-d, p. 19; Rec. Doc. 751, Goehring Testimony at 75:7-76:7; Rec. Doc. 755, Goehring Testimony at 58:24-59:6, 62:13-63:21; Rec. Doc 748, LaMarre Testimony at 176:17-177:1; *see also* Rec. Doc. 594, p. 90.
[326] PX 1-a, p. 101.
[327] *Id.* at 102.
[328] *See generally* PX 1-a, pp. 100-104.
[329] Rec. Doc. 755, Goehring Testimony at 26:16-42:18; PX 1-a, pp. 11, 103; PX 1-c, pp. 258-286; JX 22.

speech pathologist recommended a mechanical soft diet and that he be fed upright, both because he had no teeth and because he was unable to use utensils with his left hand.[330]

After his discharge from the hospital, Patient #22 was placed in NU1, where he was not immediately assessed, and he was not placed on the recommended diet.[331] Over the next two and a half months, he suffered at least nine falls, yet, instead of moving him to a room where he could be more closely monitored and/or safety measures like bed rails could be utilized, this patient was placed in a locked room with nothing but a mattress on the floor.[332]  A doctor ordered a bedside toilet so he did not have to ambulate to the restroom; however, he was not provided a bucket to catch waste for three days.[333]

The failure to provide the patient with the mechanical soft diet and feeding assistance led to this patient's death; he was forced to feed himself regular food in a locked room in the infirmary.[334]  On January 6, 2021, this patient choked on a piece of sausage and died when the airway obstruction resulted in cardiopulmonary arrest.[335]  An inmate orderly administered CPR until EMS arrived.[336]

McMunn flippantly explains away Patient #22's death by choking and inexplicably concludes that the care provided to this patient met the standard of care.[337]  Defendants utterly ignore the fact that an inmate orderly administered CPR to this patient, not infirmary staff, and no AED was applied.

---

[330] Rec. Doc. 755, Goehring Testimony at 27:10-29:11; JX 22, p. 674.
[331] Rec. Doc. 755, Goehring Testimony at 29:13-17.
[332] *Id.* at 34:4-35:13; JX 22, p. 954.
[333] *Id.* at 35:23-36:23.
[334] *Id.* at 38:18-39:10, 41:13-42:14.
[335] *Id.* at 41:13-42:14; JX 22, pp. 900-01.
[336] *Id.*; JX 22, p. 547.
[337] Rec. Doc. 756, McMunn Testimony at 66:4-13.

Considering the evidence discussed above, the Court finds the barriers to sight and sound between patients and nurses, coupled with admitted staffing shortages and the resulting improper use of inmate orderlies, demonstrates unconstitutionally deficient infirmary care.

### F.  Medical Leadership and Organization

16.    The Court previously found that the combination of inadequacies in the following areas of medical leadership and organization at LSP contributed to an unconstitutional system of healthcare: (a) lack of meaningful mortality review; (b) use of correctional personnel to manage medical decisions; (c) lack of peer review; (d) lack of medical staff involvement in budgeting; (e) lack of medical supervision by the medical director (Dr. Lavespere and now Dr. Toce); and (f) failure to maintain proper credentialing records.[338] Based on the evidence presented at the remedy trial, the Court finds that none of these inadequacies have been remedied.  This is unsurprising since, although the Court found in its liability ruling that, "[t]he buck stopped with Dr. Lavespere, and his medical supervision and quality review was woefully inadequate," he was promoted by Defendants and given even greater oversight and responsibility for all DOC medical.[339]

<u>Medical Leadership and Supervision</u>

In August 2020, LSP hired Dr. Jacob Johnson ("Dr. Johnson") as long-term healthcare administrator; the Court finds that Dr. Johnson has the training and experience necessary for this position, and that this hiring is a positive development for LSP.[340]

---

[338] For ease of discussion, the Court will address these issues in a slightly different order than as held in the liability ruling.
[339] Rec. Doc. 594, p. 40.
[340] Rec. Doc. 750, Puisis Testimony at 145:4-10.

Without citation to supporting evidence, Defendants contend that "[t]he hiring of Dr. Johnson has significantly improved the medical leadership and organization."[341]

LSP also recently appointed LPN Oliveaux to Deputy Warden, and as part of her duties, she oversees medical operations at LSP.[342]  Oliveaux previously worked in the clinic at LSP; Dr. Johnson currently reports directly to Oliveaux.[343]  She testified that she ensures that Dr. Johnson "has what he needs for our medical department to run."[344]  Oliveaux and Dr. Johnson meet regularly to discuss how to "make sure [they] provide efficient healthcare for [LSP's] offender population."[345]  Again, Defendants claim that the promotion of Oliveaux "has improved operations and provides a protective barrier between security and medical staff."[346]  Notably, as an LPN, Oliveaux has less medical training than her predecessor Tracy Falgout, an RN.[347]

Dr. Lavespere, of whom the Court was very critical in its liability ruling, was promoted to statewide Medical Director, and Dr. Toce, a physician at LSP during the liability period, was promoted to LSP's Medical Director.[348]  Neither Dr. Lavespere nor Dr. Toce testified at the remedy trial, but both gave trial depositions.  NP Park, who believes the medical staff culture at LSP is "great," testified that the work culture has not changed since Dr. Toce took over, and no real changes have taken place."[349]

Defendants offered evidence of purported improvement in medical leadership.  Dr. Johnson maintains a weekly backlog tracker, which allows him to identify any health care

---

[341] Rec. Doc. 770, p. 56.
[342] Rec. Doc. 757, Oliveaux Testimony at 55.
[343] *Id.* at 55:14-19.
[344] *Id.* at 55:22-24.
[345] *Id.* at 55:24-56:5.
[346] Rec. Doc. 770, p. 56.
[347] Rec. Doc. 757, Oliveaux Testimony at 53:11-12; Rec. Doc. 757, Johnson Testimony 186:19-21.
[348] PX 44-c, p. 8, Response to ROG No. 10; PX 1-a, p. 15.
[349] Rec. Doc. 752, Park Testimony at 66:8-22.

issues and develop a quick response.[350] Dr. Johnson and Dr. Toce conduct morning meetings on Monday through Friday with medical staff to discuss the status of patients in NU1 and NU2, patients in the ATU, and patients in outside hospitals.[351]

However, the overwhelming evidence demonstrates that these improvements have not remedied the constitutional deficiencies identified by the Court. The form has not improved the function. Dr. Toce testified that he wishes he had more time to spend with the LSP nursing staff, but his administrative duties are overwhelming.[352]  Dr. Puisis credibly concuded that:

> Dr. Toce is the only full-time physician at the facility with two physician vacancies. There is no Assistant Medical Director position and no one to assist him with supervisory responsibilities. In our opinion, due to physician understaffing, Dr. Toce is not able to meet all his supervisory duties, especially with respect to the quality of clinical care. Nurse practitioners are providing almost all clinical care with no evidence of supervision or collaboration with a physician.[353]

While the Court finds that Dr. Johnson is a good addition to LSP's leadership team, the evidence shows that his presence has had little impact on the delivery of medical care at LSP.  In fact, there is no evidence that either Oliveaux or Dr. Johnson have significantly impacted the medical care provided by LSP.

Dr. Johnson acknowledged difficulties in changing the LSP culture to be more patient centered.[354]  However, in his deposition, he "appeared unaware that he frequently received nearly blank monthly management reports from several departments—which he

---

[350] DX 48-a; Rec. Doc. 757, Johnson Testimony at 159:7-17.
[351] Rec. Doc. 757, Oliveaux Testimony at 68:16-70:10.
[352] JX 71-a, Toce Depo. at 46:1-12.
[353] PX 1-a, p. 15 (quoting JX 71-a, Toce Depo. at 46:4-10: "I don't think I'm involved enough with them. I want to spend more time in the trenches with them, and the administrative duties just keep coming. I could stay locked in my office all day long doing just administrative work and never even see them, but that would not be – that would not work.").
[354] Rec. Doc. 757, Johnson Testimony at 180:14-181:5.

admitted reflects a 'lack of oversight and a lack of leadership' in the departments he supervises."[355] This was confirmed during Dr. Johnson's trial testimony.[356]

Evidence also suggests the medical leadership at LSP has dismissed the Court's liability findings.  Dr. Toce disagreed with several of the Court's liability findings,[357] and Dr. Johnson had no memory of having read the Court's liability ruling.[358]

Dr. Lavespere identified very few changes to LSP policy since the liability ruling:

Dr. Lavespere acknowledged that DOC and LSP largely had not updated its policies in ways that impacted the overall delivery of care. Asked about 11 DOC policies and 19 LSP directives, the only changes that he identified as potentially impacting patient care were changes to the sick call policy; the peer review policy (which has not yet been implemented at LSP); the infirmary care policy (where the change was only to the amount of time and documentation required for some patients, and didn't "change[] a whole lot of health care"); and the replacement of standing orders with "individual treatment orders" in the ATU. He also noted that changes to ATU staffing were not reflected in the policy.[359]

Accordingly, the Court finds that the medical leadership and organization at LSP has not been significantly remedied such that constitutional deficiencies no longer exist. The lack of leadership, supervision, and organization, discussed further below, is the sin qua non to the unconstitutional care.

---

[355] PX 1-a, pp. 114-15 (quoting DX 37-k, Johnson Dep.).
[356] Rec. Doc. 757, Johnson Testimony at 210:24-215:24, 216:23-225:19; *see, e.g.*, 222:2-20 (blank reports from the nursing units); 224:7-10 (respiratory care); 224:11-13 (laboratory); 224:14-16 (central supply); 224:17-20 (health information management); 224:21-24 (quality improvement and ADA); *compare, e.g.*, PX 29-a, p. 617 with Liability Trial JX 2-a, p. 222; *see generally* PX 29-a; PX 29-b.
[357] JX 71-a, Toce Depo. at 9-26.
[358] DX 37-k, Johnson Depo at 7.
[359] PX 1-a, p. 13 (quoting JX 69-a, Lavespere Depo. at 51:11-19).

