UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, ET AL.                                        CIVIL DOCKET

VERSUS                                                      15-318-SDD-RLB

BURL CAIN, ET AL.

**MEMORANDUM IN SUPPORT OF MOTION TO STAY**
**REMEDIAL ORDER AND JUDGMENT PENDING APPEAL**

MAY IT PLEASE THE COURT:

Defendants[1] move the Court to stay its Remedial Order (R.Doc. 779) and Judgment (R.Doc. 780) pending the resolution of Defendants' appeal to the United States Court of Appeals for the Fifth Circuit.

        **I.**        **PROCEDURAL BACKGROUND**

On May 20, 2015, Plaintiffs filed this class action on behalf of inmates in the custody of the Louisiana Department of Public Safety and Corrections ("DOC"). Plaintiffs brought two class claims: (1) a claim for violation of the Eighth Amendment on behalf of all inmates who are now or will in the future be housed at the Louisiana State Penitentiary at Angola ("LSP"), and (2) a claim for violation of the Americans with Disabilities Act and Rehabilitation Act (collectively, "ADA/RA") on behalf of all inmates with disabilities who are now or will in the future be housed at LSP. (R.Doc. 394 at 30).

In October of 2018, the liability phase of the trial was held, and almost two and half years later, on March 31, 2021, the Court found that LSP's medical care was below the minimum

---

[1] Defendants are: the Louisiana Department of Public Safety and Corrections ("DOC"); James LeBlanc, Secretary of the DOC; Timothy Hooper, Warden of Louisiana State Penitentiary ("LSP"); Ashli Oliveaux, Assistant Warden for Health Services and ADA Coordinator for LSP; Randy Lavespere, M.D., Medical Director of the DOC; Stacye Rodriguez, Chief Nursing Officer of the DOC; Paul Toce, M.D., Medical Director for LSP; Bill Hawkins, Director of Nursing for LSP; and Cynthia Park, Nurse Practitioner at LSP.

standard allowed by the Eighth Amendment in six areas: (1) sick call, (2) emergency care/Assessment and Triage Unit ("ATU"), (3) clinical care, (4) specialty care, (5) infirmary/in-patient care, and (6) medical leadership and organizational structure. The Court further found violations of the ADA/RA. (R.Doc. 594) (the "Liability Ruling"). The Liability Ruling considered healthcare conditions and the facility conditions at LSP as they existed on or before September 30, 2016. (R.Doc. 419) In support of its findings, the Liability Ruling cited medical episodes that dated as far back as 2010. (R.Doc. 594). The use of stale medical evidence and the failure to give proper consideration to the closing Earl K. Long Hospital ("EKL") in 2013 created problems with the Court's Liability Phase. As the Court is aware, EKL was the primary provider of specialty care for LSP and the transition to another provider created difficulty. Thus, the scope of review in the liability phase was not a fair reflection of the conditions at LSP as of October of 2018, the date of trial.

This Court entered its Liability Phase ruling and then waited over one full year to hold what it termed its "remedy phase" trial in June 2022. The trial on the remedy phase was held over a ten-day period, and the Court limited the evidence it accepted to the period of time from January 1, 2019 (R.Doc. 652) through April 1, 2022, with limited exceptions thereafter.[2] This review was also problematic as it encompassed the time during which the COVID pandemic raged and disrupted care in medical facilities nationwide. This Court has refused on multiple occasions to consider actual current conditions at LSP either during the remedy phase or thereafter, instead formulating its review of conditions "as of the discovery cutoff date." (R.Doc.

---

[2] The Court placed a discovery cutoff date of April 1, 2022, and on motion by Defendants allowed limited evidence on six additional items as long as the evidence was disclosed prior to May 27, 2022. (R.Doc. 713 at 4-5). Those items were 1) updated policy and protocol for responding to self-declared emergencies; 2) evidence of job responsibilities assigned to Ashli Oliveaux and Sharita Spears; 3) evidence of inmate orderly training in March of 2022; 4) current versions of Healthcare Tracking and Status Logs; 5) Recent Morbidity and Mortality Reviews; and 6) Recent Quality Assurance and Quality Improvement meeting minutes and training materials.

