**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JOSEPH LEWIS, JR., *et al.*, on behalf of
themselves and all others similarly situated,

    Plaintiffs,

    v.

BURL CAIN, Warden of the Louisiana State
Penitentiary, in his official capacity, *et al.*,

    Defendants.

CIVIL ACTION NO. 3:15-cv-00318

JUDGE SDD

MAGISTRATE RLB

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES, COSTS AND SERVICE AWARDS

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

SUMMARY OF THE LITIGATION ...................................................................... 2

A. Investigation Phase ........................................................................................ 2

B. Liability Phase (May 20, 2015 to August 24, 2021) ....................................... 3

C. Remedy Phase (August 25, 2021 to present) .................................................. 7

LAW AND ARGUMENT ......................................................................................... 10

I.    Plaintiffs Have Prevailed on All Claims ....................................................... 10

II.    Plaintiffs' Lodestar ..................................................................................... 11

A. Plaintiffs' hours are reasonable and have been subject to careful billing
    judgment………………………………………………………………………………12

B. Plaintiffs' hourly rates are reasonable ........................................................ 14

C. Applicability of the PLRA and Apportionment ............................................. 15

III.    The Court Should Apply an Upwards Multiplier Under *Johnson* ............... 19

A. Each *Johnson* Factor Weighs in Favor of an Enhancement .......................... 19

B. The PLRA Allows Enhancement of Plaintiffs' Lodestar ................................ 25

IV.    Plaintiffs Are Entitled to Recover Their Costs and Litigation Expenses ...... 26

V.    Each Class Representative Still Living is Entitled to a Service Award. ......... 28

CONCLUSION ....................................................................................................... 30

## INTRODUCTION

This fee request arises from an extraordinary victory rarely seen in prisoner civil rights litigation.

On November 6, 2023, this Court held, "[a]fter years of discovery, 21 days of trial, and two site visits to Angola by the Court, the Plaintiffs proved that, rather than receiving medical 'care,' the inmates are instead subjected to cruel and unusual punishment by medical mistreatment." ECF 778 at 2. Further, with one narrow exception, "all of the ADA violations identified by the Court in the liability ruling persist at [Louisiana State Penitentiary] with no indication . . . that changes are planned or thought to be necessary." *Id.* at 102 (emphasis added). Thus, after nearly a decade of zealous advocacy by more than 40 attorneys, law clerks, and paralegals across six organizations, "Plaintiffs have established their entitlement to permanent injunctive relief by a preponderance of the evidence." *See id.* at 104; *see also* ECF 780 (judgment).

As the prevailing party, Plaintiffs request and are entitled to $4,085,289.86 in reasonable attorney's fees, along with a 2.0 multiplier to reflect the extraordinary results achieved in this difficult and undesirable litigation. Notwithstanding the extraordinary benefits secured for the class, the fees requested here are extremely low because counsel's lodestar is largely based on the hourly rates set by the Prison Litigation Reform Act (PLRA), rather than the market.[1] In addition, counsel has exercised thoughtful billing judgment by automatically reducing <u>all</u> non-travel time, for all timekeepers, by 20% and <u>all</u> travel time by 50-70%. Accordingly, Plaintiffs seek a total fee award of **$8,170,579.72.**

---

[1] If class counsel's fees were not capped by the PLRA, their lodestar would be $6,000,017.73. *See* **Exhibit 1** (Master Lodestar Spreadsheet).

Plaintiffs are also entitled to **$1,095,967.69** in costs and expenses, which are reasonable and were necessary to advance the litigation. *See* 42 U.S.C. §§ 1988(b), 12205; 29 U.S.C. § 794a(b).

Finally, Plaintiffs seek service awards of **$5,000 each** for the ten class representatives still living. Along with the seven class representatives who predeceased them, these men risked their personal well-being to represent thousands of others in the custody and control of Defendants. In this context, service awards are appropriate.

## SUMMARY OF THE LITIGATION

### A.    Investigation Phase

Beginning in 2013, class counsel conducted approximately 200 in-person interviews with individuals incarcerated at the Louisiana State Penitentiary (LSP) who reported receiving or witnessing grossly inadequate medical care there. *See* ECF 616-2 (Montagnes Decl.) at ¶ 13.[2] To minimize travel costs, counsel conducted these meetings over the course of 12 visits to the maximum-security prison, which is located in a remote area several hours from New Orleans. Then, counsel diligently investigated their potential claims by consulting with medical professionals and conducting significant research related to medical care, prison conditions, the grievance process, and potential claims under 42 U.S.C. § 1983.

During the investigation phase, counsel identified 12 incarcerated individuals—Joseph Lewis, Jr.; Kentrell Parker; Farrell Sampier; Reginald George; John Tonubbee; Otto Barrera; Clyde Carter; Cedric Evans; Edward Giovanni; Ricky D. Davis; Lionel Tolbert; and Rufus White—who agreed to pursue their constitutional and statutory claims for the benefit of the class.

---

[2] Plaintiffs filed an initial Motion to Set Fees and Costs on August 24, 2021. *See* ECF 616. Plaintiffs hereby incorporate by reference the arguments and authorities set forth therein, as well as the declarations, contemporaneous billing records, and expense records attached thereto.

Each plaintiff suffered from serious medical conditions that LSP officials failed to treat, and/or from disabilities that LSP failed to accommodate. As prisoners dependent on LSP for all aspects of their treatment and conditions of confinement, these men accepted enormous personal risk in the face of a lawsuit with a slim chance of success.

### B.    Liability Phase (May 20, 2015 to August 24, 2021)

Complaint. Plaintiffs, on behalf of themselves and approximately 6,000 other prisoners in the custody of Defendant Louisiana Department of Public Safety and Corrections (LDOC) at LSP, filed this lawsuit on May 20, 2015. ECF 1. They alleged, and later proved, systemic failures by LSP to provide constitutionally adequate medical care for class members, as well as violations by the LDOC of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act of 1973 (RA). *See id.* Plaintiffs subsequently amended their complaint to add named Plaintiffs Shannon Hurd, Alton Adams, Ian Cazenave, Edward Washington, and Alton Batiste. ECFs 44, 71.

Written Discovery. Counsel conducted intensive fact discovery from mid-2015 through September 2016, with a round of supplemental discovery in 2018. During this period, Plaintiffs propounded seven sets of requests for production comprising 103 distinct requests, along with five sets of interrogatories and a set of requests for admission.

To obtain this necessary discovery, counsel conducted extensive in-person and written negotiations with opposing counsel. When Defendants refused to produce medical records for all class members with chronic illness and those who died between certain dates, Plaintiffs negotiated a compromise in which Defendants produced medical records for several dozen class members instead. *See* ECF 80-1. They worked extensively with Defendants to develop a feasible electronic discovery protocol. *See* ECF 40. Plaintiffs also successfully moved to compel the production of certain documents. *See* ECF 42. Defendants eventually produced more than 100,000 emails and other files, along with tens of thousands of pages of medical records. Plaintiffs reviewed,

catalogued, and organized those documents—many of which were paper files. *See* ECF 40, 84 (documenting Defendants' dilatory production of electronic documents). Class counsel also responded to approximately 12 distinct requests for production and two dozen interrogatories propounded by Defendants to each of the 17 named Plaintiffs.

