# EXHIBIT E

1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


JOSEPH LEWIS, JR. ET
AL ON BEHALF OF
THEMSELVES AND ALL
OTHERS SIMILARLY
SITUATED

          CIVIL ACTION
          NO. 3:15-CV-00318

VERSUS

          JUDGE: SDD
          MAGISTRATE: RLB

BURL CAIN, WARDEN OF
THE LOUISIANA STATE
PENITENTIARY, IN HIS
OFFICIAL CAPACITY, ET
AL


        30(b)6 Deposition of Louisiana Department of Public Safety and Corrections through its designated representative TRACY FALGOUT, taken on March 24, 2022, via Zoom Videoconferencing.

2

APPEARANCES:

SOUTHERN POVERTY LAW CENTER
BY:  REBECCA RAMASWAMY, ESQ.
201 St. Charles Avenue
Suite 2000
New Orleans, Louisiana  70170
Phone: (504)352-4398
Email: rramaswamy@defendla.org
    REPRESENTING THE PLAINTIFFS


SHOWS, CALI & WALSH
BY: JEFFREY CODY, ESQ.
AND JOHN CONINE, ESQ.
628 St. Louis Street
Baton Rouge, Louisiana  70820
Phone: (225)346-1461
Email: jeffreyc@scwllp.com
    REPRESENTING THE DEFENDANTS


REPORTED BY:

Cecilia M. Henderson
Certified Court Reporter

3

WITNESS INDEX

                                                    Page

MS. RAMASWAMY ..............................5


        E X H I B I T   I N D E X

                                                    Page

Exhibit 1 .................................9
Exhibit 2 ................................41
Exhibit 3 ................................42
Exhibit 4 ................................62

S T I P U L A T I O N

It is stipulated and agreed by and between counsel that the deposition of TRACY FALGOUT is hereby being taken under Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of filing and certification are hereby waived; that the formalities of reading and signing are hereby specifically not waived;

That all objections, except those as to the form of the question and/or responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof may be used in evidence.

\*   \*   \*   \*   \*   \*   \*   \*

CECILIA M. HENDERSON, Certified Court Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

would be the Treatment Center.  As far as the nursing units, it would be Ash Dormitory 1, 2, 3 and 4.  And it would be Bear Dormitory at Camp C, Dorm 1.

Q     Are disabled patients at LSP housed at any other dorms that you haven't named?

A     No.

Q     Last time we talked, you said that you were getting ready to move people into Ash 3 and Ash 4.  Has anyone moved in yet?

A     Yes.

Q     How many people have moved to Ash 3 or Ash 4?

A     I can't give you an exact number, but I can offer 20 to 25.

Q     And who are those people, generally speaking?

A     Those people that Medical has determined that need to be moved into the dormitory, into Ash, into an assistant living dormitory.

Q     Where do they move from?

A     They moved from Hickory 4.

Q     So all 20 to 25 were in Hickory 4?

A     Correct.

Q    Do you know how many are in Ash 3 versus Ash 4?

A    I do not.

Q    So Hickory -- is Hickory 4 not wheelchair accessible?

A    Hickory 4 is wheelchair accessible. The Ash units -- the Ash units as itself in its entirety is closer to access for the hospital -- the Treatment Center, for meals, for pill call, for programming.  So that is why those changes have been made.

Q    And are all these 20 to 25 people who have been moved into Ash 3 and 4 in wheelchairs?

A    No.

Q    Do you know roughly how many are in wheelchairs?

A    I can't give you an exact number.

Q    Do they all have issues with ambulation?

A    Yes.  I can say that they would.

Q    Is anyone still waiting to be moved to Ash 3 or Ash 4?

A    To the best of my knowledge right now, no.

44

Q    Are there any current plans to make changes to LSP practices, policies or procedures related to discipline in the ADA?

A    Not at this time.  It would be based on, again, their custody status resulting from a disciplinary action would not change the need for accommodation.  So we would have to house them accordingly.  If they're wheelchair-bound and they're in Ash 2 dormitory and they get a disciplinary writeup and they have to go to a cell block, then we would have to put them into a wheelchair accessible cell.  Their custody level would change.  Their housing would change, but their level of accommodation would not.