Mortality Review/Quality Improvement ("QI")[360]

Without reference to supporting evidence, Defendants claim that LSP began conducting mortality reviews in late 2021;[361] the trial evidence undermines this claim and, rather, reveals that LSP's mortality review process is essentially unchanged from 2016.[362] Dr. Lavespere testified that mortality reviews had improved from quarterly meetings to monthly meetings and that more medical staff is "at the table" during mortality reviews, but LSP still has no specific mortality review policy.[363] Although LSP Policy HCP6 makes cursory reference to "[a] review of all in-custody deaths," the policy is devoid of review criteria.[364]

Dr. Puisis credibly testified that mortality review must "be a critical review to identify deficiencies, and then, from those deficiencies, to identify opportunities to improve them."[365] However, LSP's mortality reviews contain "no critical analysis, so there's no critical review; there's no identification of the deficiencies."[366] Not a single review contains identification of anything in the patient's care that could have been improved, even where fatal errors occurred.[367]

At the time of the remedy trial, LSP had conducted four mortality review meetings since January 2021; these meetings occurred on October 2021, November 2021,

---

[360] Tellingly, Defendants failed to respond in their *Reply* to any evidence identified by Plaintiffs regarding deficient mortality review.
[361] Rec. Doc. 770, p. 57. Defendants also state, without citation to evidence, that DOC headquarters also perform mortality reviews. *Id.*
[362] PX 1-a, pp. 14, 25-26; Rec. Doc. 750, Puisis Testimony at 127:18-130:24, 134:17-135:5.
[363] JX 69-a, Lavespere Depo. at 203-204.
[364] PX 1-a, p. 26 (quoting Health Care Staffing and Staff Development, Peer Review, Internal Review, and Quality Assurance dated 12 July 2020).
[365] Rec. Doc. 750, Puisis Testimony at 127:20-22.
[366] *Id.* at 128:19-21; *see generally* PX 1-a, pp. 25-31.
[367] Rec. Doc. 750, Puisis Testimony at 66:8-68:19, 74:9-23, 78:7-22, 107:1-14 (describing mortality reviews for Patients #5 & 8); Rec. Doc. 749, Vassallo Testimony at 31:20-24 (Patient #38); PX 1-a, pp. 27-30 (Patients #1 & #5).

February 2022, and March 2022.  These meetings included Dr. Toce, Dr. Johnson, the Warden, EMS, nursing, medical, and security staff. Minutes from these meetings were provided to Plaintiffs' experts.[368]  Plaintiffs' experts observed: "The minutes do not discuss the deaths critically. Neither do those meeting minutes identify any opportunities for improvement or corrective actions that might be taken to improve. In the four monthly mortality meeting minutes that were provided, twenty-six deaths were discussed. Not a single opportunity for improvement was identified."[369]  Dr. Lavespere was asked in his trial deposition if he was aware of any corrective actions taken as a result of mortality reviews; he testified that he was aware of none.[370]

Even Dr. Mathis criticized LSP's mortality review.  He agreed that LSP's mortality reviews were not "particularly critical," did not document any problems in patient care that should be corrected, did not document standard of care violations that Dr. Mathis himself identified, and were generally inadequate.[371]

Based on the trial evidence, the Court finds that no significant changes have been made to LSP's mortality review process, and the process persists in failing to identify and correct necessary issues.  LSP offered no countervailing evidence.  Meaningful mortality review is a tool for improving medical care. It is an opportunity which is being squandered by the medical leadership. The Court finds that inadequate mortality review at LSP contributes to an unconstitutional system of healthcare.

<u>Inappropriate Use of Correctional Personnel</u>

The Court previously held:

---

[368] PX 1-a, pp. 26-27 (citation omitted).
[369] *Id.* at 27.
[370] JX 69-a, Lavespere Depo. at 204:8-18.
[371] Rec. Doc. 753, Mathis Testimony at 78:9-79:6.

As evidenced by the malingering policy, the medical department at LSP is controlled by LSP security rather than medical care providers. Both Plaintiffs' and Defendants' experts agreed that this organizational hierarchy, under which the medical department reports to security, is not working. Moreover, orderlies and EMTS also report to the security chain of command for supervision, and correctional officers supervise the delivery of medications by other correctional officers.   Dr. Lavespere admitted that security personnel - not medical personnel - are tasked with the initial assessment of whether an inmate is "really sick" when they purport to have a medical emergency.   Additionally, the Assistant Warden makes resource-allocation decisions such as when nurses are required for pill call.   The Court finds that this system where health care decisions are largely made by security rather than qualified health care providers is unconstitutional.[372]

Defendants' only statement regarding security's role in medical decisions at LSP is that promoting Deputy Warden Oliveaux, who reports directly to Warden Timothy Hooper, "provides a protective barrier between security and medical staff at LSP."[373] Notably, Dr. Johnson reports directly to Oliveaux, who is in the custody chain of command.[374]

Although now a shared duty with nurses, security staff continues to supervise inmate orderlies.[375] Additionally, it appears that Dr. Toce still defers to security's opinion regarding the need for restraints. Although Dr. Toce testified that he has "the last say" on the use of black box restraints for medical transport, he also admitted that "unless they have a really good reason, you don't let them out of appropriate restraints."[376]   There remains an inappropriate deference to and reliance upon security opinions in medical decisions.

---

[372] Rec. Doc. 594, p. 30 (footnotes omitted).
[373] Rec. Doc. 770, p. 51.
[374] Rec. Doc. 750, Puisis Testimony at 145:18-149:21.
[375] Rec. Doc. 757, Stickells Testimony at 29:22.
[376] JX 71-a, Toce Depo. at 134:18-20.

<u>Peer Review/Quality Control</u>

The Court previously held there was a lack of necessary peer review at LSP.[377] As of the date of remedy trial, Dr. Puisis concluded that LSP's peer review failed to: (a) evaluate individual providers' clinical work,[378] (b) consider a sufficient sample of records, and (c) address whether patients who need specialty care are actually referred.[379] These failures caused repeated errors that contributed to the risk of serious harm to patients.[380] And, although the DOC changed its department-wide peer review policy in 2020 to increase the number of records reviewed, LSP did not follow suit.[381]  Dr. Mathis provided no opinions regarding LSP's peer review.[382]

Defendants made no of mention of peer review in any post-trial briefing to the Court.[383]   Dr. Toce testified in his trial deposition that he believed the Court's finding that LSP lacked an adequate peer review process was "no longer true;" however he failed to specifically address how LSP's peer review process has been corrected.[384]  Defendants presented no evidence regarding peer review to rebut the evidence presented by Plaintiffs.  Thus, the Court finds that LSP's inadequate peer review process persists.

LSP's quality assurance/quality improvement program ("QA/QI") is now directed by Stickells, who collects data and prepares reports reviewed by the QA/QI team.[385]

---

[377] Rec. Doc. 594, p. 37.
[378] Rec. Doc. 750, Puisis Testimony at 118:16-22, 121:6-11.
[379] PX 1-a, pp. 21-25. In 2020, a total of 9 records were reviewed using the same methodology as in 2016. *Id.* at 23 (citation omitted).
[380] Rec. Doc. 750, Puisis Testimony at 120:2-6, 122:5-8.
[381] *Id.* at 115:14-116:25; *compare* PX 19-I, p.  5 (as of July 12, 2020, requiring review of either ten charts or 1% of the prison's population) *with* PX 1-a, pp. 22-24 (reviewing nine charts in October 2020).
[382] Dr. McMunn's opinions regarding LSP's peer review practices was excluded for the reasons set for in Rec. Doc. 720, pp. 7-8.
[383] *See* Rec. Docs. 770, 774.
[384] JX 71-a, Toce Depo. at 11-12.
[385] Rec. Doc. 757, Stickells Testimony at 10; Rec. Doc. 757, Oliveaux Testimony at 68.

However, Defendants presented no empirical evidence that this program has been effective in remedying constitutional deficiencies.  Dr. Toce testified that he disagreed with the Court's liability finding that this area was lacking: "We have plenty of space, and quality control, I've been doing [adequate] quality assessment and quality QA and QI for years."[386]

Despite now being in charge of LSP's QA/QI program, Stickells has never read this Court's liability ruling, and the issues identified by this Court have never been discussed with her.[387]

Critical of the purportedly new QA/QI process, Plaintiffs' experts opined that ""[s]imply counting events does not measure the effectiveness of the services delivered nor measure outcomes of healthcare."[388]  Defendants offered no evidence to rebut these opinions; indeed, Defendants remain unpersuaded that anything was ever lacking in this regard.  The Court disagrees and finds that LSP continues to lack an adequate quality improvement program aimed at critical analysis and corrective efforts.