778 at 7 n.24).

On November 17, 2022, Defendants filed a Motion to Supplement the Record and Admit Certain Specific Evidence of Current Conditions. (R.Doc. 762). The Defendants sought to present evidence that after conclusion of the trial in June of 2022 that (i) LSP had implemented electronic healthcare records, (ii) LSP had been re-accredited by the American Correctional Association ("ACA"), and (iii) LSP has hired an additional physician and an additional nurse practitioner. The Defendants argued that the law required the Court to consider current conditions and that these matters were certain, specific, and unassailable.[3] The Court denied the motion and did not consider the changes made after the trial in June of 2022. (R.Doc. 769)

In November of 2023, over seventeen months after the remedy trial was held, the Court entered its Opinion (R.Doc. 778), the Remedial Order (R.Doc. 779) (collectively the "Remedy Ruling") all based upon conditions existing prior to May of 2022. The Opinion concluded that "the Court will enter Permanent Injunctive relief by separate order." (R.Doc. 778 at 104). Despite engaging in a ten-day trial to determine appropriate relief, the Remedial Order issued by the Court does not identify any actual injunctive relief to be granted. Instead, it requires the appointment of three special masters who will develop remedial plans with cooperation and access from LSP. The special masters will thereafter monitor and report on compliance. All fees of the special masters are to be paid by the Defendants, and the Plaintiffs were directed to file a motion for an award of attorneys' fees. (R.Doc. 779 at 4-5). The Court then entered a Judgment in favor of Plaintiffs and against Defendants dismissing the case. (R.Doc. 780).

---

[3] See also, Declaration of Paul Toce, M.D., attached as Exhibit A, ¶¶ 3-7.

## II.    ARGUMENT AND AUTHORITIES

A.    **Standard of Review on Motion to Stay Pending Appeal.**

Federal Rule of Appellate Procedure 8(a) instructs that "[a] party must ordinarily move first in the district court for … a stay of the judgment or order of a district court pending appeal…." Fed. R. App. P. 8(a). On the motion to stay, courts are to consider four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *United States v. Transocean Deepwater Drilling, Inc.*, 537 F. App'x 358, 360 (5th Cir. 2013). The first two factors "are the most critical." *Id*.

B.    **Defendants Will Be Irreparably Injured Absent a Stay Because the Remedial Order and Judgment Intrude on State Affairs and Injure the Defendants.**

Any intrusion by the federal courts into the operation of a state's prison operations is an injury to the State. States are given broad discretion to make the difficult judgments concerning institutional operations of their prisons. *Lewis v. Casey*, 518 U.S. 343, 361-63 (1996). "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). This Court agreed that "prison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order." *Tasby v. Cain*, No. 16-277, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted*, 2017 WL 4322413 (M.D. La. Sept. 28, 2017) (citing *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999)).

4

Federalism concerns are particularly acute in the context of prison management. *See Shaw v. Murphy*, 532 U.S. 223, 228-30 (2001); *Lewis*, 518 U.S. at 386 (Thomas, J., concurring); see also *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (emphasizing that federal courts are "ill-equipped to deal with the increasingly urgent problems of prison administration"), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989). The Supreme Court observed that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973).

Federal judges are ill-equipped to manage state prisons. As Justice Scalia stated in his dissenting opinion in *Brown v. Plata*, "[t]hree years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions." *Brown v. Plata*, 563 U.S. 493, 558 (2011) (Scalia, J., dissenting). Justice Scalia opined that such injunctions over state prison operations invite district court judges to "indulge incompetent policy preferences." *Id.* (emphasis omitted); *see also Shaw*, 532 U.S. at 228-30; *Lewis*, 518 U.S. at 388 (Thomas, J., concurring); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("these considerations properly are weighed by the legislature and prison administration rather than a court"). As long recognized in the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d 993, 999 (5th Cir. 1977). Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996.