Depositions. Counsel conducted over two dozen fact depositions, including, by Defendants' choice, depositions of 16 different employees pursuant to Fed. R. Civ. P. 30(b)(6). Each required significant time in terms of document review and preparation. In addition, counsel prepared for and defended the depositions of 29 class members. These individuals were incarcerated and, therefore, in the custody and control of Defendants; their depositions all took place within the confines of LSP.

Expert Discovery. Counsel coordinated with four expert witnesses: Dr. Michael Puisis, Dr. Susi Vassallo, Nurse Practitioner Madeleine LaMarre, and Mark Mazz. The testimony and findings of each expert was critical to presenting the strongest possible case. Plaintiffs' expert work included obtaining necessary discovery; coordinating expert site visits in March and July 2016; coordinating expert reports and rebuttal reports; and preparing for and coordinating deposition and liability trial testimony. Counsel also deposed and reviewed the expert reports of two defense experts. The expert depositions—five, in total—took place in Colorado, Florida, New Mexico, Illinois, and New York. Counsel conducted a four-day medical site visit in March 2016 and a one-day ADA site visit in July 2016. Initial expert discovery concluded in December 2016 and the parties conducted supplemental expert discovery in 2018.

Motions Practice. Counsel researched, drafted, and argued many major motions in the liability phase, including:

- two amended complaints (ECFs 44, 71);

- four motions to compel (ECFs 42, 80, 126, 152);

- a motion for class certification  (ECFs 133, 140, 179, 181, 185, 187, 377, 383);

- motions for partial summary judgment (ECFs 193, 194, 265, 266, 426);

- a motion to exclude one of Defendants' two expert witnesses (ECF 192); and

- two motions for sanctions (ECFs 80, 376).

In addition, Plaintiffs opposed numerous motions filed by Defendants. Further, the Parties filed a number of joint motions, which sometimes involved extensive negotiation. Finally, Plaintiffs filed 16 motions for writs of habeas corpus for class members to appear at trial. *See* ECFs 481-96.

Class Certification. Plaintiffs moved for class certification on October 14, 2016. *See* ECF 133 (motion), 140 (brief), 187 (reply). At the two-day class certification hearing, November 2-3, 2017, Plaintiffs provided argument and presented expert testimony and other evidence demonstrating that the Court could properly hear Plaintiffs' claims under Federal Rule of Civil Procedure 23(b)(2). *See* ECFs 358-69. Plaintiffs then submitted post-hearing briefing. ECF 377.

On February 26, 2018, the Court granted Plaintiffs' motion and certified a class and subclass defined as "all inmates who now, or will be in the future, incarcerated at LSP" and "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP." ECF 394 at 30. The Court also appointed named Plaintiffs as class representatives and designated the undersigned as class counsel under Rule 23(g). *Id.*

Settlement Negotiations. Plaintiffs engaged in extensive settlement negotiations with Defendants in an attempt to make a good faith effort to settle the case without the involvement of the Court. *See* ECF 451. Prior to these conferences, Plaintiffs conducted significant legal and factual research and generated numerous written settlement documents. The parties were unable to reach a resolution. *See, e.g.*, ECF 563.

Liability Trial Proceedings. In preparation for the liability trial, class counsel engaged in extensive motions practice, including by filing and opposing motions *in limine*, seeking judicial notice, and filing voluminous exhibits under seal. *See, e.g.*, ECFs 246, 247, 274, 284. Plaintiffs also filed a comprehensive, 132-page set of pretrial proposed findings of fact and conclusions of law. *See* ECF 498.

The 11-day bench trial, which commenced on October 9, 2018, involved thousands of exhibits and 25 witnesses. *See* ECF 520. Plaintiffs called 15 witnesses, including three medical experts, one architectural accessibility expert, and seven class members. Plaintiffs spent hours preparing the class representatives and witnesses, each of whom were incarcerated at LSP and therefore in the custody and control of Defendants. Defendants called 10 witnesses, and Plaintiffs cross-examined eight. Because Defendants listed nine witnesses on their "will call" list and 21 witnesses on their "may call" list, Plaintiffs had to prepare to cross-examine many more witnesses as well. *See* ECF 410 at 4-5. Each day of trial also involved considerable work outside the courtroom, including team review of the day, evaluation of the relevant legal issues, and preparation for upcoming witnesses. *See* ECF 616-2 (Montagnes Decl.) at ¶ 16. At the close of trial, Plaintiffs researched, drafted, and filed a 298-page post-trial memorandum. ECF 573; *see also* ECF 561 (reply).

Post-Liability Trial Proceedings. The Court conducted a site visit to LSP on February 5, 2020. *See* ECF 576. Two of Plaintiffs' counsel attended the visit, which included stops at the R.E. Barrow Treatment Center, the Acute Treatment Center, Nursing Unit 1, Nursing Unit 2, and the Ash 2 Medical Dormitory. *Id.*; *see also* ECF 577. Shortly thereafter, on February 21, 2020, the Court indicated by docket entry that it "will find the medical care at Angola State Penitentiary is

unconstitutional in some respects." ECF 578. The Court ordered additional settlement conferences but, despite Plaintiffs' best efforts, the parties were unable to resolve the case.

The Court's Opinion. On March 31, 2021, the Court issued a 124-page Opinion finding that Plaintiffs satisfied their burden of proving that the medical care provided at LSP violates the Eighth Amendment prohibition of cruel and unusual punishment and that LSP systemically violates the rights of disabled inmates covered by the ADA and RA. ECF 594 at 2-3, 122.

Defendants filed a motion for reconsideration or, in the alternative, to certify the ruling for interlocutory appeal, ECF 603, which Plaintiffs successfully opposed, ECF 604. Plaintiffs also defeated Defendants' subsequent petition for writ of mandamus to the Fifth Circuit Court of Appeals. *See* ECF 624.

Plaintiffs' Initial Motion for Fees and Costs. On August 24, 2021, Plaintiffs filed their initial Motion for Attorneys' Fees and Costs. ECF 616. As the prevailing parties in the Liability Phase, Plaintiffs sought $2,870,835.11 in reasonable attorneys' fees and $562,621.05 in costs for their work through the liability phase. *See id.* Defendants moved for a stay of that motion, which the Court granted on December 15, 2021. *See* ECF 631.

## C.    **Remedy Phase (August 25, 2021 to present)**

On December 15, 2021, the Court set a remedy hearing for June 2022. *See* ECF 629. Because Defendants' counsel refused to discuss the remedy hearing with Plaintiffs until their motion for reconsideration and mandamus petition were denied, the parties had less than six months to prepare. Class counsel immediately set to work gathering new discovery, identifying and coordinating with experts, retaining two additional experts, exchanging new expert reports, coordinating with class representatives and witnesses, and filing evidentiary motions.