Q    But that's a policy that exists right now and has not been changed since 2019 and is not going to change anytime soon, that you're aware of?

A    Correct.

Q    When is the ADA implicated in a disciplinary decision?

A    Can you repeat that?

Q    When is the ADA implicated in a disciplinary decision?

identify when a person's disability is implicated in a behavior that leads to discipline?

A    Yes.

Q    Is Security at LSP trained to contact the ADA Coordinator when a person is being disciplined for a behavior that implicates their disability?

A    Yes.

Q    Now, you just said that Security is trained to identify when a person's disability is implicated in a behavior that leads to discipline.  Can you explain?

A    If there a question as to whether the disciplinary action or the rule violation was the result of the disability, then the Board has the ability to defer to the ADA Coordinator and/or Medical to verify whatever may be the case dealing with that rule violation.

Q    When you say, "The Board," you mean the Disciplinary Board?

A    Correct.

Q    When you say they have the ability to defer to the ADA Coordinator and/or to

48

Medical, what does that mean, exactly?

A    Specifically, they can hold up on making any determination of the disciplinary action and wait for a response from either the ADA Coordinator's office and/or Medical as to the nature of the violation and did the disability have anything to do with that.

Q    And when that happens, does the Disciplinary Board contact either the ADA Coordinator or Medical directly?

A    Yes.  It would be through the Disciplinary Board.  They would defer on the DB document and then the DB office would contact either the ADA Coordinator's office or Medical and give them the specifics of what occurred and need a response based on the findings.

Q    Have you ever been asked, in your six years as ADA Coordinator, to weigh in on one of these deferences from the Disciplinary Board?

A    I can't recall anything specifically that has been directed to my office.  I know that over time I do recall there was conversation about an offender.  And if you

49

ask me who, when, where, why, it's just this sticks in my ahead that we had an offender that was written up for not putting his locker box away properly and he was written up.  It is a rule violation.  It got deferred to Medical because there was question about his ability to physically move that locker box.  It came back that his duty status was such that he could not move the locker box, that he needed assistance, so that was taken into consideration in the infraction.

Q    That's the only time you can specifically remember?

A    As far as back as I can remember, yeah, that's about it.

Q    And how was it taken into consideration?

A    Simply the fact that the offender didn't have physical strength to move his locker box, that he had needed assistance with it.

Q    So does that mean he was not disciplined for the violation?

A    Again, I don't recall the final outcome.  I know that -- you were asking about

55

A    Again, as I stated, I'm not aware of anything that has changed in that.  I do know that the practice has changed to afford more specificity for all staff to be able to understand and be able to provide the offender with abilities to do things based on limitations.

Q    When did that practice change?

A    It's actually kind of been an evolution started before '19; has continued to evolved through '19.  And up until -- from a medical side of it -- until I was -- as of 2000 -- the beginning of 2021, I was not as -- I was not as close to Medical as I was in the past.  So I can't really speak on it after that.  And then we end -- we had a new hospital administrator come in.  So at that point, you know, he was will there, so it gave me more of an administrative responsibility than an active role in the medical piece.

Q    Why did that practice start changing in 2019?

A    Again, it started changing before, but the emphasis got to be more specific on what an offender was able to do and not just

78

WITNESS' CERTIFICATE


I, TRACY FALGOUT, do hereby certify that the foregoing testimony was given by me, and that the transcription of said testimony, with corrections and/or changes, if any, is true and correct as given by me on the aforementioned date.


Dated: _____    Signed:_____

                        TRACY FALGOUT




_____    Signed with corrections as noted.

_____    Signed with no corrections noted.




DATE TAKEN: March 24, 2022

79

CERTIFICATE

I, CECILIA M. HENDERSON, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that TRACY FALGOUT  after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 78 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

Dated this 27th day of April, 2022

CECILIA M. HENDERSON, CCR
CCR #84099
STATE OF LOUISIANA

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112
JX72-a.00079