<u>Lack of Medical Staff Involvement in Budgeting</u>

Although the Court previously held that the lack of medical staff involvement in budgeting contributed to a constitutionally deficient healthcare system at LSP, Dr. Lavespere testified that the process of developing the budget has not changed since 2016.[389]  Despite evidence to the contrary, Dr. Lavespere testified that, "the budget has no impact on the delivery of healthcare at LSP.  There's a standard of care that we're

---

[386] JX 71-a, Toce Depo. at 12:2-8.
[387] Rec. Doc. 757, Stickells Testimony at 48:20-49:4.
[388] PX 1-a, p. 41.
[389] JX 69-a, Lavespere Depo. at 11:3-18.

going to deliver, regardless of what the budget it."[390]  Dr. Lavespere did not know an exact number for the current budget to provide medical care for inmates at LSP,[391] but he is "not really concerned with it, because it doesn't impact the way that we deliver care."[392]

Evidence establishes that LSP's medical budget is determined at a departmental and legislative level and is fixed based on the prior year's spending.[393]  Because this budget is fixed, the budget is not amended to meet potential increasing demands in health services.  Further problematic, "[n]either Stacye Rodriguez, the Director Nursing for the Department of Corrections, nor Dr. Lavespere, the Medical Director for the Department of Corrections, has an appreciable role in setting the budget, which is 'handed to [them]'"[394] If funding cannot be obtain to meet these changing needs, LSP leadership should prioritize the allocation of funding to meet the most critical patient needs at the prison.[395]

The Court finds that the lack of medical leadership involvement in LSP's budgeting process continues to negatively impact the adequacy of medical care received by inmates at LSP.

<u>Credentialing</u>

Finally, the Court found previously that LSP's failure to maintain proper credentialing records contributed to the constitutionally inadequate medical leadership and organization at LSP.[396]

---

[390] *Id.* at 13:1-4.
[391] *Id.* at 15:15-17.
[392] *Id.* at 17:12-14.
[393] PX 1-a at 15 (citation omitted).
[394] *Id.*
[395] *Id.* at 16.
[396] Rec. Doc. 594, pp. 39-40.

Defendants made no of mention of credentialing in any post-trial briefing to the Court,[397] and the evidence shows no changes have been made in this area. Dr. Lavespere testified that "credentialing is the same. There wasn't anything wrong with our credentialing."[398] Unsurprisingly, the evidence demonstrates that the lack of proper credentialing at LSP persists.

Plaintiffs' experts identified a host of examples of improper credentialing records and certifications demonstrating LSP's failure to follow its own personnel directives and showing how this failure impacts the delivery of healthcare to inmates.[399]  The Court finds this evidence and Plaintiffs' experts' findings to be credible, and both went unrebutted by countervailing evidence.

Accordingly, the failure to maintain proper credentialing records at LSP persists and contributes to the overall constitutionally deficient medical leadership and organization at LSP. The systemic leadership and management failures perpetuates the deliberate indifference and callous disregard that permeates the delivery of medical care at LSP.

---

[397] *See* Rec. Docs. 770, 774.
[398] JX 69-a, Lavespere Depo. at 213:8-10.
[399] PX 1-a, pp. 12-14, 18-21, 110-111.

## ADA/RA VIOLATIONS

### A. Expert Witnesses - Credibility

17.    Plaintiff's expert Mark Mazz ("Mazz") is a highly experienced expert in architectural compliance with the ADA.[400] Mazz was accepted by the Court as an expert under the ADA in the field of architectural barriers in both the liability and remedy phases of trial.[401]

Mazz conducted a site visit of LSP on April 6, 2022, during which he toured those parts of LSP identified by Defendants as accessible spaces.  This included the spaces Mazz surveyed in 2016 that are still deemed necessary for access, and any spaces that had been deemed substitute spaces for those surveyed in 2016.[402]  Mazz toured Ash dorms 1-4, segregation cellblock 28, NU 1 and NU2, the Visitor's Center, and the walkways leading to and from these areas.[403]   In surveying these areas, he applied the same methodology utilized during his liability phase visit–measuring spaces to ensure programmatic access required for new construction, altered spaces, and unaltered areas.[404]  Mazz testified credibly at the remedy phase trial, and his testimony and findings went unrebutted, just as they did at the liability phase trial.[405]

18.    Plaintiff's expert Dr. Dora Schriro was accepted by the Court as an expert in the field of corrections administration.[406]

---

[400] Mazz has over 40 years of experience in this field, having worked with private and public entities to identify and remedy architectural barriers to the disabled, including for the Architect of the Capitol, federal agencies, Montgomery County, Maryland, the Department of Justice's Housing and Civil Enforcement and Disability Rights sections, and the Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity. For over ten years, Mazz has served as a member of the ACA. PX 4, pp. 5–9.
[401] Rec. Doc. 748, Mazz Testimony at 47:24-48:1.
[402] PX 4, p. 2; Rec. Doc. 748, Mazz Testimony at 46:17-24.
[403] Rec. Doc. 748, Mazz Testimony at 49:9-51:6.
[404] *Id.* at 48:11-21.
[405] *See* Rec. Doc. 594, pp. 8, 97-98.
[406] PX 3, pp. 1-2; Rec. Doc. 747, Schriro Testimony at 114:3-17. Dr. Schriro has served as Director of the Missouri and Arizona correctional systems; Commissioner of the St. Louis and New York City jail systems; warden of the St. Louis city jail; Assistant Commissioner for Program Services in New York City. She also

19.    LSP did not remedy the ADA violations found by the Court following the liability trial. The Court finds the ADA violations persist and a remedy is required based on the following.

Dr. Schriro toured LSP on April 6, 7, and 8, 2022, during which time she interviewed approximately 40 Class members, including an estimated 30 members of the ADA Subclass and around ten healthcare orderlies.[407] At the remedy trial, Dr. Schriro testified about the inadequacies of LSP's ADA administration, opining that the ADA violations found by the Court identified at LSP persist, including problems with the ADA coordinator, the ADA advisory committee, staff training, orderly assistance, accommodation requests, the ADA tracking system, and disciplinary accommodations.[408] The Court found Dr. Schriro's testimony credible and credits her opinions.

LSP offered no evidence and no expert testimony that the violations previously found under the ADA and RA have been addressed or remedied.

### B.  Architectural Barriers[409]

20.    On the following record evidence, the Court finds that architectural barriers which violate the ADA and the RA persist at LSP.

At the time of the liability trial, Mazz identified 190 architectural barriers at LSP that required remediation to be ADA compliant.[410] Mazz inspected LSP on April 6, 2022 in

---

served as Commissioner of the Connecticut Department of Emergency Services and Public Protection and as Connecticut's Homeland Security Advisor. She was also the first Director of the ICE Office of Detention Policy and Planning. In all of these positions, Dr. Schriro was responsible for implementing and ensuring compliance with state and federal law, including the ADA and RA.

[407] PX 3, p. 4; Rec. Doc. 747, Schriro Testimony at 131:3-4, 131:17-21, 133:5-10.

[408] Rec. Doc. 747, Schriro Testimony at 133:25-135:16.

[409] Defendants claim they have remedied all architectural barriers required by LSP's settlement with the DOJ.  First, they offer no evidence from the DOJ affirming this claim.  Second, as the Court previously held, LSP's settlement with the DOJ is irrelevant to the ADA violations established in this case.

[410] Rec. Doc. 594, p. 49 (citations omitted).

connection with the remedy trial and issued a report connecting each barrier found to the specific ADA provision it violates.[411]  By Mazz's estimation, only 19–20% of the barriers identified in his 2016 report have been remediated by LSP.[412]

Mazz credibly showed several barriers that had not been remedied since his 2016 report, including *inter alia*, abrupt changes in walkway levels impacting wheelchair bound inmates; cell windows difficult to open and close; doors that cannot be opened independently by wheelchair bound inmates; and inaccessible drinking fountains.[413]

Defendants claim that they have remedied 141 of the 190 barriers identified in Mazz's 2016 report;[414] however, the evidence does not bear this out. and Defendants did not offer evidence to support this claim.

Defendants presented evidence that they converted Ash 1, 3 & 4 dormitories ("dorms") into handicapped accessible dorms for disabled inmates, replacing Cypress 2 and Hickory 4 as disabled dorms.[415]  This move has placed disabled inmates closer to the treatment center, pill call, cafeteria, law library, education building, and the easiest point of access for LSP's two chapels[416]–a welcome improvement allowing greater program access to these services.  However, evidence does not support Defendants' claim that the Ash dorms are fully handicapped accessible or that all disabled inmates have been moved to the Ash dorms. The Court finds that this change did not rectify the barriers to access.

---

[411] PX 4.
[412] Rec. Doc. 748, Mazz Testimony at 61:23-62:2; *see also id.* at 58:3-5, 59:14-15, 61:3-11.
[413] *Id.* at 60:2-61:11.
[414] Rec. Doc. 770, p. 54.
[415] JX 72-a, pp. 19–20.
[416] JX 73-a, pp. 99–101.

Although Defendants characterized the testimony of three disabled inmates currently housed in the Ash dorms as essentially having no accessibility issues in the Ash dorms,[417] the actual testimony from these inmates reveals otherwise. Dennis Mischler ("Mischler"), currently housed in Ash 1, testified that he is able to access the toilets and showers in Ash 1; however, he also testified that "it's very difficult" to move around in Ash 1 in his wheelchair,[418] and this access is "with difficulty because they have a ramp there . . . the width of the wheelchair" with "two cement lips on both sides. And if you don't manipulate that . . . you can hit those and tip over."[419] Mischler "almost fell a couple of times but was caught by inmates," and "other people had the same problem."[420] He further testified that, because there are sixty (60) inmates in Ash 1, "it's become very – real problematic and dangerous because when – if one person in a wheelchair is coming one way and the other person in a wheelchair is going the other way, somebody has to give. And where the problem comes in is that if you have an emergency, it could really cause a hazard really bad."[421]

Jean Paul Creppel ("Creppel") also housed in Ash 1, is a wheelchair-bound inmate, who testified that wheelchair access to the shower is "limited,"[422] and because of the width of the makeshift ramp, "if you don't hit it the right angle, you could hit the sharp curb and it could tip you over."[423] Creppel also testified that, "right before they moved us to Ash 1, they did like a – kind of a quick upgrade of the dorm and it was like a – kind of a real fast fix and they overlooked a lot of things, and they kind of shortchanged a lot of things …

---

[417] Rec. Doc. 770, p. 56 (citations omitted).
[418] Rec. Doc. 747, Mischler Testimony at 54:21-23.
[419] *Id.* at 55:9-13.
[420] *Id.* at 55:13-15.
[421] *Id.* at 55:2-7.
[422] Rec. Doc. 749, Creppel Testimony at 238:2.
[423] *Id.* at 238:16-18.