Notwithstanding these principles, prior to enactment of the Prison Litigation Reform Act (the "PLRA"), federal courts routinely entered structural injunctions[4] against prison systems.

---

[4] The term "structural injunction" is defined as an "injunction seeking to effect the reform of a social institution." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 23 (D.D.C. 2021), appeal dismissed sub nom.

5

*Valentine v. Collier*, 993 F.3d 270, 292 (5th Cir. 2021) (J. Oldham, concurring). These structural injunctions imposed massive federalism costs on the states who were required to pay the costs imposed by the injunctions. *Id*. Judge Oldham in his concurring opinion in *Valentine* explained the environment in which federal courts routinely entered structural injunctions against state prisons. *Id*. Incredibly, in 1984, 24% of the nation's state prisons were subject to structural injections. *Id.* at 293. The practice of routine issuance of structural injunctions created a significant backlash in both Congress and the courts and led to the passage of the PLRA in 1996. *Id*.

The PLRA severely circumscribed the availability of a judicial forum for prisoner complaints and stripped courts of authority to retain jurisdiction over prisons through consent decrees. *Id*. Today, courts generally recognize that structural injunctions raise "sensitive federalism concerns" by usurping state sovereignty. *Id*. at 294 (citing *Horne v. Flores*, 557 U.S. 433, 448 (2009)). One of the aims of the PLRA is to protect states from massive federalism costs brought on by unwarranted intrusions into state affairs. *Id.*

The District Court's Remedy Ruling is reminiscent of the pre-PLRA world. It constitutes an impermissible intrusion into the operations of the State of Louisiana's correctional system. The Remedy Ruling calls for the appointment of three special masters who are then to develop plans that address what appears to be all aspects of medical care and ADA/RA compliance. The special masters will then monitor and report on compliance. This massive intrusion, i.e., the complete take-over of all aspects of medical care at LSP, is contrary to principles of federalism and will impose tremendous costs upon the State. This court, by using "special masters," has decided to personally run an important and vital role which clearly belongs to the State of

---

*Ramirez v. Immigr. & Customs Enf't*, 2022 WL 4280690 (D.C. Cir. Sept. 13, 2022). Judge Oldham explained that the purpose of a structural injunction "is to alter broad social conditions by reforming the internal structural relationships of government agencies or public institutions." *Valentine*, 993 F.3d at 292.

Louisiana. The Supreme Court and the Fifth Circuit have repeatedly warned against interventions of this nature.

Additionally, the timing of the Remedy Ruling weighs in favor of granting a stay. Louisiana has just completed elections and will have a new governor and a new attorney general within two months. It is particularly difficult for the State to respond to the Court's Remedy Ruling with the transfer of power ongoing at the same time. Louisiana courts have recognized the difficulties presented by elections and newly elected officials taking office in the context of ongoing litigation. *Cf.*, *State v. Graham*, 25 La. Ann. 433, 434 (La. 1873) ("We do not recognize the right of the Attorney General, whose term of office is about expiring, to make an agreement not to take an appeal in a case, so as to preclude his successor from taking an appeal and otherwise discharging his duty to the State."); *see also*, *Gauthreaux v. Theriot*, 46 So. 892, 903 (La. 1908) ("[A] state cannot be estopped by the unauthorized acts of its officers."); *State ex rel. Guste v. First Nat'l Bank*, 305 So. 2d 687 (La. App. 4th Cir. 1974) (holding that a successor AG cannot collaterally attack a final judgment that was based on a settlement with his predecessor AG). These very real pragmatic concerns provide additional reasons to stay the pending rulings until a reasonable appeal of the very serious issues raised by the Remedy Ruling can be considered.

The Remedy Ruling is contrary to principles of federalism and will impose tremendous costs upon the State of Louisiana and force the State of Louisiana to operate its correctional system under the purview of the District Court. Such an outcome will cause irreparable injury to the Defendants.

C. **The Defendants are likely to succeed on the merits.**

Defendants are likely to succeed on the merits because the Remedy Ruling violates the requirements of the PLRA and is not based upon current conditions.