Written Discovery.  Counsel conducted intensive fact discovery from December 2021 to April 2022. Remedial discovery covered facts occurring from January 2019 through February

2022. Plaintiffs propounded four separate requests for production comprising 59 distinct requests, along with three sets of interrogatories. Defendants propounded over two dozen distinct requests for production and over two dozen interrogatories. These discovery requests required extensive negotiation over the course of months. Plaintiffs successfully opposed Defendants' motion for a protective order and obtained partial sanctions. *See* ECFs 640, 645, 661, 679. Defendants produced tens of thousands of pages in discovery, including the hand-written medical records of 60 class members, which Plaintiffs reviewed and catalogued.

Depositions. Plaintiffs conducted 19 fact depositions during the remedy phase, including two pursuant to Fed. R. Civ. Pr. 30(b)(6). Each deposition required significant preparation, including document review. Plaintiffs also prepared for and defended the depositions of 15 class members. As before, these incarcerated individuals were in the custody and control of Defendants, making deposition preparation unusually challenging.

Expert Discovery. Plaintiffs coordinated with the same four experts and retained two additional experts—Nurse Angela Goehring and Dr. Dora Schriro—to obtain necessary discovery, draft expert reports and rebuttal reports, and prepare for deposition and trial testimony. Plaintiffs also organized and facilitated expert site visits in April 2022, including a three-day medical and ADA methods of administration visit, and a one-day physical barriers ADA visit. The parties exchanged expert reports that same month. *See* ECF 629.

Settlement Efforts. Plaintiffs held extensive settlement discussions with Defendants during the Remedy Phase. After significant negotiations, the Parties reached a settlement on the physical barriers component of the ADA/RA claims on March 15, 2022. *See* ECFs 657, 658. However, two days later, Defendants moved to withdraw the settlement. *See* ECF 659. As a result, Plaintiffs were left with little time to marshal evidence on a claim they believed, based on Defendants'

representations, would be uncontested at the remedy hearing. This quick work included facilitating on short notice a site visit for Plaintiffs' ADA architectural expert, Mark Mazz.

Motions Practice. Plaintiffs researched, drafted, and argued several major filings in the remedy phase. Those include a motion to compel, ECF 646; a motion for sanctions, ECF 661; motions to exclude Defendants' experts, ECF 696, 697, 698; motions *in limine*, ECFs 692, 693; and Plaintiffs' pretrial proposed findings of fact and conclusions of law, ECF 689. As before, Plaintiffs opposed each of Defendants' major motions and prepared a number of joint motions, which sometimes involved extensive negotiation. Finally, Plaintiffs again sought and received writs of habeas corpus for class members to appear at trial. *See* ECFs 722, 724, 725.

Remedy Hearing. The ten-day remedy hearing began on June 6, 2022. During the hearing, Plaintiffs prepared and examined 12 witnesses, including four medical experts, one ADA architectural accessibility expert, one expert in LSP's ADA methods of administration, and three class members. Plaintiffs also prepared for and cross-examined 12 defense witnesses. As before, Plaintiffs had to prepare to cross-examine many more witnesses, not knowing in advance who Defendants intended to call.. Each day of trial involved considerable work outside the courtroom, including team meetings, legal research, and preparation for upcoming witnesses. Plaintiffs filed their 75-page post-trial proposed findings of fact and conclusions of law on December 9, 2022, ECF 771, and a response to Defendants' post-trial filing on January 13, 2023, ECF 775.

To produce high-quality work on a quick timeline, class counsel engaged several law student interns to complete legal research, provide trial support, and assist with witness preparation. This work was critical to Plaintiffs' ability to present the strongest possible case on an extremely low budget. These law clerks—Michael Allen, Rachel Talamo, and Alexandra Lesnik—performed work typically done by attorneys, including organizing and tracking trial

evidence, taking notes during testimony, tracking trial time, conducting legal research, and preparing witnesses to testify.

The Court's Remedy Opinion. On November 6, 2023, after nearly a decade of hard-fought litigation, this Court found "that Plaintiffs have established their entitlement to permanent injunctive relief by a preponderance of the evidence." ECF 778 at 104. The Court issued a Remedial Order and judgment that same day. ECFs 779, 780.

Class counsel immediately set to work to comply with the Court's Remedial Order, including by identifying and interviewing potential Special Masters. Defendants moved to stay the Court's Order pending appeal, ECF 783, which class counsel will oppose. Class counsel has also conferred with the class representatives and several class members, in person or by phone, regarding the status of the litigation.

Renewed Motion for Fees. Finally, Plaintiffs prepared the instant Renewed Motion for Fees, Costs, and Service Awards.[3]

## LAW AND ARGUMENT

### I.    Plaintiffs Have Prevailed on All Claims.

In litigation arising under 42 U.S.C. § 1983, the ADA, and the RA, the prevailing party is entitled to "a reasonable attorney's fee" under 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b) respectively. "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992). This can be established where the plaintiff obtains an enforceable judgment against the defendant

---

[3] "[I]t is well settled that fees-on-fees are recoverable under § 1988." *Volk v. Gonzalez*, 262 F.3d 528, 536 (5th Cir. 2001) (citing *Cruz v. Hauck*, 762 F.2d 1230, 1233 (5th Cir. 1985)).

from whom fees are sought. *See id.*; *see also Bailey v. State of Mississippi*, 407 F.3d 684, 687 (5th Cir. 2005).

Plaintiffs have clearly prevailed here. On November 6, 2023, the Court held that "Plaintiffs have established their entitlement to permanent injunctive relief by a preponderance of the evidence." ECF 778 at 104; *see also* ECF 779 at 5 (characterizing Plaintiffs "[a]s the prevailing parties"). The Court found for Plaintiffs on each of the two claims in their Complaint and Amended Complaints. ECF 778 at 97, 102. That same day, the Court entered an enforceable judgment for the class and against all Defendants. ECF 780. Plaintiffs are accordingly entitled to recover reasonable attorney's fees and costs.

## II. **Plaintiffs' Lodestar**

Courts in the Fifth Circuit use the two-step "lodestar" method to calculate reasonable attorneys' fees. *In re Fender*, 12 F.3d 480, 487 (5th Cir. 1994), *cert. denied*, 511 U.S. 1143 (1994). First, the court determines the raw lodestar amount by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate. *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323-24 (5th Cir. 1995). Reasonable hourly rates are generally calculated at the "prevailing market rates in the relevant community" by looking to the rates "for similar services by attorneys of reasonably comparable skills, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895, n.11 (1984).

Then, after calculating the lodestar, the court assesses the reasonableness of the fee. At this step, the court may either accept or adjust the fee, depending on the circumstances of the case and after assessing the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). A court's discretion in fashioning a reasonable attorney's fee is broad and will not be disturbed absent an abuse of discretion. *Id.* at 717; *see also Hopwood v. State of Texas*, 236 F.3d 256, 277 (5th Cir. 2000).