."[424]   Creppel further testified that, even from Ash 1, he had issues getting around the prison complex:  "there's long distances between callouts; like, say, the chapel or the visiting shed or library, all these places that are well over 300 yards to get to.  So you usually have a pusher, unless you're physically able to push yourself."[425]

Additionally, although Defendants claim they have moved all disabled inmates into what they call "fully handicapped accessible" Ash dorms, Warden Falgout admitted just weeks before the remedy trial that there were still wheelchair-bound inmates housed in Hickory 4.[426]

21.    The Court finds the orderly assistance program does not overcome the structural barriers to access.

Defendants point to Creppel's testimony that he is assisted by orderlies with various tasks, including making his bed.[427] Creppel testified that the inmate orderlies did everything that he needed help with and that they "had kind hearts and did a good job."[428] However, Creppel also testified that there were not enough inmate orderlies to "keep up with" the needs of the disabled inmates: "well, you have a lot of old, irritable sick men. You have people with conditions like mine, some worse, some less.  It's not very sanitary. The orderlies try to keep up with it.  But you got so much -- you have a lot of urine and defecation.  Usually in the shower area.  The access is limited."[429]

Mischler described an instance when the orderlies locked the inmates out of an Ash dorm to clean the dorm.  In an effort to get out of the sun due to his history of skin

---

[424] *Id.* at 238:4-7.
[425] *Id.* at 239:21-24.
[426] JX 73-a., Falgout Depo. at 116:22-23 (testifying on March 8, 2022, that "[w]e have some offenders [in wheelchairs] right now that are on Hickory 4").
[427] Rec. Doc. 749, Creppel Testimony at 249:21-25.
[428] *Id.* at 245:5-7, 17-19.
[429] *Id.* at 237:23-238:2.

cancer, and after he knocked on the door of the dorm but no one answered, Mischler attempted to wheel himself into a shaded area; however, he flipped over and landed on his back after trying to use an incomplete ramp with no guardrails.[430]  Mischler testified that he was in a great deal of pain after this fall, but "there was only one orderly, health care orderly, out there.  And he was with another patient at the end of the -- on the other side of the dorm."[431]  Other inmates had to assist Mischler because there not was an orderly available; the inmates "pounded on the door" for assistance, but the "orderlies wouldn't open the door."[432]

Dr. Shriro testified that, of the 80 inmate orderlies assigned to assist disabled inmates, 58 were assigned to the Ash dorms, leaving only 22 to serve as "pushers" or "walkers," i.e. "the folks who either push those wheelchairs around or assist in the, you know, walking of the wheelchair, I guess."[433]  Dr. Shriro credibly explained why this number is insufficient: "And the campus is so big, and it's of so many different kinds of terrains, and the configuration of housing units are such, I just can't imagine that 22 is sufficient for a facility as large as that is with the demographics of the population that, you know, I described to you a couple of minutes ago."[434]

22.    The Court finds that numerous architectural barriers remain at LSP that are not sufficiently ameliorated by orderlies.   The Court finds that the physical barriers to program access necessitate injunctive relief to bring LSP's facilities into compliance with the ADA and RA, where legally applicable.[435]

---

[430] Rec. Doc. 747, Mischler Testimony at 52:17-53:9.
[431] *Id.* at 53:13-15.
[432] *Id.* at 53:17-18.
[433] Rec. Doc. 747, Schriro Testimony at 144:24-145:8.
[434] *Id.* at 145:9-14.
[435] The Court intends to appoint a monitor to assist in determining the specifics of remediation of structural barriers.

### C.  Inmate Orderly Assistance Program

23.      The Court previously held that LSP violated the ADA and RA by failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications were not made and by failing to provide proper oversight of health care orderlies.  The Court finds that inmate orderlies continue to be utilized beyond the scope of their duties and training.  The Court further finds that inmate orderlies are tasked beyond their training and knowledge to compensate for the serious lack of medical staff that should be assessing and assisting the medical needs of the disabled.[436]

Defendants concede that "The training materials or practices for inmate orderlies have not changed since the close of liability discovery," and "Orderlies are used the same today as they were at the close of liability discovery."[437]

Training

The Defendants failed to prove that inmate orderlies are trained before they are assigned to work with disabled inmates.[438]   Some orderlies observed by Dr. Shriro reported that they had no training while others said they were not trained until after they had already started working on the assisted living wards.[439]

The training materials, when provided to the orderlies, are limited in usefulness considering the breadth of needs facing disabled inmates.  While LSP's PowerPoint training teaches wheelchair safety, a narration of body systems, and how to change a bed and rotate a patient, this training is extremely limited and fails to address myriad other

---

[436] *See* PX 3, p. 12.
[437] PX 44-d, p. 4.
[438] As discussed *supra*, healthcare orderly Bruce Hines testified that, although he had been working as an orderly for three years, he did not receive training until March of 2022, just weeks before the remedy phase discovery deadline.
[439] PX 3, p. 12.

disabilities, such as blindness, respiratory problems, diabetes, or dementia/mental illness, to name a few.[440]

Defendants advance Stickells' testimony regarding the inmate orderly training,[441] as evidence that LSP's orderly inmate training is improved, Dr. Schriro was critical of this training as it pertains to assisting disabled inmates in accordance with the ADA and RA. Stickells testified that the inmate orderly training has been updated to include a wheelchair safety tip,[442] but she admitted that "the substance" of the training "is the same," she "just changed the way it looks."[443]  On cross, Stickells admitted that the "new" training Power Point slides did not add new content; she simply "changed its appearance for easier reading."[444]

Stickells testified that orderly training is done "as needed" and generally when "brought to [her] attention by Dr. Jacobs". Stickells further that she advised Dr. Jacob that this training "needs to be done at least quarterly," but there is no evidence before the Court that this recommendation by LSP's ADA compliance official was followed.

Abuse/Neglect

The Court finds no pervasive pattern of  orderly abuse and/or neglect of disabled patients at LSP.   Plaintiffs contend that their evidence "showed multiple examples of orderly abuse,"[445] and they point to three instances–two where an orderly allegedly punched a patient in the head and one where an orderly choked a patient.[446]  However,

---

[440] *Id.*
[441] Rec. Doc. 757, Stickells Testimony at 23-28.
[442] *Id.* at 27:7-18; DX 47, p. 33.
[443] *Id.* at 42:22-24.
[444] *Id.* at 43:14-17.
[445] Rec. Doc. 771, p. 62.
[446] PX 1-a, p. 102 (Patient #18, who was punched in the head by an orderly); *id.* at 103 (Patient #69, who was choked by an orderly; Patient #22, who was punched in the head by an orderly).

Defendants presented evidence that the orderly who choked a patient was immediately disciplined and removed from the program.[447] Defendants also presented evidence that one of the instances of abuse claimed by Plaintiffs could not have occurred because that particular patient was deceased at the time of the alleged abuse.[448]

Evidence also establishes that LSP screens applicants for the inmate orderly program.  Stickells testified that applicants are screened for "any disciplinary action, you know, if they have a history of any type of, you know, something -- they have to meet that criteria."[449]  Stickells highlighted that LSP does not want orderlies that, for example, have "multiple disciplinary actions for theft or strong-arming somebody or something like that. We like to keep the patients safe."[450]

After Dr. Shriro's site visit, she credibly concluded that "[m]ost Healthcare Orderlies work hard and are deeply affect by the severity of patients' afflictions … most Healthcare Orderlies take a lot of pride in their work."[451]  The Court concludes that there is no pervasive problem of orderly abuse of disabled patients at LSP.

<u>Supervision of Orderlies</u>

While there is insufficient evidence of orderly abuse/neglect, the Court finds that there is a serious lack of supervision or oversight of inmate orderlies by both medical staff and security personnel. This lack of supervision necessarily contributes to violations of the ADA and RA at LSP.

---

[447] NP Park testified that this orderly "was disciplined and written up and he no longer works there."  Rec. Doc. 752, Park Testimony at 30:22-23.

[448] According to Plaintiffs' expert report, Patient #18 "was housed in a locked infirmary room and reported an orderly punched him in his head" on August 6, 2020. *See* PX1-a, p. 102. However, Patient #18 died on May 6, 2020. *See* DX 2 at 653 (confirming that Patient 18 died May 6, 2020, not on January 6, 2021, as stated in Plaintiffs' expert report).

[449] Rec. Doc. 757, Stickells Testimony at 29:13-16.

[450] *Id.* at 29:17-19.

[451] PX 3, p. 13.

Preliminarily, the Court rejects any assertion that that security should have no role in supervising inmate orderlies. Some overlap in supervision is necessary considering the position of trust inmate orderlies are placed in. It is appropriate for security to supervise the conduct of orderlies, which the Court finds is a prophylactic against potential abuse of an inmate patient by an inmate orderly. However, security is not qualified to supervise whether inmate orderlies are complying with their duties to assist inmates with health care needs and/or disabilities. Qualified medical staff must supervise this aspect of the orderly program.