1. **The Remedial Order Violates the Requirements of the PLRA.**

The PLRA severely circumscribed the availability of a judicial forum for prisoner complaints and stripped courts of authority to retain jurisdiction over prisons through consent decrees. *Valentine*, 993 F.3d at 293. Today, courts generally recognize that structural injunctions raise "sensitive federalism concerns" by usurping state sovereignty. *Horne v. Flores*, 557 U.S. 433, 448, 129 S.Ct. 2579 (2009).

While the Court cited and acknowledged the Court's obligations imposed by the PLRA (R.Doc. 778 at 102), the Court nevertheless failed to follow the dictates of the PLRA

    a. **The Remedy Ruling Did Not Comply with the Needs-Narrowness-Intrusiveness Test of the PLRA.**

The PLRA specifically requires that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."[5] 18 U.S.C. § 3626(a)(1). Further, the Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

While the Court cited the needs-narrowness-intrusiveness test, the Court did not perform the test as required by the PLRA. Instead, the Court cited the case of *Madrid v. Gomez*, 889 F.2d 1196, 1281 (N.D. Cal. 1995) for the proposition that the Defendants' current attitudes justified her actions, i.e., appointment of a special master as was done in *Madrid*. (R.Doc. 778 at 103).

---

[5] This provision of the PLRA has been and will be referred to herein as the "needs-narrowness-intrusiveness test."

The Court's decision to appoint three special masters fails all parts of the needs-narrowness-intrusiveness test. The Court did not narrowly limit the powers of the special masters. The Remedial Order will likely end up with special masters imposing best or preferred practices for LSP. The Court made no attempt whatsoever to make the Remedy Ruling or the powers of the three special master the least intrusive necessary to correct the perceived violation. Arguably, the appointment of three special masters as contemplated by the Court is the broadest and most intrusive possible relief that the Court could enter. There is nothing narrow about designating special masters with no guidance or limiting instructions to perform a massive overhaul of LSP's medical care system with no regard for governmental intrusion or taxpayer expense.

The Court's reliance on *Madrid* is misplaced and does not justify the Remedy Rulings appointment of three special masters. *Madrid*, decided in 1995, is no longer valid law after the passage of the PLRA in 1996. The PLRA, enacted after *Madrid* was decided, requires the Court to engage in the needs-narrowness-intrusiveness test, which did not occur. The Court's decision to simply appoint three special masters is an abrogation of its clear duties and responsibilities under the PLRA. The Court's ability to simply appoint special masters to craft the remedy as was done in *Madrid* is no longer an option under current applicable law.

The Second Circuit Court of Appeal addressed this exact situation and reversed a district court's attempt to appoint a special master as the Court is suggesting in the case. *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003). The Court's holding and reasoning is quoted in length:

> The plaintiffs assert that, pursuant to the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321–70 (1996), codified at 18 U.S.C. § 3626, a special master should be appointed to essentially administer DOCS in order to ensure its compliance with the Eighth Amendment. If one looks only at this country's history of prisoner rights litigation before the passage of the PLRA, this request is understandable. In a comprehensive assessment of this history, two

9

>political scientists have asserted that it amounts to "our nation's most aggressive campaign of judicial policy making." Malcolm M. Feeley and Edward L. Rubin, Judicial Policy Making and the Modern State: How the Courts Reformed America's Prisons, at 263 (1998). A primary means through which this campaign was effected was the appointment of special masters to oversee prison conditions. This was largely because "[t]he power to appoint a compliance coordinator, more familiarly known as a special master, is traditionally regarded as an inherent power of an equity court and is explicitly authorized by the Federal Rules of Civil Procedure." *Id*. at 75 (citing Fed. R. Civ. Pro. 53(b)).
>
>  Whether or not the actions of the federal courts throughout this history was consistent with their proper role in our polity, and with the effective manifestation of the Eighth Amendments ideals, is the subject of much argument. But there is no argument over whether or not the PLRA represents a fundamental break with this history. The PLRA has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically in order to ensure compliance with the Eighth Amendment. This may or may not be a good thing, but "Congress's ability to take action of this sort demonstrates that the courts are not nearly so imperial, or unstoppable, as their critics have claimed, even when grounding their authority on the Constitution." *Id*. at 383.
>
>  We hope it goes with saying that we cannot disregard the requirements set forth in the PLRA. That statute provides that a federal court may not grant any prospective relief at all—let alone appoint a special master to administer a state prison system—unless the court finds that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The mere assertion that the appointment of a special master is appropriate obviously does not meet these strictures.