**A.    Plaintiffs' hours are reasonable and have been subject to careful billing judgment.**

As detailed above, more than 40 attorneys, law clerks, paralegals, and administrative staff have contributed over nearly a decade to achieving extraordinary relief for thousands of class members. This work has included: (i) investigating medical care at LSP; (ii) preparing the class action complaint; (iii) conducting discovery and motions practice; (iv) litigating the liability trial and post-trial proceedings; (v) litigating the remedy hearing and post-hearing proceedings; (vi) participating in numerous settlement conferences; and (vii) preparing the initial and renewed motion for fees, costs, and service awards.

Pursuant to Local Rule 54.2, Plaintiffs have attached declarations and contemporaneous billing records indicating the dates, amount of time billed, and a description of the services performed.[4] Counsel have undertaken a detailed review and cross-reference of those time entries and have conferred with each other to accurately estimate the amount of time spent on each task described therein. Thus, counsel have used external information to verify the estimation of time spent on various tasks.

As these records indicate, counsel has worked efficiently and leanly over the course of this litigation. For example, where appropriate, counsel has engaged qualified law clerks with lower billable rates than attorneys.[5] Similarly, law fellows and other early-career staff examined witnesses at trial and conducted other tasks that would be conducted by partner-level attorneys on the typical case team.

---

[4] Declarations, contemporaneous billing records, and other evidence pertaining to the liability phase are already in the record at ECF 616.

[5] Hours of substantive legal work performed by interns and paralegals are generally compensable as attorney's fees. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 277 (1989) (time of "law clerks (generally law students working part time)" is compensable under § 1988); *Vela v. City of Hous.*, 276 F.3d 659, 681 (5th Cir. 2001) ("Paralegal work can only be recovered as attorney's fees if the work is legal rather than clerical."); *Dunigan v. Miss. Valley State Univ.*, No. 4:19-cv-33-dmb-jmv, 2021 WL 4392132, at *6 (N.D. Miss. Sept. 24, 2021) (allowing recovery for law student time for tasks typically performed by an attorney).

Importantly, Plaintiffs have exercised careful billing judgment in "a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). In exercising that billing judgment, <u>counsel has reduced or written off more than 6,000 hours</u> of time spent litigating this complex case, including by:

- Reducing all non-travel time for every timekeeper time by 20%;

- Reducing all travel time for timekeepers from the Promise of Justice Initiative ("PJI"), Disability Rights of Louisiana ("DRLA"), and Southern Poverty Law Center ("SPLC") by 70%;

- Reducing all travel time for timekeepers from Democracy Forward, ACLU, and Cohen Milstein by 50%;

- Writing off all time for law clerks who worked less than 40 hours on the litigation;

- Writing off all intern or paralegal hours spent on administrative or purely clerical work; and

- Writing off any entries that would not be billed to a client (*e.g.*, duplicate entries and entries for leaving voicemail).

As Table A, *infra*, indicates, Plaintiffs' exercise of billing judgment has resulted in a significant reduction of hours for which they now seek fees.

### TABLE A: PLAINTIFFS' HOURS

|  | **Before billing judgment** | **After billing judgment** | **Hours cut in exercise of billing judgment** |
|---|---|---|---|
| Liability Phase | 18,648 hours | 14,068 hours | 4,580 hours |
| Remedy Phase | 6,803.61 hours | 5,227.03 hours | 1,576.58 hours |
|  |  | **TOTAL HOURS CUT** | **6,156.58 hours** |

13

**B.**    **Plaintiffs' hourly rates are reasonable.**

Reasonable hourly rates are calculated at the "prevailing market rates in the relevant community" by looking to the rates "for similar services by attorneys of reasonably comparable skills, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895, n.11 (1984); *see also Stogner v. Sturdivant*, 2011 U.S. Dist. LEXIS 141814, at *2 n.4 (M.D. La. Dec. 9, 2011) (noting that because New Orleans and Baton Rouge are of comparable size and possess similar legal markets, the prevailing rates in the Eastern District of Louisiana inform the prevailing rates in the Middle District of Louisiana).

Plaintiffs' counsel has conducted extensive research on prevailing market rates in the community for attorneys of comparable skill, experience, and reputation. *See* **Exhibit 2** (Wright Decl.) at Ex. 2B (Reasonable Hourly Rates). Additionally, since "the rates charged in private representations may afford relevant comparisons," *Blum*, 465 U.S. at 895 n.11, Plaintiffs also submit the declarations of three local attorneys who opine that the hourly rates charged by counsel here are reasonable. *See* **Exhibit 8** (Most Decl.); **Exhibit 9** (Denson Decl.); **Exhibit 10** (Schwartzmann Decl.).

Plaintiffs have amended the hourly rates presented in their 2021 fee petition in two significant ways. First, Plaintiffs have adjusted their historical hourly rates for inflation.[6] Second, Plaintiffs have adjusted <u>downward</u> the hourly rates for all Cohen Milstein and Democracy Forward timekeepers to reflect market rates in the Baton Rouge/New Orleans community. The lodestar calculations for each timekeeper are detailed at **Exhibit 1** (Master Lodestar Spreadsheet).

---

[6] Inflation-adjusted numbers were determined using the calculator available at https://www.usinflationcalculator.com/, which uses the latest United States government CPI data (published on October 13, 2022), to adjust for inflation and calculate the cumulative inflation rate through November 2023.

### C.    Applicability of the PLRA and Apportionment

The provisions of the Prison Litigation Reform Act (PLRA) relating to attorney's fees apply to "any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U.S.C. § 1988]." 42 U.S.C. § 1997e(d)(1).

The PLRA alters the lodestar method in prisoner civil rights cases in several fundamental ways. <u>First</u>, rather than hours reasonably expended in the litigation, hours used to determine the fee award are limited to those that are (1) "directly and reasonably incurred in proving an actual violation of the plaintiff's rights" and (2) "either proportionately related to the court ordered relief" or "directly and reasonably incurred in enforcing the relief." 42 U.S.C. § 1997e(d)(1)(A)-(B)(ii). <u>Second</u>, in actions resulting in monetary judgments, the total amount of the attorney's fees award associated with the monetary judgment is limited to 150 percent of the judgment. *Id*. § 1997e(d)(2). This limitation does not apply to actions resulting in non-monetary relief. <u>Third</u>, the hourly rate used as the basis for a fee award is limited to 150 percent of the hourly rate used for paying appointed counsel under the Criminal Justice Act, 18 U.S.C. § 3006A (the "CJA rate"). 42 U.S.C. § 1997e(d)(3).

Notably, the PLRA is silent as to the second step of the lodestar method, in which a court may adjust the lodestar based on factors not subsumed in that figure. Indeed, the Ninth Circuit recently observed that "while the PLRA limits the hours and the hourly rate used in calculating the lodestar figure, it does not cap the total amount of attorney's fees awards in cases seeking declaratory and injunctive relief, and it continues to authorize a court to enhance the lodestar figure based on non-subsumed factors." *Kelly v. Wengler*, 822 F.3d 1085, 1101 (9th Cir. 2016).