Stickells, who oversees the orderly program, testified that she knows that orderlies are following their training because "the nurses will let [her] know if they're not."[452] She further testified that she also makes rounds and "check[s] on [the orderlies] [herself]."[453] In her deposition, she testified that she conducts surprise visits approximately once a month, and the orderlies "know where to find" her if they need her.[454] Dr. Shriro expressed doubt as to Stickells' purported oversight because, during her site visit, she observed the orderlies routinely exceed the scope of their duties and did not see any nurses on the floor with patients; in fact, no nurses or medical personnel visited the Ash dorms during her three-day site visit.[455]

The evidence shows that nurses and medical personnel are not rounding the Ash dorms where the disabled patients are housed; thus, Stickells' reliance on nurses to report problems of abuse/neglect/failure to adhere to training is pointless. Further, given the number of disabled inmates at LSP, the Court finds that monthly surprise visits are

---

[452] Rec. Doc. 757, Stickells Testimony at 30:12-18.
[453] *Id.* at 30:18-19.
[454] PX 3, p. 13 (quoting Stickells Deposition at 60:24 – 61:18).
[455] *Id.* at 12.

woefully insufficient to determine if orderlies are properly performing appropriately assigned tasks. For example, Stickells testified in her deposition that LSP did not have many problems with falls on the nursing unites; at trial, she was "surprised" to learn that, between March 2020 and December 2021, there were "at least 87 documented falls in the medical occurrence reports."[456]

The evidence shows that orderlies, rather than nursing staff or corrections officers, determine their work assignments.[457]  Orderlies do not have the training or skill to determine what assistance they are qualified to offer disabled inmates or what assistance requires medical staff.  Dr. Schriro credibly concluded that there was no rationale to the orderly staffing levels, nor did she observe any supervision of orderlies by either medical staff or security personnel.[458]

### D.    LSP ADA Directives/Qualified ADA Coordinator

24.    The Court finds that LSP continues to fail to meaningfully comply with its own ADA Policy Directives, which contributes to violating the ADA and RA rights of disabled inmates.

Specifically, "LSP Directive 01.016 requires LSP to maintain an ADA Advisory Committee consisting of the ADA Coordinator, the Deputy Warden for Operations, a staff attorney, the Safety Director, and the Health Information Management Supervisor.  The purpose of this committee is to review ADA compliance on a monthly basis and recommend corrective action to the warden where appropriate."[459]  The Court found that: "Despite this Directive, neither LSP's ADA Coordinator, nor its past or present wardens,

---

[456] Rec. Doc. 757, Stickells Testimony at 45:4-17.
[457] PX 3 at 12.
[458] *Id.*
[459] Rec. Doc. 594, p. 59 (footnotes omitted).

were aware of the existence of such a committee, and Defendants have admitted that '[n]o such committee existed during the pendency of this lawsuit.'"[460]

Rather than address policy compliance, LSP simply removed several of the Directive's requirements.  In 2018, after the Court issued its findings, Directive 01.016 was amended to remove any mention of an ADA Advisory Committee, any reference to training, and the qualification requirements for the ADA Coordinator.[461]  Dr. Schriro credibly testified that the original Policy created "good expectations," but the removal of these requirements is "a significant step backwards."[462]  The Court agrees. The Court finds that the ADA Coordinator is untrained and lacks the experience to manage a compliant ADA program.

The Court also finds that LSP's new ADA Coordinator, Warden Oliveaux, is perhaps less qualified than her predecessor, Warden Falgout, to oversee and administrate LSP's ADA compliance.  Specifically, the Court found that "Asst. Warden Falgout is juggling far too many competing responsibilities to adequately fulfill his obligations as ADA Coordinator for the LSP," and that "LSP failed to provide adequate training and resources to any of its ADA Coordinators, and none of the ADA Coordinators during the relevant time period possessed the knowledge or experience necessary to oversee and ensure ADA compliance."[463]

The evidence establishes that Oliveaux is juggling just as many responsibilities at LSP as Falgout did, she has less experience in general than Falgout, and the ADA training

---

[460] *Id.* (citations omitted).
[461] PX 21-d. The only language related to ADA Coordinator qualifications in the updated version reads "For the purpose of this directive, an appropriately trained and qualified individual is one who has been designated by the Warden to coordinate efforts to comply with and carry out responsibilities defined by the ADA." *Id.* at 1.
[462] Rec. Doc. 747, Schriro Testimony at 125:15-18.
[463] Rec. Doc. 594, p. 58 (citations omitted).

she has received is just as lacking.  Aside from managing ADA administration at LSP, Oliveaux is also tasked with the oversight of LSP's medical care, mental health care, emergency medical services, fire, legal program, and training academy.[464]  She testified that at least four department heads report directly to her.[465] She further testified that medical, mental health, EMS, and fire duties account for 50% of her time while other duties make up the remaining 50%.[466]

Revealingly, when Oliveaux interviewed for her current position of deputy warden in February 2022, she testified that the role of ADA Coordinator was never discussed during the interview.[467]  Oliveaux also testified that she was not aware that the role ADA Coordinator was within her job duties until after she started the job.[468]  At the time Oliveaux took over as deputy warden and became the ADA coordinator, she had no knowledge of the specifics of this lawsuit, the findings of the Court relevant to the ADA/RA after the liability trial, and no knowledge of what the ADA/RA requires for prisons.[469]  In her pre-trial deposition, Oliveaux testified that she intended to take the same ADA training that Falgout had received–training this Court found insufficient.[470]  At the remedy trial, Oliveaux testified that she had obtained additional ADA training during an "ADA Symposium," however, she also testified that this training pertained primarily to physical barriers, an area over which she has little involvement.[471]

---

[464] Rec. Doc. 757, Oliveaux Testimony at 54:13-17, 57:5-13.
[465] *Id.* at 56:9-20.
[466] *Id.* at 58:1-5.
[467] *Id.* at 80:7-17.
[468] *Id.* at 80:18-21.
[469] *Id.* at 81:1-24.
[470] *Id.* at 82:25-83:3; *see* Rec. Doc. 594, p. 58.
[471] *Id.* at 83:4-8, 83:17-19; 79:1-3.

LSP's hiring of a new DOC ADA Coordinator, Sharita Spears ("Spears") does not affect the Court's finding.[472]   Although Spears has been an attorney since December 2020,[473] her background is in family law; she has no experience with disability law or the ADA/RA.[474]   Spears' duties include supervising all ADA coordinators within the DOC; reviewing institutional policies and directives related to the ADA; maintaining the ADA database; creating and coordinating ADA training; and answering "second-level" ARPs related to the ADA.[475]   Defendants claim Spears has "overhauled" the ADA training program for staff at headquarters and all DOC facilities, including LSP.[476]   Spears intends to enhance the annual in-serving training of DOC staff to include more ADA topics.[477] While Spears appears committed to and invested in her role, some aspects of her training and administration of ADA matters are flawed and directly against LSP policy, which provides that "[t]he ADA does not require that a request for accommodation be provided in any particular manner."[478]

While Spears testified that an inmate could make an ADA accommodation request verbally or by filling out a "request for accommodation form,"[479] and that the ADA Coordinator could grant such a request, she also testified several times that, according to the ADA training slides, accommodation requests were made using the ARP process.[480]   The Court cannot discern from Spears' testimony or the training slides if the ADA accommodation request policy is being followed per the Policy Directive or forced

---

[472] Rec. Doc. 757, Spears Testimony at 88:3-7.
[473] *Id*. at 88:11-14.
[474] *Id*. at 107:14-19.
[475] Rec. Doc. 770, p. 64 (citing Rec. Doc. 757, Spears Testimony at 88-91, 105).
[476] *Id*. (citing Rec. Doc. 757, Spears Testimony at 90-91).
[477] Rec. Doc. 757, Spears Testimony at 94-95; *see also* DX43.
[478] JX 73-c, p. 4.
[479] Rec. Doc. 757, Spears Testimony at 111:3-15.
[480] *Id*. at 111:24-112:4; 114:15-25.

through the ARP process.  However, the evidence makes clear that this leadership training Power Point is confusing and could lead LSP leadership and employees to apply the policy incorrectly.

Spears testified that the DOC intends to engage Accessology, an independent ADA consulting firm, to create a transition plan to comprehensively analyze and evaluate DOC's (including LSP's) ADA practices, policies, procedures, program access, and physical access.[481]  While this is very encouraging, the Court must determine appropriate injunctive relief for those deficiencies that remain at LSP as of the remedy trial; the Court cannot make findings based on the promise of future remedies.

### E. ADA Training of Medical/Correctional Staff

25.    The Court finds that LSP fails to adequately train medical and correctional staff in ADA compliance. The Court finds that ADA training for medical and correction staff is essentially unchanged since the liability ruling and, thus, remains unlawful.

LSP admitted that training has not changed.[482]  Even more troubling, LSP removed from Directive 01.016 the requirement that all employees receive: "comprehensive annual training . . . relevant to access to programs, and activities available to individuals with disabilities."[483]  Spears testified that the annual in-service training for all correctional staff occurs annually, and these trainings are "geared toward deaf and hard-of-hearing offenders" and how to effectively communicate with them.[484]  Spears testified that this training would be updated even though, "there is not anything that [LSP] need[s] to update

---

[481] *Id.* at 98:2-25.
[482] PX 44-d, p. 3, Response to ROG 15 ("[T]he training materials [and] practices related to ADA accommodations have not changed.").
[483] *Compare* JX 73-b (2012 version), p. 8 *with* JX 73-c (2020 version).
[484] Rec. Doc. 757, Spears Testimony at 94:12-18.

so far as content," to "kind of add a little bit more information to it to better help the security staff know how to deal with these offenders."[485]    However, Spears also testified at the remedy trial that, "right now the content has not been decided upon."[486]    References to purported non-specific, future changes cannot mitigate the need for injunctive relief.