See also, *Center v. Lampert*, 726 F. App'x 672, 676 (10th Cir. 2018) (The PLRA "has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions"). The court in the Northern District of Mississippi cited *Webb* and *Lampert* and acknowledged that the PLRA "has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically in order to ensure compliance with the Eighth Amendment." *Amos v. Hall*, 2020 WL 6791516, at *1 (N.D. Miss. Jan. 24, 2020).

The Court's appointment of three special masters without undertaking the needs-narrowness-intrusiveness test violates the PLRA.

### b. The Remedial Order Appointing Three Special Masters Violates the Provisions of the PLRA Providing for the Appointment of a Special Master.

Moreover, the Court's decision to appoint a special master does not comply with any of the provisions of the PLRA pertaining to appointment of a special master. The PLRA circumscribes the district court's ability to appoint a special master. 18 U.S.C. 3626(f)(1)(A). The PLRA defines the term "special master" to mean any person appointed by a Federal Court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court. 18 U.S.C. 3626(g)(8). Thus, the PLRA clearly encompasses all appointments of a special master by a district court in prison litigation.

A special master appointed under the PLRA has the authority to "conduct hearings on the record and prepare proposed findings of fact." 18 U.S.C. 3626(f)(1)(A). The special master shall not make any findings or communications *ex parte*. 18 U.S.C. 3626(f)(6)(B).

The PLRA provides a specific process for selecting a special master. The defendant institution and the plaintiff each submit a list of not more than 5 persons to serve as a special master. Then, each party shall have the opportunity to remove up to 3 persons from the opposing party's list. The court shall select the master from the persons remaining on the list. 18 U.S.C. 3626(f)(2). The special master will be compensated as a determined rate and paid with funds appropriated to the Judiciary. 18 U.S.C. 3626(f)(4).

The District Court's appointment of a special master violates these (and more) provisions of the PLRA. Initially, the PLRA authorizes the appointment of "a special master," 18 U.S.C. 3626(f)(1)(A), not three special masters as set forth in the Remedy Ruling. Further, the special master is to conduct a hearing on the record, not engage in *ex parte* communications as called for

by the Remedy Ruling. (*see, e.g.*, R.Doc. 779 at 3-4). Moreover, under the PLRA, the special master is to be paid from funds appropriated to the Judiciary at a set rate. The Remedy Ruling requires the Defendants to pay the fees of the three special masters with no reference to any limitation as required by PLRA.

The Court's Remedy Ruling directing the appointment of not one, but three special masters, is *ultra vires* as it is clearly not in compliance with the mandatory requirements of the PLRA. The Remedy Ruling should be stayed to properly allow the Fifth Circuit to consider these fatal flaws.

    **2.**    **The Remedy Ruling Should Be Stayed Because the Court Failed to Consider Current Conditions at LSP.**

The United States Supreme Court and the Fifth Circuit have held that current conditions are critical in cases seeking prospective injunctive relief. Consideration of current conditions is vital to a determination of the threshold issue of whether Plaintiffs have an actual case or controversy under Article III of the Constitution. In determining whether a case or controversy exists in an action seeking prospective relief for allegedly unconstitutional practices, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief… if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1982) (emphasis added). As the Supreme Court has repeatedly held, an actual controversy "must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotation marks omitted).