In this case, Plaintiffs' hours apportioned to the successful litigation of their § 1983 claims are subject to the PLRA hourly cap. In contrast, Plaintiffs' fees for their ADA and RA claims are

not capped under the PLRA, since those statutes have their own fee-shifting provisions. *See Shelton v. Louisiana State*, 919 F.3d 325, 328 (5th Cir. 2019) ("The ADA's fee-shifting provision [42 U.S.C. § 12205] is interpreted under the same legal standard as the similar provision in 42 U.S.C. § 1988"); *Jonathan G. ex rel. Charlie Joe G. v. Caddo Par. Sch. Bd.*, 875 F. Supp. 352, 368 (W.D. La. 1994) (explaining that a party prevailing under the RA is "entitled to recover attorney's fees pursuant to 29 U.S.C. § 794a(b)").

The current CJA rate for court-appointed counsel is $164 per hour.[7] Thus, the maximum hourly rate used in the lodestar calculation for PLRA work performed in 2023 is $246 (1.5 x $164). Table B, *infra*, indicates the hourly rates permitted under the PLRA over the course of this litigation.

### Table B: PLRA RATES OVER TIME

| Time Period | CJA Rate | PLRA Cap |
|---|---|---|
| 01/01/2023 through present | $164 | $246 |
| 01/01/2022 through 12/31/2022 | $158 | $237 |
| 01/01/2021 through 12/31/2021 | $155 | $232 |
| 01/01/2020 through 12/31/2020 | $152 | $228 |
| 02/15/2019 through 12/31/2019 | $148 | $222 |
| 03/23/2018 through 02/14/2019 | $140 | $210 |
| 05/05/2017 through 03/22/2018 | $132 | $198 |
| 01/01/2016 through 05/04/2017 | $129 | $193 |
| 01/01/2015 through 12/31/2015 | $127 | $190 |
| 03/01/2014 through 12/31/2014 | $126 | $189 |
| 09/01/2013 through 02/28/2014 | $110 | $165 |
| 01/01/2010 through 08/31/2013 | $125 | $187 |

Plaintiffs request the maximum hourly rate permitted under the PLRA—i.e., $246 for 2023 work, $237 for 2022 work, etc.—for most work pertaining only to their Eighth Amendment claim,

---

[7] *See* https://www.uscourts.gov/rules-policies/judiciary-policies/cja-guidelines/chapter-2-ss-230-compensation-and-expenses.

because nearly every attorney's reasonable market rate exceeds the applicable PLRA rate.[8] Plaintiffs request the market rate for each attorney for work pertaining only to the ADA claim. The apportionment calculations for each timekeeper are detailed in **Exhibit 1** (Master Lodestar Spreadsheet). For convenience, the data is summarized in Table C, *infra*.

   In a further exercise of billing judgment, Plaintiffs seek fees for only 2,373 hours of ADA work (of more than 19,000 hours spent on this litigation). *See* Exhibit 1.[9] Nearly all time spent on blended work—for instance, a team meeting where both ADA and Eighth Amendment issues were discussed—has been billed as PLRA-capped time, even though the hourly rates available under the PLRA are substantially lower than the market rates for nearly all attorneys.

---

[8] The reasonable hourly rate for first-year attorney Audrea Dakho is $200, below the PLRA-capped rate.
[9] Plaintiffs have already reduced these hours by 20% for non-travel and 50-70% for travel time, for all timekeepers.

## TABLE C: LODESTAR SUMMARY
(After 20% reduction for all hours and 50-70% reduction for all travel hours)

| TIMEKEEPER | RATE | ADA HOURS | ADA LODESTAR | PLRA HOURS | PLRA LODESTAR | TOTAL LODESTAR |
|---|---|---|---|---|---|---|
| Dubner (DF) | $400 | 276.33 | $110,532 | 1,105.40 | $245,725.85 | $356,257.85 |
| Montagnes (PJI) | $400 | 120.12 | $48,048.00 | 2,912.80 | $590,342.46 | $638,390.46 |
| Bosalavage (PJI) | $250 | 13.8 | $3,450.00 | 983.7 | $233,947.70 | $237,397.70 |
| Zarrow (PJI) | $350 | 671.68 | $235,088.00 | 1,004.60 | $207,660.72 | $442,748.72 |
| Compa (PJI) | $300 | 48.22 | $14,466.00 | 1,075.10 | $204,529.28 | $218,995.28 |
| Glass (PJI) | $300 | 27.44 | $8,232.00 | 421.8 | $81,407.40 | $89,639.40 |
| Kumar (PJI) | $350 | 100.04 | $35,014.00 | 1,948.40 | $423,269.58 | $458,283.58 |
| Ramaswamy (PJI) | $350 | 125.04 | $43,764.00 | 372.6 | $87,217.44 | $130,981.44 |
| Navalance (PJI) | $350 | 1.6 | $560.00 | 407.2 | $85,026.36 | $85,586.36 |
| Farris (PJI) | $350 | 0 | 0 | 26.6 | $5,133.80 | $5,133.80 |
| Wright (PJI) | $350 | 0 | 0 | 72.2 | $17,771.04 | $17,771.04 |
| Malik (PJI) | $250 | 3.76 | $940.00 | 533.2 | $126,025.79 | $126,965.79 |
| Reingold (PJI) | $400 | 1 | $400 | 6.9 | $1,635.30 | $2,035.30 |
| Dakho (PJI) | $200 | 0 | 0 | 46.5 | $9,300.00 | $9,300.00 |
| PJI clerks/staff | $108 | 0 | 0 | 2,868.6 | $309,807.72 | $309,807.72 |
| J. Johnson (PJI) | $400 | 13.8 | $5,520.00 | 22 | $5,181.50 | $10,701.50 |
| J. Johnson (SPLC) | $400 | 3.2 | $1,280.00 | 189.2 | $39,937.68 | $41,217.68 |
| Hamilton (SPLC) | $400 | 0.17 | $68.00 | 229.9 | $54,619.15 | $54,687.15 |
| Lubin (SPLC) | $300 | 10.6 | $3,180.00 | 216.7 | $51,618.33 | $54,798.33 |
| Davidson (SPLC) | $300 | 0 | 0 | 194 | $41,060.16 | $41,060.16 |
| Angelson (SPLC) | $400 | 0 | 0 | 277.4 | $58,622.64 | $58,622.64 |
| Clark (SPLC) | $250 | 0 | 0 | 32.4 | $6,928.80 | $6,928.80 |
| Gaffney (SPLC) | $250 | 0 | 0 | 20 | $4,200.00 | $4,200.00 |
| SPLC clerks/staff | $108 | 0 | 0 | 207.8 | $22,439.81 | $22,439.81 |
| Lospennato (DRLA) | $400 | 138.92 | $62,514.00 | 0 | 0 | $62,514.00 |
| Warden (DRLA) | $250 | 382.24 | $95,560.00 | 0 | 0 | $95,560.00 |
| Tait  (DRLA) | $400 | 81.28 | $32,512.00 | 0 | 0 | $32,512.00 |
| Hamilton (ACLU) | $400 | 4.1 | $1,640.00 | 470 | $96,074.52 | $97,714.52 |
| Sirmon (ACLU) | $400 | 44 | $17,600.00 | 147.3 | $28,028.19 | $45,628.19 |
| Harrison (ACLU) | $400 | 6.6 | $2,656.00 | 32.7 | $6,314.96 | $8,970.96 |
| Small (CMST) | $450 | 6.8 | $3,060.00 | 28.4 | $5,728.72 | $8,788.72 |
| B. Johnson (CMST) | $400 | 0.08 | $32.00 | 0.3 | $60.80 | $92.80 |
| Koffman (CMST) | $450 | 0 | 0 | 2.4 | $556.80 | $556.80 |
| McCuaig (CMST) | $425 | 2.6 | $1,105.00 | 0 | 0 | $1,105.00 |
| Liu (CMST) | $425 | 0.04 | $17.00 | 0.2 | $30.40 | $47.40 |
| Schneiderman (CMST) | $250 | 99.192 | $24,798.00 | 296.4 | $70,253.62 | $95,051.62 |
| Dubner (CMST) | $400 | 173.63 | $69,452.00 | 694.6 | $134,100.54 | $203,552.54 |
| CMST staff | $108 | N/A | N/A | 85.6 | $9,244.80 | $9,244.80 |
|  |  |  |  |  | **TOTAL** | **$4,085,289.86** |