### F. Identifying and Tracking Accommodation Requests/Disability Grievances

26.    The Court finds that LSP continues to fail to identify and track disabilities and accommodations. The Court further finds that LSP's tracking system does not provide meaningful identification and tracking of disability grievances or ADA accommodation requests. The evidence before the Court demonstrates that nothing has changed to remedy this tracking procedure since the liability ruling. The Defendants admit that "there have been no changes in the way documents and/or databases are compiled, collected, or maintained with respect to … the ADA Tracking Database."[487]

While Spears testified that she checks ADA database "probably two to three times a week" and finds it searchable by year, institution, inmate DOC number, inmate name, and accommodations granted,[488] she did not testify that the database had been changed in any way since the liability ruling.    Indeed, Defendants ostensibly acknowledge this deficiency as part of the need to engage Accessology to review all ADA policies procedures.

Evidence demonstrates that the tracking database information routinely conflicts with the QA/QI program, showing conflicting numbers of accommodations for most

---

[485] *Id.* at 95:1-9.
[486] *Id.* at 95:12-13.
[487] PX 44-c, p. 6.
[488] Rec. Doc. 757, Spears Testimony at 100:22-101:23.

quarters.[489]    When asked about this discrepancy, Stickells, as QA/QI Coordinator, testified that this conflict was because accommodation requests had not been submitted to her, not necessarily because none were made.[490]  Warden Falgout was questioned about the discrepancy between the reports, and he could not explain why the QA/QI study did not document all ADA requests.[491]  Based on her experience in other correctional facilities, the reports of Subclass members, the size of LSP, and the number of disabled and aging inmates at LSP, Dr. Schriro reasonably concluded that LSP's tracking system is undercounting accommodation requests, stating that the recorded accommodation requests per month "really seems to be an exceptionally low number."[492]

### G. Evaluation/Resolution of Accommodation Requests/Disability Grievances

27.    The Court finds that the evaluation and resolution of accommodation requests and/or disability grievances remain unchanged and violate the ADA and RA. There has been no effective remedial changes made to LSP's training of medical and correctional staff or inmate orderlies, no changes to the tracking system, and there remains confusion about whether disabled inmates are required to file accommodation requests as ARPs.

Evidence shows that individualized response plans, required under LSP Directive 01.016, are not created for disabled patients.[493]  Disabled inmates reported to Dr. Shriro that, when they file accommodation requests via ARP, they receive no response.[494] There is also evidence of the inexplicable removal of an accommodation.  For example, although he has used a wheelchair for over 20 years, Class Member John Price testified

---

[489] *Compare* PX 34-b *and* PX 34-a (QA/QI reports) *with* PX 36 (ADA accommodation requests).
[490] Rec. Doc. 757, Stickells Testimony at 38:3-18.
[491] JX 72-a, Falgout Depo at 41-43:10-12.
[492] Rec. Doc. 748, Schriro Testimony at 44:20-24, 135:2-6.
[493] PX 3, p. 14.
[494] *Id.*

(via stipulation) that LSP has tried to take away his wheelchair.   This allegation was uncontroverted.[495]

### H. Identifying and Tracking Accommodation Requests/Disability Grievances

28.    The Court finds that LSP fails to accommodate disabled inmates when applying discipline. The Court finds that Defendants fail to consider the need for appropriate accommodations when disciplining disabled inmates in violation of the ADA and RA. The Court concludes that LSP's discipline policies, as applied to disabled inmates, violate the ADA/RA.

Testifying on behalf of LSP,  Warden Falgout testified that LSP had no plans "at this time" to change any LSP's practices, policies, or procedures regarding discipline of disabled inmates.[496]  Falgout was asked when an inmate's disability under the ADA would become relevant in making disciplinary decisions, and he responded, "They wouldn't … A rule violation is a rule violation."[497]   Although security is purportedly trained to seek counsel from the ADA Coordinator and/or medical staff when an inmate's conduct could be related to an infraction, and the matter should be referred to the Disciplinary Board, Falgout could not recall any specific instances when he was asked to make this determination.[498]  He recalled one instance where a disabled inmate was "written up" for not placing his locker box away properly, and it was determined after consulting with medical and the inmate's duty status that he could not physically move the locker box,

---

[495] JX77-c, pp. 8-9.
[496] JX 72-a, Falgout Dep. at 44:1-4.
[497] *Id*. at 46:6-12.
[498] *Id*. at 46-48.

and stated "so that was taken into consideration in the infraction."[499]    However, Falgout could not recall whether or not the inmate was still disciplined for the infraction.[500]

Rather than preemptively ensure that an inmate's disability is considered when creating proper discipline, if a disabled inmate wishes to appeal a disciplinary decision based on his disability, he must endure the discipline and seek an appeal.[501]    Falgout could not recall a single time when a disabled inmate appealed discipline.[502]

Oliveaux testified that she has received no training regarding ADA accommodations for disabled inmates when applying discipline.[503]

The evidence established that a quadriplegic inmate was disciplined by means of solitary condiment in a cell.  When placed in disciplinary segregation in a locked cell, Class Member Derrick Martin, who is a quadriplegic confined to a wheelchair with limited use of one arm, could not reach the call button to activate the call light.  While Parks testified that she responded to Martin's call bell on one occasion when he was in a locked cell, there is ample evidence before the Court that causes the Court to question whether nurses always or routinely respond to call lights, given the sight and sound barriers, observations by Plaintiffs' experts, and testimony of inmate orderlies.  The Court does not question the truthfulness of Park's testimony; however, the fact that she recalls responding once to a call light does not establish that disabled patients in disciplinary segregation are accommodated.

---

[499] *Id*. at 49:2-11.
[500] *Id*. at 49:24-25.
[501] *Id*. at 51-52.
[502] *Id*. at 52:8*12.
[503] Rec. Doc. 757, Oliveaux Testimony at 83:20-22.

Evidence shows that black box restraints are routinely used on disabled inmates regardless of their disabilities, and a sign on the Trip Office in the Treatment Center reads: "WE DO NOT MODIFY RESTRAINTS IN THIS OFFICE. THANK YOU FOR NOT ASKING!!!"[504] This violates LSP's policy that allows any disabled inmate to request an accommodation of any LSP employee at any time.[505]

The Court does not discount the need for security in a prison setting, and not every disability accommodation request should be granted when balanced against security needs. However, in practice, the evidence established that LSP has no process for considering the propriety of accommodation requests. LSP's blanket practices, such as the black box restraint practice o disregard a disabled inmate's disability in applying discipline. The law requires the accommodation requests of disabled inmates to be balanced against the security needs of the prison, but these determinations are to be made on a case-by-case basis.[506]  This is not occurring at LSP, and the Court finds that LSP persists in failing to consider and/or make accommodations where appropriate in administering discipline.

### I. Exclusionary Policies

29.    The Court finds that Plaintiffs have failed to carry their burden of demonstrating that LSP continues to violate the ADA/RA by uniformly excluding disabled inmates form certain duty statuses, work assignments, or hobby craft.

---

[504] PX 1-d, p. 6.
[505] JX 73-c.
[506] Determining "whether a modification or accommodation is reasonable always requires a fact-specific, context-specific inquiry."  *Pierce v. Cnty. of Orange*, 526 F.3d 1190 (9th Cir. 2008)(citing *Zukle*, 166 F.3d at 1048)).

The only evidence offered by Plaintiffs regarding blanket exclusionary policies is the expert report of Dr. Schriro, who concluded, based on Defendants' general response that "there have been no changes to the practices, procedures, or policies related to ADA accommodations."[507]  Dr. Schriro's conclusion is unfounded and speculative.

While Falgout testified that there was no specific, written change to LSP's duty status policy, he testified that "the practice has changed to afford more specificity for all staff to be able to understand and be able to provide the offender with abilities to do things based on limitations."[508]  Following 2019, Falgout explained that "the emphasis got to be more specific on what an offender was able to do and not just blanket, no duty or no hobby craft or no rodeo … there was a general consensus to transition to providing them with the ability to do things were within -- within their ability, to be able to paint or draw or do other things as far as, like, hobby craft."[509]  When asked whether all blind inmates at LSP are on no-duty status, Falgout responded that he was unaware specifically if that was the case but that it would "not necessarily" be so because medical would determine the appropriate duty for a blind inmate.[510]  Falgout explained that the severity of the blindness would impact an inmate's duty status:

> If he was blind completely blind, both bilaterally, then, if he felt comfortable in doing any work, we would do our best to provide him with something that would be safe for him, safe in the environment that he's in.  If we have someone who has unilateral sight loss, then, if they wanted to have a job, we'd have to look at their safety.  They would have to wear safety glasses. We don't want to put them in anything that would increase their potential to lose the sight in the unaffected eye. So that's what we would look at. Specific job, I don't -- again, it depends.[511]

---

[507] PX 3, p. 17.
[508] JX 72-a, Falgout Depo at 55:3-7.
[509] *Id.* at 55:21-56:17.
[510] *Id.* at 57:9-22.
[511] JX 73-a, Falgout Dep. at 95:24-96:12.