The Supreme Court has also held that current conditions are necessary to establish whether injunctive relief should be granted in prison cases like the one brought by the Plaintiffs, saying:

12

> [If a prisoner] seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct, their attitudes and conduct at the time the suit is brought and persisting thereafter. An inmate seeking an injunction on the ground that there is a contemporary violation of a nature likely to continue, must adequately plead such a violation[.]

*Farmer v. Brennan*, 511 U.S. 825, 845–46 (1994) (internal quotations and citations omitted) (emphasis added).

On March 26, 2021, the Fifth Circuit affirmed the principle that current conditions must be considered at the time of an injunction issuing. *Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021). *Valentine* involved claims of deliberate indifference under the Eighth Amendment against a prison in Texas. After an 18-day bench trial, the district court found that the Defendants violated the Eight Amendment and issued a lengthy opinion granting an injunction. The Fifth Circuit reversed, concluding that given steps taken by the defendants, including post-trial reports of Defendants to the district court, plaintiffs failed to prove entitlement to injunctive relief. In so holding, the Court stated:

> When there is a possible constitutional violation that is likely to continue over time as in a prison injunction case, we consider the evidence from the time suit is filed to the judgment. Deliberate indifference is determined based on prison officials' current attitudes and conduct. The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*Id*. at 282 (emphasis added) (internal quotations and citations omitted).

A few months later, on August 5, 2021, the Fifth Circuit rendered its opinion on the plaintiff's appeal of *Dockery v. Hall*, 443 F.Supp.3d 726 (S.D. Miss. 2019), aff'd sub nom. *Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021). There, the district court specifically considered

13

current conditions at the prison at the time of trial and post-trial. The district court ordered briefing and considered evidence of current conditions after the trial, prior to ruling. *Id*. at 377. In affirming the district court ruling, the Fifth Circuit considered current conditions and found them to be constitutional, noting that the conditions had "changed dramatically" since the beginning of the case. *Dockery v. Cain*, 7 F. 4th at 377. The Fifth Circuit affirmed the district court in all respects. *Id*.

*Valentine* and *Dockery* definitively establish that conditions at a prison must be considered at trial not to determine whether constitutional violations have occurred, but whether they continue to occur in a manner such that injunctive relief is appropriate. *Farmer*, 511 U.S. at 846.

Recent Eleventh Circuit precedent confirms that the PLRA requires the consideration of current conditions and attitudes. In *Ga. Adv. Off. v. Jackson*, 4 F.4th 1200, 1208-09 (11th Cir. 2021) (vacated as moot due to a settlement before mandate issued, 33 F.4th 1325 (11th Cir. 2022)), the Eleventh Circuit considered whether the needs-narrowness-intrusiveness criteria must be applied when a district court converts a preliminary injunction to a permanent injunction. The Eleventh Circuit describes how the PLRA interacts with a district court's traditional equity powers, noting that "[t]he PLRA only adds to the preexisting limits on injunctive relief; it does not subtract from them." *Id.* at 1208. The PLRA "supercharges" the requirements of "narrow tailoring" and "public interest considerations." *Id.* at 1209. As to the consideration of current conditions, the Eleventh Circuit held that "[b]ecause circumstances may change during the 90-day period in which the preliminary injunction is in place" that a district court must make a second set of needs-narrowness-intrusiveness findings when converting a preliminary injunction into a permanent injunction.

14

This case shows exactly why a case should be decided upon current conditions. One of the things that the Court found throughout the Opinion was that LSP has egregious record keeping. The Court found that LSP lacked adequate medical records management. (R.Doc. 778 at 18). The Court cited to LSP's alleged medical record keeping to explain away Plaintiffs' expert's error, stating:

> The Court finds that LSP's medical records remain in shambles. They are disorganized and incoherent. Medical records are the most important repository of healthcare information and a critical source of historical complaints and treatment. The utter and complete disarray of the medical records is emblematic of indifference.