**III. The Court Should Apply an Upwards Multiplier Under *Johnson*.**

After determining the lodestar amount, a court next considers the factors identified in *Johnson v. Ga. Highway Express*, 488 F.2d. 714 (5th Cir. 1974), and may adjust the lodestar upward or downward depending on the weight it allots to those factors. The district court "necessarily has discretion in making this equitable judgment." *Hensley*, 461 U.S. at 437.

The twelve Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he or she accepted the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.

Here, all twelve *Johnson* factors weigh in favor of applying an upward multiplier to Plaintiffs' fees. Most importantly, after nearly a decade of hard-fought advocacy, class counsel has achieved an excellent result for thousands of incarcerated clients, under extreme time pressure and with limited resources. Because the hourly fee available under the PLRA underrepresents this work, a 2.0 enhancement of the lodestar figure is warranted.

**A.      Each *Johnson* Factor Weighs in Favor of an Enhancement.**

This case presents the rare "exceptional success" that warrants an upward adjustment under *Johnson*. *See Hensley*, 461 U.S. at 435. In fact, every *Johnson* factor weighs clearly in favor of application of a multiplier.

(1)      Time and Labor Required: Courts have recognized "that prison litigation can be particularly time-consuming, as counsel must travel to and from remote prisons to interview

witnesses, and may devote many hours to following up on communications from Class members, to whom they owe significant duties under Rule 23." *Cole v. Collier*, No. 4:14-cv-1698, 2018 WL 2766028, at \*13.

That is true here. This complex class action involved the largest maximum-security prison in the country. The certified class and subclass were comprised of every individual incarcerated there—between 3,900 and 6,400 men—all of whom were in the physical custody and control of Defendants at all times. Despite the difficulty communicating with incarcerated clients, especially before and during the COVID pandemic, class counsel forged relationships with 17 class representatives and many more class members. Those class representatives each suffer or suffered from serious health conditions; seven died over the course of this litigation.

(2)      <u>Novelty and Difficulty:</u> This litigation has been unusually difficult. Plaintiffs' claims involve complex areas of constitutional and statutory law, and are further complicated by the PLRA and the class action mechanism. The case involved complex factual issues, including institutional policies and practices along with medical and scientific issues. Class counsel conducted a comprehensive investigation of a medical system within a maximum-security prison, navigating challenges to access and transparency. The unique nature of this case presented myriad logistical challenges related to prison security protocols and correctional staff shortages, which made visiting and communicating with clients very difficult. In addition, the vast majority of evidence—including the class members themselves—was wholly within Defendants' custody and control. Unlike plaintiffs in most lawsuits, the class representatives and witnesses in the instant case were uniquely vulnerable to retaliation by Defendants, who controlled every aspect of their health, safety, and welfare.

Further compounding these difficulties, Plaintiffs' claims of inadequate medical care—including preventable deaths, improper treatment, and inappropriate follow-up—are complex and specialized, requiring not only medical expertise but expertise in correctional medicine specifically. Expert observations and opinions were extensive and meticulous, relying on thousands of pages of paper medical records that were often out of order or missing pages. Plaintiffs also investigated the decades-long history of Angola's medical system to prove Defendants' long-standing awareness of the deficiencies in their practices. Despite countless obstacles inherent in prison litigation of this magnitude, class counsel uncovered astounding evidence of systemic constitutional and statutory violations that endangered the lives of thousands of class members. Based on this evidence, counsel secured an extraordinary remedy for their clients.

(3)    <u>Skill:</u> Prison litigation of this complexity requires expertise in constitutional law, the ADA, medical and correctional best practices, complex class action procedure, and case management. This undertaking has further required extensive fact investigation, years of counseling clients about their legal options, intricate negotiations, complex and copious written filings, and high-stakes trial presentations. The Court is well positioned to judge the skill with which Plaintiffs' counsel undertook these tasks. Among other things, the Court has reviewed Plaintiffs' numerous successful motions and their exhaustive pre- and post-trial submissions, and seen more than a dozen members of Plaintiffs' team examine witnesses across the two trials. This record provides the Court with an ample basis to evaluate whether this factor supports application of a multiplier.

(4)    <u>Preclusion of Other Employment:</u> In *Johnson,* the Fifth Circuit recognized that "once the employment is undertaken the attorney is not free to use the time spent on the client's

behalf for other purposes." 488 F.2d at 718. Here, the investment of more than 25,000 hours of attorney time over nearly nine years necessarily meant turning down other cases that would have been lower risk and would have resulted in a more immediate return on investment. For example, the Promise of Justice Initiative did not file a single new class action case in 2016, 2017, 2018, or 2019, mainly due to the extraordinary demands of this litigation.

(5)    Customary Fee: Class counsel's standard hourly rates are listed in **Exhibit 1** (Master Lodestar Spreadsheet) and **Exhibit 2B** (Reasonable Hourly Rates), and discussed in the declarations submitted with and incorporated into this Motion.

(6)    Nature of Fee: Counsel has received no compensation from any client for this matter. This means that Plaintiffs' counsel has assumed 100% risk of loss, including lost opportunities, salaries, and substantial out-of-pocket costs. The non-profit organizations that have undertaken this massive effort, including the Promise of Justice Initiative, Democracy Forward, and the Southern Poverty Law Center, have limited financial and staffing resources to expend on litigation.

(7)    Time Limitations: Plaintiffs advanced their claims, despite the many challenges posed by prisoner civil rights litigation of this scale and complexity, quickly and efficiently. As noted, this included preparing a remedy case in only six months. That work resulted in this Court's order issuing a permanent injunction.

(8)    Results Obtained: "[T]he most critical factor in determining the reasonableness of a fee award in a civil rights suit is the degree of success obtained." *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (5th Cir. 1998) (internal quotations omitted). Here, the results are undeniable.