Falgout testified similarly when asked about elderly inmates, inmates with chronic pain issues, and inmates with mental health challenges; in each case, he responded that work assignments would be based on the inmate's limitations and abilities.[512]

## V.    CONCLUSIONS OF LAW

### A.    Eighth Amendment Standard

In a "prison injunction case . . . The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally **to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future**."[513]  "Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."[514]

Deliberate indifference to "serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."[515] This inquiry consists of both an objective and a subjective test. The objective test requires showing that the prisoner has "serious medical needs,"[516] and "either has already been harmed or been 'incarcerated under conditions posing a substantial risk of serious harm.'"[517]  To prove an Eighth Amendment violation, Plaintiffs must prove that prison officials "1) show[ed] a subjective deliberate indifference to 2) conditions posing a

---

[512] *Id.* at 97-99.
[513] *Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1993))(emphasis added)(internal quotation marks omitted).
[514] *Brown v. Plata*, 563 U.S. 493, 511 (2011).
[515] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)(citations omitted); *see also Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989).
[516] *Estelle*, 429 U.S. at 104.
[517] *Braggs v. Dunn*, 257 F. Supp.3d 1171, 1189 (M.D. Ala. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

substantial risk of serious harm to the inmate."[518] An official is not liable for deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[519] To meet his burden, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[520]

Whether or not officials knew of the risk is considered the subjective component of the deliberate indifference standard,[521] which requires a state of mind amounting to recklessness as used in criminal law.[522] The subjective test requires a showing that prison officials had requisite knowledge of the risk of harm and either (1) disregarded it or (2) failed to act reasonably to abate it.[523] Willful blindness to the risk posed to inmates is not a valid defense to a deliberate indifference claim.[524]

Systemic deficiencies in a prison's health-care system can provide the basis for a finding of deliberate indifference at an institutional level.[525] The cumulative effect of

---

[518] *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. at 833-34).

[519] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[520] *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

[521] *Farmer*, 511 U.S. at 848.

[522] *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc) (citing *Farmer*, 511 U.S. at 839–40); *see also Hacker v. Cain,* No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *10 (M.D. La. June 6, 2016) ("An intent to harm or animus towards a particular inmate is not itself required so long as such reckless disregard for his or her medical needs can be shown."); *Hall v. Johnson*, No. 12-00099-BAJ-RLB, 2013 WL 870230, at *3 (M.D. La. Mar. 7, 2013).

[523] *Farmer*, 511 U.S. at 844-45; *see also Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1250 (M.D. Ala. 2017)("To establish deliberate indifference, plaintiffs must show that defendants had subjective knowledge of the harm or risk of harm, and disregarded it or failed to act reasonably to alleviate it.").

[524] *See Farmer*, 511 U.S. at 843 n.8 (a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

[525] *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .").

different deficiencies can demonstrate the subjective component of deliberate indifference, as the Supreme Court acknowledged in *Wilson v. Seiter*.[526] In class actions challenging systemic health care deficiencies, deliberate indifference to inmates' health needs may be shown by proving "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff," or by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[527]

The fact that a risk is obvious is sufficient to allow a fact finder to conclude that prison officials knew of the risk.[528] Plaintiffs may also demonstrate knowledge through inference from circumstantial evidence.[529] If there is proof of a problem that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[530]

For purposes of the remedy trial, Plaintiffs have demonstrated that "systemwide deficiencies in the provision of medical . . . care . . . taken as a whole, subject sick prisoners in [LSP] to 'substantial risk of serious harm' and cause the delivery of care in

---

[526] 501 U.S. 294, 300 (1991) (rejecting a distinction between "one-time" or "short-term" conditions of confinement and "continuing" or "systemic" conditions).
[527] *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted); *Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000); *see, e.g.*, *Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977).
[528] *Farmer*, 511 U.S. at 842; *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015); *Gates*, 376 F.3d at 333; *Robinson v. Babin*, No. 12-00629-BAJ-RLB, 2014 WL 2769009, at *4 (M.D. La. June 18, 2014).
[529] *Farmer*, 511 U.S. at 842.
[530] *Hinojosa*, 807 F.3d at 665 (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted).

[LSP] to fall below the evolving standards of decency that mark the progress of a maturing society,"[531] and that, in large part, these deficiencies persist.

Turning to the objective test, the Fifth Circuit has defined a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."[532] To establish a substantial risk of serious harm, "it does not matter whether the risk comes from a single source or multiple sources."[533] "[M]ultiple policies or practices that combine to deprive a prisoner of a 'single, identifiable human need,' such as [medical care], can support a finding of Eighth Amendment liability."[534] Moreover, the Fifth Circuit has long recognized that "the totality of circumstances concerning medical care" may violate the Eighth Amendment.[535] The "seriousness" of an inmate's medical need may also be determined by reference to the effects of a delay in treatment.[536] "Serious medical needs" also include conditions that threaten to cause health problems in the future.[537] Plaintiffs have carried this burden at the remedy trial.

As for the subjective test, Plaintiffs must demonstrate that Defendants have the same "sufficiently culpable state of mind" as found by the Court in the liability ruling.[538] "In prison-conditions cases that state of mind is one of deliberate indifference to inmate

---

[531] Rec. Doc. 573, p. 247 (quoting *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011)).

[532] *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

[533] *Farmer*, 511 U.S. at 843; *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish a Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise[.]" (emphasis in original)).

[534] *Braggs*, 257 F. Supp. 3d at 1192 (quoting *Gates v. Cook*, 376 F.3d at 333).

[535] *Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977).

[536] *Hill*, 40 F.3d at 1188.

[537] *See Farmer*, 511 U.S. at 843.

[538] *Id.* at 834 (internal citation and quotation marks omitted).

health or safety."[539]   Even in situations where awareness is shown, prison officials will not be liable "if they responded reasonably to the risk."[540]   However, prison officials cannot escape liability simply by demonstrating that they eventually took some form of "corrective action" in response to a risk of harm.[541]   Efforts to correct systemic deficiencies that "simply do not go far enough," when weighed against the risk of harm, also constitute deliberate indifference[542] because such insufficient efforts are not "reasonable measures to abate" the identified substantial risk of serious harm.[543]   Further, "[i]nsisting upon a course of action that has already proven futile is not an objectively reasonable response under the deliberate-indifference standard" and would support a finding of liability under the Eighth Amendment.[544]

In this case, deliberate indifference may also be established "by proving that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[545]   "In challenges to a correctional institution's provision of medical care, evidence of systemic deficiencies can also establish the 'disregard' element of deliberate indifference."[546] "As an evidentiary matter, these systemic deficiencies may be identified by a 'series of incidents closely related in time' or '[r]epeated examples of delayed or denied medical care.'"[547]   "[A]lthough one-off negligent treatment is not actionable, . . . frequent negligence, just like a single instance of truly egregious recklessness, may allow the court

---

[539] *Id.* (internal citation and quotation marks omitted).
[540] *Id.* at 844.
[541] *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998).
[542] *Laube v. Haley*, 234 F. Supp.2d 1227, 1251 (M.D. Ala. 2002).
[543] *Farmer*, 511 U.S. at 847.
[544] *Braggs*, 257 F. Supp. 3d at 1260.
[545] *Id.* at 1251 (internal citation and quotation marks omitted).
[546] *Id.* (citing *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).
[547] *Id.* at 1251-52 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058-59 (11th Cir. 1986)).

to infer subjective deliberate indifference."[548]  Deliberate indifference may also be "demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them."[549]

The "long duration" of unconstitutional conditions can also demonstrate correctional officials' knowledge of the deficiencies that cause a substantial risk of harm.[550]  Thus, if Plaintiffs show that a substantial risk of unreasonable harm was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and that "the circumstances suggest that the [prison officials] . . . had been exposed to information concerning the risk . . . , then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[551]

Applying the law to the findings of fact set forth above, and considering only evidence during the remedy phase period, the Court concludes as a matter of law that Plaintiffs have carried their burden of demonstrating that most of the systemic unconstitutional and/or discriminatory practices at LSP persist such that injunctive relief is necessary.  The Court finds that Defendants have been continuously deliberately indifferent to the serious medical needs of Plaintiffs in failing to address and/or correct known deficiencies; Defendants have continuously acted with deliberate indifference toward the standards of care "within modern and prudent professional standards" by delaying or denying access to medical attention to serious and urgent medical needs of inmates.[552]  As discussed at length above, the record is replete with instances showing

---

[548] *Dunn v. Dunn*, 219 F. Supp.3d 1100, 1129 (M.D. Ala. 2016).
[549] *Id.*
[550] *Alberti v. Sheriff of Harris Cty*., 937 F.2d 984, 998 (5th Cir. 1991).
[551] *Farmer*, 511 U.S. at 842-43; *see also Williams*, 547 F.2d at 1216 (concluding that the Eighth Amendment may be violated on a showing of "evidence of rampant and not isolated deficiencies").
[552] *Morales Feliciano v. Rossello Gonzales*, 13 F.Supp.2d 151, 208 (D. P.R. 1998).

failure by Defendants to take the necessary steps to provide access or avoid delay in access to medical and health care.

Specifically, the trial testimony and evidence demonstrate constitutionally inadequate care and/or access to care as it relates to the following: providing timely and adequate access to clinical care (including sick call and medication management), inpatient/infirmary care, emergency care, and specialty care. The continued deficient medical leadership, administration, and organizational structure underpins the constitutionally deficient system of healthcare. As set forth in the Court's Findings of Fact, the remedy trial evidence satisfies both the objective and subjective standards for deliberate indifference.