(R.Doc. 778 at 18). In another place, the Court called LSP's medical records incoherent, disorganized, and untrustworthy. (R.Doc. 778 at 19)

While Defendants do not concede that LSP's medical records keeping was inadequate, in October of 2022, LSP implemented electronic health records and brought that fact to the Court to consider prior to ruling, which the Court denied. (R.Doc. 769). When the Court issued its Ruling in November of 2023, electronic health records had been in place at LSP for a full year. (Ex. A, ¶ 11)

The EHR was piloted and implemented at other facilities prior to being implemented at LSP to ensure that the EHR was tailored and modified for DOC purposes. (Ex. A, ¶ 12) In order to implement an EHR at LSP, DOC had to upgrade the infrastructure at LSP. (Ex. A, ¶ 11) DOC and LSP have modified the EHR to better address the particular needs of the patient population and medical infrastructure at LSP, considering LSP's large facility population, length of sentence, diverse population demographics, and the number of patients with late-stage disease. (Ex. A, ¶ 13) DOC has trained all in-house medical staff on the use and functionality of the EHR system. (Ex. A, ¶ 14) The EHR is working well at LSP. (Ex. A, ¶ 14) All authorized users or

15

providers throughout DOC can access medical records of inmates through the EHR. ( Ex. A, ¶ 15)

Implementation of electronic health records has transformed the delivery of health care at LSP. Each patient in the EHR has a "Chart Summary" which contains basic health and demographic information, including the patient's name, date of birth, age, DOC number, location (prison and dorm), race, gender, mental health level of care, and medical level of care. (Ex. A, ¶ 16; Ex. A-5) The Chart Summary also provides one button access to the list of chronic problems or diagnoses, allergies, directives (such as DNR) and alerts. (Ex. A, ¶ 16) Additionally, recent healthcare encounters for the patient are listed in the Documents Section of the EHR and can be sorted by encounter type, date, and other criteria. (Ex. A, ¶ 17) Scheduled and upcoming appointments likewise appear in Orders Section. (Ex. A, ¶ 17) A provider can quickly access all important information about a patient's medical care by reference to the various sections of the HER. (Ex. A, ¶ 17)

Every health care encounter generates an electronic record of the health care and treatment provided to the patient. (Ex. A, ¶ 18) The template for a sick call encounter includes fields for vital signs, subjective complaints (primary and secondary), objective examination, assessment, and plan. (Ex. A, ¶ 18(a); Ex. A-6) Providers use a detailed chronic care template for chronic care encounters. (Ex. A, ¶ 18(b)) There is a specific template for a diabetes chronic care clinic encounter. (Ex. A, ¶ 18(b); Ex. A-8) Other templates are used for many other chronic conditions. (Ex. A, ¶ 18(b); Ex. A-9) The EHR has a separate template to document an ATU encounter. (Ex. A, ¶ 18(c); Ex. A-10) Infirmary progress notes are detailed. (Ex. A, ¶ 18(d)) The EHR encounter types include documents that can be used for many of the tasks regularly performed at LSP. (Ex. A, ¶ 18(e))

16

Orders resulting from clinical encounters are placed in the Orders Section and processed by the health information staff. (Ex. A, ¶ 19) Results from lab tests are automatically integrated into the patient's EHR through synchronicity with LabCorps' electronic records system. (Ex. A, ¶ 25; Ex. A-11)

As of May 23, 2022, LSP has fully implemented the electronic medication administration records through the sMARt ("Simple Medical Administration Record Technology") software. The sMARt system creates many reports. (Ex. A, ¶ 26; Ex. A-12)

These changes implemented by the EHR are transformative and should have been taken into account in connection with the Remedy Ruling. The Court's Remedy Ruling pertaining to inadequate medical recordkeeping at LSP is no longer valid as it is based on conditions that have changed.