On March 31, 2021, this Court held that "Defendants have been deliberately indifferent to the inmates' serious medical needs in the means and manner of the delivery of health care." ECF

594 at 2.  The Court likewise found Defendants liable under the ADA and RA for operating an orderly program that creates an unnecessary risk of harm to disabled and vulnerable class members, segregating disabled class members, inadequately training staff regarding the ADA, failing to process accommodation requests and disability-related grievances, failing to identify and track patients' disabilities, and failing to maintain a qualified and adequately trained ADA Coordinator. *Id.*

The Court reiterated these findings in its November 6, 2023, Opinion. *See* ECF 778. There, the Court held that "[a]fter years of discovery, 21 days of trial, and two site visits to Angola by the Court, the Plaintiffs proved that, rather than receiving medical 'care,' the inmates are instead subjected to cruel and unusual punishment by medical mistreatment." ECF 778 at 2. As for Plaintiffs' ADA claims, this Court held that, with the narrow exception of exclusionary policies in duty status/work assignments, "all of the ADA violations identified by the Court in the liability ruling persist at LSP with no indication . . . that changes are planned or thought to be necessary." *Id*. at 102. The same day, the Court issued a permanent injunction requiring the implementation and monitoring of remedial plans to address each of Plaintiffs' claims. *See* ECF 779.

(9)    <u>Experience, Reputation, and Ability of the Attorneys:</u> As this Court recognized in designating Plaintiffs' counsel to represent the class and sub-class, *see* ECF 394 at 30, Plaintiffs' counsel are highly skilled attorneys with significant experience in complex civil litigation, prisoner civil rights actions, and class action procedure.

(10)    <u>Undesirability of the Case:</u> This may be the epitome of an "undesirable" case. Prison litigation is notoriously expensive, and complicated. *See Cole v. Collier*, No. 4:14-cv-1698, 2018 U.S. Dist. LEXIS 97110, at *48 (S.D. Tex. June 8, 2018) ("Cases involving civil rights, class actions, and incarcerated clients are often costly, time-consuming, and difficult."). Cases of this

type and magnitude bear high risk and an extremely low rate of return, making them undesirable even within the civil rights community, let alone the private bar.

It is especially difficult for incarcerated plaintiffs, like those here, to find qualified counsel to take cases for which only declaratory relief or injunctive relief might be available, because of the low hourly fees available under the PLRA. *See* **Exhibit 8** (Most Decl.) at ¶¶ 16-17; **Exhibit 9** (Denson Decl.) at ¶ 9; **Exhibit 10** (Schwartzmann Decl.) at ¶ 11. Counsel took on this case knowing that it would commit them to years of litigation at submarket rates and with no return whatsoever should they lose.

(11)    Nature and Length of the Professional Relationship with the Clients: Plaintiffs' counsel have investigated unconstitutional and illegal conditions of confinement at LSP for more than a decade. During those years, counsel have met innumerable times with each class representative and many class members, both in person and by Zoom, and communicated with them regularly by phone and mail. As a result, counsel have developed meaningful, long-lasting, professional relationships with the class representatives and many class members. Counsel have also grieved the deaths of seven class representatives—Joe Lewis, Shannon Hurd, Alton Batiste, Edward Giovanni, Farrell Sampier, Reginald George, and Rufus White—who each suffered immensely because of the constitutional violations this action seeks to remedy.

(12)    Awards in Similar Cases: The rates awarded in similar cases are discussed *supra*.

Thus, all twelve *Johnson* factors support application of a 2.0 multiplier. The extraordinary results achieved here—in tandem with the decade-long nature of this case, uncertainty of recovery, skill demonstrated by counsel, and difficulty prisoners find in acquiring representation in civil rights litigation—weigh heavily in favor of an upward adjustment.

**B.    The PLRA Allows Enhancement of Plaintiffs' Lodestar.**

The PLRA does not limit this Court's discretion to apply an upwards multiplier given the excellent results achieved for the class. The relevant PLRA provision, 42 U.S.C. § 1997e(d)(3), states that fee awards may not "be <u>based</u> on an hourly rate greater than 150 percent" of the CJA rate. § 1997e(d)(3) (emphasis added). That is, the rate limited by § 1997e(d)(3) is the base rate used to calculate the lodestar, which is the PLRA's counterpart to the prevailing market rate used in non-PLRA cases. However, the PLRA does not limit the total amount of the attorney's fees award associated with the judgment where, as here, the case involves only declaratory and injunctive relief.

Basic tenets of statutory interpretation lead to this obvious result. When Congress enacted the PLRA, the two-step lodestar method for determining a reasonable attorney's fees award under § 1988 had already "achieved dominance in the federal courts." *Kelly v. Wengler*, 822 F.3d 1085, 1100 (9th Cir. 2016) (citing *Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002)). That is, federal courts would first calculate the lodestar by multiplying the hours reasonably expended by a reasonable hourly rate, and then determine whether to adjust that figure upward or downward. *See Kelly*, 822 F.3d at 1099.

However, as the Ninth Circuit observed in *Kelly*, "[t]here is nothing in the attorney's fees provisions of the PLRA that instructs a court not to take both steps in this process." *Id.* at 1100. In other words, there is no evidence that Congress intended for the PLRA to change the well-settled, two-step lodestar method. Instead, "Congress' silence is strong evidence that the PLRA contemplates the continuation of the normal practice under § 1988 of adjusting the lodestar figure by factors not subsumed in that figure." *Id.* at 1101.

Applying these basic principles of statutory interpretation, federal courts across the country—including within the Fifth Circuit—have enhanced fee awards in prisoner civil rights

cases to ensure the PLRA lodestar reflects a reasonable fee in light of the *Johnson* factors. *See, e.g.*, *Kelly*, 822 F.3d at 1102 (upholding lodestar enhancements of 2.0 and 1.3 in a prisoner civil rights class action); *Cole v. Collier*, No. 4:14-cv-1698, 2018 U.S. Dist. LEXIS 97110, at *50 (S.D. Tex. June 8, 2018) (applying a multiplier of 1.9 in a civil rights class action brought on behalf of state prisoners "to ensure the lodestar reflects a reasonable fee in light of the *Johnson* factors); *Ginest v. Bd. of Cnty. Comm'rs of Carbon Cnty., WY*, 423 F. Supp. 2d 1237, 1241 (D. Wyo. 2006) (granting a 25% multiplier despite the PLRA's cap on hourly rate); *Skinner v. Uphoff*, 324 F. Supp. 2d 1278, 1288 (D. Wyo. 2004) (same); *Bown v. Siegert*, 2020 U.S. Dist. LEXIS 244729, at *7 (D. Idaho Dec. 23, 2020) (applying a multiplier to the PLRA rates "to better reflect a reasonable rate for the rare and exceptional circumstances presented in this case").