**B.      ADA/RA**

Although "the ADA 'does not require prisons to provide *new* services or programs for disabled prisoners,' these same entities 'do have an affirmative obligation to make reasonable modifications . . . so that a disabled prisoner can have meaningful access to *existing* public services or programs.'"[553] Further, "the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA."[554]

A public entity may fulfill this programmatic access mandate by constructing new facilities or altering its existing facilities to bring them into compliance with the accessibility

---

[553] *George v. Louisiana Department of Public Safety and Corrections*, No. 3:14-00338-JWD-EWD, 2016 WL 3568109 at *9 (M.D. La. June 23, 2016)(quoting *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015)).
[554] *Id.* (citing *e.g., Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014)).

requirements of Section 35.151 or through alternative methods such as "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, [or] delivery of services at alternate accessible sites."[555]  It is true that "a public entity may comply with Title II by adopting a variety of less costly measures, including . . . assigning aides to assist persons with disabilities in accessing services.  Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes."[556]  And further, courts must be "sensitive to the fact that prisons are unique environments with heightened security and safety concerns."[557]  However, where there is no evidence to conclude that such methods are shown to ameliorate barriers presented by structural deficiencies, alterations must be made.[558]

The evidence in this case demonstrates that, even after moving most disabled inmates to the Ash dorms, there remain structural barriers both within the dorms and on the campus of LSP that are not entirely ameliorated by the use of "walkers" or orderlies. Part of the Court's injunctive relief will include the appointment of a monitor to determine what structural barriers have not been effectively ameliorated by alternate means of access.   Further, although efforts have been made to increase staffing in the infirmary/nursing units, evidence shows that inmate orderlies continue to do far more than is within the scope of their duties and knowledge, and they continue to "fill the gap" due to medical staff shortages.  The regularity and sufficiency of the ADA training provided to

---

[555] 28 C.F.R. § 35.150(b)(1).
[556] *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014)(internal citations and quotations omitted).
[557] *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 75 (2d Cir. 2016)(citing *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1216–17 (9th Cir. 2008)).
[558] *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008).

inmate orderlies were not established, and a serious lack of supervision of the inmate orderlies by medical staff persists.

Based on the Court's factual findings above, LSP's methods of administration violate continue to violate the ADA and RA by failing to provide adequate access and accommodations to its disabled inmates due to neglect and/or failure to follow both Title II's implementing regulations and some of LSP's own ADA Directives.   "A public entity may not . . . utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."[559] "In other words, a public entity cannot actively undercut the ability of a public program to benefit those with disabilities."[560]  While some of the faces of leadership at LSP have changed, the evidence demonstrates, and Defendants often concede, that none of their ADA policies and procedures have been changed since the liability ruling. LSP's ADA compliance leadership has not been equipped to address the systemic ADA/RA deficiencies.[561]

More troubling, in response to the liability ruling, LSP watered down its ADA training policies for staff and, rather than comply, it removed altogether certain LSP ADA directives.  The ADA tracking database is unchanged; there remain conflicts between QA/QI and the ADA database regarding the number of, and resolution of, accommodation requests; training slides are confusing in training LSP leadership and employees regarding how a disabled inmate must request an accommodation; evidence shows that accommodations continue to be denied without reason or analysis; and disabled inmates

---

[559] 28 C.F.R. § 35.130(b)(3)(ii).
[560] *Van Velzor v. City of Burleson*, 43 F.Supp.3d 746, 752 (N.D. Tex. 2014).
[561] *See* Finding of Fact No. 24.

are still inexplicably forced to perform tasks of which they are physically incapable or left to fend for themselves when medical assistance is clearly warranted.

As one court explained, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners."[562] In fact, "where the defendant otherwise had knowledge of the individual's disability and needs but took no action," **not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim**.[563]

The law does not require, nor is the Court suggesting, that LSP must accommodate every request of a disabled inmate. Additionally, it is well-established that "[t]he ADA provides for reasonable accommodation, not preferred accommodation. The accommodation of the inmate's disability need not be ideal; instead, it need only be reasonable and effective. Further, a correctional facility is afforded deference in its determination of an appropriate accommodation."[564] Nevertheless, "the ADA invariably requires 'a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of . . . [a possible] modification in light of the nature of the disability in question.'[565] As another appellate court said, an ADA or RA case frequently rides upon

---

[562] *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006); *see also United States v. Georgia*, 546 U.S. 151, 157 (2006).
[563] *Greer v. Richardson Indep. Sch. Dist.*, 472 F.App'x 287, 296 (5th Cir. 2012); *see also Borum v. Swisher Cty.*, No. 2:14-CV-127-J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 843–44 (S.D. Tex. 2014).
[564] *Arce v. Louisiana*, 226 F. Supp. 3d 643, 651 (E.D. La. 2016)(internal citations and quotation marks omitted).
[565] *Mealey v. Gautreaux*, No. 16-716-JWD-RLB, 2020 WL 515853, *9 (M.D. La. Jan. 3, 2020)(quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995); *e.g., cf., Henderson v. Ford Motor Co.*, 403 F.3d 1026 (8th Cir. 2005) (employment discrimination under the ADA).

'resolution of . . . complicated, fact-intensive inquiries.'"[566]

Certainly, LSP has the authority to determine whether an accommodation is appropriate at all and, if so, what accommodation is reasonable when balanced against the security and other interests of the prison.  However, the evidence shows that LSP generally denies accommodation requests without serious investigation, particularly regarding black box restraints. The problem is not that LSP utilizes black boxes to transport disabled patients; rather, the problem is that there is no evidence that LSP is considering each accommodation request on a case-by-case basis as required by the ADA.

Evidence also establishes that LSP continuously fails to consider the need for accommodations in applying discipline to disabled inmates.  While "[m]aintenance of prison security is a legitimate function of prison officials, who must be accorded broad discretion in that function,"[567] a prison must evaluate a disabled inmate's needs and the accommodations necessary to ensure reasonable access to prison services, and failure to do so violates the ADA and RA as a matter of law.[568]  This obligation to provide accommodations applies to the discipline of disabled inmates, as well:  "A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his or her penological duties with

---

[566] *Id.* (quoting *R.K. ex rel J.K. v. Bd. of Educ. of Scott Cnty., Ky.*, 494 F. App'x 589, 597 (6th Cir. 2012)).
[567] *Williamson v. Larpenter*, No. 19-254, 2019 WL 3719761, at *12 (E.D. La. July 15, 2019)(citing *Waganfeald v. Gusman,* 674 F.3d 475, 485 (5th Cir. 2012), *petition for cert. filed,* 81 U.S.L.W. 3064 (U.S. July 18, 2012) (No. 12-85) (citing *Whitley v. Albers*, 475 U.S. 312, 322 (1986); *Bell v. Wolfish*, 441 U.S. 520, 546–47 (1979))("[S]ecurity considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (quotation omitted)).
[568] *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 271–72 (D.D.C. 2015).

respect to a disabled person. A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA."[569]

Actions like assigning wheelchair-bound disabled inmates to top bunks while in disciplinary segregation is unquestionably a failure to accommodate in applying discipline, yet Falgout made clear that there is no intention at LSP to change its policies, procedures or practices in disciplining disabled inmates.  Although there is an appeal process to challenge particular disciplinary actions, it appears broken or unutilized.

With the exception of exclusionary policies in duty status/work assignments, the Court finds that all of the ADA violations identified by the Court in the liability ruling persist at LSP with no indication, except for the purported future partnership with Accessology, that changes are planned or thought to be necessary.

### C.  Remedy

The Prison Litigation Reform Act (PLRA) allows a federal court to order injunctive relief to remedy a constitutional violation "with respect to prison conditions," but the injunctive relief fashioned "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."[570] Additionally, the Court must find that the injunctive relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."[571] Further, the Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief,"[572] but "[c]ourts may not allow constitutional violations to continue simply

---

[569] *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021).
[570] 18 U.S.C. § 3626(a)(1)(A).
[571] *Id.*
[572] *Id.*

because a remedy would involve intrusion into the realm of prison administration."[573] Although "plaintiffs are not entitled to the most effective available remedy[,] they are entitled to a remedy that eliminates the constitutional injury."[574]

The attitudes of those in medical leadership at the DOC and LSP easily demonstrate that injunctive relief is required in this case.  The court in *Madrid v. Gomez* found a need for injunctive relief in a prison setting based in large part on the attitudes and conduct of prison leadership:

> Our assessment of defendants' current attitudes and conduct only reinforces our view that injunctive relief is not only appropriate in this case, but perhaps "indispensable, if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prison [ ]." *Stone*, 968 F.2d at 861. Throughout this litigation, defendants have shown no indication that they are committed to finding permanent solutions to problems of serious constitutional dimension. On the contrary, defendants have expended most of their energies attempting to deny or explain away the evidence of such problems. Even when defendants modify certain policies (as they have done in the use-of-force area), they do not argue that such changes evidence an intent to address the problems raised by this complaint; rather, defendants typically assert that they were precipitated by unrelated matters.[575]

The same could be said of the LSP Defendants. The Court's liability ruling appears to have been dismissed out of hand by Dr. Lavespere and Dr. Toce.  They claim of many unconstitutional aspects of healthcare that nothing is wrong with their policies and procedures.  Several new leaders at LSP have never seen the liability ruling, nor do they have any idea what specific aspects of healthcare at LSP must be remedied.  In the rare instances that Defendants concede necessary changes, evidence suggests that they have taken a "band-aid" approach to remedies.  Such changes do not prevent the Court

[573] *Brown v. Plata*, 563 U.S. at 511.
[574] *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015)(citing *Westefer v. Neal*, 682 F.3d 679, 683–84 (7th Cir.2012)).
[575] 889 F.Supp. 1146, 1281 (N.D. Cal. 1995)(footnotes omitted).

from ordering injunctive relief because "[c]hanges made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended."[576] Moreover, a defendant's assurance that it is "already on the path towards compliance is insufficient to moot the issue."[577]

Accordingly, the Court will enter Permanent Injunctive relief by separate order.

## VI.    CONCLUSION

For the reasons set forth above, The Court finds that Plaintiffs have established their entitlement to permanent injunctive relief by a preponderance of the evidence. The Court will enter judgment in favor of Plaintiffs and against Defendants.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 6th day of November, 2023.

_Shelly D. Dick_

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[576] *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974).
[577] *Gates v. Cook*, 376 F.3d at 342–43.