The sick call form has changed in the interim since the trial in June of 2022. One of the Court's criticisms is that the sick call request form provided no place for the time and date the request was submitted or received. (R.Doc. 778 at 25) LSP has updated its sick call form (HCP 13-a "Request for Medical Treatment") to rectify this criticism. (Ex. A, ¶ 27; Ex. A-13) DOC has also decreased the copays required for access to medical care. Patients are now charged $1 for a routine sick call and $2 for an emergency sick call. (Ex. A, ¶ 29) Patients are no longer charged for prescription medication. (Ex. A, ¶ 29)

The Court further criticized the fact that LSP had only one physician on staff at LSP at the time of the Remedy Trial. (R.Doc. 778 at 61). As of January of 2023, LSP had hired a second physician and increased the number of nurse practitioners from seven to nine.[6] (Ex. A, ¶¶ 4-8) Overall, nurse staffing has increased from 14 RN positions filled in 2019 to 27 RN positions filled in 2023. (Ex. A, ¶ 8) The increase in providers and nurses is made more

---

[6] The Court called the hiring of nurse practitioners at LSP "laudable." (R.Doc. 778 at 16)

significant by the fact that the number of inmates at LSP has declined from 5491 in 2019 to 3890 in 2023. (Ex. A, ¶ 10)

The Court's Opinion did not consider any of these important changes regarding the EHR, sick call improvements, or staffing increases. The outdated finding by the Court led to a Remedy Ruling that fails the needs-narrowness-intrusiveness criteria on its face. For instance, despite LSP already has an EHR, the Remedy Ruling directs the special masters to submit a remedial plan to address, among many other things:

> Standards and Procedures for medical records management, including electronic medical records and protocols for providing real time or contemporaneous access to medical records by outside providers, specialists, and related disciplines.

(R.Doc. 779 at 2). Thus, the Court has entered an order requiring the "special masters" to make recommendations on matters that were completed over a year ago. Defendants attempted to provide this change in conditions to the Court, but the effort was rejected. The issue of LSP's alleged inadequate medical records management is moot. Moreover, under the PLRA, the Court cannot order this relief.

**D.     The Issuance of the Stay Will Not Substantially Injure the Plaintiffs.**

Defendants show that the stay will not injure the Plaintiffs because the medical care is adequate. The fact that the stay will not injure the Plaintiffs may best be shown by the procedural history of this case.

This case has been pending for over eight years. This Court took approximately two and a half years to issue its ruling after the liability trial. The Court then took approximately another year and a half to rule after the remedy trial. Surely, the Court would not have kept the case under advisement for approximately four years in total if the Plaintiffs were being substantially injured.

Defendants request a stay to have the Remedy Ruling reviewed over the next year. Such a request is reasonable after the Court kept the matter under advisement for approximately four years.

E.  **The Public Interest Supports a Stay of the Remedial Order and the Judgment**

The public has a vested interest in the operation and security of prisons within the State of Louisiana. The Court's Remedial Order and Judgment will impose substantial costs to be borne by the taxpayers of the State of Louisiana. A stay of the Remedy Ruling to allow the Court of Appeal to review the Remedial Order and Judgment and is reasonable under the circumstances.

### III.  CONCLUSION

For these reasons, the Court should stay the Remedial Order and Judgment pending appeal.

Dated: November 20, 2023.

Respectfully submitted,

BY:  */s/ Connell L. Archey*
Connell Archey (#20086)
Randal J. Robert (#21840)
Allena McCain (#38830)
Madaline King Rabalais (#38301)
BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P.O. Box 2997
Baton Rouge LA  70821-2997
Telephone:    (225) 325-8700
Facsimile:    (225) 325-8800
Connell.Archey@butlersnow.com
Randy.Robert@butlersnow.com
Allena.McCain@butlersnow.com
Madaline.Rabalais@butlersnow.com

**SHOWS, CALI & WALSH, L.L.P.**
Jeffrey K. Cody, La. Bar Roll No. 28536
Caroline T. Bond, La. Bar Roll No. 34120
John C. Conine, Jr., La. Bar Roll No. 36834

19

*Special Assistant Attorneys General*
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-1467
Email:  jeffreyc@scwllp.com
caroline@scwllp.com
coninej@scwllp.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has this day been filed electronically with the Clerk of Court using the CM/ECF system, which will deliver notice of this filing to all counsel of record.

Baton Rouge, Louisiana this 20th day of November, 2023.

 */s/ Connell L. Archey*
Connell Archey

84520854.v1