Applying a 2.0 multiplier leads to a total fee award of **$8,170,579.72.**

## IV. Plaintiffs Are Entitled to Recover Their Costs and Litigation Expenses.

As the prevailing party, Plaintiffs are entitled to recover costs and expenses under 42 U.S.C. § 12205 (fees provision of ADA) and/or 42 U.S.C. § 1988(b) (civil rights fees provision). For the reasons that follow, Plaintiffs seek **$1,095,967.79** in necessary costs and expenses. Class counsel has verified these expenses through declarations and detailed expense reports. *See* **Exhibit 2** (Wright Decl.); **Exhibit 3** (Bosalavage Decl.); **Exhibit 4** (Dubner Decl.); **Exhibit 5** (Harper Decl.); **Exhibit 6** (Small Decl.); **Exhibit 7** (Schneiderman Decl.); *see also* ECF 616-2 to -28. As is clear from the nature of these costs, each expense was necessary to achieve the extraordinary results here.

In particular, six expert witnesses were indispensable to the Court's findings at all phases of litigation. The Court found each expert credible. For instance, the Court ruled for Plaintiffs on the ADA physical barriers claim after crediting the testimony of Mark Mazz, who identified 190 architectural barriers at LSP. *See* ECF 594 at 49; ECF 778 at 71. During the remedy phase, the

Court again credited Mr. Mazz's testimony, including his finding that Defendants had remediated only 19-20% of the barriers identified in his 2016 report. *See* ECF 778 at 72. Similarly, the Court credited Dr. Dora Schriro's testimony regarding the inadequacies of LSP's ADA administration. *See* ECF 778 at 71. Further, the Court found systemic problems with clinical care based on Dr. Puisis' chart reviews, which "revealed systemic, recurring problems with clinical care." ECF 778 at 21. And in support of its findings related to emergency care, the Court explained that "Dr. Vassallo credibly concluded that the emergency care provided by LSP remains constitutionally deficient. . . ." ECF 778 at 41. Plaintiffs could not have achieved the extraordinary results at hand but for each expert's review of records, site visits to LSP, and testimony.

Finally, Plaintiffs' counsel, which include six non-profit civil and disability-rights organizations and a national class action firm, have litigated this case leanly. For instance, to reduce travel and lodging costs, class counsel generally coordinated group visits to LSP to meet with as many incarcerated class members as possible in a single day. Similarly, class counsel arranged assignments to minimize travel for out-of-state counsel. Plaintiffs' costs and litigation expenses are summarized in Table D, *infra*.

**TABLE D: TOTAL COSTS AND LITIGATION EXPENSES**

| Organization/Firm | Liability[10] | Remedy | Total |
|---|---|---|---|
| Promise of Justice Initiative | $296,286.41[11] | $475,021.26 | $771,307.67 |
| Jeffrey Dubner (solo) | $4,348.60 | $0 | $4,348.60 |
| ACLU Foundation of Louisiana | $15,373.77 | $0 | $15,373.77 |
| Disability Rights Louisiana | $87,113.34 | $0 | $87,113.34 |
| Southern Poverty Law Center | $115,730.41 | $4,673.81 | $120,404.22 |
| Cohen Milstein Sellers & Toll PLLC | $83,336.04 | $7,387.19 | $90,723.23 |
| Democracy Forward | $0 | $6,696.96 | $6,696.96 |
| | | **TOTAL:** | **$1,095,967.79** |

## V. <u>Each Class Representative Still Living is Entitled to a Service Award.</u>

Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and sometimes to recognize their willingness to act as private attorney general." *Humphrey v. United Way of Tex. Gulf Coast*, 802 F. Supp. 2d 847, 868 (S.D. Tex. 2011) (citation omitted). In deciding the amount of a service award, courts in the Fifth Circuit consider: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation. *Id.* at 869.

---

[10] *See* ECF 616-1 at 30.

[11] This has increased by $39,567.52 from the amount listed in ECF 616-1 at 30. Plaintiffs inadvertently omitted four expert witness invoices from their 2021 fee petition. These expenses and invoices have been included here. *See* Exhibit 2S at 001 (Category 7 expense items); *id.* at 18 (Sept. 2, 2016 Mark Mazz invoice for $8,917.50), *id.* at 26 (Nov. 2, 2018 Mark Mazz invoice for $10,983.56), *id.* at 14-15 (June 11, 2016 Dr.Vassallo invoice for $5,600), *id.* at 16-17 (March 2016 Nurse Practitioner LaMarre invoice for $14,066.46).

Ten of the 17 class representatives are still living. Six are still incarcerated at LSP; two are incarcerated at another LDOC facility; two have been released. All continue to suffer from serious medical conditions and/or disabilities that formed the basis of this lawsuit. They have spent nearly nine years litigating against the same prison officials who controlled their conditions of confinement, well-being, and access to medical care. Accepting a high risk of retaliation and a low chance of achieving relief, the class representatives have responded to discovery, testified at deposition, participated in two trials, and worked closely with class counsel to prove their claims. *See* **Exhibit 3** (Bosalavage Decl.) at ¶¶ 11-27. They have also been willing to lay bare extensive and personal details of their medical history; unlike the members of the sample, the class representatives' medical records were not anonymized in the public filings or trial testimony.

The results achieved in this case could not have been obtained without the efforts and sacrifices of the class representatives. Their service has provided an extraordinary benefit to thousands of others. In recognition of their service as class representative in this case, Plaintiffs request a service award of **$5,000 each** for the ten class representatives still living: Clyde Carter; Ian Cazenave; Ricky D. Davis; Kentrell Parker; Lionel Tolbert; John Tonubbee; Edward Washington; Alton Adams; Cedric Evans; and Otto Barrera.[12] This amount is fair and reasonable in light of the time, resources, and extraordinary risk expended in prosecuting this case on behalf of the class.

---

[12] Joseph Lewis, Farrell Sampier, Reginald George, Edward Giovanni, Shannon Hurd, Alton Batiste, and Rufus White are deceased.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully seek reimbursement of $4,085,289.86 in reasonable attorney's fees and a 2.0 multiplier for the exceptional results achieved in this undesirable and difficult case, for a total fee award of **$8,170.579.72.** Plaintiffs also request **$1,095,967.79** in necessary costs and expenses. Finally, Plaintiffs seek service awards of $5,000 each for the ten living class representatives, for a total of **$50,000.**

Respectfully submitted this 6th day of December, 2023.

*/s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926
Nishi Kumar, La. Bar No. 37415
Samantha Bosalavage, La. Bar No. 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: lwright@defendla.org

Jeffrey B. Dubner (*pro hac vice*)
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 656-2722
Email: jeffrey.dubner@gmail.com

Bruce Hamilton, La. Bar No. 33170
Emily Lubin, La. Bar No. 38823
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Telephone: (504) 486-8982
Facsimile: (505) 486-8947
Email: bruce.hamilton@splcenter.org

Daniel A. Small (*pro hac vice*)
Brendan Schneiderman (*pro hac vice*)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com

Nora Ahmed (*pro hac vice*)
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
Email:  nahmed@laaclu.org

Ronald K. Lospennato, La. Bar No. 32191
Disability Rights Louisiana
8325 Oak St.
New Orleans, LA 700118
Telephone: (504) 522-0628
Facsimile: (888) 534-2996
Email: rlospennato@advocacyla.org